# Exhibit 117

```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL       )
INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
PRICE LITIGATION             ) Civil Action No.
                             )    01-12257-PBS
                             )
THIS DOCUMENT RELATES TO:    )
                             )
United States of America,    ) Hon. Patti Saris
ex rel. Ven-a-Care of the    )
Florida Keys, Inc., v.       )
Abbott Laboratories, Inc.,   )
and Hospira, Inc.            )
CIVIL ACTION NO. 06-11337-PBS   )


************************************************
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL       )
INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
PRICE LITIGATION             ) Civil Action No.
                             )    01-CV-12257-PBS
                             )
THIS DOCUMENT RELATES TO:    )
                             ) Judge Patti B. Saris
State of Arizona v. Abbott   )
Labs., et al.                )
Civil Action No. 06-CV-11069-PBS )


************************************************
            ORAL AND VIDEOTAPED DEPOSITION OF
                      BRUCE E. RODMAN
                     August 29, 2007

                        Volume 1

                   HIGHLY CONFIDENTIAL


************************************************
```

3d8b0dbb-837a-4faf-875f-bf00722949fc

## Page 2

```
 1          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
 2
 3   IN RE: PHARMACEUTICAL        )
     INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
 4   PRICE LITIGATION            ) Civil Action No.
                                 )  01-CV-12257-PBS
 5                               )
     THIS DOCUMENT RELATES TO:    ) Judge Patti B. Saris
 6   ALL CASES                    )
 7   ************************************************
 8          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
 9
10   IN RE: PHARMACEUTICAL        )
     INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
11   PRICE LITIGATION            ) Civil Action No.
                                 )  01-CV-12257-PBS
12                               )
     THIS DOCUMENT RELATES TO:    )
13                               ) Judge Patti B. Saris
     State of California, ex rel. )
14   Ven-A-Care v. Abbott         ) Magistrate
     Laboratories, et al.         ) Judge Marianne Bowler
15   Cause Nos. 03-cv-11226-PBS  )
16   ************************************************
17           NO. D-1-GV-04-001286
18   THE STATE OF TEXAS       ) IN THE DISTRICT COURT
                              )
19   ex rel.                  )
         VEN-A-CARE OF THE     )
20      FLORIDA KEYS, INC.,    )
          Plaintiffs,         )
21                            )
     VS.                      ) TRAVIS COUNTY, TEXAS
22                            )
     ABBOTT LABORATORIES INC.,)
23   ABBOTT LABORATORIES, and  )
     HOSPIRA, INC.,           )
24       Defendant(s).       ) 201ST JUDICIAL DISTRICT
25   ************************************************
```

## Page 3

```
 1        ORAL AND VIDEOTAPED DEPOSITION OF BRUCE E. RODMAN,
 2   produced as a witness at the instance of the
 3   Plaintiffs, and duly sworn, was taken in the
 4   above-styled and numbered causes on the 29th of
 5   August, 2007, from 8:47 a.m. to 4:15 p.m., before
 6   CYNTHIA VOHLKEN, CSR in and for the State of Texas,
 7   reported by machine shorthand, at the offices of
 8   Stetler & Duffy, LLP, 11 S. La Salle, Suite 1200,
 9   Chicago, Illinois, pursuant to the Federal and Texas
10   Rules of Civil Procedure and the provisions attached
11   previously.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1        A P P E A R A N C E S
 2   FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 3      Ms. Ann M. St. Peter-Griffith
        Assistant U.S. Attorney
 4      United States Attorney's Office
        Southern District of Florida
 5      99 N.E. Fourth Street
        Miami, Florida  33132
 6
     FOR THE PLAINTIFF THE STATE OF ARIZONA AND MDL
 7   PLAINTIFFS:
 8      Ms. Amber M. Nesbitt
        Wexler Toriseva Wallace LLP
 9      55 West Monroe Street,  Suite 3300
        Chicago, Illinois  60603
10
     FOR THE PLAINTIFF THE STATE OF TEXAS:
11
        Ms. Margaret Moore
12      Assistant Attorney General
        Office of the Attorney General
13      State of Texas
        Post Office Box 12548  (78711-2548)
14      300 W. 15th Street, 9th Floor
        Austin, Texas  78701
15
     FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
16
        Mr. Timothy C. Foote
17      Deputy Attorney General
        BMFEA
18      Bureau of Medi-Cal Fraud & Elder Abuse
        State of California Department of Justice
19      110 West A Street #1100
        San Diego, California  92101
20
     FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
21   HOSPIRA, INC.:
22      Ms. Tara Fumerton
        Jones Day
23      77 West Wacker, Suite 3500
        Chicago, Illinois  60601-1692
24
25
```

## Page 5

```
 1   FOR THE WITNESS:
 2      Mr. David J. Stetler
        Stetler & Duffy, Ltd.
 3      11 South LaSalle Street, Suite 1200
        Chicago, Illinois  60603
 4
     ALSO PRESENT:
 5
        Mr. Ben Stanson, Videographer
 6
 7
 8            *-*-*-*-*
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 6

INDEX

1  INDEX
2  Appearances.................................... 4
3  BRUCE E. RODMAN
       Examination by Ms. St. Peter-Griffith.... 8
4
   Reporter's Certificates........................ 261
5
6  VIDEOTAPE NUMBER
7       1 ................................. 7
        2 ................................. 60
8       3 ................................. 117
        4 ................................. 156
9       5 ................................. 206
10         EXHIBITS
11 NO.  DESCRIPTION                      PAGE
12 1314 ........................................ 11
        CD of documents produced by Mr. Rodman
13      (BR 0000-05519)
   1315 ........................................ 11
14      DVDs of documents produced by Mr. Rodman
        Volume:  BRCD001 (BRCD 00001-38340)
15      Volume:  BRCD002 (BRCD 38341-38736)
   1316 ........................................ 127
16      June 13, 1996 Interoffice Correspondence
        from Lynn Leone to All Reimbursement
17      Personnel and All Pharmacists Personnel
        (BR 02422) Highly Confidential
18
        (Referenced Exhibits)
19
   1114 ........................................ 71
20
21
22
23
24
25

Page 7

1        THE VIDEOGRAPHER:  Please stand by.
2  This is Ben Stanson representing Complete Litigation
3  Support out of Austin, Texas.  I'm the operator of
4  this camera.  This is the videotaped deposition of
5  Bruce E. Rodman as being taken pursuant to Federal
6  Rules of Civil Procedure on behalf of the plaintiffs.
7        We are on the record on August 29th,
8  2007.  The time is 8:47 a.m. as indicated on the video
9  screen.  We're at 11 South La Lasalle Street in
10 Chicago, Illinois.  This case is captioned in regards
11 to Pharmaceutical Industry Average Wholesale Price
12 Litigation, MDL Number 1456, Case Number 01-12257-PBS.
13       Will the attorneys please identify
14 themselves for the video record.
15       MS. ST. PETER-GRIFFITH:  Ann
16 St. Peter-Griffith, United States Attorney's Office
17 for the Southern District of Florida on behalf of the
18 United States.
19       MS. MOORE:  Margaret Moore on behalf of
20 the State of Texas.
21       MR. FOOTE:  Tim Foote, Deputy Attorney
22 General, California.
23       MS. FUMERTON:  Tara Fumerton appearing
24 on behalf of the defendants Abbott Laboratories,
25 Abbott Laboratories, Inc. and Hospira, Inc.

Page 8

1        MR. STETLER:  And Dave Stetler for the
2  witness.
3        THE VIDEOGRAPHER:  Thank you.  The court
4  reporter today is Cindy Vohlken, also with Complete
5  Litigation Support.  Will you please swear -- I'm
6  sorry, with a different court reporting agency.  Will
7  you please swear in the witness.
8        (At this time the witness was sworn)
9        THE VIDEOGRAPHER:  Thank you.  You may
10 proceed.
11            BRUCE E. RODMAN,
12 having been first duly sworn, testified as follows:
13            EXAMINATION
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  Good morning, Mr. Rodman.  Can we start today
16 by having you state your full name with your middle
17 initial?
18    A.  It's Bruce E. Rodman.
19    Q.  And what is your address, Mr. Rodman?
20    A.  1521 Juliet Lane in Liberty Bell, Illinois.
21    Q.  Sir, we're here today pursuant to a subpoena
22 and a deposition notice.  What did you do to prepare
23 for today's deposition?
24    A.  I met with my attorney after a telephone call
25 or two last week.  I reviewed my notes from my

Page 9

1  attorney meeting on the way on the train down this
2  morning and I guess that's about it.
3    Q.  Okay.  Now, the subpoena that was sent you by
4  the United States and I believe by the State of
5  California requested some documents.
6    A.  Uh-huh.
7    Q.  Did you search for documents?
8        MS. ST. PETER-GRIFFITH:  Go ahead.
9        MR. STETLER:  Keep going.
10    Q.  (BY MS. ST. PETER-GRIFFITH)  Did you search
11 for documents in response to the subpoena?
12    A.  Yes, and they've been submitted.
13    Q.  When --
14        MR. STETLER:  Speaking of the documents.
15        MS. ST. PETER-GRIFFITH:  Oh, good.
16    Q.  (BY MS. ST. PETER-GRIFFITH)  Did you -- are
17 these documents at your -- at your home?
18    A.  Yes.
19    Q.  Okay.  And the documents that you provided
20 pursuant to the subpoena, which I will represent come
21 in two batches.  The first is -- were hard copies of
22 documents and one of those documents was withheld on
23 the basis of privilege asserted by Abbott and they are
24 Bates stamped BR 00001 to 05519.  I know they were
25 Bates stamped after you produced them, but, sir, does

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 10

1  it sound right that you produced approximately 5500 or
2  5520 documents in hard copy form?
3      A.  In hard copy, not on the CD that you --
4      Q.  In hard copies, yes.
5      A.  You know, I didn't count them.
6      Q.  Okay.  That's fine.
7      A.  So I can tell you it was two boxes worth.
8      Q.  Okay.  Well, we'll have you identify them
9  shortly.  And then additionally you produced two CDs
10  of documents, correct, sir?
11     A.  Yes.
12     Q.  Okay.  And was that -- were those -- was that
13  about 38,340 pages of documents?
14     A.  I -- I -- I have no idea --
15     Q.  Okay.
16     A.  -- on that.
17         MS. ST. PETER-GRIFFITH:  Can we just all
18  agree that we have documents that Mr. Rodman produced?
19  The first production was BR 00001 to 05519?
20         MR. STETLER:  Yeah.  Not only can we
21  agree, I think I can affirmatively say that he
22  produced the two documents (sic) to me and my law firm
23  and we had our people here send it out to be
24  duplicated.  Those are the right numbers, both with
25  respect to the CDs and with respect to the hard copy

Page 11

1  binders and other documents he had.
2          MS. ST. PETER-GRIFFITH:  What I would
3  like to do today is to mark as the first exhibit the
4  entire package with the exception of the one document
5  withheld on privilege grounds as BR 00001 through
6  05519.  And I've had them burned on a DVD.  So what I
7  would like you just to do is give that to the court
8  reporter and that production will be Exhibit 1.  Any
9  objection?  Tara, is that okay?
10         MS. FUMERTON:  That's fine.
11         MS. ST. PETER-GRIFFITH:  Okay.  And then
12  as Exhibit 2, I would like to mark the two CDs with
13  the 38,340 additional pages -- or, I'm sorry, 38,700
14  plus additional pages of documents as Exhibit B.
15         MS. MOORE:  Are those going to be 1 and
16  2 or are you going to use our numbering --
17         MS. ST. PETER-GRIFFITH:  Oh, I'm sorry.
18  Why don't we use our numbering.
19         MS. MOORE:  That will be 1116, I
20  believe, will be the first exhibit.  I mean, 1214.
21         MS. ST. PETER-GRIFFITH:  Okay.  So
22  Exhibit 1314 will be the approximate 5519 pages and
23  then 1315 will be the two CDs with an additional
24  38,736 pages.
25         MS. FUMERTON:  So the two CDs are being

Page 12

1  marked as one exhibit?
2          MS. ST. PETER-GRIFFITH:  The two CDs are
3  being marked as one exhibit.  And I assume that they
4  do not contain the five documents that Abbott is
5  asserting privilege over.
6          MS. FUMERTON:  We don't have any
7  objection to marketing it, it's just with the general
8  caveat that this is an accurate representation.  So to
9  the extent there's anything that is in error on there,
10  we will raise that later.
11         MS. ST. PETER-GRIFFITH:  That's fine.
12  That's fine.  Understood.  I -- we burned the
13  documents and the CDs as they were produced, so ...
14         MS. FUMERTON:  Okay.
15     Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, before we
16  get to the documents, which we're going to spend a lot
17  of time with today, I would first like to ask you,
18  have you ever been deposed before?
19     A.  Never.
20     Q.  Okay.  I would like to go through a few
21  ground rules for depositions.  I'm going to ask some
22  questions and you need to answer.  You're answering
23  under oath.  If you don't understand a question that
24  I'm asking, let me know.  That way the record will not
25  be that I'm asking a question and you're giving an

Page 13

1  answer, but you didn't understand the question.  Okay?
2  So just -- and any time, excuse me, you need to take a
3  break, please let me know.  My only request is that if
4  there's a question pending, before -- if I have a
5  question out there, I would like you to answer it
6  before we take a break.  Okay?
7          Sir, did you speak with anyone
8  concerning this deposition other than your counsel?
9      A.  Yes.
10     Q.  Okay.  Who did you speak with?
11     A.  Well, my brothers on a beach in Upstate New
12  York about a week and a half ago.  As I think my wife
13  brought it up, so, therefore, I've spoken to my wife
14  about it, too.  And both my daughters, who -- you
15  know, all these were brief and cursory conversations.
16     Q.  Okay.
17     A.  And I've spoken to my current employer
18  because I felt that they should know that I'm doing
19  the deposition.
20     Q.  Okay.  And who is your current employer?
21     A.  The National Home Infusion Association.  And
22  I've also spoken to their counsel briefly about it.
23     Q.  Okay.  What did you discuss with your family
24  members generally?
25     A.  That I'm -- I really didn't want to discuss

4 (Pages 10 to 13)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 14

1  anything at all, but my wife brought it up, so I just
2  discussed that I was doing a deposition having to do
3  with a lawsuit against Abbott having to do with drug
4  pricing. That's what I think that I said.
5      Q.  Okay.  And what conversations did you have
6  with counsel for your employer?
7          MR. STETLER:  Now -- okay.  Well, I
8  guess I do have to say.  I'm going to object to that
9  because to the extent he spoke to counsel for his
10 employer, which I'm aware of, it did involve his
11 seeking advice from that lawyer and so I would object
12 on privilege grounds.
13         MS. ST. PETER-GRIFFITH:  Okay.  I'm
14 assuming you're going to instruct him not to answer?
15         MR. STETLER:  And I'm going to instruct
16 him not to answer.
17         MS. ST. PETER-GRIFFITH:  Okay.
18     Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, did you
19 speak with anyone other than counsel at your current
20 employers about this deposition?
21     A.  Well, actually, from -- a lawyer from Jones
22 Day who first called me.  That's how I first found out
23 that I was being deposed.
24     Q.  Okay.  And that was Ms. Citera?
25     A.  Yes.

Page 15

1      Q.  What do you recall discussing with
2  Ms. Citera?
3      A.  Well, she -- she called me and when we got in
4  contact, I can't remember if she reached me directly,
5  if I had to return the call, but she told me that I
6  was being deposed having to do with various lawsuits
7  against Abbott Labs, having to do with -- I guess she
8  probably said AWP, drug pricing, and she advised me
9  that I should get counsel and that Abbott would pay
10 for those legal fees, praise the Lord, and had
11 referred me to Mr. Stetler.  And, offhand, that's all
12 that I'm recalling right now.
13     Q.  Okay.  Have you spoken with anyone else other
14 than counsel and counsel for your current employer?
15     A.  Well, I had already mentioned the others that
16 I had spoken to in addition.  But besides --
17     Q.  Yeah.
18     A.  Besides that, none that I am recalling right
19 now and I don't think so.
20     Q.  Have you discussed the AWP litigation with
21 any other current or former employees of Abbott or
22 Hospira, just in general?
23     A.  One that I recall.
24     Q.  Okay.  And who is that?
25     A.  Mike Sellers, who is now with Hospira.

Page 16

1      Q.  Are you aware that Mr. Sellers has retired or
2  is retiring?
3      A.  I am aware of that.
4      Q.  Okay.
5      A.  I think he has.
6      Q.  Sir, what was your conversation with
7  Mr. Sellers?
8      A.  Well, approximately two weeks before
9  Ms. Citera contacted me we spoke and that was as a
10 result of a follow up from one of Abbott -- or, I'm
11 sorry, one of Hospira's marketing people who is in
12 interface with our association for Hospira, National
13 Home Infusion Association affairs.  This individual
14 had asked me if I would be willing to speak with Mike
15 Sellers pertaining to these lawsuits and I said sure.
16 And so we -- we were in touch and had a conversation I
17 would guess about two weeks before I heard from
18 Ms. Citera.
19     Q.  Do you remember what -- when, approximately,
20 that was, what month?
21     A.  Well, this -- I believe both of those were in
22 March.
23     Q.  And Ms. Citera contacted you approximately
24 two weeks later?
25     A.  Approximately.

Page 17

1      Q.  And what did you discuss with Mr. Sellers?
2      A.  He -- he called me, really, given my position
3  at the association, to see if there might be a way
4  for -- to find some, essentially, providers, or
5  representatives of them, at least, that would be
6  helpful to the lawsuit against Abbott pertaining to
7  the contention that the margins that a provider, a
8  home infusion provider, would receive, would earn, if
9  you will, from reimbursement for drugs over the cost
10 of those drugs was necessary for them to be able to
11 essentially provide their services.  And so that was
12 the general nature of his request.
13     Q.  Okay.  What you just described, the
14 contention that margins -- that the home fusion
15 providers receive over the cost was necessary to
16 provide services, can you explain what you mean by
17 that?
18     A.  Home infusion therapy is, at least in my
19 world and those individuals that -- for my -- the
20 association we represent, they are primarily licensed
21 pharmacies that provide intravenous and injectable
22 medications to patients in their homes and sometimes
23 other alternate site locations.  In order to provide
24 the medications, it's more than just providing
25 product.  It's a -- it's a rather complete medical

5 (Pages 14 to 17)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 18

1  service that has to do -- that requires clinical
2  pharmacists, who are quite involved with advising the
3  physicians who are ordering the medications, in
4  monitoring and interpreting and advising physicians on
5  lab results, through sometimes others in the
6  organization or others outside, such as nurses or
7  people within the pharmacy that are following up with
8  patients and listening if there are particular
9  problems or issues that the patients are bringing up.
10      The pharmacy -- pharmacists do a lot of
11  quality control checking. The drug themselves are
12  quite often compounded in a sterile clean room. And
13  the -- the -- actually, the -- the -- the billing that
14  is the reimbursement process for home infusion therapy
15  is -- is very complicated and difficult. And in order
16  to provide the home infusion therapy service to a
17  patient, it requires quite a few people on it.
18      And it also requires administration,
19  supplies, tubing, that sort of thing, needles and
20  equipment such as infusion pumps. And those are not
21  free in terms of -- you know, obviously there's a high
22  cost. If you were to tour a home infusion pharmacy
23  facility, it will depend clearly on the size of the
24  patients, you know, their census, if you will. But if
25  you were to tour, you walk, you are going to see a ton

Page 19

1  of people there and it's going to be a very different
2  experience from looking -- from walking into any
3  retail community pharmacy.
4      And so in order to provide the service,
5  there has to be reimbursement for them that is
6  adequate for them to provide the service and stay in
7  business. And part of that service is -- part of --
8  part of providing that is a margin that would be
9  achieved, i.e., a profit, gross profit, if you will,
10  the difference between what they may have paid for a
11  drug as compared to what they were reimbursed for the
12  drug.
13      And it is -- there are -- there are
14  other ways, you know, other billing aspects of home
15  infusion therapy, also, in addition to billing for the
16  drug, but they all add up to provide a necessary
17  return for them to provide the service. So that's
18  what I meant.
19  Q. Okay. And why did Mr. Sellers -- strike
20  that.
21      What did you mean when you said that
22  Mr. Sellers asked for an organization or entity that
23  would be helpful?
24  A. You know, I can't tell you word for word our
25  conversation because I don't have that type of memory,

Page 20

1  but generally I can tell you my recollections, which
2  were that he was wanting to see if it's possible to
3  get, either from the association or a provider, you
4  know, or whatever individuals that might be willing to
5  make some sort of statement to attest to the type of
6  information that I just said, which is that the margin
7  that would be made for -- by the provider from a drug
8  was one of the necessary aspects of being able to stay
9  in business.
10  Q. Did he -- strike that.
11      When you say "margin," how is the margin
12  achieved?
13  A. Well, I guess I would define the margin in
14  this case as gross margin being the difference between
15  what the drug when it's billed is reimbursed for as
16  compared to what it cost the provider.
17  Q. And are you aware of drugs being billed at
18  AWP rates?
19  A. The predominant methodology -- well, the
20  predominant methodology in -- in this -- in this
21  business of the aspect of the billing for billing of
22  the drugs has been based on an average wholesale price
23  figure.
24  Q. And when you say "average wholesale price"
25  and I say "AWP," are we talking about --

Page 21

1  A. Yes, we are.
2  Q. -- the same thing?
3  A. Yes.
4  Q. Okay. One other thing I don't think I said
5  is -- is when I -- I'm going to try when you're giving
6  an answer not to talk over you.
7  A. Okay.
8  Q. If you could do the same for me just because
9  it's very difficult for our court reporter to take
10  down two people talking at the same time. Okay?
11  A. I will try.
12  Q. Okay.
13      MR. STETLER: You anticipated her
14  question, you got it right, but it may not always be
15  the case. So let her -- just let her finish, that's
16  all. You may sneak a nod in there at the end.
17  Q. (BY MS. ST. PETER-GRIFFITH) Okay. So you
18  understood that the predominant methodology for
19  reimbursement is based upon average wholesale price or
20  AWP.
21  A. Well, I understand that extremely well now.
22  Q. Okay. What do you mean by that?
23  A. Well, one of the things I want you to
24  understand is that in my experience at Abbott Home
25  Infusion, I started with that business unit in

6 (Pages 18 to 21)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 22

1  January of 1993 and spent approximately five years as
2  being a reimbursement supervisor and I was learning
3  the business.  And this is a -- this is not an easy
4  business to learn.  And after approximately 1998 I was
5  doing other things that were not directly related to
6  the reimbursement.
7         But in any event, when I left Abbott and
8  began consulting and ultimately took a position for
9  the National Home Infusion Association, you know, I
10 learn every day.  And, you know, my knowledge in
11 general about these aspects of reimbursement and other
12 aspects of the home infusion therapy business on the
13 provider side, at least, is far more than what I knew
14 in those five years as reimbursement supervisor at
15 Abbott.
16       So, I'm sorry, what was your question?
17 Q.  No.  Well --
18 A.  I related to it.
19 Q.  -- now I have another question for you.
20 A.  Okay.
21 Q.  How is it that -- that your knowledge now,
22 based upon the position that you're in now regarding
23 reimbursement, has either grown or changed from what
24 it was when you were reimbursement supervisor at
25 Abbott?

Page 23

1         MS. FUMERTON:  Objection, form.
2  Q.  (BY MS. ST. PETER-GRIFFITH)  Oh, I also --
3         MR. STETLER:  Ignore that.
4  Q.  (BY MS. ST. PETER-GRIFFITH)  Forgot to tell
5  you that she --
6         MR. STETLER:  She'll object.
7  Q.  (BY MS. ST. PETER-GRIFFITH)  That every once
8  in a while Ms. Fumerton might have an objection.
9  Unless Mr. Stetler instructs you not to answer, if you
10 could respond to my question that I asked.
11 A.  So what did we just say?  I am or am not --
12        MR. STETLER:  She'll object and unless I
13 say something, which would be rare, indeed, you just
14 kind of ignore it and answer the question.
15       MS. FUMERTON:  My objection --
16       MR. STETLER:  It's a legal thing.
17       MS. FUMERTON:  My objection is to her
18 questions, not to anything that you're saying.  So it
19 doesn't really actually involve you, but I just wanted
20 to explain that.
21 A.  Please ask the question again.
22       MS. ST. PETER-GRIFFITH:  Sure.  Can you
23 read it back, Cindy?
24       (Requested portion was read)
25 A.  I think I would like to answer that in two

Page 24

1  aspects.
2         One is that specifically with relating
3  to drug pricing in the industry and the importance of
4  that and, perhaps, the evolving mystery of it and an
5  understanding of just what AWP is at this point is far
6  more than I understood in those five years that I was
7  responsible for a portion of the reimbursement in
8  Abbott.
9         The second is I have, I think, a
10 better -- a much better appreciation of the importance
11 of all of the aspects of how providers bill, i.e., the
12 importance of, you know, how they do claims, what they
13 bill for and how that all adds up necessary for them
14 to have -- have appropriate margins so that they can
15 stay in business.
16       You know, can I give you specifics?
17 Maybe if you ask some real questions that are
18 specific, I might be able to answer something.  But in
19 general --
20 Q.  Okay.
21 A.  -- I just know a lot more now than I did
22 then.
23 Q.  Okay.  What is your understanding of what AWP
24 is?
25 A.  Now?

Page 25

1  Q.  Yes.
2  A.  It is a benchmark that is published by now
3  three drug compendiums that is identified with drugs
4  by NDC numbers, drug by drug by drug.  That it is
5  something that is -- been a mystery as to how those
6  compendiums actually develop AWP, that there's been
7  media controversy about it and lawsuits about it, but
8  it still is the predominant method throughout most
9  payers for home infusion providers through which the
10 billings that they submit on claims for drugs are paid
11 with and these days there's typically a steep discount
12 for most payers off of that published AWP price.
13 Q.  Do you know why there's a steep discount or
14 do you have an understanding as to why?
15 A.  I guess what I can tell you is it's my
16 general impression and -- and that's all that I can
17 give you, that there is reimbursement for home
18 infusion in general and that includes the drug
19 billings specifically has been ratcheted back by
20 various payers over the last 15 years and that
21 includes AWP.
22 Q.  Okay.  What was your understanding of AWP
23 prior to your having this understanding?
24       MS. FUMERTON:  Objection, form.
25 Q.  (BY MS. ST. PETER-GRIFFITH)  I mean --

3d8b0dbb-837a-4faf-875f-bf00722949fc

1  strike.  Actually, let me ask this:  Your
2  understanding of AWP that you just described, when did
3  you come to have that understanding of what AWP was?
4      A.  Oh, that would be difficult to say, I guess.
5  I -- somewhere in the period of which -- and I think
6  it's the period that I was probably still a
7  reimbursement manager, but it could have been later.
8  I was reimbursement supervisor, but it could have been
9  later.  I came to an understanding that AWP was not
10  what I had thought it was, was what Bruce Rodman
11  thought it was from the name.
12      Q.  Okay.  And what did you think AWP was?
13      A.  I thought --
14          MS. FUMERTON:  Objection, form.
15      A.  -- from the name, not because anybody told
16  me, I just thought from the name that it was an
17  average based on statistical sampling or reporting or
18  something like that, but an average of what a
19  provider, in fact, would be paying to acquire a drug
20  from their source.  Specifically from their
21  wholesaler.
22      Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  And
23  what -- when did you have that understanding?
24      A.  Well, certainly I would say through much of
25  those five years or so that I was the reimbursement

1  supervisor.
2      Q.  When you were the reimbursement supervisor
3  within the -- and we'll get into your employment
4  history for a second, but --
5      A.  Uh-huh.
6      Q.  -- when you were a reimbursement supervisor,
7  did you receive any training as to what AWP was or
8  what Abbott's understanding of AWP was?
9      A.  Not that I can recall.
10      Q.  Okay.  I would like to circle back and round
11  out my questions concerning Mister -- your
12  conversation with Mr. Sellers.  Do you remember
13  anything else concerning your conversation with
14  Mr. Sellers?
15      A.  Not at that conversation.  I did do some
16  follow up.
17      Q.  Okay.  And what did you do for follow up?
18      A.  Well, you know, I do remember one more
19  thing --
20      Q.  Sure.
21      A.  -- actually, which was that, you know, I was
22  briefly thinking, well -- our -- our association's
23  executive director actually had just been in the
24  process of resigning and a new one was starting and,
25  you know, my first thought was, well, possibly if

1  someone from the association was going to say
2  something, it was the executive director, and that
3  wouldn't be appropriate because the new executive
4  director was just starting to learn the business.  So
5  I -- at least in my own mind I briefly thought, well,
6  maybe I could say something.
7          And I don't recall whether Mike Sellers
8  brought it up first or whether I said something, but
9  in any event, he said, "Well, that probably wouldn't
10  be appropriate" given that I had worked with Abbott
11  and I agreed with that, so I concurred.
12          So I did provide the names of two
13  individuals to Mike Sellers that he might follow up in
14  contact with.
15      Q.  Okay.  And do you know whether he did?
16      A.  Yes.  I talked to one of them and I know that
17  he did with one of them.  And I do not know about the
18  other.
19      Q.  Okay.  What was your conversation with the
20  individual that you spoke with that Mr. Sellers
21  contacted?
22      A.  That -- well, then I get the phone call from
23  Ms. Citera and that occurred after.  So I did have a
24  conversation with this one individual at one point and
25  just said, you know, just -- just be careful that --

1  don't run into more grief then you really want to.  In
2  effect, that's what I said.  I don't recall the exact
3  words.
4      Q.  Who were you speaking to?
5      A.  His name is Larry Robinson.
6      Q.  Okay.  And what is -- who is Mr. Robinson
7  affiliated with?
8      A.  Well, he was affiliated at the time with the
9  home infusion business and I think some other home
10  businesses, also, for the Methodist Hospital in
11  Memphis, Tennessee.  Their business name is Methodist
12  Alliance.
13      Q.  And why did you make that comment to him?
14      A.  Because I just try to operate prudently as
15  general practice and I got this request to do the
16  deposition, which I -- was a surprise to me, frankly,
17  and that it would take up some time.  And I just
18  said -- you know, I just wanted to be -- you know,
19  Larry -- I consider Larry a friend.  I just wanted to
20  let him know that he -- he'd want to just be careful
21  in that sense because it may take him some time that
22  he doesn't want to be involved with.  It was that
23  simple.
24          You know, and, frankly, if -- if the
25  situation had been reversed and I had the phone call

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 30

1  from Ms. Citera before the contact with Sellers, I
2  would not have talked to him because I am a prudent
3  person and felt that it would not be appropriate. I
4  would have felt that.
5      Q. Did you tell Mr. Robinson that you might be
6  deposed?
7      A. I don't recall if I said that.
8      Q. Okay. Did he tell you what his conversation
9  was with Mr. Sellers?
10     A. Yeah. He contacted me. I remember something
11 like that, but beyond that, no.
12     Q. Okay. Did you discuss with Mr. Sellers his
13 deposition?
14     A. No.
15     Q. Okay. Did you --
16     A. I wasn't -- I mean, was he deposed? I was --
17 you know, I'm not aware of that specifically.
18     Q. Did you discuss with Mr. Sellers the nature
19 of the AWP litigation at all?
20     A. No. Well, not that I can recall.
21     Q. What else do you recall about your
22 conversation with Mr. Sellers?
23     A. The extent of what I'm recalling now.
24     Q. Do you recall having conversations with any
25 other current or former Abbott or Hospira employees

Page 31

1  other than Mr. Sellers concerning the AWP litigation?
2      A. The individual that contacted me to ask if I
3  would speak to Mr. Sellers.
4      Q. And who was that?
5      A. I don't recall his name. I should, but I
6  just don't. I'm sorry.
7      Q. That's okay. What was your recollection of
8  that conversation?
9      A. It was really pretty much as I just told you,
10 which was there are some lawsuits related to the drug
11 pricing and Mike Sellers is involved and would like to
12 talk to you and I said sure.
13     Q. Do you know why Mr. Sellers called you?
14     A. Well, it was as a follow up from that. You
15 know, beyond that, I think I told you everything I
16 know about why he would have called me.
17     Q. Okay. And just to be clear, there's no one
18 else at Abbott or any other former or current employee
19 that you've spoken to about this litigation?
20     A. Not that I can recall.
21     Q. Are you in contact with current or former
22 employees at Abbott?
23     A. A little bit. Not much.
24     Q. Are you in contact with them through your
25 current work with the NHIA?

Page 32

1      A. A little bit. The marketing people at now
2  Hospira.
3      Q. Okay. And who are you in contact with at
4  Hospira?
5      A. Well, there's -- some of the people have
6  turned over -- my role, by the way, is not in the
7  aspects of, you know -- within our association we --
8  essentially vendors, such as Hospira and others, use
9  the association to reach and convey their messages and
10 their products and services. So they do such things
11 as rent booth space in our annual convention, place
12 advertisements in our magazine, and things like that,
13 provide grants for some products or services that the
14 association provides. I have very little to do with
15 that, so my contact with any of these people is very
16 cursory.
17         In the case of Hospira, my contact is
18 with the marketing team that is that type of interface
19 for Hospira with the association, which is called NHIA
20 is the shortcut to the full name of it. And they
21 have -- some of those people have just turned over,
22 actually. The last contact that I had with them,
23 actually, was this one individual and because of a
24 turnover that's why I don't recall his name, frankly.
25     Q. Okay.

Page 33

1      A. The -- I did speak to a number of them at the
2  conference, which was in early March of this year, in
3  Savannah, Georgia. It was more pleasantries than
4  anything else and --
5      Q. Do you remember who they were?
6      A. Well, one of them is the outgoing head of
7  that Alternate Site Business Unit, or at least I think
8  that's what they call it, and his name is Sean Murphy.
9  There is a replacement for Sean at this point who is a
10 woman, but I'm not recalling her name now. And
11 another individual is someone named Mary Baker, I
12 believe that's her name, who actually is a
13 clinical person in their clinical area. And this one
14 individual, I'm just not remembering his name, I'm
15 sorry, who replaced someone that I did use to speak to
16 named Jim Custud, C-u-s-t-u-d, I think. And it's his
17 replacement. And, you know, I think I probably said
18 hello to a couple of others in the booth, their booth,
19 at the conference.
20     Q. Did you have any discussion about the AWP
21 litigation?
22     A. No, other than what I told you.
23     Q. Have you had any discussions with anyone
24 outside of Abbott or Hospira other than your
25 counsel concerning -- and your -- your current

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

1 employer's counsel, concerning the AWP litigation?
2    A. Well, I told you about the one with Larry
3 Robinson. I also had a follow up, very brief
4 conversation with the other person whose name I gave
5 to Mr. Sellers.
6    Q. And who was that?
7    A. His name is Christopher Maksym, M-a --
8 Maksym, M-a-k-s-y-m.
9    Q. Okay. And who is he with?
10    A. He is with the University of Michigan's home
11 business, which goes under a business name of HomeMed
12 H-o-m-e-M-e-d. He is the senior executive of the
13 homecare business. He also, actually, is the board
14 president of our association.
15    Q. And what did you discuss with him about the
16 AWP litigation?
17    A. You know, I can't remember any details except
18 to say that higher level. It was very similar to the
19 conversation I had with Larry Robinson. Just to
20 mention to him that he may not want to get involved
21 for the same reasons. And I consider him a friend,
22 too, as well as a business colleague.
23    Q. Anything else you discussed with him about
24 the AWP litigation?
25    A. Not that I recall.

1    Q. Sir, I know this is -- we are going to go
2 through your documents in detail, but I just want to
3 confirm that with regard to Exhibit 1315, which are the two
4 CDs that you produced, were those documents that you
5 obtained from Abbott or Abbott databases?
6    A. Those are documents that were on my Abbott
7 personal computer that I used as part of the business
8 functions that I performed at Abbott. They're not --
9 I mean, they're not all the documents, but they're the
10 ones that I had kept.
11    Q. Why did you choose to keep those?
12    A. The same reason. It also applies to the
13 paper documents.
14    Q. Okay.
15    A. When I left Abbott Home Infusion Services, I
16 was fairly confident, I mean, quite confident that I
17 would end up with the National Home Infusion
18 Association, but it wasn't -- well, I also -- during
19 the first six months I was a consultant and I felt
20 that there might be other consulting opportunities
21 that I would want to undertake and if things did not
22 work out with NHIA, I might want to do that.
23    And my purpose on keeping those -- one
24 purpose was that I just -- these were documents that I
25 thought would be good for me to reference if I was

1 doing consulting to, in some cases, provide some
2 knowledge and background of things that I actually was
3 never involved with and others simply, yeah, I was,
4 but I felt that they would be good references for me
5 to use. That was one reason.
6    The other reason was during most of my
7 tenure when -- at Abbott Home Infusion Services I was
8 involved in the startup of something that became
9 called, and still is, the Home Infusion EDI Coalition
10 where EDI stands for electronic data interchange. And
11 that was initially a coalition of providers and
12 payers, actually, and other interested parties working
13 to promote the use of electronic submission of
14 healthcare claims from providers to payers as compared
15 to paper claims. And an important aspect of the work
16 on that coalition was to standardize a coding of
17 claims.
18    And in the latter portion of my tenure
19 while at Abbott -- I was, actually, always chair of
20 the Home Infusion EDI Coalition, the lead person, and
21 I still am. And in the latter years of my tenure with
22 Abbott, I made a decision with the association to
23 bring the Home Infusion EDI Coalition under the wraps
24 of NHIA, which had always been involved as a
25 participant.

1    And I did, if you will, a lot of
2 volunteer duty while I was an Abbott employee for the
3 benefit of this activity and, therefore, had a number
4 of documents that were important to me for reference
5 as I was to continue, as I had anticipated to, with
6 the association as a consultant and then an employee
7 with that activity. So that was the other reason for
8 keeping some of them.
9    Q. Okay. With regard to the documents that were
10 in hard copy form that predated your departure from
11 Abbott, were those documents that were -- that you
12 obtained from Abbott?
13    A. Well, if I understood the question, I think
14 what you may be asking is are these documents that I
15 used in doing my job at Abbott or are there any
16 others. Is that what you're trying to ask?
17    Q. No. I'm trying -- I'm just trying to confirm
18 that with regard to the first set of documents, the
19 hard copy documents.
20    A. Okay. The hard copy documents.
21    Q. Other than the documents that, obviously,
22 came after your departure from Abbott. Like, for
23 example, the Mike Sellers' e-mail.
24    A. Okay.
25    Q. Other than those, were -- is that first

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 38

1  production of documents, were those documents that --
2  that you obtained from Abbott?
3         MS. FUMERTON:  Objection, form.
4         MR. STETLER:  You can answer.
5         MS. FUMERTON:  Go ahead.  Ignore me.
6     A.  Most of those were documents that I -- I at
7  one point used when I -- or created when I was an
8  Abbott employee.
9     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
10    A.  That's what most of them are.
11    Q.  So you --
12    A.  To the best of my ability, anyway.
13    Q.  Did you use them in the ordinary course of
14 your position at Abbott?
15    A.  Most of them, yes.
16    Q.  Okay.  Is that also true for the
17 approximately 38,700 plus pages of documents that were
18 burned on CDs from your personal computer?
19    A.  Most of them, yes.  I mean, you know, when
20 you say day-to-day course of activities, I mean, some
21 of them I might have used once, but yeah.
22    Q.  But you used them as part of your position at
23 Abbott?
24    A.  Including my volunteer work as chair of the
25 Home Infusion EDI Coalition.

Page 39

1     Q.  Okay.  Well, did you consider your volunteer
2  efforts something that you did as -- part of your
3  job?
4     A.  That and far beyond.
5     Q.  Okay.
6     A.  I put a lot of time into it and a lot of
7  personal dedication and passion.
8     Q.  Sir, can you -- starting with your graduation
9  from high school or starting after your graduation
10 from high school, can you take us through your
11 educational background?
12    A.  Yes.  I have -- I went to Northwestern
13 University.  I was in the electrical engineering
14 program and I have a Bachelor's in Electrical
15 Engineering.  Then later I went to the University of
16 Chicago to obtain my MBA.
17    Q.  And did you obtain your MBA from the
18 University of Chicago?
19    A.  Yes.
20    Q.  Okay.  What year did you obtain your BA in
21 Electrical Engineering?
22    A.  BS.
23    Q.  I'm sorry, BS.
24    A.  In 1972.
25    Q.  And what year did you obtain your MBA?

Page 40

1     A.  1983.
2     Q.  Was there a period of time that you took off
3  from your studies in between obtaining your electrical
4  engineering degree and your MBA?  Did you take a
5  break?
6     A.  Yeah.  No.  I -- I started the MBA in 1980
7  and I -- I did that while I was working.
8     Q.  Okay.  Starting from your graduation from
9  Northwestern, can you take us through your employment
10 history, please?
11    A.  Sure.  My first real job out of college, and
12 first real job in many ways, was with the American
13 Hospital Supply Corporation.  Approximately the first
14 half of my career was in the area of information
15 technology.  I started with that company as a
16 programmer in their business systems and,
17 specifically, actually, in areas of order processing
18 and inventory management.  And I probably was a
19 programmer for two or three years.  Then I progressed
20 some as a supervisor or manager, I'm not recalling the
21 titles exactly, and doing certain functions within
22 that information center.  And the latter portion of
23 that actually had to do with processes of how you
24 develop computer systems, quality types of processes.
25 I left American Hospital Supply in early 1986, which

Page 41

1  was related to its acquisition by Baxter Laboratories.
2         My next position was with Abbott
3  Laboratories.  I started with Abbott in a corporate
4  function that was developing a personal computer-based
5  order entry system for Abbott's customers called
6  QuickLink and I was actually hired on as a project
7  manager.  Again, I'm not going to use exact titles
8  because I don't remember them, but --
9     Q.  Okay.
10    A.  -- conceptually I was really a project
11 manager and -- and customer liaison with a major
12 buying group in the southeast that Abbott was going to
13 enhance significantly the order entry system for this
14 buying group's hospital clients.
15    Q.  What was -- I'm sorry to interrupt.  What was
16 the name of that buying group?
17    A.  SunHealth.
18    Q.  SunHealth?
19    A.  SunHealth, uh-huh.  In Charlotte, North
20 Carolina.  It was their headquarters.
21    Q.  Okay.
22    A.  And my next position at Abbott was probably
23 in 1990 where I moved to a group in that same
24 corporate group that was a corporate consulting group
25 that provide consulting services to some of Abbott's

11 (Pages 38 to 41)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 42

1  customers, primarily hospitals but some others. And I
2  was a consultant within that group and involved in
3  doing some strategic planning consulting,
4  facilitation, essentially, up until the end of 1992.
5      Q.  I hate to interrupt again, but before we get
6  too far, the group that you worked with when you --
7  from '86 to approximately 1990, was that within a
8  particular division of Abbott?
9      A.  I do not recall if it was called this
10 division the entire time frame, but most of it that I
11 recall it was called the Corporate Hospital Marketing
12 Division up until 1993. So it was the same division
13 through that period of time.
14     Q.  And was that within a subdivision of Abbott,
15 like Hospital Products Division?
16     A.  No. It was reporting in corporately. It was
17 a division that in concept, at least, provided certain
18 marketing functions to more than one division of
19 Abbott. A lot of it was provided to the HPD division.
20     Q.  Okay. And what was your grade when you
21 were -- when you were -- held that position from '86
22 to '90?
23     A.  You're referring to Abbott --
24     Q.  Abbott's grading --
25     A.  -- salary grades?

Page 43

1      Q.  Yes.
2      A.  Well, when I started, I, frankly, don't
3  recall the grade. And I actually left out something,
4  too, now that I'm remembering, which at one point I
5  was the manager of the programming group, that the --
6  the manager that was part of my hire left and I was
7  the manager. And at that time -- and that would have
8  been, I don't know, 1980 -- 19 -- yeah, 1988 and 1989.
9  I was a grade 19 at that point.
10         When I became a consultant, that was a
11 situation where the QuickLink objectives had changed
12 and they really didn't need all that horsepower and so
13 I was at a lower grade. I frankly don't recall what
14 it was, but I'm pretty confident it was a lower grade.
15     Q.  When you were the manager of the programming
16 group, was that within a particular Abbott division?
17     A.  It was -- it was still the corporate --
18 well --
19     Q.  Okay.
20     A.  What I think was called the Corporate
21 Hospital Marketing Division at that time.
22     Q.  Okay. And you were in that position from '88
23 to 89?
24     A.  Approximately.
25     Q.  Okay. And then was it in '89 or '90 that you

Page 44

1  moved on to the corporate consulting group?
2      A.  I think I told you early approximately 1990,
3  but I --
4      Q.  Okay.
5      A.  It's been a long time.
6      Q.  Did you -- did you go from the manager of the
7  programming group to the corporate consulting group?
8      A.  I think so.
9      Q.  Okay.
10     A.  As I recall.
11     Q.  And then after '90 to '92 you maintained the
12 position of corporate -- maintained a position in the
13 corporate consulting group in strategic planning; is
14 that fair?
15     A.  That is fair.
16     Q.  Okay.
17     A.  And the facilitation of strategic planning
18 for Abbott's customers.
19     Q.  Okay. Did you work with any customers in
20 particular?
21     A.  Quite a few.
22     Q.  Do you remember who they were?
23     A.  I could probably search and remember some.
24 American Dietetic Association, which actually wasn't
25 really a customer per se, Victoria Hospital in

Page 45

1  Waukegan, St. Barnabus Hospital in New Jersey, the --
2  there's a -- there's a Catholic hospital in Baton
3  Rouge, Our Lady of -- Our Lady of something in Baton
4  Rouge. There were quite a few.
5      Q.  Okay. What kind of strategic planning did
6  you do for them?
7      A.  I and the team developed -- this was a new
8  start-up consulting business to -- we actually had
9  trade named it ProCeed and it was -- it was a
10 facilitated way of getting together senior managers
11 and these clients through a one- or two-day
12 facilitated strategic planning session where we would
13 facilitate the process of them identifying strategic
14 business opportunities or, in some cases, perhaps
15 solutions to business problems that they had and then
16 produce a report. There was a lot of preparation and
17 interviewing prior to what we would do and then we
18 would produce a rather comprehensive report, including
19 the action plan.
20     Q.  Okay. When you were the manager of the
21 programming group, what type of programming did you
22 do?
23     A.  Well, I hadn't personally done programming
24 since about 1975.
25     Q.  Okay.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 46

1    A.  So -- so I was managing those that were doing
2 the program and the -- I'm not sure of the nature of
3 what you want to find out by the type of programming.
4    Q.  Okay.  What types of systems were they --
5 were the individuals that you were managing?
6    A.  Oh, it was -- it was -- it was this QuickLink
7 order entry system and that's all it was.
8    Q.  Okay.  After '92 when you transitioned from
9 the corporate consulting group, where did you go
10 within Abbott?
11    A.  That's when I went to the Abbott Home
12 Infusion Services business in January of 1993.
13    Q.  Okay.  And what position did you initially
14 hold?
15    A.  Reimbursement supervisor.
16    Q.  And what were your responsibilities as
17 reimbursement supervisor?
18    A.  Abbott, in that business unit, provided a
19 function which acted as a billing service for some of
20 that business unit's clients, meaning to handle most
21 aspects of reimbursement, including the submission of
22 claims.  Essentially to submit it and get paid on
23 claims for services for the clients of the business
24 unit, as well as Abbott also had, when I started,
25 three pharmacies that some patients were provided the

Page 47

1 home infusion therapy services for under Abbott's name
2 and this business unit did some of those billing
3 services, too, or reimbursement services.  I was -- as
4 reimbursement supervisor, when I was there, probably
5 all the time I was involved.  In that position there
6 were always two reimbursement supervisors reporting to
7 the manager above and I was responsible for
8 approximately one-half of the billing.
9    Q.  Okay.  Had you ever had experience with home
10 infusion before that point in time?
11    A.  No.
12    Q.  Did you have any educational background or
13 training concerning home infusion?
14    A.  No.
15    Q.  Do you know why you were selected for that
16 position?
17    A.  I believe that a reason why was that the
18 manager that hired me valued my information technology
19 background and hoped that I would be able to lead a
20 charge to modernize what was, at the time, these
21 people were all working on paper, no one had a
22 personal computer in 1993, and help do something about
23 it.  Beyond that, I think that I had credentials and
24 interviewed well.
25    Q.  Who was the manager that hired you?

Page 48

1    A.  Virginia Tobiason.
2    Q.  And how long was she your manager?
3    A.  Probably two years later there was at least
4 two other individuals that were brought in kind of in
5 between Virginia and myself and the other supervisor.
6 So as a direct manager, I don't know, two to three to
7 four years.  I don't recall exactly.
8    Q.  And did you have responsibilities with regard
9 to developing a computer system to help change from a
10 paper format to a computer format?
11    A.  Well, that -- well, actually, there's
12 probably two aspects of that as to ultimately what I
13 did.  One is I did -- I was the person that managed to
14 make the case and get -- with support from the general
15 manager and with, you know, the people in support, but
16 get the people in the billing department on personal
17 computers for the first time.  So I was the person
18 involved with interfacing with the divisional IT
19 people to find these computers, which initially were a
20 lot of used computers coming from other areas.
21         The other aspect, too, and this may have
22 been an interest of Virginia, but I really don't know
23 that, was that a very important aspect of the Abbott
24 Home Infusion business was its computer system called
25 the CHIP system.  That was a system that provided the

Page 49

1 necessary computer systems to manage most aspects of
2 the home infusion business.  And an important part of
3 that was certainly the reimbursement.  And that system
4 had been crafted together over a number of years and
5 continued to have room for improvement and it's
6 possible that Virginia Tobiason hired me as
7 understanding that, because I had an IT background,
8 that I might bring some strengths to recognizing the
9 types of enhancements that could help a lot in the
10 efficiencies and perhaps accuracies, but I can say
11 more efficiencies of the functioning of the billing
12 department.
13    Q.  Did you work on the CHIP system?
14    A.  I, during that time, was pretty much the key
15 interface between the group of -- in the reimbursement
16 department between that group and the developers of
17 the CHIP system.  I was not in, at that time, the
18 programming area of the system.
19    Q.  Okay.  But you had input into -- did you have
20 input into the CHIP system?
21    A.  Oh, yes.
22    Q.  How was your relationship with Virginia
23 Tobiason?
24         MS. FUMERTON:  Objection, form.
25    Q.  (BY MS. ST. PETER-GRIFFITH)  Go ahead.  You

13 (Pages 46 to 49)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 50

1  can answer.
2      A.  I'm not sure what you're asking of that.
3          MR. STETLER:  You've got to get used to
4  that.
5      A.  Ask me more, please.
6      Q.  (BY MS. ST. PETER-GRIFFITH)  Sure.  What --
7  did you think you had a good working relationship with
8  Virginia Tobiason?
9      A.  Initially, but it was -- it was, I felt,
10 somewhat rocky --
11     Q.  Okay.  Why was --
12     A.  -- over time.
13     Q.  Why was it rocky?
14     A.  I guess I can give my views.
15     Q.  Sure.  That's --
16     A.  Only my views.  Okay.  Virginia was, and
17 presumably still is, an incredibly intelligent
18 individual, and you know, probably a very good person
19 to have on -- on your team.  She wasn't a very good
20 manager.  She was -- she was difficult to deal with
21 as -- as an employee.  You know, that would range
22 from, you know, anger to -- to -- it was probably more
23 anger than anything else at times.  My personal belief
24 is that she was threatened by competent people that
25 would be working for her.  And, again, that's my view

Page 51

1  you asked.  And from that aspect the relationship was
2  rocky.
3      Q.  How -- who were the individuals that were in
4  between you that -- that were sort of intermediate
5  managers in between you and Virginia after a period of
6  time?
7      A.  The first one was -- his name is/was Keith
8  Harper.
9      Q.  Okay.
10     A.  The -- and that was perhaps a year and a
11 half, that's what I'm guessing, maybe two years.  The
12 second one was Michael or Mike Snouffer,
13 S-n-o-u-f-f-e-r.  He was there for -- he had a much
14 longer tenure there --
15     Q.  Okay.
16     A.  -- and I reported to him for -- until
17 approximately 2000.
18     Q.  Who did you report to after 2000?
19     A.  Karla Kreklow.
20     Q.  And how long did you report to her?
21     A.  From approximately 2000 to when I left, 2003.
22     Q.  Now, did your job title of reimbursement
23 supervisor change?
24     A.  The whole time that I was responsible for
25 that aspect of the billing that I told you about, it

Page 52

1  was reimbursement supervisor.  And since you asked
2  earlier, just to fill it in, I think that was a grade
3  16 the whole time.
4      Q.  Okay.
5      A.  Then in approximately 1998, I was -- took a
6  position in the reimbursement department to be
7  essentially their, I guess, financial analyst,
8  involved primarily with assessing accounts receivable
9  and evaluating the probability of collection it --
10 collecting it, which was called a risk analysis.
11 And --
12     Q.  Did you still report to Mr. Snouffer?
13     A.  Yes, I did.
14     Q.  Okay.
15     A.  Yes.  That may have been for a year or so
16 that I was doing primarily that work.  And then in --
17 my recollection is in late 1999, or sometime in 1999,
18 this could have been 2000, but it was announced to the
19 employees that Abbott was going to be shutting down
20 the home infusion business.  And related to that, you
21 know, there were -- over the period of time, you know,
22 some people were leaving.  But in any event, the
23 position that I undertook was to be the -- what I
24 would describe as being the product manager for the
25 CHIP system that I told you about where I was the

Page 53

1  principal user liaison to help them out, educate them,
2  identify their needs to the degree that we were still
3  doing enhancements to the CHIP system, which we were
4  for some of the time, you know, involved in helping
5  and, if not, even writing the user types of
6  specifications as to what was to be done in the CHIP
7  system.  And I believe my title was manager of client
8  services at that time.  And I think, it's been a long
9  time, so I can only say I recall that I was still
10 doing risk analysis during that time of the accounts
11 receivable, too.
12     Q.  When you say "risk analysis," what -- what is
13 risk analysis or what was risk analysis within the
14 home --
15     A.  Well, that was, as I, perhaps, not adequately
16 enough had explained --
17     Q.  No, that's okay.
18     A.  -- which was -- it was important for your
19 accounts receivable, that is, billing for the services
20 that you were billing for, to make an assessment from
21 time to time of how much you actually could collect.
22 So if you have, you know, X number of dollars that are
23 on the books for your accounts receivable, can you
24 really collect that or you're going to collect
25 something less than or, in theory, more than that.

14  (Pages 50 to 53)

1  And -- because if it was going to be something
2  different, then you would, perhaps, want to consider
3  changing the balance on the books.
4          And so there was a methodology that had
5  been developed really before I came to the business
6  unit on how to do that involving basically dumping
7  data from the computer system and doing some
8  spreadsheet analysis. Which I helped perfect some,
9  both before I was doing it, as well as while I was
10 doing it. That was done on spreadsheets to do that
11 type of evaluation. So that was called a risk
12 analysis.
13    Q.  Okay. And was that part of your routine job
14 responsibility?
15    A.  When I was the financial analyst it was.
16    Q.  Okay.
17    A.  And my recollection is I was still doing that
18 during the period of time that I was the manager of
19 client services for the CHIP system, too.
20    Q.  And let's go back. What were all of your
21 responsibilities when you were a reimbursement
22 manager?
23    A.  Well, it was essentially to manage, help out,
24 assist, coach the people that were doing the
25 submission of claims for healthcare services to be

1  paid for.
2          It also -- I had explained earlier I was
3  the -- really the primary user interface from a
4  reimbursement sense for the CHIP system developers
5  during that time. And I had approximately -- and it
6  would vary from -- during the period of time, but
7  approximately 15 to 20 people that reported either
8  directly or indirectly to me, some exempt, some
9  nonexempt, if that is meaningful to you.
10    Q.  No. Will you explain that?
11    A.  Exempt means salary, nonexempt meant hourly,
12 hourly paid employees.
13    Q.  Okay.
14    A.  And all of them were -- you know, their job
15 function was to submit claims and to follow up and to
16 collect the money from various health plans.
17    Q.  What did you do to -- coming into this
18 position without a background in home infusion --
19    A.  Uh-huh.
20    Q.  -- what did you do to essentially learn the
21 home infusion reimbursement component of Abbott's
22 business?
23    A.  Well, since I knew nothing about
24 reimbursement, period, the first thing I did, I
25 remember doing that while I was going through the

1  interview process, was kind of sit down and flowchart
2  how I thought it worked based on what I was picking up
3  from some interviews.
4          I actually replaced another individual
5  who was -- had been a reimbursement supervisor and she
6  was still on board and very helpful to me in walking
7  me through further processes and training me about,
8  you know, what they did and -- or at least as you can
9  be trained, because it was difficult. Probably, you
10 know, helping me understand clients, some of the
11 people that were reporting to me, that sort of thing.
12          Beyond that, this person actually became
13 the educator for the -- the trainer for the -- for the
14 reimbursement department. Which my recollection is
15 that was the first time they had had that. So she had
16 moved from being supervisor to training -- trainer.
17 And beyond that I, as others, attended her training
18 from time to time on various billing aspects and it
19 was trial by fire.
20    Q.  Who -- who was that individual?
21    A.  Shellie Bronson.
22    Q.  Okay. Did you have any other
23 responsibilities when you were the -- when you were
24 reimbursement supervisor that we haven't discussed?
25    A.  Well, you know, as a member of the management

1  team, which I was, I guess I interventionally,
2  occasionally be involved in certain types of projects
3  and stuff, but I think I've -- I've adequately
4  supplied up the thrust of what I was doing.
5    Q.  Do you recall what those projects might have
6  been that you worked on?
7    A.  One of them I recall was an audit by the
8  Illinois Medicaid on the billing that Abbott had done.
9    Q.  Okay. What was your involvement with that?
10    A.  To be involved in organizing and producing
11 the documents for the auditors. And then they did
12 find a couple of mistakes that were made and I was
13 involved in, you know, checking their work and results
14 and then I was involved with our general manager in --
15 in working out an ultimate figure. We ultimately did
16 reimburse some money to Illinois Medicaid.
17    Q.  Do you remember what those mistakes were?
18    A.  Yeah. I remember one very vividly. It was
19 for an expensive drug called ceftriaxone
20 or Rocephin -- or, no. What's the generic?
21 Ceftriaxone was -- that was the generic. Rocephin, I
22 think, is the brand name.
23          MR. STETLER: You're looking at me?
24    A.  Sorry. Who's the pharmacist in here? And
25 the individual that had done the billing had not

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 58

1  understood how to bill properly for the units of
2  measure, you know, quantity of the drug being billed.
3  And as I later learned during this time, as I began to
4  understand more, it's no damn wonder they didn't
5  understand it because it was -- they're very
6  complicated and you -- you know, I somewhat
7  facetiously say you had to be a pharmacist to figure
8  this out.  And it has to do with the complexity of the
9  billing, at that time, at least, to Illinois Medicaid,
10 as it was and still can be.
11        So in any event, a billing mistake was
12 made.  There was a substantial overcharge to Illinois
13 Medicaid that was, also, unfortunately, not caught by
14 the people that were responsible for what we call
15 applying the cash, which is to review the -- the
16 records of payment coming from the various health
17 plans and hopefully review it for some degree of
18 accuracy, but record that you received the cash on
19 your computer system.  Well, that was not caught, even
20 though looking at it later it's like you ask how could
21 they not catch that, because it was a huge amount.
22 And that was the one that I really recall.
23        And then their method was to do an
24 extrapolation of samples of claims to extrapolate that
25 to a total period of claiming to them during the

Page 59

1  period of time which then resulted in a pretty big
2  number.
3     Q.  (BY MS. ST. PETER-GRIFFITH) Any other
4  projects that you recall being involved in?
5     A.  I'm sure there were.  That was when I was
6  coordinator.  What was that?  I'm sorry.  I was some
7  industry changes, not just coming to mind.  I probably
8  should remember it because it was important and I know
9  it was and maybe it will come back to me later.
10    Q.  That's all right.  If it does --
11    A.  But I was sort of a divisional coordinator of
12 it.  I mean, a business unit coordinator of it.
13    Q.  When it comes back to you, just let us know.
14    A.  If it does.
15    Q.  Sir -- okay.  If it does, that's fine.  I was
16 hoping to get through your -- your employment history,
17 but we've got five minutes left on the tape and my
18 rule is we have to take a break in between tape
19 changes and give the witness a break after at least
20 one tape.  So why don't we take a break at this time.
21        MS. NESBITT:  Can I just make my
22 appearance on the record --
23        MS. ST. PETER-GRIFFITH:  Sure.
24        MS. NESBITT:  -- since I was a little bit
25 late?

Page 60

1        I'm Amber Nesbitt at Wexler Toriseva
2  Wallace on behalf of the MDL plaintiffs and the State
3  of Arizona.
4        THE VIDEOGRAPHER:  And we are off the
5  record at 10:03 a.m. with the end of Tape Number 1.
6        (Recess from 10:03 to 10:21)
7        THE VIDEOGRAPHER:  Please stand by.  We
8  are back on the record at 10:21 a.m. with the
9  beginning of Tape Number 2.
10    Q.  (BY MS. ST. PETER-GRIFFITH) Sir, I just want
11 to confirm that other than what you've already
12 testified to before the break that you -- you just can't
13 recall any other responsibilities that you had when
14 you were the reimbursement supervisor.
15    A.  Well, I still can't recall that special
16 project.  Maybe that will come.  But I guess there
17 would be one other responsibility, which was that --
18 you know, during that period of time the business
19 establishing new relationships, new -- new contracts
20 with new clients and as a reimbursement supervisor I
21 was -- I had a responsibility to meet with them to,
22 you know, train and educate the clients about what we
23 would be doing for them to work out aspects of
24 interfaces as to what the client would do and what
25 Abbott's business unit would be doing in the areas of

Page 61

1  reimbursement, that sort of thing.
2     Q.  Okay.
3     A.  So that -- that -- I mean, I would consider
4  that also a fairly major portion of it.
5     Q.  Sir, we are going to come back to your tenure
6  as a reimbursement specialist in detail, but I want to
7  move on to -- after you left as -- after you left the
8  reimbursement area and became a financial analyst.
9        Other than doing the risk analyses and
10 working with the accounts receivables, from '98 until
11 approximately late '99 did you have any other
12 responsibilities?
13    A.  I was, as I had mentioned earlier, the chair
14 of the Home Fusion EDI Coalition and I was doing
15 activities during that time, although I can't really
16 recall any specifics.  And if I had other
17 responsibilities, I'm not recalling them is the best
18 way to answer that.
19    Q.  Okay.  And did you -- when you were
20 reimbursement manager, was there anyone else who was
21 also a reimbursement manager with you?
22    A.  Well, I was reimbursement supervisor.
23    Q.  Okay.
24    A.  And -- excuse me.  There were three people
25 that I'm remembering.  The one who was their -- well,

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 62

1    three people that I'm remembering during the time that
2    I was reimbursement supervisor and one who had the
3    most tenure, her name is Nancy McLoughlin.
4          THE WITNESS:  Do you need that?
5    M-c-L-o-u-g-h-l-i-n.
6       A.  There was another fellow named Tim Miller,
7    who was there more briefly, as well as another woman
8    named Angela Starks, who was also there more briefly.
9       Q.  Okay.  And, sir, I would like to take you to
10   late '99 until 2000, approximately when the
11   announcement was made that the home infusion business
12   was shutting down.
13      A.  Uh-huh.
14      Q.  First I want to ask you, how was that
15   announcement made?
16      A.  Well, I guess my recollection is that those
17   of us deemed to be part of the management team were
18   told the news by the general manager.  I'm sort of
19   remembering a meeting in a conference room.  That's
20   what I recall now.
21      Q.  Who's the general manager?
22      A.  Mike Sellers.
23      Q.  Okay.  Was he in your supervisory chain?
24      A.  Well, we had all reported in to Mike Sellers,
25   who was general manager of the business during that

Page 63

1    time.
2       Q.  Okay.  And did Mr. Sellers give a reason as
3    to why the home infusion business was -- would be
4    shutting down?
5       A.  My recollection is that Abbott had objectives
6    that had been established for sizes of businesses in
7    total revenues that Abbott was interested in in the
8    future and that this business unit was not of that
9    size and was never projected to be.
10      Q.  Okay.  Who else was in that meeting when
11   Mr. Sellers advised that --
12      A.  That's too long ago.  I could not remember
13   any specifics.
14      Q.  Okay.
15          MR. STETLER:  But let her finish her
16   question, because I think she wasn't quite done.
17   You're stepping on her a little bit is what I'm
18   saying.
19          THE WITNESS:  Sorry.
20      Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, other than
21   being the project manager for CHIPs in the late '99 to
22   2000 time frame, did you have any other
23   responsibilities other than what you described with
24   regard to retaining the risk analyses
25   responsibilities?

Page 64

1       A.  I was the -- I called it product manager for
2    the CHIP system, and that time frame was from about
3    2002-2003.  My estimate of when I was the financial
4    analyst was 1988 to 19 -- I'm sorry, 1998 to 1999 and
5    I recall that I continued serving in that role, also,
6    during that time that I was the product manager for
7    the CHIP system from 2000 to 2003.
8       Q.  Okay.
9       A.  And then, as I had said earlier, I was
10   involved as the chair of the home infusion EDI
11   coalition and there were many activities and those are
12   or is promoting what we were trying to do, "we"
13   meaning the Home Infusion EDI Coalition, in achieving
14   a standardization of coding and promotion of the
15   development of electronic claiming that I was also
16   involved in during that time.
17      Q.  Was it during this time frame that your title
18   was manager of client services?
19      A.  It was -- my estimate is 2000 to 2003 was
20   when I had that title.
21      Q.  Okay.  And did you have any other
22   responsibilities --
23      A.  It was really 2000 to 2002, I'm sorry,
24   because I left in early January 2003.
25      Q.  Okay.  Do you recall any other

Page 65

1    responsibilities that you had from the -- during the
2    2000 to 2003 time frame?
3       A.  No, I don't.
4       Q.  Have we exhausted your recollection of all of
5    your responsibilities that you had when you were an
6    employee within the Abbott Home Infusion unit?
7       A.  I think it's possible that something else
8    might come to mind more on a special project-type
9    basis, but I think we've covered it pretty well.
10      Q.  Okay.  Sir, what I would like to do -- first,
11   let me ask you, how was your relationship with
12   Mr. Snouffer?
13      A.  Professional.
14      Q.  What about your relationship with
15   Ms. Kreklow?
16      A.  I'm sorry, with who?
17      Q.  Ms. Kreklow, Karla Kreklow.
18      A.  Good.
19      Q.  Okay.  And your relationship with Mr. Harper?
20      A.  Professional.
21      Q.  Did you have any difficulties with either
22   Mr. Harper or Mr. Snouffer?
23      A.  Not really.  It was professional.  They were
24   both in tough positions and so -- but we worked
25   together professionally.

17 (Pages 62 to 65)

3d8b0dbb-837a-4faf-875f-bf00722949fc

1    Q.  When you say they were both in tough
2  positions, what do you mean?
3    A.  Well, I had already told you earlier my
4  perceptions of it was difficult to work for Virginia
5  Tobiason and they were in tough positions because they
6  were now working for her directly.
7    Q.  Okay.  Do you think that they had good
8  relationships with her?
9    A.  I think Mr. Harper definitely did not and I
10  think Mr. Snouffer managed to make it.
11    Q.  Let me ask you who within your division,
12  while you were in Home Infusion, did have a good
13  relationship with Ms. Tobiason, if anyone?
14    A.  Well, I think that in general Virginia had
15  the respect of many of -- colleagues in other areas
16  within the business unit and she -- you know, in many
17  aspects she had my respect, too.  So I think that
18  those that actually worked directly for her had
19  difficulties in general.  I think that those who were
20  colleagues, I think some of them probably had heard
21  that there would be difficulties in working for her,
22  but I think that they respected her and I'm not really
23  aware of any issues in those areas for her colleagues
24  outside of those that worked -- that reported to her.
25    Q.  Prior to coming to the Home Infusion unit,

1  did you work with any of the -- or were you familiar
2  with any of the Hospital Product Division products
3  sold by Abbott?
4    A.  Not really.
5    Q.  Prior to coming to the Home Infusion area did
6  you have an understanding as to how Medicaid or
7  Medicare reimbursed for drugs or products sold by
8  Abbott to its customers?
9    A.  No.
10    Q.  Sir, I'm going to ask you if you're familiar
11  with some terms before we get into your familiarity
12  with reimbursement.
13    A.  Certainly.
14    Q.  AWP we've gone over.  Other than the
15  definitions or your understandings of AW -- your
16  understanding of AWP as you testified to earlier, did
17  you have any other understanding as to what the term
18  "AWP" or "average wholesale price" means?
19        MS. FUMERTON:  Objection, form.
20    A.  Not that I can recall.
21    Q.  (BY MS. ST. PETER-GRIFFITH) "Contract
22  price," what's your understanding of that term?
23    A.  I don't have a specific understanding of that
24  term.  As a general business person I guess I could
25  make an assumption, but I don't have a specific

1  understanding of that in any of this context.
2    Q.  Okay.  What about direct price?
3    A.  Same thing.
4    Q.  What about WAC?
5        MS. FUMERTON:  Objection, form.
6    A.  Yeah.  Wholesale acquisition cost.  I now
7  know it means that.  You know, back when I was
8  involved with the reimbursement supervision
9  responsibility, I really don't even recall hearing the
10  term.
11    Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  Is that
12  your understanding of what WAC references, wholesale
13  acquisition cost?
14    A.  That's my -- that's my -- well, my
15  understanding now.  Remember, earlier I said I think I
16  know more now than I did then.  And my understanding
17  now is that that's what it stands for.
18        Do I really know how it's -- the term is
19  computed, what it really means, do I think I know
20  that?  No.
21    Q.  Okay.  Sir, do you -- or when did you come to
22  understand what "WAC" means?
23    A.  My recollection of the first time of hearing
24  that term was probably after I had left the
25  reimbursement supervisor responsibilities, but while I

1  was still with Abbott and I think there was -- well,
2  that there was some activity that I'm not recalling
3  right now, frankly, but Mike Snouffer was involved in,
4  among other things, trying to figure out what some of
5  these terms were and my recollection is hearing that
6  at that time for the first time.
7    Q.  Okay.
8    A.  I wasn't directly involved.
9    Q.  Do you remember in what context you heard it?
10    A.  I don't.
11    Q.  DOG -- DOJ AWP.
12        MS. FUMERTON:  Objection, form.
13    A.  There was an activity by the federal
14  government, as I recall it, sometime around the year
15  2000, I guess.  I would think -- my estimate is around
16  2000.  And from that there was a determination of AWP
17  pricing for some drugs by the Department of Justice.
18  My recollection is those were published, that -- my
19  recollection is that those were being adopted for
20  reimbursement to providers by some of the state
21  Medicaids.  That's my recollection.
22    Q.  (BY MS. ST. PETER-GRIFFITH) And where did
23  you learn that -- or how did you come to have that
24  understanding of what DOJ AWP means?
25    A.  I really don't recall.

18  (Pages 66 to 69)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 70

1   Q. Okay.
2   A. Sorry.
3   Q. Is it fair to say that you learned about it
4 in the context of your employment with Abbott?
5   A. I think it's fair to say I learned it while I
6 was employed at Abbott. I -- I am reasonably certain
7 that it was past when I was responsible for the
8 reimbursement directly, which is why I am estimating
9 it was in 2000. I think I provided a newspaper
10 clipping from USA Today in about 2000 that may have
11 been talking about that as part of the evidence. It
12 was just an article.
13   Q. Do you remember discussing the DOJ AWPs with
14 anyone at Abbott?
15   A. I cannot recall any specific discussions. My
16 expectation is I probably did.
17   Q. Do you have an understanding as to how Abbott
18 reacted to the publication of the DOJ AWPs?
19       MS. FUMERTON: Objection, form.
20   A. No. I'm really not aware of any specific
21 reaction.
22       MS. ST. PETER-GRIFFITH: If you could
23 just give me a second.
24   Q. (BY MS. ST. PETER-GRIFFITH) Sir, I would
25 like to show you what's been marked in a prior

Page 71

1 deposition in this case as Exhibit 1114 to see if that
2 refreshes your recollection.
3       MS. FUMERTON: Do you have another copy
4 of that?
5       MS. ST. PETER-GRIFFITH: We don't.
6       MS. FUMERTON: Can I just look at it
7 briefly?
8       MR. STETLER: Why don't we just look at
9 yours while we're doing it if it's not marked up and
10 we'll hand it back.
11       MS. ST. PETER-GRIFFITH: Yeah. Just --
12 (tenders document).
13   A. (Witness reviewing document).
14       (Discussion off the record)
15   Q. (BY MS. ST. PETER-GRIFFITH) Are you ready,
16 sir?
17   A. (Nodded head affirmatively).
18       (Discussion off the record)
19   Q. (BY MS. ST. PETER-GRIFFITH) Sir, does this
20 refresh your recollection about any conversations that
21 you might have had or communications that you might
22 have had with anyone at Abbott concerning the DOJ
23 AWPs?
24   A. Actually, it doesn't. I'm confident this is
25 my e-mail. You know, I -- I -- you know, Abbott Home

Page 72

1 Infusion Services would have a concern about
2 reductions in reimbursement because reimbursement was
3 important to that business unit and ultimately its
4 financial results. And, therefore, monitoring
5 developments such as this and providing information to
6 the Abbott Home Infusion Services business unit people
7 was something that would be important.
8       I, evidently, must have been asked by
9 Karla Kreklow, I don't recall, to see what I could
10 find out and I did, evidently, some searching on the
11 Internet, or elsewhere, to find out and that was the
12 result of what I did this letter on. I actually don't
13 recall at all that there was a proposal. I see a
14 point one to -- for Medicare to adopt DOJ AOGs. I
15 don't have a recollection of that, but I read it here.
16   Q. Okay. You mean DOJ AWPs?
17   A. That's what it says here, yes.
18   Q. Sir, do you know whether the adoption of or
19 the decision to publish the DOJ AWPs by the federal
20 government contributed to or caused the decision to
21 close the Home Infusion unit?
22   A. I do not know that.
23   Q. Is it possible?
24       MS. FUMERTON: Objection to form.
25   A. I have no knowledge of that whatsoever.

Page 73

1   Q. (BY MS. ST. PETER-GRIFFITH) Okay.
2   A. And no reason to believe that. The best
3 answer I can give you.
4   Q. Sir, there's another term I would like to ask
5 you whether you're familiar with and that's RxLink
6 price.
7   A. I'm not familiar with that now.
8   Q. Okay. Do you know what RxLink is?
9   A. I don't now.
10   Q. List price?
11   A. As a business person list price would be what
12 any customer could buy from any supplier selling a
13 product or service, even, at a noncontractual
14 relationship and pay for the product or service.
15   Q. Did -- did list price have any special
16 significance at Abbott?
17       MS. FUMERTON: Objection, form.
18   A. I was never involved in the establishment,
19 setting of strategy of any sort of pricing at Abbott
20 and, therefore, I can't give you an answer of anything
21 that I know about it.
22   Q. (BY MS. ST. PETER-GRIFFITH) Who was
23 responsible for setting prices at Abbott within the
24 Hospital Products Division?
25   A. I don't believe that I know that.

19 (Pages 70 to 73)

3d8b0dbb-837a-4faf-875f-bf00722949fc

1    Q.  Okay.
2    A.  I mean, I don't.
3    Q.  What about catalog price?
4    A.  Same thing.
5    Q.  What do you mean "same thing"?
6    A.  I don't know that.
7    Q.  You don't know what that term means?
8    A.  No.  I don't know who is responsible for it.
9    Q.  Okay.  Sorry.
10   A.  Sorry.
11   Q.  I'm sorry.  I should have --
12   A.  Okay.
13   Q.  -- clarified my question.
14   A.  Okay.
15   Q.  Are you familiar with the term "catalog
16   price"?
17          MS. FUMERTON:  Objection, form.
18   A.  No, I'm not.
19   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Did
20   Abbott publish a catalog?
21   A.  Yes.
22   Q.  Why did Abbott publish a catalog?
23          MS. FUMERTON:  Objection to form.
24   A.  I don't know why Abbott -- not having been
25   involved, I can't give you any specific knowledge as

1    to why Abbott would publish a catalog.  As a business
2    person, why would any company publish a catalog of
3    it's products, it seems fairly obvious to me.  But as
4    an Abbott employee and why Abbott would do that, I was
5    never involved.
6    Q.  Do you know what prices were reported in
7    Abbott's catalog?
8    A.  I really don't.
9    Q.  Did you use Abbott's catalog?
10   A.  I used Abbott's catalog from time to time
11   simply to understand what the products were that we
12   would be billing for at times on a reimbursement
13   basis.  You know, if it talked about an extension set,
14   as I was learning the business I wanted to know what
15   an extension set was, so I would look it up to see if
16   I could figure it out.  That's my recollection of how
17   I would use that.
18   Q.  Did you refer to the catalog for pricing
19   information?
20   A.  Not that I can recall.
21   Q.  "ASP," are you familiar with that term?
22          MS. FUMERTON:  Objection, form.
23   A.  Very.
24   Q.  (BY MS. ST. PETER-GRIFFITH)  What is that?
25   A.  Well, this is far beyond -- this is is -- this

1    is -- this is more recent development and well beyond
2    my tenure with Abbott.
3    Q.  Okay.  Then let me divide up my question.
4    While you were at Abbott did you have an understanding
5    as to the term "ASP"?
6    A.  I don't think it existed at that time.
7    Q.  Okay.  What is your current understanding of
8    the term "ASP"?
9    A.  It stands for "average sales price."  It's a
10   benchmark that has been developed by the government as
11   a result of the Medicare Modernization Act to
12   reimburse certain -- reimburse drugs to providers for
13   much of the Part B, B as in boy, reimbursement in
14   Medicare.
15          It is -- at the highest level, which is
16   probably my best understanding as opposed to detail,
17   but at the highest level it's supposed to be a
18   reflection of the -- the aggregate pricing for drug
19   products that manufacturers are reporting to the
20   government as what they receive when they are paid for
21   the drug products by whomever they are paid for and
22   it's supposed to be net of discounts and that sort of
23   thing.
24   Q.  Okay.  What about "NASP," are you familiar
25   with that term?

1    A.  What?
2    Q.  NASP.
3    A.  N as in Nancy?
4    Q.  Yes.
5    A.  No, I'm not.
6    Q.  Redbook, are you familiar with that term?
7    A.  I am.
8    Q.  What is Redbook?
9    A.  Redbook is one of the -- Redbook is provided
10   by one of the drug compendium companies that provides
11   pricing and some other information on drugs and
12   Redbook is a product of one of them.
13   Q.  Okay.  What are the other pricing compendia
14   that you're familiar with?
15          MS. FUMERTON:  Objection, form.
16   A.  Medi-Span and First DataBank --
17   Q.  (BY MS. ST. PETER-GRIFFITH)  And --
18   A.  -- as I recall.
19   Q.  -- when did you first become familiar with
20   pricing compendia?
21   A.  That would be when I was at Abbott Home
22   Infusion Services in the -- in my tenure as
23   reimbursement supervisor.
24   Q.  Okay.  And how did you become familiar with
25   these pricing compendia?

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 78

1    A.  Well, as I had explained earlier this
2  morning, the predominant methodology for the
3  reimbursement of drugs to home infusion providers is
4  based upon AWP.  And in Abbott's CHIP system, that I
5  explained earlier, which was a computer system used to
6  manage many aspects of the business, including
7  reimbursement, part of your billing process would be
8  to either submit charges based on AWP or at least
9  estimate that you are going to be paid on an AWP basis
10  for the determination of your accounts receivable.
11  And the CHIP system, there was a contract with the
12  company that produces Redbook to obtain that pricing
13  information so that it could be downloaded and
14  integrated into the CHIP system into its pricing logic
15  and kept current with periodic updates.
16    Q.  How -- when you say, "submit charges based on
17  AWP," what do you mean?
18    A.  There are, I would say, for the submission of
19  the drug charges two methods that is going to be
20  different payer by payer.  One method is a provider
21  would submit a charge for the drug that is the
22  provider's what I would call list price.  I might also
23  call it usual and customary price.  And, however, the
24  payer may reimburse for the drug based upon AWP, which
25  is usually a percentage and these days a percentage

Page 79

1  reduction from that published AWP amount.
2        So from a standpoint of the provider's
3  estimating and -- and keeping track of its accounts
4  receivable, the provider would like to know what the
5  difference is between the usual and customary or a
6  list price that they've submitted and what they expect
7  to be paid, which would be something less.  So that's
8  one method.
9        The second method would be the health
10  plan has actually -- you know, the health plan wants
11  to receive a claim that already has the AWP-base price
12  on it, not the list price.  In both those cases your
13  ability to be able to do that, either to know your AR
14  or -- or -- or submit the claim with the -- the claim
15  with the AWP-base price is something that a provider
16  or a biller for the services used to be able to do.
17  And that was the reason that that information was
18  important for use in the CHIP system, so -- because
19  the CHIP system was used, in fact, to prepare those
20  claims that would be submitted to the health plans.
21    Q.  Was AWP used for submitting claims for
22  reimbursement under J codes to Medicaid or Medicare?
23    A.  For Medicare the billing would be done by --
24  with HCPCS drug codes, which you are calling J codes,
25  and those claims would have been, and still are by

Page 80

1  home infusion providers, submitted at their -- at the
2  home infusion provider's usual and customary list
3  price.  Did I answer your question?
4    Q.  I'm not sure, so let's get -- move to a
5  document, if we could.
6    A.  Okay.
7    Q.  I would like you to go to your -- your
8  documents, and I'm looking for this publication,
9  "DMERC Overview IV Claims."  Do you see that?  And
10  it's BR 3124 through 3491.
11        MR. STETLER:  Give us about two minutes
12  and we'll set them up here.
13        MS. ST. PETER-GRIFFITH:  Sure.
14        THE WITNESS:  Dave, I probably don't
15  need the original of this one, if you want to have
16  someone set up so we can move along.
17        MR. STETLER:  You don't need the
18  original?
19        THE WITNESS:  I probably don't.
20        MS. ST. PETER-GRIFFITH:  I would like
21  for him -- I would like for you to refer to the
22  original.
23        THE WITNESS:  Would you like me to?
24        MS. ST. PETER-GRIFFITH:  Yes.
25        THE WITNESS:  Well, then --

Page 81

1        MS. ST. PETER-GRIFFITH:  Please.
2        MS. FUMERTON:  Can I just -- I know you
3  have no -- I just want to see the cover because I --
4        MS. ST. PETER-GRIFFITH:  Sure.
5        MS. FUMERTON:  -- need the pages.  I
6  promise I won't look.
7        MS. ST. PETER-GRIFFITH:  That's okay.
8  Yeah.  Why don't we go off the video for a second.
9        MR. STETLER:  Because I assume we are
10  going to be digging back --
11        MS. ST. PETER-GRIFFITH:  Yes.
12        MR. STETLER:  -- in these boxes.
13        THE VIDEOGRAPHER:  We are off the record
14  at 10:54 a.m.
15        (Recess from 10:54 to 10:58)
16        THE VIDEOGRAPHER:  Please stand by.  We
17  are back on the record at 10:58 a.m.
18    Q.  (BY MS. ST. PETER-GRIFFITH) Sir, if I could
19  have you flip to BR 03155 through BR 03157, which are
20  the little numbers you are going to see at the bottom
21  of the documents.
22        MS. ST. PETER-GRIFFITH:  And, Counsel,
23  it's just their sample HCFA form.
24        MS. FUMERTON:  Okay.
25        MS. ST. PETER-GRIFFITH:  And then their

21  (Pages 78 to 81)

1 sample formula of how you do it.
2     MS. FUMERTON:  Is this just a sample?  I
3 mean, we don't have any problems with --
4     MS. ST. PETER-GRIFFITH:  No.  No, no.
5 There are no -- there are no HIPAA issues here.  I
6 assume that Jones, Marie from Anywhere, USA is not a
7 real person.
8     A.  Okay.
9     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay?
10    A.  Uh-huh.
11    Q.  Sir, first of all, let me ask you, what is
12 this document that -- in general that is in the
13 binder?  Do you recognize it?
14    A.  I do.
15    Q.  What is it?
16    A.  It's a document that was used for training of
17 the Home Infusion Services billing staff on billing to
18 Medicare for home infusion.
19    Q.  And for -- sir, are you familiar with this
20 document?
21    A.  Well, I'm -- I'm familiar with it in a
22 general sense.  Am I familiar with every page?  No,
23 not necessarily.
24    Q.  Okay.  Would it be -- was it something that
25 you used during the course of your tenure in the home

1 infusion unit?
2     A.  Well, this was an example of -- you had asked
3 me earlier how I learned the business in the
4 reimbursement, and this book was used by Shellie
5 Bronson for the training of the billing staff on
6 reimbursement for Medicare, how to -- how to submit
7 claims and how the process would work, essentially.
8 That's what this book is.  So it was used as part of a
9 training class that Shellie would have performed.
10    Q.  Okay.  Sir, if you could flip to that first
11 3155 page and can you tell me, what is this document?
12    A.  That is an example with -- some completion of
13 this example of a HCFA 1500 claim form.
14    Q.  And what is a HCFA 1500 claim form?
15    A.  It was used at that time for the submission
16 of healthcare claims for services and products to many
17 health plans.
18    Q.  And would the -- including Medicaid and
19 Medicare?
20    A.  Including Medicare.  Medicaid varied those 50
21 states and it would have been used to submit claims to
22 some Medicaids.
23    Q.  Okay.  Do you remember which states --
24    A.  Not specifically.
25    Q.  -- used the HCFA 1500 form?

1     A.  I can tell you in general that for submission
2 of claims to Medicaid for drugs they were not and
3 still are not submitted on this form.
4     Q.  I'm sorry?  Can you repeat that?
5     A.  In general for claims for drugs, as
6 distinguished from, say, administration supplies, in
7 general those claims at that time submitted by a home
8 infusion provider to a Medicaid plan were not
9 submitted on this HCFA 1500 form.
10    Q.  How were they submitted?
11    A.  They were submitted either on a specific drug
12 claim form or they were submitted electronically
13 through an electronic drug claim.
14    Q.  Okay.  And would that be an electronic HCFA
15 form?
16    A.  Generally not.
17    Q.  Okay.
18    A.  And still is not.
19    Q.  Okay.  That's to Medicare?
20    A.  To Medicaid.
21    Q.  To Medicaid.  I'm sorry.  Sir, for -- on this
22 sample, do you see at the bottom under Item 24, that
23 first line one where they have some dates of service
24 and then there's a J number?
25    A.  Uh-huh.

1     Q.  What is that J number?
2     A.  That would represent a drug.
3     Q.  Okay.  Do you know which drug that
4 represented?
5     A.  Not offhand.
6     Q.  Okay.  If you could flip to the next page.
7 And, sir, what is this document?
8     A.  That actually is a copy of an itemized detail
9 list, I think we called it, that would print off from
10 the CHIP system for a claim that provides detail of
11 what was being billed to the payer.
12    Q.  Okay.  Do you see that J number that was on
13 the --
14    A.  I do.
15    Q.  -- page before?
16    A.  Uh-huh.
17    Q.  And what -- what drug is -- is described?
18    A.  Vancomycin.
19    Q.  Okay.  If you could flip to the -- the HCFA
20 1500 form, the one we were looking at before.
21    A.  Uh-huh.
22    Q.  Sir, do you see under Section F -- now, let
23 me ask you, is this a sample that individuals within
24 the reimbursement department could refer to in
25 assisting them in filling out HCFA 1500 forms?

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 86

1    A.  Well, it was used in training of those
2  billers and they would be given this book.  And how
3  they would use it, I mean, I guess one would suspect
4  that they probably did refer to it.
5    Q.  Okay.  Let me ask you.  When -- first, did --
6  did Home -- the Home Infusion reimbursement department
7  submit itself HCFA 1500 forms to Medicare or some
8  state Medicaid programs?
9    A.  Yes.
10        MS. FUMERTON:  Objection, form.
11    Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  Under
12  what circumstances would it submit HCFA 1500 forms to
13  the Medicaid program or Medicare?
14        MS. FUMERTON:  Objection, form.
15    A.  For Medicare, those forms would be submitted
16  to pay for the -- the home infusion therapy services
17  and product provided to patients that were being
18  billed for.
19        To Medicaids, as I had explained
20  earlier, there were 50 states, and still are, and they
21  have different processes.  For some of those states
22  this form would be used to bill for nondrug products.
23  I suppose it's possible that in some states it could
24  have been used to submit drug claims on.  I'm not
25  aware -- I don't recall that specifically.

Page 87

1        So the distinction between the Medicare
2  and the Medicaid is that the way of submitting claims
3  to Medicaid at that time, and still now, would not be
4  through this form.  Whereas, for Medicare it would be,
5  if it's submitted on paper.  And at that time they
6  were submitted -- I need to back off on that.  At that
7  time they were submitted on paper as well as
8  electrically to Medicare and if they were submitted
9  electronically, meaning computer to computer, you
10  wouldn't have a paper form that was sent in, but the
11  equivalent information would be sent on the claim.
12    Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  And would
13  Abbott's Home Infusion reimbursement department seek
14  reimbursement from the Medicare program and from
15  Medicaid, in some instances, using the HCFA 1500 form
16  for drugs distributed by its own -- Abbott's own
17  pharmacies?
18        MS. FUMERTON:  Objection, form.
19    A.  Or electronically.  Yes, there would be
20  occasions.
21    Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  Do you
22  know what federal tax ID number the reimbursement
23  department would use when identifying claims for which
24  Abbott's pharmacies were seeking reimbursement?
25    A.  Well, it would be -- in many, if not most

Page 88

1  instances, it would be submitted under Abbott's name
2  and, therefore, Abbott's tax ID.
3    Q.  Okay.  And, sir, if I could refer you again
4  to that J number.  Do you see that?
5    A.  Uh-huh.
6    Q.  Okay.  Is it fair to say that -- strike that.
7        When a J number is used in that -- under
8  Section D where it says, "Procedures, Services or
9  Supplies"?
10    A.  Yes.
11    Q.  What -- what does that mean when there's a
12  number that has a J before it?
13    A.  It means that you're billing for a drug.
14    Q.  Okay.  And do you see over in Section F --
15    A.  Yes.
16    Q.  -- "Charges"?
17    A.  Yes.
18    Q.  How -- for Abbott pharmacies, how is that
19  charges number determined?
20    A.  Well, this specifically is a sample, and I
21  didn't make it up, so I can't say anything about how
22  this one was done.
23    Q.  Okay.  But when you were in -- when you were
24  in the reimbursement department, where would the information
25  reimbursement department employees get the information

Page 89

1  for the charges that would need to be completed for
2  drugs that were billed to Medicare or Medicaid?
3    A.  From the computer --
4        MS. FUMERTON:  Objection, form.
5    A.  From the computer system.
6    Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  What
7  computer system?
8    A.  The CHIP computer system.
9    Q.  Okay.  And what -- where would that
10  information be on the CHIP computer system?
11    A.  That would reside in what was called an item
12  file.
13    Q.  Okay.  And where did the charge information
14  from the item file come from?
15        MS. FUMERTON:  Objection, form.
16    A.  Well, there would be, basically, a price
17  field or fields, and my memory is getting hazy here,
18  and someone was responsible for maintaining those
19  prices and it wasn't the reimbursement department.
20    Q.  (BY MS. ST. PETER-GRIFFITH) Do you know who
21  it was?
22    A.  My recollection is it would be what was
23  called the contract marketing department in Abbott
24  Home Infusion Services.
25    Q.  And do you know who had --

23 (Pages 86 to 89)

3d8b0dbb-837a-4faf-875f-bf00722949fc

1    A.  If it was -- if it was billed under Abbott's
2  name, as I had explained earlier.
3    Q.  Okay.
4    A.  Okay.
5    Q.  If it wasn't -- now, let me go back.  Were
6  there occasions when Abbott's Home Infusion
7  reimbursement department would submit claims on behalf
8  of Abbott's customers?
9    A.  Yes.
10   Q.  Okay.  Under what circumstances would that
11  occur?
12   A.  Many of Abbott's Home Infusion Services
13  customers had their own pharmacies and so the -- you
14  know, to -- to outside parties, hands off.  It was a
15  business of one of the customers and had a d/b/a name
16  that would reflect whatever the name reflected.
17  Abbott wouldn't even appear on it and that was part
18  of -- that was how -- part of how Abbott ran Abbott
19  Home Infusion Services.
20        So -- so, therefore, the -- it is one of
21  the services provided to many, not all of the clients,
22  it was to provide the billing service, meaning the
23  people that I managed a portion of.  And so those
24  claims would be submitted to health plans under the
25  name of the customer.

1    Q.  Would they also be submitted to Medicare and
2  Medicaid?
3    A.  Yes.
4    Q.  Okay.  Is it fair to say that some of
5  Abbott's Home Infusion clients would contract with
6  Abbott to provide the service of billing third-party
7  payers?
8    A.  Yes.
9    Q.  Okay.  Are you familiar with contracts that
10  Abbott had with customers who received consigned
11  goods?
12   A.  That was --
13       MS. FUMERTON:  Objection, form.
14   A.  That was one of the types of contractual
15  relations that Abbott had --
16   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
17   A.  -- in that business unit, yes.
18   Q.  Under the -- under the contractual
19  relationship where Abbott had -- where Abbott provided
20  consigned goods to its customers, how much would those
21  customers pay for the drugs and products provided by
22  Abbott to them?
23   A.  I don't know.
24   Q.  Do you know whether they paid anything prior
25  to being reimbursed by a third-party payer?

1    A.  It was my understanding that they did not.
2    Q.  Okay.  When Abbott provided the reimbursement
3  services, that is, fill it completing the HCFA 1500
4  forms --
5    A.  Uh-huh.
6    Q.  -- first of all, who's federal tax ID number
7  would be completed on the form if they were -- if they
8  were providing a service on behalf of a customer?
9    A.  It would be the customer's.
10   Q.  Okay.  Was that information that the
11  reimbursement department maintained then?
12   A.  What does that mean?
13   Q.  Meaning -- meaning did you -- did the
14  reimbursement department have the customer's federal
15  tax ID number?
16   A.  Yes.  And it would be in the computer system.
17   Q.  Okay.  Which computer system?
18   A.  The CHIP computer system.
19   Q.  Okay.  Where would that information
20  concerning the customer's tax -- federal tax ID number
21  be found?  In a particular file?
22   A.  Yeah.
23   Q.  Okay.  Do you know what the name of that file
24  is?
25   A.  Not offhand.  Conceptually we had a file

1  structure that allowed the identification of a
2  customer.
3    Q.  Okay.  And, sir, in a situation like -- like
4  the one reflected on this page where a -- where, for
5  example, Vancomycin would be billed on behalf of a
6  client --
7    A.  Uh-huh.
8    Q.  -- what number would be completed in the
9  charges Section F after the J code procedure or J code
10  number?
11   A.  It depends on who the plan was.
12   Q.  What do you mean it depends upon who --
13   A.  Medicare/Medicaid, private health plan.
14   Q.  Okay.  If they were billing -- so the charges
15  section could vary depending upon who the plan was?
16   A.  Yes.
17   Q.  Okay.  If the plan was Medicare, where would
18  you get the information concerning the charges that
19  needed to complete -- be completed in Section F?
20       MS. FUMERTON:  Objection, form.
21   A.  There was a certain amount of automation in
22  the CHIP system that, my recollection is, we improved
23  over time, but it still required some manual review
24  and, perhaps, manipulation by the billers.  But those
25  charges to Medicare should have been the sum total of

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 94

1  the usual and customary equal list price for the drug
2  that had been established to bill to payers for which
3  you -- to whom you billed list price to and Medicare
4  is one of those.
5      Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  So you
6  billed list price to Medicare?
7      A.  Yes.
8      Q.  Okay.  And where would the list price be
9  derived from?
10         MS. FUMERTON:  Objection, form.
11     A.  The list price would be found from the data
12  in the CHIP system's item file.
13     Q.  (BY MS. ST. PETER-GRIFFITH)  And, sir, did it
14  ever -- was there ever any time when Abbott, either
15  submitting claims on behalf of itself, its pharmacies,
16  or submitting claims on behalf of its customers, when
17  it ever -- was there ever a time when Abbott did not
18  list the list price in the charges section when it was
19  billing for J code of a drug?
20         MS. FUMERTON:  Objection, form.
21     A.  To Medicare?
22     Q.  (BY MS. ST. PETER-GRIFFITH)  To Medicare.
23     A.  That -- there should not have been those
24  times to the best of our ability to do it the way it
25  should have been done.

Page 95

1      Q.  Was there ever any discussion as to whether
2  the charges section on the -- on -- billed to Medicare
3  on this HCFA 1500 form was accurate if the list price
4  was used?
5         MS. FUMERTON:  Objection, form.
6      Q.  (BY MS. ST. PETER-GRIFFITH)  Do you
7  understand my question?
8      A.  Well, not really.
9      Q.  Okay.  Did any -- let me see if I can
10  rephrase it.
11         Did anyone ever question whether another
12  number, other than list price, should be used when
13  billing J codes to Medicare, either on behalf of
14  Abbott's pharmacies or on behalf of Abbott's clients?
15     A.  Not that I know of.  Now, I do want to say
16  that this is the list price of the Abbott Home
17  Infusion Services business unit.  That's not
18  necessarily the same list price as any other branch of
19  Abbott might have had.
20     Q.  Okay.  But do you know where -- were you
21  responsible or did you participate in setting the list
22  price for the Abbott Home Infusion?
23     A.  No.
24     Q.  Do you know who was?
25     A.  My recollection is it would have been

Page 96

1  residing in the contract marketing department.
2      Q.  Do you know whether it's possible that the
3  contract marketing department -- strike that.
4         Was David Brincks in the contract
5  marketing department?
6      A.  Yes.  He was the manager for quite some time.
7      Q.  Okay.  If David Brincks obtained the
8  information from the contract marketing and Hospital
9  Business Sector, would that surprise you?
10         MS. FUMERTON:  Objection, form.
11     A.  I have no knowledge of that.
12     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Do you
13  know at all whether -- do you have any indication
14  whatsoever as to whether the list price used by the
15  Abbott Home Infusion was any different than the list
16  price used by any other business unit within the
17  Hospital Products Division?
18     A.  I don't --
19         MS. FUMERTON:  Objection, form.
20     A.  I have no information on that.
21     Q.  (BY MS. ST. PETER-GRIFFITH)  At any time did
22  anyone ever question the lawfulness of using list
23  price in completing the HCFA 1500 form under charges,
24  Section F, either on behalf of Abbott's pharmacies or
25  on behalf of Abbott clients?

Page 97

1         MS. FUMERTON:  Objection, form.
2      A.  List price, as I told you, being the list
3  price set by the Abbott Home Infusion Services
4  business unit and the question being at any time did
5  anybody question the legality of it.  No one
6  questioned me or did I ever hear any question on it,
7  none that I can recall.
8      Q.  (BY MS. ST. PETER-GRIFFITH)  Why didn't
9  Abbott when charging the -- strike that.
10         When Abbott completed the HCFA 1500 form
11  seeking J -- reimbursement for J codes of a particular
12  drug on behalf of its pharmacies --
13     A.  Uh-huh.
14     Q.  -- why didn't it use either its cost or a
15  number that was slightly in excess of its cost?
16         MS. FUMERTON:  Objection, form.
17     A.  This business unit was very different from
18  almost anything else at Abbott.  You know, when Abbott
19  pharmacies perform the service, this business unit was
20  a healthcare provider.
21         When Abbott Home Infusion Services had
22  contracts with other clients who were providing many
23  services, you know, we were -- you know, we were -- we
24  were -- I don't want to say legally, but, you know, we
25  were -- we were contracted to provide services, but

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 98

1 essentially we -- you know, in this business unit, at
2 least as I operated, I identified myself as a
3 healthcare provider.  Healthcare providers have list
4 prices for their services and products.  That's the
5 way they bill to payers.  I had told you earlier they
6 may bill, or I had at least hinted at, they may bill
7 at list price or they may bill at some other rate that
8 is based upon a contract in terms of what they
9 actually submit to the payer.  But this is the way
10 it's done.  And, therefore, that's the way it was done
11 by this business unit.
12    Q.  (BY MS. ST. PETER-GRIFFITH)  When Abbott
13 billed at a J code on a HCFA 1500 form to Medicare,
14 either in electronic form or paper form, on behalf of
15 its contracting clients, those clients who contracted
16 for reimbursement services.
17    A.  Uh-huh.
18    Q.  Do you understand who I mean?
19    A.  Yeah.
20    Q.  Okay.  Did it in the -- in the charges
21 section of Section F --
22    A.  Uh-huh.
23    Q.  -- report to the federal government the
24 actual charges that the consumer paid Abbott for the
25 drug?

Page 99

1        MS. FUMERTON:  Objection, form.
2    A.  Well, for Medicare the consumer doesn't pay
3 for the drug to the healthcare provider and,
4 therefore, to Abbott.  The claims are submitted to
5 Medicare, Medicare reimburses and then they're --
6 under Part B Medicare there is either an original
7 deductible or a co-pay and then the patient is billed
8 for that.
9    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  But in
10 terms of the charges completed on the charges section
11 of the HCFA 1500 form --
12    A.  Uh-huh.
13    Q.  -- would Abbott, on behalf of its clients for
14 whom it provided reimbursement services --
15    A.  Uh-huh.
16    Q.  -- report on that HCFA 1500 form --
17    A.  Uh-huh.
18    Q.  -- the cost actually paid by the client, by
19 Abbott's consumer, for the product that is being
20 billed?
21        MS. FUMERTON:  Objection, form.
22    A.  By "Abbott's consumer" you mean one of the
23 entities that Abbott was contracted with.
24    Q.  (BY MS. ST. PETER-GRIFFITH)  Yes.  One of the
25 contract clients.

Page 100

1    A.  No, no.  The price would be established
2 through agreement with that entity, that customer, and
3 the Home Infusion Services business unit.  There would
4 also be a list price established, which would not
5 necessarily be the same list price level that Abbott
6 would be using for its own business.  There would
7 be -- there would be -- you know, that would be worked
8 out and that would be the charge that would be
9 submitted.  It would be the list price.
10    Q.  Who would set the list price for the
11 consumers or for the --
12    A.  My recollection --
13    Q.  -- Abbott contract customers?
14    A.  My recollection is typically that was
15 something that was agreed to on parameters or pricing
16 between the Abbott contract marketing department and
17 the customer.  And, you know, who actually entered the
18 data in, I don't know, frankly, but that's where it
19 would come from.
20        I think there would be other cases where
21 it was something totally determined by the customer
22 and Abbott may have -- may or may not have provided
23 them some consulting or training on how they may want
24 to think about how to go about it.  But I think there
25 may have been cases when the customer could do it

Page 101

1 totally on their own.
2    Q.  Do you know whether the customer would ever
3 set a charge, a list price charge, in seeking
4 reimbursement from the federal government at an amount
5 that was higher than Abbott's list price?
6        MS. FUMERTON:  Objection, form.
7    A.  Again, Abbott list price being the list price
8 of Abbott Home Infusion.  There could have been.  Do I
9 have specific knowledge of that?  No.
10    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Why would
11 Abbott let the customer set the charge -- the list
12 price charge for --
13    A.  Because it was the customer's business.
14    Q.  Did Abbott have any concern about the
15 accuracy of that information since Abbott was the one
16 actually submitting the claim form on behalf of the
17 customer?
18    A.  What do you mean by "accuracy"?
19    Q.  Meaning they -- meaning did Abbott ever have
20 a concern that they might -- that the number might be
21 an overcharge?
22        MS. FUMERTON:  Objection, form.
23    A.  Yeah.  As a basic quality control in the
24 reimbursement department, if we saw something that was
25 totally -- it just appeared to be out of line because

26 (Pages 98 to 101)

Page 102

1  someone had been doing this, you know, quite
2  frequently and said this just doesn't seem right,
3  then, yeah, there would be that type of concern and
4  there might be some follow activities with --
5  follow-up activities with the customer to take a look
6  at it.
7          Beyond that, you know, the concern with
8  accuracy was to properly take what was in the computer
9  system and end up with a claim that added the numbers
10 up right.  And, yeah, that was a concern and there
11 were some tools in the computer system to try and
12 prevent mistakes on that.
13         So, you know, we had that general
14 concern of just billing accuracy based on the list
15 price that was supposed to be -- you know, that was in
16 the computer system.  But that's the extent of it, I
17 think.
18 Q.  (BY MS. ST. PETER-GRIFFITH)  Would it be
19 Abbott's list price in the computer system only or
20 would the customer's list price also be there?
21 A.  Well, if it was the cost -- no.  No.  If it
22 was -- if it was the customer's business that was
23 being billed for, it would be the customer's list
24 price, period.
25 Q.  Okay.  And would you -- would you maintain a

Page 103

1  list of the customer's -- of each customer's list
2  price?
3  A.  Yes, that would be the case.
4  Q.  Where would that be found?
5  A.  In the item file of the CHIP system.
6  Q.  Okay.  How would you determine whether or not
7  a charge was unusual or out of whack or too high for a
8  particular J code?
9  A.  You know, I guess the best I can say is if
10 you've been billing it for a long time and just to
11 pick a number and, you know, you've done enough of
12 these and you think it ought to be a thousand dollars
13 and you get one that's a hundred thousand dollars you
14 might say, "This looks a little weird."
15 Q.  For J codes billed on behalf of Abbott's
16 clients, customers --
17 A.  Uh-huh.
18 Q.  -- reimbursement customers, on the HCFA 1500
19 forms to the Medicare program, why weren't the charges
20 reflective of the actual cost of the product to the
21 customer?
22 A.  As I explained before, this business unit was
23 a healthcare provider.  The list prices that any
24 healthcare provider sets are -- are of their own
25 discretion.  How they base it upon is -- is -- is

Page 104

1  their determination of how to set that pricing.  Could
2  it be based on their costs?  Yeah, it could.  Could it
3  be based on -- you know, what's the definition -- what
4  is cost?  Is that just the cost of acquisition or is
5  that all of their costs?  Could it be based on
6  competitive factors?  Sure it could.  There are
7  elements that go into it.  So there would be no
8  expectation in operating a business as a healthcare
9  provider that you would necessarily be submitting a
10 list price to any entity that was to be exactly your
11 cost for acquisition.
12 Q.  Okay.  Was Abbott at all -- was Abbott Home
13 Infusion reimbursement at all concerned that the
14 prices -- the list prices set by their customers on
15 whom they were submitting -- for whom they were
16 submitting claims to Medicare were too high?
17         MS. FUMERTON:  Objection, form.
18 A.  At the -- the best I can say is at the -- you
19 know, with the people that I worked with at Abbott
20 Home Infusion Services, I never heard that concern.
21 Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, when --
22 when a price would be looked at that a customer had
23 set and it appeared out of whack or too high, what
24 would happen?
25 A.  Well, I guess -- I guess I'm getting to the

Page 105

1  point of speculation here because I don't think that I
2  was involved in that.
3  Q.  Okay.
4  A.  If -- if -- you know, if you're asking me
5  did -- if a customer went -- went into the item file
6  and they put a price in for any item that someone
7  perceived as too much, I really don't recall any
8  instances like that.
9          The type of instances I was saying
10 earlier was if a biller working on a claim had
11 realized that this just doesn't sound right, and based
12 on their experience, mostly, I mean, entirely, then --
13 then there could be just some questions asked and
14 that's the extent of it.
15 Q.  Okay.  So -- but you never personally were
16 involved in any situation where a client was
17 questioned about the pricing of their -- of a
18 particular J code?
19 A.  You know, I could have been, but I really
20 don't recall any situations like that.
21 Q.  Okay.  Sir, if you could flip to --
22 A.  I mean, I do recall if you -- every once in a
23 while there would be something really weird in an --
24 in an -- in an AWP-type pricing coming from the
25 compendia that we were using, or something like that,

Page 106

1 and I recall being involved in a few of those cases.
2 That's a little different than list price.
3 Q. Which -- which -- what issues do you recall
4 being involved with where there was something amiss
5 with the present company?
6 A. I just have vague recollections of a couple
7 of times that either a client would call or one of our
8 people would call and say, you know, "Why is this AWP
9 like this?" And I'm sort of making this up in
10 terms -- I don't remember specifics, but I know there
11 were some, but, you know, "Why does this AWP coming
12 from Redbook appear to be different from --
13 drastically different than what is coming from
14 Medi-Span or First DataBank?" And then -- you know.
15 And I know there were a couple of cases where I would
16 get looking at that to see if there was somebody
17 somewhere in that whole collaboration between
18 manufacturer and compendia or even how we brought it
19 into the CHIP system if there was something crazy
20 about it.
21 Q. Do you -- do you recall whether there was an
22 issue with Vancomycin's AWP listing in or about 1995?
23 A. In terms of accuracy? No, I don't recall
24 that.
25 Q. Do you remember any issue with regard to

Page 107

1 Vancomycin pricing or AWP?
2 A. I do remember something in that time frame
3 where -- and I wasn't directly involved. I just
4 remember being I believe it was in, as I recall,
5 Virginia Tobiason's office and it could have been in
6 that time frame where there was -- there was
7 discussion about whether Abbott's AWP, wherever that
8 came from, you know. Put another way, I guess it
9 would be Abbott's pricing for Vancomycin was too high
10 as compared to some of the other generic products that
11 were on the marketplace. And I do recall there were
12 some discussion there.
13 Q. What discussions do you recall?
14 A. It's -- it's very removed and I really wasn't
15 involved, but I think that the -- the issue was, you
16 know, was that -- was that hurting Abbott Labs
17 competitively on Abbott's price for Vancomycin as
18 compared to generic competitors and how did that
19 relate to the reimbursement that providers would
20 receive when Vancomycin was billed.
21 Q. Do you remember what the resolution of that
22 issue was?
23 A. I don't.
24 Q. Okay. Do you remember other than Virginia
25 Tobiason, who may have been involved with that issue?

Page 108

1 A. I don't.
2 Q. Do you recall Dave Brincks being involved?
3 A. I don't.
4 Q. What about Gerald Eichhorn?
5 A. I don't recall that.
6 Q. Who is Mr. Brincks?
7 A. Well, he, at the time, was the manager of the
8 contract marketing department for a good portion of
9 the time that I was at Abbott Home Infusion Services.
10 Q. Did you work with him?
11 A. I did.
12 Q. Okay. How -- how did your two positions
13 interface or interact? Why would you have occasion to
14 work with him?
15 A. He or his department would -- you know, they
16 would be responsible for putting together contracts
17 between Abbott Home Infusion Services and its
18 customers that then were to be implemented by the
19 implementers in the case of reimbursement by the
20 reimbursement staff. So it would be in terms of
21 understanding the contract.
22 He also had some staff that -- you know,
23 a number of the patients that were treated, rather
24 than there being a master contract between Abbott or
25 between its client and the health plan, there wasn't a

Page 109

1 master contract. So something called case management
2 was done, which in this context was an individual
3 patient case negotiation performed between the -- the
4 provider and someone representing the health plan or
5 at the health plan called a case manager, typically,
6 where you would agree upon a price for providing the
7 home infusion products and services on an individual
8 patient case basis.
9 And in the contract marketing department
10 there were some people that had the responsibility to
11 be -- I think we called them the case manager, too,
12 but they would be the people contracting -- contacting
13 the health plan to arrive at that type of a
14 negotiation. So that was part of the responsibility
15 of contract marketing.
16 Q. Okay.
17 A. And -- and, you know, how would we relate to
18 that? Well, you know, we as the reimbursement
19 department had to make sure that the pricing was
20 right. So if there would have been any type of
21 questions, we would go and talk to them.
22 Q. Sir, if you could flip to Page 3297 in this
23 same -- I believe it's in the same manual. It's down
24 at the bottom. BR.
25 A. Sorry, I'm not finding it yet. 32 --

28 (Pages 106 to 109)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 110

1    Q.  97.  And I'm also going to ask you about 3298
2  and it's the same thing.
3    A.  3200.
4    Q.  32 -- yeah.
5    A.  3210.  Sorry about all that.  Sorry.  Oh,
6  it's way back here.  The matrix?
7    Q.  Sir, do you recognize this document?  I'm
8  going to ask you about this one and the one on the
9  next page and my primary focus is on the products, the
10  drug products Vancomycin and then acyclovir on the
11  next page.
12    A.  Do I recognize it?  It's in this book, so I
13  probably saw it at the time.
14       This would have been an indication of
15  the amount that would be paid for a billing for these
16  listed drugs by Medicare Part B for home infusion
17  therapy by what at the time were called regions.
18  There were four geographic sections of the country
19  called regions that you bill to depending on the
20  address of the patient.  And so that's what this is.
21  It's indicating what the reimbursement would be by
22  Medicare.  Or if there was a patient co-payor
23  deductible involved, it would be the summation of what
24  Medicare and the patient would pay for and it was
25  called a drug allowable.

Page 111

1    Q.  Okay.  Sir, if you could look under
2  Vancomycin.  Region A it says 18.51.  Does that mean
3  $18.51?
4    A.  It would mean that.
5    Q.  Okay.  And Region B it says $7.80?
6    A.  Yes.
7    Q.  Region C, $18.66?
8    A.  Yes.
9    Q.  And Region D, $10.56?
10    A.  Yes.
11    Q.  Now, all of these regions are all under the
12  same Medicare program, right?
13    A.  Yes.
14    Q.  Okay.  Do you know why there would be a --
15  such a big difference between Regions B and D as
16  compared to Regions C and A?
17    A.  I don't.
18    Q.  Do you know where this information came from?
19    A.  The government.  Well, I'm sorry.  From the
20  Medicare contractor called a DMERC at the time.
21    Q.  Okay.  And what is DMERC?
22    A.  DMERC was durable medical equipment regional
23  carrier.
24    Q.  Okay.  Why were drugs billed under J codes?
25  Why would that fall under DMERC?

Page 112

1    A.  Because Medicare required it.
2    Q.  Okay.  So it was -- it was just a Medicare
3  requirement that if you were going to bill the
4  Medicare program for these types of products in an
5  infusion context, it would be done through the DMERC?
6    A.  In a home infusion context.
7    Q.  In a home infusion context.
8    A.  Almost always there were -- there were a few
9  exceptions.
10    Q.  And, sir, if we could just flip to the front
11  page of this manual, the actual title.
12    A.  Okay.
13    Q.  I believe this is the DMERC -- is this
14  Abbott's overview or --
15    A.  This is Abbott's prepared document.
16    Q.  For DMERC --
17    A.  For billing --
18    Q.  -- claims?
19    A.  For DMERC claiming, yes.
20    Q.  Okay.  If you could go to Page 3299.  Take a
21  few minutes to review that.
22    A.  (Witness reviewing document.)
23       MS. FUMERTON:  Do you have a -- what was
24  the number again?
25       MS. ST. PETER-GRIFFITH:  3299.

Page 113

1       MS. FUMERTON:  Thank you.
2       MS. ST. PETER-GRIFFITH:  You can
3  understand why I didn't bring copies of all this for
4  you, Tara.
5    Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, do you
6  recognize this document?
7    A.  I do now, sure.
8    Q.  Okay.  What is it?
9    A.  Do I recall it specifically back then?  No.
10    Q.  Okay.  This is from Shellie Bronson --
11    A.  Yes.
12    Q.  -- who you indicated was in training?
13    A.  Yes.
14    Q.  Do you understand what the -- what the text
15  of the -- and you are listed on the cc?
16    A.  Yes.
17    Q.  Do you have any doubt that you received this
18  cc, this document?
19    A.  I assume I did.
20    Q.  Okay.  Well, would you have any reason to
21  doubt that you --
22    A.  I have no reason to doubt that I didn't.
23    Q.  Okay.  Sir, what -- what is this memo
24  describing?
25    A.  It's describing that Region B, which is one

29 (Pages 110 to 113)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 114

1  of those four DMERCs, you know, Shellie had obtained
2  an update to the -- she's called it fee screening for
3  drugs, which I would interpret to be allowable.  Is
4  that what the next page says?  It looks like it.  So
5  there was some change.  She had obtained that somehow
6  and she was informing the department about it and
7  there were two drugs that are listed that she could
8  not find any information for.
9      Q.  Including acyclovir?
10     A.  Yes.
11     Q.  And, sir, if you could look at the next two
12 pages then, 3300 and 3301.  Does this appear to be the
13 updated information that she's referencing in the
14 memo?
15     A.  I would draw that conclusion from the
16 placement of the pages and that's the best answer I
17 could give you.
18     Q.  Okay.  But this is another drug allowable
19 matrix?
20     A.  This memo is dated October 14, 1994.  This is
21 an update on 10/13/1994.  So it's probably a good
22 assumption.
23     Q.  Okay.  Sir, under the -- on the drug
24 allowable matrix, do you see the title at the top?
25 Where you just read the date, updated "10/13/94."

Page 115

1      A.  Yes.
2      Q.  It says, "Median AWP."
3      A.  Uh-huh.
4      Q.  What does that mean?
5      A.  That really doesn't relate to me and I
6  don't -- I can't answer that.
7      Q.  Okay.
8      A.  I don't know.
9      Q.  Do you know who would know what that means?
10     A.  This was a long time ago.  Shellie Bronson
11 would probably know.
12     Q.  Okay.
13     A.  Virginia Tobiason would probably know.
14     Q.  If Ms. Tobiason denied any knowledge of AWP,
15 would that surprise you?
16     A.  Any knowledge of AWP.
17     Q.  Yeah.
18     A.  You mean like what it even meant?
19     Q.  Yes.
20     A.  Yeah, that would surprise me.
21     Q.  If she testified that she learned about it
22 through the newspapers, would that surprise you?
23     A.  Yeah, that would surprise me.
24     Q.  Why would it surprise you?
25     A.  Virginia had been the head of the

Page 116

1  reimbursement in Home Infusion Services for a long,
2  long time.  She was in on the ground floor of the
3  business.  She may have been there from the very start
4  of it.  I'm not sure.  And she was an expert in the
5  field.
6      Q.  Okay.  If Ms. Tobiason was unfamiliar with J
7  code billing on HCFA 1500 forms for drugs that were
8  provided to patients either by Abbott's pharmacies or
9  Abbott's reimbursement customers, would that surprise
10 you?
11     A.  Unfamiliar meaning what exactly?
12     Q.  Meaning she wasn't aware that any J codes
13 were billed on HCFA 1500 forms.
14     A.  That would surprise me.
15     Q.  Okay.  Why would that surprise you?
16     A.  For all the reasons I just said.
17     Q.  Okay.  Sir, if you could turn to page --
18         MS. ST. PETER-GRIFFITH:  Oh, wait.
19 We've got a tape change.  Why don't we take a break.
20         THE WITNESS:  Okay.
21         MR. STETLER:  Okay.
22         THE VIDEOGRAPHER:  We are off the record
23 at 11:43 a.m. at the end of Tape Number 2.
24         (Recess from 11:43 to 11:54)
25         THE VIDEOGRAPHER:  Please stand by.  We

Page 117

1  are back on the record at 11:54 a.m. with the
2  beginning of Tape Number 3.
3      Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, one
4  question I neglected to ask you when we first talked
5  about this document.  Do you know who drafted this
6  particular manual?
7      A.  Most of these materials would have been put
8  together by Shellie Bronson, if not all of them.
9      Q.  Okay.  Do you know whether Virginia Tobiason
10 would have participated?
11     A.  I would say probably not.
12     Q.  Okay.  Why?
13     A.  Because Shellie had undertaken a position,
14 which was a new position, as the trainer for the
15 reimbursement department and that was her function was
16 to put together courses like this.  If she had picked
17 up materials from prior to that time, it was before I
18 was there and I would have no knowledge of that, and,
19 therefore, have no knowledge of who would have created
20 those materials.  Maybe there are some in here like
21 that.
22     Q.  Okay.  Sir, if you could turn to BR 03314.
23     A.  Uh-huh.
24         MS. ST. PETER-GRIFFITH:  It has some
25 notes on one page.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

1        MS. FUMERTON:  Oh, I'm sorry.
2        MS. ST. PETER-GRIFFITH:  No.  That's
3   okay.
4        MS. FUMERTON:  Is that just the one
5   document or is there more than one document there?
6        MS. ST. PETER-GRIFFITH:  No.  It's
7   one --
8        MS. FUMERTON:  Okay.
9        MS. ST. PETER-GRIFFITH:  Actually, I'm
10  going to have him confirm that.
11       MS. FUMERTON:  Okay.  That's what I was
12  checking for.
13   Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, if you
14  could look at -- just flip through 3314 through 3326,
15  which is still part of this manual, but I want to talk
16  with you about this document.
17   A.  Okay.
18   Q.  Sir, what is this document?
19   A.  These are instructions from one of the
20  Medicare contractors on how to complete a 1500 form.
21  This, actually, is not from a DMERC.  This is from a
22  Medicare contractor that was handling claims submitted
23  for total parenteral nutrition or enteral nutrition at
24  that time.
25   Q.  Okay.  And how do you know that?

1   A.  It says October -- well, it says PEN Medicare
2   Advisory and October 1993.  From the combination of
3   the date and what it says there, that's what I deduce.
4   Q.  Okay.  Sir, have you seen this document
5   before?
6   A.  Probably.
7   Q.  Do you know whether other Medicare
8   contractors would -- or whether the Medicare program
9   or HCFA itself would publish comparable guidelines for
10  other -- for reimbursement for other products on HCFA
11  1500 forms?
12   A.  They would.
13   Q.  Okay.  Have you seen them?
14   A.  Over time, yes.
15   Q.  Sir, what is parenteral and enteral
16  nutrition?
17   A.  Parenteral nutrition is -- or otherwise
18  called total parenteral nutrition by much of the
19  industry, or TPN, is provided to patients that need
20  tube feeding directly into the vein.  For some reason
21  their -- their digestive track has malfunctioned to
22  the extent that they either are able to absorb no
23  nutrients or very few nutrients either on a permanent
24  or sometimes a temporary basis, so they have to have
25  tube feeding injected directly into the blood stream.

1   So that's what TPN is.
2        Enteral nutrition is also tube feeding,
3   but it is done -- it's using enteral formulas, which,
4   actually, can also be drunk, fed orally.  But in the
5   context of businesses that many home infusion therapy
6   providers are in, it's for patients that need tube
7   feeding where the tube is placed into the digestive
8   track for one of several routes and then the nutrient
9   is fed to them in that way through gravity or I think
10  it can be done through a pump feeder.
11   Q.  Did Abbott manufacture enteral products?
12   A.  Yes.
13   Q.  Did it manufacture parenteral products?
14   A.  I believe so is the best answer I can give
15  you.  It's not something I ever kept track of.
16   Q.  With regard to the enteral products, what
17  division sold the enteral products?
18   A.  The Ross products division.
19   Q.  Did the home infusion component of the
20  Hospital Business Sector also sell enteral products as
21  part of its contracts with its customers?
22   A.  Yes.
23   Q.  Okay.  So it would sell Ross products?
24   A.  Yes.
25   Q.  Okay.  Would it seek reimbursement for Ross

1   products that were distributed by Abbott's pharmacies
2   from Medicare or Medicaid?
3   A.  Yes.
4   Q.  Would Abbott, when providing reimbursement
5   services for some of its contract clients, bill
6   Medicaid or Medicare for enteral Ross products?
7   A.  Yes.
8   Q.  What charge information would be used on the
9   HCFA 1500 forms for the Ross products that were
10  distributed by the Abbott home pharmacies?
11   A.  It would be really very similar to what I had
12  explained earlier about the -- that a list price, a
13  list charge, would be set and that's what would be
14  used.  Very similar to the drugs.  I mean,
15  conceptually, at least.
16   Q.  What about for the customers for whom Abbott
17  sold -- or Abbott provided reimbursement services,
18  what would the charge be on the HCFA 1500 form
19  submitted to Medicare or some Medicaid programs for
20  the Ross enteral products?
21   A.  It would be done --
22       MS. FUMERTON:  Objection, form.
23   A.  It would be done at the list price as
24  established by that customer and which -- and they may
25  have been totally responsible for it or they may have

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 122

1  worked with Abbott Home Infusion Services on a -- sort
2  of a consulting contractual arrangement to determine
3  that. Ultimately the -- in all -- my understanding
4  was, in all of those relationships, that the customer
5  ultimately was responsible for the pricing. That's
6  the way I understood that.
7      Q. (BY MS. ST. PETER-GRIFFITH) Unless it was
8  Abbott's pharmacy.
9      A. Unless it was Abbott's pharmacy.
10     Q. And then Abbott would be responsible for
11 setting the list price charge.
12     A. Where it was billed in Abbott's name, yes.
13     Q. Sir, this particular document, 3314 through
14 3326, is contained in the DMERC manual.
15     A. Yes.
16     Q. Would Abbott's reimbursement department, Home
17 Infusion reimbursement department, refer to the
18 guidelines published by either HCFA or HCFA
19 contractors as part of the normal routine in
20 completing and submitting billing to Medicare and
21 Medicaid?
22     A. I would say generally not.
23     Q. Why not?
24     A. Because it was -- a lot of it was really done
25 by the computer system automatically given the data

Page 123

1  that was put into it and they would be -- they would
2  be trained on -- you know, where the computer system
3  didn't do it automatically, they would be trained
4  through sessions such as this or through, perhaps,
5  getting instructions from someone else in the
6  department if they needed some help on how to do it.
7  And this is pretty detailed stuff and I would say no.
8      Q. How would the Abbott reimbursement department
9  know whether it was complying with HCFA guidelines or
10 CMS guidelines or statutes or regulations governing
11 reimbursement?
12         MS. FUMERTON: Objection, form.
13     A. Well, you know, that's a broad question.
14     Q. (BY MS. ST. PETER-GRIFFITH) Okay.
15     A. I mean, in terms of -- I mean, we are
16 focusing on how you complete a 1500 form --
17     Q. Right.
18     A. -- here.
19     Q. Let me clarify. In the context of completing
20 a 1500 form, how would Abbott know that what its
21 computer system was doing and what its personnel was
22 doing was in compliance with federal and state law
23 concerning the Medicare and Medicaid program?
24         MS. FUMERTON: Objection, form.
25     A. You know, I guess completing a 1500 form

Page 124

1  is -- really, are you giving to the payer what the
2  payer says you are supposed to give to them. And
3  Abbott would take a look at this, these types of
4  instructions, and, you know, combination between
5  the -- someone in reimbursement and someone in the
6  computer system department to program the computer to
7  appropriately complete what the computer could
8  automate.
9          And, you know, there -- there -- when I
10 came into the department, I mean, the business had
11 been underway for about ten years at that time. The
12 person that was primarily responsible for being
13 knowledgeable about and, therefore, directing,
14 managing, if you will, so that things were done
15 according to all those regulations was Virginia
16 Tobiason.
17     Q. Okay. Do you have any idea whether the
18 charges section was -- was accurately completed on
19 these HCFA 1500 forms submitted either for Abbott
20 reimbursement or reimbursement customers?
21     A. What do you mean by accurately?
22     Q. Meaning was it in compliance with state and
23 federal Medicare and Medicaid law --
24         MS. FUMERTON: Objection.
25     Q. (BY MS. ST. PETER-GRIFFITH) -- and

Page 125

1  regulations?
2      A. I understood --
3          MS. FUMERTON: Objection, form.
4      A. I understood that it was. Can you -- you
5  know, if you want me to give you some specifics or
6  cite here and there, no, I have no knowledge of that.
7      Q. Okay. How do you know it was?
8      A. Because -- well, partly because, you know,
9  the form the was completed in various fields. But
10 when it comes to the pricing, because, you know, it's
11 always been my understanding from walking in in that
12 position and just, I guess, listening and being told
13 that -- that when you bill to Medicare or Medicaid,
14 you bill at the provider's list price.
15     Q. Okay. Who told you that?
16     A. I can't recall.
17     Q. Was that a system that was in place before
18 you arrived?
19     A. Oh, yeah.
20     Q. So if it was not in compliance with state or
21 federal law, you would have no reason to know whether
22 it was or not?
23         MS. FUMERTON: Objection, form.
24     A. Certainly at that time. It's not that I'm
25 that much more knowledgeable now in this aspect, but I

32 (Pages 122 to 125)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 126

1  think that's the way it's done now by providers in
2  healthcare.
3      Q.   (BY MS. ST. PETER-GRIFFITH)  In the
4  reimbursement department, at any time when you were
5  affiliated with Abbott Home Infusion, was there ever
6  any concern that Abbott's submission of claim forms,
7  either on behalf of its pharmacies or on behalf of its
8  reimbursement clientele, was in contravention of the
9  False Claims Act?
10     A.   No.
11         MS. FUMERTON:  Objection, form.
12     Q.   (BY MS. ST. PETER-GRIFFITH)  Are you familiar
13  with the False Claims Act?
14     A.   Not intimately, no.
15     Q.   What do you know about the False Claims Act?
16     A.   What I read in the newspapers.
17     Q.   Which newspapers?
18     A.   I couldn't cite any specific ones.
19     Q.   That article that you provided as part of
20  your production?
21     A.   Maybe.  I don't recall.
22         MS. ST. PETER-GRIFFITH:  Okay.  Sir, I'd
23  like to -- we can mark this as the next exhibit even
24  though it is one of the pages that you produced.  I
25  think it's just easier for me to give him this than --

Page 127

1  rather than have you, Dave, dig through the box.
2          MR. STETLER:  Oh, good.  Yes, I agree.
3          MS. ST. PETER-GRIFFITH:  And I will
4  submit -- I'm looking at BR 02422.  And I will provide
5  it to counsel.  It appears to be a comparable document
6  to 2430.
7          MS. MOORE:  What exhibit number is this
8  now?
9          MS. ST. PETER-GRIFFITH:  This is going
10  to be 1315 or 16.  1316.
11         MR. STETLER:  Do you want both of them
12  back?
13         MS. ST. PETER-GRIFFITH:  If you could
14  give -- yeah.  We are going to mark this one.
15         MR. STETLER:  Oh, I'm sorry.
16         MS. ST. PETER-GRIFFITH:  I'm just using
17  this for me as my --
18         MR. STETLER:  I get it.
19         MS. ST. PETER-GRIFFITH:  -- copy when
20  I --
21     A.   (Witness reviewing document).  Okay.
22     Q.   (BY MS. ST. PETER-GRIFFITH)  Did she mark
23  that?  Did she put the -- can we ask her to put the
24  sticker on so that we don't forget to do that at a
25  later point in time?

Page 128

1          (Exhibit 1316 marked)
2          MS. FUMERTON:  We are marking this one
3  separately as an exhibit?
4          MS. ST. PETER-GRIFFITH:  Yeah.  Just so
5  that, frankly, Dave doesn't have to go dig through the
6  box.
7          MR. STETLER:  Which I'm all for.
8          MS. FUMERTON:  All right.  So what
9  exhibit number is this?
10         MS. ST. PETER-GRIFFITH:  This is 1316.
11         MS. FUMERTON:  Thanks.
12         MS. ST. PETER-GRIFFITH:  And it's --
13     Q.   (BY MS. ST. PETER-GRIFFITH)  What's the
14  number, sir, at the bottom?
15     A.   2422.
16     Q.   Sir, have you looked at the document?
17     A.   Yes, uh-huh.
18     Q.   Okay.  Sir, at the top of this document it
19  says "Home Infusion Services."  Do you see that?
20     A.   Yes.
21     Q.   Is that the logo for the division of Home
22  Infusion that you worked with at Abbott?
23     A.   It was a business unit, and yes.
24     Q.   Okay.  And it says "Interoffice
25  Correspondence"?

Page 129

1      A.   Yes.
2      Q.   At the top it says, "From Lynn Leone."  Do
3  you see that?
4      A.   Yes.
5      Q.   Who is Ms. Leone?
6      A.   She was in the contract marketing department
7  of the business unit.
8      Q.   Okay.  And it says at the top, "To:  All
9  Reimbursement Personnel" and to "All Pharmacists
10  Personnel."  Do you see that?
11     A.   Yes.
12     Q.   Do you know -- were you included among the
13  reimbursement personnel?
14     A.   I have no recollection of that, but I was in
15  reimbursement.
16     Q.   Okay.  In fact, you were one of two managers,
17  weren't you?
18     A.   One of two supervisors.
19     Q.   Supervisors, I'm sorry.  If a memo went to
20  all reimbursement personnel in June of 1996, would you
21  have expected that it would have gone to you?
22     A.   Yes.
23     Q.   Do you recognize this document?
24     A.   Do I recall it?  No.  Does it look like
25  something that I have an understanding of now?

33 (Pages 126 to 129)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 130

1    Q.  Okay.
2    A.  Yeah.
3    Q.  When you say you have an understanding of
4  now, what do you mean?
5    A.  I mean, I'm reading it now and if you ask me
6  some questions, I may be able to answer them.
7    Q.  Okay.  First I want to ask you, on the re
8  line it says "Lupron."  Do you see that?
9    A.  Yes.
10    Q.  What is Lupron?
11    A.  That was a drug provided by TAP
12  Pharmaceuticals.
13    Q.  Was it also distributed --
14    A.  It is provided by.
15    Q.  Was it distributed as part of the contracts
16  that the Home Infusion Services division had with its
17  clients?
18    A.  My memory on this is that there were some
19  patients being serviced by Abbott that were Lupron
20  patients.  I don't think it was a lot.  And I don't
21  think I knew much about it at the time, but, yes.
22    Q.  Okay.  Sir, does this issue -- do you
23  remember there being an issue in June of 1996
24  concerning increasing the AWP of Lupron and that
25  necessitating an increase in list price?

Page 131

1    A.  I don't.  I do not remember that.
2    Q.  Okay.  Do you remember anything with regard
3  to pricing of Lupron that affected the reimbursement
4  department?
5    A.  No.
6    Q.  Do you remember anything concerning the drug
7  Lupron at all during your tenure in the Home Infusion
8  business unit?
9        MS. FUMERTON:  Objection, form.
10    A.  I'm thinking.
11    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
12    A.  Sorry.
13        MR. STETLER:  We noticed the smoke
14  coming out of your ears.
15    A.  I think -- I think, to the best of my
16  recollection, when we were closing the business unit
17  there were issues for the patients that the Abbott
18  pharmacy in Chicago was still treating, providing the
19  Lupron to, and finding another way for them to be
20  provided with the drug therapy.  That's -- that's what
21  I recall.
22    Q.  (BY MS. ST. PETER-GRIFFITH)  Would Abbott
23  pharmacies, the Abbott-owned pharmacies, would it
24  distribute Lupron to patients?
25    A.  The Abbott-owned pharmacy that I recall in

Page 132

1  that would have been the Chicago one, so, therefore,
2  yes, they must have distributed Lupron.
3    Q.  Sir, under the contractual arrangements
4  whereby Abbott provided consigned goods was to some of
5  its Home Infusion customers.
6    A.  Yes.
7    Q.  Do you remember that?
8    A.  Yes.
9    Q.  Would it provide Lupron on a consignment
10  basis?
11    A.  I wouldn't know that specifically.
12    Q.  What about the Ross products, do you know
13  whether they provided the Ross enteral products on a
14  consignment basis?
15    A.  I would not know that specifically.
16    Q.  Okay.
17    A.  Okay.
18    Q.  Do you remember -- do you remember any --
19    A.  The best I can say, yeah.
20    Q.  Okay.  That's fine.
21    A.  Okay.
22    Q.  Do you remember any litigation arising
23  against TAP concerning its pricing of Lupron?
24    A.  The only litigation that I recall is -- had
25  to do with -- I think, as I recall, it had to do with

Page 133

1  representations that allegedly TAP was making to
2  physician offices for the Lupron and I know that --
3  from that that there were some TAP employees, I think
4  mostly on the sales side, that had been involved in
5  that.  And that's about what I recall.
6    Q.  Anything else?
7    A.  No, that's it.
8    Q.  Do you remember any litigation involving Ross
9  products?
10    A.  I recall there was a situation in Southern
11  Illinois that had to do with representations allegedly
12  by Ross, I guess, to certain providers of enteral
13  products.  And I think I recall that it had to do with
14  representations of how to bill the government for them
15  and that ultimately, I think, there was a settlement
16  between Abbott or Ross, if you will, or even some
17  obscure subsidiary that I never heard of before, and
18  the government on that case.
19    Q.  How did you know that?
20    A.  Both of those from newspapers.
21    Q.  Okay.  Was there any discussion about that at
22  all at Abbott?
23    A.  Not that I can recall.
24    Q.  Do you recall a letter from Miles White
25  concerning the Ross investigation that he sent out to

34  (Pages 130 to 133)

Page 134

1  all employees?
2      A.  I don't.
3      Q.  Do you remember any correspondence from Miles
4  White?
5      A.  No, not on that.
6      Q.  Who?  What correspondence from Miles White do
7  you recall?
8      A.  I still get them now as an Abbott retiree.
9      Q.  Okay.  Other than in the personnel context,
10 do you remember any correspondence from Miles White?
11     A.  Not specifically, no.
12     Q.  Do you remember any repercussions at all
13 within the Hospital Products Division concerning
14 either the TAP litigation or the Ross litigation?
15     A.  I do not.
16         MS. ST. PETER-GRIFFITH:  Counsel, I
17 would just point out -- counsel for Abbott, I would
18 just point out that this is a document concerning
19 Lupron within the Home Infusion.  It is, as are nearly
20 all of the documents that Mr. Rodman has provided
21 responsive to request for production from the United
22 States, has never been produced to us and I just want
23 to state that on the record that we are seeing these
24 documents for the first time through Mr. Rodman's
25 production and not through Abbott's production.  I

Page 135

1  understand that, Ms. Fumerton, you're probably not
2  responsible for the document production side of
3  Abbott's litigation, but I just wanted to point that
4  out on the record.
5          MS. FUMERTON:  Okay.  I will just say, I
6  think that, just to clarify, all these documents don't
7  refer to Lupron as I think was mentioned before, at
8  least.  You're saying that some of these documents --
9          MS. ST. PETER-GRIFFITH:  Some of these
10 documents --
11         MS. FUMERTON:  -- you've never seen
12 before.  And I would note, though, for the record, I
13 think one of the documents you've already shown
14 Mr. Rodman was admitted as an exhibit to a previous
15 deposition, so that clearly had to have been produced
16 previously.
17         MS. ST. PETER-GRIFFITH:  Okay.
18 One page.  Yes.  Most of the --
19         MS. MOORE:  But that one document,
20 Exhibit 1114, was not produced by Mr. Rodman.  I
21 mean --
22         MS. FUMERTON:  Well, no.  Correct.
23 Obviously Mr. Rodman is not a current employee of
24 Abbott, so these are the documents that Mr. Rodman
25 had, but that's -- and I don't know to what extent

Page 136

1  some of these have been produced, but I don't think
2  it's a correct representation to say that none of them
3  have not been produced in this case.
4          MS. ST. PETER-GRIFFITH:  Nearly all --
5  nearly all of them we've never seen before other
6  than --
7          MS. FUMERTON:  Well, the record will
8  show -- I mean, a review of the documents can show
9  that.  I just have no personal knowledge of that.
10     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Sir, if
11 you could look at the same book, 03328 through - I'm
12 trying to find the end of it here - 3429.
13         MS. FUMERTON:  What were the first --
14 oh.
15         MR. STETLER:  It apparently goes through
16 that tab.
17         THE WITNESS:  Wrong.
18         MR. STETLER:  Never mind.
19         MS. FUMERTON:  Do you have writing in
20 here?  I don't want to flip through --
21         MS. ST. PETER-GRIFFITH:  No.
22     A.  Okay.  About three quarters of an inch.
23     Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, what is
24 this document?
25     A.  Well, the first page is a copy from

Page 137

1  St. Anthony's Publishing of 1994 HCPCS, Level II
2  codes.  And that goes up to the next tab.  So it's
3  really documents 3330 through 3408, it would appear.
4      Q.  Okay.
5      A.  Just that.
6      Q.  Thank you, sir.  What is that document, 3328
7  through 3408?
8      A.  Well, it's a 1994 -- it's a copy of a 1994
9  HCPCS Level II Codes document as published by
10 St. Anthony's Publishing.
11     Q.  And what -- what is this document?
12     A.  It would appear that's what it is.
13     Q.  Okay.  Are you familiar with it?
14     A.  Specifically, no.  Generally, sure.
15     Q.  Okay.  Generally what are you aware of?
16     A.  Generally considerable amounts of billing for
17 home infusion services are done coding claims with
18 HCPCS codes and this is a reference -- a copy of a
19 reference publication, it would appear, for HCPCS
20 codes that were in use in 1994.
21     Q.  And would this be of use to members of the
22 reimbursement department in the Home Infusion business
23 unit?
24     A.  Yes.  Yes.
25     Q.  How is it of assistance to them?

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 138

1    A.  Well, it -- for the average biller, they
2  would seldom look at this.  We would typically have a
3  copy, or maybe two copies, resident and the
4  department, and -- but if -- generally the computer
5  system would have loaded into it HCPCS codes to
6  identify products that would ultimately, by the
7  computer system, be translated into a claim.  And
8  people that might be loading the data into the system
9  may be using this book fairly carefully to make sure
10  that that's right.  The billers typically wouldn't be
11  going to this code system.  The supervisors, like me
12  at the time, might because we didn't understand
13  something and we wanted to verify what was on the
14  claim in looking at it.
15    Q.  Okay.  Would you use this document or
16  versions of this document?
17    A.  At that time?  On rare occasions, yeah.
18    Q.  Would St. Anthony's publish one each year?
19    A.  I'm sorry?
20    Q.  Would St. Anthony's publication publish one
21  each year?
22    A.  Yes, I believe so.
23    Q.  Would this information be contained within
24  the CHIP system?
25    A.  The coding information -- some of these codes

Page 139

1  would be used in the CHIP system.
2    Q.  Okay.  But would the actual -- would the
3  information contained in this particular publication
4  be available in the CHIP system?
5    A.  The codes would.
6    Q.  The codes would?
7    A.  Some of the codes.
8    Q.  Who would enter codes into the CHIP system?
9    A.  That generally, I recall, would be done by
10  the contract marketing department for the maintenance
11  of it, I recall.  We were talking about -- earlier
12  this morning about special projects.  I mean, I do,
13  now that we bring this up, recall having involved --
14  at one point we were trying to increase the -- I don't
15  know, I guess I would say the accuracy of codes,
16  something like that, that were in the CHIP system tied
17  to the item files.
18    Q.  Okay.  And -- and who -- can you describe a
19  little bit more what that project was that you were
20  involved with?
21    A.  No, I don't think so, I can't.  I'm sorry.
22    Q.  Do you remember who oversaw the project?
23    A.  No, not really.
24    Q.  Well, was it -- was it something that was --
25  that was overseen and conducted within the

Page 140

1  reimbursement department or was it overseen and
2  conducted within the contract marketing department at
3  Home Infusion or was there an amalgam of personnel
4  from both?
5    A.  You know, I'm sorry, my memory is too hazy.
6    Q.  Okay.
7    A.  I just can't answer that.
8    Q.  Do you know why the project was undertaken?
9    A.  My memory is very hazy, I'm sorry.
10    MS. ST. PETER-GRIFFITH:  Okay.  What
11  time do we have?
12    MS. FUMERTON:  11:20-ish.
13    MR. FOOTE:  12:00.
14    MS. FUMERTON:  12:20-ish.
15    MR. FOOTE:  12:25.
16    MR. STETLER:  Never ask her again.
17    MS. FUMERTON:  Apparently not.  I don't
18  have numbers on my watch, that's the problem.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, I think
20  that the next set of documents that I would like for
21  Mr. Stetler to get for you to look at are BR --
22    MR. STETLER:  And lunch.
23    Q.  (BY MS. ST. PETER-GRIFFITH)  -- 02159 --
24    A.  So these aren't in here?
25    Q.  -- through 02287.  No, they are not.

Page 141

1    A.  Oh, okay.
2    MR. STETLER:  021 --
3    MS. ST. PETER-GRIFFITH:  51 through
4  0287.
5    Tara, if you want to flip through.  My
6  notes don't say anything --
7    MS. FUMERTON:  Okay.
8    MS. ST. PETER-GRIFFITH:  -- you know --
9    MS. FUMERTON:  I understand.
10    MS. ST. PETER-GRIFFITH:
11  -- incriminating, sticking my tongue out at Abbott or
12  anything.
13    THE WITNESS:  Does that go on the
14  official transcript?
15    THE REPORTER:  (Nodded head
16  affirmatively.)
17    MS. ST. PETER-GRIFFITH:  We are not off
18  the record?
19    MR. STETLER:  Item filed data element?
20    (Discussion off the record)
21    MR. STETLER:  Okay.  It looks like it's
22  actually two documents.
23    MS. ST. PETER-GRIFFITH:  Okay.
24    MR. STETLER:  Well, at least it's in two
25  parts.

36  (Pages 138 to 141)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 142

1          MS. ST. PETER-GRIFFITH: Okay. Well,
2    that --
3          MR. STETLER: It's two things.
4          MS. ST. PETER-GRIFFITH: It's tough for
5    me to tell from the copies.
6          MR. STETLER: Right. Exactly.
7          MS. ST. PETER-GRIFFITH: Which is part
8    of the reason why I wanted to work with the
9    originals --
10          MR. STETLER: No, that's fine.
11          MS. ST. PETER-GRIFFITH: -- so that we
12    could --
13          MR. STETLER: Are we done with this guy?
14          MS. ST. PETER-GRIFFITH: Yes.
15     A.  (Witness reviewing document). Okay. I'm
16    fine.
17     Q.  (BY MS. ST. PETER-GRIFFITH) Sir, that first
18    document that you have in front of you, can you
19    identify the -- the Bates numbers on the pages?
20     A.  First page is BR 002151 and it goes
21    through -- apparently in sequence through BR 02186.
22     Q.  Sir, do you know what this document is?
23     A.  It is a listing of data elements -- well, the
24    beginning, at least, is a listing of data elements
25    in -- or at least a partial listing of data elements

Page 143

1    in an item file that would have been part of the CHIP
2    system. There's some sort of item file procedure here
3    which -- which was written by somebody about, I guess,
4    how to load data in it. Something about standard
5    naming conventions. And then there are some examples
6    of screens.
7          Well, there's a letter here from David
8    Brincks that has to do with the subject, I guess, of
9    maintaining the item file. And there are some
10    examples of screen prints from the CHIP system of some
11    of the data in an item file that could have been real
12    or could have been made up. I'm not sure.
13          And so in its totality it is some of the
14    information that was used by the internal staff at
15    Abbott. And by "internal" we probably have to look at
16    this more, but basically by the Abbott internal staff
17    for maintaining the item file on CHIP. Or item files
18    is a better way to say it.
19     Q.  Obviously you've seen this document before
20    since it was one of the documents that you maintained
21    and took with you when you left Abbott; is that
22    accurate?
23     A.  Yes.
24     Q.  Okay. Sir, did you use this document
25    yourself in the context of your employment with the

Page 144

1    Home Infusion reimbursement department?
2     A.  I don't recall if I used this when I was --
3    as a reimbursement supervisor. I definitely would
4    have used this later on, at least portions of it, when
5    I was the product manager, manager of client services.
6     Q.  So you're -- so you're familiar with the
7    concepts raised in this document?
8     A.  Some of them. We'd have to -- you'd have to
9    ask me specifics.
10     Q.  We'll get into specifics.
11     A.  Okay.
12     Q.  But I just -- in general are you familiar
13    with the concepts?
14     A.  In general I would say I am.
15     Q.  And you would use this information in the
16    context of your advising clients concerning the CHIP
17    system; is that fair?
18     A.  Do I have specific recollection of that? No.
19    Would I have been involved in that? Probably.
20     Q.  Were you involved in the creation of this
21    document? And I would just point your attention at
22    the bottom beginning on the second page it says,
23    "Draft document," and then there's a date 10/12/99.
24     A.  Yeah. You know, I'm sorry, I may have been
25    involved in portions of it, I may not have been. It's

Page 145

1    been too long ago.
2     Q.  Do you know --
3     A.  That's the best I can say.
4     Q.  Do you know which portions you may have been
5    involved with?
6     A.  Well, I'm remembering something about track
7    infusion here and I'm wondering if I might have
8    written that.
9     Q.  Might have written which?
10     A.  Track infusion. But it's really too long
11    ago.
12     Q.  Okay. Sir, what was this document used for?
13     A.  You know, it's difficult for me to answer
14    that. Do I have specific recollections? Not really,
15    you know. So I'm giving you educated speculation if I
16    do it. Whether I should do that or not --
17     Q.  Well, I don't want you to speculate. I want
18    your recollection. If you don't recall, then you
19    don't recall.
20     A.  I really don't have specific recollections.
21     Q.  Okay. Sir, on the first page, see where it
22    says NDC number?
23     A.  Yes.
24     Q.  And there's -- there are three sentences
25    there.

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 146

1     A.  Uh-huh.
2     Q.  "Required for all drugs.  The NDC number is
3  used to pull AWP from the Redbook."
4     A.  Yes.
5     Q.  "Many payers require this information when
6  submitting claims."  Do you see that?
7     A.  Yes.
8     Q.  Which payers are being referenced there?
9     A.  Well, looking at it now, I'm not sure that's
10  really worded as best as it -- as well as it should.
11     Q.  Okay.
12     A.  As I had explained earlier, there were --
13  there are -- there were and still are two predominant
14  methods of how you bill.  You bill -- you submit a
15  claim at list price or you submit a claim at a
16  contractual discounted price, presumably discounted.
17         And for the drug portion of your claims,
18  AWP was important for either understanding what to
19  submit or understanding the difference between your
20  list price and what you expected to get.  And that's
21  how AWP was used in the CHIP system, for those two
22  purposes that I explained.
23         So looking at it now, this probably
24  would be better said that this field is important for
25  the reimbursement claiming process with many payers.

Page 147

1     Q.  Including Medicaid and Medicare?
2     A.  Yes.
3     Q.  How is it important?
4     A.  For Medicare and for Medicaid and for many
5  other payers at the time the reimbursement was -- for
6  drugs was going to be some sort of AWP-based formula
7  and that's how it was important.
8     Q.  And which payers required an AWP-based
9  formula?
10     A.  Which required you to submit your claims with
11  an AWP-based price on them, is that your question?
12     Q.  Yes.
13     A.  Not Medicare, not Medicaid, to the best of my
14  knowledge on Medicaid.  Again, there were 50 states.
15  And there would be some commercial health plans that
16  there would be contracts with that required the
17  provider to submit a claim with the -- contracted
18  agreed-upon price.
19         I had explained earlier that there were
20  cases where there would be individual case management
21  price agreements for a patient.  And, again, there
22  would be some payers that would require you to submit
23  those claims with that agreed-upon price.  And in the
24  case of drugs, that agreed-upon price would typically
25  be based upon some sort of AWP reimbursement.

Page 148

1     Q.  Okay.  Why would it be important to pull AWP
2  from the Redbook for purposes -- for reimbursement
3  purposes?
4     A.  As I had explained earlier, the Redbook was
5  the compendium source for the AWP data that was
6  integrated into the CHIP system and used for these
7  purpose of reimbursement.
8     Q.  The next item down says, "Unit of measure."
9  Do you see that?
10     A.  Yes.
11     Q.  What does that mean?
12     A.  Well, for all products, drugs and others, in
13  the computer system, in order to have it in your
14  inventory, your item file, you had to have some sort
15  of unit of measure.  If it was a pump, that unit of
16  measure would be each, one pump.  If it was a drug,
17  drugs are more complicated than that.  And so if it
18  was a solution, a unit of measure might be -- you see
19  mL here.  So it might be milliliters.  So you might
20  have a drug that was in a solution form in a 250-mil
21  bag.  If the drug was a powder, then the -- it would
22  be a weight measure and you see MG and gram, that sort
23  of thing.
24     Q.  The next item down says, "Current Contract
25  Cost."  Do you see that?

Page 149

1     A.  Yes.
2     Q.  And was that a reimbursement-related field
3  within the CHIP system?
4     A.  Not really.  The reimbursement department, at
5  least at levels of my operations, you know -- frankly,
6  we weren't concerned with cost in any particular way.
7  We didn't pay much attention to it.  This field, from
8  the description of it, was a potential reporting field
9  that could be used by others, but it was beyond -- it
10  was out of my league.
11     Q.  Who would it be used by?
12     A.  The -- it would, I think, be used for --
13  well, it could be -- if it was a client relationship,
14  it could be used -- let me read it again.
15     Q.  Sure.
16     A.  Sorry.
17     Q.  Take your time.
18     A.  (Witness reviewing document).  Okay.  The
19  purchase price ...  You know, I guess it could be used
20  for management reporting for those that were
21  responsible with profit and loss of these businesses.
22  If it was an Abbott only portion, then it would be
23  used by those in Abbott's Home Infusion management
24  that were responsible for that.  If it was a client,
25  it would be used by them.

Page 150

1    Q.  Do you know why it's included as a
2  reimbursement-related field, item file data element?
3    A.  Someone decided to put it there.
4    Q.  Is it fair to say that contract cost was not
5  something that the reimbursement department of Home
6  Infusion concerned itself with?
7    A.  Yes.
8    Q.  "Current Factory Cost," what does that mean?
9    A.  (Witness reviewing document).  The -- the --
10  the CHIP system was originally developed before I
11  came.  I don't understand all aspects of the specs at
12  that time.
13       On surface this would appear to be a
14  reference to -- for an Abbott product, a cost that
15  Abbott had assigned through the accountants, I guess,
16  for the cost of the product coming from the product
17  providing side of Abbott into the Home Infusion
18  business unit.
19       I don't know that clients would have
20  ever used this field for their businesses.  If they
21  did, you know, there were ways -- I mean, you could
22  use fields for other purposes in the CHIP system and
23  maybe generate a management report that satisfied your
24  needs as a manager responsible for P&L.  They might
25  have used it in that way.

Page 151

1       But I think that's the history of this
2  field.  It's not something I was involved in.
3    Q.  Okay.  Would it have been -- would the
4  current factory costs have been anything that
5  concerned the reimbursement department of Home
6  Infusion?
7    A.  Well, there's a reference in here, something
8  about a price schedule being -- what did I just read
9  that?  "Field referenced when a price schedule is
10  developed to price an item at acquisition cost."  So
11  if you read that you would say that, oh, there must
12  have been some potential for price agreements from the
13  payer to the provider based upon acquisition cost.  I
14  don't think that was done very much.  I don't have a
15  lot of recollection of that.
16    Q.  Would that ever have been done in a Medicare
17  or Medicaid reimbursement context?
18    A.  No.
19    Q.  Do you see then "Price" below that?
20    A.  I mean, I don't think so anyway.  I'm sorry?
21    Q.  Down at the bottom.  The very last item says
22  "Price."  Do you see that?
23    A.  Yes.
24    Q.  And it says, "Displays ... list price when
25  entered in screen two."  Do you see that?

Page 152

1    A.  Yes.
2    Q.  What does that mean?
3    A.  That would be a reference to what I was
4  talking about earlier.  That would be the list price
5  set forth the item by either Abbott Home Infusion
6  Services, if it was Abbott Home Infusion Services
7  business, or if it was a client business, it would
8  be -- they would ultimately be responsible for it,
9  whether their person actually put it in or whether an
10  Abbott person put it in there.  That would depend upon
11  the relationship.
12    Q.  Sir, if you could flip to the next page,
13  which is 2152.
14    A.  Uh-huh.  (Witness reviewing document).  Okay.
15    Q.  Sir, do you see where it says "Primary Drug"
16  at the top?
17    A.  Yes.
18    Q.  What does that mean?
19    A.  Reimbursement that was executed by Abbott at
20  that time for claims for home infusion therapy that
21  were submitted.  The way we operated was that there
22  was one drug of a therapy that was considered to be
23  the drug that was used for the pricing for the claim
24  submitted.  So if you had multiple drugs involved, for
25  example, in a compounded drug where you might have --

Page 153

1  in this example the first one I see is Vancomycin.
2  Vancomycin may be compounded into another drug which
3  would be a diluent of some sort.  The primary drug
4  would be the Vancomycin as opposed to the diluent, a
5  solution.  So -- so, essentially, it's what is the --
6  what is the most important drug clinically of the
7  therapy is the way I would describe it.
8    Q.  And what does it mean when in that first
9  sentence it says, the flag determines whether or not
10  an item's AWP will be included in the price schedule
11  calculations that involve a percentage of AWP?
12    A.  The CHIP system had an automated method of
13  pricing claims based upon contracted or case managed
14  agreements when there were those types of agreements
15  that would be used for producing a claim when the
16  claim had to be billed at the contracted price.  And
17  that automated system in the CHIP system of doing it
18  was called price schedules.  And that is what this is
19  referring to.
20       So, therefore, this flag would be set in
21  the item file to flag what would be considered to be a
22  primary drug for the purpose of developing that
23  AWP-based price --
24    Q.  When you say --
25    A.  -- for that purpose.

39 (Pages 150 to 153)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 154

1    Q.  When you say "contracted price," what do you
2  mean?
3    A.  A price that would be contracted by either
4  written contractual agreement between a health plan
5  and a provider or a price that was agreed to on an
6  individual patient case basis by the health plan and
7  the provider.
8    Q.  Does this apply to situations where Medicaid
9  or Medicare is reimbursing?
10    A.  No.
11    Q.  Sir, down at the bottom it says, "Draft
12  Document 10/12/99."  Do you see that?
13    A.  Yes.
14    Q.  Is -- have you ever seen a final version of
15  this document?
16    A.  Not that I recall.
17    Q.  Okay.  Do you know why you retained --
18    A.  Did I -- did I submit one?
19    Q.  Well, do you know why you retained a draft
20  document?
21    A.  This was something that was probably a work
22  in progress -- process and it was never completed
23  would be my best information I could give you.
24    Q.  Did you use it and rely upon it?
25    A.  When I was involved -- primarily when I was

Page 155

1  involved in the -- as manager of client services, yes,
2  I would rely on this.
3    Q.  Okay.  And you'd rely upon it for providing
4  advice to the CHIPs contractors, for the CHIPs
5  clients?
6    A.  The CHIP clients.
7    Q.  Or licensees?
8    A.  And also the -- the reimbursement staff
9  within Abbott, yes.
10    Q.  Do you know whether the other reimbursement
11  director would utilize this information?
12    A.  Who do you mean by the other reimbursement
13  director?
14    Q.  Well, there were two when you were there.
15    A.  Well, this document was -- this date, at
16  least, is after -- is well -- is after I was
17  reimbursement supervisor.
18    Q.  Okay.
19    A.  So ...
20    Q.  Do you know whether the reimbursement
21  supervisors would utilize this document?
22    A.  I would think they might, yes.
23        MS. ST. PETER-GRIFFITH:  Is now a good
24  time to take a break?
25        MR. STETLER:  Whatever is good for you.

Page 156

1        MS. ST. PETER-GRIFFITH:  Yeah, why don't
2  we at this time.
3        Is that a good time for you, sir?
4        THE WITNESS:  Sure.
5        THE VIDEOGRAPHER:  We are off the record
6  at 12:37 p.m. at the end of Tape Number 3.
7        (Lunch recess from 12:37 to 1:35)
8        THE VIDEOGRAPHER:  Please stand by.  We
9  are back on the record at 1:35 p.m. with the beginning
10  of Tape Number 4.
11    Q.  (BY MS. ST. PETER-GRIFFITH) Mr. Rodman,
12  we've taken a lunch break and I just wanted to ask
13  you, upon reflecting during the lunch break, are there
14  any answers that you've previously given in your
15  testimony here today that you would either like to
16  change or amplify?
17    A.  There is one.  I think that I mistakenly said
18  that Medicaids would be billed at list price.  There's
19  50 states.  They have different rules.  I have a
20  pretty hazy recollection that in some of those states
21  that the claims submitted were to be billed where --
22  or at least somewhere in the process of maybe getting
23  authorizations that a cost was to be given to the
24  states for the purpose of the billing.  And so I think
25  I answered that incorrectly.

Page 157

1    Q.  Okay.  Any other answers that you would like
2  to -- that you've reflected upon that you want to
3  either change or amplify?
4    A.  No, not at this time.
5    Q.  If there is at any time, just speak up and --
6  and we're happy to put that on the record.  Okay?
7    A.  Okay.  Uh-huh.
8    Q.  Sir, earlier today in your testimony you --
9  you had made a statement regarding providers paying
10  deep discounts off AWP.  Do you recall that?
11    A.  I don't think I said deep discounts.
12    Q.  You don't?
13    A.  I don't recall that.
14    Q.  Okay.  Do you recall providers -- whether
15  providers were paid at deep discounts off AWP?
16    A.  What's deep?  I mean, I -- I may have said
17  that these days, at least, that the payment is
18  typically a discount off of AWP --
19    Q.  Okay.
20    A.  -- for AWP-based reimbursement.
21    Q.  And what do you base that upon?
22    A.  You know, just at this point generally
23  talking to some of our NHI members and occasionally
24  discussing with them, which I can't pass on to others
25  that would be an issue, but to get a sense of the

40  (Pages 154 to 157)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 158

1  marketplace, what's happening, as well as talking to
2  them about how some government payers reimburse, which
3  isn't an issue because that's public knowledge.
4      Q.  Is it fair to say that you learned this
5  information after you left Abbott?
6      A.  Yes.
7      Q.  Sir, if you could go back to the document
8  that we were looking at prior to the break.  And I
9  would like for you to look at BR 02153.  Do you see
10 that?
11     A.  Yes.
12     Q.  Where it says "Screen Two Fields."  What does
13 that mean at the top, "Screen Two Fields"?
14     A.  I believe that would mean as the -- this data
15 would be displayed on a CHIP system computer screen,
16 that there would be screen one of the item file,
17 screen two of the item file and probably other
18 screens, also.
19     Q.  Okay.  Do you see where it says "Price"?  If
20 you could just --
21     A.  Yes.
22     Q.  -- read that paragraph and tell me what your
23 understanding is.
24     A.  Okay.  Reading the paragraph.  "The full list
25 price charged for the item.  Also known as U&C price.

Page 159

1  This information is captured during the invoicing
2  process and is reported in the Gross Sales Report.  If
3  requested, it may be reported" on "the Page 2 of
4  claims in addition to the discounted price."
5      Q.  Okay.  Let's break that down.  What is --
6  what does "The full list price charged for the item,"
7  what does that mean?
8      A.  That's exactly what I had explained earlier,
9  that that would be a list price set by Abbott Home
10 Infusion Services for its business or by the -- or by
11 the client for their businesses as I provided in more
12 detail earlier.  That's what that would be.
13     Q.  That's what that references.
14     A.  Yes.
15     Q.  Okay.  And what does "Also known as U&C
16 price" mean?
17     A.  Usual and customary.  I had used that term
18 earlier.  I, at least, used the two terms to mean the
19 same thing.
20     Q.  Okay.  Was that commonplace in Abbott, that
21 the two terms meant the same thing?
22     A.  Yes.
23     Q.  How is usual and customary price calculated?
24     A.  As I, again, answered earlier, I have no
25 knowledge of how that was done.  I wasn't involved

Page 160

1  with that function.
2      Q.  Okay.  And --
3      A.  With the exception of, perhaps, there seemed
4  to be some indication of that on that Lupron letter
5  that you just showed me.
6      Q.  Okay.
7      A.  But beyond that, I wasn't involved.
8      Q.  The next sentence reads, "This information is
9  captured during the invoicing process and is reported
10 in the Gross Sales Report."  Do you know what that
11 sentence means?
12     A.  Yeah I do.  That -- that -- that's an
13 accounting part of the system that had to do with when
14 a sale would be booked, which is different from
15 submitting a claim to a payer, and that was a function
16 called invoicing.  A gross sales report was -- was a
17 report that showed your sales.
18     Q.  Okay.  When would the -- when would the
19 information or the sale be booked under the -- under
20 the CHIP system?
21     A.  Usually the day after it was delivered.
22     Q.  Okay.  Then the next sentence is, "If
23 requested, it may be reported on Page 2 of claims in
24 addition" of "the discounted price."  Do you see that?
25     A.  Yes.

Page 161

1      Q.  What does that mean?
2      A.  Page 2, we had seen an example of that in
3  that earlier DMERC training document where I had
4  referred to it as an itemized list of detail coming
5  out of the CHIP system.  That was also called a Page
6  2.
7          At one time, and, really, it was true
8  when I started there, generally when a claim was
9  submitted to a payer on a 1500 form, you would also
10 provide them with that itemized list of details, which
11 is where the term Page 2 came from, i.e., Page 2 of
12 the claim.
13         It may be reported on the Page 2 of
14 claims in addition to the discounted price.  The Page
15 2 could report both the list price and the contracted
16 price, if there was a contracted price that was
17 different on them, and that's what that means.
18     Q.  And what does that mean when it says, "In
19 addition to the discounted price," what's the --
20     A.  Contracted price.
21     Q.  Okay.  "Valid List Price," what does that
22 mean?  If you could just read that paragraph to
23 yourself and then I'm going to ask you questions.
24     A.  (Witness reviewing document).  Okay.
25     Q.  And what does -- what does -- what does

41 (Pages 158 to 161)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 162

1  "Valid List Price" mean?
2      A.  The system was designed to not necessarily
3  specify who, when, where would be putting in that list
4  price into the item file in terms of a time sequence,
5  in terms of responsibility.  It could have been done
6  by an Abbott person, it could have been done by a
7  client person depending on the nature of the
8  relationship.  And this flag was part of that function
9  where when the list price was put in the system, the
10  individual doing that was supposed to take some action
11  on the CHIP system, I guess, to make this field a yes,
12  which kind of indicated whoever that individual was,
13  "Yes, I set this price and, therefore, use it."
14      Q.  Okay.
15      A.  So it was sort of an edit protection.
16      Q.  Do you know who would be responsible for
17  inputting that information and putting the Y?
18      A.  I believe that would have been done for the
19  Abbott business by -- within the contract marketing
20  department.
21      Q.  Of Home Infusion?
22      A.  Of Home Infusion.
23      Q.  Okay.
24      A.  And for the clients, that would be dependent
25  upon the relationship with the client as to who would

Page 163

1  be doing it as to either Abbott -- and if it was
2  Abbott, it would typically be done in the contract
3  marketing department.  But if it was the client, I
4  don't really have knowledge of who would be doing it
5  there.
6      Q.  If it was done by Abbott on behalf of a
7  client in the contract marketing department, would --
8  who would provide the information?  Would the client
9  provide the information, the list price information
10  for input?
11      A.  The best of my understanding was that that
12  would be based upon parameters of how to set up prices
13  that were ultimately agreed to by the client.  They --
14  they were the ones that directed on how to do it.  And
15  working within those parameters, if an Abbott employee
16  was doing it, they would be using whatever those
17  parameters were.
18      Q.  Okay.  And the next paragraph concerns "Use
19  Price Ranges."  If you could review that to yourself.
20      A.  (Witness reviewing document).  Okay.
21      Q.  And what does that -- what is -- or what are
22  use price ranges, sir?
23      A.  My recollection is that was a function of
24  pricing a claim as it would appear on that Page 2.
25  For adding on an additional price to the claim based

Page 164

1  upon the -- the specific dosage -- dosage, it says
2  here, used -- dosage of the drug used in the compound.
3  That would be the primary drug, as I had explained
4  earlier.
5      Q.  Okay.
6      A.  My recollection of that is that the ultimate
7  outcome is that there would be -- kind of like an
8  added line to the Page 2 that would have some charges
9  on it that would be list charges and that's what that
10  field was used for.
11      Q.  Okay.  "F11 Price Ranges."  Did I say that
12  correctly?  Do you see that?
13      A.  Yes.
14      Q.  Okay.  If you could just read that paragraph,
15  please, to yourself.
16      A.  (Witness reviewing document).  Okay.
17      Q.  Sir, what are F11 price ranges?
18      A.  Well, this -- this is really the same subject
19  as the previous item.  It was just part of the
20  implementation of that pricing mechanism in the
21  system.  F11 actually stands for function key 11.
22      Q.  Okay.  And would you have to hit function key
23  11 to reach a particular screen or field on screen
24  two?
25      A.  If you were to want to look to see how it was

Page 165

1  set up, what these prices that were in there, you
2  would hit F11 to see that.  If you had -- I believe
3  this was a field that would be secured, so only
4  certain authorized individuals could actually change
5  those prices.  And so I -- I -- to the best of my
6  recollection, if you happen to have that security, you
7  could probably change those prices.
8      Q.  And do you know who those individuals were?
9      A.  Do I have specific recollection?  No.  In
10  general, they would have been the same people that
11  were responsible for pricing that I talked about
12  earlier.
13      Q.  Okay.  And, sir, average wholesale price or
14  "Avg Wholesale Price," do you see that?
15      A.  Yes.
16      Q.  If you could read that paragraph, please, and
17  I will ask you some questions about it.
18      A.  (Witness reviewing document).  Okay.
19      Q.  You see the first sentence says, "The average
20  wholesale price of the item"?
21      A.  Yes.
22      Q.  Okay.  And then the next sentence --
23  actually, the first full sentence is, "This
24  information is automatically captured from Redbook
25  when the NDC number field is completed."  Do you see

42 (Pages 162 to 165)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 166

1  that?
2      A.  Yes.
3      Q.  What does that mean?
4      A.  For drugs and for enteral formula, in the
5  item file there would be a National Drug Code number
6  to identify the product, the drug or enteral product.
7  And from the Redbook data source there would be an
8  average wholesale price that could be obtained for it
9  and integrated into the CHIP system.  And I talked
10  about that earlier and that's what this is referring
11  to.
12      Q.  Okay.  The next sentence says, "A user is
13  able to change the information pulled from ...
14  Redbook, however, it would be replaced with Redbook
15  figures during quarterly Redbook updates."  Do you see
16  that?
17      A.  Yes.
18      Q.  What does that mean?
19      A.  That means that we would have had a mechanism
20  in that CHIP system for a user, probably an authorized
21  user with the proper security go in and change an AWP
22  in the CHIP system.
23      Q.  Okay.  Would that -- why would somebody do
24  that?
25      A.  The only reason that I can recall is that

Page 167

1  someone would have detected that there was some fairly
2  apparent data problem in the average sales price
3  reported by the Redbook source and that it needed to
4  be fixed somehow.
5      Q.  Okay.  When you say -- did you just say
6  average sales price, is that what you meant?
7      A.  If I did, I meant average wholesale price.
8      Q.  Okay.
9      A.  Sorry.
10      Q.  And, again, who would be responsible for
11  inputting those changes?
12      A.  Generally I think the contract marketing
13  department would be -- these were rare exceptions when
14  they would occur.  I think that -- did I mention
15  earlier, you know, if I didn't, I mean, once in a blue
16  moon -- this happened when I was a client services
17  manager.  Someone would report to me that the AWP from
18  this source is totally different than the AWP from
19  another source and is something wrong.  And that might
20  lead to try and -- you know, try and understand what
21  the issue was and make some appropriate change.  You
22  know, whether -- I really don't recall who had the
23  security to do that.  I would suspect that at least
24  during the days that I was reimbursement supervisor it
25  was in the contract marketing area.

Page 168

1      Q.  Do you recall --
2      A.  Or at the client.
3      Q.  Okay.  Do you recall whether somebody -- do
4  you recall ever being involved in a change such as
5  this, described in that --
6      A.  Yeah.  I just said, I think there were a
7  couple of, I mean, really infrequent instances where
8  somebody would have contacted me to try and look at
9  something and probably when I was manager of client
10  services.  It could have happened earlier.
11      Q.  Do you remember what those changes were?
12      A.  No.
13      Q.  The next sentence says, "The value in" the
14  "field is used to calculate price schedule rates when
15  they are based on a percentage of AWP."  Do you see
16  that?
17      A.  Yes, uh-huh.
18      Q.  What does that mean?
19      A.  Price scheduling was the CHIP mechanism for
20  automatic pricing for submission of claims.  When
21  claims needed to be submitted at a contracted rate
22  that also happened to be based on a percentage of AWP,
23  the CHIP system could do that through the price
24  schedules that were set up.
25      Q.  And what claims would be submitted based upon

Page 169

1  a percentage of AWP?
2      A.  To the best of my recollection, claims that
3  would be submitted to contracted commercial insurance
4  companies for -- some of them, not all of them, for
5  situations where there was a case management
6  individual patient case agreement.
7          And -- and, you know, given the
8  clarification that I had just said earlier about
9  Medicaid, I mean, there may have been some occurrences
10  where Medicaids had to be billed on a -- on a
11  percentage of AWP as opposed to full list charges.  I
12  really don't recall that, but it's possible.
13      Q.  Okay.
14      A.  But I will tell you that in general the
15  billing for Medicaid was very manual because of very
16  difficult billing processes, not well designed for
17  home infusion with Medicaid, and so not all of it
18  would be done --
19      Q.  What about --
20      A.  -- directly through the CHIP system either.
21      Q.  What about for Medicare?
22      A.  Medicare was always billed at list price to
23  the best of my knowledge.
24      Q.  Was always billed at what?
25      A.  List price, to the best of my knowledge.

43 (Pages 166 to 169)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 170

1    Q.  And if you could read the next one.  It says,
2  "Reimb Description."  I assume that means
3  reimbursement description?
4    A.  Yes.
5    Q.  Okay.
6    A.  (Witness reviewing document).  Okay.
7    Q.  Sir, can you explain what reimbursement
8  description means?
9    A.  It was a free form field, a text field, as it
10  says, that could be maintained on the item file and it
11  would print after the listing of an item on the Page 2
12  of a claim printout.  There's a suggestion in here as
13  to how to use it, which is to clarify for the health
14  plan that was processing the claim what the billing
15  units were and that's what it is.
16    Q.  If you could turn to the next page.
17  "Procedure Cd/Modifier."  Do you see that?  If you
18  could just review that paragraph.
19    A.  (Witness reviewing document).  Yes.
20    Q.  Sir, what is a procedure cd/modifier?
21    A.  "Procedure Cd" stands for procedure code.
22  That would be the HCPCS codes that we talked about
23  earlier.  There is also a place on a 1500 claim form,
24  or the equivalent of electronic, to what's called a
25  modify your code billing using something called a

Page 171

1  modifier and that's what modifier stands for.
2    Q.  And would you have occasion to use that
3  modifier code when you were in the reimbursement --
4  Home Infusion reimbursement department?
5    A.  To -- you would have occasion to bill claims
6  with a modifier on them, one or more modifiers, yes.
7    Q.  Okay.  When would you do that?
8    A.  You know, one example would be in Medicare
9  for a pump -- these types of things change over time.
10    Q.  Okay.
11    A.  So -- but you -- for -- for a -- for a pump,
12  which was durable medical equipment in Medicare Part B
13  terminology, the patient typically would be renting
14  the pump and there would be -- if I recall correctly,
15  you had to indicate that this was my first month of
16  billing and put a modifier in there, something like RR
17  to indicate rental.  And I don't remember these
18  details, so I'm just sort of giving you an idea.  But
19  you had to -- you had to notify the patient in like
20  the tenth or eleventh month that they had the option
21  to purchase a pump after the fifteenth month if they
22  were in service that long and you had to put a
23  modifier on that claim to indicate to the DMERC that
24  you had, in fact, notified the patient.  Stuff like
25  that.

Page 172

1    Q.  Okay.  How were patients supplied these pumps
2  on a rental basis?
3    A.  What are you looking for?
4    Q.  Well, let me clarify.  You indicated that
5  patients would -- would rent the pumps?
6    A.  Typically, yes.
7    Q.  How would that -- how would that occur?
8    A.  Well, the patients -- the home infusion
9  therapy pharmacy was responsible for delivering the
10  pump as well as -- between patients assuring the
11  quality and also assuring the quality of the operation
12  of the pump during the whole episode of the therapy.
13  So a pump would be delivered by the home infusion
14  therapy pharmacy to the patient.
15        What was the rest of your question?
16    Q.  Okay.  Let me -- let me clarify my question.
17  Would there be a rental agreement between the patient
18  and the provider?
19        MS. FUMERTON:  Objection, form.
20    A.  No, not -- not -- certainly not in writing.
21  Not that I can recall ever.
22    Q.  (BY MS. ST. PETER-GRIFFITH)  How would the
23  rental relationship be documented?
24    A.  Really on the claim.
25    Q.  Just on the claim?

Page 173

1    A.  There would be a rental fee.
2    Q.  Okay.  And would Abbott ever provide to its
3  customers pumps free of charge?
4        MS. FUMERTON:  Objection to form.
5    A.  I don't have specific recollection of how
6  that was done.
7    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Do you
8  know how much Abbott charged to provide pumps to its
9  customers?
10    A.  No.
11    Q.  Do you know whether Abbott leased pumps to
12  its customers?
13    A.  I don't have specific recollection of that.
14    Q.  In the contracts between Abbott Home Infusion
15  and its consignment partners or its -- its partner,
16  its infusion partners, whereby Abbott would provide
17  product on a consignment basis, would Abbott -- do you
18  know whether Abbott would provide pumps free of
19  charge?
20    A.  I just don't have specific recollection.
21    Q.  The next item says "Price Group."  Do you see
22  that, sir?  On this page, I'm sorry.
23    A.  Yes.
24    Q.  Page 2154.
25    A.  Uh-huh.

44  (Pages 170 to 173)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 174

1    Q.   Can you just read that to yourself?
2    A.   (Witness reviewing document).  Okay.
3    Q.   Sir, what does price group mean?
4    A.   My recollection is it was a way to categorize
5  products for purposes of -- of doing exactly what it
6  says here.  A -- this automated price scheduling
7  feature, could use it to -- you know.  Price group
8  equals to do this when it was pricing a product on a
9  claim.
10        And the other thing it talks about is to
11  do a mass price change, which would mean that if price
12  group equals two, do this to this change to do a
13  change in the list pricing on the item file that we
14  talked about.  So that's what it would be.
15    Q.   Is this a feature that would be used often?
16    A.   The mass price change would not be done
17  often.
18    Q.   Okay.  What about the individual price
19  changes?
20    A.   Again, that was out of my area of
21  responsibility or specific knowledge and I think
22  that -- I mean, I just -- I don't have -- I'm not sure
23  I ever had that knowledge.
24    Q.   Okay.  The next item says "Units/Each."  Do
25  you see that?

Page 175

1    A.   Yes.
2    Q.   Does that mean sort of what it says, the
3  number of units or number of items used?
4    A.   In order to bill Medicare, as it says here
5  you -- actually, rather than to bill them on like cans
6  or on milliliters, you had to bill them on calories of
7  nutrients provided and this field here was used for
8  the system to automatically compute that.
9    Q.   So was this just for enteral products?
10    A.   Yes.
11    Q.   Okay.  So the Ross-type nutrition products
12  then?
13    A.   There's a possibility it would have been
14  other manufacturers.  I'm not sure.  But yes.
15    Q.   Okay.  What about for glucose products?
16    A.   I don't know.
17    Q.   Okay.  And then "Calories/Unit."  Do you see
18  that?
19    A.   Yes.
20    Q.   This is, again, another field for enteral
21  products?
22    A.   Yes.
23    Q.   And what would that mean, generally?
24    A.   It was used for the same purpose.
25    Q.   Okay.  If you could turn to 2155, please,

Page 176

1  which says "Item File Procedure."
2    A.   Uh-huh.
3    Q.   Sir, do you see at the top it's a discussion
4  about adding new item files?
5    A.   Uh-huh.
6    Q.   And then the next paragraph down it says --
7  starts, "When adding a new list number to the Item
8  File, the rule of thumb is."  Do you see that?
9    A.   Uh-huh.
10    Q.   And it says, "Drugs:  U&C is based" upon "AWP
11  so it is necessary to have" the "correct NDC entered
12  into" the "CHIP system."
13    A.   Uh-huh.
14    Q.   What does that mean?
15    A.   I think what that means is what we talked
16  about earlier, that -- oh, wait a minute.  Let me back
17  up.  I think that is indicating that the setting of
18  the U&C, also called list price, for a drug on the
19  CHIP system would be based upon AWP, as it says.
20    Q.   Okay.  Would that be true just for Abbott or
21  would that also be true for Abbott's customers?
22        MS. FUMERTON:  Objection, form.
23    A.   Well, I think that would be true for any
24  drugs that were on the system for how that was being
25  done in the CHIP system.  This is an area of contract

Page 177

1  marketing that I was never involved in --
2    Q.   (BY MS. ST. PETER-GRIFFITH)  Okay.  That --
3    A.   -- so I'm -- you know, maybe I'm going
4  further than I should be saying at this point
5  because -- ask them.
6    Q.   You're -- you're anticipating my next
7  question, sir.
8    A.   Okay.
9    Q.   Okay.  Did you have any involvement with
10  adding new list numbers to the item file?
11    A.   No, not directly.  I mean, I had some
12  involvement later as manager of client services and
13  training clients and I would do various things in the
14  CHIP system, so I would have had some involvement
15  there.
16    Q.   Well, when you had some involvement, then,
17  in -- in training clients, what would you train them
18  with regard to this particular subject matter
19  concerning adding new list items?
20    A.   I doubt that I would have trained them
21  anything, but I have no specific recollection.
22    Q.   Okay.  The next item down says, "Supplies:
23  U&C based on acquisition cost so this information must
24  be provided."
25    A.   Uh-huh.

45  (Pages 174 to 177)

Page 178

1    Q.  What does that mean?
2    A.  To be honest, I don't know.
3    Q.  Do you know why the U&C for drugs was not
4    also based upon acquisition cost?
5    A.  No, I don't.
6    Q.  Do you recall any discussion at Abbott
7    about -- about the difference between drugs -- U&Cs
8    for drugs being based upon AWP as compared to
9    supplies, which was based upon --
10   A.  I don't recall any discussion I was ever
11   involved in.
12   Q.  Okay.  Sir, if you could flip to Page 2157,
13   please.
14   A.  (Witness complies).
15   Q.  If you look down, it says, in the middle of
16   the page, "Abbott Item File Standardized Naming
17   Conventions."  Do you see that?
18   A.  Uh-huh.
19   Q.  And then it says, "Drugs (Both Compounded and
20   Non-Compounded)."
21   A.  Uh-huh.
22   Q.  And then Item 1, "All drugs will be entered
23   generically, with few exceptions."
24   A.  Uh-huh.
25   Q.  "No abbreviations should be used unless it is

Page 179

1    an actual part of the generic name."  Do you see that?
2    A.  Uh-huh.
3    Q.  What does that mean?
4    A.  In the item file you had to name your product
5    because it was important when someone was looking at
6    the item file, and perhaps on these Page 2s, and other
7    places, to understand what the product was that had a
8    number assigned to it.  So this would be the product
9    description and this was indicating just a convention
10   of how to name it.
11   Q.  Okay.  Sir, if I could have you flip to
12   BR 02163.
13   A.  Uh-huh.
14   Q.  And is this a memorandum?
15   A.  It is.
16   Q.  Okay.  And who's it from?
17   A.  Dave Brincks.
18   Q.  Dated what?
19   A.  David E. Brincks.
20   Q.  I'm sorry, no.  Dated -- what's the date?
21   A.  Oh, dated.  September 6, 1994.
22   Q.  And who is it to?
23   A.  To Mike Sellers.
24   Q.  And, sir, if you could review this document.
25   A.  (Witness reviewing document).  Well, you

Page 180

1    remember earlier this morning I talked -- I remembered
2    a project that I was on.
3    Q.  Yeah.
4    A.  I believe this was it.
5    Q.  Does this refresh your recollection
6    concerning that project, sir?
7    A.  Well, a little bit.
8    Q.  Okay.
9    A.  Yeah.
10   Q.  Sir, this is --
11   A.  It was a long time ago.
12   Q.  -- from Dave Brincks to Mike Sellers and it
13   says, "Item File/Product Groups."  Do you see that?
14   A.  Yes.
15   Q.  On the re line.
16   A.  Yes.
17   Q.  Okay.  And it says, "Shellie Bronson, Bruce
18   Rodman," which is you, right?
19   A.  Uh-huh.
20   Q.  "And Lynn Leone are working as a team to
21   update the System 50 item file."
22   A.  Yes.
23   Q.  What does that mean?
24   A.  Updating the item file is probably fairly
25   obvious, so I think your question may have to do with

Page 181

1    the System 50.
2    Q.  Yes.  I'm sorry, yes.
3    A.  The CHIP system had the capability to
4    have totally different databases for different clients
5    and -- so you could have for one client an item master
6    that -- different sets of products, different prices,
7    different, et cetera, than for a second client or a
8    third client.  And then you had a database for
9    Abbott's business that was conducted in Abbott's name
10   and that's what was called the System 50.
11   Q.  Okay.  So this concerned Abbott claims then
12   or claims for Abbott products?
13   A.  It definitely would have concerned -- it
14   would have impacted claims that Abbott submitted in
15   their name.  My recollection is that there was a
16   capability to submit claims in other people's names
17   from that system and that's a hazy recollection.
18   Q.  Okay.  Do you remember which clients you
19   would potentially have been able to submit claims
20   from?
21   A.  It's too long ago.
22   Q.  Okay.  Would it have been the reimbursement
23   clients, the ones who contracted for reimbursement
24   services?
25   A.  Yes.

46 (Pages 178 to 181)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 182

1    Q.  And if you read down -- well, the next
2  sentence says that you stayed -- you were staying in
3  the evenings to work on it and you were planning on --
4    A.  See, that was why I remember this.
5    Q.  And then the next paragraph describes a
6  series of seven different enumerated items which
7  indicate how the files are being updated by group.  Do
8  you see that?
9    A.  Uh-huh.
10    Q.  Product description under Item 1.  "Make all
11  descriptions consistent and easily understood by all
12  users."
13    A.  Uh-huh.
14    Q.  Why were you doing that?
15    A.  You know, the CHIP system was a very
16  operational system.  It was used by a lot of people
17  for different functions.  It made some sense that
18  ranging from pharmacy to reimbursement, another area
19  that people that could understand through some
20  consistency of what they were seeing in the CHIP
21  system, and that's why this was done.
22    Q.  The next item says, "NDC's -- updating all NDC
23  numbers to be sure they are correct for use when AWP
24  matches NDC numbers."  Do you see that?
25    A.  Uh-huh.

Page 183

1    Q.  What does that mean?
2    A.  Drugs were to be identified on the system
3  with NDC numbers, and as we talked about earlier,
4  there were automated capabilities in the CHIP system
5  to use AWP-based data fields to either price claims or
6  at least price the reporting of expected collections.
7  And this had to do with having the data as accurate as
8  possible.
9    Q.  The next item, Number 3, says, "Creating
10  product groups for all products.  This can be used to
11  change prices by product group or change procedure
12  codes for ... override file."  Do you see that?
13    A.  Yes.
14    Q.  Does -- does this means what it sounds like,
15  that not all products were within particular groups
16  and that you grouped all the products?
17    A.  Probably.
18    Q.  Do you have a recollection of that?
19    A.  Not -- not -- no, really not specifically.
20    Q.  Okay.  I know this goes back to '94.
21    A.  This was -- you know, these -- these types of
22  fields were -- was the responsibility of the contract
23  marketing department.  Lynn Leone was in the
24  department.  As you can see, Dave Brincks wrote it.
25  And I was involved in the project because, you know,

Page 184

1  the fields were used by reimbursement in some cases,
2  at least, and I was one of the team to try and get
3  some data consistency into this file.
4    Q.  Is that the reason why they brought in folks
5  from the reimbursement department?  You've sort of
6  anticipated were my next questions.
7    A.  Yeah, I would say so.
8    Q.  Okay.  Number 4 says, "Updating prices of
9  individual products for greater consistency,
10  particularly in relation to AWP."  What does that
11  mean?
12    A.  I don't have a specific recollection of that.
13    Q.  Okay.  Do you remember updating prices of
14  individual products?
15    A.  I don't, actually.
16    Q.  Okay.  The next item says, "Entering correct
17  reimbursement descriptions for enteral" nutritions "to
18  aid in Medicare billing."  Do you see that?
19    A.  Yes.
20    Q.  Why did you need to do that?
21    A.  You know -- well, we talked about that
22  earlier about what that -- I think we said that
23  reimbursement description field, did that -- did that
24  not have an enteral example earlier --
25    Q.  Yes, it did.

Page 185

1    A.  -- and it had to do with calories per can, or
2  something like that.  And the system was not as
3  automated as we would like it to be in aspects of
4  billing because it was already very complicated.  And
5  my recollection of this was that some of the
6  computations to -- actually for the billers to get the
7  right unit billed in numbers of calories, there may
8  have been some hand cranking and by having a
9  description on how many calories are in a can that
10  would be visible to them, this would be useful.
11    Q.  Did you create that function, do you recall?
12    A.  I'm sorry?
13    Q.  Did you create that function at that time?
14    A.  What does that mean?
15    Q.  Meaning was -- was that -- was that
16  description already in there or was part of your
17  revision of the System 50 --
18    A.  Adding it for the first time?
19    Q.  -- adding it for the first time?
20    A.  I don't recall.
21    Q.  Do you know whether there were problems with
22  billing to Medicare prior to September 6, 1994 when
23  you folks undertook this particular project?
24    A.  I'm not aware that there --
25        MS. FUMERTON:  Objection, form.

47 (Pages 182 to 185)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 186

1    A.  I'm not aware that there were.
2    Q.  (BY MS. ST. PETER-GRIFFITH)  Under Item 6 it
3 says, Enter "correct procedure codes for all products.
4 Depending on payor, we may need to override this most
5 common procedure code.  Use of the product group for
6 override facilitates this function."  Do you see that?
7    A.  Yes.
8    Q.  What does that mean?
9    A.  That means entering the HCPCS code.  That
10 means that for different payers you may have had to
11 have billed the same product or set of products with
12 different HCPCS codes because of the craziness of the
13 billing structure.  Frankly, I don't recall what the
14 third one means.  There was, apparently, some override
15 capability based on this product group field.
16    Q.  Which -- do you remember which payers the
17 override feature was necessary for?
18    A.  I don't.  I don't have much recollection of
19 that at all.
20    Q.  Okay.  If you could look at Item Number 7,
21 Enter "correct calories per can."  Do you see that
22 item?
23    A.  Uh-huh.
24    Q.  Is that the enteral nutrition field code that
25 was -- that you were talking about before?

Page 187

1    A.  It's one of them, I think, yes.
2    Q.  So you were updating so that the system
3 could, for Medicare billing, more efficiently or more
4 accurately reflect the appropriate amount of calories
5 per can as required and units required?
6    A.  To my recollection, there was some automation
7 in the system on that or perhaps there wasn't because
8 we also -- I talked about that reimbursement text
9 field that could be used to put it in, which was just
10 a text field.  So how well it was automated versus how
11 much billers had to do was beyond my ability to
12 remember.  But it was certainly related to that.
13    Q.  Okay.  Do you recognize the handwriting on
14 this document?
15    A.  Well, I see a signature and at this time I
16 probably only knew one Mike that would probably have
17 written this.
18    Q.  Okay.  And who would that Mike be?
19    A.  That would be Mike Sellers.
20    Q.  Do you recognize Mike Sellers' handwriting?
21    A.  No, not specifically.
22    Q.  Sir, I think we are done with this particular
23 document and if we can move to the red folder.
24    A.  Okay.
25         MR. STETLER:  I'll take that.

Page 188

1         THE WITNESS:  Be my guest.
2    Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, the first
3 page I would like to draw your attention to is 2189.
4 I think it's the next one.
5    A.  Uh-huh.
6    Q.  Sir, what is this document?
7         MS. FUMERTON:  Can I see your copy
8 just --
9         MS. ST. PETER-GRIFFITH:  Sure.
10         MS. FUMERTON:  We are moving on to an
11 area I wasn't looking at before.
12         MS. ST. PETER-GRIFFITH:  (Tenders
13 document).
14         MS. FUMERTON:  Thanks.
15         MS. NESBITT:  What number is that?
16         MS. ST. PETER-GRIFFITH:  This is 2189.
17         MR. STETLER:  While he's looking at
18 that, during a break I could get a computer for you
19 guys to share and if you wanted to put the CD in
20 there, you could look at it.  Never mind.
21         MS. FUMERTON:  Yeah.  No.  If we're
22 going to be going through more looseleaf-type
23 documents, I think it would be helpful just because
24 then I have an idea of what we're talking about.
25    A.  Okay.  Okay.  I know what this is.

Page 189

1    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay, sir.  What
2 is this?
3    A.  You could do specialized, you know, on-demand
4 reporting through a tool called query reporting in the
5 CHIP system to extract information out of it.  Is
6 there a date on this?  No.  But looking at this, this
7 was probably something that -- this is my handwriting.
8    Q.  Okay.
9    A.  And during that period of time when I was
10 manager of client services we were considering a
11 proposal for charging our clients for Abbott staff to
12 actually write a query report for them and these were
13 some notes that I probably took myself for either
14 developing a proposal or for a meeting, or something
15 like that, on what the elements on that would be.
16    Q.  Sir, before we continue on with this
17 document, with regard to the hard copies of documents
18 that you produced pursuant to the subpoena, there was
19 at least one handwritten document which contained
20 notations from you concerning a conversation with a --
21 an Abbott lawyer that were retained for privilege
22 purposes.  This isn't that document, is it?
23    A.  Well, I don't know what was retained --
24    Q.  Okay.
25    A.  -- but this is not that.

48  (Pages 186 to 189)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 190

1     Q.  How often have you spoken with Abbott
2  lawyers, without telling me what your -- the content
3  of the conversations.
4     A.  Well, very infrequently.
5     Q.  Okay.
6     A.  You know, my recollection is I think maybe
7  when we were -- I mean, there was some matter of
8  contracts somewhere in my career that I was involved
9  in where we would to go a lawyer, I think, for that.
10  I don't have specific recollections, I'm sorry.
11     Q.  Okay.
12     A.  It was infrequent.
13     Q.  Do you recall reviewing the notes that were
14  withheld on attorney-client grounds?
15     A.  Even though I had turned them over to my
16  lawyer, I do not recall that.
17     Q.  Okay.  Do you recall any conversations with
18  lawyers at Abbott that might have been the basis for
19  the notes?
20     A.  I don't know what those notes were.  They
21  must have been, to the best of my knowledge, buried in
22  some of the other materials that I was just throwing
23  in files for.
24     Q.  Well, without telling me what your
25  conversations were with Mr. Stetler, what's the basis

Page 191

1  for the assertion of privilege, do you know?
2     A.  I have no idea.
3        MS. FUMERTON:  Well, objection --
4        MR. STETLER:  He's not asserting the
5  privilege, so ...
6        MS. ST. PETER-GRIFFITH:  Okay.
7        MS. FUMERTON:  We're asserting the
8  privilege on behalf of Abbott.
9     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Did you
10  confer with counsel for Abbott about the content of
11  those notes?
12     A.  No.
13        MS. ST. PETER-GRIFFITH:  Mr. Stetler,
14  did you?
15        MR. STETLER:  They gave me a direction.
16  I followed it.  I took a look at the notes.  It
17  appeared that they have a colorable claim, and so
18  that's my obligation to that.
19        MS. ST. PETER-GRIFFITH:  Okay.  We don't
20  have a privilege log on them.  Do you remember what
21  the dates of them were?
22        MS. FUMERTON:  I believe that some of
23  that information -- I can't recall the exact detail of
24  the information, but I know some information was
25  provided to you at the time that the documents were

Page 192

1  being produced.
2        MS. ST. PETER-GRIFFITH:  Yeah.  I don't
3  know what the date was.  That's --
4        MS. FUMERTON:  I cannot recall that
5  either.  I do not know what was -- I cannot recall
6  what was contained in that e-mail.
7        MS. ST. PETER-GRIFFITH:  Okay.
8        MR. STETLER:  It's not an e-mail.
9        MS. FUMERTON:  No.  But when we produced
10  the documents, remember, we had --
11        MR. STETLER:  Oh, your communication.
12  I'm sorry.
13        MS. FUMERTON:  Yeah.  We had sent an
14  e-mail explaining that we are withholding one document
15  and giving a -- and we gave a brief description of it.
16     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Sir, if
17  you can move on to the next page.
18        First, let me ask you, do you have any
19  recollection what these handwritten notes concern?
20     A.  Yes.  That's what I said.  It had to do with
21  establishing a charge for Abbott staff to be writing
22  queries for our customers on the CHIP system for
23  reporting purposes.
24     Q.  Okay.  For reporting to who?
25     A.  Special reporting.  Anybody that wanted to

Page 193

1  see it for anything.
2     Q.  Okay.  Did someone ask you to do that?
3     A.  Do what?
4     Q.  To -- to create that -- that mechanism
5  whereby special reports could be generated.
6     A.  I really don't recall how this came up.
7     Q.  When -- when issues like this concerning the
8  CHIP system arose, did you work with a computer
9  programmer to help facilitate the system?
10     A.  Well, an issue like this would be doing
11  specialized reporting to draw reports out of the
12  system.  I did -- you know, sometimes I would do
13  queries.  And I actually taught others how to do
14  queries later on in client services.  There were
15  people in the systems department that were better than
16  I on how to use the query system, so, therefore, I
17  would consult with them from time to time on how to do
18  a query.
19     Q.  Okay.  Did you -- with regard to any work
20  that you did with regard to the CHIP system, did you
21  work with a computer programmer?
22     A.  Sure.
23     Q.  Okay.  Who -- who were the computer
24  programmers that you worked with?
25     A.  You're asking for names that I can recall?

49  (Pages 190 to 193)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 194

1    Q.  Yes, that you can recall.
2    A.  Jerrie Goldstein, Sarah Card, Zen Focks,
3   F-o-c-k-s.
4        MR. STETLER:  Watch your language, will
5   you?
6    A.  There were others, but those are the names
7   I'm recalling right now.
8    Q.  (BY MS. ST. PETER-GRIFFITH)  If you could
9   flip to the next page, please, 2190.
10   A.  Okay.
11   Q.  Sir, do you see where it says
12  "Unpredictable" -- "Unpredictable therapy day length"?
13   A.  Uh-huh.
14   Q.  What does that mean?
15   A.  (Witness reviewing document).  I'm
16  struggling.  Sorry.  There's a lot of detail here.
17   Q.  That's okay.
18   A.  You know, right now I can only get in the
19  general ballpark here as opposed to give you a
20  specific answer.
21   Q.  Okay.  Well, what generally does it mean?
22   A.  The general ballpark is that there were
23  certain therapies that -- you know, when you bill a
24  claim, you -- you -- you would bill sometimes,
25  depending on the payer, the from date and the to date

Page 195

1   for providing the service.  For some payers the length
2   of -- the number of days might actually reflect the
3   amount that you were going to be paid because you
4   would get paid on that basis.  And for certain
5   therapies, e.g., pain, catheter care and enteral
6   nutrition therapies, there was some difficulty in
7   determining, really, how long a therapy would be for
8   or had been for because of some of the really
9   masochistic type of calculations, and whatever, that
10  had to be done.  And that's the ballpark general
11  answer here.
12   Q.  Okay.  Under Item A in the last sentence
13  reads, "Drugs could still be billed at AWP-based or
14  some other pricing."  Do you see that?
15   A.  Yes.
16   Q.  What does that mean?
17   A.  I would interpret this to mean that whatever
18  the rest of it meant in terms of billing something
19  daily or monthly, that drugs were billed separately
20  and they would be billed based on mechanisms that we
21  had already discussed, such as AWP-based mechanisms.
22   Q.  Okay.  Do you recognize this document at all?
23   A.  Well, how do I put this?  I could have
24  written it, but do I really recognize it?  No.
25   Q.  Okay.  But it's possible that you drafted it?

Page 196

1    A.  It is possible.
2    Q.  And it says at the top, "Solutions Recognized
3   to Common Reimbursement."  Is it fair to say that this
4   document was used by the reimbursement department?
5    A.  No, I don't think that is fair to say.
6    Q.  Okay.
7    A.  I think that it's probably a document that --
8   well, you know, I know that more from this envelope
9   here that I did -- it says "Price Schedule Class."
10  One of the things I did as a client services manager
11  in those later years was to teach people how to use
12  this automated pricing system on the CHIP system and
13  this document was either a handout or simply something
14  internal that I may have used to do that.  That's
15  about the best of my recollection.
16   Q.  And can you identify where -- is it just a
17  two-page document, 2190 and 2191?
18   A.  It appears to be.
19   Q.  Okay, sir.  The next document I would like to
20  ask you about is --
21        If you could go to what says Exhibit E,
22  which is 2195 and 96 and 97 through 98.
23   A.  Okay.
24   Q.  Sir, what are these documents?
25   A.  These are redacted in some -- well, redacted,

Page 197

1   but examples of real contracts or a real -- at least a
2   real contract, it appears to be.  It would be a real
3   contract.
4    Q.  And is the contract with Home Health &
5   Hospice?
6    A.  Actually, it appears, from what I'm seeing,
7   that the name of the client was not redacted on the
8   last three pages, so it was with one of our clients,
9   Parkview Home Health & Hospice.  And so these were --
10  these were kind of samples of a real contract that
11  they would have had with a payer.
12   Q.  And who did the redaction?
13   A.  I don't have a recollection of that.
14   Q.  Do you know whether you may have?
15   A.  I may have.
16   Q.  Okay.  And at the top it says "Home Infusion
17  Therapies" sort of in dark.  Do you see that in
18  dark -- I'm sorry, on 2195.  On Page 2195.
19   A.  Yes.
20   Q.  And at the top in darkened it says, "Home
21  Infusion Therapies."  Do you see that?
22   A.  Yes.
23   Q.  Can you describe what each of the columns
24  means, "Item Number," "Units," "Item Description"?
25   A.  I think so.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 198

1    Q.  Okay.  What does that mean?
2    A.  Well, item number is just a line count for
3  reference on the contract.
4    Q.  Okay.  And units?
5    A.  Most of those don't have -- it's not
6  applicable, but for anti -- anti-infective products,
7  there could be different pricing for the supplies and
8  service component by frequency of administration, such
9  as q2 -- 12h indicates every 12 hours --
10   Q.  Okay.
11   A.  -- would be the administration of the
12  antibiotic to the patient in the home.
13   Q.  And item description?
14   A.  Well, that indicates the general category of
15  the therapy, such as -- I don't know what ACTH stands
16  for, but later on antibiotic, antiviral, antifungal,
17  chemotherapy, and et cetera.
18       And then those codes that are
19  handwritten in there were probably the nonstandardized
20  different by payer billing codes, these are not HCPCS
21  codes, billing codes that were used at this time to
22  bill whoever this payer was.
23   Q.  And at the top there's a fax -- fax legend.
24  Do you see that?  It says June 8th, 2000.  It's 20 --
25  2195, at the very top of --

Page 199

1    A.  Yes.
2    Q.  Does that give you an approximation as to
3  when this document may have been created?
4    A.  Well, it was probably after that.
5    Q.  It was probably after that.  What about down
6  at the bottom where it says 092997?
7    A.  Oh, let me restate that.  That's -- no.  It
8  was probably received by Abbott Home Infusion after --
9  you know, on that date of June 8th, that -- that would
10  be my assumption.  You know, do I have specific
11  knowledge of what that code on the bottom means?  No.
12  So leave it at that.
13   Q.  Okay.  Where it says "Fee 1st Drug," do you
14  see that?
15   A.  I'm sorry, where?
16   Q.  At the top of "Home Infusion Therapies" it
17  says "Fee 1st Drug."  Do you see that?
18   A.  Oh, yes.
19   Q.  What does that mean?
20   A.  Much of home infusion billing to commercial
21  insurance was, and still is, billed on a per day or
22  per diem basis.  Per diem as we call it.  This
23  contract redacted, though, had rates per day, per
24  diem, for providing a therapy.  Some contracts would
25  have -- sometimes a patient would have more than one

Page 200

1  primary drug provided at the same time in the course
2  of the therapy, more than one antibiotic.  There would
3  be, on those cases, an additional per diem that would
4  be billed.  Some contracts call for the second per
5  diem rate to be different from the first rate and
6  typically less.  So that refers to if there was a
7  second or a third drug being provided that was an
8  antibiotic, anti-viral, anti-fungal therapy, that's
9  what that means.
10   Q.  When you say "contracts," what are you --
11  what are you referencing when you say contracts?
12   A.  This would be a contract between a commercial
13  payer, and in this particular case, as seen by a not
14  very good job of redaction, Parkview Home Health &
15  Hospice.
16   Q.  And, sir, would this apply to Medicaid or
17  Medicare reimbursement?
18   A.  No.
19   Q.  Okay.  It says, "Fee schedule Per Day + AWP."
20  Do you see that?
21   A.  Yes.  Yes.
22   Q.  What does that mean?
23   A.  Per day means per diem, as I just explained.
24  In this particular case it would appear that the drug
25  itself was being paid for at AWP.

Page 201

1    Q.  Okay.  And that would be billed to the payer
2  at AWP?
3    A.  Yes.
4    Q.  Would a -- would it --
5    A.  Well, it would be paid by the payer at AWP.
6    Q.  Okay.  What does that mean?
7    A.  I explained earlier you may sometimes bill at
8  list charge -- list price or you may bill at the
9  contracted price.  You could bill it either way.
10   Q.  Okay.  And the contracted price means the
11  contract -- the price between the third-party payer
12  and the provider?
13   A.  Yes.
14   Q.  Okay.
15   A.  Or that -- well, this is a contract, so, yes.
16   Q.  And will there ever be an instance when for
17  Medicaid or Medicare reimbursement purposes, the fee
18  schedule would be per day plus AWP?
19       MS. FUMERTON:  Objection, form.
20   A.  At that time?
21   Q.  (BY MS. ST. PETER-GRIFFITH)  At any time.
22   A.  You mean now?
23   Q.  Well, at any time that -- that you were
24  involved with Home Infusion, Abbott Hospital Products
25  Division.

51 (Pages 198 to 201)

Page 202

1          MS. FUMERTON: Objection, form.
2      A.  For Medicare there would never have been a
3  per diem billing to incorporate charges for all of
4  your supplies, pumps, or whatever, and services, which
5  is how this is done for commercial insurance.  No,
6  that would not have occurred for Medicare.
7      Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  Why not?
8      A.  For -- pardon me?
9      Q.  Why not for Medicare?
10     A.  Because you had to bill the way the
11  government through their contractor specify that you
12  bill, and that was not the methodology for billing.
13     Q.  Okay.
14     A.  And still is not.
15         For Medicaids, as I said earlier,
16  there's 50 states out there.  To the best of my
17  recollection at that time none of them were billed on
18  a per diem basis or paid on a per diem basis -- paying
19  on a per diem basis.
20     Q.  Okay.  If you could flip to 2223.
21     A.  Oh, we are moving on.
22     Q.  Yeah.
23     A.  Maybe I should put the clip back where it
24  was, huh?  It's paper-clipped.
25         (Witness reviewing document).  Okay.  I

Page 203

1  am there.
2      Q.  Okay.  Does it look like this (indicating)
3  22 --
4      A.  No yellow mark on this.
5      Q.  Okay.  Well, sir, if you could -- and if you
6  need to refer to the earlier pages, can you tell us
7  what this document is?
8      A.  I believe this is a document that I used.  I
9  may have written it for training a client that we had
10  sold the CHIP system to in the latter years.  They
11  just bought the system.  They didn't have any other
12  services other than, you know, our supporting them on
13  learning how to use and implement the CHIP system and
14  I actually was the product -- I was the key person at
15  Abbott to help out with this client and I think this
16  is a document that was used for training them.
17     Q.  Okay.
18     A.  Uh-huh.
19     Q.  It says, "Drugs which may be added to
20  hydration diluent ... are sometimes chargeable at AWP
21  per contracts."  Do you see that?
22     A.  Yes.
23     Q.  What does that mean?
24     A.  When you do a compound in home infusion, you
25  are using, by definition, at least two drugs to do the

Page 204

1  compound, maybe more than that.  But you may have --
2  you may have a -- you know, what I had called earlier
3  the primary drug of the therapy, that could be in
4  powder form.  The pharmacist or the pharmacy will --
5  would have to typically dilute that with sterile
6  water.  That's often done in that way.  And then they
7  would take that mixture and compound that into a
8  diluent, such as D5W.  So in that case there would be
9  three drugs.  This means that drugs which may be added
10  to hydration diluent and are -- let me read this
11  again.
12         Okay.  This actually is talking about
13  hydration, which is a therapy.  Patients need fluids.
14  It's not really a primary, like infection fighting or
15  cancer fighting drug in a fluid, it's simply that they
16  are -- do not have the -- as I understand this, and
17  I'm not a pharmacist, but I understand this, they
18  don't have the proper equilibrium of what are called
19  electrolytes in their body so they need hydration.
20  And this is saying that drugs can be added to whatever
21  the core, you know, the basic diluent is, which could
22  be dextrose, if I understand it, maybe others.
23         Certain drugs or minerals, or whatever,
24  could be added to that as part of getting their
25  electrolyte balance back where it needs to be and they

Page 205

1  can be billed.  They are chargeable.  They can be paid
2  for via AWP per contracts that would be between a
3  payer and a provider.  That's what this is referring
4  to.
5      Q.  Okay.  When you say a provider, would that
6  provider include Medicaid or Medicare?
7          MS. FUMERTON: Objection, form.
8      A.  Medicare for home diffusion does not pay for
9  hydration.
10     Q.  (BY MS. ST. PETER-GRIFFITH) Okay.
11     A.  Medicaid would.  Per contracts would not
12  relate to Medicaid.  That's the term for commercial
13  insurance.
14         And, I'm sorry, did I answer the
15  question?
16     Q.  Yeah, I think you did.
17     A.  Okay.  That's my wife.
18     Q.  Who's your wife, sir?
19     A.  I did write this.  I did write this.
20     Q.  Okay.
21     A.  "Prevents vomiting per nurse Sue."  I asked
22  her what this was for and she knew.
23     Q.  So your wife --
24     A.  That's what I think this is.
25     Q.  Your wife is a nurse?

52 (Pages 202 to 205)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 206

1    A.  She is a nurse.
2         MS. ST. PETER-GRIFFITH:  Is now a good
3   time for --
4    A.  It almost makes me think I didn't, actually,
5   give this to a client.  They may have been notes to
6   myself, but it's too long ago.
7    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
8    A.  Okay.
9         MS. ST. PETER-GRIFFITH:  Is now a good
10  time to take a break?
11        MR. STETLER:  Whenever you would like.
12        MS. ST. PETER-GRIFFITH:  Okay.  Why
13  don't we take -- Mr. Rodman, is now a good time for
14  you to take a break?
15        THE WITNESS:  Sure.
16        THE VIDEOGRAPHER:  We are off the record
17  at 2:42 p.m. with the end of Tape Number 4.
18        (Recess from 2:42 to 2:56)
19        THE VIDEOGRAPHER:  Please stand by.  We
20  are back on the record at 2:56 p.m. with the beginning
21  of Tape Number 5.
22   Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, and I'm not
23  sure if it's part of this folder or not, but the next
24  document I would like to discuss with you is 02293.
25   A.  It's not in this packet.

Page 207

1         MS. ST. PETER-GRIFFITH:  Can we get
2   that?
3         MR. STETLER:  02293?
4         MS. ST. PETER-GRIFFITH:  Yeah.  And,
5   Dave, we are going to need through like 2360.
6         THE WITNESS:  Do you think we're done
7   with this that I can give this back to Dave?
8         MS. ST. PETER-GRIFFITH:  Yes.
9         MR. STETLER:  Does it say "Introduction
10  and Summary," is that what you're looking at?
11        MS. ST. PETER-GRIFFITH:  "Information
12  Systems Overview."
13        MS. FUMERTON:  Do you mind if I take a
14  look at it --
15        MS. ST. PETER-GRIFFITH:  Sure.  Sure.
16        MS. FUMERTON:  -- while we're searching
17  for it?
18        MS. ST. PETER-GRIFFITH:  Yeah.
19        MR. STETLER:  I see it.  It's part of a
20  little bit bigger package.  Do you want me to give him
21  the whole package?
22        MS. ST. PETER-GRIFFITH:  Yes, please.
23  Does it go through 360?
24        MR. STETLER:  He can tell you.
25        THE WITNESS:  I'm sorry, what numbers?

Page 208

1    Q.  (BY MS. ST. PETER-GRIFFITH)  360.  2360.
2    A.  I'm sorry, repeat that.
3    Q.  The first -- the first page is -- I need
4   is --
5         MS. ST. PETER-GRIFFITH:  What is that,
6   Tara?
7         MS. FUMERTON:  Sorry.
8         MS. ST. PETER-GRIFFITH:  That's okay.
9   2293.
10   A.  That's in here.
11   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  And then
12  I'm going to be discussing various pages through 2356.
13   A.  It only goes to 2312.
14   Q.  Okay.  Well, we'll worry about the other --
15  we are putting Mr. Stetler to work here today.
16        MS. ST. PETER-GRIFFITH:  Dave, is it all
17  right while you're getting --
18        MR. STETLER:  (Indicating).
19        MS. ST. PETER-GRIFFITH:  Okay.
20   Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, if you can
21  look at 2293.  And can you tell me, what is this
22  document that you're looking at?  I mean, can you
23  identify the first and the last page?
24   A.  Well, I have to look at the beginning pages
25  first before I get there --

Page 209

1    Q.  Sure.  That's fine.
2    A.  -- because I'm not sure I'm going to
3   understand what this is, so ...
4    Q.  Okay.  Take your time.
5    A.  (Witness reviewing document).  Okay.  And
6   what page, 2293?
7    Q.  Yes.
8    A.  Okay.  Well, this says -- it is entitled here
9   as the "Request For Proposal For Software Services,"
10  which I guess means the CHIP system.  I mean, it does
11  mean the CHIP system.
12   Q.  Okay.  And this is for the --
13   A.  And this is the description of the CHIP
14  system on this page, essentially.
15   Q.  Where it says, "Section 2 - Information
16  Systems"?
17   A.  Yes.
18   Q.  And is this -- was this an RFP for Michigan
19  Home Care Services?
20   A.  It is my belief, actually, that this is an
21  RFP because the HomeMed, which is part of the
22  University of Michigan, was considering purchasing a
23  computer system.
24   Q.  Okay.  And if you could look at 2293.
25   A.  Yes.

53 (Pages 206 to 209)

Page 210

1    Q.   You indicated earlier it describes the CHIP
2  system?
3    A.   It describes -- it appears to describe the --
4  essentially the functionality of the CHIP system, at
5  least as of the time this proposal was written.
6    Q.   Okay.  About one, two, three, four, five, six
7  bullet points down where it says in the middle of the
8  page, "CHIP also provides" -- "provides the following
9  specific," do you see that?
10   A.   Yes.
11   Q.   It says "First Data Bank drug interaction
12 program" --
13   A.   Yes.
14   Q.   -- integrated" -- what does that mean?
15   A.   I had mentioned earlier that these drug
16 compendiums provided not only just pricing, but other
17 drug data.  They -- they -- they provide -- they can,
18 at least, provide data that allows a clinical
19 pharmacist or a computer system that has some
20 automation in it to identify that a -- one drug should
21 not be administered to a patient with another drug
22 because there may be an adverse effect.  And that's
23 called drug -- drug interaction.  And now that I see
24 this, my recollection is that we had those features in
25 the CHIP system to help the pharmacist to avoid those

Page 211

1  types of problems and that data was obtained from
2  First DataBank.
3    Q.   Okay.  If you could look down three bullet
4  points.  It says, "Integration with Redbook AWP for
5  automated pricing."
6    A.   Yes.
7    Q.   Do you see that?
8    A.   Yes.
9    Q.   What does that mean?
10   A.   It's exactly as we discussed earlier, that --
11   Q.   Okay.
12   A.   -- that was obtained from Redbook from -- for
13 those AWPs.
14   Q.   Sir, the next document I would like you to
15 look at is numbered 02333 and I think that might be
16 contained --
17   A.   No, that's not in this.
18   Q.   Okay.  If you could look at that next book
19 that Mr. Stetler has --
20   A.   So -- okay.
21       MS. FUMERTON:  Can I take a glance?
22       MS. ST. PETER-GRIFFITH:  Sure.  Sure.
23       MR. STETLER:  Yeah, we are not going to
24 get a laptop.  It's on -- they're both on their way to
25 San Francisco I just learned.

Page 212

1    A.   02355, 02315, so it must be in here, huh?
2  02333.  Okay.  Okay.  I'm ready.
3    Q.   Okay.  Sir, does it say -- at the top it
4  should say "Sutter."
5    A.   Yes.
6    Q.   Okay.  What is this document?
7    A.   Well, I need to put this in the context of
8  what is in these --
9    Q.   Sure.  Let's --
10   A.   -- materials --
11   Q.   Why don't we do that.
12   A.   -- for the most part.
13   Q.   That's fine.
14   A.   Okay.
15   Q.   Why don't we start with the first page number
16 and if you could you just give the --
17   A.   Yeah.
18   Q.   -- the Bates range.
19   A.   I hope -- even before I do that, I need to
20 look at this a little more.  I'm sorry.
21   Q.   Sure.
22       MS. FUMERTON:  I suppose this is as good
23 a time as any.  Just on the record I want to designate
24 the transcript as highly confidential to the extent we
25 are looking at materials that are highly confidential,

Page 213

1  discussing them.
2    A.   Okay.  For the most part these are -- these
3  appear to be materials, working materials, used by the
4  Contract Marketing department for -- for -- for the
5  maintenance of that item file that we've been talking
6  about.  I actually see one note that's -- I recognize
7  my handwriting.  I'm not sure why that's stuck in
8  here.
9    Q.   (BY MS. ST. PETER-GRIFFITH)  What page do you
10 recognize your handwriting on?  I don't mean to --
11   A.   2316.
12   Q.   Okay.
13   A.   I mean, this is actually just a set of notes
14 for something.
15       But for the most part these were not
16 created by me.  I had very little, if any,
17 responsibility for them and I'm not even sure when I
18 came into possession of this book.  And so, in
19 general, that's what this is.
20   Q.   Okay.
21   A.   Now, which page were you asking about?
22   Q.   2233 and 2234.  I'm sorry.  2333 and 2334.
23   A.   Okay.  I'm there.
24   Q.   Sir, do you recognize this?
25   A.   Not specifically.

54 (Pages 210 to 213)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 214

1    Q.  What is Abbot/CAITS pricing schedule?
2    A.  I don't know what CAITS stands for.
3    Q.  Okay.  Where it says, compounding multidose
4  bags, do you see that?  At the top.
5    A.  Yes.
6    Q.  Do you recognize that methodology for
7  calculating pricing?
8    A.  (Witness reviewing document).  You know, it's
9  pretty hazy.  It -- I mean, it certainly had to do
10  with the pricing of claims and I'm having difficulty
11  understanding the details, frankly.
12    Q.  Okay.  Is that true for the rest of the
13  compounding information on this page?
14    A.  (Witness reviewing document).  Yes, it is
15  true.
16    Q.  Okay.  If we could move to, then, Page 2353
17  through 2354.
18    A.  Okay.  Okay.
19    Q.  Sir, do you recognize this document?
20    A.  Not specifically.
21    Q.  And Shellie Bronson at the top is the
22  author --
23    A.  Yes.
24    Q.  -- do you see that?  And what position did
25  she hold on 8/13/97?

Page 215

1    A.  At that time this memo makes me recall that
2  she was also in the Contract Marketing department.
3    Q.  So she wore two hats?
4    A.  No.
5    Q.  Okay.
6    A.  No.  She had moved on from being
7  reimbursement training supervisor -- or reimbursement
8  trainer to join the Contract Marketing department, as
9  it says here, as a managed care specialist.
10    Q.  Okay.
11    A.  Okay.
12    Q.  Have you seen this document before?
13    A.  I have no specific recollection of it.
14    Q.  Okay.  Do you see where it says, "Re-cap of
15  Pricing Meeting 8/13/97"?
16    A.  I do.
17    Q.  Did you participate in any pricing meeting?
18    A.  None that I can recall.
19    Q.  If you look under Item 2 it says,
20  "Category 56 (compounded drugs)"?
21    A.  Uh-huh.
22    Q.  And then it says, "upcharge the most
23  expensive AWP x 1.4 and add a $25.00 compounding fee,"
24  do you see that?
25    A.  Yes.

Page 216

1    Q.  What does that mean?
2    A.  You know, I mean, other than what you can
3  read, which is obvious, AWP times 1.4 and add $25, I
4  don't really have more detail that I can give you on
5  that that I recall.
6    Q.  Well, what does Category 56 mean?  Does that
7  mean anything to you?
8    A.  Not really.  It -- it probably was a
9  categorization in the CHIP system of how items could
10  be put into categories.  We talked about one of them
11  before.  What -- what was that called, product group,
12  something like that.  I think there -- my recollection
13  is there was another category.  What 56 particularly
14  meant, I don't know.
15    Q.  Okay.  Well, what -- how do you interpret
16  upcharge the most expensive AWP times 1.4 percent and
17  add $25 as a compounding fee?
18    A.  Right now I'm perplexed as to what it meant
19  by "most expensive AWP."
20    Q.  Okay.
21    A.  Maybe with some refresher somewhere else it
22  might come to me --
23    Q.  Well --
24    A.  -- that I could figure it out.  But I don't
25  know what that meant.

Page 217

1    Q.  Could it mean most expensive AWP as reported
2  between the three different pricing compendia?
3    A.  I would doubt that because the CHIP system
4  only used the Redbook pricing.
5    Q.  Okay.  This -- does this appear to be a
6  formula for setting list price?
7         MS. FUMERTON:  Objection, form.
8    A.  Well, it doesn't really say that.
9    Q.  (BY MS. ST. PETER-GRIFFITH)  Do you see at
10  the end of the memo it says, "Memos for each of the
11  above pricing methodologies will be completed and
12  placed in the pricing manual"?
13    A.  Yeah.  You know, you can draw that conclusion
14  and I may be able to, also, but I have no specific
15  knowledge of it.
16    Q.  Okay.  The next page I would like to discuss
17  with you is 2374.  Is that part of the grouping that
18  you have there?
19    A.  Okay.
20    Q.  And, sir, do you see where it says,
21  "Established pricing parameters"?
22    A.  Uh-huh.
23    Q.  If you could just take a look at that
24  document.
25    A.  (Witness reviewing document).

55 (Pages 214 to 217)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 218

1        MS. FUMERTON:  Let's see.  I'm not
2    having much luck trying to find something in here.
3        MR. STETLER:  You're not?
4        MS. FUMERTON:  Well, it's just not --
5        MS. ST. PETER-GRIFFITH:  It's kind of
6    slow?
7        MS. FUMERTON:  It's not slow, it's just
8    not in the order you -- it's not in order.
9        MS. MOORE:  Box 2 has the first
10   documents and Box 1 has the higher numbers.  I figured
11   that much out.
12       MS. FUMERTON:  That would -- thank you.
13   I'm looking at Box 1.  It should be there.
14       MS. MOORE:  The opposite of what you ...
15   A.  (Witness reviewing document).  I'm ready, if
16   you are.
17   Q.  (BY MS. ST. PETER-GRIFFITH)  Oh, okay.  Sir,
18   do you recognize this document?
19   A.  No.
20   Q.  Okay.  It says at the bottom -- do you see at
21   the very bottom on the left-hand side,
22   Procedure/ITMPR.doc?
23   A.  Yes.
24   Q.  Do you know what that is?
25   A.  That appears to be a file name of where it

Page 219

1    was kept.  You know, what it was called when it was
2    kept on somebody's computer.
3    Q.  Now --
4    A.  It was in a doc setting for probably MS Word
5    document.
6    Q.  Okay.  But this is -- this manual that you're
7    looking at, which this -- which this document that we
8    are talking about appears to be contained in, is from
9    Contract Marketing Home Infusion?
10   A.  Yes.
11   Q.  Okay.  And it says, "Established Pricing
12   Parameters" at the top.  Do you see that?
13   A.  I do.
14   Q.  And "Draft."
15   A.  I see that.
16   Q.  Do you know whether these are pricing
17   parameters utilized by the Contract Marketing group in
18   Home Infusion?
19   A.  I don't specifically know.  This particular
20   book was one that I had, to the best of my knowledge,
21   never used.  I'm not sure why there's this one sheet
22   in here.  And I -- as I had explained way upfront,
23   that I thought that at some point potentially if I
24   ended up doing consulting, that some of this material
25   that was available might be useful to me some day

Page 220

1    so -- so I did keep this, but I have no detailed
2    knowledge at all of this and, frankly, this is
3    probably the first time I ever looked at it, most of
4    this stuff.
5    Q.  Okay.  We can move on, then, to Page 2490.
6    A.  Uh-huh.  Okay.
7    Q.  Okay.  Do you see that?  And is this a
8    memorandum?
9    A.  I do.
10   Q.  From Lynn Leone?
11   A.  Yes.
12   Q.  Whose title is identified as pricing
13   specialist?
14   A.  Yes.
15   Q.  What -- what part of Home Infusion would
16   Ms. Leone have been working in at that point in time?
17   A.  Contract Marketing.
18   Q.  Okay.  And this is to all reimbursement
19   specialists and clerks?
20   A.  Yes.
21   Q.  And then you are listed as a cc?
22   A.  Yes.
23   Q.  Dave Brincks is also listed and Ginny
24   Tobiason as well?
25   A.  Yes.

Page 221

1    Q.  Do you recall this document?
2    A.  No.
3    Q.  Do you have any doubt that you received this
4    document?
5    A.  I was on board as a reimbursement supervisor
6    as of that time.  My name is there, so I probably did.
7    Q.  Okay.  Sir, what does this document
8    reference?
9    A.  Case management.
10   Q.  Okay.  And what is that?
11   A.  Well, I have to read this document, which I
12   haven't done.
13   Q.  Oh, go right ahead.
14   A.  I had explained to you what we call case
15   management earlier.
16   Q.  Okay.
17   A.  Okay.
18   Q.  Why don't you take your time and read the
19   document.
20   A.  Okay.  (Witness reviewing document).
21       MS. FUMERTON:  Can I see -- we're giving
22   up on this.
23       MS. ST. PETER-GRIFFITH:  Okay.
24       (Discussion off the record)
25   A.  Well, okay.  So the question is what is this?

56 (Pages 218 to 221)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 222

1    Q.  (BY MS. ST. PETER-GRIFFITH)  Yes.
2    A.  Well, actually, it's -- as it's written in
3  the very first sentence, it's some case management and
4  pricing procedures is what it is and there actually
5  seem to be three different subjects on it.
6    Q.  Okay.  And are those subjects familiar to
7  you?
8    A.  Not especially.
9    Q.  Okay.  Do you recall an issue associated
10  with -- with the implementation of Phase II flexible
11  pricing?
12    A.  The price schedule capability that I spoke
13  about was being built in phases into the system when I
14  came on board and they called it phases, I guess.
15  Looking at this, it looks like Phase II had just been
16  completed and put into the system and this is some
17  procedure that's related to how to use the system for
18  the entry of prices that a case manager, which in this
19  case -- well, I mean, Lynn Leone was a case manager,
20  would have negotiated for individual patient therapy
21  episode into the system, so the claims would reflect
22  that price as -- if appropriate.
23    Q.  Okay.  Sir, what I would like to do next is
24  just use my copies to go through the various manuals
25  and make sure that we have -- we authenticate the

Page 223

1  manuals.  I think it just would be easier to do it
2  this way.
3    A.  That's okay with me so far.
4        MR. STETLER:  (Nodded head
5  affirmatively).
6    Q.  (BY MS. ST. PETER-GRIFFITH)  If you could --
7        THE WITNESS:  If it's okay with you.
8    Q.  (BY MS. ST. PETER-GRIFFITH) -- look at --
9        MR. STETLER:  Okay with me.
10        THE WITNESS:  Especially if it -- we get
11  out of here sooner.
12        MR. STETLER:  Well --
13    Q.  (BY MS. ST. PETER-GRIFFITH)  Well, I just
14  want to make sure we get this done before the end of
15  the day.
16    A.  Hurray.  I'll go for that.
17    Q.  If we could look at BR 212 through 532.  And
18  why don't I just pass that to counsel.
19        MS. FUMERTON:  Sure.  And I'll pass it
20  down.
21    A.  Okay.
22    Q.  (BY MS. ST. PETER-GRIFFITH)  And, sir, can
23  you identify that document?
24    A.  Well, the first page is 2001 Catalog.  This
25  would be for -- it doesn't show, but it's the Hospital

Page 224

1  Products Division and apparently it's the entire
2  catalog, I guess.  Appears that way.
3    Q.  Okay.
4    A.  Okay.
5    Q.  Give that back to me.
6    A.  We'll get done by the end of the day.
7        MR. STETLER:  Some of these may be hard
8  to figure out.
9        MS. ST. PETER-GRIFFITH:  That's why I
10  want to go through this exercise now.
11    Q.  (BY MS. ST. PETER-GRIFFITH)  The next is 714
12  through 988.  Sir, if you could identify this?  And I
13  believe Mr. Stetler might hold up --
14        MR. STETLER:  Right.
15    Q.  (BY MS. ST. PETER-GRIFFITH) -- a copy.
16        MR. STETLER:  I'll hold them if I can
17  find them on time because they're easier to recognize
18  this way.
19    A.  Why don't you give me that one.
20    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  That's
21  fine.
22    A.  Okay.
23    Q.  And, sir, what is this document?
24    A.  I believe this would be a document that would
25  have been used in the contract manage -- I'm sorry,

Page 225

1  the Home Infusion Services Contract Marketing
2  department for doing these individual patient case
3  management price negotiations that we have been
4  talking about.
5    Q.  And would you utilize this document?
6    A.  No.
7        MS. ST. PETER-GRIFFITH:  Okay.  If you
8  could get the next binder, Mr. Stetler.  Why don't we
9  just do it that way.
10        MR. STETLER:  Yeah.  You know, in
11  between there are certain things that are clipped
12  together.  We are skipping those, I assume?
13        MS. ST. PETER-GRIFFITH:  Why don't we
14  skip those for now or set them aside.  I would just
15  like to get through the binders right now.
16        MR. STETLER:  Yeah.  Okay.  This one
17  begins 1062.
18    Q.  (BY MS. ST. PETER-GRIFFITH)  If you could
19  just -- sir, if I could ask you to read the first and
20  last Bates numbers for this.
21    A.  1062 through 1152.
22    Q.  And what is that document?
23    A.  Well, it says "Sample Contracts From Contract
24  Marketing June 1999."
25    Q.  And do you recognize this document?

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 226

1    A.  Not specifically.
2    Q.  With regard to the case management binder
3  that you looked at before and this document, do you
4  know why you took it with you?
5    A.  As I had explained earlier, I felt that -- I
6  wasn't really sure if I was going to be doing
7  consulting or what type, but I thought some day
8  potentially it might be a good reference for me to use
9  for professional consulting occasions, which never, in
10  fact, happened.
11    Q.  Was this a document that you maintained in
12  your office at Abbott?
13    A.  I don't think so.
14    Q.  Okay.  What's the date on that?  Is there a
15  date?
16    A.  June 1999.
17    Q.  Okay.
18    A.  June 1999.
19    Q.  Do you want to move on to the next?
20        MR. STETLER:  Here are the next two in
21  order.
22    Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, if you
23  could give me the first and last Bates number of that
24  particular binder and describe what it is.
25    A.  The first number is 1153, the last number is

Page 227

1  1216.  This says, "Developing a Sales and Marketing
2  Plan."
3    Q.  Did Abbott Home Infusion have sales and
4  marketing plans?
5    A.  I guess we would have to define what that
6  means.
7    Q.  Okay.  What -- what -- how do you define a
8  marketing plan?
9    A.  Well, I guess in a traditional sense as an
10  MBA from a long time ago I would define it as a plan
11  for the development of the features of a product, how
12  you were going to market it, to whom, through what
13  distribution channel, at what price and that would be
14  a marketing plan.
15    Q.  Okay.  Do you know whether Abbott Home
16  Infusion had marketing plans like you just described?
17    A.  I don't have any specific recollection of
18  that.
19    Q.  Sir, this particular document that you're
20  looking -- that's in front of you now, is this a
21  document that you utilized in your work with the
22  Abbott Home Infusion business unit?
23    A.  That's why I need -- I need to look at this
24  document --
25    Q.  Sure.

Page 228

1    A.  -- to understand that.  (Witness reviewing
2  document).  This, I believe, is a document that was
3  prepared by the -- or used by, I don't know who
4  prepared it, used by the Abbott Home Infusion Services
5  sales organization to assist in training Abbott's
6  clients on how to basically set up what was called a
7  marketing plan for their home infusion services
8  business units.  That's what I think this is.
9    Q.  Okay.  And is it a document that you
10  maintained in your office when you were with Abbott?
11    A.  I don't recall.
12    Q.  Okay.
13    A.  It was not a document that I used actively.
14    Q.  Okay.
15    A.  I could have had a copy in my office.
16    Q.  Do you know who developed it or drafted it?
17    A.  No, not specifically I don't.
18    Q.  Okay.  If you will move on to the next
19  document.  And if you will give the first and last
20  number of the Bates range.
21    A.  Sure.  1217 through 1406.
22    Q.  And what is this document?
23    A.  Well, it says, "Guide to Sales Training &
24  Development."
25    Q.  Okay.  Do you recognize this document?

Page 229

1    A.  Not offhand.
2    Q.  Is it a document you maintained in your
3  office?
4    A.  I have no specific recollection.
5    Q.  Do you know whether you used it at all?
6    A.  I have no specific recollection of that.
7    Q.  Do you know what it was for?
8    A.  If I take a look at the first page --
9    Q.  Sure.
10    A.  -- I may be able to tell you.
11    Q.  Take your time.
12    A.  (Witness reviewing document).  You know,
13  it -- I can just, in effect, recite back what it says
14  in this first one and that's all that I have of -- any
15  real knowledge of, at least at this point in terms of
16  recollection, which says it was "developed as a tool
17  for Sales Management to utilize in structuring a
18  personalized orientation and training program for new
19  field sales personnel," which would be referring to
20  the sales personnel in Abbott Home Infusion Services.
21  "It contains ... primary components necessary to
22  adequately develop field sales employees to achieve
23  maximum potential in their sales career in the Home
24  Infusion Services business unit."  So it was some sort
25  of a training and/or education tool for the Home

58 (Pages 226 to 229)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 230

1  Infusion Services sales staff --
2     Q.  Okay.
3     A.  -- is what I would conclude.  Okay?
4     Q.  And, sir, what is -- what is this document,
5  if you could give the Bates range and describe the
6  document?
7     A.  Sure.  It's 1407 through 0162, which I am now
8  seeing there are some not bound stuff here.
9     Q.  Sir, what is this document or what are these
10 documents?
11    A.  Well, at least for the portion of it in the
12 binders.  This was -- I had mentioned earlier that one
13 of my responsibilities as a reimbursement supervisor
14 was to -- you know, when we -- when we implemented a
15 new Home Infusion Services client, a home infusion
16 business, was to get them started in the use of -- in
17 the aspects of reimbursement where Abbott, as a
18 billing service, would be performing those functions
19 and this was a document that would be used as part of
20 getting them started.  So there are some forms to fill
21 out and I think some of this would be done -- I
22 believe some of this would be done in -- you know,
23 perhaps through some meetings with clients on the
24 upfront to work out some of these things, at least
25 some of these forms.  That's essentially what, at

Page 231

1  least, the bound portion of this document is.
2     Q.  Would that be -- would the bound portion of
3  that document be something that you utilized in
4  your -- in your capacity in the reimbursement
5  department?
6     A.  Yes.
7     Q.  Okay.
8     A.  Either my -- either myself personally or
9  through subordinates.
10    Q.  Did you draft any portion of that document?
11    A.  I would have to look at it and recall to see,
12 but I cannot answer that, no.
13    Q.  Okay.  Sir, in the back portion, the loose
14 pages, can you identify those?
15    A.  Okay.  This first stapled document here
16 entitled "Case Management Negotiation Parameters" from
17 0 -- from 1506 through 1520, is a document that I
18 believe would have been prepared by the Contract
19 Marketing department with Home Infusion Services,
20 that -- there's a place for a signature on it.  My
21 recollection is that they would be working with the
22 clients to set parameters on how to do these price
23 negotiations on these individual patient cases.  This
24 document was used as basically a tool for
25 communications of what those parameters were and also,

Page 232

1  I believe, the client would sign it to sign off,
2  because ultimately it was their business and their
3  responsibility.
4     Q.  And what is the Bates range on that?
5     A.  I'm sorry?
6     Q.  What's the numbers at the bottom, what's the
7  range of numbers for that particular document you are
8  looking at?
9        MS. NESBITT:  I believe he said 15 --
10    A.  Show me what you're looking at.  I see up on
11 the --
12        MR. STETLER:  You read them before.
13    A.  I see up here (indicating).
14        MS. ST. PETER-GRIFFITH:  Oh, he did?
15        MS. NESBITT:  Yeah.
16        MR. STETLER:  We thought so.
17        MS. ST. PETER-GRIFFITH:  1506.  Okay.
18 I'm sorry.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  If we can move
20 on to the next grouping of documents.  At the back of
21 that binder, yes.
22    A.  Okay.
23    Q.  And what's the range of those loose
24 documents?
25    A.  Well, the first one is 1521.

Page 233

1     Q.  Okay.  And what is that?
2     A.  This is a list of key contacts in the Abbott
3  Home Infusion organization that had responsibilities
4  in reimbursement and those case management
5  negotiations in Abbott's accounting and cash
6  application area in the systems -- the CHIP systems
7  training and education and support area and other,
8  with some other department heads in various areas,
9  that was used at some point in time with a client to
10 give to them as part of a client that we were
11 implementing.
12    Q.  Okay.  And the next documents?
13    A.  This appears to be the paper of a
14 presentation, or at least a walk-through, that would
15 have been used for a client to explain how Abbott's
16 case managers perform their functions.
17    Q.  Abbott's Home Infusion case managers?
18    A.  Yes.
19    Q.  And can you give me the Bates range of that
20 grouping of documents that you are looking at right
21 now?
22    A.  The Bates range?  Sure.  015 -- I'm sorry.
23 Yeah.  01522 through 01545.
24    Q.  Okay.  Are there any other documents within
25 that binder that are not attached to the binder?

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 234

1    A.   Yeah.  This is a -- a copy of a contract with
2  a client, the Visiting Nurses Association of
3  Wisconsin, that had an agreement with Abbott to use
4  the CHIP system only, as I recall, no other services,
5  and this is the agreement that was being operated
6  under for that purpose.
7    Q.   And what is the Bates range for that
8  document?
9    A.   1546 through 1562.
10    Q.   Okay.  If you'll give that grouping to
11  Mr. Stetler and he'll -- he's putting -- giving you
12  another one.
13         MR. STETLER:  I'm getting good at this.
14    Q.   (BY MS. ST. PETER-GRIFFITH)  And, sir, this
15  document that is in front of you, if you could read
16  the Bates range and describe what it is, please.
17    A.   It starts at 1563.  The last page in here is
18  1743.
19    Q.   And it appears that there's some loose notes
20  at the top.
21    A.   It does.
22    Q.   Okay.
23    A.   It says "Account Implementation Plan."
24    Q.   And what is an account implementation plan?
25    A.   When I look at it, maybe I'll be able to tell

Page 235

1  you.
2    Q.   Oh, sure.  Okay.
3    A.   This is a letter from Timothy R. Sykes on
4  March 30th, 1995 that says, "Enclosed is an updated
5  Account Implementation Plan Manual.  This manual
6  should be used as a resource for new account
7  start-ups.  The contents of the manual will generally
8  need to be customized on an account by account basis
9  prior to use."  That's giving me a clue to your
10  question.
11         In concept this manual is a superset of
12  that earlier manual that was an implementation manual
13  used specifically for the reimbursement services
14  portion of implementing a new client.  This appears to
15  be a manual that was used by the Abbott implementors
16  to work with that client on many aspects ranging from
17  reimbursement to pharmacy services to nursing services
18  to inventory management and other aspects of it and
19  that's what this is.
20    Q.   Okay.  And would you use this document?
21    A.   I really don't recall specifically using this
22  document in my own personal responsibilities.
23    Q.   Is this a document that you would have
24  maintained in your office?
25    A.   It's possible.

Page 236

1    Q.   And what's the date of this manual?
2    A.   March 19, '95.
3    Q.   And can you describe what the loose documents
4  are at the front portion of the manual?
5    A.   Maybe.
6    Q.   Okay.
7    A.   Well, one of them is actually that cover
8  letter that I just wrote -- read as to what this
9  manual was.
10         Abbott did provide materials to the
11  clients that clients could use for -- I just want
12  to -- yeah.  They are kind of listed here.  They would
13  be materials essentially for patients or -- or it says
14  physician direct mailers, so that some of them would
15  be marketing materials, promotional posters.  Abbott
16  had developed these documents that would be provided
17  to clients that they, in turn, would provide to
18  patients or other individuals or entities that they
19  would deal with.  And this appears to be some
20  information on how to reorder some of those materials.
21  That's my memory of that as to what this is.
22    Q.   Okay.  Go on to the next manual.
23    A.   And, apparently, I was involved judging from
24  some notes of mine at one point in trying to figure
25  out how to get some for the client, so ...

Page 237

1    Q.   Do you remember which client or do your notes
2  reflect --
3    A.   It says in here.  Memorial Hospital in
4  Colorado Springs.
5         MR. STETLER:  That's next (indicating).
6    Q.   (BY MS. ST. PETER-GRIFFITH)  Sir, if you
7  could just grab the Bates range for this particular --
8    A.   Sure.  1744 through 2150.
9    Q.   And, sir, what is this document?
10    A.   Yeah.  This was a user manual to assist users
11  on how to use the portions of the CHIP system that
12  were involved in the reimbursement called the "CHIP
13  Reimbursement Module User's Guide."
14    Q.   What's the date on it?
15    A.   Well, there's not really a date listed on
16  this cover page.  There's a code that looks like it's
17  a date of December 18, 2002.  That would be a
18  reasonable interpretation.
19    Q.   Did you help --
20    A.   But there's actually -- looking through here,
21  there's a lot of different dates in here of these
22  materials.
23    Q.   Did you participate at all in drafting
24  portions of this document?
25    A.   Some memory is coming back, so you've got to

Page 238

1  give me a moment here.
2     Q.  Okay.  Sure.  Take your time.
3     A.  The answer to your question is yes.
4     Q.  Okay.  Which portions, do you know?
5     A.  Well, the only one that I know for sure is
6  one that I just flipped that caused me to say yes.
7     Q.  Okay.
8     A.  This -- there's a section here on patient
9  statements.  I know I did that.
10    Q.  Is this -- is this a manual that you would
11 use in your capacity as an employee of Abbott Home
12 Infusion or thereafter when you were working with
13 clients?
14    A.  Me personally?
15    Q.  You personally.
16    A.  I would have some use for this as -- I think
17 that this was put together initially when I was in the
18 position of reimbursement supervisor and then it was
19 added to after that, it's my recollection.  Therefore,
20 I think that I would have had some use for this at
21 that time.
22    Q.  Would this have been a document that you
23 maintained in your office?
24    A.  Yes.
25    Q.  Okay.  Why don't we move on to --

Page 239

1     A.  Okay.
2     Q.  I might have questions for you later on --
3     A.  Put this back together.
4     Q.  -- about this manual but --
5     A.  Okay.
6     Q.  -- I just want to get all of our -- all of
7  these manuals identified before we end today.
8         Sir, if you could just grab the Bates
9  range of this particular manual and describe it.
10    A.  Well, I'll just read what's here first.
11 You've got numbers here of 2698 through 2906.  It's
12 called "CHIP Reimbursement A-Z Class Materials."
13    Q.  And what are CHIP A to Z class materials?
14    A.  Well, now you have to give me some time.
15    Q.  Sure.
16    A.  (Witness reviewing document).  Okay.  My
17 recollection of this is -- I'm not saying that I wrote
18 everything, but I think I would have compiled this
19 document.  And it was a document that I believe I used
20 when I was in that manager client services position to
21 teach clients and probably Abbott reimbursement staff
22 people, also, on how to use the CHIP system for all of
23 its reimbursement-related activities.
24    Q.  Would this have been a document that you
25 maintained in your office?

Page 240

1     A.  Yes, it would have been.
2     Q.  Is it fair to say that it was drafted
3  later during your tenure with Abbott?
4     A.  That is fair to say in terms it was compiled.
5  You know, some of the materials in here may be older.
6  Don't know.
7     Q.  But it was compiled when you were in --
8  working with clients who were licensing the CHIP
9  system?
10    A.  And Abbott employees, yes.  That's my
11 recollection.  In that position when I was manager of
12 client services.
13    Q.  Okay.
14    A.  That is my recollection.
15    Q.  Okay.  Could you identify the next binder,
16 please?
17    A.  Okay.  This -- the numbers are 2907 through
18 3123.
19    Q.  And, sir, what is --
20    A.  It's entitled "Medicare Overview PEN Claims,"
21 1995.  This is another reimbursement training manual.
22 We had seen one earlier that was the DMERC manual.
23 This was to -- intended to be used for training of the
24 Abbott reimbursement staff, possibly clients, also.
25 If I didn't mention that earlier, that manual could

Page 241

1  have been used for clients, too, in the DMERC.  On how
2  to bill Medicare for parenteral and enteral claims in
3  1995.
4     Q.  Okay.  And there are some loose documents, it
5  appears, in the pocket on the inside.  Do you see
6  that, sir?
7     A.  Uh-huh.
8     Q.  What's the Bates range for the -- for those
9  loose documents?  And can you review them --
10    A.  29 -- I'm sorry.
11    Q.  Go ahead.
12    A.  2909 through 2930.
13    Q.  And can you review them and identify them?
14    A.  Well, this is sort of a collection of
15 different documents on different subjects, so one by
16 one I could, if you would like.
17    Q.  Sure, if you could.
18    A.  2909 is a document for total parenteral
19 nutrition, or TPN, that would have been intended to be
20 used to document information obtained upon the intake
21 process, accepting a patient on to home infusion
22 therapy, pertaining to why they needed TPN, as well as
23 what the specific drug formula, drug and mineral, et
24 cetera, formula for the TPN would be.  So that's what
25 this required TPN information form is.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 242

1      The required TEN information form is
2  very similar except it's for patients that were
3  receiving enteral nutrition therapy.
4      Medicare at the time had a requirement
5  to -- that the -- the -- the provider, called,
6  actually, technically a supplier, was at the time
7  required to notify the patient that -- in
8  circumstances in which the patient might have some
9  reason to believe that there would actually be
10  coverage by the Medicare program for the patient's
11  therapy, but there wasn't.
12     Q.  Okay.
13     A.  So the supplier was obligated to notify
14  patient in advance of that.  It's called the waiver of
15  liability.  There's more detail than that, but perhaps
16  that's enough for now.
17     Q.  Is that what waiver of liability means in the
18  enteral/parenteral nutrition area?
19     A.  It did then.  There's a different name for it
20  now.
21     Q.  Okay.  What's the name for it now?
22     A.  Advance beneficiary notice or ABN.
23         This one, from the desk of Virginia
24  Tobiason, dated February 16, 1995.  The numbers are
25  2915 through 2926.

Page 243

1      Q.  And what is that document?
2      A.  It's called "Reimbursement Update."
3          MS. NESBITT:  Can you say the date again
4  on that?
5          THE WITNESS:  I'm sorry?
6          MS. NESBITT:  Can you say the date on
7  that again?
8          THE WITNESS:  The numbers?  Oh, the
9  date --
10         MS. NESBITT:  No, the date.
11         THE WITNESS:  -- was -- the date is
12  February 16, 1995.
13     Q.  (BY MS. ST. PETER-GRIFFITH)  Did Ms. Tobiason
14  send out regular reimbursement updates?
15     A.  There was a period of time where she was
16  sending out a publication like this, if I recall
17  correctly, and this would appear to indicate I do,
18  upon having seen this and I probably would not have
19  remembered that otherwise.
20     Q.  Who did she send it out to?
21     A.  This would go to Abbott clients, I believe,
22  and also it was probably distributed to the Home
23  Infusion Services management and/or reimbursement.
24  That I don't really recall.
25     Q.  With regard to -- if you can look on Page 2.

Page 244

1      Do you see where it says Stark referral?
2      A.  I do.
3      Q.  Do you know what that reference is?
4      A.  At a high level it references a law commonly
5  called the Stark law --
6      Q.  And --
7      A.  -- that had to do with what types of
8  relationships physicians could have with providers of
9  health services that they might be referring patients
10  to and what they couldn't do.
11     Q.  Is that commonly referred to as Stark?
12     A.  That's commonly referred to as Stark, yes.
13     Q.  Okay.  Sir, who is Stark?
14     A.  Representative Pete Stark in California.
15     Q.  Are you aware of the fact that Representative
16  Pete Stark in California sent a letter to Miles White?
17     A.  Really?  No.
18     Q.  Okay.
19         MR. STETLER:  You didn't get a copy?
20         THE WITNESS:  I would like to see that.
21     Q.  (BY MS. ST. PETER-GRIFFITH)  Had you -- did
22  you hear anything about Pete Stark writing --
23  writing -- writing to Miles White --
24     A.  No.
25     Q.  -- at any time?

Page 245

1      A.  No, I sure didn't.
2      Q.  Okay.  If you could go on to the next
3  document, please.
4      A.  At least not that I can recall.  I might have
5  recalled that, but I'm not sure.
6          Okay.  This document numbers are 2927
7  through 2930 stapled together.  It's a copy from
8  somewhere with information about this waiver of
9  liability that I had explained earlier.  It looks like
10  it's somebody's manual.  It's got some handwritten
11  notes on it, which are my handwriting.  That's what it
12  is.
13     Q.  Okay.
14     A.  Okay.
15     Q.  Did you draft that?
16     A.  No, definitely not.
17     Q.  Okay.  If we could move on to the next
18  binder.
19     A.  This is probably -- I mean, you know, it
20  doesn't identify where it's coming from, but I know
21  enough to recognize it's probably from one of the
22  government Medicaid contractors, such as a DMERC.
23     Q.  Okay.  Sir, if you could give the Bates range
24  and describe this binder.
25     A.  Sure.  3494 through 3580 and -- oh, here it

Page 246

1    is, 3581.  I thought someone had missed -- so that's
2    what it -- that's the business.  It's entitled
3    "Reimbursement Training Program Insurance" dated 1995
4    from Abbott Home Infusion Services.  You want to know
5    what this is?
6       Q.  Yes, I do.
7       A.  Yeah.  This was another manual that was
8    provided to Abbott employees and, perhaps, to clients,
9    also, when training on reimbursement was done in this
10   case, kind of teaching them about insurance in
11   general.
12      Q.  And is it training for claims -- for
13   third-party payers, such as insurance companies,
14   private third-party payers such as insurance
15   companies?
16      A.  I would say so.  There's something in here
17   about Medicare as a secondary payer, which, actually,
18   does refer to -- at least when you bill Medicare as
19   to -- there are cases where another insurer may
20   actually be billed before Medicare will be billed even
21   though the patient is Medicare.  So there's some
22   aspect of Medicare in this book, as I see.  But to me,
23   right now looking at this, it mostly appears to be
24   referring to private insurance.  There's something
25   about hospice care.  I would have to look at that to

Page 247

1    figure it out.
2       Q.  Okay.  Sir, did you use this in the context
3    of your -- your job responsibilities within --
4       A.  I don't have any recollection of using this.
5    I might have attended one of the trainings that were
6    done on this using this book.
7       Q.  Is this a binder that you maintain in your
8    office?
9       A.  I think.
10      Q.  Do you know who conducted -- or who drafted
11   this book or who was responsible for its content?
12      A.  Likely it was Shellie Bronson.
13      Q.  Okay.  Shellie Bronson when she was working
14   with Home Infusion reimbursement or when she was
15   working in Home Infusion Contract Marketing?
16      A.  Reimbursement.
17      Q.  Okay.
18      A.  Ready for the next one?
19      Q.  Go ahead, please.  If you could give the
20   Bates range of the next document.
21      A.  3582 through 3731.  This is entitled "Abbott
22   CHIP System," "Expert Database and Query Writing."
23   It's dated October 2001.  In the period of time that I
24   was that -- product manager -- well, manager of client
25   services, that was the official name, I was teaching

Page 248

1    clients and Abbott staff how to do the custom report
2    writing using this tool called the query tool in the
3    CHIP system.  This is a manual that I would have
4    compiled together.  Not to say I would have written
5    every part of it.  I probably wrote parts of it.  And
6    that's what this is on the bottom portion.
7           And looking briefly at these, I would be
8    happy to take you through each one if you would want
9    to but --
10      Q.  Sure.  If you could.
11      A.  Hoping -- I was hoping you would say no.
12          MR. STETLER:  Then why did you offer?
13   Logical question.
14      A.  You know, both -- both of these are just
15   materials related to that training and there appears
16   to be -- I think what I was looking at here are
17   examples of what some of the data constricts --
18   constricts, structures were within the CHIP system,
19   that's what this is, so that someone writing a query
20   to try and report on this type of data would have some
21   understanding as to how it was placed into the CHIP
22   system.  I think that's what this is.
23          This, actually, appears to be examples
24   of reports that could be created from a query and work
25   created from a query.

Page 249

1       Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, if you
2    could just give the Bates range of that particular
3    document.
4       A.  Sure.  It's 039 -- I'm sorry.  3591 through
5    3593.  That's an example of a report.
6           And then we start again at 3594 through
7    3620.  And this is actually a report that lists the
8    hierarchical computer file structure within the CHIP
9    system that someone that was actually writing these
10   query reports would need to have some understanding
11   of, so this is a listing of it.
12      Q.  Okay.  And the prior document that you were
13   referencing that's -- that's loose in the binder --
14      A.  Yes.
15      Q.  -- can you give the Bates range, please?
16      A.  This one (indicating)?
17      Q.  No.  The one -- the one that's on your
18   right-hand side right there.
19      A.  This one (indicating).
20      Q.  Yes.
21      A.  3584 through 3590.
22      Q.  Okay.  If we could go to the next manual.  I
23   just want to make sure that we're able to get through
24   all these before the end of the day, at least
25   identifying them.

63 (Pages 246 to 249)

3d8b0dbb-837a-4faf-875f-bf00722949fc

1          MS. ST. PETER-GRIFFITH:  And,
2  Mr. Stetler, if I could just ask you to put those
3  loose documents in the -- in the pocket so that we
4  don't lose them.  Is there a pocket for that?  In the
5  front.  The pocket in the front.
6          MR. STETLER:  I'm just trying to get
7  them in the right order.
8      Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, if you
9  could give the Bates range of this binder.
10     A.  Sure.  It's 3738 through 3835.  It's entitled
11 "Beyond AWP:  Strategies for Maximizing Business
12 Performance."  This is a -- at least a portion, if not
13 all of this, is from the National Home Infusion
14 Association, what was called an -- what is called an
15 NHIA executive conference on February 6 of 2002.
16     Q.  Did you attend that conference?
17     A.  Well, I -- I would have been present.  Was I
18 actually in this conference, I'm not sure right now.
19     Q.  Okay.
20     A.  But I would have been at least in the
21 building and I may have.
22     Q.  Were these materials compiled by the NAIH?
23     A.  They were compiled by NHIA --
24     Q.  I'm sorry.
25     A.  -- but they consist of largely collection --

1  materials by those that were doing the presentation,
2  most of which, but not all of which, perhaps, were not
3  NHIA staff.  And, actually, I do believe I was in
4  this, yes.
5      Q.  Did you draft any portion of those compiled
6  materials?
7      A.  I don't think so.
8      Q.  And, sir, is NHIA the organization that you
9  are now employed with?
10     A.  Yes.
11     Q.  But in 2002, is that the date of that manual?
12     A.  Yes.
13     Q.  Were you employed with NHIA at that time?
14     A.  No.  No.
15     Q.  Was this a manual that you retained in your
16 office at Abbott?
17     A.  Yes.
18     Q.  Okay.  Were there other attendees that you
19 are aware of from Abbott?
20     A.  Not that I'm aware of.
21     Q.  Were you asked to provide information on
22 Abbott's behalf in contribution towards that compendia
23 of materials?
24     A.  Not that I'm aware of.
25     Q.  Okay.  And the loose documents that are in

1  the front, if you could give the Bates range and
2  describe what they are.
3      A.  The first stapled document, 3740 through
4  3747, is a presentation that evidently was done by one
5  of the individuals called "Electronic -- "Electronic
6  Prescribing:  Are We There Yet?" at this -- Wednesday,
7  February 6, 2002.  Yeah, I would say at this
8  conference.  At this particular executive conference.
9      Q.  And on the back of the last page of that
10 document is there a Bates number?  There appears to be
11 handwriting.  If you just flip it over.
12     A.  3748.
13     Q.  Okay.  And is that your handwriting?
14     A.  That is my scrawl, yes.
15     Q.  And the other loose documents, if you could
16 give the Bates range and describe those.
17     A.  3749 through 3752 called "Electronic
18 Prescribing:  Are We There Yet?"  It must have been
19 part of this presentation.  Yeah.  It's additional
20 material.  It's "Educational Objectives," "Learning
21 Assessment Questions."  These -- yeah.  This is what's
22 required for continuing education credits for those
23 that are eligible for such.
24     Q.  Okay.  Does that include you?
25     A.  No.

1      Q.  Okay.  And the -- the loose couple of pages,
2  it appears, or more than a couple, maybe, what are
3  those documents?
4      A.  The NHIA executive conference for many years
5  has been a -- what we call a preconference session -
6  now I'm speaking kind of as an NHIA employee - to the
7  NHIA annual conference.  So the NHIA annual conference
8  will be several days of presentations.  And then the
9  preconference, one of them that's held, and has been
10 held for a long time, is an NHIA executive conference.
11         So this book, and everything we
12 discussed so far, was from the executive conference.
13 At least some of these materials now are from the
14 general conference that was conducted several days
15 later.
16         So the first document, 3753, is a list
17 of what are called round table receptions.  That is a
18 period of time where individuals at the conference can
19 join a table where people are talking about particular
20 subjects and this is a list of what all the subjects
21 are, in a big room.
22     Q.  Okay.  Are the remainder just miscellaneous
23 documents?
24     A.  They are -- yeah.  I mean, there's a
25 collection of things from that conference.  This is --

64 (Pages 250 to 253)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 254

1  well, do you want more?
2     Q.  Sure.  If you could just briefly describe
3  them.
4     A.  Sure.  3754 and 3755 on the reverse side is
5  talking about what's called a DMERC advisory
6  committee.  That's a committee of suppliers that bill
7  to Medicare that -- it's kind of a sound board
8  provided to the Medicare contractor, they're still
9  around today, and this is talking about one of those
10  committees.
11        The next one is a presentation at 35 --
12  3756 through 3760 entitled NHIA -- well, it's a
13  presentation from the annual conference entitled
14  "Reimbursement Begins When the Phone Rings" by Joe
15  Pomis.  And Joe is doing a presentation here on things
16  he thinks that are important in reimbursement.
17     Q.  Okay.
18     A.  The next one is 3761, one page.  It's a
19  letter from a company that was called Pharmaceutical
20  Buyers, Inc. to NHIA conference attendees welcoming
21  them, talking about PBI being proud to sponsor the
22  executive conference and hopefully, as they would view
23  it, making the attendees feel good about PBI.
24     Q.  Okay.
25     A.  3762 is also from the conference and,

Page 255

1  actually, it's just another apparent piece of material
2  that attendees of this executive conference got with
3  PBI's name on it.  And I guess at the time the
4  association had some other companies that were helping
5  fund the executive conference and they seem to be
6  listed here, too.  That's what this document is here,
7  too.
8     Q.  Okay.  If we could move on to the next
9  binder.
10        MR. STETLER:  I'll do it.  We've got a
11  lot more to go.
12     A.  Okay.  The numbers are 3838 through 4076.
13     Q.  (BY MS. ST. PETER-GRIFFITH)  And what is
14  that?
15     A.  Well, the binder says "Home Infusion"
16  Reimbursement and Management" with David Franklin.
17  This binder was used for presentations done apparently
18  on four different dates in 2001 and 2002 where the
19  association had sponsored someone to teach those in
20  the provider side of the industry how to do
21  reimbursement.  And so this is a training binder for
22  that purpose.
23     Q.  Okay.  If you could move on to the next
24  binder.
25        MR. STETLER:  Go ahead.

Page 256

1     A.  Which one?
2        MR. STETLER:  The next one.
3     Q.  (BY MS. ST. PETER-GRIFFITH)  The next one.
4     A.  This one (indicating)?
5     Q.  The spiral bound.
6     A.  Okay.  The numbers are 4078 through 4136.
7  The binder is called "Hospital Business Sector Product
8  Overview, "Presented by: HPD Sales Training &
9  Development" on August 8, 2002.  This was a training
10  document from a class that I do recall attending that
11  was basically to be -- you know, it was presented by
12  HPD to teach those that were not involved in product
13  on a day-to-day basis, something about the HPD
14  products, and that's what this book is.
15     Q.  Okay.  The next binder.
16     A.  This one is blank on the cover.  4138 through
17  4310.  These appear to be a collection of
18  presentations from another NHIA annual conference that
19  I attended in Fort Lauderdale, Florida.
20     Q.  Well, that's my hometown, but --
21     A.  Oh, is it?  At some time.  I see a date here
22  of 1998.  I see another date of May 20th.  I don't
23  know exactly when this was, unless the date pops up
24  here.  Rx Expo '99.  It looks to me like it was in
25  1999.

Page 257

1     Q.  Okay.  If you could move on to the next
2  binder.
3        MR. STETLER:  Thank you.
4     A.  4311 through 4445.  It's called "Product
5  Launch Guide," Abbott CHIP.  Oh, okay.  Before we
6  learned that Abbott was to be closing the business
7  unit, the business unit had made a decision to --
8  to -- to commercially market the CHIP computer system,
9  to simply sell it, or at least the rights to use it,
10  in and amongst itself to other parties as opposed to
11  the full set of services the business unit had more
12  typically provided.  So this was a document that I
13  believe was used for the training of the sales staff
14  at that time to kick off that selling effort.
15        MS. ST. PETER-GRIFFITH:  Okay.  We've
16  got five minutes left on the tape.  How many more
17  binders do we have, Mr. Stetler?
18        MR. STETLER:  Five.
19     Q.  (BY MS. ST. PETER-GRIFFITH)  Five.  If we
20  could just -- sir, if you could just very quickly
21  identify the Bates ranges and the titles of the
22  binders.
23     A.  4446 through 4546.  This is a training manual
24  from a Socratic selling class that I did attend for
25  basically how to sell.

65 (Pages 254 to 257)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 258

1    Q.  Okay.  The next binder?
2    A.  4547 through 4800.  This is called "Insurance
3  Overview."  It's got a date scratched here of 1997,
4  originally 1996.  This also at times must have been
5  used for training Abbott staff and clients on aspects
6  of reimbursement is what I would say.
7    Q.  And the next one?  If you just give the Bates
8  range.
9    A.  Well, the numbers are 4801 through 5108.
10  It's also entitled "Insurance Overview."  This, also,
11  was probably used for the same purpose as the previous
12  one to train Abbott staff and, perhaps, clients on
13  reimbursement topics.
14    Q.  And the final?
15        MR. STETLER:  No, not the final.
16        MS. ST. PETER-GRIFFITH:  Oh, second to
17  last.
18        MR. STETLER:  Second to last.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  If you could --
20    A.  Okay.  Everything in the binder starts at
21  5521.  It ends at 5895.  Meaning some of it is
22  actually three-hole punched in the binder, others are
23  materials.
24    Q.  Okay.  And this binder is what?  If you could
25  describe it.  I think there's a name on the spine.

Page 259

1        MS. MOORE:  On the spine.
2    A.  Well, I'm not seeing it yet.  Oh.  Well, it
3  says "Medicare Enteral Billing."  I'm not sure that's
4  what it is, though.
5    Q.  Okay.  And if you could just describe the
6  next binder really quickly.
7    A.  Okay.
8        MR. STETLER:  No, this is (indicating)
9  the next one.
10        THE WITNESS:  This being the next one?
11  Okay.
12        MR. STETLER:  Let me hand you 5111
13  through 5519.
14        THE WITNESS:  So I'm giving you this
15  back.  Thank you.
16    Q.  (BY MS. ST. PETER-GRIFFITH)  And what --
17  what -- if you could just describe what this is.
18    A.  This says "Medicare Part B PEN Manual."
19        MS. ST. PETER-GRIFFITH:  And this is the
20  last binder, Mr. Stetler?
21        MR. STETLER:  It's the last binder.
22        MS. ST. PETER-GRIFFITH:  Okay.
23    A.  This also is a training manual having to do
24  with aspects of reimbursement.
25        MS. ST. PETER-GRIFFITH:  Why don't we

Page 260

1  adjourn for the day because I know Mr. Stetler has to
2  leave and we're out of tape.
3        MR. STETLER:  Good.
4        THE VIDEOGRAPHER:  We're off the record
5  at 4:15 p.m.  The conclusion of this session of the
6  deposition of Mr. Bruce E. Rodman.
7
8        (Deposition adjourned at 4:15 p.m.)
9        (Signature waived)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 261

1  STATE OF TEXAS )
2  COUNTY OF TRAVIS )
3
4        I, CYNTHIA VOHLKEN, CSR #1059, do hereby
5  certify that, pursuant to the agreement hereinabove
6  set forth, there came before me on the 29th day of
7  August, 2007, at 8:47 o'clock a.m., in the offices of
8  Stetler & Duffy, LLP, 11 S. La Salle, Suite 1200,
9  Chicago, Illinois, the following named person, to-wit:
10  BRUCE E. RODMAN, who was by me duly sworn to testify
11  to the truth and nothing but the truth of witness'
12  knowledge touching and concerning the matters in
13  controversy in this cause; that such witness was
14  thereupon examined under oath, and the examination
15  transcribed by computer-assisted transcription by me
16  or under my supervision, and that the deposition is a
17  true record of the testimony given by the witness.
18        I further certify that I am neither attorney
19  nor counsel for, nor related to or employed by, any of
20  the parties to the action in which this deposition is
21  taken and, further, that I am not a relative or
22  employee of any attorney or counsel employed by the
23  parties hereto, or financially interested in the
24  action.
25

66 (Pages 258 to 261)

Page 262

```
 1        That the amount of time used by each party at
 2  the deposition is as follows:
 3        Ms. Ann St. Peter-Griffith - 05:50
 4
 5        IN WITNESS WHEREOF I have hereunto set my
 6  hand on this 10th day of September, A.D. 2007.
 7
 8
 9
10
11        Cynthia Vohlken, Texas CSR 1059
          Expiration Date: 12/31/2008
          Firm Registration No. 82
12        Fredericks-Carroll Reporting
          7800 Shoal Creek Boulevard
13        Suite 200 W
          Austin, Texas 78757
14        Telephone: (512) 477-9911
             (800) 234-3376
15        Fax:    (512) 345-1417
16
    JOB NO. 2639
17
18
19
20
21
22
23
24
25
```

Page 264

```
 1        That $        is the deposition officer's
 2  charges to the Plaintiffs for preparing the original
 3  deposition transcript and any copies of exhibits;
 4        That pursuant to information given to the
 5  deposition officer at the time said testimony was
 6  taken, the following includes counsel for all parties
 7  of record:
 8        MS. ANN M. ST. PETER-GRIFFITH,
             Attorney for Plaintiff United States of
 9           America
          MS. AMBER M. NESBITT,
10           Attorney for Plaintiff State of Arizona
             and MDL Plaintiffs
11        MS. MARGARET MOORE, Attorney for Plaintiff
             State of Texas
12        MR. TIMOTHY C. FOOTE, Attorney for
             Plaintiff State of California
13        MS. TARA FUMERTON,
             Attorney for Defendants Abbott
14           Laboratories, Inc. and Hospira, Inc.
15        That a copy of this certificate was served on
16  all parties shown herein on September 10, 2007 and
17  filed with the Clerk pursuant to Rule 203.3.
18        I further certify that I am neither counsel
19  for, related to, nor employed by any of the parties or
20  attorneys in the action in which this proceeding was
21  taken, and further that I am not financially or
22  otherwise interested in the outcome of the action.
23
24
25
```

Page 263

```
 1            NO. D-1-GV-04-001286
    THE STATE OF TEXAS        ) IN THE DISTRICT COURT
 2                            )
    ex rel.                   )
 3    VEN-A-CARE OF THE       )
      FLORIDA KEYS, INC.,     )
 4      Plaintiffs,           )
                              )
 5  VS.                       ) TRAVIS COUNTY, TEXAS
                              )
 6  ABBOTT LABORATORIES INC., )
    ABBOTT LABORATORIES,      )
 7  HOSPIRA, INC., and B. BRAUN )
    MEDICAL INC.,             )
 8    Defendant(s).           ) 201ST JUDICIAL DISTRICT
 9        REPORTER'S CERTIFICATION
          DEPOSITION OF BRUCE E. RODMAN
10           August 29, 2007
11        I, Cynthia Vohlken, Certified Shorthand
12  Reporter in and for the State of Texas, hereby certify
13  to the following:
14        That the witness, BRUCE E. RODMAN, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18        That examination and signature of the witness
19  to the deposition transcript was waived by the witness
20  and agreement of the parties at the time of the
21  deposition.
22        That the amount of time used by each party at
23  the deposition is as follows:
24        Ms. Ann St. Peter-Griffith - 05:50
25
```

Page 265

```
 1        Certified to by me this 10th day of
 2  September, 2007.
 3
 4
 5
          CYNTHIA VOHLKEN, TX CSR 1059
 6        Expiration Date: 12/31/2009
          Firm Registration No. 82
 7        Fredericks-Carroll Reporting
          7800 Shoal Creek Boulevard
 8        Suite 200 W
          Austin, Texas 78757
 9        Telephone: (512) 477-9911
             (800) 234-3376
10        Fax:    (512) 345-1417
11  Job No. 2639
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

67 (Pages 262 to 265)

FREDERICKS-CARROLL REPORTING

Page 266

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


     IN RE:  PHARMACEUTICAL         )
     INDUSTRY AVERAGE WHOLESALE     ) MDL No. 1456
     PRICE LITIGATION               ) Civil Action No.
                                    )    01-12257-PBS
                                    )
     THIS DOCUMENT RELATES TO:      )
                                    )
     United States of America,      ) Hon. Patti Saris
     ex rel. Ven-a-Care of the      )
     Florida Keys, Inc., v.         )
     Abbott Laboratories, Inc.,     )
     and Hospira, Inc.              )
     CIVIL ACTION NO. 06-11337-PBS  )



     *******************************************************

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


     IN RE:  PHARMACEUTICAL         )
     INDUSTRY AVERAGE WHOLESALE     ) MDL No. 1456
     PRICE LITIGATION               ) Civil Action No.
                                    )    01-CV-12257-PBS
                                    )
     THIS DOCUMENT RELATES TO:      )
                                    ) Judge Patti B. Saris
     State of California, ex rel.   )
     Ven-A-Care v. Abbott           ) Magistrate
     Laboratories, et al.           ) Judge Marianne Bowler
     Cause Nos. 03-cv-11226-PBS     )



     *******************************************************

               ORAL AND VIDEOTAPED DEPOSITION OF
                        BRUCE E. RODMAN
                       October 11, 2007
                           Volume 2

     *******************************************************
```

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 267

```
1            NO. D-1-GV-04-001286
2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                             )
3  ex rel.                   )
      VEN-A-CARE OF THE      )
4    FLORIDA KEYS, INC.,     )
          Plaintiffs,        )
5                            )
   VS.                       ) TRAVIS COUNTY, TEXAS
6                            )
   ABBOTT LABORATORIES INC., )
7  ABBOTT LABORATORIES, and  )
   HOSPIRA, INC.,            )
8       Defendants.          ) 201ST JUDICIAL DISTRICT
9  **********************************************************
10
11     ORAL AND VIDEOTAPED DEPOSITION OF BRUCE E. RODMAN.
12  produced as a witness at the instance of the
13  Plaintiff(s), and duly sworn, was taken in the
14  above-styled and numbered causes on the 11th of
15  October, 2007, from 9:16 a.m. to 5:07 p.m., before
16  CYNTHIA VOHLKEN, CSR in and for the State of Texas,
17  reported by machine shorthand, at the offices of
18  Stetler & Duffy, LLP, 11 S. La Salle, Suite 1200,
19  Chicago, Illinois, pursuant to the Federal and Texas
20  Rules of Civil Procedure and the provisions attached
21  previously.
22
23
24
25
```

Page 268

```
1        A P P E A R A N C E S
2
   FOR THE PLAINTIFF UNITED STATES OF AMERICA:
3
     Ms. Ann M. St. Peter-Griffith
4    Assistant U.S. Attorney
     United States Attorney's Office
5    Southern District of Florida
     99 N.E. Fourth Street
6    Miami, Florida 33132
7
   FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
8
     Mr. Eliseo Sisneros
9    Deputy Attorney General
     BMFEA
10   Bureau of Medi-Cal Fraud & Elder Abuse
     State of California Department of Justice
11   110 West A Street #1100
     San Diego, California 92101
12
13 FOR THE PLAINTIFF THE STATE OF TEXAS:
14   Ms. Margaret Moore
       (By Telephonic Means)
15   Assistant Attorney General
     Office of the Attorney General
16   State of Texas
     Post Office Box 12548 (78711-2548)
17   300 W. 15th Street, 9th Floor
     Austin, Texas 78701
18
19 FOR THE RELATOR:
20   MS. SUSAN THOMAS
     Berger & Montague, P.C.
21   1622 Locust Street
     Philadelphia, Pennsylvania 19103
22
23
24
25
```

Page 269

```
1  FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
   HOSPIRA, INC.:
2
     Mr. Jeremy Cole
3    Jones Day
     77 West Wacker, Suite 3500
4    Chicago, Illinois 60601-1692
5
   FOR THE WITNESS:
6
     Mr. David J. Stetler
7    Stetler & Duffy, Ltd.
     11 South LaSalle Street, Suite 1200
8    Chicago, Illinois 60603
9
   ALSO PRESENT:
10
     Mr. Anthony Micheletto, Videographer
11
12
             *-*-*-*-*
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 270

```
1              INDEX
2  Appearances...................... 268
3  BRUCE E. RODMAN
      Examination by Ms. St. Peter-Griffith
4        (Continued)............... 272
      Examination by Ms. Thomas....... 447
5     Examination by Ms. St. Peter-Griffith
         (Continued)............... 536
6     Examination by Mr. Cole........ 553
7  Signature and Changes........... 556
   Reporter's Certificates......... 558
8
9  VIDEOTAPE NUMBER
10  1 ..................................... 271
    2 ..................................... 322
11  3 ..................................... 386
    4 ..................................... 439
12  5 ..................................... 495
13
            EXHIBITS
14
15 NO. DESCRIPTION                     PAGE
   1386........................... 314
16   Case Management Training Manual
     (BR 00714-989) Highly Confidential
17 1387........................... 341
     Reimbursement Implementation Manual
18   (BR 01407-1503) Highly Confidential
   1388........................... 367
19   CHIP Reimbursement A-Z Class Materials
     (BR 02698-2906) Highly Confidential
20 1389........................... 417
     CHIP Reimbursement Module User's Guide
21   (BR 01744-2150) Highly Confidential
   1390........................... 494
22   E-mail string; March 15, 2001 E-mail from
     Bruce Rodman to Jerrie Cicerale, Subject:
23   Price Validation (TXABT 42025-26 or
     CAABT 006782-83) Confidential
24 1391........................... 507
     Notes From Meeting With Karla Krecklow on
25   Reimbursement (7/12/01)
```

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 271

1       THE VIDEOGRAPHER:  This is Anthony
2  Micheletto representing Complete Litigation Support.
3  I am the operator of this camera.  This is the
4  videotaped deposition of Bruce Rodman as being taken
5  pursuant to Federal Rules of Civil Procedure on behalf
6  of the plaintiff.
7       We are on the record on October 11,
8  2007.  The time is 9:16 a.m., as indicated on the
9  video screen.  We are at 11 South La Lasalle Street,
10  Chicago, Illinois.  This case is captioned In Re:
11  Pharmaceutical Industry Average Wholesale Price
12  Litigation.  Case Number 01-CV-12257-PBS.
13       Will the attorneys please identify
14  themselves for the video record.
15       MS. ST. PETER-GRIFFITH:  Ann
16  St. Peter-Griffith from the United States Attorney's
17  Office, Southern District of Florida on behalf of the
18  United States.
19       MR. SISNEROS:  Eliseo Sisneros, Deputy
20  Attorney General on behalf of the State of California.
21       MS. THOMAS:  Susan Thomas, Berger &
22  Montague, on behalf of the Relator, Ven-A-Care of the
23  Florida Keys.
24       MR. COLE:  Jeremy Cole from Jones Day in
25  Chicago for the Abbott defendants and Hospira.

Page 272

1       MR. STETLER:  Dave Stetler for the
2  witness.
3       THE VIDEOGRAPHER:  The court reporter
4  today is Cynthia Vohlken from Complete Litigation
5  Support.  Please swear in the witness.
6            BRUCE RODMAN,
7  having been first duly sworn, testified as follows:
8            EXAMINATION (CONTINUED)
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Welcome back, Mr. Rodman.
11    A.  Thank you, Ann.
12    Q.  Since we were last here and we last took your
13  deposition, have you done anything in terms of
14  preparing for today's deposition?
15    A.  I spoke to my lawyer yesterday, I believe it
16  was, and compared my notes, just my notes of -- down
17  on the train.
18    Q.  Okay.  Your notes of your conversations with
19  Mr. Stetler?
20    A.  That and my outline of the documents that I
21  turned over.
22    Q.  Okay.
23    A.  Notes from my Jones Day talk when I had the
24  first phone call, that sort of thing.
25    Q.  Okay.

Page 273

1    A.  But you already have a copy of that.
2    Q.  We've already gotten copies of this.
3    A.  Yeah, uh-huh.
4    Q.  Okay.  There are no new notes that you're
5  talking about?
6    A.  Other than from my conversation with --
7    Q.  Mr. Stetler?
8    A.  Mr. Stetler yesterday, no.
9    Q.  Okay.  Sir, did you review your deposition
10  transcript of the first day of your deposition?
11    A.  I did not.
12    Q.  Okay.  After the deposition concluded and
13  during the -- our break before reconvening today, have
14  you thought about your deposition testimony at all?
15    A.  Have I thought about it?  This is the first
16  time I've ever done a deposition, so I guess I thought
17  about it, but did I spend any real time on it or
18  change any conclusions?  No.
19    Q.  That -- that was more --
20    A.  Change, no.  If that's what you're getting
21  at.
22    Q.  That was more of my question.  Did you have
23  time to reflect on the answers that you gave?  And I
24  just want to give you the opportunity at this time if
25  there's anything that you think you need to change or

Page 274

1  amplify from your answers that you gave in your first
2  deposition, I just wanted to give you the opportunity
3  to do that now.
4    A.  I can honestly say I didn't think about
5  anything like that during that time and, therefore, I
6  don't have anything to modify from then.
7    Q.  Well, the same rules apply that -- that
8  applied before.  If -- if at any time you think of
9  anything, you know, when you respond to a question, if
10  there's something that comes up later on, you know, we
11  did this before, please feel free to just let us know
12  and we're happy to have you either change or amplify
13  your information.  Okay?
14    A.  Okay.
15    Q.  At the end of the deposition we spent a lot
16  of time identifying documents that you had produced.
17  What I would like to do right now is to just have
18  you -- is to discuss some -- some general areas which
19  were clearly within the purview of -- of your
20  employment as a reimbursement specialist.  Just
21  generally.
22       And the first thing I would like to
23  discuss is the CHIPs system itself.  I believe you
24  testified earlier that you were a -- you were the
25  interface for the CHIP system.  Can you just take us

3  (Pages 271 to 274)

Page 275

1  through, what is the CHIP system and how is it
2  developed?
3      A.  Well, the development I'll just answer more
4  quickly because -- unless you want more, but it was
5  developed entirely in-house by Abbott employees and I
6  think some contractors before I was involved with the
7  business unit of Home Infusion Services.
8      Q.  Okay.
9      A.  The function of the CHIP system was to serve
10  as a complete pharmacy and business management
11  information system for a home infusion business.  So
12  it had major modules to handle inventory and
13  purchasing, to handle pharmacy patient records,
14  prescriptions, to handle the functions that -- the
15  reimbursement function would do, basically the billing
16  and collections on claims to the health plans.  And --
17  and, you know, quite a bit of management reporting and
18  a lot of that reporting was used, actually, to feed
19  accounting -- other accounting systems or, you know,
20  either -- I guess most of it was manual.  But
21  that's -- as an overview, that's what it was.
22      Q.  When you say "other accounting systems," what
23  accounting systems are you referencing?
24      A.  Well, Abbott had various accounting systems
25  of which I was not familiar with, but, you know, done

Page 276

1  by the accountants.  And so -- as an example, the CHIP
2  system would generate a gross sales report that would
3  provide an estimate in that report of gross sales and
4  net sales and the accountants would do -- would use
5  that information to feed that into Abbott's accounting
6  systems for the purpose of, you know, preparing the --
7  you know, keeping the financial books for the business
8  unit and also indirectly for the corporation since the
9  business unit was part of the corporation.  Well,
10  directly for the corporation.
11      Q.  Okay.  Which business units utilized the CHIP
12  system while -- while you -- during your tenure in the
13  reimbursement area?
14      A.  The pharmacy area, which would include those
15  responsible for inventory.
16      Q.  Okay.
17      A.  The reimbursement area.
18      Q.  Reimbursement area of which -- of Home
19  Infusion?
20      A.  Yes.
21      Q.  Okay.  And the other reimbursement area?
22      A.  Well, also of Abbott's clients that were
23  users of the CHIP system.
24      Q.  Okay.
25      A.  That would also be true for the pharmacies.

Page 277

1      Q.  Okay.  Abbott had its own pharmacies, we
2  discovered.
3      A.  Abbott did have its own pharmacies, but the
4  clients had their pharmacies, too.
5      Q.  Okay.
6      A.  The most major unit, I guess, would be --
7  would be the accounting department.  Those three would
8  be, if my memory serves me correctly, the most likely
9  hands-on users to the CHIP system.
10      Q.  And which accounting department?  Was there
11  just one big accounting department at Abbott or did
12  each business unit have its own accounting department?
13      A.  Each business unit had its own accounting
14  department.
15      Q.  Okay.  So which business units at Abbott
16  would -- which accounting departments in which
17  business units at Abbott would utilize the CHIP
18  system?
19      A.  Let me go back.  The fourth function would be
20  contract marketing.
21      Q.  Okay.
22      A.  I'm sorry.  The question was which accounting
23  department.  That would be the accounting department
24  within Home Infusion Services.
25      Q.  Would any other accounting department for any

Page 278

1  other business unit have occasion or need to use the
2  CHIP system?
3      A.  Not that I was ever aware of.
4      Q.  Okay.  What about Contract Marketing?  Which
5  business unit Contract Marketing departments would
6  utilize the CHIP system?
7      A.  Within Home Infusion Services.
8      Q.  Now, the CHIP system had a -- had a direct --
9  had access to Redbook information, correct?
10      A.  Yes.
11      Q.  Okay.  Did any other computers or computer
12  databases at Abbott have a connection to or
13  information from the Redbook?
14          MR. COLE:  Object to the form.
15      Q.  (BY MS. ST. PETER-GRIFFITH)  Go ahead and
16  answer.
17      A.  I would have no knowledge of that.
18      Q.  Did the -- was the CHIP system ever updated
19  during the -- during your tenure in the reimbursement
20  area in Home Infusion?
21      A.  Oh, absolutely.
22      Q.  Would you participate in the updates?
23      A.  As the primary interface liaison individual
24  between the reimbursement function and the CHIP
25  system, sometimes I would be involved in the design of

4 (Pages 275 to 278)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 279

1  the updates.  I would be involved in coordinating the
2  user testing of the updates.  And I would be involved
3  in trying to prevent the disasters for when updates
4  didn't work and figuring how to recover from them and
5  putting pressure on the systems department in various
6  ways.  So I was very involved in that sense, yes.  Did
7  I program it?  No.
8     Q.  Who was responsible for determining what
9  updates or augmentations needed to be made to the CHIP
10  system?
11    A.  During my tenure of involvement that was
12  really done as a group process by managers throughout
13  the unit and in some cases the general manager would
14  have a strong say because he felt that something
15  should be done.  And I don't know that I could cite an
16  example of that because I don't really remember.
17    Q.  Okay.
18    A.  So ...
19    Q.  Who was the general manager?
20    A.  Mike Snouffer was during the -- I was with
21  Abbott Home Infusion for about -- for 10 years and he
22  was the general manager for the first seven years in
23  the business unit.  And then Karla Kreklow for the
24  past three years prior to the closing of the business.
25    Q.  How would a suggestion or request for an

Page 280

1  update to the CHIP system be made?  Would someone just
2  say, "Hey, it would be a good idea if we did X, Y and
3  Z," and then would it get discussed or how would that
4  process work?
5     A.  You know, you're stretching my memory here
6  and I just --
7     Q.  Okay.
8     A.  -- have to say I don't recall those details.
9  I'm sorry.
10    Q.  Do you recall whether there was a steering
11  committee for CHIPs?
12    A.  At the risk of saying I might have been on
13  it, I don't recall.
14    Q.  Okay.  Well, the reason why I say that --
15    A.  If you refresh my memory, maybe I will.
16    Q.  Sure.  The reason why I say that, and I don't
17  necessarily think we need to pull it out now, but
18  there were references to the CHIP steering committee
19  in your -- in the calendar that you produced.
20    A.  Okay.
21    Q.  Could there have been a CHIP steering
22  committee?
23    A.  There could have been.
24    Q.  Do you know who might have been on it or who
25  was on it?

Page 281

1     A.  Well, as I did say earlier, really the
2  prioritization decisions were made by teams of
3  managers, so that probably was what was considered to
4  be the CHIP steering committee.  That would be what I
5  would think.
6     Q.  Okay.  So who do you think would be the
7  candidates that would be on the steering committee?
8        MR. COLE:  Object to the form.
9     A.  Individuals?
10    Q.  (BY MS. ST. PETER-GRIFFITH)  Yes.
11    A.  They would be, I think, the managers within
12  the reimbursement department, the manager of the
13  pharmacy in the -- Chicago at Abbott Park, the
14  accounting manager, the systems manager.  I think that
15  would be it.
16    Q.  Who was the systems manager?
17    A.  Chris Blandford.
18    Q.  I'm sorry?
19    A.  Excuse me.  Chris -- female.  Chris
20  Blandford.
21    Q.  Okay.
22    A.  B-l-a-n-d-f-o-r-d.
23    Q.  And was she the systems manager during the
24  entire tenure of your --
25    A.  Yes.

Page 282

1     Q.  Okay.  What -- who -- what about the account
2  manager, who's that?
3     A.  Jim Watson.
4     Q.  And was he there -- was he the account
5  manager during your entire tenure in reimbursement?
6     A.  Yes.
7     Q.  Okay.  And the -- the -- the pharmacy at
8  Abbott Park, who -- who was responsible or who would
9  have been the representative for the pharmacy at
10  Abbott Park?
11    A.  For the -- until he left, that would be
12  Robert Martin.  It is also possible that his second in
13  command in the pharmacy, whose name is Rich Zora,
14  might have been involved.
15    Q.  How many employees were in the Abbott -- were
16  in the pharmacy at Abbott Park, do you recall?
17    A.  My estimate would be 20.
18    Q.  And Mr. Martin, you indicated that he left.
19  When did he leave, do you recall?
20    A.  I don't recall --
21    Q.  He would --
22    A.  -- that exactly.  I could estimate that, if
23  you would like me to.
24    Q.  Sure.
25    A.  I would estimate that was about 1999.

5 (Pages 279 to 282)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 283

1    Q.  Okay.  And did someone take over for him?
2    A.  Rich Zora.
3    Q.  Okay.  And was Mr. Zora there throughout the
4  balance of your tenure with the company?
5    A.  The Chicago pharmacy was closed prior to the
6  end of my tenure.  To the best of my recollection,
7  Rich Zora was there until it was closed.
8    Q.  When was it closed?
9    A.  Again, I could only estimate that.
10   Q.  If you could estimate.
11   A.  I would say 2002.
12   Q.  Okay.  Did the Abbott pharmacy at Abbott
13  Park, or any other Abbott pharmacy, have their own
14  provider number for which they billed Medicare or
15  Medicaid?
16   A.  Yes.
17   Q.  Do you know what that number was?
18   A.  Absolutely not.
19   Q.  Okay.  Do you --
20       MR. STETLER:  We would have been
21  impressed.
22   Q.  (BY MS. ST. PETER-GRIFFITH)  Do you know
23  where we could find it?
24   A.  From the government or government
25  contractors.

Page 284

1    Q.  Okay.
2       MR. STETLER:  You mean like her client?
3  Never mind.  Sorry.  Couldn't resist.
4    Q.  (BY MS. ST. PETER-GRIFFITH)  Would you know
5  what -- what the name of the Abbott pharmacies were?
6    A.  To the best of my -- well, during my tenure
7  there were three at that time.
8    Q.  Okay.
9    A.  And to the best of my recollection, each one
10  of them was called the Abbott Home Infusion Services.
11  I think that's what it was called.
12   Q.  Okay.  So they had one name, but there were
13  three different locations?
14   A.  Exactly.
15   Q.  Okay.
16   A.  So, you know, if you wanted the provider
17  number for most of the billing that would be done to
18  Medicare, for example, you would go to the national
19  supplier clearinghouse.
20   Q.  Okay.
21   A.  They must have a history, I would assume.
22   Q.  Okay.  Did the managers that you reference,
23  the account manager, the systems manager, and the
24  pharmacy, did they -- the pharmacy head, did they all
25  work in Home Infusion?  Were they Home Infusion

Page 285

1  employees?
2       MR. COLE:  Ann, if I could just
3  interrupt.  I just want to go back and clarify
4  something.  When he was listing the managers, I
5  thought I heard him say accounting manager, but then
6  subsequent questions you're referring to it as the
7  account manager.
8       MS. ST. PETER-GRIFFITH:  Oh, thank you.
9  We'll clarify.
10       MR. COLE:  I just want to clarify which
11  is --
12   Q.  (BY MS. ST. PETER-GRIFFITH)  Is it an account
13  manager or an accounting manager?
14   A.  Accounting.
15   Q.  Accounting.  Okay.  Thank you.  I misspoke.
16       Was there an accounts manager within
17  Home Infusion?
18   A.  If that means essentially sales managers,
19  there were.
20   Q.  Okay.
21   A.  And, you know, the real title, it might have
22  been business development manager, or something like
23  that, but there were.
24   Q.  Now, the first -- when we were discussing who
25  would be involved in -- in possibly either the

Page 286

1  steering committee or participate in issues concerning
2  the updating or the -- the updating of the CHIP
3  system, you reference the reimbursement specialists or
4  the reimbursement specialist managers; is that right?
5    A.  Yeah.  There were, you know, more than one
6  individual on the management team.  Also, I would like
7  to add, I think probably there would have been a
8  representative from the contract marketing area on
9  that steering committee, too.
10   Q.  Okay.  Do you know who that would have been?
11   A.  Not offhand.  Probably was multiple people.
12   Q.  Would -- do you know who -- can you identify
13  who any of them would have been?
14       MR. COLE:  Object to the form.
15   A.  I could identify people that would likely
16  have been, yes.
17   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Who?
18       MR. COLE:  Object to the form.
19   A.  Lynn Leone.
20   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
21   A.  Shellie Bronson.  I can't really recall if
22  Dave Brincks would have been or not.  He could have
23  been, but ...
24   Q.  Was it costly to update the CHIP system?
25       MR. COLE:  Object to the form.

6  (Pages 283 to 286)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 287

1    A.  I was never involved in the budgeting for the
2  CHIP system, so I --
3    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
4    A.  -- couldn't answer that.
5    Q.  I just asked because certainly our deponent
6  earlier in the week, Mr. Robertson, had a few opinions
7  about writing some large checks.
8        Now, would you have interaction with the
9  representatives of the customers who licensed the CHIP
10  system?  Would you work with them?
11   A.  At times.
12   Q.  Okay.  When would you work with them?
13   A.  During the period in which I was part of the
14  reimbursement management team, my work with them would
15  be primarily -- we -- we -- for -- for the customers
16  that I was involved in heavily was because we were
17  responsible acting as a billing service it's called.
18   Q.  Okay.
19   A.  Which means, essentially the group that does
20  the reimbursement functions, and to shorten that, it's
21  the people that file the claims and collect the money
22  from the health plans and the patients.  And so we
23  were performing a billing service for those clients in
24  that reimbursement group.  And I would have interface
25  with the individuals that -- the customers that would

Page 288

1  be -- you know, typically be somebody who was the
2  manager, and essentially reporting what we were doing
3  to them because we were serving them.
4        Sometimes some of those responsibilities
5  would be split in terms of the customer might do
6  patient screening, patient intake and then, you know,
7  or at least certain functions of it, reimbursement
8  would do the rest.  And so I might have been involved
9  with, you know, working out operational types of
10  procedures to make that work.  So that's what I would
11  have done during that time.
12       I think I told you last time that for
13  the past -- last three years that I was there,
14  approximately -- well, there was a period of time,
15  actually, in between where I was essentially doing an
16  accounting -- not accounting, reporting types of
17  functions and analysis of accounts receivable risk for
18  about a year or so.  This was after my reimbursement
19  supervisory responsibility before my CHIP systems
20  direct responsibility.  And there my customer
21  reaction -- interaction was pretty limited during that
22  period of time.
23       But then when I was -- I think I
24  probably said to you last time that I was the --
25  essentially the product manager and trainer for the

Page 289

1  CHIP system during those past three years or so.  And
2  so my interface with customers there was involved
3  almost entirely with -- with respect to the CHIP
4  system having to do with enhancements training, try to
5  solve problems that people might have reported and
6  that my help was needed on, that sort of thing.
7    Q.  Was the CHIPs system the only vehicle that
8  was used by Home Infusion to monitor billing,
9  collections, inventories, either for Abbott itself or
10  its revenue share clients?
11       MR. COLE:  Object to the form.
12   A.  To the best of my recollection, yes.
13   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  You
14  indicated that it was -- that the CHIP system was
15  developed before you got to Home Infusion, right?
16   A.  Yes.
17   Q.  Do you have an understanding as to who
18  developed it?
19   A.  Sketchy.
20   Q.  Okay.  What's your sketchy understanding?
21   A.  That it was originally developed by a
22  consulting group or -- of some sort.  Chris Blandford,
23  I had understood, was originally part of that
24  consulting group, ended up being hired as the Abbott
25  employee CHIP systems manager.

Page 290

1    Q.  Okay.  Do you know whose idea it was to
2  develop this system?
3    A.  No.
4    Q.  Did you have any understanding as to whether
5  or not managers above Mike Sellers wanted to continue
6  with the home infusion business?
7        MR. COLE:  Object to the form.
8    A.  I know what I was told --
9    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
10   A.  When the announcement was made, that the
11  business was going to be shut down.
12   Q.  And that was at the meeting with Mike
13  Sellers, I believe you testified earlier?
14   A.  There was a meeting -- there was a meeting
15  where Mike Sellers announced that to the management
16  team.
17   Q.  Okay.
18   A.  Yes.
19   Q.  Well, what were you told?
20   A.  That Abbott's strategy for the business units
21  with Abbott was to -- for them to be substantial in
22  size.  And the number that I recall was a hundred
23  million dollars of sales or more, sales to Abbott, and
24  that Abbott did not feel that Home Infusion Services
25  could ever meet that criteria and they were not

7 (Pages 287 to 290)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 291

1  meeting it at the time and that was the reason for
2  closing the business.
3      Q.  Did you have any -- was that the first time
4  that you had ever -- strike that.
5          Was that the first time that you ever
6  had an understanding that the home infusion business
7  was not something that Abbott wanted to continue with?
8      A.  I don't recall anything earlier than that.
9      Q.  Okay.
10     A.  You know, let me re-correct that.  There's
11 something very hazy here.  I remember something very
12 hazy that one of the clients might have gotten the
13 word about the potential -- the business unit being
14 closed before we knew it and there may have been some
15 consternation then, but it's very hazy.
16     Q.  When Virginia Tobiason left, was there any
17 discussion about the continuation of the Home Infusion
18 unit?
19     A.  I can't recall that.
20     Q.  Do you know whether other people -- strike
21 that.
22         Let me ask it this way:  Prior to that
23 meeting when you learned about the closure of Home
24 Infusion --
25     A.  Uh-huh.

Page 292

1      Q.  -- did you have any understanding as to
2  whether any of the senior management above Mr. Sellers
3  wanted to close the Home Infusion unit at any time?
4      A.  Not that I recall.
5      Q.  You mentioned that when you worked with the
6  CHIP system and with -- with clients, Abbott Home
7  Infusion clients, you worked on -- or you provided a
8  billing service; is that right?
9      A.  During my tenure is one of the -- well, as
10 reimbursement supervisor, which was approximately five
11 years.
12     Q.  How did --
13     A.  Yes.
14     Q.  How did that billing service work?
15     A.  Well, in our -- and, really, in any -- in any
16 healthcare provider industry, billing service is the
17 organization that -- that is responsible for the
18 filing of claims, the collections of the monies from
19 health plans and from patients and would have some
20 responsibility for the acceptance of patients, the
21 determination of their insurance, the -- you know,
22 some reporting of, essentially, performance measures,
23 that sort of thing.
24         Beyond that in terms of how it would
25 work, I think I need more guidance as to what you

Page 293

1  would be looking for.
2      Q.  Okay.  Well, if you could explain how a
3  client that you worked with -- strike that.
4          If you could explain how Abbott, through
5  the CHIP system or otherwise, would perform a billing
6  function for a client.  Does that clarify?
7      A.  Sure.  I'll give you a scenario.
8      Q.  Okay.
9      A.  This would be for a client in the scenario
10 where they had their own pharmacy.  They would
11 typically have someone, a couple people, responsible
12 for obtaining the initial order and referral for the
13 patient, referral and order.  A scenario would be that
14 the information collected on the patient, such as
15 demographic information, patient insurance coverage,
16 patient diagnosis, what the order is would be faxed to
17 a department within the reimbursement group at Abbott
18 Park called the reimbursement screening group.
19         They would then do what they had to do
20 as best as they could to verify that, in fact, the
21 patient was covered by the insurance and that the
22 therapy would be covered and -- and that the -- yeah,
23 they would have knowledge of the contracts that the
24 client would have.  This was -- this was a case where
25 claims would be billed in the name of the client

Page 294

1  because it was their business.
2          So, you know, a lot of these patients
3  would be covered by commercial insurance companies.
4  So they would have knowledge of managed care contracts
5  between the client provider group and insurance
6  company.  So they would be looking at that, too, to
7  determine if this was an in network or an out of
8  network client, that sort of thing.
9          If it was Medicaid or Medicare, it would
10 be actually less complicated to do the verification
11 because they've got all the information they need
12 right there and they would know pretty much the -- for
13 Medicare, especially, the coverage criteria, which was
14 actually very limited.
15         And, in any event, that would be part of
16 the function in the reimbursement department to do
17 that type of screening, the document, the findings and
18 there would be both a paper file and some information
19 would be entered in the CHIP system at that point.
20 And, actually, the first information on the CHIP
21 system would be entered by the client's pharmacy
22 group.
23     Q.  Okay.
24     A.  Assuming that everything makes it through
25 that process and the client accepts the patient, which

8 (Pages 291 to 294)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 295

1  was not always the case, but if the client takes the
2  patient on-board, but ultimately the order would
3  be -- if it hadn't been received, it would be
4  received.  That would be considered to be a
5  prescription, one or more, by the client's pharmacy
6  that would be entered into the computer system.  The
7  necessary supplies and equipment for providing the
8  therapy would be entered into the computer system and
9  then that -- those supplies and equipment would be
10 picked from the -- the warehouse that the pharmacy
11 would have nearby.
12         And the drugs would be prepared.  Many
13 of them would be compounded in a clean, sterile
14 environment.  Well, they all would be in a clean,
15 sterile environment, but many -- if there was any
16 manipulation of the drug, in other words, they would
17 be -- so the compounding would be done.  The results
18 of, you know.  That would be, essentially, set up in
19 the computer system as to what needed to be provided
20 in the elements, the compounded.  Some of those drugs
21 were not compounded and it was more just picking and
22 shipping, but that would be in the system, too.
23         Then there would be a quality check in
24 the pharmacy by the pharmacist, as I understood it,
25 before the product would be delivered to the patient.

Page 296

1          And when the product was delivered,
2  there would be, actually, in the computer system - I
3  remember this, I'm amazed - something called a ship
4  confirm that would be done on the computer system.
5          MR. STETLER:  You need a better life.
6  A.  I can't believe I remembered this one.  There
7  would be something to be done -- a function called a
8  ship confirm that would then, essentially, turn that
9  order into a completed order.  There would be a
10 function in the system called an invoicing function
11 that would be done by reimbursement typically once a
12 day the next morning which would further turn the
13 record of that shipment into a sale.
14         The system would then have another
15 function called generating claims or claiming, as I
16 think we called it.  That usually was done on cycles,
17 depending on the payor, but for Medicare my
18 recollection is that for most payors we did it once a
19 month.  We would just do this function called
20 generating claims.  And that would be reimbursement
21 that would do that through the computer system.
22         At that point -- and this changed over
23 time as we improved, enhanced the system as to exactly
24 how much was manual and how much was automated by the
25 system, but -- but the claim would be on the system.

Page 297

1  There would be some -- there would certainly be a
2  review by the reimbursement specialist or a typical
3  reimbursement specialist had a reimbursement clerk, we
4  call them, one or two, or technician I think we called
5  them later, reporting to them.  Somebody in that group
6  would be doing a review of the claim to -- as best as
7  they could to ensure the quality control of it.
8          When that was completed then if it was a
9  printed claim, the computer system would print the
10 claim.  It would then be mailed in an envelope to the
11 payer.  If it was an electronic claim, which it was to
12 Medicare in the -- you know, most of my period there,
13 at least, we were able to do that electronically, so
14 it would be a computer-to-computer transmission to the
15 Medicare contractor for a Medicare claim.
16         On some Medicaid claims there would be a
17 capability to -- and, actually, I think even some
18 commercial claims, I remember one, that would be
19 capability to -- for the reimbursement clerk to rekey
20 into another computer that would be provided by -- you
21 know, or computer access provided by the Medicaid or
22 plan or the contractor of the state or the commercial
23 health plan.  So you would be taking paper -- a paper
24 claim from the CHIP system and rekeying it in to send
25 it in -- one way or the other the claim would be

Page 298

1  gotten to the payer.
2          It would be nice if the payers would all
3  pay you quickly and easily, but that did not always
4  happen and -- and it frequently didn't happen,
5  actually.  So there would be a function that we called
6  follow up that many organizations actually call
7  collections as opposed to billing.  What I've
8  described so far was essentially the billing process.
9  Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
10 A.  But the follow-up process would be that the
11 reimbursement specialist and/or clerks would have ways
12 to check on the status of the claims.  And for many
13 payers they actually call them up on the phone and try
14 to get a person and wait on hold, depending on who the
15 payer was, and that sort of thing and, you know, where
16 is my claim?  If it wasn't in -- if it hadn't come in
17 and we hadn't been paid in a certain amount of time.
18 My recollection is there were some payers that would
19 offer an electronic lookup of some sort that would be
20 of some help.
21         Sooner or later with a payer the claim
22 would come back either paid or denied or paid
23 incorrectly, partially paid.  The actual money, I
24 think in most of those days, most of the time those
25 were paper checks and they would be mailed typically

9  (Pages 295 to 298)

Page 299

1  to a lockbox.  Not all clients operated the same.
2  Some of them, I think, might have gone to a client
3  function, you know, actual street address of the
4  business.
5          There would -- from -- but, in any
6  event, you would get also as a part of that a
7  statement of what was paid called an explanation of
8  benefits.  That would be applied on the CHIP system by
9  a group that had responsibility for cash applications.
10 Which, by the way, now that I'm recalling that, was a
11 function of the accounting department at Abbott Home
12 Infusion Services.  So they had, essentially, clerical
13 people that were cash suppliers and they would be
14 matching up what they saw in an explanation of
15 benefits with what the CHIP system had opened as
16 accounts receivable for a claim.  My best recollection
17 is some clients did their own cash application and I
18 don't think that was too many of them.
19         Meanwhile, the collectors would be
20 continuing to follow up, follow up, follow up for
21 those claims that were never paid.  But when the cash
22 was applied, at the moment I'm not recalling exactly,
23 but somehow we knew that on the CHIP system and the
24 reimbursement group would determine if there needed to
25 be either re-billing because there was a mistake to

Page 300

1  the -- to the payer.  If it all looked good and if
2  there was going to be a secondary insurance plan, then
3  they would go through a similar process of generating
4  what was called a secondary claim and repeat the whole
5  process again to get that payment.
6          And after that was done, on very rare
7  occasions, there might be a third payer.  But in all
8  those situations the patient also might owe something
9  or might not owe something depending on the coverage.
10 And so there would be a billing to the patient that
11 would be done for any patient balance and the
12 reimbursement department would be responsible for
13 following up with the patient or family to get that
14 money.
15         And working with clients we had, you
16 know, ways sometimes of determining that it was a
17 hardship case and money shouldn't be collected.
18         And ultimately the paid claim, if --
19 when successful would be on the CHIP system.  As I
20 recall there was a close function which said that the
21 claim was paid and either the claim would be paid as
22 was expected or might be a write-off, meaning that it
23 wasn't paid as originally had -- originally had been
24 expected, so there would be a balance that would be
25 told to the system, we just didn't collect this.  And

Page 301

1  then it was an ongoing process.
2      Q.  How would the -- once the funds were received
3  from, let's say, a payer like Medicare or Medicaid,
4  how would those then be distributed to the client?
5      A.  If -- well, there were different models of
6  operation in the business relationships with clients.
7      Q.  Okay.
8      A.  The more typical one was a revenue share
9  relationship.  If the finances were -- if the -- if
10 the -- if the claims were being submitted in the name
11 of the client -- let's say it's Ace Home Infusion.
12 Okay.  So the claim had Ace Home Infusion on it when
13 it was sent to the payer.  That money would then --
14 the check would be cut to Ace Home Infusion.  That
15 money would then be deposited in the client's bank
16 through their lockbox process, whatever that was.
17         A revenue share arrangement was one
18 where it was essentially a percentage by therapy, as I
19 recall.  And when the -- when the cash was applied,
20 meaning the system understood that the cash had been
21 received, then there was a report out of the CHIP
22 system -- I don't know what it was called, but I'll
23 call it a revenue sharing report or a cash collections
24 report, that would do a calculation of the money that
25 was applied, meaning considered to have been in the

Page 302

1  client's bank, and it would use the revenue sharing
2  percentages that were part of the contract between
3  Abbott and the client.  And whatever that Abbott share
4  was would then be invoiced to the client.  And I now
5  recall the reimbursement department did that
6  invoicing.  And so a bill went to the client for the
7  client to pay.  That's a scenario.
8      Q.  Would the billing to the client ever reflect
9  charges for the costs of the individual drugs or
10 products provided by Abbott on a consignment basis to
11 the revenue share clients?
12     A.  Not that I know of in that model.
13     Q.  Did the CHIP system ever have any way to
14 record or monitor the cost of the product provided by
15 Abbott to the revenue share customer under these
16 revenue share agreements?
17     A.  Oh, yes, I think it did.
18     Q.  Okay.  What -- what part of the system would
19 that be?
20     A.  It would be hard to say.  It would be -- I
21 guess I would call it the invoicing system, maybe.
22     Q.  Okay.
23     A.  So, you know, there was an item master file
24 that would have an opportunity to put a standardized
25 cost for any product.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 303

1    Q.  And who would determine that standardized
2  cost?
3    A.  The accounting department within Home
4  Infusion Services.  Now, we have to be careful here --
5    Q.  Okay.
6    A.  -- when I answer that.  That would certainly
7  be true for Abbott's own business when it was being
8  billed by, you know, Abbott under the Abbott Home
9  Infusion Services and it was Abbott's pharmacy.
10    Q.  Okay.
11    A.  Okay.  How that worked and who was
12  responsible for that when it was this client model
13  that I had just described, actually, I think you'd
14  have to ask someone else.
15    Q.  Okay.  Who would I ask?
16    A.  Probably Abbott's accounting department.
17    Q.  Do you know someone in Abbott's accounting
18  department who could --
19    A.  Jim Watson would know that.
20    Q.  Jim Watson.  Okay.  Now, the process that you
21  just described, which -- which I appreciate your
22  detail because, frankly, it has helped condense a lot
23  of questions.
24    A.  Does that mean we'll save time here?
25    Q.  Was that basically the same process that was

Page 304

1  used for billing by Abbott, by services provided by
2  Abbott pharmacies?
3    A.  Ask me that again in another way.
4    Q.  Okay.
5    A.  Oh, oh, I'm sorry.  You mean was the process
6  same if it was an Abbott patient as opposed to an
7  Ace Home Infusion patient?
8    Q.  Correct.  Correct.
9    A.  Oh, yeah.  Yeah.  It would be very similar
10  except that there wouldn't be that --
11      (Brief interruption)
12      MR. STETLER:  Hello.
13      MS. MOORE:  Hi, this is Margaret Moore.
14      MS. ST. PETER-GRIFFITH:  Hi, Margaret.
15      MR. STETLER:  Sorry to interrupt, but it
16  was coming in.
17      MS. ST. PETER-GRIFFITH:  That's okay.
18      MS. MOORE:  Thank you.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, if you
20  could --
21      MR. STETLER:  You're missing a good
22  time, Margaret.
23      MS. MOORE:  Great.
24    A.  It would be very similar.  If it was truly an
25  Abbott patient, meaning Abbott just took it from any

Page 305

1  referral source that was within -- coming into Abbott,
2  there would be no revenue share portion of them.
3    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
4    A.  To the best of my recollection, we would have
5  had some cases where Abbott was performing under
6  contract.  You know, just as Abbott was a billing
7  service, Abbott was the pharmacy for clients.  Best of
8  my recollection, there were revenue shares on that.
9  So the patient would be serviced by an Abbott
10  pharmacy.
11      My recollection of that is that there
12  would be -- in some of those cases the bills would be
13  sent out under the name of the client.  And if you
14  came back and showed me something differently on that,
15  quite frankly, my memory is somewhat hazy there.
16    Q.  Okay.
17    A.  But my recollection, again, on that sort of
18  relationship is there would have been, in a typical
19  scenario, a revenue share on that basis, too.
20    Q.  Okay.  So we've got, basically, three
21  different models.  We've got the Abbott pharmacies
22  themselves.  We have the revenue share customers and
23  then we have that sort of I'll call hybrid customer.
24  Is that fair enough?
25    A.  There's more than that.

Page 306

1    Q.  Okay.  Who else?  That's what I want to
2  get -- drill down to.
3    A.  Well, there were some customers, at least one
4  that I can remember, that we did not do a revenue
5  sharing arrangement.  We -- Abbott actually did
6  provide an accounting to them and an invoice for the
7  product by product that was used.  The one that I'm
8  recalling was out of the -- out of the Abbott
9  California pharmacy at the time.
10    Q.  Do you recall --
11    A.  So it wasn't a revenue share arrangement.
12    Q.  Okay.  Do you --
13    A.  And those products might have been Abbott
14  products, but they might not have been, too.
15    Q.  Do you recall who that was?
16    A.  Yeah.  That was Cedars-Sinai at their home
17  infusion business.
18    Q.  Okay.
19    A.  So that was another model.
20    Q.  What other models can you think of?
21    A.  Well, Abbott did not do reimbursement for all
22  clients.  You know, we -- the business unit offered a
23  package of services to clients.  You know, they were
24  customized.  That was part of the strength of serving
25  the clients.  This was a service business, so you did

11 (Pages 303 to 306)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 307

1  a lot of different things depending on what the
2  client's needs were. So there were -- there were a
3  number of customers that just used the CHIP system and
4  did everything themselves. So that would be another
5  model.
6      Q.  Would they license the CHIP system from
7  Abbott?
8      A.  Yes.
9      Q.  What was the cost of the licensure, do you
10 recall?
11     A.  No.
12     Q.  Would there be any clients of other business
13 units within the Hospital Products Division that would
14 utilize the CHIP system, like an HBS client?
15     A.  Huh-uh.
16     Q.  Okay.
17     A.  That was a no. At least not that I knew of.
18     Q.  Okay. Was there a way on the CHIP system to
19 monitor estimated acquisition cost?
20         MR. COLE: Object to the form.
21     A.  You could run -- one report, I remember the
22 gross sales report, had an option to run costs and it
23 would have included an estimated acquisition cost
24 using that standard cost that I had talked about.
25     Q.  (BY MS. ST. PETER-GRIFFITH) Let me back up.

Page 308

1  How would you define "estimated acquisition cost"?
2          MR. COLE: Object to the form.
3      A.  Quite literally I would define it as being
4  the accounting department, or whoever was responsible,
5  depending on the business relationship. Put a data
6  field into the cost area of the item record and
7  inventory file reflecting whatever the item was that
8  was a cost and I would define your estimated
9  acquisition cost as being just a total of which is --
10 which is times cost. There's the figure.
11     Q.  (BY MS. ST. PETER-GRIFFITH) Okay. Was
12 estimated acquisition cost a term that was utilized in
13 the reimbursement area?
14     A.  No. Actually, the reimbursement department,
15 at least my level as supervisor and below, we -- we
16 weren't involved with cost at all.
17     Q.  Did the CHIP system have a way to identify
18 any discounts that either Abbott realized or Abbott's
19 customers realized on the cost -- on the products that
20 were provided to Abbott's customers or distributed
21 through Abbott's customers?
22         MR. COLE: Object to the form.
23     A.  Abbott's customers being Ace Home Infusion?
24     Q.  (BY MS. ST. PETER-GRIFFITH) Yes, as an
25 example.

Page 309

1      A.  Well, in the typical scenario we talked about
2  a revenue share, so there was an agreement of a
3  revenue share percentage. So for the products that --
4  you know, the products were consignment inventory and
5  to the best of my knowledge remuneration was through
6  the revenue share arrangement. That doesn't translate
7  directly into any sort of discount that I can think
8  of.
9      Q.  Okay. Does the CHIP system have a way to
10 notify the third-party payers, including Medicare or
11 Medicaid, of the fact that the revenue share customers
12 did not pay for the product until after collections
13 were made?
14     A.  No.
15     Q.  Was that something that anybody discussed in
16 discussions about the development of the CHIP system?
17     A.  Never that I was aware.
18     Q.  Was there ever any concern about needing to
19 report discounts to third-party payers, including
20 Medicare or Medicaid, upon products provided -- I'm
21 sorry, products purchased by the revenue share
22 customers or other Abbott customers and provided to
23 patients?
24         MR. COLE: Object to the form.
25     A.  Discounts to the Ace Home Infusion, the

Page 310

1  client entity?
2      Q.  (BY MS. ST. PETER-GRIFFITH) Correct.
3      A.  Never any discussion that I was aware of.
4      Q.  Why not?
5          MR. COLE: Object to the form.
6      A.  The best I could say is I never thought about
7  it personally, so I can't answer that.
8      Q.  (BY MS. ST. PETER-GRIFFITH) For products
9  like Vancomycin, which has a straight J code
10 billing --
11     A.  Uh-huh.
12     Q.  -- on a HCFA 1500 form, what would the
13 reported charge be for Vancomycin for a revenue share
14 customer?
15     A.  Depends on the payer.
16     Q.  Of Medicare.
17     A.  It would be billed at -- there's different
18 terms for this. Usual and customary, a list price,
19 usual charges. It would be -- it would be -- on the
20 claim it would be submitted at your -- you know, think
21 of list price as if there was not a contract between a
22 payer and a provider or an agreement of some sort to
23 provide anything -- any sort of discount to your -- to
24 your list price, then your claim would have your list
25 price on it.

12 (Pages 307 to 310)

Page 311

1    To Medicare the claim would have the
2  list price. The list price would be set in the
3  computer system and so there would be a price times
4  the number of units to give you a total price for the
5  units used during the time period of the claim.
6    Q.  What price would be used for Abbott
7  pharmacies?
8    A.  That was not my responsibility and I don't
9  have knowledge of how that pricing was done.
10    Q.  Okay.  Would the -- would the J code for
11  Vancomycin on a HCFA 1500 form ever be billed by the
12  reimbursement department in Home Infusion for the AWP?
13    A.  To what payer?
14    Q.  Medicare.
15    A.  No.
16    Q.  Why?
17    A.  Well, with the qualification that I was not
18  involved in the establishment of the list price --
19    Q.  Okay.
20    A.  -- I have no knowledge of that.  So if they
21  were AWPs, it could have been, but I'm not aware of
22  that.
23    Q.  Okay.  Who -- who would have been involved in
24  setting a list price?
25    A.  It could have either -- have been the client,

Page 312

1  because it was their business, or it could have been
2  that the client had, you know, a services system from
3  Abbott in establishing the list price, or if it was
4  Abbott's business, rather than the client's business,
5  it would definitely be Abbott.  And to the best of my
6  knowledge that responsibility was operationally done
7  by the accounting department within Home Infusion
8  Services.
9    Q.  Did the reimbursement department have any
10  concerns about overbilling Medicare or Medicaid for
11  drugs at -- who were -- that were priced at a certain
12  level, but actually purchased or provided at a much
13  lower discounted level?
14    MR. COLE:  Object to the form.
15    A.  Not that I'm aware of.
16    Q.  (BY MS. ST. PETER-GRIFFITH)  Did the Abbott
17  Home Infusion unit have any guidance on Medicare fraud
18  or abuse in the form of a written policy?
19    A.  I would say no, actually.
20    Q.  Okay.  Do you know if any other business
21  units within Abbott had written policies on Medicare
22  and Medicaid fraud and abuse?
23    MR. COLE:  Object to the form.
24    A.  I do not know.
25    Q.  (BY MS. ST. PETER-GRIFFITH)  Do you know --

Page 313

1  did Abbott's Home Infusion unit have any publications
2  concerning the False Claims Act?
3    A.  Not at my level and, therefore, not below my
4  level.
5    Q.  Okay.  When you say "not at your level," do
6  you mean not that you're aware of or not that you had
7  access to?
8    A.  Not that I'm aware of and I -- if anybody was
9  looking at that, it was higher level management.
10    Q.  Who would that have been?
11    A.  Well, in reimbursement that would have been
12  Virginia Tobiason.
13    Q.  Did anyone --
14    A.  Possibly Mike Snouffer because he
15  essentially -- he succeeded her when she left.
16    Q.  Okay.  Did anyone at any point raise concerns
17  about whether or not the billing practices of the
18  reimbursement department within home infusion, either
19  for the revenue share customers or for Abbott's own
20  pharmacies, were violating the False Claims Act?
21    A.  No, not that I'm aware of.
22    Q.  Do you know whether anyone ever did an
23  evaluation of that question?
24    A.  Not that I'm aware of.
25    Q.  Sir, what I would like to do next is to start

Page 314

1  going over some of the manuals.  Can you just give me
2  just one second?
3    A.  Absolutely.
4    Q.  Did anyone ever at any time raise with you or
5  anyone else, to your knowledge, in the reimbursement
6  department, the legal propriety of billing at these
7  list prices through the reimbursement Home Infusion
8  department?
9    MR. COLE:  Object to the form.
10    A.  Not that I can recall.
11    Q.  (BY MS. ST. PETER-GRIFFITH)  Why don't we
12  start with the first book, which is -- that I have is
13  the Case Management Training Manual.
14    Q.  Uh-huh.
15    Q.  Sir, what can you tell me about this manual?
16    A.  Let me breeze through it.
17    Q.  Okay.  Well, first, before you do that, I
18  would like to ask, is this a manual that you used?
19    A.  No.
20    Q.  Okay.  Who used it?
21    A.  The Contract Marketing group would have used
22  this.
23    Q.  Did you have any --
24    A.  I say that subject to if I see something in
25  here, but I think that's right.

13 (Pages 311 to 314)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 315

1    Q.  Okay.  Then I want you to take some time to
2  go over it.
3    A.  Uh-huh.
4    Q.  Did you at any time, that you can recall,
5  ever utilize this document?
6    A.  I actually can't recall that I would have
7  used this document.
8    Q.  Did you keep it in your office?  Did you have
9  a copy of it in your office?
10    A.  No, I don't believe so.
11    Q.  Do you know where you got this copy from when
12  you left?
13    A.  Yes.  We had -- closing the business we -- I
14  was one of the last people there and we -- we had some
15  days to dispose of materials and -- did I explain last
16  time why I kept some of these materials?
17    Q.  Yes, I believe you did.
18    A.  And I think -- and the reason was that I knew
19  that I was staying in the home infusion business.  I
20  was not sure exactly what I was going to be doing and
21  it might have included some consulting and I thought
22  for personal use in consulting, or whatever, that I
23  might find some value of certain things and this
24  looked like an interesting manual, so it's one that I
25  decided to keep.

Page 316

1    Q.  Okay.  Let me ask you.  You said when they
2  closed Home Infusion you were involved in the disposal
3  of materials?
4    A.  Uh-huh.
5    Q.  What do you mean?
6    A.  Literally there were a lot of materials
7  around that the business unit was shutting down.
8    Q.  Okay.
9    A.  And my recollection is that we -- we threw a
10  lot of documents out.
11    Q.  Who is "we"?
12    A.  Well, myself, and others that were still
13  there at the time.
14    Q.  Do you recall which documents you threw out?
15  I know this is a memory game.
16    A.  Absolutely not.
17    Q.  You don't?
18    A.  No.
19    Q.  Okay.  Do you recall the volume of documents
20  that you threw out?
21    A.  Not really.
22    Q.  Do you know whether or not -- when was this?
23    A.  Oh, this would have been in the end of 2002
24  and early 2003.
25    Q.  Do you know whether there were any litigation

Page 317

1  hold memos that concerned the materials that were
2  being thrown out?
3    A.  I'm not aware of any.
4    Q.  At whose instruction did you throw out
5  materials?
6    A.  I don't recall.
7    Q.  Was it something that you would have done on
8  your own initiative?
9    A.  I would say no.
10    Q.  Okay.  Who was -- when you were -- when Home
11  Infusion was being closed out, who was your
12  supervisor?
13    A.  Karla Kreklow.
14    Q.  Do you know whether Ms. Kreklow directed you
15  to do anything with regard to disposal of materials?
16    A.  I don't recall that.
17    Q.  And did anyone ever advise you that there
18  might be a litigation hold memorandum governing those
19  materials that precluded their destruction?
20    A.  No.
21    Q.  Do you ever remember receiving a litigation
22  hold memorandum?
23    A.  No, I don't remember.  So I hope you're not
24  going to show me one that has my name on it because I
25  don't remember it.

Page 318

1    Q.  Were there any written instructions that were
2  generated concerning how to dispose of the materials?
3    A.  Not that I recall.
4    Q.  Do you remember how they were physically
5  disposed of?
6    A.  My recollection is -- well, I don't
7  specifically remember shredding anything, so I think
8  we just pitched them.
9    Q.  "Pitched them" meaning put them in the
10  garbage?
11    A.  Garbage, recycle.
12    Q.  Okay.  Was there any policy concerning
13  whether or not these were confidential materials?
14    A.  The confidential materials that we would have
15  focused on would have been patient confidential
16  information.  Is that what you're asking?
17    Q.  No.  I want to know with regard to the
18  materials that you were just throwing away, was there
19  any -- did you -- were you aware of any concerns about
20  confidentiality?
21    A.  I don't -- I don't really have any
22  recollection of that.  I can certainly say that had
23  there been any patient specific materials that would
24  have been recognized, we would not have just thrown
25  those away.  I don't really recall if there was any

14  (Pages 315 to 318)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 319

1  sort of that patient data that was part of what was
2  being thrown away anyway.  Beyond that, I don't recall
3  any confidentiality whatsoever.
4     Q.  Do you know what -- for -- for the documents
5  that were being thrown away --
6     A.  Uh-huh.
7     Q.  -- do you know what portions of the business
8  unit those documents included?
9          MR. COLE:  Object to the form.
10    A.  Other than what I've turned over here, no.
11    Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  So is it
12  fair to say that some of the Contract Marketing
13  materials may have been disposed of --
14         MR. COLE:  Object to the form.
15    Q.  (BY MS. ST. PETER-GRIFFITH) -- when Home
16  Infusion closed?
17         MR. COLE:  Same objection.
18    A.  You know, I don't have any recollections to
19  speak of.  I think it's fair to say here's one that
20  wasn't disposed of that would have been had I not
21  decided to keep it.
22    Q.  (BY MS. ST. PETER-GRIFFITH) Okay.
23  Meaning -- and you're pointing to the Case Management
24  Training Manual?
25    A.  I am.

Page 320

1     Q.  Okay.  Well, we are going over that right
2  now.  Let me ask you, were you consulted concerning
3  the confidentiality designation of any of the
4  documents that you produced?
5     A.  No.
6     Q.  This document has at the bottom, it says
7  "Highly Confidential."  Do you see that?
8     A.  I do.
9     Q.  And every page, just about, in this -- in
10  this document is marked highly confidential.  Do you
11  see that?
12    A.  I do.
13    Q.  Were you at all consulted on that
14  confidentiality designation?
15    A.  Well, that label was not on here when I
16  turned the documents over for the subpoena.
17         MS. ST. PETER-GRIFFITH:  Let me just ask
18  counsel for Abbott.  Are you continuing to maintain
19  your highly confidential designation of this material?
20         MR. COLE:  Yes.
21         MS. ST. PETER-GRIFFITH:  Okay.  What's
22  the Rule 11 sustainable basis for doing that?
23         MR. COLE:  Well, we can take this up
24  offline, but at this point in time we're not willing
25  to withdraw and I believe that the materials satisfy

Page 321

1  the threshold for confidentiality under the terms of
2  the protective order.  You can reassess.  You know,
3  after the deposition I can let you know if our
4  position has changed, but right now we're -- we're not
5  willing to withdraw the confidentiality designation --
6         MS. ST. PETER-GRIFFITH:  Okay.  Even
7  though --
8         MR. COLE:  -- that appears on the
9  documents.
10         MS. ST. PETER-GRIFFITH:  Even though
11  this goes back to 1998?
12         MR. COLE:  Yes.
13         MS. ST. PETER-GRIFFITH:  Okay.
14    Q.  (BY MS. ST. PETER-GRIFFITH) Sir, do you have
15  any idea who drafted this document?
16    A.  May I look through it?
17    Q.  Sure.  Absolutely.  Go ahead.
18         MS. ST. PETER-GRIFFITH:  Why don't we go
19  off the record for a few minutes, is that okay --
20         THE VIDEOGRAPHER:  We are off the --
21         MS. ST. PETER-GRIFFITH:  -- while he
22  does that?
23         THE VIDEOGRAPHER:  We are off the record
24  at 10:22 a.m.
25         (Recess from 10:22 to 10:32.)

Page 322

1         THE VIDEOGRAPHER:  We are back on the
2  record at 10:32 a.m. with the start of Tape Number 2.
3         MS. ST. PETER-GRIFFITH:  Mr. Robertson,
4  before we get going, I'd just like to have -- we were
5  joined by Margaret -- oh, I am sorry.  Gosh.  I am
6  very sorry.  It's been a long week already.
7         Mr. Rodman, before we get going, we were
8  joined by Margaret Moore from Texas and I would just
9  like to give her the opportunity to enter her
10  appearance on the record.
11         MS. MOORE:  Thank you.  Margaret Moore
12  representing the State of Texas.
13    Q.  (BY MS. ST. PETER-GRIFFITH) When you
14  participated in this sort of disposal of the Home
15  Infusion materials, Home Infusion business unit
16  materials, do you recall who else participated?
17    A.  I really don't.
18    Q.  Is it fair to say or would it be fair to say
19  that the materials that you've sort of produced and --
20  and retained for yourself, are those the only copies
21  of these documents that remain, to your knowledge?
22    A.  I wouldn't know.
23    Q.  Okay.  What I would like to do is go over a
24  few pages of the -- of the Case Management Training
25  Manual that's in front of you there.

15  (Pages 319 to 322)

Page 323

1    A.  Okay.
2    Q.  Okay?
3    A.  Uh-huh.
4    Q.  First, do you know what -- do you know
5  what -- actually, before -- before we move on to this
6  particular document.
7         Do you have a recollection of the types
8  of materials that were -- that were tossed, that were
9  thrown away?
10    A.  Not really.
11    Q.  When you closed up your office and left, did
12  you throw away any materials that you were
13  maintaining?
14    A.  I would think I did.
15    Q.  Do you know -- do you recall what they might
16  have been?
17    A.  No.
18    Q.  Do you recall at any time ever being
19  concerned about violating a litigation hold memo by
20  tossing materials?
21    A.  No.
22    Q.  Do you know what the Contract Marketing group
23  used the Case Management Training Manual for?
24    A.  Not specifically.
25    Q.  Do you know whether Shellie Bronson helped

Page 324

1  develop it?
2    A.  Not specifically.  I don't know that.
3    Q.  Okay.  Well, what do you know?
4    A.  Well, I know that this was compiled by the
5  Contract Marketing department and I know who the
6  likely people would be.
7    Q.  Who would they be?
8    A.  Shellie Bronson would be one.
9    Q.  Okay.
10    A.  Lynn Leone would be another.
11    Q.  Okay.
12    A.  This was 1998.  There were a couple other
13  people there.  Chris Herden is a name that I remember.
14  Dave Brincks was the manager during much of that time.
15  He might have had some involvement.  It's possible I'm
16  forgetting some people.
17    Q.  Okay.
18    A.  Chris Alex might have been another.
19    Q.  Okay.
20    A.  A-l-e-x, I think.
21    Q.  Let me ask you, do you know -- have you kept
22  in contact with Shellie Bronson?
23    A.  Socially, yes.
24    Q.  Where is she located?
25    A.  Sun Valley, Ketchum, Idaho.

Page 325

1    Q.  Ketchum, Idaho?
2    A.  Well, it's -- yeah, Sun Valley, Idaho.
3  Idaho.
4    Q.  And do you happen to have her address or know
5  her address?
6    A.  No.
7    Q.  Okay.  How do you keep in touch with her
8  socially?
9    A.  E-mail, speak to her every once in a while.
10  Visit -- visited twice for ski trips.
11    Q.  Do you know what her e-mail address is?
12    A.  I have it.  I don't know what it is.
13    Q.  Okay.  I have to tell you, we might be asking
14  Mr. Stetler to get that from you because apparently
15  Abbott is -- or Jones Day is having some difficulty
16  locating her.
17         Okay.  The first page I would like to go
18  over with you is on -- if you could just take the
19  manual.  It's 721.
20         MR. STETLER:  And before I get -- and
21  while they're shuffling that, don't you call her.
22  Okay?  If they need it, you'll give it to me and I'll
23  give it to them.  Don't do anybody any favors.
24         THE WITNESS:  I'm sure Shellie will be
25  glad to meet you, Dave.

Page 326

1         MR. STETLER:  She's in Ketchum, Idaho.
2  I'll be glad to meet her.  You don't need any more
3  Fort Myers in the summer though.
4         THE WITNESS:  Do the deposition there.
5         MS. THOMAS:  Hey, you didn't even go to
6  Allentown, so ...
7         MR. STETLER:  Well, I don't need that at
8  any time of the year.
9    Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, do you know
10  what this is, "Negotiation Parameters" and
11  "Negotiation Allowables"?
12         MR. COLE:  What page are we on?
13         MS. ST. PETER-GRIFFITH:  721.
14         MR. COLE:  Thank you.
15    A.  Well, right here, this is an outline and
16  it's -- it is most likely a document that was used
17  to -- or at least used to train.  I'm not looking at
18  the rest of the page yet.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
20    A.  At that time quite a few of the patients that
21  would be accepted for service were not accepted under
22  a managed care contract between healthcare provider
23  and the health plan, but -- and I'm talking commercial
24  insurance now, but rather what was very common at that
25  time was there would be an individual, what was called

16  (Pages 323 to 326)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 327

1  case management negotiation, to determine that the
2  pricing that the client or it was an Abbott patient,
3  but the pricing for the purpose of the claim and the
4  billing and the reimbursement that would be agreed
5  upon on an individual patient case basis.  And this
6  document was probably used either as a -- well,
7  certainly as a training book, because it was labeled
8  training, so let's just say for, at least, a training
9  document for the purpose of those types of
10  negotiations that would be with commercial insurance.
11     Q.  This would be with commercial insurance?
12     A.  Yes.
13     Q.  Okay.  At the bottom -- at the very bottom it
14  says LL/CsMgtBk.  Do you see that?
15     A.  Uh-huh.
16     Q.  Does that give you any indication as to who
17  might have been involved in the drafting?
18     A.  My best guess is LL would be Lynn Leone.
19     Q.  Okay.  Do you know whether she would put
20  together materials and put her initials, LL?  Are you
21  familiar with that?
22     A.  Well, this is most likely -- in your footer
23  it's most likely the name of a file where it was kept
24  on your PC and so -- I used to do that all the time
25  myself.  So this is probably a mechanism that either

Page 328

1  case management had -- or Contract Marketing had or
2  she had to identify the file name for this piece of
3  paper and anything else that was, perhaps, within that
4  piece of paper.
5     Q.  Okay.  If you could next go to Page 729.
6     A.  Uh-huh.
7     Q.  And I'm going to direct your attention where
8  it says "Vancomycin" -- first of all, it says at the
9  top "Home Infusion Services Standard Prescription for
10  Antibiotics."  Do you see that?
11     A.  Uh-huh.
12     Q.  And then at the head -- for the headings it
13  says "Usual & Customary" with an asterisk?
14     A.  Uh-huh.
15     Q.  And Vancomycin and the price under usual and
16  customary is $270.49.  Do you see that?
17     A.  I do.
18     Q.  Do you know how that number was arrived at?
19     A.  No.
20     Q.  Who would have been responsible for
21  identifying the usual and customary for the Vancomycin
22  antibiotic?
23     A.  Well, as I had explained earlier, the setting
24  of your usual and customary prices in the -- for
25  the -- well, in this case for Vancomycin, was a

Page 329

1  function that would have been done either by the Home
2  Infusion Services accounting department and -- do I
3  know that -- I may want to -- I may want to -- I think
4  I need to retract that.
5     Q.  Okay.
6     A.  It would either have been between the
7  accounting department or the case management -- the
8  Contract Marketing department or the client that would
9  set -- establish that list price.
10         And what I believe this would have -- as
11  a -- essentially a compilation of all of the products
12  involved for the provision of Vancomycin for
13  Vancomycin therapy.  So it would be -- I believe it
14  would be more than just the drug.  It would be -- it
15  would be all of the infusion administration supplies
16  and the equipment that were part of that.  And this is
17  a compilation using those usual and customary prices,
18  a hypothetical, apparently one gram of Vancomycin
19  provided every 12 hours with a usual and customary
20  price.
21     Q.  Okay.  Let me ask you, when you use the term
22  "list price" --
23     A.  Uh-huh.
24     Q.  -- are you talking about Abbott's list price,
25  its catalog price --

Page 330

1     A.  No.
2     Q.  -- or are you talking about something
3  different?
4     A.  I'm talking about the list price that was
5  determined and placed in this product master file,
6  item file we called it --
7     Q.  Okay.
8     A.  -- for every item that was provided as part
9  of the service.
10     Q.  So you're talking about the price that's
11  identified in the CHIP system under the item file?
12     A.  Yes.
13     Q.  Okay.  Let me ask you, for Abbott pharmacies,
14  would the list price be Abbott's catalog price?
15     A.  I have no knowledge of that.
16     Q.  Okay.  Who would determine that, Contract
17  Marketing?
18     A.  It would either be Contract Marketing or
19  Accounting.
20     Q.  Okay.  If you could go to Page 757, please.
21  And I would like you to look at 757, 758 and 759.
22     A.  Okay.
23     Q.  Do you recognize this document?
24     A.  I'm not sure how to answer that.  It's a --
25  it's a document that seems familiar to me now.

17 (Pages 327 to 330)

Page 331

1    Q.  It seems familiar to you now?
2    A.  Uh-huh.
3    Q.  Do you know whether you were familiar with
4  the procedures utilized for negotiating pricing?
5    A.  I was not, actually.
6    Q.  Okay.  If you see under Item 4 and Item 5c --
7    A.  Uh-huh.
8    Q.  -- there's reference to AWP.  Do you see
9  that?
10    A.  Yes.
11    Q.  Do you know whether AWP was a price or was --
12  was -- yeah, a number that was utilized by contract
13  marketing in Home Infusion in negotiating pricing?
14    A.  Yes.
15         MR. COLE:  Object to the form.
16    A.  This would indicate that that was the case.
17  Again, these would be for commercial insurance
18  companies.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
20    A.  And, yes, that is my belief.
21    Q.  So AWP, then, was a number that was
22  utilized by Home Infusion?
23         MR. COLE:  Object to the form.
24    A.  We just talked about a way it was utilized,
25  so yes.

Page 332

1    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  The next
2  item that I would like to go -- or the next page is
3  773, please.
4    A.  Okay.
5    Q.  Do you see -- this is a price schedule
6  document?
7    A.  Uh-huh.
8    Q.  Are you familiar with any of the price
9  scheduling by Contract Marketing?
10    A.  Well, what this is is actually a document
11  that explains how to set up pricing in the CHIP
12  system.  I don't know who would have written it, but
13  that's what this is.  So in this case whoever within
14  contract marketing had compiled this book, they got
15  this document that is essentially saying how to use
16  the CHIP system.  And they could have written it,
17  actually, because we sort of had a team spread amongst
18  the management to write documentation over the years
19  for the CHIP system.  Like user documentation.  Okay.
20  So they might have written it and it wouldn't surprise
21  me, but they might not have either.
22    Q.  Could you have written it?
23    A.  I don't recall writing this one.
24    Q.  Okay.  Are you familiar with how to enter
25  pricing into the CHIP system?

Page 333

1    A.  I was familiar with these -- what were called
2  price schedules, yes.
3    Q.  Okay.  If you could look at the box, at the
4  first box.  Do you see that?  It looks like it's a --
5  it's a reflection of a computer screen --
6    A.  Yes.
7    Q.  -- is that accurate?
8    A.  Yes.
9    Q.  What does "List Pct" mean?  Do you see where
10  it says "Pricing Details"?
11    A.  List -- well, I believe that that would mean
12  list percent and -- percentage.  For list price
13  percentage.  I believe that's what that would be.
14    Q.  Okay.  What does "AWP Pct" mean?
15    A.  In fact, it explains it right above.
16    Q.  Okay.
17    A.  "Pricing should reflect 75% of the list price
18  therefore you enter" five -- "enter 75 into the 'pct'
19  field."
20    Q.  Okay.  And this is for Price Code B?
21    A.  It would appear so.
22    Q.  Do you know what Price Code B was?
23    A.  A price code that could do the things that
24  are explained --
25    Q.  I see.

Page 334

1    A.  -- in this manual.
2    Q.  So you punch in the -- on the CHIP system you
3  would punch in -- punch in the price code and you put
4  B and it would have this information?
5    A.  Okay.  Let's back up here.
6    Q.  Okay.
7    A.  Price codes were used to build into the
8  invoicing function in the CHIP system, which was where
9  you turned a ship confirm into a sale and then to
10  build into the generation of the claim to ultimately
11  be filed with the health plan.  Price codes were an
12  automated way of -- of getting the booking of sales
13  and the dollars shown on the claim to reflect an
14  agreement, which would either be one of these
15  individual case management per -- per patient case
16  negotiations or a contract between the home infusion
17  company and a commercial health plan.  And there was a
18  lot -- there were a lot of capabilities built into
19  this what was called price schedules.  That's why
20  there's A, B, C, whatever --
21    Q.  Okay.
22    A.  -- and they did different things.  And so
23  we're looking at an example of one that happens to be
24  price -- it's called Price Code B, but it's really
25  Price Schedule B.  You could assign this to

18  (Pages 331 to 334)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 335

1  essentially a patient therapy.  The therapy might be
2  antibiotic therapy versus total parenteral nutrition
3  therapy versus a whole bunch of others.  And so there
4  would be some automation of the CHIP system to adjust
5  the price to be booked for revenues and the -- to
6  adjust the charges that would be shown on the claim
7  for payers where there was this type of an agreement.
8  That's what this is.
9      Q.  Okay.  If you could flip to the next page.  I
10 believe it's 774.
11     A.  Uh-huh.
12     Q.  Now, this is for Price Code C, correct?
13     A.  Yes.
14     Q.  Okay.  And it says "Other Criteria."  Down
15 under "Other Criteria" it says "AWP can be
16 designated."  Do you see that?
17     A.  I do.
18     Q.  What does that mean?
19         MR. COLE:  Object to the form.
20     A.  I can only tell you what I'm seeing here.  I
21 think it means that you can specify that in the
22 pricing of this claim that there was a provision to
23 use the AWP in the CHIP system for the drug in order
24 to determine that price that would ultimately be
25 submitted to the insurance company.

Page 336

1      Q.  Okay.  Let me ask you, in submitting claims
2  to the insurance company, if the prices were based
3  upon AWP and AWP, as published by Redbook or other
4  pricing compendia --
5      A.  Uh-huh.
6      Q.  -- dropped or was reduced --
7      A.  Uh-huh.
8      Q.  -- would that have an impact on collections
9  from third-party insurers?
10         MR. COLE:  Object to the form.
11     A.  Well, if the -- if the charges for the
12 insurance company were based upon AWP by contract or
13 by individual agreement, and the AWP changed, then
14 that would have a corresponding impact up or down
15 depending on what it was.
16     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Would --
17 would that mean that the Abbott customer would then
18 need to renegotiate with the insurance company the
19 amount of reimbursement or what would happen?
20         MR. COLE:  Object to the form.
21     A.  If the contract either for the individual
22 case management agreement or the master contract
23 between a commercial insurance company and the
24 provider was still valid, then there would be no
25 particular grounds for negotiation --

Page 337

1      Q.  Okay.
2      A.  -- for renegotiation.
3      Q.  And then the client would just lose that --
4  that revenue?
5         MR. COLE:  Object to the form.
6      A.  Well, if the AWP went down --
7      Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
8      A.  -- that would be the case.
9      Q.  And would there also be -- if it's under a
10 revenue share agreement with Abbott, would that mean
11 that Abbott would similarly lose revenue?
12         MR. COLE:  Object to the form.
13     A.  If the AWP went down or the particular claim,
14 that would be the case.  On the other hand, you know,
15 the contract may have a renegotiation point.  So -- so
16 if outside factors, such as AWP, had some sort of
17 change, then when that contract was up for renewal,
18 depending on whether it was Abbott's contract
19 directly, which, frankly, I don't think -- I just
20 don't recall if there were any, or the client's
21 contract, there would always be an option by the
22 client or the insurance company to say, "We've got to
23 come back and negotiate."
24     Q.  (BY MS. ST. PETER-GRIFFITH)  Well, let me ask
25 sort of the converse of the questions that I just

Page 338

1  asked.
2      A.  Uh-huh.
3      Q.  If AWP went up --
4      A.  Uh-huh.
5      Q.  And -- and either the large contracts with
6  the insurers or the individual case management
7  arrangements based pricing upon AWP --
8      A.  Uh-huh.
9      Q.  -- would that mean when the AWP went up, that
10 the revenue collected by the revenue share partner
11 would similarly go up?
12         MR. COLE:  Object to the form.
13     A.  On that particular item, that's what that
14 would mean.
15     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
16     A.  At the same time, you know, historically I
17 can tell you that there has been a lot of ratcheting
18 of prices that have gone on on the home infusion
19 industry throughout the period of my tenure in it.
20     Q.  Okay.
21     A.  And so, you know, you're asking that question
22 on an individual situation with an individual contract
23 with an individual claim or series of claims, perhaps,
24 under the duration of the contract, yes, but these
25 prices have changed over the years.  So in the

19 (Pages 335 to 338)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 339

1  long-term you have to -- you have to consider what
2  might have happened, too.
3      Q.  Okay.  Well, let me ask you just -- just in
4  general.  If pricing for -- by Contract Marketing and
5  Home Infusion --
6      A.  Uh-huh.
7      Q.  -- was based upon AWP for these third-party
8  insurers --
9      A.  Uh-huh.
10     Q.  -- and AWP went up, then wouldn't the revenue
11  go up for the revenue share partners?
12         MR. COLE:  Object to the form.
13     A.  In the shorter term, yes --
14     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
15     A.  -- in the context of what I just answered.
16     Q.  Okay.
17     A.  Uh-huh.
18     Q.  And, similarly, there would be more revenue
19  that would increase the amount that Abbott could
20  collect as well.
21     A.  Yes.
22         MR. COLE:  Object to the form.
23     Q.  (BY MS. ST. PETER-GRIFFITH)  If you could go
24  to Page 981.  I'm skipping a couple hundred pages
25  here, guys.

Page 340

1      A.  I see that.  Good.  Okay.
2      Q.  Okay.  Do you see that this is a glossary?
3      A.  It says that.
4      Q.  Okay.  Are you familiar with this glossary?
5      A.  Not specifically, no.
6      Q.  Okay.  If you could look where it says "AWP."
7      A.  Uh-huh.
8      Q.  "Average wholesale price - used in drug
9  pricing."
10     A.  Uh-huh.
11     Q.  "This is the manufacturers suggested retail
12  charge."  Did you have an understanding of what --
13  that AWP meant what is reflected here?
14         MR. COLE:  Object to the form.
15     A.  I don't think during the time that I was
16  involved in the reimbursement management that I had
17  much of an understanding of what AWP really was.
18     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
19     A.  I think I had said way upfront, whenever that
20  was, a month ago, that, you know, I have been in this
21  industry now a long time and I know quite a bit more
22  now than I did then.
23     Q.  Okay.  Fair enough.  What about -- do you see
24  where it says "EAC - Estimated Acquisition Cost?
25     A.  Yes.

Page 341

1      Q.  We touched upon that a little bit earlier
2  today.  Were you aware that contract marketing had a
3  manual that had a glossary that -- that defined
4  estimated acquisition cost?
5      A.  I don't actually recall having seen this
6  before --
7      Q.  Okay.
8      A.  -- even though I kept it.
9      Q.  Did you have any understanding as to any
10  definition of "estimated acquisition cost" when you
11  were in the reimbursement department?
12     A.  No.
13     Q.  Okay.  If we could move on to the next
14  manual, which is the Reimbursement Implementation
15  Manual, I believe.
16         Sir, let me ask you.  What manuals did
17  you write, if any, when you were in the Home Infusion
18  division?
19     A.  In general manuals tend to be a compilation
20  of materials that lots of people would have written.
21  And I guess from scratch the manuals that I probably
22  compiled and may have written good portions of them
23  would have been in my last three years or so when I
24  was product manager of the CHIP system related to how
25  one as a user uses the CHIP system.

Page 342

1      Q.  Okay.  Do you remember any other manuals that
2  you contributed materials to?
3      A.  I probably contributed some to this one that
4  we're looking at.
5      Q.  The Reimbursement Implementation Manual?
6      A.  Probably.
7      Q.  Okay.  Any others that you can think of?
8      A.  Not that I can think of right now.
9      Q.  Okay.  Sir, this is designated highly
10  confidential.  Do you know why it's designated highly
11  confidential?
12     A.  It wasn't on there when I turned the document
13  over.
14         MS. ST. PETER-GRIFFITH:  Okay.  Let me
15  just ask counsel for Abbott.  Do you intend to
16  continue with this designation of this manual as
17  highly confidential?
18         MR. COLE:  As I said earlier, Counsel,
19  we are happy to reassess the confidentiality
20  designation, but as of this time, sitting in this
21  deposition, we're not willing to withdraw it.
22         MR. STETLER:  Can I just make one quick
23  observation on this?
24         MS. ST. PETER-GRIFFITH:  Sure.
25         MR. STETLER:  Just to clarify it and it

20  (Pages 339 to 342)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 343

1   may help you with more questions for -- for
2   Mr. Rodman.  As everybody will remember, these
3   documents were located in -- in a relatively short
4   period of time before Mr. Rodman was to have
5   originally appeared at his deposition.  After he
6   produced the documents to me, they remained in my law
7   firm's possession, but we made them available to
8   Abbott for the purpose of their reviewing it since
9   they were Abbott documents.
10          We were instructed by Abbott at that
11  time to designate them highly confidential with the
12  understanding that the designation may or may not
13  stick in the future, but simply for the sake of
14  expediency and marking them quick.
15          So as far as the witness knows, he
16  produced all the documents to me.  We followed
17  Abbott's direction.  And as far as whether they want
18  to stick with the highly confidential or not, we do
19  not have a dog in that fight.
20          MS. ST. PETER-GRIFFITH:  Okay.
21          MR. STETLER:  So I'm just saying that
22  procedurally that's the way it works and Mr. Rodman is
23  not going to know about whether it's confidential or
24  not.  Now, you may want to ask him, "Do you consider
25  these to be confidential," I don't care, but I just

Page 344

1   wanted to let everybody know, you know.  Because I'm
2   sitting here -- we are actually the ones, my law firm,
3   that designated it highly confidential at the
4   instruction of Abbott.
5           MS. ST. PETER-GRIFFITH:  Did Abbott's
6   attorneys look at the materials before they were
7   designated highly confidential?
8           MR. COLE:  Yes, we did.
9           MR. STETLER:  I believe that they did a
10  review and I -- quite frankly, I thought there was an
11  exchange of e-mails with somebody and Mr. Cole is new
12  to this deposition --
13          MS. ST. PETER-GRIFFITH:  Right.
14          MR. STETLER:  -- where -- where I
15  believe there's an e-mail exchange somewhere that
16  you're on, Counsel, I believe, where they said, "We
17  are just designating everything confidential for now
18  and we may or may not stick with it, but there's no
19  way within the next," I don't know, week or however
20  much time we had, "we can actually do a particularized
21  review."
22          MS. ST. PETER-GRIFFITH:  Okay.
23          MR. STETLER:  Now, that has nothing to
24  do with whether or not it sticks.
25          MS. ST. PETER-GRIFFITH:  No.  I --

Page 345

1           MR. STETLER:  -- I'm just saying that's
2   why we put it on to begin with.
3           MS. ST. PETER-GRIFFITH:  Well, part of
4   the reason why I'm asking is that was in July and now
5   we're in October.
6           MR. STETLER:  Right.  I'm just telling
7   you what we did.
8           MS. ST. PETER-GRIFFITH.  Sure.  I
9   understand.
10          MR. STETLER:  And I don't care if it
11  sticks.  I don't care if they withdraw it.  I don't
12  care if you guys fight over it.  But as the guy who
13  put it on there, I just wanted you to know why we put
14  it on there.
15          MS. ST. PETER-GRIFFITH:  Okay.  That's
16  fine.
17          MR. STETLER:  Not that I personally put
18  it on there.
19          MR. COLE:  What document are we looking
20  at now?  What's the Bates range?
21          MS. ST. PETER-GRIFFITH:  We are looking
22  at the reimbursement manual, 1407.  Do you have that?
23          MR. COLE:  I don't have --
24          MS. ST. PETER-GRIFFITH:  Is it under
25  there?

Page 346

1           MR. COLE:  I don't see 1407.
2           MS. ST. PETER-GRIFFITH:  Hold on.  Let
3   me -- let me get you a copy.  (Tenders document.)
4           MR. COLE:  Thank you.
5       Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, do you
6   consider these documents to be confidential?
7           MR. COLE:  Object to the form.
8       A.  I guess that defines -- depends on how you
9   define confidential.
10      Q.  (BY MS. ST. PETER-GRIFFITH)  Were they --
11  were they maintained as confidential documents within
12  your office?
13          MR. COLE:  Object to the form.
14      A.  Would I consider these to be documents that
15  just anybody in the general public should be able to
16  see at any time, no.
17      Q.  (BY MS. ST. PETER-GRIFFITH)  Why not?
18      A.  Because I think that these were business
19  documents that were part of Abbott's product and
20  service development that, you know, businesses don't
21  have any particular reason why they should provide
22  them.
23      Q.  Were they distributed to the clients?
24      A.  This certainly was.
25      Q.  This was?

21 (Pages 343 to 346)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 347

1    A.  Certainly.
2    Q.  Okay.  If you could -- approximately how many
3  clients do you think this was distributed to?
4    A.  Well, this -- this manual was used as -- what
5  do we call this?  Reimbursement.  This was used kind
6  of as a guide for starting a new client that Abbott
7  was doing reimbursement for.  So there's materials in
8  here that would be used to walk through with them the
9  types of decisions that had to be made.  Some of it
10  would be training material.  And this was -- I don't
11  know when -- you know, the first time this type of
12  manual was put together.  I think we probably enhanced
13  it over time.
14        The dates on this one would appear, I'm
15  just looking at them, probably to be around 1998.  And
16  this was used with a client to start them up as a
17  billing service.  And judging from this agenda in
18  here, the client was Memorial out of Colorado.
19    Q.  Sir, were you ever involved in case
20  management negotiations or developing policies or
21  practices concerning case management negotiations?
22    A.  No.
23    Q.  If you could look at Page 1409.  It says
24  "Memorial Reimbursement Training and Implementation
25  Agenda."

Page 348

1    A.  Uh-huh.
2    Q.  Do you see that?
3    A.  Yes.
4    Q.  Do you remember this particular training
5  session?
6    A.  To the point where it occurred and I was part
7  of it, yes.
8    Q.  Okay.  Well, you're listed as -- I believe
9  as -- on several agenda items.  Do you see that?
10    A.  Yes.
11    Q.  Okay.  Did you give training on -- well,
12  first of all, who did you give this training to?
13    A.  This would have been to the individuals at
14  the client, Memorial, which is one of our clients.
15    Q.  Okay.
16    A.  Uh-huh.
17    Q.  Do you remember what year this was given?
18    A.  I would estimate 1998 only because that's
19  what I see in the manuals here.
20    Q.  Okay.  And just -- just so that we could put
21  this on the record, this is -- this document and the
22  next page are stapled documents that were inside the
23  front pouch of this particular binder that you have,
24  right?  They're not part of the larger manual itself?
25    A.  That would be correct.

Page 349

1    Q.  Okay.  And it appears that at this training
2  session you gave a Medicare overview from 8:30 to
3  10:30.  Do you see that?
4    A.  It does appear that.
5    Q.  Okay.  What are CMNs?
6    A.  Certificate for medical necessity.
7    Q.  Okay.  And then after the break you gave a
8  lecture on finalizing reimbursement procedures and
9  forms.  Do you see that?
10    A.  I see that.
11    Q.  Okay.  What do you recall about this
12  presentation?
13    A.  Nothing there.
14    Q.  Okay.  The next presentation after lunch --
15  oh, you had lunch and a break and apparently you were
16  responsible for that as well.
17    A.  Apparently I was, as -- as was my boss at the
18  time, whose name was Keith Harper.
19    Q.  Okay.  Well, I hope you weren't making
20  sandwiches.  But if we could -- after lunch, there was
21  a -- there was a session on case -- or "Review Case
22  Management Negotiation Practices."  Do you see that?
23    A.  I do.
24    Q.  Do you know why you were listed with Shellie
25  Bronson?

Page 350

1    A.  I don't know why.
2    Q.  Do you remember giving a lecture?
3    A.  I don't.
4    Q.  Okay.  Were you -- if a client had questions
5  about case management negotiation practices, did you
6  ever field any of those questions?
7    A.  Not that I can recall.
8    Q.  If you had received one of those questions,
9  what would you have done?
10    A.  I would have turned it over to the Contract
11  Marketing department.
12    Q.  Okay.
13    A.  The ones that did the negotiation.
14    Q.  Then the next item was the "Finalize Cash
15  Application Procedures."  Do you see that?
16    A.  Yes.
17    Q.  Okay.  What -- what was your involvement in
18  cash application procedures?
19    A.  That was done in the accounting area, the
20  accounting department, as I had explained earlier, and
21  that was the extent of my involvement.
22    Q.  Is Michele Scarpelli a member of the
23  accounting department?
24    A.  Yes, she was.
25    Q.  Okay.

22 (Pages 347 to 350)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 351

```
 1     A.  And she was responsible -- she was the first
 2  level manager responsible for cash applications, if I
 3  recall correctly, at the time.  I think the reason my
 4  name is on all these is because I believe I -- was --
 5  for reimbursement I was the lead supervisor
 6  responsible for implementing this client and so it's
 7  probably why my name is on everything.
 8     Q.  I see.  Okay.  Do you remember what letters
 9  and agreements you discussed?
10     A.  No.
11     Q.  Okay.  Then "Review and Implement Financial
12  Reporting."  What is financial reporting?
13     A.  That would be the -- the reimbursement
14  department would produce reporting once a month for
15  the client of, you know, financial records, you know.
16  I had mentioned one earlier, a sales report, a gross
17  sales report.  Another one we -- we had talked about
18  earlier, a collections report.
19     Q.  Okay.
20     A.  And there would have been other reports, too,
21  but this is essentially the -- talking about the
22  reports that would be given to the client once a month
23  from the CHIP system.
24     Q.  It appears, if you flip the page to 1410,
25  that there was a day two.  And we're making lunch
```

Page 352

```
 1  and wrapping up on day two as well, it appears.  But
 2  before you made lunch, you were involved in a "Process
 3  Map Referral/Reimbursement Screening Finalize
 4  procedures and forms."  Do you see that?
 5     A.  Uh-huh.
 6     Q.  What is that referencing?
 7     A.  Remember when I talked about earlier the
 8  process where the referral would come to the client
 9  and then information faxed -- would be faxed to the
10  reimbursement screening department and then that
11  department would be then verifying the insurance,
12  determining if there was a contract.  So if you had an
13  in network or out of network relationship.  And in
14  this case, because it was a client model, consulting
15  with the client probably as to whether the patient was
16  really going to be accepted depending on the insurance
17  situation.  That's what that means.
18     Q.  Okay.
19     A.  Working out that process.
20     Q.  Excuse me.  Then the very last thing you
21  provided was "New Medicare CMN Requirements."  Do you
22  see that?
23     A.  Yes.
24     Q.  Were you responsible for knowing and, you
25  know, either instructing or having a base from
```

Page 353

```
 1  which -- a base of knowledge from which people could
 2  draw within your department about Medicare or Medicaid
 3  regulations?
 4     A.  Well, I had some responsibility for
 5  understanding those requirements.  It was very
 6  difficult with Medicaid because there's so many of
 7  them.  Medicare was easier in that sense.
 8         Regulations, that's -- I would call it
 9  more in terms of essentially how you worked with those
10  health plans and it would be more contract or
11  materials, their coverage criteria, how you code, that
12  sort of thing.  Not so much -- I mean, if you consider
13  that to be regulatory, yes.  If you're -- if you're
14  talking about in the sense of, you know, published
15  federal regulations, that was really not something
16  that I was involved in very much at all.
17     Q.  Well, where did you learn, where did you gain
18  your information about Medicare and Medicaid?
19     A.  Primarily at that time it was from what I was
20  taught by others that already had some expertise as I
21  came into that department.
22     Q.  Okay.  Who would they be?
23     A.  They would be Virginia Tobiason and Shellie
24  Bronson, primarily.
25     Q.  Okay.  So did you do any research on your own
```

Page 354

```
 1  independent?
 2     A.  You know, we had copies of the contractors,
 3  the Medicare contractors' manuals on coverage
 4  criteria, coding, that sort of thing.  I certainly
 5  would have read those at times.
 6     Q.  If you had a question about Medicare or
 7  Medicaid or if a client had a question about Medicare
 8  or Medicaid statutes or regulations, who would you
 9  take that question to?
10         MR. COLE:  Object to the form.
11     A.  I have to say, I don't recall that ever
12  happening, so --
13     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
14     A.  Leave it at that.
15     Q.  Is it fair to say that what you understood
16  about Medicare or Medicaid statutes you learned from
17  either Shellie Bronson or Virginia Tobiason?
18         MR. COLE:  Object to the form.
19     A.  I think what we learned, it didn't have to do
20  with statutes, it had to do with the more operational
21  aspects of how you actually -- what the coverage
22  criteria were, how you -- how you bill the claim.  You
23  know, at that time I don't recall being involved with
24  statute or regulations in the area of billing to
25  Medicare at any time.
```

23 (Pages 351 to 354)

Page 355

1      You know, what you saw in these
2   documents from the contractor was, you know -- I
3   understand this better now than I did then, you know.
4   It related somehow to regulation and statutes.  And
5   conceptually I understand some of the coverage
6   criteria where -- how they related to statute.  I
7   recall that being learned from Virginia Tobiason at
8   one point on some of this stuff.
9      Q.  Well, did you have an understanding that, you
10  know, how Medicare and Medicaid were billed and what
11  the -- what they covered was governed by state and
12  federal statutes and regulations?
13     A.  I can't really tell you pinpoint when I began
14  to understand that.  And I'm sorry.  I would like to
15  do better for you, but I can't.
16     Q.  Okay.  Well, when you were in reimbursement,
17  did you understand that what you were doing in terms
18  of claims submission, or what your staff was doing in
19  terms of claims submission, was governed by federal
20  law for the Medicare program and federal and state law
21  for the Medicaid program?
22     A.  At some point I understood that, sure.
23     Q.  Do you -- well, certainly the Medicare
24  program?
25        MR. COLE:  Let me make an objection to

Page 356

1   that last question.  I didn't mean to interrupt.  I
2   just didn't get a chance to --
3      Q.  (BY MS. ST. PETER-GRIFFITH)  Go ahead.
4         MR. COLE:  -- object to the form.
5         MS. ST. PETER-GRIFFITH:  I'm sorry.
6      Q.  (BY MS. ST. PETER-GRIFFITH)  Go ahead.
7      A.  At some point I -- I understood that for
8   Medicare, certainly, and I really don't recall being
9   focused on that with Medicaid at all.
10     Q.  Well, was there an understanding generally
11  within the reimbursement department that, you know,
12  there were statutes that governed what you were doing
13  in terms of claims submission?
14        MR. COLE:  Object to the form.
15     A.  I would say probably not.
16     Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, if you
17  could go to 1425, 1426 and 1427.
18     A.  Uh-huh.
19     Q.  It says "Reimbursement Workflow."
20     A.  Uh-huh.
21     Q.  Do you know who drafted this?
22     A.  No.
23     Q.  It looks like it was revised on 2/10/98.
24     A.  I don't, actually.
25     Q.  Did you utilize this workflow chart?

Page 357

1      A.  Well, this is pretty much what I had
2   explained to you in the first hour this morning --
3      Q.  You anticipated --
4      A.  -- so we could have saved some time.
5      Q.  You anticipated my next question.
6      A.  I'm sorry.  What was -- what was your
7   question?
8      Q.  My question was:  Does this -- is this pretty
9   much the flow of what you described earlier?
10     A.  Yes.
11     Q.  Okay.
12     A.  Uh-huh.
13     Q.  If you could go to the next page, 1427.
14  After the sort of charts --
15     A.  At least as the flow within the reimbursement
16  department itself.
17     Q.  I see.
18     A.  Yeah.  I haven't talked about the order being
19  shipped here, I guess, but it definitely was the flow
20  within the reimbursement department.
21        I'm sorry.  What am I doing?
22     Q.  You're looking at "Reimbursement Workflow"
23  where it says "Monthly" --
24     A.  Yes.
25     Q.  "Reporting Package."

Page 358

1      A.  Uh-huh.
2      Q.  Can you explain what each of these items
3   mean?
4      A.  Yes.  They mean the name of a report.  The
5   gross sales report was a monthly reporting of
6   revenues, projected revenue sales that would be used
7   for booking to the business accounting.
8         A/R summary transaction leger.  There
9   was a report that essentially said, hey, at the
10  beginning of the month you had $10,000 of A/R and at
11  the end of the month you had $8,000 of A/R and how did
12  you get there.  So there were plus- and minus-type
13  transactions to indicate how you got there between --
14  during the month.
15        The write-off analysis report, I
16  remember earlier I had mentioned when claims were
17  closed, there might have been times when you did
18  not -- you were not paid what you were expected to be
19  paid.  So this is a report that showed aggregated, and
20  perhaps individual by claim, I don't recall, the
21  difference between what you were paid when you closed
22  the claim and what you thought you were going to get
23  and the reason for it.
24        Revenue share report, we had talked
25  about that earlier, which was collections multiplied

24 (Pages 355 to 358)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 359

1   by the revenue share arrangement and it showed the
2   Abbott versus the client split.
3          The aging report was a listing of the
4   accounts receivable of outstanding claims and it
5   showed how old they were on a time -- you know,
6   monthly bucket time schedule, essentially.
7      Q.   Okay.  I assume that conference calls are not
8   related to anything.
9      A.   Well, not related to being a report.
10     Q.   Okay.
11     A.   Okay.
12     Q.   If you could, sir, go to 1431.  First, let me
13  ask you as you're flipping the pages.  Was this manual
14  utilized on a regular basis by the reimbursement staff
15  within Home Infusion?
16     A.   This was used on a regular basis to implement
17  new clients that were starting up where reimbursement
18  was serving as a billing service.  I would have to
19  start looking.  There might be a few forms in here
20  that would be completed working with the client that
21  would become part of the permanent documentation for
22  that client that would be used by some of the
23  reimbursement staff.
24     Q.   Okay.  Can you -- go to 1431.
25     A.   Uh-huh.

Page 360

1      Q.   What is this document?
2      A.   This was some of the information that would
3   be collected when the patient was first referred that
4   I had talked about in that reimbursement intake
5   screening process.  And it's called the "Patient
6   Referral Data Base Care/Service Plan."  That's what it
7   is.
8      Q.   Would the revenue -- would the revenue share
9   client be the one -- the Abbott revenue share client
10  be the one who completed this information or would a
11  Home Infusion reimbursement specialist?
12     A.   Well, actually, I don't know that this
13  information would or would not have been completed per
14  se.  It probably would have been by the client, but
15  this type of information would also have been entered
16  into the CHIP system.  And so I really didn't spend
17  much time -- I wasn't involved in the pharmacy
18  procedures.  If this form was used, it would have been
19  completed in the pharmacy by the intake people.  And
20  if that's the case, it probably -- it probably would
21  have ended up in a patient file in the pharmacy and
22  the data would have been entered into the CHIP system.
23     Q.   Is that true for Abbott pharmacies as well --
24     A.   Yes.
25     Q.   -- would they have utilized this?

Page 361

1      A.   Well, I would think they may have, as best I
2   can tell you.
3      Q.   Okay.  If you could go to 1434 and 1435 and
4   1436.  It says "Worksheets" on the preceding page.
5      A.   Uh-huh.
6      Q.   Can you tell what these -- whether this is a
7   single document or a series of documents?
8      A.   These three pages?  Well, they are related to
9   the intake process when a patient was being accepted
10  that was covered by Medicare.  The first document
11  would be used for all Medicare patients during the
12  intake process.  And then if they happen to be a total
13  parenteral nutrition or TPN patient, the second page
14  would be used.  That's 1435.  And if they happen to be
15  a total enteral nutrition patient for -- what their
16  therapy was going to be, then Page 1436 would have
17  been used for that.
18     Q.   I see.  Okay.  And that's what TEN means,
19  total enteral?
20     A.   Total enteral nutrition.
21     Q.   Okay.
22     A.   Uh-huh.
23     Q.   And then TPN is total parenteral nutrition?
24     A.   Yes.
25     Q.   Okay.  Just -- can you just briefly describe

Page 362

1   the difference between parenteral and enteral
2   nutrition?
3      A.   Absolutely.  Total parenteral nutrition is a
4   feeding of nutrients directly into the bloodstream via
5   infusion.  Total enteral nutrition is -- enterals
6   would be cans of -- enteral nutritions, but cans of
7   nutritions.  The reason that a home infusion company
8   would be involved is that the patient was being fed by
9   tubes going into the GI tract somewhere.  So there
10  would be an administration of them by tube and perhaps
11  by pump.
12     Q.   Okay.  If you could go to Pages 1440 -- 1453,
13  54 and 55.  And if you could just identify what these
14  three documents are generally.
15     A.   I'm not sure why there's multiple copies here
16  at the moment, but it looks like to me it's actually
17  different versions and later versions that I was
18  keeping.  This is generally a document that would have
19  been used for setting up the process of the receipt of
20  records of the money from claims and coming from the
21  health plans to the client or to Abbott, depending on
22  who was doing the cash application.  That's what this
23  was.  And, also, since lockbox is included, it's
24  actually the receipt of the cash itself, the checks.
25     Q.   Okay.  So is it fair to say that these

25  (Pages 359 to 362)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 363

1 identify the procedures for receipt of payment and
2 where -- where it goes in the lockbox?
3    A.  This actually looks to me like being a
4 checklist to set up those parameters --
5    Q.  I see.  Okay.
6    A.  -- with the client.
7    Q.  If you could look at 1455.
8    A.  Uh-huh.
9    Q.  There's some redactions on this page.
10   A.  Uh-huh.
11   Q.  Do you know what those -- what's being
12 redacted?
13   A.  I -- I believe this was probably the name of
14 the client -- of a client that this was used for at
15 some point.  Judging that this has a date of 1995 on
16 it, I doubt that it was the Memorial client.  There
17 would have been no reason to redact it.  And, also,
18 because there are some pages sort of crossed off and
19 stuff, it looks to me like I was probably just kind of
20 keeping some of my own records of this -- previous
21 versions that we had in the past as opposed to, you
22 know, the page that was probably used with the
23 Memorial client was the most recent.
24   Q.  The most recent --
25   A.  Yeah.

Page 364

1    Q.  -- which is that first page.
2    A.  Yeah, exactly.
3    Q.  Okay.  So basically in terms of this
4 reimbursement lockbox procedures, if the -- if you put
5 in sort of Client A, or whoever it is --
6    A.  Uh-huh.
7    Q.  -- that's what completes the blacked-out
8 sections?
9    A.  That -- it looks to me that way.
10   Q.  Okay.
11   A.  Number 4, Ace Home Infusion will mail the
12 lockbox contents to Abbott Labs.
13   Q.  Did -- did Abbott utilize any outside
14 contractors to assist in this lockbox procedure?
15   A.  Abbott used contractors in the reimbursement
16 area quite a bit at the -- and during the early
17 periods clerical people.  You know, those
18 reimbursement clerks or reimbursement technicians that
19 I talked about to do certain reimbursement functions.
20 The people involved in the application of cash, which
21 was in the accounting area, I don't recall that
22 contractors were ever used there.
23   Q.  Okay.  When you say "contractors," do you
24 mean like -- like temporary help or contracted help?
25   A.  I do, yes.

Page 365

1    Q.  Okay.  As opposed to a service, a contracted
2 company that would come in and do it?
3    A.  That's -- the former is what I mean.
4    Q.  Okay.  If you go to what I think is going to
5 be the last page that I'm going to ask you to look at
6 in this manual, 1474.
7    A.  Uh-huh.
8    Q.  It says "Other Billings."  Do you see that?
9    A.  Uh-huh.
10   Q.  And it says "Upcharges."  What are upcharges?
11      MR. COLE:  What page are we on now?
12      MS. ST. PETER-GRIFFITH:  I'm sorry.
13 1474.
14      MR. COLE:  Thank you.
15   A.  This pertains to the list price that would
16 ultimately -- that might go on the claim if it was
17 being sent to the payer, to the -- to the health plan
18 list price claim.  These were some techniques that had
19 been established that were used to essentially
20 establish more of that usual and customary pricing.
21      So, you know, upcharges -- in this
22 particular case it's kind of like there was something
23 in the system that added an additional charge to the
24 claim to determine a usual and customary price that
25 would go to the payer.  So it was a little bit more

Page 366

1 complicated in that sense than simply having a list
2 price on each item file product record.  There were
3 other ways in the system to add more dollars to the
4 claim to ultimately have a list price for the claim.
5    Q.  (BY MS. ST. PETER-GRIFFITH)  And under what
6 circumstances would that -- would that occur?  I
7 assume it wasn't a normal thing, that it was an
8 exceptional situation?
9    A.  No.  I think that probably this was a normal
10 thing.  The -- there was an automation in the system
11 to do these types of upcharges and if it was -- I
12 think it was pretty normal.
13   Q.  Okay.
14   A.  Uh-huh.
15   Q.  When would it occur, do you know?
16   A.  Most of the time, because it was pretty
17 normal.
18   Q.  Oh, I see.  Okay.  I think we are done with
19 this manual.
20      MS. ST. PETER-GRIFFITH:  What time do we
21 have?
22      MR. SISNEROS:  11:30.
23   Q.  (BY MS. ST. PETER-GRIFFITH)  Do you need to
24 take a break, Mr. Rodman --
25   A.  No.

26  (Pages 363 to 366)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 367

1    Q.  -- or do you want to plow throw a little bit?
2    A.  I'm fine.
3    Q.  Okay.
4    A.  Thank you for asking.
5    Q.  Why don't we move to the next manual so that
6    we can get the books -- some of the books out of the
7    way.  "CHIP Reimbursement A-Z Class Materials," 2698.
8         MR. COLE:  Counsel, were these all
9    marked as a -- as a group exhibit, the box itself?
10        MS. ST. PETER-GRIFFITH:  Uh-huh.
11        MR. COLE:  Okay.
12        MS. ST. PETER-GRIFFITH:  Exhibit 1.
13        MR. COLE:  Okay.
14        MS. ST. PETER-GRIFFITH:  And then
15   Exhibit 2 was the 38,000 additional pages on the
16   two -- on the two burned -- the two burned DVDs were
17   actually marked as the second exhibit.
18        MR. COLE:  All right.
19        MS. ST. PETER-GRIFFITH:  And I didn't
20   bring a portable printer, so we won't be going over
21   those.
22        MS. THOMAS:  They were actually marked
23   as 1314 and 1315.
24        MS. ST. PETER-GRIFFITH:  Yes.  Yeah.
25   I'm sorry.  Yes.  Not --

Page 368

1         MS. THOMAS:  Not literally one and two.
2         MS. ST. PETER-GRIFFITH:  Not literally
3    one and two.  They were the second.  Thank you.
4    Q.  (BY MS. ST. PETER-GRIFFITH) Sir, if you need
5    to take a few minutes to flip through this, go right
6    ahead.
7    A.  (Witness reviewing document).  Okay.
8    Q.  Okay, sir, do you recognize this document?
9    A.  I do.
10   Q.  What is it?
11   A.  It is the CHIP Reimbursement A-Z Class
12   Materials Manual.
13   Q.  Okay.  And how are you familiar with this
14   document?
15   A.  I believe I compiled this.
16   Q.  Okay.  Do you know when -- actually, let's go
17   back to that last document that we talked about.  I
18   may have asked you this question before, but I'm not
19   sure.
20        Do you know whether there are any other
21   copies of the Reimbursement Implementation Manual or
22   do you know whether they were all subject to the sort
23   of pitching that occurred when Home Infusion closed?
24   A.  I'm not aware that any were intentionally
25   saved by anybody.

Page 369

1    Q.  Okay.  Other than you?
2    A.  You know.  I mean, we had a lot of clients,
3    so they may have some.
4    Q.  Okay.  What about this CHIP Reimbursement A-Z
5    Class Materials, do you know whether these materials
6    were saved?
7    A.  I do not know if these would have been saved
8    by Abbott.  I have no knowledge if anybody else
9    decided to keep some.  Certainly clients have these.
10   Abbott did ultimately, at the very end, sell the
11   rights to the CHIP system to a third-party company
12   that was given copies of these.  Clients, I would
13   imagine there are still a few that are using the CHIP
14   system, so they probably have this.
15   Q.  Do you know what the third-party company is?
16   A.  I do.
17   Q.  What is it?
18   A.  American Healthcare Software Enterprises.
19   Q.  Let me ask you, the CHIPs computer
20   information that was on the Abbott database, what --
21   which -- first of all, which database was the CHIP
22   system on, do you know?
23   A.  Ask me that another way.
24   Q.  Well --
25        MR. STETLER:  You mean like more

Page 370

1    politely or --
2         THE WITNESS:  No.  Just I don't
3    understand the question.
4    Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  Were you
5    aware that there were different databases at Abbott,
6    computer -- computer databases at Abbott?
7    A.  CHIP system databases?
8    Q.  Any -- no.  Just different databases for --
9    company-wide.
10   A.  Oh, sure.
11   Q.  Okay.  What were some of those databases?
12        MR. COLE:  Object to the form.
13   A.  You know, Abbott at the time was probably a
14   12, 13 billion dollar company with a lot of different
15   businesses, so there would have been a lot of systems.
16   And I had roles in Abbott prior to Home Infusion
17   Services, so I was involved with just a few of them at
18   the time.
19        You know, Abbott had a purchasing
20   database that was used for acquiring Abbott products
21   that -- like office supplies, and that sort of thing.
22   I'm aware of that one.
23        In my earlier experience at Abbott --
24   well, before I was in reimbursement, I was involved in
25   the Abbott customer order entry process where

27  (Pages 367 to 370)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 371

1  customers would buy products directly from Abbott and
2  there were systems that were involved with that.
3  You know, within my Home Infusion
4  Services tenure, everything I ever did was with this
5  CHIP system, that I can recall.
6  Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  And what
7  database was this CHIP system on within Abbott?
8  A.  Well, the CHIP system actually could be set
9  up to have a lot of different databases, you know.
10  And to give you an example, we might have been serving
11  Ace Home Infusion company and we might have been
12  serving Beta Home Infusion company and the CHIP system
13  had the capability within a physical computer to set
14  them up with entirely different databases for that
15  purpose of managing the whole business function.  So
16  in one sense the CHIP system databases were the CHIP
17  system databases, but there were a lot of them.
18  Q.  Okay.  You're going to have to excuse me
19  because I am, with the possible exception of
20  Mr. Stetler, the most computer nonfluent person.
21  MR. STETLER:  Hey.
22  MS. ST. PETER-GRIFFITH:  Mr. Stetler
23  could be very computer fluent.  I'm sorry.
24  MR. STETLER:  No, you got it right.
25  MS. ST. PETER-GRIFFITH:  Okay.

Page 372

1  Q.  (BY MS. ST. PETER-GRIFFITH)  When I say
2  "database," and I might be using the wrong term, was
3  there a mainframe that contained the CHIP information?
4  A.  There were several.
5  Q.  Oh, there we go.  Okay.  What mainframe was
6  the CHIP reimbursement system on?
7  A.  The physical computers were IBM computers.
8  They were considered mid-range -- not even that,
9  small -- small to mid-range computer technology at the
10  time.  They were -- I think when the system was first
11  developed, it was called a System 34 and then it
12  became a System 36 and then a System 38 and ultimately
13  an AS400.
14  Q.  Okay.
15  A.  And so ultimately at the end we had some
16  AS400 computers that it ran on.  And there were more
17  than one.
18  Q.  Okay.  How many were there?
19  A.  There were two or three that were used for
20  production data.  I mean, data that was used for the
21  real operation.  And then there was one that was used
22  as a systems development and training system.
23  Q.  Okay.
24  A.  If I recall that correctly.
25  Q.  For the AS -- well, first of all, you said --

Page 373

1  indicated the CHIPs information was on the AS400s
2  towards the latter part?
3  A.  You know, I think that was for the majority
4  of it.
5  Q.  Okay.
6  A.  Yeah.
7  Q.  Do you recall CHIPs being on any other
8  system?
9  A.  Not beyond what I've mentioned.
10  Q.  Okay.  If I today --
11  A.  Well -- well, the CHIP system also -- there
12  were some clients that ran the CHIP system on their --
13  Q.  Okay.
14  A.  -- IBM hardware, so ...
15  Q.  Okay.  And -- and I should apologize and
16  clarify.  I meant just in terms of the systems at
17  Abbott.
18  A.  Yes.
19  Q.  Okay.  On your last day at Abbott, if I were
20  to come to you and say, "I've got this production
21  request from the United States and it says I will need
22  all the computer CHIP information that you have,"
23  where would you go to look for it?
24  A.  That I have in my possession as of that time?
25  Q.  No.  Well, that Abbott has.

Page 374

1  A.  That Abbott has in their possession --
2  Q.  Yes.
3  A.  -- as of that time?  I would look from the --
4  the backup archiving that would have been maintained.
5  Q.  And what were the policies concerning the
6  backup archiving?
7  A.  That you would have to ask the CHIP systems
8  department on -- to get the specifics.  I can tell you
9  in general that there were, not by me, very well
10  understood requirements to save patient data for a
11  number of years, which would be both medical and
12  reimbursement data.
13  Q.  Okay.  Other than patient data, would --
14  would, for example, reports be kept or the reports
15  that you talked about identifying, you know, the
16  amounts that were taken in for reimbursement and the
17  allocation to the revenue share customer and the
18  allocation to Abbott, would those types -- would that
19  type of data be backed up and saved anywhere?
20  A.  Well, the reports would not, but the data
21  that was used by the computer system to generate those
22  reports would have been backed up, yes.
23  Q.  Would the reports have been saved in hard
24  copy someplace?
25  A.  They might have been, but that was out of

28  (Pages 371 to 374)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 375

1  my -- my league.
2     Q.  Who would have retained the hard copies?
3     A.  I don't really know.
4     Q.  You said the CHIPs systems department.  What
5  is the CHIPs systems department?
6     A.  The information technology developers of the
7  system.
8     Q.  Okay.  And were there --
9     A.  The programmers.
10    Q.  Okay.  Were there particular programmers who
11 were dedicated full-time to the CHIP system?
12    A.  Yes.
13    Q.  And who were they?
14    A.  Well, there were a lot of them.
15    Q.  Oh, okay.  Who do you recall?
16    A.  Well, I mentioned the manager already.  That
17 was Chris Blandford.  Sarah Card, Jerrie Goldstein.
18 Zin Fooks, F-o-o-k-s, Z-i-n, I think.
19          MR. STETLER:  Yes.
20    A.  Shirish, S-h-i-r-i-s-h, Patel, P-a-t-e-l.
21 There were others.
22    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Were
23 they -- where were they physically located in relation
24 to Home Infusion?
25    A.  At the end?

Page 376

1     Q.  At the end.  So they were actually in the
2  Home Infusion department?
3     A.  Oh, they were in the department, but at the
4  end they were in a different location.
5     Q.  Okay.  Where they were at the end?
6     A.  They were in a building off the toll road
7  in -- I guess that's Lake Forrest that the Hospital
8  Products Division was housed in, a portion of the
9  Hospital Products Division was housed in.
10    Q.  Is that now Hospira?
11    A.  That is their building now, yes.
12    Q.  Okay.
13    A.  There's two buildings there and they were in
14 the building closer to the toll road.
15    Q.  Okay.
16    A.  And the pharmacy was closed down by then.
17 The remaining portion of the department that was in
18 place was in some lease space that was about five
19 miles down off of Route 22, off of the toll road --
20    Q.  Okay.
21    A.  -- in Bannockburn.
22    Q.  Was the CHIP system a program that was
23 designed to access only information within the Home
24 Infusion business unit or -- could it access
25 information outside of the Home Infusion business

Page 377

1  unit?
2     A.  You mean with respect to Abbott boundaries
3  you might say --
4     Q.  Yeah.  Abbott boundaries, yes.
5     A.  -- business boundaries?
6     Q.  Yes.
7     A.  Strictly within Home Infusion Services.
8     Q.  Did it pull any information at all, to your
9  knowledge, any computer information from the Hospital
10 Business Sector?
11    A.  None to my knowledge.
12    Q.  Okay.  What about list prices?
13          MR. COLE:  Object to the form.
14    A.  I wasn't involved in that, so I can't answer
15 that.
16    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Could it
17 have been, but you just don't know?
18    A.  I just don't know.
19    Q.  Okay.  So if I tell you that I deposed
20 Shirish Patel and he testified that they pulled list
21 prices from the Hospital Business Sector, would that
22 surprise you?
23          MR. COLE:  Object to the form.
24    A.  I wouldn't know.
25    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  What was

Page 378

1  your interaction with other business units?
2     A.  While I was at Home Infusion Services?
3     Q.  Yes.
4     A.  Very, very minimal.
5     Q.  Okay.  What would -- what would -- on a
6  minimal basis, what would your interaction have been?
7     A.  Well, about the only time that I can recall,
8  and it was Mr. Stetler that at some point reminded me
9  of this, which I --
10          MR. STETLER:  Whoa, whoa, you shouldn't
11 be talking about what I told you.  If you remember,
12 tell them.
13    A.  We -- we used to have occasions where -- and
14 there would be -- something would just seem -- I think
15 I talked about this last time, something would seem
16 very strange on the CHIP system having to do with an
17 AWP and if it was an Abbott product, I think I had one
18 or two or three interfaces with somebody in Contract
19 Marketing to try and figure out why this looked
20 strange.  And, frankly, that's about all that I can
21 recall.
22    Q.  When you say "Contract Marketing," do you
23 mean Contract Marketing within Home Infusion or
24 outside of Home Infusion?
25    A.  That would be outside of Home Infusion.

29 (Pages 375 to 378)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 379

1    Q.  Which Contract Marketing?
2    A.  That would be HPD.
3    Q.  HPD.  So within the Hospital Business Sector?
4    A.  Yes.
5    Q.  Sir, you said you put together the A to Z.
6  Why did you create this manual or put together this
7  compilation of materials?
8    A.  As strange as it may seem, because we were
9  closing down, we still were taking our obligations to
10 enable our clients to operate as best as they -- you
11 know, efficiently.  So I put this together -- and,
12 actually, this may have been put together originally
13 before the announcement of closing down was made.  I
14 don't recall.  But this was intended to be used in a
15 training class where I was teaching clients how to use
16 the reimbursement functions of the CHIP system.  So it
17 was a classroom tool.
18   Q.  Okay.  I would like to back up just before we
19 delve into this book.  When you said that you would --
20 if there was something funky with -- with pricing and
21 you would go to the Hospital Business Sector, how
22 would you know to go to the Hospital Business Sector
23 to clarify the issue?
24   A.  I don't recall.
25   Q.  Do you remember who you would go to?

Page 380

1    A.  I recall the name of one person, Jerrie
2  something.
3    Q.  Gerry Eichhorn?
4    A.  No, I don't think so.
5    Q.  Jerrie Cicerale?
6    A.  Cicerale, I remember that name.
7    Q.  Okay.  What was your interaction with Jerrie
8  Cicerale?
9    A.  I don't know if I've spoken to her.  There
10 may have been an e-mail or two.
11   Q.  Okay.  Do you remember what the e-mail
12 concerned?
13   A.  It would have been probably one of these
14 weirdo type AWP things.
15   Q.  And did you retain that e-mail?
16   A.  Not that I know of.
17   Q.  Do you remember when -- when that would have
18 been that you went and spoke to Jerrie?
19   A.  No.
20   Q.  Or e-mailed Jerrie?
21   A.  No.
22   Q.  Do you ever remember being subjected to a --
23 strike that.
24      Do you ever remember retaining any of
25 your documents, either your e-mails or other physical

Page 381

1  documents that you had, pursuant to instructions from
2  the legal department or pursuant to a litigation hold
3  memo?
4    A.  I do not.
5    Q.  Do you ever remember receiving a litigation
6  hold memo?
7    A.  I do not.
8    Q.  So when, approximately, did you put together
9  this document, do you remember?
10   A.  I would estimate 2000 or 2001.
11   Q.  And would it have been before or after you
12 learned about the impending closure of Home Infusion?
13   A.  That's what I said earlier, I'm frankly not
14 sure.
15   Q.  Okay.  Did someone help you compile these
16 materials?
17   A.  I think I compiled these myself.  That
18 doesn't mean that I created them.
19   Q.  Okay.
20   A.  Every piece.
21   Q.  So you put together -- you went and collected
22 a bunch of documents and put them together as a
23 manual?
24   A.  That's what it looks like to me.
25   Q.  Did --

Page 382

1    A.  But I may have written some of them.  I would
2  have to look.
3    Q.  Well, we are going to go over some of these
4  in detail, so --
5    A.  Okay.
6    Q.  Did you distribute this to anybody?
7    A.  It would have been used to train clients.  It
8  might have been used to train, also, some Abbott
9  HomMed infusion employees that were involved in
10 reimbursement and this manual would have been
11 distributed to them, yes.
12   Q.  Do you consider it a confidential document?
13   A.  Only in the sense of it was an Abbott system,
14 it's Abbott property.  Do I consider anything in there
15 highly confidential, divulging the business strategy?
16 No, not really.
17   Q.  Do you know at the -- at the end of your
18 tenure with Abbott when this -- the department was
19 closing down and -- and you were involved with -- with
20 throwing out some documents, do you know whether this
21 was the only copy that was maintained or retained or
22 were there other copies of this document that were
23 saved?
24   A.  By Abbott?
25   Q.  At Abbott.

30 (Pages 379 to 382)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 383

1      A.  At Abbott?
2          MR. COLE:  I object to form.
3      A.  I don't recall that.  Let me see.  I can tell
4   you that Abbott also maintained the right to continue
5   to use the CHIP system.  But whether that means Abbott
6   has any of these documents, I don't know.  In addition
7   to having sold the license to this other company.
8      Q.  (BY MS. ST. PETER-GRIFFITH)  This American
9   Health -- what's the full name?
10     A.  American -- what did I say?  American
11  Healthcare Software Enterprises.  I believe that's the
12  name of it.
13     Q.  Did you -- do you know whether you provided
14  this particular manual to American Healthcare Software
15  Enterprises?
16     A.  Do I have a specific recollection?  No.  Do I
17  think I did?  Probably.
18     Q.  Okay.  Did you -- did you work directly with
19  the American Healthcare Software Enterprises?
20     A.  Yes.
21     Q.  Who did you work with?
22     A.  The owner of that company is named Marsha
23  DeRosia, worked with her.  There were some other
24  employees, but I don't remember any of those names.
25     Q.  Do you know --

Page 384

1      A.  Jim somebody.  I remember Jim.
2      Q.  Jim somebody?
3      A.  Jim somebody.  He's no longer there.
4      Q.  Do you remember when you interacted with
5   them?
6      A.  Yes.  It was -- we shut down at the beginning
7   of 2003.  It could have been as early as sometime
8   later in 2001.  It was certainly in 2002.  It was part
9   of both the negotiation process to work out a deal
10  with them, as well as ultimately turning over the
11  system to them for their use and helping train them.
12     Q.  Do you know why Abbott maintained a -- the
13  right to use the CHIP system if it was phasing out
14  Home Infusion?
15         MR. COLE:  Object to the form.
16     A.  I'm not aware of any specific intended use
17  for it.  I think that there was just a general thought
18  that, well, this was Abbott property, developed
19  property.  There had been a lot of money invested in
20  it and if there became a use for it at some future
21  time, Abbott still wanted the right to use it.
22     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Do you
23  know how much they sold the CHIP system for?
24     A.  I do have a recollection of that.  It's
25  complicated to answer.

Page 385

1      Q.  Okay.  Well, do your best.
2      A.  For, I think at the time, five clients that
3   continued to use it after we shut down the business.
4   Each one of them was offered the opportunity to -- my
5   memory is a little hazy here, so ...
6      Q.  Okay.
7      A.  But they were -- they were provided the
8   opportunity to own their version of the system.  So
9   they would be owing the -- what's called the computer
10  code for it.  And they were charged a fee.  My -- the
11  actual term of the deal with American Healthcare
12  Software Enterprises, as I recall, was they were not
13  paid -- paying Abbott anything at the time of sale and
14  transfer for their rights to the system.  They were to
15  pay Abbott a royalty of a sliding scale over a period
16  of years should they have placed the usage of the
17  system with any clients after that period of time.
18     Q.  Okay.  Do you know whether they were able to
19  place it with any clients?
20     A.  I do not believe that they did.
21     Q.  Okay.  Where did you obtain your
22  understanding about why it was that Abbott decided to
23  retain rights to the CHIP system or rights to use the
24  CHIP system?
25     A.  I don't recall any more than I have told you

Page 386

1   at this point on that.
2          MS. ST. PETER-GRIFFITH:  Okay.  Why
3   don't we -- oh, first, we've got five minutes left on
4   the tape.  So why don't we take a brief break to
5   change the tape.
6          THE VIDEOGRAPHER:  We are off the record
7   at 11:49 a.m. with the end of Tape Number 2.
8          (Recess from 11:49 to 12:00)
9          THE VIDEOGRAPHER:  We are back on the
10  record at 12 o'clock noon with the start of Tape
11  Number 3.
12     Q.  (BY MS. ST. PETER-GRIFFITH)  Mr. Rodman, does
13  this manual or compilation of materials that you put
14  together, does it accurately reflect or did it
15  accurately reflect for the time information pertaining
16  to the CHIP system?
17     A.  Pertaining to the reimbursement module of it,
18  to the best of my ability it did.
19     Q.  Okay.  If you could go to Page 2701.
20     A.  I'm there.
21     Q.  Okay.  I'd just like to ask you, it says
22  "CHIP Reimbursement."  This appears to be sort of an
23  introductory type page; is that fair?
24     A.  Actually, it also was a promotional page to
25  get people to come to the class, it looks like.  You

Page 387

1  can kind of tell that from the way it's written.  But,
2  yes, it's an introductory page, too.
3      Q.  Okay.  So there were actual classes that
4  helped people have a complete understanding of the
5  many capabilities that CHIP has to offer; is that
6  fair?
7      A.  This was -- during the period of time that I
8  was the -- the -- essentially the product manager for
9  the CHIP system and the user trainer and interface
10 there were, and this was one of them.  Part of that
11 time there really weren't.
12     Q.  There really weren't what?
13     A.  Were not classes per se provided to
14 customers.  I really built a lot of that on my last
15 three years or so, so ... Built -- you know, doing
16 it.  It would seem -- you know, you may think there
17 would have been, but I can't recall that there -- you
18 know, I have to back up on that.  I want to back up.
19 I'm sorry.
20         There were some people that were
21 responsible for the -- up until the point where the
22 business unit was closing down and I became the CHIP
23 product manager, they were the people that were
24 responsible for the customer training and the direct
25 customer interface in all sections of the CHIP system.

Page 388

1  And they also had a major role in development of some
2  of the features.  Which, you know, I probably should
3  have -- could have mentioned them earlier, but I'm
4  just thinking of them now.
5      Q.  Okay.
6      A.  And who did they report in to?  I believe
7  they reported in to the individual who was the
8  director of the pharmacies.  That's -- that is my
9  recollection.  So there was -- you know, within the
10 pharmacy in our organizational structure we have
11 someone that was head of all the pharmacies and I
12 think that they reported in to him, also.
13         So that's kind of a fourth group within
14 the system that we hadn't really talked about yet that
15 certainly had some responsibility and use in the CHIP
16 system and that was these CHIP trainer educators.
17     Q.  Thank you for that amplification because
18 you've just reminded me of a question before we dive
19 into this manual that I wanted to ask you.  Were there
20 other individuals who Abbott licensed the CHIP system
21 to or sold the CHIP system to, other individuals or
22 companies?
23     A.  Yeah, there is one.  Beyond the -- beyond
24 the -- you know, the rights of companies, while they
25 had this ongoing client relationship, they have the

Page 389

1  rights to use the system, but there is a company that
2  we did sell a -- what I think we call a perpetual
3  license to use this system to and there's one.
4      Q.  And what was that company?
5      A.  Express Scripts.
6      Q.  Okay.  And did they utilize the CHIP system,
7  to your knowledge?
8      A.  They did.
9      Q.  Okay.
10     A.  They also -- they bought the right to the --
11 what's called the source code.  Which means they
12 bought the rights to actually do the programming so
13 we -- we were no longer responsible, anyway, for the
14 programming and development of the license that they
15 had, the system that they bought.
16         I actually was the -- if you will,
17 the -- from an implementation standpoint, the account
18 manager, the trainer.  I was the primary interface
19 between Express Scripts and Abbott during this period.
20 And that happened around 2000.  And that, actually, is
21 one of the reasons I put some of these manuals
22 together.
23     Q.  Okay.  Who was invited to the training
24 sessions?
25     A.  Well, there were multiple training sessions.

Page 390

1      Q.  Okay.  Would you just send out invitations
2  or --
3      A.  Yeah.  Actually, this would have been -- this
4  page we were just looking at, 2701, actually would
5  have been an invitation that would have been sent out
6  to our clients.
7          And so, you know, typically who would be
8  coming, would be people that had some responsibility
9  in reimbursement that was a client, some of the Abbott
10 people would be in these classes.  And as I say, this
11 manual was probably used for Express Scripts training
12 that I did.
13     Q.  Okay.  And under Item 4 where it says
14 "Learning Objectives" --
15     A.  Uh-huh.
16     Q.  -- there was an opportunity to learn how to
17 use automated HCFA 1500 forms and -- and how to do
18 Medicare electronic claiming, right?
19     A.  Uh-huh.
20     Q.  Do you remember what was taught about that?
21     A.  In general, it would have been what the user
22 had to do to use the system to do such things as
23 creating a HCFA 1500 form or to submit a claim to
24 Medicare electronically.  So, you know, what you had
25 to do in the screens, that sort of thing.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

eac33b4c-807b-4388-aa68-bf67ecb0bae2

1     Q.   And so the CHIP -- the CHIP system permitted
2   a user to create a HCFA 1500 form and to
3   electronically submit a claim to Medicare?
4     A.   Yes.
5     Q.   Under Item 6 it says, "Obtain overview
6   understanding of the use of price schedules for
7   automatic contract special pricing." Do you see that?
8     A.   Yes. Yes.
9     Q.   What does that mean?
10    A.   That refers to what we talked about earlier
11  today. These automated price schedules, A, B, C, D,
12  et cetera that we talked about, and how to price the
13  claims based upon the terms of the contractual
14  agreement between the health plan and the provider.
15    Q.   If you could go to 2704 and 2705. You might
16  want to start with 2703 where it says "Class Material
17  #2."
18    A.   Okay.
19    Q.   Can you tell me, what are these two -- what
20  are these two charts?
21    A.   These are charts that were a process flow
22  having to do with -- with, in this case, pharmacy or
23  reimbursement work functions and relating to, in the
24  very high level, you know, a module or a portion of
25  the CHIP system that was used to handle those

1   procedures that were being followed in these areas.
2     Q.   Who drafted this chart?
3     A.   I don't know.
4     Q.   Do you know where you got it from for
5   inclusion?
6     A.   Well, I don't recall drafting this myself.
7   That doesn't mean that I didn't. And if it wasn't me,
8   it would have been those CHIP trainers that I talked
9   to about earlier.
10    Q.   And does it accurately reflect sort of a flow
11  of the pharmacy operations that can be -- that can be
12  tracked on the CHIP system?
13    A.   It's very high level and it reflects a flow
14  of what the CHIP system was used for in pharmacy
15  operations.
16    Q.   If you could go to the next chart. Do you
17  know who created this?
18    A.   Whoever created the previous one probably
19  created this.
20    Q.   Okay. And do you have independent
21  recollection as to whether that was you?
22    A.   I don't think I created these.
23    Q.   This says "Reimbursement/Financial
24  Operations." What does this flowchart reflect?
25    A.   It, for the most part, reflects the modules,

1   major modules, some modules within the CHIP system
2   that were used to handle these billing service
3   functions and also the cash application part of it and
4   some of the accounting aspects in terms of the types
5   of sales reporting that would be produced and used by
6   the accountants.
7     Q.   What does "Contractual Deduction Table" mean?
8     A.   I just want to -- I know this perfectly, but
9   I need to explain it.
10    Q.   Okay. Take your time.
11    A.   Okay. Your list price -- we talked a lot
12  about what list price is earlier in the sense of list
13  price that would be on a claim that might go to a
14  payer may not be what you expect to collect from the
15  payer or ultimately all payers. And there are, I
16  guess, three different reasons for that.
17           One is because there was this -- if it
18  was a commercial payer, there would be some sort of a
19  managed care agreement to actually discount your list
20  price to something else. If it was a government
21  payer, typically the government payer would be
22  submitted charges that were list prices, but you knew
23  what their -- they would have allowances for paying
24  the claims. So you -- you could predict to some
25  degree exactly what you're going to get paid and you

1   knew it was going to be different from your list
2   charges and less.
3           And the third reason was there would be
4   certain occurrences where claims would just become
5   uncollectible or bad debt. And in that I would also
6   say sometimes it was uninsured and you figured you
7   were going to write them off because of an indigent
8   type case.
9           The contractual deduction table was a
10  function in the system to say, okay, if my list price
11  for a service claim was going to be a hundred dollars,
12  I really think I'm only going to collect 55 of them,
13  for the reasons I just explained. And so you would
14  put in a couple of factors that say, hey, there's
15  going to be a 40 percent reduction because if I do get
16  paid and it's not a bad debt situation, this is what I
17  think the payer is going to pay. And then there would
18  be -- so I'm down to 60 percent. And then I might put
19  in another five percent that says, you know, on
20  average I might have a five percent bad debt
21  situation.
22           So -- so the system had the capability
23  to say, hey, of that hundred dollars that was going to
24  be booked at a very gross level as a sales based on
25  the list price, right upfront I think I'm only going

33 (Pages 391 to 394)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 395

1  to collect 55. So my net sale that I would actually
2  want to book, you know, projection of revenue, would
3  be $55. And that's what the deduction table did.
4     Q.  Okay. When you say "list price," you're
5  talking about the list price in the item file in the
6  CHIP system, right?
7     A.  Well, and we added to that when you asked me
8  about upcharges later, but, yes, it's all derived from
9  the pricing setup in the item file, yes.
10    Q.  You are not talking about the catalog prices
11 for Abbott?
12    A.  I am not.
13    Q.  Okay. I just wanted to clarify because --
14    A.  That's right.
15    Q.  -- list price is a very specific term in this
16 litigation.
17    A.  Okay.
18    Q.  What does "Accounts Receivable Adjustment"
19 mean on this chart? Is that something similar?
20    A.  No. This would be on the back end. Frankly,
21 I can tell you it was on the back end. It would have
22 had to be done with when you're getting the cash in,
23 but beyond that I'm not sure what it meant by that.
24    Q.  Okay. If you could go to 2707 and 2708 and
25 take a look at this chart, please.

Page 396

1     A.  Uh-huh.
2     Q.  Did you create this chart?
3     A.  I don't know.
4     Q.  Okay. Could you have?
5     A.  I could have.
6     Q.  What does it reflect?
7     A.  Well, it's another variation of workflow that
8  we have been discussing in the past.
9     Q.  Okay.
10    A.  It's more oriented towards when you went
11 through that workflow from referral to -- at least to
12 some of the claiming, it's the types of functions on
13 the CHIP system that there were.
14       So remember when I talked about ship
15 confirmation that I was amazed I remember, you see
16 that right on here. So that's what it is. It's
17 talking about what you do on the CHIP system in order
18 to do those processes and procedures.
19    Q.  Does it accurately reflect -- do these two
20 pages accurately reflect the workflow that can be
21 monitored by the CHIP system?
22    A.  Well, to the best of the ability that I have
23 when I included this in the book, and maybe wrote it,
24 it reflected the -- the portions of the CHIP system
25 that were used to -- to -- to perform all of these

Page 397

1  procedures in that process that we talked about
2  earlier.
3     Q.  Okay. If you could go to 2712. Sir, what is
4  this a list of?
5     A.  It's entitled "Business Class/Insurance
6  Types."
7     Q.  Okay. And what does it reflect?
8     A.  We had a way in the CHIP system to classify
9  the type of health plan by major payer category. So
10 you see some of that here ranging from CHAMPUS to
11 commercial individual plan to commercial group plan to
12 Medicare/Medicaid, and so on.
13    Q.  Okay. Is it fair to say that the -- where it
14 says "business class" and "insurance class," that
15 those -- that within the CHIP system when you see "MC"
16 for business class, that that means Medicare, and when
17 you see "MD," that means Medicaid?
18    A.  Yes, I think so.
19    Q.  And then "MG" means Medigap?
20    A.  Yes.
21    Q.  Okay. Would -- would that be used --
22    A.  Well, I mean, within the CHIP system.
23    Q.  Within the CHIP system.
24    A.  If you're looking -- within the context of
25 some screen that you might have a print of, yeah.

Page 398

1     Q.  Okay.
2     A.  So ...
3     Q.  So -- and that -- that goes -- that's my
4  question is when you have a printout on a screen that
5  says "business class" or "insurance type" and it says
6  "MC" or "MD" or "MG," it's going to be Medicare,
7  Medigap or Medicaid?
8     A.  I don't recall exactly if there was some
9  flexibility that one of the clients might have had.
10 Rather than call it MC, call it MI. I don't recall if
11 these were all fixed or not, but for the most part
12 that's what people used, yes.
13    Q.  Would this be what Abbott used?
14    A.  Yes.
15    Q.  Okay. If you could go to Page 2716, 17, 18
16 and 19 and 20.
17    A.  Uh-huh. Okay.
18    Q.  Now, we've seen some of the -- we went over
19 in your earlier deposition the item file data
20 information. This appears to be a variation of that
21 same information. Can you tell me, what is this
22 series of pages of documents?
23    A.  It's a documentation of some of the -- for
24 the most part, at least, some of the data elements
25 that were used on the item file that reflected data

34 (Pages 395 to 398)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 399

1  that was relevant to the sales and reimbursement
2  claiming function.
3      Q.  Okay.  At the top it says "NDC number."  Do
4  you see that?
5      A.  Yes.
6      Q.  And it says "Required for all drugs."
7      A.  Yes.
8      Q.  "The NDC number is used to pull AWP from the
9  Redbook."
10     A.  Yes.
11     Q.  What does that mean?
12     A.  If AWP was important for the particular
13  claim, then we imported into the CHIP system AWP
14  information from the Redbook data source, data
15  compendium.  And the way to match up -- the way to --
16  the way to match that AWP figure to the item record of
17  a drug that would go ultimately on a claim was through
18  NDC numbers.  So you had to have an NDC number to
19  watch it.  That was your reference point.
20     Q.  Why -- why were you -- why did you hook in
21  the Redbook information?
22     A.  Because the predominant way -- do I want to
23  say predominant way?  This was changing over time.
24     Q.  Okay.
25     A.  A more and more common way of being paid by

Page 400

1  commercial insurers during this five years that I was
2  actually involved in reimbursement, and then even
3  later on, was to have a contractual agreement or
4  perhaps an individual case -- patient case negotiation
5  where the payment for the drug itself was based upon
6  AWP plus or minus some percentage.
7          So if your CHIP system was going to be
8  able to book your net expected sales, it had to know
9  what AWP was.  If you had to submit your claim to the
10  payer discounted by AWP, that is at -- you know, at
11  a -- at an amount less than the Home Infusion Services
12  list charge, this system needed to know what the AWP
13  was in order that you could do that.
14     Q.  Did Abbott have a license for AWP
15  information?
16          MR. COLE:  Object to the form.
17     A.  Abbott had an agreement with Redbook to use
18  the AWP information from Redbook for the CHIP system.
19     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Was that
20  something that was Home Infusion specific or do you --
21  do you have an understanding as to whether other
22  business units could access that licensed information?
23     A.  To the very best of my knowledge, it was Home
24  Infusion specific.
25     Q.  Okay.

Page 401

1      A.  And I would have no knowledge of -- beyond
2  Home Infusion on you know, any of these compendiums
3  and the data that would have been used or looked at by
4  Abbott, either contractually or in any other way.
5      Q.  Okay.  But it's possible that, for example,
6  Hospital Business Sector could have had access to the
7  Redbook data, but you just would have not known about
8  it?
9          MR. COLE:  Object to the form.
10     A.  I think it's pretty unlikely that they would
11  have had routine access, if any access to it, from the
12  use of the data that the Home Infusion Services
13  business unit had.  There was certainly nothing that I
14  knew of that was set up structurally so that there was
15  any sort of routine access of them to that data that
16  was from this Redbook data that was being brought into
17  the CHIP system, so --
18     Q.  (BY MS. ST. PETER-GRIFFITH)  Being brought
19  into the CHIP system?
20     A.  Yeah.
21     Q.  But they might have had access to it
22  elsewhere?
23          MR. COLE:  Object to the form.
24     A.  I have no knowledge of that.
25     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Did you

Page 402

1  know that Jerrie Cicerale reported list price,
2  contract -- catalog price information to Redbook?
3          MR. COLE:  Object to the form.
4      A.  No, I don't think I knew that.
5      Q.  (BY MS. ST. PETER-GRIFFITH)  You referenced
6  earlier contractual agreement to use AWP.  Who was the
7  contract between?
8      A.  That would be a contract between the
9  provider, which could have been one of our clients, or
10  could have been Abbott, and a commercial health
11  insurance plan.
12     Q.  Okay.  Now, for -- on the item file data
13  elements, after "unit of measure" it says "current
14  contract cost" and after that "current factory cost."
15     A.  Uh-huh.
16     Q.  Why was it important -- well, first of all,
17  there was -- let me just confirm.  There was an
18  opportunity within the item -- item file data within
19  the CHIP system to track current contract costs and
20  current factory costs?
21     A.  There was the capability to.
22     Q.  Okay.  Do you know whether Abbott did that?
23     A.  This was beyond what I was responsible for.
24  I believe that there was tracking of costs and that is
25  something that the accounting department did and you

35 (Pages 399 to 402)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 403

1 would need to talk to them to understand those
2 details.
3     Q.  Okay.  Were you familiar at all with how
4 current contract costs or current factory costs were
5 used?
6     A.  I think probably at the time that I asked
7 some questions to try and figure it out, I don't
8 recall much of that, and I couldn't tell you that, no.
9     Q.  Do you know whether anyone within the
10 reimbursement department when submitting claims to
11 Medicare or Medicaid, do you know whether they would
12 refer to the current contract cost or current factory
13 costs in estimating or providing to Medicaid or
14 Medicare the estimated acquisition costs for the
15 products?
16     A.  Certainly not Medicare.
17     Q.  Okay.  What about Medicaid?
18     A.  There were, I think, a question or two, I
19 think I had mentioned this a month ago when we spoke,
20 that you were to provide an acquisition cost to
21 Medicaids for submitting claims to them.  I don't
22 think this data was used, actually, for that though.
23     Q.  But it was possible for the reimbursement
24 department folks to look in the item file data
25 information and obtain information concerning the

Page 404

1 current contract costs and the current factory costs?
2     A.  Actually, that wasn't supposed to be the
3 case.  The CHIP system had a pretty darn elaborate
4 security set so that you had to have -- be authorized
5 to view lots of data and the cost data was -- was well
6 protected and the typical individual in reimbursement
7 would never even see the cost data.
8     Q.  Why was it set up that way?  Why is it that
9 the reimbursement people couldn't access the current
10 contract costs or the current factory costs?
11         MR. COLE:  Object to the form.
12     A.  They would have no business reason to do so
13 and those decisions were made way before I came on
14 board, so ...
15     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Well, no
16 business reason that you were aware of?
17     A.  No business reason that I was aware of.
18     Q.  Okay.  Do you know whether the use of the
19 factory cost data was unique to Home Infusion?
20     A.  As opposed to the rest of Abbott?
21     Q.  Yeah.
22     A.  I have no knowledge of that.
23     Q.  Or the rest of at least Hospital Business
24 Sector?
25     A.  I have no knowledge of that.

Page 405

1     Q.  Okay.  Would anyone in reimbursement, to your
2 knowledge, have any access to the current contract
3 costs or the current factory costs?
4     A.  Ask me that again.  Anybody in the
5 reimbursement department?
6     Q.  In the reimbursement department.
7     A.  Have access?
8     Q.  Right.  On the CHIP system to the current
9 contract costs or the current factory costs.
10     A.  My recollection is they weren't supposed to.
11 And as I had said earlier, this was really something
12 that was handled in the accounting area, so ...
13     Q.  Well, do you know who set up the policy that
14 they weren't supposed to?
15     A.  I inherited it, so I just kind of went along
16 with it.  So I guess I have to honestly say no, not
17 really.
18     Q.  Well, did you ever direct anyone within
19 Home -- within Home Infusion reimbursement that they
20 could not access current contract costs or current
21 factory costs?
22     A.  Well, they were just -- there was sort of a
23 standard set of security flags.  I mean, there was
24 like 200 flags that were used in the system identified
25 with the user as to what they could and couldn't do

Page 406

1 and look at in the system.  And so, you know, we had a
2 set of flags that would be used typically for
3 reimbursement specialists and those flags would be
4 turned off.  That's my recollection of that.
5     Q.  Okay.  And that wasn't something that you saw
6 any reason to change?
7     A.  The cost part of it wasn't within our
8 responsibilities in the reimbursement function.
9     Q.  Did Abbott reimbursement personnel, when
10 submitting claims to Medicare or Medicaid, at any time
11 consider reporting to Medicaid or Medicare the
12 estimated acquisition costs for particular drugs
13 billed by J code?
14         MR. COLE:  Object to the form.
15     A.  Never to Medicare for sure and I -- I don't
16 really think that that was required by any Medicaids.
17 To the best of my knowledge, I don't think it was, and
18 there would have been no reason to do that.
19     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  You
20 referenced earlier the accounting area.  What
21 accounting area were you referencing?
22     A.  Home Infusion Services.
23     Q.  Okay.  If you could go to the next page,
24 2717.  It says, "Primary Drug.  This flag determines
25 whether or not the item's AWP will be included in" the

36  (Pages 403 to 406)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 407

1 "price schedule calculations that involve a percentage
2 of AWP." Do you see that?
3    A.  Yes, I do.
4    Q.  What does that mean?
5    A.  Well, this was part of the automation.  So
6 where I had said earlier, if AWP was necessary for --
7 for establishing the charges on a claim to be
8 submitted to the payer, then -- you know, there are a
9 lot of drugs involved in Home Infusion Services for a
10 patient that's on therapy.  Since you -- you know, if
11 you're doing a compound drug, there's what I like to
12 call the primary drug or the therapy.  Acyclovir would
13 have been the primary drug.  But there also may be
14 some prescription sterile water used, some
15 prescription diluent, 5W used.
16          And my recollection of this is that when
17 Abbott was -- Abbott's automation of this for when you
18 had to be submitting a claim reduced to an amount from
19 your list charge to whatever the AWP agreement --
20 AWP-based agreement was, that we did this based upon
21 the component of the primary drug only if it was a
22 compounded therapy.  And so there was something on the
23 item file that allowed you to determine what was a
24 primary drug and what might have been just something
25 else that goes into the compound.  And I think that's

Page 408

1 what this flag was used for.
2    Q.  Do you know where you pulled these materials
3 from that we've been looking at, the item data file
4 elements?
5    A.  I believe that this was pulled from
6 documentation that had been put together at some point
7 in the past, either by the Contract Marketing
8 department, or possibly also by these -- this CHIP
9 training area that had preceded me.  It could have
10 been either.
11    Q.  Do you know whether copies of this
12 information was retained anywhere other than what you
13 sort of rescued during the general pitch session?
14    A.  Beyond everything we talked about already,
15 no, I don't know that.
16          MS. ST. PETER-GRIFFITH:  Okay.  Why
17 don't we do this.  I'm about to have, unfortunately, a
18 major coughing spell.  So why don't we take a break
19 for lunch right now, if we could.
20          THE VIDEOGRAPHER:  We are off the record
21 at 12:28 p.m.
22          (Lunch recess from 12:28 to 1:17)
23          THE VIDEOGRAPHER:  Stand by, please.  We
24 are back on the record at 1:17 p.m.
25    Q.  (BY MS. ST. PETER-GRIFFITH)  Mr. Rodman, I --

Page 409

1 what I'm going to do -- what my game plan is is to
2 pass you off in a little bit.  I would like to go
3 through the remaining pages of this manual and go over
4 the CHIP Reimbursement Module User's Guide in terms of
5 documents.  And then I have a few series of questions.
6          MS. ST. PETER-GRIFFITH:  But before we
7 get started, what I would like to do is mark
8 separately as exhibits the documents that we -- the
9 manuals that we have been looking for so that whoever
10 is reading this transcript isn't going nuts.
11          And the first manual I believe we used
12 was the Case Management Training Manual, which is
13 BR 00714 through 989.  I don't think you need to pull
14 the original, Dave.  I just want to mark this as --
15          MR. STETLER:  No, no.
16          MS. ST. PETER-GRIFFITH:  -- an exhibit.
17          MR. STETLER:  I was just going to get
18 what you were going to use next.  Because I assume
19 that --
20          MS. ST. PETER-GRIFFITH:  Oh, the CHIP --
21 yes.  It's 1744.
22          So if I could -- if I could have the
23 court reporter mark this document beginning with
24 BR 00714 titled Case Management Training Manual as the
25 next exhibit.

Page 410

1          MR. COLE:  Do we know what that is?
2          THE REPORTER:  Yes.  1386.
3          MR. COLE:  1386?
4          THE REPORTER:  Uh-huh.
5          MR. COLE:  Thank you.
6          (Exhibit 1386 marked)
7          MS. ST. PETER-GRIFFITH:  Is Margaret on?
8 No, she's going to call in.
9          And then what I would like to do is mark
10 the next -- the next manual that we looked at, which
11 was the Reimbursement Implementation Manual, BR 01407
12 is the beginning page and the ending page is BR 01503.
13 If we could mark that as the next exhibit.
14          THE REPORTER:  1387.
15          (Exhibit 1387 marked)
16          MS. ST. PETER-GRIFFITH:  And then the
17 document that we're currently looking at, which is the
18 CHIP Reimbursement A-Z Class Materials, which begins
19 BR 02698 and ends BR 02906.  If we could mark that as
20 the next exhibit.
21          THE REPORTER:  You would like the one
22 marked that says "Master Copy"?
23          MS. ST. PETER-GRIFFITH:  Yeah.  They all
24 do.
25          THE REPORTER:  Okay.

37 (Pages 407 to 410)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 411

1    (Exhibit 1388 marked)
2    Q. (BY MS. ST. PETER-GRIFFITH) The court
3 reporter actually just reminded me of a question that
4 I wanted to ask. On the first page of our copies it
5 says -- of the copies that were produced it says,
6 "Master Copy." Do you see that, sir? And you can
7 look at the exhibit that was just marked. Does that
8 say that on the front of your binder? At the top,
9 "Master Copy."
10    A. Oh, yes, uh-huh.
11    Q. Is that your handwriting?
12    A. Actually, it doesn't look like my handwriting
13 for some reason.
14    Q. Do you know why it's labeled "Master Copy"?
15    A. Yeah, I do. This was -- I -- these were
16 manuals that I specifically maintained and used in the
17 course of my job responsibilities and when we needed
18 to duplicate, I kept one that I made sure I knew was
19 the master copy for duplication --
20    Q. I see.
21    A. -- as opposed to any others that were sitting
22 around.
23    Q. Sir, if you could turn to BR 02718 in that
24 manual.
25    A. Okay.

Page 412

1    Q. Sir, what -- and -- and I believe it carries
2 over to the next page as well. Can you tell me, what
3 is this particular document?
4    A. This is just a description of more fields
5 that -- most of them, at least, if not all, were in
6 the item file on the CHIP system and it's labeled
7 "Screen Two," which means that we had more than one
8 screen to display all these items. So this was screen
9 two of two, I guess.
10    Q. Okay. And it says -- if you move down the
11 list, one, two, three, four, five items down it says
12 "Avg Wholesale Price," do you see that?
13    A. Yes.
14    Q. What is -- what does that mean?
15    A. Average wholesale price.
16    Q. Okay. And where -- is there -- was there a
17 particular screen that reflected average wholesale
18 price?
19    A. No. It would be a data element in this
20 screen two.
21    Q. Okay. What do you mean by that?
22    A. A computer screen that you're looking at with
23 display of data on the item file, a computer screen.
24    Q. Okay. And it would say "average wholesale
25 price"?

Page 413

1    A. It would have been labeled average wholesale
2 price or maybe AWP or something to reflect that, yes.
3    Q. Okay. Is this -- where it says, "Screen Two
4 Fields," the description underneath average wholesale
5 price, is that sort of a definition for CHIPs purposes
6 of average wholesale price or what is that?
7       MR. COLE: Object to the form.
8    A. Where it starts to say average wholesale
9 price --
10    Q. (BY MS. ST. PETER-GRIFFITH) Right.
11    A. -- the item -- the paragraph?
12    Q. Yeah.
13       MR. COLE: Object to the form.
14    A. I would say that's an adequate description.
15 It was a CHIP description of what's in that field.
16    Q. (BY MS. ST. PETER-GRIFFITH) Okay. And that
17 information was pulled from the Redbook?
18    A. Yes. And the user could change it as
19 explained there.
20    Q. Okay. Why would the user want to change it?
21       MR. COLE: Object to the form.
22    A. Because of -- I mean, it would be very rare,
23 but the most likely case would be someone recognized
24 that this AWP just wasn't saying it didn't make sense
25 for the item. It was probably some sort of data

Page 414

1 compendium error and perhaps coming from Redbook.
2 That would be -- that would be -- a hypothetical
3 example. It would be very rare, but that's why.
4    Q. (BY MS. ST. PETER-GRIFFITH) Okay. If you
5 could go to 02726, please?
6    A. Okay.
7    Q. And if you could look at -- first of all,
8 what is this document?
9    A. Well, on Page 02721, actually, is -- it shows
10 these screens look like, screen one and screen
11 two that I'm just referencing. And then there is a
12 typewritten number assigned to each data element
13 within that. And then the remainder pages after are
14 describing what that data element is. So this data
15 element is describing what's in fields labeled 29
16 through 33 on that earlier page.
17    Q. Okay. So on Page 2721, when it says,
18 "Average Wholesale Price 32," that's the number that
19 corresponds to the -- to the entry?
20    A. That's the number that corresponds to the
21 description of the entry that is on Page 2726, yes.
22    Q. Okay. And the same is true for Number 33,
23 "AWP Effective" wholesale --
24    A. That would be right.
25    Q. -- "Effective date"?

38 (Pages 411 to 414)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 415

1    A.  That would be right.
2    Q.  Why would you, in the CHIP system, have an
3  average wholesale price effective date?
4    A.  Because they would change.  And why would you
5  want to know the date of the change?  I'm not sure
6  about that one.
7    Q.  Okay.  It says on Page 2726, if you could
8  flip to that.
9    A.  Yeah.
10    Q.  "Query Field Name."  What does that mean?
11    A.  You could -- in addition to having reports on
12  the CHIP system that a programmer would have
13  programmed that the user could run, the -- actually,
14  the IBM software behind the system had an ability to
15  do what was called query -- query reporting, which
16  means that both the programmers, as well as a trained
17  end user of the system, could run customized reports
18  from the CHIP system, something that wasn't a routine
19  report that was part of the system that had been
20  programmed by programmers.  And in order to program a
21  query report, you had to know the CHIP assigned data
22  element name, and that's what these are.
23    Q.  Okay.  If you could go to Page 02785, please.
24  Actually, you know what, I'm going to have you flip to
25  2788.

Page 416

1    A.  Okay.
2    Q.  Sir, if you could look -- if you could just
3  look at Step Number 17.
4    A.  Okay.
5    Q.  Well, first, can you tell me -- I apologize.
6  I should have you start at the beginning.  Can you
7  tell me what this document is with -- the document
8  that begins with the steps?
9    A.  Well, it starts on Page 2781.  It says here,
10  "Class Exercise to Package Medicare Enteral Claim,
11  Attach CMN, and Transmit Claim."  So this,
12  essentially, was a training exercising -- exercise to
13  take the training attendees through the steps on the
14  CHIP system to -- to put -- put together from the data
15  that was in the CHIP system an enteral therapy claim
16  to be transmitted to Medicare.  That's what these
17  steps are, step one, two, three, four, what you had to
18  go through.
19    Q.  Okay.  And on 2788, Step 17.
20    A.  Uh-huh.
21    Q.  The first sentence reads, "Next, you have
22  your" -- "your Medicare billing expert check your
23  work."  Do you see that?
24    A.  Yes.
25    Q.  Who's the Medicare billing expert?

Page 417

1    A.  You know, I probably wrote this, but I don't
2  know -- to be honest, I don't know what I had in mind
3  at the time.
4    Q.  Did Abbott Home Infusion reimbursement have
5  Medicare billing experts?
6    A.  No.  I -- I would say that we -- within -- I
7  mean, that department was probably 40 people large at
8  one point and we would have -- some of the billers
9  were more knowledgeable than others and you had to
10  bill a particular payer, one of them being Medicare.
11  There was some of that, but that's as far as I would
12  go on that.
13    Q.  Okay.  We are done with this manual, so why
14  don't we move on to the next.
15        MS. ST. PETER-GRIFFITH:  And I'm going
16  to ask that the court reporter mark -- I would like --
17  it's the CHIP Reimbursement Module User's Guide, the
18  big thick one.  And it begins at BR 01744, appears to
19  end at BR 02150.  And I'm going to have the court
20  reporter mark a copy of this separately, although,
21  Mr. Rodman I would like you to work from your
22  original.
23        THE REPORTER:  1389.
24        (Exhibit 1389 marked)
25    A.  Okay.

Page 418

1    Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, can you
2  tell me, what is this document?
3    A.  This was a document intended to -- in fact,
4  to be used as a reference guide for users of the CHIP
5  system who were in the reimbursement function.
6        MS. ST. PETER-GRIFFITH:  Hold on a
7  second.  Mr. Stetler, is it okay if we proceed?
8        MR. STETLER:  Yes, please go.
9    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Go ahead.
10    A.  Who were users of the CHIP system in the
11  reimbursement functional area, the reimbursement
12  department, of how to do things on the CHIP system.
13    Q.  Would this get -- would this be distributed
14  to clients at all?
15    A.  Yes, it would have been.
16    Q.  Okay.  Do you consider this to be a
17  confidential document?
18        MR. COLE:  Object to the form.
19    A.  I guess, as I had said earlier, you know, do
20  I think that this was Abbott property and that,
21  therefore, it just shouldn't be given out to the
22  general public willy-nilly?  Sure.  Do I think there's
23  anything really highly confidential in terms of trade
24  secrets, that sort of thing, or whatever?  Not really.
25    Q.  Who wrote this?

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 419

1    A.  This is a compilation of materials.  I
2  actually remember, roughly, when and who did this.
3  It's -- a project was assigned, my recollection, by
4  Virginia Tobiason to another individual, who is a peer
5  of mine, another reimbursement supervisor at the time,
6  to put together something quickly because we felt we
7  needed a reimbursement CHIP systems user guide for our
8  system and that's where this came from.
9    Q.  Okay.  Who was that person who put it
10 together?
11   A.  Her name is Nancy McLoughlin.
12   Q.  Did you participate at all in the compilation
13 of the materials that comprised this CHIP
14 Reimbursement Module User's Guide?
15   A.  At that time I was not very much involved in
16 it.  Later on I probably made some changes to this.
17   Q.  Okay.  When -- when was that put together?
18   A.  I'm going to estimate 1980 -- or -- yeah,
19 1998.
20   Q.  Okay.  So it was before Ms. Tobiason left
21 Home Infusion?
22   A.  Oh, definitely.
23   Q.  Do you remember how long it took to put this
24 together?
25   A.  Not really.

Page 420

1    Q.  Do you remember what the then intended use of
2  it was?
3    A.  Well, in general, it was what I had
4  explained.  It was for CHIP users of the function.
5    Q.  Okay.
6    A.  We, actually, in the business unit had made a
7  decision, "we" meaning upper management, to begin
8  selling the rights to have and use the CHIP system to
9  other home infusion companies as just a stand-alone
10 CHIP system, not -- not part of Abbott's other
11 strategy.  So just -- you know, in effect, just like a
12 commercial software vendor would be selling a system
13 to, you know, somebody, another company.  And so there
14 was a major effort to package together documents that
15 we never really had very well at the time that --
16 because every -- at the time every computer system
17 that was sort of a corporate type or company computer
18 system would have some sort of documentation manual or
19 set of manuals of how to use it.  And that, actually,
20 was the impetus for putting together this quickly.
21   Q.  Okay.  Do you know why that decision was
22 made, just sort of off of this outside of the --
23   A.  Yeah, I do, actually.
24   Q.  Okay.
25   A.  It was recognized by Abbott's -- Abbott

Page 421

1  management within the business unit that a lot of
2  money had been put into the system.  It was a pretty
3  darn good system and it was a way to bring in some
4  additional revenues into the business unit, like going
5  to sell that system per se as a system.
6    Q.  Do you know who made that decision?
7    A.  Well, Mike Sellers was general manager at the
8  time.
9    Q.  Okay.  Do you know whether he made the
10 decision?
11   A.  Not for sure.
12   Q.  Okay.  But that would have been -- had to
13 have been something that would have had to have been
14 something signed off by, say, Don Robertson or someone
15 above Mr. Sellers?
16   A.  I wouldn't know that.
17   Q.  If you could go to Page 1763, please.
18   A.  17 -- oh, I'm sorry.
19   Q.  1763 at the bottom.
20   A.  Okay.
21   Q.  Sir, this is a page that has -- it says at
22 the bottom, "Reimbursement Master Files."  Deduction
23 and allowance master files.  Do you see that?
24   A.  Yes.
25   Q.  What are the CHIPs master files or

Page 422

1  reimbursement master files?
2    A.  Well, there were all sorts of databases in
3  the system and you would just call them different
4  files, essentially.  So this was just a -- sort of a
5  terminology to say that there was a file called the
6  deduction allowance file and somebody decided to label
7  it and say it was a master file.
8    Q.  Okay.  What is the deduction allowance file?
9    A.  Yeah.  You asked me -- we talked about this
10 already and that was when I gave that example about
11 going from a hundred dollars to $45.
12   Q.  Okay.
13   A.  This was actually the mechanism through
14 this -- through which that was done by.
15   Q.  Okay.  Meaning on the computer screen itself?
16   A.  Well, you would set up your data in the CHIP
17 system through a user screen that then would be used
18 by the system to take that sort of deduction allowance
19 in order to move from your list charges down to what
20 you expected to collect for the reporting of sales.
21   Q.  Okay.  It says midway down in this screen
22 itself on this page, do you see where it says, "Opt,"
23 "Account," "BC."  What does "Opt" mean?
24   A.  Point to -- where are you looking?
25   Q.  I'm sorry.  I'm looking right here

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 423

1    (indicating).
2        A.  Oh.  Option.
3        Q.  Okay.  What option?
4        A.  That's not shown here that I see, but there
5    is one that's here.  If you typed in a four here on
6    that one line and you hit your entry key, it would
7    probably delete that line.
8        Q.  Oh, I see.  I see.
9        A.  There may have been -- I don't know whether
10   or not it's shown.  There's probably a two.  I think a
11   two was change, typically.  So --
12       Q.  Okay.  So --
13       A.  -- that's what that was.
14       Q.  Okay.  What does "BC" mean?
15       A.  Business class.  You had shown me that table
16   earlier that showed the insureds types.
17       Q.  Okay.  So if an MC was there, that might have
18   meant Medicare?
19       A.  Yes.
20       Q.  Okay.  Payer, is that -- or py -- "Payr,"
21   what is --
22       A.  Payer.
23       Q.  That's payer?
24       A.  Health plan --
25       Q.  Okay.

Page 424

1        A.  -- better term for it, but payer, yes.
2        Q.  Why is there no information there?  Is it
3    because it needs to be completed?
4        A.  I'm sorry.  Please repeat.
5        Q.  Why is there no information there?  Is it
6    because it needs to be completed?
7        A.  The system was pretty flexible in this area.
8    It wasn't very common that you would -- you could set
9    this up to take these types of deductions/allowances
10   by -- by therapy, by type of insurance class.  You
11   could even do it by payer, by health plan.  It wasn't
12   very commonly done that way by health plan or payer
13   and that's -- this is just an example that somebody
14   put together, but that's why it's not in there.
15       Q.  Okay.  Under -- the next one is "Thpy."  What
16   does that mean?
17       A.  Therapy.
18       Q.  And what is ABT therapy?
19       A.  Antibiotic.
20       Q.  Okay.  What is ASL therapy?
21       A.  I think that stood for ancillary sets only.
22       Q.  Okay.  BLD?
23       A.  Blood.
24       Q.  CAR?
25       A.  I believe that stood for cardiac therapy.

Page 425

1        Q.  CHL?
2        A.  Chelation.
3        Q.  CHM?
4        A.  Chemotherapy.
5        Q.  CSF?
6        A.  Colony stimulating factors.
7        Q.  CTH?
8        A.  Catheter care.  Can you believe I remember
9    all this?
10       Q.  What does "List" mean?
11       A.  That would be -- not what you might be
12   thinking.
13       Q.  Okay.  That's why I'm asking.
14       A.  Every item in the --
15           MR. STETLER:  What do -- you tell a
16   witness not to speculate as to what somebody might be
17   thinking, but I didn't think you would extend it to
18   you.
19       A.  Every -- every item product record in the
20   item file would have a catalog number that was
21   assigned to it and a catalog number actually had two
22   components to it; one was called list, one was called
23   IC.  So this was the catalog number used in the CHIP
24   system for the item that was in the item master file.
25       Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Would

Page 426

1    that be the Abbott catalog number?
2        A.  You know, for Abbott products that may have
3    been the Abbott catalog number, yes.  That list IC
4    terminology, I don't recall what IC stood for, but
5    that was something that I think was sort of a, you
6    know, a crossover from it was done elsewhere in
7    the HPD division just in terms of the label that was
8    assigned to this field when the system was built.
9        Q.  Okay.  And what does "Contractual" mean?
10       A.  Actually, IC -- now that I remember, it
11   stands for inventory code.
12       Q.  Oh, okay.
13       A.  So -- I'm sorry.
14       Q.  That's okay.  The next item says "Contractual
15   Pct or $ Amount."
16       A.  Yeah.
17       Q.  What does that mean?
18       A.  Well, in this case, if a sale came through
19   from a -- providing a therapy to a patient and the
20   account number was WVU 0002 and the business class was
21   OT and the therapy was ABT, that set, we were taking a
22   100 percent contractual, which means we didn't expect
23   to have any net revenue coming out of that
24   transaction.  So the sale that would be booked,
25   actually, would be zero dollars.

41 (Pages 423 to 426)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 427

1    Q.   Okay.  And what's bad debt percentage?
2    A.   Well, in this case we were just saying the
3  whole thing we didn't expect to collect and -- for
4  whatever reason, but if that -- that -- that
5  contractual column might have said 50 percent, which
6  means we think we are going to get 50 percent of the
7  list charges on the claim.  But we are going to make
8  an allowance that some percentage, say, five percent
9  of all claims submitted that match up in these
10  criteria are just going to be ultimately bad debt
11  write-off situations.  So that would be a field you
12  could fill in on that.
13    Q.   What about revenue share?
14    A.   That would be a field that you could fill in
15  to reflect the revenue sharing between Abbott and its
16  client.
17    Q.   Okay.  Let me ask you this.  If you wrote off
18  a bad debt or took a reduction in reimbursement, would
19  Abbott's revenue share go down?
20    A.   Yes.
21    Q.   How --
22    A.   Well, why would it go down?  I mean, the
23  percentage would be the same, but the amount -- the
24  amount of money collected would go down.
25    Q.   Okay.  Is it possible that Abbott could --

Page 428

1  then could take a loss on the cost of the product it
2  furnished on a consignment basis?
3    A.   On an individual transaction?
4    Q.   Yeah.
5    A.   Sure.
6    Q.   And what is the other category?
7    A.   It was another way of putting one of these,
8  you know, estimated -- that you're going to get less
9  sales for some reason.  I actually don't recall that
10  we ever used it.
11    Q.   Okay.  If you could go to BR 01768.
12    A.   Okay.
13    Q.   And this is "Forms Master Files."  What is
14  that?
15    A.   Oh, okay.  At the time to submit a claim to
16  Medicare for home infusion therapies there was this
17  document called a Certificate of Medical Necessity or
18  CMN that ultimately had to be attested to by the
19  physician that was ordering the therapy and -- but it
20  was a form and either on paper or electronically the
21  content of the form had to be submitted to Medicare.
22  And this was a screen that was used in the automation
23  of the generation of that form in the CHIP system.
24    Q.   So you would generate the form letter and get
25  the physician to sign it?  Or Abbott would -- Abbott

Page 429

1  Home Infusion reimbursement would generate the form
2  letter?
3        MR. COLE:  Object to the form.
4    A.   Actually, originally you could do that and,
5  yes, it would -- it would be sent to the physician for
6  signature and you had to have that before you
7  submitted the claim.  As time went on, the
8  requirements of Medicare changed so that you weren't
9  able to complete certain sections of the form that the
10  physician was also supposed to complete.  So there
11  would be responsibility by the physician, or someone
12  in the office, to also complete portions of the form.
13    Q.   (BY MS. ST. PETER-GRIFFITH)  Do you remember
14  when that change occurred?
15    A.   No.  '90s.
16    Q.   Okay.
17        MR. STETLER:  And just one
18  clarification.  I think you've been saying "form
19  letter" and he's been saying "form," if that's right,
20  so maybe you want to clarify that.
21    Q.   (BY MS. ST. PETER-GRIFFITH)  Oh, okay.  Yeah.
22  What do you mean by "form"?
23    A.   It's a form.
24    Q.   It's an actual physical form?
25    A.   Not a letter.

Page 430

1    Q.   Not a letter.
2    A.   It's a form.
3    Q.   Okay.  And that's -- that's what the -- that
4  is what needed to be -- that's what the physician
5  needed to complete?
6    A.   To Medicare the physician is attesting to the
7  reason for the therapy that Medicare is going to pay
8  for.  That's what this form is for.
9    Q.   And how much of the form -- prior to that
10  change in the '90s, how much of that form was
11  completed by Abbott or by the CHIP system?
12        MR. COLE:  Object to the form.
13    A.   Well, by Abbott or -- or -- it could have
14  been both, actually, but almost all of it would have
15  been, other than the physician's signature.
16    Q.   (BY MS. ST. PETER-GRIFFITH)  Okay.  Now, if
17  you look at that same page where it says business
18  class.  Is that an example we're using "MC" to
19  represent Medicare?
20    A.   Yes.
21    Q.   If you could go to BR 01770.  It says at the
22  top "HCPCS Codes Master Files."  Do you see that?
23    A.   Uh-huh.
24    Q.   What does "Medicare category" mean on that
25  code screen?

42 (Pages 427 to 430)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 431

1     A.  I don't remember.
2     Q.  Okay.
3     A.  There might be something later that would
4  trigger my memory.
5     Q.  01778, please.
6     A.  Okay.
7     Q.  We've already discussed that CMN is
8  Certificate of Medical Necessity.
9     A.  Uh-huh.
10    Q.  Is that the form that you were talking about
11  before?
12    A.  Yes.
13    Q.  Okay.  Under Item Number 5 it says,
14  "supplier's charge for unit billed to Medicare."  Do
15  you see that?
16    A.  Yes.
17    Q.  What is that?
18    A.  At one point during the '90s a new
19  requirement on these forms came out from Medicare,
20  which was that the form had to have an estimate of the
21  charges that the supplier, the provider, would be
22  submitting to Medicare for the service that was being
23  provided that this Certificate of Medical Necessity
24  was for.  So you had to have something on the form
25  that the supplier would fill out so that then it would

Page 432

1  go to the physician, where the physician would then
2  see that, as if they really cared, when they were
3  signing that form and attested to what was on the
4  form.  That was why that was put in there.  And, you
5  know, there may have been a reason Medicare decided to
6  do that, but at the time I wasn't following that, so I
7  don't really know what triggered it.  So we had a way
8  in the CHIP system of doing some automation of putting
9  a -- what the estimate of the charges that would be
10  billed to Medicare on a section of the form that was
11  the Certificate of Medical Necessity.  And that's what
12  this was used for.
13    Q.  When -- when a change like that was
14  implemented by Medicare, or a comparable change was
15  implicated by a Medicaid program, how would you learn
16  about it?  How would the Home Infusion reimbursement
17  department learn about it?
18        MR. COLE:  Object to the form.
19    A.  Well, if it was for Medicare, the -- most of
20  your -- the large, large majority of your claims were
21  submitted to, during most of the tenure I was there,
22  what were called durable medical equipment regional
23  carriers, or DMERCs.  And there were four of them.
24  Each DMERC had a full set of procedure manuals,
25  essentially, that all of the suppliers to Medicare

Page 433

1  home infusion providers are called suppliers.  So all
2  of the suppliers had access to and through either
3  changes to those manuals, or other written
4  communications that would come from a DMERC, you would
5  be notified of these changes.  And that's how we would
6  learn about it.
7     Q.  (BY MS. ST. PETER-GRIFFITH)  Who was
8  responsible for monitoring that within the Home
9  Infusion reimbursement department when you were there?
10    A.  Well, that responsibility was probably
11  changed over time, as I recall.  Myself and my
12  colleague had some responsibility for monitoring those
13  types of changes.  Shellie Bronson, who was -- while
14  she stayed -- before she left was a reimbursement
15  trainer.  She kept track of that.  Virginia Tobiason
16  was certainly involved in keeping track of those types
17  of things, too.  And also later on Keith Harper, you
18  saw his name earlier, I reported directly to him, in
19  turn reported to Virginia and then later yet Mike
20  Snouffer.  So many people were involved in that.
21    Q.  What does Medicare schedule or "Medicare
22  Sched" mean on that -- on that particular screen
23  that's reflected on this page?
24        MR. COLE:  Still on 1778?
25        MS. ST. PETER-GRIFFITH:  Yes.

Page 434

1     A.  I can tell you what I believe it means.
2     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
3     A.  I believe it means it's the fee schedule that
4  Medicare had published for payment of the claim that
5  was coded with a 4221 per unit and I believe that's
6  what that was.
7     Q.  Okay.  If you could look at -- go to Page
8  1794.
9     A.  Okay.
10    Q.  What is a CHIP tip?
11    A.  CHIP tip.
12    Q.  What are CHIP tips?  It says -- it reflects
13  it at the bottom of the page and it begins, I believe,
14  14 pages earlier.
15    A.  Let me find the first page here.
16    Q.  It is 1782.  I'm sorry.  I should have had
17  you probably start there.
18    A.  At some point in the development of
19  documentation that a user would use, we were
20  developing something that we labeled a CHIP tip, which
21  was just another piece of user-type documentation of
22  how to use the system.  That's what --
23    Q.  Okay.
24    A.  -- a CHIP tip was.
25    Q.  Did you work on developing CHIP tips?

43 (Pages 431 to 434)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 435

1    A.   Yeah, I think so.
2    Q.   If you could go to Page 1794.
3    A.   Uh-huh.
4    Q.   Are these just definitions or what -- what
5  are these individual labels?  Like "Cost of Goods
6  Cold," "bb Billing Service," "bb Provider"?
7    A.   These, again, are more data elements in the
8  CHIP system that had to be maintained in order to let
9  the system do what it needed to do.
10   Q.   Okay.  What is revenue sharing?  Is there a
11 field for revenue sharing?
12   A.   Well, as it says here, it's informational
13 only, but it was intended to indicate that there was a
14 revenue sharing agreement between Abbott and the
15 particular client.
16   Q.   What about "Medicare Participant"?  That also
17 reflects it's information only.  What did that mean?
18   A.   A supplier can agree to be a participating
19 supplier in Medicare.  If they did, it means that they
20 accept as payment in full the Medicare fee schedule
21 allowance less the patient co-pay and that the
22 supplier can and should bill the patient for the
23 co-pay, but cannot bill the patient for anything more
24 than the co-pay.
25   Q.   Okay.

Page 436

1    A.   So that's essentially what it meant.  You
2  were participating in Medicare.  If you didn't
3  participate, then -- unless you filed the claim as if
4  you were, then you could actually bill the patient for
5  more than just the Medicare allowance co-pay amount.
6    Q.   Okay.  If you could flip to Page 1797.  Which
7  is, I believe, Page -- the next -- three pages back.
8  The -- first, actually, can I have you turn to 1795,
9  please?  Do you see in the screen where it says,
10 "Account Cash Payment Address for Billing Service"?
11   A.   There's a screen, yes.
12   Q.   Yeah.  Okay.  "Abbott Hospital Home Care
13 Services," do you see that?
14   A.   It's spelled wrong.
15   Q.   Yeah, I see that.  What is Abbott Hospital
16 Home Care Service?
17   A.   That was a made-up name of a --
18   Q.   Oh.
19   A.   That was, like I said, Ace Infusion Company.
20   Q.   Okay.  I'm sorry.
21   A.   Just made up.
22   Q.   I just wanted to confirm it wasn't, you know,
23 the actual title of the pharmacy or something.
24   A.   No.
25   Q.   If you could flip back to 1797 then.  This is

Page 437

1  a CHIP tip concerning revenue shares.
2    A.   Uh-huh.
3    Q.   Can you explain what this page means?
4    A.   Well, this is a portion of a CHIP tip and
5  this page happens to be having something to do with
6  revenue shares.
7    Q.   Okay.  We had spoken earlier about how Abbott
8  entered into these revenue share agreements with
9  its -- with its clients.
10   A.   Uh-huh.
11   Q.   Is that what the revenue share information is
12 intended to reflect?
13   A.   Yes.
14   Q.   Okay.  Where it -- in the -- in the first
15 "Exhibit 7 Revenue Shares" screen where it says share
16 percentage.  ABT means antibiotic, right?
17   A.   Yes.
18   Q.   And it says 75.5 percent.
19   A.   Yes.
20   Q.   Whose share was 75.5 percent?
21   A.   Well, first of all, the data is totally made
22 up.  It does not necessarily represent any reality.
23        Having said that, in this example, you
24 could actually see it on Exhibit 8 where now it's
25 Rex's Home Infusion Services Company.

Page 438

1    Q.   Okay.
2    A.   Okay.  Of the collections of a thousand
3  dollars for antibiotic during the time period, which
4  was the month of December, Rex was going to receive --
5  was going to get to keep 75.5 percent or $755 and the
6  account share, which would have reflected the Abbott
7  amount, would be $245.
8    Q.   Okay.  That answers my question, but I want
9  to just confirm.  If I am looking at -- if I'm pulling
10 up a CHIP system right now and I pull up this screen
11 and it says "share percentage," the share percentage
12 reflected is the client's share; is that right?
13   A.   Well, I see two share percentages.  Oh, you
14 mean here on --
15   Q.   On -- on Exhibit 7.
16   A.   You know, actually, there's -- this wasn't
17 done consistently.  You would say -- as I mentioned
18 earlier, there were a lot of different businesses that
19 were run on these CHIP systems and some of them had
20 different databases and it kind of depended how you
21 set up this field as to whether that share represented
22 the Abbott share or whether it represented the client
23 share.  It would really depend on what you were
24 looking at.
25   Q.   Okay.  So it could vary --

44  (Pages 435 to 438)

Page 439

1    A.  It could.
2    Q.  -- for client to client?
3    A.  It could be either, yeah.
4    Q.  Okay.  I'm trying to flip through these here.
5  Bear with me.  BR 1823.
6    A.  Can we take a 60-second pause here?
7    Q.  Absolutely.
8    A.  My battery just ran out.
9        MS. ST. PETER-GRIFFITH:  Why don't we
10  take a five-minute break.
11       THE WITNESS:  I don't need that, unless
12  you do --
13       MS. ST. PETER-GRIFFITH:  Oh, okay.
14       THE WITNESS:  -- or somebody else does.
15       (Discussion off the record)
16       THE VIDEOGRAPHER:  I've got about seven
17  minutes left on this tape.
18       MS. ST. PETER-GRIFFITH:  Go right ahead
19  and change it.
20       THE VIDEOGRAPHER:  We are off the record
21  at 1:57 p.m. with the end of Tape Number 3.
22       (Recess from 1:57 to 2:08)
23       THE VIDEOGRAPHER:  We are back on the
24  record at 2:08 p.m. with the start of Tape Number 4.
25    Q.  (BY MS. ST. PETER-GRIFFITH)  Mr. Rodman, if

Page 440

1  you could look at Page 1823.
2    A.  All right.
3    Q.  This deals with "Override Pricing by List
4  Item."  Do you see that?
5    A.  Yes.
6    Q.  What -- what does that mean?
7    A.  Well, it's another one of these price
8  schedules or price codes, same thing.
9    Q.  Okay.  Would that -- can be -- where you can
10  override the list price or the list item --
11    A.  Yes.
12    Q.  -- price and input another price?
13    A.  Well, the computer would do it automatically
14  based on the data that was put into it, yes.
15    Q.  Okay.  But I thought that the data that was
16  put into the system was the list item data.
17    A.  Well, that's true, but these -- these --
18  these price schedules, or as labeled here price codes,
19  could be set up where -- to implement individual
20  agreements between the provider and a health plan and
21  that would be -- some pricing that would be different
22  than what your normal list prices would be.
23    Q.  Okay.  Under C, do you see at the bottom it
24  says, "Specific pricing per agreement with a physician
25  for drug set up in price ranges," do you see that?

Page 441

1    A.  I do.
2    Q.  What does that mean?
3    A.  Well, there would be no agreement with the
4  physician.  I have no idea why someone wrote that in
5  that way.
6    Q.  Okay.
7    A.  But it was -- in general, it was another
8  automated way of having a price that would be
9  different than your list price for the drug component
10  of your claim.
11    Q.  Okay.  And then it says the "Price is not AWP
12  based."  Do you see that?
13    A.  Yeah, I do.
14    Q.  "Rather a price established for dosage
15  strength"?
16    A.  Yeah, I do see that.
17    Q.  Would there be any circumstances that you're
18  aware of where Abbott Home Infusion reimbursement
19  would bill for prices with -- per agreement with a
20  physician?
21    A.  No.
22    Q.  Okay.  And you have no idea why that's in
23  there?
24    A.  No.  I suspect that whoever wrote it didn't
25  know what they were talking about when they wrote it.

Page 442

1    Q.  Well, do you know who did write these --
2    A.  I don't.
3    Q.  -- price tips?
4    A.  I don't.
5    Q.  Moving things right along, especially for
6  Mr. Stetler's benefit.  If we could go to Page --
7        MR. STETLER:  No.  This is one time
8  where I'm not in a hurry.
9    Q.  (BY MS. ST. PETER-GRIFFITH) -- 1841, which
10  is sort of cut off on my copy.  I think that's just
11  because it's a copy.
12    A.  Yes.
13    Q.  Okay.  Sir, what is this?
14    A.  Well, there were A, B, C all the way through
15  K and Z different price schedules, which is labeled
16  price code.  They all had different capabilities to
17  try and automate the pricing of the claims based upon
18  the agreement between the payer and provider.  And
19  there are a lot of options and a lot of complication
20  here and that's what -- this was all -- this was a --
21  a sheet that was -- one sheet intended to be, look, if
22  you knew something about them in general, you could
23  probably figure out just from this one reference sheet
24  right here what this price code did and how to use it
25  on the system.

45  (Pages 439 to 442)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 443

1    Q.  Okay.  It says -- under "Pricing" it says,
2  "Method of Pricing" and then "Will it price AWP if
3  Primary Drug Flag" equals yes.  What does that mean?
4    A.  That means that the price schedule had the
5  capability, if other things were to happen that way,
6  to create charges to go on a claim based upon AWP plus
7  or minus some percentage.  If -- for -- for drugs that
8  would have been -- had this flag in the item file
9  setup as a yes.  Remember earlier I had said you have
10  a compounded drug and you would have a sterile water
11  and a diluent compounded into a primary drug like
12  Acyclovir.  And the way we were doing it, if it was
13  AWP-based charges that was to be set up, the Acyclovir
14  item would have the price flag set to yes on the item
15  file, the other two would not.  And that was matched
16  up with this thing on the price schedule.  You would
17  end up by magic with a charge on the claim for the
18  drug item that was based upon AWP of Acyclovir.
19    Q.  Okay.  Did you say by magic?
20    A.  Yeah.
21    Q.  By the magic of the CHIP system?
22    A.  By the magic of the CHIP system.
23    Q.  Okay.
24    A.  The carefully programmed logic of the CHIP
25  system impacted by the data that the user put in.

Page 444

1    Q.  Okay.  If you could go to BR 01925, please.
2    A.  Okay.
3    Q.  This is a "Claims Generation," it appears,
4  page that is part of a claims processing, for lack of
5  a better word, chapter; is that fair enough or section
6  of the claims -- of the Reimbursement CHIP Module
7  User's Guide?
8    A.  Tab.
9    Q.  Or tab.  Okay.  There we go.  What does this
10  page explain?
11    A.  It's beginning to explain -- I had -- way
12  back early this morning I had talked about the process
13  at one point you would generate claims.  You remember
14  I said with Medicare we usually generated claims once
15  a month?
16    Q.  Yep.
17    A.  This is explaining how to do it on the
18  system.
19    Q.  Okay.  Now, at the bottom it says, "'Claim
20  Format' area to determine how ... HCFA 1500/UB 92
21  forms."  Do you see that?
22    A.  Yes.
23    Q.  I think we've discussed what HCFA 1500 form
24  is in your prior testimony, but what's a UB 92?
25    A.  That's another type of claim form that is

Page 445

1  used to -- by some providers to submit healthcare
2  claims to some payers.
3    Q.  Would that be for Medicare or Medicaid?
4    A.  It certainly would be, but very rare, if at
5  all, for home infusion.
6    Q.  Okay.  How come?
7    A.  With the exception of the home infusion
8  nursing.
9    Q.  Okay.  What's -- what -- what is billed on a
10  UB 92?
11    A.  In general, in healthcare -- in the
12  healthcare industry, the UB 92 form, or the electronic
13  equivalent of it, at that time, it's now called the UB
14  04 form, are what hospital claims, nursing services
15  claims, like home nursing --
16    Q.  Okay.
17    A.  -- and perhaps certain other types of claims
18  are billed on.  Whereas at the time what was called
19  the HCFA 1500 claim form would be used by physicians,
20  it would be used by home infusion provider pharmacy
21  groups.  It would be used by DME suppliers and a
22  number of others.
23        And what form you actually had to submit
24  to what payer on depended on who the payer was, as
25  well as who you were.  It was not, and still is,

Page 446

1  totally consistent throughout the industry.  And then
2  there would be custom forms sometimes.
3    Q.  Custom forms as customized by the provider?
4    A.  By the payer.
5    Q.  Oh, okay.  If you could go to 1944.
6    A.  Uh-huh.
7    Q.  Sir, what is -- what does this page describe?
8    A.  The CHIP system did have the capability to
9  electronically send claims to Medicare and this is
10  describing how the reimbursement user would be making
11  some of that happen.  You would be transmitting the
12  equivalent of what -- if it had been a paper claim on
13  the 1500 form, you would be transmitting the
14  equivalent computer to computer.  That's what this is
15  about.
16        MS. ST. PETER-GRIFFITH:  Okay.  You know
17  what, can we take a break?  Or I need to take a break.
18  If you would like to continue, I have no problem with
19  them starting and I can come back and finish.  Do you
20  want to do that?  Just let --
21        MR. STETLER:  Whatever you want.  I
22  don't care.
23        MS. ST. PETER-GRIFFITH:  Do you have any
24  problem with that?
25        MR. COLE:  Not at all.

46  (Pages 443 to 446)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 447

1    MS. ST. PETER-GRIFFITH: I've just got
2  to take a break right now.
3          And, Susan, do you want to start or
4  Eliseo? It doesn't matter. And then I'll come back.
5  I've got probably six more pages to go over in this.
6  Would you mind doing that?
7          MR. STETLER: I should tell you, I have
8  a cookie for anybody who finishes. So if you finish
9  now, you'll get your cookie sooner.
10         MS. THOMAS: Do you want to take a break
11 for a few minutes?
12         MS. ST. PETER-GRIFFITH: Well, we've
13 already taken a bit of a break, so I just want -- I
14 know Mr. Rodman wants to get out of here. I just
15 personally need to break, so why don't we do that.
16 I'll break and then you can -- you can start and then
17 I'll come back, if you don't mind.
18         MS. THOMAS: Not a problem.
19             EXAMINATION
20 BY MS. THOMAS:
21    Q. Good afternoon, Mr. Rodman. I introduced
22 myself before. My name is Susan Thomas. I'm an
23 attorney from Berger & Montague in Philadelphia
24 representing the Relator or the whistleblower,
25 Ven-A-Care of the Florida Keys, in this litigation.

Page 448

1    A. Good afternoon.
2    Q. And the very first thing I will tell you is I
3  will not go anywhere near as long as the Department of
4  Justice.
5    A. Oh, thank you.
6    Q. So --
7    A. And if you tell me you're not going to step
8  through these manuals, that would be even better.
9    Q. I will not be going through the manuals
10 either.
11   A. All right.
12        MS. THOMAS: Mr. Stetler, could you
13 possibly pull Document 8 through 13?
14        MR. STETLER: 8 through 13?
15        MS. THOMAS: Yes, please.
16   Q. (BY MS. THOMAS) And while he's doing that,
17 in 2001 -- well, let me ask you this: Who was Karla
18 Kreklow?
19   A. Or is.
20   Q. Is.
21   A. At the time she was -- she had a title of
22 director, but she, in effect, replaced Mike Sellers
23 functionally as general manager of Home Infusion
24 Services. She reported to Mike. Mike still oversaw
25 it, along with his other responsibilities at that time

Page 449

1  after he left Home Infusion Services.
2    Q. And do you happen to know where in Abbott
3  Ms. Kreklow had previously worked? Prior to joining
4  Home Infusion, I'm sorry.
5    A. Well, she had been in Home Infusion possibly
6  as long as I had been there, since 1993. And prior to
7  that I think she came out of the sales side. I really
8  don't know the specifics.
9    Q. But in 2001 she was working for Home
10 Infusion?
11   A. Yes.
12   Q. For Abbott's Home Infusion?
13   A. Oh, yes.
14   Q. If I could ask you to take a look at this
15 document.
16        MR. STETLER: Hand the original to him?
17        MS. THOMAS: Yeah.
18        MR. STETLER: Okay.
19        THE WITNESS: Well, good Lord. Okay.
20   Q. (BY MS. THOMAS) There is no grade on this
21 one that I could find. It just seems to be a --
22        MR. STETLER: Or puffery.
23   Q. (BY MS. THOMAS) -- preliminary copy. If --
24 if you would look, sir -- first of all, do you
25 recognize this document?

Page 450

1    A. Vaguely.
2    Q. Would that mean, perhaps, that you recognize
3  this type of document, but you're not positive if you
4  recall this particular iteration?
5    A. I mean, I'm still looking and thinking on it,
6  so --
7    Q. Okay. Please go right ahead.
8    A. Sure. (Witness reviewing document). Well --
9    Q. And feel free to take whatever time you want.
10   A. -- you know, this had something to do with
11 the performance assessment or performance review. The
12 first three pages of it -- or first two pages are
13 stapled together with the remaining pages. I'm not
14 sure if that means that this was done at the same time
15 or not. I see on these first two pages sort of a
16 general generic listing of competencies and some
17 description of them and it says, "I do react," so I
18 must have written this self-evaluation, apparently. I
19 don't remember doing it, but that's what it appears to
20 be.
21   Q. Okay.
22   A. Then the third page -- right. It looks like
23 I wrote this, too. It was sort of -- I was to be
24 filling out as part of a performance review, something
25 about how good a -- how great a person I am and what I

                              47 (Pages 447 to 450)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 451

1  need to address in a growth plan.  So that looks like
2  I filled that out.  And then --
3      Q.  Actually, if you don't mind my interrupting
4  you.
5      A.  Sure.
6      Q.  My questions only pertain to the first two
7  pages.
8      A.  Oh, okay.
9      Q.  So if --
10     A.  Then we'll stop.
11     Q.  -- if you would like, we could stop there.
12     A.  No, I don't want to.  Okay.
13     Q.  Okay.  If you would look at the -- in the
14  bottom right-hand square, where it says, "I make many
15  efforts and am successful in working with others."  Do
16  you see that?
17     A.  Yes, uh-huh.
18     Q.  The second sentence of that reads, "As
19  examples, I frequently provide 'heads up' notices to
20  others, and communicate industry news on developments
21  to others that may be their responsibilities (in
22  particular, Reimbursement Management)."
23     A.  Uh-huh.
24     Q.  Did I read that correctly?
25     A.  Yes.

Page 452

1      Q.  Okay.  Could you explain what you were
2  referring to there as the type of skill or -- or task
3  that you performed?
4      A.  When I was in this role, which it says here
5  was in 2001, I was -- and this is when I was in the
6  role of the CHIP system product manager, I had learned
7  this business better and I was looking at other
8  industry developments that I would read from the news.
9  I guess we had -- or we had Internet by then, that
10  sort of thing.  So I guess when I saw things I used to
11  communicate them to others, especially with respect to
12  reimbursement, which is kind of where my experience
13  had been --
14     Q.  Okay.  So --
15     A.  -- in the past.
16     Q.  -- when you refer there to reimbursement
17  management, what particular group were you referring
18  to?
19     A.  Well, I was no longer in the reimbursement
20  department at that time, so that would have been what
21  the -- the management of the reimbursement department
22  at that time.
23     Q.  Within Home Infusion?
24     A.  Yes.
25     Q.  Were there other people in other divisions at

Page 453

1  Abbott who had anything to do with reimbursement, to
2  your knowledge?  And I mean outside of Home Infusion.
3          MR. COLE:  Object to the form.
4      A.  I would have no specific knowledge of that.
5  I'm not even sure what reimbursement would mean in
6  that context.
7      Q.  (BY MS. THOMAS)  Do you ever recall
8  discussing any reimbursement concepts with people
9  outside of Home Infusion?
10         MR. COLE:  Object to the form.
11     A.  I do remember discussing reimbursement coding
12  with a group outside of Home Infusion.
13     Q.  (BY MS. THOMAS)  What do you mean by
14  "reimbursement coding"?
15     A.  I was an industry leader at that time of a
16  group called the Home Infusion EDI Coalition and
17  working with other industry participants and also the
18  National Home Infusion Association to bring forward a
19  consistency of how you coded a claim.  The procedure
20  codes that you used to submit a claim from provider to
21  payer so that it would be consistent across multiple
22  payers and the providers, too, to make coding much
23  more efficient, to make the reimbursement more
24  efficient and make it work better, get paid quicker.
25         And, actually, we in the Home Infusion

Page 454

1  EDI Coalition we had a very significant accomplishment
2  at that time that -- for commercial health plans.  We
3  were able to achieve a result where we got the HCPCS
4  administration entity to put in a number of codes that
5  were per diem or per day charges for various home
6  infusion therapy services.  And I actually led that
7  effort and got a lot of credit for that externally in
8  the industry.  In fact, that's in large part how I
9  ended up getting my job currently for the National
10  Home Infusion Association.
11         So I do recall having a -- a
12  presentation, I think, or conversation with the
13  marketing management in the Alternate Site area about
14  this just to educate them.
15     Q.  Do you recall approximately when that was?
16     A.  Well, it was sometime between 2000 and the
17  beginning of 2003.
18     Q.  I believe you referred to --
19     A.  And, you know, I mean, I could narrow it
20  down.  Probably 2001, 2002.
21     Q.  And when you say "marketing management in Alt
22  Site," can you be more specific as to the meaning?
23     A.  Well, the general manager in the Alternate
24  Site group within the Hospital Products Division and I
25  think a couple of his reports, direct and report, but

48 (Pages 451 to 454)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 455

1  essentially in what was called the marketing side.
2      Q.  Okay.  And the general manager you're
3  referring to is who?
4      A.  Does Sean Murphy sounds right to you folks?
5          MR. STETLER:  She gets to ask the
6  questions, sorry.
7      A.  I know.  Yeah.  I hope I'm telling you --
8      Q.  (BY MS. THOMAS)  I'm not trying to play games
9  with you.
10     A.  No.  I understand.
11     Q.  I wouldn't know that name.  I'm sorry.
12     A.  I believe Sean Murphy.
13     Q.  Is that a male or female?
14     A.  That would be a male.
15     Q.  And what was his position?
16     A.  He would have been the general manager of the
17  Alternate Site's -- what was called the Alternate
18  Site's business unit at the time.
19     Q.  And you mentioned, also, I guess I should
20  have know it was a he, because you mentioned "and
21  several of his reports."  People that reported to him.
22     A.  I think so, yeah.
23     Q.  Who were they?
24     A.  I can't recall specifically who would have
25  been there.

Page 456

1      Q.  Do you have any recollection of anyone?
2      A.  I know who some of those people were, but I
3  cannot report -- I cannot tell you that they would
4  have been in the session that I'm recalling.
5      Q.  Okay.  Who are the people that you recall
6  that reported to him?
7      A.  Well, to him directly or indirectly some
8  names I remember, Jim Custud, Craig Smith.  That's
9  who's coming to me right now.
10     Q.  And what type of meeting was this that you
11  had?
12     A.  I'm sorry, Sean -- it could have been Sean
13  O'Donnell, too.  I'm struggling, I'm sorry.  So I'm
14  going to tell you it's more likely Sean O'Donnell than
15  Sean Murphy.
16     Q.  Okay.  And what was the nature of this
17  meeting?
18     A.  My recollection is at some point, you know,
19  they -- they -- I mean, any -- any -- you know, a
20  manufacturer will have some interest in understanding
21  how their customers are being reimbursed and -- and I
22  think that the reason they would have an interest in
23  this is simply to understand the basis of the coding
24  and what had developed that we had achieved, actually,
25  as an industry provider group during that time.

Page 457

1      Q.  So as best you recall, your meeting dealt
2  particularly with that accomplishment that you
3  referred to earlier about the per diem codes?
4      A.  That's my best recollection, yes.
5      Q.  Okay.  And as best you recall, you were asked
6  to go and report to that group or present to that
7  group?
8      A.  I can't recall how that happened.
9      Q.  Do you have any recollection of whether you
10  initiated it or they came to you?
11     A.  I don't have a recollection.
12     Q.  Now, when you referred to working on the EDI
13  project, for lack of a better name, was there anyone
14  from Abbott outside of Home Infusion with whom you
15  worked on that effort?
16     A.  No.
17     Q.  Do you have any recollection at the meeting
18  that you referred to with people from Alt Site whether
19  Pete Baker was in attendance?
20     A.  I don't have a recollection that he was.  I
21  think he -- I think he probably wasn't.
22     Q.  Ted Lyjak?
23     A.  Ted could have been.
24     Q.  Jeff --
25     A.  But that's only could.  I don't recall.

Page 458

1      Q.  Jeff Balzer?
2      A.  He could have been.
3      Q.  Do you know these people?
4      A.  Vaguely.  Well, Pete Baker I know better,
5  but, you know.  I mean, I know them to some degree,
6  not a lot, you know, some a little better than others.
7      Q.  Was Karla Kreklow at that meeting?
8      A.  I don't recall that she was.
9      Q.  If you'll look back in the document, in that
10  same square that we were looking at.  If you would
11  look, please, sir, at the last sentence that begins,
12  "I have been willing to assist clients at request of
13  sales representatives."
14     A.  Uh-huh.
15     Q.  What sale -- what type of sales
16  representatives are you referring to?
17     A.  Abbott Home Infusion Services sales
18  representatives.
19     Q.  And so the clients that you're referring to
20  are the same clients or customers that you've been
21  talking about --
22     A.  Yes.
23     Q.  -- much of the day?
24     A.  Uh-huh.
25     Q.  Okay.  Other than this one meeting that you

49 (Pages 455 to 458)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 459

1  mentioned with Alt Site, can you remember any other
2  occasions when on some type of formal basis you
3  communicated with anyone from HPD or Alt Site about
4  any reimbursement issues?
5      A.  No.
6      Q.  Did you have the impression while you were
7  working at Home Infusion that there was an
8  institutional effort by Abbott to kind of wall off
9  that division from the rest of the company?
10         MR. COLE:  Object to the form.
11     A.  I am not aware of any intent to do that.  I
12 am aware that the Home Infusion business unit worked
13 pretty independently from the rest of Abbott.  At
14 least at the level of involvement that I was at.  It
15 was, in many ways, like a small business within a --
16 you know, far removed from a much larger business.  We
17 had many of our own processes and procedures.  We
18 were -- you know, our function was pretty homogeneous
19 in terms of we had particular business objectives and
20 did particular things that were very unlike the rest
21 of anywhere else in Abbott.
22         The history of the group before I got
23 there was it was in a little building that was lease
24 space that wasn't even with anybody else at Abbott for
25 its first eight or nine, 10 years of existence.  But

Page 460

1  in terms of intent, I would have no knowledge of that
2  one way or the other.
3      Q.  (BY MS. THOMAS)  You were never told that
4  there was any information known within Home Infusion
5  that was not to be shared outside of that division; is
6  that correct?
7          MR. COLE:  Object to the form.
8      A.  I don't recall any specific instances like
9  that.
10     Q.  (BY MS. THOMAS)  Did you ever provide any
11 kind of information or explanation to any of the sales
12 personnel at HPD about the types of interests that
13 their clients might have in reimbursement issues?
14     A.  I can't --
15         MR. COLE:  Object to the form.
16     A.  -- recall any.
17     Q.  (BY MS. THOMAS)  You don't ever remember
18 being asked?
19     A.  I do not.
20     Q.  If you would look on the next page of the
21 same document, 009.  And, again, by chance in the
22 bottom right-hand box.  If you would just take a
23 minute, please, sir, to read that box to yourself.
24     A.  (Witness reviewing document).  Okay.
25     Q.  Now, in that paragraph there you were

Page 461

1  addressing a topic generally referred to as integrity;
2  is that correct?  It's all the way on the left, the
3  heading.
4      A.  Yes.
5      Q.  And you start off by saying that you were
6  often complimented by clients for being straight with
7  them and that you communicate well and do not mislead
8  through falsehoods.  Do you see where I'm referring?
9      A.  Uh-huh.
10     Q.  Did you have the perception that your clients
11 felt that that characteristic of yours stuck out at
12 Abbott --
13         MR. COLE:  Object --
14     Q.  (BY MS. THOMAS) -- as being different than
15 others?
16         MR. COLE:  Object to the form.
17     A.  I have no perception like that.
18     Q.  (BY MS. THOMAS)  Did anybody ever say
19 anything like that to you?
20     A.  Not that I can recall.
21     Q.  Did you think that there was -- did you read
22 anything into the fact that apparently some number of
23 clients went out of their way to point out that they
24 appreciated you being straight with them?
25         MR. COLE:  Object to the form.

Page 462

1      A.  I don't recall any instances like that.
2          MS. THOMAS:  I'm sorry.  Could you read
3  back the question and answer, please?
4          (Requested portion was read)
5      Q.  (BY MS. THOMAS)  Okay.  I'm sorry.  I
6  don't -- I don't quite understand your answer.  I was
7  asking if you read anything -- I assume there were a
8  number of instances in which your clients had made a
9  point of saying that you had been straight with them
10 because you -- right here, "I am often complimented,"
11 correct?
12     A.  I had a good relationship with my clients.  I
13 was boasting about myself here.  Because, you know, if
14 you do a performance self-appraisal that you're going
15 to show your senior management or your manager,
16 anybody that has any brains is going to boast about
17 themselves and have very little bad things about
18 themselves.  So that's what you're reading here.  So
19 what more can I say?
20         There is no intent here to imply
21 anything about anybody else and how they operated at
22 Abbott.  I do believe I had a very good relationship
23 with most clients that I ever worked with while I was
24 at Abbott, as I do believe I have now in my current
25 position.  But I think to read more than that is

50  (Pages 459 to 462)

Page 463

1  something that shouldn't be done.
2     Q.  So you did not read into the communications
3  with the clients that they felt that your tendency to
4  be straight and not mislead made you stick out
5  somewhat at Abbott?
6     A.  I did -- I do not recall reading into that
7  and I don't recall -- and I don't -- that's not what I
8  think now.
9        MS. THOMAS:  Okay.  If I could bother
10  you for Page 15.
11        MR. STETLER:  Are we done with those?
12  I'll put them back.
13        MS. THOMAS:  Yes.
14     A.  (Witness reviewing document).
15     Q.  (BY MS. THOMAS)  Have you had a chance to
16  look at this?
17     A.  Yes.
18     Q.  This document appears to have been signed by
19  Karla Kreklow at the bottom?
20     A.  Yes.
21     Q.  And is that Michael Sellers?
22     A.  It is.
23     Q.  Okay.  Do you recall either of those people,
24  whether in writing through this document or orally,
25  communicating to you the need for you to take any more

Page 464

1  proactive role in communicating reimbursement
2  information?
3        MR. COLE:  I'm sorry, Counsel.  What
4  page are we on?
5        MS. ST. PETER-GRIFFITH:  15.
6        MR. COLE:  15.  Thank you.
7     A.  I don't recall them having done that.  Is
8  that in the document here somewhere?
9     Q.  (BY MS. THOMAS)  I'm sorry?
10     A.  Is that in the document here somewhere?
11     Q.  The "Areas for Improvement."
12     A.  Uh-huh.
13     Q.  The third paragraph.  "Assume a more active
14  role in providing break through reimbursement
15  information which impacts our clients and ultimately
16  the business."
17     A.  I don't have any recollection of that.
18     Q.  You don't recall discussing that subject
19  matter with either Ms. Kreklow or Mr. Sellers?
20     A.  I don't.
21     Q.  Do you have any recollection, as you sit here
22  today, of what they were referring to?
23     A.  No.
24     Q.  What they were looking for by a more active
25  role?

Page 465

1     A.  No, I don't.
2     Q.  You testified earlier in response to a
3  question from the DOJ attorney when she asked you did
4  Abbott reimbursement personnel and Home Infusion ever
5  consider submitting EAC on to Medicare or Medicaid.
6  Do you recall that?
7     A.  A what?
8     Q.  Estimated acquisition cost.  I'm sorry.  It
9  was just this afternoon after lunch, I believe.
10     A.  Could you repeat the question?  I'm sorry.
11        MR. COLE:  Whether -- go ahead.
12     Q.  (BY MS. THOMAS)  Do you recall answering the
13  question about whether Abbott reimbursement personnel
14  ever considered submitting estimated acquisition cost
15  to Medicare or Medicaid and you responded, "definitely
16  not to Medicare" and you don't think it was required
17  by the Medicaids.
18     A.  I do recall that now, uh-huh.
19     Q.  Okay.
20        MR. COLE:  For the record, I'll just --
21  I believe I objected to that question the first time
22  it was posed and I'll just reassert the same objection
23  now.
24     Q.  (BY MS. THOMAS)  In that context of -- of
25  what Medicare, or any of the Medicaid programs were

Page 466

1  requiring to be submitted by way of price information
2  on a claim, can you explain your understanding during
3  the time that you worked for Home Infusion, let's
4  start with of what Medicare -- of what price
5  information Medicare was requesting on a claim
6  submission?
7     A.  Well, I think it would be better to state it
8  in that what the practice was than what Medicare was
9  requesting.  I don't know that Medicare requested
10  anything in particular.  The practice was that a
11  provider, and in this case the -- you know, the
12  Abbott-produced claims, would contain these usual and
13  customary charges on them when those charges were
14  submitted to Medicare.
15        THE WITNESS:  Excuse us for a minute.
16  Where is my mic?
17        THE VIDEOGRAPHER:  It fell off your
18  shirt.
19        THE WITNESS:  Oh, is that what happened?
20        MS. THOMAS:  Can you still hear him?
21        THE VIDEOGRAPHER:  Yes.
22        THE WITNESS:  Sorry.  Okay.
23     Q.  (BY MS. THOMAS)  Okay.  If you would, sir, I
24  don't think that really answers my question.  You kind
25  of rephrased it as it would be better to state what

51 (Pages 463 to 466)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 467

1  the practice was, but --
2       MR. STETLER:  But he prefaced it by
3  saying, "I don't think they required anything," which
4  I think he answered it right there.
5       MS. THOMAS:  He did say that as well.
6       Q.  (BY MS. THOMAS)  Actually, I believe what you
7  said was you don't know that Medicare required
8  anything in particular.
9       A.  If you say that's what I said I said.
10      Q.  Is that the best answer you can give to what
11  your understanding was of what Medicare required to be
12  submitted on a claim form?  And this is for a drug
13  product.
14      A.  Yes.
15      Q.  That you don't know that they requested
16  anything in particular.
17      A.  Well, they expected to see some charges if
18  you were going to bill them for it.
19      Q.  Okay.
20      A.  There was -- you know, I'm not aware of then,
21  I'm not aware even now, that there is -- for Medicare
22  that there is any particular specification of what the
23  charges are supposed to be.  That's a decision that
24  the provider makes.
25      Q.  Putting aside what the specific dollar amount

Page 468

1  that may be reported would be, conceptually do you --
2  did you, while you were working for Home Infusion,
3  have any understanding of the type or the nature of
4  the information that was requested by Medicare on a
5  claim form submission?
6       A.  Sure.
7       Q.  And what was your understanding?
8       A.  Well, there's about probably 50 different
9  pieces of data on a claim form, so --
10      Q.  Okay.  Let's narrow it --
11      A.  -- which ones do you have questions about?
12      Q.  Let's narrow it down to price elements or
13  charge elements or cost elements pertaining to drugs.
14      A.  Okay.
15      Q.  I'm sorry.  Do you need the question back?
16      A.  Yeah.  The question -- the question is --
17      Q.  What -- what understanding, if any, did you
18  have of the type of information that Medicare
19  requested on its claim form with regard to charges or
20  prices of drug products?
21      A.  Medicare would -- where a drug product was
22  being billed, Medicare would expect the provider to
23  submit charges to Medicare.
24      Q.  And what does charges mean?
25      A.  Charges would be usual and customary price.

Page 469

1       Q.  Where did you get the notion that charges
2  meant usual and customary price?
3       A.  I was learning the business at the time, you
4  know.  Where did I pick that up specifically, I can't
5  recall.  I understand a lot of that a whole lot better
6  now than, perhaps, I did then.
7       Q.  At the time that you were working in the Home
8  Infusion division of Abbott, was that simply something
9  that was already programmed into the database that you
10  didn't give a lot of thought to?
11      MR. COLE:  Object to the form.
12      Q.  (BY MS. THOMAS)  Or did somebody outright
13  tell you that what was requested was U&C?
14      A.  It was an established procedure that was an
15  integration of the information in the CHIP system and
16  the compilation of it in order to produce it into an
17  understandable claim by the reimbursement department.
18  It was certainly something that was in process when I
19  got there.
20      Q.  Do you ever recall any discussion while you
21  worked in the home infusion business at Abbott of what
22  Medicare meant when it requested information about
23  charges pertaining to drug products?
24      A.  I don't.
25      Q.  Did anyone ever point out to you anything --

Page 470

1  any support for the notion that Medicare was looking
2  for providers to report a U&C?
3       A.  Somewhere along the line I certainly picked
4  that up.  So does that mean somebody told me that?  I
5  suppose.  That's the best answer I can give you.
6       Q.  So perhaps someone told you or perhaps you
7  just saw that that's what was entered into the system?
8       MR. COLE:  Object to the form.
9       A.  You know, I wasn't involved in the
10  establishment of the U&C prices that was entered into
11  the system, so perhaps someone told me that at some
12  point.
13      Q.  (BY MS. THOMAS)  I just want to make sure
14  that we're on the same wavelength here.  I'm not
15  asking so much how a usual and customary price was
16  determined for any given product --
17      A.  Uh-huh.
18      Q.  -- but whether the information that was
19  sought by Medicare was a usual and customary price
20  rather than some other price construct.  Did you
21  understand my question that way?
22      A.  You know, I came in, I knew nothing about
23  reimbursement, period, in this business.  It hadn't
24  been my field.  I was trained a lot by Shellie
25  Bronson.  I was trained and educated by Ginny Tobiason

52  (Pages 467 to 470)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 471

1  in particular.  You know, I would read things.  I
2  don't actually ever recall reading something in this
3  particular area on it.  And somewhere along the line I
4  guess I realized that the practice was to have a usual
5  and customary pricing.  That's what a healthcare
6  provider would do and that was what was submitted to
7  Medicare at the time.
8      Q.  And that was true whether the claims that
9  Abbott was submitting or assisting in submitting were
10  in any of the three categories that you talked about
11  before, the Abbott pharmacy or the Abbott submissions
12  for customers.  I can't remember the third one.
13      A.  Well, I would say that was true in any
14  category, yes.
15      Q.  Now, did you have any understanding -- any
16  awareness while you worked for Home Infusion that the
17  usual and customary charge that was being filled in on
18  these forms was often not the same as the price that
19  the customer had paid to acquire the drug product?
20          MR. COLE:  Object to the form.
21      A.  Well, in this typical model for the product
22  that was Abbott product there was this consignment
23  inventory practice and then the ultimate reimbursement
24  to Abbott for products and service was done through
25  the revenue share.

Page 472

1          So, you know, on an individual product
2  line item basis there wasn't really a direct relation
3  that you could establish that says just for this
4  product Abbott got this much because of the
5  arrangement on the revenue share.  Overall on the
6  business, if you brought it down to a claim and looked
7  at this particular charge line, then -- then, sure,
8  the reimbursement could be identified to the product.
9          But how did that relate to what the
10  customer paid for that individual drug?  That -- you
11  know, to my understanding, that was -- that was part
12  of the total deal between Abbott and the client.  It
13  had to do with this total revenue share.  And there
14  wasn't really any sort of accounting to apply this to
15  the particular drug itself to speak of and -- nor was
16  there, that I understood, for the client any
17  particular accounting for what the client may have
18  paid for the drug because it wasn't thought of in that
19  way.  That's the best that I understood it.
20      Q.  (BY MS. THOMAS)  Did you have any perception
21  whether the U&C price that was being listed on the
22  Medicare forms had any real significance in the
23  business operations of either Abbott or its customers?
24          MR. COLE:  Object to the form.
25      A.  There were some payers that actually did

Page 473

1  still pay at the time the full amount of the charges.
2  It was called traditional indemnity insurance.
3  Sometimes they would have caps, sometimes they
4  wouldn't.  So for those cases any healthcare provider
5  would certainly want to maximize their profits, if
6  they're a for-profit provider, at least, and so there
7  would be a relationship there for sure.
8      Q.  (BY MS. THOMAS)  With regard to claims that
9  would be submitted to Medicare, did you have any
10  understanding whether there was any actual financial
11  or business significance to the U&C number that was
12  filled in on the Medicare form?
13      A.  For drugs?
14      Q.  Yes, for drugs.  I'm sorry.
15      A.  I am trying to sort out what I know now and
16  what I knew then.  Okay.
17      Q.  Take your time.
18      A.  And I don't know that -- I have to preface to
19  say I can't tell you this for sure what I knew then.
20  You know, what I did know then was that Medicare's
21  allowance would be established for a drug.  I knew
22  that Medicare would pay up to the maximum of the
23  allowance less patient co-pay.  The allowance is sort
24  of considered inclusive of patient co-pay.  So I knew
25  that Medicare would pay the maximum of the allowance

Page 474

1  or the charges the provider submitted.  So if the
2  provider submitted charges that were less than the
3  allowance, Medicare would pay those charges, which
4  could be less.  So to that degree there would be an
5  impact.
6          If the provider submitted charges that
7  were any more than the allowance, to whatever the
8  number is, if the provider was a participating
9  provider in Medicare or had filed a claim as an
10  assigned claim, which was almost always the case in
11  our business, it really didn't matter whether those
12  charges were 10 million dollars or -- and I'm saying
13  this a little facetiously, or -- or a hundred dollars.
14  If the allowance was 80, that's all you were going to
15  get from Medicare.
16      Q.  What was your understanding while you worked
17  at Home Infusion of the -- not the specific dollar
18  amount for a drug product, but of the conceptual basis
19  of Medicare's allowance for payment of drug product?
20          MR. COLE:  Object to the form.
21      A.  This is another area where I can't really
22  sort out for you what I understood when.  I certainly
23  know now that Medicare's allowance is based -- was --
24  well, still is, actually, for home infusion based on
25  an AWP-based figure.  I know now that -- at that time

53  (Pages 471 to 474)

Page 475

1  I believe it was.  When did I -- you know, when did I
2  actually come to understand that for Medicare, I'm not
3  sure.
4      Q.  (BY MS. THOMAS)  So you don't recall whether
5  you knew that while you were working for Home
6  Infusion, that Medicare had an AWP-based system?
7      A.  I -- I -- I don't recall -- well, while I was
8  with Home Infusion?  Oh, yes, I knew that when I was
9  with Home Infusion.  But whether I really came to
10 understand that for Medicare when I was a
11 reimbursement supervisor, that I'm not sure of.
12     Q.  There's been reference earlier in your dep,
13 either today or during the first day, to J codes in
14 the Medicare context.
15     A.  Uh-huh.
16     Q.  Can you explain what a J code is?
17     A.  Sure.  A J code is a HCPCS code.  It's in
18 the -- the first of the five positions of the code is
19 a J.  J codes are assigned to drugs by the HCPCS
20 administrators.  So they represent drugs.
21     Q.  Okay.  And is a J code, to your
22 understanding, generally used to cover a group of
23 drugs that have specific NDC numbers?
24     A.  It -- well, I can tell you certainly what I
25 understand now and I don't think it's changed.  So a J

Page 476

1  code -- a J code that identifies the drug because it
2  actually has the name of the drug in it would -- in
3  the case of a single-source drug would reflect one or
4  more NDC codes that would be the NDC code coming from
5  the single source, like a single manufacturer.  They
6  might be reflecting different sizes of the drug
7  container or different strengths of it, you know,
8  essentially packaging, dose, this type of strength.
9  So they could represent more than one NDC code, but it
10 would be just basically the -- conglomerate of NDC
11 codes from a single source.  If it was a multiple
12 source drug, which we normally think of as generics,
13 it could represent a lot of NDC codes.
14     Q.  When you were working in the Home Infusion
15 division of Abbott, do you recall how you knew what
16 particular NDC numbers were considered part of a
17 particular J code?
18     A.  Well, actually, that was data that was set up
19 on the item master file so that when you had a -- you
20 know, your item master for a drug was the -- you know,
21 an identifier in each item master record for the drug
22 contained the NDC number for the drug.  And we
23 would -- the organization would figure out what the J
24 code was and put that into the item master.  And then
25 the rest of it, for the purpose of claiming, happened

Page 477

1  rather automatically through the computer system.
2          We talked last time about special
3  projects that I was on and there was an early one in I
4  think 1994, which was to straighten out some of the
5  data on the item master.  And I think one of the
6  elements of that was to get some of the J codes in
7  there correct.  That was an effort that was done.  So
8  that's how that was done.
9      Q.  Okay.  When you say the organization would
10 figure out what the J code was, by "organization" you
11 mean?
12     A.  Abbott Home Infusion Services.
13     Q.  Okay.  So how did Abbott Home Infusion
14 Services figure out what NDCs were included in a
15 particular J code?  I mean, was there a data source,
16 was there a government publication?
17     A.  To the best of my recollection, most of that
18 was done by the contract marketing people, that is,
19 the Home Infusion Services contract marketing people.
20 And the way they certainly would have done it, is they
21 would have looked at HCPCS references to look at the
22 drug name.  They would have looked at either
23 manufacturer data or perhaps Redbook data or some
24 other compendium to see for the NDC code what the drug
25 name was and they would have said, "Oh, yeah.  This

Page 478

1  drug name is this, therefore, that's what the J code
2  is," and then put it into the system.
3      Q.  So it's your understanding that there was not
4  a clear delineation of what NDCs were in a
5  particular -- there was not a clear delineation by the
6  government or by any of the DMERCs of what NDC numbers
7  were grouped together to form a particular J code?
8      A.  I was not aware of a delineation like that,
9  no.
10     Q.  And it's -- and it's your understanding
11 that -- that Abbott made the determination whether a
12 particular NDC number for a drug that it manufactured
13 fell within a particular J code?
14     A.  Well, we're talking Abbott Home Infusion
15 Services here.  I'm not talking about any other area
16 of Abbott.
17     Q.  Okay.
18     A.  Okay?
19     Q.  Okay.
20     A.  So Abbott Home Infusion Services determined
21 what J code belonged to an NDC number in the CHIP
22 system so that the claiming portion of it could work
23 correctly.  That's how it worked when I was at Abbott
24 Home Infusion Services, to the best of my knowledge.
25     Q.  You made reference in the first day of your

54  (Pages 475 to 478)

Page 479

1  deposition to a publication called St. Anthony's
2  publication, publisher?
3     A.  Okay.
4     Q.  Something like that.  Do you recall that?
5     A.  Well, not really, but I would believe that I
6  said something to that because if someone asked a
7  question, yes.
8     Q.  Can you explain what St. Anthony's publishing
9  is?
10    A.  It's now called EngineX because the service
11 was acquired, but that was literally a book that
12 contained HCPCS codes and the descriptions of the
13 HCPCS codes.
14    Q.  By "descriptions" you mean which NDC numbers
15 were included?
16    A.  No.  No, I don't mean that.
17    Q.  Okay.  What do you --
18    A.  Not at all.  It would -- HCPCS code 1A, 1, 2,
19 3, 4 represents IV sets.  That's what would be in it.
20    Q.  And with regard to HCPCS codes that pertain
21 to drugs --
22    A.  Uh-huh.
23    Q.  -- what type of description did this
24 publication have?
25    A.  I'm sort of going to wing this and make it

Page 480

1  up, but HCPCS code J 1234 would represent, again,
2  Acyclovir .5 grams per unit.
3           MR. STETLER:  Maybe next time you could
4  say, "I'm giving a hypothetical, instead of "I'm just
5  making this up."
6           THE WITNESS:  Well, if you --
7           MS. THOMAS:  He said winging it.
8           THE WITNESS:  If you had told me, I
9  would have brought one of the books with me and we
10 could have looked one up.
11    Q.  (BY MS. THOMAS)  Was this a --
12           MR. STETLER:  How many of those did you
13 keep?
14           MS. ST. PETER-GRIFFITH:  There is one in
15 there.
16           MR. STETLER:  Is there?
17           MS. ST. PETER-GRIFFITH:  Yeah.
18    Q.  (BY MS. THOMAS)  Was this a publication that
19 Abbott subscribed to?
20    A.  Abbott Home Infusion Services would have
21 bought a copy of the St. Anthony's book every once in
22 a while.  I don't know whether they bought them yearly
23 or not.  I don't recall that.
24    Q.  So might that have been part of the
25 information base that Abbott used to determine which

Page 481

1  NDC numbers fell within which J codes?
2     A.  Sure.
3     Q.  Okay.  Is there anything else you can think
4  of?
5     A.  No.
6           MS. THOMAS:  If I could trouble you --
7           MR. STETLER:  Sure.
8           MS. THOMAS:  -- to pull 3296.
9           MR. STETLER:  You done with the last
10 one?
11           MS. THOMAS:  Yes.
12           MR. STETLER:  3296.
13           MS. THOMAS:  Through 3304, although I
14 don't really know if that's the whole document.
15    Q.  (BY MS. THOMAS)  Okay.  You have been handed
16 a binder, which for present purposes I'm asking you to
17 look at the documents with the Bates label BR 03296
18 through 03304.  And if you could just take a minute or
19 two to look at those sheets.
20    A.  (Witness complies.)
21           MR. COLE:  Susan, do you have an extra
22 copy of that?
23           MS. ST. PETER-GRIFFITH:  I do not.
24           MR. COLE:  Okay.
25           MS. THOMAS:  Perhaps I misunderstood.  I

Page 482

1  thought this set of documents was just going to --
2           MR. STETLER:  Yeah.  We got the set.
3  He's looking at it.
4     A.  3296 through what?  I'm sorry.
5     Q.  (BY MS. THOMAS)  3296 -- it's four or five
6  pages.
7     A.  Through 3298?
8           MR. SISNEROS:  3204.
9     Q.  (BY MS. THOMAS)  I have through 304 (sic),
10 but probably my questions will pertain to that first
11 couple of pages, primarily.
12    A.  I see where this is going now.  Okay.
13    Q.  Can you identify what Page 3296 -- and it
14 seems to go on -- it seems to be a three-page
15 attachment --
16    A.  Yeah, this was a document --
17    Q.  -- can you figure out what that is?
18    A.  -- put together for drugs showing the
19 Medicare allowables, apparently updated in 1994, which
20 says based on median AWP, so that helps refresh my
21 memory.  I guess that would mean that I did have some
22 knowledge at that time that the Medicare allowances
23 were -- had some basis of AWP involved in them and the
24 determination of them.  And this shows the allowances
25 by certain drugs for the four DMERC regions at the

55 (Pages 479 to 482)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 483

1    time.
2        Q.   Do you have any idea who put together this
3    document?
4        A.   My belief is it was put together by Shellie
5    Bronson.
6        Q.   And do you have any understanding of where
7    she would have gotten the information for this
8    document?
9            MR. COLE:  Object to the form.
10       A.   I could only make educational speculation on
11   that.
12       Q.   (BY MS. THOMAS)  I'll take that.
13           MR. COLE:  Object to the form.
14       A.   I think she would have gotten it from the
15   Medicare contractors, the DMERCs.
16       Q.   (BY MS. THOMAS)  From the DMERCs?
17       A.   Uh-huh.
18       Q.   Do you have any recollection of a document
19   like this being put together on any regular basis
20   within the Home Infusion Services area?
21       A.   I believe Shellie was doing that while she
22   was still there and it was referenced by the
23   reimbursement people.  I think probably when Shellie
24   left that that was no longer done, my thought right
25   now.

Page 484

1        Q.   And when was that?
2        A.   I can estimate that.  It should be '97.
3        Q.   What do you believe the reimbursement people
4    would have used this for?
5            MR. COLE:  Object to the form.
6        A.   For Medicare payments.  I think they may have
7    used this as a reference at times when they were
8    determining if the payment coming in was correct.
9        Q.   (BY MS. THOMAS)  Okay.  Might this also have
10   been used -- you testified earlier that at least on
11   occasion there was an effort made to try to figure out
12   whether the amount that would ultimately be received
13   in reimbursement would be similar to or the same as
14   the amount that was submitted on a claim form.  Do you
15   remember that testimony?
16       A.   Not exactly, but why don't you go on.
17       Q.   Well, the -- the -- it was -- you talked
18   about an effort made to figure out, you know, how much
19   you might actually get versus what had been submitted
20   and you talked about it being recognition, that the
21   carrier might not pay exactly what was submitted.  Do
22   you recall that?
23       A.   We went through a lot of stuff this morning
24   and I talked about the whole process.  So I talked
25   about that what you charged and what you would get

Page 485

1    back would not -- are not necessarily the same and
2    sometimes that would be still a correct payment -- I
3    don't know if I said this this morning, but I will
4    now.  Sometimes that would be still a correct payment
5    coming back from a payer and sometimes it would be an
6    indication of a mistake.
7            I believe I've also said that the
8    charges to Medicare would always be submitted with
9    usual and customary charges and that the amount that
10   the Medicare carrier would pay would be based upon the
11   Medicare allowance, which would definitely be
12   different than usual and customary charges.  If I
13   didn't say that, I'm saying it now.
14       Q.   Okay.
15       A.   Okay?
16           MR. STETLER:  You did.
17       Q.   (BY MS. THOMAS)  Fair enough.  And I believe
18   you did say something along those lines.
19       A.   Okay.
20       Q.   Would this drug allowable matrix have been
21   part of what allowed Abbott Home Infusion Services to
22   figure out the difference between what it submitted as
23   a U&C and what it was -- it or its customer was likely
24   to be reimbursed by Medicare?
25       A.   You know, I only supervised this area.  I

Page 486

1    didn't actually do that work, so -- and I never did,
2    so could I tell you yes or no that on a daily routine
3    basis that the people that were responsible for
4    determining if we were paid correctly used this chart?
5    I really couldn't tell you that.  And I just don't
6    think I can answer it any better way to say it than
7    that.
8        Q.   Do you have any understanding of whether
9    having this information available would allow the
10   people that were making that calculation to render at
11   least an educated guess as to that calculation?
12       A.   My educated guesses are that people would be
13   looking at the level of the payment working fairly
14   fast.  They would be looking to see that what was paid
15   was reasonably close to what had already been
16   determined on the system that would be paid.  That,
17   based also with experience they might have, would
18   allow them to recognize outlayers of what appeared to
19   be clear, incorrect payments one way or the other.
20   And that if that was the case, they would recognize
21   it.  And this was probably -- this could have been
22   used as a reference for them to double-check on
23   something when they recognize those outlayers.  That
24   is an educated assumption.  That's the best I can give
25   you.

56  (Pages 483 to 486)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 487

1    Q.  Do you have any recollection whether
2  information about Medicare's drug allowable was
3  maintained within the CHIPs database?
4    A.  I don't believe it was.
5    Q.  Would it seem to you that that would have
6  been useful information for someone to try to
7  ascertain what, in fact, reimbursement would be?
8    A.  Yes, it does seem like it would be useful,
9  but I do not believe that we did that.
10    Q.  Do you have any thought or recollection as to
11  why that wasn't done?
12    A.  My thought is that the system -- there were a
13  lot -- the system was complex because reimbursement
14  across multiple players was correct.  They all have
15  their different procedures for determining what they
16  were going to pay you and it was very difficult to
17  design a system to be specific to a payer because
18  there was no normal operating way of doing things.  So
19  the system, to my recollection, was not designed
20  specifically to record what the allowable would be and
21  to use that in some way for determining that amount.
22    Q.  Do you know how the people who were
23  responsible for determining whether the reimbursement
24  that was received was correct, do you know what --
25  what information they used as a benchmark to try to

Page 488

1  figure out whether the reimbursement received was
2  correct?
3    A.  I think that they -- you know the answer is
4  no, I don't.  We'll just leave it at that.
5    Q.  Well, do you have any idea?
6        MR. COLE:  Object to the form.
7        MR. STETLER:  You want him to guess?  Do
8  you want him to guess?
9    A.  If you want another educated guess, I think I
10  actually already answered it, but --
11        MR. COLE:  I don't think anyone wants
12  you to guess.
13        MR. STETLER:  I do.  I think somebody
14  does.
15        MR. COLE:  Not on this side of the
16  table.
17    Q.  (BY MS. THOMAS)  The types of customers that
18  Abbott Home Infusion Services had, could you generally
19  describe what kind of businesses they were?
20    A.  They generally were home infusion therapy
21  pharmacy businesses.
22    Q.  And did those home infusion therapy pharmacy
23  businesses purchase drug products from Abbott
24  commonly, as well as, perhaps, other manufacturers?
25    A.  If they were Abbott Home Infusion Services

Page 489

1  clients, to the best of my knowledge the Abbott drug
2  products that were purchased were done through the
3  agreement between Abbott Home Infusion Services and
4  those clients.  And so, yes, they did.
5    Q.  To your knowledge, did any of these home
6  infusion pharmacy businesses purchase product from
7  Abbott through its HPD or Alt Site divisions?
8    A.  Not to my knowledge while they would be under
9  contract with Abbott Home Infusion Services, no.
10    Q.  So there was an effort made if -- if Home
11  Infusion was working with these clients to have the
12  drug product sales go through that Home Infusion
13  Services relationship?
14    A.  Yes, that's fair to say.
15    Q.  Okay.  Did clients sort of move back and
16  forth between being clients of Home Infusion Services
17  and simply being purchasers of Abbott's drugs through
18  its other divisions?
19    A.  Not routinely, no.
20    Q.  Okay.  Was there an effort made to
21  essentially recruit clients from the H -- from the Alt
22  Site division of Abbott to become Home Infusion
23  Services clients?
24        MR. COLE:  Object to the form.
25    A.  No effort that I knew of.

Page 490

1    Q.  (BY MS. THOMAS)  How did Abbott get clients
2  for its Home Infusion Services business?
3    A.  That was a responsibility of the sales side,
4  essentially, and I wasn't involved in that, so I
5  cannot give you any specifics.  I got involved after
6  the contracts -- well, sometimes I got involved when
7  the sale was being done.  But beyond that, I wasn't
8  part of that strategy or -- tactics even.
9    Q.  Did you ever hear or become aware of
10  anything -- any kind of guidelines or policies that
11  Abbott had with regard to approaching purchasers
12  through its Alt Site division to become Home Infusion
13  Services clients?
14        MR. COLE:  Object to the form.
15    A.  I never did.
16    Q.  (BY MS. THOMAS)  Do you have any
17  understanding whether -- at least some number of the
18  purchasers from Alt Site were the types of businesses
19  that could have been signed up for Abbott Home
20  Infusion Services?
21        MR. COLE:  I'll object to the form.
22    A.  I -- I guess I had the understanding -- I had
23  the understanding then that Alternate Site had some
24  customers that, in fact, were home infusion service
25  pharmacy customers and they were not Abbott Home

57 (Pages 487 to 490)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 491

1 Infusion Services clients. So in theory could they --
2 could they fit into our business model? Yeah. Did
3 that answer your question?
4     Q.  (BY MS. THOMAS)  Uh-huh. Yes, it did,
5 actually. Thank you. So do you have any
6 understanding -- well, do you have any knowledge of
7 whether Abbott attempted to market its Home Infusion
8 Services business to those clients that could
9 potentially have become -- or to those businesses that
10 could potentially have become clients?
11         MR. COLE:  Object to the form.
12     A.  I don't have any understand that Abbott did
13 or did not.
14     Q.  (BY MS. THOMAS)  And do you have any
15 understanding of whether there was any kind of policy
16 saying either to try to do that or to try to avoid
17 that?
18         MR. COLE:  Object to the form.
19     A.  I have no understanding of that.
20     Q.  (BY MS. THOMAS)  Did you ever hear anyone
21 talk about any possible conflict on Abbott's part in
22 terms of providing the Home Infusion Services
23 consulting that it provided?
24         MR. COLE:  Object to the form.
25     A.  No. No. I will say no.

Page 492

1     Q.  (BY MS. THOMAS)  Did anyone ever talk about
2 the notion that certain businesses that were
3 purchasers through Alt Site might feel that Abbott's
4 pharmaceutical business -- its pharmacy businesses,
5 I'm sorry, were competing with those Alt Site
6 purchasers?
7     A.  I can tell you that my understanding of the
8 history of the business unit before I came was that
9 originally Abbott had entered the home infusion
10 business on our own as just an Abbott entity and that
11 the business unit realized that the company was
12 competing with its hospital customers, who also were
13 interested in being in the home infusion business. So
14 there was some sense of competition there.
15         And that led to a business strategy
16 change, as I understood it, again, before I came
17 there, for Abbott to primarily be looking for
18 customers, Abbott Home Infusion Services, that were
19 hospital customers that were starting up, or at least
20 to get involved with them in helping out with their
21 home infusion business. Their home infusion
22 businesses.
23         In terms of competition, you know, the
24 other aspect of competition, which maybe what you're
25 asking, was, you know, Ace Home Infusion Service was

Page 493

1 not an Abbott client, but they were being supplied,
2 perhaps, by Abbott Alternate Sites with product. And
3 did they view the Abbott Home Services -- Home
4 Infusion Services as competition in the marketplace,
5 I -- I never heard that one way or the other.
6     Q.  (BY MS. THOMAS)  If you would turn, sir, to
7 Page 3299. And the first sentence in that paragraph
8 there says, "Region B has provided us with an update
9 as to the Fee Screens for Drugs."
10     A.  Uh-huh.
11     Q.  Do you know what fee screens are in that
12 context?
13     A.  That would be the fee schedule allowance.
14 Again, it would be what Medicare would pay. They
15 would pay up to a maximum amount of which the patient
16 co-pay would be a portion of that amount, assuming
17 that the charges submitted to them were higher than
18 that allowance.
19     Q.  So you believe that to be referring to the
20 drug allowable matrix that -- that we've been looking
21 at and, indeed, that appears to be attached to that?
22     A.  Yes, uh-huh.
23     Q.  Okay. Were you aware of any information that
24 Abbott received from anyone that itemized what NDC
25 numbers Abbott's, or otherwise, were included in

Page 494

1 particular J codes?
2     A.  I was not aware of anything like that.
3         MS. THOMAS:  I would like to mark --
4 what exhibit number are we up to?
5         THE REPORTER:  1390.
6         MR. STETLER:  Done with this, Counsel?
7         MS. THOMAS:  Yes. Sorry. Thank you.
8         MR. STETLER:  And I guess this one, too.
9 We ended a long time ago.
10         MS. THOMAS:  I believe so.
11         MS. ST. PETER-GRIFFITH:  Wait, wait,
12 wait, wait, wait, wait. Is that one -- which one is
13 that?
14         MR. STETLER:  Oh, you're going to need
15 it back again.
16         MS. ST. PETER-GRIFFITH:  I'm going to
17 need it back.
18         (Discussion off the record)
19         MS. THOMAS:  I would like to ask to have
20 the court reporter mark, please, as Exhibit 1390 a
21 two-page document bearing two sets of Bates number,
22 TXABT 42025 and 26 or CAABT 006782 and 83.
23     Q.  (BY MS. THOMAS)  And I would ask you, sir, if
24 you could take a look at this document --
25     A.  At this?

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 495

1    Q.  -- as soon as it's marked.  Yes.  She's
2  probably got to mark it first.
3         MS. ST. PETER-GRIFFITH:  Susan, while --
4  while he's looking at that, do you want to have our --
5  our videographer change the tape?
6         MS. THOMAS:  I believe we will do that.
7    Q.  (BY MS. THOMAS)  I would just mention to you,
8  sir, when you look at this, this is a series of
9  e-mails, and like most e-mails, it makes sense to read
10  it from the bottom up because that's where it starts.
11    A.  Okay.
12        THE VIDEOGRAPHER:  We are off the record
13  at 3:25 p.m. with the end of Tape Number 4.
14        (Exhibit 1390 marked)
15        (Recess from 3:25 to 3:35)
16        THE VIDEOGRAPHER:  Stand by, please.  We
17  are back on the record at 3:35 p.m. at the start of
18  Tape Number 5.
19    Q.  (BY MS. THOMAS)  Mr. Rodman, have you had an
20  opportunity to look at the e-mails that have been
21  collectively marked as Exhibit 1390?
22    A.  During the break I just did.
23    Q.  Okay.  Thank you.  Do these appear to be
24  e-mails that reflect a conversation or communication
25  that you testified about earlier today?

Page 496

1    A.  Yes.  I think I said earlier there were
2  occasionally really outlayer-type stuff that I got
3  involved with in tying to figure out AWP pricing and
4  this is, I think, an example of that.
5    Q.  Exactly.  And I think you even refer to the
6  fact that you believed you had had a communication
7  with -- one or more times with Jerrie Cicerale.
8    A.  Rarely, but I think I indicated that, yes.
9    Q.  It would appear, since Ms. Cicerale answers
10  in the bottom -- on the bottom of Page 42025, the
11  first page, when she says in an e-mail to you, "Here
12  is the answer from First DataBank."
13    A.  Uh-huh.
14    Q.  That appears as though she's responding to
15  something that you posed to her.  Is that consistent?
16    A.  It does -- it does appear that way.
17    Q.  And it does not appear that the e-mail
18  inquiry appears in this e-mail, for whatever reason,
19  but -- but it seems that she's answering something.
20    A.  It does appear that way.
21    Q.  Okay.  Do you have any recollection whether
22  you addressed something specifically to her on this
23  point or whether you just sent out a general
24  information query to perhaps a whole unit of Abbott
25  and she happened to be the one who responded?

Page 497

1    A.  My recollection is somewhere along the lines
2  somebody told me Jerrie Cicerale was the person to
3  talk to when there were strange things happening on
4  AWP that I got involved with from the Abbott Home
5  Infusion Services responsibility.
6    Q.  Do you have any recollection who might have
7  told you that?
8    A.  I don't at this point.
9    Q.  Do you know in what division Jerrie Cicerale
10  worked at this point in time?
11    A.  I believe in the HPD Contract Marketing area.
12    Q.  Now, I believe you testified -- well, strike
13  that.
14        What is your recollection as to who
15  reported AWPs to the pricing compendia that would be
16  used in connection with Home Infusion Services'
17  business?
18        MR. COLE:  Object to the form.
19    A.  For Abbott drugs?
20    Q.  (BY MS. THOMAS)  Yes.  Sorry.
21        MR. COLE:  Object to the form.
22    A.  Somewhere along the line I developed an
23  understanding that Abbott in the HPD Contract
24  Marketing area provided some sort of a price to the
25  drug compendiums.

Page 498

1    Q.  (BY MS. THOMAS)  Can you be any more specific
2  about what type of price or when you developed this
3  understanding?
4        MR. COLE:  Object to the form.
5        MR. STETLER:  Do you want him to look at
6  the exhibit again?  It's right there (indicating).
7        MS. THOMAS:  He's welcome to look at the
8  exhibit.  You're even welcome to point him to
9  something if he needs help.
10        MR. STETLER:  It may help.  "They both
11  take."
12    A.  Yeah.  Well, I actually did see that.  I
13  actually don't recall that term.  I mean, I can see
14  that, apparently, I did see it on this e-mail at the
15  time.  I don't have any real recollection of that.
16    Q.  (BY MS. THOMAS)  I'm sorry, but that term --
17    A.  Direct price.  The term that Mr. Stetler just
18  pointed to.
19    Q.  Okay.  So in Jerrie Cicerale's e-mail where
20  she says to you, "They both," meaning First DataBank
21  and Redbook, "take our," Abbott's, "direct price and
22  they calculate AWP."  You're saying you don't have a
23  recollection of the term "direct price"?
24    A.  I really don't.
25    Q.  Okay.  Do you recall asking anybody about

59 (Pages 495 to 498)

Page 499

1  this or being surprised at this information provided
2  by Ms. Cicerale?
3        MR. COLE:  Object to the form.
4     A.  Not from this occurrence, no.
5     Q.  (BY MS. THOMAS)  Was there anything else that
6  you knew about the reporting of prices at Abbott that
7  caused you to be surprised by what Ms. Cicerale
8  represented here?
9     A.  I do remember an occurrence when I was told
10 by someone in Abbott Home Infusion services that the
11 pricing that -- some sort of price ultimately was used
12 to be computed into an AWP as reported by Abbott --
13 by Abbott HPD to the drug compendiums.  I do recall
14 being told that at one point and I had not known that
15 before.
16    Q.  And, to your knowledge, is that the same AWP
17 that was utilized in Home Infusion Services' business?
18       MR. COLE:  Object to the form.
19    A.  I have -- I had not understood before I was
20 told that and -- you know, and I was just told that.
21 I never did any follow up, so what really happened, I
22 just remember being told it.  I -- I was told that
23 there was a figure that was provided to the drug
24 compendiums and that that somehow ended up being an
25 AWP that would be reported by the drug compendiums

Page 500

1  through a -- through a mathematical formula.  But
2  beyond that, I don't -- you know, the specific of what
3  price was reported, my memory of that is pretty hazy
4  at this point.  But I do recall being surprised by it
5  because it was not what I thought was how the industry
6  worked up until then.
7     Q.  (BY MS. THOMAS)  And in your last answer when
8  you say you recall having been told that a figure was
9  provided to the compendia that was then calculated
10 into an AWP, or something like that --
11    A.  Uh-huh.
12    Q.  -- the figure provided -- what you were told
13 was that the figure that was provided was provided by
14 Abbott?
15    A.  Uh-huh.
16    Q.  Okay.  And do you have any reason to believe,
17 however, that -- whatever price was provided by Abbott
18 to the compendia that was calculated into an AWP, do
19 you have any reason to believe that that price is any
20 different than the AWP that was referred to and used
21 within Abbott Home Infusion Services?
22    A.  I have no reason to believe that it would be
23 different.
24    Q.  And do you believe that it was the same AWP?
25       MR. COLE:  Object to the form.

Page 501

1     A.  These compendia had -- you know, what they
2  did was beyond my scope of knowledge.  I think in
3  general it was beyond the scope of a lot of providers'
4  knowledge, at least.  I have no reason to believe that
5  they did any -- at this point, at least, originally I
6  had an entirely different impression of what they did,
7  but I have no reason to believe that they would have
8  done any particular further changing of it.  So, you
9  know, I -- when I learned that, I thought it was a
10 rather mathematical mechanical function that was based
11 upon some sort of price that was reported by Abbott to
12 the drug compendia and that's essentially what I
13 remember being told at one point.
14    Q.  (BY MS. THOMAS)  And it was your
15 understanding that the calculation of an AWP, that
16 that was the same AWP in the Alt Site business world
17 as it was in the Home Infusion Services business
18 world; is that correct?
19    A.  There weren't multiple AWPs, so that would be
20 correct.
21    Q.  Okay.  Now, when you say you were surprised
22 because it wasn't what you had thought to be the case,
23 could you elaborate on that?
24    A.  To me simply as at least a B grade
25 intelligent person, when I first got involved in this

Page 502

1  aspect of the field, I thought that average wholesale
2  price was probably based on some sort of statistical
3  sampling of a price that would be the amount that the
4  drug could be -- would be sold for at a wholesale
5  price as being somewhat different from retail price,
6  whatever that meant.  And I just -- this was a Bruce
7  Rodman assumption just from the name.  That it was --
8  these drug compendiums had something in place where
9  they were getting sampling of pricing and then they
10 were doing some sort of averaging and that ended up
11 being an AWP.  That's not because anybody ever told me
12 that.  It's just what I assumed.
13       MS. THOMAS:  Okay.  Do we have a clean
14 copy of Exhibit 1316 that was marked in the first day
15 of his deposition available?
16       MS. ST. PETER-GRIFFITH:  What is it?
17       MR. STETLER:  While you're looking for
18 that --
19       MS. THOMAS:  I think it may be -- there
20 may be one right there in the transcript.  At the
21 beginning.
22       MS. ST. PETER-GRIFFITH:  At the
23 beginning?
24       (Discussion off the record)
25    Q.  (BY MS. THOMAS)  Mr. Rodman, you've been

60  (Pages 499 to 502)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 503

1  handed a notebook that includes the page BR 02422,
2  which was previously marked as Exhibit 1316 in the
3  first day of your deposition. And you testified
4  generally that you think you would have received a
5  copy of this because you would have been considered
6  reimbursement personnel at the time. Is that still
7  consistent with your recollection?
8      A.  I think I remember, uh-huh.
9      Q.  If you would look, sir, at the two lists of
10  prices or two columns of prices.
11      A.  Uh-huh.
12      Q.  One of which is headed "AWP" and one of which
13  is headed "List Price."
14      A.  Uh-huh.
15      Q.  And I will represent to you, sir, having done
16  the math, that the list prices are all 1.15 times the
17  AWP that's indicated in handwriting on this document
18  for the first price and I will represent to you that
19  it is also true for all the rest of them.
20      A.  Okay.
21      Q.  Do you have any understanding -- let's --
22  let's go back in time to '96 when -- when you probably
23  received this document. Did you have any
24  understanding of there being a relationship between
25  Abbott's list prices and AWPs?

Page 504

1      A.  These are Abbott Home Infusion Services list
2  price that's entirely different from whatever you or I
3  might consider to be HPD, or in this case, actually,
4  it's a TAP product. TAP list prices. So I want to
5  make that very clear.
6          Yes, I did have an understanding that
7  the way that Abbott Home Infusion Services list prices
8  for that business unit for a drug were -- that they
9  were based upon AWP, as you see in this example.
10      Q.  And the list prices that are here are the
11  same as what you have referred to throughout this
12  deposition as usual and customary --
13      A.  Yes.
14      Q.  -- prices?
15      A.  Uh-huh.
16      Q.  Do you have any understanding of who
17  determined that list prices for these products would
18  be set at 1.15 times AWP?
19      A.  I believe that that would have been
20  determined by the Contract Marketing department of
21  which Lynn Leone was a member of.
22      Q.  Do you have any understanding whether if that
23  is the way a list -- pardon me. If that is the way
24  usual and customary price is calculated, whether, in
25  fact, that usual and customary price is, in fact, a

Page 505

1  usual or customary price?
2          MR. COLE:  Object to the form.
3      A.  That price was the price that would be
4  charged to an insurance company and the patient for
5  whatever co-pay in cases where there was not a
6  specific managed care agreement to do otherwise.
7  That's the general answer. That would be -- you know,
8  I -- I like to describe that as an arm's-length
9  transaction, meaning there's no formal agreement to
10  have any sort of different type of discounting. So if
11  there isn't any sort of an agreement, then, in fact,
12  this organization's price for the Lupron Depot 7.5 mg
13  is going to be $570.69. And that's what's going to be
14  billed to the insurance company or, if you will, the
15  insurance company and the patient.
16      Q.  (BY MS. THOMAS)  Do you have any
17  understanding whether that was the usual price paid by
18  customers?
19          MR. COLE:  Object to the form.
20      A.  In general either through -- I'm talking,
21  really, commercial insurance here now. Are you asking
22  for commercial insurance or do you want to go to
23  Medicare? Things are different.
24      Q.  (BY MS. THOMAS)  I'm actually not asking what
25  insurance would pay, but rather what customers

Page 506

1  purchasing Abbott's product would pay.
2      A.  Oh, customers purchasing Abbott's product.
3  Customer meaning like a home infusion entity?
4      Q.  Uh-huh.
5      A.  Oh, I don't think there's any particular
6  relationship there. That's not -- that's not what
7  this was for.
8          MR. COLE:  I'll assert the same
9  objection. Objection to form.
10      Q.  (BY MS. THOMAS)  But as to what this did
11  represent, it's the answer you gave just a few minutes
12  ago?
13          MR. COLE:  Object to the form.
14      A.  It represents the charges that would be
15  billed to the combination of the health plan and the
16  patient if there was no specific contractual agreement
17  to charge the health plan/patient combination
18  something different. Charges billed by the provider
19  to the health plan patient.
20      Q.  (BY MS. THOMAS)  Is your understanding of the
21  term "usual and customary" different in the context of
22  Medicare or Medicaid?
23      A.  No.
24      Q.  And as far as you understand the list price
25  identified on this form, that is only a list price in

61 (Pages 503 to 506)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 507

1   use within Abbott Home Infusion Services, correct?
2      A.  Yes.
3           MS. THOMAS:  I would like to ask the
4   court reporter to mark as Exhibit 1391 a one-page memo
5   or group of notes entitled "Notes From Meeting With
6   Karla Krecklow on Reimbursement (7/12/01)."  This may
7   have been marked as an exhibit earlier in some
8   deposition, but if it is, I don't know it.  And I
9   would just ask you to indulge me and ignore the fax
10  legend showing it coming from my office.  I guarantee
11  you it did not originate from my office.
12          MR. SISNEROS:  It was an exhibit.  I'll
13  try to find out.  I think it's been an exhibit in two
14  depositions.  What's the date on that?
15          (Exhibit 1391 marked)
16          (Discussion off the record)
17     A.  (Witness reviewing document).
18          MR. COLE:  Counsel, can I just ask, I
19  believe you say it didn't originate from your office.
20  I don't see a Bates stamp on it.  Is this included in
21  the documents that came from Mr. Rodman?
22          MS. THOMAS:  No, it is not part of
23  Mr. Rodman's documents.
24          MR. COLE:  Okay.
25          MS. THOMAS:  It's a document that we've

Page 508

1   had and I think we may have used it in Mr. Balzer's
2   deposition and I simply do not remember the
3   explanation as to why there is not a Bates number on
4   it.
5           MR. COLE:  Okay.  Is it your
6   understanding that it was a document produced by
7   Abbott?
8           MS. THOMAS:  That is my understanding.
9           MR. SISNEROS:  Yes.
10          MS. THOMAS:  But I can't be more
11  specific as to how it showed up without a Bates
12  number.
13          (Discussion off the record)
14     Q.  (BY MS. THOMAS)  Mr. Rodman, do you believe
15  you've ever seen this document before?
16     A.  I don't believe I have.
17     Q.  Do you know all the people listed as
18  participants in this meeting?
19     A.  I know them to some degree and some very
20  well.
21     Q.  Mr. Balzer and Lyjak were both salespeople or
22  accounts -- account managers within Alt Site.  Is that
23  consistent with your recollection?
24     A.  That they -- well, they may have been.  I
25  just -- I guess I knew them as -- in the marketing

Page 509

1   area, marketing really meaning sales area of Alternate
2   Sites, yes.
3      Q.  Okay.  And --
4      A.  The responsibilities they had, I -- I don't
5   recall right now.  And, you know, at one point I may
6   have known, but I don't really know now.
7      Q.  And Mr. Baker?
8      A.  Mr. Baker, actually, I got to know him fairly
9   well because when I first started at Abbott Home
10  Infusion services he was one of the sales managers in
11  the Home Infusion Services business unit for a couple
12  of years, I would say.  And that's why I know him
13  fairly well, just from that experience.  What role he
14  was in at the time here, I'm not sure.
15     Q.  Do you have any recollection whether he was
16  still with Home Infusion Services?
17     A.  He would not have been.
18     Q.  Do you --
19          MR. SISNEROS:  Excuse me.  For the
20  record, it appears to be Exhibit 481 of the Baker
21  deposition.
22     A.  He could have been general manager at the
23  time of the Alternate Site business unit, actually.  I
24  think he probably was.  That's a think.
25     Q.  (BY MS. THOMAS)  Okay.  But you more or less

Page 510

1   believe that he was in Alt Site at this point, even if
2   you don't recall --
3      A.  I more or less believe he was in Alternate
4   Site at this time.  Ask Abbott.
5      Q.  And Ms. Kreklow was in Home Infusion
6   Services?
7      A.  And she, of course, is who I knew the best
8   and she was my boss at the time.
9      Q.  Are you able to tell from having read these
10  notes, which -- which have some detail about the
11  content of this meeting, whether this is a subject
12  matter that you had discussed with Ms. Kreklow or
13  perhaps prepared her for in or about mid-2001?
14     A.  I -- I -- I can see enough in here to know
15  the general subject matter that would have triggered
16  what appears to be documented in this meeting.  I
17  actually don't think that I was -- would have fed her
18  much to prepare for this meeting.  I might have.  I'm
19  seeing some references to per diem here, and,
20  actually, I don't think they're correct as documented.
21  But I do what -- I do know what the trigger would be
22  and I believe I know who probably would have fed the
23  information to Ms. Kreklow that she would have taken
24  in.
25     Q.  Well, you sure make it tempting for me to ask

62  (Pages 507 to 510)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 511

1  you who.
2     A.  I believe that would --
3     Q.  What the subject matter, what triggered it
4  and who.  I would have asked you anyway.
5        MR. STETLER:  The last guy we had
6  answered questions he wished he had been asked instead
7  of the ones he was.  He asks his own questions.  But
8  at least you answer the question.  So who was it?
9     Q.  (BY MS. THOMAS)  At least rest assured I
10 would have asked you anyway.
11    A.  You were going to ask me --
12    Q.  You talked about --
13    A.  You are going to ask me what the incident
14 was, too.
15    Q.  You talked about a triggering event and then
16 you talked about a person.
17    A.  Yeah.  Yeah.  The person would have been
18 Mr. Snouffer.  And, again, I'm not saying --
19    Q.  And the --
20    A.  And, again, I'm not saying that I --
21    Q.  And the weapon of choice, if we use your --
22       MR. STETLER:  Lead pipe in the pantry.
23    A.  I'm not saying that I didn't provide any
24 information to Ms. Kreklow, I may have, but -- and I'm
25 making an assumption that someone did specifically for

Page 512

1  this meeting.  I don't really know that either, but
2  just as a general sense of what was going on here --
3     Q.  Okay.  And what is your sense of -- of what
4  was going on and what triggered --
5     A.  This was --
6     Q.  -- a meeting like this?
7     A.  This was --
8        MR. COLE:  I'll object to the form.
9     Q.  (BY MS. THOMAS)  I'll rephrase the question.
10 Based on your --
11    A.  Okay.  I'm going to have to tell you, this
12 could have been one of two, but I think it was one.
13 But I'm going to have to tell you honestly, it was one
14 of two.  Sorry.
15    Q.  Okay.  What were the two -- what are the two
16 things that you think --
17    A.  Well, there were two --
18    Q.  -- most likely triggered this meeting?
19    A.  There were two rather visible incidents at
20 that time --
21       MR. COLE:  Object to the form.
22    A.  -- one visible to the industry --
23       MS. THOMAS:  What was my question?
24       MR. COLE:  I was trying to get my
25 objection in after your question.

Page 513

1     A.  In this time frame there were two visible
2  incidents.  One was an industry visible incident.  The
3  second was more of an Abbott -- Abbott customer
4  incident.
5        The OIG had done a study, federal OIG,
6  and had determined that average wholesale prices were
7  different than the drug compendiums.  This is totally
8  my memory of it.  And they had published a list of
9  what became known as -- at least by me, as OIG or
10 maybe DOJ AWPs.  I don't recall.  And my recollection
11 is that when that list was published, that some of the
12 states Medicaid programs were going to adopt those
13 figures for reimbursement to providers when they were
14 paying on an AWP-based reimbursement.  So that was one
15 incident.  That was very visible throughout the
16 industry.
17       The other occurrence was -- and I -- my
18 recollection is this occurred after that.  There was a
19 decision made by Abbott to change its pricing that
20 resulted in a lowering of AWPs for some of the Abbott
21 Hospital Products Division drugs.
22       And the reason I remember that pretty
23 well was that that -- we've already talked about how a
24 fair amount of that reimbursement was based on AWPs
25 and that that would, therefore, lower the amount of

Page 514

1  collections on these claims being billed by the Abbott
2  Home Infusion Services customers.  And that was
3  something that was concerning our customers when that
4  occurred.  Especially since Abbott Home Infusion
5  Services had the business relationship and then to
6  them it was perceived as Abbott changing the pricing
7  and lowering the pricing that would -- would lower
8  their revenues.
9        And that was a fairly big deal within
10 home infusion and trying to manage that from a
11 customer perspective.  Mike Snouffer was quite
12 involved in some analysis on that at the time, I
13 recall, working for Karla Kreklow.
14       My guess is that this meeting probably
15 may have occurred at about the time that that was
16 being done.  But it really could have been the first
17 event, which was the publication of the industry
18 DOGs -- DOJs.  And you know what, if you check the
19 record on various dates of things, you can probably
20 figure out what the context was, but that's the best I
21 can tell you.  I think it was one of those two.
22    Q.  (BY MS. THOMAS)  And it is your
23 recollection --
24       MR. STETLER:  Is that all?
25       THE WITNESS:  I'm sorry?

63 (Pages 511 to 514)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 515

1      MR. STETLER: I'm kidding.
2      THE WITNESS: That was it. That's all.
3   Q. (BY MS. THOMAS) It is your recollection with
4   regard to what you said about the second possible
5   trigger, that Abbott's decision to change its pricing
6   came in response to the publication of those DOJ AWPs?
7      MR. COLE: Object to the form.
8   A. I -- I -- I -- I -- you know, I was never
9   told directly as to reasonings behind those changes of
10  Abbott's pricing, so that would be a stretch for me to
11  say it was in response to anything in particular.
12  Q. (BY MS. THOMAS) So you believe there was a
13  temporal proximity, but you couldn't say for certain
14  if that's why Abbott made the changes?
15  A. I was never involved in the decision-making,
16  you know. You're in this area of -- you -- you know,
17  you develop some beliefs based on hearsay types of
18  things that you may have picked up and I believe that
19  it had something to do with, at that time, AWP
20  being -- becoming -- it was being scrutinized more.
21  And so I do believe it had something to do with that.
22  But can I tell you that somebody told me that
23  directly? No, not really.
24  Q. Is there anything you can point to that
25  supports that conclusion that you reached, other than

Page 516

1   the timing?
2      MR. COLE: Object to the form.
3   A. I mean, I -- there's some hearsay stuff that
4   I recall, but I can't recall who told me that. If you
5   want me to repeat hearsay, I can.
6   Q. (BY MS. THOMAS) Yes.
7   A. What I recall.
8   Q. I would like you to tell me what you recall
9   of the conversation on that issue.
10     MR. COLE: Object to the form.
11  A. Okay. My hearsay recollection is that
12  somebody told me that that decision was made very high
13  up in the corporation to change that pricing. And
14  that Mike Sellers actually was in opposition to that,
15  but it was above his head further. And hearsay-wise I
16  heard it -- it went up to -- you know, near the top of
17  the corporation in that decision being made.
18  Q. (BY MS. THOMAS) Do you have any recollection
19  of either who you heard that from or the context in
20  which you heard it?
21     MR. COLE: Object to the form.
22  A. I do not.
23  Q. (BY MS. THOMAS) I mean, do you believe it
24  was sort of a casual, you know, water cooler
25  conversation, as they say, or --

Page 517

1   A. I don't have --
2      MR. COLE: Object to the form.
3   A. -- a recollection. I mean, I can tell you
4   what it wasn't. It certainly wasn't a formal
5   presentation where somebody was in there standing up
6   to a bunch of Abbott employees saying, "This is what
7   happened." That I know. But beyond that, I don't
8   have a recollection. It was probably one-on-one
9   conversations.
10  Q. (BY MS. THOMAS) Other than what you may have
11  heard in these conversations about Mr. Sellers being
12  opposed to the decision, do you have any other basis
13  to conclude that he was opposed?
14  A. I remember hearsay one other point of that.
15  Someone told me that. I don't remember who. And it's
16  hearsay. So whether it was really accurate, I don't
17  know, but I can tell you what I remember.
18     MR. STETLER: Well, she's going to ask,
19  but don't worry whether it's hearsay or not because
20  you don't even know what hearsay is. So if she says,
21  "Did anybody tell you anything," just answer it and
22  don't worry about it.
23     THE WITNESS: Okay.
24     MR. STETLER: The definition of hearsay.
25  Most lawyers don't understand it.

Page 518

1   A. I remember some --
2      MR. COLE: Object to the form.
3   A. I remember someone telling me that
4   Mr. Sellers was opposed to doing that because it would
5   be an indication of Abbott having done something
6   wrong.
7   Q. (BY MS. THOMAS) Do you know what they were
8   referring to that Mr. Sellers was concerned about?
9   A. Having to do with pricing --
10     MR. COLE: Object to the form.
11  A. -- that somehow ended up to be published AWP.
12  Q. (BY MS. THOMAS) Can you tell me everything
13  you can recall about that conversation?
14  A. I think I've told you everything at this
15  point on that.
16  Q. Do you have any recollection about who made
17  the comment pertaining to Mr. Sellers?
18  A. I don't.
19  Q. Did you ever hear, other than a comment like
20  that, any other evidence that Mr. Sellers was opposed
21  to these changes?
22  A. Not that I can recall.
23  Q. Did you ever have an understanding at the
24  time you heard the comments made about Mr. Sellers
25  what somebody -- what the concern was about Abbott and

64 (Pages 515 to 518)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 519

1    its pricing?
2          MR. COLE: Object to the form.
3       A. Ask me that again, please.
4       Q. (BY MS. THOMAS) At the time that -- that
5    somebody made a comment about Mr. Sellers opposing the
6    decision to lower the prices, in part because it could
7    be an indication that Abbott had done something
8    wrong --
9       A. Uh-huh.
10      Q. -- what understanding, if any, did you have
11   about the nature of what Abbott might have done wrong?
12         MR. COLE: Object to the form.
13      A. Well, I knew from my own reading that AWPs
14   were being scrutinized and, you know, that my
15   recollection is that -- that because they were being
16   scrutinized, leading ultimately to situations like
17   this, that, you know, it would be an indication that
18   there was something wrong that Abbott had done and --
19   in this area. But that's about as far as I can go.
20      Q. (BY MS. THOMAS) Did it ever come to your
21   attention that anyone else within Abbott opposed the
22   decision to lower -- to lower the reported prices?
23         MR. COLE: Object to the form.
24      A. No, but that doesn't mean that there weren't
25   people. But no.

Page 520

1       Q. (BY MS. THOMAS) Okay. So you didn't hear
2    about anybody else expressing opinion on that?
3       A. No.
4          MR. COLE: Object to the form.
5       Q. (BY MS. THOMAS) Now, you indicated that one
6    of your thoughts as to what might have triggered this
7    meeting was that decision by Abbott to change the
8    pricing and that that decision would lower collections
9    in the Abbott Home Infusion Services business and, you
10   know, potentially cause some customer consternation.
11      A. I indicated that was one of two
12   possibilities. The other may have been the
13   publication of DOJ prices.
14      Q. Okay. With regard to the -- the second
15   factor that you identified, that -- that some of the
16   customers within Abbott Home Infusion Services might
17   have been upset about the lower reported prices, can
18   you connect that for me to the idea of having a
19   meeting with people from Alt Site?
20         MR. COLE: Object to the form.
21      A. I have no specific knowledge of this meeting.
22      Q. (BY MS. THOMAS) Are you able to -- do you
23   have an understanding, based on your years at Abbott
24   and your knowledge of the type of business that Alt
25   Site was in, as to why, if at all, these changes in

Page 521

1    reported prices by Abbott would have been of interest
2    or concern to Alt Site?
3          MR. COLE: Object to the form.
4       A. I have an understanding of that.
5       Q. (BY MS. THOMAS) Could you explain that,
6    please?
7          MR. COLE: Object to the form.
8       A. Alternate Site had customers that were home
9    infusion service providers, and also other customers.
10   At least the Home Infusion Service providers, those
11   are the ones that I know, did have a reimbursement
12   that was based upon an AWP. So if there was going to
13   be a significant change to AWP, that would be
14   something that would impact the revenue that these
15   Alternate Site customers would be getting from the
16   insurance companies or the government that they bill
17   to and that would be something that Alternate Sites
18   should be interested in insofar as understanding where
19   their customers are actually -- you know, how they're
20   making the money that they should make.
21      Q. (BY MS. THOMAS) Well, in terms of Alternate
22   Site being interested in how its customers did
23   business and how they made money, in your opinion
24   would it have been advantageous for Abbott Home
25   Infusion Services personnel to have shared their

Page 522

1    knowledge of home infusion businesses with Alt Site
2    personnel?
3          MR. COLE: Object to the form.
4       A. I think it would help Alternate Sites
5    understand their customers' businesses a little
6    better, sure.
7       Q. (BY MS. THOMAS) I mean, it almost seems
8    self-evident, doesn't it?
9          MR. COLE: Object to the form.
10      A. It didn't happen very often that I know.
11      Q. (BY MS. THOMAS) Do you have any idea why
12   that didn't happen?
13      A. Because we operated very independently and
14   really did not work with their -- the two units really
15   didn't work together particularly closely in any way.
16   They had different business models. They were just
17   managed differently.
18      Q. But certain personnel went from one division
19   within Abbott to another, correct?
20      A. Yes.
21      Q. Do you recall ever suggesting to anyone that
22   it would seem logical and helpful for the business
23   expertise that was gathered within the Home Infusion
24   Services business to be shared in some fashion with
25   the Alt Site sales marketing people?

65 (Pages 519 to 522)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 523

1    A.  I don't recall that that was -- I mean, do I
2  recall ever being told that that would be advantageous
3  and we should be doing that periodically?  No, I don't
4  recall that.
5       MR. STETLER:  I think her question was
6  did you suggest.
7    A.  Did I suggest?
8    Q.  (BY MS. THOMAS)  Yes.
9    A.  Oh, I don't recall suggesting that.
10   Q.  Well, I mean, did it ever occur to you while
11  you were working there that, "Hey, we have people
12  selling to customers just like the ones we're getting
13  to know so well.  We ought to tell them what we've
14  learned and -- and help them in their sales and
15  marketing effort"?
16      MR. COLE:  Object to the form.
17   A.  Not -- not -- certainly not as a primary or
18  even a secondary function of my job responsibility.  I
19  talked earlier about how I talked about the
20  standardization of coding in the per diem area.  It
21  occurred to me that that would be something that they
22  probably ought to understand, but also it was tooting
23  my horn a little bit, frankly, because it was an
24  industry accomplishment.  So in that instance I could
25  have initiated that.  But, no, not generally.

Page 524

1    Q.  (BY MS. THOMAS)  Do you have any recollection
2  while you worked in the Home Infusion Services
3  business of ever thinking that it might make sense for
4  someone at Abbott to communicate expertise gained from
5  Home Infusion Services to the people that were trying
6  to sell to some very similar types of clients?
7    A.  I don't.
8       MR. COLE:  Object.  He's answered that
9  multiple times.
10   Q.  (BY MS. THOMAS)  Looking back at your time at
11  Abbott, do you have any idea why that didn't occur to
12  you?
13      MR. COLE:  Object to the form.
14   A.  The Home Infusion Services business unit
15  operated in many ways as a small business.  We were
16  our own entity.  We really didn't work with anybody
17  else in Abbott in particular to achieve our
18  objectives.  So it was -- you know, call it a cultural
19  thing, call it whatever, we had our objectives.
20   Q.  (BY MS. THOMAS)  And, again, did you --
21   A.  I mean, frankly, in some ways we competed
22  with them, so -- because some of -- you know.  Their
23  customers would have been our customers.  And if it
24  was their customers, then it would be through their
25  profit line.  If it was our customers, it would be

Page 525

1  through Home Infusion Services, so ...
2    Q.  Again, do you -- do you have any recollection
3  that type of cross communication was discouraged?
4    A.  I do not have that recollection.
5    Q.  Now, you indicated with regard to these notes
6  that you think there's a couple of things on them that
7  are wrong.  What jumped out at you?
8    A.  "Medicare (Federal Aid Programs) have adopted
9  reimbursement to Per Diem" is incorrect.  That's the
10  one that jumps out.
11   Q.  You stated earlier in your answer that
12  Mr. Snouffer was quite involved in some analysis about
13  the decision made by Abbott to change its pricing?
14      MR. COLE:  Object to the form.
15   A.  I did state that earlier.
16   Q.  (BY MS. THOMAS)  Okay.  Could you elaborate
17  on what you're referring to?
18   A.  Well, I was really not very involved in that
19  because I was responsible for the CHIP system product
20  management types of things at the time, but he was
21  the -- the head person in the reimbursement at this
22  time.  And there was a concern in terms of managing
23  the customers of what the impact might be of their
24  revenues and, hopefully, their profitability,
25  obviously.  And he -- he was looking at that and I

Page 526

1  think he was running reports, and that sort of thing,
2  to try and determine that so that the business unit
3  could determine how best to manage the customer issues
4  that it created.
5    Q.  Do you recall if there was any written
6  product generated by him or his staff?
7    A.  I do not recall.
8    Q.  Do you recall if there were any meetings
9  addressing the topic?
10   A.  I do not recall.
11   Q.  To your knowledge, was Mr. Snouffer doing
12  this analysis with respect to just Abbott Home
13  Infusion Services or also with respect to other
14  customers of Abbott's and thus the rest of Abbott's
15  business?
16      MR. COLE:  Object to the form.
17   A.  No.  It would be respect to the Abbott Home
18  Infusion Services business relationships.
19   Q.  (BY MS. THOMAS)  Okay.  As far as you know --
20   A.  Only.  As far as I know.
21   Q.  Do you know whether anyone else at Abbott was
22  evaluating what impact it might have on Abbott's
23  business other than Home Infusion Services?
24   A.  I have no specific knowledge of that.
25   Q.  Now, when you identified the first factor

66  (Pages 523 to 526)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 527

1  that you thought could have been kind of a trigger for
2  this meeting, you talked about the DOJ AWPs.
3      A.  Yes.
4      Q.  And you reference an OIG study about AWP
5  being different than what the drug compendia reported.
6  Did I understand you correctly?
7      A.  As I recall, that OIG study, the OIG looked
8  at the prices for drugs that a wholesaler -- I'm
9  sorry, that a provider was paying to buy them from the
10 wholesaler and they compared that -- that with this
11 figure called AWP and they concluded for many drugs
12 that the actual price was significantly lower.
13     Q.  And what, if any, discussion do you have at
14 about that point in time of anybody talking about
15 whether Abbott had, perhaps, done anything wrong or
16 might be liable in some fashion for its reported
17 prices?
18         MR. STETLER:  Object to the form.
19     A.  I don't remember any specific discussion.
20     Q.  (BY MS. THOMAS)  Now, you testified earlier
21 that you were very involved in that EDI effort,
22 correct?
23     A.  Uh-huh.
24     Q.  Through what outside entity primarily were --
25 were those efforts coordinated?

Page 528

1      A.  That changed over time, but when -- in the
2  latter years when we ultimately led to the success of
3  the standardization of per diem coding for home
4  infusion from getting that set of codes into the HCPCS
5  code list.  The other entities involved with the
6  National Home Infusion Association and other home
7  infusion therapy providers that were involved with the
8  Home Infusion EDI Coalition, and within NHIA.
9      Q.  Now, NHIA is different than the National
10 Alliance for Infusion Therapy?
11     A.  Yes.
12     Q.  Can you just describe very briefly what those
13 two organizations are?
14     A.  The National Home Infusion Association at
15 that time was a hybrid, still are, but we changed a
16 little now, but a hybrid of being a professional
17 association and a trade association representing
18 companies that were providers of home infusion
19 therapy.  Companies meaning licensed pharmacies.
20     Q.  And the distinction you draw between
21 professional association and trade association is
22 what?
23     A.  Professional association is more involved in
24 the advancement of an individual professional field,
25 such as a medical professional education, training,

Page 529

1  certification, research.
2         Trade association is oriented more
3  towards advancing the business interests of
4  organizations or individuals if they are individuals
5  involved in a field.
6      Q.  So a trade association would likely be
7  involved with what's commonly referred to as lobbying?
8      A.  Trade association may be involved in
9  lobbying, yes.
10     Q.  And the National Alliance for Infusion
11 Therapy?
12     A.  That, or N-A-I-T, NAIT, that was another
13 association, if you want to call it that, that also,
14 as I understood it then, was more of a trade
15 association to represent home infusion therapy
16 providers' business interests.
17     Q.  To what extent was Abbott a supporter or
18 participant in either of those entities?
19         MR. COLE:  Object to the form.
20     A.  For NAIT Abbott -- for quite some time Abbott
21 Home Infusion Services, I believe, was a member of
22 NAIT.  I mean, I know we were.  Abbott's Ross Products
23 division was also a member of NAIT.  I believe they
24 still are, but I don't really know that.
25     Q.  (BY MS. THOMAS)  What --

Page 530

1      A.  And -- I'm sorry.
2      Q.  Were you finished?
3      A.  What was your question?
4      Q.  No.  I didn't know if you were finished
5  discussing Abbott's involvement.
6      A.  I think I was going to move on to NHIA.
7      Q.  Okay.
8      A.  Okay.  NHIA, at that time, was strictly an
9  individual membership organization for providers, more
10 like a professional society would be, such as a doctor
11 might be a membership of a medical society.  So Abbott
12 itself was not a member of NHIA.  I was, as an
13 individual, a member of NHIA.
14     Q.  Is -- how was NHIA funded?
15     A.  Then?
16     Q.  Yes.
17     A.  Well, I wasn't on the NHIA management team at
18 the time, so the best I can tell you is NHIA had funds
19 coming from membership dues and from advertising in a
20 magazine that they held and from annual conference
21 that was held at the time and also a number of
22 educational events that were held.
23     Q.  Did Abbott pay your dues to NHIA?
24     A.  To the best of my recollection, because of
25 Bruce Rodman's voluntary work for the cause of coding

67  (Pages 527 to 530)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 531

1  standardization, I was comp'd on dues.  But that is
2  the best of my knowledge, so ...
3      Q.  To your knowledge, did Abbott pay membership
4  dues for any other Abbott employees that belonged to
5  NHIA?
6      A.  Not to my knowledge.  Yeah.  And, again,
7  that's the best of my knowledge.  You know, I had a
8  number of comps from them over the years, so if we
9  paid membership dues, I stand corrected.  I really
10  don't know.  They were pretty small in amount.
11      Q.  Did it appear to you that -- that Abbott was,
12  in certain respects, donating your services to NHIA
13  for some of the work you were doing?
14          MR. COLE:  Object to the form.
15      A.  Well, the Home Infusion EDI Coalition
16  actually was not a portion -- was not a unit within
17  NHIA until -- I think it was in 2002 that we did that.
18  And so it was really an independent coalition of -- of
19  home infusion providers of which NHIA was a member.
20          Did Abbott's Home Infusion Services
21  management have an understanding that I was
22  volunteering some services, some of my own time and
23  some of Abbott's time?  Sure.
24      Q.  (BY MS. THOMAS)  To your knowledge, was there
25  anything else by way of services or money that Abbott

Page 532

1  was contributing to NHIA?
2      A.  Well, I -- I believe Abbott and Alternate
3  Sites would have had a booth in the exhibition hall at
4  the annual conference.  So that's not really a
5  contribution, but that is a funding source.  I believe
6  Abbott Alternate Sites' products would have been
7  advertising in the association's magazine.
8      Q.  And what can you tell me about any support
9  from Abbott to NHIA?  I'm sorry.  We just talked about
10  NHIA.  To NAIT?
11      A.  NAIT?  I know there was a membership fee and
12  that Abbott Home Infusion Services paid it, but I
13  didn't manage that.
14      Q.  Do you know if there were contributions above
15  that membership fee?
16      A.  I do not.
17      Q.  Do you have any idea what documents one would
18  look at to ascertain what percentage of Abbott's Home
19  Infusion Services business was reimbursed by Medicare
20  or Medicaid?
21          MR. COLE:  Object to the form.
22      A.  You mean what still might exist somewhere
23  today or what would have been available then?
24      Q.  (BY MS. THOMAS)  What would have been
25  available then.

Page 533

1      A.  A collection of reports coming out of the
2  CHIP system that would have reported by payer category
3  sales, expected revenues, as well as actual
4  collections.  That's the extent of my knowledge.
5      Q.  And with respect to the revenue sharing
6  businesses, what documents would have -- if any, would
7  have reflected the percent of business reimbursed by
8  Medicare or Medicaid?
9      A.  Well, there was a report that I'm now
10  remembering that was created on a spreadsheet using --
11  this is by client, each client, essentially, using
12  data coming from the CHIP system that would break out
13  by class of payor, as well as therapy revenues.  It
14  could have been sales, actually.  I guess it was
15  sales, expected sales.  You know, sales shouldn't
16  ultimately become collections, but it was a sales
17  report that would -- was used monthly that would have
18  showed sales by month, by payer class and by therapy
19  and it would have shown the revenue share.  I do
20  recall those reports.
21      Q.  Now, to your knowledge, were any or all of
22  those reports destroyed when documents were destroyed
23  from the Home Infusion Services business?
24      A.  I have no --
25          MR. COLE:  Object to the form.

Page 534

1      A.  I have no knowledge of what happened to those
2  reports.
3      Q.  (BY MS. THOMAS)  What would be your educated
4  guess as to where one might look for them --
5          MR. COLE:  Object to the form.
6      Q.  (BY MS. THOMAS)  -- at this point in time at
7  Abbott?
8          MR. COLE:  Object to the form.
9          MR. STETLER:  I thought you didn't want
10  him to guess?
11          MS. THOMAS:  I'm sorry?
12          MR. STETLER:  I thought you didn't want
13  him to guess.
14          MS. THOMAS:  No.  He didn't want him to
15  guess.
16          MR. STETLER:  Point well taken.
17          MR. COLE:  Did you get my objection?
18          THE REPORTER:  Yes.
19          MR. COLE:  I said it twice already.
20          THE WITNESS:  So, Counselor, can I
21  answer this question?
22          MR. STETLER:  Of course.  Guess.
23      Q.  (BY MS. THOMAS)  Are you able to -- to give
24  me your most informed opinion?
25      A.  I don't have a -- I don't have a very

Page 535

1 informed opinion.  I think I shouldn't on this one.
2     MR. STETLER:  That's a first.
3     Q.  (BY MS. THOMAS)  But the reports that you
4 refer to would have been connected to the CHIPs
5 system?
6     A.  Well, they either were produced directly by
7 the CHIP system or directly from data from the --
8 coming out of the CHIP system --
9     Q.  And at the time those --
10     A.  -- through manual processes.
11     Q.  And at the time those reports were being
12 generated, what is your understanding of where, if at
13 all, they were maintained?
14     A.  Well, a lot of them were also sent to the
15 clients, but they were maintained in the reimbursement
16 department in filing cabinets.
17     Q.  To your knowledge, are they the same filing
18 cabinets that were emptied out when they brought down
19 the Home Infusion Services business?
20     A.  You know --
21     MR. COLE:  Object to the form.
22     A.  -- that -- that emptying out to the degree
23 that it occurred would have been done by the people,
24 which there were a few, but people in reimbursement at
25 the time and I wasn't involved in that, so I have no

Page 536

1 more knowledge on it.
2     Q.  The filing cabinets that you referred to, do
3 you have any idea whose they were, whose files they
4 would have been maintained in?
5     A.  In the reimbursement department at the time.
6 I know who the final manager was.
7     Q.  And that was?
8     A.  And, actually, she had the title of
9 supervisor, I think.  Janet Jones is her name.
10     MS. THOMAS:  Let's take a short break
11 and we'll decide which of us is going to finish up.
12     MR. STETLER:  All right.
13     THE VIDEOGRAPHER:  We are off the record
14 at 4:33 p.m.
15     (Recess from 4:33 to 4:45)
16     THE VIDEOGRAPHER:  We are back on the
17 record at 4:45 p.m.
18     EXAMINATION (CONTINUED)
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Actually, Mr. Rodman, can I have you turn to
21 1971, please?  Mr. Rodman, what is -- what is Box 24?
22     A.  Box 24 refers, on surface, to the 1500 form,
23 which is where the line item -- line items that are
24 actually being billed to a payer are coded and -- and
25 the charges are put on it.  In this particular case it

Page 537

1 refers to how the user would be manipulating the data
2 within the CHIP system to end up with a printed 1500
3 claim form in Box 24.
4     Q.  Okay.  At the bottom -- at the bottom, is
5 that a computer screen --
6     A.  Yes.
7     Q.  -- of -- you know, copy of the computer
8 screen that is Box 24?
9     A.  A good portion of it, yes.
10     Q.  Okay.  Is there more information that's --
11     A.  There might be.
12     Q.  Okay.  Do you see where it says "Original
13 Charge" and then "Billed Amount"?
14     A.  Yes.
15     Q.  Okay.  Where does that information come from
16 in the CHIP system so that it can be put into Box 24
17 when a HCFA 1500 form is filled out electronically on
18 the CHIP system?
19     A.  Well, there would be some calculations to try
20 and consolidate in the CHIP system charges and billed
21 amounts that were really identified by a whole -- a
22 whole bunch of items, drugs and products, like sets
23 and that sort of thing, into a particular claim line.
24 But conceptually it came from -- the original charge
25 here, actually, was this usual and customary equal

Page 538

1 list price that we've been talking about.
2     Q.  Okay.
3     A.  Okay.  Just rolled up.  And the billed amount
4 was the charges being submitted to the payer on the
5 claim.
6     Q.  Okay.  Now, if it's a HCFA 1500 form, who's
7 the payer?
8     A.  It would be most payers.
9     Q.  Most payers use this form?
10     A.  Yes.
11     Q.  Okay.  If we could go to Page -- well, let me
12 ask you, when you say the list information, so would
13 that come from the item file?
14     A.  As we talked about earlier, yes --
15     Q.  Okay.
16     A.  -- with -- we had that up -- was it upcharge?
17     Q.  Upcharge --
18     A.  Yes.
19     Q.  -- issue, yeah.  That's -- that's what I
20 wanted -- that's what I wanted to ask you.
21     A.  Yeah.
22     Q.  Okay.  Now, if you could turn to Page 1978.
23 If you could look at the bottom.  This is another --
24 what appears to be another visual of a -- of a CHIP
25 computer screen; is that right?

69 (Pages 535 to 538)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 539

1    A.  Yes.
2    Q.  Okay.  And is this another version of the Box
3  24?
4    A.  Yeah, it is.  And, offhand, I don't know the
5  difference between the two, but if we need to -- but,
6  yes, it is.
7    Q.  Okay.
8    A.  It seems to be more detailed.
9    Q.  Okay.  If you could look where it says J
10  3370.  Do you see that?
11    A.  Yes.
12    Q.  What does that mean?
13    A.  That's a drug HCPCS code.
14    Q.  Okay.  Do you know which drug HCPCS code that
15  is?
16    A.  No, I don't right now.
17    Q.  Well, if I tell you that we went over this in
18  your first deposition and we ascertained that 3370 is
19  Vancomycin, will you take my word for it?
20    A.  I will take your word for that.
21    Q.  Okay.  Do you see where it says "Line
22  Charges"?
23    A.  Yes.
24    Q.  Where is that information for the line
25  charges on the -- on this Box 24?  Where -- where does

Page 540

1  that come from?
2    A.  That would be the charges to be submitted to
3  the payer.  It would be coming from -- it depends on
4  the payer, but for a -- for Medicare specifically, as
5  I had said, charges were always submitted to Medicare
6  based on your usual and customary prices.  So these
7  would be coming, again, from that item file, possibly
8  with that upcharge as part of that.
9    Q.  Okay.  At any time, to your knowledge, when
10  you worked in reimbursement or in Home Infusion, when
11  Abbott reimbursement personnel would complete a Box 24
12  or a HCFA -- on a HCFA 1500 form, would they ever
13  evaluate -- when completing the line charge for a J
14  code drug, would they ever evaluate which was lower,
15  the AWP for the drug or the estimated acquisition
16  cost?
17         MR. COLE:  Object to the form.
18    A.  No.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  Why not?
20    A.  There is no reason for them to be even
21  interested in it.
22    Q.  Sir, if you could go to Page 2058.
23         Oh, before we do that, the section that
24  we just went over, Box 24, did you participate in
25  drafting that?

Page 541

1    A.  The document?
2    Q.  Yeah.  Feel free to review it.
3    A.  I don't recall.  It's possible.
4    Q.  It's possible?  Okay.  Take your time.
5    A.  Yeah.  I can tell you it's possible and I
6  don't recall.
7    Q.  Okay.  If you could go to Page 2058.  This is
8  a section of the CHIP Reimbursement User's Guide
9  dealing with Redbook.  Is that correct, sir?
10    A.  Seems to be.
11    Q.  Okay.  Sir, why would reimbursement personnel
12  ever need to -- in the Home Infusion unit ever need to
13  refer to Redbook?
14         MR. COLE:  What page is that, Counsel?
15         MS. ST. PETER-GRIFFITH:  2058.
16         MR. COLE:  Okay.  Thank you.
17    A.  The charges to be submitted to some payers
18  would -- rather than to be the usual and customary
19  pricing, they would be the contracted pricing, which
20  frequently for a drug was based on an AWP.
21    Q.  (BY MS. ST. PETER-GRIFFITH)  Is that for
22  payers who were not Medicare or Medicaid?
23    A.  Yes.
24    Q.  Okay.
25    A.  So that's how the information from the

Page 542

1  Redbook was used to generate that type of pricing and
2  that's why the reimbursement people would have some
3  interest in that.
4    Q.  Would they -- would there be any other reason
5  that you can think of why they would have an interest
6  in Redbook?
7    A.  No.
8    Q.  Moving right along.  I'm done with these
9  documents.  Sir, if I could ask you to put this
10  document in front of you once you've closed up the
11  book.
12         THE WITNESS:  You get this, Mr. Stetler.
13    Q.  (BY MS. ST. PETER-GRIFFITH)  I would like to
14  re-visit an answer that you gave or follow up a
15  question -- follow up an answer that you gave when
16  Ms. Thomas was asking you about this particular
17  document.  You indicated that the per diem reference
18  on these notes was incorrect?
19    A.  Yes.
20    Q.  What's incorrect about it?
21    A.  Medicare did not then and does not now pay
22  home infusion therapy providers on a per diem basis.
23    Q.  How does it pay?
24    A.  It pays on a product basis.  The drugs in the
25  products are coded with HCPCS and that's the way it

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 543

1  pays.
2      Q.   Sir, do you know who was responsible for
3  maintaining the provider numbers for Abbott
4  pharmacies?
5      A.   What does "maintaining" mean?
6      Q.   Meaning making sure that they're current and
7  that everything is copacetic and that the Abbott
8  pharmacy still can use their provider numbers.
9      A.   The reimbursement department took care of
10  that.
11      Q.   How would it take care of it?
12      A.   The reimbursement department -- well, those
13  pharmacies were all in existence when I started,
14  but -- so I can't tell you who actually applied to get
15  those provider numbers.  But if -- if -- if changes
16  had to be made because something that the National
17  Supplier Clearinghouse had on file, that, you know,
18  was something that you had to notify them of a change,
19  the reimbursement department would be responsible for
20  notifying the National Supplier Clearinghouse.
21      Q.   And who would have that responsibility within
22  the reimbursement department?
23      A.   Actually, it would -- it probably have been
24  done by a supervisor like myself when I was involved.
25      Q.   Do you recall ever doing that?

Page 544

1      A.   I recall some hellish instance.
2      Q.   Okay.
3      A.   Yeah.
4      Q.   What happened?
5      A.   It was total bureaucracy and I -- I don't
6  recall why we were doing this, frankly.  Oh, I -- no,
7  I don't know.  It could have been shutting down a
8  pharmacy.  I think that's probably what it was.  I'm
9  thinking.  I'm sorry.
10          What I recall is it was incredible
11  bureaucracy and you had to get a signature way, way,
12  way, way up high in the corporation, which was
13  difficult to do in a big corporation like Abbott.  And
14  you were -- all you were trying to do was to make some
15  fairly simple change to the National Supplier
16  Clearinghouse database.  And, actually, I think it
17  probably was involved with shutting down one of the
18  pharmacies, to let the government know that you were
19  out of business.
20      Q.   Okay.  What was your involvement in shutting
21  down the pharmacies?
22      A.   Handling that.
23      Q.   Okay.  Anything else?
24      A.   No.
25      Q.   Earlier when Ms. Thomas was -- was

Page 545

1  questioning you, you made reference to DOJ AWPs?
2      A.   I did.
3      Q.   Do you recall anything happening at Abbott in
4  response to the DOJ AWPs or when they were published?
5          MR. COLE:  Object -- object to the form.
6      A.   I don't recall anything specific.  I -- I,
7  you know, generally recall there was some concern for
8  some of the reasons that we've talked about.  The
9  Medicaids adopted DOJ's AWPs, then there would be some
10  reduction of reimbursement, but it's just a general
11  concern.
12      Q.   (BY MS. ST. PETER-GRIFFITH)  Do you recall
13  whether senior management required a study among all
14  of the divisions to determine what impact the DOJ AWPs
15  would have on the company?
16          MR. COLE:  Object to the form.
17      A.   I do not recall that.
18      Q.   (BY MS. ST. PETER-GRIFFITH)  Do you recall
19  ever hearing about anything like that?
20      A.   No.
21      Q.   Who would be -- if a division-wide or -- or a
22  cross-divisional study was required by upper
23  management or senior management, who would have the
24  sort of clout within Abbott to do that or to require
25  that?

Page 546

1          MR. COLE:  Object to the form.
2      A.   I don't know.
3      Q.   (BY MS. ST. PETER-GRIFFITH)  Okay.  Sir, did
4  you have any substantive disagreements with Virginia
5  Tobiason concerning the operation of the reimbursement
6  department?
7          MR. COLE:  Object to the form.
8      A.   Well, I believe I told you in the last
9  session that we had somewhat of a rocky relationship.
10  Did I have any major substantive arguments?  No.  I
11  think it was more in terms of personality type of
12  hang-ups.
13      Q.   (BY MS. ST. PETER-GRIFFITH)  Okay.
14      A.   If you refresh me of something, maybe I'll
15  recall something, but I don't really.
16      Q.   Well, this is a little bit beyond -- I'm --
17  I'm following up on your prior testimony.
18      A.   Okay.
19      Q.   I just wanted to find out whether you had any
20  disagreements with Virginia Tobiason concerning how
21  the reimbursement division operated?
22      A.   You know, without saying that I was hand in
23  hand in agreeing with Virginia Tobiason on everything,
24  I would say that I didn't have substantial
25  disagreements, no.

71 (Pages 543 to 546)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 547

1    Q.  You -- in testifying earlier when Ms. Thomas
2  was asking you questions, you indicated that in terms
3  of who was throwing out documents in Home Infusion at
4  the time of its closure, that you thought that it
5  would be whoever was left in -- in the -- in the Home
6  Infusion department; is that accurate?  You said there
7  were very few people?
8    A.  Yes.
9    Q.  Okay.  Who were the people?
10   A.  Well, I had mentioned earlier Janet Jones was
11 the -- she may have been the general manager, if not,
12 it was supervisor of reimbursement, but she was the
13 final person there.  Jim Watson may have been there.
14   Q.  Okay.
15   A.  Karla Kreklow was there.  I was there.  There
16 weren't many of us.
17   Q.  And do you know who actually participated in
18 the -- sort of cleaning of the Home Infusion?
19   A.  Not at this point I don't, other than me, or,
20 essentially, my office and a little bit beyond that, I
21 guess.
22      MS. ST. PETER-GRIFFITH:  I need to
23 enlist Mr. Stetler to get a group of documents, which
24 are BR 160 -- I'm going to need BR 168 and BR 205.
25 And, Dave, this is his calendar.

Page 548

1      MR. STETLER:  That makes it easier.  I
2  think.  Great.
3      MR. COLE:  What are the numbers?
4      MS. ST. PETER-GRIFFITH:  168 and 205.
5      MR. COLE:  I might have them here.
6      MS. ST. PETER-GRIFFITH:  Are they there?
7      MR. COLE:  No.  There's a gap.
8      MS. ST. PETER-GRIFFITH:  Yeah, that's
9  what -- that was my concern.
10      MR. STETLER:  Actually a little broader.
11      MS. ST. PETER-GRIFFITH:  It's a little
12 book.
13      THE WITNESS:  That's it.
14      MR. STETLER:  Broader Number.
15      MS. ST. PETER-GRIFFITH:  I think --
16      MR. STETLER:  155 to something.
17      MS. ST. PETER-GRIFFITH:  Yeah.
18      MR. STETLER:  You may have started later
19 in terms of what you want to use, but that's 155.
20      MS. ST. PETER-GRIFFITH:  Yeah.  And I
21 need -- I need him to turn to Page 168.
22      MR. STETLER:  Okay.
23      THE WITNESS:  Oh, within this?
24      MS. ST. PETER-GRIFFITH:  And, Jeremy, if
25 you need to look, go ahead.

Page 549

1    A.  Okay.  Oops.  I'm there.
2    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
3      MR. SISNEROS:  You're not.
4    Q.  (BY MS. ST. PETER-GRIFFITH)  Hold on.  I'm
5  not.
6    A.  You have that on computer?
7    Q.  Yeah.
8    A.  You scanned all this in?  Oh, my God.
9      MR. STETLER:  I think that's how we
10 produced it, if I'm not mistaken.
11      MS. ST. PETER-GRIFFITH:  No.  You
12 produced hard copies for this because I had to have it
13 scanned.  The other -- the other 38,000 pages were on
14 two DVDs.
15      THE WITNESS:  Let me guess.  You're
16 going to ask me about the HODAPP engagement party.
17      MS. THOMAS:  Okay.  Go for it.
18      MR. COLE:  In Amsterdam?
19      MR. SISNEROS:  Almost there.
20      MS. ST. PETER-GRIFFITH:  Hold on --
21      MR. SISNEROS:  Here we go.
22      MS. ST. PETER-GRIFFITH:  -- Just a
23 second.
24      MR. SISNEROS:  Okay.  This is it.
25    Q.  (BY MS. ST. PETER-GRIFFITH)  Sir, the entry

Page 550

1  at the top of -- or for Monday where it says 12:30, I
2  believe, that's -- is that -- that's all your
3  handwriting, correct?  March 19th.  Do you see that?
4    A.  I see 11:30.
5    Q.  11:30.  Okay.
6    A.  Uh-huh.
7    Q.  Can you just read what that says?
8    A.  11:30 at TAP.  A. Greenthal, Barb Ronner,
9  Ronner, R-o-n-n-e-r.  A phone number, 582-4866.  View
10 training room.
11   Q.  Okay.  Do you have any recollection of having
12 a meeting at 11:30 on March 19th of -- is it 2001 or
13 2000?
14   A.  It is.
15   Q.  2001 at TAP?
16   A.  No.  Well, I have no recollection of this
17 meeting.
18   Q.  Do you have any recollection of why you might
19 have attended or been invited to attend a meeting at
20 TAP?
21   A.  No, not at this point.  And, also, I want to
22 clarify that this actually could have been simply the
23 use of a conference room in TAP as opposed to having
24 been a meeting with TAP people.
25   Q.  Oh, okay.  Well, Mr. Greenthal, is he a TAP

72  (Pages 547 to 550)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 551

1  person?
2      A.  I don't believe he was at the time.  I think
3  he was an HPD person.
4      Q.  And the other person who's referenced, do you
5  know --
6      A.  I don't recall who she was or is.
7      Q.  Okay.  Where was TAP in relation to your
8  office?
9      A.  About five miles north on the toll road.
10     Q.  Okay.  If you could turn to Page 205, please?
11         Oh, do you know whether Mr. Greenthal
12 supervised Ms. Cicerale, Jerrie Cicerale?
13     A.  I do not know.  I do not know that.
14     Q.  Well, I've got one more very quick question
15 for you and we've got five minutes left on the tape.
16 So if I could have you turn to Page 205.
17     A.  Okay.
18     Q.  And, sir, if I could ask you to read the
19 entry concerning a meeting with Mike Sellers?
20     A.  7:30 a.m. to 9:00 a.m., Mike Sellers' office,
21 reimbursement issues.
22     Q.  Okay.  Well, other than telling us that both
23 you and Mr. Sellers get to work really early, what do
24 you recall about this meeting with Mr. Sellers
25 concerning reimbursement issues?

Page 552

1      A.  I have no recollection of that.
2      Q.  Okay.  Do you remember at all discussing any
3  reimbursement issues with Mr. Sellers?
4      A.  Over my whole tenure there?
5      Q.  Yeah.
6      A.  Or at this meeting?
7      Q.  Well, over your tenure there.
8      A.  Of course.
9      Q.  Okay.  How many conversations did you have
10 with Mr. Sellers concerning reimbursement?
11     A.  Well, he was the general manager of the unit
12 for the first approximately seven years that I was
13 there.  So we all reported in to him and he had a high
14 interest in reimbursement because reimbursement is
15 very important to a home infusion therapy business.
16     Q.  Did you discuss reimbursement issues with him
17 frequently?
18     A.  Yeah, fairly frequently, uh-huh.
19     Q.  Was he your supervisor in 2001?
20     A.  By this time I believe that he would have
21 been back in HPD proper as the chief person in
22 Contract Marketing.  Karla Kreklow was also reporting
23 to him at this time as the last director -- general
24 manager, in effect, of Home Infusion Services --
25     Q.  Why --

Page 553

1      A.  -- because this was in 2001.
2      Q.  Do you know why he's discussing reimbursement
3  at that point in time?
4      A.  No.
5      Q.  Did Mister -- do you feel that Mr. Sellers
6  had an understanding, a detailed understanding, of
7  what the reimbursement department in Home Infusion
8  did?
9          MR. COLE:  Object to the form.
10     A.  A detailed understanding.  I think he had a
11 conceptual understanding.
12         MS. ST. PETER-GRIFFITH:  Okay.  I have
13 no further questions at this time.
14         MR. SISNEROS:  No questions.
15         MR. COLE:  How much time do we have
16 left?
17         THE VIDEOGRAPHER:  We have got two
18 minutes left.
19              EXAMINATION
20 BY MR. COLE:
21     Q.  I just have a couple of quick questions for
22 you, Mr. Rodman.
23         Ms. Thomas asked you some questions
24 regarding the price drop in 2001 that Abbott took on
25 certain products.  Do you remember that testimony,

Page 554

1  sir?
2      A.  Was that when it was, in 2001?  If you say
3  so, then okay.
4      Q.  Generally you remember the questions she
5  asked you about --
6      A.  Yes, uh-huh.
7      Q.  -- about the price drop?  And I just want to
8  make sure that the record is clear.  You had no
9  involvement in Abbott's decision to lower prices; is
10 that right?
11     A.  That is correct.
12     Q.  And you never discussed the decision to lower
13 prices with Mike Sellers; is that right?
14         MS. ST. PETER-GRIFFITH:  Object to the
15 form.
16     A.  Not that I can recall.
17     Q.  (BY MR. COLE)  Let me ask you this:  Did you
18 ever discuss Abbott's decision to lower prices with
19 Mike Sellers?
20     A.  Not that I can recall.
21     Q.  And did you ever have any involvement in
22 Abbott's decision to lower the prices on certain
23 products around that time period?
24     A.  In making that decision?
25     Q.  Yes.

73 (Pages 551 to 554)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 555

```
1       A.  No.
2               MR. COLE:  That's all I have.
3               MR. STETLER:  That was seven.
4               MR. COLE:  Questions?
5               MR. STETLER:  Uh-huh.
6               MR. COLE:  But I got it in --
7               MS. THOMAS:  In less than two minutes,
8  hey.
9               MS. ST. PETER-GRIFFITH:  Nothing
10 further.
11              THE VIDEOGRAPHER:  We are off the record
12 at 5:07 p.m. with the conclusion of the deposition of
13 Bruce Rodman.
14
15          (Deposition concluded at 5:07 p.m.)
16          (Signature waived)
17
18
19
20
21
22
23
24
25
```

Page 556

```
1            CHANGES AND SIGNATURE
2  PAGE    LINE      CHANGE      REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 557

```
1       I, BRUCE E. RODMAN, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6               BRUCE E. RODMAN
7
8
9  THE STATE OF              )
10 COUNTY OF                 )
11    Before me,                 , on this day
12 personally appeared BRUCE E. RODMAN, known to me (or
13 proved to me under oath or through
14              ) (description of identity
15 card or other document) to be the person whose name is
16 subscribed to the foregoing instrument and
17 acknowledged to me that they executed the same for the
18 purposes and consideration therein expressed.
19    Given under my hand and seal of office this
20      day of              , 2007.
21
22
23
24               NOTARY PUBLIC IN AND FOR
24               THE STATE OF
25
```

Page 558

```
1  STATE OF TEXAS )
2  COUNTY OF TRAVIS )
3
4
5     I, CYNTHIA VOHLKEN, CSR #1059, do hereby
6  certify that, pursuant to the agreement hereinabove
7  set forth, there came before me on the 11th day of
8  October, 2007, at 9:16 o'clock a.m., in the offices of
9  Stetler & Duffy, LLP, 11 S. La Salle, Suite 1200,
10 Chicago, Illinois, the following named person, to-wit:
11 BRUCE E. RODMAN, who was by me duly sworn to testify
12 to the truth and nothing but the truth of witness'
13 knowledge touching and concerning the matters in
14 controversy in this cause; that such witness was
15 thereupon examined under oath, and the examination
16 transcribed by computer-assisted transcription by me
17 or under my supervision, and that the deposition is a
18 true record of the testimony given by the witness.
19    I further certify that I am neither attorney
20 nor counsel for, nor related to or employed by, any of
21 the parties to the action in which this deposition is
22 taken and, further, that I am not a relative or
23 employee of any attorney or counsel employed by the
24 parties hereto, or financially interested in the
25 action.
```

74 (Pages 555 to 558)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 559

1      That the amount of time used by each party at
2  the deposition is as follows:
3           Ms. Ann St. Peter-Griffith - 04:01
4           Ms. Susan Thomas - 02:03
5           Mr. Jeremy Cole - 00:01
6
7      IN WITNESS WHEREOF I have hereunto set my
8  hand on this 21st day of October, A.D. 2007.
9
10
11
12
           Cynthia Vohlken, Texas CSR 1059
13         Expiration Date:  12/31/2008
           Firm Registration No. 82
14         Fredericks-Carroll Reporting
           7800 Shoal Creek Boulevard
15         Suite 200 W
           Austin, Texas 78757
16         Telephone: (512) 477-9911
                 (800) 234-3376
17         Fax:     (512) 345-1417
18
   JOB NO. 2771
19
20
21
22
23
24
25

Page 561

1      That $      is the deposition officer's
2  charges to the Plaintiffs for preparing the original
3  deposition transcript and any copies of exhibits;
4      That pursuant to information given to the
5  deposition officer at the time said testimony was
6  taken, the following includes counsel for all parties
7  of record:
8         MS. ANN M. ST. PETER-GRIFFITH,
            Attorney for Plaintiff United States of
9           America
         MR. ELISEO SISNEROS, Attorney for
10         Plaintiff State of California
         MS. MARGARET MOORE, Attorney for Plaintiff
11         State of Texas
         MR. JEREMY COLE,
12         Attorney for Defendants Abbott
            Laboratories, Inc. and Hospira, Inc.
13
14     That a copy of this certificate was served on
15  all parties shown herein on October 22, 2007 and filed
16  with the Clerk pursuant to Rule 203.3.
17     I further certify that I am neither counsel
18  for, related to, nor employed by any of the parties or
19  attorneys in the action in which this proceeding was
20  taken, and further that I am not financially or
21  otherwise interested in the outcome of the action.
22
23
24
25

Page 560

1           NO. D-1-GV-04-001286
2  THE STATE OF TEXAS       ) IN THE DISTRICT COURT
                            )
3  ex rel.                  )
   VEN-A-CARE OF THE        )
4   FLORIDA KEYS, INC.,     )
          Plaintiffs,       )
5                           )
   VS.                      ) TRAVIS COUNTY, TEXAS
6                           )
   ABBOTT LABORATORIES INC.,  )
7  ABBOTT LABORATORIES, and   )
   HOSPIRA, INC.            )
8         Defendants.       ) 201ST JUDICIAL DISTRICT
9           REPORTER'S CERTIFICATION
            DEPOSITION OF BRUCE E. RODMAN
10          October 11, 2007
11     I, Cynthia Vohlken, Certified Shorthand
12  Reporter in and for the State of Texas, hereby certify
13  to the following:
14     That the witness, BRUCE E. RODMAN, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18     That examination and signature of the witness
19  to the deposition transcript was waived by the witness
20  and agreement of the parties at the time of the
21  deposition.
22     That the amount of time used by each party at
23  the deposition is as follows:
24          Ms. Ann St. Peter-Griffith - 04:01
            Ms. Susan Thomas - 02:03
25          Mr. Jeremy Cole - 00:01

Page 562

1      Certified to me this 22nd day of October,
2  2007.
3
4
           CYNTHIA VOHLKEN, TX CSR 1059
5          Expiration Date:  12/31/2008
           Firm Registration No. 82
6          Fredericks-Carroll Reporting
           7800 Shoal Creek Boulevard
7          Suite 200 W
           Austin, Texas 78757
8          Telephone: (512) 477-9911
                 (800) 234-3376
9          Fax:     (512) 345-1417
10
   Job No. 2771
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

75  (Pages 559 to 562)