# EXHIBIT 118

EXHIBIT A
[Page 2 of 2]

NOTE

(1) In the event that (a) there shall occur a change in the methodology employed by the drug data company utilized for the purposes of determining or publishing the AWP, or (b) there shall occur a change in any Health and Human Services, Medicare and/or Medicaid laws, rules, regulations or payment policies, or any rules or policies of a Medicare or Medicaid intermediary, or any other federal, state or local law, rule, regulation, policy or any interpretation thereof, or (c) HOSPICE shall commence using a source of AWP which is not based on information obtained directly from pharmaceutical manufacturers in the manner which has been done historically prior to the execution of this Agreement, and any such event results in an overall upward or downward change in pricing of five percent (5%) or more for any drug dispensed under this Agreement, the parties to this Agreement shall negotiate in good faith to amend this Agreement so as to preserve the economic expectations of the parties at the time they entered into this Agreement. The parties shall meet and confer within ten (10) days of either party notifying the other party that a change of the type described above has occurred to negotiate such amendment. There shall be no change in AWP pricing during the negotiation period unless and until both parties reach an agreement. If there is an agreement between the parties on how to preserve the economic expectations of the notifying party, the effective date of the resulting amendment shall be the first day of the second calendar month commencing after the date of the amendment. Should the parties not reach agreement on how to preserve the economic expectations of the notifying party within thirty (30) days of the notification, the parties agree to waive the right to implement any further arbitration or dispute resolution process set forth in this Agreement, and the remedy shall be the termination of the Agreement upon sixty (60) days written notice by one party to the other party. Should the termination provision be invoked, there shall be no change in AWP pricing through the sixty (60) day termination period."

**[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]**

Hospice and Palliative Care of Connecticut/lag/A1891

BR 02696

HIGHLY CONFIDENTIAL

# EXHIBIT 118 CONTINUED

# ABBOTT

Abbott Laboratories
One Abbott Park Road
Abbott Park, Illinois 60064-3500

April 2, 1990

Robert W. Mulcahey
Vice President for
  Corporate Affairs
Ingalls Health System
One Ingalls Drive
Harvey, Illinois  60426

Dear Mr. Mulcahey:

Several weeks ago we discussed by phone the proposed joint home infusion therapy agreement between Ingalls and Abbott. Previous to that, Kathy Riddle of Abbott HomeCare mentioned to you a legal opinion we received from Gardner, Carton and Douglas regarding Medicare fraud and abuse.

As I suspected, the opinion she referred to dealt with a number of aspects of the fraud and abuse statute and was specific to other Abbott customers and contracts. Therefore, we don't think it is appropriate to release the opinion to Ingalls. However, Ms. Riddle asked that I provide to you the following quote from the Gardner, Carton memorandum regarding proposed contract relationships.

> "It should be noted that contracts in which the provider, not Abbott, accepts assignment and then pays Abbott for goods and services according to a fixed fee schedule will be unlikely to be found to violate the Medicare anti-fraud and abuse laws. This statement assumes that Abbott charges each provider an amount which reflects <u>fair market value</u> for the goods and services rendered.
> It is important to recall that any unreasonbly deep discount offered by Abbott would indicate a lack of arm's-length negotiation and could cause further scrutiny of the arrangement."

You may find the above helpful in evaluating the proposed contract between Ingalls and Abbott. If you wish to discuss this matter further, feel free to call at (708) 937-5202.

Very truly yours,

James L. Albrecht
Senior Attorney

JLA/ksa
cc:  K. Riddle

(01-3948y-43)



Fishman
DEPOSITION
EXHIBIT
13
3-20-08  RG

Confidential

ABT-DOJ 316016
ABT278-6013 FL

# EXHIBIT 118 CONTINUED

## Abbott's Home Infusion Services Program and Medicare Law

Abbott's Home Infusion Services program is capable of providing a broad range of services and products in support of a client's home infusion therapy operation. Abbott has invested significant funds and resources to develop a comprehensive program we believe to be of superior quality and competitively priced in the market.

