# EXHIBIT 118
# CONTINUED

MAR 2 0 1997

Cedars-Sinai Medical Center

**Home Infusion Product Agreement**

1/6/97

Confidential

ABT-DOJ 349782
ABT282-1339        F

## HOME INFUSION PRODUCT & SERVICE AGREEMENT

This Agreement ("Agreement") is made between Cedars-Sinai Medical Center ("CSMC"), a California nonprofit public benefit corporation, and Abbott Laboratories ("Abbott"), an Illinois corporation, as of the date executed by duly authorized representatives of both parties.


**WITNESSETH**


WHEREAS, CSMC owns and operates a general acute care hospital and related medical center facilities, including a home infusion program, principally located at 8700 Beverly Boulevard, Los Angeles, California, 90048; and

WHEREAS, Abbott owns and operates a health care company which develops and supplies a broad range of health care services and products, with a place of business located at Two Hundred Abbott Park Road, Abbott Park, Illinois, 60064-3537, including a home infusion services business unit doing business as Abbott Home Infusion Services; and

WHEREAS, CSMC desires to arrange for the provision of supplies and products for patients in its Program and Abbott desires to provide such services and supplies through the Abbott Home Infusion Services in accordance with the terms and conditions set forth below;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties entered into this Agreement on the following terms and conditions:

1

Confidential

## ARTICLE 1: DEFINITIONS

A.  **"Patient"** shall mean any person requiring Home Infusion Therapy.
B.  **"Home Infusion Therapy"** shall refer to the treatment of a Patient on the prescription therapy of Total Parenteral Nutrition, Total Enteral Nutrition, Antibiotic Therapy, Pain Management, or other forms of infusion therapy which are administered via intravenous, intramuscular or other methods of administration within a home, nursing home, infusion center, or other alternate site (outside of the traditional hospital setting) location.
C.  **"Home Infusion Therapy Operation"** shall refer to the conduct of a business which provides the products and services necessary or useful to support the treatment of Patients on Home Infusion Therapy.

## ARTICLE 2: HOME INFUSION THERAPY OPERATION

CSMC has established a home infusion operation capable of treating patients in the home and other alternate site settings. CSMC's activities shall be referred to in this Agreement as the CSMC Home Infusion Therapy Operation. CSMC shall service Home Infusion Therapy Patients consistent with good medical practice and the rights of Patients to select the medical services and providers they desire.

## ARTICLE 3: PROGRAM TRANSITION PLAN

Abbott, as a sub-contractor, has provided pharmacy and other products and services to CSMC Patients under an agreement, dated April 28, 1992, as amended. As of the effective date of this new Agreement CSMC shall provide some of the services to Patients that had previously been provided by Abbott. The parties agree to transition patients to CSMC pharmacy services in a manner that shall not disrupt service to any patient. Effective January 1, 1997 CSMC shall provide pharmacy compounding services to selected new patients starting on service and selected patient re-starts. The parties shall agree to a transition plan on all other patients. In the event CSMC requests Abbott to provide pharmacy services to CSMC patients after March 31, 1997 the parties agree to utilize good faith efforts to re-negotiate the Agreement dated April 28, 1992. In the event the re-negotiation has not been successfully concluded by May 1, 1997, Abbott shall implement a 40% price increase to the contract dated April 28, 1992, as amended, effective May 1, 1997.

2

Confidential

ABT-DOJ 349784
ABT282-1341

## ARTICLE 4: PRODUCTS

**A.    PURCHASE OF PRODUCTS**

CSMC agrees to purchase it's total requirements of Abbott manufactured Home Infusion Therapy products from Abbott in each contract year providing that the pricing on Abbott products is consistent with the alternate site market pricing. The products to be provided by Abbott include:

1. Abbott Products.

    a. Abbott shall make available to CSMC Abbott manufactured products and equipment listed in Abbott's Hospital Products Division and Ross Division product catalogues and/or supplements as of April 3, 1996, excluding "Schedule II" narcotics, Nutrimix Compounders, and SmithKline Beecham Antibiotics, for use in its Home Infusion Therapy Operation.

    b. CSMC, agrees to compensate Abbott for the provision of products described above (Article 3. A. 1) at prices equal to those detailed in fully executed VHA Alternate Site Agreement(s).

    c. In the event the pricing on Abbott manufactured product is not price competitive, CSMC shall notify Abbott in writing of the product/price in question and Abbott shall have the opportunity to adjust the prices to be paid by CSMC. If within twenty-one (21) days Abbott is not able to maintain competitive prices on a product, CSMC shall have the right to purchase such product from another vendor.

    d. In the event a product is ordered, for which there is no contract price established, Abbott agrees to: i) bill CSMC at prices equal to the prices extended to other Abbott customers for like volumes, and ii) provide CSMC with pricing within twenty-four hours of CSMC's request.

