# EXHIBIT 118
# CONTINUED



JUN 3? 1994

LUTHERAN HEALTH SYSTEMS

**Home Infusion Services Agreement**

May-94

ABT-DOJ 350301
ABT282-1858          F

31-May-94

## HOME INFUSION SERVICES AGREEMENT

This Agreement ("Agreement") is made between Lutheran Health Systems ("Customer"), a North Dakota corporation, and Abbott Laboratories ("Abbott"), an Illinois corporation, as of the date executed by duly authorized representatives of both parties. The geographic area covered under the terms of this Agreement is the Lutheran Health Network, which includes all Lutheran Health System Hospitals, Clinics, and Home Health Agencies in Arizona, New Mexico, Texas, Nevada, Oregon, and Utah.

### RECITALS

WHEREAS, Customer is a provider of healthcare services; and

WHEREAS, Abbott is a healthcare company that supplies a broad and diversified line of healthcare products and services; and

WHEREAS, The parties recognize the importance of continuing the treatment of patients in the home and other alternate site settings, and specifically the provision of Infusion Therapy; and

WHEREAS, Abbott, through the Home Infusion Services business unit of its Hospital Products Division, supplies products and services in support of the treatment of Home Infusion Therapy Patients; and

WHEREAS, Abbott desires to support Customer in the operation of a business providing Home Infusion Therapy through the provision of certain products, services, and technical/business guidance to Customer, and Customer desires to obtain such assistance from Abbott upon the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties agree as follows:

### ARTICLE 1. DEFINITIONS

A. **"Patient"** shall mean any person requiring Home Infusion Therapy.

B. **"Home Infusion Therapy"** shall refer to the treatment of a patient on the prescription therapy of Total Parenteral Nutrition, Total Enteral Nutrition, Antibiotic Therapy, Chemotherapy, Pain Management, or other forms of infusion therapy which are administered via intravenous, intramuscular or other methods of administration within

1

Confidential

ABT-DOJ 350302
ABT282-1859

a home, nursing home, infusion center, or other alternate site (outside of the traditional hospital setting) location.

C. **"Home Infusion Therapy Operation"** shall refer to the conduct of a business which provides the products and services necessary or useful to support the treatment of Patients on Home Infusion Therapy.

D. **"Program Billings"** shall mean all amounts billed, prior to adjustments for contractual allowances and bad debt, for the products and services provided to Patients under this Agreement.

E. **"Program Collections"** shall mean all remuneration collected by or on behalf of Customer for products and services provided to Patients under this Agreement.

F. **"Affiliate"** shall refer to Customer's Hospitals, Clinics or Home Health Agencies in the geographic area noted in the introductory paragraph of this Agreement.

G. **"Assignment of Benefits"** shall mean the formal designation of the party authorized to receive actual payment from payors of benefits and/or patients for products and services rendered under this Agreement.

## ARTICLE 2: HOME INFUSION THERAPY OPERATION

A. Customer shall use its reasonable best efforts to develop and conduct a Home Infusion Therapy Operation and to service Patients consistent with good medical practice.

B. The Home Infusion Therapy Operation described in this Agreement shall be the sole Home Infusion Therapy Operation owned or operated by Customer and/or its Affiliates. This Agreement shall not; however, restrict the right of Patients and/or physicians to select any medical service or provider they desire.

C. Patients shall be Patients of Customer and Customer shall assume the Assignment of Benefits for all Patients serviced by its Home Infusion Therapy Operation unless specifically restricted by law and/or regulations of government payors of medical benefits.

## ARTICLE 3: CLINICAL SERVICES

A. **PATIENT CARE/NURSING SERVICES**
   1. Patient Coordination.
   
   On an as needed basis, Customer, at its expense, shall provide Patient Coordination services, which shall include but not be limited to:
   
   a. Evaluation of the clinical (under the supervision of the Patient's physician) and psychosocial needs of each Patient and identification of those who, in the opinion of the physician and health care provider personnel, qualify for Home Infusion Therapy;
   
   b. Assessment of the Patient's and Patient's family's ability to manage therapy in the home environment, including but not limited to, analysis of the Patient's and caregiver's physical and emotional preparedness to manage the therapy in a home

2

Confidential

environment, consideration of whether the Patient or caregiver needs additional resources in the home, and assessment of the Patient's and caregiver's competence and educational level;

c. Coordination of products and services necessary to support the Patient and family at home, including but not limited to coordination of the provision of ancillary products such as hospital beds, walkers, wheel chairs and other durable medical equipment.

2. <u>Patient Training</u>.

Customer, at its expense, shall train the Patient and/or the Patient's caregiver in:

a. The use of those products and devices that are prescribed for the Patient;

b. The basics of his or her therapy, including but not limited to education regarding the bodily needs for therapeutic agents, the effect of the Patient's disease on the ability of his/her body to absorb such therapeutic agents, and the efficacy of therapy;

c. Aseptic technique, including but not limited to education regarding the importance of hygiene, the need to gather supplies in a clean area, explanation as to how germs are transmitted, how to open supplies, and how to care for the catheter site;

d. Catheter care, including but not limited to education regarding catheter patency, understanding aseptic care of the catheter site and the catheter site dressing;

e. Administration technique, including but not limited to dosage of solutions to be given, proper use of administration devices and equipment, setting up tubing between the bag and the catheter, connection to and disconnection from the catheter, and general aseptic procedures for administration;

f. Electronic Drug Delivery Device operation, including but not limited to, education regarding the Electronic Drug Delivery Device, programming and general functions of the device, priming of the set, the alarm system, and general trouble shooting issues; and

g. Therapy requirements, including but not limited to an explanation of the therapy to the Patient, reviewing of potential complications and adverse effects associated with the therapy, and when to communicate with a medical professional for advice and assistance.

