of the Abbott-manufactured product to the University of Michigan, Abbott shall reimburse the University of Michigan its acquisition cost for the subsequent purchase of the non-Abbott manufactured product in question, with the exception of electronic infusion devices, and Abbott shall reimburse the University of Michigan its acquisition cost for the subsequent purchase of the non-Abbott manufactured electronic infusion devices in question, for electronic infusion devices in excess of ten (10%) percent of HomeMed™'s total electronic infusion device usage.

4.  The University of Michigan shall invoice Abbott for repayment of the University of Michigan's acquisition cost for the products referenced in 22.C.3..  Copies of the University of Michigan purchase invoice(s) shall accompany the bill submitted to Abbott. Payment terms shall be net thirty days from the date of receipt of the invoice.  A sample invoice for electronic infusion devices reimbursement is attached as Schedule IV.

D.  In the event Abbott is unable to meet the requirements for any of the Abbott manufactured product to be provided under this Agreement from its existing inventory, Abbott shall, i) reimburse the University of Michigan for its acquisition cost to purchase an equivalent non-Abbott manufactured product, for a minor product shortage (e.g., anticipated back-order of less than six weeks), or ii) adjust the compensation due Abbott in an amount equal to the market value of the product on back-order for a major

25

ABT-DOJ 319641
ABT279-1639

of the Abbott-manufactured product to the University of Michigan, Abbott shall reimburse the University of Michigan its acquisition cost for the subsequent purchase of the non-Abbott manufactured product in question, with the exception of electronic infusion devices, and Abbott shall reimburse the University of Michigan its acquisition cost for the subsequent purchase of the non-Abbott manufactured electronic infusion devices in question, for electronic infusion devices in excess of ten (10%) percent of HomeMed™'s total electronic infusion device usage.

4. The University of Michigan shall invoice Abbott for repayment of the University of Michigan's acquisition cost for the products referenced in 22.C.3.. Copies of the University of Michigan purchase invoice(s) shall accompany the bill submitted to Abbott. Payment terms shall be net thirty days from the date of receipt of the invoice. A sample invoice for electronic infusion devices reimbursement is attached as Schedule IV.

D. In the event Abbott is unable to meet the requirements for any of the Abbott manufactured product to be provided under this Agreement from its existing inventory, Abbott shall, i) reimburse the University of Michigan for its acquisition cost to purchase an equivalent non-Abbott manufactured product, for a minor product shortage (e.g., anticipated back-order of less than six weeks), or ii) adjust the compensation due Abbott in an amount equal to the market value of the product on back-order for a major

25

ABT-DOJ 319642
ABT279-1640

product shortage (e.g., anticipated back-order of greater than six weeks).

E.  The University of Michigan shall be responsible for the acquisition of all non-Abbott product and equipment required by Patient's prescriptions under the performance of this Agreement.

23. Systems Support.

A.  Abbott grants the University of Michigan a non-exclusive license to access and utilize Abbott's CHIP Software, on a timeshare basis, for use in the performance of the University of Michigan's obligations under this Agreement.

B.  All such CHIP Software programs and materials are trade secrets of Abbott and their confidentiality shall be protected by the University of Michigan.

C.  Abbott shall provide, maintain and upgrade the computer and communications hardware and operating system(s) required (e.g. AS400 computer system, operating systems, controllers, modems) to operate the CHIP Software and provide the University of Michigan access to such software on a timeshare, dial-up basis.

D.  The CHIP Software, computer and communications hardware and operating software referenced in Sections 23. A. and C., above, shall be available to the University of Michigan at all times, except during the time that Abbott is performing system backup, normal maintenance procedures, installing capacity and software upgrades, etc.

E.  Abbott shall provide the computer and communications hardware and operating software system(s) required (e.g.

26

Confidential

product shortage (e.g., anticipated back-order of greater than six weeks).

E.  The University of Michigan shall be responsible for the acquisition of all non-Abbott product and equipment required by Patient's prescriptions under the performance of this Agreement.

23. Systems Support.

A.  Abbott grants the University of Michigan a non-exclusive license to access and utilize Abbott's CHIP Software, on a timeshare basis, for use in the performance of the University of Michigan's obligations under this Agreement.

B.  All such CHIP Software programs and materials are trade secrets of Abbott and their confidentiality shall be protected by the University of Michigan.

C.  Abbott shall provide, maintain and upgrade the computer and communications hardware and operating system(s) required (e.g. AS400 computer system, operating systems, controllers, modems) to operate the CHIP Software and provide the University of Michigan access to such software on a timeshare, dial-up basis.

D.  The CHIP Software, computer and communications hardware and operating software referenced in Sections 23. A. and C., above, shall be available to the University of Michigan at all times, except during the time that Abbott is performing system backup, normal maintenance procedures, installing capacity and software upgrades, etc.

