# Exhibit 124

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE        )
LITIGATION            ) MDL No. 1456
_____ ) Civil Action No. 01-12257
                               )
THIS DOCUMENT RELATES TO:  ) Judge Patti B. Saris
_____ )
                               )
United States of America,    )
ex res. Ven-A-Care of the    )
Florida Keys, Inc. v. Abbott )
Laboratories, Inc.           )
CIVIL ACTION NO. 06-11337-PBS )
                               )
                               )

CONTINUED VIDEO DEPOSITION OF DONALD C. ROBERTSON

DATE TAKEN:   Tuesday, October 9, 2007
TIME:       9:06 a.m. to 4:58 p.m.
BEHALF OF:   The United States
PLACE TAKEN:  United States Attorney's Office
          2110 First Street,
          Fort Myers, Florida
REPORTER:    Lisa L. Rios, Court Reporter,
          and Notary Public, State of
          Florida at Large

MARTINA REPORTING SERVICES
Courtney Building, Suite 201
2069 First Street
Fort Myers, Florida  33901
(239) 334-6545
FAX  (239) 332-2913

CONFIDENTIAL

---

**Page 296**

```
 1
 2      A P P E A R A N C E S
 3
 4  ANN ST. PETER-GRIFFITH, Attorney at Law,
    Special Attorney for the Attorney General
 5  99 N.E. 4th Street, 3rd Floor,
    Miami, Florida  33132
 6  representing the United States Attorney,
    Southern District of Florida
 7
 8  DONALD E. HAVILAND, JR., Attorney at Law,
    The Haviland Law Firm, LLC,
 9  740 S. Third Street, Third Floor
    Philadelphia, Pennsylvania  19147
10  representing the Commonwealth of Pennsylvania
11
    TONI-ANN CITERA, Attorney at Law,
12  Jones Day,
    222 East 41st Street
13  New York, New York  10017-6702
    representing Abbott Laboratories, Inc.
14
15  DAVID J. STETLER, Attorney at Law,
    Stetler & Duffy, Ltd.,
16  11 South LaSalle Street, Suite 1200
    Chicago, Illinois  60603;
17  representing the Witness, Donald C. Robertson
18
    C. JARRETT ANDERSON, Attorney at Law,
19  Anderson, LLC
    1300 Guadalupe, Suite 103
20  Austin, Texas  78701
    representing the Relator, Ven-A-Care of the Florida
21         Keys, Inc.
22
23  ELISEO SISNEROS, Deputy Attorney General,
    State of California Department of Justice
24  110 West A Street, #1100
    San Diego, California  92101
25
```

---

**Page 297**

```
 1
 2      A P P E A R A N C E S  (Continued)
 3
 4  Appearing via Telephone:
 5
 6      AMBER NESBITT, Attorney at Law,
        Wexler, Toriseva, Wallace,
 7      55 West Monroe Street, Suite 3300
        Chicago, Illinois  60603;
 8      representing MDL and the State of Arizona
 9      SHARON LAHEY, Attorney at Law,
        Goodwin, Proctor
10      representing TAP Pharmaceutical Products, Inc.
11
12  Also Present:
13
    Mike Sturdevant, Videographer
14
    John Lockwood, Ven-A-Care of the Florida
15  Keys, Inc., Relator
16
17  _____
18      I N D E X
19               PAGE
20
21  Cont'd Direct Examination by Ms. St. Peter-Griffith   305
22  Cross-Examination by Mr. Haviland                     348
23  Cross-Examination by Mr. Anderson                     434
24
25
```

---

**Page 298**

```
 1
 2      I N D E X  (Cont'd)
 3      E X H I B I T S
 4
    ROBERTSON       DESCRIPTION            PAGE
 5
    11   One-page Interoffice Correspondence
 6        dated June 22, 1994 from Virginia
         Tobiason stamped ABT212120           306
 7
    12   One-page Interoffice Correspondence
 8        dated December 3, 1993 from Jeff Hamlin   313
 9  13   Two-page document with first page being
         an Interoffice Correspondence dated
10        December 6, 1993 from R. Emmet Harrigan   316
11  14   two-page document with first page being an
         Interoffice Correspondence dated December
12        21, 1993 from Jeffrey L. Hamlin           317
13  15   16-page Interoffice Correspondence dated
         March 8, 1999 from Marianne Sutcliffe      319
14
    16   30-page document with first page stamped
15        ABT006588                                 323
16  17   33-page composite exhibit with first page
         dated January 26, 2000 from Michelle
17        Scarpelli and Jim Watson                  328
18  18   45-page composite exhibit with first page
         dated February 20, 1997 from Jack Miller   330
19
20  19   16-page document with first page dated
         September 25, 1997 from Lynn E. Leone      334
21
    20   21-page document with first page being a
22        facsimile cover sheet to Chuck Santora
         from Lynn Leone                            338
23
    21   Five-page document from Jack Miller
24        with first page dated December 8, 1997    340
25  22   Two-page Unanimous Consent dated
         September 13, 2001                         366
```

Page 299

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 301

```
1                    INDEX (Cont'd)
2                 E X H I B I T S (Cont'd)
3
   ROBERTSON        DESCRIPTION           PAGE
4
   35    43-page document with first page dated
5         May 26, 1994 from Steve Kipperman
         previously marked Kipperman Exhibit No.
6         480 on 3/7/07           501
7  36    One-page document dated March 20, 1995
         from Gerald Eichhorn previously marked
8         Sellers Exhibit No. 286 on 2/13/07    517
9  37    One-page document dated April 26, 1995
         from Michael Heggie previously marked
10        Lotz Exhibit No. 63 on 8/9/06     521
11 38    One-page document dated April 27, 1995
         from Jerrie Cicerale previously marked
12        Heggie Exhibit No. 69 on 8/22/06     531
13 39    Two-page document with first page dated
         May 5, 1995 from Gerald Eichhorn previously
14        marked Heggie Exhibit No. 79 on 8/22/06  533
15 40    Four-page document with first page stamped
         AB0020103 previously marked Sellers
16        Exhibit No. 362 on 2/14/07      543
17 41    One-page Interoffice Correspondence dated
         December 22, 1994 from John Ward stamped
18        TXABT 249849          555
19 42    Two-page document with first page dated
         September 15, 1997 previously marked
20        Sellers Exhibit No. 290 on 2/13/07    559
21 43    Two-page Interoffice Correspondence dated
         September 29, 1997 from Pete Baker and
22        Mike Novak previously marked Sellers
         Exhibit No. 291 on 2/13/07      561
23
   44    One-page document dated January 19, 1998
24        from Dennis Walker to Pete Baker stamped
         ABT 281983           564
25
```

Page 300

```
1                    INDEX (Cont'd)
2                 E X H I B I T S (Cont'd)
3
   ROBERTSON        DESCRIPTION           PAGE
4
   23    Four-page document entitled, TAP
5         Pharmaceutical Products Inc.'s Answer
         and Separate Defenses to Plaintiff's
6         Complaint            372
7  24    Two-page document dated August 13, 1991
         from Nancy Sattelberg previously marked
8         as Patton Exhibit No. 5 on 4/23/03    375
9  25    One-page Privilege Log          388
10 26    One-page memorandum dated September 11, 1991
         from Victoria Shain previously marked as
11        Haberberger Exhibit No. 8        399
12 27    11-page document with first page being a
         facsimile cover sheet dated November 5, 1993
13        from Maureen M. McShane        411
14 28    One-page document dated April 1993, entitled
         TAP Pharmaceuticals Inc. President's Review
15        of Operating Results          417
16 29    13-page document with first page stamped
         ABT 07092 previously marked as Pietraszek
17        Exhibit No. 25 on 2/10/04       420
18 30    One-page document dated January 16 1996
         from Michael Heggie previously marked
19        Heggie Exhibit No. 71 on 8/22/06     475
20 31    One-page document dated January 16, 1996
         from Charlie Mitchell previously marked
21        Heggie Exhibit No. 70 on 8/22/06     478
22 32    One-page Interoffice Correspondence dated
         January 21, 1992 from Michael W. Sellers    492
23
   33    One-page Interoffice Correspondence dated
24        January 27, 1993 from Charlie Mitchell    492
25 34    One-page Interoffice Correspondence dated
         February 9, 1994 from Ann C. Thelemann    492
```

Page 302

```
1                    INDEX (Cont'd)
2                 E X H I B I T S (Cont'd)
3
   ROBERTSON        DESCRIPTION           PAGE
4
5  45    12-page document stamped TXABT38335
         previously marked Fiske Exhibit No. 526
6         on 3/21/07           566
7  46    Three-page correspondence dated July
         14, 1995 from John V. Ward with first
8         page stamped ABT 278110        569
9  47    Two-page Interoffice Correspondence dated
         January 10, 1996 from Dennis Walker with
10        first page stamped ABT 278078     573
11 48    Two-page correspondence dated December
         20, 1995 previously marked Lotz Exhibit
12        No. 64 on 8/9/06          577
13 49    One-page correspondence dated August 7,
         1996 from Dennis Walker previously
14        marked Lotz Exhibit No. 65 on 8/9/06    582
15 50    36-page document entitled, GeriMed Request
         for Proposal, dated March 8, 1996 previously
16        marked Rhodus Exhibit No. 335 on 4/26/05   586
17 51    11-page document entitled, Presentation
         to Abbott Laboratories by Pharmaceutical
18        Buyers, Inc., previously marked Sellers
         Exhibit No. 293 on 2/14/07      596
19
   52    19-page document entitled, Pharmaceutical
20        Buyers, Inc., previously marked Kipperman
         Exhibit No. 485          601
21
   53    Two-page correspondence dated June 16,
22        2000 from Lynn E. Leone previously marked
         Sellers Exhibit No. 592 on 4/12/07    603
23
   54    Two-page correspondence dated January 17,
24        2001 from Lynn E. Leone previously marked
         Sellers Exhibit No. 587 on 4/12/07    611
25
```

60e5726b-bc69-475a-8c51-36591ea203d2

Page 303

1    VIDEOGRAPHER:  We are here today, October 9, 2007,
2  at 9:06 a.m. for the videotape deposition of Don
3  Robertson, located at the United States Attorney's
4  Office, 2110 First Street, Fort Myers, Florida, in the
5  case styled, United States of America versus Abbott
6  Laboratories.
7    The videographer is Mike Sturdevant.
8    The reporter is Lisa Rios.
9    Would counsel please state their appearances for the
10  record.
11    MS. ST. PETER-GRIFFITH:  Ann St. Peter-Griffith from
12  the United States Attorney's Office on behalf of the
13  United States.
14    MR. ANDERSON:  Jarrett Anderson, Counsel for the
15  Relator.
16    MR. SISNEROS:  Eliseo Sisneros, Deputy Attorney
17  General on behalf of the State of California.
18    MR. HAVILAND:  Don Haviland for the Commonwealth of
19  Pennsylvania.
20    MS. NESBITT:  Amber Nesbitt of Wexler, Toriseva,
21  Wallace on behalf of the MDL and the State of Arizona.
22    MS. CITERA:  Toni Citera from Jones Day on behalf of
23  the Defendant.
24    MR. STETLER:  Dave Stetler for the Witness.
25    MR. LOCKWOOD:  John Lockwood.  I'm with Ven-A-Care

Page 304

1  of the Florida Keys, and I'm not an attorney.
2    VIDEOGRAPHER:  Would the court reporter swear in the
3  witness.
4    COURT REPORTER:  Sir, you understand that you're
5  still under oath from the previous deposition?
6    THE WITNESS:  Yes.
7    COURT REPORTER:  Thank you.
8    MS. CITERA:  Before we begin I just wanted to get a
9  stipulation on the record.
10    Since we were last here, Mr. Haviland's case has
11  been remanded to State Court in Pennsylvania.
12    Before we started the deposition, I asked him
13  whether he would be willing to stipulate that I need
14  only say, Objection, form, in order to preserve all form
15  objections, and also - I didn't mention this, but I
16  wanted you to also stipulate that all other objections
17  are reserved until trial.
18    MR. HAVILAND:  Agreed.
19    MS. CITERA:  Thank you.
20    MS. ST. PETER-GRIFFITH:  Before we start, as well, I
21  would just like to ask counsel from Jones Day, I had
22  asked - I had sent you an e-mail concerning Exhibit 2
23  because we had some issues with regard to the attachment
24  to that exhibit to this deposition.  I was just
25  wondering were you able to bring the original document

Page 305

1  with you?
2    MS. CITERA:  No.  I responded to your e-mail I did
3  not bring the original.  If you would like to see the
4  original, you're certainly welcome to view it at our
5  offices.
6    MS. ST. PETER-GRIFFITH:  Okay.
7    Have you been able to locate the original?
8    MS. CITERA:  We were able to locate, as I indicated
9  in my e-mail, the original version of the copy that was
10  sent to John Ward.
11    MS. ST. PETER-GRIFFITH:  Okay.  I'd just like to
12  clarify what e-mail because I haven't received an
13  e-mail.
14    MS. CITERA:  I sent you an e-mail.  Oh, you didn't
15  get that?
16    MS. ST. PETER-GRIFFITH:  No.
17    MS. CITERA:  Did you all get it?
18    MR. HAVILAND:  I saw it.
19    MR. ANDERSON:  I got it.
20    MS. CITERA:  Well, I have a copy of it, if you'd
21  like.
22    MS. ST. PETER-GRIFFITH:  Okay.  Well, when did you
23  send it?
24    MS. CITERA:  I sent it Sunday night.
25    MS. ST. PETER-GRIFFITH:  Okay.  Well, yesterday was

Page 306

1  a Federal holiday, so the office was closed.  Okay.
2    MS. CITERA:  Okay.  If you want at a break I can get
3  you a copy of the e-mail because I have it with me.
4    MS. ST. PETER-GRIFFITH:  Okay.  Thank you.
5    DIRECT EXAMINATION
6  BY MS. ST. PETER-GRIFFITH:  (Cont'd.)
7    Q    Welcome back, Mr. Robertson.
8    A    Thank you.
9    Q    Sir, I've got a few questions for you this morning
10  and then I'm going to pass it on to my colleagues so that
11  they can ask questions.
12    I also am - there's a possibility I might lose my
13  voice here and, unfortunately, it's not from rooting for the
14  Red Sox, it's because I've got a bad bronchial infection, so
15  bear with me, please, sir.
16    A    Sure.
17    Q    Sir, since we last were here and taking your
18  deposition, have you done anything to either prepare for
19  your deposition - the reconvening of your deposition or to
20  review your deposition testimony?
21    A    Well, I had spoke with Mr. Stetler regarding the
22  deposition after, but with no one else or no other
23  preparation.
24    Q    Okay.
25    Did you review any of the exhibits to your

Page 307

1  deposition?
2      A   No.
3      Q   Okay.
4          Sir, is there anything -- As you sit here today,
5  having had a little bit of time to reflect upon the first
6  day of deposition, are there any answers that you think that
7  you need to change or is there any additional information
8  that you've thought of that might amplify some of the
9  answers in your prior day's deposition?
10     A   No.
11     Q   Okay.
12         What I'd like to do is go -- My questions are
13 largely going to be geared towards documents.
14         The first document I'd like to have marked and to
15     have you review.
16         (Whereupon, Robertson Exhibit No. 11 was marked for
17     identification.)
18     Q   Sir, if you could just briefly look at this
19 document.
20     A   (Witness complies.)
21         Mm-hmm.  Okay.
22     Q   Sir, do you recognize this document?
23     A   No.
24     Q   It purports to be a June 22nd, 1994 memorandum from
25 Virginia Tobiason, and there are several people who are

Page 308

1  identified as the addressees and there's a D. Robertson.
2      Do you see that?
3      A   Mm-hmm.
4      Q   Do you have any reason to doubt that that's you?
5      A   Oh, no.
6      Q   Okay.
7          Do you recall receiving this memorandum?
8      A   No.
9      Q   Do you recall the issue that's raised in the
10 memorandum concerning the House Ways and Means Committee
11 passing an amendment requiring rebates to brand and generic
12 drugs?
13     A   I seem to remember in the early 90s there was a
14 movement to reform (indicating) health care.  But this
15 specific issue, I have no memory of this specific issue in
16 the memo.
17     Q   Okay.
18         Do you remember any discussion concerning proposed
19 changes to rebates or rebates being calculated off an
20 average manufacturer's price?
21     A   No.
22     Q   Okay.
23         The second paragraph of this memorandum says, We
24 originally lobbied.  Do you see that?
25     A   Mm-hmm.

Page 309

1      Q   Were you ever involved in any lobbying efforts on
2  behalf of Abbott?
3      A   I don't understand.
4          You mean did I ever talk to someone in the
5  Legislature of the United States regarding this issue or a
6  representative?
7          What does that mean?
8      Q   Fair enough.  Let me clarify.
9          Did you ever consult with anyone either within
10 Abbott or outside of Abbott concerning Abbott's lobbying
11 efforts?
12         MS. CITERA:  Objection to form.
13         THE WITNESS:  I don't remember.  I don't remember
14     that specifically.
15     Q   Okay.
16         Do you remember hearing about or learning about any
17 lobbying efforts by Abbott?
18         MS. CITERA:  Objection to form.
19         THE WITNESS:  Well, there was an Washington office.
20     My assumption is they were there to inform, lobby,
21     educate, whatever; I mean, I assume that was their job.
22     Q   Do you know whether any lobbying was undertaken
23 with regard to issues that were important to your particular
24 business unit?
25     A   No.

Page 310

1          MS. CITERA:  Objection to form.
2      Q   No, you don't know, or --
3      A   I don't remember.
4      Q   Okay.
5          Do you remember anything else about the issue
6  raised in this memorandum?
7          MS. CITERA:  Objection to form.
8          THE WITNESS:  No.
9      Q   Sir, do you recall an entity called UltraCare?
10     A   UltraCare?
11     Q   Mm-hmm.
12     A   Not specifically.
13     Q   Okay.
14         Does the name, at all, ring a bell?
15     A   Oh, yeah.  It seems in the business everything
16 ended in care, some kind of care --
17     Q   Okay.
18     A   -- sort of a buzz word, "care."
19     Q   Okay.
20         Sir, do you ever remember an issue regarding the
21 provision of free goods to UltraCare by the Alternate Site
22 or Home Infusion units?
23         MS. CITERA:  Objection to form.
24         THE WITNESS:  Home Infusion?
25         Home Infusion was a company that entered into

60e5726b-bc69-475a-8c51-36591ea203d2

Page 311

1    agreements with companies that provided home infusion
2    services.
3         They didn't give them free goods, they consigned
4    goods to them for which they paid when they were used --
5    Q   How much --
6         THE WITNESS:  -- on a percentage of reimbursement -
7    a percent of collections, actually.
8    Q   Okay.
9         How did you -- How did the Home Infusion unit
10   ascertain what price was charged for the drugs that they
11   consigned?
12   A   Now, are you talking about Home Infusion Services
13   or Home Infusion Product Sales?
14   Q   What's the difference?
15   A   They're two different businesses run by two
16   different people.
17   Q   Okay.
18   A   Home Infusion Services was run by a gentleman named
19   Mike Sellers.
20        Home Infusion Product Sales was run by a gentleman
21   named John Ward.
22        They were two separate businesses.
23   Q   Okay.  Let's go back to Home Infusion Services.
24        Their business model was to consign --
25   A   Their business model was to enter into agreements

Page 312

1    with hospitals or home infusion providers.
2         Sometimes we did the billing and reimbursement;
3    sometimes we did the pharmacy; we consulted with them and -
4    that's the CHIP system to which you referred - do you recall
5    that?
6    Q   Yes.
7    A   Do you recall me telling you what a deplorable
8    business this was, okay?
9         So they didn't provide them with free goods, they
10   put these goods out there and then when it went out the door
11   in a compounded bag and was part of an invoice, we would be
12   compensated by receiving a percentage of collections from
13   this hospital, company, whatever it may have been.
14   Q   And that's what I want to ask you a little bit more
15   detail about.
16        How was the actual price of the consigned products
17   ascertained if Home Infusion Services simply collected a
18   percentage of the client's --
19   A   The price that was --
20        MS. CITERA:  Objection to form.
21        THE WITNESS:  The price that was charged?
22        The price that was charged for the product would
23   have come out in an invoice to the insurance company
24   that was paying for the care of the individual --
25   Q   Okay.

Page 313

1         Then let me --
2         THE WITNESS:  -- but this would have -- This invoice
3    would probably -- Would have come out under the name of
4    the hospital or the business development agreement
5    partner, not us.
6    Q   Okay.  Let me clarify.
7         At what price would Abbott charge its consignment
8    partner or its Home Infusion client - Services client for
9    the actual product that was consigned?
10        What price would be charged by Abbott?
11        MS. CITERA:  Objection to form.
12        THE WITNESS:  That would be -- You know, the
13   specific price, I don't know how they did it.  We
14   determined a percentage of collections based upon what
15   they used and they were -- I don't remember how those
16   were determined because we worked on a percentage of
17   collection basis.  We didn't bill those individual
18   companies for that product.
19   Q   Okay.
20        So there was no individual price for the goods that
21   were consigned - charged by Abbott to the Home Infusion
22   Services customer?
23        MS. CITERA:  Objection to form.
24        THE WITNESS:  How the formula worked specifically, I
25   don't remember.

Page 314

1         All I remember -- What I do remember is that it was
2    consigned inventory.  When it was used, we got a
3    percentage of collections for the compounded bag and the
4    therapy; that's all -- I don't know how specifically
5    they did that, how it billed out.
6         I mean, you know, it had to bill out to an insurance
7    company at some point in some way - in a way that that
8    insurance company would - you know, would pay for it.
9    Q   Did Abbott Home Infusion Services, itself, invoice
10   the Home Infusion Service client, the person who - or the
11   entity that Abbott was selling to an individual price for
12   that consigned drug or product?
13   A   I don't believe --
14        MS. CITERA:  Objection to form.
15        THE WITNESS:  I don't believe they did.  I don't
16   recall.  I don't remember.
17   Q   Who would know the answer?
18   A   The people who ran Home Infusion Services;
19   Mr. Sellers would probably know that.
20   Q   Okay.
21        Sir, I'd like to have this marked as the next
22   exhibit.
23        (Whereupon, Robertson Exhibit No. 12 was marked for
24   identification.)
25   Q   If you could take a look at that.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 315

1    A   (Witness complies.)
2        Okay.
3    Q   Mr. Robertson, this is a -- Do you recognize this
4  document?
5    A   No.
6    Q   It's from a Jeff Hamlin, and the addressees are D.
7  Robertson and John Ward.
8        Do you see that?
9    A   Mm-hmm.
10   Q   Do you have any reason to doubt that the D.
11 Robertson reference is you?
12   A   No.
13   Q   Do you have any reason to doubt that you received
14 this memo?
15   A   No.
16       MS. CITERA:  Objection to form.
17   Q   The memo references an issue with UltraCare
18 continuing to undercut Abbott Laboratories.
19       Do you see that?
20   A   Yeah.
21   Q   Do you recall an issue arising concerning - in or
22 around 1993 concerning UltraCare undercutting Abbott
23 Laboratories and selling products to drug wholesalers?
24   A   I don't remember this specific issue.  It appears
25 to be an issue of product diversion.

Page 316

1    Q   Okay.
2        What is product diversion?
3    A   I guess when you sell it intended for one market
4  and it ends up in another.
5    Q   Okay.
6        Why is that of concern to Mr. Hamlin or why would
7  that be of concern to your business unit?
8        MS. CITERA:  Objection to form.
9        THE WITNESS:  Well, evidently, he's saying here that
10 whoever is UltraCare may have gotten a better price and
11 they were - they were selling it to hospitals - I don't
12 remember this specific situation.
13       Evidently, they were selling it to a market --
14 That's all -- I mean, I can read the same thing you're
15 reading.
16       MS. ST. PETER-GRIFFITH:  Okay.
17       THE WITNESS:  They were selling it into a market
18 they weren't supposed to sell it into.
19 BY MS. ST. PETER-GRIFFITH:
20   Q   My question is do you have an independent
21 recollection?
22   A   No.
23   Q   Okay.
24       Who is Mr. Hamlin, Jeff Hamlin?
25   A   As I recall, he's either a salesman or a sales

Page 317

1  manager.
2        I remember the name, but I don't remember specific
3  responsibilities.
4        (Whereupon, Robertson Exhibit No. 13 was marked for
5    identification.)
6    Q   Sir, if I could have you look at this document,
7  please.
8    A   (Referring.)
9        Mm-hmm.
10   Q   Sir, does this help refresh your recollection as to
11 this issue?
12   A   Not really.
13       But, you know, as I read it, you know, I can read
14 what it says that you've got two different markets,
15 somebody's - somebody's taking a product that's sold in one
16 market and moving it to another, and it says that Abbott's
17 undercutting Abbott price, which doesn't speak well for our
18 intelligence, does it.
19   Q   Okay.
20       Sir, do you know who Mr. Harrigan is, Emmet
21 Harrigan?
22   A   I believe Emmet Harrigan, as I recall, was someone
23 who was at the headquarters location working with a - you
24 know, they segmented by market, and he was involved in one
25 of those.

Page 318

1    Q   Okay.
2    A   His title, Director of Trade Sales, leads me to
3  believe it's some sort of - he didn't deal with hospitals,
4  rather he dealt with people who moved the product on -
5  wholesalers or whatever.
6    Q   And, sir, do you recognize this document at all?
7    A   No.
8    Q   What about the one on the next page?
9    A   (Referring.)
10   Q   Oh, I'm sorry those are two of the same document,
11 but just the date at the top.
12       Sir, on the cc list of this memorandum, there's a
13 Don Robertson listed.  Do you have any reason to doubt that
14 that's you?
15   A   No.
16   Q   Do you have any reason to doubt that you received
17 this memorandum?
18   A   No.
19       (Whereupon, Robertson Exhibit No. 14 was marked for
20   identification.)
21   A   Okay.
22   Q   Sir, do you recognize this document?
23   A   No.
24   Q   It appears to be a memo from Jeff Hamlin dated
25 December 21st, 1993 and it's addressed to Don Robertson - do

60e5726b-bc69-475a-8c51-36591ea203d2

Page 319

1  you see that - and John Ward?
2      A   Mm-hmm.
3      Q   Do you have any reason to doubt that Don Robertson
4  is you?
5      A   No.
6      Q   Do you have any reason to doubt that you received
7  this?
8      A   No.
9      Q   Does this refresh your recollection as to an issue
10  arising concerning UltraCare undercutting prices?
11      A   No.
12          Once again, it covers the issue of diversion
13  products being sold based on a contract negotiated for one
14  market and being sold in another market.
15      Q   Okay.
16      A   I don't have any other recollection other than what
17  I read.  I mean, I read what you read here.
18      Q   Sir, in the first paragraph of the sentence there's
19  a term that's used, wholesaler acquisition price, do you see
20  that - or the second sentence - the first sentence of the
21  second paragraph.
22      A   (Referring.)
23          Yes.
24      Q   What is a wholesaler acquisition price?
25      A   Evidently, it's a price he charged to a wholesaler.

Page 320

1      Q   Is it any different that what's called a WAC,
2  wholesaler acquisition cost?
3      A   I don't know that.
4      Q   Moving on from UltraCare.
5          (Whereupon, Robertson Exhibit No. 15 was marked for
6      identification.)
7      Q   Sir, this is somewhat of a thick packet.  I will
8  tell you that I'm going to concentrate on the first two
9  pages.
10      A   Mm-hmm.
11          (Referring.)
12      Q   Sir, there's handwriting on page 2 of this
13  document.
14          Do you recognize that handwriting?
15      A   Ma'am, I can't even read that handwriting.
16      Q   Okay.
17          Is it your handwriting?
18      A   No, ma'am.
19      Q   Okay.
20          Do you recognize this document at all?
21      A   No.
22      Q   Okay.
23          It appears to be a memorandum from Hospital
24  Products Division, Marianne Sutcliffe, National Accounts
25  Manager, and on the To list, there's a number of addressees,

Page 321

1  but there's a Don Robertson.
2          Do you see that?
3      A   Mm-hmm.
4      Q   Do you have any reason to doubt that that's you?
5      A   No.
6      Q   Do you have any reason to doubt that you received
7  this memo?
8      A   No.
9      Q   Sir, do you remember an issue coming up concerning
10  OwenCardinal Access Pricing?
11      A   I don't remember the issue at all.
12      Q   Okay.
13          If you could look at the first bullet point --
14      A   Mm-hmm.
15      Q   -- where it says, Initial Strategy, the second
16  sentence says, If the product is sold to a customer with
17  which Abbott has a contract, Cardinal will process a
18  chargeback for the difference between WAC and the Abbott
19  Customer price.
20          Do you see that?
21      A   Mm-hmm.
22      Q   What does that mean?
23          MS. CITERA:  Objection to form.
24          THE WITNESS:  To me, just what it says.
25          Cardinal's a wholesaler and if a customer has a

Page 322

1  different price with Abbott, that Cardinal will be
2  compensated in some way if the price were lower.
3      Q   Okay.
4          THE WITNESS:  I mean, just what you can read.
5      Q   Okay.
6          I want to know whether that has any significance to
7  you.
8      A   No.
9      Q   What about in the third bullet point where it says,
10  Obviously, this will cause a margin loss to Abbott for the
11  difference between the RxLink price and the Owen price.
12          Do you see that?
13      A   Yeah.
14      Q   Does that have any significance for you?
15      A   Other than the prices are different; no.
16      Q   What's an RxLink price?
17          MS. CITERA:  Objection to form.
18          THE WITNESS:  I think - I'd have to speculate on my
19  memory - I think it's a price that a customer paid who
20  just called in and didn't quote a specific contract - as
21  I remember.  I don't -- You know --
22      Q   Do you recall an RxLink system?
23      A   I can recall the term --
24          MS. CITERA:  Objection to form.
25          MS. ST. PETER-GRIFFITH:  Okay.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 323

1    THE WITNESS: -- what it was, how it functioned,
2    what its purpose was, I don't recall.
3    BY MS. ST. PETER-GRIFFITH:
4    Q   If you could flip to the last page, the very last
5    sentence - I'm sorry, the second page - I apologize - the
6    last page of the memo.
7    A   Okay.
8    Q   Just above where it has the typewritten, Marianne
9    Sutcliffe, it says, A meeting is being scheduled with Rick
10   Gonzalez for the week of March 22nd to discuss our response.
11   A   Mm-hmm.
12   Q   Do you see that?
13   A   Sure.
14   Q   Do you recall meeting with Rick Gonzalez to discuss
15   this issue --
16   A   No.
17   Q   -- the Owen --
18   A   No.
19   Q   Why would Mr. Gonzalez get involved, do you know?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  Well, everybody in this -- The people
22       on this -- Many of the people on this list reported to
23       him, and this is obviously an issue of interest - the
24       difference in pricing in different markets, so they'd
25       talk to Mr. Gonzalez about it.

Page 324

1    Q   Would Mr. Gonzalez regularly get involved in issues
2    concerning pricing or issues associated with chargebacks or
3    WACs or customer pricing?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  I was never -- I never attended a
6        meeting where those issues were discussed.
7        Mr. Gonzalez's interest was selling the product at
8        the price we planned and selling as much of the product
9        as we could.
10       (Whereupon, Robertson Exhibit No. 16 was marked for
11       identification.)
12   Q   Again, sir, this is a thick document, but I'm going
13   to concentrate, really, on the first page.
14   A   Okay.
15       (Referring.)
16       Mm-hmm.  Okay.
17   Q   Sir, what is Coram?
18   A   Coram, as I recall, was a company that provided
19   home infusion services and was, I think, headquartered out
20   west someplace - home infusion services, I believe they
21   provided home infusion services.
22   Q   Okay.
23       And was Chris Snead one of your employees?
24   A   Chris Snead was a salesperson in Alternate Site
25   Product Sales.

Page 325

1    Q   Which fell under your -- That was one of your
2    business units.
3    A   He worked for John Ward, yeah; and John Ward
4    reported to me.
5    Q   And she's the addressee.  Do you see that?
6    A   Mm-hmm.
7    Q   And then on the cc list, there's a Don Robertson
8    listed.
9        Do you see that?
10   A   Yeah.
11   Q   Okay.
12       Do you have any reason to doubt that that's you?
13   A   No.
14   Q   Go ahead.
15   A   This may have been -- Now, Miss Snead may no longer
16   have been working for -- If you -- I don't have the
17   department numbers memorized, but if you'll notice, Miss
18   Snead is in a different building, she's in a completely --
19   You know, and she's in a different -- Her department number
20   is different because the -- She's in a different location
21   and the Hospital Products department started with H - you
22   see Miss Snead's department number is 49R, so I don't know
23   what her responsibilities were at that time, nor do I know
24   if she was a -- AP6B, as I recall, was where the corporate
25   hospital - The Corporate Marketing Department worked, and

Page 326

1    she may have been trying to work out a deal with Coram for
2    whatever sets of reasons I don't know.
3        But she might not have reported to us at this time
4    - I may have misspoken - because the department number is
5    different --
6    Q   Okay.
7    A   -- and the physical location is different.
8    Q   Did Steve Kipperman report to you?
9    A   Kipperman, yeah.
10   Q   Okay.
11       And he's the one person who is on the From as the
12   author of the memo, right?
13   A   Right.  Right.
14   Q   Do you remember this memo?
15   A   No.
16   Q   Do you recall an issue concerning a Coram proposal
17   and a meeting with Rick Gonzalez and Tom Hodgson?
18   A   No.
19   Q   If Miss Snead, in June of 1995, was under your
20   supervision, would it have been - would you have attended a
21   meeting that she had with Rick Gonzalez and Tom Hodgson?
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  Perhaps.  I don't know.
24       May have.
25   Q   Well, would someone who was a subordinate to you

60e5726b-bc69-475a-8c51-36591ea203d2

Page 327

1 have been able to meet with Mr. Gonzalez or Mr. Hodgson
2 without you?
3     MS. CITERA:  Objection to form.
4     THE WITNESS:  Sure.
5  Q   Okay.
6     Was that a regular occurrence?
7  A   Yes.
8  Q   Why would people who are subordinate to you meet
9 with Mr. Gonzalez who, at that point in '95, what was
10 Mr. Gonzalez's position?
11  A   '95?
12  Q   Yes.
13  A   He was in charge of this corporate marketing
14 group.
15  Q   Okay.
16  A   Abbott has various divisions and the customer sees
17 Abbott as Abbott - they don't care about a divisional
18 breakdown or how these things work, in that regard - just,
19 to them, Abbott is Abbott.
20     So I believe, as I recall, this was an attempt to
21 put on one face to the customer so that they'd see, you
22 know, one person who would sort of referee all of their
23 Abbott -- In other words, if a customer had a problem with
24 an Abbott division, the Diagnostics Division, they would
25 become angry at Hospital Products Division because Abbott

Page 328

1 was Abbott.
2     So this was an effort to put on a corporate face
3 and try to mediate any disputes between divisions.
4  Q   Okay.
5     Do you recall this particular dispute in '95?
6  A   Well --
7     MS. CITERA:  Objection to form.
8     THE WITNESS:  -- I don't see any dispute here.
9 You'd have to help me with that.
10  Q   What was Tom Hodgson's position in '95, June of
11 '95?
12  A   He was president of the corporation, I believe.
13  Q   You indicated that your employees could meet with
14 the president of the corporation without your involvement;
15 is that --
16  A   Sure.
17  Q   Okay.
18     Under what circumstances would they do that?
19     What would -- In what occasions would your staff or
20 subordinates, you know, feel it necessary to consult with
21 the president of the company.
22     MS. CITERA:  Objection to form.
23     THE WITNESS:  Whenever the president of the company
24 thought it was necessary to speak to them --
25     MS. ST. PETER-GRIFFITH:  Okay.

Page 329

1     THE WITNESS:  -- If -- I guess if they were doing
2 something that were going to have an impact on the
3 entire corporation; if they wanted the support for
4 something they would see him.
5     I mean, I don't think this is, you know, a very
6 frequent occurrence, but, sure, they could see him.
7 BY MS. ST. PETER-GRIFFITH:
8  Q   Sir, this is a thick stack.  You're welcome to flip
9 through it.  I'm only going to be asking you about the first
10 page.
11     (Whereupon, Robertson Exhibit No. 17 was marked for
12 identification.)
13  Q   Okay.
14     Sir, do you remember a -- Well, let me ask you
15 this:  Do you recall what Baylor is?
16  A   No; just based on what it says here, Baylor Home
17 Infusion, I guess it's either Baylor University Hospital or
18 whoever's associated with them.
19  Q   Do you recall whether Baylor Hospital or an
20 affiliate of Baylor Hospital was a client of Abbott Home
21 Infusion?
22  A   Not specifically, no.
23  Q   Do you recall whether they were an account of any
24 of your business units?
25  A   I mean, I've heard the name Baylor, so I would

Page 330

1 assume it was in a business context that they were customers
2 of -- It indicates -- This document indicates they were
3 customers.
4  Q   Sir, on the first page, it's a January 26th, 2000
5 memorandum - do you see that - from Jim Watson and Michelle
6 Scarpelli?
7  A   Yeah.
8  Q   And on the listed To addressees, there's a D.
9 Robertson.
10     Do you see that?
11  A   Mm-hmm.
12  Q   Do you have reason to doubt that that's you?
13  A   No, ma'am.
14  Q   Do you have any reason to doubt that you received
15 this memorandum?
16  A   No.
17  Q   Okay.
18     Sir, do you recall an entity called NMC?
19  A   Yeah.  As I re- -- Yeah.  I don't remember in which
20 context, but the name NMC brings something to mind that I've
21 heard the name before or that they were customers or
22 something like that.
23  Q   Do you recall negotiating a contract with them?
24  A   No.
25  Q   Do you recall having any discussions in or around

60e5726b-bc69-475a-8c51-36591ea203d2

Page 331

1  '97 with NMC to negotiate a contract?
2     A   Specifically, no.
3     Q   This is another thick stack.
4     A   Are we done with this?
5     Q   Yes, we're done with this document.
6        This is another thick stack.  I'm only going to ask
7  you about a small portion on the first and second page and
8  then another page from within.
9        (Whereupon, Robertson Exhibit No. 18 was marked for
10 identification.)
11    A   (Referring.)
12       Mm-hmm.
13    Q   Sir, does this refresh your recollection about your
14 involvement in negotiations with an entity called NMC?
15    A   Not really.  I didn't think we did IDPN any more in
16 '97.
17    Q   Okay.
18       Well, if you could look on the second page, there
19 appears to be a memorandum, it says, Don Robertson.
20       Do you have any doubt that that's you?
21    A   No.
22    Q   And there's no author on it, but it says, cc: Lynn
23 Leone and Pete Baker.
24       Do you see that?
25    A   Yeah.

Page 332

1     Q   And it's an NMC trip report?
2     A   Yeah.
3     Q   Do you know who authored this memorandum?
4     A   No.
5     Q   Okay.
6        If you could look two pages beyond that, at the
7  bottom it says, Jack Miller.
8     A   Mm-hmm.
9        (Referring.)
10       Oh, okay.
11    Q   Could he have been the author?
12       I'm sorry, I should have had you look at the --
13    A   Sure.
14       MS. CITERA:  Objection to form.
15    Q   Okay.
16       Do you remember anything about the NMC contract
17 negotiations at all?
18    A   No.
19    Q   Sir, do you ever remember either being involved
20 with or authorizing the payment or the issue - the payment
21 of cash or the issuance of credit to Abbott customers in
22 exchange for their participating in a contract with Abbott?
23       MS. CITERA:  Objection to form.
24       THE WITNESS:  I think -- I don't recall specifics.
25       I don't recall specifics.

Page 333

1        If there were a change involved, we would probably
2  have paid for the costs associated with the changeover -
3  product that they had to throw away, overtime costs for
4  nurses to instruct people on how to use the new product;
5  we probably would have done that, that was common
6  because changeovers cost money - it cost you money to do
7  it.
8        If, for example, the people who worked in this
9  building, instead of using this machine - Lisa?
10       COURT REPORTER:  Yes.
11       THE WITNESS:  -- were to come on overtime to use my
12 machine, it would not be uncommon for the company - me -
13 to pay for Lisa's overtime.
14    Q   Do you know whether any evaluation was done as to
15 whether or not those types of payments or those types of
16 credits violated any Federal statutes?
17       MS. CITERA:  I'd object to the form.
18       And I'm also going to counsel you not to reveal any
19 conversations that you may have had with legal counsel
20 at Abbott or outside counsel for Abbott about this.
21       THE WITNESS:  Okay.
22       I don't know.  I mean, I never talked about -- I
23 don't remember discussions in that regard.
24    Q   Did anyone ever raise the issue of possible
25 anti-kickback violations?

Page 334

1        MS. CITERA:  Same objection.  Same instruction.
2        THE WITNESS:  I (indicating) --
3        MS. CITERA:  I'm just cautioning you that to the
4  extent you've had any conversations with Abbott counsel,
5  inside or outside, that you not reveal the substance of
6  those conversations.
7        THE WITNESS:  I don't remember any conversations in
8  that regard.
9     Q   Okay.
10       Do you remember anyone having any concern about
11 possible violations of the anti-kickback statute?
12       MS. CITERA:  Objection to form.  Same instruction.
13       THE WITNESS:  I don't have any recollection of that;
14 no.
15    Q   Who would you go to to evaluate whether or not the
16 provision of cash or credit to an Abbott customer at the
17 beginning of a contractual relationship violated Federal or
18 State law?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  Well, we had an attorney that was
21 president within the division and they would, as I
22 recall, bless all our contracts and the terms and
23 conditions associated with them.
24    Q   Would you rely upon that counsel to evaluate
25 whether or not Federal statutes were violated?

Page 335

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  Once again, I'm not an attorney --
3      MS. CITERA:  And also the same instruction to you.
4      THE WITNESS:  Okay.
5      I'm not an attorney.  My assumption was that they
6   were competent and we took their advice.
7    Q   See did anyone who was not an attorney raise any
8   issues concerning compliance with the anti-kickback
9   statutes?
10     MS. CITERA:  Objection to form.
11     THE WITNESS:  That I recall, no, ma'am.
12   Q   If you could just give me a moment, I'm going to
13  pare this down.
14     MR. STETLER:  No objection.
15   Q   We're going to mark this as the next exhibit and,
16  sir, there's only one page I'm going to ask you to look at,
17  although you're free to look through it.
18     (Whereupon, Robertson Exhibit No. 19 was marked for
19     identification.)
20   Q   And the page I want you to look at is it says, ABT
21  282818, at the bottom.
22     MS. CITERA:  I'm just going to ask this is out of
23     sequence?  Is it supposed to be or?
24     MS. ST. PETER-GRIFFITH:  Well --
25   A   282818.  Mm-hmm.

Page 336

1    Q   Do you see that, sir?
2    A   Yeah.
3    Q   It says at the top, NMC Profitability with
4   Programs?
5    A   Yeah.
6    Q   And do you see almost midway down the page just
7   above where it says, Plus, it says, Signing Bonus,
8   $4,000,000?
9    A   (Referring.)
10   Q   Do you see that, sir?
11   A   Mm-hmm.
12   Q   Sir, did you authorize the provision of a signing
13  bonus of $4M to NMC for its entering into a contract with
14  Abbott's Alternate Site Product Sales?
15     MS. CITERA:  Objection to form.
16     THE WITNESS:  $4M is well beyond my level to
17     authorize.
18   Q   Okay.
19     Who would have to authorize that?
20     MS. CITERA:  Objection to form.
21     THE WITNESS:  I assume it would have to be somebody
22     in the corporation, someone within our marketing - the
23     marketing, you know, I mean.
24   Q   Do you ever recall authorizing any type of signing
25  bonus or any bonus or credit to NMC?

Page 337

1    A   No.
2    Q   Who within the company would do that, to your
3   knowledge?
4      MS. CITERA:  Objection to form.
5      THE WITNESS:  The specific individual, I don't know.
6      But these contracts were all vetted by our Contract
7   Marketing Department, our Legal Department, so it was a
8   battery of people who would have access to these
9   documents and who would approve them.
10     MS. ST. PETER-GRIFFITH:  Okay.
11     Just to clarify.  When you say, our Contract
12  Marketing Department, they're --
13     THE WITNESS:  Hospital Products Division.
14     MS. ST. PETER-GRIFFITH:  Okay.  Thank you.
15     MS. CITERA:  I'm just going to -- I'm sorry, go
16  ahead.
17     THE WITNESS:  Hospital Products had a large Contract
18  Marketing Group, and we were a smaller business than
19  Hospital Products, so we wanted to make sure that the
20  pricing that we had within our group made sense,
21  otherwise you would have the tail wagging the dog.
22     So we've also vetted our contracts and the things
23  that we did through the Contract Marketing groups.
24  BY MS. ST. PETER-GRIFFITH:
25   Q   Would all of your contracts be vetted through

Page 338

1   Hospital Products Division Contract Marketing?
2    A   All's --
3      MS. CITERA:  Objection to form.
4      THE WITNESS:  All means all.  I don't know that.
5      MS. ST. PETER-GRIFFITH:  Okay.
6      THE WITNESS:  If we would renew them and the terms
7   and conditions were identical and all that it required
8   was a signature, I doubt it.
9      If there were a change in terms of conditions or
10  anything else which may have impacted the Hospital
11  Products Division, my assumption would be that we would
12  be professional enough to go and tell them, advise them,
13  and say, Is this okay with you.
14   Q   You say that's your assumption --
15   A   I don't know.
16   Q   -- was there any policy that you're aware?
17   A   No.  I know that our relationship was pretty close
18  and that we consulted frequently.
19   Q   Okay.
20     Do you know on which contracts you would have --
21   A   Specifically, no, ma'am.
22     MS. CITERA:  And I just wanted to get my objection
23  that this is out of sequence.
24     And I also notice in these past couple of exhibits,
25  they appear to be composite exhibits with colored sheets

Page 339

1    in between.  I don't know if that's the way they were
2    produced or whether counsel has inserted them, but I
3    just wanted to note that for the record.
4        (Whereupon, Robertson Exhibit No. 20 was marked for
5    identification.)
6    Q    And, sir, once again, this is a thick document.
7    I'm only going to be asking you about information on the
8    third page.
9    A    Okay.
10   Q    Well, actually, first I'll direct your attention to
11   the top of the second page where it says, Inserts to Abbott
12   Laboratories/NMC Homecare Alternate Site Product Supply
13   Agreement.
14   A    Right.
15   Q    Do you see that?
16   A    Mm-hmm.
17   Q    That identifies what the document is.
18       If you could flip to the next page where it says,
19   Insert B, and then it says, G, Compliance with Law.
20       Do you see that?
21   A    Yeah.
22   Q    Could you just read that section, Compliance with
23   Law, because that's what I'm going to be asking questions
24   about.
25   A    Mm-hmm.

Page 340

1        (Referring.)
2        MS. CITERA:  Counsel, I'm concerned that this
3    document may be a privileged document.
4        I thought that Chuck Santora was a lawyer at Abbott.
5        MS. ST. PETER-GRIFFITH:  You produced this.
6        MS. CITERA:  Well, I also have the right to snap it
7    back.
8        I don't know if you want to take a break and I can
9    confirm that this is a lawyer.
10       MS. ST. PETER-GRIFFITH:  It's a contract provision
11   that appears to have been faxed back and forth.
12       MS. CITERA:  Well, if it has the lawyer's mental
13   thoughts and they're counseling to the client, then it's
14   a privileged document.  So I'd like to --
15       MS. ST. PETER-GRIFFITH:  Well, you didn't -- It's
16   not on your privilege log, so --
17       MS. CITERA:  Well, that doesn't mean -- You guys
18   snapped back a document two weeks ago at the deposition;
19   this happened.
20       MS. ST. PETER-GRIFFITH:  Are you going to snap this
21   back?
22       MS. CITERA:  Well, I'd like to take a break and find
23   out a little bit more about the document so we can
24   either proceed skipping this document for now, or we can
25   take a break and I'll find out more about the document.

Page 341

1        MS. ST. PETER-GRIFFITH:  Okay.  We'll do this -
2    because I don't want to take too many breaks because we
3    have a lot of ground to cover, I'll move past this
4    document for now, you can find out whatever you need to
5    find out, make your decision and then even if they're in
6    the middle, I'll just jump in and ask a question about
7    it.  Okay?
8        MS. CITERA:  Sure.  Fair enough.
9        MS. ST. PETER-GRIFFITH:  What I'm going to do is
10   just put this labeled as Exhibit 20 (indicating).
11       And we can mark the next document.
12       (Whereupon, Robertson Exhibit No. 21 was marked for
13   identification.)
14   A    (Referring.)
15   BY MS. ST. PETER-GRIFFITH:
16   Q    Sir, do you recognize this document that's been
17   labeled as Exhibit 21?
18   A    No.
19   Q    It appears to be a memorandum from - if you'll look
20   on the last page - Jack Miller --
21   A    Mm-hmm.
22   Q    -- in or around December 8th, '97 directed to all
23   field reps, district managers and then a series of
24   individuals - do you see that on the first page?
25   A    Yeah.

Page 342

1    Q    And it says, Are you ready to Rock and Roll for its
2    beginning, and then it announces the NMC five-year contract,
3    right?
4    A    Right.
5    Q    In the next paragraph it says, The negotiation
6    process began many months ago and was consummated in
7    September as a direct result of the tireless efforts of Don
8    Robertson.
9        Do you see that?
10   A    Mm-hmm.
11   Q    Sir, what were your tireless efforts that you can
12   recall concerning --
13   A    This is Mr. Miller blowing sunshine at his boss's
14   boss, okay?
15   Q    Okay.
16   A    There were no tireless efforts on my part to do
17   anything with NMC.
18   Q    Were you involved at all in the NMC contract
19   negotiations?
20   A    Not that I -- Perhaps tangentially, I don't
21   remember.
22       But certainly there was no tireless efforts on my -
23   by me to go get business from NMC.
24   Q    If you'd hold on just a second, you just curtailed
25   some of my questions.

Page 343

1    A   Okay.
2    Q   Give me two minutes here.
3    A   Sure.
4    Q   Sir, do you ever remember any of your business
5   units, either Alternate Site, Renal or Home Infusion having
6   a Medicare, Medicaid fraud and abuse compliance guidelines
7   publication or operating guidelines?
8    A   Not specifically, no.
9    Q   Could they have existed, you just don't recall?
10    A   It would certainly be our policy to comply with all
11   appropriate legislation; yes.
12    Q   Well, my question is more geared towards do you
13   remember any written policy?
14    A   Not specifically, no.
15    Q   If other divisions at Abbott had a written policy,
16   would it seem likely that your business units would?
17       MS. CITERA:  Objection to form.
18       THE WITNESS:  That's an assumption I can't make
19   because I don't know.
20    Q   Do you recall any written or -- Well, do you recall
21   any written information concerning compliance with the False
22   Claims Act?
23    A   I don't remember the False Claims Act specifically.
24       No.
25    Q   Do you recall anyone with either -- Well, do you

Page 344

1   recall whether anyone at Abbott ever raised with you
2   compliance with the False Claims Act as an issue?
3       MS. CITERA:  I'm going to object to the form and
4    also give you the same caution that to the extent you had
5    any conversations with Abbott inside or outside counsel
6    that you not reveal the substance of those
7    conversations.
8       THE WITNESS:  Okay.
9       Our policy was to comply with all legislation.
10       If I did have any of those conversations, which I
11    don't specifically recall, the conversation would have
12    been about complying with the legislation.
13    Q   Let me ask you - you testified to that at your at
14   the earlier part of your deposition, as well.
15       How do you know whether or not your staff was
16   complying or those who were subordinate to you were
17   complying with Federal and State Medicaid and Medicare
18   statutes or any Federal and State statutes and regulations
19   that governed your business?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  Their instructions were to comply.  We
22    had a contracting department.  All the terms and
23    conditions of our contracts were clearly articulated.
24    They were vetted by legal people.
25       After doing that, I assume that if we're complying

Page 345

1   with the contract terms and conditions that we're in
2   compliance with all appropriate legislation.
3       Beyond that, I didn't have any, you know - I didn't
4   have any dealings with the matter.
5    Q   Would there be a way for you to verify whether or
6   not?
7    A   Personally, no.
8    Q   Would there be somebody that you would go to to ask
9   about compliance issues or to ask that compliance be
10   verified?
11    A   Once again, my assumption is that once the
12   contracts were - the contracts we had where the terms and
13   conditions were clearly articulated, were approved by the
14   division group, which was, you know, the Hospital Contract
15   Marketing group, that they were in compliance with all
16   appropriate legislation that we were doing the right things.
17    Q   What about with regard to your drug pricing?
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  I don't remember specifically dealing
20    with that issue.
21    Q   Okay.
22       Well, who would you go to to rely upon to verify
23   that what your business unit was doing with regard to
24   pricing of its products was in compliance with Federal and
25   State law and regulations?

Page 346

1       MS. CITERA:  Objection to form and also the same
2    caution.
3       THE WITNESS:  With regard to how our product were
4    priced?
5       You know, I don't remember dealing with these issues
6    specifically.  The price we charged the customer, that
7    was determined by the market and was pretty
8    straightforward.
9    Q   What about prices that were reported to the pricing
10   compendia?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  We didn't establish those prices.
13    Those prices were established by the marketing group
14    within the division.
15    Q   Okay.
16       Which market would that be --
17    A   Hospital Products Contract Marketing.
18    Q   Okay.
19       Would that be in the hospital business sector?
20    A   Yeah.  That's where that group reported.
21    Q   Okay.
22    A   Once again, as I said, we were a smaller part of
23   the once and the businesses were different, the product
24   mixes were different and we utilized their services to
25   ensure that our strategy made sense for our customers.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 347

1    Q   Did anyone at any time within Abbott who was not an
2  attorney bring to your attention any compliance issue that
3  you can recall?
4    A   No.
5      MS. CITERA:  Objection to form.
6    Q   What about when Abbott received an investigative
7  demand from the Department of Justice; do you recall any
8  issue being raised concerning either that demand or
9  compliance with Federal and State law?
10   A   Do you know --
11     MS. CITERA:  Objection to form.
12     THE WITNESS:  -- in what time frame that was in?
13     MS. ST. PETER-GRIFFITH:  '96.
14     THE WITNESS:  I don't recall it.
15  BY MS. ST. PETER-GRIFFITH:
16   Q   Do you recall anyone at any time raising with you
17  any concerns regarding - again, non attorneys raising with
18  you concerns regarding litigation that was pending
19  concerning either AWP or drug pricing?
20   A   No.
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  I don't remember it.  No.
23     MS. ST. PETER-GRIFFITH:  At this time I think what
24  I'm going to do is, subject to my coming back and
25  revisiting that exhibit, I'm going to pass the Witness

Page 348

1  again also subject to future production by Abbott - if
2  there's something that we think we need to bring you
3  back for, we reserve the right to do that.
4      And I think Mr. Haviland's going next.
5      MR. HAVILAND:  Do you want to take a break or go
6  right in?
7      THE WITNESS:  Whatever you'd like.  As you wish.
8      MR. HAVILAND:  It's your prerogative.
9  Do you want to stretch your legs for two minutes?
10     THE WITNESS:  No.  Let's just go.  Let's just do it.
11     MR. HAVILAND:  You don't want to come back.
12     THE WITNESS:  Well, it's very inconvenient for you
13  guys, as well, to be traveling around town and I
14  appreciate your time, so.
15     MS. ST. PETER-GRIFFITH:  But they want to come back
16  in February.
17     THE WITNESS:  But there's a fish out there with my
18  name on it this afternoon that I have to get to.
19     MS. CITERA:  You know what, why don't we take a
20  two-minute break, actually.
21     MR. HAVILAND:  That's fair.  Not a problem.
22     VIDEOGRAPHER:  We're going off the record.
23     (At about 10:06 a.m. - a short recess was taken)
24     (At about 10:15 a.m. - reconvened deposition)
25     VIDEOGRAPHER:  We're back on the record.

Page 349

1           CROSS-EXAMINATION
2  BY MR. HAVILAND:
3    Q   Good morning, Mr. Robertson.
4    A   Good morning.
5    Q   Don Haviland.  We met before.  I'm from
6  Pennsylvania.  I represent the Commonwealth of Pennsylvania
7  in the case brought against Abbott Laboratories as well as
8  TAP Pharmaceuticals, so I'm going to be asking you a few
9  questions this morning, hopefully not to duplicate.
10     But I do want to go back over some of your prior
11  testimony.
12     First of all, I'd like to show you what was
13  previously marked as Robertson Exhibit 2.  I don't know if
14  we have the original here, so I'm going to show you one that
15  has not been marked.
16     And you recall, sir, this was an exhibit that was
17  shown to you by Counsel from the Department of Justice which
18  you identified as being a memoranda that you authored around
19  June of 1991.
20     Do you recall that?
21   A   Mm-hmm,
22     MS. CITERA:  Objection to form.
23   Q   I want to just direct your attention, sir, to the
24  section in paragraph 2 where it talks about several
25  professional groups having vested interests in resisting the

Page 350

1  changes that are proposed by HCFA.
2      Do you see that, paragraph 2?
3    A   Okay.
4    Q   All right?
5      I'm just going to place you there.
6      Now you see that one of the vested interest - one
7  of the groups with vested interest is the American Society
8  of Clinical Oncology or ASCO, A-S-C-O.
9      Do you see that?
10   A   Mm-hmm.
11   Q   Now, could you tell me, sir, as best as you can
12  recall how it is you knew that group had a vested
13  interest in resisting changes by HCFA?
14     MS. CITERA:  Objection to form.
15     THE WITNESS:  Well, the ASCO did a great deal of --
16  They did a lot of treatment for cancer patients either
17  in their offices or in their home and how they were
18  compensated for the treatment would be of importance to
19  them.
20     MR. HAVILAND:  Okay.
21     THE WITNESS:  I mean how the doc gets paid.
22  BY MR. HAVILAND:
23   Q   Did you have any interaction with anyone
24  specifically at ASCO?
25   A   No.

15  (Pages 347 to 350)

60e5726b-bc69-475a-8c51-36591ea203d2

Page 351

1    Q    At any time?
2    A    No.
3         This is based upon information that was provided to
4    me by the - you know, probably the people underneath that
5    are cc'd and I'm just doing it, sending them a carbon copy
6    to inform that I'd sent this along to my boss to indicate
7    that we were looking at the issue.
8         But this is mostly a monitoring thing.  Our ability
9    to impact these organizations is minimal.
10   Q    And you don't recall as you sit here today direct
11   contacts you had with anyone at ASCO.
12   A    No.
13   Q    All right.
14        Do you know if you got information about ASCO's
15   interest from what you would describe as the Abbott
16   Washington personnel?
17        Do you see that in the second line?
18   A    (Referring.)
19        May have been, we had -- May have been, I don't
20   know specifically.
21        We had conversations with those folks from time to
22   time where they'd come and talk to us from time to time.
23   Q    Do you recall who the head of that office was?
24        Do you recall the name Landside?
25        MS. CITERA:  Objection to form.

Page 352

1         THE WITNESS:  Landside?
2         MR. HAVILAND:  David Landside?
3         THE WITNESS:  Oh, I've met David Landside.  I don't
4    think he was the head guy.
5    BY MR. HAVILAND:
6    Q    Okay.
7         Do you know who was at the time?
8    A    No.
9         This was a corporate -- The guy that was the head
10   of that group was a corporate officer.
11   Q    You just can't remember his name as you sit here?
12   A    I can't remember his name.
13   Q    All right.
14        Do you recall in the context of this proposed rule
15   in 1991 who you had interactions with at the Washington
16   office?
17        MS. CITERA:  Objection to form.
18        THE WITNESS:  There was a lady --
19   Q    Miss Shain?  Have you heard that name before?
20   A    Yeah, that sounds -- Scot's lady.
21        Have you ever spoken to this person?
22   Q    No.
23   A    Well, if she has a Scot's accent when you speak
24   with her, that's the lady.
25   Q    With a name like Victoria Shain, I'll take it on

Page 353

1    faith.
2    A    Right.  Mm-hmm.
3    Q    Do you recall speaking with Mr. Landside about the
4    issues in this time frame --
5        MS. CITERA:  Objection to form.
6    Q    -- I'm talking about the HCFA issues you --
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  I don't recall having spoken to him -
9    no - specifically.
10   Q    Okay.
11        Now, in the memorandum that was discussed with you
12   previously, you talked about keeping the folks in this memo
13   apprised of progress.  One of the areas you identified were
14   industry responses.
15        And I wanted to ask you specifically other than the
16   groups that you've identified, do you recall having any
17   interactions with any other drug companies about their
18   particular responses to HCFA as an issue?
19   A    No.
20   Q    No?
21   A    (Shaking head.)
22   Q    Why is that?  You shake your head.
23   A    We didn't talk to any drug companies.
24   Q    Ever?
25   A    We had a trade organization in Washington to do

Page 354

1    that.
2    Q    What was that, the PMA?
3    A    Yeah.
4    Q    All right.
5        And you never had any direct contacts with other
6    companies, yourself.
7    A    No.
8    Q    Do you know if anyone in the Washington office ever
9    did?
10   A    I assume they --
11        MS. CITERA:  Objection to form.
12        THE WITNESS:  -- met them at the PMA.
13        Other than that, I would have no knowledge.
14        I didn't know those people in Washington really
15   well.
16   Q    The Abbott Washington office, you mean.
17   A    Right.
18   Q    I'm just making sure that's what you meant.
19   A    Yeah, the Abbott Washington office.  I had very
20   little contact with them.
21        They seemed to -- They didn't seem to be very
22   effective to me.  I don't know.
23   Q    After this time frame when it appears that you had
24   some interaction, can you tell me how long that you
25   interfaced with the folks in Washington?

16 (Pages 351 to 354)

60e5726b-bc69-475a-8c51-36591ea203d2

Page 355

1    A   Oh, I'd see them from time to time for my entire
2  tenure there. I mean, you'd seem them from time to time. I
3  didn't think, you know.
4    Q   Nothing specific, though, that you had a course of
5  dealing with them about?
6    A   No. Any sp- -- No specific issues.
7       I didn't -- No.
8    Q   Do you recall in this time frame - and I'm going to
9  move forward from say, '91 to 1994, that there was a push by
10 folks in HCFA to define the estimated acquisition cost, the
11 EAC?
12      MS. CITERA: Objection to form.
13      THE WITNESS: I don't remember that.
14      There was so many acronyms floating around --
15      MR. HAVILAND: Right.
16      THE WITNESS: -- that -- Estimated acquisition cost,
17   I remember the term, acquisition cost, what someone paid
18   for a product. I don't remember estimated acquisition
19   cost.
20 BY MR. HAVILAND:
21   Q   Okay.
22      Do you have a recollection of that term being used
23 in the context of Medicare reimbursement?
24   A   Yeah. The acquisition cost would be the basis for
25 reimbursement.

Page 356

1    Q   Okay.
2       Do you recall that -- Sorry.
3    A   As I recall, that was the discussion, what someone
4  paid for a product would be utilized for reimbursement.
5    Q   Okay.
6       Do you recall that the government used the term,
7  estimated acquisition cost, for reimbursement?
8    A   They may have. I don't recall that term
9  specifically.
10      They have cost reports, don't they, they know what
11 people pay for things --
12   Q   Well, do they?
13   A   -- they don't have to estimate things.
14      I assume.
15   Q   Well, my question to you, sir, is in the context of
16 the EAC and defining it, do you recall what involvement, if
17 any, folks at Abbott had in terms of either providing cost
18 reports, interfacing with doctors providing reports or
19 anything like that?
20   A   No.
21      MS. CITERA: Objection to form.
22   Q   Did you get involved in that issue at all?
23   A   Not specifically, no.
24   Q   But generally, anyone contact you from Washington
25 about that?

Page 357

1       MS. CITERA: Objection to form.
2       THE WITNESS: They may have. I -- They may have. I
3  don't know.
4       I mean, I don't recall specifically or any specific
5  course of action that we'd taken in that regard.
6    Q   And you don't remember ever sitting in a room with
7  folks from the Washington office and folks from other drug
8  companies talking about these issues?
9       MS. CITERA: Object to the form.
10      THE WITNESS: I don't recall that specifically, no.
11   Q   Okay. Let me just make sure I can nail this down.
12      You don't recall having any direct interactions
13 with the folks from AstraZeneca?
14   A   AstraZeneca?
15      MS. CITERA: Object to the form.
16      MR. HAVILAND: Yeah.
17      THE WITNESS: No.
18   Q   How about Amgen?
19      You described earlier in your testimony Epo was a
20 terrific drug that worked in conjunction with Abbott
21 products.
22   A   Mm-hmm.
23   Q   Do you recall ever meeting with folks from Amgen?
24      MS. CITERA: Objection to form.
25      THE WITNESS: I didn't.

Page 358

1    Q   Do you know if others did?
2       MS. CITERA: Objection to form.
3       THE WITNESS: No.
4    Q   Okay.
5       As you sit here, you can't remember it.
6    A   I can't remember.
7    Q   All right.
8    A   And I would know -- I know several of the people at
9  Amgen and I don't remember us meeting or talking about this
10 or any of the representatives.
11   Q   How do you know the folks from Amgen, just from the
12 industry?
13   A   They're former Abbott employees.
14   Q   Sorry?
15   A   They're former Abbott employees.
16      The guy - the chairman was a former Abbott
17 employee. I knew them as colleagues.
18   Q   I see.
19      Who is the head of Amgen that you're thinking of?
20   A   I knew a gentleman named Harry Hickson and George
21 Rathman who was a chairman who worked at Abbott Laboratories
22 at one time.
23   Q   Did they work with you?
24   A   They worked in Diagnostics, and then they moved on
25 and they got rich and I didn't.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 359

1    Q   Let's move on.
2        You were you testified earlier that your son went
3    to work for TAP?
4    A   Mm-hmm.
5    Q   And I think you said he was there about ten years.
6    A   Ten to 12 years; yeah.
7    Q   So he started about '93, you think?
8    A   Maybe, in that time frame, somewhere around there.
9    Q   And he was a sales rep when he started?
10   A   Mm-hmm.
11   Q   All right.
12       Was he -- That's the first time you went, Mm-hmm.
13   That's yes?
14   A   Oh, yes.  Pardon me.
15       MR. STETLER:  He's been doing it all morning.
16       MR. HAVILAND:  For me.
17   A   Oh, okay.
18   BY MR. HAVILAND:
19   Q   And I think you said he was in the Illinois area.
20   A   He was a salesman in Champaign-Urbana.
21   Q   Okay.
22       And could you tell me how did he progress in the
23   company; did he ever make district sales manager?
24   A   Yeah.
25   Q   Okay.

Page 360

1        How high did he get before he left?
2    A   He was in charge of TAP Care, which is some sort of
3    internal organization they have there.  I don't remember
4    specifically what they did.  I think they did pharmacy and
5    that sort of thing.
6    Q   When did he go to the position in TAP Care?
7    A   I really don't remember; after about 6 or 7, maybe
8    even longer, maybe about 8 or 9 years, perhaps.
9    Q   So he was in sales for the 90s and then
10   transitioned around 2000 or so.
11   A   Maybe before that.  I have no specific --
12   Q   Okay --
13   A   -- I'm trying to think.  That may be.  I'm sorry.
14   Q   Okay.
15       How many children to you have, sir?
16   A   Four.
17   Q   All right.
18       How many sons?
19   A   Three.
20   Q   Any other children work at Abbott or TAP?
21   A   No.
22   Q   At the time your son went to work for TAP, where
23   was he living?
24   A   Champaign-Urbana.
25   Q   Okay.

Page 361

1        Did you ever have occasion to talk to him about his
2    work at TAP?
3    A   Infrequently.
4    Q   Over holidays?
5    A   Yeah; whenever I saw him, we'd say, How's business;
6    How're you doing?
7    Q   Did he ever talk to you about what was going on
8    with other sales reps?
9    A   No.
10   Q   Well, you're aware, sir - I think the Counsel for
11   the Department of Justice asked you about the TAP conduct
12   that led to their guilty plea.
13       And my question to you is, did your son ever raise
14   concerns about things he was seeing at the company?
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  Did he raise concerns to me?  No.
17   Q   Yeah.
18       Did he ever say, Hey, these guys in my district are
19   giving away free samples?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  No.
22   Q   When the issues came to light about the TAP
23   prosecution in 2003, did you talk to your son about it?
24   A   Perhaps briefly, we didn't -- Not in any detail.
25   Q   Did you ask him if he was involved?

Page 362

1        MS. CITERA:  Object to the form.
2        THE WITNESS:  No.  I mean, no.
3        I had no reason to believe he would be involved.
4    Q   I was just wondering if you asked him.
5    A   Oh, no.  No.
6    Q   Okay.
7        You said you had no reason to believe.
8        Did you know if your son had been given a provision
9    of samples to give out as a sales rep?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  I don't know how the sampling program
12   worked.
13   Q   Do you know if your son promoted spread?
14       MS. CITERA:  Objection to form.
15       THE WITNESS:  No.
16   Q   You don't know if he did or he didn't?
17   A   I don't know what -- No.
18       Spread?  You mean the difference between
19   acquisition and reimbursement?
20   Q   Yeah.
21       Do you know if he sold Lupron based on --
22   A   He sold Lupron.
23       MS. CITERA:  Objection to form.
24   Q   Do you know if he sold Lupron consistent with the
25   way the other sales reps were selling Lupron?

Page 363

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  I can only -- I can assume that he
3   followed all the corporate requirements and regulations.
4   Q    Okay.
5      Apart from your son, did you ever have occasion to
6   talk to other Abbott executives about TAP?
7   A    I know some of them.
8   Q    You know whom?
9   A    Some of the people that were -- Some of the TAP
10  people.  A lot of them came from Abbott.
11  Q    Do you know Mr. Pietraszek?
12  A    Sure.
13  Q    He used to be a senior guy at Abbott?
14  A    Mm-hmm.
15     He was -- I believe he ran Japan, didn't he?  He
16  ran Japan for Diagnostics or something.
17  Q    I believe that's right.
18  A    Mm-hmm.
19  Q    And then he took over TAP in the 80s?
20  A    Right.
21  Q    Did you come to know Mr. Pietraszek after he left
22  the company in '93?
23  A    After he left Abbott I haven't seen him.
24  Q    You haven't seen him.
25     Do you know he's down here?

Page 364

1   A    Yeah.  He was -- He was in -- He was in - what's
2   the name of it - Quail Creek, and I believe he moved to St.
3   Augustine or something.  Somebody told me that.
4   Q    When he was down in southwest Florida, did you have
5   occasion to meet up with him?
6   A    I haven't seen him since -- I haven't seen him in
7   forever, very long time, since he left TAP.
8   Q    What other TAP employees did you know, senior guys?
9   A    Those who came from ADD, Abbott Diagnostics
10  Division.  I know Don Patton --
11  Q    Okay.
12  A    -- I knew him in Diagnostics; I know Don Meek, we
13  attended the same church in Libertyville, Illinois - who
14  else did I know there?
15     That's about it.  I may have -- I think I met Alan
16  McKenzie --
17  Q    Okay.
18  A    -- I think that's -- Well, that's about -- And we
19  had one young lady named Susan Rodriguez who came to our
20  organization from TAP, I believe.
21  Q    Did you have occasion to talk to Mr. Patton,
22  Mr. Meek or Mr. McKenzie during the time they were being
23  tried?
24  A    No.
25  Q    Have you had occasion to talk to Mr. Patton since

Page 365

1   he left the company?
2   A    No.
3   Q    How about Mr. Burnham, have you seen him since he
4   left?
5   A    Duane Burnham?
6   Q    Yes.
7   A    No.
8   Q    You haven't seen him since he moved to southwest
9   Florida?
10  A    No.
11  Q    Okay.
12     How about Mr. Hodgson?
13  A    No.
14  Q    You don't see him down here?
15  A    No.
16  Q    During the -- I think you described you'd meet with
17  Mr. Hodgson three times a year; the April, August update,
18  and I assume there's a planning session?
19  A    There's a planning session, there's an April and
20  August update.
21  Q    When is the planning session?
22  A    The planning session takes place in around the
23  September, October time frame, and then you present it to
24  the corporation around the end of November where you - where
25  your operating plan for the next year would be approved.

Page 366

1   Q    Okay.
2   A    Around November, I think it's approved.
3   Q    And you described when your division met with
4   Mr. Hodgson there was some 30 or 40 people present --
5   A    Right.
6   Q    -- you recall that?
7   A    There always were.
8   Q    Did your division meet with Mr. Hodgson the same
9   time as other divisions?
10  A    You mean the Hospital Products Division?
11  Q    Yes.
12  A    No.  Mr. Hodgson met individually with divisions.
13  Q    Okay.
14  A    Individual operating divisions; Diagnostics,
15  Hospitals, Pharmaceuticals, International - that sort of
16  thing.
17  Q    Mr. Hodgson testified that he had occasional
18  meetings with the division heads - did you ever attend any
19  of those - outside of these periodic meetings.
20  A    I may have --
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  -- I don't have specific recollection
23  of them.
24  Q    Do you recall attending any meetings in the early
25  90s when Mr. Pietraszek was the president of TAP?

60e5726b-bc69-475a-8c51-36591ea203d2

Page 367

1    A   No.
2        I cannot ever recall having - attend a meeting when
3    TAP was present.  TAP was a joint venture.  They were off
4    site.  We had no contact with TAP.
5    Q   Meaning your division.
6    A   My group.
7    Q   Right.
8    A   Yeah.
9    Q   You're not aware of what contact TAP had with the
10   Abbott corporate folks --
11   A   No.
12   Q   -- is that right?
13       MS. CITERA:  Objection to form.
14   Q   Are you aware of what executives at Abbott sat on
15   TAP's board of directors?
16       MS. CITERA:  Objection to form.
17       THE WITNESS:  No.
18   Q   Did you know that Mr. Dempsey did for awhile?
19   A   Dempsey?
20   Q   Dempsey.
21   A   He may have done after he left my group.
22       MR. HAVILAND:  Let me go ahead and mark as Robertson
23   Exhibit 22 this document.
24       (Whereupon, Robertson Exhibit No. 22 was marked for
25   identification.)

Page 368

1        MS. CITERA:  Counsel, what case was this produced
2    in?
3        MR. HAVILAND:  It was produced in the criminal case.
4        MS. CITERA:  Isn't there a Protective Order that
5    provides that you have to establish a basis for this
6    Witness to know the contents of this document?
7        MR. HAVILAND:  I'm about to ask him about it.
8        MS. CITERA:  Well, you showed him before you
9    asked him.
10       MR. HAVILAND:  It's a unanimous consent that's
11   publicly available in the criminal docket.  That's why
12   it's not stamped confidential.
13       MS. CITERA:  Okay.  Well, I'm just warning you that
14   if I see TAP documents that are not public documents --
15       MR. STETLER:  There are no documents in the criminal
16   docket.
17       MR. HAVILAND:  This is a publicly available
18   document.
19       MR. STETLER:  Well, what you just said I know isn't
20   true because that's not the way Boston does it.  They
21   don't put the exhibits in criminal docket.
22       MR. HAVILAND:  This document was not obtained from
23   TAP, it was obtained from the criminal docket, the
24   criminal production.
25   BY MR. HAVILAND:

Page 369

1    Q   Let me ask you this:  At the time of this document,
2    which is 2001 - you see the date - September 13?
3    A   Mm-hmm.
4    Q   Did you know that Mr. Dempsey was one of TAP's
5    board of directors members, a director?
6    A   No.
7    Q   How about Mr. Watkins, did you know him?
8    A   I know Tom Watkins, yeah.
9    Q   Okay.
10       Do you know what position he held at the time in
11   2001?
12   A   When I left Abbott 15 months before this document,
13   he was the president of TAP.
14   Q   Right.
15       Did you know him when he was at Abbott?
16   A   Yeah.
17   Q   Did he work for you at all?
18   A   No.
19   Q   All right.
20       Do you know where he worked?
21   A   He worked in Diagnostics Division in sort of a
22   point of care diagnostics business.
23   Q   Mr. Dempsey worked for you from when to when?
24   A   I think he probably left in around '96 or '97 or
25   maybe even earlier.

Page 370

1    Q   Do you know what position he held in 2001?
2    A   I think he was president of Pharmaceutical
3    Products --
4    Q   Okay.
5    A   -- either that or International; one or the other.
6    Q   All right.
7        Were you ever present when there was a presentation
8    made to any Abbott executives about the facts underlying the
9    TAP investigation or the TAP plea?
10   A   No.
11       MS. CITERA:  Objection to form.
12   Q   Now, earlier, Counsel from the Department of
13   Justice was asking you about spread and issues pertaining to
14   marketing based on spread, and I don't know that this
15   question was asked, I wanted to make sure that I ask it.
16       Do you think there's anything wrong with speaking
17   to a customer of Abbott about reimbursement and spread?
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  I mean, I've been out of there a long
20   time.  I don't know if I have any opinion on the
21   subject.
22       I know that it was not done, but I really have no
23   opinion on the subject right or wrong.  I don't know
24   context -- It's very difficult to go hypothetical, you
25   know, out of a specific context.

Page 371

1    Q   Well, are you aware that it was done at TAP?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  Isn't that the problem with TAP?
4    I don't know what the problem with the TAP suit is.
5    Q   I'm asking if you were aware --
6    A   Oh, I don't know.  I don't -- Did I know that?
7    Yeah, probably.
8        The difference between reimbursement and selling
9    price was an issue at TAP; I think I knew that.
10   Q   And did you know that TAP sales representatives
11   promoted Lupron based on the profitability a doctor could
12   achieve?
13       MS. CITERA:  Objection to form.
14       THE WITNESS:  I don't recall specific- -- I mean, I
15   don't recall that specifically.
16   I think the term, return-to-pra- -- Is that the term
17   that they use?
18       MR. HAVILAND:  Yes.
19       THE WITNESS:  -- something like that.
20   Return-to-practice, I think that was a term that was
21   used by them and it was just sort of, you know, a term
22   used about whether or not the doctor would lose money on
23   the drug.
24   Q   Where did you --
25       THE WITNESS:  I don't recall specific marketing

Page 372

1    plans or programs.  I didn't get involved with TAP.
2    Q   Where did you first hear the term,
3    return-to-practice?
4    A   That may have been -- I don't know.  You know, it
5    may have been in -- It may have been even after these facts
6    and after litigation began.  I don't remember when I heard
7    the term.
8    Q   Did you ever hear of the term in the context of
9    your work at Abbott?
10   A   No.
11   Q   Did it ever come up in discussions with any other
12   Abbott executives?
13       MS. CITERA:  Objection to form.
14       THE WITNESS:  No; not that I remember it.
15   Q   So you were aware when you were at Abbott that TAP
16   was promoting based on something called, return-to-practice?
17   A   Once again --
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  -- I can't remember when I -- I can't
20   remember that they were promoting on that basis if it --
21   I can't remember whether they promoted on that basis, I
22   can't remember when I heard the first time that term.
23   What they were promoting on, I don't know.  I know I
24   heard the term in connection with TAP.
25   Q   Well, let me do this.  I want to make sure that our

Page 373

1    timing is --
2        THE WITNESS:  I don't know.  I don't remember.
3        MR. HAVILAND:  I want to go ahead and mark as
4    Robertson Exhibit 23 this document.
5        (Whereupon, Robertson Exhibit No. 23 was marked for
6    identification.)
7    BY MR. HAVILAND:
8    Q   Mr. Robertson, I'm showing you an exhibit that has
9    been marked as Robertson Exhibit No. 23.  It's an Answer
10   that of a Complaint that was filed against TAP
11   Pharmaceuticals in the State of New Jersey.
12   I want to direct your attention to the last page.
13   A   (Referring.)
14   Mm-hmm.
15   Q   You see there --
16       MS. CITERA:  I'm just going to go object to the
17   relevance of all this.  This is ridiculous.
18       MR. HAVILAND:  Okay.
19   A   Page 4?
20   BY MR. HAVILAND:
21   Q   Actually, page 24.  You see --
22   A   24.
23   Q   You see it's signed by Counsel from a firm called
24   Riker, Danzig, and beneath that is Ms. Tabacchi's firm,
25   Ms. Russo's firm, Mr. Rotatori, Jones Day.

Page 374

1    Do you see that?
2    A   Yeah.
3    Q   All right.
4    Now I want to direct your attention to page 3 of
5    the exhibit.
6    Do you see in paragraph 5 - I'm going to read along
7    with you - Defendant TAP admits that any difference between
8    a price a physician pays for a kit of Lupron and the amount
9    of reimbursement he may receive from Medicare, a Medicare
10   beneficiary, or a third-party payor for the same kit of
11   Lupron, to the extent that any reimbursement received is
12   greater than the price paid, may be referred to as a
13   physician's return-to-practice.
14   Do you see that?
15   A   Mm-hmm.
16   Q   Yes?
17   Now, in the underlying case against TAP, TAP
18   admitted that to be true, all right?
19   A   Mm-hmm.
20       MS. CITERA:  Objection to form.
21   Q   You didn't know that before --
22   A   I don't remember when I knew that.
23   Q   Okay.  You don't know specifically when you --
24   A   No.
25   Q   -- knew that.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 375

1     All right.
2        Let me read you the next sentence: Defendant TAP
3  further admits that some of its employees may have compared
4  the RTP of Lupron to the RPT of Lupron's competitor,
5  Zoladex.
6        Do you see that?
7  A   Yeah.
8  Q   My question is, did you know that fact?
9  A   No.
10     MS. CITERA:  Objection to form.
11     THE WITNESS:  No.
12  Q   Before you left Abbott, did you know that TAP was
13  competing with AstraZeneca over spread and RTP?
14  A   No.
15     MS. CITERA:  Objection to form.
16  Q   Was that ever discussed in your presence?
17  A   No.  As a matter of fact, I thought --
18     MS. CITERA:  Objection to form.
19     THE WITNESS:  -- they had a virtual monopoly.  I had
20  no -- I thought TAP had a virtual monopoly.  I don't
21  even know what Zoladex does.
22     I assume it does the same thing if it's a
23  competitor.
24  Q   Did you ever discuss return-to-practice with your
25  son?

Page 376

1     MS. CITERA:  Objection to form.
2     THE WITNESS:  Not that I recall.
3  Q   It's possible, you just don't remember?
4  A   Yeah --
5     MS. CITERA:  Objection to form.
6     THE WITNESS:  -- I just don't remember.
7  Q   We have to time better, Mr. Robertson.  When
8  Counsel objects, just hold off on your answer just so we
9  don't have the overlap here.
10     MR. STETLER:  Pause slightly.
11  Q   Slightly.
12  A   Mm-hmm.
13  Q   I want to make sure that your answer gets on the
14  record.  Okay?
15  A   Yeah.
16  Q   Did you ever discuss or did your son ever discuss
17  with you concerns he had about the promotional effort at
18  TAP?
19  A   No.
20     MS. CITERA:  Objection to form.
21     THE WITNESS:  Oh, I'm sorry.
22     MR. HAVILAND:  I'm going to go ahead and mark this
23  as Robertson Exhibit 24.
24     (Whereupon, Robertson Exhibit No. 24 was marked for
25  identification.)

Page 377

1     MS. CITERA:  This is -- I mean, this is exactly --
2  This is not something that should be shown to him
3  because you haven't established any knowledge of this of
4  document and I think it's in violation of the Protective
5  Order to --
6     MR. HAVILAND:  Well, I'm going to ask the Witness
7  about it.  If he knows about it, great; if he doesn't,
8  then he doesn't.
9     MS. CITERA:  Well, you're showing it to him before
10  you asked him about it, so --
11  BY MR. HAVILAND:
12  Q   Well, let me ask you --
13     MS. CITERA:  And then the other thing is is that if
14  you're going to ask TAP questions, then, perhaps, we
15  should get a lawyer from the Pennsylvania case for TAP
16  in on the phone.
17     MR. HAVILAND:  That's your prerogative, Counsel.  It
18  was duly noticed a long time ago.  And I agree with you,
19  you don't represent TAP in this case, but you can Berry
20  the person.  I mean, I'm not going to take a break here
21  so we can try to get somebody on the phone for TAP.
22     MR. STETLER:  Well, time let me clarify something
23  because, perhaps, I didn't realize this.
24     You're taking the deposition of this man in
25  connection with any knowledge he may have to help you in

Page 378

1  the TAP case?
2     MR. HAVILAND:  No.  No.  No.  TAP's a defendant
3  along with Abbott.
4     MS. CITERA:  TAP and Abbott are a defendant in the
5  Pennsylvania case.
6     MR. HAVILAND:  They're both defendants.
7  So I'm asking about both companies.
8     MS. CITERA:  Is there a call-in number?
9     MS. ST. PETER-GRIFFITH:  No.  We just have Amber on
10  the phone.
11     MS. CITERA:  We may need to establish one.
12     MS. ST. PETER-GRIFFITH:  Well, just to be clear, are
13  you or are you not counsel for TAP?
14     MS. CITERA:  I am not counsel for TAP in this
15  Pennsylvania litigation.
16     MR. STETLER:  Well, you know what, why don't we just
17  go ahead with it.  If there's a problem, we'll address
18  it later.  Because he's already told you he doesn't know
19  anything about this.
20     MR. HAVILAND:  And that's how I'm going to find out
21  whether he does or he doesn't, because --
22     MR. STETLER:  All right.  There's no sense arguing
23  over nothing.
24     Ask your questions.
25  BY MR. HAVILAND:

60e5726b-bc69-475a-8c51-36591ea203d2

Page 379

1    Q   Do you know a woman by the name of Nancy
2  Sattelberg?
3    A   No.
4    Q   Did you know a woman by the name of Nancy
5  Kincheloe?
6    A   Not to my -- No, I don't remember that person.
7    Q   Do you remember a Nancy that worked with Virginia
8  Tobiason at Abbott?
9    A   Nancy.  No --
10    MS. CITERA:  Objection to form.
11    THE WITNESS:  -- not specifically.
12    Q   Do you have a general recollection of somebody like
13  that?
14    A   No.
15    Q   All right.
16      In the summer of 1991, around the time that you
17  wrote your memo, do you recall discussions at Abbott about
18  the anti-kickback regulations that were affecting drug
19  companies at the time?
20    A   No.
21    Q   You don't remember discussions about that?
22    A   No.
23    Q   Do you recall that there was a safe harbor created
24  by the government for discounting?
25    A   I've heard the term, safe harbor, in one what

Page 380

1  context, I don't remember nor do I remember the specific
2  question you asked.
3    Q   Did you know whether or not the regulations being
4  passed by Medicare and Medicaid affected Abbott in any way?
5    MS. CITERA:  Objection to form.
6    THE WITNESS:  No; not --
7    Q   Did you know --
8    THE WITNESS:  -- specifically.
9    Q   I'm sorry.
10      Did you know that the anti-kickback regulations
11  being passed by Medicare and Medicaid required Abbott to
12  report discounts that it gave to any customer?
13    MS. CITERA:  Objection to form.
14      And also, I want to caution you again that to the
15    extent you've had any conversations with counsel that
16    you are not to reveal the substance of those
17    conversations.
18    THE WITNESS:  Yeah.
19    A   Now, would you ask your question again, please?
20    Q   Sure.
21      Do you recall if the regulations being passed in
22  1991 by Medicare and Medicaid specifically about
23  anti-kickback required Abbott as a drug company to report
24  discounts?
25    MS. CITERA:  Same objection and caution.

Page 381

1    THE WITNESS:  I don't know that specifically, but I
2  do know that we were assiduous in reporting whatever -
3  you know, whatever the government asked for.
4    Q   Well, let me show you this exhibit I've marked as
5  exhibit 24 to see if I can refresh your recollection.
6    MS. CITERA:  No.  No.  No.  You can't show it to
7  him.
8    MR. HAVILAND:  Yes, I can.
9    MS. CITERA:  You haven't established the proper --
10    MR. HAVILAND:  He doesn't --
11    MS. CITERA:  -- the proper foundation for it or that
12  he has knowledge of it.
13    He doesn't know these people.  He doesn't know the
14  issues.  You cannot show it to him.  It's in violation
15  of the Protective Order.
16    MR. HAVILAND:  I don't agree with that, Counsel.
17  He just said he doesn't remember the regulation.
18  I'm going to show him the memo to refresh his
19  recollection.  If it does, it does; if it doesn't, it
20  doesn't.
21    MS. CITERA:  I don't think you can show it to him.
22  I don't think that's what the Protective Order provides.
23    MR. HAVILAND:  You can use anything to refresh a
24  Witness' --
25    MS. CITERA:  I don't think --

Page 382

1    MR. HAVILAND:  -- recollection; I can bring in
2  somebody off the street to see if he remembers a face.
3    MS. CITERA:  No.  I think you have to establish
4  knowledge.  Under the Protective Order, you have to
5  establish knowledge of this document.  He doesn't have
6  it, therefore, you cannot show it to him.
7    MR. HAVILAND:  I don't agree with that.
8    I'm using this to refresh his recollection.  If it
9  does, it does; if it doesn't --
10    MS. CITERA:  Well, I suggest you move on and then
11  we'll come back to this, but I --
12    MR. HAVILAND:  Well, you know, I don't agree with
13  that restriction, Counsel.
14    MS. CITERA:  Well, Counsel, this is not the first
15  time you've done this.  This is not -- It is not
16  appropriate to show a document that he has no knowledge
17  of it.  This is governed by a Protective Order and
18  you're showing it to him and you're showing it to
19  Counsel.
20    MR. HAVILAND:  Okay.  Let me ask you this:  You're
21  not going to let me use this document, okay, right?
22    MS. CITERA:  Yeah.
23    MR. HAVILAND:  And you're not going to let me use
24  any other TAP document.
25    MS. CITERA:  No --

60e5726b-bc69-475a-8c51-36591ea203d2

Page 383

1    MR. HAVILAND: Okay. Then I'm --
2    MS. CITERA: -- unless you can establish knowledge.
3    MR. HAVILAND: -- going to suspend my examination
4 right now and we're going to bring him back, okay?
5    MR. STETLER: Well, he doesn't agree to come back.
6    MR. HAVILAND: Well, then I'm going to have to
7 Subpoena him to come back then, Counsel, because --
8    MR. STETLER: Yes, you would.
9    MR. HAVILAND: -- that's just the way it's going to
10 have to be.
11    MR. STETLER: I understand.
12    MR. HAVILAND: If I can't use documents to refresh
13 recollection --
14    MR. STETLER: I understand.
15    MR. HAVILAND: -- then we've got to get a Court to
16 rule on it. I can't make that happen at ten o'clock. I
17 can't make that happen.
18    MR. STETLER: You're not listening --
19    MR. HAVILAND: And Counsel was fully aware of this
20 issue.
21    MR. STETLER: I understand.
22    If she objects and you're not going to go ahead and
23 do it - as far as I'm concerned, you can ask him any
24 question you want. And if you have to Subpoena him
25 again, that's how you'll have to get him here. Simple

Page 384

1 as that.
2    MR. HAVILAND: Do you have an objection to me
3 showing him these exhibits?
4    MR. STETLER: None. I just said that.
5    MS. CITERA: Do you want to take a break?
6    MR. HAVILAND: Are you going to instruct him not to
7 answer?
8    MS. CITERA: I can't instruct him. I'm not saying I
9 can instruct him. But I can instruct you not to show
10 the document because --
11    MR. HAVILAND: You can.
12    That's a new one. You can instruct me how to ask a
13 question.
14    MS. CITERA: No. I can tell you that you cannot
15 show that document because it's not appropriate and it's
16 in violation of the Protective Order --
17    MR. HAVILAND: Show me how it is.
18    MS. CITERA: Do you want to take a break? We'll go
19 get the document.
20    MR. HAVILAND: I want to know whether or not I can
21 complete my examination.
22    MS. ST. PETER-GRIFFITH: Can I make a suggestion
23 here?
24    The United States - and I'm sure that the Relator
25 and California would probably agree that we have no

Page 385

1 objection to keeping these documents as confidential.
2 We do not have to necessarily -- We can identify them,
3 label them, we don't even necessarily have to give them
4 to the court reporter as long as we understand what the
5 documents are.
6    Why don't we let Mr. Haviland proceed with his
7 examination. If there's a problem at a later point in
8 time, you can snap the documents back.
9    MS. CITERA: I'd like to take a break.
10    MR. STETLER: You know what, before you do, let me
11 make a suggestion.
12    I think that's a good idea because the only thing I
13 care about is I don't want to my client to have to come
14 back. And I don't think he's going to know any of this
15 stuff anyhow.
16    So I understand the point as a general proposition,
17 which may well be a good one - I'm not taking sides -
18 but I think when we look at these documents, you have no
19 good faith basis for assuming that he's going to have
20 seen any internal TAP correspondence, but go ahead and
21 ask your questions and he'll just give you a no.
22    MR. HAVILAND: Well, Counsel, the foundation is
23 established by the fact that Miss Sattelberg was an
24 Abbott employee at the time. So --
25    MR. STETLER: Oh, big deal. Internal TAP

Page 386

1 documentation.
2    What I'm saying is go ahead and ask.
3    MR. HAVILAND: Look, you want to say internal TAP
4 documentation, it's a subsidiary division of Abbott
5 Laboratories --
6    MR. STETLER: No, it's not.
7    MR. HAVILAND: Yes, it is.
8    MR. STETLER: No, it's not.
9    It's a joint venture between two different
10 companies.
11    MR. HAVILAND: Mr. Hodgson said something different.
12    MR. STETLER: Well, Mr. Hodgson's wrong.
13    MR. HAVILAND: Well, then he may be but he's the
14 president of the company.
15    MR. STETLER: Take look at the corporation
16 resolution you just showed the man.
17    MR. HAVILAND: Look, if you want to fight about
18 this, let's fight about it in court, but I don't want to
19 waste this Witness' time.
20    MR. STETLER: I don't either.
21    MR. HAVILAND: I'm only going to show him a document
22 and ask him questions.
23    MS. CITERA: Let's take a break. We'll figure it
24 out.
25    You want to bring TAP documents and it's a cost to

Page 387

1  your time then it's your problem.
2      MR. HAVILAND:  No.  No.  No.  I'm not coming back on
3  my nickel - let's be clear about that.
4      I'm down here to ask --
5      MS. CITERA:  Well, I'm saying let's take a break
6  right now.  I will try to resolve this issue.  But you
7  have created this situation, not me.
8      MR. HAVILAND:  Abbott and TAP filed a motion in
9  Pennsylvania to try to restrict the use of TAP
10  documents; they lost that issue.  There's a reportive
11  opinion on West Law about that.
12      If we don't want to resolve it today and you're not
13  going to allow me to examine witnesses with documents
14  that I'm allowed to use in my case, then we're coming
15  back and I'm going to come back with a sanction - I'm
16  going to move for a sanction because we've litigated it
17  once already.  Okay?
18      MS. CITERA:  Okay.
19      Well, I have said, repeatedly now, let's take a
20  break and I will resolve this issue.  But I cannot
21  resolve it right here and now while we're on the record.
22  I need to talk with the people who are more familiar
23  with this issue.  But this is my understanding and I
24  think you're in violation of the Protective Order.
25      MS. ST. PETER-GRIFFITH:  Well, let me ask you.  If

Page 388

1  you're not here on behalf of TAP, can you be asserting
2  violations of the Protective Order?
3      MS. CITERA:  I represent TAP in other instances - my
4  company does, so I think I can.  I'm not here as a TAP
5  lawyer in the Pennsylvania case.  But these documents
6  were produced in other cases in which we did represent
7  TAP.
8      MR. HAVILAND:  They were produced in this case.
9      MS. CITERA:  Well, they were also produced in other
10  cases.
11      MR. HAVILAND:  But I'm in this case.  We're in the
12  Commonwealth of Pennsylvania's case.  These are
13  documents that were produced in this case.  There was an
14  issue raised by both TAP and Abbott that we cannot use
15  it, the Court overruled that, I'm here using these
16  exhibits.
17      And if you want to fight about that and you want to
18  instruct witnesses not to answer, that's fine, but I'm
19  not going to come back here again on my nickel.
20      MR. HAVILAND:  Okay, Don --
21      MR. HAVILAND:  So let's take a break.
22      VIDEOGRAPHER:  We're going off the record.
23      (At about 10:49 a.m. - a short recess was taken)
24      (At about 11:19 a.m. - reconvened deposition)
25      VIDEOGRAPHER:  We're back on the record.

Page 389

1      (Whereupon, Attorney Lahey joined the deposition via
2  telephone)
3      COURT REPORTER:  And who's appearing by phone?
4      MS. LAHEY:  I'm Sharon Lahey of Goodwin, Proctor for
5  TAP.
6      COURT REPORTER:  Thank you.
7      MR. HAVILAND:  I'm going to go ahead and mark as
8  Robertson Exhibit 25 this document.
9      (Whereupon, Robertson Exhibit No. 25 was marked for
10  identification.)
11  BY MR. HAVILAND:
12      Q   Mr. Robertson, I'm showing you an excerpted - a
13  document that has three entries from a privilege log that's
14  been produced by TAP Pharmaceuticals in this litigation.
15      MS. LAHEY:  I'd like to object, Mr. Haviland.
16      MR. HAVILAND:  I haven't even asked the question
17  yet.
18      MS. LAHEY:  I would object to you showing him the
19  document.
20      MR. HAVILAND:  TAP's privilege log?
21      MS. CITERA:  I think part of the confusion is the
22  prior exhibit, 24 was the document we left off on, that
23  was marked confidential, I think, and Ms. Lahey's
24  objection actually applies to document No. 24 and not to
25  25.

Page 390

1      MR. HAVILAND:  Okay.
2      MR. STETLER:  Well, he's not asking about 24 now,
3  so --
4      MR. HAVILAND:  I'm asking about 25.
5      MS. CITERA:  So right now he's just asking about the
6  privilege log.
7      MS. LAHEY:  Okay.
8  BY MR. HAVILAND:
9      Q   All right.
10      The privilege log is excerpted for the purpose of
11  three entries that had the name Don Robertson on them.
12      Do you see those three entries, sir?
13      A   Yeah.
14      Q   Now I want to go through these with you.  And they
15  were identified as privileged documents, so, sir, I want to
16  be clear, I'm not asking you any questions about
17  communications you've had with counsel, the documents that
18  for which counsel claimed privilege to, I want to make sure
19  that these are documents that involved you, all right, so I
20  just want to ask you about your factual information about
21  the foundation.
22      So the first entry is from December 16, 1999.
23      Do you see that?
24      A   Mm-hmm.
25      Q   And it's Cindy Pasqual.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 391

1        Do you know who that is?
2    A   No.
3    Q   Okay.
4        Did you ever have interaction with somebody at
5    Abbott legal by the name of Cindy Pasqual --
6    A   Not that I recall.
7    Q   -- P-a-s-c-u-a-l?
8    A   Not that I recall.
9    Q   If you look at the recipients on the document, it
10   looks to be a one-page document, it has Donald Robertson --
11   A   Right.
12   Q   -- Rex Petit - do you know who that is?
13   A   No.
14   Q   Kathy Blecha, B- --
15   A   Are you sure you're talking to the right guy?
16   Q   I'm trying to figure that out.  That's all I want
17   to know.
18       MR. STETLER:  Let him ask the questions --
19       THE WITNESS:  Oh, okay.
20   Q   So rather than jump through, I want to know if this
21   is you.
22       Looking at the recipients there, do you know if --
23   Do you know any of the people other than Don Robertson
24   listed there?
25   A   No.

Page 392

1    Q   All right.
2        Now the entry talks about an e-mail regarding a
3    non-profit agency's offer of free drugs to patients.
4        Do you see that?
5    A   Mm-hmm.
6    Q   Does any of the information on that - and I'm just
7    focused on that first line - indicate to you that you're the
8    Don Robertson as a recipient on this document?
9    A   No.
10   Q   As you sit here today, do you think that you're
11   that recipient?
12   A   No.
13   Q   Is it possible it's your son?
14   A   Possible.
15   Q   Okay.
16       Are there any other Don Robertsons you know of in
17   the Abbott or TAP organization?
18   A   None to my knowledge.
19   Q   All right.  Let's go to the next one.
20       It's dated two days before the first one, and this
21   one has Cindy Pasqual, Donald Robertson, Andrew Videlka - do
22   you know who that is?
23   A   No.
24   Q   How about Jim Salanty?
25   A   No.

Page 393

1    Q   You don't know either of those individuals?
2    A   No.
3    Q   All right.
4        There's a memorandum described as regarding issues
5    to discuss after an attorney presentation on TAP's Code of
6    Conduct.
7        Do you see that?
8    A   Mm-hmm.
9    Q   Do you recall ever being present for a discussion
10   about TAP's Code of Conduct?
11   A   No.
12   Q   Okay.
13       So do you think that this is the Don Robertson
14   that's sitting here today?
15   A   No.
16   Q   All right.
17       How about the last entry?  It doesn't have a date
18   on it, but it talks about a handwritten note from Don
19   Robertson to Ken, and then it says, Ken Greisman.
20       Do you know who Ken Greisman is?
21   A   No.
22   Q   Did you ever know anyone at Abbott legal by the
23   name of Greisman?
24   A   I don't remember knowing anybody -- The name sounds
25   somewhat familiar, but I don't -- Do I know this individual?

Page 394

1    No.
2    Q   Yeah.
3    A   No.
4    Q   Okay.
5        And you never had any interactions with
6    Mr. Greisman at Abbott?
7    A   May have, but I don't recall.  If they were
8    peripheral, I don't -- I don't know --
9    Q   Okay.
10   A   -- I don't remember them.
11   Q   Do you recall the time frame that you had the
12   interaction if you did?
13   A   No.
14   Q   No?
15       All right.  I want to go back to Exhibit 24 and ask
16   you generally about the issues of the safe harbor.
17       MS. CITERA:  And for the record, Ms. Lahey, this is
18   the document that was at issue.
19       Our objection still stands, Mr. Haviland, however,
20   we will let you show the Witness provided TAP's counsel
21   does.
22       MR. HAVILAND:  All right.
23       MS. LAHEY:  Mr. Haviland, just for the record, I
24   want to be clear that TAP does object to you showing the
25   Witness this document in violation of the Protective

Page 395

1    Order that's in place.
2        MR. HAVILAND:  What's the basis for the objection?
3        MS. LAHEY:  The Protective Order dated June 19th,
4    '06 clearly says in Provisions 4 and 5 that documents -
5    that during depositions and preparation for a
6    deposition, a deposition witness who is a current or
7    former employee of the party that produced the
8    applicable document or who appears based upon the
9    document, itself, or testimony in a deposition to have
10   knowledge of the content of the document designated
11   confidential or highly confidential or the specific
12   events, transactions, or data reflected in the document
13   provided such witness execute the verification which is
14   attached to the Order as Exhibit A.
15       And we've been over this argument with you in the
16   past, so I think that you should have an idea by now of
17   our objection.
18       MR. HAVILAND:  Okay.
19       MS. ST. PETER-GRIFFITH:  If I could just state the
20   position of the United States on the record.  This
21   document was produced to the United States incident to
22   the criminal matter, so, you know, we call into question
23   your designation of this document as confidential or
24   highly confidential.
25   BY MR. HAVILAND:

Page 396

1    Q   My question to you, Mr. Robertson, is this
2    memoranda, which is dated August of 1991, a couple of months
3    after the one I showed you previously that was Robertson
4    Exhibit 2, references a discussion about the anti-kickback
5    safe harbor regulations.
6        I want to direct your attention to page 2 --
7    A   Mm-hmm.
8    Q   -- and the paragraph that begins, Sellers doing
9    business with providers - do you see that?
10   A   Mm-hmm.
11   Q   It says, Sellers doing business with providers must
12   inform the buyer of its obligation to report the discount.
13       Now, recognizing that's Miss Sattelberg's opinion,
14   do you agree with that?
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  You know, I can't agree or disagree; I
17   don't know.  It's been such a long time.  I don't know
18   the context.
19       So it's hard for me to disagree or agree or have any
20   opinion.
21   Q   Well, earlier when we began the questioning, I was
22   asking about your understanding of Abbott's obligation as a
23   manufacturer under the anti-kickbacks, and you said to me
24   that you thought that Abbott was always compliant.
25       And my specific question is going to what did

Page 397

1    Abbott do with respect to its discounts in order to comply
2    with the safe harbor?
3        MS. CITERA:  Objection to form.  I also caution you
4    not to reveal any discussions with counsel.
5        THE WITNESS:  I can tell you I worked there for 26
6    years and we were assiduous in complying with the law
7    and doing - and fulfilling all of the requirements of
8    law as the - as good sense and our legal counsel told
9    us.  We were assiduous at that.
10       So when I tell that we would have complied, we would
11   have complied.  That's just the way the place ran.
12   Q   In Miss Sattelberg's memo, she talks about two
13   options for sellers; The seller must either report the
14   discount on the invoice, or, if known - I assume that's
15   known - at the time of the purchase report the existence of
16   the discount program.
17       Do you know which, if either, Abbott did?
18   A   There were --
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  Either you discounted the invoice on
21   its face - okay - - -
22       MR. HAVILAND:  Right.
23       THE WITNESS:  -- and said this price is ten bucks
24   and now the price is nine dollars - that was one way of
25   doing it.

Page 398

1        There were others where people would come to you and
2    say, We're going to buy $11M worth of product, Oh,
3    that's good, but you don't buy anything now.  Well,
4    trust us, give us the prices now.
5        In that situation we would sell them at ten dollars
6    and then when they had, in fact, lived up to their
7    contract, they would be rebated.
8    Q   Under the contract.
9    A   Right.
10   Q   Now what did Abbott do to disclose the existence of
11   that rebate to the government?
12       MS. CITERA:  Objection to form.
13       THE WITNESS:  I don't know.
14   Q   You don't know?
15   A   No.
16   Q   As you sit here today, can you think of anything
17   Abbott did with respect to disclosing its contract language
18   to the government?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  I don't know that.  I don't remember
21   that.
22   Q   Okay.
23       So as you sit here today, you don't know if Abbott,
24   in fact, disclosed the rebate you just described from its
25   contract to the government.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 399

1    MS. CITERA:  Objection to form.
2    THE WITNESS:  No --
3    MR. HAVILAND:  Okay.
4    You don't know --
5    THE WITNESS:  Well, we had rebate reports - We
6  had -- Didn't we have -- We had rebate reports, as I
7  recall, to Medicaid and that was a common -- That was a
8  subject of, you know, these rebate reports.
9    I don't know if that's what you're specifically
10  talking about.
11  BY MR. HAVILAND:
12   Q   Well, I think you're referring to - tell me if you
13  think I'm wrong - that Medicaid has a rebate component for
14  its best price regulations that requires that the
15  manufacturer report its best price for rebating --
16    MS. CITERA:  Objection --
17   Q   -- is that what you're talking about?
18    MS. CITERA:  Objection to form.
19    THE WITNESS:  I don't recall the specific context.
20  I know in that time we did talk about rebate reports
21  to Medicaid.
22   Q   The context you just described, the contract was a
23  private contract between Abbott and a customer?
24   A   Yes.
25    MS. CITERA:  Objection.

Page 400

1    Q   Okay.
2    And I just want to be clear.  As you sit here
3  today, you don't know if Abbott ever disclosed the terms of
4  those rebate contracts to the government.
5    A   I don't know that.
6    MS. CITERA:  Objection to form.
7    MR. HAVILAND:  I'm going to go ahead and mark as
8  Exhibit 26 this document.
9    (Whereupon, Robertson Exhibit No. 26 was marked for
10  identification.)
11    MS. CITERA:  And for the record, this is another
12  confidential TAP document that we object to the use of
13  and you haven't shown prior knowledge.
14  BY MR. HAVILAND:
15   Q   Mr. Robertson, attached to one of the prior
16  exhibits you recall there was a memoranda authored by
17  Victoria Shain, do you remember that?
18   A   I --
19   Q   I think it was Robertson 3.
20   A   Let's look.
21    MR. HAVILAND:  Do you have the ones from last time?
22  I had asked that we had the originals.
23  BY MR. HAVILAND:
24   Q   Do you recall the long memoranda about health care
25  issues in the early 90s that was attached to one of the

Page 401

1  exhibits earlier?
2    A   I think it was a -- Was it from Victoria Shain?
3    Q   I believe so.
4    If you don't remember --
5    A   I don't remember.
6    Q   -- that's fine.  I want to move along.
7    Do you remember Miss Shain as being someone at
8  Abbott Washington?
9    A   Yes.
10   Q   Okay.
11    Now, can you identify for me any of the other
12  people on this memo?
13    A   Jim Albrecht, I don't know; Charles Brock was an
14  Abbott lawyer; Paul Roge was an Abbott lawyer; Brian Smith I
15  believe was also an Abbott attorney; Mark Haberberger was an
16  Abbott attorney; Paul Landauer was one of our Washington
17  representatives; Ginnie Tobiason was a person that worked in
18  Home Infusion Services in the administrative area; I don't
19  know how to pronounce this last name, but I don't know
20  either Miss Sattelberg or Mr.  - however he pronounces --
21   Q   Tootell?
22   A   Tootell.
23   Q   How about Mr. Beck?
24   A   Stan Beck, I don't know how who that person is.
25   Q   Okay.

Page 402

1    Earlier in your testimony you said that you had
2  occasion to interact with, I think you called a young man in
3  Abbott legal.  Was it any of the individuals you just
4  listed?
5    A   Man, I -- I -- I don't remember the name of the
6  individual that we dealt with specifically.  Because the
7  Legal Department had individuals assigned to various
8  organizations, and I just can't remember this gentleman's
9  name.
10   Q   You had a specific someone in Abbott Legal assigned
11  to your division?
12   A   Right.
13   Q   You don't know who it was, though.
14   A   No, I don't know -- I don't know the name -- I
15  don't remember the name.
16    Were it before me, I might, but I don't -- On the
17  top of mind, I can't remember his name.
18   Q   Okay.
19    The memo by Miss Shain talks about the same topic
20  as the other memo, the safe harbor, anti-kickback
21  regulations, and it specifically references in paragraph 3
22  that, Manufacturers like Abbott are perhaps particularly
23  affected by the provisions governing discounting practices
24  and warranties, and then she references Home Care and Renal
25  Care.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 403

1     Do you see that?
2   A   Mm-hmm.
3   Q   Do you recall anything that your group did
4  specifically in terms of how it was conducting its business
5  to change its business practices after these safe harbor
6  regulations were put into effect?
7     MS. CITERA:  Objection to form.
8   A   No, I don't remember changing -- I don't remember
9  specifically changing business practices after this --
10     MR. HAVILAND:  Okay.
11     THE WITNESS:  -- I mean --
12   Q   Let me ask you specifically about Home Infusion,
13  because in Home Infusion there was direct billing going on
14  for Home Infusion Services; is that right?
15   A   Right.
16   Q   There was direct billing going on with Medicare,
17  right?
18   A   Yes.
19   Q   And Medicaid?
20   A   Yes; I believe that they billed both.
21   Q   Okay.
22   A   Well, actually, we billed in the name of the
23  customer.
24   Q   And I want to get to that because you said earlier
25  that the invoice would be generated by the customer?

Page 404

1   A   In the customer's name.
2   Q   Okay.
3     And do you know if those invoices disclosed the
4  discounts that Abbott was giving to the customer?
5   A   Did they -- You know -- Was there a list price and
6  then a - or for the service --
7   Q   Yeah.
8   A   -- noted on the invoice --
9   Q   Yes.
10   A   -- or were just net prices were noted on the
11  invoice, I don't know.
12   Q   Okay.
13   A   I can't remember.
14   Q   Can you answer this?  How did the government know,
15  either Medicare or Medicaid, that Abbott was providing this
16  particular customer - any customer - a discount when it was
17  providing Home Infusion services?
18     MS. CITERA:  Objection to form.
19     THE WITNESS:  A discount you mean on the drug.
20     MR. HAVILAND:  Yeah.
21     THE WITNESS:  I'm having trouble.  See, it really
22  didn't work that way.  We didn't -- The customer or the
23  patient was billed for the drug, but Abbott never really
24  billed the -- In other words, we had a business
25  relationship with Children's Hospital --

Page 405

1     MR. HAVILAND:  Okay.
2     THE WITNESS:  -- we would bill in the name of
3  Children's Hospital or St. Minora or any hospital with
4  whom we had an agreement.
5  BY MR. HAVILAND:
6   Q   And you say, we.  Did Abbott generate the bill in
7  the name?
8   A   Yeah; Abbott would generate the invoice or people
9  who worked for Children's Hospital, as an example, and were
10  using the Abbott system would generate the invoice.
11   Q   Okay.  Let's see if I have this right.
12     Let's take your Children's Hospital example.  If
13  they're providing a service that has a Medicare reimbursed
14  drug on it - okay - and the billing's a going to go to
15  Medicare?
16     Children's Hospital is probably not a good example.
17  Let's call it Hospital A --
18   A   Okay.
19   Q   -- - okay - they're billing Medicare --
20   A   Sure.
21   Q   -- for a specific home infusion service --
22     MS. CITERA:  Objection.
23   Q   -- and it's a covered drug under Medicare - fair
24  enough?
25   A   Yeah.

Page 406

1   Q   -- that invoice is going to reflect Hospital A's
2  provision of the service, provision of the drug and
3  reimbursement of the drug, right, not Abbott.
4     MS. CITERA:  Objection to form.
5     THE WITNESS:  The person sitting there would bill
6  for the nursing component, they would bill for the drug
7  and pharmacy component; the medical component, we would
8  collect and we would receive a percentage of
9  collections.  That's how -- That is how it worked.
10     Now, how these invoices looked --
11     MR. HAVILAND:  Yeah.
12     THE WITNESS:  -- I'm sure there are examples
13  available, I just don't recall how they looked.  I don't
14  think I ever looked at one.
15  BY MR. HAVILAND:
16   Q   Do you know that if anywhere on the invoice
17  Abbott's name appeared?
18     MS. CITERA:  Objection to form.
19     THE WITNESS:  No; as a matter of fact, I don't.
20   Q   Okay.
21     So as you sit here today, you don't know if the
22  government knew that, in the example of Children's Hospital
23  or Hospital A that we talked about, that Abbott was actually
24  providing the drug and the services for the hospital client,
25  right?

60e5726b-bc69-475a-8c51-36591ea203d2

Page 407

1        MS. CITERA: Objection to form.
2        THE WITNESS: I don't know whether the payor knew of
3   Abbott's involvement; no.
4    Q    And independent of that generation of an invoice
5   and billing to the payor - if it was Medicaid or Medicare or
6   someone else - are you aware of any other documentation that
7   was generated that would have told the government about any
8   discounts that were being provided by Abbott for the drugs
9   being administered?
10       MS. CITERA: Objection to form.
11       THE WITNESS: No; I'm not aware of any.
12   Q    Okay.
13       As you sit here today, you're not aware of any
14   reports that were made or any other documents that were
15   generated.
16       MS. CITERA: Objection to form.
17       THE WITNESS: No; I don't recall any.
18   Q    Okay.
19       Did Abbott sales folks conduct business reviews
20   with customers?
21       MS. CITERA: Objection to form.
22       THE WITNESS: Their business reviews?
23       MR. HAVILAND: Yeah.
24       THE WITNESS: I'm sure they did.
25   BY MR. HAVILAND:

Page 408

1    Q    I've seen that in some of the documents.  I just
2   wanted to ask you generally what took place during a
3   business review with an Abbott customer?
4        MS. CITERA: Objection to form.
5        THE WITNESS: Patient acquisition; level of service;
6   billing and reimbursement; collection - you know, all
7   sorts of things - inventory levels; product utilization.
8        We had an interest in keeping the - you know,
9   keeping the organization as productive and as efficient
10   as possible.  So to that extent, our priorities were
11   aligned, so we talked to them about that.
12       MR. HAVILAND: Okay.
13       THE WITNESS: When they ran the pharmacy, sometimes,
14   you know, we'd have conversations in that regard.
15       You know, you can't have a nurse drive 50 miles when
16   the fully-burdenend cost is 70 bucks an hour and she
17   gets there and finds out she can't do the infusion
18   because you're missing a two-foot tube extension --
19       MR. HAVILAND; Mm-hmm.
20       THE WITNESS: -- that just doesn't work.
21       So those sorts of things; how efficiently we could
22   run the business and help them.
23   BY MR. HAVILAND:
24   Q    Okay.
25       Did you talk to the customer during the business

Page 409

1   review about their profitability on drugs?
2        MS. CITERA: Objection to form.
3        THE WITNESS: The drugs were a small component.  The
4   drugs were a very, very small component of a home
5   infusion service business.
6        I don't know if I ever specifically talked about
7   drugs or what they charged for drugs.  I doubt it.
8    Q    How about overall profitability?
9    A    That would be an issue --
10       MS. CITERA: Objection to form.
11       MR. HAVILAND: All right.
12       THE WITNESS: -- overall profitability would be an
13   issue.
14       And, once again, the more efficient it is -- I mean,
15   as I said, you've got a nurse out there fully-loaded,
16   maybe it's costing you 70 bucks an hour, the cost of
17   these drugs is trivial and when you start talking start
18   talking about the overall cost of performing the
19   procedure of service.
20   BY MR. HAVILAND:
21   Q    Is it fair to say that the drugs and the cost was
22   one aspect, though?
23       MS. CITERA: Objection.
24       THE WITNESS: Were the drugs one aspect?
25       An aspect, yes --

Page 410

1        MR. HAVILAND: Okay.
2        THE WITNESS: -- major aspect, that's not your
3   question.
4   BY MR. HAVILAND:
5    Q    No.
6        I just wanted to know if it was an aspect.
7    A    Okay.  An aspect; yes.
8    Q    Do you know if Abbott ever used --
9        MR. STETLER: Answer his questions.
10       THE WITNESS: Mm-hmm.
11       MR. HAVILAND: He did; he actually clarified and
12   then answered it, and resisted answering the next one
13   that wasn't there.
14   BY MR. HAVILAND:
15   Q    Did Abbott ever use any computers or computer-aided
16   selling tools when it was doing business reviews?
17       MS. CITERA: Objection to form.
18       THE WITNESS: Selling tools when you're doing
19   business reviews?
20       MR. HAVILAND: Yes.
21       THE WITNESS: They're kind of two different things.
22       A selling tool is a selling tool and a business
23   review is -- A selling tool, you know, you're looking
24   about the future trying to get business; a business
25   review, we're talking about the past trying to make the

Page 411

1    future better - you know, we're talking about actuals,
2    things that happened in the past.
3        So a selling tool doesn't seem like an appropriate
4    instrument to be using there.
5    BY MR. HAVILAND:
6    Q   Okay.  I might have misspoken then.
7        So the issue in a business review is with an
8    existing customer --
9    A   Right.
10   Q   -- you're looking in the rearview mirror to look at
11   their business for a period of time to go forward?
12   A   To look - yes, to look at their operation, to look
13   at their consumption of - you know, to look at their
14   consumption of things, to look at their consumption of
15   products.
16   Q   And as you're sitting here today, you don't know if
17   Abbott sales reps ever used any computer software or laptops
18   as part of their reviews?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  Data came off our computers with
21   regard to consumption of drugs and you'd marry that to
22   how many patients were treated and, you know, you'd get
23   a cost --
24       MR. HAVILAND:  Okay.
25       THE WITNESS:  -- and you wanted to make - you know,

Page 412

1    maximize the efficiency of that operation.
2        For example, I don't know how many extension sets
3    are going to be used, so what if a customer says, I'm
4    going to put every length of extension set in there.
5    Well, that's very expensive.  Why don't you go out and
6    find out which extensions that they want and put that in
7    there, and it's much less costly.
8        Those types of reviews.
9        MR. HAVILAND:  Okay.
10       Let me go ahead and mark 27.
11       (Whereupon, Robertson Exhibit No. 27 was marked for
12   identification.)
13       MS. ST. PETER-GRIFFITH:  While you're marking that,
14   I'd just like to state for the record the document - and
15   counsel for Abbott, if you could clarify, with regard to
16   Exhibit 26, what's the basis of your objection to the
17   use of this document?
18       MS. LAHEY:  It's the Protective Order dated --
19       MS. ST. PETER-GRIFFITH:  Well, this is not a TAP
20   document - it might have been produced in the TAP case,
21   but this is clearly an Abbott document; it's authored by
22   Victoria Shain from Abbott Washington, there are at
23   least three addressees - Miss Sattelberg, Miss Tobiason
24   and Mr. Tootell - who are all Abbott employees.
25       You know, this frankly is clearly responsive to the

Page 413

1    discovery request from the United States to Abbott and
2    it should have been produced to us there.
3        So, you know, I want to get our position clear on
4    the record, this isn't a TAP document, on its face,
5    it's an Abbott document.
6        MS. CITERA:  Just for the record, I feel like we're
7    confused about exhibit numbers because I thought you
8    were talking about 27.
9        MR. HAVILAND:  26.  This is 27.
10       MS. ST. PETER-GRIFFITH:  Now he's got 27.
11       MS. CITERA:  Okay.
12   BY MR. HAVILAND:
13   Q   Mr. Robertson, I'm showing you what I've marked as
14   Robertson Exhibit 27.  It's a transmittal from Maureen
15   McShane to a Gordon Schatz.
16       Did you know Miss McShane at Abbott Legal?
17   A   No.
18   Q   You didn't know her?
19   A   (Shaking head.)
20   Q   Never interacted with her?
21   A   Not that I recall.
22   Q   All right.
23       I'm showing you this for purposes of showing the
24   attachment, which I'll represent is a printout of the
25   screens from a TAP laptop that was used during TAP business

Page 414

1    reviews, okay?
2        And I'd like you to go through this and see if what
3    you just described, in terms of Abbott having the data and
4    being able to plug in customer numbers, looked anything like
5    what we see here as Exhibit No. 27.
6        MS. CITERA:  Objection to form.
7        THE WITNESS:  (Referring.)
8        I don't recall ever having used anything like this
9    in our group.
10       I don't recall ever having developed or utilizing
11   anything like this.
12   Q   Okay.
13       Do you know if others in the Abbott organization in
14   other divisions used anything like this?
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  I have no knowledge of that; no.
17   Q   Okay.
18       Well, what you had described earlier about plugging
19   in patients and getting costs and so on, if you look at the
20   second page, you see the way this program operated; if you
21   put in the number of patients, you could generate the amount
22   of reimbursement.
23       Did Abbott have anything like that in your division
24   during your tenure?
25       MS. CITERA:  Objection to form.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 415

1        THE WITNESS:  Not in my group because we had so many
2    reimbursers.
3        In other words, you can't take -- Based on contracts
4    with customers, people paid different amounts of money,
5    so you just couldn't take patients times reimbursement
6    and get a number - where do the patients come from?  You
7    know, are they from customers paying $4 or from
8    customers paying $4.10 --
9        MR. HAVILAND:  I see.
10        THE WITNESS:  -- it wouldn't -- It wouldn't work
11    with multiple reimbursers.
12    BY MR. HAVILAND:
13    Q    So you didn't have the ability because you had so
14    many different reimbursers in your division to be able to
15    have this type of spreadsheet?
16        MS. CITERA:  Objection to form.
17        THE WITNESS:  Yeah; we wouldn't have that.
18        I mean, I'm sure you've all received medical
19    invoices where you're part of a buying group, right --
20        MR. HAVILAND:  Doesn't mean we understand them.
21        THE WITNESS:  Well, no.
22        (Continuing) -- where it says billed $10,0000,
23    contractual allowance, $8,000, well, your insurance
24    company pays, too.
25        Well, if you were to take that $10,000 and multiple

Page 416

1    it by 20, you'd be anticipating much more revenue,
2    wouldn't you?
3        And also what it another group pays $1,800.  You
4    just couldn't take that number and multiply; it doesn't
5    work.
6    BY MR. HAVILAND:
7    Q    Yeah.
8        Did you ever have occasion to have a customer - one
9    of your customers present to you some type of computer
10    program like this that showed you what they expected to get
11    in the way of reimbursement from any reimburser?
12        MS. CITERA:  Objection to form.
13        THE WITNESS:  I thing we did proformas (sp.).
14    Q    What is that?
15    A    When you start a business up you put a proforma and
16    you say, Based upon the contracts we have out and the
17    numbers of patients we can anticipate coming out of the
18    hospital and our current product mix, what I can do on a
19    proforma basis, you know, if your (indicating) insurance
20    company's paying five and your's (indicating) is paying $510
21    and your's (indicating) is paying $5.30 and I know how many
22    patients I plan to get from you, on a proforma basis, I can
23    estimate what my revenue and reimbursement's going to be.
24    Q    Okay.
25        And you did that?

Page 417

1    A    We did that before we went into businesses.
2        After you're in business with people, you have
3    actuals.
4    Q    Do you recall any -- Let me see if I understand it.
5        Did it have to be a certain level of customer to do
6    that for or did you do that for everybody?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  For people with whom we went into
9    business we would do that.
10    Q    I just want to know, it wasn't just larger
11    customers, it was for everybody that you went into business
12    with?
13    A    No.  No.  No.  These business development
14    agreements, there's only about 10 or 12 of them.  They
15    probably have a list in Home Infusion Services of how many
16    there are.
17    Q    I see.
18        In Home Infusion Services, for those that you went
19    into business with, you did these proforma projections.
20    A    Right; for those with whom we developed a business
21    development agreements, we did the proforma projections, but
22    for those to who we sold product, they would tell us what
23    the volume was going to be and we would put it into a matrix
24    and tell them what the price was going to be based on that
25    volume.

Page 418

1    Q    Okay.
2        MR. HAVILAND:  Let me go ahead and mark as Exhibit
3    28 this document.
4        (Whereupon, Robertson Exhibit No. 28 was marked for
5    identification.)
6    BY MR. HAVILAND:
7    Q    Mr. Robertson, Exhibit 28 is a document entitled,
8    TAP Pharmaceuticals, Inc., President's Review of Operating
9    Results, and it bears a date of April '93 with H. T.
10    Pietraszek, which we understand to be Mr. Pietraszek --
11        MS. CITERA:  And for the record, this is also a
12    confidential document subject to the Protective Order
13    also, we have an objection.
14        MS. LAHEY:  I will also object.
15    BY MR. HAVILAND:
16    Q    My question is, sir, did you do a similar type of
17    review for your division for Mr. Hodgson?
18        MS. CITERA:  Objection to form.
19        THE WITNESS:  Did we review our numbers --
20        MR. HAVILAND:  Yeah.
21        THE WITNESS:  With Mr. Hodgson?
22        MR. HAVILAND:  Sure.
23    BY MR. HAVILAND:
24    Q    Well, my question is when we asked TAP executives
25    about this specific issue, and Mr. Hodgson, these types of

60e5726b-bc69-475a-8c51-36591ea203d2

Page 419

1 reviews were done in advance of the April and August
2 updates, and my question is did you do the same type of
3 written report for Mr. Hodgson --
4        MS. CITERA: Objection --
5    Q   -- not necessarily this, but something like it.
6        MR. CITERA: Objection to form.
7        THE WITNESS: Yeah, different in format but the
8    issue's identical; sales, cost, income -- Sales, gross
9    expenses, income - I mean --
10   Q   Okay.
11       Did you ever provide any kind of summary
12  information about the business and business trends like you
13  see in this document?
14       MS. CITERA: Objection to the form.
15       THE WITNESS: There may have been a cover letter, I
16   just don't recall.
17       Usually there was a great deal of pretty spirited
18       discussion on these numbers so - based on the numbers,
19       and so we didn't put a cover letter on it.
20   Q   This particular document in the third to last
21  paragraph reads that, The 2nd Quarter district meetings were
22  held during the last two weeks of April and were a great
23  success. The meetings included business reviews, an
24  introduction to managed care issues and training on computer
25  based selling. The sales force was given financial selling

Page 420

1  programs for presentation to both urologists and
2  gynecologists. Early feedback is overwhelmingly positive.
3       Did Abbott, in your division, do anything like
4  what's described here in terms of giving sales reps
5  computer-aided tools to help sell?
6        MS. CITERA: Objection to form.
7        THE WITNESS: No.
8    Q   You never had laptops issued to sales reps?
9    A   Whether or not the sales reps had laptop computers,
10  I don't recall. They may have.
11   Q   My question is different. Did the company ever
12  issue --
13   A   That's what I'm talking about --
14   Q   Okay.
15   A   I don't think we bought computers for our
16  salespeople, as I recall.
17   Q   All right.
18       Were you aware at the time that TAP had done that?
19   A   I don't remember.
20   Q   Okay.
21       Do you know if any Abbott division other yours had
22  provided laptops to its sales reps?
23   A   No, I don't know that.
24       MS. CITERA: Objection to form.
25   Q   Okay.

Page 421

1        Did you ever have occasion to talk to Mr. Hodgson
2    about what other divisions were doing in terms of their
3    selling and their success?
4    A   The products were very different; the markets were
5    very different.
6        If he saw something that worked and he had a
7    suggestion, he might have brought it up.
8        But a lot of it wasn't really relative to our
9    milieu; we kind of did our own thing.
10   Q   How about did you have interactions with
11  Mr. Burnham on a periodic basis?
12   A   Infrequently.
13   Q   During those times did you ever talk to him about
14  sales activities in other divisions and what they were doing
15  in terms of their success?
16   A   No.
17       MR. HAVILAND: Let me go ahead and mark as Exhibit
18   29 this document.
19       (Whereupon, Robertson Exhibit No. 29 was marked for
20       identification.)
21       MR. HAVILAND: And this is an Abbott document, which
22   Tony will be happy to see.
23  BY MR. HAVILAND:
24   Q   Mr. Robertson, I'm showing you Exhibit 29 which
25  I'll represent has been identified as the minutes of a

Page 422

1  meeting of the TAP board from April of 1992. I don't
2  suppose you've seen these before today?
3    A   No.
4    Q   Did you know in 1992 that Mr. Burnham - you see on
5  page 2 - sat on TAP's board?
6    A   The issue of who was on TAP's board never came up.
7  It's not something I considered.
8        Would it have surprised me to learn that
9  Mr. Burnham was on their board? No.
10   Q   Okay.
11       I want to direct your attention to the exhibit
12  bates labeled ABT 07095.
13   A   Mm-hmm.
14   Q   And if you'll look at the second paragraph from the
15  bottom, there's something that says, Mr. Burnham commented.
16       Do you see that?
17   A   Mm-hmm.
18   Q   It reads, Mr. Burnham commented that without the
19  reps' efforts in educating doctors about reimbursement, et
20  cetera, the success in sales would not have been as great.
21       Do you see that?
22   A   Mm-hmm.
23   Q   Do you ever recall speaking to Mr. Burnham about
24  TAP's efforts to educate doctors about reimbursement and the
25  impact it had on TAP's sales?

Page 423

1     MS. CITERA:  Objection to form.
2     THE WITNESS:  No.
3     Q   Okay.
4     Did that topic ever come up with Mr. Hodgson?
5     MS. CITERA:  Objection to form.
6     THE WITNESS:  No -- And -- No, we never discussed
7  any reimbursement with any executive at Abbott to my
8  recall.
9     Their interest, when I did reviews with him was, How
10  much are you selling?
11    Q   Well, earlier you said in your testimony the first
12  day that, to your knowledge, Abbott sales reps did not
13  discuss reimbursement with customers.
14    Do you remember that?
15    A   I thought I said that it was not our -- It is not
16  our -- To not discuss -- We'll talk about whatever a
17  customer wants to talk about --
18    Q   Okay.
19    A   -- if a customer -- Now, talks about -- If a
20  customer wants to talk about reimbursement, okay, if he asks
21  a specific question --
22    Q   Right.
23    A   -- we'll try to get the answer to the question.
24    Now if you -- Is that your question?
25    Q   No.

Page 424

1     A   Would we refuse to answer --
2     Q   Let me make sure I have the question clear.
3     Earlier I thought you said that Abbott sales reps
4  did not discuss reimbursement with customers, and I just
5  want to make sure I understood your answer.
6     A   The question the first day came up, Did Abbott
7  market based upon reimbursement; my answer was no.
8     Q   Okay.
9     A   We'll talk about -- If a customer has a specific
10  question with regard to reimbursement, we would not say
11  we're not going to answer that, we're not going to go
12  through the effort to get you an answer.
13    Q   I see.
14    And as you sit here today, you see nothing wrong
15  with Abbott sales reps discussing reimbursement with
16  customers?
17    MS. CITERA:  Objection to form.
18    THE WITNESS:  You have to have context.  I believe
19  you have to have context.
20    Q   Okay.
21    Well, what if a customer wants to know about the
22  current level of Medicaid reimbursement, would Abbott sales
23  reps discuss that with them?
24    MS. CITERA:  Objection to form.
25    THE WITNESS:  That's publicly available information

Page 425

1  probably available on someone's computer what Medicaid
2  pays for a specific product.
3     And if it's publicly available information and the
4  customer asked the question and we could easily provide
5  that, they probably would.
6     MR. HAVILAND:  Okay.
7     THE WITNESS:  I mean, I don't see anything sinister
8  about that.
9  BY MR. HAVILAND:
10    Q   And I wanted to make sure I understood that you see
11  nothing wrong with it.
12    A   If a customer --
13    MS. CITERA:  Objection to form.
14    THE WITNESS:  -- has a specific question regarding
15  reimbursement, understanding the context, if he has a
16  specific question, I don't see anything wrong with
17  answering the question.
18    Did we market based upon that?  No, we did not.
19    Q   What if customers asked about their profitability
20  under Medicare or Medicaid reimbursement, would that topic
21  be discussed?
22    MS. CITERA:  Objection to form.
23    THE WITNESS:  Once again, I'd have to have context.
24  A simple question, perhaps, Did we market that way?  No.
25    You know, this is a long time ago and I'm --

Page 426

1     Q   Sure.
2     I guess we could probably get hung up in
3  nomenclature and I don't want to do that; you say you didn't
4  market that way.
5     But if a customer engaged an Abbott sales rep in a
6  discussion about their reimbursement and how much money they
7  might or might not make by a particular payor, whether it be
8  Medicare, Medicaid or a private payor, that topic would be
9  discussed, right?
10    MS. CITERA:  Objection to form.
11    THE WITNESS:  I don't -- What a specific payor would
12  pay for a procedure or drug?  You know, I don't know.
13  Maybe the government was - would be, I don't know.
14    Once again, it's a long time ago and I don't know
15  the context of the conversation.
16    Q   I just want to understand from your position as an
17  executive if you saw nothing wrong with it then, earlier I
18  thought I understood your testimony to be that there was
19  something off limits about discussing reimbursement.
20    A   Using it as a marketing tool.
21    MS. CITERA:  Objection to form.
22    Q   Okay.
23    And by that you mean by Abbott prompting the
24  discussion?
25    MS. CITERA:  Objection to form.

Page 427

1    Q   Where do you draw the line with marketing?  That's
2    what I'm not understanding.
3    A   I don't think we used - we would ever use any
4    reimbursement as a tool of gaining business or whatever - we
5    didn't talk about that; that was the customer's problem.
6        We talked about the -- We tried to get business
7    based upon a product and the quality of the product.
8        We didn't use reimbursement as a marketing tool.
9        If we were asked a specific question, we'd probably
10   be forced to answer it.
11   Q   And you would.
12       MS. CITERA:  Objection to form.
13       THE WITNESS:  If a customer had -- Once again,
14   depending on context, we'd answer a customer's question
15   if we could and if it were public information.
16   Q   Do you know if any of Abbott's competitors like
17   Baxter or other companies promoted based on reimbursement,
18   spread or anything that you considered not to be part of
19   your marketing?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  I have no knowledge of that.
22   Q   No knowledge?
23   A   No personal knowledge; no.
24   Q   Okay.
25       Did it ever come to your attention, a sales rep or

Page 428

1    one of your direct reports came to you and said that a
2    competitor's marketing to a customer based on spread, what
3    do we do about it?
4    A   Not that I remember.
5    Q   Okay.
6        Do you recall there being discussions about that
7    ever?
8        MS. CITERA:  Objection to form.
9        THE WITNESS:  No -- I'm trying to -- Because there
10   were an awful lot of companies in the business and --
11   No, I don't remember specific conversations about that.
12   Q   Well, what I'm keying to is in your earlier
13   testimony you said something about other companies might
14   have.
15   A   They may have.  I had no knowledge of them doing or
16   not doing that.
17   Q   My follow-up was simply do you recall as you sit --
18   A   Oh, no.
19   Q   -- here today any specific company, whether it be
20   Baxter --
21   A   No.
22   Q   - or some other competitor?
23   A   No.
24       You know, I don't want to read too much into your
25   question.  What I'm thinking is what would the result be if

Page 429

1    a company did that, how would I hear about it, and I can't
2    remember having heard it.
3    Q   Okay.
4        MR. STETLER:  Let me just say one thing.
5        MR. HAVILAND:  Yeah.
6        MR. STETLER:  Wait until he finishes asking the
7    questions.  You answered it three times during the
8    question.  It's driving her insane, isn't it.
9        Let him finish, beginning --
10       THE WITNESS:  Take solace in the fact that I'm only
11   guy that's not being paid today.
12       MR. HAVILAND;  don't be so sure about that.
13   BY MR. HAVILAND:
14   Q   Just give me a minute here.
15       Before when you were talking about the issue of
16   spread with Counsel for the Department of Justice, I think
17   you said - and make sure I've got this right - that if
18   Abbott had done that you might have gained 100 percent
19   market share.
20       Do you remember that?
21   A   If they were --
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  -- conspiracies, then you could do
24   that.
25   Q   If there was what?

Page 430

1    A   If you wanted to market that way, you could
2    probably -- You know, carrying it to -- You know, reduced to
3    absurdity.  If that were the case, wouldn't somebody get it
4    all?
5    Q   Would they?
6    A   I don't know.
7    Q   What if the competitors were doing the same thing?
8        MS. CITERA:  Objection to form.
9        THE WITNESS:  You know, once again, that's a
10   hypothetical.  I can't comment on that.  I don't know
11   the answer to that question.
12   Q   Well, it's not so much a hypothetical, sir, in the
13   sense that AstraZeneca, who competed with TAP has said in
14   open court that they competed with TAP on spread.
15       So you would agree with me that at least that some
16   companies did that, would you not?
17       MR. STETLER:  Well, you just told him he did, you
18   know.
19       MS. CITERA:  Yeah.
20       MR. HAVILAND:  Well, it's a matter of public record.
21   If you want to object, you can object.
22       MR. STETLER:  Here's my objection --
23       MS. CITERA:  He didn't have knowledge of it.
24       MR. STETLER:  Let me just state my objection.
25   If you want to ask the question - let me tell you,

60e5726b-bc69-475a-8c51-36591ea203d2

Page 431

1    I'm sitting here listening to all sorts of questions
2    that would be objectionable, okay?
3        But if you want to say, I'm telling somebody did it
4    so you'd have to agree it happened, that's really not a
5    question.
6        MR. HAVILAND:  Let me ask a different question.
7        MR. STETLER:  If you want to say, Do you have any
8    knowledge of that happening, or anything like that, I'm
9    not going to object.  But that wasn't the question.
10   BY MR. HAVILAND:
11   Q   Let me ask you a different question.
12       Are you aware that TAP and AstraZeneca competed
13   based on spread?
14   A   No.
15   Q   Would it surprise you to learn that?
16   A   Once again -- You know, I'm 64 years old, I've been
17   beat up, shot at everything else.  I mean, what would
18   surprise me in this world?  Nothing.
19   Q   All right.
20       If it was the case that Abbott could gain 100
21   percent share by competing on spread, given your fiduciary
22   obligation to your shareholders, why didn't you do it?
23       MS. CITERA:  Objection to form.
24       THE WITNESS:  We marketed on the basis of the
25   quality of our product and, you know, we didn't do it.

Page 432

1    Q   Well, what I don't understand, sir, is when you put
2    all that together, you have an obligation to your
3    shareholders to make money, correct?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  We have an obligation to our
6    shareholders to represent them professionally and
7    provide them with a reasonable return.
8    Q   Okay.
9        And if you marketed based on spread and you gained
10   greater share than you had had you not done that, why
11   wouldn't you do that to fulfill your duty to your
12   shareholders?
13       MS. CITERA:  Objection to form.
14       THE WITNESS:  Well, you know, things like
15   reimbursement go away.  Everything goes away but the
16   quality of your product, how well it works and how well
17   you serve the customer.
18       That would be a very short-term solution or a very
19   short-term way to look at the business.  Over time, it
20   just doesn't work - I don't think it would work.
21   Q   And Abbott never did it.
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  Well, to my knowledge -- You know,
24   Abbott never did it.  Who's Abbott?
25   Q   Well, you tell me.

Page 433

1    A   I mean, you know, there are hundreds and --
2        THE WITNESS:  I mean, how many employees, 55,
3    60,000?
4    A   What they're doing --
5        MS. CITERA:  I don't get to answer questions.
6        THE WITNESS:  Oh, I'm sorry.
7    A   What they are doing -- I've been out of there for
8    seven and a half years, what they're doing I am absolutely
9    clueless of.  And Abbott is 50,000 people.  I have no idea
10   what they do.
11   Q   Well, let me understand this because I want to get
12   to the bottom of your understanding why you thought that
13   Abbott might gain 100 percent market share if it marketed
14   based on spread.
15       Why would that be?
16       MS. CITERA:  Objection to form.
17       THE WITNESS:  Well, I guess if that were the only
18   consideration, then you'd arrange it so that you were
19   the least expensive and they made the most money.
20       I mean, can anomalies exist?  Yeah, anomalies might
21   exist where you mis-price a product or something and
22   that issue would happen.  But over time that won't work.
23   You've just got to market on the value of your product.
24   Q   But your suggestion is that Abbott could have done
25   that, created a market where it could have driven such

Page 434

1    profitability for --
2    A   Theoretically.
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  Theoretically; not in practice.
5    Q   I agree --
6    A   Okay.
7    Q   -- but I want to understand when you said that --
8    A   Well --
9    Q   Let me just make sure you understand the question.
10       When you said that, was your understanding that,
11   theoretically, Abbott could structure it in such a way that
12   its customers would make such profit, it would give all the
13   business to Abbott --
14       MS. CITERA:  Objection to form.
15   Q   -- is that right?
16       THE WITNESS:  Theoretically, if it works in one case
17   it would work in every case.  If that theory is correct,
18   then, yes, you would have the same situation in every
19   product.
20   Q   Okay.
21       Give me about two minutes and I'm going to be done.
22       All right?
23       VIDEOGRAPHER:  We're going off the record.
24       (Discussion off the record)
25       VIDEOGRAPHER:  We're back on the record.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 435

1     MR. HAVILAND:  Mr. Robertson, I have no further
2  questions.
3     I thank you, sir.
4     THE WITNESS:  Okay.
5     MR. ANDERSON:  Dave, I'm ready to go right now and I
6  am eager to get out of here at 4:30, but I understand
7  that you need to --
8     MR. STETLER:  Well, if you're --
9     MR. ANDERSON:  I understand we've got to take lunch,
10  we can't go until 4:30.
11     I would ask that we make it relatively quick so that
12  we can get back here, given that delay this morning on
13  the TAP issue.
14     MR. HAVILAND:  Let's do that.
15     MR. STETLER:  Not a problem at all.
16     MR. ANDERSON:  Thank you.
17     (At about 12:05 p.m. - a lunch recess was taken)
18     (At about 12:45 p.m. - reconvened deposition)
19     VIDEOGRAPHER:  We're back on the record.
20          CROSS-EXAMINATION
21  BY MR. ANDERSON:
22     Q   Mr. Robertson, good afternoon.  I hope you enjoyed
23  your lunch.  My name is Jarrett Anderson and I've got some
24  questions for you as well.
25     A   Okay.

Page 436

1     Q   I'm going to get into some documents in a moment,
2  but I wanted to ask some kind of big picture questions.
3       Isn't it true that you were, for about ten years,
4  the general manager of Alternate Site?
5     A   That's correct.
6     MS. CITERA:  Objection to form.
7     Q   And just by way of foundation, the Alternate Site
8  Business Unit at Abbott was comprised basically of three
9  subunits; Home Infusion Reimbursement Services --
10    A   Just Home Infusions Services.
11    Q   Home Infusion Services --
12    A   Right.
13    Q   -- which did reimbursement, among other things,
14  correct?
15    A   That's correct.
16     MS. CITERA:  Objection to form.
17    Q   (Continuing) -- Alternate Site Product Sales,
18  correct?
19    A   Mm-hmm.
20    Q   And then Renal Care, correct?
21    A   Right.
22    Q   Can you describe what the basic business model was
23  of Alternate Site Product Sales?
24     MS. CITERA:  Objection to form.
25     THE WITNESS:  The objective of Alternate Site

Page 437

1  Product Sales was to market the products produced by the
2  Hospital Products Division in a non-hospital
3  environment.
4     As you know, many people can be treated at home and
5  don't have to be hospitalized for concern conditions -
6  certain types of infections, I.V. antibiotics can be
7  done; total parenteral nutrition, I.V. feeding can be
8  done at home; chemotherapy.
9     These require pumps; they require antibiotics; they
10  require solutions; they require all of the products that
11  Abbott sold, and we would sell these products in a
12  non-hospital environment - home infusion service
13  companies, nursing homes, physician offices and renal
14  dialysis centers.
15    Q   Is it true that basically the customers that
16  Alternate Site Product Sales called upon were either
17  pharmacies or groups of pharmacies that bonded together so
18  they could negotiate contracts?
19     MS. CITERA:  Objection to form.
20     THE WITNESS:  We dealt with distributors - those,
21  you know, who distributed various types of products that
22  we marketed; we dealt with group purchasing
23  organizations where various organizations would pay a
24  fee and be part of a buying group where they could
25  leverage the size they could garner by volume in order

Page 438

1  to get better prices, and those are the two models -
2  and, you know, nursing homes, which were wholly-owned,
3  had they are own pharmacies.  Some of the nursing homes
4  would buy off their own contracts, some of them would
5  buy off contracts from a buying group.
6     So the products were sold in various ways through
7  various channels.
8     Q   Let's talk about the GPOs for a moment.
9       In layman's terms, those were groups of pharmacies
10  that had joined together to negotiate --
11    A   Right.
12    Q   -- contracts, correct?
13    A   -- GPO, group purchasing organization.
14     MS. CITERA:  Objection to form.
15    Q   Okay.
16       And then you mention nursing homes.
17       Isn't it true that Abbott had large national
18  nursing home chains as customers?
19    A   Yes.
20     MS. CITERA:  Objection to form.
21    Q   Such as Omnicare?
22    A   Yes.
23    Q   Is it also true that Abbott's products sold by
24  Alternate Site Product Sales were typically what's known as
25  multisource or generic products?

60e5726b-bc69-475a-8c51-36591ea203d2

Page 439

1    A   Right.
2    Q   How did Abbott go about differentiating its
3  products in selling to pharmacies, nursing homes and GPOs?
4       MS. CITERA:  Objection to form.
5       THE WITNESS:  Breadth of product offering, product
6  quality, service.
7    Q   Were any financial considerations utilized in
8  marketing products?
9    A   Well, your prices had to be competitive.
10   Q   When you say, prices, which prices are you
11 referring to?
12   A   The prices we charge the customer.
13   Q   Were any prices other than market prices considered
14 in marketing products to customers?
15      MS. CITERA:  Objection to form.
16      THE WITNESS:  Not that I recall; just what the
17 market was paying for a specific product.
18   Q   Did Abbott, under your command, ever consider the
19 dispensing fees of providers in setting the prices of its
20 products?
21      MS. CITERA:  Objection to form.
22      THE WITNESS:  Dispensing fees, not that I recall;
23 no.
24   Q   Would it be a true statement that Abbott never
25 considered the adequacy or potential inadequacy of

Page 440

1  dispensing fees paid to providers when it set its prices?
2       MS. CITERA:  Objection to form.
3       THE WITNESS:  Never's a big -- Never's a pretty -
4  pretty definitive word; I can't say never.  But to my
5  knowledge, dispensing fees weren't a consideration.
6       You know, when you're selling a 2 ml. vial of an
7  antibiotic and so is everybody else, quality, the
8  availability of that product and the breadth of product
9  line, how much they bought would determine our price.
10      Because everybody's selling the same thing,
11 virtually.
12   Q   Can you think of any instance whatsoever where
13 Abbott set the price of a multisource product based upon, in
14 part, the dispensing fees paid to providers?
15      MS. CITERA:  Objection to form.
16      THE WITNESS:  I can't think of any; no.
17   Q   Would it be appropriate in your view as a former
18 key executive at Abbott for Abbott to set the prices of its
19 products based upon the dispensing fees to the providers?
20      MS. CITERA:  Objection to form.
21      THE WITNESS:  Appropriate?  I can't determine that.
22 I don't know.  Without providing me context or a
23 specific situation, you know, what's appropriate?  I
24 mean, I don't know.
25      What does it mean; in what context to whom, you

Page 441

1  know?
2    Q   Well, in the context of you being the general
3  manager of --
4    A   We didn't do it.
5       MS. CITERA:  Objection to form.
6    Q   Okay.
7       THE WITNESS:  -- to my knowledge.
8    Q   Was there an effort made at Alternate Site not to
9  price products relying upon information concerning provider
10 dispensing fees?
11      MS. CITERA:  Objection to form.
12      THE WITNESS:  Our products were marketed based on
13 those aspects that I articulated to you earlier because
14 most of them were nondifferentiable.
15      I don't like to use the word, commodity, that's a
16 bad word in sales business.
17   Q   Well it makes it tough to sell when you only have a
18 commodity, correct?
19      MS. CITERA:  Objection to form.
20      THE WITNESS:  Well, when your sales people think
21 they're selling a commodity, it makes it tough for them
22 to sell, you know --
23   Q   Yes, sir.
24      THE WITNESS:  -- so they can't think that way.
25      I mean, you never had to be ashamed of selling any

Page 442

1  of our products; they were always high quality, they
2  were virtually freely available, we had inventory of
3  those products, and sold on that basis.
4    Q   Was reimbursement paid to providers one financial
5  consideration that Abbott utilized in pricing its products?
6       MS. CITERA:  Objection to form.
7       THE WITNESS:  Reimbursement to providers?
8       MR. ANDERSON:  Yes.
9       THE WITNESS:  Well, reimbursement to providers is
10 always going to be an issue; it has to be.
11      If a provider is getting ten bucks reimbursement,
12 you're not going to get 20 bucks for your product.  So
13 reimbursement invariably is an issue.
14 BY MR. ANDERSON:
15   Q   So reimbursement had to exceed the prices that
16 Abbott charged in Abbott view, correct?
17      MS. CITERA:  Objection to form.
18      THE WITNESS:  In a market economy, not just for
19 Abbott.
20      You know, I'm trying to answer your question here.
21 In the housing business, if - or whatever business, you
22 can't charge an intermediary more than they're going to
23 get paid for.
24   Q   How much larger --
25      MR. ANDERSON:  Strike that.  I'll rephrase.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 443

1    Q   How much greater did the reimbursement need to be
2  in Abbott's view over the price that Abbott charged
3  customers?
4    A   There was no policy --
5        MS. CITERA: Objection to form.
6        THE WITNESS: -- or thinking in that regard to my -
7    in my memory.
8    Q   Was there any threshold whatsoever?
9        MS. CITERA: Objection to form.
10       THE WITNESS: Not that I recall.
11   Q   Was that type of analysis ever conducted?
12       MS. CITERA: Objection to form.
13       MR. ANDERSON: I'll rephrase to be more specific.
14   Q   Sir, did Abbott ever look at how much the
15 reimbursement was on its products versus how much it was
16 charging customers for those products?
17       MS. CITERA: Objection to form.
18       THE WITNESS: That would a very difficult thing to
19   do because the reimbursement varies so much.
20   Q   In your experience was there any standard bench
21 mark that could be referred to estimate reimbursement?
22       MS. CITERA: Objection to form.
23       THE WITNESS: I don't remember one, no.
24   I mean --
25   Q   Does AWP ring a bell?

Page 444

1    A   Oh, I know the term AWP. That's for one customer.
2    Q   Did you view AWP to be a bench mark for estimating
3  reimbursement?
4        MS. CITERA: Objection to form.
5        THE WITNESS: I don't -- You know, that's --
6    That's -- I never reviewed the AWPs to compare them to
7    what prices we charge. What prices we charge were set
8    fundamentally by the market tolerance for a price.
9        MR. ANDERSON: Objection. Nonresponsive.
10   Q   Sir, I'm asking a different question.
11       My question was did you understand that AWP was a
12 bench mark that could be utilized in estimating
13 reimbursement paid to providers?
14   A   Yes --
15   Q   All right.
16   A   -- AWP was -- Yeah, AWP was an element for one
17 provider.
18   Q   So to the extent that reimbursement under a certain
19 product plan or under a certain government program such as
20 Medicaid varied, you could at least estimate it generally
21 using AWP, correct?
22       MS. CITERA: Objection to form.
23       THE WITNESS: I don't know if -- I don't know if
24   Federal reimbursement is what would determine that.
25   What would determine that would be market reimbursement.

Page 445

1        In other words, say the - just to use an example -
2    say the federal government is 10 percent of
3    reimbursement and they don't pay very much for it and
4    the private insurers will pay a lot for it. Well, I'd
5    charge a lot for it because private insurers are willing
6    to pay it.
7    Q   And did you --
8        THE WITNESS: Does that make sense to you?
9    Q   -- find that typically AWP was a good bench mark
10 for estimating private reimbursement?
11       MS. CITERA: Objection to form.
12       THE WITNESS: I never analyzed it in that way.
13   Q   You just knew, big picture, that AWP was a bench
14 mark.
15   A   A bench mark for one payor.
16   Q   I see.
17       Which payor?
18   A   The Medicare program.
19   Q   Only Medicare?
20   A   I believe the State programs may use that, too;
21 Medicaid program.
22   Q   State Medicaid also used AWP?
23   A   Well, I don't remember specifically.
24   Q   You're not certain specifically, but you think
25 generally that's what you recall.

Page 446

1    A   In general, yeah.
2    Q   All right.
3    A   It was an element; yeah.
4    Q   Well, I understand because, again, you're at the
5  stop of the organization, so you may not have as detailed a
6  knowledge as some of your subordinates, correct?
7    A   I don't have specific --
8        MS. CITERA: Objection to form.
9        THE WITNESS: My interest was how much does my
10   competitor gets for this product; how much do I get for
11   it; can I use the breadth of product line to get a
12   premium, can I not; can I use the breadth of a product
13   line and more volume through a specific customer based
14   upon selling 20 products instead of one to give that
15   customer a better deal and to put my company into a
16   competitive advantage in that customer's location.
17       Right.
18   Q   And you've also had to consider the customer's
19 wants and desires, correct?
20       MS. CITERA: Objection to form.
21       THE WITNESS: Well, as a general rule, you always
22   have to consider your customers, what their goals or
23   objectives are or how they view things, I guess.
24   Q   That's just a fundamental principle of marketing
25 and sales, right?

Page 447

1    A   Well, you know, at the end of the day, the customer
2  is going to make a decision based upon their wants, not
3  mine.
4    Q   Right.
5        And in order to try to garner the sale, you need to
6  understand their wants as much as you can, correct?
7    A   Their wants and their desires; right.
8    Q   And so if financial considerations, including price
9  paid and reimbursement are important to the customer, that
10 would, in turn, be at least somewhat important to Abbott,
11 correct?
12       MS. CITERA:  Objection to form.
13       THE WITNESS:  I think it may have been a factor.
14   Q   And was it, in fact, a factor in your experience?
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  I've heard the term, AWP, discussed,
17 so it may have been a fa- - you know, how big a factor,
18 I don't exactly.
19       Sure --
20   Q   You didn't quantify it, but you knew that it was a
21 consideration.
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  Reimbursement is always a
24 consideration --
25       MR. ANDERSON:  All right.

Page 448

1        THE WITNESS:  -- by all payors.
2  BY MR. ANDERSON:
3    Q   And all providers, correct?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  I would assume by all providers if
6  they're - whether they're for profit or not-for-profit
7  that reimbursement is an issue - can they get paid for a
8  specific procedure, is it approved, is it on formulary
9  and those sorts of things.
10   Q   Yes, sir.
11       And, in turn, it was also at least somewhat an
12 issue with pharmaceutical companies in your experience,
13 correct?
14       MS. CITERA:  Objection to form.
15       THE WITNESS:  Yeah, I would assume it would be.
16   Q   All right.
17       And you base that assumption on your experience of
18 ten-plus years as the head of Alternate Site, correct?
19   A   I base it on my experience in the industry.
20   Q   Including your time at Abbott.
21   A   Sure.
22   Q   Now, I'm going to shift gears, sir, to the Home
23 Infusion Services business.
24       What was the fundamental business model for Home
25 Infusion Services?

Page 449

1    A   The business model there was that there were
2  hospitals that - or, you know, hospital chains that would
3  want to get into the home infusion business but didn't know
4  anything about how to get there; how to build a pharmacy,
5  how to acquire product, delivery, billing and reimbursement,
6  as you mentioned, those sorts of things.
7    Q   And did Abbott strive to assist these hospitals
8  with their outpatient --
9    A   Yeah.
10   Q   -- pharmacy needs?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  Yeah.  We viewed that at the
13 beginning, as I go back in history prior - that's prior
14 to my arrival in Home Infusion Services - but as a way
15 to if we got these folks into the business and they
16 began to do it, it would be an outlet for product and,
17 fundamentally, a product company.
18       So we'd provide these services as a way to help them
19 get in the business, then as an outlet for our product.
20   Q   And, in layman's terms, what you're talking about
21 is if these additional providers are successful in serving
22 patients, that's going to be an additional outlet for Abbott
23 drugs to get dispensed, correct?
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  Yes.

Page 450

1    Q   And so that, in turn, would help Abbott as a drug
2  maker sell its products.
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  Yes.
5        MR. ANDERSON:  What's the objection to that?
6        MS. CITERA:  First of all, you're characterizing it
7  Abbott, Abbott, Abbott.  This was one small part of HPD
8  and you're generalizing as to Abbott and what Abbott
9  knew and what Abbott did.  This is just a small part.
10       MR. ANDERSON:  That is abuse of objection.  I would
11 ask that you --
12       MR. STETLER:  You asked her.
13       MS. CITERA:  You asked me.
14       MR. ANDERSON:  I know.  I wanted to understand the
15 basis, and there's no basis.  And I would ask that you
16 limit your objection to form to a meritorious objection.
17       MS. CITERA:  I'd ask --
18       MR. ANDERSON:  You have littered the record with
19 objection, form, to the most simplest questions.
20       MS. CITERA:  Well, why are you asking what Abbott
21 thought and what Abbott knew?
22       He doesn't know --
23       MR. ANDERSON:  This gentleman worked for Abbott.
24 This is ridiculous.
25       MS. CITERA:  Well, he worked for Alternate Site.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 451

1      MR. ANDERSON:  Toni, I would ask that you follow the
2  rules and only --
3      MS. CITERA:  I am following the rules.
4      MR. ANDERSON:  -- assert objections in good faith.
5      MS. CITERA:  I'd ask that you ask not objectionable
6  questions.
7  BY MR. ANDERSON:
8    Q   Sir, was reimbursement one of the services that
9  Home Infusion provided to customers?
10   A   Yes.
11   Q   And in that regard, did Home Infusion personnel
12  hold themselves out to be reimbursement experts?
13      MS. CITERA:  Objection to form.
14      THE WITNESS:  They had to know how to do the
15  reimbursement.  You know, we knew how to do it.
16   Q   And that's what Abbott brought to the table, so to
17  speak.
18   A   Yeah, that's what Abbott brought to the table;
19  knowing how to do it, and also the development of a
20  computer-based - computer system to do that.
21   Q   And that's the CHIP system specifically, correct?
22   A   Mm-hmm.  Yes, it is.
23   Q   And you were the head of Alternate Site when CHIP
24  was created, correct?
25   A   When the CHIP system was created, no, no, because

Page 452

1  you had to have that business before you got in the
2  business, and they were in the business before I got there.
3      Now, did I preside over some monumental expenses to
4  increase the capacity or the ability of that system?
5  Absolutely.
6    Q   And that was the design and formulation of a
7  sophisticated computer program that was known as CHIP,
8  correct?
9      MS. CITERA:  Objection to form.
10      THE WITNESS:  Well, I don't know how sophisticated
11  it was, but it was a system to do Home Infusion Services
12  billing.
13   Q   And were you aware that that program known as CHIP
14  downloaded AWP information from pricing services such as Red
15  Book?
16   A   Oh, it probably had to have if it's a -- I mean, in
17  the 1990s this entire world underwent a digital revolution
18  in everything - nobody looks at books anymore, I guess, all
19  the numbers are on computer.
20   Q   And why was it that the AWP number specifically
21  needed to be electronically downloaded in the CHIP system?
22      MS. CITERA:  Objection to form.
23      THE WITNESS:  Why was it that it had to be
24  electronically loaded?
25   Q   No.  No.  No.  I'm sorry.  I might have put

Page 453

1  emphasis on the wrong word.
2      Why was it that AWP pricing needed to be
3  electronically input into the CHIP system?
4      MS. CITERA:  Objection to form.
5      THE WITNESS:  I can't think of any other that it's
6  probably a ceiling.  If you went back to review it and
7  you wanted to find what's the ceiling, you know, that
8  would be it.  I mean, if they're going to get paid ten
9  bucks, you can't make the drug price 15, you won't sell
10  any.
11   Q   Sir, what you're describing is that you and others
12  at Abbott understood AWP was the ceiling for reimbursement?
13   A   There are --
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  There are -- No.  For a specific type
16  of customer, it may have been.  But for, as I said,
17  before that, that's - the people would be interested in
18  AWP was a small - was not a big part of the market or
19  not the biggest part of the market.
20      I mean, pricing by segment is very important.
21   Q   Were there any other pricing bench marks that were
22  a part of the CHIP system other than AWP?
23   A   We would put in our average selling prices - they
24  probably were in the system.
25      In other words, CHIP - I don't know, - but CHIP had

Page 454

1  access to what does this product sell for in our other
2  customers - in ASPS, what are they selling it for?  What's
3  the competitive environment?
4      Now, I don't think competitive prices would be
5  loaded, but obviously in a competitive environment,
6  multisource drugs, what the competitors were charging, you
7  know, making sure you're in a proper ballpark was important.
8    Q   Why was ASP information from Abbott input into the
9  CHIP system?
10   A   Average selling price?
11   Q   Yes, sir.
12   A   Well, then you could compare what you were selling
13  to one versus what you're selling it to others.
14      We were measured -- Average selling price was one
15  of our goals --
16   Q   Did the ASP --
17   A   -- to keep it up.
18   Q   Did the ASP information assist providers in any
19  way?
20   A   I don't know if they ever had -- I don't know if
21  the providers had average selling price information.  I
22  don't know that.
23   Q   Well, they had CHIP system, correct?
24   A   Yeah.  I don't know if they had access to that
25  information or not.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 455

1    I'm -- You know, there were a lot of lockouts on
2  that system.  You run it off one system, you can't have one
3  customer drawing data from another; you've got to have
4  lockouts.
5       So whether or not they had access to Abbott selling
6  price in the industry, I don't know.
7    Q   So your understanding is that CHIP had certain
8  information that was locked out from customers but may have
9  been available.
10   A   Well, I don't -- I'm just -- I'm saying I don't
11 know.
12      You don't provide -- Security for customers is very
13 important if they're working a common system.  You have to
14 be able to lockout Mr. X so he doesn't know what Mr. Y's
15 business base is - who is customers are, where he's shipping
16 stuff to, who he's billing; that's just confidential
17 information and it's proprietary information to that
18 particular customer.  So there are lockouts.
19      Whether or not the AS -- You asked if I thought ASP
20 was on there, it probably was.  Was it provided to
21 everybody?  I doubt it, but I don't know.
22   Q   To the customers that did receive it, how did ASP
23 information assist them?
24     MS. CITERA:  Objection to form.
25     THE WITNESS:  I don't know that they received it.  I

Page 456

1  don't know that anybody received it.
2      How would it assist them?
3    Q   Mm-hmm.
4     MS. CITERA:  Objection to form.
5     THE WITNESS:  I don't know.  I don't know.
6      All they cared about was the percentage of
7  reimbursement they paid to us and whether or not they
8  were making money.
9      On an individual -- These people were very
10 unsophisticated, all right?  They had -- Their problem
11 was nursing bills, physician bills, travel bills.  These
12 drugs were very small part of their business.  I don't
13 think they had the sophistication to go and examine by
14 drug what the ASP was.  I don't know.
15   Q   You mentioned the sharing of reimbursement
16 proceeds.
17      What was the basis for the reimbursement that
18 Abbott, in turn, shared with the provider?
19   A   What we did.
20      In other words, did we just bill?  Did we compound?
21 Did we deliver the drugs?  Did we provide all of the drugs?
22      For example, Rocephin was a drug we would provide
23 to a Home Infusion Service customer, but we didn't make it.
24 We were part of a buying group like anybody else; we had to
25 go buy it, so --

Page 457

1    Q   Well --
2    A   -- you know, our percentage of reimbursement on a
3  patient getting Rocephin would have to be higher than the
4  patient getting a drug that we supplied.
5    Q   What was the typical baseline for reimbursement to
6  those providers?
7     MS. CITERA:  Objection to form.
8     THE WITNESS:  As I said, what services we provided,
9  what our potential costs would be.
10   Q   Well, I'm not talking, sir, for the moment about
11 your negotiation between Abbott and the providers in the
12 percentage that would be shared.  I'm talking about the
13 underlying reimbursement.
14      What was your understanding of the baseline for the
15 reimbursement paid from a third party, whether it be private
16 or public, to the provider?
17     MS. CITERA:  Objection to form.
18     THE WITNESS:  What percentage we would get?  I don't
19 know if we looked at it in that way.
20      How that thinking went, maybe - I just looked at it
21 more macra (sp.).  How that thinking went, maybe some of
22 the Home Infusion Services people would be better
23 qualified to answer that question.
24   Q   In making its contracts with Home Infusion
25 Service's clients, did Abbott try to estimate how much

Page 458

1  revenue it would generate?
2     MS. CITERA:  Objection to form.
3     THE WITNESS:  How much revenue the business would
4  generate?
5     MR. ANDERSON:  Yes, sir.
6     THE WITNESS:  Yes.  The client - as I understand how
7  it worked - would provide us with, again, a proforma.
8  These are the types of patients that are being
9  discharged from the hospital; these are the types of
10 patients we receive; these are the services we perform;
11 these are the numbers of patients of specific types.
12      Then you can analyze that and project costs, project
13 what their reimbursement might be based on experience,
14 and try to develop a proforma which made sense for them
15 to either do or not do the business.
16 BY MR. ANDERSON:
17   Q   How did Abbott go about projecting the revenues in
18 reimbursement --
19   A   They would be given to us by the provider - by the
20 health care provider.
21   Q   And did those projections include AWP as a baseline
22 for --
23   A   No.
24   Q   -- product reimbursement?
25   A   They would say things like, Last year, we sent out

Page 459

1  this number of patients with Lyme's disease, They were
2  treated for such-and-such a period of time and this is the
3  drug they used, Rocephin, You're going to get - you know,
4  that's the number of patients.
5       And then based upon their ability to acquire
6  patients and send them out the door, you get an idea of what
7  they would bill for this, what our cost might be to
8  accomplish the service, and then we pitched a percentage of
9  revenue for us - or a percentage of collections, actually,
10 for us.
11  Q   Do you know as an general matter how those
12 calculations were made?
13  A   No -- I mean, specifically how those calculations
14 were made --
15  Q   I will be more specific.
16      Do you know generally what pricing terms, if any,
17 were a part of those projections of reimbursements?
18      MS. CITERA:  Objection to form.
19      THE WITNESS:  Pricing terms?  No.
20      Once again, the big - we keep coming back - the big
21 enchilada is how much service we provide.  And the drug,
22 itself, is a very small portion of the total
23 reimbursement for a disease state.
24  Q   Did Abbott get paid fees for its reimbursement
25 services?

Page 460

1  A   Our percentage of collections --
2      MS. CITERA:  Objection to form.
3      THE WITNESS:  -- would be higher if we did
4      reimbursement than if we didn't.
5  Q   And in those situations, was Abbott receiving fees?
6      MS. CITERA:  Objection to form.
7      THE WITNESS:  Yes, Abbott would receive fees.
8  Q   And those fees were typically a percentage of
9  collections, correct?
10  A   That's correct.
11  Q   And you understood that, as general matter, the
12 collections of the providers were part ingredient cost, part
13 dispensing fee, correct?
14  A   The reimbursement?  No.  The reimbursement included
15 nursing services, any pump - a pump, if a pump were used
16 versus a pump not being used, would include various and
17 sundry factors, of which a drug was one factor, but pretty -
18 you know, not a very large factor, but a factor.
19  Q   If is it your testimony that the drug ingredient
20 cost reimbursement was small in relation to the dispensing
21 fees?
22      MS. CITERA:  Objection to form.
23      THE WITNESS:  Once again, I'm saying that the drug
24      cost as adversed to total patient care is minuscule.
25      I'll go back through it again:  You've got a nurse

Page 461

1  that's costing you 70 bucks an hour.  She has an
2  automobile.  You've got -- You know, you've got whole
3  pharmacies, you've got capital.  And the drug was a
4  component, yes, but my contention, it was a small
5  component as a percentage of total reimbursement.
6      MR. ANDERSON:  Objection.  Nonresponsive.
7  BY MR. ANDERSON:
8  Q   I'm going to clarify this question so that you
9  understand.
10      I'm not asking about the drug cost paid by the
11 provider to Abbott --
12  A   Mm-hmm.
13  Q   -- or any other drug maker, for that matter --
14  A   Mm-hmm.
15  Q   I'm asking about the drug ingredient cost
16 reimbursement --
17  A   Oh, how the drug --
18  Q   -- paid to the provider by a third party.
19      So with that understanding, I'll rephrase.
20      Sir, is it your understanding, given your many
21 years of experience at Abbott, that the drug ingredient cost
22 paid by third-party payors such as private insurance or
23 government programs paid to providers was small in relation
24 to the dispensing fees?
25      MS. CITERA:  Objection to form.

Page 462

1      THE WITNESS:  What is a dispensing fee?
2      Tell me what you include in a dispensing fee.
3  Q   Nursing fees.
4  A   Nursing fees in home infusion, the drug cost and
5  reimbursement would be small versus nursing fees in home
6  infusion.
7  Q   Paid by providers.
8  A   Yeah; it would be small.
9      I mean, if you've got a vial for which they're
10 paying like three or four bucks and you've got a nurse that
11 you're billing the patient, say - I don't know what the
12 patient got billed - say 120 an hour, then the drug
13 component reimbursement would be smaller, would it not?
14  Q   Do you believe that the drugs that Abbott was
15 selling and, in turn, sometimes seeking reimbursement for
16 had AWPs of two dollars?
17      MS. CITERA:  Objection to form.
18      THE WITNESS:  I don't know what the AWPs were.
19  Q   Do you believe --
20      THE WITNESS:  -- I was using it as - just as - you
21 know, for the sake of example.
22      I don't know what the AWPs were.
23  Q   Do you know of any Abbott drugs whatsoever that had
24 AWPs of, say, two dollars?
25  A   I don't know --

Page 463

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  -- what the AWPs were.
3    Q   Do you have any general framework at all for the
4  level of Abbott's AWPs?
5    A   No.
6      I never looked at the AWPs.  I didn't consult the
7  AWPs.
8    Q   What was -- Circling now back to the Home Infusion
9  business model, what was the business purpose that Abbott
10  was seeking to achieve by including AWP information in its
11  CHIP program?
12      MS. CITERA:  Objection to form.
13      THE WITNESS:  I don't know.
14      I mean -- And, once again, we've been down this
15    road.  AWP would be a ceiling, an absolute ceiling
16    because you wouldn't sell any if we were higher, maybe
17    that would be a benefit to the customer.  That's the
18    only reason I can think of.
19    Q   In what way could it be a benefit to the customer?
20    A   A ceiling on price.  I mean, a ceiling on what they
21  could charge; it may have been a benefit to the customer.  I
22  don't know.
23      You'd be best of asking someone with much - someone
24  with more experience in this of doing this.
25    Q   Well, I understand you didn't have day-to-day

Page 464

1  experience, but for basically ten years while you were the
2  general manager of Alternate Site this home infusion
3  reimbursement business operated continuously, correct?
4    A   That's correct.
5    Q   And over those years, you had to gain some
6  understanding about the operation of the business.
7    A   That's correct.
8    Q   And you gained an understanding of the CHIP
9  program.
10    A   I understand -- I understood that it did billing
11  and reimbursement.
12      The technicalities of the system, how it ran on a
13  day-to-day basis, I - you know, I'm technically challenged.
14    Q   Well, I'm not asking for you to design the program
15  and write the code.
16      But with respect to just the general proposition of
17  why AWP pricing was a part of that software package, can you
18  explain any business reason other than the AWPs acted as a
19  ceiling for reimbursement?
20      MS. CITERA:  Objection to form.
21      THE WITNESS:  There had to be a reason why the
22    customers wanted the information.
23    Q   Now that we've talked about it, is your memory
24  refreshed that AWPs were important to customers because they
25  can evaluate relative reimbursement?

Page 465

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  They could, I guess; yes.
3    Q   Now, sir, talking about this other sub-business
4  unit that you managed named Renal Care, what was the basic
5  business model of Renal Care?
6    A   Initially we sold interdialytic peritoneal
7  solutions for people on peritoneal dialysis.
8      Are you familiar with that?
9    Q   Yes, sir.
10      And then I think that you've said they switched to
11  Calcijex, correct?
12    A   No.
13      Calcijex --
14    Q   You sold off that --
15    A   We sold that business.
16    Q   Yes, sir.
17      So --
18    A   Couldn't make any money.
19      We sold it to a group called Frazaneous (sp.).
20    Q   And developed Calcijex.
21    A   Calcijex was already available.
22      Calcijex was a product that was licensed from the
23  Wisconsin Alumni Research Foundation.
24    Q   What considerations did Abbott analyze in setting
25  the prices of Calcijex?

Page 466

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  The value provided by the drug; costs
3    associated with renal osteodystrophy - broken bones,
4    quality of patient life, and, frankly, what we could get
5    for the drug, how deeply we could penetrate the patient
6    base based upon a specific price.
7      That is, if you could a higher penetration at a
8    lower price that would be good, and we try to find
9    what's called an equilibrium.
10    Q   Did Abbott consider third-party drug reimbursement
11  in the pricing of Calcijex?
12      MS. CITERA:  Objection to form.
13      THE WITNESS:  Well, once again, it's a ceiling.
14    Q   In what way, if any, did Abbott consider
15  reimbursement in the pricing of its product named Calcijex?
16      MS. CITERA:  Objection to form.
17      THE WITNESS:  Reimbursement?
18    Q   I'll be more specific if that's a little confusing.
19    A   Sure.
20    Q   In what way, if any, did Abbott consider
21  reimbursement paid by third-party public or private programs
22  to providers in pricing Calcijex?
23      MS. CITERA:  Objection to form.
24      THE WITNESS:  Once again, it's a ceiling.  It's a
25    ceiling.  You can't -- They won't lose money.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 467

1    Q    And did Abbott ever consider raising the ceiling of
2    pricing on Calcijex in order to enable it to be reimbursed
3    at a higher rate?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  As I recall, we took price increases
6        with Calcijex; mm-hmm.
7    Q    And did Abbott take those price increases with the
8    purpose of raising the reimbursement on Calcijex?
9        MS. CITERA:  Objection to form.
10       THE WITNESS:  Well, raising reimbursements is not
11       something we do, that's something either that the
12       provider is either willing or unwilling to do.
13       We don't raise reimbursement.
14   Q    Did Abbott take price increases on Calcijex with
15   the purpose of influencing providers to raise reimburse -- I
16   mean, pardon me - third-party plans to raise reimbursement
17   to providers?
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  Once again, the decision to raise
20       reimbursement is made by whoever's paying.  We cannot
21       influence that.
22       The only thing we can influence is - is -- The only
23       thing we can do is to understand the value of our
24       product, raise the price and stick with it.
25   Q    Did Abbott believe that pricing changes that it

Page 468

1    implemented could influence reimbursement on its product
2    known as Calcijex?
3        MS. CITERA:  Objection to form.
4    A    If we charge more for our product, the reimbursing
5    authorities, either they had the opportunity to raise what
6    they would pay for the drug, or say no, we would we will not
7    pay you more for the drug; that was their option.
8    Q    Did Abbott ever raise the AWP on Calcijex without
9    raising the market price on Calcijex?
10   A    Not to my knowledge, no.
11   Q    Would you have approved of any action by any Abbott
12   personnel to raise the AWP on Calcijex while not raising the
13   market price on Calcijex?
14   A    I don't think --
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  I don't think that issue ever came up.
17       Calcijex was a proprietary product, okay, which has
18       subsequently, as you may know, been replaced by a next
19       generation of product.
20       As I recall, we took price increases in Calcijex.
21       It was a proprietary product.  And the reimbursement
22       authorities, whether or not they're willing to raise
23       reimbursement is really up to them.  But we were able to
24       maintain the customer base with price increases.
25       MR. ANDERSON:  Objection.  Nonresponsive.

Page 469

1    BY MR. ANDERSON:
2    Q    My question was very narrow, Mr. Robertson.
3        I was asking you did you ever approve of any Abbott
4    personnel raising the AWP on Calcijex without raising the
5    market price on Calcijex?
6    A    No.
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  No.
9    Q    Why not?
10   A    Because we took a price increase and -- We just
11   took a price increase in the drug.  Why would you do that?
12   Q    Were you ever made aware that the AWP on Calcijex
13   was raised by Abbott personnel without the market price of
14   Calcijex being raised?
15   A    No.
16       MS. CITERA:  Objection to form.
17   Q    If you had been made aware that the AWP on Calcijex
18   had been increased without the market price being raised,
19   would you have approved of that conduct?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  Once again, without context, I don't
22       see any reason why you would raise the AWP without
23       raising the price of the product on a proprietary
24       product; no.
25   Q    So I take it then that you wouldn't condone that

Page 470

1    type of activity?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  Well, why couldn't we get a price
4        increase for a proprietary product that provides high
5        value?  That's my answer.
6    Q    Do you ever recall any analysis at Abbott about bad
7    debt expenses of physicians who dispense Calcijex because
8    Medicare patients could not pay the 20 percent co-pay?
9    A    Bad debt expenses, I don't -- I don't remember
10   specifically a bad debt expenses on patients being
11   discussed.
12       Because this is a chronic disease.  I mean, these
13   folks are going to, you know, they're there forever
14   hopefully -- You know, hopefully they continue to live.  So
15   it's a little bit different from an antibiotic.
16   Q    Do you remember in any way whatsoever generally
17   that Abbott analyzed the impact of Medicare patients not
18   paying the 20 percent co-pay for Calcijex?
19   A    You know, it seems logical that that would have
20   happened.  Do I recall specific -- It seems logical -- That
21   seems a logical thing to do because, you know, once again,
22   they're chronics.  You know who's going to pay and who's not
23   going to pay.
24   Q    Why does it seem logical that that type of analysis
25   may have occurred?

60e5726b-bc69-475a-8c51-36591ea203d2

Page 471

1    A    Because they're chronics accident and you can't --
2  In other words, once you know a patient isn't going to make
3  the co-pay or if they, you know -- I mean it would seem that
4  the doctors would know that.
5         But, once again, we didn't do the billing and
6  reimbursement on Calcijex, as you probably know; we just
7  charged for the drug.
8    Q    Did Abbott consider the charges that it was going
9  to institute on Calcijex to be within its control?
10        MS. CITERA:  Objection to form.
11        THE WITNESS:  Please --
12   Q    Did Abbott control the prices that it charged on
13  Calcijex?
14   A    Yeah; we controlled the price we charged on any
15  drug, except --
16   Q    Did Abbott --
17   A    -- on the -- Because you either will sell it at
18  that price or you will not.
19   Q    Did Abbott control the AWPs that were published on
20  Calcijex?
21   A    Abbott submitted the AWPs, I believe, or Hospital
22  Marketing would submit the prices so then the AWPs would --
23  for publication; yeah.
24   Q    And that goes for all of Abbott products, correct?
25        MS. CITERA:  Objection to form.

Page 472

1         THE WITNESS:  I would assume so.
2    Q    So as far as you know given your experience in
3  Abbott, Abbott set and published the AWPs on its products,
4  correct?
5         MS. CITERA:  Objection to form.
6         THE WITNESS:  The data would be sent to whomever;
7  yeah.
8    Q    And published.
9    A    And published.
10   Q    Yes, sir.  Out to all of America.
11   A    Well --
12        MR. STETLER:  I never got one.
13        MR. ANDERSON:  We'll make sure you get a
14  subscription, Dave.
15   A    Whoever had the Red Book --
16        MR. STETLER:  I had to eliminate the drama from the
17  question, but --
18   A    Isn't it the Red Book?
19        MR. STETLER:  I was talking over the answer.  You're
20  going to have to say it again.
21        THE WITNESS:  Okay.
22        (The partial answer was read back as previously
23  recorded by the court reporter)
24   A    Yes.  Is that correct?  Isn't that the book that
25  published them?

Page 473

1  BY MR. ANDERSON:
2    Q    Yes, sir.
3         Do you, now that we've talked about it, recall any
4  situation where the AWP on Calcijex was raised in order to
5  raise reimbursement on Calcijex?
6    A    To raise -- The AWP raised to raise reimbursement?
7         If -- Well, all I -- We had price increases
8  virtually annually on Calcijex, okay?
9    Q    Mm-hmm.
10   A    The customer at that -- We had no control over
11  reimbursement.  Those people paying for the drug either said
12  we'll pay for it or we won't.
13        And to my knowledge, we never raised the AWP
14  without raising the selling price of the product.
15   Q    I'll be more specific.
16        Do you ever recall any instance where Abbott raised
17  the AWP on Calcijex when market prices were not being raised
18  in order to raise the reimbursement spread to physicians?
19   A    No.
20        MS. CITERA:  Objection to form.
21   Q    Would that be appropriate in your view?
22        MS. CITERA:  Objection to form.
23        THE WITNESS:  It's not for me to determine what's
24  appropriate.  I mean --
25   Q    Well, you were the boss.

Page 474

1    A    Well, we never did it.
2    Q    It never happened?
3    A    In Cal- -- I can't -- No.  We made the price
4  increases stick - I mean, to my knowledge.
5    Q    If it had happened under your watch, would that
6  have been approved?
7    A    I'd want to --
8         MS. CITERA:  Objection to form.
9         THE WITNESS:  -- ask the people why they did it.
10   Q    You would have?
11   A    Yeah; Why would you do that?
12   Q    And what if they told you, Because we've got to
13  cover the to percent co-pay?
14        MS. CITERA:  Objection to form.
15        THE WITNESS:  You know, I don't know how I would
16  have responded.
17        We just -- I don't know what percentage of patients
18  do and don't pay the co-pay.  I don't know the magnitude
19  of the problem --
20   Q    Well, if one patient didn't pay the co-pay would
21  that make it right for Abbott to raise the AWP in order to
22  increase the spread on reimbursement to cover that one
23  patient's failed co-pay?
24        MS. CITERA:  Objection to form.
25        THE WITNESS:  I can't tell you the answer to that.

46  (Pages 471 to 474)

Page 475

1    I don't --
2    Q   Well, where do you draw the line?
3        THE WITNESS:  -- have a context.
4        MR. STETLER:  You know, Counsel --
5        MS. CITERA:  Objection to form.
6        MR. STETLER:  Maybe -- I'm not sure he's finishing
7    his answers before you're cutting him off the last two.
8    BY MR. ANDERSON:
9    Q   I'm sorry.  I didn't mean to cut you off,
10   Mr. Robertson.  Please finish.
11       MR. STETLER:  I'm not sure he can remember the
12   question now.
13   Q   Where do you draw the line, sir, on how many
14   patients can't pay a co-pay before it's okay to raise --
15   A   I don't know the -- I don't know --
16       MS. CITERA:  Objection to form.
17       THE WITNESS:  -- how to answer your question.
18       (The question was read back as previously recorded
19   by the court reporter)
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  You know, in a vacuum, I don't know.
22   I don't know the answer to that question.
23   BY MR. ANDERSON:
24   Q   Well, let's take a look at some specific context
25   here.  This has been marked in this case as Exhibit 71,

Page 476

1    Mr. Robertson, and --
2        MS. CITERA:  Are you not re-marking it?
3        MS. ST. PETER-GRIFFITH:  Why don't we mark it as a
4    Robertson exhibit because this was in the Texas and now
5    we're purely in --
6        MR. ANDERSON:  Well, it's been used in multiple
7    depositions, including Federal depositions.
8        But I'm fine with marking it.
9        MS. ST. PETER-GRIFFITH:  Robertson.
10       MR. STETLER:  Let's do that.
11       MR. ANDERSON:  Please mark it.
12       (Whereupon, Robertson Exhibit No. 30 was marked for
13   identification.)
14   BY MR. ANDERSON:
15   Q   Do you recognize this document, sir?
16   A   Have I seen it?  No.
17   Q   Does it appear to be a letter written by Michael
18   Heggie on behalf of Abbott to Medi Span?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  Yeah.
21   Q   Does Medi Span ring a bell with you as a pricing
22   service?
23   A   I don't -- I don't recognize the name Medi Span
24   specifically as a company.
25   Q   You are familiar, generally, that there are pricing

Page 477

1    services such as First Data Bank and Red Book that
2    publish --
3    A   Right; Red Book I've heard that one.  I don't know
4    who Medi Span is --
5    Q   Okay.
6    A   -- the term, Red Book, I've heard.
7    Q   All right.
8        Does this appear to be a notification by Abbott
9    that the prices on Calcijex are going up?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  Well, it says it's changing them.  I
12   can assume it's a price increase.
13   Q   And it's specifically a price known as AWP,
14   correct?
15   A   Mm-hmm.
16   Q   And then reading from that paragraph immediately
17   under the prices, it reads, quote, I know this is not the
18   usual formula you use for Abbott Hospital Products Division,
19   however this is the formula we use for these two products.
20       Did I read that correctly?
21   A   Mm-hmm.
22   Q   Does that jog your memory in any way about any
23   pricing reporting that Abbott instituted concerning
24   Calcijex?
25   A   No.  I mean, they handled these things differently.

Page 478

1    I don't understand how they're handled differently.
2    Q   What was the standard formula for calculating AWP?
3    A   I don't know.
4    Q   You don't know the Abbott HPD standard formula
5    was?
6    A   How they figured --
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  -- it out specifically?  He -- The
9    formula, no.
10   Q   You knew there was a formula, you just don't recall
11   what --
12   A   Don't know what it is.
13   Q   Does 18.75 percent markup sound like the typical
14   formula?
15   A   I don't know.
16       I mean, once again, I'm not familiar with this
17   issue.
18   Q   Are you familiar with a gentleman named Michael
19   Heggie?
20   A   Oh, yeah, I know Michael Heggie.
21   Q   And he worked under your command, correct?
22   A   He worked in the Renal Care area.
23   Q   So back in January of '96, if he was reporting AWP
24   information out to the pricing services, was that authorized
25   conduct on his part?

60e5726b-bc69-475a-8c51-36591ea203d2

Page 479

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  How they were informed?  You know,
3  once again, I -- Mike had a relationship with the
4  corporate - you know, the division people.  Him sending
5  out a letter, I don't know who sends it out - him,
6  anybody - I don't know who sent the letter out.
7      Q   But do you have any reason to believe whatsoever
8  that the pricing notification that's shown in Heggie Exhibit
9  71 and Robertson Exhibit 30 was somehow --
10     A   Where's 30?
11     Q   -- unauthorized?
12     A   Oh, this is 30?
13     Q   Yes, sir.
14     MS. CITERA:  Objection to form.
15     THE WITNESS:  No, I don't know that it was
16  unauthorized.
17     Q   Okay.
18     (Whereupon, Robertson Exhibit No. 31 was marked for
19  identification.)
20     Q   Mr. Robertson, please review what's been marked as
21  Robertson Exhibit 31, also marked as Heggie Exhibit 70.
22     A   (Witness complies.)
23     Okay.
24     Q   Have you finished your reading of this exhibit,
25  sir?

Page 480

1      A   I've read it; mm-hmm.
2      Q   Does this refresh your memory at all about how
3  Abbott set the AWP on Calcijex?
4      A   No.
5      Q   Does this refresh your memory at all about any
6  pricing decisions that were made with respect to Calcijex?
7      A   Not really.  I mean, I see what it says here
8  (indicating).
9      Q   Do you agree that this e-mail written by Michael
10  Heggie dated January 16th, 1996 sets forth a rationale for
11  raising the AWP on Calcijex?
12     A   It appears --
13     MS. CITERA:  Objection to form.
14     THE WITNESS:  It appears to.
15     Q   Do you see any mention by Mr. Heggie in this e-mail
16  about his desire to raise the market price actually charged
17  by Abbott to customers?
18     MS. CITERA:  Objection the form.
19     THE WITNESS:  That's not in here.
20     Q   Do you agree that Mr. Heggie says that raising this
21  AWP on Calcijex would, quote, Make customers whole on their
22  first go round with reimbursement?
23     A   (Referring.)
24     Will you point out what --
25     Q   What I'm reading here, sir, I'll read for the

Page 481

1  benefit of the record, quote --
2      MR. STETLER:  We'll stipulate you read it right.
3      MR. ANDERSON:  Okay.  And I'll read it again, Dave,
4  if it will help.
5  BY MR. ANDERSON:
6      Q   Customers are whole --
7      MR. STETLER:  What I'm saying is you don't need to.
8      Q   -- on their first go round with reimbursement.
9      Do you see that?
10     A   I see that.
11     Q   Does that indicate to you that Mr. Heggie was
12  justifying this increase of the AWP on Calcijex for
13  reimbursement purposes?
14     MS. CITERA:  Objection to form.
15     THE WITNESS:  I assume you've asked Mr. Heggie this.
16  He's the best one to answer that question.
17     Based upon what I see, which is the same thing you
18  see, it appears so.
19     Q   Would that type of pricing conduct be authorized
20  conduct?
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  You know, once again, I don't know.
23  Making customers whole?  It might be accepted, I don't
24  know.  It appears so.
25     Q   Accepted by whom?

Page 482

1      A   Accepted by whoever's making the decision.
2      Q   Abbott management?
3      A   I don't know, maybe --
4      MS. CITERA:  Objection to form.
5      THE WITNESS:  Well, I don't know.  It appears it was
6  done here.
7      The answer to your question is it appears it was
8  done.
9      Q   Would Charlie Mitchell have the authority to
10  approve such conduct?
11     A   I don't -- I don't remember Charlie Mitchell very
12  well.  I don't know what his specific responsibilities were.
13     Q   Charlie was part of HPD Hospital business sector,
14  wasn't he.
15     A   I'm trying to put a face and a name together.
16     Yeah, I think Charlie was part of HPD business
17  sector.  I remember he was AP - 34, was it, that building.
18     Q   Does this situation with Calcijex indicate to you
19  that Charlie Mitchell understood how the reporting of AWP
20  could impact reimbursement on Abbott drugs?
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  Based upon what I read here, I guess
23  so.
24     But what happened to the selling price - isn't that
25  the issue?  I mean, your -- You know, what happened to

Page 483

1    the selling price?
2    Q    Well, if the selling price went up in tandem, would
3    that help the provider be made whole --
4         MS. CITERA:  Objection --
5    Q    -- on the first go round?
6         MS. CITERA:  Objection to form.
7    A    But that wasn't my question.  The question is the
8    actual numbers should be available for that time period and
9    what happened to the actual price.
10   Q    And what you're saying is you would expect that
11   there would have to be a --
12   A    There would have to be --
13   Q    -- related market price increase?
14   A    There would have to be an increase in market price.
15   Q    What if there wasn't?
16        MS. CITERA:  Objection to form.
17        THE WITNESS:  There should have been.
18   Q    So it would be --
19   A    I don't know why --
20   Q    -- wrong in your view to raise the AWP?
21        Sir, you and I both need to wait for one another.
22        I'll rephrase that last question.
23        Would it be wrong, Mr. Robertson, for the AWP on
24   Calcijex to be increased without the market price also being
25   increased?

Page 484

1         MS. CITERA:  Objection to form.
2         THE WITNESS:  I don't -- You know, once again, what
3    would the motivation be?  Make a customer whole, I
4    understand that as a motivation.
5         But my question is - that's a hypothetical question.
6    My question to you is do you have the actual data what
7    happened?
8    Q    It didn't go up.
9         MS. CITERA:  Objection to form.
10        THE WITNESS:  Because we took them every year, price
11   increases of Calcijex.
12   Q    I'm telling you in January of '96, when this AWP
13   was increased, the market price on Calcijex did not go up.
14        Assuming I'm representing that correctly to you,
15   sir, would that be wrong?
16   A    Now --
17        MS. CITERA:  Objection to form.
18        THE WITNESS:  This was when the memo was written.
19   When the AWP on Calcijex went up.
20   Q    Well, look at the exhibit right before it, sir.
21   A    I understand that.
22   Q    Does that indicate to you the AWPs going up?
23   A    This indicates to me when this letter went out to
24   the services.  It doesn't tell me anything about when the
25   AWP went up.  It doesn't tell me anything about the

Page 485

1    increase, decrease or staying the same of unit prices of
2    Calcijex on January 16th.
3         Now, if there was a delay in the raising of AWP and
4    a delay in our price increase which are commensurate, that's
5    the question I have.  Does that make sense to you?  It does.
6    Q    It does.
7         If the formula to create an AWP on Calcijex was
8    higher than the formula on all the other Abbott drugs - that
9    is, it was 25 percent rather than whatever the percentage is
10   on the other hospital products, that same percentage is
11   going to hold true every single time a price increase is
12   taken, correct?
13        MS. CITERA:  Objection to form.
14        THE WITNESS:  I don't under- -- I'm sorry.  Just go
15   by that again one more time.
16   Q    You mentioned that Calcijex price increases were
17   taken every year --
18   A    That's correct.
19   Q    -- is that correct?
20        And you're talking about market prices, correct?
21   A    That's correct; end-user prices.
22   Q    End-user prices charged by Abbott, correct?
23   A    Mm-hmm.
24   Q    And if the AWP is a 25 percent markup off of those
25   prices - correct - --

Page 486

1         MS. CITERA:  Objection to form.
2         THE WITNESS:  Yeah.
3    Q    -- then every time you raise the market price, the
4    AWP is still going to be 25 percent higher, correct?
5    A    That's correct.
6    Q    So once Abbott changed the formula for these
7    Calcijex items, the market price would never catch up, would
8    it?
9         MS. CITERA:  Objection to form.
10        THE WITNESS:  If you follow that formula.  That's
11   just arithmetic.
12   Q    Yeah.
13        And the providers are always going to be made whole
14   on just the 80 percent Medicare reimbursement, correct?
15        MS. CITERA:  Objection to form.
16        THE WITNESS:  If they didn't collect from their
17   patients.
18   Q    Yes, sir.
19        And so in some, Medicare, even though they're only
20   supposed to be paying 80 percent, has just paid 100 percent
21   for that drug, correct?
22        MS. CITERA:  Objection to form.
23        THE WITNESS:  Other than administration -- I don't
24   know if they get administration fees or whatever else
25   they get.

49  (Pages 483 to 486)

Page 487

1    Q   Other than fees.
2        And so is that appropriate in your view?
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  You know, I can't -- I don't know.  I
5    can't make a determination on that.  Is it appropriate?
6    Do I make policy whether the federal government
7    should pay 80, 60, 90, 40 percent?  That's not a
8    decision I can make.
9    Q   Back in 1996 when you were the general manager of
10   the Alternate Site Business Unit, including Renal Care,
11   including Alternate Site Product Sales, including Home
12   Infusion reimbursement, if you would have been made aware
13   that the AWP on Calcijex had been manipulated and the
14   formula had been increased from 20 to 25 percent, would you
15   have condoned that activity?
16       MS. CITERA:  Objection to form.
17       THE WITNESS:  I would have asked why.
18   Q   And if the answer was, In order for physicians to
19   be made whole on the reimbursement off of the 80 percent
20   Medicare only, would that have been condoned?
21       MS. CITERA:  Objection to form.
22       THE WITNESS:  Probably.
23   Q   Why?
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  I don't know.  It's custom, the way it

Page 488

1    would be -- You know, it's the way historically it was
2    done.
3    Q   Did Abbott have a custom of manipulating
4    reimbursement on its products?
5        MS. CITERA:  Objection to form.
6        THE WITNESS:  I don't know about the word,
7    manipulation.
8        Do we raise and lower prices on our products?  Yeah,
9    based on market condition.
10   Q   In order to impact the reimbursement?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  Once again, reimbursement is a
13   function of what the - you know - --
14       MR. ANDERSON:  Provider's willing to pay.
15       THE WITNESS:  -- what the provider's willing to pay.
16   Q   I mean the payor's willing to pay, correct?
17   A   Yeah; what the payor's willing to pay.
18   Q   And so in this case when the payor's getting AWPs
19   that are going up, the payor's going to pay the increased
20   amount, correct?
21   A   That's their --
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  -- No - that's their determination.
24   Q   That's their determination.
25       Because when they get the AWPs from Abbott, it's

Page 489

1    their decision to use the AWPs, is that your point?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  It's their decision -- No.  It's their
4    decision what to reimburse.
5    Q   Did Abbott tell the government, or any payor, for
6    that matter, public or private, that it was changing the
7    formula on Calcijex from 120 percent of list price to 125
8    percent?
9    A   Not to my knowledge.
10       MS. CITERA:  Objection to form.
11   Q   Why not?
12   A   I don't know.
13   Q   You think that the federal government, particularly
14   the federal Medicare program would have found that
15   information interesting?
16       MS. CITERA:  Objection to form.
17       THE WITNESS:  Conjecture?
18   Q   Yes, sir.
19   A   I don't know.
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  Yes, I guess they would.
22   Q   Yeah.
23       Why didn't Abbott tell them?
24       MS. CITERA:  Objection to form.
25       MR. STETLER:  I'm going to object at this point.

Page 490

1        You're putting words in his mouth.  He didn't say
2    they didn't tell them, he said he didn't know.
3        These question are so sneaky, they're driving me
4    crazy.
5        MR. HAVILAND:  Have you sat through any of Abbott's
6    depositions with the government?  Do you think they're
7    sneaky, Dave?
8        MS. CITERA:  Move to strike that.
9        MR. STETLER:  You know what, I haven't sat through a
10   single one.
11       MR. ANDERSON:  I want my answer -- I object --
12       MR. STETLER:  I sat through yours, I was fine; I sat
13   through her's, I was fine.  Okay?
14       MR. ANDERSON:  Dave, I object to the speaking
15   objection.
16   BY MR. ANDERSON:
17   Q   But, sir, I just want the question answered.
18   A   May I please ask the question again?
19       MR. ANDERSON:  I want it read back.
20       (The question was read back as previously recorded
21   by the court reporter)
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  I don't know that they did -- I
24   don't -- That the formula was changed?  I don't know
25   that they did not tell them; I don't know if they ever

60e5726b-bc69-475a-8c51-36591ea203d2

Page 491

1  presented a formula to the federal government.  I don't
2  know.
3     Q   Did Abbott in any way whatsoever to your knowledge
4  ever notify the government that it was manipulating the AWP
5  on Calcijex?
6        MS. CITERA:  Objection to form.
7        THE WITNESS:  Manipulating?  That's --
8     Q   I'll rephrase, sir.
9        In January of 1996, when the formula was changed on
10 Calcijex by Abbott, did Abbott notify the government of that
11 in any way whatsoever?
12       MS. CITERA:  Objection to form.
13       THE WITNESS:  I don't think so.
14       MR. HAVILAND:  Want to take a break?
15       MR. ANDERSON:  I've got a few more questions.
16 BY MR. ANDERSON:
17    Q   Mr. Robertson, in your ten-plus years as the top
18 executive of Alternate Site, did you or anyone else at
19 Abbott ever notify the government of large reimbursement
20 spreads between AWP and market price?
21    A   I didn't.
22       MS. CITERA:  Objection to form.
23    Q   And do you know of anyone else that did?
24    A   No.
25       MS. CITERA:  Objection to form.

Page 492

1     Q   So how was that -- How did Abbott expect the
2  government to be aware of those large reimbursement spreads?
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  I don't know.
5     Q   Why didn't Abbott inform the government of large
6  spreads between AWP and market pricing on its generic drugs?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  Now, that's given that large spreads
9  existed.  I have no knowledge that large spreads
10 existed.
11       You're telling me large spreads existed?
12    Q   Yes, sir.
13       MS. CITERA:  Objection.
14    Q   We'll look at some large spreads.
15    A   Okay.
16    Q   But assume that large spreads existed.  Why didn't
17 Abbott ever inform the government that such spreads between
18 AWP and market prices existed?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  I don't know.
21    Q   Is it for the same reasons that Abbott didn't
22 notify the government about the change in the formula for
23 AWP on Calcijex?
24       MS. CITERA:  Objection --
25       THE WITNESS:  Once again, as I said --

Page 493

1        MS. CITERA:  -- to form.  He said he didn't know.
2        THE WITNESS:  -- I didn't know.
3        That's four I don't know's in a row, sir.
4     Q   How many I don't know's?  What do you mean, that's
5  four I don't know's?
6     A   Well, you've asked me the same question four times
7  and I said, I don't know, four times.
8     Q   No.  I changed the question.
9        MR. STETLER:  Sounded the same to me.
10       MS. CITERA:  You're asking him to build on something
11 that he already said he didn't know.
12       MR. ANDERSON:  Let's take a break.
13       VIDEOGRAPHER:  We're going off the record.
14       (At about 1:49 p.m. - a short recess was taken)
15       (At about 2:02 p.m. - reconvened deposition)
16       (Whereupon, Robertson Exhibit No. 32 was marked for
17 identification.)
18       (Whereupon, Robertson Exhibit No. 33 was marked for
19 identification.)
20       (Whereupon, Robertson Exhibit No. 34 was marked for
21 identification.)
22       VIDEOGRAPHER:  We're back on the record.
23 BY MR. ANDERSON:
24    Q   During the break I've marked some exhibits,
25 Mr. Robertson, that I'd like you to take a look at, they are

Page 494

1  Exhibit 31, 32 and 33 to the Robertson deposition.
2        Have you had a chance to review those?
3     A   I've looked at these two.  I haven't looked at 33.
4     Q   Okay.
5        MR. HAVILAND:  I think my count may be off.  I had
6  31 as the Cicerale memo; am I wrong about that?
7        MS. CITERA:  31 is the Cicerale memo; you're right.
8        MR. ANDERSON:  Okay.  Then you're right, Don.
9        That has to be 32 then.
10       Okay.  I'll clean this up real quickly.
11 BY MR. ANDERSON:
12    Q   Mr. Robertson, if you could look at what's been
13 marked as Exhibit 32, 33 and 34 - do you have those three
14 pieces of paper?
15    A   Mm-hmm.
16    Q   And do you agree that 32 is a memo dated January
17 21st, 1992; Exhibit 33 is a memo dated January 27th, 1993,
18 and Exhibit 34 is a memo dated February 9th, 1994?
19       Is that correct?
20    A   Yeah.
21    Q   And you're copied on all of these memos, correct?
22    A   Yeah.
23    Q   And all three are titled, Catalog Price Increase,
24 correct?
25    A   Right.

Page 495

1    Q   Were you typically copied on the annual price
2    increase work sheets that were circulated within Abbott?
3    A   The work sheets?  You mean the works in progress?
4    Q   Yes, sir.
5    A   No.
6        The work sheets on individual products?  No.
7    Q   Well, let's take a look at, for instance, the first
8    sentence of Exhibit 32, Attached is the first edition of the
9    1992 catalog price increase worksheets for your review.
10       Did I read that correctly?
11   A   That's correct.
12   Q   Did you typically get the worksheets?
13   A   No.
14       I'm copied on the memo.  I may not have been copied
15   on the worksheets because I didn't get involved in it.  I
16   didn't do it.
17   Q   When you say you didn't get involved in it, what
18   are you referring to?
19   A   In working on the worksheets.
20   Q   Why were you copied on the catalog price increase
21   memoranda?
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  Well, so that I would know that it
24   went out or that some activity was taking place on it, I
25   would assume.  I would assume that - you have to ask

Page 496

1    Mr. Sellers - I assume Mr. Sellers wanted me to know
2    that these folks were working on these things.
3    Q   How did catalog price increases impact the business
4    that you managed in Alternate Site?
5    A   Catalog price increases?
6        MS. CITERA:  Objection to form.
7        THE WITNESS:  If we were -- You know, if we were
8    going to take catalog price increases, we would
9    obviously try to accompany them with actual price
10   increases and make them stick.
11   Q   Did you have any experience in taking market price
12   increases with hospital - I mean non-hospital Alternate Site
13   customers?
14   A   With taking price increases with non- -- No.  The
15   pricing was generally done by the general managers of the
16   individual business like Home -- Alternate Site Product
17   Sales, they would talk to the sales managers, they would do
18   an analysis in the field and see what they could get in
19   terms of price increases.
20       Price increases over this period of time, by the
21   way, were very difficult to get.
22   Q   And when you talk about price increases being
23   difficult to get in 1992, '93 and '94, you're referencing
24   market prices charged customers, correct?
25   A   Yeah.  The market prices on - for the generics were

Page 497

1    pretty steady.
2    Q   Why were the catalog prices on the generics in '92,
3    '93 and '94, for instance, going up?
4    A   On all -- They increased -- I mean the six percent
5    on all items?  I don't know that.
6    Q   When you were copied on these annual price increase
7    memos, did you ever ask why the catalog prices were going
8    up?
9    A   I don't remember asking that; no.
10   Q   Are you curious today about why those prices were
11   going up?
12   A   Well, I assume there was inflation; I assume that
13   the cost went up and that we would do our best to get the
14   price increases; we could set a goal, an objective to get
15   the price increases.
16   Q   Did you experience Abbott setting catalog price
17   increases with the thought that they would actually charge
18   customers those prices?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  Well, that was my belief; that we
21   would try - that an effort would be made to raise prices
22   in the field.  Yes.
23   Q   And over the years is it true that Abbott basically
24   failed to charge those increased catalog prices in the
25   field?

Page 498

1        MS. CITERA:  Objection to form.
2        THE WITNESS:  As I recall, some we can make stick,
3    some because of a competitive situation, you can't make
4    stick.
5    Q   And is it true that basically Abbott never got
6    those catalog price increases to stick?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  Nobody ever paid catalog price.
9    Q   So why did Abbott go to the trouble of raising the
10   catalog prices each year?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  Why did Abbott go through the trouble
13   of it?  Because you make an effort to raise prices as
14   best you can --
15   Q   Well, in your experience --
16       THE WITNESS:  -- and then you could show the
17   customer that they were still getting a significant
18   discount from list price - from catalog price.
19   Q   Can you think of any other pricing decisions made
20   by Abbott where year after year they tried to get a price
21   that they didn't really have any experience successfully
22   charging customers?
23   A   That's a long time.  You know, I really don't
24   remember.
25       I thought our history in Alternate Site, at least,

60e5726b-bc69-475a-8c51-36591ea203d2

Page 499

1   of raising price wasn't so bad.  It was pretty -- You know,
2   I didn't think it was dismal but, once again, this is a long
3   time ago.
4       Q   Are you aware of any other impact that raising
5   catalog or list prices each year would have on Abbott drugs?
6       MS. CITERA:  Objection to form.
7       THE WITNESS:  These catalog prices?
8       Well, I think we discussed last time I was here that
9   catalog price was one component of determining AWP; is
10  that correct?
11      Q   So you and others at Abbott, back in '92, '93 and
12  '94, for instance, knew that when catalog price increases
13  were reported that would cause AWPs to go up?
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  That is an element; that's correct.
16      My objective was to get higher prices for our
17  products.
18      Q   In the market.
19      A   In the market; yes.
20      Q   But with respect to these catalog price increases,
21  you also knew that that could cause AWPs on Abbott products
22  to go up.
23      A   I guess they do.  I don't remember.
24      Q   Well, we'll take a look at a document in a moment
25  that may refresh your memory.

Page 500

1       Throughout your tenure, sir, at Alternate Site all
2   the way up through the summer of 2000, did you continue to
3   be made aware of the annual catalog price increases that
4   Abbott was taking?
5       A   I don't recall that happening on an annual basis.
6       Q   Can you recall any instance where you were no
7   longer made aware of the catalog price increases?
8       MS. CITERA:  Objection to form.
9       THE WITNESS:  You know, once again, that was a long
10  time ago.  Whether or not I was -- Annual increase in
11  catalog prices, whether or not I was made aware, I don't
12  know that.
13      Q   Your mic just fell, Mr. Robertson.
14      Will you agree with me that, at the minimum, these
15  three Exhibits, 32, 33 and 34 reflect that you were made
16  aware of the annual catalog price increases?
17      A   For those years?
18      Q   Yes, sir.
19      A   Evidently.
20      Q   And it appears that also Mr. Ward was made aware,
21  correct?
22      A   Yeah.  John's on - he's carbon-copied on this, too.
23      Q   And at this time he was your direct report and he
24  was specifically in charge of Alt Site Product Sales,
25  correct?

Page 501

1       A   Yeah.
2       Q   How would Mr. Ward and his salesmen benefit, if at
3   all, from being made aware of catalog price increases that
4   Abbott was reporting?
5       MS. CITERA:  Objection to form.
6       THE WITNESS:  Well, specifically, to tell you how
7   they specifically benefitted, you may get a question
8   from a customer.
9       If the price goes up in a catalog, you may get a
10  question from a customer and you should be aware of it.
11      Q   And, likewise, if the AWPs went up in the pricing
12  publications, is it true that Ward and his other salesmen
13  would also potentially get questions from customers about
14  that?
15      MS. CITERA:  Objection to form.
16      THE WITNESS:  They may have.  I don't have any
17  specific knowledge.  They may have.
18      Q   And so being aware of raised AWPs would be
19  something that Ward and his salesmen would benefit from,
20  correct?
21      MS. CITERA:  Objection to form.
22      THE WITNESS:  I don't know.  Because, you know, when
23  you got a contract, the contract's a contract.  Does
24  that make sense to you?
25      Q   It does.  But the contract doesn't govern the

Page 502

1   reimbursement, does it?
2       A   No.  The contract covers the price.
3       Q   The price paid.
4       But during the course of that contract - let's say
5   it's for five years, and AWPs go up each year during that
6   five-year period, the contract's not going to prevent the
7   AWP from going up, is it?
8       MS. CITERA:  Objection to form.
9       THE WITNESS:  I guess not.
10      Q   And so the Abbott salespersons could benefit from
11  being made aware of increasing list prices or increasing
12  AWPs, correct?
13      MS. CITERA:  Objection to form.
14      THE WITNESS:  They might.  I have no knowledge of it
15  happening.  They might.
16      Q   If you could, Mr. Robertson, take a look at what's
17  been marked in this case as Exhibit 480 and we'll now mark
18  it as Exhibit 35.
19      (Whereupon, Robertson Exhibit No. 35 was marked for
20  identification.)
21      Q   I think in the first day of your deposition you
22  looked at a memo similar to this, correct?
23      A   Yeah.  Mm-hmm.
24      Q   And then if you look underneath the cover page of
25  Exhibit 35, do you see that, in fact, there's a listing of

60e5726b-bc69-475a-8c51-36591ea203d2

Page 503

1    Abbott products with AWP prices for those products?
2       A   Mm-hmm; I see that.
3       Q   In looking at Exhibit 480 also marked as Exhibit
4    Robertson No. 35, do you recall that Abbott personnel
5    circulated AWP information to one another?
6       MS. CITERA:  Objection to form.
7       THE WITNESS:  You know --
8       MR. STETLER:  Just for clarity, I think this is No.
9    9, too, in his previous deposition.
10      MR. ANDERSON:  Well, this one's more complete, Dave,
11   that's why I marked it.
12      This one has all the AWPs.  Exhibit 9 did not.
13      MS. CITERA:  I think there was some suggestion that
14   this was --
15      MR. STETLER:  Forget I said anything.
16      MS. CITERA:  -- similar but not the same.  That's
17   the problem.
18      MR. ANDERSON:  They're similar, but they're not the
19   same.
20      MS. CITERA:  But the memo is exactly the same.
21      MR. ANDERSON:  The front page is the same; yes.
22   BY MR. ANDERSON:
23      Q   Now, back to my question, sir.
24      In looking at Exhibit 480, is your memory refreshed
25   that Abbott personnel circulated AWPs?

Page 504

1       A   No.  I didn't -- I didn't see this.
2       Q   You don't remember seeing this exact document.
3       A   No.
4       Q   But I'm asking a bigger question, and that is do
5    you remember that Abbott personnel circulated AWPs?
6       A   No.
7       MS. CITERA:  Objection to form.
8       Q   This morning you mentioned that Abbott --
9       A   Well, it's public information, isn't it, in the Red
10   Book?  I mean, salespeople would have access to it if they
11   wanted to look it up.
12      Q   Right.
13      And customers had access to it also.
14      A   Yeah; right, if they want to look them up.
15      Q   But if customers had questions about an AWP, it
16   would be helpful for the Abbott salespersons to have those
17   AWPs so they can, in turn, answer the questions of the
18   customer, correct?
19      MS. CITERA:  Objection to form.
20      THE WITNESS:  I guess.
21      Q   And, in fact, that's what Mr. Kipperman's basically
22   setting forth in Exhibit 480, also known as Robertson 35,
23   correct?
24      A   Mm-hmm.  Yeah.
25      Q   And what was the basic reason why customers would,

Page 505

1    from time to time, ask questions about AWPs?
2       MS. CITERA:  Objection to form.
3       THE WITNESS:  Well, because they wanted to know.
4       Q   For reimbursement?
5       A   For whatever --
6       MS. CITERA:  Objection to form.
7       Q   Well, let's take a look at what Mr. Kipperman
8    writes.  He says, As you are aware, on at the beginning of
9    April, Abbott took a list price increase.  This also has an
10   effect on our AWP, Average Wholesale Price, which Red Book
11   quotes for reimbursement purposes.
12      Did I read that correctly?
13      A   Yeah.
14      Q   Does that jog your memory that customers would ask
15   questions about AWP because it had to do with reimbursement?
16      A   Kipperman thought so.
17      Q   Yes, sir.
18      And I'm asking more specifically about you.
19      Do you also have that memory?
20      MS. CITERA:  Objection to form.
21      THE WITNESS:  Specifically, did customers want to
22   know AWP for reimbursement?  I think they did.
23      Q   Okay.
24      Now would you consider the sharing of AWP
25   information with customers to constitute marketing the

Page 506

1    spread?
2       MS. CITERA:  Objection to form.
3       THE WITNESS:  Sharing AWP with customers is just
4    sharing AWP.
5       I mean, the leap of faith there is that there is big
6    spread or a spread that would cause a change in volume.
7    I don't know of that ever happening.
8       Q   How would you go about calculating whether or not
9    there was a big spread?
10      A   I didn't calculate --
11      MS. CITERA:  Objection to form.
12      THE WITNESS:  I didn't calculate spread.
13      I mean, a customer, how would a customer do it?
14      Q   Yes, sir.
15      I'll rephrase to make sure the record's clear here.
16      How did Abbott understand a customer could go about
17   calculating a spread?
18      MS. CITERA:  Objection to form.
19      THE WITNESS:  How did Abbott -- Well, I guess it's
20   acquisition cost and what the reimbursement is, isn't
21   that -- Now, I don't know if AWP is the one and only
22   deal that constitutes reimbursement; - that constitutes reimbursement;
23   I don't know that.
24      Q   Well, to the extent a provider could analyze the
25   AWP on a drug versus the acquisition cost in the market on

60e5726b-bc69-475a-8c51-36591ea203d2

Page 507

1 that drug, would that assist the provider in estimating the
2 relative reimbursement spread?
3    A   Oh, yeah. I'm not --
4        MS. CITERA: Objection to form.
5        THE WITNESS: What I'm saying is how big a factor
6    AWP is, what portion of it is a reimbursement. You
7    understand what I'm saying?
8    Q   You're saying not all plans may use AWP in
9    reimbursement.
10   A   Right; not all plans used AWP. AWP may be one of
11   eight factors that's used to determine reimbursement.
12       I don't know the relative importance of AWP in
13   determining reimbursement.
14   Q   But you do know that it's one --
15   A   It's one -- It's a factor --
16   Q   Yes, sir.
17   A   -- whether or not it carries a weight of 80 or
18   whether or not it carries a weight of eight, I don't know --
19   You know, 8 percent of the decision would be based on it, or
20   80, I don't know.
21   Q   Are you aware of any other pricing terms that are a
22   part of reimbursement?
23   A   Acquisition cost, wholesale acquisition cost; that
24   sort of thing.
25   Q   What's your understanding of how wholesale

Page 508

1 acquisition cost is used in reimbursement?
2    A   That's probably a computed number based upon -- You
3    know, we may give them that, too - I don't remember how.
4        But you've asked the terms that I've heard and
5    those are the terms that I've heard.
6    Q   When you say, we may give them that, too, you mean
7    Abbott?
8    A   Abbott may give them, too; I don't know.
9    Q   Report it to the pricing services?
10   A   To whomever, whoever asked for the information.
11       Whether or not that information is provided, I
12   don't recall.
13   Q   And what do you understand WAC to mean?
14   A   Wholesale acquisition cost.
15   Q   And how is that price used by Abbott in its
16   business?
17   A   I don't --
18       MS. CITERA: Objection to form.
19       THE WITNESS: I don't know. I don't remember. I
20   don't know. It's just a number. I don't know how it
21   was used. I don't remember how it was used.
22   Q   Do you have any memory that WAC was billed by
23   Abbott to wholesalers when they purchased drugs from Abbott?
24   A   A specific price, no, because different wholesalers
25   would pay different prices. So this had to be a computed

Page 509

1 number in some way. I don't remember how it was computed.
2    Q   Do you recall any effort by Abbott to uniform the
3    prices that it charged wholesalers?
4        MS. CITERA: Objection to form.
5        THE WITNESS: I don't remember because -- I don't
6    remember that. I have no recollection of that.
7    Q   Who do you think would know most about how Abbott
8    billed wholesalers?
9        MS. CITERA: Objection to form.
10       THE WITNESS: Well, that would be the people in the
11   division that did the - you know, that did the billing.
12   We didn't bill - Alternate Site didn't bill. There was
13   a division organization that billed for everybody.
14   Q   So people like Ted Lijack or Harry Adams would know
15   most about how Abbott billed wholesalers, correct?
16       MS. CITERA: Objection to form.
17       THE WITNESS: Harry Adams?
18       MR. ANDERSON: Yes, sir.
19       THE WITNESS: He was in the Hospital Products
20   division. Lijack was like a national account guy in our
21   area.
22       Now, the mechanics of how it got done, you know,
23   they didn't do the mechanics, but they -- You know I
24   don't know what they would know about how we billed,
25   what the specific process was.

Page 510

1    Q   Can you name a specific unit or person that you
2    perceive was most knowledgeable of how Abbott billed
3    wholesalers?
4    A   I don't know the name of the - or maybe I knew it,
5    I don't recall the person in charge of our billing
6    department.
7    Q   Now going back to my original question, sir, would
8    you consider the sharing of AWP information from Abbott
9    personnel to Abbott customers to constitute marketing the
10   spread?
11       MS. CITERA: Objection to form.
12       THE WITNESS: I don't -- I don't think that you --
13   There's an assumption that that was done without the
14   question being asked.
15       Am I confused here?
16       If the customer asked the question, we probably
17   would answer the question, What's the AWP on this, you
18   know, they would probably answer the question.
19   Q   Okay.
20       So if a customer requested AWP information from
21   Abbott and Abbott, in turn, responded to that request, in
22   your view that would not constitute marketing the spread,
23   correct?
24       MS. CITERA: Objection to form.
25       THE WITNESS: That's not a proactive attempt to do

60e5726b-bc69-475a-8c51-36591ea203d2

Page 511

1    anything.  If the customer asks for the information, you
2    provide it.
3        Q   Did you take any steps to inform all of the
4    personnel that were ultimately reporting to you, whether
5    directly or indirectly, that they could respond to customer
6    inquiries about AWPs?
7        A   I don't remember ever broaching that issue with
8    them.
9        Q   Did you ever tell anyone that they could not
10   respond to customer --
11       A   No.
12       Q   -- inquiries about AWP?
13       A   No.
14           I don't recall ever having said, No, you  can't --
15   If someone asks for AWP you can't tell them.
16       Q   Did you ever tell anybody that they shouldn't share
17   AWP information with customers?
18       A   No.
19       Q   Were you aware that over the years Abbott personnel
20   routinely included AWP information in their bid proposals?
21       MS. CITERA:  Objection to form.
22       THE WITNESS:  No.
23       Q   To this day, have you become aware that Abbott
24   personnel routinely included AWP information in Abbott bid
25   proposals to customers?

Page 512

1        A   You just -- No - you just told me that --
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  -- I didn't know that.
4        MR. STETLER:  He's asking questions.  He's not
5    telling you anything.
6        THE WITNESS:  Mm-hmm.
7    BY MR. ANDERSON:
8        Q   Mr. Robertson, do you consider the inclusion of AWP
9    information in bid proposals by Abbott personnel to
10   customers to constitute marketing the spread?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  Not necessarily, no.
13       Q   And why is that?
14       A   Well, what if there is no spread?  What are you
15   marketing?  What if the price is equal to?  I mean, what are
16   you marketing?
17       Q   Do you have any knowledge whatsoever about products
18   where Abbott set the AWP exactly at the market price?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  No.
21       Q   Okay.
22           Well, assuming that there is some spread on Abbott
23   products, do you believe that sharing AWP information by
24   including it, for instance, in bid proposals by Abbott to
25   customers constitutes marketing the spread?

Page 513

1        MS. CITERA:  Objection to form.
2        THE WITNESS:  What I would consider is that the
3    customer asked for it.
4        Q   In the bid request?
5        A   Yeah.
6            If he comes out and they ask for it, we'd probably
7    put it in - if the customer asked for it.
8        Q   And as far as you know up through your tenure as
9    the top manager at Alternate Site in the summer of 2000,
10   Abbott was continuing to share AWPs upon request, correct?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  I have no reason to believe that we
13   would not comply with a customer request, that the AWP
14   be put in there.
15       Q   And as the top executive at Alternate Site, you're
16   not aware of any policy, written or otherwise, that would
17   have prevented Abbott personnel from sharing AWPs to
18   customers upon request, whether it be in an RFP or a bid
19   request or what have you, correct?
20       A   I'm not aware of a policy which forbade that.
21       Q   And, in fact, it was your experience that AWPs were
22   sometimes shared by Abbott personnel, correct?
23       MS. CITERA:  Objection to form.
24       THE WITNESS:  Once again, I have no experience in
25   that.  I didn't get -- you know, I didn't get down to

Page 514

1    that level of detail.
2            But if a customer asked us, as I've said before, we
3    probably would have told them.
4        Q   That's your expectation, but you just didn't have
5    the kind of day-to-day --
6        A   Well, how many --
7        Q   -- job responsibility.
8        A   -- in other words, how many asked?  Did one percent
9    of the people ask?  Did two percent of the people ask?  Did
10   five percent of the people ask?  I have no idea.  Did
11   everybody ask?  I have no idea whether people ever asked
12   these questions or really wanted the AWPs.
13       MR. STETLER:  Let him finish the question.
14       THE WITNESS:  Okay.
15       MR. STETLER:  It's not him.  It's you.  You're not
16   letting him finish the questions.
17   BY MR. ANDERSON:
18       Q   Mr. Robertson, are you aware of any instance where
19   a customer paid AWP to Abbott?
20       A   No.
21       Q   Are you aware of any instance where a customer paid
22   catalog or list price to Abbott?
23       A   I'm sure it occurred, but it was infrequent.
24       Q   How infrequent?
25       A   Very infrequent.

Page 515

1    Q    Can you quantify it at all?
2    A    Less than one percent of the time.
3    Q    Did you make that type of quantification or become
4  aware that Abbott had made that type of quantification?
5    A    Abbott had made that type of -- No.
6    Q    Well, how do you - where do you come up with --
7    A    Just get a sense.
8    Q    Just get --
9    A    Everybody -- In other words, it's sort of a
10  question what's historical practice within the industry?
11  How many of us run right out to a car dealer and say, Let me
12  pay sticker price?
13        People discount from their catalogs and we
14  discounted from our catalog.  Not uncommon in the health
15  care industry for discounts to be taken from catalog.
16       MR. ANDERSON:  Objection.  Nonresponsive.
17  BY MR. ANDERSON:
18    Q    I was asking a more specific question,
19  Mr. Robertson, and that is how did you gain the general
20  awareness that less than one percent of the time --
21    A    Oh --
22    Q    -- Abbott actually charged list price or direct
23  price to - I mean - pardon me - list price or catalog price
24  to a customer?
25    A    Because of the numbers of -- The very, very rapid

Page 516

1  growth of group purchasing organizations, everybody was a
2  member of some group it seemed, because membership wasn't
3  costly and they could save sufficient money on the purchase
4  as justified, otherwise they wouldn't have existed.
5    Q    And that kind of dynamic was coming about in the
6  early, early 90s, correct?
7    A    That kind of dynamic was around in the 90s, yes.
8    Q    And so from the early 90s all the way through the
9  mid 90s and the late 90s and, for that matter, the early
10  part of this decade, Abbott's been aware that virtually no
11  customers were going to be paying list price or catalog
12  price.
13       MS. CITERA:  Objection to form.
14       THE WITNESS:  I would assume so.
15    Q    And you base that assumption on your experience at
16  Abbott, correct?
17    A    Very few people paid list or catalog price because
18  they were all parts of some group or another or in other
19  ways - in one way or another got to participate in a group
20  purchasing contract.
21    Q    Yes, sir.
22        And you've known that for many years.
23    A    That's the way it is.
24    Q    And others at Abbott were aware of that.
25    A    I can't --

Page 517

1       MS. CITERA:  Objection to form.
2       THE WITNESS:  -- speak for others at Abbott, but it
3    wasn't difficult to figure out.
4    Q    Do you, Mr. Robertson, recall any issues regarding
5  the pricing of vancomycin?
6    A    No.
7    Q    Did you ever authorize any price changes in 1995
8  concerning the AWPs on vancomycin?
9    A    I don't remember doing that.
10    Q    Did you gain any awareness whatsoever while you
11  were at Abbott about any pricing submissions made by Abbott
12  that were unique in 1995 concerning vancomycin?
13       MS. CITERA:  Objection to form.
14       THE WITNESS:  Specifically in 1995, specifically
15    that drug, I'm not aware of any for that specific - for
16    that specific drug, I don't remember seeing the data.
17    I don't know.  It was a long time ago.
18    Q    Just as a basic matter, do you recall that
19  vancomycin was one of the more important products that were
20  sold by Alternate Site?
21       MS. CITERA:  Objection to form.
22       THE WITNESS:  Yeah.  It's one of the products.  I
23    imagine it's a pretty important product.
24    I don't know or specifically remember what the
25    volumes were.

Page 518

1    Q    But the sales volumes were large enough that you
2  recall generally it was an important product --
3    A    I recall --
4    Q    -- financially.
5       MS. CITERA:  Objection to form.
6       THE WITNESS:  I recall the name of the drug and
7    that, yeah, we sold quite a bit of it.
8        (Whereupon, Robertson Exhibit No. 36 was marked for
9    identification.)
10    Q    Mr. Robertson, if you could take a look at what's
11  been marked as Exhibit 36 also marked as Exhibit 286.
12        (Witness complies.)
13        Mm-hmm.  Okay.
14    Q    Does this appear to be an e-mail from Gerald
15  Eichhorn to Jerrie Cicerale with copies to Mark Sebree and
16  Mike Sellers?
17    A    Mm-hmm.
18    Q    And it's dated March 20th, 1995, correct?
19    A    Mm-hmm.
20    Q    And the subject is, Vanco List Price, and then
21  there's some proposed list prices for the vancomycin NDC
22  numbers, correct?
23    A    There is some proposed changes; right.
24    Q    Do you, after reviewing this exhibit, have any
25  refreshed memory whatsoever about pricing submissions or

Page 519

1 decisions that Abbott instituted on vanco in 1995?
2    MS. CITERA: Objection.
3    THE WITNESS: No. I don't know what these decisions
4 did, what impact they had.
5    Q   Were you involved at all in any vancomycin pricing
6 decisions in '95.
7    A   No.
8    Q   Would Mr. Sellers have had authority to set prices
9 on vancomycin in 1995?
10    MS. CITERA: Objection to form.
11    THE WITNESS: For the division? For the division?
12    Q   Well, what do you mean by, for the division, sir?
13    A   Well, for the entire division. I think in '95,
14 Sellers was in Alternate Site Product Sales, wasn't he, and
15 then he became director of Contract Marketing where he had
16 pricing responsibility there.
17    I don't think as a guy who did Alternate Site
18 Product Sales or Home Infusion Services he would set prices
19 for the division.
20    Q   Which group at Abbott do you think had the
21 authority to set list prices at Abbott back in 1995?
22    MS. CITERA: Objection to form.
23    THE WITNESS: Each of the individual markets -
24 injectable drugs, I.V. solutions, pumps - those
25 organizations set prices - catalog prices for their

Page 520

1 specific product.
2    Q   Did Gerald Eichhorn have authority to set list
3 prices in 1995?
4    MS. CITERA: Objection to form.
5    THE WITNESS: I can see Gerry Eichhorn now, but I
6 don't remember what authority he did or didn't have or
7 what his responsibilities were.
8    Q   Did you ever --
9    THE WITNESS: I thought he was a marketing guy.
10    Q   Contract marketing?
11    A   I don't know if it was contract marketing. It was
12 up there on the second floor in the building where they
13 were.
14    Q   When you say, they, you're talking about HPD,
15 Hospital Business sector?
16    A   Mm-hmm.
17    Q   And the second floor is where the contract
18 marketing department was - office is?
19    A   Mm-hmm.
20    Q   That's a yes?
21    A   Yes.
22    Q   Thank you, Mr. Robertson.
23    MR. STETLER: Does that apply to the last 100 times
24 you've done that?
25    THE WITNESS: It could.

Page 521

1    Q   Mr. Robertson, did you ever become aware of anyone
2 taking any unauthorized pricing increases or decreases on
3 any Abbott product?
4    A   No.
5    MS. CITERA: Objection to form.
6    Q   So as far as you know, every price that was ever
7 published by Abbott was authorized by Abbott.
8    MS. CITERA: Objection to form.
9    THE WITNESS: I don't know of any that were
10 published that weren't.
11    Q   Now, looking at Exhibit 36, and, specifically, the
12 second to last paragraph, I'm going to read for the benefit
13 of the record: Please notify Red Book and Medi Span of
14 these changes ASAP. They are the sources for creating the
15 AWP that is important to Alternate Site.
16    Did I read that correctly?
17    A   Mm-hmm. Yes, you did.
18    Q   How was AWP important to Alternate Site?
19    MS. CITERA: Objection to form.
20    THE WITNESS: It's a component of reimbursement.
21    Q   And did you and others at Alternate Site recognize
22 that Red Book and Medi Span were sources for AWP
23 information?
24    MS. CITERA: Objection to form.
25    THE WITNESS: I understood that Red Book was; I'm

Page 522

1 not - as I said earlier, I'm unfamiliar with Medi Span.
2    Q   And did you have an awareness that First Data Bank
3 was also a source for AWP --
4    A   No.
5    Q   -- information?
6    A   The only one I was familiar with was Red Book.
7    Q   Did you understand that Abbott voluntarily
8 published its prices to Red Book so that AWPs and other
9 prices would be published by Red Book concerning Abbott
10 products?
11    MS. CITERA: Objection to form.
12    THE WITNESS: I understood that they would publish
13 the prices; yes.
14    Q   And Abbott voluntarily and purposefully reported
15 prices to Red Book so that they would be published, correct?
16    MS. CITERA: Objection to form.
17    THE WITNESS: Yes.
18    (Whereupon, Robertson Exhibit No. 37 was marked for
19 identification.)
20    Q   Now, if you could, Mr. Robertson, please review
21 what's been marked in this case as Exhibit 37 also known as
22 Lotz Exhibit 63.
23    A   Lotz 63; yeah.
24    (Referring.)
25    Q   Do you agree that Exhibit 37 appears to be a memo

Page 523

1    written by Michael Heggie dated April 26, '95?
2        A    Uh-huh -- Yes, I do.
3        Q    Thank you, sir.
4             And it's regarding the vanco price change, correct?
5        A    Right.
6        Q    And does it look like this memo came out basically
7    a month after the prior exhibit marked Exhibit 36
8    (indicating)?
9        A    36, it says March 20th, and this says April 26th,
10   1995; uh-huh.
11       Q    Does this refresh your memory at all about
12   customers complaining to Alternate Site personnel about a
13   price decrease that Abbott took on vancomycin?
14            MS. CITERA: Objection to form.
15            THE WITNESS: No.
16       Q    Does Exhibit 37 or, for that matter, any of the
17   discussion we've had here today refresh your memory that
18   Abbott made some price changes in 1995 that impacted the
19   reimbursement on vancomycin?
20       A    Well, they lowered --
21            MS. CITERA: Objection to form.
22            THE WITNESS: They lowered list price here.
23       Q    You're referring to Exhibit 37, sir?
24       A    Mm-hmm.  They lowered list price -- They lowered
25   list price in No. 37.

Page 524

1        Q    And the list prices were being decreased rather
2    significantly, correct?
3        A    Yes, they were; substantially.
4        Q    Do you know how it was that Abbott was able to
5    decrease list prices so significantly?
6            MS. CITERA: Objection to form.
7            THE WITNESS: Well, if one looks -- I don't know.
8    But if you look at it, the list prices are -- I mean,
9    these are huge discounts, so the new list price is
10   probably more representative of the actual selling price
11   of the product.
12       I mean it's sort of you've got to be somewhere in
13   the ballpark, I think.  As I recall, you know, it's
14   important to be somewhere in the ballpark.
15       Q    Why is it important to be in the ballpark?
16            MS. CITERA: Objection to form.
17            THE WITNESS: Well, you want my opinion?
18       Q    Yes, sir.
19            MS. CITERA: Objection to form.
20            THE WITNESS: Well, my opinion is the same reason,
21   because people will - it builds confidence - you know,
22   if you're in the ballpark, it builds confidence.
23       Do you really trust -- For example, you go get an
24   MRI and it says they bill you 10,000 your insurance
25   company pays 1200 and they accept it.  That doesn't give

Page 525

1    you a lot of confidence in the MRI company's - the
2    integrity of their pricing or - you know, especially
3    with people who aren't insured.
4        Q    Did you learn that some participants in the
5    industry did not have confidence in Abbott's list prices?
6            MS. CITERA: Objection to form.
7            THE WITNESS: No; not specifically.  No, I didn't
8    learn that.
9        But what I'm trying to tell you is, philosophically,
10       if you're within a range of your actual selling prices,
11       you're probably better off.
12       Q    Did Abbott take steps to set its list prices in
13   relation to the market prices?
14            MS. CITERA: Objection to form.
15            THE WITNESS: You know, I don't know how that was
16       done specifically, whether there was a specific range or
17       not.
18       I'm speaking philosophically that I think it's
19       better if they're at a range that they were adjusted.
20       Q    In your experience, did Abbott set any list prices
21   on its products in relation to the market prices on those
22   same products?
23            MS. CITERA: Objection to form.
24            THE WITNESS: You know -- The division?  I don't
25       remember.  It would seem logical, but I don't remember.

Page 526

1    It's a long time ago.
2        Q    Do you expect that Abbott should have set its list
3    prices in relation to the actual market prices for those
4    products?
5            MS. CITERA: Objection to form.
6            THE WITNESS: As I've indicated to you,
7    philosophically, if it's in the same ballpark it would
8    seem that customers would be more receptive and you
9    would have more confidence in your -- They would have
10   more confidence in your price.
11       Q    As the general manager of the Alternate Site
12   Business unit, did you ever ask that the list prices on
13   Abbott products be set in relation to the actual market
14   prices?
15       A    This is something we really never discussed.  I
16   can't recall having discussed these things; a comparison of
17   list and actual prices.
18       I remember going over mix, which is, you know, your
19   average selling price will change based upon whether big
20   customers are buying or small customers are buying.
21       But I don't remember going over that specific
22   issues with our guys; no.
23       Q    Did you ever become aware that, in fact, the list
24   prices on Abbott products were five, seven, ten times higher
25   than actual market prices on Abbott products?

Page 527

1     MS. CITERA:  Objection to form.
2     THE WITNESS:  I don't recall specifically.
3     Did I come away with it with a sense that the list
4  prices were significantly higher?  I don't recall data.
5  That was a long time ago.
6     I mean, specific numbers, I don't remember that.
7     Q   Given the logic that you've just testified about
8  that list prices should be in relation to market prices --
9     A   That's my philosophy - excuse me.
10     Q   Yes, sir; philosophy.  Thank you.
11     Given that philosophy, did you gain an
12  understanding of why the list prices on many Abbott products
13  were not similar or somehow related to market price?
14     A   No.
15     MS. CITERA:  Objection to form.
16     Q   Did you ask?
17     A   No.
18     Q   Why not?
19     A   I just didn't.
20     Q   Was that considered like a taboo?
21     A   No.
22     MS. CITERA:  Objection to form.
23     THE WITNESS:  Was I discouraged from asking, is that
24  your question?
25     MR. ANDERSON:  Yes, sir.

Page 528

1     THE WITNESS:  No, I was not discouraged from asking
2  that question.
3     Q   Did you ever discourage anyone from analyzing that
4  issue?
5     A   No.
6     Q   Now looking back in hindsight, do you think that
7  would have been a sound business practice to analyze why the
8  list prices on some Abbott prices were so much higher than
9  the market prices?
10     MS. CITERA:  Objection to form.
11     THE WITNESS:  Well, there were -- I didn't have the
12  data from all businesses.  I just didn't pay any
13  attention to it.
14     Q   Well, with respect to Alt Site --
15     THE WITNESS:  In other words, if there's a
16  hospital -- You know, we're all out of the same catalog.
17  If there's a reason for -- I never got into a discussion
18  with Hospital Products to why that was, to answer your
19  question.  I just never - I never did.
20     Q   I understand your testimony about that,
21  Mr. Robertson, I'm asking a slightly different question, and
22  that is, now looking back in '91, '92, '93 and so on, do
23  you think it would have been a sound business practice to
24  investigate why it was that some Abbott products had list
25  prices that were three, four, five, seven, ten times higher

Page 529

1  than actual market price?
2     MS. CITERA:  Objection to form.
3     THE WITNESS:  You know, it's tough to go back in
4  time like that.
5     Could it have been, I suppose, but we didn't do
6  it -- I didn't do it.
7     Q   Are you aware of -- Well, first of all, let's read
8  the section in Exhibit 37 titled, Medicaid?
9     A   Mm-hmm.
10     Q   And this is what Michael Heggie wrote back in April
11  of '95, quote, Medicaid:  Medicaid pays for the most part
12  from NDC numbers.  Having a published list price which is
13  high allows a provider to bill at that list price.  Some
14  providers - pardon me - some customers who are buying our
15  vanco at a deep discount off list may ask about the price
16  change.
17     Did I read that correctly?
18     A   Yeah.
19     Q   Do you agree with the principle that having a high
20  list price will allow providers to bill at those prices?
21     A   That's what Mr. Heggie says.  I don't -- You know,
22  I don't know.
23     Once again, in the business, too, what you bill and
24  what you get paid are two different things.
25     Q   Well, let's focus upon what you did or didn't know.

Page 530

1     Did you ever become aware that having a high
2  published list price would allow providers to bill at higher
3  prices --
4     A   No.
5     Q   -- when they sought reimbursement?
6     A   No.
7     Q   Never had an awareness about that.
8     A   No -- About list prices?  No.
9     Q   Did you ever have an awareness that having a high
10  published list price would, in fact, allow providers to bill
11  at higher AWPs on those products?
12     A   I thought -- My impression, AWP and list price were
13  two independent issues - that was my perception - but they
14  were not connected.
15     Q   But you understood there was a formula between the
16  two.
17     MS. CITERA:  Objection to form.
18     Q   You've already testified to that.
19     A   Yeah; that AWP was a calculation.
20     Q   From list.
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  That the list was a component of the
23  calculation.
24     Q   Yes, sir.
25     So did you have an understanding then that the

60e5726b-bc69-475a-8c51-36591ea203d2

Page 531

1  published list price would, in fact, allow providers to bill
2  at higher AWPs?
3      A   I don't remember considering that issue.  I may
4  have - maybe I should have.  But I don't remember.
5      Q   Do you agree with the statement in the first
6  paragraph under the actual prices that are set forth on
7  Exhibit 37 that reads, quote, These price changes will
8  affect reimbursement and so customers may question us.  This
9  change will affect three types of payors or insurers and I
10 will outline the effect.  The reimbursement effect is
11 probably why customers will bring this issue up.
12      Do you agree that customers would raise
13 reimbursement issues with Abbott?
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  If I read this memo, the Medicaid
16 would.
17      Q   Do you agree that just as a general matter
18 customers would raise reimbursement issues with Abbott
19 personnel?
20      MS. CITERA:  Objection to form.
21      THE WITNESS:  As I recall, we weren't asked
22 frequently about reimbursement from customers.  As I
23 recall.
24      Q   Would you think it appropriate if the training
25 manual for Abbott Alternate Site personnel included a

Page 532

1  requirement to ask questions about reimbursement?
2      A   To ask questions --
3      MS. CITERA:  Objection to form.
4      THE WITNESS:  -- of whom?
5      Q   Customers.
6      A   I would have to have context.
7      Q   Well, assume with me, sir, that the training manual
8  for Abbott Alternate Site sales personnel included a request
9  that customers be asked about reimbursement; do you think
10 that that would be an appropriate sales technique?
11      MS. CITERA:  Objection to form.
12      THE WITNESS:  Well, if they were asking about
13 reimbursement, I don't know why they were asking about
14 reimbursement, what their payor mix was; that may be an
15 issue, I don't know.
16      Q   Are you aware of any situation where --
17      THE WITNESS:  I haven't see the manual, either.
18      Q   Did you ever discipline anyone or did anyone ever
19 get disciplined to your knowledge for creating a sales
20 manual that was unauthorized?
21      A   Not to my knowledge.
22      MS. CITERA:  Objection to form.
23      (Whereupon, Robertson Exhibit No. 38 was marked for
24 identification.)
25      Q   Mr. Robertson, does Exhibit 38 look to be an e-mail

Page 533

1  thread where, basically, Jerrie Cicarele was forwarding to
2  Harry Adams the prior e-mail about the setting of new list
3  prices on vanco?
4      A   It appears to be.
5      Q   So it's very similar in that regard to Exhibit 36,
6  correct?
7      A   That portion is; yes.
8      Q   Now, you'll agree with me, also, won't you, that
9  this foreword from Jerrie Cicerale to Harry Adams is dated
10 April 27th, '95 which is one day after Michael Heggie's --
11      A   Right.
12      Q   -- memo, correct?
13      A   Mm-hmm.
14      Q   And Harry Adams was over in HPD, HPS that had
15 authority over list prices, correct?
16      MS. CITERA:  Objection to form.
17      THE WITNESS:  I don't know Harry's specific
18 responsibilities, but I know he worked over there.
19      Q   And that was the basic business unit that had
20 authority to --
21      A   Hospital Business Systems.
22      Q   -- set and publish list prices --
23      A   Okay.
24      Q   -- correct?
25      A   I don't remember that specifically.  I remember

Page 534

1  that he was part of the Hospital Business Systems
2  organization or Hospital Business Sector organization.
3      Q   And you knew as a general matter that that
4  organization also is the one that published list prices,
5  correct?
6      A   Yes -- The division did; yeah.
7      (Whereupon, Robertson Exhibit No. 39 was marked for
8  identification.)
9      Q   Mr. Robertson, if you could now review what's been
10 marked as Exhibit 39 - Robertson 39, also known as Heggie
11 No. 79?
12      A   Mm-hmm.
13      Q   Does this appear to be an e-mail from Gerry
14 Eichhorn to Harry Adams, Jerrie Cicerale and John Ward?
15      A   (Referring.)
16      To me, it appears to be either a fax or a memo -
17 yeah; it's communication.
18      Q   And John Ward's part of that communication,
19 correct?
20      A   Yeah; he's an addressee.
21      Q   And so is Mr. Adams, correct?
22      A   He's an addressee.
23      Q   And this is dated May 5th, 1995 which is several
24 days after late April, 1995, correct?
25      A   This is dated May 5th.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 535

1    Q    And John Ward, at that point, was reporting to you
2  and he was the general manager of Alternate Site Product
3  Sales, correct?
4    A    That's correct.
5    Q    Now, looking at the text of Exhibit 39, the first
6  page of Exhibit 39 and then also the attachment --
7    A    Mm-hmm.
8    Q    -- do you see that some suggested AWP increases are
9  being proposed?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  (Referring.)
12       It's an AWP increases are being proposed?
13       (Referring.)
14       The 5th takes it from this -- There were significant
15  decreases in the list prices of these drugs --
16    Q    There were some --
17       THE WITNESS:  -- in the previous memo.
18    Q    Around March or April of 1995, correct?
19    A    April, yeah; significant decreases.  Right.
20    Q    Do you recall then subsequently in May, 1995 that
21  Abbott instituted some increases on those same vanco
22  products?
23    A    Price increases?
24    Q    Yes, sir.
25    A    I don't recall specifically, no.

Page 536

1    Q    Do you agree that the front page of Exhibit 39
2  reads, On the attached spreadsheet the shaded May 4th list
3  price columns identifies the new vanco list price.  As we
4  agreed at yesterday's meeting, the new price will be the
5  average between the old - open parens - prior to April 1st,
6  1995 - closed parens - and the current April 1st to May 3rd.
7       Did I read that correctly?
8    A    Yes.
9    Q    Does that indicate to you that Abbott was thinking
10  about increasing the prices that they had just decreased?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  It depends if -- It says to me there's
13  going to be some blended pricing here.  Mm-hmm.
14    Q    Well, just, conceptually, let's think about it.
15       If the price was up here and then we've seen that
16  the price came down around April of 1995, correct?
17    A    Mm-hmm.
18    Q    And then Abbott's talking about raising the price
19  at least to somewhere in between the old and the new price,
20  that would be an increase, a subsequent increase, correct?
21       MS. CITERA:  Objection to form.
22       THE WITNESS:  I'm sorry.  Please repeat that.
23    Q    If Abbott had the prices up here, let's say, at 250
24  bucks --
25    A    Right.

Page 537

1    Q    -- and it came down to 75 bucks --
2    A    Mm-hmm.
3    Q    -- you with me so far?
4    A    Yeah.
5    Q    - -- and then it went back up to an average between
6  250 and 75, that would be an increased price.
7    A    That would be an increased price.
8    Q    Do you remember now that, in fact, Abbott did raise
9  the prices on vancomycin?
10    A    No.
11    Q    Do you remember anything whatsoever about Abbott
12  raising the prices on vancomycin in May of 1995 to levels
13  that were even higher than were previously set?
14       MS. CITERA:  Objection to form.
15       THE WITNESS:  Where prices were?
16       MR. ANDERSON:  Yes.
17       THE WITNESS:  List prices?
18       MR. ANDERSON:  Yes.
19       THE WITNESS:  No.
20  BY MR. ANDERSON:
21    Q    Did you approve of any changes in vancomycin prices
22  in 1995?
23    A    I don't remember having done that; no.  I don't
24  remember it.
25    Q    To the extent vancomycin list prices were being

Page 538

1  decreased and then subsequently re-increased, would you
2  expect John Ward to have raised that issue with you?
3       MS. CITERA:  Objection to form.
4       THE WITNESS:  It would depend on what the reason why
5  was he raising the list price, because the market had
6  changed?  Because I don't know why he would change the
7  price.
8       Do you have a major competitor who bows out of the
9  industry?  Do you have a major competitor who can't
10  supply product any longer?  Do prices just generally go
11  up?  Do you change the product presentation?
12       If I knew the specifics I might be able to be more
13  helpful.
14    Q    So the reasoning behind the list price change is
15  what would be important to you?
16    A    Yeah.  I don't know why you would do that.
17    Q    Well, assume with me that the testimony in this
18  case from the corporate representative of Abbott is that the
19  list prices were subsequently re-increased because customers
20  complained about low reimbursement.
21       If that is an accurate statement on my part about
22  the testimony from the corporate representative, would that
23  be a legitimate reason to increase list price?
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  You know, I can't make that

Page 539

1 determination.
2    Is that -- Did the corporate representative make
3 that representation to you?
4    MR. ANDERSON: Yes, sir; under oath.
5    THE WITNESS: I have no knowledge of these prices.
6 I don't remember the prices changing or why they
7 changed.
8 BY MR. ANDERSON:
9    Q   But you were the top executive in charge of --
10    A   But the problem is we have -- There were 4,000 line
11 items in Abbott catalog. This is one of those items, it
12 was one drug. Now, it may have been a substantial product,
13 but it wasn't something I paid an awful lot of attention to;
14 the prices of individual drugs.
15    I'm sorry. I don't remember the specifics.
16    Q   And I appreciate that you're not remembering any
17 specifics about vanco.
18    I'm asking assume with me that Abbott has testified
19 they raised the prices on vanco because customers complained
20 about low reimbursement.
21    If that testimony is, in fact, the testimony that
22 Abbott gave, would that be an appropriate reason to raise
23 list prices in your view as the top executive at Alternate
24 Site?
25    MS. CITERA: Objection to form.

Page 540

1    THE WITNESS: Customer complaints about this in the
2 competitive environment, whatever your competitors are
3 doing, it was a competitive environment. I don't know,
4 maybe they wanted to match the competitors. I don't
5 know.
6    Q   So long as Abbott's doing it to match competitors
7 reimbursement it would be okay?
8    MS. CITERA: Objection to form.
9    THE WITNESS: I'm not trying to justify what did or
10 didn't happen.
11    I think the prices - both the list prices and the
12 wholesale prices should reflect near - pretty near what
13 the actual price is for the drug.
14    Q   It's your position that the wholesale price and the
15 list price should be pretty dang close to the actual market
16 pricing?
17    A   I think that -- Well, I don't know about the --
18 Wholesale price is a different kettle of fish because there
19 are -- Once again, there are deep discounts based on volume.
20 So I don't know. I just can't make a determination based on
21 this. Not knowing the specifics 12 years after the fact, I
22 don't know.
23    And the question you asked me is philosophical
24 because I have no practical knowledge of this.
25    Q   I realize that, sir.

Page 541

1    And the reason that I'm posing that kind of
2 philosophical executive level question to you is because
3 this occurred under your command, so to speak. I know that
4 you don't understand or remember the specifics, and I
5 appreciate that.
6    But I'm asking you because really you're the only
7 person I can ask from that top level position about the
8 appropriateness of those decisions.
9    MS. CITERA: I'm going to object to form and object
10 to the commentary.
11    He was not in charge of Hospital Products Division.
12 You're asking him about -- You're suggesting in your
13 question that Alternate Site had the ultimate
14 responsibility for this.
15    MS. ST. PETER-GRIFFITH: Well, is it Jones Day's
16 representation here today at this deposition that it was
17 exclusively a Hospital Products Division determination?
18    MS. CITERA: What I'm saying -- I'm not testifying
19 here, but what I'm saying here is he is misrepresenting
20 things to the Witness and he is suggesting that
21 Alternate Site had the ultimate responsibility.
22    I don't think the testimony has supported that, and
23 that's what I'm saying.
24    MS. ST. PETER-GRIFFITH: Well, he's not
25 misrepresenting anything because he's been pretty

Page 542

1 consistent with the testimony.
2    And if you're going to make this comment on the
3 record, I want to know whether it's your
4 representation -- If you're objecting to this line of
5 questioning, if it's your representation that the
6 vancomycin price change decision --
7    MS. CITERA: I'm not going to testify here, Ann.
8    MS. ST. PETER-GRIFFITH: Well --
9    MS. CITERA: I'm not going to testify here.
10    MS. ST. PETER-GRIFFITH: Well, then don't object to
11 the question. Let him discover the information.
12    MS. CITERA: When he is putting stuff in his
13 questions that are inappropriate or otherwise harassing
14 to the Witness then it's my obligation to point it out.
15    MR. ANDERSON: Objection to Miss Citera's sidebar
16 remarks and move to strike.
17 BY MR. ANDERSON:
18    Q   I'm going to ask this question, Mr. Robertson, and
19 we'll move on. Okay?
20    A   Mm-hmm.
21    Q   Understanding that you don't recall the specific
22 details about any vancomycin price changes, but assuming
23 that in 1995 Abbott raised the vancomycin list prices in
24 response to customer complaints about lower reimbursement,
25 do you, as the former executive in charge of Alternate Site,

Page 543

1 believe that that would be an appropriate business decision?
2        MS. CITERA: Objection to form.
3        THE WITNESS: My response to that is, once again, in
4    a perfect world your pricing - the price you receive,
5    your catalog pricing, et cetera, should be as close as
6    possible.
7    Q    And what is sometimes imperfect about the actual
8  commercial marketplace where a list is not relatively close
9  to the actual market pricing?
10       MS. CITERA: Objection to the form.
11       THE WITNESS: Everything we don't control.
12   Q    Such as?
13   A    Competitive activity.
14   Q    Competitive activity, you mean like the conduct,
15 for instance, of Baxter on the fluids?
16       MS. CITERA: Objection to form.
17       THE WITNESS: No. By competitive activity, I mean
18    that it is, in fact, a competitive world and if you have
19    business people want to go get it. And if someone cuts
20    their price in half and you are forced either by for a
21    contractual reason or another reason to match that
22    price, you're going to drift.
23   Q    And would the same hold true if, for instance,
24 vancomycin competitors such as Lederle raised their list or
25 AWP price?

Page 544

1        MS. CITERA: Objection to form.
2        THE WITNESS: If they raised their list or AWP
3    price?
4        MR. ANDERSON: Yes.
5        THE WITNESS: I don't know if we would raise it
6    based on that.
7  BY MR. ANDERSON:
8    Q    For instance, if, let's say, Lederle raised the AWP
9  on vanco that was competing with Abbott's and, in turn, the
10 reimbursement on Lederle's product was increased, would that
11 be a competitive situation that Abbott would respond to by
12 potentially increasing its price?
13   A    I don't recall --
14       MS. CITERA: Objection to form.
15       THE WITNESS: I don't recall that situation having
16    happened. And it's sort of speculation, and I don't
17    know what would have happened.
18   Q    Well, I don't want you to speculate. If you don't
19 recall it, let's see if this next exhibit will refresh your
20 memory a little bit.
21       (Whereupon, Robertson Exhibit No. 40 was marked for
22 identification.)
23   Q    Okay. Mr. Robertson, have you had a chance to flip
24 through Exhibit 40?
25   A    Yes, I have.

Page 545

1    Q    First, do you recognize the first page of Exhibit
2  40?
3    A    No.
4    Q    Have you ever seen any document similar to that?
5    A    I can't remember having seen this.
6    Q    Are you aware of a situation over the years where
7  Abbott included AWP analysis in its bids to customers?
8        MS. CITERA: Objection to form.
9        THE WITNESS: No.
10   Q    Would that be appropriate communication of
11 information by Abbott to customers?
12       MS. CITERA: Objection to form.
13       THE WITNESS: I don't think that's something we
14    would want to do.
15   Q    Do you consider the first page of Exhibit 40 to
16 consider marketing the spread?
17       MS. CITERA: Objection to form.
18       THE WITNESS: If that came from an Abbott
19    representative, that would be unauthorized, that would
20    be looking at the spread.
21   Q    And I take it then that similar types of analysis
22 where an AWP spread is physically calculated by Abbott and
23 included in communications from Abbott to customers would be
24 considered marketing the spread as well?
25       MS. CITERA: Objection to form.

Page 546

1        THE WITNESS: You're providing them information. If
2    that's considered marketing it, they asked for that
3    information and we provided it, I guess it would be; I
4    don't know.
5    Q    And would you consider that type of marketing the
6  spread conduct to be appropriate or --
7    A    I think we should just --
8        MS. CITERA: Objection to form.
9        THE WITNESS: My opinion --
10       MR. ANDERSON: Yes, sir.
11       THE WITNESS: -- we should just -- We should let the
12    competitive activity and the comparisons be left to the
13    customer. We should market our price and market based
14    upon the quality and availability of our products.
15   Q    Which price should Abbott market?
16   A    What price it is going to charge.
17   Q    What about the published prices such as the list
18 price of AWP?
19       MS. CITERA: Objection to form.
20       THE WITNESS: The customer's most interested in the
21    price they're going to pay.
22   Q    But they're also interested in those other
23 reimbursement prices, too.
24   A    Well, now we get back to --
25       MS. CITERA: Objection to form.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 547

1    THE WITNESS: -- the subject of spread again, don't
2  we.
3    MR. ANDERSON: Yes, sir.
4    THE WITNESS: Yeah.
5  BY MR. ANDERSON:
6    Q   And when we get back to that, that's ultimately a
7  list price or an AWP that, in part, Abbott controls,
8  correct?
9    A   Yes.
10    MS. CITERA: Objection to form.
11    Q   And is it appropriate for Abbott to market those
12  prices?
13    MS. CITERA: Objection to form.
14    THE WITNESS: Once again, you get back to the
15  spread. Is it appropriate to market the spread? No,
16  it's not.
17    I mean, that's your question, is it not?
18    Q   Yes.
19    And did Abbott take any steps to stop its personnel
20  from marketing the spread?
21    MS. CITERA: Objection to form.
22    THE WITNESS: If people were found to be marketing
23  the spread, I would assume that they would have been
24  corrected.
25    Q   By whom?

Page 548

1    MS. CITERA: Objection to form.
2    THE WITNESS: Whoever found out.
3    It's not our policy to market the spread.
4    Q   Did you ever learn of anybody at Abbott, whether it
5  be a salesperson or somebody in contract marketing such as,
6  for instance, Steve Kipperman or Debbie Longly or Cindy
7  Dawson marketing the spread?
8    A   I didn't know about that --
9    MS. CITERA: Objection to form.
10    THE WITNESS: -- if they did. I'm not saying they
11  did. If they did, I didn't know about it.
12    Q   Right.
13    I'm just asking if you ever learned of that.
14    A   No.
15    Q   But if you had learned about it, you're saying you
16  would have put a stop to it?
17    MS. CITERA: Objection to form.
18    THE WITNESS: What I'm saying is it was not our
19  policy to market the spread.
20    I don't know how I would have behaved. But what I'm
21  telling you is what I believe and --
22    Q   Yes, sir.
23    Let's look at the second page of Exhibit --
24    MS. CITERA: I don't think he finished his answer.
25    Did you?

Page 549

1    MR. ANDERSON: I didn't mean to cut him off.
2    THE WITNESS: Well, you know, we're all Metal of
3  Honor winners until the shooting starts. But it was not
4  our policy to market in that way and I would have
5  discouraged it.
6  BY MR. ANDERSON:
7    Q   What do you mean? You're talking about it's --
8    A   It's easy to be --
9    Q   -- sometimes hard to make tough decisions?
10    A   -- It's easy to be -- It's easy to be outreistic --
11    THE WITNESS: Oh, pardon me, ma'am.
12    Q   Go ahead.
13    A   It's easy to be outreistic outside the fray.
14    I'd like to think that we would market it that way,
15  we would just market based upon the quality, breadth of
16  product line and availability of our products.
17    Q   But sometimes when you're actually in those
18  competitive situations and reimbursement's one of the
19  factors, it's hard --
20    A   How our people would have responded?
21    MS. CITERA: Objection to form.
22    MR. ANDERSON: Yes, sir.
23    THE WITNESS: I would hope that they would have
24  responded -- Your hope would be that they would market
25  based upon those aspects of our products that I've

Page 550

1  characterized; quality, breadth of product line and
2  availability.
3    Q   But you recognize that the temptation would
4  certainly be there to market it based on reimbursement and
5  spread.
6    A   May have been --
7    MS. CITERA: Objection to form.
8    THE WITNESS: Could have been.
9    Q   Probably was, wasn't it?
10    MS. CITERA: Objection to form.
11    THE WITNESS: Attach a probability, I -- You know --
12    MR. ANDERSON: Well, yeah, I mean --
13    THE WITNESS: -- you can attach a probability to
14  that.
15    Q   You can, can't you.
16    MS. CITERA: Objection.
17    THE WITNESS: But there would be a temptation to do
18  that --
19    MR. ANDERSON: Yes, sir.
20    THE WITNESS: -- and that would be high.
21    Q   Yes, sir.
22    Now, if you look at the second page of Exhibit 40,
23  you see that there's a bunch of AWPs listed for various
24  vancomycin products?
25    A   Yeah.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 551

1    Q    And I've taken the liberty of focusing and actually
2  circling three of those just for ease of reference.  We've
3  got the Lilly one gram vial with an AWP of $15.60 - you see
4  that?
5    A    Mm-hmm.
6    Q    Then we've got a Lederle one gram at $11.51,
7  correct?
8    A    Mm-hmm.
9    Q    And then we've got the Schein one gram at $14.04,
10  correct?
11    A    Schein; yeah.
12    Q    But then the Abbott one gram vancomycin is $60.44,
13  correct?
14    A    Mm-hmm.
15    Q    Do you know why it was that Abbott's vanco had an
16  AWP that was so much higher than the competitors?
17    A    No.
18        MS. CITERA:  Objection to form.
19    Q    Can you see how that would have provided Abbott
20  with a reimbursement advantage?
21        MS. CITERA:  Objection to form.
22        THE WITNESS:  Among some customers, yes.
23    Q    And if Abbott had purposefully set a price - an AWP
24  price or caused an AWP price to be published at $60 or
25  higher in order to address customers' concerns about

Page 552

1  reimbursement, would that be appropriate?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  If you look at this, the vanco seems
4    to be an anomaly.  I mean, this condition doesn't exist
5    in any other drug that we sold - and we sold a pot load
6    of other drugs.
7    Q    Do you remember that vanco was different than the
8  other drugs?
9    A    No.
10        Looking at this -- You know, looking at this now,
11  the only one we talked about is vanco, so I assume this
12  problem did not exist in others.
13    Q    Oh, you're assuming that?
14    A    Right.
15    Q    Well, what if we pulled out the Red Book and it
16  turns out that across the board lots of Abbott HPD products
17  have AWPs that are a heck of a lot higher than others, would
18  that be appropriate?
19        MS. CITERA:  Objection to form.
20        THE WITNESS:  I can't explain that, why that would
21    be.
22    Q    But in those situations, that, again, would be a
23  reimbursement advantage for Abbott's drugs, wouldn't it?
24        MS. CITERA:  Objection to form.
25        THE WITNESS:  Perhaps among certain customers, yeah.

Page 553

1    Q    Yeah.  Particularly those Alt Site Product's
2  customers that Alt Site Product Sales called upon --
3        MS. CITERA:  Objection to form.
4    Q    -- correct?
5        THE WITNESS:  I don't know if particularly.
6    Q    You don't know them by name, but just as a general
7  matter you knew --
8    A    No.  I don't know if we would have an advantage -
9  specific advantage or if Alternate Site would have a
10  specific advantage over hospitals or anybody else.
11    Q    Did you have an understanding that hospital
12  customers were also interested in AWPs?
13        MS. CITERA:  Objection to form.
14        THE WITNESS:  You know, I never discussed that
15    issue.  That issue never came up with me.
16    Q    Let's back up a second.
17        In looking at the second page of what's marked as
18  Exhibit 40, also marked as Exhibit 362, do you think listing
19  AWPs like this for competitive products right next to each
20  other constitutes marketing the spread?
21        MS. CITERA:  Objection to form.
22        THE WITNESS:  You're telling that to somebody.  I
23    don't know who the addressees - or who got this.
24    Q    So the answer to my question is you think that that
25  would constitute marketing the spread?

Page 554

1        MS. CITERA:  Objection to form.
2        MR. STETLER:  You know, just stop --
3        THE WITNESS:  I don't know if the marketing person
4    got this.
5        MR. STETLER:  Please don't mischaracterize his
6    answers.  He says, I don't know who it was sent to; You
7    say, In other words, it constitutes marketing the
8    spread.
9        MR. ANDERSON:  No.  He said, You're telling that to
10    somebody, Dave, that's what he said.
11        MR. STETLER:  Yeah.  If you're telling it to a
12    customer, it might be one thing; if you're telling it
13    somebody you're working with, it might mean something
14    else.
15        MR. ANDERSON:  Okay.
16        Well, I appreciate that.
17        THE WITNESS:  There are no addressees on here.
18        MR. STETLER:  As he said.
19  BY MR. ANDERSON:
20    Q    So if this was going to a customer, that could
21  constitute marketing the spread, correct?
22        MS. CITERA:  Objection to form.
23        THE WITNESS:  I don't know if this went to a
24    customer.  One could say yeah, maybe it would be.
25    I don't know if it went to customers.  I don't know

60e5726b-bc69-475a-8c51-36591ea203d2

Page 555

1   who got this.
2      Q   Now looking at the third page of Exhibit 40,
3   Mr. Robertson, focusing specifically upon the text in the
4   little spreadsheet --
5      A   Right here (indicating)?
6      Q   -- and I'll read for the record and I'll have a
7   couple of questions for you, quote, Dave, my suggested list
8   price is five percent over RxLink and new AWP is calculated
9   at 1.1875 of new list.
10      Did I read that correctly?
11      A   Mm-hmm.
12      Q   Are you familiar with either of those formulas for
13   calculating prices?
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  I know that RxLink was a way that we
16   priced products to uncontracted customers - customers
17   who didn't have a signed contract - I know that.
18      No.  1.1875 is pretty precise and news to me.  I
19   don't know.  I don't remember.
20      Q   Yes, sir.
21      Mr. Robertson, since you've raised RxLink, was it
22   your understanding that the RxLink prices that Abbott
23   charged wholesalers were not proprietary prices?
24      A   I don't understand what you mean by, proprietary
25   prices.  What does that mean?

Page 556

1      Q   I'll phrase it in your terms.
2      Was it your understanding that the RxLink prices
3   that Abbott ant charged to wholesalers were not contract
4   prices?
5      A   My understanding that RxLink prices were prices
6   charged to customers who did not have contracts with Abbott.
7      Q   And, accordingly, since they were not contract
8   prices, are you aware of any situation where Abbott viewed
9   those prices to be, quote, proprietary or trade secret?
10      MS. CITERA:  Objection to form.
11      THE WITNESS:  I don't remember that.
12      Q   Now that you've looked at this calculation for AWP
13   at 1.1875 of new list, does that refresh your memory that
14   that was the standard formula?
15      A   No.
16      Q   It doesn't?
17      A   I just -- I'm sorry, I thought I said a minute or
18   two ago that the 1.1875 is new to me.  I didn't know of any
19   formula.
20      Q   Specific numbers.
21      A   Right.
22      (Whereupon, Robertson Exhibit No. 41 was marked for
23   identification.)
24      Q   Have you had a chance to review Exhibit 41,
25   Mr. Robertson?

Page 557

1      A   No.
2      (Referring.)
3      Q   Okay.
4      Does this memo appear to be referencing a sales
5   call that you and Mr. Ward were going to make to Coram
6   Healthcare?
7      A   It references a call we were supposed to make;
8   yeah.
9      Q   And did you, in fact, from time to time call on
10   Coram?
11      A   Yes.  We -- I've met the people at Coram.
12      Q   You'll see in the second paragraph there's a
13   reference to Coram asking for WAC, AWP and price; is that
14   correct?
15      A   (Referring.)
16      Right.
17      Q   Did you have an understanding that customers such
18   as Coram were interested in WAC, AWP and price?
19      MS. CITERA:  Objection to form.
20      THE WITNESS:  You know, I have no recollection of
21   RFPs coming out and people telling me that they wanted
22   three separate prices; I don't remember that --
23      Q   Do you have any --
24      THE WITNESS:  -- because this (indicating) is part
25   of a request for proposal.

Page 558

1      Q   Do you have any general memory that customers were
2   interested in Abbott providing AWP information to them?
3      A   If they asked --
4      MS. CITERA:  Objection to form.
5      THE WITNESS:  -- we probably would have provided it.
6   It's public information.
7      Q   I understand that, and I'm not trying to belabor
8   your prior testimony about that.
9      I'm not asking if the customer requested it would
10   you send it to them - I understand your prior testimony
11   about that.
12      I'm asking did you, in fact, experience that
13   customers would typically ask for AWP information from
14   Abbott?
15      A   I didn't read --
16      MS. CITERA:  Objection to form.
17      THE WITNESS:  -- the AFPs -- the RFPs - pardon me.
18   They were never sent to me; I didn't know what sort
19   of information was asked for.
20      Q   So with respect to the RFPs that were sent from
21   customers to Abbott and, in turn, Abbott's response to those
22   request for bids or request for proposal, you left that to
23   the Alternate Site Contract Marketing department, correct?
24      A   Those were the people who knew most about it, about
25   the competitive environment, about the specific customer and

60e5726b-bc69-475a-8c51-36591ea203d2

Page 559

1 they sent out the proposals.
2 Q Did you or anyone else to your knowledge ever
3 analyze the typical bids or bid proposals or RFP responses
4 that Alternate Site Contract Marketing sent out to Abbott
5 customers?
6 A Did I review them?
7 Q Did you or anybody else, to your knowledge.
8 MS. CITERA: Objection to form.
9 THE WITNESS: I didn't review them and I would
10 assume that the - prior to them going out they would
11 have been reviewed by the general manager of that
12 individual business if they were for a big customer.
13 Q Back in the 90s, who was the general manager of
14 Alternate Site Contract Marketing?
15 A There were a bunch of people who worked in
16 contracting; Kipperman was -- Steve Kipperman was a guy that
17 worked there, and there were probably one or two others
18 whose names I can't recall. It wasn't a big group.
19 Q Was Kipperman considered the manager of the
20 Contract Marketing Department?
21 A You know, I don't know what Steve's particular
22 title was.
23 Q Did Alternate Site Contract Marketing in any way
24 report to Mr. Ward as he was the head of Alternate Site
25 Product Sales?

Page 560

1 A Right. Steve Kipperman reported to John Ward.
2 Q Okay.
3 Do you know if Mr. Ward ever evaluated how
4 Alternate Site Contract Marketing was sending information to
5 customers in bid proposals or RFP responses?
6 A No. I have no specific knowledge of that.
7 Q Did Mr. Ward ever alert you to the fact that AWPs
8 were being shared by Abbott in the context of a bid
9 proposal?
10 MS. CITERA: Objection to form.
11 THE WITNESS: No. I don't remember that.
12 Q Would you consider the inclusion of AWP information
13 in bid proposals to constitute marketing the spread?
14 MS. CITERA: Objection to form.
15 THE WITNESS: If we were to include it without being
16 asked, it might. If we were asked to include it and it
17 was part of the customer's request for proposal and
18 that's the way they wanted to see the proposal done, we
19 probably would have obliged to do it that way.
20 I mean, at the end of the day, you've got to do what
21 the customer asks you to do, otherwise your RFP would be
22 thrown out.
23 Q Yes, sir.
24 (Whereupon, Robertson Exhibit No. 42 was marked for
25 identification.)

Page 561

1 A (Referring.)
2 Mm-hmm.
3 Q Does Exhibit 42 appear to be a sales report that
4 was provided to Pete Baker and Mickey Pettus back on
5 September 15th, 1997?
6 MS. CITERA: Objection to form.
7 THE WITNESS: This is directed to them; yeah.
8 Mm-hmm.
9 Q And under the section titled, HPD, I'm reading the
10 first bullet, Pricing has consistently come up as a key
11 concern. So has the spread between contract price and AWP.
12 Did I read that correctly?
13 A Yeah.
14 Q And this is pertaining to a customer known as
15 Optioncare, correct?
16 A Right.
17 I don't know who wrote this.
18 MR. STETLER: He's going to ask you that. Why don't
19 you wait.
20 Q Do you think you ever got information to the effect
21 that Optioncare was interested in AWP and spread?
22 A I don't remember specifically.
23 Q If you had, would you have explained that Abbott's
24 not to discuss such things with the customer?
25 MS. CITERA: Objection to form.

Page 562

1 THE WITNESS: I'm sorry if I -- We've been -- We've
2 done this a number of times and every time you've asked
3 the question I told you we didn't market the spread. I
4 don't know how many more ways to say it; we'd market the
5 quality.
6 And would I have thought this was not a good way to
7 do it? Yes; that's correct. But I really feel that
8 I've given you my answer.
9 Q I understand. I'll keep moving, then.
10 A Thank you, sir.
11 Q Let's take a look at the next exhibit ?
12 (Whereupon, Robertson Exhibit No. 43 was marked for
13 identification.)
14 MS. CITERA: Jarrett, just while we're looking at
15 this exhibit, what's your plan? I may have some
16 questions.
17 MR. ANDERSON: I'm moving quickly but I've still,
18 gosh, probably ten more exhibits.
19 MS. CITERA: Eliseo, are you asking questions?
20 MR. SISNEROS: I'm going to give him everything I've
21 got, so my plan is not to ask questions.
22 MS. CITERA: I just want to make sure that I get to
23 ask some questions.
24 MR. ANDERSON: Yeah. I hear you.
25 I mean, I'm certainly trying to conclude the

60e5726b-bc69-475a-8c51-36591ea203d2

Page 563

1    deposition today. I don't want to travel back to Fort
2    Myers.
3    BY MR. ANDERSON:
4        Q   I like you and all, Mr. Robertson, but it's hard to
5    get here.
6        A   It' sure is. It's hard to get out of here, too.
7        Q   Have you had a chance to look at Exhibit 43,
8    Mr. Robertson?
9        A   Not really, but I read the top.
10       Q   Well, no, take your time. I didn't mean to rush
11   you.
12           I'll help you. My focus is going to be at the last
13   paragraph of the first page.
14       A   Last paragraph?
15           (Referring.)
16           Okay.
17       Q   You will agree with me, won't you, that Exhibit 43
18   is dated September 29th, '97?
19       A   Yes.
20       Q   And it's just a few days after the prior exhibit
21   marked as Robertson 42?
22       A   Mm-hmm. Yes.
23       Q   And this is from Pete Baker --
24       A   Right.
25       Q   -- to yourself, correct?

Page 564

1        A   Right.
2        Q   And is it true that these types of documents were
3    basically a monthly sales reports that Mr. Baker and his
4    predecessor Mr. Ward provided to you concerning Alt Site
5    Product Sales?
6        A   Correct.
7        Q   And the purpose of that was to keep you apprised of
8    what was going on in the market place at a high level?
9        A   That's -- Yes, to find out what was going on in the
10   marketplace; that's correct.
11       Q   And these were typically known as monthly
12   highlights or significant events reports, correct?
13       A   Sort of; yes.
14       Q   And this particular one references the same
15   interest that Optioncare has in AWP and contract price
16   spread, correct?
17       A   Yes.
18       Q   And --
19           MS. CITERA:  Objection to form.
20           Sorry.
21       Q   And that's down at the bottom of the first page of
22   Exhibit 43, right?
23       A   That's what it says.
24       Q   Do you recall having any conversation or other
25   communications with Mr. Baker about Optioncare's interest in

Page 565

1    spread?
2        A   No.
3        Q   Do you have any doubt that Abbott responded to
4    Optioncare's interest in spread by providing AWP and
5    contract price information?
6            MS. CITERA:  Objection to form.
7            THE WITNESS:  It was probably provided to them if
8        that's what they asked for.
9        Q   Are you familiar with a customer known as Olsten or
10   Olstein?
11       A   I've heard the name some, Olsten. I think it's now
12   defunct.
13       Q   In the past, did you, from time to time, receive
14   communications from the sales force about Olsten business
15   dealings?
16       A   I can't remember specifically.
17       Q   This next document may help you refresh your
18   memory.
19           (Whereupon, Robertson Exhibit No. 44 was marked for
20       identification.)
21       Q   Does Exhibit 44 appear to be a memo from Dennis
22   Walker to Pete Baker, and copies to you, Miss Leone and Dave
23   Harling?
24       A   Right.
25       Q   And it's pertaining to an RFP that was received by

Page 566

1    Abbott from Olsten, correct?
2        A   Mm-hmm. Yes.
3        Q   Did you typically get involved at least with the
4    high level presentation of a bid proposal or an RFP response
5    by Abbott to the customer?
6        A   No. I mean, I visited customers and talked about
7    what their problems were, et cetera, et cetera. But as a
8    regular situation, sitting and going through those numbers
9    with them, no.
10       Q   You were more at the high executive level, correct?
11       A   I'm not saying -- What I'm saying is I didn't sit
12   down and go over product line by product line, line-by-line
13   prices, sizes, list codes, bar codes, terms and conditions
14   of delivery with the customers. I didn't do that.
15       Q   In some big picture way, did you have conversations
16   yourself with customers about reimbursement concerns that
17   customers had?
18       A   I can't remember specific talks with specific
19   customers.
20           I know that the decrease in reimbursement was a
21   significant cause of concern to everyone in that market
22   segment at that time, that prices in the market segment were
23   kind of crashing.
24       Q   Reimbursement prices?
25       A   Oh, yeah.

Page 567

1    Q   From private and public payors or was there one
2   certain type of payor?
3    A   Well, specific therapies; total parenteral
4   nutrition, and then managed care came along in the early 90s
5   and the prices had gone down significantly.  Total
6   parenteral nutrition was, you know, about half the price it
7   had been two or three years earlier.
8        So the therapies were going down in price.
9    Q   Did Abbott Alternate Site sell TPN?
10   A   We sold the components; mm-hmm.
11   Q   Meaning the bags of fluid and what have you?
12   A   Right.  Fat lipids, protein and sugar.
13       (Whereupon, Robertson Exhibit No. 45 was marked for
14   identification.)
15   Q   Mr. Robertson, I've handed you, or the court
16   reporter has handed you what's been marked as Exhibit 45,
17   also marked in this case as Exhibit 526.
18       If you could, take a look at the fifth page of the
19   document, which is bates labeled AB0019801.
20   A   (Witness complies.)
21       Page 5?
22   Q   Yes.
23       That's it.
24   A   This is it?
25   Q   Yes, sir.  You're there.

Page 568

1    A   Okay.
2        Do you see up in the top left-hand corner of the
3   document a --
4    A   Right.
5    Q   -- title, Olsten Kimberly Quality Care Proposal
6   Analysis?
7    A   Mm-hmm.
8    Q   Does this type of format for a document look
9   familiar to you?
10   A   I don't remember having gone over these, but it
11   seems pretty straightforward.
12       I may have seen them in the past.  I don't
13   remember.
14   Q   Do you believe that this is a document that was
15   created by Abbott?
16   A   I have no reason to doubt it.
17   Q   In looking over at the right-hand column, do you
18   see there's a column titled, Abbott AWP?
19   A   Right.
20   Q   And then to the left of that immediately is a
21   column titled, Competitive AWP, correct?
22   A   Right.
23   Q   Did Abbott typically include a listing of its AWPs
24   in contrast to its competitors?
25       MS. CITERA:  Objection to form.

Page 569

1        THE WITNESS:  Did we --
2    Q   Let me --
3        THE WITNESS:  -- volunteer to do that?
4    Q   Let me rephrase, sir, because I didn't complete my
5   question and it's not a good question.  I'll make it more
6   specific.
7        Typically when Abbott was sending responses to
8   request for proposals or bid responses to customers, did it
9   include AWP information on its products contrasted with
10   competitive products?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  I don't know that gratuitously if we
13   were asked for it - and this indicates we did, but would
14   we just do that?  I don't think so.  If we were asked
15   for it, we have the documentation here.
16   Q   So, for instance, if an Abbott customer asked
17   Abbott, Hey, could you tell me how your AWPs match up
18   against the AWPs of other drug companies on certain
19   products, Abbott sales personnel were authorized to provide
20   that type of information?
21       MS. CITERA:  Objection to form.
22       THE WITNESS:  I didn't authorize them to do it, but
23   evidently they provided it when they were asked.  They
24   had the capability of doing it.  I mean, that's what it
25   says here.

Page 570

1    Q   By just pulling the AWPs from the Red Book,
2   correct?
3    A   Yeah.
4    Q   Is that a yes?
5    A   Yes.
6        Evidently we just -- Evidently we were saving the
7   customer some work, which they could have done, too.
8    Q   Now in your experience, did some customers just
9   flat out tell Abbott that they were going to be making
10  purchasing decisions based on spread?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  They may have.  I have no specific
13   knowledge of that.
14   Q   Did you have some involvement in making sales calls
15   or otherwise dealing with a customer known as Gerimed?
16   A   Gerimed, that's a geriatric company of nursing
17   homes.
18       I may have.  I don't remember specifically.
19       (Whereupon, Robertson Exhibit No. 46 was marked for
20   identification.)
21       (Whereupon, at about 3:36 p.m., Mr. Haviland left
22   the deposition)
23   Q   If you could look at the last page of Exhibit 46,
24   Mr. Robertson.
25   A   Mm-hmm.

Page 571

1    Q   Is that your handwriting?
2    A   No.
3        MS. CITERA:  Just for the record, this was also
4    marked as Exhibit 10, the memo.
5        MR. ANDERSON:  Is the handwriting part of Exhibit
6    10?
7        MS. CITERA:  Yeah.
8        MR. ANDERSON:  Well, my mistake.
9    BY MR. ANDERSON:
10   Q   Did you get involved at all, sir, in Abbott's
11   contract negotiations with Gerimed?
12   A   I don't recall specifically - 12 years ago, I don't
13   recall.
14   Q   Does reviewing what's been marked as Exhibit 46
15   also marked as Exhibit 10 refresh your memory at all about
16   your involvement with Gerimed?
17   A   I'm afraid --
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  -- these customers and these acronyms
20   begin to run around.  I mean, you just take here GPO,
21   MHA, PBI - I mean, they just tend to run together after
22   12 years.
23       I don't recall specifically becoming involved with
24   Gerimed.
25   Q   Yeah.  I gathered from the first day of your

Page 572

1    testimony that when you said, Americans love acronyms that
2    that's one thing you didn't miss when you were in South
3    America.
4    A   No.  I didn't miss acronyms.  No.
5    Q   Do you recall, now that mention it, that PBI and
6    MHA were pretty major customers of --
7    A   As I recall --
8        MS. CITERA:  Objection to form.
9        THE WITNESS:  -- PBI was a purchasing group and MHA,
10   I don't know what they did.  But I believe PBI was a
11   purchasing group.
12   Q   Representing pharmacies that would dispense Abbott
13   drugs, correct?
14   A   They would dispense anybody's drugs; right.
15   Q   Right; Abbott drugs and any other --
16   A   Sure.
17   Q   -- company's drugs.
18   A   Yeah.
19       And it says MHA, another alternate site GPO.  So I
20   assume MHA is another -- MHA - so you'd use an acronym to
21   describe an acronym.
22   Q   Do you agree that Exhibit 46 references some
23   coordination between Abbott Alternate Site personnel, HPS
24   personnel and corporate personnel in negotiating with
25   Gerimed?

Page 573

1        MS. CITERA:  Objection to form.
2        THE WITNESS:  Pat DeGrace was a division person.
3    And it says here we need to cooperate with HBS National
4    Accounts.  They wanted to use corporate resources.
5    Q   Did you find that often with big customers at
6    Alternate Site such as Gerimed or MHA or PBI that there
7    would be an effort to coordinate and, as you said this
8    morning, put one face on Abbott by HBS and corporate
9    personnel interfacing with Alternate Site --
10   A   That wasn't their objective - the group's
11   objective.  The group's objective was to get lower prices
12   by -- You know, in other words, they wanted to put a
13   500-pound gorilla in the room, not the $2M contract I'm
14   negotiating, but the $10M the assisted division has on the
15   table, too.
16       So they thought they could get a better deal from
17   Abbott if it were a corporate relationship.
18   Q   And Abbott also saw some benefit to coordinating
19   its marketing efforts amongst the divisions, correct?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  That was -- That's a matter of
22   opinion.
23       I didn't think it worked real well.
24   Q   From your view as the head of Alternate Site, you
25   didn't necessarily think it worked well, but obviously

Page 574

1    Abbott corporate did because they had these guys like Mickey
2    Pettus handling that business, right?
3    A   Right.
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  They probably thought it was a pretty
6    good deal.
7        (Whereupon, Robertson Exhibit No. 47 was marked for
8    identification.)
9    Q   Does Exhibit 47 appear to be an interoffice memo
10   from Dennis Walker to you, John Ward and Guy Wiebking?
11   A   Wiebking --
12   Q   Wiebking.
13   A   -- yes, it does.
14   Q   And are your handwritten notes on this document?
15   A   Yes, they are.
16   Q   And you write to Dennis Walker, John Ward, Let's
17   work out a strategy together for these two --
18   A   Mm-hmm.
19   Q   -- is that right?
20   A   Right.
21   Q   Did you ultimately work with Dennis Walker and John
22   Ward in formulating a strategy for Gerimed?
23   A   I don't -- I don't really recall.  You know, I
24   don't really recall whether we did or didn't.
25   Q   Do you recall --

60e5726b-bc69-475a-8c51-36591ea203d2

Page 575

1    A   I know if I just look at this right now, when you
2  see there's a merger on hold, that means they want to use
3  the merge purchase opportunity to get a contract out of you,
4  then the merger doesn't take place and they want you to live
5  with the prices.
6    Q   So they can pitch the higher volume --
7    A   They pitch the higher volume, you give them the
8  prices for the higher volume, they don't make the merger and
9  then, all of a sudden, you're on the hook for these prices.
10         It didn't seem like a good idea to me.  You know,
11  reading again 12 years later, it still doesn't seem like a
12  good idea.
13   Q   And so that is likely what you mean by, work out a
14  strategy?
15   A   Well, as I read this, it sort of jumps off the page
16  at you, doesn't it?
17   Q   I'm asking you, sir.
18   A   Yeah.  It jumps off the page at me.
19   Q   Okay.
20     MR. STETLER:  Abandon the role reversal.  He gets to
21  ask every single question.
22     THE WITNESS:  Okay.
23   Q   I'm looking down at the second to last bullet point
24  on the first page.
25   A   Yes, sir.

Page 576

1    Q   I'll read for the record, quote, Three factors
2  could increase the probability of us capturing this
3  business; 1, Lowering ASPS prices below PBI to get to the
4  current Baxter levels; 2, A corporate program involving, HPD
5  (ASPS), Ross and PPD; Completion of the merger and
6  leveraging the HBS MedEcon business to get the Gerimed
7  business.
8         Did I read that correctly?
9    A   Mm-hmm.
10   Q   Did, in fact, HPD, Ross and PPD work together to
11  get a corporate program with either MedEcon or Gerimed?
12   A   I don't remember that specific situation as to how
13  that happened.
14       I think I indicated to you earlier that the
15  priorities weren't aligned all the time so that working
16  together as one corporate entity didn't always work.  The
17  incentives weren't aligned among the divisions.
18       So I can't tell you whether or not this
19  specifically worked.
20   Q   How did the incentives sometimes differ?
21   A   Well, if I get paid based upon my group's
22  performance and you ask me to drop my prices so that Ross
23  can get more business and so you can get paid, I might have
24  some objection to that.  Because we're measured by different
25  things; you're measured in one -- If the plan says one thing

Page 577

1  and then you make a mid-course correction you would be
2  perceived to have failed when actually you took a bullet for
3  assisted division.
4         So things have to -- Priorities and incentives have
5  to be aligned, and they weren't always.
6    Q   Did you find that some customers saw a benefit in
7  doing business with PPD, for instance, because then they
8  could also do business with Abbott Alternate Site?
9      MS. CITERA:  Objection to form.
10     THE WITNESS:  PPD?  Well, we only dealt in
11  injectable pharmaceuticals, we had no oral
12  pharmaceuticals, so there wasn't really a match up
13  there.  And the Alternate Site business didn't have much
14  to do with P.O., oral medications.
15     Oral medications, they'd go to their local pharmacy;
16  nobody has to give come to the house and give you the
17  glass and the water and the pill.  Where somebody has to
18  come to the house if they're going to hook you up with a
19  needle and put it in your vein.
20   Q   Well, I understand that the drugs are dispensed
21  differently.
22       I'm asking was there some benefit from your
23  experience that customers perceived in doing business with
24  Abbott and its divisions, including Ross, PPD and HPD?
25   A   Yes.

Page 578

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  We were perceived as being able to get
3  lower prices by bringing in higher volumes.
4    Q   All right.
5      (Whereupon, Robertson Exhibit No. 48 was marked for
6  identification.)
7    Q   Does Exhibit 48 appear to be a memo that was sent
8  to John Ward, you and Jeff Yablon by Dennis Walker back in
9  December of '95?
10   A   Yeah; addressed to Ward and Yablon and I are copied
11  on it.
12   Q   And it pertains to Gerimed, correct?
13   A   Yes.
14   Q   And, in essence, Mr. Walker is describing his sales
15  call to Gerimed, correct?
16   A   Yes.
17   Q   And then Mr. Ward commended Dennis for writing,
18  quote, a good report, and he asked that this be circulated
19  to the staff, correct?
20     MS. CITERA:  Objection to form.
21     THE WITNESS:  Please see that Mike Dorr knows about
22  the merger hold.  Mike Dorr.
23   Q   Yes, sir.
24       I'm also focusing up at the top, you see that
25  reads, Staff, please circulate?

Page 579

1    A   (Referring.)
2        Oh, okay.
3    Q   Is that Mr. Ward's handwriting?
4    A   I don't know.  I don't recognize it.  Maybe.
5    Q   Did you find that sometimes when there were
6    important reports from the field that they would be
7    circulated to other salesmen?
8        MS. CITERA:  Objection to form.
9        THE WITNESS:  Well, this -- Yeah, if it was valuable
10   information, anything, we tried to inform people of what
11   we thought was important.
12   Q   Do you believe that Exhibit 48 was likely
13   circulated to the other Alternate Site sales personnel?
14       MS. CITERA:  Objection to form.
15       THE WITNESS:  No.  I think it went to John Ward's
16   staff and it circulated among John Ward's staff.
17   Q   Generally who are those people?  I know you might
18   not be able to name names, but.
19   A   Oh, they would be the people responsible for
20   contracting; it would be national account - national account
21   managers even if they didn't have a Gerimed or a - but they
22   would know what activities were taking place in the market
23   that may some time affect them.
24   Q   So generally it would have been Alternate Site
25   Contract Marketing and the NAMs or national account

Page 580

1    managers?
2    A   Yeah; whoever reported to John.
3    Q   I see.  Okay.
4        Do you agree that, in essence, Mr. Walker is
5    describing how Gerimed is interested in awarding bids to the
6    products that are the most profitable and have the highest
7    spreads?
8    A   It says that.
9        MS. CITERA:  Objection to form.
10   Q   And were you also aware that Gerimed had a computer
11   system or software program that helped identify best
12   reimbursement?
13   A   No.
14   Q   Over the years when you were at Alternate Site, did
15   you become aware that there were tools in the marketplace,
16   whether they be software or otherwise, that assisted
17   providers in identifying best spreads or relative
18   reimbursement?
19   A   There was a -- Over the course of the last - from
20   1990 to 2000, there was a fundamental revolution in
21   information technology, and the books were out and online
22   data bases were in.  Pretty much, yeah, customers could get
23   whatever information they wanted.
24   Q   So to be specific, when you said the books were
25   out, you mean a printed Red Book was no longer necessary

Page 581

1    because computer programs or what have you had the
2    electronic AWPs and --
3    A   They could do it electronically.
4    Q   Yes, sir.
5    A   They could find the information electronically;
6    right.
7    Q   And you and others at Abbott were aware that
8    providers had these computer-based tools to help them
9    identify spreads, correct?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  Computer-based tools specifically or
12   by customer, no.  That this could this be done, sure.
13   Q   Conceptually you all were aware of it.
14   A   Conceptually --
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  -- that someone could do it; yeah.
17   Q   And conceptually that it was done, correct?
18       I'll rephrase to be more specific.
19       You and others at Abbott did know that conceptually
20   there were tools out there to help providers identify
21   spreads.
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  I think it's safe to say that a
24   reasonable person could say if they marry this
25   information up together, they could figure that out.

Page 582

1    Q   Do you think that when providers would figure that
2    out that that would constitute marketing the spread?
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  Marketing the -- Not really, no.  If
5    they found that out on their own?
6        MR. ANDERSON:  Yes, sir.
7        THE WITNESS:  Based upon public information?
8        MR. ANDERSON:  Mm-hmm.
9        THE WITNESS:  That they got from third parties?
10       MR. ANDERSON:  Yes, sir.
11       THE WITNESS:  That's not us marketing the spread.
12   BY MR. ANDERSON:
13   Q   Even when the public information, so to speak, such
14   as the market price charged and AWP caused to be reported
15   derives from Abbott?
16       MS. CITERA:  Objection to form.
17       THE WITNESS:  The AWP and the cost to be reported?
18   Q   The AWP that was caused - see, my Texas twang got
19   me there - --
20   A   Oh.
21   Q   -- The AWP that was caused to be reported.
22   A   The AWP that was reported, that's public
23   information.
24   Q   Yes, sir.
25   A   This same public information is provided by others,

60e5726b-bc69-475a-8c51-36591ea203d2

Page 583

1 correct?
2 Q Yes.
3 A It's provided by these others in an electronic
4 form. The individuals in the field, that is customers,
5 anybody who was interested, has the opportunity to access
6 this material and do this for themselves. If, in fact, they
7 do that for themselves, I don't characterize that as us
8 marketing the spread. It's a conclusion they come to based
9 upon public information.
10 Does that answer your question?
11 Q I think it does.
12 In essence, the fact that providers could ascertain
13 relative spreads or spread analysis or reimbursement
14 analysis was just a fact of the marketplace, correct?
15 MS. CITERA: Objection to form.
16 THE WITNESS: Well, this was a factor of the
17 marketplace from the beginning if you cared to go to the
18 books and take this information out; if you had the time
19 and energy to go to the book.
20 Q The computer's just made it easier, right?
21 A The computer made easier to do something that had
22 been possible for a very long time.
23 Q Yes, sir.
24 (Whereupon, Robertson Exhibit No. 49 was marked for
25 identification.)

Page 584

1 Q Okay. Mr. Robertson, we'll take a break after this
2 exhibit.
3 Please review what's been marked as Robertson
4 Exhibit 49.
5 A I can't read this part here (indicating).
6 Q You're having trouble reading the handwriting?
7 A Yeah.
8 (Referring.)
9 A Don't, something, this program.
10 Q Yeah. I'll get to that in --
11 A Don't sanction this program? Don't, something,
12 this program.
13 Q Yes, sir.
14 You're referring to the part of Exhibit 49 that is
15 a handwritten note with an arrow pointing toward a circled
16 section of the memo, correct?
17 A Mm-hmm.
18 Q And this is memo dated August 7th, '96 to the
19 infusion specialist and the district managers with copies to
20 you, Baker and Novak from Dennis Walker, correct?
21 A Yeah.
22 Q And at the time he was a national account manager
23 calling on Gerimed, correct?
24 MS. CITERA: Wait. Wait. Wait.
25 MR. STETLER: I think you misspoke. I think you

Page 585

1 said, you, Baker and Novak.
2 MR. ANDERSON: I apologize.
3 A Ward, Baker and Novak. I'm not an addressee.
4 Q Yes. That wasn't a trick, Mr. Robertson. I
5 apologize.
6 MR. STETLER: But it's a good illustration of how
7 you don't listen to the question. So why let him
8 finish?
9 Q Looking at the memo, sir, I'll read for the benefit
10 of the record the section that's been circled, quote,
11 Gerimed usually recommends that our products be included on
12 a member's formulary because of the higher spread between
13 the contract price and our average wholesale price, AWP.
14 Did I read that correctly?
15 A Yes.
16 Q As a general matter, were you and others at Abbott
17 aware that some providers chose Abbott products because of
18 the higher reimbursement spreads on Abbott products?
19 A Well, evidently, they did.
20 MS. CITERA: Objection to form.
21 Q In looking at the written comment that points to
22 that section, do you agree that it reads, quote, Don't
23 mention this anymore?
24 A It could be, mention.
25 Q Yes, sir.

Page 586

1 A It could, mention, could be, sanction, it could be
2 a lot of things.
3 Q Did you ever issue an instruction that discussions
4 of providers selecting Abbott products due to higher spreads
5 should not be made?
6 A I don't remember doing that; no.
7 Q Were you aware of anyone in the Alternate Site
8 Business Unit giving such instructions?
9 A I don't recall that; no.
10 Q Can you think of any reason why Alternate Site
11 personnel would want to discourage other Abbott people from
12 mentioning customers' interest in Abbott's higher spreads?
13 MS. CITERA: Objection to form.
14 THE WITNESS: What other Abbott people? I'm having
15 trouble --
16 Q Just as a general matter, sir, can you think of any
17 reason why some Abbott personnel would try to discourage
18 other Abbott personnel from mentioning customers' interest
19 in Abbott's products based on higher spread?
20 MS. CITERA: Objection to form.
21 THE WITNESS: I think we've discussed that at some
22 length that you market your product based upon quality,
23 availability, terms and conditions of service. The
24 reimbursement is transient and could go away and it's
25 not a good way to market your product.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 587

1    Q   Did you or anyone else to your knowledge perceive
2  that it might be illegal or improper to market the spread to
3  customers?
4    A   No.
5        MS. CITERA:  Objection to form.
6    Q   We've only got a minute left on the tape so let's
7  take a quick break.
8        VIDEOGRAPHER:  We're going off the record.
9        (At about 4:02 p.m. - a short recess was taken)
10       (At about 4:12 p.m. - reconvened deposition)
11       (Whereupon, Robertson Exhibit No. 50 was marked for
12    identification.)
13       VIDEOGRAPHER:  We're back on the record.
14  BY MR. ANDERSON:
15    Q   One more document, Mr. Robertson, along this
16  Gerimed topic.
17       This is a pretty lengthy document, Mr. Robertson,
18  I'm not going to ask you questions about all of the pages.
19  I'm marking a couple of pages here that I'm going to let
20  your counsel and then counsel for the defendants have an
21  opportunity to look at if they want to.
22       I'll tell you that the three pages I'm going to be
23  focusing on - and you may just want to dogear them like I
24  have - the first one is ABT206386, and then the next one
25  will be 6393, and then the last one will be 6401.

Page 588

1        MR. ANDERSON:  Toni, do you want to look at those
2    three pages?
3        MR. STETLER:  You know, if it helps, I don't object
4    if you want to look right over his shoulder.
5        MR. ANDERSON:  Okay.
6        MR. STETLER:  You know, don't feel like you're
7    breathing down his neck.
8        THE WITNESS:  I'm allowed to speak for myself.
9        MR. STETLER:  That's apparent, just usually in the
10    middle of a question, so.
11       THE WITNESS:  Oh, geez.  I'm being abused here.
12       MR. ANDERSON:  Yeah.  I wouldn't put up with it.
13       MS. ST. PETER-GRIFFITH:  Mr. Robertson, you can come
14    to dinner with us if you'd like.
15       THE WITNESS:  I have options.
16       MR. STETLER:  And just imagine how nice that will be
17    on the government.
18  BY MR. ANDERSON:
19    Q   All right.  Let's start over.
20       Mr. Robertson, have you had a chance to look at the
21  three pages of Exhibit 50 that I've marked there with the
22  yellow sticky?
23    A   I haven't read, them but I see them.
24    Q   Yes.
25       And do they appear to be part of a larger document

Page 589

1  titled, Gerimed Request For Proposal?
2    A   Yes.
3    Q   And did you typically receive this type of
4  information?
5    A   No.
6    Q   Would this be the type of material that you would
7  have relied upon the NAMs and the Alternate Site Contract
8  Marketing personnel to work with?
9        MS. CITERA:  Objection to form.
10       THE WITNESS:  This most probably would be sent to
11    the account manager and he would then shepherd it
12    through the process to make sure that we complied to the
13    customer request, whatever information they wanted.
14    Q   Right.
15       And so then, for instance, looking at the first
16  page that we've marked, which is ABT206386, you see a
17  section there titled, Reimbursement Assistance?
18    A   Yes.
19    Q   And, in essence, does that describe how the Gerimed
20  program works to, quote, Identify the lowest cost product
21  and the best spread for the particular state?
22    A   The Gerimed program?
23       MS. CITERA:  Objection to form.
24       THE WITNESS:  That's what it says; yes.
25    Q   And, again, that's consistent with the general

Page 590

1  proposition that providers had software tools that they
2  could utilize to identify best spreads.
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  Providers would have that capability.
5    I mean, I would imagine that if this RFP were asked
6    to be submitted on a disc and you gave them the disc,
7    that it would be reasonable to assume that anybody
8    familiar with a computer program, et cetera, could come
9    up with those data relatively easily.  It would just be
10    arithmetic that, I would assume.  I don't know.
11    Q   The disc that you're referring to would be like a
12  CD, for instance, that Abbott would create and then FedEx to
13  the customer, correct?
14    A   I don't know --
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  -- whether it appears here but it's
17    possible for them to request that the RFP be on a disc.
18    And if it's on a disc, there's no transcription, there's
19    no nothing; they just put it in and they've got the
20    data.
21       And based upon the sophistication these people seem
22    to indicate they have in the beginning, it's not
23    unreasonable to think that that might have happened.
24    Q   To prevent a clerk from physically inputting price
25  after price.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 591

1    A   Yeah.
2    Q   And that information would be the actual market
3  price offered by Abbott and also the AWPs to the extent the
4  customer asked for AWPs, correct?
5       MS. CITERA:  Objection to form.
6       THE WITNESS:  Asked for us to provide them, I would
7  assume we would provide them.
8    Q   Yes.
9       Now look at the second page that we've tagged there
10 with the yellow sticky, which is ABT206393, does look like
11 an advertisement for the EmphaSys system?
12      MS. CITERA:  Objection to form.
13      THE WITNESS:  I don't know what it is.
14      It looks like it comes out of a binder.  Whether
15   that's an advertisement or a training thing for the
16   system, I don't know what it is.
17   Q   And then there's some bullet points there regarding
18 the software capabilities, correct?
19   A   Mm-hmm.
20   Q   And the first one says, EmphaSys on Best Spread,
21 correct?
22   A   That's correct.
23   Q   And then continuing on, EmphaSys on Lowest Price;
24 EmphaSys on Unit Dose Packaging; EmphaSys on State Specific
25 Reimbursement.

Page 592

1       Did I read those four correctly?
2    A   Yes.
3    Q   And the state specific reimbursement would be state
4  Medicaid reimbursement, correct?
5       MS. CITERA:  Objection to form.
6       THE WITNESS:  I don't know that.  I mean, I don't
7  know.
8    Q   Are you aware of any other type of state drug
9  reimbursement?
10      MS. CITERA:  Objection to form.
11      THE WITNESS:  State specific reimbursement;
12   reimbursement is different in every state.
13      If, for example, you're in the home infusion
14   business and you do a patient in the state of
15   Mississippi, you can't bill -- You can't get a check;
16   Billy Bob gets a check, buys a Bass boat and now your
17   receival has turned into a Bass boat and you've got to
18   go get that.
19      So reimbursement by state differs greatly.  It's not
20   just reimbursement for Medicare and Medicaid; Blue
21   Cross/Blue Shield on a state-by-state is different.
22   Q   Well, you lost me there - don't get me wrong, I
23 appreciate Bass boats, but I don't get how the state
24 reimbursement would lead to the Bass boat.
25      Can you explain that?

Page 593

1    A   Okay.
2       If you -- Why is it different?  Blue Cross and Blue
3  Shield in the state of Mississippi, if you bill them your
4  payment will go to the patient, not to you.  That's the
5  difference in reimbursement; you have to make sure that as
6  you hope to get reimbursed that you are - make that clear to
7  the patient, the patient understands, it that you're going
8  to get paid, that a check for $40,000 doesn't show up on a
9  doorstep - because that's what's going to happen - and then
10 they pay you.
11      So there are idiosyncrasies of reimbursement even
12 for the same organization.  Blue Cross/Blue Shield, in Blue
13 Cross/Blue Shield of Illinois, you can get a check - they'll
14 send it to you; Ohio won't - now, that's during my tenure.
15 So that state-by-state reimbursement understanding is
16 important.
17      Whether or not they're referring to state specific
18 reimbursement for Medicaid, I have no idea.
19   Q   The type of state drug reimbursement that you're
20 talking about right now where the payments may be sent to a
21 patient as opposed to a provider, are you talking about
22 Medicaid reimbursement, or what type of payor are we talking
23 about?
24   A   Where the payment would go to the patient?
25   Q   Yes, sir.

Page 594

1    A   Blue Cross/Blue Shield.
2    Q   Okay.
3       So you're talking about private pay --
4    A   Right.
5    Q   -- reimbursement.
6    A   And by state, even the same organizations like Blue
7  Cross and Blue Shield will have specific requirements,
8  specific things that you have to do which, if this system is
9  to be of value, the provider should know and understand.
10   Q   All right.
11      So to sum it up, this bullet point about EmphaSys
12 on State Specific Reimbursement does not necessarily
13 indicate to you that it's only about Medicaid, it could be
14 about private insurance.
15   A   It could be about both.  I have no idea.
16   Q   I see.  Okay.
17      I thought maybe I was going to get a Bass boat out
18 of the deal.
19      Now let's take a look --
20      MR. STETLER:  Well, when he said Billy Bob, we all
21   knew he was using an analogy a Texas lawyer could
22   appreciate.
23      MR. ANDERSON:  And it worked.
24      THE WITNESS:  Abbott has two or three of them.  They
25   may be from Mississippi.

Page 595

1  BY MR. ANDERSON:
2    Q   Okay.
3       Now let's flip to the last yellow sticky there,
4  ABT206401 --
5    A   Yes, sir.
6    Q   -- and, particularly, I'm focusing your attention
7  on the Section H, which I've circled, titled, Low price and
8  best spreads, and I'll read for the benefit of the record:
9  Contract pricing will be evaluated on lowest price and/or
10 best spread between AWP and the contract price for
11 multisource products.
12       Did I read that correctly?
13   A   Yes.
14   Q   Is that consistent with a general understanding
15 that you had about how some customers evaluated bid
16 proposals or RFP responses from Abbott?
17       MS. CITERA: Objection to form.
18       THE WITNESS: No.  This constant attention to best
19   spread is sort of new news to me.
20   Q   You knew it was an issue but you didn't know it was
21 this big an issue.
22   A   I didn't know --
23       MS. CITERA: Objection to form.
24       THE WITNESS: -- to -- I didn't know it appeared in
25   RFPs and things like that where people were asking for

Page 596

1    such information.
2       Yeah, spread was an issue, but you've got a lot of
3    documentation here where it's cited.  I mean, I don't
4    know.
5    Q   At least from your executive position while you had
6  a general awareness of it, you didn't know that customers
7  were quite so explicit about their request for best spread?
8       MS. CITERA: Objection to form.
9       THE WITNESS: We had -- We had in Alternate Site, I
10   mean, thousands of customers that -- You know, these
11   organizations are interested in it, sure, but obviously
12   we had thousands and thousands of customers who never
13   asked such a question, either, you know.
14   Q   Would you agree that the GPOs such as Gerimed and
15 PBI and MHA and Optioncare, those are the big customers that
16 really drive volumes, correct?
17       MS. CITERA: Objection to form.
18       THE WITNESS: That drive volumes, that have the most
19   opportunity for Abbott to get volume, right --
20       MR. ANDERSON: Yes.
21       THE WITNESS: -- none of those - right -- The GPOs
22   themselves create no demand.
23   Q   I know.  But they provide an opportunity for Abbott
24 to sell in greater volume, correct?
25   A   That's correct.

Page 597

1       MS. CITERA: Objection to form.
2       THE WITNESS: That's fair.
3    Q   And so if those are some of the larger customers
4  and they're the ones that are being very explicit in their
5  request of best spread, that tells you that the marketplace
6  was interested in best spread, correct?
7       MS. CITERA: Objection to form.
8       THE WITNESS: One could assume that.
9    Q   And that's a fair assumption based on your
10 experience, correct?
11       MS. CITERA: Objection to form.
12       THE WITNESS: As I indicated just a moment ago that
13   I did not understand - know that the interest in this
14   issue was that high.
15   Q   I know.  But I'm saying based on your experience
16 now in ten years of management plus your review of these
17 documents that were exchanged between Abbott and customers,
18 that's a fair assumption.
19       MS. CITERA: Objection to form.
20       THE WITNESS: That the customers were interested in
21   it would be a fair assumption, yes.
22   Q   Okay.
23       Now along those lines, I've got a document here,
24 it's been marked previously as Exhibit 293.
25       (Whereupon, Robertson Exhibit No. 51 was marked for

Page 598

1    identification.)
2    Q   Please review what's been marked as Exhibit 51,
3  also marked Exhibit 293, Mr. Robertson.
4       MS. CITERA: Jarrett, are you going to talk about a
5    specific page?
6       MR. ANDERSON: Yes.  Toward the back there's a page
7    that shows a - I think it's called, The Opportunity
8    Lost, or something like that - I'm doing that from
9    memory.
10   A   (Referring.)
11 BY MR. ANDERSON:
12   Q   Missed Opportunity Report.  It's page TXABT453409.
13   A   (Referring.)
14       Mm-hmm.
15   Q   Now I realize, Mr. Robertson, that we've shown
16 several documents about this, and hopefully we can move
17 quickly through this.
18       Do you agree this appears to be a Powerpoint
19 presentation by PBI to Abbott Laboratories?
20       MS. CITERA: Objection to form.
21       THE WITNESS: I don't have any idea of the genesis
22   of this, I mean, who generated it or --
23   Q   Well, looking at the title, do you agree --
24   A   It says, PBI, yeah.
25       I mean, this specific document you're talking about

60e5726b-bc69-475a-8c51-36591ea203d2

Page 599

1 here (indicating) --
2   Q   Yes.
3   A   -- 409, it appears to have been generated by PBI.
4   Q   And then the greater document, if you look at the
5 cover page of Exhibit 51 reads, Presentation to Abbott
6 Laboratories By Pharmaceutical Buyers, Inc., correct?
7   A   Right.
8   Q   Okay.
9       Now flipping to that page that we've focused on
10 titled, Missed Opportunity Report, do you see there a column
11 titled, Spread?
12   A   Yes.
13   Q   And does this appear to be another tool that was
14 available to providers to identify pharmaceutical products
15 that had best reimbursement spreads?
16     MS. CITERA:  Objection to form.
17     THE WITNESS:  Could it be used for that purpose?  I
18 guess.
19   Q   Are you familiar with these types of reports?
20     MS. CITERA:  Objection to form.
21     THE WITNESS:  These types of reports?
22     MR. ANDERSON:  Yes.
23     THE WITNESS:  No.  I mean, I may have seen one.  But
24 am I familiar with them?  I mean, I can't tell you that.
25 BY MR. ANDERSON:

Page 600

1   Q   Now if you could flip to the second to last page --
2   A   When was this generated?  Does it have any time?  I
3 mean --
4   Q   We might be able to locate that for you,
5 Mr. Robertson.
6       Look at the second to last page.
7   A   Right.
8   Q   Do you see there that it's titled, Key Issues
9 Facing PBI/Abbott?
10   A   Mm-hmm.
11   Q   And then the very first bullet is, AWP Impact,
12 correct?
13   A   Mm-hmm.
14   Q   Does this look like another example of customers
15 communicating to Abbott about how AWPs are important to
16 customers?
17     MS. CITERA:  Objection to form.
18     THE WITNESS:  Well, I can't determine that.  I mean,
19 they could be complaining - I don't know what they're
20 complaining.  They could be complaining our AWPs are too
21 low, they could be complaining about a lot -- I mean, I
22 don't know specifically what they're complaining about.
23   Q   Do you recall that sometime in 2001 Abbott lowered
24 some AWPs?
25   A   2001, I was done.

Page 601

1   Q   I know.
2   A   I don't remember.
3   Q   Okay.  Well, you were asking -- I'll start over.
4       You've mentioned that customers might be
5 complaining about low reimbursement.
6       Did you ever experience that?
7   A   You know, specifically and in the mechanism how it
8 worked, customers were always complaining about
9 reimbursement - I mean constantly.
10       Generally they were complaining about falling
11 reimbursement at the insurance company level.
12   Q   And what did they expect Abbott to do about it?
13   A   I don't know.
14     MS. CITERA:  Objection to form.
15     THE WITNESS:  Obviously when they say, Well, we've
16 had our prices cut by 20 percent, they expect you to
17 take a 20 percent hit.
18   Q   On the market price.
19   A   Yeah.
20   Q   Did they ever ask that Abbott raise AWPs or list
21 prices?
22   A   Not to my knowledge; no.
23       But some of our customers can make whining an art
24 form.
25   Q   All right.

Page 602

1     MS. ST. PETER-GRIFFITH:  As you're mixing up the
2 documents there - not mixing them up - sorting through
3 them, I just want to state we actually have until 5:30
4 before the building closes, so we've got time.
5     MS. CITERA:  Well, I need to -- I was under the
6 understanding that we were done at 4:30, so I have a car
7 coming at 4:45.
8     MS. ST. PETER-GRIFFITH:  Oh, my.  I'm sorry.
9     MS. CITERA:  I could --
10     MR. ANDERSON:  Well, let's go off the record real
11 quick.
12     VIDEOGRAPHER:  Going off the record.
13     (Discussion off the record.)
14     (Whereupon, Robertson Exhibit No. 52 was marked for
15 identification.)
16     VIDEOGRAPHER:  Back on the record.
17 BY MR. ANDERSON:
18   Q   Mr. Robertson, if you could take a moment to flip
19 through what's been marked as Exhibit 52 also marked as
20 Exhibit 485.
21   A   (Witness complies.)
22   Q   Are you familiar in any way with the general format
23 of the main body of this exhibit?
24   A   It looks the same -- You know, same thing, which I
25 would assume that they have for every supplier.

60e5726b-bc69-475a-8c51-36591ea203d2

Page 603

1    Q   It's your belief that this type of spread and AWP
2   analysis reflected in the Exhibit 52 was probably done by
3   PBI for all the manufacturers that it --
4    A   Well, this one covers us --
5        MS. CITERA:  Objection to form.
6        THE WITNESS:  -- but we're probably not one of the
7   only ones for which it was done.
8    Q   Right.
9        There's no reason to believe that only Abbott had
10  its AWPs and spread analyzed by PBI, correct?
11   A   That's correct.
12       MS. CITERA:  Objection to form.
13   Q   And Abbott's competitors likely had their AWPs and
14  contract prices analyzed by PBI, correct?
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  I don't know that, but I can't
17  understand why we would be the only one.
18   Q   And so to the extent Abbott had a spread advantage
19  over its competitors, PBI would be aware of that, correct?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  If they had the data on everyone, I
22  assume that they could.
23   Q   Which you assume they did, correct?
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  Right; that they had the data on

Page 604

1   everyone.
2    Q   What month did you leave in 2000 from Abbott?
3    A   June.
4    Q   Were you still working afterward but on some type
5   of retirement timeline, or were you out the door in June?
6    A   No.  My last day at work was June 30th.
7    Q   June 30th.
8        Right before you left, did you have any involvement
9   in analyzing the impact of new AWP information that was
10  being published by First Data Bank on Abbott's business?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  I don't remember that.
13   Q   Do you have any memory whatsoever about something
14  known as the DOJ AWPs?
15   A   Department of Justice, is that what it is?
16   Q   Yes, sir.
17   A   No, I don't remember -- I don't recall it.  I may
18  have, I just don't remember it.
19   Q   Do you have any memory whatsoever about something
20  known as the Ven-A-Care AWPs?
21   A   Ven-A-Care?
22   Q   Yes.
23   A   No.
24       (Whereupon, Robertson Exhibit No. 53 was marked for
25  identification.)

Page 605

1    Q   Quickly, Mr. Robertson, if you could take a look at
2   what's been marked as Exhibit 53.
3    A   Mm-hmm.
4    Q   The first page of Exhibit 53 also marked as Exhibit
5   592 in the Sellers' deposition appears to be an e-mail
6   between Lynn Leone and Mike Sellers dated June 16th, 2000,
7   correct?
8    A   Yes.
9    Q   And this was just a couple of weeks before your
10  departure from Abbott Alternate Site, correct?
11   A   I already had my pack on.
12   Q   And in reviewing this, do you see that it appears
13  Miss Leone's conducting some analysis for Mr. Sellers?
14       MS. CITERA:  Objection to form.
15       THE WITNESS:  Of three products, it appears.
16   Q   And then when you flip to the three products, the
17  three products are vancomycin, 1 gram, flip top vial, the
18  sodium chloride irrigation, 500 ml, and the dextrose
19  Add-Vantage vial, correct?
20   A   Right.
21   Q   And then each of those is broken down by Medicare,
22  Medicaid and total estimated government sells percentages,
23  correct?
24   A   Correct.
25   Q   Do you have any idea why Abbott would be interested

Page 606

1   in analyzing the sales to those sectors of the market?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  Why they would be interested in
4   examining sales by market segment?
5        MR. ANDERSON:  Yes.
6        THE WITNESS:  We examined sales by segment, I guess,
7   pretty frequently; how much was in home infusion
8   companies, how much was in nursing homes, how much was
9   in various and sundry places.
10       And to examine this by reimbursement source wouldn't
11  be, say, typical of something you would do.
12  BY MR. ANDERSON:
13   Q   Why would Abbott analyze sales by reimbursement
14  source?
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  By reimbursement source?
17       THE WITNESS:  Well, if you want to know how well
18  you're doing within that particular area or is one area
19  grossly under-represented.
20       If the total estimate government sales in the United
21  States - if they reimbursement 37 percent of the health
22  care, okay, and our sales, they represent 23 percent,
23  we're missing an opportunity somewhere.
24   Q   How would Abbott go about maximizing the
25  reimbursement of its products in Medicaid?

60e5726b-bc69-475a-8c51-36591ea203d2

Page 607

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  I'm not talking about reimbursement,
3   I'm talking about sales and market share, what the total
4   opportunity is versus what our actuals are.
5      And one would have to understand that analyzing and
6   say, Why aren't we doing real well in government
7   accounts?  What's the reason?  Don't we have the product
8   offerings that they want?  What are the reasons we're
9   not doing real well?
10   Q    Well, you'll agree, won't you, that Abbott doesn't
11  actually sell product directly to Medicaid programs.
12     MS. CITERA:  Objection to form.
13     THE WITNESS:  Sell to Medicaid programs?
14     No.  We sell to end users customers, ASPS sells to
15  end users.
16   Q    Right.
17     And then those providers such as pharmacies, in
18  turn, get reimbursed by payors including Medicaid, correct?
19   A    Right.
20   Q    Why would Abbott seek to analyze the percentage of
21  its products being reimbursed by Medicaid?
22     MS. CITERA:  Objection to form.
23     THE WITNESS:  Well, I don't know understand if
24  that's what they're doing here.
25   Q    Will you tell me what they are doing?

Page 608

1   A    (Referring.)
2      Total sales were $4.3M, you see that?
3   Q    Yes.
4   A    Medicare is 8.9 percent of sales; Medicaid is 13.9
5   percent of sales of vanco, and total government by
6   reimbursement is 22 percent.
7      That means that - what's the number - 77 percent of
8   our reimbursement is coming from private insurers.
9   Q    Or Medicare -- Oh, no, you're right, it's private.
10   A    No.  It's private.  77 percent of our reimbursement
11  is coming from insurers.
12     So then when we look at that and say, Wait a
13  minute, 37 percent of the health care dollars, 70 percent of
14  the dollars in nursing homes are government; there a skew
15  there.  Let's -- You know, that's what you would use it for
16  to see if your market share reflects overall market
17  opportunity or whether on a segment-by-segment basis you're
18  not doing very well.
19   Q    And how could Abbott go about increasing the
20  reimbursement percentage --
21     MR. ANDERSON:  Strike that.  I'll rephrase.
22  BY MR. ANDERSON:
23   Q    How could Abbott go about increasing its percentage
24  of its total sales for vanco, for instance, that are going
25  to providers who ultimately get reimbursed by Medicaid?

Page 609

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  Okay.
3      What segments of the market are most served by
4   Medicaid?  Nursing homes.  Are we calling on the nursing
5   homes?  Are we seeing the doctors?  Are we creating
6   demand?  Are we selling our entire product line, you
7   know, to the nursing home community, the nursing home
8   market.
9      Because your share of the market should be at
10  least -- I mean, we wanted to get high market share so
11  if it's 38 percent of the opportunity, why would 22
12  percent of our sales be there?  What are we doing wrong
13  and how can we improve?  It's --
14   Q    And then you could, in turn, market more heavily to
15  the types of providers that get reimbursed by Medicaid,
16  correct?
17   A    Reimbursement is --
18     MS. CITERA:  Objection to form.
19     THE WITNESS:  Reimbursement is irrelevant.
20     What I'm saying is why are we not doing well in this
21  specific market segment?  Maybe we don't call on them.
22     That has nothing do with reimbursement.
23   Q    I hear you but --
24     THE WITNESS:  Maybe we don't have the proper product
25  offerings for them - they're too big, they're too small.

Page 610

1   Maybe the whole nursing home market went to coonaloans
2   (sp.) because they don't like sticking needles in old
3   people.
4      We've got to find that stuff out.
5   Q    And looking at the Medicaid or Medicare
6   reimbursement as a percentage of total sales would assist
7   Abbott in identifying those marketplace issues?
8      MS. CITERA:  Objection to form.
9      THE WITNESS:  Total sales reimbursement is a
10  reflection - or, actually, let me just say this
11  correctly:  People get paid.  When you add up what
12  people get paid, that makes a market size.
13  Reimbursement cannot be a relevant issue.
14     I mean, I think your point is that reimbursement
15  drives everything, and my contention is that it does not.
16   Q    Oh, I'm not trying to make that point, sir --
17   A    Oh, okay.
18   Q    -- I'm just trying to ask you to explain why Abbott
19  would go to the trouble of analyzing --
20   A    I think it's --
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  -- very common practice to understand
23  your business by market segment, type of customer,
24  reimbursement, evaluate that opportunity and make sure
25  that you're utilizing - in other words, are we doing

60e5726b-bc69-475a-8c51-36591ea203d2

Page 611

1    things right, are we doing the right things, are we
2    calling on the right people.
3       Q   Thank you.
4       Do you have any understanding of why these three
5    particular products noted on the second page of Exhibit 53
6    would have been selected for such an analysis?
7       MS. CITERA: Objection to form.
8       THE WITNESS: No. It's not big dough.
9       Q   Were those three products known to be utilized by
10   providers who would get reimbursed by Medicare or Medicare?
11      A   Vanco's an antibiotic, irrigation solutions, they
12   would all use, and dextrose solution is just, you know, an
13   I.V. solution.
14      But I mean these aren't big numbers. I mean, the
15   Home Infusion product business was probably a - I don't want
16   to - maybe 125, $130M.
17      Vancomycin's $4.3M; why it would be singled out, I
18   have no idea. I don't know.
19      But why another one that's $400,000 would be
20   singled out.
21      Q   Do you understand those three products may have
22   been products for which the Department of Justice through
23   First Data Bank published lower AWPs in May of 2000?
24      MS. CITERA: Objection to form.
25      THE WITNESS: I don't know that.

Page 612

1       Q   One last exhibit, Mr. Robertson.
2       (Whereupon, Robertson Exhibit No. 54 was marked for
3       identification.)
4       Q   In looking at Exhibit 54, also marked as Sellers
5    Exhibit 587, do you agree that this appears to be an e-mail
6    from Lynn Leone to Mike Sellers where she attaches a
7    document titled, Revised AWP Impact Analysis?
8       MS. CITERA: Objection to form.
9       THE WITNESS: Revised AWP Impact; that's what it
10   says.
11      Q   Do you have any memory whatsoever about Abbott's
12   awareness that changes in AWP may impact sales?
13      MS. CITERA: Objection to form.
14      THE WITNESS: In a general sense, any change of
15   reimbursement can impact sales.
16      Q   And was it true that Abbott was aware that a
17   decrease in AWPs on its products may cause there to be lost
18   sales?
19      MS. CITERA: Objection to form.
20      THE WITNESS: A decrease in AWPs or a decrease in
21   reimbursement?
22      Q   Well, I'll address that in your comment.
23      Is it true that Abbott understood that to the
24   extent decreased AWPs caused there to be decreased
25   reimbursement on Abbott products, Abbott would lose some

Page 613

1    sales of its products?
2       MS. CITERA: Objection to form.
3       THE WITNESS: Not necessarily.
4       Q   What reasons could exist that would prevent Abbott
5    from losing sales.
6       A   That everybody was at parity with AWP and they all
7    went down, then the customers could ask for a decrease in
8    price because it's not necessary for anybody to lose sales.
9       Q   What if in a given multisource competitive class
10   some manufacturers' AWPs came down but other manufacturers'
11   AWPs did not, would that provide a sales disadvantage for
12   Abbott if their AWPs came down?
13      MS. CITERA: Objection to form.
14      THE WITNESS: I'm sorry. I thought we were dealing
15   with this document where everybody's came down.
16      Q   In reading Exhibit 54, do you understand that all
17   the AWPs came down?
18      A   Yeah.
19      And you said the DOJ - what is it - that all the
20   AWPs were coming down, was it not?
21      All AWPs for everyone. This is a market
22   phenomenon.
23      Q   You're referencing Point No. 1?
24      A   Yeah.
25      I ignored the May changes completely for Abbott and

Page 614

1    competitors and reviewed the proposal at WAC+5 against old
2    AWPs for everyone.
3       I mean, old AWPs.
4       Q   And then Miss Leone continues and says, This may be
5    part of the problem. Should I continue to take that into
6    consideration?
7       A   What I see frankly, sir, is an analysis here and a
8    ten point disclaimer here.
9       The analysis is a bunch of baloney.
10      Q   Do you have any memory now that you've reviewed the
11   last couple of exhibits about any publication of AWPs in the
12   summer of 2000 that negatively impacted Abbott sales?
13      MS. CITERA: Objection to form.
14      THE WITNESS: I don't recall that.
15      Q   Do you recall any perception by Abbott at any time
16   that lower AWPs on its products may cause it a competitive
17   selling disadvantage?
18      MS. CITERA: Objection to form.
19      THE WITNESS: Our -- As I recall at that time, it
20   was Abbott's AWPs versus those of other, it a complete
21   shuffle in reimbursement going to acquisition cost as
22   adversed to AWP.
23      Actually, what do you pay for this, and the people
24   would be reimbursed based upon acquisition cost, which
25   is probably the way it should work versus an artificial

60e5726b-bc69-475a-8c51-36591ea203d2

Page 615

1    number.
2    Q   Did you understand why there was some movement in
3    2000 toward setting reimbursements based on provider actual
4    acquisition cost?
5        MS. CITERA:  Objection to form.
6        THE WITNESS:  My opinion?  I can't jump into the
7    heads of those individuals.
8        But determining reimbursement based on actual cost
9    versus an estimated cost would seem to me to be a better
10   idea.
11   Q   How did you gain that understanding?
12   A   Anytime you can base an estimate on actual numbers
13   versus estimated numbers, it's a better idea.
14   Q   No.  I'm saying back in 2000, how did you become
15   aware that there was this movement toward changing
16   reimbursement?
17   A   I think it was when we replaced Calcijex with
18   Zemplar, it's a better drug, and then the whole subject of
19   how a drug gets reimbursed through Medicare, that process,
20   and that they were going to - that they wanted to go to
21   actual acquisition cost or acquisition cost minus a
22   percentage of whatever; that they were going to go to actual
23   numbers as adversed to some estimated number or AWP.
24       I think that's when the conversation came up.
25   Q   With whom?

Page 616

1    A   With folks in our Renal Care business and others
2    about, you know, how is the actual reimbursement going to
3    take place.
4    Q   And who outside of Abbott was involved in these
5    conversations?
6        MS. CITERA:  Objection to form.
7        THE WITNESS:  Outside of Abbott?
8    Q   Yeah.
9        You're talking about internal, purely internal
10   discussions at Abbott or was --
11   A   No.  I didn't think there were some of the Medicare
12   organizations, specifically, South Carolina and, perhaps,
13   Texas were talking about going to a different way of
14   reimbursing.
15   Q   For - what's it called, Zemplar?
16   A   Yeah; for Zemplar or for Calcijex.  For all of --
17   Q   And Zemplar is Z-e-m-p-l-a-r?
18   A   Right.
19       (Continuing) -- for all the drugs that they paid
20   for.
21       Going on actual acquisition cost was probably a
22   much better idea.
23   Q   And was this right before you had retired?
24   A   Just before I left, these conversations.
25       Zemplar was launched in the year that I left.

Page 617

1    Q   Were you part of these conversations?
2    A   They were within our group in the -- The Renal Care
3    group had these conversations of changes proposed in
4    reimbursement; yeah.
5    Q   I'm asking, sir, were you part of the conversations
6    between Abbott and --
7    A   Oh, no.  No.  No.  No.  Between South Carolina?
8    Q   Yeah.
9    A   No.
10   Q   Okay.
11       Who was?
12   A   I think -- It was Renal, so maybe Susan Rodriguez,
13   she was a GM, or Mike Heggie or someone was part of those.
14   Q   What about Lorraine Mershimer?
15   A   Lorraine Mershimer?  She may have been out of Renal
16   Care by then.  I think she was out of Renal Care by that
17   time.
18       Susan Rodriguez took Lorraine Mershimer's job.
19   Q   Do you recall Ginny Tobiason or Virginia Tobiason
20   being involved at all.
21   A   No.  She went to corporate by that time.
22   Q   Okay.
23       MR. ANDERSON:  At this time I will pass the Witness,
24   and I appreciate your time here today.
25       MS. CITERA:  Well, as I've indicated off the record

Page 618

1    and somewhat on the record, it is now almost five
2    o'clock.
3        We've had two days of questioning and I'm being
4    passed the Witness at five o'clock, and I now was just
5    informed that we can stay until 5:30.
6        I'm not going to be able to finish my questions.
7    Not knowing that we were going to be able to stay until
8    5:30, I had a flight booked at 6:30, I have a car
9    waiting outside for me.
10       And so I am just going to say that we need to keep
11   the deposition open.  I would be happy to do it by
12   phone.
13       MR. STETLER:  Well, I reserve my right to whine
14   about it, but I'll work with everybody.
15       I just want to tell you my availability is going to
16   get really, really tight, so if we could do it by phone
17   that presents a much more realistic possibility.
18       MR. ANDERSON:  I'm in favor of phone.  The only
19   thing I would ask is to the extent we do it by phone
20   that it's an all or nothing proposition, except maybe
21   for you, Dave.  But if you're going to be present, Toni,
22   then I would like to be present and vice-versa.
23       MS. CITERA:  No.  But I would even be willing to
24   ship the exhibits because you've gone over a lot of
25   exhibits and I want to go back over them so I would ship

60e5726b-bc69-475a-8c51-36591ea203d2

Page 619

1   him a copy so that he has them in front of him.  So I'm
2   more than willing to do that.
3       MR. ANDERSON:  We'll try to work on the logistics.
4       MS. CITERA:  Okay.
5       MS. ST. PETER-GRIFFITH:  And the United States has
6   no objection to doing it by phone, either.
7       And, you know, to the extent that we can help
8   facilitate something down here in this office, we're
9   happy to work through that as well.
10      MS. CITERA:  That would be great.  Thank you.
11      MR. ANDERSON:  And at least I, on behalf of the
12  Relator, continue to reserve my right to further
13  questions after your questioning and supplement
14  production that directly impacts the questioning of this
15  Witness.
16      MS. ST. PETER-GRIFFITH:  The United States asserts
17  the same reservation.
18      MR. SISNEROS:  Same reservation for California.
19      MS. NESBITT:  Same reservation for Arizona and MDL.
20      VIDEOGRAPHER:  That concludes the deposition.
21  The time is 4:58 p.m.
22      (Whereupon, at about 4:58 p.m., the deposition was
23  adjourned.)
24      (The Witness waived reading and signing the
25  transcript.)

Page 620

1   STATE OF FLORIDA   )
2   COUNTY OF LEE      )
3
4       I, Lisa L. Rios, Court Reporter, and Notary Public,
5   State of Florida at Large, do certify that I was authorized
6   to and did stenographically report the foregoing deposition
7   of DONALD C. ROBERTSON, and that the foregoing typewritten
8   transcript, consisting of pages 1 through 616, is a true
9   record of the testimony given by the witness.
10      I further certify that I am not a relative, employee,
11  attorney or counsel of any of the parties, nor am I a
12  relative or employee of any of the parties' attorney or
13  counsel connected with the action, nor am I financially
14  interested in the action.
15
16
17      Dated this 24th day of October, 2007.
18
19
20      _____
        Lisa L. Rios
21      Court Reporter
        Notary Public
22      State of Florida at Large
23
24
25

Page 621

1
2           CERTIFICATE OF OATH
3
4   STATE OF FLORIDA   )
5   COUNTY OF LEE      )
6       I, Lisa L. Rios, Court Reporter, and Notary Public,
7   State of Florida at Large, certify that DONALD C. ROBERTSON
8   appeared before me and was duly sworn.
9       WITNESS my hand and official seal this 24th day of
10  October, 2007.
11
12
13      _____
        Lisa L. Rios
14      Court Reporter
        Notary Public
15      State of Florida at Large
16
17
18
19
20
21
22
23
24
25