# Exhibit 126

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
                          Chicago, IL

Page 1

                    IN THE UNITED STATES DISTRICT COURT

                  FOR THE NORTHERN DISTRICT OF ILLINOIS

                           EASTERN DIVISION


IN RE:  PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE          )

LITIGATION,                      )  Case No.

        Plaintiffs,              )  0112257-PBS

                                 )

  vs.                            )HIGHLY CONFIDENTIAL

                                 )

ABBOTT LABORATORIES, INC., and   )

HOSPIRA,                         )

        Defendants.              )

-------------------------------x


        The oral and videotaped deposition of

MICHAEL W. SELLERS, called by the Plaintiffs for

examination, taken pursuant to the Federal Rules of

Civil Procedure of the United States District Courts

pertaining to the taking of depositions, taken before

Janice M. Kocek, CSR, a Notary Public within and for

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 2

1   the County of Cook and State of Illinois and a
2   Certified Shorthand Reporter of said State, taken at
3   77 West Wacker Drive, Suite 3500, Chicago, Illinois,
4   on the 1st day of November, 2007, at the hour of 9:20
5   o'clock a.m.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 4

1   APPEARANCES: (Continued)
2
3   FOR THE RELATOR:
4       MR. C. JARRETT ANDERSON
5       Anderson LLC
6       1300 Guadalupe, Suite 103
7       Austin, Texas 78701
8
9   FOR THE DEFENDANTS ABBOTT LABORATORIES INC.
10  AND HOSPIRA, INC.:
11      JONES DAY
12      MS. TINA M. TABACCHI
13      77 West Wacker Drive
14      Suite 3500
15      Chicago, Illinois 60601-1692
16
17
18
19
20
21
22

Page 3

1   APPEARANCES:
2
3   FOR THE PLAINTIFF UNITED STATES OF AMERICA:
4       MS. ANN M. ST.-PETER-GRIFFITH
5       Assistant U.S. Attorney
6       United States Attorney's Office
7       Southern District of Florida
8       99 N.E. Fourth Street
9       Miami, Florida 33132
10
11  FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
12      MR. ELISEO SISNEROS
13      Deputy Attorney General
14      BMFEA
15      Bureau of Medi-Cal Fraud & Elder Abuse
16      State of California Department of Justice
17      110 West A Street #1100
18      San Diego, California 92101
19
20
21
22

Page 5

1                 I N D E X
2
3   WITNESS:  MICHAEL W. SELLERS              PAGE
4   Direct Examination by Ms. St. Peter-Griffith    10
5   Direct Examination by Mr. Anderson           230
6
7
8
9              E X H I B I T S
10  NUMBER                        MARKED
11  Exhibit Sellers 001, Deposition transcript      62
12  Exhibit Sellers 002, Emails              158
13  Exhibit Sellers 003, Emails              161
14  Exhibit Sellers 004, Email from Jerry Eickhorn  240
15  Exhibit Sellers 005, Memo              247
16  Exhibit Sellers 006, Spreadsheet titled Exh. F  274
17  Exhibit Sellers 007, Interoffice correspondence 284
18  Exhibit Sellers 008, Hospital Products
19           Division Procedure        313
20  Exhibit Sellers 009, Catalog Price Adjustment  318
21
22

2  (Pages 2 to 5)

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Page 6

1           PROCEEDINGS
2           THE VIDEOGRAPHER:  This is Anthony
3   Micheletto representing Henderson Legal Services.
4   I am the operator of this camera.  This is the
5   videotaped deposition of Mike Sellers as being
6   taken pursuant to Federal Rules of Civil Procedure
7   on behalf of the Plaintiff.
8           We are on the record November 1st, 2007.
9   The time is 9:20 a.m., as indicated on the video
10  screen.  We are at the offices of Jones Day, 77
11  West Wacker Drive, Chicago, Illinois.
12          This case is captioned in re
13  Pharmaceutical Industry Average Wholesale Price
14  Litigation, Case Number 0112257-PBS.
15          Will you the attorneys please identify
16  themselves for the video record?
17          MS. ST. PETER-GRIFFITH:  Anne St.
18  Peter-Griffith from the United States Attorneys
19  Office, Southern District of Florida, on behalf of
20  the United States.
21          MR. ANDERSON:  Jarrett Anderson for the
22  Realtor.

Page 7

1           MR. SISNEROS:  Eliseo Sisneros, Deputy
2   Attorney General, State of California.
3           MS. TABACCHI:  Tina Tabacchi on behalf of
4   the Defendants.
5           THE VIDEOGRAPHER:  The court reporter
6   today is Janice Kocek from Henderson Legal
7   Services, Washington, D.C.
8           Please swear in the witness.
9           (Witness sworn.)
10          MS. ST. PETER-GRIFFITH:  Before we get
11  started, Mr. Sellers, my name is Anne St.
12  Peter-Griffith.  I'm from the U.S. Attorneys
13  Office, as I just indicated earlier.
14          What we'd like to do is get a
15  stipulation on the record as between Counsel.
16          Sir, in early 2007 you had, I
17  believe, three days of deposition; and what we
18  would like to do is basically incorporate that
19  deposition testimony -- that prior deposition
20  testimony into the record here today as if it is
21  given in the MDL case that was given in the State
22  of Texas.

Page 8

1           We understand that Counsel will be
2   preserving all objections raised, as well as that
3   deposition was given in part in his individual
4   capacity, as I read, and also in part as a 30(b)(6)
5   representative.
6           You're here today as, as a -- testifying
7   in your individual capacity.  That's how you were
8   subpoenaed.  So it would be the Government's
9   position that we're not adopting the 30(b)(6)
10  testimony and just keeping it as his individual
11  testimony.
12          Is that fine, Tina?
13          MS. TABACCHI:  Just to clarify, when you
14  say the MDL case that you're referring to the
15  Department of Justice case and the State of
16  California's case and that the basis for the
17  stipulation is your representation that it's your
18  intention not to revisit areas of testimony that
19  Mr. Sellers has already given.  Though, you do
20  intend to follow-up, you do not intend to re-plow
21  old ground and that we were under some limitations
22  based on the Texas rules in terms of the objections

Page 9

1   that we asserted and that we have reserved all
2   objections.
3           I, think we're all on the same page.
4           MR. ANDERSON:  As a for instance, if you
5   assert an objection form, that objection form
6   preserves all objections that you may have to that
7   question but it doesn't preserve an objection to
8   every single question.
9           MS. TABACCHI:  Well, we can debate this
10  later.
11          MS. ST. PETER-GRIFFITH:  Why don't we
12  discuss that off record.  I mean, if there are,
13  there are things you feel you need to assert an
14  objection to, under the federal rules we can talk
15  about that at a later point in time.
16          MS. TABACCHI:  Fine.
17          MS. ST. PETER-GRIFFITH:  Part of it is,
18  you know, we just don't want to have to reask some
19  of the questions.  Obviously there are certain
20  topics that transcend all these cases that we're
21  going to delve into, but my focus is not to revisit
22  a lot of the exhibits and to ask questions more in

3 (Pages 6 to 9)

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 10

1  a narrative form as opposed to, you know, specific
2  questions that were asked more in leading form.
3       MS. TABACCHI:  Well, obviously our, our
4  goal is to streamline this process and to make it
5  less burdensome for Mr. Sellers who has been
6  deposed a number of times and to be as efficient as
7  possible. We can go forward.
8       MS. ST. PETER-GRIFFITH:  That's fine.
9          MICHAEL W. SELLERS, called as a
10 witness herein, having been first duly sworn, was
11 examined and testified as follows:
12          DIRECT EXAMINATION
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  Sir, can you state your full name,
15 please?
16     A.  Michael W Sellers.
17     Q.  Mr. Sellers, where do you live?
18     A.  I live in Libertyville, Illinois.
19     Q.  Sir, I know the answer to this question,
20 but have you been deposed before?
21     A.  Yes.
22     Q.  Approximately how many times?

Page 11

1      A.  Six or seven, I think.
2      Q.  And were all those depositions related to
3  AWP litigation?
4      A.  No.
5      Q.  Okay. Why don't we just briefly go
6  through your prior deposition history.  We don't
7  have to revisit all the AWP, but I just want to
8  make sure that we capture everything.
9      A.  I was deposed back in the early '80s in a
10 follow-up to a, a contract audit that the OIG had
11 made.
12     Q.  When you say OIG, was that United States
13 HHS OIG?
14     A.  Yeah -- no, it was the DOD OIG.  I'm
15 sorry.
16     Q.  Okay.  And what, what audit was that
17 pertaining to?
18     A.  It, it was pertaining to a, a federal
19 contract.  It was a post-completion audit on a
20 federal contract.
21     Q.  What, what was your next deposition?
22     A.  My next deposition was in Texas on this

Page 12

1  case.
2      Q.  Okay.  Was that a statement under oath --
3      A.  Yes.
4      Q.  -- do you recall?
5          Okay.  Or an evaluation under oath,
6  something like that?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  It was, it was something
9  under oath.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  And were you there testifying in
12 your individual capacity or as a representative of
13 Abbott?
14     A.  I, I believe at that time we were, we
15 were answering questions that the State of Texas
16 had as representatives of Abbott.
17     Q.  When you say "we," was there -- did you
18 -- was this a joint deposition or was there more
19 than one individual who testified?
20     A.  Two of us went down there, myself and
21 Lynn Leone.
22     Q.  Okay.  And then your next testimony under

Page 13

1  oath?
2      A.  I, you know, I -- I don't remember the
3  order, but it -- you know, I've --
4      Q.  Was there a West Virginia?
5      A.  There was, there was a -- there was a
6  West Virginia.  There was the MDL case.
7      Q.  Okay.
8      A.  Texas two or three times.
9      Q.  Three days of deposition for Texas?
10     A.  Yeah.
11     Q.  Any -- and those all are AWP?
12     A.  There was a West  -- I think there was a
13 West Virginia, I believe.
14     Q.  Okay, okay.  Other than those, do you
15 recall any other times when you've testified under
16 oath?
17     A.  No.
18     Q.  Have you given any testimony in court?
19     A.  No.
20     Q.  Okay.  Have you signed any affidavits
21 that you can recall?  Probably many?
22     A.  Signed a number of affidavits with regard

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 14

1   to responses to interrogatories, yes.
2       Q.  Okay.  Was that all involved --
3   concerning AWP litigation?
4       A.  Yes.
5       Q.  And were you signing in your individual
6   capacity or on behalf of the corporation?
7           MS. TABACCHI:  Object to the form.
8           THE WITNESS:  You'd have to ask the
9   attorney that.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  Okay.  I can't ask her, so.
12          Other than what you've discussed, is
13  there any other testimony that you can recall
14  giving or statements under oath?
15      A.  No.
16      Q.  Sir, I know you've done this a number of
17  times, but I'm going to just refresh you as to kind
18  of the ground rules for taking deposition.
19          I'm going to ask questions.  You need to
20  before answering my questions if you could pause
21  just briefly in the event that Ms. Tabacchi wants
22  to assert an objection, that way we're not all

Page 15

1   talking over each other.
2       A.  Okay.
3       Q.  If you don't understand a question that
4   I'm asking, please tell me because otherwise, I
5   will deem your answer responsive to my question and
6   so that we're all on the same page.
7           If you don't understand something, please
8   let me know, or if you need me to clarify, please
9   let me know.  If you need to take a break, just
10  speak up and we can take a  break.  My only request
11  is that we not take a break while a question is
12  pending.
13          Is there any reason, sir, that you can't
14  give a deposition here today?
15      A.  No.
16      Q.  Okay.  You're not taking any medication
17  or anything?
18          MS. TABACCHI:  Object to the form.
19  You're asking if he's taking any medication that
20  affects his testimony?
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  That would cause you -- that affects your

Page 16

1   ability, that affects your --
2       A.  No.
3       Q.  Sir, have you had any conversations
4   concerning your testimony here today other than
5   with Counsel?
6       A.  In preparation --
7           MS. TABACCHI:  Objection to the form.
8           THE WITNESS:  In preparation for this
9   deposition?
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  Yes.
12      A.  No.
13      Q.  And sir, are you represented here today
14  by Counsel?
15      A.  No well.
16          MS. TABACCHI:  That's okay.
17          MS. ST. PETER-GRIFFITH:  Tina, can you,
18  can you just clarify as to who you're here
19  appearing for today?
20          MS. TABACCHI:  I am here today on behalf
21  of Abbott Laboratories and the witness.
22          MS. ST. PETER-GRIFFITH:  Okay.

Page 17

1   BY MS. ST. PETER-GRIFFITH:
2       Q.  Sir, have you -- since -- let me ask you
3   this:  Have you had any conversations with current
4   or former Abbott employees concerning -- other than
5   Counsel, I don't want to know about your
6   conversations with Counsel, concerning the AWP
7   litigation?
8           MS. TABACCHI:  Object to the form.
9           THE WITNESS:  Time frame?
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  Well, let's start in 2007.
12          MS. TABACCHI:  Object to the form.
13          THE WITNESS:  In 2007 I, I had some
14  conversations prior to the Texas depositions based
15  on the fact that I was representing the the,
16  corporation.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Okay.  Any other conversations?
19      A.  No.
20      Q.  Do you recall having a conversation with
21  Bruce Rodman?
22      A.  I had a conversation with Bruce Rodman.

5 (Pages 14 to 17)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 18

1    Q.  Was that --
2    A.  In 2007, yes.
3    Q.  And what did that -- was that
4  conversation concerning?
5    A.  It was concerning the identification of a
6  couple of homecare providers that I could contact.
7    Q.  And why were you seeking that information
8  from Mr. Rodman?
9        MS. TABACCHI:  I'm going to caution the
10  witness not to reveal any communications with
11  Counsel. If you need a break to discuss a privilege
12  issue, we can request an opportunity to discuss
13  that if you feel that your answer would reveal
14  attorney/client communications.
15       THE WITNESS:  I was, I was looking to
16  contact a couple of homecare people so I could put
17  them in contact with Jones, Day.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  And what was your conversation with Mr.
20  Rodman, to the best that you can recall?
21    A.  He is currently working with the National
22  Home Infusion Association in some capacity.  I'm

Page 19

1  not sure exactly what.  He also used to work in an
2  organization that I ran in Abbott.
3        So I was asking him if having been out of
4  the home infusion industry for a while myself, I
5  asked -- I was asking if he knew of some people in
6  the industry that would be willing to, to talk to
7  Abbott's legal counsel with regard to getting some
8  background on home infusion.
9    Q.  Why did you go to Mr. Rodman for that?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  Again, he in his current
12  capacity is interacting with those folks on a
13  regular basis.  And my prior work relationship with
14  Bruce, he seemed like a natural contact to make.
15    Q.  Did you initially make the contact or did
16  someone else make it for you?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  I believe that I did talk
19  to some, to some other people.  Where in particular
20  I, I don't recall at this point, but I, I left a
21  message for Bruce.  Whether the people I talked to
22  beforehand might have reminded me that Bruce was

Page 20

1  working for that organization, might have contacted
2  him, I don't know.
3    Q.  Do you know whether a Hospira employee
4  contacted Mr. Rodman to request whether he would
5  have time to confer with you?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  I'm not aware of that.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Did you speak to anyone in Hospira
10  concerning your, your initiation -- initiating
11  contact with Mr. Rodman?
12    A.  I probably did.
13    Q.  Do you know who?
14    A.  It was someone in the products sale
15  business.  I don't remember -- recall at this time
16  who.
17    Q.  And what did Mr. Rodman tell you in
18  response to your inquiry?
19    A.  I think we had a conversation, again,
20  like any two people that hadn't been in contact for
21  a few years, getting up to speed on where he was,
22  what he was doing, what -- where he was going.

Page 21

1        And I basically posed the question to him
2  of, you know, I was looking for some homecare
3  providers that were not large national corporations
4  and did he -- did he have any contacts that he
5  thought would be helpful.  And he ended up -- he
6  ended up getting back to me.  I don't think he, he
7  gave me those when I, when I talked to him
8  originally.
9    Q.  Okay.  And so he -- you had a follow-up
10  conversation with him?
11    A.  I believe he did get back to me with a
12  couple of names and contact information.
13    Q.  Do you know who those -- what -- who
14  those names were?
15    A.  One was Chris Maxim, who is with the
16  University of Michigan Homecare Program, and the
17  other was -- I'm trying to remember his first name,
18  but his last name is Robinson.  And he's with, I
19  believe, the Methodist Homecare Program in Memphis.
20    Q.  Okay.  And what did you do with this
21  information?
22    A.  I contacted both of those individuals.

6  (Pages 18 to 21)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 22

1    Q.  And what was your conversation with these
2  individuals?
3    A.  I, again, I knew both of those
4  individuals from my work in home infusion.  So
5  again, it was catching up on what had changed,
6  where each of us were at that point in time.  And
7  then I asked them if they would mind if I gave
8  their names to a legal firm who was looking for
9  some information with regard to reimbursement in
10  home infusion and they both agreed that they would
11  take the call.  So that was, that was it.
12    Q.  Did you have any other communications
13  with them?
14    A.  No.
15    Q.  Okay.  Do you know whether they ever were
16  in contact with Jones, Day?
17    A.  I don't know.
18    Q.  Are you -- did you have any further
19  conversations with Mr. Rodman?
20    A.  No.
21    Q.  Did you -- other than contacting Mr.
22  Rodman, have you had any other communications with

Page 23

1  current or former Abbott employees about the AWP
2  litigation other than incident to your
3  investigation for your 30(b)(6) deposition?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  In 2007, no.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Okay.  What about prior to 2007?
8    A.  I, I -- you know, I don't remember prior
9  to that, but --
10    Q.  Do you ever recall making other types of
11  inquiries or requests to current or former Abbott
12  employees concerning identifying individuals within
13  the medical community that could assist Abbott or
14  Abbott's counsel incident to the AWP litigation?
15    A.  No.
16    Q.  So this was the only type call that you
17  made, to Mr. Rodman?
18    A.  Yes.
19    Q.  What did you do to prepare for today's
20  deposition?
21    A.  I reviewed a document that had my most
22  recent affidavit attached to.  And I reviewed with

Page 24

1  Counsel --
2        MS. TABACCHI:  I'm going to caution the
3  witness not to reveal the substance of
4  communications with Counsel.
5      MS. ST. PETER-GRIFFITH:  Well, I'd like to
6  know the document he reviewed.
7        THE WITNESS:  It was, it was an
8  interrogatory with regard to some price changes
9  that were made in, I believe, 2001.
10  BY MS. ST. PETER-GRIFFITH:
11    Q.  And I don't want to know what you
12  communicated, but did you meet with Counsel in
13  preparation for deposition?
14    A.  Yes.
15    Q.  Okay.  Was that Miss Tabacchi?
16    A.  Yes.
17    Q.  Anybody else?
18    A.  No.
19    Q.  How long did you meet with Miss Tabacchi?
20    A.  Four, five hours.
21    Q.  When did you meet with her?
22    A.  Two days ago.

Page 25

1    Q.  Sir, you received a subpoena that we
2  served upon Counsel.  Did you look for any
3  documents responsive to the subpoenas -- the
4  documents subponaed?
5    A.  I, I don't believe I saw the subpoena.
6    Q.  So is it fair to say then you didn't
7  search for -- to see whether you personally had any
8  documents responsive to the subpoena?
9    A.  No.
10      MS. ST. PETER-GRIFFITH:  Tina, can we get
11  him to do that?
12      MS. TABACCHI:  Do you want to ask him if
13  he took any documents with him when he left?
14      MS. ST. PETER-GRIFFITH:  Well, I first
15  want to know whether he searched for any documents
16  that he might have had responsive to the subpoena.
17        THE WITNESS:  No, I did not.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Okay.  Sir, do you have any Abbott
20  documents that you took with you when you left?
21    A.  No.
22    Q.  Okay.  What about pertaining to your

7 (Pages 22 to 25)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.   HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 26

1   employment history, do you have documents that you
2   retained concerning your employment history with
3   Abbott or Hospira?
4       A.   I have --
5           MS. TABACCHI:  Object to the form.
6           THE WITNESS:  I have former resumes.
7   BY MS. ST. PETER-GRIFFITH:
8       Q.   Just former resumes?
9       A.   Uh-huh.
10      Q.   Anything else?
11      A.   No.
12      Q.   Okay.  Well, the former resumes are
13  responsive to the subpoenas; so I'd like to have
14  those produced, please.
15          Sir, do you have any retirement documents
16  or comparable information?
17          MS. TABACCHI:  Object to the form.
18          THE WITNESS:  I'm not sure what you mean
19  by "retirement documents."
20
21
22  BY MS. ST. PETER-GRIFFITH:

Page 27

1       Q.   Any documents pertaining to your
2   retirement, your profit sharing income, anything
3   like that?
4           MS. TABACCHI:  Object to the form.
5           THE WITNESS:  Yes.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.   And those pertain to your -- did those
8   pertain to your employment with Abbott --
9           MS. TABACCHI:  Object to the form.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   -- or Hospira?
12      A.   Both.
13          MS. ST. PETER-GRIFFITH:  Again, Tina, I'm
14  going to ask the witness search to see what
15  documents he has that are responsive to the
16  subpoena because both of those categories of
17  documents are.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   Sir, can you take us through your
20  educational history?
21      A.   Sure.
22      Q.   From the point in time when you graduated

Page 28

1   from high school?
2       A.   I graduated from high school in -- and
3   went down to Champaign, University of Illinois.
4   Received a Bachelor's in mechanical engineering
5   from the University of Illinois.  I have taken some
6   postgraduate courses but have not completed a
7   postgraduate degree.
8       Q.   Where did you go take your postgrad work?
9       A.   Lake Forest School of Management.
10      Q.   And what course work did you take there?
11      A.   I, I believe I took an econ. course,
12  human behavior course, and there may have been a
13  couple of others.
14      Q.   I'm sorry, sir, did you tell us when you
15  got your engineering degree?
16      A.   1969.
17      Q.   And when did you take the course work at
18  Lake Forest?
19      A.   I can't remember the exact year but it
20  probably would have been in late '70s, early '80s.
21      Q.   So your -- in terms of your degree
22  history, you have a BA in mechanical engineering?

Page 29

1       A.   Yes, yeah.
2       Q.   Did you ever take any course work in the
3   medical area?
4           MS. TABACCHI:  Object to the form.
5           THE WITNESS:  No.
6
7
8   BY MS. ST. PETER-GRIFFITH:
9       Q.   And sir, beginning with your graduation
10  from University of Illinois, can you take us
11  through your employment history, please?
12      A.   Graduating from U of I I took a position
13  as a manufacturing engineer for Texas Instruments
14  in Richards, Texas.  I was there for two-and-a-half
15  to three years.  I then moved and took a position
16  as production control manager for Panduit,
17  P-a-n-d-u-i-t, Corp., which is down in Tinley Park,
18  Illinois.  I was in that position for two years.
19  And then I joined Abbott in 1974 as a raw material
20  planner.
21          Do you want me to keep going?
22      Q.   Oh, yeah.

8 (Pages 26 to 29)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 30

1    A.  Oh, okay.
2    Q.  We're going to take you through, through
3  to 2007.
4    A.  Okay.
5        MS. TABACCHI:  I can't believe that this
6  has not been explored in --
7        MS. ST. PETER-GRIFFITH:  Not in a
8  narrative form, no.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Sir, if you could take us through your
11  employment history.  You, you started with Abbott
12  as a raw material planner.  How long did you hold
13  that position.
14   A.  Again, it was about -- almost two years,
15  yeah.
16   Q.  Okay.  And then what position did you
17  assume after that?
18   A.  Materials manager at Buffalo, New York
19  plant for Abbott Laboratories.  I was in that job
20  for about a year-and-a-half.
21   Q.  Okay.
22   A.  Came back to Chicago working,

Page 31

1  again, working for Abbott as a, a -- I believe a
2  production planning manager was the title.  I held
3  that job until 1981, when I moved and took over
4  pricing operations position.
5    Q.  Okay.  In which division?
6    A.  It was all within the Hospital Products
7  Division, everything -- my whole career with Abbott
8  has been within the Hospital Products Division.
9    Q.  Okay.
10   A.  That was in the Pricing Department as it
11  was known then.  It's now known as Contract
12  Marketing. So you might hear me use that term or
13  those terms interchangeably.
14   Q.  And what was the position that you
15  assumed in the pricing department?
16   A.  Manager of pricing operations.
17   Q.  And that was beginning in '81?
18   A.  '81.
19   Q.  Okay.  And how long did you hold that
20  position?
21   A.  I was in -- I was in the Pricing
22  Department for about four-and-a-half years.  In

Page 32

1  that four-and-a half years I held various
2  responsibilities.  The first was pricing operations
3  manager, the second was -- I was also responsible
4  for government contract pricing, and then I -- in
5  my last year there I think I became the the, the
6  pricing manager responsible for contracting with
7  commercial customers.
8    Q.  And that is up until approximately when,
9  1985?
10   A.  Through '8 -- yeah, through the end of
11  '85, I believe.
12   Q.  And sir, what was -- what background did
13  you have concerning pricing that brought you to
14  that position?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I, I, I got the position as
17  pricing operations manager because of my background
18  with computer systems.  Abbott was installing a, a
19  brand new corporate pricing system in 1981.  They
20  had been working on it for a few years.  And it was
21  going to require that the divisions carry more
22  responsibility in pricing orders than they had in

Page 33

1  the past.
2        And so they were looking for someone that
3  had some facility in large computer systems.  I had
4  done some work on that in my prior position, in my
5  prior positions with, with Abbott.  And so, you
6  know, I convinced them I could do it.  So they gave
7  me that opportunity.  The other positions came to
8  me by virtue of my experience within the Pricing
9  Department.
10   Q.  Which you developed t from beginning in
11  1981?
12   A.  '81, yeah.
13   Q.  Okay.  Did you have any prior sales
14  experience in the pharmaceutical area?
15   A.  No.
16   Q.  In '85 or at the end of '85 what position
17  did you assume with Abbott?
18   A.  Marketing manager for a couple, a couple
19  of product lines.  One, our administration
20  equipment or IV administration equipment.  So
21  basically the tubing networks that are used below
22  the IV bag taking the solution down to the patient

9 (Pages 30 to 33)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 34

1  as well as irrigation solutions were also my
2  responsibility.
3       And irrigation solutions are large volume
4  sterile containers that are used to irrigate where
5  the solution is used, not as an infusion into the
6  body but is used to irrigate.  So they, they might
7  use it during surgery to irrigate a surgical site
8  or they might use it on the floors to irrigate
9  wounds, variety of -- wherever you need sterile
10 solution but not an IV solution.
11     Q.  And how long were you the -- did you
12 serve in that marketing manager capacity?
13     A.  A couple of years.
14     Q.  So through to the end of '87?
15     A.  Yes.
16     Q.  And then what position did you assume --
17 well, let me ask you, was that, was the -- was your
18 assumption of the position, marketing manager, a
19 promotion?
20     A.  Yes.
21     Q.  Okay.  And who was your supervisor?
22     A.  Peter Karas for part of the time and Joy

Page 35

1  Admundson for the remainder of the time.
2      Q.  And did you supervise anybody?
3      A.  No.
4      Q.  At the end of '87 what position did you
5  assume within HPD?
6      A.  I took over the position of director of
7  product sales.
8      Q.  Okay.
9      A.  That was within, that was within what was
10 known as the Homecare Unit at that time, all part
11 of the Hospital Products Division.
12     Q.  And did, did the term -- well, let me ask
13 you, how long did you hold that position?
14     A.  Two years, two-and-a-half years, yeah.
15     Q.  And the Homecare Unit, is that Alternate
16 Site?
17         MS. TABACCHI:  Object to the form.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Or did it become Alternate Site?
20     A.  It's a, it's a component that eventually
21 became -- well, it's a, it's a business that
22 eventually became two components of Alternate Site,

Page 36

1  yes.
2      Q.  What were those two components?
3      A.  Home Infusion Services and Alternate Site
4  product sales.
5      Q.  And when did it -- when did the business
6  unit title change from Homecare to Home Infusion
7  Services and Alt. Site Product Sales?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  I believe it happened
10 sometime in '91 or sometime in '90, '91 -- '90 or
11 '91, I think.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Well, did you have this position, by my
14 calculation, through to mid-1990?
15     A.  Yeah, sounds right.
16     Q.  Did it change -- did that remain changed
17 --
18     A.  It didn't change, it didn't change --
19     Q.  -- while you were there?
20     A.  -- while I was there, no.
21     Q.  Okay.  And who was your supervisor?
22     A.  Joy Admundson.

Page 37

1      Q.  During the entire two-and-a-half-year
2  period?
3      A.  Yes.
4      Q.  Okay.  And did you supervise anyone?
5      A.  Yes.
6      Q.  Who did you supervise?
7      A.  You know, I -- you're going to stretch me
8  to, to be able to tell you.  During, during that
9  period my employees went from three to thirty-four.
10     Q.  Oh.
11     A.  So, you know, there were, there were a
12 number of people that were working for me at, at
13 the end of that.
14     Q.  Well, let me ask you this:  What was the
15 -- you were the director of product sales.  Were
16 there particular titles underneath you that -- of
17 categories of people that you supervised?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  Yes.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay.  What were they?
22     A.  I had sales managers and they had sales

10 (Pages 34 to 37)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 38

1  representatives reporting to them.  I had an
2  internal office staff.  Again, it, it evolved over
3  that time because we, we were successful in growing
4  the business; and so at, at the end I had marketing
5  -- I had a marketing manager, I had someone
6  responsible for contracts, and that's, that's about
7  what I remember of the organization at that point.
8     Q.  Okay.  And do you remember who any of the
9  -- who your marketing manager was?
10    A.  I, I believe at the end it was Karla
11 Kreklow was my marketing manager.
12    Q.  And when you say "at the end," did that
13 position evolve towards the end of your tenure,
14 this position?
15    A.  Yeah, when I first started with three
16 people I didn't have a marketing manager.  I was
17 the marketing manager.  So, you know, as -- again,
18 as, as our business grew, you know, we were able
19 to, to expand.  And in addition, in that time frame
20 we acquired a company where we, we picked up the
21 sales team for that company.
22    Q.  Okay.  What company was that?

Page 39

1     A.  A company by the name of Pancretech based
2  out of San Diego.
3     Q.  Sir, do you remember who any of the sales
4  managers were?
5     A.  Under bright lights it's hard to remember
6  all of this.
7     Q.  We can actually have those dimmed.
8     A.  Especially this, this -- that far back.
9  There was a Craig Smith was one of my sales
10 managers, Pete Fitzpatrick was one of my sales
11 managers, there was a Debbie -- I can't remember
12 Debbie's last name at this point.  And a Mike --
13 God, the last name's not coming to me that was in
14 the central area.  So I had four, I had four
15 managers.
16    Q.  Could, could it have been Debbie DeYoung?
17    A.  No.
18    Q.  Do you remember any of the sales
19 representatives?
20    A.  No.
21    Q.  Were you the, the second tier supervisor
22 for the sales representatives?

