# EXHIBIT 128



Nov 30 2007
5:37PM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) | MDL No. 1456<br>Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.*<br>CIVIL ACTION NO. 06-11337-PBS | ) | |

**UNITED STATES' SECOND SET OF REQUESTS FOR ADMISSION**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff, United States of America, requests that Abbott Laboratories, Inc. (hereafter "Abbott" or "Defendant") answer the following requests for admission. The United States requests that Abbott serve all written answers to these admissions within 30 days.

## I. INSTRUCTIONS

A. Whenever appropriate, the singular form of a word shall be interpreted as plural, and the masculine gender shall be deemed to include the feminine.

B. If the contention is made that any requested admission subject is not subject to discovery in whole or part by reason of privilege or otherwise, identify each privilege assertion and the basis therefore.

C. You are required to answer these requests as to each Pharmaceutical identified in the United States's Complaint. To the extent that You may only admit the requested admission

in part with respect to any particular Pharmaceutical or a particular part of the relevant time period, as those terms are defined herein, please qualify your answer to identify which Pharmaceutical and/or time period to which your admission applies.

D. Relevant Time Period: Unless otherwise indicated in a specific admission request, the admissions requests herein cover the time period of January 1, 1985 to the present and documents or events relating to such period even though created or occurring before that period.

## II. DEFINITIONS

A. As used herein, the term "Documents" is used in its broadest sense, as defined in the Federal Rules of Civil Procedure, and includes the original of each existing identical or non-identical copy or draft thereof, by whatever means made, of any writing of any kind. The term "Documents" includes writings; records; files; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; charts; digital or chemical process photographs; video, phonographic, tape, or digital recordings or transcripts thereof; drafts; jottings; and notes. Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.

B. As used herein, the terms "You," "Your," "Abbott," and "Defendant" refer to

Abbott; to its corporate predecessors, including all merged predecessor corporations; to any other past or present subsidiary, affiliate, spinoffs or d/b/a of Abbott; and to all entities currently or formerly owned, operated, or managed by Abbott, and all current and former directors, officers, principals, partners, employees, agents, representatives, or other persons acting for or on behalf thereof, including, but not limited to, any otherwise independent attorney, accountant, investigator or consultant.

C. The term "affiliated" shall mean any form of business relationship, including, but not limited to, employee, director, officer, owner, agent, consultant, or contractor.

D. Words in the singular should be construed as including the plural, and plural words should be construed as including the singular.

E. The terms "accuracy," "accurate" or "accurately," when used in reference to Price Representations or sales transactions, are used with reference to whether the information is reflective of the prices actually paid in the marketplace by any purchasers, including but not limited to prices paid by wholesalers, pharmacies, oncology supply houses, group purchasing organizations or physicians.

F. The term "Price Representations" means any statement, assertion, representation or declaration of the price of any Pharmaceuticals, including but not limited to Average Wholesale Price, Wholesale Acquisition Cost, Wholesale Net Price, Direct Price, List Price or Suggested Net Trade.

G. The term "Pharmaceutical" means any drug or other product sold by You.

H. The term "Spread" is used to refer to the difference between the actual acquisition cost or purchase price of a Pharmaceutical (paid by purchasers of the Pharmaceuticals) and the

price or cost determined, published or arranged by the manufacturer or the reimbursement rate paid by third party payors (to purchasers of the Pharmaceuticals). Third party payors include Medicare, Medicaid and private insurance. Thus, the Spread is the gross profit or margin actually or potentially realized by the purchasers of the Pharmaceuticals.

I. The term "AWP" means the price that You report, advertise, market, publish or cause to be published, directly or indirectly, as the average wholesale price for any Pharmaceutical.

J. The term "WAC" means the price that You report, advertise, market, publish or cause to be published, directly or indirectly, as the wholesale acquisition cost or wholesaler acquisition cost for any Pharmaceutical.

