# Exhibit C



25865463

Jun 27 2009
3:29AM

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No.1456 |
|  | Master File No. 01-CV-12257-PBS |
|  | Subcategory No. 06-CV-11337-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corporation, et al.*, Civil Action No. 07-10248-PBS | Magistrate Judge Marianne B. Bowler |

## THE ROXANE DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Helen E. Witt, P.C.
Anne M. Sidrys, P.C.
Eric T. Gortner
John W. Reale
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel for Defendants
Boehringer Ingelheim Corp.,
Boehringer Ingelheim Pharmaceuticals, Inc.,
Boehringer Ingelheim Roxane, Inc., and
Roxane Laboratories, Inc.*

Dated: June 26, 2009

**TABLE OF CONTENTS**

Page

I. INFORMATION AVAILABLE TO THE GOVERNMENT REGARDING THE DIFFERENCE BETWEEN AWP AND ACTUAL ACQUISITION COSTS: 1980 – 1989.....................................................................................................1

II. GOVERNMENT POLICY DECISIONS TO MAINTAIN AWP AND NOT USE ACTUAL ACQUISITION COST AS THE BASIS FOR REIMBURSEMENT: 1980 – 1991.....................................................................................................9

III. ADDITIONAL INFORMATION ESTABLISHING THE DIFFERENCE BETWEEN AWP AND ACTUAL ACQUISITION COSTS:  1990 – 1999 ....................11

IV. GOVERNMENT POLICY DECISIONS TO MAINTAIN AWP AND NOT USE ACTUAL ACQUISITION COST AS THE BASIS FOR REIMBURSEMENT: 1992 – 1999.....................................................................................................24

V. INFORMATION AVAILABLE TO THE GOVERNMENT REGARDING THE DIFFERENCE BETWEEN AWP AND ACTUAL ACQUISITION COSTS: 2000 - 2001 ....................................................................................................27

VI. GOVERNMENT POLICY DECISIONS:  2000 – 2001 ....................................................30

VII. FEDERAL GOVERNMENT CONTINUES TO USE AND APPROVE AWP AS A BASIS FOR REIMBURSEMENT ................................................................32

VIII. INFORMATION REGARDING WIDESPREAD DISCOUNTS OFF AWP: IPRATROPIUM BROMIDE AND NEBULIZER DRUGS..............................................34

IX. THE GOVERNMENT RECEIVED A WORKING DATABASE THAT SHOWED THE "SPREADS" FOR ALL OF ROXANE'S DRUGS ...............................38

X. GENERAL ROXANE BACKGROUND .........................................................................39

XI. ROXANE'S UNDERSTANDING OF AND PRACTICES REGARDING AWP ...........40

XII. ROXANE'S UNDERSTANDING OF AND PRACTICES REGARDING WAC...........42

XIII. ROXANE'S PRICE REPORTING PRACTICES .............................................................44

XIV. FULS FOR ROXANE'S DRUGS AT ISSUE..................................................................45

XV. ROXANE PROVIDED AMPS DIRECTLY TO CMS ....................................................49

XVI. STATES ALSO GAIN INFORMATION FROM ROXANE'S AMPS............................52

XVII. THE GOVERNMENT'S NOVAPLUS CLAIMS.............................................................53

A.      Roxane Named And Priced NovaPlus Label Ipratroprium Bromide Identically To Roxane Label Ipratropium Bromide And Considered Both Generic Drugs. ...................................................................................53

B.      The Medicare Regulatory Framework For Hospital Reimbursements Under The Medicare Parts A and B.......................................................57

C.      The DMERCs' Inconsistent And Private Procedures For Constructing Pricing Arrays And Establishing Payment Rates.....................................59

D.      HCFA's Regulations And Directives Distinguished Generics From Brands Based On Whether The Drug Used Its Generic Chemical Name.........................63

E.      The DMERCs' Idiosyncratic And Private Classification Criteria Ignored And Were Inconsistent With HCFA's Regulatory Definitions And Directives. ...............................................................................................65

F.      Some Of The DMERCs Inconsistently Classified The Roxane And NovaPlus-Label Ipratropium Bromide Products As *Both* Brands And Generics, At Differing Times. ................................................................73

G.      The Government's Damages Expert Includes Damages Based On The DMERCs' Classification Of NovaPlus As A Brand.................................74

H.      The Government's Damages Are Also Inflated By Their Expert's Failure To Discount Damages As A Result of Three DMERCs Failure To Include NDCs For A Generic Product In Their Arrays. ....................................79

XVIII.  DIVESTMENT OF ORAMORPH SR, ROXANOL & ROXICODONE ........................80

XIX.    THE GOVERNMENT HAS NO EVIDENCE SUPPORTING ITS UNJUST ENRICHMENT OR AZATHIOPRINE MEDICARE CLAIMS. ....................................81

XX.     THE GOVERNMENT'S METHODOLOGY OF ALLEGED MEDICAID DAMAGES.............................................................................................................81

A.      Overview Of The Government's Methodology For Calculating Alleged Medicaid Damages...........................................................................81

B.      Description Of Datasets Utilized By The Government. ........................82

C.      Dr. Duggan Did Not Determine Whether State Medicaid Programs Complied With Their CMS-Approved Regulatory Formulae When Paying Medicaid Claims. .................................................................................84

D.      Dr. Duggan Did Not Determine The Basis Of Payment For Medicaid Claims. .................................................................................................85

ii

E.      The Calculation Of Alleged Damages Based On Actual State Medicaid
        Claims Data Within The Sixteen State Sample. ...................................................88

F.      Intrastate Extrapolations To CMS Datasets Within The Sixteen State
        Sample To Estimate Alleged Damages.................................................................91

G.      Interstate Extrapolations To CMS Datasets For The Remaining
        Thirty-Three State Medicaid Programs To Estimate Alleged Damages. ..............92

H.      The Total Amount Of Alleged Medicaid Damages Based On Interstate
        And Intrastate Extrapolations To CMS Datasets....................................................93

I.      Total Alleged Medicaid and Medicare Damages Post-December 31, 2000..........93

(Texas) Dep. 47-48, 96-97; Tab 150, KS 00000042 (Kansas Medicaid compared AMPs provided by CMS to FULs and MACs used for drug reimbursement))

133.    Though only restriction of the states' use of URA information is that states cannot publicly disclose the identity of a specific manufacturer or prices charged by that manufacturer. Under federal regulations State Medicaid programs were permitted to use URA and AMP information as a "baseline" for reimbursement and as a comparison for reimbursement benchmarks.    (Tab 138,  42  U.S.C.  § 1396r-8(b)(3)(D)  ("(I)information  disclosed  by manufacturers or wholesalers … is confidential and shall not be disclosed by … a State agency (or contractor therewith) in a form which discloses the identity of a specific manufacturer or wholesaler (or) prices charged for drugs by such manufacturer or wholesaler …."); Tab 143, Roxane Rebate Agreement § VII; Tab 28, 1-15-09 Gladden Dep. 60-61, 92-93; 96-97)

134.    Indeed, some States have passed laws requiring manufacturers to provide AMPs directly to State Medicaid programs, including Texas (2002), Vermont (2008), New Mexico (2005), and Maine (2005).  (Id. 94-96; VT. STAT. ANN. tit. 33, § 2010 (Vermont); N.M. STAT. § 27-2E-1 (New Mexico);  ME. REV. STAT. ANN. tit. 22, § 2698-B (Maine))

## XVII.  THE GOVERNMENT'S NOVAPLUS CLAIMS

### A.    Roxane Named And Priced NovaPlus Label Ipratroprium Bromide Identically To Roxane Label Ipratropium Bromide And Considered Both Generic Drugs.

