# Exhibit D



25865560
Jun 27 2009
2:19AM

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>Master File No. 01-CV-12257-PBS<br>Subcategory No. 06-CV-11337-PBS<br><br>Judge Patti B. Saris<br><br>Magistrate Judge Marianne B. Bowler |
| THIS DOCUMENT RELATES TO:<br>*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.* v. *Boehringer Ingelheim Corporation, et al.*,<br>Civil Action No. 07-10248-PBS | |

### THE ROXANE DEFENDANTS' MEMORANDUM
### IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Helen E. Witt, P.C.
Anne M. Sidrys, P.C.
Eric T. Gortner
John W. Reale
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
*Counsel for Defendants*
*Boehringer Ingelheim Corp.,*
*Boehringer Ingelheim Pharmaceuticals, Inc.,*
*Boehringer Ingelheim Roxane, Inc., and*
*Roxane Laboratories, Inc.*

Dated: June 26, 2009

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................................1

I. THE GOVERNMENT CANNOT PREVAIL ON ANY MEDICAID CLAIM
   WHICH IT CANNOT PROVE WAS PAID BASED ON ROXANE'S AWPS OR
   WACS. ................................................................................................................................3

   A. The FCA Requires Proof Of A "False Claim" And Materiality. ............................3

   B. Because The Government Has No Evidence To Prove That Claims Were
      Actually Paid Based On False AWPs Or WACs, Its Medicaid Counts
      Cannot Survive Summary Judgment. .....................................................................4

II. ROXANE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE
    THE GOVERNMENT CANNOT ESTABLISH LIABILITY OR DAMAGES
    THAT ARE NOT BASED ON STATE MEDICAID CLAIMS DATA. ............................4

   A. Roxane Is Entitled To Summary Judgment On Claims Relating To
      Thirty-Three Medicaid Programs Because The Government Improperly
      Relies On An Extrapolation To Establish Both Liability And Damages.................5

   B. Roxane Is Entitled To Summary Judgment Where Claims Data
      Was Not Used In The Calculation Of Alleged Medicaid Damages Relating
      To Sixteen Medicaid Programs................................................................................9

III. ROXANE IS ENTITLED TO SUMMARY JUDGMENT ON ANY CLAIM NOT
     PAID ON THE BASIS OF A PUBLISHED EAC FORMULA THAT IS
     DEPENDENT ON AWPS OR WACS. ............................................................................9

   A. Summary Judgment Is Warranted On All Medicaid Claims Not Paid
      Pursuant To Published And CMS-Approved State Reimbursement
      Formula. ...................................................................................................................9

   B. The Government Cannot Establish Liability For Any Medicaid Claim
      That Was Paid On A Basis Other Than The EAC. ................................................11

IV. CLAIMS THAT DEPEND ON THE DMERCS' MISCLASSIFICATIONS AND
    OTHER ERRORS SHOULD BE DISMISSED. ..............................................................12

   A. The False Claims Act Limits Recovery Solely To Damages
      That Are Foreseeable And Closely Connected To The Alleged Conduct. ............15

   B. The DMERCs' Disregard Of Regulatory Mandates For Distinguishing
      Generics From Brands Is An Intervening Factor That Negates Causation............16

1. HCFA's Regulations And Directives Required DMERCs To Classify Generic Drugs Based On Whether They Were Named After The Underlying Generic Chemical Compound. ...............................16

2. The DMERCs' Idiosyncratic And Private Procedures Were Inconsistent With Regulatory Definitions and HCFA Directives..............17

3. There Can Be No Causation Because There Is No Connection Between Reporting "False" AWPs And The DMERCs' Independent Decisions On How To Classify Generics And Brands. ........20

4. The Government's Newfound Theory That Novaplus Is A "Brand" Under the Regulation Is Pretextual. ...........................................................22

C. Certain DMERCs' Failure To Update Their Pricing Arrays In A Timely Fashion Is An Additional Intervening Factor That Negates Causation. ................23

V. THE GOVERNMENT CANNOT ESTABLISH SCIENTER BASED ON DMERCS' INTERVENING ERRORS. ..............................................................................24

