# Exhibit 56

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*,
Civil Action No. 05-11084-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of Plaintiffs' Motion For Partial Summary Judgment
and In Opposition To Dey's Motion For Partial Summary Judgment

```
 1:1                      NO. GV002327
   2   THE STATE OF TEXAS         ) IN THE DISTRICT COURT EX REL.           )
   3      VEN-A-CARE OF THE       ) FLORIDA KEYS, INC.,     )
   4           PLAINTIFF(S),      ) )
   5   VS.                        ) TRAVIS COUNTY, TEXAS )
   6   DEY, INC.; ROXANE          ) LABORATORIES, INC., WARRICK   )
   7   PHARMACEUTICALS CORPORATION, ) SCHERING CORPORATION,         )
   8   SCHERING-PLOUGH CORPORATION, ) LIPHA, S.A., MERCK-LIPHA,   )
   9   S.A., MERCK, KGAA, AND EMD   ) PHARMACEUTICALS, INC.,         )
  10           DEFENDANT(S).      ) 53RD JUDICIAL DISTRICT
  11   *****************************************
  12   ORAL AND VIDEOTAPED DEPOSITION OF
  13   CYNTHIA JANE COLLIE
  14   FEBRUARY 19, 2003
  15   *****************************************
  16
  17       ORAL AND VIDEOTAPED DEPOSITION OF CYNTHIA JANE
  18   COLLIE, PRODUCED AS A WITNESS AT THE INSTANCE OF THE
  19   PLAINTIFF(S), AND DULY SWORN, WAS TAKEN IN THE
  20   ABOVE-STYLED AND NUMBERED CAUSE ON FEBRUARY 19, 2003,
  21   FROM 9:07 A.M. TO 5:29 P.M., BEFORE WILLIAM M.
  22   FREDERICKS, CSR IN AND FOR THE STATE OF TEXAS,
  23   REPORTED BY MACHINE SHORTHAND, AT THE COURTYARD
  24   HOTEL, MEETING ROOM B, 10900 FINANCIAL CENTER
  25   PARKWAY, LITTLE ROCK, ARKANSAS, PURSUANT TO THE TEXAS
```

```
2:1   RULES OF CIVIL PROCEDURE.

  2

  3    A P P E A R A N C E S

  4   FOR THE PLAINTIFF(S):

  5          MR. RAYMOND C. WINTER OFFICE OF THE ATTORNEY GENERAL

  6          STATE OF TEXAS      POST OFFICE BOX 12548 AUSTIN, TEXAS 78711-2548

  7    FOR THE RELATOR:

  8    MR. JAMES JOSEPH BREEN

  9          THE BREEN LAW FIRM, P.A. P. O. BOX 297470

 10          PEMBROKE PINES, FLORIDA 33029-7470

 11   FOR THE DEFENDANT(S) DEY, INC.:

 12          MR. STEVEN A. FLECKMAN FLECKMAN & MCGLYNN, P.L.L.C.

 13          515 CONGRESS, SUITE 1800 AUSTIN, TEXAS 78701-3503

 14    -AND-

 15    MR. DARRELL PRESCOTT

 16          COUDERT BROTHERS, LLP 1114 AVENUE OF THE AMERICAS

 17          NEW YORK, NEW YORK 10036-7703

 18   FOR THE DEFENDANT ROXANE LABORATORIES, INC.:

 19          MR. R. ERIC HAGENSWOLD SCOTT, DOUGLASS & MCCONNICO, L.L.P.

 20          ONE AMERICAN CENTER, FIFTEENTH FLOOR 600 CONGRESS AVENUE

 21          AUSTIN, TEXAS 78701

 22

 23

 24

 25
```

