# Exhibit 83

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*,
Civil Action No. 05-11084-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of Plaintiffs' Motion For Partial Summary Judgment
and In Opposition To Dey's Motion For Partial Summary Judgment

```
                        CAUSE NO. GV002327

THE STATE OF TEXAS              )    IN THE DISTRICT COURT
ex rel.                         )
    VEN-A-CARE OF THE           )
    FLORIDA KEYS, INC.          )
                                )
          Plaintiffs,           )
                                )
V.S.                            )    TRAVIS COUNTY, TEXAS
                                )
DEY, INC.; ROXANE               )
LABORATORIES, INC. and          )
WARRICK PHARMACEUTICALS         )
CORPORATION,                    )
                                )
          Defendants.           )    53rd JUDICIAL DISTRICT
```

********************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
CHARLES A. RICE
October 30, 2001
********************************************************

ORAL DEPOSITION OF CHARLES A. RICE, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 30th day of October 2001, from 9:06 a.m. to 5:02 p.m., before Randall N. Finch, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Coudert Brothers, 600 Beach Street, Third Floor, San Francisco, California 94109, pursuant to Notice, the Texas Rules of Civil Procedure and the provisions as previously set forth.

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF STATE OF TEXAS:

 3         MR. JOE CRAWFORD, MR. PATRICK J. O'CONNELL,
           MR. JARRETT ANDERSON, MR. RAYMOND WINTER
 4         Office of the Attorney General
           State of Texas
 5         P.O. Box 12548
           Austin, Texas 78711-2548   (512) 475-4300
 6                                    (512) 474-1062 Fax

 7   FOR THE RELATOR:

 8         MR. JAMES JOSEPH BREEN
           The Breen Law Firm, P.A.
 9         8201 Peters Road, Suite 1000
           Plantation, Florida 33324   (954) 916-2713
10                                     (954) 916-2714 Fax
                 -and-
11         MR. JOHN E. CLARK (Of Counsel)
           Goode Casseb Jones Riklin Choate &
12         Watson, P.C.
           2122 North Main Avenue
13         P.O. Box 120480
           San Antonio, Texas 78212-9680  (210) 733-6030
14                                    Fax (210) 733-0330
                 -and-
15         MS. SUSAN THOMAS

16   FOR THE DEFENDANT DEY, INC.:

17         MR. STEPHEN M. HUDSPETH
           Coudert Brothers
18         1114 Avenue of the Americas
           New York, New York 10036-7703  (212) 626-4442
19                                        (212) 626-4120
                 -and-
20         MR. STEVEN A. FLECKMAN
           Fleckman & McGlynn, P.L.L.C.
21         515 Congress Avenue, Suite 1800
           Austin, Texas 78701-3503   (512) 476-6900
22                                    (512) 476-7644 Fax

23   FOR THE DEPARTMENT OF JUSTICE:

24         MR. ANDY MAO, Civil Division
           601 D Street, N.W., Room 9929
25         Washington, D.C. 20004   (202) 616-0539
```

```
 1                    A P P E A R A N C E S  (Cont'd)

 2   FOR THE DEFENDANT ROXANE LABORATORIES, INC.:

 3            MR. GREG PIERCE
              Scott, Douglass & McConnico, L.L.P.
 4            One American Center, 15th Floor
              600 Congress Avenue
 5            Austin, Texas, 78701   (512) 495-6300
                                     (512) 474-0731 Fax
 6
     FOR THE DEFENDANT WARRICK PHARMACEUTICALS CORPORATION:
 7
              MR. C. MICHAEL MOORE
 8            Locke Liddell & Sapp, L.L.P.
              2200 Ross Avenue, Suite 2200
 9            Dallas, Texas 75201-6776   (214) 740-8000
                                         (214) 740-8800 Fax
10
     FOR THE PLAINTIFF, VEN-A-CARE OF THE FLORIDA KEYS,
11   INC.:

12            MR. ZACHARY BENTLEY

13
     ALSO PRESENT:  Mr. Richard Rienstra, Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

1   correct?

2   A.   I believe it is, yes.

3   Q.   Okay.  As chief executive officer of Dey

4   Laboratories, is there any area of the company that you

5   are not ultimately responsible for?

6   A.   Technically, no.

7   Q.   Now, you're aware that this case involves

8   price representations to Medicaid authorities, correct?

9   A.   I'm aware of that, yes, sir.

10   Q.   If those price representations were wrong, is

11   it Mr. Johnson's responsibility to make sure they were

12   correct?

13   A.   In my view, no.

14   Q.   Is it your responsibility?

15   A.   Inevitably my responsibility is to the entire

16   company, so in part, yes.  But there are other people

17   also responsible.

