# Exhibit 128

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.,*
Civil Action No. 05-11084-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of Plaintiffs' Motion For Partial Summary Judgment
and In Opposition To Dey's Motion For Partial Summary Judgment

```
1:1                IN THE UNITED STATES DISTRICT COURT
  2                  FOR THE DISTRICT OF MASSACHUSETTS
  3     ----------------------------------X
  4     IN RE:   PHARMACEUTICAL INDUSTRY     )
  5     AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456
  6     ----------------------------------) Civil Action
  7     THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS
  8     United States of America, ex. rel. ) Hon. Patti Saris
  9     Ven-a-Care of the Florida Keys,    )
 10     Inc., v. Abbott Laboratories, Inc.,)
 11     Civil Action No. 06-11337-PBS; and )
 12     United States of America, ex. rel. ) VIDEOTAPED
 13     Ven-a-Care of the Florida Keys,    ) DEPOSITION OF
 14     Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA
 15     Action No. 05-11084-PBS; and United) DEPARTMENT OF
 16     States of America, ex. rel.        ) COMMUNITY HEALTH
 17     Ven-a-Care of the Florida Keys,    ) by JERRY
 18     Inc., v. Boehringer Ingleheim      ) DUBBERLY
 19     Corp. et. al., Civil Action        )
 20     No. 07-10248-PBS.                  ) DECEMBER 15, 2008
 21     ----------------------------------X
 22
```

```
 2:1              VIDEOTAPED DEPOSITION OF
   2                   JERRY DUBBERLY
   3
   4                 December 15, 2008
   5                    8:51 a.m.
   6
   7                75 Spring Street, SW
   8                600 U.S. Courthouse
   9                  Atlanta, Georgia
  10
  11      Jennifer D. Hamon, CCR-B-2287, RPR
  12
  13
  14
  15
  16
  17
  18
  19
  20
  21
  22
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
35:1        Q.   Would it be fair to say that in the
   2    years prior thereto, it was a gradual build-up to
   3    the 21 million level?
   4        A.   Yes.  The prior years were similar but
   5    smaller.
   6        Q.   Any particular year that you can think
   7    of where there would have been some larger than
   8    normal spike?
   9        A.   Not to my knowledge.
  10        Q.   Does -- does the State of Georgia
  11    contract out for the processing of its
  12    pharmaceutical claims?
  13        A.   We do.
  14        Q.   Can you describe who that is and how
  15    that may have changed over the years since 1991.
  16        A.   Since -- in 1991, EDS was the pharmacy
  17    benefit manager, which I'll refer to as "PBM,"
  18    that processed the pharmacy claims for their
  19    adjudication system.  So they determined the
  20    disposition status, and they applied the State's
  21    rules in terms of reimbursement rates for
  22    pharmacies.
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
36:1            That vender changed in 2000 -- I
   2    believe it was July 1st of 2000 -- when the
   3    department contracted and went live with Express
   4    Scripts to process the pharmacy claims and
   5    perform the similar functions.
   6            And then that role changed again
   7    January 1st of 2007, when the department moved to
   8    a company called SXC.
   9       Q.   But continuously from 1991 through to
  10    the present, the process has been delegated to an
  11    outside contractor?
  12       A.   The process for claims adjudication and
  13    payment, yes.
  14       Q.   Has that always been a computerized
  15    system?
  16       A.   At -- I'm not sure at what point it
  17    converted from -- from paper or -- or other means
  18    to -- to electronic, but my understanding is it
  19    has been since 1991 at least.  So --
  20       Q.   What's the approximate annual -- can
  21    you give us any sense of the approximate annual
  22    budget for the pharmacy program over the years?
```

```
76:1        Q.   Is it feasible to just set
    2  reimbursement for all NDCs at AWP minus 65
    3  percent?
    4        A.   No.  The MAC rate typically applies to
    5  generics, and generics are typically based upon
    6  pricing studies that some of the government
    7  entities have done.  There's a wider margin
    8  between the published AWP and the actual
    9  acquisition cost for those drugs.
   10             (Whereupon a document was
   11  identified as Exhibit Georgia 014.)
   12        Q.   (By Mr. Lavine)  I just marked as
   13  Exhibit 14 a two-page document.  It reflects at
   14  the top "Department of Health and Human Services"
   15  with a date of April 12th, 1994, with a document
   16  number at the lower right-hand side of HHC902-
   17  0878.
   18             I'll just ask you to take a look at
   19  that and then tell me if you recognize that
   20  document.
