# Exhibit 132

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*,
Civil Action No. 05-11084-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of Plaintiffs' Motion For Partial Summary Judgment
and In Opposition To Dey's Motion For Partial Summary Judgment

Weeks, Lisa - October 21, 2008 09:15:00 a.m.

```
 1:1                UNITED STATES DISTRICT COURT
   2                  DISTRICT OF MASSACHUSETTS
   3   ---------------------------------x
   4   In Re:  PHARMACEUTICAL INDUSTRY    ) MDL No. 1456
   5   AVERAGE WHOLESALE PRICE LITIGATION ) Civil Action
   6   ---------------------------------x 01-12257-PBS
   7   THIS DOCUMENT RELATES TO:          )
   8   United States of America, ex rel.  ) Hon. Patti B.
   9   Ven-A-Care of the Florida Keys,    )   Saris
  10   Inc., v. Abbott Laboratories, Inc.,)
  11   Civil Action No. 06-11337-PBS      )
  12   and United States of America ex    ) Video 30(b)(6)
  13   rel. Ven-a-Care of the Florida     ) Deposition of
  14   Keys, Inc., v. Dey, Inc., et al.,  ) State of North
  15   Civil Action No. 05-11084-PBS      ) Carolina Dept.
  16   and United States of America ex    ) of Health &
  17   rel. Ven-a-Care of the Florida     ) Human Services
  18   Keys, Inc., v. Boehringer          ) by Lisa Weeks
  19   Ingelheim Corp., et al., Civil     )
  20   Action No. 07-10248-PBS            ) Raleigh, NC
  21   ---------------------------------x October 21, 2008
  22   Reporter: Marisa Munoz-Vourakis-RMR, CRR, Notary Public
```

```
2:1              Video Deposition of THE NORTH CAROLINA
  2     DEPARTMENT OF HEALTH AND HUMAN SERVICES by LISA WEEKS,
  3     taken by the Plaintiffs, at the US Attorney's Office,
  4     310 New Bern Avenue, Terry Sanford Building, Raleigh,
  5     North Carolina, on the 21st day of October, 2008 at
  6     9:15 a.m., before Marisa Munoz-Vourakis, Registered
  7     Merit Reporter, Certified Realtime Reporter and Notary
  8     Public.
  9
 10
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
```

Weeks, Lisa - October 21, 2008 09:15:00 a.m.

```
45:1        Q.   You talked about another component of
   2   the formula, the state maximum allowable cost?
   3        A.   Yes.
   4        Q.   Could you describe what that means?
   5        A.   It's a state specific limit on generic
   6   drugs that have more than two generics available.
   7        Q.   And how does a state maximum allowable
   8   cost affect the reimbursement formula?
   9             MR. KATZ:  Objection to form.
  10        A.   It's one of the reference prices that
  11   we use when we process a claim.
  12        Q.   And if you could clarify the formula.
  13   You mentioned the various components of the
  14   formula.  How do they -- how does the claims
  15   processing know which basis to pay a claim?
  16        A.   The claims processing systems selects
  17   the lower or the lowest of the previously
  18   mentioned pricing methodology, AWP minus ten
  19   percent, the federal upper limit, the state
  20   maximum allowable cost list or usual and
  21   customary.
  22        Q.   Does the state maximum allowable costs
```

```
46:1   apply to all drugs?
   2        A.   No, just generics with more than two
   3   generics available.
   4        Q.   And how does the state determine the
   5   state maximum allowable cost for each drug?
   6        A.   Well, to begin with, we have an
   7   actuarial services contractor, Mercer, who
   8   maintains and monitors it for us.  But there's a
   9   specific methodology they use to determine the
  10   price for these drugs.
  11        Q.   And what is that methodology?
  12        A.   It is based on 150 percent of the cost
  13   of the lowest cost generic.  And if that cost is
  14   lower than the second lowest cost, then ten
  15   percent is added to that.
  16        Q.   Added to what?
  17        A.   To the cost of that drug.
  18        Q.   To the first lowest or the second
  19   lowest?
  20        A.   The second lowest.
  21        Q.   And when you say the lowest cost, what
  22   is the source for cost?
```

