UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ) ) | Subcategory No. 06-cv-11337-PBS (Doc. No. 6291) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corporation, Inc., et al.,* CIVIL ACTION NO. 07-10248-PBS ) ) ) ) | Hon. Patti B. Saris Magistrate Judge Marianne B. Bowler |

**UNITED STATES' NOTICE OF FILING OF A CORRECTED
EXHIBIT 27 TO THE DECLARATION OF JAMES J. FAUCI SUBMITTING
EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGEMENT AND IN OPPOSITION TO THE ROXANE
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGEMENT**

The plaintiff United States of America hereby submits a Corrected Exhibit 27 to the Declaration of James J. Fauci Submitting Exhibits in Support of Plaintiff's Motion for Partial Summary Judgement and in Opposition to the Roxane Defendants' Motion for Partial Summary Judgement.

                                    Respectfully submitted,

                                    MICHAEL K. LOUCKS
                                    ACTING UNITED STATES
                                    ATTORNEY

                    By:    */s/ James J. Fauci*
                                James J. Fauci
                                Assistant U.S. Attorney
                                United States Courthouse
                                1 Courthouse Way, Suite 9200
                                Boston, MA 02210
                                (617) 748-3298

**CERTIFICATE OF SERVICE**

      I hereby certify that I have this day caused an electronic copy of the above document and related exhibits to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

                                                           /s/ James J. Fauci  
Dated: July 30, 2009                                        James J. Fauci

# Exhibit 27

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

# Condensed Transcript

# Deposition of Roxane 30(b)(6) Judy Waterer

taken on
May 9, 10 and 11, 2007

**State of Alabama
v.
Abbott Laboratories, Inc., et al.**

**Case No. 2005-219**



**Certified Court Reporters and Certified Legal Video Specialists**
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com

Judy Waterer
May 9, 2007

Page 1

```
 1           IN THE CIRCUIT COURT OF
           MONTGOMERY COUNTY, ALABAMA
 2
    STATE OF ALABAMA,
 3       Plaintiff,
    vs.              CIVIL ACTION NO. 2005-219
 4  ABBOTT LABORATORIES, INC.,
    et al.,
 5       Defendants.
 6  ------------------------------------
 7    IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
               STATE OF HAWAII
 8
    STATE OF HAWAII,
 9       Plaintiff,
    vs.              CIVIL NO. 06-1-0720-04 EEH
10  ABBOTT LABORATORIES, INC.,
    et al.,
11       Defendants.
12  ------------------------------------
13         UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
14
    THE COMMONWEALTH OF MASSACHUSETTS,
15       Plaintiff,
    vs.              C.A. NO. 03-11865 PBS
16  MYLAN LABORATORIES, INC.,
    et al.,
17       Defendants.
18    *    *    *    *    *    *    *    *
19                VOLUME I
20    The videotaped deposition of JUDY WATERER,
    VOLUME I, was taken before Cornelia J.
21  Baker, Certified Court Reporter and
    Certified Shorthand Reporter, as
22  Commissioner, on Wednesday, May 9, 2007,
    commencing at approximately 10:13 a.m., in
23  the law offices of Kirkland & Ellis, 153
    East 53rd Street, New York, New York
24  pursuant to the stipulations set forth
    herein.
25
```

Judy Waterer
May 9, 2007

```
                                                              Page 2
 1      *     *     *     *     *     *     *
 2                    APPEARANCES
 3
 4   Representing the State of Alabama:
 5            MR. CLINTON C. CARTER
              Attorney at Law
 6            Beasley, Allen, Crow, Methvin,
                 Portis & Miles, P.C.
 7            272 Commerce Street
              Montgomery, Alabama   36104
 8
 9   Representing the State of Massachusetts:
10            MR. RICHARD C. HEIDLAGE
              MR. ROBERT C. MOLVAR
11            Attorneys at Law
              The Commonwealth of Massachusetts
12            One Ashburton Place
              Boston, Massachusetts   02108
13
14   Representing the State of Hawaii:
15            MR. MICHAEL WINGET-HERNANDEZ
              Attorney at Law
16            Winget-Hernandez, L.L.C.
              3112 Windsor Road, #228
17            Austin, Texas   78703
18
19   Representing Roxane Laboratories, Inc:
20            MS. HELEN E. WITT
              Attorney at Law
21            Kirkland & Ellis, L.L.P.
              200 East Randolph Drive
22            Chicago, Illinois   60601
23
24
25
```

