```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


    IN RE:                        )
                                  )  CA No. 01-12257-PBS
    PHARMACEUTICAL INDUSTRY AVERAGE )  CA No. 06-11337-PBS
    WHOLESALE PRICE LITIGATION     )  Pages 1-52
                                  )




                      SCHEDULING CONFERENCE

            BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE






                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        July 24, 2009, 2:15 p.m.








                        LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 3205
                        Boston, MA  02210
                        (617)345-6787
```

8e0fabe9-c837-43c4-a912-a8f3f2cfb23d

1    A P P E A R A N C E S:

2

3       NICHOLAS N. PAUL, ESQ., Supervising Deputy Attorney
     General, Office of the Attorney General, Bureau of Medi-Cal
     Fraud & Elder Abuse, 110 West A Street, #1100, P.O. Box
4    85266, San Diego, California, 92186, for the State of
     California.

5

6       JAMES J. BREEN, ESQ., The Breen Law Firm, P.A.,
     3562 Old Milton Parkway, Alpharetta, Georgia, 30005,
     for Ven-A-Care of The Florida Keys.

7

8       L. KIRK ROGERS, ESQ., Assistant Attorney General,
     Complex Civil Enforcement Bureau, Medicaid Fraud Control
     Unit, Office of the Attorney General, State of Florida,
9    PL-01, The Capitol, Tallahassee, Florida, 32399-1050,
     for the State of Florida.

10

11      JAMES P. CARROLL, JR., ESQ., Kirby McInerney, LLP,
     830 Third Avenue, 10th Floor, New York, New York, 10022,
     for the New York Counties in MDL 1456 and the State of Iowa.

12

13      JOHN T. MONTGOMERY, ESQ. and JOHN P. BUEKER, ESQ.,
     Ropes & Gray, LLP, One International Place, 02110,
     for Schering-Plough and Warrick Pharmaceuticals.

14

15      JOHN P. McDONALD, ESQ., Locke Lord Bissell & Liddell,
     LLP, 2200 Ross Avenue, Suite 2200, Dallas, Texas, 75201,
     for Schering-Plough and Warrick Pharmaceuticals.

16

17      BETH TRENT, ESQ., Schering-Plough Corporation,
     2000 Galloping Hill Road, K-6-1 1800, Kenilworth,
     New Jersey, 07033-0530, for Schering-Plough.

18

19      SARA BLOOM, ESQ., Assistant United States Attorney,
     Office of the United States Attorney, United States District
     Court, 1 Courthouse Way, Boston, Massachusetts, 02210,
20   for the United States of America.

21      ANDY J. MAO, ESQ., Trial Attorney, United States
     Department of Justice, Civil Division, Ben Franklin Station,
22   Washington, D.C., 20044, for the United States of America.

23      PETER A. MULLIN, ESQ., Office of the Attorney General,
     One Ashburton Place, Boston, Massachusetts, 02108, for the
24   Commonwealth of Massachusetts.

25   ALSO PRESENT:  John M. Lockwood, M.D., Ven-A-Care of the
                    Florida Keys.

8e0fabe9-c837-43c4-a912-a8f3f2cfb23d

1            P R O C E E D I N G S

2            THE CLERK:  In Re:  Pharmaceutical Industry

3    Average Wholesale Price Litigation, Civil Action 01-12257

4    and 06-11337, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6            MR. PAUL:  Nicholas Paul, the California

7    Department of Justice, for California.

8            MR. BREEN:  Jim Breen.  I represent the relator,

9    Ven-A-Care of the Florida Keys, Inc.  And for the record,

10   your Honor, in the event that there is any testimony needed,

11   I brought the relator's officer, John Lockwood.  This is on

12   the settlement today, Dr. John Lockwood.

13           MS. ROGERS:  Kirk Rogers.  I represent the state

14   of Florida.  I'm an Assistant Attorney General, and I have a

15   limited notice of appearance.  It will be filed today.

16           MR. MONTGOMERY:  John Montgomery for

17   Schering-Plough and Warrick Pharmaceuticals.

18           MR. BUEKER:  John Bueker, your Honor, for Schering

19   and Warrick.

20           MR. McDONALD:  John McDonald for Schering and

21   Warrick, your Honor.

22           MR. TRENT:  Beth Trent for Schering and Warrick.

23           MS. BLOOM:  Sara Bloom on behalf of the United

24   States.

25           MR. MAO:  Andy Mao for the United States.

1          MR. MULLIN:  Good afternoon, your Honor.  Peter

2     Mullin for the Commonwealth of Massachusetts.

3          THE COURT:  All right, thank you.

4          MR. CARROLL:  Good afternoon, your Honor.  James

5     Carroll on behalf of the New York counties in MDL 1456 and

6     the State of Iowa.

7          THE COURT:  Why am I here?

8          MR. BREEN:  Your Honor, Jim Breen for the relator,

9     Ven-A-Care of the Florida Keys.  Your Honor, we're here

10    today on a motion that Ven-A-Care, the relator, filed with

11    Schering for a scheduling conference.  That was the best way

12    we could think to tee it up, not knowing exactly what would

13    occur once we presented the settlement we've reached to the

14    Court.

15          We've reached a settlement, your Honor, after much

16    work among the parties that would resolve basically three

17    different lawsuits, one being California Ex Rel Ven-A-Care

18    versus Schering Warrick, an action that was initiated in

19    1997, removed to Federal Court and is part of this MDL, as

20    your Honor is aware; the State of Florida Ex Rel Ven-A-Care

21    versus Schering and Warrick, an action that was also

22    initiated back in 1997.  It was removed but remanded.  It's

23    pending before the Circuit Court of the State of Florida,

24    Second Judicial Circuit in and for Leon County, Florida.

25    However, the State of Florida has joined in the settlement

1    agreement, as I say, so we could have this four-way

2    settlement, and with all the Schering defendants.

3           It also settles the Ven-A-Care, United States

4    Ex Rel Ven-A-Care case versus Schering and Warrick, which is

5    the action that was part of the actions commenced in 1995.

6    Schering was brought into those cases in 1997.  As your

7    Honor is aware, those are the cases that were brought up

8    from Florida and joined with some cases that were brought

9    here in the District of Massachusetts, Schering and Warrick

10   being a common defendant.

11          Both the State of California and Florida have

12   intervened in the state cases and have prosecuted those

13   cases with the relator.  There was another companion case,

14   Texas Ex Rel Ven-A-Care versus Schering and Warrick.  That

15   was very aggressively litigated and settled back in 2004.

16          In addition, there's a number of other cases that

17   have already resolved where Ven-A-Care, with the

18   encouragement of the Department of Justice, has assisted

19   various states that are not qui tam states.  Missouri, for

20   example, is one.  There's been settlements, Ohio and others,

21   that we can present to your Honor.

22          THE COURT:  Which have settled or in the process

23   to be done?

24          MR. BREEN:  They're done, they're done.

25          THE COURT:  So Texas is done.  What else is done?

1              MR. BREEN:  Texas is done, Ohio is done, Missouri

2     is done.

3              THE COURT:  And these are all against Schering?

4              MR. BREEN:  Yes, your Honor, and we can give you

5     the complete list.

6              THE COURT:  All right.  And on the California and

7     Florida --

8              MR. BREEN:  Let me give you the list, Judge, if

9     you'd like.

10             THE COURT:  No, I'm just trying -- I understand

11    that there's some concern about the sweep of the release.

12    This all hasn't really been teed up other than as a

13    scheduling conference, and then I start getting all these

14    motions to intervene.  So it hasn't actually been squarely

15    joined other than through the back door of motions to

16    intervene, so that's why I just want to understand.  So what

17    do you view my job is today?

