## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| PHARMACEUTICAL INDUSTRY | ) | Subcategory No. 06-11337 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | Hon. Patti B. Saris |
| _____ | ) | |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| *United States ex rel. Ven-A-Care of the* | ) | |
| *Florida Keys, Inc.* v. *Schering Corporation,* | ) | |
| *Schering-Plough Corporation and* | ) | |
| *Warrick Pharmaceuticals Corporation* | ) | |
| Civil Action No. 09-CV-10547 | ) | |
| MDL Action No. 1456 | ) | |
| | ) | |
| *United States ex rel. Ven-A-Care of the* | ) | |
| *Florida Keys, Inc.* v. *Schering Corporation,* | ) | |
| *Schering-Plough Corporation and* | ) | |
| *Warrick Pharmaceuticals Corporation* | ) | |
| Civil Action No. 00-CV-10698 | ) | |
| MDL Action No. 1456 | ) | |
| | ) | |
| *California ex rel. Ven-A-Care of the* | ) | |
| *Florida Keys, Inc.* v. *Schering Corporation,* | ) | |
| *Schering-Plough Corporation and* | ) | |
| *Warrick Pharmaceuticals Corporation* | ) | |
| Civil Action No. 03-CV-11226 | ) | |
| MDL Action No. 1456 | ) | |
| | ) | |

## AFFIDAVIT OF BETH TRENT, ESQ.

I, Beth Trent, Esq., being duly sworn, depose and state as follows:

1.      I became employed as a Legal Director at Schering Corporation on October 31,

2005, at which time I became the principal in-house lawyer at Schering responsible for managing

its AWP litigation.  I have continued in that role through the present.

- 1 -

2.      In that role, I have supervised AWP litigation on a daily basis – including directing our defense in three trials and successfully negotiating multiple AWP settlements – and lead our on-going efforts to achieve a global resolution of AWP litigation.

3.      I submit this Affidavit in support of the parties' Joint Motion for Approval of the Settlement Between California, Florida, and the Relator Ven-A-Care of the Florida Keys on behalf of itself and the United States and Schering-Plough, Schering, and Warrick.  Specifically, I submit this Affidavit to explain to the Court why (i) the Proposed Findings as to Schering's brand drugs and (ii) preclusion as to the federal-share of any alleged Medicaid overpayment are essential elements of any viable settlement.

***AWP-Related Cases Naming Schering/Warrick as Defendants***

4.      Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation ("Schering/Warrick") have been defendants in AWP litigation since 1997 when Ven-A-Care first added claims against Schering/Warrick to its federal *qui tam* Complaint, which asserts claims under the federal False Claims Act ("FCA").

5.      Over the last twelve years, Schering/Warrick have been named as defendants in thirty-seven (37) AWP-related cases.  A list of those cases is attached hereto as Exhibit A.

6.      Schering and/or Warrick remains a defendant in twenty-four (24) AWP-related cases:

> a.      Schering/Warrick are defendants in seventeen (17) state court actions brought outside of the AWP MDL by the States of Alaska, Alabama, Florida, Hawaii, Idaho, Illinois, Kansas, Kentucky, Mississippi (two separate cases), Pennsylvania, South Carolina, Utah, and Wisconsin and by the counties of Erie, Oswego, and Schenectady, New York.

> b.      In addition, Schering/Warrick are defendants in the Arizona, California, Iowa, Massachusetts, and New York counties matters pending before this Court.

     c.       Schering/Warrick are also defendants in the two Ven-A-Care *qui tam* actions brought under the federal FCA that are pending before this Court and that would be resolved as a part of this Settlement.

