# EXHIBIT A

FILED BY_____ D.C.

97 AUG 20  AM 11: 10

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,
ex rel. Ven-A-Care of the
Florida Keys, Inc.,

Plaintiffs,

v.

Abbott Laboratories; ██████
██████████ et al.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 95-1354-Civ-Marcus

**FILED UNDER SEAL**

**UNITED STATES'
STATUS REPORT**

The United States presents to this Court, ex parte and under seal, its status report in the above-referenced case and states:

Substantial activity has occurred since the United States last brought this matter before the Court.  For example, many meetings and conferences have been held with the representatives of the Medicaid programs of the states of Florida, Texas and New Jersey.  Another meeting is scheduled for August 21, 1997 with representatives of the Medicaid program for Alabama.  Preliminary

8/20/97

ABT008-0354

discussions have been held with representatives of the Medicaid programs of other states as well.  The meetings have been productive, particularly with regard to enlisting the aid of each state in searching for relevant information and data.

A first wave of documentary evidence was recently received from the State of Texas.  The documents relate to representations made by several of the defendants to the Texas Medicaid program with regard to their drug prices.  Those documents have been reviewed and follow-up discussions have been held to request additional materials from Texas which are maintained in archives which were not as easily accessible as the first group of documents.

The State of Florida has provided the United States with computer data regarding the billings which it has received for many of the drugs at issue.  Although the computer information was analyzed in part and was very helpful, the analysis could not be completed because the data needed to be revised.  The revised data has not yet been received and further analysis has been delayed.

Most importantly, the Health and Human Services Office of Inspector General is in the process of preparing "Inspector General" subpoenas for service upon each of the named defendants. The subpoenas are currently being reviewed for approval by the appropriate officials in Washington, D.C.  Once the subpoenas have been approved, it is anticipated that they will be quickly

2

ABT008-0355

issued and served upon each of the 24 defendants.  The subpoenas
will seek, among other things, documents which reflect the prices
at which the drugs were actually sold as well as all
communications with any Medicaid program regarding price
representations.  Also, the subpoenas are not going to be
"broadsides" seeking hundreds of thousands of pages of documents,
but instead, targeted requests that relate directly to the
evidence provided by Florida and Texas Medicaid.  Receipt of
corroborating evidence, pursuant to the subpoenas, will greatly
advance the investigation and will enable the United States to
narrowly tailor the issues relevant to the intervention
decision..

Most recently, the Plaintiff in this action has now filed a
Second Amended Complaint.  The Second Amended Complaint has
expanded the allegations from 105 to 222 pages and names a total
of 24 pharmaceutical companies as defendants.  The Court
previously extended the seal in this matter through August 19,
1997 based upon the government's need for additional time to
investigate this complicated and difficult case.  As set forth in
the Relator's motion accompanying the Second Amended Complaint,
the filing of the second amended complaint has thereby triggered
a new 60-day evaluatory period for the government.  The United
States will endeavor to comply with the new deadline set thereby.

3

ABT008-0356

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

WILLIAM A. KEEFER
UNITED STATES ATTORNEY

By:

MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL 33132
(305) 536-5472 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

MICHAEL F. HERTZ
JOYCE R. BRANDA
T. REED STEPHENS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 616-1437

4

ABT008-0357

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this _20ᵗʰ_ day of March, 1997 to:

Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131

                                    _____
                                    ASSISTANT UNITED STATES ATTORNEY

5

ABT008-0358      L

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,            )
ex rel. Ven-A-Care of the            )
Florida Keys, Inc.,                  )
                                     )    Case No. 95-1354-Civ-Kehoe
        Plaintiffs,                  )
                                     )
                                     )    **UNITED STATES' UNOPPOSED**
        v.                           )    **APPLICATION FOR EXTENSION OF**
                                     )    **TIME TO ELECT WHETHER TO**
                                     )    **INTERVENE IN QUI TAM ACTION**
Abbott Laboratories;                 )    **AND MEMORANDUM OF LAW**
                    et al.,          )
                                     )
        Defendants.                  )
_____)

        The United States, pursuant to 31 U.S.C. § 3730(b)(3), presents to this Court, ex parte

and under seal, this application for an extension of time of one hundred fifty (150) days up to and

including April 23, 1999, in which to notify the Court of its decision whether to intervene in the

above-captioned False Claims Act qui tam action, during which the Complaint and all other

related filings shall remain under seal.[1]

_____

    [1] *The Legal Authority supporting the proposed extension is set forth in the Government's
Memorandum accompanying its First Application for an Extension of Time. Rather than
reiterating the same points, the Government respectfully refers the Court to this previously
submitted memorandum.*

11/17/98

Since counsel for the United States appeared before the Court in March 1998, the United States has been diligently investigating the allegations set forth in the relator's Second Amended Complaint, filed in August 1997. Twenty-four defendants and two other subpoenaed non-parties have continued to provide documents over the course of the past several months. Counsel for the United States has pressed defendants to state that all responsive documents have been produced yet defendants continue to produce additional documents. The United States has also incurred considerable expense creating an electronic database for storage and review of the thousands of documents.

As set forth in the Declaration of T. Reed Stephens ("Stephens Declaration") accompanying the instant application, the United States has pursued a non-stop agenda of meetings and telephone conferences with numerous parties in an effort to meet the November 23rd intervention deadline. The meetings with the defendants and the state Medicaid entities described herein were authorized by the orders partially lifting the seal on the *qui tam* complaint. Nine face-to-face meetings lasting hours in duration each have been conducted with defense counsel. Many other meetings in at least five states have taken place among counsel for the United States and the representatives of the 47 state Medicaid Fraud Control Units actively participating in the assessment of this qui tam matter. See Stephens Declaration and Declaration of Carolyn McElroy, Director Maryland Medicaid Fraud Control Unit, accompanying the instant Application for Extension of Time.

Despite this activity, plaintiff's counsel has been able to meet, to date, with counsel for only ten of the 24 defendants. The first sixty days of the requested extension will permit counsel for the United States to have initial substantive meetings with the remaining 14 defendants and

- 2 -

ABT008-1062

continue to meet with counsel for the first ten.  The final 90 days of the requested extension will be devoted to completing any settlement negotiations.  Thus far, plaintiff is engaged in earnest settlement talks with one of the defendants.

Counsel for the United States has kept the relator's representatives actively involved in the investigation so there would be no question from relator's perspective as to whether the United States has been "dragging its feet" over these past months.  Relator agrees that the five month extension will allow the United States and the State representatives to complete its investigation.

In addition to the reasons set forth in the Stephens Declaration, additional good cause exists for the five month extension.  As set forth in the accompanying Declaration of David Honig, Assistant Attorney General for the State of Florida ("The Honig Declaration"), the State of Florida has been

## CONCLUSION

For the foregoing reasons and those set forth in the accompanying declarations, plaintiff

- 3 -

ABT008-1063

respectfully requests that the Court grant the instant request for a five month (150) extension of

time in which to elect to intervene — during which this qui tam matter will remain under seal.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By:    _____
       MARK A. LAVINE
       Assistant U.S. Attorney
       99 N.E. 4th Street
       Miami, FL  33132
       (305) 961-9303 Tel.
       (305) 536-4101 Fax
       Fla. Bar No. 648876


By:    _____
       MICHAEL F. HERTZ
       JOYCE R. BRANDA
       T. REED STEPHENS
       GEORGE VITELLI
       Civil Division
       Commercial Litigation Branch
       P.O. Box 261
       Ben Franklin Station
       Washington, D.C.  20044
       (202) 307-0404

November 17, 1998

- 4 -

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing Motion for

Extension of Time (without the attached declarations) was mailed this _17ᵗʰ_ day of November,

1998 to:


Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131


ASSISTANT UNITED STATES ATTORNEY

- 5 -

ABT008-1065

# EXHIBIT C

FILED

APR 22 1999

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,      )
ex rel. Ven-A-Care of the      )
Florida Keys, Inc.,            )      Case No. 95-1354-Civ-Gold
                               )
            Plaintiffs,        )      **DECLARATION OF T. REED**
                               )      **STEPHENS IN SUPPORT OF**
             .                 )      **UNITED STATES' UNOPPOSED**
                               )      **APPLICATION FOR EXTENSION OF**
            v.                 )      **TIME TO ELECT WHETHER TO**
                               )      **INTERVENE IN QUI TAM ACTION**
                               )
Abbott Laboratories; ▮▮▮▮      )
▮▮▮▮▮▮▮▮▮ et al.,              )
                               )
            Defendants.        )
_____)


I, T. Reed Stephens, do state and declare as follows:

1. I am a trial attorney in the Commercial Litigation Branch, Civil Division in the United States Department of Justice, and I am assigned primary responsibility for the above-captioned qui tam litigation. I make the instant declaration in support of the United States' Application for an Extension of Time to Elect to Intervene in the above-captioned litigation.

2. This case is a qui tam action against numerous pharmaceutical manufacturers — ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dey Labs., Glaxo Wellcome Inc., Bayer, Inc., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ SmithKline Beacham, Inc., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ — initiated by relator Ven-A-Care of the Florida Keys, Inc. ("relator"), pursuant to the False Claims Act, as amended, 31 U.S.C. § 3730(b).

ABT008-1038

3.  Relator, Ven-A-Care of the Florida Keys, is a provider of a broad class of specialty drugs that generally cannot be purchased over the counter by the public.  These drugs, which are not orally administered, are often used to treat life-threatening or terminal illnesses, such as AIDS, cancer, and hemophilia.  These drugs are typically administered by an injection, IV infusion, or by inhalation.

