# EXHIBIT T



EXHIBIT
Abbott 299

**nmc** National Medical Care, Inc.

*Reservoir Place*
*1601 Trapelo Road*
*Waltham, Massachusetts 02154*
*(617) 466-9850*

HCFA/BA/EULA/LUD.
'91 AUG 15 PM 3:15

August 2, 1991

Health Care Financing Administration
Room 309-G
Hubert H. Humphrey Building
200 Independence Avenue S.W.
Washington, D.C.  20201

RE:  BPD-712-P

Dear Sirs and Madames,

I am writing to convey the comments of National Medical Care, Inc. (NMC) with regard to that portion of the proposed Medicare Fee Schedule for Physicians' Services (as published in the <u>Federal Register</u>, June 5, 1991) pertaining to Fee Limitations on Drugs Furnished Incident To A Physician's Service. NMC's comments with regard to the general physician payment provisions of the proposed rule will be conveyed separately.

## SCOPE OF THE DRUG PAYMENT PROPOSAL.

HCFA officials have publicly stated that they expect to apply the drug payment provision of this NPRM to all Medicare Part B covered drugs, including those delivered and billed by chronic renal dialysis facilities and other Part B service providers. Such application is <u>unwarranted by the statute which gave rise to this NPRM or by the proposed regulatory language itself</u>, and is in no way supported or justified by any data or analysis included or referenced in the proposal.

1.    The proposed drug payment methodology and levels presumably flow from Congress' mandate (Pub. L. 101-239) for development and implementation of a physicians fee schedule, and Congress' explicit instruction that "drugs provided incident to a physician's service" could be included in that fee schedule.  **ESRD services and supplies are among the Medicare covered services clearly excluded by the statute from the reach of the proposed fee schedule and its adjuncts.**

Chronic renal dialysis facilities are allowed to provide and to bill for only those services which are integral to or ancillary to dialysis.  This principle has been reaffirmed in writing on many occasions by high ranking officials of the Bureau of Policy Development.  The established fact that ESRD facilities provide, bill for and are paid for various pharmaceutical items is

**nmc** National Medical Care, Inc.

2

sufficient to establish that those pharmaceuticals have
never been considered to be "incident to a physicians
service", and therefore ought not to be within the reach
of a regulation written to implement Pub. L. 101-239.

2.  To the extent that HCFA relies upon established "inherent
    reasonableness" determination procedures and rules for
    arriving at the proposed drug payment level, it's data
    and analysis cannot reasonably be extended to apply to
    chronic  renal  dialysis  facilities  and/or  the
    pharmaceutical items for which they bill.  HCFA has no
    direct data on drugs administered by dialysis facilities
    and the prices those facilities pay for those drugs.  Nor
    does it have data from which these essential facts can
    reasonably be inferred.  Subsequent to the publication of
    this proposed rule, HCFA requested that the OIG design
    and implement a study to determine which drugs are most
    frequently administered in dialysis facilities and what
    price facilities pay – a clear indication that **HCFA knows
    that its present information is inadequate to justify
    application of this proposal to ESRD facilities.**

3.  ESRD facilities, unlike physicians, are required by
    Medicare rules to file annual cost reports, and in those
    reports to assign operating overhead to ancillary
    services such as covered pharmaceuticals.  Because
    essential  overhead  costs  are  thus  excluded  from
    **calculation of the base dialysis payment rate, ancillary
    service payment to ESRD facilities must allow for that
    overhead if facilities are to cover their operating
    costs.  It is one thing to say that drug payments are**
    *"based upon acquisition cost"* – quite another to specify
    **that payment is absolutely limited to direct acquisition
    cost.**  Rules for payment for pharmaceutical items
    provided ancillary to dialysis in the dialysis facility
    must reflect the need to cover assigned overhead.

NMC urges HCFA to **limit the application of any drug payment
policy developed as an adjunct to the physicians fee schedule to
only those drugs intended by Congress to be affected by physician
payment reform**: those provided in the physicians office and billed
for by the physician.

GENERAL COMMENTS.

For reasons detailed below, NMC opposes the current proposal
to establish payment limits for drugs furnished incident to a
physician's services at 85% of Average Wholesale Price (AWP) as
published in the Red Book.

**nmc** National Medical Care, inc.

3

1.   The proposal is seriously flawed in its reliance upon the
     principle of discounted Red Book price as the determinant
     of Medicare's payment level for drugs.

