# EXHIBIT U
# Part 2

- 4 -

to establish "realistic and equitable" charges if the usual mechanisms for determining reasonable charges result in "grossly excessive" charges that are not "inherently reasonable." The provision requires HCFA to issue regulations that set out the factors to be used in these determinations.

While the statute and accompanying regulations do not extensively address how HCFA is to determine the initial issue of whether charges are "grossly excessive," the regulations set out several circumstances which "may result in grossly ... excessive charges," including where "charges are grossly ... in excess of acquisition or production costs." 42 C.F.R. § 405.520(g)(1). The preamble to the proposed rule on drug payments cites this provision as authority for the proposed limits.

HCFA is authorized to limit payments for drugs only if these standards are satisfied. These standards do not authorize HCFA simply to limit payment to the estimated acquisition cost. Rather, under the statute and regulations, limitations can be imposed only if payments are "grossly" in excess of acquisition costs. This standard plainly allows for Medicare payments to exceed acquisition costs by a significant amount, so long as the amount is not grossly excessive, and HCFA lacks authority to reduce payment amounts to equal the acquisition costs.

Moreover, any limits imposed must be "realistic and equitable." As we demonstrate below, there are numerous considerations that are properly taken into account in addition to the acquisition cost of the drug itself but that have not been incorporated into the proposed limits.

### 2. Procedural Requirements

In addition to the proposal's failure to meet the substantive standards for payment limits, there are two serious procedural defects in the proposal.

First, the proposed use of price data for a sample of drugs to establish an across-the-board rule for all drugs is inconsistent with the statute. Section 1842(b)(8) of the Act permits HCFA to deviate from the reasonable charge methodology only for "particular items or services" when the reasonable charge methodology results in charges that are grossly excessive. Each covered drug is a different item and has a different HCFA Common Procedure Coding System (HCPCS) code. Even if HCFA establishes that the usual reasonable-charge methodology results in grossly excessive charges for a particular drug, that fact is not justification under the statute for applying the limitation to other drugs.

We do not regard this point as hypertechnical, but rather one that goes to the heart of our concern with the proposed rule. It is true that some drugs can be purchased by some physicians at prices below AWP. But, as pointed out above, prices are not uniform for all physicians at all times. Survey data, such as that of the OIG, are applicable only to the drugs, individuals, and times surveyed. Survey information on some drugs cannot properly be extrapolated to other drugs as HCFA is proposing to do.

Second, we take exception to the proposal to establish lower payment rates for unspecified "high cost" or "high volume" drugs through informal issuances to carriers. The essence of this

- 5 -

proposal is that HCFA would identify drugs for which the estimated acquisition cost is less than 85 percent of AWP, and would announce that estimated acquisition cost informally.

This proposal is inconsistent with the rulemaking requirements of the Administrative Procedure Act (5 U.S.C. § 553), as well as with the comparable provisions of the Medicare statute. Under section 1871(a)(2) of the Social Security Act, "[n]o rule [or] requirement ... that establishes or changes a substantive legal standard governing ... the payment for services ... shall take effect unless it is promulgated by the Secretary by regulation ...." Under this provision, HCFA lacks authority to reduce payment for a drug simply by announcing a purported estimated acquisition cost that is less than 85 percent of AWP.

Implementation of this proposal would depend critically on what HCFA estimates to be the acquisition cost of each affected drug. As noted above, there is no uniform acquisition cost amount that HCFA could simply ascertain and act upon. Instead, any amount used by HCFA would be an average or otherwise represent only a portion of the acquisition costs actually being incurred. Any estimate will inevitably be subject to question. Such estimates must be the subject of public notice and opportunity for comment in order to satisfy the applicable legal requirements.

### C. HCFA Should Accept the PPRC's Recommendation

The Physician Payment Review Commission, which reviewed the HCFA proposal for drug payment limits in the context of the Administration's parallel legislative proposal, commented that, because physicians do not face uniform prices, "formulation of policy in this area is difficult." The Commission recommended that "alternative policies should be studied" instead of "putting an artificial limit on what physicians, who have little control or prices, can be reimbursed ...."[2]

ASCO agrees with the Commission that the most appropriate course of action at this time is to defer adoption of a uniform payment methodology pending further study. The present basic methodology and carrier discretion should continue in the interim.

### D. Considerations in Establishing A
### Realistic and Equitable Payment Method

As discussed above, we believe that any across-the-board methodology for all drugs would fail to conform to the statutory authority for limits only where the payments for "particular items or services" have been shown to be grossly excessive. We will nevertheless address the considerations that HCFA should take into account if it proceeds to establish a uniform payment methodology.

---

[2]    Letter dated June 24, 1991, from Philip R. Lee, M.D., Chairman of the Commission, to the Speaker of the House of Representatives and the President of the Senate, pages 16-18.

