```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


  IN RE:                        )
                               )  CA No. 01-12257-PBS
  PHARMACEUTICAL INDUSTRY AVERAGE )
  WHOLESALE PRICE LITIGATION      )  Pages 1 - 30
                               )
```

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
August 10, 2009, 4:10 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

3        EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
     LLP, 55 Cambridge Parkway, Suite 301, Cambridge,
     Massachusetts, 02142, for the Class Plaintiffs.
4

5        AMBER M. NESBITT, ESQ., Wexler Wallace, LLP,
     55 West Monroe Street, Suite 3300, Chicago, Illinois, 60603,
     for the Class Plaintiffs.
6

7        LYNDON M. TRETTER, ESQ., (By Telephone) Hogan & Hartson,
     LLP, 875 Third Avenue, New York, New York, 10022,
     for the Defendant, Bristol-Myers Squibb.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical industry

3  Average Wholesale Price Litigation, Civil Action 01-12257,

4  will now be heard before this Court.  Will counsel please

5  identify themselves for the record.

6          MR. NOTARGIACOMO:  Good afternoon, your Honor.  Ed

7  Notargiacomo from Hagens Berman Sobol Shapiro for the class

8  plaintiffs.

9          MS. NESBITT:  Good afternoon, your Honor.  Amber

10  Nesbitt of Wexler Wallace, LLP, also on behalf of the class

11  plaintiffs.

12          THE COURT:  Mr. Tretter, I hear you're somewhere.

13          MR. TRETTER:  Yes, your Honor, I'm in bed.  Thank

14  you for allowing me to participate by phone.

15          THE COURT:  From what I hear about your physical

16  state, I didn't want you up here.

17          MR. TRETTER:  Well, I've learned it's not

18  contagious.  It felt like the flu, but actually it was food

19  poisoning.

20          THE COURT:  Oh, I'm sorry about that.

21          MR. TRETTER:  But thank you very much for your

22  concern.

23          THE COURT:  Tell me about this settlement.  In

24  particular, anything unusual about it?

25          MR. NOTARGIACOMO:  Your Honor, the settlement, the

1   structure of the settlement is very similar to the

2   settlements that have been previously presented and approved

3   by the Court with very little exception.  The only real

4   difference is, of course, the drugs involved and the amount

5   of money to be paid by the defendant.

6           THE COURT:  No odd release language?

7           MR. NOTARGIACOMO:  The release language is based

8   on, if not identical -- I haven't checked word for word --

9   but it's based on the release language in the AZ settlement

10  and the GSK settlement, and I think the Track Two

11  settlement.

12          THE COURT:  Are there any other pending lawsuits

13  or possible pending lawsuits involving these drugs?

14          MR. NOTARGIACOMO:  Not that I am aware of, your

15  Honor.

16          MR. TRETTER:  There was one case by Mr. Haviland

17  involving Arizona plaintiffs, but that's recently been

18  dismissed; I mean, very recently.

19          THE COURT:  This recently came up in my McKesson

20  case in a way that I hadn't anticipated, and I wanted to

21  know whether there was some other lawsuit that is somehow

22  implicated in this.

23          MR. TRETTER:  The only other lawsuit, your

24  Honor -- and I think they're expressly excluded by the

25  release -- are lawsuits on behalf of state Medicaid that

1    might involve these particular drugs, but that's outside of

2    this settlement by the express terms.

3              THE COURT:  And what is the claims process?

4              MR. NOTARGIACOMO:  The claims process will be

5    similar to that devised for Track Two.  That is, for -- I'll

6    take each of the classes, the consumer classes.  Class 1,

7    they will be notified with a short two-page initial notice

8    with a return mail card that they just have to sign to

9    verify that they made either a full payment, or, in the case

10   of Class 1, it should be just a percentage copayment; and

11   that gets returned to the claims administrator.  Based on

12   that representation, they get sent a full notice.  That

13   notice will either be one of two types:  It will either be a

14   notice that gives them a right to opt out if they live in

15   certain states that had not previously been noticed prior to

16   the Massachusetts, the BMS trial.

17             THE COURT:  Wait, wait, wait, wait.  Nobody would

18   have been noticed other than Massachusetts.  You mean in the

19   national -- I don't know what you mean.

20             MR. NOTARGIACOMO:  There was -- well, I'm sorry.

21   You certified --

22             THE COURT:  A national.

23             MR. NOTARGIACOMO:  -- a national class but

24   excluding certain states.

