Exhibit D – Part 2

15, 2003, this rule in relevant part defined the EAC as AWP - 10%. N.Y. Laws 2003, Ch. 62, PartZ2.

82.     Thus, Nassau County reimburses providers for Covered Drugs at an amount that is based upon the Covered Drugs' Estimated Acquisition Cost ("EAC") or Average Wholesale Price ("AWP"), as published and reported by the publishers discussed above. As alleged, given that these AWPs are false and inflated, Nassau has been overcharged.

83.     In 2001, only two of Nassau's leading Medicaid reimbursed drugs (Albuterol Aer and Augmentin) had HCFA upper limits established. For all other drugs where Medicaid reimbursements were made by Nassau, such payments were based on AWP and therefore wrongfully and falsely inflated pursuant to the scheme alleged herein. This means that the vast majority of at least Nassau's top Medicaid reimbursements in 2001 were inflated.

84.     As stated, there is another aspect to the Medicaid Statutory Scheme implicated here. Under 42 U.S.C. § 1396r-8, in order for a manufacturer of a drug to have its products compensated under Medicaid, the manufacturer must enter into a rebate agreement with the Secretary of Health and Human Services. Pursuant to the rebate agreement, the manufacturer promises to report to Medicaid its "best price" and to pay rebates to Medicaid to ensure that the nation's insurance program for the poor receives the same favorable drug prices offered to other large purchasers of drugs. The statute defines the best price as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity or governmental entity." The section also provides that "best price" includes "cash discounts, free goods that are contingent on any purchase requirement, volume discounts and rebates" and does not include "prices that are merely nominal in amount."

85.     Upon information and belief, each defendant herein entered into such a rebate agreement with the Secretary of Health and Human Services.  In that agreement, each agreed to comply with Section § 1396r-8, and hence:

(a)     Agreed to report its best price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, in any quarter and to make rebates where necessary;

(b)     Agreed that it would determine its best price based upon its average manufacturer's price, calculated as "net Sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements)," and that it would include in that calculation cash discounts and all other price reductions "which reduce the actual price paid"; and

(c)     Agreed that the best price would not take into account nominal prices, defined as prices that are less than ten percent of the average manufacturer's price in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

86.     New York Social Services Law § 367-a(7)(d) expressly incorporates the rebate requirements of 42 U.S.C. § 1396r-8 and provides that where a manufacturer has entered into a rebate agreement, as outlined above, Medicaid reimbursements shall be made only pursuant to the terms of that rebate agreement.

87.     Non-compliance with the best price requirements carries strict penalties.  For example, 42 U.S.C. § 1396r-8(c)(ii) expressly provides that "any manufacturer with an agreement under this section that knowingly provides false information is subject to a civil money penalty in an amount not to exceed $100,000 for each item of false information."

88.     Nassau, like any Medicaid payor, was an intended third-party beneficiary of these rebate agreements.

## C.   DEFENDANTS' FRAUDULENT CONDUCT RESPECTING AWP REPORTING AND FAILURE TO REPORT BEST PRICES

### 1.     Artificially Inflating and Fraudulently Reporting AWPs

89.     Each Defendant Drug Manufacturer provided directly, or caused to be provided (i.e., through WACs that are converted to AWPs) AWPs for each of its drugs to the RedBook, the Blue Book, Medi-Span and other pharmaceutical compendia for Covered Drugs.

90.     At all times relevant hereto, the defendant drug manufacturers deliberately, routinely and intentionally published or caused to be published AWPs for Covered Drugs that did not reflect the actual prices for the drugs.  These inflated prices were reported to cause Medicaid and other governmental programs to overpay for the Covered Drugs.  The purpose of artificially inflating the providers' profits was to create an illegal kickback to the providers funded by Medicaid and other government insurers.  In other words, the scheme was perpetrated so that providers who purchased the drugs at a low cost would bill patients and their insurers at the inflated AWPs and earn a substantial profit from the "spread" between the real cost and the various AWP related reimbursement rates.  This practice of taking advantage of the difference between the supplier's purchase price and the amount that a provider receives via Medicaid is referred to internally by Defendants as "marketing the spread."

91.     Defendants knew and understood that Medicaid relied on the RedBook and other compendia to determine the AWPs of the covered drugs.  Because Defendants, acting on behalf of their relevant Manufacturer-Publisher enterprises, controlled the published AWPs, Defendants knew and understood that they could manipulate the providers' profits from Medicaid contributors, such as Nassau.

2.     **Failure to Report Best Prices**

92.     After execution of the rebate agreement required pursuant to 42 U.S.C. § 1396r-8, each Defendant is required to report its average manufacturer's price in each quarter. Yet, consistent with their artificial inflation of AWPs to publishers, Defendants routinely do not report the actual "best price" but, instead, excludes from best price discounts, free samples and other inducements offered to providers to increase use of a drug, being reimbursed by governmental entities at a reimbursement rate pegged to AWP.

93.     The AWP scheme succeeds precisely because providers are able to obtain drugs at prices significantly below current Medicaid reimbursements. Most manufacturers sell drug products to physicians and other suppliers at a discount from AWP. Sometimes these discounts are substantial.

