Exhibit D – Part 3

According to the DOJ's January 23, 2001 press release, by setting an extremely high AWP, and subsequently selling the product to doctors at a dramatic discount, Bayer induced physicians to purchase its products rather than those of competitors by enabling doctors to profit from reimbursement paid to the by the government. The Bayer AWPs at issue in this settlement were Kogenate®, Koate-HP®, and Gamimrnune®, which are widely used in treating hemophilia and immune deficiency diseases.

193.    The Bayer investigation revealed that the practice in which Bayer selectively engaged, commonly referred to by drug manufacturers as "marketing the spread," also had the effect of discouraging market competition from manufacturers that do not inflate AWPs as a way of inducing doctors to purchase their products. In addition to entering into the monetary settlement, Bayer reached a five year agreement with the OIG of HHS that the company's conduct will be monitored by the government under a corporate integrity agreement. Under the compliance agreement, Bayer will provide the state and federal governments with the average selling prices of its drugs in order to facilitate the government's setting of fair reimbursement rates for the company's products, and potentially the products of any competitors attempting to take advantage of Bayer's cooperation.

194.    This Bayer settlement also included settlement of allegations that Bayer knowingly underpaid the Medicaid program for rebates owed by it to the states.

195.    Additionally, recently Bayer settled certain charges in connection with its efforts to evade paying rebates to states' Medicaid programs which were based on the lowest drug prices they were paying to an HMO, Kaiser Permanente for Cipro® and another Bayer drug, Adalat CC®. Bayer is to pay a total of $275 million to resolve criminal charges and civil liabilities in connection with the fraudulent drug pricing of Cipro® and Adalat®. The criminal

portion of the global agreement calls for Bayer to plead guilty to charges that it violated the

Food, Drug and Cosmetic Act by failing to notify the FDA between August and December 1995,

of its production of private label Cipro® for Kaiser.  Bayer has agreed to pay a criminal fine of

$5.6 million and will admit that it engaged in this conduct with the intent to defraud or mislead.

In the civil portion of its global settlement, Bayer will resolve its federal civil False Claims Act

liabilities and pay the United States, 49 states, the District of Columbia, and Public Health

Service Entities $251 million in civil damages for losses suffered by the Medicaid program and

the Public Health Service entities due to Bayer's failure to report its Kaiser private label price to

the government as the true "best price" for its drugs.

196.    The 2001 Bayer settlement may resolve any claims Nassau has with respect to the

drugs at issue there, but it certainly goes no further.  To the extent Bayer's recent Best Price

Settlement concerns overcharges paid for by Nassau for Cipro® it purports to resolve only one or

two years of such overcharges.

197.    At all times relevant herein, Bayer, on behalf of the relevant Manufacturer-

Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its

pharmaceutical products through direct communications with industry compendia.

## I.    BERLEX

198.    At all times relevant hereto, Berlex routinely has reported or caused to be

reported, inflated average wholesale prices, resulting in overcharges to Nassau.

199.    Based on Nassau's investigation, in 2001 Berlex reported false and inflated AWPs

for Betaseron®, as shown in Exhibit A.

200.    Upon information and belief, Berlex has engaged in similar inflationary practices

in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

201.    Even Nassau's investigations do not reveal the full impact of Berlex's fraud because Nassau's estimates do not include Berlex's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Berlex's discounting, promotional and pricing practices.

202.    When Berlex's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Berlex's discounting and rebate activities, which affect its Best Price, are uniquely within Berlex's control at this time and will be revealed through discovery.

203.    At all times relevant herein, Berlex, on behalf of the relevant Manufacturer-Publisher enterprise, reported or set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## J.    BIOGEN

204.    At all times relevant hereto, Biogen routinely has reported or caused to be reported inflated average wholesale prices, resulting in overcharges to Nassau.

205.    Based on Nassau's investigation, in 2001 Biogen reported false and inflated AWPs for Avonex®, as shown in Exhibit A.

206.    Upon information and belief, Biogen has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

207.    Even these investigations do not reveal the full impact of Biogen's fraud because Nassau's estimate does not include Biogen's failures to report its Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Biogen's discounting, promotional and pricing practices.

208.    When Biogen's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding

- 59 -

Biogen's discounting and rebate activities, which affect its Best Price, are uniquely within Biogen's control at this time and will be revealed through discovery.

209.    At all times relevant herein, Biogen, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

## K.    BOEHRINGER

210.    At all times relevant hereto, Boehringer routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Boehringer reported inflated AWPs for Combivent®.

