Exhibit D – Part 5

Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Pfizer Defendants' Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons. As to each of these Pfizer Defendants' Manufacturer-Publisher Enterprises, the Pfizer Defendants' and each of Thomson Medical, First DataBank, and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Pfizer Defendants' Manufacturer-Publisher Enterprises was operated and conducted by the Pfizer Defendants' for criminal purposes, namely, carrying out the AWP Scheme.

(cc)   *The Pharmacia Manufacturer-Publisher Enterprises*: The Pharmacia Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Pharmacia, and Pharmacia, including its directors, employees and agents: (1) the Pharmacia-Thomson Medical Enterprise; (2) the Pharmacia-First DataBank Enterprise; and (3) the Pharmacia-Facts & Comparisons Enterprise. Each of the Pharmacia Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Pharmacia Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between

- 117 -

Pharmacia and Thomson Medical, Pharmacia and First DataBank, and Pharmacia and Facts & Comparisons. As to each of these Pharmacia Manufacturer-Publisher Enterprises, Pharmacia and Thomson Medical, Pharmacia and First DataBank, and Pharmacia and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Pharmacia Manufacturer-Publisher Enterprises was operated and conducted by Pharmacia for criminal purposes, namely, carrying out the AWP Scheme.

(dd)   *The Reliant Manufacturer-Publisher Enterprises*: The Reliant Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Reliant, and Reliant, including its directors, employees and agents: (1) the Reliant-Thomson Medical Enterprise; (2) the Reliant-First DataBank Enterprise; and (3) the Reliant-Facts & Comparisons Enterprise. Each of the Reliant Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Reliant Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Reliant and Thomson Medical, Reliant and First DataBank, and Reliant and Facts & Comparisons. As to each of these Reliant Manufacturer-Publisher Enterprises, Reliant and Thomson Medical, Reliant and First DataBank, and Reliant and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Reliant Manufacturer-Publisher Enterprises was operated and conducted by Reliant for criminal purposes, namely, carrying out the AWP Scheme.

(ee)    *The Serono Manufacturer-Publisher Enterprises*:  The Serono Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Serono, and Serono, including its directors, employees and agents:  (1) the Serono-Thomson Medical Enterprise; (2) the Serono-First DataBank Enterprise; and (3) the Serono-Facts & Comparisons Enterprise. Each of the Serono Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Serono Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Serono and Thomson Medical, Serono and First DataBank, and Serono and Facts & Comparisons.  As to each of these Serono Manufacturer-Publisher Enterprises, Serono and Thomson Medical, Serono and First DataBank, and Serono and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Serono Manufacturer Publisher Enterprises was operated and conducted by Serono for criminal purposes, namely, carrying out the AWP Scheme.

(ff)    *The Schering-Plough Manufacturer-Publisher Enterprises*:  The Schering-Plough Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Schering-Plough Group, and Schering-Plough Group, including its directors, employees and agents:  (1) the Schering-Plough Group-Thomson Medical Enterprise; (2) the Schering-Plough Group-First DataBank Enterprise; and (3) the Schering-Plough Group-Facts & Comparisons Enterprise. Each of the Schering-Plough Manufacturer-Publisher Enterprises is an ongoing and continuing

business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Schering-Plough Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough and Thomson Medical, Schering-Plough and First DataBank, and Schering-Plough and Facts & Comparisons. As to each of these Schering-Plough Manufacturer Publisher Enterprises, Schering-Plough and Thomson Medical, Schering-Plough and First DataBank, and Schering-Plough and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Schering-Plough Manufacturer-Publisher Enterprises was operated and conducted by Schering-Plough for criminal purposes, namely, carrying out the AWP Scheme.

(gg)   *The Takeda Manufacturer-Publisher Enterprises*:  The Takeda Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Takeda, and Takeda, including its directors, employees and agents:  (1) the Takeda-Thomson Medical Enterprise; (2) the Takeda-First DataBank Enterprise; and (3) the Takeda-Facts & Comparisons Enterprise. Each of the Takeda Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Takeda Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Takeda and Thomson Medical, Takeda and First DataBank, and Takeda and Facts & Comparisons. As to

each of these Takeda Manufacturer-Publisher Enterprises, Takeda and Thomson Medical, Takeda and First DataBank, and Takeda and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Takeda Manufacturer Publisher Enterprises was operated and conducted by Takeda for criminal purposes, namely, carrying out the AWP Scheme.

      (hh)    *The TAP Pharmaceuticals Manufacturer-Publisher Enterprises*: The TAP Pharmaceuticals Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by TAP Pharmaceuticals, and TAP Pharmaceuticals, including its directors, employees and agents: (1) the TAP Pharmaceuticals-Thomson Medical Enterprise; (2) the TAP Pharmaceuticals-First DataBank Enterprise; and (3) the TAP Pharmaceuticals-Facts & Comparisons Enterprise.  Each of the TAP Pharmaceuticals Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the TAP Pharmaceuticals Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between TAP Pharmaceuticals and Thomson Medical, TAP Pharmaceuticals and First DataBank, and TAP Pharmaceuticals and Facts & Comparisons.  As to each of these TAP Pharmaceuticals Manufacturer-Publisher Enterprises, TAP Pharmaceuticals and Thomson Medical, TAP Pharmaceuticals and First DataBank, and TAP Pharmaceuticals and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the TAP

- 121 -

Pharmaceuticals Manufacturer-Publisher Enterprises was operated and conducted by TAP Pharmaceuticals for criminal purposes, namely, carrying out the AWP Scheme.

