Exhibit K

**Menu**

Home

Action

Feedback

Search

Site Map

**Also See**

Response

Related
Links

# *Medicare Drug Pricing Manipulations*

September 25, 2000

The Honorable Nancy-Ann Min DeParle
Administrator
Health Care Financing Administration
200 Independence Avenue, S.W.
Washington, DC 20201

Dear Administrator Min DeParle:

I am writing in response to your September 8, 2000 letter, in which you announced that the Health Care Financing Administration ("HCFA") provided new pricing data to its Medicare carriers to limit excessive reimbursements for Medicare-covered drugs. I wish to express my concerns about the way in which the Administration has proceeded with respect to this matter and how these changes will be implemented. In addition, I am writing to bring to your attention very troubling information uncovered by a Committee on Commerce investigation strongly suggesting that certain drug manufacturers may be deliberately inflating the reported "average wholesale price" for their Medicare-covered drugs -- upon which Medicare reimbursement is set -- in order to increase the sales of their drugs.

HCFA has known for many years that it was paying inflated prices for certain drugs, yet the legislative proposals made by the Administration to remedy the problem have been deeply flawed, in part because they ignored the rampant price manipulations in which certain drug manufacturers have been engaged. It was refreshing to see that, through your action, HCFA and the

Case 1:01-cv-12257-PBS    Document 6375-16    Filed 08/14/09    Page 3 of 36

Administration have at least acknowledged that they have a responsibility to protect Medicare and America's senior citizens from indiscriminate price gouging on certain pharmaceutical products. Your actions also demonstrate that HCFA already possesses -- and indeed has always possessed -- the authority to remedy this problem itself, without need of new legislation or any other Congressional action.

I remain deeply concerned, however, over the actions taken by the Administration to resolve this problem, which seem more intended to generate favorable media coverage than to respond to substantive public policy issues. Specifically, I refer to the correspondence I received from Health and Human Services Secretary Shalala on May 30, 2000, declaring that new pricing information would be provided to Medicare carriers in June of this year.

In subsequent meetings between my staff and HCFA representatives, it quickly became apparent that this announcement had been made without careful consideration of how these price changes would impact quality and access to care issues, and further that it would be impossible for HCFA to implement these changes within the time frame specified in Secretary Shalala's letter. I was hardly surprised, therefore, when I learned that HCFA had in fact failed to meet the Administration's own deadline. Obviously, the Administration had decided to declare a new policy without any meaningful analysis beforehand.

On September 8, 2000, I received your letter indicating that HCFA finally had issued new pricing information to Medicare carriers, which could then be used to establish more accurate reimbursement rates that would take effect January 1, 2001. However, your letter specifies that this new pricing information will not be applied to certain

drugs used in oncology and hemophilia treatments. As your letter also notes, payments for these drugs constitute 30 percent of Medicare's expenditures for covered drugs and 25 percent of the estimated savings that would result from any change in Medicare reimbursements. Yet, according to your letter, it has been determined that these particular drugs should be excluded from the proposed price change because of a conclusion by HCFA that "Medicare payments for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders are inadequate." If this problem does indeed exist, it is one that HCFA should have been aware of and remedied long before I first wrote to Secretary Shalala, rather than tacitly allowing an alleged cross-subsidization between drug reimbursement rates and practice expenses to continue to exist. I am particularly disturbed by both HCFA's continuing failure to address this type of problem, and the practical consequences of such failure, which obstruct efforts to implement an accurate payment system for Medicare-covered drugs and cause further delay in giving financial relief to America's vulnerable Medicare beneficiaries.

In your September 8, 2000 letter, you also noted that HCFA will continue to gather more information relating to the reimbursements for certain drugs. In order to further this inquiry, I wish to share with you some of the information uncovered during the investigation that the Committee on Commerce has conducted into the setting of reimbursements for Medicare-covered drugs. To date, this investigation has revealed troubling patterns involving certain drug manufacturers, which appear to have deliberately manipulated the spreads between the prices they charge to providers and the Medicare reimbursement levels that are set based upon information they provide. These spreads, consisting of extra Medicare dollars available to providers, were in turn used to create profit-based incentives for providers to use

a particular manufacturer's drug. This evidence shows that, in many instances, Medicare reimbursements -- which are based under Federal regulations upon the manufacturer- reported Average Wholesale Price (AWP) -- have little relationship to market-based prices, and have been used as a means to increase drug manufacturers' market share by providing improper financial incentives to health care providers.

The information obtained over the course of the Committee's investigation cumulatively demonstrates that the current reimbursement methodology for Medicare-covered drugs and HCFA's oversight of that program are so deeply flawed that they invite rampant abuse -- allowing drug manufacturers to essentially determine, as part of their sales and marketing strategies, how much particular health care provider groups will be reimbursed under Medicare. As a consequence of these critical flaws, Medicare and the senior citizens, disabled individuals and others who depend on Medicare to pay for certain drugs have paid billions of dollars in inflated drug prices.

As a result of what has been uncovered by the Committee's investigation, I am deeply fearful of proposals that rely upon an unreformed HCFA to administer an expanded drug benefit for all Medicare beneficiaries. Absent significant reforms, such proposals can only result in the exponential growth of this type of abuse, with the inevitable loss of additional billions of scarce Medicare and Medicare beneficiary dollars. Such a course can be described only as reckless and irresponsible, given the rampant level of abuse that the Committee's investigation has uncovered to date in the limited drug benefit currently provided under Medicare. I support a drug benefit program that will help senior citizens pay the high costs of prescription drugs, but we must guarantee that the benefit will be structured in a

Case 1:01-cv-12257-PBS   Document 6375-16   Filed 08/14/09   Page 6 of 36

way that does not result in similar price gouging of either the intended beneficiaries or the Medicare system itself.

