# Exhibit 13

to

*Declaration of George B. Henderson, II Submitting Exhibits*
*In Opposition to the Roxane Defendants'*
*Motion for a Finding of Spoliation and for Sanctions*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, Civil Action No. 06-11337-PBS;<br><br>*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS; and<br><br>*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp., et al.*, Civil Action No. 07-10248-PBS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | MDL No. 1456<br>Master File No. 01-12257-PBS<br>Subcategory Case No. 06-11337-PBS<br><br>Hon. Patti B. Saris<br><br>Magistrate Judge Marianne B. Bowler |
| | | |

**DECLARATION OF MARK G. DUGGAN, PH.D., IN SUPPORT OF THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. QUALIFICATIONS ......................................................................................... 1

II. MEDICAID DATA USED IN MY DAMAGES CALCULATIONS ...................................4
    A. MEDICAID CLAIMS DATA
        1. CLAIMS DATA COLLECTED DIRECTLY FROM STATE MEDICAID AGENCIES
        2. SMRF/MAX DATA
        3. SDUD DATA
    B. VALIDATION AND USE OF THE DATA

III. MEDICARE DATA USED IN MY DAMAGES CALCULATIONS.......................... 8
    A. MEDICARE CLAIMS DATA
        1. CLAIMS DATA
        2. ARRAYS
    B. VALIDATION AND USE OF THE DATA AND ARRAYS

IV. BASE DAMAGE CALCULATIONS....................................................................... 9
    A. AVERAGE SELLING PRICES
    B. MEDICAID DAMAGES METHODOLOGY
        1. APPLICATION OF LOWER OF METHODOLOGY AND
            INTERACTION WITH MAC/SMAC
        2. OUTCOME FOR THE 10, 14 OR 16 STATES
    C. MEDICARE DAMAGES METHODOLOGY

V. EXTRAPOLATION ......................................................................................17

    A. MEDICAID EXTRAPOLATION
        1. THE NATURE OF THE EXTRAPOLATIONS
           a. INTRA-STATE EXTRAPOLATION
           b. INTER-STATE EXTRAPOLATION

    B. MEDICARE EXTRAPOLATION
        1. DME CLAIMS NEEDED NO EXTRAPOLATION
        2. PART B CLAIMS FOR ABBOTT ANALYSIS

VI. ABBOTT'S HOME INFUSION.......................................................................32

I, Mark G. Duggan, hereby declare as follows:

1.      I am a Professor in the Department of Economics at the University of Maryland, College Park, Maryland.  However, at this time and continuing through the 2009-2010 academic year, I am on leave to work on national health care policy as the Senior Economist for health care on the White House Council of Economic Advisers.

## I.  QUALIFICATIONS

2.      I received my Bachelor of Science in Electrical Engineering from M.I.T. in 1992, and my Master of Science in Electrical Engineering from M.I.T. in 1994.  I obtained my Doctorate in Economics from Harvard University in 1999.  I was an Assistant Professor in the University of Chicago's Department of Economics, and a Visiting Assistant Professor in M.I.T.'s Department of Economics before joining the University of Maryland's Department of Economics in 2003.

3.      I was awarded a two-year Alfred P. Sloan Foundation Fellowship in 2004, an award that is made each year to only six to eight economists who are selected from those in the entire profession who are within six years of receiving their Ph.D.  I have served on several committees at the University of Maryland and have received teaching and/or advising awards at Harvard University, M.I.T., the University of Chicago, and the University of Maryland.  I have served as an advisor to approximately 20 Ph.D. students at the University of Chicago and the University of Maryland, with my recent advisees accepting positions at major universities and the World Bank.

4.      My professional activities include serving as a Research Associate at the National Bureau of Economic Research in the Health Care and Public Economics programs.  I was also recently a Visiting Fellow at the Brookings Institution and I am a member of the American Economic Association and the American Society of Health Economists.  I serve as an Associate Editor of the *Journal of Public Economics* and on the Board of Editors of the *American Economic*

*Journal: Economic Policy.* I have been the Principal or co-Principal Investigator on numerous research grants, including current ones from the National Science Foundation and the Social Security Administration. The National Science Foundation grant is for a project with Fiona Scott Morton, Ph.D., to explore the effect of the Medicaid program on the price and availability of pharmaceutical treatments to the 52 million individuals currently insured by the program.

5.      I have published more than a dozen papers and have presented my research at numerous professional conferences and at dozens of academic institutions including Columbia University, Harvard University, M.I.T., Princeton University, Stanford University, University of Chicago, and Yale University. One paper I published was the lead article in the January 2005 issue of the *Journal of Health Economics* and was titled *Do New Prescription Drugs Pay for Themselves? The Case of Second Generation Antipsychotics.* Another recent paper, jointly authored with Dr. Scott Morton, was titled "The Distortionary Effects of Government Procurement: Evidence for Medicaid Prescription Drug Purchasing" and was published as the lead article in the February 2006 issue of the *Quarterly Journal of Economics.* A more recent paper on the Supplemental Security Income program, jointly authored with my colleague Melissa Kearney, Ph.D., and published in the Autumn 2007 issue of the *Journal of Policy Analysis and Management*, received the Raymond Vernon Memorial Prize for being voted the best research article in that journal in 2007.

6.      Other papers I have published focus on the Medicaid and Medicare programs and have been published in some of the leading journals of my profession, including the *Journal of Public Economics*, the *Quarterly Journal of Economics*, the *Journal of Economic Perspectives*, and the *RAND Journal of Economics.* I have published empirically-oriented papers on other topics in leading journals including the *American Economic Review, Forum for Health Economics and Policy, Journal of Economic Perspectives, Journal of Political Economy, Journal of Policy*

*Analysis and Management*, and the *Journal of Public Economics*. In two of my current projects, I am analyzing the impact of Medicare Part D on pharmaceutical prices (with Dr. Scott Morton) and the effect of consolidation in the health insurance industry on health insurance premiums (with Leemore Dafny, Ph.D., and Subramaniam Ramanarayanan, Ph.D.).

7.    My research is empirically oriented and focuses on the impact of government expenditure programs such as Medicaid, Medicare, and Social Security. I have conducted several studies in which I apply advanced quantitative methods to large-scale data sets to investigate questions in applied microeconomics that are of interest to academics and policymakers. A central issue in most of these studies is determining whether a causal relationship exists between one variable and another. For example, in my *Journal of Health Economics* paper on pharmaceutical treatments, I investigate the impact of certain new treatments on Medicaid spending and health outcomes.

8.    Much of this work has included the aggregation of highly complex encounter-level data to the individual level, which is then often merged with other data. For example in a paper published in the *Journal of Public Economics*, I aggregate Medicaid claims and expenditure data to the individual level and then merge this with data on individual-level HMO enrollment. Similarly in current research on Medicare Part D with Dr. Scott Morton, I am utilizing encounter-level data from the Medical Expenditure Panel Survey to estimate the Medicare market share for every one of the top 1,000 drugs in the United States.

