## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| | ) | (Subcategory Docket: 06-11337) |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Judge Patti B. Saris |
| *Inc. v. Abbott Laboratories, Inc.*, | ) | |
| No. 07-CV-11618-PBS | ) | Magistrate Judge Marianne B. Bowler |

## ABBOTT LABORATORIES INC.'S MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION
## UNDER THE FALSE CLAIMS ACT'S PUBLIC DISCLOSURE BAR

Dated:  August 21, 2009

James R. Daly
Eric P. Berlin
Tara A. Fumerton
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

*Counsel for Defendant Abbott Laboratories Inc.*

CHI-1708703v5

# TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 8

I.   VEN-A-CARE'S ALLEGATIONS ARE BASED ON PUBLIC DISCLOSURES .......... 8

II.  VEN-A-CARE IS NOT AN ORIGINAL SOURCE OF THE ALLEGATIONS IN
     THE COMPLAINT ...................................................................................................... 14

     A.   Ven-A-Care, As A Corporation, Cannot Be An Original Source ...................... 14

     B.   Even If It Could Be Considered An "Individual," Ven-A-Care Was Not
          An Original Source .......................................................................................... 16

          1.   Ven-A-Care's Claimed Knowledge Of Abbott's Alleged Inflation
               Of AWP And WAC Is Based On Second-Hand Research ..................... 18

          2.   Ven-A-Care Has No Direct And Independent Knowledge That
               Abbott Marketed The Spread For The Ery Drugs ................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Dingle v. Bioport Corp.*,
   388 F.3d 209 (6th Cir. 2004) ..................................................................................9

*In re Nat. Gas Royalties Qui Tam*,
   562 F.3d 1032 (10th Cir. 2009) ....................................................................... passim

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   491 F. Supp. 2d 20 (D. Mass. 2007.) ...................................................................2, 4

*In re Pharm. Indus. AWP Litig.*,
   538 F. Supp. 2d 367 (D. Mass. 2008) .............................................................. passim

*In re Spookyworld, Inc.*,
   346 F.3d 1 (1st Cir. 2003) ......................................................................................15

*Lee v. ABC Carpet & Home*,
   236 F.R.D. 193 (S.D.N.Y. 2006) .............................................................................15

*Seal 1 v. Seal A*,
   255 F.3d 1154 (9th Cir. 2001) ................................................................................10

*United States of America ex. rel. Made In The USA Foundation v. Billington*,
   985 F.Supp. 604 (D. Md. 1997) ..............................................................................19

*United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc.*,
   186 F. Supp. 2d 458 (S.D.N.Y year.) .....................................................................10

*United States ex rel. Findley v. FPC-Boron Employees' Club*,
   105 F.3d 675 (D.C. Cir. 1997) ...............................................................................17

*United States ex. rel. Fine v. Advanced Sciences*,
   99 F.3d 1000 (10th Cir. 1996) ................................................................................17

*United States ex rel. Gear v. Emergency Med. Assocs. Of Ill., Inc.*,
   436 F.3d 726 (7th Cir. 2006) ....................................................................................9

*United States ex. rel. Harsman v. Alcan Elec. and Eng'g*,
   197 F.3d 1014 (9th Cir. 1999) ...........................................................................11, 19

*United States ex. rel. Hockett v. Columbia/HCA Healthcare Corp.*,
   498 F.Supp.2d 25 (D.D.C. 2007) ............................................................................19

# TABLE OF AUTHORITIES

(continued)

Page

*United States ex rel. O'Keeffe v. Sverdup Corp.*,
131 F. Supp. 2d. 87 (D. Mass. 2001) ...........................................................................8,11, 16, 18

*United States ex rel. Poteet v. Lenke*,
604 F. Supp. 2d 313 (D. Mass. 2009) ....................................................................................8, 10

*United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*,
384 F.3d 168 (5th Cir. 2004) .................................................................................................9, 13

*United States ex rel. Rost v. Pfizer, Inc.*,
507 F.3d 720 (1st Cir. 2007).................................................................................................8, 19

*United States ex rel. Settlemire v. District of Columbia*,
198 F.3d 913 (D.C. Cir. 1999) ...................................................................................................10

*United States v. Catholic Healthcare W.*,
445 F.3d 1147 (9th Cir. 2006) .....................................................................................................9

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000)....................................................................................................................15

## STATUTES

1 U.S.C. § 1 ...................................................................................................................................15

31 U.S.C. § 3729(a)(1) & (a)(2) ....................................................................................................3

31 U.S.C. § 3730(b)(1) ................................................................................................................15

31 U.S.C. § 3730(e)(4)..................................................................................................................14

31 U.S.C. § 3730(e)(4)(A) ................................................................................................... passim

31 U.S.C. § 3730(e)(4)(B) ............................................................................................................15

42 U.S.C. § 1396r–8(k)(1)(A).......................................................................................................13

56 Fed. Reg. 7049 (Feb. 21, 1991) ...............................................................................................13

## OTHER AUTHORITIES5

Qui Tam *Actions*, § 4.02[D], at 4-108.8 (3d ed. 2009-1 supp.) ...................................................16

S. Rep. No. 99-345 (1986) ............................................................................................................16

CHI-1708703v5

The False Claims Act ("FCA") makes clear that a district court lacks jurisdiction to adjudicate a dispute brought solely by a relator where the allegations at issue were publicly disclosed and the relator is not an original source of the disclosed information.  31 U.S.C. § 3730(e)(4)(A) ("No court shall have jurisdiction over an action under [the FCA] based upon the public disclosure of allegations or transactions . . ., unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.").  That is precisely the case here.  Plaintiff Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care") filed this FCA action under seal against Abbott Laboratories Inc. ("Abbott") in 2001, alleging that Abbott reported to pricing compendia inflated prices for certain oral erythromycin ("Ery") products in order to create "spreads" between those prices and healthcare providers' actual costs and that Abbott then marketed its Ery products based upon these "spreads."  Setting aside for this motion whether these allegations are well-founded (they are not), it is clear that this Court has no jurisdiction over this case because Ven-A-Care is not a proper *qui tam* relator under the FCA's public disclosure bar.

