EXHIBIT 21

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                            Atlanta, GA

Page 1

            UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL       )

INDUSTRY AVERAGE WHOLESALE ) MDL NO. 1456

PRICE LITIGATION            ) CIVIL ACTION:

THIS DOCUMENT RELATES TO   ) 01-CV-12257-PBS

U.S. ex rel. Ven-A-Care of ) Judge Patti B. Saris

the Florida Keys, Inc. v.  )

Abbott Laboratories Inc.,  ) Chief Magistrate Judge

No. 07-CV-11618-PBS         ) Marianne B. Bowler


            VIDEOTAPED 30(b)(6) DEPOSITION OF

                JOHN M. LOCKWOOD, M.D.

                    Volume I

     (Taken by Defendant Abbott Laboratories Inc.)

                 April 23, 2009

                  9:27 a.m.

                 Suite 800

           1420 Peachtree Street, N.E.

                Atlanta, Georgia

Reported by:   F. Renee Finkley, RPR, CRR, CLR,

CCR-B-2289

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                              Atlanta, GA

Page 10

1      MR. BREEN:  I'm going to just deposit a
2  technical objection.  To the extent that this
3  requires that the witness reveal communications
4  with counsel that are subject to the
5  attorney/client privilege, I would instruct him
6  not to answer, but to let us know if he feels
7  there's an area he cannot respond completely on
8  because of that.
9      Aside from that, I think he can give you
10  an answer to the question, cause it's a
11  practical answer as opposed to a lot of
12  legalisms that went into it.
13      THE WITNESS:  I think we decided that I
14  might be most knowledgeable on the Ery topic.
15  Q.  (By Mr. Berlin)  And why is that?  Why
16  would you be more knowledgeable than Mr. Jones or
17  Mr. Cobo or Mr. Bentley about these issues?
18  A.  Because I spent a lot of time working and
19  developing the concepts and ideas that went into the
20  Ery case.
21  Q.  How did it come to be that you were the
22  one who spent the time working and developing on the

Page 11

1  concepts for the Ery case?
2  A.  I think I just took it on as a project for
3  myself.
4  Q.  And let's just be clear about one thing.
5  You and I during the course of this deposition will
6  sometimes refer to the Erythromycin drugs as Ery, and
7  that's clear, right?
8  A.  That would be fine, yes.
9  Q.  When did you --
10  A.  Well, to the extent we're talking about
11  the oral Erythromycins in this case.
12  Q.  Yes.  Yes.  That's correct.  And again,
13  that -- this case -- might as well, while we're on
14  the subject, mark the -- I'm going to mark a copy of
15  the complaint and its exhibits as Exhibit 2 for this
16  deposition.
17      (Exhibit Lockwood Ery 002 was
18      marked for identification.)
19  Q.  (By Mr. Berlin)  Here you go,
20  Dr. Lockwood.  What I've handed you is Exhibit 2,
21  which is a copy of the complaint in this case and the
22  exhibits to the complaint.  Just so we're clear about

Page 12

1  the -- and I'm going to get to the complaint in more
2  detail later, but just as a preliminary issue, when
3  we refer to Ery or the Erythromycins at issue in the
4  case, those are the NDCs that are listed in paragraph
5  33; is that correct?
6  A.  Yes.
7  Q.  And going back to your previous answer
8  about why you're testifying here today, you said that
9  you took on the job of spending time to work and
10  develop the concepts for this case.  When did you
11  first embark upon that task?
12  A.  I would say in particular, just to these
13  drugs and this complaint, sometime in 2000.
14  Q.  And we'll get to this in much greater
15  detail later, but what led you to look at these
16  particular drugs, the drugs listed in -- at least
17  some of the drugs listed in paragraph 33 in 2000?
18  A.  I was looking at some of our pricing data
19  and I noticed a couple of things about these drugs.
20  These were Abbot Pharmaceutical Products Division
21  drugs, PPD drugs.  It was known to me that Abbott PPD
22  was primarily a brand company.  I knew some of these

Page 13

1  drugs are brands and I noticed discrepancies between
2  the prices that we could buy these drugs from the
3  wholesalers and the reported WAC prices; and I
4  noticed that there was generally a relationship, a
5  very consistent relationship between the normal
6  Abbott brand drugs at Pharmaceutical Products
7  Division, they're more typical brands, I guess.
8      There was a very solid repeatable
9  relationship between the wholesale -- the -- I guess
10  I need to say this properly, the wholesale catalog or
11  list price, whatever, the wholesaler's catalog price
12  and the average wholesale price and the catalog
13  wholesaler's price and the reported WAC.
14      And for these particular drugs I found
15  those relationships were not the same as the other
16  brand drugs at PPD.  And it stuck out -- it stuck out
17  to me when looking at that.  And I spent more time
18  looking and understanding why that was the case and
19  what was causing it and understanding that because I
20  quite simply thought that there was perhaps a
21  fraudulent misrepresentations in prices for these
22  drugs.

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                              Atlanta, GA

Page 18

1  different way.  Are there drugs listed, NDCs listed
2  in paragraph 33 that did not have generic competition
3  at some point during the complaint period?
4       A.   Let me look at the complaint period, but
5  I -- I believe the answer to that is yes, that there
6  are some without generic competition during the
7  complaint period.  This is such a hyper-technical
8  thing.  It would take me some time to look at that
9  for each NDC number.  I'd probably have to go through
10 a Redbook and a few other things to really be a
11 hundred percent sure.
12      But there are a number of these that at
13 least at -- and I believe through the entire
14 complaint period, but certainly during the complaint
15 period had no competition for that particular drug
16 form.  Yeah, for that drug form.  Yeah.
17      MR. BREEN:  Eric, this is a good example
18 of what I was saying earlier.  If this is a
19 topic -- there's a general question about if
20 there were any -- if there were any that didn't
21 have generic competition of the Erys during the
22 complaint period that you feel is in one of your

Page 19

1  designated areas for Dr. Lockwood as a
2  Ven-A-Care 30(b)(6) to take a position on as
3  opposed to find out factually, let me know.
4       We'll take some time during the break or
5  tonight, go through the complaint and try to
6  figure it out, or it may be an area that really
7  isn't appropriate to try to get a position out
8  of Ven-A-Care on if it's just a factual issue.
9  So let me know if it's one of those, one of
10 those areas.
11      MR. BERLIN:  I think the answer to your
12 question, Jim, is that I'm not asking
13 Dr. Lockwood to solve that.  What I'm asking is
14 what is Ven-A-Care's knowledge of that.
15      MR. BREEN:  Okay.  So --
16      MR. BERLIN:  I'm not asking him -- it may
17 be that his answer is we don't have knowledge
18 as -- you know, NDC by NDC, and what you'd have
19 to do is go and solve it in the way that he
20 described.  And I'm not asking him to solve it.
21 I'm asking what is Ven-A-Care's knowledge of
22 that.

Page 20

1       MR. BREEN:  Got you.  Okay.  I just want
2  to let you know if -- you know, zig or zag on
3  those, however you think is appropriate, but
4  when you get to one of them and he doesn't have
5  a present recollection that's sufficient to
6  respond, let me know and I will -- we will
7  endeavor to try to remedy that is all I'm
8  saying.
9       MR. BERLIN:  I appreciate that.  Thank
10 you.
11      Q.   (By Mr. Berlin)  Why were you looking at
12 this issue in 2000?
13      A.   Well, we were looking -- and we started
14 looking at this earlier than 2000 -- at oral drugs
15 where we felt that there were issues with the
16 reported WACs and in particular where, had the WAC
17 prices been reported what we felt would be
18 accurately, that there in fact would have been a
19 change in the federal upper limit for those drugs, if
20 they were on a federal upper limit, and -- and also
21 looking at what effect that may or may not have had
22 on the reported AWP for those drugs.  And we had

Page 21

1  looked in detail at that FUL issue or started to look
2  in detail at that FUL issue and I happened to look at
3  the Abbott drugs just as part of the process.
4       Q.   What led you to look at the Abbott drugs
5  at that point in 2000 as opposed to sometime in 1999
6  or 1998?
7       A.   Well, this isn't the only thing I was
8  doing at Ven-A-Care.  We had a wide variety of
9  projects going on.  I certainly had a wide variety of
10 projects going on at any one time and it was just a
11 matter of, I guess, what we had time to look at in
12 terms of investigating and looking at these issues.
13 And I looked at -- happen to look at Abbott in more
14 detail in 2000, and in many ways, this complaint
15 describes what I found.
16      Q.   Was that something that was on -- really
17 what I'm trying to determine, is it something that
18 was on sort of an agenda or task list that you had
19 saying I want to look at the Abbott drugs and you
20 were just busy or was it just that day you thought I
21 ought to look at the Abbott drugs on this?
22      A.   I don't think that we were ever that

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                          Atlanta, GA

1  organized that we had a specific task list about what
2  to do, but we started looking at some oral drugs
3  and -- and in particular looking at the FUL issue.
4  And that ultimately led to me looking at -- so, I
5  mean, I looked at lots of other manufacturers too.
6  It's not like I only looked at Abbott.  But I looked
7  at these drugs and looked at PPD and found what I
8  thought were discrepancies and problems with these
9  drugs in terms of their price reporting.
10     Q.   When you sat down to look at this issue,
11 describe how you went about doing that, I mean sort
12 of the mechanics of and the documents that you used
13 to try to evaluate the issue.
14     A.   Well, we had a number of things available,
15 meaning we had a number of different price lists
16 available, and we had McKesson catalogs that went
17 back I think to 1992, which contained prices on these
18 drugs or many of these drugs.  We had some Bergen
19 Brunswig printouts that contained prices on these
20 drugs.
21        And during 2000 we had been essentially
22 shifted by McKesson from the catalogs into an

1  electronic version of their catalog called Econolink
2  that was on a computer, so that I basically did a
3  printout or looked at the Abbott drugs listed in
4  Econolink, because I guess it was user-friendly or it
5  was computerized, whatever, and really looked at and
6  saw and noticed the discrepancies between the
7  so-called regular costs at McKesson, which is their
8  catalog price, list price, noncontract price, variety
9  of different names for it, and the AWPs.
10        And during 2000 I was able to -- I did a
11 number of things.  I was able to print that Econolink
12 database to a file, a text file.  And during 2000 and
13 perhaps a little bit earlier, but mainly during 2000,
14 one of my other projects was to learn and teach
15 myself how to use Microsoft Access, which is a
16 software program that allows you to manipulate
17 databases.
18        So one of the things I was able to do was
19 to import the text file from this electronic catalog
20 into Microsoft Access, including all the pricing
21 data, times, dates, the whole thing as a text file.
22 And then I was able to essentially investigate this

1  more by creating new columns where I would, for
2  instance on an investigative level, divide the
3  average wholesale price by the regular cost, the
4  catalog price.  That would give me a ratio.  And then
5  I could --
6     Q.   I'm sorry.  Which number was the numerator
7  and denominator?
8     A.   The AWP that was in that program divided
9  by the noncontract catalog price, regular cost
10 column, what -- there were a number of different
11 names for this column, and that gave me a ratio;
12 essentially divide the AWP by the regular cost
13 column.
14        That showed me that for the bulk of the
15 Abbott PPD drugs, that that ratio was 1.25, as I
16 recall.  Now, this is a -- kind of an interesting
17 math issue, but in -- as I recall -- and I'd probably
18 have to sit down, do the math again.  But I think if
19 you add 20 percent to the WAC price -- First Data
20 Bank was doing that to arrive at an AWP, but the
21 reverse of that gives you a 1.25 ratio.  It's a
22 little bit -- it's a math glitch.

