# Exhibit 10

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

Russillo, Thomas                              January 8, 2009
                        Irvine, CA

              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS


IN RE PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Master File No.

LITIGATION                       ) 01-12257-PBS

_____  )

                                 )

THIS DOCUMENT RELATES TO:        ) VIDEOTAPED

                                 ) DEPOSITION OF

United States of America ex rel. ) THOMAS RUSSILLO

Ven-a-Care of the Florida Keys,  )

Inc., v. Boehringer Ingelheim    ) JANUARY 8, 2009

Corp. et al., Civil Action No.   )

07-10248-PBS, and The City of    )

New York et al. v. Abbott        )

Laboratories et al., Civil       )

Action No. 03-10643-PBS.         )

_____  )


(Cross-noticed captions on following pages.)

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

---

                                                          Page 2

 1      IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI

 2                  FIRST JUDICIAL DISTRICT

 3       - - - - - - - - - - - - - - - - - -

 4    STATE OF MISSISSIPPI,                )

 5                  Plaintiff,             )

 6         vs.                            ) Civil Action No.

 7    ABBOTT LABORATORIES, INC., et al. ) G2005-2021

 8                  Defendants.            )

 9       - - - - - - - - - - - - - - - - - -

10

11

12

13

14         Videotaped deposition of THOMAS RUSSILLO, a

15    witness herein, called for examination by counsel

16    for the plaintiff in the above-entitled matter,

17    pursuant to notice, taken at 18800 MacArthur

18    Boulevard, Corona del Mar Conference Room, Irvine,

19    California, beginning at 9:01 a.m. and ending at

20    5:06 p.m., on Wednesday, January 8, 2009, before

21    Lisa O'Sullivan, California Certified Shorthand

22    Reporter No. 7822, RMR, CRR.

---

Russillo, Thomas                                    January 8, 2009
                                Irvine, CA

Page 22

1     Q    Are you familiar with a company called

2  Bedford Labs?

3     A    Yes, I am.

4     Q    What is that?

5     A    That was the name of our generic division,

6  Ben Venue's generic division.

7     Q    So Bedford Laboratories is a part of

8  Ben Venue.  Is that fair to say?

9     A    That's right.  That's correct.

10    Q    And are you familiar with a company called

11 Boehringer Ingelheim Pharmaceuticals, Incorporated?

12    A    Yes.

13    Q    If I refer to that as BIPI today, will you

14 understand that I mean Boehringer Ingelheim

15 Pharmaceuticals, Incorporated?

16    A    Yes.

17    Q    Can you describe in general the business of

18 BIPI as of 1998?  By business I mean, among other

19 things, the types of products the company marketed

20 and sold.

21    A    To the best of my knowledge, BIPI included

22 Ben Venue Laboratories, Roxane Laboratories, a

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

                                                        Page 23

1    consumer health business, and branded products.

2        Q    To your knowledge, Roxane Laboratories was a

3    part of BIPI?

4        A    I believe it was.

5        Q    Were you ever an employee of BIPI?

6        A    I think -- I'm not sure.  I told you

7    earlier, my paycheck came from Ben Venue.

8        Q    Your paycheck came from Ben Venue?

9        A    Yes.

10       Q    Did your paycheck ever come from any other

11   Boehringer Ingelheim entities from the period of

12   November 1997 until 2005?

13       A    I don't believe so.

14       Q    Did you have any responsibility for any

15   portions of BIPI's business?

16       A    Yes.

17       Q    What responsibilities were those?

18       A    At what point in time are you talking about?

19       Q    Take me from 1998 up to the present, to the

20   best of your ability.

21       A    From 1997, November 1997, at the time of the

22   acquisition, I was retained in my current title,

Russillo, Thomas                          January 8, 2009
                    Irvine, CA

Page 24

1    retained as president and chief operating officer

2    of Ben Venue Laboratories.

3          So Ben Venue Laboratories, its contract

4    manufacturing division, and Bedford Laboratories,

5    its generic marketing arm for injectables

6    manufactured by Ben Venue, was under my

7    responsibility.

8          Sometime at the end of 1998, I was also

9    given additional responsibilities for the Roxane

10   multisource business.

11      Q   Did you ever have any responsibilities for

12   the branded drug business?

13      A   No, I did not.

14      Q   What is Roxane Laboratories?

15      A   Roxane Laboratories, as I understood them,

16   was a Columbus-based manufacturing operation that

17   had some branded products and multisource products.

18      Q   And to your knowledge, you were never paid

19   by Roxane Laboratories?

20      A   That is correct.

21      Q   But in the course of your employment with

22   Ben Venue Laboratories, from some point in 1998

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

Page 25

1    onwards, you had responsibility for part of

2    Roxane's business?

3        A    That's correct.

4        Q    I'm going to show you a document that the

5    court reporter will mark as Exhibit 1.

6             (Exhibit Russillo 001 is marked.)

