# Exhibit 11

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

# In The Matter Of:

*THE STATE OF TEXAS v. DEY, INC., ET AL.*

*JUDY WATERER*
October 24, 2001

**FREDERICKS-CARROLL REPORTING**
*Court Reporting-Video Services-Litigation Support*
7719 WOOD HOLLOW DRIVE, SUITE 156
Austin, TX 78731
(512) 477-9911    FAX: (512) 345-1417

Original File 11024JW.V1, 307 Pages
Min-U-Script® File ID: 1319758827

**Word Index included with this Min-U-Script®**

Page 1

[1]                    CAUSE NO. GV002327
[2] THE STATE OF TEXAS           ) IN THE DISTRICT COURT
    ex rel.                      )
[3]    VEN-A-CARE OF THE         )
    FLORIDA KEYS, INC.           )
[4]                              )
       Plaintiffs,               )
[5]                              )
    VS.                          ) TRAVIS COUNTY, TEXAS
[6]                              )
    DEY, INC.; ROXANE            )
[7] LABORATORIES, INC. and       )
    WARRICK PHARMACEUTICALS      )
[8] CORPORATION,                 )
[9]    Defendants.               ) 53rd JUDICIAL DISTRICT
[10]
[11]        ORAL AND VIDEOTAPED DEPOSITION OF
[12]                 JUDY WATERER
[13]               October 24th, 2001
[14]
[15]   ORAL AND VIDEOTAPED DEPOSITION OF JUDY WATERER,
[16] produced as a witness at the instance of the Plaintiff
[17] and duly sworn, was taken in the above-styled and
[18] numbered cause on the 24th of October, 2001, from
[19] 8:20 a.m. to 5:10 p.m., before Debra L. Sietsma, CSR
[20] in and for the State of Texas, reported by machine
[21] shorthand, at Vorys, Sater, Seymore & Pease, LLP,
[22] 52 East Gay Street, Columbus, Ohio, pursuant to the
[23] Texas Rules of Civil Procedure and the provisions as
[24] previously set forth.
[25]

Page 2

[1]
[2]              APPEARANCES
[3]
[4] FOR THE PLAINTIFF:
[5]  MR. JOE CRAWFORD, MR. PATRICK J. O'CONNELL,
       MR. JARRETT ANDERSON
[6]    Office of the Attorney General
       State of Texas
[7]    Post Office Box 12548
       Austin, Texas 78711-2548
[8]
    FOR THE RELATOR:
[9]
       MR. JAMES JOSEPH BREEN
[10]   The Breen Law Firm, P.A.
       8201 Peters Road, Suite 1000
[11]   Plantation, Florida 33324
[12]     - and -
[13]   MS. JOY P. CLAIRMONT
       Berger & Montague, P.C.
[14]   1622 Locust Street
       Philadelphia, Pennsylvania 19103
[15]
         - and -
[16]
       MR. JOHN E. CLARK (Of Counsel)
[17]   Goode Casseb Jones Rikfin
       Choate & Watson, P.C.
[18]   2122 North Main Avenue
       P.O. Box 120480
[19]   San Antonio, Texas 78212-9680
[20] FOR DEFENDANT DEY, INC.:
[21]   MR. STEPHEN M. HUDSPETH
       Coudert Brothers
[22]   1114 Avenue of the Americas
       New York, New York 10036-7703
[23]
[24]
[25]

Page 13

[1] you're sure there was a court reporter present and
[2] then the testimony at trial, you think you may have
[3] had some statements recorded at, as you said,
[4] corporate headquarters?
[5]   A: Correct.
[6]   Q: Who was present at the meeting at corporate
[7] headquarters?
[8]   A: I know Bruce Banks was, the guy from the FBI.
[9] I don't recall who else might have been there.
[10]   Q: Do you recall where the guy with the FBI was
[11] officed out of?
[12]   A: No.
[13]   Q: Who's Bruce Banks?
[14]   A: He's one of our corporate attorneys.
[15]   Q: Who's — what corporate — excuse me. Strike
[16] that.
[17]       What corporation?
[18]   A: I'm not sure. We're kind of an intermingled
[19] company.
[20]   Q: When you are refer to "we," who are you
[21] referring to?
[22]   A: The Boehringer Ingelheim Corporation. And
[23] this is where it gets very jumbled for me, because
[24] there are a lot of legal definitions for how what I
[25] consider to be different branches of the company are

Page 14

[1] interrelated.
[2]   Q: Well, we're kind of —
[3]   A: I — I'm not the one that can answer his
[4] position.
[5]   Q: Okay.
[6]   A: I don't know how that works.
[7]   Q: Do you — can you list for me the
[8] corporations that you believe exist that you deal with
[9] on a day-to-day basis?
[10]   A: I work for Roxane Laboratories.
[11]   Q: Okay. Is that a corporation?
[12]   A: I don't know. It's incorporated, yes.
[13]   Q: Okay. And you're also aware of a company
[14] known as Boehringer Ingelheim?
[15]   A: Boehringer Ingelheim Pharmaceuticals,
[16] Incorporated.
[17]   Q: Are there any other corporations that you're
[18] aware of in this —
[19]   A: I don't know what's a corporation and what's
[20] a — something else. I don't know if they're
[21] subsidiaries or cousins or whatever.
[22]   Q: Okay.
[23]   A: The — the company that I ultimately report
[24] into is a — is a multinationally represented company
[25] with many different areas of expertise.

Page 15

[1]   Q: Which company do you ultimately report to?
[2]   A: Boehringer Ingelheim in Germany.
[3]   Q: I'm going to come back to all of this because
[4] it's really drawing me kind of far afield from where
[5] we started.
[6]   A: Yeah. And I'm not going to do well with
[7] answering it because it's a lot of legal definitions
[8] for how things are incorporated.
[9]   Q: I understand. I don't want you to make legal
[10] conclusions. I'm just asking you for your — what
[11] your understanding of the corporate hierarchy is
[12] and —
[13]   A: Uh-huh.
[14]   Q: — the relationships between the
[15] corporations.
[16]   A: Okay.
[17]   Q: Okay. Let's go back to your background and
[18] experience.
[19]       How long have you been in the drug
[20] industry?
[21]   A: About 20 years.
[22]   Q: Beginning after you graduated from high
[23] school, can you provide me with your educational
[24] background?
[25]   A: I completed a Bachelor of Science degree at

Page 16

[1] the Penn State University in Animal Science, and I
[2] have an MBA in Pharmaceutical Marketing from
[3] St. Joseph's University in Philadelphia.
[4]   Q: When did you get the BS from Penn State?
[5]   A: '79.
[6]   Q: When did you get the MBA from St. Joe's?
[7]   A: I don't recall the year. It was somewhere in
[8] the vicinity of ten years ago.
[9]   Q: 1991, sometime in that time frame?
[10]   A: I — I don't recall the year.
[11]   Q: Where did you first go to work after you
[12] graduated from Penn State?
[13]   A: DuPont.
[14]   Q: What was your job at DuPont?
[15]   A: I started out there as a genetic
[16] toxicologist.
[17]   Q: What were your job duties as a genetic
[18] toxicologist?
[19]   A: I was screening preliminary compounds for
[20] carcinogenicity and mutagenicity in microstudies.
[21]   Q: Would it be fair to say that that was lab
[22] work?
[23]   A: Yes.
[24]   Q: Where did you next work?
[25]   A: I moved into quality assurance.

Page 33

[1] activities, including development of new programs,
[2] selection of development candidates for new products
[3] under development, advertising promotion, training
[4] sales representatives, covering new launches,
[5] designing packaging, et cetera.
[6]   Q: What products were you responsible for?
[7]   A: At the time I got there, there were over 400;
[8] and, again, it was just the multisource line. Roxane
[9] has a brand side and a multisource side.
[10]   Q: So at the time you were hired, you were hired
[11] to be the product manager; is that correct?
[12]   A: I was hired to be the program development
[13] manager, whose responsibilities included —
[14]   Q: Managing products?
[15]   A: Yes.
[16]   Q: And the products for which you were managing
[17] were over 400 multisource —
[18]   A: Uh-huh.
[19]   Q: — products?
[20]   A: Uh-huh, yes.
[21]   Q: Advertising, training, marketing — what
[22] other duties did you list? I'm sorry.
[23]   A: Development, interaction with development.
[24]   Q: Development meaning R&D, like creation of a
[25] drug? What do you mean by "development"?

Page 34

[1]   A: Exactly that.
[2]   Q: What about pricing?
[3]   A: Pricing.
[4]   Q: What was your involvement in developing
[5] pricing?
[6]   A: I suggested it and had it routed for
[7] approval.
[8]   Q: Would it be fair to say that you had primary
[9] input in setting pricing for your 400 multisource
[10] products?
[11]   A: Yes.
[12]   Q: Who oversaw — strike that.
[13]   Who did you forward your pricing
[14] suggestions onto?
[15]   A: Over time the group of people that had to
[16] approve it changed, but I — I would say the constant
[17] ones over time would have been marketing management,
[18] sales management, contracts management and then
[19] someone at a senior level of management.
[20]   Q: Can you name specifically persons that were
[21] most involved in —
[22]   A: Initially or — I mean it's — we have had
[23] very, very many changes in our company.
[24]   Q: I realize.
[25]   A: And our processes and procedures have evolved

Page 35

[1] and streamlined, so it has — it has changed
[2] dramatically over time, so I could name a lot of
[3] names.
[4]   Q: Okay. Well, let's just take it year by year,
[5] then.
[6]   In 1996 —
[7]   A: I couldn't begin to do that.
[8]   Q: You can't?
[9]   A: I could not begin to tell you who signed
[10] every document.
[11]   Q: Oh, I realize that. I'm not trying to be
[12] unreasonable and ask you to list every name of every
[13] person who signed a document, but the people who were
[14] most heavily involved —
[15]   A: Okay.
[16]   Q: — do you recall some of their names?
[17]   A: For marketing it would have been me.
[18]   Q: Yes.
[19]   A: For senior management at various times it was
[20] Ed Tupa. At various times it was who he reported to,
[21] and that changed over time.
[22]   Q: Pardon me.
[23]   A: Okay.
[24]   Q: Who would have — who did Ed Tupa report to
[25] initially in 1996?

Page 36

[1]   A: Jerry Wojta.
[2]   Q: Can —
[3]   A: W-O-J-T-A.
[4]   Q: Okay. Who — anyone else in senior
[5] management that was involved —
[6]   A: Not that I'm aware of.
[7]   Q: — to your recollection?
[8]   What about in the — okay. In marketing
[9] that was you, correct?
[10]   A: Correct.
[11]   Q: What about in sales?
[12]   A: That changed over time. The most common one
[13] would have been Rich Feldman. Rich was not there when
[14] I initially got there, but I don't recall doing price
[15] changes before he got there.
[16]   Q: Do you recall doing any pricing before Rich
[17] got there?
[18]   A: I don't recall. I don't recall doing price
[19] changes.
[20]   Q: Who did Rich report to?
[21]   A: Ed Tupa.
[22]   Q: Who did Jerry report to?
[23]   A: I don't know.
[24]   Q: Was Jerry employed by Roxane?
[25]   A: Yes. I believe he was president and COO or

Page 53

[1] Q: Do you have a basic understanding of
[2] what city he lives in?
[3] A: I believe he's still in Dublin.
[4] Q: Dublin?
[5] A: Uh-huh, yes.
[6] Q: Is that a town nearby Columbus?
[7] A: Columbus, yes.
[8] Q: They're sister cities?
[9] MR. COVAL: It's a suburb.
[10] THE WITNESS: It's a suburb.
[11] Q: (BY MR. ANDERSON) A suburb. Okay.
[12] What about Jerry Wojta?
[13] A: Wojta.
[14] Q: Wojta.
[15] A: He has lived in the Columbus area for many
[16] years. I assume he still does.
[17] Q: Is he still president and COO of Roxane?
[18] A: No. He retired.
[19] Q: But you believe he still lives in Columbus?
[20] A: I believe so.
[21] Q: Do you know when Jerry retired?
[22] A: Couple of years after I started.
[23] Q: 1998 sometime or —
[24] A: I'm not good with time lines.
[25] Q: Okay. Do you recall when Ed Tupa retired?

Page 54

[1] A: Around two years ago.
[2] Q: Okay.
[3] A: He left after Jerry did. There was probably
[4] somewhere around a year separating it, but I don't
[5] know the precise years.
[6] Q: Who's the new president and CEO of Roxane?
[7] A: Doesn't exist.
[8] Q: Who's the top executive of Roxane?
[9] A: I — I'm not sure how to answer that. There
[10] is — the manufacturing side — it — the management
[11] has been split up and reports to different areas, so
[12] the production side now goes through Peter Dickinson.
[13] Q: What about the sales —
[14] A: Sales and marketing goes through
[15] Tom Russillo.
[16] Q: Can you spell Prussillo?
[17] A: R —
[18] Q: Oh, excuse me.
[19] A: Russillo, R-U-S-S-I-L-L-O.
[20] Q: Thank you.
[21] Do you know what Tom's title is?
[22] A: I believe it's president and COO of Ben Venue
[23] Laboratories.
[24] Q: Okay. President and COO of what?
[25] A: Ben Venue.

Page 55

[1] Q: Two words?
[2] A: Yes, V-E-N-U-E.
[3] Q: Is Ben Venue a subsequent company to Roxane?
[4] A: I don't know what you mean by "subsequent."
[5] It was acquired after Roxane was acquired.
[6] Q: Pardon me. That was a poor question.
[7] Is Ben Venue a subsidiary of Roxane?
[8] A: No.
[9] Q: Is it a subsidiary of Boehringer?
[10] A: I don't believe that the legal definition is
[11] "subsidiary," but it is within the corporate umbrella
[12] of Boehringer Ingelheim.
[13] Q: Is it your understanding that
[14] Boehringer Ingelheim owns Ben Venue?
[15] A: In some — yeah, in a — in a very general
[16] way. How it's structured, I'm not —
[17] Q: Right. I'm not — I'm not asking you for
[18] some type of detailed analysis of the stock ownership
[19] of Ben Venue, but it's your understanding —
[20] A: It's privately held.
[21] Q: Right. Well, but there's still privately
[22] held stock.
[23] Is it your understanding that Boehringer
[24] owns Roxane?
[25] A: Yes.

Page 56

[1] Q: Where is Ben Venue?
[2] A: Cleveland — or Bedford, Ohio.
[3] Q: Bedford's a —
[4] A: Bedroom community of Cleveland.
[5] Q: Okay. When did Tom become — strike that.
[6] When did Tom leave Roxane?
[7] A: He was never at Roxane. He got bought with
[8] Ben Venue.
[9] Q: Okay. And the sales and marketing personnel
[10] of Roxane report to Tom Russillo, who's at Ben Venue?
[11] A: Correct.
[12] Q: Okay. Are there other divisions of Roxane
[13] that report to a senior person other than
[14] Peter Dickinson or Tom Russillo?
[15] A: I'm not sure. There's been a lot of
[16] transition.
[17] Q: When did the transition begin?
[18] A: Transition and change has been ongoing since
[19] I started with Roxane.
[20] Q: The transition and change impacted the
[21] corporate hierarchy of Roxane?
[22] A: Yes.
[23] Q: And that's been ongoing since you started?
[24] A: Yes.
[25] Q: How often would you say that job titles and

Page 57

[1] job responsibility reporting changes in Roxane?
[2]    That may be too broad, but I'm trying —
[3]    A: It's — it's constant.
[4]    Q: — okay — I'm trying to get a feel for
[5] the — the timing of the different transitions.
[6]    A: I mean I — I can answer regarding my
[7] management and my department.
[8]    Q: Okay. Let's start there.
[9]    How often has your management and the
[10] people that report to you and the people that you
[11] report to changed?
[12]    A: Very little. I started out reporting to
[13] Ed Tupa. When he retired, I then reported to
[14] Tom Russillo. For a brief period of about a year he
[15] had a person that worked between he and I that, when
[16] Tom was unable to come down to Roxane, I would report
[17] through him to Tom; but officially, I always reported
[18] to Tom Russillo.
[19]    Q: Okay. Unofficially, who is that person that
[20] you would — was the go-between between you and Tom?
[21]    A: Tony Pera.
[22]    Q: How do you spell Tony's last name?
[23]    A: P-E-R-A.
[24]    Q: Who is Tony employed by?
[25]    A: Now he's employed by Akorn.

Page 58

[1]    Q: Akorn Corporation?
[2]    A: I don't know.
[3]    Q: Is Akorn owned by Boehringer?
[4]    A: No.
[5]    Q: Is Akorn related in any way to Roxane?
[6]    A: No.
[7]    Q: Did Tony just take a new job with a totally
[8] independent company?
[9]    A: Correct.
[10]   Q: Where is Akorn located?
[11]   A: I believe it's in the Chicago area.
[12]   Q: Is Akorn in the drug industry?
[13]   A: Yes.
[14]   Q: Is it a drug manufacturer?
[15]   A: I believe so.
[16]   Q: Is there — are there other people that are
[17] on the same corporate level as Peter Dickinson and
[18] Tom Russillo in reporting at Roxane?
[19]   A: I don't think so.
[20]   Q: Okay. Do you —
[21]   A: I'm not sure where regulatory and
[22] QC — exactly who they report to, so I'm — I'm not
[23] positive.
[24]   Q: Who do you suspect that regulatory and QC
[25] report to?

Page 59

[1]    A: I'm not going to speculate. That's — I mean
[2] I — I think everybody goes through Peter, but I'm not
[3] positive. I'm —
[4]    Q: Is Peter employed by Roxane?
[5]    A: I believe so.
[6]    Q: Does Peter report to someone at Boehringer?
[7]    A: Yes.
[8]    Q: Do you know why the president and COO
[9] position held by — previously held by Jerry Wojta was
[10] dissolved?
[11]   A: No.
[12]   Q: Have you ever discussed the reason that that
[13] position was dissolved with anyone?
[14]   A: Sure.
[15]   Q: What are your — what — what do you believe
[16] is the reason for that, or what —
[17]   A: I believe the company is restructuring and
[18] it's eliminating redundant positions and that it
[19] wanted to get leadership more from its own internal
[20] people than the people that they acquired companies
[21] from and they felt that that position was no longer
[22] appropriate in the restructuring. What their actual
[23] reasons were — that's just my estimation of what it
[24] is.
[25]   Q: Okay. Since 1996 and your involvement with

Page 60

[1] Roxane, how many companies has Roxane acquired?
[2]    A: Roxane has not acquired any, to my knowledge.
[3]    Q: How many companies have been acquired by
[4] Boehringer that have become part of the Roxane
[5] corporate structure?
[6]    A: None that I'm aware of.
[7]    Q: Well, you mentioned that there was an effort
[8] to remove redundant positions —
[9]    A: Uh-huh.
[10]   Q: — and persons that may have been acquired in
[11] previous company acquisitions; is that correct?
[12]   A: I think there was a natural attrition and
[13] that, as people retired, they structured things more
[14] to bring their satellite companies within the
[15] corporate umbrella.
[16]   Q: Do you have any understanding as to how long
[17] Jerry Wojta was with Roxane?
[18]   A: Many, many years.
[19]   Q: Over ten?
[20]   A: Yeah.
[21]   Q: When — I think previously you mentioned that
[22] Roxane had been purchased at some point in time by
[23] Boehringer?
[24]   A: Yes.
[25]   Q: When was that? Do you know?

Page 165

A: I can't answer that.
Q: When you have these discussions about pricing and the effect of various factors, including the Medicaid rebate, do these discussions occur in any kind of a meeting with other people, or is it just something that you think about yourself?
A: Okay. I'm — I missed part of that. Can you —
Q: Okay. When you have these discussions or these considerations that you give to the impact of Medicaid rebates on your pricing decisions —
A: Okay.
Q: — do these discussions occur in, like, meetings among various Roxane employees, or is it something that you just handle on your own and make a few phone calls if you need the information?
A: It can be handled in different ways. Most likely, someone in contracts will identify that we're hitting a new pricing tier that hasn't been there before and send up a flare that says, "Are you aware of this? Do you care about this? Do you want us to look into it further?" And if that happens, then it will be looked into further.
   If it's a situation where that's the price and that's what's in the market and we do it

Page 166

because we don't have a choice unless we just exit the whole market, we would probably skip the assessment or do it retro just to see how bad we got hurt; but prices go down, rebates get impacted.
Q: So the only time the rebate issue comes to your attention is when somebody from contracts calls you and talks about it. Is that it?
A: Yes.
Q: So you — it's never discussed in any kind of a committee meeting or a working group meeting or anything like that?
A: No.
Q: Do you have a pricing committee at Roxane?
A: On the brand side they have one, yes.
Q: How about the generic side?
A: We have very brief participation in it, and it was so cumbersome as to be ridiculous.
Q: When did you attempt to have a pricing committee with respect —
A: I think it was about two years ago they spent about a year trying to put it together. And then the first time we tried to run pricing through, it took months and months; and in the generic industry you make price changes daily.
Q: Who was on the pricing committee?

Page 167

A: I would not be able to answer that. The whole world.
Q: The whole world?
A: The attachments were very extensive. I don't remember who was on a committee and who was on a subcommittee and who was involved in creating it. It's not something that we had a great deal of participation or use for.
Q: Were you involved in it?
A: I attended, I believe, one meeting in Connecticut about it.
Q: Can you recall anybody else that was involved in it?
A: My assistant product manager represented the multisource interests in the business.
Q: That was who?
A: Lesli Paoletti.
Q: Lesli Paoletti.
   Anybody else?
A: Not that I recall.
Q: Why did you go to Connecticut for this?
A: Because that's where brand land is and that's where the process development was being driven.
Q: Including the generic process development?
A: They were trying to fit us into their system

Page 168

that was —
Q: Who is they?
A: BI Pharmaceuticals was trying to have a uniform pricing committee for all pricing decisions.
Q: Did you — did you resist their involvement in your pricing decisions?
A: We — did I resist their involvement in our pricing decisions?
   I — I'm not sure I understand what you mean by that.
Q: Well, it sounds to me like Boehringer Ingelheim was — was trying to set up a committee where there would be Boehringer Ingelheim corporate personnel involved in your pricing decisions. Is that an accurate statement?
A: Yes.
Q: Did you resist it?
A: We tried to have them involved in decisions that were appropriate for their degree of understanding of the business and leave them out of the other decisions. It would be ridiculous for a brand product manager to make a decision whether or not I can match a contract price.
Q: But doesn't Boehringer Ingelheim have final decision-making authority on what you do?

Case 1:01-cv-12257-PBS   Document 6412-12   Filed 08/28/09   Page 9 of 10

JUDY WATERER                                                THE STATE OF TEXAS v.
October 24, 2001                                            DEY, INC., ET AL.

Page 169

[1] A: My boss has final decision-making on what I
[2] do.
[3] Q: Who is that?
[4] A: Tom Russillo.
[5] Q: And he works for — for Roxane at this point
[6] in time?
[7] A: No. He works for Ben Venue Laboratories.
[8] Q: Ben Venue at this time.
[9]   We need to slow down — we need to put a
[10] little pause between when you talk and I talk.
[11]   So is it your testimony that
[12] Boehringer Ingelheim has no ultimate authority with
[13] respect to your pricing?
[14] A: No.
[15] Q: Do they or don't they?
[16] A: My boss reports in through somebody that —
[17] he wouldn't make a decision if it was against what his
[18] boss wants.
[19] Q: And who is his boss?
[20] A: Currently it's Warner Gerstenberg.
[21] Q: Who is he?
[22] A: His boss. I can't remember his title.
[23] Q: Where does he work — who does he work for?
[24] A: I — I know his responsibilities are
[25] overseeing all of Tom's responsibilities. I believe

Page 170

[1] he's also responsible for Boehringer Ingelheim. I
[2] don't know his exact title or —
[3] Q: Where does he live?
[4] A: He works out of the Connecticut office.
[5] Where he lives, I don't know.
[6] Q: Is he a German?
[7] A: I don't know what — I don't know whether
[8] he's a nationalized American. He does have a German
[9] accent.
[10]   MR. MCCONNICO: So do I. That doesn't
[11] mean anything.
[12]   THE WITNESS: At some point in his life,
[13] he was.
[14]   MR. BREEN: I lived in Germany for
[15] seven years and developed it myself.
[16] Q: (BY MR. BREEN) Have you ever been to
[17] Boehringer's headquarters in Germany?
[18] A: No.
[19] Q: Do you know whether Warner Gerstenberg was
[20] ever the president and chief operating officer of
[21] Roxane?
[22] A: He may have stepped in when — I think he was
[23] for a brief period.
[24] Q: When?
[25] A: When Jerry Wojta left, I think he might have

Page 171

[1] stepped in for a period. He never located to Columbus
[2] or was active in any of my interactions.
[3] Q: Have you ever had any discussions with
[4] Mr. Gerstenberg regarding pricing for Roxane's generic
[5] products?
[6] A: No.
[7] Q: Earlier you testified that you were a witness
[8] in a criminal case.
[9]   What was the name of the company?
[10] A: Respiratory Distributors, Inc.
[11] Q: And the individual that was indicted?
[12] A: Neil Yeager.
[13] Q: Neil Yeager.
[14]   Did you know Neil Yeager?
[15] A: I came to know him through a business
[16] relationship, yes.
[17] Q: And what was his — what was his duties with
[18] RDI?
[19] A: I believe he headed up their sales. I'm not
[20] sure. My relationship with him was he was who my
[21] contact was with the company regarding our contract
[22] negotiation.
[23] Q: RDI is a group purchasing organization?
[24] A: No.
[25] Q: What is it?

Page 172

[1] A: It's a distributor.
[2] Q: And what kind of customers does it distribute
[3] to?
[4] A: They were a distributor to respiratory home
[5] care pharmacy.
[6] Q: Home care pharmacies?
[7] A: Yes.
[8] Q: Okay. Who do you deal with at RDI now?
[9] A: We don't deal with RDI now.
[10] Q: Why not?
[11] A: Because they're not a customer that has
[12] responded in a reliable or upright and honest manner
[13] with us, so we don't deal with them anymore.
[14] Q: How did they —
[15] A: I'm not even sure they still exist.
[16] Q: Okay. How is it that they did not respond to
[17] you in a reliable, upright and honest fashion?
[18] A: We were told that they were reselling our
[19] product to non-end-use customers.
[20] Q: What is a non-end-use customer?
[21] A: Not a pharmacy.
[22] Q: So who were they selling it to?
[23] A: Other resellers.
[24] Q: Other distributors?
[25] A: I never saw specifically who they sold it —

Page 217

[1] I suppose that's you?
[2] A: Yes.
[3] Q: And what does the number three signify?
[4] A: The number of head count allocated to the
[5] department.
[6] Q: The people that are your subordinates?
[7] A: Yes.
[8] Q: Okay. Above Tom Russillo looks — Executive
[9] VP BU Ethical Pharmaceuticals, S. Berkle.
[10]    Who is S. Berkle?
[11] A: Shelley Berkle, for a period of time, headed
[12] up the sales and marketing of both BIPI and Roxane.
[13] He's not in that position currently.
[14] Q: Do you know where Shelley Berkle is?
[15] A: He is no longer responsible for the Roxane
[16] line. He is now responsible for brand only.
[17] Q: What does "BU Ethical Pharmaceuticals"
[18] signify?
[19] A: The business unit. They created something
[20] called a business unit that had to do with ethical
[21] pharmaceuticals. They have other business units, so
[22] that was a —
[23] Q: What are ethical pharmaceuticals?
[24] A: RX, prescription.
[25] Q: Why the term "ethical"?

Page 218

[1] A: That's how they referred to.
[2] Q: By —
[3] A: The industry.
[4] Q: What are unethical pharmaceuticals?
[5] A: Got me. Never heard that term. Nonethical
[6] pharmaceuticals would be your OTC's.
[7] Q: Over-the-counters?
[8] A: Yes.
[9] Q: Okay. In I could, flip to Roxane 1433; and
[10] this is an order chart, apparently, for
[11] Marketing-Contract Operations. And I'd like to direct
[12] your attention over to the right-hand side. It says
[13] "Government Contracting," then a line down to
[14] Odette Hamlin, Medicaid Analyst.
[15]    Have you ever had any dealings with
[16] Odette Hamlin?
[17] A: Probably. She was part of the finance group.
[18] Some of my questions that I sent to Don Comston, he
[19] might have forwarded through to her.
[20] Q: What is your understanding of the term
[21] "Medicaid Analyst"?
[22] A: I have no idea.
[23] Q: Do you know what Odette's job was?
[24] A: No. It was in — she was in — she was one
[25] of many people in finance. I didn't really deal with

Page 219

[1] her.
[2] Q: Do you have any idea as to what aspects of
[3] Medicaid Odette analyzed?
[4] A: No.
[5] Q: Did Odette ever share her analyzation of
[6] Medicaid with you?
[7] A: As I say, I — I don't recall having much
[8] interaction with Odette. I would send my requests to
[9] Don, and he would get information back to me. It may
[10] or may not have originated from Odette.
[11] Q: So from time to time you would receive
[12] analysis of Medicaid?
[13] A: If I asked Don, because a pricing was
[14] changing, if there was going to be an impact and that
[15] making an offer to this customer would be a bad
[16] business decision, I would ask him to look at it. And
[17] he would get back and let me know whether or not we
[18] were shooting ourselves in the foot.
[19] Q: In what respect would that be a bad business
[20] decision?
[21] A: If a single customer comes with a competitive
[22] request that they want us to match a price that is
[23] below a price tier we've been at before, that would
[24] make changes to the way the Medicaid rebate was done,
[25] and potentially we would end up having to pay more

Page 220

[1] money into the Medicaid rebate. We wanted to have
[2] that knowledge when the business decision was made
[3] because, if going to contract with somebody who bought
[4] three units a year was going to cost me $10,000 in
[5] incremental rebate, it didn't make sense to go with
[6] that customer. We always tried to look at the big
[7] picture. So we managed by exception; and if there was
[8] an exception that looked questionable and was going to
[9] new levels, we'd look at resetting it and
[10] understanding the impact.
[11] Q: So would it be fair to say that y'all closely
[12] monitored Medicaid rebate impact upon your business?
[13] A: No.
[14] Q: Okay. What is it that you just explained to
[15] me, then?
[16] A: An exception.
[17] Q: How would —
[18] A: If something struck us as being really
[19] outside of the ordinary and it sent off an alert that
[20] said, "Beep, beep, beep, this one looks nuts," then
[21] we'd investigate it further. It wasn't everything
[22] that came in or every change that came in that was
[23] assessed.
[24] Q: Do you have a system in place to find those
[25] exceptions?