# Exhibit 15

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

Berkle, Sheldon                        October 31, 2008
                    Naples, FL

                 UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

------------------------------X

IN RE: PHARMACEUTICAL          ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     ) CIVIL ACTION

PRICE LITIGATION               ) 01-CV-12257-PBS

------------------------------X

THIS DOCUMENT RELATES TO       )

United States of America, et al,) Judge Patti B.

Ven-a-Care of the Florida Keys, ) Saris

Inc.,                          )

     vs.                       )

Boehringer Ingelheim, Corp.,   ) Chief Magistrate

et al.                         ) Judge Marianne B.

Civil Action 07-10248-PBS      ) Bowler

------------------------------X


     (Cross-caption appears on following page)

     VIDEOTAPED DEPOSITION OF SHELDON BERKLE

                    VOLUME I

                 Naples, Florida

             Friday, October 31, 2008

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                              October 31, 2008
                         Naples, FL

                                                    Page 2

 1        IN THE COURT OF THE SECOND JUDICIAL CIRCUIT

 2              IN AND FOR LEON COUNTY, FLORIDA

 3   --------------------------------X

 4   THE STATE OF FLORIDA ex rel.        )

 5   VEN-A CARE OF THE FLORIDA KEYS,     )

 6   INC., a Florida Corporation, by     )

 7   and through its principal           )

 8   officers and directors, ZACHARY     )

 9   T. BENTLEY and T. MARK JONES        )

10          Plaintiffs,               ) CIVIL ACTION

11       vs.                          ) NO. 98-3032A

12   BOEHRINGER INGELHEIM CORPORATION, )

13   et al.                              )

14          Defendants.               )

15   --------------------------------X

16

17

18

19

20

21

22

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                    Naples, FL

Page 28

1        A.    Yes, there was.

2        Q.    When was that?

3        A.    It was November 1994.

4        Q.    And when did you stop working for

5   Boehringer Ingelheim's American operations?

6        A.    The end of 2003.

7        Q.    Upon transfer to the U.S., which

8   specific entity did you work for?

9        A.    BIPI.

10       Q.    BIPI.  What was your position there?

11       A.    Executive vice president.

12       Q.    Executive vice president.

13             Did you have -- Did you have a position

14  at any other Boehringer Ingelheim entities in

15  America at that time?

16             MR. GASTWIRTH:  Objection to form.

17             THE DEPONENT:  I was a vice president

18  for BI Corporation.

19  BY MR. FAUCI:

20       Q.    Is it okay if we refer to that as BIC?

21       A.    Sure.

22       Q.    What about a company known as Roxane

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                           October 31, 2008
                    Naples, FL

Page 29

1   Laboratories, did you have a position with them?

2             MR. GASTWIRTH:  Objection to form.

3             THE DEPONENT:  No.

4   BY MR. FAUCI:

5        Q.   Can you describe in general the

6   business of BIPI in the 1994 time frame.  By

7   business I mean, among other things, what types

8   of products was the company marketing or selling?

9        A.   Again, it was involved in the research;

10  basic research, clinical research and marketing

11  sales of human pharmaceuticals.  It was a

12  relatively smaller company in the U.S.

13  pharmaceutical business.  And we were involved in

14  a couple therapeutic areas at that point,

15  respiratory medicine predominantly.

16       Q.   Were most of BIPI's products branded

17  drugs or generic drugs?

18       A.   Branded drugs.

19       Q.   Can you describe the business of BIC at

20  about the same time, the 1994 time frame.

21       A.   My understanding of what BIC was was

22  really as a holding company for the U.S.

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

                                              Page 31

1        Q.    Can you tell me what the difference is
2    between a multi-source or --
3             MR. GASTWIRTH:  Just hold on for one
4    second.
5             MR. FAUCI:  Sure.
6             MR. GASTWIRTH:  Okay.  Thanks.
7    BY MR. FAUCI:
8        Q.    Can you tell me the difference between
9    a multi-source or generic product and a branded
10   generic product.
11       A.    Again, my understanding is a multi-
12   source product is a product in which there are
13   several companies marketing the same chemical
14   entity with really no differentiation in terms of
15   the quality aspects of those drugs.
16            Branded generics in my estimation is
17   then again not so different in the sense that
18   these products are still marketed by multiple
19   companies; however, there is a brand name
20   attached to that generic drug and there is an
21   attempt to try to differentiate those branded
22   generics from each other.

Berkle, Sheldon                                    October 31, 2008
                        Naples, FL

Page 38

1       Q.   I believe your testimony earlier was

2   that Roxane was not included within the business

3   unit; is that correct?

4       A.   I believe I said that it was a separate

5   division.

6       Q.   Can you elaborate what you mean by

7   that.

8       A.   Roxane was a separate business entity.

9   They had their own budgets, their own plans.  Any

10  involvement that I had was really on a strategic

11  level with Roxane.

12      Q.   So is it your testimony that the

13  business unit was just limited to BIPI?

14      A.   The business unit was primarily BIPI

15  plus a strategic oversight of Roxane, but Roxane

16  had its own management team and it was

17  responsible for the annual budgets, marketing

18  plans, day-to-day operations.

19      Q.   But at least on a strategic level -- Is

20  it fair to say that on a strategic level Roxane

21  sat within the business unit?

22           MR. GASTWIRTH:  Objection to form.

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                    October 31, 2008
                        Naples, FL

Page 39

1          THE DEPONENT:  I don't think I would

2     use the term "sat."  They had a separate physical

3     presence, separate facilities.  And within the

4     strategic oversight, yes.

5     BY MR. FAUCI:

6          Q.    What is OPINA?

7          A.    OPINA is an acronym that stood for the

8     optimization of the pharmaceutical business

9     within North America.

10         Q.    The two -- I'm going to read again just

11    from the end of that paragraph.  It says, The two

12    leading entities, BIPI and Roxane -- I'm sorry,

13    I'm going to go back a little bit before.

14         Of primary importance to this position

15    will be, and then it says among other things, the

16    maximizing of synergies of the two leading

17    entities, BIPI and Roxane.  Were there synergies

18    between BIPI and Roxane?

19         A.    Certainly not -- not at the -- not when

20    I first came in '94.  There really were two

21    separate businesses.

22         Q.    Did you view as one of your goals when

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                              October 31, 2008
                          Naples, FL

Page 40

1  you were hired to maximize synergies between the

2  two companies?

3       A.   I -- Again, I -- Certainly at that

4  point in time my primary focus was on building

5  the branded human pharmaceutical business within

6  BIPI.  And certainly one of my -- one of my

7  objectives was to look down the road as to

8  whether there were, in fact, any synergies

9  between the BIPI operation and the Roxane

10 operation.

11      Q.   And down the road were there any

12 synergies that could be exploited or --

13      A.   Yeah.  We --

14           MR. GASTWIRTH:  Objection to form.

15           THE DEPONENT:  We certainly did look at

16 certain things where we were able to create some

17 synergies, yes.

18 BY MR. FAUCI:

19      Q.   Was this a -- a goal that-- was one of

20 the goals that you were hired for, to look into

21 improving the synergies or exploiting or finding

22 synergies between these companies?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

                                                Page 41

1            MR. GASTWIRTH:   Objection to form.

2            THE DEPONENT:   The primary reason why I

3    was brought to the U.S. was really to grow the

4    branded pharmaceutical business within BIPI.

5    BY MR. FAUCI:

6        Q.   That was the primary reason?

7        A.   Right.   Primary reason.

8        Q.   Was coordinating or improving upon the

9    synergies between BIPI and Roxane a reason that

10   you were hired?

11       A.   Yes.

12       Q.   If you turn to the next page of Exhibit

13   2.  Do you see where it says basic

14   responsibilities, essential functions?

15       A.   Yes, I do.

16       Q.   Can you read into the record the third

17   bullet point.

18       A.   The one that begins with "insures

19   optimization"?

20       Q.   That's correct.

21       A.   Sure.   Insures optimization of

22   performance in the U.S. through the development

                 Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

Berkle, Sheldon                        October 31, 2008
                          Naples, FL

Page 42

1    and direction of innovative strategies and

2    tactics for BIPI and RLI, including prescription

3    OTC switches and activities to defend brand name

4    products from generic erosion.

5    BY MR. FAUCI:

6         Q.    Is RLI Roxane?

7         A.    Yes, it is.

8         Q.    It's okay if we refer to both terms

9    interchangeably today, RLI, Roxane, they both

10   mean Roxane Laboratories?

11        A.    Yes.

12        Q.    What are RX/OTC switches?

13        A.    Again, that refers to products that are

14   originally prescription drugs, drugs that must be

15   prescribed by a physician.  And sometimes when

16   drugs have been on the market for a long period

17   of time, have established a solid safety record,

18   you can approach the FDA and determine if you

19   can, in fact, transition that product or those

20   products from a prescription basis to over-the-

21   counter basis so that you can buy them in the

22   pharmacy without a prescription.

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

1              THE DEPONENT:  It's possible.

2     BY MR. FAUCI:

3         Q.    Do you have any reason to believe it

4     wasn't sent to Roxane employees?

5         A.    I don't know whether it was or wasn't

6     to be honest with you.

7         Q.    Do you see at the second page that this

8     document was signed by--I might mispronounce his

9     name--Werner Gerstenberg?

10        A.    Yes.  And that's correct by the way.

11        Q.    Thank you.

12              Who is Mr. Gerstenberg?

13        A.    Mr. Gerstenberg was the CEO of

14    Boehringer in the United States.

15        Q.    And by Boehringer in the United States,

16    do you mean BIPI?

17        A.    I mean all the divisions.  The total

18    company.

19        Q.    So was he the CEO of BIC?

20        A.    You know, again, I don't know what the

21    legal aspects were, but he was basically the

22    overall country manager for the United States.

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                October 31, 2008
                        Naples, FL

Page 48

1      Q.    Including Roxane?

2      A.    Including Roxane.

3      Q.    Did you report to Mr. Gerstenberg?

4      A.    Yes, I did.

5      Q.    Was there anyone in between you and Mr.

6  Gerstenberg in the hierarchy of the corporation

7  or were you pretty much directly reporting to

8  him?

9            MR. GASTWIRTH:   Objection to form.

10           THE DEPONENT:   I reported directly to

11  Mr. Gerstenberg.

12  BY MR. FAUCI:

13     Q.    On the first page in the fourth

14  paragraph down, can you just read the first

15  sentence into the record.

16     A.    Starting with Shelly's duties?

17     Q.    Yes.   Thank you.

18     A.    Shelly's duties will mainly focus on

19  the strategic alignment of our ethical

20  pharmaceutical business in the U.S. and he will

21  be responsible for the operating result for this

22  area.

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                               October 31, 2008
                         Naples, FL

Page 53

1    BY MR. FAUCI:

2        Q.   Were you an officer at any other -- any

3    other Boehringer Ingelheim companies besides BIPI

4    and BIC?

5            MR. GASTWIRTH:  Objection to form.

6            THE DEPONENT:  No.

7    BY MR. FAUCI:

8        Q.   Which company paid your salary?

9        A.   I believe it was BIPI that paid my

10   salary.

11       Q.   Did you receive a salary from BIC?

12       A.   No.

13       Q.   Did you sit on any boards of directors

14   for Boehringer Ingelheim companies?

15           MR. GASTWIRTH:  Objection to form.

16           THE DEPONENT:  The only board -- The

17   only direct position I believe I had was with --

18   was with Roxane Laboratories.

19   BY MR. FAUCI:

20       Q.   Do you know approximately how long you

21   served on the Roxane board?

22       A.   Off the top of my head I can't

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                October 31, 2008
                        Naples, FL

                                                     Page 54

1    remember.  It may be a few years, but I can't

2    remember specifically.

3         Q.   Do you remember anyone else who served

4    on the board?

5         A.   Of?

6         Q.   Of Roxane.

7         A.   Certainly Mr. Gerstenberg.

8         Q.   Can you remember anyone else?

9         A.   I'm not -- Again, it was not an active

10   board per se.  I think it was more of a legal --

11   legal entity.

12        Q.   What do you mean it wasn't an active

13   board?

14        A.   There -- Again, very -- You know, it's

15   a number of years ago, so it's hard for me to

16   remember, but as far as I remember there were

17   very, very infrequent meetings and it was more to

18   form than anything else.  It wasn't operational

19   in other words.

20        Q.   Do you recall any meetings of the

21   Roxane board of directors?

22        A.   Not specific.

                Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

Berkle, Sheldon                          October 31, 2008
                         Naples, FL

Page 57

1    bottom right-hand corner.

2              Do you recognize this document?

3      A.    Not specifically.

4      Q.    Do you see on the first page it says,

5    Minutes of the meeting of board of directors,

6    Boehringer Ingelheim Corporation, October 28,

7    1998?

8      A.    Yes, I do.

9      Q.    I'm going to direct your attention to

10   BIC Juris 0236.

11     A.    Okay.

12     Q.    Can you please read the first sentence

13   from the paragraph starting, Mr. Berkle.

14     A.    Mr. Berkle explained the reorganization

15   of the strategetic business unit ethical

16   pharmaceuticals advising that it now has two

17   components, one being generic drugs and the other

18   branded generic drugs.

19     Q.    Do you agree that the strategic

20   business unit ethical pharmaceuticals had two

21   components, one being generic drugs and the other

22   branded generic drugs?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                October 31, 2008
                        Naples, FL

Page 58

1          A.    I -- A slight variation of that.   I
2    think this refers to the Roxane component of the
3    strategic business unit.   It doesn't refer to the
4    BIPI component, which is purely branded.
5          Q.    So there was --
6          A.    Really three.
7          Q.    I'm sorry.   What do you mean by really
8    three?
9          A.    Again, this is -- this refers only to
10   Roxane Laboratories.
11         Q.    Okay.
12         A.    Okay?   That's --
13         Q.    And so there was a Roxane Laboratories
14   component of the business unit?
15         A.    Yes.   According to -- According to this
16   anyway definition.
17         Q.    The third sentence down in the same
18   paragraph it says, Sales and marketing for
19   branded generics will report to BIPI
20   counterparts.   Are branded generics, are those
21   Roxane products?
22         A.    Yes, they were.

Berkle, Sheldon                           October 31, 2008
                        Naples, FL

Page 59

1      Q.    Why are Roxane sales and marketing
2  reporting to their BIPI counterparts?
3           MR. GASTWIRTH:   Objection to form.
4  That's not what this document says.
5  BY MR. FAUCI:
6      Q.    Well, I can -- Let's just look at the
7  sentence.  It says, Sales and marketing for
8  branded generics will report to BIPI
9  counterparts.  Can you tell me what -- what you
10  think that sentence means?
11      A.    Well, I can tell you what the situation
12  actually was.
13      Q.    Okay.  That's --
14      A.    Okay.  And -- And again, because I
15  certainly can't recall having seen this document,
16  and I certainly didn't write this document.
17           The situation was that there were
18  people within the Roxane organization, within the
19  Roxane business unit, business entity that had
20  responsibility for the day-to-day operations and
21  the various functions, including marketing and
22  sales.

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

Page 60

1         And as I think we talked about

2    previously in the document, just slightly above

3    that particular line, there's two components of

4    the Roxane business, multi-source generic and

5    branded generic.

6              So for the branded generic products

7    there was only a few of them.  Those people

8    within the Roxane business entity did report

9    functionally to designated people within the BIPI

10   organization, but the day-to-day operations were

11   still conducted by Roxane people.

12        Q.   Okay.  The last sentence of this same

13   paragraph reads, The contracting and pricing

14   departments will be combined for ROI and BIPI.

15   Do you recall if this -- if this happened?

16        A.   This happened really from the

17   administrative perspective, so that there was --

18   you know, the actual establishment of pricing or

19   contracting was done by individuals within the

20   Roxane business entity, but the processing of the

21   administration, the submission of prices, were

22   done by a central unit within -- within BIPI that

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                           October 31, 2008
                              Naples, FL

Page 91

1    instance?

2         A.    Absolutely.

3         Q.    Couple paragraphs down it says, Shelly

4    and I -- And this is David Townley writing.  He

5    writes, Shelly and I have talked this -- talked

6    through this tonight and he suggested that I

7    approach you directly to request your assistance.

8              Do you recall having a conversation

9    with Mr. Townley in and around the October 1995

10   time frame?  I recognize it's a long time ago.

11        A.    Not -- Not specifically.

12        Q.    Do you have any reason to believe you

13   didn't have a conversation with Mr. Townley as he

14   references in this e-mail?

15        A.    No, I do not.

16        Q.    I'm going to read a little bit further.

17   What we need from you is a clear strategic

18   outline of overall USA plans with respect --

19   reference to points one, three and four above to

20   also include sales casts for the PEP planning

21   period; i.e., 1996 to 2000.

22              This should be from a total USA

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                          Naples, FL

Page 92

1   perspective; i.e., BIPI and Roxane combined

2   strategy.  For example, how much Ipratropium UDV

3   business can Roxane take from BIPI and how do we,

4   quote, shut out, quote, other non-Bi generics as

5   far as possible?  What does it mean for Roxane to

6   take Ipratropium business from BIPI?

7        A.   You know, again, it's not my language.

8   You know, I can't tell you specifically what

9   someone else meant or didn't mean by that.  So

10  again, strategically the two companies would work

11  together to try to maintain the Ipratropium

12  business whether it be Atrovent or otherwise

13  within the Boehringer family of companies.

14       Q.   What did you understand Mr. Townley to

15  mean when he writes this should be from a total

16  USA perspective, i.e. BIPI and Roxane combined

17  strategy?

18            MR. GASTWIRTH:  Objection to form.

19            THE DEPONENT:  You know, I think I just

20  referred to that.  I think -- number one, that

21  this strategy -- this overall strategy referred

22  to as the PEP strategy certainly was broader than

Henderson Legal Services, Inc.

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                         October 31, 2008
                        Naples, FL

Page 109

1    Berkle.  We are back on the record.

2    BY MR. FAUCI:

3        Q.   Mr. Berkle, I've handed you what the

4    court reporter marked as Exhibit 12.  Please take

5    a moment to familiarize yourself with it.

6        A.   Okay.

7        Q.   See the first page of this document

8    appears to be a fax cover sheet?

9        A.   Yes.

10       Q.   From Ed Tupa to Mr. Shelly Berkle.  Do

11   you see that?

12       A.   Yes, I do.

13       Q.   Do you recall receiving this document?

14       A.   No, I don't.

15       Q.   The first paragraph says -- the top of

16   it, the heading, says, Ipratropium Bromide UDV

17   generic launch home health care market meeting

18   summary.  Do you see that?

19       A.   Yes, I do.

20       Q.   And then below that, Roxane

21   Laboratories represented by Tom Via, Jerry Walsh,

22   John Powers, Ed Tupa and consultant Mark Pope,

Berkle, Sheldon                              October 31, 2008
                          Naples, FL

Page 110

1    and Boehringer Ingelheim represented by Scott

2    Richardson, Mike Spitalli and Joe Ashey met to

3    discuss the approaching generic launch of

4    Ipratropium Bromide on January 24th.

5              Tom Via, who's he?

6         A.   He was in the marketing department at

7    Roxane Laboratories.

8         Q.   Jerry Walsh?

9         A.   Jerry was a Roxane employee.  I can't

10   remember his specific title or --

11        Q.   We've --

12        A.   -- position.

13        Q.   Sorry.  We've already talked about Mr.

14   Powers and Mr. Tupa.

15        A.   Correct.

16        Q.   Consultant Mark Pope, who is he?

17        A.   I have no idea.  He's a consultant

18   obviously.

19        Q.   Have you ever heard of him?

20        A.   I can't recall.

21        Q.   And then Boehringer Ingelheim, is that

22   BIPI?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                              October 31, 2008
                         Naples, FL

Page 111

1        A.    Yes, it is.

2        Q.    And they're represented by three people

3   at this meeting?

4        A.    Correct.

5        Q.    Why are BIPI personnel at this meeting?

6        A.    You know, I think again, you know,

7   Atrovent was a BIPI drug, the brand -- the patent

8   would be expiring.  It was anticipated that the

9   two sister companies would work together to best

10  protect the -- or maintain Atrovent or

11  Ipratropium business within the Boehringer

12  family.

13        So I don't think there's anything

14  negative about that.  I think it's only natural

15  business that companies try to work together to

16  see how can they maintain the business.

17        Q.    The last paragraph, The single latest

18  factor that will influence the success of this

19  product is Dey Laboratories.  Do you agree with

20  that?

21        A.    Where are you reading from?

22        Q.    The very -- First sentence of the very

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
Naples, FL

Page 119

1       A.   Yes, I do.

2       Q.   And we said earlier Mark Pope was

3  identified as a consultant for Roxane.  Do you

4  recall that?

5       A.   Yes, I do.

6       Q.   The third paragraph says, Mr. Pope

7  says, I think it's unrealistic to consider that

8  there will be anywhere near a reasonable amount

9  of brand loyalty for this product given the

10  market dynamics and the nature of competition.

11  The challenge is to get BIPI to, quote, buy into,

12  quote, the long term strategic benefits while

13  relinquishing today's profit dollars and control

14  of the bulk of the product sales.

15       Would there be any long-term strategic

16  benefits to BIPI of relinquishing today's profit

17  dollars?

18       MR. GASTWIRTH:  Objection to form.

19       THE DEPONENT:  Not to BIPI specific,

20  but if there is a recognition there's going to be

21  other generic competition it would be beneficial

22  to keep the business within the Boehringer

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                    October 31, 2008
                          Naples, FL

Page 120

1    family.

2    BY MR. FAUCI:

3         Q.   Beneficial to the whole Boehringer

4    Ingelheim family?

5         A.   Correct.

6         Q.   Was there -- Were you aware of any

7    strategy to give up or relinquish market share of

8    Atrovent in order to have it moved to Roxane?

9              MR. GASTWIRTH:  Objection to form.

10             THE DEPONENT:  None that we haven't

11   already discussed.  Again, there had been

12   discussion on allowing Roxane to preemptively

13   launch their generic version of Ipratropium

14   Bromide.  And as such you obviously -- Atrovent

15   would lose some market share when it was still

16   exclusive.

17   BY MR. FAUCI:

18        Q.   But it would be -- that would be

19   beneficial to the whole BI family?

20        A.   Correct.

21        Q.   That's all with that document.

22             Moving along.  I'm going to show you a

Berkle, Sheldon                                    October 31, 2008
                          Naples, FL

Page 147

 1    is, but it's not going to be within the context

 2    of this document specifically.

 3           MR. FAUCI:  That's fine.  Let's just

 4    redo this again.

 5    BY MR. FAUCI:

 6      Q.   This strategy costs the innovator

 7    company a lot of money.  What do you understand

 8    it to mean that it was the innovator company?

 9    Who do you think that is?

10      A.   From a general interpretation of the

11    word "innovator," innovator to me means the

12    original branded product.  In this case the

13    original branded product of Ipratropium was

14    Atrovent which was a BIPI product.

15      Q.   And how did the strategy of launching

16    Ipratropium Bromide cost BIPI a lot of money?

17           MR. GASTWIRTH:  Objection to form.

18    BY MR. FAUCI:

19      Q.   Let me try that again.  Do you agree

20    that the strategy of launching Ipratropium

21    Bromide, the timing of the launch, cost BIPI a

22    lot of money?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                          Naples, FL

Page 148

1      A.   Again, in the context that Roxane
2  preemptively launched Ipratropium prior to any
3  other generic competitors had a cost from a BIPI
4  perspective.  It allowed sales for the Roxane
5  product at a lesser price than the branded price
6  at a time when Atrovent still was patent
7  protected.
8      Q.   I'm going to move on from this
9  document.
10           I think we're on Exhibit 19.  I'm going
11  to have the court reporter mark this.
12                (Exhibit Berkle 019 was marked.)
13           THE DEPONENT:  Okay.
14  BY MR. FAUCI:
15      Q.   Was it your prior testimony, and
16  correct me if I'm wrong, that -- that your
17  involvement to the extent you had involvement
18  with Ipratropium Bromide came around the time of
19  its launch?
20           MR. GASTWIRTH:  Objection to form.
21  Misstates the witness' prior testimony.
22           MR. FAUCI:  It's a question about

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                October 31, 2008
                          Naples, FL

                                                  Page 196

1         A.   Yes, I did.

2         Q.   And did you notice any correct -- any

3    inaccuracies during that reading?

4         A.   Not that I could remember.

5         Q.   That's all.

6              I'm going to show you Exhibit 29.

7              (Exhibit Berkle 029 was marked.)

8              MR. GASTWIRTH:  And I'll object to the

9    introduction of that deposition -- prior

10   deposition transcript as an exhibit to this

11   deposition.

12             We've got obviously a deposition being

13   conducted in that case, so I'm not going to allow

14   for the admissibility of Mr. Berkle's prior

15   deposition testimony to be used in connection

16   with the deposition that's occurring today.  So

17   his testimony today will stand for itself.

18             MR. BREEN:  The only concern I've got

19   with that is we've got -- we've got the one day

20   with this witness that has been scheduled, and if

21   I'm going to -- if that's what Roxane is going to

22   do, stand on this not being -- his prior

                  Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

Berkle, Sheldon                                October 31, 2008
                          Naples, FL

Page 197

1    testimony not being usable in the case, even the

2    issues are the same and everything else, it may

3    significantly extend the amount of time I'm going

4    to need with this witness particularly since this

5    case has been cross-noticed in the Florida case.

6           So -- And I ask you just to reconsider

7    that maybe.  I don't want to waste this witness'

8    time, but if I've got to go back and ask him 90

9    percent of the questions, I think that's really

10   unnecessary, but if I have to, I'll have to do

11   it.

12          MR. GASTWIRTH:  I'm going to let my

13   objection stay on the record today and we can

14   talk after the conclusion of the deposition.

15          MR. BREEN:  Right.  Because obviously

16   if I had to do that we're not going to get it

17   done today and we've only scheduled this

18   gentleman for one day as of now.  So we can work

19   it out I'm sure, but I just want to make sure

20   it's clear.

21          MR. GASTWIRTH:  I understand.  I'm

22   still objecting to the introduction.

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                        October 31, 2008
                        Naples, FL

Page 203

1    that this document needs to be revoked on

2    attorney-client or work-product grounds.

3              MR. BREEN:  Absolutely.  From Ven-a-

4    Care's perspective the fact that you're doing

5    that as an accommodation is appreciated.  We will

6    not consider that a waiver or a general waiver of

7    -- of the matter.

8              MR. FAUCI:  Nor will the United States.

9              MS. ROGERS:  Or the State of Florida.

10             MR. GASTWIRTH:  Thank you.

11   BY MR. FAUCI:

12        Q.   So moving back, Mr. Berkle.  Do you

13   recall that around the 1997 time frame there were

14   discussions about the need to review BIPI and

15   RLI's contracting and pricing processes?

16             MR. GASTWIRTH:  Objection to form.  Did

17   you say 1999?

18             MR. FAUCI:  1997.  Intended to say

19   1997.

20             THE DEPONENT:  You know, I don't - I

21   don't remember the specific time frames.  Part of

22   the difficulty is you've shown me memos

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

Page 214

1      Q.    The first page of this is an e-mail.

2   It's from Dan Gerrity.

3      A.    Right.

4      Q.    It seems to attach a document about the

5   pricing policy and procedures.  Do you see that?

6      A.    Yes.

7      Q.    It says, Please review the attached

8   draft pricing policy and procedure and provide me

9   any changes you deem appropriate.  Do you see

10  that?

11     A.    Yes, I do.

12     Q.    And this e-mail is dated May 3rd, 2001.

13  Do you see that?

14     A.    I do.

15     Q.    Let's turn to the pricing policy and

16  procedure document.  It says, Scope, this policy

17  is applicable to wholesale acquisition cost,

18  average wholesale price, minimum bid price,

19  direct price for brand products of Boehringer

20  Ingelheim Pharmaceuticals, Inc. and Roxane

21  Laboratories.

22          I had to adjust my microphone there.

Berkle, Sheldon                          October 31, 2008
                    Naples, FL

                                              Page 215

1    Was there a single policy applicable to those

2    prices for brand products of Boehringer Ingelheim

3    Pharmaceuticals and Roxane Labs?

4              MR. GASTWIRTH:  Objection.  Form.

5              THE DEPONENT:  A single policy?

6    BY MR. FAUCI:

7        Q.   Let me rephrase that.  It says, This

8    policy is applicable to various prices for brand

9    products of Boehringer Ingelheim Pharmaceuticals,

10   Inc. and Roxane Labs.  Do you see that?

11       A.   Yes, I do.

12       Q.   Does it surprise you that there's a

13   document out there that says that there's one --

14   that there's a policy that's applicable to prices

15   for both companies?

16             MR. GASTWIRTH:  Objection.  Form.

17             THE DEPONENT:  My understanding of this

18   is that it's applicable to the branded products.

19   Okay.  So BIPI and branded generics of Roxane.

20   BY MR. FAUCI:

21       Q.   So you think this pertains to a pricing

22   policy for Roxane's branded generics and BIPI's

Berkle, Sheldon                              October 31, 2008
                        Naples, FL

Page 216

1    brand products; is that correct?

2         A.    I believe so.  And, you know, again my

3    memory isn't a hundred percent, but this was in

4    May of '01, according to the cover memo -- cover

5    e-mail --

6         Q.    Cover e-mail.  Sure.

7         A.    -- and I believe this was approaching

8    the time when we divested of the Roxane branded

9    generic line.

10        Q.    What do you mean you divested of the

11   Roxane branded generic line?

12        A.    The -- Again, if I recall correctly

13   Viramune, which was under the Roxane label, was

14   transferred to the BIPI label and then the

15   palliative care line was in fact divested sold.

16        Q.    To who?

17        A.    It was initially sold to Elan who then

18   I know in turn sold it somewhere else.  So this

19   was -- you know, this would have been for a very

20   short period of time.

21        Q.    What was the -- the drug that you said

22   was transferred to BIPI?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                      Naples, FL

Page 219

1        THE DEPONENT:  I believe so.

2   BY MR. FAUCI:

3        Q.   And do you know if BIPI paid Roxane for

4   Viramune?

5        MR. GASTWIRTH:  Objection.  Form.  This

6   is really -- This is outside of context of this

7   complaint, so --

8        MR. FAUCI:  How is it -- Well, I'm not

9   -- I've got one more question on this.

10       THE DEPONENT:  I -- You know, I can't

11  answer that definitively.  I don't believe so,

12  but I don't know.

13       MR. FAUCI:  I'll just state for the

14  record, Roxane's asserted a cooperate veil

15  defense in this case and whether or not Roxane

16  transferred a product to BIPI for fair market

17  value is squarely within the allegations of the

18  complaint.  But that's all I have on that.

19  BY MR. FAUCI:

20       Q.   Right below it it says pricing

21  approvals.  Do you see that?

22       A.   Yes.

Berkle, Sheldon                         October 31, 2008
                        Naples, FL

Page 220

1      Q.    Recommended prices must be approved in

2   the following sequence.   First, PTC committee.

3   Second, executive vice president ethical

4   pharmaceuticals.   Is that you?

5      A.    Yes, it is.

6      Q.    And third, president and CEO of

7   Boehringer Ingelheim Corporation.   Who is that?

8      A.    That was Mr. Gerstenberg.

9      Q.    Mr. Gerstenberg.

10     A.    Right.

11     Q.    And so according to this document you

12  were supposed to approve prices for BIPI brand

13  products and Roxane branded generics?

14          MR. GASTWIRTH:   Objection.   Form.

15          THE DEPONENT:   It appears to be.

16  BY MR. FAUCI:

17     Q.    And so -- and this policy applies to

18  wholesale acquisition costs?

19          MR. GASTWIRTH:   Objection.   Form.

20          THE DEPONENT:   Yes.

21  BY MR. FAUCI:

22     Q.    And average wholesale prices?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                October 31, 2008
                          Naples, FL

                                              Page 221

1            MR. GASTWIRTH:  Objection.

2            THE DEPONENT:  Again, you know, my

3    primary concern was the wholesale acquisition

4    cost and then the details in terms of

5    establishing reference prices was left to others.

6    BY MR. FAUCI:

7        Q.   But you had to approve them?

8            MR. GASTWIRTH:  Objection.  Form.

9            THE DEPONENT:  I can't recall

10   specifically exactly what I would have approved,

11   but certainly my focus would be on the WAC.

12   BY MR. FAUCI:

13       Q.   When you approve price, what was sent

14   to you?

15           MR. GASTWIRTH:  Objection.  Form.

16   Approve prices for what?

17   BY MR. FAUCI:

18       Q.   Any -- This document is saying that Mr.

19   Berkle recommended prices must be approved in the

20   following sequence.  First, PTC committee.

21   Second, executive vice president ethical

22   pharmaceuticals.  Was that you, Mr. Berkle?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

                                                    Page 222

1        A.   Yes, it was.

2        Q.   And this policy is applicable to

3   wholesale acquisition costs and average wholesale

4   prices.  That's what it says at the top?

5        A.   Yes.

6        Q.   When you -- If you were to approve a

7   wholesale acquisition cost or an average

8   wholesale price, what would be sent to you to

9   make the decision on whether or not to approve

10  it?

11            MR. GASTWIRTH:  Objection.  Form.

12            THE DEPONENT:  You know, let me

13  reiterate that I can't recall exactly what was

14  sent to me.  My focus was on WAC.  It would have

15  been a summary of the information that is listed

16  under pricing proposals.

17            MR. FAUCI:  Can you repeat the answer

18  for me.

19                 (Record was read by the court

20  reporter.)

21  BY MR. FAUCI:

22        Q.   What types of information would be

Berkle, Sheldon                                October 31, 2008
                          Naples, FL

                                                    Page 231

1    adjustment.

2         Q.    Have you read or seen this before?

3         A.    No, I have not.

4         Q.    That's all.  We're going to do another

5    document.

6                     (Exhibit Berkle 034 was marked.)

7    BY MR. FAUCI:

8         Q.    The court reporter has handed you

9    what's been marked as Exhibit 34.  It's a very

10   lengthy document.  Feel free to read it, but I'm

11   going to direct your attention to specific parts

12   of it, so just tell me when you feel ready to

13   have some questions -- have some questions asked.

14                MR. BREEN:  Did you already mark this

15   one?

16                MR. FAUCI:  Yep.  34.

17                THE DEPONENT:  Okay.

18   BY MR. FAUCI:

19        Q.    Do you recognize this document?

20        A.    Not specifically.

21        Q.    Look at the first page.  It appears to

22   be an e-mail from Fred Duy.  Who's he?

                  Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                    October 31, 2008
                          Naples, FL

Page 232

1        A.    Fred was a Roxane employee.

2        Q.    And it's sent to you, Shelly Berkle?

3        A.    Yes, it is.

4        Q.    Subject, Roxicodone 15/30mg launch

5    plan.  Do you see that?

6        A.    Yes, I do.

7        Q.    And then does the attachment to this e-

8    mail appear to be a launch plan for Roxicodone?

9        A.    It certainly appears to be at least a

10   summary of a launch plan.  Highlights.

11       Q.    Is Roxicodone a Roxane product?

12       A.    Yes, it was.

13       Q.    Second sentence of the e-mail, The

14   strategy is essentially what you saw in

15   Tarrytown.  What's Tarrytown?

16       A.    It's -- Tarrytown is a town in New York

17   State close -- just across the border from

18   Connecticut.

19       Q.    What brought you to Tarrytown?

20       A.    I'm sorry?

21       Q.    What brought you to Tarrytown?

22       A.    Well, there's a conference that was

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                    October 31, 2008
                 Naples, FL

Page 233

1   utilized frequently for meetings by -- by the
2   BIPI people, BIPI/Roxane people.
3       Q.   Do you recall -- The strategy is
4   essentially what you saw in Tarrytown.  Do you
5   recall being exposed to strategies relating to a
6   launch document in Tarrytown?
7       A.   I can't -- I can't remember
8   specifically that meeting.  You know, certainly I
9   was at multiple meetings over the years in
10  Tarrytown, but I can't remember the details.
11      Q.   It goes on to say that, It--I think the
12  strategy--has been updated and expanded with
13  specific tactics by Doug Bierl with input from
14  lots of people here and in Ridgefield.  Who's
15  Doug Bierl?
16      A.   I haven't got a clue.
17      Q.   What's Ridgefield?
18      A.   Ridgefield is the town -- location of
19  BI Pharmaceuticals.
20      Q.   Where was Roxane?
21      A.   In Columbus, Ohio.
22      Q.   Ridgefield means BIPI?

Berkle, Sheldon                              October 31, 2008
                          Naples, FL

Page 234

1       A.    It means BIPI, BIC.

2       Q.    BIC.  Why are people in Ridgefield

3   updating and expanding a strategy for the launch

4   of a Roxane product?

5            MR. GASTWIRTH:  Objection.  Form.

6            THE DEPONENT:  This goes along with

7   some of the memos you've shown me before.

8   Roxicodone was a branded generic and, therefore,

9   there was some supervisory role that some -- a

10  few BIPI people played.  But again, the launch

11  plan, as you see here, was put together by Roxane

12  employees.

13  BY MR. FAUCI:

14      Q.    It says, We expect approval by the user

15  fee deadline, August 29th.  What does that mean?

16      A.    I assume that refers to the FDA

17  approval.

18      Q.    FDA approval -- The FDA approval of the

19  drug?

20      A.    Correct.

21      Q.    Okay.  Last sentence of that paragraph,

22  If you can fit it into your schedule, we would be

Berkle, Sheldon                          October 31, 2008
                    Naples, FL

Page 235

1    happy to present the launch plan to you and

2    whoever you think is appropriate in Ridgefield.

3    Do you recall if this launch plan was presented

4    to you in Ridgefield?

5           A.    I do not recall.

6           Q.    Do you recall if you read the launch

7    plan?

8           A.    I don't recall specifically if I did or

9    didn't.

10          Q.    Do you recall whether you approved the

11   launch of the Roxicodone product?

12                MR. GASTWIRTH:   Objection.   Form.

13                THE DEPONENT:   The way you've said it

14   is basically we put together a data package for

15   FDA approval, which meant that the decision was

16   that we would move ahead once approved to market

17   the drug.

18                So this would have been not just a sole

19   decision on my part.   Okay.   This would have

20   involved Gerstenberg, Russillo, other people.

21   Medical department, regulatory department.

22   BY MR. FAUCI:

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

Berkle, Sheldon                                    October 31, 2008
                           Naples, FL

Page 236

1        Q.   Do you recall if you were one of the

2   people who gave approval for marketing the

3   Roxicodone product?

4             MR. GASTWIRTH:  Objection.  Form.

5             THE DEPONENT:  I -- I believe I

6   certainly was a part of the senior management

7   team that -- that would have heard the

8   recommendation and would have agreed to -- to

9   marketing it.

10  BY MR. FAUCI:

11       Q.   I direct your attention to page 23.

12  It's Shaffer 001474.  The heading is Market

13  Situation, Market Characteristic Summary.

14       A.   Got it.

15       Q.   Do you see at the bottom it says price

16  and reimbursement driven.  Do you see that?

17       A.   I see that.

18       Q.   At the top it's market characteristics

19  summary.  Do you see that?

20       A.   Yes.

21       Q.   Let's break that down.  What does it

22  mean for something to be price driven?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                      October 31, 2008
                       Naples, FL

                                         Page 254

1          And in this case, as far as I can see,

2   it -- it allowed -- it was a competitive pricing

3   versus, you know, multiple tablets of a five-

4   milligram Oxycodone on the market.  So...

5       Q.   The fact that the suggested AWP for the

6   Roxicodone five-milligram 100s was twice as high

7   as the WAC, that wouldn't have jumped out at you?

8          MR. GASTWIRTH:  Objection.  Asked and

9   answered.

10         THE DEPONENT:  Yeah.  I mean, I said,

11  you know, you have to take that in context of

12  what the competitive environment was.

13  BY MR. FAUCI:

14      Q.   Mr. Berkle, thank you very much for

15  coming here today.

16         Oh, I guess I have one more question

17  for you.  I'm sorry.

18      A.   Good thing I didn't say you're welcome.

19         (Exhibit Berkle 036 was marked.)

20         THE DEPONENT:  Okay.

21  BY MR. FAUCI:

22      Q.   Who's Christine Ferrara?

              Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                              October 31, 2008
                           Naples, FL

Page 255

1        A.    Chris was a BIPI employee and was
2    involved in the contract pricing department.
3        Q.    Do you recognize this e-mail?
4        A.    No, I don't specifically.
5        Q.    Do you see that it's an e-mail --
6    there's two e-mails.  One's from Christine
7    Ferrara dated August 23rd to Fred Duy.  Do you
8    see that?
9        A.    Yes, I do.
10       Q.    The subject is price?
11       A.    Yes.
12       Q.    Dear Fred, Shelly assigned the
13   approval, but Werner won't be in until tomorrow
14   at which time I expect that he will review and
15   hopefully approve as well, regards, Chris.  Do
16   you see that?
17       A.    Yes, I do.
18       Q.    And then above it.  The top e-mail
19   again is from Christine Ferrara to Fred Duy.
20   It's dated August 24th.  Do you see that?
21       A.    Yes, I do.
22       Q.    It says, Attach, Roxicodone WAC AWP

Berkle, Sheldon                           October 31, 2008
                        Naples, FL

                                              Page 256

1    proposal.doc.  Do you see that?

2         A.   Yes.

3         Q.   Fred, I have received verbal

4    confirmation that the attached pricing has been

5    approved by Shelly and Werner.  Do you see that?

6         A.   Yes, I do.

7         Q.   Does this refresh your --

8         A.   No.  I mean, I assume it is what it is,

9    but I certainly don't remember.

10        Q.   You don't have any reason to think that

11   you didn't, in fact, approve the Roxicodone WAC

12   AWP proposal?

13             MR. GASTWIRTH:  Objection.  Form.

14             THE DEPONENT:  I have no reason to not

15   believe that.

16             MR. FAUCI:  For real this time I'll say

17   thank you very much for your testimony.  I have

18   no further questions at this time.  I reserve the

19   right to ask questions after Mr. Gastwirth if, in

20   fact, Mr. Gastwirth asks questions.

21             MR. GASTWIRTH:  Off the record for a

22   minute.

Berkle, Sheldon                          October 31, 2008
                         Naples, FL

Page 262

 1   tenure?

 2            MR. GASTWIRTH:   Objection.   Form.

 3            THE DEPONENT:   Werner Gerstenberg.

 4   BY MR. BREEN:

 5        Q.   And who was the president of BIPI

 6   during your tenure?

 7        A.   There was no president of BIPI.

 8        Q.   Then who was the chief executive

 9   officer that ran the company?

10        A.   Again, my position I believe was the

11   highest level position within BIPI reporting to

12   the present CEO of BIC.

13        Q.   Okay.   So all and all Mr. Gerstenheimer

14   was your boss?

15        A.   Mr. Gerstenberg.

16        Q.   Gerstenberg.   I apologize.

17            Mr. Gerstenberg was your boss?

18        A.   Correct.

19        Q.   Okay.   Now, let's talk a little bit

20   more about Roxane.   I've heard your testimony

21   today in response to the Department of Justice's

22   questions, and after going back through the

Berkle, Sheldon                          October 31, 2008
                         Naples, FL

Page 263

1    deposition that we took some time ago, I got -- I

2    gathered a certain impression.  I'm going to

3    state that to you and tell me -- I want you to

4    tell me if I'm correct or not.

5              When it came to branded pharmaceuticals

6    being marketed by Boehringer Ingelheim's U.S.

7    operations, you generally had some

8    responsibilities for the sales and marketing

9    aspects?

10             MR. GASTWIRTH:  Objection.  Form.

11             THE DEPONENT:  For the -- You're

12   talking about the branded business within BIPI?

13   BY MR. BREEN:

14        Q.   I'm talking about the branded business

15   in general.

16             MR. GASTWIRTH:  Objection.  Form.

17             THE DEPONENT:  The --

18             MR. GASTWIRTH:  I mean, there are --

19             MS. ROGERS:  Please don't make speaking

20   objections.

21             THE DEPONENT:  Let me -- Let me just

22   state that throughout my tenure I was responsible

Berkle, Sheldon                                    October 31, 2008
                            Naples, FL

Page 264

1    for marketing -- sales and marketing of BIPI

2    branded products.  For Roxane branded products I

3    had responsibility for certain periods of time

4    during my tenure.

5              As an example, after year 2000 I had no

6    involvement whatsoever.  Oh, I'm sorry, I

7    shouldn't say that.  Let me rescind that comment.

8    That after 2000 I had no involvement with Roxane

9    multi-source business whatsoever.  I already

10   stated in my previous testimony that sometime

11   after 2000 the Roxane branded business

12   disappeared.

13   BY MR. BREEN:

14       Q.   That's because the Roxane corporate

15   entity was turned into a manufacturing entity?

16              MR. GASTWIRTH:  Objection.  Form.

17              THE DEPONENT:  The -- Certainly the

18   physical company was a manufacturing site.  The

19   Roxane products were combined together with the

20   Ben Venue products under the leadership of Tom

21   Russillo in terms of relative to the marketing

22   and sales and product development, sorry.  Also

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

Page 265

1    product development.

2    BY MR. BREEN:

3         Q.    And about when was that in 2000?

4         A.    I don't remember the specific dates.

5         Q.    Do you recall if it was earlier or

6    later in the year?

7         A.    You know what, I don't even want to

8    hazard to guess.

9         Q.    Why don't you take a look at Exhibit 32

10   -- or 35 which -- What happened to the originals?

11        A.    Yeah.  It's right here.

12        Q.    Thank you.

13        A.    Okay.

14        Q.    This is dated August 22nd, 2000.

15        A.    Right.

16        Q.    And this is the one where you and Mr.

17   Gerstenberg are approving Roxicodone prices.  Do

18   you see that?

19        A.    Yes, I do.

20             MR. GASTWIRTH:  Objection.  Form.

21   BY MR. BREEN:

22        Q.    Is there any doubt in your mind that

Berkle, Sheldon                              October 31, 2008
                           Naples, FL

Page 266

1   what Exhibit 35 is is a document that indicates

2   that you and Mr. Gerstenberg were at least being

3   asked to approve Roxicodone prices?

4        A.   I think I testified to that already.

5        Q.   Okay.  So does this help refresh your

6   recollection as to whether or not by at least

7   August 22nd, 2000 Roxane -- whether or not

8   Roxane's drug products had been combined with Ben

9   Venue?

10              MR. GASTWIRTH:  Objection.  Form.

11              THE DEPONENT:  You know, again, I -- I

12   can't remember.  It's just too long ago and

13   there's too many things that have occurred in my

14   -- my work experience that really this was such a

15   -- you know, disappeared from my importance that,

16   you know, I just can't remember the details.

17   BY MR. BREEN:

18        Q.   Well, do you have -- do you know

19   whether or not -- Well, strike that.

20              Were you involved in any leadership

21   capacity in the combining of Roxane and Ben

22   Venue's products?

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

Page 337

1    responsibility for setting prices was not

2    management responsibility at Roxane?

3            MR. GASTWIRTH:  Objection.  Form.

4    Objection.  Misstates this witness' prior

5    testimony as well as my prior question of the

6    witness.

7    BY MR. BREEN:

8        Q.   All right.  Let me restate the

9    question.  The fact of the matter is you did from

10   time to time exercise some managerial

11   responsibility with respect to Roxane's

12   operations, at least in the price setting area,

13   didn't you?

14           MR. GASTWIRTH:  Objection.  Form.

15           THE DEPONENT:  For a period of time for

16   the branded generics I -- I approved what was

17   recommended by Roxane management within the

18   Roxane entity.

19   BY MR. BREEN:

20       Q.   All right.  So let me ask the question

21   so I can overcome counsel's objection like we did

22   earlier.  If I ask you if you ever had any

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                              October 31, 2008
                          Naples, FL

Page 338

1    management responsibility at Roxane, would your

2    answer be what you just said?

3            MR. GASTWIRTH:  Objection.  Form.

4    BY MR. BREEN:

5        Q.   Let me ask the question.  Did you ever

6    have any managerial responsibility at Roxane?

7            MR. GASTWIRTH:  Objection.  Form.  He's

8    -- He's answered this question a number of times.

9            MR. BREEN:  Okay.  If it's an asked and

10   answered objection, that's one thing, but if

11   you're objecting to form I'm going to ask it

12   until I get it right.

13           MR. GASTWIRTH:  He's answered the

14   question.  He said he's had no managerial

15   responsibility over Roxane.  He had no day-to-day

16   operational responsibility over Roxane.

17           MR. BREEN:  Let's go back because,

18   Counsel, you're misstating his testimony.

19           MR. GASTWIRTH:  Okay.

20   BY MR. BREEN:

21       Q.   Setting pricing is a managerial

22   responsibility, isn't it?

                 Henderson Legal Services, Inc.
202-220-4158                  www.hendersonlegalservices.com

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                    Naples, FL

Page 339

1          MR. GASTWIRTH:  Let me hear that
2     question back, please.  Thank you.
3               (Record was read by the court
4     reporter.)
5          MR. GASTWIRTH:  Which company are you
6     speaking of?
7          MR. BREEN:  Roxane.
8          THE DEPONENT:  I was not involved in
9     the setting of Roxane multi-source products,
10    pricing for multi-source products.  I was
11    involved for -- for a period of time approving
12    prices that were recommended by Roxane's senior
13    managers for the branded generic products.
14    BY MR. BREEN:
15         Q.   For Roxane, correct?
16         A.   For Roxane.
17         Q.   And that was a management function,
18    wasn't it?
19         MR. GASTWIRTH:  Objection.  Form.
20         THE DEPONENT:  It was not a day-to-day
21    operational function.  It was an occasional
22    responsibility.

Berkle, Sheldon                                    October 31, 2008
                        Naples, FL

Page 341

1       Q.    Were you -- Was that a management
2   function, sir?
3           MR. GASTWIRTH:  Objection.  Asked and
4   answered.
5   BY MR. BREEN:
6       Q.    Was that a management function, sir?
7           MR. GASTWIRTH:  Objection.  Asked and
8   answered.  You are being argumentative with this
9   witness.
10          MR. BREEN:  No.  You're being -- You're
11  being -- You are being totally inappropriate,
12  Counsel.  I am cross-examining this witness based
13  upon your questions.  Now, we can stop and we can
14  we redo this deposition at another time and I'll
15  let the judge rule on this, but he'll let me get
16  an answer to this question.  I'll guarantee you.
17          MR. GASTWIRTH:  I'll let you get a
18  fourth answer to this question.
19          THE DEPONENT:  I will repeat myself.  I
20  was not involved in the establishment of prices
21  for the multi-source business.  I was involved in
22  approving prices for branded drugs, Roxane

                Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

Berkle, Sheldon                              October 31, 2008
                        Naples, FL

                                                    Page 342

1    branded generic drugs, which were recommended by

2    senior management at Roxane.  If that's how you

3    define managerial responsibility, then that's

4    what it is.

5    BY MR. BREEN:

6         Q.    Thank you.  And with respect to what

7    you just said you did, with respect to branded

8    drug prices at Roxane, who made the decision as

9    to when you would and when you would not

10   participate managerially with respect to Roxane

11   prices?

12             MR. GASTWIRTH:  Objection.  Form.

13             THE DEPONENT:  You know, I think we

14   spent some time at looking at process, and

15   particularly pertinent to Roxicodone, and I think

16   we saw that the recommended price was asked for

17   approval by myself and Mr. Gerstenberg.

18   BY MR. BREEN:

19        Q.    Okay.  So you and Gerstenberg decided

20   when you would and when you would not participate

21   in Roxane pricing decisions, correct?

22        A.    For --

                Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                      Naples, FL

Page 343

1          MR. GASTWIRTH:  Objection.  Form.

2          THE DEPONENT:  For branded generics.

3    BY MR. BREEN:

4        Q.   All right.  Could you and Mr.

5    Gerstenberg have easily decided that you would

6    exercise some responsibility for multi-source

7    products?

8          MR. GASTWIRTH:  Objection.  Form.

9          THE DEPONENT:  Certainly I could not.

10   BY MR. BREEN:

11       Q.   Could Mr. Gerstenberg?

12       A.   As country manager, I can't speculate

13   as to what he could or could not do.  I can't

14   answer for Mr. Gerstenberg.

15       Q.   All right.  So what circumstances

16   existed that permitted Mr. Gerstenberg and you to

17   managerially decide when you would participate in

18   the branded pricing actions of Roxane but not

19   participate in the multi-source pricing?

20         MR. GASTWIRTH:  Objection.  Form.

21   Managerially decided is your term, not this

22   witness'.

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                        Naples, FL

---

                                              Page 344

 1           THE DEPONENT:  Yeah.  You know, there

 2    was a procedure that was established for branded

 3    -- for BIPI brands and for Roxane branded

 4    generics that stated that I would approve and Mr.

 5    Gerstenberg would approve.

 6    BY MR. BREEN:

 7           Q.    And who established that procedure?

 8           A.    That was a recommendation by a

 9    committee.

10           Q.    And the committee was made up of whom?

11           A.    People from BIPI and from Roxane.

12           Q.    And when was that?

13           A.    You know, again, if we looked back at

14    the memos you'd be more definitive in terms of

15    the timing.  When was that?  That was around,

16    what, '99, 2000, something like that.

17           Q.    And the committee's recommendations

18    were made to whom?

19           A.    I think you're being redundant here.

20    Did I not already state that the recommendations

21    were made based on the memos I've seen to myself

22    and to Mr. Gerstenberg for branded generics.

---

19683184-bff4-4227-a96a-409b79dd21fe