# Exhibit 20

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

Duy, Walter Frederick                    December 16, 2008
                    Columbus, OH

Page 1

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

-------------------------X

IN RE: PHARMACEUTICAL        )  MDL No. 1456

INDUSTRY AVERAGE WHOLESALE   )  Civil Action No.

PRICE LITIGATION             )  01-12257-PBS

-------------------------X

THIS DOCUMENT RELATES TO:    )  Judge Patti B. Saris

United States of America,    )

ex rel. Ven-A-Care of the    )  Magistrate Judge

Florida Keys, Inc, et al. v.)   Marianne B. Bowler

Boehringer Ingelheim Corp.,  )

et al., Civil Action No.     )

07-10248-PBS                 )

-------------------------X

     VIDEOTAPED DEPOSITION OF WALTER FREDERICK DUY

              Tuesday, December 16, 2008

                    9:57 a.m.

              Habash, Reasoner & Frazer

         471 East Broad Street, 15th floor

              Columbus, Ohio  43215

         REPORTED BY:  SUSAN L. COOTS, RPR

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                        Columbus, OH

---

                                                    Page 2

1                    A P P E A R A N C E S

2

3     On behalf of United States Department of Justice

4

5            LAURIE A. OBEREMBT, Attorney at Law

6            Assistant United States Attorney

7            Civil Division, Commercial Branch

8            P.O. Box 201

9            Ben Franklin Station

10           Washington, D.C.   20044

11           (202) 514-3345

12           Laurie.Oberembt@usdoj.gov

13

14    On behalf of Relator Ven-a-Care of the

15    Florida Keys, Inc.

16

17           SHAUNA ITRI, Attorney at Law

18           Berger & Montague, P.C.

19           1622 Locust Street

20           Philadelphia, Pennsylvania   19103-6305

21           (215) 875-3000

22           sitri@bm.net

---

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                         Columbus, OH

Page 48

1        A.    Yes.   The -- the official title was

2    vice president administration.   On this CV, we

3    probably used vice president operations because

4    that was the functional responsibility.

5             MS. OBEREMBT:   I'm going to ask the

6    court reporter to mark as Exhibit 4 a document

7    entitled Corporate Data, dated June 27th, 1990,

8    with Bates numbers of ROX020-0095 through 0096.

9             (And, thereupon, Deposition

10   Exhibit Duy 004 was marked for purposes of

11   identification.)

12       Q.    Does this appear to be an accurate list

13   of the directors of Roxane Laboratories in June

14   of 1990?

15            MR. KAVANAUGH:   Objection to form.

16            THE WITNESS:   Yes.   It appears to be

17   accurate.

18   BY MS. OBEREMBT:

19       Q.    Were you an officer of Roxane

20   Laboratories at that time?

21       A.    Yes, ma'am.

22       Q.    And how long did you remain an officer

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                         Columbus, OH

Page 49

1    of Roxane Laboratories?

2        A.    Until 1996.

3        Q.    And why did you cease to be an officer

4    in 1996?

5        A.    My position was moved from reporting

6    into Roxane Laboratories to reporting to a BIPI

7    person in Connecticut.

8        Q.    And when you say BIPI, to what are you

9    referring?

10       A.    Boehringer Ingelheim Pharmaceuticals,

11   Inc.

12       Q.    At that point, did you cease to be an

13   employee of Roxane Laboratories and then become

14   an employee of BIPI?

15       A.    I don't think so.  I think I remained a

16   Roxane employee.  I don't remember which badge I

17   had then.  They changed over the --

18       Q.    But starting in 1996, you began

19   reporting to somebody at BIPI; is that correct?

20       A.    Yes.

21       Q.    And who was that person?

22       A.    Jeff Huth.

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

Page 50

1          Q.    Can you spell that last name?

2          A.    I'm sorry.  H-U-T-H.

3          Q.    And what was Mr. Huth's title at that

4     time?

5          A.    I don't know his specific title.  He

6     was the -- the head of business development.

7          Q.    And how long did you report to Mr.

8     Huth?

9          A.    I don't remember specifically.  He --

10    he left that position at some point after 1996

11    and was replaced by Steve Marlin, M-A-R-L-I-N.

12         Q.    And how long did you report to Mr.

13    Marlin?

14         A.    Until I left.

15         Q.    And what was Mr. Marlin's title?

16         A.    At the time, he was either director or

17    executive director business development.  He

18    became vice president of business development.

19         Q.    And did you remain a Roxane

20    Laboratories employee while you reported to Mr.

21    Marlin?

22         A.    To the best of my knowledge.

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

```
                                                    Page 51
 1        Q.   As far as you know, you were a Roxane
 2   Laboratories employee your entire career with the
 3   company?
 4        A.   Yes.
 5        Q.    You previously listed that a Mr. Shelly
 6   Burkle was on the board at the time Roxane
 7   decided to divest itself of its palliative care
 8   line of business; is that correct?
 9        A.   Yes, ma'am.
10        Q.   Do you recall when Mr. Berkle came to
11   the company?
12             THE VIDEOGRAPHER:  You're okay.  Sorry.
13             THE WITNESS:  No, I don't.
14   BY MS. OBEREMBT:
15        Q.   Let me see if I can show you something
16   that might refresh your recollection.  I'd like
17   to mark as Exhibit No. 5 a document entitled
18   Employee Bulletin, dated August 25th, 1994, with
19   a Bates number of ROX038-3188 through 3189.
20                  (And, thereupon, Deposition
21   Exhibit Duy 005 was marked for purposes of
22   identification.)
```

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

```
                                                  Page 53
 1    BY MS. OBEREMBT:
 2         Q.   And did you ever report to Mr. Burkle?
 3         A.   Not directly.
 4         Q.   Was he ever in your chain of command?
 5         A.   Yes.
 6         Q.   When?
 7         A.   Well, from the -- from 1996 on, Jeff --
 8    both Jeff Huth and Steve Marlin reported to him.
 9    And when he came on the organization charts,
10    there would be -- I don't know that I've ever
11    seen one.  But if you were drawing one, there
12    would be a dotted line from me and from Ed Tupa
13    to him, even though we reported to the -- the
14    president of Roxane.
15         Q.   And what does it mean to be a dotted
16    line report to Mr. Berkle?
17         A.   A question that I'm not sure businesses
18    have answered over decades.  He would give us
19    functional advice.
20         Q.   What does that --
21         A.   Although --
22         Q.   -- mean in English?
```

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

Page 54

1       A.    Although -- if we were coming up -- if

2   I was coming up with a business plan that had to

3   do with a human pharmaceutical drug, even though

4   I reported to the president of Roxane and -- and

5   would talk to him, I would also talk to Shelly

6   about how this fits into his sphere of the

7   business, and he would have to approve of what we

8   were doing.

9       Q.    So even though you worked for Roxane

10  Laboratories, if you were going to make a

11  significant move with respect to a drug, you had

12  to obtain Mr. Berkle's approval; is that fair to

13  say?

14          MR. KAVANAUGH:   Objection to form.

15          THE WITNESS:  Yeah.  That's fair to

16  say.

17  BY MS. OBEREMBT:

18      Q.    Who was the president of Roxane Labs at

19  the time?

20      A.    I'm not sure when Jerry Wojta left.  He

21  was here then I believe.

22      Q.    On the second page of the memo, if you

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                        Columbus, OH

                                                    Page 55

1    could turn to that.   Oh, you're already there.

2    Is that what you're referring to when you say

3    functional -- he gave functional advice when it

4    says you -- that you and Mr. Tupa are going to

5    report functionally to Mr. Berkle?

6         A.   Yes.

7         Q.   Did Mr. Berkle hold any position with

8    Roxane Laboratories?

9              MR. KAVANAUGH:   Objection to form.

10             THE WITNESS:   He was a member of our

11   board.

12   BY MS. OBEREMBT:

13        Q.   Do you know if Mr. Berkle held any

14   executive position with Roxane Laboratories?

15        A.   I don't know.

16        Q.   At the time, did you have any

17   understanding about any executive position that

18   he might have held with Roxane?

19             MR. KAVANAUGH:   Objection to form.

20             THE WITNESS:   No.

21   BY MS. OBEREMBT:

22        Q.   On the second page of the document,

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                         December 16, 2008
                            Columbus, OH

Page 56

1    there's a reference to a Warner Gerstenberg.  Do

2    you see that?

3         A.   Yes, ma'am.

4         Q.   Do you recall what Mr. Gerstenberg's

5    position was at the time?

6         A.   I don't know as to this specific time.

7    He was the head of the holding company when I

8    left.

9         Q.   Was that in 2001?

10        A.   Yes.  And prior to that, had been the

11   chief financial officer.  I'm not sure what his

12   title is, but he headed the accounting finance

13   group for a while and then became the head of the

14   holding company.  I'm not sure when that

15   happened.

16        Q.   Do you know if he held any executive

17   position with Roxane Laboratories?

18        A.   I don't.  He acted as the president of

19   Roxane following Jerry Wojta's retirement for

20   some time, a relatively short period of time.  I

21   don't know if he had a title or if he was a

22   Roxane employee.

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

Page 57

1        Q.    Did someone ultimately assume the
2    presidency of Roxane Laboratories?
3              MR. KAVANAUGH:  Objection to form.
4    BY MS. OBEREMBT:
5        Q.    Do you know if someone ultimately
6    assumed the position of president of Roxane
7    Laboratories?
8        A.    We had -- I don't know if they were
9    called presidents.  There was a -- there were two
10   people who split the -- one had the operations
11   part of the business.  Dr. Shepard had the other
12   parts of the business.
13       Q.    Who was the person who had the
14   operations part of the business?
15       A.    Gerry Perez.  P-E-R-E-Z.  Gerry with a
16   G.
17       Q.    I'd like to mark as Exhibit No. 6 an e-
18   mail dated June 4th, 1996, and with a Bates
19   number of ROX0407520.
20             Do you see your name mentioned in
21   Exhibit No. 6?
22                  (And, thereupon, Deposition

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

Page 169

1   that you look forward to working with folks, "

2   ... even if only for this brief but exciting

3   period." What did you mean by that?

4        A.   Well, I mean -- I assumed I was only

5   there for, you know, until a replacement came,

6   which wouldn't be very long.

7        Q.   At least that was your hope, right?

8        A.   It turned out not to be very long, but

9   for a different reason.  And it was exciting

10  because we were, in fact, launching Roxicodone,

11  and we had new things going on.

12       Q.   I'd like to mark as Exhibit No. 33 an

13  e-mail from Fred Duy, dated August 12th, 2000,

14  with Bates No. SHAFFER001451.

15               (And, thereupon, Deposition

16  Exhibit Duy 033 was marked for purposes of

17  identification.)

18               MS. OBEREMBT:  Can we go off the record

19  for about two minutes, please.

20               THE VIDEOGRAPHER:  Off the record at

21  1535.

22               (Recess taken.)

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                           Columbus, OH

Page 170

1              THE VIDEOGRAPHER:  On the record at

2      1541.

3      BY MS. OBEREMBT:

4              Q.   Have you had a chance --

5              A.   Let me point out, in response to your

6      earlier questions about the e-mail names.

7              Q.   Yes.

8              A.   Why we had -- we were all Boehringer

9      Ingelheim.  You'll notice that in the -- the

10     wisdom of the centralized computer folk, even for

11     e-mails, though, we were ROXUS, as opposed to

12     BIPIS, or some other thing.

13             Q.   Thank you for that addition.

14                  Have you had a chance to read Exhibit

15     33?

16             A.   Yes.

17             Q.   Is that an e-mail from you to Mr.

18     Shelly Burkle?

19             A.   Yes.

20             Q.   Did you draft this e-mail?

21             A.   Yes, ma'am.

22             Q.   And what are you communicating to Mr.

Duy, Walter Frederick                    December 16, 2008
                        Columbus, OH

                                              Page 171

 1    Berkle here?
 2         A.   I'm sending him the launch plan for
 3    Roxane -- for Roxicodone 15 and 30 milligram
 4    tablets.
 5         Q.   And why did you send the launch plan to
 6    Mr. Berkle?
 7         A.   He was my boss' boss and was
 8    responsible for human pharmaceuticals in the U.S.
 9         Q.   And -- and he was with BIPI; is that
10    right?
11              MR. KAVANAUGH:  Objection to form.
12              THE WITNESS:  He had an office at BIPI.
13    He was on our board.
14    BY MS. OBEREMBT:
15         Q.   Do you know what title he held at BIPI
16    at this time in 2000?
17         A.   I don't.  He probably also had a BIC
18    title, too, and I don't know what that was
19    either.
20         Q.   Were you ever aware of him having a
21    Roxane title, other than being on the board?
22         A.   Not to my knowledge.  Although he may

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                      December 16, 2008
                         Columbus, OH

Page 172

1    have been president at one time.  I don't know.

2         Q.    Other than being your boss' boss, why

3    else did you send him the Roxicodone launch plan?

4         A.    Well, again, because he was -- he was

5    responsible for human pharmaceutical marketing in

6    the United States.

7         Q.    Did you need to have him approve this

8    before it was finalized?

9         A.    Not the plan.  I mean, he had already

10   approved going forward, so it was to say, "Here's

11   the plan.  Here's what we're going to do."

12        Q.    Hypothetically, what if Mr. Berkle had

13   said, "No, I think this is a terrible plan"?

14             MR. KAVANAUGH:  Objection to form.

15             THE WITNESS:  Then we -- we would have

16   stopped, I guess, what we were doing and tried to

17   make it less objectionable.  Less terrible.

18   BY MS. OBEREMBT:

19        Q.    So it was your understanding that he

20   had the authority to advise you to make changes

21   in the plan?

22        A.    Yes.

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

Page 173

1        Q.    In the second paragraph there you

2   reference a pricing committee meeting.  What did

3   you mean by that?

4        A.    Well, as I said earlier, you know, I

5   don't really remember what the pricing committee

6   did, but I guess they had to approve all prices,

7   so we had submitted a pricing proposal for

8   Roxicodone to them.

9        Q.    Do you know who wrote the launch plan

10  for Roxicodone?

11       A.    Doug Bierl wrote much of it and

12  compiled all of it.

13       Q.    And can you remind me again who Mr.

14  Bierl was?

15       A.    He was a contract employee that we --

16  he wasn't an employee.  He was a contract person

17  that we hired for this project to do the launch

18  plan for this project, meaning do the launch plan

19  for Roxicodone 15 and 30.

20       Q.    Who else besides Mr. Bierl helped write

21  the launch plan?

22       A.    Well, I don't know everyone that may

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                        Columbus, OH

Page 174

 1   have been involved.  And I'm sure he got input on
 2   all the parts of it from various Roxane people,
 3   from the ad agency involved, from the market
 4   research people involved.  I don't know who else,
 5   but I'm sure there were a fair number of people
 6   that had -- had input or provided him with
 7   information that he could then form that into a
 8   portion of the plan.
 9        Q.    Did you write any portion of the plan?
10        A.    Not that I remember specifically.
11        Q.    Did you approve the plan before you
12   sent it to Mr. Berkle?
13        A.    Yes.
14        Q.    Did anybody else need to approve it
15   before you sent it to Mr. Berkle?
16        A.    And I say approve; edit might be a
17   better word.  I mean, I'm sure before I sent it
18   to Mr. Berkle, I read it.  If there were things I
19   didn't like, word changes, maybe, I would have
20   talked to Doug and we would have agreed to change
21   or he would have convinced me not to change it.
22        Q.    So is it fair to say you would have

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

Page 175

1    been in agreement with the plan when you sent it

2    to Mr. Berkle?

3         A.   Yes.

4         Q.   Did anybody else need to review the

5    plan before you sent it to Mr. Berkle?

6         A.   I'm sure that as it was being put

7    together we got review of, for instance, the

8    sales activity by the sales managers involved.

9    Any information in the plan regarding regulatory

10   compliance, we would have gotten from the

11   regulatory people, and so they would have

12   reviewed their part of it.  I don't know that

13   anyone else read the entire plan and said, you

14   know, "This is great."  Although there could have

15   been several people who did.

16        Q.   Do you remember sending a draft of the

17   plan around to anybody else before you sent it to

18   Mr. Berkle?

19        A.   I don't remember specifically, but it

20   would have been usual practice for me to do that,

21   maybe to Rich Feldman just to say, "Does this

22   read right?"  I don't know if Rich was there then

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                December 16, 2008
                    Columbus, OH

                                              Page 176

1   or not.  Jerry Hart may have looked at the whole

2   thing.

3        Q.   Do you see Mr. Feldman's name on the e-

4   mail?

5        A.   Yes.  And he's still a ROXUS, so I

6   assume he was still in Columbus.

7        Q.   Is there anybody else who you might

8   have circulated a draft to, other than Mr. Hart

9   or Mr. Feldman?

10       A.   I don't remember specifically.  I may

11  have let Steve -- Dr. Marlin look at it.  I don't

12  know if Shepard was -- Dr. Shepard was still

13  involved or not.  Doesn't look like it, so maybe

14  not.  Or I may have sent him one, and said, "Hey,

15  if you get a chance, let me know what you think."

16       Q.   As you look at the -- the folks that

17  you reference in this e-mail, does anybody come

18  to mind as the possible author of the notes that

19  we looked at earlier?

20            MR. KAVANAUGH:  Objection to form.

21            THE WITNESS:  No.  I mean, the people -

22  - it's not Greg or Chris, I don't think, that

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                           Columbus, OH

Page 177

1    wrote that.  As I said, I first thought it was --
2    it may have been Doug, but I don't think it -- I
3    mean, there were things there that he wouldn't
4    have written notes about, I don't think.  So no,
5    it doesn't help me.
6    BY MS. OBEREMBT:
7         Q.   Okay.  I'd like to mark as Exhibit No.
8    34 a document that's previously been marked as
9    Shaffer Exhibit 20, and it's Bates numbered
10   SHAFFER001451 through 1516.  And it also has a
11   copy of the e-mail that we just looked at on the
12   top of the exhibit, along with a document
13   entitled Roxicodone CII, 15 milligram and 30
14   milligram tablets Launch Plan, dated August 11,
15   2000.
16             (And, thereupon, Deposition
17   Exhibit Duy 034 was marked for purposes of
18   identification.)
19             I'd also like to add that the last page
20   of the exhibit contains a document entitled
21   Roxicodone 50 milligram and 30 milligram tablets,
22   Introductory Pricing Proposal.

Henderson Legal Services, Inc.

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                        Columbus, OH

Page 181

1    product on the shelf.  They could build one by

2    telling the patient to take five tablets instead

3    of -- or three tablets instead of one.

4            But we thought we could drive the

5    market for these unique strengths by getting

6    physicians to write them for their patients who

7    needed more than 5 or 10 milligrams of

8    breakthrough medication.

9        Q.   And how did price and reimbursement as

10   listed here form part of that strategy?

11       A.   Well, the -- the thing we knew we had

12   to do with price and reimbursement was take them

13   out of the pharmacist's decision to stock the

14   product or not.  If -- if we spent the effort to

15   generate a prescription for Roxicodone 15

16   milligrams, and the patient took it to the

17   pharmacy, and his pharmacist said, "Well, I don't

18   have that, but I can give you Purdue Frederick's

19   5 milligram tablet or Endos (phonetic) 5

20   milligram tablet, or any of the other three or

21   four, ten, 5 milligrams tablets; you just have to

22   take three of them instead of one," and he'd

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

Page 182

1    write the directions, and the patient would

2    probably accept that.  The physician would

3    probably accept that.

4            So we had to make sure there was no

5    incentive -- financial incentive for the

6    pharmacist to do that.  And to -- so that the

7    pharmacist would, in fact, stock, give up shelf

8    space, for both the 5 milligram oxycodone

9    product, and the 15 and 30 oxycodone products.

10   Q.    And how does that relate to

11   reimbursement?

12   A.    Well, it would -- if the pharmacist's

13   reimbursement for a 5 milligram tablet, for three

14   5 milligram tablets, for instance, were greater

15   than our 15 milligram tablets, he had a

16   disincentive to stock our product.  He had more

17   of an incentive to substitute 5 milligram tablets

18   versus 5 and 15.

19   Q.    So did you want to use reimbursement to

20   create an incentive to stock the Roxicodone

21   products?

22   A.    We wanted to make sure that

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                         Columbus, OH

Page 183

1   reimbursement -- that the spread in the end, his

2   spread, was not a disincentive to stocking

3   Roxicodone 15 and 30.

4        Q.   So you wanted to make sure that the

5   spread that Roxane -- you wanted to make sure

6   that the spread on the Roxane product was at

7   least equal to the spread the pharmacist would

8   earn on the competing product?

9        A.   Correct.

10       Q.   And when you talk about reimbursement

11  here, are you talking -- are you including

12  Medicare and Medicaid in that?

13            MR. KAVANAUGH:  Objection to form.

14            THE WITNESS:  Yes.  It would be any

15  third-party payor.

16  BY MS. OBEREMBT:

17       Q.   If you could turn to page 31 of the

18  launch plan.  Do you see the heading Distribution

19  Plan at the top of this page?

20       A.   Yes, ma'am.

21       Q.   And do you see a reference to sales

22  representatives informing retail pharmacies of

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                        Columbus, OH

---

Page 196

1        Q.   I'd like to have marked as Exhibit No.

2   37 a better, more complete version of Exhibit No.

3   35.  And it's e-mail from Shelly Burkle to

4   Christine Ferrara dated August 15th, 2000.

5             Does Exhibit 13 (sic) make clear that

6   Mr. Berkle was asking Christine Ferrara whether

7   or not the price review process could be speeded

8   up?

9                 (And, thereupon, Deposition

10  Exhibit Duy 037 was marked for purposes of

11  identification.)

12       A.   Yes.

13       Q.   I'd like to mark as Exhibit No. 38 an

14  e-mail from Mike Leonetti to Fred Duy, dated

15  August 17th, 2000, Bates No. BOEH00236145.

16            Is this an e-mail from Mr. Leonetti to

17  you?

18                 (And, thereupon, Deposition

19  Exhibit Duy 038 was marked for purposes of

20  identification.)

21       A.   Yes, ma'am.

22       Q.   And who is Mike Leonetti?

---

Duy, Walter Frederick                    December 16, 2008
                         Columbus, OH

Page 197

1          A.    He had various jobs within BIPI.  At --
2    at this point, he -- he oversaw marketing
3    planning -- a part of the marketing planning
4    process for some products.  And I don't remember
5    what all he was responsible for, but he may well
6    have been responsible at the time for the Roxane
7    palliative care products.
8          Q.    Did you need his approval in order to
9    move forward with the launch plan?
10         A.    Not that I remember.
11         Q.    Does his e-mail reference a "very
12   favorable pharmacy spread" here?
13         A.    Yes.
14         Q.    And what is -- to what is he referring
15   there?
16               MR. KAVANAUGH:  Objection to form.
17   BY MS. OBEREMBT:
18         Q.    What is your understanding of what he's
19   referring to there?
20               MR. KAVANAUGH:  Objection to form.
21               THE WITNESS:  My guess would be he's
22   talking about the difference in the reimbursement

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                       Columbus, OH

Page 198

1    of an exclusive product versus a generic product.

2    BY MS. OBEREMBT:

3        Q.    And does that go back to your earlier

4    testimony that typically a generic product was

5    discounted more off of AWP than a brand product?

6        A.    Yes.

7              MS. OBEREMBT:  Why don't we take -- go

8    off the record right now to change tape.

9              THE VIDEOGRAPHER:  Off the record at

10   1625.

11                 (Recess taken.)

12                 (Mr. Fauci left the deposition.)

13             THE VIDEOGRAPHER:  On the record at

14   1631.

15   BY MS. OBEREMBT:

16       Q.    I'd like to ask the court reporter to

17   mark as Exhibit No. 39 an e-mail dated August

18   18th, 2000, from Mr. Fred Duy to Mr. Mike

19   Leonetti and others.  And the Bates number is

20   BOEH00236098 through 100.

21             Is this your response to Mr. Leonetti's

22   e-mail to you that we looked at in Exhibit No.

b8801923-ea65-46c3-bf0f-3c323aea3b1b

Duy, Walter Frederick                    December 16, 2008
                        Columbus, OH

Page 202

1    the top of page 2 of our intent with the

2    marketing strategy for Roxicodone 15 and 30 is to

3    keep price and retail pharmacy reimbursement from

4    becoming roadblocks.  We were trying to eliminate

5    pricing as a factor.

6         Q.   You wanted to ensure that your spread

7    was at least equal to or higher than the spread

8    of the competing product; is that right?

9              MR. KAVANAUGH:  Objection to form.

10             THE WITNESS:  Of the -- to the 5

11   milligram product offered by more people than us.

12   BY MS. OBEREMBT:

13        Q.   So -- so you wanted the spread to be at

14   least equal to or higher than the spread for that

15   5 milligram product with which you were

16   competing; is that right?

17        A.   Yes.

18        Q.   I'd like to mark as Exhibit No. 40 an

19   e-mail dated August 18th, 2000, from Jim King

20   with a Bates number of BOEH00236135 through 136.

21             Does this e-mail indicate that Mr. King

22   approved the price proposal for Roxicodone in the

Duy, Walter Frederick                    December 16, 2008
                          Columbus, OH

```
                                                    Page 203

 1    launch plan

 2              (And, thereupon, Deposition

 3    Exhibit Duy 040 was marked for purposes of

 4    identification.

 5              MR. KAVANAUGH:  Objection to form.

 6              THE WITNESS:  Yes.

 7    BY MS. OBEREMBT:

 8         Q.   And why do you think it indicates he

 9    approved it?

10         A.   Well, it says it's from him to

11    Christine, and he says, "The price looks good."

12         Q.   Okay.  Who was Mr. King?

13         A.   He was head of the sales force, the --

14    all of BIPI's and Roxane's sales forces.

15         Q.   And was it your understanding that his

16    approval was necessary for the price to be

17    approved finally?

18         A.   It would be my guess that he was on the

19    pricing committee.

20         Q.   Do you ever remember meeting with him

21    on the pricing committee?

22         A.   No.
```

b8801923-ea65-46c3-bf0f-3c323aea3b1b