# Exhibit 25

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

# In The Matter Of:

*THE STATE OF TEXAS  v.*
*DEY, INC., ET AL.*

---

*EDWARD J. TUPA*
*January 31, 2003*

---

*FREDERICKS-CARROLL REPORTING*
*Court Reporting-Video Services-Litigation Support*
*7719 WOOD HOLLOW DRIVE, SUITE 156*
*Austin, TX  78731*
*(512) 477-9911    FAX: (512) 345-1417*

*Original File 30131ET.V1, 261 Pages*
*Min-U-Script® File ID: 4124027092*

**Word Index included with this Min-U-Script®**

Page 1

[1]             CAUSE NO. GV002327
[2]     THE STATE OF TEXAS              ) IN THE DISTRICT COURT
        ex rel.                         )
[3]     VEN-A-CARE OF THE               )
        FLORIDA KEYS, INC.,             )
[4]     Plaintiffs,                     )
[5]  VS.                                ) TRAVIS COUNTY, TEXAS
[6]  DEY, INC.; ROXANE                  )
     LABORATORIES, INC.; WARRICK        )
[7]  PHARMACEUTICALS CORPORATION;       )
     SCHERING-PLOUGH CORPORATION;       )
[8]  SCHERING CORPORATION;              )
     LIPHA, S.A.; MERCK-LIPHA, S.A.;)
[9]  MERCK, KGAA; AND EMD               )
     PHARMACEUTICALS, INC.,             )
[10]    Defendants.                     ) 53RD JUDICIAL DISTRICT
[11]
            ORAL AND VIDEOTAPED DEPOSITION OF
[12]
                     EDWARD J. TUPA
[13]
                   JANUARY 31ST, 2003
[14]
[15]
[16]       ORAL AND VIDEOTAPED DEPOSITION OF
[17] EDWARD J. TUPA, produced as a witness at the instance
[18] of the State of Texas and duly sworn, was taken in the
[19] above-styled and numbered cause on the 31st of
[20] January, 2003, from 8:28 a.m. to 3:53 p.m., before
[21] Debra L. Sietsma, CSR in and for the State of Texas,
[22] reported by machine shorthand, at 52 East Gay Street,
[23] Columbus, Ohio, pursuant to the Texas Rules of Civil
[24] Procedure and provisions as previously set forth.
[25]

Page 2

[1]                     APPEARANCES
[2]
[3] FOR THE PLAINTIFF:
[4]     MS. CYNTHIA O'KEEFFE
        Office of the Attorney General
[5]     State of Texas
        Post Office Box 12548
[6]     Austin, Texas 78711-2548
[7] FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
[8]     MR. JARRETT ANDERSON
        Attorney at Law
[9]     2411 Hartford Road
        Austin, Texas 78703
[10]
    FOR DEFENDANT DEY, INC.:
[11]
        MS. LEILA R. PITTAWAY
[12]    Coudert Brothers
        1114 Avenue of the Americas
[13]    New York, New York 10036-7703
[14] FOR DEFENDANT ROXANE LABORATORIES, INC.:
[15]    MR. STEPHEN E. McCONNICO
        Scott, Douglass & McConnico, L.L.P.
[16]    One American Center, Fifteenth Floor
        600 Congress Avenue
[17]    Austin, Texas 78701
[18]    - and -
[19]    MR. PAUL J. COVAL
        Vorys, Sater, Seymour and Pease, L.L.P.
[20]    52 East Gay Street
        P.O. Box 1008
[21]    Columbus, Ohio 43216-1008
[22] FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
    SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
[23]
        MS. KARIN B. TORGERSON
[24]    Locke Liddell & Sapp, L.L.P.
        2200 Ross Avenue, Suite 2200
[25]    Dallas, Texas 75201-6776

Page 34

[1] A: Oh, I'm sorry. I didn't understand your
[2] question.
[3] Q: — of those companies? I'm sorry.
[4] A: Walgreens, I believe Rite Aid.
[5] Q: Thank you.
[6] Were there any other differences in the
[7] business that you noticed that you haven't mentioned
[8] now from when you were at Roxane previously to when
[9] you came back in 1994?
[10] A: In — in terms of the marketplace and the —
[11] there was a greater emphasis — there was a greater
[12] emphasis forming around the AIDS marketplace, because
[13] the company had one drug on the market that had appeal
[14] to that market and another drug that was coming along
[15] that would have appeal to the AIDS market.
[16] Q: I'm sorry. What are you saying? Age?
[17] A: AIDS, AIDS, the disease AIDS.
[18] Q: HIV?
[19] A: Yes.
[20] Q: And I believe that you indicated previously
[21] that the drugs that Roxane was selling when you
[22] came — or manufacturing when you came back in 1994,
[23] it was more of a commodity. Is that correct?
[24] A: More of a commodity, yes, but not exclusive
[25] of other products that had a — a specialty

Page 35

[1] characteristic of meeting the differentiated product market exclusivity
[2] in some fashion, either by protection — patent
[3] protection or — or packaging capability that wasn't
[4] common in the industry.
[5] Q: When you returned in 1994, was Roxane already
[6] contemplating the launch of a new drug called
[7] Ipratropium bromide unit dose vials?
[8] A: I — I don't know if they were contemplating
[9] it at that point or not. I — I don't know at what
[10] point that began.
[11] Q: Do you have any recollection of when you
[12] became cognizant that that launch was upcoming?
[13] A: I — I don't recall a date or a specific
[14] time, but it was a situation where the Boehringer
[15] Ingelheim Pharmaceuticals product was going to run
[16] into generic competition, and then the decision was
[17] debated as to what — how to handle that situation.
[18] And Roxane — since Roxane was the manufacturer of the
[19] Boehringer product and was a Boehringer company, we
[20] evaluated what Roxane could do with that for the —
[21] for the total corporate entity.
[22] Q: And the Boehringer product was Atrovent; is
[23] that correct?
[24] A: That's correct.
[25] Q: I guess what I'm trying to figure out is:

Page 36

[1] Was it pretty shortly after you came on board that you
[2] became aware that this was a product that was going to
[3] be launched, Ipratropium bromide was going to be
[4] launched by Roxane pretty quickly after you got there?
[5] A: To my knowledge, it was fairly soon, yes.
[6] Q: Was that one of the first projects that you
[7] began to work on after you came back in 1994?
[8] A: It was one of the projects that was given —
[9] that we were giving attention to amongst other
[10] products, and it — and I'd assign the look at that
[11] product to various other people to do.
[12] Q: Did you personally pay attention to the
[13] subject of the launch?
[14] A: Yes, I did.
[15] Q: And would it be accurate to say that you were
[16] the ultimate overseer of the marketing and sales plan
[17] for the launch of that product?
[18] A: I would give the final approval on it, yes.
[19] Q: Was one of your first tasks in looking at
[20] the marketing —
[21] A: May — may I go back to that —
[22] Q: Sure.
[23] A: — prior question?
[24] Q: Certainly.
[25] A: I wasn't quite finished.

Page 37

[1] While I would give the approval for
[2] marketing, that's not the only approval it got. I
[3] mean this was a — I wasn't — I couldn't unilaterally
[4] make that decision.
[5] Q: You couldn't make what decision unilaterally?
[6] A: On — on the final marketing plan. I mean
[7] I — I would approve it for marketing, but then others
[8] in the organization at Roxane or even at
[9] Boehringer Ingelheim would — would also be involved
[10] in it.
[11] Q: In approving the marketing plan?
[12] A: Yes.
[13] Q: And who would that be that would also have to
[14] give approval?
[15] A: Well, the president of the company would be
[16] involved, and I — I — I believe that Mr. Berkle had
[17] been involved as well.
[18] Q: And the president of Roxane was Mr. Wojta
[19] still?
[20] A: Yes. To my knowledge, it was.
[21] Q: And who was Mr. Berkle?
[22] A: He was head of the pharmaceuticals business
[23] for — human pharmaceuticals business for Boehringer
[24] companies in the United States.
[25] Q: Would that be the parent company of Roxane?

Page 38

[1] A: Boehringer Ingelheim Corporation was the
[2] parent company of Roxane, yes.
[3] Q: And is that who Mr. Berkle worked for?
[4] A: Yes.
[5] Q: Other than Mr. Wojta and Mr. Berkle, was
[6] there anyone else who would have had to have approved
[7] the marketing plan for Ipratropium bromide?
[8] A: I — I don't know that.
[9] Q: Is it that you do not recall or you don't
[10] know whether or not any other approvals were needed?
[11] A: I don't know beyond — I — I don't know if
[12] Mr. Berkle needed approval higher up, so I — I just
[13] don't know that.
[14] Q: You've told me everybody that you know that
[15] needed —
[16] A: That — yes, yes.
[17] Q: — to approve it?
[18] Was one of the first tasks that you had
[19] when you looked at this project, at the marketing
[20] launch for this drug, to identify the markets for the
[21] drug?
[22] A: One of the first tasks was — no, I don't —
[23] I don't think that's correct.
[24] Q: Tell me what the first tasks were.
[25] A: The — the first tasks were trying to make a

Page 39

[1] decision as to whether Roxane should launch the
[2] product preemptively before other companies entered
[3] the market or not and decisions on production
[4] capacities and how we could handle both Atrovent
[5] and — and the Roxane generic launch.
[6] Q: And as the head of sales and marketing, this
[7] production decision was — was one of your tasks?
[8] A: I was involved in — in considering that
[9] issue. It wasn't — I wasn't alone in that,
[10] obviously.
[11] Q: After those initial tasks, did you need to
[12] identify the markets for the drug once it was
[13] manufactured?
[14] A: Yes.
[15] Q: And did you identify those markets?
[16] A: Well, to the best of the company's ability,
[17] they did. You know, I didn't do it personally, but
[18] people in the company did that, yes.
[19] Q: And they informed you what those markets
[20] were; is that correct?
[21] A: Yes.
[22] Q: Did those markets include wholesalers?
[23] A: Yes.
[24] Q: Group purchasing organizations?
[25] A: Yes.

Page 40

[1] Q: Mail order pharmacies?
[2] A: I don't recall that specifically but —
[3] Q: Is it possible that was one of the markets?
[4] A: Sure.
[5] Q: Warehousing chains?
[6] A: Yes.
[7] Q: Nonwarehousing chains?
[8] A: Again, it's logical that there was — I just
[9] don't remember anything specific about that.
[10] Q: And when we're talking about warehousing and
[11] nonwarehousing chains, are we talking about pharmacy
[12] chains?
[13] A: Yes, we are.
[14] Q: And was an additional market that was
[15] identified for the drug the home health care market?
[16] A: Yes, it was.
[17] Q: Would it be fair to say that Roxane had
[18] previous experience in all these markets except home
[19] health care?
[20] A: Yes.
[21] Q: Did you hire a consultant to educate you and
[22] your company about the home health care market?
[23] A: Would you ask that again? I'm sorry.
[24] Q: Did you hire a consultant to educate you and
[25] your company about the home health care market?

Page 41

[1] A: Yes.
[2] Q: And what was the consultant's name?
[3] A: Pope.
[4] Q: And can you tell me who recommended Mr. Pope
[5] to you?
[6] A: My recollection is I had put the — since we
[7] didn't know anything about that market, I had asked my
[8] staff to — to recommend if they knew of anybody, to
[9] recommend someone that we could hire. And it came
[10] through my own staff as to who — as to the
[11] availability of Pope. I never new — heard of Pope
[12] before, so that's how it came about. I don't — I
[13] don't recall which person specifically gave me that
[14] recommendation.
[15] Q: Could it have been —
[16] A: But it came from within the organization.
[17] Q: Sure.
[18]    Could it have been Rich Feldman?
[19] A: No.
[20] Q: Could it have been Tom Via?
[21] A: It could have been. I — I just don't know,
[22] but it couldn't have been Rich Feldman because it was
[23] before his time —
[24] Q: Okay.
[25] A: — I — I believe.

Page 134

[1] we had objectives that we documented before the year
[2] began. And we were evaluated against those
[3] objectives, and those objectives, then, had a value,
[4] an economic value, if they were achieved.
[5]   Q: And so it appears that in 1996 you achieved
[6] all of those objectives and were paid the maximum
[7] amount that you could have been paid under that
[8] incentive program, correct?
[9]   A: It appears that, yes.
[10]  Q: Do you remember how much that was?
[11]  A: No, I have no idea.
[12]  Q: Okay. With regard to the third paragraph
[13] from the bottom, with this first sentence, "He has
[14] developed" — referring to you — "He has developed a
[15] closer bond" with — "between Roxane and our
[16] distribution channels."
[17]   What were the distribution channels?
[18]  A: Wholesalers and — primarily wholesalers and
[19] chain drug stores.
[20]  Q: What had you done to develop closer bonds
[21] with those customers?
[22]  A: Well, we had changed the organizational
[23] structure of our — of our sales organization that
[24] called on those accounts and — I don't know if by
[25] this time — anyway, included in the organizational

Page 135

[1] change was bringing aboard Rich Feldman, who had a
[2] great deal of experience and a lot of contact with
[3] wholesalers and — and he developed, then, a — his
[4] programs to — to implement a — a program that was
[5] not in place at Roxane for having a very close contact
[6] with wholesalers on a regular basis.
[7]   Q: And what did that program or — or those
[8] programs entail in concrete terms?
[9]   A: Calling on the accounts on a regular basis,
[10] understanding their situations with respect to our
[11] products or our competitors' products, putting
[12] together programs that would be appealing to them.
[13]  Q: Financially appealing to them; is that
[14] correct?
[15]  A: Well, I think we're all in business.
[16]  Q: So would that be "Yes"?
[17]  A: In the end it has to have some financial
[18] effect, sure.
[19]  Q: And then the sentence goes on — "and in the
[20] case of Ipratropium bromide UDV's, launched new
[21] activities with home health care organizations."
[22]  A: Uh-huh.
[23]  Q: Is that correct?
[24]  A: Yes, it is.
[25]  Q: Now, this would indicate that Mr. Wojta is

Page 136

[1] acknowledging that this was an important task for you
[2] for this particular year, to launch activities with
[3] this particular segment of the market, correct?
[4]   A: Yes.
[5]   Q: And that that related particularly to the
[6] launch of Ipratropium UDV's, right?
[7]   A: That is correct.
[8]   Q: Okay. It goes on to indicate that you added
[9] a new staff member, and that would be Waterer? He's
[10] referring to Judy Waterer, correct?
[11]  A: I'm sorry. Where are you?
[12]   I'm sorry. I'm catching up to you.
[13]  Q: "He added a new member (Waterer) to his
[14] staff"?
[15]  A: Yeah, uh-huh, uh-huh.
[16]  Q: So Mr. Wojta is commending you for hiring
[17] Judy Waterer —
[18]  A: Uh-huh.
[19]  Q: — correct?
[20]  A: Yes.
[21]  Q: And it indicates that Judy Waterer's job was
[22] to develop new programs for distributors?
[23]  A: For wholesalers and — I — I — I don't know
[24] how you want to use the word "distributor." That's
[25] the only reason I'm qualifying it.

Page 137

[1]   Q: Well, I appreciate that.
[2]   Could you — could you tell me what you
[3] understand that he meant there, what kind of new
[4] programs, and for whom?
[5]   A: Well, in — in this case, "distributors"
[6] would have meant the wholesalers, the chain drug
[7] organizations and probably home health care, in this
[8] case.
[9]   Q: And it indicates that you are at — at this
[10] point — "in the process of recruiting for the
[11] position of director, trade and pharmacy affairs,
[12] which will focus greater attention on this critical
[13] aspect of both the BIPI and Roxane business."
[14]  A: Yes.
[15]  Q: What critical aspect is he referring to?
[16]  A: Well, that — that — that was the function
[17] of dealing directly with the wholesalers and — and
[18] chain stores and keeping in mind that I will — the —
[19] within the scope of my responsibilities, the — the
[20] trade business, meaning the wholesalers, just chains
[21] and so forth, for both BIPI and Roxane resided in this
[22] organization.
[23]  Q: In what organization?
[24]  A: In — in the marketing and sales department
[25] of Roxane Laboratories.

**Page 138**

[1] Q: Could you please say that again? Were you in
[2] charge of marketing for both BIPI and Roxane?
[3] A: No. The trade relations part of — of the
[4] marketing function, which was within marketing and
[5] sales for Roxane Laboratories, also had the trade
[6] relations function for BIPI.
[7] Q: So this person that you were going to hire
[8] would report to both entities; is that correct?
[9] A: He would report only to me but be responsible
[10] for both entities.
[11] Q: Okay. Thank you for clarifying that.
[12]     And who was hired for that position
[13] ultimately?
[14] A: That was — that was the Rich Feldman hire.
[15] Q: So would it be safe to say that hiring
[16] Judy Waterer and developing relationships and
[17] launching activities with regard to home health care
[18] customers entitled you to receive the maximum
[19] incentive payment in 1996? Would that be fair?
[20] A: Well, that was just a small portion of it.
[21] If you read the rest of it, there's Viramune. There's
[22] all kinds of other business besides this —
[23] Q: Well, but this was significant enough for him
[24] to mention in your appraisal that's one page, correct?
[25] A: I — I — I appreciate that, but there's —

**Page 139**

[1] there are things mentioned besides Ipratropium
[2] bromide.
[3] Q: Certainly. But hiring Judy Waterer is
[4] acknowledged here as an important thing that you did
[5] this year —
[6] A: Yes.
[7] Q: — especially with regard to Ipratropium
[8] bromide, correct?
[9] A: With regard to the generic program, correct.
[10] Q: I'm not representing this is the last
[11] document you'll see today, but it's the last one I'm
[12] going to give you.
[13] A: Thank you.
[14] Q: It's Exhibit No. 651, and ask you to take a
[15] look at that.
[16]     Would you agree that this appears to be
[17] an interoffice memo to you from Mr. Tom — and I'm
[18] afraid I'm mispronouncing his name. I've said "Via"
[19] because I've spent a lot of time in San Antonio, and
[20] that's what that spelling is — means in San Antonio.
[21] Is it "Via"?
[22] A: It's Via in this country, yeah.
[23] Q: Via, okay.
[24]     You're not insinuating San Antonio's not
[25] in your country, are you?

**Page 140**

[1]     (Discussion off the record).
[2] Q: (BY MS. O'KEEFFE) Okay. I'm not sure if I
[3] got an answer from you.
[4]     This appears to be an interoffice memo
[5] from Tom Via to you dated June 10th, 1996; is that
[6] correct?
[7] A: That's correct.
[8] Q: And the subject of the memo is "Respiratory
[9] Distributor Partners," correct?
[10] A: Yes.
[11] Q: Okay. Could you please read the very first
[12] sentence.
[13] A: "After one week into the launch of IBUDV, it
[14] has become apparent that in order to secure and
[15] maintain a larger segment of the home care market,
[16] Roxane Laboratories will need to begin selling to
[17] distributors of respiratory products."
[18] Q: It appears that he is identifying a need that
[19] has become apparent very early in the launch of the
[20] product; is that correct?
[21] A: Yes.
[22] Q: And just to kind of establish a time frame,
[23] he indicates it's a week into the launch, and the date
[24] of the memo is June 10th; so that would indicate that
[25] I was correct, that within the first few days of

**Page 141**

[1] June 1996 was the time period when Ipratropium bromide
[2] was launched, correct?
[3] A: Yes.
[4] Q: The second paragraph, the very first
[5] sentence, could you please read that?
[6] A: "From the data we have been able to assemble
[7] so far, it appears RDI would be the preferential
[8] partner for Roxane."
[9] Q: And do you understand what the acronym "RDI"
[10] refers to?
[11] A: It's defined above, Respiratory Distributors,
[12] Incorporated.
[13] Q: And are you familiar with that company?
[14] A: Yes.
[15] Q: And could you please read — or I'll read.
[16] At the bottom of that second full paragraph it says,
[17] "RDI's customer base covers nearly 80 percent of the
[18] home care market. RDI does not cover large chain home
[19] care agencies such as Apria. These accounts are being
[20] called on by the national accounts sales force; so by
[21] partnering with RDI, Roxane should be able to nearly
[22] cover the entire home care market."
[23]     Is that a correct reading of that
[24] sentence?
[25] A: Yes. That's what it states, yes.

Page 166

[1] A: Are you referring to the cash terms, two
[2] percent in 30 days?
[3] Q: Yes, and I appreciate that. Yesterday I
[4] called that "prompt pay," and I was corrected and told
[5] it was called "terms." And so now I'm calling it
[6] "terms," but we do need to communicate.
[7] What — what is the typical terms that
[8] Roxane would offer on the sale of its products?
[9] A: Before the WAC adjustment, it was one percent
[10] on all products except Schedule 2 narcotics, and on
[11] those it was probably three and a half percent
[12] after —
[13] Q: I didn't mean to interrupt. I'm sorry. I
[14] thought you were done.
[15] But one percent net what?
[16] A: I believe it was net 30.
[17] Q: 30 days?
[18] A: Yes.
[19] Q: So in that instance, if a wholesaler paid
[20] within 30 days, they would receive one percent off?
[21] A: That's correct.
[22] Q: And would that one percent off be off of the,
[23] quote, "WAC price"?
[24] A: Yes.
[25] Q: All right. You mentioned that it changed

Page 167

[1] after the WAC adjustment.
[2] What did the terms change to after the
[3] WAC adjustment?
[4] A: It became two percent across the board.
[5] Q: Two percent net 30?
[6] A: Two percent net 30.
[7] Q: And, again, in that instance, if the
[8] wholesaler mailed its payment of the, quote, "invoice
[9] price" within 30 days, they would receive a two
[10] percent discount?
[11] A: Yes.
[12] Q: Okay. In what way was Roxane concerned that
[13] the, quote, "terms" or prompt-pay discount of
[14] one percent was too high?
[15] A: I don't think we ever thought that.
[16] Q: Okay. Strike that.
[17] In what way was Roxane concerned that
[18] the payment of a one percent prompt-pay discount was
[19] detrimental to its profitability on certain products?
[20] A: I — I don't recall that we ever thought
[21] that.
[22] Q: Okay. You don't remember discussions about
[23] prompt-pay discounts on — on WACs which were too
[24] high, in effect being more than the actual cost of the
[25] product in the marketplace?

Page 168

[1] A: No, I don't remember that.
[2] Q: Well, I'll — we'll refer to some exhibits
[3] later in the deposition.
[4] Is — is there any other use of — of
[5] WAC in the pharmaceutical industry that you're aware
[6] of other than, quote, "invoicing wholesalers"?
[7] A: I — I don't know of any other use for it.
[8] Q: Is WAC used as a benchmark price in setting
[9] Medicaid reimbursements, to your knowledge?
[10] A: I have no idea. I don't — I don't know what
[11] the — I — I don't know what their benchmark was,
[12] whether WAC played in some programs or not. I
[13] didn't —
[14] Q: What prices are utilized by Medicaid
[15] authorities in setting pharmaceutical reimbursements?
[16] A: In some cases, AWP.
[17] Q: Is there any other prices —
[18] A: I have no —
[19] Q: — that you're aware of?
[20] A: Hopefully, but I don't —
[21] Q: What do you mean, "hopefully"?
[22] A: Well, I would hope that's — that states have
[23] gone to something rational.
[24] Q: What's wrong with AWP?
[25] A: Well, I think it's — it's a — it's a price

Page 169

[1] that all the states know is — is — is a — it's like
[2] trying to pay a commission to a car salesman based on
[3] manufacturers suggested retail price rather than on
[4] what he sold it for.
[5] Q: When you say manufacturers retail price, you
[6] mean the sticker price on a car?
[7] A: Right, right.
[8] Q: Have you ever been able to buy a car for
[9] 90 percent off of sticker price on a car?
[10] A: I haven't.
[11] Q: Have you ever heard of that happening at all?
[12] A: Probably not.
[13] Q: Are you aware that some generic drugs sell in
[14] the marketplace for 90 percent off of AWP?
[15] A: Yes.
[16] Q: Do you think that state Medicaid
[17] administrators were aware of that?
[18] A: Yes.
[19] Q: What proof do you have? Have you ever talked
[20] to a Medicaid administrator about that?
[21] A: Specifically about 90 percent?
[22] Q: Or any percent.
[23] A: They have all the same information that
[24] everybody else in the industry does, and that's called
[25] First DataBank and — and it's all transparent. They

Page 170

[1] know what it is.
[2] Q: Well, let's talk about First DataBank.
[3] Roxane published prices to First
[4] DataBank, didn't it?
[5] A: I presume so.
[6] Q: Well, do you recall that?
[7] A: Yes, yes.
[8] Q: What prices did Roxane publish to First
[9] DataBank?
[10] A: I'm assuming — again, I wasn't doing it, so
[11] I'm making —
[12] Q: Yes.
[13] A: — but I would expect it would be AWP and
[14] WAC.
[15] Q: And that was done within the marketing
[16] department which reported to you, correct?
[17] A: I don't know that it — I don't know who
[18] submitted it.
[19] Q: Do you recall that Judy Waterer published AWP
[20] and WAC prices to First DataBank?
[21] A: I don't know who submitted them, no.
[22] Q: Do you recall that anyone under your
[23] supervision was reporting WAC and AWP pricing
[24] information to First DataBank?
[25] A: Yes.

Page 171

[1] Q: All right. Who specifically?
[2] A: Well, I — I don't know.
[3] Q: You just knew it was underneath your control
[4] and command?
[5] A: Yes, yes, yes. I knew it was probably
[6] different at different times, so I don't know.
[7] Q: Do you recall Roxane making a decision to,
[8] quote, "not publish WAC" to First DataBank?
[9] A: No, I don't.
[10] Q: You've never heard that before?
[11] A: I — I first heard of it two — three days
[12] ago.
[13] Q: In what context?
[14] A: It was a document that was shared — was
[15] shown to me.
[16] Q: Who showed it to you?
[17] A: The attorneys for — for Roxane.
[18] Q: Mr. Coval?
[19] A: Mr. Coval, yes.
[20] Q: Did Mr. McConnico also meet with you?
[21] A: Yes, yes.
[22] Q: Were — did you ask why it was that Roxane
[23] chose to not publish WAC?
[24] A: I just — I saw that, but I — it didn't mean
[25] anything because I don't recall that ever occurring

Page 172

[1] and I don't know what it was referring to.
[2] Q: Did they explain to you why Roxane chose to
[3] not publish WAC?
[4] A: No.
[5] Q: So once you looked at the document, what, if
[6] anything, was said about the document?
[7] A: Nothing. I was — I was asked if I knew what
[8] that was, and I said, "I have no idea."
[9] Q: From what source do you believe state
[10] Medicaid administrators received transparent pricing
[11] of marketplace conditions?
[12] A: From what source?
[13] Q: Yeah. Earlier you mentioned that you believe
[14] all the pricing's transparent.
[15] A: Yes.
[16] Q: How — how — from what source do you believe
[17] that the Medicaid administrators in America were
[18] exposed to, quote, "transparent pricing"?
[19] A: Well, I would guess that they get First
[20] DataBank and Redbook, and I mean these have to be
[21] competent people.
[22] Q: Do — is it your understanding that First
[23] DataBank publishes contract prices?
[24] A: No.
[25] Q: Is it your understanding that First DataBank



Page 173

[1] publishes any prices other than WAC and AWP?
[2] A: Yes.
[3] Q: What other prices do they publish?
[4] A: I don't know what they publish today, but
[5] they did publish direct price.
[6] Q: Did Roxane report direct prices to First
[7] DataBank?
[8] A: At the time we didn't have AWPs. That's all
[9] we had. So if there was a First DataBank, then we
[10] did, yes.
[11] Q: I'm sorry. I missed that.
[12] What did you say?
[13] MR. ANDERSON: Could you read that back,
[14] Debbie? I'm sorry.
[15] (The requested portion was read).
[16] Q: (BY MR. ANDERSON) What do you mean by that?
[17] A: Well, there was — there was a time when we
[18] never had AWPs. We sold direct price. That was —
[19] that was our price.
[20] Q: There was a time when Roxane only had direct
[21] prices?
[22] A: Yes, direct or wholesale.
[23] Q: It also had wholesale prices?
[24] A: Yes.
[25] Q: And that held true for both brand and generic