# Exhibit 30

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

NO. CV3-03079

THE STATE OF TEXAS                    IN THE DISTRICT COURT OF


- - - - - - - - - - - - - - x



THE STATE OF TEXAS
ex rel.
      VEN-A-CARE OF THE
      FLORIDA KEYS, INC.

            Plaintiffs,

vs                                  TRAVIS COUNTY, TEXAS


ROXANE LABORATORIES, INC.,
BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,
BEN VENUE LABORATORIES, INC.,
and BOEHRINGER INGELHEIM
CORPORATION

            Defendants.        201st JUDICIAL DISTRICT

- - - - - - - - - - - - - x


            VIDEOTAPED DEPOSITION OF JIM KING

            Taken before Lori Miller, Licensed Shorthand
Reporter, a Notary Public in and for the State of

Connecticut, pursuant to Notice and the Connecticut Practice

Book, at The Inn at Ethan Allen, 21 Lake Avenue Extension,

Danbury, Connecticut, on December 3, 2004, commencing at 9:30

a.m.

1    APPEARANCES:

2

3

         Representing the Plaintiff State of Texas
4

               ATTORNEY GENERAL OF TEXAS
5              300 West 15th Street
               Ninth Floor
6              Austin, Texas  78701
                    By Cynthia O'Keeffe, Esquire
7

         Representing the Relator
8

               ANDERSON LLC
9              1300 Guadalupe, Suite 103
               Austin, Texas  78701
10                  By C. Jarrett Anderson, Esquire
11

         Representing the Defendants
12

13             SCOTT, DOUGLAS & McCONNICO, LLP
               One America Center
14             Fifteenth Floor
               600 Congress Avenue
15             Austin, Texas  78701
                    By Steven J. Wingard, Esquire
16

17             VORYS, SATER, SEYMOUR and PEASE, LLP
               52 East Gay Street
18             Columbus, Ohio  43216-1008
                    By Paul J. Coval, Esquire
19

20             Edward Miller, Esquire
               Boehringer Ingelheim Pharmaceuticals, Inc.
21             900 Ridgebury Road
               Ridgefield, Connecticut  06877
22

23

24

25

1    whether or not it was a federal or state proceeding.  Do

2    you remember whether it was a criminal or civil

3    proceeding?

4         A    It was a criminal proceeding.

5         Q    And was that the prosecution of a gentleman

6    named Neil Yager.

7         A    Yes, it was.

8         Q    Do you recall how long you testified; was it a

9    day or several days?

10        A    It was probably about 20 minutes.  Yes, it was

11   one day, and it was about 20 minutes to 25 minutes,

12   something like that.  It was reasonably short.

13        Q    And you were there on behalf of Boehringer

14   Ingelheim Pharmaceuticals, Inc.?

15        A    Yes.

16        Q    Who are you currently employed by?

17        A    Boehringer Ingelheim Pharmaceuticals.

18        Q    And what is your title with the company?

19        A    Head sales operations.

20        Q    How long have you been with that company?

21        A    Thirty years.

22        Q    I believe you started in 1974?

23        A    '74.

24        Q    You started as a sales representative,

25   correct?

1    A    Yes, ma'am.

2    Q    Have you always been in sales ever since you

3    joined the company?

4    A    Sales or marketing.

5    Q    And how long have you been in your present

6    position?

7    A    Two years.

8    Q    Do you have any plans to retire at this time?

9    A    I'm retiring December 31st.

10    Q    And how long has your retirement been

11    announced?

12    A    About three weeks, I believe.

13    Q    And what are your plans after your retirement?

14    A    I'm not real sure right now.  Take it easy for

15    awhile, and I don't know, maybe I'll find a part-time

16    job somewhere else.  I'm not sure.

17    Q    When you retire, do you plan to move from your

18    present residence?

19    A    No.  Not in the near term, anyway.

20    Q    Do you plan to take any extensive vacations,

21    trip around the world, anything like that?

22    A    Not that either; maybe a couple weeks here and

23    there.

24    Q    How would you we be able to get in touch with

25    you after you retire?

1    A    No, I did not.

2    Q    When you were the head of sales at Boehringer

3  Ingelheim Pharmaceuticals, Inc., I believe you held that

4  position from August of 1999 until May 2000?

5    A    Yes.  Just a comment:  These are my

6  recollections of the dates.  They're reasonably close to

7  the months, et cetera, but they're just my recollection.

8  This is my personal resume.

9    Q    And were you responsible for the sales force

10  of the sister company Roxane Laboratories during that

11  period of time when you were the head of the sales?

12    A    Yes, for the branded part oft he line, yes, I

13  was.

14    Q    And in that capacity, did you supervise two

15  sales directors at Roxane Labs?

16    A    That's correct.

17    Q    And who were those two sales directors?

18    A    Mark Schaffer and Jerry Hart.

19    Q    And did you also supervisor a sales training

20  group at Roxane Labs?

21    A    Yes, I did.  It was one person.

22    Q    Who was that?

23    A    Fiona McKenna was her name.

24    Q    And where were these folks located that you

25  were supervising?

1    can't recall what you said, when you were filling that

2    position before he came in, did you have

3    responsibilities to Roxanne?

4        A    No, I did not.

5            MS. O'KEEFFE:   I'm going to ask the court

6        reporter to mark an exhibit.

7            (Plaintiff's Exhibit King No. 101,

8        Roxanne Laboratories organizational chart,

9        marked for Identification.)

10   BY MS. O'KEEFFE:

11       Q    Mr. King, I'm going to hand you what the court

12   reporter has marked Plaintiff's Exhibit King 101, and

13   the Bates label for the record on this is Rox-01438.

14           Mr. King, you can hand that extra copy to

15   Roxanne's counsel so they can take a look at that while

16   we discuss it.

17           Does this appear to be an organizational

18   chart?

19       A    Yes, ma'am.

20       Q    And is it labeled Roxane Laboratories, Inc.,

21   budget 1999?

22       A    That's what the label is, yes.

23       Q    And I believe it indicates in the box

24   president and COO Roxanne, W. Gerstenberg.

25       A    That's correct.

Page 18

1      Q     Is that Warner Gerstenberg?

2      A     That's correct.

3      Q     And in 1999, he was the president and COO of

4  Roxanne Laboratories; is that correct?

5                  MR. WINGARD:  Object to the form.

6      A     I'm not sure that's correct.  He was the

7  president and either COO or CEO of Boehringer Ingelheim

8  Corporation, and as such was the head of Roxanne.  But I

9  believe Roxanne had their own president.

10      Q     So, to your knowledge, this organizational

11  chart is wrong?

12      A     I would say, yes.  I don't think was the

13  president of Roxane Laboratories.  He was a president of

14  Boehringer Ingelheim Corporation.

15      Q     Who do you believe was president Roxanne

16  Laboratories in 1999?

17      A     I'm thinking Jerry Voida (phonetic), but that

18  may have been right after his time.  I believe that Kirk

19  Shepard held that position for a little awhile after

20  Jerry Voida left, and I'm not sure of the time involved,

21  the time window.

22      Q     Was he responsible for preparing such an

23  organizational chart, do you know?

24                  MR. WINGARD:  Objection to form.

25      A     I really don't.  I really don't know.

1    Laboratories and Ben Venue?

2        A    That wasn't my memory of it.  My memory of it

3    is Shelly Berkle was responsible for the Ethical

4    Pharmaceutical part.  This chart is not my memory of how

5    the way it worked.

6        Q    But you do agree that this chart reflects,

7    that both the multisource and the branded products for

8    both, or for BIPI, Ben Venue, and Roxanne, are all

9    encompassed within the business unit Ethical

10   Pharmaceuticals?

11       A    That's what this chart describes.

12                 MR. WINGARD:  Objection to form.

13   BY MS. O'KEEFFE:

14       Q    Mr. King, do you have any explanation for why

15   your position is on an organizational chart that depicts

16   Roxane Laboratories' budget in 199?

17                 MR. WINGARD:  Objection form.

18       A    No, I don't, really

19   BY MS. O'KEEFFE:

20       Q    To your knowledge, was any portion of your

21   salary paid by Roxane Laboratories?

22       A    It was not.

23       Q    Was any portion of your salary allotted to

24   Roxane Laboratories' budget?

25       A    No, it was not.

0c8fc425-54e6-11d9-9863-0040f48294eb

Page 25

1      Q     Do you see just below the box with

2   Mr. Russillo's name the box immediately below that which

3   shows manager of multisource products, Judy Waterer, or

4   J. Waterer?

5      A     Yes, I do.

6      Q     And, to your knowledge, she did hold that

7   position in 1999?

8      A     I really couldn't say, but according to this

9   chart, that's what it says.

10     Q     Okay.  To your knowledge, did Sheldon Berkle

11  supervise those who were selling and marketing both

12  Boehringer Ingelheim Pharmaceuticals and Roxane drugs?

13     A     That wasn't my memory of it, except for the

14  Roxanne on the branded side.

15     Q     And when you say the branded side, what are

16  you referring to?

17     A     Basically the palliative products for Roxane

18  and the Viramune product, Viramune, Roxane's Viramune,

19  and all of the BIPI products.

20     Q     And when you say branded drugs, do you mean

21  drugs that Roxane actually held a patent on?

22     A     I don't think that's the right way, I don't

23  think that's the way I would put it.  I would say drugs

24  that we promoted in the doctor's office to be prescribed

25  under the brand name.

1      Q    Would that include Marinol?

2      A    Yes, it would.

3      Q    Oramorph?

4      A    Yes.

5      Q    Roxicet?

6      A    I'm not sure Roxicet was part of it.

7      Q    Roxicodone?

8      A    Roxicodone probably was.

9      Q    Can you think of any other palliative care
10  drugs that would fall in this branded category?

11     A    Not off of the top of my head I can't.

12     Q    Could you explain to the what Marinol is?

13     A    Is this the jury?

14     Q    Yes.  This will be played to the jury.

15     A    Marinol.  It's quite sometime ago now, I'm
16  dredging this out of my memory.  I believe Marinol was
17  an appetite enhancing drug for people suffering from
18  AIDS.

19        People who suffer from AIDS have a tendency to
20  lose a lot of weight and they get very thin, and it's
21  not healthy for them.  And Marinol was an appetite
22  increasing, somehow it increased the appetite and let
23  these people eat more, and therefor they were healthier.
24  That's what I recall.

25      Q    Are you aware that the main ingredient of

0c8fc425-54e6-11d9-9863-0040f48294eb

Page 36

1          the relator, I have to respond by saying

2          that you have the ability to assert the

3          privilege using the snap back provision.

4                    However, we are preserving our

5          rights subject to adjudication of whether or

6          not a privilege exists, to re-notice

7          Mr. King's deposition and depose him as to

8          these provisions which have now been

9          redacted.

10                    MR. WINGARD:  So noted.

11   BY MS. O'KEEFFE:

12          Q    Mr. King, did you indicate you had an

13   opportunity to look at King Exhibit --

14          A    Yes, ma'am.

15          Q    -- No. 103?

16               Okay.  I'd like to ask you a few questions

17   about it.

18               Does this appear to be a report of a pricing

19   committee in 1997?

20          A    Yes, ma'am.

21          Q    And it's listed on Boehringer Ingelheim

22   stationery, correct?

23          A    That's correct.

24          Q    And you are the author of this pricing

25   committee report, correct?

1     A     Yes, I am.

2     Q     Now, why were you the author of this report?

3     A     I'm not 100 percent clear on why.  I was

4  probably the chair of this ad hoc pricing committee, and

5  as such was the author of the report back to my boss,

6  Shelly Berkle.

7     Q     Do you recall when this pricing committee was

8  established?

9     A     No, I do not.

10     Q     The date on this document is May 30th, 1997.

11  Do you believe that this could possibly be the first

12  report of that committee?

13     A     I really don't know.  I'm sorry.

14     Q     The names listed under the caption list, at

15  the bottom of the document, starting with Shelly Berkle,

16  are these the people who were present at the meeting?

17     A     I do not believe so.

18     Q     Are these the people who were on the pricing

19  committee?

20     A     No, they were not.

21     Q     And how do you know that?

22     A     Shelly Berkle would never have attended a

23  committee like this.  He would have delegated the

24  committee chair to me.  And Phil Franks would never have

25  attended.  Other than that, I'm not sure, but those two

Page 38

1    were not on the committee.

2         Q    Okay.  But do you recall was on the committee?

3         A    I don't really recall, but I'm just making an

4    assumption that it would have been Judy Waterer, Ken

5    Gross, Dan Gerrity, Bruce Banks, and myself.

6         Q    So, your belief is the committee was comprised

7    of everyone, yourself and everyone on the list, except

8    for Shelly Berkle and Phil Franks, correct?

9                   MR. WINGARD:  Objection to form.

10        A    That would be an assumption on my part, yes.

11   BY MS. O'KEEFFE:

12        Q    Could you please go through the list and tell

13   me, starting with Shelly Berkle, and to your best

14   recollection in 1997 what company or companies he worked

15   for and what his position was?

16        A    Shelly Berkle was executive vice president of

17   BIPI, B-I-P-I, head of our ethical business unit.

18        Q    And did he work for any other Boehringer

19   Ingelheim companies at that time, to you knowledge?

20        A    Not to my knowledge, no.

21        Q    How about Judy Waterer?

22        A    She was a Roxane employee.

23        Q    And what was her title?

24        A    I really don't know.

25        Q    What was her basic job responsibility as you

0c8fc425-54e6-11d9-9863-0040f48294eb

Page 39

1  understood it?

2          MR. WINGARD:  Objection to form.

3     A    I'm really not clear what Judy did.  She

4  worked for Roxanne in the multisource side, I don't

5  know.

6  BY MS. O'KEEFFE:

7     Q    Do you know if she had responsibility for

8  marketing multisource products for Roxane?

9          MR. WINGARD:  Objection to form.

10    A    I really don't know.

11  BY MS. O'KEEFFE:

12    Q    How about Ken Gross?

13    A    Ken Gross was a BI employee, a BIPI employee,

14  and he was the head of our managed care operation.

15    Q    Was that a sales function or a marketing

16  function?

17    A    Marketing function.

18    Q    And what about Dan Gerrity?

19    A    Dan was a BIPI employee, and I believe he had

20  something to do with contracting.

21    Q    Do you know, was he head of contracts?

22    A    I really don't know, I'm sorry.

23    Q    What about Chris Ferraro?

24    A    I've known Chis for a long time.  What she was

25  doing in '97, I really don't know.

0c8fc425-54e6-11d9-9863-0040f48294eb

Page 40

1    Q    Do you know what company she was working for?

2    A    She was a BIPI employee.

3    Q    You don't have any earthly idea why she would

4    have been on the pricing committee?

5    A    I really don't.  I'm sorry.

6    Q    What about Bruce Banks?

7    A    He was a legal counsel.

8    Q    And what company did he work for?

9    A    BIPI, I believe.

10   Q    And what about Phil Franks?

11   A    Phil was our general counsel and as such

12   probably -- he was our general counsel for the

13   corporation.

14   Q    And what was that corporation?

15   A    BIC, Boehringer Ingelheim Corporation.

16   Q    And is that the parent corporation of

17   Boehringer Ingelheim Pharmaceuticals, Inc.?

18   A    Yes, I believe so.

19   Q    And also the parent of Roxane Laboratories,

20   Inc.?

21   A    Yes, ma'am.

22   Q    And also the parent of Ben Venue, Inc.?

23        MR. WINGARD:  Objection to form.

24   A    I'm not sure it was in '97, I don't have a

25   good handle on the time windows involved.  But Ben

0c8fc425-54e6-11d9-9863-0040f48294eb

1   Venue, if they were in existence with us, then would

2   have reported to the corporation, BI Corporation.

3       Q    Just so I'm clear, Mr. Banks was legal counsel

4   with Boehringer Ingelheim Pharmaceuticals, Inc., and to

5   your recollection Phil Franks was general counsel for

6   the parent company.  Is that correct?

7       A    To the best of my recollection, yes, ma'am.

8       Q    With regard to the second page of the exhibit,

9   which is actually numbered page one, and for the record,

10  it's Paoletti Bates No. 03604.

11          I'd like you to look at the very top

12  paragraph, titled objective, and could you please read

13  that short --

14      A    Review ongoing pricing litigation -- out loud,

15  ma'am?

16      Q    Yes.

17      A    Review ongoing pricing litigation, review

18  BIBI's RLI's current pricing and customers.  Tender a

19  proposal for future models regarding class of trade and

20  pricing.  Provide recommendations concerning the legal

21  implications of integration of RLI and BIPI on pricing

22  issues.

23      Q    Does it appear that it was the objective of

24  the pricing committee to review Roxanne and BIPI pricing

25  issues in that recommendations about Roxane and BIPI

Page 42

1    pricing issues?

2         A    That's what it appears, yes, ma'am.

3         Q    Now, if you could please turn to the third

4    page exhibit, Paoletti 03605, and -- actually, I'll ask

5    you to turn to the very next page, Paoletti 03606.

6              And under the paragraph marked BIPI/RLI future

7    status that would refer to Boehringer Ingelheim

8    Pharmaceuticals, Inc., and Roxane's future status,

9    correct?

10        A    I have that, yes.

11        Q    Beginning with the second sentence that starts

12   with attention, could you please read the rest of that

13   paragraph?

14        A    Attention needs to be paid by BIPI/RLI to

15   identify which customers compete with which customers

16   and price our products in a similar fashion to each of

17   these competitive classes to maximize profitability

18   and/or market share without running afoul of the

19   antitrust statutes.

20             We prepared three appendices which describe

21   what we believe are three major classes of entities from

22   which time to time may compete.  However, there are

23   permutations of each class that must be clearly known to

24   all operational contracting entities before entering

25   into agreements.

Page 43

1          Continue?

2     Q    No, you can stop there.

3          Mr. King, was the focus here in this meeting

4     on developing a way to identify BIPI and Roxane

5     customers that competed with each other and to offer

6     them similar pricing on the same products?

7     A    I'm not sure I understand the question.

8     Q    Okay.

9     A    Come again, please.

10    Q    Would you like to have the question repeated?

11    A    Yes, repeat it for me again, please.

12         MS. O'KEEFFE:  Could the court reporter

13    please read the question back?

14              (Pending question read.)

15         MR. WINGARD:  Object to form.

16    A    I'd of to split on this question, I'd have to

17    split my answer into two parts.  It would be the BIPI

18    side to identify customers that compete with each other

19    and offer them similar pricing on the branded part of

20    our business.

21         And it would have been Roxane's, I believe, to

22    do a similar sort of thing with products that were on

23    the generic, or multisource side of the business.

24         But our pricing for those two separates

25    segments, it would be our objective to attempt to

0c8fc425-54e6-11d9-9863-0040f48294eb

Page 91

1    attorney/client communication, had been

2    brought to our attention earlier.

3                 MR. ANDERSON:  Not to go round and

4    round, but of course you realize that we are

5    disagreeing, first, that any such burden

6    exists on the receiving party, and,

7    secondly, that we could even be capable of

8    perceiving that you might assert privilege

9    to this document.

10                I recognize that you may disagree

11   with me on this; I'm just stating our

12   opposition on the record.

13                MR. WINGARD:  Okay.

14   BY MS. O'KEEFFE:

15       Q    Mr. King, this morning we discussed the

16   pricing committee meeting that occurred in May of 1997.

17   Do you recall that?

18       A    I'm not sure, just as a clarification, I'm not

19   sure the meeting actually occurred.  That's when that

20   paper was written.

21       Q    Okay.  So --

22       A    Yes, I do recall the issue.

23       Q    And do you recall that there was a pricing

24   committee in existence in May of 1997 --

25       A    Yes, ma'am.

Page 92

1      Q      -- at Boehringer Ingelheim Pharmaceuticals,

2   Inc.?

3      A      Yes, ma'am.

4      Q      And do you recall that that pricing committee

5   you acted as the head of that committee for awhile?

6      A      Yes.  The chair, yes.

7      Q      And that there were representatives from both

8   Roxane and Boehringer Ingelheim Pharmaceuticals, Inc.,

9   on that committee; is that correct?

10      A      Yes, ma'am.

11      Q      Can you recall some of the names of the people

12   who were on that committee?

13      A      Dan Gerrity, Judy Waterer, Bruce Banks,

14   myself, Ken Gross.  I believe that's does it.

15      Q      And which of those parties were employed by

16   Roxanne?

17      A      I believe Judy Waterer was employed by

18   Roxanne, and I think that's it.

19      Q      And Bruce Banks was legal counsel for what

20   entity?

21      A      I believe BIPI.

22      Q      And Phil Franks was general counsel for

23   what --

24      A      I believe Phil was the general counsel for the

25   entire corporation.

1      Q     And are you referring to Boehringer Ingelheim

2   Corporation?

3      A     Yes, ma'am.

4      Q     And is that the parent of both Roxanne and

5   BIPI?

6      A     I don't know if that's the terminology, but,

7   yes, it is the highest entity in the pyramid of

8   companies.

9      Q     Here in the United States?

10      A     Yes, ma'am.

11      Q     And is it true that you were writing a report

12   on May 30th, 1997, to record the objectives of this

13   committee?

14      A     It was part of the reason why I was writing

15   the report, yes, to describe the objectives.

16      Q     And was one objective of the pricing committee

17   to review Roxanne and BIPI pricing issues and make

18   recommendations about Roxane and BIPI pricing issues?

19              MR. WINGARD:  Objection; privileged.

20        Instruct the witness not to answer.

21              MS. O'KEEFFE:  You're asserting

22        the privilege as to the purpose of the

23        committee?

24              MR. WINGARD:  As to the purpose --

25        maybe I misunderstood your question.  Would

0c8fc425-54e6-11d9-9863-0040f48294eb

Page 94

1      you read back your question?

2              (Pending question read.)

3              MR. WINGARD:  Let me think about

4      it.

5              Can you rephrase it?

6              MS. O'KEEFFE:  I'll ask the

7      question again.

8  BY MS. O'KEEFFE:

9      Q    Was an objective of the pricing committee in

10  1997, of which you were the head, to review Roxanne and

11  BIPI pricing issues and make recommendations about

12  Roxanne and BIPI pricing issues?

13              MR. WINGARD:  You can answer that.

14      A    That was one of the objectives, yes.  Rather

15  stated that issues, it would be pricing strategy, that's

16  the way I would formulate the answer.  It was to review

17  Boehringer and ROI pricing strategies.

18  BY MS. O'KEEFFE:

19      Q    Okay.  And did the committee make several

20  recommendations at the end of that meeting as to how

21  pricing should be handled in the future for both BIPI

22  and Roxanne?

23              MR. WINGARD:  Objection; privileged.

24      Instruct him not to answer.

25              MS. O'KEEFFE:  How is that