# Exhibit 45

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
## Chicago, IL

Page 1

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

----------------------------X

In Re:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )  MDL No. 1456

PRICE LITIGATION                ) Civil Action No.

----------------------------X 01-12257-PBS

THIS DOCUMENT RELATES TO:       )

United States of America ex     )

rel. Ven-a-Care of the          )

Florida Keys, Inc., et al.      )

v. Boehringer Ingelheim         )

Corp., et al., Civil Action     )

No. 07-10248-PBS                )

----------------------------X

        The videotaped 30(b)(6) deposition of

Roxane Laboratories, Inc., Roxane Laboratories, Inc.

n/k/a Boehringer Ingelheim Roxane, Inc., Boehringer

Ingelheim Pharmaceuticals, Inc., and Boehringer

Ingelheim Corporation by JAMES F. McINTYRE

                Chicago, Illinois

            Thursday, February 26, 2009

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 2

```
 1        IN THE COURT OF THE SECOND JUDICIAL CIRCUIT

 2             IN AND FOR LEON COUNTY, FLORIDA

 3    --------------------------------X

 4   THE STATE OF FLORIDA                )

 5   ex rel.                             )

 6        VEN-A-CARE OF THE              )

 7        FLORIDA KEYS, INC., a          )

 8        Florida Corporation,           )

 9        by and through its             )

10        principal officers             )

11        and directors,                 )

12        ZACHARY T. BENTLEY             )

13        and T. MARK JONES,             )

14             Plaintiffs,               )

15          vs.                          ) Civil Action No.

16   BOEHRINGER INGELHEIM               ) 98-3032A

17   CORPORATION, et al.                 )

18             Defendants.               )

19    --------------------------------X

20

21

22        (cross-captions continue on following page)
```

Henderson Legal Services, Inc.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 29

1        A.    Well, all of our operating units are
2    separate legal entities, so each one reported
3    separately.
4        Q.    I'm looking at this -- well, let's maybe
5    take a step back.  When was the first time you saw
6    this document?
7        A.    I don't recall whether I saw this back at
8    the time of the project or not, but certainly
9    during the course of preparing for this deposition
10   I've seen it.
11       Q.    Does this appear to be a presentation
12   that Mr. Tetzner made?
13       A.    That's what it appears to be, yes.
14       Q.    And the language you just read, he says -
15   - or the slide says, "We currently operate in the
16   U.S. with a variety of legal entities that do not
17   necessarily reflect the nature of our businesses.
18   This results in two sets of reporting: One in terms
19   of legal entities and another in terms of
20   businesses."  Do you see that?
21       A.    Yes.
22       Q.    I'm trying to understand what -- what's

Henderson Legal Services, Inc.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

                                                              Page 30

1    the difference between a -- a reporting that is in

2    terms of legal entities as opposed to reporting in

3    terms of businesses?

4         A.   Well, Roxane Laboratories is a legal

5    entity.  But the sales is sales and marketing, and

6    -- and the operations piece is a manufacturing.  We

7    report separately in terms of -- of the -- the

8    performance results for those two segments of that

9    particular company, so we really had two businesses

10   within that one legal entity.  And that's what the

11   organization was trying to -- reorganization was

12   trying to fix.

13        Q.   Why was this regarded as something that

14   needed to be fixed?

15        A.   The -- the manufacturing business, who

16   was -- the COO was Rob Fromuth, reported directly

17   to the CEO of the U.S.

18        Q.   Mr. Fromuth was a Roxane employee?

19        A.   Yes.

20        Q.   And who did he report to?

21        A.   Marti Carroll, CEO of the U.S. of BIC.

22        Q.   CEO -- CEO of BIC?

                    Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

                                                              Page 31

1        A.   Yes.   And he was responsible for

2   operations, our manufacturing.

3        Q.   I believe the question I had asked

4   earlier was:  Why was this situation regarded as a

5   problem that needed to be fixed?

6        A.   Well, the sales and marketing side of the

7   business, who was the vice president or general

8   manager of the -- the -- the multi-source or the

9   generic business for Roxane Laboratories, reported

10  to someone different.

11       Q.   Who was that person?  Who -- who was the

12  person in charge of the marketing and sales of

13  Roxane Laboratories?

14       A.   Paul Kersten.

15       Q.   When was Mr. Kersten in charge of that?

16       A.   Oh, at least since 2001.  I don't know if

17  it goes back any further than that.

18       Q.   And who did he report to?

19       A.   He reports to -- at that time, 2001, Tom

20  Russillo.

21       Q.   Do you know who Mr. Russillo reported to?

22       A.   Marti Carroll.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 32

1      Q.    When did Marti Carroll become the CEO of

2    BIC?

3      A.    End of 2002 or early 2003, I'm not sure.

4      Q.    Do you know who's -- who his predecessor

5    was?

6      A.    Werner Gerstenberg.

7      Q.    And so prior to, when Mr. Gerstenberg was

8    CEO of BIC, would Tom Russillo have reported to him

9    then?

10     A.    Yes, I would suspect so.

11     Q.    The second paragraph reads, "This system

12   often does not convey clearly the performance of

13   our businesses and leads to complexity in

14   interpreting how each business is faring.  The

15   accounting reconciliations between the legal

16   entities and the businesses reduce but do not

17   remove this complexity."  Do you see that?

18     A.    Yes.

19     Q.    What is an accounting reconciliation?

20     A.    To identify -- basically identifying the

21   costs that are related to the marketing side of the

22   business versus the manufacturing side of the

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

                                                                    Page 33

1     business.

2          Q.   What do you mean, "identifying"?

3          A.   I'm sorry?

4          Q.   Can you clarify what you mean by

5     "identifying the" --

6          A.   If we --

7          Q.   -- "costs"?

8          A.   -- want to separate, we can identify

9     which costs go with the sales -- sales side of the

10    business versus which costs go with the

11    manufacturing side of the business.  By having

12    those two legal entities together, that was a diff

13    -- that was a challenge.

14         Q.   When would an accounting reconciliation

15    have been performed?

16         A.   Every month.

17         Q.   Do you know if Roxane and BIPI had their

18    own internal accounting systems?

19         A.   Roxane and BIPI -- beginning --

20              MS. RIVERA:  Object to form.  Sorry.

21              MR. FAUCI:  It's all right.

22    BY THE WITNESS:

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

Page 34

1        A.    Beginning in December of 2000, we were on

2    the same system, but we were separate legal

3    entities.  So within that system, we had our own

4    accounting --

5    BY MR. FAUCI:

6        Q.    Separate --

7        A.    -- records.

8        Q.    Separate accounting staffs?

9        A.    In part, yes.  Before 2001, yes, there

10   was completely separate accounting staffs.

11       Q.    And after 2001?

12       A.    After 2001, some of the accounting was

13   centralized with BIPI as a central service and that

14   charge -- and they were charged back -- Roxane was

15   charged back for that service.

16       Q.    What do you mean, "Roxane was charged

17   back for that service"?

18       A.    The costs -- the costs associated with

19   performing that accounting service for Roxane was

20   charged back to the Roxane legal entity.

21       Q.    I'll have some more questions about that

22   later.  I think we'll stick with this document now.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

Page 37

1   wasn't allocated to BIPI.

2   BY MR. FAUCI:

3       Q.   Sitting here today, do you have a sense

4   of what that bullet point means?

5       A.   No, I don't.

6       Q.   Skipping down two bullet points, it says,

7   "introduction of the shared services concept."

8       A.   Yes.

9       Q.   What is the shared service and con --

10  services concept?

11      A.   That some -- or certain services are

12  centralized under the BIPI umbrella, but they

13  perform services and charge those services back to

14  the subsidiaries, similar to what I just mentioned

15  about the accounting activities.

16      Q.   So this is separate from the Boehringer

17  Ingelheim Services Center?

18      A.   No, I think it's making reference to the

19  Boehringer Ingelheim Services Center.

20      Q.   I'm just trying to be clear.  Are you

21  familiar with an entity known as the Boehringer

22  Ingelheim Services Center?

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

Page 38

1       A.    Yes.

2       Q.    Can we call that BISC?

3       A.    Yes.

4       Q.    Is BISC a separate entity than BIPI?

5       A.    At that time, yes.

6       Q.    Were there shared services that were
7    located in BIPI?

8             MS. RIVERA:   Object to form.

9    BY THE WITNESS:

10      A.    Shared services that were located in
11   BIPI?  Yes.

12   BY MR. FAUCI:

13      Q.    And were there shared services that were
14   housed in the BISC?

15      A.    Yes.

16      Q.    Which shared services were in BIPI?

17      A.    The accounting that I previously
18   mentioned, the -- I believe at that time tax was
19   part of BIPI, legal services, I believe, were part
20   of BIPI.  Those are a couple that come to mind.

21      Q.    And so --

22      A.    HR and IT services.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

Page 39

1      Q.   So those departments would be housed in

2   Connecticut?

3      A.   Yes.

4      Q.   And they'd be composed of BIPI employees?

5           MS. RIVERA:  I object to form, and I

6   don't know if we can specify a time frame, 'cause -

7   - just figure out what time frame we're talking

8   about.

9   BY MR. FAUCI:

10     Q.   When did the shared services concept come

11  into being?

12     A.   Specifically relating to the BISC?

13     Q.   No, specifically related to those

14  services that were located at BIPI.

15     A.   Well, it depends on the function.

16     Q.   Why don't we go function by function

17  then.

18     A.   Okay.

19     Q.   Do you know when a shared services

20  function for accounting came into being at BIPI?

21     A.   2001.

22     Q.   Tax?

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

Page 40

1       A.   As far as I know, tax since I've been
2   with the company in '96, so.
3       Q.   Legal?
4       A.   Since the beginning of my tenure.
5       Q.   HR?
6       A.   Again, since the beginning of my tenure.
7       Q.   And IT?
8       A.   Yes.
9       Q.   Beginning of your --
10      A.   Beginning --
11      Q.   -- tenure?
12      A.   -- of tenure.
13      Q.   And so I guess my question, the time
14  frame is from 1996 to the present.  Those various
15  functions, accounting, tax, legal, HR, IT, were
16  those departments composed of BIPI employees?
17      A.   Yes, the best of my knowledge.
18      Q.   And those departments had
19  responsibilities on behalf of Roxane?
20      A.   They were centralized services that were
21  performed by Roxane -- or for Roxane and charged
22  back to Roxane.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 49

1          MS. RIVERA:  And again I just want to

2    make sure it's clear for the record that detailed

3    questions about the shared services outside the

4    context of how they relate to the legal entity

5    reorganization in 2005, I object to is beyond the

6    scope of the subpoena.

7          But go ahead and answer, Jim.

8    BY THE WITNESS:

9      A.    Okay.  Well, I think it's -- this, to my

10   knowledge, the -- that it was shared, but it was

11   charged back to the individual companies, just like

12   all these other shared services that are listed on

13   this particular page that we've already discussed.

14   BY MR. FAUCI:

15     Q.    Thank you.  So turning your attention

16   back to Exhibit 2 -- actually, just more generally,

17   you've said earlier that these various services

18   were charged back to Roxane?

19     A.    Yes.

20     Q.    What does that mean?

21     A.    It means the cost of performing that

22   service was -- was charged to Roxane and reflected

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

```
                                                          Page 50
 1      in their cost.

 2              Q.    Was that done annually, quarterly?

 3              A.    That was done monthly.

 4              Q.    Was Roxane billed?

 5              A.    I don't --

 6              MS. RIVERA:   Object to form.

 7      BY THE WITNESS:

 8              A.    I don't know that there was a specific

 9      invoice created, but we were all in the same

10      system, so it was able to -- it was all done within

11      the system.

12      BY MR. FAUCI:

13              Q.    On an accounting basis?

14              A.    Yes.

15              Q.    How were the amounts to be charged back

16      determined?

17              A.    It depends on the service.  There are

18      various drivers determined for each service.

19              Q.    What's -- I'm sorry, go ahead.

20              A.    At the beginning of the year, the service

21      provider functions, which is basically this list,

22      where the -- would -- would develop their annual
```

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 51

1    operating budgets, and then based on whatever the

2    serve -- whatever the drivers are for a certain

3    activity, there would be a rate established, and

4    then each of the legal entities would be charged

5    back based on that rate and a -- and the amount of

6    usage of the service they -- they had.

7         Q.   Let's try and narrow it down.  Let's

8    stick with legal.

9         A.    Okay.

10        Q.    Who determined the -- well, if you could

11   walk me through the process, maybe just focusing on

12   legal, about how Roxane was charged for those

13   services.

14        A.    The legal department would -- would

15   develop their annual operating budget, they would

16   present it to all the receivers of the legal

17   services, the -- those -- the -- the receivers of

18   that service, so basically the legal entities,

19   would -- would have approve -- would be able --

20   would -- would approve that particular budget or

21   challenge that budget.

22             And then based on the number of hours

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

                                                                 Page 52
1    that were estimated to be used within each legal

2    entity, the -- the legal entities would -- would be

3    charged back an hourly -- based on an hourly rate.

4    But they'd -- they would have first -- first right

5    of -- right of refusal on the budget.

6            Q.    When was the budget compiled?

7            A.    At the beginning of the budget process.

8            Q.    Was it a yearly budget?

9            A.    Yes.

10           Q.    Would the budgets contain projections for

11   how much -- what percentage of the legal services

12   would go to Roxanne, what percent would go to BIPI?

13           A.    Yes.

14           Q.    What were those projections based on?

15           A.    Based on historical average hours.  And

16   then what would happen is on a -- on an ongoing

17   basis throughout the year, they would be trued up

18   based on if -- if one legal entity was using more

19   of a service than another, they would true that up

20   so that the -- the appropriate legal entity was

21   charged by the end of the year.

22           Q.    Did personnel in the legal department log

                    Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

---

                                                              Page 53

1    how much of their time was spent performing tasks

2    on behalf of each entity?

3          A.   I don't --

4               MS. RIVERA:   Object --

5    BY THE WITNESS:

6          A.   -- know.

7               MS. RIVERA:   -- to form and foundation.

8    BY THE WITNESS:

9          A.   I don't know for sure if they did that.

10   BY MR. FAUCI:

11         Q.   So how was it trued up?  What was the --

12   what was the mechanism for deciding whether or not

13   this projection was accurate for a given month or

14   quarter?

15              MS. RIVERA:   Object to form and

16   foundation and again entire line of questioning

17   beyond the scope of the subpoena.

18              But if you know, Jim.

19   BY THE WITNESS:

20         A.   I -- I don't know specifically.

21              MR. ANDERSON:   This is Jarrott Anderson.

22   And I want to note for the record that it's the

---

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 62

1        A.    Apparently, it says so, yes.

2        Q.    Mr. Russillo testified that

3   notwithstanding his responsibilities for Roxane, he

4   was on the Ben Venue payroll, and he was not paid

5   by Roxane.  I'm on page 23 of his January 8, 2009,

6   deposition.  And I'll just read you what he said.

7            "Answer:  I told you earlier my paycheck

8   came from Ben Venue.

9            "Question:  Your paycheck came from Ben

10  Venue?

11           "Answer:  Yes.

12           "Question:  Did your paycheck ever come

13  from any other Boehringer Ingelheim entities from

14  the period of November 1997 until 2005?

15           "Answer:  I don't believe so."

16           My question to you was:  Was there any

17  formal accounting mechanism within Boehringer

18  Ingelheim for Roxane to reimburse Ben Venue for

19  work Mr. Russillo did on Roxane's behalf?

20       A.    Not to my --

21           MS. RIVERA:  Object --

22  BY THE WITNESS:

Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 63

1          A.    -- knowledge.

2               MS. RIVERA:  -- to form and foundation.

3     BY THE WITNESS:

4          A.    Not to my knowledge.  It was for the

5     other sales and marketing people though.

6     BY MR. FAUCI:

7          Q.    What do -- say that again.

8          A.    There was reimbursement for the other

9     sales and marketing people that were on Ben Venue

10    payroll but worked for our -- for Roxane.  Those

11    costs were charged back to Roxane.

12         Q.    Which sales and marketing people do you

13    have in mind?

14         A.    The Roxane Laboratories sales and

15    marketing.

16         Q.    Can you give me some names?

17         A.    Paul Kersten, Judy Waterer, Leslie

18    Paoletti.

19         Q.    So those people were on Ben Venue's

20    payroll?

21         A.    At that time, yes.

22         Q.    Which -- at what time?

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                          Chicago, IL

Page 64

1          A.    2005.

2          Q.    Do you know when they started going on

3     Ben Venue's payroll?

4                MS. RIVERA:  Object to --

5     BY THE WITNESS:

6          A.    Not --

7                MS. RIVERA:  -- form and foundation.

8     BY THE WITNESS:

9          A.    Not exactly.

10    BY MR. FAUCI:

11         Q.    What was the mechanism whereby Roxane

12    paid for the services?

13         A.    There was accounting entries to charge

14    back for Roxane legal entity.

15         Q.    Do you know how their salaries were

16    allocated?

17         A.    They were completely allocated.  All the

18    Roxane Laboratories sales and marketing people were

19    completely allocated to the Roxane legal entity.

20         Q.    So if a employee had responsibilities on

21    behalf of both companies, would his salary be

22    allocated to both companies?

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

                                                                    Page 65

1          A.   I don't know that.

2          Q.   Would that be reflected in accounting

3     records, the allocation?

4          A.   Yes.

5          Q.   Would it show up on a Roxane income

6     statement?

7          A.   You'd have to drill down to the cost

8     center level.  We wouldn't see it specifically on

9     the income statement.

10         Q.   And so you may have gathered I'm not the

11    most sophisticated accounting person in the world.

12    You say drill down to where?

13         A.   The cost center level.

14         Q.   What does that mean?

15         A.   It's a department.

16         Q.   And so if you drill down far enough

17    somewhere, there would be a record that employee X

18    was paid by Ben Venue but did work on behalf of

19    Roxane, and then how would that be accounted for?

20         A.    It would be charged back to Roxane, and

21    you'd see it in the sales and marketing department

22    cost center.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 72

1       A.    Yes.

2       Q.    And do you remember that we discussed the

3  Ipratropium Bromide was the generic equivalent of

4  Atrovent?

5       A.    Yes.

6       Q.    And that Atrovent was a BIPI product?

7       A.    Correct.

8       Q.    Are you aware that in 1996 Roxane

9  launched Ipratropium Bromide several months in

10  advance of the expiration of patent exclusivity for

11  Atrovent?

12      A.    Yes.

13      Q.    Do you know whether Roxane obtained from

14  BIPI a license to preemptively launch Ipratropium

15  Bromide?

16      A.    I'm aware that they paid a royalty.

17      Q.    What do you mean, "they paid a royalty"?

18      A.    It paid an 11 percent royalty to BIPI in

19  order to -- to sell Ipratropium Bromide.

20      Q.    How was that determined, 11 percent?

21      A.    Earlier -- early agreements between BIPI

22  and -- and -- and BII at -- that negotiated royalty

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 73

1    percentage, and that had been validated by outside

2    third-party consultants, that it was arm's length.

3         Q.    I'm sorry, what is "BII"?

4         A.    Boehringer Ingelheim International.

5         Q.    What is that?

6         A.    It's the parent, German parent.

7         Q.    And so there was royalty agreements

8    between BII and BIPI?

9         A.    Yes.

10        Q.    And those were at 11 percent?

11        A.    Ten or 11 percent.  Ten percent, I think.

12        Q.    Who would be paying royalty -- would BIPI

13   be paying royalties to BII, or vice versa?

14        A.    Depends on which product, but BIPI -- and

15   in the case of Ipratropium Bromide, BIPI was paying

16   BII.

17        Q.    Do you mean in the case of Atrovent?

18        A.    Yes.  Atrovent, yeah.

19        Q.    And so BII held the patent for Atrovent?

20        A.    Yes.

21        Q.    And BIPI paid BII 11 percent royalty?

22        A.    Ten or 11.  I'm not --

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 74

1      Q.   I'm -- I'm talking about the relationship

2    between Roxane and BIPI.

3      A.   Uh-huh.

4      Q.   We've established that Ipratropium

5    Bromide is the generic equivalent of Atrovent.

6    Roxane paid BIPI the same 11 or -- ten or 11

7    percent royalty that BIPI in turn paid to BIII --

8      A.   Yes.

9      Q.   -- BII?

10     A.   Yes.

11     Q.   Was there anything done to establish that

12   ten or 11 percent was an appropriate royalty rate

13   for a generic manufacturer to pay the holder of a

14   branded patent?

15     A.   Third-party consultants were brought in

16   to -- to validate that that was an arm's length

17   rate.

18     Q.   Who?

19     A.   At that time, KPMG.

20     Q.   Is that the same auditing firm that

21   established that 11 percent was an appropriate

22   royalty rate as between BIPI and BIII?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                         Chicago, IL

                                                              Page 75

1        A.   I don't know that, that they were

2   involved in.

3        Q.   And so this ten or 11 percent was paid by

4   Roxane for the life of Ipratropium Bromide?

5            MS. RIVERA:  Object to form.

6   BY THE WITNESS:

7        A.   Until the product was discontinued, yes.

8   BY MR. FAUCI:

9        Q.   Okay.  What -- my questions earlier --

10  let's introduce an exhibit.

11           MR. FAUCI:  Which exhibit are we on?

12               (WHEREUPON, a certain document was

13  marked Exhibit McIntyre 006, for identification.)

14           MS. DENTON:  What exhibit are we on?

15           MR. FAUCI:  Six.

16           MS. RIVERA:  Six.

17           MS. DENTON:  I thought this was six.

18           MS. RIVERA:  That was five.

19           MR. FAUCI:  That was five.

20           MS. DENTON:  Okay.

21  BY MR. FAUCI:

22       Q.   Have you -- are you familiar with this

                   Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

                                                          Page 84

1            THE VIDEOGRAPHER:  We are back on the

2    record at 10:50 a.m. with the start of tape number

3    two.

4    BY MR. FAUCI:

5        Q.    We were just talking about the process by

6    which Roxane sold Atrovent to BIPI.  Do you

7    remember that?

8        A.    Yes.

9        Q.    And you said that it sold it at cost

10   plus, do you recall that?

11       A.    Yes.

12       Q.    And we were trying to educate me and the

13   jury on what cost plus meant.  And you said that

14   cost includes the ingredient costs, the labor costs

15   and the overhead costs, do you recall that?

16       A.    Yes.

17       Q.    What's the plus?

18       A.    The margin.

19       Q.    Do you recall what the margin was?

20       A.    No.  In the 1993 contract, we were unable

21   to determine exactly what the margin would have

22   been and how that pricing was determined for that -

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

                                                                Page 85

1      - and during that time frame.

2           Q.   So what was the result?

3           A.   I'm not sure I understand the question.

4           Q.   Oh, when you say you were unable to

5      determine what the margin was, what do you mean?

6      In preparation for today?

7           A.   Yes.

8           Q.   But there was a margin in the 1993

9      contract that --

10          A.   I'd have to --

11          Q.   -- presumably?

12          A.   -- believe that there was, yes.

13          Q.   Do you know what the margin was at any

14     point in time from 1996 to the present?

15          A.   Yes.

16          Q.   What was it, and when did it become that?

17          A.   We're talking specifically about

18     Ipratropium Bromide UDVs?

19          Q.   Atrovent UDV.

20          A.   Atrovent -- Atrovent UDVs.  Well,

21     Atrovent UDVs were discontinued in 2003, so --

22          Q.   Okay.

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

                                                              Page 86

 1        A.    -- but be -- up until 2003, the margin

 2    was based -- was 2.2 percent, based on full cost.

 3        Q.    What does that mean, "based on full

 4    cost"?

 5        A.    Well, it includes the cost of the active

 6    ingredient.

 7        Q.    In addition to the labor and the

 8    overhead?

 9        A.    Labor and the overhead, that's --

10        Q.    How was --

11        A.    -- correct.

12        Q.    -- the 2.2 percent figure arrived at?

13        A.    2.2 percent on total cost is -- gives --

14    gives the same absolute margin or absolute profit

15    as ten percent on cost minus API.

16        Q.    What is "API"?

17        A.    Active pharmaceutical ingredient; that's

18    the Ipratropium Bromide.  The way we do things

19    today is we charge ten percent on only third-party

20    acquired materials.

21        Q.    Materials acquired from outside --

22        A.    Outside, nonaffiliate companies.  If it

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                          Chicago, IL

                                                                    Page 87
1    has affiliate material in there, we subtract that

2    from the total cost, because that affiliate

3    material already has some markup, so we don't --

4    it's not fair to mark it up twice.

5         Q.   Okay.  So focusing on the Atrovent UDV,

6    that there would be some markup applied to the

7    ingredient that Roxane would have purchased from

8    either BIPI or BII?

9         A.   Based -- yes, based on the way we do it

10   now or did it in -- from -- up until 2003.

11        Q.   And so based on the way it was done up

12   until 2003?

13        A.   Yes.

14        Q.   And because of that, the margin from

15   Roxane to BIPI was only 2.2 percent, is that

16   correct?

17        A.   At that time, yes.  We don't know what it

18   was back in '93.

19        Q.   When did it become 2.2 percent?

20        A.   About that time, 2001, 2002.

21        Q.   And it stayed that way until 2003?

22        A.   Yeah, we discontinued the product.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

Page 88

1        Q.    And I understand that the -- why the 2.2

2    was used in place of the ten percent, but how was

3    the 2.2 number arrived at?

4        A.    Because it gave the same -- as I

5    mentioned, it gave the same level of profit as

6    using ten percent on a cost excluded the API.

7        Q.    Was it negotiated?

8        A.    Yes, and later -- later validated by

9    outside consultants.

10       Q.    And would this 2.2 percent or ten percent

11   markup have been true on all the products that

12   Roxane manufactured for Boehringer Ingelheim

13   entities?

14       A.    Yes.

15       Q.    Let me show you a document marked Exhibit

16   8.

17             (WHEREUPON, a certain document was

18   marked Exhibit McIntyre 008, for identification.)

19   BY THE WITNESS:

20       A.    1998 Expectation and Budget.

21   BY MR. FAUCI:

22       Q.    It's a September 30, 1998, document, that

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

Page 198

1              MR. FAUCI:   Objection to form.

2      BY MS. RIVERA:

3          Q.    If you would turn to the page that ends -

4      - if you see the BOEH numbers there --

5          A.    Uh-huh.

6          Q.    -- that ends in 452, it's a -- it's right

7      -- it's a commentary right after the income

8      statement.

9          A.    Total company income statement, right?

10          Q.    Yes.

11          A.    Yes, okay.  I have it.

12          Q.    Okay.  And it says, "2001 actual income

13     is 175 million," and it says under that, attribute

14     -- "Attributable to the Elan deal for the purchase

15     of pain/palliative care products line." Can you

16     tell me what that means in terms of how much Roxane

17     was paid for its divestment of the Elan palliative

18     care line?

19          A.    That -- well, this -- this would

20     represent the amount of income that they were made

21     -- made on this sale of the -- the line.

22          Q.    Okay.  So is that the same as saying that

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

Page 199

1    Roxane made $175 million from the divestiture of

2    the Elan products?

3         A.   Yes.

4              MR. FAUCI:   Objection to form.

5    BY MS. RIVERA:

6         Q.   I mean the divestiture of the products to

7    -- to Elan.

8         A.   Yes.

9         Q.   Okay.  And can you tell from your

10   knowledge and from your review of the documents

11   whether that income was budgeted for in -- for

12   Roxane for 2001?

13        A.   I could -- yes, it was -- it was not

14   budgeted for.

15        Q.   Okay.  So is this consistent with your

16   testimony that in 2001 Roxane had a unbudgeted

17   influx of income in the amount of $175 million?

18        A.   Yes.

19        Q.   Okay.  And that contributed in part to

20   the reason why the 2002 dividend payment was

21   higher?

22        A.   That would be --

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                           Chicago, IL

                                                               Page 210

1

2                    FURTHER EXAMINATION

3    BY MR. FAUCI:

4        Q.    I believe you testified in response to

5    questions from Ms. Rivera that when Roxane was

6    deciding whether or not to pay a dividend to BIC,

7    it considered whether there was an appropriate debt

8    to equity ratio.  Do you recall that?

9        A.    That's -- yes.

10       Q.    What was the debt to equity ratio that

11   was considered appropriate to pay a dividend?

12       A.    That the ratio -- the guideline ratio is

13   at one-and-a-half to one.

14       Q.    So just so we're clear on this, that it

15   was appropriate to pay a dividend if there was --

16       A.    If the ratio was less than that.

17       Q.    If the ratio of --

18       A.    If the --

19       Q.    -- debt to equity --

20       A.    Yes.

21       Q.    -- was less than one-and-a-half to one?

22       A.    Yes.

                  Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                            Chicago, IL

                                                              Page 211
1          Q.    Where did that ratio come from?
2          A.    That guideline's issued by our German
3     parent.
4          Q.    Can you look back at Exhibit 28.
5                MS. RIVERA:  Is that one I marked?
6                MR. FAUCI:  Yes.
7                MS. RIVERA:  Okay.
8                MR. FAUCI:  It's the 12/31/2001
9     commentary to the financial statements --
10               MS. RIVERA:  Okay.
11               MR. FAUCI:  -- for year-end.
12               MS. RIVERA:  Okay.
13    BY MR. FAUCI:
14         Q.    And I'll direct your attention to page
15    four, where there's a reference to a 2001 actual
16    income of $175 million.  Do you see that?
17         A.    Yes.
18         Q.    Is it your testimony that that income was
19    in addition to Roxane's net income that appears on
20    its income statement?
21         A.    No, this would be part of that.
22         Q.    So let's look at Exhibit 20 -- 20.

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                        Chicago, IL

                                                          Page 212

1        A.    Exhibit 20.  Mine are not -- obviously

2   not in very good order.

3             MS. RIVERA:  Me neither.

4   BY MR. FAUCI:

5        Q.    This is the document I showed you that

6   was the year-end financial statement for Roxane on

7   December 31, 2001.

8        A.    Yes.

9        Q.    Can you turn to the statement of income.

10       A.    Yes.

11       Q.    What's the net income after tax for

12  Roxane in 2001?

13       A.    139 million.

14       Q.    Where would I look to see where the $175

15  million income --

16       A.    This --

17             MS. RIVERA:  Sorry.

18  BY MR. FAUCI:

19       Q.    -- from the --

20             MS. RIVERA:  Let him finish his question.

21  BY MR. FAUCI:

22       Q.    -- sale of Elan is booked?

                  Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

Roxane Laboratories, Inc (James F. McIntyre)                     February 26, 2009
                              Chicago, IL

Page 213

1        A.    This comment is written under subcategory

2    income slash expense two, so if you look further --

3    further up the P&L, you'll see something called

4    "All Other," comma, "II."

5        Q.    I see that.

6        A.    You follow it over to the 2001 actual

7    column, you'll see 174,000 -- $174,800,000, that's

8    the -- that's the reference to the 175 in that

9    comment --

10       Q.    And why is --

11       A.    -- so --

12       Q.    -- that in parentheses?

13       A.    Because for that particular line item,

14   parentheses means income.  If it's --

15           MS. RIVERA:  Don't try to figure out the

16   accounting.

17   BY THE WITNESS:

18       A.    That 175 is pretax.

19   BY MR. FAUCI:

20       Q.    Okay.  So notwithstanding the fact that

21   Roxane received 175,000 -- $175 million for the

22   Elan sale, its income for 2001 was $139 million?

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
                              Chicago, IL

                                                              Page 214

1         A.    That's correct.

2               MR. FAUCI:  I have no further questions.

3               MS. RIVERA:  Okay.

4               MR. FAUCI:  Ros?

5               MS. POLLACK:  I just have a few.

6               MS. RIVERA:  Well, we only -- how much --

7    do we have to change --

8               THE VIDEOGRAPHER:  I've --

9               MS. RIVERA:  -- the tape?

10              THE VIDEOGRAPHER:  I've got less than a

11   minute.

12              MS. POLLACK:  Okay.  Why don't we change

13   it; and that way, we won't have a problem.

14              THE VIDEOGRAPHER:  We are off the record

15   at 3:15 p.m. with the end of tape number three.

16                   (WHEREUPON, a discussion was had off

17   the record.)

18              THE VIDEOGRAPHER:  We are back on the

19   record at 3:17 p.m. with the start of tape number

20   four.

21

22                   FURTHER EXAMINATION

3290963b-fd9b-45c2-b7e9-ee2d2617ccc4