# Exhibit 47

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

# In The Matter Of:

### THE STATE OF TEXAS v. DEY, INC., ET AL.

## JOHN ROBERT POWERS
### February 4, 2003

### FREDERICKS-CARROLL REPORTING
Court Reporting-Video Services-Litigation Support
7719 WOOD HOLLOW DRIVE, SUITE 156
Austin, TX 78731
(512) 477-9911    FAX: (512) 345-1417

Original File 30204JP.V1, 266 Pages
Min-U-Script® File ID: 0345086789

**Word Index included with this Min-U-Script®**

Page 1

[1]         CAUSE NO. GV002327
[2]  THE STATE OF TEXAS            )IN THE DISTRICT COURT
     ex rel.                       )
[3]  VEN-A-CARE OF THE             )
     FLORIDA KEYS, INC.,           )
[4]      Plaintiffs,               )
[5]  VS.                           )TRAVIS COUNTY, TEXAS
[6]  DEY, INC.; ROXANE             )
     LABORATORIES, INC.; WARRICK   )
[7]  PHARMACEUTICALS CORPORATION;  )
     SCHERING-PLOUGH CORPORATION;  )
[8]  SCHERING CORPORATION;         )
     LIPHA, S.A.; MERCK-LIPHA, S.A.;)
[9]  MERCK, KGAA; AND EMD          )
     PHARMACEUTICALS, INC.,        )
[10]     Defendants.               )53RD JUDICIAL DISTRICT
[11]
            ORAL AND VIDEOTAPED DEPOSITION OF
[12]              JOHN ROBERT POWERS
[13]              FEBRUARY 4TH, 2003
[14]
[15]
[16]        ORAL AND VIDEOTAPED DEPOSITION OF
[17] JOHN ROBERT POWERS, produced as a witness at the
[18] instance of the State of Texas and duly sworn, was
[19] taken in the above-styled and numbered cause on the
[20] 4th of February, 2003, from 9:04 a.m. to 5:13 p.m.
[21] before Debra L. Sietsma, CSR in and for the State of
[22] Texas, reported by machine shorthand, at 4700 Guardian
[23] Drive, Durham, North Carolina, pursuant to the Texas
[24] Rules of Civil Procedure and the provisions as
[25] previously set forth.

Page 2

[1]           APPEARANCES
[2]
[3]  FOR THE PLAINTIFF:
[4]      MR. MICHAEL WINGET-HERNANDEZ
         Office of the Attorney General
[5]      State of Texas
         Post Office Box 12548
[6]      Austin, Texas 78711-2548
[7]  FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
[8]      MR. GARY L. AZORSKY
         MS. SUSAN SCHNEIDER THOMAS
[9]      Berger & Montague, P.C.
         1622 Locust Street
[10]     Philadelphia, Pennsylvania 19103
[11] FOR DEFENDANT DEY, INC.:
[12]     MS. LEILA R. PITTAWAY
         Coudert Brothers
[13]     1114 Avenue of the Americas
         New York, New York 10036-7703
[14]
     FOR DEFENDANT ROXANE LABORATORIES, INC.:
[15]
         MR. STEPHEN E. McCONNICO
[16]     Scott, Douglass & McConnico, L.L.P.
         One American Center, Fifteenth Floor
[17]     600 Congress Avenue
         Austin, Texas 78701
[18]
             - and -
[19]
         MR. PAUL J. COVAL
[20]     Vorys, Sater, Seymour and Pease, L.L.P.
         52 East Gay Street
[21]     P.O. Box 1008
         Columbus, Ohio 43216-1008
[22]
     FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
[23] SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
[24]     MS. KARIN B. TORGERSON
         Locke Liddell & Sapp, L.L.P.
[25]     2200 Ross Avenue, Suite 2200
         Dallas, Texas 75201-6776

Page 39

[1] account with which we were dealing with a rebid and
[2] the ability to compare that customer's sales levels
[3] against like customers.
[4]  Q: If I understand you, I — I think what you're
[5] telling me is that you were suggesting to IT that,
[6] with respect to customers that you were receiving
[7] requests for bids from, that as to those customers,
[8] you're suggesting that IT go back and input historical
[9] sales information about that customer. Is that right?
[10]  A: Historical sales information was available.
[11]  Q: Uh-huh.
[12]  A: There were reports that were run based upon
[13] the contract sales activity of a particularly
[14] identified customer; so you would have to look, for
[15] example, at Novation as a group purchasing
[16] organization. You were generally restricted in your
[17] ability to what we call "drill down." You couldn't
[18] necessarily look at specific customers, the individual
[19] members who made up what we called Novation, or what
[20] was called Novation. That became difficult in the
[21] sense that, if large numbers of these customers would
[22] move from one group purchasing organization to
[23] another, it was difficult to evaluate the impact of
[24] that move.
[25]  Q: So I think what you're saying is that

Page 40

[1] information that was consolidated by the purchasing
[2] group was no longer available as to each purchaser?
[3]  A: The purchasing group didn't gather
[4] information. It was all sales information that we had
[5] within our system; and the information, again, was
[6] available. There just weren't the reports or the
[7] ability to drill into the system to pull it out in a
[8] way that was the most meaningful for us. Instead, we
[9] had to take the pre-existing reports and patch
[10] something together that we used to evaluate or do our
[11] analysis of the effectiveness of a pre-existing
[12] agreement and to project what impact a new contract
[13] would do in terms of sales for us.
[14]  Q: What was the next position that you held at
[15] Roxane after May of 1996?
[16]  A: I was still director of contracts. I believe
[17] the — the title changed slightly, but, again, it was
[18] encompassing a bit more of the business in that I
[19] worked with the Boehringer people that previously we
[20] had never had interaction with.
[21]  Q: And what was the event that marked your —
[22] this change in your responsibilities?
[23]  A: Corporately decisions were made that the
[24] Roxane business and the Boehringer business should get
[25] closer together in terms of management, that the two

Page 41

[1] companies shouldn't be run as two separate entities
[2] any longer. So we were given — a variety of people
[3] were given opportunities to understand the Boehringer
[4] business and try to come up with one stronger company.
[5]  Q: Were there any — were there any significant
[6] changes in your basic job responsibilities when you
[7] made that shift other than that there were more people
[8] involved in the process?
[9]  A: Probably the most significant was that I
[10] added two staff members who stayed in the Boehringer
[11] office in Ridgefield, Connecticut, who I would spend
[12] approximately one week a month with for the last
[13] five years that I worked for the corporation. I would
[14] physically go to Connecticut and work with them, meet
[15] the product management group, develop programs, be
[16] involved in meetings.
[17]  Q: What was the — strike that.
[18]   Who did you — who did you answer to
[19] during the time that you were contracts operations
[20] director?
[21]  A: Until 1998 it would have been Ed Tupa. When
[22] he left the company — I believe it was in October of
[23] 1998 — I reported to Greg Ciarelli, who was located
[24] in the Boehringer office in Ridgefield, and — and he
[25] is the gentleman to whom I reported until I left the

Page 42

[1] company.
[2]  Q: Did you get along with Ciarelli?
[3]  A: Yes.
[4]  Q: What was it that caused you to leave
[5] ultimately?
[6]  A: Through a reorganization of the business, I
[7] was involuntarily separated from the company, my
[8] entire staff was.
[9]  Q: Did — were you involved in the process of
[10] reorganizing the business, and did you concur with the
[11] notion that your job should be eliminated?
[12]  A: I suppose indirectly I participated; but I
[13] wouldn't have agreed that I should be terminated, no.
[14]  Q: Who took — who took your place?
[15]  A: Essentially Christine Marsh.
[16]  Q: Who hired Christine Marsh?
[17]  A: I did.
[18]  Q: When?
[19]  A: I believe it would have been in 1999.
[20]  Q: So I take it you didn't hire her to replace
[21] you?
[22]  A: That is correct.
[23]  Q: What did you hire her to do?
[24]  A: She was to be the associate director of the
[25] department. Because of the travel that I needed to do