# Exhibit 53

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

Page 1

NO.  GV3-03079

```
THE STATE OF TEXAS           )   IN THE DISTRICT COURT
                             )
ex rel.                      )
   VEN-A-CARE OF THE         )
   FLORIDA KEYS, INC.,       )
        Plaintiff(s),        )
                             )
vs.                          )   TRAVIS COUNTY, TEXAS
                             )
ROXANE LABORATORIES, INC.,   )
BOEHRINGER INGELHEIM         )
PHARMACEUTICALS, INC., BEN   )
VENUE LABORATORIES, INC.,    )
and BOEHRINGER INGELHEIM     )
CORPORATION,                 )
        Defendant(s).        )   201ST JUDICIAL DISTRICT
```

**********************************************************
ORAL AND VIDEOTAPED DEPOSITION OF

SHELDON BERKLE

JANUARY 27TH, 2005

VOLUME 1 OF
**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF SHELDON BERKLE, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on the 27th of January, 2005, from 9:01 a.m. to 5:15 p.m., before CAROLYN J. FORD, Registered Professional Reporter and Notary Public, State of Florida at Large, reported by machine shorthand at the Doubletree Guest Suites, 12200 Tamiami Trail North, Naples, Florida, pursuant to the Texas Rules of Civil Procedure and the provisions attached previously.

A P P E A R A N C E S

FOR THE PLAINTIFF(S):

    CYNTHIA O'KEEFFE, ESQ.
    Assistant Attorney General
    Office of the Attorney General
    State of Texas
    Post Office Box 12548  (78711-2548)
    300 W. 15th Street, 9th Floor
    Austin, Texas  78701

    JOSEPH V. CRAWFORD, ESQ.
    Wright & Greenhill, P.C.
    221 West 6th Street, Suite 1800
    Austin, Texas  78701-3495

FOR THE RELATOR:

    JAMES JOSEPH BREEN, ESQ.
    The Breen Law Firm, P.A.
    3562 Old Milton Parkway
    Alpharetta, Georgia  30005

FOR THE DEFENDANT(S):

    STEPHEN E. McCONNICO, ESQ.
    Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas  78701

    PAUL J. COVAL, ESQ.
    Vorys, Sater, Seymore & Pease, L.L.P.
    52 East Gay Street
    Columbus, Ohio  43216

ALSO PRESENT:

    EDWARD MILLER, ESQ.
    Assistant General Counsel
    Chief Compliance Officer
    Boehinger Ingelheim Pharmaceuticals, Inc.

    Jana Dobin, Videographer

1    A    Yes.
2    Q    And then you said, I'll look at it for the
3 recommended pricing for BIPI.  You were talking about
4 Boehringer Ingelheim Pharmaceutical, Inc., which primarily
5 manufactures branded products?
6    A    Yes.
7    Q    Who was going to look at Roxane's branded
8 products?
9    A    Again, that would be the senior executive within
10 the Roxane organization.  And at that time it would have
11 been Jerry Wojta and then ultimately Werner Gerstenberg as
12 CEO and head of BIC.
13   Q    So in November of 1996, the German executives
14 were looking, reviewing all product pricing for both the
15 brand side and the generic side of the Boehringer U.S.
16 operations?
17   A    Again, I can only talk for the branded.
18 Certainly for the branded side, I don't know the details
19 that they would have got involved in with the generics.
20   Q    Well, why would you have put out this information
21 saying that one of their points, number nine, that you're
22 giving everybody a heads up on is they want to review and
23 confirm all product pricing long-term.  And you're telling
24 Ed to review this for Roxane.  Doesn't -- doesn't that
25 tell you that they want to look at the generic prices as

1  well as the brand prices?
2      A    Again, I can't interpret, you know, what the
3  parent company wanted.  I would have been conveying a
4  message.
5      Q    Well, Ed Tupa, can you please tell us what -- he
6  was the guy responsible for the generic side; right?
7      A    Yes.
8      Q    So why would you be bringing Ed into this picture
9  giving him a specific job telling him in connection with a
10 review and confirmation of all -- of all product pricing
11 long-term if you didn't think the Germans wanted to look
12 at generic pricing?
13     A    Again, I don't know what they wanted to look at
14 or not look -- wanted or did not want to look at.  Ed
15 would have discussed this with Mr. Wojta and they would
16 have had whatever appropriate discussions with the parent
17 company.
18     Q    Then you go on.  You say (as read):  The timeline
19 for development of these numbers will be very short and I
20 would recommend that you start looking at this
21 immediately.
22     A    Right.
23     Q    (As read):  I will confirm the required dates by
24 Monday, the latest.  This is a top priority.  And you put
25 that in all caps.

Page 44

1  A    Uh-huh.
2  Q    Did you ordinarily send memos around saying "I
3  want to see it Monday at the latest and this is a top
4  priority" in all caps.  Was that common?
5  A    I would not say it's common.  I think it probably
6  relayed the message I received from the parent companies
7  saying they have some timeline that they want to look at
8  -- look at everything.
9  Q    Is it -- then you were trying to convey some
10 sense of urgency?
11     MR. McCONNICO:  Objection; form.
12 A    Again, you know, I only see what you see and it
13 would appear that there was some timeline urgency here.
14 Q    [By Mr. Breen]  Now, if we go back to the first
15 page and we -- we move up the e-mail chain here to
16 November 25, 1996, at 1:13 p.m.  Do you see this memo from
17 Herman -- from Herman Dick?
18 A    Uh-huh.
19 Q    He works with Roxane; right?
20 A    I -- I assume on the signature on the top that he
21 did.  I don't even recall him to be honest with you.
22 Q    And you see that it's a memo to Ed -- or e-mail
23 to Ed saying (as read):  Judy Waterer and I changed the
24 budgeted units for ipratropium MDI to reflect a October
25 1st, 1997 launch.

1   A   Uh-huh.
2   Q   And then they go on --
3       MR. McCONNICO:  Shelly, try to say yes or no when
4   you respond because --
5   A   Yes.
6       MR. McCONNICO:  -- it's difficult for the
7   reporter.
8   A   Yes.
9   Q   [By Mr. Breen]  Then they go on to provide the
10  information that you told them they were going to have to
11  provide for the ipratropium MDI?
12  A   Again, I don't think I told them specifically
13  what to do.  This, again, is an informational e-mail.
14  Q   So when you were saying I will -- all right.  And
15  you're -- you're copied on here; do you see that?
16  A   Yes, I do.
17  Q   Why would they have copied you if you had
18  absolutely nothing to do with ipratropium bromide MDI?
19  A   Again, there was a dotted-line responsibility
20  that I had strategically for the organization.  I believe
21  I also previously mentioned to you for ipratropium, this
22  was a unique case in that it was a generic version of a
23  brand Atrovent that was marketed by BI Pharmaceuticals.
24  And, therefore, there was an information exchange between
25  the two organizations.

1  you had access to a computer; correct?
2    A    Correct.
3    Q    And I'm sure you know how to use the internet --
4    A    Yes.
5    Q    -- correct?  Do you recall any instance where you
6  ever attempted to log on to any State of Texas official
7  web site to check any State of Texas law?
8    A    No.
9    Q    Do you know whether or not a person under your
10 supervision could have if they wanted to go on to a web
11 site and found out what the law of Texas was with respect
12 to the reporting of drug prices to the vendor drug
13 program?
14   A    Again, I'm not aware whether someone did it or
15 didn't do it.  Certainly if it was pertinent to their job,
16 then they had the, you know, ability to make the decision
17 to tap into that sort of web site should it be available.
18   Q    Okay.  And -- but my question was really more
19 specific than that.  I just want to know did you know
20 whether or not that service, that ability was even there
21 and available for someone to check if they wanted to?
22   A    No.
23   Q    Who under your direct chain of command would have
24 had the responsibility to know and understand and comply
25 with Texas law concerning the reporting of drug prices in

1  your direct chain of command?
2    A   That would have been under Mr. Ciarelli's
3  responsibility.
4    Q   All right. And with respect to the Roxane people
5  that had the dotted-line responsibility of reporting to
6  you, who with Roxane would have had the ultimate
7  responsibility to be sure that Roxane employees complied
8  with the laws of Texas concerning the reporting of drug
9  prices to the Texas vendor or drug program?
10   A   Again Mr. Ciarelli had responsibility for both
11 the BIPI and Roxane products.
12   Q   Okay. So -- and I don't want to be too folksy,
13 but maybe this would be helpful. I know that you've heard
14 of President Harry Truman.
15   A   Absolutely.
16   Q   Okay. And Harry Truman, I didn't meet him, but
17 I've always heard that he had a sign on his desk that says
18 "The buck stops here." You heard of that story too?
19   A   Sure.
20   Q   Which means he was ultimately responsible. Do
21 you understand what the meaning of "the buck stops here"
22 is?
23   A   General terms.
24   Q   Okay. With respect to -- first of all with
25 respect to BIPI, where did the buck stop? On whose desk

1  did the buck stop with respect to understanding Texas law
2  and complying with Texas law about reporting drug prices
3  in your direct chain of command?
4      A    That would be within Mr. Ciarelli's group.
5      Q    And the same question for Roxane, where -- on
6  whose desk did the buck stop with respect to knowing and
7  complying with Texas law and reporting drug prices?
8      A    Mr. Ciarelli.
9      Q    Now, do you know where Mr. Ciarelli is today?
10     A    He works within the Boehringer organization in
11 Ridgefield, Connecticut.
12     Q    Okay.  And in your mind and according -- do I
13 understand your testimony to be, that the buck stops with
14 Mr. Ciarelli and that nobody above that, not you, not Mr.
15 Gerstenberg, nobody else above that has any duty or
16 responsibility whatsoever with respect to knowing Texas
17 law and complying with it concerning reporting of drug
18 prices?
19     A    I think, again, having direct line responsibility
20 for Mr. Ciarelli, Mr. Gerstenberg having been my boss,
21 again, it depends on how you interpret "the buck stops
22 here."  Again, we did not -- we were a large organization.
23 We had thousands of transactions occurring at any one
24 point in time.  You know, thousands of employee -- a
25 couple thousand employees reporting to me.  It was -- I

1  was not involved in every bit of information or decision
2  that was made throughout the corporation.  It would be an
3  impossibility.
4       Q    Okay.  And I understand that and believe me I
5  don't want to quarrel or quibble.
6       A    Yeah.
7       Q    We talked about buck stopping.  You said that
8  buck stopped with Mr. Ciarelli.  My question now is:  Is
9  it your position -- and if it is that's fine, but if it's
10 not, tell me -- is it your position that there was
11 absolutely no duty or responsibility above the level of
12 Mr. Ciarelli within the BI group of companies to see to it
13 that the laws of Texas concerning price reporting were
14 followed and obeyed and understood?
15      A    I would say I would have some responsibility for
16 that.
17      Q    All right.  And what degree of responsibility
18 would you have had?
19      A    I would, again, ensure that people within my
20 organization, within the organization together with the
21 assistance of legal department, communicate in general
22 terms that we had certain compliance responsibility to
23 adhere to regulations, laws throughout the United States.
24      Q    Is Mr. Ciarelli a lawyer?
25      A    No, he is not.

Page 219

1        MR. McCONNICO:  It's this one.  That's it.
2    Q   [By Mr. Breen]  Okay.
3        MR. McCONNICO:  It has the press thing on the
4    bottom, that Wall Street Journal article.
5        THE WITNESS:  It's not in here.
6        MR. McCONNICO:  They steal them sometimes.
7        MR. BREEN:  Could you hand him that one?
8        MR. McCONNICO:  Sure.  I got all kind of notes on
9    it.
10       MR. BREEN:  Just ignore --
11       MR. McCONNICO:  Can't read my writing anyway.
12       MR. BREEN:  -- the notes.
13   Q   [By Mr. Breen]  But -- and I assume you've never
14   seen this before today --
15   A   Correct.
16   Q   -- that you recall anyway?  Now -- now, but Jim
17   Rowenhorst he report -- he worked under Gregg Ciarelli;
18   right?
19   A   He either worked under Gregg Ciarelli or there
20   was a -- sort of a state marketing group that reported to
21   Mike -- Mike Leonetti so may have been some time frame
22   differences.
23   Q   But these -- these guys both work for BIP U.S.
24   which is Boehringer Ingelheim Pharmaceuticals so there
25   is --

Page 220

1    A    Correct.
2    Q    -- there's no doubt they were under your direct
3  chain of command?
4    A    Yes.
5    Q    There's no -- there are dotted lines and straight
6  lines and hard lines, they're under you?
7    A    Yes.
8    Q    And they're talking about Combivent unit dose
9  vial and that was -- that was your baby?
10   A    Correct.
11   Q    Okay.  So we -- we don't have any issues about
12 the people involved or the drug involved not being under
13 you on your watch?
14   A    Correct.
15   Q    Okay.  Now, look at this newspaper article that
16 Mr. Rowenhorst is attaching to his e-mail.  It's Medicare
17 Plans Major Overhaul Target Massive Overpayments by Laurie
18 McGinley and David Cloud of the Wall Street Journal; do
19 you see that?
20   A    Yes, I do.
21   Q    And if you go to the second page, the first full
22 paragraph it says (as read):  State and federal officials
23 believe that some drug companies are reporting
24 artificially inflated AWPs to industry guides that are
25 used for government reimbursement purposes.  The companies