# Exhibit 54

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

# In The Matter Of:

*THE STATE OF TEXAS  v.*
*DEY, INC., ET AL.*

---

*JAMES A. ROWENHORST*
*April 3, 2003*

---

*FREDERICKS-CARROLL REPORTING*
*Court Reporting-Video Services-Litigation Support*
*7719 WOOD HOLLOW DRIVE, SUITE 156*
*Austin, TX  78731*
*(512) 477-9911    FAX: (512) 345-1417*

*Original File 30403JR.V1, 224 Pages*
*Min-U-Script® File ID: 2224958285*

**Word Index included with this Min-U-Script®**

APR 2 1 2003

Page 1

[1]         CAUSE NO. GV002327
[2] THE STATE OF TEXAS            )IN THE DISTRICT COURT
    ex rel.                       )
[3]    VEN-A-CARE OF THE          )
       FLORIDA KEYS, INC.,        )
[4]        Plaintiffs,            )
[5] VS.                           )TRAVIS COUNTY, TEXAS
[6] DEY, INC.; ROXANE             )
    LABORATORIES, INC.; WARRICK   )
[7] PHARMACEUTICALS CORPORATION;  )
    SCHERING-PLOUGH CORPORATION;  )
[8] SCHERING CORPORATION;         )
    LIPHA, S.A.; MERCK-LIPHA, S.A.;)
[9] MERCK, KGAA; AND EMD          )
    PHARMACEUTICALS, INC.,        )
[10]       Defendants.            )53RD JUDICIAL DISTRICT
[11]
         ORAL AND VIDEOTAPED DEPOSITION OF
[12]
              JAMES ALLEN ROWENHORST
[13]              APRIL 3RD, 2003
[14]     ORAL AND VIDEOTAPED DEPOSITION OF
[15] JAMES ALLEN ROWENHORST, produced as a witness at the
[16] instance of the State of Texas and duly sworn, was
[17] taken in the above-styled and numbered cause on the
[18] 3rd of April, 2003, from 8:08 a.m. to 3:31 p.m.,
[19] before Debra L. Sietsma, CSR in and for the State of
[20] Texas, reported by machine shorthand, at the offices
[21] of Vorys, Sater, Seymour & Pease, L.L.P.,
[22] 2100 One Cleveland Center, Cleveland, Ohio, pursuant
[23] to the Texas Rules of Civil Procedure and the
[24] provisions as previously set forth.
[25]

Page 2

[1]                   APPEARANCES
[2]
[3] FOR THE PLAINTIFF, STATE OF TEXAS:
[4]     MS. CYNTHIA O'KEEFFE
        Office of the Attorney General
[5]     State of Texas
        Post Office Box 12548
[6]     Austin, Texas  78711-2548
[7] FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
[8]     MR. JARRETT ANDERSON
        Attorney at Law
[9]     2411 Hartford Road
        Austin, Texas  78703
[10]
    FOR DEFENDANT DEY, INC.:
[11]
        MS. LEILA R. PITTAWAY
[12]    Coudert Brothers
        1114 Avenue of the Americas
[13]    New York, New York  10036-7703
[14] FOR DEFENDANT ROXANE LABORATORIES, INC.:
[15]    MR. R. ERIC HAGENSWOLD
        Scott, Douglass & McConnico, L.L.P.
[16]    One American Center, Fifteenth Floor
        600 Congress Avenue
[17]    Austin, Texas  78701
[18]     - and -
[19]    MR. PAUL J. COVAL
        Vorys, Sater, Seymour and Pease, L.L.P.
[20]    52 East Gay Street
        P.O. Box 1008
[21]    Columbus, Ohio  43216-1008
[22] FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
     SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
[23]
        MR. JOHN P. MCDONALD
[24]    Locke Liddell & Sapp, L.L.P.
        2200 Ross Avenue, Suite 2200
[25]    Dallas, Texas  75201-6776

Page 25

[1] **A:** Yes.
[2] **Q:** And did you have people that reported to you?
[3] **A:** Yes.
[4] **Q:** And how many people did you have that
[5] reported to you?
[6] **A:** Two.
[7] **Q:** And what were their names?
[8] **A:** Jill Nelson and — I don't recall the other
[9] person's name.
[10] **Q:** And what were their job duties?
[11] **A:** Jill was a — Jill's job duties included
[12] submitting invoices and mailing information to the
[13] manufacturers.
[14] **Q:** And what about the other person?
[15] **A:** Administrative assistant.
[16] **Q:** How long were you in that position with that
[17] company?
[18] **A:** Approximately two and a half years.
[19] **Q:** Did you ever have another position with that
[20] company, or was that your only position with that
[21] company?
[22] **A:** That was my only position.
[23] **Q:** And what about your previous job experience
[24] in — made you qualify for that particular position?
[25] **A:** Restate the question, please.

Page 26

[1] **Q:** When you were hired for the position as the
[2] manager of contracts, that — was that the —
[3] **A:** Manufacturer relations, yes.
[4] **Q:** Okay. Manufacturer relations.
[5]     When you were hired for that position,
[6] what about your previous education and/or work
[7] experience made you qualified for that position?
[8] **A:** My Bachelor's degree in pharmacy and my
[9] previous pharmacy experience.
[10] **Q:** Specifically, what in your pharmacy
[11] experience made you qualified for that job?
[12] **A:** My general knowledge of the retail pharmacy
[13] environment.
[14] **Q:** Would your knowledge of pricing of drugs have
[15] made you particularly qualified for that job?
[16] **A:** I don't know if that was an overriding factor
[17] in being selected for that position.
[18] **Q:** Where did you go after that position?
[19] **A:** I went to Boehringer Mannheim
[20] Pharmaceuticals.
[21] **Q:** And what year was that?
[22] **A:** Approximately 1996, as best I can recall.
[23] **Q:** What position did you get at Boehringer
[24] Mannheim?
[25] **A:** I was the senior manager of pricing and

Page 27

[1] contracting strategies.
[2] **Q:** And how did you hear about that job?
[3] **A:** I don't recall if I was recruited or — I
[4] believe I was recruited for the position.
[5] **Q:** How long did you work for that company?
[6] **A:** Approximately a year and a half.
[7] **Q:** And then what happened?
[8] **A:** They were — when you say "what happened,"
[9] what happened to me?
[10] **Q:** Well, I assume you either took a job with
[11] another company or the company somehow transformed
[12] organizationally to where you weren't working for that
[13] particular company anymore. Is that correct?
[14] **A:** That's correct.
[15] **Q:** What happened?
[16] **A:** I took another position.
[17] **Q:** And what position did you take?
[18] **A:** I took the position of manager of
[19] reimbursements at Boehringer Ingelheim
[20] Pharmaceuticals.
[21] **Q:** Can you explain to me the relationship
[22] between Boehringer Mannheim and Boehringer Ingelheim
[23] at that particular point in time?
[24] **A:** There's no relationship. Similarity in names
[25] is all.

Page 28

[1] **Q:** So it's just a coincidence that the first
[2] name of both of those entities is Boehringer?
[3] **A:** Yes.
[4] **Q:** There's — to your knowledge, there's no
[5] business relationship between those two companies, or
[6] there was none at the time that — that you were
[7] working there?
[8] **A:** Correct.
[9] **Q:** Is there anything I'm missing there? Doesn't
[10] seem to make sense to me. Is there something I'm
[11] missing?
[12] **A:** No. I mean —
[13] **Q:** Do you have any idea of the history — did —
[14] is there any similar or related history between those
[15] two companies?
[16] **A:** When you say "related history of those two
[17] companies," I'm not sure I understand.
[18] **Q:** Well, I guess, Mr. Rowenhorst, I'm just
[19] having a difficult time understanding how there are
[20] two companies with such similar and unusual names that
[21] don't have any relationship to one another. And I'm
[22] just trying to figure out if there's any — any
[23] connection historically, organizationally, any
[24] connection whatsoever between those two entities that
[25] ever existed, to your knowledge.

Page 69

[1] Q: What were some of those drugs?
[2] A: Those drugs could have been Ipratropium
[3] bromide, Albuterol, Serevent, Advair, several within
[4] the — what are considered to be beta-agonist classes
[5] as well as inhaled corticosteroid classes as well as
[6] anticholinergics.
[7] Q: Do you believe that if pharmacies were to
[8] receive lower reimbursements on competitive COPD
[9] treatment that, then, they would, as compared to the
[10] reimbursement on Spiriva, that that would assist
[11] Spiriva in being a successful drug sold by BI?
[12]    MR. MCDONALD: Object to the form.
[13]    THE WITNESS: Your question is if the
[14] reimbursement to the pharmacies is lower than
[15] competitive therapies?
[16] Q: (BY MR. ANDERSON) It got kind of long, so
[17] let me break it up.
[18]    In your analysis of Spiriva's
[19] reimbursement as compared to competitive COPD
[20] treatments, did you find that Spiriva's reimbursement
[21] was higher than its competitors?
[22] A: That is not what the analysis showed, no.
[23] Q: Did you find that Spiriva's reimbursement was
[24] actually going to be lower than its COPD competitors?
[25] A: That is not what the analysis showed either,

Page 70

[1] no.
[2] Q: What did the analysis show?
[3] A: The analysis showed that the customers
[4] evaluated its clinical profile and potential price
[5] points against competitive products and gave us an
[6] idea of its potential market uptake based on the
[7] various price points used within that analysis.
[8] Q: Let's take a look at the next page of your
[9] 2000 performance evaluation, ROX-TX-02995.
[10]    "Key Result Areas," and I'll read, in
[11] part, quote, "Maximize sales, market share and
[12] margin."
[13]    Did I read that correctly?
[14] A: That's correct.
[15] Q: And then under "Objectives," the first
[16] objective is, quote, "Develop a market strategy to
[17] capitalize on the state Medicaid programs."
[18]    Did I read that correctly?
[19] A: That's correct.
[20] Q: How does BI go about capitalizing on state
[21] Medicaid programs?
[22]    MR. HAGENSWOLD: Object to form.
[23]    THE WITNESS: My — if the question
[24] is — what is the question again? It's how does BI
[25] capitalize on Medicaid?

Page 71

[1]    MR. ANDERSON: Yes, sir.
[2]    THE WITNESS: BI would recognize that
[3] Medicaid is a potential market channel that our drugs
[4] are sold through, and so we would look at
[5] opportunities within that marketplace to sell our
[6] products.
[7] Q: (BY MR. ANDERSON) Would a market strategy to
[8] capitalize on state Medicaid programs developed by you
[9] also be utilized by Roxane?
[10] A: No.
[11] Q: In your job responsibilities at BI, do you
[12] consult with Roxane or provide any type of input into
[13] the operation of Roxane's business?
[14] A: In my current function?
[15] Q: Let's start right now with your current
[16] function, yes, sir.
[17] A: No.
[18] Q: In your prior experience at BI, have you ever
[19] had job responsibilities that involved the operation
[20] of Roxane in any manner?
[21] A: Yes.
[22] Q: In what ways did you have involvement with
[23] the operation of Roxane?
[24] A: As the reimbursement manager, I was involved
[25] in working with Roxane to ensure that reimbursement

Page 72

[1] channels were available for the sale of our products
[2] if there seemed to be any reimbursement obstacles in
[3] the marketplace.
[4] Q: What do you consider to be a reimbursement
[5] obstacle?
[6] A: If, in the adjudication process that the
[7] pharmacist uses to have their drugs reimbursed, during
[8] that adjudication process there would be a message
[9] coming back that the drug was not paid for or that
[10] there may be a prior authorization related to the
[11] adjudication of those claims, we would consider that
[12] to be a reimbursement obstacle.
[13] Q: Would you also consider it to be a
[14] reimbursement obstacle if, in a multisource generic
[15] competitive market, Roxane's reimbursement was lower
[16] than its competitors?
[17]    MR. MCDONALD: Object to the form.
[18] Q: (BY MR. ANDERSON) Let me rephrase that.
[19]    Would you also consider it, sir, to be a
[20] reimbursement obstacle if, in a generic multisource
[21] environment, a Roxane generic reimbursement by
[22] Medicaid is lower than the Medicaid reimbursement on a
[23] generic competitor's of Roxane's?
[24] A: If the lower reimbursement resulted in our
[25] competitor's products being used more often, that

Page 125

[1] situation with Florida Medicaid independently of your
[2] document review recently?
[3] **A:** When you say "independently of my other
[4] document review," would —
[5] **Q:** Just do you recall this instance? Did it —
[6] **A:** I recall some of the details around this
[7] instance, yes.
[8] **Q:** Okay. And you recalled the — some of the
[9] details around this instance prior to going back and
[10] reviewing the — the e-mail documentation recently,
[11] correct?
[12] **A:** Yes. This documentation has helped refresh
[13] my memory to some degree.
[14] **Q:** Gotcha.
[15] Why did you copy Mike Leonetti on your
[16] second e-mail dated November 4th, '99?
[17] **A:** I don't recall the reason on why he would
[18] have been copied.
[19] **Q:** Was Mike — I notice that next to his name
[20] there's "HR BIPUS."
[21] Did I read that correctly?
[22] **A:** You read that correctly.
[23] **Q:** Does that stand for Human Resources,
[24] Boehringer Ingelheim Pharmaceuticals, U.S.?
[25] **A:** That's my understanding of that.

Page 126

[1] **Q:** What is your understanding of Mike Leonetti's
[2] job responsibilities generally back in
[3] November of '99?
[4] **A:** I believe — my best recollection is that
[5] Mike was in charge of the managed care division within
[6] Boehringer Ingelheim.
[7] **Q:** Given his responsibilities in managed care,
[8] why would it be important to Mr. Leonetti that he be
[9] informed about this WAC and direct price deletion
[10] issue?
[11] **MS. PITTAWAY:** Objection as to form.
[12] **MR. HAGENSWOLD:** Same objection.
[13] **THE WITNESS:** It may be a case where —
[14] I'm not sure why. It may be a case where he was
[15] brought into the discussion, but I — I don't know.
[16] **Q:** (BY MR. ANDERSON) Do you have any
[17] understanding of how the information that's contained
[18] within 654 would assist Mr. Leonetti in managing the
[19] department — the managed care department?
[20] **MR. HAGENSWOLD:** Object to form.
[21] **MS. PITTAWAY:** Object to form.
[22] **THE WITNESS:** With him being in charge
[23] of the department, it would — it would be important
[24] for him to be aware of — of various issues that
[25] affect the department and the marketplace.

Page 127

[1] **Q:** (BY MR. ANDERSON) Would the deletion of WAC
[2] and direct prices by Roxane from the First DataBank
[3] database increase reimbursements made by managed care
[4] entities?
[5] **MR. HAGENSWOLD:** Object to form.
[6] **MR. MCDONALD:** Object to the form.
[7] **THE WITNESS:** It's — I — it's all
[8] dependent on the method of reimbursement used to
[9] reimburse for those drugs.
[10] **Q:** (BY MR. ANDERSON) Well, assume with me, sir,
[11] that First DataBank no longer was publishing the WAC
[12] and direct prices for Roxane's drugs.
[13] Then the only price that would be out in
[14] the market published by First DataBank would be AWP,
[15] correct?
[16] **MR. HAGENSWOLD:** Object to form.
[17] **THE WITNESS:** If — if that were the
[18] case, that would be — AWP would be the price that was
[19] out there published under — in First DataBank.
[20] **Q:** (BY MR. ANDERSON) Would there be any other
[21] published price from Roxane, to your knowledge, other
[22] than AWP in that circumstance?
[23] **MR. HAGENSWOLD:** Object to the form.
[24] **MS. PITTAWAY:** Objection as to form.
[25] **MR. MCDONALD:** Object to the form.

Page 128

[1] **THE WITNESS:** I'm not — I'm not aware
[2] of — of other prices. There may be some out there,
[3] but I'm not — not aware.
[4] **MR. HAGENSWOLD:** Okay. Before we leave
[5] this document, and in relation to Mr. Leonetti's
[6] receipt of this document and who was copied on it, I
[7] just want to point out on the record that there's no
[8] indication that Mr. Leonetti or Mr. Rowenhorst
[9] received the e-mail at the top of the page, which was
[10] from Judy Waterer to Lesli Paoletti on November 5th,
[11] 1999.
[12] **MR. ANDERSON:** From Lesli to Judy.
[13] **MR. HAGENSWOLD:** Yes.
[14] **MR. ANDERSON:** Right. Okay.
[15] **MR. HAGENSWOLD:** The last e-mail.
[16] **Q:** (BY MR. ANDERSON) Let's take a look at the
[17] e-mail that — that you did receive, Mr. Rowenhorst,
[18] and — and apparently Mike Leonetti and
[19] Lesli Paoletti, too, particularly the last two
[20] sentences.
[21] "In the event that we are unable to get
[22] them to correct the database and they insist on
[23] reporting incorrect data, we will probably have to
[24] involve legal. Let's hope it doesn't get to that."
[25] Do you recall whether or not legal did

Page 181

[1] period that I actually worked for him, there was no
[2] call for any meetings outside of the introductory
[3] meeting that he and I had, that I recall.
[4]  Q: Who at BI did you interface with the most,
[5] regarding business?
[6]  A: I mean there were — there were many people
[7] that I interacted with. In terms of, you know, direct
[8] responsibility, it would have been my superior at the
[9] time.
[10]  Q: Who was that?
[11]  A: Well, in the context that we just referred
[12] to, it was Greg Ciarelli.
[13]  Q: Right. And then who was that — who was your
[14] supervisor after that?
[15]  A: After that it was Gary Ellexson when I moved
[16] to managed care marketing.
[17]  Q: Well, you held the position as reimbursements
[18] manager for, what, two years?
[19]  A: Something like that, two, two and a
[20] half years, right.
[21]  Q: And during that two-year period, did you
[22] report to Greg Ciarelli?
[23]  A: During that two-and-a-half-year time period,
[24] I reported to Greg Ciarelli for that — for a period
[25] of time, yes.

Page 182

[1]  Q: Did you report to Greg Ciarelli for the
[2] majority of that two-and-a-half-year time period?
[3]  A: No.
[4]  Q: Who did you report to for the majority of
[5] that two-and-a-half-year time period?
[6]  A: Again, I'm not quite sure of the timing of —
[7] of changes in management, but it — it may have been
[8] Mike Leonetti who — who was the majority of the time.
[9]  Q: Did you meet with Mike Leonetti often to let
[10] him know what projects you were working on and — and
[11] how those projects were coming along?
[12]  A: And when you say "often," does that —
[13]  Q: Well, you had to keep him abreast of what you
[14] were doing, right?
[15]  A: Correct.
[16]  Q: And that was so that he was aware of the
[17] projects that you were working on and that you were
[18] doing a good job, correct?
[19]  A: Correct.
[20]  Q: Did you discuss your work on these
[21] reimbursement projects with Mr. Leonetti?
[22]  A: I would imagine I did, yes.
[23]  Q: And did Mr. Leonetti ever tell you that he
[24] disapproved of the work that you were performing
[25] regarding reimbursement?

Page 183

[1]  A: No. I don't recall him disapproving of my
[2] work.
[3]  Q: Have you ever been disciplined by anyone at
[4] BI, but particularly Mr. Leonetti, regarding any work
[5] on pharmaceutical reimbursements?
[6]  A: No. I've never been disciplined specific to
[7] reimbursements for my work there.
[8]  Q: Other than your communications with
[9] Judy Waterer regarding reimbursement, who at Roxane
[10] did you — did you communicate with about
[11] reimbursement issues?
[12]  MR. HAGENSWOLD: Object to form.
[13]  THE WITNESS: As I recall, Judy was my
[14] main contact with respect to various reimbursement
[15] issues; but I also would communicate with
[16] Lesli Paoletti.
[17]  Q: (BY MR. ANDERSON) Do you remember ever
[18] communicating with Rich Feldman regarding
[19] reimbursement issues connected to Roxane's drugs?
[20]  A: There may have been communication with him.
[21] I don't recall specific to Roxane products whether —
[22] whether he and I communicated or not.
[23]  (Exhibit 867 marked).
[24]  Q: (BY MR. ANDERSON) Now, Mr. Rowenhorst, I'd
[25] ask that you review what's been marked as Exhibit 867.

Page 184

[1] It's a multipage document that was produced to us
[2] today before lunch, ROX-TX-16273, consecutively
[3] through 16278.
[4]  A: Okay. I've reviewed the document.
[5]  Q: Do you remember the — well, first of all —
[6] strike that.
[7]   Do you know who created these pages?
[8]  A: Pages 1, 2, 3 and 4 were created by me.
[9] Pages 5 and 6 of that document were created by someone
[10] else, and I'm not sure who.
[11]  Q: All right. Well, the pages that you did
[12] create, which are one, two, three and four,
[13] ROX-TX-16273 through 16276, did you create this as
[14] part of a PowerPoint presentation or other
[15] presentation of some sort?
[16]  A: It would have been for a PowerPoint
[17] presentation.
[18]  Q: And was the PowerPoint presentation that
[19] these documents were a part of presented to the
[20] Combivent inhalation solution launch team?
[21]  A: Yes. I believe that was the audience that
[22] they were intended for.
[23]  Q: And along those lines, it looks like the
[24] second-to-last page of this exhibit is an agenda for a
[25] meeting that was held by that team on May 24th, 2000;

Page 201

[1] and legal.
[2] **Q:** Do you ever recall having a conversation with
[3] a person in regulatory regarding Medicaid
[4] reimbursement?
[5] **A:** I do not recall any conversations pertaining
[6] to Medicaid reimbursement with a regulatory official.
[7] **Q:** Well, I'm not — when I say "regulatory," I'm
[8] talking about internal BI regulatory personnel.
[9] Do you understand what I'm talking
[10] about?
[11] **A:** No. If you could define that for me, it
[12] would be helpful, I guess.
[13] **Q:** Okay. Well, when you said "regulatory
[14] official," I thought you might be referring to
[15] government officials.
[16] **A:** No. I was referring to regulatory
[17] individuals within Boehringer Ingelheim
[18] Pharmaceuticals.
[19] **Q:** Oh, okay. Good.
[20] Do you recall ever consulting with
[21] anybody at BI who had regulatory responsibilities
[22] regarding Medicare reimbursement?
[23] **A:** I don't recall consulting with any regulatory
[24] individuals within BI Pharmaceuticals about Medicare
[25] reimbursement.

Page 202

[1] **Q:** Likewise, do you ever recall having any
[2] conversations or communications of any sort with the
[3] legal department regarding Medicare reimbursement?
[4] **MR. HAGENSWOLD:** Objection, form.
[5] **THE WITNESS:** I — have I had
[6] conversations with our legal department —
[7] **MR. HAGENSWOLD:** Hold on just a minute.
[8] Don't answer yet.
[9] We're going to ask him not to answer
[10] that — we're going to instruct him not to answer that
[11] question on the basis that his discussions with legal
[12] are privileged, and revealing the topics he discussed
[13] with legal is privileged communication.
[14] **MR. ANDERSON:** Okay. Well, I — are you
[15] going to accept your counsel's instruction?
[16] **THE WITNESS:** Absolutely.
[17] **MR. ANDERSON:** Okay. I appreciate your
[18] position, Eric. I'm not, at this point, asking for
[19] the — any substance of any conversation. I'm just
[20] asking whether or not a conversation occurred; but if
[21] you'd like me to, I'll move on.
[22] **MR. HAGENSWOLD:** Well, if — if you're
[23] asking if a conversation about a particular topic
[24] occurred, I'm going to instruct him not to answer.
[25] **MR. ANDERSON:** Okay.

Page 203

[1] **Q:** (BY MR. ANDERSON) Mr. Rowenhorst, during
[2] your tenure at BI, you've had job responsibilities
[3] regarding pharmaceutical reimbursement, correct?
[4] **A:** Specific to Boehringer Ingelheim
[5] Pharmaceutical products, yes.
[6] **Q:** And you've also had responsibilities in
[7] communicating with Roxane regarding pharmaceutical
[8] reimbursement, correct?
[9] **A:** I have communicated with employees of Roxane
[10] related to reimbursement issues on specific topics,
[11] yes.
[12] **Q:** And that was done within the course and scope
[13] of your employment with Boehringer Ingelheim, correct?
[14] **A:** Within the scope of Boehringer Ingelheim
[15] Pharmaceuticals, yes.
[16] **Q:** Okay. Now, other than yourself, can you
[17] think of any other individual at Boehringer Ingelheim
[18] or a Boehringer Ingelheim company — related company
[19] who had job responsibilities specifically pertaining
[20] to pharmaceutical reimbursement?
[21] **A:** I'm not aware of anyone within BI
[22] Pharmaceuticals or any of the affiliated subsidiaries
[23] with responsibility for reimbursements.
[24] **Q:** So would you consider yourself to have been,
[25] over your time at BI, a resource regarding

Page 204

[1] pharmaceutical reimbursement knowledge that others in
[2] the company could utilize to answer their questions
[3] regarding pharmaceutical reimbursement?
[4] **A:** In my role as reimbursements manager, I was
[5] consulted on various reimbursement issues by various
[6] individuals within the company.
[7] **Q:** And, similarly, would you consider yourself
[8] to have been a resource of reimbursement knowledge at
[9] Boehringer Ingelheim to answer questions that
[10] customers may have had about pharmaceutical
[11] reimbursement?
[12] **A:** I could have been a potential resource within
[13] Boehringer Ingelheim Pharmaceuticals to address
[14] customers in the — from the definition of a
[15] dispensing pharmacist regarding reimbursement issues.
[16] **Q:** And, in fact, today we've gone over an
[17] exhibit which is an example of you acting as a
[18] resource regarding Medicaid reimbursement issues for a
[19] customer, which is Tupa Exhibit 654, correct?
[20] **A:** That's an example of where I would have acted
[21] as a resource pertaining to that reimbursement issue,
[22] correct.
[23] **Q:** Okay. Now, would you say that, if someone at
[24] Roxane had had a question about Medicaid
[25] reimbursement, that they could have called you and