# Exhibit 61

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the August 28, 2009 Declaration of James J. Fauci In Opposition To
Corrected Boehringer Ingelheim Corporation and Boehringer Ingelheim Pharmaceuticals, Inc.
Local Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion For Summary Judgment

Page 259

```
-------------------------------------------x
UNITED STATES OF AMERICA, ex rel,
VEN-A-CARE, FLORIDA KEYS, INC.,
                    Plaintiffs,
                    Case No. 07-10248
        -against-
BOEHRINGER INGELHEIM CORPORATION,
et al.,
                    Defendants.
-------------------------------------------x
```

                    May 20, 2009
                    8:03 a.m.


                CONFIDENTIAL

        Continued deposition of JONATHAN R.
MACEY, taken at the offices of Kirkland & Ellis,
Citigroup Center, 153 East 53rd Street, New York,
New York, before Georgette K. Betts, a Certified
Shorthand Reporter, Registered Professional
Reporter and Notary Public within and for the
States of New York and New Jersey.

Macey, Jonathan R. - Vol. II CONFIDENTIAL                May 20, 2009
                          New York, NY

Page 260

1                A P P E A R A N C E S:

2

3   Attorneys for United States

4

5            U.S. DEPARTMENT OF JUSTICE

6            U.S. ATTORNEY'S OFFICE

7            John Joseph Moakley Federal

8            Courthouse

9            1 Courthouse Way

10           Suite 9200

11           Boston, Massachussettes 02210

12           BY:   JAMES J. FAUCI, ESQ.

13

14

15  Attorneys for Ven-A-Care

16

17           BERGER & MONTAGUE, P.C.

18           1622 Locust Street

19           Philadelphia, Pennsylvania 19103

20           BY:   SHAUNA ITRI, ESQ.

21                 ROSLYN G. POLLACK, ESQ.

22                 (via phone)

                                                        Page 292

1           Q.    Turn to paragraph 39 of your report,
2     please.
3                 The heading above paragraph 39 reads,
4     "Roxane Adhered Conscientiously to Appropriate
5     Corporate Formalities."
6                 And then paragraph 39 itself starts by
7     saying --
8           A.    Where was the formalities?  I'm sorry.
9           Q.    Subheading B, right above paragraph 39.
10          A.    Okay.  Thank you.
11          Q.    So the paragraph itself starts:
12                "In examining Roxane's internal
13    corporate governance, I focus on what I regard as
14    the three most important facets of organizational
15    form.  These are:  One, board composition, two,
16    board processes and methods, and three, board
17    action."
18                Do you see that?
19          A.    Yes, I do.
20          Q.    In this sentence by the use of the word
21    "board," are you referring to a corporation's
22    board of directors?

Macey, Jonathan R. - Vol. II CONFIDENTIAL                    May 20, 2009
                        New York, NY

Page 293

1        A.   Yes.
2        Q.   Are these three topics the most
3   important considerations in evaluating whether or
4   not to pierce a corporation's veil?
5        A.   No.
6        Q.   What do you regard these three topics as
7   the most important factors to?
8        A.   Okay.  So yesterday we talked about
9   various factors that might be involved in a
10  decision to pierce the corporate veil and we
11  talked about the issue of corporate formalities,
12  which I said was a factor but not a particularly
13  important factor -- not an overwhelmingly
14  important factor but a factor that people should
15  take into account.  And the reason for this is
16  because information about corporate formalities
17  provides data about whether the corporation is an
18  actual entity separate and distinct from other
19  entities.
20           And so here what I'm saying is that in
21  terms of the issue of corporate formalities, the
22  most important facets are board composition, board

Macey, Jonathan R. - Vol. II CONFIDENTIAL                    May 20, 2009
                      New York, NY

Page 294

1    processes, and methods.
2        Q.   Do you know who drafted Roxane's board
3    resolutions, board minutes?
4        A.   No.
5        Q.   Do you have an opinion as to whether
6    corporate formalities are usually followed in the
7    context of corporate groups?
8        A.   There's a wide -- we observe a wide
9    range of behavior, but in well run companies that
10   are well managed corporate formalities are
11   generally adhered to.  And when one gets down to
12   family corporations or smaller corporations, less
13   sophisticated firms, one sees variance.  So
14   there's definitely a range with respect to
15   adherence to corporate formalities.
16       Q.   Is it fair to say that for a corporation
17   the size of Roxane corporate formalities are
18   almost always followed?
19       A.   Generally speaking, corporations with
20   Roxane's resources and capitalization have
21   advisors who make sure that they follow corporate
22   formalities, yes.

Page 318

1  to kind of prevent themselves -- to prevent them
2  from being susceptible to bank runs.
3       Q.   I believe you testified that the
4  benchmark -- I'm sorry, I don't recall we can
5  either have the court reporter read it back or you
6  can tell me again.
7       A.   Okay.
8       Q.   What is the benchmark in the
9  pharmaceutical industry?
10      A.   Well, there's a range, of course, of
11 firms but you would see ranges in the 5-to-1 to
12 10-to-1 range would not be unusual.
13      Q.   What is that standard based on?
14           What is your understanding of that
15 standard based on?
16      A.   It's based on looking at pharmaceutical
17 firms and looking -- and computing averages.
18      Q.   Have you done that?
19      A.   Have I personally done it?
20      Q.   Yes.
21      A.   No.
22      Q.   But you read where that's done

1   elsewhere?
2       A.   Correct.
3       Q.   Can you think of an article that -- off
4   the top of your head that does that?
5       A.   Not off, no.
6       Q.   The ratio, the benchmark you cited, do
7   you have an opinion as to whether that benchmark
8   is larger as we sit here today than it would have
9   been 1995?
10      A.   Oh.  No.  No.
11      Q.   No, you don't have an opinion?
12      A.   Correct.  I will say -- I don't have a
13  specific opinion.  I will add, though, that these
14  are fairly stable over time in general, although
15  this may have been a hot time of higher
16  volatility.  I would add, to the extent that they
17  vary, it's more likely that higher debt-equity
18  ratio rather than lower would have been tolerated.
19      Q.   In the past?
20      A.   Well, in that period.  Not in all of the
21  past, but in 2005 versus, say, right now.
22      Q.   I'm sorry, 1995.

Page 320

1    A.   In 1995, right.
2    Q.   Did you compare Roxane's level of
3  capitalization to that of other pharmaceutical
4  companies?
5    A.   Not specific other ones, no, just
6  specific industry average.
7    Q.   And you did in forming your opinions in
8  this case compare Roxane's capitalization to the
9  industry average, the industry benchmark?
10   A.   Right.
11   Q.   And your understanding of the industry
12 benchmark is based on your review of other
13 literature in the field which has articulated that
14 benchmark?
15   A.   Yes, that's my recollection of what the
16 benchmark is.
17   Q.   And as you sit here today, there's no
18 authority you could point me to for the benchmark,
19 specific authority?
20   A.   Correct.
21   Q.   What is a debt-to-equity ratio?
22   A.   A debt-to-equity ratio is simply the