# Exhibit 305

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II                          July 10, 2008

Napa, CA

Page 300

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3        --------------------------------X

4     IN RE PHARMACEUTICAL INDUSTRY        )

5     AVERAGE WHOLESALE PRICE LITIGATION)

6        --------------------------------X Volume 1

7     THIS DOCUMENT RELATES TO:           ) MDL NO. 1456

8     The City of New York, et al.,       ) Civil Action

9     V.                                  ) No. 01-12257-PBS

10    Abbott Laboratories, et al.         )

11       --------------------------------X

12    THIS DOCUMENT RELATES TO:           )

13    State of California, ex rel.        )

14    Ven-A-Care v. Abbott Laboratories,)

15    Inc., et al., Case No.              )

16    03-cv-11226-PBS                     )

17       --------------------------------X

18                    JULY 10, 2008

19         DEPOSITION OF DEY, L.P. AND DEY, INC.

20              BY PAMELA MARRS - VOLUME II

21

22    Reported By: WENDY L. VAN MEERBEKE, CSR No. 3676

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

Napa, CA

July 10, 2008

Page 324

1    the code of conduct from the company's official

2    file is in the process of being produced.   It

3    hasn't been produced yet.   Whether or not the

4    code of conduct was part of an individual

5    employee's files that researched or another area,

6    that is possible that it's in the production.   I

7    just can't point you to where that would be.

8           MR. AZORSKY:

9           Q.   And you made repeated reference to

10   written procedures relating to copy clearance at

11   Dey.   I'm wondering whether you had an

12   opportunity to take a look or gather any further

13   information with respect to such written

14   procedures relating to copy clearance.

15          A.   No.   I didn't realize I was to be

16   prepared on that today.

17          MS. GIULIANA:   Right.   Also, Gary, I

18   don't want to get on your record too much.   The

19   things that you're referring to now are based on

20   a request that you had made to me by e-mail last

21   Wednesday, and I think I informed you that I

22   wished that you had given me a little bit more of

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

Napa, CA

July 10, 2008

Page 325

1    a heads-up so that I could look into those

2    matters first to determine whether or not it was

3    within the scope of your topics and then second

4    to, you know -- in the event that it was within

5    the scope, to actually make the effort to find

6    the information and either prepare Pam or produce

7    it.

8              Because you got the request to me very

9    late, I wasn't able to look into those things, so

10   I can't make a representation -- I can tell you

11   that we didn't look for those things, but what I

12   can't tell you is whether I agree that those

13   things are even within the scope of the notice

14   and that we would ever agree to that.

15              MR. AZORSKY:

16        Q.    And as I responded to your e-mail to

17   me, my e-mail to you of last week was simply

18   intended to be a reminder of issues that arose at

19   the May deposition and that were a part of the

20   record at that deposition.   So it was -- it was

21   not at least considered from plaintiffs'

22   perspective to be a last-minute request, but

Page 347

1     that it exists because our customers use it, and

2     in some cases where our reimbursement rates have

3     been lower than others, we've lost business.

4             We as a company are aware of it in that

5     general context.  I have never seen a list that

6     lists all of our products and compares and shows

7     the spread.  I have not seen that document.

8             MR. AZORSKY:

9       Q.   So you're saying that in -- in one

10    context or another through marketing and

11    competition with respect to Dey's generic drugs,

12    there -- there is a reference to spread and

13    looking at spread during the natural course of

14    engaging in business with respect to those

15    generic drugs?

16      A.   I know that customers --

17            MS. GIULIANA:  Object to form.

18            THE WITNESS:  I know that customers

19    bring it up.  I know that it's, you know, a fact

20    of life in the business world.  I'm not aware of

21    a conscious, you know, routine decision that

22    where, you know, people were looking at the

Page 349

1    Jerry Crank and Russ Johnston that spread was not

2    discussed frequently at Dey; is that correct?

3         A.   Well, in preparing for the last

4    deposition, those were two of the people -- and

5    Gary Stone.  I think we talked to Gary Stone.

6    Just, again -- and we had asked different people

7    these questions before at different points in

8    time in the litigation.  You know, Russ Johnston

9    was in inside sales during his early years with

10   the company.  He does not recall it coming up in

11   his role as an inside salesperson.

12             So that's really all I have to go on,

13   is some selective conversations with Dey

14   salespeople based in Napa.

15        Q.   You said you also spoke with Gary

16   Stone.  What did Gary Stone say with respect to

17   the frequency of discussions of spread at Dey?

18        A.   Again, he -- he didn't recall that the

19   spread was something that came up frequently in

20   conversations.  I mean, the biggest place where

21   it probably shows up in -- in the documents is --

22   you know, you'll see a bid price worksheet where

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

Napa, CA

July 10, 2008

Page 350

1    a customer raises the issue.  We've certainly had

2    customers raise the issues in the context of

3    contracting as well as in seeking to have us

4    lower our price to them.

5         Q.    I'd like to focus on the sources of

6    your understanding that spread was not discussed

7    frequently at Dey.  And you indicated that the

8    sources of that information are Jerry Crank, Russ

9    Johnston, Gary Stone.  Anyone else?

10        A.    Those are the people I spoke with last

11   month or the month before last.  In prior years -

12   - and Todd Galles.  I'm sure I probably talked to

13   Charles Rice and Bob Mozak at one point -- at

14   some point in previous years, but I don't recall

15   the specific time periods.

16             The information that I was getting from

17   internal people was that it wasn't something that

18   was a pervasive practice.

19        Q.    Okay.  In addition to Mr. Crank, Mr.

20   Johnston, Mr. Stone, Mr. Galles, Mr. Rice and Mr.

21   Mozak, what other internal people gave you that

22   impression?

Page 367

```
 1              THE WITNESS:  I'm saying that as a
 2    practical matter, the system -- I mean, there's
 3    all kinds of testimony and documentation that
 4    this is a flawed system.  I'm sure that that's --
 5    you know, those documents you've seen.
 6              What I'm saying is that the way the
 7    system was set up, it really didn't allow for
 8    that.  And our position has always been, fine,
 9    lower AWP, but do it for every one.  Treat
10    everyone the same, because otherwise, the
11    companies that -- if you lowered AWP for one
12    company and not the other who's selling the same
13    generic drug, then -- then the pharmacists won't
14    buy your drug.
15              So the system is what really needs to
16    be fixed.  There have been recent actions to try
17    to take care of that.
18.             MR. AZORSKY:
19         Q.   So Dey could have lowered its AWP when
20    prices decreased, but did not do so due to
21    competitive pressures because competitors' AWPs
22    remained high; is that correct?
```

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II                                    July 10, 2008

                                    Napa, CA

                                                                        Page 368

 1                MS. GIULIANA:  Objection to form.

 2                THE WITNESS:  Dey would not have had

 3      any sales if it had lowered its AWPs

 4      substantially below the competitors' AWPs.

 5                MR. AZORSKY:

 6        Q.    So in order to maintain sales, Dey kept

 7      its AWPs at or about where it was initially set

 8      and did not lower them as prices decreased;

 9      correct?

10                MS. GIULIANA:  Objection to form.

11                THE WITNESS:  It's really not an issue

12      of maintaining.  It's an issue of whether or not

13      you'd have any sales.  And just to add to that --

14      and this is in my previous testimony, too.  We

15      did have a product that we tried to launch and it

16      was in the middle of when people were trying to

17      figure out what all this litigation was about.

18      It was a nasal spray product.  We launched.  We

19      set a very low WAC and AWP, much lower than our

20      competitors, and we had to discontinue the

21      product.  No one would buy it.

22                So it pretty much put us out of

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II                                    July 10, 2008

Napa, CA

Page 369

1    business on that product.

2              MR. AZORSKY:

3         Q.   In that situation, did Dey consider

4    raising its AWP and WAC in order to get more

5    sales for that product?

6         A.   No, because we were under the

7    impression that that was inappropriate at that

8    time based on the information obtained throughout

9    the litigation process.

10        Q.   Well, at that time, did Dey then lower

11   its AWPs and WACs for all of its generic

12   products?

13             MS. GIULIANA:   Objection to the form.

14             THE WITNESS:   As I said, it's

15   impractical to expect one manufacturer to lower

16   its AWPs significantly below other similar

17   products because there would be no sales and the

18   company would go out of business.

19             MR. AZORSKY:

20        Q.   Well, Mr. Upp, the national accounts

21   manager in Dey's sales department, said that when

22   these situations arose when a customer would

Page 393

```
 1   Wells.  I actually thought there was a memo or

 2   something to him that I've seen at some point in

 3   the past.  Maybe not.  I -- I was not aware of

 4   that specific conversation that I recall, but I

 5   was aware of the fact that there was some attempt

 6   to discuss the issue with Florida to seek

 7   resolution.

 8            MR. AZORSKY:

 9       Q.   Do you have any information that

10   contradicts Mr. Uhl's characterization of that

11   communication with Florida?

12            MS. GIULIANA:  Objection to form.

13            MR. AZORSKY:

14       Q.   As I've described it --

15       A.   I don't recall hearing that level of

16   detail before.

17       Q.   Mr. Uhl also testified that Carrie

18   Jackson spoke to Jerry Wells also and that Jerry

19   Wells informed her that he couldn't make a change

20   based upon Uhl's representations, but that the

21   pricing compendia, Red Book or Blue Book or First

22   DataBank, had to make a change.  Does Dey have
```

Page 394

```
 1    any information to contradict that?

 2              MS. GIULIANA:  Objection to form.

 3              THE WITNESS:  Again, I don't recall

 4    those specifics.  I -- you know, again, I have

 5    this vague recollection of seeing an internal

 6    memo at one point that mentioned Jerry Wells.

 7    Maybe it was Carrie Jackson, but I'd have to find

 8    the document to be sure.

 9              MR. AZORSKY:

10         Q.   Well, does your -- does the -- is it

11    your recollection that any information in the

12    memo that you're referring to contradicts that

13    testimony?

14              MS. GIULIANA:  Objection to form.

15              THE WITNESS:  I don't -- I don't recall

16    what the memo said.  I'm sorry.  I'd have to look

17    at it again.

18              MR. AZORSKY:

19         Q.   Bruce Tipton, the former director of

20    national accounts in the sales department at Dey,

21    said that all the sales and marketing heads would

22    get together to discuss pricing issues or
```

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

July 10, 2008

Napa, CA

1    sales management.  I don't recall -- back in

2    those other -- prior to, say, 2002, sales and

3    marketing was run more independently as -- and

4    the information wasn't shared as freely

5    throughout the organization as it was in later

6    years where there was more involvement of the

7    other departments.

8        Q.   Is it your understanding that at these

9    plan of action meetings that took place during

10   the period you're aware they took place that

11   there were discussions about pricing and

12   marketing of Dey's products?

13       A.   Well, I'm not aware of pricing.  Right

14   -- you know, most of our products in the last

15   five years are brands, and most of our reps call

16   on physicians.  We have a trade force, but it's

17   only a few people.  We have 200 -- about 200

18   people that call on physicians and another 40

19   that call on hospitals.

20            So those people don't really deal with

21   price.  The people who call -- who would call on

22   physicians are really there to promote the

Henderson Legal Services, Inc.

202-220-4158                                    www.hendersonlegalservices.com

1   attributes of the product.  So I've not been to

2   one of these meetings.  I have not seen an

3   agenda, but I know that they're usually busy

4   putting together marketing literature to drop at

5   the physician office before these meetings.

6           I know at the national sales meeting,

7   which is a once-a-year event, they do have

8   breakout sessions for the trade people and the

9   other people who might be more involved in

10  pricing, but I don't -- I haven't been to a sales

11  meeting in a long time, so I'm not sure if

12  pricing is one of the topics they talk about or

13  not.

14          Again, that's the last five years.  I'm

15  not sure what the discussions were prior to that.

16      Q.  So if I understand your answer

17  correctly, you're not certain whether they

18  discuss pricing, but you -- it is your

19  understanding that they discuss marketing

20  strategies and materials at these plan of action

21  meetings described by Mr. Mozak?

22          MS. GIULIANA:  Objection to form.

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

July 10, 2008

Napa, CA

```
 1              THE WITNESS:  Well, the time period I'm
 2    talking about was after Bob left, so it was when
 3    new management came in that I became a little
 4    more aware of what some of the practices were.
 5              MR. AZORSKY:
 6         Q.   So you don't know what was discussed at
 7    the ones that he would have been testifying
 8    about?
 9         A.   No.  I --
10              MS. GIULIANA:  Objection to form.
11              THE WITNESS:  I don't know what was
12    discussed at those meetings.  I did -- I wasn't
13    even aware of the fact they were having them,
14    quite frankly.
15              MR. AZORSKY:
16         Q.   I guess then if you're not aware that
17    they had such meetings -- I guess that means you
18    haven't seen any documents memorializing what
19    took place at any such meetings?
20              MS. GIULIANA:  Objection to form.
21              THE WITNESS:  I don't recall seeing
22    documents.  Again, the national sales meeting is
```

Henderson Legal Services, Inc.

202-220-4158                                           www.hendersonlegalservices.com

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

Napa, CA

July 10, 2008

Page 460

1          MS. GIULIANA:  Same objection.

2          THE WITNESS:  I think what I said was

3    that it -- it was my understanding it was

4    industry practice to set AWPs for generics at a

5    percentage off of the brand and that that

6    information was generally obtained from Ed

7    Edelstein at First DataBank when his advice was

8    sought by Bob Mozak.

9          MR. HENDERSON:

10   Q.    Okay.  So I -- to prepare for this

11   particular topic, what did you do?

12   A.    This week, nothing.  Before, I do

13   recall reading a transcript of a deposition where

14   the contact with Ed Edelstein was referenced.

15   It's something that I have just generally heard

16   from the attorneys as well as Mr. Mozak in the

17   course of providing documents for this

18   litigation.

19          Other than the reference to Mr.

20   Edelstein, I don't recall a specific document

21   right now that talked about industry practice.

22   It was more just what he indicated to me.

Henderson Legal Services, Inc.

Page 461

1       Q.    Okay.  So based on -- Dey's view that

2    it was industry practice to set AWP at

3    approximately -- well, let me back up.

4             Do I understand correctly that Dey

5    believes and has believed that the industry

6    practice with respect to setting AWPs for generic

7    drugs is to set the AWP at approximately ten

8    percent below the AWP of the brand product?

9       A.    I don't recall if it was ten percent or

10   15 percent, but it was in that -- it was in that

11   range.

12      Q.    Okay.  And am I correct in

13   understanding that the basis for that belief is

14   that the phone conversation that Mr. Mozak had

15   with Ed Edelstein -- I can't remember the date --

16   sometime in the early 1990s, I believe --

17      A.    I think it was before albuterol was

18   launched in '92 sometime.

19      Q.    Okay.  So am I correct in understanding

20   that that's the basis for Dey's belief about the

21   industry practice?

22            MS. GIULIANA:  Objection.  Form.

Page 462

```
 1              THE WITNESS:   That's the specific --

 2              MR. HENDERSON:

 3      Q.    Which right now --

 4      A.    -- third party that I recall being

 5   mentioned.  Bob and other people would, of

 6   course, had knowledge of what was going on in the

 7   industry just from virtue of being in sales and

 8   marketing, which, you know, again, I was -- I was

 9   relying on Bob to relay industry practice type of

10   information to me.

11      Q.    Okay.  In preparation for this topic,

12   did you talk to Bob Mozak about Dey's belief

13   regarding the industry practice?

14              MS. GIULIANA:  Objection.  Form.

15              THE WITNESS:  I didn't speak with him

16   in preparing for this recent deposition.  When he

17   was still with Dey and the litigation was

18   ongoing, we spoke about it then.

19              MR. HENDERSON:

20      Q.    Okay.  What -- what did he tell you?

21      A.    Just that that was the -- that that's

22   how AWPs were set, from a mechanical standpoint
```

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

Napa, CA

July 10, 2008

Page 463

1    that that was the basis upon which AWPs were set

2    by Dey and generally by other companies as well.

3         Q.   I see.  Do you recall whether or not he

4    said that's how it's set by other companies?

5         A.   Well, yeah.  I -- he said, you know,

6    that's just, you know, the way the industry

7    works.  I'm not saying that's a direct quote, but

8    yes.

9         Q.   Okay.  Other than -- is there any other

10   -- I think we probably should stop because the

11   videographer needs to change the tape.

12        A.   Okay.

13             MS. GIULIANA:  And also the temperature

14   seems to be rising in this room.

15             THE VIDEOGRAPHER:  Going off the

16   record.  The time is 2:19.  This is the end of

17   tape number two, Volume II in the deposition of

18   Pamela Marrs.

19                  (Recess taken.)

20             THE VIDEOGRAPHER:  Back on the record.

21   The time is 2:31.  This marks the beginning of

22   tape number three, Volume II in the deposition of

```
 1              MS. GIULIANA:  Objection.  Form.

 2              MR. HENDERSON:

 3         Q.   And in fact, when First DataBank did

 4    not publish the AWP that Dey had reported, Dey

 5    took action to correct the situation?

 6         A.   Well, the way we learned of the fact

 7    that they hadn't published --

 8         Q.   I'm not asking you how you learned.

 9         A.   Let me finish.  Let me finish.  We did

10    nothing to control that situation.  We only

11    became aware of it when our customers called us

12    threatening to not purchase our product anymore

13    because they had been notified by First DataBank

14    of this price that we knew nothing about, and we

15    were faced with the situation where if we didn't

16    take some action, those customers all would have

17    gone away and the plant in Napa would have

18    closed.

19         Q.   Ms. Marrs, you just said that Dey did

20    not control that situation.  In fact, Dey sued

21    First DataBank to force them to publish what you

22    had reported.  Didn't Dey do that?
```

Page 469

```
 1              MS. GIULIANA:  Objection to form.

 2              THE WITNESS:  We took action after our

 3    customers reported to us that the numbers had

 4    been changed in a manner in which was

 5    inconsistent with everyone else in the industry.

 6              MR. HENDERSON:

 7       Q.    When Dey learned that First DataBank

 8    had not published the AWP that Dey reported to

 9    them, Dey sued First DataBank to correct that?

10              MS. GIULIANA:  Objection.  Form.  It's

11    asked and answered.

12              THE WITNESS:  We sued First DataBank,

13    and our intention was we didn't care if our AWP

14    changed, but everyone else's needed to change and

15    there needed to be a level playing field.

16              MR. HENDERSON:

17       Q.    You sued First Data -- you didn't ask

18    First DataBank to publish everybody -- to publish

19    a different AWP for everybody else.  You sued

20    First DataBank to force them to publish the AWP

21    that you reported to First DataBank; isn't that

22    correct?
```

Page 502

1    launch.  And I'd like to ask a few questions

2    about the -- Dey's belief regarding any industry

3    practice concerning changing or not changing the

4    AWP after launch.

5        A.    It's my understanding --

6              MS. GIULIANA:  Objection to the form.

7              THE WITNESS:  It's my understanding

8    that for generics, the price is set at launch and

9    it does not change subsequently.  But for brands,

10   it is set at launch and it is subsequently

11   changed, and it moves in the same direction as

12   the actual price changes in the marketplace.

13             MR. HENDERSON:

14       Q.    And tell me who at Dey has had that

15   belief --

16             MS. GIULIANA:  Objection to the form.

17             MR. HENDERSON:

18       Q.    -- about this being an industry

19   standard.

20             MS. GIULIANA:  Same objection.

21             THE WITNESS:  Same answer as before, I

22   guess.  You know, it's something that we've

1    consistently done.  It's something that it's our

2    understanding -- and that would be a little

3    broader because it's actually the contracts

4    people who implement the price changes.  So, for

5    example, if there's a WAC change on a generic,

6    they do the revised pricing and -- and reporting

7    of that, and over the years they would change the

8    WAC and not change the AWP.

9              On the same hand, if they were

10   processing a price change for a brand which would

11   traditionally be an increase to the price, then

12   they would publish both a new WAC and a new AWP.

13   And the AWP and the WAC would go up by the same

14   percentage point.

15             So the people who process those

16   transactions would be aware of them.

17             MR. HENDERSON:

18        Q.   I appreciate that, Ms. Marrs.  My

19   question was, who at Dey -- and if you could,

20   please identify them by name -- had this belief?

21        A.   It would be primarily Russ Johnston.

22   He's the one who has been in charge of those

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

July 10, 2008

Napa, CA

1      A.    I believe that's what is represented in

2   these documents in Exhibit 33.  And if I could

3   just add one thing, because before when we spoke

4   about this question, we were focused on the AWP

5   piece.  We didn't really talk about the WAC

6   piece, which to me is confusing because it says,

7   "WACs that were higher than actual wholesale

8   acquisition costs."

9            Well, by definition -- by Dey's

10  definition and I believe by industry definition -

11  - although I'm not 100 percent sure if everyone

12  in the industry does this.  Our WAC is our

13  invoice price to the wholesaler.  So from our

14  standpoint, WAC equals invoice price -- actual

15  invoice price.  So to me these are saying the

16  same thing.

17      Q.    Okay.  Let's discuss that topic.

18  You're right.  Our previous questions and your

19  testimony was -- did not cover the WAC issue.

20            You said Dey's WACs are Dey's invoice

21  prices?

22      A.    To wholesalers.

Henderson Legal Services, Inc.

www.hendersonlegalservices.com