# Exhibit 306

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.
v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Johnston, Russell        CONFIDENTIAL        December 10, 2008
New York, NY

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3     -------------------------------X

 4     In Re:  PHARMACEUTICAL          )

 5     INDUSTRY AVERAGE WHOLESALE      )   MDL No. 1456

 6     PRICE LITIGATION                )   Civil Action No.

 7     -------------------------------X   01-12257-PBS

 8     THIS DOCUMENT RELATES TO:       )

 9     United States of America ex     )   CONFIDENTIAL

10     rel. Ven-A-Care of the          )

11     Florida Keys, Inc., et al.      )   DEPOSITION OF

12     v. Dey, Inc., et al., Civil     )   RUSSELL JOHNSTON

13     Action No. 05-11084-PBS; and    )

14     United States of America ex     )   December 10, 2008

15     rel. Ven-A-Care of the          )   9:39 a.m.

16     Florida Keys, Inc., et al.,     )

17     v. Boehringer Ingelheim Corp.,) New York, NY

18     et al., Civil Action No.        )

19     07-10248-PBS                    )

20     -------------------------------X

21

22
```

Johnston, Russell                CONFIDENTIAL                December 10, 2008
                                 New York, NY

Page 10

```
 1    the Notary Public, was examined and testified as

 2    follows:

 3

 4                    EXAMINATION

 5    BY MR. HENDERSON:

 6        Q.   Sir, could you state your full name for

 7    the record.

 8        A.   My full name is Russell Ray Johnston

 9    III.

10        Q.   Mr. Johnston, where do you live?

11        A.   I live in Dixon, California.

12        Q.   Is that near Napa?

13        A.   It's about a 35, 40-minute drive from

14    Napa.

15        Q.   Who are you employed by?

16        A.   I'm employed currently by Dey, L.P. in

17    Napa.

18        Q.   You've been deposed before, have you

19    not?

20        A.   Yes, sir, I was in 2002.

21        Q.   And was that in litigation between Dey

22    and the State of Texas?
```

```
 1      A.   Yes.
 2      Q.   Okay.  Sir --
 3           And do you understand that today the
 4   oath that you've just taken is the same oath that
 5   would apply if you were testifying in a court of
 6   law?
 7      A.   Yes, sir, I do.
 8      Q.   Okay.  I'll be asking you a series of
 9   questions today, of course.  And if you don't
10   understand anything that I ask you, please let me
11   know and I'll rephrase the question.  I'm not
12   here to make trick questions.
13      A.   Okay.
14      Q.   Likewise, if you need to take a break,
15   let me know and we'll take a break.  The only
16   exception being is that if there's a question
17   pending we'd like to finish the answer before we
18   take a break.
19      A.   Okay.
20      Q.   Now, as I understand correctly from
21   your 2002 deposition, you started off with Dey in
22   March of 1992 as an inside sales representative?
```

 1      A.   That's correct.
 2      Q.   And did you work there in that capacity
 3   through approximately June of 1994?
 4      A.   I'm not positive of the months, but
 5   that's approximately correct.
 6      Q.   Okay.  And as an inside sales rep did
 7   you make outbound telephone calls to customers or
 8   potential customers of Dey?
 9      A.   Outbound as well as took inbound calls
10   on occasion as well.
11      Q.   Okay.  In approximately June of 1994
12   did you then become an inside sales coordinator?
13      A.   That's correct.
14      Q.   Was that a slight promotion from your
15   earlier position?
16      A.   It was.
17           As the department grew it was a
18   position created to assist the department
19   supervisor in oversight of the overall
20   activities, and I was selected for that position.
21      Q.   Okay.  And in approximately the fall of
22   1995 or -- yes, approximately that time, were you

Page 29

```
 1            MR. DOYLE:  Objection to form.
 2       A.   -- my knowledge.
 3       Q.   And excuse me if I sound a little
 4  repetitive.  I'll ask some similar questions
 5  regarding WAC prices.
 6            WAC prices, am I correct in
 7  understanding that Dey's wholesale acquisition
 8  cost, the prices that Dey reports, reflect the
 9  amount shown generally on the invoices that Dey
10  submits to wholesalers for its drugs?
11       A.   It is the invoice price to wholesalers
12  for our products.
13       Q.   Okay.  Typically when Dey sells to a
14  wholesaler is there a contract price which is
15  lower than the WAC price?
16       A.   When we sell to a wholesaler?
17       Q.   Yes.
18            MR. DOYLE:  Objection as to form.
19       A.   No.
20       Q.   No?
21       A.   (Shaking head.)
22       Q.   Does Dey offer -- provide certain
```

Johnston, Russell  CONFIDENTIAL  December 10, 2008
New York, NY

Page 31

```
 1      A.   No.  And let me speak about rebates.
 2           No, let me -- besides the prompt pay
 3   and certain stocking discounts that may be
 4   provided to the wholesaler in the event of a new
 5   warehouse or stocking a new product, if the
 6   wholesaler has its own GPO function with respect
 7   to that contract there could be some rebate
 8   components.
 9      Q.   Is the WAC price that Dey reports for
10   its drugs higher than the average of the actual
11   net price paid by wholesalers for its drugs after
12   discounts?
13           MR. DOYLE:  Objection as to form.
14      A.   And again, I -- wholesale acquisition
15   cost is the invoice price charged every
16   wholesaler for every Dey product.
17      Q.   I understand that.
18      A.   And we've talked prompt pay as a
19   possibility if, in fact, the invoice is paid on
20   time, and so with respect to selling it to the
21   wholesaler that's normally the landscape.
22      Q.   Is the --
```

Page 32

```
 1              Dey has contracts with wholesalers,
 2      correct?
 3          A.   We have a few contracts with
 4      wholesalers, yes.
 5          Q.   When you say a few are you saying that
 6      Dey sells to a lot of wholesalers without
 7      contracts?
 8          A.   The sale to a wholesaler -- and I can
 9      certainly mention the biggest -- the largest
10      three, AmerisourceBergen, Cardinal, and McKesson,
11      in selling it to them there's no contract
12      involved in that.  It's an invoice by invoice,
13      purchase order by purchase order arrangement.
14      Purchase orders come in at the products priced at
15      WAC, invoicing is at WAC.
16          Q.   Are these sales -- let me back up.  I'm
17      going to come back to this topic a little later.
18              Do you expect to be changing jobs or
19      leaving Dey in the reasonably near future?
20          A.   Most likely, yes.
21          Q.   Do you have an end date in mind for
22      your employment for Dey?
```

Page 104

```
 1    directly from Dey, the customer will actually

 2    acquire the product through a wholesaler?

 3         A.   Essentially, yes, through a full

 4    service wholesaler, yes.

 5         Q.   All right.  And in the case of indirect

 6    contracts do the customers ever in your

 7    experience pay for Dey products at or above Dey's

 8    WAC price?

 9              MR. DOYLE:  Objection as to form.

10         A.   I have no visibility to what the

11    purchaser is actually invoiced from a wholesaler,

12    I have no visibility to that.

13         Q.   Do you have any reason to believe that

14    customers who purchased drugs under an indirect

15    contract ever pay at or above WAC?

16              MR. DOYLE:  Objection as to form.

17         A.   And again, I have no visibility to it.

18    It's possible.

19         Q.   With regard to the agreement between

20    Dey and the indirect contract customer, does --

21    these agreements frequently have prices that are

22    agreed to between Dey and the customer, correct?
```

```
 1   also stated in here, but I haven't read the
 2   entire thing.
 3           But why specifically they indicate on
 4   lowest price and/or best spread, I have no idea
 5   what their decision process is on that.
 6       Q.  Okay.  Now, I'd like to refer you back
 7   to page 0546.  This is still part of the RFP.
 8           MR. DOYLE:  I don't have it.
 9           MS. GIULIANA:  0556?
10           MR. DOYLE:  0546.
11           MR. HENDERSON:  0546.
12       Q.  This describes RxMed's member services,
13   correct?
14       A.  At the top of the page it says "RxMed
15   Member Services," yes.
16       Q.  And then it describes something called
17   "EmphaSys."  It reads, "RxMed promotes the use of
18   our state of the art software product -
19   EmphaSys."
20           Have you ever seen the operation of
21   this software program?
22       A.  No, I have not.
```

Page 212

```
 1     Q.    Have you ever heard about it?
 2     A.    I don't recall hearing about it, no.
 3     Q.    This is described as follows, "This
 4   program, written under the Windows operating
 5   system, is designed to display all contract items
 6   while allowing the member to manipulate the data
 7   to accomplish many tasks."
 8           And I'm going to skip two sentences.
 9           The paragraph then reads, "Members can
10   review item codes for their wholesaler, view
11   products with the best spread and lowest cost, or
12   open multiple windows to compare data."
13           Do you understand that pharmacies today
14   often have software that they use for purchasing
15   drugs where the software can show the -- or help
16   them calculate the spread between their
17   acquisition cost and the reimbursement amount?
18           MR. DOYLE:  Objection as to form.
19     A.    No, I was not.
20     Q.    I'm sorry?
21     A.    No, I was not.
22     Q.    Further down under the section entitled
```