# Exhibit 325

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1  IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND FOR
        LEON COUNTY, FLORIDA
2
   THE STATE OF FLORIDA           )
3                                  )
   ex rel.                        )
4                                  )
                                   )
5  VEN-A-CARE OF THE              )
   FLORIDA KEYS, INC.,            )
6  a Florida Corporation, by      )
   and through its principal      )
7  officers and directors,        )
   ZACHARY T. BENTLEY and         )
8  T. MARK JONES,                 )
                                   )
9              Plaintiffs,         )
                                   )
10 VS.                             )   CIVIL ACTION NO.
                                   )   98-3032A
11 BOEHRINGER INGELHEIM           )
   CORPORATION; DEY, INC.; DEY,   )
12 L.P.; EMD PHARMACEUTICALS,     )
   INC.; LIPHA, S.A.; MERCK,      )
13 KGaA; MERCK-LIPHA, S.A.;       )
   SCHERING CORPORATION;          )
14 SCHERING-PLOUGH CORPORATION;   )
   ROXANE LABORATORIES, INC.;     )
15 and WARRICK PHARMACEUTICALS    )
   CORPORATION,                   )
16         Defendants.             )
17
18             *-*-*-*-*
19
20
21     VIDEOTAPED DEPOSITION OF HELEN SELENATI
22                  Volume 2
23
24
25

Page 214

1   On the 5th day of May, 2005, between the
2   hours of 9:16 a.m. and 5:38 p.m., at the Marriott San
3   Mateo San Francisco Airport, 1770 South Amphlett
4   Boulevard, San Mateo, California, before me, CYNTHIA
5   VOHLKEN, a Certified Shorthand Reporter for the State
6   of Texas, appeared HELEN SELENATI, who, being by me
7   first duly sworn, gave an oral deposition at the
8   instance of the Plaintiffs in said cause, pursuant to
9   the Florida Rules of Civil Procedure.

Page 215

1   APPEARANCES
2
    FOR THE STATE OF FLORIDA:
3
    Mark S. Thomas, Esquire
4   Mary S. Miller, Esquire
    Assistant Attorneys General
5   Office of the Attorney General
    Medicaid Fraud Control Unit
6   PL-01, The Capitol
    Tallahassee, Florida 32399-1050
7   (850) 414-3600
8
    FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
9
    Gary L. Azorsky, Esquire
10  Berger & Montague, P.C.
    1622 Locust Street
11  Philadelphia, Pennsylvania 19103-6305
    (215) 875-3000
12
    -and-
13
    Mark D. Eibert, Esquire
14  Cotchett, Pitre, Simon & McCarthy
    San Francisco Airport Office Center
15  840 Malcolm Road, Suite 200
    Burlingame, California 94010
16  (650) 697-6000
17
    FOR THE DEFENDANT(S) BOEHRINGER INGELHEIM CORPORATION
18  and ROXANE LABORATORIES, INC.:
19  Bill L. Bryant, Jr., Esquire
    (Not Present)
20  Akerman Senterfitt
    106 East College Avenue, Suite 1200
21  Post Office Box 1877 (32302-1877)
    Tallahassee, Florida 32301
22  (850) 224-9634

Page 216

1   FOR THE DEFENDANT(S) DEY, INC., DEY, L.P., EMD
    PHARMACEUTICALS, INC., LIPHA S.A., MERCK KGaA and
2   MERCK-LIPHA S.A.:
3       William A. Escobar, Esquire
        Antonia F. Giuliana, Esquire
4       Kelley Drye & Warren LLP
        101 Park Avenue
5       New York, New York 10178
        (212) 808-7941
6
7   FOR THE DEFENDANT(S) SCHERING CORPORATION,
    SCHERING-PLOUGH CORPORATION and WARRICK
8   PHARMACEUTICALS CORPORATION:
9       John P. McDonald, Esquire
        Locke Liddell & Sapp, LLP
10      2200 Ross Avenue, Suite 2200
        Dallas, Texas 75201-6776
11      (214) 740-8000
12
    ALSO PRESENT:
13
        Mr. John M. Kling
14          Senior Vice President, Legal
            Dey
15      Mr. Raymond C. Winter
            Texas Office of the
16          Attorney General
        Mr. Richard Rienstra, Videographer
17
18          *-*-*-*-*

Page 217

1           INDEX
2   Appearances.................... 215
3   HELEN SELENATI
        Examination by Mr. Azorsky (Cont.)....... 219
4       Examination by Mr. Escobar............... 259
        Examination by Mr. Mr. McDonald.......... 437
5
    Signature and Changes.................. 459
6   Reporter's Certificate................. 461
7
    VIDEOTAPE NUMBER
8
        5 .................................. 219
9       6 .................................. 276
        7 .................................. 327
10      8 .................................. 382
        9 .................................. 425
11
12          EXHIBITS
13  NO.  DESCRIPTION                        PAGE
14          (Previous Exhibits)
15  9 (Marrs-FL and Galles 459)............... 313
    26 (Marrs-FL and Rice 578)................ 451
16  27 (Marrs-FL and Ellis 476)............... 333
    33 (Marrs-FL and Ellis 478)............... 330
17  35 (Marrs-FL)............................. 317
    36 (Marrs-FL and Galles 461).............. 441
18  37 (Marrs-FL)............................. 372
    42 (Selenati)............................. 219
19  45 (Marrs-FL, Uhl 777 and Plaintiff's 7).. 345
    46 (Selenati)............................. 221
20
            (New Exhibits)
21
    47 ....................................... 245
22  Audiotape of the two phone messages
    Mr. Mozak left on Ms. Selenati's answering
23  machine
24  48 ....................................... 251
    The testimony of Helen Burnham Selenati
25  from the sanctions hearing in December 2002

Page 230

1   MR. ESCOBAR: Objection to the form.
2   A. Yes, it did.
3   Q. (BY MR. AZORSKY) What -- what happened as a
4   result of the memo being sent?
5   A. Well, the whole --
6   MR. ESCOBAR: Objection to the form.
7   Sorry.
8   Q. (BY MR. AZORSKY) If anything.
9   A. The whole commotion around the business that
10  we were using (sic) to Warrick died down and there was
11  no more complaints coming out of the sales force and
12  it seemed like the situation had been rectified.
13  Q. Is that your signature appearing next to your
14  name on the first page of Exhibit 46?
15  A. Yes, it is.
16  Q. Was that your common practice to write your
17  name --
18  A. Yes, it was.
19  Q. -- next to your typed name on a memorandum
20  that was circulated?
21  A. Well, it meant that I had signed off on it.
22  Q. Are -- are you aware that in the Texas
23  litigation Dey took the position that you're a rogue
24  employee, that you created this memorandum and planted
25  it in the file in an effort to spite or get back at

Page 231

1   Mr. Mozak for personal reasons?
2   MR. ESCOBAR: Objection to the form of
3   the question. Mischaracterizes the testimony and it's
4   highly improper and you're misleading the witness.
5   A. I'm aware that in the Texas investigation Dey
6   Labs' position was that I was a rogue employee and
7   that I planted this memo deliberately and hid it in
8   the files in order to somehow take revenge on
9   Mr. Mozak.
10  Q. (BY MR. AZORSKY) You're aware that they took
11  that position?
12  A. I'm aware that --
13  MR. ESCOBAR: Objection to the form.
14  A. I'm aware that they took that position.
15  Q. (BY MR. AZORSKY) Is there any truth or
16  legitimacy to that position?
17  A. Well, of course not. I mean, this memo was
18  written in May of '95 and it took -- if I was wanting
19  to get back at Mr. Mozak, I'm -- I'm a fairly
20  intelligent and action-oriented person. I would not
21  have waited eight years for -- for an investigation to
22  happen and for somebody to be going through the files
23  to find this memo in God knows what file. I mean,
24  this file -- there was, what, four years -- three or
25  four years in which somebody could have cleaned up my

Page 232

1   files. If I really wanted to do this on purpose, I
2   would have definitely been more purposeful in the --
3   in the -- in taking action.
4   And apart from that, after Mr. Mozak
5   left me the voice mail message, I waited another eight
6   months for the Texas attorney general's office to
7   contact me, whereas I knew that that was incriminating
8   evidence right there. If I was wanting to get back at
9   him for any reason I could have had many, many
10  opportunities to report him to the authorities and I
11  chose not to.
12  Q. When you stated earlier in reference to
13  Exhibit 46 that -- when you referred to Warrick's
14  elevated WAC prices, did you understand that Warrick
15  had reported a WAC price that was higher than what
16  Warrick was selling its -- its drugs for in the
17  marketplace?
18  MR. McDONALD: Object to the form.
19  MR. ESCOBAR: Objection to the form.
20  A. I had no idea what Warrick was selling their
21  product for in the marketplace, but I do know that
22  their WAC price was above the Dey's WAC price. And by
23  assumption one would assume that their selling price
24  was lower because their spread was bigger.
25  MR. McDONALD: Objection, nonresponsive.

Page 233

1   Q. (BY MR. AZORSKY) Their selling price was
2   lower than what?
3   MR. ESCOBAR: Objection to the form.
4   A. Their selling price was lower than their WAC
5   price because it created a broader spread for their
6   clients.
7   Q. (BY MR. AZORSKY) Okay. When did you leave
8   the employ of Dey?
9   A. I think it was August '95.
10  Q. Did you have an occasion after -- at some
11  time after you left the employ of Dey to have one or
12  more conversations with Mr. Mozak about your May 30,
13  1995 memo marked as Exhibit 46?
14  A. Yes, I did.
15  Q. When was the first time you had a
16  conversation with Mr. Mozak about that?
17  A. I think it was December '99 when we met for
18  the first time in I think about two and a half years
19  and that was the first time that him and I had a
20  discussion about the memo.
21  Q. I'm sorry, that was when?
22  A. The first time him and I had a discussion
23  about the discovery of this memo.
24  Q. Was when?
25  A. December '99.

Page 278

1  contracts worked with, but in the marketing department
2  I never saw a list or a price that referred -- was
3  referred to as an AMP, a price net of all discounts.
4  Never saw that.
5    Q.  Were you aware that with some of the changes
6  in the legislation drug manufacturers, both brand
7  manufacturers and generic manufacturers, had to enter
8  into rebate arrangements where they would pay rebates
9  to the states in order to participate in the Medicaid
10  program?
11    A.  I believe that was part of what the contracts
12  department did, yes.
13    Q.  And during the time that you were at Dey were
14  you aware that there was a rebate program where Dey
15  paid rebates to states?
16    A.  Yes, I had heard of that.
17    Q.  And did you have any knowledge as to how
18  those rebates were calculated?
19    A.  I have no idea.
20    Q.  Were you aware that Dey reported AMP prices
21  to the federal government?
22    A.  No, I was not.
23    Q.  And nobody from the Florida attorney
24  general's office or the Texas attorney general's
25  office or any other people that you've met ever told

Page 279

1  you about Dey's AMP price?
2    A.  No.
3    Q.  So I take it that you were not -- as part of
4  your job you were not necessarily familiar with all
5  the price levels that Dey reported to governments or
6  other entities; is that right?
7        MR. AZORSKY:  Objection, form.
8        MR. THOMAS:  Object to the form.
9    Q.  (BY MR. ESCOBAR) You can answer the
10  question.
11    A.  I'm thinking.  Can you restate that again?
12    Q.  (BY MR. ESCOBAR) Sure.  You've testified, I
13  think, that you were not familiar with Dey's AMP.  So
14  my question to you is would you agree that as part of
15  your job you weren't familiar with all the prices that
16  Dey had or that Dey had to publish or give to the
17  government or other people?
18    A.  I was only familiar with the prices that were
19  published on the price sheets.  I was not familiar
20  with what went on in the contracts department in terms
21  of prices that were reported to the government, no.
22    Q.  And the price sheets are the ones you
23  mentioned yesterday, which were the different colored
24  price lists; is that right?
25    A.  That's correct.  That went out to the sales

Page 280

1  force.
2    Q.  Okay.  Now, when you joined Dey, did you at
3  some point become aware of the concept of another
4  price, AWP?
5    A.  Yes.
6    Q.  And AWP, that term existed before you joined
7  Dey; is that correct?
8    A.  That's correct.
9    Q.  And was it your understanding that companies
10  had to have an -- an AWP price for their products in
11  order to be able to participate in the market?
12    A.  Well, I became aware of that over time.  It
13  wasn't something that I was aware of immediately when
14  I joined.
15    Q.  Well, at some point after you joined Dey you
16  became aware that drug companies had to have an AWP
17  price if they wanted to compete, right?
18    A.  That's right.  If they wanted to be published
19  in the databases.
20    Q.  And if you didn't have an AWP price, could
21  you actually effectively participate in the various
22  programs that existed on drugs?
23    A.  I don't know.
24    Q.  All right.  Now, the AWP -- you testified
25  yesterday about AWP.  Where did your learning as to

Page 281

1  what AWP was, where did that come from?  Did you have
2  any before you joined Dey?
3    A.  No, I had none whatsoever.
4    Q.  Now, as part of the process of launching
5  Albuterol, you were involved in actually putting
6  together a plan, a launch plan, correct?
7    A.  Can you say that again?
8    Q.  You were involved in putting together and
9  organizing a launch plan for coordinating the various
10  activities of the company in order to launch the
11  Albuterol product, correct?
12    A.  That's correct.
13        (Exhibit 51 marked)
14    Q.  (BY MR. ESCOBAR) I'm showing you what has
15  been marked as Exhibit 51.  And this is -- the first
16  page is entitled "Dey Laboratories, Inc. New Product
17  Marketing Plan Albuterol Sulfate Inhalation Solution
18  0.083% 3 milliliters."  "Prepared by:  Helen A.
19  Burnham."  "Date:  February, 1992."  Can you just take
20  a look at the document and tell the jury what this is?
21    A.  (Witness reviewing document).  Okay.  I
22  reviewed it.
23    Q.  And this was a -- Exhibit 51 is a marketing
24  plan for the launch of Albuterol that you put
25  together, correct?

Page 302

1  nobody really -- nobody at Dey knew that?
2       MR. AZORSKY: Objection to form.
3    A.  I have no idea whether nobody knew that. I
4  was instructed by Bob Mozak to make that phone call.
5    Q.  (BY MR. ESCOBAR) Okay. And when Mr. Mozak
6  instructed you on that, he didn't tell you anything
7  about this 10 percent, did he?
8    A.  No, he didn't.
9    Q.  Okay. So the first time you heard about the
10 10 percent was in your conversation with
11 Mr. Edelstein; is that correct?
12   A.  That's correct.
13   Q.  Now, what would this 10 percent be applied
14 to?
15   A.  The AWP of the existing branded product.
16   Q.  And did you actually do that?
17       MR. AZORSKY: Objection to form.
18   A.  Did I do what?
19   Q.  (BY MR. ESCOBAR) In other words, did you go
20 back after you spoke to Mr. Edelstein and obtain an
21 AWP for a branded product, multiply that by 10 percent
22 and come up with an AWP for Dey's Albuterol?
23   A.  I don't think I did that. I reported back to
24 Mr. Mozak that the AWP needed to be set at 10 percent
25 below the branded product's price in order for us to

Page 303

1  be considered a generic product.
2    Q.  And did you say anything else to Mr. Mozak
3  about that?
4    A.  I don't remember.
5    Q.  You don't remember exactly what you said
6  then?
7    A.  We are talking about 13 years ago. I don't
8  remember everything I said in conversations. I
9  remember the gist of the conversation.
10   Q.  Okay. Now, so you've given us your best
11 recollection on that conversation, right?
12   A.  That's right.
13   Q.  By the way, that's true generally that --
14 you -- you testified about a lot of conversations
15 yesterday. That's true about all the conversations,
16 that you don't remember all of them verbatim, do you?
17      MR. AZORSKY: Objection to form.
18   A.  Of course not.
19   Q.  (BY MR. ESCOBAR) Sorry?
20   A.  Of course not.
21   Q.  Okay. Now, was it your understanding that at
22 some point Dey set an AWP for its Albuterol?
23   A.  That was my understanding, yes.
24   Q.  And the Dey AWP was set at a level lower than
25 the brand --

Page 304

1    A.  That's correct.
2    Q.  -- correct? Yes?
3    A.  That's correct.
4    Q.  And at the time that the AWP was set, it was
5  your understanding that AWP was used in connection
6  with reimbursement by government agencies; is that
7  right?
8    A.  That's correct.
9    Q.  And was it your general understanding that
10 the specifics differed, but some states used AWP with
11 a formula to come up with a reimbursement for
12 pharmaceutical products?
13   A.  That's correct.
14   Q.  Now, at the moment that the Albuterol from
15 Dey was first put into the market and it was first
16 reimbursed by a Medicaid agency to any provider, the
17 reimbursement by that agency was at an amount lower
18 than the reimbursement had been for the brand,
19 correct?
20      MR. AZORSKY: Objection to form.
21   A.  I have no idea what -- what the reimbursement
22 was or what -- what was -- the first reimbursement was
23 all about.
24   Q.  (BY MR. ESCOBAR) Well, let me see if I
25 understand this then. You -- at -- you launched the

Page 305

1  Albuterol, right?
2    A.  That's right.
3    Q.  It was sold to people in the market, right?
4    A.  That's right.
5    Q.  Patients got it and used it, right?
6    A.  Correct.
7    Q.  And it's your understanding that at some
8  point it was reimbursed -- providers were reimbursed
9  for the Albuterol they got from Dey, right?
10   A.  That's right.
11   Q.  And the Dey AWP you knew was lower than the
12 brand that existed, right?
13   A.  That's right.
14   Q.  So any entity that reimbursed on the basis of
15 AWP would automatically be paying less on
16 reimbursement for the Dey product than the existing
17 brand, correct?
18   A.  That's correct.
19   Q.  Okay. So once Dey came into the market and
20 launched its Albuterol, every government agency that
21 reimbursed on AWP was saving money because of the
22 introduction of Dey, right?
23      MR. AZORSKY: Objection to form.
24      MS. MILLER: Form.
25   A.  They were paying less, yes.

24 (Pages 302 to 305)

Page 310

1  both the government and the provider, in terms of less
2  expenses for the government and more profit for the
3  provider.
4  Q. (BY MR. ESCOBAR) So would you agree with me
5  then that what that meant was that the generic product
6  became a more attractive product for providers than
7  the brand product because they can make more money?
8  A. Correct.
9  Q. And when you discussed yesterday the issue of
10 spread, the -- putting in terms of -- of the use of
11 spread the way you described it yesterday, when Dey
12 launched its Albuterol product, it cost less, so,
13 therefore, it had a better spread from the perspective
14 of the provider, right?
15       MR. AZORSKY: Objection to form.
16 Mischaracterizes prior testimony.
17 A. The provider's acquisition cost, the
18 difference between the provider's acquisition cost and
19 the provider's reimbursement fee was bigger.
20 Q. (BY MR. ESCOBAR) And from your standpoint
21 that gave -- from your standpoint at Dey, the various
22 people working on launching the Albuterol, that gave
23 Dey a competitive market advantage in the marketplace
24 because the providers would be attracted to dispensing
25 Dey rather than the more expensive brand.

Page 311

1  A. Correct.
2  Q. And that was part of your plan, wasn't it?
3  A. That was -- that was part of the plan, yes.
4  Q. And the more that providers did exactly that,
5  that is, the more that they bought Albuterol and
6  signed contracts with Dey to buy Albuterol, the more
7  that the government would save money since they were
8  reimbursing on Dey less than they had been on the
9  brand, correct?
10       MR. AZORSKY: Objection to form.
11       MS. MILLER: Objection to form.
12 A. It seems logical.
13 Q. (BY MR. ESCOBAR) So would you agree with me
14 then that when Dey launched its Albuterol, it helped
15 both the government and the providers?
16       MR. AZORSKY: Objection to form.
17       MS. MILLER: Objection, form.
18 A. I don't know whether Dey was in the business
19 of helping anybody. They were in the business of
20 making profit for themselves.
21 Q. (BY MR. AZORSKY) Which was a legitimate
22 thing.
23 A. Correct.
24 Q. Okay. So the end result of the fact that now
25 Albuterol was in place was that the government saved

Page 312

1  money, Dey made profits, and the providers made
2  profits, right?
3        MR. AZORSKY: Objection, form.
4        MS. MILLER: Objection to form.
5  A. That's correct.
6  Q. (BY MR. ESCOBAR) Now, there was -- as far as
7  you were concerned when you were working on this at
8  Dey, there was absolutely nothing wrong with this, was
9  there?
10 A. No, there was nothing wrong with this.
11 Q. In fact, it was -- this is exactly what the
12 American system of the marketplace is set up to do,
13 right?
14       MR. AZORSKY: Objection to form.
15       MS. MILLER: Objection to form.
16 A. Well, the capitalist system encourages profit
17 making, yeah.
18 Q. (BY MR. ESCOBAR) And the fact that Dey would
19 make profits, that would enable Dey to keep
20 manufacturing an Albuterol product that as far as you
21 were concerned was better for patients and better for
22 the reimbursing entities and better for the providers,
23 right?
24       MR. AZORSKY: Objection to form.
25       MS. MILLER: Objection to form.

Page 313

1  A. That's correct.
2  Q. (BY MR. ESCOBAR) I'm sorry?
3  A. That's correct.
4  Q. Now, when all of you were working on the
5  launch of the Dey Albuterol and looking at all of
6  these things, you-all viewed this as a positive aspect
7  of what you were doing, right?
8  A. That's correct.
9  Q. And there was -- you didn't view this as
10 being in any way illegal or improper, did you?
11 A. No, I didn't think about it that way at all.
12 Q. And nobody told you that that was illegal,
13 did they?
14 A. Nobody did, no.
15 Q. Let me direct your attention, if you would,
16 to Exhibit 9 in that book. Exhibit --
17 A. I see it.
18 Q. What's been marked as Marrs Exhibit 9. The
19 first page is a memo from Robert Mozak to Pam Marrs,
20 Charles Rice, Jean-Pierre Termler regarding Albuterol
21 pricing strategy. Do you see that?
22 A. That's correct.
23 Q. And I -- I think one of the lawyers for
24 Florida showed you this yesterday. Do you recall
25 generally seeing this?

Page 318

1  second page, you see that there is a document that
2  consists of six pages Bates numbered DL-Texas 0090891
3  through 897?
4      A.  Yes, I see that.
5      Q.  And those pages of the exhibit -- the first
6  page is entitled "Dey Laboratories, Inc. A Report on
7  the Medicaid Program" dated March 26th, 1991, right?
8  Do you see that?
9      A.  That's right.
10     Q.  Now, if you turn to Page 2 where you have a
11 section -- that's a report that you prepared?
12     A.  It appears so, yes.
13     Q.  If you look at Page 2 on the point -- 2.2,
14 "Medicaid Reimbursement."
15     A.  I see that.
16     Q.  Can you just read the first sentence and
17 those two bullet points?
18     A.  "Under the Medicaid program, reimbursement
19 rates must be set at a level high enough to:
20         "insure high quality care on a
21 state-wide basis" in brackets "to attract a large
22 number of providers" closed brackets and second
23 bullet, "provide payment in full for services
24 rendered."
25     Q.  And that reflected your understanding on that

Page 319

1  point, right, at that point in time?
2      A.  That's right.
3      Q.  And was it your understanding that that
4  objective that you just read, that that was at least
5  in part accomplished by the reimbursement mechanism
6  that existed in the states using AWP?
7      A.  That's right.
8      Q.  As far as you knew, Dey didn't tell any of
9  the states how to reimburse, did they?
10     A.  No, they didn't.
11     Q.  The -- the decision on how a state would
12 reimburse providers on Medicaid were decisions that
13 were made at the various states, right?
14     A.  That's right.
15     Q.  And they -- as you looked at the information
16 that came across your desk regarding reimbursement
17 mechanisms, you saw that states used different
18 formulas, right?
19     A.  That's right.
20     Q.  Over time some of them had AWP minus an
21 amount, right?
22     A.  That's right.
23     Q.  And some of the states had larger deductions
24 from the AWP than other states, right?
25     A.  Might have been, yeah.

Page 320

1      Q.  And then at some point you understood that
2  some states went away from using the AWP as the
3  benchmark for reimbursement and were using WAC,
4  correct?
5      A.  That's right.
6      Q.  And all of those decisions were made, as far
7  as you understood, by the states and Dey had no say in
8  that, correct?
9      A.  That's correct.
10     Q.  And in fact, if a state decided to reimburse
11 on some other system, you had no control over that,
12 did you?
13     A.  No.
14         MR. AZORSKY:  Objection, lack of
15 foundation.
16         MS. MILLER:  Objection.
17     Q.  (BY MR. ESCOBAR)  Go ahead.
18     A.  No, Dey had no control over that.
19     Q.  And if -- if a state, for example, decided
20 that they would reimburse on whatever the provider
21 actually paid for the -- for the pharmaceutical
22 product, you had no control over that, did you?
23         MR. AZORSKY:  Objection to form.
24         MS. MILLER:  Form.
25     A.  No, we had no control over that.

Page 321

1      Q.  (BY MR. ESCOBAR)  Reimbursement by Medicaid
2  though was something that you had to be aware of in
3  order to run the business in a way that made sense to
4  you, right?
5          MR. AZORSKY:  Objection to form.
6      A.  It was something that we considered as part
7  of our -- the way we did business, yes.
8      Q.  (BY MR. ESCOBAR)  And as a logical matter,
9  you would expect that a pharmaceutical company
10 couldn't really run its business without being aware
11 of how Medicaid reimbursed on some basis, right?
12     A.  No.  It was something that was essential to
13 running your business.
14     Q.  And -- and the rules of how the Medicaid
15 program worked on reimbursement were set by the
16 government.  It wasn't set by Dey, right?
17     A.  That's correct.
18         MR. AZORSKY:  Objection, form.
19     Q.  (BY MR. ESCOBAR)  Let me direct your
20 attention to -- in the same document to Page 4 under
21 Item 5.  And again, we're looking at what's been
22 previously marked as Marrs Exhibit 35.  And there is a
23 section there entitled "Recent Developments in the
24 Medicaid Program."  Do you see that?
25     A.  I see that.

Page 342

1  generic manufacturers, once you launch -- when you are
2  the first entrant -- generic entrant into the market
3  and you're competing with the brands, you also
4  anticipate, don't you, that at some point other
5  generic competitors may emerge?
6        MR. AZORSKY:  Objection to form.
7        MS. MILLER:  Objection, form.
8     A.  That was always one of the anticipations that
9  Dey had.
10    Q.  (BY MR. ESCOBAR)  And in connection with the
11 products that we've been discussing, for example,
12 Albuterol and cromolyn, that did, in fact, happen,
13 correct?
14    A.  That's correct.
15    Q.  And over a period of time after the launch
16 other companies launched generic competitors to Dey's
17 Albuterol, right?
18        MR. AZORSKY:  Objection to form.
19    A.  That's right.
20    Q.  (BY MR. ESCOBAR)  And other companies also
21 launched generic competitors to cromolyn.
22        MR. AZORSKY:  Objection, form.
23    A.  I think so.  It's not really clear right now
24 to me whether there were immediate competitors to
25 cromolyn.

Page 343

1     Q.  (BY MR. ESCOBAR)  And once competitors came
2  in, did that have an effect on the pricing to your
3  customers?
4     A.  It normally would affect the pricing, yes.
5     Q.  And what was your understanding as to how it
6  would affect the pricing when you got new competitors?
7     A.  Well, if a new competitor came along and
8  reduced their pricing in order to entice the customers
9  to buy their product, then Dey would have to lower
10 their price to remain competitive.
11    Q.  So over time would the presence of additional
12 competitors prices of Dey's products would go
13 downright?
14    A.  They would erode and go down, yes.
15    Q.  And that was kind of a natural sequence of
16 events in the generic area?
17        MR. AZORSKY:  Objection to form.
18    A.  That was a natural sequence of events, yes.
19    Q.  (BY MR. ESCOBAR)  And that is different than
20 the way things work in the brand world, right?
21        MR. AZORSKY:  Objection to form.
22    A.  To my -- to my understanding that is
23 different to the way it works in the branded world --
24 world.
25    Q.  (BY MR. ESCOBAR)  So based on your

Page 344

1  understanding is it your sense that over time as Dey's
2  products were in the marketplace and generic
3  competitors came in, Dey's profit margin on that
4  declined?
5        MR. AZORSKY:  Objection to form.
6     A.  That's correct.
7     Q.  (BY MR. ESCOBAR)  So, for example, Albuterol,
8  the profit margin that Dey would make would erode over
9  the years after the launch as competitors came in,
10 right?
11    A.  That's --
12        MR. AZORSKY:  Objection to form.
13        MS. MILLER:  Objection to form.
14    A.  That's correct.
15    Q.  (BY MR. ESCOBAR)  Over time when you were
16 involved in preparing the color pricing sheets, is one
17 of the reasons that you had to prepare new sheets
18 because in fact you were putting in new lower prices?
19        MR. AZORSKY:  Objection to form.
20    A.  That was one of the reasons why we would
21 revise price sheets, yes.
22    Q.  (BY MR. ESCOBAR)  All right.  Now, let me
23 turn to -- there was some questioning I think
24 yesterday about the information that came to the
25 attention of people at Dey, including yourself,

Page 345

1  concerning the spread on products for Warrick and Dey
2  in Florida.  Do you recall generally that subject
3  matter?
4     A.  Yes, I do.
5     Q.  Let me show you what was marked yesterday as
6  Exhibit 45.  And Exhibit 45 was the Carrie Jackson
7  memo, right?
8        MR. AZORSKY:  Objection, form.
9     A.  That's correct.
10        MR. ESCOBAR:  When you marked this
11 yesterday did you have any attachments to it?
12        MR. AZORSKY:  No.  It was one-page --
13        MR. ESCOBAR:  Oh, okay.
14        MR. AZORSKY:  -- document.
15    Q.  (BY MR. ESCOBAR)  Let's go through that first
16 page.  It's the memo from Ms. Jackson to Mari Carrell,
17 Alberto Hoyo and Ross Uhl with a copy to you and
18 Mr. Mozak, right?
19        MR. AZORSKY:  Objection to form.
20    A.  That's right.
21    Q.  (BY MR. ESCOBAR)  Now, this is dated August
22 12th, 1994, right?
23    A.  That's correct.
24    Q.  And Ms. Jackson was reporting to the
25 recipients of her memo about a conversation she -- she

Page 358

1   A.  I would imagine so.
2   Q.  And if a state wanted to save money on
3   reimbursement, they could reimburse on the lower WAC
4   rather than on a higher AWP, right?
5         MR. AZORSKY:  Objection to form.
6         MS. MILLER:  Objection to form.
7   A.  Well, there was a different formula that was
8   applied to AWP and to WAC and a state could decide
9   which price they were going to choose.
10  Q.  (BY MR. ESCOBAR) And if they chose WAC, they
11  were generally reimbursed at a low number for the Dey
12  products, right?
13        MR. AZORSKY:  Objection, form.
14  A.  I don't know.  It depends entirely on the
15  formula that was applied to the WAC and to the AWP.
16  Q.  (BY MR. ESCOBAR) And -- and you don't know
17  how they arrived at those formulas, right?
18  A.  I have no idea.
19  Q.  Okay.  Now, the -- there came a point in time
20  when -- about -- some months after Ms. Jackson's memo
21  where you sent out your memo regarding Albuterol WAC
22  pricing, right?  Exhibit 46; isn't that right?
23  A.  No.  I sent off my memo on May 30th, '95.
24  Q.  And Ms. Jackson's memo reporting on her
25  conversation with Jerry Wells of the Florida Medicaid

Page 359

1   office was in August of '94, right?
2   A.  That's correct.
3   Q.  And in that span of time, from August '94 to
4   May of '95, you were looking at other -- and people at
5   Dey were looking at other ways to deal with this issue
6   of the difference in the spread between Warrick and
7   Dey?
8   A.  That's correct.
9   Q.  Now, when you sent your memo out on May 30th,
10  1995, you put your name there, Helen, right?
11  A.  That's right.
12  Q.  And as you were sitting there sending this
13  out and writing your name Helen on it, you didn't
14  think that you were doing anything wrong, did you?
15        MR. AZORSKY:  Objection to form.
16        MS. MILLER:  Objection, form.
17  A.  No, I didn't think I was doing anything
18  wrong.
19  Q.  (BY MR. ESCOBAR) You wouldn't have done it
20  if you thought it was wrong, right?
21  A.  That's correct.
22  Q.  You wouldn't have done it if you thought that
23  there was something illegal or fraudulent or improper
24  about this, correct?
25  A.  Correct.

Page 360

1   Q.  And the reason you sent it out is because
2   based on your knowledge you weren't doing anything
3   wrong at all, right?
4         MR. AZORSKY:  Objection to form.
5   A.  Correct.
6   Q.  (BY MR. ESCOBAR) Now, when you sent this out
7   to the sales and marketing people, part of your
8   objective was so that they would know what Dey was
9   doing with respect to the Albuterol WAC pricing,
10  right?
11  A.  So that they would know that and so that they
12  could then go out and market the new WAC price to the
13  customers, yes.
14  Q.  And -- now, you wrote there -- under the list
15  of states you wrote -- why don't you read that
16  sentence there.
17  A.  "As you know, the following states are
18  now" --
19  Q.  I'm sorry.  The one after the states.
20  A.  "WAC is not representative of our published
21  wholesale list prices, but like AWP, is used for
22  calculation of reimbursement.  Our updated WAC values
23  are in line with the Warrick WAC values provided by
24  First DataBank and should level the playing field for
25  Medicaid reimbursement.

Page 361

1   Q.  Now, the other thing that you did with
2   respect to this matter was to send your memo to the
3   databases, including the one to Beth Raider that you
4   sent out on May 30th, 1995, right?
5   A.  That's right.
6   Q.  And subsequently it was your understanding
7   that the databases updated their WAC prices for the
8   Dey products indicated to the new higher numbers?
9   A.  That's the assumption I would make that once
10  I notified them by fax that the prices would be
11  adjusted.
12  Q.  So part of what you were doing here, your
13  intention was to notify everybody who had an interest
14  in this through the databases that Dey actually had a
15  new WAC price that was higher than what it had before,
16  right?
17  A.  That's --
18        MR. AZORSKY:  Objection to form.
19  A.  That's correct.
20  Q.  (BY MR. ESCOBAR) You didn't -- you didn't
21  keep the fact that there was a new higher WAC price
22  secret, did you?
23  A.  No, we didn't.
24  Q.  In fact, you published it to -- in the
25  publications that you knew the states would see,

38 (Pages 358 to 361)

Page 370

1  reference, that was what you had -- what you had done
2  in your updating memorandum that you had sent out to
3  the sales force, correct?
4      A.  I would imagine that is a result of the
5  memorandum in May of '95, yes.
6      Q.  To your knowledge, did you or anybody from
7  Dey ever hear from Mr. Wells asking questions about
8  this updating?
9      A.  I never heard from him and as far as I'm
10 aware, nobody else heard from him about it.
11     Q.  Did -- did any of the people from the
12 attorney general's office in Florida who you've met
13 with, you know, recently did any of them show you any
14 of the documents indicating these visits, the visit in
15 Florida and the discussion about the updating with
16 Mr. Wells?
17         MR. AZORSKY:  Objection to form.
18         MS. MILLER:  Object to form.
19     A.  I have not seen them until today.
20     Q.  (BY MR. ESCOBAR)  Not until I've shown them
21 to you now, right?
22     A.  That's right.
23         MR. ESCOBAR:  Let me just -- the -- I
24 think when we copied this the Bates number of Exhibit
25 53 did not print out, so it's Dey-Florida 0039599.

Page 371

1      Q.  (BY MR. ESCOBAR)  Now, you testified about
2  the spread in conversations in response to questions
3  yesterday from counsel.  The money that constituted
4  the spread, who got that money?
5      A.  Well, that money was -- came to the provider
6  of the dispensed medication.
7      Q.  And the provider would be a pharmacy or
8  whoever dispensed the medication, right?
9      A.  Correct.
10     Q.  And Dey never got any of the spread, did it?
11     A.  No, it didn't.
12     Q.  It was your understanding, though, when you
13 were at -- the whole period that you were at Dey, it
14 was your understanding that for providers the subject
15 of a spread was a significant and important issue; is
16 that right?
17     A.  That's right.  The spread was very important
18 to the providers of our medications to the public.
19     Q.  And did you get that understanding because
20 information came back to Dey from its sales force?
21     A.  That's one of the ways in which I got that
22 impression, yes.
23     Q.  And was it your impression that customers
24 discussed the issue of the spread and raised the issue
25 of the spread with Dey salespeople?

Page 372

1      A.  I don't know who raised the topic, but I
2  certainly know that that was a topic of discussion
3  between salespeople and providers.
4      Q.  If you'd turn in your binder to Marrs Exhibit
5  37.  You have that in front of you?
6      A.  I have that in front of me.
7      Q.  And this is a document that counsel went
8  through with you yesterday relating to the various
9  approvals for what's referred to here as Part Number
10 0933800, which is a comparison worksheet; is that
11 right?
12     A.  That's right.
13     Q.  Now, when you signed -- you signed your name
14 here on April 5th, 1995 to this particular approval
15 form, correct?
16     A.  That's right.
17     Q.  And that indicated that in your function as
18 the marketing manager you were approving this
19 comparison worksheet, right?
20     A.  That's correct.
21     Q.  And the comparison worksheet would be a
22 worksheet that people could use to compare the spread
23 on two different products; is that right?
24     A.  That's correct.
25     Q.  And when you approved that, you didn't think

Page 373

1  you were doing anything wrong, did you?
2      A.  No, I didn't.
3      Q.  You wouldn't have signed your name if you had
4  thought it was wrong, right?
5      A.  That's correct.
6      Q.  And you didn't think that salespeople
7  comparing the spread, that there was anything wrong
8  with that, did you?
9      A.  No.  That was what -- part of what we did.
10     Q.  And when you approved this form -- well, let
11 me -- let ask you this:  The signature was the date --
12 you put the signature -- your signature on April 5th,
13 '95, right?
14     A.  That's right.
15     Q.  You actually never saw anybody use the
16 worksheet, did you?
17     A.  In practice, in front of a customer?
18     Q.  Yes.
19     A.  I never saw anybody use it, no.
20     Q.  And this particular worksheet that was
21 approved related to one of Dey's products, right?
22     A.  That's right.
23     Q.  And you don't know whether there was a
24 similar worksheet created and approved in this method
25 for any other product, do you?

Page 374

1   MR. AZORSKY: Objection, form.
2   A. I'm not sure.
3   Q. (BY MR. ESCOBAR) Let me turn your attention
4   to what was marked earlier as Exhibit 42. And Exhibit
5   42 is one of the documents that counsel for Florida
6   talked to you about, right?
7   A. That's right.
8   Q. And if I recall correctly from your testimony
9   this morning, this was the -- you determined last
10  night at home by looking at a document that it's your
11  recollection that this Exhibit 42 was part of a
12  presentation at a 1995 marketing meeting?
13  A. That's correct. I looked at a photograph
14  which determined that this was the logo that was used
15  at the 1995 national sales meeting in Arizona.
16  Q. And -- now, this exhibit also has attached to
17  it a worksheet, a couple of worksheets, right?
18  A. That's right.
19  Q. And when you -- when you were at this sales
20  meeting and the worksheet was being discussed, as you
21  indicated in your testimony, you didn't think that
22  there was anything wrong with that, did you?
23  A. No, I didn't.
24      MR. AZORSKY: Objection to form.
25  Q. (BY MR. ESCOBAR) And if you didn't think

Page 375

1   that people should be discussing the worksheet or
2   comparison of spreads at the meeting, you would have
3   said so, right?
4       MR. AZORSKY: Objection to form.
5   A. I probably would have said something, yeah.
6   Q. (BY MR. ESCOBAR) And with respect to the
7   worksheet that is attached to Exhibit 42, did you ever
8   see anybody actually use one of those worksheets?
9       MR. AZORSKY: Object to the form.
10      MS. MILLER: Objection, asked and
11  answered, wasn't it?
12      MR. ESCOBAR: No. I was asking about
13  the prior worksheet.
14      MR. AZORSKY: Objection, form.
15  A. I saw -- I think at this sales meeting when
16  Debi and Ross were presenting this, somebody actually
17  filled out the prices. They worked through this price
18  sheet as they were going along and explaining to the
19  sales force how to fill this out and they were filling
20  it in on -- with soft-tip pen on an overhead and
21  that's the only time I saw somebody actually
22  completing one of these forms was at the national
23  sales meeting as part of an educational tool for the
24  sales force.
25  Q. (BY MR. ESCOBAR) And you never saw a

Page 376

1   salesperson use it with a customer?
2       MR. AZORSKY: Objection, form.
3   A. I did not see a salesperson use it with a
4   customer, no.
5   Q. (BY MR. ESCOBAR) Did you ever go on any
6   sales call your -- calls yourself?
7   A. Yes, I did.
8   Q. With who?
9   A. I went with -- let me think. I went with
10  Ross Uhl. The guy in Texas, Jim Gist, I was in a
11  sales call with him once. I went with Debi Codute,
12  Michelle Ashby. That's about all I can recall off the
13  top of my head.
14  Q. On any of those sales calls were there
15  discussions about spread?
16  A. There certainly were discussions about
17  spread, especially with Ross Uhl in Florida.
18  Q. And with a custom -- that is, with a
19  customer?
20  A. With a customer, yes.
21  Q. And did the customer in Florida indicate to
22  you why spread was important at the meeting you
23  attended?
24  A. No, not that I recall.
25  Q. The meeting in Florida, do you recall who the

Page 377

1   customer was?
2   A. I have no idea, no.
3   Q. Do you recall what kind of --
4   A. It was a home healthcare pharmacy.
5   Q. And it was you and Mr. Uhl?
6   A. That's correct.
7   Q. And then one or more people from the
8   customer?
9   A. There was one or more people, maybe one or
10  two people.
11  Q. And let me ask you this: Would -- that
12  meeting, can you place it in time?
13  A. That was fairly close to the beginning of the
14  launch of the Albuterol product because we went into
15  the back of the facility and they still had their old
16  filling machines there that they were using to fill
17  their little unit-dose bottles that they self-
18  compounded in the back and I was shocked to see that
19  the machinery was still up and plugged in and standing
20  there.
21  Q. This was in -- so this would have been in
22  '92?
23  A. Yeah, probably -- yeah, late '92, maybe early
24  '93, somewhere around there.
25  Q. So it was after the launch?

Page 450

1  price than Dey on its unit-dose product?
2       MR. AZORSKY: Objection to form.
3  A. I have no idea.
4  Q. (BY MR. McDONALD) When you left Dey in
5  August of 1995, had you ever dealt with MACs in
6  conjunction with pharmaceutical reimbursement?
7       MR. AZORSKY: Objection to form.
8  A. I don't know what MACs means.
9  Q. (BY MR. McDONALD) Maximum -- maximum
10 allowable cost. Have you ever heard that?
11 A. No.
12 Q. You did testify that you had heard or people
13 comment that AWP meant "ain't what's paid."
14 A. That's right.
15 Q. Do you think that that was common knowledge
16 in the industry, that AWP was "ain't what's paid"?
17      MR. AZORSKY: Objection to form.
18 A. I don't know. I've never heard of it
19 anywhere either mentioned or spoken to at -- referred
20 to like that other than by the Dey sales force.
21 Q. (BY MR. McDONALD) Well, did you think it was
22 some secret that AWP wasn't an actual price?
23 A. I didn't think it was a secret within Dey,
24 no.
25 Q. Do you think it was a secret within the

Page 451

1  pharmaceutical industry that AWP wasn't an actual
2  price?
3       MR. AZORSKY: Objection to form.
4       MS. MILLER: Objection to form.
5  A. I have no idea.
6  Q. (BY MR. McDONALD) Well, look back on Exhibit
7  26. It's in the book here (indicating). This is a
8  memo that was done by Mr. Mozak in October of 1993,
9  correct?
10 A. That's correct.
11 Q. And if you'll look on the second page. There
12 is an analysis done here of reimbursement, correct?
13 A. Correct.
14 Q. And at the bottom section of the page it
15 shows reimbursement at 80 percent of AWP. Do you see
16 that?
17 A. Yes, I see that.
18 Q. And that's AWP minus 20 percent, correct?
19 A. That's right.
20 Q. Do you know why in October of 1993 Dey's
21 analysis of reimbursement was AWP minus 20 percent?
22 A. I have no idea why Mr. Mozak used that
23 formula.
24 Q. Does it surprise you that that was the
25 analysis being done by Dey in 1993, that is, AWP minus

Page 452

1  20 percent?
2       MR. AZORSKY: Objection to form.
3       MS. MILLER: Objection to form.
4  A. I have no comment about that or any judgment
5  about it. It was what he used and, you know.
6  Q. (BY MR. McDONALD) Doesn't surprise you to
7  see that though, does it?
8       MR. AZORSKY: Objection to form.
9  A. No, it doesn't surprise me to see that.
10      MR. AZORSKY: I want to note that it's
11 5:30.
12      MR. McDONALD: As long as she's okay.
13 I'm going to try --
14      THE WITNESS: No. We can go for another
15 10 minutes.
16      MR. McDONALD: I'm going to try to get
17 done.
18 Q. (BY MR. McDONALD) If you look at Exhibit 46,
19 please. That's one of the ones that was marked today.
20 A. Okay.
21 Q. Or yesterday.
22 A. Oh, the famous one.
23      THE REPORTER: They're in order.
24      THE WITNESS: They're in order?
25      MR. McDONALD: They were. Maybe --

Page 453

1       THE WITNESS: They were in order.
2       THE REPORTER: I put them at the last
3  break again.
4       THE WITNESS: You did? That's nice of
5  you. Okay.
6  A. There it is. Okay. I got it.
7  Q. (BY MR. McDONALD) You testified earlier that
8  you never looked at First DataBank to see what prices
9  it had reported; is that correct?
10 A. I never actually got a copy of the price
11 lists that they published and never looked in those
12 price lists to see what they had, no.
13 Q. Okay. I want to focus your attention on the
14 third paragraph of this -- of the first page in the
15 second sentence that begins "Our updated WAC values."
16 Do you see where I'm looking?
17 A. Uh-huh.
18 Q. "Our updated WAC values are in line with the
19 Warrick WAC values provided by First Data Bank." Do
20 you see that?
21 A. Uh-huh.
22 Q. Yes?
23 A. Yes, I see that.
24 Q. Since you don't -- you've never looked at
25 First DataBank, you don't know if that's a true