# Exhibit 326

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Ross Uhl  2/24/2003

1

```
1             CAUSE NO. GV002327
2
3
4     THE STATE OF TEXAS,        )
4     ex rel.                    )
5       VEN-A-CARE OF THE        )
5       FLORIDA KEYS, INC.,      )
6                                ) IN THE DISTRICT COURT
6         Plaintiffs,            )
7                                ) TRAVIS COUNTY, TEXAS
7     v.                         )
8                                ) 53RD JUDICIAL DISTRICT
8     DEY, INC.,                 )
9     ROXANE LABORATORIES, INC., and )
9     WARRICK PHARMACEUTICALS    )
10    CORPORATION, SCHERING-PLOUGH )
10    CORPORATION, SCHERING      )
11    CORPORATION, LIPHA, S.A.,  )
11    MERCK-LIPHA, S.A., MERCK, KGAA, )
12    and EMD PHARMACEUTICALS, INC., )
12                                )
13        Defendants.             )
13
14
15
16         VIDEO DEPOSITION OF ROSS UHL
17             ORANGE BEACH, ALABAMA
18
19
20    The video deposition of ROSS UHL,
21    taken at the Hilton Garden Inn,
22    23092 Perdido Beach Boulevard,
23    Orange Beach, Alabama, on
24    February 24, 2003, commencing at
25    approximately 9:20 a.m.
```

2

```
1              A P P E A R A N C E S
2   FOR VEN-A-CARE:
2       SUSAN THOMAS, ESQUIRE
3       BERGER & MONTAGUE, P.C.
3       ATTORNEYS AT LAW
4       1622 LOCUST STREET
4       PHILADELPHIA, PENNSYLVANIA 10103
5       (215) 875-3000
5   FOR VEN-A-CARE (CORPORATE REPRESENTATIVE):
6       ZACHARY T. BENTLEY, ESQUIRE
6       ATTORNEY AT LAW
7       3426 DUCK AVENUE
7       KEY WEST, FLORIDA 33040
8       (305) 292-1635
8   FOR THE STATE OF FLORIDA:
9       MARK THOMAS, ESQUIRE (VIA TELEPHONE)
9       ASSISTANT ATTORNEY GENERAL
10      PL01 CAPITAL
10      MEDICAID FRAUD CONTROL UNIT
11      TALLAHASSEE, FLORIDA 32399
11  FOR THE STATE OF TEXAS:
12      RAYMOND C. WINTER, ESQUIRE
12      ASSISTANT ATTORNEY GENERAL
13      P. O. BOX 12548
13      AUSTIN, TEXAS 78711-2548
14      (512) 475-4208
14  FOR DEY, INC.:
15      STEVEN A. FLECKMAN, ESQUIRE
15      FLECKMAN & McGLYNN
16      ATTORNEYS AT LAW
16      515 CONGRESS AVENUE, SUITE 1800
17      AUSTIN, TEXAS 78701
17      (512) 476-7900
18              AND
18      DARRELL PRESCOTT, ESQUIRE
19      COUDERT BROTHERS
19      ATTORNEYS AT LAW
20      1114 AVENUE OF THE AMERICAS
20      NEW YORK, NEW YORK 10036-7703
21      (212) 626-4400
```

3

```
1           APPEARANCES (CONTINUED)
2   FOR ROXANE LABORATORIES, INC.
2       R. ERIC HAGENSWOLD, ESQUIRE
3       SCOTT, DOUGLASS & McCONNICO, LLP
3       ATTORNEYS AT LAW
4       ONE AMERICA CENTER
4       600 CONGRESS AVENUE, 15TH FLOOR
5       AUSTIN, TEXAS 78701-2589
5       (512) 495-6300
6
6   FOR WARRICK PHARMACEUTICALS CORP. AND SCHERING-PLOUGH
7   CORP. AND SCHERING CORP.:
7       C. MICHAEL MOORE, ESQUIRE
8       LOCKE, LIDDELL & SAPP, LLP
8       ATTORNEYS AT LAW
9       2200 ROSS AVENUE, SUITE 2200
9       DALLAS, TEXAS 75201-8001
10      (214) 740-8000
13  VIDEOGRAPHER:
13      MIKE KORBE, KORBE PRODUCTIONS, INC.
15  COURT REPORTER:
15      DEBRA AMOS ISBELL, CSR,RDR,CRR
16      ISBELL & ASSOCIATES
```

4

```
1                 I N D E X
2   EXAMINATION
3   By Mr. Winter - page 7
4   By Mr. Fleckman - page 176
5   By Mr. Moore - page 263
6   By Mr. Hagenswold - page 295
7   By Ms. Susan Thomas - page 299
8   By Mr. Fleckman - page 335

11  EXHIBITS

12  Exhibit 776 - page 8
12      State of Texas' Notice of Intention to Take
13      Oral Deposition and Subpoena Duces Tecum
13      (8 pages)
14  Exhibit 777 - page 71
14      Dey Laboratories Memorandum to Mari Carroll,
15      Alberto Hoyo, Ross Uhl from Carrie Jackson,
15      8/12/94, Re: State of Florida Medicaid
16      Program - TX-D&W-07924 (1 page)
16  Exhibit 778 - page 95
17      Teams Win - Working a Homecare Pharmacy,
17      Ross Uhl, Monday, January 24, 1994, 12-1 p.m. -
18      DL-TX-0075972-991 (20 pages)
18  Exhibit 779 - page 157
19      Dey Laboratories Memorandum to Dave Marr from
19      Ross Uhl, 10/14/97, Re: GeriMed Rebate
20      Clarification - DL-TX-0020864-865 (2 pages)
20  Exhibit 780 - page 159
21      Dey Laboratories fax sheet to Ross Uhl from
21      Cindy Daulong, 8/3/95, with attached
22      Reimbursement Comparison Worksheet -
22      DL-TX-0029712-713 (2 pages)
```

### 54

1  nonconfrontational working environment?
2      A. I would say that they had a nonconfrontational
3  working situation from what I observed at these
4  meetings.
5      Q. And from your observations, Ms. Burnham seemed
6  to be a person who was supportive of her superior, Mr.
7  Mozak?
8          MR. FLECKMAN: Objection; form.
9      A. That is correct.
10 MR. WINTER:
11     Q. Let me show you what was marked in these
12 depositions as Exhibit 72. And this has what has been
13 called throughout this case as the Helen Burnham memo.
14 You were shown a copy of that in the statement that you
15 gave to Mr. Breen and Mr. O'Connell; is that correct?
16     A. That is correct.
17     Q. And at the time you did not recall having
18 previously seen or received that memorandum; is that
19 accurate?
20     A. I don't recall seeing this memo, this
21 particular memo; that's correct.
22     Q. You did not recall that when you were shown it
23 last fall when Mr. O'Connell and Mr. Breen showed it to
24 you?
25     A. That is also correct.

### 55

1      Q. On the distribution --
2          MR. FLECKMAN: Hold on just one second. Go
3  ahead and complete your response.
4      A. I was going to say the reason is -- there's one
5  word in there that I know that I would have remembered,
6  the word "updated," "our updated WAC values." Updated,
7  if it's read in context with the word "Warrick," updated
8  would have meant that there would have been an increase
9  in WAC to reflect Warrick's WAC value. That's how I
10 interpret this now and how I would have interpreted it
11 then. And that would have been quite contrary to some
12 things that were available to me as far as what was
13 going on out there.
14 MR. WINTER:
15     Q. What do you mean when you say contrary to
16 things that were available to you as far as what was
17 going on out there?
18     A. Well, I would say prior to this memo I pointed
19 out that Warrick had had a price out there in the market
20 that Red Book was used to reimburse. They were using
21 that as their WAC even though they didn't call it their
22 WAC. And I was very proactive with trying to determine
23 why the State of Florida would utilize this price as the
24 WAC and reimburse on this what I considered at the time
25 was a fictitious number. Therefore by reading this and

### 56

1  saying our updated WAC, that would indicate that we came
2  up to match it, which would have put us in the same
3  situation they were.
4          MR. MOORE: Excuse me. Objection;
5  nonresponsive.
6  MR. WINTER:
7      Q. Would that have been inappropriate, in your
8  opinion, for Dey to have raised its WAC to match
9  Warrick's WAC?
10         MR. MOORE: Objection; form.
11     A. It would have been contrary to the work that I
12 had done as far as contact the state Medicaid --
13 contacted Florida and questioned him vigorously on why
14 they were paying what they were paying. So the answer
15 is yes.
16 MR. WINTER:
17     Q. Yes, it would have been inappropriate?
18         MR. MOORE: Objection; form.
19     A. Yes, it would have been inappropriate.
20         MR. MOORE: Please note my objection.
21         MR. WINTER: Duly noted.
22         MR. MOORE: I just wanted to make sure. I
23 didn't get a chance to make it because y'all were
24 talking over each other. I wanted it on the record
25 between the question and answer. Thank you.

### 57

1          MR. WINTER: You bet.
2      Q. Mr. Uhl, you mentioned that these conversations
3  that you had -- withdraw that question.
4          You indicated in response to the question I had
5  about Exhibit 72 that prior to the date noted on Exhibit
6  72, which is May 30th, 1995, this incident had occurred
7  where something was brought to your attention with
8  respect to Warrick's WAC process?
9      A. That is correct.
10     Q. Let's go back to that prior date, now, that you
11 were referring to. Do you recall approximately when
12 that was?
13     A. I don't. But in my sworn statement, you showed
14 an exhibit that pinpointed a memo from Carrie Jackson
15 regarding some conversations that she had had with Jerry
16 Wells with the State of Florida. And this was about the
17 same time that I was hearing from my customers about how
18 they had switched product to Medicaid in the State of
19 Florida. They had switched their customers, their
20 Medicaid customers, to a competitive product due to a
21 more favorable reimbursement. So whatever time around
22 that memo was the time that I initiated a phone call to
23 Jerry Wells myself to question him. Prior to this I had
24 seen no memos or heard nothing about any change in our
25 procedure as far as WAC goes.

58

1  Q. Okay. I'm going to show you an exhibit here in
2  just a minute. And it's dated August 12th, 1994. And I
3  will tell you right now this is the memo that you're
4  referring to from Carrie Jackson. But before I hand you
5  this memo, let me ask you: Assuming that's accurate,
6  August of 1994 is the date of the memo, is that your
7  testimony, that it's around August 1994 that you had
8  this conversation with one of your customers?
9  A. It would have been in that same time frame. It
10  would have been prior to August.
11  Q. Probably July, June or July?
12  A. It could have been several months before that,
13  yes.
14  Q. So sometime in 1994 you had a conversation with
15  a customer?
16  A. Correct.
17  Q. Who brought to your attention the fact that
18  Warrick had a more favorable reimbursement; is that what
19  you said?
20  A. A more favorable reimbursement in the State of
21  Florida and also Texas because the customer had a
22  pharmacy in Texas.
23  Q. So the same customer who is complaining to you
24  -- withdraw that.
25      The same person who's telling you that Warrick

59

1  has a more favorable reimbursement in Florida also told
2  you that he or she owned a pharmacy in Texas and Warrick
3  had a more favorable reimbursement in Texas as well?
4      MR. MOORE: Objection; form and leading.
5  A. That is correct.
6  MR. WINTER:
7  Q. Is that correct? Okay.
8      MR. MOORE: Objection; form and leading.
9      MR. WINTER: I think leading goes with form.
10  You don't need to say that unless I ask you.
11      MR. MOORE: I may say it anyway. Don't lead
12  the witness.
13      MR. WINTER: Well, I don't think you get to
14  unless I ask you.
15      MR. MOORE: That will be up to me.
16      MR. WINTER: Well, I don't think so.
17      MR. MOORE: Well, that's a decision I'll make
18  as we go along.
19      MR. WINTER: Well, it's a decision we may have
20  to go to the judge with if we have to.
21      MR. MOORE: Go on, Ray.
22      MR. WINTER: I'm ready to go on.
23      MR. MOORE: You're not entitled to lead the
24  witness and you know it. He's a third-party witness.
25  You know that, don't you?

60

1      MR. WINTER: I know. I know the rules.
2  Q. What was the name of the customer?
3  A. Pharmacy Factors.
4  Q. So you've just told us -- who was the
5  individual at Pharmacy Factors that you were speaking
6  with?
7  A. I believe his name was Jeff -- I can't recall
8  his last name. Jeff Hunt or Jeff -- Jeff Hunt, I think.
9  Q. Was Mr. Hunt the owner of Pharmacy Factors?
10  A. No.
11  Q. What was Mr. Hunt's position at Pharmacy
12  Factors?
13  A. He was a pharmacy manager.
14  Q. And did he tell you that Pharmacy Factors also
15  owned a pharmacy in Texas?
16  A. Yes. I was aware of that from the various
17  sites that we shipped to.
18  Q. Where in Florida was Mr. Hunt at the time you
19  had the conversation with him?
20  A. Clearwater.
21  Q. And is that where the Pharmacy Factors pharmacy
22  was located, Clearwater?
23  A. One of their pharmacies was in Clearwater.
24  Q. Where else did they have pharmacies?
25  A. West Lake Village, California, and Houston,

61

1  Texas, I believe, Houston.
2  Q. So let's go back to 1994, summer of 1994. And
3  Mr. Hunt told you what?
4      MR. MOORE: Objection; form.
5  MR. WINTER:
6  Q. With respect to Warrick and reimbursement?
7      MR. MOORE: Objection; form.
8  A. Mr. Hunt indicated that because of a more
9  favorable reimbursement in Texas and Florida, that he
10  was going to put his patients on the Warrick product.
11  But then added it was a minimal part of their business,
12  less than 10 percent of their overall business, as to
13  say don't worry, we're not switching completely. Just
14  some patients.
15  MR. WINTER:
16  Q. So 10 percent of his business was going to be
17  diverted from Dey's products to Warrick's products?
18  A. He told me that he was or had moved his
19  patients in Texas and Florida to the Warrick product,
20  yes.
21  Q. What was he going to do with the other 90
22  percent of his business?
23  A. He would keep those patients on Dey Labs'
24  product.
25  Q. What was the differentiation between the 90

**62**

1  percent and the 10 percent?
2     A. Because he mentioned that there was more of a
3  favorable reimbursement for the product in Texas and in
4  Florida.
5     Q. So was it only those 10 percent of his
6  customers that were purchasing a specific product that
7  both Warrick and Dey manufactured that would switch to
8  the Warrick product?
9     A. Yeah. It was albuterol. He said: The
10 albuterol product I'm going to buy from Warrick for my
11 patients, my Medicaid patients in Florida and Texas,
12 because of a more favorable reimbursement.
13    Q. And why did that strike you as something that
14 was, in your words, "inappropriate"?
15       MR. MOORE: Objection; form.
16    A. That didn't strike me as inappropriate. It
17 struck me -- perhaps it hit home then and gave me a
18 better understanding of exactly how and why the
19 reimbursement formulas of states play a role, an active
20 role, in the provider pharmacy; i.e., Pharmacy Factors'
21 decisionmaking and which products they choose for their
22 patients. And of course, upon further understanding of
23 this conversation that I more likely had with him and
24 others is that Texas and Florida had something in
25 common; i.e., they reimbursed from WAC as opposed to

**63**

1  some other type of calculation.
2       MR. MOORE: Objection; nonresponsive.
3  MR. WINTER:
4     Q. Prior to this conversation that you had with
5  Mr. Hunt, did you have the understanding or impression
6  that Dey's WAC prices were at or about the same as
7  Warrick's?
8     A. No. With this conversation it became clear to
9  me that Warrick's WAC price or at least what this
10 customer was telling me that they were being reimbursed
11 was different than ours. Therefore there was a more
12 favorable reimbursement.
13       MR. MOORE: Objection; nonresponsive.
14 MR. WINTER:
15    Q. Was there anything wrong with Warrick selling
16 its products at a different WAC price than you?
17       MR. MOORE: Objection; form.
18    A. I didn't have a judgment on if it was right or
19 wrong. I just knew that I was losing business.
20 MR. WINTER:
21    Q. So you undertook -- you took it upon yourself
22 to do some investigation into the way the different
23 states would reimburse Florida and Texas?
24    A. I started investigating the situation to try to
25 get an understanding of exactly what I was up against,

**64**

1  yes.
2     Q. And you brought that to the attention of your
3  superiors in Napa?
4     A. No, not at that time. Because I didn't really
5  know what I was looking for. It was only when I
6  intercepted a piece of sales and marketing -- a piece of
7  marketing literature that Warrick had left behind to one
8  of my customers that it became clear on how this
9  different spread or this reimbursement was taking place.
10    Q. Well, you say you intercepted a piece of sales
11 and marketing literature that Warrick had left behind
12 with a customer?
13    A. Correct.
14    Q. What do you mean by intercepted?
15    A. It was sent in to me by one of my -- it might
16 have been this customer. I don't know if it was him or
17 not. But I received a sales piece from Warrick that had
18 what they called like a distributor price. I don't know
19 what the term was, but it was just a price. It was a
20 price on the paper. And then that price, by doing some
21 more investigation, was apparently picked up by Red Book
22 -- I believe it was Red Book or Blue Book, I'm not sure
23 which one -- that they used that price as the WAC. Now,
24 nowhere on the marketing piece of Warrick did it say
25 WAC. It just had a price on it. It didn't say WAC; it

**65**

1  just had a price on it. But Blue Book or Red Book
2  picked that pricing up and used that as the WAC to
3  calculate what the reimbursement would be, WAC minus
4  something at the time, as I recall, WAC 10 or WAC 8 or
5  WAC minus 10 plus something plus a dispensing fee.
6       So then I realized: Well, this is the reason
7  why this customer wants to put his patients on this
8  product because this WAC is much higher than Dey's,
9  Dey's WAC, which, if all things are equal, they're using
10 WAC as a parameter. They're using this number as WAC.
11 So I felt like it was just a mistake; this number was
12 not intended to be WAC from Warrick, it was just a
13 number that had been, what I thought, incorrectly picked
14 up by the data process.
15       So that's when Carrie had sent me in some
16 information about Jerry Wells. And I said: I'm going
17 to call Jerry Wells with the state Medicaid, Florida
18 State Medicaid, and point out this mistake. I said:
19 You guys are using a fictitious price. It's not the WAC
20 price.
21       And he told me: There's nothing I can do about
22 it. They just go by what they tell us.
23       I said: I need clarification.
24       And he said: We just pay what is reported to
25 Blue Book or Red Book.

Ross Uhl 2/24/2003

**66**

1 And I said: But what's being reported is
2 incorrect.
3 And he said: Well, Warrick will have to call
4 us and get that changed.
5 I said: They're not going to call you because
6 it's a higher price. There's no incentive for them to
7 call you and change that, at least in my estimation.
8 So that's how that conversation went. So
9 that's when I became understanding of the sensitivity of
10 WAC and how it played a role in provider pharmacies
11 dispensing product A over product B.
12 MR. MOORE: Objection; nonresponsive.
13 MR. HAGENSWOLD: Same objection.
14 MR. WINTER:
15 Q. So was it your understanding that as a result
16 of this higher price being used in the reimbursement
17 methodology, that there was a bigger spread on the
18 Warrick product?
19 A. Yes, that was my understanding.
20 Q. And what's your definition of spread?
21 A. It would be in this case the WAC price of a
22 product minus the actual cost to the pharmacy.
23 Q. Minus the actual cost to the pharmacy?
24 A. And the difference is, in essence, the spread.
25 Q. And that would be the profit that the pharmacy

**67**

1 makes on the Medicaid reimbursement?
2 MR. MOORE: Objection; form.
3 A. At that point the word "profit" didn't dawn on
4 me because that was not relevant to my selling career at
5 Dey Labs. I was only concerned with one thing and
6 that's losing the business to Warrick. The generics are
7 market driven, price driven, and reimbursement up until
8 now was a moot point to me. But then when I discovered
9 that reimbursement, because of what I thought was a
10 mistake in Red Book or Blue Book's part, that was giving
11 a competitor an unfair advantage because simply I think
12 it might have even been a clerical mistake. Then I
13 said: Whoa, now I see why spread is relevant to the
14 situation and not me going in cost to cost with my
15 competitor anymore.
16 MR. WINTER:
17 Q. Did you later come to the understanding that
18 spread is synonymous with the profit that the pharmacist
19 makes on Medicare or Medicaid reimbursement?
20 MR. MOORE: Objection; form. Leading the
21 witness.
22 A. Again, I'm hesitant to say yes because simply
23 that was not an area where I wanted to go because it was
24 none of my business, anything about the pharmacy's
25 profit. It was none of my business if the pharmacy was

**68**

1 profitable or not.
2 Q. That wasn't any of your concern at this time?
3 A. Absolutely not.
4 Q. Later did that become part of something that
5 you were concerned with?
6 A. No, it did not. Their profit did not become my
7 concern.
8 Q. I said I'd show you this memo, so I'm going to
9 go ahead and give it to you now. It's the only copy I
10 have. I've marked it as Exhibit 777.
11 Do you want to look at it first?
12 MR. MOORE: Can we take a break at some point
13 here?
14 MR. WINTER: Sure. Why don't we do that as
15 soon as we deal with this exhibit.
16 MR. MOORE: Sure.
17 (EXHIBIT 777 WAS MARKED FOR IDENTIFICATION.)
18 MR. WINTER:
19 Q. Mr. Uhl, I've marked as Exhibit 777 a document
20 that's Bates labeled TX-D&W-07924. It's also got
21 another Bates label that's DL-001 on it. Go ahead and
22 look at it and tell me when you're finished.
23 A. (Reading.) Yes, this is the memo that I was
24 referring to regarding initiation by Carrie to call
25 Jerry Wells at the State of Florida Medicaid office.

**69**

1 And the word "direct price," this is the word that I
2 couldn't recall earlier. Again, on the Warrick
3 marketing piece, the $59.40 for a carton of 60
4 albuterol, they never claimed that it was their WAC.
5 They just used the word "direct price." And so when I
6 looked at this, this marketing piece, I thought: Well,
7 this is just a mistake and this should be rectified.
8 And that's when Jerry said: Well, I can't
9 change it on your behalf. Someone from Warrick is going
10 to have to submit to First Data Bank or Red Book and
11 change it.
12 And that's when I said: Jerry, they're not
13 going to do that.
14 And thinking of saying that now, I must have
15 had an understanding about the spread then. They're not
16 going to change that.
17 Q. Did you speak with anybody else at Florida
18 Medicaid besides Jerry Wells?
19 A. No.
20 Q. Did you explain for Jerry Wells what Dey's
21 spread was on its products?
22 A. No.
23 Q. After you had your conversation -- let me ask
24 you this: Did you have one conversation with Mr. Wells
25 or numerous conversations?

70

1    A.  I recall just one.  It might have taken me a
2  couple of times to reach him, but I recall just having
3  one conversation with Jerry Wells.
4    Q.  Did you know at the time of your conversation
5  with Jerry Wells what the spread was for Dey's products?
6    A.  I was not aware of even -- right; no, I was
7  not.
8    Q.  After your conversation with Mr. Wells, did you
9  bring it, the contents of the conversation, to the
10  attention of Ms. Jackson in Napa?
11    A.  I would say that I don't recall per se.  But I
12  would say that I certainly would have brought it to her
13  attention and probably even spoke to Bob on it, yes.
14    Q.  And is that what prompted Ms. Jackson to make
15  her own communication to Ms. Wells?
16    A.  Well, initially I thought that I had actually
17  initiated the conversation.  But then when you showed me
18  this document at the sworn testimony earlier, it says
19  that Mr. Wells would like to talk to Ross.  So it may be
20  that Carrie had independently gathered this information
21  or I submitted that marketing piece to Carrie and she
22  actually -- that could have been it -- that she did some
23  followup and then sort of put this in this format and
24  then sent it back to me.  Apparently she spoke to Jerry
25  and then said:  He'd like to talk to you, Ross.

71

1    Q.  So your recollection is refreshed now by the
2  memorandum; you believe that Ms. Jackson spoke to Mr.
3  Wells first?
4    A.  Yes.
5    Q.  And Mr. Wells indicated to you that he couldn't
6  make a change based on your representations but he'd
7  have to hear directly from Warrick?
8    A.  Correct.  Not that he would have to hear from
9  Warrick.  That the database, the data collection agency
10  -- which is, again, either Red Book or Blue Book or
11  First Data Bank -- would have to make the change because
12  they simply -- they went by what First Data Bank or Red
13  Book or Blue Book submitted to them.  That's how they
14  based their reimbursement, on Blue Book.
15    Q.  And if I understood your testimony a moment
16  ago, what you said to him in response to that is they're
17  not going to do that, they have no incentive to do it?
18    MR. MOORE:  Objection; form.  Excuse me.
19  Objection; form.
20  MR. WINTER:
21    Q.  Is that correct?
22    MR. MOORE:  Same objection.
23    A.  That's correct.
24  MR. WINTER:
25    Q.  Did you explain to him why in your opinion

72

1  there was no incentive to make the change?
2    A.  I don't recall, but I probably would have said
3  they're making more money that way.  And I never made
4  the connection that the state was paying out more
5  money.  I was just thinking that the provider is making
6  more money.
7    MR. MOORE:  Objection; form.  Objection;
8  nonresponsive.
9  MR. WINTER:
10    Q.  Did you explain to Mr. Wells what you
11  understood to be the spread?
12    A.  I don't recall ever getting in that kind of
13  conversation with him, no.
14    MR. WINTER:  Why don't we go ahead and take a
15  break now.  It's 10:40.  Let's come back at 10:50.
16    (A RECESS WAS TAKEN FROM 10:44 TO 10:49 A.M.
17     - FIVE MINUTES)
18  MR. WINTER:
19    Q.  Mr. Uhl, before we took a break, we were
20  looking at a couple of different exhibits.  First of
21  all, we were looking at Exhibit 72, which is dated May
22  30th, '95.  And then later we looked at Exhibit 777
23  dated August 12th, '94; correct?
24    A.  That is correct.
25    Q.  And Exhibit 777 relates to communications that

73

1  you had with Mr. Jerry Wells at Florida Medicaid which
2  were prompted by a conversation you had with one of your
3  customers at Pharmacy Factors; is that correct?
4    A.  That is correct.
5    Q.  And that gentleman's name was Jeff Hunt?
6    A.  That is correct.
7    Q.  And essentially did Mr. Hunt come to you and
8  tell you that he was going to have to switch 10 percent
9  of his business off of Dey's albuterol and go to
10  Warrick's albuterol?
11    A.  He called me to let me know that they were
12  going to put their patients in Texas and Florida --
13  their Medicaid patients in Texas and Florida on Warrick
14  due to a more favorable reimbursement.
15    Q.  So Mr. Hunt initiated communication to you?
16    A.  That is correct.
17    Q.  And he specifically told you in that
18  communication that Warrick had a more favorable
19  reimbursement?
20    MR. MOORE:  Objection; form of the question.
21    A.  That is correct.
22  MR. WINTER:
23    Q.  Did any of your other accounts make the same or
24  a similar complaint to you?
25    A.  Yes.

74

1  Q. Who?
2  A. There were other accounts. One that I can
3  recall was MK Diabetic.
4  Q. MK Diabetic?
5  A. Yes. And Respiratory.
6  Q. And Respiratory is part of the name?
7  A. Same name. In Jacksonville, Florida.
8  Q. Any others, sir?
9  A. I don't recall any others specifically other
10 than I had a go-forward knowledge of the State of
11 Florida's reimbursement policy and how customers in
12 Florida, homecare customers, would use the Warrick
13 product for their Medicaid patients.
14 Q. Did Pharmacy Factors ever return its albuterol
15 business to Dey?
16 A. To my knowledge, as I recall, no. The Medicaid
17 business stayed with Warrick Pharmaceuticals.
18 Q. Did MK Diabetic and Respiratory ever return its
19 albuterol business for Medicaid patients to Dey?
20 A. Patients that they had put on the Warrick
21 product stayed on the Warrick product.
22 Q. Based on your observations of the interaction
23 between Ms. Burnham and Mr. Mozak, do you believe that
24 Ms. Burnham had the authority to adjust or update Dey's
25 WAC without Mr. Mozak's permission?

75

1  A. No.
2  Q. Please describe all the times that you can
3  recall where you heard of an incident where Ms. Burnham
4  took unauthorized action at Dey Labs?
5     MR. FLECKMAN: Objection; form.
6  A. I can't recall any time that I was aware of Ms.
7  Burnham taking any action on her own.
8  MR. WINTER:
9  Q. You testified a moment ago that what prompted
10 you to call Jerry Wells was your feeling that this
11 pricing situation had placed Dey at a competitive
12 disadvantage?
13    MR. MOORE: Objection; form.
14 MR. WINTER:
15 Q. Is that correct?
16    MR. MOORE: Same objection.
17 A. What prompted my call would be -- yes, yes,
18 that's correct.
19 MR. WINTER:
20 Q. Did you ever call any of the Medicare carriers,
21 any of the DEMERCs, and bring to their attention there
22 was this difference in the spread for Dey's product
23 versus Warrick's product?
24 A. No, not Medicare.
25 Q. Did you ever notify any of your customers that

76

1  Dey had made an adjustment to its WAC prices to level
2  the playing field with Warrick?
3  A. I was never aware that Dey made an adjustment
4  to their WAC price. As I mentioned earlier, I don't
5  recall ever seeing this memo about this term that we've
6  updated our WAC values. This memo says to sales and
7  marketing. But as I testified earlier, I do not recall
8  ever seeing this memo.
9     MR. FLECKMAN: Let the record reflect that the
10 witness is referring to Exhibit Number what?
11    THE WITNESS: 72.
12    MR. WINTER: Objection; nonresponsive.
13 Q. Did you ever notify any of your customers that
14 Dey had made an adjustment to its WAC price in order to
15 level the playing field with Warrick?
16    MR. FLECKMAN: Objection; form.
17 A. No.
18 MR. WINTER:
19 Q. And just so she can get it all down, when
20 anybody is stating an objection, let's let them finish
21 first before you answer.
22 A. Okay.
23 Q. Thanks. You stated that when you first came to
24 Dey Labs, Dey had not yet launched its albuterol
25 product; correct?

77

1  A. That is correct.
2  Q. Do you recall when Dey did launch its albuterol
3  product?
4  A. March of 1992.
5  Q. Were you involved in preparation and gearing up
6  for the launch of Dey's albuterol?
7  A. We had some prelaunch discussions, some
8  meetings, to talk about markets, market share, where we
9  were going to sell the product. But in my view, there
10 was not an organized rollout plan for a product as
11 important as albuterol was to Dey Laboratories.
12 Q. In your experience, later as Dey matured as a
13 company, was there more organized implementation of
14 product rollout?
15 A. In my view, there was not.
16 Q. Do you consider that to be a weakness at Dey?
17 A. Yes, I did.
18 Q. So you said there were some informal meetings
19 to discuss market. And I'm sorry, what else did you
20 say? What else was discussed at these informal
21 meetings?
22 A. Discussed the literature, the customers that
23 would have been priority versus low priority was where
24 the calls were going to be made first.
25 Q. Where was the focus going to be?

90

1  prepared for the launch?
2  A.  Correct.
3  Q.  At any of these meetings prior to the launch,
4  did you discuss with any of your colleagues the fact
5  that Dey intended to incentivize retail and chain
6  pharmacies to purchase Dey's unit dose albuterol by
7  increasing the spread for Medicaid and Medicare
8  reimbursement?
9  A.  No.
10 Q.  At any time prior to the launch did you discuss
11 with any of your colleagues a pricing strategy to
12 increase the spread to retail and homecare accounts by
13 lowering acquisition costs?
14 A.  No.
15 Q.  Did you discuss at any time prior to the actual
16 launch in March of 1992 what your bid range for
17 pharmacies and chain pharmacies was going to be?
18 A.  Yes.
19 Q.  Did you ever discuss how that bid range would
20 increase the spread for retail and provide Dey with the
21 highest profit?
22 A.  I don't recall during these discussions any
23 conversation about spread simply because we were the
24 only generic albuterol available, and it was either our
25 product or a much higher priced branded product, such as

91

1  the Ventolin or the Proventil.
2  Q.  Okay.  After a generic competitor for Dey's
3  albuterol unit dose came on the market sometime in 1993
4  -- and your testimony is that would have been Warrick;
5  correct?
6  A.  Correct.
7  Q.  After Warrick launched its product to compete
8  with Dey's unit dose albuterol, do you recall when you
9  first had a conversation with anyone at Dey Labs
10 regarding a spread?
11 A.  I don't recall any conversations about spread,
12 Medicare or Medicaid during this time.
13 Q.  During which time, sir?
14 A.  During this launch time or even when Warrick
15 introduced the product.
16 Q.  So you don't recall it in 1992 leading up to
17 the launch or in 1993 when Warrick was introduced --
18 when Warrick introduced its competitive product?
19 A.  Correct.
20 Q.  Did you attend the national sales meetings,
21 sir?
22 A.  In which year?
23 Q.  The national sales meetings for any year in
24 which you worked with Dey Labs.
25 A.  Yes, I did.

92

1  Q.  Were there any national sales meetings that you
2  did not attend between 1991 and the year 2000 when you
3  worked at Dey Labs?
4  A.  No.
5  Q.  So you attended '91 through 2000 inclusive?
6  A.  Correct.
7  Q.  And did you from time to time have a
8  presentation or a breakout session in which you would
9  lead the discussion at a national sales meeting?
10 A.  Yes, I did.
11 Q.  And prior to having your item placed on the
12 agenda for a national sales meeting, would you have to
13 go through some sort of a signoff or approval process?
14 A.  Yes.  Probably in one of these premeetings or
15 presales meetings, we discussed topics or were assigned
16 topics to discuss.
17 Q.  I'm going to show you now a document that I
18 think may be already in evidence as an exhibit, but
19 we're going to give it a new name because I can't find
20 it.  So it's going to be 778.  And it's DL-TX-0075972.
21     (EXHIBIT 778 WAS MARKED FOR IDENTIFICATION.)
22     MR. WINTER:  I've got one extra copy if anybody
23 needs one.
24     MR. MOORE:  I've got one.  Thank you.
25 MR. WINTER:

93

1  Q.  Mr. Uhl, would you take a minute and look
2  through this document, please, and look up when you're
3  finished.
4  A   (Reading.)  Okay.
5  Q.  Would you identify Exhibit 778 for us, please?
6  A.  778 is entitled Teams Win, Working a Homecare
7  Pharmacy, authored by myself on Monday, January 24th,
8  1994, 12 to 1 p.m.
9  Q.  Is January 24th, Monday, 1994, 12 to 1 p.m.,
10 when you prepared this document or when you presented
11 it?
12 A.  When I presented it.
13 Q.  Did you present it at the 1994 national sales
14 meeting?
15 A.  Yes.
16 Q.  And did you send this handout or a draft of
17 this through your chain of command for review and
18 approval before you made the presentation at the January
19 '94 national sales meeting?
20 A.  I would say yes, I did.
21 Q.  What's the purpose of this handout, sir?
22 A.  The purpose of this presentation, noting that
23 it was from 12 to 1 p.m., tells me that it was a
24 breakout meeting where we broke out into small groups,
25 probably on a rotation basis.  The purpose was to bring

94

1  the sales force, the national sales force, up to speed.
2  This was like a primer on how the homecare pharmacy
3  worked as all of them would have homecare pharmacies in
4  their territory. And as all homecare pharmacies shipped
5  to patients that were on Medicare, this was an attempt
6  to help explain exactly how this market functions from
7  my position -- from what I understood at the time.
8      Q. In looking, I guess, at the fourth page into
9  the presentation, you've got on DL-TX-0075975 -- do you
10 see the Bates number on the bottom right-hand corner?
11     A. Yes.
12     Q. On that page you've got some background
13 information, some definitions.
14     A. Correct.
15     Q. And as you look at these definitions, does this
16 refresh your recollection that as of January 1994 you
17 had at least some understanding as to how Medicare and
18 Medicaid had reimbursed providers for dispensing
19 pharmaceutical products?
20     A. That is correct.
21     MR. FLECKMAN: Before you go any further, read
22 the question back to me, Ms. Court Reporter.
23     (REQUESTED PORTION OF RECORD READ.)
24     MR. FLECKMAN: Hold on just one second.
25     Okay.

95

1      MR. WINTER: Steve, are you ready?
2      MR. FLECKMAN: Yes, I am.
3  MR. WINTER:
4      Q. Mr. Uhl, I'd like you to go ahead and continue.
5  Have you already looked through the entire document
6  once?
7      A. Yes, I have.
8      Q. Okay. Let's go to the section that says
9  Selling to a Homecare Pharmacy on DL-TX-0075985.
10     A. Okay.
11     Q. And under the heading Durable Medical Equipment
12 Dealers, you have several bullet points; is that
13 correct?
14     A. That is correct.
15     Q. And you're describing for your audience who
16 durable medical equipment dealers are?
17     A. These are companies that supply the oxygen for
18 Medicare patients or sick room supplies or beds, foam or
19 egg crate beds, things of this nature, meaning durable
20 medical equipment.
21     Q. So you're identifying what a DME dealer is and
22 how it functions in this market?
23     A. Yes.
24     Q. And you're also describing what home health
25 care agencies are, and it includes some bullet points

96

1  under your description of home health agencies?
2      A. Correct.
3      Q. The next page you have a heading titled Retail
4  Pharmacies. And you include several bullet points
5  describing retail pharmacies and their relationship
6  between home health care and DME dealers?
7      A. Right. This example was used so the sales
8  representative could spot some signs to where if a
9  retail pharmacy was involved in taking Medicare claims
10 -- for instance, a sign on the door that says we bill
11 Medicare -- higher volume of meds as opposed to other
12 retail stores of that same size.
13     Q. And again, this whole presentation is to
14 educate the national sales staff on how they can sell
15 Dey's products to home health care facilities?
16     A. Correct.
17     Q. As well as to retail?
18     A. That's correct.
19     Q. On the next page, under Roman numeral III,
20 entitled Selling Against the Competition, what are you
21 describing here?
22     A. This is just kind of a bullet point breakdown
23 of objections that they could be handed in the field and
24 a comparison of our product versus four competitors
25 listed on this page.

97

1      Q. So, for example, with Warrick under foams --
2  the first bullet point was foams in cup, what do you
3  mean by that?
4      A. Certainly. The product is used in conjunction
5  with a compressor-driven nebulizer, and this nebulizer
6  has a little cup in which you pour the medication in.
7  And then when the compressor is turned on, it
8  aerosolizes. And during the aerosolization process, the
9  Warrick product, because it has a preservative in it,
10 tends to foam. And sometimes the patients -- it looks
11 like soap. Sometimes the patients can get panicky when
12 they see that. They see that and they think there's
13 something wrong with the medication.
14     Q. So with Dey's product, you didn't have that
15 problem with foaming in the cup?
16     A. That's correct. Because we did not introduce a
17 preservative to the product.
18     Q. The second bullet point talks about a screw-top
19 cap -- or it says screw-top?
20     A. Correct.
21     Q. Are you referring to the screw-top cap on the
22 Warrick product which Dey had a twist-off cap?
23     A. As I mentioned earlier, the Warrick product had
24 a threaded screw-top cap not unlike a bottle of
25 White-Out for the old typewriters. And our product had

102

1  some pharmacies were compounding their own products but
2  billing Medicaid by using Dey's NDC?
3      A.  Correct.
4      Q.  And you thought that was illegal?
5      A.  Yes.
6      Q.  Under the heading General, are you describing
7  -- what are you describing there under general?
8      A.  Just, I think, more of a recap of bullet
9  points, walk-away points:  Sterile unit dose with no
10 preservative, so it would reference the Warrick.  I
11 might have even said:  Okay, now, what am I referring to
12 here?  The Warrick product.  We at this point had
13 already sold millions of vials.  In other words, we had
14 already introduced into the marketplace millions of
15 vials of our product with no product complaints.  We
16 manufactured all of our products as opposed to going to
17 an outside contract manufacturer.  The incentive that we
18 had another product in the pipeline, cromolyn sodium.
19 And that would be a company like a one-stop shop.  You
20 would have a full line of these bronchodilators, the
21 classic drugs.
22     Q.  So these are selling points that really go back
23 to Dey's characteristics and how they compare formally
24 with all the competitors previously listed?
25     A.  That is correct.

103

1      Q.  Let's go to the next page under Roman number
2  IV, Pricing and Reimbursement.  And you're talking about
3  here Homecare Economics and Margins for Albuterol; is
4  that right?
5      A.  Correct.
6      Q.  Are you explaining how homecare pharmacy --
7  under the heading Homecare Pharmacy Profit, let's walk
8  through each of those different entries and please
9  explain for us.
10     A.  This was an attempt to at least explain how the
11 Medicare -- number one, why were these homecare
12 pharmacies in business and how they made their money by
13 servicing the Medicare patient.  And I brought up a few
14 examples, one for the homecare, one for the DME dealer.
15 Because at this time there was a relationship between a
16 pharmacy and a DME dealer.
17         In the first example, if a pharmacy had the
18 patient -- in other words, the prescription came from
19 the doctor, the pharmacy would take possession of the
20 Dey product for whatever cost, in this case 45 cents.
21 They would bill the DME dealer in essence an upcharge.
22 So they would charge the DME dealer 35 cents a vial.
23 And then the profit would have been -- I'm not sure of
24 the profit.  Let me look at this.
25     Q.  Are these selling points that you're educating

104

1  your national sales staff to use when marketing their
2  products to homecare pharmacies?
3      A.  No.  This was just an attempt on my part to
4  help them try to understand what's in it for the
5  homecare pharmacy and why are they interested at all in
6  taking on a Medicare patient.  I don't recall at any
7  time that this was to be used outside of this meeting to
8  discuss reimbursement.  Because as I mentioned before,
9  that's really not our area where we're trying to sell
10 against competition or put product in the pharmacy.  But
11 this was an explanation to try to explain to them how a
12 pharmacy and a DME dealer both profited and worked by
13 purchasing either our product or a competitor's or
14 compounding it and then getting a reimbursement from
15 either a Medicaid or a Medicare provider.
16     Q.  So you're explaining for your audience, your
17 sales staff colleagues, some of the factors and
18 considerations that may motivate the provider when he
19 makes a purchasing decision?
20     A.  That is correct.
21     Q.  And it was your understanding at the time in
22 January of 1994 that in part providers were motivated by
23 reimbursement?
24     A.  Correct.
25     Q.  And you make a similar presentation on the next

105

1  page for the sodium that was in the pipeline; is that
2  right?
3      A.  The cromolyn sodium.
4      Q.  Cromolyn sodium.  Excuse me.
5      A.  Yes; that's correct.
6      Q.  Did you ever see any drug utilization data that
7  was published -- that was compiled with respect to any
8  state Medicaid program?
9      A.  No, I didn't.  As a matter of fact, when you
10 presented this exhibit from Carrie, she mentions usage.
11 And we were never privy or didn't know that information
12 was obtainable by us.
13     Q.  When you say we, you mean --
14     A.  The sales force.
15     Q.  -- the sales staff?
16     A.  Yes.
17     Q.  So apparently Ms. Jackson was privy to that
18 information but you weren't?
19     A.  Correct.
20     Q.  Where did you get the understanding that some
21 pharmacists were compounding the albuterol instead of
22 purchasing the pharmaceutical product?
23     A.  By just a visual observation of their pharmacy.
24     Q.  You saw it on the shelf?
25     A.  Yes.

Ross Uhl 2/24/2003

106

1 Q. And it's labeled as a compounded product?
2 A. Yes. It won't say compounded, but it's their
3 own labels and not ours or Warrick's or Glaxo's or
4 anyone else's.
5 Q. Other than the 1994 national sales meeting, did
6 you make any other presentations that come to mind
7 readily?
8 A. I can't recall any other formal presentation to
9 a group regarding homecare pharmacies.
10 Q. And I'm not limiting my question to homecare
11 pharmacies. Let me ask another question.
12 As you're no doubt aware at this point, we've
13 deposed several of your former colleagues. And Mr.
14 Galles and Ms. Daulong and Mr. Upp all recalled a
15 presentation that you made, they believe is the 1995
16 national sales meeting, where you discussed how the
17 reimbursement spread was a factor for retail pharmacists
18 when they make purchasing decisions. Do you recall
19 making such a presentation?
20 A. I don't recall that.
21 Q. Let me show you what's previously been marked
22 as Exhibit 460. And while we're looking for that
23 exhibit, you mentioned that when the managed care group
24 came online, its first supervisor was Mr. Tipton?
25 A. Correct.

107

1 Q. And you went to work for him in managed care?
2 A. Yes; that's correct.
3 Q. So would you have been working with Mr. Tipton
4 in managed care in the spring of 1995?
5 A. I believe that is correct, yes.
6 Q. Let me show you Exhibit 460 and ask you to take
7 a couple of minutes to look through that. Look up when
8 you're ready, please.
9 MR. MOORE: Do you have any extra copies of
10 that one?
11 MR. WINTER: I may have one.
12 A. (Reading.) Okay.
13 Q. Mr. Uhl, is Exhibit 460 a part of a handout
14 that you prepared and presented at the 1995 national
15 sales meeting?
16 A. I see by the stamp Building on Success, that
17 must have been our theme. And this looks familiar. I
18 don't recall a formal presentation, but this does look
19 familiar, yes.
20 MR. WINTER: Objection; nonresponsive.
21 Q. Sir, is Exhibit 460 something that you
22 prepared?
23 A. I recall that I did prepare this worksheet or
24 at least assisted in putting this worksheet together,
25 yes.

108

1 Q. And did you present this worksheet as part of a
2 breakout session or block of instruction at the 1995
3 national sales meeting?
4 A. Judging by the stamp Building on Success, I
5 would say I did present this at a breakout meeting at
6 the -- did you say '95 sales meeting?
7 Q. Yes, sir, I did say 1995. So your testimony is
8 yes, you did present this Exhibit 460 at a breakout
9 session in '95?
10 A. Yes, I did.
11 Q. Let's just go ahead and look at the first page
12 of the document, sir. You've got three bullet points.
13 And under the first bullet point that says AWP
14 reimbursement, what is it that you're trying to impart
15 to your audience there?
16 A. I believe I was illustrating one method of
17 reimbursement by third-party providers such as managed
18 care or Medicare or Medicaid.
19 Q. And you're explaining for your audience --
20 withdraw that question.
21 Was your audience for this presentation the
22 sales staff?
23 A. It must have been the national sales force,
24 yes.
25 Q. And so is this an effort to explain to your

109

1 audience, the national sales force, why AWP
2 reimbursement was an important factor for customers when
3 making purchasing decisions?
4 A. I'm trying to recall the purpose of bringing up
5 the AWP reimbursement. But I'm assisted by looking at
6 the bullet point number 2, and the topic of this must
7 have had something to do with converting customers from
8 unit dose to multidose -- I'm sorry. I had that
9 backwards. From multidose to unit dose. So we
10 reimbursed -- but there is reimbursement on multidose
11 and there's reimbursement on unit dose. So I probably
12 was presenting the differences between reimbursement of
13 multidose and unit dose.
14 Q. Was it your understanding that there was an
15 incentive for your customers to convert from using and
16 purchasing -- withdraw the question.
17 Were you trying to explain for the sales staff
18 how they could describe for customers the incentive they
19 had to switch from purchasing multidose albuterol
20 products to unit dose albuterol products?
21 A. Well, as I recall from just looking at this
22 right now, I think the motivation behind this was to
23 move patients -- excuse me, not patients -- but to move
24 customers from multidose to unit dose. And there must
25 have been some discussions before this meeting that

1  Did I read that correctly?
2      A.  Correct.
3      Q.  Is that a reference to the presentation that
4  you made?
5      A.  I would say it is.
6      Q.  Did Ms. Debi Codute assist you in that
7  presentation.
8      A.  Yes.
9      Q.  Who was Ms. Codute?
10     A.  Ms. Codute was a sales or a district account
11 manager or a salesperson who was chosen personally by
12 Bob Mozak to become part of the managed care group along
13 with myself.
14     Q.  Did Mr. Mozak personally instruct you and Ms.
15 Codute to put together a presentation for the national
16 sales meeting on this issue?
17     A.  I don't recall that he specifically instructed
18 us.  But I'm sure there was some conversation that
19 Debbie Codute and myself and Bob had about topics for
20 the national sales meeting.
21     Q.  Turning to the last page of the reimbursement
22 comparison award sheet itself, the copy that you're
23 looking at now does not include along the bottom of it
24 the file path.  And I'll represent to you that we have
25 another copy somewhere that has a file path along the

127

1  bottom.  And Mr. Galles looked at that file path and
2  recognized it as a document that he had actually
3  prepared himself on his computer.  And apparently, based
4  upon the memo, he thought that he had gotten the idea
5  for that particular format from Steve Robertson.
6      A.  Okay.
7      Q.  But it's your testimony -- or is it your
8  testimony that the substance of what is put forth on
9  this reimbursement comparison worksheet is essentially
10 the same substantively as the information that you
11 presented through your unit dose worksheets and your
12 multidose worksheets that you presented in the national
13 sales meeting?
14     A.  That is correct.
15     Q.  Now, looking at the left-hand column of the
16 reimbursement comparison worksheet on the left-hand
17 side, it's talking about albuterol multidose bottles,
18 20 ML; correct?
19     A.  Okay.
20     Q.  Looking at the left-hand side of the
21 reimbursement comparison worksheet under the heading of
22 Albuterol Multidose Bottles, 20 Milligrams, whose
23 product are you talking about?
24     A.  I don't know for 100 percent sure, but I would
25 imagine we would be making that comparison either with

128

1  the Ventolin multidose or the Warrick multidose.
2      Q.  So is this either the Schering product or the
3  Warrick product?
4          MR. MOORE:  Objection; form.
5      A.  I can't be sure which product -- we could
6  compare AWPs of those products to try to determine who
7  had a -- which company had an AWP of $12.50.
8  MR. WINTER:
9      Q.  But as you sit here today and look at it, you
10 don't recall which company had that AWP?
11     A.  That's correct.
12     Q.  Was it your understanding that whoever's
13 company -- whichever company owned that AWP, that the
14 AWP would have been a price that the company set?
15     A.  It would have been a published Red Book, Blue
16 Book price for their AWP for that product, yes.
17     Q.  That the database service would have published
18 based upon information provided by the manufacturer?
19         MR. MOORE:  I'm going to object to the form of
20 the question as leading the witness.
21         MR. FLECKMAN:  Yeah.  I object.
22         MR. MOORE:  You're not entitled to lead this
23 witness.  You know that.
24         MR. FLECKMAN:  Let me just hear this question
25 back.

129

1          (REQUESTED PORTION OF RECORD READ.)
2          MR. FLECKMAN:  Is that the whole question?
3          MR. WINTER:  I'll ask another question.
4          MR. MOORE:  No.  There's a leading question.
5          MR. WINTER:  Let's move on.
6          MR. MOORE:  Yeah.  Okay.
7  MR. WINTER:
8      Q.  Do you know how the database services got the
9  AWP that they published?
10     A.  Yeah.  The database services collect that
11 information from information that the manufacturer
12 submits at the time of the abbreviated new drug
13 application.
14     Q.  The next entry underneath the AWP is an entry
15 that says cost.  Do you know where that information came
16 from?
17     A.  I don't recall where that information would
18 come from.  It could have been an average industry cost,
19 it could have been from competitive reports, their cost.
20 What they were charging a retail pharmacy was $5.75.
21     Q.  Is that information that you could have
22 gathered from your sources; in other words, talking to
23 your accounts?  Like you mentioned an account was a
24 source of intelligence.
25     A.  That is correct.

130

1   Q. And are there other sources of information
2   besides just talking to your retail accounts?
3   A. Certainly from group pricing or rather group --
4   retail buying groups or other types of groups will share
5   their current cost in order for you to say if you want
6   the business, you can submit that product. But
7   generally just from asking what are they charging you
8   for that 20-milliliter bottle of albuterol.
9   Q. And you're comparing that on the left-hand --
10  well, taking the left-hand column all the way through,
11  do you see the entry that says reimbursements?
12  A. Yes.
13  Q. Would you explain that first entry for us,
14  please, where it says albuterol reimbursement per TX
15  equals $8.75/40 equals 22 cents?
16  A. Okay. This mathematical formula is based on
17  the reimbursement of $8 -- the assumed reimbursement of
18  $8.75 and divided by 40, which is the approximate
19  treatments per bottle that a patient could get. Bear in
20  mind, this bottle is a dropper bottle. So the patient
21  would insert the dropper into the bottle and pull out
22  several drops that equaled a treatment. And those drops
23  would equal 40, 40 treatments.
24  Q. So you understood that there were approximately
25  40 treatments per multidose bottle?

131

1   A. Correct.
2   Q. And the abbreviation TX stands for treatment?
3   A. Prescription.
4   Q. Prescription? Okay.
5   A. Correct.
6   Q. So under the column reimbursement where it
7   says: Total reimbursement for TX, 22 cents, is that 22
8   cents per prescription or 22 cents per treatment?
9   A. Per treatment. Maybe that TX does mean
10  treatment. I forgot what that means now. Right. That
11  was the idea, was to break it down into the treatment so
12  it could be compared with a unit dose albuterol
13  treatment.
14  Q. Okay. So then underneath the column still on
15  the left-hand side of the page where it says cost, you
16  have the entry: Albuterol cost per TX, $5.75, divided
17  by 40 equals 14 cents; correct?
18  A. Correct.
19  Q. And what is it you're calculating there?
20  A. Okay. That would be for -- I'm not sure if
21  that cost is for -- oh, that's for the multidose.
22  Okay. Up at the top heading there. If you took the
23  5.75 -- the bottle which cost 5.75 and divided that by
24  40 treatments, that gave you a treatment cost or cost
25  per treatment, in essence, of that medication, at 14

132

1   cents.
2   Q. And if you added in the cost of the saline,
3   then you had a cost of approximately 20 cents per
4   treatment?
5   A. Correct.
6   Q. And so where the customer -- the provider
7   pharmacy paid 20 cents per treatment and was reimbursed
8   22 cents per treatment, they make 2 cents on each
9   treatment; is that correct?
10  A. That's correct.
11  Q. And then under the annualized per patient, you
12  just multiplied that out by the number of patients for
13  the year to get the estimated profit?
14  A. I believe that's correct how we did that, yes.
15  Q. And on the right-hand column under Dey unit
16  dose albuterol, are you engaging in essentially the same
17  exercise only for Dey's products and Dey's prices?
18  A. Correct. We took the AWP and then broke it
19  down by what we felt was the reimbursement. Again, that
20  reimbursement was either something we could know exactly
21  what it was or an estimate. And then took that price.
22  And that's for a carton, it looks like, which I don't
23  know -- for 25 vials. And then took that and just did
24  the same kind of calculation to come up with a per dose
25  cost versus reimbursement.

133

1   This right-hand calculation, I'm not really --
2   the left hand looks more familiar with what we
3   originally looked at at the sales meeting, but this one
4   looks a little foreign to me. They took a per carton,
5   it looks like, and then took the cost -- or the
6   reimbursement, and then you plugged in your cost per
7   vial and then came up with what -- that's why it's a
8   worksheet. So the retail would plug in what their costs
9   for a dose of -- unit dose of Dey albuterol would be and
10  then subtract it from reimbursement. And then you would
11  come up with an overall difference between cost and
12  reimbursement would be the profit.
13  Q. And when the numbers are all plugged in, was it
14  your understanding and experience that the reimbursement
15  profit for a provider who was dispensing Dey's unit dose
16  was far in excess of the reimbursement profit of a
17  provider who was dispensing Warrick's multidose?
18  A. Correct.
19  Q. And in fact, is that what you were
20  demonstrating through the multidose and unit dose
21  worksheets that you created?
22  A. Correct. It's the same -- it's the same type
23  of table, just slightly --
24  Q. And you understood that the payors in this
25  instance, when we're talking about Medicare and

Ross Uhl  2/24/2003

218

1   Q.  So the opinion that you just offered is your
2   speculation on the subject; is that fair to say?
3       MR. WINTER:  Objection; form.
4   A.  My opinion is formed based on the ten years
5   that I spent at Dey Laboratories submitting pricing and
6   submitting questions and submitting advice, submitting
7   suggestions to the committee, to Bob and to others.  And
8   knowing how our company operated, the decisions were
9   made unilaterally by Bob Mozak.
10  MR. FLECKMAN:
11      Q.  Let me ask you something.  In the ten years, as
12  I understand your testimony, you've testified that there
13  is no other occasion that you're aware of on which WAC
14  was ever misreported intentionally to a price reporting
15  service to your knowledge; correct?
16      A.  I'm getting off the question because
17  "misreported," I don't really understand "misreported."
18      Q.  Let me ask you a question and see if I can get
19  you to answer it.  In the ten years that you were
20  employed with Dey, are you personally familiar with any
21  situation in which Dey increased WAC on a generic
22  product?  I thought you said you were not.
23          MR. WINTER:  Objection; form.
24      A.  I am not, no.  Only this memo would indicate
25  that -- would suggest that we increased the WAC at this

219

1   given time.
2   MR. FLECKMAN:
3       Q.  And you're making some inferences in the year
4   2003 about the meaning of this memo and how it came to
5   be created eight years ago; correct?
6       A.  Correct.
7       Q.  Okay.  But you don't know how it came to be
8   created eight years ago, do you?  Yes or no?  Do you
9   know how this memo came to be created eight years ago?
10          MR. WINTER:  Objection; form.
11      A.  Well, again, I can offer conjecture on how I
12  felt like this memo might have been created.
13  MR. FLECKMAN:
14      Q.  That's what I'm asking.  Is it basically your
15  conjecture?  Is that what you're saying?  You can offer
16  conjecture as to how this may have come to be created
17  eight years ago?
18      A.  I can offer conjecture.
19      Q.  Okay.  But aside from conjecture, you were not
20  a party to any conversations or dialogue where you were
21  a participant in conversations or overheard
22  conversations regarding the subject of raising WAC
23  that's reflected in this memo?
24          MR. WINTER:  Objection; form.
25      A.  That is correct.

220

1   MR. FLECKMAN:
2       Q.  Go ahead.
3       A.  That is correct.
4       Q.  Would you take a look at the second paragraph
5   under the listing of states contained in this memo?
6       A.  On this 721?
7       Q.  Right.  Under the listing of states, the third
8   paragraph.
9       A.  Yes.
10      Q.  It's 72, Exhibit 72.  Do you see the first
11  phrase:  WAC is not representative of our published
12  wholesale list prices?
13      A.  Yes, I see it on the memo.
14      Q.  But you've testified that WAC is representative
15  of the published wholesale list prices because that's
16  the invoice price to the wholesaler; correct?
17      A.  That is correct.
18      Q.  Now, based on your experience at Dey, do you
19  think that Helen Burnham would have known that that
20  phrase is inaccurate?
21          MR. WINTER:  Objection; form.
22  MR. FLECKMAN:
23      Q.  Or do you think that she would not have known
24  that?
25          MR. WINTER:  Objection; form.

221

1   A.  Well, her department --
2   MR. FLECKMAN:
3       Q.  No, sir.  I'm asking about her.
4           MR. WINTER:  Steve, let him finish his answer.
5   MR. FLECKMAN:
6       Q.  I would like you to hang in there with me.  I
7   know it's late.  I'm going to ask you to listen to my
8   questions.  I'm not asking you to go speculate about her
9   department.  I'm asking you:  Do you think that based
10  upon your ten years of being with Dey -- as a matter of
11  fact, let me back up.  Let me withdraw that.  Let me ask
12  you something.
13          You joined Dey in 1990, didn't you?
14      A.  Yes.
15      Q.  You didn't work with Helen Burnham in her
16  department ever, did you?
17      A.  That's correct.
18      Q.  And in fact, she was not there during your
19  ten-year term of employment with Dey, was she?
20      A.  She was employed during part of my employment
21  with Dey Labs.
22      Q.  For five years?
23      A.  Okay.  Was it five years?
24      Q.  She left in August -- roughly August 1995.
25  Does that refresh your recollection?

230

1 over time?
2    A. It's going to affect the rebate over time.
3    Q. Right.
4    A. Yes.
5    Q. Okay. So on day one of that contract, you
6 wouldn't know what that rebate is going to be unless you
7 had a crystal ball?
8    A. Correct.
9    Q. And that's illustrative of the type of
10 performance discount or rebate that was sometimes
11 available to some of your customers in the marketplace?
12    A. Correct.
13    Q. Would you take a look at Exhibit Number 490?
14 Is this a memo that you wrote on or about the date
15 stated?
16    A. Yes, this is a memo that I wrote.
17    Q. And you're writing to whom? Bruce Tipton?
18    A. To Bruce Tipton.
19    Q. Was he your supervisor at that time?
20    A. That is correct.
21    Q. And you are expressing concern about competitor
22 pressures on pricing, on Dey's pricing in that memo?
23    A. Yes. I was responding to competitive pressure
24 from the competitor of Goldline.
25    Q. Tell us who Goldline is.

231

1    A. Goldline is a multisource generic manufacturer
2 and distributor of all types of pharmaceuticals, OTC and
3 prescription.
4    Q. Was Goldline a competitor of one of the generic
5 products that we've discussed here, albuterol or
6 ipratropium bromide or cromolyn or the acetylcysteine?
7    A. No. It was a competitor of the meter dose
8 inhaler of albuterol.
9    Q. Meter dose inhaler?
10    A. Yes.
11    Q. How about Zenith? Was Zenith a competitor?
12    A. That's actually synonymous with Goldline,
13 Zenith Goldline.
14    Q. They had merged?
15    A. Maybe not at this time or maybe prior to that.
16 But they were -- yes, Zenith Goldline, yes.
17    Q. They were two competitors at one point in time
18 and then they merged, weren't they?
19    A. I believe so, yes.
20    Q. Would you characterize the albuterol market --
21 you can hand that back to me -- as a highly competitive
22 market?
23    A. The albuterol -- overall albuterol multidose,
24 unit dose and meter dose inhaler, yes.
25    Q. Did you feel that you were dealing with

232

1 sophisticated consumers when you were dealing with these
2 buying groups and other customers that you had contracts
3 with?
4       MR. WINTER: Objection; form.
5    A. Sophisticated? I felt like I was dealing with
6 professionals who certainly had a handle on the market,
7 the business that they were in, yes.
8       MR. FLECKMAN:
9    Q. Did you have the feeling that they did not
10 understand reimbursement implications and reimbursement
11 profit? Or did you have the feeling that they did
12 understand that subject?
13    A. If you're referring to -- are you referring to
14 like the GeriMeds and the MHAs or in general?
15    Q. (Nodding affirmatively.)
16    A. No. GeriMed and MHA clearly have an
17 understanding of the reimbursement process.
18    Q. Did they need Ross Uhl to teach them that
19 subject?
20    A. Actually quite the contrary. GeriMed actually
21 probably gave me the idea for this reimbursement
22 calculator.
23    Q. By the way, on the worksheet that we looked at,
24 which I think is Exhibit 461 -- it's the last page of
25 Exhibit 460 -- I believe Mr. Galles may have testified

233

1 that he actually put that together. You've got your
2 hand on it right there.
3    A. Okay.
4    Q. Are you positive that Ms. Daulong, Cindy
5 Daulong Collie, prepared that or is it possible that Mr.
6 Galles prepared it?
7    A. No. It's possible that Mr. Galles prepared
8 this. It was sent by Cindy, and it seems like I had
9 discussions with Cindy prior to this -- the January '94
10 national sales meeting, Exhibit 778. But it certainly
11 could have been prepared by Todd.
12    Q. So when Mr. Winter asked you the question and
13 you responded at one point that Ms. Daulong had prepared
14 that, that was an assumption on your part and not
15 necessarily an accurate one?
16       MR. WINTER: Objection; form.
17    A. It could have been an accurate assumption. It
18 was my understanding at the time that Cindy Daulong was
19 the author of this.
20       MR. FLECKMAN:
21    Q. Okay. And that was an assumption on your part,
22 but you're not positive?
23    A. Correct.
24    Q. What did you mean in Exhibit 781 when you
25 said:

### 234

1  "Whether we like it or not,
2  reimbursement will be a key factor
3  and we must take the initiative
4  early and present this product
5  correctly. After that it is
6  probably out of our hands."
7  A. Was the note to Steve Resnik?
8  Q. Yes.
9  A. I meant that unfortunately there's pressure
10 from our competitors like Roxane and Warrick, but we
11 also had pressure from customers because they are
12 sensitive to reimbursement issues. It's their
13 livelihood, the Medicare business. And they make their
14 money by supplying medications to Medicare
15 beneficiaries. And that would have to be taken into
16 account when we were introducing Duoneb as a branded
17 where the cost would be very close to the reimbursement.
18    Q. And when you said in this same letter or memo
19 that: "Positioning this product in front of HCFA, the
20 agency that administers Medicare benefits, as a branded
21 product and commanding a higher reimbursement may be
22 akin to threading a wet noodle through a needle
23 blindfolded," were you referring to the sort of premium
24 and reimbursement that branded products have
25 historically commanded through the Medicare program?

### 235

1       MR. WINTER: Objection; form.
2    A. I can't speak for how brandeds are reimbursed
3  in Medicare because I'm not familiar with that. What I
4  was referring to there is if you have a base of business
5  that's used to submitting a claim for reimbursement for
6  a medication and paying this cost from Dey or anyone
7  else and getting reimbursed this cost, if you now try to
8  impose upon them perhaps a better product, it's one
9  product that's got both drugs in it, however they're
10 used to this reimbursement, especially if they make it
11 themselves. It was akin to threading a wet noodle
12 because probably it's not going to be done. They're not
13 going to switch to a product that's got a much higher
14 acquisition and no reimbursement. That's what I meant
15 by that.
16 MR. FLECKMAN:
17    Q. Okay. So in other words, HCFA might simply not
18 either approve or purchase the product for whatever
19 constituents it serves?
20    A. Yeah. HCFA may allow a reimbursement, but the
21 reimbursement may be near what Dey was going to ask for
22 the cost for that product.
23    Q. You left Dey while that product was in its
24 incubation?
25    A. I left Dey before the product was approved by

### 236

1  the FDA.
2     Q. So the product had not been launched?
3     A. That's correct.
4     Q. And you don't know anything about the launching
5  of that product or how it's been priced or what it's
6  been sold at or whether it's been launched at all;
7  correct?
8     A. No. I have knowledge of it because I'm
9  currently involved in a similar business, in a similar
10 industry. So I have anecdotal information about Duoneb
11 in the market.
12    Q. From third parties?
13    A. From my customers.
14    Q. Would you take a look at Exhibit 785 and tell
15 me whether this is the type of request for proposal that
16 GeriMed gave Dey while you were at Dey and whether this
17 is the sort of information that Dey would then respond
18 to.
19       (EXHIBIT 785 WAS MARKED FOR IDENTIFICATION.)
20    A. Yes. This is what I would call a bid package.
21 This would be sent directly into Dey, not to me.
22       MR. FLECKMAN: Hold on one second. Hand that
23 one back to me, Ray. Forgive me.
24       Bear with us for just a second while we clarify
25 something. This is March 6, this is March 6 and this is

### 237

1  March 8. Thank you. I don't have an extra copy. So
2  before you testify, let me give Mr. Winter an
3  opportunity to look at it.
4        MR. WINTER: I have a copy. Thanks.
5  MR. FLECKMAN:
6     Q. Go ahead. You were saying?
7     A. This is typical of what we call a bid package
8  from, in this case, this customer GeriMed that would be
9  submitted directly to our contracts administrator at Dey
10 Labs.
11    Q. And in this contract would GeriMed provide its
12 members -- in connection with this contract, would
13 GeriMed provide its members with any software and
14 assistance to identify reimbursement spread?
15    A. I don't understand your question.
16    Q. Would GeriMed provide its members with software
17 to assist them in evaluating what type of reimbursement
18 profit they could get from Medicaid on these products?
19    A. Oh, I've never seen it, but I'm going to say
20 yes, based on some documentation from GeriMed that I
21 have seen.
22    Q. And that was dated what? March 8?
23       MR. WINTER: Steve, just for the record, would
24 you go ahead and read the Bates number of this Exhibit
25 785?