# Exhibit 327

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

```
 1      IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND FOR
                       LEON COUNTY, FLORIDA
 2
        THE STATE OF FLORIDA                 )
 3                                           )
        ex rel.                              )
 4                                           )
                                             )
 5         VEN-A-CARE OF THE                 )
           FLORIDA KEYS, INC.,               )
 6         a Florida Corporation, by         )
           and through its principal         )
 7         officers and directors,           )
           ZACHARY T. BENTLEY and            )
 8         T. MARK JONES,                    )
                                             )
 9                        Plaintiffs,        )
                                             )
10      VS.                                  )   CIVIL ACTION NO.
                                             )   98-3032A
11      BOEHRINGER INGELHEIM                 )
        CORPORATION; DEY, INC.; DEY,         )
12      L.P.; EMD PHARMACEUTICALS,           )
        INC.; LIPHA, S.A.; MERCK,            )
13      KGaA; MERCK-LIPHA, S.A.;             )
        SCHERING CORPORATION;                )
14      SCHERING-PLOUGH CORPORATION;         )
        ROXANE LABORATORIES, INC.;           )
15      and WARRICK PHARMACEUTICALS          )
        CORPORATION,                         )
16              Defendants.                  )
17
18                        *-*-*-*-*
19
20
21         VIDEOTAPED DEPOSITION OF HELEN SELENATI
22                       Volume 1
23
24
25
```

Page 94

1  and then photocopied?
2      MR. ESCOBAR: Objection. All I see are
3  smudges.
4      MR. THOMAS: Thank you, Mr. Escobar.
5  And we'll swear you in as a witness, but -- but let us
6  finish with this one.
7      MR. ESCOBAR: Just trying to help.
8  A. Well, it appears that her -- her name was
9  highlighted for distribution. That's what it appears
10 like, but it's difficult to tell in a black and white
11 photocopy.
12 Q. (BY MR. THOMAS). Could I direct you to Marrs
13 Exhibit Number 33 in the book?
14 A. I've got it.
15 Q. Let me direct your attention as well on that
16 exhibit to the cc list. Does it appear that Pam Marrs
17 is the second name on the cc list?
18 A. Yes, it is her name.
19 Q. Does it appear somehow darkened, marked
20 through?
21 A. Yes, it does.
22 Q. Do you think it's possible that that was a
23 photocopy of a highlighted document?
24     MR. ESCOBAR: Objection to the form. It
25 calls for speculation.

Page 95

1  A. Yeah, it appears that way.
2  Q. (BY MR. THOMAS) Let me direct you, if I
3  might, to Pamela Marrs Exhibit Number 26 in the book.
4  The "to" paragraph, to Pam Marrs and Charles Rice.
5  A. Yes, I see it.
6  Q. Does it appear that the word "Pam Marrs" is
7  darkened?
8  A. It appears that her name was highlighted.
9      MR. ESCOBAR: Objection to the form.
10 Q. (BY MR. THOMAS) Let me ask a general
11 question about profits. Why do you think Dey would
12 care if its customers made profits on Dey's drugs?
13 A. Well, if your customers make profits, then
14 they continue to buy your product. If they make the
15 best profit off your product, then they will continue
16 to buy your product. So by giving the customers the
17 best profit we get higher sales volumes. That we,
18 Dey, get higher sales volumes.
19 Q. Is it your understanding that sales volume
20 might fall if profit or spread on Dey drugs fell?
21     MR. ESCOBAR: Objection to the form.
22 A. Well, it is my belief that if any of our
23 customers could make more profit off a competitor
24 product, then Dey would lose some sales to
25 competitors.

Page 96

1  Q. (BY MR. THOMAS) Are there any instances
2  where you recall that happening, where Dey's spread
3  somehow fell below a competitor's for a particular
4  product and Dey's sales for that product fell?
5  A. Yes, that happened in Florida with the
6  Warrick introduction of the competitor to Albuterol.
7  Warrick provided the clients with a better spread.
8  Q. Would you consider Warrick to be a competitor
9  with Dey for Dey's generic Albuterol products?
10     MR. McDONALD: Object to the form.
11 A. Yes, they were a direct competitor.
12 Q. (BY MR. THOMAS) Do you recall what Dey's
13 action was in the instance that you just mentioned
14 regarding Florida with Warrick's spread exceeding that
15 of Dey's and Dey losing market share thereby?
16     MR. McDONALD: Object to the form.
17     MR. ESCOBAR: Objection to the form.
18 A. I get confused by all this --
19 Q. (BY MR. THOMAS) Surely. Let me ask the
20 question again.
21 A. Okay. Please.
22 Q. Do you recall the outcome of the Florida
23 circumstance that you had mentioned in response to an
24 earlier question where the profit on the Dey generic
25 Albuterol product exceeded that of the profit on the

Page 97

1  Dey generic Albuterol product?
2      MR. ESCOBAR: Objection to the form.
3  A. What the outcome was that the customer
4  bought -- didn't want to buy Dey product anymore and
5  continued to buy the Warrick product.
6  Q. (BY MR. THOMAS) Did Dey take any action
7  after that?
8      MR. ESCOBAR: Objection to the form.
9  A. Yes. We -- we -- we tried many attempts to
10 try and level the playing field so that we could
11 provide the same sort of spread to the customer as
12 Warrick was providing.
13 Q. (BY MR. THOMAS) How did Dey do that?
14 A. Well, we tried a few different things.
15 The -- Warrick's spread was better because they had
16 listed a higher WAC price compared to Dey's WAC price,
17 so, therefore, they was -- they were providing the
18 customer with a better spread.
19     So in order to combat that we first of
20 all called up First DataBank to see whether they would
21 reclassify the Warrick product as a branded product
22 rather than a generic product because to our
23 understanding Dey set their WAC price at a price that
24 was -- that was equivalent to a branded product price
25 and then Warrick came along and listed their product

Page 98

1  at a higher WAC. So we tried to get First DataBank to
2  change Warrick's product to a branded product status.
3  Q. And were you successful?
4  A. No, we weren't.
5  Q. What did Dey do then?
6  A. Well, we spoke about different things that we
7  could do. There was some discussion about even
8  calling up Warrick and having a discussion with them
9  around it, but that never happened because nobody
10 really felt comfortable doing that. And then the
11 decision was made to increase the WAC to match that of
12 Warrick's WAC price.
13 Q. Can you think of any other specific instances
14 where spread became an issue regarding competition
15 with another manufacturer against a Dey product?
16     MR. ESCOBAR: Objection to the form.
17 A. Could you repeat it for me?
18 Q. (BY MR. THOMAS) Surely. You had just given
19 us some detail of your recollection of an incident in
20 Florida whereby Dey had to take action or did take
21 action in order to regain or capture additional market
22 share based upon actions of Warrick regarding
23 Albuterol. Can you think of any other instances in
24 any other states with any other drugs, any other
25 points in time when something similar occurred?

Page 99

1     MR. ESCOBAR: Objection to the form.
2     MR. McDONALD: Object to the form.
3     MR. ESCOBAR: Mischaracterizes her
4  testimony, also.
5  Q. (BY MR. THOMAS) Let me ask the question
6  again. Did that ever happen in Texas?
7     MR. ESCOBAR: Objection to the form.
8  A. I have no idea whether that happened in
9  Texas.
10 Q. (BY MR. THOMAS) Have you ever heard the term
11 "generally and currently available in the marketplace"
12 as it relates to pharmaceutical prices?
13 A. Generally and currently available.
14 Q. In the marketplace.
15 A. In the marketplace. It's not something I'm
16 particularly familiar with.
17 Q. To your understanding is there any way for a
18 Medicaid program of a state to get prices other than
19 the prices reported to the price databases?
20     MR. ESCOBAR: Objection to the form, no
21 foundation. And I think you know the answer to that
22 in Florida, Mr. Thomas.
23 Q. (BY MR. THOMAS) Do you know of any other
24 source of prices?
25 A. Well, Medicaid could ask the companies

Page 100

1  directly for prices, you know, and they could get it
2  from -- from the company directly.
3  Q. Well, Ms. Selenati, it's noon. How would you
4  feel about a lunch break?
5  A. That's fine with me.
6     MR. THOMAS: Very good. Let's -- let's
7  take some time for lunch. Is an hour good?
8     MR. ESCOBAR: Sure.
9     MR. THOMAS: Hour and a half?
10    MR. ESCOBAR: An hour.
11    MR. THOMAS: Hour.
12    MS. GIULIANA: Yeah.
13    MR. AZORSKY: Let's ask Ms. Selenati.
14    MR. ESCOBAR: Do you need more than
15 that?
16    THE WITNESS: An hour is fine.
17    MR. THOMAS: An hour enough time?
18    THE WITNESS: Uh-huh.
19    THE VIDEOGRAPHER: We are off the record
20 at 12:02 p.m. This concludes Tape Number 2.
21    (Lunch recess from 12:02 to 1:18)
22    THE VIDEOGRAPHER: We are back on the
23 record at 1:18 p.m. This is the beginning of Tape 3.
24 Q. (BY MR. THOMAS) Ms. Selenati, earlier in the
25 deposition you had mentioned it was your recollection

Page 101

1  that Dey's Albuterol launched in early 1992; is that
2  correct?
3  A. That's correct.
4  Q. And at the launch of Dey's Albuterol an AWP
5  was set by Dey?
6  A. That's correct.
7  Q. How did Dey do that?
8  A. Well, it was based on the originator
9  product's AWP and we -- I called up First DataBank,
10 found out what Schering and -- and Glaxo had listed
11 their AWP at and we then deducted 10 percent from that
12 and then set our AWP at 10 percent below the AWP of
13 the originator companies.
14 Q. Do you recall who you talked to at First
15 DataBank?
16 A. Ed Edelstein.
17 Q. Do you recall how long that launch AWP
18 lasted?
19 A. I don't think we ever adjusted it. I don't
20 remember ever adjusting the AWP.
21 Q. The branded product that you utilized to set
22 the launch AWP for Dey's Albuterol, was that
23 Schering's Proventil?
24    MR. ESCOBAR: Objection to the form.
25    MR. McDONALD: Object to the form.

Page 114

1 regard.
2 Q. (BY MR. THOMAS) Is it your understanding
3 that any of Dey's customers relied upon those
4 nonspread marketing efforts?
5        MR. ESCOBAR: Objection to the form.
6 A. In the beginning they definitely did.
7 Q. (BY MR. THOMAS) And then after the
8 beginning?
9        MR. ESCOBAR: Objection to the form.
10 A. Well, once competitors entered the market,
11 then pricing became an issue. Because in the
12 beginning all you were trying to do was convert --
13 convert users from preserved unit-dose to a
14 nonpreserved unit-dose with an easier opening
15 mechanism. But once generic competition came onto the
16 market, it was all about price.
17 Q. (BY MR. THOMAS) And is it your belief that a
18 nonpreserved formulation is superior to a preserved
19 formulation?
20 A. Well, it's better for the patient.
21 Q. And why is that?
22        MR. McDONALD: Object to the form.
23 A. Because the preservatives that were put into
24 the unit-dose products was shown to be detrimental for
25 asthmatic patients.

Page 115

1 Q. (BY MR. THOMAS) Were there any nonspread
2 advantages of the Dey's Albuterol product over the
3 Copley generic Albuterol product?
4        MR. ESCOBAR: Objection to the form.
5 A. You know, I don't even remember what Copley
6 looked like, whether it was the same little preserved
7 unit preserve dose. I don't even remember what
8 Copley's product looked like. At that stage there
9 were many competitors on the market and I -- I can't
10 remember what Copley's looked like.
11 Q. (BY MR. THOMAS) Were there any nonspread
12 advantages of the Dey generic Albuterol product over
13 the Warrick generic Albuterol product?
14 A. Yes, there was.
15        MR. McDONALD: Object to the form.
16        MR. ESCOBAR: Objection.
17 Q. (BY MR. THOMAS) What were those?
18        MR. McDONALD: Object to the form.
19 A. It was the sterile formulation that didn't
20 have preservative and the easy opening vials.
21 Q. (BY MR. THOMAS) If you could, let me direct
22 you to Exhibit Number 35 in the book in front of you
23 from the Pamela Marrs deposition. That's the big
24 composite exhibit where the first document is a
25 memorandum that you wrote and the second document is a

Page 116

1 memorandum that your a direct report, Carrie Jackson,
2 wrote.
3 A. Yes, I've got -- which one do you want me to
4 look at?
5 Q. The Carrie Jackson report. Specifically if
6 you could turn to the page that's got Florida pricing
7 on it.
8        MR. McDONALD: Do you have a Bates
9 number?
10        MR. ESCOBAR: 905.
11        MR. McDONALD: Thank you.
12        MR. THOMAS: 905.
13 A. Okay. I've got it.
14 Q. (BY MR. THOMAS) Carrie Jackson was a direct
15 report to you?
16 A. That's correct.
17 Q. What's the purpose of this report that Carrie
18 Jackson wrote?
19        MR. ESCOBAR: Objection.
20 A. Well, this was to inform the salespeople in
21 adjustments that were made from time to time in
22 reimbursement formats, whether you needed to get your
23 product on the formulary, what Medicare was doing,
24 what Medicaid was reimbursing. It was to give the --
25 keep the sales force up-to-date what was happening in

Page 117

1 each one of the states in terms of reimbursement.
2 Q. (BY MR. THOMAS) If I can get you to turn one
3 page forward to Bates page 90906.
4 A. I've got it.
5 Q. At the very top of the page, third line down.
6 Underneath the column entitled "Reimburse. Basis." I
7 assume that means reimbursement.
8 A. Yes.
9 Q. WAC plus seven percent.
10 A. Correct.
11 Q. What does that mean? What's the significance
12 of WAC plus seven percent?
13 A. Well, that's what the provider of the
14 medication to the patient was reimbursed by Medicaid
15 and that was the WAC price plus seven percent on top
16 of the WAC price.
17 Q. Okay. And that's -- comports with what you
18 had stated earlier, that WAC and AWP pricing is based
19 upon a statewide specific formula.
20        MR. ESCOBAR: Objection to the form.
21        MR. McDONALD: Object to the form.
22 A. Well, not statewide, but -- yeah, each
23 state --
24 Q. (BY MR. THOMAS) I'm sorry.
25 A. -- had their own formula.

30 (Pages 114 to 117)

Page 134

1  A.  No, I never went to a regional meeting, not
2  that I can recall.
3      MR. AZORSKY:  Can I have this document
4  marked as Exhibit 41, please.
5      (Exhibit 41 marked)
6  Q.  (BY MR. AZORSKY) Ms. Selenati, I've had a
7  document marked as Exhibit 41 and I'll ask you to take
8  a look and review that document.
9  A.  (Witness reviewing document).  Okay.  I think
10 I've -- I've seen this.
11 Q.  Okay.  Can you identify this document?
12 A.  Well, this looks very similar to a
13 presentation that Ross Uhl made at that national sales
14 meeting in -- at the Claremont Hotel.
15 Q.  And the national sales meeting in the
16 Claremont Hotel was in 1994; is that correct?
17 A.  That's correct.
18 Q.  And this is dated Monday, January 24, 1994,
19 with the time of 12:00 p.m. to 1:00 p.m., correct?
20 A.  Correct.
21 Q.  So does that indicate to you that this was
22 a -- either a handout or a part of the presentation
23 that Mr. Uhl gave at that national sales meeting?
24 A.  Well, I particularly recognize this one slide
25 with the question mark and all the acronyms on there.

Page 135

1  I particularly remember that slide and I was impressed
2  with Ross Uhl's capabilities of doing, you know,
3  computer-generated slides.  So I -- I, you know,
4  recognize some of these slides as overheads that were
5  presented at the national sales meeting.
6  Q.  Does that indicate to you that this is --
7  that this document is -- is part of a presentation
8  that Mr. Uhl gave at that national sales meeting?
9      MR. ESCOBAR:  Objection to the form.
10 A.  That's -- that's what I think it is, yes.
11 Q.  (BY MR. AZORSKY) And Mr. Uhl presented --
12 let me start that over.  Mr. Uhl gave a presentation
13 at the national sales meeting in 1994 to --
14 A.  Correct.
15 Q.  -- to whom?
16 A.  Well, it was everybody that was -- that
17 attended the national sales meeting.  Starting at the
18 top, Bob Mozak.  Well, Charles Rice was there.  I
19 don't know whether he sat in on every single
20 presentation, but he certainly was a looming character
21 there.  So Charles Rice, Bob Mozak, Bob Pallas, Bruce
22 Tipton, Cindy Daulong, myself, all my product
23 managers.  If Eve was there at the time, Eve Fagrell,
24 she would have been in the audience as well.  All the
25 regional sales managers and all the -- the field sales

Page 136

1  representatives.  Susan Schnars, who was in charge of
2  inside sales, she would have been there with all the
3  inside salespeople, except maybe for one or two that
4  stayed behind to watch the phones.
5  Q.  So among the people to whom Mr. Uhl made his
6  presentation at the 1994 national sales meeting were
7  regional sales managers and inside salespeople?
8      MR. ESCOBAR:  Objection to the form.
9  A.  They were part of the audience, yes.
10 Q.  (BY MR. THOMAS) Please turn to the second
11 page of Exhibit 41.
12 A.  (Witness complies).
13 Q.  And that page is entitled "Outline For
14 Discussion"?
15 A.  Correct.
16 Q.  And the fourth point of four is pricing and
17 reimbursement of Albuterol; is that correct?
18 A.  Correct.
19 Q.  Was pricing reimbursement of Albuterol a
20 topic addressed by Mr. Uhl to the regional sales
21 managers and inside salespeople at Dey during the
22 national sales meeting in 1994?
23 A.  Yes, that was part of his presentation.
24 Q.  Why would salespeople at Dey be interested
25 not just in the pricing of Albuterol, but also in the

Page 137

1  reimbursement of Albuterol?
2      MR. ESCOBAR:  Objection to the form.
3  A.  Can you say that again?
4  Q.  (BY MR. AZORSKY) Sure.  Why -- why would a
5  presentation have been made to the salespeople at Dey,
6  not just about the pricing of Albuterol, but about
7  also the reimbursement of Albuterol?
8      MR. ESCOBAR:  Objection to the form.
9  A.  Because this ties in to the whole concept of
10 maximizing the spread for our clients versus the
11 competition.
12 Q.  (BY MR. AZORSKY) And please turn to the
13 fourth page of Exhibit 41.
14 A.  (Witness complies).
15 Q.  And that is entitled "I.  Background
16 Vocabulary."  Do you see that?
17 A.  Correct.
18 Q.  And on that page it has a series of
19 definitions?
20 A.  That's right.
21 Q.  And the first definition is a definition of
22 AWP?
23     MR. ESCOBAR:  Objection to the form.
24 A.  That's right.
25 Q.  (BY MR. AZORSKY) And how is AWP defined

35 (Pages 134 to 137)

Page 374

1  MR. AZORSKY: Objection, form.
2  A. I'm not sure.
3  Q. (BY MR. ESCOBAR) Let me turn your attention
4  to what was marked earlier as Exhibit 42. And Exhibit
5  42 is one of the documents that counsel for Florida
6  talked to you about, right?
7  A. That's right.
8  Q. And if I recall correctly from your testimony
9  this morning, this was the -- you determined last
10 night at home by looking at a document that it's your
11 recollection that this Exhibit 42 was part of a
12 presentation at a 1995 marketing meeting?
13 A. That's correct. I looked at a photograph
14 which determined that this was the logo that was used
15 at the 1995 national sales meeting in Arizona.
16 Q. And -- now, this exhibit also has attached to
17 it a worksheet, a couple of worksheets, right?
18 A. That's right.
19 Q. And when you -- when you were at this sales
20 meeting and the worksheet was being discussed, as you
21 indicated in your testimony, you didn't think that
22 there was anything wrong with that, did you?
23 A. No, I didn't.
24     MR. AZORSKY: Objection to form.
25 Q. (BY MR. ESCOBAR) And if you didn't think

Page 375

1  that people should be discussing the worksheet or
2  comparison of spreads at the meeting, you would have
3  said so, right?
4     MR. AZORSKY: Objection to form.
5  A. I probably would have said something, yeah.
6  Q. (BY MR. ESCOBAR) And with respect to the
7  worksheet that is attached to Exhibit 42, did you ever
8  see anybody actually use one of those worksheets?
9     MR. AZORSKY: Object to the form.
10    MS. MILLER: Objection, asked and
11 answered, wasn't it?
12    MR. ESCOBAR: No. I was asking about
13 the prior worksheet.
14    MR. AZORSKY: Objection, form.
15 A. I saw -- I think at this sales meeting when
16 Debi and Ross were presenting this, somebody actually
17 filled out the prices. They worked through this price
18 sheet as they were going along and explaining to the
19 sales force how to fill this out and they were filling
20 it in on -- with soft-tip pen on an overhead and
21 that's the only time I saw somebody actually
22 completing one of these forms was at the national
23 sales meeting as part of an educational tool for the
24 sales force.
25 Q. (BY MR. ESCOBAR) And you never saw a

Page 376

1  salesperson use it with a customer?
2     MR. AZORSKY: Objection, form.
3  A. I did not see a salesperson use it with a
4  customer, no.
5  Q. (BY MR. ESCOBAR) Did you ever go on any
6  sales call your -- calls yourself?
7  A. Yes, I did.
8  Q. With who?
9  A. I went with -- let me think. I went with
10 Ross Uhl. The guy in Texas, Jim Gist, I was in a
11 sales call with him once. I went with Debi Codute,
12 Michelle Ashby. That's about all I can recall off the
13 top of my head.
14 Q. On any of those sales calls were there
15 discussions about spread?
16 A. There certainly were discussions about
17 spread, especially with Ross Uhl in Florida.
18 Q. And with a custom -- that is, with a
19 customer?
20 A. With a customer, yes.
21 Q. And did the customer in Florida indicate to
22 you why spread was important at the meeting you
23 attended?
24 A. No, not that I recall.
25 Q. The meeting in Florida, do you recall who the

Page 377

1  customer was?
2  A. I have no idea, no.
3  Q. Do you recall what kind of --
4  A. It was a home healthcare pharmacy.
5  Q. And it was you and Mr. Uhl?
6  A. That's correct.
7  Q. And then one or more people from the
8  customer?
9  A. There was one or more people, maybe one or
10 two people.
11 Q. And let me ask you this: Would -- that
12 meeting, can you place it in time?
13 A. That was fairly close to the beginning of the
14 launch of the Albuterol product because we went into
15 the back of the facility and they still had their old
16 filling machines there that they were using to fill
17 their little unit-dose bottles that they self-
18 compounded in the back and I was shocked to see that
19 the machinery was still up and plugged in and standing
20 there.
21 Q. This was in -- so this would have been in
22 '92?
23 A. Yeah, probably -- yeah, late '92, maybe early
24 '93, somewhere around there.
25 Q. So it was after the launch?