# Exhibit 329

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| ex rel. | ) |
|    VEN-A-CARE OF THE | ) |
|      FLORIDA KEYS, INC., | ) |
|        Plaintiff(s), | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC., WARRICK | ) |
| PHARMACEUTICALS CORPORATION, | ) |
| SCHERING CORPORATION, | ) |
| SCHERING-PLOUGH CORPORATION, | ) |
| LIPHA, S.A., MERCK-LIPHA, | ) |
| S.A., MERCK, KGAA, and EMD | ) |
| PHARMACEUTICALS, INC., | ) |
|        Defendant(s). | ) 53RD JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

CYNTHIA JANE COLLIE

February 19, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF CYNTHIA JANE COLLIE, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on February 19, 2003, from 9:07 a.m. to 5:29 p.m., before William M. Fredericks, CSR in and for the State of Texas, reported by machine shorthand, at the Courtyard Hotel, Meeting Room B, 10900 Financial Center Parkway, Little Rock, Arkansas, pursuant to the Texas

Page 2

1  Rules of Civil Procedure.
2
3        A P P E A R A N C E S
4  FOR THE PLAINTIFF(S):
5     MR. RAYMOND C. WINTER
      Office of the Attorney General
6     State of Texas     Post Office Box 12548
      Austin, Texas 78711-2548
7
   FOR THE RELATOR:
8
   MR. JAMES JOSEPH BREEN
9     The Breen Law Firm, P.A.
      P. O. Box 297470
10    Pembroke Pines, Florida 33029-7470
11 FOR THE DEFENDANT(S) DEY, INC.:
12    MR. STEVEN A. FLECKMAN
      Fleckman & McGlynn, P.L.L.C.
13    515 Congress, Suite 1800
      Austin, Texas 78701-3503
14
     -and-
15
   MR. DARRELL PRESCOTT
16    Coudert Brothers, LLP
      1114 Avenue of the Americas
17    New York, New York 10036-7703
18 FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
19    MR. R. ERIC HAGENSWOLD
      Scott, Douglass & McConnico, L.L.P.
20    One American Center, Fifteenth Floor
      600 Congress Avenue
21    Austin, Texas 78701
22
23
24
25

Page 20

1 actually becoming overwhelming and needed to be broken
2 into two parts. My preference was to go into the
3 computer side of what I was doing, and my title was
4 changed to Manager Sales Operations and I focused on
5 the being the liaison between the IT Department and
6 Sales and Marketing and developing all of our computer
7 systems for our sales forces. We implemented a sales
8 force automation system. And then I was still
9 responsible for our sales reporting; sales
10 commissions.
11     And I did also during that time help the
12 Contract Department develop their contract
13 administration system. We migrated it from a PC-based
14 system to our AS400 system, which was our mainframe
15 for this company, which allowed our pricing system now
16 to tie directly to the accounting portions of the
17 computer system, the chargeback system and all of the
18 invoicing system. And then I left in May of 2001.
19 Q. So from 1998 until May of 2001 you held that
20    title of Manager Sales Operations?
21 A. That's correct.
22 Q. And did you report directly to Ms. Tate
23    during that time period?
24 A. Yes, I did.
25 Q. Before 1998 when you directly reported to

Page 21

1 Willia Tate, who was your direct supervisor as the
2 Manager of Contracts and Sales and Marketing
3 Information?
4 A. There were kind of some ins and outs of -- in
5 the reporting structure. A large portion of the time
6 I reported directly to Bob Mozak, the Vice President
7 of Sales and Marketing.
8     On an organization chart, it didn't make
9 a lot of sense for a manager to report directly to an
10 Executive Vice President, so from time to time we
11 would try to have me reporting to like a National
12 Sales Director. And so Mark Pope was one of those
13 National Sales Directors; Bruce Tipton was one of
14 those.
15     I found issues with the way that these
16 people directed my work and asked no longer to report
17 to those people, and the default person to report to
18 in those cases then was Bob Mozak. So -- and I don't
19 really remember the exact dates I reported to who.
20 Q. So in addition --
21     MR. FLECKMAN: Hold on just one second.
22     Objection, nonresponsive.
23 Q. (BY MR. WINTER) In addition to -- to
24    Mr. Young, who you earlier testified was somebody you
25    directly reported to --

Page 22

1 A. Yes.
2 Q. -- when you first came to the company --
3    correct?
4 A. Yes.
5 Q. -- you also over your tenure directly
6    reported to Mark Pope and Bruce Tipton?
7 A. Yes.
8 Q. And Bob Mozak?
9 A. Yes.
10 Q. And Willia Tate?
11 A. Yes.
12 Q. Was there anybody else that you ever had a
13    direct report relationship with?
14 A. I don't think so.
15 Q. Okay. Now, you mentioned just a moment ago
16    that during the time period that you reported to
17    Mr. Pope and Mr. Tipton that you had issues with the
18    way they handled your work?
19 A. Yes.
20     MR. FLECKMAN: Objection, form.
21 Q. (BY MR. WINTER) Is that correct?
22 A. Yes.
23     MR. FLECKMAN: Objection, form.
24 Q. (BY MR. WINTER) I just didn't hear what you
25    said.

Page 23

1 A. Yes.
2 Q. Okay. Could you explain what those issues
3    were, please.
4     MR. FLECKMAN: Objection, form.
5 A. We had established guidelines, I will say.
6 We didn't have published policies and procedures at
7 those points in time, but we had some guidelines that
8 had been discussed among executive management as to
9 how we would handle pricing and contract negotiations.
10     I found that both Mr. Pope and
11 Mr. Tipton would circumvent those guidelines, and they
12 did things that I felt were outside of the guidelines
13 or the loose policies, if you will, and they were
14 asking me to do things that from my limited knowledge
15 of the law felt unethical or perhaps illegal, and I
16 objected strongly to those people being in charge of
17 those areas of the company. I felt like my job was to
18 call attention to anything that could be possibly
19 damaging to the company. And when I objected,
20 executive management agreed with me and had me report
21 directly to Mr. Mozak.
22 Q. Did you bring your concerns to the attention
23    of Mr. Mozak?
24 A. Yes. And also Pam Marrs, the CFO.
25 Q. Did you ever take your concerns directly to

Page 60

1  A. I don't specifically recall him being in the
2     meetings.
3  Q. As the person who was the Chair of the
4     Pricing Committee meetings, did you take notes?
5  A. Yes.
6  Q. Longhand?
7  A. Yes.
8  Q. Did you retain those notes in your files?
9  A. The notes were made -- we had a sheet per
10    contract being considered. It was a bid price
11    worksheet. The sales representatives would complete
12    that, and any notes of decisions made in the Pricing
13    Committee were made on those separate sheets; and then
14    those sheets were filed in that particular customer's
15    file. There was no overall log or minutes of a
16    Pricing Committee meeting.
17 Q. Was there an attendance roster?
18 A. For a period of time, yes.
19 Q. Would you maintain the attendance roster in
20    your files?
21 A. I would have in the Contract Department, yes.
22 Q. And in addition to any annotations that were
23    made on a bid price worksheet, which would then at the
24    adjournment of the meeting be placed in the file for
25    that particular contract, would you take --

Page 61

1        MR. FLECKMAN: Objection, form.
2  Q. (BY MR. WINTER) -- notes from time to time
3     on --
4        MR. FLECKMAN: Go ahead.
5  Q. (BY MR. WINTER) -- on your own -- let me ask
6     the question better.
7        You testified that a representative from
8     the sales staff would present a bid price worksheet
9     with a recommended price adjustment on it, is that
10    correct?
11 A. Correct.
12 Q. And that the Pricing Committee would consider
13    that request for a change in pricing and its decision
14    in that regard would be noted on the bid price
15    worksheet, is that correct?
16 A. Correct.
17 Q. And at the adjournment of the committee
18    meeting, would the bid price worksheet then be placed
19    in the file for that particular account?
20 A. Yes.
21 Q. Okay. In addition to any notes and
22    annotations made on a bid price worksheet, did you
23    from time to time take notes of your own on a -- on a
24    note pad?
25 A. Possibly, yes.

Page 62

1  Q. And if you had taken such notes, would you
2     have kept those in your files?
3  A. Yes.
4  Q. Did anyone else serve on the Pricing
5     Committee as a scribe or a stenographer of any sort?
6  A. Not in that role specifically, no.
7  Q. When you resigned from Dey Labs in 2001 --
8     was it?
9  A. Yes.
10 Q. -- did you have a collection of papers and
11    files that you had accumulated over your tenure at
12    Dey?
13 A. Yes.
14 Q. Do you recall about -- approximately what
15    quantity that was?
16 A. In my possession at the time of my
17    resignation, probably four lateral file drawers of
18    files.
19 Q. And did you physically place the documents in
20    those four lateral file drawers into boxes?
21 A. Portions of those files, yes.
22 Q. Into approximately how many boxes?
23 A. About four.
24 Q. About four boxes?
25 A. Yes.

Page 63

1  Q. Why did you distinguish between the portion
2     of the files that you put into four boxes and the
3     portion of the files that you did not put into the
4     four boxes?
5  A. I had a discussion with Pam Marrs, and she
6     had requested that prior to my leaving, if there was
7     anything that could possibly be construed to be
8     connected with any of the subpoena requests we had
9     received, to place it in a box and give to her.
10       I cleaned out files, things that were
11    seminars I had attended, different things like that.
12    I kept a lot of files. So there were things that were
13    not relevant to anyone but me particularly, and since
14    I was leaving, they were no longer relevant at all. I
15    threw those files away.
16       But all of my files from national sales
17    meetings, from marketing product launches and things
18    of that nature I put in a file. And the reason that I
19    may not have provided those documents under a subpoena
20    request is because they would have been outside the
21    specific date range of the subpoena request.
22 Q. How did you know that?
23 A. Because when I assisted in the document
24    collection, the page with the specific date range was
25    provided to me from the subpoena.

Page 64

1  Q. Let me make sure I understand that
2     accurately.
3         Is it your testimony that at the time
4     that Dey was responding to document production
5     requests from the federal government --
6  A. Yes.
7  Q. -- in the 1997 subpoena, that someone within
8     Dey gave you a specific date range that educated you
9     as to the documents you were looking for?
10 A. Yes.
11 Q. Okay. Did some -- how was that date range
12    provided to you?
13 A. I believe a -- an actual page of the subpoena
14    was copied and given to me.
15 Q. And that page from the subpoena had listed
16    within the body of a question a date range?
17 A. Yes.
18 Q. Okay. Do you recall who at Dey provided you
19    with that excerpt from the subpoena?
20 A. Pam Marrs.
21 Q. And this would have been in the fall of 1997,
22    is that correct?
23 A. I believe so.
24 Q. Now, is this -- is this incident you're
25    talking about right now the only instance where you

Page 65

1     conducted a search of your documents in response to a
2     governmental investigation?
3  A. I'm not clear about the instance right now.
4     Are you talking about when I resigned from the company
5     and I was cleaning out files?
6  Q. No, ma'am. In between the time you're
7     talking about right now, which to the best of your
8     recollection was in the fall of 1997 -- correct?
9  A. Okay. Yes.
10 Q. Isolating and setting aside the incident in
11    the fall of 1997 when Dey was responding to the
12    federal investigation and isolating and setting aside
13    the events that transpired when you left Dey Labs in
14    2001 --
15 A. Okay.
16 Q. -- was there any other incident or event
17    where you looked through your files in response to a
18    governmental body's investigation?
19 A. Yes.
20 Q. And when did that occur?
21 A. I don't recall the dates, but to the best of
22    my recollection there were subpoenas from the State of
23    Texas and from the State of California where I
24    participated in document collection.
25 Q. So is it your testimony that you recall at

Page 66

1     least two events, two investigations, one in response
2     to the State of Texas and a second one in response to
3     the State of California --
4  A. Yes.
5  Q. -- in addition to the federal investigation
6     in 1997?
7  A. Yes.
8  Q. Okay. So apart from the event where you
9     looked through your files upon resignation, you can
10    now recall three discrete time periods where you
11    reviewed your files and looked for documents
12    responsive to a governmental investigation?
13 A. Yes.
14 Q. One by the federal government in 1997, a
15    second one by the State of Texas and a third one by
16    the State of California?
17 A. Yes.
18 Q. Okay. But you -- you're not certain as to
19    what the dates were on the Texas or the California
20    investigation --
21 A. No.
22 Q. -- is that correct?
23 A. That's correct.
24 Q. Okay.
25         (Discussion off the record.)

Page 67

1  Q. (BY MR. WINTER) Do you recall whether the
2     first one chronologically was the federal government's
3     OIG subpoena in 1997?
4  A. I don't recall specifically.
5  Q. You're not sure which order they occurred in?
6  A. Correct.
7  Q. Now, your testimony was that when the federal
8     government delivered a subpoena asking for Dey to
9     produce documents, that Ms. Marrs copied an excerpt
10    from the subpoena and gave you a portion of the
11    subpoena that you were supposed to look for responsive
12    documents?
13 A. Correct.
14 Q. Okay. Did she explain to you why she didn't
15    give you the entire subpoena?
16 A. No, she did not explain to me.
17 Q. So she just said, Look for these particular
18    documents?
19 A. Yes.
20 Q. Okay. This specific time frame?
21 A. Yes.
22 Q. Okay. Did -- did Ms. Marrs -- strike that.
23         When you were responding to -- when Dey
24    was responding to the request by the State of Texas,
25    did you follow a similar procedure?

Page 68

1 A. Yes.
2 Q. Was it Ms. Marrs -- was Ms. Marrs the
3    individual who gave you the specific description of
4    the documents that you were look -- supposed to be
5    looking for?
6 A. Yes.
7 Q. And did she follow the same practice of
8    copying an excerpt from the State of Texas' document
9    request and providing that with you?
10 A. Yes.
11 Q. Okay. And again, did she follow the same
12    protocol when you were responding to the document
13    production request by the State of California?
14 A. Yes.
15 Q. Okay. And it's your present recollection
16    that the documents that you put into the four banker's
17    box -- were they banker's type boxes?
18 A. Yes.
19 Q. Such as the box that I'm referring to right
20    behind me here (indicating)?
21 A. Yes.
22 Q. In all three of these incidents, were the --
23    withdraw that question.
24       When you resigned from Dey in 2001, you
25    testified that you placed approximately four banker's

Page 69

1    boxes worth of documents out of your filing cabinet
2    into the boxes?
3 A. Correct.
4 Q. Because you felt that they were arguably
5    responsive to the previous governmental
6    investigations?
7 A. "Arguably." I --
8 Q. Did you believe that they --
9       MR. FLECKMAN: Hold on. Hold on a
10    second.
11       MR. BREEN: Restate the question.
12       MR. FLECKMAN: Let the witness complete
13    her response before you jump in.
14       MR. WINTER: I believe she was finished.
15 Q. (BY MR. WINTER) Were you finished?
16 A. I was questioning the word "arguably." I
17    didn't understand what you meant.
18 Q. Let me make -- ask the question better.
19       Did you believe -- why, again, did you
20    place a portion of your lateral file drawers into the
21    four banker's boxes?
22       MR. FLECKMAN: Objection, form.
23 A. I did not believe that the documents were
24    responsive to any of the subpoena requests; however, I
25    didn't want to be the one to have made that final

Page 70

1    determination. So to preserve them, I put them in the
2    box.
3       We had at one point in time received
4    some second document production requests from one of
5    the original requests that expanded the date range,
6    and so we had to go back and go further in the past
7    and produce documents, and my feeling was if that
8    occurred again some of my documents would be
9    responsive; therefore, I wanted to preserve them in
10    case there was any further document requests that
11    would include those documents.
12 Q. (BY MR. WINTER) So if I understand
13    correctly, the reason why the four banker's boxes
14    worth of -- worth of material were not originally
15    produced is because it was your opinion that those
16    documents did not fall within the date range specified
17    in the first questions?
18 A. The date range or the content.
19 Q. Okay. But you felt that if the date range
20    was expanded, that the documents that you had in your
21    possession may be responsive to some amended question
22    or supplemental question?
23 A. Correct.
24 Q. Is that correct?
25 A. (Nodding head.)

Page 71

1 Q. Okay. Was the content of your four boxes in
2    any way related to Dey's strategy of enhancing or
3    increasing the spread on Medicare and Medicaid
4    reimbursements?
5 A. Yes. The -- I had the handouts of that
6    national sales meeting where this workshop was
7    presented, and I'm referring to Exhibit 460.
8 Q. 460? You had a copy of this in your four
9    doc -- boxes of documents?
10 A. I believe I did.
11 Q. Okay.
12 A. I recalled the workshop presented by Ross Uhl
13    and knew that it was germane to this investigation;
14    however, it did not fall within the original date
15    range of documents that was asked to be produced. But
16    I knew at some point in time it would be an important
17    document.
18 Q. What did you do with your four banker's boxes
19    of materials at the time that you were preparing to
20    resign from Dey Labs?
21 A. I delivered them personally to Pam Marrs.
22 Q. And what did Ms. Marrs do with them, if you
23    know?
24 A. I don't know.
25       (Discussion off the record.)

Page 72

1  Q. (BY MR. WINTER) Prior to delivering those
2     four boxes of documents to Ms. Marrs, did you have any
3     conversations with Bob Mozak as to what should be done
4     with your four boxes of documents?
5  A. I did.
6  Q. And what did Mr. Mozak tell you?
7  A. He asked me to shred anything I had in my
8     possession.
9  Q. And what did you tell Mr. Mozak in response
10    to his directive that you shred the documents?
11 A. That I would not do that.
12 Q. Did he argue with you?
13 A. I don't recall an argument, no.
14 Q. Did Mr. Mozak at any other time in your
15    tenure at Dey Labs direct you to shred anything?
16 A. Not to my recollection.
17 Q. What we'd like to do now is take a recess off
18    the record and allow you to look at some documents
19    that we brought with us today, and then we'll go back
20    on the record and find out if any -- if any of these
21    documents that we're going to show you are documents
22    that you've described for us.
23 A. All right.
24 .     MR. BREEN: Just for the record, the
25    documents we're talking about are those that were

Page 73

1     specifically produced and identified by counsel as
2     being the -- we've got the request here and counsel's
3     response -- being the documents that were placed in
4     these boxes by Ms. Marrs -- by Ms. Collie before she
5     left the company.
6         THE REPORTER: Off the record?
7         MR. FLECKMAN: Well --
8         THE VIDEOGRAPHER: We're off the record
9  at --
10        THE REPORTER: Stand by. Wait.
11        Off the record?
12        MR. FLECKMAN: The -- you're talking
13 about recent correspondence where we've turned over
14 the boxes to you guys?
15        MR. BREEN: Right.
16        MR. FLECKMAN: Yeah.
17        MR. BREEN: There were three banker's
18 boxes delivered to the Texas AG's office I believe
19 yesterday.
20        MR. FLECKMAN: I think there are four
21 boxes that we have, and we were delivering all
22 responsive and relevant materials from those.
23 Anything related whatsoever to spread we were
24 delivering to you guys.
25        MR. BREEN: My understanding is we got

Page 74

1     three boxes --
2         MR. FLECKMAN: And Jessica is doing
3  that.
4         MR. BREEN: Okay.
5         MR. FLECKMAN: Okay?
6         MR. WINTER: Just -- I'll clarify. What
7  I observed yesterday when I left my office were a
8  total of eight boxes of documents that were produced
9  by Dey to the State of Texas that the State of Texas
10 received yesterday.
11        MR. FLECKMAN: Okay. Those are --
12        MR. WINTER: Let me finish, please.
13        MR. FLECKMAN: Yeah.
14        MR. WINTER: Of those eight boxes of
15 documents that were produced yesterday, three of them
16 specifically were identified as containing documents
17 responsive to the State's Request No. 5 in its Second
18 and Third Request for Production which specifically
19 asked Dey to produce four boxes of documents compiled
20 by Ms. Collie and turned over to Ms. Marrs at her
21 resignation.
22        MR. FLECKMAN: Yeah, I think I can
23 explain. Jessica McGlynn in my office is handling
24 that. What's happened is that Pam Marrs has turned
25 over to us copies of everything that Ms. Daulong left

Page 75

1  with Pam Marrs. They were in four boxes.
2         THE WITNESS: Collie.
3         MR. FLECKMAN: Ms. Collie.
4         THE WITNESS: Thank you.
5         MR. FLECKMAN: Forgive me. The --
6  and -- and Jessica has gone through those and removed
7  nonresponsive materials that have nothing to do with
8  the issues in this case and has invited you to come
9  over and examine those to confirm that they're
10 nonresponsive. All the rest have probably been
11 compressed into three boxes.
12        MR. BREEN: Right. That's -- that's our
13 understanding also.
14        MR. FLECKMAN: Yeah.
15        MR. BREEN: We just want to as
16 efficiently as possible see if the witness recalls
17 these being those documents. That's all.
18        MR. FLECKMAN: Right. To our -- to our
19 understanding and knowledge, none of that has been --
20 has been discarded by Pam Marrs since Ms. Collie gave
21 it to her.
22        THE REPORTER: Off the record, please.
23        THE VIDEOGRAPHER: We're off the record
24 at 10:55.
25        (Recess.)

Page 76

1  THE VIDEOGRAPHER: We're back on the
2  record at 11:20.
3  Q. (BY MR. WINTER) Before we -- or, actually,
4  during the recess that we just took, Ms. Collie, we
5  showed you two banker's boxes worth of documents that
6  were produced to the State of Texas yesterday by Dey
7  Labs, and these Bates ranges are 0096540 through
8  0100303, comprising Box No. 1; Box No. 2, Bates range
9  0100564 through 0104152, Box No. 2; and Box No. 3
10  being Bates range 0105048 through 0106572.
11  And, Ms. Collie, is it true that you
12  have flipped through these three boxes of documents
13  and confirmed that these were materials that you had
14  collected from your file drawer at your resignation
15  and placed into what for you were four banker's boxes
16  of materials?
17  MR. FLECKMAN: Hold on just a minute.
18  Can we just accept your representation,
19  Mr. Winter, that those are the Bates number ranges
20  that you just showed Ms. Collie and me?
21  MR. WINTER: Certainly.
22  MR. FLECKMAN: Okay.
23  MR. BREEN: And just for the record,
24  there are some gaps in the Bates numbering of these
25  documents, and I think you also represented that in

Page 77

1  your letter to the State.
2  MR. FLECKMAN: Yeah. Right. We
3  identified that.
4  MR. BREEN: Right. But in general,
5  those are the Bates ranges that we showed Ms. Collie
6  during the -- during the break.
7  MR. FLECKMAN: Terrific.
8  Q. (BY MR. WINTER) So, Ms. Collie, if you would
9  confirm for me that you looked through the Bates
10  ranges that we -- that I just stated on the record,
11  which we have compressed from three boxes as produced
12  to two -- you saw two boxes, correct?
13  A. Correct.
14  Q. -- and confirm for me, if you will, that the
15  two boxes you saw included documents that you had
16  collected at your resignation and delivered to Pam
17  Marrs?
18  A. That's correct.
19  Q. Okay. Now, you stated before we took a
20  recess that when you brought the four boxes to
21  Mr. Mozak's attention he directed you to shred them?
22  A. That's correct.
23  Q. And you told Mr. Mozak that you would not do
24  that, and instead you delivered the documents to
25  Ms. Marrs, is that correct?

Page 78

1  A. After Mr. Mozak instructed me to shred them,
2  I was uncomfortable with that direction and expressed
3  my concern to both Willia Tate and to Pam Marrs; and
4  Pam and I discussed it further, and she asked then
5  that I just go through the four file drawers and
6  anything that I felt could possibly be relevant to any
7  of the pending lawsuits, to put those into a box, and
8  then I did that and then provided them to Pam.
9  Q. And the -- again, the number of boxes that
10  you provided to Pam was four?
11  A. That's correct.
12  Q. Okay. What did you do with the balance of
13  the contents of your file drawer that did not go into
14  the four boxes?
15  A. I probably threw away most of it. I may have
16  left some for the person who took over my position.
17  Other things in those file drawers were things
18  relating to the computer project I worked on. They
19  had no bearing whatsoever on any products, any pricing
20  or anything like that.
21  Q. But you had a conversation with Willia Tate
22  and also with Pam Marrs where you discussed
23  Mr. Mozak's directive to you to shred the documents?
24  A. Yes.
25  Q. What was said in those conversations?

Page 79

1  A. They agreed with me that that was not
2  appropriate to do at that point in time, and then Pam
3  and I made the decision to -- for me to provide to her
4  anything that I felt was relevant.
5  Q. Did you specifically inform Ms. Tate and
6  Ms. Marrs that Mr. Mozak had directed you to shred the
7  documents?
8  A. Yes.
9  Q. Was Mr. Mozak present in the conversations
10  that you had with Ms. Marrs and Ms. Tate?
11  A. No.
12  Q. Did Mr. Mozak know that you declined to
13  execute his order to shred and instead delivered the
14  documents to Ms. Marrs?
15  A. I don't know. I never informed him.
16  Q. Did you leave your conversation with
17  Mr. Mozak by giving Mr. Mozak the impression that you
18  had complied or would comply with his directive?
19  A. No. I told Mr. Mozak that I was not willing
20  to do that and did not have any further conversations
21  with him about the documents.
22  Q. And -- and earlier in response to an earlier
23  question that I asked you, you stated that you did not
24  have an argument with him over the issue, correct?
25  A. That's correct.

Page 92

1  by management before they could be placed on the
2  agenda?
3  A. Yes.
4  Q. Who would participate in this review and
5  approval process at Dey?
6  A. The National Accounts Sales Manager; the
7  Director of Sales, whether it be institutional or
8  national depending on what period of time we're in;
9  Bob Mozak; the Marketing Director or manager; and
10 sometimes Charles Rice would be involved.
11 Q. So if, for example, Ross Uhl wanted to make a
12 presentation about marketing the spread, would the
13 sales director or Mr. Mozak have had to have approved
14 of that presentation before it could be placed on the
15 agenda?
16 A. Yes.
17 Q. Did you ever personally participate in any
18 manager's meetings where the discussion centered on an
19 anticipated or proposed presentation involving
20 education to sales staff on how to discuss with
21 customers marketing the spread?
22 A. I don't recall that as a specific topic of a
23 manager's meeting; however, I attended all the
24 quarterly manager's meetings, and so if it was
25 discussed at one of those I'm sure I participated in

Page 93

1  that conversation.
2  Q. Okay.
3  A. I just don't specifically recall.
4  Q. You just don't have an independent
5  recollection of that as you sit here now?
6  A. That's correct.
7  Q. Okay. Earlier you looked at Exhibit 460, and
8  I'll ask you to go back and look at that one again,
9  please.
10 A. Uh-huh.
11 Q. And I'd like you to direct your attention to
12 the very last page of Exhibit 460, which is Bates
13 numbered DL-TX-0090880.
14     Does this specific document look
15 familiar to you?
16 A. Yes.
17 Q. Do you recall this document being referred to
18 as the profit gain Excel spreadsheet?
19 A. Yes.
20 Q. Do you know who created it?
21 A. I'm not sure, but it may have been Debbie
22 Codute.
23 Q. Why do you say it may have been Debbie
24 Codute?
25 A. Because she was a real numbers person, and it

Page 94

1  was her forte, if you will, to do a lot of analysis;
2  and while Ross Uhl understood all of this, he wasn't
3  one to put it on paper very well.
4  Q. And your earlier testimony was that you
5  recall discussions of Dey selling its products by
6  providing an incentive to retail and chain pharmacies
7  by enhancing the spread, you recall conversations of
8  that nature involving both Ms. Codute and Mr. Uhl?
9  A. Yes.
10 Q. Do you recall engaging in any conversation
11 along -- on that issue of providing an incentive to
12 retail and chain customers by enhancing the spread, do
13 you recall any such conversations that you had with
14 Todd Galles?
15 A. I don't recall any one-on-one conversations,
16 but I am sure that I was in meetings where that was
17 the topic of conversation where we were both in
18 attendance.
19     (Document tendered.)
20 Q. (BY MR. WINTER) Have you ever seen
21 Exhibit 462 before?
22 A. I don't remember specifically, but I most
23 likely did see it.
24 Q. When you say that you most likely did see it,
25 can you explain why?

Page 95

1  A. Well, I'm not copied on it, and the contract
2  group was not under the catchall category of any of
3  these that it's directed to; however, the marketing
4  group -- Todd was typically good about making sure I
5  was included in any type of document of this sort.
6  Q. Do you believe that a document such as this
7  where the Marketing Department is instructing the
8  Sales Department to utilize this profit gain Excel
9  spreadsheet would have had to have gone before the
10 Pricing Committee for review and approval before it
11 was disseminated to the sales staff?
12 A. This would not have come before the Pricing
13 Committee. This would have been a sales strategy,
14 which that typically was not discussed at Pricing
15 Committees.
16 Q. It went up through a separate approval --
17 A. Yes.
18 Q. -- chain?
19 A. That was more of a marketing function than a
20 Pricing Committee function.
21 Q. But it doesn't surprise you that Mr. Galles
22 would have been distributing for sales staff use the
23 profit gain Excel spreadsheet?
24 A. No.
25 Q. At any time during your tenure at Dey Labs,

Page 168

1  Q. Okay.
2  A. There are some samples of some commission
3     programs; there is a sales force automation proposal
4     that I had put together; my calendars, which I kind of
5     used as personal journals; my performance evaluations
6     from about '91, '92 forward.
7  Q. Okay.
8  A. My monthly highlight reports in my capacity
9     as Sales Operations Manager, and miscellaneous and
10    sundry things. Actually, it looks like some paychecks
11    and some vacation slips and 401(k) information, more
12    personal-related information.
13 A     -- we had a management consultant come
14    in, and I've got that evaluation. And then my resumes
15    and a few e-mails that I had with Dey personnel after
16    I left the company, which were more of a personal
17    nature than anything else.
18 Q. Have you had a chance to review the materials
19    you brought with you today?
20 A. As I collected them --
21 Q. Yes.
22 A. -- yes, I did.
23 Q. Is there any -- are you aware of anything in
24    there that involves pricing or anything of that nature
25    such as we've been discussing today?

Page 169

1  A. No, there's not. I made a point not to bring
2     any of those types of documents with me when I left
3     the company because I considered them to be company
4     confidential information.
5  Q. So other than your calendar or journal that
6     may be necessary or helpful to refresh your
7     recollection about the dates or places, would there be
8     anything else in there that you brought today that
9     touches on the issues we've been discussing with you?
10 A. No.
11 Q. Okay. And would you have any objection
12    during one of the breaks if counsel wants to review
13    that in your presence --
14 A. Please feel free.
15 Q. -- to see if there's anything in there that
16    we might want to ask you about?
17 A. No objection.
18 Q. Okay. Again, this is -- it touches on what I
19    asked you a moment ago.
20    Did you ever become aware that from May
21    of 1995 up until the latter part of 1997, that a WAC
22    report for Dey's albuterol that had been sent to First
23    Data Bank was not updated or corrected for that period
24    of time?
25 A. I wasn't personally aware of that, no.

Page 170

1  Q. How about generally aware of it?
2  A. I can't even say I was generally aware of it.
3     It was outside my responsibility, and we all wore too
4     many hats anyway, and I was -- just figured that was
5     somebody else's job, so I didn't bother to know
6     anything about that.
7  Q. So as long as you were at Dey laboratories,
8     as far as you can recall, you never even heard
9     anything regarding a WAC report that had been
10    submitted by Helen Burnham?
11 A. I just was aware that it was her
12    responsibility to report WAC pricing to all the
13    databanks, and as to any specifics, no, I'm not aware
14    of any.
15 Q. Okay.
16    MR. BREEN: Anything else?
17    We'll pass the witness.
18    MR. FLECKMAN: Zac?
19    MR. BREEN: Don't even try.
20    EXAMINATION
21 Q. (BY MR. FLECKMAN) Ms. Collie, I introduced
22    myself earlier today. I'm Steve Fleckman. I
23    represent Dey. I want to ask you a couple of
24    questions about what we've come to call in this case
25    the Helen Burnham memo.

Page 171

1  A. Yes.
2  Q. Okay. Now, as I understand it, you're not
3     saying that you have any specific recollection of
4     Exhibit 72? It's in your file, but you don't have a
5     specific recollection of that document as I understand
6     your testimony today, is that correct?
7  A. That's correct.
8  Q. And, in fact, you don't recall receiving that
9     document or reviewing it in 1995, do you?
10 A. Not specifically, no.
11    THE REPORTER: Steve, raise your
12    microphone a little. You're rubbing it.
13    MR. FLECKMAN: Thank you. The -- do you
14    need me to review any -- to go back over that?
15    THE REPORTER: No, sir.
16    MR. FLECKMAN: Okay.
17 Q. (BY MR. FLECKMAN) Let me ask you something:
18    We have been told in this case that for Dey WAC was
19    its published wholesale list price to the manufact --
20    I mean, to the wholesaler.
21 A. All right.
22 Q. Do you agree with that?
23    MR. BREEN: Object to the form.
24 Q. (BY MR. FLECKMAN) Let me -- let me rephrase
25    that.

Page 172

1    Tell me what you understood WAC to
2    represent at Dey.
3 A. That was the wholesale list price, as we
4    called it, and that was the price that the wholesalers
5    actually were invoiced for the product, and it was the
6    same for all wholesalers. We did not differentiate
7    between any of the wholesaler customers.
8 Q. Did you ever hear it expressed that it was
9    Dey's practice or policy to charge the wholesalers one
10   WAC and report a fictitious WAC or a different WAC to
11   any Medicaid agency or price reporting service? Did
12   you --
13 A. Not -- not to my knowledge.
14 Q. Okay. Is that consistent or inconsistent
15   with what you understood to be the practice at Dey
16   while you were there over the years?
17 A. That was consistent with the practice.
18 Q. What was consistent? Because I've asked you
19   about a --
20 A. Oh.
21 Q. -- particular issue. Let me -- let me repeat
22   my question to make sure that you and I have not
23   misunderstood each other.
24       If someone were to suggest that they
25   reported a WAC to a price reporting service that was

Page 173

1    inflated and much higher than the WAC that was
2    invoiced to the wholesaler, would that be consistent
3    with the practice at Dey or inconsistent with the
4    practice at Dey?
5        MR. BREEN: Objection to form.
6        MR. WINTER: Objection, form.
7 A. Inconsistent.
8 Q. (BY MR. FLECKMAN) Okay.
9 A. If -- as you're referring to WAC.
10 Q. Right. Exactly.
11       Now, WAC is a published invoice price or
12   list price to a -- to the manufacturer, correct?
13 A. To the wholesaler.
14 Q. To -- I keep saying manufacturer. I mean
15   wholesaler.
16       WAC was a published list price to the
17   man -- the wholesaler?
18 A. Correct.
19 Q. The -- now, if someone were to suggest to you
20   that WAC is not representative of Dey's published
21   wholesale list prices while you were there, would that
22   be accurate or inaccurate?
23       MR. BREEN: Objection to form.
24 Q. (BY MR. FLECKMAN) Is not representative of
25   Dey's published wholesale list prices.

Page 174

1 A. Perhaps I'm being confused because there is
2    average wholesale price, AWP --
3 Q. I'm --
4 A. You're not referring to anything to do with
5    AWP?
6 Q. No.
7 A. All right.
8 Q. I'm just saying -- I'm just saying if someone
9    were to say to you -- someone were to assert that WAC
10   is not representative of Dey's published wholesale
11   list prices, would you agree with that or would you
12   disagree based upon --
13       MR. BREEN: Objection --
14 Q. (BY MR. FLECKMAN) -- your experience at Dey?
15       MR. BREEN: Objection to form.
16       MR. WINTER: Objection, form.
17 Q. (BY MR. FLECKMAN) You may answer.
18 A. I would disagree.
19 Q. Okay. That would not be a truthful
20   assertion, would it, based on your experience at Dey?
21 A. Based on my experience --
22 Q. That would be --
23 A. -- correct.
24 Q. That would be untruthful?
25 A. Yes.

Page 175

1 Q. Okay. Now, if someone were to imply that
2    Cindy Daulong, now Cindy Collie, yourself, was
3    responsible for the reporting of pricing information
4    to the publishing services and the states, would that
5    be truthful or untruthful?
6 A. Untruthful.
7 Q. Untruthful? Are you sure?
8 A. Someone may have said it.
9 Q. No. Are you certain that would be untruthful
10   if they said it?
11 A. Yes.
12 Q. Let me read to you what Helen Burnham said
13   implying that in her statement to the State of Texas
14   and ask you whether you agree with this or not.
15       Question posed by one of the
16   representatives of the Plaintiffs: "Do you recall who
17   in the Contracts Department was re" -- "was
18   responsible for that reporting of pricing information
19   either to the publishing services or to the states?"
20       Answer by Helen Burnham Selenati:
21   "Cindy Daulong was responsible for all contracts."
22       Was that implication truthful or
23   untruthful in her sworn statement to the State of
24   Texas?
25 A. She didn't answer the question.

Page 176

1 Q. She evaded the question, didn't she?
2 A. Yes, she did.
3    MR. BREEN: Objection to form.
4 Q. (BY MR. FLECKMAN) But what was the
5    implication that you took -- what inference would you
6    take from that testimony based on the question that
7    was asked?
8    (Document tendered.)
9 Q. (BY MR. FLECKMAN) Read the question and then
10   read the answer and tell me based on the question that
11   was asked, what would be a fair inference in context?
12   MR. WINTER: Objection, form.
13 A. If someone did not understand the difference
14   of what was meant by reporting of pricing information
15   versus responsibility for contracts, someone could
16   possibly understand that I was responsible for
17   reporting of pricing information to the database
18   services.
19 Q. (BY MR. FLECKMAN) And that would be
20   untruthful, wouldn't it?
21 A. Yes, it would.
22 Q. The -- let me hand you Exhibit 72, which you
23   did not receive in 1995 or recall receiving in 1995 or
24   reviewing in 1995, and I'm going to represent to you
25   that so far of the people who have been asked, Eve

Page 177

1    Gmeiner does not recall having received this memo,
2    Todd Galles does not recall having seen this memo at
3    that time, Rob Ellis does not recall having received
4    this memo at that time, Lou Barricelli doesn't recall
5    the memo, the -- Mary Anderle doesn't recall the memo,
6    Bruce Tipton and Rick Upp don't recall the memo,
7    having gotten the memo at that time, and Ross Uhl gave
8    a statement to the State of Texas stating that he
9    didn't recall the memo at that time.
10       And I'm going to ask you to read the
11   first part of this sentence right here in this
12   paragraph out loud (indicating), just the first part
13   dealing with WAC, and tell me whether or not you agree
14   with that assertion in that memo.
15   MR. BREEN: Objection to form.
16 A. "WAC is not representative of our published
17   wholesale list prices, but like AWP, is used for
18   calculation of reimbursement."
19 Q. (BY MR. FLECKMAN) As to the first part of
20   that before the comma in that phrase, do you still
21   disagree with that assertion?
22   MR. BREEN: Objection to form.
23 A. I disagree with that assertion.
24 Q. (BY MR. FLECKMAN) Okay. That assertion is
25   not a truthful statement, is it?

Page 178

1 A. I don't believe it is.
2 Q. Now, Ms. Burnham would have known what WAC is
3    because she worked at Dey long enough to know what WAC
4    was, didn't she?
5 A. Yes.
6    MR. WINTER: Objection, form.
7 Q. (BY MR. FLECKMAN) There's no reason why
8    Ms. Burnham would have made a statement in this memo
9    that would be contrary to a common understanding at
10   Dey that existed while she was employed there in that
11   department, is there?
12 A. I wouldn't know of any reason for her to do
13   that.
14 Q. But she did?
15 A. Obviously. There's a memo.
16 Q. Now, the -- do you recall the circumstances
17   of -- any circumstances involving a man by the name of
18   Chris Gurchiek?
19 A. Yes.
20 Q. Do you recall Mr. Gurchiek -- do you recall
21   whether you ever heard that Mr. Gurchiek had
22   communicated with the State of Texas Medicaid office
23   to ask them to take a close look at the issue of WAC?
24 A. Yes, I recall that.
25 Q. Mr. Gurchiek has testified that that occurred

Page 179

1    sometime in 1996 and that he could not get the State's
2    attention at that time and that he ended up having to
3    call the Attorney General's Office and still couldn't
4    get any response.
5       Do you recall anything about that? And
6    if you do, please tell us what you recall.
7    MR. BREEN: Objection to form.
8 A. Yes, I recall the -- the concern as I
9    understood it was that competitors were not accurately
10   reporting their true WAC; that they had a different
11   WAC for different wholesalers, and therefore what was
12   reported to the State was not accurate. Dey really
13   did charge our wholesalers our WAC, and so that
14   created some issue about reimbursement.
15 Q. (BY MR. FLECKMAN) Let me ask you, if a drug
16   manufacturer sells its drug to a pharmacy and the
17   pharmacy resells that drug to a cash customer, would
18   you expect from your experience in this industry that
19   the pharmacy would anticipate and want to make a
20   profit on that sale?
21 A. Yes.
22 Q. And would you measure the profit as the gross
23   margin or would -- let me rephrase that.
24       Would the profit be influenced by the
25   gross margin between the cost of acquiring those goods

Page 184

1   to be honest and tell the truth?
2 A. Yes.
3 Q. Okay. And he encouraged you to volunteer --
4   voluntarily participate in the process?
5 A. Yes.
6 Q. Okay. Now, up until the time that you began
7   to see subpoenas from the government, my understanding
8   is it never occurred to you that Dey was doing
9   anything wrong with respect to Medicaid reimbursement
10  issues, correct?
11 A. Correct.
12 Q. Okay. And as of this day, you still have
13  not, I take it, secured any type of legal counsel to
14  advise you whether or not Dey has done anything wrong,
15  correct?
16 A. Correct.
17 Q. Okay. So you haven't formed a conclusion as
18  to whether or not Dey was in violation of the law or
19  cooperating with the Medicaid authorities or something
20  in between, correct?
21 A. Correct.
22 Q. Now, when Mr. -- when Mr. Winter's office
23  spoke with you about logistics and arranging your
24  deposition, did anyone ever suggest to you that in all
25  the years that Dey has been reporting to the Texas

Page 185

1   Medicaid authority, that AWP has been known to the
2   Texas Medicaid representatives to be a price that
3   nobody pays in the industry and nobody has really ever
4   paid for generic drugs? Did they ever tell you that?
5 A. No one from their office said anything about
6   that, no.
7 Q. Okay. Did they tell you that in all the time
8   that Dey has been reporting and -- to the Medicaid
9   authorities in Texas and providing its WAC on its
10  various generic products that are involved in this
11  case that the Medicaid authorities have, in fact,
12  asked for Dey's list prices?
13      MR. BREEN: Objection to form.
14      MR. WINTER: Object to form.
15 Q. (BY MR. FLECKMAN) Did they ever tell you
16  that?
17 A. I'm sorry. Repeat the question.
18 Q. Did they tell you that the Texas Medicaid
19  authorities have been asking for Dey's wholesale list
20  price --
21      MR. WINTER: Objection, form.
22 Q. (BY MR. FLECKMAN) -- on its -- on its
23  generic products?
24 A. I can't say that I recall that question
25  coming from -- or that piece of information coming

Page 186

1   from them.
2 Q. Okay. Now, if I were to ask you while you
3   were employed with Dey to provide me with your
4   wholesale list price for albuterol, what would that
5   wholesale list price be?
6 A. Whatever the current invoice price is for
7   wholesalers.
8 Q. Okay. And what did you call that at Dey?
9 A. WAC.
10 Q. Now, if the Texas Medicaid authorities had
11  asked you to report to them the wholesale list price
12  for albuterol products, would you have provided them
13  your WAC?
14 A. Yes.
15      MR. WINTER: Objection, form.
16 Q. (BY MR. FLECKMAN) And if that's what they
17  had asked for, would you regard that as being improper
18  in any way?
19 A. No.
20 Q. The -- how about the conversation that you
21  had with Pam Marrs? Ms. Marrs agreed with you that
22  you should not dispose of your records, correct?
23 A. Correct.
24 Q. Okay. And you see that Ms. Marrs did not
25  dispose of your records, correct?

Page 187

1 A. Correct.
2 Q. Okay. The -- and -- and Willia Tate also
3   agreed with that conclusion as well, I take it?
4 A. Yes.
5 Q. Okay. Now, you didn't have an argument with
6   Mr. Mozak after you told him you were not going to
7   dispose of your records, did you?
8 A. No.
9 Q. And you didn't say to Mr. Mozak, Mr. Mozak,
10  there are documents related to spread or related to
11  the issues that the subpoena covered or related to the
12  lawsuit? You didn't say that to Mr. Mozak, did you?
13 A. No.
14 Q. And you didn't say, What should I do with
15  those documents that relate to the lawsuit?
16 A. No.
17 Q. Okay. You had a lot of documents in your
18  office, and you simply said, What should I do with all
19  the documents in my office, and Mr. Mozak said to
20  shred them?
21 A. I never asked him what to do with any of my
22  documents.
23 Q. Okay. He just volunteered that you --
24 A. He just said, I'd like you to shred
25  everything in your office.

Page 188

1 Q. Okay. And there was no discussion about
2  specific items in the office or what your files had or
3  didn't have in them?
4 A. No.
5 Q. Okay. With regard to the issue of Helen's
6  interactions with Charles Rice, do you know what had
7  given rise to the -- the unpleasantness between them?
8 A. There was an issue with a safety violation of
9  an employee, or not really a violation. An employee
10  had injured their back, and when Helen questioned this
11  employee was it job related, did she need medical
12  assistance, at that point in time the employee said
13  no.
14    Helen didn't report this to our safety
15  officer or anyone -- any other member of management.
16  There later came a claim from that employee for an
17  on-the-job injury that Dey obviously had to pay
18  workman's compensation for, so Helen was --
19 Q. Was she reprimanded in this --
20 A. Yes, she was reprimanded that she had not
21  followed company policy with regard to this safety
22  issue.
23 Q. Okay. And, in fact, she had not followed
24  company policy, correct?
25 A. Correct.

Page 189

1 Q. The -- did you know Eve Gmeiner?
2 A. Yes.
3 Q. Did you have a high regard for Eve Gmeiner?
4 A. Yes.
5 Q. Is she an honest person?
6 A. Yes.
7 Q. The -- Ms. Gmeiner has said that at the time
8  that Exhibit 72 was drafted by Ms. Burnham, not only
9  did she not see it, but she couldn't understand why
10  that report would have been made to First Data Bank by
11  Ms. Burnham because by that time, according to
12  Ms. Gmeiner's testimony, the function of price
13  reporting had been centralized to Ms. Gmeiner.
14    If Ms. Gmeiner's testimony is to that
15  effect, would you believe Ms. Gmeiner to be a credible
16  person?
17    MR. BREEN: Objection to form.
18 A. Yes.
19 Q. (BY MR. FLECKMAN) The -- can you recall any
20  conversation ever in the Pricing Committee where Bob
21  Mozak or anyone else, yourself included, ever
22  suggested that you should increase Dey's albuterol WAC
23  on its albuterol 25's, increase the WAC that was
24  reported to First Data Bank by 40 percent above what
25  you were invoicing your wholesalers?

Page 190

1    MR. BREEN: Objection to form.
2 A. I don't recall that.
3 Q. (BY MR. FLECKMAN) The -- I think the
4  evidence is going to show that Ms. Burnham reported at
5  the time of her memo, Exhibit 72, to First Data Bank
6  and possibly also to Medi-Span, another reporting
7  service, WACs for three albuterol solutions, the 25's,
8  the 30's and the 60's, I believe. And I'm just going
9  to mention the 25's for purposes of this question.
10    I'll represent to you that at the time
11  Ms. Burnham made that report to First Data Bank,
12  albuterol 25's were priced at WAC 14.50 for the 25's
13  at Dey.
14 A. Uh-huh.
15 Q. This is mid-1995. And Ms. Burnham sent a fax
16  to First Data Bank claiming that the WAC was 24.75.
17    Do you recall Mr. Mozak ever suggesting
18  such an activity should be undertaken, such -- such --
19  that such an act should be engaged in?
20    MR. BREEN: Objection to form.
21 A. I would not have been involved in a
22  conversation where that decision was made.
23 Q. (BY MR. FLECKMAN) My question to you is
24  different. Not --
25    MR. FLECKMAN: Objection, nonresponsive.

Page 191

1 Q. (BY MR. FLECKMAN) My question is did you
2  ever hear such a discussion?
3 A. No.
4 Q. Okay. In the Pricing Committee, did you ever
5  hear such a discussion?
6 A. No.
7 Q. Okay. Was the Pricing Committee in existence
8  in 1995?
9 A. I believe it was started in -- sometime
10  during 1995. I don't recall exactly when.
11 Q. Okay. If it turns out that the Pricing
12  Committee was in existence in 1995, were you a member
13  of it at that time of -- at that time?
14 A. Yes.
15 Q. Okay. The -- were you generally made aware
16  of the WACs that were set at Dey?
17 A. I was typically informed when the Marketing
18  Department would send out the new price list, and I
19  was copied on that as a member of the Sales and
20  Marketing Department.
21 Q. Now, do you ever recall a situation where you
22  were informed that Dey's albuterol 25 WAC had gone
23  from $14.50 to $24.75?
24    MR. BREEN: Objection to form.
25 A. No, I don't recall.

Page 248

1   increase the Medicaid reimbursement spread, do you
2   have evidence that that was ever done by Dey?
3        MR. BREEN: Objection to form.
4        MR. WINTER: Objection, form.
5 A. I have no evidence to that fact.
6 Q. (BY MR. FLECKMAN) And how long were you with
7   Dey?
8 A. 17 years.
9 Q. And much of that time was spent on the
10   Pricing Committee or involved in contracts and
11   contract administration?
12 A. Yes.
13 Q. You had mentioned at one point today, and I
14   think it's only fair to the record that this be
15   reflected, that you've had some unhappy experiences in
16   your family recent -- over the past year and that
17   today your presence of mind has not been ideal.
18        Is that a fair statement?
19 A. Yes.
20 Q. Okay. And I think that without getting into
21   details, your mother is in the hospital now, is she
22   not?
23 A. Yes.
24 Q. I want to thank you for joining us today. I
25   know it's a difficult time for you.

Page 249

1        I think you mentioned that as a result,
2   that your memory may be somewhat inspecific or cloudy
3   on details today. Is that fair to say?
4 A. That's fair.
5 Q. At one point you said that Mr. Rice had --
6   may have attended, and I think -- I don't want to
7   misquote you, but I think you said a Pricing Committee
8   meeting from time to time. Is that -- is that
9   accurate?
10 A. Yes.
11 Q. Was it the case that Mr. Rice attended all
12   Pricing Committee meetings or just occasionally
13   attended?
14 A. He occasionally attended.
15 Q. So he didn't attend -- he didn't attend with
16   the same constancy and frequency of Mr. Mozak by any
17   stretch of the imagination?
18 A. Correct.
19 Q. And you didn't mean to suggest otherwise?
20 A. Correct.
21 Q. Now, you said that at one point Bob Pallas
22   may have sat on the committee before Mary Anderle, and
23   then you qualified to say you were trying to remember
24   if the committee existed at that time and you weren't
25   certain of that.

Page 250

1 A. Correct.
2 Q. Is that a fair statement?
3 A. Yes.
4 Q. Okay. Now, when you were asked to gather
5   documents for subpoenas and you discussed that with
6   Pam Marrs, did you understand that -- let me rephrase
7   that.
8        At the time that you were asked to
9   gather documents for the subpoen -- the various
10   subpoenas that were received by Dey from various
11   governmental agencies, did you make a genuine and
12   honest effort to produce documents that were
13   responsive to those subpoenas?
14 A. Yes.
15 Q. Okay. And did you make a genuine and honest
16   effort to produce documents that were within the date
17   range and subject matter scope of those requests?
18 A. Yes.
19 Q. And did you have the feeling that Pam Marrs
20   was encouraging you to do that?
21 A. Yes.
22 Q. Just so that the jury is clear about this, is
23   it your testimony or is it not your testimony that Dey
24   generally and almost uniformly competed on these
25   generic products by lowering its negotiated prices?

Page 251

1 A. Yes.
2 Q. Although you stated that Exhibit 72, which
3   was an early -- which was shown to you early on in the
4   deposition -- that's the Helen Burnham memo or a part
5   of the memo -- it doesn't have the fax attached to
6   it -- that it was your belief that Helen would not
7   report prices without Mr. Mozak's approval, you don't,
8   in fact, know what conversation, if any, she had
9   regarding that subject before she prepared that
10   Exhibit 72 memo, do you?
11 A. That's correct.
12 Q. And, in fact, when you read the memo, after I
13   pointed certain language out to you in that memo, you
14   recognized and confirmed that it was not accurate?
15 A. Correct.
16 Q. And, in fact, even as you sit here today you
17   would disagree with what Ms. Burnham said in that
18   memo?
19 A. Yes.
20 Q. Did I understand you to say that the rebates
21   that were generally made available to the wholesalers
22   or other customers were generally calculated at an
23   overall or gross product level?
24 A. For the source program rebates, yes.
25 Q. For the source program rebates. So that