# Exhibit 330

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Scrunch® www.scrunch.cc  GC Software,  Seattle, Washington

Page 1

NO. GV002327

THE STATE OF TEXAS          ) IN THE DISTRICT COURT
ex rel.                     )
    VEN-A-CARE OF THE       )
    FLORIDA KEYS, INC.,     )
        Plaintiff(s),       )
                            )
VS.                         ) TRAVIS COUNTY, TEXAS
                            )
DEY, INC.; ROXANE           )
LABORATORIES, INC., WARRICK )
PHARMACEUTICALS CORPORATION, )
SCHERING CORPORATION,    )
SCHERING-PLOUGH CORPORATION, )
LIPHA, S.A., MERCK-LIPHA,   )
S.A., MERCK, KGAA, and EMD )
PHARMACEUTICALS, INC.,     )
        Defendant(s).      ) 53RD JUDICIAL DISTRICT

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT ELLIS
February 10th, 2003

*******************************************

    ORAL AND VIDEOTAPED DEPOSITION OF ROBERT ELLIS,
produced as a witness at the instance of the
Plaintiff(s), and duly sworn, was taken in the
above-styled and numbered cause on February 10th,
2003, from 9:13 a.m. to 5:36 p.m., before Cynthia
Vohlken, CSR in and for the State of Texas, reported
by machine shorthand, at the offices of Cotchett,
Pitre, Simon & McCarthy, 840 Malcolm Road, Suite 200,
Burlingame, California pursuant to the Texas Rules of
Civil Procedure.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF(S):
    MR. RAYMOND C. WINTER
    Office of the Attorney General
    State of Texas
    Post Office Box 12548
    Austin, Texas 78711-2548
FOR THE RELATOR:
    MR. ADAM D. MILLER
    Engstrom, Lipscomb & Lack, P.C.
    10100 Santa Monica Boulevard, 16th Floor
    Los Angeles, California    90067-4107
FOR THE DEFENDANT(S) DEY, INC.:
    MR. DARRELL PRESCOTT
    Coudert Brothers, LLP
    1114 Avenue of the Americas
    New York, New York 10036-7703

Page 2 (cont.)

    -and-
    MR. STEVEN A. FLECKMAN
    Fleckman & McGlynn, P.L.L.C.
    515 Congress, Suite 1800
    Austin, Texas 78701-3503
FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
    MR. R. ERIC HAGENSWOLD
    Scott, Douglass & McDONALD, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas 78701

Page 3

FOR THE DEFENDANTS WARRICK PHARMACEUTICALS
CORPORATION, SCHERING-PLOUGH CORPORATION AND
SCHERING CORPORATION:
    MR. JOHN P. MCDONALD
    Locke Liddell & Sapp, LLP
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201-6776
ALSO PRESENT:
    Mr. Thomas A. Temmerman,
        California Office of the
        Attorney General
    Mr. Zachary Taylor Bentley, II
    Mr. Richard Rienstra, Videographer
    Ms. Judy Schlup

Page 4

INDEX

Appearances.................................... 2
ROBERT ELLIS
    Examination by Mr. Winter.............. 7
    Examination by Mr. Miller.............. 89
    Examination by Mr. Fleckman............ 162
    Examination by Mr. McDonald............ 272
    Examination by Mr. Winter.............. 276
    Examination by Mr. Fleckman............ 297
Signature and Changes...................... 299
Reporter's Certificate...................... 301
VIDEOTAPE NUMBER
    1 .............................. 6
    2 .............................. 67
    3 .............................. 114
    4 .............................. 179
    5 .............................. 239

EXHIBITS

NO.  DESCRIPTION                          PAGE
476 ........................................... 45
    Cromolyn Sodium Nebulizer Solution
    Marketing Plan
477 ........................................... 57
    July 21, 1992 Memo from Rob Ellis to NPCC

Page 12

1 Q. Termier?

2 A. Yes, that's right. That's right.

3 Q. Did you interview with Mr. Rice?

4 A. No, not at that time, no.

5 Q. And what was your first job title?

6 A. Marketing assistant.

7 Q. And did you get subsequently promoted while

8    you were at Dey?

9 A. I was promoted to a product manager

10    approximately two years later.

11 Q. Approximately March of '94?

12 A. Sounds about right.

13 Q. Roughly?

14 A. Yeah. I'm not sure of the exact date.

15 Q. To product manager, I'm sorry, is that

16    correct?

17 A. Yes, product manager, that's right.

18 Q. What were your duties and responsibilities as

19    a marketing assistant?

20 A. More or less just helping out on the

21    marketing side, doing everything that Helen asked me.

22    I did a lot of collateral development, sales

23    collateral development, did some sales training, did

24    various print jobs. One of my first projects was just

25    to -- to research the reimbursement status of Medicare

Page 13

1    and Medicaid, put together that database.

2 Q. Tell me about that, please. Who assigned

3    this project to you?

4 A. That was Helen. It was something that I

5    believe they had started before, but something they

6    put me on right away is just call all the state

7    agencies and record what their reimbursement

8    structures were and then assemble a database that we

9    had that for referral.

10 Q. And did you do that, did you assemble this

11    database?

12 A. Yeah, I guess I did.

13 Q. What was the name of that database?

14 A. I don't think I gave it a name. It was just

15    a database of information. Probably the Medicare or

16    Medicaid database is what we generally referred it

17    to -- referred to it as.

18 Q. And this is a database that was on the

19    mainframe at Dey?

20 A. No. No. It was -- simply I think I just put

21    together an Excel spreadsheet, you know. For

22    instance, Arkansas, reimbursement structure, whether

23    they reimbursed for generics or Albuterol at the time.

24 Q. Would this have been on your computer system

25    at Dey, just on --

Page 14

1 A. Yeah, it started on my computer system.

2    Sure.

3 Q. Would it have been accessible by everyone

4    else in the organization or in the alternative if

5    someone else wanted to access it would they have to

6    come to you and you could access it on your computer?

7 A. They -- at that time they would have to come

8    to me. I didn't make it generally accessible. It was

9    just on my computer. I don't think we -- I was tied

10    into any -- any local network at the time.

11 Q. Was it multi-pages or just one page, do you

12    recall?

13 A. You know, I'm not sure. I'm not sure. I

14    really don't -- I don't recall that.

15 Q. But the task was to -- to call the various

16    states and identify whether or not they were

17    reimbursing for Dey's products?

18 A. Uh-huh. To find the states that didn't and

19    actively seek reimbursement for Albuterol.

20 Q. Were you also determining what their

21    reimbursement formula was, for example, AWP minus

22    or --

23 A. Absolutely.

24 Q. -- wholesale cost plus?

25 A. I'm sorry. Yeah. That was the -- that was

Page 15

1    the main objective of the project.

2 Q. Did you understand why that was important to

3    Dey's managers?

4 A. No, not at the time. I didn't have a clue.

5    It was just my very first project, so I dug in.

6 Q. As you dug in and started executing the task

7    that was given to you did you come to an understanding

8    as to why that information was important to Dey?

9 A. Eventually, yes. I -- I completely

10    understood the reimbursement structures and -- and how

11    it drove generic substitution business.

12 Q. And what is the understanding that you came

13    to as far as the reimbursement and how it drove

14    generic substitution business?

15 A. Pharmacists, retail pharmacists are

16    reimbursed based on the formula AWP minus 30 percent

17    whatever the state does, so if that's -- if that's

18    financially rewarding to them and incentivizes them to

19    make that substitution over the brand.

20 Q. And when you're talking about competition

21    between generics, did you understand that your

22    customers, your pharmacy customers were also

23    interested not in competition versus the brand, but in

24    competition among generics, did you understand that

25    your customers, your pharmacy customers were also

Page 28

1 distributed them?
2 A. Yes, they did.
3 Q. Okay. Going back to this meeting that you
4 recollect where you were discussing pricing for
5 Cromolyn at or about -- actually prior to the launch,
6 did I understand that this was a meeting where
7 Mr. Mozak presided, Ms. Daulong was present,
8 Ms. Burnham was present, Susan Schnars was present and
9 you-all were discussing what to set the AWP and WAC
10 prices for Cromolyn?
11 A. That's right.
12 Q. As well as the published price to retail
13 generic distributors; is that right?
14 A. That's right. We were setting all the prices
15 for all our price lists.
16 Q. And --
17 A. All our class of customers.
18 Q. All your classes of trade. Okay. And did
19 you have a contribution to this meeting where you were
20 making a recommendation or were you there simply to
21 listen and take notes and observe?
22 A. As best I remember I came -- I was the one
23 that prompted the meeting, asked everybody to
24 participate. And I had some pricing recommendations
25 that I presented, but the meeting was immediately

Page 29

1 directed by Bob Mozak, who went to the board and
2 started discussing prices, and I think everyone else
3 just became observers at that point and Helen and Bob
4 decided what the prices were going to be.
5 Q. And in your experience working at Dey the --
6 the two -- two and a half years that you were there
7 who was the ultimate authority in deciding what prices
8 would be?
9 A. Bob Mozak.
10 Q. You mentioned that you brought some
11 recommendations to this particular meeting as to what
12 the AWP should be and the WAC prices should be; is
13 that right?
14 A. What all our prices should be, yeah.
15 Q. Okay. What -- what informed your
16 recommendation? Where did you get the idea and how
17 did you come up with the recommended pricing that you
18 presented to this meeting?
19 A. I mostly followed what our -- our past
20 history was on pricing and made any final tweaks based
21 on Cromolyn relative to Intal, which was the brand at
22 the time, and how we would relate to that. Because we
23 were the sole generic at the time.
24 Q. Who manufactured Intal?
25 A. That was Fisons.

Page 30

1 Q. Pfizer?
2 A. Fison.
3 Q. Fison.
4 A. F-i-s-o-n.
5 Q. F-i-s-o-n; is that right?
6 A. That's right.
7 Q. And so you say you followed your -- your
8 established procedure for -- if I understood you
9 correctly, when you were selecting your
10 recommendations for AWP and for wholesale acquisition
11 cost and for the other prices to classes of trade you
12 followed an established procedure; is that right?
13 A. No.
14 Q. I'm sorry.
15 A. There was no established procedure. I was
16 basing my recommendations off what our historical
17 pricing was relative to each other -- relative to each
18 class of trade. I was making an attempt. I really
19 didn't have much idea what I was doing, but I was
20 trying to be proactive in -- in guiding this process
21 forward.
22 Q. Okay. So you were looking at what your
23 historical prices had been for other products, is that
24 right, since -- you're now talking about Cromolyn,
25 which is going to be a new product, correct?

Page 31

1 A. That's right.
2 Q. So you are looking at your prices, your AWP
3 prices, your WAC prices, your prices to retail generic
4 distributors for Albuterol; is that correct?
5 A. That's right.
6 Q. Okay. And you're using that as sort of a
7 benchmark to -- to make your recommendation for the
8 Cromolyn prices?
9 A. Yes, that's right.
10 Q. Okay. Were you also looking at the published
11 prices that Fison had -- had put out on the
12 marketplace for Intal?
13 A. Yes.
14 Q. Okay. And is there a relationship between
15 what their prices are and where you want to set your
16 AWP for your first generic?
17 A. Yes. Yes. I know through discussions that I
18 had with Helen and her discussions with First DataBank
19 that you had to be at least 10 percent, just -- just a
20 hair above 10 percent below the AWP on the brand to be
21 labeled as a generic by First DataBank. So that was
22 your ceiling price you could have on AWP and that was
23 really your starting point from deriving the rest of
24 your pricing.
25 Q. Okay. So you would have looked at what

Scrunch® www.scrunch.co. GC Software. Seattle, Washington

Page 212

1   price reporting services while you were with Dey on
2   its generic products?
3 A. Changes in its WAC?
4 Q. Yeah, in its WACs.
5 A. Yeah, I think so. We had price changes, yes.
6 Q. And tell the jury what happened to those
7   prices when you reported them year after year to the
8   price reporting services?
9 A. Our WAC price? I think our WAC prices went
10  down.
11 Q. You can't recall a single situation in which
12  your WAC prices went up, can you?
13 A. No.
14 Q. Not a -- not a one.
15 A. No.
16 Q. And so that -- for those states that were
17  using Dey's WAC as a component of the reimbursement
18  formula, the WACs that Dey was reporting to the price
19  reporting services, as you understood, were going
20  down.
21 A. That's right.
22 Q. And this is consistent with what you
23  understood management's directive to you to be because
24  you were simply doing a ministerial task. You were
25  taking the prices you were given and reporting those,

Page 213

1   correct?
2 A. That's right.
3 Q. You weren't -- you weren't creating the
4   prices, were you?
5 A. No. No.
6 Q. Now, would it surprise you if I told you that
7   one of your colleagues reported outlandishly high WACs
8   on one occasion to a price reporting service or
9   multiple price reporting services in 1995 that were
10  completely inconsistent with Dey's internal WAC
11  prices?
12 A. I would be very surprised.
13     MR. WINTER: Objection, form.
14 Q. (BY MR. FLECKMAN) Say that -- he talked over
15  you. What did you say?
16 A. I said I would be very surprised.
17 Q. Okay. Would that be -- if that occurred
18  would that be consistent with anything you know about
19  the policies of Dey or would it be inconsistent with
20  what you know about the policies of Dey while you were
21  there?
22 A. Completely inconsistent.
23 Q. Did you ever see a memo circulated to you
24  telling you that one of your colleagues intended to
25  jimmy up the prices reported on WAC to the reporting

Page 214

1   services on Albuterol?
2 A. I don't remember that.
3 Q. If you had seen a memo which purported to
4   report prices 40 to 50 percent higher than your
5   current WACs on those Albuterol products to the price
6   reporting services, would you have taken note of that
7   as a member of the marketing department?
8 A. I would ask them, yeah, I probably would ask
9   them why are we doing that.
10 Q. And that never occurred?
11 A. I don't recall it happening.
12 Q. It's going to take me a second, but I want to
13  find this. The -- I'm going to ask you not -- I'm
14  just going to show you the second page of this
15  document.
16     MR. FLECKMAN: Actually, Ray, do you
17  have the exhibit, I hate to introduce it yet again, do
18  you have the exhibit that we previously used --
19     MR. WINTER: You're looking for Helen's
20  memo?
21     MR. FLECKMAN: No. I'm actually looking
22  for one page which is a fax. I think I'll just do it
23  this way.
24 Q. (BY MR. FLECKMAN) Let me -- let me hand you
25  a page which I'm going to mark Exhibit 482 and I'm

Page 215

1   going to represent to you that I have detached this
2   from another page to which it is appended as an
3   exhibit in this particular case.
4 A. Okay.
5 Q. But I want to show it to you because I want
6   to ask you have you any recollection of seeing those
7   WAC prices for those products, and I will represent to
8   you that at the time that fax was sent to First
9   DataBank Dey's WAC for the Albuterol products was not
10  24.75 for the 25's but rather $14.50 for the 25's, and
11  I will tell you that Lou Barricelli has been asked and
12  he didn't see it, Rick Upp has been asked, he didn't
13  see it, Mary Anderle has been asked, she doesn't
14  recall it, Todd Galles has been asked, he doesn't
15  recall it and I'm now asking you do you recall it?
16 A. No. No.
17 Q. Now, let me show you a memo, let me just ask
18  you, if Dey's WAC was $14.50 on that Albuterol 25's
19  would Dey have authorized you or anyone else as far as
20  you know and as far as your experience at Dey went to
21  report this inconsistent price to the reporting
22  agencies or to any Medicaid authority?
23 A. No. No.
24 Q. Okay. Let me show you what has been marked
25  as Exhibit -- well, before I do that, let me just read

Page 216

1     something to you.  The -- do you agree or disagree
2     with this statement:  "WAC is not representative of
3     our published wholesale list prices."  Do you agree or
4     disagree with that statement?  "WAC is" --
5 A. I disagree.
6 Q. You disagree.  Do you strongly disagree?
7 A. Yeah.  WAC -- WAC represents our published
8     prices.
9 Q. Your published wholesale list prices?
10 A. Our published wholesale list prices.
11 Q. Okay.  Let me hand this to you.  I'll
12     represent to you that there's a good deal of
13     controversy over whether this memorandum was
14     distributed as it purports to have been distributed at
15     this time and I'll ask you do you recall ever setting
16     eyes on this memoranda before today?
17 A. No.  No.
18 Q. Let me ask you to turn with me to your
19     December -- you can set that aside.  Thank you, sir.
20     By to the way, you worked for Helen Burnham, correct?
21 A. That's right.
22 Q. In 1995 you still were supervised by Helen
23     Burnham, correct?
24 A. That's right, yeah.
25 Q. And she never had a discussion with you about

Page 217

1     that memorandum, did she?
2 A. No.  No.
3 Q. Now, she claims that she was authorized at
4     Dey to report these fake prices to First DataBank.
5         MR. WINTER:  Objection, form.
6 Q. (BY MR. FLECKMAN)  But I understood that you
7     and Todd Galles and Eve were the ones who typically
8     reported prices to the pricing reporting services.
9 A. That's right.  Helen was never involved in
10     that.
11 Q. Let me ask you to turn to Exhibit 476.
12     Before we actually get into this exhibit, as you sit
13     here today would you -- did you like Helen Burnham?
14 A. To begin with.
15 Q. Okay.
16 A. Not in the end.
17 Q. Okay.  What was it about the process of your
18     experience working for Ms. Burnham that antagonized
19     you?
20 A. Oh, it was a slow evolution over the, what,
21     three and a half years that I was there.  I don't
22     think she -- she --
23 Q. They can't hear you.  If you --
24 A. I'm sorry.  I don't think -- the problem I
25     had is I don't think Helen fairly represented what I

Page 218

1     want to say Todd, me and Eve were really doing in
2     marketing to upper management.  I think she -- she
3     took -- she put her own interpretation on things when
4     she presented it to management.
5 Q. Did you feel that she was not in all respects
6     entirely truthful about what she reported to upper
7     management in the way she characterized the marketing
8     activities and efforts?
9 A. No.  Helen -- Helen and I had one incident
10     that probably started our road south where I lost
11     confidence in her.
12 Q. Okay.  How did you lose confidence in her or
13     trust in her?
14 A. There was one time that she came to me she
15     asked me to call the product manager for Ventolin and
16     actively come to agreement on what prices should be.
17 Q. When was that?
18 A. That was during the course of my employment
19     there.
20 Q. Did she indicate to you that anybody had
21     directed her to do that or did it seem to you that she
22     was doing this of her own accord?
23 A. It seemed like she was trying to catch me
24     off guard because I was still young at the time and I
25     wouldn't know that that was wrong and she was trying

Page 219

1     to get me to do it and I said flat out no, that that's
2     price fixing.  I can't do that.  And she just kind of
3     said, "Oh, okay."
4 Q. And she just dropped the subject.
5 A. Yeah.
6 Q. Did she ever raise it with you again?
7 A. No.  No.
8 Q. The -- did you know that Helen had a strong
9     animosity toward Charles Rice on a personal level?
10 A. Yes.  That was very apparent.
11 Q. Okay.  How did it manifest itself?
12 A. Helen -- Helen was a very -- very strongly
13     opinionated person and she would -- she would just
14     interject her opinions and wasn't very professional in
15     doing so at times.
16 Q. Did you ever feel that -- well, tell me how
17     it related to Charles Rice when you say that she had a
18     strong -- let me not put words in your mouth.  You
19     tell how that -- what you've just related to us, how
20     that had anything to do with Charles Rice in
21     particular and her -- and her animosity toward him.
22 A. Well, I can only speak to meetings where
23     Charles and i and Helen were in the same meeting and
24     she would -- she would take a bit of an aggressive
25     stance in exerting her opinions.  Even though Charles

Scrunch® www.scrunch.cc  GC Software, Seattle, Washington