# Exhibit 332

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

| Page 1 | Page 2 |
|---|---|
| CAUSE NO. GV002327 | 1  APPEARANCES |
| THE STATE OF TEXAS        )   IN THE DISTRICT COURT | 2  FOR THE PLAINTIFF STATE OF TEXAS: |
| ex rel.                             ) | 3  MR. JOE CRAWFORD, MR. PATRICK J. O'CONNELL, |
|     VEN-A-CARE OF THE   ) |     MR. JARRETT ANDERSON, MR. RAYMOND WINTER |
|     FLORIDA KEYS, INC.    ) | 4  Office of the Attorney General |
|                                        ) |     State of Texas |
|         Plaintiffs,             ) | 5  P.O. Box 12548 |
|                                        ) |     Austin, Texas 78711-2548  (512) 475-4300 |
| VS.                                )   TRAVIS COUNTY, TEXAS | 6         (512) 474-1062 Fax |
|                                        ) | 7  FOR THE RELATOR: |
| DEY, INC.; ROXANE      ) | 8  MR. JAMES JOSEPH BREEN |
| LABORATORIES, INC. and ) |     The Breen Law Firm, P.A. |
| WARRICK PHARMACEUTICALS ) | 9  8201 Peters Road, Suite 1000 |
| CORPORATION,            ) |     Plantation, Florida 33324  (954) 916-2713 |
|                                        ) | 10        (954) 916-2714 Fax |
|         Defendants.           )   53rd JUDICIAL DISTRICT |     -and- |
| ************************************************ | 11  MR. JOHN E. CLARK (Of Counsel) |
| ORAL AND VIDEOTAPED DEPOSITION OF |     Goode Casseb Jones Riklin Choate & |
| CHARLES A. RICE | 12  Watson, P.C. |
| October 30, 2001 |     2122 North Main Avenue |
| ************************************************ | 13  P.O. Box 120480 |
| ORAL DEPOSITION OF CHARLES A. RICE, produced |     San Antonio, Texas 78212-9680  (210) 733-6030 |
| as a witness at the instance of the Plaintiffs and duly | 14        Fax (210) 733-0330 |
| sworn, was taken in the above-styled and numbered cause |     -and- |
| on the 30th day of October 2001, from 9:06 a.m. to 5:02 | 15  MS. SUSAN THOMAS |
| p.m., before Randall N. Finch, CSR in and for the State | 16  FOR THE DEFENDANT DEY, INC.: |
| of Texas, reported by machine shorthand, at the offices | 17  MR. STEPHEN M. HUDSPETH |
| of Coudert Brothers, 600 Beach Street, Third Floor, |     Coudert Brothers |
| San Francisco, California 94109, pursuant to Notice, | 18  1114 Avenue of the Americas |
| the Texas Rules of Civil Procedure and the provisions |     New York, New York 10036-7703  (212) 626-4442 |
| as previously set forth. | 19        (212) 626-4120 |
| |     -and- |
| | 20  MR. STEVEN A. FLECKMAN |
| |     Fleckman & McGlynn, P.L.L.C. |
| | 21  515 Congress Avenue, Suite 1800 |
| |     Austin, Texas 78701-3503  (512) 476-6900 |
| | 22        (512) 476-7644 Fax |
| | 23  FOR THE DEPARTMENT OF JUSTICE: |
| | 24  MR. ANDY MAO, Civil Division |
| |     601 D Street, N.W., Room 9929 |
| | 25  Washington, D.C. 20004  (202) 616-0539 |

Page 124

1 A. Yes, sir, I see it.
2 Q. Ever seen that before?
3 A. Yes, I have.
4 Q. Purports to be a memo dated 30 May 1995 from
5    Helen Burnham to sales and marketing with an attachment
6    to it --
7 A. Yes, sir.
8 Q. -- cc R.F. Mozak?
9 A. Yes.
10 Q. Now, in 1995, as I understand it, you were not
11    responsible for sales and marketing in a managerial
12    capacity?
13 A. No, I was.
14 Q. You were at that time?
15 A. Yes. It was only prior to the middle of 1992
16    that I was not.
17 Q. Okay. So Ms. Burnham I would assume then
18    indirectly reported to you?
19 A. Indirectly through a circuitous route, yes,
20    sir.
21 Q. Okay. Now, when was the first time you saw
22    this document?
23 A. That I don't recall.
24 Q. Did you see it at the time that it was created
25    by Ms. Burnham?

Page 125

1 A. No, sir, I don't believe so.
2    MR. HUDSPETH: Excuse me, may I just
3    interject. I think you have attached to here something
4    that is not the attachment to the document as it
5    appears. At least it's not in numerical sequence in
6    the production that was given by Dey.
7    MR. BREEN: Well, to make is easier, if
8    you want to remove that, Counsel, I have no objection
9    to it.
10    MR. HUDSPETH: Yes, so we are marking --
11    just so we are clear on the record, Exhibit 72 will now
12    consist of one page which is -- what is the first
13    page -- what has been previously referred to as Exhibit
14    72. The second page is now removed. So henceforth
15    when we speak of Exhibit 72 we're talking about a
16    one-page document.
17    MR. BREEN: That's fine.
18    MR. ANDERSON: Let's go off the record.
19    VIDEOGRAPHER: We're off the record at
20    1:48 p.m.
21    VIDEOGRAPHER: Back on the record at
22    1:48 p.m.
23    MR. BREEN: Read my last question back
24    for my train of thought purposes.
25    (Requested portion was read)

Page 126

1 Q. (By Mr. Breen) I see some writing next to
2    Ms. Burnham's name and date which appears to say Helen.
3    Do you see that?
4 A. Yes, sir, I see it.
5 Q. Do you know if that is or is not Ms. Burnham's
6    writing?
7 A. I don't know. I can presume it is, but I
8    don't recognize her signature, sorry.
9 Q. Okay. On the bottom the preparer's initials
10    appear to be HB:MF. Do you know who MF is?
11 A. I'm trying to recall, but I don't know people
12    employed in the company at that time. I suspect it was
13    a secretary. I -- I don't know if Ms. Burnham actually
14    had a secretary --
15 Q. Okay.
16 A. -- but we could con -- you know, again, we
17    could consult our files to find out.
18 Q. The memorandum purports to be about Albuterol
19    WAC pricing. Do you see that?
20 A. Yes, do I.
21 Q. Now, what was Ms. Burnham's responsibility in
22    May of 1995 at Dey -- at Dey?
23 A. Ms. Burnham was Manager of Marketing.
24 Q. And so she managed the entire marketing
25    department?

Page 127

1 A. Yes, at that time.
2 Q. And if I understood your -- your testimony
3    earlier, the marketing department had responsibility at
4    that time for establishing prices of Dey's products?
5 A. Marketing and sales.
6 Q. And sales?
7 A. Yes.
8 Q. And sales and marketing is basically housed
9    under one roof, correct?
10 A. That's correct.
11 Q. So who at Dey was superior to Ms. Burnham with
12    respect to actual responsibility for setting prices?
13 A. Mr. Mozak.
14 Q. And you can see here that this memo was cc'd
15    to R.F. Mozak, correct?
16 A. Yes, I see that.
17 Q. Now, are you aware of any document or response
18    memorandum or e-mail or anything that exists whereby
19    Mr. Mozak took issue with anything that Ms. Burnham
20    says in this memo?
21 A. I'm not aware of that, no.
22 Q. Have you ever had any discussion with
23    Mr. Mozak about Ms. Burnham's memo of May 30, 1995?
24 A. I'm sure I have, yes, sir.
25 Q. Can you recall any of those discussions that

Page 176

1  A. My invoice price to wholesalers is WAC. I
2     don't think I can state it any clearer.
3  Q. So is it your testimony today that the State
4     of Texas should rely upon Dey's representation of WAC
5     in order to estimate acquisition cost?
6  A. Since I'm not familiar with what the state
7     considers estimated acquisition cost to be, I can't
8     answer that question.
9  Q. Well, if you were paying for Dey's drugs,
10    would you rely upon your WAC to estimate acquisition
11    cost?
12        MR. HUDSPETH: Objection; form.
13        THE WITNESS: I can't answer that.
14 Q. (By Mr. Breen) Well, Ms. Burnham said that --
15    in her memo of May 30, 1995, that "WAC is not
16    representative of our published wholesale list prices,
17    but, like AWP, is used for calculation of
18    reimbursement. Our updated WAC values are in line with
19    the Warrick WAC values provided by First Data Bank and
20    should level the playing field for Medicaid
21    reimbursement."
22        Is that true, what she said about your
23    WAC prices?
24 A. No, sir, it's not. It isn't -- it was not
25    then, it is not today, nor has it ever been, to my

Page 177

1     knowledge. What compelled her to write that, I have no
2     idea.
3  Q. Well, she said that "Our updated WAC values
4     are in line with WAC -- Warrick WAC values provided by
5     First Data Bank." Is that part untrue?
6  A. To the best of my knowledge, the "updated WAC
7     prices" she's referring to was what she in fact
8     reported only to Blue Book. She did not report it to
9     Red Book, Medi-Span or any state agency. That's what
10    our documents show.
11 Q. Do you know if Warrick's WAC prices for the
12    relevant drugs today are higher than Dey's?
13 A. I can't say that I know that for all the
14    relevant drugs.
15 Q. But you testified earlier that you felt that
16    Dey's WAC prices are in general lower than its
17    competition. Correct?
18 A. And historically that's been true. You asked
19    about today. I'd have to consult the data reports and
20    see what the prices that are reported reveal.
21 Q. So is it your testimony that historically,
22    based upon the best information that's been made
23    available to you so far, or that you've reviewed so
24    far, that historically Warrick's WAC prices have been
25    higher than Dey's?

Page 178

1  A. Yes, sir.
2  Q. Do you believe that Warrick's true prices have
3     been higher than Dey's?
4         MR. HUDSPETH: Objection to form.
5         MR. MOORE: Same objection.
6         THE WITNESS: Can you define true price?
7  Q. (By Mr. Breen) The prices that are really
8     paid by their customers after deducting all
9     chargebacks, discounts, rebates and other reductions in
10    price.
11 A. I actually don't know the answer to that.
12 Q. Well, when you testified earlier that Dey's
13    WAC prices are historically lower than its competition,
14    I took that as a reason to believe that Dey is trying
15    to sell product at the lowest price possible in the
16    competitive marketplace. Did I misunderstand you?
17 A. Considering the fact that you and I haven't
18    discussed anything regarding the lowest price possible,
19    I don't know how you've reached that conclusion.
20 Q. Well, do you think it's a good thing that
21    Dey's WAC prices are historically the lowest in the
22    marketplace for your drugs?
23 A. It's a good thing for Dey.
24 Q. Why?
25 A. For a lot of different reasons.

Page 179

1  Q. What are they?
2  A. For example, with the lower WAC price, the
3     prompt pay discount is lower. If I use a higher WAC
4     price and provide a prompt pay discount, for example,
5     one percent or two percent, that number is higher. So
6     I prefer to pay a lower prompt pay discount.
7     Similarly, to the total amount of chargebacks involved,
8     if -- if the WAC tends to be a high -- at a high level
9     and the market price -- or the contract price, excuse
10    me, is significantly lower, there's a great deal of
11    cash which is tied up on the part of the wholesaler and
12    on the part of Dey.
13        The wholesaler has paid at WAC. Dey is
14    reimbursing at a later time, whenever the contract is
15    served. The wholesaler is without cash. Dey is
16    holding cash they can't do anything with and eventually
17    reimburses it back. That's not good for the customer
18    nor for Dey if that number is very, very high. So
19    having a lower amount involved in the chargeback
20    process is to our advantage.
21        Similarly, if that number gets extremely
22    large -- well, if there's an error, one percent of a
23    very large number is worth a lot more than one percent
24    of a very small number. So a smaller number in the
25    chargeback area is much more manageable.