# Exhibit 333

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| ex rel. | ) |
|   VEN-A-CARE OF THE | ) |
|   FLORIDA KEYS, INC., | ) |
|     Plaintiff(s), | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC., WARRICK | ) |
| PHARMACEUTICALS CORPORATION, | ) |
| SCHERING CORPORATION, | ) |
| SCHERING-PLOUGH CORPORATION, | ) |
| LIPHA, S.A., MERCK-LIPHA, | ) |
| S.A., MERCK, KGAA, and EMD | ) |
| PHARMACEUTICALS, INC., | ) |
|     Defendant(s). | ) 53RD JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
BRUCE TIPTON
February 13th, 2003
(CONTAINS ATTORNEYS' EYES ONLY TESTIMONY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF BRUCE TIPTON, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on February 13th, 2003, from 9:03 a.m. to 6:21 p.m., before Cynthia Vohlken, CSR in and for the State of Texas, reported by machine shorthand, at the Fairfield Inn by Marriott Carlsbad, 760 Macadamia Drive, Carlsbad, California pursuant to the Texas Rules of Civil Procedure.

Page 2

APPEARANCES

FOR THE PLAINTIFF(S):
    MR. RAYMOND C. WINTER
    Office of the Attorney General
    State of Texas
    Post Office Box 12548
    Austin, Texas 78711-2548

FOR THE RELATOR:
    MR. DAVID R. LIRA
    Girardi & Keese
    1126 Wilshire Boulevard
    Los Angeles, California  90017-1904

FOR THE DEFENDANT(S) DEY, INC.:
    MR. DARRELL PRESCOTT
    Coudert Brothers, LLP
    1114 Avenue of the Americas
    New York, New York 10036-7703

Page 2 (cont.)

    -and-
    MR. STEVEN A. FLECKMAN
    Fleckman & McGlynn, P.L.L.C.
    515 Congress, Suite 1800
    Austin, Texas 78701-3503

FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
    MR. R. ERIC HAGENSWOLD
    Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas 78701

FOR THE DEFENDANTS WARRICK PHARMACEUTICALS

Page 3

SCHERING CORPORATION
    MR. JOHN P. MCDONALD
    Locke Liddell & Sapp, LLP
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201-6776

ALSO PRESENT:
    Mr. William S. Schneider,
        California Office of the
        Attorney General
    Mr. Zachary Taylor Bentley, II
    Mr. Richard Rienstra

Page 4

INDEX

| | |
|---|---|
| Appearances.................................. | 2 |
| **BRUCE TIPTON** | |
|     Examination by Mr. Winter............. | 7 |
|     Examination by Mr. Lira................ | 124 |
|     Examination by Mr. Fleckman........... | 194 |
|     Examination by Mr. McDonald........... | 258 |
|     Examination by Mr. Winter............. | 264 |
|     Examination by Mr. Lira................ | 286 |
|     Examination by Mr. Fleckman........... | 299 |
| Signature and Changes....................... | 302 |
| Reporter's Certificate...................... | 304 |
| ATTORNEYS' EYES ONLY........................ | 127 |
| **VIDEOTAPE NUMBER** | |
|     1 .................................. | 6 |
|     2 .................................. | 69 |
|     3 .................................. | 129 |
|     4 .................................. | 188 |
|     5 .................................. | 244 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 488 | Notice | 14 |
| 489 | December 11, 1995 Memo from Ross Uhl to Bruce Tipton, Subject:  GeriMed and RxMed | 96 |

Page 29

1 Q. Who did you interview with at Dey?
2 A. Bob Mozak, and then eventually all -- well,
3    several of the senior management team members,
4    including the CEO and Charles Rice and others. I
5    don't remember now, but primarily with Bob.
6 Q. What was the position that you took when you
7    came to Dey in October 1995?
8 A. Initially it was -- initially it was national
9    sales manager of national accounts. Probably not
10   that -- that exact title, but it was national sales
11   manager and my responsibility was national accounts
12   and managed care, I think.
13 Q. National accounts and managed care?
14 A. Yeah. They didn't really have a managed care
15   department.
16 Q. You interviewed with Bob Mozak and Charles
17   Rice. Did you also interview with Pam Marrs?
18 A. Yes, I did. Thank you. Yeah.
19 Q. And did you interview with Mary Anderle?
20 A. Perhaps, yeah. She was there at the time.
21   No, no, no. I think she came -- no. She came on
22   board later. So no, I don't believe so.
23 Q. Debbie Bronstein, did you interview with her?
24 A. No. She -- both the last -- both Mary and
25   Debbie were hired after I joined Dey.

Page 30

1 Q. Okay. So your first job position or job
2   title was to be in charge of national accounts and
3   managed care; is that -- is that correct?
4 A. Well, yes. Again, you're talking about a
5   small organization. They lump national accounts.
6   Anything that wasn't tied down, you know, was national
7   accounts. So in a small organization it included the
8   traditional drug wholesalers, the retail chains. They
9   wanted to develop a presence of managed care, so I had
10   some experience there so they lumped that in. Again,
11   I don't think they knew -- well, they didn't know
12   exactly what was involved at the time in managed care.
13   And then the other -- the primary sales group worked
14   with the -- what's called the nonretail accounts or
15   institutional accounts, if you will.
16 Q. So institutional accounts were somebody else,
17   not in your chain?
18 A. Yeah. Early on. Well, yeah, institutional
19   accounts -- institutional accounts meaning primarily
20   the hospitals. That was definitely a different -- a
21   different group.
22 Q. An account is a customer, correct?
23 A. Yes.
24 Q. Okay. So you had --
25 A. Customer group.

Page 31

1 Q. A customer group. You had underneath your
2   responsibility wholesalers and retail chains?
3 A. Correct.
4 Q. Did you have retail generic distributors or
5   were they lumped in with wholesalers?
6 A. You know, they shifted back and forth. Early
7   on I did not. There was a year or so when -- when I
8   did and then ultimately they shifted back to the --
9   the other sales group.
10 Q. Who was the other sales group that you are
11   referring to?
12 A. That would be the institutional sales group.
13 Q. Who did --
14 A. The ones who called on the hospitals.
15 Q. Okay. Who did -- well, strike that. Let me
16   ask you about your position as national accounts and
17   managed care manager. Was it manager of national
18   accounts?
19 A. Uh-huh. National sales manager.
20 Q. Okay. Were you headquartered as far as your
21   duty station here in Napa?
22 A. Yes.
23 Q. Okay. But you spent some time on -- on the
24   road as well.
25 A. Correct.

Page 32

1 Q. Did you have a staff of sales representatives
2   out in the field?
3 A. I did.
4 Q. How many?
5 A. Early on it was four or five. Four or five
6   early on and then that group expanded to about six
7   when I left. So between four and six.
8 Q. Four and six and these individuals were sales
9   representatives?
10 A. Yeah. National account managers is what they
11   were called, but essentially, yes.
12 Q. Okay. National account managers.
13 A. Right.
14 Q. And these national account managers that
15   reported to you, were they spread out across the
16   United States?
17 A. Yes.
18 Q. Okay. And they were calling on wholesalers
19   and retail chains; is that correct?
20 A. Correct. And -- and we had the -- we had the
21   respiratory -- I can't remember the name we called
22   these folks, but they specialized in respiratory
23   therapy.
24 Q. Respiratory therapists?
25 A. Well, they didn't call on the respiratory

Page 33

1 therapists, but they called on some businesses that --
2 essentially they did mail order respiratory solution
3 is what they did. Home care -- home care pharmacies
4 is what they were called and their business for us,
5 for Dey, was distribution of -- of respiratory
6 solutions.
7 Q. I see. Did you also call on long-term care
8 facilities, or your people?
9 A. Yeah. Yeah, we did. And I think from the
10 very beginning we did, if I remember.
11 Q. Did Mr. Ross Uhl report to you?
12 A. He did, yes.
13 Q. Did Lou Barricelli report to you?
14 A. No.
15 Q. Did Rick Upp report to you?
16 A. Yes. At one time Rick -- Rick when I first
17 joined the company was on the other side of the
18 business as the regional or district manager and then
19 he joined national accounts group about midstream my
20 involvement with Dey.
21 Q. Jim Bucaric, did he report to you?
22 A. He did not.
23 Q. He did not. He was in the institution side.
24 A. He was, yeah.
25 Q. So on the occasions that you were traveling

Page 34

1 outside of Napa were you visiting the four to six
2 national account managers that worked for you and
3 riding along with them, going with them on account
4 calls?
5 A. Yes.
6 Q. Did you know a gentleman by the name of Ron
7 Tipton?
8 A. No, but -- but I understand that there was a
9 Ron Tipton that worked in the inside sales group with
10 Dey, but I think he left shortly after I joined the
11 organization, but I think that's -- that's the name.
12 Q. You never met him?
13 A. No, I never met him.
14 Q. Not any relation to you as far as you know?
15 A. As far as I know.
16 Q. Okay.
17 A. Sure is a good man though.
18 Q. When you came to Dey Labs in October of 1995
19 did you get any kind of specialized training or did
20 they expect you to hit the ground running?
21 A. The latter. They expected me to hit the
22 ground running.
23 Q. Did they give you any kind of instruction on
24 Dey's products, on the merits of the specific drugs
25 Dey manufactured?

Page 35

1 A. I'm sure I went through a brief training, but
2 again, with -- with generics, they're commodity
3 products. You're not selling the doctor. You don't
4 have to get into chemicals, the chemical structure,
5 the physiology. You've got a product and you've got a
6 price and you've got a reputation.
7 Q. And you're trying to find a way to
8 distinguish your product versus your genetic (sic)
9 competitor's product?
10 A. Generic competitors, yeah.
11 Q. Well, when you got to Dey Labs did somebody
12 tell you or give you any instruction on the Medicaid
13 system and -- and the whole concepts of the way that
14 the spread is a factor?
15 A. No.
16 Q. Is that something you learned on the job?
17 A. Correct.
18 Q. Through conversations with colleagues and --
19 A. Yeah. It's just really if you understand the
20 big picture in the business, something that you
21 would -- you would pick up on. I never had a class,
22 never had someone sit me down and tell me this is how
23 it worked.
24 Q. Did anybody ---
25 A. Learned through experience.

Page 36

1 Q. Excuse me. I didn't mean to talk over you.
2 Are you finished?
3 A. That's okay. Yeah.
4 Q. When you were at Dey did anybody ever tell
5 you that a part of the manner in which Dey was going
6 to sell its products was by enhancing the spread on
7 Medicaid and Medicare reimbursements?
8 A. No.
9 Q. Did you ever see anything in writing in that
10 regard?
11 A. No. The only thing that I recall is some
12 creative salespeople recognizing that spread was an
13 element of a customer decision may have prepared
14 something that highlighted where we stood. But every
15 customer that -- where spread was an important issue
16 knew the company's products and prices and oftentimes
17 told us you -- we can't do business with you because
18 your spread is -- is not good enough, or whatever. So
19 the customers knew much better than the sales reps, in
20 my opinion, what products should be used because of
21 the spread and where it was advantageous to them or
22 not. So that's how the market was.
23 Q. And the customers for whom spread was an
24 important issue would have been the retail chain
25 pharmacies; is that correct?

Page 85

1  MR. HAGENSWOLD: Same objection.
2  A. If he said it I believe it. Sure.
3  Q. (BY MR. WINTER) So you don't think
4     Mr. Rice -- I don't want to talk over you. Are you
5     finished with your answer?
6  A. I'm finished. Sure.
7  Q. So you don't think Mr. Rice knew about the
8     usage of Exhibit 461 or other documents which promoted
9     the reimbursement profit or spread to customers?
10 A. I -- I have no idea whether he knew or not.
11 Q. Okay. Mr. Mozak testified that he didn't
12    authorize or approve the use of Exhibit 461 or of
13    documents that promoted for customers and potential
14    customers the reimbursement profit that those
15    customers could get on a Dey product versus a
16    competitor's product. He testified that he didn't
17    approve it and he would not have authorized it. Do
18    you believe that testimony from Mr. Mozak?
19 A. Yes. If he said it I believe it.
20 Q. How do you reconcile Mr. Mozak's testimony
21    that he did not approve it with what you've testified
22    now as to your experience working at Dey labs and the
23    fact that in your experience Dey did use Exhibit 461
24    and other promotional products that outlined the
25    difference in reimbursement profit?

Page 86

1  A. This is -- this is a form. It's on paper.
2     It's -- it's a hard copy. It's not -- it wasn't
3     uncommon to talk about spread advantages. Everybody
4     in this business, in the generic business talked about
5     it. Our customers knew when we walked in how our
6     spread was compared to others. So it's no secret
7     what -- what the spread was, so in the context of
8     selling one would look for whatever was reasonable to
9     differentiate himself from the competition. This was
10    just one other tool.
11       I think this was short-lived, using --
12    using this document, as I remember, and, you know, I
13    wouldn't necessarily place any more emphasis on this
14    than -- in terms of our overall selling strategy than
15    the fact that our preservative -- our product was
16    preservative free, had a better package, we had a
17    better reputation, et cetera.
18       MR. McDONALD: Objection --
19       MR. WINTER: Objection, nonresponsive.
20       MR. McDONALD: -- nonresponsive.
21       MR. HAGENSWOLD: Objection, from.
22    Objection, nonresponsive.
23 Q. (BY MR. WINTER) Mr. Tipton, let me -- let me
24    ask this question. You've testified that everybody
25    promoted their products by using -- or strike that.

Page 87

1     You testified that all pharmaceutical companies in
2     your experience were promoting the reimbursement
3     profit that a customer could get by outlining the
4     spread. Is that accurate?
5        MR. McDONALD: Object to the form.
6        MR. HAGENSWOLD: Object to the form.
7        MR. McDONALD: Object to the form.
8  A. If a competitor had a spread advantage in my
9     experience they would make that known to the customer
10    if the customer was not already aware of it.
11       MR. McDONALD: Objection, nonresponsive.
12 Q. (BY MR. WINTER) And within Dey it was
13    well-known that spread was an issue and a factor in
14    some classes of customers' decision-making process
15    when they were selecting which generic pharmaceutical
16    to buy?
17 A. Well-known, I think certain people knew about
18    it.
19 Q. Did Mr. Mozak know about it?
20 A. I don't know. I would think so. I -- I
21    don't know for sure.
22 Q. Is it your best recollection that Mr. Mozak
23    knew about it because you had conversations with him
24    about it from time to time?
25       MR. FLECKMAN: Objection, form.

Page 88

1  A. I believe he was aware that we had some
2     pricing -- some spread advantages.
3  Q. (BY MR. WINTER) And my question is given
4     that you had conversations with Mr. Mozak from time to
5     time about spread and that your customers would come
6     to you and tell you if there was a reason why they
7     couldn't purchase Dey's products because a
8     competitor's spread was better, if that was the type
9     of information that was known to Dey's management how
10    can you -- and given the fact that Exhibit 461 there
11    Mr. Galles testified had gone through copy clearance
12    and had been approved for distribution, how then can
13    you reconcile Mr. Mozak's testimony where he said he
14    didn't know anything about it and wouldn't have
15    approved it?
16       MR. HAGENSWOLD: Object to the form.
17       MR. FLECKMAN: Objection, form.
18       MR. McDONALD: Object to the form.
19 A. I can't speculate on --
20 Q. (BY MR. WINTER) Okay.
21 A. -- what Todd Galles said and Mr. Mozak said
22    and why Bob may or may not have approved it.
23 Q. And again, I'm not asking you to speculate as
24    to what Todd Galles said. I'm telling you what Todd
25    Galles said.

Page 93

1  making that known.
2  Q. To a customer?
3  A. To a customer.
4  Q. Or a potential customer?
5  A. Correct.
6  Q. Okay. In your opinion there's -- that's a
7     legitimate sales technique?
8  A. If -- if that's the fact of the marketplace.
9     Usually those customers that I mentioned before are
10    savvy enough to know that on their own. More often
11    than not as I recall they would tell me these are the
12    products we are buying because the -- to a large
13    degree because the spread is -- is better. So it's no
14    secret.
15       MR. McDONALD: Objection, nonresponsive.
16 Q. (BY MR. WINTER) When you were employed at
17    Dey did Ross Uhl come to you with proposals from time
18    to time that he asked you to review and approve before
19    they could be submitted to customers?
20 A. Yes.
21 Q. Do you recall reviewing and approving a
22    proposal to an outfit called Managed Healthcare
23    Associates?
24 A. Do I recall a proposal to Managed Healthcare
25    Associates from Ross Uhl, was that the question?

Page 94

1  Q. Yes, sir.
2  A. I don't -- they were a customer, he had
3     responsibility for them for a certain period of time.
4     I'm sure he had proposals on how the do business with
5     them, I don't -- you know, other than that I don't
6     recall a specific one.
7  Q. Do you recall -- what, sir, is Managed
8     Healthcare Associates?
9  A. I'm sorry?
10 Q. What kind of customer is Managed Healthcare
11    Associates?
12 A. They're a long-term care GPO.
13 Q. Do you recall another GPO by the name of
14    GeriMed?
15 A. Yes.
16 Q. Do you recall whether Mr. Uhl came to you
17    with a proposal that he wanted to present to GeriMed?
18 A. I do not.
19 Q. When we take a break we'll see what exhibit
20    number this is. I believe it's already in --
21    designated as an exhibit in these depositions and if
22    not we'll find another -- give a new number to it.
23       MR. FLECKMAN: Let me -- let me suggest
24    then that we just identify it by Bates --
25       MR. WINTER: Sure.

Page 95

1        MR. FLECKMAN: -- number for now.
2        MR. WINTER: Be happy to.
3  Q. (BY MR. WINTER) I'm handing you a copy of a
4     multi-page document that begins with Bates Number
5     DL-TX-0029703. Do you see that, sir, on the
6     right-hand column?
7  A. I do.
8        MR. McDONALD: Ray, I hate to interrupt
9     you. My copy you gave me has -- says Exhibit 328 on
10    it.
11       MR. WINTER: Oh, great.
12       MR. FLECKMAN: That is what it is.
13       MR. WINTER: Thank you. I appreciate
14    it. 328?
15       MR. McDONALD: That's somebody's
16    handwriting. I propose -- suppose it's yours.
17       MR. WINTER: That's probably mine. Do
18    we have 328 with us today? We do.
19 Q. (BY MR. WINTER) Let me go ahead and give you
20    the one that's already in -- in the evidence here or
21    part of the deposition exhibits. Mr. Tipton, here you
22    go.
23 A. Okay.
24 Q. Thank you. Now, that exhibit, 328, do you
25    recognize it, sir?

Page 96

1  A. Vaguely.
2  Q. Can you tell us what it is?
3  A. Well, I'll review it. It looks as though
4     this is a review of how the profitability would be
5     enhanced by using unit-dose versus the multi-dose.
6  Q. Profitability for whom?
7  A. For the customer. In this case this would be
8     MHA.
9  Q. And would that be the profit that MHA's
10    members could make on Medicaid reimbursement?
11 A. That's what it looks to be, yes.
12 Q. And do you recall whether or not Mr. Uhl
13    presented this document to you for your review and
14    approval before he utilized it out in the field?
15 A. I do not remember. This appears to be just
16    a -- plugging the numbers into the template that was
17    previously provided as 460.
18 Q. During the time period that Mr. Uhl reported
19    to you before he could have utilized the document such
20    as Exhibit 328 would he have had to present it to you
21    for your approval before using it?
22 A. No.
23 Q. Okay. I will hand you now what is marked as
24    Exhibit 489 and the Bates label on that is DL1584 and
25    it's a multi-page document that runs through DL1592.

Page 217

1 that one individual on one occasion reported
2 excessively inflated WAC prices to a data reporting
3 service --
4 MR. WINTER: Objection, form.
5 Q. (BY MR. FLECKMAN) -- for Albuterol sulfate
6 solution, three products, I think. Were you aware of
7 such an occurrence?
8 A. Yes.
9 Q. Okay. Tell me what you know about that.
10 A. I know secondhand that there was a situation
11 in the state of Florida whereby an incorrect AWP was
12 listed for a competitor and after numerous attempts to
13 get that state to provide and list the correct one the
14 response from Dey was to adjust their price to -- just
15 to be on even ground with competition.
16 Q. Who did you talk with about that? You say
17 that that's -- that that's secondhand information to
18 you.
19 A. Someone mentioned -- I don't remember who
20 mentioned it to me specifically, but I remember
21 someone saying that that -- that that had occurred.
22 Q. Was this -- was this -- do you recall when
23 this information was imparted to you?
24 A. I don't.
25 Q. Okay. So you can't place it in time frame,

Page 218

1 but you're positive that you were not personally
2 involved in this?
3 A. I'm positive I was not involved in it, right.
4 Q. Okay. And you're positive that you do not
5 recall who it was.
6 A. Correct.
7 Q. And you're positive you do not recall who
8 told you about it.
9 A. I do not.
10 Q. And you don't recall when they told you about
11 it.
12 A. Not exactly, no.
13 Q. Okay. And do you recall ever receiving a
14 written memo advising you at the time that that was
15 occurring?
16 A. No.
17 Q. Okay. If you had seen such a memo would it
18 have made an impact on you such that you would have
19 remembered receiving such a memo?
20 A. Yes.
21 Q. Okay. I'm going to hand you a memo that --
22 MR. FLECKMAN: Mr. Winter, would your
23 memory be such that you would recall what the -- what
24 the -- you don't need to record this. Let's go off
25 for a second.

Page 219

1 THE VIDEOGRAPHER: You want to go off
2 the record, off the video?
3 MR. FLECKMAN: Yes.
4 THE VIDEOGRAPHER: We're off the record
5 at 4:06 p.m.
6 (Discussion off the record)
7 THE VIDEOGRAPHER: We're back on the
8 record at 4:06 p.m.
9 Q. (BY MR. FLECKMAN) Okay. Let me ask -- let
10 me read something to you and I'll ask you whether you
11 agree or disagree this statement. WAC is -- "WAC was
12 Dey's published wholesale list price to
13 manufacturers." "WAC was Dey's published wholesale
14 list price to manufacturers for its generic drugs."
15 A. To manufacturers?
16 Q. No, no. Forgive me. Let me try that one
17 again. Good listening. The -- "WAC was Dey's
18 published wholesale list price for its generic drugs
19 to wholesalers."
20 A. Right.
21 Q. Okay. Now, let me read another statement to
22 you and see whether you agree or disagree with this.
23 "WAC is not representative of Dey's published
24 wholesale list prices." Do you agree or disagree with
25 that?

Page 220

1 A. Disagree.
2 Q. Is that accurate or is that inaccurate?
3 A. It's inaccurate.
4 Q. Why is that inaccurate?
5 A. Our wholesale acquisition cost was our
6 published price and that's what we charged
7 wholesalers.
8 Q. Okay. Now, let me show you a memo and ask
9 you whether -- this is Exhibit Number 72. Just look
10 at the first page because the second page is not part
11 of Exhibit 72. And I'm going to ask you if you have
12 ever seen this memo from Helen Burnham at or about the
13 time it was dated, May 30, 1995?
14 A. I do not remember seeing this.
15 Q. Okay. I'm going to represent to you that you
16 have company in that respect because Eve Gmeiner, who
17 worked for Ms. Burnham at the time, never saw it, Todd
18 Galles never saw it and Rob Ellis never saw it, Lou
19 Barricelli doesn't recall it and Ross Uhl doesn't
20 recall it. I don't think Mary Anderle recalls it.
21 MR. WINTER: Objection, form.
22 Q. (BY MR. FLECKMAN) Now, my question to you is
23 did Ms. Burnham ever mention anything about that to
24 you in 1995?
25 A. No.

Page 221

1 Q. Okay. Would -- if you had seen such a memo,
2    and you've already indicated that you disagree with
3    the paragraph at the bottom of the memo.
4        MR. WINTER: Objection, form.
5 Q. (BY MR. FLECKMAN) Is that accurate?
6 A. Uh-huh.
7 Q. I'm sorry? You have to give a verbal
8    statement.
9 A. Yeah. I disagree that WAC is not
10   representative of our published wholesale list price.
11 Q. If this memo had been provided to you would
12   you have remembered this memo?
13 A. Yes.
14 Q. Does this memo seem to you consistent or
15   inconsistent with Dey's practices and policies
16   regarding the reporting of WAC for its generic
17   products while you were with that company?
18 A. Inconsistent.
19 Q. Do you -- if Mr. Mozak has testified that he
20   did not know of the existence of this memo in 1995 and
21   he did not authorize Ms. Burnham to send that memo and
22   that he was not aware that she had done so in 1995,
23   would you find that credible or incredible?
24 A. Credible.
25       MR. LIRA: I'll object. Foundation.

Page 222

1  Object to the form.
2     MR. FLECKMAN: Okay.
3     MR. WINTER: Object to form.
4 A. Credible
5 Q. (BY MR. FLECKMAN) The -- did you have any
6    dealings with Helen Burnham other than the interview
7    you had with her when you took the job?
8 A. Define "dealings."
9 Q. Business dealings with her while you were at
10   Dey.
11 A. Yes.
12 Q. Okay. Would you describe your interactions
13   with Helen Burnham, generally your impression of her
14   over that period of time that you dealt with her.
15 A. She was the marketing department pretty much
16   when I joined the company. Of course, other people
17   joined thereafter. Her style was -- she is a
18   pharmacist. She knew her business. Definitely was
19   knowledgeable about the -- the Dey products. If you
20   want -- if you'd like me to comment on her personality
21   or style I'll --
22 Q. I'm going to ask you about that next.
23 A. Okay.
24 Q. I'm going to ask you about that next. Tell
25   me -- and I -- we are not here to savage anybody, but

Page 223

1    this is important because she's testified that she
2    told everybody in sales and marketing about this memo
3    and gave everybody a copy of it and I haven't yet
4    found anybody who received a copy of this.
5        MR. WINTER: Objection, form.
6        MR. FLECKMAN: That's fine.
7 Q. (BY MR. FLECKMAN) The -- so my question to
8    you is what was Ms. Burnham's personality as you
9    recall it during the six -- approximately six years --
10   let me rephrase that. During the period of over or
11   roughly a year that you had interactions with
12   Ms. Burnham at Dey?
13 A. She was very determined. She was outspoken.
14   She was also kind and generous. And as I said before,
15   she, you know, she was the marketing department pretty
16   much for the times that -- that we worked together.
17 Q. Did she -- did she demonstrate to your
18   observation any tendency to go to Bob Mozak for
19   approval of decisions that she made in each and every
20   instance?
21       MR. LIRA: I'm going to object to form.
22       MR. FLECKMAN: That's fine.
23 Q. (BY MR. FLECKMAN) You can answer that.
24 A. I don't -- I can't really judge that. I
25   can't determine that.

Page 224

1 Q. Okay. You've said that she was -- that
2    Ms. Burnham was a determined person. Do you think it
3    would be consistent or inconsistent with your
4    observation of her personality for her to make a
5    decision on her own to do something of what is
6    reflected in that memo, Exhibit 72, to report
7    exaggerated WACs to reporting services?
8 A. I can't --
9        MR. WINTER: Objection, form.
10       MR. LIRA: Objection to form.
11 A. I can't make that judgment.
12       MR. FLECKMAN: What is your objection to
13   form?
14       MR. WINTER: You're talking to me or
15   Mr. Lira?
16       MR. FLECKMAN: Both of you.
17       MR. LIRA: Calls for speculation on his
18   part and lacks foundation.
19       MR. FLECKMAN: Okay. What is your
20   objection to form?
21       MR. WINTER: Use of the term
22   "exaggerated."
23       MR. FLECKMAN: That's your only
24   objection to form?
25       MR. WINTER: Yeah.

Page 253

1   MR. HAGENSWOLD: Same objection.
2 A. I'm not clear on the question.
3 Q. (BY MR. FLECKMAN) That's fine. I'm going
4   to -- I'm going to cure it.
5 A. Okay.
6 Q. To what extent as a -- as a -- just a matter
7   of day-to-day experience within the selling function
8   at Dey was spread -- did spread have to be addressed?
9   To what extent did the issue of spread have to be
10  taken into account in your selling program?
11 A. It was -- with selected customers at the
12  forefront of the discussions, with some customers it
13  was one of many concerns and considerations that a
14  customer would use to determine whether or not they
15  would purchase your product.
16      In the generic world it was a common
17  topic of discussion, how you stacked up relative to
18  the spread, again, with certain customers depending --
19  dependent -- was a determinant on whether you got the
20  business or maintained the business.
21     MR. HAGENSWOLD: Objection,
22  nonresponsive.
23     MR. McDONALD: Same objection.
24 Q. (BY MR. FLECKMAN) Did you ever at Dey while
25  you were there, did -- do you ever recall a situation

Page 254

1   where you -- while you were there where you increased
2   WACs in order to build spread?
3 A. No, I don't recall that.
4 Q. The -- do you recall that while you were at
5   Dey that was not the policy of Dey?
6 A. It's not -- it was not the practical policy
7   of Dey to -- to do that, no.
8 Q. The -- you mentioned at the outset of your
9   deposition that you had spoken very briefly with me
10  and with Mr. Hudspeth and you thought that the -- that
11  we both had been on the phone and -- and I'll
12  represent to you that we, in fact, were both on the
13  phone with you. Did we in any way attempt to
14  influence your testimony in any respect other than to
15  tell the truth?
16 A. No.
17 Q. Okay. The -- do you have a recollection of
18  talking with Mr. Winter?
19 A. Yes.
20 Q. Okay. And I take it Mr. Winter did not
21  suggest to you any alteration in your testimony
22  either, did he?
23 A. No, he did not.
24 Q. Okay. The -- and you spoke with him on two
25  or three occasions?

Page 255

1 A. Yes.
2 Q. Okay. You said at one point during the
3   examination earlier today that with respect to the
4   issue of spread in your view and based on your
5   experience the customers knew better than the sales
6   representatives about the issue of spread. What did
7   you mean by that?
8 A. I mean that their business was dependent
9   upon knowing what the spread was. Their
10  profitability, again, with these customers who are
11  highly dependent upon, with Medicaid prescriptions in
12  particular, long-term care providers, their
13  business -- the profitability of their business
14  depended upon their reimbursement levels and they knew
15  the products that had favorable spreads and the ones
16  that did not.
17 Q. Did you generally regard the customers that
18  you dealt with while you were at Dey as being savvy,
19  experienced customers?
20 A. Most of them.
21 Q. The -- did they seem to understand the
22  dynamics of the marketplace fairly well, the ones you
23  dealt with?
24 A. Yes.
25 Q. With regard to the product that is shipped by

Page 256

1   Dey to a wholesaler, during the time when you were
2   with Dey, would you have a way of matching specific
3   lots of medicine, l-o-t-s, lots of medicine or cartons
4   of medicines to shipments from the wholesaler to
5   various customers? Did you have at Dey a mechanism
6   for tracking exactly what lots went out the door
7   from the --
8 A. Yes.
9 Q. -- from the wholesaler?
10 A. Yes.
11 Q. Okay. The -- aside from -- aside from -- and
12  whose function was that to do that?
13 A. Distribution. It wasn't a sales function by
14  any means, so --
15 Q. Okay. So you were not involved in that?
16 A. -- the warehouse -- no, I was not.
17 Q. Okay. Are you guessing at -- at the
18  mechanism? Would you be guessing at the mechanism?
19  Is that something that you were intimately familiar
20  with and dealt with or is that something --
21 A. I just -- I believe that we had that
22  mechanism. We had some recalls and we had a way of
23  identifying, as I recall, where the product went. So
24  I'm not guessing, but I'm not 100 percent certain. I
25  just remember that that occurred and we could identify

Page 265

1  A. Okay.
2  Q. NDC number would be 495020697-03. Do you see
3     an entry for that NDC number on the red flagged page?
4     There's actually two red flags but if you go deeper
5     into --
6        MR. FLECKMAN: Could you give us a Bates
7     page?
8        MR. WINTER: If I get the document back
9     I sure will.
10       MR. FLECKMAN: That's all right.
11 A. Okay. Now, which -- you're talking about
12    Albuterol 25's. Do I see the $14 price?
13 Q. (BY MR. WINTER) Yes, sir. First of all,
14    let's look at the top of the page and provide a Bates
15    number here. It's DL-TX-0079910. And across the top
16    of the page you see columns that designate different
17    NDC numbers?
18 A. Uh-huh. I do.
19 Q. And do you see an NDC number that ends with
20    69703 and dollars per carton?
21 A. Yeah. I think those are actually Dey's
22    product number, but -- as opposed to NDC numbers, but
23    yes, I do see that.
24 Q. Okay. And that product number, if it had the
25    prefix, would be the complete NDC?

Page 266

1  A. Yeah, I think -- I think that's how it
2     worked.
3  Q. And would that be the --
4  A. Yes.
5  Q. -- product number for the Albuterol 25's, if
6     you know?
7  A. I believe so.
8  Q. Okay. Do you see -- were there any prices on
9     this page that are at $14.50 or more?
10 A. No. I see $14.
11 Q. Flip through the document, the -- all the
12    pages for that column for 69703. Do you see any
13    prices at $14.50 or more for that product?
14       MR. FLECKMAN: Objection, form.
15 A. No.
16 Q. (BY MR. WINTER) Okay. So for -- at least
17    for this time period of July and August 1995 nobody
18    was purchasing Dey's .083 percent Albuterol sulfate
19    inhalation solution at a WAC plus price?
20       MR. FLECKMAN: Hold on just one second.
21    Objection, form.
22       MR. McDONALD: Same objection.
23 A. These are just contracts prices. These are
24    just contract price. It doesn't mean nobody was
25    buying it.

Page 267

1  Q. (BY MR. WINTER) So is there another universe
2     of customers that are not on that list?
3  A. If somebody did not have a contract they
4     would not show up on here and -- and they may have
5     purchased the Dey product at a higher price. It would
6     be WAC plus an up charge.
7  Q. You were asked about the profit gain Excel
8     spreadsheet, and it appears on many different
9     exhibits, but let's just show you Exhibit 462. I'll
10    put it back in front of you again so you can refer it.
11    And if I understood your responses to questions that
12    were posed by Mr. Lira correctly, you said that you
13    recall that some point in time you had heard or
14    received instruction that that document, that profit
15    gain Excel spreadsheet was no longer to be used.
16 A. Yeah. Either it -- either it was
17    communicated or it died a death on its own. I'm
18    not -- I'm not clear on how that happened.
19 Q. And I want you to focus now on when you
20    believe it happened that it was either communicated or
21    it died a death on its own, but in any event it was no
22    longer to be used.
23 A. Yeah. I think my comment earlier was it was
24    short-lived and I -- I would say less than two years.
25 Q. So do you think it was sometime in 1997?

Page 268

1  A. Yes.
2  Q. Do you recall a period in 1997 when Dey
3     received a subpoena from the Health and Human Services
4     Commission, Federal Office of the Inspector General
5     related to an inquiry or investigation about Dey's
6     pricing?
7  A. All I -- all I -- I don't remember, you know,
8     the date. I do remember being advised that that
9     inquiry was -- was occurring.
10 Q. Now, do you recall whether this instruction
11    or this -- this death on its own of utilization of
12    this exhibit, this profit gain XLS, whether that
13    occurred after this investigation that you recall?
14 A. I don't.
15 Q. You don't know one way or the other?
16 A. I do not.
17 Q. Did you come up with -- well, strike that.
18       You testified that there was a time
19    period in your experience at Dey where the national
20    account managers who reported to you would utilize
21    this profit gain XLS spreadsheet, correct?
22 A. Yes.
23 Q. Okay. My question is did you come up with
24    the idea to instruct your national account managers to
25    utilize that profit gain XLS or any other mechanism

Page 277

1  price to the state of Florida --
2  A. No, to the Medicaid, I guess.
3  Q. To state of Florida's Medicaid authority?
4  A. Yeah.
5  Q. Was the price that Dey gave to the state of
6     Florida's Medicaid authority a price that was raised
7     or elevated from its ordinary listed WAC price?
8        MR. FLECKMAN: Objection, form.
9  A. I don't -- I don't know for sure that that
10    was the case.
11 Q. (BY MR. WINTER) In your experience working
12    with Helen Burnham did you have occasion to make any
13    judgment as to her integrity?
14 A. Not really, no.
15 Q. Did it ever come to your attention that she
16    had lied about anything?
17 A. No.
18 Q. So did you have any reason then to conclude
19    that she was untruthful?
20        MR. FLECKMAN: Objection, form. About
21    what? Objection, form.
22 A. Did I have any reason to believe that Helen
23    Burnham was untruthful?
24 Q. (BY MR. WINTER) Yes, sir.
25 A. No.

Page 278

1  Q. In the situation that we've talked about a
2     few minutes ago when someone, a -- a representative of
3     a retail pharmacy, for example, who did not have a
4     contract --
5  A. Correct.
6  Q. -- came to Dey and wanted to purchase Dey's
7     products, that's the situation you described where you
8     would direct that representative to the wholesaler,
9     correct?
10 A. Representative -- yes, Dey representative.
11    It very often would come in through the phone through
12    customer service.
13 Q. Just to make sure, I don't think I asked the
14    question very well. Let me -- let me try again. If
15    you had a representative from a retail pharmacy who
16    was not on a contract and they came to you or to one
17    of the people that you supervised and wanted to
18    purchase Dey's products would the -- do I understand
19    correctly that the response you or your subordinates
20    would give to that pharmacy representative would be to
21    direct the pharmacy representative to go talk to the
22    wholesaler?
23 A. First of all, that scenario would not occur
24    with our group. We call it national accounts, so an
25    independent retailer would not -- we would not be in

Page 279

1     contact with them typically. If that question arose
2     it would be generated by the customer to customer
3     service and my advice to customer service would be to
4     direct them to the wholesaler.
5  Q. Do you have any specific recollection of this
6     scenario coming up where customer service came to you
7     and said, "Hey, I've got this contact from this
8     independent retailer. What do I do"?
9  A. No.
10 Q. Now, a chargeback occurs when a wholesaler
11    who is, if I understand your testimony correctly,
12    buying Dey's product at WAC prices, is then in a
13    position where it's going to turn around and sell the
14    product to a customer who has a separate contract with
15    Dey, correct?
16 A. With Dey and the GPO, typically.
17 Q. Okay. So in other words, to be more precise
18    then, a chargeback situation occurs when a wholesaler,
19    such as McKesson or Bergen, who has purchased a
20    quantity of Dey product at WAC prices is going to turn
21    around and sell that same product or a portion of that
22    product to a customer who is a member of a GPO that
23    has a contract with Dey, correct?
24 A. Yes.
25 Q. Okay. Did you recall or do you recall a time

Page 280

1     period when major wholesalers such as McKesson or
2     Bergen Brunswig required Dey to provide chargeback
3     credits up front before the transaction between the
4     wholesaler and the membership of the GPO?
5  A. Do I recall when they requested that, is that
6     your question?
7  Q. Well, my question is --
8  A. Or required that?
9  Q. I guess I used the word --
10 A. Yeah.
11 Q. -- "required" in my question.
12 A. Yeah.
13 Q. And -- and let me ask that question first.
14    Do you recall a time period where the major
15    wholesalers such as McKesson and Bergen Brunswig
16    required Dey to provide that chargeback up front?
17 A. I do not recall a situation where they
18    required that, no.
19 Q. Do you recall a situation where the major
20    wholesalers such as Bergen Brunswig and McKesson
21    requested that Dey provide the chargeback up front?
22 A. I do and -- and I don't believe it was either
23    McKesson or Bergen. It was someone else, as I
24    remember, another wholesaler.
25 Q. Okay. But you don't recall the name of that