# Exhibit 334

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

NO. GV002327

THE STATE OF TEXAS         ) IN THE DISTRICT COURT
ex rel.                    )
    VEN-A-CARE OF THE      )
    FLORIDA KEYS, INC.,    )
        Plaintiff(s),      )
                           )
VS.                        ) TRAVIS COUNTY, TEXAS
                           )
DEY, INC.; ROXANE          )
LABORATORIES, INC., WARRICK )
PHARMACEUTICALS CORPORATION, )
SCHERING CORPORATION,      )
SCHERING-PLOUGH CORPORATION, )
LIPHA, S.A., MERCK-LIPHA,  )
S.A., MERCK, KGAA, and EMD )
PHARMACEUTICALS, INC.,     )
        Defendant(s).      ) 53RD JUDICIAL DISTRICT
****************************************

ORAL AND VIDEOTAPED DEPOSITION OF
RICHARD UPP, JR.
February 14th, 2003
****************************************

ORAL AND VIDEOTAPED DEPOSITION OF RICHARD UPP, JR., produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on February 14th, 2003, from 9:10 a.m. to 3:40 p.m., before Cynthia Vohlken, CSR in and for the State of Texas, reported by machine shorthand, at the Fairfield Inn by Marriott Carlsbad, 760 Macadamia Drive, Carlsbad, California pursuant to the Texas Rules of Civil Procedure.

Page 2

APPEARANCES

FOR THE PLAINTIFF(S):
    MR. RAYMOND C. WINTER
    Office of the Attorney General
    State of Texas
    Post Office Box 12548
    Austin, Texas 78711-2548
FOR THE RELATOR:
    MR. NICHOLAS M. HUTCHINSON
    Girardi & Keese
    1126 Wilshire Boulevard
    Los Angeles, California       90017-1904
FOR THE DEFENDANT(S) DEY, INC.:
    MR. DARRELL PRESCOTT
    Coudert Brothers, LLP
    1114 Avenue of the Americas
    New York, New York 10036-7703
    -and-

Page 2 (cont.)

    MR. STEVEN A. FLECKMAN
    Fleckman & McGlynn, P.L.L.C.
    515 Congress, Suite 1800
    Austin, Texas 78701-3503
FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
    MR. R. ERIC HAGENSWOLD
    Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas 78701

Page 3

FOR THE DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION
    MR. JOHN P. MCDONALD
    (Not Present)
    Locke Liddell & Sapp, LLP
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201-6776
ALSO PRESENT:
    Mr. William S. Schneider,
        California Office of the
        Attorney General
    Mr. Zachary Taylor Bentley, II
    Mr. Richard Rienstra, Videographer

Page 4

INDEX

| | |
|---|---|
| Appearances.................................. | 2 |
| RICHARD UPP, JR. | |
|     Examination by Mr. Winter.............. | 7 |
|     Examination by Mr. Fleckman............ | 138 |
|     Examination by Mr. Hagenswold.......... | 215 |
|     Examination by Mr. Winter.............. | 217 |
|     Examination by Mr. Fleckman............ | 229 |
| Signature and Changes....................... | 231 |
| Reporter's Certificate....................... | 233 |
| VIDEOTAPE NUMBER | |
|     1 ................................... | 6 |
|     2 ................................... | 72 |
|     3 ................................... | 121 |
|     4 ................................... | 192 |

EXHIBITS

| NO. DESCRIPTION | PAGE |
|---|---|
| 497........................................... | 54 |
|     1994 National Sales Meeting | |
| 498........................................... | 56 |
|     Working a Homecare Pharmacy by Ross Uhl | |
| 499........................................... | 74 |
|     (Withdrawn, was marked as Exhibit 341) | |
| 500........................................... | 74 |
|     Manager's Weekly Recap, Regional Manager | |

Page 129

1    just do you remember when that was kind of question.
2  Q. You discussed a certain point with Ross Uhl
3    where you remember the WAC being raised?
4  A. Well, that that was the loss -- that that was
5    the point of the litigation and that -- do I have a
6    recollection of it or did he.
7  Q. Do you have any recollection of an incident
8    where the WAC was raised?
9  A. I remember it was -- was adjusted at one
10   time, yeah.
11 Q. Do you remember by whom?
12 A. No. Just by Dey. Just Dey did it.
13 Q. You remember Dey raising the WAC?
14 A. Right.
15 Q. Do you remember why Dey raised the WAC?
16 A. No.
17 Q. I'll show you what's been marked as Exhibit
18   72 in the depositions in this matter. Just look up
19   after you've had a chance to read it, please.
20 A. (Witness reviewing document).
21 Q. Do you believe that memo -- first of all,
22   have you ever seen that memorandum before?
23 A. I don't remember it.
24 Q. You don't remember whether you've seen it or
25   not?

Page 130

1  A. No.
2  Q. Okay. You knew Helen Burnham when you worked
3    at Dey Labs?
4  A. Yes.
5  Q. What was her title?
6  A. She was in marketing.
7  Q. Was she in charge of marketing?
8  A. She reported to Bob Mozak.
9  Q. So Bob Mozak was over both sales and
10   marketing; is that correct?
11 A. Yes.
12 Q. Okay.
13 A. Yeah. The entire time I was there he was in
14   charge of -- he was the head of sales and marketing.
15 Q. Having read this memo -- you did get a chance
16   to read through it; is that right?
17 A. Uh-huh.
18       MR. FLECKMAN: Objection, form.
19 Q. (BY MR. WINTER) Did you get a chance to read
20   through the memo?
21 A. Uh-huh.
22 Q. Okay. Do you see that this memo indicates
23   that Dey has now raised its WAC price?
24       MR. FLECKMAN: Objection, form.
25 A. No. It's in line it says.

Page 131

1  Q. (BY MR. WINTER) Okay. So the memo says
2    there's been an adjustment to Dey's WAC, but it
3    doesn't say whether it's been raised or lowered; is
4    that correct?
5  A. Our updated WAC values are in line. Okay.
6    Yeah. I can see where you see that, yeah.
7  Q. Okay. Now, you previously -- before I handed
8    you this document you had a recollection of a
9    situation where Dey raised its WAC, correct?
10       MR. FLECKMAN: Objection, form.
11 A. Well, I knew there was an adjustment made,
12   yeah.
13 Q. (BY MR. WINTER) You knew there was an
14   adjustment made to Dey's WAC.
15 A. Uh-huh.
16 Q. Do you know whether that adjustment was to
17   make the WAC price higher or lower?
18 A. To make it in line with what the competitors
19   were doing would be my guess.
20 Q. Okay. But taking --
21       MR. FLECKMAN: Objection,
22   responsiveness.
23       MR. HAGENSWOLD: Same objection.
24 Q. (BY MR. WINTER) Taking the point where the
25   WAC was before the adjustment was made --

Page 132

1  A. Uh-huh.
2  Q. -- was the WAC raised or was it lowered?
3       MR. FLECKMAN: Objection, form. The
4    witness has already said he's guessing.
5  A. Yeah. I would -- it would only be a guess
6    for me.
7  Q. (BY MR. WINTER) Is it your understanding --
8       MR. WINTER: Objection, nonresponsive.
9  Q. (BY MR. WINTER) Is it your understanding
10   that the adjust -- strike that.
11       Did I understand you correctly to state
12   that you knew of an incident where Dey adjusted its
13   WAC and it did so to make its WAC in line with what
14   the competitor's WAC was?
15       MR. FLECKMAN: Objection, form.
16 A. Yeah.
17 Q. (BY MR. WINTER) Did you know who the
18   competitor was?
19 A. I believe it was Warrick.
20 Q. Did you understand that Dey's management made
21   this adjustment?
22 A. Yes. Yes.
23 Q. In the time that you worked with Helen
24   Burnham -- strike that.
25       In the time that you knew Helen Burnham

Page 141

1 Q. Okay. So you never -- never actually
2    physically --
3 A. No.
4 Q. -- attended a pricing committee meeting?
5 A. No.
6 Q. Well, do you think that the members attended
7    the pricing committee meetings at Dey?
8 A. The ones that were based in Napa did, yes.
9    The ones that were not based in Napa didn't.
10 Q. And you would call in?
11 A. (Nodded head affirmatively).
12 Q. I'm sorry?
13 A. Yeah, we would call in.
14 Q. I'm sorry, you would call in?
15 A. Yes.
16 Q. Okay. And where were you when you would call
17    in typically for these meetings?
18 A. I could be anywhere. It depends when they
19    were held. I could be at home in my office, I could
20    be on the road in a hotel room if I was working with
21    somebody.
22 Q. Did you call in for every meeting of the
23    pricing committee?
24       MR. WINTER: Objection, form.
25 A. I don't know.

Page 142

1 Q. (BY MR. FLECKMAN) You don't know. Did you
2    ever see any minutes of the pricing committee?
3 A. Not that I recall.
4 Q. And typically speaking is the pricing
5    committee where a WAC would be set?
6 A. No.
7 Q. Where would WAC be set?
8 A. I have no idea.
9 Q. So WAC was not set by the pricing committee?
10 A. Not that I'm aware of, no.
11 Q. Okay. And when WAC was set for Dey's
12    products, generic products, how would you find out
13    about that?
14 A. Probably get a memo in the mail or --
15 Q. What would the memo look like? Would it be a
16    memo that would tell you that WAC has been updated?
17 A. I guess, yeah. I'm not sure. I don't
18    remember.
19 Q. Okay. How about -- how about the WAC -- was
20    there a wholesale price list at Dey for its products?
21 A. A WAC price list?
22 Q. A wholesale price list.
23 A. That would be WAC. Yeah, I think so. I --
24 Q. You think so?
25 A. Yeah. I don't specifically remember.

Page 143

1 Q. Okay. So do you remember how you would get
2    ahold of the wholesale price list if there was one?
3 A. It would be -- if there was one it would have
4    been sent out from the home office.
5 Q. Okay. And is that the same price list that
6    would be furnished to Dey's wholesale customers, the
7    wholesale price list?
8 A. For wholesalers?
9 Q. (Nodded head affirmatively).
10 A. I would assume so, yes.
11 Q. Okay. Do you know?
12 A. No.
13 Q. Okay. The -- now, on the -- this wholesale
14    price list, do you ever recall seeing a wholesale
15    price list as you sit here today while you were at
16    Dey?
17 A. I'm trying to remember any price list. I
18    don't remember.
19 Q. Okay. The -- do you ever recall having a
20    conversation with Bob Mozak in which he told you that
21    he was establishing a new WAC price?
22 A. No.
23 Q. Okay. Do you ever recall having a
24    conversation with Bob Mozak in which he asked you to
25    report a new WAC price to any wholesaler?

Page 144

1 A. No.
2 Q. How about to any price reporting service?
3 A. No.
4 Q. How about to any state Medicaid authority?
5 A. No.
6 Q. Okay. Do you ever recall having a
7    conversation of that nature with Helen Burnham?
8 A. No.
9 Q. The -- now, this memo, Exhibit Number 72 that
10    we looked at earlier today, I want to ask you some
11    questions about that, but let me first get your
12    definition of a term. The -- what was WAC as you
13    understood it when you were employed --
14 A. Wholesale acquisition cost.
15 Q. Okay. And what did that represent? What was
16    the wholesale acquisition cost for Dey's products?
17    What did it represent?
18 A. What we would sell to a wholesaler for.
19 Q. Was that a published price?
20 A. I believe it was.
21 Q. Okay. Was it an invoice price that you would
22    invoice the wholesaler for?
23 A. I believe it was.
24 Q. Okay. And was that a list price to the
25    wholesaler?

Page 145

1  A. I believe it was.
2  Q. Okay. The -- do you think that WAC at all
3     times while you were at Dey meant that to you?
4  A. Yes.
5  Q. The -- is there an reason why you would have
6     ever taken a different view of that situation then you
7     are taking today?
8  A. No, not that I remember.
9  Q. Do you ever recall anybody else at Dey taking
10    a different position with respect to what WAC was than
11    you've just articulated?
12 A. No.
13 Q. Okay. If somebody had denied that that was
14    the case to you and said that WAC was not
15    representative of -- representative of Dey's published
16    invoice price to the wholesaler, would you agree with
17    that proposition or would you say no, you're wrong?
18    MR. WINTER: Objection, form.
19 A. I guess I would have to ask what they meant
20    then.
21 Q. (BY MR. FLECKMAN) Okay. So that would
22    strike you as different than your understanding,
23    wouldn't it?
24 A. Yes.
25 Q. And you don't recall any circumstance such a

Page 146

1     communication reached you while you were at Dey, do
2     you?
3  A. Not that I remember.
4  Q. Okay. Now, the -- do you recall any
5     situation while you were at Dey in which you ever
6     participated in any effort to defraud any governmental
7     authority?
8  A. No.
9  Q. Do you recall any situation in which you were
10    ever a participant in any scheme to deceive any
11    governmental entity?
12 A. No.
13 Q. As you sit here today do you think that you
14    acted in any fraudulent or deceptive manner with
15    respect to any governmental entity at all?
16 A. No.
17 Q. The -- would you agree or disagree that the
18    term "spread" simply represents what the pharmacy
19    or -- in the case of a retail, what the pharmacy is
20    going to make off of the cost of goods sold by getting
21    reimbursed for those same goods?
22 A. Say that again.
23 Q. I'll rephrase. It was awkwardly put. Would
24    you agree or disagree that spread simply represents
25    the pharmacy's profit on the goods that it buys?

Page 147

1  A. For the most part, yeah.
2  Q. So spread is another -- is synonymous with
3     profit where the payer instead of being the cash
4     customer is a third-party payer?
5  A. Yes.
6  Q. Okay. The -- now, do you consider profit to
7     be a -- any sort of sinister term in the drug
8     industry?
9  A. No.
10 Q. The -- does the company that you currently
11    work for seek to make profits?
12 A. Yes.
13 Q. Okay. Do your customers of the current --
14    the company that you currently work for seek to make a
15    profit?
16 A. Yes.
17 Q. Okay. Do you see anything wrong with that at
18    all?
19 A. No.
20 Q. Okay. The -- when you're marketing products
21    of Dey to your customers, are you marketing those
22    products to your customers so that they can make a
23    loss or break even or are you marketing those products
24    to those customers so that they can make a profit?
25 A. I market so that our company can make a

Page 148

1     profit. What they do with it it's up to them.
2  Q. Would they buy your product if they made a
3     better profit on somebody else's products?
4  A. I'm sorry?
5  Q. Would these customers buy your generic
6     products if they could make a bigger profit and a
7     better profit easier on somebody else's generic
8     products?
9  A. At times, yes.
10 Q. Okay. And at times what?
11 A. Why?
12 Q. At times yes and at times no?
13 A. Yes. Both.
14 Q. Okay. Both. Do you -- do you -- are you
15    contending that profit is not a consideration for your
16    customers now?
17 A. No, I'm not.
18 Q. Okay. Did you think that profit was a
19    consideration for your customers at Dey?
20 A. Yes.
21 Q. Did you ever believe otherwise while you were
22    at Dey?
23 A. No.
24 Q. Now, when you began in the pharmaceutical
25    industry you've said that predominantly the cash

Page 197

1 would be issuing such a memorandum or purporting to do
2 price reporting to First DataBank or anybody else. Do
3 you have any facts that would controvert, that would
4 dispute what Eve Gmeiner, Rob Ellis and Todd Galles
5 have told us in that respect?
6 A. No, other than I don't remember what the
7 timing of that or what the date of that was, when they
8 came on board, because they were all here after, you
9 know, after -- after her.
10 Q. Well, they've testified they were -- they
11 were here --
12 A. During that time?
13 Q. -- during 1995 during that time frame.
14 A. Then no.
15 Q. Okay. The -- so let's pull out Exhibit 72.
16 The fact of the matter is you don't recall ever
17 getting that memo, do you?
18 A. No.
19 Q. Okay. And -- and in fact, you've already
20 told me you disagree with one of the assertions that
21 Ms. Burnham makes in this memo. Read this to yourself
22 and then read it aloud to the jury. "WAC is not
23 representative" -- let me just read it. It will be
24 simpler. "WAC is not representative of our published
25 wholesale list prices." You don't agree with that at

Page 198

1 all, do you? That's not accurate.
2 A. It doesn't sound accurate, no.
3 Q. Is it possible that the conversation that you
4 recalled in your earlier testimony where some third
5 party, whom you cannot recall at this time, mentioned
6 that there was an issue about adjusting WACs, is it
7 possible that that rumor reached you after -- years
8 after this memo? Is it possible that that rumor may
9 have reached you after 1997?
10     MR. WINTER: Objection, form.
11 A. I don't know.
12 Q. (BY MR. FLECKMAN) You have no way of knowing
13 when that rumor reached you, do you?
14 A. No.
15 Q. But as to you it was simply a rumor, correct?
16     MR. WINTER: Objection, form.
17 Q. (BY MR. FLECKMAN) You were not personally
18 involved in any aspect of what Ms. Burnham is
19 referring to there, were you?
20 A. I wasn't involved with that, no.
21 Q. Okay. And you don't know whether it occurred
22 or didn't occur, do you, because you've never
23 investigated that issue.
24 A. Right.
25 Q. So earlier today when Mr. Winter got you to

Page 199

1 testify that you recalled a situation where Dey had
2 adjusted WACs to meet a competitive issue, you were
3 relating a rumor that you heard and it would be
4 speculation as to you, wouldn't it?
5     MR. WINTER: Objection, form.
6 A. Yes.
7 Q. (BY MR. FLECKMAN) The -- now, with regard to
8 the adjustment of WACs, Dey did, in fact, adjust WACs
9 downward from time to time, didn't it?
10 A. I believe so.
11     MR. FLECKMAN: I'm going to suggest we
12 take a break. I'm not sure how much more I have, but
13 I'm going to try to comb through some things and see
14 what I need.
15     THE VIDEOGRAPHER: We are off the record
16 at 2:49 p.m.
17     (Recess from 2:49 to 3:04)
18     THE VIDEOGRAPHER: We are back on the
19 record at 3:04 p.m.
20 Q. (BY MR. FLECKMAN) You testified earlier
21 that -- that at Clintic you sold nutritional products
22 and you used a term that I think would be helpful to
23 define, enteral/parenteral. What is that?
24 A. Enteral and parenteral nutrition.
25 Q. Yes. Just help us with that. What are --

Page 200

1 define each of those terms, if you would.
2 A. Enteral is by mouth, parenteral is by vein.
3 Q. Okay. The -- then tell -- tell us -- clarify
4 what are the classes of trade that Dey sold to
5 customarily that you -- that you had some
6 responsibility for?
7 A. Wholesalers, homecare pharmacies, long-term
8 care, retail pharmacy.
9 Q. Okay. What is the long-term care segment of
10 the trade?
11 A. Nursing home, closed-door pharmacies.
12 Q. Okay. And by "closed-door pharmacies" you
13 mean pharmacies that serve the particular nursing
14 home?
15 A. Yeah. It didn't have street foot traffic at
16 all.
17 Q. Okay. Okay. And then you mentioned
18 hospitals. Now, hospital is a separate class of
19 trade?
20 A. Yes.
21 Q. The -- and you said -- you didn't think the
22 spread was important to a hospital and why would that
23 be?
24 A. Not as much.
25 Q. Is it because their payor system is slightly