# Exhibit 335

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.
v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

```
 1   NO. GV002327
 2
     THE STATE OF TEXAS              ) IN THE DISTRICT COURT
 3   ex rel.                         )
        VEN-A-CARE OF THE            )
 4      FLORIDA KEYS, INC.,          )
             Plaintiff(s),           )
 5                                   )
     VS.                             ) TRAVIS COUNTY, TEXAS
 6                                   )
     DEY, INC.; ROXANE               )
 7   LABORATORIES, INC., WARRICK     )
     PHARMACEUTICALS CORPORATION,    )
 8   SCHERING CORPORATION,           )
     SCHERING-PLOUGH CORPORATION,    )
 9   LIPHA, S.A., MERCK-LIPHA,       )
     S.A., MERCK, KGAA, and EMD      )
10   PHARMACEUTICALS, INC.,          )
             Defendant(s).           ) 53RD JUDICIAL DISTRICT
11
12         *******************************************
13         ORAL AND VIDEOTAPED DEPOSITION OF
14         DEBRA BRONSTEIN
15         March 11th, 2003
16         *******************************************
17         ORAL AND VIDEOTAPED DEPOSITION OF DEBRA BRONSTEIN,
18   produced as a witness at the instance of the
19   Plaintiff(s), and duly sworn, was taken in the
20   above-styled and numbered cause on March 11th, 2003,
21   from 9:57 a.m. to 8:12 p.m., before Cynthia Vohlken,
22   CSR in and for the State of Texas, reported by machine
23   shorthand, at the Amerisuites-Old Town, 7300 East 3rd
24   Street, Scottsdale, Arizona pursuant to the Texas
25   Rules of Civil Procedure.
```

Page 28

```
 1   A.   L.D. Caulk Company, which is part of L.D.
 2   which is part of Dentsply.
 3   Q.   How do you spell that?
 4   A.   D-e-n-t-s-p-l-y, Dentsply.
 5   Q.   And the L.D. company?
 6   A.   C-a-u-l-k.
 7   Q.   C-a-u-l-k.
 8   A.   In Milford, Delaware.
 9   Q.   Is that where you worked out of, out of
10   Delaware?
11   A.   Yes, that's correct. And then after that --
12   I mean, do you want my employment history?
13   Q.   No, not really. I don't think I need to go
14   into that right now. So let me -- let me just recap
15   what -- what you have told us. In 1989 you worked for
16   a pharmaceutical company, GynoPharma, which
17   manufactured products for -- gynecological products?
18   A.   That's correct.
19   Q.   And mostly branded products, but including
20   one generic which is an oral contraceptive?
21   A.   That's right.
22   Q.   Okay. And when did you come to Dey Labs?
23   A.   January of 1996.
24   Q.   January '96. Okay. And how did you -- how
25   did you come to that position at Dey?
```

1  you interviewed with?
2  A.  Yes.  I apologize for the lapse of memory,
3  but it was -- the head of personnel.  She still is the
4  head of personnel to the best of my knowledge.
5  Q.  Ms. Villegas?
6  A.  Yes.  Amelia Villegas.
7  Q.  And did you ever interview with Mr. Rice?
8  A.  I believe I did, yes.
9  Q.  Do you know who made the ultimate decision
10 whether or not to hire you?
11 A.  That would be an assumption on my part.
12 Q.  Okay.  What position were you hired into at
13 Dey Labs?
14 A.  Director of marketing.
15 Q.  Now, did you fill the position that had been
16 vacated by Ms. Burnham?
17 A.  That's correct.  Actually, I don't know if
18 she had the title of director of marketing.  She may
19 not have.  She may have been marketing manager.
20 Q.  Did she perform essentially the same function
21 that you performed when --
22 A.  To the best of my knowledge.
23 Q.  Okay.  Who did you report to?
24 A.  Bob Mozak.
25 Q.  Did you ever have occasion to report directly

1  Q.   And do you know whether it was a federal
2  governmental agency or a state governmental agency?
3  A.   I don't recall.
4  Q.   Okay. Fair enough. Do you believe that this
5  document search that you conducted was in response to
6  the request, the subpoena, from the governmental
7  agency asking for documents?
8  A.   I'm sorry, could you repeat that question?
9  Q.   Sure. Do you believe that the document
10 search that you undertook when Mr. Galles' found
11 Exhibit 72 was conduct in response to this subpoena or
12 document request by a governmental agency?
13 A.   Yes.
14 Q.   And you believe that had to do -- something
15 to do with an investigation into pricing?
16 A.   That's right.
17 MR. WINTER: Okay. We are going to
18 change the tape, so why don't we be efficient with our
19 time here and take a real quick break if anybody needs
20 to.
21 THE VIDEOGRAPHER: We're off the record
22 at 11:09 a.m. This conclude Tape Number 1.
23          (Recess from 11:09 to 11:19)
24 THE VIDEOGRAPHER: Everyone ready?
25 MR. WINTER: Yes.

Page 209

1   Q.   Okay.  The -- is this something that you
2   would understand and know in the course of performing
3   your duties while at Dey?
4   A.   Yes.
5   Q.   Is it something that you would expect that
6   your predecessor, Helen Burnham, would understand and
7   know in performing her duties in her capacity as your
8   predecessor at Dey?
9   A.   Absolutely.
10  Q.   Would you take a look with me at Exhibit 72.
11  You were shown this by the State as a document that
12  Ms. Burnham authored.  Take a look, if you would, at
13  the first phrase of the paragraph I'm pointing to and
14  I'm going to read it into the record.  "WAC is not
15  representative of our published wholesale list
16  prices."  Do you agree that that's an accurate
17  statement or would you say based upon your experience
18  at Dey that that's an inaccurate statement?
19  A.   I would say that's an inaccurate statement.
20  Q.   You don't agree with that statement?
21  A.   I don't agree with that statement.
22  Q.   Now, can you -- can you confirm that you had
23  absolutely nothing to do with the preparation of that
24  memo?
25  A.   I can -- yes.

Fredericks Reporting & Litigation Services, LLC
www.FRLTEXAS.com

Page 254

```
 1   Q.    Okay.  So if a pharmacy is looking to
 2   reimbursements from let's say a third-party payer or
 3   from the Medicaid system or the Medicare system, where
 4   is the pharmacy going to look to get its profits?
 5   A.    Dispensing fees and other differences in
 6   prices.
 7   Q.    From the reimbursement?
 8   A.    Uh-huh.
 9   Q.    I'm sorry?
10   A.    Reimbursement, yes.  I'm sorry.
11   Q.    Occasionally I just have to -- we have to
12   keep it audible.  So based on your experience at Dey
13   you've indicated in your testimony that the importance
14   of particular factors to a customer in terms of what
15   that customer focused on in making its purchase of a
16   Dey product would be an individualized -- would be
17   fairly individual to the customer.
18   A.    That's correct.
19   Q.    The -- did you find that some of the
20   customers were more concerned about the profit they
21   were going to get from the third-party payers and
22   Medicaid reimbursers?
23   A.    Yes, absolutely.
24   Q.    Did you feel that -- that Dey educated these
25   customers in the importance of reimbursements --
```

```
 1   reimbursement as a source of profit to them or did you
 2   feel that they understood this?
 3   A.   They educated Dey, not the other way around.
 4   They educated us, the management, they educated the
 5   reps, they educated us about reimbursement.
 6   Q.   The -- would you say that the --
 7   A.   And their -- their role in it and what comes
 8   to them we had no idea.
 9   Q.   The --
10   A.   I had no idea.
11   Q.   How about -- just take a second here.  You
12   refer to the term AWP as a sort of reference price or
13   list price earlier in your testimony.  The -- have you
14   ever been under the impression that AWP represented a
15   price that's actually paid by somebody for a generic
16   drug in the marketplace?
17   A.   I don't know.  We simply suggest it and then
18   walk away from it, so I honestly don't know if anybody
19   does or doesn't.  It's possible there's some dummy out
20   there paying it.
21   Q.   The -- and -- but did Dey typically sell
22   its -- sell its products at AWP as far as you know?
23   A.   No.
24   Q.   Okay.  The -- and you knew that the entire
25   time you were at Dey.
```

Page 263

1  prices to without going back to the pricing committee
2  for approval.
3  A.   That's right.
4  Q.   Okay.  And then there was a second tier where
5  they could --
6  A.   Go to their --
7  Q.   -- negotiate a price down to even below that
8  as long as they had a supervisor's permission.
9  A.   That's right.
10 Q.   Okay.  And then the third tier was that they
11 would then have to go to the pricing committee for
12 approval and that's where Bob Mozak would have a role.
13 A.   Right.  And we also, which had been done
14 before, but we also requested that they provide the
15 amount of information that would be required to
16 evaluate and place these customers against the grid,
17 the volume.  Volume all these people do with, you
18 know, programs, exactly, so they had to put certain
19 information into the pricing committee for us to use
20 the grid.
21 Q.   Okay.  The -- do you consider WAC to be a
22 fictitious price or do you consider WAC to be a
23 meaningful price from the standpoint of a
24 manufacturer?
25 A.   It's a jumping off point.  It's a meaningful

1   price.  It has -- you know, it -- it gives a -- an
2   anchor is probably what I would call it.
3   Q.   The -- if you didn't have some kind of list
4   price would it make it more difficult to have a
5   structure with which to negotiate prices?
6   A.   Yes, of course.
7   Q.   Explain, if you would, what are samples
8   provided to the home care pharmacies?
9   A.   Okay.  It's unusual for generic companies to
10  have samples because the price is so low they can't
11  afford to sample, plus what's the purpose of the
12  sample.  I mean, it's -- it's to try something and if
13  it's generic it's exactly like something else.  So
14  having samples was very unusual.  But for a home
15  healthcare providing them with samples allowed them to
16  get placement in doctors' offices so that when a
17  patient left the office they had drug immediately to
18  start taking until the home healthcare company started
19  their deliveries.
20  Q.   Was there a sample program that was approved
21  by the federal government where you would label not
22  for resale the sample?
23  A.   Absolutely.
24  Q.   Is that the convention or the -- or the
25  procedure that Dey complied with?

Page 288

1   drafted, is it fair to say you really do not know what
2   Mr. Termier's position was at that particular time?
3   A.   That's fair to say, yes.
4   Q.   Okay.  You know that at some point in time
5   when you joined Dey he was affiliated with Lipha.
6   A.   Yes.
7   Q.   Okay.  And you know that at the time you
8   joined day Mr. Rice was the president or CEO of Dey.
9   A.   Yes.
10  Q.   But you're not certain and really don't have
11  any idea what positions they held at that particular
12  time.
13  A.   Right.
14  Q.   Okay.  I want to clarify something.  We've
15  been over this so many times you would think it is
16  already clarified.  I'm sure it is, but I don't want
17  to leave anything to chance here.  When you were first
18  shown Exhibit 72 and you were asked to comment on when
19  you first saw it, your testimony I believe was that
20  you believe you saw it perhaps in 1995, but you
21  misspoke, didn't you?
22  A.   Oh, yes. No, no, no, no.  It was during
23  the -- whatever.  If it's a discovery process or
24  whatever it was.  It was during the first looking for
25  the documents.

```
 1   Q.   Okay.  In response --
 2   A.   So that would have been 1997.
 3   Q.   In response to the government request.
 4   A.   Yes.
 5   Q.   Okay.  Did -- did Mr. Mozak ever say anything
 6   that you would interpret as discouraging you from
 7   instructing your -- the people who worked for you to
 8   find documents responsive to the government's request?
 9   A.   No.  No, he never did.
10   Q.   Did he seem to you when he asked you to
11   cooperate in that process to be sincere and earnest in
12   that -- in that request?
13   A.   Yes, he did.
14   Q.   Was there anything about the retention policy
15   which you regarded as suspect or improper in any way?
16   A.   No.
17   Q.   The -- at any job you've held ever has
18   anybody suggested to you that you should keep every
19   single scrap of paper that inhabits your office to
20   infinity?
21   A.   No.  I've worked for a company that had
22   retention policies.
23   Q.   Did Dey's retention policy that you do recall
24   seem to you one that was reasonable in nature?
25   A.   Yes.  In fact, I think they kept things
```

Page 299

1  A.    Cindy's group.
2  Q.    Okay. And the reason for that was what?
3  A.    Just to consolidate all of the pricing kinds
4  of things in one department and make it easier.
5  Q.    Okay. Was it -- was it a step in the
6  direction of trying to make sure that the prices were
7  routinely consistently reported to the price reporting
8  services so that they could be accurately published?
9  Was it consistent with that goal or -- or not
10 necessarily?
11 A.    Are you asking my opinion? I don't -- I
12 don't -- I think it was done within my department
13 consistently and reliably. I think it was just an
14 attempt to restructure things that made more sense.
15 You know, why keep that in marketing when the other
16 work that's being done is being done under contracts.
17 So I don't think it was a consistency.
18 Q.    Okay. The --
19 A.    Hope.
20 Q.    From time to time did you observe that the
21 data reporting services simply got some of the
22 information wrong or failed to pick up a price change?
23 A.    Absolutely.
24 Q.    And in fact, in the case of Bluebook when you
25 did your internal review, your historical examination,

1   did you find that First DataBank and Bluebook had in
2   fact failed to pick up Eve Gmeiner's correction at the
3   end of 1995?
4   A.  Yes.
5   Q.  So they had carried forward the wrong figure
6   even after that, although Ms. Gmeiner's facts showed
7   that Dey attempted to correct the Albuterol prices.
8   A.  Right.
9   Q.  You said that some market share programs
10  could affect negotiated prices.  And by market share
11  programs you're talking about programs which were
12  designed to promote Dey's product and to achieve
13  market share?
14  A.  To increase market share --
15  Q.  Okay.
16  A.  -- of Dey's products versus others.
17  Q.  Whether through quantity purchases or whether
18  through co-promotional activities, what have you.
19  A.  Co-op advertising, yeah, whatever.
20  Q.  Okay.  You refer to certain monthly reports.
21  I've seen a host of them that were authored by Todd
22  Galles within your department.  Did he sometimes
23  author the monthly report?
24  A.  No.  Todd and Eve and Diane and any of the
25  other product managers, Steven Resnik.  They would