# Exhibit 336

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

```
 1                          NO. GV002327
    THE STATE OF TEXAS              ) IN THE DISTRICT COURT
 2  ex rel.                        )
        VEN-A-CARE OF THE          )
 3      FLORIDA KEYS, INC.,        )
            Plaintiff(s),          )
 4                                 )
    VS.                            ) TRAVIS COUNTY, TEXAS
 5                                 )
    DEY, INC.; ROXANE              )
 6  LABORATORIES, INC., WARRICK    )
    PHARMACEUTICALS CORPORATION,   )
 7  SCHERING CORPORATION,          )
    SCHERING-PLOUGH CORPORATION,   )
 8  LIPHA, S.A., MERCK-LIPHA,      )
    S.A., MERCK, KGAA, and EMD     )
 9  PHARMACEUTICALS, INC.,         )
            Defendant(s).          ) 53RD JUDICIAL DISTRICT
10

11    *******************************************

12           ORAL AND VIDEOTAPED DEPOSITION OF

13                      TODD GALLES

14                  February 6, 2003

15    *******************************************

16

17       ORAL AND VIDEOTAPED DEPOSITION OF TODD GALLES,

18  produced as a witness at the instance of the

19  Plaintiff(s), and duly sworn, was taken in the

20  above-styled and numbered cause on February 6th, 2003,

21  from 9:07 a.m. to 7:20 p.m., before Cynthia Vohlken,

22  CSR in and for the State of Texas, reported by machine

23  shorthand, at the Napa Valley Marriott Hotel, 3425

24  Solano Avenue, Napa, California pursuant to the Texas

25  Rules of Civil Procedure.
```

1    recommendations and, you know, pricing decisions, you

2    know, were generally a senior management decision.

3         Q.    Mr. Galles, I'm going to hand you what's been

4    previously marked in these depositions as Exhibit

5    Number 72, which is a memorandum from May 30, 1995.   I

6    believe everyone here at the table has got a copy of

7    this, but I've got additional ones if anybody needs

8    one.   Have you ever seen that document before?

9         A.    Yes.

10        Q.    Did you see it at the time it was written or

11   thereabouts?

12        A.    I believe not.   I think I've only seen this

13   through the discovery of materials for this purpose.

14        Q.    Do you recall when is the first time that you

15   saw the memo?

16        A.    As I recall, the first time I saw the memo

17   was when we pulled our files as part of the discovery

18   and had to make, whatever, five copies of everything

19   and ship them to the lawyers.

20        Q.    Do you recall approximately what date that

21   was?

22        A.    I would -- I'm just calculating maybe 1997.

23   It seemed like it was probably a couple of years while

24   I was still there that that happened.

25        Q.    When you say "we," who are you referring to?

1          A.     The patient is getting a lot more benefit

2     from a unit-dose than from a multi-dose, and so I

3     don't think you can take that out of context.   A

4     unit-dose product offers a sterile product with

5     benzalkonium chloride.  I mean, there's all kinds of

6     benefits that a patient is getting as a better

7     product.  So it's not pure price, it's price and

8     feature benefit to a patient and, you know, that's a

9     decision that people have to make --

10                    MR. WINTER:   Objection --

11         A.     -- all along.

12                    MR. WINTER:   -- nonresponsive.

13                    MR. FLECKMAN:   One -- hold on one

14     second.  I don't mind you making an objection.  I do

15     mind you interrupting his answer.  Let's just make

16     sure that the witness has finished his answer.

17                    THE WITNESS:   (Nodded head

18     affirmatively).

19                    MR. FLECKMAN:   Okay.  Have -- have you

20     finished your answer?

21                    THE WITNESS:   Yes.

22                    MR. FLECKMAN:   Okay.

23                    MR. WINTER:   Would you repeat my

24     previous question, please?

25                    (Requested portion was read)

Page 164

1    up by people who would pick up their intra-office

2    mail.

3        A.    Correct.

4        Q.    Okay.  And that was a standard and routine

5    function at Dey for disseminating information?

6        A.    Yes.

7        Q.    Okay.  Now, the first time that you ever saw

8    the Helen Burnham memo, that is, Exhibit 72, is in

9    1997 when you were going through some old files in the

10   administration building, correct?

11       A.    Yes.

12       Q.    Okay.  Can you as you sit here today say that

13   you have any personal knowledge whatsoever as to the

14   creation of that memorandum by Ms. Burnham?  Any

15   personal knowledge.

16       A.    I have no personal knowledge.

17       Q.    Of that memorandum?

18       A.    Only from, you know.

19       Q.    I'm not talking about after 1997.

20            MR. PITRE:  Excuse me.  I thought we

21   were supposed to let the witness finish before you --

22   he was in the middle of answering the question.

23       Q.    (BY MR. FLECKMAN)  You may answer.

24            MR. PITRE:  Will you allow him to

25   finish?

Page 167

1    reporting an inflated WAC price to anyone on one of

2    its products?

3                    MR. PITRE:  Objection, form.

4                    MR. WINTER:  Objection, form.

5        A.    No.

6        Q.    (BY MR. FLECKMAN)  The -- tell me or tell the

7    jury how you reported WAC prices on Dey's products

8    once you assumed that function.  Where did you get the

9    WAC prices from?  Was it a price sheet that had been

10   approved by the pricing committee?

11       A.    Marketing, myself or whomever, would make a

12   recommendation after looking at what the competitors'

13   prices were.  The pricing committee would approve the

14   pricing.  We'd insert it in the launch letters and the

15   pricing database letters and the state Medicaid

16   formulary letters and distribute them.

17       Q.    Did any circumstance ever come to your

18   attention where you had to correct prices that a

19   database reporting service had, that a data reporting

20   service had in its -- in its database?

21       A.    There periodically would be I guess reports

22   or something where they -- like a spreadsheet or

23   something would come from the pricing database and

24   you'd look over it to make sure there weren't errors.

25       Q.    Okay.  And did you occasionally encounter

Page 185

1    generic competitors for its products?

2         A.    That's my phone.  Sorry.  No.

3         Q.    Tell us what you mean by that when -- when

4    you say it did not.  What -- what was -- what was it

5    attempting to do?

6         A.    We would price -- in the case of, say,

7    Ipratropium we priced at Roxane pricing and it

8    wasn't -- if you came in and undercut them you just

9    start a pricing spiral which wouldn't make sense for

10   anybody so you came in and you priced basically at the

11   same level.

12        Q.    Over time did Dey report declining WAC prices

13   to the reporting services and the Medicaid

14   authorities?

15        A.    Yes.

16        Q.    Do you recall in your experience at Dey

17   outside of maybe some isolated situation of shortage

18   of materials, shortage of raw materials, where Dey

19   raised its WAC prices on any product?

20        A.    Not on any of the generics.

21        Q.    That's what I'm referring to.

22        A.    Yeah.  No.

23        Q.    How about the Albuterol sulfate, did it raise

24   its WAC prices on the Albuterol sulfate?

25        A.    No.

1    Exhibit 342.

2              MR. FLECKMAN:  342?  Because this is

3    not -- I don't have 342 here.

4              (Discussion off the record)

5       Q.   (BY MR. FLECKMAN)  Okay.  Let me hand you

6    what's been marked Exhibit 342 in Eve Gmeiner's --

7    well, that was used in Eve Gmeiner's deposition.  And

8    I'll represent to you that she has looked at that and

9    identified that as a correction of WACs on Dey

10   products for First DataBank.  Would you look it over

11   and tell me whether this seems to you to be Eve

12   Gmeiner's handwriting on here?

13             MR. WINTER:  Objection, form.

14      Q.   (BY MR. FLECKMAN)  Take a look at the second

15   page.

16             MR. WINTER:  Which exhibit, Steve?

17             MR. FLECKMAN:  The same one we were just

18   talking about, 342.

19      A.   Well, the first note on the 591 page --

20      Q.   (BY MR. FLECKMAN)  Uh-huh.

21      A.   -- that's me, fax to Beth Rader at First

22   DataBank.  And there must have been red ink on it, and

23   so that was, you know, will the red fax, if not copy

24   first, and then -- then there's the signature saying

25   it was done.

Page 237

1       Q.    Okay.   And let me see if I can piece together

2    who that signature might be.   I think we -- we have

3    encountered somebody, but I'm momentarily blanking.

4    Who would that be, if you recall?   If you don't

5    recall, don't worry about it.

6       A.    Yeah, I don't know.

7       Q.    Is this the typical instruction you would

8    give for something to be faxed to a price reporting

9    service?

10      A.    Yeah.

11      Q.    Okay.   Is this a typical way that you would

12   be assured that it had been faxed?   Somebody would

13   just make a note done and date it?

14      A.    Yeah.

15      Q.    Nothing unusual about that to you?

16      A.    No.

17      Q.    Okay.   Take a look at the second page.   Down

18   at the bottom.   Do you recognize Eve Gmeiner's

19   handwriting?

20      A.    Yeah.

21      Q.    Okay.   Take a look at the pages which

22   represent the corrected schedules.   Do you recognize

23   your handwriting for the label color codes on the

24   left-hand margin?

25      A.    Yes.

Page 238

1      Q.    Okay.  Do you recognize Eve Gmeiner's

2   handwriting on here for the corrections on the prices

3   themselves?

4      A.    Looks like hers, yeah.

5      Q.    Okay.  Take a look on the next to last page

6   for the Albuterol 25's that we've been looking at.

7   And what do you find there as the listed price for

8   First DataBank for the Albuterol 25's that has been

9   scratched through?

10      A.    It looks like 24.75, maybe.

11      Q.    Okay.  And that looks like it corresponds to

12   the price in Helen Burnham's fax, doesn't it?

13      A.    Yes.

14      Q.    Okay.  Now, look under there what -- what Eve

15   Gmeiner has written and read to the jury what Eve

16   Gmeiner has written as a correction.

17      A.    14.50 effective February 1, '95.

18      Q.    Okay.  So that's a correction that was faxed

19   at your instructions to First DataBank to Beth Rader,

20   correct?

21      A.    Correct.

22      Q.    And that was indicated by one of the Dey

23   employees as having been done on December 4, 1995 on

24   the first page, correct?

25      A.    Right.

Page 262

1    Q.    Have you testified today to the truth to the

2    best that you can recall it?

3    A.    Yes.

4    Q.    Is there any point of information either

5    during the course of my examination or during the

6    course of the plaintiffs' examination, Mr. Winter or

7    Mr. Pitre, that you would like to clarify at this

8    point other than as you may have clarified during the

9    course of the deposition already?

10   A.    Not at this time.

11   Q.    Take a look at Ms. Burnham's memo, 72.   Well,

12   don't even bother to look at it.   Let me just ask you

13   a question.   Do you believe that WAC is representative

14   of Dey's published wholesale list prices?

15             MR. WINTER:   Objection, form.

16   Q.    (BY MR. FLECKMAN)   While you were with Dey?

17   A.    Yes.

18   Q.    Do you believe that that was well-known

19   within the marketing department at Dey?

20   A.    Yes.

21   Q.    Do you believe that Helen Burnham knew that?

22   A.    Yes.

23   Q.    Why was the pricing sheet called a cheat

24   sheet, the one that went to the sales force?   And let

25   me just hand this to you.

1    This is getting to be abusive, Mr. Pitre.   Move on.

2         Q.    (BY MR. PITRE)   Go ahead.

3         A.    No.

4         Q.    Good.   Did you read the sentence here that

5    says, "WAC is not representative of our published

6    wholesale list prices"?   Did you read that?

7         A.    When?

8         Q.    When you found this in your file.

9         A.    I'm sure I did, you know.

10        Q.    Did you agree with it?

11        A.    What does it say?

12        Q.    "WAC is not representative of our published

13   wholesale list prices."

14        A.    No, I don't agree with it.

15        Q.    Did you bring that to anybody's attention?

16        A.    No.

17        Q.    Ms. Burnham, I believe you indicated she's

18   the godmother of one of your children?

19        A.    Yes.

20        Q.    Do you believe that she's an honest person?

21        A.    Yes.

22        Q.    Do you believe that she is somebody that

23   tells the truth?

24        A.    Yes.

25        Q.    Do you have any reason to doubt at least her