# Exhibit 337

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.
v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

CAUSE NO. GV002327

| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
|---|---|---|
| ex rel. | ) | |
| VEN-A-CARE OF THE | ) | |
| FLORIDA KEYS, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| DEY, INC.; ROXANE | ) | |
| LABORATORIES, INC. and | ) | |
| WARRICK PHARMACEUTICALS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | 53rd JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT FRANCIS MOZAK
November 1, 2001

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF ROBERT FRANCIS MOZAK, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 1st day of November 2001, from 9:12 a.m. to 4:57 p.m., before Randall N. Finch, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Coudert Brothers, 600 Beach Street, Third Floor, San Francisco, California 94109, pursuant to Notice, the Texas Rules of Civil Procedure and the provisions as previously set forth.

Page 2

1  APPEARANCES
2  FOR THE PLAINTIFF STATE OF TEXAS:
3  MR. JOE CRAWFORD, MR. PATRICK J. O'CONNELL,
   MR. JARRETT ANDERSON, MR. RAYMOND WINTER
4  Office of the Attorney General
   State of Texas
5  P.O. Box 12548
   Austin, Texas 78711-2548  (512) 475-4300
6           (512) 474-1062 Fax
7  FOR THE RELATOR:
8  MR. JAMES JOSEPH BREEN
   The Breen Law Firm, P.A.
9  8201 Peters Road, Suite 1000
   Plantation, Florida 33324  (954) 916-2713
10          (954) 916-2714 Fax
   -and-
11 MR. JOHN E. CLARK (Of Counsel)
   Goode Casseb Jones Riklin Choate &
12 Watson, P.C.
   2122 North Main Avenue
13 P.O. Box 120480
   San Antonio, Texas 78212-9680  (210) 733-6030
14          Fax (210) 733-0330
15 FOR THE DEFENDANT DEY, INC.:
16 MR. STEPHEN M. HUDSPETH
   Coudert Brothers
17 1114 Avenue of the Americas
   New York, New York 10036-7703  (212) 626-4442
18          (212) 626-4120
   -and-
19 MR. STEVEN A. FLECKMAN
   Fleckman & McGlynn, P.L.L.C.
20 515 Congress Avenue, Suite 1800
   Austin, Texas 78701-3503  (512) 476-6900
21          (512) 476-7644 Fax
22 FOR THE DEPARTMENT OF JUSTICE:
23 MR. ANDY MAO, Civil Division  (Not present)
   601 D Street, N.W., Room 9929
24 Washington, D.C. 20004  (202) 616-0539
25

Page 184

 1  form, but using McKesson headings.  Correct?
 2 A. Mm-hmm.
 3 Q. Which part of the company would prepare --
 4  could have prepared some -- had the capacity to prepare
 5  something like that in October of 1996?
 6     MR. HUDSPETH:  Objection; form.
 7     THE WITNESS:  It could have been done by
 8  an individual salesman in the field with his own
 9  personal computer, and perhaps somebody who had a
10  computer internally.
11 Q. (By Mr. Breen)  Could it have been done by the
12  accounting department?
13 A. Could have been.
14 Q. Did they have computers?
15 A. Yes.
16 Q. At that time?
17 A. Yeah, they would have had computers.
18 Q. Okay.
19     (Exhibit 90 marked)
20     MR. WINTER:  Next exhibit is Exhibit 90,
21  it's 0009401.
22 Q. (By Mr. Breen)  Have you ever seen this
23  before, sir?
24 A. No.
25 Q. Again, does this appear to be a Dey

Page 185

 1  Laboratories prepared document?
 2 A. It has Dey Laboratories' name on it, so it may
 3  have been -- it -- it's possible it was reported --
 4  done inside.
 5 Q. Do you know what Bindley Western is?
 6 A. Yes.
 7 Q. And have you ever heard of the Bindley Western
 8  source program proposal?
 9 A. Bindley Western has a source program for
10  select pharmacies within its group similar to the
11  Bergen and McKesson.
12 Q. Bindley is another big wholesaler, right?
13 A. Yes.  It was.
14 Q. Was it acquired?
15 A. Yes, it was acquired.
16 Q. By who?
17 A. Cardinal.
18 Q. Cardinal.  Does Cardinal have its own group
19  purchasing program?
20 A. Yes, it does.
21 Q. For its pharmacies?
22 A. Yes, it does.
23 Q. And that's one of the other largest
24  wholesalers in the country?
25 A. Yes, it is.

Page 186

 1 Q. Okay.  Now, let's go back to this Bindley
 2  Western document, which purports to be dated 1/12/96.
 3  And again, I see in the third column from the right the
 4  word "Source" which appears to be the name of Bindley
 5  Western's group purchasing arrangement or program, and
 6  then the word "Net Price" under it again.  Do you see
 7  that?
 8 A. Yes, I see that.
 9 Q. Just like on the McKesson form, I saw the word
10  "Select" which was McKesson's select program and then
11  the word "Net Price" under that.
12 A. Yes.
13 Q. Now, was Bindley Western related to McKesson?
14 A. Not that I'm aware of.
15 Q. In any way in 1996?
16 A. Not that I'm aware of.
17 Q. So I'll ask you again with respect to the
18  Bindley Western Exhibit 90, what -- whose term is the
19  net -- is the term "Net Price"?
20 A. Refers to the contract price.
21 Q. Okay, I understand that when you see net price
22  you think contract price.
23 A. Right.
24 Q. We know that.  But I'm trying to figure out if
25  this term net price, which I now see on two separate

Page 187

 1  and divergent spreadsheets prepared purportedly by Dey
 2  Laboratories, is a term used by Dey Laboratories in its
 3  own communication systems.
 4 A. It is -- it is not normally used.
 5 Q. It's -- okay, not normally used.  And in order
 6  to find out why the word "Net Price" keeps popping up
 7  on these types of spreadsheets as we have in front of
 8  us now, who at Dey should I go talk to?
 9 A. Finance department or the contract department,
10  either one.
11 Q. And would your answer be the same for the
12  suggested sales price or the suggested sale price?
13 A. Yes.
14 Q. Go talk to finance or accounting.  Who there?
15 A. Pam Marrs.
16 Q. Pam Marrs.  Okay.  And how about in contracts?
17 A. Russell Johnston.
18 Q. Russell Johnston.  Okay.
19     Now, let me show you what was marked as
20  Exhibit 72 yesterday during Mr. Rice's deposition.
21  I'll ask, have you ever seen that document before?
22 A. I saw it about two years ago for the first
23  time during when we were collecting documents.
24 Q. You were surprised when you saw that document
25  for the first time two years ago?

Page 188

1  A. Yes, I was.
2  Q. Why?
3  A. Well, first of all, it's incorrect. It should
4     have never gone out.
5  Q. Incorrect in what context?
6  A. In -- in several contexts. It didn't -- it
7     didn't mention all the WAC states. It's also incorrect
8     as it -- as it relates to the first sentence in the
9     second paragraph, where it says WAC is not
10    representative of the published wholesale prices.
11 Q. Well, what WAC states did it miss, to your
12    knowledge?
13 A. Probably missed Texas, I -- and I'm not sure
14    I -- others.
15 Q. Okay. But Texas is conspicuously absent?
16 A. Yes, it was.
17 Q. Okay. It also talks about increasing the WAC
18    prices as a competitive response to Warrick. Correct?
19 A. Doesn't quite say that in those terms, no.
20 Q. Well, why don't you read it? I hate to have
21    you do this, but just read the language that we're
22    talking about right now so we can discuss it and make
23    sure that the questions are clear.
24 A. The whole -- with the whole letter or just the
25    last sentence?

Page 189

1  Q. The last sentence about adjusting WAC prices.
2  A. "Our updated WAC values are in line with the
3     Warrick WAC value -- Warrick WAC values provided by
4     First Data Bank and should level the playing field for
5     Medicaid reimbursements."
6  Q. Did Mrs. -- was Mrs. Burnham involved in
7     increasing WAC prices at Dey Laboratories at or about
8     the time of that memo?
9  A. Yes, she did.
10 Q. Was she authorized to do that?
11 A. No, she was not.
12 Q. Was she disciplined for it.
13 A. She left the company approximately three
14    months after it happened, so she was not disciplined.
15 Q. And when it happened -- I realize you first
16    saw the memo about two years ago, but that memo goes
17    back to what, '95?
18 A. Yes. Correct.
19 Q. Were you aware that Ms. Burnham had increased
20    WAC prices at or about the time that she did it?
21 A. I was not aware that she had done that.
22 Q. When did you first become aware that she had
23    done that?
24 A. I became aware of it about six months later
25    when through normal routine checks one of the other

Page 190

1     individuals in the marketing department was doing some
2     routine checks with the databases and came to me and
3     mentioned to me that the WAC price in the First Data
4     Bank was incorrect, that it -- that it was correct in
5     the two other databases --
6  Q. Okay.
7  A. -- Red Book and Medi-Span, but it was
8     incorrect in First Data Bank.
9  Q. Well, First Data Bank is the one that the
10    Medicaid programs rely on. Right?
11        MR. HUDSPETH: Objection; form.
12        THE WITNESS: Well, I'm not sure which
13    one they -- they -- whether it's that one or all of
14    them, but I instructed her to immediately change it at
15    that point in time.
16 Q. (By Mr. Breen) And was it changed?
17 A. We informed the First Data Bank that they
18    needed to change it. I'm not sure if they actually did
19    change it at that point in time, but we definitely did
20    inform them.
21 Q. What did Dey do, if anything, to compensate
22    the state Medicaid programs for any increased
23    reimbursement they may have made due to that
24    unauthorized increase in the reported WAC?
25        MR. MOORE: Objection; form.

Page 191

1        MR. HUDSPETH: We would join in that
2     objection, obviously.
3        THE WITNESS: I am unaware of that.
4        MR. BREEN: Okay. Well, let me ask the
5     question betterer.
6        MR. MOORE: Betterer.
7        MR. HUDSPETH: By the way, I'm assuming
8     we are continuing to operate under the rules if one
9     person objects it applies for everybody on the defense
10    side. Right?
11       MR. MOORE: That's been our agreement in
12    all the depositions.
13       MR. HUDSPETH: Anybody have a problem
14    with that?
15       MR. ANDERSON: For the defense and the
16    plaintiff.
17       MR. HUDSPETH: Yeah, that's what I
18    thought.
19       MR. BREEN: I always assumed that if one
20    of you finds my question objectable -- objectionable,
21    everybody is going to agree with them.
22 Q. (By Mr. Breen) Okay. Let's go back to '95.
23    About six months after Ms. Burnham increased WAC
24    prices, you find out about it. Correct?
25 A. Yeah. It was actually December of that same