# Exhibit 338

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

```
                            NO. GV002327
1
   THE STATE OF TEXAS            ) IN THE DISTRICT COURT
2  ex rel.                       )
        VEN-A-CARE OF THE        )
3       FLORIDA KEYS, INC.,      )
             Plaintiff(s),       )
4                                )
   VS.                           ) TRAVIS COUNTY, TEXAS
5                                )
   DEY, INC.; ROXANE             )
6  LABORATORIES, INC., WARRICK   )
   PHARMACEUTICALS CORPORATION,  )
7  SCHERING-PLOUGH CORPORATION,  )
   and SCHERING CORPORATION,     )
8       Defendant(s).            ) 53RD JUDICIAL DISTRICT

9

10      ********************************************

11             ORAL AND VIDEOTAPED DEPOSITION OF

12                  ROBERT FRANCIS MOZAK

13                  November 6th, 2002

14                       Volume 3

15      ********************************************
```

16      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT FRANCIS

17   MOZAK, produced as a witness at the instance of the

18   Plaintiff(s), and duly sworn, was taken in the

19   above-styled and numbered cause on November 6th, 2002,

20   from 9:11 a.m. to 5:01 p.m., before Cynthia Vohlken,

21   CSR in and for the State of Texas, reported by machine

22   shorthand, at the offices of Coudert Brothers, 600

23   Beach Street, San Francisco, California pursuant to

24   the Texas Rules of Civil Procedure.

25

1        A.   When he was in Napa and we were having lunch

2    he did mention to me that he also had been contacted

3    by the State and he wanted to know what it was about

4    and I -- I told him basically the same answer, that

5    this was a call from Texas and they had been calling

6    some of our former employees and -- and -- and he was

7    probably being called for that reason.  And if he had

8    any -- any questions about it that he could contact

9    Mr. Hudspeth.

10       Q.   And do you know if Mr. Tipton followed up on

11   that recommendation or -- or suggestion and contacted

12   Mr. Hudspeth?

13       A.   I don't know if he did that or not.

14       Q.   Have you had any subsequent conversation with

15   Mr. Tipton after this lunch meeting?

16       A.   No, sir.

17       Q.   A little while ago, Mr. Mozak, we were

18   talking about this memo, Exhibit 72, and you've

19   indicated several times that you did not have

20   knowledge of the memorandum at or about -- at or

21   around May 30th, 1995.  And I think what you've

22   indicated to us is that you discovered the existence

23   of the memo a couple of years ago when responding to

24   production requests in this litigation or a related

25   investigation; is that correct?

Page 562

1      A.    Yes.

2      Q.    Okay.   To your knowledge was it a common

3   practice for Ms. Burnham to take action, looking back

4   now, whether or not you knew it at the time, looking

5   back as you sit here today was it common for

6   Ms. Burnham to take action without your authorization?

7              MR. FLECKMAN:   Objection, form.

8      A.    Well, I -- I -- Ms. Burnham was a very

9   independent individual and I -- I would -- I would

10  not, you know, stay in touch with all of her

11  day-to-day activities.   My management style is not to

12  micromanage and she often did things that I would not

13  know about specifically.

14     Q.    (BY MR. WINTER)   Did you find that there were

15  occasions other than this where Ms. Burnham took

16  action without your knowledge that was unauthorized?

17     A.    No, not that it was unauthorized.   However,

18  she ran the marketing department and many of the

19  activities that went on she would have, you know, done

20  on a unilateral basis in terms of, you know, kinds of

21  materials she developed and/or how she ran her

22  department.   She didn't talk with me, you know, every

23  day about every little thing that went on.

24     Q.    Okay.   So I just want to make sure I

25  understand your testimony, but you're describing

Page 563

1    yourself as not a micromanager, a person who would let

2    their subordinates have a certain amount of latitude

3    to run their program as -- as they saw fit.

4            MR. FLECKMAN:  Objection,  form.

5        Q.   (BY MR. WINTER)  That's what I understood you

6    to say; is that correct?

7            MR. FLECKMAN:  Objection, form.

8        A.   Yeah, I would characterize myself in that

9    manner.

10       Q.   (BY MR. WINTER)  So understanding that did

11   you say that Ms. Burnham then would oftentimes take

12   action without receiving specific guidance from you?

13       A.   Well, I think it would depend on, you know,

14   what the situation would be.  I -- I think that she

15   would run her department as she saw fit and I wouldn't

16   interfere on a daily basis on how she ran the

17   department.

18       Q.   Okay.

19       A.   I mean --

20       Q.   And that makes sense to me.

21           MR. FLECKMAN:  Excuse me just a second.

22   I'm not sure that he was through with his answer.

23           THE WITNESS:  That -- that's --

24   that's --

25       Q.   (BY MR. WINTER)  Are you finished with the

```
1        A.    Yes, sir.

2        Q.    Okay.  So is it your testimony, sir, that the

3   first time you saw Helen Burnham's memo, which is

4   Exhibit 72, and the first time you saw the -- the

5   document which has now been marked Exhibit 342 was at

6   the time that your marketing department was

7   researching Dey's WAC history?

8        A.    Yes, sir.

9        Q.    And that was after December of 1995, correct?

10       A.    To the best of my recollection.

11       Q.    And to the best of your recollection it was

12  precipitated by Dey's receipt of the first OIG

13  subpoena in this matter; is that correct?

14            MR. FLECKMAN:   Objection, form.

15       A.    Yeah, that would be my recollection.

16            MR. BREEN:   Okay.  Counsel, just so I

17  can clean this question up, what's the basis for your

18  objection?

19            MR. FLECKMAN:   What's the antecedent for

20  "it."

21            MR. BREEN:   Okay.

22       Q.   (BY MR. BREEN)  Let's make sure this is clear

23  on the record.

24            MR. BREEN:   You're not asking me to

25  define "it," are you?  Okay.  Okay.
```