# Exhibit 343

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment

Page 527

CAUSE NO. GV002327

| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| ex rel. | ) |
| VEN-A-CARE OF THE | ) |
| FLORIDA KEYS, INC., | ) |
| Plaintiffs, | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC.; WARRICK | ) |
| PHARMACEUTICALS CORPORATION; | ) |
| SCHERING-PLOUGH CORPORATION; | ) |
| SCHERING CORPORATION; | ) |
| LIPHA, S.A.; MERCK-LIPHA, S.A.; | ) |
| MERCK, KGAA; AND EMD | ) |
| PHARMACEUTICALS, INC., | ) |
| Defendants. | ) 53RD JUDICIAL DISTRICT |

*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF

CHARLES A. RICE

VOLUME III

March 24th, 2003

*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF CHARLES A. RICE, produced as a witness at the instance of the State of Texas and duly sworn, was taken in the above-styled and numbered cause on the 24th of March, 2003, from 8:11 a.m. to 6:08 p.m., before Debra L. Sietsma, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Fleckman & McGlynn, P.L.L.C., 515 Congress, Suite 1800, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions as previously set forth.

Page 528

APPEARANCES

FOR THE PLAINTIFF, STATE OF TEXAS:
    MR. PATRICK J. O'CONNELL,
    MR. RAYMOND C. WINTER
    Office of the Attorney General
    State of Texas
    Post Office Box 12548
    Austin, Texas 78711-2548

FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
    MR. JAMES JOSEPH BREEN
    The Breen Law Firm, P.A.
    P.O. Box 297470
    Pembroke Pines, Florida 33029-7470
    - and -
    MR. JOHN E. CLARK (Of Counsel)

Page 528 (cont.)

    Goode Casseb Jones Riklin
    Choate & Watson, P.C.
    2122 North Main Avenue
    P.O. Box 120480
    San Antonio, Texas 78212-9680

FOR DEFENDANT DEY, INC.:
    MR. STEPHEN M. HUDSPETH
    MR. DARRELL PRESCOTT
    Coudert Brothers
    1114 Avenue of the Americas
    New York, New York 10036-7703
    - and -
    MR. STEVEN A. FLECKMAN
    Fleckman & McGlynn, P.L.L.C.
    515 Congress Avenue, Suite 1800
    Austin, Texas 78701-3503

Page 529

FOR DEFENDANT ROXANE LABORATORIES, INC.:
    MR. R. ERIC HAGENSWOLD
    MR. STEVEN J. WINGARD
    Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas 78701

FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
    MR. C. MICHAEL MOORE
    Locke Liddell & Sapp, L.L.P.
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201-6776

FOR THE UNITED STATES DEPARTMENT OF JUSTICE:
    MR. ANDY J. MAO
    Trial Attorney, Civil Division
    P.O. Box 261
    Ben Franklin Station
    Washington, DC 20044

ALSO PRESENT:
    Mr. Zachary Taylor Bentley, II
    Mr. Brian Bobbitt, Videographer

Page 530

INDEX

WITNESS: CHARLES A. RICE, VOLUME III

| EXAMINATION | PAGE |
|---|---|
| By Mr. Breen ........... | 535 |
| By Mr. Fleckman ......... | 842 |
| By Mr. Breen. .......... | 848 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 566 | ................. | 569 |
| | Documents Regarding Advance Paradigm | |
| 567 | ................. | 572 |

---

Kelley Drye & Warren      - Sheet 1 -      (212) 808-7800

Page 589

1  A. I did, because Euthyrox was essentially a --
2     a brainchild of Merck, or at least Merck's strategic
3     marketing group.
4  Q. If you go to the next-to-the-last page,
5     DL-TX-0090854, you'll see a list of pricing
6     strategies. The first one, "Increase the spread to
7     retail home care accounts by lowering acquisition cost
8     more than AWP."
9        Do you see that?
10 A. Yes, sir.
11 Q. And I assume that you were aware that that
12    was Dey's pricing strategy back in 1992? Is that
13    correct?
14 A. I obviously got a copy of this memo, yes.
15 Q. So you were aware that Dey's pricing strategy
16    was to increase the spread by lowering acquisition
17    cost more than AWP back in 1992?
18 A. I was aware that, in order for generics to
19    have any uptake in the market, there had to be an
20    increase in the spread compared to the brand that was
21    currently on the market. Yes, I was aware of that.
22 Q. Would you please look at Exhibit 475.
23 A. Yes, sir, I have that.
24 Q. Purports to be an e-mail from you dated
25    3-18-2002 to Mr. Mel Engle.

Page 590

1        Do you see that?
2  A. Yes, sir, I do.
3  Q. It's -- and I'm -- I'm going to read from it.
4     "It's absolutely imperative that we get every one of
5     our sales and marketing employees to stop
6     communicating in terms of AWP minus a percentage in
7     the same sentence as reimbursement. This is
8     discoverable even on e-mail history files, and we must
9     get to a point that we are not even giving the
10    impression that we promote our products with this" --
11    this -- "in mind. This is very serious business as
12    everything" -- we do -- "we are doing is under
13    scrutiny."
14       Do you see that?
15 A. Yes.
16 Q. Did you send this e-mail to Mr. Engle?
17 A. Yes, sir, I did.
18 Q. And did Mr. Engle, to your knowledge, do
19    anything in response to this e-mail?
20 A. I believe he did communicate throughout sales
21    and marketing and throughout the company that we were
22    not to communicate anything regarding of how a managed
23    care entity reimbursed under its formulary.
24 Q. Why did you wait till March 18th, 2002 to
25    order your subordinates to stop selling and marketing

Page 591

1     your products in terms of the reimbursement spread off
2     of AWP?
3  A. I think my e-mail is self-explaining, "stop
4     communicating in terms of AWP minus a percent."
5  Q. Well, that was --
6  A. And I did this for the benefit of Mr. Engle,
7     who was new to the company. Mr. Engle started with us
8     in January of 2002, so I was getting him involved in
9     this so he understood my position.
10 Q. Oh, this was just for Mr. Engle's purposes,
11    then?
12 A. It was to get him involved, yes.
13 Q. It wasn't so he would get every one of your
14    sales and marketing employees to stop communicating in
15    terms of AWP minus a percentage?
16 A. It was, yes. But he is now in the loop as of
17    this date, so I made sure he understood my position.
18 Q. So why did you wait till March 18th of 2002
19    to tell any of your employees to stop the conduct
20    referred to in Exhibit 475?
21 A. I don't think you can say I waited, sir.
22    This was precipitated by the attachment which, I
23    believe, came to me around or on that date; and this
24    is a specific reference to an agreement or
25    negotiations with PCS.

Page 592

1  Q. All right. So is it your testimony, then,
2     that this was not the first time that you communicated
3     to your subordinates that they should stop
4     communicating in terms of AWP minus a percentage in
5     the same sentence as reimbursement?
6  A. Not in those specific terms; but I've had
7     discussions with staff, including Mr. Mozak, including
8     sales and marketing management, regarding the issues
9     surrounding how we market our products.
10 Q. All right. When was the first time that you
11    told your employees to stop communicating in terms of
12    AWP minus a percentage in the same sentence as
13    reimbursement or words to that effect?
14 A. In words to that effect, this time; but prior
15    to this time, I can't tell you what words I used.
16 Q. Well, when -- when did you ever try to
17    communicate to any of your subordinates that they
18    should stop marketing Dey's products based upon the
19    reimbursement spread?
20 A. I was not aware that Dey's employees were
21    marketing on the basis of reimbursement spread, sir.
22    I can't answer that question. We've had discussions
23    over the years regarding how we market our products.
24    We've had presentations. We've had training. All of
25    that applies, but I can't be specific to tell you when

Page 601

1  ten percent, the higher the AWP, the better the
2  spread."
3       Do you see that?
4  A. Yes.
5  Q. So do you know -- and you'll see
6  Laura Sanchez here says, in Exhibit 570 in the middle,
7  "I also advised CareMark to look very closely at
8  AlPharma with their packaging. Contract manufacturing
9  and the possibility that sometime they may have to
10 adjust their AWPs if, in fact, they are deemed to be
11 overly inflated, or if they are actively promoting
12 their AWP, which is against FDA regulations."
13      Do you see that?
14 A. I see that. I don't have a clue what it
15 means.
16 Q. So do you know -- I mean as -- as -- as the
17 former President and CEO of Dey Laboratories, do you
18 think there was anything wrong with AlPharma actively
19 promoting their AWPs?
20 A. I think in -- if I understand and recall
21 this, the way they were promoting it, the way they
22 were setting their AWP, yes, I think that was creating
23 an unlevel playing field.
24 Q. How was it that they were setting the AWPs to
25 create an unlevel playing field?

Page 602

1  A. They were setting them much, much higher than
2  the current competitive environment, certainly higher
3  than Dey's and Warrick's and other competitors'; so
4  they are trying forcibly to win business on the basis
5  solely of manipulating the spread.
6  Q. What's wrong with that?
7  A. We discussed that before. Manipulating the
8  AWP upwards in order to create an artificial spread,
9  I -- we agreed, coupled with promoting it to
10 customers, which they're obviously doing here, is what
11 I consider to be marketing the spread.
12 Q. And you don't think there's anything wrong
13 with setting an AWP from the outset that's higher than
14 the prices that your drugs are actually being sold for
15 by the wholesalers, do you?
16 A. No. I think there's always some measure of
17 difference between AWP and -- and the price that the
18 products are being sold. It doesn't matter whether
19 they're generics or brands. There -- there's a
20 distribution channel that has to be satisfied with
21 some measure of profitability.
22 Q. So you think there's something wrong with a
23 competitor coming in and setting their AWP higher than
24 the AWP that's -- that are already in the marketplace
25 for the generics, but you don't think there's anything

Page 603

1  wrong with Dey not adjusting their AWPs downward as
2  the prices of the drugs fall in the marketplace?
3  A. No. We adjusted our WACs downward, which is
4  the issue here with the State of Texas, as I
5  understand it. The AWPs, as we've testified, have
6  rarely changed, if at all.
7  Q. So how can -- how can there be something
8  wrong with your competitors establishing an AWP higher
9  than yours if there's nothing wrong with -- with your
10 own company failing to adjust their AWPs downward as
11 prices fall?
12 A. When Dey first sets its AWP on a new generic
13 coming to market, everybody in the system wins. We're
14 saving money for, in this case, the states who use
15 AWP, the states who use WACs, because we're lower than
16 the branded competition. Our average selling price,
17 or whatever we're charging to our customers, creates
18 a -- a small additional spread for providers; so they
19 win by switching to the generic, which, let's face it,
20 if they convert from a brand, they have a cost.
21 Changing from one product to another is costly. That
22 has to be take into consideration.
23      In terms of coming to market late, in
24 the case of AlPharma, with a -- what was -- I can't
25 remember if it was third, fourth or fifth generic to

Page 604

1  the market -- and publishing an extraordinarily high
2  AWP can only be for one reason, and that is to
3  manipulate market share on the basis of the spread.
4  I -- I find that objectionable, and I don't think they
5  should have done it.
6  Q. Okay. Now, you say that when -- when Dey
7  came to market with a new drug and provided incentives
8  to -- to providers to use Dey's new product by
9  increasing the spread on Medicare and Medicaid
10 reimbursement, that you believe Medicaid saved money
11 because the AWP on the generic was lower than the
12 brand, correct?
13 A. The WAC was lower than the brand as well.
14 Q. Okay. Let's talk about AWP right now.
15      Isn't it a fact, sir, that -- that Dey
16 would set the AWP at -- at ten percent less than the
17 brand AWP when it would launch a product?
18 A. Approximately, yes.
19 Q. And then it would leave it there going
20 forward, correct?
21 A. That's my understanding, yes.
22 Q. All right. So even though the actual prices
23 in the marketplaces were falling as generic
24 competition became healthy and brought the prices of
25 the generics down, correct?

Page 605

1  A. Yes, sir.
2  Q. So the -- the spread between the AWP and the
3     actual prices in the marketplace got progressively
4     greater because Dey did not lower its AWP?
5  A. Because none of the competitors lowered their
6     AWP, yes, sir.
7  Q. I understand that. But Dey did not lower its
8     AWP; and, therefore, the spread got greater and
9     greater, correct?
10 A. Yes, sir.
11 Q. All right. So the incentive to the
12    pharmacist or the provider that was being reimbursed
13    based upon AWP got greater and greater as the prices
14    came down and Dey did not lower its AWP, correct?
15 A. And for all competitors, yes, sir, that's
16    correct.
17 Q. But -- but the incentive that Dey had
18    arranged got greater and greater as the prices came
19    down and Dey did not lower its AWP, correct?
20 A. As is the case with all generics, yes, sir.
21 Q. Correct for Dey also, correct?
22 A. Correct for Dey, correct for every generic
23    company out there. And, by the way, every branded
24    company.
25 Q. So if you'll go to -- back to Exhibit 459 --

Page 606

1  A. 459?
2  Q. -- right -- which Mr. Winter will hand you --
3  A. Yes, sir.
4  Q. -- and you'll look at the next-to-the-last
5     page again under "Pricing Strategies" where it says,
6     the first strategy, "Increase the spread to retail
7     home care accounts by lowering acquisition cost more
8     than AWP."
9         Do you see that?
10 A. Yes, sir, I see it.
11 Q. So that pricing strategy was intended to
12    continue throughout the life of the product as the
13    spread and, therefore, the incentive got greater and
14    greater as the actual acquisition cost became
15    progressively lower but the AWP stayed the same,
16    correct?
17 A. Let's say it was a part of the market
18    dynamics for Dey's generic products, for all generic
19    companies' generic products; however, we compensated
20    for that by lowering the WAC periodically, as we've
21    stated before.
22        MR. WINTER: Objection, nonresponsive.
23 Q. (BY MR. BREEN) When you testified earlier
24    today that Exhibit 459 only involved the launch of a
25    product, were you considering the fact that the

Page 607

1     pricing strategy would exist throughout the life of
2     the product because AWP would be kept at a static
3     level and the spread off of AWP would get greater and
4     greater as the prices fell?
5  A. Your question is did I consider that fact?
6  Q. Yes.
7  A. Yes.
8  Q. So Pricing Strategy No. 1 on Exhibit 459 in
9     front of you, on the next-to-the-last page -- is it
10    your testimony that that pricing strategy only applies
11    at the launch and doesn't apply throughout the life of
12    the product?
13 A. No, sir. What I implied about the launch is:
14    This is referring to increase the spread over the
15    brand. At the launch there are no generic
16    competitors. We're talking about one new generic
17    entry coming to market versus the brand, which is
18    higher priced based on where First DataBank and others
19    tell us to set our AWP and our WAC. So what I'm
20    talking about here is increase the spread relative to
21    the brand. That is the generic incentive.
22 Q. I understand.
23 A. That's what I was referring to.
24 Q. I understand that, but I'm -- I'm looking at
25    Exhibit 459, next-to-the-last page, the first pricing

Page 608

1     strategy. It says, "Increase the spread to retail
2     home care accounts by lowering acquisition cost more
3     than AWP."
4         Do you see that?
5  A. Yes, sir.
6  Q. All right. Isn't that the same pricing
7     strategy that exists throughout the life of the
8     product as AWP remains static and the spread becomes
9     greater and greater as the price falls?
10 A. It's a market dynamic. I wouldn't actually
11    call it a pricing strategy. When there are more
12    generic entrants to the market, the selling price does
13    come down, yes, sir.
14 Q. All right. Now, going back to Exhibits 469
15    and 470 --
16 A. 469?
17 Q. -- 469 and 4 -- no, 569 and 570. I'm sorry.
18    I misspoke.
19 A. Yes, sir.
20 Q. Did Dey Laboratories provide free goods to
21    any of its customers in order to overcome the unfair
22    disadvantage that it was placed in when a competitor
23    inflated an AWP?
24 A. Sir, I don't know; and I can't tell that from
25    this document if that was, in fact, what was done or

Page 757

1 Q. And would this be the kind of document --
2    kind of marketing plan that you would be made privy to
3    as the Chief Executive Officer of Dey Laboratories?
4 A. I would be copied on it, yes.
5 Q. And would you -- would you typically go
6    through something like this to make sure there was
7    nothing in it that violated what you felt was company
8    policy?
9 A. Rarely.
10 Q. Do you recall ever having seen this document
11    before, this marking plan?
12 A. I'm pretty sure I saw it, yes.
13 Q. Go to, if you would, Page 48 of the plan,
14    which is DL-TX-0091054 --
15 A. Uh-huh.
16 Q. -- and you'll see Section 3, "Objectives."
17    And the last one on that page is "To provide incentive
18    to retail/chain providers to use Dey's Cromolyn by
19    increasing the spread on Medicare/Medicaid
20    reimbursements."
21    Do you see that?
22 A. Yes, sir, I do.
23 Q. That was basically the same objective for the
24    pricing strategy for the Albuterol launch, wasn't it?
25 A. It's verbatim except for the word "Cromolyn."

Page 758

1 Q. Okay. Do you recall seeing that objective in
2    the marketing plan at the time that the marketing plan
3    was created?
4 A. No, sir, I don't.
5 Q. Go to the next page. You'll see the AWP
6    reimbursement spread analysis at the bottom?
7 A. Yes, I see that.
8 Q. And, again, on the next page?
9 A. Yes, I see that.
10    (Exhibit 593 marked).
11 Q. (BY MR. BREEN) Okay. Now, if you'd look at
12    Exhibit 593, which you should also have in front of
13    you, which -- prepared by Mr. Ellis, January 1, 1994,
14    the "Abridged Marketing Plan."
15    Do you see that?
16 A. Yes, I do see that.
17 Q. Again, would this be the kind of document
18    that would be provided to you if it was going to be
19    put into place by Dey's marketing department?
20 A. Again, I would have been copied on it.
21 Q. Go, if you would, to Page 43.
22 A. I see that.
23 Q. Same -- same objective, "To provide incentive
24    to retail/chain providers to use Dey's Cromolyn by
25    increasing the spread on Medicare/Medicaid

Page 759

1    reimbursements."
2    Do you see that?
3 A. I see that.
4 Q. And was the intent there to arrange a spread
5    on Medicare/Medicaid reimbursement on Dey's generic
6    Cromolyn that was -- that was a greater spread than
7    what the pharmacy would enjoy if they bought the
8    brand?
9 A. I believe that was probably what Mr. Ellis
10    intended, yes.
11 Q. And that was the intention of -- of Dey in
12    terms of its pricing strategy whenever it launched a
13    generic drug, correct?
14 A. That's correct.
15 Q. Build in a bigger spread than the pharmacist
16    or provider could make if it -- than if -- than if it
17    bought the brand drug?
18 A. That's correct.
19 Q. Okay. If you go to Exhibit 465, please --
20 A. Yes.
21 Q. Again, it's a multipage document prepared
22    by -- from Todd Galles, March 4th, 1996, Dey Albuterol
23    Sulfate Inhalation Solution .5 percent, 20 milliliter.
24    Do you see this?
25 A. I see this.

Page 760

1 Q. This is the unit-dose Albuterol, correct?
2 A. No, sir. This is multidose.
3 Q. This is multidose. I'm sorry.
4 A. Yes, sir.
5 Q. Okay. Have you ever seen this document
6    before?
7 A. I don't think I did.
8 Q. Well, if you look at the second paragraph,
9    you'll see in the middle he says, "In addition, we
10    included the multidose to unit-dose conversion reprint
11    and worksheet and a retail profit gain worksheet. We
12    used both successfully last year. Refamiliarize
13    yourselves with these two pieces so that they can work
14    to your advantage again. These pieces should
15    reinforce the importance of our unit-dose business and
16    also help you strategize where to pick up multidose
17    business. Let us not forget that unit dose should
18    remain our top priority," and that's underlined.
19    Do you see that?
20 A. Yes, sir, I see it.
21 Q. And then if you'll go to the -- about halfway
22    through the stack, and it's Bates-stamped
23    DL-TX-0076254, you'll see a copy of the reimbursement
24    comparison worksheet --
25 A. Yes, sir. That's marked here.