# Exhibit 344

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 697

CAUSE NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS | )IN THE DISTRICT COURT |
| ex rel. | ) |
|    VEN-A-CARE OF THE | ) |
|    FLORIDA KEYS, INC., | ) |
|       Plaintiffs, | ) |
| | ) |
| VS. | )TRAVIS COUNTY, TEXAS |
| | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC.; WARRICK | ) |
| PHARMACEUTICALS CORPORATION; | ) |
| SCHERING-PLOUGH CORPORATION; | ) |
| SCHERING CORPORATION; | ) |
| LIPHA, S.A.; MERCK-LIPHA, S.A.; | ) |
| MERCK, KGAA; AND EMD | ) |
| PHARMACEUTICALS, INC., | ) |
|       Defendants. | )53RD JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT FRANCIS MOZAK
VOLUME IV
March 13th, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF Robert Francis Mozak, produced as a witness at the instance of the Relator and duly sworn, was taken in the above-styled and numbered cause on the 13th of March, 2003, from 9:37 a.m. to 7:22 p.m., before Debra L. Sietsma, CSR in and for the State of Texas, reported by machine shorthand, at 300 West 15th Street, 9th Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions as previously set forth.

Page 698

APPEARANCES

FOR THE WITNESS, ROBERT FRANCIS MOZAK:
    MR. WARTIN F. GAYNOR, III
    Cooley Manion Jones, L.L.P.
    21 Custom House Street
    Boston, Massachusetts    02110-3536

FOR THE PLAINTIFF, STATE OF TEXAS:
    MR. PATRICK J. O'CONNELL,
    MR. RAYMOND C. WINTER
    Office of the Attorney General
    State of Texas
    Post Office Box 12548
    Austin, Texas    78711-2548
    - and -
    MR. JOSEPH V. CRAWFORD
    Wright & Greenhill, P.C.

Page 698 (cont.)

    221 West 6th Street, Suite 1800
    Austin, Texas    78701

FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
    MR. JAMES JOSEPH BREEN
    The Breen Law Firm, P.A.
    P.O. Box 297470
    Pembroke Pines, Florida    33029-7470
    - and -
    MR. JARRETT ANDERSON
    Attorney at Law
    2411 Hartford Road
    Austin, Texas    78703

FOR DEFENDANT DEY, INC.:
    MR. STEPHEN M. HUDSPETH
    MR. DARRELL PRESCOTT
    Coudert Brothers
    1114 Avenue of the Americas
    New York, New York    10036-7703

Page 699

    MR. STEVEN A. FLECKMAN
    Fleckman & McGlynn, P.L.L.C.
    515 Congress Avenue, Suite 1800
    Austin, Texas    78701-3503

FOR DEFENDANT ROXANE LABORATORIES, INC.:
    MR. R. ERIC HAGENSWOLD
    Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas    78701

FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
    MR. C. MICHAEL MOORE
    MR. JOHN P. MCDONALD
    Locke Liddell & Sapp, L.L.P.
    2200 Ross Avenue, Suite 2200
    Dallas, Texas    75201-6776

FOR THE U.S. DEPARTMENT OF JUSTICE:
    MS. LAURIE A. OBEREMBT
    Trial Attorney - Civil Division
    U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C.    20044

FOR THE STATE OF FLORIDA:
    MR. MARK S. THOMAS
    MS. MARY S. MILLER
    Office of the Attorney General
    State of Florida
    PL-01 The Capitol
    Tallahassee, Florida    32399-1050

ALSO PRESENT:
    Mr. John Maloy Lockwood, M.D.

Page 723

1  need to -- you need to create a -- a -- a -- a
2  discount from the branded product to switch pharmacies
3  to a -- to a generic product.
4      This is in the interest of everybody.
5  If you -- if you establish a lower WAC or a lower AWP,
6  it not only -- it -- it -- it -- it allows the -- the
7  pharmacist to buy at a lower price. It allows the
8  State as well as the Federal government to reimburse
9  the generic at a lower price. If you didn't have such
10 a spread, they would continue to use brand products;
11 and if they continued to use brand products, you would
12 continue to reimburse at a higher level. So this is a
13 win-win for everybody. This is a standard practice.
14 Why would you even have generics in the marketplace to
15 begin with?
16     MR. WINTER: Objection, nonresponsive to
17 the last question.
18 Q. (BY MR. BREEN) Now, since you knew on
19 November 1st, 2001 that it was a strategic objective
20 of Dey Laboratories to provide incentives to retail
21 and chain providers by increasing the spread on
22 Medicare and Medicaid reimbursements -- you knew that
23 that was one of the objectives, correct?
24 A. Yes, of course, I said that.
25 Q. And you -- and you also knew -- and I'll take

Page 724

1  you to Exhibit -- or Page 090854 -- that you had
2  created a pricing strategy for Dey, as indicated on --
3  on Paragraph 1, to "increase the spread to retail/home
4  care accounts by lowering acquisition cost more than
5  AWP."
6      You -- you -- that was your -- you
7  created that strategy, didn't you?
8  A. Yes, I did.
9  Q. And you also created the strategy that's --
10 that's stated in Paragraph 2, "Pharmacy/chain bid
11 range: $23.95 to $26.50 (average $25.95) will
12 increase spread for retail and provide Dey with
13 highest" -- highest -- "profit."
14     Do you see that?
15 A. Yes, I do.
16 Q. That was part of your strategy, wasn't it?
17 A. Yes, sir.
18 Q. It was your strategy to create and increase
19 the spreads on Medicaid and Medicare reimbursement so
20 that Dey would make a higher profit, correct?
21 A. Sir --
22 Q. Is that correct, sir?
23 A. Yes, it was --
24 Q. All right. Now --
25 A. -- but you're missing the point.

Page 725

1  Q. I'm -- I'm just asking if that was your
2  strategy.
3      MR. FLECKMAN: He gets to complete his
4  response. If you find that it -- if you conclude that
5  it's nonresponsive, you can object. He gets to
6  complete his answer.
7      MR. BREEN: All right.
8      MR. FLECKMAN: Let him answer the
9  question.
10     Go ahead.
11     THE WITNESS: Yes. First of all, we
12 established some general guidelines. And, of course,
13 if you look at Objective 2, you can see that the
14 average guideline here is even higher than WAC as --
15 in terms of an established price range, 25.95, when
16 our WAC was 24.95. So we did establish some general
17 guidelines in terms of pricing.
18     However, as I explained to you, this is
19 common practice in terms of anytime a new generic
20 comes to the marketplace, you need to create a -- a
21 discounted structure in order to switch to a generic
22 product. If you didn't do that, it would be a
23 lose-lose for everybody. Certainly, Dey gained by
24 having them move from a Proventil branded product to a
25 generic version; but so did the State and so did the

Page 726

1  Federal government, because now you're reimbursing on
2  a lower WAC and a lower AWP. So, you know, clearly
3  that's the objective for having -- for generics, and I
4  don't know what else you would do in this case.
5  Q. (BY MR. BREEN) So was this creating the
6  spread on Medicare and Medicaid reimbursement and
7  increasing the spread on Medicare/Medicaid
8  reimbursement a marketing strategy of Dey
9  Laboratories?
10 A. It was a -- it was the -- it was the -- it
11 was the setting of prices for a new generic of which a
12 part of that is naturally creating some sort of a
13 spread, yes.
14 Q. So was it part of Dey's marketing strategy?
15 A. To set a price, of course.
16 Q. So was it part of Dey's marketing strategy to
17 set and increase the spreads on Medicare/Medicaid
18 reimbursement through its pricing?
19 A. Sir, every product that comes on the market
20 has a spread. It always has a spread. There's an AWP
21 and there's a -- you have to have a spread. If you
22 have a branded product at -- at X and you come out
23 with another product that was 20 percent below X,
24 there is a spread. In this case, yes, this is the
25 spread that occurred as a result of comparing the

Page 727

1  branded product Proventil to the switch to the generic
2  product Albuterol --
3       MR. BREEN: All right.
4       THE WITNESS: -- which is the first on
5  the market.
6       MR. BREEN: All right. So --
7       MR. WINTER: Objection, nonresponsive.
8  Q. (BY MR. BREEN) So -- just so I understand
9     this now, you are telling the jury now under oath that
10    it was Dey's marketing strategy to create and increase
11    the spread on Medicare and Medicaid reimbursement
12    through its pricing. Is that correct?
13 A. Yes. It was our -- it was our intention to
14    discount the product from the branded product so that
15    we would then have a lower reimbursement, we would
16    establish a lower WAC, we would establish a lower AWP.
17    Pharmacists would benefit, patients would benefit, and
18    certainly the State would benefit as well.
19 Q. And you knew that when you gave the answers
20    to the questions that I just read to you, beginning on
21    Page 85 of your deposition taken on November 1st,
22    2001?
23 A. Yes.
24 Q. You knew that?
25 A. Yes.

Page 728

1  Q. And when I say, "You knew that," you knew
2     that Dey had created and implemented the pricing and
3     marketing strategy that you've just testified about?
4  A. Yes. That's the way -- that's how we
5     established our prices after we had the recommendation
6     of the ranges from First DataBank.
7  Q. Now, why didn't you tell anybody at Lipha
8     that it was Dey's strategy to create and increase the
9     spread on -- on its products as its marketing and
10    pricing strategy?
11      MR. FLECKMAN: Object to form.
12   Objection, form.
13      THE WITNESS: Sir, I'm -- I'm saying
14   that we established a -- a WAC and an AWP. As a
15   natural result of that, there is a spread. Okay? I
16   said we are increasing the spread because the
17   spread -- there was a spread that you create naturally
18   from the higher-price brand product to the lower-price
19   generic product. That is common in the industry. It
20   happens. That's all we were doing.
21      MR. WINTER: Objection, nonresponsive.
22 Q. (BY MR. BREEN) Did you conceal that strategy
23    from the executives at Lipha?
24 A. No. I didn't conceal anything.
25 Q. Were they aware of it?

Page 729

1       MR. FLECKMAN: Objection, form.
2       THE WITNESS: I don't know if they were
3  aware of it or not. This document was sent, and I
4  don't think that anybody felt that we were doing
5  anything that wasn't not only wrong -- was not wrong,
6  and it was common practice. How else do you -- how
7  else do you establish a -- a -- a generic price on the
8  marketplace? I could -- I could have no spread and
9  raise the price and make it higher. I don't think the
10 State or the reimbursers would like us to do that, and
11 that wouldn't solve anybody's problem for coming
12 out -- wouldn't -- coming out with generics.
13      MR. WINTER: Objection, nonresponsive.
14 Q. (BY MR. BREEN) Exhibit 459 was sent to who,
15    sir?
16 A. I think just to these individuals.
17 Q. Including Mr. Termier?
18 A. Yes.
19 Q. So you didn't send it to anybody at Lipha at
20    the time, did you?
21 A. No, I don't believe so.
22 Q. All right. Now, have you ever had any
23    conversations with any executives at Lipha where you
24    let them know about your marketing pricing spread
25    strategy?

Page 730

1  A. I -- in this context, I -- I take exception
2     to the use of "marketing strategy of spreads," because
3     all we were doing is establishing a price.
4        And to answer your question, no, I
5     didn't discuss that with anybody at Lipha.
6  Q. But Mr. Rice, in his sales commentaries,
7     would -- would -- would provide Merck with that
8     information about the spread, wouldn't it?
9        MR. FLECKMAN: Objection, form.
10 Q. (BY MR. BREEN) Wouldn't he?
11 A. I'm not aware of what he put in his
12    commentaries.
13 Q. All right. We'll get -- we'll get back to
14    that.
15       Now, Mr. Termier went to Lipha after he
16    left Dey Laboratories --
17 A. Yes, he did.
18 Q. -- correct?
19       And he was fully aware -- and I'll --
20    let me use your words. He was fully aware that it was
21    Dey's pricing strategy to provide incentives to
22    providers to use Dey's products by increasing the
23    spread on Medicare and Medicaid reimbursements,
24    correct? Mr. Termier knew that that was Dey's pricing
25    strategy?

Page 731

1  A. Yes. He was -- he received this memo and --
2     and I believe he was present at the meeting when we
3     talked about it.
4  Q. Okay. And -- and after going to Lipha, did
5     anybody at Lipha ever instruct you or anybody else at
6     Dey, to your knowledge, that they should not follow
7     the pricing strategy that is stated in your memo dated
8     February 24th, 1992?
9        MR. FLECKMAN: Objection, form.
10       THE WITNESS: No. Nobody instructed me.
11 Q. (BY MR. BREEN) Now -- let me see Cromolyn.
12    Did Dey continue to follow the pricing
13    strategy that was announced in your memo of
14    February 24th, 1992 all the way up until the time you
15    left the company?
16       MR. GAYNOR: Objection, form.
17       THE WITNESS: I believe in establishing
18    a -- a price for a new generic, we followed
19    essentially the same guidelines that we were advised
20    by First DataBank, which was to set the AWP at
21    approximately, you know, the area of ten percent below
22    the branded product and the WAC price at somewhere
23    between 15 and 25 percent below the AWP price. This
24    was the advice we got from First DataBank.
25       And whenever we were the first generic

Page 732

1     on the market, that was the basic strategy that we
2     followed. If we were not the first generic on the
3     market, we usually looked at the competitive generic
4     and either -- usually matched their AWP or -- and --
5     and/or WAC. It would have been at basically what the
6     competition was doing. So if we were first, we
7     followed that format advised to us by First DataBank;
8     and if we were second, we usually looked at the
9     competitive situation.
10 Q. (BY MR. BREEN) So if you were second, was
11    it your -- was it still your strategy to provide
12    incentives to retail and chain providers by increasing
13    the spread on Medicare and Medicaid reimbursements?
14 A. Sir, the incentive you're -- you're referring
15    to is that it's a lower-price generic.
16 Q. My question -- okay.
17       MR. WINTER: Objection, responsive.
18       MR. BREEN: Objection, nonresponsive.
19       Please read the question back.
20       (The reporter read the last answer).
21       THE WITNESS: Yes, it is a lower-price
22    generic.
23       THE REPORTER: I'm sorry. That's the
24    answer.
25       (The requested portion was read).

Page 733

1        MR. FLECKMAN: Objection, form.
2        THE WITNESS: If we were second? If we
3     were second, we -- we -- we established our price
4     based upon what the -- the current competitive pricing
5     ranges were for competitive products.
6  Q. (BY MR. BREEN) So you'd try to match the
7     spreads that were already in the marketplace?
8  A. We matched their price -- you know, we -- we
9     tried to be somewhat market competitive, yes.
10 Q. By matching their spread?
11 A. By matching their price and whatever spread
12    that you're referring to.
13 Q. I'm -- I'm -- I'm referring to the spread
14    that you were referring to when you talked about
15    providing incentives to retail/chain providers to
16    use Dey's products by increasing the spread on
17    Medicare/Medicaid reimbursement.
18 A. You know --
19       MR. GAYNOR: Objection, form.
20       MR. BREEN: That's the spread I'm
21    talking about.
22       THE WITNESS: I think you're talking --
23    we're talking about lots of spreads here. I mean I'd
24    like to -- you to define what you mean by "spread" in
25    this case.

Page 734

1  Q. (BY MR. BREEN) All right. Well, let's do --
2     let me -- let me do it this way.
3        Would you please look at what's been
4     marked as Exhibit --
5  A. Because we've talked about spread a lot of
6     times. Excuse me. Maybe I shouldn't interrupt.
7        MR. BREEN: Counsel, I don't have a
8     question pending right now.
9        THE WITNESS: Okay.
10       MR. BREEN: And I would object to the
11    witness' comments as nonresponsive. Move to strike.
12       Would you please show the witness what
13    has been marked as Exhibit 476.
14       THE WITNESS: Thank you.
15 Q. (BY MR. BREEN) Okay. This purports to be a
16    Cromolyn sodium nebulizer solution marketing plan?
17 A. Yes, sir.
18 Q. Bates-stamped DL-TX-0091006. I believe it's
19    sequential up to 91074.
20 A. Okay.
21 Q. Have you ever seen this before?
22 A. Yes, I have.
23 Q. Purports to be dated December 15th, 1993,
24    prepared by Robert Ellis?
25 A. Yes, sir.

Page 735

1  Q. Did Mr. Ellis work for you?
2  A. Yes, he did.
3  Q. Okay.
4  A. Not directly, but he was in my department.
5  Q. All right. And was Mr. Ellis -- was part of
6     his responsibilities to carry out Dey's pricing
7     strategy of providing incentives to retail/chain
8     providers to use Dey's products by increasing the
9     spread on Medicare/Medicaid reimbursements?
10 A. Well, I think he was following the same
11    procedure we did with Albuterol, which was to -- since
12    Cromolyn was the first generic on the market, we --
13    the only guideline that we had was the branded product
14    Intal. And so we followed the same pricing strategy
15    of establishing our first products -- first prices on
16    the marketplace, and that would have been basically
17    the same idea. We -- we -- we set an AWP at
18    approximately ten percent or so below the branded AWP,
19    and we established a WAC price that was somewhere 15
20    to 25 percent below that.
21       So on the -- so the answer to your
22    question, he was -- yes. He was following the same
23    strategy of establishing a price for a new generic
24    product on the marketplace.
25 Q. Could you please go to Page 48 of the

Page 736

1     marketing plan, which is Bates-stamped 0091054?
2  A. Yes. I see it.
3  Q. And you see where it -- it says, "Control and
4     Implementation Aqueous Cromolyn" at the top?
5  A. Oh, yes, yes.
6  Q. Three is "Pricing," and then there's the
7     "Objectives" there.
8        Do you see that?
9  A. Yes, I do.
10 Q. And one of the objectives is "To seek the
11    highest prices possible in retail, home care and
12    hospital segments."
13       Do you see that?
14 A. Yes, I do.
15 Q. And the next -- next one is "To maximize
16    Dey's profitability."
17       Do you see that?
18 A. Yes.
19 Q. And then the fourth one is "To provide
20    incentive to retail/chain providers to use Dey's
21    Cromolyn by increasing the spread on Medicare/Medicaid
22    reimbursements."
23       Do you see that?
24 A. Yes, sir.
25 Q. How would increasing the spread on

Page 737

1     Medicare/Medicaid reimbursements help Dey to seek the
2     highest prices possible in the retail and home care
3     segments?
4  A. I think -- I think the increasing spread is
5     just a natural outgrowth of the fact that you're --
6     you're -- you're lowering the price to the -- you're
7     setting a lower price for the generic and -- and he's
8     now buying the generic at a lower price. It is more
9     profitable for pharmacies to use generic products than
10    it is to use branded products. That's just a fact of
11    life.
12 Q. But how does that help --
13       MR. WINTER: Objection, nonresponsive.
14 Q. (BY MR. BREEN) How does that help Dey seek
15    the highest prices possible in the retail/home care
16    market segments?
17 A. I think Dey tried to sell -- since we're the
18    first -- exactly since we're the first generic on the
19    market, we -- we attempt to establish a price that,
20    quite frankly, allows the pharmacy to switch from a
21    branded product to a generic at the same time that we,
22    as a company, are getting the most profitability since
23    we're first on the market.
24       We recognize that there's going to be
25    competition very quickly. You do try to get the

Page 738

1     highest price possible initially and then -- because
2     you know very shortly you're going to have a great
3     deal of competition and your contract prices are going
4     to drop. And then once your contract prices are going
5     to drop, your WACs are going to drop. Just exactly
6     what happened. It's -- it's the natural life cycle of
7     a generic product.
8  Q. But my question is: How did you balance the
9     spread that you provided on Medicare/Medicaid
10    reimbursements with the -- seeking the highest
11    possible prices?
12       MR. GAYNOR: Objection, form.
13 Q. (BY MR. BREEN) Well, let me restate the
14    question.
15 A. Yeah.
16 Q. I mean the -- the spread on Medicare/Medicaid
17    reimbursement would be the difference between the
18    reimbursement and what the customer was actually
19    paying for the product, correct?
20 A. Yeah. As a -- yes. And, in fact, on a new
21    product, the Medicaid spread and -- is -- is -- is
22    virtually very, very small, because if you establish
23    your reimbursement at the WAC, which is usually the
24    case when a new generic comes out, and you're selling
25    at or around WAC in most cases -- I'm not saying there

Page 739

1     weren't some contracts that were lower than WAC, but
2     there's -- there were many prices that were above WAC,
3     particularly in a newer product.
4         So if anything, you're -- I'm not sure
5     there really is an "increased spread," quote, unquote,
6     in -- in reimbursing for Medicare in that particular
7     scenario when you first launch. I think the -- the
8     incentive to the pharmacist is the fact that he's now
9     buying the product for a lower price because he's
10    paying a lower WAC, and he also knows that over time,
11    as soon as competition comes out, that WAC and that
12    contract price is going to drop and he, then, usually
13    makes more money on a generic than he does on a brand
14    due to the competition, whereas brands are always
15    increasing their prices, usually annually. The
16    competition forces prices down on the generic product,
17    and he knows that over time he will make more money on
18    a generic than he will on a brand.
19 Q. So --
20 A. And so we're trying to balance -- when we
21    first come out with a price, we are trying to balance,
22    number one, the objective of switching the -- the --
23    the -- the account from a brand to a -- with the fact
24    that certainly we want to make profit when we first
25    come out. We've just had all this investment on this

Page 740

1     new product, and we want to get some of that back
2     because we know the price is going to drop quickly.
3     And Mr. Ellis was doing nothing more than following
4     that practice.
5 Q. So -- I'll ask the question again.
6         How was creating the spread or the
7     incentive through the spread assisting Dey in seeking
8     the highest prices possible?
9         MR. GAYNOR: Objection, form.
10 Q. (BY MR. BREEN) How does the spread help Dey
11    seek high prices?
12 A. The spread that you're referring -- that is
13    referred to in there is the difference between the
14    brand price and the -- and -- and -- and it helps Dey
15    to get profitability because they're -- they're now
16    buying the Dey generic instead of the Schering
17    Proventil product, so it's going to be more profitable
18    for Dey Laboratories.
19 Q. I understand how that helps Dey --
20        MR. WINTER: Objection, nonresponsive.
21 Q. (BY MR. BREEN) I understand how that helps
22    Dey get more profitability, but what I want you to
23    explain to the jury is: How does providing incentive
24    through this spread help Dey maintain the highest
25    possible prices in the retail and home care market?

Page 741

1         MR. GAYNOR: Objection, form.
2         THE WITNESS: In the home care -- are we
3     speaking specifically about home care now --
4         MR. BREEN: Well, if you'll --
5         THE WITNESS: -- or in general?
6         MR. BREEN: I'm saying if you go back to
7     Page 48 of the marketing plan --
8         THE WITNESS: Okay.
9         MR. BREEN: -- it's -- one of the
10    objectives is "To seek the highest prices possible in
11    retail, home care and hospital segments."
12        THE WITNESS: Yes. Our -- our --
13 Q. (BY MR. BREEN) So my question is: How does
14    providing the incentive by increasing the spread on
15    Medicare and Medicaid reimbursements help Dey seek the
16    highest possible prices in the home care market?
17 A. The spread on Medicaid and Medicaid (sic)
18    reimbursements is just a -- a -- a -- a spill-out of
19    whatever your price is.
20        Initially it doesn't increase the --
21    the -- initially there's probably virtually no spread
22    for the pharmacy for Medicaid and Medicaid (sic)
23    reimbursement. It's only over time as contract prices
24    drop that maybe they -- that -- that spread does
25    increase for them, but initially there really isn't

Page 742

1     much of a spread when you set your prices.
2         Our objective was to set the highest
3     price we could possibly get in the market and still be
4     considered a generic product, and that's -- and that's
5     what our objective was.
6         MR. WINTER: Objection, nonresponsive.
7 Q. (BY MR. BREEN) So as -- as the -- as the
8     customers receive greater spreads over time, as you
9     just testified --
10 A. Yes.
11 Q. -- did that help -- did that assist Dey in --
12    in avoiding falling prices or at least prices falling
13    as fast as they otherwise would have without the
14    spread?
15 A. No. I think once -- once a reimbursement
16    level is established by the State or the
17    government, whoever establishes it, at that point it's
18    not a question of spread. It's a question -- the
19    account is interested in only one thing: "What price
20    can I -- where can I get it at the lowest price?"
21        And what he does is he bids one -- one
22    competitor against another competitor to -- to drive
23    the price down, and he will be reimbursed upon
24    whatever that reimbursement level is based upon his
25    purchase price. Over time, as you know, as our

Page 795

1    this?
2         MR. BREEN: If you look at the bottom
3    right-hand corner, you'll see -- purported to have
4    been issued on 27 July, 2000.
5         THE WITNESS: Okay.
6  Q. (BY MR. BREEN) Have you ever seen this
7    before?
8  A. Again, I think the same answer. It didn't
9    come to me directly. I may have seen some questions
10   and read through it once or twice; so, yes, the answer
11   would be yes.
12 Q. All right. So you recall Dey Laboratories
13   receiving a second OIG subpoena in or about
14   27 July, 2000 --
15 A. Yes, sir.
16 Q. -- is that correct?
17 A. Yes, sir.
18 Q. And were you involved at all in -- in
19   gathering documents to respond to this subpoena which
20   is now marked Exhibit 556?
21 A. No. I didn't gather any documents to respond
22   to this other than what I might have had in my own
23   office.
24 Q. Okay. So did you do -- did you perform any
25   function with respect to Exhibit 556 that you did not

Page 796

1    perform with respect to 555?
2  A. No, sir.
3  Q. Did you perform any -- any function with
4    respect to 555, your first subpoena, that you did not
5    perform with respect to 556, the second subpoena?
6  A. No. I -- I -- I deliberately did not want to
7    get involved in collecting documents.
8  Q. Why not?
9  A. Because I didn't want to get involved in --
10   in going through the files. I deliberately stayed
11   away from them. I only collected my own files and
12   turned them in, and Ms. Marrs coordinated the
13   collection of documents around the company.
14 Q. Now, when -- when Ms. Daulong left Dey
15   Laboratories, were you still in a supervisory position
16   over her?
17 A. No, I was not.
18 Q. Okay. Who was she working for at the time
19   she left Dey?
20 A. She was reporting to Willia Tate.
21 Q. And who did Willia Tate report to?
22 A. She reported to me.
23 Q. And at the time that -- that -- up to the
24   point in time when Ms. Daulong left Dey Laboratories,
25   was her office maintained in the same building as

Page 797

1    yours -- as yours?
2  A. Yes, it was.
3  Q. On the same floor?
4  A. No. Different floor.
5  Q. Different floor. All right.
6         And do you recall having any
7    conversations with Ms. Daulong at or -- or shortly
8    before she left the company regarding production of
9    documents in response to the ongoing Federal
10   investigation?
11 A. I did not speak to her about documents at all
12   at the time she left the company.
13 Q. Did you speak to her about documents at all
14   at any time?
15 A. No. As a matter of fact, I didn't.
16 Q. Okay. Ms. Daulong has testified that she
17   had -- did have a conversation with you about
18   documents that she had in her office immediately
19   before leaving the company.
20        Are you aware that she so testified?
21 A. Yes, I am.
22 Q. Are you aware that Ms. Daulong has testified
23   under oath that you directed her to shred the
24   documents that she had maintained in her office?
25 A. Well, I read that, yes, and I -- I don't know

Page 798

1    how she could have said that because I never talked to
2    her about shredding documents. I never talked to her
3    about her documents, period, much less shredding them.
4  Q. Okay. Have you ever had any discussions with
5    Todd Galles about documents or computer file
6    information maintained under his responsibilities at
7    Dey Laboratories?
8  A. Have I -- would you repeat that?
9  Q. Let me restate the question.
10        Did you ever have any discussions with
11   Todd Galles about documents or other evidence that Dey
12   Laboratories might provide in response to either one
13   of these subpoenas, 555 or 556?
14 A. I -- the only -- the only conversation I can
15   remember with him as it related to documents is after
16   he had -- I believe he had collected a lot of the
17   documents in the marketing department. And I believe
18   he had found the Helen Burnham memo, and he mentioned
19   that to me. And -- and he said he had turned it in,
20   and I said, "Fine. That's what you should have done."
21   And that would be the only conversation that I can
22   remember at all with him as it related to documents
23   being collected.
24 Q. Well, you're aware that -- that Mr. Galles
25   prepared some of these spreadsheets that your sales

Page 799

1  department was to use in order to compare the
2  reimbursement profits on Dey's Albuterol with that of
3  its competitors, don't you?
4      MR. GAYNOR: Objection form.
5      THE WITNESS: I believe he was
6  involved -- I -- I -- in preparing them to some
7  degree. You know, exactly what his role was, I can't
8  be sure. I never talked to him about it.
9  Q. (BY MR. BREEN) All right. In order, now,
10  to -- just to try to ask this question a little bit
11  differently -- maybe it won't be objectionable -- do
12  you know whether or not Mr. Galles ever prepared any
13  kind of marketing or sales materials that in any way
14  referred to the reimbursement spread with respect to
15  Dey's drugs?
16 A. Well, he was involved in the multidose to
17  unit-dose conversion promotion that went on in '95, I
18  believe.
19 Q. I'll -- I'll hand you now what's been marked
20  as Exhibit 461 for Mr. Galles' deposition and ask that
21  you look at that.
22 A. Uh-huh.
23 Q. Do you know whether or not that is a
24  spreadsheet that was prepared by Todd Galles?
25 A. No, I don't know whether it was prepared by

Page 800

1  Todd Galles. I'm not sure if this was prepared by him
2  or somebody in the sales department.
3 Q. Is --
4 A. I know that he did, you know, send it out.
5  Whether he actually prepared it or not, I don't know.
6 Q. Okay. But you know that -- that when that --
7  what is now Exhibit 461 was -- was distributed for use
8  by Dey's sales force, Mr. Galles is the one that
9  ultimately sent it out for use?
10 A. Yes, I'm aware of that.
11 Q. Okay. And he -- when he -- when he did that,
12  he was working under your supervision, correct?
13 A. Well, he was reporting to Debbie Bronstein, I
14  would think, at that point in time. Not directly to
15  me, but he was in my department.
16 Q. And Ms. Bronstein was reporting to you?
17 A. Yes.
18 Q. And if Mr. Galles testified that he prepared
19  what is now Exhibit 461, would you have any reason to
20  believe that he was -- he's incorrect in so stating
21  that?
22 A. That he prepared it?
23 Q. Yes.
24 A. No. If he said he prepared it, I would
25  believe that he did prepare it.

Page 801

1 Q. Okay. Did you ever have any discussions with
2  Mr. Galles where you advised him to cease any kind of
3  work on a sales or marketing material that was similar
4  to Exhibit 461 and to not distribute any materials
5  similar to Exhibit 461?
6      MR. GAYNOR: Objection, form.
7      THE WITNESS: No. I can't recall of a
8  conversation that relates to this with him. I mean
9  we -- we did stop utilizing this sheet, I think,
10  sometime in '96, mid '96 or thereabouts. I -- I -- I
11  don't recall specifically ever talking to him about
12  ceasing this particular sheet. I think it sort of
13  died by itself sometime in mid '96, and I would assume
14  that this was -- this was something that we -- we --
15  you know, we went outside to print this stuff usually.
16  We went to outside printers -- I -- as opposed to
17  making them internally, so I -- I -- I can't say
18  whether -- I never talked to -- to him about this
19  particular sheet, if that's what you're asking me. I
20  have no -- no recollection of that.
21 Q. (BY MR. BREEN) Well, did you -- were you
22  aware of the existence of Exhibit 461 and the fact
23  that it was being printed by outside printers at the
24  time it was being used by your company?
25 A. I was -- I was aware of the fact that it was

Page 802

1  being used by our company, as I testified before. I
2  don't know whether it was used -- being printed inside
3  or outside. Normally we sent all of our materials
4  outside. That would have been my logical answer to
5  the question, "Where was it made?"
6      "Out -- it was printed outside."
7 Q. Did you ever instruct Mr. Galles to cease
8  work on and to destroy any marketing materials he was
9  working on for Dey Laboratories?
10 A. No, not to my -- no, I did not.
11 Q. Did you ever instruct Mr. Galles to delete
12  any files whatsoever from his computer system?
13 A. I wouldn't even know what was in his computer
14  system.
15      MR. WINTER: Objection, nonresponsive.
16      THE WITNESS: Well, okay. No, I
17  didn't -- I -- what was the question again?
18 Q. (BY MR. BREEN) Did you ever instruct
19  Mr. Galles to delete any information from his
20  computer?
21 A. Not that I can remember, no.
22 Q. Let me show you again what's been marked as
23  Exhibit 72.
24      (Discussion off the record).
25      THE WITNESS: Yes, sir.