# Exhibit 355

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| ex rel. | ) |
|   VEN-A-CARE OF THE | ) |
|   FLORIDA KEYS, INC., | ) |
|     Plaintiff(s), | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC., WARRICK | ) |
| PHARMACEUTICALS CORPORATION, | ) |
| SCHERING CORPORATION, | ) |
| SCHERING-PLOUGH CORPORATION, | ) |
| LIPHA, S.A., MERCK-LIPHA, | ) |
| S.A., MERCK, KGAA, and EMD | ) |
| PHARMACEUTICALS, INC., | ) |
|     Defendant(s). | ) 53RD JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
CARRIE-JEAN JACKSON
April 18th, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF CARRIE-JEAN JACKSON, produced as a witness at the instance of the Defendant(s), and duly sworn, was taken in the above-styled and numbered cause on April 18th, 2003, from 9:08 a.m. to 1:03 p.m., before Cynthia Vohlken, CSR in and for the State of Texas, reported by machine shorthand, at the Sacramento Marriott Rancho Cordova, 11211 Point East Drive, Rancho Cordova, California pursuant to the Texas Rules of Civil Procedure.

Page 2

APPEARANCES

FOR THE PLAINTIFF(S):
    MR. RAYMOND C. WINTER
    Office of the Attorney General
    State of Texas
    Post Office Box 12548
    Austin, Texas 78711-2548
FOR THE RELATOR:
    MR. FRANK M. PITRE
    Cotchett, Pitre, Simon & McCarthy
    840 Malcolm Road, Suite 200
    Burlingame, California    94010
FOR THE DEFENDANT(S) DEY, INC.:
    MR. DARRELL PRESCOTT
    Coudert Brothers, LLP
    1114 Avenue of the Americas
    New York, New York 10036-7703
FOR THE DEFENDANT ROXANE LABORATORIES, INC.:

Page 2 (cont.)

    MR. STEVEN S. WINGARD
    Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas 78701

Page 3

FOR THE DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
    MR. JOHN P. MCDONALD
    Locke Liddell & Sapp, LLP
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201-6776
ALSO PRESENT:
    Ms. Adelina O. Berumen,
        California Office of the
        Attorney General
    Mr. Brian Bobbitt, Videographer

Page 4

INDEX

| | |
|---|---|
| Appearances................................. | 2 |
| CARRIE-JEAN JACKSON | |
|     Examination by Mr. Prescott............ | 5 |
|     Examination by Mr. Winter.............. | 56 |
|     Examination by Mr. Pitre............... | 108 |
|     Examination by Mr. McDonald............ | 164 |
| Signature and Changes....................... | 166 |
| Reporter's Certificate...................... | 168 |
| VIDEOTAPE NUMBER | |
|     1 .................................. | 5 |
|     2 .................................. | 53 |
|     3 .................................. | 108 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 880 | ........................................ | 18 |
| | August 31, 1993 Letter from Ms. Jackson to Ms. McNeill, Re:    Medicaid Reimbursement | |
| 881 | ........................................ | 27 |
| | Handwritten Notes, Vacation/Sick Leave Request | |
| 882 | ........................................ | 48 |
| | February 24, 1995 Memorandum From Ms. Jackson to Mr. Mozak, Re:    Office Incident; 2/24/95; 9:20 a.m. | |
| 883 | ........................................ | 61 |
| | Resume | |
| 884 | ........................................ | 95 |
| | 1/18/95 Fax from Ms. Jackson to Ms. Burnham | |
| 885 | ........................................ | 146 |
| | 11/30/94 Performance Review | |

Page 17

1  A. Right.
2  Q. And this letter states, does it not, that,
3     quote, this will advise you that your application for
4     inclusion of the drug Cromolyn sodium inhalation USP
5     on the list of drug products for which the Texas
6     drug -- Texas Vendor Drug Program will reimburse
7     pharmacies on Medicaid prescriptions has been
8     approved, close quote?
9  A. That is correct.
10 Q. So the application was approved one day after
11    the price lists were submitted; is that correct?
12 A. It seems to be that way, yes.  And it looks
13    like they backdated the approval to May 2nd.
14 Q. The Vendor Drug Program?
15 A. Yes.  It says the effective date for this
16    approval is May 2nd.  She dated it May 18th.  So it
17    looks like they backdated it to when possibly after --
18    right after they received the April 27th letter.
19 Q. So it was made retroactively effective?
20 A. I interpret that to be retroactive to May 2nd
21    of 1994.
22 Q. Retroactive after they received the price
23    lists, right?
24 A. Right.  After they received the price lists
25    she said, okay, well, it's approved as of May 2nd.

Page 18

1  Q. Thank you.  Now I'd like to mark as the next
2     exhibit in order a letter dated August 31, 1993, which
3     appears to be from Ms. Jackson to Martha McNeill.
4        MR. PRESCOTT:  I'm sorry, I don't have
5     extra copies to this one, but let's pass it around.
6        (Exhibit 880 marked)
7  Q. (BY MR. PRESCOTT)  Ms. Jackson, I'll show you
8     the document we just marked Exhibit 880.  The copy is
9     a little faint, but is that -- does that appear to be
10    your signature on there?
11 A. It appears to be.
12 Q. Upper lower right?
13 A. Uh-huh.
14 Q. Is this the letter that you sent to Martha
15    McNeill on or about August 31, 1993?
16 A. It looks to be, yes.
17 Q. And -- and you did this at a time when you
18    were holding the position of contract department
19    coordinator --
20 A. Yes.
21 Q. -- at Dey?
22 A. Yes.
23 Q. Was this -- was it part of your duties in
24    that position to send letters such as this?
25 A. That was not my main focus.  My main focus

Page 19

1     was contract related.
2  Q. Would you have -- before sending this out
3     have obtained the approval of anyone else at Dey
4     before sending it out?
5  A. I would have been told to send it out, run it
6     by probably at that time might have been either Bob or
7     Mark at that point.
8  Q. Meaning Bob Mozak or Mark Pope?
9  A. Mark, exactly.  And getting approval to send
10    it out.
11 Q. And directing your attention to the first
12    sentence in the second paragraph of Exhibit 880.  Did
13    you on the date of this letter write to Ms. McNeill,
14    quote, many of our customers are Medicaid providers
15    and request reimbursement information when making a
16    purchasing decision, close quote?
17 A. Yes.
18 Q. And did you also on this same date and in
19    this letter write, quote, in order to provide them
20    with the best possible service we periodically request
21    this information from each Medicaid carrier, close
22    quote?
23 A. Yes.
24 Q. I'm going to show you a document that's been
25    previously marked Mozak Deposition Exhibit 561.  And

Page 20

1     do you recognize this?
2  A. From previous copies you've submitted, yes.
3  Q. Are these your handwritten initials in the
4     top center?
5  A. Those are my initials.
6  Q. Is this a memorandum you prepared on or about
7     August 12, 1994?
8  A. Yes, it looks to be.
9  Q. And did you send it to the people indicated
10    on here?
11 A. I would have either dropped it off on their
12    desk -- these were -- Mari was in-house, but Alberto
13    and Ross were outside, so I put -- would put it in
14    interoffice mail type of thing, the weekly mail to
15    them.
16 Q. Now, on the first line of the body of the
17    memo it refers to your having spoken with Jerry Wells
18    at Florida Medicaid.
19 A. Uh-huh.
20 Q. Do you -- do you recall -- strike the
21    question.
22        Does this memorandum, to the best of
23    your knowledge, set forth what you and Mr. Wells
24    discussed?
25 A. Yes.  It looks like it -- it would have.  It

**Page 21**

1  was just relaying to Alberto, Ross, Helen and Bob my
2  discussion with Jerry.
3  Q. And the memorandum was an accurate recitation
4  of what Mr. Wells had told you to the best of your
5  ability?
6  A. To the best of my knowledge. Of course, I
7  wouldn't have my hand notes, but that looks to be the
8  best.
9  Q. Apart from what is set forth in this
10  memorandum do you have any recollection of that
11  conversation with Mr. Wells?
12  A. I honestly cannot say.
13  Q. Do you recall discussing this memorandum with
14  any of the people listed on it?
15  A. No. When things like this would happen I
16  would pass the memo over to -- to distribution and
17  look for them to return the call to Jerry to discuss
18  further.
19  Q. Did anyone ever report back to you that he or
20  she had talked with Jerry Wells about the subject
21  matter of this?
22  A. I don't recollect.
23  Q. I'm going to show you a document we've
24  previously marked Deposition Exhibit 342.
25       MR. PRESCOTT: And again, I'm sorry, I

**Page 22**

1  only have one copy, so I will pass this around. It
2  does have my highlighted yellow on the first page.
3  Q. (BY MR. PRESCOTT) Ms. Jackson, I'm going to
4  ask you to look through Deposition Exhibit 342 and
5  tell me if you recognize it or any part of it. Please
6  take your time. It's multipage. Take your time and
7  look through it.
8  A. (Witness reviewing document). I don't
9  remember seeing this, but this was after I left the
10  company dated 12/4 of '95.
11  Q. So this handwriting on the first page that
12  says done 12/14/1995 (sic), that is certainly not
13  yours?
14  A. Huh-uh. No.
15  Q. That was my question. Thank you. I'm going
16  to show you a document that's been previously marked
17  Deposition Exhibit 230. It's a number of pages long,
18  so take your time and look through it.
19  A. (Witness reviewing document). I remember
20  doing this document.
21  Q. Did you prepare this document on or about the
22  date it bears, which is August 12, 1993?
23  A. It's familiar, yes.
24  Q. And those are your handwritten initials on
25  this page?

**Page 23**

1  A. Yes, those are my initials.
2  Q. How did you gather the information -- well,
3  let me step back. What is the document?
4  A. It's a report to distribution, which is on
5  the back, giving the status of Medicare and/or
6  Medicaid for each individual state. How I compiled
7  the individual information I don't remember, but I was
8  tasked with providing this report on a periodic basis,
9  updating it as required showing the different states
10  and their requirements and that type of thing.
11  Q. And who asked you -- did someone ask you to
12  do this at Dey?
13  A. Since it's cc'd to Helen, I would cc my --
14  the requester, although I was more than likely
15  reporting to -- August of '93, I don't recall
16  reporting to Helen, but I cc'd her, so that would mean
17  she was the requester.
18  Q. Okay. Did you have any understanding as to
19  why you were being asked to do this?
20  A. I don't remember now how much in-depth
21  knowledge I had back then, to be honest. I'm sure I
22  had a general sense of what the request was. I don't
23  recall how much in-depth I knew back then.
24  Q. I'm going to ask you similar questions about
25  a document previously marked Deposition Exhibit 231.

**Page 24**

1  Is this a document you prepared on or about February
2  2, 1994?
3  A. Yes.
4  Q. Those are your initials on it?
5  A. Yes.
6  Q. And does this -- does looking at this
7  document help you to remember how you gathered the
8  information?
9  A. What it does bring to mind, as I remember,
10  there was a period of months there from August '93 to
11  February of '94 where they had wanted this report
12  periodically, more frequent than six months here, and
13  the focus -- I was put on other things, you know, with
14  conventions and that type of thing, so I was unable to
15  get to it and I remember there was a length of time
16  where Helen had asked me, "Okay. Carrie, can you
17  update this?" How I gathered the information, there
18  again, I don't remember.
19  Q. Okay.
20  A. So... I remember it was a lot of work and
21  she said, "Well, we are going to do it on an as-needed
22  basis from now on."
23  Q. As you sit here today do you have any
24  understanding as to why you were being asked to do
25  this?

Page 25

1 A. Just to update if there were any dollar
2    changes or procedure changes at the individual states.
3    I didn't -- at that point I did not know what
4    distribution would be with this information.
5 Q. Now, you've brought with you certain
6    handwritten notes; is that correct?
7 A. Yeah. Yes. A variety of notes.
8 Q. Could you pull out from what you brought with
9    you the handwritten notes you have? And I'm going to
10    go through each of them and ask you to give us your
11    best recollection of what they are and what they
12    signify, if anything.
13 A. Okay.
14 Q. If it's all right with you, I'll ask the
15    reporter to put exhibit stickers on them and then
16    we'll make copies and return your --
17 A. Okay.
18 Q. -- either your originals or a clean copy to
19    you, whatever you prefer.
20 A. The originals would be nice.
21    MR. PRESCOTT: All right. Why don't we
22    mark them as a group and we can go through them page
23    by page.
24    MR. WINTER: Can I look at this?
25    MR. PRESCOTT: Sure.

Page 26

1    MR. WINTER: Now, what are you going to
2    mark? Are you going to mark the originals or are you
3    going to mark -- since they are going back to the
4    witness you've got -- you already have a set of copies
5    of these, don't you?
6    MR. WINTER: We have a set of copies and
7    I believe they've been produced to you as DL-TX-165209
8    through --
9    MR. WINTER: Through 22?
10    MR. PRESCOTT: 165223.
11    MR. WINTER: 223. Okay. I've got those
12    as well.
13    MR. PRESCOTT: The originals are -- may
14    be -- going to be easier to read than the photocopies
15    that we have.
16    MR. WINTER: And I agree, but just for
17    marking purposes since we are going to deliver the
18    originals back to the witness, it seems like we ought
19    to mark the copy if everybody is agreeable with that.
20    MR. PRESCOTT: If counsel would like we
21    can take a break and I'll go downstairs and get copies
22    made of these.
23    MR. WINTER: Well, yeah. Why don't we
24    take a quick break off the record and figure out what
25    we are going to do here.

Page 27

1    THE VIDEOGRAPHER: Stand by.
2    MR. PRESCOTT: Okay. Let's go off the
3    record.
4    THE VIDEOGRAPHER: The time is 9:45 a.m.
5    Off the record.
6    (Recess from 9:45 to 10:12)
7    (Exhibit 881 marked)
8    THE VIDEOGRAPHER: Stand by. The time
9    is 10:12 a.m. We are back on the record.
10 Q. (BY MR. PRESCOTT) Ms. Jackson, while we were
11    off the record I've obtained and provided to counsel
12    copies of some handwritten notes that you brought with
13    us -- with you this morning and the reporter has
14    marked them as Exhibit 881. At the lower right there
15    are Numbers 1 through 23.
16 A. Uh-huh.
17 Q. And are those numbers that you placed on the
18    pages during the break?
19 A. They are numbers.
20 Q. Now, could we go through these pages in the
21    order they appear and would you tell us what the notes
22    on each page refer to?
23    MR. WINTER: Darrell, before we do that
24    I have another housekeeping question. Excuse me for
25    interrupting the question. Some of these, if I

Page 28

1    understood correctly, correspond to materials that
2    you've already produced and Bates labeled. Are you
3    just going to go ahead and re-Bates number all these
4    with new Bates numbers?
5    MR. PRESCOTT: We can do that, although
6    you've got them with the exhibit we've just marked.
7    MR. WINTER: My concern is though that
8    some of them may be -- some of the pages in Exhibit
9    881 may not be identical to or maybe in addition to
10    what you've already Bates numbered. So I'm just
11    trying --
12    MR. PRESCOTT: We -- we provided to you
13    what Ms. Jackson had previously provided to Fleckman &
14    McGlynn, so we can renumber these and reprovide them,
15    if you would like.
16    MR. WINTER: I just thought maybe --
17    MR. PRESCOTT: Depending on how they
18    copy.
19    MR. WINTER: Just start a new series of
20    Bates numbers with Exhibit 881.
21    MR. PRESCOTT: Fine.
22    MR. WINTER: Okay.
23 Q. (BY MR. PRESCOTT) You have a copy of Exhibit
24    881 in front of you.
25    MR. McDONALD: Darrell, before you get

Page 109

1     correct?
2 A. Correct.
3 Q. And Exhibit 230 is the result of that
4     assignment; is that correct?
5 A. Correct.
6 Q. And at that point in time you gathered
7     together as much information as you could regarding
8     federal Medicare and state Medicare; is that correct?
9     Excuse me, state Medicaid.
10 A. Medicare.
11 Q. Federal Medicare and state Medicaid; is that
12     correct?
13 A. August of '93 I don't know if it was
14     Medicaid. Yes. I would say yes.
15 Q. All right. And as of the time that you had
16     prepared the report in August of 1993, you were in the
17     process of trying to obtain information from the
18     various states regarding their formula for
19     reimbursement, am I correct?
20 A. Correct.
21 Q. And you spent quite a deal of time trying to
22     get that information. Would I be fair in that
23     characterization?
24 A. Correct.
25 Q. And then what you did is at some point in

Page 110

1     time as of the next report that you prepared, Exhibit
2     231, which is dated February 7th of 1994 --
3 A. February 2nd.
4 Q. February 2nd, 1994, that is a report that you
5     prepared regarding the information you then obtained
6     from the various states, am I correct?
7 A. Correct.
8 Q. And for example, you had information for the
9     state of Florida regarding their reimbursement under
10     Medicaid, am I correct?
11 A. Correct.
12 Q. And you also got information regarding the
13     formula that the state of Texas used for reimbursing
14     under Medicaid; is that correct?
15 A. Correct.
16 Q. And if I looked at Texas you have the
17     reimbursement basis as wholesaler cost plus 12
18     percent; is that correct?
19 A. Yes, that is correct.
20 Q. And that's information that you had gotten
21     based on the directives you had from Dey to collect
22     this information, correct?
23 A. Dey requested me to collect the information.
24     I sent out the form, or what have you, and this is the
25     response.

Page 111

1 Q. And as February 2nd, 1994 all the information
2     you got from all of the states regarding their
3     Medicaid reimbursement was sent to distribution, am I
4     correct?
5 A. That is correct.
6 Q. And by distribution, if you would be so kind,
7     if you look at Exhibit 230, there is a list of all the
8     people who got distributed the first memo, Exhibit
9     230, the one in August of 1994, am I correct?
10 A. Correct.
11 Q. And the distribution list includes a variety
12     of people on the sales staff of Dey Labs; is that
13     correct?
14 A. Correct.
15 Q. And in addition to the sales staff it also
16     includes individuals at the Napa office, correct?
17 A. Correct.
18 Q. And that includes Rob Ellis, correct?
19 A. Correct.
20 Q. Bob Mozak, correct?
21 A. Correct.
22 Q. And Bob Pallas, correct?
23 A. Correct.
24 Q. So you had distributed the memo, Exhibit 230,
25     regarding the Medicare update to everybody on the

Page 112

1     distribution list that we just discussed, correct?
2 A. That is correct.
3 Q. And that included a variety of the sales
4     force that we've already described, correct?
5 A. Those listed here, yes, that is correct.
6 Q. And you did the same thing with respect to
7     the memorandum that you had prepared on February 2nd
8     of 1994, correct?
9 A. That is correct.
10 Q. And the sales people are the folks who
11     actually sell Dey products to various customers such
12     as drug companies, correct?
13 A. Correct.
14         MR. McDONALD: Object to the form.
15 Q. (BY MR. PITRE) Home healthcare providers,
16     correct?
17 A. Correct.
18 Q. Pharmacies, correct?
19 A. Correct.
20 Q. And those are the same people who apply under
21     the state Medicaid system for reimbursement, correct?
22 A. What do you mean by they are the same people
23     that apply?
24 Q. The -- the drug companies, they are the ones
25     who obtain reimbursement through the state Medicaid