# Exhibit 364

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Hill, William                                          November 11, 2008

Charlotte, NC

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 01-12257-PBS

- - - - - - - - - - - - - - - -X

In re: PHARMACEUTICAL INDUSTRY :

AVERAGE WHOLESALE PRICE        :

LITIGATION                     : MDL No. 1456

- - - - - - - - - - - - - - - -X

THIS DOCUMENT RELATES TO:      :

Unites States of America ex    :

rel. Ven-a-Care of the Florida :

Keys, Inc., et al. v. Dey,     :

Inc., et al., Civil Action     :

No. 05-11084-PBS               :

- - - - - - - - - - - - - - - -X

(Cross captions appear on the following pages)


Video deposition of WILLIAM HILL, taken by the

United States of America, at 2800 Coliseum Center

Drive, Charlotte, North Carolina, on the 11th day

of November, 2008 at 9:02 a.m., before Andrea L.

Nobrega, Court Reporter and Notary Public.

Hill, William

Charlotte, NC

104

1    party customer, you are not really talking about

2    a customer of Dey, rather you are talking about a

3    third-party payer who would pay for the product

4    that was purchased by a patient or a health -- or

5    a doctor, for example?

6        A.    Correct.

7        Q.    Was it your understanding then that a

8    pricing objective of Dey was to provide incentive

9    to retail and chain providers to use Dey's

10   Cromolyn by increasing the spread on third-party

11   payer reimbursements?

12           MS. GIULIANA:   Objection to the form.

13           THE WITNESS:   Again, I don't think it

14   was promoted to us as increase of spread.   I

15   think it was to provide a cost effective, safe,

16   generic alternative that benefited the pharmacy

17   and the patient.

18   BY MR. HENDERSON:

19       Q.    If Dey's AWP was significantly higher

20   than its actual sales price, and therefore, the

21   acquisition cost paid for by the retail or chain

22   pharmacist, would in your experience that result

Hill, William

November 11, 2008

Charlotte, NC

128

1    Did you mean to say yes?

2            THE WITNESS:  I'm sorry, it's another

3    way, semantics to say we are trying to

4    incorporate these products together as opposed to

5    being, you know, one product at a time evaluated.

6    BY MR. HENDERSON:

7        Q.   And these two bullets, the third one

8    and the fifth one, which are similar, although I

9    think you said they were somewhat difficult to

10   implement, nonetheless, were they objectives that

11   you attempted to implement in a general sense?

12       A.   In a general sense we did try to have

13   those discussions to broaden the Dey

14   representation with customers, but as I said, it

15   was very quickly dismissed.

16       Q.   The fourth objective, which we

17   discussed, did you also have as an objective in

18   your sales calls to encourage the use of Dey's

19   Cromolyn by pointing out the spread on third-

20   party reimbursements?

21           MS. GIULIANA:  Objection to the form.

22           THE WITNESS:  Again, I don't think that

Hill, William                                   November 11, 2008

Charlotte, NC

129

1    would be an accurate characterization. I think,

2    again, we were selling a plastic vial product

3    versus a brand product that was made in glass.

4    So we had far different issues with mothers

5    snapping open the top of a glass ampule and

6    getting glass splinters in their finger and

7    having bloody fingers.

8           So the packaging in Cromolyn was even a

9    bigger sell than the price point, because at that

10   point mothers really didn't care. They were just

11   tired of getting bloody fingers from snapping the

12   tops off of glass ampules.

13          So again, that was probably a three or

14   four prong strategy with the packaging, the right

15   product at appropriate market pricing, and

16   affording patient opportunity to save some money,

17   too.

18   BY MR. HENDERSON:

19       Q.   So is it your testimony that a spread

20   was not something that you discussed in promoting

21   Dey's Cromolyn sodium products?

22          MS. GIULIANA:  Objection to the form.

Hill, William                                          November 11, 2008

Charlotte, NC

131

1         A.    Another factor at this point in time,

2    too, is an inventory holding cost for a customer.

3    A customer would much rather have less capital

4    tied up on a less expensive drug on a shelf as

5    opposed to more money tied up in a more expensive

6    brand product.  That was a selling point in

7    promoting generics over brands, so the working

8    capital issue for a pharmacy.

9         Q.    Meaning because the generic was less

10   expensive, you would have less money tied up with

11   product on a shelf?

12        A.    That's correct.

13              MR. HENDERSON:  I would like to have

14   this marked as Exhibit No. 6.

15              (Exhibit Hill 006 marked for

16   identification.)

17              MR. HENDERSON:  I'm sorry, your copies

18   are two-sided.

19              If you could look through this

20   document, sir, I would appreciate it.

21              MS. GIULIANA:  I think it's -- never

22   mind.

Case 1:01-cv-12257-PBS Document 6426-82 Filed 08/28/09 Page 7 of 31

143

1     person that was smaller, the multidose allowed

2     doctors to titrate doses, whereas Dey's was a

3     standardized dose.

4           So I think the message for Dey was --

5     the selling message was, this is not to replace

6     20 ml, but where appropriate, where it's a

7     standard dose here and a standard dose here, one

8     of the selling messages was if your grandmother

9     had asthma and was 85 years old, would you trust

10    her to use a dropper -- it was about that big --

11    to put it into a nebulizer and then get some

12    saline to mix her own -- basically to mix her own

13    dose of medication or would you prefer to have an

14    alternative where it's a safe infection limiting

15    option for her.

16          Q.    When you received some instruction from

17    Debi Codute, did you cover -- did you cover how

18    to educate pharmacists on the different

19    reimbursements of Dey's product as compared to a

20    competitor's product?

21                MS. GIULIANA:  Objection to the form.

22                THE WITNESS:  I wouldn't say

Hill, William                                     November 11, 2008
                          Charlotte, NC

144

1    reimbursements plural.  I would say here is a

2    unit, a potential unit dose scenario and here is

3    what we understand to be today's multidose plus

4    saline scenario.

5    BY MR. HENDERSON:

6       Q.    So it did include comparing the

7    reimbursement on Dey's unit dose product as

8    compared to a competitor's multidose product?

9       A.    Yes, it did.

10      Q.    Was that comparison for the purpose of

11   educating the pharmacist on the fact that the

12   pharmacist could make more profit by selling

13   Dey's unit dose product as compared to selling a

14   competitor's multidose product?

15            MS. GIULIANA:  Objection to the form.

16            THE WITNESS:  In theory, yes.

17            MR. HENDERSON:  I would like to have

18   this next document marked as Exhibit No. 7.

19                (Exhibit Hill 007 marked for

20   identification.)

21   BY MR. HENDERSON:

22      Q.    Mr. Hill, I have handed you a document

Hill, William

November 11, 2008

Charlotte, NC

156

1    of it?

2        A.    Which, in fact, was the same product

3    with a different NDC number, which would have by

4    default had to have a different AWP than what you

5    see on these to be characterized as a generic.

6        Q.    And the Arcola product, which was a

7    generic was to your recollection priced lower

8    than Dey's product?

9        A.    That's why Dey had to adjust, one of

10   the reasons why they had to adjust the price.

11       Q.    And coming back to Exhibit No. 8, is it

12   your recollection that when Dey's price went

13   down, the spread or profit as I think you

14   referred to it, increased for purchasers of Dey's

15   Cromolyn?

16       A.    I think it -- to be clear, it put Dey

17   at parity with the competition in the

18   marketplace.  There was not -- Dey didn't go   .

19   below competitive prices.  They matched

20   competitive prices in the market.

21       Q.    Do you know whether or not the amount

22   of profit for Dey's Cromolyn was greater or less

Hill, William                                    November 11, 2008

Charlotte, NC

162

1         Q.    Do you recall the subject matter of the

2    group one workshop here, multidose study-

3    hospital?

4         A.    That was -- as I referenced earlier, at

5    this point in time there was a lot of concern

6    about infection and the joint commission for the

7    accreditation of hospitals.

8              The acronym JCAOH that I referred to

9    earlier, there was a lot of issues with patient

10   safety and infection in hospitals, so the

11   multidose -- there was a standard dose in a

12   hospital setting.

13             The focus of that was to talk about the

14   impact and potential liabilities that the

15   hospitals had from this joint commission in using

16   not just a multidose product, but any products

17   where there is risk of infection to patients.

18        Q.    Did that involve information to help

19   sales reps better promote the unit dose Albuterol

20   product that Dey sold?

21        A.    Yes.

22        Q.    Turning to the group two topic --

Hill, William

Charlotte, NC

November 11, 2008

163

1    actually, let me withdraw that comment.  I'm

2    going to hand you what's been marked as Hill

3    Exhibit No.  10.

4            If you are looking at this landscape

5    fashion, in the lower right-hand corner of this

6    indicates the theme building on success.  Do you

7    see that?

8        A.   Yes.

9        Q.   Can you tell us whether or not this was

10   material that was used at the 1995 national sales

11   meeting in Arizona?

12       A.   Yes, I would think that it was.

13       Q.   Was this handed out at the group two

14   workshop?

15       A.   Yes, I think it would have been.

16       Q.   And does this describe in part what was

17   discussed during that group two workshop?

18       A.   Yes.

19       Q.   Do you have an understanding as to

20   whether or not these materials were made

21   available to all of the sales reps who attended

22   that workshop?

164

1          MS. GIULIANA:  Objection to the form.

2          THE WITNESS:  All I can speak is what I

3    saw in my group, is that everybody would have

4    received the same materials.

5    BY MR. HENDERSON:

6          Q.  So if they follow the same approach for

7    the other groups, they would have received these

8    materials as well?

9          MS. GIULIANA:  Objection to the form.

10         THE WITNESS:  I guess you could assume

11   that, yes.

12   BY MR. HENDERSON:

13         Q.  During that workshop, was there

14   discussion about AWP reimbursement, why it's

15   important, how it's calculated and what it means

16   in terms of reimbursement from the third-party

17   payers to the managed care organizations?

18         A.  Yes, there was.

19         Q.  And of course I read from the bullets

20   on the first page of Exhibit No. 10.

21         Was there also discussion at the

22   workshop about why multidose to unit dose

165

1    Albuterol conversion makes good business sense

2    for the customer base?

3        A.    Yes.

4        Q.    And what do you recall about why

5    converting from multidose to unit dose Albuterol

6    would make good business sense for the customer?

7        A.    Well, based on some assumptions that

8    were gathered in the field in a couple different

9    markets -- specifically I guess that Debi Codute

10   had done the majority of their research in this

11   area with unit test and multidose.

12           It was her conclusion that there would

13   be opportunity both for a profit alternative for

14   a pharmacy and then also the other things we

15   talked about earlier with product safety and lack

16   of infection risk.

17       Q.    Okay.  So there was two basic factors.

18   One was the quality of the Dey product and its

19   safety advantages, that was one?

20       A.    Uh-huh.

21       Q.    And the other factor was a pharmacist

22   could make more profit using the multi -- I'm

Hill, William                                            November 11, 2008

Charlotte, NC

173

1          MS. GIULIANA:  Objection to the form.

2          THE WITNESS:  Actually I could point

3     out to you on page one where there is a flaw that

4     we found out after the fact with the assumptions

5     on the multidose.  If you look on line three that

6     it says zero for reimbursement for saline?

7     BY MR. HENDERSON:

8          Q.   Yes.

9          A.   Actually, and you will probably see, I

10    know they are not in the call reports, but for

11    patients to use this, it was a multidose

12    concentrate where you needed to add saline to it.

13          So, in fact, a lot of the plans did

14    cover at a disproportionately high amount, they

15    did pay for saline.

16          So the flaw is when we run out and use

17    this in the field and showed this to pharmacies,

18    and they said, okay, yeah, they understood the

19    concept here, and then they would put in their

20    own numbers, actually some disproportionately

21    high reimbursements were being paid for water,

22    saline.

Hill, William

Charlotte, NC

November 11, 2008

174

1        So the impact of -- in a lot of cases I

2   agree with you, that the Dey product was still

3   more profitable, but the fact that there was a

4   zero in here -- in the sales meeting there always

5   was a zero.  Nobody knew that any third parties

6   would pay for more, but it stands to reason to

7   appropriately dose a product, you needed, number

8   one, to add the saline to dilute it to the right

9   concentration, and number two, you need to use a

10  saline to rinse it out because you didn't want

11  the infection in your -- risk in your nebulizer.

12       Q.   So you later learned that for

13  multidosed products that at least some third-

14  party payers did reimburse for saline?

15       A.   Right.

16       Q.   Is it fair to say that whoever authored

17  this didn't realize that?

18       A.   I think they may have missed that

19  detail, yes.

20       Q.   And you would agree that even with the

21  correcting for that error, the profit per patient

22  per year for the Dey Albuterol product was

Hill, William                                    November 11, 2008

Charlotte, NC

175

1    greater than for the multidose competitive

2    product?

3                MS. GIULIANA:  Objection to the form.

4                THE WITNESS:  Actually, believe it or

5    not, there were cases in Philadelphia where we

6    ran the model that plans paid so much for the

7    saline, that actually a multidose was more

8    profitable than the unit dose.

9                It completely shot holes -- in certain

10   cases -- now there are certain cases it's not a

11   one size fits all.  There were certain cases

12   where Dey was more profitable to unit dose, but

13   there were other cases to use a multidose plus a

14   saline was a more profitable option for a retail

15   pharmacist.

16   BY MR. HENDERSON:

17        Q.   And these situations where the

18   multidose was more profitable, was -- were those

19   a minority or majority of situations?  What's

20   your recollection about that?

21                MS. GIULIANA:  Objection to the form.

22                THE WITNESS:  It would be hard to say

179

1    multidose product.  Do you recall that question

2    and answer?

3              MS. GIULIANA:  Objection to the form.

4              THE WITNESS:  (Witness nods head.)

5    BY MR. HENDERSON:

6        Q.   Do you recall whether or not this sort

7    of worksheet that is Exhibit No. 12 or the two

8    worksheets that are part of -- that are Exhibit

9    No.  11, were used at that time or that you saw

10   such things at that time in 1994?

11             MS. GIULIANA:  Objection to the form.

12             THE WITNESS:  I don't recall a specific

13   sheet.  I do remember sitting with Debi with a

14   legal pad and her showing me, just handwriting

15   some things out and explaining this is how this

16   scenario might work and different situations, a

17   generic versus a brand, this is how it might play

18   out.

19             I don't remember a formal structure,

20   but I know that it was part of Debi's overall

21   daily sales planning her presentation prior to

22   the national sales meeting in February '95.

Hill, William

November 11, 2008

Charlotte, NC

237

1    unit dose conversion" reprint and worksheet and

2    the "retail profit gain" worksheet.  You used

3    both successfully last year.  Re-familiarize

4    yourselves with these two pieces so they can work

5    to your advantage again.

6              These pieces should reinforce the

7    importance of our unit dose business and also

8    help you strategize where to pick up multidose

9    business.  Let us not forget that unit dose

10   should remain our top priority.  Did I read that

11   correctly?

12        A.    Yes, that's correct.

13        Q.    Was it your understanding that the

14   sales of Dey's unit dose product was still a top

15   priority when Dey launched its multidose product?

16        A.    Yes.

17        Q.    Did you understand that Dey -- it was

18   Dey's policy that sales reps continue to use the

19   reimbursement comparison worksheet in order to

20   convert customers from using a multidose

21   competitor product to Dey's unit dose product at

22   least where it seemed appropriate in the

Hill, William                                    November 11, 2008
                        Charlotte, NC

287

1           MR. HENDERSON:  I have no further
2    questions.  Thank you, sir.
3           MS. HANSCOM:  On behalf of California,
4    I will just have to reserve my time.  I haven't
5    had sufficient time in order to allow Ms.
6    Giuliana time to cross.
7           MS. ROGERS:  On behalf of the State of
8    Florida, we would reserve as well.
9           MR. AZORSKY:  On behalf of Ven-A-Care
10   of the Florida Keys, we reserve time to ask
11   questions as well in order to give Ms. Giuliana
12   15 minutes to ask her questions.
13          MR. WINGET-HERNANDEZ:  On behalf of my
14   client, I reserve my questions as well.
15
16          EXAMINATION BY COUNSEL FOR DEY, INC.
17   AND DEY, L.P.
18   BY MS. GIULIANA:
19       Q.   Mr. Hill, you worked for Dey from April
20   1994 to August of 1996, correct?
21       A.   Correct.
22       Q.   And during that time you were an

Hill, William                                    November 11, 2008

Charlotte, NC

288

1    outside sales rep for Dey, correct?

2         A.    Correct.

3         Q.    And you called on Dey's local customers

4    in Pennsylvania?

5         A.    That's correct.

6         Q.    You didn't call on national customers,

7    correct?

8         A.    No, did not.

9         Q.    And no one reported to you?

10        A.    No.

11        Q.    What was your territory again?

12        A.    Exclusive to the State of Pennsylvania.

13        Q.    So all of the testimony that you gave

14   today with respect to your communications with

15   customers is confined to the Pennsylvania

16   territory?

17             MS. HANSCOM:  Object to the form.

18             MS. GIULIANA:  You can answer.

19             THE WITNESS:  Yes.

20   BY MS. GIULIANA:

21        Q.    So you never made a call on a customer

22   in California, correct?

Hill, William                                    November 11, 2008
                          Charlotte, NC

289

1              MS. HANSCOM:  Object to the form.

2              THE WITNESS:  I did not.

3    BY MS. GIULIANA:

4        Q.   Nor did you make any calls on customers

5    in Florida, correct?

6              MR. AZORSKY:  Objection to the form.

7              MR. HERNANDEZ:  Objection, leading.

8              MS. HANSCOM:  Objection to the form.

9              THE WITNESS:  I did not.

10             MS. HANSCOM:  Ms. Giuliana, just so we

11   don't have all of us objecting.

12             MS. GIULIANA:  Objection for one is

13   good for all.

14   BY MS. GIULIANA:

15       Q.   Did you make any calls on customers in

16   New York

17             MS. HANSCOM:  Object to the form.

18             THE WITNESS:  No.

19   BY MS. GIULIANA:

20       Q.   Did you make any calls on customers in

21   Wisconsin?

22             MS. HANSCOM:  Object to the form.

Hill, William                                    November 11, 2008

Charlotte, NC

290

1              THE WITNESS:  No.

2    BY MS. GIULIANA:

3         Q.   And you testified a lot today about

4    call reports that you created in the course of

5    your work at Dey, correct?

6              MS. HANSCOM:  Object to the form.

7              THE WITNESS:  Yes.

8    BY MS. GIULIANA:

9         Q.   Did call reports play any role in a

10   customer placing an order with Dey?

11             MS. HANSCOM:  Object to the form.

12             THE WITNESS:  Not necessarily.

13   BY MS. GIULIANA:

14        Q.   Did you get paid off of the call

15   reports that you submitted to Dey?

16             MS. HANSCOM:  Object to the form.

17             THE WITNESS:  No, I did not.

18   BY MS. GIULIANA:

19        Q.   Were your commissions at Dey based on

20   the call reports that you submitted?

21             MS. HANSCOM:  Object to the form.

22             THE WITNESS:  No, they were not.

Hill, William

November 11, 2008

Charlotte, NC

297

```
 1              MS. HANSCOM:  Object to the form.
 2              THE WITNESS:  I did not.
 3    BY MS. GIULIANA:
 4         Q.   Isn't it correct that you worked for
 5    several pharmaceutical companies before you
 6    started working at Dey in 1994?
 7         A.   I did.
 8         Q.   Approximately how many years have you
 9    been in the drug business prior to Dey?
10         A.   Approximately eight years.
11         Q.   Is the spread a concept that you heard
12    about before you started working at Dey?
13         A.   It is.
14              MS. HANSCOM:  Object to the form.
15    BY MS. GIULIANA:
16         Q.   Is the spread something that Dey
17    invented?
18              MS. HANSCOM:  Objection to the form.
19              THE WITNESS:  No.
20    BY MS. GIULIANA:
21         Q.   Is the spread something that is unique
22    to Dey?
```

298

1         MS. HANSCOM:  Object to the form.

2         MS. GIULIANA:  You can answer.

3         THE WITNESS:  Not at that point in

4    time, no.

5    BY MS. GIULIANA:

6    Q.   Is the spread something that Dey taught

7    you about?

8         MS. HANSCOM:  Object to the form.

9         MS. GIULIANA:  I withdraw that

10   question.  Is the spread a concept that Dey

11   taught you?

12        MS. HANSCOM:  Object to the form.

13        THE WITNESS:  No.

14   BY MS. GIULIANA:

15   Q.   Did anyone ever tell you that there was

16   anything wrong with talking about the spread

17   while you were at Dey?

18        A.   No.

19        Q.   Or prior to your time at Dey?

20        A.   No.

21        MS. HANSCOM:  Object to the form.

22   BY MS. GIULIANA:

Hill, William                                    November 11, 2008

Charlotte, NC

299

1          Q.   Did you feel that there was anything

2     wrong with talking about the spread while you

3     worked at Dey?

4               MS. HANSCOM:   Object to the form.

5               THE WITNESS:   No.

6     BY MS. GIULIANA:

7          Q.   And one definition of the spread is

8     that it's the difference between two price

9     points, correct?

10         A.   Correct.

11              MR. HENDERSON:   Objection as to form.

12    BY MS. GIULIANA:

13         Q.   And the price points could be -- one of

14    the price -- strike all that.

15              And one of the price points on one hand

16    could be AWP and on the other hand it could be a

17    contract price, correct?

18              MS. HANSCOM:   Object to the form.

19              THE WITNESS:   That's correct.

20    BY MS. GIULIANA:

21         Q.   And all those prices were well known to

22    your customers, correct?

Hill, William                                          November 11, 2008

Charlotte, NC

```
                                                      300
 1              MS. HANSCOM:  Object to the form.

 2              THE WITNESS:  They were visible to all,

 3   yes.

 4   BY MS. GIULIANA:

 5        Q.   And a customer could get Dey's AWPs

 6   from Red Book, correct?

 7              MS. HANSCOM:  Object to the form.

 8              THE WITNESS:  Yes.

 9   BY MS. GIULIANA:

10        Q.   Or First Data Bank?

11        A.   Yes.

12              MS. HANSCOM:  Object to the form.

13   BY MS. GIULIANA:

14        Q.   Or from a wholesaler?

15              MS. HANSCOM:  Object to the form.

16              THE WITNESS:  Yes.

17   BY MS. GIULIANA:

18        Q.   Or from another publicly available

19   source?

20              THE COURT REPORTER:  I'm sorry, if you

21   just pause for a minute so I can get her

22   objection and then --
```

Hill, William                                       November 11, 2008

Charlotte, NC

301

1            MS. GIULIANA:  I'm trying to get Mr.

2    Hill out before 5:15.

3            THE COURT REPORTER:  The last one I

4    have is or First Data Bank.

5    BY MS. GIULIANA:

6        Q.  Or from a wholesaler?

7            MS. HANSCOM:  Object to the form.

8    BY MS. GIULIANA:

9        Q.  Okay.  So a customer could get Dey's

10   AWP from a wholesaler, correct?

11           MS. HANSCOM:  Object to the form.

12           THE WITNESS:  Yes.

13   BY MS. GIULIANA:

14       Q.  Or from another publicly available

15   source?

16           MS. HANSCOM:  Object to the form.

17           THE WITNESS:  Yes.

18   BY MS. GIULIANA:

19       Q.  And when you talked to customers while

20   working at Dey, customers had a general awareness

21   of the AWP of Dey's competitors, correct?

22           MS. HANSCOM:  Objection, form.

Hill, William

November 11, 2008

Charlotte, NC

302

1           THE WITNESS:  Yes.

2    BY MS. GIULIANA:

3       Q.   And your customers also knew what

4    contract price your competitors were offering to

5    those customers, correct?

6            MS. HANSCOM:  Objection, form.

7            THE WITNESS:  Yes.

8    BY MS. GIULIANA:

9       Q.   Okay.  So in any situation in which you

10   may have discussed the spread with a customer,

11   you weren't telling the customer something that

12   they didn't already know, correct?

13           MS. HANSCOM:  Objection, form.

14           THE WITNESS:  That's correct.

15   BY MS. GIULIANA:

16      Q.   Or something that they didn't already

17   have the ability to determine?

18           MS. HANSCOM:  Objection, form.

19           THE WITNESS:  That's correct.

20   BY MS. GIULIANA:

21      Q.   Or something that they weren't already

22   interested in?

Case 1:01-cv-12257-PBS Document 6426-82 Filed 08/28/09 Page 29 of 31

303

1           MS. HANSCOM:  Objection, form.

2           THE WITNESS:  Correct.

3   BY MS. GIULIANA:

4       Q.   Isn't it correct that in most of the

5   conversations that you had with customers

6   concerning the spread, it was the customer who

7   initiated the topic?

8           MS. HANSCOM:  Objection, form.

9           THE WITNESS:  I would agree.

10  BY MS. GIULIANA:

11      Q.   Earlier today Mr. Henderson showed you

12  a document called a reimbursement comparison

13  worksheet, correct?

14      A.   Yes.

15      Q.   Now, is there anything that would go

16  into any of the blanks in that worksheet that a

17  customer didn't already know?

18          MS. HANSCOM:  Objection, form.

19          THE WITNESS:  No.

20  BY MS. GIULIANA:

21      Q.   So the customer already had the

22  information available to fill in any of the

Hill, William                                    November 11, 2008
                        Charlotte, NC

304

1    blanks in that worksheet?

2           MS. HANSCOM:  Objection, form.

3           THE WITNESS:  Yes, they would.

4    BY MS. GIULIANA:

5       Q.   So in any situation where you sat down

6    with a customer and reviewed that document with a

7    customer, you are not telling the customer

8    anything he didn't already know?

9           MS. HANSCOM:  Objection, form.

10          THE WITNESS:  No.

11   BY MS. GIULIANA:

12      Q.   And did you ever use the reimbursement

13   comparison worksheet with respect to Dey's

14   Ipratropium product?

15          MS. HANSCOM:  Objection, form.

16          THE WITNESS:  No, I did not.

17   BY MS. GIULIANA:

18      Q.   Did you ever use the reimbursement

19   worksheet with respect to Dey's Cromolyn product?

20          MS. HANSCOM: Objection, form.

21          THE WITNESS:  Not that I recall.

22   BY MS. GIULIANA:

305

1    Q.    Did you ever use reimbursement
2 comparison worksheet or the concept set forth in
3 that worksheet to try to convert a customer from
4 a competitor's unit dose Albuterol product to
5 Dey's unit dose Albuterol product?
6         MS. HANSCOM:   Objection, form.
7         THE WITNESS:   Not on a unit dose to
8 unit dose scenario, no.
9 BY MS. GIULIANA:
10    Q.    During the course of your work at Dey,
11 did you have knowledge of the different
12 reimbursement formulas that different states used
13 to reimburse Medicaid claims?
14         MS. HANSCOM:   Objection, form.
15         THE WITNESS:   My knowledge was
16 exclusive to Pennsylvania.
17         MS. HANSCOM:   I didn't hear that.
18         THE WITNESS: .My knowledge was
19 exclusive to Pennsylvania, for the plans that
20 were honored in Pennsylvania.
21 BY MS. GIULIANA:
22    Q.    And as far as you know, the decision as