# Exhibit 365

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support**
**of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Ricks-Bey, Michael T.                                January 8, 2009
                        Burlington, CO

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - x

In re: PHARMACEUTICAL          :

INDUSTRY AVERAGE WHOLESALE     :

PRICE LITIGATION               : MDL No. 1456

- - - - - - - - - - - - - : Civil Action No.

                               : 01-12257-PBS

THIS DOCUMENT RELATES TO:   :

                               : Magistrate Judge

United States of America     : Marriane B. Bowler

ex rel. Ven-a-Care of the    :

Florida Keys, Inc., et al.   :

v. Dey, Inc., et al.,        :

Civil Action No. 05-11084    :

PBS.                           :

- - - - - - - - - - - - - x

(Cross-noticed captions on following pages.)


VIDEOTAPED DEPOSITION OF MICHAEL T. RICKS-BEY

January 8, 2009

Ricks-Bey, Michael T.                                    January 8, 2009
                         Burlington, CO

17

1    your testimony.

2         A.    Okay.

3         Q.    Also, if -- from time to time, we'll

4    take a break.  And if you need to take a break,

5    let us know.

6         A.    All right.

7         Q.    We are here at the -- well, just for

8    the record, state your full name, please.

9         A.    Michael Todd Ricks-Bey.  Public

10   Minister, Sovereign Muurish American.

11        Q.    Were you also known as Michael Ricks?

12        A.    Yes.

13        Q.    Okay.  We're here at the Kit Carson

14   Correctional Facility, which is a state prison in

15   Colorado; correct?

16        A.    Correct.

17        Q.    And you are an inmate here; is that

18   right?

19        A.    A detainee.

20        Q.    A detainee.  Thank you.  And

21   presumably, you were -- have been found guilty of

22   a crime; is that why you're here?

Ricks-Bey, Michael T.                                    January 8, 2009
                          Burlington, CO

18

1        A.    Presumably, yes.

2        Q.    Okay.  Just if you would very briefly

3    tell us what crime or crimes have caused you to

4    be here.

5        A.    I was found guilty of sexual assault.

6        Q.    And when was that?

7        A.    In -- September 8 of 2005.

8        Q.    And how long is your sentence,

9    approximately?

10       A.    20 years.

11       Q.    Okay.  Since you've been here at the

12   Kit Carson correctional institution, have you had

13   any disciplinary actions made against you?

14       A.    No.

15       Q.    You indicated that you're a minister?

16       A.    Public minister.

17       Q.    Public minister.  Very briefly, just

18   explain to us what that means.

19       A.    Well, a public minister -- I wish I had

20   my documents so I could give you a more accurate

21   -- but a public minister is a -- kind of falls

22   upon a foreign jurisdiction.  It's like an

Ricks-Bey, Michael T.                                    January 8, 2009
                          Burlington, CO

19

1    ambassador for a foreign country.

2              So I -- my jurisdiction falls up under

3    the United States government, which is why I'm

4    willing to give this testimony today; otherwise,

5    I would have to object to giving testimony.

6              But as a public minister, I have been

7    established as a sovereign Muurish American, and

8    that I fall up under a foreign jurisdiction,

9    which is approved by the federal government.  So

10   . . .

11        Q.   Okay.  And do you believe you can give

12   truthful testimony today to the best of your

13   ability?

14        A.   As a public minister, it's my

15   obligation to do so.

16        Q.   Okay.  Did you speak to me briefly

17   yesterday by telephone?

18        A.   Yes, I did.

19        Q.   Tell us the substance of that

20   conversation.

21        A.   Well, basically, to -- first to

22   introduce yourself and introduce what this

Ricks-Bey, Michael T.                                    January 8, 2009
                          Burlington, CO

22

1    as exhibits today.  And I'm handing you what's

2    been marked as Exhibit Ricks No. 1.  And this is

3    -- this is a document that was produced to us by

4    Dey Laboratories.  And this has some new-hire and

5    termination dates in it.

6               And you'll see on the first page, as

7    you go down about two thirds or three quarters of

8    the way down, it -- do you see your name Ricks,

9    comma, Michael T.?

10        A.    Yes.

11        Q.    And it indicates -- this would indicate

12   a hire date when you were hired of March 1, 1994?

13        A.    That is correct.

14        Q.    Do you believe that to be correct?

15        A.    Yes.

16        Q.    Okay.

17        A.    I said '93, but it was in March of '94.

18        Q.    Sure.  I understand that these -- this

19   was sometime ago, so --

20        A.    Yes.

21        Q.    If you're not sure about something, let

22   us know.

23

1        A.    Okay.

2        Q.    And we have another document that may

3    help us on the termination date.

4              (Exhibit Ricks-Bey 002 was marked for

5    identification.)

6        Q.    And this is Ricks Exhibit 2.  And on

7    the second page of this document, you'll see a

8    little less than halfway down, your name, and

9    according to the column headings -- which appear

10   on the first page.

11       A.    I see it.

12       Q.    It has a termination date of April 1,

13   1996.

14       A.    Okay.

15       Q.    Does that sound about right to you?

16       A.    Yes.

17       Q.    Do you recall who hired you at Dey?

18       A.    I was looking at his name right now.

19   Richard Upp, who's the regional manager.

20       Q.    Okay.  And how did you come about to

21   find this -- find the job?

22       A.    I believe it was during a -- I had

Ricks-Bey, Michael T.                          January 8, 2009
                    Burlington, CO

25

1    title at the time?

2         A.   He was the regional manager.

3         Q.   So you were hired in -- what did we

4    say, April of 1994?  March of 1994?

5         A.   March of '94.

6         Q.   And what was your job position there

7    when you were hired?

8         A.   I was the district sales manager for

9    Dey Laboratories, covering Arizona, Colorado,

10   Utah, and New Mexico.

11        Q.   And as a district sales manager, what

12   did you do?

13        A.   My responsibility was to call on

14   hospitals and pharmacies to promote our --

15   albuterol was the pharmaceutical product that we

16   sold to the hospitals and to the pharmacies.

17            In addition to that, we worked with

18   larger corporations such as Kaiser Permanente,

19   Columbia HCA, securing contracts with each of

20   these headquarters.

21        Q.   Okay.

22        A.   It would then filter down to the

Ricks-Bey, Michael T.                              January 8, 2009
                          Burlington, CO

26

1    different hospitals that we called on.

2         Q.   The -- these other larger companies,

3    were -- how would you -- is there a name that you

4    would apply to them?  Were they, for example,

5    group purchasing organizations?

6         A.   Right.  Yes.

7              MR. KATZ:  Objection to form.

8         Q.   (BY MR. HENDERSON)  And where did you

9    work out of?

10        A.   I worked -- my home base was out -- we

11   worked out of our home.  We had offices in our

12   home. And we had information from Day

13   Laboratories of who our customer base were within

14   our territory, and so we would cover those areas

15   that -- of our responsibilities.

16             As you said, the group purchasing

17   organizations were our -- also part of our

18   target; because again, it filtered down, because

19   if a hospital or a -- buying is part of a group

20   purchasing, they would get better pricing --

21        Q.   Yep.

22        A.   -- compared to someone that was out on

Ricks-Bey, Michael T.                          January 8, 2009
                    Burlington, CO

27

1    their own.

2         Q.   So if you had -- if you could secure a

3    contract with a group purchasing organization, it

4    would be a lot of sales that would come within

5    that contract?

6         A.   Yes.

7              MR. KATZ:   Objection, form.  Before we

8    continue, Mr. Ricks, can you give me an

9    opportunity to object before answering Mr.

10   Henderson's question, please.  Thank you.

11             MR. HENDERSON:  Thank you.

12             THE DEPONENT:  Okay.

13        Q.   (BY MR. HENDERSON)  And you worked out

14   of your home, which was -- where was that

15   located?

16        A.   In -- 18199 East Lasalle Place in

17   Aurora, Colorado.

18        Q.   Aurora, Colorado?

19        A.   Aurora.

20        Q.   Okay.  Were you on the road a lot?

21        A.   Yes.  Unfortunately.  Cost me a

22   marriage.

1  toward a nebulizer, and the multi-dose was just

2  beginning to come on line.  I can't remember all

3  the specifics.

4       Q.   Fair enough.  What about chromolyn

5  sodium? Does that ring a bell to you?

6            MR. KATZ:  Objection to form.

7       A.   Yes, it does.

8       Q.   (BY MR. HENDERSON)  And what do you

9  remember about that product?

10      A.   The cromolyn, I believe, was geared

11 towards children or infants.  The albuterol --

12 one of the things that we promoted, because

13 albuterol was in a blue capsule, or had a blue

14 label, and the cromolyn was in -- had a yellow

15 label.

16           So that was one of the things that we

17 promoted, was the difference of being able to

18 distinguish our product from the others, because

19 the competition was in a clear plastic.

20           There were instances where a -- a -- if

21 you don't use it, you lose it -- the person that

22 administered the albuterol would just reach in,

Ricks-Bey, Michael T.                                January 8, 2009
                    Burlington, CO

31

1    grab and administer.  Because there was a

2    potential to give the wrong product, Dey

3    Laboratories color-coded its product to

4    distinguish what is the albuterol and what is the

5    cromolyn.

6         Q.   Do you recall whether or not you

7    promoted a Dey product that was a 17-gram metered

8    dose inhaler albuterol?

9         A.   Yes.

10        Q.   Do you recall whether you promoted a

11   Dey product that was ipratropium bromide?

12             MR. KATZ:  Objection to form.

13        A.   That one I don't recall.

14        Q.   (BY MR. HENDERSON)  Okay.  I think you

15   already mentioned the chromolyn sodium.  Do you

16   recall a Dey product called acetylcysteine

17   solution?

18             MR. KATZ:  Objection, form.

19        A.   Yes.

20        Q.   (BY MR. HENDERSON)  Do you recall

21   whether you promoted that product?

22        A.   Yes.  The name rings a bell, and that

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

33

1   or their purchasing group didn't have it in the

2   warehouse, they're going to substitute with

3   something else.

4            So part of our responsibility was to

5   make sure that the wholesaler -- we did contracts

6   with the wholesaler as well -- to make sure that

7   they stocked the product so when time come to

8   order, then it will get -- it will get ordered.

9        Q.   Right.  Did you actually yourself

10  negotiate contracts with wholesalers, or was that

11  something that somebody else did?

12       A.   No --

13            MR. KATZ:  Objection, form.

14       A.   -- I negotiated contracts with the

15  wholesalers with the larger organizations, like I

16  said, Columbia HCA, Kaiser; and once the contract

17  was secured, then it was my job to make sure that

18  the hospitals were aware that it was on

19  formulary, it was on contract, and that they can

20  pull from their wholesaler to order the product.

21       Q.   (BY MR. HENDERSON)  Did you -- with

22  respect to contracts with wholesalers, did you

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

34

1  actually have authority to sign that contract?

2      A.   I would negotiate the contract.  It

3  would go up higher for the contract to be signed.

4  I would sign it from my end that we have an

5  agreement that we would establish a contract.

6  But then it would go up higher to the

7  headquarters to be formally contracted.

8      Q.   Okay.  When you say "up higher," is

9  that the Dey -- the management of Dey in Napa,

10 California?

11     A.   Yes.

12     Q.   Was that generally true with respect to

13 any formal contract for the purchase of Dey

14 products that you were involved with?

15          MR. KATZ:  Objection, form.

16     A.   Yes.

17     Q.   (BY MR. HENDERSON)  You mentioned --

18 well, you didn't mention, but did you have

19 accounts that were clinics?

20     A.   Yes.  A lot of times the clinics were

21 part of a purchasing group.  So again, going back

22 to getting better pricing, they formed a

Ricks-Bey, Michael T.

Burlington, CO

January 8, 2009

41

1    A.   Okay.  Like I said, I was hired in

2  March of '94.  Shortly after that, I went out to

3  Napa Valley to the training.  I want to say the

4  training was about two weeks.  I can't recall

5  specifically.

6         It was -- introduced the product that

7  we were going to be selling, getting a

8  understanding of the product, going through

9  competition, the effects of the drug, the side

10 effects of the drug; getting a full understanding

11 of what we were going to be selling, who we were

12 going to be selling to and going through that

13 training, role-playing scenario.

14    Q.   Yeah.  Do you recall who was presenting

15 at the training?

16    A.   I don't.

17    Q.   But Mr. Upps (sic) was there?

18    A.   He was not during the training itself,

19 but he would come in from time to time.

20    Q.   Do you remember a woman named Debi

21 Codute?

22    A.   Yes.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

49

1        Q.  (BY MR. HENDERSON)  All right.  Let's

2  -- I'm going to -- we had another document marked

3  as Exhibit 4, but I'm going to change the

4  exhibit, so that I'll use this as Exhibit 4.

5        (Exhibit Ricks-Bey 004 was marked for

6  identification.)

7        I'm handing you what's been marked as

8  Exhibit 4.  Have you had a chance to look at that

9  Exhibit 4, Mr. Ricks-Bey?

10     A.  Yes.

11     Q.  Do you recall ever seeing this?

12     A.  Yes.  Vaguely.

13     Q.  Okay.  And this consists of three

14  slightly different versions of this reimbursement

15  comparison worksheet?

16     A.  Correct.

17     Q.  And if we just look at the -- well,

18  first of all, do you recall whether you actually

19  used this worksheet in any of your calls?

20     A.  I don't.  Again, when I negotiated

21  pricing, primarily looking at what the

22  competition was offering in terms of their

Ricks-Bey, Michael T.          January 8, 2009
                    Burlington, CO

69

1        Q.   Do you see that?

2        A.   Yes.

3        Q.   And under the Group I workshop, one of

4    the members is yourself?

5        A.   Yes.

6        Q.   And the topic of that was "Multi-Dose

7    Study - Hospital"?

8        A.   Correct.

9        Q.   Then there are also two other

10   workshops, a Group II and a Group I·II.  Do you

11   recall attending workshops when you were at the

12   1995 national sales meeting?

13       A.   Yes.

14       Q.   Do you recall attending one or more of

15   these particular workshops?

16       A.   Yes.  What we did, we rotate it; we

17   rotate it throughout the day.

18       Q.   So did you attend each one of these

19   three?

20       A.   Yes.

21       Q.   Presumably starting with the first one,

22   Group I?

Ricks-Bey, Michael T.                                    January 8, 2009
                        Burlington, CO

70

1        A.    Yes.

2        Q.    Okay.  And the multi-dose

3   study-hospital, do you recall anything about that

4   workshop, about the subject of it?

5        A.    Well, pretty much your responsibilities

6   in covering hospitals.

7        Q.    In Group II, the multi-dose

8   conversion/retail, do you recall what the subject

9   of that workshop was?

10       A.    Introducing the multi-dose unit

11   compared to the -- to the unit dose.

12       Q.    I'm sorry, say that again?

13       A.    Introducing -- if I'm not mistaken,

14   introducing the multi-dose compared to albuterol,

15   the unit dose.

16       Q.    Okay.  At this time, do you recall that

17   Dey was selling both products?

18       A.    Yes.

19       Q.    And do you recall whether there was --

20   what do you recall about that workshop, if

21   anything?

22       A.    Too long to remember.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

85

1  compared to the competition.  Because if you can

2  see it, then you're more convinced that it would

3  be beneficial.

4      Q.   (BY MR. HENDERSON)  Did you ever use

5  anything like this -- this -- I'm sorry.  Let me

6  start over again.

7          This reimbursement comparison worksheet

8  that's Exhibit 4 relates to albuterol.  Did you

9  ever use this or anything similar to it for

10  purposes of promoting Dey's cromolyn sodium

11  products?

12      MR. KATZ:  Objection, form.

13      A.   Yes.

14      Q.   (BY MR. HENDERSON)  Was there a

15  comparison worksheet for the cromolyn sodium

16  product, or was it something that you made up

17  yourself?

18      MR. KATZ:  Objection, form.

19      A.   It was both.  Because as I worked with

20  a product, I can show them again and have them to

21  write it out, instructed them how to calculate

22  product that they are currently using compared to

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

86

1    Dey Laboratories' product.

2              So again, they can see themselves that

3    it would be most beneficial for them to use Dey

4    product.

5         Q.   (BY MR. HENDERSON)  Was it effective?

6         A.   Yes.

7         Q.   Did you use a comparison worksheet for

8    any other Dey products, that you recall?

9              MR. KATZ:  Objection, form.

10        A.   Pretty much all the products that we

11   had. We had a price -- I mean, pricing was the

12   primary issue of all the products that we sold.

13   Being that we were a generic pharmaceutical

14   company compared to a proprietary pharmaceutical

15   company, our pricing was less.  So it would be

16   beneficial for -- to use a generic product

17   compared to a proprietary product.

18        Q.   (BY MR. HENDERSON)  Now, we saw from

19   Exhibit 8 that in March of 1996, Dey launched --

20   approximately March '96, Dey launched its

21   multi-dose product.

22              Before that time, Dey was competing

Ricks-Bey, Michael T.                                    January 8, 2009
                         Burlington, CO

                                                                116

1            MR. KATZ:  Object.

2       Q.   (BY MR. AZORSKY)  -- the reimbursement

3   comparison worksheet?

4       A.   Yes.

5            MR. KATZ:  Objection to form.

6       Q.   (BY MR. AZORSKY)  And so here you're

7   trying to convince a customer to purchase Dey's

8   product as opposed to a competitor's product

9   because of the increased profit that they would

10  get from purchasing Dey's product?

11           MR. KATZ:  Objection to form.

12      A.   It wasn't -- pricing was important.

13  But again, I was always distinguishing the

14  difference between what Dey products were -- had

15  to offer compared to what the comparisons -- or

16  the -- my competition.

17      Q.   (BY MR. AZORSKY)  Sure.  And there were

18  other differences; correct?

19      A.   That's correct.

20      Q.   And what kind of differences were there

21  between Dey's product and the competitors'

22  albuterol product?

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

117

1      A.    Well, the unit dosing; also, the

2   product labeling.  As I stated early in my

3   testimony, that it's unmistakable to use because

4   a instance where a nurse grabs saline when she

5   thought she was grabbing albuterol and gave it to

6   a patient, there was complication as a result of

7   that.

8          Because of the product labeling, it was

9   a distinct difference; so safety was also an

10  issue in addition to cost.

11         So if I can show them that their end

12  user, who are the techs, that they're going to

13  use a product more because of -- they don't see

14  costs in terms of the end user.  They see the

15  effectiveness -- the efficacy of the product as

16  well as safety of the product, they are going to

17  be more apt to use the product that is more safe

18  for their patients.

19         So when I promoted the product, I

20  promoted the whole package, not just cost.

21  Because there's times you have to sell against

22  cost.

Ricks-Bey, Michael T.                                    January 8, 2009
                        Burlington, CO

118

1        Q.    So you would promote Dey's products

2    based upon labeling?

3        A.    Yes.

4        Q.    And safety?

5        A.    Yes.

6        Q.    And cost?

7        A.    Yes.

8        Q.    And increased profit margin; correct?

9        A.    Showing them where they can increase

10   their profit margin.  As you can see at the very

11   end, that was kind of the end theme.  That was

12   not the top of my list to show them how they can

13   increase their profit margins.  That was, in

14   addition to everything I just showed you, you can

15   increase your profit margins.

16            Because I know hospitals, and their

17   bottom line is, we've got to reduce cost at all

18   cost, so that's what I was promoting.

19       Q.    And so when you used the reimbursement

20   comparison worksheet, which is Exhibit 4, with

21   your customers, is that something that you would

22   use in addition to promoting other aspects of

Ricks-Bey, Michael T.                                    January 8, 2009
                          Burlington, CO

160

1    retail pharmacies paid for Dey's products if they

2    purchased such products through wholesalers?

3              MR. KATZ:   Objection to form.

4         A.    Yes.

5         Q.    (BY MR. AZORSKY)   What kind of

6    information were you seeking to obtain from

7    customers who were purchasing their drug products

8    through wholesalers?

9         A.    Primarily their pricing information, to

10   get an idea of what they are currently paying, to

11   see if I was able to establish a opportunity to

12   sell them on wholesalers -- using wholesalers or

13   different means other than directly from Dey.

14        Q.    What did you do with the information

15   that you obtained from customers with respect to

16   the purchase price that they bought products from

17   wholesalers?

18        A.    I would report that back to management,

19   my boss, who was Rick Upp.

20        Q.    What were the circumstances under which

21   you left the employment of Dey?

22        A.    I'm trying to remember.  Again, I can't

Ricks-Bey, Michael T.                                    January 8, 2009
                        Burlington, CO

161

1    recall the last person's name.  He took over for

2    Rick Upp.  And he and I had differences of

3    opinion on, in my opinion, ethics, and being

4    forthcoming with your customer base.

5            Because when I first started with him,

6    I trained with him.  I spent about a week with

7    him in the field getting an idea of his practice

8    and how he -- and he was less than forthcoming

9    with truth.

10           I didn't particularly agree with it,

11   but that was -- that was his method.  And when he

12   became my boss -- we were equals at the time, but

13   when he became my boss, we didn't see -- see eye

14   to eye, so I was terminated.

15       Q.    And that was in April 2006?

16       A.    '96.

17       Q.    Oh, I'm sorry.  I skipped a decade.

18   April of -- that was in April 1996?

19       A.    That's correct.

20           MR. AZORSKY:  I have no further

21   questions. I believe at this juncture, Ms.

22   Hanscom will have some questions for you.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

163

1    think.

2         MR. AZORSKY:  But also, we were told

3    that we didn't have to be out by a certain time.

4    And you asked for two hours, so I don't see that

5    being an issue.

6         MR. KATZ:  Hopefully.  I mean, I don't

7    think they're going to let us stay here all night

8    long.

9         MR. HENDERSON:  You'll have two hours.

10        MR. KATZ:  Okay.

11        MR. HENDERSON:  Do you want to switch

12   places?

13        MS. HANSCOM:  I'll just switch.

14              EXAMINATION

15   BY MS. HANSCOM

16        Q.   Good afternoon, Mr. Ricks-Bey.  Again,

17   I'm Rita Hanscom with the attorney general's

18   office with the State of California.

19        A.   Afternoon.

20        Q.   Do you recognize the name Steve

21   Robertson?

22        A.   Yes.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

164

1      Q.   How do you recognize that name?

2      A.   That is the last regional manager that

3  I had prior to my departure date at Dey

4  Laboratories.

5      Q.   And did you work with him before he

6  became your supervisor?

7      A.   Yes.

8      Q.   When was that, approximately?

9      A.   In the very beginning of my employment

10  -- I can't remember if I worked with him before I

11  went to sales training or after.  But it was

12  during that -- that timeline.  I worked with him

13  in his territory, which was in California.

14      Q.   When you worked with him in his

15  territory, did you go out on sales calls with

16  him?

17      A.   Yes.

18      Q.   In California?

19      A.   Yes.

20      Q.   Where?

21      A.   Oh, my God.  Basically, the same type

22  of customer base that I called on in my area:

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

165

1    pharmacies, wholesalers, hospitals.  So

2    everything that I did in my territory, we did in

3    his territory in California.

4        Q.   What time of -- what were the date --

5    what was the date you worked with him; do you

6    remember?

7        A.   I -- it had to be March, April time

8    frame, I think, of '94.

9        Q.   When you first started with Dey?

10       A.   When I first started, yes.  In fact, I

11   went on -- I went with him on a sales call before

12   I got hired as, I would call a ride-along, to

13   kind of get an idea of what the day-to-day

14   activity was. And I spent a day with him prior to

15   getting hired.

16           And then after I was hired, I spent

17   some time with him on a day-to-day basis of going

18   on these sales calls.

19       Q.   Did he instruct you -- during that time

20   period when you went with him in California, did

21   he instruct you on different sales methods?

22       A.   Sales protocols, yes.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

166

1      Q.   Do you recall anything in particular?

2      A.   Well, pretty much the way I performed

3  my duties was the way that Dey Laboratories

4  operated for all sales reps, and so he

5  demonstrated what my day-to-day activities would

6  encounter.

7      Q.   Did he provide any materials to you

8  during that time frame?

9      A.   Not to take with me, no.  Because I

10  obtained that once I got to the sales office.

11      Q.   You're familiar with Exhibit 4, the

12  reimbursement comparison worksheet that we've

13  been talking about today; is that right?

14      A.   Yes.

15      Q.   Do you recall using this when you

16  worked with Mr. Robertson in your early days

17  training with him in California?

18      A.   Yes.

19      MR. KATZ:  Objection to form.

20      A.   Yes.  I'm sorry.

21      Q.  (BY MS. HANSCOM)  And what do you

22  recall?

Ricks-Bey, Michael T.                                        January 8, 2009
                        Burlington, CO

175

1    ahead and keep going?

2              MR. KATZ:  Let's just go ahead.

3              MS. HANSCOM:  It's 2 o'clock.  Perfect.

4              (Exhibit Dey 1020 was marked for

5    identification.)

6                        EXAMINATION

7    BY MR. KATZ

8        Q.    Good afternoon, Mr. Ricks-Bey.  I'm

9    going to hand you what has been marked Dey

10   Exhibit 1020. Okay.  Now, Dey Exhibit 1020 is

11   made up of documents that you brought with you

12   today at this deposition; right?

13       A.    That's correct.

14       Q.    Can you tell me what these documents

15   are?

16       A.    These documents establish myself as a

17   secure party as well as a public minister, and

18   how I stand under the jurisdiction of the United

19   States.

20       Q.    Where did all these documents come

21   from?

22       A.    Documents that I created.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

176

1    Q.   Did you create all of these documents?

2    A.   Yes.

3    Q.   Did you -- were some of them based on

4    forms that you got from somewhere, or did you

5    just create them all?

6    A.   Documents --

7         MR. AZORSKY:   Objection to form.

8    A.   These are documents of research that I

9    have been doing for the last three and a half

10   years.

11   Q.   (BY MR. KATZ)  Did you type out all of

12   these forms?

13   A.   Yes.

14   Q.   Why don't we start with -- why don't

15   you turn to the third page, then.  Do you see at

16   the top left, it refers to the Washitaw Nation of

17   Muurs, United States of America, Republic of

18   Oklahoma, County of Beckham.  Did I pronounce

19   that correctly?

20   A.   Washitaw Nation of Muurs.

21   Q.   Muurs.  I'm sorry.  What is that?

22   A.   This is the tribal that I'm a member of

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

177

1   under the Washitaw Nation of Muurs.  As you look

2   further into the documents, it has a certificate

3   that accompanies that.

4       Q.   What do you -- you said tribal?

5       A.   Yes.

6       Q.   What do you mean by that?

7       A.   Under the Muurs, you're established

8   under the tribe.  Bey is my tribal name.

9       Q.   Is Muurs -- is that the name of the

10   tribe?

11       A.   Yes.

12       Q.   Okay.  When was this tribe established?

13       A.   If you look at the documents, it will

14   show you under the declaration of nationality.

15   I'm not at liberty to give you legal advice; you

16   would have to seek counsel to establish and

17   interpret.

18       Q.   Well, did you create this tribe?

19       A.   No, I did not.

20       Q.   Who did?

21       A.   It was created in -- the corporate

22   office is in Chicago.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

179

1    during the time of slavery of when slaves were

2    brought to this country and dispersed throughout.

3        Q.    Do you consider this tribe a separate

4    nation?

5        A.    Yes.

6        Q.    Okay.  And you're a citizen of that

7    nation?

8        A.    Yes.

9        Q.    Do you also consider yourself a citizen

10   of the United States?

11       A.    I have dual citizenship.

12       Q.    Okay.  You mentioned that today's a

13   holiday for the tribe.  What holiday it is?

14       A.    It's the prophet's birthday.

15       Q.    And how do you celebrate this holiday

16   usually?

17       A.    Not in here.

18       Q.    Right.  I mean, how would you celebrate

19   the holiday if you weren't here?

20       A.    We gather in our -- within each of your

21   temples, you would gather together and celebrate

22   his birthday.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

182

1      Q.   Do you believe that the United States

2  and Colorado have jurisdiction over you or they

3  do not have jurisdiction over you?

4      A.   No, they do not.

5      Q.   When you referred to yourself as a

6  detainee earlier in the deposition, what did you

7  mean by that?

8      A.   Well, I'm unlawfully being detained in

9  this facility.

10      Q.   Can you explain why you are being ·

11  unlawfully detained?

12      A.   No.

13      Q.   Do you --

14      A.   I can explain, but I choose not to;

15  because that will go into my court case that I

16  have going on, which this has nothing to do with.

17      Q.   Do you believe you're being unlawfully

18  detained in part because the State of Colorado

19  has no jurisdiction over you?

20      A.   That is correct.

21      Q.   And if the United States detained you,

22  you would believe you were unlawfully detained --

Ricks-Bey, Michael T.                                      January 8, 2009
                          Burlington, CO

191

1    like this.  It's Empire Washitaw, and I really

2    can't pronounce --

3          A.   Dugdyahmoundya, Washitaw Nation of Muur

4    Certificate of Title.

5          Q.   Right.  And if you look down in the

6    second paragraph at the pledge of allegiance, do

7    you see where it refers to Land of Washitaw?

8          A.   Which part?

9          Q.   The second paragraph of the pledge of

10   allegiance.

11         A.   Yes.

12         Q.   What is the Land of Washitaw?

13         A.   It's -- again, it's stated in the

14   documents itself.

15         Q.   Were you born in the Land of Washitaw?

16         A.   In the Washitaw Nation of Muurs, under

17   part of Virginia, the State of Virginia, which

18   was a part of the land of the Washitaw nation.

19         Q.   But would you say that you were -- were

20   you born in the United States or were you born in

21   the Muurish nation?

22         A.   Well, the Muurs nation existed before

Ricks-Bey, Michael T.
Burlington, CO

January 8, 2009

192

1    the United States existed.

2        Q.   So when you were born, you were born in

3    the Muurish nation; right?

4            MR. HENDERSON:   Objection.

5        Q.   (BY MR. KATZ)   Is that right?

6        A.   Yes.

7        Q.   If you look at the back of that page,

8    is that a map of Washitaw?

9        A.   Yes.

10       Q.   Okay.  Now, earlier in the deposition

11   -- I don't know if it was on the record or not --

12   but you made a reference to being an expert

13   witness or being sworn in as an expert witness.

14   What did you mean by that?  Why did you believe

15   that you were here today as an expert witness?

16       A.   Well, because I was the one that was

17   out in the field performing the duties that you

18   would not have knowledge of or anyone else who

19   was not performing these duties; so therefore, I

20   would be considered an expert in what I was

21   performing.

22       Q.   Do you know the difference between an

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

193

1   expert witness and a fact witness?

2        A.   Yes.

3        Q.   Can you describe that?

4        A.   An expert witness is someone who worked

5   specifically on that particular area of

6   expertise. A fact witness is just matter of

7   factly someone told me this or I heard this.

8        Q.   Do you have any legal basis to believe

9   that you're an expert witness?

10            MR. HENDERSON:   Objection.

11       A.   Legal basis based on what?

12       Q.   (BY MR. KATZ)   Do you believe you would

13  be classified as an expert witness under the

14  federal rules of civil procedure?

15            MR. AZORSKY:   Objection to form.

16       A.   Under whose jurisdiction?

17       Q.   (BY MR. KATZ)   Under the jurisdiction

18  of the District of Massachusetts.

19            MR. AZORSKY:   Objection to form.

20       Q.   (BY MR. KATZ)   The United States

21  District Court.

22            MR. AZORSKY:   Objection to form.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

194

1       A.   You would have to again refer back to

2   the documents.  It would give you the answers

3   that you're looking for.

4       Q.   (BY MR. KATZ)  Do you mean Dey Exhibit

5   1020?  Are those the documents that you're

6   referring to?

7       A.   Yes.

8       Q.   They would tell me whether or not you

9   would be an expert witness?

10      A.   Yes.

11      Q.   And would they say whether or not you

12  would be an expert witness with respect to your

13  time at Dey?

14      A.   No.  When you say Dey forms, I'm

15  speaking of the documents that I provided.

16      Q.   Okay.  Do you believe you're an expert

17  witness with respect to what you've described

18  about your employment with Dey?

19      A.   Yes.

20      Q.   Okay.  And does Dey Exhibit 1020 bear

21  in any way on whether or not you would be an

22  expert witness with respect to what you described

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

195

1    of your employment at Dey?

2        A.   With Exhibit 1020, I was establishing

3    to you as to who I am out of respect to Dey

4    Laboratories and my employment.  I would

5    establish myself as an expert witness because of

6    the fact, as I said before, I worked and

7    performed these duties day in and day out, so I

8    focused on nothing else other than those specific

9    things.

10           An expert is someone that deals with a

11   particular area of expertise to perfect their

12   knowledge of what they're working on.

13       Q.   You don't have any legal basis for

14   that, do you?  That's just your personal opinion?

15       A.   I would refer you back to document

16   1020. When you come into the legal -- when you

17   bring in the legal aspect, I refer you back to

18   Exhibit 1020.

19       Q.   And that would tell me whether or not

20   you would be an expert witness?

21       A.   That would tell you my legal expertise.

22       Q.   Okay.  Now, during this deposition,

Ricks-Bey, Michael T.
Burlington, CO
January 8, 2009

198

1  that you gave.  For example, you testified --

2  well, let's turn to Exhibit 4.

3           MR. AZORSKY:  Objection to form.

4      Q.   (BY MR. KATZ)  Start there.  Now,

5  originally you testified that you vaguely

6  remembered this reimbursement comparison

7  worksheet; right?

8      A.   Not that I recollect, no.

9      Q.   I think the -- when we have the

10 transcript, I think that's what it will say.

11          MR. AZORSKY:  Object to form.

12     Q.   (BY MR. KATZ)  And do you remember that

13 you testified that you didn't even remember using

14 this reimbursement comparison worksheet when you

15 were first asked about it?

16     A.   No.  There were different forms that

17 were being utilized.  And when I saw the form, I

18 know precisely what forms that were being

19 utilized.

20     Q.   Okay.  Well, when you were first asked

21 about Ricks-Bey Exhibit 4, didn't you testify

22 that you didn't recall using it?

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

199

1      A.   I said I don't recall the form.  I

2  didn't say I didn't recall using it.

3      Q.   Okay.  But then later on, in response

4  to questions, you were asked about your account

5  call records, you testified that you did use

6  these forms; is that right?

7      A.   Yes.

8      Q.   Let's take a look at those.  Can you

9  turn to Ricks Exhibit 17.  In looking at your

10  account call records in Ricks-Bey Exhibit 17, and

11  in responding to some of the leading questions of

12  plaintiffs' counsel, you testified that you

13  believed that you had used the reimbursement

14  comparison worksheet in Ricks Exhibit 4; right?

15          MR. AZORSKY:  Objection to form.

16          MR. HENDERSON:  Objection to form.

17      A.   I'm not sure if I understand your

18  question.

19      Q.   (BY MR. KATZ)  Well, let's just use the

20  first page as an example.

21      A.   Okay.

22      Q.   You were asked about increased profit

Ricks-Bey, Michael T.

Burlington, CO

January 8, 2009

206

1    Q.   And as you testified, the primary part

2    of the presentation would be emphasizing the

3    product features of Dey's products; right?

4              MR. AZORSKY:  Objection to form.

5              MR. HENDERSON:  Objection.

6    Q.   (BY MR. KATZ)  For example, like you

7    would present the -- Dey's unit-dose albuterol

8    had safety features; right?

9              MR. HENDERSON:  Objection.

10   A.   Yes.

11   Q.   (BY MR. KATZ)  And can you describe how

12   Dey's unit-dose albuterol was safer than a

13   competitor's drug?

14   A.   Well, one, because of the -- the

15   labeling. It had a blue -- a blue label as

16   opposed to a clear label.

17   Q.   And another product feature you might

18   have emphasized was the fact that Dey's product

19   was sterile; right?

20             MR. AZORSKY:  Objection to form.

21             MR. HENDERSON:  Objection.

22   A.   Yes.

1     Q.   (BY MR. KATZ)  And another feature you

2  might have presented was the fact that the unit

3  dose as compared to the multi-dose had less of a

4  risk of cross-contamination; right?

5         MR. HENDERSON:  Objection.

6     A.   Yes.

7     Q.   (BY MR. KATZ)  And another feature you

8  would have emphasized was that the unit dose

9  would have had less opportunity for waste; right?

10        MR. HENDERSON:  Objection.

11        MR. AZORSKY:  To form.

12    A.   Yes.

13    Q.   (BY MR. KATZ)  And when I say "waste,"

14  I mean that you would use the entire vial of the

15  unit dose --

16    A.   As premeasured as the competition.

17    Q.   Right.  And the unit dose is

18  premeasured, so there would also be time savings

19  involved; right?

20        MR. HENDERSON:  Objection.

21    A.   Yes.

22    Q.   (BY MR. KATZ)  And it would also be

Ricks-Bey, Michael T.                     January 8, 2009
                    Burlington, CO

208

1    more accurate because there could be human error

2    in measuring; right?

3              MR. HENDERSON:   Objection.

4        A.    That's correct.

5        Q.    (BY MR. KATZ)   And the vials were in

6    plastic, which were safer than glass in some

7    respects; right?

8              MR. HENDERSON:   Objection.

9        A.    As the competition was in plastic as

10   well.

11       Q.    (BY MR. KATZ)   But it was definitely an

12   advantage for Dey's product to be in plastic

13   bags; right?

14             MR. HENDERSON:   Objection.

15       A.    Well, let me explain it this way.   I

16   mean, that was not always a selling factor.

17   Because my customers will always come back to the

18   bottom line: Your price is more expensive than

19   what the competition is.

20             So in order to overcome -- in respect

21   to all the features that I sold to in the

22   beginning, I still had to overcome the pricing

Ricks-Bey, Michael T.

Burlington, CO

January 8, 2009

226

1      A.   Well, Mr. Robertson wanted me to

2   perform the duties that he was performing when we

3   first started.  I was the only minority in the

4   sales force.  And how he handled himself, I felt

5   that I was discriminated against.

6      Q.   Now, earlier you testified that you

7   believed you were terminated because you had a

8   difference of opinion with Mr. Robertson?

9      A.   That doesn't change.

10     Q.   All right.  Why does that not -- do you

11  believe you were fired because of discrimination

12  or because you had a difference of opinion with

13  Mr. Robertson?  Which one is it?

14     A.   That led up to.

15     Q.   So you believe one caused the other?

16     A.   I don't know what caused it, but I know

17  what took place.

18     Q.   When you were terminated from Dey, were

19  you told the reasons why you were terminated?

20     A.   Absolutely not.  I even asked to have

21  an attorney present, and I was denied to even

22  have an attorney present, which I thought was

Ricks-Bey, Michael T.                                    January 8, 2009
                        Burlington, CO

230

1    regarding Dey?

2         A.   No.

3         Q.   And at least for part of the time,

4    there was a lawyer on the phone by the name Kirk

5    Rogers, who is an assistant attorney general

6    representing the State of Florida.  Have you ever

7    had any communications with Ms. Rogers?

8         A.   No.

9         Q.   Have you ever had any communications

10   with the attorney general's office of the State

11   of Florida?

12        A.   No.

13        Q.   Prior to the deposition and other than

14   the phone call that you had with Mr. Henderson,

15   have you had any communications with any

16   representatives of any law enforcement agency

17   regarding Dey?

18        A.   No.

19        Q.   Now, currently, you're in the Kit

20   Carson Correctional Facility?

21        A.   Kit Carson Correctional Center.

22        Q.   Which is a prison; right?

Ricks-Bey, Michael T.                                  January 8, 2009
                          Burlington, CO

                                                              231

1        A.    No.  It's a warehouse.

2        Q.    Why do you say it's a warehouse?

3        A.    Have you ever been to a prison?

4        Q.    This would be my first.

5        A.    Well, you haven't even gone to one now.

6    This is a warehouse.  This is a place where you

7    house detainees.  In a prison, if you look up the

8    definition of prison in the CRS, a prison is in

9    Canon City.  That's where a prison is.

10            And this is not considered a prison.

11   This is a private corporation that houses bodies

12   for a profit.  So this is a organization that is

13   paid for housing bodies.

14        Q.    Well, currently you're serving a

15   sentence of 20 years to life; right?

16        A.    No.

17        Q.    What is your sentence?

18        A.    I don't have a sentence.  As I told you

19   before, I'm being illegally detained.

20        Q.    Okay.  But you are in prison.  And is

21   it fair to say that you'd expect to be here for

22   about 20 years?

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

232

1      A.    No.

2      Q.    Why is that?

3      A.    Read these documents.

4      Q.    Okay.  Well --

5      A.    By June I will not be here.

6      Q.    -- let me rephrase.  Let me rephrase.

7            You are being detained; and if nothing

8      changes, you would expect to be here for about 20

9      years; is that right?

10     A.    No.

11     Q.    Why is that?

12     A.    As I just explained to you, with the

13     documentations that I have filed, by June, I

14     should be leaving this warehouse.

15     Q.    Is it your opinion that if you refuse

16     -- if you had refused to cooperate in this

17     deposition today, that that could have affected

18     the length of time that you would be at Kit

19     Carson Correctional Center?

20     A.    Are you threatening me?

21     Q.    No, I'm not.  I'm asking you what your

22     opinion was.

Ricks-Bey, Michael T.                                    January 8, 2009
                        Burlington, CO

234

1    going to be here less.  We didn't discuss any of

2    those things on the phone.

3            So I am not intimidated because who he

4    works for, who he works for, who she works for.

5    That doesn't influence me one way or the other.

6        Q.    Earlier today you asked for Mr.

7    Henderson's contact information.  Why did you ask

8    for his contact information?

9        A.    Well, because I see that -- because I

10   was not -- as a expert witness, I should be paid

11   for my testimony, just like any other expert

12   witness who comes and testify for you.  You pay

13   for their testimony, do you not?

14       Q.    Okay.  So since you're testifying on

15   behalf of the Department of Justice, you believe

16   you should be paid?

17       A.    I'm not testifying on behalf of the

18   Department of Justice.  I'm testifying on the

19   truth as it took place during the timeline that

20   they are required -- that they are asking about.

21   That has, again, no bearing whatsoever.  These

22   are the facts. This is what took place during

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

255

1     Q.   Okay.  Can you describe the nature of

2  your discussions with Mr. Mozak other than that

3  you discussed Dey's products?

4     A.   That's what the discussion was about.

5     Q.   Okay.  Does discussions include sales

6  and marketing strategies?

7     A.   Yes.

8     Q.   Did you propose any sales or marketing

9  strategies?

10    A.   No.

11    Q.   Do you have any authority to make any

12 sales or marketing strategies -- or did you have

13 any authority to make any sales or marketing

14 strategies on behalf of Dey?

15         MR. HENDERSON:  Objection, form.

16    A.   I was hired to represent Dey.  So

17 therefore, I did have some authorities.

18    Q.   (BY MR. KATZ)  Do you believe that you

19 had authority to set sales strategy?

20         MR. HENDERSON:  Objection to form.

21    Q.   (BY MR. KATZ)  Or do you believe that

22 authority came from Dey management?

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

256

1      MR. AZORSKY:  Objection to form.

2      A.   The authority to operate my day-to-day

3  operation that was handed down to me was -- from

4  management was carried out.

5      Q.   (BY MR. KATZ)  Okay.  So Dey's

6  management set the strategy, not you; right?

7      A.   That's correct.

8      Q.   Did you ever have any communications

9  with any other of Dey's management?

10      A.   Rick Upp, Steve Robertson, the sales

11  team or the sales -- other sales reps that we

12  strategized, talking about things that are

13  working. I shared success I was having.  Others

14  shared the success they were having.

15      Q.   Were you ever involved in any sales or

16  marketing strategy meetings with Dey's

17  management?

18      A.   No.  Well, yes.

19      Q.   When?

20      A.   During sales meetings.

21      Q.   You mean the national sales meeting?

22      A.   Yes.  Or the regional meetings.

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

257

1        Q.    And how many people were at those

2    regional meetings?

3        A.    Seven or eight at the regional meetings

4    and a hundred plus in the national meeting.

5        Q.    Did you ever have any sales or

6    marketing strategy meeting with Dey's management

7    based in Napa?

8        A.    Yes.

9        Q.    You had -- you were involved in sales

10   or mar -- and marketing strategy meetings in

11   Napa?

12       A.    We went to Napa to have these meetings,

13   yes.

14       Q.    How many times?

15       A.    Two or three.

16       Q.    Did you propose any strategies during

17   these meetings?

18       A.    I gave my input of what I thought was

19   ideal for -- on sales calls on being more

20   efficient on sales calls.

21       Q.    But once again, in terms of setting

22   strategy, the final authority was with Dey's

Ricks-Bey, Michael T.                                    January 8, 2009
                          Burlington, CO

                                                                    258

1    management, not with you; right?

2         A.    That's correct.

3         Q.    Have you ever had any communications

4    with Brett Calder?

5         A.    I don't recall.

6         Q.    Chuck Adams?

7         A.    I don't recall.

8         Q.    Kevin Pierson?

9         A.    Don't recall.

10        Q.    You don't recall one way or the other?

11        A.    No.

12        Q.    Do those names sound familiar to you?

13        A.    Vaguely.

14        Q.    Now, just to be clear, your territory

15   that you were responsible for was Alabama,

16   Colorado, New Mexico and Utah; right?

17        A.    Wrong.

18        Q.    What -- tell me again your territory.

19        A.    Colorado, Utah --

20        Q.    I'm sorry.  I meant Arizona.

21        A.    Arizona.

22        Q.    Let me start again.  Your territory was

Ricks-Bey, Michael T.                                    January 8, 2009
                        Burlington, CO

259

1    Arizona, Colorado, New Mexico, and Utah; right?

2        A.   That's correct.

3        Q.   Okay.  And your territory did not

4    include New York; right?

5        A.   That is correct.

6        Q.   Your territory did not include

7    California; correct?

8        A.   Correct.

9        Q.   Your territory did not include Florida;

10   correct?

11       A.   Correct.

12       Q.   Your territory did not include

13   Kentucky; correct?

14       A.   Correct.

15       Q.   Your territory did not include

16   Illinois; correct?

17       A.   Correct.  My territory covered those

18   four states you just mentioned.  However, we --

19   when they set the sales plan, it didn't just go

20   for Colorado; it goes throughout --

21       Q.   All I'm asking about, who you made

22   calls on and --

260

1      A.   I made calls on those four states.

2      Q.   Okay.  And just so the record's clear,

3   you didn't make calls on --

4      A.   Any other place outside of those four

5   states:  Colorado, Utah, Arizona, New Mexico.

6      Q.   I just want to make the record clear,

7   because there are attorneys representing some of

8   the other states, so --

9      A.   I think they understand.

10      Q.   Okay.  You didn't make calls in

11   California, Florida, Kentucky, Illinois,

12   Wisconsin, Iowa, Pennsylvania, and Kansas;

13   correct?

14      A.   If they're outside those four states,

15   no.

16      Q.   And you mentioned that you did a

17   ride-along with Steve Robertson for a short

18   period of time in California; right?

19      A.   That's correct.

20      Q.   And that was just one day before you

21   were hired; right?

22      A.   I did a ride-along with him, and I did

Ricks-Bey, Michael T.                                    January 8, 2009
                        Burlington, CO

261

1    a week before training and a week after training.

2         Q.   So two weeks total; right?

3         A.   Correct.

4              (Exhibit Dey 1023 was marked for

5    identification.)

6         Q.   I'm going to hand you a document marked

7    Dey Exhibit 1023.  I'd like you to take a look at

8    it, let me know when you're ready.

9              MS. HANSCOM:  What exhibit has this

10   been marked as?

11             MR. KATZ:  1023.

12             MS. HANSCOM:  1023?

13             MR. KATZ:  1023.

14             MS. HANSCOM:  Okay.

15        Q.   (BY MR. KATZ)  Are these call reports

16   that you filled out?

17        A.   Yes.

18        Q.   And your name is not on here, but

19   territory 17 was your territory?

20        A.   That's correct.

21        Q.   And that was your territory from March

22   1, 1994, to April 1, 1996?

Ricks-Bey, Michael T.

Burlington, CO

January 8, 2009

262

1    A.   Correct.

2        Q.   And looking through these account call

3    records, would you agree with me that in these

4    account call records, you listed some of the

5    product features that we discussed earlier in the

6    deposition which would be beneficial to the

7    patients who bought Dey's drugs?

8        A.   That's correct.

9        Q.   And for instance, on page 1, you

10   mention safety and conveniences.  And that would

11   relate to cross-contamination issues, the

12   labeling issues, the fact that the pharmacist

13   didn't have to measure, and some of the other

14   things that we --

15           MR. HENDERSON:  Objection to form.

16       Q.   (BY MR. KATZ)  You also mentioned that

17   cromolyn is in plastic, and you saw that as a

18   benefit; right?

19           MR. HENDERSON:  Objection, form.

20       A.   Correct.

21       Q.   (BY MR. KATZ)  And then on the next

22   page, you also mentioned safety and convenience,

Ricks-Bey, Michael T.

January 8, 2009

Burlington, CO

263

1  right, in the follow-up area?

2      A.   Continue to build rapport with the

3  staff and reinforce Dey albuterol safety and

4  convenience.

5      Q.   And promoting the safety and

6  convenience of Dey's drugs was something that you

7  did regularly when you met with customers; right?

8          MR. HENDERSON:   Objection, form.

9      A.   Correct.

10          MR. HENDERSON:   Excuse me, I'll be

11  objecting to a lot of questions.  So if you could

12  just give me half a second to throw that in, that

13  would be great.

14          MR. KATZ:   It's best for the record so

15  people aren't talking over each other.

16          THE DEPONENT:   Okay.

17      Q.   (BY MR. KATZ)   And if you quickly scan

18  through these pages, you'll see that safety and

19  convenience appears a lot in these account call

20  records; right?

21      A.   Yes.

22      Q.   Because that was something that you

Ricks-Bey, Michael T.                                                January 8, 2009
                                    Burlington, CO

264

1   commonly promoted when you were promoting Dey's

2   products; right?

3          MR. HENDERSON:  Objection, form.

4      A.   I promoted safety and convenience as

5   well as pricing and profit margins, and -- as I

6   testified earlier.

7      Q.   (BY MR. KATZ)  And then if you go to

8   page 20, if you count to the 20th page.

9          MR. AZORSKY:  Can you just --

10         MR. KATZ:  I'll give it to you in a

11  second.

12     Q.   (BY MR. KATZ)  And it's -- at the

13  bottom of the number is Dey Labs 0197953.  This

14  is another account call record that you filled

15  out; right?

16     A.   Okay.

17     Q.   Actually, these are all account call

18  records you filled out; right?

19     A.   Yes.

20     Q.   And in this one, you're discussing that

21  the paramedics wouldn't need refrigerators for

22  Dey's drug, right -- or Dey's unit-dose

Ricks-Bey, Michael T.  
Burlington, CO  
January 8, 2009

265

1    albuterol?

2        A.    Correct.

3        Q.    And that's because it didn't need to be

4    refrigerated; right?

5        A.    Correct.

6        Q.    And that was another benefit of Dey's

7    unit-dose albuterol that you discussed with --

8        A.    I --

9        Q.    -- potential customers; right?

10        A.    Again, I testified that the benefits of

11    the product, that was part of my job description,

12    to sell the benefits of Dey products, not just

13    albuterol, but all the products that I -- I sold.

14            Again, I also showed them the benefits

15    of -- for them as a buyer, that it would increase

16    their profit margins.

17            So I didn't discriminate one way or

18    another, just selling the benefits of the

19    product. I also showed them where there was cost

20    savings for them.

21            MR. KATZ:  All right.  Well, this would

22    be a good time to break, because you have to --

Ricks-Bey, Michael T.                                January 8, 2009
                          Burlington, CO

269

1          Q.   You can set that aside.  Now, I'd like

2    you to pull out Ricks-Bey Exhibit 12 and 13.   I

3    just want to make sure I heard your testimony

4    correctly.

5          A.   Hold on, I don't have 13.  Okay.

6          Q.   Now, on Exhibit 13, where the

7    description is average wholesale list price, AWP,

8    is it your testimony that that's referring to the

9    second page of Ricks-Bey Exhibit 12?

10         A.   Okay.  Let's go back again.  On Exhibit

11   -- which exhibit?

12         Q.   Exhibit 13, for the description of

13   average wholesale price list, AWP, it's the sixth

14   one down, is it your contention that that is

15   referring to the second page of Ricks Exhibit 12

16   titled AWP Price Listing Guide?

17              MR. AZORSKY:  Objection to form.

18         A.   To my understanding, yes.

19         Q.   (BY MR. KATZ)  Could you be mistaken

20   about that?

21         A.   Not at this point, no.

22         Q.   You can set that aside.  Can you pull