# Exhibit 395

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| ex rel. | ) |
|    VEN-A-CARE OF THE | ) |
|    FLORIDA KEYS, INC., | ) |
|       Plaintiff(s), | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC., WARRICK | ) |
| PHARMACEUTICALS CORPORATION, | ) |
| SCHERING-PLOUGH CORPORATION, | ) |
| and SCHERING CORPORATION, | ) |
|      Defendant(s). | ) 53RD JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

JAMES HAROLD GIST

November 5th, 2002

Volume 1

(CONTAINS ATTORNEYS' EYES ONLY TESTIMONY)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF JAMES HAROLD GIST, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on November 5th, 2002, from 9:17 a.m. to 5:04 p.m., before Cynthia Vohlken, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Coudert Brothers, 600 Beach Street, San Francisco, California pursuant to the Texas Rules of Civil Procedure.

Page 2

APPEARANCES

FOR THE PLAINTIFF(S):
    MR. RAYMOND C. WINTER
    MR. PATRICK J. O'CONNELL
    MS. CYNTHIA O'KEEFFE
    Office of the Attorney General
    State of Texas
    Post Office Box 12548
    Austin, Texas 78711-2548

FOR THE RELATOR:
    MR. JAMES JOSEPH BREEN
    The Breen Law Firm, P.A.
    P. O. Box 297470
    Pembroke Pines, Florida 33029-7470
    -and-
    MR. FRANK M. PITRE
    Cotchett, Pitre, Simon & McCarthy
    840 Malcolm Road, Suite 200
    Burlingame, California    94010

Page 2 (cont.)

FOR THE DEFENDANT(S) DEY, INC.:
    MR. STEPHEN M. HUDSPETH
    Coudert Brothers
    1114 Avenue of the Americas
    New York, New York 10036-7703
    -and-
    MR. STEVEN A. FLECKMAN
    Fleckman & McGlynn, P.L.L.C.
    515 Congress, Suite 1800
    Austin, Texas 78701-3503

FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
    MR. R. ERIC HAGENSWOLD
    Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas 78701

Page 3

FOR THE DEFENDANT WARRICK PHARMACEUTICALS CORPORATION AND SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
    MS. KARIN B. TORGERSON
    Locke Liddell & Sapp, LLP
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201-6776

ALSO PRESENT:
    Mr. Eliseo Sisneros,
        California Office of the
        Attorney General
    Mr. Zachary Taylor Bentley, II
    Ms. Anne Arnold
    Mr. Brian Bobbitt, Videographer

Scrunch® www.scrunch.cc GC Software, Seattle, Washington

Page 19

1  Q. Okay.
2  A. Duane Young, who was one of the major
3     stockholders, was the vice president of marketing. We
4     made unit-dose bronchodilators. Excuse me. And that
5     was basically it for a while.
6  Q. And --
7  A. But as -- go ahead.
8  Q. You, please, go ahead.
9  A. Okay. As we moved along from '80 we got
10    the -- after Metaproterenol became a generic we got
11    that product and did real well with it. We were the
12    first group, generic group, to get the generic
13    Metaproterenol, which was a good dilator. From there
14    we went to -- we had the Epinephrin. We had Atropine.
15    All in unit doses.
16        Then lo and behold after we got bought
17    again or Dey just got bought, at that -- at a point in
18    time -- and I'm going to have to think about this.
19    Had to have been 16 years ago or 17 years ago that Dey
20    was bought.
21 Q. 1985, approximately?
22 A. '85 is when I came on, I believe.
23 Q. When you came on.
24 A. Right.
25 Q. Well, let's go back now.

Page 20

1  A. Right. I said '80 and it was '85.
2  Q. Okay. So between 1980 and 1985 what did you
3     do?
4  A. I worked for --
5  Q. For Bard?
6  A. -- Dey. No. I worked for Dey.
7  Q. You worked for Dey?
8  A. Uh-huh.
9  Q. Well, let's go back just for a second
10    because --
11 A. Okay.
12 Q. -- I'm starting to get a little confused now.
13    You said you worked for Aerwey beginning sometime
14    around 1974 or '75, correct?
15 A. Yes.
16 Q. And approximately a year and a half after you
17    first started working for Aerwey, Aerwey was bought
18    out by Bard?
19 A. C. R. Bard, right.
20 Q. And you remained working for --
21 A. C. R. Bard.
22 Q. -- C. R. Bard until approximately 1980,
23    correct?
24 A. Uh-huh.
25 Q. Okay. And then in 1980 you went to work for

Page 21

1     Dey Labs and Mr. Duane Young was the vice president of
2     marketing. You mentioned him.
3  A. Uh-huh.
4  Q. Is he the gentleman that hired you?
5  A. Yes.
6  Q. Okay. And so you go to work for Dey in 1980
7     and Mr. Young hires you to perform what function?
8  A. Sales rep.
9  Q. Sales rep. Out of the Dallas area?
10 A. I had 13 states.
11 Q. You had 13 states that you were responsible
12    for?
13 A. That is correct.
14 Q. Okay. Were you based in Dallas?
15 A. Yes.
16 Q. And then you started to tell us about an
17    event that occurred in 1985.
18 A. I'm trying to fit in the Lipha situation.
19 Q. Okay.
20 A. Which we were, again, bought out, which was
21    our first time with Dey. Okay?
22 Q. Okay.
23 A. Are you -- okay. It's been about 17 years
24    since that was -- since that happened.
25 Q. Okay.

Page 22

1  A. The buyout. Okay.
2  Q. So in 1985 approximately Lipha buys out Dey;
3     is that correct?
4  A. I believe so.
5  Q. Does your responsibility change in 1985 when
6     Lipha buys out Dey?
7  A. No.
8  Q. So you're continuing to be a sales
9     representative based in Dallas with responsibility for
10    selling Dey's products over a 13 state area?
11 A. 13 states.
12 Q. Okay. And you have that responsibility from
13    1980 until when?
14 A. Now.
15 Q. So you have essentially --
16 A. I don't have 13 states.
17 Q. Okay.
18 A. I have north Texas only.
19 Q. Okay. So your area has contracted, reduced
20    in size, however --
21 A. Yes, it has.
22 Q. -- however, the function that you're
23    performing is essentially the same; is that correct?
24 A. Yes and no. Initially my job was to call on
25    respiratory retail pharmacy wholesalers and that's

Page 179

1  A. No.
2  Q. Page 29712 purports to be a fax cover sheet
3     to Ross Uhl from Cindy Daulong. Have you ever seen
4     that before?
5  A. Yes.
6  Q. When did you see that?
7  A. Last night.
8  Q. Last night?
9  A. Uh-huh.
10 Q. Okay. And that's dated August 3rd, 1995?
11 A. Hmm?
12 Q. That fax cover sheet is dated August 3rd,
13    1995?
14 A. Yes.
15 Q. That's the same one you saw last night?
16 A. Yes.
17 Q. The first time you saw it was last night?
18 A. Yes.
19 Q. Look at Page 29713 which is attached to it.
20    Ever seen that before or anything like it before?
21 A. Yes.
22 Q. When?
23 A. Maybe -- I don't know exactly when.
24 Q. When did you see it, approximately?
25 A. How long has -- let me think. How long has

Page 180

1     Albuterol been out? Geez. I can't -- I can't guess.
2  Q. I don't want you to guess. Let me see if I
3     can help you recollect. Did you see this document
4     last night?
5  A. Yes, that one.
6  Q. This is 29713.
7  A. I'm sorry?
8  Q. Page 29713 --
9  A. Yes.
10 Q. -- you saw this last night?
11 A. Yes.
12 Q. Was last night the first time you ever saw
13    this document?
14 A. No.
15 Q. All right. Have you seen this document
16    anytime in the last five years since you have been
17    calling exclusively on hospitals?
18 A. No.
19 Q. All right. So you have a recollection of
20    having seen this document before last night, so it
21    must have been more than five years ago, correct? Let
22    me ask the question this way.
23 A. Please.
24 Q. If you saw this document before last night
25    but you haven't seen this document while you've been

Page 181

1     calling on hospitals in the last five years --
2  A. Right.
3  Q. -- then can I assume you saw it at some point
4     more than five years ago?
5  A. Got you.
6        MR. HUDSPETH: Objection, form.
7        MR. BREEN: What's wrong with the
8  question, Counsel?
9        MR. HUDSPETH: Because you are asking
10    for a conclusion based on speculation as to when he
11    saw it.
12 Q. (BY MR. BREEN) Did you see this document for
13    the first time more than five years ago, sir?
14 A. Yes.
15 Q. That's 29713?
16 A. 29713.
17 Q. Okay. And did you use this document or one
18    like it in the course of performing your duties as a
19    salesperson for Dey Laboratories?
20 A. No.
21 Q. Who provided you with this document or showed
22    you this document four to five years ago?
23 A. That would be Rick Upp.
24 Q. Rick Upp. Okay. And did Rick Upp give you
25    any instructions regarding this document, 29713?

Page 182

1  A. Suggestions.
2  Q. Suggestions. And what did he suggest you do
3     with respect to this document?
4  A. Use it.
5  Q. Use it how?
6  A. Well, it looks pretty explanatory. I mean,
7     you are trying to get business from someone.
8  Q. Okay. So I can just -- and the jury can just
9     look at this document and follow the self-explanatory
10    words on it, is that what you're saying? There is
11    nothing more to it than what's on here?
12 A. To me it's not.
13 Q. Okay. So then what this document is and what
14    Mr. Upp suggested that you use it for was a
15    reimbursement comparison worksheet to convince
16    customers to buy Dey products rather than Warrick's,
17    correct?
18       MS. TORGERSON: Objection, form.
19 A. Evidently.
20 Q. (BY MR. BREEN) And you have a present
21    recollection sitting here today that Mr. Upp was
22    suggesting that you try to get more sales per day by
23    telling customers that they can make more profit on
24    reimbursement on Dey's products than Warrick's, don't
25    you?

Page 183

1  A. I'm sorry.
2     MR. BREEN: Read it back, please.
3  A. No. I'm more or less where I just didn't
4     understand the last part of it.
5     MR. BREEN: Read the question back,
6     please. I want you to hear this whole question.
7     (Requested portion was read)
8     MR. HUDSPETH: Objection, form.
9  Q. (BY MR. BREEN) Let me restate the question.
10    Sitting here today, sir, do you recall Mr. Upp giving
11    you any suggestions regarding what has now been marked
12    as Exhibit 328, Page 0029713?
13 A. Yes.
14 Q. And do you recall Mr. Upp suggesting to you
15    that you should try to convince customers to buy Dey
16    products as opposed to Warrick products because they
17    can make a greater profit on the reimbursement on
18    Dey's products?
19 A. Is that a question?
20 Q. That's a question. Do you recall that?
21 A. Okay. Ask me again.
22    MR. BREEN: Read it back, please.
23    THE WITNESS: Sorry.
24    MR. BREEN: That's all right.
25    (Requested portion was read)

Page 184

1  A. Yes.
2  Q. (BY MR. BREEN) And you didn't follow that
3     suggestion, did you?
4  A. No, I did not.
5  Q. Because you thought it was wrong, didn't you?
6  A. No.
7  Q. You didn't think it was wrong?
8  A. I didn't know whether it was right or wrong.
9  Q. Do you think it is wrong sitting here today?
10 A. Without being flippant, yes.
11 Q. Why do you think it's wrong?
12 A. I don't. I don't have any thought one way
13    or -- or the other about it. I don't like doing those
14    things --
15 Q. Why not?
16 A. -- so I don't do them. I just don't. That's
17    me.
18 Q. All right. Well --
19 A. Consider it being maybe if you want to use
20    the term lazy, whatever, that's too much work for me.
21 Q. It was too much work to do what?
22 A. Go through the -- the stuff here.
23 Q. In other words, to use Exhibit 3 --
24 A. To use that last -- yeah.
25 Q. -- page, 29713, you just didn't do it because

Page 185

1     it was too much work?
2  A. Yeah.
3  Q. Well, rather than use Page 29713 did you ever
4     try to follow through on any of Mr. Upp's suggestions
5     by just telling customers --
6  A. No.
7  Q. -- that they can make more profit on Dey's
8     product than Warrick's?
9  A. No.
10 Q. Why not?
11 A. I don't know.
12 Q. Did you think it would be -- at the time did
13    you think it would be right to do that?
14 A. Right to not do it?
15 Q. No, to do it.
16 A. To do it? I think it's the same answer I had
17    a while ago.
18 Q. Now, you knew back in 1995 that the Texas
19    Medicaid program was basing their reimbursement for
20    Dey's product based upon Dey's wholesale acquisition
21    cost, didn't you?
22 A. Right.
23 Q. So you knew that Texas Medicaid was basing
24    it's reimbursement based upon the prices that Dey was
25    reporting, correct?

Page 186

1  A. Right.
2  Q. Okay. So if you -- if Dey -- if a customer
3     was able to make a greater profit on Dey's product
4     based upon reimbursement than it was on Warrick
5     product, you knew it was based upon the prices Dey was
6     reporting, didn't you?
7  A. Uh-huh.
8  Q. Is that correct?
9  A. Yeah.
10 Q. Now, in knowing that you didn't think there
11    was anything wrong with marketing Dey's Albuterol to
12    customers by telling them that they can make a greater
13    profit on it than they could on Warrick?
14 A. I didn't do that.
15 Q. I know you didn't do that. My question is
16    didn't you think there was anything wrong with it when
17    your boss came and suggested that you do it?
18    MR. HUDSPETH: Objection, form.
19    MR. BREEN: Read the question back,
20    please.
21    (Requested portion was read)
22 A. I didn't think one way or another about it.
23 Q. (BY MR. BREEN) All right. Now, sitting here
24    today you've got at least five -- you've got seven
25    more years experience in pharmaceutical sales for Dey

Page 191

```
1    anything wrong with marketing the spread on
2    reimbursement to customers?
3 A. No.
4 Q. As a matter of fact, based upon Exhibit 328,
5    29713, your superiors at Dey Laboratories actually
6    encouraged you to market the products based upon the
7    greater profitability on the spread, didn't they?
8         MR. HUDSPETH:  Objection, form.
9 A. I don't know.
10 Q. (BY MR. BREEN)  Well, look at Exhibit 326 or
11   rather 328, Page 29713.  That last worksheet --
12 A. The last one, yeah.
13 Q. -- that Mr. Upp suggested you use to market
14   Dey's products, correct?
15 A. Right.
16 Q. Okay.  And Mr. Upp suggested that you market
17   Dey's products based upon a reimbursement comparison
18   where you show the customer they can make more money
19   on Dey's product based upon reimbursement than they
20   could on Warrick's product, correct?
21        MR. FLECKMAN:  This has already been
22   asked and answered.  Objection, form.
23 Q. (BY MR. BREEN)  I believe --
24        MR. FLECKMAN:  This has already been
25   asked and answered.
```

Page 192

```
1         MR. BREEN:  That's fine.  That's fine,
2    Counsel.
3 Q. (BY MR. BREEN)  Now let me go back to what
4    I'm saying.
5         MR. BREEN:  I'm asking a different
6    question, Counsel, and do not --
7         MR. FLECKMAN:  That's fine.
8         MR. BREEN:  You can make your objection,
9    but don't interrupt.
10        MR. FLECKMAN:  I will interrupt anytime
11   you ask --
12        MR. BREEN:  Okay.  Fine.
13        MR. FLECKMAN:  -- something
14   objectionable.
15        MR. BREEN:   That's fine, Counsel.
16        MR. FLECKMAN:  And quit telling me not
17   to interrupt.
18        MR. BREEN:  Counsel, the objection under
19   the rules is "objection, form," and that's the
20   objection.  Objection, privileged or any other basic
21   objections under --
22        MR. FLECKMAN:  No, there's an additional
23   basis of objection.  I've raised it.  I've told you
24   that if you continue to ask in a hostile tone of this
25   witness questions that you've already secured answers
```

Page 193

```
1    to it becomes discovery abuse and I'm going to stop
2    it.
3         MR. BREEN:  All right.  Counsel, like I
4    said --
5         MR. FLECKMAN:  Okay.  You go ahead.
6    Just go ahead.
7         MR. BREEN:  -- Counsel, you can do what
8    you think you need to do, but let me complete my
9    question.
10        MR. FLECKMAN:  Okay.
11 Q. (BY MR. BREEN)  Isn't it true, sir, that your
12   superiors at Dey Laboratories encouraged you to market
13   Dey's products by showing customers that they can make
14   more profit on reimbursement for Dey's products than
15   its competitors?
16 A. No.
17 Q. So is it your testimony, sir, that you did
18   not believe that Mr. Upp was encouraging you to market
19   Dey's products based upon a higher reimbursement
20   profit than its competitors when he suggested you use
21   what's been marked as 29713 and it's attached to
22   Exhibit 328?
23 A. That's too organized for me.  I don't do
24   things that way.  And no is the answer.
25        MR. BREEN:  Objection.  Move to strike.
```

Page 194

```
1    Nonresponsive.
2 Q. (BY MR. BREEN)  So is it your testimony, sir,
3    that Mr. Upp was not encouraging you to market Dey's
4    products based upon the reimbursement spread?
5 A. He probably was.
6 Q. He was, wasn't he?
7 A. Probably.
8 Q. And he was your supervisor.
9 A. Yes.
10        MR. BREEN:  I'm handing counsel what has
11   been marked as Exhibit 329.  Purports to be a
12   memorandum to Mr. Gist from Rick Upp dated June 4th,
13   1995.  It's two pages.  Bates stamped DL-TX-0407069
14   and 070.
15        MR. FLECKMAN:  While he reads it --
16        MR. O'CONNELL:  Make a couple copies?
17        MR. FLECKMAN:  Yeah, let's do that.
18        MR. BREEN:  If you want to take a break
19   we can do that.
20        MR. FLECKMAN:  Yeah, let's do.
21        MR. BREEN:  Okay.
22        THE VIDEOGRAPHER:  Stand by.  The time
23   is 3:53 p.m.  Off the record.
24        (Recess from 3:53 to 4:21)
25        THE VIDEOGRAPHER:  Stand by.  We are
```

Page 203

1 Q. My question is when he said, "I want to see a
2    plan," and he puts it in writing and he sends it to
3    you in a memo on Dey Laboratories' memoranda in
4    writing, he says, "I want to see a plan," is that a
5    suggestion or an instruction?
6 A. That sounds like an -- an instruction.
7 Q. All right. Now, go back to the beginning of
8    the paragraph again.
9 A. Which paragraph?
10 Q. Same paragraph we have been reading. "As we
11    also discussed, I want you to put together a game plan
12    for covering your retail pharmacy accounts, especially
13    the independents that are members of our retail
14    GPO's."
15        You indicated a minute ago that you
16    thought that was a mere suggestion. Do you still
17    believe that he was only suggesting that or was that
18    an instruction?
19 A. It was probably an instruction.
20 Q. All right.
21 A. Sorry about that.
22 Q. Okay. And as part of his instruction he
23    tells you, "This is especially true of presentations
24    of the profit difference in the reimbursement of unit
25    dose vs. multi-dose." Do you see that?

Page 204

1 A. I see that.
2 Q. Now, I'll ask you again. Did Rick Upp ever
3    instruct you to make presentations of the profit
4    difference in the reimbursement of unit dose versus
5    multidose?
6        MR. FLECKMAN: Objection, form.
7 A. He may have instructed.
8 Q. (BY MR. BREEN) He did, didn't he?
9 A. He may have.
10 Q. Sitting here today do you think -- do you
11    think that he did?
12 A. I don't know what his thinkings were.
13 Q. Sitting here today, sir, is it your belief
14    that in June of 1995 your supervisor at Dey Laboratory
15    instructed you to put together presentations of the
16    profit difference in the reimbursement of multi -- of
17    unit dose versus multidose?
18 A. I never did it.
19        MR. BREEN: Read the question back,
20    please.
21        (Requested portion was read)
22        MR. HUDSPETH: It's already answered.
23    Are you looking for another answer?
24        MR. BREEN: It is not answered.
25        MR. HUDSPETH: There is an answer on the

Page 205

1    record.
2        MR. BREEN: The answer was "I never did
3    it." That's not -- okay. Objection. Move to strike.
4    Nonresponsive.
5 Q. (BY MR. BREEN) I asked for the question to
6    be read back. I would like you to answer the
7    question.
8        MR. HUDSPETH: Hold on. Let the
9    question be read back.
10        (Requested portion was read)
11        MR. HUDSPETH: Objection, form.
12 A. Oh. He may have.
13 Q. (BY MR. BREEN) Who did your performance
14    reviews for the period of time which would have
15    included June 14, 1995?
16 A. Rick.
17 Q. And was he a good supervisor in your opinion?
18 A. He was good. He was fair.
19 Q. Were you fair with him?
20 A. Yes.
21 Q. When he gave you an instruction to do
22    something did you ordinarily follow it?
23 A. Maybe.
24        MR. BREEN: Objection, nonresponsive.
25    Move to strike.

Page 206

1 Q. (BY MR. BREEN) Did you ordinarily follow
2    Mr. Upp's instructions to do things when he gave them
3    to you as your supervisor?
4 A. Yes.
5 Q. Did you ever get a bad performance review
6    from Mr. Upp?
7 A. Not really.
8 Q. Did he ever discuss with you your failure to
9    prepare presentations of the profit difference in the
10    reimbursement of unit dose versus multidose?
11 A. I beg your pardon.
12 Q. Did he ever discuss with you your failure to
13    prepare presentations of the profit difference in the
14    reimbursement of unit dose versus multidose?
15 A. He may have.
16 Q. Do you have any recollection of that?
17 A. No.
18 Q. You indicated a moment ago that you prepared
19    a plan in response to his instructions that he want --
20    I want to see a plan, correct?
21 A. Yes, but I'm not sure I did it.
22 Q. You don't know if you ever did a plan?
23 A. Probably didn't. I'm not into organization.
24 Q. Okay. Well, let me show you --
25        MR. BREEN: All right. And just for the