# Exhibit 396

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

CAUSE NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| ex rel. | ) |
|    VEN-A-CARE OF THE | ) |
|    FLORIDA KEYS, INC. | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC. and | ) |
| WARRICK PHARMACEUTICALS | ) |
| CORPORATION, | ) |
| | ) |
|    Defendants. | ) 53rd JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
CHRISTOPHER WILLIAM GURCHIEK
May 3, 2002

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF CHRISTOPHER WILLIAM GURCHIEK, produced as a witness at the instance of the State of Texas and duly sworn, was taken in the above-styled and numbered cause on the 3rd of May, 2002, from 9:14 a.m. to 5:01 p.m., before Debra L. Sietsma, CSR in and for the State of Texas, reported by machine shorthand, at Coudert Brothers, 600 Beach Street, San Francisco, California, pursuant to the Texas Rules of Civil Procedure and the provisions as previously set forth.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
   MR. PATRICK J. O'CONNELL,
   MR. RAYMOND C. WINTER
   Office of the Attorney General
   State of Texas
   Post Office Box 12548
   Austin, Texas   78711-2548

FOR THE RELATOR:
   MR. JAMES JOSEPH BREEN
   The Breen Law Firm, P.A.
   8201 Peters Road, Suite 1000
   Plantation, Florida   33324
     - and -
   MR. JOHN E. CLARK (Of Counsel)
   Goode Casseb Jones Riklin
     Choate & Watson, P.C.
   2122 North Main Avenue
   P.O. Box 120480

Page 2 (cont.)

   San Antonio, Texas   78212-9680
     - and -
   MS. JOY P. CLAIRMONT
   Berger & Montague, PC
   1622 Locust Street
   Philadelphia, Pennsylvania   19103

FOR DEFENDANT DEY, INC.:
   MR. STEPHEN M. HUDSPETH
   Coudert Brothers
   1114 Avenue of the Americas
   New York, New York   10036-7703
     - and -
   MR. STEVEN A. FLECKMAN
   Fleckman & McGlynn, PLLC
   515 Congress Avenue, Suite 1800
   Austin, Texas   78701-3503

Page 3

FOR DEFENDANT ROXANE LABORATORIES, INC.:
   MR. R. ERIC HAGENSWOLD
   Scott, Douglass & McConnico, L.L.P.
   One American Center, Fifteenth Floor
   600 Congress Avenue
   Austin, Texas   78701

FOR DEFENDANT WARRICK PHARMACEUTICALS CORPORATION:
   KARIN B. TORGERSON
   Locke Liddell & Sapp, LLP
   2200 Ross Avenue, Suite 2200
   Dallas, Texas   75201-6776

ALSO PRESENT:
   Mr. Richard Rienstra, Videographer

Page 4

INDEX

WITNESS: CHRISTOPHER WILLIAM GURCHIEK

| EXAMINATION | PAGE NO. |
|---|---|
|   By Mr. Winter. . . . . . . . . . . | 5 |
|   By Mr. Breen . . . . . . . . . . . | 68 |
| VIDEOTAPE NUMBER | PAGE NO. |
|   1 . . . . . . . . . . . . . | 5 |
|   2 . . . . . . . . . . . . . | 68 |
|   3 . . . . . . . . . . . . . | 127 |
|   4 . . . . . . . . . . . . . | 184 |
|   5 . . . . . . . . . . . . . | 239 |

(No exhibits were marked during this deposition).

\*-\*-\*-\*-\*

Page 9

1 college at Du Page Junior College so I could actually
2 get to play. Spent two years there, got my
3 Associate's degree, got a scholarship to Illinois
4 State to play baseball, played there for two years,
5 signed with the Kansas City Royals, played with the
6 Royals for about a half a year in Appleton, Wisconsin.
7 I signed with an independent club in Boise, Idaho,
8 played with them for a year, went back to Boise,
9 played with them for another year, and retired from
10 baseball at 26, I think, I was.
11     At that point I had a semester left of
12 college, finished up my degree, Bachelor's of Science
13 degree. Human science is the actual degree. Moved to
14 Chicago where my sister lived, tried to get a regular
15 job, as my dad would say, went to work for Kraft
16 General Foods as a salesperson in Chillicothe, Ohio,
17 worked for them for about a year, moved to Florida,
18 took a management position for an import company
19 called Teters. They imported silk flowers,
20 arrangements, that kind of stuff, sold to Wal-Marts,
21 K-Marts, that kind of -- kind of a thing, managed nine
22 merchandisers, interviewed for a pharmaceutical
23 company in Clearwater called MTS/Vangard. They sent
24 me to Atlanta, Georgia in '90 -- '91, in that area,
25 worked for MTS/Vangard for roughly two years. They

Page 10

1 filed Chapter 11 or 7, whichever is reorganization,
2 because the company still exists. They laid me off,
3 along with the entire sales force, national accounts,
4 everybody.
5     I went to work for a company called
6 Artronic, which was a medical cart-type company, had
7 medical supplies, labels, that kind of thing, worked
8 still out of Atlanta, Georgia. Worked for them for
9 about a year, interviewed for -- for a position with
10 Dey Laboratories in Atlanta in 1996. Now we're
11 getting closer to where I can remember actual dates.
12     In April of '96 Dey Laboratories hired
13 me and moved me to Houston. I lived in Houston for
14 approximately a year. I was the key account manager
15 for Dey at that time. A position opened up back in
16 Atlanta as a key account manager, and I moved back --
17 asked to be transferred to go back to Atlanta,
18 Georgia, and worked as a key account manager for --
19 for Dey in Atlanta.
20     Another year went by. I was promoted to
21 a regional sales manager where I covered the southeast
22 from Texas, basically, to Florida. I had six key
23 account managers that worked for me. A managed care
24 representative works for me, a -- two neonatology
25 specialists work for me, and that's it. That's where

Page 11

1 we are today.
2 Q. Still --
3 A. Regional manager.
4 Q. Regional account manager since 1997?
5 A. Approximately. Probably -- probably more
6    around the end of '97 or '98. And I'd -- I'd have to
7    look at records to be able to give you an exact date.
8 Q. So you retired from baseball sometime in the
9    late 1980's?
10 A. Yes.
11 Q. '89, '88?
12 A. '89 would be approximate guess.
13 Q. And where is your college degree from?
14 A. Illinois State. I have two degrees. I have
15    a Associate's from College Du Page and a degree from
16    Illinois State.
17 Q. Illinois State?
18 A. Illinois State.
19 Q. Okay. I wasn't quite understanding what you
20    were saying there.
21 A. Okay.
22 Q. And your degree from Illinois State is -- is
23    what degree?
24 A. It's a Bachelor of Science and -- and I
25    believe it's called -- human science was the degree.

Page 12

1    It was -- they used to call it a physical education
2    nonteaching degree. Basically it's all the science
3    without the teaching.
4 Q. Okay.
5 A. Okay.
6 Q. What did you play in baseball?
7 A. I played right field, sometimes center.
8 Q. Did you see the news last night where the guy
9    hit four home runs?
10 A. Yeah. Unbelievable. In the zone, as they
11    say.
12        MR. HUDSPETH: Chris was very fast in
13    right field, very -- very impressive, as well as had
14    an incredibly strong arm, still does.
15 Q. (BY MR. WINTER) When you went to work for
16    your first pharmaceutical company, that was in 1991?
17 A. Approximately.
18 Q. What did you do for that company?
19 A. I called on hospitals, wholesale DCs,
20    pharmacies, long-term care facilities, some home care.
21    I covered Georgia, South Carolina, Alabama and the
22    southern part of Tennessee.
23 Q. So were you what would be the equivalent of a
24    regional sales representative?
25 A. Territory sales representative.

Page 93

1    product?
2  A. Would they have to know the AWP for selling a
3    generic product, the people under me?
4  Q. (Nods head affirmatively).
5  A. No.
6  Q. Not have to know, but would that be something
7    that would be a factor in selling a generic product?
8  A. Not that I'm aware of, no.
9  Q. So I mean -- I don't want to -- I don't want
10    to characterize your testimony, but I just want to
11    make sure I understand it.
12       Are you saying that AWP is not a factor
13    that is considered by a salesman for Dey in selling
14    either a branded or a -- or a generic pharmaceutical
15    product?
16       MR. HUDSPETH: Objection, form.
17 Q. (BY MR. BREEN) My question is: Is that what
18    you're saying?
19 A. I'm saying that anybody that works for me,
20    for them to know what our AWP is on any given product
21    is not a factor in selling the product, to my
22    knowledge.
23 Q. Okay. Do you know if knowledge of the AWP is
24    a factor for anybody else selling Dey's branded or
25    generic products?

Page 94

1  A. No, I do not.
2  Q. Okay. Has it ever been a factor for you in
3    selling Dey's branded or generic products since
4    your -- the beginning of your time with Dey?
5  A. Knowing AWP?
6  Q. Knowing the AWP of a particular product.
7  A. It has never been a factor in selling Dey
8    product, not for me.
9  Q. Do you think it's ever been a factor for any
10    of your customers in deciding whether or not they
11    should buy a Dey product?
12       MR. HUDSPETH: Objection, form.
13       THE WITNESS: I don't know.
14 Q. (BY MR. BREEN) Have you ever had a suspicion
15    or perception that it might be a factor?
16       MR. HUDSPETH: Objection, form.
17       THE WITNESS: I don't know if I've
18    ever -- no. I don't believe I've ever had a suspicion
19    that it was a factor.
20 Q. (BY MR. BREEN) Have you ever heard anybody,
21    be they with Dey or with another entity or business,
22    ever articulate to you that AWP may be a factor in
23    deciding whether or not to buy a branded or generic
24    pharmaceutical product?
25       MS. TORGERSON: Objection, form.

Page 95

1       MR. BREEN: Now everybody's picking on
2    me.
3       THE WITNESS: Not -- not to my
4    knowledge. Not that I can recall right now.
5  Q. (BY MR. BREEN) Does the Georgia Medicaid
6    program reimburse for any of Dey's pharmaceutical
7    products that it sells to home care pharmacies?
8  A. Does the Georgia Medicaid program --
9  Q. Program reimburse for any of Dey's products
10    that it sells to home care pharmacies?
11 A. I believe they do.
12 Q. Okay. And may I ask why you have the
13    perception that they do?
14 A. Because our product is on their formulary.
15 Q. And how do you know that?
16 A. Because we submitted it to the State of Texas
17    when we -- or the State of Georgia when we first
18    launched DuoNeb.
19 Q. Did you -- were you personally involved in
20    that process?
21 A. No.
22 Q. Now, you mentioned DuoNeb, but my question
23    specifically is: Does the Georgia Medicaid program
24    reimburse for any of Dey's products?
25       So we know they reimburse for DuoNeb,

Page 96

1    correct?
2  A. Yes.
3  Q. Okay. And do you know whether you needed a
4    J code for Georgia Medicaid to reimburse for DuoNeb?
5  A. For Medicaid?
6  Q. Georgia Medicaid.
7  A. I don't believe so.
8  Q. Did it have to be FDA approved?
9  A. To be on their formulary?
10 Q. Yes.
11 A. I believe so.
12 Q. Did you have to submit any kind of price
13    information to the Georgia Medicaid program for DuoNeb
14    to be on the formulary for Georgia Medicaid?
15 A. I don't know.
16 Q. Do you know who actually submitted the
17    information required by Georgia Medicaid to
18    successfully place DuoNeb on the Georgia Medicaid
19    formulary?
20 A. No, I don't.
21 Q. Do you have a perception of who in connection
22    with Dey or what department in connection with Dey
23    would have responsibility for that function?
24 A. I would think it would be contracts.
25 Q. Do you know who's in charge of that

Page 109

1  Q. All right. So in -- in the spring of '96
2     when you went to work for Dey, you had never really
3     had occasion to read Drug Topics or read the
4     Pharmaceutical Representatives Magazines or anything
5     like that; is that correct?
6  A. No. Very rarely if I did at all.
7  Q. And -- and it -- would it be accurate to say
8     that you had a general understanding of how Medicare
9     reimburses for pharmaceutical products at that point?
10 A. I knew that there was some kind of
11    reimbursement; but how it worked, I -- I really didn't
12    have any understanding of that.
13 Q. Would it be accurate to state that your
14    understanding of that Medicare reimbursement of
15    pharmaceutical products when you went to work for Dey
16    in the spring of '96 was -- was -- was less than it is
17    today?
18 A. Yes.
19 Q. Okay. And -- and we pretty well -- you
20    pretty well testified what your understanding of it is
21    today, correct?
22 A. Correct.
23 Q. All right. Now, would it be accurate to
24    state that you had -- well, let me just ask the
25    question.

Page 110

1     Did you have a -- the same, better or
2     less understanding of how Medicaid reimburses for
3     Dey's products when you first went to work for Dey in
4     the spring of '96?
5  A. Between Medicare and Medicaid?
6  Q. Correct.
7  A. I probably thought of them both as the same.
8  Q. Okay.
9  A. Not much information about either one of
10    them.
11 Q. Okay. Now, I asked you a little while ago
12    about your understanding of how Medicaid reimburses
13    for Dey's products in Georgia today.
14    Do you have a understanding of how
15    Medicaid reimburses for Dey's products in Florida
16    today?
17 A. Do I know what the reimbursement is?
18 Q. Yes.
19 A. No.
20 Q. Do you know what -- what method or mechanism
21    is employed to determine how much to reimburse for
22    Dey's products in Florida?
23 A. No. I believe they use -- I don't know
24    the -- the scale. I don't know their reimbursement
25    rate; but I believe Florida is an AWP state, meaning

Page 111

1     they use AWP for reimbursement.
2  Q. Okay. Now --
3  A. I -- I believe that.
4  Q. I understand. And if you believe it or
5     that's your comprehension --
6  A. Yeah.
7  Q. -- just say that, and I understand.
8  A. Okay.
9  Q. It's not a test.
10 A. Sure.
11 Q. And if -- you know, if they reimburse some
12    other way, it's not -- I just want to know what your
13    understanding is.
14 A. Yeah.
15 Q. Have you ever had an understanding that
16    Florida reimbursed for Dey's products through Medicaid
17    in a different manner than you just testified about?
18 A. The generic products?
19 Q. Any of Dey's products.
20 A. Any Dey products?
21    I -- I believe Florida products that we
22    sold in the state of Florida might have been MAC'd.
23 Q. The generic products?
24 A. Yes.
25 Q. Okay. What do you mean by MAC'd?

Page 112

1  A. Maximum allowable cost, I believe, is what it
2     stands for.
3  Q. And do you know how Florida would determine
4     maximum allowable cost for Dey's products?
5  A. No, I -- I don't.
6  Q. Okay. All right. Sitting here today, do you
7     have an understanding of how the method that -- that
8     Georgia employs to determine reimbursement for Dey's
9     products?
10 A. I believe they use Minnesota Multistate.
11 Q. Minnesota Multistate?
12 A. Correct.
13 Q. What is that?
14 A. It is an organization that has been created,
15    I believe, to handle state formularies for certain
16    states that either are struggling to keep their end of
17    the information updated, that kind of thing. So
18    they'll -- I believe Georgia's a -- uses Minnesota
19    Multistate for their formulary, so to speak.
20 Q. In determining how much to pay for drugs?
21 A. In determining what products would be
22    available --
23 Q. Okay.
24 A. -- on state --
25 Q. Right now we're talking about determining

Page 253

1  Q. Yes.
2  A. Since I've been with Dey, not that I'm aware
3     of.
4  Q. Okay. And the next page you'll see in the
5     middle of the page it says "Formulary, Brand, Generic,
6     Link to/Systems." And then the next bullet point is
7     "Pricing (AWP versus cost)."
8        Do you see that?
9  A. Yes, I do see it.
10 Q. Have you ever seen or been aware of any
11    discussions at Dey regarding pricing where AWP is
12    compared to cost?
13 A. In a Dey forum?
14 Q. Dey forum or words uttered by Dey people, any
15    form whatsoever.
16 A. Have I ever heard of AWP versus cost?
17 Q. Correct.
18 A. Not that I'm aware of, no.
19 Q. Being discussed in -- with respect to
20    pricing.
21 A. AWP versus cost?
22 Q. Just like you see it in front of you here,
23    correct.
24 A. No.
25 Q. Do you see out to the side somebody's wrote

Page 254

1     "Spread, branded 28 percent, generic" -- 38 to
2     50 -- or "30 to 50 percent"? Do you see that?
3  A. Yes.
4  Q. Does that mean anything to you?
5  A. No.
6  Q. Okay. Is Ross Uhl still with the company?
7  A. Ross Uhl, no, I -- he is not.
8  Q. Do you know what -- where he is?
9  A. No, I do not.
10 Q. Do you know if he retired?
11 A. Retired from?
12 Q. From -- from working, period.
13 A. Oh, I have no idea.
14 Q. Do you know when he left Dey?
15 A. I'd be guessing, no. A couple years ago,
16    year ago. I -- I don't recall.
17 Q. Okay. Do you know if he -- did he -- was he
18    in Napa when he left Dey?
19 A. No. Ross lived in Atlanta, Georgia.
20 Q. Atlanta.
21    And his title at that time was what?
22 A. He was the national account manager.
23 Q. National account manager.
24    Okay. All right. Just a couple things
25    to sum up.

Page 255

1     After you went to the Attorney General
2     in Texas or called the Attorney General, did you ever
3     report to anybody else at Dey that you had done so?
4        MR. HUDSPETH: Objection, form.
5  Q. (BY MR. BREEN) Or you did call the Attorney
6     General in 1996, correct?
7  A. When I -- at that time when I did that --
8  Q. Right.
9  A. -- did I tell anybody the day after or the --
10 Q. Let me restate the question.
11 A. Okay.
12 Q. You called the Attorney General in 1996,
13    correct --
14 A. Correct.
15 Q. -- in Texas.
16    And before calling the Attorney General,
17    you did not inform anybody at Dey that you were going
18    to do that, did you?
19 A. No, I did not.
20 Q. All right. After calling the Attorney
21    General, did you ever report to anybody at Dey that
22    you had called the Attorney General?
23 A. Yes.
24 Q. Okay. Who did you first report it to and
25    when?

Page 256

1  A. I reported it to the same people that I've
2     given you before that I've talked to and about the
3     Texas Medicaid situation that I was experiencing in
4     1996.
5  Q. Did you tell anybody in 1996 that you had
6     called the Attorney General?
7  A. Not that I believe, no.
8  Q. Did you tell anybody in 1997 that you had
9     called the Attorney General?
10 A. Not that I recall.
11 Q. So it wasn't until this discussion was had a
12    year or two ago with some members of senior management
13    of Dey Laboratories that you revealed that you had
14    called the Texas Attorney General?
15    MR. HUDSPETH: Objection, form.
16    THE WITNESS: I don't recall when I
17 first told them. It -- it came up whenever I first
18 had my discussion with some of the upper management
19 people, and those are the people that I gave you
20 before who I spoke with about the specific Texas
21 issue. I did mention -- when I mentioned that, I also
22 mentioned -- it might not have been the first
23 conversation. It might not have been in the second
24 conversation, but at some point I did let them know my
25 frustration and also that I had made a phone call to