# Exhibit 397

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| ex rel. | ) |
|    VEN-A-CARE OF THE | ) |
|    FLORIDA KEYS, INC., | ) |
|       Plaintiff(s), | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC., WARRICK | ) |
| PHARMACEUTICALS CORPORATION, | ) |
| SCHERING CORPORATION, | ) |
| SCHERING-PLOUGH CORPORATION, | ) |
| LIPHA, S.A., MERCK-LIPHA, | ) |
| S.A., MERCK, KGAA, and EMD | ) |
| PHARMACEUTICALS, INC., | ) |
|       Defendant(s). | ) 53RD JUDICIAL DISTRICT |

**********************************************

ORAL AND VIDEOTAPED DEPOSITION OF
WILLIA TATE
February 7th, 2003

**********************************************

ORAL AND VIDEOTAPED DEPOSITION OF WILLIA TATE, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on February 7th, 2003, from 10:05 a.m. to 4:03 p.m., before Cynthia Vohlken, CSR in and for the State of Texas, reported by machine shorthand, at the Napa Valley Marriott Hotel, 3425 Solano Avenue, Napa, California pursuant to the Texas Rules of Civil Procedure.

Page 2

APPEARANCES

FOR THE PLAINTIFF(S):
   MR. RAYMOND C. WINTER
   Office of the Attorney General
   State of Texas
   Post Office Box 12548
   Austin, Texas 78711-2548

FOR THE RELATOR:
   MR. FRANK M. PITRE
   Cotchett, Pitre, Simon & McCarthy
   840 Malcolm Road, Suite 200
   Burlingame, California   94010

FOR THE DEFENDANT(S) DEY, INC.:
   MR. DARRELL PRESCOTT
   Coudert Brothers, LLP
   1114 Avenue of the Americas
   New York, New York 10036-7703
   -and-

Page 2 (cont.)

   MR. STEVEN A. FLECKMAN
   Fleckman & McGlynn, P.L.L.C.
   515 Congress, Suite 1800
   Austin, Texas 78701-3503

FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
   MR. R. ERIC HAGENSWOLD
   Scott, Douglass & McConnico, L.L.P.
   One American Center, Fifteenth Floor
   600 Congress Avenue
   Austin, Texas 78701

Page 3

FOR THE DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
   MR. JOHN P. MCDONALD
   Locke Liddell & Sapp, LLP
   2200 Ross Avenue, Suite 2200
   Dallas, Texas 75201-6776

ALSO PRESENT:
   Mr. Thomas A. Temmerman,
      California Office of the
      Attorney General
   Mr. Zachary Taylor Bentley, II
   Mr. Richard Rienstra, Videographer

Page 4

INDEX

| | |
|---|---|
| Appearances................................... | 2 |
| WILLIA TATE | |
|    Examination by Mr. Winter.............. | 6 |
|    Examination by Mr. Fleckman............ | 197 |
|    Examination by Ms. Torgerson........... | 226 |
|    Examination by Mr. Pitre............... | 228 |
| Signature and Changes........................ | 232 |
| Reporter's Certificate....................... | 234 |
| VIDEOTAPE NUMBER | |
|    1 ................................... | 5 |
|    2 ................................... | 82 |
|    3 ................................... | 154 |
|    4 ................................... | 220 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 471 | ........................................... | 107 |
| | Training material | |
| 472 | ........................................... | 142 |
| | Executive Summary, American Drug Stores, Salt Lake City, Utah | |
| 473 | ........................................... | 154 |
| | Confidential Dey Sales & Marketing 2000 Business Plan | |
| 474 | ........................................... | 175 |
| | String of e-mails | |

Page 16

1  you came to the Bay area in 1989 as a regional
2  manager --
3  A. Uh-huh.
4  Q. -- and how long --
5  A. Yes.
6  Q. -- did you stay with Novo Nordisk?
7  A. I was with Novo Nordisk for 11 years.
8  Q. Until --
9  A. Until I went to Dey September 1, '97.
10 Q. '97. Okay.
11 A. Yes.
12 Q. So 11 years including the -- going back to
13    your time in Ohio?
14 A. Sales rep, yes.
15 Q. Okay. So September 1, '97 you came to Dey
16    Labs.
17 A. Yes.
18 Q. Why did you transfer from Novo Nordisk to Dey
19    Labs?
20 A. Because I wanted to get the home office
21    experience of the management side without moving to
22    New Jersey, which is what I would have to do with
23    Novo.
24 Q. Because the home office of Novo was in --
25 A. New Jersey.

Page 17

1  Q. -- New Jersey. Did you say Princeton?
2  A. Princeton.
3  Q. Were you recruited to Dey or did you actively
4     solicit the employment or how did you first make
5     contact with Dey and find out about the opening?
6  A. A recruiter called me thinking I was William,
7     so that's how I found out about Dey.
8  Q. Thinking you were William?
9  A. Yes, because my name is W-i-l-l-i-a and
10    everybody likes to think it's William.
11 Q. So there is an i"?
12 A. Yeah, there is an "i".
13 Q. Before the "a" at the end. There's two i's?
14 A. No. W-i-l-l-i-a.
15 Q. Okay.
16 A. It is William without the "m" and then, of
17    course, my middle name is May, so my middle initial is
18    M.
19 Q. I'm glad you --
20 A. So I got a little perturbed because she
21    thought I was William and I wasn't.
22 Q. I'm glad you cleared that up for me because
23    I've had a bit of a question in my mind as to whether
24    or not there was an "i" before the "a" --
25 A. Yes.

Page 18

1  Q. -- and I've seen it both ways on some
2     documents.
3  A. Uh-huh.
4  Q. Okay. So I appreciate you --
5  A. Okay.
6  Q. -- telling us that. Okay. So the recruiter
7     called you and in the context of you setting him
8     straight that you're Willia and not William --
9  A. Right.
10 Q. -- you found out about the position?
11 A. Yes.
12 Q. Okay. And did you interview with somebody at
13    Dey?
14 A. Yes.
15 Q. Who did you interview with?
16 A. Bob Mozak, Robert. He's not the only one,
17    but that's the first person --
18 Q. And who else?
19 A. -- I made contact with. Pam Marrs, CFO,
20    Amelia Villegas, DHR. She was at that time director
21    of HR. And Debbie Bronstein, who was the head of
22    marketing, was director of marketing.
23 Q. Did you interview with Mr. Rice as well?
24 A. I met him. I didn't formally interview with
25    him.

Page 19

1  Q. And when you were hired on what was your
2     first job title?
3  A. I was director of institutional sales, which
4     was the hospital side, which also encompassed the
5     inside sales department and building a sales training
6     department, which they were just starting.
7  Q. Inside sales, hospitals and sales training --
8  A. Yes.
9  Q. -- is that correct? And who was your direct
10    supervisor?
11 A. Bob Mozak.
12 Q. And what was Mr. Mozak's title at the time?
13 A. Executive vice president of sales and
14    marketing.
15 Q. Was there a director of sales in place?
16 A. No.
17 Q. So that --
18 A. We were the directors. There were three
19    directors of sales. Mine was of the institutional.
20    There was a director of trade, which was Bruce Tipton,
21    and he had trade and managed care, what they call
22    trade and managed care. And there was Ed Marcoon, who
23    was the director of what they called clinical at that
24    time, which was the office based salespeople.
25 Q. Clinical. So inside sales was you?

Page 32

1  meetings like once a quarter or once a month that
2  Mr. Rice also attended?
3  A. He had a quarterly management meeting where
4  he met with all of the managers and directors of the
5  organization as a whole in a big group. So that was
6  the only fixed meetings that we had.
7  **Q. Other than the quarterly management meeting**
8  **did you have ad hoc meetings that were on a schedule**
9  **that came up as needed where you would meet Mr. Rice?**
10 A. It would be as needed.
11 **Q. Okay. And you left -- did you maintain the**
12 **position as director of sales until such time as you**
13 **left Dey?**
14 A. Yes.
15 **Q. Which was in December of 2001 -- '2?**
16 A. Just 2002.
17 **Q. 2002. Why did you leave Dey?**
18 A. The job was eliminated.
19 **Q. Does that mean that they --**
20 A. Said --
21 **Q. They fired you, did they --**
22 A. Said it doesn't -- no. I was -- the job was
23 downsized, it doesn't exist anymore, and I was given a
24 severance. Is that what you mean, severance package
25 or --

Page 33

1  **Q. I see. Did they give you a choice or did**
2  **they just say, "Sorry, we're eliminating your job and**
3  **here's" --**
4  A. No, they didn't give me a choice.
5  **Q. Okay. But they gave you a package to --**
6  A. Yes.
7  **Q. Okay. And did you then immediately take the**
8  **position that you have now?**
9  A. It was -- I interviewed for quite a few
10 positions, but it -- I didn't formally accept the job
11 until the end of December. It was about three weeks
12 later.
13 **Q. Do you know whose decision it was to**
14 **eliminate your position?**
15 A. I was told it was the vice president of
16 sales. Bob retired, was going to retire at the end of
17 the year. They brought in a vice president of sales.
18 They kind of split -- there's no more executive vice
19 president of sales and marketing. There's a vice
20 president of sales and a vice president of marketing.
21 And I was told that she and Mr. Engle, who is the new
22 CEO who was the COO at that time, after Mr. Rice left
23 at the end of the year made the decision. That's what
24 I was told.
25 **Q. So you -- you understood that Mr. Engle and**

Page 34

1  the new vice president of sales made the determination
2  to reorganize and eliminate your position?
3  A. That they did not need that position anymore.
4  **Q. Who is the new vice president of sales?**
5  A. Okay. Let me think of her name now. I did
6  this the other day. I must not want to remember her
7  name. Christy Taylor.
8  **Q. Was Ms. Taylor somebody who was new to the**
9  **organization, new to the company?**
10 A. Yes. She had come in in October. September,
11 I'm sorry. I misspoke. September.
12 **Q. September of '02?**
13 A. Yes.
14 **Q. Do you know where she came from?**
15 A. Yeah. She came from a temp organization.
16 I'll think -- I'll think of the name of it. I don't
17 recall it right now, but she had worked with Mr. Engle
18 in a prior company, Allergan, in a sales capacity.
19 **Q. But Mr. Engle had been at Dey longer than she**
20 **had; is that correct?**
21 A. Yes. He came in in January.
22 **Q. Of '02?**
23 A. Yes.
24 **Q. Okay. During the time period that you were**
25 **at Dey you were aware of the lawsuit that's -- that we**

Page 35

1  are here to talk about today?
2  A. I was aware there was a lawsuit, yes.
3  **Q. How did you become aware of that?**
4  A. They asked for everybody to give any
5  documents prior to -- I want to -- it seems like I
6  remember '95. Any documents anybody had and they had
7  certain things. I wasn't very much involved because
8  of the fact that it -- I wasn't there at that time and
9  when I came in I really got no records because my job
10 had -- the office I got didn't have anything in it.
11 It had -- everything had been -- I don't know. The
12 lady who left the job, the company was building a new
13 building and the building we were in was temporary, so
14 they made a conference room an office for me and I
15 didn't really inherit anything because of the fact
16 that those things were not in the purview of what I
17 was getting ready to do in the organization, so I just
18 built everything I had from scratch.
19 **Q. Now, you're referring to back when you first**
20 **came to Dey --**
21 A. As institutional.
22 **Q. -- in September of '97?**
23 A. Yes.
24 **Q. And who was the person that you were**
25 **replacing? Who had held your job previously?**

Page 216

1  contamination. And when people are very ill, such as
2  people who use nebulized solutions, you can end up
3  invoking infections upon those people just passing it
4  on and reusing that vial. And from the standpoint of
5  also not having very precise drawing up techniques of
6  what the patient is actually getting. So there's just
7  a lot of inherent problems that those patients just do
8  not need, that unit-dose takes that away. Because
9  it's a unit of use used specifically for a patient,
10 not one vial used over many patients and carried
11 around and subject to contamination.
12 Q. There's a single use for the unit-dose then
13    and then you're done with it.
14 A. Yes.
15 Q. So no risk of contamination to the patient
16    population.
17 A. No.
18 Q. Has anyone at Dey ever suggested to you that
19    WAC is not your published invoice price?
20 A. No.
21 Q. If someone were to suggest that to you would
22    you regard that as accurate or inaccurate?
23 A. I would think it was inaccurate.
24 Q. Do you believe that a -- as you understand
25    it, I think you testified to your understanding of

Page 217

1  Medicaid, you're not -- you've never been involved
2  with the administration of the Medicaid program, have
3  you?
4 A. No.
5 Q. Okay. And you don't really interact with the
6    Medicaid program in any way, do you?
7 A. No.
8 Q. Okay. So you don't know how it operates at
9    the state level in Texas or doesn't operate, correct?
10 A. No.
11 Q. And you're not purporting to express any
12    opinion on that issue today, are you?
13 A. No.
14 Q. The questions that sought to elicit from you
15    some opinions as to the Medicaid program are basically
16    your guesses about that subject, I take it?
17 A. Yes.
18       MR. WINTER: Objection, form.
19       MR. PITRE: Objection, form.
20 Q. (BY MR. FLECKMAN) You don't have any basis
21    and expertise to render opinions about the Medicaid
22    program, do you?
23 A. No.
24       MR. WINTER: Objection, form.
25 Q. (BY MR. FLECKMAN) Whether it's a Medicaid

Page 218

1  patient population or any other patient population do
2  you feel that Dey's products had superior advantages?
3       MS. TORGERSON: Objection, form.
4 A. Absolutely.
5 Q. (BY MR. FLECKMAN) And do you believe that
6    those products that -- do you believe that it was an
7    appropriate objective to get those products in the
8    hands of patients?
9 A. Absolutely.
10 Q. For their health welfare?
11 A. Yes.
12 Q. And if you are selling a product at Dey, a
13    generic product at Dey that has superior qualities or
14    good qualities and no one will buy that product, are
15    you going to be successful in getting that product in
16    the hands of the patients who need them?
17 A. No.
18 Q. Take a look with me at Exhibit 471.
19 A. Okay.
20 Q. Are you aware of anyone at Dey who was
21    actually using this particular -- any of these
22    particular documents to -- to do any selling of your
23    products?
24 A. No, I'm not.
25 Q. Whatever may have been the history with

Page 219

1  regard to Mr. Tipton and Mr. Uhl and Rick Upp during
2  the period prior to the time you got to Dey have you
3  understood -- what have you understood since you
4  arrived at Dey was the policy of Dey in terms of
5  selling your products with respect to the issue of
6  Medicaid reimbursement?
7       MR. WINTER: Objection, form.
8 Q. (BY MR. FLECKMAN) Since --
9 A. I'm not sure. I don't know what you're
10    asking me.
11 Q. Okay. Let me ask, you arrived at Dey in
12    late -- or in September --
13 A. 1997.
14 Q. -- 1997. Since that time what has been your
15    understanding of the way that Dey wants its products
16    sold?
17 A. It was based on the fact that we had value
18    added, value propositions in our products that would
19    allow us to be able to market and sell our products
20    based on those merits.
21 Q. And have you personally observed any behavior
22    since you took over the sales -- I think initially
23    institutional sales, have you observed any situations
24    in which Medicaid reimbursement was used within Dey as
25    a selling or marketing tool?

Page 220

1  A. No.
2  Q. Have you been asked to use -- to make use of
3     Medicaid reimbursement as a selling or marketing tool
4     by any executives at Dey?
5  A. No.
6  Q. This -- this may not be in your area since
7     you don't work in contracts, but do you -- are you
8     able to determine when Dey ships product to a
9     wholesaler like McKesson or Cardinal how that -- how
10    particular shipments or lots of product are going to
11    be resold by them or -- or distributed by that
12    wholesaler, can you determine that when you ship the
13    inventory to the wholesaler?
14 A. No, unless we have some kind of special
15    arrangement.
16       THE VIDEOGRAPHER: We need to change our
17    videotape.
18       MR. FLECKMAN: We can do that now.
19       THE VIDEOGRAPHER: We are off the record
20    at 3:37 p.m. This concludes Tape Number 3.
21       (Discussion off the record)
22       THE VIDEOGRAPHER: We're back on the
23    record at 3:39 p.m. This is the beginning of Tape 4.
24 Q. (BY MR. FLECKMAN) Do you know how much
25    product -- what percentage of Dey's product would be

Page 221

1     resold by a wholesaler at or above WAC?
2  A. No.
3  Q. Do you know what percentage of Dey's product
4     would be sold by a wholesaler -- resold by a
5     wholesaler below WAC?
6  A. No. I'd be guessing.
7  Q. Do you -- were you ever involved in the
8     launch of a generic product as against a brand product
9     while you were at Dey?
10 A. No.
11 Q. Is it necessary for a pharmacy to carry Dey's
12    products in order for the product to be available to
13    the pharmacy's patients who come in with a
14    prescription?
15 A. Yes.
16 Q. Do you think a pharmacy would carry Dey's
17    products if it could make a bigger profit on a
18    competitor's product?
19 A. Yes.
20 Q. Do you think that a pharmacy would favor the
21    competitor's product if it could make a bigger profit
22    on the competitor's product?
23 A. I don't know. I would be -- I would be
24    assuming what the pharmacy would do, but maybe that's
25    why I didn't have a hundred percent market share. So

Page 222

1     I can only guess. That's the only reason I believe I
2     do.
3        MS. TORGERSON: Objection,
4     nonresponsive.
5        THE WITNESS: Uh-oh.
6  Q. (BY MR. FLECKMAN) Do you know what AMP is?
7     AM, as in Mary, P as a term used in the industry?
8  A. I know what it is. It's probably a lot more
9     fuzzy what it means to me.
10 Q. Okay. This is not something that -- that you
11    would have a definite idea of its definition or how
12    it's calculated?
13 A. I kind of saw it more as an inter -- some
14    people used one, some people used AWP, some people
15    used AMP, it just depended. It was a terminology
16    thing. I didn't really know what the clear definition
17    of AMP by itself is.
18 Q. Okay. Tell us, if you would, what you meant
19    by the best price and how free goods would go into the
20    calculation of best price on a generic product.
21 A. It was my understanding that we had to report
22    anything that would affect what's called the absolute
23    best price in the market for your product to the VA
24    for purposes of making sure that they always had your
25    best price.

Page 223

1  Q. Did --
2  A. So I know we were always careful to make sure
3     anything that would affect price would be reported.
4  Q. That -- that include rebates?
5  A. Yes.
6  Q. Would it include other discounts?
7  A. Anything that would affect the price -- the
8     absolute price of the product, yes.
9  Q. And that was reported to the Veterans
10    Administration of the federal government?
11 A. Yes.
12 Q. How -- how often was it reported? At least
13    annually?
14 A. I was under -- under the impression at least
15    annually and that you had to monitor it ongoing to
16    make sure they always knew. It was your
17    responsibility.
18 Q. Did Dey attempt to do that?
19 A. Yes.
20 Q. Did it do that religiously and in good faith?
21 A. Yes.
22 Q. And was that the entire period of time that
23    you were affiliated with Dey?
24 A. Yes.
25 Q. So as you understood it the government had

Teringer, Kate                                                              April 4, 2007
Philadelphia, PA

```
                                                                    Page 1
  1              STATE OF WISCONSIN CIRCUIT COURT

  2                  DANE COUNTY, BRANCH 7

  3

  4    STATE OF WISCONSIN,       :

  5                              :

  6              Plaintiff,      :

  7                              : Case No. 04-CV-1709

  8       vs.                    : Unclassified-Civil:

  9                              : 30703

 10    AMGEN, INC., et al.,      :

 11              Defendants.     :

 12              (CAPTION CONTINUED)

 13            Oral deposition of KATE TERINGER,

 14    was taken, pursuant to notice(s), at THE

 15    PHILADELPHIA AIRPORT MARRIOTT, One Arrivals

 16    Road, Business Suite No. 822, Philadelphia,

 17    Pennsylvania, on Wednesday, April 4, 2007,

 18    beginning at 11:50 a.m., before, M. Kathleen

 19    Muino, Professional Shorthand Reporter and

 20    Notary Public, there being present:

 21

 22                       - - -
```

```
 1   were explaining what the unit price is, and you
 2   mentioned that it was the actual price, not to be
 3   confused with the purchasing price?
 4   A.    Correct.
 5   Q.    I just want to make sure I understand what
 6   that means.  Can you just kind of try to explain
 7   that a little more?
 8   A.    In the sale record, the unit price is the
 9   price the customer is charged for that line item,
10   not to be confused with any other pricing that
11   might happen within receiving. Obviously, if
12   AmerisourceBergen receives a product, that unit
13   price is different from the price charged to the
14   customer.
15   Q.    Would the unit price be the same as a
16   contract price?
17   A.    It could be, if the item was sold on
18   contract.
19   Q.    Okay.  And --
20   A.    With a markup, usually.  So you would have
21   the contract price and a markup applied.
22   Q.    So the unit price would equal a contract
```

```
 1   price plus markup?
 2   A.    Yes, if it's a contract sale.
 3   Q.    Are there any discounts or anything that
 4   would be taken into consideration with the unit
 5   price?
 6   A.    Not at that point.
 7           MS. EATHERTON:  Okay.  That's it for my
 8   questions.
 9           MR. DUEFFERT:  I have one follow-up and
10   then we can go to the phone.
11                        - - -
12                 RE-CROSS-EXAMINATION
13                        - - -
14   BY MR. DUEFFERT:
15   Q.    On unit price, as shown in the data, would
16   that reflect all shipping and handling charges
17   charged to the customer?
18   A.    No, actually, I don't think it does.  There's
19   a shipping and handling charge that is calculated
20   separately and kept in the invoice header.  So
21   freight charges are calculated outside that unit
22   price charged to the customer.  That's their price
```