# Exhibit 398

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 243

NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS ex rel. VEN-A-CARE OF THE FLORIDA KEYS, INC., Plaintiff(s), | ) IN THE DISTRICT COURT ) ) ) ) ) |
| VS. | ) TRAVIS COUNTY, TEXAS ) |
| DEY, INC.; ROXANE LABORATORIES, INC., WARRICK PHARMACEUTICALS CORPORATION, SCHERING CORPORATION, SCHERING-PLOUGH CORPORATION, LIPHA, S.A., MERCK-LIPHA, S.A., MERCK, KGAA, and EMD PHARMACEUTICALS, INC., Defendant(s). | ) ) ) ) ) ) ) ) ) ) ) 53RD JUDICIAL DISTRICT |

************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
PAM MARRS
April 16th, 2003
Volume 2
(Contains Attorneys' Eyes Only Under Separate Cover)

************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF PAM MARRS, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on April 16th, 2003, from 9:13 a.m. to 2:50 p.m., before Cynthia Vohlken, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Napa Valley Marriott Hotel, 3425 Solano Avenue, Napa, California pursuant to the Texas Rules of Civil Procedure.

Page 244

APPEARANCES

FOR THE PLAINTIFF(S):
  MR. RAYMOND C. WINTER
  Office of the Attorney General
  State of Texas
  Post Office Box 12548
  Austin, Texas 78711-2548

FOR THE RELATOR:
  MR. JAMES JOSEPH BREEN
  The Breen Law Firm, P.A.
  P. O. Box 297470
  Pembroke Pines, Florida 33029-7470
  -and-
  MR. FRANK M. PITRE
  Cotchett, Pitre, Simon & McCarthy
  840 Malcolm Road, Suite 200

Page 244 (cont.)

  Burlingame, California   94010

FOR THE DEFENDANT(S) DEY, INC.:
  MR. DARRELL PRESCOTT
  MS. LISA LEWIS
  Coudert Brothers, LLP
  1114 Avenue of the Americas
  New York, New York 10036-7703

FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
  MR. R. ERIC HAGENSWOLD
  Scott, Douglass & McConnico, L.L.P.
  One American Center, Fifteenth Floor
  600 Congress Avenue
  Austin, Texas 78701

Page 245

FOR THE DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
  MS. ELIZABETH E. MACK
  Locke Liddell & Sapp, LLP
  2200 Ross Avenue, Suite 2200
  Dallas, Texas 75201-6776

ALSO PRESENT:
  Ms. Kirsten L. Flanagan, CPA
  Mr. Zachary Taylor Bentley, II
  Mr. Brian Bobbitt, Videographer

Page 246

INDEX

| | |
|---|---|
| Appearances.................................. | 244 |
| **PAM MARRS, VOLUME 2** | |
| Examination by Mr. Winter.............. | 250 |
| Examination by Mr. Breen............... | 327 |
| Examination by Mr. Hagenswold.......... | 414 |
| Examination by Ms. Mack................ | 415 |
| Signature and Changes........................ | 419 |
| Reporter's Certificate....................... | 421 |
| **VIDEOTAPE NUMBER** | |
| 1 ................................... | 247 |
| 2 ................................... | 308 |
| 3 ................................... | 362 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 872 | Memo from Bruce Tipton to Bob 5/23 | 361 |
| 873 | 1995 Compensation Criteria (Part B) | 361 |
| 874 | May 8, 1995 Memorandum from Robert Covay to Bruce Tipton, Re: Achievement of Objectives for 1995 Commissions | 361 |
| 875 | Dey Laboratories, L.P. Monthly Product | 368 |

Page 322

1  response to the second HHS OIG subpoena was broader
2  than the first HHS OIG subpoena?
3  A. Well, again, to the extent that the questions
4     were different, yes.
5  Q. In either -- in your efforts to respond to
6     either the first HHS OIG subpoena or the second HHS
7     OIG subpoena did Dey disseminate the document request
8     itself to anyone other than the contracts department?
9  A. Yes. I don't remember -- I don't have a
10    complete list of who we gave it to, but the process
11    would be it would come in, I would have my secretary
12    make copies and give it to the affected people,
13    whether it be Charles, Bob, people in accounting or
14    sales and marketing. But I don't -- I didn't keep a
15    list of who I gave it to to be quite honest. You
16    know, I'm pretty sure that Russ has a copy, I believe
17    Cindy has -- had a copy. I know Bob and Charles got
18    copies.
19 Q. You believe that Cindy had a -- Cindy Daulong
20    had a copy of the subpoena itself that's Exhibit 555?
21 A. I think so. Again, I'd have to check my
22    records. I know I have a document that -- a copy of
23    the document that she received. Now I can't remember
24    if it's this one or the first one. But the process
25    would be in general that it would be distributed in

Page 323

1     its full form to whoever would be helpful in gathering
2     the documents.
3  Q. And you believe that Mr. Mozak also had
4     copies of all of these document requests, the 1997 HHS
5     OIG subpoena, the 2000 HHS OIG subpoena and the Texas
6     CID?
7  A. Yes.
8  Q. You're certain that he got copies of those
9     requests in their entirety?
10 A. Yes.
11 Q. Do you recall when Ms. Daulong left Dey's
12    employment?
13 A. I don't specifically.
14 Q. You don't remember what month or year it was?
15 A. I could guess.
16 Q. I don't want you to guess.
17 A. Okay.
18 Q. I'm just asking. You don't remember.
19 A. I mean, the record is available back at the
20    office. I just don't have a good memory for dates
21    like that.
22 Q. And what you're telling me is you don't
23    recall what month and year it was, correct?
24 A. Correct.
25 Q. Do you recall generally though that she left

Page 324

1     Dey's employment?
2  A. Yes.
3  Q. Okay. And moved back to Arkansas; is that
4     true?
5  A. Yes.
6  Q. Okay. And at the time that she left Dey's
7     employment did she come to you with a collection of
8     documents that she had compiled over the years that
9     she thought may have been responsive to some of these
10    governmental investigations?
11 A. She came to me with documents that she had in
12    her office and didn't know what to do with before she
13    left.
14 Q. Now, did she tell you that she thought that
15    some of those documents may be responsive to the
16    government's investigations?
17 A. No. She just was concerned about what to do
18    with the documents.
19 Q. She never suggested to you that she thought
20    those documents may be responsive to the government's
21    investigations?
22 A. No, I don't recall that. She was concerned
23    because she knew that we were not to throw anything
24    away and she wanted to make sure that they were --
25    that I knew about them and they were protected.

Page 325

1  Q. Why weren't you to throw anything away?
2  A. Because our attorneys had advised us of that.
3  Q. Because of the government's investigations?
4  A. Correct.
5  Q. Okay. Did Ms. Daulong also tell you what
6     Mr. Mozak told her to do with the contents of her
7     office?
8  A. She said that he had -- I don't remember the
9     exact words. Something to the effect that Bob told
10    her not to bother with it or something like that. I
11    don't recall the exact words.
12 Q. Did she tell you that Mr. Mozak had told her
13    to shred the contents of her office?
14 A. I don't -- I don't recall her using the word
15    "shred."
16 Q. Did she --
17 A. The implica -- go ahead.
18 Q. I'm sorry. You go ahead. I didn't mean to
19    interrupt.
20 A. I don't recall her using the word "shred."
21 Q. But you started to say the implication was
22    something and --
23 A. Was that he wasn't concerned about the
24    documents.
25 Q. Did she use the word "destroy"?

Page 390

1 Q. And that would be --
2 A. So it's just dollars divided by units.
3 Q. Dollars divided by units, and those are
4    dollars received by Dey from customers that it sold
5    its products to.
6 A. Well, not received by. It's the sales number
7    reported during the month on an accrual basis, you
8    know, with all the different accruals and estimates
9    still in there.
10 Q. Okay. All the accruals for chargebacks,
11    rebates, et cetera.
12 A. Correct.
13 Q. And -- and that would be based -- an average
14    sales price would be net of chargebacks.
15 A. Yes.
16 Q. And it also would be based upon sales to all
17    of Dey's kinds of customers, including hospitals,
18    correct?
19 A. Yes.
20 Q. All right. AMP, on the other hand, is what?
21 A. AMP is on a processed basis, so it would not
22    include any kind of a gap. Accrual based accounting.
23    It's based on processed chargebacks, processed rebates
24    and it's to the retail class of trade.
25 Q. So -- so in addition to not including

Page 391

1    accruals, only -- only including realized or processed
2    chargebacks and rebates, it would also not include
3    sales to hospitals, would it?
4 A. I don't believe so.
5 Q. All right.
6 A. I mean, there's, you know, there might be
7    some outpatient pharmacy. I don't -- they --
8 Q. Okay.
9 A. They have a very automated way they pull the
10    data, but --
11 Q. I understand. But it --
12 A. -- the big picture, no.
13 Q. In general the large in-patient hospital
14    pharmacies, that probably wouldn't include sales to
15    those, but it would if it was an outpatient pharmacy
16    as far as you know?
17 A. Yeah.
18 Q. All right. So is it safe to say then in some
19    instances ASP might be higher than AMP and other
20    instances it might be lower than AMP?
21 A. Depending on the differences between
22    processed and accrual basis there could be a lot of
23    variations, yeah.
24 Q. Could it also have something to do with the
25    difference between the -- the proportion of sales that

Page 392

1    might occur to hospitals versus non-hospitals?
2 A. It could.
3 Q. Okay. So there's -- there's different
4    variables that it might affect, whether it's -- one is
5    higher than the other or not?
6 A. Yes.
7 Q. And -- and other than using this to
8    explain -- to communicate with your lawyers, which I'm
9    not going to go into, was this ASP/AMP analysis used
10    for any other purpose by Dey Laboratories to your
11    knowledge?
12 A. No. It was really just to look at how
13    different the numbers could in some cases be.
14
15    (End of attorneys' eyes only)

Page 393

1 Q. (BY MR. BREEN) Okay. A couple of follow-up
2    questions. When we took Mr. Rice's deposition last
3    time he advised us that --
4       MR. BREEN: Is it Exhibit 259, the '94
5    memorandum?
6       MR. WINTER: 459.
7       THE WITNESS: '94?
8       MR. BREEN: 459?
9       MR. WINTER: Yeah.
10 Q. (BY MR. BREEN) He advised us that Exhibit
11    459, which we are going to hand you a copy of again,
12    which is the February 22nd, 1994 memorandum that I --
13    I asked you about earlier.
14 A. '94 or '92?
15 Q. '92. I'm sorry. And you've got a copy in
16    front of you again.
17 A. Okay.
18 Q. He advised us that he was given to believe
19    that this document was found in a filing cabinet near
20    his assistant's desk area when the lawyers from -- for
21    Dey went through the files in January of 2003 or
22    thereabouts, again, looking for documents. Have you
23    ever heard that described as being the way this
24    document was found?
25       MR. PRESCOTT: I'll object to the extent

Page 394

1   you're inquiring into any privileged communication and
2   instruct you not to answer. You may answer if you
3   have heard that from someone other than an attorney
4   for the company.
5 A. I've only heard it from the attorneys.
6 Q. (BY MR. BREEN) Where was your office located
7   with -- in connection with Mr. Rice's office or from
8   that perspective? Was it near it, far away?
9 A. It was -- there was a series of offices here
10  (indicating), series of offices here (indicating).
11  His was here (indicating), mine was across the way.
12 Q. Across the way. So were you within 50 yards
13  of his office?
14 A. Yeah.
15 Q. Do you know where Mr. Rice's assistant's desk
16  was?
17 A. Right outside Charles' office.
18 Q. Right outside his office. And do you have a
19  recollection of there being some filing cabinets in
20  the exterior office area -- area near his assistant's
21  desk?
22 A. Yes.
23 Q. And do you know whether or not files were
24  kept in there that had been papers that may have been
25  of use to the chief executive officer of the company

Page 395

1   time to time?
2 A. There are filing cabinets there. I've
3   actually never -- I don't know what's in them.
4 Q. When you were participating in the
5   accumulation of documents for the October two -- or
6   1997 OIG subpoena, did you initiate any kind of -- of
7   index or control log or anything that would allow you
8   to confirm that things had been -- places had been
9   searched and where documents had come from?
10 A. I did not.
11 Q. Have you ever done that kind of thing in
12  connection with document searches before or since?
13 A. No.
14 Q. So has anybody to your knowledge, other than
15  lawyers, created any kind of index or -- or list of
16  places searched whenever Dey would try to locate
17  documents in response to these various subpoenas?
18 A. No. It was left up to the people responsible
19  for those areas.
20 Q. So who was responsible for these filing
21  cabinets located in the vicinity of Mr. Rice's
22  assistant?
23 A. Charles.
24 Q. It was his responsibility?
25 A. Correct.

Page 396

1 Q. So based upon the document review for the
2   1997 OIG subpoena or the document search, was it
3   Mr. Rice's responsibility, as you understood it, to
4   locate any responsive documents that might have been
5   in those filing cabinets?
6       MR. PRESCOTT: Object to the form.
7 A. Charles was responsible for any document
8   search of his records.
9 Q. (BY MR. BREEN) Okay. And that would -- all
10  right. So let me restate the question. Whose
11  responsibility was it to search the filing cabinets in
12  the vicinity of Mr. Rice's assistant in response to
13  the October 1997 subpoenas?
14      MR. PRESCOTT: Object to the form.
15 Q. (BY MR. BREEN) Let me -- let me restate the
16  question. He's going to make me get it right.
17      MR. PRESCOTT: I can explain the basis
18  for the objection, if you would like.
19      MR. BREEN: No. I know -- I know -- I
20  know the basis.
21 Q. (BY MR. BREEN) Was it anybody's
22  responsibility to your knowledge to search the filing
23  cabinets near Mr. Rice's assistant's secretary -- or
24  Mr. Rice's assistant's desk in response to the October
25  '97 subpoena?

Page 397

1       MR. PRESCOTT: I object to the form.
2 A. Charles was responsible for his documents
3   under his control.
4 Q. (BY MR. BREEN) To your knowledge was the
5   filing cabinets in the vicinity of Mr. Rice's
6   assistant, were those filing cabinets filing cabinets
7   that should have been searched in response to the
8   October 1997 subpoena to your knowledge?
9       MR. PRESCOTT: Object to the form.
10 A. Yes.
11      MR. BREEN: Okay. What's wrong with
12  that question?
13      MR. PRESCOTT: Your question implies
14  that the October 1997 OIG subpoena reached back to
15  1992.
16      MR. BREEN: Okay.
17      MR. PRESCOTT: Because that is the date
18  of the document you are referring to.
19      MR. BREEN: Well, let's -- I hear you.
20      MR. PRESCOTT: You have the subpoena.
21  You can verify that.
22 Q. (BY MR. BREEN) Let's go to the subpoena.
23      MR. BREEN: That's a very good point.
24 A. Oh, I don't think -- is it in this binder?
25      MR. WINTER: No, it's not.

Page 398

1    MR. BREEN:  We are going to give it to
2    you real quick.  As a matter of fact, why don't we
3    take a brief break, it will probably be the last break
4    of the day, get organized and we'll get the subpoenas.
5        (Recess from 2:12 to 2:26)
6    THE VIDEOGRAPHER:  Stand by.  The time
7    is 2:26 p.m.  We are back on the record.
8 Q. (BY MR. BREEN) All right. I've handed you
9    what's already been marked in these depositions as
10   Exhibit 593, which is the Cromolyn sodium nebulizer
11   solution 20 milligram or two milliliter abridged
12   marketing plan prepared by Robert Ellis, January 1,
13   1994.  Have you ever seen this before?
14 A. I've seen it recently in connection with the
15   document production.
16 Q. And I'll direct your attention to Page 43,
17   under "Pricing." We've got a little yellow tab there
18   for you.  And specifically the next to the last
19   objective on the bottom is, "To provide incentive to
20   retail/chain providers to use Dey's Cromolyn by
21   increasing the spread on Medicare/Medicaid
22   reimbursements." Do you see that?
23 A. I do.
24 Q. Have you ever -- were you aware that it was
25   part of the -- an objective of the Cromolyn launch

Page 399

1    plan under pricing to provide such an incentive by
2    increasing the spread on Medicare/Medicaid
3    reimbursements?
4 A. I was not.
5 Q. And similarly you don't recall being aware of
6    the same objective in the Albuterol pricing strategy
7    as reflected in Exhibit 459, dated February 24th,
8    1992?
9 A. I just don't recall being involved in -- in
10   these kinds of things.
11 Q. Okay.  But do you understand today that these
12   are the kinds of documents that the inspector general
13   was looking for when they served the subpoenas on --
14   on Dey Laboratories --
15 A. Yes.
16 Q. -- in October of '97 and in 2000?
17 A. Yes, I do.
18 Q. Now, specifically -- I mean, had you been --
19   are you aware that these documents were not turned
20   over to the inspector general?
21   MR. PRESCOTT:  Object to the form.
22 A. No, because I don't know -- I didn't look at
23   all the marketing materials that were submitted.  They
24   were copied, sent on to the attorneys.  I didn't look
25   at everything.

Page 400

1 Q. (BY MR. BREEN) So you don't know of whether
2    or not these were turned over to the inspector general
3    in response to the '97 subpoena or the 2000 subpoena?
4 A. I don't know what has or hasn't been turned
5    over to the OIG.  I know that we've submitted many,
6    many documents to Coudert and then they did the -- the
7    document production --
8 Q. Do you know --
9 A. -- and --
10 Q. Do you know if Exhibit 459 was submitted to
11   Coudert in order to respond to the inspector general's
12   subpoenas, either one of them?
13 A. No, I don't because I didn't look at the
14   sales and marketing materials before they were
15   submitted.
16 Q. The same for 593?
17 A. 593.
18 Q. That's the Cromolyn launch exhibit.
19 A. Yeah.  I just -- I don't know.
20 Q. So whose job was it to make sure that
21   documents such as Exhibit 593 and 459 got turned over
22   to Coudert Brothers so they could respond to the OIG
23   subpoenas in '97 and 2000?
24 A. Well, as I said before, various people in
25   sales and marketing were tasked with going through all

Page 401

1    of the relevant files, providing the information to me
2    or my secretary.  It would be consolidated and sent on
3    to the attorneys.
4 Q. Well, somebody had to be responsible for
5    Exhibits 593 and 459.  I mean, wouldn't -- wouldn't it
6    be reasonable to assume that a responsible corporate
7    representative would be responsible for this, turning
8    these documents over?
9 A. Well, I mean, ultimately I guess you could
10   say it was Bob's responsibility, but people in his
11   department were doing the document search.
12 Q. Now, if Exhibit 459 was found in that filing
13   cabinet near Mr. Rice's assistant's desk, as we've
14   been given to believe by Mr. Rice, is there anybody
15   other than Mr. Rice who would have had the
16   responsibility for turning this document over?
17   MS. MACK:  Object to the form.
18 A. For -- for his own personal files?
19 Q. (BY MR. BREEN) Well, my question is it was
20   in his filing cabinet by his assistant's desk.  Other
21   than Mr. Rice is there any corporate official at Dey
22   who would have responsibility for turning this
23   document over in response to an OIG subpoena?
24 A. Not -- not unless he delegated it to
25   somebody.  I don't know exactly, you know, if he had

Page 402

1 his secretary help him or not, quite frankly. But,
2 you know, it was -- he was taking care of his
3 documents.
4 Q. Did you ever have any discussions with
5 Mr. Rice about Exhibit 459 or any other specific
6 document that -- that was discovered in 2003?
7 A. In 2003?
8 Q. Yes, ma'am. Yes, ma'am.
9 A. No. He's -- he's not -- he was no longer
10 with the company.
11 Q. So Exhibit 459, as far as you know, wasn't
12 even uncovered until Mr. Rice left the company.
13 A. I -- I don't know for sure. I mean, I know
14 that that was when I first saw it was in 2003. I
15 don't know -- I mean, you're telling me I guess it
16 wasn't in the previous documents. I don't know that
17 to be a fact, but there were thousands of pieces of
18 paper presented, but --
19 Q. Well, do you have any idea then if there were
20 thousands of pieces of paper presented why the
21 documents that specifically stated that it was Dey's
22 pricing objective and pricing strategy to provide
23 incentives to providers to use Dey's products by
24 increasing the spread on Medicare/Medicaid
25 reimbursements were the ones that weren't turned over

Page 403

1 to the OIG?
2    MS. MACK: Object to the form.
3    MR. PRESCOTT: I object to the form.
4 A. I don't know why this specific document was
5 not located.
6 Q. (BY MR. BREEN) Did you ever determine
7 whether a copy of Exhibit 459 was existing in your
8 files at any time?
9 A. I did not go back through my files. The
10 legal counsel did.
11 Q. Okay. And do you know whether legal counsel
12 located a copy of Exhibit 459 in your files?
13 A. I'm not sure. I know some documents were
14 located in my files. I don't know if this specific
15 one was. I see I'm on the distribution.
16 Q. Do you know -- have you ever had any
17 discussions with legal counsel about Exhibit 459 and
18 how it was found, where and by whom?
19    MR. PRESCOTT: Objection, inquires into
20 attorney/client privileged communication.
21    MR. BREEN: Well, I respect the fact if
22 you instruct her not to answer, but I think we are
23 entitled to know who found this and where and I don't
24 even know if that's a privileged issue at this point.
25    MR. PRESCOTT: You're entitled to

Page 404

1 inquire, but you are not entitled to inquire into
2 communications, privileged communications, between
3 counsel for the company and Ms. Marrs.
4    MR. BREEN: Well --
5    MR. PRESCOTT: So to the -- to that
6 extent we are asserting the privilege.
7 Q. (BY MR. BREEN) Well, so we can depose the
8 proper person, have you ever had a discussion with a
9 Coudert Brothers lawyer about -- and don't tell me
10 what you said, but about the subject matter of the
11 circumstances of finding Exhibit 459?
12 A. Yes.
13 Q. Which Coudert Brothers lawyer did you have
14 that discussion with?
15    MR. PRESCOTT: Objection. The question
16 inherently calls for the substance of a communication
17 with counsel for the company.
18 Q. (BY MR. BREEN) Don't want to know what
19 they said to you or what you said to them, I just want
20 to know which lawyer you had the discussion with.
21    MR. PRESCOTT: Same objection. Instruct
22 you not to answer on grounds of privilege.
23    MR. BREEN: All right. Well, we'll
24 certify that and deal with it. Hopefully we are going
25 to deal with it in a simple way. Okay.

Page 405

1    MR. HAGENSWOLD: Jim, sorry to
2 interrupt, but I think I've decided that I do have
3 just a couple of questions. Do we need to squeeze
4 that in at the end or would Mr. Prescott give us
5 leeway to take a couple of extra minutes?
6    MS. MACK: I have the same questions. I
7 just -- this is my first deposition with this group
8 and I didn't know if the eight hours is just for you
9 or if we are all supposed to --
10    MR. BREEN: Why don't we go off the
11 record for this conversation because we are burning --
12 we are burning record time.
13    THE VIDEOGRAPHER: All right. Stand by.
14 The time is 2:34 p.m. Off the record.
15    (Discussion off the record)
16    THE VIDEOGRAPHER: Stand by. The time
17 is 2:36 p.m. We're back on the record.
18 Q. (BY MR. BREEN) Does the accounting
19 department at Dey Laboratories maintain any IMS
20 information or data?
21 A. Not -- not that I know of. I know that
22 there's a report that goes to -- I don't know. I
23 don't remember who it goes to, Germany or France, but
24 that has an IMS category on it, but it's -- it's just
25 a reporting category. It's -- we don't get the actual