# Exhibit 399

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**



DEY, L.P.
2751 Napa Valley Corporate Drive
Napa, CA 94558
TEL.(707) 224-3200 FAX (707) 224-8916

June 30, 2000

The Honorable Tom Bliley
Chairman, Commerce Committee
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Bliley:

We are responding to your request for documents with regard to prices charged for prescription drugs marketed by Dey, L.P. and are in the process of producing those documents. Should you or your staff require explanations pertaining to any of these documents, we stand ready to meet with you for that purpose.

We also stand ready to assist in any way we can to help in the resolution of the decades-old question of creation of an appropriate reimbursement system. The system needs to be one which adequately serves the patient population most in need of prescription drugs without penalizing any other participant in the process. These other participants include those involved in the development, manufacturing, and distribution of vitally important products and especially those health care providers and care givers who fulfill the government's mandate to see that those in need receive these products the same as anyone else.

We offer the following information in anticipation that the Commerce Committee, and all other interested parties, will give fair and balanced consideration to all of both the evidence and the policy issues concerning this matter. The factual record here is extensive. Yet some of the proposals being offered for corrective action strike at the very core of the free market dynamics which are elements necessary for making a reimbursement system which works for all involved. All who are knowledgeable about these matters agree that changes are necessary. I certainly agree with your concerns expressed in a recent press release about a "quick fix" not working in anyone's best interest and especially not in the interests of the patients which our national health care programs are intended to serve and protect.

In Secretary Shalala's letter to you dated May 31, 2000, HHS admits that HCFA has been "...actively working on this issue... for many years." This letter further cites a decision in 1991 by the government, due to what the letter states would have been "burdensome and unfeasible" surveys, to rely on average wholesale price for purposes of determining reimbursement for prescription drugs. Yet the publicly available information dating back as early as 1968 clearly demonstrates that AWP is not a reflection of actual market prices; this conclusion about AWP has been reiterated again and again by officials at both the federal and the state level, most notably by HHS's own Office of Inspector General. The same conclusion has been reached in

The Honorable Tom Bliley
Page 2

the courts. No one was deceived about this. Quite the contrary, government officials have acknowledged this reality for over 30 years now; here is a small sampling of what they have said:

### 1968

Report by the Task Force on Prescription Drugs of the Department of Health Education and Welfare (HEW) entitled; "The Drug Makers and the Drug Distributors": "...wholesalers, retailers, hospitals and government agencies often pay markedly different prices for the same drug and dosage form..." and "...the Red Book and the Blue Book do not reflect the actual manufacturers' prices to wholesalers and retailers...."

### 1974

In November 1974, HEW published a proposal to establish limits on Medicaid payments for multiple source drugs, including drugs dispensed by physicians. The notice stated: "Red Book data, Blue Book data (i.e., AWP) and other standard prices ... were frequently in excess of actual acquisition cost." 39 Fed. Reg. 41,480 (Nov. 27, 1974) *see* 40 Fed. Reg. 34,516 (Aug. 16, 1975) (final rule).

### 1977

HCFA reminded the states in a December 1977 Action Transmittal that they were required to estimate provider acquisition cost in setting reimbursements stating: "[T]he Department is not convinced that those states which continue to reimburse at average wholesale price or wholesale invoice cost have made a real effort to approach actual acquisition cost." "Title XIX Social Security Act: Limitation on Payment Reimbursement for Drugs: Estimated Acquisition Cost (EAC)," HCFA Action Transmittal 77-13 (MMB) (Dec. 13, 1977), *reprinted in* Medicare & Medicaid Guide (CCH) 28,714.

### 1980

The General Accounting Office reported that HHS was aware that AWP was higher than the price pharmacists actually paid for a drug. See GAO, "Programs to Control Prescription Drug Costs Under Medicaid and Medicare Could be Strengthened," GAO Rep. No. HRD-81-36 (Dec. 31, 1980), *reprinted in* Medicare & Medicaid Guide (CCH) 1 30,907.

### 1984

OIG reported that the actual prices charged to retail pharmacies were as much as 42% below AWP. See Medicaid Action Transmittal No. 84-12 (Sept. 1984), reprinted in Medicare and Medicaid Guide (CCH) T 34,157. This OIG report audited drug prices in six states and concluded that AWP was not "even an adequate estimate of the prices providers are generally paying for their drugs. AWP represents a list price and does not reflect several types of discounts."

The Honorable Tom Bliley
Page 3

### 1989

Senate Special Committee on Aging's Majority Staff Report entitled "Prescription Drug Prices: Are We Getting Our Money's Worth?" (August 1989):

-- "The VA achieves an average discount of <u>41% off AWP for single source drugs and 67% off AWP for multiple source drugs.</u>"

-- "Hospitals, HMOs and nursing homes that contract with wholesalers <u>achieve discounts up to 99% off AWP.</u>" (Emphasis supplied)

### 1991

In the same year that Secretary Shalala's letter identified as the year that the government decided to continue its reliance on AWP instead of what the letter refers to as "burdensome and unfeasible" surveys, an administrative appeal brought by the State of Arkansas was heard before HHS' own Departmental Appeals Board. That Board rejected Arkansas' argument that its AWP represented the State's "best estimate of the price generally and currently paid for those drugs [for which reimbursement was sought by the State at the AWP level]." The Board found that the "State was aware that pharmacies generally paid less than that amount and that ... the State had no pertinent records to support a determination that AWP represented the price generally and currently paid." Docket No. 90-119, August 21, 1991. In fact, HCFA entered an exhibit in this proceeding which showed that the Director of Arkansas's Division of Economic Medical Services <u>as early as 1988</u> had expressed concern that "AWP is an artificially high basis for reimbursement." Id.

### 1992

Reports submitted by the National Association of Retail Druggists to Congress in 1992 showed that AWP for brand-name drugs could exceed the price paid by the provider by up to 94%. See Hearing Before the Subcomm. on Health and the Environment of the Comm. on Energy and Commerce for the House of Representatives (Jul. 31, 1992.) Also, the executive summary of an OIG report issued in November of 1992 stated: "AWP is not a reliable indication of the cost of a drug to physicians."

### 1994

HCFA underscored the need for the states to use empirical methods in the fall of 1994, when it sent the Directors of State Medicaid Agencies a circular entitled "Expiration of Pharmacy Reimbursement Moratorium -- INFORMATION." The circular reminded states that they would be able to adjust reimbursement rates for prescription drugs effective December 31, 1994 and reminded states that, since the legislatively established moratorium was ending, they should:

> "[D]etermine that their estimated acquisition cost (EAC) levels are current. By definition, EAC means the agency's best estimate of

07/03/00 12:01 FAX 212 626 4120 COUDERT BROTHERS ⌀005/006
Case 1:01-cv-12257-PBS  Document 6426-116  Filed 08/28/09  Page 5 of 6

The Honorable Tom Bliley
Page 4

> the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers. <u>States wishing to modify their EAC levels may, among other methods of verification, audit an appropriate number of pharmacies to determine current acquisition costs before making modifications to the EAC levels</u>". (Emphasis supplied).

A 1994 OIG report gave the results of a random sample of 314 pharmacies in 11 states. The report found that, on average, the actual acquisition cost of generic drugs was 42.5% below AWP. The OIG conducted multiple separate reviews of pharmacy acquisition costs for drugs reimbursed under various state Medicaid programs in the early to mid 1990's. Each review confirmed that there were large differentials between AWP and actual purchase price.

## 1995

A May, 1995 OIG report found that "(1) many pharmacies surveyed charged customers less for generic albuterol sulfate than Medicare allows; and (2) all five buying groups surveyed have negotiated prices substantially lower than Medicare reimbursements for albuterol sulfate."

## 1997

President Clinton himself in his weekly radio address stated:

> "<u>Sometimes the waste and abuse aren't even illegal; they're just embedded in the practices of the system.</u> Last week, the Department of Health and Human Services confirmed that our Medicare program has been systematically overpaying doctors and clinics for prescription drugs – overpayment that cost taxpayers hundreds of millions of dollars .... Now, these overpayments occur because Medicare reimburses doctors according to published average wholesale price – the so-called sticker price – for drugs. Few doctors, however, actually pay the full sticker price. <u>In fact, some pay just one tenth of the published price.</u>" White House Office of Press Secretary, Remarks by the President in Radio Address to the Nation (Dec. 13, 1997) (emphasis supplied).

## 1998

HCFA's February, 1998 description of its FY 1999 legislative proposals specifically states that AWP "is but a 'sticker' price."

Thus, for over thirty years, and certainly at the time the government now acknowledges it made its decision to rely on AWP for reimbursement purposes, the public record has been filled

07/03/00  12:01 FAX 212 626 4120  COUDERT BROTHERS                                      ☒006/006
Case 1:01-cv-12257-PBS   Document 6426-116   Filed 08/28/09   Page 6 of 6

The Honorable Tom Bliley
Page 5

with evidence of the nature of AWP and the indisputable fact that it is not representative of any actual market price. In fact, pharmaceutical manufacturers do not have the expertise to conduct customer pricing surveys to determine actual prices, nor should they, as we understand the law, be doing so as a regular practice under the antitrust laws.

Some state regulators when discussing the OIG surveys have specifically said that broader issues of adequacy of reimbursement need to be addressed to assure that prescription drugs are as readily available to those served by government programs as to others. See, for example, Reply of C. Robin Britt, Sr., Secretary of the North Carolina Department of Human Resources, to the OIG dated July 1, 1996: "We have recognized the problems that arise from balancing the appropriate EAC against assuring adequate access to providers by the recipient."[1] Likewise, Florida regulators in responding to the 1995 OIG study stated: "Restricting reimbursement to actual cost might have the unintended effect of discouraging purchase of promotional products and eventually shifting the market to single-source products which are universally much more costly."[2]

It is clear that the best solution to the perceived problem of AWP-based reimbursement in the Medicare program lies in a full dialog among the interested parties. Those parties include representatives of regulatory agencies, pharmacies and other health-care providers, pharmaceutical manufacturers, and the indigent and elderly whom these programs serve. The purpose of this dialog is to find a politically acceptable reimbursement system which controls costs but does not disfavor purchase of any products (including generics which have done so much to reduce drug costs) or create an unlevel playing field for any product. It is also vitally important that the reimbursement system not disincentivize pharmacists and other health-care providers from serving those whom Medicare is designed to assist.

Sincerely,

Charles Rice
President and CEO

cc: The Honorable John D. Dingell, Ranking Member

---

[1] "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the North Carolina Department of Human Services," DHHS, OIG, September 1996, A-06-95-00071, Appendix 4.

[2] "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program for the Florida Agency for Health Care Administration," DHHS, OIG, August 1996, A-06-95-00065, Appendix 4.