# Exhibit 3

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the August 28, 2009 Declaration of Sarah L. Reid**
**In Support of Defendants' Common Opposition to Plaintiffs'**
**Motion for Partial Summary Judgment**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -

Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE

Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

162

1      payment rates for pharmaceuticals?
2          A.    Any regulatory change.
3          Q.    It's supposed to go through the
4      legislature?
5          A.    Through this committee, yes.  And this
6      committee is a standing committee throughout the year.
7      It's not just in session.
8          Q.    So the executive branch isn't making
9      changes in payment rates willy nilly without some
10     review of the legislature?
11         A.    Right.  But there is a provision for
12     emergency.  And you have to go through ALR for
13     emergency also.  And that's a fast track.
14         Q.    If you would go to the third paragraph on
15     page 142.  This is talking about the fact that
16     amendments will set EAC at WAC plus 10 percent.  Do
17     you see that?
18         A.    Mm-hmm.
19         Q.    The last sentence says there
20     "Extemporaneously compounded prescriptions and
21     over-the-counter products will not be subject to this
22     pricing methodology but will continue to be priced

1    under the current methodology."

2        A.    Mm-hmm.

3        Q.    What does that mean?

4        A.    Okay.  In pharmacy in the old days you
5    compounded a prescription.  Not everything was in a
6    tablet or a capsule.  So extemporaneously compounded
7    prescriptions is that at the pharmacy counter you mix
8    a cream with an ointment with some powdered drug and
9    you do when you do and you put it in a tube or -- you
10   compound a prescription.  Okay.  The ingredients that
11   are used in that will not be based on the wholesale
12   acquisition cost.  It's the total price of the
13   compound using all the AWPs for that.

14             So the bottom line, if you had three
15   ingredients in it it would be one price charged for
16   the three ingredients.  And the NDC number, which
17   depicts the products that were used, in those days we
18   had a blanket number which we used, 00998 with all
19   zeros, which depicted compounded prescription.  Okay?
20   Those products were -- the dose prescriptions were
21   priced if they were under -- they were priced if they
22   were over $15, meaning they had to be sent in so we

1   could review what they're charging.  Because you could

2   certainly -- something that you were normally charging

3   $20 for and the pharmacy charged $80 we would pay 80

4   if we didn't review it.  And 20 is over the 18.  So we

5   took anything that was under 18 and we let it go

6   through the 998, but anything above it, if that

7   sounds -- if you understand that point.

8           And the other, what was the issue about --

9   the over-the-counter products were payable one time.

10  It's 50 percent greater than the AWP.  So therefore we

11  would pay -- if it was Maalox and it was $1 a bottle

12  we would pay up to 1.50 for the Maalox.  There was no

13  dispensing fee involved for over-the-counter products.

14  That kind of thing.  Let me just say it another way.

15          As long as the AWP -- the way pharmacy

16  charged for drugs over the counter, it was a wholesale

17  price AWP, a normal markup was 150 percent.  So it's

18  one and a half times, so a dollar would be a dollar

19  fifty.  When the cost of the over the counter drug

20  became greater than the normal dispensing fee, then

21  the normal dispensing fee went into play.  For

22  instance, if the dispensing fee was $4 and it was a

165

1    **$12 AWP we wouldn't just pay $18, we would pay no more**

2    **than 12 and 4, which was $16.**

3         Q.    Got it.

4         **A.    Okay.**

5         Q.    So for the over-the-counter products the

6    markup on the ingredient cost would be covering the

7    dispensing fee?

8         **A.    Yes.**

9         Q.    Up to a limit of --

10        **A.    No greater than the dispensing fee.**

11        Q.    Got it.  Now, let me give you just a

12   hypothetical question.  Let's say at the time this

13   memo was written and this policy goes into effect

14   there's a home infusion pharmacy that was

15   administering vancomycin to a patient.  And in order

16   to do that he has to compound it with a dilutant like

17   sodium chloride.  Is that the type of claim that would

18   fall within this carve-out of the methodology?

19              MS. YAVELBERG:  Objection, form.

20        **A.    We're talking here '91.  To be frank with**

21   **you, there was very little home infusion done in '91.**

22   **Very little.  The way it really happened was that the**

1  patient because of the lack of sophistication for home

2  infusion was hospitalized for -- vanco is a serious

3  drug.  And you don't normally give vanco at home.  And

4  we're talking about the outpatient pharmacy services.

5  And I don't recall it being an issue in '91.

6          But to answer your question if it were so,

7  if an outpatient pharmacy were dispensing the product

8  it would fall under the same guidelines as any other

9  compounded prescription.

10     Q.    Why did the regulations at this time at

11 least carve out compounded prescriptions from the new

12 methodology?

13     A.    Because the idea of compounding was its own

14 issue.  It costs more to compound.  It takes more time

15 for pharmacists to compound.  It was not something

16 that we were interested in limiting the cost -- not

17 the cost, but addressing the cost on.

18     Q.    So would it be fair to say, Mr. Fine -- to

19 make sure I understand your testimony correctly here,

20 and tell me if I'm not getting it right -- that

21 because of the additional cost to compound

22 prescriptions at this time you didn't want to reduce

167

1    the ingredient cost reimbursement?

2            MS. YAVELBERG:  Objection, form.

3        A.    **I hear what you're saying.  But -- I'm**

4    **trying to think back 16, 17 years.  We had to hand**

5    **price these products.  And it was difficult.  And that**

6    **played a part into it.  Not only what it cost the**

7    **pharmacist to put this together.  So it's very hard**

8    **for me to say exactly why the reason was.**

9        Q.    And if you look at the next page it states

10   "These amendments will also increase the provider's

11   dispensing fee from a flat rate of $3.70 to $4.69 for

12   prescriptions with an allowable cost below $34.92 and

13   to $5.92 where the allowable cost is at or above

14   $34.92."  Is that right?

15       A.    **Mm-hmm.**

16       Q.    So at the same time that Maryland decreased

17   the payment for ingredient cost it increased the

18   dispensing fee, right?

19           MS. YAVELBERG:  Objection, form.

20       A.    **This is what happened at the time, yes.**

21       Q.    I'd like to hand you what we've marked

22   previously as Abbott Exhibit 581.  Mr. Fine, these

310

1    of that product and that's why it was given at that
2    price.  And then in a nursing home it's a little
3    different.  The nursing home has control of the
4    patients within the facility.  And the medical
5    director works hand in glove with the nursing home
6    pharmacy and what happens is that they select a
7    preferred product that the pharmacy can get at the
8    best price and literally the pharmacy negotiates, bids
9    against one company for the same product against the
10   other, to obtain the preferred drug for that facility.
11        Q.    And could retail pharmacies do the same
12   thing?
13        A.    No.
14              MR. TORBORG:  Object to form.
15        A.    No.  Retail pharmacies could not do the
16   same because retail pharmacies are open to the public.
17   It's not a closed system.  So whatever prescription
18   comes in is what prescription is written for for
19   whatever product and the retail pharmacy must carry
20   all products.
21        Q.    Let me jump to compounded drugs for a
22   couple of minutes.

311

1        A.     Okay.

2        Q.     Do you remember talking about that earlier

3   today?

4        A.     Yes.

5        Q.     Now, why were compounded drugs priced

6   manually?

7        **A.     Because they had multiple ingredients.  A**

8   **pharmacy billing was a single entity, line entity, for**

9   **the compound.  And there's no way to ascertain what**

10  **products -- what ingredients were in the compound**

11  **without pricing them manually.  We had a $15, I**

12  **believe, break point where we trusted the pharmacy**

13  **that if there was a compound under $15 -- a charge**

14  **under $15 -- that that was allowed to go through the**

15  **system.  But over $15 each one had to be manually**

16  **priced.**

17       Q.     And when you say manually priced can you

18  explain how Maryland did that?

19       **A.     The pharmacist reviewing the price would**

20  **look at the ingredients that were used and then**

21  **ascertain the quantity that was used in the compound,**

22  **then go through the formulary file, the First Databank**

312

1  file, which had the pricing and would then calculate
2  the price individually for each ingredient, total it,
3  add the dispensing fee, and allow that for the
4  payment.
5      Q.   Now, compound drugs I think you testified
6  earlier a lot of these were the -- you called them
7  injectables or infusion drugs; is that right?
8      A.   Infusion drugs.
9      Q.   Are there also supplies that also sometimes
10 go along with these drugs?
11     A.   It can't be administered without the tubing
12 and/or pump and/or stand depending on the kind of
13 product.
14     Q.   And did Maryland reimburse for those
15 supplies?
16     A.   Certainly.
17          MR. TORBORG:  Object to form.
18     A.   Yes.
19          MS. YAVELBERG:  What's the objection?
20          MR. TORBORG:  I think the term supply is a
21 little vague.
22          BY MS. YAVELBERG: