# EXHIBIT 1

Sullivan, Harry Leo                              March 12, 2008
                        Nashville, TN

UNITED STATES DISTRICT

FOR THE DISTRICT OF MASSACHUSETTS


---------------------------X

IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

PRICE LITIGATION            )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO    )

U.S. ex rel. Ven-a-Care of  )

of the Florida Keys, Inc.   )

    v.                      )  No.06-CV-11337-PBS

ABBOTT LABORATORIES, INC., )

---------------------------X


    (cross captions appear on following pages)


        Deposition of HARRY LEO SULLIVAN

                Volume I

          Nashville, Tennessee

        Tuesday, March 12, 2008

            9:05 a.m.

Sullivan, Harry Leo                                     March 12, 2008
                            Nashville, TN

Page 58

1  you're talking specifically about a MAC process?
2  Q.  The data that would tell me essentially
3  what was paid and how it was determined what
4  would be paid.
5  A.  Nothing in the computer will tell you
6  how the price was determined.  But there should
7  be records of -- because that was all manually
8  input at that time.  And I, I'm the one that did
9  it.
10      I would literally go -- I could log
11  into the mainframe and change prices.  It would
12  put a date on there.  It would even print an
13  audit trail, of any changes, because, you know, I
14  had a user name and anything I did in that
15  computer there was an audit trail printed out to
16  -- and I guess, I would assume, some taped copy
17  as well.
18      And you needed that because, and you
19  needed historical information in the claims
20  processing system because Medicaid claims
21  typically can be submitted all the way back 365
22  days a year.

Page 59

1      But you may have cases like SSI
2  determination that may take two or three years
3  for the patient to be determined SSI eligible,
4  automatically Medicaid eligible, and they can
5  submit back from the beginning of that
6  determination period all their pharmacy claims.
7      So you have to be able to process those
8  claims and pay the price that was appropriate at
9  that time of dispensing.
10      There should be records of that.
11  Q.  We'll talk about the MAC program a
12  little bit later, but if you wanted to change a
13  price for a particular drug, you had the ability
14  to go into the computer and change the price?
15  A.  Yes.  I did.  I don't -- I wouldn't say
16  that was true in every state.
17  Q.  Okay.  What authorities, if any, would
18  you have to go through in order to change a price
19  for a particular drug?
20  A.  That was my responsibility.  I, I, I
21  would do it as part of my job, as part of making
22  sure that -- two things occurred, particularly

Page 60

1  with multi-source drugs.  One, is that we didn't
2  pay too much.  And, two, is that we paid enough
3  to insure an incentive for pharmacists to take
4  the extra step to, if necessary, call a physician
5  and get the prescription changed to a multi-
6  source drug.
7  Q.  And when you talk about an incentive
8  you're talking about a financial incentive?
9  A.  Yes.
10  Q.  And what kind of financial incentive
11  would you provide?
12  A.  What, what I tried to make sure I did
13  during this time, this -- I would say from '89 to
14  '94, was, was make sure that there, there was
15  profit to be made for a pharmacist for dispensing
16  generic drugs.  It -- these, these folks are
17  pretty savvy.
18      If I'm paying based on what I have
19  submitted to HFCA at the time or CMS today on a
20  state plan that says I will pay AWP minus 10 plus
21  $4 or 3.91 or $4, whatever, for a brand name, and
22  I'm setting MAC prices on the corresponding

Page 61

1  generic that pay the pharmacist his or her net
2  cost, it's not going to take them very long to
3  figure out which drug to process.
4      When they can buy the drug at, you
5  know, AWP minus 18, 20, 22, versus selling it at
6  cost plus a dispensing fee, they're going,
7  they're going to figure that out.  And I'm
8  shooting myself in the foot from a budget
9  standpoint, from a, trying to be a responsible
10  manager for the state's taxpayers.
11      So you, you want to -- you want there
12  to be some measure of profit, some incentive over
13  and above a dispensing fee, to incentivize
14  pharmacists to use the generic.
15  Q.  We'll talk about some other
16  communications that you have had with some other
17  state Medicaid programs, but was that issue
18  creating a financial incentive to promote the use
19  of multiple-source drugs something that you
20  discussed with other state pharmacy
21  administrators?
22  A.  Maybe at national meetings where there

                                16 (Pages 58 to 61)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 62

1  might be some, some discussion on, you know,
2  brand versus generic, or to use a MAC or not to
3  use a MAC.
4       You also have issues in different
5  states of do they allow dispenses written?  Do
6  they have a two-line prescription form?  Or what
7  are their particular guidelines for physicians
8  and pharmacists when it comes to being able to
9  substitute a generic?  So, but I don't remember
10 saying, you know, I'm paying 2 cents apiece for
11 generic penicillin, what do you pay?  What -- I
12 don't, I don't think anybody ever did that.
13      Q.  From your experience, do you think it
14 was well accepted amongst the Medicaid pharmacy
15 administrative community that you would want to
16 pay some profit on multiple-source drugs to
17 incentivize their use?
18      MS. DAMOULAKIS:  Objection.
19      A.  It's just so fundamental, I don't
20 remember discussing that with anybody.  I think
21 it's just -- it's something you -- you know, I
22 mean it's just -- makes good sense.  I don't, I

Page 63

1  don't remember any specific discussions with
2  anybody on, you really need to make it profitable
3  so that they will have an incentive to use it.
4  BY MR. TORBORG:
5       Q.  In your view it's just one of those
6  fundamental tenets of how you operate a state
7  Medicaid pharmacy program.
8       A.  One of my bosses long ago told me that
9  the color of health care is green, and that's
10 true.
11      Q.  In your time as the director of
12 pharmacy services, did you have communications
13 with the federal government concerning drug
14 payments?
15      A.  I don't know in what context you would
16 -- I mean can you -- is there another way you can
17 ask that question?
18      Q.  I'll try.
19      In determining how much the state
20 should be paying for drugs, both as an ingredient
21 cost component and as a dispensing cost
22 component, did you have discussions with the --

Page 64

1  any representatives from CMS then known as HFCA.
2       A.  I couldn't name any individual in HFCA
3  or CMS, and I don't remember -- and I couldn't
4  tell you the exact time.  I would say in the, in
5  the early Nineties HFCA putting directives out to
6  the state, and it was, it was as if they're
7  suggesting that, you know, we're going to be
8  looking -- kind of giving you a heads-up, the way
9  they would do with, with policy.  That, you know,
10 we're aware that a lot of states are, are paying
11 AWP minus 5 or whatever.  And we really think
12 that y'all need to get to maybe 10 percent.  I
13 don't know where -- you know, if OIG or somebody
14 gave them some number.  They wanted everybody to
15 get to 10.  Or some convoluted calculation of WAC
16 or acquisition costs or however you could get
17 there that would demonstrate to HFCA that you're
18 doing about AWP minus 10.
19      Tennessee was -- and this may -- there
20 may be various constraints on other states.  For
21 example, some state may -- reimbursement may be
22 subject to legislation within the state.  May

Page 65

1  have to be legislated.  It may be up to the
2  Medicaid director or the pharmacy director, it
3  may be tied to a cost-to-dispense study from a
4  state university, college of pharmacy, or
5  something like that.  So it -- I'm sure it varied
6  wide, widely from state to state on their
7  flexibility to comply with, with such a -- and it
8  wasn't a mandate at that time.  But it was -- you
9  could clearly tell that HFCA was wanting
10 something done with reimbursement for pharmacy
11 services that, that I guess saved money or more
12 closely approximated what people were really
13 paying for drugs.
14      Q.  You made a comment or some comments
15 about some of the -- tell me if I'm paraphrasing
16 you wrong here -- but there might be some
17 roadblocks that would come between a state
18 pharmacy director and wanted to comply with what
19 HFCA wanted to do.  Is that fair to say?
20      A.  Well, no, ultimately, in Tennessee, for
21 example, at that time, and really pretty much
22 still today, two-thirds of the bill's paid by the

17 (Pages 62 to 65)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Page 98

1   -- if, if actual acquisition costs is being used
2   as a reimbursement methodology, it still does not
3   get to net cost.
4       Q.   During the entirety of the time that
5   you were the director of pharmacy services for
6   Tennessee Medicaid, did you believe that the AWPs
7   in the compendia were a reliable source of
8   information regarding what pharmacies or
9   physicians actually paid for drugs?
10      A.   No.
11      Q.   And from your interactions with other
12  state pharmacy administrators, in your view did
13  other state pharmacy administrators believe that
14  AWPs were a reliable source for what pharmacies
15  and physicians actually paid for drugs?
16          MR. DRAYCOTT:  Objection.
17      A.   Again, I don't ever remember such a
18  specific discussion with, with those peers,
19  because it just wouldn't come up.  I -- everybody
20  knows the sky's blue.  I mean it is that basic to
21  me.  I couldn't imagine some -- one of your peers
22  in that situation sitting down and saying, Hey,

Page 99

1   Did you know pharmacists really aren't paying
2   AWP?
3   BY MR. TORBORG:
4       Q.   So just as the sky, just as everyone
5   knows the sky is blue, you think your peers knew
6   that average wholesale prices did not represent a
7   reliable source of the prices at which physicians
8   and pharmacies actually paid for drugs.
9       A.   That's correct.
10      Q.   During the entirety of the time that
11  you were the director of pharmacy services for
12  Tennessee, did you believe that the AWPs and the
13  compendia approximated what pharmacies or
14  physicians actually paid for drugs?
15          MR. DRAYCOTT:  Objection.
16      A.   No.
17          No.
18          And "approximate" is kind of a hard
19  term.  Well, I mean I guess you could say AWP
20  minus 22 approximates what their AWP, but I don't
21  know how you would define approximate.  But --
22  BY MR. TORBORG:

Page 100

1       Q.   Would that be --
2       A.   -- the way I would look at it, I would
3   answer no.
4       Q.   During the entirety of the time that
5   you were the director of pharmacy services for
6   Tennessee Medicaid, did you believe that there
7   was some consistent percentage by which average
8   wholesale prices exceeded actual acquisition
9   costs?
10      A.   Um --
11      Q.   Did you -- let me ask it a different
12  way.
13          Did you believe that you could shave
14  20, 30 percent off of it and get to a reliable
15  number of what pharmacies and physicians actually
16  paid for drugs?
17      A.   Well, it would, it would depend on -- I
18  mean, are we talking brand or generic?
19      Q.   Both right now.  Would you draw a
20  distinction?
21      A.   Oh, yeah.  Yeah.
22      Q.   All right.

Page 101

1       A.   The generic drugs, you know, you could
2   pay AWP minus 80 percent and still the pharmacist
3   make money for some, I assume.
4           But AWP minus 25 might be below cost
5   for a brand name drug for a rural pharmacy that
6   has a very small volume.  Okay?  So there is,
7   there is a difference between brand and generic.
8           In Tennessee, it wasn't as pronounced
9   because, you know, what I did as part of my job,
10  as soon as a drug became multi-source, and after
11  OBRA '90, as soon as that drug, the multi-source
12  version of a drug was cheaper than the brand name
13  net-net of Medicaid rebates, we MACed it.  So AWP
14  wasn't an issue on the generic side.
15      Q.   And why did you --
16      A.   But to say 20-30 percent, use that
17  number, you would have to distinguish between
18  brand and generic.
19      Q.   Would it be fair to say, Mr. Sullivan,
20  that during the entirety of the time that you
21  were the director of pharmacy services for the
22  State of Tennessee that you knew that the AWPs

26 (Pages 98 to 101)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                           Nashville, TN

| Page 102 | Page 104 |
|---|---|

**Page 102**

1 and the Red Book and Blue Book were a
2 particularly unreliable source for actual
3 acquisition costs for generic drugs.
4         MR. DRAYCOTT: Objection.
5     A.  That's true.
6 BY MR. TORBORG:
7     Q.  And from your interactions with other
8 state pharmacy administrators, do you believe
9 that they knew that as well?
10        MR. DRAYCOTT: Objection.
11    A.  Same answer as before.  I don't
12 remember ever discussing it.  I think it's safe
13 to assume that, though.  I would assume that.
14 BY MR. TORBORG:
15    Q.  Okay.  And why, why would you assume
16 that?
17    A.  Because it's, it's such a known fact
18 within the industry.
19    Q.  And do you have an understanding of why
20 it is that the AWPs in the compendia are a
21 particularly unreliable source for actual
22 acquisition costs for generic drugs?

**Page 103**

1         MR. DRAYCOTT: Objection.
2     A.  No, I really don't know.
3 BY MR. TORBORG:
4     Q.  Okay.
5     A.  I mean the way -- I'll tell you my take
6 on AWP, and this might answer your question, I'm
7 not sure, but particularly in days gone by, maybe
8 not so much today, AWP was a starting point for
9 negotiations for different classes of trade.
10 Based on volume and other issues, setting.  A
11 hospital versus a physician's office, versus a
12 chain drugstore, versus a small independent
13 drugstore.
14    Q.  And are you familiar with the process
15 of what happens to the price for a generic drug
16 as time goes on?
17    A.  Yes.
18    Q.  And what is your understanding of that?
19    A.  Well, the minute a drug loses its
20 patent, a single-source drug loses its patent and
21 FDA approves some generic competitor, generally
22 there is some time period of exclusivity for that

**Page 104**

1 first approved generic competitor, six, nine
2 months, whatever it is, depending on the drug,
3 the potential market for the drug, the
4 availability of raw materials and whatever else
5 comes into play, that in that initial six- to
6 nine-month period of time, when a competitor to
7 the innovator drug reaches market, typically that
8 first multi-source alternative is not
9 dramatically less expensive than a brand name.
10        The brand name typically stops
11 detailing that drug, unless there is some unusual
12 circumstances.
13        The generic is sold primarily by
14 pharmacists who are calling physicians who are
15 substituting via the, whatever laws are allowable
16 in each individual state, and after that period
17 of exclusivity, then multiple competitors will
18 arrive on the scene, usually, and the price drops
19 dramatically.
20        There is a window of time there, in a
21 Medicaid program, where you may be getting, based
22 on calculations of A and P versus best price

**Page 105**

1 under the Medicaid drug rebate program, a 40, 50
2 percent rebate for the brand name drug, and 11
3 percent for the generic, which hadn't -- the
4 price hadn't bottomed out on yet; there is no
5 real competition yet on the generic side.
6         So it would behoove a state to continue
7 to, to even block the generic.  Not less.  As a
8 matter of fact, I have had chains upset with me
9 because I didn't cover a generic until there were
10 multiple competitors there, because I wanted all
11 the utilization shift to the gener -- the brand
12 while I was getting this 50 percent rebate until
13 the minute that we had competition, and then I
14 could MAC the drug on the generic side, where MAC
15 less 11 percent rebate was less expensive to me
16 than brand less 50 percent.
17    Q.  You talked a little bit about the, what
18 happens to the pricing of the pharmaceutical
19 independent marketplace after the generic comes
20 in.  Did you have any expectation, Mr. Sullivan,
21 regarding whether or not manufacturers would try
22 to make sure that the prices reported in the

                                    27 (Pages 102 to 105)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                      March 12, 2008
                        Nashville, TN

Page 106

1  compendia were matching the actual market prices
2  as they lowered on generic drugs?
3      A.  For multi-source drugs?
4      Q.  Yes.
5      A.  I had no knowledge, and I didn't care
6  because if it was up to me, I think, as my job,
7  to find out what the net cost was to the
8  pharmacist.
9          Two things, availability, statewide, in
10  Tennessee, of the generic, and, secondly, what
11  are they paying?  I have to know that in order to
12  get back to what we were talking about earlier,
13  providing the proper incentive to dispense
14  generic for the pharmacist to do whatever
15  intervention was necessary with either the
16  patient or the physician, or both, to get the
17  generic substitution accomplished.
18      Q.  Now where would you get the information
19  that you would use in the MAC program regarding
20  what pharmacists were -- pharmacies were actually
21  paying for drugs?
22      A.  My, my system was, was not very

Page 107

1  sophisticated or very scientific, but nonetheless
2  believe it to have been very effective.
3          What I did was, I knew I had a contact
4  within the largest generic distributor in our
5  area, and one of the most -- one of the more
6  popular.  Again during this time that I, that I
7  was setting MAC prices, rather than MCOs or PBMs,
8  the, the best deal on generics weren't coming
9  from, from big wholesalers.  They were coming
10  from generic distributors.
11          So I had contacts within this one
12  particular company who would tell me, who would
13  first of all keep me apprized any time they, they
14  were able to distribute new generic drugs, also
15  give me information if, if there was some problem
16  with an existing generic drug's availability, and
17  also tell me and give -- send me catalogs that
18  they sent to the pharmacists and then tell me
19  additionally what am I looking at for this drug
20  X, Y, Z, what does a hundred of them cost a
21  pharmacy?  I didn't look at Red Book or Blue Book
22  or First Data; I called the people that sell it.

Page 108

1          Then I took that information, and never
2  going to take at one source completely at face
3  value, then I would call three or four -- I used
4  independent pharmacists in different parts of the
5  state, and I called.  And I said, I understand,
6  and I wouldn't mention that particular
7  distributor.  They never knew where I got my
8  numbers.  The pharmacists never knew where I got
9  my numbers.  But I would say, I'm thinking, I
10  believe that you can get this new generic, or
11  whatever it is, for five dollars a hundred, and
12  I'm going to set the MAC at 7.50 a hundred.  Does
13  that give you any heartburn?  And that's the way
14  I did business.
15          These, I trusted these people,
16  obviously.  But there are three different sources
17  there who are on the front lines in a pharmacy
18  who are running a business, who they have a
19  personal stake in.  That's why I went to
20  independents.  And then the distributor, who is
21  selling.  And who over the course of that
22  interaction I never found them to be anything but

Page 109

1  honest.
2          So -- and you can, you can quickly tell
3  if you have got something set too low, the phone
4  will ring.
5          So that -- and then I just -- I built
6  in a little, 30 percent or whatever, profit to a
7  generic MAC.  But I would immediately MAC -- AWP
8  was irrelevant.  For generic drugs.
9      Q.  And did you have a practice for doing,
10  for doing this process for all generic drugs?
11      A.  Yes.
12      Q.  And you did this all by yourself.
13      A.  Yes.
14      Q.  One person?
15      A.  Yes.
16      Q.  And you had other duties as well, --
17      A.  Yes.
18      Q.  -- correct?
19      A.  Yes.
20      Q.  And tell me a little bit about --
21      A.  Of course, you know, I, when I went to
22  work there in '89 we already had a MAC program.

Sullivan, Harry Leo                                    March 12, 2008
                          Nashville, TN

---

Page 114

1  entered into our system, and then paid
2  eventually.
3        Just resistance to change, I guess.
4    Q.  Did you -- did you have any involvement
5  when the MAC program was first started in
6  Tennessee?
7    A.  It preceded me.
8    Q.  And do you have any insight as to the
9  amount of labor involved to get the process
10 underway?
11   A.  It would have been significant, but not
12 anything like you started from square one today,
13 because, number one, there weren't that many
14 drugs.  Weren't that many multi-source drugs.
15 And we had a very restrictive formulary.  So even
16 if there was -- for a lot of drugs, even if there
17 was a generic alternative, even the generic
18 wasn't covered.
19   Q.  When you were the director of pharmacy
20 services, Tennessee Medicaid, from '89 through
21 2004, save the, the nine months, did you believe
22 that you had no choice but to use the AWPs and

---

Page 115

1  the compendia to set payment rates for generic
2  drugs?
3        MR. DRAYCOTT:  Objection.
4    A.  Had no choice.  As -- well --
5  BY MR. TORBORG:
6    Q.  When you say you had no choice, what do
7  you mean?
8    A.  That was your question, I think, you
9  had --
10   Q.  Did you believe that there was no other
11 practical alternative but to use what was in the
12 compendia --
13       MR. DRAYCOTT:  Objection.
14 BY MR. TORBORG:
15   Q.  -- to reimburse generic drugs?
16   A.  It was, it was the most expedient is
17 all I would say.  And it was going when I got
18 there, and I would say an industry standard that
19 we, that we -- a wheel we couldn't reinvent.
20   Q.  But you used a MAC program to reimburse
21 generic drugs; is that right?
22   A.  Yeah.  Now I thought you were talking

---

Page 116

1  about brand name in your original question.
2        I keep the two totally separate.  I
3  have never reimbursed anybody for generic based
4  on AWP.
5    Q.  So would it be fair to say that you
6  believed you had another choice to set
7  reimbursement rates for generic drugs?
8    A.  Oh, yes.
9    Q.  Apart from the compendia.
10   A.  Yes.  Yes.  I'm sorry.
11   Q.  You mentioned federal upper limits in
12 one of your previous questions.  I think we both
13 know what that's, what that's all about.
14       Did you become aware at any point
15 during your work with Tennessee that CMS
16 apparently deliberately did not establish federal
17 upper limits for intravenous and injectable drug
18 products?
19       MR. DRAYCOTT:  Objection.
20   A.  I wouldn't say that I ever knew that
21 they intentionally didn't do that, but I -- you
22 know, the -- I don't remember -- I don't remember

---

Page 117

1  injectables being part of the FUL, but it could
2  have been.  I, I just don't remember that.
3        Again, that's another thing that, in
4  Tennessee, and I'm sure this will vary again from
5  state to state, in Tennessee we chose, for
6  example, in a physician's office, under certain
7  settings, or home health is probably a better
8  example, certainly certain drugs and other
9  things, all of them, we wanted to run through the
10 pharmacy program.  For several reasons.  The
11 reimbursement for drugs on like a HFCA 1500 or
12 whatever the -- would have happened from a home
13 health agency to a home health division within
14 TennCare to process, those folks had no clue that
15 if -- what the difference between what was billed
16 and what should be paid should be.  So typically
17 a hundred percent of bills was paid.  So we
18 didn't want, didn't want that situation.  We
19 wanted it to certainly be fair, but wanted most
20 of those things to come through the pharmacy
21 program to control costs.
22       So in the instance of IV solutions or

---

30  (Pages 114 to 117)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                March 12, 2008
                        Nashville, TN

Page 150

1  concerns on whether or not the payment for these
2  kind of therapies was, was adequate?
3      A.  Well, my opinion, particularly in the,
4  in the home health arena, was -- and during this
5  specific time period, the growth in Tennessee was
6  such of those type of providers that it wouldn't
7  -- that wouldn't -- not lead you to believe that
8  the reimbursement for Medicaid was inadequate.
9          When people are hollering and screaming
10 or you have trouble getting providers to take
11 care of your patients is when that was more
12 likely a concern.
13     Q.  Well, do you know when the home
14 infusion business really started taking off?
15     A.  Well, it certainly took off in the
16 early Nineties.  And I can't remember -- and
17 Tennessee was a little bit different because we
18 very purposely avoided expansion of home
19 community based services under the Medicaid
20 program because the vast majority of the patients
21 who would receive those services were dual
22 eligibles, which meant they had Medicaid and

Page 151

1  Medicare.  And Medicare home health was, was
2  truly exploding.  We had hundreds of providers in
3  Tennessee of home health services.  I dare say
4  there's, you know, maybe 20 now.  Because there
5  was, there was indeed a bonanza on the Medicare
6  side in Tennessee.  Other states didn't face it
7  quite as -- if they had chosen to expand or had
8  very aggressive home community-based services
9  through Medicaid, might have had a little bit
10 different policy issues.  We purely shifted to
11 Medicare, cost shifted to Medicare, with the
12 duals.  And so it wasn't maybe not as, as intense
13 on a Medicaid issue in Tennessee as it might be
14 elsewhere is what I'm saying.
15     Q.  The page starting with -- at 425 and
16 then going over to 426, there is a discussion of
17 what some states are doing in the home IV
18 reimbursement area, Minnesota indicates
19 compounding or a dispensing fee of $8 for IV
20 drugs, and then Washington indicates that they're
21 paying a compounding amount, Ohio as well.
22         Do you have an understanding of what

Page 152

1  they're talking about when they talk about a
2  compounding fee?
3      A.  Yes.
4      Q.  And what, what is that?
5      A.  Well, certain, be it -- I mean you can
6  compound IV drugs if you have the right equipment
7  and filters and hoods to keep it, make it a
8  sterile product.
9          And you can compound drugs for
10 inhalation.  If you have, again, the right
11 equipment, similar to what would be in a
12 hospital, to, to handle sterile products.
13         And you take the raw ingredient and
14 mimic whatever, generally, the brand name or the
15 innovator product was.
16     Q.  And do you know in Tennessee, either
17 before TennCare or after TennCare was paying a
18 compounding fee for IV?  Do you know if that was
19 something that was being paid?
20     A.  Ah, no.  But there's, there's ways to
21 pay it without, without having a separate -- you
22 know, I noticed on here that one form is for

Page 153

1  payment, one form is for reimbursement of
2  supplies, one form is for -- you know, they're,
3  they're making a variety to submit multiple
4  forms.  And I wouldn't -- I can't tell you a
5  specific product or specific time period, but one
6  of my strategies was in issues like this, where
7  compounding was involved, I didn't want to go
8  down the road, at least in the early Nineties, of
9  getting into paying for compounded prescriptions,
10 because that can -- that could range from a
11 sterile product all the way down to an ointment,
12 okay?
13         And, and our claims reimbursement
14 system hadn't evolved to the current NCPDP
15 sophistication of today.  So it was very hard to
16 put in a, a set compounding fee for what, what
17 products?
18         One may take a minute to make, one may
19 take an hour and a half.
20         So getting back to, to the MAC issue,
21 some, sometimes for certain products in this
22 arena, you would take that into account for the

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                March 12, 2008
                        Nashville, TN

Page 154

1    MAC.
2         For example, I might say, I'm not
3    paying for the tape that you use to hold the IV
4    needle into place. I'm not paying for the IV
5    needle or the tube set. I'm not going to -- I
6    don't want bills for that. I know you've got to
7    do it to administer this drug. So we're going to
8    add on the cost of this drug X, because I know
9    this, this and this always goes with it, and I
10   know there is a fixed cost for that, but I don't
11   want five bills. I want 10 different places.
12   Bill me for the drug. And I'll make sure that
13   the -- whatever the MAC is incorporates all your
14   other costs. And you have to talk with providers
15   and know what that is. I mean, you know.
16        Q.   So, in short, you would use the payment
17   for the drug itself to cross-subsidize other
18   things that might need to be paid to fairly --
19        A.   And that would include compounding.
20        Q.   And it may include nursing services
21   that were not included, things of that nature?
22        A.   (Nodding yes.)

Page 155

1        Q.   Did anyone in the federal government
2    ever tell you that you were not allowed to do
3    that?
4        A.   No.
5        Q.   And if they had told you that, what
6    would you have said?
7        A.   That I wasn't allowed to pay for
8    compounding or --
9        Q.   That you weren't allowed to use the
10   payment for the drug to cross-subsidize those
11   other services or supplies?
12        A.   If they had told me I couldn't do it,
13   what would I do?
14        Q.   Yes.
15        A.   I would have had to have found another
16   way to, to handle the billing.
17        Q.   But they never told you that.
18        A.   No.
19        Q.   Do you know if other states were doing
20   -- were adopting similar type strategies to run
21   the programs?
22        A.   No, I don't -- I mean it may be

Page 156

1    addressed in this letter. I don't know. It
2    seems to talk about different states, but I'm
3    sure there were varying levels of complexity in
4    the billing process, and what was and wasn't
5    billable and what was and wasn't included, but I
6    don't know it and I didn't discuss it with folks.
7        Q.   Have you heard the term cross-subsidy
8    or cross-subsidization in the context of pharmacy
9    reimbursement?
10        A.   No, not -- no, I haven't.
11        Q.   I'm going to show you another, another
12   -- going to mark that as another exhibit.
13             MR. TORBORG: I think this is 578.
14             (Exhibit Abbott 578 marked.)
15   BY MR. TORBORG:
16        Q.   For the record, what we have marked as
17   Exhibit 578 bears the Bates numbers HHC 002-0400
18   through 407. It's another Medicaid pharmacy
19   bulletin. This one dated January-February of
20   1988.
21             Mr. Sullivan, if I could ask you to go
22   to Bates page ending in 402. In particular the

Page 157

1    discussion on the first full paragraph about
2    Montana Medicaid. Do you see that?
3        A.   Yes.
4        Q.   Where it says, Similarly, Montana
5    Medicaid compensates for the additional time and
6    expense of dispensing compounded drugs by
7    allowing the provider's usual and customary
8    charge up to 2.5 times the cost of ingredients,
9    paren, reimbursement for other outpatient drugs
10   is a lower of AWP minus 10 percent, or the cost
11   of the drug, end paren. Do you see that?
12        A.   Yes.
13        Q.   Is that the, the type of thing that
14   Tennessee was doing?
15        A.   It's a different approach to -- yeah.
16   Make -- paying the provider for the, for the
17   compounding without -- and setting a limit on
18   what I will pay up to two and a half percent.
19   It's just a different, different twist.
20        Q.   Does it -- does this refresh your
21   recollection about any other types of approaches
22   like this that other states were using?

40  (Pages 154 to 157)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 166

1  exhibit.
2          (Exhibit Abbott 579 marked.)
3  BY MR. TORBORG:
4      Q.  For the record what we have marked as
5  Abbott Exhibit 579, bears the Bates numbers HHC
6  902-0657 through 65, excluding 61 and 62.
7      A.  Hmm.
8      Q.  Mr. Sullivan, I take it from your
9  reaction to the document that you're familiar
10  with at least some of the material contained
11  within this?
12     A.  Well, it's just interesting that you
13  threw this out right after you asked the previous
14  question.  That's why, what made me giggle.
15     Q.  If you would take a look at that and
16  let me know if you're familiar with any of these
17  documents and then I'll ask you some questions
18  about it.
19     A.  Okay.
20     Q.  I'll be starting with 660 and then
21  working my way sort of chronologically through
22  the document.

Page 167

1      A.  Okay.
2          Yeah.
3          Yeah, yeah, this came from NACDS.
4  I don't remember seeing this.  I
5  remember the discussion.  I don't remember seeing
6  this document.
7      Q.  Which document is that?
8      A.  The second page.
9      Q.  The second page?
10     A.  This was... hmm.  So yeah.  Yeah, this
11  was another good idea that didn't work.
12     Q.  Okay.  Let me try to paraphrase what I
13  think was, what's reflected in these documents,
14  at least in part.
15     A.  Okay.
16     Q.  And you can tell me if I'm wrong just
17  to kind of speed things up.
18         It appears as though sometime in 1991,
19  December 1991, Tennessee -- your, your Medicaid
20  (c) issued a bulletin that indicated that usual
21  and customary charges should be the amount that
22  is no greater than the lowest contract price to

Page 168

1  another customer.
2      A.  That's right.
3      Q.  And an organization called the national
4  association of trained drug stores took exception
5  to that.
6      A.  To say the least.
7      Q.  And indicated that was not consistent
8  with the moratorium that had been put on changes
9  to drug reimbursement in the OBRA '90.
10     A.  OBRA '90, yes.
11     Q.  And then there was some communication
12  from the regional office of HFCA to your office,
13  or Tennessee Medicaid.
14     A.  (Nodding yes.)
15     Q.  And then there is some correspondence
16  that you may not have been aware of from the
17  regional office to HFCA headquarters.
18     A.  Um-hum.
19     Q.  Is that a fair recitation of what these
20  reflect?
21     A.  Yes.
22     Q.  And do you recall this, this issue?

Page 169

1      A.  Yes.
2      Q.  Okay.  Tell me what you recall about
3  this.
4      A.  Um, we -- I thought, that the OBRA '90
5  was irrelevant, but because North Carolina had a
6  most favored nation policy, and vigorously
7  enforced it, when I put out this bulletin saying
8  we're going to do the same thing, NACDS was, was
9  real upset and took the approach with HFCA that
10  this was something new, and it had -- and it
11  violated the OBRA '90 thing on some moratorium on
12  changes to pharmacy reimbursement.
13         The -- we had some ongoing negotiations
14  with NACDS, started out very contentious at first
15  and wound up pretty, pretty amiable.
16         The, the best argument they had was our
17  reimbursement rate with Tennessee Medicaid was
18  pretty low, was lower than most states, and that
19  it approached the ground level anyway, of what
20  they were getting that moment in time, from other
21  third-party payers.  So the juice of enforcement
22  really wasn't worth the squeeze of the benefit.

43  (Pages 166 to 169)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 170

1  So we backed off and never did implement the
2  policy is really, really the way it played out.
3      Q.  Do you know why it was -- were you
4  involved in --
5      A.  And then, and then when's, sometime
6  after that, I wouldn't absolutely swear to it,
7  but I believe then we -- that usual and customary
8  piece, either in a bulletin, I don't want -- or
9  maybe the state plan, something was thrown in
10 there to the cash-paying public or to the general
11 public, or something, some clarification of that.
12     Q.  Were you involved in this issue
13 yourself?
14     A.  Yes.
15     Q.  So even though the letter comes from
16 Manny Martens, --
17     A.  Yeah, I wrote it.
18     Q.  You're the one that wrote it?
19     A.  Um-hum.
20     Q.  And what you were trying to do was to -
21 - is it fair to say that what you were trying to
22 do was to make the usual and customary charge for

Page 171

1  a pharmacy claim submitted by a provider --
2      A.  Well, it was just --
3      Q.  -- mean something real?
4      A.  It was -- no.  It was, it was simpler
5  than that.
6          It was the imposition of something
7  similar to North Carolina, which is a most
8  favored nation clause.
9          If you're willing to accept AWP minus
10 20 plus a dollar from anybody, the State of
11 Tennessee should get that same deal.  That was
12 what I was after.  It didn't work.
13     Q.  Did you believe comparisons to what
14 other third-party payers were paying for drugs is
15 a useful metric regarding what Medicaid programs
16 ought to pay for drugs?
17     MR. DRAYCOTT:  Objection.
18     A.  No.
19 BY MR. TORBORG:
20     Q.  And why is that?
21     A.  Because you do have to factor in the
22 access issue.

Page 172

1      Um, some providers may think that these
2  -- that the Medicaid patients are more difficult,
3  more time-consuming, more expensive patients to
4  deal with.  And you don't want to let that get in
5  the way of still delivering quality care and
6  access to care.
7      Q.  Would it be fair to say, then, that you
8  think that Medicaid programs ought to pay more
9  than what other third-party payers pay?
10     MR. DRAYCOTT:  Objection.
11     A.  I think they need to do, within
12 budgetary limits, all they can to assure access
13 to the best providers in the state.
14     For example, if you look at orthopedic
15 surgeons, or orthopedists, regardless of, of what
16 an MCO and TennCare may be willing to pay those
17 providers, they just, at one point in time just
18 said, We don't do TennCare.  So you got a heck of
19 a problem there.  Reimbursement level may have
20 been more than any other third party, they just
21 wouldn't participate.  So you got to, you got to
22 be careful about that.

Page 173

1  BY MR. TORBORG:
2      Q.  Did your department or the state
3  generally ever prepare studies or commission
4  studies to compare provider acquisition costs to
5  AWP?
6      A.  No.
7      Q.  Whether it be --
8      A.  I don't think so.
9      Q.  Do you recall the organization called
10 Myers and Stauffer?  Do any work with them?
11     A.  I might have.  I don't know.
12     Q.  Did you -- did Tennessee Medicaid
13 either itself or have someone else do any studies
14 on what it cost to dispense prescription drugs in
15 Tennessee?
16     A.  Um, during, during my tenure, no.  But
17 I was aware -- I even had at least two that were
18 done prior to my employment with the state.  My
19 predecessor had left, you know, in his files, and
20 I had reviewed them, done by UT College of
21 Pharmacy in Memphis.
22     Q.  I wanted to ask you another question

44  (Pages 170 to 173)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                      March 12, 2008
                        Nashville, TN

Page 214

1   just very, very recently in the news as well?
2   First DataBank's role in determining AWP in a
3   settlement.  McKesson chose not to settle and
4   First Databank --
5           MR. DRAYCOTT:  You are correct.  There,
6   there, there is a, I believe, a class
7   certification occurred with respect to First
8   DataBank.
9           THE WITNESS:  McKesson is holding out.
10          MR. DRAYCOTT:  There is also a
11  settlement with respect to First Databank.
12          THE WITNESS:  Okay.  That, that's the
13  end of this, isn't it?  This is 2000?
14          MR. DRAYCOTT:  I'm going to let Mr.
15  Torborg deal with your questions.
16          MR. TORBORG:  Let me --
17          THE WITNESS:  Okay.  My, my -- the
18  reason for saying that is, I'm more familiar with
19  what's recently going on, and I think it's all
20  related, okay?
21  BY MR. TORBORG:
22      Q.  Well, let me bear, you know, bear down

Page 215

1   the document a little bit --
2       A.  Okay.
3       Q.  -- maybe I can refresh your
4   recollection --
5       A.  All right.
6       Q.  -- about what this specific issue was
7   in play here.
8           The letter refers to, in the second
9   paragraph, a proposal that was discussed at the
10  state pharmacy director's July 1999 national
11  conference.
12      A.  Right.
13      Q.  Apparently there was a presentation
14  made by United States Attorney Reed Stevens,
15  HHSOF OIG associate counsel, Mary Ruden, and the
16  Maryland MFCU director -- and MFCO is M-F-C-O --
17  C-U, Director Carolyn McElroy.
18          Do you recall at all, Mr. Sullivan,
19  that meeting?
20      A.  I probably was there.
21      Q.  Do the names Reed Stevens, Mary Ruden
22  and Carolyn McElroy ring a bell?

Page 216

1       A.  Yes.
2       Q.  You have attended meetings where they
3   have been in attendance?
4       A.  I'm sure I have.
5       Q.  Have you had any conversations with Mr.
6   Stevens at any point in time?
7       A.  No.  No.
8       Q.  How about Ms. Ruden?
9       A.  No.
10      Q.  How about Carolyn McElroy?
11      A.  No.
12          Excuse me.
13      Q.  Look at the next paragraph.  It states,
14  Stated briefly, under impending change to current
15  procedures, FDB will base the average wholesale
16  price as it reports on market prices rather than
17  the prices identified by manufacturers.
18  Additionally, FTB will no longer report a price
19  for a product unless its manufacturer has
20  certified the completeness and accuracy of
21  pricing information submitted.
22          Does this refresh your recollection at

Page 217

1   all about what -- this specific proposal?
2       A.  Yes, sir.
3       Q.  And as refreshed, do you -- can you
4   tell me anything more about your recollection of
5   this initiative?
6       A.  Well, I just -- I'm just not sure
7   whatever happened between then and today that is
8   complying with that statement, whether it was or
9   wasn't.
10          I think, you know, everybody might be
11  missing the boat if, if they want to consider AWP
12  to be an accurate assessment of what people pay
13  for drugs.
14      Q.  And --
15      A.  This isn't going to fix it.
16      Q.  And if you look further down the
17  paragraph, the carryover paragraph on page 110,
18  the second page of the exhibit, the sentence is
19  that starts with More importantly.  Do you see
20  that?
21      A.  Yes.
22      Q.  It says, More importantly, in view of

                                    55 (Pages 214 to 217)

Sullivan, Harry Leo                                    March 12, 2008
                          Nashville, TN

Page 282

1      A.  Right.
2      Q.  And there is nothing wrong with
3  entering into an agreement to provide for that
4  either; right?
5          MR. DRAYCOTT:  Objection.
6      A.  No.
7  BY MR. KATZ:
8      Q.  Okay.  Now one of the prices which
9  would be covered by 7A would be AMP; right?
10     A.  Yes.
11     Q.  And this provision would prevent CMS
12 and Tennessee from disclosing Dey's AMP; right?
13     A.  Yes.
14     Q.  So this, this provision contemplates
15 that Tennessee would have --
16     A.  Well, we wouldn't -- we wouldn't -- I
17 don't think we'd even know what AMP was.
18     Q.  Well, this provision in this contract
19 contemplates that Tennessee might have AMP
20 information; right?
21     A.  Yeah.  But I think practically all we
22 ever got was unit rebate amounts.

Page 283

1      Q.  And for a generic drug you can
2  determine the AMP from the unit rebate amount;
3  right?
4      A.  You think that.  I'm not positive that
5  you can back into AMP on a generic drug by that
6  simple calculation.  I just -- I would have to
7  look real hard at the, at the law again to see
8  how that's calculated to make that leap.
9      Q.  Okay.  Assuming the statute --
10     A.  It's too transparent for me.  I can't
11 believe that the manufacturers let it get into
12 the code that way, if that's true.
13     Q.  Assuming the statutory formula is, for
14 instance, in 1994 unit rebate amount equals, for
15 a generic drug, 11 percent of AMP, and if you had
16 the unit rebate amount, you could calculate the
17 AMP; right?
18     A.  If that is true, then that's probably
19 an accurate statement.
20     Q.  And then the state would have the drug
21 manufacturer's AMP information for generic drugs;
22 right?

Page 284

1      A.  They could back into it if all that is
2  correct, yes.
3      Q.  Okay.  And you're not aware of any
4  statute which would prevent CMS from just
5  transferring all the AMPs directly to the state
6  and which -- and asking the state to calculate
7  the URAs, right?
8      A.  No, I don't, I don't think that would
9  ever happen.
10     Q.  You're not aware of any statute that
11 would prevent that, are you?
12         MR. DRAYCOTT:  Objection.
13     A.  Well, first, it just wouldn't -- first
14 of all, the manufacturers aren't going to
15 duplicate 51 times what they're sending once to
16 CMS.  It just -- it wouldn't happen.
17 BY MR. KATZ:
18     Q.  Setting that aside, is there anything
19 in the statutes, federal statutes or state
20 statutes, which would prevent CMS from providing
21 all the AMP information that Dey provided CMS, or
22 any other drug manufacturer provided CMS, and

Page 285

1  then providing that to Tennessee?
2          MR. DRAYCOTT:  Objection.
3  BY MR. KATZ:
4      Q.  As far as you know.
5      A.  It wouldn't happen.
6          I just -- it's too much work.  There's
7  480 or however ever many manufacturers involved
8  with 400,000 NDCs, and all the unit rebate
9  amounts that go with that, and duplicating that
10 51 times, it just -- it isn't going to ha --
11 can't foresee -- I couldn't foresee that ever
12 happening.  I don't know that the law prohibits
13 it from occurring, if that's your question.
14     Q.  Okay.  But you would agree with me,
15 though, that this contract between Dey and the
16 federal government and all states with approved
17 Medicaid programs, such as Tennessee, provides
18 for states keeping AMP information confidential
19 in case they do have it; is that right?
20     A.  Yes.
21     Q.  Okay.  And there is nothing wrong with
22 that; right?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 286

1    A.  No.
2       MR. DRAYCOTT: Objection.
3    Q.  Okay.
4    A.  And even as we've progressed through
5  today with all the supplemental rebates, this
6  language is pretty much identical and
7  supplemental rebate agreements between
8  manufacturers and the states.
9  BY MR. KATZ:
10   Q.  And pursuant to supplemental rebate
11 agreements do drug manufacturers report AMPs
12 directly to the states?
13   A.  Um, some might.  I can't -- I think
14 what you're more likely to see primarily on the -
15 - supplementary rebates don't touch the generic
16 side.  So the brand name side, what you're more
17 likely to see is some calculation may be based on
18 utilization or formulary placement, or whatever
19 that would be, in addition to a unit rebate
20 amount, you've already gotten from the HCFA
21 quarterly tape, or some way to avoid having to
22 give you a state all that AMP data, or one of

Page 287

1  your PBMs, because of the lack of security that
2  may exist there.  So you're more likely to say,
3  We want an additional percentage or number
4  associated with a unit rebate amount, in addition
5  to.  That would take me ultimately from I know
6  I'm getting 35 percent of the drug spend for that
7  drug in Medicaid rebate now, I want 10 more.  I
8  want the net effect of -- whatever the
9  calculations are, let's agree it's going to be 10
10 percent more.
11   Q.  Let's suppose a state Medicaid program
12 decided that they wanted to base a rebate on AMP
13 but they didn't want to use the same formula as,
14 as the federal government did for the Medicaid
15 rebate agreement that we're looking at now.
16 Could they then require the drug manufacturer, as
17 far as you know, to report the AMP directly to
18 the state?
19   A.  They could --
20      MR. DRAYCOTT: Objection.
21   A.  They could draw up a contract if the
22 manufacturer was agreeable to make them give you

Page 288

1  every trade secret you got, if they want to sign
2  it, that's --
3  BY MR. KATZ:
4    Q.  Okay.  I would like you to turn to
5  Section 2 of the rebate agreement where it says
6  Manufacturer's responsibilities.
7    A.  I'm not sure where you are here.
8       MR. DRAYCOTT: Page 6.
9    A.  Back the other way.  Okay.
10 BY MR. KATZ:
11   Q.  After the initial --
12   A.  Yes.
13   Q.  -- first few pages.  Okay.  You found
14 it?
15   A.  Yeah.
16   Q.  Okay.  Okay.  I would like you to take
17 a look through this section, and just goes on to
18 the next page, and let me know when you're
19 finished.
20   A.  Okay.  Starts with Manufacturer's
21 responsibilities?
22   Q.  Yes.

Page 289

1    A.  Okay.
2       (Respite.)
3    A.  Okay.
4    Q.  Okay?  Ready?
5    A.  Um-hum.
6    Q.  And one of the drug manufacturer's
7  responsibilities is to calculate and report AMP
8  to CMS; is that right?
9    A.  Yes.
10   Q.  Is there any mention of the -- Dey
11 being required to calculate AWP in any way?
12   A.  No.
13   Q.  Is there any mention of Dey being
14 required to calculate WAC in any way?
15   A.  No.
16   Q.  Is there any mention of AWP at all in
17 this contract?
18   A.  No.
19   Q.  Is there any mention at all of WAC in
20 this contract?
21   A.  Not that I'm --
22      MR. DRAYCOTT: Besides that it's

73 (Pages 286 to 289)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 218

1    the Medicaid program's legal obligation to
2    reimburse true provider acquisition costs, such
3    an effort by the states to ensure payment is
4    based on actual prices, it is mandatory. Do you
5    see that?
6        A.  Yeah, I see it.
7        Q.  Do you recall a discussion at any
8    meeting that state Medicaid programs have a legal
9    obligation?
10       A.  No.  No.
11       Q.  Was that consistent with your
12   understanding of what was required by the state,
13   Tennessee?
14       A.  No.
15       Q.  And what was your understanding of what
16   was required?
17       A.  Well, I mean why -- if there was a
18   legal obligation to only reimburse true provider
19   acquisition costs, then why do we go through the
20   trouble of submitting state plans?  You tell me
21   what reimbursement is going to be.
22       Q.  What do you mean by that?

Page 219

1        A.  Well, why would -- if the federal
2    government is saying you are legally obliged to
3    pay no more than cost, then you tell me what cost
4    is.  Why do I bother submitting a state plan
5    amendment that says I'm going to apply the lesser
6    of this, or AWP minus that, or this or that or
7    the other, that you approve if I'm legally
8    obliged to paying cost.  Obviously -- I mean you
9    don't know what cost is.  You can't -- or else
10   you would dictate it.
11           Does that make sense?
12       Q.  A little bit.
13       A.  That's -- it's impossible to enforce,
14   and I don't ever remember anybody ever telling
15   me, Leo, you got a legal obligation to only pay
16   true provider's cost.  You do that and you won't
17   have a program.
18           Only people that could do that is a
19   340B federally qualified health plan.
20       Q.  If we go down to Paragraph 4 of this
21   letter, or I'm sorry, toward the bottom of the
22   page where there is an indent 4.  Do you see

Page 220

1    that?
2        A.  Um-hum.
3        Q.  It states, If providers concede that
4    reimbursement exceed acquisition costs but
5    maintain that the surplus is necessary to cover
6    ancillary costs of the drugs' administration,
7    e.g., nursing or incidental supply expenses,
8    their argument runs expressly counter to law.
9    Under Medicaid program requirements reimbursement
10   is dependent on the acquisition costs of the
11   drugs, not the overhead costs involved in
12   dispensing them.
13          Do you see that?
14       A.  Yes.
15       Q.  Okay.  Do you agree with that
16   statement?
17       A.  No.
18       Q.  Why not?
19       A.  Well, I mean, in practicality, that's
20   not the way it's done, and, and I never, I never
21   was advised by my bosses or people from the
22   regional office or people from central office of

Page 221

1    HFCA or CMS that that's the way things had to be
2    done.
3        Q.  And do you believe that reimbursement
4    was limited to the actual acquisition costs of
5    the drugs, that you would have an effective
6    program that provided access to care to
7    beneficiaries?
8        A.  It would severely compromise access to
9    care, in my opinion.
10       Q.  And would that be true across all fifty
11   states, in your opinion?
12       A.  There may be some rural versus urban
13   mix that, that might skew that, but I would think
14   so.
15       Q.  The next, next page, the carryover
16   paragraph, first sentence, states, No entity
17   charged with implementation or enforcement of
18   Medicaid program rules can responsibly
19   countenance a reimbursement system that violates
20   the statutory obligation to reimburse provider
21   acquisition costs.
22          Did you -- do you agree with that, Mr.

                                  56 (Pages 218 to 221)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                           March 12, 2008
                    Nashville, TN

Page 298

1    Q.  Right.
2    A.  Then, then we'd pay a hundred twenty.
3    Q.  But if the usual and customary was a
4  hundred.
5    A.  Oh.  And they billed it at a hundred,
6  then we'd only pay a hundred.
7    Q.  Okay.  So --
8    A.  You're relying, pre audits, on their
9  honesty to bill the usual and customary.
10       And their computer systems do that for
11  them.
12    Q.  But just to be clear, Tennessee
13  Medicaid never paid more than the usual and
14  customary charge; right?
15    A.  No.  Never paid more than AWP minus 13.
16    Q.  Right.  But it also never paid more
17  than the usual and customary charge.
18    A.  We, we, we might well have.
19    Q.  How?
20    A.  It depended on the honesty of the
21  billing provider.  If their usual and customary
22  was less than AWP minus 13.

Page 299

1    Q.  Let me rephrase.  Let me rephrase,
2  okay?
3    A.  All right.
4    Q.  Tennessee Medicaid never paid more than
5  the amount billed by the provider; right?
6    A.  That's, that's correct, unless --
7  unless there was some error in units or some --
8  generally speaking, yes.
9    Q.  Okay.  If there was no error --
10    A.  There certainly are times when claims
11  are overpaid, but it's, it's rare.
12    Q.  Assuming everything was done correctly,
13  Tennessee Medicaid never paid more than the
14  amount billed by the provider; right?
15    A.  That's correct.
16    Q.  And the provider was not supposed --
17  was supposed to bill its usual and customary
18  charge; right?
19    A.  That's correct.
20    Q.  Okay.  And the usual and customary
21  charge was the value it placed on the services it
22  provided; right?

Page 300

1    A.  Yes.
2    Q.  And so Tennessee Medicaid never paid
3  more than the value of the serv -- the services
4  that the provider gave to the Medicaid
5  beneficiary; right?
6       MR. DRAYCOTT:  Objection.
7    A.  I can't say that with -- because I
8  don't know the honesty level of the billing for
9  usual and customary.  If they billed me usual and
10  customary all the time, then the only thing I
11  would say about that, contrary to what your
12  question says, is that, well, at least I didn't
13  pay more than the cash-paying public did.  Maybe
14  still getting royally screwed, I don't know.
15  BY MR. KATZ:
16    Q.  Okay.  Let's -- let me rephrase that,
17  then.
18       From the standpoint of the provider,
19  and let's assume that there is no dispute that
20  the provider is honest and submits its true usual
21  and customary charge, okay?  And as its usual and
22  customary charge it submits the value it places

Page 301

1  on the services it gives to the Medicaid
2  beneficiary, it never receives more from
3  Tennessee, Tennessee Medicaid than that amount;
4  right?
5       MR. DRAYCOTT:  Objection.
6    A.  I'll agree.
7       MR. KATZ:  Okay.  I would like to mark
8  this has Dey Exhibit 124.
9       (Exhibit Dey 124 marked.)
10  BY MR. KATZ:
11    Q.  If we could just take a look at the
12  letter and let me know when you're ready.
13    A.  Go ahead.
14    Q.  Okay.  Do you recognize this letter?
15    A.  I'll tell you, I remember a lot of
16  correspondence from Dey during my time, but I --
17    Q.  I would like you to turn to the fourth
18  page of the exhibit.
19    A.  Yeah.  I'm on the distribution list
20  there.
21    Q.  Do you have any reason to doubt that
22  you actually did receive this letter?

76 (Pages 298 to 301)

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 310

BY MR. DRAYCOTT:
1    Q.   Just a reminder, Mr. Sullivan, my name
2  is Justin Draycott with the Civil Division of the
3  Department of Justice.  I represent the United
4  States in this matter and I'm going to try to
5  move this quickly.
6       At the outset I just repeat one of the
7  instructions that Mr. Torborg, or really a
8  request of Mr. Torborg made with you at the
9  outset, which is anything I ask you is unclear,
10  please just feel free to ask me for
11  clarification.
12       The first question I have for you is,
13  are you familiar with the term spread?
14    A.   Yes.
15    Q.   Well, let me back that up.  Spread in
16  the context of pharmaceutical reimbursement.
17    A.   Yes.
18    Q.   And do you understand that term to be
19  the difference between a provider's acquisition
20  cost for a drug and the amount that's ultimately
21  reimbursed under AWP-based regimen?

Page 311

1    A.   Yes.
2    Q.   And when I say the term, I don't mean
3  it in a pejorative sense, I'm just talking about
4  the difference between the --
5    A.   Cost.
6    Q.   -- cost of acquiring the drug and
7  ultimately what's reimbursed for that drug.
8    A.   Yes.
9    Q.   And if you could just keep that
10  definition in mind as we move forward.
11    A.   Okay.
12    Q.   I'm going to direct your attention back
13  to the first hour of your testimony with Mr.
14  Torborg, and in particular you were testifying at
15  that time about the period during 1989 and 1994,
16  that is, before the TennCare regimen began.  And
17  Mr. Torborg asked you whether or not it was
18  consistent with the fundamental principles that
19  Tennessee Medicaid was operating on to
20  incentivize providers by allowing some level of
21  profit with respect to the reimbursement amount
22  that was allowed by the state.  Do you recall

Page 312

1  that testimony?
2    A.   Yes.
3    Q.   And have I characterized it
4  approximately in a correct manner?
5    A.   Yes.
6    Q.   With respect to the --
7    A.   I think that, we were speaking I
8  believe primarily on the generic side.
9    Q.   All right.  But also I think you
10  applied it to, yeah, to the generic, and that you
11  were hoping to provide an incentive to move
12  utilization to generic drugs.
13    A.   Yes.
14    Q.   With respect to that profit component,
15  should your testimony be understood to mean that
16  any level of profit that might be generated by
17  the application of a spread, or the existence of
18  a spread, was in accordance with the fundamental
19  principles that Medicaid, the Medicaid program in
20  Tennessee was operating under?
21       MR. TORBORG:  Object to form.
22    A.   It would, it would depend on the level

Page 313

1  of that profit.
2  BY MR. DRAYCOTT:
3    Q.   For example, should we understand your
4  testimony to be that if there was a thousand
5  percent profit, for example, on a bag of water,
6  that wouldn't necessarily, by virtue of your
7  testimony, something that should be considered
8  to be consistent with the principles, the
9  fundamental principles that operated with respect
10  to Tennessee Medicaid at the time?
11    A.   I would answer that question maybe two
12  different ways.  First off, depending on the cost
13  of a product and looking at whatever the
14  dispensing fee is, it could be that a thousand
15  percent profit is a couple of dollars, okay?  So
16  it doesn't look quite so ridiculous, so
17  unacceptable, from a taxpayer's standpoint.
18       When it, when it is, when you are
19  talking about huge money, then that's when I
20  failed.  So to answer your question, it may be
21  appropriate in some small percentage of cases
22  that it would be a thousand percent profit, but I

79 (Pages 310 to 313)

Sullivan, Harry Leo                           March 12, 2008
                    Nashville, TN

---

Page 314

1  would, I would agree that, generally speaking, if
2  thousands of percents of profits are being made
3  on ingredient costs on a drug dispensed in the
4  Medicaid program that I was overseeing, that I've
5  made a mistake somehow, and it shouldn't be that
6  way.
7      Q.   That because, are you saying because
8  you didn't have a MAC in place?
9      A.   Either a MAC or some control on units
10 or some edit in the system that would have
11 prevented that occurrence.
12     Q.   But we shouldn't, we shouldn't consider
13 that, for example, twelve dollars offered for a
14 one-dollar bag of sterile water, that where the
15 acquisition cost was a dollar or dollar and a
16 half, we shouldn't automatically assume that your
17 testimony is meant to endorse the idea that a
18 payment rate, if it were to occur at 12 or 15
19 dollars was necessarily, just because it included
20 profit, should we necessarily assume that that
21 was consistent with the fundamental principles
22 that determined --

Page 315

1      A.   No.
2      Q.   -- appropriate reimbursement under the
3  Medicaid program.
4      A.   No.
5          MR. TORBORG:  Object to form.
6  Misstates the facts.
7  BY MR. DRAYCOTT:
8      Q.   You also I think testified that setting
9  -- you have to be careful not to set a
10 reimbursement amount that was too low because you
11 wanted to provide an incentive and to make sure
12 that there was patient access to, to providers
13 who were participating in the program.
14     A.   Yes.
15     Q.   Is there also a problem with creating,
16 with reimbursement, allowing reimbursement to be
17 too high?  Did that also -- if it's, if it's --
18 let's consider the example of a drug for which
19 there is an inflated amount of reimbursement
20 because of a very high AWP, does that present,
21 present the issue or the potential for
22 overutilization?  In other words, it would create

Page 316

1  its own incentives for providers.
2          MR. KATZ:  Objection to form.
3      A.   If a provider became aware that two
4  competing products were reimbursed at such
5  dramatically different levels, from a profit
6  standpoint, yeah, that could affect prescribing
7  patterns.
8  BY MR. DRAYCOTT:
9      Q.   And is that of concern to the Tennessee
10 Medicaid program, or was it during your tenure?
11     A.   Well, not so much -- yes.  But more
12 back to what, what I was talking about in the
13 previous question, that I failed.  I've made a
14 mistake somewhere for that to occur in the first
15 place.
16     Q.   When you say that, again it's because
17 of not putting a MAC in place that would have
18 completed the expenditure?
19     A.   That's, that's the jumping off spot,
20 yes.
21     Q.   And that, so your failure there, as
22 you're describing it as such, would be with

Page 317

1  respect to generic drugs?
2      A.   Yes.  By and large.  Because the, the
3  brand name thing is pretty much set tight at AWP
4  discount reimbursement.
5      Q.   Mr. Torborg also asked, showed you a
6  paragraph in the complaint by the United States
7  in this case in which it sets out a definition of
8  the term AWP.  More specifically, it was
9  paragraph 42 of the complaint.  Do you remember
10 being shown that definition?
11     A.   Yes.
12     Q.   And you said that you didn't agree with
13 it; is that correct?
14     A.   Well, I had -- I guess I'd have to look
15 at it again, but I didn't have a, a clear
16 understanding of who the end purchaser was, I
17 think, was where I was a little bit --
18     Q.   Well, was your concern that the
19 definition of AWP was not in accord with the AWPs
20 that were reported in the compendia?
21         MR. TORBORG:  Object to form.
22     A.   I would like to look at it again to

Henderson Legal Services, Inc.

202-220-4158                 www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                          Nashville, TN

Page 326

1    A.  No.
2        MR. KATZ:  Objection to form.
3    A.  Nor federal matching share either.
4        MR. DRAYCOTT:  That was my last
5  question.
6        THE WITNESS:  Outstanding.
7        MR. TORBORG:  I have a couple follow-up
8  questions.  If anyone -- see if anyone else on
9  the phone has any.  Anyone?
10       MS. LIEBERMAN:  Roxane would like to
11  reserve the right to ask questions at a later
12  date.
13       MR. DRAYCOTT:  I'm not representing
14  this witness, but I think the witness's
15  preference, and he can state it for himself,
16  would be to get this deposition finished today.
17       THE WITNESS:  That's correct.
18       MR. TORBORG:  Is there anybody else who
19  has questions today for Mr. Sullivan?  I have a
20  couple follow-ups, but I'll wait until everyone
21  else has had a chance to question.
22       MR. LYNN:  This is Paul Lynn.  I do not

Page 327

1  have any questions.
2        MR. JONES:  This is Scott Jones.  Go
3  ahead.
4        MR. TORBORG:  Okay.
5
6            REDIRECT EXAMINATION
7  BY MR. TORBORG:
8    Q.  Mr. Sullivan, I have just a couple
9  followup questions from the questions Mr.
10  Draycott had asked you.
11       First, Mr. Draycott asked you some
12  questions about a thousand percent spreads on
13  drugs; correct?
14    A.  Yes, sir.
15    Q.  And asked you if your testimony should
16  be seen by the jury in this case as endorsing or
17  not endorsing such spreads and whether or not
18  payment of a thousand percent spreads would be
19  appropriate.  Do you recall that?
20    A.  Yes.
21    Q.  Do you believe the better way to look
22  at the appropriateness of a Medicaid program

Page 328

1  paying a margin or spread on a drug is the dollar
2  value of the spread rather than the percentage?
3    A.  You know, at certain ends of the scale,
4  both need to be looked at, but I would agree that
5  the dollar difference is something that needs to
6  be looked at first, because, you know, a thousand
7  percent makes headlines but doesn't mean anything
8  if you don't have a dollar amount affixed to it.
9    Q.  And do you think expressing spreads in
10  terms of a percentage, like Mr. Draycott did, can
11  oftentimes --
12       MR. DRAYCOTT:  Objection.
13  BY MR. TORBORG:
14    Q.  -- misconvey the real spread that's
15  being paid by a Medicaid program?
16    A.  That's possible.
17    Q.  It may be that a spread of a thousand
18  percent might be an appropriate amount to pay,
19  depending on the facts and circumstances of both
20  the drug involved and the services involved in
21  paying those, dispensing those drugs?
22    A.  It gets back to partially this thought

Page 329

1  process of not wanting the drug to merely be a
2  commodity.  So if, for example, your dispensing
3  fee is limited to 2.50 and the drug -- and it is
4  a very inexpensive drug, and it does cost 6 bucks
5  to dispense that drug to a Medicaid patient,
6  ratcheting down reimbursement based on a
7  percentage of profit on the ingredients side may
8  make it prohibitive for that provider to dispense
9  the product.  If that makes sense.
10    Q.  It does.
11       If I could ask you to take out the
12  United States complaint once again, Tab 19.  It's
13  paragraph 42.  This is the point in the complaint
14  that states AWP is used to refer to the price at
15  which a pharmaceutical firm or a wholesaler sells
16  a drug to a retail customer who then administers
17  it to a patient; correct?
18    A.  Yes.
19    Q.  Mr. Draycott had asked you some
20  questions whether or not you were aware of the
21  legal definition of AWP; is that right?  Do you
22  recall that?

                              83 (Pages 326 to 329)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

---

Page 330

1    A.  Yes.
2    Q.  And before this lawsuit, have you ever
3  heard of anyone talking about the, what the legal
4  definition of average wholesale price would be?
5    A.  I, I don't remember that.
6    Q.  And --
7    A.  And I don't claim to know what the
8  legal definition of AWP is.  If I ever implied
9  that, I didn't mean to.
10    Q.  Well, this is -- this paragraph says
11  AWP is used to refer.  Do you see that?
12    A.  Yes.
13    Q.  It goes on.
14        And so that means somebody is referring
15  to AWP in a way that is calculated -- that is
16  indicated in this complaint.  Is that fair to
17  say?
18        MR. DRAYCOTT:  Objection.  Objection.
19    A.  That's the way I would read it.
20  BY MR. TORBORG:
21    Q.  That's not the way -- you did not refer
22  to AWP as the price at which a pharmaceutical

---

Page 331

1  firm or wholesaler sold drugs to retail
2  customers, did you?
3        MR. DRAYCOTT:  Objection.
4    A.  Yeah, I don't believe it to be true,
5  but the previous statement you made, that is the
6  way I would read it, too, is it is used by some
7  people, or by the Blue Book, or the industry as,
8  you know, the price that it's -- I believe people
9  would say that, but that's not actually true
10  sometimes.
11    Q.  And that's not how -- you never used
12  AWP to refer to the price at which pharmaceutical
13  firms or wholesalers sold drugs to customers?
14    A.  Actually paid for it, no.
15    Q.  So Mr. Draycott and the other
16  Department of Justice lawyers may use it to refer
17  to that, but that's not what you use to refer to
18  it; is that right?
19        MR. DRAYCOTT:  Objection.
20    A.  I don't think AWP is the price a
21  drugstore pays for, for a drug.
22  BY MR. TORBORG:

---

Page 332

1    Q.  And from your interactions with other
2  state pharmacy administrators, do you believe
3  that they use AWP to refer to the actual price at
4  which pharmaceutical firms or wholesalers sold
5  drugs to customers?
6        MR. DRAYCOTT:  Objection.
7    A.  I would just say globally that I don't
8  think any pharmacist practicing retail pharmacy
9  in particular ever believed AWP to be what people
10  paid for drugs.
11        MR. TORBORG:  That's all the questions
12  I have.  Thank you very much.
13        MR. DRAYCOTT:  We are concluded.
14        THE WITNESS:  Thank you.
15        MR. DRAYCOTT:  Thank you very much.
16        VIDEOGRAPHER:  This concludes the
17  deposition of Leo Sullivan, Volume 1.  The number
18  of tapes used was five.  Going off the record.
19  Time now is 16:47.
20        (Deposition concluded at 4:47
21  p.m.)
22

---

Page 333

1        SIGNATURE OF THE WITNESS
2
3
4
5
6        _____
7        HARRY LEO SULLIVAN
8
9  Subscribed and sworn to and before me
10  this _____ day of _____, 20_____.
11
12
13  _____
14    Notary Public
15
16
17
18
19
20
21
22

---

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com