Abbott is compensated for the services and products it provides through payment of a percentage of collections made by the client. The percentage is negotiated through arms' length discussions and is based upon the various services and products Abbott may be asked to provide the client.

In a few instances, Abbott has been asked whether this percentage-of-collections approach is consistent with the Medicare laws and safe harbors. Abbott believes this percentage approach is sound under the law. Abbott has also reviewed this approach with outside legal counsel in Washington, D.C., who concurs with Abbott's view. Medicare safe harbors do not provide automatic protections for all percentage arrangements, nor do they declare that percentage arrangements are improper[1]. Instead, the safe harbors provide that, even though the large majority of percentage arrangements may represent legitimate compensation to a supplier, a percentage arrangement is inappropriate if it is intended as a disguise for the payment for patient referrals.

The percentage compensation negotiated by Abbott is wholly attributable to the delivery of services and products to the client, and the percentage-of-collections retained by the client is wholly attributable to the client's responsibilities under its home infusion therapy operation. No part of the percentage retained by the client is intended as a payment or reward for any business referral. Again, the percentage rate charged by Abbott is a competitive one, falling within a reasonable commercial range, but it does not take into account any value of any business referral. There is no requirement that any level of Abbott products be used in the client's operation.

Abbott has used a percentage-of-collections approach in our home infusion services contracts for a number of reasons. First, in an uncertain environment of collection of payments, this approach fosters a sense of partnership and commitment between companies through a sharing of risk. It lets the prospective client know Abbott is prepared to accept a portion of the risk of non-payment. Second, Abbott invests significant funds and efforts in establishing a comprehensive program offered to clients. The products and services are combined in an aggregate percentage charge by therapy because (1) the broader program investments (e.g., facility equipment, inventory) and services (e.g., facility design services) provided initially by Abbott represent substantial expenditures some clients would find very difficult to manage if they had to bear them up-front, and (2) the case-by-case mix of products and services makes establishing separate charges administratively difficult (and more expensive!).[2]

While not a legal opinion for your organization, we hope this explanation of Abbott's intent and view is helpful.

---

[1] Notably, the Internal Revenue Service has issued guidelines expressly providing a safe harbor under the 501(c)(3) tax-exempt entity laws for percentage arrangements between non-profit hospitals and for-profit physician groups. See I.R.S. Rev. Proc. 93-19.

[2] Medicare-covered patients generally constitute less than fifteen percent (15%) of the patients on home infusion therapy. The structure of Abbott's proposal is not driven by Medicare business. The Medicare portion is incidental to the home infusion business and plays no real part in Abbott's desire to use a percentage-of-collections arrangement.

5/22/98



Fishman DEPOSITION EXHIBIT 14 3-20-08

Confidential         ABT-DOJ 351271
                     ABT282-2828     FL

# FAX

Northwestern Memorial Hospital
Office of the General Counsel
240 East Ontario St. - Suite 500
Chicago, IL 60611

Date: 6/11/98
Number of pages including cover sheet: 8

FAX 312-926-2484

To: Kana Kreklow

From: Jaclue Darrae

Phone:
Fax Phone:
CC: Adrienne Casanova
    via e-mail

Phone: 312/926-2484
Fax Phone: 312/926-0077

REMARKS: ☐ Urgent  ☒ For your review  ☐ Reply ASAP  ☐ Please comment

Sorry for delay. Received at 10:40 this am.

JMD

*** CONFIDENTIALITY NOTE ***

The pages accompanying this facsimile transmission contain information which may be confidential or privileged. The information is intended to be for the use of the individual or entity named in this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately.

Confidential

ABT-DOJ 351269
ABT282-2826    FL

*7/55/97*   *Matt Hanley*   *Patty Dittman*

~~[redacted]~~ - Abbott IV Requirements Agreement

5. **Prices.** Prices for the Products for Northwest Community are contained in the attached price list (see Exhibit A).

6. **Price Adjustments.** Prices in this agreement will be held firm through December 31, 2000. Prices will then increase by the lesser of CPI-U or three percent (3.0%). Should Northwest Community commit to purchase Abbott's Electronic Drug Delivery Infusion Devices by December 31, 1997, prices will be held firm for the entire contract term.

7. **Participation Dividend.** Customer shall be entitled to earn an annual contract dividend of up to a maximum of eight and a half (8.5%) on purchases of Abbott I.V. Solutions and Equipment products. (Exhibit A)

   The annual contract dividend will be paid to Northwest Community in the form of a credit memorandum or check within ninety (90) days after the contract anniversary date of each contract year.

8. **Total Delivered Cost Dividend.** Abbott will provide an annual dividend of twelve (12.0%) percent on purchases of Abbott I.V. Solutions and Equipment products (Exhibit A).

   The dividend will be paid in the form of credit memorandum or check within ninety (90) days after the contract anniversary date of each contract year.

9. **New Product Implementation Incentive.** Abbott will increase the Total Delivered Cost Dividend (as referenced above) by three (3.0%) percent to a total of fifteen percent (15.0%) based upon Northwest Community converting its total requirements of Abbott's LifeShield® Needleless System or Gravity Administration Sets and Electronic Drug Delivery Systems.

   The only exception to the above needleless requirement will be Northwest Community's endoscopy area.

   The dividend will be paid in the form of credit memorandum or check within ninety (90) days after the contract anniversary date of each contract year.

10. **Signing Bonus.** Abbott will pay Northwest Community seventeen thousand, six hundred dollars ($17,600) upon Abbott's and Northwest Community's signed acceptance of this agreement.

11. **Conversion Allowance.** Abbott will pay Northwest Community one hundred dollars ($100.00) per Census Bed upon conversion to the Products listed above.

12. **Risk Sharing Program.** Northwest Community may opt to participate in Abbott's Hospital Products Division Risk-Sharing Program (Adjusted Patient Day Model or other future models) at any time during the term of this contract.

13. **VHA Opportunity Program Eligibility.** Northwest Community, VHA, and Abbott will consider Northwest Community eligible for the VHA Opportunity Program, based on the commitment to use the above products, including Abbott's Electronic Drug Delivery Infusion Devices.

   If the VHA Opportunity Program with Abbott is not extended through the term of the Northwest Community-Abbott IV Solutions and Equipment Agreement, then Abbott will guaran-

Confidential

ABT-DOJ 351270
ABT282-2827   FL

# EXHIBIT 118 CONTINUED

# ABBOTT

Office of
General Counsel

Abbott Laboratories
One Abbott Park Road
Abbott Park, Illinois 60064-3500
Telecopy No.: (708) 937-9556

## FACSIMILE TELECOPY COVER SHEET

DATE: 5/15

TO: Kathy Biddle

COMPANY: Abbott HomeCare

FROM: Dennis Albrecht

TOTAL NUMBER OF PAGES (INCLUDING COVER SHEET): 2

PHONE NUMBER OF TELECOPY MACHINE: -10484

** IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE CALL AS SOON AS POSSIBLE --

(708) 937-5202
(Kim Andersen)

(3948y-24)



Fishman
DEPOSITION
EXHIBIT
15
3-20-08  PG

Confidential

ABT-DOJ 335485
ABT281-1490 FL

CONTRACT STRUCTURE OPTIONS

Health Care Services of New England
Braintree, Massachusettes

FEE-FOR-SERVICE

o   Abbott accepts Assignment of Benefits on patients.

o   Abbott provides all Reimbursement screening, billing and collection services.

o   Customer may elect to provide some or all of the following services to their patients:
    - Patient training
    - In-home follow-up nursing
    - Product compounding according to patient prescriptions
    - Delivery of compounded products and supplies to patient's home
    - Home inventory management of patient's supplies
    - Clinical Management services

o   Abbott provides back-up to customer on services listed above, on an as needed basis.

o   Abbott provides the products, supplies and equipment utilized by the Homecare patient.

o   Abbott pays customer for services provided as illustrated in Exhibit A.

o   Health Care Services of New England assumes responsibility for marketing and managing contracts to group member hospitals.

o   Abbott pays Health Care Services of New England a management fee of two percent (2%) of net revenue collected.

o   Health Care Services of New England will comply with the disclosure requirements of the Medicaid-Medicare Antifraud and Abuse Amendments of 1977, As Amended. This disclosure shall include, among other things, reporting all management fees paid to Health Care Services of New England.

o   Abbott and Health Care Services of New England agree to mutually review and approve all contract proposals between Health Care Services of New England and Member Hospitals, prior to contract submission.

o   Abbott reserves the right to not accept a patient based on the patient's reimbursement profile for the stated diagnosis and intended treatment.

1081D/1

Confidential

ABT-DOJ 335486
ABT281-1491 F

HEALTH CARE SERVICES OF NEW ENGLAND
Braintree, Massachusettes

Exhibit A

SCHEDULE OF FEE

FEE-FOR-SERVICE CONTRACT OPTION

| SERVICES | FEES PAID TO ACCOUNT FOR SERVICES PERFORMED[1]: | | | |
|---|---|---|---|---|
| | TPN | TEN | ANTI | CHEMO |
| Patient Training | $500.00[2]/patient | $200.00/patient | $100.00/patient | $150.00/patient |
| In-home Follow-up Nursing[4] | $ 3.50/day | $ 2.50/day | $ 20.00/day[3] | $ 2.50/day |
| Clinical Management[5] | $ 3.75/day | $ 2.00/day | $ 3.00/day | $ 2.50/day |
| Compounding[6] | $ 30.00[7] | N/A | $ 5.00/dose | $ 8.00/dose |
| Delivery/Inventory Management | $ 7.00/day | $ 1.75/day | $ 7.00/day | $ 7.00/day |

1. "Day" refers to the number of days a patient actually administers the therapy.

2. Training fee for pre-mix patient; self-mix would be $750.

3. Nursing fee for peripheral vein only, central line fee would be $8.00/day.

4. If the customer cannot bill third party payors directly, Abbott would reimburse the customer while in-home nursing follow-up continues to be required. Appropriate documentation of patient contact must be provided.

5. Includes review of pertinent clinical data and adjustment of therapy as needed. Abbott would reimburse the customer as long as these services are required.

6. In assuming responsibility for Compounding, the Customer must also provide ancillary supplies and perform Delivery and Inventory Management.

7. Compounding fee for up to 1 liter; up to 2 liters would be $35.00; compounding fee for over 2 liters would be $40.00.

Confidential

ABT-DOJ 335487
ABT281-1492 L

# EXHIBIT 118 CONTINUED

PERSONAL AND CONFIDENTIAL

TO: DAVE BRINCKS

FROM: JEFF SHAW

SUBJECT: LEAHY CLINIC

On Tuesday, July 27, 1993 at approximately 11:45 AM I received a telephone call from Carol McCarthy regarding a request from a client (Leahy Clinic). The request was for a memorandum from an Abbott attorney stating that in his/her judgment, Abbott's revenue share structure for home infusion services agreements was not in violation of Medicare safe harbor regulations (i.e. that these arrangements were legal). I expressed to Carol my personal reservations regarding this request, but agreed to make an inquiry to Brian Taylor.

Brian expressed his desire not to provide such written judgments to non-Abbott parties for the following reasons:

    1. Abbott attorneys act as counsel for Abbott not our potential clients or other third parties.

    2. Clients should obtain legal opinions/advise from their own legal counsels. As Abbott could become a party to negotiations with Leahy Clinic, such attempts to provide legal advise could clearly give the appearance of a conflict of interest.

    3. Such written judgments could be construed by outside (governmental) bodies as a marketing/sales tool, thus discouraging prospective clients from performing their own due diligence with regard to the legality of contracts and business arrangements (i.e. a "red flag" regarding these arrangements).

Brian said that Carol could tell the client that Abbott legal counsel is comfortable with the legality of these relationships; and that we currently a party to several of them. However it is best for all involved to consult with their own attorneys on these types of issues. I conveyed these comments to Carol.

Carol then expressed her frustration with this response and "offered" to provide the client with a written memorandum herself. I conveyed my strong recommendation that she not do that. After repeating her suggestion, I again counseled strongly against it. The situation then seemed to cool down a bit.

I have since left Carol a Voice Com stating that you may be able to provide her with a lead which may help to satisfy her clients request, while preserving Brian's wishes that we not engage in this practice.



Jeff,
Good job on this.
Keep me posted on status, and/or if
you feel I should get involved.



Fishman
DEPOSITION
EXHIBIT
16
3-20-09   RG

Highly Confidential                                                     ABT-DOJ 307075
                                                                           ABT274-4555      FL

# EXHIBIT 118 CONTINUED



**ABBOTT**

*Home Infusion Services*

One Abbott Park Road
Abbott Park, IL  60064

May 19, 1993

Mr. Gerald M. Clouse, R.Ph., M.A.
Executive Director
Kettering Health Care, Inc.
1259 E. Dorothy Lane
Kettering, OH  45419

Dear Mr. Clouse:

We are writing to you to express, first and foremost, Abbott's ongoing commitment to support Midwest Home Infusion Services. We believe you have been pleased with the quality of support we have provided in the past and which we continue to provide today. In looking to the future, however, we are increasingly concerned about the difficulties we have encountered in working to revise our agreement with Midwest.

As you'll recall, Midwest requested that our current agreement be revised due to your legal counsel's concerns surrounding a "percentage of collections" agreement and its possible implications under the safe harbor rules. Although Abbott was very comfortable with the structure of a "percentage of collections" agreement, Abbott nonetheless was willing to modify the agreement to follow a "fee-for-service" approach as requested by Midwest's counsel. Midwest's counsel drafted and sent us a proposed "fee-for-service" agreement. We reviewed and responded in line with the parameters of that proposal. We are now informed, however, that the proposed "fee-for-service" structure is no longer acceptable to your outside counsel.

I asked Brian Taylor, from Abbott's legal department, to give me some background on both "percentage of collections" and "fee-for-service" agreements. A copy of his memo is enclosed. You will see that Abbott Home Infusion Services has signed a number of agreements with clients across the country. The forms of these agreements, which include both structures, have been subjected to legal review by both Abbott's counsel and client's counsel.



Fishman
**DEPOSITION EXHIBIT**
18
3-20-08  RG

Mr. Gerald M. Clouse, R.Ph., M.A.
May 19, 1993
Page 2.

Abbott has attempted in good faith to address the concerns put forth to us by your outside counsel. Despite our efforts and the fact that there has been no successful legal challenge to this type of agreement, we are potentially being forced to withdraw valuable services from Midwest's program. We do not desire this result, nor do we believe that it is in your best interests.

We remain optimistic that agreement and compromise will be reached. However, in proceeding with our discussions, it may be helpful to remember some of the special services Abbott provides to Midwest - services which Midwest would have to assume or replace if our relationship were ever to terminate. As examples, Abbott currently provides all of your non-Abbott products, all reimbursement services, access to our proprietary home infusion software system, computer hardware to access the system, product support, and product/nursing in-services upon request. Although Abbott could partially support midwest with a Product Sales Agreement should Midwest take over those special activities, the terms of a Product Sales Agreement are typically more restrictive (e.g., 30-day payment terms and no nursing/therapy in-service).

Mr. Clouse, our relationship with you, your organization, and program has developed significantly over the years through the hard work of both parties. We are and will continue to work very hard to reach an agreement that maintains a solid relationship between Midwest Home Infusion Services and Abbott Home Infusion Services. I hope that we can resolve this matter quickly and move forward with our business.

Thank you for your time and attention to this situation. If you have any questions, please do not hesitate to contact me at (708) 937-1774.

Sincerely,

*[signature]*

Christopher W. Herden
Contract Marketing Analyst


cc: Barry Stegall
bCC: Tom Olinger
     Craig George
Enc. David Brincks
     Bill Purp

Herden/atrdoc

Confidential                                                                 ABT-DOJ 340985
                                                                             ABT283-0540     L

# EXHIBIT 118 CONTINUED

 **ABBOTT**

INTEROFFICE CORRESPONDENCE

FROM:  OFFICE OF GENERAL COUNSEL

DEPT. NO. 322, BLDG. AP6D, EXT. 75202

TO:  C. Herden

DATE: May 18, 1993

RE:  Midwest Home Infusion Services

You asked for my thoughts concerning Kettering/Midwest's request for revision of the Home Infusion Services Agreement. As you know, the Agreement is currently structured for Abbott to provide a range of products and services in support of Midwest's home care program, in return for which Midwest pays us a percentage of collections. Midwest requested the Agreement be revised to move away from a percentage of collections arrangement. Despite our position that a percentage arrangement is both legally sound and more sensible from a business standpoint, we stated our willingness to convert to a fee-for-service arrangement. Midwest sent us a proposed fee-for-service agreement, and we made a few changes we felt were necessary. Now, however, I understand Midwest wishes to back away from its own fee-for-service approach. This has caused some confusion and frustration.

As background, Abbott has used a percentage of collections approach in a number of contracts and is comfortable with the legality of this structure. After the Medicare Safe Harbors issued in 1991, we had a more complex percentage of collections contract reviewed by Washington, D.C., counsel specializing in the Medicare area. Indeed, two partners who were former senior staff of the Office of Inspector General reviewed the contract. They saw no problem with the transaction under the Medicare law. They pointed out the Safe Harbors do not restrict percentage arrangements - the Safe Harbors just do not provide a universal safe harbor for all of them. The Safe Harbors recognize percentage arrangements have a place in health care business but, from a concern that a percentage arrangement could be devised to mask referral payments, the Safe Harbors require more than a superficial review to substantiate the legitimacy of the percentage figure. The attorneys asked questions concerning the elements that went into the percentage figures and were satisfied with the answers and the rationale for this approach.[1]

Abbott has used a percentage of collections approach in our home infusion contracts for a number of reasons. First, in an uncertain environment of collection of payments, this approach fosters a sense of partnership and commitment between companies through a sharing of risk. It lets the other company know Abbott is prepared to accept a portion of the risk of non-payment. Second, Abbott invests significant funds and efforts in establishing a comprehensive program offered in its entirety to customers, a program which we believe is of superior quality and competitively priced in the market. We avoid

---

[1]  I note, incidentally, that the Internal Revenue Service recently issued guidelines expressly providing a safe harbor under the 501(c)(3) tax-exempt entity laws for percentage arrangements between non-profit hospitals and for-profit physician groups. While the IRS is not the OIG, the IRS has not been known to be one of the more liberal agencies in Washington.

Confidential


Fishman
DEPOSITION
EXHIBIT
19
03-20-08

ABT-DOJ 340986
ABT283-0541          F

Interoffice Correspondence
May 18, 1993
Page 2

breaking out separate charges because (1) the broader program investments (e.g., facility equipment) and services (e.g., facility design services) provided initially by Abbott represent substantial expenditures some customers would find very difficult to manage if they had to bear them up-front, and (2) the case-by-case mix of products and services makes establishing separate charges administratively difficult (and more expensive!).[2]

While Abbott prefers the percentage of collections approach, we have used and are willing to use a fee-for-service approach. In structuring our fees for products and services, however, we still avoid breaking out separate charges for the same reasons described in the preceding paragraph. Nonetheless, some clients feel this fee-for-service approach represents a more predictable cost structure (although it does eliminate risk sharing).

Finally, if there be any concern of ensuring compliance with the Medicare laws from a cost reporting standpoint, we are always willing to assist our clients in providing any information they need to prepare accurate cost reports.

I hope this background is helpful. Please call me if you have any questions.

Brian S. Taylor
Senior Attorney

BST:ka

---

[2] Medicare-covered patients constitute less than fifteen percent (15%) of the patients on home infusion therapy. The structure of Abbott's proposal is not driven by Medicare business. The Medicare portion is incidental to the home infusion business and plays no real part in Abbott's desire to use a percentage of collections or fee for service arrangement.

Confidential
ABT-DOJ 340987
ABT283-0542        L