2. Electronic Drug Delivery Devices.

    a. Abbott agrees to lease to CSMC, on as needed basis, the Drug Delivery Devices detailed in Schedule I, attached hereto.

    b. CSMC agrees to reimburse Abbott for the use of these devices at the rental rates detailed in Schedule I.

    c. Abbott agrees that thirty-five (35%) percent of the rental payments made to Abbott on an individual device shall be applied towards the acquisition cost of that device in the event the device is lost.

    d. Abbott agrees that the monthly rental rates quoted herein shall include the cost for repair of such devices. Abbott payment of repair expenses is subject to: i) Abbott's approval of the vendor providing such services, and ii) the provision of invoices for these services. Such invoices shall detail the repair charges and the serial number of the each device serviced. CSMC shall be responsible for routine recertification of these devices.

Confidential

ABT-DOJ 349785
ABT282-1342

3. Product Orders/Delivery.

Orders for the products included in this Agreement should be placed via Abbott Alternate Site Logistics at 1-800-752-4926. Orders shall be for full cases of Abbott-manufactured products. Abbott and CSMC shall operate in good faith to establish mutually agreed upon protocols to insure timely deliveries which reflect the business needs of both parties. In the event premium routing is requested, Abbott shall have the option to bill such additional costs to CSMC.

4. Return Goods Policy.

Abbott products in full, unopened, original shipping cases may be returned, at Abbott's expense for shipping, for 100% credit, provided such items have six (6) months or more of dating when received by Abbott. All products shipped by Abbott in error or any item which has less than six months dating upon receipt by CSMC shall also be eligible for 100% credit. All other items returned with less than six (6) months dating shall not be eligible for return.

**B. PRODUCT WARRANTIES**

1. Abbott agrees to replace and/or repair Abbott-manufactured products that are defective in material, workmanship, manufacturing and/or design at no cost to CSMC. This provision states the full extent of Abbott's warranty for products it manufacturers.

2. Abbott represents and warrants that products it manufactures, when used in accordance with the directions on the labeling, are fit for the purposes and indications described in the labeling. Unless the Home Infusion Therapy product is used in accordance with its instructions, these warranties are void and of no effect. Abbott disclaims all other expressed or implied warranties.

## ARTICLE 5: SERVICES

**A. REIMBURSEMENT SERVICES**

1. CSMC Reimbursement Services.

CSMC shall perform reimbursement services which shall include but not be limited to: verification of the reimbursement status of all Patients relative to the stated diagnosis and intended treatment; obtaining Assignment of Benefits and Certificate of Need; preparing and submitting all primary and coinsurance claims; collection services; and all financial reporting.

2. Abbott Reimbursement Services.

Abbott, under the agreement referenced in section Article 3 herein, will have provided reimbursement services, as described in Article 5 A. 1, above, for CSMC Patients until the transition to this new Agreement. An accounts receivable ("A/R") balance will exist on the billings associated with Abbott reimbursement services. The parties agree that Abbott shall continue to pursue collections on the outstanding accounts receivable ("A/R") balance on patient care services provided up to and including December 31, 1996, until

4

ABT-DOJ 349786
ABT282-1343

April 30, 1997 or until the A/R balance equals one hundred thousand ($100,000) dollars, excluding collection agency accounts, whichever occurs first. While Abbott continues to pursue collections on the outstanding A/R, CSMC shall compensate Abbott for the reimbursement services provided at three and one-half (3.5%) per-cent of program collections.

Effective April 30, 1997 or when the A/R balance equals one hundred thousand ($100,000) dollars, excluding collection agency accounts, whichever occurs first, CSMC shall assume responsibility for collections on any remaining A/R balance. Abbott shall be compensated for the work previously completed on this A/R through the payment to Abbott of three (3.0%) per cent of the remaining A/R. Payment terms shall be net thirty (30) days. Abbott reserves the right to assess CSMC a late payment fee of one and one-half percent (1.5 %) per month on the full amount due, on overdue amounts.

**B.    ABBOTT HOME INFUSION NETWORK ACTIVITIES**

1. Abbott shall provide CSMC access to the Annual Executive Conference on Home Infusion. CSMC shall be responsible for associated travel and lodging expenses.

2. Abbott shall provide CSMC with copies of it's quarterly newsletter entitled "Home Infusion Topics".

3. Abbott shall conduct and provide CSMC access to any sales training sessions (i.e. Socratic Selling, etc.) made available to the Abbott Home Infusion Network. CSMC shall be responsible for any tuition, associated travel and lodging expenses.

4. Abbott shall support access to other Abbott Home Infusion Network clients for purposes of market research, clinical evaluations, or other information where CSMC may benefit from such information.

5. Abbott shall also provide CSMC with the option to access any Non-Abbott product buying group contracts for the acquisition of products not manufactured by Abbott, which Abbott may elect to make available to its Home Infusion network clients.

**C.    CONSULTING/TRAINING SERVICES**

CSMC shall have access to the consulting and training programs developed by Abbott Home Infusion Services, under the terms and conditions detailed in Schedule II, attached hereto.

## ARTICLE 6: COMPENSATION

**A.    ABBOTT PRODUCT**

In consideration of Abbott's obligations under this Agreement, Abbott shall invoice CSMC monthly, with payment terms of ninety (90) days, for the product shipped to CSMC in the prior month. The inventory value of the products shipped to CSMC shall be determined by calculating the number of units shipped in the prior month times the contract rate, as detailed in Article 4: Products, Section A 1. Abbott reserves the right to assess CSMC a late payment fee of one and one-

5

Confidential

half percent (1.5 %) per month on the full amount due, on overdue amounts.

**B.    ELECTRONIC DRUG DELIVERY DEVICES**

CSMC shall reimburse Abbott for the electronic drug delivery devices provided by Abbott as detailed in Article 4: Products; Section 2 at the monthly rental rates detailed in Schedule I. Abbott shall invoice CSMC monthly for the compensation due Abbott for electronic drug delivery devices. Payment terms shall be net thirty (30) days. Abbott reserves the right to assess CSMC a late payment fee of one and one-half percent (1.5 %) per month on the full amount due, on overdue amounts.

## ARTICLE 7: TERM/TERMINATION

**A.    TERM**

The initial term of this Agreement shall be five (5) years, commencing on January 1, 1997 and extending through December 31, 2001. After the initial term, this Agreement will be automatically extended for successive one (1) year periods unless and until either party terminates this Agreement as herein provided.

**B.    TERMINATION**

1. Either party may terminate this Agreement at ~~the end of June 30, 1997,~~ any time without cause. Ninety day (90) written notice of termination shall be provided to the other party prior to the date on which termination is to be effective.

2. In the event either party commits a breach of this Agreement, the non-breaching party shall notify the breaching party , in writing, of its intent to terminate this Agreement unless said breach is cured within sixty (60) days. In the event the breaching party has demonstrated good faith efforts to cure the breach, but has not completely cured such breach, the other party may grant the party in breach an additional ninety (90) days to cure such breach. Such extension shall not be unreasonably withheld.

3. To the extent permitted by law, this Agreement shall automatically terminate in the event of the bankruptcy or insolvency of either party.

4. In no event shall any termination permitted by this Agreement affect the rights or obligations of either party which may have accrued prior to termination, including but not limited to reimbursement for any products or services rendered prior to the effective date of termination.

## ARTICLE 8: OTHER TERMS/CONDITIONS

**A.    RELATIONSHIP OF PARTIES**

Nothing herein contained shall be construed to make the parties hereto partners or members of a joint venture relationship, or to create a trust

Confidential

ABT-DOJ 349788
ABT282-1345

or partnership, or to impose a trust or partnership, on or with regard to any of the parties. Each party shall be responsible for its own obligations and liabilities as herein provided. No party shall be under the control of, or shall be deemed to control the other. No party shall be the agent or representative of the other party or have a right or power to bind the other party without such party's express written consent. The parties shall be in the relationship of independent contractors.

**B.   INSURANCE**

Each party, at its sole expense, shall procure and maintain during the term of this Agreement such policies of general liability, professional liability and other insurance (including self-insurance) as shall be necessary to insure it, its employees and agents against any claim or claims for damages arising by reason of bodily injury, death or tangible property damage directly or indirectly caused by or in connection with the performance of this Agreement. Each of such policies shall be in amounts reasonably acceptable to the other party, but shall not be less than $1.0 million per person for bodily injury, death or tangible property damage. Each party shall deliver an insurance certification to the other party upon request.

**C.   CONFIDENTIAL INFORMATION**

Both parties agree to keep the terms of this Agreement confidential during the term of the Agreement and for a period of three (3) years following the termination of this Agreement. In addition, each party may, from time to time, disclose certain confidential information to the other party. Each party shall take all reasonable steps to prevent disclosure of any information designated by the other party as being confidential, and shall not use or disclose any such information during the term of this and for a period of three (3) years following termination of this Agreement, except as permitted by this Agreement or in writing by the other party. The foregoing shall not apply to information:

  i) which the receiving party can show was known to it prior to the disclosure by the other party;

  ii) which is or becomes public knowledge through no fault of the receiving party; or

  iii) which is lawfully disclosed to either party by a third party.

**D.   TRADEMARKS**

Customer shall not (a) use any Abbott trademark, trade name, service mark, service name, logo, style or copyrighted material (collectively, "Trademarks"), without Abbott's prior written consent to such use and the form of such use, (b) use any Trademark in its business name, logo or style, or (c) infringe, contest or harm Abbott's rights in or to any Trademark.

**E.   OWNERSHIP OF MATERIALS**

Under the terms of this Agreement Abbott shall make available, for use within Customer's Home Infusion Therapy Operation, materials developed solely by and at the expense of Abbott. Such materials include, but are not limited to, patient training materials, in-service training materials, policy and procedure guidelines, project

7

ABT-DOJ 349789
ABT282-1346

implementation plans, financial analysis models, and software. The following shall govern the use of these materials:

1. Customer, at its own expense, shall have the right to modify such materials.
2. Abbott developed materials modified by Customer shall be deemed the joint property of both parties and their use shall be confined to the activities and Customer Home Infusion Therapy Operation described in this Agreement.
3. Neither Abbott developed materials or such materials modified by the Customer shall be distributed outside of Customer's Home Infusion Therapy Operation without the prior written consent of Abbott.

**F.   LAW**

1. Each party covenants that it shall abide by all applicable federal, state, and local statutes, laws, rules, regulation, licenses, certificates, and authorizations in the performance of its respective obligations under this Agreement.
2. In the event that any provision of this Agreement is rendered invalid or unenforceable by any act of the federal, state, or local government, or declared null and void or unenforceable by any court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect and shall continue to bind the parties, except to the extent the major purposes of this Agreement would be frustrated by such a continuation.

**G.   FORCE MAJEURE**

Neither party will be liable for any delay, prevention, or failure to perform any duties or obligations under this Agreement (except for the obligation to make payment) due to strikes, explosions, flood, riot, lock out, injunction, interruption of transportation, accidents, inability to obtain supplies at reasonable prices, war, act of governmental authority, acts of God, or other causes beyond its control.

**H.   NOTICE**

Any notice to the parties required or permitted under this Agreement shall be given in writing. The notice shall be deemed to have been given at the following times:  (a) on the date of service if served personally on the party to whom notice is to be given; (b) on the first day after transmission if transmitted by telex or electronic facsimile; (c) on the second day after deposit if deposited with an overnight express courier service, or (d) on the second day after mailing if mailed to the party to whom notice is to be given by first-class mail, postage prepaid, addressed to the parties as follows:

> Abbott Laboratories
> Abbott Home Infusion Services
> 200 Abbott Park Road, AP34
> Abbott Park, IL 60064-3500
> Attention: Contract Marketing Dept. H59

8

Confidential

Cedars-Sinai Medical Center
8700 Beverly Boulevard
Los Angeles, California 90048
Attention:

Any party may change its address for purposes of this Article 8 I by giving the other party written notice of the new address in the manner set forth above.

**I.    ASSIGNMENT**

This Agreement will be governed by the laws of the State of California and shall not be assigned in whole or in part by either party without the other party's prior written consent.

## ARTICLE 9: APPROVALS/SIGNATURES

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto, and their respective successors and permitted assigns.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

Cedars-Sinai Medical Center:                    Abbott Laboratories:

By:   Michael Thunder Nanko, Ph.D            By:   Kathryn A. Riddle
      Please Print or Type                          Please Print or Type

Title:  Vice President, Continuing Care       Title:  Manager, Contract Mktg.
        Services and Psychiatry

Signed: _____             Signed: _____

Date:   1/29/97                              Date:   3/24/97

9

Confidential

SCHEDULE I

Electronic Drug Delivery Devices
Lease Rates

| List Number | Product Description | | Monthly Lease Rate |
|---|---|---|---|
| 13038-04 | Abbott AIM | | $98.00 |
| 13905-04 | Provider One Plus | | $86.50 |
| 00083-01 | Companion | * | $0.00 |
| 52036-01 | Patrol | * | $0.00 |
| 50596-01 | Quantum | * | $0.00 |

* Assumes an administration set commitment of eighteen (18) per month.
In the event CSMC does not meet this set commitment, CSMC agrees
to return sufficient devices to Abbott to maintain the set commitment.

10

ABT-DOJ 349792
ABT282-1349

# SCHEDULE II

# CONSULTING FEES

### DAILY FEE SCHEDULE [1]

| | | |
|---|---|---|
| Engineering | $ | 1,000/day |
| Pharmacy Operations | | 1,000/day |
| Nursing Continuing Education Programs | | 1,000/day |
| Sales/Marketing        -   Consulting | | 1,000/day |
|                            -   Training Classes | | 1,000/day |
| Reimbursement    [2] | | 1,000/day |

[1]    Daily rate for each Abbott specialist.  CSMC shall be responsible for all reasonable travel expenses including transportation, food, and lodging incurred by Abbott and/or CSMC personnel.

[2]    Up to three (3) CSMC attendees. Additional attendees shall be charged $250 each.

Payment shall be due thirty (30) days from date of Abbott Invoice.

Provision of these consulting services shall be at mutually agreed times.

Abbott shall not increase these rates for the first twelve (12) months of this Agreement, but reserves the right to adjust these rates anytime thereafter.

Confidential

ABT-DOJ 349793
ABT282-1350                    L

# EXHIBIT 118
# CONTINUED



Home
Infusion
Services

---

**Children's Memorial HealthCare Resources, Inc.**

**Home Infusion Product Service Agreement**

---

10/20/98

Confidential

**CMHR**

| **PREFACE** |
|---|

This Agreement ("Agreement") is made between Children's Memorial HealthCare Resources, Inc. ("CMHR"), an Illinois corporation, and Abbott Laboratories, Inc. ("Abbott"), a Delaware corporation, as of the date executed by duly authorized representatives of both parties.

WHEREAS, CMHR is a provider of healthcare services; and

WHEREAS, Abbott is a healthcare company that supplies a broad and diversified line of healthcare products and services; and

WHEREAS, CMHR provides treatment of patients in the home and other alternate site settings, and has a qualified staff to support such treatment; and

WHEREAS, Abbott, through the Home Infusion Services business unit of its Hospital Products Division, supplies products and services in support of the treatment of Home Infusion Therapy Patients; and

WHEREAS, CMHR desires to obtain use of Abbott products and services to support its home infusion therapy business upon the terms and conditions of this Agreement.

| **DEFINITIONS** |
|---|

A. "Patient" shall mean any person requiring Home Infusion Therapy.

B. "Home Infusion Therapy" shall refer to the treatment of a patient on the prescription therapy of Total Parenteral Nutrition, Total Enteral Nutrition, Antibiotic Therapy, Chemotherapy, Pain Management, or other forms of infusion therapy which are administered via intravenous, intramuscular or other methods of administration within a home, nursing home, infusion center, or other alternate site (outside of the traditional hospital setting) location.

C. "Home Infusion Therapy Operation" shall refer to the conduct of a business, which provides the products and services necessary or useful to support the treatment of Patients on Home Infusion Therapy.

D. "Affiliate(s)" shall refer to any entity that owns directly or indirectly more than thirty percent (30%) of the stock of CMHR or of which CMHR directly or indirectly owns more than thirty percent (30%) of its stock.

Confidential

## SECTION I: HOME INFUSION PRODUCT & SERVICE AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE 1: HOME INFUSION THERAPY OPERATION

CMHR has established a Home Infusion Therapy Operation capable of treating patients in the home and other alternate site settings. CMHR's activities shall be referred to in this Agreement as the CMHR Home Infusion Therapy Operation. CMHR shall service Home Infusion Therapy Patients consistent with good medical practice and with the rights of Patients to select the medical services and providers they desire.

## ARTICLE 2: BALANCE OF OBLIGATION

In consideration of signing this Agreement Abbott will agree to forego its rights to exclusive patients referrals as described under the previous agreement, thereby transferring all patient referrals to the CMHR owned pharmacy, effective on the date that CMHR commences operations of its Home Infusion Pharmacy. The commencement date shall be agreed upon by both parties at least thirty (30) days in advance in order to ensure a smooth transition and seamless continuity of patient care. Both parties will agree on a patient transition plan that will be an efficient utilization of available resources for both companies. All other rights and obligations accrued prior to the effective date of this Agreement are affected.

## ARTICLE 3: PRODUCTS

### A.   SIGNING BONUS

Abbott will provide CMHR at no charge with an inventory of Abbott product valued at $45,000 (sufficient for one (1) month's usage of home infusion operations). This will be paid in the form of a credit memo issued to Purchaser within sixty (60) days after the Effective Date of this Agreement.

### B.   CHIP COMPUTER SOFTWARE SYSTEM AGREEMENT

In order to ensure a seamless continuation of patient records and outcomes monitoring Abbott grants CMHR a non-exclusive and non-transferable license to access and use Abbott's CHIP system Home Infusion ("CHIP System") at no cost for the first six (6) months after commencement date of CMHR's fully operational pharmacy. Abbott grants CMHR the option to

10/20/98

Confidential

extend utilization of the CHIP after the initial period based upon the terms outlined in Section II, Article I.

## C.   PURCHASE OF PRODUCTS:

1. Product Purchases:

a. Schedule I reflects the products ("Products") covered by this Agreement. In the first year of the Agreement CMHR shall purchase a minimum of eighty-five (85%) percent, "Minimum Committed Volume", of its total Home Infusion product needs as listed in Schedules I and II, including pump lease payments, from Abbott Home Infusion Services. The Minimum Committed Volume will be determined on a prorated basis should the first year of the CMHR pharmacy operation not coincide with the anniversary date of the Agreement. CMHR shall furnish Product purchase information, which allows Abbott to determine the "Minimum Committed Volume" with reasonable accuracy.   For purposes of this Agreement "purchases" shall mean the net invoice price for each Product ordered and invoiced less any returns or credits.   In Years Two through Five Purchaser agrees to purchase a minimum of ninety (90%) percent of the dollar amount purchased during the immediately preceding twelve (12) month period, or ninety (90%) of the Minimum Committed Volume, whichever is greater.

b. If there is a material reduction in the patient population or a change in therapeutic practice that effects product utilization at CMHR Home Infusion Program then within sixty (60) days of CMHR's request, Abbott and CMHR will meet and in good faith negotiate a modification of the CMHR's Minimum Committed Volume, prices of Products and other applicable terms. CMHR will provide information, reasonably satisfactory to Abbott, which clarifies the reduction in CMHR's purchases.

c. The prices that CMHR shall pay to Abbott for the Products shall be as indicated in Schedule I.   Prices shown on the Schedule will become effective upon the execution of this Agreement and will remain firm for the first two (2) years except as noted in Article 3.C.1.f.. Product prices may be increased no more that the Medical Product CPI over the previous 12-month period's pricing, in each of the subsequent years until the expiration of the agreement.

d. Product Discount: If CMHR's aggregate purchases of Products during any twelve (12) month period of the Agreement (measured from annual Anniversary Date to annual Anniversary Date) is greater than ninety (90%) percent over the prior period (or the Minimum Committed Volume in Year 1) Abbott shall pay CMHR a discount on all Product purchases (excluding Ross Nutritional Products) computed by multiplying the aggregate Product purchases (less Ross Nutritional Products) during the given twelve (12) month period times seven (7%) percent. This discount is based on total dollar value of purchases. If aggregate Product purchases

10/20/98

Confidential

ABT-DOJ 350946
ABT282-2503

(or the Minimum Committed Volume in Years two through five) meet or exceed prior period aggregate purchases the base discount shall increase to a ten (10%) percent total discount on all HPD Product purchases. Discounts will be paid within sixty (60) days of the end of the particular period in the form of a credit memo.

e.  Growth Dividend: Abbott shall pay CMHR a Growth Dividend on all incremental purchases over prior year purchases valued at one (1%) percent for every one (1%) percent incremental growth of CMHR purchases over the Minimum Committed Volume up to a maximum of twenty (20%) percent.

f.  Market Competitive/First Right of Refusal: Abbott shall use its best efforts to match any authorized competitive vendor's contract price quote within thirty (30) days upon receipt of written confirmation (competitive invoice) of competitive price quote to Abbott Laboratories' Home Office.  If Abbott is unwilling to match the competitive price offer, Abbott will negotiate in good faith with CMHR.  In the event that Abbott is unwilling to match the competitive quote, CMHR shall have the option to remove the specific product or products form this Agreement with no penalty.

1.  Product Orders/Delivery:
    Orders for the products included in this Agreement must be placed via Abbott Alternate Site Logistics at 1-800-752-4926 between the hours of 8:15 AM and 4:55 PM CST. Orders shall be for full cases of product. Allow five (5) business days for the delivery of products.   When specifically requested, expedited or special transportation costs shall be added to the invoice.

2.  Return Goods Policy:
    Abbott products in full, unopened, original shipping cases may be returned, at CMHR's expense for shipping, for one hundred (100%) percent credit provided such items have six (6) months or more of dating when received by Abbott. All products shipped by Abbott in error or any item which has less than six months dating upon receipt by CMHR shall also be eligible for one hundred (100%) percent credit provided notification has been received within thirty (30) days of error.  All other items returned with less than six (6) months dating shall not be eligible for return.

10/20/98

Confidential

3. The products provided by Abbott include:

a) Abbott-Manufactured Products:

Abbott agrees to provide CMHR with the I.V. Solutions, FirstChoice™ Injectable Drugs, Administration Sets, Ross Nutritional Solutions, Ancillary Supplies, and other items delineated in Schedule I attached hereto at the prices therein.

b) Enteral Device Supply Programs:

All Ross enteral devices are available to CMHR at no charge provided an aggregate set usage equal to fifteen (15) sets per pump per month is committed and attained over each calendar year. In the event that the aggregate pump set utilization does not meet the minimum level, CMHR will return excess devices to Abbott within thirty (30) days of notification at CMHR's expense.

c) Infusion Device Lease Program:

Abbott will provide a fixed five (5) year infusion pumps ("Devices") lease program to CMHR for the sixty-two (62) infusion devices currently in use at CMHR patient homes, and CMHR agrees to pay to Abbott the monthly capital equipment installments as stated in Schedule II. Abbott shall offer to CMHR Capital equipment installments will be billed automatically by Abbott and are due on the first of the month following the date of invoicing and will remain firm for the term of this agreement. CMHR, at its option, shall have the right to purchase the specified Devices at the current fair market value provided by Abbott.

Abbott shall pass title up front to CMHR for all devices delivered hereunder.

## D.   PRODUCT WARRANTIES

1.    Abbott agrees to replace and/or repair Abbott-manufactured products that are defective in material, workmanship, manufacturing and/or design at no cost to CMHR. This provision states the full extent of Abbott's warranty for products it manufacturers.

2.    Abbott represents and warrants that products it manufactures, when used in accordance with the directions on the labeling, are fit for the purposes and indications described in the labeling. Unless the Home Infusion Therapy product is used in accordance with its instructions, these warranties are void and of no effect. Abbott disclaims all other expressed or implied warranties.

10/20/98

Confidential

ABT-DOJ 350948
ABT282-2505