3. <u>Patient Conversion Recertification</u>.

Customer, at its expense, shall provide Patient Conversion Recertification for Patients converting to the Customer Home Infusion Therapy Operation from another program. Recertification shall include the following:

a. Assessing the Patient's knowledge base and skill level in performing care associated with therapy;

3

ABT-DOJ 350304
ABT282-1861

    b. Reviewing and evaluating the Patient's ability to understand and/or perform items listed in the section above entitled "Patient Training", and

    c. Promoting compliance with care and techniques listed in the section above entitled "Patient Training".

4. In-Home Nursing.

    a. Customer shall coordinate follow-up nursing visits to the Patient's home for the purpose of monitoring the clinical status of the Patient, obtaining samples for needed lab tests, training the Patient on any changes in therapy, and reviewing and reinforcing procedures to ensure Patient compliance with administration of the Patient's therapy and aseptic techniques.

    b. Charges for the nursing visits shall be invoiced to a third-party payor and/or Patient by the nursing agency providing the service. Revenues generated from these nursing visits shall not be included in Program Billings and/or Program Collections.

**B. PHARMACY SERVICES**

The pharmacy shall be licensed in the name of Customer who shall maintain licensure and compliance with all federal and state pharmacy regulations in the location(s) where Customer operates pharmacy(s) hereunder.

1. Pharmacy Services.

Customer, at its expense, shall provide pharmacy and clinical monitoring services, which shall include the following:

    a. Obtaining prescription and clinical information for each Patient, from the Patient's Physician;

    b. Evaluating prescriptions for accuracy, safety and appropriateness;

    c. Preparing compounding worksheets, labels and other documents required by applicable pharmacy regulations for each prescription;

    d. Compounding, packaging and dispensing Patient prescriptions;

    e. Clinical review, by a licensed pharmacist, of the Patient's therapy regimen; and

    f. Consultation from a licensed pharmacist to physicians, if requested, on therapy changes and/or regimen.

2. Delivery Services.

Customer, at its expense, shall be responsible for the provision of delivery services, which shall include the following:

    a. Delivering products and supplies to the Patient's residence and/or vacation location, nursing home, infusion center, or other alternate site location;

    b. Reviewing the Patient's inventory of products and supplies to monitor stock rotation and re-order to minimize potential interruptions of therapy;

4

ABT-DOJ 350305
ABT282-1862

**C. CLINICAL TRAINING/SUPPORT**

Abbott shall provide the following training and/or support services as specified below. All training shall meet or exceed JCAHO guidelines where applicable.

1. <u>Patient Care/Nursing Training and Support.</u>

   a. <u>Patient Training Materials.</u>

   Abbott, at its expense, shall provide copies of its existing Patient Training Manuals, Therapy Training records, and Patient Training Materials for use by Customer's Patients. Training materials shall be provided in sufficient quantity to cover anticipated patient volume.

   b. <u>Nursing Training.</u>

   1. As mutually agreed, Abbott, at its expense, shall train Customer personnel on the use of Abbott products and Electronic Drug Delivery Devices. Attendees to such training shall not be limited in number but shall be direct employees of Customer. Customer agrees that an initial product training session must be completed prior to servicing any Patients under this Agreement.

   2. Abbott shall provide, at mutually agreed times, Continuing Education programs on high-tech home infusion therapies for Customer's personnel or for nursing agencies that service patients relative to this Agreement. Attendees to such training shall not be limited in number but shall be direct employees of Customer. Abbott shall reserve the right to limit such programs to **fifteen (15)** during the term of this Agreement but not more than **four (4)** during any one year. Additional Continuing Education programs on high-tech home infusion therapies may be provided under terms and conditions detailed in **Schedule IV** attached hereto. Customer shall have the right to videotape such training, provided such videotape is only re-played for Customer's employees, or Customer receives express permission from Abbott, and the videotape is surrendered to Abbott upon termination of this Agreement.

   c. <u>Nursing Policy and Procedure Guidelines.</u>

   Abbott shall provide copies of its existing guidelines to support Customer's development of high-tech nursing policies and procedures for use by Customer to include but not limited to those addressing patient selection criteria.

   d. <u>Technical Support.</u>

   Abbott, at its expense, shall maintain a twenty-four hour toll-free customer service line, staffed by a registered nurse, for professional-to-professional consultation. There shall be no limit on Customer's access to said customer service line.

Confidential

ABT-DOJ 350306
ABT282-1863

2. Pharmacy Training and Support.

    a. Pharmacy Training.

Abbott shall provide "hands-on" training on Home Infusion Therapy pharmacy services. This training shall be conducted on Abbott premises, and Customer shall pay the associated travel and lodging expenses. Abbott shall reserve the right to limit such training to **five (5)** days during the first year of this Agreement, and **one (1)** day per year for the remainder of the term of this Agreement. Additional pharmacy services training may be provided under terms and conditions as detailed in **Schedule IV** attached hereto.

    b. Pharmacy Policy and Procedure Guidelines.

Abbott shall provide copies of its existing guidelines to support Customer's development of pharmacy policies and procedures for use by Customer.

    c. Technical Pharmacy Support.

Abbott shall provide unlimited phone consultation with Customer on general pharmacy operations, personnel training requirements, pharmacokinetics and other pharmacological techniques, and other activities related to the operation of the pharmacy, as mutually agreed, for the term of the Agreement. Abbott shall assist Customer with the identification of JCAHO and regulatory pharmacy issues.

    d. Quality Assurance Policy and Procedure Guidelines.

Abbott shall provide copies of its existing guidelines to support Customer's development of quality assurance policies and procedures for use by Customer.

**D.  FACILITY**

    a. Capital Requirements.

Customer shall provide for, at its sole expense, the rental, acquisition, and/or build-out of a facility to house its Home Infusion Therapy Operation. Customer shall also provide all pharmacy, office, and computer equipment required for the operation.

    b. Facility Engineering Support.

Abbott shall consult with Customer on the site selection, design, layout, equipment requirements, and construction of its Home Infusion pharmacy, including an analysis of staffing requirements and projected operating costs. Abbott shall reserve the right to limit such consulting to **three (3) days** during the term of this Agreement. Additional engineering consultation may be provided under the terms and conditions outlined in **Schedule IV**, attached hereto.

    c. Abbott Capital Equipment.

        1) Abbott shall provide one (1) Nutrimix™ Macro Compounder per Customer Pharmacy location for use by Customer in performance of this Agreement.

6

ABT-DOJ 350307
ABT282-1864

2) Abbott shall retain title to this equipment until the expiration of the initial term of this Agreement, at which time title shall be transferred to Customer. Customer shall maintain this equipment free and clear of all liens, encumbrances, attachments and security interests for charges of any kind. In the event this Agreement is terminated prior to its full term, Abbott shall retain title to such equipment.

3) Customer shall provide on-going maintenance and calibration of the equipment referenced above.

## ARTICLE 4. PRODUCT

### A.  PROVISION OF PRODUCTS

1. Consigned Abbott Products.

   Abbott shall provide Customer with consigned inventory of Abbott manufactured products and equipment listed in Abbott's Hospital Products Division and Ross Division product catalogues and/or supplements as of April 5, 1993, excluding "Schedule II" narcotics, Nutrimix Compounders, and Adria FirstChoice™ Oncology Products, according to the procedures outlined in **Schedule I**, for Customer to utilize in performance of this Agreement. Notwithstanding the foregoing, Customer may, at its sole and absolute discretion, use products other than Abbott products. The use of non-Abbott products shall not affect or change the compensation distribution required by the Section of this Agreement herein entitled "Compensation".

2. Non-Abbott Products.

   Customer shall be responsible for the acquisition of non-Abbott product and equipment required by Patient prescriptions and the performance of this Agreement.

### B.  PRODUCT WARRANTIES

1. Abbott agrees to replace and/or repair Abbott-manufactured products that are defective in material, workmanship, manufacturing and/or design at no cost to Customer. This provision states the full extent of Abbott's warranty for products it manufacturers.

2. Abbott represents and warrants that products it manufactures, when used in accordance with the directions on the labeling, are fit for the purposes and indications described in the labeling. Unless the Home Infusion Therapy product is used in accordance with its instructions, these warranties are void and of no effect. Abbott disclaims all other expressed or implied warranties.

3. Products not manufactured by Abbott shall be subject to the manufacturers warranty only and shall have no other expressed or implied warranties.

7

Confidential

ABT-DOJ 350308
ABT282-1865

## ARTICLE 5: BUSINESS MANAGEMENT SERVICES

**A.   REIMBURSEMENT SERVICES/SUPPORT**

1. Customer Reimbursement Responsibilities.

   Customer, at its expense, shall provide certain Reimbursement Services (for Home Infusion Therapy Services provided under the terms of this Agreement), including the following:

   a. Verification of the insurance/third party reimbursement status, if any, of all potential and existing Patients including reimbursement status as to the stated diagnosis and intended treatment;

   b. Customer shall be responsible for obtaining information required to support claims, such as, Patient Assignment of Benefits and Certificate of Medical Need forms. Customer shall provide such information to Abbott on a timely basis (typically thirty (30) days), as specifically defined in mutually agreed upon policies and procedures.

2. Abbott Reimbursement Services.

   Abbott, at its expense, shall provide certain Reimbursement Services (for Home Infusion Therapy Services provided under the terms of this Agreement), including the following:

   a. Preparing and submitting all primary and coinsurance claims in the name of Customer and performing all reasonable collection activities in accordance with mutually agreed upon policies and procedures;

   b. Providing case management services on behalf of Customer in accordance with discounting parameters approved by Customer;

   c. Preparing monthly accounts receivable reports showing month of service billed, amount billed, amount paid by primary insurance carrier, amount paid by secondary insurance carrier and balance due for each Patient;

   d. Providing Customer with notification of a write-off request, when an account is deemed uncollectable. This notification shall include Patient's name, Patient's billing and collection history and reason(s) that a write-off is requested (e.g. family financial hardship). No write-offs shall be taken without Customer's approval of the write-off request or specific write-off guidelines approved by Customer; and

   e. Retention of all Patient documentation related to reimbursement for the legally required period of time, which in no event shall be less than seven (7) years.

3. Overdue Accounts.

   In the event an account is deemed uncollectable, as defined by mutually agreed upon policies and procedures, Abbott may file legal proceedings to collect such overdue Patient account; provided, however, that no such proceedings shall be initiated without the mutual written consent of Customer and Abbott, including

8

agreement as to the payment of legal fees and costs associated with collection litigation (litigation fees shall be twenty five (25%) of collections if Abbott's collection agency is utilized). Such written consent or rejection shall be provided within ninety (90) days or a reasonable time frame as determined by mutually agreed upon policies and procedures. In the event Customer rejects initiating collection proceedings, Customer agrees to compensate Abbott for products and services provided under the terms of this Agreement in accordance with Article 6 "Compensation".

4.  Low Reimbursement Patients.

In the event Abbott or Customer determine that a Patient does not have adequate reimbursement coverage for the intended Home Infusion Therapy, Customer and Abbott agree to confer and mutually determine the best course of action for the Patient.

5.  Tax.

a.  Customer shall be responsible for the reporting and paying of any applicable program tax, including any applicable sales, excise or other tax. As mutually agreed, Abbott shall provide Customer with appropriate reports.

b.  Prior to servicing any patients under this Agreement, Customer shall provide Abbott with its tax status (i.e. taxable, non-taxable) in writing and any applicable documentation.

6.  Cash Collections/Lockbox.

Customer, at its expense, shall provide a lock box dedicated exclusively to the receipt of Program Collections. Customer shall arrange with the financial institution administering the lock box to transmit directly to Abbott, upon receipt, a photocopy of total contents of each envelope received at the lock box, including checks and all other correspondences; and a photocopy of deposit slips and adding machine tapes from the checks deposited showing the total amount deposited.

In the event program collections are not forwarded to the designated lock box, the following shall apply.

(1) Once Abbott is verbally notified that the claim has been paid, Abbott shall forward the following information to LHS: third party payer name, address and telephone number; patient's name, policy number and group number; dates of service; total amount billed; total amount paid; name and address of payee. Abbott shall also attempt to obtain a copy of the canceled check. Check copy charges, if incurred, shall be charged to LHS.

(2) LHS shall be responsible for locating the checks, explanation of benefits and other correspondence and forwarding copies to Abbott.

(3) In the event LHS is not able to provide copies of the checks, explanation of medical benefits and other correspondence with thirty (30) days of the date the above referenced notification is forwarded to LHS, Abbott shall remove the record from the active

9

ABT-DOJ 350310
ABT282-1867



accounts receivable ledger and the amount reported paid shall be deemed collected for purposes off calculating compensation due Abbott. Such records shall be coded to provide for appropriate audit trail and monthly and year-to-date totals.

(4) Abbott shall not be required to provide any further follow-up on these program collections.

**B. SALES AND MARKETING**

1. <u>Marketing of Home Infusion Therapy Operation.</u>

   a. Customer shall be responsible for the formulation and execution of a marketing and sales strategy for its Home Infusion Operation. Customer shall be responsible for all expenses incurred in marketing the Home Infusion Operation.

   b. Each party agrees to obtain prior written approval from the other party when using the other party's name in any communications, which shall include but not be limited to, sales and marketing literature, press releases, presentations, or other public presentations.

2. <u>Marketing Consulting/Support.</u>

   a. Abbott shall provide a sales training course for one (1) employee of Customer at a mutually agreed time. Abbott shall be responsible for reasonable travel related expenses incurred on behalf of Customer's employee. Additional sales training may be provided under the terms and conditions outlined in **Schedule IV**, attached hereto.

   b. On an ongoing basis, Abbott agrees to consult with Customer on the design, layout, and production of promotional literature. All production expenses shall be paid by Customer.

   c. Abbott shall conduct and provide Customer access to the Annual Executive Conference on Home Infusion. Customer shall be responsible for associated travel and lodging expenses.

**C. INFORMATION SYSTEMS**

1. <u>Software Licensing Agreement.</u>

   Abbott grants Customer a non-exclusive license to access and utilize Abbott's **CHIP System** software (includes current and any upgraded configurations), on a timeshare basis, for use in the performance of Customer's obligations under this Agreement. Abbott shall retain all right, title and interest in and to the CHIP System software and all modifications, improvements and updates to the software that are developed by or for Abbott. None of the software, modifications, etc., may be modified, transferred, copied, photocopied, reproduced, translated, or reduced to any electronic medium with machine readable form, in whole or in part, without the prior written consent of Abbott.

2. <u>Computer Hardware.</u>

   a. Abbott shall provide and maintain the computer and communications hardware and operating system(s) required on Abbott premises (IBM AS400 computer system, operating

10

ABT-DOJ 350311
ABT282-1868

systems, controllers, and modems) to operate the CHIP System software and which facilitate Customer access to such software on a timeshare basis.

b. Customer shall be responsible for the procurement, installation, testing, and maintenance of all computer and communications hardware and operating software system(s) required at Customer location(s) (Computer terminals/P.C.'s, operating systems, printers, controllers, modems, cabling, etc.) to access and utilize the CHIP System software on a timeshare basis. Customer agrees that such equipment and software shall be compatible with that utilized by Abbott (IBM AS400).

c. Customer shall be responsible for contacts with telecommunication companies to facilitate the installation of lease lines or to restore any lease line outages which may occur.

d. Customer shall be responsible for the costs associated with any lease lines or dial-up (if access via modem) charges associated with accessing the CHIP System software.

e. Abbott shall provide consultation to support Customer's selection of computer hardware. Abbott consultation shall consist of the identification of some hardware and configuration options, but shall not constitute technical hardware consulting (including technical specifications, performance; etc.) which shall be the responsibility of authorized hardware vendors and/or producers.

f. Abbott shall provide Customer a mutually agreed upon detailed written installation schedule and installation consultation to support Customers' installation, configuration, and testing of computer hardware.

3. Software Support.

a. The CHIP System software shall be available for Customer to access at all times, except during times where Abbott is performing system backups, maintenance procedures, or is installing capacity and/or software upgrades, and the Customer shall be notified in advance.

b. Abbott shall provide Customer training on the use of CHIP System software through the provision of i) CHIP System documentation, and ii) User training by Abbott personnel, as detailed in **Schedule III**. Customer shall be responsible for travel expenses (transportation, lodging, and meals) associated with such training. Additional training may be provided under terms and conditions detailed in **Schedule III** attached hereto.

c. Abbott shall provide a "CHIP System Support Center", located on Abbott premises, to answer phone questions related to the use of the CHIP System software. The CHIP System Support Center shall be staffed from 8:15 AM to 4:55 PM, Central Standard Time, Monday through Friday, except for Abbott observed holidays.

d. Abbott shall provide data back-up support, and disaster recovery support for data stored on Abbott mainframes (AS400).

11

ABT-DOJ 350312
ABT282-1869

e. All data files applicable to the Home Infusion Therapy Operation described in this Agreement shall be the property of Customer and shall be made available to Customer upon termination of this Agreement in the computer/machine readable format utilized by Abbott's CHIP System at the time of such termination.

## ARTICLE 6: COMPENSATION

A. Billings for the products and services provided under the terms of this Agreement shall be submitted to third party payers of medical benefits and/or Patients.

B. Each party shall consider the compensation, when distributed according to this Agreement, as payment in full and shall not seek to claim any additional amount from the other party, Patients or any other third party payor, except as specifically provided herein. No payments will be made for any referrals. Payments will only be made for delivery of products and services.

C. In consideration of Abbott's obligations under this Agreement, Customer shall pay Abbott a portion of the cash collected (**Program Collections**) from Customer's Home Infusion Therapy Operation, in accordance with the rates set forth in **Schedule II.** Abbott shall invoice Customer for the compensation due Abbott, with payment due thirty (30) days from date of invoice. Abbott reserves the right to assess Customer a late payment fee of one and one-half percent (1 1/2%) per month on the full amount due, on overdue amounts. Abbott's compensation shall begin to accrue relative to the claims which Abbott processes (i.e. performs reimbursement services) in the name of LHS. The parties agree to use their best efforts so that Abbott's assumption of billing responsibilities shall coincide with Abbott's provision of consigned Abbott product to LHS. Billing services performed by Abbott, in the name of LHS, shall state that claim payment should be made to the lock box noted in Article 5.A.6. In the event such claim payments are not made into this lock box, the procedures set forth in Article 5.A.6. shall be followed, and LHS shall use its best efforts to notify Abbott when such claim(s) have been paid. LHS shall retain sole responsibility for all collections and financial reporting relating to accounts receivable established prior to Abbott's assumption of reimbursement activities.

D. **Schedule II** reflects negotiated amounts based on products and services to be provided by Abbott, estimated volume, and gross billing rates for Home Infusion Therapy services charged by Customer as of October 1 1993. These amounts may be re-negotiated in the event; i) Customer and Abbott agree to changes in the structure of this Agreement, ii) Abbott introduces additional products that Customer elects to utilize in the performance of its patient care obligations under this Agreement, or iii) Customer changes the gross billing rates charged to third party payers of medical benefits and/or falls significantly below volume estimates such that after one year, Customer Annualized

12

ABT-DOJ 350313
ABT282-1870

Program Billings (based on the most recent six months of actual billing data) are less than one million dollars ($1,000,000).

E.   In the event Home Infusion reimbursement mechanisms (excluding payer mix variations) not envisioned in this Agreement render the calculation of **Program Collections** substantially undeterminable (i.e. "capitation" or "episode of illness" reimbursement), Abbott and Lutheran agree to develop a mutually acceptable methodology for calculating Home Infusion **Program Collections** under this Agreement.

## ARTICLE 7. TERM/TERMINATION

**A.   TERM**

The initial term of this Agreement shall be five (5) years commencing on **June 15, 1994.**   After the initial term, this Agreement will be automatically extended for successive one (1) year periods unless and until either party terminates this Agreement as herein provided.

**B.   TERMINATION**

1. 1. Either party may terminate this Agreement at the end of **June 14, 1999**, or at the end of any **June 14** thereafter. Written notice of termination shall be provided to the other party prior to the **March 14** immediately preceding the **June 14** on which termination is to be effective. Abbott agrees, in the event of significant regulatory or governmental policy changes, to negotiate in good faith any changes necessary to this Agreement.

2. After year two (2) of this Agreement, Customer shall have the right to perform Reimbursement Services per Article 5.A., provided at least ninety (90) day prior written notice is given to Abbott. Customer and Abbott agree to negotiate in good faith any changes necessary to this Agreement.

3. In the event either party commits a breach of this Agreement, the non-breaching party shall notify the breaching party , in writing, of its intent to terminate this Agreement unless said breach is cured within thirty (30) days. In the event the breaching party has demonstrated good faith efforts to cure the breach, but has not completely cured such breach, the other party may grant the party in breach an additional ninety (90) days to cure such breach. Such extension shall not be unreasonably withheld .

4. To the extent permitted by law, this Agreement shall automatically terminate in the event of the bankruptcy or insolvency of either party.

5. In no event shall any termination permitted by this Agreement affect the rights or obligations of either party which may have accrued prior to termination, including but not limited to reimbursement for any products or services rendered prior to the effective date of termination.

13

ABT-DOJ 350314
ABT282-1871

## ARTICLE 8: OTHER TERMS/CONDITIONS

**A. CONTRACTS**

    1. Affiliated Agencies:

        Customer shall notify Abbott in writing prior to extending this Agreement to any Affiliated agency.

    2. Non-Affiliated Agencies:

        Customer and Abbott shall confer on the terms of any future contracts extended to Non-Affiliated agencies of Customer whose Patients would be serviced via this Agreement.

**B. RELATIONSHIP OF PARTIES**

Nothing herein contained shall be construed to make the parties hereto partners or members of a joint venture relationship, or to create a trust or partnership, or to impose a trust or partnership, on or with regard to any of the parties. Each party shall be responsible for its own obligations and liabilities as herein provided. No party shall be under the control of or shall be deemed to control the other. No party shall be the agent or representative of the other party or have a right or power to bind the other party without such party's express written consent. The parties shall be in the relationship of independent contractors.

**C. EMPLOYEE PROTECTION**

During the term of this agreement and for a period of twelve (12) months following termination or expiration of its term, the parties agree that their respective personnel involved in the activities hereof shall not solicit or cause solicitation of employees of the other party who are involved in the activities hereof, except as mutually agreed upon by both parties. The foregoing shall not apply to general solicitations not directed at such employees of the other party.

**D. INSURANCE AND INDEMNIFICATION**

    1. Insurance:

        Each party, at its sole expense, shall procure and maintain during the term of this Agreement such policies of general liability, professional liability and other insurance (including self-insurance) as shall be necessary to insure it, its employees and agents against any claim or claims for damages arising by reason of bodily injury, death or tangible property damage directly or indirectly caused by or in connection with the performance of this Agreement. Each of such policies shall be in amounts reasonably acceptable to the other party, but shall not be less than $1.0 million per person for bodily injury, death or tangible property damage. Each party shall deliver an insurance certification to the other party upon request.

    2. Indemnification:

        a. **Abbott** shall indemnify, hold harmless and defend Customer, its employees and agents from and against any and all loss, claims, causes of action, costs or expenses, including reasonable attorney's fees, arising from bodily injury, death or tangible

14

property damage caused by any wrongful or negligent act or omission of Abbott, its employees or agents in the performance of their obligations or duties under this Agreement.

b. **Customer** shall indemnify, hold harmless and defend Abbott, its employees and agents from and against any and all loss, claims, causes of action, costs or expenses, including reasonable attorney's fees, arising, or alleged to arise, from bodily injury, death or tangible property damage caused by any wrongful or negligent act or omission of Customer, its employees or agents in the performance of their obligations or duties under this Agreement.

c. The indemnifications provided in (a) and (b) above shall only apply if the party seeking indemnification notifies the other party in writing of a claim or lawsuit covered by the indemnity within thirty (30) days after receipt of notice of such claim or lawsuit, or within the time reasonably required to file an answer to such lawsuit if thirty (30) days notice cannot reasonably be given. The party seeking indemnification shall cooperate in the investigation and defense of any claim or lawsuit covered by this indemnity and will not compromise or settle any such claim or lawsuit without the prior written consent of the party providing the indemnification.

3. <u>Limitation of Liability.</u>

Abbott and Customer shall have no liability under this Agreement for any indirect, incidental or consequential damages or lost profits or revenues, except to the extent of any such damages resulting from any personal injury caused by Abbott's or Customer's negligence, wrongful acts or breach of this Agreement.

**E.   CONFIDENTIAL INFORMATION**

Both parties agree to keep the terms of this Agreement confidential during the term of the Agreement and for a period of three (3) years following the termination of this Agreement. In addition, each party may, from time to time, disclose certain confidential information to the other party. Each party shall take all reasonable steps to prevent disclosure of any information designated by the other party as being confidential, and shall not use or disclose any such information during the term of this and for a period of three (3) years following termination of this Agreement, except as permitted by this Agreement or in writing by the other party. The foregoing shall not apply to information:

   i) which the receiving party can show was known to it prior to the disclosure by the other party;

   ii) which is or becomes public knowledge through no fault of the receiving party; or

   iii) which is lawfully disclosed to either party by a third party.

**F.   TRADE SECRETS**

15

Confidential

ABT-DOJ 350316
ABT282-1873

Whenever this Agreement refers to Abbott-developed business knowledge, policy and procedure guidelines, software, project implementation plans or other materials, the parties agree that all such materials are trade secrets of Abbott, that the materials are disclosed to assist in the operation of Customer and that they will be kept confidential by Customer. Any Customer-developed business knowledge attained by Abbott shall be kept confidential by Abbott. This clause shall survive termination of this Agreement.

**G.  TRADEMARKS**

Customer shall not (a) use any Abbott trademark, trade name, service mark, service name, logo, style or copyrighted material (collectively, "Trademarks"), without Abbott's prior written consent to such use and the form of such use, (b) use any Trademark in its business name, logo or style, or (c) infringe, contest or harm Abbott's rights in or to any Trademark.

**H.  OWNERSHIP OF MATERIALS**

Under the terms of this Agreement Abbott shall make available, for use within Customer's Home Infusion Therapy Operation, materials developed solely by and at the expense of Abbott. Such materials include, but are not limited to, patient training materials, in-service training materials, policy and procedure guidelines, project implementation plans, financial analysis models, and software. The following shall govern the use of these materials:

1. Customer, at its own expense, shall have the right to modify such materials.

2. Customer shall have the right to retain any Customer modified material at the termination of this Agreement.

3. Abbott developed materials modified by Customer shall be deemed the joint property of both parties and their use shall be confined to the activities and Customer Home Infusion Therapy Operation described in this Agreement.

4. Neither Abbott developed materials or such materials modified by the Customer shall be distributed outside of Customer's Home Infusion Therapy Operation without the prior written consent of Abbott.

**I.  LAW**

1. Each party covenants that it shall abide by all applicable federal, state, and local statutes, laws, rules, regulation, licenses, certificates, and authorizations in the performance of its respective obligations under this Agreement.

2. In the event that any provision of this Agreement is rendered invalid or unenforceable by any act of the federal, state, or local government, or declared null and void or unenforceable by any court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect and shall continue to bind the parties, except to the extent the major purposes of this Agreement would be frustrated by such a continuation.

16

Confidential

ABT-DOJ 350317
ABT282-1874

**J.  FORCE MAJEURE**

Neither party will be liable for any delay, prevention, or failure to perform any duties or obligations under this Agreement (except for the obligation to make payment) due to strikes, explosions, flood, riot, lock out, injunction, interruption of transportation, accidents, inability to obtain supplies at reasonable prices, war, act of governmental authority, acts of God, or other causes beyond its control.

**K.  AUDIT AND INSPECTION**

1. Customer, and Abbott, shall keep and maintain full and accurate records and books (in accordance with Generally Accepted Accounting Principles "GAAP") of its activities relating to this Agreement as shall evidence its compliance with the terms and conditions of this Agreement.

2. Upon Abbott's or Customer's written request, the other party shall afford the requesting party or its designees reasonable opportunity, during normal business hours, to examine books and records relating to reimbursement, sales, compounding, and inventory records, as well as to inspect inventories and operations, relating to this Agreement.

**L.  REVIEW OF COMMITMENTS**

The parties agree to review the Customer Home Infusion Therapy Operation against the commitments set forth in this Agreement, at mutually agreed times.

**M.  NOTICE**

All notices hereunder shall be in writing and shall be delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested, to the following address of the respective parties or such other address as may be identified from time to time by the parties hereto:

> Abbott Laboratories
> Abbott Home Infusion Services
> One Abbott Park Road
> Abbott Park, IL 60064-3500
> Attention: Contract Marketing Dept. H59
>
> Advanced Home Health
> 325 East Elliot, Suite 27
> Chandler, AZ  85225
> Attention: Jennifer Huppenthal

Such notice shall be effective upon receipt if personally delivered, or on the third business day following the date of mailing.

**N.  ENTIRE AGREEMENT**

17

Confidential

ABT-DOJ 350318
ABT282-1875

This Agreement and the attachments set forth the entire Agreement of the parties. This Agreement may only be amended in writing, signed by authorized representatives of both parties.

## O.   ASSIGNMENT

This Agreement will be governed by the laws of the State of Illinois and shall not be assigned in whole or in part by either party without the other party's prior written consent.

## ARTICLE 9: APPROVALS/SIGNATURES

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto, and their respective successors and permitted assigns.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**Lutheran Health Systems**                          **Abbott Laboratories**

Name:  _Steven R. Orr_                               Name: _____

     Please Print or Type                                      Please Print of Type

Title:  _President/CEO_                               Title: _Manager, Contracting &_
                                                     _Business Development_

Signed: _____                            Signed: _David E. Brincks_

Date:  _June 3, 1994_                                Date: _6/8/94_

18

Confidential

ABT-DOJ 350319
ABT282-1876

(Page 1 of 3)

## SCHEDULE I

### BACKGROUND

Abbott shall provide Customer full cases of Abbott-manufactured product, excluding "Schedule II" narcotics and Adria FirstChoice™ Oncology Products, as consigned inventory. All consigned inventory remains the property of Abbott and cannot be resold or used for any purpose or activity not specifically identified as part of the Home Infusion Operation defined by this Agreement.

### INVENTORY STOCKING LEVELS

Customer shall manage this inventory according to sound materials management practices to minimize the occurrence of outdated product and the need for emergency shipments resulting in premium delivery costs. Abbott shall maintain a reasonable level of inventory, normally one (1) to two (2) months of projected usage.

### INVENTORY ORDERS

Initial and reorders shall be for full cases of Abbott-manufactured products. Allow five (5) business days for the delivery of products. If premium routing is requested, the additional cost will be billed to Customer.

A minimal inventory of Electronic Drug Delivery Systems ("EDDS") will be maintained in the Customer's pharmacy. Additional EDDS will be shipped to Customer at the time a Patient initiates therapy. If necessary, these devices will be shipped via premium routing, at Abbott expense, to assure that service requirements are met.

### REQUIRED NOTIFICATION-ABBOTT REIMBURSEMENT

*PATIENT REFERRAL/STATUS CHANGE:*

When a Patient is started on home infusion therapy, Customer shall input directly into the system or, if the system is unavailable, call Client Order Entry at 1-800-228-4663, FAX information to (708) 937-0066. The information requested at this time shall be: Therapy; Patient Data; Hospital Data; Physician Data; Reimbursement Data; Customer Data; and Start Date. Also, Client Order Entry must be notified whenever a change in Patient status occurs (Therapy/prescription change, end date, etc.).

*PATIENT SHIPMENT:*

Within three (3) business days of each Patient shipment, Customer shall confirm all shipments via the CHIP System. Any additional information can be mailed to: Abbott Laboratories Home Infusion Services, Reimbursement-Invoicing Dept. H56, One Abbott Park Road, Abbott Park, IL 60064, or faxed via FAX #: (708) 937-9424.

(Page 2 of 3)

**SCHEDULE I**

**REQUIRED DOCUMENTATION**

Patient shipping records are utilized to bill third party payors and or Patients for products and services rendered and for maintaining perpetual inventory balances. It is, therefore, imperative that these records be recorded in the system on a timely basis. Abbott reserves the right to hold additional product orders and/or compensation due Customer if shipment confirmations are not submitted on a timely basis.

Customer shall submit the following data to Abbott:

  Monthly:   Monthly usage, by Abbott product number.

  Quarterly: "Balance on Hand", by Abbott product number.
  
  EDDS Listing. The "Devices" listing shall show model, description, serial number and location (include patient name if applicable).

**ELECTRONIC DRUG DELIVERY SYSTEM CONTROL**

**Customer shall be responsible for maintaining serial number control for each EDDS received with traceability to individual Patients.** Upon completion of a therapy utilizing an EDDS, Customer shall contact Abbott Alternate Site Logistics at 1-800-752-4926 for routing instructions.

Customer shall be responsible for providing all regularly scheduled maintenance for all EDDS. In the event an EDDS has a reported malfunction, it must be returned, at Abbott expense, to an Abbott facility for recertification prior to reuse. Please contact Abbott Alternate Site Logistics for shipping instructions.

**INVENTORY VERIFICATION**

Annually a joint physical inventory of consigned product will be conducted by Customer and Abbott. Abbott recognizes there will normally be some inventory shrinkage, exclusive of EDDS and capital equipment. However, inventory shortages in excess of five percent (5%) shall be the responsibility of Customer and shall be billed at prices comparable to those paid by other Abbott Alternate Site customers for like volumes. Any EDDS which cannot be located within thirty (30) days of a physical inventory shall be deemed missing/lost and shall be billed to Customer at a percentage (based on the amount of time the pump was in service prior to being classified as lost) of the price for refurbished pumps available to Abbott from Medical Specialties, Inc. according to the following: Less than one year in service charged at 85% of refurbished price, one to two years at 65%, two to three years at 45%, and three years or greater at 30%.

Confidential

**SCHEDULE I**

## RETURNED GOODS POLICY

Excess or unused Abbott products in full unopened cases may be returned, at Customer expense, provided such items have six (6) months or more of dating when received by Abbott. Items returned with less than six (6) months dating will be billed to Customer at prices comparable to those paid by other Abbott Alternate Site customers for like volumes.

## INSURANCE

Customer must maintain insurance sufficient to cover the value of product on consignment and Customer's activities hereunder.

## SCHEDULE II

### Compensation Schedule

| Type of Home Infusion Therapy | Percent of Program Collections Due Abbott |
|---|---|
| Total Parenteral Nutrition | 35% |
| Total Enteral Nutrition | 55% |
| Antibiotic Therapy | 17% |
| Chemotherapy | 17% |
| Pain Management | 29% |
| I.V. Hydration | 57% |
| Catheter Care | 5% |
| GCSF (Neupogen) | 5% |
| Injection | 15% |
| Other Therapies | 17 % until determined otherwise by mutual consent |

ABT-DOJ 350323
ABT282-1880

**SCHEDULE III**

<u>CHIP SYSTEM TRAINING SCHEDULE</u>

I.      System Set-up Support:
        -    Two (2) days on data/file definition on AS400

II.     Systems Training at Abbott:
        -    One   (1) day Management Training/Overview
        -    One   (1) day Query (Report Writing) Training
        -    Three (3) days on pharmacy operations module
        -    Three (3) days on reimbursement/billing module
        -    Two   (2) days on inventory/order entry module
        -    One   (1) day of additional training (any module)

III.    System Training at Customer Location:
        -    Two   (2) days upon system start-up at customer location
        -    Two   (2) days of follow-up training 6 weeks after start-up

IV.     Future Training Support (New releases, updates, etc.) at Abbott:
        -    Two (2) days annually

<u>ADDITIONAL SYSTEM TRAINING</u>

$350 per eight (8) hour day, per Abbott consultant:

   (1)   In addition to the daily fee, Customer shall be responsible for all
         reasonable travel expenses including transportation, food, and
         lodging incurred by Abbott and/or Customer personnel.
   (2)   Payment shall be due thirty (30) days from date of Abbott
         invoice for consulting services. Abbott shall not increase these
         fees for the first twelve (12) months of this Agreement, but
         reserves the right to increase rates annually thereafter.

Abbott and Customer shall mutually agree on the dates and times for all
consulting services.

Confidential

C/

Doc:
active: K on.
Final K.

Confidential

ABT-DOJ 350325
ABT282-1882        L