E.  Abbott shall provide the computer and communications hardware and operating software system(s) required (e.g.

26

Confidential

P.C.'s operating systems, printers, controllers, modems, etc.) to access and utilize the CHIP Software on a dial-up, time share basis for the start-up of the University of Michigan Home Infusion Therapy Services facility. Such equipment and software shall be compatible with that referenced in the Section 23. C., above. The University of Michigan shall be responsible for the maintenance and upgrading of this equipment and for the purchase, maintenance and upgrading of additional equipment required to support the ongoing operation of the HomeMed™ Home Infusion Therapy Services.

F.  Abbott is responsible for the costs associated with the lease line required to access the CHIP Software for one University of Michigan location. The University of Michigan is responsible for the costs associated with any lease line charges for any additional locations.

G.  The University of Michigan is responsible for contacts and costs with telecommunication companies regarding the restoration of any line outages.

H.  Abbott shall provide the University of Michigan training on the use of CHIP Software through the provision of i) System manuals, and ii) up to ten (10) days of user training by Abbott personnel. Additional training may be provided under terms and conditions as may be mutually agreed to by the two parties.

I.  Abbott shall complete installation of the Chip Software and associated hardware at the University of Michigan's location.

J.  Abbott shall provide a "Help Desk" at Abbott to answer

27

Confidential

ABT-DOJ 319645
ABT279-1643

phone questions related to the use of the CHIP Software. The Help Desk shall be staffed 8:15 AM to 4:55 PM, CST, Monday through Friday, except for Abbott recognized holidays. Abbott shall provide the University of Michigan with a schedule of Abbott recognized holidays at the beginning of each calendar year.

K. Abbott shall retain all right, title and interest in and to the CHIP Software and all modifications, improvements and updates to the software that are developed by or for Abbott. None of the software, modifications, etc., may be modified, transferred, copied, photocopied, reproduced, translated, or reduced to any electronic medium with machine readable form, in whole or in part, without the prior written consent of Abbott.

L. The University of Michigan may, upon thirty (30) days written notice, elect to operate the CHIP Software on their own hardware instead of the Abbott timeshare system. In the event the University of Michigan elects to operate their own hardware, Section 23. C. listed herein shall no longer apply to this Agreement.

M. In the event the University of Michigan elects to operate the Chip Software on it's own stand alone hardware, the compensation due Abbott shall be adjusted as referenced in the section herein entitled Compensation.

N. The University of Michigan shall be invited to participate in the Abbott Home Infusion Services systems steering committee. The purpose of this committee is to select and prioritize the system enhancements to be completed on the CHIP Software.

28

Confidential

ABT-DOJ 319646
ABT279-1644

O.  HomeMed™ shall continue to have access to the CHIP
    Software at the end of any extended term of this Agreement
    as defined in Section 33, according to the following:

    1.  Access shall be free of charge with a minimum of seven
        hundred and fifty thousand ($750,000) dollars per year
        in Home Infusion Therapy product purchases by
        HomeMed™.  Pricing for such product shall be no
        greater than the prices paid by other Abbott Alternate
        Site customers, for like volumes and product mix.  The
        University of Michigan shall have access to the Abbott
        analysis which demonstrates that the prices paid by
        the University of Michigan are no greater than the
        prices paid by other Abbott Alternate Site customers,
        for like volumes and product mix.

    2.  In the event product purchases equal less than seven
        hundred and fifty thousand ($750,000) dollars per year
        by HomeMed™, the University of Michigan shall
        compensate Abbott for use of the CHIP Software by an
        annual lease payment of ninety thousand ($90,000)
        dollars.

    3.  The University of Michigan shall also have the option
        to:  utilize the Abbott timeshare hardware system;
        utilize lease lines provided by Abbott; access the
        Help Desk; utilize all CHIP Software upgrades and
        updates; participate in the user steering committee;
        and access up to five (5) days of system training per
        year at no additional cost to the University of
        Michigan.

Confidential

ABT-DOJ 319647
ABT279-1645

24. <u>Marketing of HomeMed™.</u>

A.   The University of Michigan and Abbott shall jointly
develop a business plan to promote the University of
Michigan Home Infusion Therapy Services to the internal
and external University of Michigan markets.  Such plan
shall be consistent with the details submitted in Exhibit
D of the Abbott Laboratories response to the University of
Michigan RFP no.140887, dated November 26, 1991.  All
such programs and materials are trade secrets of Abbott
and their confidentiality shall be protected by the
University of Michigan.

B.   The University of  Michigan, with assistance from Abbott,
shall be responsible for developing preferred provider
arrangements with local insurance companies, HMO's, PPO's,
employers, and other payors.

C.   The University of Michigan shall be included in programs
developed by Abbott for national insurance companies, so
long as HomeMed™ is not categorically and specifically
denied as an acceptable provider.

D.   Each party agrees to obtain prior written approval from
the other party when using the other party's name in any
literature.

25. <u>Ownership of Materials.</u>

Over the life of the Agreement Abbott shall make
available, for use within the University of Michigan Home
Infusion Therapy Services, program materials that have been
developed solely at the time and expense of Abbott.  Such
materials include, but are not limited to, patient training
materials, in-service training materials, train-the-trainer

30

Confidential

ABT-DOJ 319648
ABT279-1646

programs and materials, project implementation plans and nursing and pharmacy policies and procedures. The following shall govern the use of these materials.

A. The University of Michigan, at its own expense, shall have the right to modify such materials.

B. The material shall remain the property of Abbott until such time as major, substantial changes have been made.

C. As mutually agreed, such substantially changed materials shall be deemed the joint property of both parties and shall not be distributed outside of the University of Michigan Home Infusion Services without the prior written consent of both parties.

26. Business Expansion.

A. Each party shall bring new business opportunities, within the University of Michigan Service Area, in the area of Home Infusion Therapy, to the other party's attention for their information, evaluation, and consideration. Within thirty (30) days of notification the parties shall determine the appropriate joint marketing strategy that shall be utilized relative to these new business opportunities. New business opportunities within the University of Michigan Service Area shall not be pursued independently by either party without the other party's prior consent. Such consent shall not be unreasonably withheld. All such programs and materials are trade secrets of Abbott and their confidentiality shall be protected by the University of Michigan.

B. Abbott shall provide the University of Michigan with information on new Abbott-manufactured products, new

31

ABT-DOJ 319649
ABT279-1647

therapeutic agents and new therapies relevant to the Home Infusion Therapy market.

27. Research Activities.

The University of Michigan and Abbott shall jointly pursue research projects according to the structure detailed in pages seven and eight (7 & 8) of the Requirements section of the Abbott Response to the University of Michigan RFP No. 140887, dated November 26, 1991. All such programs and materials are trade secrets of Abbott and their confidentiality shall be protected by the University of Michigan.

28. Incorporation of RFP.

The promises and representations made by Abbott in response to the University of Michigan RFP No. 140887, dated November 26, 1991 as set forth in Abbott materials dated December 16, 1991 and December 20, 1991 are hereby incorporated by reference and made a part of this Agreement. All such programs and materials are trade secrets of Abbott and their confidentiality shall be protected by the University of Michigan.

29. Pre-Facility Start-Up Services.

At the request of the University of Michigan, Abbott shall provide other University of Michigan Home Infusion Therapy Services start-up services, as mutually agreed. These services may include, but not be limited to, product compounding, the provision of non-Abbott manufactured product and the delivery of compounded product to the Patient. The parties agree to negotiate in good faith the compensation due Abbott for these activities.

32

Confidential

ABT-DOJ 319650
ABT279-1648

30. <u>Other Activities.</u>

    The University of Michigan shall be invited to participate in the following:

A.    Abbott Home Infusion Services client network which includes meetings with key Abbott Home Infusion Services clients; and

B.    The FIX system which includes: The Formulary™ subscription service monthly monographs; and the formulary information exchange which provides an open nationwide forum for exchange of ideas, comments, experiences and expertise.

31. <u>Compensation.</u>

A.    Billings for the Home Infusion Therapy products and services provided under the terms of this Agreement shall be submitted to the third party payors of medical benefits and/or the Patients.

B.    The University of Michigan shall establish the rates to be charged for such Home Infusion Therapy products and services. In the event the University of Michigan requests that Abbott update it's price files on the CHIP Software, Abbott shall be given no less than fourteen (14) working days prior written notification of any changes in the rates to be charged to third party payors and/or the Patients.

C.    In consideration of Abbott's obligations under this Agreement, the University of Michigan shall pay Abbott a portion of the Program Collections from the University of Michigan's Home Infusion Therapy Services, in accordance with the rates set forth in Schedules V or VI. Schedule V sets forth the rates due Abbott so long as Abbott provides

Confidential

ABT-DOJ 319651
ABT279-1649

reimbursement services and Schedule VI sets forth the rates due Abbott if the University of Michigan provides reimbursement services. Adjustments are shown in Schedules V and VI to the rates due Abbott in the event the University of Michigan elects to operate the CHIP Software on its own stand alone computer hardware. Monthly Abbott shall invoice the University of Michigan for the compensation due Abbott. Payment terms shall be net sixty (60) days from date of receipt of invoice. Abbott reserves the right to assess the University of Michigan a late payment fee of one and one-half percent (1 1/2%) per month on the full amount due, on overdue amounts.

D.  Each party shall consider the compensation generated from Program Collections, when distributed according to this Agreement, as payment in full and shall not seek to claim any additional amount from the other party, Patients or any other third party payor, except as specifically provided herein.

E.  Schedules IV and V reflect negotiated amounts based on products and services to be provided by Abbott and the gross billing rates for Home Infusion Therapy referenced in the Abbott response to the University of Michigan RFP No. 140887, dated November 26, 1991. These amounts may be re-negotiated in the event; i) the University of Michigan and Abbott agree to changes in the structure of Home Infusion Therapy products and services provided, ii) Abbott introduces additional Home Infusion Therapy products that the University of Michigan elects to utilize

34

ABT-DOJ 319652
ABT279-1650

in the performance of it's Patient care obligations under this Agreement, or iii) the University of Michigan reduces the gross billing rates charged to third party payors of medical benefits.

32. <u>Access to Books and Records.</u>

Upon written request, each party shall afford the other party, or its designees, reasonable opportunity, during normal business hours, to examine the other party's relevant books and records in order to verify compliance with this Agreement. All books and records shall be kept according to Generally Accepted Accounting Principles (GAAP).

33. <u>Term</u>.

The initial term of this Agreement shall be five (5) years and three months, commencing on April 1, 1992. After the initial term, the University of Michigan shall have the option to i) re-negotiate the terms and payment due Abbott under this Agreement for an additional term of five years to include at a minimum but not be limited to the purchase of product and access to the Chip Software system, or ii) seek competitive bids on a package owned and serviced from a single supplier to include product and a fully integrated software system which encompasses the functions required to manage and run the day to day operations of the University of Michigan Home Infusion Therapy Services provided however, that if the University of Michigan during the initial term internally develops it's own financial and operating systems through the efforts of it's own employees and/or independent consultants then the bids would be for product only, and if Abbott submits the lowest and best bid

Confidential

ABT-DOJ 319653
ABT279-1651

the Agreement will be re-negotiated in good faith by both parties for a term to end June 30, 2002.

34. <u>Termination</u>.

A.  Either party may terminate this Agreement upon ninety (90) days written notice to the other party in the event of a breach by such other party of a material provision of this Agreement which is not cured within such ninety (90) day period.  In the event the breaching party has demonstrated good faith efforts to cure the breach, but has not completely cured such breach, the other party may grant the party in breach an additional ninety (90) days to cure such breach.  Such extension shall not be unreasonably with held.

B.  In no event shall any termination permitted by this Agreement affect the rights or obligations of either party which may have accrued prior to termination, including but not limited to reimbursement for any Home Infusion Therapy products or services rendered prior to the effective date of termination.

C.  To ensure continuity of care, Abbott, at the request of the University of Michigan, shall continue to serve all Patients under the terms of this Agreement for a period of up to one hundred and eighty (180) days after any notice of termination.

D.  At the termination of this Agreement and for a period of five (5) years thereafter, neither Abbott nor its agents shall contact any HomeMed™ patients without advance written permission of the University of Michigan.

E.  In the event the Agreement is terminated for any reason

36

ABT-DOJ 319654
ABT279-1652

prior to the end of the initial term, the University of Michigan shall buy out Abbott's initial capital investment in the University of Michigan Home Infusion Operation facility and equipment, as set forth in Section 5 of this Agreement, according to the following schedule:

| Time Period | Buyout as a % of Abbott's Capital Investment |
|---|---|
| End of Yr 1 | 80% |
| End of Yr 2 | 60% |
| End of Yr 3 | 40% |
| End of Yr 4 | 20% |

The pre-facility start up estimate of Abbott's initial capital investment in the University of Michigan Home Infusion Operation totals six hundred and ten thousand five hundred dollars ($610,500). Abbott shall establish a unique budget for the purpose of capturing the capital investments made by Abbott. The total and supporting detail of such budget shall be submitted to the University of Michigan at the completion of the facility start-up project.

F.   This Agreement is terminable in the sole discretion of the University of Michigan if Abbott changes ownership, closes its Home Infusion Services Business Unit, declares bankruptcy, or is sold.

35. Discounts.

The University of Michigan shall disclose any discount under any state or federal program which provides cost based reimbursement to the University of Michigan for the Home Infusion Therapy goods and services provided under this Agreement.

36. Contracts.

The University of Michigan and Abbott shall confer on the

37

Confidential

ABT-DOJ 319655
ABT279-1653

terms of any future contracts extended to affiliated and non-affiliated agencies of the University of Michigan whose Patients would be serviced via this Agreement.

37. Review of Commitments.

The parties agree to review the University of Michigan Home Infusion Therapy Services against the commitments set forth in this Agreement, at semi-annual management meetings.

38. Relationship of Parties.

A.   Each party will be solely responsible for its own actions.

B.   Nothing herein contained shall be construed to make the parties hereto partners or joint venturers, or to create a trust or partnership, or to impose a trust or partnership, on or with regard to any of the parties. Each party shall be individually responsible for its own obligations and liabilities as herein provided.  No party shall be under the control of or shall be deemed to control the other. No party shall be the agent (except for reimbursement services) or representative of the other party or have a right or power to bind the other party without such party's express written consent.  The parties shall be in the relationship of independent contractors.

39. Employee Protection.

During the term of this agreement and for a period of twelve (12) months following termination or expiration of its term, the parties agree that their respective personnel involved in the activities hereof shall not solicit or cause solicitation of employees of the other party who are involved in the activities hereof, except as with respect to employees mentioned in Section 7.B. of this Agreement and as mutually

38

Confidential
ABT-DOJ 319656
ABT279-1654

agreed upon by both parties.  The foregoing shall not apply to general solicitations not directed at such employees of the other party.

40. <u>Warranties.</u>

Abbott warrants that products it manufactures, when used in accordance with the directions on the labeling, are fit for the purposes and indications described in the labeling.  Unless the Home Infusion Therapy product is used in accordance with its instructions, these warranties are void and of no effect. There are no other expressed or implied warranties.

41. <u>Insurance and Indemnification.</u>

A.  Insurance:  Each party, at its sole cost and expense, shall procure and maintain during the term of this Agreement such policies of general liability, professional liability and other insurance (including self-insurance) as shall be necessary to insure it, its employees and agents against any claim or claims for damages arising by reason of bodily injury, death or tangible property damage directly or indirectly caused by or in connection with its performance of this Agreement.  Each of such policies shall be in amounts reasonably acceptable to the other party, but shall not be less than $1.0 million per person for bodily injury, death or tangible property damage. Each party shall deliver an insurance certification to the other party upon request.

B.  Indemnification

1.  Abbott shall indemnify, hold harmless and defend the University of Michigan, its employees and agents from and against any and all loss, claims, causes of

39

Confidential

ABT-DOJ 319657
ABT279-1655

action, costs or expenses, including reasonable attorney's fees, arising, or alleged to arise, from bodily injury, death or tangible property damage caused by any wrongful or negligent act or omission of Abbott, its employees or agents in the performance of their obligations or duties under this Agreement.

2.   The University of Michigan shall indemnify, hold harmless and defend Abbott, its employees and agents from and against any and all loss, claims, causes of action, costs or expenses, including reasonable attorney's fees, arising, or alleged to arise, from bodily injury, death or tangible property damage caused by any wrongful or negligent act or omission of the University of Michigan, its employees or agents in the performance of their obligations or duties under this Agreement.

3.   The indemnifications provided in (1) and (2) above shall only apply if the party seeking indemnification notifies the other party in writing of a claim or lawsuit covered by the indemnity within thirty (30) days after receipt of notice of such claim or lawsuit, or within the time reasonably required to file an answer to such lawsuit if thirty (30) days notice cannot reasonably be given.  The party seeking indemnification shall cooperate in the investigation and defense of any claim or lawsuit covered by this indemnity and will not compromise or settle any such claim or lawsuit without the prior written consent of the party providing the indemnification.

Confidential

ABT-DOJ 319658
ABT279-1656

42. Law.

A.   Both parties acknowledge that the University of Michigan is subject to certain State of Michigan laws and that nothing in this Agreement shall prohibit the University of Michigan from complying with any of those laws including but not limited to Freedom of Information Acts or other laws requiring disclosure of information.

B.   Abbott agrees to abide by all applicable federal and Michigan law in the execution of its obligations under this Agreement.

C.   If it is determined that Section 952 of the Medicare and Medicaid provisions of the Omnibus Reconciliation Act of 1980 applies to this contract, then until the expiration of four (4) years after the furnishing of services required by this contract, HomeMed™ and/or Abbott shall make available to the extent required by law, upon written request of the Secretary of the Department of Health and Human Services or upon request of the Controller General of the United States or any of their duly authorized representatives, any and all books, documents and records deemed necessary to certify the nature and extent of costs for services furnished under this Agreement.

D.   The parties understand and expressly agree that any claims, demands or motions asserted against the Regents of the University of Michigan, its agents or employees, shall be brought only in the Michigan Court of Claims, as it is the only court of exclusive jurisdiction over claims against the University of Michigan, a Michigan constitutional corporation.

Confidential

ABT-DOJ 319659
ABT279-1657

E.   Abbott, its successors and assigns, consent to the jurisdiction of the U.S. District Court for the Eastern District of Michigan or the Washtenaw County Courts for the State of Michigan with respect to any claims arising under this Agreement.

43. Force Majeure.

Neither party will be liable for any failure to perform any duties or obligations under this Agreement (except for the obligation to make payment) due to strikes, explosions, flood, riot, lock out, injunction, interruption of transportation, accidents, inability to obtain supplies at reasonable prices, war, act of governmental authority, acts of God, or other causes beyond its control. Abbott will utilize reasonable best efforts to provide products and services, but in the event of shortages will use reasonable best efforts to allocate product among all customers.

44. Confidential Information.

A.   Both parties agree to keep the terms of this Agreement confidential during the term of the Agreement and for a period of five (5) years following the termination of this Agreement. In addition, each party may, from time to time, disclose certain confidential information to the other party. Each party shall take all reasonable steps to prevent disclosure of any information designated by the other party as being confidential, and shall not use or disclose any such information during the term of this Agreement and for a period of three (3) years following termination of this Agreement, except as required by relevant law, as permitted by this Agreement or in writing

42

ABT-DOJ 319660
ABT279-1658

by the other party.  The foregoing shall not apply to information:

1.   which either party can show was known to it prior to the disclosure by the other party;

2.   which is or becomes public knowledge through no fault of the receiving party; or

3.   which is lawfully disclosed to either party by a third party.

B.   Both parties during this Agreement will learn of information which each party regards as confidential proprietary trade secret information and both parties shall keep all such information confidential.  This clause shall survive termination of this Agreement.

45.  Entire Agreement.

This Agreement and the attachments sets forth the entire Agreement of the parties.  This Agreement may only be amended in writing signed by authorized representatives of both parties.

46.  Notice.

All notices hereunder shall be in writing and shall be delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested, to the following address of the respective parties:

Abbott Laboratories
Abbott Home Infusion Services
900 N. Shore Drive
Lake Bluff, IL 60044

Attn:  General Manager
with a copy to: General Counsel

43

ABT-DOJ 319661
ABT279-1659

University of Michigan Medical Center
HomeMed™
2850 South Industrial Hwy
Ann Arbor, Michigan 48104

Attn:  General Manager, HomeMed™

Such notice shall be effective upon receipt if personally delivered, or on the third business day following the date of mailing.

47. Assignment.

This Agreement will be governed by the laws of the state of Michigan and may not be assigned in whole or in part by either party without the other party's prior written consent.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

The Regents of the
University of Michigan

By: _____

Name: FARRIS W. WOMACK, VICE PRESIDENT
Please Print or Type  CM-JVM

Title: _____

Date: MAR 31 1992

By: _____

Name: _____
Please Print or Type

Title: _____

Date: _____

Abbott Laboratories

By: _____

Name: W. G. DIEMER
Please Print or Type

Title: Manager, Contracting & Business Development

Date: 4/1/9_

44

ABT-DOJ 319662
ABT279-1660

SCHEDULE I

EQUIPMENT LISTING

| PHARMACY EQUIPMENT | QUANTITY |
|---|---|
| VERTICAL HOOD | 1 |
| HORIZONTAL HOOD | 3 |
| REFRIGERATOR | 2 |
| FREEZER | 1 |
| STORAGE CARTS | 4 |
| TRANSPORT CARTS | 6 |
| STORAGE TOTES | 15 |
| WORK STOOL | 6 |
| METTLER BALANCE | 1 |
| CLEAN ROOM SUPPLIES | – |
| MISC. PHARMACY SUPPLIES | – |
| WAREHOUSE SHELVING | 659 FEET |
| SECURITY SYSTEM | – |
| INCUBATOR | 1 |
| PALLET JACK | 1 |
| MISC. CLEANING EQUIPMENT | – |
| SAFE | 1 |
| WORK TABLE | 5 |
| MISC. PHCY LICENSE SUPPLIES | – |
| EQUIPMENT INSTALLATION | – |
| HOOD CERTIFICATION | 4 |
| FREIGHT | – |
| SALES TAX | – |

| OFFICE EQUIPMENT | |
|---|---|
| PRIVATE OFFICE FURNITURE | 5 |
| OPEN CUBICLE WORK STATIONS | 21 |
| FILE | 15 |
| BOOKCASE | 7 |
| TYPEWRITERS | 2 |
| CONFERENCE TABLE/CHAIRS | 1 |
| PC COMPUTER EQUIPMENT AND SOFTWARE | 6 |
| MISC. OFFICE SUPPLIES | – |
| SYSTEM EQUIP. (MONITORS, PRINTERS) | 18 |
| BREAK ROOM EQUIPMENT | – |
| FREIGHT | – |
| SALES TAX | – |

45

Confidential

ABT-DOJ 319663
ABT279-1661

SCHEDULE II

HOME INFUSION THERAPY

("MONTH") PROGRAM REVENUES

BY PAYOR

| Therapy | Gross Billings | Estimated Collection Rate | Estimated Program Collections | Actual Program Collections |
|---|---|---|---|---|
| TPN | $ | % | $ | $ |
| TEN | | | | |
| Antibiotic | | | | |
| Chemotherapy | | | | |
| Pain Management | | | | |
| I.V. Hydration | | | | |
| D.H.P.G. | | | | |
| Catheter Care | | | | |
| Other | | | | |
| Total | | | | |

46

Confidential

SCHEDULE III
Consigned Inventory

**BACKGROUND**
Abbott will provide the University of Michigan full cases of Abbott manufactured product as consigned inventory. All consigned inventory remains the property of Abbott and cannot be resold.

**INVENTORY STOCKING LEVELS**
The University of Michigan will be expected to manage this inventory with good materials management practices to minimize the occurrence of outdated product and the need for emergency shipments resulting in premium delivery costs.

Reasonable levels of inventory shall be maintained, normally three months of projected usage is adequate.

**INVENTORY ORDERS**
Initial and reorders shall be for full cases of Abbott manufactured products. Allow five (5) business days for the delivery of products. If premium routing is requested, the additional cost will be billed to the University of Michigan.

A minimal inventory of Electronic Drug Delivery Devices will be maintained in the University of Michigan's pharmacy. Additional Electronic Drug Delivery Devices will be shipped to the University of Michigan at the time a Patient initiates therapy. These devices will be shipped via premium routing, if necessary, to assure that service requirements are met.

**INVENTORY VERIFICATION**
The University of Michigan shall submit the following data to Abbott: monthly usage, by Abbott product number; quarterly "Balance on Hand", by Abbott product number; and a quarterly accounting of all Electronic Infusion Devices. The "Devices" listing shall show model, description, serial number and the patient's name utilizing the device, if any.

Yearly a joint physical inventory of consigned product will be conducted by the University of Michigan and Abbott. Abbott recognizes there will normally be some inventory shrinkage. However, significant physical inventory shortages will be the responsibility of the University of Michigan and will be billed at prices comparable to those paid by other Abbott Alternate Site customers for like volumes.

47

Confidential

ABT-DOJ 319665
ABT279-1663

SCHEDULE III
Consigned Inventory
(Con't)

## RETURNED GOODS POLICY

Excess or unused Abbott products in full unopened cases may be returned provided such items have six (6) months or more of dating when received by Abbott. Items returned with less than six (6) months dating will be billed to the University of Michigan at prices comparable to those paid by other Abbott Alternate Site customers for like volumes.

In the event the University of Michigan receives product with less than six months dating from Abbott, Abbott shall be notified of such and the product shall be replaced at no charge to the University of Michigan.

## ELECTRONIC DRUG DELIVERY DEVICES CONTROL

The University of Michigan will be responsible for maintaining serial number control for each Abbott Manufactured Electronic Drug Delivery Device received with traceability to individual Patients. When an Electronic Drug Delivery Device is picked up from a Patient, the University of Michigan shall call Abbott Materials Management at 1-800-752-4926 for instructions. If an Electronic Drug Delivery Device has a reported malfunction, it is an Abbott requirement that it must be returned to an Abbott facility for recertification prior to reuse.

## INSURANCE

The University of Michigan must maintain insurance sufficient to cover the value of product on consignment and the University of Michigan's activities hereunder.

48

Confidential

SCHEDULE IV

Sample Invoice for acquisition cost reimbursement
non Abbott-manufactured electronic infusion devices
Month of June, 1992

| Patient Name | Device Used | Does Abbott mfg comparable? | 90 day resolution period complete? | Non-Abbott devices Did U of M acquire? | U of M acquisition cost | # of devices in reim pool | dollars in reim pool |
|---|---|---|---|---|---|---|---|
| HPN,1 | Provider | N/A | yes | no | $0.00 | 1 | $0.00 |
| HPN,2 | CADD-TPN | yes | yes | yes | $100.00 | 1 | $100.00 |
| HPN,3 | CADD-TPN | yes | yes | yes | $100.00 | 1 | $100.00 |
| HPN,4 | Provider | N/A | yes | no | $0.00 | 1 | $0.00 |
| TEN,1 | Companion | N/A | no | no | $0.00 | 0 | $0.00 |
| TEN,2 | Companion | N/A | no | no | $0.00 | 0 | $0.00 |
| TEN,3 | Companion | N/A | no | no | $0.00 | 0 | $0.00 |
| TEN,4 | Kangaroo, 224 | yes | no | yes | $50.00 | 0 | $0.00 |
| TEN,5 | Kangaroo, 224 | yes | no | yes | $50.00 | 0 | $0.00 |
| TEN,6 | Kangaroo, 224 | yes | no | yes | $50.00 | 0 | $0.00 |
| TEN,7 | Kangaroo, 324 | yes | no | yes | $50.00 | 0 | $0.00 |
| Pain, 1 | CADD-PCA | yes | yes | yes | $100.00 | 1 | $100.00 |
| Pain, 2 | CADD-PCA | yes | yes | yes | $100.00 | 1 | $100.00 |
| Pain, 3 | CADD-PCA | yes | yes | yes | $100.00 | 1 | $100.00 |
| Terbutaline | Minimed | no | no | yes | $75.00 | 0 | $0.00 |
| | | | | | Total | 7 | $500.00 |

| | |
|---|---|
| Total device pool | 7 |
| # of Abbott mfgd devices | 2 |
| # non-Abbott mfgd devices | 5 |
| Potential % eligible for reimbursement | 90.0% |
| % Abbott of total | 28.6% |
| % eligible for reimbursement | 61.4% |
| U of M acquisition cost | $500.00 |
| Total due University of Michigan | $307.14 |

49

ABT-DOJ 319667
ABT279-1665

SCHEDULE IV

Sample Invoice for acquisition cost reimbursement
non Abbott-manufactured electronic infusion devices
Month of June, 1992

| Patient Name | Device Used | Does Abbott mfg comparable? | 90 day resolution period complete? | Non-Abbott devices Did U of M acquire? | Non-Abbott devices U of M acquisition cost | # of devices in reim pool | dollars in reim pool |
|---|---|---|---|---|---|---|---|
| HPN,1 | Provider | N/A | yes | no | $0.00 | 1 | $0.00 |
| HPN,2 | CADD-TPN | yes | yes | yes | $100.00 | 1 | $100.00 |
| HPN,3 | CADD-TPN | yes | yes | yes | $100.00 | 1 | $100.00 |
| HPN,4 | Provider | N/A | yes | no | $0.00 | 1 | $0.00 |
| TEN,1 | Companion | N/A | no | no | $0.00 | 0 | $0.00 |
| TEN,2 | Companion | N/A | no | no | $0.00 | 0 | $0.00 |
| TEN,3 | Companion | N/A | no | no | $0.00 | 0 | $0.00 |
| TEN,4 | Kangaroo, 224 | yes | no | yes | $50.00 | 0 | $0.00 |
| TEN,5 | Kangaroo, 224 | yes | no | yes | $50.00 | 0 | $0.00 |
| TEN,6 | Kangaroo, 224 | yes | no | yes | $50.00 | 0 | $0.00 |
| TEN,7 | Kangaroo, 324 | yes | no | yes | $50.00 | 0 | $0.00 |
| Pain, 1 | CADD-PCA | yes | yes | yes | $100.00 | 1 | $100.00 |
| Pain, 2 | CADD-PCA | yes | yes | yes | $100.00 | 1 | $100.00 |
| Pain, 3 | CADD-PCA | yes | yes | yes | $100.00 | 1 | $100.00 |
| Terbutaline | Minimed | no | no | yes | $75.00 | 0 | $0.00 |
| | | | | | Total | 7 | $500.00 |

| | |
|---|---|
| Total device pool | 7 |
| # of Abbott mfgd devices | 2 |
| # non-Abbott mfgd devices | 5 |
| Potential % eligible for reimbursement | 90.0% |
| % Abbott of total | 28.6% |
| % eligible for reimbursement | 61.4% |
| U of M acquisition cost | $500.00 |
| Total due University of Michigan | $307.14 |

49

Confidential
ABT-DOJ 319668
ABT279-1666

SCHEDULE V

Compensation Schedule with
Abbott Providing Reimbursement Services

| Type of Home Infusion Therapy | Percent of Program Collections Due Abbott Timeshare | Stand Alone |
|---|---|---|
| Total Parenteral Nutrition | 39.5% | 39.2% |
| Total Enteral Nutrition | 48.0% | 47.7% |
| Antibiotic Therapy | 14.0% | 13.7% |
| Chemotherapy | 24.0% | 23.7% |
| Pain Management | 24.0% | 23.7% |
| I.V. Hydration | 40.0% | 39.7% |
| IVIG | 14.0% | 13.7% |
| Terbutaline | 10.0% | 9.7% |
| Nebupent | 10.0% | 9.7% |
| Epogen | 10.0% | 9.7% |
| Neupogen | 10.0% | 9.7% |
| Cath Care | 10.0% | 9.7% |
| Other Therapies | To be determined by mutual consent | |

50

Confidential

SCHEDULE VI

## Compensation Schedule with University of Michigan Providing Reimbursement Services

|  | Percent of Program Collections Due Abbott | |
|---|---|---|
| Type of Home Infusion Therapy | Timeshare | Stand Alone |
| Total Parenteral Nutrition | 28.4% | 28.1% |
| Total Enteral Nutrition | 38.5% | 38.2% |
| Antibiotic Therapy | 9.0% | 8.7% |
| Chemotherapy | 12.0% | 11.7% |
| Pain Management | 12.0% | 11.7% |
| I.V. Hydration | 29.0% | 28.7% |
| IVIG | 9.0% | 8.7% |
| Terbutaline | 5.0% | 4.7% |
| Nebupent | 5.0% | 4.7% |
| Epogen | 5.0% | 4.7% |
| Neupogen | 5.0% | 4.7% |
| Cath Care | 5.0% | 4.7% |
| Other Therapies | To be determined by mutual consent | |

Confidential

ABT-DOJ 319670
ABT279-1668 L