Page 40

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I'm not sure what you mean
3  by "second tier."
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Meaning did the sales representatives
6  report directly to you or did they report to the
7  sales managers or someone else?
8     A.  No, they, they reported directly to sales
9  managers.  Sales managers reported to me.
10    Q.  Do you recall who any of the internal
11 office staff members were?
12    A.  I, I can't bring up any names at this
13 point.
14    Q.  Now, now, sir, in two-and-a-half years
15 you said that you were successful in growing the
16 business. What was the business of Homecare that
17 you were responsible for directing when you were
18 the director of products sales during this
19 two-and-a-half-year period from '87 to mid-'90?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  I was, I was responsible
22 for a brand new area that was growing in the, in

Page 41

1  the market, something that would eventually be
2  called Alternate Site.
3       The rest of Homecare was focused on
4  delivery of homecare services.  My group was
5  responsible for selling products in the HP -- HPD
6  catalog to nonhospital entities without the
7  homecare services.  So homecare companies that may
8  have competed with the homecare clients, we would
9  sell Abbott product to.
10      We would sell Abbott product to
11 distributors, the smaller distributors.  We would
12 sell Abbott product to clinics, whatever -- you
13 know, whatever was not a hospital, not hospital
14 affiliated.
15      If it was hospital affiliated it got
16 covered by the hospital business sector.  But if it
17 was not hospital affiliated, if it was an
18 independent ambulatory surgery center, for
19 instance, that would be a customer of ours.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Sir, what was the dollar -- well, let me
22 ask you this:  Were there other directors within

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 42

1   the Homecare Unit that were responsible for the
2   homecare component of the business?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  I believe there were.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.  Do you remember who that was?
7       A.  One was Tim Sykes, and there, there may
8   have been others.  I'm not sure.
9       Q.  What's the distinction between the
10  homecare component of the business and the eventual
11  Alt. Site component of the business that, that you
12  were overseeing?
13      A.  Homecare was focused on delivery of
14  services to patients.  We were, we were focused on
15  selling product.  It was, it was, it was -- in
16  product sales it was the more conventional buy/sell
17  relationship with customers.
18          It's just that by virtue of the -- by
19  virtue of the name of our division, Hospital
20  Products Division, we had up until this time one
21  focus, and that was walking in the hospital and
22  selling our products.  And so this position was

Page 43

1   looking at, okay, is there a market opportunity for
2   our products external to the hospital.
3       Q.  And did that position essentially
4   originate with you or did you take it over from
5   someone else?
6       A.  No, it originated with me, yes.
7       Q.  Towards the end of your tenure in this --
8   as director of products sales, did you at any time
9   report to Don Robertson?
10      A.  No.
11      Q.  And sir you indicated that, that the
12  business grew within this two-and-a-half-year
13  period. What do you attribute that growth to?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  Hard work.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  Okay.  Well, let me, let me ask it a
18  different way.  What, what were the needs of the
19  customers that you were essentially marketing to or
20  trying to develop this market niche for?
21      A.  Well, you have to go back to 1983.  In
22  1983 something called DRGs were introduced as a

Page 44

1   reimbursement mechanism for hospitals.  Basically
2   under the DRGs, again, this originated with
3   Medicare but eventually moved over to the
4   commercial segment as well, but what, what -- DRGs
5   basically reimbursed the hospital based on
6   diagnosis-related groups, that's what DRG stands
7   for, and so the hospital would get a fixed payment
8   for treatment.  So basically the hospital's
9   incentive in that scenario is to treat the patient
10  and get them out of the hospital as quickly as
11  possible.
12          In addition, along, along this same
13  period of time, there was an industry trend that
14  was, was beginning that people could take what were
15  conventional treatments within the hospital and
16  provide them to patients, to patients outside of
17  the traditional, you know, big building that a
18  hospital was.
19      Q.  Is that the homecare component to the
20  market?
21      A.  It's part of it.  Ambulatory surgery was
22  another one.  Home nursing was another one.  All of

Page 45

1   those were growing exponentially in the early '80s,
2   or actually started, started in the early '80s and,
3   and were, were starting to really blossom in around
4   '88, '89.
5           So what we were trying to do was identify
6   all the different avenues for our products that we
7   could promote.  And so we were hitting the market
8   at the right time and we were hitting the market
9   with the right story, and, and the right products
10  for what the clinicians were trying to deliver at
11  the time.
12      Q.  What was the right story?  What, what do
13  you mean by that?
14      A.  That, you know, we, we had a reputation
15  at Abbott Laboratories of being a company that
16  delivered excellent products with good quality,
17  good delivery capability.  We had regional
18  distribution whereas some of our competitors did
19  not in terms of our own warehouses.  And so, you
20  know, that was, that was what these smaller
21  entities wanted to hear.
22      Q.  When you say "these smaller entities,"

12  (Pages 42 to 45)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 46

1  who were the clients that you were selling to at
2  this point in time?
3      A.   Home Healthcare of America, there was
4  also a company called Option Care, there was
5  Beverly Home -- Beverly Nursing at the time,
6  nursing homes. So it, it was across a pretty broad
7  spectrum of what people were, were providing in
8  terms of care.
9      Q.   Were these customers customers that would
10 be seeking reimbursement from third-party payers
11 under the DRG system or some other system?
12     MS. TABACCHI:  Object to the form.
13     THE WITNESS:  I would, I would assume
14 they would seek reimbursement on any of the
15 services that they provided.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.   Do you know how they were reimbursed for
18 -- during this period of time how they were
19 reimbursed?
20     A.   They wouldn't have been reimbursed under
21 DRGs because they were not a hospital; but what I'm,
22 what in particular during that period of time, I'm

Page 47

1  not sure.
2      Q.   Sir, we're going to get back to your
3  responsibilities in this position at a later point
4  in time, but I want to just take you through your
5  history some more. In approximately -- I have us
6  through mid-1990. Does that sound about right?
7      A.   Uh-huh.
8      Q.   Is that when you transitioned? Did you
9  transition to a different -- -- well, first of all,
10 let me ask you this: Was your assumption of the
11 directorship of product sales a promotion for you,
12 or was it a lateral from the marketing manager
13 position?
14     A.   Initially it was a lateral that developed
15 into a promotion.
16     Q.   Okay. When you were promoted did your
17 position title change?
18     A.   No.
19     Q.   Okay. So in mid-1990 what position did
20 you assume?
21     A.   Director of Contract Marketing.
22     Q.   And director of Contract Marketing where?

Page 48

1      A.   Hospital Products Division, hospital
2  side.
3      Q.   So is that commonly referred to as HBS?
4      A.   It was a, it was, it was the contract
5  support function for HBS, yes. That eventually
6  became HBS, yes.
7      Q.   When did HBS eventually become HBS?
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  There was -- sometime in
10 '90, '91 there was a, a reorganization of the
11 division. And at that point Alternate Site was
12 defined as a business, HBS was defined as a
13 business, and that's when Don Robertson came into
14 the division. So it was subsequent to my leaving
15 the product sales piece. But that's, that's --
16 sometime in that time frame was when HBS
17 originated.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   Okay. Did HBF -- HBS or your position as
20 director of Contract Marketing have any
21 relationship with Alt. Site?
22     MS. TABACCHI:  Object to the form.

Page 49

1      THE WITNESS:  No formal organizational
2  chart relationship. But seeing as we were, we were
3  both pricing the same products, you know, we, we
4  did confer with one other periodically.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.   Okay. Well, let me ask you this: You
7  were the director of Contract Marketing for HBS.
8  At the time of its inception did Alt. Site have its
9  own Contract Marketing department?
10     A.   Actually, the three components of, of
11 Alt. Site did have their own contracting functions.
12     Q.   Okay. You mentioned -- well, first of
13 all, what are the three components of Alt. Site?
14     A.   Renal Care, Home Infusion Services and
15 Alternate Site product sales.
16     Q.   You said we were both pricing the same
17 product. What did you mean by that?
18     A.   Well, for Alternate Site product sales
19 they sold the same product that HBS sold out of the
20 same catalog. It was just to different markets.
21     Q.   Okay. But you -- the term you used that
22 as I wrote it down was we were both pricing the

13  (Pages 46 to 49)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
                        Chicago, IL

Page 50

1  same product.  Were there different catalogs or was
2  there just one Hospital Products Division catalog?
3      A.  There was one Hospital Products Division
4  catalog but any contracts were being drafted by the
5  two organizations separately.
6      Q.  And who did the pricing that was reported
7  in the catalog?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  HBS.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  So would that have fallen under your
12 responsibilities?
13     A.  Yes.
14     Q.  And who was your supervisor when you were
15 the director of Contract Marketing and HBS?
16     A.  Guy Wiebking.
17     Q.  Oh, first let me ask you, I don't think I
18 asked you, how long did you hold this position?
19     A.  A couple of years.
20     Q.  So through mid-'92?
21     A.  I believe so, yeah.
22     Q.  So Guy Wiebking was your supervisor and

Page 51

1  did you have any subordinates?
2      A.  Yeah, there were about 55 people in the
3  organization, if I remember right.
4      Q.  Who all were subordinate to you in some
5  way?
6      A.  Yes.  I didn't tell them that, but.
7      Q.  Okay.  What were the positions that were
8  under that, the fell -- subordinate positions
9  underneath the director of Contract Marketing?
10     A.  I believe I had a couple of contract
11 managers.  May have had three, I'm not sure.  But
12 -- and I would have had a, a manager of operations.
13 And a, a systems manager, possibly a manager of
14 government contracting.
15     Q.  Do you remember who any of your contract
16 managers were?
17     A.  They, they changed.  A lot of that, a lot
18 of the area within contracting is -- was meant as
19 developmental positions.  So we normally rotated
20 people in from the sales force into Contract
21 Marketing and then back into the sales forces as
22 sales managers, and then back in the Contract

Page 52

1  Marketing as contract managers and then to a
2  variety of other positions.
3          So it was -- it -- the tenure in those
4  positions was somewhere in the, you know, two- to
5  three-year time frame.  So we would have had people
6  move in and out.
7          But I think when I, when I first started
8  in there Sean O'Donnell was one of my managers,
9  Jeff Handlin was another one of my managers.  I
10 believe Seth Sterns was still running the systems
11 area.  And I can't remember the lady that was
12 running my operations component.
13     Q.  Do you remember -- well, let me ask you
14 this:  Was the -- bring -- you mentioned bringing
15 in members from the sales force to some of these
16 management positions.
17          Was that to identify individuals in the
18 sales force and sort of bring them up through the
19 ranks so that they would assume other positions?
20          MS. TABACCHI:  Object to the form.
21          THE WITNESS:  Yeah -- yes, they were --
22 that's what I was referring to in terms of

Page 53

1  development positions, it's to give them a broader
2  exposure to the business, to contracting, to, you
3  know, all the ins and outs of, of working in a
4  central office and then, and then move them in --
5  in some cases back into the field to become sales
6  managers.
7          We thought that actually that experience
8  gave us much better sales managers because then
9  they were much more capable of making good business
10 decisions based on that.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Would you look for any type of salesmen
13 for that position?  Were those  -- were you looking
14 for like the best and the brightest to kind of
15 bring up through the ranks?
16          MS. TABACCHI:  Object to the form.
17          THE WITNESS:  Definitely.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Now, when you were the director of
20 Contract Marketing with HBS, did you bring to that
21 position your experience in what was eventually to
22 become Alt. Site?

14  (Pages 50 to 53)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.   HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 54

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I'm, I'm not sure I
3   understood your question.
4   BY MS. ST. PETER-GRIFFITH:
5        Q.  Sure, let me, let me rephrase it.  You
6   came to the position of director of Contract
7   Marketing with your experience in developing what
8   was eventually to become the Alt. Site market; is
9   that fair to say?
10       A.  Yeah, I came, I came to this position,
11  yes, after the couple of years or two-and-a-half
12  years spending in the, in the, in product sales
13  component of Alt. -- of what eventually became Alt.
14  Site, yes.
15       Q.  Okay.  And is it fair to say that you had
16  an understanding of that Alt. Site sort of market
17  base and what the customer needs were and who the
18  customers were?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  I would, I would say I had
21  a better understanding than the -- than a number of
22  other folks that were in the hospital side

Page 55

1   exclusively, yes.
2   BY MS. ST. PETER-GRIFFITH:
3        Q.  Okay.  Just to jump back a little bit,
4   prior to assuming the directorship of Contract
5   Marketing, did you deal at all with Abbott's
6   pharmacies?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  No.
9   BY MS. ST. PETER-GRIFFITH:
10       Q.  Okay.  In mid-'92 -- well, when you
11  assumed the position of director of Contract
12  Marketing, was that a promotion?
13       A.  Yes.
14       Q.  And in mid-'92 when you left that
15  position, what position did you assume?
16       A.  General manager for home infusion
17  services.
18       Q.  Prior to assuming this -- the position of
19  general manager for Home Infusion Services, did you
20  have any background in Home Infusion Services?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  None other than I, I was

Page 56

1   party to -- well, I was part of the organization
2   called Homecare when I was heading up the product
3   sales business.  So my exposure to the true
4   homecare side of the business was, you know, being
5   in staff meetings where various things might have
6   been discussed, as well as the fact that selling to
7   homecare companies we had to understand a little
8   bit about what they were doing in order to make
9   sure that we -- our product offerings were valid.
10  BY MS. ST. PETER-GRIFFITH:
11       Q.  When you were the general manager for
12  Home Infusion Services, did you retain any
13  responsibilities for catalog pricing?
14       A.  No.
15       Q.  And when you assumed the general
16  managership for Home Infusion Services, was that a
17  promotion or a lateral move?
18       A.  Promotion.
19       Q.  And who was your -- who was your boss?
20       A.  Don Robertson.
21       Q.  How long did you hold that position?
22       A.  Up until the beginning of 2000.

Page 57

1        Q.  So for nearly seven-and-a-half years?
2        A.  Uh-huh.
3        Q.  Is it fair to say that during that seven-
4   and-a-half-year period you developed an
5   appreciation for the home infusion market?
6        A.  Yes.
7        Q.  And the needs of home infusion, your home
8   infusion client base?
9        A.  Yes.
10       Q.  What were the positions that reported to
11  you when you were the general manager for Home
12  Infusion Services?
13       A.  I had a director of operations.  I had a
14  marketing manager.  I had a manager of contract
15  pricing, and I had a reimbursement manager, and a
16  systems manager.
17       Q.  Do you remember who any of these were
18  that -- who any of the individuals were that
19  assumed these directorships or managing
20  responsibilities?
21       A.  Tim Sykes was the director of operations.
22  What was the next one I gave you?

15  (Pages 54 to 57)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                        Chicago, IL

---

Page 58

1    Q.  Marketing manager.
2    A.  Marketing manager was actually changed,
3  but for the most of the time it was Barb Diebold,
4  D-i-e-b-o-l-d, I believe.
5    Q.  Contracting Pricing?
6    A.  Contracting Pricing, again for the
7  majority of that time was Dave Brincks,
8  B-r-i-n-c-k-s.
9    Q.  Reimbursement manager?
10    A.  Virginia Tobiason.
11    Q.  Okay.  And systems manager?
12    A.  Chris Blanford.
13    Q.  And were Ms. Tobiason and Ms. Blanford
14  the systems manager and reimbursement manager
15  during your entire tenure?
16       MS. TABACCHI:  Objects to the form.
17       THE WITNESS:  Chris was.  Virginia was
18  not.  She left toward the end of my tenure.  She was
19  there for the majority of the time.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Do you remember who replaced her?
22    A.  Yeah, I can see him.

---

Page 59

1    Q.  Okay.  Your visualizing a face
2  unfortunately doesn't help us.
3    A.  Well, just bear with me.
4    Q.  Okay.
5    A.  Mike Snouffer, S-n-o-u-f-f-e-r.
6    Q.  And your marketing manager you said for
7  most of the time was Barb Diebold?
8    A.  Diebold.
9    Q.  Diebold?
10    A.  Uh-huh.
11    Q.  Who else was -- when did Ms. Diebold hold
12  that position?
13    A.  I can't give you an exact date.  I, you
14  know, I think Barb was in that position for
15  probably half or two-thirds of that time, probably
16  two-thirds of that time.
17    Q.  And who else assumed the position after
18  Barb?
19    A.  A gentleman by the name of Anthony
20  Maestas, M-a-e-s-t-a-s.
21    Q.  And Dave Brincks, you indicated that he
22  was there for most of your tenure.  I assume that

---

Page 60

1  he was not there when you started; is that fair?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  I believe he was there when
4  I started.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Okay.  Did he leave at some point then?
7    A.  Yeah.  I'm not sure where he went, but I,
8  I believe he did and was replaced by Cathy Riddle,
9  R-i-d-d-l-e.
10    Q.  Did you assume -- or did you originate
11  the position of general manager for Home Infusion
12  Services or did you have a predecessor?
13    A.  I had a predecessor.
14    Q.  Who was that predecessor?
15    A.  Bill Dempsey.
16    Q.  And sir, we're going to go back over
17  responsibilities and, and business models in a
18  second, but I wanted to identify what relationship
19  Home Infusion Services had in terms of contract --
20  or I'm sorry, catalog pricing with the Hospital
21  Business Sector?
22    A.  None.

---

Page 61

1    Q.  Did the Home Infusion Services during
2  your tenure, tenure as general manager for Home
3  Infusion Services rely upon HBS to do all catalog
4  -- to set all the catalog prices?
5       MS. TABACCHI:  Object to the form.
6       THE WITNESS:  Yes.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  In 2000 after leaving the position of
9  general manager of Home Infusion Services, what did
10  you -- what position did you assume?
11    A.  General manager for Contract Marketing
12  and Home Infusion Services.
13       MS. TABACCHI:  Ann, before we launch into
14  a new position, let me know when it's a good time
15  for a five-minute break.
16       MS. ST. PETER-GRIFFITH:  We can take a
17  break right now.  Is that good, sir?
18       THE WITNESS:  That's fine.
19       THE VIDEOGRAPHER:  We are off the record
20  at 10:27 a.m. with the end of tape number one.
21       (Brief recess.)
22       THE VIDEOGRAPHER:  We are back on the

16  (Pages 58 to 61)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Page 62

1  record at 10:42 a.m. with the start of tape number
2  two.
3        (Whereupon, Exhibit Sellers 001 was
4  marked for identification.)
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Mr. Sellers, we've had marked as Exhibit
7  Sellers 001 the prior deposition that Texas took
8  over a three-day period beginning in 2007. We may
9  refer to that later. I just wanted to mark it as
10  the first exhibit so that we could make it as part
11  of the record in this deposition.
12        MS. TABACCHI:  Are you following your
13  numbering system?  Does it have a number?
14        MS. ST. PETER-GRIFFITH:  I have Sellers
15  1, in part because we several depositions ago gave
16  up on trying to follow where we were in Texas and
17  are just going by, you know witness name and
18  number.
19        MS. TABACCHI:  Okay.
20        MS. ST. PETER-GRIFFITH:  Otherwise, you
21  know, I think --
22        MS. TABACCHI:  We have multiple numbering

Page 63

1  systems in the case.
2        MS. ST. PETER-GRIFFITH:  Yeah.
3        MS. TABACCHI:  Fine.
4        MS. ST. PETER-GRIFFITH:  Bottom line, if
5  Texas isn't here I try not to use their system.
6        MR. SISNEROS:  Does this include video?
7  Was there videos in the Texas record?
8        MR. ANDERSON:  Yes. So just for the
9  record, the transcripts and the video shall be
10  considered as though taken in this case with your
11  reservation of your objections under the Texas
12  rules.
13        MS. TABACCHI:  If you want the videos to
14  be considered taken in the case, I guess I would
15  ask that you provide us with a set of the videos
16  because we did not order any of the videotapes.
17        MS. ST. PETER-GRIFFITH:  Okay.
18        MR. ANDERSON:  Yeah, no problem.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  Sir, let me ask you, did you read your
21  deposition transcript in the Texas case?
22        MS. TABACCHI:  Object to the form.

Page 64

1        THE WITNESS:  I read them after I gave
2  the testimony --
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Okay.
5    A.  -- to verify that they were correct as I
6  remember.
7    Q.  And did you do that, did you verify that
8  they were correct, as you remember?
9        MS. TABACCHI:  Object to the form.
10        THE WITNESS:  I believe so.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  Okay. Sir, before we took the break you
13  indicated that in 2000 you assumed the position as
14  general manager for Contract Marketing and Home
15  Infusion Services. Is that --
16    A.  Yes.
17    Q.  What -- was that part of HBS or Alternate
18  Site or which part -- which component of the
19  Hospital Products Division did you -- were you in,
20  I guess?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  Will, subsequent -- I mean,

Page 65

1  around that same time Don Robertson announced his
2  retirement. So that the Alternate Site business
3  unit, which was -- would, would have been
4  comparable for the Alternate Site business sector,
5  let me use that term --
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Okay.
8    A.  -- versus the Hospital Business Sector,
9  ceased to exist at that point, or sometime in 2000
10  they were all part of HPD. There were -- we still
11  had the Renal Care business and we still had the
12  Alternate Site product sales business. The Home
13  Infusion business that I had headed up was, was
14  being shut down, so it was in a -- it was in a, you
15  know, a turn-down mode?
16    Q.  Okay. So is it -- in terms of your title
17  of general manager for Contract Marketing, let's
18  take that component to the title, were you
19  responsible for Contract Marketing in all of HPD?
20    A.  Just for the hospital side.
21    Q.  Okay. Well, did the Alternate Site
22  product sales, Contract Marketing, was that somehow

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 66

1  merged into the HBS Contract Marketing?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  Sometime around mid-2000.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Okay.
6    A.  The contract management piece of
7  Alternate Site was moved under my responsibilities
8  so that all of -- so that all of the contract
9  responsibilities for the Hospital Products Division
10 were in one organization.  But when I, when I first
11 took the position it was -- they were separate.
12   Q.  Did you take the position at the
13 beginning of 2000?
14   A.  Yes.
15   Q.  And then about six months later you got
16 the Alt. Site Contract Marketing?
17   A.  As I, as I recall it was around that
18 time.
19   Q.  And when was Home Infusion Services
20 phased out or shut down?
21   A.  We made the business decision to cease
22 taking new clients and to not renew any, any

Page 67

1  contracts in 1997.  We realized that it would
2  probably take another four or five years to fulfill
3  our contract responsibilities with our clients.
4    Q.  Okay.  And who made the decision in '97
5  to not take new customers for the Home Infusion
6  department or sector?
7    A.  Well --
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  It, it, it was a -- it was
10 a -- it was a consensus business decision of HPD
11 management.
12 BY MS. ST. PETER-GRIFFITH:
13   Q.  Who specifically in HPD management made
14 that call?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I can't, I can't say that
17 any one person made that call.  Don Robertson, and
18 I, and I recommended it.  And after some
19 consideration I -- it was, it was agreed upon.
20
21
22 BY MS. ST. PETER-GRIFFITH:

Page 68

1    Q.  Why did you recommend it?
2    A.  The market had changed considerably.  We
3  had originally had one profile that we had been
4  promoting and in the years prior to 1997 we were
5  seeing that we were having less success in that
6  business model and in terms of gaining new clients.
7  Our assessment of the general marketplace was that
8  we didn't believe that it was a viable business
9  longer term and so that's what led to the decision.
10   Q.  Did Mr. Robertson express any interest in
11 closing the Home Infusion business earlier than
12 '97?
13   A.  Not that I remember.
14   Q.  Okay.  And when you assumed the position
15 of general manager for Contract Marketing and Home
16 Infusion Services, did that title change after Home
17 Infusion was phased out in about 2000 or --
18   A.  2001.
19   Q.  -- 2001?
20   A.  Yeah, we struck the last --
21   Q.  I'm sorry?
22   A.  We struck the last few words off the end

Page 69

1  of it.
2    Q.  Okay.  And then your position then was
3  just with general manager for Contract Marketing?
4    A.  Yes.
5    Q.  Okay.  Were there any other general
6  managers for Contract Marketing --
7    A.  No.
8    Q.  -- during this time period?
9        Within the Hospital Products Division at
10 all?
11   A.  No.
12   Q.  And how long did you hold that position
13 as general manager for Contract Marketing?
14   A.  Until April of 2004.
15   Q.  And what happened in April of 2004?
16   A.  We ceased to become part of Abbott
17 Laboratories.  We were Hospira.
18   Q.  And is that when you ceased as an Abbott
19 employee?
20   A.  Yes.
21   Q.  Okay.  And what was your job after April
22 -- or in April of 2004?

18 (Pages 66 to 69)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 70

1       MS. TABACCHI:  Before we proceed, Mr.
2   Sellers is here in his capacity as a former Abbott
3   employee. We're happy to go through a very
4   high-level discussion, if you wish, to ask him
5   about his positions at Hospira; but he's not
6   prepared to testify today in any detail at all
7   about Hospira, which is a separate company.
8       MS. ST. PETER-GRIFFITH:  Okay. Well,
9   I, I'm -- you know, he's, he's been subpoenaed as
10  an individual employee -- or an individual.  I
11  mean, he's not -- I'm not looking for him to commit
12  an answer on behalf of Hospira, if that's what your
13  concern is.
14      MS. TABACCHI:  We can have this
15  discussion off record but we are currently involved
16  in discussions with your colleagues about the
17  nature of discovery of Hospira.
18      Mr. Sellers has agreed to be here as a
19  former Abbott employee.  He's here as an Abbott
20  employee.  He is not here to testify in detail
21  about Hospira, who is not a party to this case, and
22  he's, he's not going to testify in detail about

Page 71

1   Hospira. The subpoena was, the subpoena was in his
2   capacity as a, as a former Abbott employee.
3       MS. ST. PETER-GRIFFITH:  The subpoena
4   was, was not limited to that and he's, he's here as
5   an individual.  I just want to know -- I'm trying
6   to get his employment background.
7       MS. TABACCHI:  That's fine.
8   BY MS. ST. PETER-GRIFFITH:
9       Q.  What was your position at Hospira?
10      A.  I was --
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  I was vice president of
13  Contract Compliance and Integration.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  And who was your superior?
16      A.  Peter Baker.
17      Q.  And how long did you hold that position?
18      A.  Until July 1, 2007.
19      Q.  And what happened on July 1, 2007?
20      A.  I retired from Hospira.
21      Q.  And what have you been doing since your
22  retirement?

Page 72

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  Loving my grandchildren.
3   BY MS. ST. PETER-GRIFFITH:
4       Q.  Okay.  Let me rephrase.  Have you held
5   any employment positions since your retirement from
6   Hospira?
7       MS. TABACCHI:  Object to the form.
8       THE WITNESS:  I am doing some project
9   work for Hospira.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  What type of project work are you doing
12  for Hospira?
13      MS. TABACCHI:  Again, Mr. Sellers can
14  testify very generally about the nature of his
15  work. I do not have an understanding of how
16  sensitive or confidential the work is and Hospira
17  is not a party to this litigation.
18      THE WITNESS:  The project I'm currently
19  working on is, is related to some product changes
20  and strategy to effect those product changes.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Are you doing any other -- are you doing

Page 73

1   this on a contract basis with Hospira?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  I am a contracted employee
4   with Hospira, yes.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.  Are you assisting in any litigation
7   against either Hospira or Abbott?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  I -- you know, I, I -- I
10  obviously have been looking over interrogatories
11  since I left.  The one we, we originally talked
12  about is an example of that.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  When you reviewed --
15      A.  That may be in -- I'm not sure.  That may
16  be, you know, as a function for both or either.
17      Q.  And we learned yesterday that you're
18  going to be the corporate designee for Hospira's
19  deposition, or at least you were identified.  Were
20  you aware of that?
21      A.  I think I'm aware of that.
22      MS. TABACCHI:  In the Texas matter, not

19 (Pages 70 to 73)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                       Chicago, IL

Page 74

1  in this litigation.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.  Sir, are you being compensated for any of
4  your role in litigation?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  I am being compensated for
7  any research that I'm doing with regard to my past
8  employment.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  And have you been doing research with
11 regard to your past employment incident to
12 assisting in litigation matters?
13    A.  I'm not sure I understood that question.
14    Q.  Okay.  As -- are you doing the research
15 -- when you say you're being compensated for
16 research that you're doing, are you doing the
17 research incident to assisting in litigation
18 matters?
19       MS. TABACCHI:  Object to the form.  I'm
20 also going to caution the witness not to reveal any
21 communications with Counsel for Hospira or Abbott.
22       THE WITNESS:  Some.

Page 75

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  How much time are you spending doing
3  research for litigation?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  I, I don't have a number
6  right off the top of my head.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Well, have you been compensated for it?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  With, with no, not yet.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Well, are you, are you -- do you
13 anticipate billing for that research?
14    A.  Yes.
15    Q.  And what is your billable rate?
16       MS. TABACCHI:  Object to the form.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  You can tell me your billable rate.
19    A.  $107.20.
20    Q.  How much time have you spent doing
21 research that you anticipate billing for?
22    A.  Again, I, I haven't tallied it.

Page 76

1     Q.  Do you anticipate billing for your time
2  to appear at deposition?
3     A.  No.
4     Q.  Do you anticipate billing for time
5  expended in preparing for deposition?
6     A.  Yes.
7     Q.  Do you anticipate billing for time that
8  you spent with Ms. Tabacchi, the four or five hours
9  that you indicated at the beginning of your
10 deposition?
11    A.  I would call that preparation, yes.
12    Q.  Can you provide any estimate as to the
13 amount of time that you've spent doing research
14 that you anticipate billing for?
15    A.  I'd say it's probably less than 25 hours.
16 Again, I, I haven't tallied it, so.
17    Q.  And who will you be billing?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  Abbott Laboratories.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Sir, what I'd like to do is go back over
22 your responsibilities, and we're going to go back

Page 77

1  to -- I'd like to go back to your directorship for
2  Contract Marketing, which you assumed in mid- -- in
3  the mid-1990s is.
4        In the mid-1990s what was --
5     A.  Mid-1990.
6     Q.  Mid-1990, I'm sorry.  You were in that
7  position until mid-'92, right?
8     A.  Yes.
9     Q.  I'm sorry.  Let me clarify that.  For
10 that approximate two-year period, what was the
11 business model for Hospital Products Division, HBS?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I'm not, I'm not sure I
14 understand your question.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.  What, what was the business model?  What,
17 what business was HBS in?  Who were its clients?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  We, we primarily sold to
20 hospitals, various generic drugs, intravenous
21 solutions, administrative equipment that goes with
22 intravenous solutions, and infusion pumps.

20  (Pages 74 to 77)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 78

1   BY MS. ST. PETER-GRIFFITH:
2       Q.   And what were your responsibilities when
3   you were the director of Contract Marketing?
4           MS. TABACCHI:  Object to the form.
5           THE WITNESS:  I was -- I was responsible
6   for all contracts with customers for that hospital
7   business.
8
9
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   Any other responsibilities?
12      A.   Just a lot of sub-responsibilities go
13  into that, but that, that was the -- that was the
14  main responsibility I had.
15      Q.   Well, what were the sub-responsibilities?
16      A.   Well, the, the whole administration of
17  any contracts, which would be looking at do we have
18  price increase clauses, could we negotiate a price
19  increase or is there other clauses that, that we
20  would have to honor with regard to contracts,
21  handling relationships with our trading partners,
22  drug wholesalers in particular and, and

Page 79

1   registering, you know, those sales accurately.
2           We also had -- I also had responsibility
3   for any contracting with the Government.  And at,
4   at a point during the -- again, this was '90,
5   though, right?
6       Q.   '90 to '92.
7       A.   Yeah, that's it.
8       Q.   Any other sub-responsibilities?
9       A.   No.
10      Q.   What about for pricing, did you have any
11  responsibilities with regard to pricing?
12      A.   Yeah, I mean, that was all part of the
13  contracts, pricing was a part of the contracts.
14      Q.   Okay,then, I want to find out what all
15  responsibilities were concerning the contracts,
16  including pricing that you had from '90 to '92?
17          MS. TABACCHI:  Object to the form.
18          THE WITNESS:  I'm, I'm struggling to give
19  you an answer for that.  Maybe I, maybe I just see
20  it differently.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   Okay, how do you see it differently?  I

Page 80

1   want to know what you did, day-to-day position?
2       A.   I'm trying to figure out what you're,
3   what you're meaning.
4           Obviously in negotiating contracts
5   there's someone that keeps track of what prices are
6   offered, what prices are accepted, and in general
7   that our responsibility was that.
8           We were also responsible for the catalog,
9   price catalog and whatever represented  -- you
10  know, whatever ancillary pieces that were in that.
11  I'm, I'm not sure I can -- I'm not sure what, what
12  more you want me to say.
13      Q.   Okay.  Well, did you have any other
14  responsibilities with regard to pricing?
15          MS. TABACCHI:  Object to form.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   Other than the contract negotiations and
18  keeping track of -- or overseeing someone that kept
19  track of offers and accepted offers as well as the
20  price catalog?
21      A.   Well, we developed the offers.  That's --
22  maybe I missed that.  We did the analysis to

Page 81

1   justify any price offers that we might make.
2       Q.   And what were your responsibilities with
3   regard to the price catalog?
4           MS. TABACCHI:  Object to the form.
5           THE WITNESS:  That department held the
6   responsibility for publishing the price catalog, as
7   well as submitting prices to any of the drug
8   compendia, as well as updating the corporate data
9   files with regard to prices.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   Who used the corporate data files with
12  regard to prices?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  Mainly Contract Marketing.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.   Just Contract Marketing and HBS?
17      A.   But also, but also, you know, the order
18  processing system would use those to price the
19  orders, or invoices.
20      Q.   Did you participate in either approving
21  or setting price catalog -- catalog pricing?
22          MS. TABACCHI:  Object to the form.

21  (Pages 78 to 81)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                        Chicago, IL

Page 82

1      THE WITNESS: Yes.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  What was your participation?
4      A.  It was working collaboratively with each
5  of the marketing groups and, and developing a, a
6  consensus on what we should do with regard to price
7  catalog changes, if any.
8      Q.  And how would you go about doing that?
9      A.  Annually we would create a file of all
10  the products, what their current prices were.  We
11  would put a recommended price change in and then we
12  would send that out to each of the marketing
13  managers and ask them to look at the products and
14  tell us if there was any reason that they felt we
15  shouldn't do the price changes that were
16  recommended, or was there any reason to do more
17  than the price changes recommended. So it was, like
18  I said, it was, it was a collaborative effort.
19      Q.  Do you remember at any time that you were
20  responsible for catalog pricing, catalog prices
21  going down?
22      MS. TABACCHI: Object to the form.

Page 83

1      THE WITNESS:  I, I don't remember -- you
2  know, I don't remember specifically what we did
3  with each list number every year.  In general, the
4  prices went up.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Okay.  And how would you determine how
7  the prices would go up?
8      MS. TABACCHI: Object to the form.
9      THE WITNESS:  Typically we would try to
10  forecast where the CPI was going.  We would then
11  look at that versus what we felt the market would
12  accept.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  And what, what market was paying Abbott
15  at its catalog price?
16      MS. TABACCHI: Object to the form.
17      THE WITNESS:  Non-contracted customers.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Would contract, would contract -- would
20  contracted customers also see the same price
21  increases that the catalog pricing --
22      MS. TABACCHI: Object to the form.

Page 84

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  -- increased at?
3      MS. TABACCHI: Object to the form.
4      THE WITNESS:  In, in, in some cases if
5  the catalog price limited our ability to increase
6  contract price, we would obviously have to increase
7  our catalog price before we could increase our
8  contract price.  So in those cases there was a
9  relationship, but it wasn't at the identical same
10  time that we would have taken the catalog price
11  increase.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Well, for example, Vancomycin, the price
14  for Vancomycin --
15      A.  Yes.
16      Q.  -- took a 4 percent or whatever CPI
17  percentage increase every year.  Would the contract
18  price similarly take that increase?
19      MS. TABACCHI: Object to the form.
20      THE WITNESS:  May or may not have.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Okay.  Do you have any specific

Page 85

1  recollection of it taking that price increase?
2      MS. TABACCHI: Object to the form.
3      THE WITNESS:  We had thousands of
4  contracts.  You know, I don't have any direct
5  recollection of, of any particular contract or any
6  particular product over that time period.
7
8
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  Do you remember there being any
11  significant disparities between pricing for some
12  products such as Vancomycin, sodium chloride,
13  dextrose, between the catalog price and the
14  contract pricing?
15      MS. TABACCHI: Object to the form.
16      THE WITNESS:  There was always a
17  difference between our catalog price and our
18  contract prices.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  Why was there always a difference?
21      A.  There would be no sense in someone
22  contracting with us to get catalog price.

22  (Pages 82 to 85)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL          November 1, 2007
                          Chicago, IL

Page 86

1    Q.  What, what was the purpose of having a
2  catalog price?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  Again, it covered
5  non-contract customer purchases.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  And what percentage of Abbott's market
8  were not on contract?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  It varied.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Okay.  Well, what  -- how did it vary?
13   A.  It varied over the years, it varied by
14 product.
15   Q.  Okay.  Well, can you identify -- can you
16 estimate what percentage of Abbott's market,
17 Hospital Business Sector market, or I'm sorry,
18 Hospital Products Division market purchased at the
19 contract price?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  The contract price?
22 BY MS. ST. PETER-GRIFFITH:

Page 87

1    Q.  I'm sorry, at the catalog price?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  I'd, I'd be speculating.  I
4  don't have any specific numbers.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Well, we've heard testimony in this case
7  repeatedly that it was 1 percent or less.  Would
8  that surprise you?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  Seems too low.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Well, how does it seem too low?
13   A.  I would think that it was, it was higher
14 than that in '90 to '92.
15   Q.  Do you have any information that it was
16 higher to that, higher?
17   A.  No.
18       MS. TABACCHI:  Object to the form.
19 BY MS. ST. PETER-GRIFFITH:
20   Q.  What other responsibilities did you have
21 with regard to submitting prices to the pricing
22 compendia?

Page 88

1    A.  I'm sorry, I missed the question.
2    Q.  Sure.  What responsibilities did you have
3  with regard to Abbott's submissions of its catalog
4  prices to the pricing compendia?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  I had an individual on, on
7  staff and that was her responsibility once a
8  catalog price change was made.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Who was that individual?
11   A.  Jerrie Cicerale.
12   Q.  Would it surprise you to learn that
13 Jerrie Cicerale characterized Abbott's catalogs as
14 junk mail?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I don't -- you know, I
17 don't know how you want me to answer that.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.  Well, would it, would it surprise you?
20   A.  Yes.
21       MS. TABACCHI:  Object to the form.
22 BY MS. ST. PETER-GRIFFITH:

Page 89

1    Q.  Okay.  Why would it surprise you?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Because there was a lot
4  more work that went into it than I, than I would
5  apply to junk mail.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Okay.  Well, what work went into it?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  The whole price review that
10 we went through was not a small task.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  And who went through that price review?
13   A.  Variety of people in Contract Marketing
14 and all the marketing, every marketing manager.
15   Q.  So every marketing manager reviewed
16 catalog pricing prior to there being -- prior to it
17 being submitted to the pricing compendia?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  Every product  -- every
20 marketing manager in the Hospital Business Sector,
21 yes.
22 BY MS. ST. PETER-GRIFFITH:

23  (Pages 86 to 89)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Page 90

1    Q.  Okay.  Did you?
2    A.  Did I?
3    Q.  Participate in the review of the catalog
4  pricing that was submitted to the pricing
5  compendia?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  As the, as the director?
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Yes.
10    A.  Yes.
11    Q.  Did you have to approve it before it was
12  submitted to the pricing compendia?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  I had to approve it as far
15  as it was -- that it was the catalog prices that we
16  were going to publish.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  So is it fair to say that before a report
19  was made to the pricing compendia you signed off on
20  that report?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  I didn't sign-off on the

Page 91

1  report.  I signed off on the, on the prices.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  Well, would the, would the prices --
4  would you expect that the prices that you signed
5  off on would be the prices that would be reported
6  to the pricing compendia?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  That's my experience.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Because you were the, you were the
11  general manager, the boss?
12    A.  Yeah, I was the director at the time.
13    Q.  Okay.  Did you have any other
14  responsibilities from mid-'90 to mid-'92?
15    A.  No.
16        MS. TABACCHI:  Object to the form.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  And you took with you, didn't you, sir,
19  your experiences to that position that you had
20  previously when you were in the Homecare Unit?
21        MS. TABACCHI:  Object to the form.
22  BY MS. ST. PETER-GRIFFITH:

Page 92

1    Q.  Is that fair?
2    A.  Yes.
3    Q.  Okay.  Sir, your next position -- I've
4  got to flip back here.  Excuse me.  Well, let me
5  ask you this:  When you were the marketing manager
6  from '85 -- in '85 through the end of  '87, what
7  were your responsibilities?
8    A.  I was responsible for the development of
9  the product line.  I was responsible for the
10  promotional efforts that were put forth with regard
11  to our product line and coordinating those efforts
12  with the sales team.  And I was responsible for
13  responding to any customer inquiries with regard to
14  our products, those products.
15    Q.  Any other responsibilities with that
16  position?
17    A.  I was, I was responsible for the, the
18  sales forecast and for the actual sales that came
19  against that forecast.
20    Q.  Did you work with anyone concerning
21  catalog pricing when you were the marketing
22  manager?

Page 93

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I'm sure I did.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  What about contract pricing?
5    A.  I may have.
6    Q.  Do you recall how you participated with
7  either catalog pricing or possibly with contract
8  pricing during this period of time, from '85 to
9  '87?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  No, I'm, I'm basically
12  responding to the fact that, that, that from time
13  to time marketing managers get involved in
14  particular customers on particular contracts.  They
15  don't do it as a -- on a steady basis.  And the,
16  the Contract Marketing department reviews general
17  price trends with the marketing managers
18  periodically, so.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  Okay.  When you were the director of
21  product sales within the, the Homecare Unit, what
22  were your responsibilities there?

24  (Pages 90 to 93)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 94

1     A.  My responsibilities were for the
2 development of the market, sales to that market,
3 any marketing promotional efforts directed toward
4 that market, again, forecasts and the general P & L
5 for the business, profit and loss statement for the
6 business.
7     Q.  So you had some pretty broad
8 responsibilities then, essentially for getting Alt.
9 Site up and running; is that fair?
10     A.  Yes, product sense.
11     Q.  What was your understanding of, of how
12 Abbott undertook its pricing for this particular
13 market segment?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  Which market segment are we
16 talking about?
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  The Alt. Site product sales, the non-DRG,
19 nonhospital market that you were developing the
20 business for.
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  Our, our intent was to --

Page 95

1 actually was to try to understand what price it
2 would take to penetrate that market.  So a lot of
3 what we did was trying to understand what
4 competitors were doing and, and, and what we'd have
5 to do to, to grow the market.
6         But in general because Alt. Site
7 customers were smaller and would not use the
8 volumes that hospital customers would use, which
9 would mean that our distribution costs to those
10 customers would probably be higher than to a
11 hospital.  A hospital, if I move in a truckload of
12 product, it's a lot different than if I move in
13 four cases to, you know, Dr. Joe, Joe's Clinic.
14 There are, there are different economics to, to
15 moving those products.
16         So in general, we tried to price higher
17 than the, the hospital level, but still provide
18 some discount to catalog price for commitment.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  When you were pricing your products, did
21 you take into account distribution costs of the, of
22 the smaller market segment?

Page 96

1     A.  Yes.
2     Q.  Not, not to the smaller segment but their
3 distribution costs?
4     A.  No.
5         MS. TABACCHI:  Object to the form.
6 BY MS. ST. PETER-GRIFFITH:
7     Q.  And you indicated that at this point in
8 time the customers were smaller and, and probably
9 wouldn't use volume.
10         Did you have an understanding through
11 your experience with HPD that the Alt. Site market
12 at some point changed and, and went away from this
13 smaller market to a larger, to larger group
14 purchasing organizations and larger purchasers who
15 did do larger volumes?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  No.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  No, it never changed?
20     A.  No.
21     Q.  The Alt. Site market never changed?
22         MS. TABACCHI:  Object to the form.

Page 97

1         THE WITNESS:  It didn't change in the way
2 that you, that you spoke to.
3
4
5 BY MS. ST. PETER-GRIFFITH:
6     Q.  Okay.  Let me ask you this:  Did the Alt.
7 Site market change from these smaller customers?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  No.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Do you know whether Alternate Site,
12 Hospital Products Division Alternate Site ever sold
13 to larger group purchasing organizations?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  There was a consolidation
16 of, of purchasers in, in Alternate Site, group
17 purchasing organizations.  That is true.  But the,
18 the end customer was still that small entity.  You
19 can't compare an ambulatory surgery center in
20 Lubbock, Texas to Baylor Medical Center in Dallas.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  When there was a transition to the

25  (Pages 94 to 97)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.   HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 98

1   smaller customers combining together into larger
2   group purchasing organizations, did that change the
3   market dynamic for Abbott and how it conducted its
4   pricing for Alternate Site?
5           MS. TABACCHI:  Object to the form.
6           THE WITNESS:  I think in general the, the
7   market grew, became more competitive and, and
8   prices were adjusted to reflect that over the years
9   after I left there.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   Okay.  When you were the director of
12  product sales within the Homecare Unit essentially
13  developing the market, the Alt. Site market, what
14  participation did you have, if any, in setting
15  catalog prices?
16      A.   None.
17      Q.   What about reporting catalog prices?
18      A.   None.
19      Q.   Did you have an understanding as to the
20  relationship between catalog prices and
21  reimbursement that was sought by the Alternate Site
22  market?

Page 99

1           MS. TABACCHI:  Object to the form.
2           THE WITNESS:  No.
3   BY MS. ST. PETER-GRIFFITH:
4       Q.   You didn't have any appreciation for
5   that?
6           MS. TABACCHI:  Object to the form.
7           THE WITNESS:  Not at that time.
8   BY MS. ST. PETER-GRIFFITH:
9       Q.   Are you familiar with the term AWP?
10      A.   Yes.
11      Q.   What is AWP?
12      A.   You want a definition?
13      Q.   I want your understanding -- I want Mike
14  Sellers' understanding of what is AWP?
15      A.   AWP is average wholesale price.
16      Q.   Okay.  Did you understand that the
17  Alternate Site market based -- had, had
18  reimbursement from third-party payers that was in
19  part based upon AWP?
20          MS. TABACCHI:  Object to the form.
21          THE WITNESS:  I, I don't think between
22  '88 and '90 I had an appreciation, nor -- I'm not

Page 100

1   sure that was the case between '88 and '90.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.   Okay.  When did you develop an
4   appreciation for that?
5           MS. TABACCHI:  Object to the form.
6           THE WITNESS:  I gained some appreciation
7   that AWP may have some relationship during my
8   tenure as a Home Infusion general manager.
9   BY MS. ST. PETER-GRIFFITH:
10      Q.   Did you have any other responsibilities
11  when you were the director of product sales within
12  the home, Homecare Unit?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  No.  I think I've covered
15  them all.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   Okay.  I just want to make sure that we
18  exhaust -- and have we exhausted on your
19  responsibilities when you were the director of
20  Contract Marketing for the Hospital Business Sector
21  in the mid- --
22      A.   I feel exhausted.

Page 101

1       Q.   Okay.  Sir, I'd like to move on to what
2   were your responsibilities when you were the
3   general manager for Home Infusion Services from
4   mid-'92 and the following seven-and-a-half years
5   until 2000?
6       A.   Again, I was responsible for the total
7   business, forecasting the business, reporting our
8   sales back against that, responsible for the sales
9   efforts, the sales report, the sales force reported
10  to me, responsible for administering all of our
11  contractual responsibilities with all of our
12  clients. In general growing that business was, was
13  my, my goal; and that either grew through addition
14  of clients or it grew through the expansion of
15  current clients.
16      Q.   And what was the business model for the
17  Home Infusion Unit during your tenure as general
18  manager?
19          MS. TABACCHI:  Object to the form.
20          THE WITNESS:  The predominant business
21  model that, that we promoted through most of that
22  time period was a, a contracted joint venture

26 (Pages 98 to 101)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 102

1  between us and typically hospital-based homecare
2  programs.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  How did that joint venture work?
5      A.  We would define in a written document
6  with our client what the entire Home Infusion
7  Services business was.  And we would then define
8  what the client would do in delivering those
9  services and what Abbott would offer in terms of
10  either services, products to fulfill, you know,
11  delivering the, the Home Infusion Services to the
12  patient, to the patient's home.
13      Q.  And were products provided to the
14  contract joint venture providers on a consignment
15  basis?
16      MS. TABACCHI:  Object to the form.
17      THE WITNESS:  Typically, yes.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Okay.  And how would that relationship
20  work?
21      A.  As they needed product they would order
22  it through our materials -- the materials group in

Page 103

1  Home Infusion Services, the materials group in Home
2  Infusion Services would ship the products to the
3  client, and then the client would use those
4  products in delivering services to the patient.
5      Q.  And would they have to pay for those
6  products?
7      MS. TABACCHI:  Object to the form.
8      THE WITNESS:  No.  They would not pay --
9  they would not pay an invoice for specific
10  products, no.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  How was Abbott compensated under these
13  contractual arrangements?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  Typically what was agreed
16  to in our contract was that there would be a
17  percentage of income based on therapy that would be
18  split between Abbott and the client.  So Abbott
19  would get a percentage of the Home Infusions
20  company's income.  Again, it was defined down at the
21  therapy level.
22  BY MS. ST. PETER-GRIFFITH:

Page 104

1      Q.  Would that income include income or
2  reimbursement derived from federal Medicare or
3  federal and state Medicaid programs?
4      MS. TABACCHI:  Object to the form.
5      THE WITNESS:  Included all income for
6  the, for the entity, whether it came from federal,
7  state or commercial.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  And who was responsible for evaluating
10  whether or not this consignment joint venture
11  arrangement complied with federal and state
12  Medicare and Medicaid statutes and laws and
13  regulations?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  All, all of those contracts
16  were, were reviewed, both from a business
17  standpoint, as well as from a legal compliance
18  standpoint.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  Okay.  And who did the review for the
21  legal compliance?
22      A.  Abbott legal counsel.

Page 105

1      Q.  And were they signed off on as being
2  appropriate arrangements that complied with all
3  federal and state Medicare and Medicaid laws?
4      A.  Yes.
5      MS. TABACCHI:  Object to the form.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Was there any concern at all that they
8  might violate federal anti-kickback statutes?
9      MS. TABACCHI:  Object to the form.  I'm
10  going to caution the witness not to reveal any
11  communications with Counsel on this issue.
12      THE WITNESS:  I, I personally didn't feel
13  that there were -- there was any liability there,
14  seeing as the contract delineated the risk that
15  each party was accepting in the arrangement and
16  delineated what, what would be paid to each party.
17      There was no guarantees.  There was no --
18  there was nothing that wasn't -- there was nothing
19  done outside of those arrangements -- done in those
20  arrangements that wasn't written in that document.
21  And each party was notified in that document of
22  their reporting responsibilities to whatever

27 (Pages 102 to 105)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                    Chicago, IL

Page 106

1   agencies might request data.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.  Well, how do you know -- how did you as
4   the general manager for Home Infusion Services know
5   that these particular arrangements complied with
6   all federal and state Medicare and Medicaid
7   statutes and laws?
8           MS. TABACCHI:  Object to the form.
9           THE WITNESS:  I'm not going to talk about
10  my discussions with legal counsel.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  I'm not asking about your discussions
13  with legal counsel.  I'm asking you how is it that
14  you as the general manager for this entire business
15  unit knew that this business model and these
16  contracts complied with federal and state Medicare
17  and Medicaid laws?
18          MS. TABACCHI:  I'm going to caution the
19  witness not to reveal communications with Counsel.
20  If you can answer the question without revealing
21  discussions with Counsel.
22          THE WITNESS:  I feel I had been assured.

Page 107

1   BY MS. ST. PETER-GRIFFITH:
2       Q.  Okay.  Can you answer that question
3   without revealing conversations with Counsel?
4       A.  No.
5       Q.  And who did you speak with in the
6   Counsel's office?
7       A.  I can't remember who was there at the
8   time.
9       Q.  Do you remember how many conversations
10  you had?
11      A.  No, not specifically.
12      Q.  Do you remember who they were with?
13      A.  No.
14      Q.  Do you remember when they took place?
15      A.  No.
16      Q.  What was your understanding as to how
17  Medicaid and Medicare reimbursed for these types of
18  Home Infusion clients that, that served as the
19  market for Home Infusion Services?
20          MS. TABACCHI:  Object to the form.
21          THE WITNESS:  I knew, I knew they
22  reimbursed based on a variety of different

Page 108

1   formulas.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.  Okay.  And what were those formulas?
4       A.  I don't know the formulas.
5       Q.  Do you know whether there were any
6   manuals that delineated that for the Home Infusion
7   Unit?
8           MS. TABACCHI:  Object to the form.
9           THE WITNESS:  I don't remember reading
10  anything that delineated by state or by any
11  particular factor of how, of how those numbers were
12  derived.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Do you know whether there was any written
15  manual, though, or manuals that provided guidance
16  to the Home Infusion Unit concerning that?
17      A.  There were a number, there were a number
18  of manuals in Home Infusion Services.  So it, it
19  would not surprise me if the manual talked in
20  general about some of those things.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Well, do you know whether the Contract

Page 109

1   Marketing component to Home Infusion had guidance
2   on how to assist the joint venturers in their -- in
3   their pricing for their services?
4           MS. TABACCHI:  Object to the form.
5           THE WITNESS:  Our contract function
6   didn't participate with our clients in pricing the,
7   the pricing that the customer -- that our clients
8   did on their services.
9   BY MS. ST. PETER-GRIFFITH:
10      Q.  It didn't?
11      A.  Not to my recollection.
12      Q.  Did you, do you know whether any
13  component of Home Infusion, Home Infusion Services
14  provided assistance to the Home Infusion joint
15  venturers as to how they should be pricing for
16  their clients?
17          MS. TABACCHI:  Object to the form.
18          THE WITNESS:  The reimbursement area may
19  have provided some template.  But it was typically
20  the reimbursement area that, that worked with
21  clients with regard to.
22  BY MS. ST. PETER-GRIFFITH:

28 (Pages 106 to 109)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                        Chicago, IL

Page 110

1     Q.  Do you know whether the Home Infusion,
2  the Home Infusions Services joint venturers were
3  reimbursed by Medicare or Medicaid or third-party
4  payers using an AWP formula or some formulary that
5  used AWP?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  Again, I -- depending on
8  the therapy, depending on the drug, there were all
9  number of formulas, there were all number of
10 protocols.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Did you, though, have an understanding as
13 to whether any of these protocols or formulas were
14 in part based upon AWP?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I was aware that some
17 products may have been derived from an AWP-type
18 formulation, but I was also aware of products that
19 weren't.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Okay.  Which products were and which ones
22 weren't?

Page 111

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  Well, you know, I can tell
3  you the ones I know that weren't, and that is
4  nutritional solutions were not.  They were based,
5  at least for Medicare, were based on a, a payment
6  schedule based on calories delivered to the
7  patient.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  And it's your --
10    A.  It had nothing to do with AWP.
11    Q.  You're sure of that?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  There was nothing published
14 that said it had anything to do with AWP.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.  Okay.  What --
17    A.  Plus it was covering more products than,
18 than just one.
19    Q.  Okay.  Which products that were utilized
20 in Home Infusion or by Abbott's Home Infusion joint
21 venturers were reimbursed based upon AWP?
22       MS. TABACCHI:  Object to the form.

Page 112

1        THE WITNESS:  I don't know any that I can
2  quote off the top of my head.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.  What with Vancomycin?
5     A.  Don't --
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  Don't know.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  Did you delegate responsibility for
10 understanding how reimbursement was made to
11 somebody --
12       MS. TABACCHI:  Object to the form.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.  -- within the Home Infusion Unit?
15    A.  Virginia Tobiason ran the department.
16 But reimbursement on a particular account or a
17 particular patient or, you know, varied
18 significantly.
19    Q.  But the --
20    A.  It also depended on which state you were,
21 you were dealing in.
22    Q.  Are you familiar with the term usual and

Page 113

1  customary?
2     A.  Yes.
3     Q.  What is usual and customary?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  Usual and customary is what
6  you would say is your standard cost for a therapy.
7  So it would be the standard billing rate, let me
8  put it that way, the standard billing rate for a
9  client for a therapy.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  Do you know whether usual and customary
12 rates were set based upon some formulary that
13 involved AWP?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  I'm not aware of how they,
16 how they were set.  They varied based on client.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  Okay.  Well, do you -- are you familiar
19 with whether the Home Infusion Unit during your
20 seven-and-a-half-year tenure as the head of it
21 provided guidance to the joint venturers as to how
22 to set usual and customaries based upon AWP?

29  (Pages 110 to 113)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                     Chicago, IL

Page 114

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  No.
3    BY MS. ST. PETER-GRIFFITH:
4      Q.  No, you don't recall or, no, they didn't
5    do that?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  No, I don't recall.
8    BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay.  Is it possible that Abbott's Home
10   Infusion Unit could have been providing advice to
11   Counsel as to how to calculate usual and
12   customaries based upon AWP?
13         MS. TABACCHI:  Object to the form.
14         Can you please read the question
15   back?
16         (Record read as requested.)
17   BY MS. ST. PETER-GRIFFITH:
18     Q.  And, I'm sorry, I didn't mean advice to
19   Counsel.  I meant advice to customers and joint
20   venturers.
21         MS. TABACCHI:  I object to the form
22   still.

Page 115

1          THE WITNESS:  It was my experience that
2    when we had a brand new client come on board that
3    had no experience in the marketplace, we would
4    provide a template of UNCs.  But our, our, our
5    statement to them was these are your numbers, not
6    ours; so you, you don't need to accept them, you
7    can change them however you want, in fact, we would
8    urge you to change them to whatever you want it to
9    be, because these are going to be your numbers.  So
10   how the UNCs were calculated on an item-by-item
11   basis, I have no knowledge of.
12   BY MS. ST. PETER-GRIFFITH:
13     Q.  Did you think it was your responsibility
14   as the director of Home Infusion to have an
15   understanding as to how usual and customaries were
16   reimbursed by Medicaid and Medicare given this
17   particular market?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  No.
20   BY MS. ST. PETER-GRIFFITH:
21     Q.  How come?
22         MS. TABACCHI:  Object to the form.

Page 116

1          THE WITNESS:  Usual and customaries
2    weren't reimbursed.
3    BY MS. ST. PETER-GRIFFITH:
4      Q.  Usual and customaries weren't reimbursed?
5      A.  Usually not.
6      Q.  Okay.  Well, how were your joint venture
7    clients reimbursed for their services, which in
8    turn Abbott took a percentage of?
9      A.  Again --
10         MR. MS. TABACCHI:  Object to the form.
11         THE WITNESS:  -- usual, usual and
12   customary is the billing rate.  The, the payer,
13   regardless of whether it's a Government payer or an
14   independent payer, pays what they want to pay.  And
15   so  -- and in fact, we monitored what our
16   collections were as a percentage of UNC because we
17   knew UNC was not a number that we were going to
18   collect on, just as hospitals bill today.  They've
19   got a standard billing rate that nobody pays except
20   for the uninsured, as I understand it.
21   BY MS. ST. PETER-GRIFFITH:
22     Q.  Now, did Virginia Tobiason's unit

Page 117

1    actually submit claims on behalf of some of the
2    Home Infusion joint venturers to third-party
3    payers?
4          MS. TABACCHI:  Objection to form.
5          THE WITNESS:  If that was part of our
6    contract, if that was part of the services we
7    offered, yes.
8    BY MS. ST. PETER-GRIFFITH:
9      Q.  How did the reimbursement department go
10   about ascertaining what they would bill to
11   third-party payers on behalf of the joint
12   venturers?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  The client decided.
15   BY MS. ST. PETER-GRIFFITH:
16     Q.  How, and how is that communicated to
17   Abbott's Home Infusion reimbursement department?
18     A.  It was defined by putting those UNCs in
19   our operating system.
20     Q.  Okay.  Would that be the CHIP system?
21     A.  Yes.
22     Q.  So the, the customer's UNCs would be

30 (Pages 114 to 117)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 118

1  implemented into the CHIP system and then that
2  would be an automated system that the reimbursement
3  department could use in terms of generating billing
4  on behalf of the joint venturer?
5      A.  Yes.
6      Q.  Do you know whether the nutritional
7  products for the largest ten state's Medicaid
8  programs based their reimbursement upon AWPs?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I, I have no knowledge with
11  regard to that.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Who within Home Infusion would know that?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I'm not sure anybody in
16  Home Infusion in 2007 would know what happened in
17  1992 to '97 with regard to particular states.  But
18  for the most part, that was within Virginia
19  Tobiason's organization.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay.  What was your understanding of
22  AWPs upon the home infusion market?

Page 119

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  Can you please read the
3  question back?  I'm not sure I understand.
4          (Record read as requested.)
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Again, I think there were
7  a, a variety of reimbursement mechanisms used.
8  Whether it's AWP, mean acquisition cost, mean AWP,
9  median AWP, any number of, of payers used any
10  number of those as a baseline, whether it was AWP
11  minus, AWP plus, I think there were variations on
12  all those themes throughout that time period.
13  There was also WAC plus, WAC minus, since, since
14  those were the two published data points.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.  I want to go over these terms that you've
17  just thrown out here.  What does AWP -- what do you
18  mean by AWP being an acquisition cost?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  I didn't say that.  I said
21  mean acquisition cost.  I believe somebody had --
22  some insurer someplace had that as a -- how they

Page 120

1  calculated it, I'm not sure, but I remember the
2  term.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Why did the RedBook information show up
5  on the CHIP system?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Because a lot of the payers
8  required on their claim forms some numbers that
9  would come out of RedBook, both for Abbott product
10  as well as non-Abbott product.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Which payers?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I, I cannot tell you that.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.  Medicaid or Medicare?
17     A.  I don't know.
18     Q.  Who would know?
19     A.  Again, Virginia ran that organization.
20     Q.  Did you have an understanding as to
21  whether or not reporting AWP on a HICFA 15 -- well,
22  let me ask you this, do you know what a HICFA 1500

Page 121

1  form is?
2      A.  I've heard the term.
3      Q.  Do you know what it is?
4      A.  I wouldn't know one if it walked past me
5  on the street.
6      Q.  Okay.  Where would RedBook get its
7  information for determining AWP?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  I do not know.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.  Well, do you know if there was any
12  relationship between the catalog prices reported by
13  Abbott's Hospital Products Division and the
14  calculation of AWP by the third-party compendia?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  I know that RedBook was one
17  of the Compendia that we reported prices to.
18         MR. ANDERSON:  Objection, not responsive.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Did you have an understanding as to the
21  relationship between the catalog prices reported by
22  the Hospital Products Division to the third-party

31 (Pages 118 to 121)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL          November 1, 2007
                          Chicago, IL

Page 122

1  compendia and the calculation of AWP?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  No.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  You didn't have any understanding of that
6  relationship?
7     A.  I didn't have any understanding of it,
8  no.
9     Q.  Do you -- were there any resources that
10  you were familiar with that could have helped you
11  identify that understanding?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I have no idea.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.  Did you have any other responsibilities
16  when you were the general manager for Home Infusion
17  Services?
18     A.  No.  That kept me pretty busy.
19     Q.  So we've exhausted your memory on what
20  you, what your responsibilities were?
21     A.  Yes, yes.
22     Q.  And then, sir, in 2000 you moved on to

Page 123

1  the general manager for Contract Marketing and then
2  for Home Infusions Services, and then ultimately
3  Home Infusions Services was phased out?
4     A.  Right.
5     Q.  During this period of time was your
6  responsibilities with regard to Home Infusion
7  Services to oversee the phasing out of that
8  business?
9     A.  Yes.
10     Q.  What was done with the CHIP system?
11     A.  As I, as I understand -- we, we tried to
12  work with our clients to get as many clients off
13  the CHIP system as possible.  And at some point we
14  decommissioned it.
15     Q.  Okay.  Did you license it?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  Did I license it?
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Well, did, did Abbott -- I'm sorry, did
20  Abbott license the CHIP system to, to any third
21  parties that you're aware of or former clients?
22       MS. TABACCHI:  Object to the form.

Page 124

1       THE WITNESS:  I, I believe we may have.
2  I, I can't tell you who.  We may have.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.  Okay.  Did you have any other
5  responsibilities after 2000 for Home Infusion
6  Services?
7     A.  Well, it went into 2001.  We actually --
8  I don't -- I think we actually closed all the
9  things down at the end of 2001.
10     Q.  Let me ask you this, I meant to ask you
11  this before:  When you were -- for the seven-and-a-
12  half years that you were the general manager of
13  Home Infusion Services, did you have any
14  responsibilities with regard to Abbott's
15  pharmacies?
16     A.  Yes, they reported into that business
17  unit.
18     Q.  What were your responsibilities with
19  regard to Abbott's pharmacies?
20     A.  The operation of the pharmacies.
21     Q.  At -- at any point -- well, how many
22  pharmacies did Abbott have?

Page 125

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  When I, when I assumed the
3  position in '92 we had three pharmacies.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Do you remember where they were located?
6     A.  One was in Fairfield, New Jersey, one was
7  in Abbott Park, Illinois, and one was in Santa Fe
8  Springs, California.
9     Q.  And did those pharmacies seek
10  reimbursement from or bill to the Medicaid --
11  Medicare or Medicaid programs?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  No.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.  None at all?
16     A.  No.
17     Q.  I just want to make it clear.  The Abbott
18  pharmacies did not at any time during your tenure,
19  your seven-and-a-half years as the director
20  overseeing Home Infusion, bill to Medicaid or
21  Medicare?
22     A.  No, they didn't.

32 (Pages 122 to 125)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 126

1    Q.  Do you know whether they had a Medicare
2  or Medicaid provider numbers?
3    A.  Yes, they have did.
4    Q.  All right.  Do you know what those
5  numbers were?
6    A.  No.
7    Q.  Okay.  How do you know that they didn't
8  bill to Medicare or Medicaid?
9    A.  Because they didn't bill anybody.
10    Q.  They didn't bill -- what do you mean they
11  didn't bill anybody?
12    A.  Our pharmacies were not responsible for
13  billing.
14    Q.  What were they responsible for?
15    A.  They were responsible for compounding
16  drugs, preparation of drugs and supplies for
17  patients and delivery of supplies and compounded
18  drugs to patients as well as training patients.
19    Q.  And how were they reimbursed for, for the
20  delivery of supplies to patients?
21    A.  They weren't reimbursed at all.
22      MS. TABACCHI:  Objection to form.

Page 127

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Well, why did you have them?
3      MS. TABACCHI:  Object to the form.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Why did you have -- why did Abbott have
6  these pharmacies?
7      MS. TABACCHI:  Object to the form.
8      THE WITNESS:  Again, they were, they were
9  a component of the services that we could offer a
10  client.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  Okay.  So you provided -- so Abbott
13  provided services to its joint venturers that were
14  pharmacies -- essentially pharmacy services?
15    A.  Some our clients, yes.
16    Q.  Okay.  And then would the -- whose name
17  would the delivery of the supplies be billed to a
18  third-party payer?
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  In the name of the client.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  The joint venture client?

Page 128

1    A.  Yes.
2    Q.  Are you aware at any time of Abbott
3  pharmacies having its own client base which is
4  billed directly to Medicaid or Medicare?
5    A.  Our pharmacies did not do any billing.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Was that during your tenure with Home
8  Infusion or are you aware of them not doing any
9  billing at any time?
10    A.  I'm not aware of pharmacies ever doing
11  any billing.
12    Q.  Did the pharmacies eventually shut down?
13    A.  Yes.
14    Q.  Okay.  Was that, was that -- did that
15  occur at the same time as the phasing out of Home
16  Infusion in 2000, 2001?
17    A.  No, we actually shut down the Fairfield,
18  New Jersey pharmacy at some point earlier.  I don't
19  know whether that was in '9 -- that may have been
20  in '96.  I'm not sure.
21    Q.  Okay.  What about the other two?
22    A.  The other two -- the Santa Fe Springs

Page 129

1  pharmacy closed first.  It probably closed in maybe
2  '99, and the Chicago-based pharmacy I think closed
3  in 2000, maybe the beginning of 2001.  I'm not
4  sure.  But it was, it was the last pharmacy to
5  close.
6    Q.  Okay.  Have we exhausted your
7  responsibilities or your memory concerning your
8  responsibilities in 2000, 2001 for Home Infusion
9  services?
10    A.  Yes.
11    Q.  Okay.  What were your responsibilities as
12  the general manager for Contract Marketing from
13  2000 to April of 2004?
14    A.  It -- it was pretty much the same as, as
15  I had had in, in 1990 to 1992.  The difference was
16  that the organization was about twice the size.
17  And our -- you know, our, our work burden was, was
18  at least twice the size.  But still the same,
19  responsible for analysis, offering, negotiation,
20  contract development, contract completion,
21  administration of the contracts, responsible for
22  the, you know, Government contracts as well.

33 (Pages 126 to 129)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 130

1    Q.  What about catalog pricing, same
2  responsibilities as you had before?
3    A.  Yes.
4    Q.  Any additional responsibilities with
5  regard to catalog pricing?
6    A.  No.
7    Q.  Well, let me ask you, during this period
8  of time did you have increased responsibilities
9  because the Hospital Business Sector, Contract
10  Marketing had absorbed the Alt. Site Contract
11  Marketing?
12    A.  Well, I think I said that before that
13  around the middle of 2000 I was given the direct
14  responsibility for those contracting efforts.
15    Q.  And I -- you did say that before.  My
16  question is did that increase your workload and
17  your responsibilities, I guess?
18    A.  Yes.
19    Q.  Okay.  Was there any difference between
20  how Alt. Site Contract Marketing went about pricing
21  its contracts and how the Hospital Business Sector
22  priced its contracts?

Page 131

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I'm sure there were some
3  inherent differences, but I'm not aware of any, any
4  fundamental differences, no.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Well, was AWP important to the Alt. Site
7  customers, to your knowledge?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I have no idea whether it
10  was important to them or not.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  Do you know whether the sales force as
13  part of proposal analyses provided AWP information
14  to Alt. Site customers?
15    A.  That was not our practice.
16    Q.  You're certain of that?
17    A.  Yes.
18    Q.  Well, we've heard testimony in this case
19  that proposal analyses provided to customers
20  included an AWP analysis on a regular basis.  Were
21  you aware of that?
22        MS. TABACCHI:  Object to the form.

Page 132

1  Object to the form.
2        THE WITNESS:  It would be a surprise.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Why do you say that it was not our
5  practice?
6    A.  It just wasn't our practice.  In fact, I
7  believe the late, late '90s we had instructed the
8  sales force that it was not our practice.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  And how did you instruct the sales force
11  in the late '90s that it was not your practice?
12    A.  Pete Baker in his communication to me
13  said that there was some instruction given to them
14  around that time frame.
15    Q.  Do you know whether it was oral or
16  written?
17    A.  No, I don't.
18    Q.  Is your understanding that there was an
19  instruction based exclusively upon your
20  conversation with Pete Baker?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  Is my knowledge?

Page 133

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Yes.
3    A.  That specific knowledge, yes, with regard
4  to that.
5    Q.  Okay.  Do you have any other -- other
6  than your --
7    A.  Other than, other than that, it's just a
8  general haze somewhere back here that --
9    Q.  Well, you seem somewhat certain that that
10  was not your practice in Alt. Site to provide AWP
11  information to Alt. Site customers.  I want to know
12  why you're so certain of that?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  I just, I just -- my
15  general recollection is, is that, you know, we had
16  -- we had, we just didn't handle that.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  And what is the basis of that
19  recollection?
20    A.  Again, I don't --
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  It's general recollection.

34 (Pages 130 to 133)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 134

1        MS. ST. PETER-GRIFFITH:  Why don't we
2   take a break.  We've got to change the tape.
3        THE VIDEOGRAPHER:  We are off the record
4   at 12:01 p.m. with the end of tape number two.
5        (Lunch recess.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 135

1        A F T E R N O O N   S E S S I O N
2        THE VIDEOGRAPHER:  We are back on the
3   record at 12:55 p.m. with the start of tape number
4   three.
5   BY MS. ST. PETER-GRIFFTH:
6        Q.  Good afternoon, Mr. Sellers.
7        A.  Good afternoon.
8        Q.  Mr. Sellers, earlier today you testified
9   that RedBook, when we were talking about RedBook
10  information in the CHIP system you said that
11  RedBook contained some information, and I want to
12  identify your understanding as to what information
13  RedBook had that was utilized by the Hospital
14  Business Sector or Hospital Products Division in
15  general.
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  As, as I recall the -- the
18  -- and I don't, I don't remember exactly all of the
19  data that, that we got on our update tapes from
20  RedBook that were, that would -- were then sent in
21  to the CHIP system; but basically the compendia
22  list had what the list price of a drug was, what

Page 136

1   the WAC price for the drug was.
2        It also, as you noted, I think had an AWP
3   of -- for at least some products.  It also listed a
4   number of other statistics with regard to products,
5   some related to the way FDA looked at it and some
6   related to how the, how the product was packaged
7   and so on.
8        So it, it was a reference for -- you
9   know, a lot of that data was put in CHIP as a
10  reference because a good number of the drugs that
11  we would use or bill for were not manufactured by
12  Abbott Laboratories.
13       Q.  Well, would you use that information also
14  for Abbott Laboratory products?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  Yes.
17  BY MS. ST. PETER-GRIFFTH:
18       Q.  Okay.  And how would you use that
19  information?
20       A.  Again, that, I'm not sure exactly what
21  all was used and where.  I just know that in prior
22  conversations there was a reason to have it there

Page 137

1   from the reimbursement group.
2        Q.  But you don't have --
3        A.  But I don't know exactly where they used
4   it.
5        Q.  What about for the Contract Marketing
6   Group, would there be a reason for the Contract
7   Marketing group like Dave Brincks and his staff to
8   have access to information contained in RedBook?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  I, I don't believe so.
11  BY MS. ST. PETER-GRIFFTH:
12       Q.  Okay.  Well, do you know or --
13       A.  I don't, I don't believe so.
14       Q.  Do you know -- when did you first learn
15  that AWP impacted reimbursement for some
16  third-party payers?
17       A.  Object to the form.
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  I can't tell you a time.
20  BY MS. ST. PETER-GRIFFTH:
21       Q.  Well, was it '80s, '90s?
22       A.  Sometime during the '90s.

35 (Pages 134 to 137)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
                      Chicago, IL

Page 138

1    Q.  And how did you learn that information?
2    A.  I can't -- I can't recall.
3    Q.  Did anyone within either Alt. Site or
4  Home Infusion ever sit down and explain to you the
5  significance or the importance of AWP to Home
6  Infusion or Alternate Site customer reimbursement?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  Not that I recall.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Who would you have expected to explain
11  that to you?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I wouldn't have expected
14  anyone to explain it to me.
15  BY MS. ST. PETER-GRIFFTH:
16   Q.  Well, if AWP was significant to either
17  Home Infusion or Alternate Site reimbursement,
18  would that be something that you would want to
19  know?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  I would -- I would only
22  expect to have heard anything about it if there was

Page 139

1  a, a difficulty that our reimbursement team had
2  with, with it for some reason.  I mean, I, I didn't
3  as a normal course of my, my work look at every
4  claim that went out, nor would I have known what I
5  was looking at if I had.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Okay.  Well, in the '80s when you
8  originated product sales group in the Homecare
9  Unit, did you have an understanding or an
10  appreciation for the impact of AWP on
11  reimbursement?
12   A.  I don't believe I did.
13   Q.  Well, you -- in terms of hearing about an
14  issue coming up in '95 did you hear about an issue
15  concerning Vancomycin catalog pricing changes and
16  the impact on AWP?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  In, in '95 I remember
19  hearing a, an issue with regard to our list price
20  on Vancomycin.
21  BY MS. ST. PETER-GRIFFTH:
22   Q.  Okay.  Well, what was your understanding

Page 140

1  of the issue?
2    A.  We were getting some push-back from our
3  clients because in their discussions with managed
4  care payers, as I remember, they were inquiring as
5  to why they were using Abbott's Vancomycin versus
6  using somebody else's Vancomycin.
7    Q.  Okay.  What happened?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  Dave Brincks was, was, was
10  going to work on it and I believe he talked to some
11  people in HBS Contract Marketing about it, and he
12  convinced them that they should reduce the price,
13  the list price on -- I don't know how many SKUs of
14  Vancomycin but on a couple at least.
15  BY MS. ST. PETER-GRIFFITH:
16   Q.  Okay.  What are -- you said SKUs?
17   A.  Stock-keeping units.
18   Q.  Oh, okay.  And so Mr. Brincks convinced
19  them to -- someone within HBS to change the list
20  prices on Vanco?
21   A.  I believe that was the result of his
22  discussions, yes.

Page 141

1    Q.  Okay.  And did those change -- did those
2  reduced list prices remain in effect in '95 after
3  Mr. Brincks had that conversation?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  Well, they, they were, they
6  were put into effect after he had the conversation;
7  and as I recall from documents I've seen subsequent
8  to that, the price was then brought back up to
9  where it was prior to that adjustment at some later
10  point in time in 1995.
11  BY MS. ST. PETER-GRIFFTH:
12   Q.  Do you remember it was brought back up?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  Not specifically, no.
15  BY MS. ST. PETER-GRIFFTH:
16   Q.  Were you consulted with regard to this
17  Vancomycin price change?
18   A.  I was made aware by Dave of what his
19  discussions were and what he was trying to do, what
20  he ended you being successful in doing.  And then
21  he also made me aware of when it reversed.
22   Q.  Do you know whether the sales force had

36  (Pages 138 to 141)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 142

1  any input into the decision to raise the Vancomycin
2  price after it was lowered at the request of Mr.
3  Brincks?
4      A.  I don't know --
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  I don't know who all had
7  any input in regard to that since we didn't control
8  list price in Home Infusion.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Sir, I'd like to take you to your first
11 day as a Hospira employee.  Do you recall anything
12 significant happening in the first week that
13 Hospira was in existence concerning Hospira's
14 prices on the former Hospitals Products Division
15 products?
16         MS. TABACCHI:  Object to the form.
17 Again, he's not here to testify in his capacity as
18 a Hospira employee.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Go ahead, you can, you can --
21         MS. TABACCHI:  I'm going to instruct the
22 witness not to testify in his capacity -- he's not

Page 143

1  here to testify about Hospira.  We can take this
2  off the record.
3          MS. ST. PETER-GRIFFTH:  I -- he is here
4  as an individual to testify.  He's not -- I'm not
5  asking about his capacity as Hospira employee.  I'm
6  asking him about something that happened when he
7  was a Hospira employee.
8          If you're instructing him not to
9  answer, I'm telling you, Tina, we're going to take
10 it to the Judge and I will come back here because
11 there is a very -- this relates to a subsequent
12 remedial measure that apparently was taken at
13 Hospira.
14         And I'm trying to inquire whether the
15 decision was made during the period of time that it
16 occurred at Hospira or prior to that point in time
17 when he was an Abbott employee.
18         So you have a choice, but you're going to
19 fly me back here and we're going to ask these
20 questions again.
21         MS. TABACCHI:  He's not going to testify
22 about anything that Hospira did.

Page 144

1          MS. ST. PETER-GRIFFTH:  And what's your
2  basis for that?
3          MS. TABACCHI:  Well, let's go off the
4  record.
5          MS. ST. PETER-GRIFFTH:  No, what -- I
6  want on the record for you to state your basis as
7  to why I cannot ask this gentleman questions about
8  his experiences as a Hospira employee.
9          MS. TABACCHI:  Because it's my
10 understanding that he was -- I was not involved in
11 the communications.  I'd like to call my partner.
12 It's my understanding that the agreement to produce
13 Mr. Sellers today was in his capacity as an Abbott
14 employee.  Hospira is not a party to this case.
15         MS. ST. PETER-GRIFFTH:  That conversation
16 -- let me tell you something, the United States
17 never agreed to that.  We wanted him in his
18 individual capacity.  I'm not here asking him
19 questions in his -- in his capacity to speak for
20 Hospira.  I'm here to ask questions to Mike
21 Sellers, the individual.
22         MS. TABACCHI:  All right.  I would like

Page 145

1  to request then that we go off the record so that I
2  can make a phone call and then we can resolve this.
3          MS. ST. PETER-GRIFFTH:  Okay.
4          THE VIDEOGRAPHER:  We are off the record
5  at 1:06 p.m.
6              (Brief recess.)
7          THE VIDEOGRAPHER:  We are back on the
8  record at 1:11 p.m.
9  BY MS. ST. PETER-GRIFFTH:
10     Q.  Mr. Sellers, are you familiar with or are
11 you aware of price changes, either catalog price
12 changes or contract price changes that occurred for
13 the former Abbott product line that Hospira
14 subsumed within the first week of Hospira's
15 existence?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  I believe in 2004 we made
18 some catalog price changes, but I don't remember
19 anything that was remarkable about those.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  Do you recall whether some of those
22 changes, catalog price changes were significant?

37 (Pages 142 to 145)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL     November 1, 2007
Chicago, IL

Page 146

1  And when I say "significant" I mean a 30, 40, 50
2  percent reduction in the prices.
3      MS. TABACCHI:  Object to the form.
4      THE WITNESS:  All I remember is that some
5  prices went up, some prices went down.
6  BY MS. ST. PETER-GRIFFTH:
7      Q.  Do you recall when the decision was made
8  to make those catalog price changes?
9      MS. TABACCHI:  Object to the form.
10     THE WITNESS:  Probably in the couple of
11 months preceding our spin.
12 BY MS. ST. PETER-GRIFFTH:
13     Q.  And who made those decisions?
14     MS. TABACCHI:  Object to the form.
15     THE WITNESS:  The, the price changes were
16 developed by my, my team, again reviewed with
17 marketing, and, and adjusted accordingly.  And then
18 reviewed with the soon-to-be Hospira management.
19 BY MS. ST. PETER-GRIFFTH:
20     Q.  And who was the soon-to-be Hospira
21 management?
22     A.  I, I would -- I -- I don't know.  I

Page 147

1  would, I would assume -- I, I believe we reviewed
2  it with, with Chris Begley and our legal counsel at
3  that time.
4      Q.  And who was your legal counsel?
5      A.  Brian Smith, he's our head legal counsel.
6      Q.  Any other legal counsel that you --
7      A.  Roy Spedward was, was also involved.
8      Q.  And why was the decision made prior to
9  the Hospira spin to make changes in catalog
10 pricing?
11     MS. TABACCHI:  I'm going to caution the
12 witness not to reveal the substance of any
13 communications with counsel.
14     THE WITNESS:  It was a, it was a normal
15 catalog price adjustment.  It probably was on a
16 parallel with what we had done in 2003.  And, and
17 probably in parallel with what we had done in 2002.
18 BY MS. ST. PETER-GRIFFTH:
19     Q.  And what had you done in terms of catalog
20 price adjustments in 2003 and 2002?
21     MS. TABACCHI:  Object to the form.
22     THE WITNESS:  We had reviewed prices,

Page 148

1  decided which ones were going to go up, which ones
2  were going to go down.  So it was, it was a
3  mixture. It wasn't an across-the-board increase.
4  It wasn't an across-the-board decrease.  It
5  depended on each product.
6  BY MS. ST. PETER-GRIFFTH:
7      Q.  Prior to 2002 do you recall catalog
8  prices being adjusted downward at any time?
9      A.  Yes.
10     Q.  When?
11     A.  2001.
12     Q.  What happened in 2001 that caused a price
13 adjustment downward on the catalog prices?
14     MS. TABACCHI:  Object to the form.  Also
15 going to caution the witness not to reveal the
16 substance of any communications with Counsel with
17 respect to 2001 price adjustments.
18     THE WITNESS:  In 2001 we made an overall
19 view -- a review of our catalog prices and it was a
20 consensus that a number of those should be reduced.
21 BY MS. ST. PETER-GRIFFTH:
22     Q.  And what was it in 2001 that caused the

Page 149

1  overall review of the catalog price changes?
2      MS. TABACCHI:  Object to the form.  I'm
3  going to caution the witness again not to reveal
4  the substance of any communications with Counsel.
5  BY MS. ST. PETER-GRIFFTH:
6      Q.  I'm not interested in your communications
7  with Counsel, okay, so you know that's not
8  something that I want to hear about.  But why was
9  the decision made?
10     MS. TABACCHI:  Object to the form.
11 Again, the witness should not reveal communications
12 with Counsel.
13     MS. ST. PETER-GRIFFTH:  Tina, I don't
14 think you need -- I mean, I'm, I'm telling him
15 right now he doesn't need to disclose any
16 communications with Counsel.  Each time you do that
17 it sounds like you're coaching the witness, so I
18 don't want that instruction -- I mean, I, I -- I am
19 telling the witness I'm not interested in
20 communications with Counsel so he knows that.
21     MS. TABACCHI:  All right.  But you also
22 appreciate that this whole area is very complicated

38 (Pages 146 to 149)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 150

1  in the sense that there are a lot of privilege
2  issues, and so navigating through those waters is
3  not easy.  I just want to make sure that the
4  witness does not testify about the substance of
5  communications with Counsel in this line of
6  questioning.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Do you understand that, sir?
9     A.  Yes.
10       MS. ST. PETER-GRIFFTH:  Okay, the witness
11  understands that.
12       THE WITNESS:  There was a consensus among
13  management that we should change our prices.
14  BY MS. ST. PETER-GRIFFTH:
15     Q.  And who, who was the consensus among?
16     A.  Well --
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  Well, it involved HPD
19  management.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.  Who in HPD management?
22     A.  I would assume it would involve Guy

Page 151

1  Wiebking, who was my boss, Chris Begley, and Rick
2  Gonzalez, who was the division president at the
3  time.
4     Q.  Anyone else?
5     A.  No, that would have been the division
6  hierarchy.
7     Q.  Were you involved in the decisionmaking?
8     A.  I was the one that did the analysis.
9     Q.  When you say you did the analysis, what
10  do you mean?
11     A.  Well, I was the one that -- that
12  orchestrated the analysis in pulling together all
13  of the prices and defining where our current prices
14  were, what, what comparisons we made, what impacts
15  we could foresee, that kind of analysis.
16     Q.  And what impacts did you foresee?
17     A.  Well, if you -- if you reduce your list
18  price, you're going to get lower sales at list
19  price. So your noncontract customers are going to
20  pay less; therefore, your -- any revenue that you
21  may have planned based on an ongoing purchase
22  history of noncontract sales is obviously going to

Page 152

1  go down. Anything -- if you reduce your prices
2  below contract prices, you obviously have to take
3  those contract prices down.  So those -- that's,
4  that's the analysis that we went through.
5     Q.  Any other impact that you evaluated?
6     A.  No.
7     Q.  Isn't it true, sir, that for some of the
8  AWPs on the products that -- for which you took a
9  list, list price reduction that those AWPs were
10  already lowered because of conduct by the
11  Department of Justice?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  We did not -- we didn't
14  look at AWPs.  We don't set AWPs so we didn't look
15  at AWPs in that analysis.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  In evaluating whether or not to reduce
18  the list price, are you telling me, is it your
19  testimony, sir, under oath in this litigation --
20     A.  Yes.
21     Q.  -- that AWP had no impact upon that
22  decision?

Page 153

1       MS. TABACCHI:  Objection, object to the
2  form.
3       THE WITNESS:  You asked whether AWP, if
4  we, if we looked at that -- AWPs that were lowered
5  by the Department of Justice.  No, we didn't.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  Okay.  Sir, my question to you is this:
8  Did the activities undertaken by the Department of
9  Justice to lower AWPs have any impact on the
10  decision to lower list prices in 2001?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  It -- it was not a sole --
13  there were, there were a number of factors that
14  probably led up to our doing this analysis.
15
16
17  BY MS. ST. PETER-GRIFFTH:
18     Q.  Okay.  What were -- well, you said it was
19  not the sole factor.  Was it a factor?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  There, there were a lot of
22  things happening in 2000 in the industry, in

39 (Pages 150 to 153)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 154

1  Congress, in CMS, which wasn't CMS at that time;
2  but -- so there were -- there were -- there was a
3  lot of discussion going on.  There was a lot of
4  things happening.  All of those contributed to us
5  evaluating our price model.
6  BY MS. ST. PETER-GRIFFTH:
7      Q.  Sir, I'm going ask you, I'm going to ask
8  court reporter to read back my question and I'm
9  going to ask you to answer it, please.
10         (Record read as requested.)
11         MS. TABACCHI:  I'm going to object to the
12  form, asked and answered.
13         THE WITNESS:  It may have been one of the
14  contributing factors.
15  BY MS. ST. PETER-GRIFFTH:
16      Q.  Do you know for a fact whether it was a
17  contributing factor?
18      A.  No.
19         MS. TABACCHI:  Object to the form.
20  BY MS. ST. PETER-GRIFFTH:
21      Q.  Did you have any opinion as to whether or
22  not Abbott should lower its list prices or some of

Page 155

1  its list prices in the Hospital Products Division
2  in 2001?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  I, I don't think I can
5  answer that question.
6  BY MS. ST. PETER-GRIFFTH:
7      Q.  Why don't you think you can answer that
8  question?
9      A.  Because I think that relates to
10  discussions we may have had with Counsel.
11      Q.  I don't want to know, sir, what your
12  discussions with Counsel were.  What I want to know
13  is whether you had an opinion in -- as to whether
14  or not Abbott should have lowered some of its HPD
15  list prices?
16      A.  Uh-huh.
17      Q.  Did you have an opinion?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  Yes.
20  BY MS. ST. PETER-GRIFFTH:
21      Q.  What was that opinion?
22      A.  I was part of the consensus agreement

Page 156

1  that we lower the prices in 2001.
2      Q.  Do you know why Bruce Rodman was under
3  the impression that you opposed the 2001 price
4  reduction, list price reductions?
5         MS. TABACCHI:  Objection.  Object to the
6  form.
7         THE WITNESS:  No, I don't.
8  BY MS. ST. PETER-GRIFFTH:
9      Q.  Did you ever tell anyone at any time that
10  you opposed the 2001 list price reduction because
11  it would make Abbott look guilty of wrongful
12  conduct?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I, I, I may have.  I don't
15  know.  That doesn't --
16  BY MS. ST. PETER-GRIFFTH:
17      Q.  Okay.  Now, sir, you indicated that in
18  2001 you undertook an analysis.  Did you personally
19  do that or did someone else do that?
20      A.  Maylene Soto was my financial analyst and
21  she carried the heavy burden of doing all of the
22  Excel spreadsheets for me, but going through each

Page 157

1  one, she and I both did.
2      Q.  Okay.  Was Lynn Leone at all involved --
3      A.  No.
4      Q.  -- in the analysis?
5      A.  No.
6      Q.  Did Lynn Leone, to your knowledge,
7  undertake any analysis for you in 2002 or 2001
8  concerning AWP or list prices?
9         MS. TABACCHI:  Object to the form.
10         THE WITNESS:  No.
11  BY MS. ST. PETER-GRIFFTH:
12      Q.  Do you know whether Lynn Leone undertook
13  any analysis or evaluations at your request of AWP
14  or list prices at any time?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  I, I do believe that we've
17  looked at in, in these depositions we've looked at
18  some places where Lynn Leone did an analysis, I
19  believe, originally for Pete Baker, but I, I may be
20  incorrect there. Did an analysis of what could be a
21  potential impact of the reduction in prices we took
22  in 2001 on Alternate Site product sales.

40  (Pages 154 to 157)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 158

1  BY MS. ST. PETER-GRIFFTH:
2      Q.  Do you know whether that was at your
3  behest or not?  Do you recall?
4      A.  I don't recall.
5          (Whereupon, Exhibit Sellers 002 was
6  marked for identification.)
7  BY MS. ST. PETER-GRIFFTH:
8      Q.  Sir, do you recall seeing this document?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  Not specifically.
11 BY MS. ST. PETER-GRIFFTH:
12     Q.  Can you identify it?
13     A.  Well, it's a series of, of e-mails to me,
14 from me, back to me with an apparent analysis that
15 Lynn did in, I would assume, 2000 since that's when
16 the e-mail is dated.
17     Q.  Okay.  Do you recall asking her to do the
18 analysis that's reflected on the attached -- the
19 second page of this document?
20     A.  No.
21     Q.  Let me ask you, do you have more than two
22 pages there?

Page 159

1      A.  I have three pages.  The last one is --
2      Q.  Thanks.  Let me take that back because I
3  only meant for -- well, let me ask you, why don't
4  we keep this attached as Page 3.  Do you have the
5  third page there as well?
6          MS. TABACCHI:  I do.
7  BY MS. ST. PETER-GRIFFTH:
8      Q.  And is that the e-mail requesting the
9  information?
10         MS. TABACCHI:  Object to the form.
11
12
13 BY MS. ST. PETER-GRIFFTH:
14     Q.  Or what is this document?
15         MS. TABACCHI:  Can we identify it by
16 Bates numbers because now we have three different
17 pages of three different things?
18         THE WITNESS:  Sure.  993 is the bottom
19 number.
20 BY MS. ST. PETER-GRIFFTH:
21     Q.  Okay.
22     A.  Right?  It would appear that she provided

Page 160

1  the information to me twice, once on June 16th and
2  then on June 30.
3      Q.  Okay.
4      A.  I mean, that's, that's what I deduce from
5  seeing these two together.
6      Q.  Why did you request -- or did you request
7  that she do that, provide you with that
8  information?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I don't recall requesting
11 this.  This was about the same time as the -- we
12 became aware of the DOJ changes to certain product
13 prices.  And I know, I know that at least Vanco was
14 on that list, so I, I would deduce that this was
15 related to that.
16
17
18 BY MS. ST. PETER-GRIFFTH:
19     Q.  Well, do you know whether Lynn Leone
20 would on her own initiative undertake such a study
21 or would she do so at someone's request?
22         MS. TABACCHI:  Object to the form.

Page 161

1          THE WITNESS:  She's a very competent
2  employee so I, I wouldn't -- if, you know, if she
3  did it on her own then it would not surprise me.
4  BY MS. ST. PETER-GRIFFTH:
5      Q.  What position did Lynn Leone hold in June
6  of 2000, do you recall?
7      A.  She was the manager for Contract
8  Marketing and Alternate Site product sales, but she
9  reported to me at this point in time.
10     Q.  Do you recall why she would have reported
11 such information to you if she had done this on her
12 own?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  Again, I, I can only infer
15 based on the time frame.  I believe the DOJ made
16 their adjustments to prices in May of 2000.
17         (Whereupon, Exhibit Sellers 003 was
18 marked for identification.)
19         (Witness reviewed documents.)
20 BY MS. ST. PETER-GRIFFTH:
21     Q.  Sir, does this refresh your recollection
22 as to whether you requested that Lynn Leone

41 (Pages 158 to 161)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 162

1  undertake an evaluation of these three products
2  that are identified in the last two pages of this
3  exhibit, or the last page of this exhibit?
4      A.  No.
5      Q.  Okay.  Sir, if you could look at the
6  first page of this exhibit.
7      A.  Yes.
8      Q.  It appears to be an e-mail to Rick
9  Gonzalez with cc's to a variety of people from you?
10     A.  Yes.
11     Q.  Do you recall sending this e-mail?
12     A.  Yes.
13     Q.  Why did you send this e-mail?
14     A.  To keep our management aware of things
15  that would -- that were in the public record about
16  our products.
17     Q.  Okay.  Did you view the AWP issue that's
18  raised in your e-mail as being significant to
19  Hospital Products Division?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I don't believe I did, but
22  --

Page 163

1  BY MS. ST. PETER-GRIFFTH:
2      Q.  Why not?
3      A.  Huh?
4      Q.  I'm sorry, go ahead.
5      A.  I don't believe I did.  But in -- in
6  light of I'm sending something to the division
7  president, you not only have to cover what's
8  happening but some background as to why it might or
9  might not be relevant.
10     Q.  Okay.  Why did you think that the
11  information contained in this e-mail might or might
12  not be relevant to the division president, Rick
13  Gonzalez?
14         MS. TABACCHI:  Objection to form.
15         THE WITNESS:  Well, I thought it was, I
16  thought it was a reasonable background so he and
17  the others could understand what's happening.
18  BY MS. ST. PETER-GRIFFTH:
19     Q.  Okay.  Now, prior to this point in time
20  did you have an understanding the Department of
21  Justice was looking at AWP pricing and catalog
22  pricing and overall in general pricing issues for

Page 164

1  products, including Abbott products?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  I, I -- I don't remember, I
4  don't remember specifically what knowledge I had
5  about the DOJ at the time.  The -- in 2000 and, and
6  in 2001 there were a lot of things circulating
7  around in the press and so on.  So I don't know
8  whether we had any prior knowledge that they were
9  talking to First DataBank or not.
10  BY MS. ST. PETER-GRIFFTH:
11     Q.  But that's not my question, sir.  My
12  question is not your knowledge whether or not they
13  were talking to First DataBank.  My question is
14  were you aware that the Department of Justice was
15  looking into or investigating pricing by drug
16  companies, including Abbott?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  I don't specifically recall
19  when I became aware that the DOJ was doing that.
20  BY MS. ST. PETER-GRIFFTH:
21     Q.  Do you recall receiving any litigation
22  hold memoranda concerning Department of Justice or

Page 165

1  HHS OIG subpoenas?
2      A.  We got a number of hold memoranda dating
3  back to 1997.  And so I remember getting a number
4  of those communications.  Specifically about the
5  DOJ, I, I, I don't recall seeing one specific about
6  the DOJ. I'm sure there was, but --
7      Q.  Do you recall having any concern prior to
8  2000 about the Hospital Products Division having
9  inflated catalog prices which in turn led to
10  inflated AWPs?
11         MS. TABACCHI:  I object to the form.
12         THE WITNESS:  I, I think by virtue of the
13  fact that documents that we had had to produce up
14  to now -- up to then, we knew in general what the
15  investigations were looking at.  What allegations
16  were going to be made I'm not sure we knew at this
17  point in time.
18  BY MS. ST. PETER-GRIFFTH:
19     Q.  Prior to this point in time did Abbott do
20  anything, did Abbott Hospital Products Division do
21  anything with regard to evaluating whether its list
22  prices and in turn the AWPs that were generated

42 (Pages 162 to 165)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                        Chicago, IL

Page 166

1  from them were too high?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  No, because we didn't know
4  what "too high" meant.  I, I, I don't think at this
5  point in time we knew, we knew what the allegations
6  would be.  We looked at our practices and said we
7  thought our practices were valid, legal, and you
8  know, we were, we were more in a, in a, in a wait
9  and see.
10
11
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Sir, do you know what the term spread
14  means?
15      A.  It has a lot of meanings.  I know where
16  -- how it's been used in a number of these
17  litigations, yes.
18      Q.  Okay.  Well, how -- what is that?  Define
19  it, your understanding, please.
20      A.  My understanding of how it's used in, in,
21  in the documents that I've seen with regard to
22  these litigations is the difference between what

Page 167

1  the provider pays for the product versus what the
2  provider gets reimbursed for the product.
3      Q.  And did you understand that
4  reimbursement, at least for some Abbott products,
5  was based upon AWP?
6      A.  I understood AWP had been in a number of
7  the factors.  As I say here, there were any number
8  of formulas being used by, by payers.  I, I, I
9  picked a couple just so it would -- and they
10  weren't, they weren't anybody specific, they were
11  just as a, as points of example.  And as I said
12  before, there's all kinds of formulas have been
13  used starting in, in the mid-'90s.
14      Q.  But sir, my question is did you
15  understand that AWP was used for reimbursement for
16  some Abbott products?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  AWP may have been a, a
19  reference point for some reimbursement schemes for
20  all products.
21  BY MS. ST. PETER-GRIFFTH:
22      Q.  Okay.  And you understood, did you not,

Page 168

1  that the list prices reported to the compendia were
2  utilized to calculate AWP?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  At this point in time we
5  assumed that was the case, yes.  But we -- I can't
6  say that we knew.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  You didn't -- you're saying that you
9  didn't know?
10      A.  We didn't know how they developed the
11  prices.  We, we, we assumed that it was based on
12  our list price.
13      Q.  Okay.  Did you have an understanding as
14  to the corollary between a high list price causing
15  the generation of a high AWP?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  I, I don't think -- I don't
18  think we had put the two, the two together until
19  sometime in 2000.
20  BY MS. ST. PETER-GRIFFTH:
21      Q.  Why do you say that?
22      A.  I just don't, I just don't recall us

Page 169

1  putting the two together.
2      Q.  Well, do you recall customers being
3  concerned about high AWPs on Abbott products and
4  having an interest in seeing high AWPs on Abbott
5  products?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  I wasn't party to any
8  conversation with customers, no.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  Do you recall customers asking about what
11  Abbott's AWPs were on some of its products and
12  basing decisions to award contracts upon the AWPs
13  or the spreads?
14        MS. TABACCHI:  Object to the form.
15        THE WITNESS:  I, I am sure customers ask
16  about a lot of different things.  What they use in
17  terms of their decisions to make purchases from one
18  company versus the other, I don't know.
19  BY MS. ST. PETER-GRIFFTH:
20      Q.  Did you have an understanding as to
21  whether Abbott's customers utilized AWP and spread
22  as a determinant of whether or not they would give

43 (Pages 166 to 169)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
                    Chicago, IL

Page 170

1  Abbott its business?
2       MS. TABACCHI:  Object to the form, asked
3  and answered.
4       THE WITNESS:  I did, I did not think that
5  that was a major consideration for the decision to
6  purchase Abbott product.
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  Do you recall hearing from any sales
9  force or sales managers or Contract Marketing
10  managers about the importance of AWP and spreads to
11  Abbott's customers?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I've seen documents that
14  relate to that based -- from this document
15  accumulation.
16  BY MS. ST. PETER-GRIFFITH:
17       Q.  Including some that were directed to you,
18  right, sir?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  I don't, I don't remember.
21  But I've seen documents that relate to that.  Was I
22  aware of it in, in June of 2000?  I -- I may have

Page 171

1  been.  I don't know.
2
3
4  BY MS. ST. PETER-GRIFFTH:
5       Q.  You may have been.  How early may have
6  you -- how early was it that you may have been
7  aware of that information?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  Well, it wouldn't, it
10  wouldn't have been important for me to be aware of
11  it until I came into my job in Contract Marketing
12  the second time.
13  BY MS. ST. PETER-GRIFFITH:
14       Q.  Well, if it was, if spreads and AWP
15  reimbursement was important to Home Infusion or
16  Alt. Site, wouldn't it have been important for you
17  to understand that when you worked in those, within
18  those business units?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  As I said before, when I
21  was responsible for Alternate Site product sales it
22  was not an issue.  When I was in Home Infusion

Page 172

1  Services it, it wasn't -- it wasn't -- it wasn't a
2  controlling factor, but it's not something that we
3  worked on.
4  BY MS. ST. PETER-GRIFFITH:
5       Q.  How do you know it wasn't a controlling
6  factor when you were in Home Infusion?
7       A.  Because when you look -- when you look at
8  at how we got reimbursed, very rarely did we get
9  reimbursed for a drug.  We got reimbursed for a
10  compounded drug.
11       And there were -- as I said, as many
12  payers as there were, there were that many
13  different formulas for how they were going to
14  reimburse us.  So I'm not sure that we ever drew
15  that string that says it's, it's a vital piece.
16  It, it varied over the time period; and AWP was not
17  the consistent factor over that time period, that I
18  remember.
19       Q.  Did you have an understanding when you
20  were within Home Infusion that usuals and
21  customaries were calculated in large measure for
22  many payers based in part upon an AWP formulary?

Page 173

1       MS. TABACCHI:  Object to the form, asked
2  and answered.
3       THE WITNESS:  Well, one, usual and
4  customaries were not calculated by the payer.  But
5  how the payer -- how the payer calculated what they
6  decided to pay you at the end of the day, I, I was
7  aware that there were all kinds of formulas and it
8  varied by payer, it varied by, by, by therapy.
9  BY MS. ST. PETER-GRIFFITH:
10       Q.  Well, you understood, sir, did you not,
11  that when either Abbott's joint venturers or Abbott
12  Home Infusion submitted claims to Medicare and
13  Medicaid, they had to be accurate and not submit
14  false claims on their billing?
15       Is that -- did you have that
16  understanding, sir?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  Yes.  We were -- and we
19  were very diligent to make sure that all of our
20  claims were accurate.
21  BY MS. ST. PETER-GRIFFTH:
22       Q.  Okay.  How do you know that?

44 (Pages 170 to 173)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 174

1    A.  Because I ran the business.
2    Q.  Okay.  And how did you when you were
3  running the business verify that Abbott's Home
4  Infusion Unit was not submitting false claims to
5  the United States or to any of the state Medicaid
6  programs?
7       MS. TABACCHI:  Object to the form.
8       THE WITNESS:  We challenged what we, what
9  we billed versus what we got paid.  Anything
10  outside of that we, we, we would look at it, Ginny
11  looked at it.  So I -- you know, we've, we never
12  had any problem with any, with any payer wanting to
13  audit something. And we were very diligent in
14  training our folks that it was essential that they
15  stay to the letter.
16  BY MS. ST. PETER-GRIFFTH:
17    Q.  Okay.  How did you verify that they
18  stayed to the letter?
19    A.  I just told you.
20    Q.  Okay.  What did you, what did -- what
21  were the policies and procedures in place within
22  Abbott Home Infusion to ensure that the

Page 175

1  reimbursement staff did not submit false claims to
2  Medicare or to any state Medicaid program?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  Virginia and our finance
5  people did periodic audits of claims, as I
6  remember.
7  BY MS. ST. PETER-GRIFFTH:
8    Q.  Okay.  And was there a policy concerning
9  doing periodic audits of claims to ensure against
10  submission of false claims?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  I would expect there to be.
13  I don't know that there was one.  I don't remember
14  -- I don't remember.
15  BY MS. ST. PETER-GRIFFTH:
16    Q.  Who was responsible within Abbott Home --
17  let's start with Abbott Home Infusion for ensuring
18  compliance with Medicare or state Medicaid laws and
19  regulations?
20    A.  The reimbursement department.
21    Q.  Okay.  Who specifically?
22    A.  Virginia Tobiason and the department.

Page 176

1    Q.  Okay.  Who within Hospital -- who within
2  Alt. Site was responsible for ensuring compliance
3  with state and Medicaid or Medicare -- I'm sorry,
4  Medicare or state Medicaid statutes and
5  regulations?
6       MS. TABACCHI:  Object to the form.
7       THE WITNESS:  Virginia.
8  BY MS. ST. PETER-GRIFFTH:
9    Q.  So her position transcended outside of
10  Home Infusion and extended into Alt. Site?
11    A.  No, there was no other claims being made
12  by the other segments of Alternate Site.
13    Q.  Okay.  How did you ensure that Alt. Site
14  was not causing false claims to be submitted to
15  Medicare or Medicaid?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  Wasn't my job.
18  BY MS. ST. PETER-GRIFFTH:
19    Q.  Whose job was it?
20    A.  I assume it would have been John Ward's
21  and Pete Baker's and Don Robertson's over that time
22  period.

Page 177

1    Q.  In 2001 when the price changes were made,
2  what formula was adopted for determining what the
3  list price would be?
4       MS. TABACCHI:  Object to the form.
5       THE WITNESS:  I don't remember a, a, a
6  specific formula.
7  BY MS. ST. PETER-GRIFFTH:
8    Q.  You don't remember whether there was a
9  formula that was adopted in terms of identifying
10  what list prices would be reported to the reporting
11  agencies?
12    A.  I, I don't --
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  I don't recall a specific
15  formula.
16  BY MS. ST. PETER-GRIFFTH:
17    Q.  Okay.  Why weren't the price changes that
18  occurred in 2001 taken earlier by Abbott Hospital
19  Products Division?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  I don't know.
22  BY MS. ST. PETER-GRIFFTH:

45  (Pages 174 to 177)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                          Chicago, IL

Page 178

1     Q.  Okay.  Is there any reason that you can
2  think of why they weren't taken earlier?
3        MS. TABACCHI:  I object to the form.
4        THE WITNESS:  Again, I said when we came
5  in -- when I came into the job in 2000 it was, it
6  was our appraisal that everything we had done,
7  everything was okay.  We had not done anything that
8  would cause us to change those prices.
9  BY MS. ST. PETER-GRIFFTH:
10    Q.  If everything was okay why six months
11  later did you change the prices?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  I told you there was a
14  consensus that we should change them at that point
15  in time.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  And what factored into that consensus
18  other than you've already testified that AWP, and
19  AWP investigation by the Department of Justice
20  factored into that?
21        MS. TABACCHI:  Object to the form,
22  mischaracterizes the witness's testimony.  I'm also

Page 179

1  going to caution the witness not to reveal
2  communications with Counsel.
3        THE WITNESS:  I, I, I think there were,
4  there were a number of things happening, like I
5  said, in, in Congress, in HCFA at the time, in --
6  that, that caused us to review that.
7
8
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Okay.  What was happening in Congress
11  that caused you to review it?
12    A.  Well, there was a number of discussions
13  going on, a number of speeches being made about
14  changing or mandating a change in the reimbursement
15  formulas.
16    Q.  Okay.  What were they?
17    A.  I don't recall them.
18        MS. TABACCHI:  Object to the form.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  Why would those speeches cause Abbott to
21  make changes to its list prices in 2001 that it
22  didn't previously see the need to make?

Page 180

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  It was just the right time.
3  BY MS. ST. PETER-GRIFFTH:
4    Q.  Why was it the right time?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  That's as far as I can go.
7  BY MS. ST. PETER-GRIFFTH:
8    Q.  What do you mean that's as far as you can
9  go?  That's as far as you can go without revealing
10  conversations with attorneys?
11    A.  Yes, right.
12    Q.  So you've testified to everything that
13  you can with regard to why the 2001 price changes
14  were taken other than what you can't reveal because
15  of communications with attorneys?
16    A.  Yes.
17    Q.  Okay.  You mentioned one other factor,
18  you said changes that were going on in HCFA.  What
19  were those changes?
20    A.  I don't recall the specifics.
21    Q.  And what other lawyers -- or which
22  lawyers were you conferring with with regard to the

Page 181

1  decisionmaking on the 2001 price changes?
2    A.  There were a number of Abbott counsel.
3    Q.  Okay.  Who were they?
4    A.  We talked to head of litigation, Laura
5  Schumacher, one or two of her attorneys.  I think
6  that was, I think that was it.  And I don't
7  remember their names.
8    Q.  Do you recall speaking with any attorneys
9  outside of the in-house counsel?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  I did not.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  Do you know whether anyone else did?
14    A.  No.
15    Q.  Sir, at any time prior to 2001 did Abbott
16  Hospital Products Division ever report to Medicaid
17  or Medicare its contract prices that it was
18  charging its customers?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  Not that I recall.
21  BY MS. ST. PETER-GRIFFTH:
22    Q.  Whose responsibility would that have

46 (Pages 178 to 181)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL         November 1, 2007
                          Chicago, IL

Page 182

1  been?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  No one's.
4  BY MS. ST. PETER-GRIFFTH:
5    Q.  Why do you say no one's?
6    A.  As far as I know there was no requirement
7  to report contract prices to the federal agency.
8    Q.  Did you see any other reason why Abbott
9  should have reported its contract prices to
10 Medicare or Medicaid?
11   A.  No.
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  We were reporting AMP, we
14 were reporting our federal supply schedule prices,
15 so no.
16 BY MS. ST. PETER-GRIFFTH:
17   Q.  Have we exhausted your memory on the
18 decisionmaking with regard to the 2001 price
19 changes undertaken by Abbott Hospital Products
20 Division?
21   A.  I think so.
22       MS. TABACCHI:  If we're going to switch

Page 183

1  topics, is this a good time to take a break?
2        MS. ST. PETER-GRIFFTH:  Sure.
3        THE VIDEOGRAPHER:  We are off record at
4  1:53 p.m.
5        (Brief recess.)
6        THE VIDEOGRAPHER:  We are back on the
7  record at 2:08 p.m.
8  BY MS. ST. PETER-GRIFFTH:
9    Q.  Mr. Sellers, I have actually -- I thought
10 I had three, I actually have four large documents
11 that I'd like for you to review.  We can go over
12 them one at a time.  The first three are, I will
13 represent to you, manuals that were produced to us
14 earlier by Bruce Rodman.
15       Do you know who Mr. Rod man is?
16   A.  Yes, I do.
17   Q.  You testified earlier about speaking to
18 him.
19   A.  This year?
20   Q.  This year, yeah.
21   A.  Yes.
22   Q.  Sir, the first manual that I'd like you

Page 184

1  to look at is the one that says "Reimbursement
2  Implementation Manual."  I'm not going to ask you
3  detailed questions about it.  My question is do you
4  recall this document?
5    A.  I, I recall knowing of such a document
6  but not having read that document.
7    Q.  Okay.
8    A.  This looks like it's a 1998 revision, so,
9  you know, I'm not intimately familiar with whatever
10 might be in here.
11   Q.  But you don't contest that it may have
12 been a manual used by the Abbott Home Infusion
13 Services reimbursement department when you were --
14 oversaw the Abbott Home Infusion?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I -- again, I, I remember
17 that we had a training program for our clients
18 based upon claims and reimbursement.  And that's
19 what I assume this would be.  Since it's an
20 implementation manual, I would assume it's a manual
21 for implementing new clients.
22 BY MS. ST. PETER-GRIFFITH:

Page 185

1    Q.  And just for the record I'd just like to
2  identify the document you're looking at as having
3  Bates label BR01407 through BR01505.
4        Sir, the next document I'd like you to
5  look at is CHIPs Reimbursement Class Material.
6        And Tina, you're welcome to keep these
7  because I have five boxes worth of stuff to ship
8  back.
9        MS. TABACCHI:  Thank you.
10 BY MS. ST. PETER-GRIFFTH:
11   Q.  Sir, and my, my question for you is going
12 to be a similar one in terms of whether you
13 generally recognize this document as a document
14 that was utilized within Abbott Home Infusion?
15   A.  I, I don't recognize the name nor
16 necessarily the document itself.  It, it would not
17 surprise me for a document like this to have been
18 in existence.
19   Q.  Okay.  And just for the record, Mr.
20 Sellers is looking at -- or has in front of him a
21 document that's Bates labeled BR02698 through
22 02906.

47 (Pages 182 to 185)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 186

1      And sir, the final -- if you can just
2  take off the -- yeah.  Sir, the final document I'm
3  going to ask you about with regard to this
4  particular series is the CHIP Reimbursement Module
5  Users Guide; and again, my question is do you
6  recognize this as a document that may have been
7  generated by or utilized in the Abbott Home
8  Infusion department?
9      A.  Again, I'm not, I'm not directly familiar
10  with this document.  It, it does look like it would
11  be a document that would -- or a manual that we
12  would have.
13      Q.  Okay.  And for the record, Mr. Sellers
14  has in front of him a document labeled -- with the
15  Bates label BR01744 through BR02150.
16      Sir, do you recall when Abbott Home
17  Infusion was being wound up as a business, were
18  there any policies concerning the retention of
19  manuals by Abbott for the business -- for the Home
20  Infusion business that it was winding up?
21      MS. TABACCHI:  Object to the form.
22      THE WITNESS:  I don't, I don't, I don't

Page 187

1  remember any specific policy, no.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  You don't remember any specific policy?
4      A.  No.
5      Q.  Do you think it's -- is it possible then
6  that documents pertaining to Home Infusion may have
7  been destroyed upon the closing out of the Home
8  Infusion business unit?
9      MS. TABACCHI:  I object to the form.
10      THE WITNESS:  I, I -- you know, I don't
11  have any knowledge either way.
12
13
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Were you involved with the sort of
16  day-to-day process associated with closing out the
17  Abbott Home Infusion business unit?
18      A.  Up until February of 2000, yes.
19      Q.  Okay.  But after February of 2000 did you
20  have any involvement?
21      A.  Well, Karla Kreklow who was running that
22  -- or was orchestrating that shutdown reported to

Page 188

1  me, I believe, changed her reporting relationship
2  from Don Robertson to me upon Don's retirement, so
3  that was in -- sometime in 2000.
4      Q.  Was she overseeing the day-to-day
5  business associated with closing out the Home
6  Infusion Unit?
7      A.  Yes.
8      Q.  Do you know why documents may have been
9  -- pertaining to the Abbott Home Infusion Unit may
10  have been destroyed despite the existence of
11  document hold memoranda?
12      MS. TABACCHI:  Object to the form.
13      THE WITNESS:  No.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Okay.  Were you aware that documents
16  within the Home Infusion Unit may have been
17  destroyed?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  No.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Did you ever confer with Karla Kreklow
22  concerning the retention of documents pertaining to

Page 189

1  Abbott Home Infusion upon the winding up of that
2  business?
3      A.  I remember talking to Carla about the
4  fact that any, any documentation would go into
5  normal, the normal Abbott archiving that was
6  related to Abbott. Any documents relating to
7  patients and, and, client files were -- her
8  intentions, and I believe we followed through on
9  that, was to return all those to the clients.  It
10  was there -- it was their data anyway.
11      Q.  What Abbott retention sort of policies
12  are you referencing?
13      A.  Not necessarily the policy.  It was --
14  Abbott maintains an archival process for, for
15  documents.  And, and we talked about just as we
16  were closing things down to -- the documents should
17  go into that normal archival process.
18      Q.  Can you explain more about your
19  understanding of the normal archival process?
20      A.  It's just when you had business documents
21  that you wanted to retain, you couldn't retain them
22  in your current work areas, you'd send them to

48 (Pages 186 to 189)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 190

1    Abbott archives.
2        Q.   Where is Abbott archives located, do you
3    know?
4        A.   No.  I mean, they -- I'm sure they had
5    warehouses stuffed with documents someplace.
6        Q.   Sir, what I'd like to do is go over the
7    next document with you, and this one we are going
8    to look at a few pages.  I'm going to first ask you
9    whether you recognize this document?
10       A.   I can't go through the whole thing?
11       Q.   I'm going to focus your attention to
12   specific pages.
13       A.   I do remember a document that was called
14   Contract Marketing Basic Operating Procedures, yes.
15       Q.   Okay.  Did you contribute to information
16   contained in that document --
17           MS. TABACCHI:  Object to the form.
18   BY MS. ST. PETER-GRIFFITH:
19       Q.   -- that you recall?
20       A.   I don't, I don't believe so.
21       Q.   Sir, I'm going to represent to you that
22   this is a document that was utilized at the

Page 191

1    deposition of Guy Wiebking and it was identified as
2    the Hospital Products Division, or HPS, Contract
3    Marketing Basic Operating Procedure Manual.
4            Do you have any reason to doubt that
5    identification?
6        A.   That's what the title of the document
7    was.
8        Q.   Okay.  Do you remember utilizing the
9    Contract Marketing Basic Operating Procedure
10   Manual?
11       A.   No.
12       Q.   Do you know what its purpose was within
13   the Hospital Business Sector or Hospital Products
14   Division?
15       A.   It, it --
16           MS. TABACCHI:  Object to the form.
17           THE WITNESS:  Yeah, I believe it was --
18   it was created sometime in the late '90s and with
19   some, some updates to it by one of the contract
20   managers; and I think the intent was to provide a
21   reference document for his contract analysts.
22   BY MS. ST. PETER-GRIFFITH:

Page 192

1        Q.   For contract analysts?
2        A.   Yeah.
3        Q.   Anyone else?
4        A.   No, that -- I think that was the primary
5    target.
6        Q.   Would upper management refer to this
7    particular manual for any reason?
8            MS. TABACCHI:  Object to the form.
9            THE WITNESS:  No.  As I remember talking
10   to my predecessor, it wasn't a document that he
11   went by, but it was, like I said, a document
12   prepared by one of his managers that -- one of his
13   managers was using.
14   BY MS. ST. PETER-GRIFFITH:
15       Q.   Well, did you understand that one person
16   put this information together or that a variety of
17   people did?
18       A.   As I went through the document when I
19   first came in to Contract Marketing, I, I, I -- I
20   remember there were a number of names as authors,
21   the majority of them being analysts that worked for
22   this one main manager.

Page 193

1        Q.   Well, was the content of this particular
2    document relevant to what the contract analysts
3    were doing?
4            MS. TABACCHI:  Object to the form.
5    BY MS. ST. PETER-GRIFFITH:
6        Q.   Or their position, what their
7    responsibilities were?
8        A.   Some pieces of it.
9        Q.   Were there other pieces that weren't
10   relevant?
11       A.   Yes.
12       Q.   Okay.  Why, why put together a Contract
13   Marketing manual then that wasn't relevant to
14   anything that the analysts were doing?
15           MS. TABACCHI:  Objection to form.
16           THE WITNESS:  That's why we ceased to use
17   it when I took over the job.
18   BY MS. ST. PETER-GRIFFITH:
19       Q.   You ceased to use this particular
20   document when you took over the job?
21       A.   We ceased to recognize this document at
22   all when I took over the job.

49 (Pages 190 to 193)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 194

1    Q.  Why is that?
2    A.  Because I didn't think it was an
3  appropriate document for basic operating
4  procedures.  It was, it was a mixture of practices,
5  procedures, very rarely stepped into what I would
6  call the procedure realm and none of the procedures
7  -- none of it had been vetted by anybody other than
8  the author.  So it was a pretentious title for an
9  anecdotal collection of information.
10   Q.  By the way, who's your predecessor?  You
11  referenced your predecessor.
12   A.  Okay.  Now you did it, now you did it.
13   Q.  Don't mean this to be a memory game, but
14  --
15   A.  Well, at my age anything like this with
16  names is a memory game in front of harsh lights.
17   Q.  Mr. Mitchell?
18   A.  No, it was Pat Keeley.  But thank you for
19  prompting me with Mr. Mitchell.
20   Q.  Who was Mr. Mitchell?
21   A.  Charlie Mitchell was the director of
22  Contract Marketing after I left in '92.  And at

Page 195

1  some point then he moved on and transitioned it to
2  Pat Keeley between '92 and 2000.
3    Q.  Did you have an understanding as to what
4  time period this particular manual was used?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  No, but my, my recollection
7  was it was '98, '99 was when the majority of it was
8  written.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Okay.  Did you have an understanding as
11  to whether access to this particular manual was
12  restricted in any way?
13   A.  It was not that I'm aware of.
14   Q.  So is it fair to say then if -- you know,
15  if someone said within Hospital Business Sector,
16  geez, this information might help out an inquiry
17  that I got from Home Infusion that the information
18  contained in this manual could be shared with Home
19  Infusion, for example?
20        MS. TABACCHI:  Object to form.
21        THE WITNESS:  Prior to 2000 I would have
22  no control over that.

Page 196

1  BY MS. ST. PETER-GRIFFTH:
2    Q.  Sir, if you could turn to Abbott, it says
3  Texas Abbott Page 676029 and it's Page 207 of 290,
4  if that's of better assistance.  I think it is.
5    A.  Okay.  Yes.
6    Q.  Are you there?  Does it say -- what does
7  it say at the top, I hope?
8    A.  Medicare Medicaid Fraud and Abuse.
9    Q.  We are, sir, literally on the same page.
10        Sir, do you recognize this particular
11  excerpt from the Basic Operating Procedures manual?
12   A.  No.
13   Q.  Whose Mr. Joe T-a-l-a-n-g-e-s?
14   A.  Talanges.
15   Q.  Thank you, sir.
16   A.  Yeah.
17   Q.  Whose Mr. Talanges?
18   A.  He was a contract analyst at, at the time
19  this was written.
20   Q.  And do you know where -- where he
21  obtained the information that is the content of
22  this particular Medicare Medicaid fraud and abuse

Page 197

1  section?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  No.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Do you know why a Medicare and Medicaid
6  fraud and abuse section would be included within
7  the Basic Operating Procedures manual for Contract
8  Marketing analysts?
9        MS. TABACCHI:  Object to the form.
10        THE WITNESS:  No, I don't.
11  BY MS. ST. PETER-GRIFFITH:
12   Q.  Sir, if you could go to the second page,
13  which is 208 of this particular section?
14   A.  Yes.
15   Q.  Do you see where it says Discount Safe
16  Harbors?
17   A.  Yes.
18   Q.  Could you just read that section?  You
19  can just read it to yourself.  I'm going to ask you
20  questions about it.
21        (Witness reviewed documents.)
22        THE WITNESS:  Down to the title GPL and

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 198

1   Safe Harbors?
2   BY MS. ST. PETER-GRIFFITH:
3      Q.  Yeah.  Do you see that, sir?
4      A.  Yes, I read that one section.
5      Q.  Let me ask you, does this Discount Safe
6   Harbor section that you just read reflect a policy
7   or practice that you understood to be in place
8   within the Hospital Business Sector?
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  It reflects to some extent
11  but not as I would have preferred it to have been
12  written.
13  BY MS. ST. PETER-GRIFFTH:
14     Q.  Well, how would you have preferred it to
15  have been written?
16     A.  Well, I, I think the -- the presumption
17  that federal agencies will not investigate
18  shouldn't be in there.  We shouldn't do things
19  based on whether somebody's going to look at it or
20  not, we should do things based on that it is the
21  right thing to do and the legal thing to do.  And
22  the def- -- the examples of practices I don't think

Page 199

1   are, are very well defined.
2      Q.  Okay.  How would you define them?
3      A.  Well, I think, I think that in order to
4   satisfy the discount safe harbor the discount has
5   to be defined, the factors under which the discount
6   are given have to be defined between both parties,
7   and that both parties are aware of their
8   obligations to report prices as, as defined by
9   various statutes.
10     Q.  When you say discount safe harbor, what
11  do you mean?  Was there in fact a safe harbor to
12  exist?
13     A.  Yes.
14     Q.  What was that safe harbor?
15     A.  I can't quote you line and verse.  I'm
16  not a lawyer.  I'm a poor struggling mechanical
17  engineer that was -- that was cast into a legal
18  job.
19     Q.  I'm not looking for your, for the -- you
20  know, your technical legalese, sir.  I want Mike
21  Sellers' understanding of what the discount safe
22  harbor was?

Page 200

1      A.  As I understand it in the Medicare law
2   there are a number of safe harbor practices that
3   were defined.  One of them is that it is a
4   customary practice between sellers and buyers, not
5   Mike Sellers, but sellers and buyers --
6      Q.  Understood.
7      A.  -- that discounts are granted, and those
8   -- as long as they are documented and clear to both
9   parties, and I'm -- I'm shortening the thing, but
10  it's not very long anyway, are legal.
11     Q.  Okay.  Did you have an understanding as
12  to Abbott's responsibilities as a seller to report
13  information or pricing under a safe harbor?
14     A.  As I understood it we did not have a
15  responsibility to report.  What we had a
16  responsibility to do was to make sure that we
17  notified our customers that they may have a
18  responsibility to report and that we expect them to
19  satisfy those requirements.
20     Q.  If you could go up to the top section on
21  this page where it says "Most Common Forms of
22  Fraud," do see that?

Page 201

1      A.  Yeah.
2      Q.  Item Number 1 is false billing.  What was
3   your understanding, Mike Sellers, as what false
4   billing may have entailed or what, what --
5         MS. TABACCHI:  Object to the form.
6   BY MS. ST. PETER-GRIFFITH:
7      Q.  H-o-w false billing was a form of fraud?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  I didn't write this, so you
10  know, I can't tell you, you know, where Joe
11  Talanges got this and what he was trying to
12  communicate.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Did you have an understanding as to
15  whether false billing constituted a form of fraud
16  in violation of Medicaid and Medicare statutes and
17  regulations?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  I do from my, from my Home
20  Infusion days that falsifying a claim could be
21  grounds under the fraud and abuse clause to be an
22  issue, yes.

51 (Pages 198 to 201)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL         November 1, 2007
                    Chicago, IL

Page 202

1  BY MS. ST. PETER-GRIFFTH:
2      Q.  And what is what is falsifying a claim?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  It could be any number of
5  things.  It's basically, you know, not, not giving
6  on the claim the information that is asked for but
7  instead giving false information.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay.  Like a false price for a
10  particular service or product?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  A false diagnosis, a false,
13  falsification of whether the patient was eligible.
14  There's any number of things that, you know, could
15  lead to someone saying it's a false bill.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Okay.  Well, does that include charging
18  more on a bill to Medicaid or Medicare than what is
19  permitted under Medicaid or Medicare statutes and
20  regulations?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  No.  I -- as I -- that's

Page 203

1  not the way I understood Medicare, Medicaid.  You
2  could put whatever usual and customary you wanted
3  on the bill.  They were going to pay what the
4  formula was, whatever formula they used.  And you
5  would get back from Medicare what the allowable
6  charge was but you had to put your usual and
7  customary on, on the bill, as I remember, as I
8  remember.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Do you recall whether Home Infusion
11  billed for particular drugs or products using the J
12  code system?
13     A.  I don't, I don't have any specific
14  knowledge.  I remember hearing about J codes.
15     Q.  What is your understanding of what J
16  codes are?
17     A.  It's, it's a billing code used by
18  Medicare.
19         MS. ST. PETER-GRIFFTH:  Why don't we take
20  a break to change the tape.
21         THE VIDEOGRAPHER:  We are off the record
22  at 2:33 p.m. with the end of tape number three.

Page 204

1          (Brief recess.)
2          THE VIDEOGRAPHER:  We are back on the
3  record at 2:41 p.m. with the start of tape number
4  four.
5  BY MS. ST. PETER-GRIFFTH:
6      Q.  Mr. Sellers, earlier you indicated, and I
7  want to revisit this with you in a little bit, that
8  a provider could charge whatever usual and
9  customary it wanted; is that accurate?
10     A.  That was my understanding.  On a --
11     Q.  Did you have an understanding --
12     A.  On a claim.
13     Q.  On a claim, I understood.
14         But did you have an understanding that
15  the usual and customary that was charged, at least
16  to Medicare and Medicaid, needed to be based upon
17  actual charges to customers?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  I, I, I was aware that,
20  that the, that the usual -- that whatever was put
21  on the claim would go to the customer eventually.
22  But it was my -- it's also my understanding that

Page 205

1  when the allowable came back, which was not
2  necessarily our usual and customary, it was defined
3  by Medicare and/or Medicaid, when the allowable
4  came back, that was when we billed the co-pay to
5  the patient and that, that was what we reported to
6  the patient that we may have billed this, this is
7  the allowable Medicare, Medicaid is paying this,
8  and therefore, any differential is what, you know,
9  you owe us.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.  When Abbott HPD priced its either
12  contract price or list price, did it factor into
13  its pricing the possibility that the providers
14  might not be able to recover the co-pay?
15     A.  No.
16         MS. TABACCHI:  Object to the form.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Sir, I'd like to go back a little bit
19  again to the definition -- your understanding of
20  what false billing can include.  Do you have an
21  understanding as to whether billing a false price
22  to Medicare or Medicaid for a particular product or

52 (Pages 202 to 205)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 206

1  drug is permissible?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Again, I have a hard -- I
4   have a hard time with my recollection of the
5   process seeing how we -- anyone could bill a false
6   price.
7   BY MS. ST. PETER-GRIFFTH:
8       Q.  Okay.  But did you have an understanding
9   as to whether billing a false price constituted
10  Medicaid or Medicare fraud or abuse?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  I guess by virtue of what I
13  just answered I would have to say no.
14  BY MS. ST. PETER-GRIFFTH:
15      Q.  No, you didn't have an understanding?
16      A.  I did not have an understanding that
17  billing a price that was not what, what Medicare or
18  Medicaid would usually pay was a false billing.  A
19  false billing in my mind is other parts of the
20  claim that would cause the, the Government agency
21  to come to a different payment code or payment
22  protocol.

Page 207

1       Q.  Did you have any understanding in all
2   your years of experience within the Hospital
3   Products Division that if you submitted a claim to
4   Medicare or Medicaid that falsely represented the
5   price paid or sought to be collected for a
6   particular product or bill that was fraud or abuse?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  No.
9   BY MS. ST. PETER-GRIFFTH:
10      Q.  No, you didn't have an understanding?
11      A.  No.
12      Q.  Would it surprise you that that
13  constitutes fraud or abuse?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  Again, I, I, I would answer
16  by saying I don't see, at least in my recollection
17  of the process, how a price on a claim would have
18  anything to do with -- and again, I'm not totally
19  familiar with, as I said before, the HCFA 1500 and
20  all the other -- or whatever other forms were used
21  by other Medicaid agencies.  But, I, I, I can't --
22  I don't understand -- or at least in, in, in my

Page 208

1   recollection I, I can't put in context why a price
2   would be false.
3   BY MS. ST. PETER-GRIFFTH:
4       Q.  Why a price would be false?
5       A.  Yes.
6       Q.  Did you have an understanding as to
7   whether or not Medicaid or Medicare had set
8   regulations concerning what prices could be
9   reported or billed --
10         MS. TABACCHI:  Objection.
11  BY MS. ST. PETER-GRIFFTH:
12      Q.  -- under those programs?
13      A.  I didn't have any detailed knowledge of
14  that, no.
15      Q.  Then how can you be so certain that
16  Abbott Hospital Products Division complied with
17  federal and state Medicare and Medicaid statutes?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  Again, I, I believed that
20  my organization was doing everything it could to do
21  everything per the statutes.
22  BY MS. ST. PETER-GRIFFTH:

Page 209

1       Q.  But you have no way of verifying that?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  No.
4   BY MS. ST. PETER-GRIFFTH:
5       Q.  You do have a way of verifying that?
6       A.  No.
7       Q.  No, you don't, or yes, you do?
8          Do you have a way of verifying it, yes or
9   no?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  No.
12  BY MS. ST. PETER-GRIFFTH:
13      Q.  Sir, if you could go to Page 247 of 290.
14  This particular subject is reference books and it
15  appears to be in a manual section that was written
16  originally by Bob Brian and then revised by
17  Christine Berg.
18         Do you see that?
19      A.  Yes.
20      Q.  Do you see where it says Drug Topics,
21  RedBook, Pharmacies Fundamental Reference?
22      A.  Yes.

53 (Pages 206 to 209)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 210

1     Q.  Would you agree with me, sir, that this
2   particular section identifies RedBook's AWP
3   formula?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  It identifies a formula,
6   yes.
7   BY MS. ST. PETER-GRIFFITH:
8     Q.  It purports that this is RedBook's
9   formula, right?
10    A.  That's what it puts forward, yes.
11    Q.  It also identifies to the reader, at
12   least those who have access to the manual, that the
13   RedBook is, is an important book that provides
14   valuable information; is that fair?
15          MS. TABACCHI:  Object to the form.
16          THE WITNESS:  No, I don't think that's
17   fair.  It says that it details extremely limited
18   data about the drug.  So I, I -- and again, I --
19   BY MS. ST. PETER-GRIFFTH:
20    Q.  Well, detailed?
21    A.  I can read -- I can spend some time
22   reading this if you'd like.

Page 211

1     Q.  Sure, go ahead.
2          (Witness reviewed documents.)
3          THE WITNESS:  Okay.
4   BY MS. ST. PETER-GRIFFTH:
5     Q.  Sir, what information does this
6   particular paragraph concerning drug topics RedBook
7   convey to anyone reading the Contract Marketing
8   Basic Operating Procedure manual?
9          MS. TABACCHI:  Object to the form.
10          THE WITNESS:  I think it, it gives some
11   general outline as to what the -- what the book
12   contains and it gives them a place to reorder it if
13   they want to buy a new one.
14   BY MS. ST. PETER-GRIFFTH:
15    Q.  Okay.  But it also identifies how AWP as
16   calculated by RedBook is calculated off a list
17   price for a particular product, correct?
18    A.  Again, it, it defines a formula.  I don't
19   know whether it is the formula or not but it
20   defines a formula, yes.
21    Q.  Well, do you have any reason to doubt
22   that the formula identified here is not the RedBook

Page 212

1   formula that is available?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Again, I've, I've, I have
4   never seen a definition of the RedBook formula when
5   I came into the job, or I definitely wouldn't have,
6   wouldn't have known it back in 1998.
7   BY MS. ST. PETER-GRIFFITH:
8     Q.  Well, do you know whether -- well,
9   clearly this information was readily available to
10   individuals within the Hospital Products Division,
11   right?
12          MS. TABACCHI:  Objection to the form.
13          THE WITNESS:  What information?
14   BY MS. ST. PETER-GRIFFITH:
15    Q.  That AWP is calculated by RedBook off
16   list price.
17          MS. TABACCHI:  Object to the form.
18          THE WITNESS:  I, I can't say it was
19   readily available.  Someone came up with some
20   information and they put it on this document.  This
21   document was available to some people in Contract
22   Marketing.  I'll grant you that.

Page 213

1          But my preface on the whole document,
2   whether it was not a vetted document, it was a
3   drafted by a bunch of people in Contract Marketing
4   and not necessarily looked at by everybody in
5   Contract Marketing.
6   BY MS. ST. PETER-GRIFFTH:
7     Q.  Well, do you have any reason to doubt the
8   information contained in that particular paragraph?
9          MS. TABACCHI:  Object to the form.
10          THE WITNESS:  Being familiar with some of
11   the other pieces in this, I, I discount this whole
12   document.
13
14
15   BY MS. ST. PETER-GRIFFTH:
16    Q.  Why do you discount this whole document?
17    A.  Because I don't think it was, I don't
18   think it was very well written nor very well
19   thought out.
20    Q.  Well, do you have a different definition
21   for AWP calculation?
22    A.  No, I told you, I told you before I did

54 (Pages 210 to 213)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 214

1   not know what the calculation was.
2      Q.  Well, is it fair to say, though, that
3   others had access to that information based upon
4   the information contained in the Contract Marketing
5   Basic Operating Procedures manual?
6         MS. TABACCHI:  Object to the form, asked
7   and answered.
8         THE WITNESS:  I would say obviously Bob
9   Bryant thought he had that information, yes.
10  BY MS. ST. PETER-GRIFFTH:
11     Q.  Okay.  But do you have any reason to
12  doubt why other people wouldn't have -- strike
13  that.
14        Do you have any reason to doubt that
15  other people would not have access to this
16  particular manual?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  Yeah, it was, it was only
19  available to Contract Marketing people.
20  BY MS. ST. PETER-GRIFFTH:
21     Q.  But you testified earlier you weren't
22  aware of any restrictions on the information?

Page 215

1      A.  It wasn't restricted within Contract
2   Marketing but it was only Contract Marketing.  It
3   was on, it was on a protected drive-by that was
4   available only to Contract Marketing people.
5      Q.  Well, do you have any reason to doubt --
6   well, strike that.
7         Do you have any reason to believe that
8   there were any restrictions on the dissemination of
9   information contained in this particular document?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  You know, I don't, I don't,
12  I don't know exactly what -- you know, I came in in
13  2000 and we curtailed the use of the document.
14  BY MS. ST. PETER-GRIFFTH:
15     Q.  Okay.  But prior to 2000 you were in the
16  Home Infusion Unit; weren't you?
17     A.  Yes.
18     Q.  And you were in Alternate Site?
19     A.  Yes.
20     Q.  And we know that the CHIP system had
21  access to the RedBook information, right?
22     A.  It had it had access to the RedBook

Page 216

1   prices.
2      Q.  RedBook -- what prices?
3      A.  List, WAC, AWP.
4      Q.  Do you have any reason to doubt that AWP
5   information was not widely available to the
6   Hospital Products Division during your tenure
7   within the Hospital Products Division?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  I think, I think in general
10  AWP was irrelevant to the vast majority of people
11  in, in HPD.
12  BY MS. ST. PETER-GRIFFTH:
13     Q.  Was it irrelevant to the individuals
14  within Home Infusion?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  It was only relevant where
17  that data was needed to to be placed on a claim or
18  other document that a payer might need.
19  BY MS. ST. PETER-GRIFFTH:
20     Q.  Well, would it be relevant to calculating
21  usual and customaries?
22        MS. TABACCHI:  Object to the form.

Page 217

1         THE WITNESS:  You and I have already
2   disagreed on that.  I don't, I don't, I don't -- I
3   have no knowledge that it was used in the
4   calculation of usual and customary.
5   BY MS. ST. PETER-GRIFFTH:
6      Q.  It could have been, you just have no
7   knowledge?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  I have no knowledge.
10  BY MS. ST. PETER-GRIFFTH:
11     Q.  Well, was AWP important to Alternate
12  Site?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  Alternate Site was three
15  different businesses.
16  BY MS. ST. PETER-GRIFFTH:
17     Q.  Okay.  Was AWP important to Alternate
18  Site product sales?
19     A.  I don't, I don't believe it was
20  critical piece of information for them.  It may
21  have been of interest to a few people periodically.
22     Q.  Was it -- do you know whether it was

55 (Pages 214 to 217)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                       Chicago, IL

Page 218

1  important to -- or of interest to outside product
2  sales customers?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  Other than, other than some
5  documents that I've seen where they've asked for
6  that information, I'm not aware of any bigger push
7  for that information.
8
9
10 BY MS. ST. PETER-GRIFFTH:
11      Q.  Well, do you know why Alternate Site
12 product sales Contract Marketing personnel would
13 provide AWP analysis with the proposal analyses
14 submitted to customers?
15      MS. TABACCHI:  Object to the form.
16      THE WITNESS:  I'm not aware that they
17 provided that information to anybody.  I have been
18 shown as part of this litigation some formats that
19 I can't say was an Abbott analysis format that
20 included a column for AWP.
21          Again, I would not say that was an
22 AWP analysis as much as it was a column where you

Page 219

1  could have put AWP if somebody was interested in
2  looking at AWP.
3  BY MS. ST. PETER-GRIFFTH:
4       Q.  Well, would you defer to the Contract
5  Marketing personnel and their recollections and
6  testimony as to whether AWP was -- AWP information
7  was provided to Alternate Site product sales
8  customers?
9       MS. TABACCHI:  Object to the form.
10      THE WITNESS:  If, you know, if they've
11 got a different recollection they would be looking
12 at it. I wasn't working at it at the time.  I was
13 trying to run Home Infusion Services.
14 BY MS. ST. PETER-GRIFFTH:
15      Q.  Sir, what I'd like to do now is to
16 actually take your --
17      A.  Done with this?
18      Q.  Done with that.
19      A.  Okay.
20      Q.  If you could take your transcript,
21 please. I'm interested in Page 309, which I think
22 is Page 2.

Page 220

1       MS. TABACCHI:  Do you have another copy
2  of day three?
3       MR. ANDERSON:  We may not have any
4  questions about it.
5       THE WITNESS:  I'm sorry, I missed your
6  reference.
7  BY MS. ST. PETER-GRIFFTH:
8       Q.  I'm sorry, Page 309.
9           Sir, if you could look at your answer
10 after -- on the top after Ms. Tabacchi's objection.
11 If you need to read prior to that, that's fine, but
12 I'm going to ask you questions about that
13 particular answer that begins "by the fact" on Line
14 4.
15          (Witness reviewed documents.)
16      THE WITNESS:  Okay.
17 BY MS. ST. PETER-GRIFFTH:
18      Sir, you gave an answer to a question
19 that I believe Mr. Anderson, my colleague sitting
20 here, asked you and your answer was,
21      "By the fact that we operated a
22 reimbursement services corporation, yes, we

Page 221

1  understood that our clients wanted to be fairly
2  reimbursed for the services and products that they
3  delivered to patients."
4       Do you see that?
5       A.  Yes.
6       Q.  I'd like to explore to you what you mean
7  by -- what you Mike Sellers consider to be fairly
8  reimbursed for a product, an Abbott product or a
9  drug?
10      A.  Well, again, my basis is that in Home
11 Infusion Services you very rarely are delivering
12 one drug.  It's not like a, an injectable drug
13 delivered in a physician's office where the only
14 thing you do is draw it up out of the, out of the
15 vial and shoot it into the patient.  That's very
16 simplistic, but it's not, it's not like that.
17          You're talking -- we're talking about
18 therapies that involve intravenous feeding, we're
19 talking about therapies that are -- that is
20 intravenous antibiotics, and any -- and a number of
21 other things, as well as pain management.
22          So what -- when we talked to our clients

56 (Pages 218 to 221)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 222

1  about, about this, they're interested in the fact
2  that in total they deliver the drug, the supplies
3  to go with it, the infusion pump, the nursing
4  services that, that -- to make sure you adequately
5  care for the patient, and, and all of the backroom
6  activities, such as compounding the drugs and so on
7  that, that goes on.
8       And so when I talk about fairly
9  reimbursed, what they wanted was make sure that the
10  reimbursement they got was in consideration for all
11  the effort and, and the costs they expended in
12  order to properly care for that patient.
13    Q.  Okay.  Do you know whether Medicaid or
14  Medicare provides for compensation for everything
15  that you just described?
16      MS. TABACCHI:  Object to the form.
17      THE WITNESS:  Again, it's changed over
18  time.  In, in my tenure in Home Infusion Services
19  my recollection is that there were some components
20  of that that each of those agencies covered and
21  there were other components that they did not
22  cover.

Page 223

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  If they did not cover them, was Abbott
3  concerned about finding other ways to let its
4  customer base make up for those losses?
5      MS. TABACCHI:  Object to the form.
6      THE WITNESS:  No, what we were -- what we
7  were mainly concerned with is getting the maximum
8  amount of payment we could for whatever services
9  were delivered.
10      If a payer decided they weren't going to
11  pay for the nursing services or decided they
12  weren't going to pay for the supplies, there wasn't
13  anything that we could necessarily do with that;
14  but we could make sure that we got, you know,
15  whatever they, they deemed as the, as the pace
16  horse for that.
17      We would -- if it was, if it was way
18  under, then our, our counsel would be that you
19  cannot afford to provide for these patients and so
20  you need to consider that before you enroll these
21  kinds of patients.
22      So I mean, that, that would have been --

Page 224

1  that would have been our response to the fact that
2  they weren't getting adequate reimbursement.
3    Q.  I'd like to go back to the question that
4  I started out asking you with regard to fair
5  reimbursement.
6      For -- setting aside services, for
7  products within Home Infusion that were billed as
8  products -- and I submit to you that we've heard
9  testimony in this case that were some, that were
10  billed under J code, either drugs or products, for
11  example, Vancomycin.
12    A.  Uh-huh.
13    Q.  Do you, Mike Sellers, think that it is
14  fair reimbursement for a provider to collect 30
15  percent or more than what the drug cost the
16  particular care provider?
17      MS. TABACCHI:  Object to the form.
18      THE WITNESS:  I, I don't pretend to be a
19  payer.  And it's, it's -- that's, that's the
20  payer's decision.  I would, I would personally
21  think that if it costs something to deliver that
22  total package to the patient, that that total cost

Page 225

1  should be considered by the payer.
2      Should they not do that, over the long
3  haul, there will be nobody servicing those
4  patients, and so that doesn't serve either the
5  provider nor the payer, and least of all it serves
6  -- it doesn't -- it, it, it drops the ball for the
7  patient.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Well, sir, my question, though, is do you
10  think that it is fair to reimburse --
11    A.  I don't think it's a question I can
12  answer.
13    Q.  Well, I'm trying to, sir, understand what
14  you, Mike Sellers.  You said be fairly reimbursed,
15  and I'm exploring for you -- with you.
16      Do you think that it is fair to reimburse
17  a provider at 30 percent or more than -- meaning
18  they get paid their 100 percent plus 30 percent on
19  top of that more -- strike that.  Let me ask this
20  again.
21      Do you think it is fair for a provider to
22  be reimbursed at 130 percent or more than what it

57 (Pages 222 to 225)

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.   HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 226

1    cost them to acquire the particular product?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  I, I, I, again, I don't
4    think you can separate drug.  And what I think is
5    fair is that a payer comprehend what the cost is to
6    provide that service.  And the payer needs to give
7    the provider some profit margin on that.  It's up
8    to them as to what that is.  Because otherwise if
9    there is no profit margin, there is no provider.
10   BY MS. ST. PETER-GRIFFTH:
11        Q.   Well -- and let's explore that then.
12   Using your term, do you think that a profit margin
13   that is more than 30 percent of the cost of the
14   drug is a fair reimbursement?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  Again, that, that's a
17   payer's decision, not, not, a decision for me to
18   make.
19   BY MS. ST. PETER-GRIFFITH:
20        Q.   I'd like an answer to -- I want your
21   opinion, sir, on that.
22        MS. TABACCHI:  I object to form.

Page 227

1         THE WITNESS:  I can't give you an opinion
2    on that.
3    BY MS. ST. PETER-GRIFFITH:
4         Q.   Well, do you think -- you can't give me
5    an opinion -- well, let me ask you this:  Do you
6    think it is fair that a provider receive 200
7    percent reimbursement on a product that it
8    provides?
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  Again, it depends on how it
11   -- what it cost to deliver that product to the
12   patient.
13   BY MS. ST. PETER-GRIFFITH:
14        Q.   What about 300 percent?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  You know, I, I -- I've been
17   in the business where, where we, we quote on
18   business and we anticipate what we're going to make
19   on that business or what we're going to lose on
20   that business. And I expect everybody that I deal
21   with, whether it be payer, a provider, to make
22   those same kind of assessments.  I can't make an

Page 228

1    assessment as to what's an equitable, fair,
2    reimbursement level for a payer to a provider.  I
3    can't.
4    BY MS. ST. PETER-GRIFFITH:
5         Q.   At all?
6         A.   No.
7         Q.   Sir, you've been in this business for how
8    long, seventeen years now or more?
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  Well, depends on how far
11   you want to go back, but.
12   BY MS. ST. PETER-GRIFFTH:
13        Q.   And you have no way of gauging what fair
14   reimbursement is for a drug or product provided by
15   a provider?
16        A.   No, fair is in the eyes of the beholder.
17        Q.   Okay, and I --
18        A.   Okay.  So, you know, Dr. Jones could look
19   at it and say, you know, 50 percent profit margin
20   is fair.  Dr. Smith could look at it and say a 5
21   percent margin is fair.  And so, you know, I -- I,
22   I can't judge that.  It's, it's going to be judged

Page 229

1    by the marketplace anyway.
2         Q.   It's going to be judged by the
3    marketplace?
4         A.   Yeah.
5         Q.   What you do you mean by that?
6         A.   Well, if you don't give them enough
7    margin you won't have providers.
8         Q.   Is it also true, sir, that if one
9    component of the market is affording an opportunity
10   for the providers to receive an excessively high
11   margin, that that might attract the providers to
12   that particular manufacturer?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  Plain economics would tell
15   you that, yes.
16   BY MS. ST. PETER-GRIFFTH:
17        Q.   Sir, to what extent did factors such as
18   the possibility for over-prescription of critical
19   drugs like Vancomycin factor into the pricing
20   decisions by the Hospital Products Division?
21        A.   None.
22        Q.   None whatsoever?

58 (Pages 226 to 229)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 230

1     A.  None.
2     Q.  If you just give me a second, I am at a
3  position where I think I'm ready to pass the
4  witness, but I want to go over my notes.
5         THE VIDEOGRAPHER:  We are off record at
6  3:12 p.m.
7         (Brief recess.)
8         THE VIDEOGRAPHER:  We are back on the
9  record at 3:18 p.m.
10        MS. ST. PETER-GRIFFTH:  At this time the
11 United States passes the witness to the Relator,
12 subject to possibly recalling him in the event of
13 production of additional documents by Abbott.
14        THE WITNESS:  Are you done with this,
15 Jarrett?
16        MR. ANDERSON:  For the moment, yes, sir.
17        DIRECT EXAMINATION
18 BY MR. ANDERSON:
19    Q.  Mr. Sellers, if I understand your work
20 background at Abbott correctly, from mid-'90
21 through mid-'92 and then again from early 2000
22 through your retirement this summer, the summer of

Page 231

1  2007, you were directly involved in the setting of
2  catalog or list prices, correct?
3     A.  I participated in that process, yes.
4     Q.  And I believe you've testified previously
5  that in setting those list prices Abbott would hope
6  to gain some incremental dollars to noncontract
7  customers, correct?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  I believe I have said that
10 up to 2000, yes.
11 BY MR. ANDERSON:
12    Q.  Up to 2001 when the price -- list prices
13 came down, correct?
14    A.  Correct.
15    Q.  Other and then -- and other than
16 attempting to increase whatever incremental sales
17 there were to noncontract customers, was there any
18 other reasoning behind Abbott's decision to
19 annually increase the list prices roughly the rate
20 of inflation?
21    A.  Well, the only, only other reason, I
22 believe I've talked about that, is if a list price

Page 232

1  limited our ability to take prices up on contracts,
2  and therefore, we would then raise the price to
3  give us room to raise the contract prices.
4     Q.  If the contract prices on a given product
5  were very, very close to the list prices you would
6  raise the list price so that in turn you could
7  raise the contract prices?
8     A.  Yes.
9     Q.  Are there any other rationales that you
10 were aware of in your tenure at Abbott behind the
11 annual increase of list prices or catalog prices
12 prior to 2001?
13    A.  No.
14    Q.  Is it true, sir, that Abbott -- well,
15 strike that.
16        I'll ask it more open endedly.  Did
17 Abbott consider providers' dispensing fees and
18 setting any Abbott catalog prices?
19    A.  No.
20        MS. TABACCHI:  Object to the form.
21 BY MR. ANDERSON:
22    Q.  Did Abbott consider provider dispensing

Page 233

1  fees in any respect in setting any Abbott price?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  Again, Abbott did not set
4  the usual and customary fees.  That was set by the
5  client.  But, you know, they may have included a
6  dispensing fee in their analysis of that, but as
7  far as any published prices from Abbott, no.
8  BY MR. ANDERSON:
9     Q.  All right.  So excluding usual and
10 customaries that providers may have set, and
11 bearing in mind your prior testimony that providers
12 may have set usual and customaries predicated on a
13 template provided by Abbott, setting that aside,
14 you're not aware of Abbott ever considering
15 provider dispensing fees in any respect in setting
16 any Abbott price, correct?
17    A.  I'm not aware of that.
18    Q.  All right. Did Abbott consider providers'
19 profit margins in -- on drug cost reimbursement in
20 the setting of any Abbott list prices or other
21 prices?
22    A.  No.

59 (Pages 230 to 233)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 234

1    Q.  Did Abbott consider providers' drug cost
2  reimbursements in setting any prices?
3    A.  No.
4    Q.  Did Abbott consider providers' drug cost
5  margins in setting prices?
6    A.  No.
7    Q.  Did Abbott -- strike that.
8      Was Abbott aware back in 1990 through
9  1992 when you were involved in the setting of list
10  prices that those prices were being published to
11  pricing services such as RedBook or First DataBank?
12      MS. TABACCHI:  Object to the form.
13      THE WITNESS:  I as well as a number of
14  people in Contract Marketing were aware that we
15  were reporting prices that -- to the compendia and
16  they were publishing it, publishing our prices in
17  the compendia, yes, during that time frame.
18  BY MR. ANDERSON:
19    Q.  Why was Abbott publishing those prices to
20  the Compendia back in 1990 through 1992?
21      MS. TABACCHI:  Object to the form.
22      THE WITNESS:  The, the reason was we were

Page 235

1  requested to, that it was a general convention.  It
2  also allowed our price -- our products to be listed
3  with all the other drug items.  And so, you know,
4  that's, that's why we, we reported to them.
5  BY MR. ANDERSON:
6    Q.  Is it true that customers of Abbott's
7  requested that Abbott report prices to First
8  DataBank and RedBook so that those prices would be
9  listed in the Compendia?
10      MS. TABACCHI:  Object to the form.
11      THE WITNESS:  It's not my recollection
12  that customers asked for that.  It was, again, as I
13  remember it, it was, it was, it was basically a
14  general practice that had been done for years.
15  BY MR. ANDERSON:
16    Q.  I think a moment ago you testified that
17  we were requested, we being Abbott, were requested
18  to publish their prices to First DataBank and
19  RedBook.
20      Who requested that Abbott publish those
21  prices?
22      MS. TABACCHI:  Object to the form.

Page 236

1      THE WITNESS:  What I was referring to was
2  requests from First DataBank, RedBook.  I believe
3  there was another service there at one point in
4  time.  Whether it still exists, I don't know.  But
5  it was requests from them that we report our prices
6  to them.
7
8
9  BY MR. ANDERSON:
10    Q.  How did you, how did you become aware of
11  that request?
12    A.  Again, this is like legacy knowledge.  I'm
13  -- I don't know when and where I became aware of
14  that.
15    Q.  In 1990 through '92 when you were
16  involved in the setting and publication of prices,
17  were you aware that the prices that were being
18  reported to First DataBank and RedBook by Abbott
19  were used to calculate AWPs on Abbott drugs?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  I think I've testified
22  before that we reported over -- over that time

Page 237

1  period I believe we were reporting our list price
2  to the compendia.  We knew that they were
3  publishing it.  They were also publishing AWP.
4      I was not aware of what formula they were
5  using, whether it was based on that or something
6  else.  But I, I did know that, you know, they would
7  publish our prices, along with a bit of other data
8  that was used by various pharmacies across the
9  country on the drugs.  So the compendia was a
10  reference point for dispensing pharmacies, as I
11  remember.
12
13
14  BY MR. ANDERSON:
15    Q.  At least back in 1990 through 1992 did
16  you or others at Abbott appreciate that when list
17  price increases were published by data to First
18  DataBank and RedBook in turn higher AWPs would be
19  published by First DataBank and RedBook?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  What was your, what was
22  your preface to that?

60  (Pages 234 to 237)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 238

BY MR. ANDERSON:
1
2      Q.  Back in the 1990 through 1992 time frame
3   when you involved in the setting and publication of
4   prices to First DataBank and RedBook, did you and
5   others at Abbott appreciate that that caused higher
6   AWPs to be published?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  Somebody may have.  I don't
9   know.
10  BY MR. ANDERSON:
11     Q.  Do you have any reason to doubt that
12  Abbott personnel were aware that the reporting of
13  annual list price increases caused the publication
14  of higher AWPs?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  Again, I don't remember in
17  that time period talking to anybody about that.
18  BY MR. ANDERSON:
19     Q.  Are you saying that you don't remember
20  whether it was that time period or are you saying
21  that you're certain you did not know in 1990
22  through '92 that higher list prices --

Page 239

1      A.  I'm saying I, I don't recall whether I
2   knew anything about that in particular.
3      Q.  But you are sure that at least sometime
4   in the mid-'90s you became aware that the
5   publication by Abbott of increased list prices and
6   the reporting of those to First DataBank and
7   RedBook would cause increased AWPs to be published,
8   correct?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  At, at some point I became
11  aware that, that there was some correlation between
12  the increase in our list price and an increase in
13  AWP.
14  BY MR. ANDERSON:
15     Q.  And most likely that correlation was
16  known to you at least back in the mid-'90s,
17  correct?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:   Sometime after '95, I
20  would say.  But -- getting hard to remember that
21  far back, you know.
22  BY MR. ANDERSON:

Page 240

1      Q.  Well, in the context of -- well, I'll try
2   to give you a marker.
3      A.  Okay.
4      Q.  Getting back into the 1995 Vanco price
5   decrease and subsequent price increase, at least by
6   that time you and others at Abbott appreciated that
7   the publication of a list price by Abbott to First
8   DataBank and RedBook would cause the publication of
9   either higher or lower AWP depending on which
10  direction the list price went, correct?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  Again, going back to that
13  '95 time frame, I don't, I don't think it, it was
14  relevant to me.  The -- as I recollect, the issue
15  was our list price, not AWP, as it was, as it was
16  reported to me.
17  BY MR. ANDERSON:
18     Q.  Let, let's see if we can refresh your
19  recollection with what's been marked previously as
20  Exhibit 69.  I'm now marking it as Exhibit Sellers
21  004.
22         (Whereupon, Exhibit Sellers 004 was

Page 241

1   marked for identification.)
2   BY MR. ANDERSON:
3      Q.  Mr. Sellers, I'll draw your attention
4   specifically down to the first e-mail in this
5   document dated March 20th, 1995 from Jerry Eickhorn
6   to Jerrie Cicerale with copies to you and Mark
7   Sebree.
8          Do you see that?
9      A.  Yes.
10     Q.  Do you believe you received this e-mail
11  at or near the time of March 20th, 1995?
12     A.  Yes.
13     Q.  Specifically in the first paragraph do
14  you agree Mr. Eickhorn sets forth some new list
15  price changes on three Vancomycin products?
16     A.  Yes.
17     Q.  And then continuing on, do you see in the
18  second-to-last paragraph where it he states,
19         "Please notify RedBook and MediSpan of
20  these changes ASAP, they are the sources for
21  creating the AWP that is important to Alternate
22  Site"?

61 (Pages 238 to 241)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 242

1    A.  Yes.
2    Q.  Did I read that correctly?
3    A.  Yes.
4    Q.  Does that jog your memory that back in
5  '95 you and others at Abbott had an appreciation
6  that reporting list prices to First DataBank and
7  RedBook caused different AWPs to be published for
8  Abbott drugs?
9    A.  I'm aware that's what Jerry Eickhorn
10  put in this note. As again, I'm not, I'm not sure
11  my recollection of the original issue was about AWP
12  or whether it was about list price.
13    Q.  Well, does this document indicate to you
14  that you and others at Abbott understood that the
15  way a list price was published and reported by
16  Abbott to First DataBank and RedBook would impact
17  the publication of AWP?
18    MS. TABACCHI:  Object to the form.
19    THE WITNESS:  It indicates to me that
20  that's, that's what Jerry understood. If you can
21  extrapolate that to a bigger population, I, I, I
22  can't. But that's what he thought that needed to

Page 243

1  be communicated, so.
2  BY MR. ANDERSON:
3    Q.  Does this document help you place an
4  approximate date on when you gained an
5  understanding that the publication of list prices
6  by Abbott had an effect on the publication of AWPs
7  on Abbott products?
8    A.  I, I guess I would, I would tell you that
9  I -- it -- this statement wouldn't have surprised
10  me in '95, but most likely I'm not sure I would
11  have read down that far on this before I'd have
12  gone on to something else, you know.
13    Q.  Well, the, the, the prices -- the price
14  changes that occurred on Vancomycin in '95 were
15  unique; weren't they?
16    MS. TABACCHI:  Object to the form.
17    THE WITNESS:  What do you mean by
18  "unique"?
19  BY MR. ANDERSON:
20    Q.  It wasn't very typical for a list price
21  on an Abbott drug to get dropped drastically and
22  then only a month later be doubled or tripled; was

Page 244

1  it?
2    MS. TABACCHI:  Object to the form.
3    THE WITNESS:  It, it, it was a price
4  change that was outside the catalog price cycle.
5  In that sense it was unique. It, it was a
6  reduction, which we did not normally see. That
7  would be unique.
8  BY MR. ANDERSON:
9    Q.  And, and without belaboring your prior
10  testimony, subsequently Abbott re-increased those
11  list prices to appease some customer complaints
12  about lower reimbursement upon Abbott drugs,
13  correct?
14    MS. TABACCHI:  Object to the form.
15    THE WITNESS:  Well, I think they took
16  away this price reduction. You know, you call it
17  re-increased. What I'm saying is that we
18  implemented a price reduction and some weeks later
19  we took that reduction away and put the price back
20  to where it was before the price reduction went in
21  place.
22  BY MR. ANDERSON:

Page 245

1    Q.  And, and that reinstatement of the list
2  prices that existed prior to the decrease was done
3  as a result of customer complaints about lower
4  reimbursement, correct?
5    MS. TABACCHI:  Object to the form.
6    THE WITNESS:  I'm not sure I agree with
7  that. Could you ask that again?
8  BY MR. ANDERSON:
9    Q.  Well, I can direct you to your prior
10  testimony if that will help, sir, but I was --
11    A.  No, no, if you could just read the
12  question again.
13    Q.  Well, I'll rephrase it for speed.
14    Is it true that in 1995 when Abbott chose
15  to reinstate the list prices that existed prior to
16  the decrease sometime in March of 1995 that that
17  subsequent price, list price publication was done
18  to address customers' complaints about lower
19  reimbursement?
20    MS. TABACCHI:  Object to the form.
21    THE WITNESS:  I, I think earlier today I
22  said it was taken back up. I wasn't sure exactly

62  (Pages 242 to 245)

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 246

1  what the factors were that went into that decision.
2  That was -- I wasn't party to that decision.
3  BY MR. ANDERSON:
4      Q.  Do you at least recall that one of the
5  factors in the decision was that customers,
6  particularly Alternate Site product sales customers
7  such as pharmacy providers, were complaining about
8  lower reimbursement?
9      A.  I, I, again, I think if, if we go back
10  and look at prior testimony, what I have said is
11  that there were some issues raised by Alternate
12  Site. Whether it was a customer issue or not, I
13  don't, I don't have any, any base knowledge with
14  regard to that.
15      Q.  Three pages off.  If you could, take a
16  look at Page 505, sir, of your prior testimony --
17      A.  Is that on day two?
18      Q.  Yes, given on February 14th, 2007.
19  Specifically I'm reading from Page 505, Line 4,
20  question by me,
21      "And to sum it all up, the ultimate
22  decision on the Vancomycin price changes in 1995

Page 247

1  was to keep the list prices higher rather than
2  lower to appease customer complaints about
3  reimbursement, correct?"
4      There's an objection and then your
5  answer,
6      "A decision was made to reinstate the
7  prices that were before the reduction, yes."
8      Did I read that correctly?
9      A.  Yes.
10      Q.  Do you disagree with that testimony?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  No, I was, I was basically
13  saying that I agree that the old prices were
14  reinstated.
15  BY MR. ANDERSON:
16      Q.  Do you agree that one of the reasons for
17  the reinstatement of the old list prices on
18  Vancomycin in 1995 were because customers were
19  complaining about lower reimbursement?
20      A.  I don't, I don't have any knowledge to,
21  to make that statement.
22      (Whereupon, Exhibit Sellers 005 was

Page 248

1  marked for identification.)
2  BY MR. ANDERSON:
3      Q.  Mr. Sellers, if you could, take a look at
4  what's been marked as Exhibit 63, also now marked
5  in this deposition as Exhibit Sellers 005.
6  Specifically I'm drawing your attention, sir, to
7  the paragraph titled "Medicaid."  But I'll allow
8  you to review it as much as you need.
9      (Witness reviewed documents.)
10  BY MR. ANDERSON:
11      Q.  Does this memo from Michael Heggie dated
12  April 26th, 1995 appear to pertain to the
13  Vancomycin price changes?
14      THE WITNESS:  Let me just have one
15  second.
16      (Witness reviewed documents.
17      THE WITNESS:  I'm sorry.  Your question
18  again was?
19  BY MR. ANDERSON:
20      Q.  Does this memo written by Michael Heggie
21  on April 26th, 1995 appear to pertain to Vancomycin
22  price changes?

Page 249

1      MS. TABACCHI:  Object to the form.
2      THE WITNESS:  It does appear to reference
3  the price changes that were made.
4  BY MR. ANDERSON:
5      Q.  Do you agree that Mr. Heggie states that,
6  in the first paragraph reading, quote, "In the last
7  several days we have received calls regarding the
8  price change on Vancomycin products."
9      Did I read that correctly?
10      A.  Yes.
11      Q.  Does that refresh your memory that there
12  were complaints about decreased list prices on
13  Vancomycin by customers?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  The only time I have seen
16  this document is in this litigation, so at the
17  time, no.
18  BY MR. ANDERSON:
19      Q.  Well, I'm, I'm asking a broader question,
20  Mr. Sellers, and that is --
21      A.  Again, again, it doesn't say who the
22  calls came from.  So --

63 (Pages 246 to 249)

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 250

1    Q.   You mean the specific names of the
2  customers?
3    A.   No, it doesn't say customers called.
4    Q.   Who else would have been calling about
5  the price changes?
6    A.   I don't know.  But it, it doesn't say
7  customers called.
8    Q.   Well, let's continue on then.  Reading
9  from the next paragraph,
10        "These price changes will affect
11  reimbursement and so customers may question us."
12        Does that indicate to you that customers
13  were calling with complaints about reimbursement?
14        MS. TABACCHI:  Object to the form.
15        THE WITNESS:  No, it indicates to me that
16  Mike Heggie was anticipating we might get calls
17  from customers.
18  BY MR. ANDERSON:
19    Q.   About lower reimbursement, correct?
20        MS. TABACCHI:  Object to form.
21        THE WITNESS:  About the price changes.
22  BY MR. ANDERSON:

Page 251

1    Q.   And the price changes were --
2    A.   Because we could only talk about our
3  price changes.  We don't control reimbursement.
4    Q.   Well, we'll get to the section on
5  Medicaid in a moment, sir, but will you agree that
6  these list prices were coming down?
7    A.   Yeah.
8    Q.   Okay.  For instance, what previously was
9  Vancomycin fliptop vial one gram with an NDC number
10  of 6533, the -- what used to be the list price of
11  $509 went all the way down to $150, correct?
12    A.   Correct.
13    Q.   All right.  And did you appreciate or did
14  others at Abbott appreciate that that lower list
15  price would cause the reimbursement on that product
16  to go down?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  No, I go, I go back to the
19  original reason that we went and asked for this,
20  and from Home Infusions' standpoint, and that was
21  we were getting some push-back from Managed Care as
22  to why they were using Abbott's Vancomycin versus

Page 252

1  somebody else's, so.
2  BY MR. ANDERSON:
3    Q.   Well, we could spend some time on the
4  case manager's complaints that initiated Dave
5  Brincks' suggestion for a price decrease, but I'm
6  asking a different question, sir; and that is once
7  the price decreases occurred, is it true that
8  customers complained about lower reimbursement?
9    A.   I don't have any knowledge with regard to
10  that.
11    Q.   Do you recall testifying that you
12  received persuasive arguments from Karla Kreklow
13  about a need to raise the list price because
14  customers were complaining about lower
15  reimbursement?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  I do believe I remember
18  testifying that Carla may have been one of the more
19  persuasive people with regard to why the prices
20  should be taken back up.
21  BY MR. ANDERSON:
22    Q.   Was part of her persuasive argument that

Page 253

1  customers were complaining about lower
2  reimbursement?
3    A.   I don't remember.  I don't recall the
4  argument in, in detail.
5    Q.   Do you remember generally that it had to
6  do with customer complaints about reimbursement?
7        MS. TABACCHI:  Object to the form, asked
8  and answered.
9        THE WITNESS:   She was, she was the
10  marketing manager and it, it related to her
11  concerns about how this might affect her business.
12  But I, I don't -- I don't have any recollection of
13  talking about specific customer calls or customer
14  calls at all.
15  BY MR. ANDERSON:
16    Q.   Well, what was the impact that the lower
17  list prices was having on the marketing in her
18  function as the marketing manager?
19        MS. TABACCHI:   Object to the form.
20        THE WITNESS:  She, she just felt that it,
21  it would have a negative impact on her.
22  BY ANDERSON:

64  (Pages 250 to 253)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.   HIGHLY CONFIDENTIAL          November 1, 2007
Chicago, IL

Page 254

1     Q.  And what was the negative impact?
2         MS. TABACCHI: Object to the form.
3         THE WITNESS:  As I said, I don't remember
4   the argument at this point, but I do remember her
5   being the, the advocate.
6   BY MR. ANDERSON:
7     Q.  Well, if you're in marketing and there's
8   a negative impact it means there's some decreased
9   sales or otherwise some kind of customer complaint,
10  correct?
11        MS. TABACCHI:  October to the form.
12        THE WITNESS:  A marketing manager is paid
13  to kind of look at their business and be wary of
14  any changes that might, might negatively affect it.
15  So I considered her as doing her job and
16  identifying that there was some potential if, if
17  this remained in place, but I don't -- I don't
18  remember seeing any definitive evidence to that
19  effect.
20  BY MR. ANDERSON:
21    Q.  Well, I'm not asking about definitive
22  evidence.  I'm asking about your memory of the

Page 255

1   marketing impact that the lower list prices had?
2     A.  I've, I've given you my memory.
3     Q.  Let's see if the second-to-last bulleted
4   paragraph will help you in any respect remember
5   these, these events.  I'm reading from the section
6   titled "Medicaid."
7         Mr. Heggie writes, quote,
8         "Medicaid pays for the most part from NDC
9   numbers.  Having a published list price which is
10  high allows a provider to bill at that list price.
11  Some customers who were buying our Vanco at a deep
12  discount off list may ask about the price change."
13        Did I read that correctly?
14    A.  Correct.
15    Q.  Does that assist you in remembering that
16  list prices were involved or pertained to the
17  reimbursement of Vanco?
18        MS. TABACCHI: Object to the form.
19        THE WITNESS:  No, again, I, I, I never
20  saw this document at the time those discussions
21  were going on.  It, it's an appraisal by Mike
22  Heggie.  So that's all I can tell you.

Page 256

1   BY MR. ANDERSON:
2     Q.  Does it stand to reason, sir, that the
3   testimony you gave under oath on February 14th,
4   2007 would be more accurate than the testimony
5   you're giving here today about the reasons why
6   Abbott raised or reinstated the list prices in or
7   about May of 1995 on Vanco?
8         MS. TABACCHI: Object to the form.
9         THE WITNESS:  You know, if you -- if we
10  want to talk about some specifics, I can address
11  them if you'd like, or attempt to address them for
12  you.
13
14
15  BY MR. ANDERSON:
16    Q.  Well, I'm specifically referring to your
17  testimony that we read at Page 505, Line 4 through
18  Line 12.
19        MS. TABACCHI:  This question has been
20  asked and answered.
21        MR. ANDERSON:  No, this is a slightly
22  different question.

Page 257

1         THE WITNESS:  I believe what I, what I
2   was saying here was that a decision to reinstate
3   the prices that were before the reduction was
4   correct.
5   BY MR. ANDERSON:
6     Q.  How was it correct?
7     A.  It's correct that the prices went back
8   up.
9     Q.  But the question wasn't about whether the
10  prices went up.  It's undisputed that the prices
11  went up, the question was the reasoning behind why
12  the prices went up?
13    A.  I, I, I didn't -- I wasn't there agreeing
14  with your reason, so I was just agreeing that we
15  did take the prices back up.
16    Q.  So today you are contradicting your
17  testimony in February 14, 2007, correct?
18        MS. TABACCHI: Object to the form, and
19  this is now harassing the witness.
20        MR. ANDERSON:  I need to ask this
21  question.
22        MS. TABACCHI:  He has explained his

65 (Pages 254 to 257)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 258

1    answer to you twice.
2    BY MR. ANDERSON:
3        Q.  Unless she instructs you not to answer,
4    Mr. Sellers, you are required to answer the
5    question.
6        MS. TABACCHI:  I will point out that we
7    are going to end today at 5:00; and if you want to
8    spend this time on this topic, that's your choice.
9        MR. ANDERSON:  Well, if he would agree
10   that that's how he testified, then we could have
11   moved on minutes ago.
12       MS. TABACCHI:  The testimony is in the
13   transcript.  You've asked him twice now.  He's told
14   you that was his answer and explained to you the
15   answer.
16   BY MR. ANDERSON:
17       Q.  Sir, are you contradicting your prior
18   testimony at Page 505, Lines 11 and 12?
19       A.  No.
20       Q.  All right.  Now, if I understand your
21   testimony, you believe Abbott did not market the
22   spread over the years; is that correct?

Page 259

1        A.  That wasn't -- that was not the practice.
2        Q.  What is your understanding of marketing
3    the spread?
4        A.  That would be going out and selling our
5    products based on the fact that there was an
6    established differential between the price that the
7    customer paid and what they would be reimbursed.
8        Q.  Would sharing AWPs with a customer
9    constitute marketing the spread?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  May or may not.  I, I would
12   -- I would, I would more see marketing the spread
13   as being a more overt practice of going in and
14   saying use the Abbott Vancomycin before you use the
15   Lily Vancomycin because you'll make more money,
16   which we definitely did not market.
17       The way we marketed our products was on
18   the breadth of our product line, the quality of our
19   product line, and the dependability of
20   manufacturing.  And that --
21   BY MR. ANDERSON:
22       Q.  How do you know --

Page 260

1        A.  And our prices as far as contract were
2    intended to stand alone.
3        Q.  How do you know that Abbott did not
4    market its products by contrasting its AWPs with
5    competitors' AWPs?
6        A.  I haven't, I haven't seen a preponderance
7    of documents that show that.  I haven't seen one
8    document that shows that.
9        Q.  Have you attempted to find any such
10   documents?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  No, but I've seen plenty of
13   documents in the last few years.
14   BY MR. ANDERSON:
15       Q.  Have you, have you talked with anyone to
16   determine whether those types of documents --
17       A.  I talked to Pete Baker about what steps
18   were taken to, to talk to his sales force about the
19   issue.  And, and, and he and I are in lock step in
20   terms of what was done and what was the practice
21   and what was not a practice.
22       Q.  Did Pete Baker have oversight over the

Page 261

1    Alternate Site Contract Marketing personnel in the
2    --
3        MS. TABACCHI:  Object to the form.
4    BY MR. ANDERSON:
5        Q.  -- in the mid-'90s?
6        A.  For a while in the late '90s.
7        Q.  What about in the mid-'90s?
8        A.  They reported to John Ward.
9        Q.  Have you spoken to --
10       A.  But early to that Pete was responsible
11   for the sales force.  So he went from sales force
12   to the full responsibility, so I would, I would
13   trust that he knew what the salespeople were doing.
14       Q.  Have you, have you spoken to anyone in
15   Alternate Site Contract Marketing from the mid-'90s
16   about whether or not they shared AWP information
17   with customers?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  No.
20   BY MR. ANDERSON:
21       Q.  Have you ever learned that Abbott
22   personnel shared reimbursement spreadsheets with

66 (Pages 258 to 261)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 262

1  customers?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  No.
4  BY MR. ANDERSON:
5     Q.  Would reimbursement spreadsheets
6  constitute marketing the spread?
7     A.  I don't know what a reimbursement
8  spreadsheet is.
9     Q.  Have you ever heard of Abbott personnel
10  creating spreadsheets that reflected AWP spreads?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  No.
13
14
15  BY MR. ANDERSON:
16     Q.  Would creating and sharing spreadsheets
17  that show AWP spread constitute marketing the
18  spread?
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  Depends on the question
21  that was being asked.
22  BY MR. ANDERSON:

Page 263

1     Q.  What do you mean by that?
2     A.  Well, I, again, I told you what I, what I
3  contended marketing the spread to be.  And that
4  would be a promotional effort to go out and sell
5  the fact that they could make more money on our
6  product.  We did not do that.
7       We -- again, we sold on, on three issues
8  and sold very effectively on three issues.  If in
9  fact it was our AWPs that were covering the
10  marketplace, we would have had 100 percent of the
11  market.  We did not.
12     Q.  Why would you have had 100 percent of the
13  market?
14     A.  Well, you're taking Vanco in particular,
15  we know that we were the highest price at this
16  point in time on Vanco.  You've got analysis that
17  shows you that.  So, you know, that's, that's the
18  extension of logic that, that I'm hearing you
19  ask me to agree to, and I don't.
20     Q.  Well, I, I didn't raise any point about
21  Abbott having the highest AWPs.  Is it true, sir,
22  that you're aware that in the past prior to 2001

Page 264

1  Abbott did in fact generally have higher AWPs than
2  its competitors?
3       MS. TABACCHI:  Objection to form.
4       THE WITNESS:  No, I'm saying on
5  Vancomycin I'm aware that we had high list prices.
6  BY MR. ANDERSON:
7     Q.  How did you become aware of that?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  From Dave Brincks.
10  BY MR. ANDERSON:
11     Q.  Did Dave Brincks explain to you that
12  Abbott's list prices were higher than all the
13  competitor Vancomycin makers?
14      MS. TABACCHI:  Objection to the form.
15      THE WITNESS:  That's what I remember.
16  BY MR. ANDERSON:
17     Q.  Did you ever gain an understanding that
18  Abbott had higher AWPs than competitive products on
19  other drugs?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  No, because I never looked
22  at AWPs.

Page 265

1  BY MR. ANDERSON:
2     Q.  Did you ever speak to Steve Kipperman
3  about whether or not AWP information had been
4  shared routinely by Alternate Site Contract
5  Marketing personnel to customers?
6     A.  No.
7       MS. TABACCHI:  Object to the form.
8  BY MR. ANDERSON:
9     Q.  Did you ever speak to Debbie Longley
10  about whether or not AWP information had been
11  shared by Alternate Site Contract Marketing
12  personnel to customers?
13     A.  No.
14     Q.  Did you ever talk to Dennis Walker about
15  whether or not AWP information had been shared by
16  Alternate Site personnel to customers?
17      MS. TABACCHI:  Object to the form.
18      THE WITNESS:  No.
19  BY MR. ANDERSON:
20     Q.  Did you ever talk to Christine Sneed
21  about whether or not AWP information had been
22  shared with customers?

67 (Pages 262 to 265)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                          Chicago, IL

Page 266

1      A.  No.
2          MS. TABACCHI:  Object to the form.
3
4
5  BY MR. ANDERSON:
6      Q.  Did you ever talk to Ted Lyjack about
7  whether or not AWP information was shared by Abbott
8  personnel to customers?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  No.
11 BY MR. ANDERSON:
12     Q.  Did you ever talk to Michael Heggie about
13 whether or not AWP information was shared from
14 Abbott personnel to customers?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  No.
17 BY MR. ANDERSON:
18     Q.  If those persons all testified under oath
19 that AWP information was shared by Abbott to
20 customers, would that constitute marketing the
21 spread?
22         MS. TABACCHI:  Object to the form.

Page 267

1          THE WITNESS:  That, that's, that's a
2  subjective question.  I mean, it's a hypothetical
3  question.
4  BY MR. ANDERSON:
5      Q.  In your subjective opinion would that
6  constitute marketing the spread?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  I'm not going to answer a
9  hypothetical question.
10 BY MR. ANDERSON:
11     Q.  Are you willing to say that it does not
12 constitute marketing the spread?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  Again, it depends on what
15 the, what question is being answered.
16 BY MR. ANDERSON:
17     Q.  What question is being answered?
18     A.  Yeah.
19     Q.  So for instance, if a customer's
20 demanding AWP information and Abbott personnel
21 provides it, would that constitute marketing the
22 spread?

Page 268

1      A.  No.
2          MS. TABACCHI:  Object to the form.
3  BY MR. ANDERSON:
4      Q.  Why not?
5      A.  Because the customer put it as a demand
6  before we could make a contract offer.
7      Q.  And how does that justify the sharing or
8  other analysis of AWP?
9      A.  It wouldn't but it could happen.  It, you
10 know, it wouldn't for me, but it might have for
11 someone else.
12     Q.  When you say it wouldn't justify it for
13 you, you mean that the sharing of AWPs even if
14 requested by customers would still be inappropriate
15 in your view?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  My recommendation to
18 anybody that would have come up with that would
19 have been to refer the customer -- the customer to
20 the sources that published AWP.  It's a readily
21 available number.  It's publicly available.  It
22 doesn't need to be covered on our document since we

Page 269

1  don't set that price.
2  BY MR. ANDERSON:
3      Q.  Would the publication of higher list
4  price which would in turn trigger the publication
5  of the high AWP constitute marketing the spread?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  No.
8  BY MR. ANDERSON:
9      Q.  Why not?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  You know, your list price
12 changes for a variety of reasons, none of which
13 have we ever looked at in terms of the AWP.  So if,
14 if, if the list price changes, increases or
15 decreases, it's -- it doesn't, it doesn't -- it
16 can't necessarily be -- the logic can't be extended
17 to, oh, therefore AWP, you're increasing the
18 spread.
19 BY MR. ANDERSON:
20     Q.  Given your testimony a couple of
21 questions ago, I take it that you were aware AWPs
22 were public; is that true?

68 (Pages 266 to 269)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 270

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  Yeah.
3   BY MR. ANDERSON:
4        Q.   And since AWPs were made public or
5   publicly available, customers could evaluate AWPs
6   without any assistance from Abbott, correct?
7        A.   Correct.
8        Q.   So given that fact, do you stand by your
9   testimony that the publication of a high list price
10  which in turn causes the publication of a high AWP
11  does not constitute marketing the spread?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  Yes.
14  BY MR. ANDERSON:
15       Q.   Do you believe that the publication of a
16  high list price when the market prices are much
17  lower and decreasing constitutes marketing the
18  spread?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  No.
21
22

Page 271

1   BY MR. ANDERSON:
2        Q.   Do you believe the publication of
3   increasing list prices while market prices are flat
4   or declining constitute marketing the spread?
5        MS. TABACCHI:  Object to form.
6        THE WITNESS:  No.
7   BY MR. ANDERSON:
8        Q.   Are you aware that in fact over the years
9   up to 2001 Abbott did in fact cause high list
10  prices to be published on most HPD products when
11  the market prices of those products were --
12       (Discussion off the record)
13  BY MR. ANDERSON:
14       Q.   Sir, are you aware that over the years
15  prior to 2001 Abbott published high list prices
16  which were increasing each year when the market
17  prices for those same HPD products were declining
18  or flat?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  I, I am aware that over the
21  years '91 through '99 a number of our prices took
22  customary increases, list prices took customary

Page 272

1   increases over that time period.  For some of those
2   products, the contract prices could have stayed the
3   same or declined.
4        What I, what I have previously testified
5   to is that we looked at catalog price increase as a
6   revenue generator for Abbott Laboratories and, and
7   that's why we passed through the price increases.
8   BY MR. ANDERSON:
9        Q.   And upon further evaluation, Abbott
10  learned that those incremental revenues were not
11  worth the price increases, correct?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I don't, I don't know what
14  you're asking.
15  BY MR. ANDERSON:
16       Q.   Isn't it true that Abbott stopped its
17  annual list price increases in or around the spring
18  of 2001?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  We, we did not take a price
21  increase in 2000.
22  BY MR. ANDERSON:

Page 273

1        Q.   And in addition in 2001 you drastically
2   decreased many list prices, correct?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  Correct.
5   BY MR. ANDERSON:
6        Q.   So at that point obviously Abbott didn't
7   find those incremental revenues to be worthwhile,
8   correct?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  I, I, I think, again, a
11  general assessment was made of our pricing in light
12  of a number of factors and we made the decision to
13  adjust our prices down lower in 2001.
14       (Whereupon, Exhibit Sellers 006 was
15  marked for identification.)
16  BY MR. ANDERSON:
17       Q.   I'm going to go back, sir, to this -- my
18  line of questioning about what constitutes
19  marketing the spread.  Could you take a look at
20  what's been marked as Exhibit Sellers 006, also
21  previously marked as Exhibit 163, and I don't have
22  an extra copy for your Counsel but it's pretty

69  (Pages 270 to 273)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 274

1  straightforward.
2       MR. ANDERSON:  Let's go ahead and switch
3  the tape while the witness is reviewing the
4  exhibit.
5       THE VIDEOGRAPHER:  We are off record at
6  4:05 p.m. with the end of taper number four.
7       (Brief recess.)
8       THE VIDEOGRAPHER:  We are back on the
9  record at 4:07 p.m. with the start of tape number
10  five.
11  BY MR. ANDERSON:
12      Q.  Have you had an opportunity to review
13  what's been marked as Exhibit Sellers 006?
14      A.  Yes.
15      Q.  Do you agree that this appears to be a
16  spreadsheet titled Exhibit F?
17      A.  Yes.
18      Q.  Does it look like this spreadsheet
19  contains AWP analysis comparing the AWPs of
20  Lyphomed products to those of Abbott products?
21      MS. TABACCHI:  Object to the form.
22      THE WITNESS:  For select products, yes.

Page 275

1  BY MR. ANDERSON:
2       Q.  Would you consider this type of
3  documentation to constitute marketing the spread?
4       MS. TABACCHI:  Object to the form.
5       THE WITNESS:  I, I don't know who
6  prepared this document.  It's -- it doesn't look
7  like an Abbott document.  I think I've told you
8  that before.  And in, in reading the footnotes it
9  would appear to be, to be developed by, by somebody
10  that knew Lyphomed product. So my first, my first
11  inclination is that somebody else did the
12  comparison, even though it may have been in our
13  files.
14
15
16  BY MR. ANDERSON:
17      Q.  Are you aware that Debbie Longley
18  testified that these types of documents was created
19  by Alternate Site marketing?
20      A.  No.
21      Q.  Are you aware Debbie Longley testified
22  that these types of documents were typically

Page 276

1  attached to bids by Abbott to customers?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  No.
4  BY MR. ANDERSON:
5       Q.  Does this type of document constitute
6  marketing the spread?
7       MS. TABACCHI:  Object to the form.
8       THE WITNESS:  It's closer but it's -- I
9  wouldn't, I wouldn't say it's what I would consider
10  marketing the spread, but it is, it is walking a
11  fine line.
12  BY MR. ANDERSON:
13      Q.  How much further would it need to go to
14  constitute marketing the spread?
15      MS. TABACCHI:  Object to the form.
16  BY MR. ANDERSON:
17      Q.  You said it's walking a fine line.  What,
18  what do you mean?
19      A.  Well, again, again, I'm not sure we, we
20  created this document, so.
21      Q.  You haven't done any investigation to
22  determine that Abbott did not create this document;

Page 277

1  have you?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  No.
4  BY MR. ANDERSON:
5       Q.  You haven't talked to anybody about
6  whether or not Abbott created this document; have
7  you?
8       A.  No.
9       Q.  So you don't have any evidence whatsoever
10  that Abbott did not create this document, correct?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  I don't have evidence
13  either way.
14  BY MR. ANDERSON:
15      Q.  Well, whether or not Abbott created the
16  document, would you agree that the document
17  constitutes marketing the spread?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  I agree the document covers
20  more information on AWP than we should, we should
21  have done, if it was indeed us.
22

70 (Pages 274 to 277)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 278

1
2    BY MR. ANDERSON:
3       Q.  Do you --
4       A.  But I, I, I, I don't necessarily say it's
5    marketing the spread considering -- well, I don't.
6    There's no extension from the Lyphomed side to say
7    that there is a differential.  I mean, and if you
8    had extended it from the Lyphomed side and shown
9    that we had priced it to an advantage, that might
10   make sense, but I don't see that here.
11      Q.  Do you agree this type of document marked
12   as Exhibit Sellers 006 is currently prohibited under
13   Abbott and Hospira policies?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  That -- our, our practice
16   is not to report AWPs, yes.
17   BY MR. ANDERSON:
18      Q.  Not to share AWPs with customers?  What
19   do you mean by report?
20      A.  Well, put on a report that we give to a
21   customer --
22      Q.  Okay.

Page 279

1       A.  -- AWPs.
2       Q.  Right.
3       A.  Our, our practice is to refer the
4    customer to one of the compendia.
5       Q.  So I take it that this type of document
6    marked as Exhibit Sellers 006 would currently be
7    prohibited under Abbott policies, correct?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  It, it would not be an
10   acceptable practice.
11   BY MR. ANDERSON:
12      Q.  And isn't that true that policy was first
13   documented in writing prohibiting the discussion of
14   AWP in 2003?
15      MS. TABACCHI:  Object to the form.
16      THE WITNESS:  I don't, I don't believe
17   that's the case.
18   BY MR. ANDERSON:
19      Q.  Are you aware of some documented policy
20   against sharing?
21      A.  I don't know whether it was documented
22   but people were definitely made aware of it earlier

Page 280

1    than that.
2       Q.  Well, limiting my question, sir, to
3    written policies, isn't it true that Abbott did not
4    formulate a written policy against sharing AWP
5    information with customers until 2003?
6       MS. TABACCHI:  Object to the form.
7       THE WITNESS:  I, I don't, I don't, I
8    don't have knowledge one way or the other.
9    BY MR. ANDERSON:
10      Q.  You would defer to whenever the policy
11   came out with respect to the date of the policy?
12      MS. TABACCHI:  Object to the form.
13      THE WITNESS:  Again, I -- I know, I know
14   our salespeople and our Contract Marketing people
15   were, were talked to sometime after 1995 about any
16   incidence of that.
17   BY MR. ANDERSON:
18      Q.  How do you know that?
19      A.  Again, by discussions with Pete Baker.
20      Q.  And Mr. Baker had these conversations
21   with you sometime in the late '90s or early this
22   decade, correct?

Page 281

1       A.  Well, I had a confirming conversation
2    with Pete Baker within the last year or two, yes,
3    but it was a confirming of what I understood or
4    remembered from that earlier time period.
5       Q.  But you're unable to put a, a year, for
6    instance, on when the oral policy --
7       A.  A lot of things run together.
8       Q.  Okay.  Well, can you testify that there
9    was an oral policy issued by Abbott to Abbott sales
10   personnel to not share AWPs with customers prior to
11   the year 2000?
12      MS. TABACCHI:  Object to the form.
13      THE WITNESS:  I have testified that there
14   was definition of what an acceptable and
15   unacceptable practice was with regard to AWP, yes,
16   prior to 2000.
17   BY MR. ANDERSON:
18      Q.  Do you recall when roughly that oral
19   policy was issued?
20      A.  '96, '97, '98, I don't know which.
21      Q.  Do you know whether or not Abbott
22   personnel actually obeyed that oral instruction to

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL     November 1, 2007
Chicago, IL

Page 282

1  not share AWPs?
2      A.  I, I, I don't know firsthand.  I know
3  that I have not seen any documentation in anything
4  that's been created that would indicate to me that
5  it was a widespread practice.
6      Q.  Are you aware of any instances where
7  Abbott personnel were disobeying the oral
8  instruction to not share AWPs with customers?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I'm not personally aware of
11 any, no.
12 BY MR. ANDERSON:
13     Q.  Have you heard that some Abbott personnel
14 disobeyed the oral instruction to not share AWPs?
15     A.  I, I don't think I can answer that with,
16 without --
17         MS. TABACCHI:  Other than communications
18 with Counsel.
19         THE WITNESS:  Other than crossing over to
20 communications with Counsel.
21 BY MR. ANDERSON:
22     Q.  Well, I don't know want to know the

Page 283

1  substance of your conversations with Counsel; but
2  if you've learned independent of learning from a
3  lawyer that Abbott personnel were disobeying this
4  oral instruction to not share AWPs, I would like
5  your answer.
6      A.  I have not earned -- learned independent
7  of --
8      Q.  Attorneys?
9      A.  Attorneys.
10     Q.  Why did Abbott go to the trouble of
11 issuing a written policy prohibiting sales
12 personnel from discussing AWPs with customers?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I'm not, I'm not sure which
15 policy you're referring to.  But I can tell you
16 that in and around 2003 I had my group work on
17 putting together true policies and it could have
18 been in one of those procedures and policies that
19 were printed back at that time.
20 BY MR. ANDERSON:
21     Q.  Was that something that you were
22 instructed by your superiors to do or was that

Page 284

1  something that you did on your own initiative?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  It was, it was something I
4  started on my own initiative but was then ratified
5  by the corporate ethics and compliance activities.
6  BY MR. ANDERSON:
7      Q.  Why did you feel like it was important to
8  issue written policies prohibiting the discussion
9  of AWPs with customers?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  I didn't specifically think
12 about that issue.  What I, what was important to me
13 was I had a department of a hundred-some-odd
14 people. We had a sales team that was three, four
15 hundred people.  And we did not have formal
16 policies and procedures in Contract Marketing, so
17 it was my intent to cover all relevant topics that
18 we needed policies and procedures on in and around
19 that time frame. Again, I'm -- I'm talking blind to
20 the, to the document you're referring to.
21         (Whereupon, Exhibit Sellers 007 was
22 marked for identification.)

Page 285

1  BY MR. ANDERSON:
2      Q.  Mr. Sellers, would it be fair to say that
3  you were primarily tasked with Abbott's effort to
4  evaluate whether or not to lower and publish list
5  prices in 2001?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  I, I was tasked to prepare
8  an analysis of list price and contract price and,
9  and propose some changes to those prices, yes.
10 BY MR. ANDERSON:
11     Q.  Who asked you to do that?
12         MS. TABACCHI:  I'm going to caution the
13 witness not to reveal the substance of any
14 communications with Counsel.
15         THE WITNESS:  I, I, I believe it came
16 from our division president, Rick Gonzalez.
17 BY MR. ANDERSON:
18     Q.  And did Mr. Gonzalez explain to you why
19 he wanted you to evaluate the list price issue?
20     A.  Rick didn't have to explain anything to
21 me. Whatever he wanted, I, I would usually go ahead
22 and do.  But, you know, I, I was well aware of, of

72 (Pages 282 to 285)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL     November 1, 2007
Chicago, IL

Page 286

1   what was, what was in the press, what was in --
2   about this issue.  So it was not a surprise that we
3   would go through this analysis.
4        Q.  And one of the issue that you become
5   aware of was the DOJ investigation, correct?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  I'm, I'm -- I wasn't aware
8   of a DOJ investigation.
9   BY MR. ANDERSON:
10       Q.  Were you aware of the DOJ AWPs that were
11  published by First DataBank, for instance, in the
12  summer of 2000?
13       A.  I was, I was aware -- I think we've
14  talked -- we've gone through that, yes.
15       Q.  And relatedly were you aware that there
16  was some underlying DOJ investigation?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  I'm not sure I made that
19  linkage.  We -- to be honest, I don't believe we
20  were real sure what the DOJ was doing at or around
21  that time period.
22  BY MR. ANDERSON:

Page 287

1        Q.  What generalized knowledge did you have
2   about this list price issue prior to Mr. Gonzalez's
3   conversation with you about the list price project?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  What list price issue are
6   we talking about?
7   BY MR. ANDERSON:
8        Q.  Well, you mentioned that Rick didn't need
9   to explain it to you because you understood it.
10  What, what was your general understanding of that
11  issue?
12       A.  I think I said Rick didn't have to
13  explain anything he asked for.  He's the boss.  I
14  go ahead and do what he says.  But the, the
15  analysis was, was, was not something that was
16  surprising to me in light of the fact that there
17  was a -- a significant focus on this whole issue
18  throughout the press, and like I said, the speeches
19  to Congress that are -- that Congressmen were
20  making.  And so, you know, it's -- this was just
21  something that kind of anticipated we'd probably
22  end up doing something.

Page 288

1        Q.  Can you be more specific about what the
2   issue was, what your understanding of the issue
3   was?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  I don't, I don't think
6   there was a -- the issue.  In, in all the things
7   that, that we had looked at prior, and, and, and
8   felt comfortable with was that the reasons that we
9   had increased our list prices were for the reasons
10  that I just told you and had nothing to do with any
11  lateral -- collateral effect on other parts of the
12  industry.
13       It just was not part of it, mainly
14  because the, the people responsible for that were
15  out of touch with any customers that, that would
16  have reflected that impact.
17       So as we looked at it, it, it appeared
18  that while we had done everything in good faith on
19  both sides, we really didn't need to -- you know,
20  there wasn't an issue.  But that being said, there
21  was a lot of discussion going on and a number of
22  other pharmaceutical companies that were in the, in

Page 289

1   the press and so on.  And so it was not a surprise
2   to me that we would want to evaluate our position
3   in some type of comprehensive form.
4   BY MR. ANDERSON:
5        Q.  How long did you have an understanding
6   that the differences between the list prices and
7   the market prices could be a problem?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I, I don't, I don't, I
10  don't think I ever registered them as necessarily a
11  problem.  I registered them in my mind as two
12  different actions that created a disparity that
13  maybe we didn't want to continue.
14  BY MR. ANDERSON:
15       Q.  And I appreciate that, and I'm
16  understanding that you're saying that this
17  realization was coming about or at least existed in
18  the 2000 or 2001 time frame.
19       I'm asking, sir, how many years prior to
20  2000 had you understood that there was a
21  discrepancy between the list prices and the market
22  prices?

73 (Pages 286 to 289)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL     November 1, 2007
Chicago, IL

Page 290

1     MS. TABACCHI:  Object to the form.
2     THE WITNESS:  I mean, obviously I was
3 aware of that on Vancomycin back in 1995.  That's
4 why we initiated the reduction.  But other than
5 that, there had never been a comprehensive analysis
6 put together to compare the two.  And, and prior to
7 that time -- prior to 2000, it was not my
8 responsibility to look at that.
9 BY MR. ANDERSON:
10    Q.  Well, you mentioned the Vancomycin issue
11 and you mentioned that the discrepancy was one of
12 the reasons for the reduction.
13        When you and others at Abbott became
14 aware of that significant discrepancy in '95 on
15 Vancomycin, and without belaboring the testimony
16 about why that reduction didn't hold, did that
17 knowledge cause you or anyone else to evaluate
18 other HPD products?
19    MS. TABACCHI:  Object to the form.
20    THE WITNESS:  No.
21 BY MR. ANDERSON:
22    Q.  Why not?

Page 291

1     MS. TABACCHI:  Object to the form.
2     THE WITNESS:  Again, it was not my -- it
3 wasn't my job at that point.
4 BY MR. ANDERSON:
5    Q.  Whose job was it?
6     MS. TABACCHI:  Object to the form.
7     THE WITNESS:  I would assume it would be
8 the director of Contract Marketing if anybody were
9 to look at that.  I had no -- and it has just been
10 proven, I had no impact on the list price setting
11 being -- sitting over in Home Infusion Services.
12 BY MR. ANDERSON:
13    Q.  How was that proven?
14    A.  We've just gone through an hour or more
15 of the fact that we tried to initiate lower prices
16 and they lasted for six to eight weeks.
17    Q.  And actually, they were retroactively
18 reversed so they lasted about three days, right?
19    MS. TABACCHI:  Object to the form.
20    THE WITNESS:  I don't remember, I don't
21 remember.  You've probably studied this a lot
22 closer than I have in the past.

Page 292

1     MR. ANDERSON:  Yeah.
2     MS. TABACCHI:  Can I just ask, is the
3 State of California going to have questions for the
4 witness?
5     MR. SISNEROS:  I don't think there's
6 going to be time.
7     MS. TABACCHI:  Do you have questions or
8 you don't have questions?
9     MR. SISNEROS:  No, I do have questions.
10    MS. TABACCHI:  You don't?
11    MR. SISNEROS:  I do.
12    MS. TABACCHI:  Oh, you do?
13    MR. SISNEROS:  I do.
14 BY MR. ANDERSON:
15    Q.  Was there any reason in your mind, sir,
16 back in 1995 for you to believe that the
17 discrepancies that existed between list price and
18 market price on Vanco did not exist on other HPD
19 products?
20    MS. TABACCHI:  Object to the form.
21    THE WITNESS:  I had reason to believe
22 that Vanco was not -- was not a model for the rest

Page 293

1 of the catalog, yes.
2 BY MR. ANDERSON:
3    Q.  What, what was that reason?
4    A.  The list prices when we introduced the
5 product, which was I think prior to 1990, as a
6 generic, it had just come off patent, Eli Lily was
7 the innovator, as I remember we set our published
8 prices equivalent to the innovator prices.
9        What happens in -- when a generic
10 drug comes on the market is prices fall, sometimes
11 precipitously, because there are multiple
12 competitors on the market, everybody's trying to
13 get a piece of the business, and the traditional
14 profit margins of branded pharmaceuticals go by the
15 wayside.
16        So at, at -- when that, when that
17 happened our contract prices fell with the market.
18 And I was not aware of anybody -- at any time that
19 we went back and adjusted our published prices to
20 reflect that fall.  So I, I really saw Vanco in
21 these instances as somewhat of an anomaly.
22    Q.  Did you find that the market prices on

74 (Pages 290 to 293)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 294

1 most HPD drugs that were subject to multi-source
2 competition dropped when there were other products
3 in the marketplace?
4       MS. TABACCHI:  Object to the form.
5       THE WITNESS:  Well, that was our
6 business. I mean, our business is, is, is generic
7 drugs. It is -- Vanco was an early example of
8 that; but you know, we be would have expected any
9 other drugs that came off patent the prices to
10 drop.
11 BY MR. ANDERSON:
12    Q.  So in that reflect Vanco wasn't really
13 any different than any other multi-source drug; was
14 it?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  Well, lot of our, a lot of
17 our drugs have been multi-source for years.  So
18 Vanco was a, was a recent example, let's say it was
19 five, six years old at that time.  Right?
20 BY MR. ANDERSON:
21    Q.  Right.
22    A.  It was 1995 and let's say we introduced

Page 295

1 it in  '89.  It was in or around that time frame.
2       So again, I, I considered it to be an
3 anomaly, not a rule.
4    Q.  Well, you mentioned the older drugs.  The
5 older drugs that were subject to multi-source
6 competition would have had market prices that would
7 have decreased years ago and then reached some type
8 of equilibrium, correct?
9       MS. TABACCHI:  Object to the form.
10       THE WITNESS:  I would have expected that,
11 yes.
12 BY MR. ANDERSON:
13    Q.  And in fact, that was your experience;
14 wasn't it?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  That there would be an
17 equilibrium reached on price?
18 BY MR. ANDERSON:
19    Q.  Yes.
20    A.  Yeah, I think, I think -- again, going
21 back to general economics?
22    Q.  Sure.

Page 296

1    A.  Multiple competitors in a market price,
2 the prices are going to seek one another and
3 they're going to seek a lower level and then
4 they'll, they'll stay at that lower level or
5 slightly increase with, with inflation after it
6 hits the bottom.
7    Q.  And if the multisource products that are
8 much older than Vanco, for instance, have market
9 prices which are relatively flat but each and every
10 year for ten, twenty years the list price is
11 increased 4 percent and 6 percent and 3 percent
12 over and over and over again, that would cause
13 there to be an increase in discrepancy between the
14 list price and the market price, correct?
15       MS. TABACCHI:  I object to form.
16       THE WITNESS:  I would agree that would,
17 that would, that would promote a disparity between
18 the two prices, yes.
19 BY MR. ANDERSON:
20    Q.  And there was nothing that was unique
21 about the list price increases that Abbott took
22 prior to 2001 that was limited to Vancomycin,

Page 297

1 correct?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  In, in general they, they
4 probably were not across the board but they were
5 over a -- probably a good section of the catalog at
6 any one point one year.  Again, I haven't looked at
7 each year to determine what level of price increase
8 we took and what level and what was the coverage.
9       I do, I am aware that there were at times
10 when there were some market conditions that the
11 marketing managers did not want us to take a price
12 increase on a certain product.  So we did not do
13 just blanket increases.  That's why we went through
14 that whole analysis every year.
15 BY MR. ANDERSON:
16    Q.  In, in hindsight, Mr. Sellers, should
17 Abbott have analyzed all of its list price, market
18 price discrepancies, at least in 1995 when it did
19 so for Vanco?
20       MS. TABACCHI:  Object to the form,
21 mischaracterizes the witness's testimony.
22       THE WITNESS:  You know, that's purely

75 (Pages 294 to 297)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 298

1  speculative.  Hindsight there's a lot of things
2  that, that look different, so.
3  BY MR. ANDERSON:
4      Q.  Can you answer the question?
5      A.  My personal opinion?
6      Q.  Yes.
7          MS. TABACCHI:  Object to the form of the
8  question.
9          THE WITNESS:  Again, my personal opinion
10 during that time frame was that, you know, we were
11 doing things for the right reasons.  So I'm not
12 sure I would have advocated that, no.
13 BY MR. ANDERSON:
14     Q.  The right reasons being the effort to
15 garner this incremental sales revenue on 1 percent
16 or whatever of sales, correct?
17     A.  A small percentage.  I will, I will agree
18 with a small percentage, but yes.
19     Q.  All right.  If you could, take a look at
20 what's been marked as Exhibit Sellers 007, also
21 previously marked as Exhibit 1144.
22     A.  Okay.

Page 299

1          MS. TABACCHI:  You don't have a copy?
2          MR. ANDERSON:  You can look at mine if
3  you want and then just hand it back to me.
4          MS. TABACCHI:  Sure.
5          (Witness reviewed documents.)
6          THE WITNESS:  Okay.
7  BY MR. ANDERSON:
8      Q.  Mr. Sellers, do you recognize what's been
9  marked as Exhibit Sellers 007?
10     A.  Yes.
11     Q.  And the cover memo was written by you to
12 meeting attendees dated March 7th, 2005, correct?
13     A.  Correct.
14     Q.  You refer to a meeting that was going to
15 be held in Rich Gonzalez's office; is that right?
16     A.  Correct.
17     Q.  Did the meeting in fact occur?
18     A.  I don't remember.
19     Q.  Most likely did it occur?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I would have expected it to
22 occur.

Page 300

1  BY MR. ANDERSON:
2      Q.  Do you recall who the attendees of the
3  meetings in Mr. Gonzalez's office were?
4      A.  Again, I would, I would assume it was
5  myself -- and again, this is assumption because I
6  can't tell you for sure, but myself, Rick Gonzalez,
7  Guy Wiebking, and Chris Begley.
8      Q.  And at the time your position was general
9  manager Contract Marketing correct?
10     A.  Correct.
11     Q.  And that --
12     A.  It looks like this was done in February
13 9th, 2001.
14     Q.  February 9th, 2001?
15     A.  Well, that's, that's when this document
16 was created.  It looks like the meeting was March
17 7th.
18     Q.  Right.  Okay.  We'll get there in a
19 second.  Mr. Gonzalez was at the time the president
20 of HPD, correct?
21     A.  Yes.
22     Q.  What was Mr. Wiebking's title?

Page 301

1      A.  Let me, let me go back on that.  I can't
2  remember whether Rick was still the president at
3  that time or whether he was the corporate group
4  president with HPD reporting to him.  I, I, I think
5  Chris Begley had replaced him as president by that
6  time.
7      Q.  Okay.  But --
8      A.  Chris Begley reported to him.
9      Q.  I see.
10     A.  So it was still that -- that was still
11 the hierarchy for HPD.
12     Q.  And Mr. Wiebking was your direct report,
13 correct?
14         MS. TABACCHI:  Object to form.
15         THE WITNESS:  Who I reported to.
16 BY MR. ANDERSON:
17     Q.  And his position was in the spring of
18 2001?
19     A.  He was the vice president of commercial
20 services or something like that.
21     Q.  All right.  Now, looking at particularly
22 the third and fourth pages of Exhibit Sellers 007

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 302

1  --
2      A.  Yes.
3      Q.  -- Mr. Sellers, did you create those
4  pages?
5      A.  Yes.
6      Q.  Now, writing at the top of the -- on the
7  third page you state, quote,
8          "Per directions from last meeting, 1,
9  discussed price adjustments with other divisions."
10         Then I'm reading for the sub-bullet
11  titled PPD, quote,
12         "PPD, standard WAC prices at 5 percent
13  below list, potential exposure on Ery products
14  which are sold at 40 to 60 percent below list.
15  Some sales volume risk with lower list price."
16         Did I read that correctly?
17     A.  Yes.
18     Q.  What did you intend to conveys with that
19  statement?
20         MS. TABACCHI:  I've got to caution the
21  witness not to reveal any attorney/client
22  communications.  I don't have a copy of this -- are

Page 303

1  you going spend a lot of time going through details
2  line by line?
3          MR. ANDERSON:  Well, I certainly am this
4  line.  There's a few other sections, but --
5          MS. TABACCHI:  As you know, Jarrett, much
6  of this work was done in connection with Counsel,
7  so there are a lot of privilege issues involved in
8  the discussions here.
9          THE WITNESS:  Yeah, I think, I think the
10  -- it would be the same impact that we were talking
11  with with HPD, reducing a list price --
12         MS. TABACCHI:  Thank you.
13         THE WITNESS:  -- would have some, some
14  impact on PPD and Ery products.
15  BY MR. ANDERSON:
16     Q.  And that impact -- okay.  So you're
17  drawing a comparison between the impact on the Ery
18  products for lower list prices similar to the
19  impact on HPD products if lower list prices were
20  instituted?
21     A.  Correct.
22     Q.  And the impact would be twofold, correct,

Page 304

1  it would be on the one hand the lower incremental
2  sales, whatever those may be at noncontract prices,
3  correct?
4      A.  That would be one.
5      Q.  And then the second impact would be sales
6  volume decreases due to lower reimbursement,
7  correct?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  No.
10  BY MR. ANDERSON:
11     Q.  Well, let's take a look at what you've
12  set forth at the bottom of Page 3, sir.  Do you see
13  a section titled "Definite Impact"?
14     A.  Yes.
15     Q.  That reads "Price loss due to reduction,"
16  correct?
17     A.  Correct.
18     Q.  Then under that you've also written a
19  subsection titled "Potential Impact," quote,"Volume
20  loss due to reimbursement reductions."
21         Did I read that correctly?
22     A.  Correct.

Page 305

1      Q.  And the reimbursement reductions you
2  projected would cause $8.8 million in sales volume
3  loss to the Alternate Site products sales.  Did I
4  read that correctly?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  It had the potential of
7  having that effect, yeah.
8  BY MR. ANDERSON:
9      Q.  So at least back in February and March of
10  2001 you were projecting and reporting to Rick
11  Gonzalez, among others, that decreased
12  reimbursement could cause decreased sales, correct?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I was, I was reporting to
15  them that there was a definite impact of $10
16  million -- or $1 million in 2001 and $2 million in,
17  in, in succeeding years based on doing the
18  reductions we had talked about up to this point and
19  that the -- in looking and, and talking to
20  Alternate Site and Home Infusion there could be
21  some potential of other losses that could come from
22  reimbursement impact.

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 306

BY MR. ANDERSON:
 2     Q.  And why did you have the belief that
 3  decreased list prices could have reimbursement
 4  effects?
 5     A.  I think these numbers came from Lynn
 6  Leone's analysis and it was a -- it was purely a
 7  mathematical arrangement -- deal of going through
 8  and saying, okay, if there is a direct relationship
 9  and customers react to that direct relationship,
10  then this could have an impact of this volume.
11  There was nothing more definitive than that.  It
12  was, it was purely a, a look at what are, you know,
13  worst case downsides.
14     Q.  Why did you and Ms. Leone project that
15  reimbursement decreases would cause a reaction from
16  customers?
17        MS. TABACCHI:  Object to the form, asked
18  and answered.
19        THE WITNESS:  Again, I just went through
20  that logic.  We, we said if there is a direct
21  relationship, we didn't say that there was, but if
22  there was a direct relationship to changing our

Page 307

 1  list prices and the attractiveness of our products
 2  in terms of reimbursement, we would see -- we could
 3  foresee that we could see reductions as big as
 4  these.
 5  BY MR. ANDERSON:
 6     Q.  I'll rephrase slightly because I don't
 7  think you're answering my question.
 8        Did Abbott have some reason to believe
 9  that reimbursement reductions on its products
10  resulting from the publication of lower list prices
11  would be viewed negatively by Abbott's customers?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  It had nothing to do with
14  what we believed.  It was a matter of trying to
15  identify what is the worst case scenario.  What we
16  were trying to establish is, okay, regardless of
17  whether we believe it or not, what if there is a
18  direct correlation between the two and our
19  customers act on that direct correlation and this
20  would be the impact.
21        The same for Home Infusion Services was
22  what if there is a correlation, we're not sure

Page 308

 1  there was, but what if there was a correlation and
 2  what if payers acted on that.
 3        So, you know, as a, as a good business
 4  manager, as all of these people were, you always
 5  want to when you're looking at something you want
 6  to look at what's, what's the upside, what's the
 7  downside, what's the worst case issue, and, and
 8  make your assessment based on that.
 9        And that's what we were trying to reflect
10  here and that's why we called it potential, because
11  we weren't saying that this was going to happen.
12        If we believed that it was going to
13  happen, we would have put it under definite.  But
14  we did not believe that it was going to happen.
15  Could some portion of it happen?  Maybe.  But we,
16  we -- we truly tried to identify a worst case for
17  this analysis.
18  BY MR. ANDERSON:
19     Q.  I will rephrase to address your focus on
20  the word potential.  Why was it that Abbott
21  projected the potential sales volume loss that
22  would result from lower reimbursements if Abbott

Page 309

 1  published lower list prices?
 2        MS. TABACCHI:  Objection, asked and
 3  answered.
 4        THE WITNESS:  I think I answered that
 5  question.
 6        MS. TABACCHI:  Twice.
 7        THE WITNESS:  I think I've answered.
 8  BY MR. ANDERSON:
 9     Q.  No, you've explained that you made this
10  projection but I'm asking what underlying rationale
11  existed for making the projection?
12     A.  I explained --
13        MS. TABACCHI:  Same objection.
14        THE WITNESS:  I explained the rationale
15  was in you were to, to look at it and say there is
16  a direct correlation, don't know if there's a
17  direct correlation or not, but if there was a
18  direct correlation could this happen?  Yes.
19        That, that doesn't, doesn't say that we
20  believed it would happen.  It just says that,
21  again, making assumptions, making an assumption
22  that there's a direct correlation, what is the

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL       November 1, 2007
Chicago, IL

Page 310

1  worst case scenario for management to consider.
2  BY MR. ANDERSON:
3     Q.  Why did Abbott consider that there might
4  be sales volume loss?
5        MS. TABACCHI:  Object to the form, asked
6  and answered.
7        THE WITNESS:  I've, I've, I've told you
8  that all through this time frame there's been
9  plenty of discussion about AWP and whether it's
10 related to reimbursement or not.  Whether I
11 believed it or not is irrelevant, so we said, okay,
12 regardless of what, what we believe, go ahead and
13 do the analysis.  It says if there is a direct
14 correlation, this is what it is.
15 BY MR. ANDERSON:
16    Q.  Did Abbott have some basic perception
17 that some customers would stop buying Abbott drugs
18 if the list prices were decreased and in turn
19 reimbursement was decreased?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  Again, I'm, I'm speaking
22 for Mike Sellers.  Mike Sellers did not believe

Page 311

1  there was a, a direct correlation with that, but we
2  did have to go through this analysis.
3  BY MR. ANDERSON:
4     Q.  And the analysis you're referring to is
5  Page 3 of Exhibit Sellers 007 where in essence you are
6  projecting some lost sales due to lower
7  reimbursement on Abbott drugs?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  We're saying that that
10 could be a potential impact, yes.
11 BY MR. ANDERSON:
12    Q.  And likewise, in conducting this
13 evaluation, you learned that there could be the
14 same sales volume exposure loss on the Erythromycin
15 products sold by PPD?
16       MS. TABACCHI:  Object to the form,
17 mischaracterizes his prior testimony.
18       THE WITNESS:  I don't think that's what I
19 said.  What I said was that the same exposure that
20 we were projecting under definite would happen
21 under the Erythromycin sample.  I wouldn't pretend
22 to do any broader analysis than that for PPD.  They

Page 312

1  know their market much better than I do.
2  BY MR. ANDERSON:
3     Q.  Do you recall testifying earlier, sir,
4  that you did in fact talk to Joe Fiske about sales
5  volume loss on the erythromycin products if AWPs
6  were lowered?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  I, I, I believe in prior
9  depositions you've shown me a scratch piece of
10 paper that talks about Erythromycin.  As I
11 remember, it related to a conversation I had with
12 Joe Fiske; but to go beyond that, I can't, you
13 know, other than what I, what I, what I wrote in
14 this document.  Undoubtedly that information came
15 from Joe Fiske.  I didn't have that information.
16 BY MR. ANDERSON:
17    Q.  Undoubtedly that information came from
18 Joe Fiske, you're referring to the information --
19    A.  About the Ery.
20    Q.  About the Ery shown on the third page of
21 Exhibit Sellers 007?
22    A.  The discount levels, yes.

Page 313

1        (Whereupon, Exhibit Sellers 008 was
2  marked for identification.)
3  BY MR. ANDERSON:
4     Q.  Okay.  If you could, Mr. Sellers, take a
5  look at what's been marked as Exhibit Sellers 008.
6  I'm only going to be asking you questions about the
7  first page, before we have to conclude for the day.
8     A.  Okay.
9     Q.  Is this one of the policies that you led
10 the creation of?
11    A.  Yes.  I can't tell whether this is an end
12 process document or the finished document; but yes,
13 it's the general format of the policies that we
14 started to put in place in 2003.
15    Q.  And specifically directing your attention
16 to the purpose of this policy, I'll read for the
17 benefit of the record,
18       "This document outlines the procedure for
19 processing orders that have been placed on hold for
20 manual price review during order creation by
21 customer" -- "corporate customer service.  This
22 review may be requested by the individual placing

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 314

1  the order because they may dispute the
2  system-generated price or the hold may be automatic
3  due to systems-generated blocks developed to audit
4  catalog priced orders."
5      Did I read that correctly?
6      A.  Yes.
7      Q.  Is it true Abbott has system-generated
8  blocks to audit catalog price orders?
9      A.  Yes.
10     MS. TABACCHI:  Object to the form.
11     THE WITNESS:  Yes.
12 BY MR. ANDERSON:
13     Q.  Why does Abbott block sales at catalog
14 prices?
15     MS. TABACCHI:  Object to the form.
16     THE WITNESS:  Well, let me explain that a
17 block is not a hard and fast, it's just a net in
18 the system that stops the order from going forward.
19 It doesn't delete the order; it doesn't do anything
20 else.
21     In order for the order to go forward,
22 Contract Marketing for either of these reasons

Page 315

1  would have to go into the system and make some
2  input on the order to release it to go forward.
3      We had implemented systems-generated
4  blocks on catalog orders because we had run into a
5  number of customers who when they placed their
6  orders they may have placed their orders sooner
7  than we got the contracts implemented on or they
8  may have placed their orders after a contract had
9  expired and a new contract was being negotiated.
10     And so the reason we put the block in was
11 so that we would not create orders that would then
12 have to be re-priced and re-billed.  Because then
13 the customer would come back and say, well, I had a
14 contract and we'd say, well, but it didn't get
15 implemented but two days later.
16     So our, our folks would then look at
17 those orders, challenge to make sure we didn't have
18 anything pending, either, like I said, prior
19 contract or a future contract, and if neither of
20 those existed would release the orders so that they
21 would contract price -- or catalog price.  If they,
22 if we had either the other situations in place,

Page 316

1  then we would intervene, put in the right, the
2  price off the contract that should have been and
3  send it on its way.
4      So it was a way to ensure that, that we
5  didn't have big issue with billing and catalog
6  price and then having to come back and re-bill it
7  later when the customer was inflamed.  It's better
8  that we take a little more time on the order going
9  out and get it right as right as we can get it and
10 send it to the customer.  It's purely a customer
11 service issue.
12 BY MR. ANDERSON:
13     Q.  So to put it simply, Abbott's experience
14 was that catalog priced orders created customer
15 problems, correct?
16     MS. TABACCHI:  Object to the form.
17     THE WITNESS:  No.
18 BY MR. ANDERSON:
19     Q.  Isn't that what you just explained, that
20 you all would block them so that you wouldn't have
21 some type of problem down the road?
22     MS. TABACCHI:  Object to the form.

Page 317

1      THE WITNESS:  No.  Our experience was, as
2  you've brought up before, that a large percentage
3  of our orders go out at contract price.  On that
4  small percentage that goes out on catalog price we
5  just wanted to make sure that we were right.
6      And so, so that, that was the issue.
7  It wasn't necessarily -- we had customers that are
8  not on contract, that buy product at catalog price.
9  We don't have once we put this in place, we did not
10 have a big re-bill issue coming back to us.
11 BY MR. ANDERSON:
12     Q.  Is it true that Abbott has experienced
13 problems with customers when they -- those
14 customers are billed at catalog price?
15     MS. TABACCHI:  Object to the form.
16     THE WITNESS:  No.
17 BY MR. ANDERSON:
18     Q.  Does, does Abbott create automatic blocks
19 for contract invoices?
20     MS. TABACCHI:  Object to the form.
21     THE WITNESS:  There may be some in the
22 system.  I, I can't say off the top of my head if

Henderson Legal Services
202-220-4158

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 318

1  there are.
2        (Whereupon, Exhibit Sellers 009 was
3  marked for identification.)
4  BY MR. ANDERSON:
5     Q.  Sir, take a look at what's been marked as
6  Exhibit Sellers 009.  It's also marked as Exhibit
7  940.
8        (Witness reviewed documents.)
9     THE WITNESS:  Okay.
10  BY MR. ANDERSON:
11    Q.  Did you draft this document, sir?
12    A.  I do believe that I did.
13    Q.  Who was the intended audience of this
14  document?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  Yeah, I, I don't remember.
17  BY MR. ANDERSON:
18    Q.  Do you believe you created this around
19  January 18th, 2001?
20    A.  I may have begun the creation of it
21  around that time period.  Whether this draft is of
22  that original generation or not, I, I can't tell.

Page 319

1     Q.  Reading from your memo in the middle of
2  the first page beginning with the phrase, "The wide
3  disparity," I'm reading for the benefit of the
4  record, quote,
5        "The wide disparity in catalog prices and
6  average market prices as currently configured is
7  not supported by sufficient financial or market
8  factors to survive a scrutiny of public opinion."
9        Did I read that correctly?
10    A.  Yes.
11    Q.  Is that a true statement?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  That was obviously my
14  opinion at the time.
15  BY MR. ANDERSON:
16    Q.  Okay.  Continuing on, second sentence,
17       "This was voiced in December 2000 in a
18  letter from U.S. representative Pete Stark to Miles
19  White."
20       Did I read that correctly?
21    A.  Yes.
22    Q.  Were you contacted by anyone about

Page 320

1  Representative Stark's letter to Miles White?
2     A.  I don't remember if I was contacted by
3  anyone.  I may have been.  I don't know.  I did see
4  the letter but --
5     Q.  How did you receive a copy of the letter?
6     A.  I, I can't remember.
7     Q.  Did you work at all with Miles White or
8  his staff in responding to Representative Stark's
9  letter?
10    A.  No.
11    Q.  Why did you receive a copy of the letter?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I can't remember who gave
14  it to me nor why they gave it to me.
15  BY MR. ANDERSON:
16    Q.  Do you know if anyone at Abbott worked to
17  formulate any response to Representative Stark's
18  letter?
19    A.  I don't recall.
20    Q.  What was your take on Representative
21  Stark's letter?
22       MS. TABACCHI:  Object to the form.

Page 321

1       THE WITNESS:  I, I thought it was a -- a
2  statement of Pete Stark's opinion.
3  BY MR. ANDERSON:
4     Q.  Did it concern you?
5       MS. TABACCHI:  Object to the form.
6  BY MR. ANDERSON:
7     Q.  I'll rephrase to be more specific.
8       Did representative Stark's letter concern
9  you?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  Any, any form of potential
12  negative press or negative impressions about the
13  corporation concerned me.
14  BY MR. ANDERSON:
15    Q.  Now looking up in the first paragraph in
16  the section titled "Background," I'm reading toward
17  the end of the paragraph, specifically the
18  second-to- last sentence,
19       Quote, "Though the majority of
20  eventual sales dollars are processed at steep
21  discounts to the catalog pricing, under contractual
22  commitments there continues to be a small portion

81 (Pages 318 to 321)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 322

1  of sales (less than 1 percent) which are processed
2  at these elevated levels."
3        Did I read that correctly?
4    A.  Yes.
5    Q.  Did you know back in the early 2001 time
6  period that less than 1 percent of Abbott's sales
7  were at list price?
8    A.  I wrote it in there.
9    Q.  Did you know prior to early 2001 that
10 less than 1 percent of Abbott's prices were at list
11 price?
12   A.  I can't tell you when --
13      MS. TABACCHI:  Object to form.
14      THE WITNESS:  -- when I came to that
15 information.
16 BY MR. ANDERSON:
17   Q.  Do you think you first learned that only
18 less than 1 percent of sales were at list price
19 because you were asked to analyze this issue by Mr.
20 Gonzalez?
21      MS. TABACCHI:  Object to the form.
22      THE WITNESS:  I don't know what data I

Page 323

1  was referencing here.
2  BY MR. ANDERSON:
3    Q.  Do you feel like prior to getting
4  involved in any type of evaluation of Abbott's
5  prices in 2000 or 2001 you had an understanding
6  that less than 1 percent of Abbott sales were at
7  list price?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  I would say when I knew it
10 it was a small percentage.
11 BY MR. ANDERSON:
12   Q.  Were you shocked to learn that it was
13 definitively less than 1 percent?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  I, I, I -- I don't recall
16 shock.
17 BY MR. ANDERSON:
18   Q.  So that -- the fact that less than 1
19 percent of Abbott's sales were list price was
20 relatively consistent with what your perception was
21 of the volume of Abbott list price sales, correct?
22      MS. TABACCHI:  Object to the form.

Page 324

1        THE WITNESS:  Again, my impression all
2  along is it's been a relatively small percentage in
3  the latter part of the 1990s.
4  BY MR. ANDERSON:
5    Q.  Did you feel like over the years due to
6  the wide discrepancies between catalog prices also
7  known as list prices and market prices that Abbott
8  faced some exposure?
9       MS. TABACCHI:  Object to the form.
10      THE WITNESS:  I, I got lost in the middle
11 of that question.
12 BY MR. ANDERSON:
13   Q.  Did you feel like the wide disparity in
14 catalog prices and market prices on Abbott drugs
15 created exposure for Abbott?
16      MS. TABACCHI:  Object to the form.
17      THE WITNESS:  I'm not sure I felt that
18 way.  I was trying to -- I was -- I think in this
19 document, again, I don't know where it was used,
20 but in this document I was trying to portray, you
21 know, what might be viewed.
22      I didn't, I didn't say necessarily that I

Page 325

1  viewed it that way.  Again, I felt that all of our
2  actions had inadvertently created the disparity and
3  all of the actions were done for different reasons.
4  BY MR. ANDERSON:
5    Q.  Where did you state in Exhibit Sellers
6  009 where you felt like these discrepancies were
7  inadvertent?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  Well, I, I explained up at
10 the top how they were disconnected.  In my -- in
11 the way I read that it's inadvertent.
12 BY MR. ANDERSON:
13   Q.  Oh, okay.  Do you feel like Rick Gonzalez
14 was made aware of your findings set forth in
15 Exhibit Sellers 009?
16      MS. TABACCHI:  Object to the form.
17      THE WITNESS:  I, I don't know who saw
18 this document, if anybody.
19 BY MR. ANDERSON:
20   Q.  You think you created this on your own
21 initiative?
22      MS. TABACCHI:  Object to the form.

82 (Pages 322 to 325)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                              Chicago, IL

Page 326

1        THE WITNESS:  I think I created the
2   document.  I think it was provided to attorneys.
3   But whether it went any further than that, I don't,
4   I don't recall.
5   BY MR. ANDERSON:
6        Q.   Looking in the paragraph titled "division
7   impact," I'm reading from the second sentence,
8   quote,
9        "Additionally lowering the catalog price
10  will reduce the Average Wholesale Price, AWP,
11  published by the market clearinghouses and may
12  result in lost sales due to alternative sourcing of
13  products by customers away from Abbott in the
14  Alternate Site markets where both government and
15  commercial reimbursement to providers is based upon
16  a function of AWP."
17       Did I read that correctly?
18       A.   Yes.
19       Q.   Is that a true statement?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  I think that's a statement
22  that's consistent with everything we've talked

Page 327

1   about today, yes.
2   BY MR. ANDERSON:
3        Q.   So -- and is that statement consistent
4   with your understanding over the years from the
5   early '90s to the present?
6        MS. TABACCHI:  Object to the form, asked
7   and answered.
8        THE WITNESS:  Again, I wrote this in 2001
9   with the knowledge I had in 2001.
10  BY MR. ANDERSON:
11       Q.   I understand you wrote this in 2001.  My
12  question wasn't when you wrote this.
13       I'm saying, sir, is that statement about
14  how catalog price reductions will impact AWPs and
15  in turn result in lost sales consistent with your
16  experience at Abbott over the years?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  I think, I think the
19  statement says "may result."  So we're back to the
20  discussion of definite versus --
21  BY MR. ANDERSON:
22       Q.   I can address that.

Page 328

1        A.   -- definite versus potential.
2        Q.   I'll rephrase, sir.
3        A.   And --
4        Q.   Let, let me rephrase for purposes of the
5   record so we don't belabor that point.
6        Sir, was the fact that you state in
7   Exhibit Sellers 009 that catalog price reductions
8   will result in AWP price reductions and may result
9   in lost sales by customers away from Abbott in the
10  Alternate Site markets due to reimbursement
11  consistent with your experience at Abbott over the
12  years?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  No, it's -- well, the "may"
15  is consistent with my experience, but the, the hard
16  linkage between the two is not consistent with my
17  experience.
18  BY MR. ANDERSON:
19       Q.   What do you mean the hard linkage?
20       A.   A definitive change in AWP gives you a
21  loss in sales.  I have not --
22       Q.   Oh, okay.  No, I understand.

Page 329

1        A.   That's why the "may" is important.
2        Q.   Yes, no, I understand.
3        A.   Because I -- that's not what I believed
4   was going to happen.
5        Q.   Continuing on, quote,
6        "A pending reduction in AWP proposed by
7   the Department of Justice, DOJ, in several major
8   Alternate Site products would force some portion of
9   this impact for Government reimbursed care
10  regardless of Abbott's actions."
11       Did I read that correctly?
12       A.   Yes.
13       MS. TABACCHI:  Object to the form.
14  BY MR. ANDERSON:
15       Q.   Is that a true statement?
16       A.   It is true that it was a pending
17  reduction.  It had been pending since May of the
18  prior year.  And yes, the DOJ had dictated AWPs
19  that were lower than the current AWPs.  So yes,
20  it's true.
21       Q.   And that, to be consistent with your
22  prior testimony, was one of the reasons or factors

                              83 (Pages 326 to 329)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
Chicago, IL

Page 330

1  that Abbott began evaluating the need to publish
2  lower list prices, correct?
3       MS. TABACCHI:  Object to the form,
4  mischaracterizes the witness's testimony.
5       THE WITNESS:  I said that, that was a
6  happening in 2000.  It -- I, I, I did not testify
7  that it, it was the factor that did it.  I said --
8  BY MR. ANDERSON:
9    Q.  I know.  I said a factor?
10   A.  I said it may, it may have been a, a
11 factor in consideration with all the other things,
12 including Pete Stark's letter.  I don't know.
13   Q.  Now, looking at the back page, Mr.
14 Sellers, which is Page 2 of Exhibit Sellers 009,
15 you set forth the same potential impact of sales
16 volume lost reimbursement, correct?
17   A.  Yes.
18   Q.  And then you also set forth some product
19 examples.  Why did you choose those specific
20 products?
21   A.  I, I think those were just some prime
22 examples, if I remember.  I, I, I don't remember a

Page 331

1  --
2    Q.  Prime examples of what?
3    A.  Of just where -- how, how some of the
4  prices would change.
5    Q.  And some of the products that had extreme
6  discrepancies between list prices and market
7  prices?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  Again, I don't remember
10 what the selection criteria were for the examples.
11 BY MR. ANDERSON:
12   Q.  Well, I'm not asking for the precise
13 criteria, sir.  I'm just asking generally did you
14 pick these products because they were examples of
15 Abbott products that had extreme discrepancies
16 between list prices and market prices?
17      MS. TABACCHI:  Object to the form.
18      THE WITNESS:  Again, I don't -- I don't
19 know what criteria I used to pick the products.
20 BY MR. ANDERSON:
21   Q.  Can you think of any other criteria?
22      MS. TABACCHI:  Object to the form.

Page 332

1       THE WITNESS:  I don't --
2       MS. TABACCHI:  Asked and answered.
3       THE WITNESS:  No.  I mean, there could be
4  any number of criteria.
5  BY MR. ANDERSON:
6    Q.  Will you agree that these products do
7  appear to have significant discrepancies between
8  list prices and ASP?
9       MS. TABACCHI:  Object to the form.
10      THE WITNESS:  These have some significant
11 disparities, yes.
12      MS. TABACCHI:  All right.
13      MR. ANDERSON:  At this time I guess we
14 need to conclude for the day.  It's 5:15.  I have
15 tried to focus on new material that's never been
16 questioned of Mr. Sellers, and I still have some
17 more new material that Mr. Sellers has not been
18 questioned about.  So I guess we'll need to
19 reconvene at a later date.
20      MS. TABACCHI:  Well, we, we are not
21 agreeing that Mr. Sellers will appear on another
22 date. We'll take that up with you at another time.

Page 333

1       I take it do you have additional
2  questions, Mr. Sisneros?
3       MR. SISNEROS:  I would have additional
4  questions, but to the extent possible today,
5  everything -- I've been passing my questions, so
6  that's the way I've been working.
7       MS. TABACCHI:  Okay.  Very good.
8       THE VIDEOGRAPHER:  We are off the record
9  at 5:18 p.m. with the conclusion of the November
10 1st, deposition of Mike Sellers.
11      AND FURTHER DEPONENT SAITH NOT...
12
13
14      _____
15         MICHAEL W. SELLERS
16
17 Subscribed and sworn to and before me
18 this _____ day of _____, 20____.
19
20
21 _____
22    Notary Public

84 (Pages 330 to 333)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

Page 334

1  STATE OF ILLINOIS   )
2                      )  SS:
3  COUNTY OF C O O K   )
4        I, JANICE M. KOCEK, a Certified Shorthand
5  Reporter within and for the County of Cook and State
6  of Illinois, do hereby certify that heretofore,
7  to-wit, on the 1st day of November 2007, personally
8  appeared before me MICHAEL SELLERS in a cause now
9  pending and undetermined in the United States District
10  Court, in re the Pharmaceutical Industry Average
11  Wholesale Price Litigation are the Plaintiffs, and
12  Abbott Laboratories, Inc. and Hospira, Inc. are the
13  Defendants.
14        I further certify that the said witness was
15  first duly sworn to testify the truth, the whole truth
16  and nothing but the truth in the cause aforesaid; that
17  the testimony then given by said witness was reported
18  stenographically by me in the presence of the said
19  witness, and afterwards reduced to typewriting by
20  Computer-Aided Transcription, and the foregoing is a
21  true and correct transcript of the testimony so given
22  by said witness as aforesaid.

Page 335

1        I further certify that the taking of this
2  deposition was pursuant to notice, and that there were
3  present at the deposition the attorneys hereinbefore
4  mentioned.
5        I further certify that I am not counsel for
6  nor in any way related to the parties to this suit,
7  nor am I in any way interested in the outcome thereof.
8        IN TESTIMONY WHEREOF:  I have hereunto set
9  my hand this 12th day of November, 2007.
10
11
12  _____
13  JANICE M. KOCEK, C.S.R.
14
15
16
17
18
19
20
21
22

85 (Pages 334 to 335)

76d9cdbf-edbf-4a35-a63c-c665a8432da9