K. The term "Direct Price" means the price You report, advertise, publish or cause to be published, directly or indirectly, as the "DP" or direct price for any Pharmaceutical.

L. The term "List Price" means the price You report, advertise, publish or cause to be published, directly or indirectly, as the list or catalogue price for any Pharmaceutical.

M. The term "Best Price" means the price You report or otherwise disseminate as the best price for any Pharmaceutical, including the price You report for purposes of the Medicaid Rebate Program.

N. The term "AMP" means the price You report or otherwise disseminate as the average manufacturer's price for any Pharmaceutical, including the price You report for purposes of the Medicaid Rebate Program.

O. The term "Price Publications" means (1) the *Red Book* published by Thomson Publishing, (2) the *Blue Book* published by First Databank, (3) the electronic or automated price

service and the Hospital Formulary Pricing Guide published by Medi-Span, Inc., and any other pricing compendia published by those companies.

P. The term "average or estimated acquisition cost" is the average or estimated – as those terms are defined in any commonly-available dictionary – amount that Your customers would pay to purchase Your Pharmaceuticals.

Q. The terms "disclose," "disclosed" or "disclosure" as used below means to reveal, make known, make public or expose. It explicitly does not refer to the reporting of any AMPs by You as part of the Medicaid Drug Rebate Program.

R. The term or phrase "marketed the Spread" means the use of Spreads or potential profit margins as one of the means of inducing or encouraging Your customers to buy Your Pharmaceuticals.

S. The term "Subject Drugs" refers to the drugs identified in ¶ 34 of the United States' First Amended Complaint.

T. The term "Consignment Partner" shall mean any entity which entered into a contractual arrangement with Your Alternate Site or Home Infusion Business units whereby You agreed to provide all or some of Your Product on a consignment basis.

U. The term "TAP" shall refer to "TAP Pharmaceutical Product, Inc.", which an Abbott Joint Venture.

## III. REQUESTS FOR ADMISSION

1. Admit that You opposed federal legislative efforts in 1997 to either (1) set Medicare drug reimbursements using actual acquisition cost information or (2) to grant the Secretary of

Health and Human Services the discretion to set Medicare drug reimbursements at some amount below AWP or 95% of AWP.

2. Admit that Your customers would be financially affected by any changes in the way the Medicare or any state Medicaid program set reimbursement levels for Abbott drugs.

3. Admit that the List Prices for the Subject Drugs that You provided to the Price Publications was used by those Price Publications to determine the AWP for those drugs.

4. Admit that you reported WACs for the Subject Drugs.

5. Admit that some of Your employees (whether current or former) knew that the AWPs and/or WACs for the Subject Drugs determined how much Medicare and state Medicaid programs reimbursed for those drugs.

6. Admit that You received the October 31, 2000 letter from Congressman Fortney "Pete" Stark to Miles White.

7. Admit that You never responded in any way to Congressman Stark regarding his October 31, 2000 letter.

8. Admit that You changed the way You reported catalogue/list prices in 2001, at least in part, due to the negative publicity arising from Congressional investigations into Your pricing reporting practices, and/or federal and state investigations into Your price reporting practices.

9. Admit that You lowered Your List Prices on the Subject Drugs in 2001, in part, in response to the AWP changes that First Databank undertook at the suggestion of the Department of Justice.

10. Admit that Your Home Infusion Services group at one point owned Medicare and

Medicaid provider pharmacies.

11. Admit Your Home Infusion Services group submitted reimbursement claims to the Medicare and/or state Medicaid programs on behalf Your owned-pharmacies or Your customers.

12. Admit that You were aware of the United States' investigation into Your Price Reporting as early as 1996, when You received an investigative subpoena regarding the subject matter.

13. Admit that You provided services to TAP, including the services of Your in-house legal department, computer and technology departments, and Your government relations/lobbying department.

14. Admit that, at the time of TAP's guilty plea, You knew that spread marketing and setting List Prices or AWPs at levels far higher than what customers paid for contravened the False Claims Act and Anti-kickback Statute.

15. Admit that Your Alternate Site Business Unit, and/or Your Home Infusion pharmacies sold TAP's Lupron drug to Your customers.

16. Admit that you knew that the United States believed that spread marketing violated the False Claims Act and Anti-kickback Statute.

17. Admit that prior to 2002, You never had a Compliance Department or any other separate department responsible for ensuring compliance with State and Federal Medicare and Medicaid statutes and regulations during the period from 1991 until 2001.

18. Admit that Virginia Tobiason was responsible for Federal and State Medicare and Medicaid statutory and regulatory reimbursement compliance within HPD during her

tenure as a reimbursement supervisor within Your Home Infusion Business Unit.

19. Admit that Your Alternate Site Business Unit sold and distributed Your Ross Division nutritional products, including enteral products, and/or sold and distributed Ross Division pump products, for which reimbursement may be made by Medicaid or Medicare or other federal health care programs.

20. Admit that notwithstanding the TAP criminal plea and Your side letter with the Department of Justice, at no time did You report Your true contract prices for the Subject Drugs to the Department of Justice, HHS-OIG or CMS at any time from 1991 through 2003.

21. Admit that You never notified any Medicare or Medicaid official of any price You actually charged to any of Your customers for the any of the Subject Drugs at any time from January 1, 1989 through to December 31, 2003.

22. Admit that prior to 2001 Michael Tootell advised the Your in-house legal department that he had concerns about the legality of the high Spreads on Your products.

23. Admit that for the years 1989 through 2002, You never had or maintained a written policy concerning or prohibiting your HPD sales force from marketing the Spread.

24. Admit that for the years 1989 through 2002, You never had or maintained a written policy prohibiting your HPD sales force from discussing Medicare or Medicaid reimbursement with customers.

25. Admit that for the period from January 1, 1991 through to December 31, 2003, if Your customers asked for AWP information, Your HPD employees were not restricted in their ability to provide that AWP information to customers by any formal or informal

corporate Abbott policy.

26. Admit that for the period from January 1, 1991 through to December 31, 2003, if HPD customers requested AWP information as part of requests for bids, or requests for information as part of the contract negotiation process, You would provide that information, including AWP information for the Subject Drugs.

27. Admit that at times during the period from January 1, 1991 through to December 31, 2003, You knew some HPD customers would evaluate contract proposals based upon Spread.

28. Admit that if customers in their Requests for Bid, or requests for contract information, would request it, You would provide AWP, or other information, to Your customers that would enable them to calculate Spreads on the Subject drugs.

29. Admit that You knew that some of Your HPD customers at times during the period from January 1, 1991 through to December 31, 2003 would award contracts based upon which manufacturer had the most advantageous or largest Spreads.

30. Admit that for the period from 1991 until 2001 You sold the Subject Drugs at its published List Prices to less than 5 percent of Your customers.

31. Admit that for the period from 1991 until 2001, for those non-List Price customers who did not purchase Your Subject Drugs at List Price, the Spread between the List price reported by You and the price You contracted with those non-List Price customers exceeded 30%.

32. Admit that Your HPD Contract Marketing Unit was responsible for setting all List Prices for the Subject Drugs.

33. Admit that Your Alternate Site Business Unit had no responsibility for setting List Prices for the Subject Drugs.

34. Admit that in setting any of Your pricing for any of the Vancomycin sold by HPD, You never considered the negative health impact that overutilization of Vancomycin could cause.

35. Admit that in setting any of Your pricing for the Subject Drugs, You never considered the effect that high List Prices would have on patient Medicaid or Medicare co-pays.

36. Admit that Your HPD Home Infusion Business Unit entered into contracts whereby it would provide customers with products, including the Subject Drugs on a consignment basis.

37. Admit that when Your HPD Home Infusion Business Unit entered into contracts to consign goods to the Consignment Partners, You would not charge customers for the Subject Drugs.

38. Admit that when Your HPD Home Infusion Business Unit entered into contracts to consign goods, it would collect a percentage of the Consignment Partners', reimbursements from Third Party Payors, including Medicaid and Medicare based upon the therapies billed to those Third Party Payors.

39. Admit that when Your HPD Home Infusion Business Unit entered into contracts to consign goods to Your Consignment Partners, You would never collect payment from the Consignment Partners for the Subject Drugs, except to the extent that You shared in a percentage of reimbursement collections from Third Party Payors.

40. Admit that You permitted the Consignment Partners to set their own prices for the

consigned products, including the Subject Drugs, that the Consignment Partners would distribute to their customers.

41. Admit that You billed Medicare and Medicaid directly for products and services dispensed by Your Home Infusion Pharmacies using Your EIN number, and/or Your own Medicare and Medicaid provider codes.

42. Admit that the cost to You in stocking and dispensing Abbott, Ross, and TAP drugs and products was only a small fraction of the amounts reimbursed by Medicare and Medicaid for those drugs and products.

43. Admit that the Your Home Infusion Pharmacy billing to Medicare and Medicaid were conducted through the Your Reimbursement Department in Your HPD Alternate Site Home Infusion Department.

44. Admit that the HCFA 1500 forms, or Medicaid reimbursement forms, submitted by Your Reimbursement Department would reflect Your EIN number and provider number as the entity to be reimbursed.

45. Admit that in pricing Home Infusion ususal and customary charges for goods and services for your Consignment Partners, You would at times use AWP as part of the usual and customary charge.

46. Admit that at no time did You ever disclose to HHS, HHS-OIG, CMS, any Medicare carrier, or any Medicaid program or official, that You were collecting a portion of the Spread reimbursed to Your Home Infusion Pharmacies or Your Consignment Partners.

47. Admit that HPD maintained and utilized information concerning AWPs from Redbook in its computer systems, including within its CHIP system.

48. Admit that if one of Your HPD customers requested information concerning AWPs on your products, including the Subject Drugs, that Your HPD salespersons were permitted to furnish that AWP information if requested by Your customer.

49. Admit that in 1991, according to Your Vice President and General Manager of Alternate Site, You believed that "the abandonment of AWP as a good indicator of product acquisition cost" would have significant implications for Your Alternate Site Business.

50. Admit that in 1991, Your Alternate Site and Washington based governmental relations employees contacted the American Society of Clinical Oncology (ASCO), the PMS, the American Society of Nephrology (ASN) and the Alliance for Infusion Therapy, to determine a response to proposed rule changes to AWP based reimbursement by HCFA.

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3398
Fax: (617) 748-3272

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

/s/ Ann M. St. Peter-Griffith
Mark A. Lavine
Ana Maria Martinez
Ann St. Peter-Griffith
Special Assistant U.S. Attorneys
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone: (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

/s/ Gejaa T. Gobena
Michael F. Hertz
Joyce R. Branda
Renée Brooker
Justin Draycott
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 307-3852

Dated: November 30, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' SECOND SET OF REQUESTS FOR ADMISSION** to be served on the following counsel by electronic mail:

James J. Breen
The Breen Law Firm, P.A.
3350 S.W. 148th Avenue
Suite 110
Miramar, FL 33027
Tel: (954) 874-1635
Fax: (954) 874-1705
Email: jbreen@breenlaw.com
*Counsel for Relator*

Daniel Reidy, Esq.
James Daly, Esq.
Tina M. Tabacchi
Brian J. Murray
Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601-1692
Tel: (312) 782-3939
Fax: (312) 782-8585
Email: jrdaly@jonesday.com

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: christophercook@jonesday.com

Dated: November 30, 2007

/s/ Ann M. St. Peter-Griffith
Ann M. St. Peter-Griffith