135.    In June 1996, Roxane began manufacturing and marketing the first generic version of the chemical compound, ipratropium bromide, which is used to treat symptoms associated with chronic respiratory conditions.  (Tab 62, 10-24-01 Waterer Dep. 38-39; Tab 65, 5-10-07 Waterer Dep. 292-94.)   Roxane marketed and sold the drug under the name "Ipratropium Bromide Inhalation Solution 0.02%."   (Tab 151, RLI-AWP 00212508-09 at RLI-AWP 00212508 (9-19-2000 Ltr. from J. Powers to S. Norvell).)

136.    Both prior to 1996 and thereafter, the brand-name product for ipratropium bromide was sold and marketed under the proprietary trade name "Atrovent."  (Tab 5, 12-12-08 C. Carr-Hall Dep. 244; Tab 152, Decl. C. King ¶ 18.)

137.    In accordance with industry practice, Roxane set the AWP for its new ipratropium bromide generic product at approximately 10% below the AWP of Atrovent.  (Tab 64, 11-28-05 Waterer Dep. 37; Tab 65, 5-9-07 Waterer Dep. 186-87; Tab 65, 5-11-07 Waterer Dep. 604.)

138.    In 1997, Dey Laboratories launched a competing generic product, also named after the generic chemical compound, "Ipratroprium (Bromide Inhalation Solution 0.02%.)" (Tab 36, 03-17-08 Lockwood Dep. 646-48; Tab 5, Carr-Hall Dep. Ex. 40 at BOEH01050028, "Dey Recognize the Difference" (Dey Marketing Flier).)  This product had a Dey label.  (*Id.*)

139.    From 2000 onward, numerous generic manufacturers entered the ipratropium bromide marketplace, including Alpharma, Zenith Goldline, and others.  (Tab 185, Roxane Ex. 118 at AWP033-434–AWP033-435, AWP033-0372–AWP033-373 (AdminaStar Federal pricing arrays); Tab 53, 12-2-08 Tawes Dep. 978.)  Like the Roxane and Dey products, all of these manufacturers named their generic products after the chemical compound name, "ipratropium bromide," and all carried the respective manufacturer or distributor label. (Tab 154, 2001 RedBook at 368.)

140.    In 1998, Roxane and Dey bid on a private-label contract to sell generic ipratropium bromide through Novation LLC, a large group-purchasing organization (GPO) that targets the hospital class of trade.  (Tab 155, RLI-AWP-00122465-470 at RLI-AWP 00122467, "Novation Agreement Launch Package, Confidential" (NovaPlus Ipratropium Agreement Launch Package); Tab 5, 12-12-08 C. Carr-Hall Dep. 236-237; Tab 5, 12-12-08 Waterer Dep. 116.)

141.    In order to facilitate the sale of lower-priced products to its member hospitals, Novation created a private label program—the "Products Lowered Utilizing Standardization" or "NovaPlus" label—which consists of over 300 generic products, all of which carry the private-label designation of "NovaPlus" to identify the supplier for Novation's hospital members.

(Tab 156, htttp://www.novationco.com/suppliers/novaplus.asp; Tab 157, http://www.novationco. com/programs/enhanced_savings.asp.)   As part of the NovaPlus program, Novation contracts with manufacturers of pharmaceuticals and medical equipment to supply products that will be sold exclusively to Novation GPO members at discounted prices under the "NovaPlus" label. (Tab 156, http://www.novationco.com/suppliers/novaplus.asp; Tab 157, http://www.novationco.c om/programs/enhanced_savings.asp.)

142.    In early 1999, Roxane was awarded the NovaPlus contract by Novation and began to manufacture generic ipratropium bromide for sale exclusively to Novation's hospital members under the NovaPlus label.    (*Id.*; Tab 158, RLI-AWP-00122479–RLI-AWP-00122482 at RLI-AWP-00122479 (Novation, LLC Agreement Announcement).)   Like Roxane's and Dey's products, the Novation product was named after the generic chemical name, "Ipratropium Bromide Inhalation Solution 0.02%," but carried the "NovaPlus" label, rather than a Roxane label.   (Tab 151, RLI-AWP 00212508-09 (9-19-2000 Ltr. from J. Powers to S. Norvell); Tab 155, NovaPlus Ipratropium Agreement Launch Package at RLI-AWP 00122468; Tab 159, RLI-AWP-00008196 (April ' 99 New from Roxane).)

143.    Shortly before the product's launch in June 1999, Roxane sent out letters announcing the private-label agreement.    (*See, e.g,* Tab 158, Novation Agreement Announcement, RLI-AWP-00122479-82.)    These letters identified the new product as

"Ipratropium Bromide Inhalation Solution 0.02% with a NOVAPLUS® label" and "Ipratropium Bromide Inhalation Solution 0.02% (NovaPlus)." (Tab 158, Novation Agreement Announcement at RLI-AWP-00122479-82; Tab 159, April '99 New from Roxane at RLI-AWP 00008196).

144.   Roxane's letters also listed new Roxane NDCs for the product and the same AWPs for the NovaPlus labeled products that were used for Roxane's other generic ipratoprium bromide products.   (Tab 158, Novation LLC Agreement Announcement at RLI-AWP-00122479-82; Tab 159, April '99 New from Roxane at RLI-AWP 00008196).

145.   The AWPs for the Roxane and NovaPlus label ipratroprium bromide products were identical.  The following chart shows the AWPs for each of these products, which remained the same throughout the pertinent time period

| Package Size | Roxane ipratroprium bromide | NovaPlus ipratropium bromide |
|---|---|---|
| 25 | $44.06 | $44.06 |
| 30 | $52.87 | $52.87 |
| 60 | $105.74 | $105.74 |

(Tab 158, Novation LLC Agreement Announcement at RLI-AWP-00122479-82.)

146.   Roxane sold the NovaPlus label ipratropium bromide to Novation members at a contract price that was at or at times lower than the contract price for Roxane label ipratropium bromide.  (Tab 151, 9-19-2000 Ltr. from J. Powers to S. Norvell at RLI-AWP 00212508).)

147.   It was Roxane's understanding that NovaPlus was a generic pharmaceutical product.  (Tab 66, 12-12-08 Waterer Dep. 105)

148.   Novation also sent mailings to its members announcing it would "introduce Iptratropium Bromide into the NOVAPLUS™ line of products." (Tab 160, 4-6-99 S. Norvell Memo to Novation Authorized Distributors at RLI-AWP 00224752; Tab 161, 4-14-1999 S. Norvell Revised Memo to Novation Authorized Distributors at RLI-AWP 00122471-85.)

Another mailing announced the launch of "NOVAPLUS™ Ipratropium Bromide." (Tab 155, NovaPlus Ipratropium Bromide Agreement Launch Package at RLI-AWP 00122465-70.)

149.    From June 1999 until May 2004, the NovaPlus label ipratropium bromide was sold exclusively to Novation members under the private-label agreement. (Tab 155, NovaPlus Ipratropium Bromide Agreement Launch Package at RLI-AWP 00122465-70; Tab 162, BOEH01522558, "The Multi-Source Gold Sheet, March 22, 2004" (March Gold Sheet); Tab 163, BOEH02953413, "The Multi-Source Gold Sheet, April 8, 2004" (April Gold Sheet); Tab 164, BOEH02953409, "The Multi-Source Gold Sheet, May 3, 2004" (May Gold Sheet).)

150.    Roxane and Novation's Agreement was initially set to expire in January 2004. (Tab 155, NovaPlus Ipratropium Bromide Agreement Launch Package, RLI-AWP 00122465-70.) But due to lack of demand, the decision to discontinue NovaPlus ipratropium bromide was made in June 2003 and official notice was sent to Novation in July 2003. (Tab 165, BOEH04310697, 7-11-03 Ltr. from L. Paoletti to R. Day). The NovaPlus-label ipratropium bromide product was discontinued between March-May 2004. (Tab 162, March Gold Sheet at BOEH01522558; Tab 163, April Gold Sheet at BOEH02953413; Tab 164, May Gold Sheet at BOEH02953409.)

**B.    The Medicare Regulatory Framework For Hospital Reimbursements Under The Medicare Parts A and B.**

151.    Drugs dispensed to Medicare beneficiaries during inpatient hospital stays are not paid for separately but are reimbursed along with procedures as part of a bundled package through diagnosis-related groups under Medicare Part A. *See* 42 U.S.C. § 1395ww(a)(4).

152.    Beginning on July 1, 2000, drugs dispensed to Medicare beneficiaries during outpatient hospital visits to Hospital Outpatient Departments (OPDs), including hospital pharmacies, are reimbursed under Medicare Part B's Outpatient Prospective Payment System

(OPPS).  *See* 42 U.S.C. § 1395l(t)(2); 65 Fed. Reg. 18434, 18436 (April 7, 2000)  Similar to Medicare Part A, Medicare Part B's OPPS typically reimburses drugs dispensed in OPDs on a "package" basis under an Ambulatory Payment Classification System, which is comprised of all items and services for that procedure, identified by their individual J-codes and/or other HCPCS codes—meaning that under the OPPS, Medicare Part B pays for all items and services related to a procedure with a lump sum—not for individual drugs based on claims made under J-codes. *See* 42 U.S.C. § 1395l(t)(2); 42 C.F.R. §§ 419.21, 419.31; addenda to 65 Fed. Reg. 18434 (April 7, 2000).

153.    Because Novation's membership consists almost exclusively of hospitals, and given the structure of the Medicare regulatory scheme, it is unlikely that very many NovaPlus ipratropium bromide prescriptions were reimbursed under the Medicare program.  (Tab 45, 5-18-09 Scott Morton Dep. 341-44, 346-48.)

154.    According to plaintiffs' expert, Dr. Mark G. Duggan, "Roxane's NovaPlus products, at least for Medicaid, account for a miniscule share of all Medicaid prescriptions for ipratropium bromide."  (Tab 18, 3-5-09 Duggan Dep. 187.)  Dr. Duggan uncovered only 48 NovaPlus ipratropium bromide prescriptions paid for by the Medicaid program throughout the entire United States during the six-year period that NovaPlus ipratropium bromide was sold.  (*Id.* 186-188; Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 127.)

155.    Dr. Duggan estimated, based on an extrapolation from the number of Medicaid prescriptions that perhaps only 150 NovaPlus ipratropium bromide prescriptions were reimbursed out of the 12.8 million ipratropium bromide prescriptions paid for under Medicare Part B over the same span.  (Tab 18, 3-5-09 Duggan Dep. 188; Tab 20, 5-18-09 Duggan Dep. 156-57; Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 127.)

C. **The DMERCs' Inconsistent And Private Procedures For Constructing Pricing Arrays And Establishing Payment Rates.**

156.    HCFA and later CMS delegated the task of setting the maximum reimbursement rate for Medicare Part B drugs dispensed via durable medical equipment (DME) to private contractors called durable medical equipment regional carriers (DMERCs).  *See* 42 U.S.C. § 1395m(a)(12); 42 C.F.R. § 421.210.  The country is divided into four DME regions and each DMERC, following HCFA/CMS guidelines, sets the maximum Medicare rate for DME drugs within its region.  *See* 42 U.S.C. § 1395m(a)(12); 42 C.F.R. § 421.210; http://www.ezdme.com/ aboutez/dmerc_regions.htm.

157.    During the pertinent time period there were four DMERCs that processed ipratropium bromide claims under Medicare Part B.  (Tab 50, 2-29-08 Stone Dep. 422-23.)  The four DMERCs were generally known as DMERC-A, AdminaStar Federal, Palmetto, and Cigna. (Tab 18, 3-5-09 Duggan Dep. 130-31.)

158.    Throughout the relevant period, in order to maintain oversight and facilitate compliance with the applicable regulations, HCFA and CMS would issue program memoranda to the carriers, including the DMERCs, which were "instruction[s] to our carriers who administer the Medicare program."  (Tab 40, Niemann Dep. 365; *see also* Tab 51, 4-25-07 Tawes Dep. 435 ("A program memorandum is a memo sent to intermediaries or carriers by CMS headquarters").)

159.    By regulation, when pricing drugs for reimbursement purposes under Medicare Part B, the DMERCs were required to utilize the lesser of the "median average wholesale price for all sources of the generic forms of the drug or biological or the lowest average wholesale price of the brand name forms of the drug or biological."  42 C.F.R. § 405.517 (emphasis added); *see also* Tabs 167-168, Roxane Exs. 41 and 42, AWQ025-0722 and AWQ025-0880 (Medicare Professional Reimbursement Desk Procedure - Drug Pricing Procedure).

160.    Each of the DMERCs independently set maximum reimbursement rates for its region by consulting the pricing compendia, converting the published AWPs of the drugs selected from the compendia into unitized prices by dividing the published AWPs by the quantity or strength of the packaged drug, compiling those prices into worksheets called pricing arrays, and then calculating the median price of these arrays.  (Tab 22, 8-26-08 Eiler Dep. 47-49, 116; Tab 30, Helton Dep. 22-23; Tab 167, Roxane Ex. 41 at AWQ025-0722– AWQ025-0725 (Drug Pricing Procedure); Tab 169, Roxane Ex. 100 at AWP034-0462–AWP034-0466 (Drug Pricing Procedure); Tab 170, Abbott Ex. 524 at HHD008-0282– HHD008-0287 (Medicare Professional Reimbursement Desk Procedure).)

161.    When the median AWP of the generic sources of a drug and the lowest AWP for a brand source were equivalent, the DMERCs used one of the prices as the maximum allowable rate, but could not tell which price actually set the reimbursement rate.  (Tab 30, Helton Dep. 230-31; Tab 49, 2-28-08 Stone Dep. 194.)

162.    The DMERCs' arrays and classification of drugs were not publicly available. (Tab 22, 8-26-08 Eiler Dep. 157-58.)

163.    Although HCFA directives to the DMERCs allowed for consideration of a wide variety of published sources, such Red Book, Blue Book, or Medispan, in practice the DMERCs limited their review exclusively to the Red Book compendium.  (*See, e.g.*, Tab 171, Abbott 1015, HHC021-0030, December 1998 HCFA Transmittal; Tab 22, 8-26-08 Eiler Dep. 27-28, 47-48, 116-19, Tab24, 9-23-08 Eiler Dep. 481-82; Tab 30, Helton Dep. 22-23, 36, 37; Tab 49, 2-28-08 Stone Dep. 34-35, 65-66, 87-88; Tab 183, Decl. of C. King ¶ 7; Tab 172, Roxane Ex. 51 at AWQ029-00326–AWQ029-00328 (Uniform Drug Pricing Project).)

164.    During the relevant period, the four DMERCs updated their pricing arrays at different times, and also selected prices from different Red Book sources that were not always consistent. (Tab 22, 8-26-08 Eiler Dep. 125-26, 135-36; Tab 30, Helton Dep. 108, 224-26, 237; Tab 50, 2-29-08 Stone Dep. 284-86.)   For example, sometimes one DMERC would receive a monthly update earlier than the other DMERCs, so they would use the update while the other DMERCs would use an outdated version.  (Tab 22, 8-26-08 Eiler Dep. 135-36; Tab 30, Helton Dep. 158-59.)

165.    The inconsistent use of different versions of Red Book sometimes resulted in drugs being omitted from a DMERC's array in one quarter and then reappearing in a later quarter. (Tab 23, 8-27-08 Eiler Dep. 280-86, 295-96.)

166.    The DMERCs varied widely in the sources of Red Book that they relied upon, with some DMERCs using the annual update, others consulting the monthly updates or quarterly electronic CDs, and others using both at times.   (Tab 22, 8-26-08 Eiler Dep. 47-48, 125-26, 133-34; Tab 24, 9-23-08 Eiler Dep. 481-82; Tab 30, Helton Dep. 44-45, 224-26; Tab 49, 2-29-08 Stone Dep. 113; Tab 50, 2-29-08 Stone Dep. 284-85; Tab 183, Decl. of C. King ¶¶  7, 9; Tab 168, Roxane Ex. 42 at AWQ025-0876–AWQ025-0887 (12-1-99 Ltr. from R. Stone to C. Carpenter).)

167.    Each DMERC separately decided how to construct the arrays by reviewing the descriptions in the compendia, and by also consulting other external resources such as reference guides and medical directors that each DMERC had on staff and by exercising their judgment. (Tab 22, 8-26-08 Eiler Dep. 27, 48-49, 58-59, 119-20, 149, Tab 24, 9-23-08 Eiler Dep. 487-88; Tab 30, Helton Dep. 89, 160-61; Tab 49, 2-28-08 Stone Dep. 77-78, 86, Tab 50, 2-29-08 Stone

Dep. 275-76; Tab 53, 8-27-08 Eiler Dep. Roxane Ex. 41 at AWQ025-0722–AWQ025-0725 (Drug Pricing Procedure).)

168. At times the narrative description of a drug in Red Book was not clear enough for the DMERCs to determine whether to include the drug in their pricing arrays, which meant that sometimes the DMERCs had to use their own judgment in making that determination. (Tab 24, 9-23-08 Eiler Dep. 487.)

169. As such, DMERCs did not consistently include all forms of a drug in their arrays. (Tab 22, 8-26-08 Eiler Dep. 48, 147-148, Tab 24, 9-23-08 Eiler Dep. 487-88; Tab 30, Helton Dep. 150-51; Tab 50, 2-29-08 Stone Dep. 298-299)

170. The AdminaStar Federal DMERC acknowledged this divergence, stating that other DMERCs "did things a little different than we did." (Tab 22, 8-26-08 Eiler Dep. 128.)

171. The DMERCs noted in correspondence with HCFA that they had issues "determining the correct forms of the drugs to pickup from REDBOOK," and asked HCFA to make program memoranda "more specific in what items should be excluded and/or included in the calculation" in order to "help eliminate the wide interpretations by different carriers." (Tab 172, Roxane Ex. 51 at AWQ029-00327 (Uniform Drug Pricing Project); *see also* Tab 30, Helton Dep. 160-61.)

172. Although the DMERCs at times contacted manufacturers to verify prices for durable medical equipment, they never contacted the manufacturers to verify the pricing for drugs listed in Red Book. (Tab 22, 8-26-08 Eiler Dep. 73.)

173. Because of the historic variance in payment rates across DMERCs for the same drugs, beginning in approximately 1997, continuing with the "Uniform Drug Pricing Project" in 1999, and again in 2001, the DMERCs consulted and shared information with each other to

reduce inconsistencies—usually without any participation by HCFA/CMS. (Tab 22, 8-26-08 Eiler Dep. 127-28, 135-36, 153-54, 166-67, 171-72; Tab 30, Helton Dep. 99-100, 144-46, 169-71, 277-78; Tab 50, 2-29-08 Stone Dep. 282-83; Tab 183, Decl. of C. King ¶ 17; Tab 168, Roxane Ex. 42 at AWQ025-0876–AWQ025-0887 (12-1-99 Ltr. from R. Stone to C. Carpenter); Tab 172, Roxane Ex. 51 at AWQ029-00326–AWQ029-00328 (Uniform Drug Pricing Project); Tab 173, Roxane Ex. 52 at AWQ029-000104– AWQ029-000105 (5-15-01 E-mail from R. Stone to C. King, C. Eiler, C. Helton, B. Douglas, and V. Brantley); Tab 169, Roxane Ex. 100 at AWP034-0462–AWP034-0466 (Drug Pricing Procedure); Tab 174, Roxane Ex. 102 at AWP039-1420 (7-6-99 E-mail from C. King to C. Eiler).) The DMERCs did not, however, coordinate their construction of arrays or ensure that all four DMERCs were using the same published prices or classifying drugs in an identical way. (Tab 22, 8-26-08 Eiler Dep. 153-54; Tab 30, Helton Dep. 108-09, 144-46; Tab 172, Roxane Ex. 51 at AWQ029-00326– AWQ029-00328 (Uniform Drug Pricing Project; Tab 174, Roxane Ex. 102 at AWP039-1420 (7-6-99 E-mail from C. King to C. Eiler).)

### D. HCFA's Regulations And Directives Distinguished Generics From Brands Based On Whether The Drug Used Its Generic Chemical Name.

174.   On November 2, 1998, HCFA implemented a final rule that revised its payment methodology for generics under Medicare Part B to include consideration of AWPs for brand drugs. *See* 63 Fed. Reg. 58813, 58849 (1998) (Tab 112, Abbott Ex. 209). HCFA adopted a payment formula for generic drugs that required Medicare carriers, including the DMERCs, to compare "the lower of the median price of the generic AWPs" with "the lowest brand name AWP," and then pay the lower amount. *Id.*; *see also* 42 CFR § 405.517 (1998).

175.    In response to a comment generated during the rulemaking process, HCFA

provided the following definition of what it considered to be a "brand" for purposes of Medicare

Part B payments:

> Our definition of "brand" is any product that is marketed under a name other than
> the generic chemical of the drug.  If a manufacturer chooses to market its product
> under a proprietary name rather than the generic chemical name of the drug, we
> believe this is a brand . . . . A "brand" product is defined as a product that is
> marketed under a labeled name that is other than the generic chemical name of the
> drug or biological.

(Tab 112, Abbott Ex. 209).

176.    HCFA also included a near-identical definition of "brand" as in the regulation in a

program memorandum issued to carriers following the regulation: "A 'brand name' product is

defined as a product that is marketed under a labeled name that is other than the generic chemical

name for the drug or biological."  ((Tab 171, Abbott Ex. 1015 at HHC201-0030 (HCFA Program

Memorandum, Transmittal No. AB-98-76; Tab 175, Abbott Ex. 529 at AWQ025-1349 (HCFA

Program Memorandum, Transmittal No. AB-98-76).)

177.    The Medicare Supplier Bulletin that preceded the November 1998 regulation also

illustrated this distinction by including a table listing generic names in one column and the

corresponding trade/brand names in the next.    (Tab 176, Eiler Ex. 6 at AWQ058-0950,

("Medicare Supplier Bulletin Region B DMERC"); Tab 177, Dey Ex. 126 at HHD011-0223,

("Cigna DMERC: Nebulizer Medications".)   One of the entries explicitly listed "ipratropium

bromide" as the "generic" and "Atrovent" as the corresponding "trade/brand" name.  (Tab 176,

Eiler Ex. 6 at AWQ058-0950, ("Medicare Supplier Bulletin Region B DMERC"); Tab 177, Dey

Ex. 126 at HHD011-0223, "Cigna DMERC: Nebulizer Medications".)   In every instance, the

trade/brand example was comprised solely of a proprietary trade name, and did not include the

underlying chemical compound in the name of the drug.    (Tab 176, Eiler Ex. 6 at

AWQ058-0950, ("Medicare Supplier Bulletin Region B DMERC"); Tab 177, Dey Ex. 126 at

HHD011-0224, ("Cigna DMERC: Nebulizer Medications".)

178.   In December 1998, HCFA issued a Program Memorandum that directed the

Medicare DMERCs to implement the November 1998 regulatory changes.   (Tab 171, Abbott

Ex. 1015 at HHC201-0030 (HCFA Program Memorandum, Transmittal No. AB-98-76);

Tab 175, Abbott Ex. 529 at AWQ025-1349 (HCFA Program Memorandum, Transmittal No.

AB-98-76).)   HCFA directed the carriers to obtain published AWPs from "sources such as the

Red Book, Blue Book, or Medispan."   (*Id.*)

E.   **The DMERCs' Idiosyncratic And Private Classification Criteria Ignored
     And Were Inconsistent With HCFA's Regulatory Definitions And Directives.**

179.   Throughout the relevant period the DMERCs constructed separate arrays for

generic and brand versions of ipratropium bromide to determine whether the median of the

generic AWPs was lower than the lowest brand AWP.   (Tab 24, 9-23-08 Eiler Dep. 547; Tab 18,

3-5-09 Duggan Dep. 146)

180.    In determining whether a drug was a generic versus a brand, the DMERCs'

Medicare Professional Reimbursement Desk Procedures, Drug Pricing Procedure ("Drug Pricing

Procedure") did not use the regulatory definition that a "brand" product is defined as a product

that is marketed under a labeled name that is other than the generic chemical name of the drug or

biological."   (Tab 22, 8-26-08 Eiler Dep. 145-46, Tab 24, 9-23-08 Eiler Dep. 485, 547-49 ("Q:

Now I want to suggest to you, Ms. Eiler that Novaplus actually has always been a generic

product, not a brand product.   And that if one – I want you to assume that if one had done

additional research, the generic status of that drug might have been discovered . . ."), 558-603

("Q: Okay.  I'd like you to assume today that in fact they're [Novaplus NDCs] generic drugs,

and that if you have done some additional research, besides just looking at the RedBook, you

might have determined that they were in fact generics."); Tab 30, Helton Dep. 253-54;  Tab 168,

Roxane Ex. 42 (12-1-99 Ltr from R Stone to C. Carpenter), Tab 169, Roxane 100 (Drug pricing

Procedure).)  Instead, the Medicare Professional Reimbursement Desk Procedures, Drug Pricing

Procedure directed the DMERCs to use the following methodology to determine whether a drug

was a brand drug:

> To determine if a drug is generic or brand, look at the bold face upper case name
> of the drug [in the Drug Topics Red Book publication].  If there is another name
> for the drug immediately below it in lower case letters (the generic name), the
> entries following are generally brands.  If there is no lower case drug name
> immediately below the bold face upper case name, the bold face upper case name
> is the generic name and all the entries below are generics. In either case, if an
> entry below the drug name refers to another page, that entry would be for a brand
> name.  If there is a question as to whether a drug is brand or generic, consult the
> PDR Generics, telephone the drug company or **Red Book** (1-800-222-3045).

(Tab 168, Roxane Ex. 42 at AWQ025-0881-82, (12-1-99 Letter from R. Stone to C. Carpenter –

Drug Pricing Procedure) (emphasis in original); (*see also* Tab 22, 8-26-08 Eiler Dep. 145-46;

Tab 24, 9-23-08 Eiler Dep. 485, 547-49; Tab 169, Roxane 100 (Drug Pricing Procedure).

181.    The DMERCs sometimes determined whether a drug was a brand by whether it

had the word "See" in the Red Book, indicating a cross reference.  (Tab 30, Helton Dep. 253-54)

182.    The DMERCs also sometimes made the brand/generic classification without

consulting the printed Red Book.  (Tab 24, 9-23-08 Eiler Dep. 600-03.)  On those occasions,

DMERCs would review certain files on a Red Book CD database that did not have the same

capitalization convention as the printed volumes but instead listed the brand drugs in separate

data files.  (*Id*.; Tab 50, 2-29-08 Stone Dep. 305-310.)

183.    Once a DMERC made the initial determination of whether a drug was a generic

or a brand, the DMERC would carry that same classification through in subsequent quarters

unless "some notation in the RedBook . . . indicated it had changed from branded to generic or

vice versa."  (Tab 24, 9-23-08 Eiler Dep. 603.)

184.    The Annual Red Book did not begin listing the NDCs for the NovaPlus label ipratropium bromide inhalation solution until 2001.  (*Compare* Tab 154, 2001 RedBook at 368 *with* Tab 178, 2000 Red Book at 369.)

185.    In the 2001 Annual Red Book, under the bold-faced, upper-case **IPRATROPIUM BROMIDE** heading in the left-hand column, the Red Book listed all ipratropium products by manufacturer. (Tab 154, 2001 Red Book at 368.)  For example, under the **IPRATROPIUM BROMIDE** heading it listed generic ipratropium bromide products by **(Alpharma USPD), (Dey), (Roxane)** and **(Zenith Goldline)**.  (*Id.*)

186.    The 2001 Annual Red Book listed the three NovaPlus label ipratropium bromide NDCs (0054-8404-11, 0054-8404-13, 0054-8404-21) directly underneath to the Roxane label ipratropium bromide NDCs (0054-8402-11, 0054-8402-13, 0054-8402-21).  (*Id.*)  All six NDCs were listed under the "**(Roxane)"** manufacturer designation.  (*Id.*)

187.    The 2001 Annual Redbook listed identical AWPs for the three Roxane label NDCs and the corresponding NovaPlus label NDCs of the same package sizes.  (*Id.*)  For example, the Roxane-label 2500 ml 25s unit dose vial (NDC 00054-8402-11) listed an AWP of 44.06; the NovaPlus-label 2500 ml 25s unit dose vial (NDC 00054-8404-11) listed the same AWP of 44.06.  (*Id.*)

188.    The 2001 Annual Red Book descriptions for the three NovaPlus label NDCs were identical to the corresponding package sizes for the three Roxane label NDCs.  For example, all six NDCs contained the description "SOL, IH (S.D.V. […] PROTECTAPAK 0.02%."  (*Id.*)

189.    The 2001 Annual Red Book listings for the NovaPlus-label NDCs did not contain the word "NovaPlus" anywhere under any of the **IPRATROPIUM BROMIDE** listings or **(Roxane)** NDC sub-listings.  (*Id.*)

190.    The 2001 Annual Red Book listings for the NovaPlus label NDCs did not contain the word "See" next to the NovaPlus label or Roxane label NDCs.  (*Id.*)

191.    The 2001 Annual Red Book contained a listing under the **IPRATROPIUM BROMIDE** heading that read as follows:  **(Boehr Ingelheim)**  *See ATROVENT.*  (*Id.*)

192.    The 2001 Annual Red Book listing for the Roxane label or NovaPlus label ipratropium bromide did not contain the word "ipratropium bromide" in either bold face or capitals under the **(Roxane)** listing.   (*Id.*)

193.    The 2001 Annual Red Book listing did not contain a separate entry for "IPRATROPIUM BROMIDE NOVAPLUS."  (*Id.*)

194.    Other than different NDC numbers, the NovaPlus label NDC listings in the 2001 Annual Red Book were identical to the corresponding package sizes of the Roxane-label NDCs. (*Id.*)

195.    The 2001 Annual Red Book listings for the NovaPlus NDCs identified them as generic drugs under the Medicare Professional Reimbursement Desk Procedures, Drug Pricing Procedure (Tab 168, Roxane Ex. 42 at AWQ025-0881-82, 12-1-99 Ltr. from R. Stone to C. Carpenter, Drug Pricing Procedure).   There was a "bold face upper case name," (*i.e.*, **IPRATROPIUM BROMIDE**) in the 2001 Annual Red Book listing, but there was not "another name for the drug immediately below it in lower case name letters (the generic name)," and thus the entry did not indicate a brand.   (Tab 154, 2001 Red Book at 368; *supra* ¶¶ 46, 51-60.) Because "there is no lower case drug name immediately below" **IPRATROPIUM BROMIDE,** ipratropium bromide "is the generic name and all the entries below are generics."   (Tab 168, Roxane Ex. 42 at AWQ025-0881-82, 12-1-99 Ltr from R Stone to C Carpenter.)

196.    The 2001 Annual Red Book listing for the NovaPlus NDCs identified them as generic drugs according to the criteria used by at least the Adminastar DMERC for distinguishing brand from generic drugs.  (Tab 24, 9-23-00 Eiler Dep. 547-49).

197.    The 2001 Annual Red Book listing for the NovaPlus NDCs identified them as generic drugs according to the criteria used by at least the Cigna DMERC for distinguishing brand from generic drugs.  (Tab 30, Helton Dep. 253-54).  Specifically, the word "see" was not next to any of the NovaPlus-NDCs.  (Tab 154, 2001 Red Book at 368).  According to the Cigna DMERC's criteria for identifying brand drugs, the 2001 Annual Red Book listing for "ATROVENT" identified that product as a brand product for ipratropium bromide because it had the word "See" and a cross-reference next to it.  (Tab 30, Helton Dep. 253-54).

198.    In the 2002 Annual Red Book, under the bold-faced, upper-case **IPRATROPIUM BROMIDE** heading in the left-hand column, the Red Book listed all ipratropium products by manufacturer. (Tab 180, 2002 Red Book at 389)  For example, under the **IPRATROPIUM BROMIDE** heading it listed generic ipratropium bromide products by **(Alpharma USPD), (Dey), (Roxane)** and **(Zenith Goldline)**.  (*Id.*)

199.    The 2002 Annual Red Book listed the three NovaPlus-label ipratropium bromide NDCs (0054-8404-11, 0054-8404-13, 0054-8404-21) directly underneath to the Roxane label ipratropium bromide NDCs (0054-8402-11, 0054-8402-13, 0054-8402-21).  (*Id.*)  All six NDCs were listed under the "**(Roxane)**" manufacturer designation.  (*Id.*)

200.    The 2002 Annual Red Book listed identical AWPs for the three Roxane-label NDCs and the corresponding NovaPlus-label NDCs of the same package sizes.  (*Id.*)  For example, the Roxane-label 2500 ml 25s unit dose vial (NDC 00054-8402-11) listed an AWP of

44.06; the NovaPlus-label 2500 ml 25s unit dose vial (NDC 00054-8404-11) listed the same AWP of 44.06.  (*Id.*)

201.    The 2002 Annual Red Book descriptions for the three NovaPlus label NDCs were identical to the corresponding package sizes for the three Roxane-label NDCs.  For example, all six NDCs contained the description "SOL, IH (S.D.V. […] PROTECTAPAK 0.02%."  (*Id.*)

202.    The 2002 Annual Red Book listings for the NovaPlus label NDCs did not contain the word "NovaPlus" anywhere under any of the **IPRATROPIUM BROMIDE** listings or **(Roxane)** NDC sub-listings.  (*Id.*)

203.    The 2002 Annual Red Book listings for the NovaPlus label NDCs did not contain the word "See" next to the NovaPlus label or Roxane label NDCs.  (*Id.*)

204.    The 2002 Annual Red Book contained two listings under the **IPRATROPIUM BROMIDE** heading that read as follows:  **(Boehr Ingelheim Pharm)** *See ATROVENT.*  (*Id.*)

205.    The 2002 Annual Red Book listing for the Roxane label or NovaPlus label ipratropium bromide did not contain the word "ipratropium bromide" in either bold face or capitals under the **(Roxane)** listing.   (*Id.*)

206.    The 2002 Annual Red Book listing did not contain a separate entry for "IPRATROPIUM BROMIDE NOVAPLUS."  (*Id.*)

207.    Other than different NDC numbers, the NovaPlus label NDC listings in the 2002 Annual Red Book were identical to the corresponding package sizes of the Roxane-label NDCs. (*Id.*)

208.    The 2002 Annual Red Book listings for the NovaPlus NDCs identified them as generic drugs under the Medicare Professional Reimbursement Desk Procedures, Drug Pricing Procedure  (Tab 168,  Roxane  Ex. 42  at  AWQ025-0881-82,  (Medicare  Professional

Reimbursement Desk Procedure, Drug Pricing Procedure)).  There was a "bold face upper case name," (*i.e.*, **IPRATROPIUM BROMIDE**) in the 2002 Annual Red Book listing, but there was not "another name for the drug immediately below it in lower case name letters (the generic name)," and thus the entry did not indicate a brand.  (Tab 180, 2002 Red Book at 389; *supra* ¶¶ 46, 64-73.)  Because "there is no lower case drug name immediately below" **IPRATROPIUM BROMIDE,** ipratropium bromide "is the generic name and all the entries below are generics."  (Tab 168, Roxane Ex. 42 at AWQ025-0881-82, 12-1-99 Ltr. from R. Stone to C. Carpenter - Drug Pricing Procedure AWQ025-0876-79)).

209.    The 2002 Annual Red Book listing for the NovaPlus NDCs identified them as generic drugs according to the criteria used by at least the Adminastar DMERC for distinguishing brand from generic drugs.  (Tab 24, 9-23-08 Eiler Dep. 547-49).

210.    The 2002 Annual Red Book listing for the NovaPlus NDCs identified them as generic drugs according to the criteria used by at least the Cigna DMERC for distinguishing brand from generic drugs.  (Tab 30, Helton Dep. 253-54).  Specifically, the word "see" was not next to any of the NovaPlus-NDCs.  (Tab 180, 2002 Red Book at 389).  According to the Cigna DMERC's criteria for identifying brand drugs, the 2002 Annual Red Book listing for "ATROVENT" identified that product as a brand product for ipratropium bromide because it had the word "See" next to it.  (Tab 30, Helton Dep. 253-54).

211.    Each time the DMERCs utilized the quarterly Red Book electronic CD databases by uploading a new electronic CD, the data provided on the previous electronic CD was deleted.  (Tab 23, 8-27-08 Eiler Dep. 295.)  The DMERCs could not keep a record of the data from the previous electronic CD other than by printing a hard copy.  (*Id.*)

212.   The few hard copy printouts produced by the DMERCS list *all* drugs—brand and generic—in all-capital letters.  (Tab 24, 09-23-08 Eiler Dep. 600-03; Tab 179, AWP039-3207 (July 2000 Red Book for Windows printout); Tab 180, AWP038-0705 (April 2002 Red Book for Windows printout); Tab 178, AWP039-2444 (April 2000 Red Book for Windows printout).)

213.   Although the internal procedures required the DMERCs to consult manufacturers, the Physicians Desk Reference book, or the Red Book itself if questions arose about the classification of a drug, there is no evidence that any DMERC did so with respect to classifying iptratropium bromide products.  (Tab 22, 8-26-08 Eiler Dep. 119-20.)

214.   The DMERCs did no additional research besides looking at RedBook to determine whether a drug was a generic or a brand.  (Tab 24, 9-23-08 Eiler Dep. 559.)  The DMERCs did not verify their classifications using First DataBank, Medispan, or any other compendia besides RedBook.  (*Id.*)

215.   First DataBank is a widely-used pricing compendium relied on by commercial and government third-party payors, including many State Medicaid programs, as well as others in the pharmaceutical industry to determine the generic status of NDCs.  (Tab 182, Aff. of F. Scott Morton ¶ 7.)

216.   In order to assist these entities in determining whether a drug is a generic or brand, First DataBank publishes a database containing several different "classification indicators." (Tab 182, Aff. of F. Scott Morton ¶ 3.)

217.   Among others, these indicators include the "generic name drug indicator" and the "generic price indicator."  (Tab 182, Aff. of F. Scott Morton ¶ 3.)

218.     During the relevant time period, all of First DataBank's classification indicators were *identical* for Roxane-label and NovaPlus label ipratropium bromide.  (Tab 182, Aff. of F. Scott Morton ¶ 6.)

219.     For example, under "generic name indicator," First DataBank listed *both* the Roxane-label and NovaPlus-label ipratropium bromide as "Generically named AND multiple source."  (Tab 182, Aff. of F. Scott Morton ¶¶ 5-6.)

220.     Similarly, under "generic price indicator," First DataBank listed *both* the Roxane-label and NovaPlus-label ipratropium bromide as "Priced as a lower cost alternative." (Tab 182, Aff. of F. Scott Morton ¶¶ 5-6.)

F.     **Some Of The DMERCs Inconsistently Classified The Roxane And NovaPlus-Label Ipratropium Bromide Products As *Both* Brands And Generics, At Differing Times.**

221.     The four DMERCs varied considerably in their classifications of the NovaPlus and Roxane label ipratropium bromide products.  (Tab 18, 3-5-09 Duggan Dep. 146).  Of the four DMERCs, only DMERC-A consistently placed the NovaPlus and Roxane labeled products in its generic arrays throughout the pertinent time period.  (Tab 183, Ex. A to Decl. of C. King at AWQ071-0043,     AWQ071-0047,     AWQ071-0052,     AWQ071-0059,     AWQ071-0063, AWQ071-0066, AWQ071-0070, AWQ071-0073, AWQ071-0077 (DMERC-A arrays).)   The remaining three DMERCs classified either the NovaPlus label product or the Roxane label as a brand, and, in some instances, alternated the classification of the *same* product across time periods.  (*See, e.g.*, Tab 24, 9-23-08 Eiler Dep. 549, 552-554; Tab 184, Eiler U.S. Ex. 11 (AdminaStar Federal Arrays) at AWP038-0704-05; Tab 185, Roxane 118 at AWP033-1352.)

222.     The Palmetto DMERC placed the NovaPlus product in its generic arrays from April to July 2003, even though it had previously classified the product as a brand in prior arrays. (Tab 186, Roxane Ex. 46 at  AWQ022-0074-AWQ-022-077.)  Beginning in July 2003, Palmetto

re-classified the NovaPlus product as a brand and placed it back into its brand array.  (Tab 186, Roxane Ex. 46 at  AWQ022-0078- AWQ -022-081.)

223.    The AdminaStar Federal DMERC classified the ***Roxane label*** ipratropium bromide as a brand for over one year, from July 2002 to October 2003, even though AdminaStar had previously classified it as a generic for the prior six years.  (Tab 24, 9-23-08 Eiler Dep. 552-54; Roxane 118 at AWP033-1352, AWP033-1243, AWP033-1810, AWP033-1653-54, AWP033-2124, AWP033-1988; Tab 184, U.S. Eiler Ex. 11 (AdminaStar Federal arrays).)

224.    Both the Cigna and AdminaStar DMERCs classified the NovaPlus label product as brand in all of the pricing arrays that listed the drug.  (Tab 187, Roxane 58 (Cigna arrays); Tab 185, Roxane 118 at AWP033-0434-35, AWP033-0372-73, AWP033-0268-69, AWP033-1128-29, AWP033-0987-88, AWP033-0862, AWP034-1742, AWP033-0737-38, AWP033-0550-51, AWP033-1474, AWP033-1352, AWP033-1243, AWP033-1810, AWP033-1653-54, AWP033-2124, AWP033-1988 (AdminaStar Federal arrays).)

### G.    The Government's Damages Expert Includes Damages Based On The DMERCs' Classification Of NovaPlus As A Brand.

225.    The Government's damages expert, Dr. Duggan attempted to determine the Government's damages by calculating the "difference" between (1) what the federal government reimbursed for Roxane's NDCs under Medicare and Medicaid from 1996 to 2008 and (2) what the federal government would have reimbursed during the same period if instead Dr. Duggan's average sales prices (derived from Roxane's indirect transactional data) had been used to determine the "actual" AWPs for Roxane's drugs.  (Tab 18, 3-5-09 Duggan Dep. 61-64; Duggan Ex. 001, 02-06-09 Duggan Report  1.)

226.    Dr. Duggan's primary methodology consisted of replacing the published AWPs for Roxane's NDCs with his derived AWPs.  (Duggan Ex. 001, 02-06-09 Duggan Report at 11.)

He then placed the derived AWPs into electronic pricing arrays prepared based on the original DMERC arrays.  (Duggan Ex. 001, 02-06-09 Duggan Report 98-99.)

227.   In calculating what the federal government would have reimbursed under Medicare for ipratropium bromide, Duggan used the DMERCs' arrays without studying or attempting to check the DMERCs' prices against the compendia, correcting for inconsistencies, or scrutinizing the DMERCs' process for creating the pricing arrays.  (Tab 18, 3-5-09 Duggan Dep. 132-34, 146-49, 152, 166.)

228.   Dr. Duggan presented four independent damages models.   (Tab 18, 3-5-09 Duggan Dep. 61-64.)   One model calculated damages based on replacing prices for only the Roxane label ipratropium bromide and excluding the NovaPlus label ipratropium bromide products. (referred hereinafter as the "No-NovaPlus model")   (Tab 18, 3-5-09 Duggan Dep. 61-64; Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 3B.).   A second model replaced prices for both the Roxane label and NovaPlus label ipratropium bromide NDCs.   (hereinafter the "NovaPlus model")   (Duggan Ex. 001, 02-06-09 Duggan Report 3A; Tab 18, 3-5-09 Duggan Dep. 61-64.)   The last two models calculated damages based on changing prices for Dey ipratropium bromide products in addition to the Roxane drugs. (Tab 18, 3-5-09 Duggan Dep. 61-64.)[1]

229.   In the No-NovaPlus model, Dr. Duggan replaced Roxane's AWPs in the arrays with a "revised AWP" to determine whether Medicare spending would be affected.  (Tab 18, 3-5-09 Duggan Dep. 140-41; Duggan Ex. 001, 02-06-09 Duggan Report 98-99.)  Dr. Duggan

---

[1]   The two damages models that improperly incorporate Dey's independent published AWPs in calculating Roxane's damages are not the subject of this motion, except to the extent that one model incorporates the DMERCs' misclassification of NovaPlus as a brand.

calculated damages whenever replacing Roxane's prices affected the median of the generic array.  (Tab 18, 3-5-09 Duggan Dep. 140-41.)

230.    Dr. Duggan evaluated the electronic pricing array and lined up the prices. (Tab 18, 3-5-09 Duggan Dep. 131-32.)  If there was an odd number of prices, he determined the median by disregarding the highest and lowest prices and taking the middle price.  (Tab 18, 3-5-09 Duggan Dep. 131-32.)  If there was an even number of prices, Dr. Duggan disregarded the highest and lowest prices and averaged the middle two prices.  (Tab 18, 3-5-09 Duggan Dep. 131-32.)

231.    Under the No-NovaPlus model, substituting Roxane's revised AWPs has no effect on the median later on in the relevant period for most of the DMERCs.    (Tab 20, 5-18-09 Duggan, Dep. 184.)

232.    For example, in the No-NovaPlus model, Dr. Duggan explained that the Palmetto DMERC's allowed amount was unaffected after the third quarter of 2001 when replacing Roxane's published AWPs with his derived AWPs.  (Duggan Ex. 001, 02-06-09 Duggan Report 104.) (Tab 188, D. Williams Aff. at ¶ 11.)

233.    Similarly, under Dr. Duggan's analysis, replacing Roxane's AWP with a revised AWP did not affect the median of the DMERC-A arrays after the third quarter of 2001. (Tab 188, D. Williams Aff. at ¶ 11.)

234.    Under Dr. Duggan's analysis, replacing Roxane's AWP with a revised AWP also did not affect the median of the Cigna arrays after the third quarter of 2001  (*Id.*)

235.    And under Dr. Duggan's analysis, replacing Roxane's AWP with a revised AWP did not affect the median of the AdminaStar arrays after the second quarter of 2000.  (*Id.* at 10.)

236.    Under the No-NovaPlus model, Duggan attempted to correct or reconcile some of the DMERCs errors based on "what [he] considered to be most appropriate at the time." (Tab 18, 3-5-09 Duggan Dep. 137-38.)  For example, Duggan decided to correct AdminaStar's erroneous inclusion of the Roxane-label ipratropium bromide in the branded portion of the array. (Tab 18, 3-5-09 Duggan Dep. 138-41, 144-45.)

237.    Under the NovaPlus model, Duggan replaced prices for both the Roxane label and NovaPlus-label AWPs.  (Tab 18, 3-5-09 Duggan Dep. 62-63.)  Dr. Duggan then calculated damages whenever replacing Roxane's prices would have affected the median of the generic array or the lowest brand price because, in his view, movement in either one would affect the allowed amount.  (Tab 18, 3-5-09 Duggan Dep. 140-41.)

238.    With respect to the NovaPlus label ipratropium bromide, Duggan did not attempt to determine whether the DMERCs' classification of the drug was appropriate and instead "accepted what [the DMERCs] did," relying on each DMERCs' separate determination of whether the drug was a brand or generic without correcting for any errors or inconsistencies. (Tab 18, 3-5-09 Duggan Dep. 145-47; Tab 20, 5-18-09 Duggan Dep. 159.)

239.    Thus, because the DMERCs' treatment varied across DMERCs and for certain time periods within DMERCs, Duggan sometimes treated the NovaPlus label as a brand as the DMERCs did under the NovaPlus model.  (Tab 18, 3-5-09 Duggan Dep. 146, 152-53.)

240.    Because the regulations allowed payments to be based on "the lowest brand AWP" whenever it was lower than the median of generic AWPs, in Dr. Duggan's "but-for" world, the "revised NovaPlus AWP" now becomes the hypothetical "lowest brand AWP." (Tab 18, 3-5-09 Duggan Dep. 140-141, 159-60.)

241.    As a result, the NovaPlus prices establish the payment basis for *all* quarters and *all* ipratropium bromide claims. (Tab 18, 3-5-09 Duggan Dep. 140-141, 159-60.)

242.    Although the misclassification of NovaPlus as brand had no impact upon Medicare payments in the real world (because the NovaPlus and Roxane label AWPs were identical at all times), under Dr. Duggan's "but for" world, it has a massive impact.  (Tab 20, 5-18-09 Duggan Dep. 158.)   During any quarter in which Dr. Duggan finds liability in the NovaPlus model, he assigns *all* J-Code payments to Roxane, which include claims for payments for not only Roxane products, but any claims submitted for other manufacturers' ipratropium products. (Tab 20, 5-18-09 Duggan Dep. 157-58.)

243.    There is a significant difference in Duggan's calculation of alleged damages under No-NovaPlus model (*i.e.*, excluding NovaPlus label products) and NovaPlus models (*i.e.,* incorporating both the Roxane label and NovaPlus label); specifically, Dr. Duggan calculates an alleged damage figure of $234 million for his No-NovaPlus Model but $1.17 billion under the model that includes the NovaPlus label product.  (Duggan Ex. 001, 02-06-09 Duggan Report 3; Tab 18, 3-5-09 Duggan Dep. 183.)

244.    Dr. Duggan later conceded that the No-NovaPlus scenario recognizes that NovaPlus had "virtually no utilization" despite its "massive effect" on his damages calculations. (Tab 20, 5-18-09 Duggan Dep. 155-56.)   He testified that he understands that there are good arguments that NovaPlus is not a brand drug and remains "agnostic" as to whether the NovaPlus or No-NovaPlus damages model is more appropriate.  (Tab 18, 3-5-09 Duggan Dep. 181-82; Tab 20, 5-18-09 Duggan Dep. 155-56, 169.)  He testified that one could make a good case for the No-NovaPlus scenario based on the fact that the DMERCs may have misclassified NovaPlus as a brand, the very low utilization of the NovaPlus products under Medicare Part B and Roxane's

declining marketshare during the time period when Dr. Duggan calculates damages purportedly attributable to the NovaPlus prices.  (Tab 20, 5-18-09 Duggan Dep. 157-60.)

> **H.      The Government's Damages Are Also Inflated By Their Expert's Failure To Discount Damages As A Result of Three DMERCs Failure To Include NDCs For A Generic Product In Their Arrays.**

245.      Two ipratropium bromide inhalation solution products manufactured by Zenith Goldline appeared in the April 2000 monthly Red Book paper update and in the April 2000 electronic Red Book for Windows publication.  (Tab 178, April 2000 RedBook Update at 43; Tab 189, AWP039-2444 (April 2000 Red Book CD Printout).).

246.      One of these Zenith Goldline ipratropium bromide products (NDC 00172-6407-44) had an AWP of $44.10.  CD Printout; Tab 189, AWP039-2444 (April 2000 RedBook CD Printout).)  The second Zenith Goldline ipratropium bromide product (NDC 00172-6407-49) had an AWP of $105.60 price listed in CD printout.  (Tab 178, April 2000 RedBook at 43; Tab 189, AWP039-44 (April 2000 Red Book CD Printout).)

247.      AdminaStar Federal included these two Zenith Goldline NDCs on a non-final array for the second quarter of 2000.  (Tab 185, Roxane Ex. 118 at AWP033-45 (AdminaStar Federal arrays).)  It is unclear whether AdminaStar Federal decided to use that array to calculate the maximum allowable cost for that quarter.  (Tab 23, 8-27-08 Eiler Dep. 297-301.)

248.      From the third quarter of 2000 through the second quarter of 2002, AdminaStar added the Zenith Goldline drugs to the generic portion of the pricing arrays it used for ipratropium bromide.      (*See* Tab 185, Roxane Ex. 118 at AWP033-72–AWP033-73, AWP033-0268-69, AWP033-1128–29, AWP033-0987–88, AWP033-0862, AWP033-1742, AWP033-0737–738, AWP033-055051, AWP033-1474  (AdminaStar Federal arrays).)

249. The Government's damages expert, Dr. Duggan, found that once these values were added to AdminaStar's arrays, the AWPs for Roxane's drugs no longer affected the calculation of the median AWP for the J7644 J-Code.  (Tab 188, D. Williams Aff. ¶ 13.)

250. After the second quarter of 2000, Dr. Duggan's methodology properly dictates that there should be no damages for Roxane from that time onward. (*Id.*)

251. Unlike AdminaStar Federal, the other three DMERCs did not include the Zenith Goldline ipratropium bromide products in any of their pricing arrays.  (*See* Tab 186, Roxane Ex. 46 (Palmetto arrays); Tab 187, Helton Ex. 58 (Cigna arrays); Tab 152, Ex. A to Decl. of C. King (DMERC-A arrays).)

252. As a result, the Government's damages expert, Dr. Duggan calculated damages for DMERC-A, Palmetto, and Cigna after the second quarter of 2000.   (Tab 188, D. Williams Aff. ¶ 14.)   Dr. Duggan calculates damages for these quarters totaling $87.99 million.  (*Id.*)

## XVIII. DIVESTMENT OF ORAMORPH SR, ROXANOL & ROXICODONE

253. On September 28, 2001, Roxane divested certain drugs to Elan Pharma International Ltd. ("Elan"), including all Oramorph SR (0054-4793-25, 0054-4805-27, 0054-4790-25, 0054-4805-25, 0054-4805-19, 0054-4792-25), Roxanol (0054-3751-58, 0054-3751-50, 0054-3751-44), and Roxicodone (0054-4658-25, 0054-4665-25) NDCs at issue in this Action.  (Tab 190, Asset Purchase Agreement ¶ 1.1 at 8-9; U.S. Compl. Ex A (noting that Roxane divested each of these NDCs to Elan)

254. After the divestment, Elan owned all of the NDAs associated with these NDCs and assumed all liabilities and obligations arising from the manufacture, sale, and marketing of these products.  (Tab 190, Asset Purchase Agreement ¶ 1.1 at 2, ¶ 2.1(d) at 11)