VI. ROXANE IS NOT LIABLE FOR ANY CLAIM POST-2000 BECAUSE THE "PERFECT STORM OF INFORMATION" NEGATES THE ELEMENTS OF SCIENTER AND FALSITY. ........................................................................................25

A. Roxane Cannot Have The Requisite Scienter, Given the Widespread Information On Drug Pricing And Submission Of AMPs To The Government..........................................................................................................26

B. Given This Widespread Information Of Generic Drug Pricing, The Government Cannot Establish The Element of Falsity. ................................27

C. By 2001 All Pertinent Players In The Marketplace Knew Of Extensive And Large Spreads, Particularly Among Generic Drugs......................................27

D. The Record Confirms That The Government Had An Abundance Of Information Regarding The Pricing Of Generic Drugs. .........................................28

E. The Government Also Had Specific Pricing Information About The Magnitude Of Discounts Available For Purchasers Of Ipratropium Bromide.................................................................................................................31

F. By 2001, The Government Had Pinpoint Data Detailing The Purported "Mega Spreads" Of The Roxane Drugs At Issue Here..........................................32

G. The Government Repeatedly Rejected Attempts To Reimburse At Levels Closer To Actual Acquisition Cost. .....................................................................32

**Page**

VII.   THE GOVERNMENT'S PRE-2001 CLAIMS ARE TIME-BARRED UNDER
       THE FCA'S SIX-YEAR STATUTE OF LIMITATIONS. ...............................................34

       A.    The Complaint Cannot Relate Back To Any Of Ven-A-Care's
             Pre-Intervention Complaints Because They Were Jurisdictionally
             Defective. ........................................................................................................35

VIII.  THERE IS NO EVIDENCE TO SUPPORT THE GOVERNMENT'S
       UNJUST ENRICHMENT CLAIMS. ......................................................................37

IX.    THE GOVERNMENT HAS NO EVIDENCE TO SUPPORT DAMAGES FOR
       MEDICARE CLAIMS PERTAINING TO AZATHIOPRINE. .........................................39

CONCLUSION ............................................................................................................................39

¶ 120, at Tab 139)  Nor does CMS mechanically follow the requirements of the FUL regulation in any event.  (56.1 ¶¶ 118, 121-123).

Likewise, for most of the relevant period in this lawsuit, numerous State Medicaid programs set MAC prices for generic drugs.  (*Id.* ¶ 279).  Many of them did not base their MAC prices on AWPs or WACs, which breaks the causal link.  *In re Pharm. Industry Avg. Wholesale Price Litig.*, 478 F. Supp. 2d at 181; *see also* (56.1 ¶ 279).  Moreover, the Government has produced *no* evidence that any State based its MAC prices on Roxane's AWPs or WACs, which forecloses any recovery on claims paid pursuant to any state MAC price.

Finally, the U&C is completely untethered to Roxane's published AWPs or WACs.  It is a price submitted by providers on every Medicaid claim and its definition varies from State-to-State.  (56.1 ¶ 276)  Some States define U&C as the price paid by retail or cash-paying customers, but other States have adopted "best price" or "most favored nation" definitions, which require the pharmacy to submit the lowest price charged or accepted from any customer or reimburser.  (*Id.*)  In any event, any claim paid on a U&C is not linked to Roxane's AWPs or WACs and thus cannot be a false claim attributable to Roxane.

**IV.    CLAIMS THAT DEPEND ON THE DMERCS' MISCLASSIFICATIONS AND OTHER ERRORS SHOULD BE DISMISSED.**

The Government presents two independent damages models for Roxane's drugs: one that correctly excludes damages created by the Medicare Durable Medical Equipment Regional Carriers' (the "DMERCs") misclassifications of the Novaplus-label ipratropium bromide as a brand (the "No Novaplus Model"), and the other that includes Novaplus ipratropium bromide

when it was misclassified as a brand (the "Novaplus Model").[11]  (56.1 ¶¶ 225-44)  The differences between the two damages models are staggering – the Government alleges a figure of $234 million for its No Novaplus Model, but then inflates its figure to $1.17 billion for the Novaplus Model. (56.1 ¶ 243)  Although the misclassification of Novaplus as a brand had no impact upon Medicare payments in the real world (because the Novaplus and Roxane-label AWPs were identical at all times), the Government's recreation of a "but for" world under the Novaplus Model creates a massive hypothetical impact.  (56.1 ¶¶ 237-42)  Specifically, the Government replaces the actual Novaplus AWPs with "revised AWPs" based on sales transactional data.  (56.1 ¶ 226)  Because the regulations allowed payments to be based on "the lowest brand AWP," in the Government's "but-for" world the DMERCs' misclassification of Novaplus as a "brand" allows the Government to convert the "revised Novaplus AWP" into the new "lowest brand AWP."  (56.1 ¶¶ 240-42)  As a result, these "revised Novaplus AWPs" now become the hypothetical payment bases for *all* quarters and *all* ipratropium bromide claims, even though it is unlikely that *any* Novaplus products were ever reimbursed under Medicare Part B.  (*Id.*)

No doubt uncomfortable with the disparity between the two models, the Government's own damages expert, Dr. Duggan, acknowledged that while including Novaplus ipratropium bromide in the model has a "massive" impact on the Government's damages, the Novaplus NDCs had *extremely* low utilization under Medicare Part B – potentially accounting for only 150

---

[11] The Novaplus-label ipratropium bromide was a generic product identical to the Roxane-label ipratropium.  It received a Novaplus-label because it was a private label product sold exclusively to Novation GPO's hospital members.  (Novation used the "Novaplus label" to identify its products.)  (56.1 ¶¶ 140-50).

out of more than *12 million* ipratropium bromide claims under Part B.[12] (56.1 ¶¶ 151-55, 242-44) Dr. Duggan further admitted there is a "good case" for excluding Novaplus ipratropium bromide altogether from the Government's damages. (56.1 ¶ 244) Dr. Duggan is right.

The Government's claim for relief, premised on the inclusion of Novaplus ipratropium bromide, is flawed for a number of reasons. Most critically, the Novaplus Model hinges on how the DMERCs classified the Roxane and Novaplus-label ipratropium bromide products as generics or brands. Yet, the undisputed evidence shows that three of the four DMERCs, entrusted with making accurate and consistent distinctions between generic and brand drugs, disregarded the Health Care Financing Administration's ("HCFA")[13] regulatory definitions and mandates, and instead implemented an unreliable, labyrinthine set of internal procedures and criteria that had no resemblance to the regulatory definition. Moreover, the DMERCs routinely failed to adhere even to their own internal classification criteria. As a result, the DMERCs' classifications of Roxane's generic products were random and unpredictable, replete with gross errors and blatant inconsistencies.

Importantly, Roxane's reporting of allegedly "inflated" AWPs had *nothing* to do with the DMERCs' independent decision-making process for classifying drugs or updating prices. Thus, there can be no causal connection between Roxane's conduct and the theoretical loss occasioned by the DMERCs' determination of whether a drug was a generic. And there is not a shred of evidence suggesting that Roxane could foresee the inconsistent (and often indecipherable) methodology employed by the DMERCs, let alone know that they in fact misclassified the

---

[12] The reason there were so few (if any) Novaplus-label ipratropium bromide claims under the provisions of Medicare Part B at issue here is that these products were sold exclusively to hospitals. (*See* 56.1 ¶¶ 151-55)

[13] HCFA was renamed the Centers for Medicare and Medicaid Services ("CMS") in 2001.

Novaplus-label ipratropium bromide as a brand.[14] To the contrary, because the DMERCs' internal procedures were not public, these errors remained entirely unknown to Roxane. Thus, there is **no** basis in law (or economics) to attribute to Roxane massive damages based on the vagaries of the DMERCs' error-ridden procedures.

> **A. The False Claims Act Limits Recovery Solely To Damages That Are Foreseeable And Closely Connected To The Alleged Conduct.**

The FCA provides for automatic treble damages, and therefore its damages provisions are punitive in nature. *Vermont Agency of Natural Res. v. United States*, 529 U.S. 765, 784-85 (2000). Accordingly, courts typically apply a proximate causation standard to "narrow, rather than enlarge, the field of actions for which FCA liability may be imposed." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield*, 472 F.3d 702, 714-15, n.17 (10th Cir. 2006). Indeed, this Court previously determined that general causation principles derived from tort law apply to the FCA. *See U.S. ex rel. Franklin v. Parke-Davis*, No. CIV. A. 96-11651 PBS, 2003 WL 22048255 at **4-6 (D. Mass. Aug. 22, 2003).[15] Accordingly, a plaintiff must have competent evidence to demonstrate that the alleged false statements were the proximate cause of the alleged damages. This requires evidence to establish that the resulting damage was foreseeable and had a sufficiently close nexus to the defendant's conduct. *Id.* at **4-5. When an unforeseeable intervening factor causes the alleged harm, that intervening factor breaks the chain of legal causation and a plaintiff cannot recover damages. *See id.* at *5 (citing *U.S. ex rel. Cantekin v.*

---

[14] Nor is there any evidence that Roxane intended for the Novaplus-label ipratropium bromide to be considered anything other than a generic in the marketplace. *See infra* Section V.

[15] *See generally U.S. ex rel. Fago v. M&T Mortgage Corp.*, 518 F. Supp. 2d 108, 122 (D.D.C. 2007) (noting the majority rule applying proximate cause analysis for both liability and damages under the FCA); *Sikkenga*, 472 F.3d 702 at 714 (citing *United States v. Hibbs*, 568 F.2d 347, 349 (3rd Cir. 1977) for proposition that "traditional principles of tort law" apply to causation for damages under the FCA).

*Univ. of Pittsburgh*, 192 F.3d 402, 416 (3rd. Cir. 1999) and applying intervening factor analysis). Thus, causation under the FCA requires a substantially stronger evidentiary showing than a mere "but for" cause of any alleged losses. *See U.S. ex rel. Fago v. M&T Mortgage Corp.*, 518 F. Supp. 2d 108, 122 (D.D.C. 2007). As shown below, the Government cannot meet this standard.

> **B.    The DMERCs' Disregard Of Regulatory Mandates For Distinguishing Generics From Brands Is An Intervening Factor That Negates Causation.**
>
> **1.    HCFA's Regulations And Directives Required DMERCs To Classify Generic Drugs Based On Whether They Were Named After The Underlying Generic Chemical Compound.**

On November 2, 1998, HCFA implemented a final rule that revised its payment methodology for generics under Medicare Part B to include consideration of AWPs for brand drugs. (56.1 ¶ 174) HCFA adopted a payment formula for generic drugs that required the four DMERCs to compare "the lower of the median price of the generic AWPs" with "the lowest brand name AWP," and then pay the lower amount. (*Id.*) In response to a comment generated during the rule making process, HCFA provided the following definition of a "brand" for purposes of Medicare Part B payments:

> Our definition of "brand" is any product that is marketed under a name other than the generic chemical name of the drug. If a manufacturer chooses to market its product under a proprietary name rather than the generic chemical name of the drug, we believe this is a brand.

(56.1 ¶ 175) In December 1998, HCFA issued a Program Memorandum that directed the DMERCs to implement these November 1998 regulatory changes. (56.1 ¶¶ 176, 178) This HCFA directive specifically included the above regulatory definition. (*Id.*)

The Novaplus-label ipratropium bromide product met the regulatory criteria for a generic, not a brand, drug. It was marketed under its full generic chemical compound name of "ipratropium bromide inhalation solution 0.02%" and listed in the publishing compendia as such,

-16-

(56.1 ¶¶ 142-47), as were all other generic ipratropium products. (56.1 ¶ 139) Indeed, the Medicare Supplier Bulletin that preceded the regulatory definition specifically listed "Ipratropium bromide" as a generic name and "Atrovent" as the companion "Trade/Brand" name. (56.1 ¶ 177) Thus, the product was not marketed under a "propriety name rather than the generic chemical name of the drug," and, accordingly, should not have been classified as a brand by any DMERC. In any event, as shown directly below, the DMERCs ignored HCFA's regulatory definition, and instead privately adopted an unrelated alternate methodology.

### 2. The DMERCs' Idiosyncratic And Private Procedures Were Inconsistent With Regulatory Definitions and HCFA Directives.

The undisputed evidence demonstrates that the DMERCs' actual procedures– which were entirely unknown to Roxane – ignored HCFA mandates.[16] (56.1 ¶¶ 162, 174-82) Although the governing regulation *required* the DMERCs to classify drugs marketed under the "generic chemical name" (here, "ipratropium bromide") as generics, the DMERCs in fact paid no attention to that criteria. (56.1 ¶¶ 174-82) Instead, they adopted an entirely different private methodology that depended principally on whether a drug name was capitalized in the Redbook compendia, which apparently revealed only whether a drug was *generally* – not necessarily – a brand:

> To determine if a drug is generic or brand, look at the bold face upper case name of the drug [in the Drug Topics Redbook publication]. If there is another name for the drug immediately below it in lower case letters (the generic name), the entries following are generally brands. If there is no lower case drug name immediately below the bold face upper case name, the bold face upper case name is the generic name and all the entries below are generics. In either case, if an entry below the drug name refers to another page, that entry would be for a brand name. If there is a question as to whether a drug is brand or generic, consult the PDR Generics, telephone the drug company or **Redbook** (1-800-222-3045).

---

[16] For an overview of the DMERCs' construction of pricing arrays, (*see* 56.1 ¶¶ 156-73, 179).

(56.1 ¶ 180) (emphasis in original).

Although the DMERCs' disregard of regulatory criteria in itself negates causation, s*ee Mylan,* 608 F. Supp. 2d at 147-48, the causal chain is further attenuated here by the additional fact that the DMERCs failed to apply even their own internal procedures in a predictable – or foreseeable – manner. (56.1 ¶¶ 179-224)  For instance, the DMERCs implemented their procedures in widely divergent ways, often relying on different underlying data, updating arrays at different times and in different ways, and exercising independent, and often conflicting, discretionary choices. (56.1 ¶¶ 162-73)  Indeed, both HCFA and the DMERCs were well-aware of long-standing inconsistencies and problems with the DMERCs' pricing of drugs. (56.1 ¶¶ 164-73)

Not surprisingly, given the indecipherable written procedures quoted above and the varied methodology adopted in practice, the DMERCs' classifications of Roxane's generic products were chaotic: only one of the four DMERCs (DMERC-A) correctly and consistently placed the Novaplus and Roxane-label generic products consistently in its generic arrays throughout the pertinent time period. (56.1 ¶ 221)  The other three DMERCs misclassified either the Novaplus-label or the Roxane-label products as brands, and, in some instances, varied the classification of the *same* product across time periods. (56.1 ¶¶ 221-24)  For example, the Palmetto DMERC correctly placed the Novaplus product in its generic arrays from April to July 2003, even though it had misclassified the product as a brand in prior arrays. (*Id.*)  After July 2003, Palmetto again re-classified the Novaplus product as a brand.  Similarly, the Adminastar DMERC misclassified the Roxane-label ipratropium bromide as a brand for more than a year, from July 2002 to October 2003, even though Adminastar had classified it as a generic for the prior six years. (*Id.*)  Adminastar then re-classified the product back to a generic after October

2003. (*Id.*) Both the Cigna and Adminastar DMERCs misclassified the Novaplus-label product as a brand throughout. (*Id.*)

The resulting jumble of contradictory classifications is partially explained by the adopted procedures, which, on their face, informed the DMERCs that these criteria could not differentiate brands from generics with any degree of certainty. (56.1 ¶¶ 221-24)  Instead, the procedures merely stated they might identify Redbook entries that were "<u>generally</u> brands." (*Id.*)  And, anticipating the potential confusion that would likely arise, the procedures required DMERCs to call manufacturers, such as Roxane, directly, or the Redbook itself, if classification questions arose. (*Id.*)  Such classification questions plainly *should* have arisen, given that the DMERCs' decisions were often in direct conflict with each other, and, at times, in conflict with their own prior decisions from one quarter to the next. (*Id.*)  There is no evidence, however, that any DMERC availed itself of this option and contacted Roxane or the Redbook for clarification. (56.1 ¶¶ 213-14)

Moreover, the DMERCs' errors become even more incomprehensible and attenuated from any cognizable theory of causation when one attempts to reverse engineer the DMERCs' cryptic methodology of interpreting Redbook listings.[17]  Specifically, both the 2001 and 2002 Annual Redbooks (which are the first two years that the Novaplus AWPs appeared in the Redbook), list the Novaplus NDCs **identically** with respect to capitalization (and every other descriptor) to the Roxane-label ipratropium bromide, a product that *no one* in this litigation disputes was properly classified as a generic. (56.1 ¶¶ 184-210)  In fact, the *only* distinction in

---

[17] The precise bases of the DMERCs' Novaplus classifications cannot be reconstructed because most of the evidence was destroyed during the intervening seven years that this case remained under seal.  For instance, the electronic CDs that many DMERCs relied upon during this time automatically erased prior data with each quarterly update. (56.1 ¶¶ 211-12)  These CDs were not preserved or produced by the Government.

the Redbook listings between the two products is the NDC numbers. (*Id.*) Thus, according to the DMERCs' own criteria, the Novaplus NDCs also should have been classified as generics not just by DMERC-A, but by the other three DMERCs as well. (*Cf.* 56.1 ¶ 180 *with* ¶¶ 221-24)  In any event, the bases for the DMERCs' classifications here remain a mystery that eludes explanation even under their own procedures.

The DMERCs' unexplained exclusive reliance on Redbook compendia is yet another intervening factor that attenuates causation here.  The governing regulation did not limit the DMERCs to Redbooks – they were free to consider other compendia sources, such as the First Data Bank (FDB) Blue Book, which is the principal source of AWPs for the Medicaid program. (56.1 ¶¶ 163, 215)  In contrast to the Redbook, the FDB Blue Book has a host of indicators that specifically help identify generic drugs. (56.1 ¶¶ 215-20)  Had the DMERCs looked at the FDB Blue Book, as contemplated under the governing regulation, they could have readily observed that *all six* generic indicators in the FDB Blue Book unambiguously flagged the Novaplus-label ipratropium as a generic drug. (*Id.*).  Indeed, the FDB Blue Book generic indicators were *identical* for both the Novaplus and Roxane-label ipratropium bromide products. (*Id.*)  Thus, it is perplexing why the DMERCs ignored such a widely used and recognized compendia, which had specific generic indicators (that cannot be found in the Redbook), and which clearly suggested the generic status of the Novaplus product. (*See generally* 56.1 at ¶¶ 215-20)

> **3.     There Can Be No Causation Because There Is No Connection Between Reporting "False" AWPs And The DMERCs' Independent Decisions On How To Classify Generics And Brands.**

Importantly, the DMERCs' misclassification of Novaplus as a brand had *nothing* to do with the alleged false statements here, which are the purportedly "inflated" AWPs Roxane reported. *See Fago v. M&T Mortgage Corp.*, 518 F. Supp. 2d at 122.  The crucial inquiry for causation for damages under the FCA is whether the alleged damages "arose because of the

*falsity* of the claim." *Id.* (quoting *U.S. ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995)).  Here, there is *no* connection between reporting an allegedly "false" AWP (*i.e.,* one that exceeds average acquisition cost) for the Novaplus product and the DMERCs' independent decisions to classify the drug as a brand or generic.  This alone negates any causation.  *See id.* at 122 (granting summary judgment on causation for damages under the FCA because plaintiff "failed to demonstrate any evidence showing that [the alleged bad conduct] was in any way related to the actual reason" for the alleged harm).  Nor is there any evidence that Roxane had *anything* to do with the DMERCs' internal procedures for classifying drugs, or that in reporting allegedly "false" AWPs for the Novaplus ipratropium, Roxane instructed or advised the DMERCs that the product should be classified as a brand.[18]  This too negates causation.  *See United States ex rel. Kinney v. Hennepin County Med. Cntr.*, No. CIV. 971680, 2001 WL 964011 at **9-10 (D. Minn. Aug. 22 2001) (granting summary judgment because there was no evidence that defendant instructed or otherwise affected a separate party's intervening conduct).

Simply put, there is *no* evidence that could allow a jury to determine that it was foreseeable that the DMERCs would not only (1) ignore the regulatory definition and HCFA mandates, (2) substitute an entirely different classification methodology, but also (3) then fail to implement their own internal criteria consistently.  To the contrary, the reasonably foreseeable expectation is that contractors, such as DMERCs, will follow HCFA's regulatory mandates.  Indeed, this Court has previously determined that there can be no recovery for payment methodologies that deviated from regulatory requirements.  *See Mylan,* 608 F. Supp. 2d at

---

[18] To the contrary, as discussed *infra* at Section V, *every* signal that Roxane sent to the marketplace indicated that the Novaplus-product was a generic.

147-48. Specifically, the State of Massachusetts was precluded from recovering for payments when it deviated from the regulatory requirement allowing use of only published WACs, and instead used published AWPs. *Id.* The Court's analysis depended on the unforeseeable nature of the State's deviation from regulatory mandates, which has equal application here. *Id.* In addition, the Government certainly has no evidence to show that DMERCs' deviations and errors were reasonably foreseeable to Roxane because the DMERCs' procedures and classification decisions were exclusively internal processes not visible to Roxane. (56.1 ¶ 162) *Cf. Franklin*, 2003 WL 22048255 at **4-5 (causation requires harm to be foreseeable). Thus, the misclassification of the Novaplus-product was entirely unknown to Roxane throughout the period. Accordingly, claims that depend on the DMERCs' regulatory deviations are foreclosed as a matter of law.

### 4. The Government's Newfound Theory That Novaplus Is A "Brand" Under the Regulation Is Pretextual.

Seeking to disregard the plain regulatory language, the Government has fabricated a *post-hoc* argument that the addition of the term "Novaplus" to the generic chemical name of "ipratropium bromide inhalation solution 0.02%" somehow converted the product into a brand under the regulatory definition. As an initial matter, this argument is a nullity because, as discussed above, the DMERCs unpredictably adopted their own idiosyncratic methodology. Setting aside that fundamental causation problem, the Government's argument here fails for the additional reason that it is contrary to the plain terms of the regulation: the presence of the word "Novaplus" merely identifies the supplier of the product, and does not otherwise alter the basic fact that the generic chemical compound "ipratropium bromide" is the front-and-center name of the product. (56.1 ¶¶ 142-46)

Moreover, the Government's newfound argument is pretextual. This argument arose only *after* the Government's late discovery that some of the DMERCs had committed these errors. Prior to that, the Government had acknowledged that Novaplus had "always" been a generic product. For instance, in September 2008, one of the senior Department of Justice attorneys leading this litigation acknowledged this fact in deposition questioning of the Adminastar DMERC's Rule 30(b)(6) representative:

> Q: Now I want to suggest to you, Ms. Eiler that **Novaplus actually has always been a generic product, not a brand product**. And that if one – I want you to assume that if one had done additional research, the generic status of that drug might have been discovered . . ."
>
> * * *
>
> Q: Okay. I'd like you to assume today that **in fact they're [Novaplus NDCs] generic drugs**, **and that if you have done some additional research, besides just looking at the RedBook, you might have determined that they were in fact generics**.

(56.1 ¶ 180 (Eiler Dep. at 549, 558-59)) (emphasis added). Less than one month after the Government made these representations, it moved to amend its complaint to add the Novaplus NDCs. Several months later the Government issued expert reports that reversed course and now *embraced* the DMERCs' misclassification of Novaplus as a vehicle to artificially inflate the alleged damages. (56.1 ¶¶ 225-44) Thus, the Government's eleventh-hour addition of the Novaplus NDCs appears to be nothing more than gamesmanship and a blatant attempt to capitalize on the DMERCs' errors in the Government's made-up "but for" world.

    **C.**    **Certain DMERCs' Failure To Update Their Pricing Arrays In A Timely Fashion Is An Additional Intervening Factor That Negates Causation.**

To establish correct payments for generic drugs, the DMERCs were required to timely update their pricing arrays to include additional AWPs as they were added to the publishing compendia. (56.1 ¶¶ 156-73) In 2000, Zenith Goldline entered the ipratropium bromide market,

and, correspondingly, Red Book began publishing AWPs for Zenith's NDCs at least as early as April 2000. (56.1 ¶¶ 245-48)  In July 2000, the Adminastar DMERC properly added these AWPs to its pricing arrays. (*Id.*)  The other three DMERCs, however, inexplicably failed to update their arrays with these same AWPs.  (56.1 ¶ 251)

The DMERCs' errors in timely updating their arrays have an enormous impact on Dr. Duggan's damages calculations. (56.1 ¶¶ 249-52)  When Adminastar properly added the Zenith Goldline AWPs in July 2000, the AWPs for Roxane's drugs no longer affected the calculation of the median AWP, and Dr. Duggan's methodology properly dictates that there should be no damages for Roxane from that time onward. (*Id.*)  But Dr. Duggan continues to assign $88 million of alleged damages in this time period based on the other DMERCs' failures to update their arrays with the very prices that Adminastar properly included. (*Id.*)  There is no principled reason why these three DMERCs, purportedly operating under the *same* regulatory mandates, internal procedures, and publishing compendia as Adminastar, should ignore the Zenith Goldline AWPs.  And there certainly is no basis in law to ascribe damages to Roxane based upon these failures to follow regulatory mandates.  Accordingly, the Government cannot recover any damages beyond the July 2000 time period when Roxane AWPs should not have affected the median AWP.

### V.  THE GOVERNMENT CANNOT ESTABLISH SCIENTER BASED ON DMERCS' INTERVENING ERRORS.

In addition to being unable to establish causation, the Government also cannot establish scienter based on the DMERCs' errors.  Under the FCA, the Government must prove that in "knowingly" reporting AWPs for the Novaplus-label product, Roxane actually knew or acted in deliberate ignorance or reckless disregard that certain DMERCs would place the Novaplus AWPs in brand versus generic pricing arrays.  *See* 31 U.S.C. § 3729(a)(1), (2).  The

-24-

Government, however, has *no* evidence that Roxane even knew – much less intended – that DMERCs would categorize this product as a brand.  To the contrary, the undisputed evidence demonstrates that Roxane *always* believed these products were properly classified as generic drugs, and provided every possible indication to the marketplace of that fact. (56.1 ¶¶ 135-47) *First,* the Novaplus products entered the marketplace *years* after other generics had already penetrated the marketplace. (56.1 ¶¶ 135-42)  Thus, there could be no question that these were not patent-protected products.  *Second*, the Novaplus products were given the chemical compound name of "ipratropium bromide," just like every other generic ipratropium product in the marketplace. (56.1 ¶¶ 142-43)  *Third*, the Novaplus products received *identical* AWPs as the Roxane-label ipratropium bromide, an undisputed generic drug, in contrast to the significantly higher AWPs for the brand product, Atrovent. (56.1 ¶¶ 137, 145)  *Finally,* and significantly, the Novaplus products were sold at the same, or even lower, contract prices than Roxane's generic ipratropium bromide. (56.1 ¶ 146)  Taken together, the undisputed facts defeat any attempt to establish that Roxane intended these products to be treated as brands.[19]

## VI.   ROXANE IS NOT LIABLE FOR ANY CLAIM POST-2000 BECAUSE THE "PERFECT STORM OF INFORMATION" NEGATES THE ELEMENTS OF SCIENTER AND FALSITY.

Plaintiffs cannot prove the required elements of scienter or falsity after 2000 and therefore summary judgment should be granted on all claims beginning in 2001.

---

[19]   The Government similarly cannot establish scienter for the DMERCs' failure to timely update their arrays, as discussed *supra* in Section IV(C).