Collie, Cynthia Jane - February 19, 2003 00:00:00 a.m.

```
20:1   ACTUALLY BECOMING OVERWHELMING AND NEEDED TO BE BROKEN
   2   INTO TWO PARTS.  MY PREFERENCE WAS TO GO INTO THE
   3   COMPUTER SIDE OF WHAT I WAS DOING, AND MY TITLE WAS
   4   CHANGED TO MANAGER SALES OPERATIONS AND I FOCUSED ON
   5   THE BEING THE LIAISON BETWEEN THE IT DEPARTMENT AND
   6   SALES AND MARKETING AND DEVELOPING ALL OF OUR COMPUTER
   7   SYSTEMS FOR OUR SALES FORCES.  WE IMPLEMENTED A SALES
   8   FORCE AUTOMATION SYSTEM.  AND THEN I WAS STILL
   9   RESPONSIBLE FOR OUR SALES REPORTING; SALES
  10   COMMISSIONS.
  11   AND I DID ALSO DURING THAT TIME HELP THE
  12   CONTRACT DEPARTMENT DEVELOP THEIR CONTRACT
  13   ADMINISTRATION SYSTEM.  WE MIGRATED IT FROM A PC-BASED
  14   SYSTEM TO OUR AS400 SYSTEM, WHICH WAS OUR MAINFRAME
  15   FOR THIS COMPANY, WHICH ALLOWED OUR PRICING SYSTEM NOW
  16   TO TIE DIRECTLY TO THE ACCOUNTING PORTIONS OF THE
  17   COMPUTER SYSTEM, THE CHARGEBACK SYSTEM AND ALL OF THE
  18   INVOICING SYSTEM.  AND THEN I LEFT IN MAY OF 2001.
  19   Q.   SO FROM 1998 UNTIL MAY OF 2001 YOU HELD THAT
  20   TITLE OF MANAGER SALES OPERATIONS?
  21   A.   THAT'S CORRECT.
  22   Q.   AND DID YOU REPORT DIRECTLY TO MS. TATE
  23   DURING THAT TIME PERIOD?
  24   A.   YES, I DID.
  25   Q.   BEFORE 1998 WHEN YOU DIRECTLY REPORTED TO
```

Collie, Cynthia Jane - February 19, 2003 00:00:00 a.m.

```
70:1    DETERMINATION.  SO TO PRESERVE THEM, I PUT THEM IN THE
   2    BOX.
   3    WE HAD AT ONE POINT IN TIME RECEIVED
   4    SOME SECOND DOCUMENT PRODUCTION REQUESTS FROM ONE OF
   5    THE ORIGINAL REQUESTS THAT EXPANDED THE DATE RANGE,
   6    AND SO WE HAD TO GO BACK AND GO FURTHER IN THE PAST
   7    AND PRODUCE DOCUMENTS, AND MY FEELING WAS IF THAT
   8    OCCURRED AGAIN SOME OF MY DOCUMENTS WOULD BE
   9    RESPONSIVE; THEREFORE, I WANTED TO PRESERVE THEM IN
  10    CASE THERE WAS ANY FURTHER DOCUMENT REQUESTS THAT
  11    WOULD INCLUDE THOSE DOCUMENTS.
  12    Q.   (BY MR. WINTER)  SO IF I UNDERSTAND
  13    CORRECTLY, THE REASON WHY THE FOUR BANKER'S BOXES
  14    WORTH OF -- WORTH OF MATERIAL WERE NOT ORIGINALLY
  15    PRODUCED IS BECAUSE IT WAS YOUR OPINION THAT THOSE
  16    DOCUMENTS DID NOT FALL WITHIN THE DATE RANGE SPECIFIED
  17    IN THE FIRST QUESTIONS?
  18    A.   THE DATE RANGE OR THE CONTENT.
  19    Q.   OKAY.  BUT YOU FELT THAT IF THE DATE RANGE
  20    WAS EXPANDED, THAT THE DOCUMENTS THAT YOU HAD IN YOUR
  21    POSSESSION MAY BE RESPONSIVE TO SOME AMENDED QUESTION
  22    OR SUPPLEMENTAL QUESTION?
  23    A.   CORRECT.
  24    Q.   IS THAT CORRECT?
  25    A.   (NODDING HEAD.)
```

Collie, Cynthia Jane - February 19, 2003 00:00:00 a.m.

```
71:1   Q.   OKAY.  WAS THE CONTENT OF YOUR FOUR BOXES IN
   2   ANY WAY RELATED TO DEY'S STRATEGY OF ENHANCING OR
   3   INCREASING THE SPREAD ON MEDICARE AND MEDICAID
   4   REIMBURSEMENTS?
   5   A.   YES.  THE -- I HAD THE HANDOUTS OF THAT
   6   NATIONAL SALES MEETING WHERE THIS WORKSHOP WAS
   7   PRESENTED, AND I'M REFERRING TO EXHIBIT 460.
   8   Q.   460?  YOU HAD A COPY OF THIS IN YOUR FOUR
   9   DOC -- BOXES OF DOCUMENTS?
  10   A.   I BELIEVE I DID.
  11   Q.   OKAY.
  12   A.   I RECALLED THE WORKSHOP PRESENTED BY ROSS UHL
  13   AND KNEW THAT IT WAS GERMANE TO THIS INVESTIGATION;
  14   HOWEVER, IT DID NOT FALL WITHIN THE ORIGINAL DATE
  15   RANGE OF DOCUMENTS THAT WAS ASKED TO BE PRODUCED.  BUT
  16   I KNEW AT SOME POINT IN TIME IT WOULD BE AN IMPORTANT
  17   DOCUMENT.
  18   Q.   WHAT DID YOU DO WITH YOUR FOUR BANKER'S BOXES
  19   OF MATERIALS AT THE TIME THAT YOU WERE PREPARING TO
  20   RESIGN FROM DEY LABS?
  21   A.   I DELIVERED THEM PERSONALLY TO PAM MARRS.
  22   Q.   AND WHAT DID MS. MARRS DO WITH THEM, IF YOU
  23   KNOW?
  24   A.   I DON'T KNOW.
  25             (DISCUSSION OFF THE RECORD.)
```

```
72:1   Q.   (BY MR. WINTER)  PRIOR TO DELIVERING THOSE
   2   FOUR BOXES OF DOCUMENTS TO MS. MARRS, DID YOU HAVE ANY
   3   CONVERSATIONS WITH BOB MOZAK AS TO WHAT SHOULD BE DONE
   4   WITH YOUR FOUR BOXES OF DOCUMENTS?
   5   A.   I DID.
   6   Q.   AND WHAT DID MR. MOZAK TELL YOU?
   7   A.   HE ASKED ME TO SHRED ANYTHING I HAD IN MY
   8   POSSESSION.
   9   Q.   AND WHAT DID YOU TELL MR. MOZAK IN RESPONSE
  10   TO HIS DIRECTIVE THAT YOU SHRED THE DOCUMENTS?
  11   A.   THAT I WOULD NOT DO THAT.
  12   Q.   DID HE ARGUE WITH YOU?
  13   A.   I DON'T RECALL AN ARGUMENT, NO.
  14   Q.   DID MR. MOZAK AT ANY OTHER TIME IN YOUR
  15   TENURE AT DEY LABS DIRECT YOU TO SHRED ANYTHING?
  16   A.   NOT TO MY RECOLLECTION.
  17   Q.   WHAT WE'D LIKE TO DO NOW IS TAKE A RECESS OFF
  18   THE RECORD AND ALLOW YOU TO LOOK AT SOME DOCUMENTS
  19   THAT WE BROUGHT WITH US TODAY, AND THEN WE'LL GO BACK
  20   ON THE RECORD AND FIND OUT IF ANY -- IF ANY OF THESE
  21   DOCUMENTS THAT WE'RE GOING TO SHOW YOU ARE DOCUMENTS
  22   THAT YOU'VE DESCRIBED FOR US.
  23   A.   ALL RIGHT.
  24   MR. BREEN:  JUST FOR THE RECORD, THE
  25   DOCUMENTS WE'RE TALKING ABOUT ARE THOSE THAT WERE
```

   73:1    SPECIFICALLY PRODUCED AND IDENTIFIED BY COUNSEL AS

      2    BEING THE -- WE'VE GOT THE REQUEST HERE AND COUNSEL'S

      3    RESPONSE -- BEING THE DOCUMENTS THAT WERE PLACED IN

      4    THESE BOXES BY MS. MARRS -- BY MS. COLLIE BEFORE SHE

      5    LEFT THE COMPANY.

      6    THE REPORTER:  OFF THE RECORD?

      7    MR. FLECKMAN:  WELL --

      8    THE VIDEOGRAPHER:  WE'RE OFF THE RECORD

      9    AT --

     10    THE REPORTER:  STAND BY.  WAIT.

     11    OFF THE RECORD?

     12    MR. FLECKMAN:  THE -- YOU'RE TALKING

     13    ABOUT RECENT CORRESPONDENCE WHERE WE'VE TURNED OVER

     14    THE BOXES TO YOU GUYS?

     15    MR. BREEN:  RIGHT.

     16    MR. FLECKMAN:  YEAH.

     17    MR. BREEN:  THERE WERE THREE BANKER'S

     18    BOXES DELIVERED TO THE TEXAS AG'S OFFICE I BELIEVE

     19    YESTERDAY.

     20    MR. FLECKMAN:  I THINK THERE ARE FOUR

     21    BOXES THAT WE HAVE, AND WE WERE DELIVERING ALL

     22    RESPONSIVE AND RELEVANT MATERIALS FROM THOSE.

     23    ANYTHING RELATED WHATSOEVER TO SPREAD WE WERE

     24    DELIVERING TO YOU GUYS.

     25    MR. BREEN:  MY UNDERSTANDING IS WE GOT

```
74:1   THREE BOXES --

  2    MR. FLECKMAN:  AND JESSICA IS DOING

  3    THAT.

  4    MR. BREEN:  OKAY.

  5    MR. FLECKMAN:  OKAY?

  6    MR. WINTER:  JUST -- I'LL CLARIFY.  WHAT

  7    I OBSERVED YESTERDAY WHEN I LEFT MY OFFICE WERE A

  8    TOTAL OF EIGHT BOXES OF DOCUMENTS THAT WERE PRODUCED

  9    BY DEY TO THE STATE OF TEXAS THAT THE STATE OF TEXAS

 10    RECEIVED YESTERDAY.

 11    MR. FLECKMAN:  OKAY.  THOSE ARE --

 12    MR. WINTER:  LET ME FINISH, PLEASE.

 13    MR. FLECKMAN:  YEAH.

 14    MR. WINTER:  OF THOSE EIGHT BOXES OF

 15    DOCUMENTS THAT WERE PRODUCED YESTERDAY, THREE OF THEM

 16    SPECIFICALLY WERE IDENTIFIED AS CONTAINING DOCUMENTS

 17    RESPONSIVE TO THE STATE'S REQUEST NO. 5 IN ITS SECOND

 18    AND THIRD REQUEST FOR PRODUCTION WHICH SPECIFICALLY

 19    ASKED DEY TO PRODUCE FOUR BOXES OF DOCUMENTS COMPILED

 20    BY MS. COLLIE AND TURNED OVER TO MS. MARRS AT HER

 21    RESIGNATION.

 22    MR. FLECKMAN:  YEAH, I THINK I CAN

 23    EXPLAIN.  JESSICA MCGLYNN IN MY OFFICE IS HANDLING

 24    THAT.  WHAT'S HAPPENED IS THAT PAM MARRS HAS TURNED

 25    OVER TO US COPIES OF EVERYTHING THAT MS. DAULONG LEFT
```

```
75:1    WITH PAM MARRS.  THEY WERE IN FOUR BOXES.
   2    THE WITNESS:  COLLIE.
   3    MR. FLECKMAN:  MS. COLLIE.
   4    THE WITNESS:  THANK YOU.
   5    MR. FLECKMAN:  FORGIVE ME.  THE --
   6    AND -- AND JESSICA HAS GONE THROUGH THOSE AND REMOVED
   7    NONRESPONSIVE MATERIALS THAT HAVE NOTHING TO DO WITH
   8    THE ISSUES IN THIS CASE AND HAS INVITED YOU TO COME
   9    OVER AND EXAMINE THOSE TO CONFIRM THAT THEY'RE
  10    NONRESPONSIVE.  ALL THE REST HAVE PROBABLY BEEN
  11    COMPRESSED INTO THREE BOXES.
  12    MR. BREEN:  RIGHT.  THAT'S -- THAT'S OUR
  13    UNDERSTANDING ALSO.
  14    MR. FLECKMAN:  YEAH.
  15    MR. BREEN:  WE JUST WANT TO AS
  16    EFFICIENTLY AS POSSIBLE SEE IF THE WITNESS RECALLS
  17    THESE BEING THOSE DOCUMENTS.  THAT'S ALL.
  18    MR. FLECKMAN:  RIGHT.  TO OUR -- TO OUR
  19    UNDERSTANDING AND KNOWLEDGE, NONE OF THAT HAS BEEN --
  20    HAS BEEN DISCARDED BY PAM MARRS SINCE MS. COLLIE GAVE
  21    IT TO HER.
  22    THE REPORTER:  OFF THE RECORD, PLEASE.
  23    THE VIDEOGRAPHER:  WE'RE OFF THE RECORD
  24    AT 10:55.
  25              (RECESS.)
```

```
76:1    THE VIDEOGRAPHER:  WE'RE BACK ON THE
   2    RECORD AT 11:20.
   3    Q.   (BY MR. WINTER)  BEFORE WE -- OR, ACTUALLY,
   4    DURING THE RECESS THAT WE JUST TOOK, MS. COLLIE, WE
   5    SHOWED YOU TWO BANKER'S BOXES WORTH OF DOCUMENTS THAT
   6    WERE PRODUCED TO THE STATE OF TEXAS YESTERDAY BY DEY
   7    LABS, AND THESE BATES RANGES ARE 0096540 THROUGH
   8    0100303, COMPRISING BOX NO. 1; BOX NO. 2, BATES RANGE
   9    0100564 THROUGH 0104152, BOX NO. 2; AND BOX NO. 3
  10    BEING BATES RANGE 0105048 THROUGH 0106572.
  11         AND, MS. COLLIE, IS IT TRUE THAT YOU
  12    HAVE FLIPPED THROUGH THESE THREE BOXES OF DOCUMENTS
  13    AND CONFIRMED THAT THESE WERE MATERIALS THAT YOU HAD
  14    COLLECTED FROM YOUR FILE DRAWER AT YOUR RESIGNATION
  15    AND PLACED INTO WHAT FOR YOU WERE FOUR BANKER'S BOXES
  16    OF MATERIALS?
  17    MR. FLECKMAN:  HOLD ON JUST A MINUTE.
  18    CAN WE JUST ACCEPT YOUR REPRESENTATION,
  19    MR. WINTER, THAT THOSE ARE THE BATES NUMBER RANGES
  20    THAT YOU JUST SHOWED MS. COLLIE AND ME?
  21    MR. WINTER:  CERTAINLY.
  22    MR. FLECKMAN:  OKAY.
  23    MR. BREEN:  AND JUST FOR THE RECORD,
  24    THERE ARE SOME GAPS IN THE BATES NUMBERING OF THESE
  25    DOCUMENTS, AND I THINK YOU ALSO REPRESENTED THAT IN
```

Collie, Cynthia Jane - February 19, 2003 00:00:00 a.m.

```
77:1   YOUR LETTER TO THE STATE.
   2   MR. FLECKMAN:  YEAH.  RIGHT.  WE
   3   IDENTIFIED THAT.
   4   MR. BREEN:  RIGHT.  BUT IN GENERAL,
   5   THOSE ARE THE BATES RANGES THAT WE SHOWED MS. COLLIE
   6   DURING THE -- DURING THE BREAK.
   7   MR. FLECKMAN:  TERRIFIC.
   8   Q.  (BY MR. WINTER)  SO, MS. COLLIE, IF YOU WOULD
   9   CONFIRM FOR ME THAT YOU LOOKED THROUGH THE BATES
  10   RANGES THAT WE -- THAT I JUST STATED ON THE RECORD,
  11   WHICH WE HAVE COMPRESSED FROM THREE BOXES AS PRODUCED
  12   TO TWO -- YOU SAW TWO BOXES, CORRECT?
  13   A.  CORRECT.
  14   Q.  -- AND CONFIRM FOR ME, IF YOU WILL, THAT THE
  15   TWO BOXES YOU SAW INCLUDED DOCUMENTS THAT YOU HAD
  16   COLLECTED AT YOUR RESIGNATION AND DELIVERED TO PAM
  17   MARRS?
  18   A.  THAT'S CORRECT.
  19   Q.  OKAY.  NOW, YOU STATED BEFORE WE TOOK A
  20   RECESS THAT WHEN YOU BROUGHT THE FOUR BOXES TO
  21   MR. MOZAK'S ATTENTION HE DIRECTED YOU TO SHRED THEM?
  22   A.  THAT'S CORRECT.
  23   Q.  AND YOU TOLD MR. MOZAK THAT YOU WOULD NOT DO
  24   THAT, AND INSTEAD YOU DELIVERED THE DOCUMENTS TO
  25   MS. MARRS, IS THAT CORRECT?
```

```
78:1    A.    AFTER MR. MOZAK INSTRUCTED ME TO SHRED THEM,
   2    I WAS UNCOMFORTABLE WITH THAT DIRECTION AND EXPRESSED
   3    MY CONCERN TO BOTH WILLIA TATE AND TO PAM MARRS; AND
   4    PAM AND I DISCUSSED IT FURTHER, AND SHE ASKED THEN
   5    THAT I JUST GO THROUGH THE FOUR FILE DRAWERS AND
   6    ANYTHING THAT I FELT COULD POSSIBLY BE RELEVANT TO ANY
   7    OF THE PENDING LAWSUITS, TO PUT THOSE INTO A BOX, AND
   8    THEN I DID THAT AND THEN PROVIDED THEM TO PAM.
   9    Q.    AND THE -- AGAIN, THE NUMBER OF BOXES THAT
  10    YOU PROVIDED TO PAM WAS FOUR?
  11    A.    THAT'S CORRECT.
  12    Q.    OKAY.  WHAT DID YOU DO WITH THE BALANCE OF
  13    THE CONTENTS OF YOUR FILE DRAWER THAT DID NOT GO INTO
  14    THE FOUR BOXES?
  15    A.    I PROBABLY THREW AWAY MOST OF IT.  I MAY HAVE
  16    LEFT SOME FOR THE PERSON WHO TOOK OVER MY POSITION.
  17    OTHER THINGS IN THOSE FILE DRAWERS WERE THINGS
  18    RELATING TO THE COMPUTER PROJECT I WORKED ON.  THEY
  19    HAD NO BEARING WHATSOEVER ON ANY PRODUCTS, ANY PRICING
  20    OR ANYTHING LIKE THAT.
  21    Q.    BUT YOU HAD A CONVERSATION WITH WILLIA TATE
  22    AND ALSO WITH PAM MARRS WHERE YOU DISCUSSED
  23    MR. MOZAK'S DIRECTIVE TO YOU TO SHRED THE DOCUMENTS?
  24    A.    YES.
  25    Q.    WHAT WAS SAID IN THOSE CONVERSATIONS?
```

Collie, Cynthia Jane - February 19, 2003 00:00:00 a.m.

```
79:1    A.    THEY AGREED WITH ME THAT THAT WAS NOT
   2    APPROPRIATE TO DO AT THAT POINT IN TIME, AND THEN PAM
   3    AND I MADE THE DECISION TO -- FOR ME TO PROVIDE TO HER
   4    ANYTHING THAT I FELT WAS RELEVANT.
   5    Q.    DID YOU SPECIFICALLY INFORM MS. TATE AND
   6    MS. MARRS THAT MR. MOZAK HAD DIRECTED YOU TO SHRED THE
   7    DOCUMENTS?
   8    A.    YES.
   9    Q.    WAS MR. MOZAK PRESENT IN THE CONVERSATIONS
  10    THAT YOU HAD WITH MS. MARRS AND MS. TATE?
  11    A.    NO.
  12    Q.    DID MR. MOZAK KNOW THAT YOU DECLINED TO
  13    EXECUTE HIS ORDER TO SHRED AND INSTEAD DELIVERED THE
  14    DOCUMENTS TO MS. MARRS?
  15    A.    I DON'T KNOW.  I NEVER INFORMED HIM.
  16    Q.    DID YOU LEAVE YOUR CONVERSATION WITH
  17    MR. MOZAK BY GIVING MR. MOZAK THE IMPRESSION THAT YOU
  18    HAD COMPLIED OR WOULD COMPLY WITH HIS DIRECTIVE?
  19    A.    NO.  I TOLD MR. MOZAK THAT I WAS NOT WILLING
  20    TO DO THAT AND DID NOT HAVE ANY FURTHER CONVERSATIONS
  21    WITH HIM ABOUT THE DOCUMENTS.
  22    Q.    AND -- AND EARLIER IN RESPONSE TO AN EARLIER
  23    QUESTION THAT I ASKED YOU, YOU STATED THAT YOU DID NOT
  24    HAVE AN ARGUMENT WITH HIM OVER THE ISSUE, CORRECT?
  25    A.    THAT'S CORRECT.
```

Collie, Cynthia Jane - February 19, 2003 00:00:00 a.m.

```
80:1   Q.   DID HE ATTEMPT TO PERSUADE YOU IN ANY MANNER
   2   WHEN YOU STATED THAT YOU WERE UNCOMFORTABLE WITH THE
   3   CONCEPT OF SHREDDING THE DOCUMENTS?
   4   A.   NOT THAT I RECALL.
   5   Q.   WAS ANYONE ELSE PRESENT WHEN MR. MOZAK
   6   DIRECTED YOU TO SHRED THE MATERIALS?
   7   A.   NO.
   8   Q.   WHERE DID THE CONVERSATION TAKE PLACE?
   9   A.   IN HIS OFFICE.
  10   Q.   SO JUST TO SET THE SCENE, WAS THIS -- DID
  11   IT -- WAS IT SUCH THAT YOU WERE CLEANING OUT YOUR
  12   OFFICE, YOU IDENTIFIED THESE MATERIALS, AND YOU WENT
  13   TO BOB'S OFFICE AND YOU SAID, HEY, I'VE GOT THESE
  14   MATERIALS THAT MAY BE RELEVANT TO THE LAWSUIT?
  15   A.   NO.
  16   Q.   OKAY.
  17   A.   THIS CONVERSATION OCCURRED WHEN I GAVE HIM MY
  18   NOTICE THAT I WAS RESIGNING.
  19   Q.   OKAY.
  20   A.   AND HE IN GENERAL SAID, I WOULD LIKE YOU TO
  21   SHRED EVERYTHING IN YOUR OFFICE.
  22   Q.   AND THAT'S WHEN YOU STATED YOU WEREN'T
  23   COMFORTABLE WITH THE IDEA OF SHREDDING?
  24   A.   YES.
  25   Q.   OKAY.
```

Collie, Cynthia Jane - February 19, 2003 00:00:00 a.m.

```
91:1   Q.   OKAY.  DID DEY HAVE A PRACTICE OF HOLDING A
   2   MANAGER'S MEETING SOMETIME IN THE FALL OF THE YEAR
   3   IMMEDIATELY PRIOR TO THE NATIONAL SALES MEETING THAT
   4   WOULD OCCUR IN JANUARY OR FEBRUARY?
   5   A.   WE HELD THOSE -- TRIED TO HOLD THOSE
   6   QUARTERLY.  SO, YES, WE WOULD HAVE HAD ONE IN THE
   7   FALL.
   8   Q.   SO DEY'S PRACTICE WAS TO HOLD QUARTERLY
   9   MANAGER'S MEETINGS?
  10   A.   CORRECT.
  11   Q.   AND AT THE -- WERE THOSE QUARTERLY MANAGER'S
  12   MEETINGS HELD GENERALLY THE MARCH, JUNE, SEPTEMBER,
  13   DECEMBER TIME FRAME?
  14   A.   APPROXIMATELY, YES.
  15   Q.   OKAY.  AND IN THE FOURTH QUARTER MANAGEMENT
  16   MEETING, WOULD DEY TYPICALLY GO OVER AND PREPARE FOR
  17   THE NATIONAL SALES MEETING THAT WOULD BE HELD THE
  18   FOLLOWING NEW YEAR?
  19   A.   WE WOULD START THE DISCUSSIONS THEN.  WE --
  20   TYPICALLY IN PLANNING FOR THE NATIONAL SALES MEETING
  21   WE WOULD HAVE NUMEROUS MEETINGS LEADING UP TO THE
  22   MEETING ITSELF.
  23   Q.   WAS IT YOUR EXPERIENCE THAT ANY ITEMS THAT
  24   DEY PERSONNEL WISHED TO PLACE ON THE AGENDA FOR THE
  25   NATIONAL SALES MEETING HAD TO BE REVIEWED AND APPROVED
```

```
92:1    BY MANAGEMENT BEFORE THEY COULD BE PLACED ON THE

   2    AGENDA?

   3    A.   YES.

   4    Q.   WHO WOULD PARTICIPATE IN THIS REVIEW AND

   5    APPROVAL PROCESS AT DEY?

   6    A.   THE NATIONAL ACCOUNTS SALES MANAGER; THE

   7    DIRECTOR OF SALES, WHETHER IT BE INSTITUTIONAL OR

   8    NATIONAL DEPENDING ON WHAT PERIOD OF TIME WE'RE IN;

   9    BOB MOZAK; THE MARKETING DIRECTOR OR MANAGER; AND

  10    SOMETIMES CHARLES RICE WOULD BE INVOLVED.

  11    Q.   SO IF, FOR EXAMPLE, ROSS UHL WANTED TO MAKE A

  12    PRESENTATION ABOUT MARKETING THE SPREAD, WOULD THE

  13    SALES DIRECTOR OR MR. MOZAK HAVE HAD TO HAVE APPROVED

  14    OF THAT PRESENTATION BEFORE IT COULD BE PLACED ON THE

  15    AGENDA?

  16    A.   YES.

  17    Q.   DID YOU EVER PERSONALLY PARTICIPATE IN ANY

  18    MANAGER'S MEETINGS WHERE THE DISCUSSION CENTERED ON AN

  19    ANTICIPATED OR PROPOSED PRESENTATION INVOLVING

  20    EDUCATION TO SALES STAFF ON HOW TO DISCUSS WITH

  21    CUSTOMERS MARKETING THE SPREAD?

  22    A.   I DON'T RECALL THAT AS A SPECIFIC TOPIC OF A

  23    MANAGER'S MEETING; HOWEVER, I ATTENDED ALL THE

  24    QUARTERLY MANAGER'S MEETINGS, AND SO IF IT WAS

  25    DISCUSSED AT ONE OF THOSE I'M SURE I PARTICIPATED IN
```