18   Q.   Now, you've been aware for more than two years

19   now that an issue exists regarding Dey Laboratories'

20   reports of prices to government authorities, haven't

21   you?

22   A.   I have been aware that there have been some

23   issues, yes.

24   Q.   How long have you been aware of that?

25   A.   Probably since about 1997.

1:28P

1    Q.    '97.
2    A.    Mm-hmm.
3    Q.    And how did you become aware of that?
4    A.    There were communications between our attorney, ourselves and the Department of Justice regarding a potential action, which we're still waiting to hear about.
8    Q.    Since 1997 and becoming aware that there was an issue regarding the reports of Dey Laboratories' prices to government reimbursement authorities, have you taken any direct responsibility for that -- the performance of that function on your -- by your company?
14   A.    I have not taken any direct responsibilities, no.
16   Q.    Have you taken any --
17   A.    Well, clarification: that did not already exist.
19   Q.    That did not already exist?
20   A.    Yes.
21   Q.    Have you increased your scrutiny of that area as the chief executive officer?
23   A.    I have not increased my scrutiny of that area, no.
25   Q.    Have you done anything whatsoever to make sure

```
 1        A.    To the best of my recollection this was a test
 2   whereby we -- before this time we had never sampled
 3   generic products, and in fact the industry at large did
 4   not sample generic products.  It was Homedco's belief
 5   at the time that a physician sampling program could be
 6   used to further penetrate the market with, again, our
 7   product which we felt had certain points of
 8   differentiation in the market.
 9        Q.    And 9,000 cartons, though, was that a
10   physician sampling program?
11        A.    Yes.
12        Q.    And didn't it provide for additional samples
13   based upon a percentage of sales?
14        A.    Yes, it did.
15        Q.    Did Dey Laboratories go forward with that
16   program with Homedco?
17        A.    My understanding is we did not.  This was
18   changed a number of times.  Again, I believe Mr. Mozak
19   probably has the history on this.
20        Q.    Okay.  Now, did Homedco pay, to the best of
21   your recollection, a price at or above WAC after
22   deducting all rebates, chargebacks, discounts and other
23   reductions in price?
24        A.    Again, I don't recall.
25        Q.    Did Dey Laboratories ever or Dey, Inc. ever
```

2:54P (line 9)

|       |    |                                                                            |
|-------|----|----------------------------------------------------------------------------|
|       | 1  | market the spread between reimbursement amounts and the                    |
|       | 2  | actual cost of Dey products in an effort to get                            |
|       | 3  | customers to purchase Dey Laboratories' Albuterol?                         |
| 2:56P | 4  |     MR. HUDSPETH:  Objection to form.                  |
|       | 5  |     THE WITNESS:  I'm sorry.  Could you                |
|       | 6  | repeat the question?                                                       |
|       | 7  |     MR. BREEN:  Would you please read the              |
|       | 8  | question back.                                                             |
|       | 9  |     (Requested portion was read)                       |
|       | 10 |     THE WITNESS:  To my knowledge, we did              |
|       | 11 | not.  There have been occasions where customers has --                     |
|       | 12 | have asked us to identify "the spread."  But an active                     |
|       | 13 | marketing promotion which was solely based on "the                         |
|       | 14 | spread," no.  Nor would we condone that.                                   |
|       | 15 |   Q.   (By Mr. Breen)  Have you ever heard of the AWP            |
|       | 16 | reimbursement promotion for Gerimed?                                       |
|       | 17 |   A.   I've seen that document, yes.                             |
|       | 18 |   Q.   Did you condone that program?                             |
|       | 19 |   A.   I did not.                                                |
|       | 20 |   Q.   Did anybody at Dey Laboratories condone that              |
|       | 21 | program?                                                                   |
|       | 22 |   A.   To my knowledge, no.                                      |
|       | 23 |   Q.   Was it authorized?                                        |
|       | 24 |   A.   To my knowledge, no.  But I -- again, we don't            |
|       | 25 | have records on that.                                                      |

documents?

A. These documents were provided to a congressional committee, and the congressional committee asked us questions specific to this document and we responded to those questions.

Q. Were those documents -- or are the originals of those documents or copies part of Dey's business records?

A. They're in our files, so -- I can say they're in our files.

Q. Do you know how they got in your files?

A. I presume they were inserted there by these sales staff members.

Q. And who was the most senior sales staff member that you believe today would have had anything to do with inserting those documents in Dey's files?

2:59P  A. Well, there are two names mentioned here, Mr. Bruce Tipton, who was director of national accounts, and Mr. Ross Uhl, whom I believe reported to Mr. Tipton.

Q. Okay. Do they still work for the company?

A. Neither of them do, no.

Q. When did they leave?

A. I don't recall.

Q. Do you know why they left?

1    A.    I don't.

2    Q.    If you'll go through there you'll see it's an

3 AWP reimbursement program.  Do you see that?

4    A.    I see the title on the page, yes.

5    Q.    What is an AWP reimbursement program?

6    A.    I don't know what an AWP reimbursement program

7 is.  To the extent that this document describes it --

8              MR. HUDSPETH:  That's not the word here.

9              MR. BREEN:  What is it?

10             THE WITNESS:  It's an AWP reimbursement

11 promotion.

12             MR. BREEN:  Promotion.  I'm sorry.

13 Thank you, Counsel.

14             MR. HUDSPETH:  Mm-hmm.

15   Q.    (By Mr. Breen)  What is an AWP reimbursement

16 promotion?

17   A.    Well, it appears they were contemplating a

18 promotion of one product that Dey marketed versus a

19 competitive product but a different dosage form on the

20 basis of the difference between the AWPs.

21   Q.    On the difference between the AWPs or the

22 difference between the spreads between reimbursement

23 and actual cost to the customer?

24   A.    Well, in the difference between AWPs as well.

25 I mean, that has to be part of it, yes.  Yes.

|     |     |
| --- | --- |
| 1 | A. It's unnecessary. |
| 2 | Q. Is it wrong? |
| 3 | A. I'm not saying it's wrong. It depends on what |
| 4 | the customer perceives is right. Is it illegal? I |
| 5 | don't know. I'd have to defer to counsel. |
| 6 | Q. I'm not asking if it's legal. I'm just saying |
| 7 | from your own testimony, you just told us that Gerimed, |
| 8 | which was the customer, wanted to buy product that had |
| 9 | a greater spread. Correct? |
| 10 | A. That's what the Gerimed document stated, yes. |
| 11 | Q. Vis-a-vis competing products. Correct? |
| 12 | A. That's what the Gerimed document said. |
| 13 | Q. So two members of your sales staff put |
| 14 | together a promotional package to show Gerimed that |
| 15 | they could make a bigger spread on Dey's product than |
| 16 | on Warrick's product. Correct? |
| 17 | MR. HUDSPETH: Objection to form. |
| 18 | Q. (By Mr. Breen) Is that correct? |
| 19 | A. In essence, that's what this document states. |
| 20 | Q. Okay. Is that not marketing the spread? |
| 21 | A. Marketing the spread is actually going out and |
| 22 | promoting this to customers without customers |
| 23 | requesting it. We do not create promotional materials. |
| 24 | This is not on Dey letterhead. I don't know if this |
| 25 | ever went to the customer and I have said -- again, |

3:04P (at line 19)

1  I'll repeat: I would not condone it and I do not
2  believe Bob Mozak would condone it.
3      Q.   That was my question. Is it wrong to promote
4  Dey's product over Warrick's product based upon a
5  bigger spread? That's my question.
6           MR. HUDSPETH: Objection to form.
7           THE WITNESS: In -- in my view?
8      Q.   (By Mr. Breen) Yes.
9      A.   Yes.
10     Q.   Why?
11     A.   Because it's against what Dey Laboratories
12 represents.
13     Q.   And what does Dey Laboratories represent that
14 makes that wrong?
15     A.   We treat our customers fairly. We treat our
16 products fairly. We sell our products on the merits of
17 the product -- the clinical, the safety, and the
18 product presentation itself. We do not sell on the
19 spread, period.
20     Q.   Even if it puts your company at a competitive
21 disadvantage. Is that correct?

3:05P
22     A.   Yes.
23     Q.   And do you stand by that principle?
24     A.   Of course I do.
25     Q.   Do you think that Warrick has gained market

```
1              MR. FLECKMAN:  That's okay.  Go ahead.
2       Q.   (By Mr. Breen)  If Dey reduces its WAC but
3  then takes action with a customer to preserve that
4  relationship to maintain the same spread for the
5  customer based upon the new WAC, isn't that the same as
6  marketing the spread?
7       A.   Absolutely not.  How would you presume it to
8  be marketing the spread?
9       Q.   Well --
10      A.   If -- if the WAC was raised and the price to
11 the customer was lowered, that would be marketing the
12 spread.  You're trying to enhance sales in that case by
13 creating an artificial spread.  Or if a customer has a
14 pricing situation whereby the WAC or AWP in this -- in
15 any case is higher, and yet the market price or the
16 price to the customer or the contract price is reduced,
17 that's marketing the spread.
18           Here we're not marketing the spread.
19 We're acting on behalf of the customer.  We're changing
20 our WAC, which the customer has no control over.
21 Therefore, we adjust our contract price to maintain the
22 same spread which is already lower than our
23 competition.
24      Q.   Your spread is lower than your competition?
25      A.   I believe it would be on the this particular
```