   21        A.   I have seen it before.
   22        Q.   Can you take a look at the next-to-last
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
77:1    paragraph on page 2 starting with, We would also
   2    clarify our policy that a dispensing fee
   3    determination must be separate and distinct from
   4    the estimated acquisition cost determination --
   5         A.   Yes.
   6         Q.   -- and unrelated to the cost of the
   7    drug product.
   8         A.   Yes.
   9         Q.   Is -- is the state plan for Georgia
  10    Medicaid program consistent with that statement?
  11              MR. COLE:  Object to the form.
  12         A.   The acquisition cost and the dispensing
  13    fee are separately approved by CMS and our state
  14    plan.
  15         Q.   (By Mr. Lavine)  And does Georgia also
  16    have a policy known as a "most favored nation"
  17    regarding -- that applies to dispensing fees?
  18         A.   We do.
  19         Q.   Can you explain that.
  20         A.   The most favored nation requirement is
  21    that a pharmacy must pass along to the department
  22    the lowest reimbursement methodology that it
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
83:1         A.   Not to my knowledge.
   2         Q.   So are the people who handle the rebate
   3    program for Georgia Medicaid separate from the
   4    people in charge of the reimbursement policy?
   5         A.   Yes, they are.
   6         Q.   Are they also within the pharmacy
   7    division?
   8         A.   We have one state employee who works
   9    managing a vendor who does all of the intricacies
  10    of invoicing and dispute resolution and -- and
  11    that sort of effort.
  12              So there's one employee at the State.
  13    And then we contract with a separate entity from
  14    the pharmacy benefit management company to handle
  15    rebates for us.
  16         Q.   And the one employee you just
  17    described, that's in connection with managing the
  18    rebate program.
  19         A.   Right.
  20         Q.   Are you aware -- are you aware of any
  21    confidentiality restrictions on the use of the
  22    AMP data?
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
84:1        A.   AMP is a confidential number that we
   2   are not allowed to publish.
   3        Q.   Do you know if the agreement between
   4   the Federal Health and Human Services and the
   5   manufacturers includes any language on that, on
   6   the confidentiality?
   7        A.   I've -- I've never seen the language.
   8   I would assume there is, but I have not seen the
   9   language.
  10        Q.   Does the State of Georgia generally
  11   receive the actual AMP data from the federal
  12   government?
  13             MR. ROBBEN:  Object to the form.
  14        A.   The AMP data is submitted to our rebate
  15   vendor.  We don't typically receive AMP data at
  16   the State, with the exception of the draft data -
  17   - the draft AMP data that CMS was publishing
  18   subsequent to the DRA.
  19        Q.   (By Mr. Lavine)  Has the State of
  20   Georgia ever tried to reverse engineer AMP data
  21   to help establish an estimated acquisition cost?
  22             MR. ROBBEN:  Object to the form.
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
85:1          A.   No, we have not.
   2          Q.   (By Mr. Lavine)  Has the State of
   3    Georgia ever used AMP data to establish
   4    reimbursement amounts?
   5          A.   No, we have not.
   6          Q.   Is it the understanding of Georgia that
   7    the State would be allowed to use AMP data for
   8    establishing reimbursement rates?
   9          A.   I know of no explicit restriction.
  10    However, operationally it would be very
  11    difficult.
  12          Q.   What about the confidentiality
  13    requirements?
  14          A.   That's -- that's where it would be very
  15    -- it would be difficult.  You could reimburse.
  16    You could -- you could use AMP arguably to
  17    reimburse, but you would have to tell the
  18    pharmacy you're reimbursing off a price you can't
  19    tell them, and then arguably they can reverse
  20    engineer in to identify what the AMP is.  So --
  21          Q.   The end result being it would violate
  22    the confidentiality provisions?
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
86:1        A.   That's probably where the attorneys --
   2   that's probably where the attorneys would end up
   3   with it.  But from a -- from a -- from my
   4   standpoint, I don't know of anything that says
   5   you shall not use AMP in reimbursement
   6   methodologies.
   7        Q.   You're basing your conclusion on the
   8   idea that the data -- the AMP information needs
   9   to be maintained confidentially.
  10        A.   AMP does need to be maintained
  11   confidentiality -- confidential.
  12             MR. LAVINE:  What number are we on?
  13             THE COURT REPORTER:  15.
  14               (Whereupon a document was
  15   identified as Exhibit Georgia 015.)
  16        Q.   (By Mr. Lavine)  Let me show you what
  17   I've marked as Exhibit 15.  It's a letter dated
  18   January 1, 2007 on the letterhead of CMS directed
  19   to a Gwendolyn Donnell at First Health Service
  20   Corporation.
  21             Do you know who Gwendolyn Donnell is?
  22        A.   Ms. Dunwell is the --
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
206:1              And if you turn to page 2 of 3, which
   2     is the third page of the exhibit, at the top,
   3     there's a -- there's sort of questions down the
   4     page, and the top one is 3.
   5              And it says, If your reimbursement
   6     formula contains some form of estimated
   7     acquisition cost (WAC, EAC), please define how
   8     you determine this cost.
   9              Do you see that?
  10         A.   I do.
  11         Q.   And then written in, it appears to me
  12     it says, "Survey of area wholesalers."
  13              Do you see that?
  14         A.   It does.
  15         Q.   Do you know what that refers to?
  16         A.   No.
  17         Q.   But as far as you know sitting here
  18     today, there wasn't any survey of wholesalers.
  19         A.   I have no -- no files or history of a
  20     survey of wholesalers.
  21         Q.   Okay.  That's all I have for that.
  22              We talked -- you and Mr. Lavine talked
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
207:1    earlier today about the MAC, the GMAC.
   2         A.   Right.
   3         Q.   And I believe you said that the GMAC is
   4    something that's prepared by the PBM pursuant to
   5    a proprietary formula.
   6         A.   True.
   7         Q.   Is it proprietary as to Georgia
   8    Medicaid as well?  In other words, does -- does
   9    Georgia Medicaid not know the formula?
  10         A.   I do not know the formula.
  11         Q.   Is that something that the PBM holds
  12    confidential as to Georgia Medicaid?
  13         A.   They do.
  14         Q.   Have they given Georgia Medicaid any
  15    visibility into what the resulting price is as
  16    compared to other measures?
  17              MR. LAVINE:  Object to form.
  18         A.   Yes.
  19         Q.   (By Mr. Robben)  And was that the AWP
  20    minus 65 or 70 percent you mentioned earlier
  21    today?
  22         A.   Yes.
```

```
208:1       Q.   Is -- is that -- is it guaranteed to be
    2   65 or 70 percent below AWP for every GMAC?
    3       A.   No.
    4       Q.   So for some it might be different.
    5       A.   Yes.
    6       Q.   Is the 65 to 70 percent below AWP an
    7   average or some type of aggregate figure?
    8       A.   It's an aggregate figure.
    9       Q.   Do you have knowledge sitting here
   10   today on behalf of Georgia Medicaid as to when
   11   that GMAC component of the reimbursement formula
   12   was first implemented?
   13            MR. LAVINE:  Object to form.
   14       A.   I do not.
   15       Q.   (By Mr. Robben)  Do you know -- strike
   16   that.
   17            Was -- is the current GMAC formula
   18   proprietary?
   19       A.   It is.
   20       Q.   And was Express -- did Express Scripts
   21   also have a GMAC?
   22       A.   They did.
```

```
209:1         Q.    And was it proprietary as well?
   2          A.    It was.
   3          Q.    Was there continuity between the two
   4    PBMs, or did they each bring their own GMAC
   5    formula to the table?
   6          A.    They each brought their own.
   7          Q.    When SXC -- is that -- do I have it
   8    correct, SXC?
   9          A.    SXC.
  10          Q.    Okay.  When SXC took over as the PBM
  11    for the Georgia Medicaid program, did the MACs
  12    substantially change from what they had been
  13    under the Express Scripts regime?
  14          A.    Not drastically in aggregate, no.
  15          Q.    Did they -- did they tend to go up or
  16    down, or did they sort of vary?
  17          A.    They varied.
  18          Q.    Has Georgia Medicaid given the PBMs
  19    some guidance as to how they want the MACs set?
  20          A.    Yes.  We've advised them that we want
  21    the -- the max somewhere around AWP minus 65
  22    percent in aggregate whenever you look at the --
```

Dubberly, Jerry - December 15, 2008 08:51:00 a.m.

```
210:1    when you look at the whole picture.
   2         Q.   So that -- that's their marching
   3    orders, so to speak.
   4              MR. LAVINE:  Object to form.
   5         A.   That's their -- the litmus test as to
   6    whether they're in a reasonable range.
   7         Q.   (By Mr. Robben)  Do you have the right
   8    -- or does Georgia Medicaid have the right,
   9    rather, to -- let me strike that.
  10              Is there a process that Georgia
  11    Medicaid undertakes to ensure itself that the
  12    MACs that are being set by the PBMs do in fact
  13    reach the litmus test level of AWP minus 65
  14    percent?
  15         A.   Only by exception if we hear a
  16    complaint from the provider, but no routine, no.
  17         Q.   You had spoken earlier today about a
  18    circumstance where the MAC -- GMAC had to be
  19    adjusted upward.
  20              Do you remember that?
  21         A.   Correct.
  22         Q.   Can you explain that a little bit more.
```