Weeks, Lisa - October 21, 2008 09:15:00 a.m.

```
47:1         A.    Again, Mercer has a proprietary
   2    database that they use that has AWPs.
   3         Q.    And so how does that relate -- do they
   4    use that in determining the state maximum
   5    allowable cost?
   6         A.    Yes, they use the AWPs from that
   7    database.
   8         Q.    In what way do they use the AWPs?
   9         A.    They are determining the cost of the
  10    drugs so they can develop the cost for the MAC
  11    drugs.
  12         Q.    When did the State of North Carolina
  13    first implement the MAC list?
  14         A.    2001.
  15         Q.    Has the formula for setting the MAC
  16    been the same to the present time?
  17         A.    Yes.
  18         Q.    Why did the State of North Carolina
  19    begin the MAC program?
  20         A.    The state developed and implemented
  21    that program to -- as a cost containment measure
  22    for pharmacy.
```

Weeks, Lisa - October 21, 2008 09:15:00 a.m.

```
48:1         Q.   And I think you said in 2001?
   2         A.   Yes.
   3         Q.   And why did it begin it in 2001?
   4         A.   Because pharmacy had become the number
   5    one line item and had been so for the last
   6    several years before that time.
   7         Q.   And what does that have to do with
   8    creating the MAC program?
   9         A.   The MAC program reduces expenditures
  10    for pharmacy.
  11         Q.   And let's talk a little bit about how
  12    North Carolina went about developing the MAC
  13    program.
  14              Did North Carolina do it all by itself?
  15         A.   No, again, the state used Mercer.
  16         Q.   And what's Mercer?
  17         A.   Again, it's the actuarial services
  18    contract vendor for the state, and also there was
  19    input from pharmacy providers.
  20         Q.   And did Mercer, did Mercer make
  21    proposals that the state then reviewed?
  22         A.   Yes, I believe so.
```

Weeks, Lisa - October 21, 2008 09:15:00 a.m.

```
49:1         Q.   And why did the state turn to Mercer
   2    for this work?
   3         A.   Because Mercer had the expertise.
   4         Q.   And ultimately was the Mercer plan
   5    reviewed and approved by the state?
   6         A.   Yes.
   7         Q.   You mentioned that the formula provides
   8    for 150 percent of the lowest priced generic,
   9    unless that is lower than the second lowest
  10    generic, is that correct?
  11         A.   Yes.
  12         Q.   In which case you would add ten percent
  13    to the second lowest generic.  Did I state that
  14    correctly?
  15         A.   That's right, yes.
  16         Q.   Why would North Carolina provide for
  17    that second option?  Why wouldn't you just use
  18    150 percent of the lowest price generic?
  19         A.   Because the state tries to cover the
  20    cost to the pharmacy provider for the drug.
  21         Q.   And why would 150 percent of the lowest
  22    price generic not do that?
```

```
112:1    the units utilized of a drug, the manufacturer
    2    will pay a rebate per unit amount.
    3         Q.   And have you ever -- are you familiar
    4    with the term average manufacturer's price or
    5    amp?
    6         A.   I mean, I'm somewhat familiar with it.
    7         Q.   Would the state be familiar with that
    8    term?
    9         A.   Yes.
   10         Q.   And has the state ever used -- does the
   11    state use amp data?
   12              MR. KATZ:  Objection to form.
   13         A.   No.
   14         Q.   Does the state have amp data?
   15              MR. KATZ:  Objection, form.
   16         A.   No, the only relevance to amp is the
   17    unit rebates that we get on the CMS tape.  That's
   18    the only thing that the state has anything to do
   19    with amp, and that goes to CMS.  So I would say
   20    the state doesn't have amps.
   21         Q.   And has the state ever used the unit
   22    rebate amounts for purposes of determining claim
```

```
113:1   reimbursement amounts?
    2       A.   No.
    3       Q.   And why not?
    4       A.   Well, first of all, that's confidential
    5   information.  We treat it very confidentially,
    6   because it's a requirement in Section 1927 of the
    7   Social Security Act that it's kept confidential.
    8   So we treat it very confidentially, and the
    9   process isn't -- we can't use those in claims
   10   processing.
   11            MS. YAVELBERG:  I'd like to show you --
   12   I'd like to mark this as Exhibit 14.
   13            (The document referred to was
   14   marked Plaintiff's Exhibit Weeks 014 for
   15   identification.)
   16       Q.   Ms. Weeks, if you will take a minute to
   17   look that document over.
   18            (Pause.)
   19       A.   Okay.
   20       Q.   This is a document dated January 2002
   21   called notice of price change.
   22            First, let me ask a general question.
```

```
335:1              MS. YAVELBERG:  Objection, form.
    2         A.   I don't understand what your question
    3    is about Dey.
    4         Q.   Were there any discussions among any of
    5    the North Carolina Medicaid agency officials as
    6    to what Dey considered AWP to be?
    7              MS. HAYES:  Objection.
    8              MS. YAVELBERG:  Objection, form.
    9         A.   No, I don't believe so.
   10    BY MR. KATZ:
   11         Q.   Because here Dey is telling North
   12    Carolina Medicaid what it considers AWP to be, so
   13    I'm asking whether or not you are aware of any
   14    discussion where that was actually discussed?
   15              MS. YAVELBERG:  Objection, form.
   16              MS. HAYES:  Objection.
   17         A.   I don't know that it was discussed.
   18    Again, we don't pay much attention to these
   19    things when they come in.
   20         Q.   Do you think something like this would
   21    be important where Dey tells the North Carolina
   22    Medicaid agency that as you know, the AWP listed
```

```
336:1   here does not represent any actual price which
    2   will be or has been charged or paid for this
    3   product?
    4           MS. YAVELBERG:  Objection, form.
    5       A.  Okay.  We use AWP in North Carolina.
    6   AWP is in First Data Bank, and we can't bother
    7   the AWP that's in our file.  If we receive such a
    8   thing, we couldn't do anything with it.  We don't
    9   use these for anything.  We use our drug file for
   10   pricing claims.
   11       Q.  When price notification letters are
   12   received by North Carolina Medicaid, does someone
   13   actually read them, or are they immediately
   14   thrown in the trash?
   15           MS. HAYES:  Objection.
   16           MS. YAVELBERG:  Objection to form.
   17       A.  We don't use the information, because
   18   it's already available to us in the drug file, if
   19   it's AWP information.
   20           If it's WAC information, we can't use
   21   it either, because we don't price under WAC.  So
   22   there's no usefulness.  We can't change anything
```

Weeks, Lisa - October 21, 2008 09:15:00 a.m.

```
337:1   based on these notifications.
    2       Q.   That really wasn't my question.
    3            My question is if you did receive a
    4   letter like this --
    5       A.   If we did, okay.
    6       Q.   -- would someone at the North Carolina
    7   Medicaid agency read through this letter?
    8            MS. HAYES:  Objection.
    9            MS. YAVELBERG:  Objection to form.
   10       A.   Probably not.  Probably would not pay a
   11   whole lot of attention to it.  Again, we don't
   12   use this for anything.  We use our file for
   13   pricing drugs.
   14       Q.   I understand that, but, I mean, there's
   15   more than just prices in this letter.  There's
   16   also a discussion of AWP and WAC in the letter.
   17            I mean, would, when receiving this
   18   letter, whoever receives it read through the
   19   entire letter to see whether or not there's
   20   anything important that the North Carolina
   21   Medicaid agency might need to know?
   22            MS. YAVELBERG:  Objection to form,
```

Weeks, Lisa - October 21, 2008 09:15:00 a.m.

```
338:1   asked and answered.
    2         MS. HAYES:  Objection, the witness has
    3   repeatedly testified that she does not know if
    4   the agency received this letter.
    5         MR. KATZ:  My question is if it did
    6   receive this letter.
    7         MS. YAVELBERG:  Objection, form, asked
    8   and answered.
    9      A.   I don't know if North Carolina Medicaid
   10   received this letter, and when we receive letters
   11   of this nature, we do not pay attention to them
   12   because we don't use the information.  If you
   13   want to get our attention, you need to do it in a
   14   better way than this.
   15      Q.   Let me just do this, have you ever had
   16   any communications with any representatives of
   17   Dey?
   18      A.   Like pharmaceutical representatives?
   19   Drug reps?
   20      Q.   Any representatives?
   21         MS. HAYES:  Just for clarification, are
   22   you asking about her personally, or as the state
```