Judy Waterer
May 9, 2007

Page 62

1         A.  I believe so.  And again, we
2    need to discuss price, not contract price.
3         Q.  Is it fair to say that since
4    1991, Roxane has reported prices to First
5    DataBank?
6         A.  I believe so.
7         Q.  These prices reported to First
8    DataBank are reported electronically,
9    correct?
10        A.  I'm not sure.  In fact, I am
11   sure, because it -- well, it may be
12   electronic now.  In the '90s, we used to get
13   paper copies to go through and correct and
14   mail back, so it hasn't always been
15   electronic.
16        Q.  Tell me about this process in
17   the '90s where you got copies and you
18   corrected it and sent them back.
19        A.  The pricing compendia would
20   occasionally send us a voluminous report and
21   say, Please check this for accuracy.  And we
22   would go through and verify if their records
23   matched our records.  And if they didn't,
24   we'd cross it out and put in the correct
25   price, as we knew it, and send it back and

Judy Waterer
May 9, 2007

Page 63

1  hope that they would adjust it.
2       Q.  These voluminous reports would
3  have the prices that Roxane reported,
4  correct?
5       A.  Yes -- well, it wasn't always
6  accurate.  But more often than not, yes.
7       Q.  And these third-party compendia
8  would send the prices to Roxane and say,
9  Roxane, verify these prices, tell us if
10 they're correct, and if they're incorrect,
11 change them accordingly; is that right?
12      A.  In the mid '90s, yes.
13      Q.  And Roxane would do that?
14      A.  Yes.
15      Q.  And you were a part of that
16 process?
17      A.  Indirectly, but yes.
18      Q.  Do you know if that
19 specifically happened with First DataBank?
20      A.  I don't remember which one sent
21 it.
22      Q.  Are you familiar with the term
23 "National Drug Data File"?
24      A.  No.
25      Q.  Why does Roxane report prices

Page 104

1            Q.   So it's your testimony that
2   Roxane has never concerned itself with the
3   competitor's price and tried to market the
4   spread to gain market share away from that
5   competitor?
6            A.   It -- again, on a very rare
7   instance, there may have been something that
8   had to do with the difference in AWPs.  It
9   would not be our general practice.  It would
10  be a very rare occasion.
11           Q.   But it has happened, correct?
12           A.   Okay.  Give me the question
13  again, because I want to make sure it's very
14  specific.
15           Q.   Has Roxane ever concerned
16  itself with marketing the spread to the
17  extent that it attempted to market the spread
18  and gain market share from a competitor?
19                MS. WITT:  Object to the form.
20           A.   It's possible.
21           Q.   It's very possible, isn't it?
22                MS. WITT:  Object to the form.
23           A.   I don't have any -- I can't
24  recollect that.
25           Q.   I mean, there's no purpose in

Page 105

1  marketing the spread other than to gain
2  market share, correct?
3         A.  What do you mean when you say
4  "market the spread"?
5         Q.  You don't know what that means?
6         A.  I want to make sure that it
7  means the same to both of us.  I've heard it
8  defined different.
9         Q.  You tell me what it means.
10        A.  When I hear the term "market
11 the spread," being a marketing person, I
12 think that it is an active initiative, a
13 directive to go out and make this your
14 standard process for selling.
15        Q.  And Roxane has utilized that
16 tactic, correct?
17        A.  I believe there may have been a
18 few instances of it, yeah.  I don't recall
19 any specifics.
20        Q.  What's an FUL?
21        A.  Don't know.
22        Q.  Ever heard the term "federal
23 upper limit"?
24        A.  I may have.  I don't remember.
25        Q.  Speaking on behalf of Roxane,

```
 1   price change, correct?
 2           A.  Yes.
 3           Q.  In fact, the first line says,
 4   Effective March 16, 1998, Roxane
 5   Laboratories, Inc., will be announcing a
 6   broad-line Wholesaler Acquisition (WAC)
 7   change, correct?
 8           A.  Yes.
 9           Q.  Did Roxane make a corresponding
10   change to the AWP prices as well?
11           A.  In conjunction with this
12   particular change, I don't believe so.
13           Q.  Do you think it was appropriate
14   for Roxane to change the WAC and yet leave
15   the AWP the same?
16              MS. WITT:  Object to the form.
17           A.  I think the industry norm is to
18   keep the AWP consistent with the industry
19   norm, so they're unrelated.
20           Q.  And the main thrust between
21   changing the WAC price here was to bring it
22   in line with the WACs of competitors,
23   correct?
24           A.  No.
25           Q.  Well, what was the main thrust
```

Judy Waterer
May 9, 2007

Page 153

```
 1   this, we were looking for anyplace that we
 2   would have a significant negative impact to
 3   us.  And it was suggested that that be looked
 4   into.  We looked into it, and it was
 5   basically neutral or not a problem.
 6           Q.  And then on the next pages are
 7   the price listing themselves, correct?
 8           A.  Yes.
 9           Q.  There's a column that says,
10   Current Pricing and a column that says, New
11   Pricing, correct?
12           A.  Yes.
13           Q.  And I haven't looked at all of
14   them, but looks like generally the current
15   AWP price and the new AWP price are the same,
16   correct?
17           A.  I think so.
18               (Witness reviewed document.)
19           A.  Yes.
20           Q.  Do you know whether or not
21   Plaintiffs' Exhibit 7 was given to First
22   DataBank?
23           A.  They would not have had an
24   internal document.  And depending on when it
25   occurred, it may or may not have been
```

1  reported.  We stopped reporting WAC around
2  this time.  So if I'm thinking it through,
3  they may not have gotten this, because this
4  was somewhere around the same time frame when
5  we stopped reporting WAC.  So I would guess
6  not.
7           Q.  It's very possible that these
8  WAC price changes were not reported at all to
9  the third-party compendia, correct?
10          A.  If this occurred after we made
11 a corporate decision to discontinue reporting
12 WAC pricing, we wouldn't have reported any
13 WAC changes to the pricing compendia,
14 correct.
15          Q.  And Roxane would not have
16 reported these WAC price changes directly to
17 state Medicaid agencies, correct?
18          A.  To the extent that it's the
19 three that we're talking about, I do not
20 believe that there were any communications
21 about WAC pricing, period.  So I don't think
22 that there would have been any reason to send
23 them something about WAC pricing.
24          Q.  It's your testimony on behalf
25 of Roxane that the WAC price changes

Page 162

1  meant.
2          Q.  Well, let's forget what Anthony
3  meant for a second.  Interpret it for me on
4  behalf of Roxane, this term "lower our price
5  to meet the spread."
6          A.  I would have to assume that
7  they were looking for a lower bid price so
8  that our product would end up being equally
9  profitable to whoever else they were bidding
10 with.  And if our AWP was out of line with
11 our competitors, one way to do it might be to
12 lower our bid price.
13         Q.  And by meeting the spread,
14 could that mean the difference between what a
15 pharmacist paid for the drug and what the
16 pharmacist was reimbursed for by a state
17 Medicaid agency?
18         A.  I don't think it specifies any
19 agency in particular.  I would think any
20 reimburser whose program was tied to AWP in
21 some way could be impacted by that.
22         Q.  Which would include state
23 Medicaid agencies, correct?
24         A.  I, I am understanding that some
25 state Medicaid agencies in some cases tie to

Judy Waterer
May 9, 2007

Page 163

```
 1   AWP.
 2            Q.  So the answer to my question is
 3   yes, correct?
 4            A.  With regard to the three here
 5   in particular, I'm not certain if they're
 6   AWP-driven or driven by something else.  So
 7   in a broad general sense, if someone is in
 8   a -- has a reimbursement plan that in some
 9   way is linked to AWP, the answer is yes.  But
10   I don't know which customers -- or I'm sorry,
11   which reimbursers that might be.
12            Q.  All right.  Let me show you
13   what I'm going to mark as Plaintiffs' Exhibit
14   10.  Take a second, please, ma'am, and tell
15   me if you recognize that.
16                 (Whereupon Plaintiffs' Roxane
17                  Waterer No. 10 was marked for
18                  identification and attached
19                  hereto.)
20                 (Witness reviewed document.)
21            A.  No.
22            Q.  Who is Don Comston?
23            A.  Don Comston was in the finance
24   department at --
25            Q.  And I think you've told me
```

Judy Waterer
May 9, 2007

Page 180

```
 1   correct?
 2           A.  Again, I'll have to say that is
 3   not what AWP is, so of course, it wouldn't.
 4           Q.  And Roxane did nothing to
 5   communicate to the state Medicaid agencies
 6   that there was a discount of 35 percent or
 7   45 percent or 60 percent off of the reported
 8   price, correct?
 9           MS. WITT:  Object to the form.
10           A.  I don't believe that Roxane
11   reported any pricing to the three state
12   Medicaid groups that we're talking about.  So
13   I would have to say, yes, that's correct.
14           Q.  And whatever this discount
15   ended up being, 35 percent, 45 percent, 60
16   percent, that is a contractual discount that
17   Roxane tries to keep confidential, correct?
18           A.  Yes.
19           Q.  It's not something that's
20   publicly available, and it's not something
21   that the state Medicaid agencies could have
22   ever found out about, correct?
23           A.  I don't know about ever found
24   out about.  I would have to believe that --
25   we've had a general practice of cooperating
```

Judy Waterer
May 9, 2007

Page 213

1  reported WAC was for Roxane drugs from First
2  DataBank after you stopped reporting them,
3  and you said you thought First DataBank
4  reported WAC as a zero, but you weren't sure,
5  correct?
6       A.  I'd have to go back and put
7  that in context.  There was, to the best of
8  my recollection, quite a bit of going back
9  and forth with, I believe it was First
10 DataBank, over the fact that they were not
11 reporting it properly.  And we did our level
12 best to get them to report things accurately.
13      Q.  But, but this e-mail clearly
14 states that if you stopped supplying First
15 DataBank with WACs, that they would publish
16 the old WACs, correct?
17           MS. WITT:  Object to the form.
18      A.  She informed me that the states
19 would use the last published WACs.  So she
20 said the states will use the WAC -- the old
21 WAC, for Medicaid.
22      Q.  Right.  So Roxane knew back in
23 December of 1997 that even though they were
24 not reporting a WAC to First DataBank that
25 First DataBank was publishing the old WACs,

Page 214

1   and that state Medicaid agencies were relying
2   on them, correct?
3           A.   I didn't know what they were
4   relying on them for.  It just says that they
5   are going to continue to report that.
6                I believe that the later
7   documents show that we did our level best to
8   try to have the pricing compendia report
9   things -- or stop reporting inaccurate data.
10          Q.   Is it really your testimony
11  that Roxane didn't know that states used the
12  reported WAC for their reimbursement system?
13          A.   I didn't know a lot about
14  reimbursement of states.  It just -- Medicaid
15  was a very small percentage of our business.
16  And it -- to me, when somebody said Medicaid,
17  it meant the rebate that we had to pay.
18          Q.   Well, this e-mail is not
19  discussing rebates, is it?
20          A.   It just says that that's what's
21  going to get reported to Medicaid.  I don't
22  know what that means Medicaid's going to do
23  with it.
24          Q.   Well, sitting here today, you
25  understand that state Medicaid agencies, like

Judy Waterer
May 9, 2007

Page 387

1  Marinol, as a branded product, I would expect
2  that they would take annual price increases
3  consistent with the pharmaceutical CPI.
4  However, I don't recall any specific
5  knowledge of that occurring.
6         Q.  Okay.  Well, as far as you
7  personally, your personal knowledge, are you
8  suggesting, as I think you are, that in the
9  case of a branded product, the AWP is set
10 differently than the way that the AWP is set
11 in the generic world?
12        A.  I'm not sure what you mean by
13 that.
14        Q.  Can you tell me whether --
15 strike that.
16             Yesterday, I believe you
17 testified that for generic products,
18 typically the AWP is set at about 10 percent
19 of the brand product, correct?
20        A.  Yes.
21        Q.  And that it's not changed
22 thereafter except on the occasion when
23 there's a specific reason to change it?
24        A.  Yes.
25        Q.  Is that also true of the brand

Judy Waterer
May 9, 2007

Page 388

```
 1   products, to your knowledge -- to your
 2   personal knowledge?
 3             A.  I believe that it's set.  And
 4   the specific reason for changing it is to
 5   take advantage of -- most companies on the
 6   brand side increased product prices
 7   consistent with the pharmaceutical CPI.  One
 8   of those prices would be AWP, so that would
 9   typically go up.
10             Q.  So in order to just
11   characterize the difference between the way
12   that AWP works on the generic side as opposed
13   to the brand side, would it be fair to say
14   that on the brand side, the AWP is expected
15   to go up on a regular basis, and on the
16   generic side, it's not expected to change
17   unless there's a reason to change it?
18             A.  I mean, I think we're splitting
19   hairs.  I think in both cases there's a
20   reason to change it.  And the reason that I'm
21   saying we're splitting hairs is, on the
22   generic side we take AWP as up when we have
23   an opportunity to participate in the CPI
24   going up.  And that can be routine in the
25   same way that it can be on the brand.
```