18             MR. BREEN:  Your Honor, at least from Ven-A-Care's

19    perspective and I believe from those that are seeking to

20    have this settlement approved --

21             THE COURT:  Do I have to approve it under

22    California and Florida law?

23             MR. BREEN:  Your Honor, both of those False Claims

24    Act, like the United States False Claims Act, provides for

25    consent to dismissal by the Attorney Generals and by the

1    court.  So that's not really the issue, though.  The issue

2    here is because there's a decline --

3              THE COURT:  Well, it is the issue that the United

4    States doesn't agree.

5              MR. BREEN:  Correct, Judge, that's the issue for

6    the United States.

7              THE COURT:  So is he right in saying that

8    California and Florida want the settlements?

9              MR. BREEN:  Yes, your Honor.

10             THE COURT:  You both --

11             MR. PAUL:  Yes, your Honor.  We're fully engaged

12   in the settlement, and this is the settlement that both

13   states want.

14             THE COURT:  Thank you.  Have you presented this

15   all to me straight up this way?

16             MR. MONTGOMERY:  Yes, your Honor.  I'm not sure

17   what you mean by "straight up."  We have presented to you

18   the papers, which are, of course, voluminous.  The papers

19   articulate the terms of the settlement.  They articulate to

20   you that what this settlement is designed to accomplish is a

21   comprehensive resolution.

22             I think you noted, your Honor, when we had our

23   mediation conference recently that you recognized that these

24   cases that have been before you now for almost eight years

25   are mature, that there are some impediments to settlement

1   finality.  This, as I think you'll learn as you get into

2   this settlement, it is structured to provide finality in an

3   action, which is the relator action by Ven-A-Care, which is

4   the only action which is national in scope.  You have

5   proposed intervenors, New York, Massachusetts, who claim to

6   have an interest here because with respect to the so-called

7   federal share, they are litigating in their state actions

8   for recovery of exactly the same dollars that are resolved

9   by the Ven-A-Care/Schering settlement, which is also about

10  the federal share.  So I'm just trying to give you a flavor

11  for the kind of conflicts or issues that are going to --

12          THE COURT:  I understand, but when you and I

13  talked last, the battle was between the states and the

14  federal government.  This is different.

15          MR. MONTGOMERY:  No, no, no.  This is the battle.

16          THE COURT:  I don't --

17          MR. MONTGOMERY:  I don't think it's between the

18  states and the federal government.

19          THE COURT:  Well, at least the way I understood

20  it, it was different.

21          MR. MONTGOMERY:  There is a knot, if I can use a

22  metaphor, there is a knot that is choking the settlement

23  process.  DOJ holds that knot.  We're trying to loosen it by

24  the structure of this settlement, which is conditioned on

25  your Honor making some rulings.  The rulings that we propose

1    that your Honor make on issues that you'll find familiar are

2    rulings that we believe will have preclusive effect on other

3    cases.  So it's the scope of the -- it's the implications of

4    an approval of this settlement and dismissal of the actions

5    that generates the commentary that you've been getting the

6    last couple of days from both DOJ and from some states.

7            So what we think is before you today is, we need

8    to have a process.

9            THE COURT:  So what you want today --

10           MR. MONTGOMERY:  We want a schedule.

11           THE COURT:  You want a schedule.  You're not

12   expecting me to resolve anything today, because it hasn't

13   been teed -- we were looking for a motion.

14           MR. MONTGOMERY:  Right.

15           THE COURT:  It's billed and labeled as a status

16   conference, which is what we granted the request for, but I

17   don't actually have a set of briefs on what to do, right?

18   And that's all you want today.

19           MR. MONTGOMERY:  We teed it up as a scheduling

20   conference because we thought that was the quickest way to

21   get before your Honor to invite commentary, which we now

22   have, and to let you set a schedule.  We would like the

23   schedule to be a speedy one because there's $55 million in

24   escrow at a bank ready to be paid to California, Florida,

25   the relator, and through the relator to the United States.

1          THE COURT:  All right, you're answering my

2   question, which is, all you want today is a schedule for how

3   to resolve it?  You think I need, you, Ven-A-Care, think I

4   need to approve or bless all three of the settlements?

5          MR. BREEN:  Yes, your Honor.

6          THE COURT:  You haven't yet filed a motion to have

7   me do that, right?

8          MR. BREEN:  We have not, your Honor.

9          THE COURT:  Because I've been looking through the

10  docket trying to find something.  There's nothing that's on

11  the table today to be resolved in terms of my approval other

12  than the motions to intervene?

13         MR. BREEN:  That's technically correct, your

14  Honor, and maybe if I could just explain why that is.  And

15  it is odd, but let me explain why.  And working diligently

16  with Eric Green and trying to complete this settlement and

17  do it in a way where we could at least address, illuminate

18  and address some of the difficulties we're encountering in

19  reaching resolutions in these cases, it became clear --

20         THE COURT:  Have you been working with the federal

21  government?

22         MR. BREEN:  Yes, your Honor, yes, and they're

23  here.

24         THE COURT:  No, but to try and engage them in the

25  settlement?

1          MR. BREEN:  Yes.  Yes, your Honor, and we've

2     made -- I don't want to talk about where we are on that

3     aspect.  Mr. Mao is here to speak for the federal

4     government.  We've kept them apprised every step of the way

5     as to what --

6          THE COURT:  Who's here for the federal government?

7     Oh, you are, okay, all right.

8          MR. BREEN:  Yes, we have, your Honor, and we have

9     not been able to reach a resolution where the federal

10    government would come into the settlement.  The settlement

11    we reached with Schering and with the two states is

12    specifically understood and is part of the deal that

13    Ven-A-Care would not be able to bring the United States into

14    the settlement, the release, or the dismissal itself.  That

15    leaves the United States in the position of the government

16    that's got an interest in, an objectionability over the

17    dismissal, and that is the interest that they are asserting

18    at this juncture.  We're --

19         THE COURT:  So they've rejected it essentially,

20    and the question is whether that's reviewable in any way.

21    Is that what I have to decide?

22         MR. BREEN:  Not yet, Judge, not yet.

23         THE COURT:  All right.

24         MR. BREEN:  Because we haven't moved yet and moved

25    the settlement to that point in time when your Honor has to

1    rule.  We're trying to finish a process here where because

2    we know that if we --

3              THE COURT:  What do you want me to do right now?

4    Do you want me to set a schedule for a -- you're going to

5    file a motion by X-Y-Z date to approve, is that what you're

6    going to do, for all three?  And then we get an opportunity

7    for folks who are against it to refile or to file for the

8    first time why they disagree with it?

9              MR. BREEN:  That's true, your Honor, but one of

10   the things we're going to need as part of that is a schedule

11   to determine who even has standing to object to the

12   settlement because --

13             THE COURT:  Well, whether I take them as standing

14   or as amicus, I'm going to hear from them.

15             MR. BREEN:  Well, your Honor, they're moving to

16   intervene in a False Claims Act case that specifically

17   provides that only the United States can intervene in.  I

18   mean, we've got --

19             THE COURT:  Even so, even if I don't let them

20   intervene, I am going to let them file something.  So, I

21   mean, I understand it has technical importance as to who

22   gets to appeal or doesn't, but I'm still going to hear from

23   them as to the practical effects of the settlement on them.

24   Obviously it's affecting their suits.  Why shouldn't they be

25   allowed to be heard?  Do you agree it's affecting their

1   lawsuits, it's wiping out part of their lawsuits?

2           MR. BREEN:  I don't think so, Judge.

3   Ven-A-Care -- and I think you're going to find as these

4   issues get before your Honor that you may have -- there may

5   be differences of perspective and opinions on what this

6   settlement does.  Ven-A-Care has agreed to give a dismissal

7   to the fullest extent it's capable of under the False Claims

8   Act to resolve its cases against Schering.

9           THE COURT:  But you've added drugs, for example,

10  right?

11          MR. BREEN:  Well, your Honor, there's been drugs

12  added that have been part of the investigation and part of a

13  litigation Ven-A-Care has done.

14          THE COURT:  That's different.  So you added drugs.

15  That's an issue.

16          MR. BREEN:  We did.  We did, your Honor.

17          THE COURT:  Okay, right?  And you're wiping out

18  the federal piece of the litigation in these state court

19  proceedings, right?

20          MR. BREEN:  I don't believe so, Judge, and I think

21  that's where --

22          THE COURT:  They think you are, right?

23          MR. BREEN:  That is a concern.  I don't believe we

24  are.

25          THE COURT:  Well, are you just -- see, I need to

1    get into the weeds anymore.  They think you are, right?

2    Isn't that the basic concern, that you're wiping out a piece

3    of the recovery they're seeking?  Isn't that what they're

4    saying they're worried about?

5             MR. BREEN:  That is their concern, Judge.

6             THE COURT:  So whether they're right or wrong,

7    they've got a stake in presenting that position.

8             MR. MONTGOMERY:  The federal share that any state

9    might recover, of course, goes to the federal government.

10            THE COURT:  Of course.

11            MR. MONTGOMERY:  So the states are not

12   disadvantaged here at all.  The question is whether the

13   federal share should be paid through this settlement, or

14   whether the federal share is going to be recovered through

15   these state actions.

16            THE COURT:  Right, right.

17            MR. MONTGOMERY:  So it's not a loss --

18            THE COURT:  I understand that --

19            MR. MONTGOMERY:  -- to any state.

20            THE COURT:  -- but they're seeking certain

21   recovery for the state and the federal share.

22            MR. MONTGOMERY:  Correct.

23            THE COURT:  Actually, I thought that was the

24   debate here, whether --

25            MR. MONTGOMERY:  That is an important part of the

1    debate.

2           THE COURT:  All right, that's what I had thought

3    the big issue was.  And then the issue is whether or not you

4    should be able to collect it or whether the states should.

5    So I don't know whether it matters.  They think it does.

6    I'm simply saying it affects them.  I don't know why I

7    shouldn't let them intervene.  But, in any event, you

8    haven't even opposed it yet, right?  We've just gotten the

9    motions in the last day or two.

10          MR. BREEN:  We have, Judge.  In an effort --

11          THE COURT:  Are you planning on opposing it?

12          MR. BREEN:  We will oppose intervention, Judge.

13   We don't oppose them being heard.  I mean, I think it's a

14   distinction with a difference.

15          MR. MONTGOMERY:  That will be our position as

16   well.  We don't think they should be permitted to interfere

17   with this settlement, we don't think they should have

18   appellate rights, but being heard is another matter.

19          THE COURT:  Is it just dispositive if the federal

20   government says "no"?

21          MR. BREEN:  The False Claims Act says the case

22   cannot be dismissed, your Honor, without the consent of the

23   court and the United States.

24          THE COURT:  So I thought I read what they gave me

25   as "no."  I could set this all up, and I know it will send

1   people's kids to college and the like, but, I mean, at the

2   end of the day, does "no" mean no?  I will say, I didn't

3   grant the motion to intervene just on a matter of quick

4   because as soon as I saw the government's answer, I said,

5   "Is this over?"

6             MR. BREEN:  Your Honor, number one, the purpose of

7   this settlement is to resolve cases, the cases that we've

8   been litigating now for well over a decade.

9             THE COURT:  I'm totally sympathetic.  I am simply

10  saying, if they say "no," is it no?

11            MR. MONTGOMERY:  We don't think so, your Honor.

12            THE COURT:  Okay.

13            MR. MONTGOMERY:  You'll have to decide that, and

14  this is not the time to resolve it, but we don't think so.

15  We also don't hear them yet saying "no."  It is true they've

16  objected, but we have --

17            THE COURT:  You say "no," Mr. Mao?

18            MR. MAO:  At this point, the government believes

19  that a settlement can be crafted that resolves everyone's

20  issues, to the extent that the scope is narrowed to the

21  parties at issue, so the government is refraining from a

22  full-blown 37(b)(1) --

23            THE COURT:  Today as framed, is it a thumbs up or

24  a thumbs down?

25            MR. MAO:  Down.

1        THE COURT:  Okay.  So it's "no" to what it is.  So

2   I think part of what we need to do is, we need to set up a

3   briefing schedule and a mediation schedule, which you've

4   effectively done which I appreciated.  It brought us all to

5   the table.  So I've never actually -- I suppose there's

6   always the arbitrary and capricious standard.  It's just a

7   hard burden for you.  So let's do this:  When can you file

8   your motion and brief it?

9        MR. BREEN:  We can have that done within a week,

10  your Honor.

11       MR. MONTGOMERY:  We want to go fast.

12       THE COURT:  Maybe, but I have my vacation.  I am

13  trying the Neurontin case, the first of a thousand suicide

14  cases in the country, on Monday that's going to go for three

15  weeks, and then I'm on vacation.  So this is not going to

16  happen, just so that I don't make any associates lose their

17  summer vacation, all right.  So let's just talk about as a

18  practical matter what's realistically going to happen here.

19       So you can do it in a week if you want, but I am

20  not going to get to this for a month, okay, just as a

21  practical matter.  So it's not like -- there's no urgency to

22  it.  It's, I'm assuming, sitting there earning interest in

23  some account.

24       MR. BREEN:  Well, there's no interest these days,

25  Judge, but it's in an account.

1          THE COURT:  It's in an account, fair enough.

2          MR. BREEN:  It's not losing interest.

3          THE COURT:  It's not losing interest.  So do you

4    want it in a week?

5          MR. BREEN:  Your Honor, give us two weeks to file

6    something and --

7          MR. MONTGOMERY:  You know, your Honor, we have

8    filed a settlement.  Objections have been filed to the

9    settlement.  I don't know why we need to --

10         THE COURT:  Do I have to affirmatively approve

11   something?

12         MR. BREEN:  Your Honor, the way --

13         THE COURT:  Then you need to file a motion to have

14   me approve it.

15         MR. BREEN:  That's right, Judge, you do.  At a

16   minimum, you need to give your consent to the dismissal.

17         THE COURT:  All right, so I think like in a class

18   settlement, I suppose, or a --

19         MR. BREEN:  The same standard.

20         THE COURT:  So what is it, fair, reasonable --

21         MR. BREEN:  Fair, adequate, and reasonable.

22         THE COURT:  All right.  So you'll file a motion as

23   to why this meets those standards, all right.  And I'm

24   assuming Mr. Montgomery's team will do what?

25         MR. MONTGOMERY:  Well, we'll do this at the same

Page 19

1   time.

2            THE COURT:  I don't know --

3            MR. MONTGOMERY:  We're on the same side.  We have

4   some different --

5            THE COURT:  I understand that, but I don't know --

6   usually -- you know this -- in big class actions, you don't

7   have to file anything.  If you want to, you can.

8            MR. MONTGOMERY:  Right.  Whatever is going to be

9   filed in support of the settlement, why don't we do that in

10  two weeks.

11           THE COURT:  Fine.

12           MR. MONTGOMERY:  And why don't those who want to

13  be heard file two weeks after that, and then a month from

14  now when your Honor is --

15           THE COURT:  No, it works out just well, actually.

16  It works out fine.

17           MR. MONTGOMERY:  I mean, we're not --

18           THE COURT:  All right, so two weeks from now is --

19  that puts us into -- it's the 24th now -- August 7?

20           MR. BREEN:  Yes, your Honor.

21           THE COURT:  Does that seem somewhat reasonable for

22  you to file your brief?  Would August 21 destroy anybody's

23  lives for an opposition?

24           MR. MONTGOMERY:  Well, the opponents have a leg

25  up.  They've already filed their opposition.  They might

1    want to expand on it and respond to us, but --

2           THE COURT:  Well, they've mostly done it through

3    interventions.

4           What do you want, Mr. Mao, what do you want?

5    Don't be shy.  Are you from Washington, or are you from

6    here.

7           MR. MAO:  From Washington.  I was just going to

8    say, I'm gone the last week of August.  To the extent that

9    our briefs can be due after I get back --

10          THE COURT:  Well, this is perfect for you because

11   the 21st is right before you leave, right?

12          MR. MAO:  Yes, your Honor.

13          THE COURT:  You're going to need the vacation,

14   isn't that right?  You've already done some of this legwork,

15   so if you were to file the 21st, that would be terrific.

16          MR. BREEN:  I'll be gone the week after that,

17   Judge.

18          THE COURT:  Sure, I mean, it's the dog days of

19   August, fine.  So let me just say this:  Can you file

20   oppositions to the motion to intervene in that same time

21   period that you were going to file your motion?

22          MR. MONTGOMERY:  Yes, your Honor.

23          MR. BREEN:  Yes, yes.  Yes, Judge.

24          MR. MULLIN:  Your Honor, if I could be heard on

25   the motion to intervene.  We filed one of the motions to

Page 21

1    intervene.  I would ask that you set the responses to that

2    motion for two weeks.

3              THE COURT:  Yes, that's exactly what I was saying.

4              MR. MULLIN:  So then we'd have some time to do any

5    reply.

6              THE COURT:  You know, can I say, quite candidly,

7    also, regardless of whether I allow you to intervene or

8    not -- I haven't read an opposition yet -- I'm going to let

9    you at least file amicus briefs.  So that you should file

10   anything that you have criticizing the settlement, styling

11   it whichever you want, maybe either/or kind of thing,

12   because I'll want to hear from the other states that are

13   affected, could you file that by the 25th, the date of the

14   25th, August 25th?

15             MR. MONTGOMERY:  The 21st.

16             THE COURT:  You're right, I'm off a month.  The

17   21st?

18             MR. MULLIN:  What are you asking us to do by the

19   21st?

20             THE COURT:  I'm telling Ven-A-Care to file any

21   opposition, and Schering, to file any opposition to the

22   motion to intervene by August 7.  So that basically gives

23   them two weeks to respond to that.  I don't know what I'm

24   going to do.  I do know I'll hear from you on the validity

25   or not of the settlement.  And so you can get that in by the

1   21st, okay?

2         MR. MULLIN:  Could we have till the 28th, just

3   because I'm supposed to be out the week of the 17th?

4         THE COURT:  To do what, to file -- well, I suppose

5   you could.  I mean, I don't feel strongly about that, but

6   what I do feel strongly about is, we'll hear it -- this case

7   has a dynamic of its own.  I almost always get a reply, and

8   frequently a surreply, which I actually, unlike some judges,

9   I find extraordinarily helpful because it's at that point

10  that the issues have been refined.  It's not like trains

11  passing in the night, so I very much like them, so I'm not

12  preventing them.  But suppose we were to say within a week

13  of -- so you'll file whatever you're going to file on the

14  28th, but I'm going to still keep the 21st for the main

15  briefs because somebody else has another vacation scheduled,

16  and I'd be here forever; and then perhaps any replies by,

17  why don't we say September 4, and any surreplies by

18  September 11, and let me give you an afternoon in

19  mid-September to hear it argued.  Do you have, like, what

20  would you say, two hours?

21        MR. MONTGOMERY:  Well, let me mention one feature

22  of this, your Honor, that may affect the time block you'd

23  like to reserve, and that is, as Mr. Breen mentioned, he has

24  Dr. Lockwood here.  Also, one who you may want to hear

25  from --

1          THE COURT:  Do I need him?

2          MR. MONTGOMERY:  Well, I'm not sure about

3    Dr. Lockwood, but there's one person you may need.

4          THE COURT:  Not that you're not welcome.  Who's

5    Dr. Lockwood?  Welcome.  So at least it was worth the trip.

6    All right.

7          MR. MONTGOMERY:  Your Honor, one feature of this

8    settlement is that we propose that you make findings of

9    fact.  The findings of fact we ask you to make are based

10   upon an analysis that has been done by Dr. Addanki who

11   you've seen here before.  We don't know whether the elements

12   of Dr. Addanki's analysis are contested by the Department of

13   Justice, but they may be.

14         THE COURT:  But isn't that highly unusual for me

15   to make findings of fact in the context of a False Claims

16   Act approval?

17         MR. MONTGOMERY:  Yes.

18         THE COURT:  All right.

19         MR. MONTGOMERY:  Yes.  But it is uniquely a

20   judicial function, and we have reasons for doing it.  It is

21   the mechanism or one of the mechanisms that we are trying to

22   use here to bring finality.

23         THE COURT:  I understand that.  No one's sicker of

24   this case than I am, okay?  I've been doing this since 2001,

25   and actually -- well, 2001, let's just -- and it keeps

1   growing rather than shrinking, so I agree with that.  That

2   having been said, I'm worried, as soon as I saw the

3   government's position, that it is not worth even exploring

4   all the creative ways I can bring finality if the law is

5   basically a guillotine on this settlement if they don't

6   approve.  So I think all I should hear on that date is

7   basically what you all -- and if I think I can and should be

8   making fact findings, I'll set another date.

9            MR. MONTGOMERY:  All right, just one alternative.

10  Of course, we could shift this and just file a motion for

11  summary judgment.  So, I mean, what we're asking you to do

12  is in a context that appears unusual, and we agree it is

13  unusual, but it is not functionally unusual at all, except

14  it arises in a settlement context.

15           THE COURT:  Well, some of your findings, I was

16  looking at them, direct from my bench memo, but, of course,

17  some of them did not.  And even to the extent I found it, it

18  was based on that record, and I can't preclude someone else

19  from coming up with another record.  And I think in the

20  New York cases as well as the government cases, I've sort of

21  punted.  They've yielded to the moment, but then they've

22  reserved their rights to push back, if I'm remembering

23  correctly, for the extra 5 percent.

24           MR. MONTGOMERY:  I would suggest, to speed this

25  along, it would be helpful if you would direct the

1  Department of Justice to actually tell us whether they

2  disagree with anything that we have said --

3           THE COURT:  I'm not getting -- Mr. Mao, I'm

4  working over his way.  So at this point I've got a schedule

5  for briefing it.  Did you, New York --

6           MR. CARROLL:  Yes, your Honor.

7           THE COURT:  Standing the great state of New York.

8  I feel like the convention.

9           MR. CARROLL:  I would just add to the discussion

10  here that we do have an issue with the calculations, not

11  that they are necessarily wrong, but our issue is that there

12  needs to be more evidentiary support.  Our position is that

13  we're not intending to be an impediment to any settlement.

14  We just want the settlement to be done consistent with the

15  Court's ruling; and as the Court knows, the WAC list price

16  test and the three benchmarks set by its Track One opinion

17  are currently before the Court on GSK's motion for partial

18  summary judgment.

19           THE COURT:  Sure.

20           MR. CARROLL:  So that's an issue that goes into

21  our objection to the proposed settlement.

22           THE COURT:  Thank you.  All right, so let me just

23  say, all right, we're all set with you in terms of the

24  briefing schedule.  Now, if you guys could sit down and I

25  can focus on Uncle Sam here for a minute.

1          So I have been hearing complaints about the

2   Justice Department in terms of not working with people in a

3   settlement.  And I know the federal government hasn't been

4   involved in this for eight years, but I have.  I'm looking

5   to start resolving these cases.  So what is your position on

6   trying to settle this federal share part with either the

7   Ven-A-Cares or with the states as they settle?

8          MR. MAO:  It has always been the government's

9   position that the best resolution would be a global one

10  resolving all of the federal and state issues

11  simultaneously.

12         THE COURT:  Yes, but that may not be able to

13  happen.  So now we have Ven-A-Care.  These people have been

14  carrying a lot of water.

15         MR. MAO:  And what I would just say is that it's

16  for that reason that the government invested four years

17  trying to negotiate a global settlement involving Schering

18  and Warrick and the states.  When that failed, the

19  government tried to negotiate a settlement involving simply

20  the federal share.  It's only when then all of those

21  settlement discussions basically --

22         THE COURT:  All right, but right now I'm narrowly

23  focused.  I've got one proposal.  Let's assume you shaved

24  off the extra drugs -- I'm not ruling that -- you shaved off

25  the extra drugs, and let's assume that you just had a

1   settlement with Florida and California.  And as I understand

2   it, the settlement, does it settle the federal share and the

3   state share?

4            MR. BREEN:  It settles Ven-A-Care's qui tam claims

5   on behalf of the United States, so that would be --

6            THE COURT:  Do you have an objection solely -- if

7   you shaved off the extra drugs and you only limited it to

8   California and Florida, do you have an objection?

9            MR. MAO:  No, your Honor.  To the extent -- wait,

10  let me clarify.  To the extent that it's made clear in both

11  the settlement agreement and a proposed order that the

12  United States' interests are only prejudiced with regard to

13  the Medicaid claims arising from California and Florida,

14  then the government would not have --

15           THE COURT:  So what else would that leave, just so

16  I'm not playing games here?

17           MR. MONTGOMERY:  Everything else.

18           THE COURT:  Like, well, I don't know what

19  "everything" means.

20           MR. MONTGOMERY:  Every state case that's pending,

21  any that might be filed in the future.

22           THE COURT:  But that's exactly right, though.  I

23  mean, California -- let me just deal right now with the

24  California -- look, I read about California every day.

25  California is in a mess, so if they need this money --

1    California is a mess, so I would like to get some money.

2    Florida is a little less bad, but California, I'd like to

3    get this money into the state coffers.  If we only settled

4    the Florida cases, state and federal side of Medicaid, is

5    there any objection to them?

6              MR. MAO:  No, your Honor.

7              THE COURT:  Anybody else have an objection to

8    them?

9              MR. MULLIN:  Your Honor, the Commonwealth of

10   Massachusetts would have no objection.  We think that that's

11   what should be done here, that the proposed settlement

12   agreement that's been given to you, the language in the

13   release language is much, much broader than just resolving

14   California and Florida.

15             THE COURT:  Because it waives what?  What else

16   does it waive?

17             MR. MULLIN:  It purports to waive the federal

18   share in every pending case.  The relator has no authority

19   to do that.

20             THE COURT:  Every pending case where?  Be precise.

21   You mean in Massachusetts?

22             MR. MULLIN:  In the Massachusetts case and every

23   other state case.

24             THE COURT:  Well, why would I possibly approve

25   that?  Is it it waives the Massachusetts -- paying Florida

1    and California for the Massachusetts share?

2              MR. MONTGOMERY:  Absolutely not.  We've paid

3    $55 million.  We're prepared to justify that amount as fair,

4    adequate, and reasonable to satisfy the federal share

5    everywhere.  That's what we paid for.

6              THE COURT:  Everywhere?

7              MR. MONTGOMERY:  Everywhere.  And if we can't

8    accomplish that, your Honor, there's no settlement.  Now, if

9    it's not fair, adequate, and reasonable, obviously there's a

10   problem.

11             MR. MULLIN:  Your Honor --

12             THE COURT:  I see the problem.

13             MR. MONTGOMERY:  It's a --

14             THE COURT:  I don't see how I don't -- excuse me,

15   excuse me.  I have no idea how one quantifies these things,

16   but I certainly understand why New York and Massachusetts

17   have a major stake in this.  Of course they can intervene.

18   How can you say "no"?  You're wiping out their cause of

19   action.  Can't they say that that's not a fair distribution

20   for Massachusetts?

21             MR. MONTGOMERY:  We're not wiping out the cause of

22   action, your Honor.

23             THE COURT:  Excuse me.  I don't know if it's worth

24   the paperwork to oppose this motion to intervene.  Do you

25   agree that you're wiping out Massachusetts?

1          MR. BREEN:  No, your Honor, I don't.  And that's

2     why I think we need to take a step back and look at what

3     we're doing here.  Ven-A-Care brought a federal False Claims

4     case in '97 in several state cases.  Because of those cases,

5     the activity that Ven-A-Care has engaged in on the U.S.

6     level and on the state level, we've been able to resolve

7     lots of cases, assist in resolving lots of cases, and

8     there's been lots of money paid to the federal government.

9          THE COURT:  But what are you wiping out in

10    Massachusetts and New York?

11         MR. BREEN:  As far as -- all Ven-A-Care has agreed

12    to give, and all we've given in this settlement agreement,

13    and from the outset all we've agreed to give -- and it's

14    done, it's in an agreement signed by everybody involved --

15    is what Ven-A-Care can give in terms of a dismissal as a

16    qui tam relator.  This is a nonintervene case.  Nobody's

17    asking --

18         THE COURT:  Let me just understand.  Maybe I'm

19    just -- I must have a disconnect because it hasn't been teed

20    up, as I said, in a motion.  When you settle this case

21    involving the United States, are you -- the $55 million

22    picks up the federal share in every state in the United

23    States of America?

24         MR. BREEN:  The $55 million picks up the

25    California settlement, the Florida settlement, and

1    Ven-A-Care's claims as a qui tam relator on behalf of the

2    United States.

3              THE COURT:  For the federal share?

4              MR. BREEN:  Well, your Honor, that --

5              THE COURT:  Or federal and state?

6              MR. BREEN:  For the federal and state shares of at

7    least --

8              THE COURT:  Of all fifty states?

9              MR. BREEN:  No, your Honor, not the -- we've never

10   purported to sue for the state shares for all fifty states.

11             THE COURT:  But for the federal share of all fifty

12   states?

13             MR. BREEN:  Your Honor, the only thing that we can

14   settle is what we can bring as a qui tam relator.

15             THE COURT:  I just want to understand.  Are you

16   seeking to settle the federal share of all fifty states?

17             MR. BREEN:  We are seeking to settle Ven-A-Care's

18   claims on behalf of the United States that we brought --

19             THE COURT:  For all fifty states?

20             MR. BREEN:  Well, Judge --

21             THE COURT:  Yes or no.

22             MR. BREEN:  Right now there's not fifty states

23   left, number one, okay?  And, your Honor, and I'm not trying

24   to be difficult.

25             THE COURT:  All right, fair enough, fair enough.

1    For the remaining fifty states --

2              MR. BREEN:  I'm not trying to be difficult about

3    this.

4              THE COURT:  So for many states other than Florida

5    and California?

6              MR. BREEN:  To the extent that -- it's really a

7    question of law, your Honor.  We have got --

8              THE COURT:  You know what, I feel like I must have

9    lost my trial skills.  All right, so this is a "yes" or "no"

10   question.  Okay, yes or no:  Are you trying to settle the

11   federal share of state claims other than California and

12   Florida?

13             MR. BREEN:  No.  We are settling the federal

14   claims that Ven-A-Care brought, period, on behalf of the

15   United States.  To the extent we can dismiss our case, we're

16   just asking to let us dismiss our case with prejudice.

17   That's what we're asking.  And it is true --

18             THE COURT:  Excuse me.

19             MR. BREEN:  And, Judge, and this is difficult.

20   This is why we're having a hard time settling these cases.

21   It is true that Schering will probably argue this in some

22   other jurisdiction that it settles the federal share.

23   That's Mr. Mullin's concern.

24             THE COURT:  Does it release Schering in

25   Massachusetts?

1          MR. MULLIN:  Your Honor, if I can try and clarify.

2          THE COURT:  Yes.

3          MR. MULLIN:  I think there's a difference of

4     agreement between Ven-A-Care and Schering-Plough as to

5     what's being released here.  Ven-A-Care thinks it's only

6     releasing its claims nationwide on behalf of the United

7     States.  The Schering-Plough position is that they're

8     releasing on behalf of the United States, and it will

9     resolve the federal share nationally.

10          This is the language of the settlement agreement.

11     It's on Page 8, Paragraph 5:  "The relator, on behalf of the

12     United States, and on behalf of the relator, fully and

13     finally releases Schering-Warrick from any claim, action,

14     suit or proceeding that the relator has asserted or could

15     have asserted on behalf of the United States, or on behalf

16     of itself, arising out of or related to the covered conduct

17     for the covered drugs during the relevant time period,

18     including but not limited to the federal share of any claim

19     brought by a state arising out of or related to the covered

20     conduct or the covered drugs."

21          And I'd tell the Court that the covered drugs is

22     not only the drugs that are pled but other drugs.

23          THE COURT:  Right, you've told me that.  Thank

24     you, thank you.  So, I mean --

25          MR. BREEN:  That's got to be understood, though,

8e0fabe9-c837-43c4-a912-a8f3f2cfb23d

Page 34

1    in the context that it's Ven-A-Care of the Florida Keys

2    giving the release, not the United States.  We have never --

3    this settlement does not include a condition that we bring

4    the United States --

5              THE COURT:  You know what, I think you all need to

6    go back to the drawing boards a little bit with the federal

7    government, all right.  How much of that can be parsed out

8    so we can give California and Florida some relief here?  Can

9    we parse it?

10             MR. MONTGOMERY:  Well, we can certainly talk about

11   it, your Honor, but I think the answer is that we cannot

12   succeed.

13             THE COURT:  All right.  All right, now, from the

14   federal government's point of view, I have heard some

15   concerns about -- are you willing to try and to settle it so

16   that the federal share in Florida and California is

17   released?

18             MR. MAO:  Yes, your Honor.

19             THE COURT:  And does it seem like a fair

20   settlement if it's the federal share?

21             MR. MAO:  To the extent that the scope of release

22   of this settlement is limited to the federal share of

23   California and Florida, the government would not object.

24             THE COURT:  I take it, for you, that doesn't give

25   you the kind of relief you want?

1        MR. MONTGOMERY:  Well, no.  We're paying much too

2    much money.  We would not do that.

3        THE COURT:  How much do you think the nationwide

4    federal share would be?

5        MR. MAO:  I'm afraid I'm not prepared to make that

6    estimate right now.

7        THE COURT:  How much do you think the state

8    federal share would be for -- excuse me, I said that

9    completely wrong.  That if you were looking at the federal

10   share for Florida and California, how much is that worth?

11       MR. BREEN:  You're asking me, Judge?

12       THE COURT:  Yes.

13       MR. BREEN:  I've got it right in an allocation

14   agreement we would file with the Court.  I can tell you the

15   exact amount.  $23,474,000, your Honor.

16       THE COURT:  For each or for --

17       MR. BREEN:  Combined.

18       THE COURT:  Combined.  So could this settle for

19   the 23, and then we can battle about the rest?

20       MR. MONTGOMERY:  Well, your Honor, what Mr. Breen

21   is talking about is an allocation exercise that Schering is

22   hearing about for the first time.  We're not part of

23   allocation.

24       THE COURT:  Well, let me ask, would the federal

25   government be able to approve, if it's just California or

1    Florida, that amount of money?

2              MR. MAO:  Yes, your Honor.

3              THE COURT:  All right, so I'm just saying this

4    so that -- I don't know if you're willing to settle for much

5    less --

6              MR. MONTGOMERY:  We didn't agree to pay that

7    amount of money to California and Florida.

8              THE COURT:  I understand, but you're hearing it,

9    so I'm just laying it out there as part of a potential

10   approach to settlement because what I'm hearing is that in

11   Schering's view, 55 is way too much, and you're agreeing

12   that 55 is too much if I'm just talking about these two

13   states.

14             MR. BREEN:  No, your Honor, we're not agreeing

15   with that.

16             THE COURT:  So how did you come up with the

17   $23 million?

18             MR. BREEN:  We came up with $55 million because

19   that was the amount that Schering agreed to pay to settle

20   Florida, California, and Ven-A-Care's dismissal with

21   prejudice, and be able to ask the Court --

22             THE COURT:  And you give half of it to these two

23   states?  What about New York, isn't that as big?

24             MR. BREEN:  Your Honor, the settlement is based

25   upon the damages incurred by Florida and California.

1      THE COURT:  I understand that, but then you're

2  releasing everybody else.

3      MR. BREEN:  I don't believe I am, your Honor.  I

4  believe I'm giving --

5      THE COURT:  All right, I think I get the lay of

6  this land.  We're going to have all motions teed up.  Do you

7  all have a date?  Were you willing, Mr. Mao -- and I don't

8  know if Ms. Bloom would be involved as well -- to go work

9  with Eric Green to try and come up with a number that would

10  satisfy the federal government?  Maybe Mr. Mullin and

11  Mr. Carroll could be part of this as well.  In other words,

12  for their drugs for a national release, do you have a figure

13  in mind?

14      MR. MAO:  I do not, your Honor.  I can develop a

15  figure as far as --

16      THE COURT:  You haven't been part of this with

17  Professor Green at all?

18      MR. MAO:  Well, the government has been in

19  negotiations with the company.

20      THE COURT:  Are you just not the person who has

21  been dealing?

22      MR. MAO:  No, I would be exactly the person to

23  make that calculation.  I'm just not prepared right now to

24  tell you what number it would take.

25      THE COURT:  So are you prepared -- I mean, it may

1   just fall flat on its face, but are you prepared to walk in

2   with a number that the federal government could live with --

3           MR. MAO:  Yes, your Honor, absolutely.

4           THE COURT:  -- for a national settlement of the

5   federal share?

6           MR. MAO:  Absolutely.

7           THE COURT:  And the states can then do -- now,

8   this is what Professor Green and I talked about, which was

9   some source of frustration, so -- Mr. Montgomery is alluding

10  to the fact that at a few of these status conferences we've

11  raised this, is how does that leave -- if the states want to

12  settle the state share, let's say, and they're typically

13  paying 40 percent -- I'm making up that number -- can you

14  live with the fact that that constitutes 40 percent of

15  whatever the value is?

16          MR. MAO:  Yes, your Honor.  The government would

17  not object.  To the extent that the federal share has been

18  resolved, the government would accept --

19          THE COURT:  Now, suppose Mr. Mullin wants to

20  settle on behalf -- what's Massachusetts?  What percentage

21  do we pay here?

22          MR. MULLIN:  We're a 50/50 --

23          THE COURT:  We're a 50/50 state?  Okay.  So let's

24  say he settled for a million dollars, could you agree that

25  the federal government gets another million if it wins?

1          MR. MAO:  I believe so.

2          THE COURT:  So whatever they settled for --

3          MR. MAO:  Whatever the federal matching portion

4    is --

5          THE COURT:  -- you would limit your damages in

6    going forward in a lawsuit to that?

7          MR. MAO:  Again, I'm the lowest man on the totem

8    pole.  I believe that --

9          THE COURT:  Could you talk about that?  I think

10   that's one source of frustration.  And maybe I'm

11   understanding it incorrectly because I'm not involved in the

12   weeds of the debate, but I want to, so you can pass this on

13   up high, get to a position where states can settle for their

14   share --

15         MR. BUEKER:  And keep all the money.

16         THE COURT:  -- and keep all their money.  And then

17   if you want, you can go ahead and litigate for the rest of

18   it, but you'd be capped at the 50 percent.  Do you see what

19   I'm trying to say?  Because otherwise the parties can't

20   settle these cases unless they know what their upward

21   exposure is for the federal share.  I just need a formula or

22   an agreement, and then you can maybe even jointly work with

23   the states towards settlement.

24         MR. MAO:  I understand the situation, your Honor.

25   The problem in the backdrop is the CMS letter and the

1    obligations that states have to recover both the federal and

2    state shares.  So, again, according to the agency itself,

3    the Medicaid programs have an obligation to pursue both the

4    federal and state share in any sort of overpayment

5    situation.  So the agency has taken a position that they

6    can't simply go after the state share of any sort of

7    Medicaid damages that are suffered.  Nevertheless, we of

8    course will be willing to work with the states in coming up

9    with some sort of mechanism that may accelerate the ability

10   to settle these matters.

11          THE COURT:  Because I see -- I don't pretend to

12   have an answer here.  I just simply know that

13   Professor Green, who has been working diligently on this,

14   feels as if that is a roadblock, that there's got to be some

15   understanding to cap the exposure of, let's say, Schering,

16   if they're going to ever settle.

17          MR. MULLIN:  Your Honor, if I might, I think that

18   whole issue is a red herring.  I don't believe any state is

19   not reaching a settlement with Schering because it's

20   concerned as to how much money it has to pay to CMS.  The

21   big sticking point in all the negotiations has been how many

22   dollars are on the table.  Mr. Mao's office, including

23   Mr. Mao, was in over four years of negotiations with

24   Schering-Plough about global settlements, and the two sides

25   were never close together with regard to what the numbers

1   were.  At the hearing that --

2         THE COURT:  Excuse me.  It would be very useful

3   for me to see a prototype to make sure that that was clear,

4   that it's never been a case where the federal side is

5   rejecting the state court's good-faith settlement number

6   simply because they think they don't want to be limited

7   to -- let's say you were to settle for a million and they

8   think it's two million, that's --

9         MR. MULLIN:  That's not how it works, your Honor.

10  Every state is totally empowered to settle its case for

11  whatever amount it wants to settle.  And then when it

12  receives the money, whatever the federal share is it pays to

13  the federal government.  We don't have to submit settlements

14  to the federal government.  We don't have to get their

15  approval.  That's just not a factor.

16        THE COURT:  All right, all right, that's very

17  useful to know.  And then does that bind the federal

18  government, that it can't go get --

19        MR. MULLIN:  As a practical --

20        THE COURT:  No, I don't want practical.  I'm

21  pushing you the way I did Mr. Breen.  Not as a practical

22  matter.  If you've settled for two million, and you in good

23  faith allocated that a million to the Commonwealth and a

24  million to the federal government, could Mr. Mao go, "What,

25  are you crazy?  You short-sold the federal government.

1    We're going to go sue some more"?

2            MR. MULLIN:  He can't because he hasn't filed the

3    case and he's beyond the statute of limitations.  The case

4    that Mr. Breen has pending could be pursued; and if that

5    were the case, whatever they'd paid this Commonwealth of

6    Massachusetts would be a setoff in the damages in that case.

7    The practical reality --

8            THE COURT:  But the federal government has sued

9    some on some of these cases.

10           MR. MULLIN:  The only federal case pending against

11   Schering-Plough is the Ven-A-Care qui tam.

12           THE COURT:  No, but you're not hearing me.  I

13   understand with Schering-Plough, maybe, but there are other

14   cases, and I've been told that --

15           MR. MULLIN:  Three.

16           THE COURT:  I understand.  There's Dey --

17           MR. MULLIN:  Roxane and Abbott.

18           THE COURT:  Roxane and Abbott, right?

19           MR. MULLIN:  Right.

20           THE COURT:  And I'm told that that's a problem in

21   trying to resolve those cases.

22           MR. BREEN:  In nine other declined cases, Judge,

23   that we're proceeding with.

24           THE COURT:  So we need a prototype for the federal

25   government to be involved so that you're not perceived as a

Page 43

1    roadblock to a reasonable settlement.

2              MR. MULLIN:  Your Honor, just so you know, Dan

3    Anderson, who's Mr. Mao's boss, was at the conference we had

4    with Professor Green.

5              THE COURT:  Well, I'm very glad to hear that

6    actually, so that's wonderful.

7              MR. BREEN:  Your Honor, Mr. Mullin hit on a very

8    important point, and I'm glad you pressed him like you

9    pressed me because there's something we're missing here.

10   And you were pressing me, am I waiving the federal share, am

11   I waiving the federal share?  And I couldn't give you an

12   answer because that's a legal issue that's undetermined

13   right now.  Okay, we've agreed to give --

14             THE COURT:  The language sounded like it.

15             MR. BREEN:  I know, Judge, but because it's being

16   given by a relator.  How far the relator can go is a

17   question of law.  But, your Honor, there's something we're

18   just not even talking about, but Mr. Mullin brought it up.

19   He's a separate sovereign.  He's got the full power of

20   Massachusetts law behind him.  He paid a hundred percent of

21   these claims.  I do not believe that Ven-A-Care in a

22   declined case settling its federal claims, after we've

23   helped collect more than half the money out there, way more

24   than half the money out there, prejudices Mr. Mullin in the

25   least in pursuing whatever he can pursue under his separate

1    statutes.  The same thing for Wisconsin and the same thing

2    for New York.  I'm not settling those claims.  I'm a qui tam

3    relator.  I've got no authority to bind him on anything.

4              THE COURT:  Excuse me.  Yes, you do if he's

5    seeking the federal share.  Maybe I don't care.  Maybe I

6    don't care who gets it.  I don't know why I should care if

7    Massachusetts gets it or Ven-A-Care gets it.  Maybe I don't

8    care.

9              MR. BREEN:  That's not the issue.

10             THE COURT:  The big -- that's a different issue

11   because you get a percentage of it for your relator, but, I

12   mean, I understand the economic incentives here.  But maybe

13   I don't care as a matter of public policy; but if they do

14   have a stake in it, you are wiping out half the damages in a

15   50/50 state.

16             MR. BREEN:  No, Judge, because it's a setoff

17   issue.  It's a contribution issue.

18             THE COURT:  I understand you.  I will wait till I

19   get there.  My biggest concern is, once the federal

20   government goes thumbs down, I don't know where that leaves

21   me.

22             MR. BREEN:  You're right, Judge, that's the issue.

23   I agree with that.

24             THE COURT:  And right now it's a thumbs down.  So

25   I think you have a lot of work to do to get in the same room

1  with the federal government and to pare this down, and maybe

2  in a way you could have the two states.  Massachusetts and

3  New York seem to have had a significant interest in this,

4  and maybe you can include them as representative of other

5  states out there that might have actions, and try and figure

6  out a formula.

7         Do you have a meeting date with Professor Green

8  yet.

9         MR. BREEN:  Judge, we've met with him.  We meet

10 with him all the time.  I mean --

11        THE COURT:  Well, maybe we're at the end of the

12 rope, and it's just me at this point.

13        MR. BREEN:  No, no, no, your Honor.  We'll meet

14 with him again.

15        THE COURT:  Well, I would suggest you do because

16 unless I see some fabulous case law to the contrary -- well,

17 you probably, Mr. Mao, live and die this statute.  What's

18 the standard of review that I have of you?

19        MR. MAO:  Actually I'm not entirely sure what the

20 standard of review is, but I can get you that.  I should

21 know but --

22        THE COURT:  You're about to live and die this

23 statute.  So, Ms. Bloom, do you --

24        MS. BLOOM:  I believe that our position is that it

25 is, that it is our discretion, and therefore that there

1    isn't an arbitrary and capricious review, that --

2            THE COURT:  Is there a case in the United States

3    of America that says that?

4            MR. BREEN:  Yes, your Honor, it's --

5            MS. BLOOM:  Yes.  I believe Judge Tauro has

6    addressed that issue, and we have the absolute --

7            THE COURT:  He didn't review under any standard?

8    He just said "absolute"?

9            MR. BREEN:  None except the Ninth Circuit.

10           MS. BLOOM:  You can't dismiss the United States

11   claims with prejudice, I believe.

12           THE COURT:  So what does the Ninth Circuit say?

13           MR. BREEN:  Your Honor, the Ninth Circuit is the

14   only circuit -- and this is an issue I live and die by, I'm

15   a qui tam relator lawyer --

16           THE COURT:  Yes, you do, yes.

17           THE COURT:  The Ninth Circuit is the only circuit

18   that is, on a settlement dismissal as opposed to a dismissal

19   for 9(b) or something like that, is the only circuit that

20   has said that the Justice Department has a reasonableness

21   standard, and there's a reasonableness review, and the court

22   can take away the discretion.

23           THE COURT:  But it's got to be deferential.  It's

24   just it may not be a total --

25           MR. BREEN:  Right.  But the rest of them, the

1  statute says what it says:  I can't dismiss it unless you

2  agree and the Justice Department agrees.  I mean, that's

3  what the statute says, and that's what I'm up against.  But

4  I just want everybody to understand this.  As a qui tam

5  relator, we're doing the best we can to get these cases

6  resolved, the best we can.

7            THE COURT:  What happens if you just simply say,

8  "I'm sick of it.  I'm not spending any more money"?

9  Dr. Lockwood says, "Forget this.  I like Massachusetts, but

10  it's raining."  So, you know, what if he simply says that?

11  Can you just walk away from the suit?

12            MR. BREEN:  Your Honor, I believe we can, and the

13  Justice --

14            THE COURT:  So let me push you on this.  So let's

15  say he says "good-bye."

16            MR. MAO:  That's fine, as long as the United

17  States' interests are not prejudiced.

18            THE COURT:  No, no, no, no.  What if he says, "I'm

19  not spending any money.  I'm not throwing good money after

20  bad.  Good-bye," are you guys willing to take up the suit?

21  Are you ready to intervene?

22            MR. MAO:  I'm sorry.  Could you repeat that again,

23  please.

24            THE COURT:  They say "Enough."  You've said, "I've

25  done the best I can," says Mr. Breen, "Dr. Lockwood.  I've

1   spent more than I'm going to do.  I'm at the end of my rope.

2   I'm walking away," are you going to intervene?

3           MR. MAO:  The government already declined in the

4   first instance.  Whether or not we would intervene for cause

5   if the relators dropped out, unclear.  I don't know.

6           THE COURT:  I'm just saying, at some point you've

7   got to be a little flexible here too.

8           MR. MAO:  I agree.

9           THE COURT:  Because otherwise you're going to be

10  sitting at this chair.

11          MR. BREEN:  Well, your Honor, I mean, the Justice

12  Department in their --

13          THE COURT:  What about California and -- at some

14  point -- you're separate sovereigns.  If he pulls out, you

15  continue to -- both of you --

16          MR. BREEN:  We will not pull out of California and

17  Florida, your Honor.  We are going to litigate those to

18  trial, like we did in Texas, or get them resolved.  The

19  question is the declined cases.

20          THE COURT:  I just met some guy the other day, I

21  forget his name, who was trying one of these cases in

22  Alabama or down South?

23          MR. BREEN:  Yes, your Honor.

24          THE COURT:  Whatever happened with that?

25          MR. BREEN:  Hung jury, Judge.  Your Honor, but the

1   point is, the Justice Department in this case indicated that

2   one of the reasons they declined was, the states' cases are

3   being litigated, and they're going to collect through there.

4   We can sit back and just collect under the alternative

5   remedy standard, your Honor, and we can brief that.  I mean,

6   there are --

7           THE COURT:  You might want to because at some

8   point, if they just go thumbs down, and I decline to go

9   behind that, you have some serious -- I'm looking at

10  Dr. Lockwood -- I'm looking across the abyss, as I call it,

11  over there -- you have some serious decisions to make.

12          MR. BREEN:  That's why I brought him.

13          THE COURT:  Fair enough.  And you as the

14  government will be stuck in a pretty bad -- instead of

15  getting less than you want, you may get zero.

16          MR. MAO:  Yes, your Honor.

17          THE COURT:  So I think, at this point, can you --

18  before you leave here today, I want you to set a time with

19  Professor Green and see if you can do something here, and

20  just write me a letter in a week about when that date is,

21  but it should be before our hearing in September.  Okay?

22          MS. BLOOM:  Judge, if I can just clarify one point

23  that may help move these, I think the government's issue is

24  not so much whether it's getting more or less than it wants,

25  but that the languages of the releases must match what it's

1    getting paid for, and that it must think it's fair,

2    adequate, and reasonable for each thing.  So this dispute

3    about what's really being released then is the problem.

4            THE COURT:  The $55 million they're claiming,

5    Mr. Montgomery says, is what -- now, obviously he's doing it

6    from Schering's point of view -- is what he says matches

7    what you could -- a fair compromise of what you could

8    reasonably recover nationally.  I don't have my handle on

9    the numbers well enough.

10           MS. BLOOM:  I think it's the release language that

11   is the biggest holdup, but of course that has a lot of --

12           THE COURT:  But suppose you think it isn't

13   $55 million but $100 million, that's at least the beginning

14   of a debate for a national release.  They just want

15   finality, and it sounds like a good word to me.  You notice

16   how Mr. Montgomery knows how to get me going, which is

17   finality to this case, you know, like, let's just wrap it

18   up.  And if there's a way of your maybe -- if they'd be

19   willing to spend some more just to end it.  I'm assuming

20   that's what the board is asking you, the corporate board,

21   like, enough, attorneys' fees, just over.  So maybe, I don't

22   know, is someone here from Schering?  You are?

23           MR. TRENT:  Beth Trent.

24           THE COURT:  So at some point if you could be

25   involved in this as well.  I mean, at some point this is

Page 51

1   expensive.

2         MR. TRENT:  I'm smiling because as everyone here

3   knows, I'm always involved.

4         THE COURT:  All right, fair enough, you're sitting

5   at this side of the bench.

6         Okay, so is there anything else I need to do with

7   this case?

8         MR. MONTGOMERY:  I think we need that date from

9   Robert.

10        THE COURT:  Yes, Robert.

11        THE CLERK:  September 25 at 2:00 p.m.

12        THE COURT:  Fabulous.  Thank you.  And, once

13   again, regardless of what your status is, the states are

14   welcome to appear and argue.

15        MR. MULLIN:  Thank you, your Honor.

16        THE COURT:  All right, let me ask you this from

17   California and Florida.  I love having you here, but we

18   actually have technology that would let you argue and watch

19   this stuff from your various states.

20        MR. PAUL:  We're aware of that, your Honor, and

21   it's an important case to us, and you lose something by

22   being on the disconnected end of a phone call.

23        THE COURT:  You do, but we are finally tech -- I

24   just had a trial here where I had witnesses from Israel,

25   Hong Kong, Canada, and across the United States testifying

1    on the screen, and it was not perfect, but it saved a huge

2    amount of money.  And I'm just willing to offer that to you,

3    should you want to, or anybody in your offices want to do

4    that.

5              MR. PAUL:  I appreciate that, your Honor.  We

6    would like to get this settlement to work.  It's very

7    important to us.

8              THE COURT:  Okay, thank you.

9              THE CLERK:  Court is in recess.

10             (Adjourned, 3:13 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 53

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )


        I, Lee A. Marzilli, Official Federal Court
Reporter, do hereby certify that the foregoing transcript,
Pages 1 through 52 inclusive, was recorded by me
stenographically at the time and place aforesaid in Civil
Action No. 01-12257-PBS and 06-11337-PBS, In Re:
Pharmaceutical Industry Average Wholesale Price Litigation,
and thereafter by me reduced to typewriting and is a true
and accurate record of the proceedings.
        In witness whereof I have hereunto set my hand
this 2nd day of August, 2009.




                /s/ Lee A. Marzilli
                _____
                LEE A. MARZILLI, CRR
                OFFICIAL FEDERAL COURT REPORTER