7.      Schering/Warrick has also brought three AWP cases to trial.

     a.       Schering/Warrick was the first defendant to try an AWP case to a jury. After a jury trial in late 2005 of the State of West Virginia's claims against the Schering/Warrick for Medicaid fraud, fraudulent misrepresentation, and violation of the state's Consumer Credit and Protection Act, the jury, on December 7, 2005, found in favor of Schering/Warrick on all counts.

     b.       Schering/Warrick was also a Track 1 Defendant in the MDL Class Action. In this Court's June 2007 Opinion following a bench trial on Classes 2 and 3, the Court found no liability as to the Schering brand products at issue in that action, Proventil®, Temodar®, and Intron-A®.  In November 2007, the Court determined that Warrick was also not liable because Plaintiffs could not establish any damage relating to Warrick's price reporting. Accordingly, on November 20, 2007, the Court entered judgment in favor of Schering-Plough, Schering, and Warrick.  Plaintiffs did not appeal from that judgment.

     c.       Schering/Warrick also tried a case brought by the State of Missouri to a jury in October 2008.  Following an initial finding for the State, Schering/Warrick settled the case with the State of Missouri for $31 million.

8.      In addition, Schering/Warrick has been dismissed from three private class actions pending outside this MDL – two of which were pending in New Jersey state courts and one of which was pending in the Arizona state court – and an action brought by the State of Minnesota.

***Successful Settlements***

9.      Between 2004 and 2009, Schering/Warrick settled other actions brought by state Attorneys General on behalf of the Medicaid programs prior to trial:  Texas (2004 - $27 million), Arkansas (2007 - $550,000), Connecticut (2007 - $257,000), Ohio (2009 - $4.3 million), Nevada (2009 - $350,000), and Montana (2009 - zero).  With the exception of the Texas settlement which pre-dated my employment at Schering, I was the lead inside counsel involved in negotiating each of these settlements.  While the circumstances of each settlement varied, based

on my experience, they all had one thing in common:  the claims asserted in each case reflected the same economic and marketplace realities that form the basis of this Court's decision in the AWP MDL action.

10.     Specifically, as this Court is well aware, most branded pharmaceutical products are sold at or about their list price, known in the industry as WAC, subject to some modest and well-known discounts, such as the widely-available 2% prompt pay discount.  In turn, the national pricing compendia publish AWPs for brand drugs reflecting an industry-standard mark-up of twenty or twenty-five percent over the WAC for the particular NDC.  In contrast, the pricing for generic drugs works differently, as generic drugs do not enjoy the same patent protection as brand drugs.  Accordingly, generic drugs are sold like commodities almost exclusively on the basis of price competition, and the differences between published prices (AWPs) and actual prices tend to be greater than they are for brand drugs.

11.     The functional result of these marketplace realities is that Schering's brand drugs do not present "spread" or sales at WAC patterns upon which this Court found liability in the MDL Class Action case and, recognizing these realities, the states with which Schering/Warrick have been able to settle are ones that have not asserted claims as to Schering's brand drugs.

***Impediments to Global Resolution***

12.     Following our West Virginia and MDL trials, Schering/Warrick renewed its efforts to achieve a global resolution of all Medicaid-related AWP cases with DOJ and the states. In that context, Schering/Warrick provided DOJ with a comprehensive analysis of the spread and sales at list for Schering's brand drugs.  In fact, at DOJ's request, the expert analysis, underlying data, and other information bearing on the reasonableness of the treatment of brand drugs in this

Settlement were provided to DOJ in February of 2008.  However, Schering/Warrick faced a number of significant roadblocks to global resolution, most notably:

- In many of the pending state cases, the AWP theory of liability differs from the theories advanced before this Court in a way that extends liability to Schering's brand drugs;

- That difference also artificially and necessarily increases the claim for the federal-share of damages; and

- At the same time, the fact that states (not the federal government directly) are asserting claims for the federal-share of damages introduces procedural problems that have substantively impaired Schering/Warrick's ability to present a defense as to the federal-share.

13. Medicaid is a joint federal-state program in which CMS must approve state Medicaid plans, including the reimbursement formula, and state and federal governments share funding responsibilities.  The federal government pays for not less than 50% of all Medicaid expenditures and, in some cases, up to as much as 70% of the expenditures.  This is what I refer to as the "federal-share."  By statute, when a state sues to recover an alleged Medicaid overpayment, it must seek to recover not only any monies that the state allegedly overpaid, but also any monies that the federal government allegedly overpaid.  Thus, where as here, DOJ/CMS has "declined to intervene against Schering/Warrick, in part, because it knew that several states had sued Schering/Warrick for the Covered Conduct and were presumably pursing both the federal and state shares of their respective state's Medicaid damages," (Corrected United States' Objection to the Proposed Settlement Between Schering-Plough Corp., Schering Corp., Warrick Pharmaceuticals Corp. and Ven-A-Care of the Florida Keys, and Proposed Order at 5-6 (July 21, 2009) (Dkt. 6283)), state theories of liability materially impact the magnitude of the claim for the federal-share.  Equally importantly, the manner in which states and DOJ respond to discovery issues, and states shape evidentiary issues, significantly impacts Schering/Warrick's ability to develop and present a defense to claims for the federal-share.

**Impact of State Theories of AWP Liability on the Magnitude of the Federal-Share**

14.     The effect of these issues is perhaps best understood by comparing the liability

faced by Schering/Warrick under this Court's ruling and the liability faced by Schering/Warrick

on the same set of facts in certain state court proceedings.  In cases before this Court, plaintiffs'

theory of liability has recognized a simple and hardly exceptional fact of the pharmaceutical

marketplace:  states reimburse pharmacies for more than the price at which Schering/Warrick

sells its products to wholesalers.  If this were not the case, pharmacies would lose money on

every Medicaid transaction.  This simple fact is embedded in the MDL plaintiffs' "expectations"

theory and is likewise reflected in this Court's decisions.

15.     Notwithstanding this economic reality, however, in many of the other cases

pending around the country, the fundamental theory plaintiffs espouse is that every penny by

which the state chooses to reimburse pharmacists over Schering/Warrick's net wholesaler selling

price is a penny of damages.  I refer to this as a theory of "unlimited liability."  By way of

illustration, if Schering's WAC for a brand drug is $1.00 and the mark-up to AWP is 25%, its

AWP is $1.25.  Assuming that the wholesaler gets a 2% prompt pay discount, the net price paid

by the wholesaler would be $0.98.  In a state that reimburses pharmacies at AWP-10%, the

pharmacy would be paid $1.13.  Under a theory of unlimited liability, the damages claimed

would be $0.15.

16.     To put in its starkest terms, in contrast to the rulings of this Court under which the

circumstances described above would not give rise to any liability, this unlimited theory of

liability functionally results in substantial damages every time Schering sells any brand drug at

or near WAC.  Put differently, certain state plaintiffs are seeking to collect damages for what this

Court has described as an industry-standard and widely-understood mark-up from WAC to AWP

for brand drugs of twenty or twenty-five percent, which was imposed by the pricing compendia when publishing AWPs for brand drugs.  For Schering/Warrick, the result is that, outside of the AWP MDL, approximately 85% of plaintiffs' damages claims are derived from brand pricing of a type that this Court determined did not result in liability.

### Procedural Issues That Impair Schering/Warrick's Ability to Present a Defense as to Claims for the Federal-Share

17.     The federal-state nature of the Medicaid program presents impediments to the resolution of these claims that are not merely monetary.  The DOJ/CMS decision to seek recovery of the federal-share indirectly through AWP cases brought by state and local governments has introduced process issues that substantively impair Schering/Warrick's ability to develop and present a defense to claims for the federal-share as well.  The process issues presented in connection with claims for the federal-share are best illuminated through the use of actual examples from the AWP litigation that I supervise.

18.     The New York counties case pending before this Court supplies a good example of the discovery problems that Schering/Warrick faces when litigating federal-share claims in a case brought by state or local governments.  In that case, defendants sought the deposition of Cindy Bergin, one of the individuals at CMS responsible for setting Federal Upper Limits, but had their request for that discovery denied by CMS, which cited the *Touhy* regulations. Nevertheless, in assisting plaintiffs' counsel in opposing summary judgment, another CMS employee (Sue Gaston) provided an affidavit, which speculated about the FUL that Ms. Bergin might have set if presented with a hypothetical set of facts.  Thus, on the one hand, CMS – the real party in interest on the federal-share claims – frustrated discovery and, on the other hand, it assisted plaintiffs' by providing testimony that was not subject to cross-examination.  In the end,

if plaintiffs succeed on their claims, CMS will collect the federal-share of the damages recovered.

19.     The process and procedural issues presented in state court proceedings outside of the AWP MDL have placed even greater limitations on Schering/Warrick's ability to mount a defense to claims on the federal-share.  In those state cases, Schering/Warrick have been denied direct discovery of CMS on such critical issues as the federal government's knowledge and understanding of AWP as it reviewed and approved state reimbursement formulae according to which the federal-share was calculated and paid.  Compounding these limits on discovery, at trial, states seeking to recover the federal-share have, at the same time, succeeded in precluding Schering/Warrick from introducing evidence relating to CMS's knowledge and understanding of AWP and the interplay between reimbursement and the federally-mandated access requirement.

20.     Again, these issues are best illuminated by events in an AWP trial that I supervised.  For example, at trial in Missouri, Schering/Warrick were precluded from even uttering the words "access" or "cross-subsidization."  In fact, during their Missouri trial, Schering/Warrick were permitted to offer into evidence only one of the numerous OIG reports that study Medicaid reimbursement (the report that specifically studied Missouri reimbursement).  In that instance, although Missouri's written response to the report was to explain to OIG that Missouri was reimbursing at a rate greater than pharmacists' actual acquisition cost to compensate them for dispensing fees that were too low to ensure that Missouri satisfied the federally-mandated access requirement, Schering/Warrick were precluded from presenting that response to the jury.  Indeed, Schering/Warrick were ordered to redact from the only OIG report that they were permitted to show to the jury Missouri's explanation to OIG for why Missouri had set its reimbursement rate at the level it had chosen.  A copy of that trial

exhibit with highlighting used to show those portions of the OIG report that Schering/Warrick were ordered to redact is attached hereto as Exhibit B.

21.     Thus, even though CMS was the real party in interest as to the federal-share, DOJ and CMS's decision to pursue recovery of the federal-share through state actions enabled Missouri to litigate for the federal-share while Schering was precluded from showing that CMS knew Missouri was reimbursing at a rate that was, on average, higher than pharmacists' actual acquisition cost, that CMS knew why Missouri was reimbursing at a higher rate than pharmacists' actual acquisition cost, and that CMS did not require Missouri to change its reimbursement formula.

***Additional Roadblocks***

22.     On October 28, 2008, CMS sent a letter to State Health Officials.  What I understand to be a true and accurate copy of that letter is attached hereto as Exhibit C.  In relevant part, the letter reiterates CMS's position that, in seeking to recover any alleged Medicaid overpayment, a state must seek both the state- and federal-share of that alleged overpayment, must refund any recovery immediately (*i.e.*, even before an appeal becomes final), and must fund ***all*** of the costs of the litigation out of the state-share of any recovery.  Notably, it has been my experience in trying to settle these cases that, by seeking to impose all of the costs of litigation on the states, CMS has created a disincentive for states to recognize the market realities in their theories of AWP liability.

23.     That disincentive is compounded by the natural incentive of the private plaintiffs lawyers who have been hired by the states to prosecute AWP cases on their behalf to characterize liability in the most expansive terms possible in order to maximize their own compensation.

*Opportunity for Global Resolution*

24.     In November 2008, DOJ declined to intervene in Ven-A-Care's federal FCA *qui tam* actions seeking recovery of the federal-share of any alleged Medicaid overpayment nationwide.  That decision presented Schering/Warrick with a unique opportunity to resolve the impediments that existed to a global settlement relating to the federal-share.  The foundation for this opportunity is that all of the Ven-A-Care cases, federal and state, have always reflected the marketplace realities recognized by this Court that limit – and in Schering's case eliminate – brand liability.  Thus, in negotiating with the Relator, settlement was not impeded by inflated demands based on unlimited AWP liabilities theories.  Instead, consistent with this Court's view that these AWP cases are "mature" (which we understand to mean that the history of the cases should provide guidelines for resolution), we were able to engage in rational negotiations with the Relator.

25.     Taken in combination with the fact that, by its very nature, a resolution reached with the Relator should be a resolution of the entire federal-share, we were able to engage in productive negotiations that resulted in the Settlement presented here.

Signed under the pains and penalties of perjury.

Beth Trent