4.  Relator alleges in its complaint (and in the subsequent amended complaints) that the defendant drug manufacturers inflate the reported prices of the drugs so that government payors, such as Medicare, Medicaid, and TRICARE, pay fraudulently inflated reimbursement to providers who buy these drugs and, in turn, supply them to patients suffering from these serious illnesses.  The defendant drug manufacturers' alleged incentive for carrying on this scheme is to attract providers to purchase their drugs.  Even though the provider — not the manufacturer — receives the inflated reimbursement payment from the government, the manufacturer benefits greatly through increased profit caused by increases in market share for its drugs.

5.  Relator alleges that defendants are able to influence drug brand purchases by providers because they control the basis for Medicare and Medicaid reimbursement for its products -- the reported price.  The relator alleges that reported prices for Medicaid and Medicare drugs come in two classes:  Average Wholesale Price ("AWP") and Wholesale Acquisition Cost ("WAC").  The defendant drug manufacturers allegedly determine -- without any government or private insurance input -- what the AWP and WAC will be for their respective products.

6.  Since the service of subpoenas, authorized by the Department of Health and Human Services Office of Inspector General ("HHS-OIG"), on each of the 24 defendants, the government's investigation has progressed substantially.  The government outlined its

- 2 -

ABT008-1039

investigative steps in detail in its previous request for an extension of the intervention deadline. The past few months of investigation — as set forth below — have been equally productive, but the demands of an investigation of 24 separate corporate entities requires that the government request an additional extension of time.

7.  The United States and Relator shared hundreds of pages of documents with the National Association of Medicaid Fraud Control Unit Directors ("NAMFCU") who have responsibility for assessing Medicaid fraud allegations affecting their respective states.  The membership of NAMFCU has been instrumental in past False Claims Act matters involving multiple jurisdictions because of its ability to efficiently obtain data on potential damages, identify witnesses on the state level, obtain authority to compromise claims or initiate civil actions.  In the instant qui tam, NAMFCU's ongoing participation is necessary to facilitate the orderly resolution or litigation of this matter.

8.  The United States continues to receive from the defendants documents responsive to the HHS-OIG subpoenas.  The United States has also committed substantial financial resources to creating electronic document storage and review databases for the tens of thousands of pages of documents produced by the defendants pursuant to the subpoenas.

9.  Beginning in December 1998 and continuing through the present, counsel for the United States has conducted over a dozen additional witness interviews across the country in furtherance of its investigation into the allegations.  The government has been negotiating with the defendants for the interviews of over a dozen additional former and current employees.

10.  Counsel for the United States and the Executive Committee of NAMFCU continue to facilitate the identification of witnesses and evidence relevant to the allegations.  This work has

- 3 -

ABT008-1040

enabled the United States and the Relator to organize a substantial amount of information as

substantive discussions continue with the defendants.  This activity continues to the present and

is vital to the efficient resolution of this qui tam matter since the allegations include all 50 states

as well as the federal Medicare program.  On March 18, 1999, counsel for the United States and

Relator updated the NAMFCU Directors during their annual meeting in Washington, D.C.

11.  Counsel for the United States has conducted seven additional face-to-face meetings

with counsel for various defendants regarding the allegations and the evidence.[3]  These

substantive meetings and settlement conferences occurred on February 15th, March 5th, March

10th, March 19th, March 24th, April 12th, and April 13th of this year.   The next face-to-face

meeting with defense counsel is planned for April 29th.  Numerous telephone conferences have

also been conducted between counsel for the United States and the myriad defendants.

12.   These meetings have resulted in settlement offers from two defendants and raise the

prospect that the number of defendants in this qui tam can be whittled down during the pre-

intervention period in a manner that serves judicial economy.

13.   The meetings with the offering defendants and other defendants have also dealt with

issues of prospective regulatory compliance and, ultimately, the mitigation of the damages

allegedly suffered by the government.  The compliance issues are critical to the resolution of this

matter and considerable effort is necessary to bring the parties to agreement.

14.  The Civil Division's policy is generally to afford a defendant an opportunity to be

apprized of the False Claims Act allegations and make a substantive response before the

---

[3]     Counsel for the government conducted nine such meetings prior to the last intervention
deadline.

ABT008-1041

government makes its election to intervene in a matter such as this. To date, the defendants have

insisted mostly on face-to-face meetings with Counsel for the United States. The sheer volume

of defendants has, however, made it impossible for Counsel for the United States — despite its

best efforts — to give a meaningful opportunity to each of the 24 defendants. Additional time is

needed to complete this process which will allow all parties to fully frame the legal and factual

issues.

15. If the instant extension request is granted, the United States will (1) continue its

settlement negotiations with defendants who have communicated good faith offers of settlement,

(2) continue to pursue opportunities to interview the witnesses represented by the various defense

counsel and witnesses employed by non-parties, such as First DataBank, and (3) continue to meet

with each defendant's counsel so that the defendant can be fully informed of the qui tam

allegations and be given a reasonable time in which to respond to the evidence and the

allegations.

16. To date, no defendant has expressed any reservations regarding the continuance of

the seal. To the contrary, the defendants — rather than asserting prejudice at the continuance —

have, instead, suggested that they need additional time to rebut the allegations prior to the

intervention deadline. This circumstance has been caused primarily by the number of defendants

(the majority of which were named by the relator for the first time when the qui tam complaint

was amended in August 1997).

17. The United States and the various state Medicaid programs are also continuing to

work on efforts to mitigate further the damages caused by the alleged scheme to defraud the state

and federal healthcare programs. For example, the current settlement negotiations have led to at

ABT008-1042

least one proposal from two defendants that could allow for substantial mitigation of damages for

certain drugs identified in the complaint.   The lifting of the seal at this time could result in a lost

opportunity that likely would not be available during the first several months of the litigation.

18.  I have discussed the instant extension request with counsel for relator.  Relator does

not object to this request for extension.

I declare under penalty of perjury that the foregoing is true and correct.

T. Reed Stephens

Dated: April 21, 1999

- 6 -

ABT008-1043          L

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,       )
ex rel. Ven-A-Care of the       )
Florida Keys, Inc.,             )       Case No. 95-1354-Civ-Kehoe
                                )
            Plaintiffs,         )       **DECLARATION OF T. REED**
                                )       **STEPHENS IN SUPPORT OF**
                                )       **UNITED STATES' UNOPPOSED**
            v.                  )       **APPLICATION FOR EXTENSION OF**
                                )       **TIME TO ELECT WHETHER TO**
                                )       **INTERVENE IN QUI TAM ACTION**
Abbott Laboratories;            )
                     et al.,    )
                                )
            Defendants.         )
_____  )

I, T. Reed Stephens, do state and declare as follows:

1.  I am a trial attorney in the Commercial Litigation Branch, Civil Division in the United

States Department of Justice, and I am assigned primary responsibility for the above-captioned

qui tam litigation.  I make the instant declaration in support of the United States' Application for

an Extension of Time to Elect to Intervene in the above-captioned litigation.

2.  This case is a qui tam action against numerous pharmaceutical manufacturers —

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Dey Labs., Glaxo Wellcome Inc.,

Bayer, Inc., ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ SmithKline Beacham, Inc., ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓ — initiated by relator Ven-A-Care of the Florida Keys, Inc.

("relator"), pursuant to the False Claims Act, as amended, 31 U.S.C. § 3730(b).

3. Relator is a provider of a broad class of specialty drugs that generally cannot be purchased over the counter by the public. These drugs which are not orally administered are often used to treat life-threatening or terminal illnesses, such as AIDS, cancer, and hemophilia. These drugs are typically administered by an injection, IV infusion, or by inhalation.

4. Relator alleges in its complaint that the defendant drug manufacturers inflate the reported prices of the drugs so that government payors, such as Medicare, Medicaid, and TRICARE, pay fraudulently inflated reimbursement to providers who buy these drugs and, in turn, supply them to patients suffering from these serious illnesses. The defendant drug manufacturers' alleged incentive for carrying on this scheme is to attract providers to purchase their drugs. Even though the provider — not the manufacturer — receives the inflated reimbursement payment from the government, the manufacturer benefits greatly through increased profit caused by increases in market share for its drugs.

5. Relator alleges that defendants are able to influence drug brand purchases by providers because they control the basis for Medicare and Medicaid reimbursement for its products -- the reported price. The relator alleges that reported prices for Medicaid and Medicare drugs come in two classes: Average Wholesale Price ("AWP") and Wholesale Acquisition Cost ("WAC"). The defendant drug manufacturers allegedly determine -- without any government or private insurance input -- what the AWP and WAC will be for their respective products.

6. In March 1998, the United States and relator came before the Court to request additional time to investigate this matter and pursue settlement negotiations with the defendants. Counsel for the United States identified numerous investigative tasks that the United States would pursue over the course of the extension period. In response, the Court extended the time

- 2 -

ABT008-1067

to make an intervention election until November 23, 1998.  During this most recent extension period, the United States has performed virtually all of the tasks which it identified for the Court during the March 1998 hearing.  The one task of that list not yet completed is the conducting of meetings with counsel for all 23 defendants.  The following is a recitation of a portion of plaintiff's activities since the hearing in March.

7.  On March 19 and 20, 1998, counsel for the United States and Relator addressed the National Association of Medicaid Fraud Control Unit Directors during its annual meeting in Washington, D.C.  At this time, the United States and Relator shared hundreds of pages of documents with the NAMFCU members who have responsibility for assessing Medicaid fraud allegations affecting their respective states.  The membership of NAMFCU has been instrumental in past False Claims Act matters involving multiple jurisdictions because of its ability to efficiently obtain data on potential damages, identify witnesses on the state level, obtain authority to compromise claims or initiate civil actions.  In the instant qui tam, which involves 24 defendants, NAMFCU's ongoing participation is necessary to facilitate the orderly resolution or litigation of this matter.

8.  The United States sought and obtained from the Department of Health and Human Services Office of Inspector General ("HHS-OIG") additional subpoenas which were served in July 1998 upon the Hearst Corporation (controlling entity for First DataBank and Medi-Span) and Medical Economics (controlling entity for the RedBook), the two entities that the defendants, utilize to publish the allegedly false prices to the state and federal governments.  First DataBank has cooperated to some extent with the subpoena.  Medical Economics has delayed compliance with the subpoena served upon it.

- 3 -

ABT008-1068

9. Throughout May, June, and July, Counsel for the United States maintained a steady line of communication with the directors of the Medicaid Fraud Control Units of over a dozen states including Florida, Arizona, North Carolina, Maryland, Washington state, Rhode Island, and Illinois, as well as the Medicaid pharmacy personnel in many of these states. These communications were coordinated by NAMFCU. The United States has also committed substantial financial resources to creating electronic document storage and review databases for the tens of thousands of pages of documents produced by the defendants pursuant to the subpoenas served upon them by HHS-OIG.

10. Counsel for the United States entered into an informal working relationship with the Executive Committee of NAMFCU in order to facilitate the identification of witnesses and evidence relevant to the allegations. This work has enabled the United States and the Relator to organize a substantial amount of information as a prelude to substantive discussions with the defendants. In particular, the NAMFCU representatives have been gathering from all 50 states the specific pieces of information relating to the allegedly fraudulent reimbursement claims submitted by the providers who purchased defendants' drugs. See Declaration of Carolyn McElroy, Director Maryland Medicaid Fraud Control Unit, Accompanying the Motion for Extension of Time. This activity continues to the present and is vital to the efficient resolution of this qui tam matter since the allegations include all 50 states as well as the federal Medicare program.

11. In July 1998, counsel for the United States initiated contacts with the defendants' counsel regarding the evidence produced by the defendants. Counsel for the United States conducted telephone conferences with counsel for one of the defendants during the weeks of July

- 4 -

ABT008-1069

13th and the 20th.

12.  In August 1998, counsel for the United States initiated the first of a series of telephone conferences with counsel for Medical Economics in an effort to obtain its good faith compliance with the subpoena served upon it.  To date, Medical Economics has produced only one document in response to the subpoena.  Also during August, during the week of August 10th, counsel for the United States conducted a telephone conference with counsel for another defendant.

13.  On September 1, 1998, counsel for the United States met with Relator and its counsel in Miami, Florida to review documents produced by defendants and to prepare for the first settlement conference with one of the defendants.

14.  On September 10, 1998, counsel for the United States and Relator and its counsel met with representatives of the state of Illinois in Chicago, Illinois, to obtain additional assistance in gathering evidence regarding the qui tam matter.

15.  On September 16, 1998, counsel for the United States, for the Department of Health and Human Services, and for the States of Maryland and Washington (representing all 47 members of NAMFCU) conducted a five hour settlement conference with counsel for one of the defendants in Washington, D.C.  The meeting yielded sufficient progress to warrant scheduling a second meeting for the following week.

16.  On September 14, 1998, counsel for the United States and the Department of Health and Human Services Office of Inspector General again attempted to negotiate Medical Economics' compliance with the OIG subpoena served upon it.

17.  During the week of September 14th, counsel for the United States also initiated

- 5 -

discussions with the Food and Drug Administration regarding evidence regarding the subject of the September 14th settlement conference.

18.  On September 24th, a second settlement conference was conducted with counsel for the defendant with whom lengthy discussions were held on September 16th.

19.  On October 8, 1998, counsel for the United States met with counsel for a different defendant in Miami, Florida to discuss the qui tam allegations.  In addition, to presenting its initial responses to the allegations, defense counsel inquired as to how much time was available to it before the qui tam intervention deadline.

20.  On October 14, 1998, counsel for the United States, for the HHS-OIG, and NAMFCU met with counsel for a third defendant in Washington, D.C. to discuss the qui tam allegations against it.  Defense counsel also inquired about the intervention deadline and its opportunity to rebut the evidence.

21.  On October 19, 1998, Relator and its counsel traveled to San Diego, California to share information with representatives of the state of California.  Counsel for the United States participated in the first day of the meeting by telephone.  The meeting resulted in additional cooperation and assistance being pledged by the state of California.

22.  On October 20, 1998, counsel for the United States met again with counsel for the second defendant in Washington, D.C. to hear defense counsel's partial rebuttal of the evidence. Defense counsel also disclosed that it had hundreds of pages in its possession that it was now prepared to turn over to the United States.

23.  After meeting with Defense Contract Audit Agency and Defense Criminal Investigative Service representatives in Miami, Florida on October 21, 1998, counsel for the

ABT008-1071

United States returned to Washington, D.C. to meet again with the second defendant's counsel on October 23, 1998. At that time, counsel for the United States reviewed several hundred pages of newly produced documents relevant to the qui tam allegations.

24. During the week of October 19, 1998, counsel for the United States contacted counsel for a fourth defendant to discuss the qui tam allegations. Defense counsel stated that it would review its records and formulate a response to the evidence and the allegations. Defendant has, to date, not offered any formal rebuttal to the evidence.

25. On October 28, 1998, counsel for the United States, for the HHS-OIG met with counsel for a fifth defendant in Washington, D.C. to discuss the qui tam allegations for three hours. Despite having had months to interview company employees and review its own records, defense counsel professed to having no actual knowledge of its client's potential responses to the evidence presented by the United States at this meeting. Defense counsel inquired about the intervention deadline however.

26. On October 30, 1998, counsel for the United States and for the HHS-OIG conducted a telephone conference with a law firm that represents five other defendants in this matter. Counsel for the United States expressed concern regarding the possible conflict of interest in the multiple representations then disclosed the qui tam allegations to defense counsel. Defense counsel, in this instance as well, professed ignorance as to what factual responses its five clients would have to the evidence presented despite having had an open line of communication to counsel for the United States since the service of the HHS-OIG subpoenas in October 1997.

27. On November 4, 1998, counsel for the United States and Relator and its counsel met with representatives of the Office of Attorney General of the State of New York in New York

- 7 -

ABT008-1072

City to obtain specific additional assistance and cooperation in investigating the qui tam allegations.

28.  In addition, on November 4, 1998, counsel for the United States met again with counsel for the first defendant in New York, New York.  At that time, defense counsel presented a second settlement proposal that may successfully address not only the financial issues but also may provide a regulatory blueprint for resolving the regulatory issues raised by the qui tam litigation.  Additional meetings are necessary, and defense counsel have asserted that their client has yet to work out all settlement issues internally.

29.  On November 4, 1998, counsel for the United States interviewed a key employee of a non-party drug manufacturer to learn how that company's drug pricing practices differed from the defendant drug manufacturers.

30.  On November 10, 1998, counsel for the United States, HHS-OIG, and NAMFCU met with counsel for the third defendant in order to receive from defendant a more detailed presentation of its defenses.  Despite this presentation, the third defendant has yet to make available any witnesses for interview in support of its purported defenses.  At this meeting, counsel requested an additional meeting during the week of November 23rd.  The meeting has since been confirmed

31.  On November 12, 1998, counsel for the United States and for HHS-OIG met with counsel for the fifth defendant in Washington, D.C. to discuss in further detail the qui tam allegations.  Although counsel for the United States first spoke to the defendant's in-house counsel three weeks prior to the meeting date, defense counsel was unable to provide any information to the United States regarding the evidence or identities of witnesses who could

- 8 -

ABT008-1073

potentially support defendant's defense theories.  At the end of the meeting, defense counsel

specifically stated that it would support the United States' request for an extension of the seal.

32.  On November 13, 1998, counsel for the United States and NAMFCU representatives

met with counsel for First DataBank, a subpoenaed non-party, in New York City.  The purpose

of the meeting was to obtain press for further compliance with the HHS-OIG subpoena and

obtain an explanation of how First DataBank goes about obtaining the pricing information that it

publishes to the public on behalf of the defendants.

33.  Counsel for the second defendant has scheduled a meeting with Counsel for the

United States on November 17th because of concerns that it will not have the opportunity to

make a full rebuttal presentation prior to the intervention deadline.

34.  In all, Counsel for the United States has conducted in the past 60 days alone nine

face-to-face meetings with counsel for five of the defendants.  Two additional meetings are

currently scheduled within the next ten days.  In addition, Counsel for the United States

conducted a three hour conference call with the law firm representing five other defendants and a

face-to-face meeting with a crucial subpoenaed non-party.  The Civil Division's policy is

generally to afford a defendant an opportunity to be apprized of the False Claims Act allegations

and make a substantive response before the government makes its election to intervene in a

matter such as this.  To date, the defendants have insisted mostly on face-to-face meetings with

Counsel for the United States.  The sheer volume of defendants has, however, made it impossible

for Counsel for the United States — despite its best efforts — to give a meaningful opportunity to

each of the 23 defendants.  Additional time is needed to complete this process which will allow

all parties to fully frame the legal and factual issues.  There are several tasks that the Counsel for

ABT008-1074

the United States will perform by April 1999 if the Court grants the instant unopposed request for extension.

35. The United States will (1) continue its settlement negotiations with defendants who have communicated good faith offers of settlement, (2) continue to pursue opportunities to interview the witnesses represented by the various defense counsel and witnesses employed by non-parties, First DataBank and Medical Economics, (3) continue to meet with each defendant's counsel so that the defendant can be fully informed of the qui tam allegations and be given a reasonable time in which to respond to the evidence and the allegations. At the current rate of nearly one meeting per week, we will have an opportunity to conduct at least one substantive meeting with each defendant by mid-January. The remaining 90 days of the 150 period is intended to provide time for follow-up communications of a substantive nature between the parties. These follow-up communications include the witness interviews referenced above as well as the settlement negotiations.

36. To date, no defendant has expressed any reservations regarding the continuance of the seal. To the contrary, the defendants — rather than asserting prejudice at the continuance — have, instead, suggested that they need additional time to rebut the allegations prior to the November 1998 intervention deadline. This circumstance has been caused primarily by the number of defendants (several of which were named for the first time when the qui tam complaint was amended in August 1997) named by the relator.

37. The United States and the various state Medicaid programs are also continuing to work on efforts to mitigate further the damages caused by the alleged scheme to defraud the state and federal healthcare programs. For example, the current settlement negotiations have led to at

- 10 -

ABT008-1075

least one proposal from a defendant that could allow for substantial mitigation of damages for certain drugs identified in the complaint. Further, the McElroy Affidavit gives additional information on the state level efforts to achieve regulatory changes — with the assistance of defendants — that mitigate the damages. The lifting of the seal at this time could result in a lost opportunity that likely would not be available during the first several months of the litigation.

38. I have discussed the instant extension request with counsel for relator. Relator does not object to the request for a 150 day extension.

I declare under penalty of perjury that the foregoing is true and correct.

T. Reed Stephens

Dated: November 16, 1998

- 11 -

ABT008-1076

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 95-1354-CIV-GOLD

UNITED STATES OF AMERICA,　　　　)
ex rel. Ven-A-Care of the　　　　　)　　**FILED UNDER SEAL**
Florida Keys, Inc.,　　　　　　　)
　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　)
　　　　　　　　　　　　　　)
Abbott Laboratories;　　　　　　)
　　　　　　　　　　　t al.,　　)
　　　　　　　　　　　　　　)
　　. Defendants.　　　　　　　)
_____)

**UNITED STATES' UNOPPOSED APPLICATION FOR EXTENSION OF TIME TO
ELECT WHETHER TO INTERVENE IN QUI TAM ACTION AND MEMORANDUM
OF LAW**

　　　　The United States, pursuant to 31 U.S.C. § 3730(b)(3), presents to this Court, ex parte

and under seal, this application for an extension of time of ninety (90) days up to and including

October 19, 2000, in which to notify the Court of its decision whether to intervene in the above-

captioned False Claims Act qui tam action, during which the Complaint and all other related

filings shall remain under seal.[1]

_____

　　[1] The Legal Authority supporting the proposed extension is set forth in the Government's
Memorandum accompanying its First Motion for an Extension of Time. Rather than reiterating
the same points, the Government respectfully refers the Court to this previously submitted
memorandum.

This case is a <u>qui tam</u> action against 29 pharmaceutical manufacturers[2] initiated by relator Ven-A-Care of the Florida Keys, Inc. ("relator"), pursuant to the False Claims Act, as amended, 31 U.S.C. § 3730(b).  In sum, the Third Amended Complaint alleges that the defendants have purposely caused the publication of artificially high (i.e. false) drug prices which are relied upon by third-party payors such as Medicare and Medicaid to set reimbursement levels. As a result, the providers (physicians, home health care companies and pharmacies) enjoy a large profit because they are able to actually purchase the drugs for a significantly discounted price and get reimbursed at the much higher, false, published price.  The Complaint further alleges that this approach is used a marketing tool in order to generate additional sales of the drugs.

Since the time of the last extension request, the United States has made substantial progress in this investigation.  Of great significance is that the publishing entity responsible for gathering pharmaceutical pricing information and distributing it to the various state Medicaid programs has implemented a change in the way it does business[3].  As of May 1, 2000, the publishing entity began providing more accurate prices for many of the drugs whose prices were

---



[2] The named defendants include Abbott Laboratories, Inc., Bayer Corporation, Dey, Inc., Glaxo Wellcome, Inc.,

[3] As noted in the Unites States' previous memorandum, the state Medicaid programs utilize the pricing information published by this entity to reimburse for pharmaceuticals provided to Medicaid recipients.  This issue is important because the heart of this case has always been that the prices provided by the defendants through the publishing entity to the Medicaid programs are vastly inflated in order to provide illegal profits to the practitioners who utilize the products. In other words, if a physician buys a drug for $5, but gets reimbursed $100 from Medicaid, he makes a profit of $95.

most exaggerated.  The published prices for a large portion of the drugs will now be closer to the actual selling prices of the drugs.  Thus, the wrongful conduct of the defendants won't be able to cause windfall profits to the medical community.   In addition, a large portion of ongoing damages being suffered by the Medicaid programs is in the process of being eliminated.

In addition, as stated in the United States's previous motion, the United States has begun to pursue an accelerated schedule of settlement discussions with the defendants in the hope that such discussions will move at a faster pace, in part because of the publication of the more accurate prices.  Settlement negotiations are very near to conclusion with Bayer Laboratories. The representatives of the state and federal governments met with Bayer's representatives for several hours on May 1st to set up a framework of resolving outstanding settlement issues.  This led to additional lengthy face-to-face meetings on June 7th, July 11th and July 12th.  The parties continue to work on the few remaining outstanding settlement issues and plan to reconvene on July 25th in what the parties hope will be the last substantive settlement conference.

As part of a further push to both move this case toward settlement and to conclude the United States' intervention investigation, the Department of Health and Human Services is in the process of serving subpoenas to the defendants and various witnesses.  Follow-up subpoenas will be served on the 24 defendants previously named as defendants in the case.  New subpoenas will be served on the 6 new defendants named for the first time in the Relator's recently filed Third Amended Complaint and upon 9 pharmaceutical wholesalers who regularly deal in the goods at issue.

Other efforts to spur this case forward are moving forward as well.  A 96-page memorandum of law prepared by the Relators was recently provided to many of the defendants as an additional inducement to settle the case.  The memorandum contains a detailed explanation of the law underlying the claims in the case.  In addition, over the next few weeks, the United

States is going to invite every defendant to participate in a uniform settlement process with the goal of pushing through as many settlements as possible prior to commencing litigation in this matter. The United States submits that the pre-litigation settlement of the allegations of the complaint against as many defendants as possible is especially desirable in a case of this magnitude and complexity. The additional extension of time, at a minimum, should allow the more advanced negotiations to come to fruition and allow the other negotiations to advance to a point where a appraisal can be made as to whether a settlement is likely. At that point, it is hoped that a decision on intervention can be made with the expectation that actual litigation will be necessary with respect to only a minority of the defendants.

As a result of this activity, plaintiff's counsel has been able to meet or commence discussions with counsel for all defendants except for those named for the first time in the Relator's Third Amended Complaint. Indeed, the Department of Justice's policy is generally to afford a defendant an opportunity to be apprized of the False Claims Act allegations and make a substantive response before the government makes its election to intervene in a matter such as this. To date, the defendants have insisted mostly on face-to-face meetings with Counsel for the United States. The sheer volume of defendants has, however, made it impossible for Counsel for the United States — despite its best efforts — to give a meaningful opportunity to each of the defendants. Additional time is also needed to complete this process which will allow all parties to fully frame the legal and factual issues.

In sum, the requested extension will permit counsel for the United States to (1) continue its witness interviews and depositions, (2) continue its current settlement negotiations with defendants, including the finalization of at least one agreement, (3) pursue additional efforts to mitigate the damages allegedly suffered by the Medicare and Medicaid programs, (4) push for compliance with the new agency subpoenas served on the defendants and other witnesses and (5) analyze the additional documents subpoenaed from the defendants and witnesses. As before, the

ABT008-1614

Respectfully submitted,

DAVID W. OGDEN
ASSISTANT ATTORNEY GENERAL

GUY A. LEWIS
UNITED STATES ATTORNEY

By:

MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9003 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876
Mark.Lavine@usdoj.gov

By:

MICHAEL F. HERTZ
JOYCE R. BRANDA
T. REED STEPHENS
DIANA YOUNTS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
(202) 307-0404

July 21, 2000

ABT008-1615

# EXHIBIT F

**CIVIL DIVISION**
**COMMERCIAL LITIGATION BRANCH**
**FRAUD SECTION**



FROM:    U.S. Department of Justice
         Civil Division
         Commercial Litigation Branch
         Fraud Section

         U.S. Department of Justice          Street Address:
         P.O. Box 261                        Patrick Henry Building
         Ben Franklin Station                 601 D Street, N.W.
         Washington, D.C. 20044              Washington, D.C. 20004

         Fax No.    202-514-0280
         Voice No.

SENT BY: T. Reed Stephens

TO: David Reidy

FAX No. 312 - 782 - 8585

NUMBER OF PAGES SENT (INCLUDING COVER PAGE): 11

SPECIAL INSTRUCTIONS:

IMPORTANT: This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the above address.



**United States Department of Justice**

Civil Division

*MFH:JRB:TRStephens*                         *(202) 307-0404*
46-19-1821                                    *Post Office Box 261*
                                              *Benjamin Franklin Station*
                                              *Washington, D.C. 20044*

COMMUNICATION MADE PURSUANT TO
FEDERAL RULE OF EVIDENCE 408

September 30, 1999

**BY FACSIMILE AND FIRST CLASS MAIL**

Daniel E. Reidy, Esq.
Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601-1692

  Re: United States ex rel. [Relator] v.
    [Abbott Labs] [FILED UNDER SEAL]

Dear Mr. Reidy:

  The purpose of this letter is to notify your client Abbott
Laboratories ("Abbott") that a <u>qui</u> <u>tam</u> has been filed naming it
as a defendant in a False Claims Act matter.  This <u>qui</u> <u>tam</u> matter
is still subject to a sealing order, and you may not disclose its
existence beyond your client.  In addition to this notification,
our purpose is also to inform you and your client of our
perspective of the legal and factual elements of the case as the
government determines whether to proceed against Abbott under the
False Claims Act and/or common law theories.

  In the <u>qui</u> <u>tam</u> complaint, which is over two hundred pages in
length (exclusive of exhibits), the relator alleges that Abbott
caused the Medicare and the state Medicaid programs to pay
excessive reimbursement for infusion and oncology drugs by
inflating the drugs' Average Wholesale Prices ("AWP"), Wholesale
Acquisition Costs ("WAC"), and Direct Prices ("DP").  The states
and the federal government use these prices as benchmarks in
establishing provider reimbursement for hundreds of thousands of
National Drug Codes.  The relator alleges that Abbott is aware of
this reliance and, in turn, manipulated the AWPs, WACs, and DPs
so as to increase the Medicare and Medicaid reimbursement paid to
Abbott's customers.  These customers, healthcare providers, are
paid through claims presented to Medicaid and Medicare which are
allegedly false because these claims knowingly overstated several

times over both the provider acquisition cost and the wholesaler
acquisition cost for the drugs.  The complaint alleges that
Abbott is culpable for the submission and payment of these false
claims because of the high degree of control that it exercises
over the amount of reimbursement paid to the providers.

A.    **Legally Enforceable Or "Truthful" Claims May Still**
      **Be Rendered False By A Fraudulent Course of Conduct**

The provider claims at issue in the _qui tam_ are neither
facially "truthful" nor legally enforceable.  Even if a court
disagreed, however, the courts have repeatedly looked beyond the
face of such claims to the nature of the conduct underlying the
submission of the claims.  In past False Claims Act litigation,
the government has successfully relied on the proposition that a
claim that may be truthful on its face can be rendered false if
it was submitted pursuant to a fraudulent course of conduct.

In _United States v. Incorporated Village of Island Park_, 888
F. Supp. 419 (E.D. N.Y. 1995), the district court held that

> the provisions of the False Claims Act are to be read
> broadly and reach beyond "claims" which might be
> legally enforced, to all fraudulent attempts to cause
> the Government to pay out sums of money; thus the
> statute is violated not only by the person who makes a
> false statement or false record to get the government
> to pay a claim, but also by one who engages in
> fraudulent course of conduct that causes government to
> pay a claim for money.  (Emphasis added).

_Island Park_, 888 F. Supp. at 439, citing _United States v. McLeod_,
721 F. 2d 282, 284 (9th Cir. 1983)(payments by government for
timber sale proceeds were legally enforceable claims but not
enforceable by defendant who no longer owned land)(quoting _United
States v. Niefert-White Co._, 390 U.S. 228, 233, 88 S. Ct. 959,
962 (1968).

_Island Park_ is not a "rogue" decision but rather a well-
reasoned one that includes a lengthy precedential and legislative
backdrop for the court's holding.[1]  The _Island Park_ court makes
clear that "the legislative history indicates that the FCA was
intended to cover each and every claim submitted . . . by means

---

[1]    The expansive language of the _Niefert-White_ opinion was
recently cited with approval in _United States v. Carpentieri_,
1998 WL 749042, *4 (October 26, 1998 S.D.N.Y.)(Sand, J.) quoting
_United States v. General Dynamics_, 19 F.3d 770, 773 (2d Cir.
1994)("refus[ing] to accept a rigid, restrictive reading" of
FCA).

- 2 -

of false statements, or other corrupt or fraudulent conduct, or
in violation of any statute or applicable regulation." S. Rep.
No. 345 at 9, reprinted in 1986 U.S. Code Cong. and Admin. News,
5266, 5274. Bid-rigging schemes, such as that described in
United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943), are
indicative of claims that technically may not be false but that
were derived from "a fraudulent course of conduct." The
"truthful" claims become false because of the fraudulent course
of conduct used to trick the government into paying them. See
also United States v. CFW Construction Co., 649 F. Supp. 616, 618
(D.S.C. 1986)(in bid rigging cases the proscribed harm does not
stop with the execution of the contract but extends to each
intermediate step along the path to payment by the government),
appeal dismissed, 819 F. 2d 1139 (4th Cir. 1987).

     The Island Park court followed this analysis when it held
the following:

     "[w]hen claims for payment on those mortgages were
     submitted by the innocent mortgagees, the fraudulent
     course of conduct pursuant to which the mortgages were
     approved emerge in `full vigor' and become part of
     those claims, which therefore constitute false claims
     within the meaning of the False Claims Act."

Island Park, supra, at 440.

     Other holdings that similarly deal with otherwise legally
enforceable claims include United States ex rel. Sanders v. East
Alabama Healthcare Authority, 953 F. Supp. 1404 (M.D. Ala.
1996)(no requirement that government prove that services
underlying alleged false Medicare and Medicaid claims were
"unnecessary, not rendered") citing Peterson v. Weinberger, 508
F. 2d 45, 52 (5th Cir. 1975); United States ex rel. LaValley v.
First National Bank of Boston, 707 F. Supp. 1351, 1352 (D. Mass.
1988)(lender's claim upon government loan guarantee was not
fraudulent but false statement in loan application was); and
United States v. Ehrlich, 643 F. 2d 634 (9th Cir.) cert. denied
454 U.S. 940 (1981).

     The progeny of the Niefert-White case do not require a
showing that the defendant violated a specific statute or
regulation. Even so, the allegedly false and misleading price
information disseminated by Abbott potentially violates the Food
and Drug Administration's ("FDA") primary labeling provision
contained in the Food, Drug and Cosmetic Act ("FDCA"), 21
U.S.C.A. § 301 et seq. We believe that the FDA, which has direct
regulatory authority over your client and its products, will
conclude that Abbott's price representations (directly to the
Medicaid programs, First DataBank, Medi-Span and/or the Red Book)
may be false and/or misleading within the meaning of section 502
of the FDCA.

**B.    Abbott's AWPs May Be False and Fraudulent Even
If It Argues That The AWPs Represent a "Reasonable
Interpretation" Of An Ambiguous Regulation or Statute**

After the fact assertions by drug manufacturers that their
AWPs are set under "reasonable" criteria in the face of
"ambiguous" guidance from applicable regulations and statute
cannot provide a dispositive defense to the qui tam allegations.
The Ninth Circuit Court of Appeals' recent decision in United
States ex rel. Oliver v. Parsons Company, et al., 1999 WL 503843
(9th Cir. (Cal.))(July 19, 1999), gives a cogent analysis of why
this defense argument fails.  In Oliver, the panel held that the
district court erred in finding that the "'falsity' element under
the Act was not met because Parsons demonstrated that it made a
reasonable interpretation of an ambiguous accounting standard,
citing Hagood v. Sonoma County Water Agency . . . ".  Oliver,  .
1999 WL 503843, at *3.  The Ninth Circuit stated that "Hagood
does not stand for the proposition that a 'reasonable
interpretation' of a regulation precludes falsity." Id.  The
Ninth Circuit concluded, rather, that it is "Parsons' compliance
with these regulations, as interpreted by this court, that
determines whether" the claims were false.  Id.

The purported "reasonableness" of a drug manufacturer's
interpretations of Average Wholesale Price and Wholesale
Acquisition Cost cannot alone preclude a finding of falsity.  The
Oliver court explicitly approved of the Department of Justice's
reading of the law in footnote 2 where it stated

the Government correctly points out the potential
problem created by embracing a 'reasonable
interpretation' exception to the 'falsity' of a claim.
A defendant could submit a claim, knowing it is false
or at least with reckless disregard as to falsity, thus
meeting the intent element, but nevertheless avoid
liability by successfully arguing that its claim
reflected a 'reasonable interpretation' of the
requirements.  Id. at *5.

We have extensive evidence of deceptive manufacturer
marketing tactics designed to shift excessive government drug
reimbursement dollars from payors to providers.  In one Abbott
document, dated January 1996, the Abbott employee outlines an
ongoing Abbott scheme to set the AWP of Calcijex at 125% of the
"single case price" because the Medicare program only reimburses
Abbott's customers for "80% of the published AWP."  This scheme
which was "not something new and [] is not a change in policy"
resulted in Abbott customers being reimbursed for at least 100%

of their acquisition cost for the drug rather than Medicare's
stated policy of paying 80%.  The Abbott employee states that
Abbott inflates the AWPs for "other HPD products" by "120% of
list."  This evidence — that Abbott knowingly circumvents
government Medicare policy — contradicts any assertion that
Abbott employs "reasonable interpretations" of the applicable
Medicaid and Medicare regulations and statutes.

> **B.   False Statements To Government Contractors
>        Or Other Third Parties May Also Provide the
>        Predicate For A False Claims Act Violation**

        In addition to the allegedly false and misleading price
representations made directly to the state Medicaid programs by
your client, the evidence shows that Abbott submitted price
information to First DataBank, a contractor to the state
governments, that was allegedly intended to give a false
impression of the true wholesale and direct prices of the drugs
at issue here.  These allegedly false statements may form the
predicate of a False Claims Act violation even though the
communications were not directly between your client and the
government.  Moreover, the case law in the Eleventh Circuit
extends the reach of the False Claims Act to false statements
made to third parties who are not government contractors.  Under
the latter circumstance, false statements to Medi-Span and Red
Book must also be taken into consideration.[2/]

        In United States ex rel. Luther v. Consolidated Industries,
et al., 720 F. Supp. 919 (N.D. Ala. 1989)(false claims submitted
by subcontractor to government contractor), the court led its
analysis with the following:  "[a] false claim is actionable
although the claims or false statements were made to a party
other than the Government, if the payment would ultimately result
in a loss to the United States."  Luther, 720 F. Supp. at 921.
The Luther court cited a number of other supporting opinions
involving false statements made to government contractors and
other entities not directly in a contractual relationship with
the government.  See, e.g., United States v. Lagerbusch, 361 F.
2d 449 (3rd Cir. 1966)(defendant's false representations were
made to private employer which operated government installation
under terms whereby government reimbursed employer for all
operating costs), United States v. Douglas, 626 F. Supp. 621,
626-27 (E.D. Va. 1985)(film makers potentially liable for false
report submitted to Navy by Navy pilot used by filmmakers to

---

[2/]   In the January 1996 Abbott memorandum referenced above, the
Abbott employee notes that Abbott sends the inflated AWPs to
Medi-Span so that the Medicare Intermediaries, who "get their
pricing from the published AWP's of the three reporting
agencies," will receive the false and misleading information.

organize stunts even though filmmakers took no part in making report), and Murray & Sorenson, Inc. v. United States, 207 F. 2d 119 (1st Cir. 1953). As the Luther court summed up, "even though the false claims in this case were presented to Teledyne, and not the government directly, a claim was submitted 'upon or against the government' under the False Claims Act." Id.

We find additional authority in the Fourth Circuit Court of Appeals' recent decision in Harrison v. Westinghouse Savannah River Company, 1999 WL 308587 (4th Cir. (S.C.))(May 17, 1999)(defendant allegedly made false statements in order to induce government into offering subcontract to third party), as significant evidence of the likelihood that the courts will view Fujisawa as culpable for the provider claims submitted to Medicaid and Medicare. The decision makes clear that the holding of United States v. Niefert-White — that the False Claims Act is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government" — is a sound cornerstone of False Claims Act case law. Harrison, supra, at *9, quoting, United States v. Niefert-White, 390 U.S. 228, 232 (1968).

In the decision, the Harrison court makes clear that False Claims Act liability extends to cover any source of false information sent to the government whether or not that source is the "recipient or beneficiary of the fraudulently induced contract." Id. at *14. This liability attaches not just in the case of contracts and subcontracts but any time there is " . . . fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder." Id. at *9. This is so whether or not the claims submitted were otherwise "truthful." Id. In fact, the Harrison court's opinion is closely aligned with the reasoning set forth in our letter to you, dated April 26, 1999.

Nowhere in the opinion does the Harrison court restrict the definition of "falsity" to statements that violate a statute or regulation. Nor does the court require a falsified certification. Rather the court takes the common sense approach of analyzing — through its four prong test -- whether or not the allegedly false statement is true. Id. at *9.

For example, in January 1995, Abbott sent a memorandum to First DataBank by facsimile that purports to give Abbott's "trade" and "wholesale" prices for Dextrose 50% Injection 2000ML. Abbott reported a wholesale price of $238.74. This price far exceeds the actual wholesale price of Dextrose when sold through an infusion wholesaler such as Florida Infusion or Oncology Therapeutics Network. Similarly, on September 23, 1998, Abbott informed First DataBank by electronic mail that the "Direct" price of Vancomycin HCL was $612.90 per package of ten while the "WHLS" price was $380.00 per package of ten. These prices far

- 6 -

outstrip the actual direct and wholesale prices of these products that were commonly purchased through the so-called distributor channels. For example, the Ultracare wholesale catalog lists the same Vancomycin NDC at $7.41 per unit and $370.59 for a package of 50. Additional inflated "Wholesale" prices were provided for Dextrose 5% Injection 150 ML, Sodium Chloride 0.9% Injection 10 ML, and Sodium Chloride 0.9% Injection 150 ML on November 24, 1998.

In April and May 1995, Abbott provided inflated "wholesale" prices for Amikacin Sulfate and Vancomycin HCL. Abbott staff notes from March 1997 confirm that Abbott employees consider WAC and "wholesale" to be synonymous so there is little doubt that Abbott understood that it was representing WAC prices as the prices at which it was selling its products to wholesalers. Even as Abbott provided First DataBank in 1998 with Direct Prices that were hundreds of dollars higher than WAC prices for products such as Acyclovir, Abbott staff appear to have chalked up the discrepancies to "contract savings" that applied only to WAC pricing.

These allegedly false or misleading statements — whether made directly to the states or transmitted through First DataBank, Medi-Span or the Red Book — would very likely fall within the Eleventh Circuit definition of materiality. In <u>United States v. Diaz</u>, 690 F. 2d 1352, 1357 (11th Cir. 1982), the Eleventh Circuit held that an allegedly false statement is material if "[it] had a natural tendency to influence, or be capable of affecting or influencing a government function." Moreover, the government does not have to show

> actual reliance on the false statements. A statement can be material even if it is ignored or never read by the agency receiving the misstatement. False statements must simply have the capacity to impair or pervert the functioning of a government agency.

<u>Id</u>.

Based on the current evidence, Abbott's conduct appears to have directly contributed to the costly perversion of the functioning of both the Medicare and Medicaid reimbursement systems.

C.  **Defendants' Assertion of "Government Knowledge" Is Undermined By Repeated Industry Lobbying Regarding AWP And Actual Drug Cost**

During the course of our investigation, we have become aware of the assertion that the "government" had knowledge that AWP is not indicative of providers' actual acquisition cost for

- 7 -

pharmaceuticals.  Even taking this at face value, this assertion
is only an affirmative defense to the allegation that your client
acted "knowingly" within the meaning of the False Claims Act.
Assertions of government knowledge will be undermined by (1)
contrary assertions within the industry that AWP is a
representation of actual cost and (2) false and misleading price
representations made by Abbott directly to state Medicaid
agencies.

Specifically, we have credible evidence that at least one
defendant — acting in concert with an "independent" patient
group — represented to congressional staffers this past October
that AWP is the actual measure of cost to providers for a host of
oncology drugs.  These representations were not limited to this
defendant's products but, in fact, were made about the brand name
and generic versions of many chemotherapy drugs without reference
to specific manufacturers.  These facts will undermine the
government knowledge defense.

Moreover, throughout 1996, one defendant used a consultant,
characterized as an "independent" health care provider group,
which attempted to influence Medicare Carrier medical directors
on important reimbursement issues.[3/]  This evidence further
demonstrates the tactics used by the industry to discourage
reforms in the drug reimbursement system.  Ironically, one
letter-writing campaign involved the defendant's effort to
discredit a major product by another defendant.  The consultant
intended to discredit this other company without stampeding HCFA
into "implementing new reimbursement methodologies" that would
result in acquisition cost reimbursement in the Medicare and
Medicaid programs."[4/]  The consultant was also concerned about
the government discovering that it was actually acting on behalf
of the first defendant.

---

[3/]    The purported provider interest group upon whose letterhead
the Medicare correspondence was sent had the same mailing address
and telephone number as that of the consultants hired by the
defendant.

[4/]    The evidence will also reflect that HCFA  — rather than
acquiescing to AWP-based reimbursement — took steps to shift
Medicare reimbursement to an actual acquisition cost basis (see
42 C.F.R. Part 405.517) in 1992.  HCFA was thwarted on procedural
grounds by measures sponsored by the American Society of Clinical
Oncologists — a constituency that reaps tremendous financial
benefit from the continuation of AWP-based reimbursement.  The
state Medicaid programs have consistently taken discounts off of
AWP in recognition that it overstates costs by 10-20%.

As to the second counter to the "government knowledge" defense, in June 1993, Abbott provided false and misleading wholesale price information about Vancomycin HCL in response to Texas Medicaid's request for accurate, certified wholesaler and distributor price information.  For example, Abbott listed Vancomycin HCL, 1 gram for $49.42 per unit and $494.20 per case of 10.  Ultracare listed the same product with a unit price of $7.41 and offered a case of 50 units for $370.59. In January 1993, Abbott provided similarly misleading wholesale price information about Dextrose 5% injectable solution.  These documents demonstrate that states did seek accurate price reporting for reimbursement purposes.

We suspect that this evidence is only the tip of the iceberg.  Our view is that the "government knowledge" defense can be effectively countered on summary judgment by evidence that the industry has undermined the impact of HCFA's and the Office of Inspector General's price/cost research by systematically giving important government officials misleading information regarding AWP's relationship to actual cost.

### Conclusion

At this time, we are not persuaded that either (1) the purported lack of false statements directly to the government, (2) the "government knowledge defense" or (3) the "truthful" claims defense can establish -- as a matter of law -- that neither the federal nor the state governments have a claim for which relief can be granted.

Thus far, the evidence supports the allegation that your client was engaged in a course of conduct designed specifically to get provider claims paid in amounts far exceeding what the providers — particularly those purchasing from wholesalers — paid to acquire their products.  Your client was never compelled by the government to create dramatic reimbursement "spreads" for its products.  Moreover, your client has the unilateral power to eliminate these "spreads" overnight.[3]

---

[3]   We have compiled evidence showing that other large drug companies — operating within the same system — not only resist the temptation to set initial wide spreads or increase spreads over time but actually reduce AWP's when their customers' actual acquisition costs go down.  The preliminary evidence shows that the normal "spread" is approximately 16.66%.  This figure is well within the range of state efforts to discount AWP for reimbursement purposes.  Several manufacturers that are also defendants in this qui tam have dozens of products for which they have set spreads of exactly 16.66% where the spread reflects actual wholesale prices to providers.

- 9 -

Government payors should not have to change their systems of drug reimbursement just to police reimbursement abuses involving what appears to be less than 1% of the tens of thousands of drugs on their formularies. Our view is in accord with the Eleventh Circuit Court of Appeals in <u>United States v. Calhoon</u>, 97 F. 3d 518, 528 (11th Cir. 1996), when it stated that the Medicare reimbursement system is not to be reduced to "a cat and mouse game" where the overwhelmed government is required to police the honesty of providers seeking to maximize profits. The Eleventh Circuit acknowledged that the government has neither the resources nor the obligation to audit the entire Medicare system. We think this observation is no less applicable to the Medicaid system.

Feel free to contact us to discuss the evidence (documents or potential witness interviews) or case law that you consider relevant to the government's intervention decision. We look forward to hearing from you.

Sincerely,

T. REED STEPHENS
Trial Attorney
Commercial Litigation Branch
Civil Division

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By:
Mark A. Lavine
ASSISTANT U. S. ATTORNEY
U.S. Attorney's Office

cc:  Mary Riordan, HHS-OIG OGC
     Carolyn McElroy, Maryland MFCU Director

# EXHIBIT G

Boughn, Julie Carolyn                    January 16, 2007
                    Washington, DC

                                                      Page 1

              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

    ---------------------------X

    IN RE: PHARMACEUTICAL      : MDL NO. 1456

    INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION:

    PRICE LITIGATION           : 01-CV-12257-PBS

                               :

    THIS DOCUMENT RELATES TO   :

    U.S. ex rel. Ven-A-Care of : Judge Patti B. Saris

    the Florida Keys, Inc. v.  :

    Abbott Laboratories, Inc., : Chief Magistrate Judge

    No. 06-CV-11337-PBS        : Marianne B. Bowler

    ---------------------------X



         Videotaped Deposition of JULIE CAROLYN

    BOUGHN, held at the Law Offices of Jones Day,

    51 Louisiana Avenue, Northwest, Washington, D.C.

    20001-2113, before Cindy L. Sebo, RMR, CSR, CRR,

    RPR, of Henderson Legal Services, Notary Public in

    and for District of Columbia.

271ebd97-cf4b-4d10-9d80-ab3d42892489

Boughn, Julie Carolyn                                    January 16, 2007
                        Washington, DC

Page 222

1      A.   Um-hum.
2      Q.   Nothing like that?
3      A.   No.
4      Q.   Any formalized mechanism for getting
5  rid of old and outdated documents or information?
6      A.   Not that I'm aware of.
7      Q.   Have you had any involvement
8  whatsoever in either gathering or preserving
9  documents or information in connection with this
10  case?
11      A.   I've had no personal involvement.
12      Q.   Has someone in your office been
13  assigned that responsibility?
14      A.   Not that I'm aware of.
15      Q.   Okay.  When did you first become aware
16  of this litigation?
17      A.   This litigation?
18      Q.   Yeah.
19      A.   I believe it was when Leslie sent me
20  an e-mail with the -- I guess it was a deposition
21  request --
22      Q.   Right.

Page 223

1      A.   -- if I remember it from earlier,
2  saying, who can answer all of these questions.
3      Q.   I have a -- a last series of
4  questions, and then we can take a short break and
5  -- and make sure that I haven't forgotten
6  something really obvious and -- and hopefully wrap
7  it up.
8          I apologize ahead of time if some of
9  these questions are -- are -- are redundant, but
10  in terms of going from the general to the
11  specific, I'd like to go to the -- to -- to the
12  rather specific.
13      A.   Okay.
14      Q.   And that is, if we were to try to
15  collect e-mails to start with for specific
16  employees who were employed by CMS between 1991
17  and 2001, starting with all of the e-mails for
18  certain specified employees, what would be the
19  best way for going about doing that?
20      A.   The request would certainly have to
21  come into -- to my office, and this is assuming
22  that all the proprietary stuff's been worked out,

Page 224

1  okay?
2      Q.   Precisely.  That's -- that's -- that's
3  these folks' jobs over here.
4      A.   Yeah.  The request would come into my
5  office, and then we would, you know, basically
6  need to take a look at what is it we actually have
7  that we can provide --
8      Q.   Um-hum.
9      A.   -- you might even want to have that
10  conversation before, just to say here's what we
11  could do --
12      Q.   Okay.
13      A.   -- and -- and then we would go about
14  doing what we could, you know, here's the backups
15  -- or, you know, here's so-and-so's PST folders,
16  you know, whatever it took to -- to comply as well
17  as we could.
18      Q.   Assuming that there was a PST folder,
19  assuming it was -- it was a current employee, they
20  were on the Out -- Outlook and Exchange server and
21  they had a PST folder --
22      A.   Um-hum.

Page 225

1      Q.   -- how difficult is it to make a copy
2  of that PST folder?
3      A.   That's easy.  That's actually
4  something we do pretty routinely.
5      Q.   And what's the best way for doing it,
6  copying it onto a portable hard drive, DVD?
7      A.   We usually put it on CD or DVD.
8      Q.   For older data, say, Groupwise --
9      A.   Um-hum.
10      Q.   -- how does the process differ there?
11      A.   It's only different in the sense that
12  I don't have to go to the Department's e-mail
13  servers, I have those servers sitting on the floor
14  of my data center.
15      Q.   But in terms of the -- the difficulty
16  or ease of making a copy of that folder is
17  similar?
18      A.   Yes.
19      Q.   What information would you need in
20  order to -- to do a -- a comprehensive search for
21  -- for such folders?  Would it be simply a name or
22  is there other information that -- that you would

57 (Pages 222 to 225)

271ebd97-cf4b-4d10-9d80-ab3d42892489

Boughn, Julie Carolyn                          January 16, 2007
                        Washington, DC

Page 226

1  need?
2      A.   Any of the employee's names, I -- what
3  helps me is user I.D.s, if I know their user
4  I.D.s, and then, for lack of a better word,
5  permission to do it --
6      Q.   Right.
7      A.   -- you know, authority.
8      Q.   But in terms of the actual information
9  name and user I.D.?
10     A.   If it was a lot of data, we would be
11 talking -- I mean, if it was a lot of users,
12 something, you'd be talking about providing the
13 CDs or DVDs or whatever, something like that, I
14 mean, it would obviously take staff time to do
15 that.
16     Q.   Right.  And as it multiplies, it just
17 -- it gets difficult simply by virtue of being a
18 lot of work?
19     A.   Um-hum.
20     Q.   Not by being difficult in the -- in
21 the doing of it?
22     A.   No, right.

Page 227

1      Q.   When it comes to shared drives or
2  portions of the shared drive --
3      A.   Um-hum.
4      Q.   -- attributable to a specific
5  employee, is it sim -- would the process be
6  similar?
7      A.   Um-hum.
8      Q.   And similarly easy in the doing,
9  perhaps getting difficult in the magnitude --
10     A.   Yep.
11     Q.   -- if there are too many requests?
12     A.   Yes.
13     Q.   And how long does it take to do a
14 single -- a single drive?
15     A.   It depends entirely upon how much data
16 they have.
17     Q.   Let's assume it's a huge one.
18     A.   We usually ask, you know, when it's a
19 one -- one-off, two-off, you know --
20     Q.   Um-hum.
21     A.   -- type of thing, we usually ask for
22 24 hours.

Page 228

1      Q.   I assume it's easier for you if it's
2  batched, rather than dripped one at a time over?
3      A.   You know, honestly, I don't know how
4  we would do it in a batched mode.  It seems to be
5  something that we'd have to have one person doing
6  for one thing, but --
7      Q.   Oh, so no matter how many you get,
8  you're going to be doing one at a time anyway, so
9  it's serial?
10     A.   I -- I'm just not aware of any sort of
11 scripts or things that we have --
12     Q.   Um-hum.
13     A.   -- and even if you had a script, you'd
14 have to still put in every person's user I.D. in
15 order to start doing it, but, yeah.
16     Q.   You say it's something you do with
17 some -- some regularity?
18     A.   Sure.  I mean, you know, the IG's
19 investigating somebody for some reason, they want
20 their mailbox, their mail folder, you know, their
21 fol -- fol -- folders --
22     Q.   Right.

Page 229

1      A.   -- so it's not like every day we get a
2  dozen of them or anything like that, but it
3  happens enough that we know how to do it.
4      Q.   More than once in a blue moon?
5      A.   Yeah.
6      Q.   The same analysis for archived files?
7      A.   For the group -- for the archives on
8  the IXOS?
9      Q.   Precisely.
10     A.   I'm not quite as familiar with how we
11 would do that, but I believe -- I mean,
12 functionally, it should be very similar.
13     Q.   And the Groupwise archives?
14     A.   The Groupwise are just PST folders, so
15 it's same.
16     Q.   Is it easier to pull an entire PST
17 file than it is to pull individual e-mails from
18 out of a PST file that meet criteria, whether it's
19 by date, keyword or whatever?
20     A.   Yes.
21     Q.   If we take -- I guess we've already
22 asked that.  I think we've already tied up that,

58 (Pages 226 to 229)

271ebd97-cf4b-4d10-9d80-ab3d42892489

# EXHIBIT H

**OIG PRIVILEGE LOG**

| DOC NO. | DOCDATE | DOCTYPE | DESCRIPTION | AUTHOR | DISTRIBUTION | PRIVILEGE |
|---------|---------|---------|-------------|--------|--------------|-----------|
| HHD919-00270038 | 07/12/1996 | Facsimile | Memorandum summarizing investigation into fraudulent claims for nebulizer drugs | Metzger, Paul M.D. (Medical Director, Region C, DMERC) | Tantillo, Tom (Office of Criminal Investigations - DHHS); Jackson, Ben (OIG); Vito, Rob (OIG); Shrigley, William (OIG); Bowman, Sam (OIG); Proctor, Jackie (OIG); Ruiz, Linda (HCFA); Primac, Aron (HCFA); Pearcy, Sue (HCFA); Edge, Michael (SADMERC); Schmadel, Don (Region C DMERC) | Deliberative Process; Investigative Files |
| HHD919-01730176 | XX/XX/XXXX | Draft Report | Is Medicare reimbursement for Lupron inherently reasonable? | | | Deliberative Process |
| HHD919-01770178 | 05/01/1998 | Draft Letter | Excessive Medicare Payments for Prescription Drugs | Grob, George (Deputy Inspector General) | Kelly, Peter (Med Mart) | Deliberative Process |
| HHD919-01790180 | 06/02/1997 | Draft Note | Medicare Reimbursement for prescription drugs | Grob, George | Rosen, Dean | Deliberative Process |
| HHD919-01830183 | 03/28/1996 | Fax Cover Sheet | Cover sheet with comments re newspaper articles | Vito, Robert | Winn, Peter (AUSA) | Attorney Client |
| HHD919-01840184 | 03/28/1996 | Fax Cover Sheet | Cover sheet with comments re "Suppliers Acquisition Cost for Albuterol Sulfate" | Vito, Robert | Winn, Peter (AUSA) | Attorney Client |
| HHD919-01860186 | 06/10/1996 | Fax Cover Sheet | Fax cover sheet for Barron's article with comments | Vito, Robert | Theis, Mike (DOJ) | Attorney Client |
| HHD919-01960196 | 05/09/1997 | Draft Letter | Request for information re certain prescription drug codes | Vito, Robert | Boehm, Cathy, Medicare Fraud Information Specialist | Deliberative Process |
| HHD919-01970197 | 05/07/1997 | Draft Letter | Request for information re certain prescription drug codes | Vito, Robert | | Deliberative Process |
| HHD919-01980198 | 05/07/1997 | Draft Letter | Request for information re certain prescription drug codes | Vito, Robert | | Deliberative Process |
| HHD919-03710371 | 02/29/2000 | Letter | Description of materials being supplied to special investigator at request of AUSA in Boston | | Riordan, Mary | Attorney-Client; Deliberative Process; Investigative Files |
| HHD919-05940612 | 08/11/2005 | Facsimile | Markup of Draft OIG Report on ASP | Riordan, Mary E. | McNulty, Lauren (OEI) | Deliberative Process; Attorney Client |
| HHD919-06130633 | 08/XX/2005 | Report | Draft Report: Monitoring Medicare Part B Drug Prices: A Comparison of Average Sales Price to Average Manufacturer Price, with handwritten marginalia | OIG | | Deliberative Process |
| HHD919-06590661 | XX/XX/XXXX | Draft Workplan | Draft: OEI Work Planning Groups | | | Deliberative Process |
| HHD919-07340738 | 11/05/2003 | Agenda | Pharmaceutical Cases Coordination Meeting | | | Attorney-Client; Work Product; Deliberative Process; Investigative File |
| HHD919-07421579 | XX/XX/XXXX | Binder | Materials from DOJ conference re prosecution of health care fraud related to pharmaceutical companies | | | Attorney-Client; Work Product; Deliberative Process; Investigative File |

# EXHIBIT I

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

Centers for Medicare & Medicaid Services
*Office of Strategic Operations
and Regulatory Affairs*

200 Independence Avenue SW
Washington, DC 20201

PRIVILEDGED AND CONFIDENTIAL

DATE:        FEB 19 2004

TO:          All Center and Office Directors
             Regional Administrators

FROM:        Jacquelyn Y. White
             Director
             Office of Strategic Operations and Regulatory Affairs

SUBJECT:     Document Preservation and Production - Lupron Marketing and Sales Practices
             Litigation, and Pharmaceutical Industry Average Wholesale Price Litigation

### REPLY DUE BY: February 25 and March 12, 2004

On October 23, 2003, and December 18, 2003, the Department of Health and Human Services
(HHS) was served with two virtually identical subpoenas requesting documents and other responsive
information related to the above-referenced litigation. The purpose of this memorandum is to
provide guidance to ensure that the CMS Central Office and all CMS Regional Offices identify and
provide to the Office of General Counsel (OGC), information necessary to respond to the attached
discovery requests.

Please be aware that this memorandum is privileged and confidential, and should not be disclosed
outside your office without prior OGC approval.

**BACKGROUND**

Both of the cases identified in the subject line above actually consist of several separate lawsuits
from around the country which have been consolidated into two multi-district actions (MDLs) in the
United States District Court for the District of Massachusetts. The two MDL cases are commonly
referred to as the Lupron MDL and the AWP Litigation MDL. In both, numerous private and state
government plaintiffs have alleged that the defendant drug manufacturers inflated the "average
wholesale price" (AWP) for their drugs which they reported to pharmaceutical pricing compendia.
The inflated AWP far exceeded the actual acquisition costs paid by physicians for those drugs,
according to these allegations. As a result, Medicare, which reimbursed physicians for these drugs
based upon the reported AWP, paid inflated amounts. (Plaintiffs are either Medicare beneficiaries
who seek return of the inflated portion of their co-pay or state governments that are bringing
consumer protection claims on behalf of their citizens.) The plaintiffs in the Lupron MDL make

PRIVILEDGED AND CONFIDENTIAL

Page 2 - All Center and Office Directors, Regional Administrators

these allegations against defendant TAP Pharmaceuticals as to its drug Lupron.[1]  The plaintiffs in the
AWP Litigation MDL make these allegations against various other drug manufacturers in connection
with other Medicare-covered drugs.

The defendants contend that they are not liable because the Federal Government, including CMS,
was aware that drug AWPs, reported to pricing compendia did not accurately reflect actual
acquisition costs.  The defendants have served the attached subpoenas on HHS in order to search for
records that establish this point.

The United States is not a party to any of these lawsuits.  Nonetheless, the Federal Rules of Civil
Procedure, which govern these cases, impose certain obligations upon CMS as a non-party with
potentially relevant information to the claims and defenses in these cases.

REDACTED MATERIAL

---

[1]  In 2001, TAP Pharmaceuticals paid approximately $850 million to the United States in
settlement of civil and criminal claims arising from these allegations.

PRIVILEDGED AND CONFIDENTIAL

Page 3 - All Center and Office Directors, Regional Administrators

Promptly designate a person who will coordinate your discovery responses. Please e-mail your designee's name and telephone number to Glenda Bailey of my staff at GBailey1@cms.gov and Troy Barsky of OGC at Troy.Barsky@hhs.gov by **February 25, 2004**. All responsive documents must be delivered to OGC by **March 12, 2004**. Upon delivery to OGC, please notify Glenda that you have complied with this request.

If you have any questions or need additional information, please call Glenda at (410) 786-6538 or Troy Barsky at (202) 205-8689.

Attachments

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) Civil Action No. 01-12257-PBS ) |
| **THIS DOCUMENT RELATES TO:** | ) Hon. Patti B. Saris ) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corp., et al.,* Civil Action No. 07-10248-PBS | ) ) ) ) ) |

### UNITED STATES' OBJECTIONS AND RESPONSES TO THE ROXANE DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the United States provides these objections and responses to Defendants Boehringer Ingelheim Roxane, Inc. and Roxane Laboratories, Inc.'s (Collectively "Roxane") First Set of Interrogatories ("Interrogatories") Directed to Plaintiff United States of America.

### Introductory Statement and General Objections

1.      Subject to and without waiving general and specific objections, and objections to Roxane's definitions and instructions, the responses set forth herein are based on information currently known to the United States, and its attorneys, and are made without prejudice to the right of the United States to assert additional objections should grounds for objections be discovered at a later time. The United States has not completed its discovery of the facts pertaining to this action as discovery is ongoing in this case, and Roxane has not yet fully responded to the United States' discovery requests.  The United States reserves the right to rely on any facts, documents, or other evidence that may be developed by the parties, or come to the United States' attention, and to supplement these Interrogatories when and if appropriate at a

**Interrogatory No. 20**:  Confirm whether the Government requested that any State Medicaid agency maintain documents related to this litigation, in the form of a litigation hold or other substantially similar request.  Identify the date and the individual or department to which the Federal Government made such a request (if any).

**RESPONSE:**  The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory.  The United States objects to this interrogatory on the following, additional grounds.  Objection, as used in this interrogatory, the phrase "related to this litigation" is overly broad, vague, ambiguous, and not subject to objective application in identifying responsive information.  Objection, the interrogatory is overly broad and unduly burdensome because it seeks requests made by the entire legislative and executive branches of the U.S. Government (according to Roxane's definition of U.S. Government).  Objection, the interrogatory seeks information that is not relevant to any claim or defense in this case, and is not reasonably calculated to lead to the discovery of admissible evidence.   Objection, the interrogatory improperly asks for information protected from disclosure by one or more privileges, including but not limited to the attorney-client privilege, the work product privilege, the common interest privilege, the consulting expert privilege, the law enforcement investigative files privilege, and the deliberative process privilege.  Subject to and without waiving specific and general objections, and objections to Roxane's definitions and instructions, the United States responds that in November 2006, the United States issued a request to all directors of State Medicaid Fraud Control Units to preserve documents concerning State Medicaid payments for drugs.

**Interrogatory No. 21**:  Identify which States have sent the Federal Government any payments related to settlements with Roxane in other AWP litigation. For any such State, describe the

# EXHIBIT K

DATE:        May 21, 1992

FROM:        Chief
             Distribution Management Branch, OBA

SUBJECT:     Freeze on all Medicare Claims at the Federal Records Centers

TO:          Regional Office Records Liaison Officers

On May 6, the Department of Justice (DOJ) requested the Health Care Financing Administration freeze all Medicare claims and payment records because of current and future litigation (attached).  DOJ projects it will be several years before these records can again be routinely destroyed.

In answer to our request (see May 12 letter attached), the Assistant Archivist stated they would continue to keep Medicare records currently stored in the records centers, but as a result of this freeze, they could not accept any additional Medicare records into the centers.

Since Medicare contractors do not have the ability to store these records onsite, an alternative storage location must be found.  We will be meeting next week with the Assistant Archivist and the Department of Justice to resolve this issue.  In the meantime, please notify all Medicare contractors they cannot transfer any additional records to the FRCs.

If you have any questions, please call me on FTS (410) 966-7892 or Vickie Robey, HCFA's Records Officer, on FTS (410) 966-7883.

                              Jane Eagan

Attachments

cc: Director, OFO
    Director, BPO
bcc:Bill Zavoina
    Don Posen
    Les Horneman
    Lee Mosedale

OBA/OAS/DPDS/DMB VRobey:var 5/19/92
DISC: 1992 RECORDS
TITLE: FRZE-RLO



EXHIBIT

_Abbott 69_
_3-20-07_

HHD043-0008