Review of the OIG studies of drug pricing to retail pharmacies
(not physicians' offices) relied upon by HCFA as support for this
proposal reveal that the observed average discount of 15% hides
**drug-specific discounts ranging from 0.23% to 42% below Red Book.**
The adequacy and fairness of any particular "Red Book minus -%"
approach to drug payment will be wholly dependent upon the mix of
drugs administered by the individual physician - and that mix
varies enormously among specialties and among individual
practitioners.  Any single payment model based on discounting. Red
Book price will have **prejudicial impacts on some specialties and/or
practitioners, and consequently will create inducement to alter
care patterns in response to those impacts.**

HCFA ·acknowledges in its commentary that the Red Book is
simply unreliable as a real price data source.   While HCFA is
impressed by a class of drugs for which Red Book AWP appears
routinely to overstate real price, albeit by greatly varying
amounts, NMC has frequently encountered circumstances where Red
Book price lags substantially behind the real acquisition cost of
a drug.   Furthermore, because the Red Book is an unaudited source
wholly dependent upon manufacturer representations, there is no
protection against manufacturer's simply increasing the published
AWP in future years as a way of increasing physician reimbursement
levels.   It is probably a mistake to tie reimbursement to the Red
Book in any way; it is certainly a mistake to try to cut things so
fine as to identify the precise average amount by which the Red
Book deviates from real AWP.  Any reasonable drug payment policy
will be based on real drug acquisition cost data, not generalized
inferences from a demonstrably unreliable source.

As a technical matter, it should be noted that while in the
discussion of the proposal it is clear that HCFA proposes to pay
85% of AWP of a drug *as published in the Red Book*, the actual
proposed regulatory language is "85% of the national average
wholesale price of the drug *as determined by HCFA*".  In the first
case, AWP is a category of data, of questionable relationship to
reality, contained in the particular published source.   In the
second, AWP is empirically determined by HCFA and might in fact be
an accurate reflection of prices paid. But certainly HCFA does not
propose to pay 85% of the actual average acquisition cost - a
policy which would result in none of the affected drugs being
provided.  This inconsistency needs to be eliminated.

**nmc** National Medical Care, Inc.

4

2. Within the framework of the "inherent reasonableness"
rule invoked as the authority for the drug payment
proposal, HCFA has not met its statutory obligation to
demonstrate that present payments for pharmaceuticals
incident to a physician's service are excessive.

The statute allows use of the principle of inherent
reasonableness when application of standard rules for determining
reasonable charges result in charges which are nonetheless
unreasonably high or low. Regulations provide examples of
empirical circumstances which might indicate that charge limits
resulting from application of the standard of "the lesser of
actual, customary or prevailing charges" are nonetheless
unreasonable. In this NPRM, HCFA presents no data bearing on the
"reasonableness" of past or present drug charges.

HCFA does provide data which purport to show that the cost of
pharmaceuticals to the provider is lower than the AWP published in
the Red Book. Even if those data were germane to the question of
the costs incurred by physicians or other providers who would be
affected by this rule, the relevance of Red book price to the
"reasonableness" standard is wholly unexplored and undefended.

But HCFA has not provided data which are in any way germane to
evaluating the proper level of payment for drugs administered
incident to a physician's service, or to evaluating the adequacy of
present or proposed reimbursement levels. There are no data on
physician drug costs, additional costs associated with "incident
to" drugs, comparison of Medicare payment levels to payments by
other third parties, or other issues which must be addressed to
demonstrate the "unreasonableness" of present Medicare payment
levels and/or to defend the newly proposed payment formula. The
proposal therefore seems to be a simple "back door payment
reduction" rather than a determination of "reasonableness" as
required by law.

The data referenced by HCFA to support the proposal come from
two OIG studies, conducted in 1984 and 1988, of the cost to retail
pharmacies of drugs most commonly reimbursed by State Medicaid
programs. As stated above, OIG found that retail pharmacies paid,
on average, about 85% of the AWP as published in the Red Book, with
the drug-specific discount ranging from less than 1% to more than
40%. HCFA extends these findings to drugs administered by
physicians in their office on the ground that they see no reason
why doctors cannot obtain the same discounts as are available to
retail pharmacies. This extension is unfounded and possibly absurd
both with regard to price and with regard to comparability of
product. The Physicians Payment Assessment Commission has spoken
clearly and authoritatively on this subject in opposing an
identical proposal in the Administration's FY 1992 budget.

**NMC** National Medical Care, Inc.

Pharmacies routinely and predictably order relatively high volumes of relatively large numbers of drugs; by comparison, doctors require quite small volumes of only a few drugs. It would follow naturally that pharmacies can benefit from opportunities for bundled pricing of products, "loss leaders", volume discounts, preferential financing and payment terms, and other competitive pricing tools available to drug distributors. In contrast, physician offices are expensive to service and do not provide volumes and variety of product demand consistent with deep discounting.

Virtually all of the drugs paid for by Medicaid are self-administered - prescribed by a physician but supplied in tablet, capsule, liquid or ointment form by a retail pharmacy. None of these drugs are covered by Medicare, which explicitly excludes self-administered medications. Drugs administered by the physician in his/her office and billed to Medicare are therefore always administered by injection or infusion. They are, in other words, a completely different group of drugs than those represented in the OIG retail pharmacy data. Inference about discounting practices across these two distinct groups of drugs is unwarranted. We should note that institutional providers, such as renal dialysis facilities, provide a yet more specialized subset of injectables and infusibles even further removed from the drugs represented in the OIG studies.

Finally, it should be noted that the Medicaid drug payment provision of OBRA-1990, which guarantees that State Medicaid programs receive the largest discount available to any customer for a drug, has changed drug discounting practices enormously <u>and may have rendered the OIG study data, even as they apply to retail pharmacies, wholly obsolete</u>. Congress has taken note of the fact that large volume public purchasers such as the Veterans Administration have lost their historic discounts on many drugs, and that HMOs have also been very seriously impacted by the disappearance of pharmacy discounts on which they had come to rely. There has not yet been any large scale review of drug discounting to other customers, but it is almost certain that average discounts have diminished due to this recent change in Medicaid law. Any drug payment proposal which relies on pre-1991 data is inherently and possibly fatally flawed, and must be carefully reviewed.

    4.    HCFA's regulatory impact analysis of the drug payment provision of the proposed rule is grossly deficient, in that it does not speak to the changes in drug utilization and availability, and consequent adverse effects on quality of care, which might well result from the underpayment for some drugs and to some practitioners which will flow from the proposal.

**nmc** National Medical Care, Inc.

6

If the proposed rule is implemented, it is unreasonable to expect that physicians will continue to provide drugs for which they cannot cover their full costs, especially expensive drugs such as EPO.  Because there is great variation from drug to drug with regard to the relationship between Red Book price and the price physician's generally pay, the rule will inevitably create changes in drug utilization and availability for Medicare beneficiaries: drugs which cannot readily be acquired by physicians at 85% of Red Book AWP or less will not readily be available to beneficiaries in the doctor's office.

SUMMARY AND CONCLUSION.

For the reasons detailed above, NMC believes that HCFA has failed to demonstrate that present pharmacy payment levels are unreasonable, and has presented no data which are in any way germane to the problem of assessing the adequacy of "85% of Red Book AWP" as a limit for reimbursing pharmacy items provided incident to a physician's services.

We further believe that extension of any proposed pharmacy payment rule developed in response to physician's fee schedule reform should be applied to only those services referenced by the statute: pharmacy items provided incident to a physician's service in the physician's office, and billed by the physician.  In particular, pharmacy items provided in a chronic dialysis facility incident to hemodialysis therapy, and billed by the facility, are expressly excluded from the reach of the statute, and **any proposed change in pharmacy reimbursement to dialysis facilities must be justified and defended with data which are applicable to dialysis facility operations.**  No such data are yet available.

Finally, we believe that the general approach of basing pharmacy payment on some fixed multiple of Red Book AWP is fatally flawed:

1.  the relationship between Red Book AWP and actual purchase price is extraordinarily variable from drug to drug and across different classes of purchasers;  because there is no standard market basket of drugs which can represent the "average" **experience of physicians in different specialties or even within the same specialty,** any constant  AWP  multiple  will  result  in  skewed reimbursements.

2.  the Red Book provides a static and frequently outdated description of an all too variable reality;  there must be a mechanism to recognize real price increases to physicians and other providers as they occur, in order to avoid significant lags between published price and effective price;  reliance on Red book prices has in the

**nmc** National Medical Care, Inc.

7

past lead to significant underpayment for drugs subject
to substantial price fluctuation or increases.

3.   Because Red Book prices are provided by the manufacturer
and printed without review or audit, there is no
guarantee that manufacturers will not manipulate listed
prices to their own benefit.

Intermediaries must retain the flexibility to respond to real
pharmacy costs of providers, and to develop reimbursement protocols
which provide fair compensation:

-   Intermediary surveys to estimate drug acquisition costs
    are one reasonable approach to pharmacy pricing, so long
    as the Intermediary is quick to recognize cost increases
    passed on to providers by manufacturers and distributors.

-   National cost limits for sole source pharmaceuticals
    which are directly distributed by the manufacturer are
    likewise an option; where the drug is distributed
    indirectly, a single national price may be inappropriate.

-   Continued use of Red Book AWP as a presumptive cost
    limit, subject to demonstration that real costs are
    higher, provides a measure of cost control which might be
    lacking from a pure reasonable charge environment.

In any case, Medicare payment rates must take account of direct
cost of pharmaceuticals **and** otherwise uncompensated costs
associated with the provision of the pharmacy item. **Any pharmacy
payment scheme which institutes payments below the full real cost
of the providing entity is inherently flawed and will adversely
affect beneficiary access to care of acceptable quality.**

Thank you very much for your consideration.

Very truly yours,

Edward E. Berger, Ph.D.
Vice President for Government Relations