- 6 -

### 1. Drug Acquisition Costs

Physicians can frequently purchase drugs for less than the published AWP. It is not clear, however, what amount of discount should be assumed to exist. The OIG surveys were poorly designed to address this question, since they dealt with a relatively small number of oral drugs purchased by pharmacies. The OIG surveys were also geographically limited, and the 1989 survey was mostly based on information from a single wholesaler. It is by no means clear that the results of these limited surveys adequately reflect prices paid by physicians for injectable drugs that are often relatively low volume products.

Whatever basic acquisition cost is assumed, however, it must be modified to take into account Medicare's payment policies. If Medicare pays only for the amount of drug actually used, there will inevitably be wastage of drug for which the physician is not reimbursed. The amount of the drug in a standard container size rarely corresponds exactly to the prescribed chemotherapy dosage for a patient, since prescribed dosages vary depending on the type of cancer involved and physical characteristics of each patient. Once a drug container is opened, good medical practice requires that the contents be used or disposed of in a limited period of time to assure sterility. For example, the labeling for etoposide -- one of the principal chemotherapy agents -- recommends disposal 48-96 hours after opening. Since the timing of chemotherapy obviously depends on the needs of the patients, it is sometimes impossible to use the left-over drugs before their sterility can no longer be assured. Such losses are compounded by the fact that a patient may be given up to three different types of drugs in one chemotherapy regimen, and the remainders of each are subject to wastage.

Also, despite best efforts, accidental breakage of drug containers occasionally occurs. In addition, drugs are sometimes not used before they expire, partially because, as noted, the needs of the patient dictate when a drug will be used.

Definitive data on drug wastage are not available, but it can be substantial. One large, multi-site oncology practice that carefully monitors drug wastage estimates that about 25 percent of the drugs it purchases are lost to waste and not billed. It is clear that this factor can be a major cost factor to oncology practices.

### 2. Other Drug-Related Costs

In determining a reasonable charge for drugs, and in determining a "realistic and equitable" payment limitation, HCFA should consider all costs directly related to use of the drugs. If certain costs are incurred only because drugs are administered in a physician's office, these costs should be covered by the Medicare payment for the drugs. Principal among these costs are certain administrative costs, sales tax in some states, and unpaid coinsurance.

There are administrative costs that are associated exclusively with use of drugs in a physician's office, such as procurement costs and costs of maintaining the inventory. In addition to personnel costs, these costs include the significant cost of capital (or debt service) to maintain an inventory of drugs that may be worth tens of thousands of dollars. Although it is difficult to

quantify these costs, some allowance must be made for them in calculating a reasonable Medicare payment amount if the payment amount is to cover all the costs associated with the drugs.

In some states, drugs administered by physicians are subject to the sales tax. Physicians who must pay that tax are obviously subjected to out-of-pocket losses if Medicare does not reimburse it.

An additional cost, which can be very significant, is unpaid coinsurance. Under Medicare Part B, patients must pay a 20 percent coinsurance payment each time they receive covered drugs. This coinsurance is sometimes uncollectible. Bad debt costs for oncologists can be substantial, especially for higher cost drugs. For example, the patient's share of a $500 chemotherapy regimen is $100.

Any payment method designed to cover the costs of drugs should take into account bad debts related to those drugs. Failure to do so would result in out-of-pocket losses for the physician. Consideration of bad debts in determining reasonable charges would be consistent with the payment methodology for maintenance dialysis, where bad debts are paid. 42 C.F.R. § 413.170(e). As in the case of dialysis, where bad debts are appropriately paid because the coinsurance requirement can be substantial, a prolonged course of chemotherapy can similarly result in a large patient liability and hence a large potential out-of-pocket loss to the physician when the coinsurance is not paid.

### E. Adverse Effects of the Proposal

The analysis in the notice of proposed rulemaking of the potential impact of the proposal is extremely limited. The preamble asserts that "physicians are in an excellent position to demand discounts" because "drug sales are dependent upon the drugs a physician prescribes .... " Based on this assumption about physicians' market power, the notice concludes, "Since the physician has great leverage with the entity from which he or she purchases drugs to acquire a significant discount for the drug, we do not anticipate that there will be an adverse effect upon quality, access, beneficiary liability, assignment rates, reasonable charge reductions on unassigned claims, and participation rates of physicians." 56 Fed. Reg. 25801. ASCO disagrees with the premise that physicians have great leverage to obtain lower prices and with the conclusion that there will be no adverse effects from the proposed sharp reductions in payments.

The notion that physicians have leverage to demand price reductions because drug sales depend on physicians is faulty economic analysis. Sales of all products depend on customers' buying them, but that axiomatic fact does not mean that the buyers have great leverage over the sellers. To the contrary, buyers have market power only in limited circumstances, such as when they are of unusually large size. That is, of course, not the case for physicians, who typically purchase relatively small quantities of drugs. To the extent that the HCFA proposal relies on a belief that physicians will be able to obtain lower prices to offset Medicare's payment reductions, the proposal is seriously misguided. Physicians will face the same market conditions they do now, regardless of what Medicare's drug payment policy is. The developing experience with the recently enacted Medicaid rebate law indicates that even large purchasers, such as the Department

- 8 -

of Veterans Affairs, may lack the ability to demand deep discounts when the sellers decide that it is no longer in their interest to offer them lower prices.

The expectation that physicians may unilaterally demand discounts is particularly inappropriate in anticancer chemotherapy. Unlike a pharmacy, which buys a wide range of products from a number of different manufacturers with many drugs being substitutable for one another, an oncologist must have every available anticancer drug in his armamentarium or he may not be able to provide patients with state-of-the-art care. If an oncologist is placed in a position where he or she is required to forgo a particular product because of the unwillingness of the manufacturer to provide discounts, patient care will be at risk. Therefore, without jeopardizing the well-being of beneficiaries, it is difficult to see how HCFA could conclude that "physicians are in an excellent position to demand discounts." Physicians who wish to care properly for their patients simply do not have the bargaining power to threaten doing without a particular drug -- which is the only way to force the discounting contemplated by the proposed rule.

If physicians incur out-of-pocket losses on drugs that they administer, some may be compelled to cease purchasing drugs for their own inventory. Patients who need an injectable drug would be required to purchase it out of their own funds at a pharmacy and bring it to the physician's office for administration. This highly undesirable outcome would not only be a major inconvenience for patients (many of whom, like the patients of oncologists, are seriously ill), but it would also deprive the patients of Medicare coverage, since Medicare covers drugs only as an incident to a physician's service. Thus, to preclude the possibility of loss of Medicare coverage and a significant shift of drug costs to beneficiaries, it is essential that Medicare payment for drugs fully cover physicians' costs related to those drugs.

Another unintended consequence of the proposal may be to encourage the shifting of care from the relatively low cost physician's office to the more expensive hospital setting. A recent survey by the General Accounting Office found that a substantial number of oncologists admitted patients to a hospital because of the refusal of third-party payors to reimburse for outpatient administration of anticancer drugs.[3] The systematic under-reimbursement of anticancer drugs could have the same impact. Thus, paradoxically, the proposal to reduce payments for drugs could actually result in higher cost to the program.

Finally, the experience with erythropoietin (EPO), recently analyzed in the Journal of the American Medical Association (JAMA),[4] underscores the risk of inadequate payment for important pharmaceutical products. A team from the congressional Office of Technology Assessment reviewed the history of HCFA's reimbursement of EPO for dialysis patients during a period when payment per treatment was capped and concluded:

---

[3]   "Off-Label Drugs: Initial Results of a National Survey," GAO/PEMD-91-12BR (February 1991).

[4]   JAMA, July 10, 1991, Vol. 266, No. 2, p. 247.

- 9 -

> "Perhaps most important, the case of recombinant human
> erythropoietin emphasizes the importance of assessing the quality
> of care provided to beneficiaries.  Given the strong financial
> incentive for providers to skimp on the dose, HCFA policy fell
> short in failing to establish mechanisms to routinely monitor dose
> and patient response.  It now appears that, for thousands of
> beneficiaries, Medicare expenditures over many months were
> supporting ineffective doses, and patients were not reaping the full
> potential of recombinant human erythropoietin treatment."[5]

The analogy between the EPO payment methodology and the proposed methodology for other drugs is not precise because the current proposal would not cap payment for each treatment in the same way, but the fact remains that both represent dramatic and unexplored deviations from past practice in payment for drugs.  It is difficult to predict, and HCFA has apparently not even considered, the possible impact on patient care of adopting a payment methodology for anticancer chemotherapy drugs which in some states will drastically reduce the amounts physicians are reimbursed for these products.

## F. Conclusion

In ASCO's view, HCFA should not implement the proposed reduction in payment for drugs.  The proposed across-the-board methodology does not conform to the statutory requirement that payment limits be established only if charges would otherwise be grossly excessive for particular items or services.  The current payment method should be continued while other approaches to drug payment are studied.

If HCFA is determined to adopt a uniform payment methodology, it should at least insure that the method meets the statutory requirement that the payments be "realistic and equitable." This means that the Medicare payment should be calculated to include the costs of drug product that is unavoidably wasted as well as administrative, sales tax, and bad debt costs directly related to drug use.  While definitive data are not available to estimate acquisition cost, wastage amounts, administrative costs, sales tax, or bad debts, reasonable estimates suggest that a realistic and equitable payment amount would be substantially higher than the proposed 85 percent of AWP.

For example, if we assume 25 percent wastage (as suggested by the information discussed above), 15 percent bad debts, and 5 percent administrative costs (with sales tax varying from state to state), and if we assume that the OIG survey results are correct and applicable to drugs purchased by physicians, the estimated acquisition cost of 85 percent of AWP should be increased by 45 percent (to about 125 percent of AWP) to cover the assumed costs.  Although ASCO recommends retaining current payment rules, if HCFA does plan to take action based on the very limited information it has available to it, the agency should be sure that all costs are reasonably covered.

---

[5]/     Id. at 252.