25             THE COURT:  Did we ever send out notice?  That was

1    one of the things that confused me.  I didn't think we sent

2    out notice because it went up on appeal.

3              MR. TRETTER:  Class 1?  I don't think Class 1 ever

4    went on appeal.

5              THE COURT:  All right, so this where I've got to

6    get this straight.  This is only Class 1?

7              MR. NOTARGIACOMO:  Correct, your Honor.

8              THE COURT:  So the opt-out option --

9              MR. NOTARGIACOMO:  Applies to those states that

10   weren't previously provided -- consumers in those states who

11   weren't previously provided an opt-out option.  So if

12   they're from one of those states, they'll get a notice very

13   similar to the other notice, but it provides them with an

14   option to opt out.

15             THE COURT:  So can we just -- I have so many of

16   these cases.  Class 1 I certified for Massachusetts only and

17   made certain findings.

18             MR. TRETTER:  No.

19             MR. NOTARGIACOMO:  No.

20             MR. TRETTER:  Class 1 is the Medicare consumers.

21             THE COURT:  So the Medicare consumers.  Was it

22   national, or was it class?

23             MR. TRETTER:  It was national, and it was -- it

24   was almost national.  I think what Ed is saying is that

25   there were a few states that you didn't certify that were

1   now included in the settlement.

2           THE COURT:  So if there was a national settlement

3   before and I sent out a notice, what is new about this?  Is

4   it that we've added states?

5           MR. NOTARGIACOMO:  Yes.

6           MR. TRETTER:  I think there are about six states

7   that were not previously certified in your ruling that are

8   now part of a settlement class.

9           THE COURT:  But am I right in remembering that

10  whatever the settlement was in Class 1 was agreed upon by

11  everybody, right, so it was never paid?

12          MR. TRETTER:  What happened is, there was --

13          THE COURT:  I'm just trying to get a history.  I'm

14  not understanding.  We settled -- there are three things I

15  remember about Bristol-Myers.  One piece went to trial which

16  was only --

17          MR. TRETTER:  Class 2/Class 3 Massachusetts.

18          THE COURT:  Right, and that went up on appeal.

19          MR. TRETTER:  Correct.

20          THE COURT:  Then there was a national class that I

21  certified at some point which is on appeal.

22          MR. TRETTER:  The national class was -- no.  Oh,

23  national Class 2/Class 3, let's call that one "multistate"

24  because you excluded many states.  That one you never

25  entered the order because you were waiting for the First

1  Circuit appeal.

2         THE COURT:  Perfect.  Now, this Bristol-Meyers

3  Class 1 I thought had been settled years ago, so it was a

4  bit of a surprise to me, when I finally focused on it, that

5  we're coming back again at it.  And it's all of the classes,

6  right?

7         MR. TRETTER:  Fair enough.  Let me try to explain

8  what happened with Class 1.  There was your Class 2/Class 3

9  Massachusetts decision in June, 2007, and a couple of weeks

10 thereafter there was a memorandum of understanding between

11 BMS and Class 1.  It never went past the memorandum of

12 understanding phase.  I think that's what your Honor has in

13 mind.

14        MR. NOTARGIACOMO:  But it was presented to you

15 because there was a disagreement about how to interpret the

16 MOU, and we sought your guidance with respect to that.  And

17 there was a minute order with respect to that.  And it was

18 shortly after that decision by your Honor or minute order on

19 the MOU that we went back to Professor Green, who oversaw

20 all of these negotiations, and we were able to hammer out a

21 national settlement that included all three classes, not

22 just Class 1 that had been the previous subject of the MOU.

23        MR. TRETTER:  Exactly.

24        THE COURT:  So when you're allowing -- this is

25 what's confusing me -- so now you're allowing an opt-out but

1  only for certain states in Class 1.

2          MR. TRETTER:  Because nobody ever appealed -- in

3  your original 2005 or 2006 class decision when you first

4  certified only a Massachusetts 2 and 3, you did also certify

5  an almost nationwide Class 1.  Nobody ever appealed that.

6          THE COURT:  Oh, all right.  But did notice ever go

7  out?

8          MR. TRETTER:  That would be class counsel.

9          MR. NOTARGIACOMO:  For Class 1 notice -- I have to

10  think back now myself.

11          THE COURT:  Because the only question that I had

12  in reading it was, I wasn't sure why there was only an

13  opt-out for certain states and not other states.  And so I

14  couldn't remember whether we'd ever sent out notice, or

15  indeed whether -- I had sort of a memory it was settled, so

16  the history wasn't --

17          MR. NOTARGIACOMO:  I believe there was national

18  publication notice.

19          THE COURT:  I don't remember.

20          MR. NOTARGIACOMO:  But I'd have to go back

21  truthfully --

22          THE COURT:  Because otherwise it makes no sense

23  just to allow certain states an opt-out right.  You would

24  want all states to have the opt-out right if we never

25  actually sent out a notice.

1        MR. TRETTER:  Your Honor raises the right

2   question, which is, did class counsel after your first

3   decision on a nationwide class, which was only Class 1, did

4   some sort of notice go out at that time?  And, if so, then

5   obviously only the new state Class 1 people would be

6   entitled to opt out.  If not, then all of Class 1 would

7   be entitled.

8        THE COURT:  Let me even play devil's advocate for

9   a minute because this is such a serpentine history of this

10  case.  Arguably, even if I sent out notice, it was four

11  years -- how many years ago was it?

12       MR. NOTARGIACOMO:  Three years ago.

13       THE COURT:  Four years ago, three or four years

14  ago?  Should we just do it again?  It's so long ago that I

15  couldn't remember, and you can't remember.

16       MR. NOTARGIACOMO:  I'm the one who should

17  remember, your Honor, of all of us.

18       THE COURT:  Mr. Tretter can't remember.

19       MR. TRETTER:  Mr. Tretter is sick, so he, you

20  know, he definitely can't remember.

21       THE COURT:  Yes, but I'm not.  I have no excuse

22  for the deficit, the mental deficit here.

23       MR. NOTARGIACOMO:  I do believe there was national

24  publication notice.  I don't believe that -- no, no, no, I'm

25  sorry, your Honor.  I'm now remembering what we did get from

1    CMS at the time were the names and addresses, not the actual

2    payment information but the names and addresses for

3    Track One drugs, everyone who had a Track One drug, and I

4    believe mail notice went out to those people.  I will have

5    to check that, your Honor, and get back to you.

6         THE COURT:  You just should verify that because

7    let me just say, if there was actual mail notice, I don't

8    think there's a need to go back, but was it a different

9    settlement at that point?

10        MR. TRETTER:  Well, it would have been a

11   litigation class, your Honor.  At that point, when you

12   certified, you certified as to Track One.  Ed's right.  It

13   was J&J and GSK.  It was all five defendants, but GSK was

14   the first to settle.  But there was a litigation class, a

15   nationwide litigation Class 1 that was created with a few --

16        THE COURT:  Right, but now that I've got a

17   settlement, shouldn't I tell them what it is so that they

18   can opt out?

19        MR. TRETTER:  Well, I think the rules on class

20   actions are, if you receive a litigation notice as a class

21   member, you can't opt out of the settlement.  You can

22   object, but you're bound.

23        THE COURT:  Let me put it this way:  I don't

24   remember, but I at least think for the record we need -- I

25   also seem to remember some complaints from class counsel

1    about how expensive it was.  I don't remember with

2    precision.  But we at least should have for the record what

3    happened, what it was notified for, and why I'm only

4    allowing opt-out with respect to certain classes, if in fact

5    individual mail notice went to virtually everyone.

6              MR. NOTARGIACOMO:  I am remembering now as we

7    discuss this, your Honor, that we did get names and

8    addresses of all those folks.  I will verify still, but I

9    believe we sent actual mail notice.  And the reason it was

10   so expensive is because -- and this needs to be part of the

11   way this settlement is structured -- that list that we get

12   from CMS, we can't tell who's a co-payor and who's not a

13   co-payor, who has Medigap insurance and who doesn't.  So we

14   sent it to all of those people regardless.  It was

15   overinclusive.

16             THE COURT:  So aren't you going to have to do the

17   same thing with the states that weren't included before?

18             MR. NOTARGIACOMO:  Well, we will be doing that

19   with everyone on the CMS list.  Everyone will get that two-

20   or three-page short notice with a card.  Only those who

21   apply and say, "Yes, I'm one of the class members who

22   actually made a percentage copayment --"

23             THE COURT:  Back up for a minute.  I'm sorry to

24   keep you --

25             MR. NOTARGIACOMO:  That's okay.

feb77d08-4709-441f-a378-ac69c40465cc

1      THE COURT:  Your proposal is, do you have a CMS,

2  Center for Medicare and Medicaid Services, list for everyone

3  in the country?

4      MR. NOTARGIACOMO:  Yes.

5      THE COURT:  And resend out a notice?

6      MR. NOTARGIACOMO:  Everyone in Class 1 who's on

7  that CMS list would get the short Class 1 notice with a

8  return reply.

9      THE COURT:  So everyone in the United States of

10  America.  And is it just co-payors, or is it also people who

11  paid --

12      MR. NOTARGIACOMO:  CMS would only have -- would

13  have individual --

14      THE COURT:  Well, then once you're sending it out

15  to everyone, why don't I give everyone an opt-out right?

16      MR. NOTARGIACOMO:  It's certainly within the

17  Court's --

18      THE COURT:  I mean, I'm allowed to do a second

19  opt-out.  It's been four years.  It might be worth doing.

20      MR. TRETTER:  You know, I don't think BMS would

21  object.  I'd like to know what the answer was on the first

22  before committing.

23      THE COURT:  So now that there's no extra expense

24  and it's been four years, unless there's a good reason not

25  to and I have the second opt-out right, let's just do it and

1    do this right, and then -- our experience is, very few

2    people opt out actually.  Very few people claim, but very

3    few people opt out, but at least it's direct mail notice.

4    And then we'll -- so we don't have to make it just those

5    states.  It makes it actually easier.

6            MR. NOTARGIACOMO:  That's fine, your Honor.  It's

7    just a matter of rather than sending back, you know, two

8    different notices, depending on state, we'd send back the

9    exact same notice, and it would have the opt-out paragraph

10   in it.

11           THE COURT:  Yes, okay.  So then the next issue,

12   all right, so now we've taken care of Class 1, and the

13   TPP --

14           MR. NOTARGIACOMO:  But let me just finish Class 1.

15           THE COURT:  Yes, yes.

16           MR. NOTARGIACOMO:  So the second round, everyone

17   who sent back that card would get a full notice with an

18   individualized, you know, sheet that actually shows what CMS

19   data tells us their payments were.  They review that, and if

20   they have no qualms with it and no changes to it, they don't

21   have to do anything else.  The claims administrator will

22   determine what their claim is based on the distribution

23   approved by the Court, and they'll get a check without

24   having to do anything more.  If they disagree with it, they

25   can provide the claims administrator with different

1    information --

2              THE COURT:  Okay, good, so it's easy.

3              MR. NOTARGIACOMO:  It's easy.

4              Class 2 are third-party payors.  Just like

5    third-party payors in Class 3, they'll get a direct mail

6    notice, and there will also be publication in some trade

7    magazines, which we've done before.  We never have any

8    problems having TPPs file claims.

9              THE COURT:  All right.

10             MR. NOTARGIACOMO:  In Class 3, we propose a

11   publication notice in three major national magazines.  I

12   believe they are People Magazine, Newsweek, and TV Guide,

13   along with notice on the Web and press releases, as well as

14   contact with a number of organizations, grass-root

15   organizations that deal specifically with people with

16   medical conditions.

17             THE COURT:  And before in one of the other cases,

18   we were able to get lists from the third-party payors back

19   to a certain period of time, and then the lists were lost.

20   Are you doing that here?

21             MR. NOTARGIACOMO:  We're not doing that here, and

22   specifically because with respect to the damages with

23   respect to BMS, Class 3 is very, very small, much smaller

24   than -- and I'm not sure exactly why.  Well, I think the

25   reason why is that these drugs are drugs that are primarily

1  taken by the elderly, and they are covered by Medicare.

2          MR. TRETTER:  No, no.  The reason is because they

3  were multi-source for very long periods of time, and

4  therefore, even under Hartman's analysis, there would have

5  been no Class 3 damages.  In other words, a drug that went

6  multi-source in 1993, you know, within six months would have

7  had a MAC, so there was no Class 3 damages.  I think there

8  there was a very short window of Class 3 damages which was

9  for one drug, Taxol, for a six-month period in 2001.

10          MR. NOTARGIACOMO:  There's a smattering of damages

11  in some small period for some of the other drugs in Class 3,

12  but for the most part, Class 3 is very, very small, in the

13  order of less than one percent of the damages.  So class

14  counsel didn't feel it was cost-effective to go out and to

15  try to spend a lot of money to --

16          THE COURT:  But can I play devil's advocate?  Why

17  should we be advertising?  Wouldn't it be -- because you're

18  not going to find these people that way.  They tend to be

19  older and sicker.  Last time we did this go-around, it cost

20  us almost a million dollars to publish in the magazines and

21  go on the Web, right?  And we found we had almost -- almost

22  no claims came out of it.

23          MR. NOTARGIACOMO:  That's true, but we've actually

24  scaled it down because we didn't feel spending a million

25  dollars to chase $90,000 in damages in Class 3 made much

1    sense.  So I think the estimates are between $300,000 and

2    $350,000 to do the publication and the Web and those things

3    that we propose to try to reach Class 3 members.

4              THE COURT:  But could that money be spent just as

5    well having the -- I'm just playing this out because we've

6    done it before -- trying to go to the third-party payors and

7    say, try and find people from that time period Mr. Tretter

8    was talking about to see if we can find these people?

9              MR. NOTARGIACOMO:  Going back that far, it's

10   almost impossible for any of those TPPs to go back that far

11   without having to resurrect computer systems that have long

12   been shelved.

13             THE COURT:  We've done it in other cases, right?

14             MR. NOTARGIACOMO:  But not going back that far.

15   In GSK, for instance, we had the TPPs give us what was on

16   their current system, so it went back four or five years in

17   some instances.  But never, none of those TPPs could provide

18   us with names and addresses going back into the early '90s

19   or even mid-'90s because in sixteen years their computer

20   systems have changed two, three, four times.  And even if

21   they exist, they're mothballed somewhere, and it's very

22   expensive to resurrect those systems to try to get the data

23   off the old tapes, for instance.

24             THE COURT:  Well, this is what we should do, I

25   think, because I have no confidence that despite our

Page 18

1    absolute best efforts, probably that will be consistent with

2    the due process clause but which are worrisome, I don't

3    think we're going to find these people with Parade Magazine

4    notice.  So I'm wondering whether at least with respect to

5    the big TPPs who benefit the most -- who would they be,

6    the --

7              MR. NOTARGIACOMO:  Usually, you know, Aetna,

8    WellPoint, Cigna.  Those are the large --

9              THE COURT:  Well, if you could call their counsel

10   and see if it's feasible.  And I will just simply add in the

11   notice plan, to the extent feasible, the major TPPs, and

12   we'll see what we can do --

13             MR. NOTARGIACOMO:  Does your Honor wish a report

14   at some very early point to say it's feasible, but it's

15   going to cost X number of dollars?

16             THE COURT:  Yes.

17             MR. NOTARGIACOMO:  Class counsel recommends we do

18   it or we don't do it?

19             THE COURT:  Yes, I think that's fine, you know, an

20   exploration of the feasibility of doing it through TPPs, but

21   I don't want to hold up the publication plan.  But if they

22   can do it, the TPPs have benefited hugely from these

23   settlements, so I don't mind if it cost them a little bit to

24   try and find -- it's, after all, their beneficiaries.

25             MR. NOTARGIACOMO:  Would it make sense to move

1    things along if we say within the next two weeks we'll

2    provide you with a report?

3              THE COURT:  That sounds fine.

4              MR. NOTARGIACOMO:  I believe I can get that

5    accomplished.

6              THE COURT:  Good, okay.  All right, so that's the

7    claims process.

8              MR. NOTARGIACOMO:  Well, with respect to Class 3,

9    assuming we reach those people, just like in Track Two,

10   they'll have two options:  They can choose what's called the

11   easy refund option, I believe.  And as long as they certify

12   that they made percentage co-payments for one or more of the

13   drugs, they'll receive a flat payment of $35.  Or they can

14   seek a full estimation refund and provide us with an

15   estimate of their out-of-pockets with respect to the drugs

16   and documentation for each one of those drugs, not for every

17   purchase, just one piece of documentation supporting their

18   claim for each drug that they're making a claim for, and

19   they will be provided the full amount of their --

20             THE COURT:  Well, let me ask you this:  Is $35

21   enough money, given the fact at least some of BMS's drugs,

22   am I remembering correctly, tended to be of the more

23   expensive variety?

24             MR. NOTARGIACOMO:  Some of them like Taxol and

25   others I believe are more expensive.

1          THE COURT:  Like I remember, like, in the
2     thousands, right?
3          MR. NOTARGIACOMO:  Depending on the course of
4     treatment, it can --
5          THE COURT:  Right.  I remember you flagged that in
6     your brief.  So should it be more money?
7          MR. NOTARGIACOMO:  Well, we certainly could
8     increase the $35, or if there's money left over at the
9     end -- and I'm not sure there will be, depending on how the
10    CMS data comes back -- we could send a supplemental check to
11    those people who got the $35 and increase it to $50 or $100
12    or however --
13         THE COURT:  You don't care, Mr. Tretter, do you,
14    as long as it stays within the allocation?
15         MR. TRETTER:  That's correct, your Honor.
16         THE COURT:  Well, why don't we -- rather than have
17    it go into a cy pres fund, $35 seems unreasonably -- well,
18    not unreasonably.  For some of the drugs, just certifying
19    that you did it, you paid more than $35.  In other words,
20    just the fact that you -- almost every co-pay is going to be
21    higher than that, right?
22         MR. NOTARGIACOMO:  If you're paying -- well, in
23    Class 3 they might be paying 20 percent.  I'm not sure what
24    they --
25         THE COURT:  Twenty percent, and what was the

1    typical course of treatment?  I remember this.  It was

2    $1,200 or $2,000 or something like that, right?

3              MR. TRETTER:  A lot depends on the time period

4    that you're talking about, and it depends on the drug.  Not

5    everyone will have taken the Taxol.  That's where the

6    damages were found.  But, you know, there are other people

7    that were taking cytoxan or things like that are very old

8    drugs that don't cost very much money.

9              THE COURT:  I see.  Well, that's very useful.  So

10   I'm just wondering whether you could recalibrate it that

11   subject to availability, it would go up to treble damages.

12             MR. TRETTER:  Well, my understanding -- and Ed can

13   correct me -- is that if they have some proof -- the $35 is

14   for people with sort of a no-fault.  In other words, "I

15   don't have any records, so I don't know, I just certify."

16   But if you have a record, you're eligible for a lot more.

17             THE COURT:  Right, but let's face it, they're old

18   people who have got cancer, and it's sixteen years later.

19   Would you -- I don't keep my medical --

20             MR. TRETTER:  Look, and, your Honor, we don't have

21   a dog in the fight.

22             THE COURT:  Right, I mean, you don't have a dog,

23   and, I mean, I'm not an old person yet.  I wouldn't keep

24   those records.  I don't have my records from fifteen years

25   ago.  Do either of you?  No one has their records from

1    fifteen years ago, so it's unrealistic to think it's going

2    to happen, especially if they were old then and they were on

3    Medicare.  What was that, sixty-five?  So they're now in

4    their eighties, at least.  So I'm thinking $35 seems like

5    what most people are going to be getting.

6              MR. NOTARGIACOMO:  You know, it's possible.  One

7    of the things they could provide if they want a full refund

8    is a letter from the doctor's office.

9              THE COURT:  Who's going to get a letter of sixteen

10   years ago?  I mean, I'm just saying people are sitting in a

11   nursing home.  I'm thinking you should -- what can we do at

12   this point?  He doesn't care.

13             MR. NOTARGIACOMO:  Well, we could try to choose a

14   figure, and rather than say, "You will receive --" I'm just

15   picking a number -- "$150," we could say something like,

16   "You will receive up to a flat payment of $150."

17             THE COURT:  Why don't you just say "at least $35"?

18             MR. TRETTER:  May I make a -- are we talking about

19   Class 1 or Class 3 here?

20             MR. NOTARGIACOMO:  Class 3.

21             MR. TRETTER:  Who is it that gets the $35?  Is it

22   just Class 3, or is it Class 1?

23             THE COURT:  Class 1 is easy because CMS tells you

24   exactly, exactly --

25             MR. TRETTER:  So it's only the Class 3 consumers

1   that we're talking about?

2            THE COURT:  Yes.

3            MR. NOTARGIACOMO:  Well, I assume that they --

4            THE COURT:  There are going to be almost none of

5   them.  Let's start there.  Maybe just say at least $35 but

6   up to what?  What do you think --

7            MR. TRETTER:  Well, isn't there some way that you

8   could increase the minimum by decreasing the maximum and

9   still stay within whatever you've allocated to Class 3?  In

10  other words, if you don't think people are going to go

11  through lots and lots of stuff to fill out what could be the

12  maximum, why can't you raise the minimum, and sort of

13  instead of trebling or whatever you're doing at the maximum,

14  doubling it.  Does that make sense?

15           MR. NOTARGIACOMO:  I'm not sure I understood it.

16  Did you understand it?

17           THE COURT:  Maybe it's the food poisoning.

18           MR. TRETTER:  Yes, it could be, could be.

19           THE COURT:  I'm sort of thinking that I don't have

20  a silver number, bullet for this, but, I mean, we could say

21  a hundred bucks a person and I think still be pretty safe,

22  right?  In other words, I think we --

23           MR. NOTARGIACOMO:  We're talking about a small

24  number of people --

25           THE COURT:  Of people, and you're talking about,

1    you can say up to what, $35 times three, up to this amount,

2    because that's trebling if you were to use that as sort of a

3    liquidated.  And that would be maybe closer to what --

4               MR. NOTARGIACOMO:  -- $105.

5               THE COURT:  Yes, up to $105, depending on how many

6    people claim or something.

7               MR. NOTARGIACOMO:  Okay, we can --

8               THE COURT:  We might actually get more people make

9    an effort to even just send in the form.

10              MR. NOTARGIACOMO:  Right.

11              THE COURT:  Does anyone have a problem with this?

12   No, okay.  So then we've got --

13              MR. NOTARGIACOMO:  Classes 1, 2, and 3 as far

14   as -- and then the other portion of it is the distribution.

15   We just talked about the claims process.  The distribution

16   would be heavily weighted in favor of the three drugs that

17   have the most damages, cytoxan, Taxol, and Vepesid.  So a

18   consumer's claim for out-of-pockets for those drugs would be

19   triple; and the out-of-pockets for the other drugs, they

20   would receive their out-of-pocket without a multiplier of

21   any sort.  So it's only one time for the other four drugs,

22   where it's three times their out-of-pockets for cytoxan,

23   Taxol, and Vepesid.  That applies to Class 1 --

24              THE COURT:  That makes sense.

25              MR. NOTARGIACOMO:  -- and Class 3 consumers who

1   take the --

2           THE COURT:  And does this totally put the BMS to

3   bed?

4           MR. NOTARGIACOMO:  Yes, it would, your Honor.

5           MR. TRETTER:  Yes.

6           THE COURT:  Okay, so --

7           MR. TRETTER:  And we're working to get out of

8   Arizona case, your Honor.  I think you're going to be able

9   to say "good-bye" to us.

10          THE COURT:  So what's the date we should have for

11  the -- do we know of any objectors as we're sitting here?

12          MR. TRETTER:  I'm sure Don Haviland will have

13  something to say.

14          THE COURT:  Well, there have been an increasing

15  number of objectors each time I have one of these, so we're

16  the new feeding frenzy in town, and I just didn't know if

17  there were any issues we knew right now that were surfacing.

18          MR. NOTARGIACOMO:  Nothing on preliminary

19  approval.  But it's summer.  I'm not sure if people are

20  paying attention to the docket.  I'm sure, by the time we

21  get to final approval, we'll have people --

22          THE COURT:  I mean, almost everything I have has

23  been going up on appeal, I think.  We're up to the fourth?

24          MR. TRETTER:  I mean, I think there is one issue

25  that your Honor should be attuned to, which is, when we

1    originally went with the MOU -- and this is discussed in the

2    class counsel's papers -- when we originally did the MOU and

3    we were just doing Class 1, it was $13 million, and now it's

4    $4 million and change for Class 1.  And the reason is

5    because when we did that MOU and it was two weeks later, you

6    said, "Wait a second, the 30 percent rule applies to Class 1

7    as well."  Well, then it became clear that the Class 1

8    damages were no higher than $4 million.  So this settlement

9    does provide for at least, you know, theoretically, if

10   everybody put in, a hundred percent of their damages, but

11   you should be aware of this.

12           THE COURT:  Well, also conceivably, if I'm

13   remembering correctly, one of the issues on appeal is

14   whether that was a correct legal ruling.

15           MR. NOTARGIACOMO:  That's correct, your Honor.

16           THE COURT:  So is everyone taking those risks into

17   account as we go?

18           MR. TRETTER:  Exactly.

19           MR. NOTARGIACOMO:  Yes, I believe we are, your

20   Honor.  That's one of the reasons that for some of the other

21   drugs that aren't in the top three, there's still a release

22   being provided.  Even though the calculated damages were

23   small, one of the things that is being released is the

24   possibility that you might be overturned.

25           THE COURT:  I could be overturned on any of it,

1   right, on both sides of this wagon?

2               MR. NOTARGIACOMO:  Exactly.

3               MR. TRETTER:  That's right.  I mean, that's why

4   Eric Green got involved, and that's why it took a while.

5               THE COURT:  It's been almost what, three-quarters

6   of a year, six months anyway, right, that --

7               MR. NOTARGIACOMO:  Since you had the MOU issue in

8   front of you?

9               THE COURT:  No, no, no, since it went up on

10  appeal, like, the argument was --

11              MR. NOTARGIACOMO:  Oh, on the Massachusetts trial?

12  Yes, it's been fully briefed, and it's --

13              THE COURT:  No, but I think it's been under

14  advisement for --

15              MR. TRETTER:  What, the BMS appeal?

16              THE COURT:  Yes, the whole thing has been --

17              MR. TRETTER:  But it's been stayed.  We got a stay

18  from the First Circuit when we reached the settlement.

19              THE COURT:  I actually didn't know that.  So

20  something must have --

21              MR. TRETTER:  Oh, I'm sorry, your Honor.

22  Absolutely.  As soon as we had the settlement, we didn't

23  want a decision.

24              THE COURT:  Oh, I see.  But is something still

25  percolating?  Is it just AstraZeneca left?

1      MR. TRETTER:  Well, it will be, yes.  The answer

2  to that is -- well, I think the J&J case; in other words,

3  the class plaintiffs' appeal of the J&J aspect is still

4  there too.

5      THE COURT:  Fair enough, fair enough.  I forgot

6  that.  All right, so thank you for alerting me to that.

7  Those are exactly what I want.  I mean, at the last hearing

8  I hit an issue that no one flagged for me and just took me

9  aback, so I'd like to know as they percolate through.

10      So there is no other litigation affected.  At

11  least with respect to BMS, it's stayed, an appeal.  There's

12  a possible issue about a decrease from the memorandum of

13  understand till the present, which both sides have taken

14  into account, the fact that the case was pending on appeal.

15      So at this point I will approve it.  You'll make

16  those changes, put in all the dates consulting with

17  Mr. Alba, and I'll sign it.

18      MR. NOTARGIACOMO:  Very good, your Honor.

19      THE COURT:  Okay, is there anything else I need to

20  know?  No?

21      MR. NOTARGIACOMO:  Not that I'm aware of.

22      MR. TRETTER:  Thank you again, your Honor, for

23  letting me appear by phone.

24      MR. NOTARGIACOMO:  As long as I'm here, your

25  Honor, and I know your Honor won't be here next week, a week

1    before -- this doesn't relate to BMS.  It relates to the GSK

2    supplemental distribution.  We had some moneys left over, a

3    considerable amount of money left over in the GSK consumer

4    pot.  That went to Eric Green for mediation.  He made a

5    determination and asked class counsel to submit to the Court

6    a schedule of a second distribution.  And we did that about

7    a week and a half ago, and I just wanted to bring it to your

8    attention.

9            THE COURT:  I'm glad you did because we don't

10   always see --

11           MR. NOTARGIACOMO:  I'd like to get that money out

12   the door, if we can, to consumers because we actually --

13           THE COURT:  I had thought I actually approved

14   that, but if I didn't, I will.

15           MR. NOTARGIACOMO:  Well, I have to say I was on

16   vacation last week, and I haven't caught up with all of my

17   e-mail today, so it may be that your --

18           THE COURT:  We'll check.  It's possible.  There's

19   so much in that case, and I have this other huge

20   multidistrict litigation which has been blossoming in my

21   time demands, and between the two, I could have missed it.

22   So as you always are, you call politely and let me know if I

23   haven't done some things, so that's fine.

24           Okay, thank you.  Have a nice rest of the summer.

25   Mr. Tretter, get better.

1          MR. TRETTER:  Thank you very much, your Honor.

2          THE COURT:  Okay, bye-bye.

3          THE CLERK:  Court is in recess.

4          (Adjourned, 4:39 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court

8  Reporter, do hereby certify that the foregoing transcript,

9  Pages 1 through 30 inclusive, was recorded by me

10 stenographically at the time and place aforesaid in Civil

11 Action No. 01-12257-PBS, In Re:  Pharmaceutical Industry

12 Average Wholesale Price Litigation, and thereafter by me

13 reduced to typewriting and is a true and accurate record of

14 the proceedings.

15          In witness whereof I have hereunto set my hand

16 this 14th day of August, 2009.

17

18

19

20

21          /s/ Lee A. Marzilli
                                    _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23

24

25

feb77d08-4709-441f-a378-ac69c40465cc