94.     The widely available prices from wholesalers and group purchasing organizations ("GPOs") for covered drugs are considerably less than the AWPs used to establish the Medicaid reimbursement. For most of the high-expenditure or high volume physician-administered drugs, widely available discounts from AWP range at the low end from 13 percent to 34 percent. Recent ongoing federal investigations and settlements involving certain named Defendants reveal much greater discounts sometimes as high as 85%. Providers who have been identified as low-volume billers for certain drugs can also purchase drugs for considerably less than the Medicaid reimbursement.

95.     Upon information and belief, each of the defendant pharmaceutical companies has also utilized an array of other inducements to stimulate sales of their drugs. These inducements, including educational grants, volume discounts, and rebates or free goods, were designed to result in a lower net cost to the purchaser while concealing the actual cost price beneath a high invoice price. A product invoiced at $100 for ten units of a drug item might really only cost the

- 30 -

purchaser one-half that amount.  If one assumes a subsequent shipment of an additional ten units

at no charge, or a "grant," "rebate" or "credit memo" in the amount of $50, the transaction would

truly cost just $5 per unit net.  Through all these "off-invoice" means, drug purchasers were

provided the substantial discounts that induced their patronage while maintaining the fiction of a

higher invoice price-the price that corresponded to reported AWPs and inflated reimbursement

from Medicaid.  One example is this from Bayer:

> BAYER: "I have been told that our present Kogennate price, $.66,
> is the highest price that Quantum is paying for recombinant factor
> VIII.  In order to sell the additional 12mmlu we will need a lower
> price.  I suggest a price of $.60 to $.62 to secure this volume.

96.     Manufacturers or wholesalers also offer purchasers rebates based on the volume

of products purchased not in a single sale but over a period of time.  Manufacturers also establish

"chargeback" arrangements for purchasers, which result in the AWP overstating what those

purchasers pay.  Under these arrangements, the purchaser negotiates a price with the

manufacturer that is lower than the price the wholesaler charges for the product.  The wholesaler

provides the product to the purchaser for the lower negotiated price, and the manufacturer then

pays the wholesaler the difference between the wholesale price and the negotiated price.

97.     The Defendants also engage in extensive distribution of free samples through

their sales and marketing representatives as a means of lowering price.  The free samples are

used to offset the total cost associated with the drugs, thereby increasing the "spread."  Upon

information and belief, and as confirmed by certain recent settlements as described herein,

Defendants specifically instruct providers to bill the government for the free samples, which

Defendants know is unlawful.  The free samples are not taken into account by the drug

companies in calculating the AWP, which in turns inflates the AWP.

98.     Every free sample of a drug for which a provider bills the government effectively reduces the provider's overall cost for that drug.

99.     Thus, while federal and state Medicaid statutes law require the Defendants to provide quarterly rebates if they charge more than the lowest or "best price" offered to any commercial customer, the Defendants routinely fail to do so.  This is because Defendants know that, due to practical problems with ascertaining actual cost charges or street prices, Medicaid administrators routinely determine the allowable payment for a prescription drug based upon the AWP reported by the applicable pharmaceutical manufacturer.  *See* New York Social Services Law § 367-a(9).

100.    Recently, two defendants herein, Bayer and GlaxoSmithKline, agreed to pay $344 million to resolve allegations that they engaged in health care fraud against state programs by failing to report their "best price."  The wrongful scheme in which they engaged was known as "lick and stick" wherein they sold re-labeled products to an HMO at deep discounts, and then concealed and avoided their obligations to pay millions of dollars in additional rebates to the Medicaid program.

101.    At the time of the offenses, Kaiser Permanente Medical Care Program ("Kaiser") was the nation's largest HMO, providing care and treatment to more than 6 million persons, and often purchased drugs directly from drug manufacturers to save on costs for its members, negotiating aggressively for lower prices.  Both Bayer and Glaxo provided discounted prices to Kaiser for their drugs and engaged in private labeling for the HMO, affixing different labels to their drug products.  These slightly altered labels allowed Bayer and Glaxo to avoid reporting to the federal government the new low prices given to Kaiser and to avoid paying millions of dollars in additional drug rebates to the Medicaid program.  The type of fraud scheme is known

- 32 -

as "lick and stick" in reference to the use of a new label on the drug. This is but one example of the ways in which Defendants avoid paying proper rebates.

**D.   THE DEFENDANT DRUG MANUFACTURERS' USE OF AWP FRAUD TO INCREASE AND MAINTAIN VOLUME AND MARKET SHARE FOR GENERIC AND MULTI-SOURCE DRUGS**

102.   The Defendant Drug Manufactures' AWP fraud is most exacerbated for generic drugs or for brand name drugs, such as Fluoxetine and Albuterol, for which there are biological or therapeutic equivalents.

103.   Multi-source drugs or biologicals are also reimbursed on the basis of AWP. New York's Social Services Law defines AWP for multi-source drugs as equal to the lesser of the median AWP of all of the generic forms of the drug or biological, or the lowest brand name product AWP. NY CLS Soc Serv § 367-a(9). Because reimbursement is pegged to the AWP, drug makers act in unison by elevating the AWP for all generic drugs, thereby inflating the amount of the reimbursement that occurs through Medicaid.

104.   As stated by one industry consultant:

> . . . This situation is more pronounced with generic drugs. Many generic companies have taken advantage of this use of AWP by substantially inflating their published AWPs . . . . [T]he system allows a retailer to acquire a drug at a low cost $2.50 per 100 tablets, for example, while relying on a published AWP ($20.00 or more) for its own pricing. It is not uncommon that the $25.00 retail price for a generic drug renders a gross profit well above $20.00 for the retailer. It is also common for the AWP of a generic product to remain stable while the actual selling price declines . . . It is obvious that AWP is not an accurate measure of the prices manufacturers charge. It must also be noted that not all generic products will be priced similarly. Some, in fact, use the more traditional method of a 20% markup to reach an AWP. This can be a handicap for generic companies choosing this method because retailers often use the AWP as the starting point for many pricing decisions and an artificially high AWP provides the retailer with greater profits.

105.    The raising of an individual defendant's reported AWP for a multi-source drug raises the median AWP at which the generic drug is reimbursed.  While any one generic manufacturer can only affect the median generic reimbursement AWP for a product, Defendants can and do create a spread between the median AWP and the actual prices paid by reporting AWPs that are far in excess of the actual wholesale prices while simultaneously maintaining or lowering actual wholesale prices.

106.    According to HHS and industry experts, the actual average prices paid by prescription drug wholesalers are on average 27% lower than average retail prices, yet the AWPs reported by defendants are routinely and significantly higher than they should be per that ratio. Exhibit A to this Complaint sets forth the year 2001 reported AWPs for certain defendants' drugs and the approximate amount of overcharge to Nassau based on this estimate of the true average wholesale price of each drug, with retail prices where available, as presented in Exhibit B to the Affadavit of Aaron D. Hovan, submitted in *County of Suffolk v. Abbott Laboratories, Inc.*, E.D.N.Y. Case No. CV-03-229, MDL No. 1456.

107.    Upon information and belief, generic manufacturers are aware of the AWPs reported by their competitors and of the actual sales price of their generic competitors.  Generic drug manufacturers manipulate their own AWPs in order to gain or maintain a competitive advantage in the market for their generic products.  Each Defendant generic maker or distributor competes by inflating its AWP and thereby inflating the median AWP.  The natural and expected result of the "leap frogging" of increasing AWPs is that multi-source drugs have some of the highest spreads of any drugs, sometimes resulting in an AWP over 50,000% over actual costs.  A few examples are set forth below:

| Defendant | Multi-Source Drug | *RedBook* AWP | DOJ Determined Actual AWP | Percentage Spread |
|---|---|---|---|---|
| Baxter | Dextrose | $ 928.51 | $ 2.25 | 41,167% |
| Baxter | Sodium Chloride | $ 928.51 | $ 1.71 | 54,199% |
| Boehrigner | Leucovorin Calcium | $ 184.40 | $ 2.76 | 6,581% |
| B. Braun | Sodium Chloride | $ 11.33 | $ 1.49 | 660% |
| BMS Group* | Etoposide (Vepesid) | $ 136.49 | $ 34.30 | 298% |
| Dey | Albuterol Sulfate | $ 30.25 | $ 9.17 | 230% |
| Immunex* | Leucovorin Calcium | $ 137.94 | $ 14.58 | 846% |
| Pharmacia* | Etoposide | $ 157.65 | $ 9.47 | 1,565% |
| Sicor Group | Tobramycin Sulfate | $ 342.19 | $ 6.98 | 4,802% |
| Watson | Vancomycin HCL | $ 70.00 | $ 3.84 | 1,567% |

\* Defendants herein.

108.    In sum, generic or multi-source drugs are subject to the same fraudulent AWP manipulation as set forth in this Amended Complaint.

E.    **MOTIVATION FOR DEFENDANTS' AWP PRICING SCHEME**

109.    As stated, the purpose and intent of Defendants' fraudulent AWP Scheme is to manipulate and thereby increase the amount of reimbursement received by providers of drugs manufactured and sold by Defendants.

110.    Specifically, Defendants' AWP Scheme contemplates that (a) Defendants will intentionally report falsely and fraudulently inflated AWP prices for these drugs to industry

publications; and (b) Defendants will actually charge providers amounts for these drugs that are substantially less than the AWP that Defendants have fraudulently reported.

111.    The provider then receives reimbursement from Medicaid, based upon the fraudulently inflated AWP. This circumstance results in a substantial financial incentive to the provider, representing the difference between the inflated AWP-based reimbursement to the provider and the significantly lower direct price charged by Defendants to the provider.

112.    Defendants refer to the amount received by the provider resulting from the difference between the fraudulently inflated AWP reimbursement and the price actually paid by the provider as the "spread."

113.    Each of the Defendants has sought to manipulate the market for drugs at issue by inducing providers to prescribe these drugs, rather than competing drugs, because of the higher "spread" resulting from the falsely and fraudulently inflated AWP.

114.    By participating in the AWP Scheme, Defendants seek to influence providers to prescribe the drug with the greatest "spread" between the AWP and the actual direct price paid by the provider to the manufacturer. In fact, Defendants have greatly increased their profits by manipulating the AWP to create falsely inflated "spreads," which result in financial incentives to providers to prescribe specific drugs subject to the AWP Scheme.

115.    The manipulation of AWP at the expense of Medicaid is further revealed when the Defendants sell drugs that are not reimbursed by Medicaid. In these circumstances, the drug companies often report accurate AWPs and actually compete with other drug companies on the basis of having a lower AWP than the other company. The company with the lower AWP will urge physicians to consider the cost to the patient when selecting drugs and promote its lower

AWP as a selling tool. Thus, when Medicaid is not involved, Defendants often ensure that their AWPs are accurate so as to compete for market share based on price.

116.    Defendants were aware that providers would purchase and utilize products that have the widest spread between the providers' true costs and the reimbursement paid by third parties. All Defendants made representations of their AWP for various drugs, which representations were not accurate. In doing so, Defendants hoped that providers would view the inflated AWP as a reason for selecting their drug. Defendants also knew that this selection would be at the expense governmental payors, like Nassau.

## V.    GOVERNMENT INVESTIGATIONS

117.    The United States Department of Justice ("DOJ"), the United States General Accounting Office ("GAO"), the Office of the Inspector General at the United States Department of HHS ("OIG"), and certain Congressional subcommittees have been investigating Defendants and other pharmaceutical manufacturers for questionable practices regarding the industry's calculation of AWPs and for offering illegal incentives to providers.

118.    In connection with the investigation of the United States Congress, Congressman Stark wrote most, if not each, of the Defendants herein in a letter dated October 31, 2000:

> You should by now be aware of Congressional investigations
> revealing that Abbott has for many years reported and published
> inflated and misleading data and has engaged in other deceptive
> business practices. This letter is a call for your company to
> immediately cease overcharging taxpayers and jeopardizing public
> health .... The price manipulation scheme is executed through
> Abbott's inflated representations of average wholesale price
> (AWP) and direct price ("DP") which are utilized by the Medicare
> and Medicaid Programs in establishing drug reimbursements to
> providers. The difference between the inflated representations of
> AWP and DP versus the true price providers are paying, is
> regularly referred to in your industry as "the spread." The
> evidence amassed by Congress clearly shows that Abbott has
> intentionally reported inflated prices and has engaged in other

improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Abbott manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs. This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims . . . . Based on the evidence collected, Abbott should make arrangements to compensate taxpayers for the financial injury caused to federally funded programs. Any refusal to accept responsibility will most certainly be indicative of the need for Congress to control drug prices. If we cannot rely upon drug companies to make honest and truthful representations about their prices, then Congress will be left with no alternative but to take decisive action to protect the public.

119.   Congressman Stark made the following five "shocking conclusions":

First — Certain drug manufacturers have abused their position of privilege in the United States by reporting falsely inflated drug prices in order to create a de facto improper kickback for their customers.

Second — Certain drug manufacturers have routinely acted with impunity in arranging improper financial inducements for their physicians and other healthcare provider customers.

Third — Certain drug manufacturers engage in the fraudulent price manipulation for the express purpose of causing federally funded health care programs to expend scarce tax dollars in order to arrange de facto kickbacks for the drug manufacturers' customers at a cost of billions of dollars.

Fourth — Certain drug manufacturers arrange kickbacks to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive effect upon the physician/patient relationship and the exercise of independent medical judgment.

Fifth — Certain drug manufacturers engage in illegal price manipulation in order to increase utilization of their drugs beyond that which is necessary and appropriate based on the exercise of independent medical judgment not affected by improper financial incentives.

120.    The Stark materials indicate that Defendants employed a number of other financial inducements to stimulate the sales of their drugs at the expense of Medicaid. Such inducements include the practices described herein, i.e., volume discounts, rebates, off-invoice pricing and free goods designed to lower the net cost to the purchaser while concealing the actual cost of the drug from reimbursement officials.

121.    Congressman Stark released numerous examples of the manipulation of AWP:

(a)     In the 2000 edition of the RedBook, Defendant Bristol-Myers reported an AWP of $1,296.64 for one 20mg/ml, 50mg vial of Vepesid (Etoposide) for injection, while selling the exact same drug in the same quantity to a GPO for $70. This represents a spread between Bristol-Myers' falsely inflated AWP and the real price of $1,226.64. Bristol-Myers is a defendant herein.

(b)     Effective January 10, 1995, Defendant Glaxo increased the AWP for Zofran by 8.5 percent while simultaneously fully discounting this increase to providers. The net effect of these adjustments was to increase the amount of reimbursements available to providers from Medicaid and others whose reimbursement is based on the AWP. Because the net price paid to Glaxo for the non-hospital sales of the Zofran multi-dose vial is actually lower, it does not appear that the increase in the AWP was designed to increase revenue per unit to Glaxo. Absent any other explanation, this adjustment appears to reflect an intent to induce providers to purchase Zofran based on the opportunity to receive increased reimbursement from Medicaid and other third party payors.

(c)     Other examples include Adriamycin, an antibiotic used in cancer treatment and manufactured by Pharmacia, a defendant herein, which had a reported AWP of $241.36 as of

- 39 -

April 2000. The real wholesale price was $33.43. In 1997, when the reported AWP for this drug was $946.94, it was being offered to physicians for as low as $152.00.

(d)      Toposar, also manufactured by Pharmacia, is used to treat testicular and lung cancer. Its AWP as of April 2000 was $28.38; DOJ found that retailers were buying it for $1.70.

(e)      Amikacin, used to treat an infection that HIV positive people are susceptible to and manufactured by defendant Abbott, had an AWP of $54.56. The actual best price was $6.75. Vancomycin, an antibiotic used to treat intestinal infections and manufactured by Abbott, had an AWP of $68.77 as of April 2000. DOJ adjusted it to $8.14.

122.    The Department of Health and Human Services, Office of Inspector General and Department of Justice also are actively investigating the fraudulent pricing practices. Certain of these investigations are discussed in the allegations respecting the individual defendants, *infra*. In sum, however, the investigations confirm unlawful practices herein described.

123.    The Office of Inspector General ("OIG") 2001 review estimated that actual price of brand name prescription drugs was, at the low end, 21.84% below the reported AWP across the board. The OIG estimated that as much as $1.08 billion nationwide could have been saved for the 200 most frequently reimbursed drugs in Calendar Year 1999, if reimbursement had been based on a greater percentage discount off of AWP, or actual price. Other reports, such as a September 21, 2000 GAO Report had determined that actual prices for top Medicaid/Medicare drugs such as Albuterol and Ipratropium bromide were 85% and 75% less than their AWPs. Applying this range of percentages to Nassau County's Medicaid result in millions of dollars of illegal overcharges since 1995 alone.

124.    That same September 21, 2000, GAO report found that:

- 40 -

> Widely available discounts for 17 of the physician-billed drugs we examined averaged between 13 percent and 34 percent less than AWP.
>
> For two other physician-billed drugs, Dolasetron mesylate and Leucovorin calcium, average discounts were considerably larger – 65 percent and 86 percent less than AWP

125.    The report specifically implicated the conduct of defendants Amgen and Johnson & Johnson with respect to at least one of the drugs, paid for by Nassau as a Medicaid pharmacy cost i.e., epoetin alfal sold as Epogen®.

126.    In sum, according to the GAO report, the discounts on physician-billed drugs (based on wholesaler and the GPOs' catalogue prices) were notably lower than Medicaid's payment of ten (10) percent below AWP.

127.    The government investigation confirmed the effectiveness of the AWP scheme. For example, an April 2002 GAO report focusing on sales of a drug in Florida found that Medicaid usage of Vancomycin nearly doubled when Abbott raised the AWP.

128.    This is further demonstrated by comments made in publicly available documents by defendants SmithKline Beecham and TAP:

> SMITHKLINE: "In the clinic setting however, since Medicare [like Medicaid] reimbursement is based on AWP, product selection is largely based upon the spread between acquisition cost and AWP . . . . Therefore, the spread between the AWP and clinic cost represents a profit to the clinic of $50.27 for the medication alone . . . . From this analysis, there seems to be no other reason, other than profitability, to explain uptake differentials between the hospital and clinic settings, therefore explaining why physicians are willing to use more expensive drug regiments."
>
> TAP: "As we have also discussed, Northwest Iowa Urology is very upset about the allowable not going up.  I personally met with the doctors to discuss the issue 4/17.  The physicians have started using Zoladex but would stop if the allowable issue was taken care of.  NWI Urology has 180 patients on Lupron."

129.    The OIG recently re-admonished pharmaceutical companies to provide an accurate AWP. In its April 2003 report "Compliance Program Guidance for Pharmaceutical Manufacturers," the OIG reminded that "government sets reimbursement with the expectation that the data provided are complete and accurate" (emphasis added). The OIG report made it clear that the AWP must be a meaningful figure that is not artificially inflated:

> Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers. Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues). Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements.

130.    And, the OIG rejected the notion that purposeful AWP manipulation was a lawful practice:

> The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer. In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed. To the extent that a manufacturer controls the "spread," it controls its customer's profit.

> Average Wholesale Price (AWP) is the benchmark often used to set reimbursement for prescription drugs under the Medicare Part B program. For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o). Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP. Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

- 42 -

If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated.  Unlike bona fide discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser (the federal or state government).  Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral of program business.  In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.

In the light of this risk, we recommend that manufacturers review their AWP reporting practices and methodology to confirm that marketing considerations do not influence the process.  Furthermore, manufacturers should review their marketing practices.  The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute.  Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product.

## VI.    ALLEGATIONS PARTICULAR TO
## NASSAU AND THE INDIVIDUAL DEFENDANTS

131.    Nassau's own investigations of pricing data confirm that the Average Wholesale

Prices reported by Defendants for the Covered Drugs reimbursed by Nassau are fraudulent and

inflated.  The results of these investigations are set forth in Exhibit A hereto.

132.    As set forth in detail below for every defendant, Nassau's research establishes that

every reported AWP is false and fraudulently inflated, and that Nassau was overcharged for

every Covered Drug.

133.    Even these overcharge estimates are understatements because they do not include

the Defendants' failures to report Best Price as required by federal and state rebate statutes.  The

impact of these failures on the AWPs at issue and Nassau's overcharges as a result will be

revealed through discovery of Defendants' discounting, promotional and rebate practices. When Defendants' failures to report Best Prices are factored in, the spread between reported and true AWPs will be even greater. The facts surrounding Defendants' pricing and promotional activities, which implicate the true Best Price for Covered drugs are uniquely within Defendants' control at this time.

134.    Though the above investigations refer to specific defendants, numerous investigations have been announced concerning the allegations contained in this complaint as they relate to the pharmaceutical industry as a whole. More specifically, the US Attorney's office in Boston, the Department of Justice, and the General Accounting Office of the Department of Health and Human Services have announced that they are conducting investigations concerning the industry-wide practice of overstating AWPs and marketing of the spread:

> At least 20 pharmaceutical companies are being investigated by law enforcement and legislative bodies looking into their marketing practices, particularly those related to drugs billed and paid for under federal health programs.

***

> Industry-wide investigations: Beyond TAP, the current investigation includes about 20 pharmaceutical companies and untold numbers of physicians, according to a number of sources. "The Justice Department is casting *as broad a net as possible* to get as much information as it can," Holcomb[, executive vice president of the consulting firm Policy Directions, Inc.,] said

Milton Liebman, *Beyond Ethics: Companies deal with legal attacks on marketing practices*, Medical Marketing & Media No. 2, Vol. 37, Feb. 1, 2002, at 74 (Emphasis added).

> Authorities in Massachusetts and across the nation are not waiting for Congress to act. Government sources said prosecutors at the US Attorney's office in Boston and the Massachusetts attorney general's office are investigating whether at least 20 pharmaceutical companies committed fraud by manipulating the prices of drugs reimbursed through Medicare and Medicaid...

- 44 -

"The waste gets bigger every year," said George Grob, deputy inspector general for evaluation and inspections, "The current system is based on make-believe numbers that are too easy to manipulate..."

Alice Dembner, Medicare Waste Raises Cost of Drugs by $1B: Congress to Hear Report on Overpayment Excess, The Boston Globe, Sept. 21, 2001, at A2.

...the U.S. attorney's office in Boston has reportedly initiated AWP probes against 20 drug companies and GlaxoSmithKline has confirmed that it has received subpoenas from the U.S. attorney in Boston, the U.S. Justice Department and state prosecutors in Texas, California and Nevada, all involving drug-pricing issues.

Joseph Slobodzian, *Suits claim overpricing; Cases filed in a dozen courts in a few weeks*, The National Law Journal, Dec. 10, 2001, at A15.

Earlier this year, the Department of Justice confirmed that the U.S. Attorney's Office for the District of Massachusetts in Boston was investigating the pharmaceutical industry's marketing and pricing practices.

Keith Lind, Drug Marketing and Pricing Practices: Major Enforcement Target, All Regions, Dec. 21, 2001, sec. Consultancy.

## A.   ABBOTT LABS

135.   At all times relevant hereto, Abbott Labs routinely has reported or caused to be reported, inflated average wholesale prices resulting in overcharges to Nassau. Based on Nassau's investigation, in 2001 Abbott reported inflated AWPs for Kaletra®, Softgel® and Depakote®, as shown in Exhibit A.

136.   Upon information and belief, Abbott has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

137.   Even these investigations  do not reveal the full impact of Abbott's fraud because they do not include Abbott's failures to report Best Price as required by federal and state rebate statutes. The full impact of these failures on Nassau's overcharges will be revealed through discovery of Abbott's promotional, discounting and pricing practices.

138.    When Abbott's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Abbott's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Abbott's control at this time and will be revealed through discovery.

139.    In connection with its scheme to inflate AWPs, Abbott has been investigated by at least the United States Department of Justice, the United States Congress, Commonwealth of Massachusetts, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

140.    Recently, Abbott agreed to pay $622 million in criminal and civil penalties for the activities of its Ross Products Unit in defrauding Medicare and Medicaid in a manner substantively identical to the allegations herein concerning failure to report Best Price.  In that proceeding, the U.S. Attorney's Office in the Southern District of Illinois had probed whether Ross Units and its rivals had been using kickbacks to boost sales and defraud government insurers by discounting or giving away products.  Providers, thereafter, would seek government reimbursements at higher prices.

141.    Abbott was also, notably, co-venturer with Japan's Takeda Chemical Industries, Ltd. in TAP Pharmaceuticals, which paid $875 million in a 2001 settlement of allegations that TAP provided free and unreported samples of Lupron®, a prostate cancer drug, to physicians with the understanding that the doctors would bill Medicaid and Medicare for reimbursement at an inflated AWP rate.

142.    At all times relevant herein, Abbott, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

**B.    AGOURON**

143.    At all times relevant hereto, Agouron routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Agouron reported inflated average wholesale prices for Viracept®.

144.    Upon information and belief, Agouron has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

145.    Even these investigations do not reveal the full impact of Agouron's fraud because they do not include Agouron's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Agouron's promotional, discounting and pricing practices.

146.    When Agouron's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Agouron's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Agouron's control at this time and will be revealed through discovery.

147.    At all times relevant herein, Agouron, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

**C.    AMGEN**

148.    At all times relevant hereto, Amgen routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau.  Based on Nassau's investigation, in

- 47 -

2001 Amgen reported inflated average wholesale prices for Epogen®, Enbrel® Kit and Neupogen®, as shown in Exhibit A.

149.     Upon information and belief, Amgen has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

150.     Amgen has utilized other impermissible inducements to stimulate sales of its drugs. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.

151.     A 1993 OIG Report detailed how Amgen gave substantial year-end rebates to its customers based on their purchases of Epogen®. The report noted that Medicare and Medicare beneficiaries did not receive the benefit of any rebates; all monies remained with the provider. There was no way to provide for any rebates on Medicare claim forms, and Amgen's rebates were not provided until year-end:

> [T]he effect of the rebates is that it reduces the actual cost of EPO
> to a dialysis facility, thus increasing their gross profit. Presently,
> the rebates represent price reductions which benefit the facilities
> exclusively.

152.     By utilizing hidden inducements; Amgen provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

153.     Even these investigations  are understated because Nassau's estimates do not take into account Amgen's failures to include Best Price as required by federal and state statute. The full impact of these failures on Nassau's overcharges will be revealed through discovery of Amgen's promotional, discounting and pricing practices.

154.     When Amgen's failure to report Best Price for the drugs paid for by Nassau is factored in the spread between reported AWP and true AWP will be even greater. The facts

surrounding Amgen's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Amgen's control at this time and will be revealed through discovery.

155.    At all times relevant herein, Amgen, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

**D.    ASTRAZENECA**

156.    At all times relevant hereto, AstraZeneca routinely has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau.  In 2001, based on Nassau's investigation, AstraZeneca reported inflated average wholesale prices for Prilosec® 20 mg tablets and Nexium®, as shown in Exhibit A.

157.    Upon information and belief, AstraZeneca has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs manufactured by AstraZeneca.

158.    Even these investigations do not reveal the fall impact of AstraZeneca's fraud because Nassau's estimates do not include AstraZeneca's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of AstraZeneca's promotional and pricing practices.

159.    When AstraZeneca's failure to report Best Price for these drugs is factored in the spread between reported AWP and true AWP will be even greater.  The facts surrounding AstraZeneca's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within AstraZeneca's control at this time and will be revealed through discovery.

160.    In connection with the improper AWP scheme discussed herein, AstraZeneca has been investigated by at least the United States Department of Justice, the Office of the Inspector General of the U.S. Department of Health and Human Services and the U.S. Food and Drug

Administration.  In January 2002, a federal grand jury in Wilmington, Delaware returned an

indictment accusing a New Jersey doctor of conspiring with AstraZeneca to resell free samples

of Zoladex® that an AstraZeneca sales representatives had given the doctor.  The indictment

alleged that AstraZeneca (i) sold Zoladex® to the New Jersey doctor and others at prices

substantially below the AWP reported by AstraZeneca, and (ii) provided the New Jersey doctor

with materials showing how much more profit he could make by using Zoladex® instead of its

competitor, Lupron®.

161.    In June 2003, AstraZeneca pled guilty and paid $354.9 million to settle the

Zoladex® charges.  As the U.S. Food and Drug Administration said in it s statement regarding

the settlement, "AstraZeneca provided thousands of free samples of Zoladex® to physicians

knowing that they would charge their patients and insurance programs for the samples."

162.    Upon information and belief, the Zolodex® example is merely one of the ways in

which AstraZeneca wrongfully and falsely has inflated its reported AWPs.  This unlawful

activity, has resulted in excessive overpayments by Nassau.

163.    On May 29, 2003, AstraZeneca entered into a Corporate Integrity Agreement

("CIA") with the OIG of the United States Department of Health and Human Services "to

promote compliance... with the statutes, regulations and written directives of Medicare,

Medicaid and all other federal health care programs as defined in 42 U.S.C. 1320a-7b(f)"

("Federal Health Care Program Requirements").  Contemporaneously AstraZeneca entered into a

Settlement Agreement with the United States and various states.'

164.    The CIA covers any individuals who sell or market government reimbursed

products on behalf of AstraZeneca, calculate or report prices, and/or include, negotiate,

implement or report information related to government contracts relating to federal health care

programs, including Medicare and the Medicaid Drug Rebate program (codified at 42 U.S.C. 1396r-8 *et seq.*)  The CIA also covers any AstraZeneca employee or agent responsible for "(1) sales and marketing activities for Government Reimbursed Products; (2) the calculation and reporting of prices for federal health care programs, including . . . Medicaid or (3) the negotiation, implementation, and any reporting of information related to government contracts."

165.   In addition to promising compliance with federal health care program requirements, the CIA requires AstraZeneca to establish a written code of conduct to be agreed to by each covered person that confirms AstraZeneca's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all government contracting requirements and to market and sell its government reimbursed products in accordance with federal health care program requirements."

166.   The CIA requires further that AstraZeneca implement policies and procedures that address:

(a)   the code of conduct described above as well as;

(b)   the calculation and reporting of accurate prices for Government Reimbursed Products to certain entities, including the Centers for Medicare & Medicaid Services ("CMS"), the State Medicaid programs, and the drug price reporting services on which government agencies now rely (etc., First DataBank Inc., the RedBook, etc.) or shall rely in the future;

(c)   the proper calculation and reporting of all data and information reported to CMS and/or the State Medicaid programs in connection with the Medicaid Drug Rebate program, codified at 42 U.S.C. § 1396r-8;

(d)     the proper uses and tracking of drug samples in accordance with all applicable requirements, including, but not limited to, the Prescription Drug Marketing Act, codified in 21 U.S.C. §§ 331, 333 and 352; and

(e)     measures designed to promote marketing and sales practices that conform with all statutes, regulations and requirements applicable to Government Reimbursed Products. The Policies and Procedures shall specify that AstraZeneca shall comply with the federal anti-kickback statute, codified at 42 U.S.C. § 1320a-7b(1) & (2), and other applicable statutes, regulations or requirements.

167.     The CIA contemplates monetary penalties for non-compliance, and the retention of an independent review organization, ("IRO").  The IRO shall perform two types of review: (1) a systems review of AstraZeneca's systems, processes, policies and practices relating to the Medicaid Drug Rebate Program ("Medicaid Rebate Systems Review") and (2) a review of specific contract price transactions to determine whether those transactions were considered for purposes of determining Best Price in accordance with AstraZeneca's policies and procedures and Medicaid Drug Rebate Program requirements.

168.     At all times relevant herein, AstraZeneca, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the AWPs for its pharmaceutical products through direct communications with industry compendia.

E.     AVENTIS

169.     At all times relevant hereto, Aventis routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Aventis reported inflated average wholesale prices for Anzemet® and Taxotere®.

170.    Upon information and belief, Aventis has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

171.    Even these investigations do not reveal the full impact of Aventis' fraud because they do not include Aventis' failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Aventis' promotional, discounting and pricing practices.

172.    When Aventis' failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Aventis' discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Aventis' control at this time and will be revealed through discovery.

173.    In a report published by the Department of Health and Human Services, the DOJ documented at least 15 instances where the published AWPs for various dosages of drugs manufactured by Aventis were substantially higher than the actual prices listed by wholesalers

174.    An OIG report (see "Medicare Reimbursement of Prescription Drugs," OEI03-00-00310, Jan. 2001) further revealed that:  (i) the AWP for all immune globulin 5 mg doses listed in the 1997 RedBook were inflated by an average spread of 32.21%; (ii) a 10 mg dose of Anzemet® had a Medicare Median of $14.82 and a Catalog Median of $8.29, resulting in a spread of 78.76%; and (iii) a 20 mg dose of Taxotere® had a Medicare Median of $283.65 and a Catalog Median of $8.29, resulting in a spread of 18.75%.

175.    Aventis also has been investigated in connection with its pricing activities by the Commerce Committee of the U.S. House of Representatives, the Attorney General for the State

of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

176.    At all times relevant herein, Aventis, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

**F.    BARR**

177.    At all times relevant hereto, Barr routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Barr reported inflated AWPs for Warfarin®.

178.    Upon information and belief, Barr has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

179.    Even these investigations do not reveal the full impact of Barr's fraud because Nassau's estimates do not include Barr's failures to report Best Price for Fluoxetine® as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Barr's promotional, discounting and pricing practices.

180.    When Barr's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Barr's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Barr's control at this time and will be revealed through discovery.

181.    At all times relevant herein, Barr, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

- 54 -

## G.   BAXTER

182.   At all times relevant hereto, Baxter routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau. Based on Nassau's investigation, in 2001 Baxter reported inflated AWPs for Gammagard®.

183.   Upon information and belief, Baxter has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

184.   Even these investigations do not reveal the full impact of Baxter's fraud because Nassau's estimates do not include Baxter's failures to report Best Price for Gammagard ® as required by federal and state rebate statutes. The full impact of these failures on Nassau's overcharges will be revealed through discovery of Baxter's promotional, discounting and pricing practices.

185.   When Baxter's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Baxter's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Baxter's control at this time and will be revealed through discovery.

186.   At all times relevant herein, Baxter, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## H.   BAYER

187.   Bayer routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau. Based on Nassau's investigation, in 2001 Bayer reported false and inflated AWPs for the drug Cipro®, as shown in Exhibit A.

188.   Upon information and belief, Bayer has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

- 55 -

189.     Even these investigations do not reveal the full impact of Bayer's fraud because Nassau's estimate does not include the Bayer's failures to report the Best Price for Cipro® as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Bayer's discounting, promotional and pricing practices.

190.     When Bayer's failure to report Best Price for these drugs is factored in, the spread between reported and true AWP will be even greater.  The facts surrounding Bayer's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Bayer's control at this time.

191.     Bayer's wrongful conduct in this arena is not speculative.  In January 2001, Bayer agreed to pay a total of $14 million to the United States and 45 states to settle allegations under the federal False Claims Act that the company caused physicians and other health care providers to submit fraudulently inflated reimbursement claims to the state and federally funded Medicaid program.  Bayer reached the agreement with the Justice Department, the United States Attorney's Office for the Southern District of Florida in Miami, the Office of Inspector General for the Department of Health and Human Services, and a team of state negotiators from Maine, Nevada, New York and Washington representing the National Association of Medicaid Fraud Control Units.

192.     The government's investigation of the allegations, contained in a *qui tam* or whistleblower lawsuit in which the government intervened against Bayer, revealed that, beginning in the early 1990's, Bayer falsely inflated the reported drug prices referred to by the industry as the Average Wholesale Price (AWP), the Direct Price, and the Wholesale Acquisition Cost used by State Governments to set the reimbursement rate for the Medicaid program.