211.    Upon information and belief, Boehringer has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

212.    Even these investigations do not reveal the full impact of Boehringer's fraud because Nassau's estimates do not include Boehringer's failures to report Best Price for Combivent® as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Boehringer's promotional, discounting and pricing practices.

213.    When Boehringer's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Boehringer's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Boehringer's control at this time and will be revealed through discovery.

214.    At all times relevant herein, Boehringer, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

- 60 -

### L.   BRISTOL-MEYERS SQUIBB

215.    Bristol-Meyers Squibb ("BMS") routinely has reported or caused to be reported, inflated average wholesale prices resulting in overcharges to Nassau.  Based on Nassau's research, in 2001 BMS reported false and inflated average wholesale prices for Buspar®, Glucophage®, Sustiva®, and Pravachol®, as shown in Exhibit A.

216.    Upon information and belief, BMS has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

217.    Even these investigations do not reveal the full impact of BMS' fraud because Nassau's estimates do not include Bristol-Meyers' failures to report its Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Bristol-Meyers' promotional, discounting and pricing practices.

218.    When Bristol-Meyers' failure to report Best Price for these drugs is factored in, the difference between reported AWP and true AWP will be even greater.  The facts surrounding Bristol-Meyers' discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Bristol-Meyers' control at this time.

219.    In connection with its scheme to inflate AWPs, BMS has been investigated by the United California Department of Justice Office of the Attorney General, State of California Department of Justice, Bureau of Medi-Cal Fraud and Elder Abuse, and the U.S. House of Representatives Committee on Commerce.

220.    These investigations confirm BMS' involvement in the wrongful activity underlying this Complaint.  For example, by letter dated February 27, 2001 to BMS, Representative Start outlined numerous examples of illegal practices by BMS.  Referring to a letter from Denis Kaszuba, a senior pricing analyst at BMS to Medispan dated August 10, 1992 (BMSAWP/0011247), Rep. Stark noted:

Bristol has control over the AWPs, DPs, and WACs published for
its drugs and directs national publishers to change their prices.
Bristol directed a national publisher of drug prices to increase all
of Bristol's AWPs for oncology drugs by multiplying Bristol's
supplied direct prices by a 25% factor rather than the previous
20.5% factor . . .   The increasing the AWP created a spread that, in
itself, provided a financial kickback to oncologists for prescribing
Bristol's cancer drugs.

221.   In the same letter, Rep. Stark noted:

The evidence clearly shows that Bristol has intentionally reported
inflated prices and has engaged in other improper business
practices in order to cause its customers to receive windfall profits
from Medicare and Medicaid when submitting claims for certain
drugs.  The evidence further reveals that Bristol manipulated prices
for the express purpose of expanding sales and increasing market
share of certain drugs where the arranging of a financial benefit or
inducement would influence the decisions of healthcare providers
submitting the Medicare and Medicaid claims.

222.   At all times relevant herein, Bristol-Myers Squibb, on behalf of the relevant

Manufacturer-Publisher enterprise, has controlled and set the reported AWPs for its

pharmaceutical products through direct communications with industry compendia.

## M.   CHIRON

223.   At all times relevant hereto, Chiron has reported or caused to be reported inflated

AWPs, resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Chiron

reported inflated average wholesale prices for the drug Tobi®, as shown in Exhibit A.

224.   Upon information and belief, Chiron has engaged in similar inflationary practices

in prior and subsequent years resulting in comparable damage to Nassau.

225.   Even these investigations do not reveal the full impact of Chiron's fraud because

they do not include Chiron's failures to report Best Price as required by federal and state rebate

statutes.  The full impact of these failures on Nassau's overcharges will be revealed through

discovery of Chiron's promotional, discounting and pricing practices.

226.     When Chiron's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Chiron's discounting and rebate activities, which affect the Best Prices for its drugs, and uniquely within Chiron's control at this time and will be revealed through discovery.

227.     At all times relevant herein, Chiron, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

N.    **ELI LILLY**

228.     At all times relevant hereto, Eli Lilly routinely has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Eli Lilly reported false and inflated AWPs for Zyprexa® and Prozac®, as shown in Exhibit A.

229.     Upon information and belief, Ely Lilly has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

230.     Even these investigations do not reveal the full impact of Eli Lilly's fraud because Nassau's estimates do not include Eli Lilly's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Eli Lilly's discounting, promotional and pricing practices.

231.     When Eli Lilly's failure to report Best Price for their drugs is factored in, the spread between reported and true AWP will be even greater.  The facts surrounding Eli Lilly's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Eli Lilly's control at this and will be revealed through discovery.

232.    At all times relevant herein, Eli Lilly, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

**O.    FOREST**

233.    At all times relevant hereto, Forest has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Forest reported inflated average wholesale prices for Celexa®, as shown in Exhibit A.

234.    Upon information and belief, Forest has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau.

235.    Even these investigations do not reveal the full impact of Forest's fraud because they do not include Forest's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Forest's promotional, discounting and pricing practices.

236.    When Forest's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Forest's discounting and rebate activities, which affect the Best Prices for its drugs, and uniquely within Forest's control at this time and will be revealed through discovery.

237.    At all times relevant herein, Forest, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

**P.    FUJISAWA**

238.    At all times relevant hereto, Fujisawa routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau.  For example, based on Nassau's investigations, Fujisawa reported false and inflated AWPs for Prograf®, as shown in Exhibit A.

- 64 -

239.    Upon information and belief, Fujisawa has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

240.    Even these investigations do not reveal the full impact of Fujisawa's fraud because Nassau's estimates do not include Fujisawa's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Fujisawa's discounting, promotional and pricing practices.

241.    When Fujisawa's failure to report Best Prices for its drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Fujisawa's discounting and rebate activities, which affect Best Price, are uniquely within Fujisawa's control at this time.

242.    In connection with its scheme to inflate AWPs, Fujisawa has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, and the Attorney General for the State of California.

243.    At all times relevant herein, Fujisawa, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

## Q.    GENENTECH

244.    At all times relevant hereto, Genentech routinely has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau.  For example, based on Nassau's investigation, in 2001 Genentech reported false and inflated AWPs for Pulmozyme®, as shown in Exhibit A.

- 65 -

245.   Even these investigations do not reveal the full impact of Genentech's fraud because Nassau's estimates do not include Genentech's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Genentech's discounting, promotional and pricing practices.

246.   When Genentech's failure to report Best Price for their drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Genentech discounting and rebate activities, which affect Best Price, are uniquely within Genentech's control at this time and will be revealed through discovery.

247.   Upon information and belief, Genentech has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

248.   At all times relevant herein, Genentech, on behalf of the relevant Manufacturer-Publisher enterprise, reported or set, or caused to be set, the reported AWP for its pharmaceutical products through direct communications with industry compendia.

R.   **GENZYME**

249.   At all times relevant hereto, Genzyme routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Genzyme reported inflated AWPs for Renagel®.

250.   Upon information and belief, Genzyme has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

251.   Even these investigations do not reveal the full impact of Genzyme's fraud because Nassau's estimates do not include Genzyme's failures to report Best Price for Renagel®

- 66 -

as required by federal and state rebate statutes. The full impact of these failures on Nassau's overcharges will be revealed through discovery of Genzyme's promotional, discounting and pricing practices.

252. When Genzyme's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Genzyme's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Genzyme's control at this time and will be revealed through discovery.

253. At all times relevant herein, Genzyme, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## S.   THE GSK DEFENDANTS

254. At all times relevant hereto, the GSK Defendants have reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau. In 2001, based on Nassau's investigation, GlaxoSmithKline reported false and inflated AWPs for Epivir®, Wellbutrin®, Lamictal®, Paxil®, and Serevent® Inhaler, as shown in Exhibit A.

255. Upon information and belief, GSK has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

256. Even these preliminary investigations do not reveal the full impact of GSK's fraud because Nassau's estimates do not include GSK's failures to report Best Price as required by federal and state rebate statutes. The full impact of these failures on Nassau's overcharges will be revealed through discovery of GSK's discounting, promotional and rebate practices.

257. When GSK's failure to report Best Price for their drugs is factored in, the difference between reported and true AWP will be even greater. The facts surrounding the GSK

Defendants' discounting and rebate activities, which affect the Best Price for their drugs, are uniquely within the GSK Defendants' control at this and will be revealed through discovery.

258.    At all times relevant hereto, the GSK Defendants reported or set, or caused to be set, the reported AWP for their pharmaceutical products through direct communications with industry compendia.

259.    In connection with its scheme to inflate AWPs, the GSK Group has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, the Attorney General for the State of California, and the Attorney General for the State of Nevada, Medicaid Fraud Control Unit.

260.    These investigations confirm that the GSK Group has engaged in the wrongful conduct at the heart of this Complaint.

261.    As set forth above, GlaxoSmithYline recently agreed to settle its federal False Claims Act liabilities and pay $87,600,922 to the United States, 49 states, the District of Columbia and Public Health Service Entities for losses suffered by the Medicaid programs and the Public Health Service entities due to GSK's conduct.

262.    That proceeding alleged that GSK repackaged and privately labeled Paxil®, an antidepressant, and Flonase®, a nasal spray, for Kaiser at discounted prices, but failed to report these lower prices as "best prices" to the government.

263.    The GSK Defendants deliberately conceal and have concealed their fraudulent reporting and marketing of the AWP spread.  The GSK Defendants routinely require that their customers keep secret the prices they were being charged for GSK Defendants' drugs.

264.    At all times relevant herein, the GSK Defendants, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for their pharmaceutical products through direct communication with industry compendia.

265.    On April 13, 2003, SmithKline Beecham Corporation, d/b/a/ GlaxoSmithKline entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United Dates Department of Health and Human Services "to promote compliance" with the statutes, regulations and written directives of Medicare, Medicaid and all other federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) ("Federal Health Care Program Requirements").  Contemporaneously, GSK entered into a Settlement Agreement with the United States and various states.

266.    Persons covered by the "CIA" include all employees of the U.S. pharmaceuticals division of G1axoSmithKline responsible for, *inter alia*, "reporting of pricing information for any products that are reimbursed by federal health care programs, including under the Medicaid Drug Rebate program, codified at 42 U.S.C. § 1396r-8," and "obligations related to government contracts, including the agreements entered with the Department of Health and Human Services under the Medicaid Drug Rebate program and the Drug Pricing program under the Public Health Service (PHS) Act, 42 U.S.C. 11256."

267.    In addition to promising compliance with federal health care program requirements, the CIA requires GSK to establish a written code of conduct to be agreed to by each covered person that confirms GSK's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all government contracting requirements and to market and sell its Government Reimbursed Products in accordance with federal health care program requirements."

- 69 -

268.    The CIA requires further that GSK implement policies and procedures that address:

(a)    The code of conduct described above as well as;

(b)    The methods for gathering, calculating, verifying and reporting the data and information reported to the Centers for Medicare and Medicaid Services ("CMS") and/or the state Medicaid programs in connection with the Medicaid Drug Rebate program;

(c)    Promotional practices that conform with all applicable federal health care program requirements, including the Medicaid Drug Rebate program and the Federal antikickback statute, codified at 42. U.S.C. § 1302a-7b; and

(d)    The requirements of all government contracts, including those under the Medicaid Drug Pricing program.

269.    The CIA contemplates monetary penalties for non-compliance, and the retention of an independent review organization ("IRO").  The IRO shall perform two types of review: (1) a systems review of GSK's systems, processes, policies and practices relating to the Medicaid Drug Rebate program ("Medicaid Rebate Systems Review"); and (2) a review of specific contract price transactions to determine whether those transactions were considered for purposes of determining Best Price in accordance with GSK's policies and procedures and Medicaid Drug Rebate program requirements.

## T.    IVAX CORPORATION

270.    At all times relevant hereto, upon information and belief, Ivax has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau for its drugs, including Clozapine®.

271.    Like all other defendants herein, Ivax failed to report Best Price as required by federal and state rebate statutes. The full impact of these failures on Nassau's overcharges will be revealed through discovery of Ivax's promotional, discounting and pricing practices.

272.    The facts surrounding Ivax's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Ivax's control at this time and will be revealed through discovery.

273.    At all times relevant herein, Ivax, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

**U.    JOHNSON & JOHNSON DEFENDANTS**

274.    At all times relevant hereto, the Johnson & Johnson Defendants (Johnson & Johnson, Janssen, Ortho-McNeil, and Ortho Biotech) routinely have reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau, as shown in Exhibit A.

275.    Based on Nassau's research, in 2001 Janssen reported false and inflated AWPs for Risperdal®, Duragesic®, and Aciphex®.

276.    With respect to Ortho-McNeil and Ortho Biotach, based on Nassau's investigation, in 2001 Ortho-McNeil reported false and inflated AWPs for Ultram®, Topamax®, Levaquin®, and Procrit®.

277.    Upon information and belief, the Johnson & Johnson Defendants have engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

278.    Even these investigations do not reveal the full impact of the Johnson & Johnson Defendants' fraud because Nassau's estimates do not include the Johnson & Johnson Defendants' failures to report Best Price as required by federal and state rebate statutes.

- 71 -

279.    When Johnson & Johnson's failure to report Best Price for their drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Johnson & Johnson's promotional, discounting and rebate activities, which affect Best Price, are uniquely within Johnson & Johnson's control at this and will be revealed through discovery.

280.    In connection with its scheme to inflate AWPs, the Johnson & Johnson Defendants have been investigated by the General Accounting Office and the Office of the Attorney General for the Commonwealth of Massachusetts.

281.    The Johnson & Johnson Defendants deliberately conceal and have concealed their fraudulent reporting and marketing of the AWP spread.  The J&J Defendants routinely require that their customers keep secret the prices they were being charged for Johnson & Johnson drugs.

282.    At all times relevant herein, the Johnson & Johnson Defendants, on behalf of the relevant Manufacturer-Publisher enterprise, have controlled and set, or caused to be set, the reported AWPs for their pharmaceutical products through direct communication with industry compendia.

## V.    KEY

283.    At all times relevant hereto, Key routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Key reported inflated AWPs for K-Dur®.

284.    Upon information and belief, Key has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

285.    Even these investigations do not reveal the full impact of Key's fraud because Nassau's estimates do not include Key's failures to report Best Price for K-Dur® as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Key's promotional, discounting and pricing practices.

- 72 -

286.    When Key's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Key's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Key's control at this time and will be revealed through discovery.

287.    At all times relevant herein, Key, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

**W.    MEDIMMUNE**

288.    At all times relevant hereto, Medimmune routinely has reported or caused to be reported false and inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Medimmune reported false and inflated AWPs for Synagis®, as shown in Exhibit A.

289.    Upon information and belief, Medimmune has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

290.    At all times relevant herein, Medimmune, on behalf of the relevant Manufacturer-Publisher enterprise, have controlled and set, or caused to be set, the reported AWPs for their pharmaceutical products through direct communication with industry compendia.

**X.    MERCK**

291.    At all times relevant hereto, Merck routinely has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Merck reported false and inflated average wholesale prices for Vioxx®, Singulair®, Fosamax®, Crixivan®, and Zocor®, as shown in Exhibit A.

- 73 -

292.     Upon information and belief, Merck has engaged in similar inflationary practices in prior years, resulting in comparable damage to Nassau for all covered drugs.

293.     Even these investigations do not reveal the full impact of Merck's fraud because the true average wholesale prices for these drugs are even lower than the estimated average retail prices Nassau has calculated here.  Thus, the real spreads between reported and true AWP are even greater than Nassau's estimates.  In addition, Nassau's estimates do not include Merck's failures to report Best Price as required by federal and sate rebate statutes.  The full impact of their failures on Nassau's overcharges will be revealed through discovery of Merck's promotional, discounting and pricing practices.

294.     When Merck's failure to report Best Price for these drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Merck's discounting and rebate activities, which affect the Best Prices of its drugs, are uniquely within Merck's control at this time.

295.     At all times relevant herein, Merck, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

Y.     **MYLAN**

296.     At all times relevant hereto, Mylan routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Mylan reported inflated AWPs for Nifedipine®.

297.     Upon information and belief, Mylan has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

298.     Even these investigations do not reveal the full impact of Mylan's fraud because Nassau's estimates do not include Mylan's failures to report Best Price for Nifedipine® as

required by federal and state rebate statutes. The full impact of these failures on Nassau's overcharges will be revealed through discovery of Mylan's promotional, discounting and pricing practices.

299. When Mylan's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Mylan's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Mylan's control at this time and will be revealed through discovery.

300. At all times relevant herein, Mylan, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## Z.    NOVARTIS

301. At all times relevant hereto, upon information and belief, Novartis has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau for its drugs, including Clorazil®.

302. Like all other defendants herein, Novartis also fails to report Best Price as required by federal and state rebate statutes. The full impact of these failures on Nassau's overcharges will be revealed through discovery of Novartis's promotional, discounting and pricing practices.

303. The facts surrounding Novartis's discounting and rebate activities, which affect the Best Prices for its drugs, and uniquely within Novartis's control at this time and will be revealed through discovery.

304. At all times relevant herein, Novartis, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

- 75 -

## AA.   ORGANON

305.   At all times relevant hereto, Organon routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Organon reported inflated AWPs for Remeron®.

306.   Upon information and belief, Organon has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

307.   Even these investigations do not reveal the full impact of Organon's fraud because Nassau's estimates do not include Organon's failures to report Best Price for Remeron® as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Organon's promotional, discounting and pricing practices.

308.   When Organon's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Organon's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Organon's control at this time and will be revealed through discovery.

309.   At all times relevant herein, Organon, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## BB.   THE PFIZER DEFENDANTS (PFIZER, AGOURON AND SANOFI-SYNTHELABO, INC.)

310.   Pfizer and its subsidiaries (Agouron and Sanofi-Synthelabo, Inc.), collectively referred to herein as the "Pfizer Defendants," routinely has reported or caused to be reported, inflated AV/Ps, resulting in overcharges to Nassau.  Based on Nassau's research, in 2001 the

Pfizer Defendants reported false and inflated AWPs for its drugs, including Ambien®, Glucotrol®, Lipitor®, Neurontin®, Norvasc®, Zithromax®, Zoloft®, Zyrtec®, Xalatan®, and Celebrex®, as shown in Exhibit A.

311. Upon information and belief, Pfizer has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

312. Even these investigations do not reveal the full impact of Pfizer's fraud because Nassau's estimates do not include Pfizer's failures to report Best Price as required by federal and state rebate statutes. The full impact of these failures on Nassau's overcharges will be revealed through discovery of Pfizer's promotional, discounting and rebate practices.

313. When Pfizer's failure to report Best Price for these drugs is factored in, the difference between reported ant true AWP will be even greater. The facts surrounding Pfizer's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Pfizer's control at this time.

314. Pfizer has been investigated by the Office of the Inspector General of the Department of Health and Human Services and has entered into a $49 million settlement arising from illegal practices with respect to Lipitor®. The OIG found that Pfizer has been providing unrestricted educational grants and rebates that were in fact discounts off the purchase price of Lipitor®. Pfizer concealed these discounts from states who were entitled to receive the "Best Price" for Lipitor®.

315. On October 24, 2002, Pfizer entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United Dates Department of Health and Human Services "to promote compliance... with the statutes, regulations and written directives of Medicare, Medicaid and all other federal health care programs (as defined in 42

U.S.C. § 11320(f)" ("Federal Health Care Program Requirements").  Contemporaneously Pfizer entered into a Settlement Agreement with the United States and various states.

316.    The CIA applies specifically to, *inter alia*, "all employees of the Pfizer Pharmaceuticals Group whose job responsibilities directly relate to the gathering calculation, verification or reporting of information for purposes of the Medicaid Drug Rebate program." (codified at 42 U.S.C. § 1396 *et seq.*)

317.    In addition to promising compliance with federal health care program requirements, the CIA requires Pfizer to establish a written code of conduct to be agreed to by each covered person that confirms Pfizer's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all government contracting requirements and to market and sell its Government Reimbursed Products in accordance with federal health care program requirements."

318.    The CIA requires further that Pfizer implement policies and procedures that address:

(a)    The code of conduct described above as well as;

(b)    The methods for gathering, calculating, verifying and reporting the data and information reported to the Centers for Medicare and Medicaid Services ("CMS") and/or the state Medicaid programs in connection with the Medicaid Drug Rebate Program; and

(c)    Promotional practices that conform with all applicable federal health care program requirements, including the Medicaid Drug Rebate Program and the Federal Antikickback Statute, codified at 42 U.S.C. § 1302a-7b.

319.    The CIA contemplates monetary penalties for non-compliance, and the retention of an independent review organization, ("IRO").  The IRO shall perform two types of review:

- 78 -

(1) a systems review of Pfizer's systems, processes, policies and practices relating to the Medicaid Drug Rebate program ("Medicaid Rebate Systems Review"); and (2) a review of specific contract price transactions to determine whether those transactions were considered for purposes of determining Best Price in accordance with Pfizer's policies and procedures and Medicaid Drug Rebate program requirements.

320.    Pfizer deliberately conceals and has concealed its fraudulent reporting and marketing of the AWP spread.  Pfizer routinely requires that its customers keep secret the prices they were being charged for Pfizer's drugs.

321.    At all times relevant herein, Pfizer, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## CC.   PURDUE

322.    At all times relevant hereto, Purdue routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Purdue reported inflated AWPs for Oxycontin®, as shown in Exhibit A.

323.    Upon information and belief, Purdue has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

324.    Even these investigations do not reveal the full impact of Purdue's fraud because Nassau's estimates do not include Purdue's failures to report Best Price for Oxycontin® as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Purdue's promotional, discounting and pricing practices.

325.    When Purdue's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding

Purdue's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Purdue's control at this time and will be revealed through discovery.

326.    At all times relevant herein, Purdue Pharma, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## DD.    RELIANT PHARM

327.    At all times relevant hereto, Reliant has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau.  For example, based on Nassau's own investigation, in 2001 Reliant reported false and inflated AWPs for Axid®, as shown in Exhibit A.

328.    Upon information and belief, Reliant Pharm has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all Covered Drugs.

329.    Even these investigations do not reveal the full impact of Reliant's fraud because Nassau's estimates do not include Reliant's failures to report Best Price for Axid® as required by federal and state rebate statutes.  The full impact of Reliant's failures on Nassau's overcharges will be revealed through discovery of Reliant's promotional and pricing practices.

330.    When Reliant's failure to report Best Prices for its drugs is factored in, the spread between reported and true AWP and actual cost will be even greater.  The facts surrounding Reliant's discounting and rebate activities, which affect the Best Price for its drugs, are uniquely within Reliant's control at this time.

331.    At all times relevant herein, Reliant, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

- 80 -

## EE.    SCHERING-PLOUGH

332.    At all times relevant hereto, Schering-Plough has reported or caused to be reported false and inflated AWPs, resulting in overcharges to Nassau.  For example, based on Nassau's investigation, in 2001 Schering-Plough reported false and inflated AWPs for Claritin®, as shown in Exhibit A.

333.    Even these investigations do not reveal the full impact of Schering-Plough's fraud because Nassau's estimates do not include Schering's failures to report Best Price as required by federal and state rebate statutes.  The full impact of Schering's failures on Nassau's overcharges will be revealed through discovery of Schering's promotional and pricing practices.

334.    When Schering-Plough's failure to report Best Prices for its drugs is factored in, the spread between reported and true AWP will be even greater.  The facts surrounding Schering's discounting and rebate activities, which affect the Best Price for its drugs, are uniquely within Schering's control at this time.

335.    Upon information and belief, Schering has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

336.    In connection with its practices of inflating AWPs, Schering-Plough has been investigated by the Department of Justice, Texas Attorney General, West Virginia Attorney General, California Attorney General, California Bureau of Medi-Cal Fraud and Elder Abuse, and the Department of Health and Human Services Office of the Inspector General, and the U.S. Attorney for the District of Massachusetts.

337.    On May 30, 2003, Schering-Plough announced that the U.S. Attorney for the District of Massachusetts had advised that its subsidiary, Schering Corporation, is the subject of a federal grand jury investigation.  Schering-Plough is the target of a criminal investigation

involving:  (i) providing remuneration, such as drug samples, to providers to induce the purchase of Schering products for which payment was made through federal health care programs; (ii) selling misbranded or unapproved drugs; (iii) submitting false wholesale pricing information for its pharmaceutical products to the government; and (iv) destroying evidence and obstructing justice relating to the government's investigation.  *See* Schering-Plough Press Release dated May 30, 2003, located at http://www.sch-plough.com/news/2003/business/20030530.html).

338.    Moreover, according to Schering-Plough's Form 10-K for the year 2000, this investigation has focused on "whether the AWP set by pharmaceutical companies for certain drugs improperly exceeds the average prices paid by dispensers . . . and other pricing and/or marketing practices."

339.    Schering took a charge of $150 million for the fourth quarter of 2002 to reflect its estimate of the likely legal liability from this government probe.  The key basis for the government investigation is the federal anti-kickback statute, which prohibits pharmaceutical companies from giving money or other items of value to doctors in exchange for prescribing particular products to Medicaid patients.

340.    This probe is not a unique experience for Schering.  A 2000, Medicaid investigation by the Texas Attorney General had revealed that Schering-Plough, with its subsidiary Warrick, defrauded the State of Texas in the amount of $14.5 million.  Investigators determined that Schering-Plough provided the greatest "spread" amongst the drug companies selling albuterol in Texas, and thereby obtained the largest market share for albuterol.  Schering-Plough sold a box of albuterol to pharmacies for $13.50, while it charged the Texas Medicaid program $40.30, a 200% increase.  *See* Cornyn Sues Three Drug Companies for Medicaid Fraud,

Press Release by the Office of the Attorney General, State of Texas, September 7, 2000
(www.oag.state.tx.us.gov).

341.    Schering deliberately concealed and has concealed its fraudulent reporting and
marketing of the AWP spread.  Schering routinely requires that its customers keep secret the
prices they were being charged for Schering's drugs.

342.    At all times relevant herein, Schering, on behalf of the relevant Manufacturer-
Publisher enterprise, has controlled and set, or caused to set, the reported AWPs for its
pharmaceutical products through direct communication with industry compendia.

**FF.   SERONO**

343.    At all times relevant hereto, Serono routinely has reported or caused to be
reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in
2001 Serono reported inflated AWPs for Serostim®.

344.    Upon information and belief, Serono has engaged in similar inflationary practices
in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

345.    Even these investigations do not reveal the full impact of Serono's fraud because
Nassau's estimates do not include Serono's failures to report Best Price for Serostim® as
required by federal and state rebate statutes.  The full impact of these failures on Nassau's
overcharges will be revealed through discovery of Serono's promotional, discounting and pricing
practices.

346.    When Serono's failure to report Best Price for these drugs is factored in, the
spread between reported AWP and true AWP will be even greater.  The facts surrounding
Serono's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely
within Serono's control at this time and will be revealed through discovery.

347.    At all times relevant herein, Serono, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

**GG.    TAKEDA**

348.    At all times relevant hereto, Takeda routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau.  Based on Nassau's investigation, in 2001 Takeda reported inflated AWPs for Actos®.

349.    Upon information and belief, Takeda has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

350.    Even these investigations do not reveal the full impact of Takeda's fraud because Nassau's estimates do not include Takeda's failures to report Best Price for Actos® as required by federal and state rebate statutes.  The full impact of these failures on Nassau's overcharges will be revealed through discovery of Takeda's promotional, discounting and pricing practices.

351.    When Takeda's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Takeda's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Takeda's control at this time and will be revealed through discovery.

352.    At all times relevant herein, Takeda, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

**HH.    TAP**

353.    At all times relevant hereto, TAP has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau.  For example, based on Nassau's investigation, in 2001 TAP reported false and inflated AWPs for Prevacid®, as shown in Exhibit A.

354.    Even these investigations do not reveal the full impact of the fraud because Nassau's estimates do not include TAP's failures to report Best Price as required by federal and state rebate statutes.  The full impact of TAP's failures on Nassau's overcharges will be revealed through discovery of TAP's promotional and pricing practices.

355.    When TAP's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding TAP's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within TAP's control at this time.

356.    Upon information and belief, TAP has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau for all covered drugs.

357.    In connection with its scheme to inflate AWPs, TAP has been investigated by the Department of Justice.  In addition, on October 13, 2001, the United States Attorney in Boston, Massachusetts announced that TAP Pharmaceutical Products, Inc., a corporation that arose from a partnership between Takeda Chemical Industries Ltd. and Abbott Laboratories, a defendant herein, had agreed to pay $875 million to resolve criminal charges and civil liabilities in connection with its fraudulent pricing and marketing practices for the drug named Lupron®. As part of the agreement:

(a)    TAP agreed to plead guilty to a conspiracy to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t) and 333(b), and to pay a $290 million criminal fine, the largest criminal fine ever in a health care fraud prosecution.  The plea agreement between the United States and TAP specifically stated that TAP's criminal conduct caused the Government losses of $145,000,000;

(b)      TAP agreed to pay the United States Government $559,483,560 for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct;

(c)      TAP agreed to pay the fifty states and the District of Columbia $25,516,440 for filing false and fraudulent claims with the States, as a result of TAP's drug pricing and marketing misconduct, and for TAP's failure to provide state Medicaid programs TAP's best price for Lupron®, as required by law;

(d)      TAP agreed to comply with the terms of a sweeping Corporate Integrity Agreement that, among other things, significantly changes the manner in which TAP supervises its marketing and sales staff and ensures that TAP will report to the Medicare and Medicaid programs the true average sale price for drugs reimbursed by those programs;

(e)      Abbott and Takeda (the TAP co-venturers) agreed to cooperate fully with the ongoing government investigation of TAP and its former officers and employees in exchange for the United States declining prosecution of Abbott and Takeda for conduct relating to Lupron®; and

(f)      An Indictment was unsealed in the District of Massachusetts against six current or former TAP employees (including an account executive, three District Managers, a National Accounts Manager and the former Vice President of Sales) and a urologist, alleging that they conspired to (i) bill Medicare for free samples of Lupron® and (ii) market Lupron® using the "spread" and the "return to practice" program.

(g)      The TAP Defendants have been sued in a separate class action in connection with their fraudulent pricing and marketing practices for Lupron®.