(ii)     *The Warrick Manufacturer-Publisher Enterprises*:  The Warrick Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported. the AWPs that were provided to them by Warrick, and Warrick, including its directors, employees and agents: (1) the Warrick-Thomson Medical Enterprise; (2) the Warrick-First DataBank Enterprise; and (3) the Warrick-Facts & Comparisons Enterprise. Each of the Warrick Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Warrick Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Warrick and Thomson Medical, Warrick and First DataBank, and Warrick and Facts & Comparisons.  As to each of these Warrick Manufacturer-Publisher Enterprises, Warrick and Thomson Medical, Warrick and First DataBank, and Warrick and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Warrick Manufacturer-Publisher Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.

(jj)     *The Wyeth Manufacturer-Publisher Enterprises*:  The Wyeth Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Wyeth, and Wyeth, including its directors, employees and agents: (1) the Wyeth-Thomson Medical Enterprise;

(2) the Wyeth-First DataBank Enterprise; and (3) the Wyeth-Facts & Comparisons Enterprise. Each of the Wyeth Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Wyeth Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Wyeth and Thomson Medical, Wyeth and First DataBank, and Wyeth and Facts & Comparisons. As to each of these Wyeth Manufacturer-Publisher Enterprises, Wyeth and Thomson Medical, Wyeth and First DataBank, and Wyeth and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Wyeth Manufacturer-Publisher Enterprises was operated and conducted by Wyeth for criminal purposes, namely, carrying out the AWP Scheme.

397.   The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate their AWP Schemes involved thousands of communications throughout the relevant time including, *inter alia*:

(a)   Marketing materials about the AWPs for Covered Drugs and the available spread, which were sent to providers located across the country;

(b)   Written representations of the false and inflated AWPs for Covered Drugs as set forth in Exhibit A made to the RedBook and similar publications, which were made at least annually, and in many cases, several times during a single year,

(c)   Thousands of written and oral communications discussing, confirming, and forwarding free samples of drugs, for which the Defendants understood that the providers would unlawfully seek inflated reimbursement;

(d)     Documents providing information or incentives designed to lessen the prices that providers paid for the drugs, and/or to conceal those prices or the AWP Scheme alleged here;

(e)     Written communications, including checks, documents discussing and relating to grants, payments of consulting fees, debt forgiveness and/or other financial inducements, as detailed herein;

(f)     Written and oral communications with U.S. and state Government agencies and private insurers that fraudulently misrepresented what the AWPs for Covered Drugs were, or that were intended to deter investigations into the AWPs for the Covered Drugs or to forestall changes to reimbursement based on something other than AWPs;

(g)     Written and oral communications with health insurers and patients, inducing payments for Covered Drugs that were made in reliance on AWPs; and

(h)     Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendants' AWP Scheme.

(i)     In addition to the above-referenced RICO predicate acts, the Defendants' respective corporate headquarters have communicated by use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the AWP Scheme.

### Conduct of the RICO Enterprises' Affairs and RICO Conspiracy

398.    During all relevant times, each defendant has exerted control over its particular Publisher Enterprise in violation of Section 1963(c) of RICO, has conducted or participated in the conduct of the affairs of that particular RICO enterprise, directly or indirectly, in the following ways:

(a)     Each defendant has directly controlled the price at which providers purchase its Covered Drugs;

(b)     Each Manufacturer/Publisher enterprise has directly controlled the false and inflated AWPs that are reported in the RedBook as set forth in Exhibit A and similar industry publications;

(c)     Each defendant has directly controlled the price at which providers are reimbursed by the Medicaid Program;

(d)     Each defendant has directly controlled the creation and distribution of marketing, sales, and other materials used to inform providers located nationwide of the profit potential of its Covered Drugs;

(e)     Each defendant has directly controlled the marketing and sales scheme to artificially and unlawfully inflate the Medicaid reimbursement rate (and co-payment rate) to induce providers to prescribe Covered Drugs to their patients.

(f)     Each defendant has directly controlled the use and distribution of free samples of its Covered Drugs to providers.

399.    Each defendant has directly or indirectly controlled the ability of providers to unlawfully seek reimbursement from the Medicaid Program for free samples;

400.    Each defendant has relied upon its employees and agents to promote the AWP Schemes alleged herein through the U.S. mails, through interstate wire facilities, and through direct contacts with providers; and

401.    Each defendant has controlled and participated in the affairs of its respective Publisher Enterprise by using a fraudulent scheme to manufacture, market and sell its Covered Drugs through the use of unlawful inducements to providers.

- 125 -

402.     Each of the Publisher Enterprises identified in ¶ 341 of this Amended Complaint had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.  Each of the distribution enterprises also had a consensual decision-making structure because, as described above, each defendant knew it was part of the AWP scheme and the providers played an active role in the affairs of the enterprise.  In violation of Section 1962(d) of RICO, each of the Defendants and each of the providers that were members of the Distribution Enterprises conspired to conduct the affairs of such enterprises through the pattern of racketeering activity alleged herein.  The conspiratorial agreement between the Defendants and the providers and their overt acts are described in this Complaint.

**Pattern of Racketeering Activity**

403.     Each of the Defendants has conducted and participated in the affairs of its respective Publisher Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Defendants intended to defraud Nassau and other Medicaid payors, the foreseeable and intended victims of the AWP Scheme.

404.     The Defendants' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their Covered Drugs, thereby creating a "spread" based on the inflated figure in order to induce providers to prescribe their Covered Drugs to their patients and causing the Medicaid program to pay an artificially-inflated rate of reimbursement for the

Covered Drugs. The Defendants' AWP Scheme also consisted of providing free samples of the drugs to providers, instructing (or urging) such providers to bill the Medicaid program for these free samples, and providing the providers with other unlawful financial incentives, including kickbacks and bribes, to induce use of the Covered Drugs.

405.   The AWP Scheme was calculated and intentionally crafted so as to ensure that the Medicaid Program would be over-billed for the Covered Drugs. In designing and implementing the AWP Scheme, the Defendants were at all cognizant of the fact that the entire Medicaid Program and all patients for whom the Covered Drugs are prescribed rely upon the honesty of the Defendants in setting the AWP as reported in the RedBook and similar publications. Thus, Plaintiff was an intended target and victim of the Defendants' AWP Scheme.

406.   By intentionally and artificially inflating the AWP and thereby affording the providers with unlawful financial inducements to use the Covered Drugs, and by subsequently failing to disclose such practices to the patients from whom reimbursement was sought through the U.S. mails or interstate wire facilities, the Defendants engaged in fraudulent, and unlawful conduct constituting a pattern of racketeering activity.

407.   The Defendants' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Nassau and all Medicaid payors. Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff. Each of the Defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Distribution Enterprise and the Medicaid Enterprise. Damages Proximately Caused by the Defendants' AWP Scheme

408.    The Defendants' violations of federal law and their pattern of racketeering activity have directly, proximately and foreseeably caused Nassau to be injured in its business or property because Nassau has paid many millions of dollars in inflated reimbursements or other payments for Covered Drugs.

409.    Defendants sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme.  As required by federal and state Medicaid law, plaintiff has made inflated reimbursement payments for Covered Drugs based on and/or in reliance on reported and false AWPs.

410.    Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiff for three times the damages that Plaintiff has sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT II**

**VIOLATION OF FEDERAL MEDICAID STATUTE, 42 U.S.C. § 1396r-8**
**FAILURE TO REPORT BEST PRICE**

411.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

412.    Each of the Defendant pharmaceutical companies is a manufacturer of a Covered Drug.

413.    Pursuant to 42 U.S.C. § 1396r-8, each of the Defendant pharmaceutical companies entered into a rebate agreement with the Medicaid Program under which the Medicaid Program would receive rebates determined in part by "best price," which is defined as "the lowest price available from the manufacturer."

414.    In particular, as part of the rebate agreement, each Defendant agreed that:

(a)     It would determine its best price, taking into account discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, in any quarter and would make quarterly rebates where necessary to bring the price down to the actual lowest price offered to any commercial entity;

(b)     It would determine its best price based upon its average manufacturer's price, calculated as "net Sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements)" and that it would include in that calculation cash discounts and all other price reductions "which reduce the actual price paid;" and

(c)     It would not take into account nominal prices, defined as prices that are less than 10 percent of the average manufacturer's price in that quarter, so long as the sale of a product at a nominal price was not contingent on any other sale.

415.    In keeping with their artificial price inflation scheme, each Defendant did not report the actual "best price" or "average manufacturer's price," but instead (i) reported higher prices and (ii) excluded discounts, free samples and other inducements offered to physicians that resulted in lower prices than the prices reported to the Medicaid Program.

416.    Each of the Defendants thereby violated 42 U.S.C. § 1396r-8 in that they submitted untrue, incomplete, inaccurate, and misleading information used to determine the amount of reimbursement under the Medicaid program. More specifically, each Defendant made claims or caused claims to be made which had the effect of the Medicaid Program not receiving rebates based upon accurately reported "best price" information, and the Defendants knew that the claims were rendered false, in whole or in part, by two methods: falsely reporting the prices paid by commercial entities for its products, and not accounting for the discounts and other

inducements offered to commercial entities.  Further, acting with the intent to defraud and in order to obtain authorization to qualify as a provider and to provide specific goods, each Defendant made or caused to be made false statements promising that it would comply with the mandates of 42 U.S.C. § 1396r-8.

417.    Defendants knew, or by virtue of their position, authority or responsibility should have known, of the falsity of their claims, statements or representations.

418.    Defendants had the authority or responsibility to make such claims, statements and representations, exercised that authority and, as a direct or indirect result, the false statement was made, resulting in a claim for an item when Defendants knew or had reason to know that they were not entitled under applicable statutes, regulations, rules, or policies to Medicaid payment or for the amount of payment requested or claimed.

419.    As a result of the Defendants' violations of 42 U.S.C. § 1396r-8, Nassau paid substantially higher prices for reimbursement of the Covered Drugs than it should have, and the Medicaid Program was deprived of its appropriate rebate as a result of Defendants' inaccurate reporting of best price.

**COUNT III**

**VIOLATION OF N.Y.  SOCIAL SERVICES LAW § 367-a(7)(d)**
**<u>FAILURE TO REPORT BEST PRICE</u>**

420.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

421.    Each of the Defendant pharmaceutical companies is a manufacturer of a Covered Drug.

422.    Pursuant to 42 U.S.C. § 1396r-8, each of the Defendant pharmaceutical companies entered into a rebate agreement with the Medicaid Program under which the

- 130 -

Medicaid Program would receive rebates determined in part by "best price," which is defined as "the lowest price available from the manufacturer."

423.   42 U.S.C. § 1396r-8 is incorporated by New York State's Medicaid Statute. *See* New York Social Services Law § 367-a(7)(d).  New York law expressly provides that each of the Defendants who have executed a rebate agreement are to be paid pursuant to that agreement.

424.   After execution of its agreement, each Defendant was required to report its "best price" in each quarter to the Medicaid Program.

425.   In keeping with their artificial price inflation scheme, each Defendant did not report the actual "best price" or "average manufacturer's price," but instead (i) reported higher prices and (ii) excluded discounts, free samples and other inducements offered to physicians that resulted in lower prices than the prices reported to the Medicaid Program.

426.   Each of the Defendants thereby violated N.Y. Soc. Serv. Law § 367-a(7)(d) in that they submitted untrue, incomplete, inaccurate, and misleading information used to determine the amount of reimbursement under the Medicaid program.  More specifically, each Defendant made claims or caused claims to be made which had the effect of the Medicaid Program not receiving rebates based upon accurately reported "best price" information, and the Defendants knew that the claims were rendered false, in whole or in part, by two methods: falsely reporting the prices paid by commercial entities for its products, and not accounting for the discounts and other inducements offered to commercial entities.  Further, acting with the intent to defraud and in order to obtain authorization to qualify as a provider and to provide specific goods, each Defendant made or caused to be made false statements while promising that it would comply with the mandates of N.Y. Soc. Serv. Law § 367-a(7)(d).

427.    Defendants knew, or by virtue of their position, authority or responsibility should have known, of the falsity of their claims, statements or representations.

428.    Defendants had the authority or responsibility to make such claims, statements and representations, exercised that authority and, as a direct or indirect result, the false statement was made, resulting in a claim for an item when Defendants knew or had reason to know that they were not entitled under applicable statutes, regulations, rules, or policies to Medicaid payment or for the amount of payment requested or claimed.

429.    As a result of the Defendants' violations of 42 U.S.C. § 1396r-8 and New York Social Services Law § 367 *et seq.*, Nassau paid substantially higher prices for reimbursement of the Covered Drugs than it should have, and the Medicaid Program was deprived of its appropriate rebate as a result of Defendants' inaccurate reporting of best price.

### COUNT IV

### VIOLATION OF NEW YORK DEPARTMENT OF HEALTH
### REGULATIONS 18 N.Y.C.RR § 515.2(b,)(4) and (5)

430.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

431.    The Regulations of the New York Department of Health 18 N.Y.C.R.R. § 515.2(b)(4) provide that "[c]onversion of a medical assurance payment, or any part of such payment, to a use or benefit other than for the use and benefit intended by the medical assistance program," is an "unacceptable practice" within the New York Medicaid Program.

432.    The Regulations of the New York Department of Health, 18 N.Y.C.R.R. § 515.2(b)(5) provide that, "[u]nless the discount or reduction in price is disclosed to the client and the department and reflected in a claim," an "Unacceptable Practice" within the New York Medicaid Program is committed by "offering or paying either directly or indirectly any payment

(including any kickback, bribe, . . . rebate or discount), whether in cash or in kind, in return for

purchasing, . . . ordering or recommending any medical care, services or supplies for which

payment is claimed under the program."

433.   By engaging in the acts and practices described above, Defendants have engaged

in and continue to engage in Unacceptable Practices within the New York Medicaid Program as

defined at 18 N.Y.C.R.R § 515.2(b)(4) and (5).

## COUNT V

### VIOLATION OF NEW YORK SOCIAL SERVICES LAW § 145-b
### OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS

434.   The County of Nassau realleges and incorporates the preceding paragraphs as if

fully set forth herein.

435.   New York Social Services Law § 145-b provides that "[i]t shall be unlawful for

any person, firm or corporation knowingly by means of a false statement or representation, or by

deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of

himself or others, to attempt to obtain or to obtain payment from public funds for . . . supplies

furnished . . . pursuant to" the Medicaid Program.

436.   By engaging in the acts and practices described above, Defendants have

knowingly made false statements and representations or engaged in a fraudulent scheme on

behalf of themselves and others, resulting in the overpayment of public funds for Defendants'

prescription drugs covered by the New York Medicaid Program in violation of Social Services

Law § 145-b.

437.   Specifically, Defendants conduct violated NY Soc. Serv. § 145-b because

Defendants, and each of them, by means of their false statements and representations and

deliberate concealment of material facts attempted to obtain and did in fact obtain payment from

public funds for supplies furnished pursuant to this chapter. Defendants made false "statements or representations" under § 145-b(1)(b) because they gave "a [false} report of data which serves as the basis for a claim or a rate of payment."

438.    Defendants have "attempted to obtain and did obtain payment from public funds for supplies" under § 145-b(1)(c) because they obtained a portion of public funds from which payment was made, and because "public funds [we]re used to reimburse . . . an entity from which payment was obtained."

439.    In the alternative, to the extent the court finds Defendants did not obtain payment by virtue of the indirect manner in which they received the public funds that their false statements procure, Defendants remain liable because they made a false statement or representation "on behalf of others . . . to obtain payment from public funds"

## COUNT VI

## **BREACH OF CONTRACT**

440.    The County of Nassau realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

441.    As required by 42 U.S.C. § 1396r-8, each Defendant entered into a Rebate Agreement with the Secretary of Health and Human Services ("HHS"). In that agreement, each agreed to comply with Section 1396r-8, and hence:

(a)    Agreed to report its best price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, in any quarter and to make rebates where necessary; and

(b)    Agreed that it would determine its best price based upon its average manufacturer's price, calculated as "net Sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase

- 134 -

requirements)" and that it would include in that calculation cash discounts and all other price reductions "which reduce the actual price paid;" and

(c)     Agreed that the best price would not take into account nominal prices, defined as prices that are less than 10 percent of the average manufacturer's price in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

442.    New York Social Services Law § 367-a(7)(d) expressly states that any defendant was has entered into such rebate agreement with HHS, is to be reimbursed pursuant to 42 U.S.C. § 1396r-8.

443.    Nassau, like any Medicaid payor, was an intended third-party beneficiary of these rebate agreements.

444.    After execution of the rebate agreements, Defendants reported their average manufacturer's price in each quarter to the Medicaid Program.

445.    In keeping with their artificial inflation of the AWPs, Defendants did not report the actual "best price," for, but not limited to, the drugs identified herein but a significantly greater price that, among other things, excluded discounts and other inducements offered to physicians.

446.    Defendants have therefore breached their rebate agreements and caused massive foreseeable damage to the County of Nassau.

## COUNT VII

### UNFAIR TRADE PRACTICES
### (Violations of N.Y. Genl. Bus. Law & 349 *et seq.*)

447.    The County of Nassau realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

448.     As set forth in particularity herein and in Exhibit A, Defendants herein have intentionally and wrongfully inflated the reporting of Average Wholesale Prices for the Covered Drugs.

449.     As alleged herein, this AWP scheme was designed to increase Defendants' sales for their drugs, control the market and decrease consumer choice.

450.     Defendants' intentional wrongful acts caused direct damage to tax paying consumers and Nassau by wrongfully increasing their Medicaid burden.

451.     The Defendants' intentional misconduct has damaged the public and Nassau County taxpayers.

452.     New York's Medicaid Statute expressly states, *inter alia*, that "[m]edical assistance for needy persons is hereby declared to be a matter of public concern and a necessity in promoting the public health and welfare.". *See* Social Services Law § 363. Defendants' deceptive acts, as described herein, are in direct contravention of this statutorily articulated public policy. Defendants' practices were consumer-oriented and continue to have a broad impact on consumers and the taxpaying public.

453.     The County is required by State Law to balance its budget. Every dollar spent on Medicaid, is a dollar that cannot be spent elsewhere.

454.     Defendants' conduct as alleged in this Complaint constitutes deceptive acts or practices in that:

     (a)     Defendants have failed to disclose material facts in the conduct of trade or commerce in that they have not disclosed that the AWP does not reflect the true average wholesale price of the drug products they sell, and that the "best prices" they report are not the

- 136 -

actual "best prices" offered to other commercial entities, but are instead inflated in order to drive up the prices paid for medications by the County of Nassau;

(b)     Defendants have made false or misleading statements of facts concerning the price of goods in that they have lied about the true AWP and "best prices" paid for their medications in order to drive up the prices paid by the County of Nassau;

(c)     Defendants have knowingly made false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs, and that their reported "best prices" are in fact the "best prices" offered to a commercial entity for their drugs; and

(d)     Defendants have violated state and federal statutes and regulations relating to the sale or lease of goods including, without limitation, the "best price" requirement of the Medicaid statute, the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, the Racketeer Influenced and Corrupt Organizations Act (RICO), particularly 18 U.S.C. § 1962(c) and (d), and New York's Social Services Law, § 367-a, and § 145-b and 18 N.Y.C.R.R. 515.2(b)(4) and (5). These statutory and regulatory violations serve, at minimum, as predicates for the violation of New York's Gen. Bus. Law § 349.

455.    The wrongful conduct alleged in this Complaint occurs and continues to occur in the ordinary course of Defendants' business and has caused great harm to the County of Nassau and the consumers who live there. Nassau has suffered actual damages because it has had to overpay millions of dollars in Medicaid pharmacy costs as a direct and proximate result of Defendants' deceptive practices.

## COUNT VIII

### FRAUD

456.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

457.    As detailed in this Complaint and Exhibit A, Defendants have engaged in actual fraudulent reporting of AWPs and have acted intentionally and with actual malice.

458.    Defendants have made false representations with knowledge of their falsity, have concealed material facts with the purpose of overcharging Nassau and Nassau rightfully has relied upon such misrepresentations.  Direct, proximate and foreseeable injury has resulted as a result of such reliance.

459.    Defendants also had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Nassau participants, and deliberately proceeded to act in conscious or intentional disregard of, or with indifference to, the high probability of this injury.

460.    New York's Social Service Law § 366-b expressly provides that "any person who, with intent to defraud, presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise, or who knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise, or knowingly submits false information for the purpose of obtaining authorization of furnishing services or merchandise under this title, shall be guilty of a class A misdemeanor . . .".

461.    Defendants' knowing and intentional submission of inflated AWPs to publishers for the express purpose of effectuating the AWP scheme alleged herein constitutes an intentional fraud pursuant to common law and New York Social Services Law § 366-b.

- 138 -

## COUNT IX

### UNJUST ENRICHMENT

462.    The County of Nassau realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.  To the extent the court determines there is no contractual relationship between Nassau and the Defendants, as a direct and proximate result of the unlawful conduct described above, Defendants have been and will continue to be unjustly enriched.

463.    Defendants have benefited from their unlawful acts through the increased sale of Covered Drugs with the greatest spread.  It would be inequitable for Defendants to retain any of their ill-gotten gains earned as a result of the scheme alleged herein, which gains would not exist but for the overpayments made by Nassau.

464.    Defendants have also benefited from their unlawful acts in a number of other ways.  For example, Defendants have been "saved from expense" when they fraudulently underpaid Best Prices rebates to the State of New York and consequently Nassau County.  It would be inequitable for Defendants to retain these and other ill-gotten gains earned as a result of their failure to report best prices.

465.    Nassau is entitled to an accounting and the establishment of a constructive trust consisting of all overcharges paid by Nassau for Covered Drugs.

## X.    PRAYER FOR RELIEF

WHEREFORE, plaintiff the County of Nassau prays for judgment against all Defendants as follows:

466.    Awarding plaintiff actual, statutory, treble and all other available damages for Defendants' violation of 18 U.S.C. § 1962(c);

467.    Adjudging and decreeing that Defendants have engaged in the intentional fraudulent conduct alleged herein in violation of N.Y. Soc. Serv. Law §§ 367-a(7)(d), 366-b and 42 U.S.C. § 1396r-8 and 18 N.Y.C.R.R. § 515.2(b)(4) and (5);

468.    Awarding Nassau actual, statutory, treble and all other available money damages, including interest, for Defendants' violation of N.Y. Gen. Bus. Law § 349 in an amount to be determined at trial;

469.    Awarding Nassau actual, statutory, treble and all other available money damages, including interest, for Defendants' violation of N.Y. Soc. Serv. Law § 145-b in an amount to be determined at trial;

470.    Awarding Nassau actual and compensatory damages in an amount to be determined at trial, with interest, for Defendants' breach of contract;

471.    Awarding Nassau actual and punitive damages in an amount to be determined at trial, with interest, for Defendants' intentional fraud;

472.    Ordering Defendants each to prepare an accounting to determine the amounts Defendants have illegally profited at Nassau's expense, and disgorgement to Nassau of such monies, with interest;

473.    Imposing a constructive trust and ordering Defendants to pay restitution to Nassau in the amount Nassau has been overcharged for Covered Drugs, with interest;

474.    Awarding plaintiff the costs of the suit, including costs, reasonable attorneys' and experts' fees pursuant to 18 U.S.C. § 1964(c), N.Y. Gen. Bus. Law § 349 and N.Y. Soc. Serv. Law § 145-b;

475.   Such other further and different relief as the Court deems just and proper.

Dated: November 23, 2004
         New York, New York

**LORNA B. GOODMAN,**
**Nassau County Attorney, by**

**MILBERG WEISS BERSHAD**
**& SCHULMAN LLP**

By: _____
         Melvyn I. Weiss (MW-1392)
         Michael Buchman (MB-1172)
         One Pennsylvania Plaza
         New York, New York 10119-0165
         Telephone:  (212) 594-5300
         Facsimile:  (212) 868-1229

         *Special Counsel for the*
         *County of Nassau*

# Exhibit A

| Manufacturer | Drug | Reported Average Wholesale Price AWP | Estimated True AWP | Estimated Overcharge | Estimated Overcharge as a percentage of reported AWP |
|---|---|---|---|---|---|
| ABBOT LABS | DEPAKOTE TAB 250MG | $1.04 | $0.77 | $0.27 | 26.0% |
| | DEPAKOTE TAB 500MG | $1.92 | $1.38 | $0.54 | 28.1% |
| AMGEN | KALETRA CAP SOFTGEL | $3.91 | $2.79 | $1.12 | 28.6% |
| | EPOGEN VIAL 10,000 U/ML | $134.59 | $95.60 | $38.99 | 29.0% |
| | ENBREL KIT 25MG | $163.33 | $109.74 | $53.59 | 32.8% |
| | NEUPOGEN VIAL 300 MCG/ML | $227.60 | $140.94 | $86.66 | 38.1% |
| ASTRAZENECA | PRILOSEC CAP 20MG | $4.49 | $3.05 | $1.44 | 32.1% |
| | SEROQUEL TAB 100MG | $2.91 | $2.17 | $0.74 | 25.4% |
| | SEROQUEL TAB 200MG | $5.48 | $3.96 | $1.52 | 27.7% |
| | SEROQUEL TAB 25MG | $1.60 | $1.20 | $0.40 | 25.0% |
| BAYER | CIPRO TAB 500MG | $5.40 | $3.95 | $1.45 | 26.9% |
| BERLEX | BETASERON VIAL 0.3MG | $1,273.00 | $906.98 | $366.02 | 28.8% |
| BIOGEN | AVONEX VL 33 MCG | $1,076.25 | $752.69 | $323.56 | 30.1% |
| BRISTOL-MEYERS SQUIBB | BUSPAR TAB 15 | $2.34 | $1.75 | $0.59 | 25.2% |
| | GLUCOPHAGE TAB 1000MG | $1.61 | $1.18 | $0.43 | 26.7% |
| | GLUCOPHAGE TAB 500MG | $0.78 | $0.58 | $0.20 | 25.6% |
| | PLAVIX TAB 75MG | $4.06 | $2.86 | $1.20 | 29.6% |
| | PRAVACHOL TAB 20MG | $3.08 | $2.09 | $0.99 | 32.1% |
| | PRAVACHOL TAB 40MG | $4.52 | $3.00 | $1.52 | 33.6% |
| | SUSTIVA CAP 200MG | $4.80 | $3.67 | $1.13 | 23.5% |
| | ZERIT CAP 40 MG | $5.60 | $4.07 | $1.53 | 27.3% |
| CHIRON | TOBI 300MG/5ML SOLUTION | $2,766.00 | $2,080.97 | $685.03 | 24.8% |
| ELI LILLY | ZYPREXA TAB 10MG | $9.64 | $6.84 | $2.80 | 29.0% |
| | ZYPREXA TAB 15MG | $14.46 | $10.26 | $4.20 | 29.0% |
| | ZYPREXA TAB 2.5MG | $5.37 | $3.90 | $1.47 | 27.4% |
| | ZYPREXA 20MG | $19.25 | $13.23 | $6.02 | 31.3% |
| | ZYPREXA 5MG | $6.34 | $4.52 | $1.82 | 28.7% |
| | ZYPREXA TAB 7.5MG | $6.76 | $5.10 | $1.66 | 24.6% |
| FOREST | CELEXA TAB 20MG | $2.41 | $1.77 | $0.64 | 26.6% |
| FUJISAWA | PROGRAF CAP 1MG | $375.39 | $171.17 | $204.22 | 54.4% |
| GENENTECH | PULMOZYME SOL 1 MG/ML | $1,439.48 | $1,000.78 | $438.70 | 30.5% |
| THE GSK DEFENDANTS - | FLONASE 0.05% NASAL SPRAY | $62.41 | $43.36 | $19.05 | 30.5% |
| | COMBIVIR TAB | $10.96 | $7.84 | $3.12 | 28.5% |

Page 1 of 3

**Exhibit A**

| Manufacturer | Drug | Reported Average Wholesale Price AWP | Estimated True AWP | Estimated Overcharge | Estimated Overcharge as a percentage of reported AWP |
|---|---|---|---|---|---|
| | EPIVIR TAB 150MG | $5.06 | $3.64 | $1.42 | 28.1% |
| | LAMICTAL TAB 100MG | $2.91 | $2.20 | $0.71 | 24.4% |
| | ZIAGEN TAB 300MG | $6.80 | $4.78 | $2.02 | 29.7% |
| | FLOVENT INHALER 110MCG | $70.58 | $54.82 | $15.76 | 22.3% |
| | SEREVENT INHALER 21MCG | $84.01 | $64.03 | $19.98 | 23.8% |
| | WELLBUTRIN TAB 150MG | $1.93 | $1.35 | $0.58 | 30.1% |
| | AUGMENTIN TAB 875-125 | $5.38 | $3.85 | $1.53 | 28.4% |
| | AVANDIA TAB 8MG | $5.13 | $3.55 | $1.58 | 30.8% |
| | PAXIL TAB 10MG | $2.70 | $1.94 | $0.76 | 28.1% |
| | PAXIL TAB 20MG | $2.82 | $1.92 | $0.90 | 31.9% |
| | PAXIL TAB 30MG | $2.90 | $2.08 | $0.82 | 28.3% |
| | PAXIL TAB 40MG | $2.95 | $2.20 | $0.75 | 25.4% |
| JOHNSON & JOHNSON DEFENDANTS | ACIPHEX TAB 20MG | $3.92 | $3.01 | $0.91 | 23.2% |
| | RISPERDAL TAB 0.25MG | $2.96 | $2.10 | $0.86 | 29.1% |
| | RISPERDAL TAB 0.5MG | $3.07 | $2.20 | $0.87 | 28.3% |
| | RISPERDAL TAB 1 MG | $3.17 | $2.39 | $0.78 | 24.6% |
| | RISPERDAL TAB 2MG | $4.87 | $3.74 | $1.13 | 23.2% |
| | RISPERDAL TAB 3MG | $5.94 | $4.63 | $1.31 | 22.1% |
| | RISPERDAL TAB 4MG | $7.68 | $6.14 | $1.54 | 20.1% |
| ORTHO MCNEIL AND ORTHO BIOTACH | TOPAMAX TAB 100MG | $3.63 | $2.59 | $1.04 | 28.7% |
| | ULTRAM TAB 50MG | $1.02 | $0.72 | $0.30 | 29.4% |
| | LEVAQUIN TAB 500MG | $9.30 | $6.95 | $2.35 | 25.3% |
| | PROCRIT VIAL 10000U/ML | $133.56 | $93.36 | $40.20 | 30.1% |
| | PROCRIT VIAL 20000U/ML | $267.12 | $185.26 | $81.86 | 30.6% |
| | PROCRIT VIAL 40000U/ML | $534.24 | $369.47 | $164.77 | 30.8% |
| MEDIMMUNE | SYNAGIS VIAL 100MG | $1,416.48 | $932.96 | $483.52 | 34.1% |
| MERCK | CRIXIVAN CAP 400MG | $3.04 | $2.12 | $0.92 | 30.3% |
| | FOSAMAX TAB 70MG | $15.54 | $12.37 | $3.17 | 20.4% |
| | SINGULAIR TAB 10MG | $2.93 | $2.08 | $0.85 | 29.0% |
| | VIOXX TAB 25MG | $2.76 | $1.95 | $0.81 | 29.3% |
| | ZOCOR TAB 20MG | $4.59 | $3.06 | $1.53 | 33.3% |
| THE PFIZER DEFENDANTS - | AMBIEN TAB 10MG | $2.69 | $2.03 | $0.66 | 24.5% |

**Exhibit A**

| Manufacturer | Drug | Reported Average Wholesale Price AWP | Estimated True AWP | Estimated Overcharge | Estimated Overcharge as a percentage of reported AWP |
|---|---|---|---|---|---|
| | GLUCOTROL XL TAB 10MG | $0.83 | $0.63 | $0.20 | 24.1% |
| | LIPITOR TAB 10MG | $2.39 | $1.61 | $0.78 | 32.6% |
| | LIPITOR TAB 20MG | $3.64 | $2.42 | $1.22 | 33.5% |
| | LIPITOR TAB 40MG | $3.64 | $2.39 | $1.25 | 34.3% |
| | NEURONTIN TAB 300MG | $1.39 | $0.93 | $0.46 | 33.1% |
| | NEURONTIN TAB 400MG | $1.67 | $1.15 | $0.52 | 31.1% |
| | NEURONTIN TAB 600MG | $2.18 | $1.38 | $0.80 | 36.7% |
| | NEURONTIN TAB 800MG | $2.17 | $1.47 | $0.70 | 32.3% |
| | NORVASC TAB 5MG | $1.50 | $1.04 | $0.46 | 30.7% |
| | NORVASC TAB 10MG | $2.18 | $1.38 | $0.80 | 36.7% |
| | ZITHROMAX TAB 250MG | $7.58 | $5.59 | $1.99 | 26.3% |
| | ZOLOFT TAB 100 MG | $2.65 | $1.85 | $0.80 | 30.2% |
| | ZOLOFT TAB 50MG | $2.65 | $1.86 | $0.79 | 29.8% |
| | ZYRTEC TAB 10 MG | $210.95 | $132.88 | $78.07 | 37.0% |
| | XALATAN 0.005% EYEDROPS | $53.38 | $39.15 | $14.23 | 26.7% |
| | CELEBREX CAP 100MG | $1.58 | $1.19 | $0.39 | 24.7% |
| | CELEBREX CAP 200MG | $2.76 | $1.93 | $0.83 | 30.1% |
| RELIANT PHARM | AXID CAP 150MG | $183.57 | $128.23 | $55.34 | 30.1% |
| SCHERING-PLOUGH | CLARITIN TAB 10MG | $92.99 | $61.02 | $31.97 | 34.4% |
| TAP | PREVACID CAP 15MG | $4.36 | $3.12 | $1.24 | 28.4% |
| | PREVACID CAP 30MG | $4.44 | $3.06 | $1.38 | 31.1% |
| WARRICK | ALBUTEROL INHALER 90 MCG | $21.41 | $10.98 | $10.43 | 48.7% |
| WYETH | EFFEXOR TAB 75MG | $1.68 | $1.63 | $0.05 | 3.0% |
| | PROTONIX TAB 40MG | $3.30 | $2.45 | $0.85 | 25.8% |