The Committee began its investigation into the setting of Medicare reimbursements for covered drugs over one and a half years ago. Over the course of the investigation, the Committee contacted numerous drug manufacturers and requested information and internal documents relating to their sales and marketing practices for particular drugs. Committee staff reviewed almost 100,000 pages of internal documents from drug manufacturers relating to pricing, interviewed several drug manufacturer employees, and have been in contact with State and Federal investigators to obtain information relating to their pending inquiries into drug manufacturer practices and reimbursement issues generally.

By disclosing the inappropriate practices and other disturbing findings of this extensive Committee investigation, it is my hope that this information can be used to develop appropriate safeguards to protect Medicare and its beneficiaries from this type of abuse in the future. In order to further your efforts relating to this issue, I have summarized some of the information obtained in the course of the Committee's inquiries below, and attached several documents that shed greater light on the types of practices and abuses that the Committee has uncovered.

Scope of the Problem

Echoing the previous findings of numerous reports by the Department of Health and Human Services' Office of Inspector General (OIG), the Committee has uncovered substantial evidence that Medicare reimburses health care providers at prices dramatically more than what they actually pay for certain drugs. In fact, the Committee has identified prices that are routinely made available to many providers, but are far below Medicare reimbursement rates. These include 1999 prices for

Case 1:01-cv-12257-PBS   Document 6375-16   Filed 08/14/09   Page 7 of 36

Vancomycin, the Abbott Labs-manufactured antibiotic, which a health care provider could buy for $76.00, but for which the AWP upon which Medicare's reimbursement was based was $261.84. Similarly, in 1998 a health care provider could buy Gensia's Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97. Also in 1998, Pharmacia-Upjohn's Bleomycin had an AWP of $309.98, but health care providers could purchase it for $154.85. In 1997, Pharmacia-Upjohn's Vincasar could be purchased for $7.50, while the AWP was a staggering $741.50. (Attachment 1)

It must be stressed that 20% of these inflated Medicare payments come directly out of beneficiaries' pockets. In fact, in numerous instances, the 20 percent co-payment paid for a drug by a Medicare beneficiary alone exceeded the actual cost of the drug to the health care provider, not even including the 80 percent payment made by Medicare. For the chemotherapy drug Leucovorin, a Medicare beneficiary paid $4.36 in 1996, for a drug that his or her health care provider could have purchased for only $1.89. That same provider received a total combined payment from Medicare and the patient of $21.53. (Attachment 2)

In addition, larger provider group practices or businesses employing numerous health care providers often obtain further additional steep discounts, which are often provided in the form of rebates or free goods. Wholesalers also obtain additional discounts through the use of chargebacks, which reflect reduced prices made available to their customers. (Attachment 3)

The Committee also has uncovered evidence that, in some instances, certain manufacturers have returned cash to health care providers purchasing their drugs, describing these questionable payments as educational

Case 1:01-cv-12257-PBS   Document 6375-16   Filed 08/14/09   Page 8 of 36

grants, marketing grants, payments for data gathering or administrative fees, all of which appear to have been provided for the purpose of further lowering the actual cost for particular drugs and increasing the Medicare spreads. (Attachment 4) Many of these schemes are deliberately structured so as to not appear on any invoice or other billing record. As a consequence, any efforts to use actual acquisition costs for drugs to determine reimbursement amounts, including the proposals made in the President's last two budgets, would fail to detect many of these deep discounts.

In addition, the Committee's investigation uncovered a document containing a manufacturer's claim that certain health care providers were using its competitor's drug to fraudulently increase their profits by using less than an entire dose of a drug, but billing Medicare as if a full dose were administered, and then submitting additional bills for the use of the remainder of the dose. (Attachment 5)

## Setting and Marketing of the Spread

Several drug manufacturers, in their initial replies to Committee requests for information, stated that they did not establish the amount of reimbursement provided by Medicare for their drugs. However, documents obtained by the Committee clearly indicate that not only do manufacturers routinely report numbers upon which the AWP is set, but also some of these manufacturers are inflating the prices they report in order to artificially increase the Medicare reimbursements, and the corresponding profits available to providers based upon the use of particular drugs. (Attachment 6)

The Committee has discovered evidence that strongly suggests that several drug manufacturers are deliberately promoting the sales of their drugs based on the excess payments for their drugs under Medicare, which constitute a direct monetary windfall for a provider.

These excess payments are referred to by a variety of terms, including "spread," "return-to-practice," "return-on-investment," or most explicitly "profit." Manufacturers often prepare side-by-side comparisons of the spreads available on their drugs versus their competitors, which are then sometimes used to promote sales to providers. (Attachment 7)

These comparative analyses are often quite detailed, including estimates of potential profits available to a health care provider over the course of treating a large number of Medicare patients. In one particularly egregious example, GlaxoWellcome marketed its anti-nausea drug Zofran by promoting the fact that a health care provider could make $84.59 in profit every time he or she administered that drug. Glaxo further estimated that the profit available for Zofran was $12.32 more than the profit available from a competitor product manufactured by SmithKline Beecham, and that a medical practice that administered 165,000 doses of Zofran could earn over two million dollars of additional profit for that practice by choosing Glaxo's product. (Attachment 8)

In addition, the Committee's investigation revealed that manufacturers have carefully analyzed how their competitors' sales representatives were deliberately promoting the profits available from Medicare as a powerful selling tool. In some instances, these companies actually prepared written complaints about such efforts, although they ultimately decided not to forward this information to government authorities, possibly due to fears of exposing their own practices. (Attachment 9)

## Impact of the Spread on Utilization Decisions

The Committee's investigation also uncovered evidence indicating that manufacturers believe that the sales and

utilization of their drugs could be hampered by smaller spreads, regardless of therapeutic benefit to patients. Documents from various manufacturers explicitly discuss how the profit available to health care providers appeared to be the primary reason why these health care providers were willing to administer the therapeutically equivalent but more expensive drugs of their competitors. (Attachment 10)

One manufacturer in particular was concerned that it would be very difficult to increase the sales of a therapeutically-superior second-generation product, because the spread on its earlier product was so great that health care providers would decline to use the newer drug, even though it had significant clinical advantages in treating patients. (Attachment 11)

The Committee's investigation also uncovered disturbing evidence that many health care providers may be making clinical decisions based more on the profit available from the use of a particular drug than any concern about a therapeutic outcome. The Committee reviewed utilization patterns of biological products in the State of Florida that strongly suggest that an exclusive focus on profit led health care providers to dramatically increase their use of a particular product -- which previously had been rarely utilized -- after the State Medicaid program significantly decreased the reimbursements available for all competitor products. (Attachment 12)

The Committee's investigation identified patterns of drug utilization based upon reimbursement that also may have frightening implications for public health. A review of utilization patterns strongly suggests that the use of vancomycin, the antibiotic of last resort used in treating otherwise deadly bacterial infections, may have dramatically increased as the result of the excessive Medicare spreads effectively created by Abbott Laboratories. (Attachment 13) Many experts believe that,

Case 1:01-cv-12257-PBS   Document 6375-16   Filed 08/14/09   Page 11 of 36

as a result of such types of over-utilization, new vancomycin-resistant bacteria recently have emerged as a growing public health risk.

In addition to the above-referenced documents, the Committee has identified several other documents that relate to these same issues, which I have included for your review. (Attachment 14)

Each of the examples cited above reveals how price manipulations by certain drug manufacturers -- as well as HCFA's failure to adequately define the statutory term "average wholesale price" to prevent such manipulations -- have caused Medicare to pay amounts far in excess of any reasonable estimation of a true average wholesale price. Proposals to reform the current system that continue to attempt to determine reimbursement based upon a percentage of AWP or actual acquisition cost are therefore doomed to fail, unless the types of abuses identified above are effectively addressed by HCFA through more vigorous oversight and improved regulations that ensure that prices being paid by Medicare reflect actual market-based prices, consistent with the intent of Federal law.

It is my hope that, by sharing this information with you, HCFA will finally begin to give this issue the priority it deserves, and will work harder to eliminate these abuses and better protect Medicare and its beneficiaries. I request that you provide the Committee with a monthly report detailing HCFA's progress in addressing this problem. If you should have any questions regarding any of the information provided above or on any related matter, please contact me or have your staff contact Charles Clapton, Committee counsel, at (202) 226-2424.

Sincerely,

Tom Bliley
Chairman

TB:cc

cc: The Honorable John D. Dingell, Ranking Member

## *Response*

Response Not Received or Response Not Currently Available

## *Related Documents and Issues*

Oversight

Medicare and Medicaid Fraud

Medicare Drug Pricing Investigation

| Action | Schedule | News | Contacts | Members |
| Subcommittees | Publications | Commerce-Democrats |
Search |

**The Committee on Commerce**
**2125 Rayburn House Office Building**
**Washington, DC 20515**
**(202) 225-2927**
**Feedback**



Attachment 6

Barbara Burcke and I met with Jeff Dubinsky at NYC Health and Hospital. Confusion reigns supreme here! After keeping us waiting 1 ½ hours, Jeff told us that the relationship between NYC H&H and Greater New York is moving along. He seems very confused by this, but told us that his members can now buy off Greater New York those items that NYC H&H does not have a contract for. I told him that we would need verification of this because if any of his accounts called us we would reject them the Greater NY pricing. My guess here is that HHC will cease to exist in one year and all will be done through Greater NY. I will address this issue with Bill Larkin when I see him next.

## II.   REGION OPPORTUNITIES/UPDATE

We picked up a Ceftrox conversion at another of Ellen Rosenberg's accounts. A small hospital with limited usage but every little bit.....

We also have put Ceftrox on formulary at Norwalk hospital in CT. More details to follow below.

The region has been slow to take syringes back to the market. Fear, I guess. Opportunities appear slow in coming. Discussions with groups indicate little interest.

NYC EMS would like to place a one time buy for Adenocard. Pricing will be submitted on vials and syringes. Do we have a program to replace vials with syringes if the customers would like? Would we consider one?

## III.   MARKETING

Kudos to the entire staff for an excellent meeting for the Scan launch! Virtually all of my reps have commented on how good the program was and how much they learned. Several have indicated that as future training is needed the same format should be followed.

I was very proud of my group. Pam tells me that we finished third and I felt this was quite respectable. As you are aware, my region is last in Adenocard sales and points to the fact that we have only two or three places that use Adenocard for this purpose as the reason for this. Our training performance should indicate that our lack of sales is not related to knowledge! It would have been great to win, but being prepared to sell Adenoscan will pay its own dividends. We all worked very hard!

Many thanks to Rick and Bruce for adjusting the AWP on the five gram Vanco. This should lead to more business. As I have previously reported, some companies are still using AWP for reimbursement purposes. Chartwell has been told to search for the largest spread and order accordingly. I would have liked to see us match Abbott's AWP

CONFIDENTIAL

for our complete Vanco, and Cefazolin line. I will settle for the five gram at $1 below Abbott but that means that we will still have to compete at the other end of the equation. For example, if Abbott's AWP is $163 and their contract is $30 and if our AWP is 162 we will have to be at least $29 to have the same spread. Follow?

IV.    NEXT MONTHS' PRIORITIES

1) ASHP. JUNE 4 ARRIVAL. MEET WITH DENNIS AND DAN FOR REVIEW.
2) CORPORATE MARKETING RESPONSIBILITIES JUNE 12-18
3) AMERINET/VECTOR MEETING JUNE 19-21
4) WORK IN THE FIELD WITH LOWE, DINGIVAN, AND CAFIERO

*NOTE: As a reminder I have planned to take 8 days vacation around the July 4 holiday, meaning I will be off from June 30 -July 16. Due to Catapolt training I may have to "work" July 6. I will let you know.

F 18297

CONFIDENTIA

Christopher Cheney
# Bayer 

08/07/97 01:15 PM
**Pharmaceutical Division**

To:      Brian Shortell/WESTH/PH/US/BAYER
cc:
Subject: Re: Recombinate AWP Change

FYI ... it looks like if the reports are true we will need to follow suit.
————————— Forwarded by Christopher Cheney/BAYER-US-NOTES on 08/07/97 01:13 PM —————————

David Mahoney
08/07/97 12:19 PM

To:      Christopher Cheney/BAYER-US-NOTES
cc:
Subject: Re: Recombinate AWP Change

Chris, if Baxter has increased their AWP then we must do the same. Many of the Homecare
companies are paid based on a discount from AWP. If we are lowed than Baxter then the return
will be lower to the HHC. It is a very simple process to increase our AWP, and can be done
overnight. Lets talk about this next week at our meeting in Old Saybrook.
08/06/97 06:35 AM

Christopher Cheney
# Bayer

08/06/97 06:35 AM
**Pharmaceutical Division**

To:      Brian Shortell/WESTH/PH/US/BAYER
cc:      Carole Guthrie/WESTH/PH/US/BAYER, David Mahoney/BAYER-US-NOTES, Terry
         Tenbrunsel/BAYER-US-NOTES
Subject: Recombinate AWP Change

Carole reports that a rep has heard that Baxter recently increased the AWP for Recombinate from
$1.18 to $1.24. Do we have any means for verifying this information? Secondly if the info is
correct would it be possible for us to match their increase? Would you be able to comment on the
pro's and con's of a change to our AWP?

Call me when you get a chance.

BAY00310

Baxter
0003153

" Increasing AWPs was a large part of our negotiations with the large homecare companies."

Baxter
0003187

" The deliberate manipulation of AWP or WAC prices is a problem that we need to address. The spread between acquisition cost and AWP/WAC is direct profit for customers, and is being used to increase product positioning in the market by certain manufacturers"

- Caremark and Olsten comprise greater than 50% of our sales revenue and total unit sales for Recombinate and greater than 70% of our sales revenue and total unit sales for Hemofil M (1996 and 1997 YTD)

- Increasing AWPs was a large part of our negotiations with the large homecare companies    **I thought First Data Bank set AWP??**

- Homecare companies that reimburse based on AWP make a significantly larger margin okn FVIII products compared to Baxter

eg. If Caremark or Olsten reimburse at today's AWP, their margins are greater than fifty cents per unit for Recombinate and greater than forty cents per unit for Hemofil M

- Our customers do not have to pass on the increase in AWPs to patients by reimbursing at these levels                    0003153

- We need to be prepared for competitors to alarm the hemophilia community that Baxter has increased ASP and AWP!

- We need to stress that we witheld from increasing prices during product shortages in 1996 and now even though the prices increase seems untimely, it is necessary and has been postponed as long as possible  **This document tells the true story!!!**

- Baxter has been a leader in cost containment by keeping prices down - perhaps homecare companies, treatment centers, and insurance companies need to also do their fair share

## Venoglobulin-S 5% Solution Solvent Detergent
### * New ASP = $76.15 / gram

| NDC Number | Item Description | AWP Pack Price | AWP Eff. Date |
|---|---|---|---|
| 49669-1612-1 | Soln, 5%, 50mL, 2.5g, ea, w/ IV set | $ 190.38 | 6/16/94 |
| 49669-1613-1 | Soln.,5%, 100mL, 5.0g, ea, w/ IV set | $ 380.75 | 6/16/94 |
| 49669-1614-1 | Soln., 5%, 200 mL, 10.0g, ea, w/ IV set | $ 761.50 | 6/16/94 |

Published AWP's for competitive products are as follows:
(Reference: Average AWP per 1994 Redbook)

| | | | |
|---|---|---|---|
| Cutter | Gamimune N 5% | $ 57.12/ g | |
| Cutter | Gamimune N 10% | $ 75.00/ g | |
| Baxter | Gammagard S/D | $ 64.00/ g | *List Price/ Cust. Srvc |
| Sandoz | Sandoglobulin | $ 42.00/ g | |
| ARC | Polygam | $ ? / g | |
| Immuno | Iveegam | $ 65.00/ g | |
| Armour | Gammar IV | $ 62.00/ g | |
| Alpha | Venoglobulin-I | $ 47.00/ g | NOW ↑ $60.82/ g |
| Alpha | Venoglobulin-S | $ 65.00/ g | NOW ↑ $76.15/ g |

Pharmacy billing and management services can bill for product based on the published AWP and thereby net incremental margin with Venoglobulin-S usage. Margin for the pharmacy is the difference between AWP and acquistion cost ($76.15/ g -$30/ g = $46.15/ g margin). Good luck in capturing new homecare/clinic accounts!

cc:

AA 000529



GWZ 0030803

CONFIDENTIAL. This document is being produced by
Glaxo Wellcome Inc. in response to Congressman Bliley's
letter of May 5, 2000 regarding the Committee on Commerce
Investigation.

2GW/HRCOMM/6:

# SB

## SmithKline Beecham.
### *Pharmaceuticals*

| MEMORANDUM |
|---|

Oncology and Specialty Products Business Unit

March 21, 1996

TO:  R. de Souza                    cc:  M. Davis
                                          R. Van Thiel

FROM:  D. Tasse

RE:  Kytril Price Increase

I recommend a 4.8% price increase effective March 25, 1996 for all Kytril presentations.  This is in repose to a Glaxo Wellcome price increase of 4.8% for Zofran effective March 8, 1996.

The following are the revised prices for wholesalers and oncology distributors:

|  | FORM | WAC | AWP |
|---|---|---|---|
| Wholesalers: | 1mg/ml vial | 139.17 | 173.95 |
|  | 1mg 2's tablet | 66.02 | 82.55 |
|  | 1mg 20's tablet | 660.24 | 825.30 |
| Oncology Distributors: | 1mg/ml vial | 122.47 | 173.95 |
|  | 1mg 2's tablet | 62.72 | 82.55 |
|  | 1mg 20's tablet | 627.23 | 825.30 |

0321b.doc

*Verbal approval from Richard de Souza*

*obtaind by Dave Tasse*

SBCC 0743

# Kytril Price Increase   3/26/96

| | 1mg Vial | | 2x1mg | | 20x1mg | |
|---|---|---|---|---|---|---|
| | PRE | POST | PRE | POST | PRE | POST |
| AWP | 166.00 | 173.95 | 78.75 | 82.55 | | 825.30 |
| WAC | 132.80 | 139.16 | 63.00 | 66.04 | 630.00 | 660.24 |
| ONCOLOGY | 116.86 | 122.46 | 59.85 | 62.74 | 598.50 | 627.23 |

# Zofran Price Increase   3/7/96

| | 40mg Vial | | 32mg Bag | | 3x8mg | |
|---|---|---|---|---|---|---|
| | PRE | POST | PRE | POST | PRE | POST |
| AWP | 233.02 | 244.43 | 196.76 | 206.41 | 56.11 | 58.86 |
| WAC | 194.18 | 203.69 | 163.97 | 172.01 | 46.76 | 49.05 |
| ONCOLOGY | 167.09 | 167.09* | 125.47 | 125.47 | 46.76 | 49.05 |

+ Discount  $36.60  (18%)
• Discount  $48.54  (28.2%)

SBCC 0297



**INTEROFFICE CORRESPONDENCE**

TO:   ATC Sales Force
      ATS Sales Force
      P. DeHart
      D. Flanaghan
      P. Gatto
      J. Gross
      G. Mull
      J. Brown

FROM:   Christine Chow

DATE:   19 September, 1996

### RE: New AWP's

Bayer increased the AWP for Gamimune® N 10% from $75 per gram to $90.00 per gram beginning August, 1996. These increases were published in the August 96 Update of the Red Book. NDC numbers were changed to reflect Bayer's corporate identity numbering system. Please see attached page from the Red Book.

Alpha has increased our AWP for Venoglobulin®-S 5% and Venoglobulin®-S 10%. Effective 16 September 1996, our published Red Book Price is:

|                     | Old AWP      | New AWP     |
|---------------------|--------------|-------------|
| Venoglobulin-S 5%   | $76.15/ gram | $ 90/ gram  |
| Venoglobulin-S 10%  | $80/ gram    | $ 95/ gram  |

These new prices have been submitted to the Red Book and MediSpan and can be used for out-patient billing purposes. Please feel free to call if you have additional questions.

Very Best Regards,

cc:   Management Committee
      R. Mamidi
      S. Tonetta, Ph.D.
      G. Chan
      S. Wada

AA 000609

Cicerale, Jerrie        AP

| | | |
|---|---|---|
| From: | Mitchell, Charlie | AP |
| To: | Heggie, Michael | AP |
| Cc: | Cicerale, Jerrie | AP; Mershimer, Loreen        AP |
| Subject: | RE: Medi Span | |
| Date: | Tuesday, January 16, 1996 6:18PM | |

This should be OK - I see no issue from our perspective.

Do you understand why MediSpan reported an AWP last year different than the one we submitted? It would stand to reason they would use the number we gave them unless there is some complicating factor we don't fully understand. I'm concerned they may be accessing data from some other source (my department, one of the industry data bases, our wholesaler catalog, etc.) and even with this letter things might still get messed up. Another phone call to sort out this one issue might be time well spent.

Otherwise, this should be fine.

From: Heggie, Michael          AP
To: Mitchell, Charlie         AP
Cc: Cicerale, Jerrie          AP; Mershimer, Loreen          AP
Subject: Medi Span
Date: Tue, Jan 16, 1996 12:08PM

Charlie I would like to change the way in which Medi Span reports the AWP for Calcijex and Jerrie asked that I inform someone in your area of what I was doing. I'll explain why and the history.

I have reported for the past several years the AWP for Calcijex to both Red Book and Blue Book/First Data Bank. I have not delt with Medi Span in the past as they have really been an insignificant reporting source for our drug. However, this year I spoke to Michelle Christopher at Medi Span just to cover that base. At that time(Dec. 8) I had the impression that she was going to report the AWP for Calcijex at the AWP I supplied to her. She did not do so.

The reason this is important is that dialysis clinics are paid by Medicare for Calcijex. The Medicare Intermediaries get their pricing from the published AWP's of the three reporting agencies. Medicare pays 80% of published AWP. We purposaly set the AWP to be 125% of the published single case price. All other HPD products are reported with an AWP of 120% of list. If you work the math backwards from the dialysis providers side you get

$509.60 (list single case price) X 50 ampuls = $10.19 per amp
Medicare pays 80 % of AWP set by us at $637.00 or $12.74 per amp
$12.74 x .80 = $10.19  Customers are whole on their first go round with reimbursement.

We have done this for all of the years I have been involved, this is not something new and it is not a change in policy.

Just to be safe I will hold off from sending my memo to Medi Span until you have a chance to read this or if you wish to discuss this. The reason for the immediacy is that Texas BC and BS a major Intermediary for several chains has dropped the Red Book reporting system and gone to the Medi Span system and we need to clear this up with Medi Span so that the Texas Intermediary has the correct information in their reimbursement file.

< <File Attachment: MEDISPAN.DOC> >  < <File Attachment: MEDISPAN.DOC> >

ABT001113

AB 0006317

Januar, 12, 1995    VIA FAX

# ımmunex

Beth Rader
First Data Bank
1111 Bayhill Drive
Suite 350
San Bruno, CA  94066

Dear Beth:

Below you will find a list of new suggested Average Wholesale Prices (AWPs) for selected Immunex products, along with a new NDC for ███████████████ ll effective January 10, 1995.



| Product | NDC | New Suggested AWP |
| --- | --- | --- |

Also, please note that the following product will no longer be sold in single vials and will be available only in boxes of ten.  Its AWP has been multiplied by ten and is in the table below. Each vial size has a new NDC and is now available under Immunex packaging.  These changes are effective January 10, 1995.

| Product | Old NDC | New NDC | New Suggested AWP |
| --- | --- | --- | --- |
| Leucovorin Calcium for Injection, preservative-free, cryodesiccated powder | | | |
| box of 10 vials | | | |
| 50 mg | 00205-5330-92 | 58406-0621-37 | $215.30 |
| 100 mg | 00205-4646-94 | 58406-0622-35 | $394.10 |
| 350 mg | 00205-4645-77 | 58406-0623-33 | $1379.40 |

Please update your databases accordingly.  A new copy of Immunex's Average Wholesale Price Product Pricing Guide will be sent to you next week.  If you have any questions, call me at (206) 389-4320.  Thank you.

Sincerely,

*Mary Lipinsky*

Mary Lipinsky
Manager, Health Care Policy

IMNX 002271
CONFIDENTIAL

cc:   Laura Driscoll
      Silvia Chang-Haines
      Teresa Hedges
      Jim Hynes
      Kathleen Stamm

51 University Street, Seattle, Washington 98101
206.587.0430, Fax 206.587.0606



*a publication of Medical Economics Company*

January 12, 1996

Kathleen Stamm
Immunex Corporation
51 University Street
Seattle, Washington
98101

Dear Kathleen:

This letter is a confirmation letter that we have received and entered your latest AWP price changes in our system.  The price changes that were effective January 3, 1996 were posted in our system on January 5, 1996.  I have enclosed an updated copy or your Red Book listing for your files.  If there is anything else I could help you with do not hesitate to call.

Sincerely,

*Lisa Brandt*

Lisa Brandt
Red Book Data Analyst



FIVE PARAGON DRIVE · MONTVALE · NEW JERSEY 07645 · 201 358-7600

IMNX 002262
CONFIDENTIAL

# Glaxo Memo

To:        Jim Dawson
           Andy Hartsfield
           Patti Pozelia
           Rick Sluder
From:      Nancy Pekarek
Date:      10/25/94
Subject:   Issue considerations on Zofran pricing strategies


Attached is a draft outlining the issues we discussed yesterday regarding Zofran pricing strategies.  Please review for further discussion this afternoon.

GW1IG/7:00013

## Zofran pricing recommendation considerations

If Glaxo chooses to increase the NWP and AWP for Zofran in order to increase the amount of Medicaid reimbursement for clinical oncology practices, we must prepare for the potential of a negative reaction from a number of quarters.  Some likely responses:

1) Press:  Glaxo's health care reform messages stressed the importance of allowing the marketplace to moderate prices.  On the surface, it seems that in response to the entrance of a competitor in the market, Glaxo has actually raised its price on Zofran — perhaps twice in one year.  How do we explain that price increase on a drug that is already been cited in the press as one of, if not the most expensive drug on the hospital formulary?

If we choose to explain the price increase by explaining the pricing strategy, which we have not done before, then we risk further charges that we are cost shifting to government in an attempt to retain market share.

2) Congress:  Congress has paid a good deal of attention to pharmaceutical industry pricing practices and is likely to continue doing so in the next session.  How do we explain to Congress an 8% increase in the NWP between January and November of 1994, if this policy is implemented this year?  How do we explain a single 9% increase in the AWP?  What arguments can we make to explain to congressional watchdogs that we are cost-shifting at the expense of government?  How will this new pricing structure compare with costs in other countries?

3) Private insurers, out-of-pocket payers:  These groups, and perhaps others, are likely to incur greater costs as a result of this pricing strategy.. How will they be affected?  What response do we have for them?

*Other questions to consider:*

1.  What percentage of our Zofran business in the clinical setting is subject to Medicaid reimbursements?  If this proportion of the business is relatively small, why implement such a sweeping policy?  Have we considered and tried other options for retaining market share short of a pricing strategy that will be seen as an exhorbitant increase?

2.  Both before and after the entrance of Kytril on the market, Glaxo's public position has been that the company would not compete on the basis of price, but rather continue to reinforce the message that Zofran provides therapeutic value in the marketplace.  If we do try to explain the pricing rationale, we seem to be doing an about face.  What does this say about the stability of our product, and the future of a company that has taken the public position that our future depends on the strength of newer products like Zofran?

3. How will SKB respond to Glaxo's new pricing policy? Are we igniting a price war? If SKB lowers their price again, how do we respond?

4. What kind of response can we expect from consumer advocates? How does Glaxo respond to those advocates?

5. How do we respond to critics' charges that this policy proves that the pharmaceutical companies are unfairly discriminating against independent pharmacists by offering discounts to different classes of trade as well as other issues in that debate?

6. Do we have plans to use this same strategy with regard to other Glaxo products?

7. Does this pricing policy, and similar policies implemented by other companies, provide evidence to reform advocates who support the establishment of government price review boards? Is the industry helping to moderate health care costs when it implements policies that increase the cost of pharmaceuticals to government?

GWNcB

2

GW1IG/7:00015

GW11G/8:0001 1

GWN:8

## Medicare part B Expenditures
### for Zofran Injection

| Average Zofran Monthly Units | Average Zofran Monthly Dollars | Average Zofran Monthly Doses | Average Zofran Medicare B Monthly Doses | Current Monthly Medicare B Reimbursement ($137.45/dose) | Current Yearly Medicare B Reimbursement ($137.45/dose) |
|---|---|---|---|---|---|
| 34,210 | $5,915,593 | 41,052 | 25,452 | $3,498,410.39 | $41,980,924.66 |
| | | | | New Monthly Medicare B Reimbursement ($149.62/dose) | New Yearly Medicare B Reimbursement ($149.62/dose) |
| | | | | $3,808,164.15 | $45,697,969.79 |
| | | | | | Additional Yearly Medicare B Expenditure $3,717,045.13 |
| | | | | Attributable to AWP Increase | $1,747,011.21 |

Assumptions:
Medicare B = 62% of Patients
Average Dose Billed = 32mg

# Armour Pharmaceutical Company Interoffice Correspondence

| Date | 18 January 1995 | Information Copies |  |
|------|-----------------|--------------------|--|
| To   | Jeff Albrecht   | To | Bruce Henderson<br>Joe Pugliese<br>Mary Ann Tomasso |
| From | Anita Brandon   |  |  |

Subject    **Texas Medicaid Drug Vendor Program**

Current Reimbursement Methodology:
Product cost (+) 7% profit margin (+) $4.55 dispensing fee (+) $.10 per claim submission.

- Each manufacturer is responsible for submitting accurate pricing information for each of their products. This information includes the product's AWP, price to wholesalers, and direct price.

- On the basis of the cost information provided, the Drug Vendor Program processes the amounts through their standard reimbursement methodology and calculates the current reimbursement allowable for all products. The only exception is PHS entities.

- Pricing for PHS entities is calculated by actual invoice submission.

Texas Medicaid Drug Vendor Program does not, in any way, discriminate against any one product manufacturer or drug in the way it applies its reimbursement methodology. Pricing discrepancies are a result of dated and/or falsified cost information supplied by the manufacturers. It is important that Armour Pharmaceutical Company comply with all federal regulations, regardless of the actions presented by its competitors.

Concerning the reimbursement allowable variances for recombinant factor VIII products, the Department of Reimbursement Services has taken the appropriate action steps to bring about a resolution.

The attached *Reimbursement Answerline* report contains CONFIDENTIAL information that should not be shared, discussed or disseminated to anyone outside of Armour Pharmaceutical Company!

KoPPaE

C5IG/7:000001

Attachment 7

# *Baxter*

Interoffice Memorandum—For Internal Use Only

To: Pete O'Malley

Date:  June 11. 1996

cc: Larry Guiheen
    Matt Likens
    John Sonnier

From:  Kyle A. Bush

Subject:  AWP/WAC

Attached is a memo from one of our customers voicing a concern about the reimbursement
levels of Gammagard S/D.  Reimbursement for Gammagard S/D in Florida is significantly
lower than any of the other IGIVs.

Reimbursement for IGIVs is based on either AWP (+/- a percentage depending on the state),
or wholesale acquisition cost (WAC) + 8%.  (WAC is used as the method of reimbursement in
TX, RI, MA, MD, FL, CO, AL).

Walter has provided us with WAC prices for several IGIVs..

| Ven S 10% | Ven S 5% | Gam N 10% | Gam P-IV | Poly S/D | Gam S/D |
|-----------|----------|-----------|----------|----------|---------|
| $71.26 g  | $67.76   | $67.76    | $51.89   | $51.62   | $38.09  |

This price is being promoted by certain manufacturers sales force as a financial incentive to use
their product  The deliberate manipulation of AWP or WAC prices is a problem that we need to
address.  The spread between acquisition cost and AWP/WAC is direct profit for customers, and
is being used to increase product positioning in the market by certain manufacturers.

6/17

- Will raise AWP for GG/SD by 15%
- Reasons are:
    - Nonjustification      - SD Process
    - HIV antigen           - R+D
    - Pull off label
- will try to implement  Q3 1996

2003187

# *Baxter*

Interoffice Memorandum - For Internal Use Only

To: Sales Managers
    Biotech Sales
    Hemophilia Sales

Date: August 6, 1997

cc: Brad Bridges    Pete O'Malley
    L.Cunningham    Steve Finney
    Jim Post    Judy Reuter

From: Kyle Bush

Subject: AWP History

Attached is a 1997 AWP history update for all IGIV products. Under the "1997 AWP column", the BOLDED entries represent recent increases.

We are very aware of the current AWP increases in the market place and the potential impact that could have on alternate site sales for Gammagard S/D. We have a strategy to raise AWP's for Hyland's products and will proceed when the timing is right. Specifically, we can increase AWP's proportionate to the average ASP increase for a specific product line. Or, we can justify an AWP increase if our internal investments have increased; i.e. PCR testing, packaging improvements, HIV/HCV antigen testing, capacity improvements, etc...

We increased the AWP for Gammagard S/D by 15% in October 1996. We will look at Gammagard S/D again in Q4 - 97 and see if the timing (criteria mentioned above has been met ) is right for another AWP increase.

Price History
(as of 8/6/97)

| | Size | NDC | 1996 AWP Change | 1997 AWP | AWP/gram | 1996 WAC | 1996 WA (Bergan) |
|---|---|---|---|---|---|---|---|
| **ARC** | Polygam 5% | | | | | | |
| | 2.5 gram | | n/a | n/a | | | |
| | 5 gram | | n/a | n/a | | | |
| | 10 gram | | n/a | n/a | | | |
| | Polygam S/D 5or10% | | | | | | |
| | 2.5 gram | 52769-0471-72 | $145.00 | $168.93 | $67.57 | | $112 |
| | 5 gram | 52769-0471-75 | $290.00 | $337.86 | $67.57 | | $225 |
| | 10 gram | 52769-0471-80 | $580.00 | $675.72 | $67.57 | | $450 |
| **ALPHA** | Venoglobulin-I 5% | | | | | | |
| | 2.5 gram | | $152.05 | $152.05 | $60.82 | | |
| | 5 gram | | $304.10 | $304.10 | $60.82 | | |
| | 10 gram | | $608.20 | $608.20 | $60.82 | | |
| | Venoglobulin-S 5% | | | | | | |
| | 2.5 gram | 49669-1612-01 | $190.38 | $225.00 | $90.00 | | |
| | 5 gram | 49669-1513-01 | $380.75 | $450.00 | $90.00 | | |
| | 10 gram | 49669-1614-01 | $761.50 | $900.00 | $90.00 | | |
| | Venoglobulin-S 10% | | | | | | |
| | 5 gram | 49669-1622-01 | $400.00 | $475.00 | $95.00 | | $150 |
| | 10 gram | 49669-1623-01 | $800.00 | $950.00 | $95.00 | | $360 |
| | 20 gram | 49669-1624-01 | $1,600.00 | $1,900.00 | $95.00 | | $720 |
| **ARMOUR** | Gammar IV 5% | | | | | | |
| | 1.0 gram | 00053-7490-01 | $62.00 | n/a | $62.00 | | |
| | 2.5 gram | 00053-7490-02 | $155.00 | n/a | $62.00 | | |
| | 5 gram | 00053-7490-05 | $310.00 | n/a | $62.00 | | |
| | 5gr x 6pk | 00053-7490-06 | $1,767.00 | n/a | $58.90 | | |
| | 10 gram | 00053-7490-10 | $620.00 | n/a | $62.00 | | |
| | Gammar IV P 5% | | | | | | |
| | 1.0 gram | 00053-7486-01 | $75.00 | $75.00 | $75.00 | | $4 |
| | 2.5 gram | 00053-7486-02 | $187.50 | $187.50 | $75.00 | | $12 |
| | 5 gram | 00053-7486-05 | $375.00 | $375.00 | $75.00 | | $24 |
| | 5gr x 6pk | | | | $68.00 | | |
| | 10 gram | 00053-7486-10 | $750.00 | $750.00 | $75.00 | | $48 |
| **BAXTER** | Gammagard 5% | | | | | | |
| | 0.5 gram | | n/a | n/a | | | |
| | 2.5 gram | | n/a | n/a | | | |
| | 5 gram | | n/a | n/a | | | |
| | 10 gram | | n/a | n/a | | | |
| | Gammagard S/D 5or10% | | | | | | |
| | 0.5 gram | 00944-2620-01 | $54.92 | $54.92 | $109.84 | $34.00 | |
| | 2.5 gram | 00944-2620-02 | $184.25 | $184.25 | $73.70 | $108.00 | $ |
| | 5 gram | 00944-2620-03 | $368.50 | $368.50 | $73.70 | $210.00 | $2 |
| | 10 gram | 00944-2620-04 | $737.00 | $737.00 | $73.70 | $420.00 | $4 |
| **MILES/BAYER** | Gammune N 5% | | | | | | |
| | 0.5 gram | 00192-0640-12 | $47.50 | $47.50 | $95.00 | | |
| | 2.5 gram | 00192-0640-20 | $148.75 | $148.75 | $59.50 | | |
| | 5 gram | 00192-0640-71 | $297.50 | $297.50 | $59.50 | | |
| | 12.5 gram | 00192-0640-25 | $743.75 | $743.75 | $59.50 | | |
| | Gammune N 10% | | | | | | |
| | 1 gram | 00192-0649-12 | $90.00 | $90.00 | $90.00 | | |
| | 5 gram | 00192-0649-20 | $450.00 | $450.00 | $90.00 | | |
| | 10 gram | 00192-0649-71 | $900.00 | $900.00 | $90.00 | | |
| | 20 gram | 00192-0649-24 | $1,800.00 | $1,800.00 | $90.00 | | |
| **SANDOZ** | Sandoglobulin | | | | | | |
| | 1 gram | 00078-0120-58 | $70.02 | $70.02 | $70.02 | | $ |
| | 3 gram | 00078-0122-59 | $133.20 | $133.20 | $44.40 | | |
| | 3 gr x 10 | 00078-0122-19 | $1,305.00 | $1,305.00 | $43.50 | | $ |
| | 6 gram | 00078-0124-60 | $252.00 | $252.00 | $42.00 | | |
| | 6 gr x 10 | 00078-0124-19 | $2,484.00 | $2,484.00 | $41.40 | | |
| | 12 gram | 00078-0244-93 | $504.00 | $504.00 | $42.00 | | |
| | 12 gr x 10 | 00078-0244-19 | $4,956.00 | $4,956.00 | $41.30 | | |

CONFIDENTIAL-FOR INTERNAL USE ONLY