9.    In carrying out research, I have followed the methods that are generally applied and accepted in my profession to ensure that the data sets that are constructed are accurate and reliable. I have then applied the most appropriate microeconometric methods to investigate causal relationships. For example, in the *Journal of Health Economics* paper referred to above, I used instrumental variables methods to estimate the effect of new pharmaceutical treatments on

3

Medicaid expenditures. In a *Journal of Public Economics* paper on Medicaid managed care, I used a differences-in-differences methodology that exploited the differential timing of county-level Medicaid managed care mandates to estimate the effect of HMOs on Medicaid expenditures. And in a *Quarterly Journal of Economics* paper, my co-author and I estimated multivariate regression models that were grounded in economic theory to estimate the effect of Medicaid market shares on pharmaceutical prices.

10.     I was retained as an expert by the United States and relator Ven-A-Care to apply my expertise in analyzing large scale data sets and using econometric methods, as I do in my academic work described above, to compute damages in these cases. I understand that this declaration will be used by the United States and relator in support of a motion for partial summary judgment, and in opposition to the summary judgment motions filed by defendants.

11.     My prior work in these average wholesale price (AWP) cases involved preparing expert reports, including supplemental and rebuttal reports. I understand that some of my expert reports have been appended to the papers filed by defendants. The statements in my reports and my deposition testimony given in these cases are accurate and I would testify under oath consistently with the statements I have made in the reports, depositions, and in this declaration.

## II. MEDICAID DATA USED IN MY DAMAGES CALCULATIONS

### A. Medicaid Claims Data

12.     There seems to be considerable confusion by defendants over the claims data that I have used in my analysis, and it has been misrepresented in various ways by defendants. My analysis relies upon two main categories of Medicaid claims data. One category is data that was collected directly from the states in connection with this litigation. The other data was collected by the Centers for Medicare and Medicaid Services ("CMS" formerly the Health Care Financing Administration ("HCFA")) directly from the states in connection with CMS' administration of

4

the Medicaid program. The data collected from the states by CMS is of two types. One is known as the State Drug Utilization Data ("SDUD"). The other category includes three similar types of data known as the Medicaid Analytic Extract ("MAX") data, the State Medicaid Research Files ("SMRF") and the Medicaid Statistical Information System (MSIS). This data is similar and is generally referred to together as SMRF/MAX or SMRF/MAX/MSIS. The combination of the datasets provided me with claims data from all 50 states.

### 1. Claims Data Collected Directly from State Medicaid Agencies

13. The collection of claims data directly from state Medicaid agencies was an ongoing process pursued to some extent by both the United States and by the defendants. It is my understanding that any data initially acquired by the United States was made available to defendants and vice versa. In total, data was acquired directly from over 30 states which covered at least part of the claims period at issue in this case.

14. The data collected directly from the states generally contained a high level of detail. Thus, it included the information on a claim by claim basis and often included a breakdown of the ingredient cost and dispensing fee, as well as other related claims information.

### 2. SMRF/MAX/MSIS Data

15. CMS itself collected a large amount of Medicaid claims data directly from the states which is referred to as SMRF/MAX/MSIS. The MAX data, which is the current version of the data is described by CMS as "a set of person-level data files on Medicaid eligibility, service utilization, and payments." Similar data for prescription drug claims are also available for 30 states in one or more years from 1991 through 1998, with the data referred to as the SMRF data during this earlier period. The SMRF/MAX/MSIS data is claims level data with over 40 data elements including, for example, the NDC, the date of service, the charged amount, the paid amount, the date of the payment, and the quantity. SMRF-MAX and MSIS provide the specific

5

amount billed and paid (rounded to the nearest dollar, but since it is reasonable to expect that half are rounded up and half are rounded down it is unlikely for there to be any material impact).

### 3. SDUD Data

16.     CMS also provided SDUD data based on information collected from the states. This data provides detailed information about drugs dispensed by pharmacies and reimbursed on an NDC basis by the Medicaid programs of each state, including the total number of prescriptions filled and the total amount paid for each NDC in every quarter. This information on NDC-state-quarter-specific Medicaid spending and utilization for the 1991 through 2007 time period is publicly available on the CMS website. The SDUD data is "aggregate" data and does not provide detail for each individual claim in the manner provided by the data collected directly from the states and the SMRF/MAX/MSIS data.

### B. Validation and Use of the Data

17.     For various reasons, including need, timing, and resources, I did not perform a claim by claim analysis of all of the data collected from the individual states. However, I did use the data from the additional states in other ways, for example, to help evaluate which were the best states to include in the claim by claim analysis, and to help validate the SMRF/MAX/MSIS/SDUD data. The various datasets, when used in combination, also help to calculate the basis of the claims when doing so with one database was not possible. Forgoing the use of data is a common and accepted practice in economics and econometrics and doing so in this case did not adversely affect my analysis. Thus, for my Medicaid analyses, I utilized claims data obtained directly from state Medicaid agencies for 10 states in my Abbott analysis, 14 states for my Dey analysis and 16 states in my Roxane analysis. The data from these states accounted for between 63 and 68 percent of the total dollars paid for the defendants Complaint products. The reason that they account for such a large share of claims is that I endeavored to perform the most detailed

6

analysis on the state claims data for the states with the largest number of claims, including California, Florida, and New York, rather than on the states with the smallest number of claims, such as Vermont, Wyoming, and the District of Columbia. The remainder of my analysis relied upon the data collected from the states by CMS. The use of these various datasets in combination allowed me to calculate the basis of the payment for the claims with a high level of precision.

18.     As noted above, the claims data collected directly from state Medicaid agencies is extensive and accounts for between 63 and 68 percent of the total dollars paid for the defendants' Complaint products. The SDUD and SMRF/MAX data pertained to varying time periods for all 50 states plus the District of Columbia, and overlapped substantially with each other and with the data obtained directly from the states. The overlap in the data sets allowed me to validate the accuracy of each data set through a review and comparison of each so that only data determined to be reliable was utilized. Although there were differences between the datasets, the reasons for the differences was discernible and could be appropriately accounted for in my analysis. I found no material variations between the datasets.

19.     I never calculated any damages except where I had data that was based upon claims submitted to the state Medicaid programs which I had evaluated for reliability and concluded was reliable as was the case for detailed claims level data and aggregate data. In order to further improve upon the reliability of my results, I performed various reviews. For example, I checked each claim contained in the data acquired directly from the states to verify its accuracy by seeing if I could replicate the amount paid. Data that was found to not match a state's methodology, or that was otherwise questionable was not used in my analysis. As a result, I discarded large amounts of data that likely would have increased the calculated damages.

### III. MEDICARE DATA USED IN MY DAMAGES CALCULATIONS

#### A. Medicare Claims Data

20.     The pharmacy benefit of the Medicaid program generally reimburses drugs on the basis of NDCs which are unique for each package size of each drug.  In contrast, the Medicare program uses the alpha-numeric Healthcare Common Procedure Coding System ("HCPCS") which can refer to several different NDCs even if the drugs are made by different manufacturers. The alpha-numeric HCPCS codes most often used to bill for drugs are preceded by the letter "J" and are known as J-codes.

#### 1. Claims Data

21.     The Medicare J-code billing data that I used to perform my Medicare analysis was complete and was obtained directly from CMS.  I analyzed the J-code data separately for the durable medical equipment ("DME") claims and for the Medicare Part B claims which generally represent drugs administered incident to the care of a physician.  The vast majority of DME claims were processed by a total of four DME carriers at any one time.  The DME carriers are called Durable Medical Equipment Regional Carriers or "DMERCs".  The Part B claims were processed by a greater number of carriers.  The individual Part B carriers are identified by a total of 92 different codes, though in many cases the same carrier has multiple codes.

#### 2. Arrays

22.     The payment amounts for each HCPCS J-code are determined by each DME and Part B insurance carrier (e.g. Palmetto) in accordance with instructions from CMS with the typical carrier using the median AWP of the NDCs included in the carrier's array as the per-unit allowed amount, with this changing to 95 percent of the median on January 1, 1998.  The particular NDCs that are included in an array vary across carriers and can vary within the same carrier over time.  Carriers sometimes shared arrays, or the resulting calculations, and didn't

8

always prepare new arrays if there were no changes to the prices. However, a complete set of the arrays used by every carrier to select the medians for each J-code for each time period was not available for my use.

### B. Validation and Use of the Data and Arrays

23.    There are three parts to my analysis of the Medicare claims. First, I reviewed the claims processed by Medicare under the DME benefit. These DME claims were processed by the DMERCs. I have array information that applies to more than 90 percent of the claims for these DME claims and, as I detail in my report, I dropped those claims for which I was unable to replicate the allowed amount from the claim from the array documents. There was no need to extrapolate damages in connection with the DME claims.

24.    Second, I reviewed the claims processed by regular Medicare Part B carriers in situations where I had at least some of the arrays. Third, I reviewed claims processed by regular Medicare Part B carriers for which I did not have the arrays. I performed separate damage calculations for each. These second and third steps were only necessary for my analysis of the Abbott claims.

### IV.  BASE DAMAGE CALCULATIONS

25.    There were several steps to my actual damage calculations. The first step was to calculate the average selling price of the defendants' products using the defendants' own transaction data. I then used the results of that analysis to determine the amounts that would have been paid by Medicare and Medicaid in reliance upon those transaction based prices.

26.    I directly calculated Medicaid damages on a claim by claim basis using data acquired directly from the ten states for Abbott, fourteen states for Dey and sixteen states for Roxane representing 63% to 68% of the total dollars paid on the defendants' drugs. I extrapolated from that amount to calculate a relatively modest amount of additional damages in quarters for which SDUD or SMRF/MAX/MSIS data was available and state-provided data was not for those same

10, 14 or 16 states. I also extrapolated from that amount to the other states plus the District of Columbia to calculate additional damages. In addition to extrapolation, I also used the state claims data for the states that I extrapolated to calculate the actual amounts paid and number of claims for the subject drugs in order to improve the precision of the arithmetic conclusions. In general, for Abbott my analysis covered from 1991 to 2001, for Dey my analysis covered from 1996 Q2 to 2008 Q1, and for Roxane my analysis covered from 1996 to the present.

27. I directly calculated Medicare damages on the DME claims where I had 90% of the arrays for all three defendants.

28. For Abbott, on the Part B claims where I had some arrays I performed a calculation of damages. I used that damage calculation as a basis for calculating damages associated with the other Part B carriers.

### A. Average Selling Prices

29. In general, to calculate the average selling prices of the defendants' products, I simply divided the sum of total sales and chargebacks (if applicable) for each NDC by the sum of the total quantity. I performed that calculation for each NDC and quarter from 1991 to 2001 for Abbott; for 1992Q to 2007 Q1 for Dey; and for 1996 Q2 to 2006 Q4 for Roxane.

30. For Abbott, Dey and Roxane, I calculated the average prices paid for indirect sales to pharmacies.

31. For Abbott, the pharmacy prices were about 20% higher than the overall average selling prices, and I also excluded customer rebates from my average price calculation which had the effect of raising the average price approximately 6% more.

32. For Dey, the pharmacy prices were about 2 to 3% higher than the overall average selling prices.

10

33.     For Roxane, the pharmacy prices were about 5 to 9% higher than the overall average selling prices.

34.     Attachment A is a chart identifying the average price and the 95th percentile price I calculated for the 44 Abbott NDCs based upon the *Indirect Data* for the pharmacy classes of trade.

35.     Attachment B is a chart identifying the average price and the 95th percentile price I calculated for the Dey NDCs based upon the Indirect Data for the pharmacy classes of trade.

36.     Attachment C is a chart identifying the average price and the 95th percentile price I calculated for the Roxane NDCs based upon the Indirect Data for the pharmacy classes of trade.

**B. Medicaid Damages Methodology**

37.     My expert reports lay out the manner in which I examined the data collected directly from the 10, 14 and 16 states which I will summarize briefly.

38.     My approach where I analyzed the data collected directly from a state was similar across states.  First, I examined the data itself to confirm that it was reliable and within the scope of the case.  For example, the data produced by Illinois included dates of service through 2007.  Thus, for the Abbott case, all Illinois data beyond 2001 was disregarded for my calculation of damages.  I performed this type of review for all of the 10, 14 and 16 states for each defendants' NDCs and made all necessary adjustments.

39.     The next step I took for each state was to examine its adjudication formula.  The process for Illinois is again instructive.  Consistent with the method used by many other states when adjudicating Medicaid claims, Illinois Medicaid took the sum of the estimated ingredient cost and a dispensing fee, which for generic products ranged between $3.58 and $15.00 from 1991 through June of 1998.  More specifically, the dispensing fee was set equal to ten percent of the ingredient cost, though if the calculated amount fell below $3.58 or above $15.00 then the

11

dispensing fee was set to $3.58 and $15.00, respectively. The minimum and maximum dispensing fees increased to $3.69 and $15.45, respectively, in July of 1998, and then again to $3.75 and $15.70 in July of 1999. In both instances, ten percent of the ingredient cost would be paid if the resulting amount fell within the reported range. On December 15, 2000, the dispensing fee was set to a flat rate of $4.17 that was unrelated to the ingredient cost, with this amount increasing to $5.10 on July 1, 2001, where it stayed until the end of 2001. The sum of the estimated ingredient cost and the dispensing fee is compared with the provider charged amount, with the Illinois Medicaid program paying the lesser of the two.

40.    In Illinois as in most other states, the scaled AWP was sometimes compared with an FUL (federal upper limit) or SMAC (state maximum allowable cost). This would typically occur if a product had an FUL and/or SMAC in effect and either one of them was lower than the scaled AWP. In these cases the algorithm was the same, except that the scaled AWP would be replaced by the FUL or the SMAC.

41.    I then compared the adjudication formula to the actual claims data. For example, I often found claims that had a paid amount that was equal to zero. I also checked the claims to see if I could replicate the amount paid. Thus, I would identify claims for which I was unable to replicate the amount paid or where there appeared to be some data error such as an implausibly large dispensing fee. I excluded all such claims from my analysis sample. I did this review for each state.

42.    I then linked each claim to the NDC-quarter-specific average prices described in the preceding sections to determine how the use of alternative values for the AWP would have affected state Medicaid spending. In other words, I took the average prices I had calculated from the defendants' transaction data, scaled it up by 25%, and then substituted that price in place of the AWPs that were actually published in the First Databank data and used by the state in the

12

adjudication of the claims. Any necessary WACs and Direct Prices were replaced in a similar fashion.

### 1. Application of Lower of Methodology and Interaction with MAC/SMAC

43.     In some cases, I was aware that the states may have added another price parameter to their reimbursement algorithms in addition to AWP, WAC, Direct Price or U&C. For example, some states added a ceiling price known as a Maximum Allowable Cost ("MAC") or a Federal Upper Limit ("FUL") for one or more Complaint products at some time during the period of interest. In these cases, the published prices, AWP, WAC, or Direct Price, continue to be used in the reimbursement algorithm, but in almost all cases they were also compared to the MAC or FUL to see which is lower.

44.     In the application of the adjudication methodologies from the various states, my analysis only produced a damages figure in circumstances where the reporting by defendants of prices based on the averages I calculated would have caused the state to reimburse the claim in a lower amount. My methodology effectively "re-adjudicated" each of the claims in the same manner as would have been done by the state in the first place had these more accurate average prices been reported by defendants and then utilized by the states.

45.     With rare exceptions, each state's adjudication methodology employed a "lower of" logic such that a defendants' price that was higher than any alternative price would cause the lowest of the alternative prices (i.e., SMAC or U&C) to be selected. In contrast, a price from defendants that was lower than any alternative price would cause defendants' price to be selected. Thus, if defendants' AWP, when scaled in accordance with the applicable state methodology (i.e. AWP - 12%) resulted in a lower amount than any potential alternative price, it would be used as the basis of payment, and the alternative prices would not be used. Concomitantly, if defendants' AWP, when scaled in accordance with the applicable state methodology (i.e. AWP - 12%)

13

resulted in a higher amount than any potential alternative price, the alternative price would be used as the basis of payment, and the defendants' scaled AWP, although used as part of the logarithm to decide which price would be used as the basis of payment, would not directly be used as the basis of payment.

46.    A rare exception to the "lower of" approach is found in New York which did not have a MAC program, but did use FULs without comparing them to see if they were lower than other potential alternative prices.  There were no FULs for Abbott drugs so the New York exception did not affect my analysis in the Abbott case.  However, in the parallel analysis which I performed in connection with the Dey and Roxane cases, where some of the products did have FULs, I accounted for the New York exception by simply not calculating damages for New York in any case where an FUL was in effect.

### 2. Outcome for the 10, 14 or 16 States

47.    In general, I found that defendants' actual published prices changed the outcome of the adjudication methodology in a very large percentage of the claims for each of the states.  For example, in the case of Illinois, I found that Abbott's actual published prices changed the outcome of the adjudication methodology in 97.6% of the claims.  Although the higher amount paid by Illinois may have in some cases been limited by a MAC or the actual charge of the provider to an amount less than Abbott's scaled AWP, the reason that the MAC or the actual charge would have been used was the inclusion of Abbott's actual published price in the adjudication methodology.  If Abbott's actual published price had not been relied upon by the state in the adjudication methodology, but instead a price based on the actual average prices that I calculated had been relied upon, the state's reimbursement would have been based on the actual average prices and not on the MAC or actual charge.

14

48.     I repeated the analysis described above for the 10, 14 and 16 states. Again, the United States directed me to drop Ohio and I used a different approach for Indiana (with respect to my Abbott analysis) because my review of the data collected directly from the state showed it to be unreliable.

### C. Medicare Damages Methodology

49.     The manner in which I calculated damages for Medicare is straightforward. If, for example, defendants had one product in a particular carrier's array for one of the HCPCS codes listed in the Complaint, then that price would be substituted in the array to see if the median price from that array would change.

50.     For example, for the latter half of 1995, Palmetto used an array for this J3370 code that included five products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-6534-01 | **10.88** | 5.08 |
| 00074-4332-01 | 30.23 | 4.46 |
| 00641-2778-43 | 18.81 | 18.81 |
| 00205-3154-88 | 5.76 | **5.76** |
| 00364-2472-33 | 7.00 | 7.00 |

51.     Prices in this table represent the per-package price. Given that there are five prices, the median price (in bold) is the one that is less than two prices and greater than two prices - $10.88, which is the price for the Abbott 74653401 product. This NDC and the one other Abbott NDC (74433201) are both in the Complaint.

15

52.     Now suppose that one were to replace the Abbott products' AWPs with 125 percent of the products' average pharmacy indirect price in that same time period, which is listed in the next column of the same table above. In this case, the median price would fall substantially, from $10.88 to $5.76.

53.     I repeated this exercise for all of the arrays located from the carriers, and this allowed me to estimate how Medicare spending would have changed if alternative prices had been used for defendants' products' AWPs. More specifically, if using 125 percent of defendant's average transaction prices as the AWP for defendants' NDCs would reduce the median, I replaced the per-package price used by the carriers in adjudicating the claim with the revised median. Thus, in this particular example, Palmetto Medicare DME claims with a per-unit cost of $10.88 during the time period this array is in effect would be replaced by $5.76. And similar to the approach used by the Medicaid program, the calculated amount would be compared with the provider charged amount, with the carrier paying the lesser of the two.

54.     I repeated the foregoing process for each of the carriers for each of the defendants. It is important to emphasize that the dollar figure for the damages does not account for the effect on the co-payments of Medicare recipients.

55.     In the Abbott analysis, with respect to the Part B carriers, I performed this analysis for Connecticut General, Wisconsin Physician Services, certain other Region 5 carriers that shared the arrays with Wisconsin Physician Services, Kentucky Adminastar, West Virginia Nationwide, other Metra Health and Florida Blue Shield. (During the latter several years of the study period, seven other carriers operating in CMS Region 5 – Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin – used the allowed amounts from the WPS arrays described above.

## V. EXTRAPOLATION

56.     Extrapolation is simply described as a way to estimate by projecting known data. Extrapolation is a useful tool used by economists even if complete and perfect data exists. This is the case because use of all data is often time consuming or prohibitive and unnecessary. There are acceptable methods of extrapolation and I have used them in this case.

57.     An economist is normally faced with the challenge of applying quantitative or statistical methods to data and data sets that are often incomplete, non-comprehensive, or imperfect. In fact, the need for an economist is often driven by the lack of sufficient quantitative information. Economists have and use tools in practical applications and in academic research to adjust for incomplete or imperfect data. Those tools include but are not limited to econometrics, statistical sampling, and extrapolation. Such tools are aided by econometric, statistical, and mathematical software. These same tools used in academic research can be used in calculating damages in cases in litigation. I have used these same tools in my academic research as well as the average wholesale price litigation in which I have been involved since approximately March 2006.

58.     It has been brought to my attention that defendants have filed various motions claiming that my selective use of data sets undermines or invalidates the work I did on arriving at a reasonable estimation of damages in this case. For example, Abbott states, "Even as to the ten state Medicaid programs that produced some detailed claims data, there are significant time periods for those states where claims data is not available....The Government cannot use an expert opinion to paper over this glaring deficiency in its case. The Government asked Dr. Duggan to extrapolate data from ten states.... [ ] to cover the massive gaps in its data, both within the group of states for which some data was used, and across states [] for which no data was used." Abbott MSJ at 17. This is incorrect and perhaps misleading. As explained above, I had various data sets for use. The fact that I did not have state-produced claims data for some states

17

does not mean I did not have state claims data. As I explained above, CMS had state claims data collected from earlier state productions in a form different than the individual claims data provided by the states during the litigation. In fact, if states were unable or unwilling to produce in litigation their individual claims data, I still could have performed a reasonable estimate of damages in this case from the state data collected by CMS. Therefore, it is not correct to state or suggest that I did not have state claims data for all states.

59.    I also understand that defendants have claimed that my use of extrapolation in these AWP cases was flawed. Abbott MSJ at 16-19, Roxane MSJ at 5-8. Specifically, I understand that defendants have said that the extrapolation is "inconsistent with basic statistical standards, they are subject to clear selection bias, and they are demonstrably unreliable." These arguments are incorrect and I can show that they are incorrect. Some of this I explained at my depositions in the AWP litigation; however, since the questions at the depositions were controlled by defendants, I did not have the opportunity to fully explain my methods. I try to do that in this declaration.

### A. Medicaid Extrapolation

60.    I can state to a reasonable degree of economic certainty that my use of extrapolation in these cases arrived at a reasonable approximation of the damages, or difference between (1) what the federal government reimbursed for certain pharmaceutical products dispensed to Medicaid recipients during the relevant period, and (2) what the federal government would have reimbursed for the same drugs during the same time period if prices reflective of the actual prices at which defendants were transacting business had been reported by defendants.

61.    I used claims data collected directly from state Medicaid agencies for the 10, 14 or 16 states which account for approximately two-thirds of all Medicaid claims for the Complaint NDCs of the defendants.

62.     As I described, for each of these 10, 14 or 16 states, the states did not directly produce to the United States in connection with the lawsuit all of the claims data for all of the drug products for all of the quarters at issue. In those instances I used claims data that the states provided to CMS in connection with the normal operations of the Medicaid program, some of which was claims-level data and some of which was the type of aggregated data that I described above. Aggregated data describes high-level data that is composed of a multitude or combination of other more individual data. The use of such aggregated data does not diminish the reliability or validity of the damages estimate I calculated. As an economist, I am trained in methods of using aggregated data when individual data is unavailable or prohibitive and unnecessary, all of which was true in this litigation.

63.     For the remainder of the states, I used the information regarding the 10, 14 or 16 states as the basis for estimating the additional damages. The extrapolation from the 10, 14 or 16 states to the other states was reasonable for at least the following reasons. First, I extrapolated only to those periods for which I had claims data that I found to be reliable. Second, I used data for more than one thousand combinations of NDC quarters when estimating the damages associated with the other states.

64.     Third, for 10, 14 or 16 states, I ran my analysis on a claim by claim basis. My extrapolations were based on my detailed analysis of this large proportion of the overall claims. As I stated, the 10, 14 or 16 states accounted for 63% to 68% of the total dollars paid for the defendants' Complaint NDCs and my methodology allowed me to re-adjudicate each of those millions of claims. As an economist, I found this method to be more appropriate than other methods I could have used. This was a better method than a traditional random sample, which would have been a review of a smaller fraction of those claims. This was also a better method than sampling each NDC for each state for each year which could have required thousands of

separate samples with numerous sample claims in each sample; such an approach would have been near impossible and fewer claims would have been reviewed.

65.     Fourth, in many circumstances I had detailed state data and other aggregated data described above for the same time periods. When I compared data obtained directly from the states to this other data, I found the aggregated data or CMS data was reliable because there were few significant variations between the two because the total dollars and units generally matched, and all of the variations were accounted for.

66.     Fifth, I examined all of the data which I relied upon to assess its quality. For example, I reviewed every claim in the data collected from the 10, 14 or 16 states to confirm that I could replicate the amount paid. This was a detailed review. For example, my examination of the data provided by Indiana in connection with my Abbott analysis revealed it to be unreliable, and I therefore did not use it in my analysis.

67.     Sixth, I had state claims data from over 30 states which covered at least part of the relevant time period, and I performed a general review of this data to confirm that it was consistent with my other findings. I chose not to use all of the state data in my possession to perform detailed claim by claim calculations because it was prohibitive or duplicative and unnecessary.

68.     Seventh, by focusing on the 10, 14 or 16 states, I was able to perform a higher quality review of the state claims data which served as the basis for the extrapolation. The state pharmacy reimbursement methodologies for the 10, 14 or 16 states were very similar to the state pharmacy reimbursement methodologies for the other states.

69.     Eighth, the average amounts paid for each NDC by the 10, 14 or 16 states were very similar across the 10, 14 or 16 states. The average amounts paid for each NDC by the 10, 14 or 16 states were also very similar to the average amounts paid for each NDC by the other states.

70.     Ninth, I eliminated a substantial number of claims which did not precisely match the expected reimbursement and the damages on those claims were assumed to be zero even though it is likely that there were some damages associated with those claims. Finally, I made numerous downward adjustments in the scope and magnitude of my extrapolations that would much more than offset the magnitude of any differences between the 10, 14 or 16 states and the other states.

### 1. The Nature of the Medicaid Extrapolations

71.     It is my opinion that a reliable estimate of the total damages to the United States can be based on the data collected directly from the 10, 14 or 16 states which represent almost two-thirds of all the claims at issue, together with the data collected from the states by CMS for the other states.

72.     As I calculated the damages in this case, I performed many different tests to confirm that the data was suitable for the purposes at hand. Thus, there were numerous checks done to confirm that each of the data sets was reliable and could be used in the manner that I used them. The numerous checks that I performed on the data are described throughout the following analysis and in my expert reports.

73.     The nature of the extrapolations which I performed in this case have been fundamentally misconstrued by the defendants and their experts who criticize my extrapolations. They posit that extrapolations can only be done in connection with routine random samples, or routine disproportionate random stratified samples of the type typically done when examining the claims of a single provider over the course of a single year. Samples are used because it is normally impossible to examine an entire population. Thus, researchers select a sample of the population, and use the information learned during the examination of the sample as a basis for predicting the nature of the entire population. Of course, it is important that the sample be representative of

21

the entire population, and not be biased in any systematic fashion. The typical way to select a representative, non-biased sample is through randomization. However, a sample can still be representative and non-biased even if not selected through a random process.

74.     As I explain in a rebuttal report, the 10, 14 or 16 states are not a random sample of the entire universe of 50 states. I chose to focus on the largest states to obtain the maximum amount of precision. Put simply, it is more important to the total value of the damages to be as accurate as possible for the state of Florida, than it is in the state of Vermont.

75.     In addition, as is shown throughout my analysis, the 10, 14 or 16 states are fairly representative of the other states. My extrapolation methodology was strengthened by specific data from the states that were the subject of the calculations to ensure that damages nationwide were understated, rather than overstated.

76.     One quite simple, but significant component of the extrapolation that I have done (as is true for any extrapolation) is that it is based on averages. Thus, assuming you have done the types of checks that I have done, the variables that would tend to raise the damages figures are balanced by the variables that would tend to lower the damages figures. On average, of course, the number is reliable. To be conservative, I explicitly created and applied variables to limit or counter the effect of variable data that might otherwise raise damages. A criticism based solely upon cherry picking examples of the variables that would tend to raise the damages figures without factoring in the variables that would tend to lower the damages figures is not reliable. Rather, such biased criticism suffers from the exact same type of flaw that the defense experts allege to be the supposed problem with my analysis. A key difference is that my analysis considered both sides of the equation, whereas the defendant's experts appear to only or primarily consider the side of the equation that benefits defendants. There are numerous examples throughout my analysis of adjustments that reduce the amount of the damages that I

22

have calculated, and those adjustments more than offset any of the alleged shortcomings leveled by the defendants. In addition, defense experts' criticisms are leveled without the benefit of any actual quantification of the supposed impact, so they are unhelpful.

### a. Intra-State Extrapolation

77.     In certain periods for each of these 10, 14 or 16 states, I did not have complete state claims data collected directly from the states. However, that data was generally very complete.

78.     In my Abbott analysis, the data from the 10 states accounted for approximately 86.8% of the claims. Thus, I used the SMRF/MAX/MSIS for 8.7 percent of the claims data and aggregate SDUD data for an additional 4.5 percent.

79.     In my Dey analysis, the data from the 14 states accounted for approximately 82.1 percent of the claims. Thus, I used the SMRF/MAX/MSIS for 8.9 percent of the claims data and aggregate SDUD data for an additional 9.0 percent.

80.     In my Roxane analysis, the data from the 16 states accounted for approximately 93.5 percent of the claims. Thus, I used the SMRF/MAX/MSIS for 4.3 percent of the claims data and aggregate SDUD data for an additional 2.3 percent.

81.     The advantage of using each state's own claims data when extrapolating to those NDC-quarters when I do not have state claims data is that these NDC-quarters will typically share the same adjudication methodology and provider characteristics as in the NDC-quarters for which I do have state claims data.

82.     As a check on my approach on this issue, for each of the five largest states for which I performed within-state extrapolations in the Abbott case (Florida, California, New Jersey, New York, and Kentucky) and for each of the states used in the Dey and Roxane cases, I assumed for the sake of the calculation that the state Medicaid claims data started one year later than they actually did. I then utilized the SMRF/MAX/MSIS claims data if it was available and otherwise

23

used the SDUD data to estimate the total value of the damages during these one-year periods. My findings indicate that the total value of the damages is actually substantially higher when I use the claims data collected directly from the states compared to when I extrapolated using the SDUD and SMRF/MAX/MSIS claims data. The fact that I did not have complete state Medicaid claims data collected directly from the states for the entire time period considered for these states reduced rather than increased the total value of the damages. My extrapolation therefore inured to the benefit of the defendant.

### b. Inter-State Extrapolation

83.     In connection with my extrapolation from the 10, 14 or 16 states to the other states, I also performed various additional checks. As mentioned above, these states account for a disproportionately large share of all Medicaid claims for Complaint products, as they include the large states such as New York and California while excluding states with relatively few claims such as Wyoming and Vermont. Additionally, my coverage with state claims data is most complete during those years with the highest number of Medicaid claims and Medicaid expenditures.

84.     In considering the validity of the extrapolation, it is worth noting that the two groups of states share many common features. All of the states reimburse for the same defendants' Complaint drugs and all of the states are subject to the same federal regulations. All of the states use published prices when adjudicating claims and the vast majority of the states use the AWP. The fraction of states in the two groups that use the WAC is similar and the scaling factors for these prices are on average similar between the two groups. With rare exceptions, all of the states in the two groups have a "lower of" methodology.

85.     Additionally, in general, the ratio of the damages to total Medicaid spending across the 10, 14 or 16 states – despite the different adjudication methodologies – is stable. Thus, the

24

fraction of claims with damages greater than zero and the ratio of damages to the total amount paid is quite similar across states, whether the state uses the AWP, the WAC, or the DP. For the 10 Abbott states, for example, the percentage of claims with damages greater than zero ranged from 90% to 98.8%.

86.    It is also important to remember that often in applied microeconomic research there is *no* data for those entities to which the extrapolation is being performed. However, in this setting I am utilizing multiple sources of detailed information regarding Medicaid claims for the Complaint products for those states to which I am extrapolating. Additionally, I do not extrapolate to any state or time period in which I do not have CMS claims data or SDUD data.

87.    Furthermore, it is indeed common practice in applied microeconomic research to use data for a subset of the entire population when estimating the effect for the full population. For example, the seminal research on the effect of the unemployment insurance (UI) program, including work by Bruce Meyer that was published in *Econometrica* in 1990, utilized administrative UI data for just 8 states to estimate the effect of the UI program on trends in the national labor market. Additionally, research by Drs. Adams, Gruber, and Newhouse published in the *Journal of Human Resources* in 1997 examined the effect of physician fee changes in Tennessee while using Georgia as a control to shed light on the effect of Medicaid physician reimbursement on the treatment of Medicaid recipients. Additionally, it is common practice in applied microeconomic research to use data for a sample that may not be fully representative to estimate results for the U.S. as a whole. For example, Gruber and Rodriguez in their 2007 *Journal of Health Economics* study have data for a sample of just one percent of all physicians, and the characteristics of these physicians differ substantially from the average physician in the U.S. Despite this, they adjust their estimates accordingly to arrive at estimates for the provision of uncompensated care by all physicians in the U.S.

25

88. When considering the algorithm that I use in my analysis, it is important to emphasize that I used data for up to 10, 14 or 16 states which resulted in more than one thousand NDC-quarter combinations when I estimated the value of the difference for these same NDC-quarter combinations in each of the remaining states. My examination of the adjudication algorithms used by these states, their reimbursement per claim, and so forth indicated that they were indeed very similar to the other states.

89. The algorithm I used was very straightforward. For each NDC-quarter in which I had state claims data for the 10, 14, or 16 states, I first calculated the average fraction of claims with a difference greater than zero. I also calculated the average ratio of the difference to the amount of Medicaid spending on these claims. In calculating these averages, I weighted each of the 10, 14 or 16 states that had data for that NDC-quarter equally, while states with no claims data for that NDC-quarter have a weight of zero. These averages then were applied to the other states.

90. I began my analysis of each of the other state's SMRF/MAX/MSIS data by applying inclusion criteria analogous to those described above for the 10, 14 or 16 preceding states. For example, I dropped claims with a paid amount of zero or with a strictly positive third party payment amount. I then aggregated the number of claims and total Medicaid spending for each state by NDC-quarter. I followed a similar inclusion algorithm for the SDUD data. I then merged this claims data for each of the remaining states to the claims ratio and difference ratio values for each NDC-quarter constructed using the 10, 14 or 16 states' Medicaid claims data described above. I then multiplied the number of claims in each state-NDC-quarter by the corresponding claims ratio value to estimate the number of claims with a difference greater than zero. Similarly, I multiplied the Medicaid spending in each state-NDC-quarter by the corresponding difference ratio value to determine the amount of difference in Medicaid spending on these claims. It is true that in some NDC-quarters that I have data for fewer than the 10, 14 or

16 states. Dr. Williams, for example, points out that in 2007 quarter 4 for Roxane NDC 0054-4297-31, I utilize state claims data from two states to extrapolate to 33 other state Medicaid programs. However, Dr. Williams has left out some important information. First, he failed to explain that only 18 of the 33 states show any utilization for that NDC during that quarter and that total utilization of all 20 states together was only $10,177. Also, he failed to note that the total utilization for that NDC for the two states was a total of $4,465 while the total utilization for the other 18 states combined was $5,712. Thus, the basis for the extrapolation represented almost 45% of the total utilization.

### B. Medicare Extrapolation

91.     I can state to a reasonable degree of economic certainty that my use of extrapolation in these cases arrived at a reasonable approximation of the Medicare damages, or difference, between (1) what the federal government reimbursed for certain pharmaceutical products dispensed to Medicare recipients during the relevant period, and (2) what the federal government would have reimbursed for the same drugs during the same time period if prices reflective of the actual prices at which defendants were transacting business had been reported by defendants.

92.     For all three defendants, my analysis of the Medicare claims based upon the carriers and carrier periods with arrays was reasonable for at least the following reasons. First, all carriers were hired by CMS to perform the same job, received the same instructions from CMS, and used the same price source – Red Book. Second, for those arrays I did use in my analysis, at least one of the defendants' products was included in almost every case.

93.     Third, I eliminated a substantial number of claims which did not precisely match the expected reimbursement, and I assumed the damages on those claims were zero even though it is likely that there were some damages associated with them. An assumption that there were no damages for the other carriers is much more likely to be wrong by a larger margin than these

27

results. Finally, I understand defendants theorize that carriers used different approaches to select a median. I have not seen any evidence from defense or otherwise that carriers used different approaches in cases where I had arrays than in cases where I did not have arrays. Rather, I believe I reasonably concluded the method was the same.

94.    For my Abbott analysis, the extrapolation based upon the Part B carriers and carrier periods with arrays was reasonable for at least the following reasons. First, for the time periods where I did not have arrays, the percentage of damages I calculated was substantially lower than where I did have the arrays. Second, in claims during time periods for which I did not have arrays, the allowed amount is equal to the published price of an Abbott product over 1.3 million times, thereby demonstrating that an Abbott product had to have been in the array. Second, I did not calculate damages regarding 7 of the 12 Complaint J-codes, which account for more than 11 percent of Medicare spending on Complaint J-codes. For the DME claims, I restricted attention to just the J3370 code, which reduced the difference I calculated below what it would have been if I considered the other J-codes (especially J7051) as well.

**1. DME Claims Needed No Extrapolation**

95.    For the DME carrier damages, I had array information that applied to more than 90 percent of the claims during the time in which almost all of the claims were paid. As I explained in my expert reports, I dropped those claims for which I was unable to replicate the allowed amount from the claim from the array documents. Thus, I performed no extrapolation of damages in connection with the DME claims.

96.    For Abbott , it is also important to note that the total damages I calculated was conservative because I dropped DME claims for several of the J-codes.

28

## 2. Part B Claims for Abbott Analysis

97.      To calculate the damages in circumstances where the arrays were not available, I used my results from the carriers for which I had array information to conduct analyses analogous to those in the preceding sections for the remaining carriers.  Before doing this, I first considered the Medicare Part B claims for all carriers to determine whether the two groups were comparable.  An examination of the data suggests that the amount paid per claim for each J-code, the pattern of spending over time, and the proportion of claims accounted for by each of the five J-codes is quite similar.

98.      I also determined the frequency with which each of the two groups had an Abbott NDC's AWP (or 95 percent of its AWP) as the allowed amount per unit.  I did this to investigate whether other carriers used Abbott NDC's as frequently in their arrays during the time period of interest.  For example, I found that 24.41 percent of Medicare claims administered by Connecticut General and the other carriers described above had an Abbott AWP as the allowed amount during the 1995Q3 (the first quarter for which I have arrays for multiple products) to 2001Q4 period.  The corresponding fraction for all other carriers is 18.44 percent.  I adjusted my estimates for the remaining carriers to account for the fact that the Medicare claims data indicated they used Abbott NDCs somewhat less frequently than CIGNA and the other carriers above.

99.      To estimate the number of claims for these remaining carriers with a value of the difference that is greater than zero and the total value of the difference, I used an algorithm analogous to others I used and described in detail in my expert reports.  Specifically, for the total value of the difference, I multiplied NDC-specific total Medicare spending by these carriers by the ratio of the difference to the total amount of Medicare spending for the carriers for this same

NDC. I then deflated this value to account for the fact that these other carriers less frequently had Abbott AWPs as their allowed amounts.

100. I considered the 1993Q1 to 2001Q4 period for these remaining carriers (thus ignoring 1991 and 1992), and calculated the number of provider payments with at least one claim with a value of difference that exceeded zero as described for the other Medicare carriers above.

101. The total value of the difference for the remaining carriers is $15.708 million, which represents 16.7 percent of the total amount spent by these carriers. This is lower than the corresponding ratio of 22.9 percent for the carriers for which I had arrays because I scaled down the difference as described above.

102. As above, the value of the difference does not account for the effect on Medicare recipients' co-payments amounts which would amount to 25% of the total difference. For example, if the total difference was $4,000,000, the impact on Medicare recipients' would be $1,000,000. Additionally, I have excluded 6 of the 11 J-codes from consideration, with these six accounting for approximately 4.5 million carrier claims and 11.0 percent of spending for the remaining carriers. This latter adjustment served to reduce the total value of the difference below what it would be if I considered all eleven J-codes in the Complaint.

103. As indicated in Table 35 of my June 19, 2008 report, I have array information for 21 of the 91 carriers listed. Because these carriers tended to be significantly larger than the average, they accounted for a disproportionate share (40 percent) of Medicare carrier claims for the five J-codes that I considered. Thus while this fraction is somewhat smaller than the corresponding one for the Medicaid analyses described above (64 percent), it is still much greater than economists frequently have for analyses of government programs. For example, the 12 states for which Meyer had data in the *Econometrica* paper described above accounted for just 27 percent of the United States population.

104.    Of the 6.172 million claims for the 21 carriers for which I did have some array

information, I had array information from carrier documents for 3.590 million (58.2 percent) of

them.  As I described in my expert reports, I extrapolated back in time for additional claims.

Before doing this, however, I examined the claims data to check that there was some evidence

that the carrier was using Abbott products in its arrays by checking whether an Abbott product's

AWP is the allowed amount in some cases.  When there was little evidence to suggest that

Abbott products appeared in the AWP, I dropped the claims from consideration, which led me to

drop 590,000 (9.6 percent) of the claims for these 21 carriers.

105.    After dropping these claims, I applied an extrapolation methodology for the Medicare

carrier claims that was analogous to the one described above for the 10 Medicaid states.  As was

true above for Medicaid, my methodology for this was quite conservative, both because I

dropped claims as described above and because the ratio of the difference to Medicare spending

for these 1.992 million claims was 40 percent lower than the corresponding ratio for those

carrier-quarters when I did have array information (28.5 versus 17.2 percent).  Because of this,

76 percent of the $15.580 million difference for these carriers resulted from those carrier-quarter

combinations in which I had arrays.

106.    As for the remaining 70 carriers, which accounted for 60 percent of Medicare carrier

claims for the five J-codes that I considered, I applied an extrapolation methodology that was

similar to the across-state one that I used for the Medicaid analyses.  As I described in my report,

my examination of the Medicare claims data for the two groups of carriers (the 21 and the 70)

indicated that the amount paid per claim for each J-code, the pattern of spending over time, and

the proportion of claims accounted for by each of the five J-codes was similar.  However, my

analyses also indicated that the frequency with which the seventy carriers used Abbott products

in their arrays appeared to be lower.  More specifically, I found that 24.4 percent of the claims

administered by the 21 carriers had an Abbott AWP as the allowed amount versus just 18.4 percent of the claims paid by the remaining 70 carriers. It is important to emphasize that for more than 1.3 million claims for these 70 carriers, I was certain that an Abbott product was included in the array because its AWP was the allowed amount and no other firm's product typically had that same AWP at the same time.

107.    I therefore adjusted my estimates for these 70 carriers downward to account for this factor. The methodology that I employed is similar to the one that I and other economists use when extrapolating the results from a sample that may not be representative to the full population. For example, Gruber and Rodriguez in their 2007 *Journal of Health Economics* study have data for a sample of just one percent of all physicians, and the characteristics of these physicians differ substantially from the average physician in the United States. Despite this, they adjust their estimates accordingly to arrive at estimates for the provision of uncompensated care by all physicians in the United States.

108.    As noted previously in paragraph 101, using an appropriate and transparent methodology to adjust my difference results for the 21 carriers to the remaining 70, I found that the ratio of the difference to spending for the remaining 70 was substantially lower for this latter group. More specifically, the ratio of the difference to spending for these 70 carriers was 16.7 percent versus 22.9 percent for the initial 21 carriers.

## VI. ABBOTT'S HOME INFUSION

109.    Attachment D contains the tables attached to my Supplemental Expert Report in the Abbott case, which provided a summary of data from Abbott's CHIP (Client Home Infusion Program) system. From 1990 to 2000, Abbott ran its own infusion pharmacy, where it supplied pharmaceutical products directly to patients. Abbott billed third party payers including Medicaid and Medicare for these products using the CHIP system. Abbott also used the CHIP system to

bill third party payers, including Medicare and Medicaid, on behalf of other health care providers, with this service continuing through at least the fourth quarter of 2001. All of these tables are based on data that was supplied by Abbott.

110.    Attachment D (expert report, Table A) provides an overview of all sales recorded in the CHIP system. The number of line items is considerably larger than the number of claims because each claim could include many products. The first several columns summarize transactions with both Abbott clients and other providers' clients, while the latter several columns consider only clients of Abbott's pharmacy clients.

111.    As the first several columns show, the total number of claims, the number of line items, the total amount billed, and the total amount paid steadily increased until late 1998, and then declined after that. The total amount paid during the period was $661.897 million, with $158.336 million (24 percent of the total) of this accounted for by customers of Abbott's pharmacy. The share of sales accounted for by Abbott's pharmacy, which exceeded 40 percent in every quarter through 1993Q2, declined steadily during the last several years.

112.    Attachment D (expert report Tables B and C) repeats this exercise while restricting attention only to Medicaid and Medicare claims, respectively, that have at least one line item for one of the products listed in the United States' Complaint. Payments from Medicaid were equal to $23.103 million for all clients and to $5.342 million for customers of Abbott's pharmacy. Payments from Medicare were equal to $22.653 million, with Abbott pharmacy clients accounting for $5.675 million of that amount. Attachment D (expert report Tables D and E) provides similar information while restricting attention to line items for those pharmaceutical products included in the United States' Complaint against Abbott. As shown in the first of these two tables, the total amount paid by Medicaid across all customers was $419,215. Clients of Abbott's pharmacy accounted for $110,860 in that spending and for 6,160 line items for

Complaint products. The total amount paid by Medicare across all customers was $2.497 million. Clients of Abbott's pharmacy accounted for $269,639 of that spending and for 8,484 line items for Complaint products.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _23rd_ day of July, 2009.

Mark G. Duggan, Ph.D.

34