Ven-A-Care's allegations against Abbott were publicly disclosed long before Ven-a-Care filed its Complaint.  Since at least the 1980s and throughout the 1990s, Congressional hearings, government reports, and the media have brought to the public's attention the fact that published prices, such as AWPs, for pharmaceuticals (and particularly generic products, which include the Ery drugs) were far higher than what healthcare providers actually paid.  Indeed, several of these public disclosures showed spreads on the Ery drugs similar to the spreads alleged in Ven-A-Care's complaint.  These public disclosures also focused on manufacturers' and even Abbott's alleged practice of  "marketing the spread" between AWP and actual cost to encourage providers to purchase and dispense their products.  By the time Ven-A-Care filed this case in 2001, the public discourse on these issues was so widespread that this Court has likened it to a "perfect

- 1 -

storm" of information that precludes liability for manufacturers at least from that point forward.

*In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 40 (D. Mass. 2007).

In addition, Ven-A-Care, the sole plaintiff here, cannot claim to be an original source of this information.  First, as a matter of law, as a corporation (rather than an individual), Ven-A-Care cannot be an original source under the FCA.  Second, the facts also doom Ven-A-Care's claim to be an original source.  Ven-A-Care never purchased even one of the Ery drugs at issue in this case, submitted a Medicaid claim or received a Medicaid payment for any of the Ery drugs, had any contact with Abbott regarding the Ery drugs, or had any personal knowledge about Abbott's marketing practices for the Ery drugs.  Indeed, discovery has shown that Ven-A-Care had no direct or independent knowledge of the information upon which any of its allegations against Abbott are based.  Instead, Ven-A-Care concedes that it learned of Abbott's alleged "fraud" with respect to the Ery drugs not as the recipient of Abbott's marketing or of excess Medicaid payments for the Ery drugs but by reviewing wholesaler catalogs and other publications long after Ven-A-Care had ceased operating as a home infusion pharmacy and had become solely a professional *qui tam* relator.

For these reasons, Ven-A-Care is not a proper *qui tam* relator, and this Court has no subject-matter jurisdiction over this case.  Because the Government has declined to intervene in this matter, leaving Ven-A-Care as the sole plaintiff, the entire case should be dismissed with prejudice.  31 U.S.C. § 3730(e)(4)(A). [1]

---

[1] Abbott brings this motion pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).  A motion to dismiss for lack of subject-matter jurisdiction may be raised at any time, and the court may consider evidence outside the pleadings to determine whether subject-matter jurisdiction exists.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Gonzalez v. U.S.*, 284 F.3d 281, 288 (1st Cir 2002).

## BACKGROUND

### I.  PROCEDURAL HISTORY

Ven-A-Care's current complaint (the "Complaint") alleges that, with respect to these forty-three Ery NDCs, "Abbott reported inflated pharmaceutical prices that it knew Medicaid relied upon to set reimbursement rates" and that "Abbott's actual sales prices, the prices generally and currently available in the marketplace, . . . were far less than the prices reported by Abbott." (Complaint, Intro ¶.)[2]  Ven-A-Care alleges AWP spreads on the Ery drugs ranging from 52% to 249%, with most spreads around 100%.[3]  (*See* Complaint, Ex. A.)  Ven-A-Care further alleges that Abbott "actively promot[ed] [these] government-funded 'spreads' between (1) its fraudulently inflated prices and (2) its actual sales prices as an inducement to its customers." (*Id.*)  The Complaint asserts that Abbott's actions violated 31 U.S.C. § 3729(a)(1) & (a)(2).[4]

### II.  PUBLIC DISCLOSURES CONCERNING ABBOTT AND THE ERY DRUGS

Since at least the 1980s, and growing increasingly frequent in the 1990s, government reports and the news media have widely disclosed that published prices for pharmaceuticals and particularly generic drugs[5] were substantially higher than the actual transaction prices paid by

---

[2] This case is distinct from the FCA *qui tam* action that Ven-A-Care filed against Abbott in 1995 in the U.S. District Court for the Southern District of Florida and that is now pending before this Court for pretrial purposes (the "DOJ Action").  Ven-A-Care filed this case in this Court (rather than transferred it here) in 2001, many years after the DOJ Action was instituted; the Government has elected not to intervene in this case; and this action involves a completely different division of Abbott and is more limited in terms of subject matter – it concerns only 43 NDCs of Abbott's Ery drugs, only Medicaid payments, and significantly lower alleged spreads.  (*See* Complaint, ¶ 33.)

[3] The spreads represented in Ven-A-Care's Complaint are in effect exaggerated by 100%.  For example, based on Ven-A-Care's method of calculating spread in the Complaint's Exhibit A, even if a drug's AWP is only 5% more than the "relator's cost," Ven-A-Care would claim that drug has a 105% spread.  For consistency and to enable valid comparisons, this brief will utilize a proper calculation of spread.

[4] On May 20, 2009, the FCA was amended and its provisions renumbered.  This memorandum cites to the pre-May 20, 2009 version of the FCA, which was in effect at the time of the filing of the Complaint.  The May 20, 2009 amendments are irrelevant to the jurisdictional issue raised in this motion.

[5] While the Ery drugs named in the Complaint retained their brand names, they faced generic competition during the relevant period and are considered multi-source generics.  Because the drugs maintained their brand names, everyone was able to recognize that a particular version of erythromycin was manufactured and sold by

pharmacies and that some pharmaceutical manufacturers were marketing these "spreads" to convince providers to purchase the manufacturers' drugs. As this Court has recognized in a related AWP case, by 2001 when Ven-A-Care initiated this action, "there was a perfect storm of information that reflected the size of the spreads, largely because of the compelling information collected by the HHS Office of Inspector General ("OIG"). In addition, the press began to report on the rampant abuse of the AWP system." *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d at 40. Many of the public disclosures addressed the particular issues in this lawsuit: spreads on generic drugs; marketing the spreads; Abbott; and Abbott's Ery drugs. The following public disclosures are examples:

- September 1984: The HHS-OIG issued a report titled "Medicaid—Limitation on payment for drugs." (Ex. 2.)
  - The report's purpose was "to alert Departmental management officials to the opportunity for significant reductions in program expenditures if actions are taken to stop the present widespread use of average wholesale prices (AWP) in determining program reimbursement for prescription drugs." (*Id.* at 10.192.) The report noted that "AWP means non-discounted list price" and that "[p]harmacies purchase drugs at prices that are discounted significantly below AWP or list price." (*Id.* at 10.193.)
  - The report analyzed the differences between AWP and pharmacy acquisition costs for a select number of drugs, including EES 400®, an Abbott trademarked drug at issue in this case. (*See id.,* at 10.203; Complaint ¶ 33.) The report found that the *70th percentile* of the audited prices for EES 400® was $16.49 while the published AWP was $21.95 – a spread of 33%. (*Id.*) The report further found that the median price paid for EES 400® in Massachusetts was $14.06 – a spread of 56%. (*Id.*) Ven-A-Care's Complaint, filed decades later, alleges a similar spread of 52-62% for the same drug. (Complaint, Ex. A.)
- September 1986: The State of Colorado Department of Social Services wrote to HCFA, the federal agency responsible for Medicaid regarding proposed regulatory changes concerning maximum limits for generic drugs, and warned specifically that pharmaceutical manufacturers were using spreads on drug prices as a "marketing

---

(continued…)

Abbott. For example, EES® and Ery-TAB® (discussed in the public disclosures described below and named in the Complaint) are both Abbott trademarked versions of erythromycin. (*See* Aff. of Kenneth Meditz, Ex. 1.)

tool": "Published data in Red Book or Blue Book should be used with caution. Market surveys of various brands of generics should be used to verify accuracy of the data. . . . Submission of artificially high AWP prices has been used as a marketing tool by the generic companies to sell their products."  (Ex. 3 at 4.)

- July 1987:  The Kentucky-based *Lexington Herald-Leader* published a front-page story entitled "Drug Industry Overcharging Medicaid Prescriptions Cost Taxpayers Millions of Extra Dollars" (Ex. 4 at 1), which warned that "Medicaid programs across the country are making millions of dollars in overpayments because of flaws and abuses in the way they buy prescription drugs for the poor."  (*Id.*)  The article noted that AWPs were inflated, and discussed in detail a "sales technique called 'playing the spread,'" noting that a large "spread, or difference, between the [AWP] and the actual price" meant that "a pharmacist buying that drug could make a larger profit."  (*Id.* at 4-5.)  The article even disclosed that some "companies actually advertised that they had a better spread" and that "many companies routinely list Average Wholesale Prices and 'your price' in their catalogs to show the spread."  (*Id.* at 5.)[6]

- July 1992:  The Energy and Commerce Committee of the U.S. House of Representatives held a hearing concerning proposed bills to establish limits on certain drug prices.  (Ex. 11.)  As part of that hearing, price lists showing the discrepancies between AWP and contract prices available to certain providers were introduced into the public record.  (*Id.* at 302-310.)  Several of Abbott's Ery drugs at issue in this case were on that list, including EES 400[®] TABs, EES[®] liquid, Ery-TAB[®] , and Pediazole[®] suspension.  (*Id.*)  The price lists show discounts for these drugs ranging from AWP-56% to AWP-86% (spreads of 127% to 614%).  (*Id.*)  These spreads, publicly disclosed in 1992, equal or exceed the spreads alleged by Ven-A-Care on the same drugs a decade later.

- June 1996:  *Barron's* published an article entitled "Hooked on Drugs," which detailed not only an alleged spread between Abbott's reported AWP and its actual prices for certain of its generic drugs, but also asserted that drug manufacturers, including Abbott, employed "drug salespeople . . . [who] let[] the doctor know that his product

---

[6] Public disclosures of supposed AWP manipulation from that time period are plentiful.  *See, e.g.*, OIG, Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program at 7 (1989) (Ex. 5) ("AWP is not a reliable price to be used as a basis for reimbursements for either the Medicaid or Medicare programs."); Harold Cohen, *AWPs Are a Joke, But No One Is Laughing*, Drug Store News, May 1, 1989, at 195 (Ex. 6) ("[t]aking into consideration all the various pricing schedules available from drug manufacturers, the AWP would be a much lower number than is normally used," and "AWP is being manipulated by many pharmaceutical manufacturers [so that] pharmacists . . . will use or substitute the product with the best AWP"); *VA Obtains Rx Drug Price Discounts*, The Pink Sheet, July 24, 1989, at 5-7 (Ex. 7) ("For multiple-source products . . . the department 'typically' obtains 'discounts ranging from 39% to 93%, but most multiple-source drugs in our depots are currently being purchased with discounts of greater than 80%' off AWP."); Barbara Demick, *When Drugstores Tell You No*, Phila. Inquirer, Feb. 12, 1989, at G01 (Ex. 8) ("In a recent study . . . it was found that drugstores actually pay 15 percent less than average wholesale price for brand-name prescription drugs and up to 50 percent less for generics."); 1989 Cong. test. of Louis B. Hays, Acting Administrator of HCFA (Ex. 9)("While the term 'average wholesale price' is suggestive of the amount that pharmacies actually pay for the drug, it is in fact significantly higher than actual costs."); Harold Cohen, *There's Nothing 'Average' About AWP*, Drug Store News, June 11, 1990, at 75 (Ex. 10) ("AWP has become an exploited figure that is often picked out of thin air by pharmaceutical manufacturers who know that as long as third-party programs continue to use AWP as a base for reimbursement, the higher the number the better their chances are of getting their product dispensed").

- 5 -

has a bigger spread between AWP and the real price than any other generic firm." (Ex. 12 at 3.)

- March 1997:  Various representatives of state Medicaid programs and an HHS-OIG investigator, Paul Chesser, attended a Medicaid Pharmacy Administrators Symposium in Asheville, North Carolina.  (Ex. 13.)  At least one meeting was held to obtain input from the state Medicaid administrators about basing rebates on AWP rather than AMP.  (*Id.* at 1.)  The record of discussion notes that one reason offered in support of basing rebates on AWP was "that those drug manufacturers that play games with AWP (overstate AWP for marketing purposes) would immediately lower their AWPs to a more realistic level."  (*Id.*)

- August 1997:  The OIG issued a comprehensive report that concluded that pharmacies pay an average of 42.5% less than AWP for generic drugs, such as Abbott's Ery drugs, dispensed to Medicaid beneficiaries.  (*See* Ex. 14 at 4.)  This report publicly disclosed that generic drugs, on average, had spreads of approximately 74%, which is similar to the spreads that Ven-A-Care alleges on most of the Ery drugs at issue in this case.  While the report does not name any specific drug, there can be no doubt that the report included oral, patient administrated, generic drugs such as the Erys, and OIG work papers created in connection with the report specifically show that the report included Abbott's Ery-TAB®.  (Ex. 15.)[7]

- May 1998:  An OIG report titled "Need to Establish Connection Between the Calculation of Medicaid Drug Rebates and Reimbursement for Medicaid Drugs" reiterated that "[b]ecause AWP is usually used as a basis for reimbursement at the pharmacy level, manufacturers can use it as a marketing tool to gain market share." (Ex. 18 at 5.)  This report goes on to acknowledge that "[t]he drug industry currently treats AWP as a published list price rather than a true wholesale price."  (*Id.*)

Each of these public disclosures reveal the same information upon which Ven-A-Care's

allegations in its Complaint are based.  Indeed, a review of Ven-A-Care's production

demonstrates that it had possession of several of these reports, including the 1996 *Barron's*

Article and the 1997 OIG Report.  (Ex. 19; Ex. 20.)

## III.   VEN-A-CARE'S ALLEGED DISCOVERY OF THE ERY CLAIMS

Ven-A-Care claims that it "discovered" its allegations about the Ery drugs in 2000.  (Apr.

23, 2009 Lockwood 30(b)(6) Dep. ("30(b)(6) Dep.") at 12:7-13; 21:4-15, 40:8-41:6, 245:9-13,

---

[7] Additionally, state investigations prior to 2001 found spreads on generic drugs, including the Erys named here, that equaled or exceeded the spreads stated in Ven-A-Care's Complaint.  *See e.g.,* 1998 Myers & Stauffer Report, "Idaho Drug Acquisition Cost Study" (Ex. 16) (finding that the average actual acquisition cost for Ery-TAB was AWP-66.5%); 1999 Myers & Stauffer Report, "A Survey of Dispensing and Estimated Acquisition Costs of Pharmaceuticals in the State of Wyoming" (Ex. 17) (finding that the average acquisition costs for generic drugs with a MAC was AWP-73.6% and noting that Ery-TAB was a drug included in the study).  *See Hays v. Hoffman,* 325 F.3d 982, 987 (8th Cir. 2003).

Ex. 21.)  Ven-A-Care, however, has never purchased or dispensed, or received Medicaid

payment for, any of the Abbott Ery drugs at issue in this case.  (Ven-A-Care's First Amended

Answers to Abbott's First Set of Interrogatories No. 1, Ex. 22.)  Ven-A-Care never had any

contact with Abbott relating to the Ery drugs and never witnessed Abbott "marketing the spread"

on the Ery drugs.  (30(b)(6) Dep. at 112:8-11, 104:12-105:4, Ex. 21.)  When Ven-A-Care filed its

Complaint in 2000, Ven-A-Care had no knowledge to support its allegation that Abbott marketed

the spread on these Ery drugs.  (*Id.* at 42:2-43:3,102:22-106:7, 183:15-184:8, 185:4-12, 185:19-

22)

By 2000, Ven-A-Care, which had operated as a home infusion pharmacy, was no longer

servicing patients and was operating as a full-time litigation, discovery boutique.  (30(b)(6) Dep.

at 68:14-20, 408:13-409:5, Ex. 21.)  Having no direct or independent knowledge to support its

allegations, Ven-A-Care instead concedes that it discovered its allegations by reviewing public

price compendia like Redbook and wholesaler price catalogs to which thousands of other

pharmacies had access.  (Complaint ¶ 14, 30(b)(6) Dep. at 22:10-24:13, 35:18-38:6, Ex. 21.)

Ven-A-Care principally relied on an electronic version of McKesson's wholesaler catalog

referred to as "Econolink."  The Econolink software contained, on an NDC-by-NDC basis, both

the published AWP and the "regular cost" or price that McKesson would offer to any potential

customer.  (*Id.* at 22:16-23:9)  Notably, Ven-A-Care did not subscribe to Econolink until April

2000, long after it had ceased operating as a functional pharmacy.  (*Id.* at 41:21-22.)  Presumably,

therefore, Ven-A-Care obtained the Econolink software only to search for additional cases to file

in its role as a professional *qui tam* relator.

## ARGUMENT

The FCA's a public disclosure bar denies courts subject-matter jurisdiction over suits

based on "allegations or transactions" that have been "public[ly] disclos[ed] . . . in a criminal,

- 7 -

civil, or administrative hearing, in a congressional, administrative, or [GAO] report, hearing, audit, or investigation, or from the news media," unless the relator "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). Accordingly, the "threshold question in a False Claims Act case is whether the statute bars jurisdiction." *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 727 (1st Cir. 2007). The "[r]elator carries the burden of proving jurisdiction," *In re Pharm. Indus. AWP Litig.*, 538 F. Supp. 2d 367, 376 (D. Mass. 2008), and the Court should strictly construe the FCA's public disclosure bar and resolve doubts against federal jurisdiction. *United States ex rel. Poteet v. Lenke*, 604 F. Supp. 2d 313, 318 (D. Mass. 2009). Courts make four inquiries to assess jurisdiction under Section 3730(e)(4):

> (1) whether there has been public disclosure of the allegations or transactions in the relator's complaint; (2) if so, whether the public disclosure occurred in the manner specified in the statute; (3) if so, whether the relator's suit is 'based upon' those publicly disclosed allegations or transactions; and (4) if the answers to these questions are in the affirmative, whether the relator falls within the 'original source' exception as defined in § 3730(e)(4)(B).

*Rost*, 507 F.3d at 728. There can be no dispute that these factors are satisfied in the present case and that the Court should dismiss the case with prejudice for lack of subject-matter jurisdiction.

## I.     VEN-A-CARE'S ALLEGATIONS ARE BASED ON PUBLIC DISCLOSURES.

To determine whether there has been a public disclosure of the relator's allegations (the first *Rost* inquiry), this Court has adopted the D.C. Circuit's "widely accepted framework for determining whether a public disclosure of the allegations or transactions has occurred." *See In re Pharm. Indus. AWP Litig.*, 538 F. Supp. 2d at 383; *United States ex rel. O'Keeffe v. Sverdup Corp.*, 131 F. Supp. 2d. 87, 94 (D. Mass. 2001) (Saris, J.). That framework uses the shorthand "X + Y = Z," where "X stands for the allegedly false set of facts set forth in the claim at issue," "Y is a proxy for the allegedly true set of facts," and "Z represents the allegation of fraud." *O'Keeffe*, 131 F. Supp. 2d at 94 (citing *United States ex rel. Springfield Terminal Ry. Co. v.*

CHI-1708703v5

*Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)).  When "X [the false set of facts] and Y [the true set

of facts] surface publicly, or when Z is broadcast . . . , there is little need for *qui tam* actions, and

the claim will be barred unless the relator qualifies as an original source."  *Id.*

 For a court to find that there has been a public disclosure of the relator's allegations, the

public disclosure need not specifically identify all of the alleged fraud's particulars or call the

conduct "fraud."  A disclosure is sufficient if it "'set[s] the government squarely on the trail of

fraud' such that it would not have been difficult for the government to identify [the defendant] as

a potential wrongdoer."  *In re Pharm. Industry AWP Litig.*, 538 F. Supp. 2d at 383 n.10 (citing

authorities).  Indeed, in another MDL *qui tam* action alleging "industry-wide" fraud against

scores of defendants, the Tenth Circuit recently held that a report was a public disclosure, even

as to defendants not specifically named, because the public disclosure revealed an "identified

technique" of fraud by a group of companies that the Government could identify from its records.

*In re Nat. Gas Royalties Qui Tam*, 562 F.3d 1032, 1043 (10th Cir. 2009); *see also United States

ex rel. Gear v. Emergency Med. Assocs. Of Ill., Inc.,* 436 F.3d 726, 729 (7th Cir. 2006) ("We are

unpersuaded by an argument that for there to be public disclosure, the specific defendants named

in the lawsuit must have been identified in the public records.").

 In addition, the "elements of the fraud allegation need not be made public in a single

document," *United States v. Catholic Healthcare W.*, 445 F.3d 1147, 1152 (9th Cir. 2006), but

rather can come from multiple sources "considered as a whole."  *United States ex rel. Reagan v.

E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 n.8 (5th Cir. 2004); *see also Dingle v.

Bioport Corp.*, 388 F.3d 209, 214 (6th Cir. 2004) ("The fact that the information comes from

different disclosures is irrelevant.").

 With respect to the second *Rost* inquiry, disclosures may occur in one or more of the

following manners, all implicated in the present case:

- Congressional hearings, testimony, and statements.  *United States ex rel. Settlemire v. District of Columbia,* 198 F.3d 913, 919 (D.C. Cir. 1999).

- An administrative or congressional "report," including reports issued by HCFA or HHS's Office of Inspector General.  *United States ex rel. v. AdminaStar Fed., Inc.*, 324 F.3d 492, 496 (7th Cir. 2003).

- In the course of an "investigation" or "audit," such as when federal investigators share "documents from [their] investigations" and "information learned in them" with third parties.  *Seal 1 v. Seal A*, 255 F.3d 1154, 1161 (9th Cir. 2001).

- The "news media," which includes newspapers, magazines, and other publications that "disseminate information to the public in a periodic manner" and "are as generally accessible to any other strangers to the fraud as would be a newspaper article."  *United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc.,* 186 F. Supp. 2d 458, 463 (S.D.N.Y. 2002), *aff'd,* 53 F. App'x 153 (2d Cir. 2002).

*See generally* 31 U.S.C. § 3730(e)(4)(A).

As to the third *Rost* inquiry, allegations are "'based upon' a public disclosure when the allegations in the relator's complaint are similar to, supported by, or the same as those that have been publicly disclosed regardless of where the relator obtained his information."  *In re Pharm. Indus. AWP Litig.*, 538 F. Supp. 2d at 377-379 (internal citation and quotations omitted) (following majority interpretation of "based upon"); *Poteet*, 604 F. Supp. 2d at 321.[8]

There is no doubt that the first three *Rost* factors are met here.  The public documents, discussed *supra* at pages 4-6, disclosed Ven-A-Care's two core allegations in the Complaint:  (1) that the published prices for Abbott's Ery drugs exceeded pharmacies' acquisition costs by certain percentages; and (2) that Abbott allegedly marketed the "spread" between the published prices and pharmacies' acquisition costs.  Without a doubt, these disclosures are "similar to" (indeed, they are effectively the "same as") the allegations raised by Ven-A-Care, and thus Ven-

---

[8] The Seventh Circuit recently joined the majority, *Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907 (7th Cir. July 2, 2009), leaving the Fourth Circuit as the only circuit following the minority "derived upon" standard. Ven-A-Care's repeated assertion in its deposition that it had not known of, received, or relied upon the public disclosures (*e.g.*, 30(b)(6) Dep. at 309: 21-310:2, 321:18-19, 329:10-13, 348:21-349:1, 356:104, 396:15-22, Ex. 21), misses the mark.  In trying to save its case, Ven-A-Care has relied on the almost universally rejected "derived upon" standard.

A-Care's Complaint must be deemed to be "based upon" these public disclosures.  Both

individually and together, these public disclosures show that the allegations in Ven-A-Care's

Complaint were in the public domain long before Ven-A-Care filed its first complaint against

Abbott in this case in 2001, and they deprive this Court of jurisdiction over this case unless Ven-

A-Care can prove that it is an original source of the allegations (which, as the next section shows,

it cannot).

With respect to Ven-A-Care's first core allegation, the 1984 OIG report (Ex. 2) and the

1992 Congressional hearing (Ex. 11), for example, reported spreads on the Abbott Ery drugs that

equaled or exceeded the spreads later alleged by Ven-A-Care for the same drugs – a point that

Ven-A-Care conceded in its deposition.  (*See* 30(b)(6) Dep., 357:13-361:8, Ex. 21.)  Likewise,

the 1997 OIG report (Ex. 14), which also included Ery, found that generic drugs on average had

spreads similar to the spreads that Ven-A-Care alleges on the Ery drugs in this case.[9]  (*Id.* at 4.)

In the parlance of *O'Keefe*, these disclosures identified the "X" (published prices) and the

"Y" (actual transaction costs) that form the foundation of Ven-A-Care's claims in this case.

Whether disclosures specifically label such discrepancies as "fraud" (the "Z") is irrelevant.  *See*

*O'Keeffe*, 131 F. Supp. 2d at 94 (stating that either X and Y *or* Z must be disclosed to constitute

a public disclosure); *see also United States ex rel. Harsman v. Alcan Elec. and Eng'g,* 197 F.3d

1014, 1020 (9th Cir. 1999) ("fraud need not be explicitly alleged to constitute public

disclosure").

With respect to Ven-A-Care's second core allegation, the 1986 Colorado Dep't of Social

Services letter (Ex. 3), the 1987 *Lexington Herald-Leader* newspaper article (Ex. 4), the 1996

---

[9] Notably, while Abbott does not need to show that Ven-A-Care actually took its allegations from or relied upon the 1997 OIG report in order for the public disclosure bar to apply (*see In re Pharm. Indus. AWP Litig.,* 538 F. Supp. 2d at 377-379), Ven-A-Care, in fact, did receive a copy of this report near the time that it was issued – several years before this suit was filed.  (*See* Ex. 20., 1997 OIG Report Produced by Ven-A-Care.)

*Barron's* article (Ex. 12), the 1997 Record of Discussion of the Medicaid Pharmacy

Administrators Symposium (Ex. 13), and the 1998 OIG report (Ex. 18) all disclosed the

allegations that pharmaceutical companies, including Abbott, used the AWP spread as a

marketing tool.  These public disclosures are also "similar to" Ven-A-Care's claims regarding

Abbott's alleged marketing of the "spread," and Ven-A-Care's claims are thus also "based upon"

these disclosures for purposes of the FCA.

      While not every report discussing inflated published prices and marketing the spread

specifically mention Abbott and the Ery drugs, several do, and together the public disclosures

certainly contained enough information to "set the government squarely on the trail of fraud" that

Ven-A-Care eventually alleged here with respect to Abbott.  *See In re Pharm. Indus. AWP Litig.*,

538 F. Supp. 2d at 383 n.10 (stating that jurisdictional bar can apply even if defendant was not

specifically named in public disclosure); *United States v. Alcan Elec. & Eng'g*, 197 F.3d 1014,

1019 (9th Cir. 1999) (holding that jurisdictional bar applied even where public disclosure did not

specifically name defendant because the government had access to documents identifying class

of potential wrongdoers).  Indeed, a detailed industry-wide disclosure with respect to generic

drugs (like the 1997 OIG report discussed above) is sufficient to qualify as a public disclosure

about specific drugs within the class of drugs covered.  *See In re Nat. Gas Royalties Qui Tam*,

562 F.3d at 1043.[10]

---

[10] In *Natural Gas*, a *qui tam* relator, in 1997, accused over 200 defendants of "utilizing several identified mismeasurement techniques to knowingly underreport or cause others to underreport the heating content and volume of gas, with a resultant underpayment of federal royalties."  *Id.* at 1037.  Similar improper measurement techniques had been previously described in documents related to an investigation conducted in the 1980s by the United States Senate Select Committee on Indian Affairs, but the documents did not identify any specific companies that had engaged in the practice.  *Id.* at 1039.  Focusing specifically on the importance of these documents, the Tenth Circuit was called upon to decide whether "public disclosures of . . . mismeasurement by other industry members and in the industry as a whole were sufficient to trigger the public disclosure bar as to Defendants not named in these disclosures."  *Id.* at 1040.  The Court held that the industry-wide disclosures were in fact sufficient to trigger the FCA's public disclosure bar.  It noted that the disclosures "provided specific details about the fraudulent scheme and the types of actors involved in it, removing this from a situation where the government would need to comb through

- 12 -

A similar analysis applies in the present case.  First, just as in *Natural Gas*, the 1997 OIG report, for example, publicly reported a specific technique, practiced industry-wide, that allegedly caused the Government to make incorrect payments – here, the technique of creating a spread between published AWP and actual cost for generic drugs.  Second, the drug manufacturers that had large spreads on their drugs were every bit as easily identifiable as the defendants in *Natural Gas*.  Manufacturers are required to enter into a drug rebate agreement with HCFA and to get Government approval to sell generic drugs, so the pool of potential actors is well known to the Government.  *See* Medicaid Drug Rebate Agreement, 56 Fed. Reg. 7049 (Feb. 21, 1991).  Third, as in *Natural Gas*, the Government had the ability to investigate the true average costs of manufacturers' drugs because every drug manufacturer is required to provide the Government with its generic drugs' "average manufacturer's price" on a quarterly basis.  *See* 42 U.S.C. § 1396r–8(k)(1)(A).  Thus, by simply comparing the manufacturers' AMPs to the compendia-published prices, the Government could have quickly and easily identified those manufacturers' drugs that maintained a large spread.

Even if there were any doubt whether each of the Ery-specific disclosures, Abbott-specific disclosures or industry-wide disclosures described above individually constitutes a sufficient public disclosure under 31 U.S.C. § 3730(e)(4)(A), there can be no question that, when they are "considered as a whole," they are more than sufficient to satisfy the public disclosure test established by this and other courts.  *See E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d at 174 n.8.

---

(continued…)

myriad transactions performed by various types of entities in search of potential fraud." *Id.* at 1042.  Indeed, the disclosures were such that the Government could "target its investigation toward specific actors and a specific type of fraudulent activity." *Id.*  Finally, the Court found that the "government's ability to investigate the potential fraud in this case [was] also furthered" because the Government knew, and had contracts, with the parties paying royalties, had records related to the transactions, and could investigate the defendants based on their relationship.  *Id.*

## II.   VEN-A-CARE IS NOT AN ORIGINAL SOURCE OF THE ALLEGATIONS IN THE COMPLAINT.

Because the allegations in Ven-A-Care's complaint were publicly disclosed, this Court

has no jurisdiction over this case unless Ven-A-Care can demonstrate that it was an original

source of these disclosures.  *See* 31 U.S.C. § 3730(e)(4).  Ven-A-Care cannot meet this burden

here because:  (1) a corporation cannot be an original source as a mater of law; and (2) Ven-A-

Care does not have direct and independent knowledge of the information upon which the

allegations in the Complaint are based.

### A.   Ven-A-Care, As A Corporation, Cannot Be An Original Source.

In Paragraph 14 of the Complaint, Ven-A-Care makes its case that it is an original source:

> The Relator, Ven-a-Care became aware of Abbott's false claim
> scheme alleged herein due to its position as an industry insider.
> The Relator commenced its *qui tam* action against Abbott for the
> drugs at issue based upon its industry insider information.  Ven-A-
> Care, as a pharmacy, has access to pricing information such as
> wholesaler and GPO catalogues and computer programs revealing
> the prices generally and currently available in the marketplace, but
> not known to the general public or the Government.  Ven-A-Care,
> as an industry insider, discovered that Abbott created huge profit
> spreads on the Drugs at issue and that the Drugs were reimbursed
> by Medicaid at amounts that substantially, and in some cases,
> exceeded two or three times the cost of the drug.  Ven-A-Care's
> principals were aware that Medicaid reimbursed for drugs at
> amounts that were intended to be based on an estimation of cost
> and not provide for huge windfall profits at the Government's
> expense.

(Complaint ¶ 14 (emphasis added).)

Although Ven-A-Care, a corporation, can be a relator, it is not an "individual" and

therefore cannot be an original source under the FCA.  The FCA draws this distinction between

"person," which includes a corporation, and "individual," which does not.  The statute permits

that a "a person may bring a civil action" under the FCA, 31 U.S.C. § 3730(b)(1); that "a person

shall have the right to continue as a party to the action" if the Government does not intervene, *id.*

- 14 -

§ 3730(c)(1); and that there is no jurisdiction over publicly-disclosed allegations unless "the person bringing the action is an original source of the information," *id.* § 3730(e)(4)(A) (all emphasis added).  The FCA's next subparagraph makes clear, however, that "'original source' means an individual who has direct and independent knowledge . . . ." *Id.* § 3730(e)(4)(B) (emphasis added).

The term "person" under the FCA is statutorily defined, to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1 U.S.C. § 1; *see also, e.g.*, *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 782 (2000) (looking to 1 U.S.C. § 1 in defining scope of term "person" under False Claims Act).  As the statutory definition of "person" indicates, an "individual" is distinct from a "corporation," and therefore cannot be a "corporation."  *See* 1 U.S.C. § 1.  Indeed, in *In re Spookyworld, Inc.*, 346 F.3d 1, 7 (1st Cir. 2003), the First Circuit found that similar language in a statute that likewise "define[d] 'person' to include 'individuals, partnerships, and corporations," showed that "the term [individual] was not meant to include corporations."  *See also Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 198 (S.D.N.Y. 2006) (holding that where the statutory term "person" was defined as "an individual, partnership, association, [or] corporation," the term "'individual' . . . does not include corporations").

Congress's decision to avoid the standard term "person" in 31 U.S.C. § 3730(e)(4)(B) and instead require an original source to be an "individual" must be presumed as meaningful and deliberate, particularly given its repeated use of the more-inclusive term "person" elsewhere in the very same section and paragraph.  *See* 1 John T. Boese, *Civil False Claims and* Qui Tam *Actions*, § 4.02[D], at 4-108.8 (3d ed. 2009-1 supp.) (noting that an "organization may be absolutely barred from bringing suits in cases of public disclosure," as "the original source rule does not refer to the relator as the 'person' . . . but as the 'individual'").  Indeed, such a

- 15 -

requirement is logical given that an original source must have "direct," and not second-hand, knowledge of the information upon which his or her claims are based. *See O'Keeffe*, 131 F. Supp. 2d at 95.

Likewise, defining an "original source" as an "individual" is consistent with the "paradigm of the inside whistleblower" at whom the False Claims Act is directed. *O'Keeffe*, 131 F. Supp. 2d at 93. The legislative history of the 1986 amendments repeatedly reference the idea of an individual employee providing insider information about her employer's false claims. *See, e.g.*, S. Rep. No. 99-345, at 34 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5299 ("few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation"). By contrast, the legislative history does not discuss corporate relators, let alone anything that could overcome the presumption that the use of the term "individual" rather than "person" was deliberate.

Given that language, Ven-A-Care is not, by definition, an original source of the Complaint's allegations. Ven-A-Care, having filed complaints around the country and represented by sophisticated counsel, even drew the distinction between Ven-A-Care and its principals in paragraph 14 of the Complaint, but maintained the allegation that Ven-A-Care itself was the "industry insider" and original source. (Complaint ¶ 14.) For this legal reason alone, the Court should dismiss the Complaint.

### B.    Even If It Could Be Considered An "Individual," Ven-A-Care Was Not An Original Source.

To be an "original source," a relator must have "direct and independent knowledge" of all of the "information upon which the relators' allegations are based." *Rockwell*, 549 U.S. at 470-71; *see also In re Pharm. Indus. AWP Litig.*, 538 F. Supp. 2d at 379 ("definition [is] conjunctive, requiring the relator to have both 'direct' and 'independent' knowledge"). "Section 3730(e)(4)

- 16 -

does not permit jurisdiction in gross just because a relator is an original source with respect to some claim." *Rockwell*, 549 U.S. at 476. "To establish original source status knowledge, a qui tam plaintiff must allege specific facts – as opposed to mere conclusions – showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." *Natural Gas*, 562 F.3d at 1045 (internal quotations and citations omitted).

In order for a relator's knowledge to be direct, the information must be "firsthand knowledge." *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 690 (D.C. Cir. 1997). "[T]o be independent, the relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources," *United States ex. rel. Fine v. Advanced Sciences*, 99 F.3d 1000, 1007 (10th Cir. 1996), and must be independent of public disclosures. "Secondhand information, speculation, background information, or collateral research do not satisfy a relator's burden of establishing the requisite knowledge." *Natural Gas*, 562 F.3d at 1045. Likewise, "[t]he fact that a relator has background information or unique expertise allowing him to understand the significance of publicly disclosed allegations and transactions is also insufficient." *Id.*

Ven-A-Care is not an original source. Ven-A-Care admits that it has never purchased any Ery drug at issue in this case, received a Medicaid payment for a drug at issue, had any contact with Abbott regarding the Ery drugs, or observed Abbott actually "marketing the spread" with respect to the drugs. (30(b)(6) Dep. at 106:4-7; 177:22-178:11; 183:15-184:6, Ex. 21; Interrog. No. 1, Ex. 22.) To the contrary, Ven-A-Care freely admits that it crafted the allegations against Abbott by researching second-hand information (catalogs, and the like) that was widely available to pharmacies – something that courts have made clear *cannot* qualify a relator as an original source. "Although Relator argues that his particular interdisciplinary expertise and

- 17 -

background allow him to understand the significance of publicly disclosed information, that is not enough to qualify him as an original source." *O'Keefe*, 131 F. Supp. 2d at 96 (Relator's claim based on information "gained through his analysis of existing data" found insufficiently direct to make him an original source).

> 1.    Ven-A-Care's Claimed Knowledge Of Abbott's Alleged Inflation Of AWP And WAC Is Based On Second-Hand Research.

The Ery drugs at issue in this case are typically dispensed by retail pharmacies.  As a home-infusion pharmacy, Ven-A-Care typically would not have dispensed the erythromycin products at issue here.  Not surprisingly, therefore, Ven-A-Care admits that it has no evidence of ever purchasing one of the Ery drugs at issue here.  (*See* Interrog. No. 1, Ex. 22 .)  Ven-A-Care also admits that it has no evidence that it ever submitted a claim to Medicaid for reimbursement for one of the drugs at issue.  (*Id.*)  It, therefore, has no first-hand knowledge of the spread between the price paid and the Medicaid payment.

Rather than learning about Abbott's alleged fraud through operations as a pharmacy and business dealings with Abbott, Ven-A-Care "discovered" Abbott's alleged fraud with respect to the Ery drugs in 2000 by researching wholesaler catalogs and pricing publications such as Redbook.  (30(b)(6) Dep. at 20:11-21:15, 22:16-23:9, 49:2-4, Ex. 21.)  As described above, Ven-A-Care principally relied on an electronic version of McKesson's wholesaler catalog referred to as "Econolink," which Ven-A-Care didn't even obtain until April 2000, long after it had ceased operating as a functional pharmacy, presumably to research its next case.  (*Id.* at 41:21-22.)  In short, Ven-A-Care's admitted source of knowledge was a comparison of published AWPs with prices that it found in public, widely-available catalogs, compendia, and price lists.

This is precisely the type of case that the FCA's public disclosure bar was designed to prevent.  *See Rost*, 507 F.3d at 727.  Ven-A-Care must show *direct* knowledge, not information

that it gleaned from reading materials published by others.  Ven-A-Care has not done so.  This lawsuit is based not on what Ven-A-Care knew, but what Ven-A-Care read.  Ven-A-Care's claimed position as an alleged "industry insider" is irrelevant to the inquiry.  *See Alcon Elec. & Eng'g.*, 197 F.3d at 1021 (relator's "status as a member of a union" whose members were engaged in alleged fraudulent scheme does not, alone, qualify him as an original source).  The law simply does not envision an "original source" outside the defendant or the government with no relationship to the questioned transaction or claim.  *See, e.g., Rockwell*, 549 U.S. at 461-462 (relator employed by defendant nuclear facility and provided sensitive internal documents to government); *Rost*, 507 F.3d at 723-724 (relator was former Pfizer executive blowing whistle on Pfizer marketing drug for unapproved uses); *United States ex. rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 51-55 (D.D.C. 2007) (relator employed by defendant hospital).  The Court, therefore, cannot permit Ven-A-Care to continue with this *qui tam* suit.

> 2.  <u>Ven-A-Care Has No Direct And Independent Knowledge That Abbott Marketed The Spread For The Ery Drugs</u>

Likewise, Ven-A-Care has no direct and independent knowledge of the allegation that Abbott marketed the spread with respect to the Ery drugs.  It is telling that Ven-A-Care's Section 3730(b)(2) disclosure to the government, which requires "a written disclosure of substantially all material evidence and information the person possessed," does not even mention Abbott marketing the spread on Ery.  (Ex. 23.)  For this reason alone, the Court should dismiss the Complaint.  *United States of America ex. rel. Made In The USA Foundation v. Billington*, 985 F.Supp. 604, 608 (D. Md. 1997) (dismissing case for failure to make 3730(b)(2) disclosure); *Erickson ex rel. United States v. Am. Inst. Of Biological* Sciences, 716 F. Supp. 908, 911 (E.D. Va. 1989) (same).

In the Complaint, Ven-A-Care alleges that Abbott was "actively promoting [the]

- 19 -

government-funded 'spreads'" on the Ery drugs.  (Complaint, Intro ¶.)  In support of Ven-A-Care's opposition to a motion to dismiss a similar case against other defendants, one of Ven-A-Care's shareholders submitted an affidavit attempting to show that Ven-A-Care was an original source of its allegations and stating:  "Ven-A-Care was targeted by, and thus exposed to, marketing practices whereby the defendant drug manufacturers created huge spreads for the drugs at issue through the inflated price reports and then directly and indirectly marketed those spreads to pharmacies such as Ven-A-Care."  (Aff. of T. Mark Jones ¶ 3, Ex. 24.)  Putting aside these allegations' legal insufficiency, Ven-A-Care cannot make the same claim here.  At its Rule 30(b)(6) deposition, Ven-A-Care conceded that it has no direct or independent knowledge of Abbott marketing a spread on an Ery drug:

> Q. . . . Has anyone from Ven-A-Care ever witnessed an Abbott representative marketing the spread on Ery?
>
> MR. BREEN: Objection to form.
>
> THE WITNESS:  Not to us directly.
>
> Q.  (By Mr. Berlin) Well, to anyone.
>
> A.  That we know of, no.

(30(b)(6) Dep. at 184:2-8.  *See also id.* at 42:2-43:3,183:15-21, 185:4-12, 185:19-22, Ex. 21.)  Accordingly, Ven-A-Care cannot claim that it was an original source of its allegations concerning Abbott's alleged marketing the spread of the Ery drugs, and the case should be dismissed.

## CONCLUSION

Ven-A-Care's Complaint should be dismissed with prejudice for lack of subject-matter jurisdiction.

Dated:  August 21, 2009

Respectfully submitted,

/s/ Tara A. Fumerton_____
James R. Daly
Eric P. Berlin
Tara A. Fumerton
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

*Counsel for Defendant Abbott Laboratories Inc.*

## <u>CERTIFICATE OF SERVICE</u>

      I, Tara A. Fumerton, an attorney, hereby certify that I caused a true and correct copy of the foregoing ABBOTT LABORATORIES, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION UNDER THE FALSE CLAIMS ACT'S PUBLIC DISCLOSURE BAR to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 21st day of August, 2009.

                /s/ Tara A. Fumerton

                Tara A. Fumerton

CHI-1708703v5