1         But suffice it to say that for all the PPD
2  drugs, that ratio was about 1.25.  For the -- mainly
3  the drugs in this complaint, that ratio was
4  significantly higher, and it varied from drug to
5  drug, but significantly higher, so that it allowed me
6  to also look at -- I ultimately looked at the
7  reported WACs on those and found, I felt, consistency
8  in the other PPD drugs that -- they're typical brand
9  drugs.  The regular cost column was very consistent
10 with the reported wholesale acquisition cost, and for
11 these Ery drugs, it was inconsistent.
12        I then also looked at these drugs in
13 regards to the FUL.  And for many of the drugs that
14 were initially filed -- and I think with our initial
15 notice and whatever, disclosures, whatever those
16 legal terms are, but one of our initial letters to
17 the government on this, we pointed out that -- at
18 least in our opinion, that had Abbott reported what
19 we assume were the real wholesale prices, which were
20 actually below the price we were getting it -- and
21 we're assuming 2 to 5 percent below -- that in many
22 of those cases, had Abbott, in our opinion, reported

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                          Atlanta, GA

Page 34

1    would be much more time and labor-intensive
2    to -- to do it.
3         Ultimately we did look at some of those
4    prices going further back based on the prices
5    that we saw in the McKesson catalogs and in
6    Bergen.  The thing that really drew it to my
7    attention was that the Econolink software had
8    the Economost number and it had the NDC number,
9    both, meaning it showed you which NDC linked to
10   which Economost number, which made that process
11   much easier once I sort of discovered the issue,
12   and I could look back at it somewhat
13   retrospectively.
14        Q.   (By Mr. Berlin)  You could look back
15   retrospectively because you found the number -- the
16   NDC linked to the Economost number?
17        A.   Yes.
18        Q.   At what point did you make that link?
19        A.   Well, in 2000, the -- what -- McKesson was
20   sort of moving out of the catalog business into the
21   electronic world and they literally told us at some
22   point they would probably quit producing the paper

Page 35

1    catalog, that everything would be electronic.  And
2    I -- I think the last paper catalog they actually
3    produced was, I think, 2003, meaning they don't
4    produce a paper catalog now.  Everything is
5    electronic on this.  And they were in the process of
6    transitioning people out of the paper catalogs into
7    the electronic stuff.
8         But I think the electronic version of
9    their catalog allowed me to more readily see the
10   relationships, understand them more readily.  They
11   were, I guess in some degree, concealed, not a
12   hundred percent, but became much more apparent when I
13   looked at the electronic version, and -- and that's
14   how I discovered it.
15        Q.   In the complaint which we've marked as
16   Exhibit Number 2, in paragraph 49, you allege that
17   the alleged fraud was occurring from at least on or
18   before January 1, 1994.  So at the point that you
19   filed the complaint against Abbott, how were you able
20   to make the allegation that these price discrepancies
21   were occurring all the way back to 1994?  In other
22   words, what, at the time you were filing this, was

Page 36

1    the basis for that allegation?
2         A.   I had gone back and looked at those
3    catalogs now that I had the link.  And of course I
4    could look at the NDC and the Economost number and
5    look at the catalog and make sure that the
6    description in the catalog fit the description in the
7    electronic catalog to be sure that I was comparing
8    apples to apples and then compare those to the
9    reported prices that we had in Redbook and Blue Book
10   or First Data Bank.
11        Q.   Prior to 2000, did Ven-A-Care have any
12   documents which would have enabled it to make that
13   sort of comparison on the prices for the
14   Erythromycins?  In other words, could Ven-A-Care have
15   made this determination prior to 2000?
16        A.   I guess it would have been possible, but
17   it was -- as I said earlier, it would require a good
18   deal more analysis and it would require the focus on
19   those drugs to see it or dig it out or understand it.
20        Q.   Prior to 2000, did Ven-A-Care have any
21   other documents that would have enabled it to make
22   these price comparisons?

Page 37

1         A.   Well, we had some documents that showed
2    prices on these Ery drugs or -- some or most of the
3    Ery drugs or maybe all.  We had, I think, a catalog
4    from Gulf Distributor that was a 1994 catalog.  We
5    had the McKesson catalogs.  We had, as I recall, two
6    printouts from Bergen Brunswig, one for 1998 and one
7    for 1999 that included the Erythromycin drugs.
8         And we had another mailer from McKesson
9    that we got in 1998 that was, I think, called Prefer
10   RX, from McKesson, which listed, as I recall, the NDC
11   number; and it may have listed the Economost number
12   too.  I'm not sure.  And it listed the -- just from
13   memory, it lists the McKesson sell price, the usual
14   normal McKesson sell price in one column, and then it
15   listed essentially a discounted column that was, I
16   think, the preferred RX price which was being
17   offered, which I assume is a -- I don't know if there
18   was a contract associated with it or not, but another
19   listing for a lower price in 1998 where you could buy
20   the drug on a contract below the usual McKesson sell
21   price.
22         And I think the McKesson sell price that

                    Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                     April 23, 2009
                            Atlanta, GA

Page 38

1  was listed in that is also sometimes called the
2  regular cost at McKesson, the noncontract price or
3  sometimes called the catalog list price, meaning it's
4  essentially their nondiscounted price.  That's what I
5  can think of right now.  There might be more stuff,
6  but those are the ones I can think of right now.
7      Q.   Prior to 2000, did Ven-A-Care have any
8  document that within that document there was a
9  comparison of any price on the Erythromycins and the
10 AWP or WAC for the Erythromycin?
11     A.   Well, that's an interesting question.
12     Q.   Thank you.
13     A.   The Gulf Distributor's catalog had a
14 column listed as AWP next to the drug's price.  And
15 it's interesting because for many or at least some of
16 the Ery drugs, the price under the AWP column was not
17 the reported AWP but was actually the price that they
18 would sell you the drug for, meaning they were
19 referring to their sale price, their -- the price
20 they would sell you the drug for as average wholesale
21 price.
22        And the other interesting aspect of this

Page 39

1  is that Bergen, in their printouts in 1998 and 1999,
2  also had a price column next to the drug and the NDC
3  number, and that column was labeled average wholesale
4  price.  And it too was the price that they would sell
5  you the drug for and it was not the reported average
6  wholesale price of the drug in all circumstances.  In
7  some circumstances it was, and I don't mean with the
8  Ery drugs, but in terms of the greater universe of
9  pharmaceuticals, because we're talking about a front
10 and backside printout that's four inches deep.
11        You know, I don't know.  The Econolink
12 system contained prices on about 25,000
13 pharmaceuticals, ballpark.  And I'm assuming the
14 Bergen printouts had at least that many, if not more.
15 I haven't done a count to see exactly how many
16 pharmaceuticals are listed in that.
17        But it was interesting that these were
18 wholesalers who were representing their -- the price
19 that they sold the drug to pharmacies at under a
20 column labeled average wholesale price.  And it took
21 me a little while to understand that that was going
22 on because I had assumed that those were the reported

Page 40

1  wholesale prices, but when we actually started
2  looking at it, for many of the pharmaceuticals, they
3  were not.  So they were actually -- what I'm assuming
4  is that wholesaler was saying this is the average
5  price that we sell this drug for at wholesale, I
6  assume.  That's -- the column it was listed under was
7  that.
8      Q.   So from those documents that you just
9  described, the Gulf Distributor's catalog and the
10 Bergen catalogs, Ven-A-Care was not able to determine
11 the spread between the purchase price available to
12 Ven-A-Care and the reported AWP or reported WAC?
13     A.   We would -- to do that comparison, we
14 would have to look at our other pricing sources or
15 the compendium basically, yes.
16     Q.   And did -- and just to be clear, it's your
17 testimony that Ven-A-Care did not, in fact, do that
18 prior to 2000?
19        MR. BREEN:  Objection, form.
20        THE WITNESS:  Not to -- I mean to the best
21 of Ven-A-Care's knowledge at this point in time,
22 we're not aware that we did that, no.

Page 41

1        MR. BREEN:  Just for the record, you mean
2  for the Ery drugs, right?
3        THE WITNESS:  For the Ery drugs, yes.
4        MR. BERLIN:  Yes.
5        THE WITNESS:  Yes, for the Ery drugs.
6        MR. BREEN:  I withdraw my objection.
7      Q.   (By Mr. Berlin)  Did Ven-A-Care have any
8  single document -- so I'm drawing the distinction
9  between taking a document and going off to the
10 compendia and trying to do this process that you
11 described is a -- let me just back up.  That process
12 you described is a bit laborious, right?
13     A.   It would have been a little bit to -- to
14 look at that.  Certainly the electronic software,
15 the -- made that process much easier.  There's no
16 question that -- that the electronic catalog made
17 looking at that -- because part of the electronic
18 catalog was an AWP column for the drug.
19     Q.   And when was the first time that
20 Ven-A-Care got an electronic catalog of any sort?
21     A.   The Econolink system we got, as far as I
22 can determine, it looks like about April of 2000,

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
Atlanta, GA

Page 42

1    somewhere in that range.
2        Q.   Prior to April of 2000 or whenever
3    Ven-A-Care got the Econolink system, did it -- did
4    Ven-A-Care have any one document, whether that's a
5    hard copy document or a page on a database, that
6    compared the price at which Ven-A-Care could purchase
7    these Erythromycin drugs, or for any of the
8    Erythromycin drugs, to the reported AWP or the
9    reported WAC to show the spread between those
10   numbers?
11       A.   Right now I cannot think of any.  If I
12   come up with something in the next day or two, I
13   will -- I'll let you know.  I can't think of a single
14   document right now that has that, except for the
15   electronic catalog -- or catalogs actually.
16       Q.   So the spread information, the difference
17   between the -- what you've described as the actual
18   price versus the reported AWP was not available to
19   Ven-A-Care until April of 2000 without somewhat of a
20   laborious process of comparing the two?
21       A.   I would say that we didn't have that, no.
22   That -- that doesn't mean that others didn't, but I'm

Page 43

1    not aware that -- I'm not aware at this time that we
2    had that, although, as I said, I -- if I find
3    something, I'll let you know.
4        MR. BERLIN:  Why don't we take a break to
5    change the videotape.
6        THE VIDEOGRAPHER:  We're off the record at
7    10:26 a.m.
8        (A recess was taken.)
9        THE VIDEOGRAPHER:  This is the beginning
10   of tape number two.  The time is 10:37 a.m. and
11   we are back on the record.
12       THE WITNESS:  The only thing I might add
13   is that we were not an early converter to the
14   electronic catalog and we knew the electronic
15   catalog had -- had been around for a while.  And
16   it was really a -- it was an old DOS-based
17   program that was -- had been modified to work in
18   the Windows environment in, you know, that time.
19   So we knew that there had been electronic
20   catalogs around for some time.  Exactly how
21   long, I'm not so sure that I know.
22       Q.   (By Mr. Berlin) Do you have knowledge as

Page 44

1    to approximately when the Econolink system became
2    available to other pharmacies?
3        A.   I think I'll need to look at that to give
4    you an answer, and I may need to look at the catalogs
5    and other things that we have.
6        Q.   Why was Ven-A-Care, as you describe, a
7    late adopter to that?
8        A.   We had not been ordering a lot of drugs
9    from McKesson, certainly, and McKesson was -- had
10   been for many years -- I hate to pigeonhole them
11   exactly and say they were a backup wholesaler for us
12   because for certain things, they may have been a
13   primary wholesaler for us at times.  But I think they
14   knew that they were not our only source for -- for
15   drug pricing or -- and that even during the time
16   period when Ven-A-Care was seeing lots of patients,
17   they weren't our only primary wholesaler.
18       They were -- I guess you could call them a
19   backup, but they -- when we needed oral drugs and
20   that sort of thing, we typically would buy from them
21   or Gulf Distributing.  Whereas we might have direct
22   contracts with some manufacturers, we might have

Page 45

1    purchases from distributors.  They're -- I'm just --
2    I don't want to clear -- because I think their
3    position as a wholesaler for us changed over time and
4    literally from day-to-day as to whether if we were
5    looking to buy oral drugs, there may have been
6    periods of time when they -- we were mainly buying
7    from them; but we may not have been buying all of our
8    IV drugs from them.  So I -- I hope I'm appropriately
9    characterizing them.
10       MR. BREEN:  And actually I don't think
11   that -- I would -- to the extent that you're
12   asking the witness to give a 30(b)(6) answer as
13   to generally Ven-A-Care's purchasing history and
14   habits and what have you over time, I'd object
15   because I don't think it's within the
16   designations.  But that said, I'm happy to have
17   Mr. Jones or somebody give a more comprehensive
18   answer, if you would like.
19       MR. BERLIN:  That said, I didn't ask him a
20   question which actually led to that answer.
21       MR. BREEN:  Well, that may be part of the
22   problem.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
Atlanta, GA

Page 46

1        MR. BERLIN: So you're objecting that he's
2    going -- I didn't ask anything that went to the
3    purchasing history.
4        MR. BREEN: Okay. At any rate, objection.
5    Objection, nonresponsive.
6        MR. BERLIN: I understand your point. And
7    that's perfectly fine.
8        MR. BREEN: If you need that information,
9    we're going to have to get it from Mr. Jones.
10       MR. BERLIN: That's fine. It's fine for
11   at least now. Let's see how -- how we go.
12    Q.   (By Mr. Berlin) So I'm not asking you to
13   put a specific calendar date for this answer, but
14   approximately when is the earliest that Ven-A-Care
15   learned about the -- about any spread for any of the
16   Erys listed in paragraph 33 in the complaint?
17    A.   Well, I think, at least right now to the
18   best of our knowledge, when I looked at this
19   relationship in 2000 -- that doesn't mean that
20   someone didn't see it at some earlier time and it
21   didn't click or occur to them or -- or they
22   understood the significance or fully understood it.

Page 47

1    But I think right now to the -- you know, to the
2    extent that we can answer that question, I would say
3    2000.
4     Q.   And this goes back to what I asked you
5    earlier about, about -- about time and the task list.
6    This wasn't a situation where you knew about this for
7    a few years but you just didn't find the time to
8    develop it; this was the situation where you really
9    first learned about the spread in -- in 2000 on these
10   Ery drugs? Is that your testimony?
11    A.   In large degree. We -- you know, we're
12   looking at a wide number of pharmaceuticals, and, you
13   know, that number is characterized in a number of
14   different ways. Some people say 60,000 NDC numbers.
15   Some people say 100,000 NDC numbers are out in the
16   marketplace on a regular basis being looked at by
17   people. Whatever that number is, a large number of
18   drugs.
19       Part of our -- my difficulty in this is
20   that we lost invoices in -- I think it's 1999,
21   Hurricane George, as we've testified about this
22   before. The hurricane hit, the roof leaked, and the

Page 48

1    ceiling fell down and water poured into an area that
2    had boxes and boxes of those things. And they were
3    sitting in water and ruined, so that my ability to go
4    back and look at those invoices, receipts, all of
5    those things is -- I don't have that ability.
6        So we're relying on the memory of the
7    people who, you know, worked at Ven-A-Care that time
8    period when Ven-A-Care was ordering lots of drugs or
9    more drugs from McKesson for -- for that information.
10   Did somebody look at it in 1993 or '94 and realize
11   there was something going on? Maybe. I don't have
12   direct knowledge of that right now, but I also --
13   unfortunately for me, I'm missing the paperwork that
14   might help me do that.
15    Q.   But you're not sitting here testifying
16   that someone in Ven-A-Care knew about the spread
17   information but you all sat on it for a year or a
18   number of years and first started actively
19   investigating it in 2000?
20    A.   No, I'm not -- I'm not saying that. I'm
21   also -- I don't know if somebody looked at an invoice
22   and went, huh, gee, I wonder what that is. I

Page 49

1    don't -- I don't know the answer to that and because
2    of the lack of information. So at least at present,
3    my best answer is the Econolink software led me to
4    see the relationships that we're talking about.
5     Q.   And after you saw the relationships, you
6    brought that to the attention of the other owners of
7    Ven-A-Care?
8     A.   Yes, I did.
9     Q.   And when you brought it to their
10   attention, did they in any way express to you that
11   they had already known about that?
12    A.   Not directly, no.
13    Q.   What do you mean not directly?
14    A.   No, not that I recall. No one jumped up
15   and said, oh, gee, I knew about that spread in 1993
16   or '92 or '91 or whatever. No.
17    Q.   Well, directly or indirectly, did they
18   give you -- was there any indication that the
19   co-owners -- and we've referred to them by name
20   before, that the co-owners had known this prior to
21   you bringing it to their attention?
22    A.   No.

13 (Pages 46 to 49)

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                        Atlanta, GA

Page 66

1    want me to sit down with him and try to recreate
2    that.
3         MR. BERLIN: Yeah. That's fine. Why
4    don't we skip this question.
5         MR. BREEN: As long as it's clear it's not
6    a 30(b)(6) question.
7         MR. BERLIN: That's correct.
8         MR. BREEN: I'll be happy to help the
9    witness give the best answer possible.
10        MR. BERLIN: That he can give.
11        MR. BREEN: Understanding that --
12        MR. BERLIN: I appreciate that.
13        MR. BREEN: -- there's a lot of cases.
14    Q.   (By Mr. Berlin) And just to be clear,
15   Ven-A-Care does have a financial stake in this
16   litigation, right?
17    A.   Yes, sir, like we do in all these qui tam
18   cases, as I understand. And our lawyers certainly
19   have a stake in it.
20    Q.   And again, another question to update is
21   is Ven-A-Care still a licensed pharmacy?
22    A.   Yes, sir.

Page 67

1     Q.   And what does that mean to be a licensed
2    pharmacy?
3     A.   It means that we have met the State of
4    Florida's requirements for a pharmacy license.
5     Q.   And can you describe for the jury, just in
6    general terms, what those requirements are?
7     A.   Is this part of the designation or no or
8    is this something different?
9     Q.   These areas that I'm going into right now
10   are just some background information that --
11    A.   Okay, cause I can't tell you that I
12   prepared --
13    Q.   That's okay.
14    A.   -- for this.
15    Q.   That's fine. And I'll -- specifically for
16   everyone's comfort, I'll specifically designate this
17   as outside the 30(b)(6). So if you can answer that
18   just to the best of your personal knowledge.
19    A.   Well, my -- I think you have to either
20   have or employ a pharmacist who has the appropriate
21   training and licensure and then you have to meet a
22   variety of standards set up by the Florida board. Am

Page 68

1    I familiar with every one of those? No. I guess I'd
2    refer you to the Florida Department of Professional
3    Regulation and their requirements for pharmacy.
4         Mr. Cobo, who is our pharmacist, really
5    deals with that matter, and my experience with it is,
6    I would say, peripheral. I know he does it. I know
7    that he maintains it, but I don't know all the hoops
8    he jumps through.
9     Q.   Does Ven-A-Care have to pay any fee to the
10   State of Florida or to anyone to maintain the
11   license?
12    A.   Every license I've ever got in the State
13   of Florida had some fee associated with it, yes.
14    Q.   And is it still true that Ven-A-Care has
15   not seen a patient since approximately 1998?
16        MR. BREEN: Objection to form.
17        THE WITNESS: I think that would probably
18    be correct. I think that's been testified to
19    many times before, and I'm not aware of any --
20    any new ones, no.
21    Q.   (By Mr. Berlin) That's what I was getting
22   at. You did testify to that on page 169 of your

Page 69

1    deposition. And really what I was asking is, is that
2    still true in a sense that since that time,
3    Ven-A-Care has not seen patients?
4         MR. BREEN: Objection to form.
5         THE WITNESS: Well, I don't think we
6    have -- yes. I don't think we have any new
7    ones, no.
8     Q.   (By Mr. Berlin) So why has Ven-A-Care
9    maintained its pharmacy license if it's not seeing
10   any patients?
11    A.   Well, for a number of reasons. We have
12   over the years many times talked about getting back
13   into the pharmacy business in different ways. And I
14   think some of this has been talked about, but we want
15   that opportunity and availability. Certainly we are
16   interested in the pharmaceutical world. We're
17   interested in pharmaceutical pricing and in
18   particular we're interested in fraud, what we
19   perceive as fraud by manufacturers.
20        So I think we want to main -- much like I
21   maintain my medical license. I'm not doing a lot of
22   orthopedics, but I do my continuing medical education

18  (Pages 66 to 69)

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                              Atlanta, GA

Page 102

1        Now, sometimes, you know, I think that
2   manufacturers became sensitized to whether what
3   they were doing was correct at some point in
4   time.  Ven-A-Care has been banging the -- you
5   know, banging around on the AWP issue for a long
6   long time now.  So some of them became more
7   cautious about how their marketing the spread
8   was done or occurred.
9        But that -- it's the nature of it that --
10  that when you can compare the typical
11  reimbursement prices to your acquisition cost,
12  you're looking at this saying, hey, this is a
13  nice opportunity, wonder how long it will last,
14  maybe forever, maybe not.  I don't know.
15    Q.   (By Mr. Berlin) Does Ven-A-Care believe
16  that the Econolink software markets the spread?
17    A.   I believe that, yes.  Ven-A-Care believes
18  that, yes.
19    Q.   And does Ven-A-Care -- am I pronouncing
20  your company as Ven-A-Care or Ven-A-Care?
21    A.   Either one will do.
22    Q.   Does Ven-A-Care have any specific evidence

Page 103

1   that Abbott knew about -- knew that this software
2   marketed the spread?
3        MR. BREEN:  Objection to form.
4        THE WITNESS:  You know, I might want to
5   take a minute and look at a document or two
6   before I answer that question.
7    Q.   (By Mr. Berlin) Okay.
8    A.   And I can do it now or I can do it at the
9   lunch break.
10    Q.   Which documents do you need to look at to
11  be able to answer that question?
12    A.   Well, I might want to look at at least one
13  of our GPO contracts before I answer.  I don't -- you
14  know, I -- I try to remember a lot of things.
15    Q.   I'm not faulting you.  I just want to know
16  what documents you need to look at.  The GPO
17  contract.  What else would you look at to help you
18  answer that question?
19    A.   Right now that would be the thing I would
20  be most interested in looking at is that.
21    Q.   Do you have that with you?
22    A.   I think I do.

Page 104

1    Q.   Let's -- let's -- could you pull that out
2   and we'll mark that as an exhibit?
3        MR. BREEN:  Why don't we go off the
4   record.
5        THE WITNESS:  Actually I don't know if I
6   do.  Let me see.
7        MR. BREEN:  He doesn't have it.  I can get
8   access to it electronically.
9    Q.   (By Mr. Berlin) Okay.  Well, let's
10  continue and we'll come back to that.
11    A.   Okay.
12    Q.   Okay.  Does Ven-A-Care know of an Abbott
13  employee who specifically market the spread on the
14  Ery NDCs?
15    A.   Well, I guess we would -- we would say I
16  think two things:  Did we talk to an Abbott employee
17  specifically who marketed the spread to us?  And I
18  would say no.  But I think at the same time
19  Ven-A-Care assumes that -- and believes that whoever
20  was marketing the Erythromycin drugs, these Ery
21  drugs, for Abbott knew that he was creating these
22  inducements and putting them out in the marketplace

Page 105

1   for pharmacies to appreciate.  So we would assume
2   that -- we believe that the marketing team, whoever
3   those people are that are responsible at Abbott, know
4   their marketing spread.
5    Q.   And in that situation that you just
6   described, is that what Ven-A-Care previously has
7   referred to as where the spread markets itself?
8        MR. BREEN:  Objection to form.
9        THE WITNESS:  I think people have said
10  that, but I think it's really -- it's probably
11  even -- I mean, it's more detailed than that.
12  So I think what I've talked about is that
13  pharmacists are in the spread business.  When
14  you create spreads for them and put them out in
15  the marketplace, pharmacists will find them.  To
16  suggest that they don't look for them or they
17  won't find them is ridiculous.  And I would just
18  say that manufacturers that do not need to
19  beware.  It's ridiculous to take that position,
20  in our mind.
21    Q.   (By Mr. Berlin) And other than what
22  you've just described, does Ven-A-Care have any

27 (Pages 102 to 105)

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                           April 23, 2009
Atlanta, GA

Page 106

1  specific knowledge of an Abbott employee who marketed
2  the spread on Ery?
3       MR. BREEN:  Objection to form.
4       THE WITNESS:  We did not have a specific
5    conversation with an Abbott employee who
6    marketed the spread to us on the Erythromycin
7    oral drugs.
8    Q.   (By Mr. Berlin)  And beyond an employee
9  communicating with Ven-A-Care, does -- and putting
10 aside what you've described as that Abbott must have
11 known by setting these prices, does Ven-A-Care have
12 any knowledge of an Abbott employee marketing the
13 spread to a pharmacy other than Ven-A-Care?
14   A.   Not including information that were
15 involved in investigations, I assume, meaning prior
16 to any investigations?
17   Q.   No.  I'm asking you sitting here right now
18 about Ven-A-Care's knowledge.  Does Ven-A-Care --
19   A.   As of today, right now?
20   Q.   Yes.
21   A.   After Texas investigations and discovery
22 documents and all of those things?

Page 107

1    Q.   Absolutely, I'm asking you for that, and
2  I'm asking you -- Dr. Lockwood, let me be clear.  I'm
3  asking you -- putting aside your point that these
4  spreads -- that the pharmacists know about the
5  spreads, they find them, and putting aside the point
6  that no Abbott employee has marketed the spread
7  directly to Ven-A-Care, I'm asking you do you know,
8  have any information about an Abbott employee going
9  out and marketing the spread on any of the Erys named
10 in this complaint to any other pharmacy?
11   MR. BREEN:  Objection, form.
12   THE WITNESS:  I'm now free to talk about
13   discovery documents that Abbott has produced?
14   Q.   (By Mr. Berlin)  If you know about them,
15 yes.
16   MR. BREEN:  Understand this is not -- I've
17   not prepared him as a 30(b)(6) witness to talk
18   about information that's been produced in
19   discovery.  He's got knowledge of it.  I'll let
20   him testify about it.
21   MR. BERLIN:  Wait a minute.  It's --
22   mean, the topic is unequivocal, Ven-A-Care's

Page 108

1    knowledge concerning pricing, marketing and
2    reimbursement of the subject drugs, how
3    Ven-A-Care utilized or acquired the knowledge;
4    and the other topic is Ven-A-Care's knowledge,
5    if any, of Abbott's price reporting and
6    marketing practices for the subject drugs.  It
7    didn't ask as to a certain date.  I mean, it's
8    open-ended.
9       MR. BREEN:  We've got objections to it.
10   So we could either stand on the objections --
11      MR. BERLIN:  Well, you never objected
12   based on that.
13      MR. BREEN:  Stand on the objections and
14   have the court determine it.  He's going to
15   answer this question to the best of his ability.
16   I'm just saying I don't think that this 30(b)(6)
17   witness is required to marshal discovery
18   evidence.
19      MR. BERLIN:  That's fair enough.
20   Q.   (By Mr. Berlin)  But give me your
21 understanding of -- sitting here today, answer it as
22 well as you can.

Page 109

1    A.   Well, first of all, I recall seeing
2  discovery documents from Abbott where there was
3  discussion about how we're going to market these Ery
4  drugs to retail buying groups.  And there was a
5  group -- I can't name the names; I don't have them.
6    Q.   Let me -- actually let me try to simplify
7  this a little bit, cause I'm not -- I understand how
8  you're answering this, and I apologize for
9  interrupting your answer, but let me see if I can
10 take care of Mr. Breen's objection and simplify this
11 a little bit.
12   A.   Okay.
13   Q.   Do you have any knowledge of, specific
14 knowledge of an Abbott employee, not based just on
15 internal documents, but actually going out and
16 marketing the spread?  Have you heard of that from
17 another pharmacist or from any other source that an
18 employee actually went out and marketed the spread on
19 Erythromycin?
20   MR. BREEN:  Objection, form.
21   THE WITNESS:  Well -- and I hope I'm
22   answering this within the parameters that you're

28  (Pages 106 to 109)

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
Atlanta, GA

Page 110

1   talking about -- an Abbott employee, as I
2   recall, Mr. Fiske, when he was deposed in the
3   Texas case, we explained to Mr. Fiske the issue
4   of Abbott's reported WACs to the compendia and
5   that states used those WACs; and we discussed in
6   detail during that deposition, as I recall, what
7   Abbott termed its base deal pricing to
8   wholesalers.
9       And he was asked specifically if he
10  understood how Medicaid programs could be
11  confused by his positions and that Medicaid
12  programs might be confused by his differing
13  representations of WAC, that it would have some
14  impact upon them; and he ultimately answered
15  something along the lines of, yes, I understand
16  how they could be confused by that.
17      So, to me, that was Mr. Fiske saying,
18  yeah, we -- we created a reported WAC, we -- we
19  had a different real transaction price and -- to
20  wholesalers and, gee, I understand that that
21  could have had some impact on Medicaid programs
22  and confused them.

Page 111

1       And at least in my mind, that's him
2   admitting that that -- the inducement he
3   created.  And did he go out and do it?  I think
4   he stayed right at Abbott and did it.  The
5   inducement he created, he understood how that
6   could have an effect upon the programs and
7   reimbursement.  And to me, that's him admitting
8   he's marketing the spread when he sets those
9   prices.
10      Now, beyond that, in terms of walking out
11  and talking to a pharmacy specifically, I don't
12  know that he did that to the Ery drug
13  specifically, but this gentleman negotiates a
14  lot of different prices for Abbott's drugs.  He
15  sometimes bundles drugs, it appears to me.  He
16  sometimes bundles the Ery drugs with other
17  drugs.  Those things look like, you know,
18  inducement marketing to me.  I see them doing
19  that.  I hope -- I don't know if that answers
20  your question adequately or not, but that would
21  be my interpretation of those things.
22      Q.   (By Mr. Berlin)  And does Ven-A-Care have

Page 112

1   any knowledge of any Abbott employee specifically
2   talking to a pharmacy about the spreads on Ery?
3       MR. BREEN:  Objection, form.
4       THE WITNESS:  I guess if we're including
5   all the Abbott discovery, I would say that I'm
6   not -- I don't know that I am adequately
7   prepared to answer that in terms -- based on all
8   the discovery that's been done.  I don't think
9   anyone at Ven-A-Care knows specifically of a
10  Abbott person outside of discovery in these
11  cases that went and talked to a pharmacist.
12      Q.   (By Mr. Berlin)  Could you look back at
13  the complaint and look at the -- it's actually page
14  2, the sentence before the header one.  It's on --
15  it's not a numbered paragraph.  It says, these
16  efforts allowed Abbott to increase its profits by
17  boosting sales for its drugs.
18      A.   Yes.
19      Q.   What is Ven-A-Care's evidence that these
20  efforts allowed Abbott to increase its profits?
21      A.   Well, I would say the entire argument that
22  I made probably in the past 20 or 30 minutes that by

Page 113

1   putting these spreads out in the marketplace and
2   creating larger spreads than normal, that they're
3   creating an inducement in the marketplace that
4   ultimately leads to more purchases of their
5   pharmaceuticals, and as such, Abbott benefits by
6   that.
7       It's -- I suspect that manufacturers make
8   decisions about setting prices and how they set
9   prices, and they do that in an effort to always
10  maximize their profits.  I find it hard to believe
11  that -- that -- that manufacturers such as Abbott do
12  anything other than set prices to maximize their
13  profits.  It's what they do.
14      And when they create increased spreads
15  like these -- they did for the Ery drugs, when
16  they're not doing that for the other drugs at PPD, I
17  think they're doing that to increase their
18  utilization in profits; because if nobody buys their
19  drug, I don't think they make any money.
20      Q.   Any other evidence to support that
21  allegation?
22      A.   Other evidence, including discovery

29 (Pages 110 to 113)

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                              Atlanta, GA

Page 182

1    interrogatory answer.
2       A.   Okay.
3       Q.   And it says that Abbott contracted with
4    the GPOs, wholesale source programs and chain
5    pharmacies for the expressed purpose.  And let me
6    under -- is your understanding of expressed purpose,
7    does that mean expressly written or expressly stated?
8    I mean are there documents?  Is there a time when you
9    understand that Abbott spoke to these folks or had a
10   written contract that specifically said you will
11   market the spread?
12       MR. BREEN:  Objection to form.
13       THE WITNESS:  I will need to investigate
14       this further, but it would appear that the
15       Leader program that's mentioned in here looks
16       like it's a spread marketing tool that -- where
17       you're comparing profitability.
18       Q.   (By Mr. Berlin) And that's whether
19   something exists.  The question is whether Abbott
20   contracted with the GPO to -- for the expressed
21   purpose of marketing the spread?
22       MR. BREEN:  I'll object that you

Page 183

1       interrupted the witness again.
2       MR. BERLIN:  Well, okay.  Fine.
3       Q.   (By Mr. Berlin) Go ahead, Dr. Lockwood.
4       MR. BREEN:  And, therefore, move to strike
5       his last answer since it was incomplete.
6       THE WITNESS:  I'll need to look at this
7       some more.  I have to read the answer here.  I'm
8       sorry.
9       Q.   (By Mr. Berlin) Okay.  Well, you know,
10   I'm going to add this to what I'd like to discuss
11   tomorrow.
12       A.   Okay.  Are we making a list?
13       MR. BREEN:  Uh-huh, and then we're going
14       to go over it before we end today.
15       Q.   (By Mr. Berlin) Did you personally ever
16   witness an Abbott representative marketing the spread
17   on Ery?
18       A.   No, not to us.  No.  No, and -- no, I
19   haven't seen an Abbott -- I mean, other than what I
20   might construe testimony to mean in the litigation;
21   outside of that, no.
22       Q.   And when I say witness, I don't mean

Page 184

1    reading testimony.  I mean witnessing with one's --
2    one's five senses.  Has anyone from Ven-A-Care ever
3    witnessed an Abbott representative marketing the
4    spread on Ery?
5       MR. BREEN:  Objection to form.
6       THE WITNESS:  Not to us directly.
7       Q.   (By Mr. Berlin) Well, to anyone.
8       A.   That we know of, no.  I -- I mean, that
9    gets complicated though.  I -- I mean, I would -- no.
10   I think I need to know more.  We have -- as I said, I
11   think there's a thing called Prefer RX where, you
12   know, McKesson is circulating a contract discounted
13   price, and I got to believe that Abbott knows they're
14   circulating that contract price.
15       They have this retail buying group thing
16   they're sending out trying to stir up retail buying
17   group purchases at that time.  And, you know, those
18   are probably marketing-the-spread-type documents.
19   Now, is there a person associated with it?  Somewhere
20   somebody sent that out.  Did I see the person do it?
21   No.  I -- I mean, I think we have a lot of documents
22   that we perceive as spread-marketing documents.

Page 185

1       Q.   Well --
2       A.   Seeing an individual market it is
3    different than that.
4       Q.   And does anyone at Ven-A-Care have any
5    personal knowledge about an Abbott representative
6    going into a pharmacy and specifically marketing Ery,
7    whether it's marketing the spread or any sort of
8    marketing of Ery?
9       MR. BREEN:  Objection to form.
10       THE WITNESS:  I don't know that we know of
11       a human being who walked in and did that that
12       we're familiar with.
13       Q.   (By Mr. Berlin) And isn't it true in the
14   1990s that all sellers of Erythromycins had spreads?
15       MR. BREEN:  Objection, form.
16       THE WITNESS:  They may have.  They may
17       have, depends on when and where, but they may
18       have, yes.
19       Q.   (By Mr. Berlin) Do you know how Abbott
20   spreads on Ery compared to other companies' spreads
21   on Ery?
22       A.   I have not specifically studied that, no.

47 (Pages 182 to 185)

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6)                    April 23, 2009
                          Atlanta, GA

Page 242

1  about in about 1998 or '99, as I recall.  We at one
2  point gave that logon to the government so they could
3  log on to Innovatix, and I think that included Rob
4  Vito at the OIG so they could look at some of these
5  things.
6      Q.   Do you know when you provided this to
7  folks in the federal government?
8          MR. BREEN:  Objection to form.  What is
9      "this" specifically?
10         MR. BERLIN:  He just said that they
11     provided password to Innovatix.
12     Q.   (By Mr. Berlin) So when did you provide
13 that password and when did you -- when did you
14 provide access for the federal government?
15     A.   I believe in 1998.  You want the exact
16 date, I think we can get that document.
17     Q.   And at the time that you --
18     A.   I think I've seen that document in the
19 past few days, I believe.  It's a document that I
20 think I have seen.
21     Q.   Do you know whether prior to -- at any
22 time prior to 2000 -- back up a second.  You

Page 243

1  testified earlier that you first discovered the --
2  what you're alleging to be fraud with respect to the
3  Erythromycin pricing in 2000.  Do you know whether
4  spreads on the Ery drugs were available through the
5  Innovatix.com website prior to 2000?
6      A.   My understanding is I don't think they
7  were.  We had and we produced a rather extensive item
8  catalog for -- I think in 1998 it was labeled Greater
9  New York Hospital Association, but I know it was a
10 1998 publication.  And it included Abbott's Hospital
11 Products Division drugs, but I don't believe -- I'm
12 relatively sure, in fact, that it did not include the
13 Pharmaceutical Products Division drugs.
14     Q.   Do you know when the -- so -- ask another
15 question.  Was that simply a situation that the
16 Abbott Ery, the PPD Erys were not available through
17 this GPO; they didn't have a deal for them?
18     A.   That may be the case.  I just know that we
19 didn't have a price for it in that particular catalog
20 and the, you know, Abbott Ery drugs were not exactly
21 on my radar screen at that point in time.  I'm
22 looking at this stuff sometimes retrospectively.  You

Page 244

1  know, we analyze drug pricing a lot, but there are a
2  lot of drugs to analyze.
3          So the connection, as I recall, to
4  Innovatix was relatively slow and there was no way to
5  log on and say print all the NDCs for me.  That -- I
6  don't think there was that option.  So we looked
7  periodically at the Innovatix website for things as a
8  pricing source, information source.
9      Q.   Do you know when Abbott Ery, PPD Erys
10 first showed up on the either Greater New York or
11 Innovatix.com?
12     A.   I don't know exactly.  I can say that they
13 were certainly there on this date.  If they were
14 there before that, it wouldn't surprise me.  In fact,
15 I would expect that they were there somewhat before
16 that, certainly the day before, probably, but -- and
17 we have lots of pieces of paper because sometimes
18 these people do announce to you when they sign a
19 contract with a new manufacturer and sometimes they
20 don't.  It's just that simple.
21         If they think it's a big deal, sometimes
22 they announce it.  They send out -- it's part of

Page 245

1  their marketing for the manufacturer that they say,
2  well, you know, look how lucky you are, you now have
3  this manufacturer's prices available to you.
4      Q.   Let me ask one quick question which may
5  help us streamline things for tomorrow.  I know that
6  you -- that Ven-A-Care made several presentations to
7  states and the federal government and NMFCUs, and
8  some of those presentations were prior to 2000.
9  Given your testimony today that you had no knowledge
10 about the Ery spreads prior to that time, am I
11 correct that Ery was never mentioned in any
12 presentation prior to 2000?
13     A.   I'm not aware that it was.  I really think
14 that I first focused on this in the 2000 time frame,
15 specifically, and that doesn't mean that we didn't
16 know that Abbott had Ery drugs or that there -- you
17 know, that there may or may not be discounting on
18 them or whatever.
19         But I think I could say that in 2000 is
20 the first time I really sat down and did a hard
21 analysis of what was occurring in the marketplace
22 with the Ery drugs.  And in general, presentations to

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

4d3f1c3e-8aa1-4d0b-b489-388ee40e91ec

Lockwood, M.D., John M. - 30(b)(6) - Vol. II     HIGHLY CONFIDENTIAL                April 24, 2009

259

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL        )

INDUSTRY AVERAGE WHOLESALE ) MDL NO. 1456

PRICE LITIGATION             ) CIVIL ACTION:

THIS DOCUMENT RELATES TO   ) 01-CV-12257-PBS

U.S. ex rel. Ven-A-Care of ) Judge Patti B. Saris

the Florida Keys, Inc. v.  )

Abbott Laboratories Inc.,  ) Chief Magistrate Judge

No. 07-CV-11618-PBS         ) Marianne B. Bowler

HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED 30(b)(6) DEPOSITION OF

JOHN M. LOCKWOOD, M.D.

Volume II

(Taken by Defendant Abbott Laboratories Inc.)

April 24, 2009

9:44 a.m.

Suite 800

1420 Peachtree Street, N.E.

Atlanta, Georgia

Reported by:   F. Renee Finkley, RPR, CRR, CLR,

CCR-B-2289

308

1    system.
2         (Exhibit Lockwood Ery 012 was
3    marked for identification.)
4         Q.   (By Mr. Berlin)  Now, I'm getting into,
5    Dr. Lockwood, some of the documents that we provided
6    to Ven-A-Care on disk in advance of the deposition
7    and specifically listed in our topic number 13.  I'm
8    providing you these copies.  If you happen to have
9    brought another copy that is easier for you to
10   reference, you're welcome to use those, but I just --
11   we gave those to you well in advance and I just am
12   bringing it to your attention that we're going to get
13   into those now.
14        MR. BREEN:  We don't have hard copies with
15    us.  We've been looking at them electronically
16    just because we got so much paper, so if you've
17    got hard copies, it will be helpful.
18        MR. BERLIN:  Whatever is convenient for
19    you guys, but I'm going to mark them as
20    exhibits.  I just wanted to --
21        MR. BREEN:  Okay.  Good.
22        MR. BERLIN:  And maybe -- I don't know

309

1    that I'll mark all of them, but, you know, we
2    just wanted to give you the range.
3         Q.   (By Mr. Berlin)  The first one that we've
4    marked as Exhibit Number 12 is a memorandum to the
5    secretary from Phillip R. Lee dated February 7, 1969
6    under the U.S. -- United States Government Department
7    of Health, Education and Welfare, Office of the
8    Secretary.  Could you turn to page 147 of the
9    document?
10        First of all, let me just ask you
11   generally, did you get an opportunity prior to today
12   to review those documents that we had provided to
13   you?
14        **A.   Yes, I reviewed these several days ago.**
15   **Yes.**
16        Q.   Had you seen the document that we've
17   marked as Exhibit 12 prior to us providing it to you?
18   And again, let me just clarify that we're now
19   formally back in your role as a 30(b)(6) corporate
20   representative.
21        **A.   Ven-A-Care was not aware of this document**
22   **or, you know, to our best understanding or**

310

1    **recollections, no one was aware of this document at**
2    **Ven-A-Care until it was provided to us.**
3         Q.   And on page 147 you'll see there's the
4    italicized heading Actual Acquisition Cost, and then
5    the next paragraph under that states, under the
6    pricing system now prevalent in the drug industry,
7    the published wholesale price of a drug product is
8    subject to a complex system of frequently changing
9    discounts, including discounts based on the purchase
10   of other drug products, and cumulative discounts
11   based on the volume that may be computed after the
12   end of the accounting year.
13        I don't mean to be cheeky by asking this
14   since this is a document from 1969, but I just need
15   to get this formally on the record.  Does Ven-A-Care
16   contend that it was the original source of this
17   particular information that I just read?
18        MR. BREEN:  Objection, form.
19        THE WITNESS:  I guess I don't know what
20    you mean by are we the original source of this
21    information.  I don't think I understand that
22    as -- if it's a legal concept, I don't

311

1    understand what you mean by original source of
2    this information.  I assume whoever wrote this
3    wrote it.  I don't -- Ven-A-Care did not write
4    this in 1969.  It was written by whoever,
5    whoever is listed here.
6         MR. BERLIN:  And let me just pause and
7    talk to you Jim.  One thing you said yesterday
8    was that as Ven-A-Care's -- and I don't mean
9    to -- you can correct me if I say this wrong,
10    that some or all of these documents are not
11    public disclosures as defined by The Act.  Is
12    that correct?
13        MR. BREEN:  Our position is that these
14    documents -- none of these documents are public
15    disclosures as defined by the False Claims Act
16    that Ven-A-Care's allegations or actions were
17    based upon.
18        MR. BERLIN:  And is that something that
19    Dr. Lockwood is prepared to testify on or do you
20    view that solely as a -- I guess let me just ask
21    that.
22        MR. BREEN:  I think Dr. Lockwood is

320

1     acquisition cost, if that term was available at
2     the time, or AWP.  But I think I'm going to take
3     it as what it says, listed wholesale prices.
4         Q.   (By Mr. Berlin)  Well, do you know to
5     which listed wholesale prices they were referring to
6     in this document?
7         A.   Well, I mean, I --
8             MR. BREEN:  Objection, form.
9             THE WITNESS:  I think they have it listed
10    as listed wholesale price and it's 1969 and I'm
11    going to -- I can't interpret.  I don't know
12    what they knew.  It may have included AWP.  I --
13    I don't know.  They're saying listed wholesale
14    prices.  I guess I got to take it for what it --
15    what it says.
16            MR. BREEN:  By the way, just for the
17    record, Eric, I've asked Alison offline here to
18    check and you say we didn't provide any
19    objections, but we objected as follows:  The
20    designation mischaracterizes and misstates the
21    law and relative burdens on the parties relating
22    to the original -- to original source and

321

1     probably disclosure and potentially the
2     allegations of The Relator's qui tam complaints.
3         So we've been telling you from the time we
4     filed our objections that we think you're
5     misstating it.  But that said, I prepared him to
6     do the best job he can in responding to all of
7     your questions.
8             MR. BERLIN:  That ignores the month of
9     communications back and forth that occurred
10    after you served those objections.
11            (Exhibit Lockwood Ery 013 was
12            marked for identification.)
13        Q.   (By Mr. Berlin)  Dr. Lockwood, we've
14    marked as Exhibit 13 the -- this GAO report on
15    Effects of MAC Program on Prescription Drug Cost
16    dated December 31, 1980.  Had Ven-A-Care seen this
17    document prior to receiving a copy from us?
18        A.   To the best of our knowledge, the answer
19    is no, we had not seen it or relied on it.
20        Q.   And did you have an opportunity to read
21    the document?
22        A.   I did.

322

1         Q.   I guess the question is did you read the
2     document?
3         A.   Yes, I did.
4         Q.   Could you turn to the number up in the
5     upper right-hand corner, 9761?
6         A.   I might note it was a lot of reading.
7     Yes, sir.
8         Q.   What is your understanding of the table
9     that is on this page?
10        A.   I'm going to need to re-read some of this
11    to give you the answer to that.  This is a discussion
12    in a chart of what appears to be the pharmaceutical
13    reimbursement board at, I guess, HHS or HCFA; and
14    they're discussing adjusting the federal MAC,
15    sometimes called the federal upper limit, and looking
16    at information to them from the marketplace and
17    trying to set what is essentially a ceiling price so
18    that they will not pay more than a certain amount, a
19    ceiling.  And they're talking about adjusting those
20    prices periodically based on updated information.
21        Q.   What was the updated information they were
22    suggesting using?

323

1         A.   It says, HHS officials told us they
2     eyeballed the statistics received monthly from IMS to
3     determine if the drug can still be obtained at the
4     MAC limit.  These statistics stratify what about
5     1,600 pharmacists across the nation pay for the
6     largest selling 300 drugs during a selected period.
7     For example, the statistics would show the amount at
8     or which about 10 percent of the 1,600 pharmacists
9     purchase a particular drug and 20 percent purchased
10    the drug and so on through the 90th percentile.
11        So they're using IMS data, and I think in
12    here as well -- let me go back.  I think they're
13    using -- in accumulating information for the board's
14    use, the HCFA personnel used several source
15    materials, including IMS America Limited, a private
16    corporation, Market Data, Drug Tropics -- Topics
17    Redbook and the Blue Book listings of wholesale drug
18    prices, Physicians Desk Reference and others in
19    identifying market volume and most commonly purchased
20    package sizes.  The IMS data are the only source
21    material used.  So that's apparently what they used.
22        Q.   Do you have an understanding as to what

Lockwood, M.D., John M. - 30(b)(6) - Vol. II    HIGHLY CONFIDENTIAL                    April 24, 2009

19 (Pages 328 to 331)

328

1   set?
2        A.   Well, I -- I think I would just say what
3   they said, which is when they used their criteria,
4   they felt they could lower this MAC, and -- and they
5   claim using this informal criteria that they could
6   lower the MAC.  And once again that's looking at -- I
7   don't know how many manufacturers were making
8   Erythromycin stearate at that point in time, but it
9   sounds like multiple, and there were apparently
10  significant price differences between those multiple
11  manufacturers.
12       Q.   Did Ven-A-Care provide any information to
13  the government that was used to create this report?
14       A.   In December 1st, 1980, no.
15            (Exhibit Lockwood Ery 014 was
16            marked for identification.)
17       Q.   (By Mr. Berlin)  We've put before you
18  Exhibit 14, which is a transmittal containing an OIG
19  report dated September 1994 entitled Changes to the
20  Medicaid Prescription Drug Program Could Save
21  Millions.
22            MR. BREEN:  Objection.  The one I've got

329

1   says September 1984.  I think you said '94.
2            MR. BERLIN:  Oh, I misspoke then.  Thank
3   you.  1984.
4            THE WITNESS:  Yes.
5        Q.   (By Mr. Berlin)  Has Ven-A-Care seen this
6   document previously?  And in particular, what I'm
7   referring to is the 1984 OIG report, whether in this
8   particular form or another form.
9        A.   Let me just make sure I'm looking at the
10  right one for just a second.  Once again, we, to the
11  best of our knowledge, were not aware of this report
12  and did not make use of the report until it was given
13  to us by Abbott.
14       Q.   Meaning earlier this year or a few months
15  ago?
16       A.   Yes.  Yes.  We didn't rely on this report
17  and we did not -- no one recalls reading this report
18  that I'm aware of.
19       Q.   And you did read it prior to today?
20       A.   Yes, sir, I did read it, but there's a
21  lot -- a lot of reading here.  Go ahead.
22       Q.   And could you turn to -- well, just

330

1   generally, what, in general terms, is your
2   understanding of this document?  I'm not asking for a
3   dissertation on it, just a sentence or two.
4            MR. BREEN:  Objection, form.
5            THE WITNESS:  Well, I would need to
6        refresh my memory about this.  As I recall, I
7        had 22 of these documents or something like that
8        and -- and I read them but I need to --
9        Q.   (By Mr. Berlin)  Well, that's fine.  I'll
10  withdraw --
11       A.   -- go back over them.
12       Q.   My question is can you sit here without
13  doing that, and your answer is no, so let's move into
14  the document.  Can you turn to page 3 of the
15  document.  It's -- three is in the center of the
16  bottom you'll see.  And do you see in the first
17  paragraph, oh, maybe about nine lines down, there's a
18  new sentence that reads, within the pharmaceutical
19  industry, AWP means nondiscounted list price.
20  Pharmacies purchasing drugs at prices that are
21  discounted significantly below AWP or list price.  I
22  think I misread that.  Pharmacies purchase drugs at

331

1   prices that are discounted significantly below AWP or
2   list price.  And then the third paragraph begins, the
3   use of AWP in determining Medicaid reimbursement for
4   drugs has been a problem that HCFA has recognized for
5   some time.
6            And then also could you turn to page 22?
7   I want to read one more thing and then I have a
8   question for you.  And you'll see at the bottom, last
9   sentence on the second paragraph:  AWP represents a
10  list price and does not reflect several types of
11  discounts such as prompt payment discounts, total
12  order discounts, end of year discounts, and any other
13  trade discounts, rebates or free goods that do not
14  appear on the pharmacist's invoices.
15            With respect to those three parts that I
16  read to you, did Ven-A-Care provide any information
17  to the federal government that, to your knowledge,
18  was used in reaching those conclusions?
19            MR. BREEN:  Objection, form.  You mean
20       prior to 19 -- prior to September 1984?
21            MR. BERLIN:  Yes.
22            THE WITNESS:  No.  Prior to September of

---

348

1    allegations -- are there any allegations in the
2    complaint that Ven-A-Care claims were not
3    disclosed in this document.
4         THE WITNESS:  I guess we believe --
5         MR. BREEN:  Objection to form.
6         THE WITNESS:  I guess we believe the
7    allegations in this complaint are not disclosed
8    in this document.
9    Q.   (By Mr. Berlin)  At all?
10   A.   Well, I -- I mean, they are different.
11   They're different things.
12        (Exhibit Lockwood Ery 015 was
13        marked for identification.)
14   Q.   (By Mr. Berlin)  What we've marked as
15   Exhibit 15 is a printout of an article from the
16   Lexington Harold Leader dated July 5, 1987, Drug
17   Industry Overcharging Medicaid Prescription Drug
18   Taxpayers Millions of Extra Dollars.  When was the
19   first time you've seen this article, anyone at
20   Ven-A-Care?
21   A.   The first time Ven-A-Care saw this article
22   was when it was sent to us by Abbott and it was not

---

349

1    relied on by us.
2    Q.   And could you go to the third paragraph,
3    and it starts, the problem officials say?  You see
4    where I'm referring to?
5    A.   Yes, sir.
6    Q.   It says, pricing data often described in
7    the pharmaceutical industry as meaningless or a,
8    quote, joke, period, end quote.  The system is
9    distorted even further by drug companies that publish
10   prices that are dramatically higher than the prices
11   they actually charge pharmacies.  The sales technique
12   called playing the spread allows some pharmacies a
13   larger profit margin on Medicaid drugs and frequently
14   forces companies that play by the rules to lose
15   business.  Now, did you -- you did have an
16   opportunity to read this?
17   A.   I read this document, yes.
18   Q.   And there's a further discussion about,
19   quote, playing the spread, end quote.  And is it your
20   understanding of that that that is similar to what
21   Ven-A-Care has referred to as marketing the spread?
22        MR. BREEN:  Objection, form.

---

350

1         THE WITNESS:  I think we described what we
2    believe as marketing the spread in some detail.
3    There may be similarities, but this document
4    doesn't say anything about Abbott, that I could
5    see.  And I don't -- I don't think it identifies
6    Abbott as a company that's doing that sort of
7    thing, and in particular, the pharmacy --
8    Pharmaceutical Products Division of Abbott is
9    not identified doing this sort of thing in this
10   document.
11   Q.   (By Mr. Berlin)  And could you turn to
12   page 4?
13   A.   Yes.
14   Q.   And do you see the third paragraph there
15   says, but then Medicaid officials began getting
16   company catalogs either on their own or from
17   competitors that laid -- that -- excuse me, that
18   listed the real drug prices that pharmacies were
19   paying.
20        And that's what Ven-A-Care did, right?  It
21   looked at catalog information that listed the prices
22   that pharmacies actually were paying and compared

---

351

1    that with the prices that were listed in Redbook?
2         MR. BREEN:  Object to the form.
3         THE WITNESS:  Well, I would say what
4    Ven-A-Care did is Ven-A-Care certainly used its
5    pricing catalogs and its pricing materials in
6    bringing the complaint, but more specifically it
7    looked at Abbott and Abbott's behavior in those
8    catalogs and -- and price lists and identified
9    what we believe is fraud on Abbott's part.
10        And I just don't see Abbott identified in
11   this document.  It doesn't tell us which
12   companies they got catalogs for, who they were,
13   at least -- well, let -- it doesn't explain that
14   in this paragraph at least.  And I don't see
15   anywhere in here that -- where they got catalogs
16   that involved Abbott's drugs necessarily.
17   Q.   (By Mr. Berlin)  When it refers to the
18   Medicaid officials getting company catalogs, it
19   doesn't refer to any particular pharmaceutical
20   company, right?
21        MR. BREEN:  Objection, form.
22        THE WITNESS:  Well, in that -- at least in

---

Lockwood, M.D., John M. - 30(b)(6) - Vol. II     HIGHLY CONFIDENTIAL                    April 24, 2009

26 (Pages 356 to 359)

356

1      A.   Ven-A-Care first saw this document when it
2  was produced to us by Abbott is our current
3  understanding, thinking, and we did not rely on this
4  document.
5      Q.   When you say produced by Abbott are you --
6  when did you receive that?
7      A.   Well, when you sent it to us.
8      Q.   And could you turn -- and I'm going to
9  refer to the page numbers at the top of the page.
10      A.   Okay.
11      Q.   Could you turn to page 239?
12          MR. BREEN:  239 or 289?
13      Q.   (By Mr. Berlin) Let me try again.  293.
14  And you'll see there is a table there preceded by the
15  text, in September 1985, the oversight subcommittee,
16  for example, revealed the following pricing practices
17  as typical of our market.  And it lists product, AWP
18  and contract price, right?
19      A.   Well, I -- it lists products, AWP and
20  contract.
21      Q.   And these -- the difference between AWP
22  and contract show AWP spreads as calculated in

357

1  Exhibit A to Ven-A-Care's complaint, if you -- in
2  other words, if you calculate the AWP spreads as
3  Ven-A-Care did in that exhibit, this page shows AWP
4  spreads as large or larger than any spread alleged in
5  your complaint, right?
6          MR. BREEN:  Objection, form.
7          THE WITNESS:  I believe this chart shows
8      some drugs with very large complaints.  They're
9      not the same drugs that are in our complaint.
10      Excuse me.  I see some drugs in this chart with
11      very large spreads.  They're not the same drugs
12      that are in our complaint.
13      Q.   (By Mr. Berlin) But this is representing
14  that -- that in September 1985, and then reprinted
15  here again in 1992, there was knowledge that there
16  were spreads as high as 1,600 percent, right?  For
17  example, K-tab, that spread is 16.84 percent?
18      A.   I would say based on this, there was
19  knowledge in -- certainly at the time this was done,
20  and apparently the oversight committee thought there
21  was a wide range of prices available in the
22  marketplace, yes.

358

1      Q.   Could you turn to page 303 and 304?
2      A.   Okay.
3      Q.   You see toward the bottom of page 303 it
4  lists -- well, let me just back up a second.  This --
5  this table on these two pages and also on other pages
6  of this document shows AWP price, direct price,
7  contract price, discount off of AWP and discount off
8  of direct, right?
9      A.   Those are the columns that are listed as
10  well as a description of the drug on 303 and 304,
11  yes.
12      Q.   And one of your comments when I showed you
13  the table on 293 was that that didn't list any of the
14  drugs that are at issue in your complaint, right?
15      A.   That's correct, that table did not.
16      Q.   And in this table, if you go down, it
17  shows EES 400 tabs, EES 200 liquid, EES 400 liquid,
18  which are all Ery products, right?
19      A.   These are Erythromycin products, yes.
20      Q.   And then on the next page, 304, it lists
21  several measurements of Ery tab, Eryped.  You see
22  that part of the page?

359

1      A.   Ery tab and Eryped, yes.
2      Q.   And then going back to EES 400 tabs on
3  page 303 --
4      A.   Yes.
5      Q.   -- which shows an AWP price of 104.12 and
6  a contract price of 46.25, and then it shows the
7  discount off of AWP is 55.58 percent.  Is that also
8  expressed as AWP minus 55.58 percent would equal the
9  contract price?
10      A.   Well, it says what it says.  It says
11  discount off of AWP, and the way they calculate it,
12  which I assume is accurate, these purposes, is 55.58
13  percent.  Yes.
14      Q.   And that -- I did the math and it
15  translates to a AWP spread as calculated in Exhibit A
16  to the complaint of 20 -- of 225 percent.
17      A.   Okay.  Assuming your math is accurate.
18      Q.   You'll accept that?
19      A.   I'll accept that, assuming --
20      Q.   And that is -- that's -- that is in the
21  range of AWP spreads that Ven-A-Care alleges in its
22  complaint, right?

360

1       A.   I think it's in the range of AWP spreads,
2   yes.
3       Q.   And the next page, if you look at Ery tab,
4   250 milligrams, and Ery tab, 250 milligrams, is one
5   of the Abbott NDCs included in your complaint, right?
6       MR. BREEN:  Objection, form.
7       THE WITNESS:  Yes.  I don't know if
8       these -- if these -- if there are other Ery
9       tabs, if these represent other manufacturers or
10      whether they represent Abbott, it doesn't say
11      that.
12      Q.   (By Mr. Berlin)  And --
13      A.   And that's true for, as far as I can tell,
14  all the drugs in this chart.  I don't see -- I don't
15  see anything from -- that expressly says its Abbott's
16  drug, but go ahead.
17      Q.   And for that drug, the Ery tab, 250
18  milligrams, it has an AWP of 23.75, right?
19      A.   Yes, sir, I see that.
20      Q.   Contract price of $3.51?
21      A.   Yes, sir, I see that.
22      Q.   And I know you don't have a calculator,

361

1   but I did it and it comes out to 677 percent.  At
2   least looking at those numbers, does that look
3   approximately correct?
4       A.   Assuming your math is correct, I would
5   accept that, that that's true.
6       Q.   And that's actually as large or larger
7   than the spreads alleged in your complaint, right?
8       A.   I would -- I would say that's true,
9   although our -- I mean, our complaint is specifically
10  for Abbott's drugs.
11      Q.   And did you provide information to the --
12  you being Ven-A-Care provide any information to the
13  government that led to the disclosure of this
14  information in this document that we've marked as
15  Exhibit 16?
16      A.   Well, I believe we started disclosing
17  information to the government in 1990, and I would
18  say that that was discussed in Mr. Jones' deposition,
19  I assume.  And I don't know if the information we
20  disclosed to the government in 1990 found its way to
21  this report or not.
22      Q.   Well, let me ask --

362

1       A.   I think -- well, I don't need to -- I
2   think I have to rely on Mr. Jones' representations in
3   that time period.
4       Q.   And I'm going to ask you a more narrow
5   question now, which is, based on the fact that you
6   didn't disclose your allegations about Erythromycin
7   to the government until the year 2000, can I
8   correctly assume that Ven-A-Care was in no way a
9   source of this pricing information about Erythromycin
10  in this document marked as Exhibit 16?
11      A.   We did not supply the pricing information
12  on this -- in this document.
13      MR. BERLIN:  Okay.  I'm going to mark
14      another document now.  It's actually -- it's an
15      excerpt of the OIG working file of the audit
16      that led to the OIG's 1997 report, and we'll
17      mark it as Exhibit 17.
18      (Exhibit Lockwood Ery 017 was
19      marked for identification.)
20      Q.   (By Mr. Berlin)  First of all,
21  Dr. Lockwood, when did Ven-A-Care become aware that
22  OIG was conducting the audit that eventually led to

363

1   its reports in 1996 and 1997?
2       A.   I would expect that kind of information,
3   to the extent we have it, would have been discussed
4   in Mr. Jones' deposition in that -- that time period.
5   He and Mr. Bentley were the people who worked with
6   the government from 1990 certainly up until the time
7   I became more involved with Ven-A-Care.  So I would
8   rely on his statements on that.
9       MR. BERLIN:  Jim -- and I apologize.
10      Obviously there are a lot of depositions for me
11      to make it through, but I didn't see an answer
12      to that precise question.  Are you able to --
13      I'm not representing to you it's not there.  I
14      just don't recall seeing it.  Are you able to
15      refer me to that.
16      MR. BREEN:  I can't sitting here right
17      now.  I will do the following, though:  I'll
18      look into it, talk to Mr. Jones about it.  I do
19      not think that we're going to have Ven-A-Care
20      giving the OIG information on the oral
21      Erythromycins prior to this report.  Okay.  I
22      think that's what you're trying to --

Lockwood, M.D., John M. - 30(b)(6) - Vol. II    HIGHLY CONFIDENTIAL                                    April 24, 2009

36 (Pages 396 to 399)

---

396

1    of tape number five.  The time is 2:26 p.m. and
2    we're back on the record.
3            MR. BREEN:  I'd ask that the question
4    pending be read back so it's very clear what
5    question the witness is answering.
6            MR. BERLIN:  Actually I withdraw the
7    question.
8            MR. BREEN:  After you had him read the
9    report?
10           MR. BERLIN:  I'm going to ask him in a
11   minute.  I'm withdrawing that particular --
12       Q.   (By Mr. Berlin)  Have you had a chance to
13   read the report?
14       A.   I've read the report, yes, sir.
15       Q.   And when did Ven-A-Care become aware of
16   this report?
17       A.   Well, we certainly focused on this report
18   when you sent it to us.  We did not rely on this
19   report -- report in filing our lawsuit.  We don't
20   have a direct recollection of specifically reading
21   this report -- although someone may have -- and we're
22   ready to answer questions.

---

397

1        Q.   As of 1996 was Ven-A-Care's investigation
2    into the -- into these AWP and pricing issues limited
3    to injectables and IV drugs?
4            MR. BREEN:  Objection to form.
5            THE WITNESS:  I would say that we were
6        focused on mainly injectables and IV drugs at
7        that point in time.  I wouldn't say that it was
8        entirely limited to that, no.
9        Q.   (By Mr. Berlin)  As of that time, had
10   Ven-A-Care brought to the government's attention any
11   specific allegation as to any pharmaceutical other
12   than injectables or IV drugs?
13           MR. BREEN:  I'm going to again object,
14       outside the designations for this 30(b)(6)
15       deposition.  Mr. Jones covered that in detail.
16       If you want to ask him as a 30(b)(1) based upon
17       his recollection, that's fine, but he's covered
18       this in detail.  I don't want to go over the
19       topics because that will be coaching the
20       witness, but your question is covered by the
21       other depositions.
22       Q.   (By Mr. Berlin)  Can you answer that

---

398

1    question?
2            MR. BREEN:  As a 30(b)(1) witness?
3            MR. BERLIN:  He can answer it and you can
4        object as to how you see it whenever you want.
5        Q.   (By Mr. Berlin)  Please answer the
6    question.
7        A.   Well, I would say that in the time period
8    you're discussing that Mr. Jones is much more
9    familiar with Ven-A-Care's activities because I
10   really had just begun working at Ven-A-Care in the
11   '95 to '96 time frame and had limited
12   responsibilities and part-time responsibilities
13   whereas Mr. Jones was full-time and had been involved
14   from the beginning.
15           So his knowledge, much like probably all
16   of these older documents, is better than mine in that
17   area.  I -- I know that we discussed some oral
18   medications in -- on a personal level in -- oh, I
19   think by 1997 we had for sure.  But I think Mr. Jones
20   is the guy who can give you the answer to this
21   question far better than I can.
22       Q.   I'll be very clear that I'm now asking you

---

399

1    as an individual, do you personally have any
2    knowledge of Ven-A-Care bringing to any government
3    entity's attention any allegation with respect to a
4    pharmaceutical other than injectables or IVs at any
5    time prior to the end of 1996?
6            MR. BREEN:  Objection, form.  And Eric,
7        there's one thing about the question if you
8        would modify it, I think we could get a very --
9        much clearer answer.
10           THE WITNESS:  We had discussed some oral
11       medications with the government, had discussed
12       some issues about them, and I recall doing that
13       in -- I think I personally recall doing it in
14       '97.  Whether we had done it earlier than that,
15       I don't -- I think that's Mr. Jones' deal.  I --
16       and I think we felt that had been covered in his
17       deposition.  I certainly didn't prepare myself
18       to work on that in particular, at least --
19       Q.   (By Mr. Berlin)  Did you attend the --
20   I've referred earlier to the presentation to Texas in
21   1997?
22       A.   Yes, sir, I did.

---

---

408

1  conversations are far better known to Mr. Jones than
2  they are to me and it was our intent to stimulate the
3  government in the pharmaceutical pricing area.
4      Q.   And --
5      A.   I mean, I think that's been
6  well-documented by letters from Ven-A-Care over
7  the -- I mean, it's been talked about a lot.
8      Q.   And then Ven-A-Care -- I mean, what you're
9  saying is this was a big issue to Ven-A-Care, right?
10     MR. BREEN:  Objection to form.
11     Q.   (By Mr. Berlin)  I mean pursuing -- let me
12  withdraw the question pursuant to counsel's
13  objection.  Ven-A-Care stopped seeing patients in
14  1998, right?
15     MR. BREEN:  Objection to form.
16     THE WITNESS:  That's the last patient that
17  I think we recall seeing, yes.
18     Q.   (By Mr. Berlin)  And between that time now
19  11 years later, pursuing AWP and pricing alleged
20  fraud has been Ven-A-Care's main business, right?
21     A.   It's certainly been our major activity,
22  and I don't know if it's proper to call it a

409

1  business, but it's certainly our major activity.
2      Q.   It's something that you work, would you
3  say, full-time on, almost full-time?
4      A.   I worked full-time on it, I would say.  I
5  spend a lot of time working on it, yes, sir.
6      Q.   And at any point prior to 2000 -- use that
7  date -- did Ven-A-Care know that the OIG had issued a
8  report that found that for generic drugs, that
9  pharmacies pay an average of 42.5 percent less than
10  AWP for drugs sold to Medicaid beneficiaries?
11     MR. BREEN:  Objection to form.
12     Q.   (By Mr. Berlin)  I'm not asking whether
13  you read it but whether Ven-A-Care knew that this
14  report had been issued?
15     A.   We don't have a specific recollection of
16  that at this time.  We don't have a specific
17  recollection of this exact report or the details of
18  it at this time.  We didn't rely on the report in
19  filing our lawsuit.  That's, I think, what I can say
20  about it.
21     Q.   And prior to 2000, did anyone from the
22  government alert you that an OIG report had been

410

1  issued after your conversations with Mr. Vito in
2  providing pricing information to the government?
3      A.   I'm not aware of that specifically.  Our
4  conversations with Mr. Vito were usually him calling
5  and wanting information or us calling him and giving
6  him information as opposed to discussing the latest
7  OIG report.
8      Q.   And your purpose of providing that was to
9  stimulate government activity and hopefully even a
10  report like this, right?
11     A.   It was fine with us if they did that, yes.
12  Yes.  As I said, I don't -- we -- we may have read
13  this report.  Someone at Ven-A-Care may have read
14  this report.  We don't have a -- we don't believe we
15  have a copy of this report in our file that we can
16  say that we -- oh, yeah, we all read this; we can't
17  say that, or that we relied on it in some way or that
18  it changed or affected our complaint in some way.
19     We knew the government was generating
20  reports and seeing some increased interest, but we
21  were also busy working on other things all the time,
22  so --

411

1      Q.   What other things are you referring to?
2      A.   Well, pursuing the litigation that we were
3  involved in at that time.
4      Q.   And Dr. Lockwood, you understand that one
5  of the topics that you're here to testify about was
6  when and how Ven-A-Care became aware of each of the
7  documents that we provided to you, right?
8      A.   I think that's what I -- I'm trying to
9  tell you.
10     Q.   I understand.  I just want to make sure
11  that we're on the same page.
12     A.   I don't have a specific recollection.
13  That doesn't mean that someone at some point didn't
14  see this document perhaps listed on an OIG website.
15  I don't -- I don't know.  We don't -- the question is
16  did someone have a specific recollection of this or
17  does Ven-A-Care have a specific recollection of this
18  specific document and whole host of circumstances
19  around it that would give us some special knowledge
20  for this document.  I don't think we have that.
21     Q.   And let me --
22     A.   I'm sorry.  Some of the Albuterol reports