7        Q    BY MR. FAUCI:  As a general ground rule for

8    whenever I show you a document, take time to

9    familiarize yourself with it.  If it's a lengthy

10   document, I will try and direct your attention to

11   specific points of it.

12            Are you familiar with this document?

13       A    I don't recall actually seeing this

14   document, but -- so I have to say no, I'm not

15   familiar with this document.

16       Q    At the top, it says "Roxane Laboratories,

17   Inc., Unanimous Written Consent of Directors."  Do

18   you see that?

19       A    Yes, I do.

20       Q    If you look at the last paragraph, beginning

21   with the word "resolved."

22       A    Yes.

Russillo, Thomas                           January 8, 2009
                        Irvine, CA

Page 26

1      Q    Can you read that section for me?

2      A    "Resolved that, effective October 23, 1998,

3   Mr. Thomas R. Russillo, President and Chief

4   Operating Officer of this Corporation's affiliate,

5   Ben Venue Laboratories, Inc., of Bedford, Ohio, be,

6   and he hereby is, assigned responsibility for the

7   Marketing of Multisource Products, Medical Affairs,

8   Drug Regulatory Affairs, and Scientific Affairs

9   functions of this Corporation."

10     Q    What does it mean that you were assigned

11  responsibility for these functions?

12     A    I'm not sure what this meant.  I only know

13  what happened.

14     Q    Did you regard Ben Venue and Roxane as

15  separate companies?

16     A    Yes, I did.

17     Q    If you were an employee of Ben Venue, why do

18  you think you were put in charge of Roxane's

19  marketing department?

20     A    I was put in charge of Roxane's multisource

21  marketing because they marketed generics, and Ben

22  Venue had been marketing generics since 1992.

Russillo, Thomas                                January 8, 2009
                        Irvine, CA

Page 27

1    Q   From November 1997 -- oh, sorry.  Strike

2  that.

3         From the date of this document,

4  October 1998, is it accurate to say that you were

5  in charge for the marketing of multisource products

6  at Roxane?

7         MS. RIVERA:  Object to form.

8         THE WITNESS:  I'm not sure of the exact date

9  it happened.  It was at the end of 1998.

10   Q   BY MR. FAUCI:  If you look at the bottom, it

11  says, "In witness whereof, we have duly signed this

12  instrument effective as of the 14th day of October,

13  1998."

14        Do you see that?

15   A   Yes, I do.

16   Q   From that point on, do you think it's fair

17  to say that you were in charge of Roxane's

18  marketing?

19        MS. RIVERA:  Object to form.

20        THE WITNESS:  I'm not sure that that's fair

21  to say.  No.

22   Q   BY MR. FAUCI:  Was there a point in time at

Russillo, Thomas                                    January 8, 2009
                            Irvine, CA

1    which you became in charge of Roxane's marketing

2    department for multisource drugs?

3        A    Yes, there was.

4        Q    And was that around the 1998 time frame?

5        A    The end of 1998, yes.

6        Q    Was there anyone at Roxane that you had to

7    report to regarding marketing decisions for

8    Roxane's multisource products?

9            MS. RIVERA:   Object to form.

10           THE WITNESS:   Werner Gerstenberg was the

11   president of Roxane Laboratories.  As such, I had

12   an obligation to keep him informed as to what was

13   going on.

14       Q    BY MR. FAUCI:   How often did you talk to

15   Mr. Gerstenberg?

16       A    I would say weekly.

17       Q    If you made a marketing decision on a

18   Roxane's product, did you have to run it by

19   Mr. Gerstenberg?

20       A    Not normally, no.

21       Q    Were there occasions when you needed to have

22   Mr. Gerstenberg approve a Roxane marketing

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                              January 8, 2009
                           Irvine, CA

1   decision?

2       A    Those occasions would have been limited.

3   And they would have been at my discretion to advise

4   him, as he was my supervisor.

5       Q    When might you have advised him of a

6   decision that you wanted his sign-off on?

7       A    I don't recall any specific ones.

8       Q    Was there anyone at Boehringer Ingelheim

9   that you had to report to regarding marketing

10  decisions for Roxane's multisource products?

11          MS. RIVERA:  Object to form.

12          THE WITNESS:  As I said earlier, I reported

13  to Werner Gerstenberg.  So anything that I did as

14  either Ben Venue COO or as head of multisource

15  business, ultimately I reported to Werner.

16          So anything that I thought was -- that he

17  was in need of being aware of, I would advise him

18  of.

19      Q    BY MR. FAUCI:  Did you ever report to Shelly

20  Berkle?

21      A    No, I did not.

22      Q    Other than Mr. Gerstenberg, can you think of

Russillo, Thomas                          January 8, 2009
                          Irvine, CA

1     anyone else that you reported to during your time

2     from 1998 to the present -- to the end of your time

3     at Roxane?

4          A    Yes.

5          Q    Who else?

6          A    I reported -- Werner Gerstenberg retired in,

7     I believe, December of 2003 and was replaced by

8     Marty Carroll as the new CEO.  I reported to him.

9          Q    Anyone else?

10         A    I can't think of anyone.

11         Q    You said Roxane also marketed branded

12    products?

13         A    At some point in time, yes.

14         Q    Are you familiar with the term "branded

15    generic"?

16         A    Yes.

17         Q    What is a branded generic?

18         A    As the name would indicate, it is a generic

19    that has been given a brand name.

20         Q    Who had responsibility for marketing

21    Roxane's branded generics?

22         A    At what point in time?

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

1     Q    1998 onwards.

2     A    Some of the branded generics became the

3    responsibility of Roxane multisource at the end of

4    1998.  So I had responsibility, people who worked

5    for me had responsibility.

6     Q    Can you think of anyone else that had

7    responsibilities for Roxane's branded generics?

8     A    As I said, not all branded generics at

9    Roxane were my responsibility.

10     Q    Do you know whose responsibility they were?

11          MS. RIVERA:  Object to form.

12     Q    BY MR. FAUCI:  Do you know -- let me

13    rephrase that question.

14          For the drugs at Roxane that you did not

15    have responsibility for marketing for, who was in

16    charge of marketing?

17          MS. RIVERA:  Object to form.

18          MR. FAUCI:  That's a horrible question.  Let

19    me rephrase that.

20     Q    For the branded generic drugs at Roxane, can

21    you tell me who had responsibility for marketing

22    decisions?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                January 8, 2009
                        Irvine, CA

Page 32

1        MS. RIVERA:  Object to form.

2        THE WITNESS:  There were many branded

3   generics.  Some of those branded generics were

4   retained by the multisource division.  So for those

5   products, I would have still had responsibility.

6        The others, the ones that were not -- they

7   were branded generics, but they were not part of

8   the multisource business, those products were

9   transferred to BIPI.

10   Q    BY MR. FAUCI:  Who would have had

11   responsibility for those products at BIPI?

12   A    Well, there was a group of Roxane employees

13   who managed the branded Roxane business.

14   Q    Can you tell me who those people are?

15   A    Again, they changed at various times.  Ed

16   Tupa would be the name that comes to mind.

17   Q    Did Shelly Berkle have responsibility for

18   Roxane's branded generic products?

19   A    My recollection is that Ed Tupa at some

20   point in time reported to Shelly.

21   Q    Do you know if Mr. Berkle had responsibility

22   for Roxane's branded generic products at any point

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                January 8, 2009
                        Irvine, CA

Page 33

1    in time?

2           MS. RIVERA:  Object to form.  Asked and

3    answered.

4           THE WITNESS:  I think he had oversight of

5    that, just like I had oversight of multisource

6    business.

7       Q    BY MR. FAUCI:  I'm going to direct your

8    attention to the names at the bottom of this

9    document, Exhibit 1.  Who is Walter Poerschmann?

10      A    Walter Poerschmann was a German-based

11   employee of Boehringer Ingelheim, who was head -- I

12   think he was head of North America and South

13   America Ethical Pharmaceuticals.

14      Q    What does Ethical Pharmaceuticals mean?

15      A    Branded pharmaceuticals.

16      Q    What about Philip Franks?

17      A    Philip Franks was, I believe, the general

18   counsel at the time.

19      Q    And Sheldon Berkle.  Can you tell me who he

20   was?

21      A    He was head of Ethical Pharmaceuticals

22   business unit.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                        January 8, 2009
                        Irvine, CA

Page 34

1    Q   Did any of Mr. Poerschmann, Mr. Franks, or

2   Mr. Berkle have day-to-day responsibility at Roxane

3   Laboratories?

4    A   As I said, Shelly had oversight for the

5   branded business.  So that portion of the branded

6   business that was being handled by Roxane, I guess

7   he had some responsibility for.

8    Q   And how often was Mr. Gerstenberg at Roxane?

9    A   You know, I really don't know how many times

10   he went there.

11    Q   Was he based there?

12    A   No, he was not.

13    Q   Did you see him once a month, more than

14   that, or less than that, in person?

15    A   In relation to?

16    Q   How often, to the best of your memory, was

17   Mr. Gerstenberg present on the Roxane campus?

18    A   I couldn't answer that question.  I don't

19   know.

20    Q   I'm going to show you a document the court

21   reporter is going to mark as Exhibit 2.

22        (Exhibit Russillo 002 is marked.)

Russillo, Thomas                              January 8, 2009
                        Irvine, CA

1      Q    Do you think it would have been sent to

2   people outside of the Boehringer Ingelheim family

3   of companies?

4      A    I don't know.

5      Q    Next to the date, it says Ridgefield,

6   Connecticut.  Which company was based in

7   Ridgefield, Connecticut?

8      A    Ridgefield, Connecticut, to me meant BIPI.

9      Q    Did it also mean BIC?

10     A    It could have, yes.

11     Q    Was there any difference in your mind

12  between BIC and BIPI?

13         MS. RIVERA:  Object to form.

14         THE WITNESS:  I believe that BIC was the

15  overriding holding company, and BIPI was an

16  operating arm.

17         But as I said earlier, the Boehringer

18  Ingelheim structure at that level was, you know,

19  not something I was extremely familiar with.

20     Q    BY MR. FAUCI:  When you thought of

21  Connecticut, you thought of Boehringer Ingelheim?

22     A    That's correct.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                              Irvine, CA

1      Q    Is it consistent with your recollection that

2    you and Mr. Waterer reviewed and recommended AWP

3    changes for the multisource line of products?

4      A    I don't recall doing that.  No.

5      Q    You don't recall doing what?

6      A    Recommending AWP changes.

7      Q    Do you recall approving AWP changes?

8      A    I do.

9      Q    Did you ever ask anyone at Boehringer

10   Ingelheim to sign off on an AWP change that you

11   were involved with?

12          MS. RIVERA:  Object to form.

13          THE WITNESS:  There would have been -- it

14   would have been at my discretion.  I would have

15   asked Werner Gerstenberg, if I thought there was a

16   sensitive AWP issue.

17     Q    BY MR. FAUCI:  Is there anyone else you

18   would have talked to about a sensitive AWP issue?

19     A    No.

20     Q    What would make an AWP issue sensitive?

21     A    Well, at this time --

22          MS. RIVERA:  Hold on.  Object to form.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                              Irvine, CA

Page 99

1          THE WITNESS:  At this point in time, I was
2     very sensitive to the AWP litigation that was
3     floating around.
4          Q    BY MR. FAUCI:  So as of the late 1990s, you
5     were aware that there was investigations into
6     inflated AWPs?
7          A    Yes, I was.
8          Q    Let's turn to the first page of the exhibit,
9     of the attachment, where it says, "Impact of June
10    2000, BU Reorganization on PAC Process."
11         A    Yes.
12         Q    Was there a reorganization of the business
13    unit in or around June 2000?
14         A    Yes, there was.
15         Q    What was the result of that?
16         A    The result of that was, as best I recall,
17    the pricing decision committees, as you've shown me
18    in the previous things, were implemented on the
19    brand side, and we were left pretty much on the
20    side to do our own thing, on the multisource side.
21         Q    Turn to page 4 of the document, where it
22    says "PTC Team Post-June 2000."  What is the PTC

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                January 8, 2009
                          Irvine, CA

                                                    Page 133

1     A    Yes.

2     Q    Why is Mr. Berkle making this presentation

3  with you?

4     A    I can't tell from the minutes what part of

5  the presentation -- what presentation he gave.

6     Q    Why would he be giving any presentation

7  about Roxane?

8     A    Because he had overall oversight for the

9  Roxane branded business.

10     Q    Let's look at BIC JURIS 0194, Boehringer

11  Ingelheim Pharmaceuticals, Inc., BU Ethical

12  Pharmaceuticals.  And that presentation's made just

13  by Mr. Berkle.

14         Do you see that?

15     A    Yes.

16     Q    And then if you turn to the next page, it

17  says Roxane branded products included in the

18  presentation by Mr. Berkle.  Do you see that?

19     A    Yes.

20     Q    So is it consistent with your understanding

21  that Mr. Berkle would be a final say-so on Roxane's

22  branded business?

Russillo, Thomas                                January 8, 2009
                        Irvine, CA

Page 134

1        MS. RIVERA:  Object to form, foundation.

2        THE WITNESS:  Can I have a repeat of that

3    question?

4        MR. FAUCI:  Can you repeat that?

5            (Record is read.)

6        MR. FAUCI:

7    Q    Would have a final say-so.

8    A    On Roxane's branded business?

9    Q    Yes.

10       MS. RIVERA:  Object to form, foundation.

11       THE WITNESS:  I don't know if he had final

12   say.  He had a boss to whom he reported as well, so

13   I would assume it would be Mr. Gerstenberg.

14   Q    BY MR. FAUCI:  But Mr. Berkle was senior in

15   the chain of command for Roxane's branded business.

16   Is that fair to say?

17       MS. RIVERA:  Object to form.

18       THE WITNESS:  He was the head of the Ethical

19   business unit.

20   Q    BY MR. FAUCI:  And that included Roxane's

21   branded business?

22   A    Yes.

Henderson Legal Services, Inc.

Russillo, Thomas                                    January 8, 2009
                            Irvine, CA

```
                                                      Page 166
 1    documentation would consist of.

 2        Q    And so as long as she showed you that the

 3    AWP change was necessary to make Roxane's AWPs as

 4    high as its competitors, that would be enough for

 5    you to approve it?

 6        A    In general, that would probably be enough.

 7        Q    Were you concerned about the government's

 8    investigations into AWP inflations?

 9        A    Absolutely.

10        Q    Let's look at the top e-mail from

11    Ms. Waterer.  She says, "Bob, got the information

12    yet?  Discussed it with Tom; and depending on the

13    strength of the customer information you can pull

14    together, he'll support it.  No guarantees of

15    getting it through."

16             Do you see that?

17        A    Yes, I do.

18        Q    If you were -- if it was your decision as to

19    whether or not to approve it, why wouldn't there be

20    any guarantee of getting it through?

21        A    I don't know what she was referring to when

22    she said that.  She could have been referring no
```

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                                Irvine, CA

                                                        Page 172

1    brother wants to punish, they will, so why not make

2    some money meanwhile."

3           Do you see that?

4    A    Yes, I do.

5    Q    What do you understand Mr. Sykora to be

6    referring to when he writes "big brother"?

7           MS. RIVERA:  Object to form and foundation.

8           THE WITNESS:  I don't know for sure.  I can

9    only speculate who he meant.

10   Q    BY MR. FAUCI:  Have you ever heard of the

11   government referred to as big brother?

12   A    Yes.

13   Q    And you know the government was concerned

14   about inflated AWPs?

15   A    Yes.

16   Q    As early as 1999?

17   A    Yes, I do.

18   Q    Can you think of any reason why Boehringer

19   Ingelheim would be upset with Roxane for raising

20   its AWPs on furosemide?

21          MS. RIVERA:  Object to form.

22          THE WITNESS:  What do you mean by Boehringer

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

Page 173

1    Ingelheim?

2         Q    BY MR. FAUCI:  BIC and/or BIPI.

3              MS. RIVERA:  Object to form and foundation.

4              THE WITNESS:  Yeah.  You mean that the

5    company would be upset?

6         Q    BY MR. FAUCI:  Yeah.  The question is can

7    you think of any reason why BIC and/or BIPI would

8    punish Roxane for raising its AWPs?

9              MS. RIVERA:  Object to form and foundation.

10             THE WITNESS:  I don't know whether in this

11   case the AWP was actually raised or not.  All I

12   know is that I would have reviewed it.  If I

13   thought it was justified, I would have approved it.

14             And I believe that the people you're

15   referring to, BIC or BIPI or whomever, would not

16   have had any objection.  I wouldn't have signed off

17   on it if I thought there was going to be a problem.

18        Q    BY MR. FAUCI:  You wouldn't have signed off

19   on it without their approving?

20        A    I wouldn't have signed off on it if I

21   thought it was going to be a problem.

22             If I was concerned about it, I would have

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                         Irvine, CA

                                                        Page 174

 1    called Werner Gerstenberg and told him what I

 2    thought was going on and what I thought should be

 3    done.  And then he would have either agreed or

 4    disagreed.

 5        Q   So do you think you consulted with Werner

 6    Gerstenberg about the decision as to whether or not

 7    to raise AWPs for Roxane?

 8        A   Don't recall.

 9        Q   For furosemide, I apologize.

10        A   I don't recall.

11        Q   In the top e-mail from Ms. Waterer, the

12    second paragraph down, she writes, "You've

13    indicated that AWP on furosemide is critical now

14    and that we'd have real business opportunities if

15    we could change it.  As you've been informed, Tom

16    is prepared to take furosemide up the line."

17            Do you see that?

18        A   Yes.

19        Q   Who would you be taking furosemide up the

20    line to?

21        A   I believe she's referring to that if I

22    needed to, I would take it up the line.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

1      Q    To who?

2      A    Werner Gerstenberg.

3      Q    Anyone else?

4      A    No.

5      Q    Where is Werner Gerstenberg based?

6      A    Connecticut.

7      Q    What was his job function?

8      A    He was the CEO of -- now, let's take it in

9   respect.  In this particular case, he would have

10   been acting as the president of Roxane.

11      Q    Was he also the president of other

12   Boehringer Ingelheim companies?

13      A    Yes, he was.

14      Q    Which companies, to your knowledge?

15      A    I believe he was the president of BIC.

16      Q    Which was the parent company based in

17   Connecticut?

18      A    Yes.

19      Q    Can you think of any other Roxane employees

20   that were based in Connecticut?

21      A    Can I think of any?

22      Q    Yeah.

Russillo, Thomas                          January 8, 2009
                          Irvine, CA

Page 179

1    Boehringer Ingelheim in Connecticut, unless I felt

2    there were circumstances that I needed to review

3    with Werner Gerstenberg.

4         Q    BY MR. FAUCI:  And do you recall if you felt

5    as if there were circumstances you needed to review

6    that related to the AWP increase for furosemide?

7         A    I don't recall at this point in time,

8    because I didn't have the data yet.

9         Q    You just have no recollection one way or the

10   other?

11        A    No.  I'd have to see the next series of

12   e-mails and information that would have passed.

13        Q    So it's possible that depending on what the

14   sales justification looked like, you might have

15   felt the need to go to Boehringer Ingelheim; is

16   that correct?

17        A    It is possible.

18             MS. RIVERA:  Object to form.

19        Q    BY MR. FAUCI:  And you don't know one way or

20   another whether you did?

21        A    No, I don't.

22        Q    Did you regard the decision to raise AWPs on

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                              Irvine, CA

1    furosemide as sensitive?

2         MS. RIVERA:  Object to form.

3         THE WITNESS:  I regarded any decision to

4    raise AWPs as needing to be justified.

5       Q   BY MR. FAUCI:  You write, "Rich can assure

6    you of the mood in BI."  Do you see that?

7       A   Yes.

8       Q   Is "Rich" Richard Feldman?

9       A   I believe that's who I'm referring to.  Yes.

10      Q   What do you mean, the mood in BI?

11      A   The mood at Boehringer Ingelheim was the

12   same as mine.  It was very sensitive to AWP

13   changes.

14      Q   Because of its awareness of the lawsuits

15   that had been filed?

16      A   Yes.

17      Q   You can put that aside.  I'm going to show

18   you an exhibit marked Exhibit 27.

19          (Exhibit Russillo 027 is marked.)

20      Q   BY MR. FAUCI:  This is a somewhat lengthy

21   document.  Take a moment to review it, and just

22   indicate to me when you're ready for a question.

Russillo, Thomas                                January 8, 2009
                        Irvine, CA

                                                    Page 192

1    this is a decision that you would have taken to

2    Werner Gerstenberg?

3         A    Based on the data that I've seen here and

4    the quick review, I would say I probably did not.

5         Q    What was the type of decision you would take

6    to him?

7         A    If we were raising an AWP without adequate

8    justification, meaning I didn't see a competitor's

9    analysis that showed we were just blending in with

10   the rest.

11        Q    So with knowledge the AWP investigations

12   were going on, and with knowledge that this AWP

13   increase raised the AWPs to 14 times the average

14   contract price, that would not have been reason for

15   you to go to Mr. Gerstenberg and say, "Is this

16   okay?"

17        A    I can't answer your question exactly,

18   because this -- as you've seen from the e-mail

19   trails on this and others, there were a number of

20   these going on.

21             Once I had established Werner Gerstenberg's

22   position on this, I would have implemented it.

Russillo, Thomas                                    January 8, 2009
                              Irvine, CA

Page 193

1  So -- and I don't remember eight years ago how

2  concerned he was.

3        I might have brought it to him.  I don't

4  think I did, because we've had others before that.

5  I knew where he stood.

6     Q    Would you have done this without feeling

7  comfortable that Mr. Gerstenberg was okay with it?

8     A    I can't tell you at the time.  I don't know

9  whether I went to him or not.

10    Q    You said you knew where he stood.  What do

11 you mean by that?

12    A    I knew that his position was if we were

13 meeting competitors, to stay competitive and that's

14 why we were raising the AWP, we would not be

15 perceived as taking advantage of the AWP.

16    Q    Where did you get that understanding of

17 Mr. Gerstenberg's position from?

18    A    Over many conversations with him.

19    Q    Did you have those -- was anybody else

20 involved in those conversations?

21    A    There may have been.  I don't -- I don't

22 recall the specific conversations.

Russillo, Thomas                                January 8, 2009
                          Irvine, CA

Page 194

1     Q    Could legal have been involved in those

2     conversations?

3     A    Could have been.  Yes.

4     Q    Would legal inside counsel -- were those

5     Boehringer Ingelheim employees, or Roxane

6     employees?

7     A    Which ones?

8     Q    Any inside counsel that might have been

9     involved in those decisions.

10         MS. RIVERA:  Object to form.

11         THE WITNESS:  Legal services was a shared

12     service.  We did not have, within Roxane or Ben

13     Venue, specific attorneys at that time.

14     Q    BY MR. FAUCI:  Where was the legal services

15     based?

16     A    Connecticut.

17     Q    With Boehringer Ingelheim?

18         MS. RIVERA:  Object to form.

19         THE WITNESS:  Well, they were in the

20     Boehringer Ingelheim environment.  Yes.

21     Q    BY MR. FAUCI:  Let's show you Exhibit 30.

22             (Exhibit Russillo 030 is marked.)

Russillo, Thomas                              January 8, 2009
                          Irvine, CA

                                                    Page 204

1          THE WITNESS:  My boss was, and always was,

2     Werner Gerstenberg.  So yes, I was instructed to

3     oversee that business under Werner Gerstenberg.

4          Q    BY MR. ANDERSON:  And you reported to Werner

5     Gerstenberg in his role as president and CEO of

6     BIC, Boehringer Ingelheim Corporation; correct?

7          A    Yes.

8          Q    Likewise, Mr. Berkle, as president of BIPI,

9     Boehringer Ingelheim Pharmaceuticals, Incorporated,

10    was reporting to Mr. Gerstenberg, president of BIC,

11    with respect to the Roxane branded drugs; correct?

12         A    I'm not sure.

13         MS. RIVERA:  Object to form.

14         THE WITNESS:  I'm not sure whether Shelly

15    was president of BIPI or not.

16         Q    BY MR. ANDERSON:  Okay.

17         A    He was head of the business unit Ethical

18    Pharmaceuticals.  And in that capacity, he reported

19    to Mr. Gerstenberg.

20         Q    And likewise, that reporting capacity

21    encompassed Mr. Berkle's oversight of Roxane's

22    branded products; correct?

Russillo, Thomas                              January 8, 2009
                        Irvine, CA

Page 205

1           MS. RIVERA:  Object to form and foundation.

2           THE WITNESS:  Yes, I believe so.

3      Q    BY MR. ANDERSON:  Would it be fair to say

4    that the Roxane multisource and branded products

5    were managed within the Boehringer Ingelheim

6    corporate framework after roughly 1999?

7           MS. RIVERA:  Object to form.

8           THE WITNESS:  Try -- I'm not sure what you

9    mean by the question.  Would you please try to

10   rephrase it or repeat it?

11     Q    BY MR. ANDERSON:  Would it be fair to say

12   that Boehringer Ingelheim was controlling the

13   marketing of Roxane multisource products and Roxane

14   branded products after roughly 1999?

15          MS. RIVERA:  Object to form.

16          THE WITNESS:  I can't define it the way

17   you're describing it.

18     Q    BY MR. ANDERSON:  How would you define it?

19     A    That Roxane Labs had two divisions within

20   Roxane:  One that handled the brand piece; one that

21   handled the multisource piece.  And the person who

22   oversaw them on the multisource side was me, and

Russillo, Thomas                              January 8, 2009
                              Irvine, CA

Page 206

1    the person that oversaw them on the Roxane branded

2    side was Shelly Berkle.

3        Q    And both you and Mr. Berkle did not actually

4    work for Roxane; correct?

5        A    I don't believe Shelly did.  I know I

6    didn't.

7        Q    But instead, were managing those two aspects

8    of Roxane's business at the direction of Boehringer

9    Ingelheim; correct?

10            MS. RIVERA:  Object to form.

11            THE WITNESS:  When you say Boehringer

12   Ingelheim, if you mean Werner Gerstenberg, the

13   answer is yes.

14       Q    BY MR. ANDERSON:  Is that what -- is that

15   consistent with your understanding?

16       A    Is what consistent?

17       Q    That Mr. Gerstenberg, as the head of BIC,

18   was directing you and Mr. Berkle to manage Roxane's

19   business.

20       A    Yes.

21       Q    Likewise, when Mr. Carroll became the

22   president of BIC and replaced Mr. Gerstenberg, did

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

1    the same arrangement exist?

2        A    Yes, it did.

3             MS. RIVERA:  Object to form.

4        Q    BY MR. ANDERSON:  All right.  This morning,

5    I think you testified at one point that AWP is

6    arbitrary.  Do you recall that testimony?

7        A    Yes, I do.

8        Q    I'm switching gears, by the way.

9        A    That's okay.

10       Q    I'm sure you picked up on that.  Can you

11   elaborate on what you mean by that?

12       A    There's a whole lot of different adjectives

13   you could use.  You know, arbitrary meaning it's

14   not an important number.  It's a misnomer.  It's

15   not average wholesale price in three sense -- the

16   sense of the three words.

17            It's -- as I think I explained earlier, it

18   is the way we enter the market by listing a price,

19   typically 10 percent off the brand.

20       Q    Are you familiar with how AWPs are set for

21   brand drugs?

22       A    No, I am not.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

Page 221

1    manner in which Roxane priced its drugs?

2        A    I recall reviewing pricing.  I recall taking

3    a look at sales figures, profit figures.  In all of

4    that context, I'm sure we looked at the way they

5    priced.

6            You know, this was 10 years ago.  I just

7    don't remember the exact details.

8        Q    I believe you testified this morning that in

9    connection with evaluating Roxane pricing, Roxane

10   did consider relative AWP spreads; is that correct?

11       A    Yes.

12           MS. RIVERA:  Object to form.

13       Q    BY MR. ANDERSON:  Is that one of the issues

14   that you considered in evaluating the Roxane

15   pricing?

16           MS. RIVERA:  Object to form.

17           THE WITNESS:  The way we would have done it

18   is we looked at the market share.  We looked at the

19   pricing of the competitors and asked the question

20   why, if we were competitively priced, we weren't

21   getting more business, and what we needed to do.

22       Q    BY MR. ANDERSON:  And one mechanism that

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                              January 8, 2009
                        Irvine, CA

Page 222

1  Roxane could increase its sales would be by

2  matching relative spreads of other generic

3  companies; correct?

4            MS. RIVERA:  Object to form.

5            THE WITNESS:  Matching spreads?  What do you

6  mean by that?

7      Q   BY MR. ANDERSON:  Raising AWPs or decreasing

8  market prices to match relative spreads being

9  offered on competitive generic drugs.

10     A   We would raise AWPs if competitors' pricing

11  was higher than ours and we had to match up to it.

12  Yes.  We would do that.

13     Q   And was that done with authority from

14  Boehringer Ingelheim?

15            MS. RIVERA:  Object to form.

16            THE WITNESS:  That was my decision to do it.

17     Q   BY MR. ANDERSON:  And did you believe that

18  was authorized?

19     A   Yes, I did.

20     Q   By your superior, Mr. Gerstenberg, on behalf

21  of BI?

22            MS. RIVERA:  Object to form.

Russillo, Thomas                                January 8, 2009
                            Irvine, CA

Page 223

1           THE WITNESS:  By my superior.

2       Q   BY MR. ANDERSON:  Did you ever receive any

3   form of discipline from Mr. Gerstenberg about the

4   way in which Roxane had priced its drugs?

5       A   I don't recall any.  No.

6       Q   Did you ever receive any type of negative

7   feedback or complaints from anyone about -- anyone

8   that was superior to you in the Boehringer

9   organization about the way Roxane's drugs were

10  priced?

11      A   That's a difficult question to answer,

12  because we were constantly looking at our profit

13  and loss statements and trying to maximize our

14  potential.

15          So as --

16      Q   It's too broad.

17      A   -- a business unit operator, I was under

18  constant -- I won't say warning, but I was always

19  told, you know, do -- keep doing a better job.

20      Q   I understand.  I'll be a little more

21  specific, because that was pretty broad.

22          Did you ever receive any negative feedback

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                    January 8, 2009
                    Irvine, CA

                                         Page 259

1    who want big spreads, do you have any information

2    about the government being aware of the magnitude

3    of AWP spreads?

4           MS. RIVERA:  Object to form.

5           THE WITNESS:  I believe that the people who

6    were responsible for the Medicare system knew that

7    AWP was not the list price that people were paying.

8       Q    BY MR. ANDERSON:  And I understand that

9    you're testifying to that, sir.  I want to

10   understand the basis for that testimony.

11      A    I have no proof.

12      Q    Okay, all right.  Did you consult with any

13   lawyers with respect to the legality of Roxane's

14   AWP practices?

15      A    As a result of the lawsuits, our practices

16   were reviewed by lawyers who did investigations.

17      Q    Lawyers for which company?

18      A    Lawyers acting on behalf of Boehringer

19   Ingelheim.

20      Q    And without disclosing any of the content of

21   your communications with those lawyers, did you

22   learn of any changes in the way AWPs for Roxane

Russillo, Thomas                                    January 8, 2009
                              Irvine, CA

Page 260

1    products were set?

2        A    No, I did not.

3        Q    So as far as you know, despite the existence

4    of lawsuits and government investigations and

5    congressional investigations, the way in which

6    Roxane sets AWPs has remained the same?

7            MS. RIVERA:  Object to form.

8            Go ahead.

9            THE WITNESS:  As far as I know, it hasn't

10   changed.

11       Q    BY MR. ANDERSON:  Would you say that there

12   was synergy or an economies of scale for Roxane,

13   Ben Venue, Bedford, BIPI, and BIC to operate as one

14   company?

15           MS. RIVERA:  Object to form.

16           THE WITNESS:  I think the intent of merging

17   the multisource businesses was that there were

18   synergies.  I don't believe there were that many.

19       Q    BY MR. ANDERSON:  And the purpose in

20   transitioning the different companies to operate as

21   one was to save money; right?

22           MS. RIVERA:  Object to form.  Misstates

Russillo, Thomas                                    January 8, 2009
                              Irvine, CA

Page 280

1      Q   Is this the document that had like your name

2  and Judy Waterer's name?

3      A   Yes, I believe so.

4          MS. RIVERA:  Hold on.  I think I know what

5  you might be talking about.  They all -- all these

6  e-mails look alike.

7          MR. FAUCI:  This one?

8          MR. ANDERSON:  Try Exhibit 11.

9          MS. RIVERA:  This right here?

10         THE WITNESS:  No.  Yeah, it could be.  Maybe

11  it is.

12         I think this was a proposal that never

13  happened, though.  This is not the one that was ...

14     Q   BY MR. ANDERSON:  Do you recall, sir, other

15  than you and Judy Waterer, who else was part of

16  this pricing approval process?

17     A   Yeah.  I'm looking at this form, and there

18  are names here that would probably have been common

19  to that.  So besides Judy Waterer, there would have

20  been somebody from contracts.  If not John Powers,

21  someone else.

22         There would have been somebody from finance.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                            Irvine, CA

Page 281

1  The finance guy was in Roxane.  I don't remember

2  his first name, but Lewis was his name.

3        And there was a controller who worked -- who

4  he worked for.  I don't remember whether both of

5  those people were on it.  I don't recall whether

6  legal signed it or not in the early stages.  This

7  proposal added legal to it, I believe.

8     Q    And you're referring to the proposal set

9  forth in Exhibit 11?

10    A    Yes.

11    Q    And that reference to legal that would have

12 been added, at least as of the date of that

13 document, would have been the Boehringer Ingelheim

14 legal department; correct?

15        MS. RIVERA:  Object to form.

16        THE WITNESS:  I believe it would have been

17 an attorney who was part of the contracts and

18 processing group.

19    Q    BY MR. ANDERSON:  For which company?

20    A    For BIPI.

21    Q    BIPI, yes, sir.

22    A    But he would be again acting in his capacity

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd