# EXHIBIT 2

Reid, Robert Paul                                              December 15, 2008
                              Columbus, OH

Page 1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -  ) MDL No. 1456

IN RE: PHARMACEUTICAL INDUSTRY  ) Master File No.

AVERAGE WHOLESALE PRICE LITIGATION) 01-12257-PBS

--------------------------------)

THIS DOCUMENT RELATES TO:       ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc, et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS    )

---------------------------------


            VIDEOTAPED DEPOSITION OF ROBERT PAUL REID

                     Monday, December 15, 2008

                     9:59 o'clock a.m.

                     Jones Day

                     325 John H. McConnell Boulevard

                     Suite 600

                     Columbus, Ohio 43215

                  SHAYNA M. GRIFFIN

            REGISTERED PROFESSIONAL REPORTER

Reid, Robert Paul                                                December 15, 2008
Columbus, OH

Page 38

1  products these are?
2      A.  They all appear to be injectables.
3      Q.  Some are referred to as irrigation.
4  See that?
5      A.  Yes.  I see that.
6      Q.  What's the difference between
7  injection and irrigation?
8      A.  Well, an injection would be -- would
9  be introduced into the circulatory system of the
10 body; and the irrigation would be introduced into
11 the renal system of the body.  So, in other words,
12 it would be like a catheter put into a urethra
13 and then the item in question would be used for
14 flushing.
15     Q.  Some of the NDCs listed there relate
16 to Vancomycin.  You're familiar with that
17 product?
18     A.  I am.
19     Q.  Is it your understanding that at
20 times that's a product that is infused into a
21 patient?
22     A.  Yes.

Page 39

1      Q.  What's the difference between an
2  infusion and injection?
3      A.  An injection is usually immediate and
4  an infusion is usually over time, slowly over
5  time.
6      Q.  Mr. Reid, did you review any
7  documents to prepare for your deposition here
8  today?
9      A.  Yes, I did.
10     Q.  Did any of those documents refresh
11 your recollection about your time in the
12 department?
13         MS. GEOPPINGER:  I'm going to object to
14 the form of the question.  You mean his entire
15 career?
16         MR. TORBORG:  Yes.
17         MS. GEOPPINGER:  Okay.  You can answer
18 if you can.
19     A.  There were some items in the
20 information that I received that evoked my
21 memory, if you will.
22     Q.  Which documents were those?

Page 40

1      A.  Well, I think the one about the
2  letter that came to me from Ven-A-Care reminded
3  me of who the person was that sent it and what
4  the question was and what my answer was.
5      Q.  Are there any other documents that
6  when you were reviewing them preparing for
7  today's deposition invoked your memory to
8  remember something?
9      A.  I'd have to look through them and
10 answer the question accordingly.
11     Q.  Can you give me a sense for the
12 volume of documents that you reviewed.
13     A.  This packet here.
14     Q.  Did you meet with any attorneys to
15 prepare for today's deposition?
16     A.  Yes, I did.
17     Q.  Okay.  And when -- when was that?
18     A.  Last Thursday.
19     Q.  And who was in attendance at that?
20     A.  Louise -- I can't remember her last
21 name.
22         MS. GEOPPINGER:  Roselle?

Page 41

1         THE WITNESS:  Roselle, yes.
2         MS. GEOPPINGER:  R-O-S-E-L-L-E.
3  BY MR. TORBORG:
4      Q.  Anyone else?
5      A.  I think Drew -- well, no.  There was
6  just Louise and I.
7      Q.  Okay.  I'd like to review briefly
8  your educational and work background.
9      A.  All right.
10     Q.  And to do that, why don't we mark as
11 Abbott/Reid 1 the copy of your resume that you
12 handed me this morning.
13     A.  Thank you.  Okay.
14     Q.  Do you have your copy back?  I gave
15 it back --
16     A.  I do.
17     Q.  Could I get -- I want to mark that
18 one as our exhibit so I'll have one I can read.
19         - - -
20     (And, thereupon, Exhibit Abbott-Reid
21 001 was marked for purposes of identification.)
22         - - -

11 (Pages 38 to 41)

Reid, Robert Paul                                                December 15, 2008
Columbus, OH

Page 42

1      THE WITNESS:  Now, do I keep this?
2      MS. GEOPPINGER:  Here.  Why don't I
3  take this, and then you can look at the exhibit.
4  There you go.
5      THE WITNESS:  This one here?
6      MS. GEOPPINGER:  Are you finished with
7  this for the moment?
8      MR. TORBORG:  Yes.  Thank you.
9      THE WITNESS:  Okay.  I got it.
10     MR. TORBORG:  Okay.
11     MR. HENDERSON:  And, Mr. Reid, no, you
12 do not keep that.  The court -- the stenographer
13 gets to keep that exhibit.
14     THE WITNESS:  Oh, I'm sorry.
15     MS. GEOPPINGER:  No, no.  You're going
16 to use it for now.
17     MR. HENDERSON:  Not now.
18     THE WITNESS:  Oh, okay.
19     MS. GEOPPINGER:  And then when we're
20 done we'll leave it with the court reporter.
21     MR. HENDERSON:  I've encountered a
22 situation where the witness walked away with all

Page 43

1  the exhibits after the deposition.
2      MR. CYR:  That was Michigan; right?
3      MR. HENDERSON:  I think so.
4  BY MR. TORBORG:
5      Q.  We'll give you a copy of this if you
6  need it, we can leave it, okay?
7      A.  Right.  Thank you.
8      MS. GEOPPINGER:  I have it as well.
9      THE WITNESS:  Thank you.
10 BY MR. TORBORG:
11     Q.  Mr. Reid, would you tell us what the
12 document is that we marked as Abbott Exhibit 1.
13     A.  It was basically work experience and
14 honors that I've received over time and what
15 agencies I had consulted with during the period
16 before I was an employee of the State of Ohio.
17 There was a period of '76 to '91 where I was
18 actually a contracting consultant, and I had the
19 latitude at that time to speak at a variety of
20 events.
21     Q.  Mr. Reid, it looks like from the date
22 at the top that maybe you prepared this in April

Page 44

1  of this year.
2      A.  Yes.
3      Q.  And just walking through your
4  educational background, it appears as though you
5  received a graduate degree in pharmacy from Ohio
6  State in 1958.
7      A.  Yes.
8      Q.  And then after that you worked at a
9  retail pharmacy?
10     A.  I did.
11     Q.  Okay.  Which pharmacy was that?
12     A.  At -- it was McLaughlin's Pharmacy.
13     Q.  And where is McLaughlin's Pharmacy
14 located or where was it?
15     A.  In Columbus, Ohio, North High at Cook
16 Road.
17     Q.  And what were your duties in that
18 job?
19     A.  A.&&&dispensing pharmacist.
20     Q.  And then it appears from your resume
21 here that your next job was as an owner/manager
22 of a retail pharmacy starting in 1969.

Page 45

1      A.  Of that same store.
2      Q.  Did you buy out the previous owner?
3      A.  Previous owner, yes.
4      Q.  Now, as an owner/manager of -- was it
5  still called McLaughlin's Pharmacy or --
6      A.  Well, we changed the name -- I can't
7  remember the year that we changed the name, but
8  we changed to Overbrook because that was a name
9  given to the geographic area that I was -- that
10 the store was in.
11     Q.  Now, in your -- from 1969 to 1988 --
12 that's when you owned it; right, through 1988?
13     A.  Yes.  Yes.
14     Q.  Did you -- I assume you purchased
15 drugs.
16     A.  All the time.
17     Q.  And who did you purchase drugs from?
18     A.  Different wholesalers over time;
19 initially, mostly from a company called Orr,
20 Brown and Price, and then later on from a company
21 called Bailey Drug.
22     Q.  Were those drug wholesalers?

12 (Pages 42 to 45)

Reid, Robert Paul                                          December 15, 2008
Columbus, OH

Page 54

1  Q. I've heard of something called the
2  URA.
3  A. Yeah, the unit rebate amount.
4  Q. That's what you were referring to
5  there?
6  A. Yes.
7  Q. And someone in the computer area of
8  the department would take that unit rebate amount
9  per NDC and times it -- multiply it by the number
10 of the units?
11 A. Yes.
12 Q. And then a bill would go out to the
13 manufacturers?
14 A. Yes.
15 Q. Apart from working on this rebate
16 area --
17 A. Right.
18 Q. -- what else did you work on as a
19 staff pharmacist?
20 A. That was about the time that we
21 developed our relationship with First DataBank,
22 and they provide -- they would monthly provide us

Page 55

1  a list of all the new drugs that were in the
2  marketplace. And we -- I would go over that list
3  and make a decision on each line as to whether or
4  not it would be covered without prior
5  authorization or covered with prior
6  authorization. We did not have an option to not
7  cover it at all, because part of OBRA '90
8  indicated that if the manufacturer was paying
9  rebates, we had to cover, in some fashion, all of
10 their products.
11 Q. Now, do you know who processes the
12 claims that pharmacies -- pharmacy providers send
13 seeking reimbursement from Ohio Medicaid?
14     MS. GEOPPINGER: Object to the form of
15 the question.
16     You can answer.
17 A. Initially, the State did it itself.
18 The management information system processes --
19 processed the claims, determined the
20 reimbursement amount and provided payment.
21 Q. Eventually that changed?
22 A. That changed eventually until we got

Page 56

1  a contractor to do that for us. And that
2  contractor was First Health, First Health
3  Services.
4  Q. Do you know approximately when that
5  happened?
6  A. I want to say '99.
7  Q. Now, I'll be asking you some
8  questions today about -- I think it's come up
9  before about the state MAC program --
10 A. Yes.
11 Q. -- that Ohio had.
12 A. Yes.
13 Q. What involvement did you have with
14 that?
15 A. All of it.
16 Q. All of it.
17    Tell me what you mean by that, "all of
18 it."
19 A. Well, I was the sole person
20 responsible for the development of the rates.
21 Q. And is that true going back to 1991
22 when you started as a staff pharmacist?

Page 57

1  A. Prior to 1991, we paid for generics
2  using generic code numbers, numbers that we
3  created, billing code numbers that we created. So
4  if a pharmacy dispensed, let's say, an item like
5  Phenergan tablets, all of the Phenergan tablets,
6  12 and a half milligram, would be billed under a
7  common number that we created. We didn't use
8  NDCs at that time. OBRA '90 actually forced us
9  to use NDCs in order to capture rebates.
10 Q. So after OBRA '90 came in, did you no
11 longer use the separate codes that Ohio had?
12 A. Correct.
13 Q. Did you have to set up new codes to
14 determine equivalent drugs?
15 A. The NDC numbers.
16 Q. So you would put NDC numbers in
17 groups and then assign them a number?
18 A. On the generic side, yes.
19 Q. Now, I've heard something called a
20 generic sequence number.
21 A. Yes.
22 Q. Are you familiar with that?

15 (Pages 54 to 57)

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                                December 15, 2008
Columbus, OH

Page 58

1    A.  That's a First DataBank term.
2    Q.  What is your understanding of what
3  that is?
4    A.  It's a five-digit numeric number.
5  Again, using Phenergan 12 and a half milligram as
6  the example, every manufacturers' form of generic
7  Phenergan 12 and a half milligram and the trade
8  number had the same generic sequence number.
9    Q.  Did you guys use those on your MAC
10 program?
11   A.  Well, we used them for informational
12 purposes.  They were not -- they are not -- they
13 weren't on the invoice that the pharmacy provided
14 to us, nor were they on the reconciliation that
15 we provided back to the pharmacy.
16   Q.  How did you group NDCs that were
17 bioequivalent together?
18   A.  Yeah, that would be by that generic
19 sequence.
20   Q.  Okay.  Did you start working on the
21 MAC program as a consultant prior to 1991?
22   A.  Yes.  Back when we were using the

Page 59

1  dummy numbers, yes.
2    Q.  Okay.  And then you continued to have
3  responsibility once you started as a staff
4  pharmacist; correct?
5       MS. GEOPPINGER:  Object to the form of
6  the question.
7       You can answer.
8    A.  Yes.  I continued to do that.
9    Q.  And then in 1995 you became the
10 administrator of the pharmacy services unit; is
11 that right?
12   A.  Yes.  Yes.
13   Q.  When you were a staff pharmacist, who
14 did you report to?
15   A.  Robyn Colby.
16   Q.  What was her position?
17   A.  Bureau chief, health plan policy.
18   Q.  Were there any other staff
19 pharmacists at that time?
20   A.  Not -- you said '95?
21   Q.  Let's do 1991 through 1995.
22   A.  No, there were no others.  There were

Page 60

1  consultants that worked in other departments.  I
2  don't know when they started and when they
3  stopped.  But at various times there were -- I no
4  longer worked in the prior authorization unit
5  after I became a staff person.  But there were
6  pharmacists that still worked in the prior
7  authorization unit.
8    Q.  But as far as the MAC program --
9    A.  As far as the MAC program, that was
10 me.
11   Q.  And only you?
12   A.  And only me, until 2001.
13   Q.  When you became the administrator of
14 the pharmacy services unit, who did you report to
15 then?
16   A.  Robyn Colby.
17   Q.  Was the -- moving from a staff
18 pharmacist to an administrator, was that a
19 promotion?
20   A.  I don't remember.  It was -- it was a
21 title, a meaningful title, but it was a committee
22 of one, just me.

Page 61

1    Q.  Are you familiar with something
2  called the National Pharmaceutical Council --
3    A.  I am.
4    Q.  -- and reports that they issue every
5  year?
6    A.  Yes.
7    Q.  They describe the various programs
8  that states have for pharmacy benefits?
9    A.  All 50 states, yes.
10   Q.  In looking back through those, I
11 notice that you were listed, at least from 1991
12 to 2001, as the drug program coordinator or state
13 administrator.
14   A.  Yes.
15   Q.  Something like that.
16   A.  Yes.
17   Q.  What does that mean?
18   A.  It was just a title.  It didn't mean
19 anything then -- any different than state
20 pharmacy project manager or program manager.  It's
21 all semantics.
22   Q.  Do you know why you would be

16 (Pages 58 to 61)

Reid, Robert Paul                                                December 15, 2008
Columbus, OH

Page 62

1  designated as that person for Ohio?
2      A.  I was the only one involved in
3  pharmaceutical pricing at that time.
4      Q.  Did your job duties as administrator
5  stay the same throughout 1995 through September
6  of 2008?
7      A.  Well, only -- it only differed to the
8  extent that I had assistants came on board.
9      Q.  When did the assistants come on
10 board?
11     A.  The first one was 2001.
12     Q.  Who was it that came on board?
13     A.  Tammie, T-A-M-M-I-E, Stroup,
14 S-T-R-O-U-P.
15     Q.  What kind of assistance did she
16 provide?
17     A.  In every detail that we worked on she
18 was -- she was involved.  She actually was -- she
19 actually did our state plan amendments.
20     Q.  Prior to 2001, did you have any part
21 in doing the state plan amendments?
22     A.  No.  That was mostly Ms. Colby.  I

Page 63

1  never really got involved in state plan
2  amendments.
3      Q.  You're familiar with what they are?
4      A.  Vaguely.  I think the state is
5  required to tell CMS what they are doing with CMS
6  money.
7      Q.  And did you review those plans from
8  time to time?
9      A.  I don't remember that I ever did.
10         MR. TORBORG:  Why don't we take a
11 break.  Go off the record.
12         THE WITNESS:  Good.
13         THE VIDEOGRAPHER:  One moment, please.
14     Off the record at 10:57.
15         (Discussion held off the record.)
16         THE VIDEOGRAPHER:  On the record at
17 11:03.
18 BY MR. TORBORG:
19     Q.  Welcome back, Mr. Reid.
20     A.  Thank you.
21     Q.  While you were within the department
22 working on pharmacy issues, did you attend any

Page 64

1  conferences or meetings attended by other people
2  in other state Medicaid programs --
3      A.  Oh, yes.
4      Q.  -- who did what you did?
5      A.  Yes, frequently.
6      Q.  Tell me about those.
7          MS. GEOPPINGER:  I'm going to object to
8  the form of the question.
9  BY MR. TORBORG:
10     Q.  Just generally, who they were
11 sponsored by, who was in attendance, that kind of
12 thing.  And then I'll bear down on each of those
13 in a little bit.
14         MS. GEOPPINGER:  Object to the form of
15 the question.
16         You can answer if you can.
17     A.  Okay.  There is an organization
18 called the American Association of -- let's see.
19 Medicaid -- American Association of Medicaid
20 Pharmacy -- I can't remember --
21     Q.  Let me throw out one and see if --
22     A.  Okay.

Page 65

1      Q.  I've heard something called SAMPA,
2  the state --
3      A.  The southern version of that.
4      Q.  Okay.
5      A.  And WMPAA was the western version,
6  and EMPAA was the eastern version.  The Midwest
7  did not have its own association, but we were
8  frequently invited to participate in one that was
9  called the national meeting.
10     Q.  Did you -- were you ever invited to
11 attend either the western, southern or eastern
12 regions of that organization?
13     A.  I remember the western and the
14 southern, and I also remember the overall one,
15 the national association.
16     Q.  And was this the organization that
17 you were trying to remember the name of, or did
18 you have something else in mind?
19     A.  It was AMPAA --
20     Q.  AMPAA?
21     A.  Yeah.  But I can't remember what the
22 initials stood for.

17 (Pages 62 to 65)

Reid, Robert Paul                                               December 15, 2008
Columbus, OH

Page 78

1    Q.  And did you see the subpoena for your
2  deposition requested production of documents that
3  you might have in your possession?
4    A.  I'm sorry.  Would you repeat that.
5    Q.  Strike that.  Let me start over.
6    A.  Oh.
7    Q.  Do you have any documents at home?
8    A.  No.
9    Q.  Or anywhere else that related --
10   A.  This is all I had, and I got that on
11 Thursday or in the middle of the week.
12   Q.  When you left your job you left all
13 your files behind; correct?
14   A.  I did.
15   Q.  There might be materials relating to
16 the PTAG in there that you didn't look for?
17   A.  Maybe, uh-huh.
18   Q.  Fair to say?
19   A.  Uh-huh, maybe.  Because I encouraged
20 them to retain my assistant.
21   Q.  And that's Tammie?
22   A.  No.  This is another one, Margaret

Page 79

1  Scott.
2    Q.  Margaret Scott, okay.
3    A.  She came on board in '04.
4    Q.  Did the PTAG have phone call
5  meetings?
6    A.  Yeah, teleconferences.
7    Q.  Okay.  Apart from the yearly
8  face-to-face meeting that eventually, I think,
9  you indicated went to a teleconference, were
10 there other just phone calls?
11       MS. GEOPPINGER:  I'm going to object to
12 the form of the question.  I think he testified
13 that they were monthly, then quarterly.  So you
14 mean in addition to the monthly and quarterly, or
15 are you including those?
16 BY MR. TORBORG:
17   Q.  Did you have phone calls with PTAG?
18   A.  There were phone calls requesting
19 agenda items from the -- CMS sponsored the
20 meetings, but we had a moderator, APHS -- APHSA.
21 I can't remember what that stood for.
22   Q.  They -- this organization played a

Page 80

1  part in developing the agenda --
2    A.  Yes.
3    Q.  -- and organizing the meetings?
4    A.  Yes.
5    Q.  Did you have phone calls amongst the
6  PTAG members every month?
7    A.  Well, at the meeting itself.
8    Q.  Yes.
9    A.  At the teleconference itself.  It was
10 every month for a while and then it was
11 quarterly.
12   Q.  You don't know when it went quarterly
13 --
14   A.  No, I don't remember.
15   Q.  -- from monthly to quarterly?
16   A.  Huh-uh.
17   Q.  Fair enough.
18       And was it your practice to attend
19 those phone calls?
20   A.  Yes, it was.
21   Q.  What was your understanding of what
22 the purpose of the PTAG was?

Page 81

1    A.  I think it was CMS gathering
2  information; Larry Reed and Sue Gaston, in
3  particular.
4    Q.  And when you say "gathering
5  information," what do you mean by that?  What
6  kind of information were they gathering?
7    A.  Well, whatever was pertinent to the
8  agenda.
9    Q.  Was another purpose of the PTAG to
10 allow the states to discuss their experiences
11 with all things relating to Medicaid pharmacy?
12       MS. GEOPPINGER:  Object to the form of
13 the question.
14       You can answer.
15   A.  Yes.
16   Q.  And you indicated, I believe, before
17 that there were minutes kept of the meetings; is
18 that right?
19       MS. GEOPPINGER:  Object to the form --
20 object to the form of the question.  That
21 mischaracterizes his testimony.
22       You can answer.

21 (Pages 78 to 81)

Reid, Robert Paul                                                December 15, 2008
Columbus, OH

Page 86

1  matters. We had a 50-state e-mail connection,
2  not related to the PTAG.
3     Q.  That was next on my list here to ask
4  you about, so let me ask you about that.
5     A.  Oh, okay.
6     Q.  Tell me about the e-mail connection
7  that you had with the other states.
8     A.  Yeah. Carolyn Sojourner, who was the
9  pharmacy administrator for South Carolina, took
10 it upon herself to create a National Association
11 of Medicaid Pharmacy Administrators. That was
12 that -- yeah, that was it. And every time
13 anybody on the 50 states asked a question, all 50
14 states got to see the question. And any time
15 that the states -- any of the states would reply
16 to the question, if they had replied to all, then
17 every state would be privy to the answers. Very
18 informative. All 50 Medicaid agencies are
19 different, of course. If you've seen one, you've
20 seen one. But people are interested in what
21 their peers are doing.
22    Q.  Do you have a sense for when that

Page 87

1  e-mail group started?
2     A.  I would say around 2000.
3     Q.  Now, prior to that, was there a
4  mechanism where your peers at other states could
5  communicate?
6     A.  Phone.
7     Q.  Pull out a document, see if it
8  refreshes your recollection on anything.
9         MR. TORBORG:  Mark this as Abbott/Reid
10 2.
11            - - -
12        (And, thereupon, Exhibit Abbott-Reid
13 002 was marked for purposes of identification.)
14            - - -
15        THE WITNESS:  Thank you.
16 BY MR. TORBORG:
17    Q.  For the record, what I've marked as
18 Abbott/Reid 2 bears the Bates numbers
19 AWP-IL-00010038 through 42.
20       Mr. Reid, your -- you can look at this
21 document if you want to. I'm going to have some
22 questions about it for you later. I want to ask

Page 88

1  you first to go to the second page in the
2  document --
3     A.  Yes.
4     Q.  -- bearing the Bates number ending
5  039. And I'm pointing to --
6        MS. GEOPPINGER:  Bear with me just a
7  second.
8        MR. TORBORG:  I'll explain it.
9        MS. GEOPPINGER:  Okay. Go ahead.
10 BY MR. TORBORG:
11    Q.  When I refer to Bates numbers, I'll
12 refer to --
13    A.  Uh-huh.
14    Q.  -- that little number in the lower
15 right corner of the document.
16    A.  Uh-huh, okay.
17    Q.  And I usually will read off the last
18 three digits.
19    A.  Okay.
20    Q.  And so here, for example, I'm asking
21 you to go to 039 --
22    A.  Okay.

Page 89

1     Q.  -- which will be on the page that
2  you're at.
3     A.  Okay.
4     Q.  Okay.
5        Now, this appears to be a fax cover
6  page titled "Facsimile Transmission Medicaid
7  Pharmacy Program Administrators." This one is
8  dated September 25th, 1995.
9     A.  Okay.
10    Q.  And in looking at that list, does
11 that appear to contain both yourself at the top
12 of the third column --
13    A.  Yes.
14    Q.  -- as well as a number of your other
15 -- of your peers at other state Medicaid
16 programs?
17    A.  Yes. Looks like all of them.
18    Q.  Do you recall getting faxes like this
19 in this kind of form?
20    A.  Vaguely. That's 1995.
21    Q.  Was this a way that your peers in
22 other states communicated on issues?

23 (Pages 86 to 89)

Henderson Legal Services, Inc.
202-220-4158                                            www.hendersonlegalservices.com

Reid, Robert Paul                                         December 15, 2008
                              Columbus, OH

---

Page 106

1   words, the New York attorneys -- Attorney
2   General's office was not telling states that they
3   had to do something because of this information.
4        MR. TORBORG:  I'd like to mark as
5   another exhibit -- this will be Abbott/Reid 3.
6   This is an excerpt from a deposition that I took
7   of an individual by the name of Harry Leo
8   Sullivan.
9        A.  I know Leo, Tennessee.
10       Q.  Okay.  He was -- he had your job in
11  Tennessee is your understanding?
12       A.  Yes, yes.  A little different slant
13  to it because they were mostly managed care.
14       Q.  Sure.
15       A.  And we weren't at the time.
16       Q.  I'd like you, if you would, to go to
17  the second page of --
18            - - -
19       (And, thereupon, Exhibit Abbott-Reid
20  003 was marked for purposes of identification.)
21            - - -
22  BY MR. TORBORG:

Page 107

1        Q.  I'd just like to read to you some of
2   his testimony and get your response to it.
3        A.  The second page, okay.
4        Q.  Second page, starting at page 100 in
5   the top right corner.  There are four pages per
6   -- four pages of transcript --
7        A.  Oh, 100.  Yeah, I got it.
8            MS. GEOPPINGER:  Bear with me just one
9   second.
10           Mr. Reid, how it works on these
11  transcripts is it reads down this way, okay.
12           THE WITNESS:  I got you.  So this is
13  100 here?
14           MS. GEOPPINGER:  Yes.
15  BY MR. TORBORG:
16       Q.  I'll be asking you to follow along as
17  I read page 100, line 13.  See the little 13 on
18  the left side there?
19       A.  Yes.
20       Q.  Down to page 101, 18.  I'll go ahead
21  and read into the record, if you will follow
22  along.

Page 108

1        "Question:  Did you believe that you
2   could shave 20, 30 percent off of it" -- and I'm
3   referring to AWP here.
4        A.  Uh-huh.
5        Q.  -- "and get a reliable number of what
6   pharmacies and physicians actually paid for
7   drugs?
8        "Answer:  Well, it would depend on -- I
9   mean, are we talking brand or generic?
10       "Question:  Both right now.  Would you
11  draw a distinction?
12       "Answer:  Oh, yeah, yeah.
13       "Question:  All right.
14       "Answer:  The generic drugs, you know,
15  you could pay AWP minus 80 percent and still the
16  pharmacists make money for some, I assume.  But
17  AWP minus 25 might be below cost for a brand name
18  drug for a rural pharmacy that has very small
19  volume.  Okay.  So there is -- there is a
20  difference between brand and generic.
21       "In Tennessee, it wasn't as pronounced
22  because, you know, what I did as part of my job,

Page 109

1   as soon as a drug became multi-source, and after
2   OBRA '90, as soon as that drug -- the multisource
3   version of the drug was cheaper than the brand
4   name net-net of Medicaid rebates, we MACed it.  So
5   AWP wasn't an issue on the generic side."
6        A.  Correct.
7        Q.  "Question:  And why did you --" then
8   the answer, "But to say 20, 30 percent, use that
9   number, you would have to distinguish between
10  brand and generic."
11           Do you see that?
12       A.  I got it.
13       Q.  Do you have an understanding of what
14  his testimony was there?
15           MS. GEOPPINGER:  Object to the form of
16  the question.
17           You can answer if you know.
18       A.  I can say that I don't know what --
19  where Mr. Sullivan was coming from, but I would
20  say generally that I might have responded to
21  those questions in the same manner.  He's making
22  a clear distinction between trade name drugs and

28 (Pages 106 to 109)

Page 110

1  generic drugs, and that is true.
2     Q.  That's something that you understood
3  as well?
4     A.  Yes.
5     Q.  That discounts were higher on the
6  generic side than they were on the brand name
7  side?
8     A.  The representation of AWP, the
9  difference between AWP and AAC was greater on the
10 generic side than it was on the trade name side.
11    Q.  That's something that you were aware
12 of?
13    A.  Yes, I was aware of that.
14    Q.  Now, Ohio at some point used
15 something called wholesale acquisition cost to
16 reimburse pharmacies --
17    A.  Yes.
18    Q.  -- correct?
19    A.  Yes.
20    Q.  What was your understanding of what
21 wholesale acquisition cost represented?
22    A.  Well, what the wholesaler paid for

Page 111

1  the drugs from the manufacturer.
2     Q.  Did you have an understanding -- what
3  understanding did you have regarding the
4  relationship between AWP and WAC, WAC being short
5  for wholesale acquisition cost?
6     A.  Uh-huh.  We always used the baseline
7  if the AWP was a dollar, the WAC would be 80
8  cents for trade name drugs.
9     Q.  How about for generic drugs?
10    A.  All over the board.
11        MR. TORBORG:  Mark as Abbott/Reid 4
12 another document.
13           - - -
14        (And, thereupon, Exhibit Abbott-Reid
15 004 was marked for purposes of identification.)
16           - - -
17 BY MR. TORBORG:
18    Q.  For the record, what I've marked as
19 Abbott/Reid 4 bears the Bates No. OH004755
20 through 56.  Appears to be a February 25, 1997,
21 letter from Mr. Reid to an Ernie Boyd, Executive
22 Director, Ohio Pharmacists Association.

Page 112

1     A.  Okay.
2     Q.  Mr. Reid, do you -- after you've had
3  a chance to look at this document -- take all the
4  time you need --
5     A.  Thank you.
6     Q.  -- my first question will be just
7  whether you recall it?
8     A.  Okay.  I do recall it.
9     Q.  Did you draft this letter?
10    A.  I did.
11    Q.  Okay.  On or around February 25th,
12 1997?
13    A.  Correct.
14    Q.  And then you've copied a Bill Ryan
15 and a Patrick Lanahan.  Who are they?
16    A.  Bill Ryan was the director of the
17 department, and Patrick Lanahan was the bureau
18 chief before Robyn Colby.
19    Q.  They were people with -- that were
20 employed by Ohio, those two people?  Mr. Ryan --
21    A.  Yes, Yes.
22    Q.  Now, in the first paragraph you've

Page 113

1  indicated, "Pursuant to our recent meeting, I
2  wanted to respond to your request for the
3  relationship between WAC, wholesale acquisition
4  cost, and AWP, average wholesale price, based on
5  our perceptions here at the department"; right?
6     A.  Right.
7     Q.  And this was something that was
8  happening because on or around this time Ohio was
9  moving to -- from an AWP-based formula for
10 trading drugs to a WAC-based formula; correct?
11    A.  Yes.  Yes.
12        MS. GEOPPINGER:  For the record, I'm
13 just going to object to the form.
14        THE WITNESS:  Okay to answer?
15        MS. GEOPPINGER:  Yes.
16        THE WITNESS:  We went -- I recall that
17 we went from AWP minus 7 percent to WAC plus 11
18 percent.  And I think the reason we did that was
19 we were in a budget crunch, and since AWP --
20 since WAC plus 11 percent equated to AWP minus I
21 think it was 11.2, you could see that the -- we
22 were decreasing the reimbursement that we were

29 (Pages 110 to 113)

Page 118

1    A.  Okay.
2    Q.  -- about the relationship between WAC
3  and AWP?
4        MS. GEOPPINGER:  Wait.  Just a minute.
5        For the record, let me object to the
6  form.
7        You can answer.  Go ahead.
8    A.  Yes.
9    Q.  I think you estimated that WAC was
10 about 80 percent of AWP.
11   A.  Yes.
12   Q.  This is saying --
13   A.  For trade name drugs.
14   Q.  And then just skip down to the next
15 paragraph, you wrote, "On the generic side, it is
16 difficult, if not impossible, to determine the
17 relationship between WAC and AWP."
18   A.  That's correct.
19   Q.  Do you know why you said that?
20   A.  Well, because it was true.
21   Q.  And then the next sentence you state,
22 "We do not -- we do make every attempt to set our

Page 119

1  maximum allowable reimbursements at the 65 --
2  66th percentile of what pharmacies actually are
3  paying for generics"; right?
4    A.  Yes, right.
5    Q.  Now --
6    A.  Basically that meant that if a
7  pharmacy was a prudent buyer, he would buy at the
8  low end; and if he was a rural pharmacy that
9  didn't have a lot of buying power, he would buy
10 -- maybe pay a little more.
11   Q.  Why did the department make every
12 attempt to set MACs for generics?
13   A.  To save money.
14   Q.  The State didn't have to set MACs for
15 individual products, did it?
16   A.  The State could have done what other
17 states -- some other states did, and paid for
18 generics at AWP minus some percentage.  Illinois,
19 I recall, was like 62 percent that I remember.
20 But AWP minus 62 percent still would not
21 necessarily reflect actual acquisition cost in
22 our estimation at the time.

Page 120

1    Q.  Then you say in the next sentence,
2  "We are currently undertaking an exercise with
3  First DataBank to assess the impact of paying for
4  generics at WAC plus nine percent, but we won't
5  know the outcome of methodology until we compare
6  the results with our present structure."
7    A.  Yes.  I remember that.
8    Q.  Okay.  What led to that project?
9    A.  Well, I think we were trying to find
10 a WAC plus that would suit most of the people
11 most of the time.  And as I recall, I think we
12 decided that WAC plus nine percent was not good
13 enough.  And I think we chose WAC plus 11.
14   Q.  But you maintained maximum allowable
15 cost for most generic drugs?
16   A.  Unless -- unless the -- now, this is
17 after the rebate program, okay.  Much like what
18 Leo Sullivan said in his responses, we would try
19 to find out what pharmacies were actually paying
20 for their generics, and we would try to set a
21 reimbursement rate accordingly.  However,
22 sometimes that reimbursement rate that we

Page 121

1  computed meant that we were actually paying more
2  for the generic than we were paying for the
3  trade, because the rebates played into the
4  calculations.
5    Q.  The last sentence of your paragraph
6  you wrote, "Optimistically, the results will be
7  comparable, but the labor intensity of managing
8  the prices will be greatly minimized."
9        Do you see that?
10   A.  Yes.
11   Q.  Was the idea to go to a WAC-based
12 methodology for generics so you could avoid
13 having to go through the MAC process?
14   A.  That's true.  And I think it turned
15 out that it wasn't viable.  Well, I'm sure it
16 turned out that it wasn't viable.
17   Q.  You learned that the WAC prices were
18 not reliable for generics either?
19   A.  That's correct.  They were fairly
20 reliable for trade name drugs, but they weren't
21 reliable for generics.
22   Q.  Do you recall discussing that with

Reid, Robert Paul                                                December 15, 2008
                              Columbus, OH

Page 150

1   throughout the country defined usual and
2   customary charge to mean the lowest price paid by
3   third-party insurers.
4      A.  I can't comment on what other states
5   did.
6      Q.  Okay.
7      A.  But I do know that it happened.
8      Q.  Okay.  And that's what I was trying
9   to get at.
10     A.  Uh-huh.
11     Q.  And to see -- did Ohio ever do that?
12     A.  No, we never did that.
13     Q.  Was that ever proposed as something
14  that --
15     A.  I don't think so.
16         MS. GEOPPINGER:  Object to the form for
17  the record.
18         Go ahead.
19  BY MR. TORBORG:
20     Q.  Do you recall ever thinking to
21  yourself, we ought to take this path that some of
22  the other states are taking?

Page 151

1      A.  I more recall indicating that we
2   should not do that.
3      Q.  Okay.  And why was that?
4      A.  Again, it's the little guy and the
5   big guy issue.  Not everybody had the same buying
6   power.  And we didn't want to pay -- we wanted to
7   pay the pharmacies all the same way.  We didn't
8   want to pay different pharmacies different ways.
9   So we wanted to be consistent in our
10  reimbursement methodology.
11     Q.  And you knew because of that approach
12  of wanting to treat all of them the same way
13  there would be some providers who made a profit
14  on the amount that they would pay?
15         MS. GEOPPINGER:  Object to the form of
16  the question.
17         You can answer.
18     A.  We called it "work the spread."
19     Q.  Okay.  What do you mean by that?
20     A.  Well, the better -- the people that
21  had -- the pharmacies that had the better buying
22  power had a higher difference between what they

Page 152

1   actually paid for the product and what we were
2   allowing ourselves to reimburse them.  And this
3   -- rural pharmacies didn't have that -- quite
4   that big a spread.
5      Q.  The spread was the difference between
6   what Ohio Medicaid was paying and what they were
7   paying -- the pharmacies were paying for the
8   drugs?
9      A.  Right.
10     Q.  Right?
11         You were aware of the fact that there
12  was a difference there?
13     A.  I knew that it existed.
14     Q.  And did you think there was anything
15  wrong with the pharmacy providers, as you say it,
16  working the spread?
17     A.  Private enterprise.
18         MR. HENDERSON:  Objection.
19  BY MR. TORBORG:
20     Q.  What do you mean by that?
21     A.  We have an objection here.  I don't
22  know where to go.

Page 153

1          MS. GEOPPINGER:  You can answer.
2      A.  Oh.  I think the essence of private
3   enterprise is that the better your buying power,
4   the more profit you're going to make.  The more
5   prudent you are in buying, the better businessman
6   you are.
7      Q.  Nothing you see necessarily wrong
8   with a pharmacy making a profit off a -- off
9   dispensing a prescription to a Medicaid patient?
10         MS. GEOPPINGER:  Objection.
11         You can answer.
12     A.  I didn't see anything wrong with it.
13  It's a common way of doing business, not only in
14  pharmacy, but other types of merchandise as well.
15     Q.  Now, if we can go down to Subsection
16  B, this is under Section A(2).  We talked about
17  usual and customary charge already; right?
18     A.  Uh-huh.
19     Q.  And B was the estimated acquisition
20  cost (EAC) --
21     A.  Uh-huh.
22     Q.  -- plus the dispensing fee; right?

39 (Pages 150 to 153)

Reid, Robert Paul                                                    December 15, 2008
Columbus, OH

Page 158

1  A. Well, I think we took into
2  consideration -- let's take the example of
3  Phenergan 12 and a half milligram that we used
4  earlier. We would try to determine how much
5  pharmacies were paying for each version of that
6  from the various generic companies, and we put
7  them on a grid and picked the one price that was
8  available 65 percent of the time.
9  Q. Let me back up a little bit.
10     Where did you get the -- those prices
11 from?
12 A. First DataBank, mostly.
13 Q. For the generic drugs?
14 A. Well, they would give us -- they
15 would give us a starting point -- when they sent
16 their monthly reports to us, they would give us a
17 starting point of WAC plus seven for the -- I
18 think it was whatever -- whatever the going rate
19 was at the time. We wouldn't necessarily use
20 those prices, but they would be ones that we
21 would put in that grid to determine which one was
22 the 65th percentile. Very complicated.

Page 159

1  Q. Which other prices would you use?
2  A. Oh, we would call pharmacies and ask
3  them. Pharmacies would call us and volunteer
4  information. And we, in more recent times, were
5  using the MAC prices that were set by other
6  states, all of which were public record.
7  Q. Which pharmacies would you call?
8  A. I would call my own, which was
9  Northland Pharmacy, in Columbus. I would call
10 Cline's Pharmacy in Akron. And there was a rural
11 store that I called, which has since gone out of
12 business, just to get a feel for what was going
13 on in the market, the dynamics of the
14 marketplace.
15 Q. And they would provide you with a
16 price at which they actually purchased the drug?
17 A. Yes.
18 Q. And those are the prices that you
19 would then put in your grid?
20 A. Yes. Sometimes a pharmacy would
21 object to the price that we had set and they
22 would send an invoice as documentation of what

Page 160

1  they were really paying for a product. And they
2  would encourage us to raise our allowable. A lot
3  of times there was a lot of other information on
4  that invoice that we would use.
5  Q. What other information?
6  A. Well, prices of other drugs.
7  Q. Okay.
8  A. Sometimes, you know, stores would
9  black out everything except they would only
10 answer the question. But other times they would
11 send an invoice -- a copy of an invoice that gave
12 us a lot of information.
13 Q. And some pharmacies actually called
14 to volunteer this information to you?
15 A. Once in a while I would get a call --
16 understandably, not very often -- you're paying
17 too much. And they would be representing
18 themselves as a taxpayer.
19 Q. So the prices that you used to set
20 the MAC amount, those were based on actual prices
21 that you got from pharmacies; correct?
22 A. Right.

Page 161

1  Q. They are not based on --
2  A. Well, partly, yeah.
3  Q. What else were they based on?
4  A. Well, we would take the First
5  DataBank price into consideration, although
6  rarely use it on the grid, unless it was
7  reasonable, comparable.
8  Q. So if the First DataBank price was
9  not comparable to the other prices, you wouldn't
10 use it?
11 A. No. I would consider it to be an
12 outlier.
13 Q. If it was an outlier, it wouldn't
14 even go into the 65th percentile calculation?
15     MS. GEOPPINGER: Object to the form of
16 the question.
17     You can answer.
18 A. Yes.
19 Q. And you did all this by yourself?
20 A. I did it all by myself up until 2001.
21 Q. Now, it says here that --
22     MS. GEOPPINGER: What are we looking

41 (Pages 158 to 161)

Henderson Legal Services, Inc.
202-220-4158                                        www.hendersonlegalservices.com

Reid, Robert Paul                                          December 15, 2008
                              Columbus, OH

Page 178

1  calculated based on the AWP?
2     A.  It is, yeah, and still is.  Always has
3  been.
4     Q.  And the idea here was that if you
5  based the rebate payment amount on AWP, that
6  might result in AWP numbers decreasing?
7     A.  Yes.
8         MS. GEOPPINGER:  Object to the form of
9  the question.
10 BY MR. TORBORG:
11    Q.  And you recall a conversation of this
12 idea; right?
13    A.  Uh-huh.
14        MS. GEOPPINGER:  That was a yes?
15    A.  Yes, sir.
16        MS. GEOPPINGER:  Okay.
17 BY MR. TORBORG:
18    Q.  Do you know what happened to that
19 idea?
20    A.  I don't -- well, we never did -- CMS
21 never did change the calculation for the rebate
22 per unit price, so I presume it never went

Page 179

1  anywhere.
2     Q.  In the first paragraph under the
3  discussion -- let me back up.
4     A.  Uh-huh.
5     Q.  Under participants, it lists various
6  state Medicaid pharmacy administrators; correct?
7     A.  Correct.
8     Q.  Elizabeth Geary of Connecticut?
9     A.  Yes.
10    Q.  Pat Gladden of Texas; Marvin
11 Hazelwood of Illinois?
12    A.  Uh-huh.
13    Q.  Yourself from Ohio --
14    A.  Uh-huh.
15    Q.  -- Benny Ridout from North Carolina?
16    A.  Uh-huh.
17    Q.  David Shepherd from Virginia, M.J.
18 Terrebonne from Louisiana?
19    A.  Uh-huh.
20    Q.  And Jerry Wells from Florida?
21    A.  Yes.
22    Q.  As well as Paul Chesser from the

Page 180

1  office --
2     A.  OIG.
3     Q.  OIG.  If we go back in the
4  discussion, third sentence of the first
5  paragraph, the notes state, "They believed that
6  basing rebates on AWP would result in AWP
7  becoming a meaningful number on which they could
8  base reimbursement."
9     A.  That's true.
10    Q.  And is it fair to say at this time
11 that these state officials in attendance at this
12 meeting did not believe AWP was a meaningful
13 number on which they could base reimbursement?
14        MS. GEOPPINGER:  Object to the form of
15 the question.
16        You can answer.
17    A.  Speculative on my part, but I would
18 assume that they felt that way.
19    Q.  And the next sentence states, "They
20 also thought that those drug manufacturers that
21 play games with AWP (overstate AWP for marketing
22 purposes) would immediately lower their AWPs to a

Page 181

1  more realistic level."
2     A.  Uh-huh.
3     Q.  Do you see that?
4     A.  I see that.
5     Q.  Do you have an understanding of
6  what's being reflected there?
7     A.  Yes.
8         MS. GEOPPINGER:  Object to the form of
9  the question.
10        You can answer.
11    A.  I do.
12    Q.  And what is that understanding?
13    A.  Well, what it says, that these people
14 collectively felt that using AWP as a baseline
15 for rebates would result in lower -- more
16 realistic AWPs.
17    Q.  And there's reference there to
18 overstating AWP for marketing purposes.  Do you
19 see that?
20    A.  Yes.
21    Q.  Do you have an understanding of what
22 that is referring to?

                                          46 (Pages 178 to 181)

Page 182

1    A.  Yes.  I think it was more directed at
2  the generic industry.  It was not uncommon for
3  there to be a wide, wide disparity between AWP
4  and AAC, actual acquisition cost; maybe hundreds
5  of dollars per bottle.
6    Q.  And how about the language for
7  marketing purposes, do you recall a discussion
8  about that?
9    A.  Vaguely.
10   Q.  What do you recall --
11   A.  I don't know that -- I don't recall
12 that we singled out anyone, any manufacturer in
13 particular.  It would not be uncommon for a
14 generic manufacturer to say to a retailer that
15 they should buy their product because their
16 product had a wide -- wider spread between the
17 posted AWP and the amount that the retailer was
18 actually going to pay.
19   Q.  And that's something that you knew
20 about during your time in the department?
21   A.  Yes.
22       MR. HENDERSON:  Objection.

Page 183

1  BY MR. TORBORG:
2    Q.  Do you recall when you first became
3  aware of that phenomena happening?
4    A.  Not really.
5    Q.  Is that something that based on your
6  interactions with other state representatives
7  that you believe that they were aware of that as
8  well?
9        MS. GEOPPINGER:  Object to the form of
10 the question.
11       You can answer.
12   A.  Okay.  Yes, I think that probably
13 influenced me a lot, the relationship with my
14 peers.
15   Q.  You believe that your peers were
16 aware of that phenomena happening in the
17 marketplace?
18       MS. GEOPPINGER:  Object to the form of
19 the question.
20       MR. HENDERSON:  Objection.  Lack of
21 foundation.
22   A.  Yeah, I believe that.

Page 184

1    Q.  Now, Mr. Reid, are there procedures
2  that you would need to follow in your position in
3  the department?
4        MS. GEOPPINGER:  Object to the form of
5  the question.
6  BY MR. TORBORG:
7    Q.   -- if you became aware of a --
8        MS. GEOPPINGER:  Sorry.
9  BY MR. TORBORG:
10   Q.   -- suspected fraud?
11   A.  Well, my dealings with suspected
12 fraud would be mostly directed at retailers, not
13 pharmaceutical companies.
14   Q.  Were there times where you had
15 occasion to deal with suspected fraud at the
16 retail level?
17   A.  Yes.  The Surveillance and
18 Utilization Review Bureau would often ask my
19 opinion about a particular case that they were
20 investigating.
21   Q.  Do you recall ever -- well, let me
22 back up.

Page 185

1        Are you aware of -- are there like
2  steps that you need to take if you become aware
3  of a potential fraud situation?
4        MS. GEOPPINGER:  Object to the form of
5  the question.  It's also been asked and answered.
6        You can answer.
7    A.  I think it was conscionable of me to
8  cooperate with the SUR, Surveillance and
9  Utilization Review, on any investigation they had
10 on pharmacies for any fraudulent issue.
11   Q.  If you were the one who became aware
12 of it, would you go contact somebody?
13   A.  I called --
14       MS. GEOPPINGER:  You're referring to a
15 fraud?
16       MR. TORBORG:  Yes, sir -- yes, ma'am.
17 Sorry.
18       MS. GEOPPINGER:  That's all right.
19   A.  Yeah, I would call SUR, talk to
20 Dwyer, Jim Dwyer -- Dyre.
21   Q.  And are you aware of ever contacting
22 SUR or Mr. Dyre relating to any drug pricing

47 (Pages 182 to 185)

Reid, Robert Paul                                                December 15, 2008
Columbus, OH

Page 214

```
 1  avoid losing access."
 2        Do you see that?
 3     A. Yes.  We talked about that earlier.
 4     Q. Access was an important issue to the
 5  states?
 6     A. It was.  It always is.
 7     Q. And it says, "This seems inconsistent
 8  with paying incentives, but doesn't."
 9        Do you know what that means?
10        MR. HENDERSON:  Objection.
11     A. I don't recall what that meant.
12     Q. If you go down to No. 8.
13     A. 8, okay.
14     Q. Would you read that into the record
15  for me.
16     A. "Sharpen the pencil on pricing
17  generics closer to what they are actually
18  available" --
19        MS. GEOPPINGER:  I believe it says
20  "really."
21     A. Oh, "really available," I'm sorry,
22  "for having nothing to do with average wholesale
```

Page 215

```
 1  price and little to do with wholesale acquisition
 2  costs."
 3     Q. Do you have an understanding of what
 4  that means?
 5     A. Yes.
 6     Q. What does that mean?
 7     A. Basically try to find out what they
 8  really -- what pharmacies really pay for them,
 9  and don't use AWP and don't use WAC.
10     Q. And do you recall being involved in a
11  presentation that was making this recommendation
12  at this time?
13     A. Well, it was a large committee and
14  everybody had input.  I don't know which input I
15  had.
16     Q. Fair enough.  Let's take a look at
17  the Bates page ending 197.
18     A. 197.
19     Q. Actually, let's start with 196.
20     A. 196.
21     Q. This is a -- appears to be a reprint
22  of a PowerPoint that was done.  Is that what it
```

Page 216

```
 1  appears to be to you?
 2     A. It does.
 3     Q. And in the middle there is a section
 4  called "Solutions."
 5     A. Yes.
 6     Q. And then you'll see that that tracks
 7  some of the solutions that you can see on 189.
 8     A. Okay.
 9     Q. If you'd verify that for me.
10     A. You mean the slide following
11  "Solutions"?
12     Q. Yeah.  If you look at like OBRA 1990.
13     A. Yeah.  Okay.  Well, it appears as
14  though Mark Butt --
15        MS. GEOPPINGER:  Here.  He's asking you
16  to refer to this page here.
17        THE WITNESS:  Oh, okay.  Okay.
18        MR. TORBORG:  Thank you.
19        MS. GEOPPINGER:  Sure.
20        THE WITNESS:  Yeah, I'm sure it did.
21  BY MR. TORBORG:
22     Q. Like, for example, Mr. Butt stated
```

Page 217

```
 1  federal legislation to extend list of exemption
 2  drugs, drug categories to include life-style
 3  drugs?
 4     A. Yes.
 5     Q. That's -- that's the same No. 1 that
 6  we see on page 189?
 7     A. I think the states objected to being
 8  forced to cover Viagra.
 9     Q. Okay.  And --
10     A. And they wanted -- they wanted OBRA
11  to be amended to reflect that states -- that it
12  was optional for states to cover that drug.
13     Q. Okay.  And if we go to 197, there is
14  a slide at the bottom.  It's the next page.
15     A. 197, okay.
16     Q. The last slide at the bottom says,
17  "Other Solutions."
18     A. Uh-huh.
19     Q. "Robert Reid, Presenter."
20     A. Uh-huh.
21     Q. That's you; right?
22     A. That's me.
```

55 (Pages 214 to 217)

Page 218

1    Q.  And the last bullet there states,
2  "Price generics closer to their availability
3  prices (drop AWP and WAC pricing)"?
4    A.  Yes.  That was always my contention.
5    Q.  Does it appear then that you were the
6  one who was providing that recommendation at this
7  meeting?
8    A.  That's probably my -- I was probably
9  charged with the responsibility of exploring that
10 area.
11   Q.  Okay.  And if we go, finally, to the
12 Bates page ending 203.
13       MS. GEOPPINGER:  I'm sorry.  Did you
14 say 203?
15       MR. TORBORG:  203, yeah.
16       THE WITNESS:  I'm getting there.
17       MS. GEOPPINGER:  Take your time.
18       THE WITNESS:  Hmm?
19       MS. GEOPPINGER:  Take your time.  One
20 more.
21       THE WITNESS:  Solutions.
22 BY MR. TORBORG:

Page 219

1    Q.  The last one there states, "Sharpen
2  the pencil when pricing generics."
3    A.  Oh, yeah.  Repetitive to what we
4  talked about earlier.
5    Q.  Do you recall this page at all?
6    A.  I wrote that.
7    Q.  You were trying to tell your
8  colleagues at other states you shouldn't be using
9  AWP and WACs to reimburse generics?
10       MS. GEOPPINGER:  Object to the form of
11 the question.
12 BY MR. TORBORG:
13   Q.  Correct?
14   A.  Correct.
15   Q.  Okay.
16   A.  I don't think they listened.
17   Q.  Do you know why they didn't listen?
18       MS. GEOPPINGER:  Object to the form of
19 the question.
20       MR. HENDERSON:  Objection.
21   A.  I don't know why they didn't listen.
22   Q.  Why don't we take a look finally --

Page 220

1  I'm almost done, Mr. Reid -- at the Exhibit 19,
2  which was the United States complaint.
3        MS. GEOPPINGER:  Oh, it's -- why don't
4  you let me have the pile.  I'll pull it out for
5  you.  It's one we had already marked -- they had
6  marked before here.
7        THE WITNESS:  Exhibit 19?
8        MS. GEOPPINGER:  I think it's right
9  here.
10       MR. TORBORG:  Thank you.
11       MS. GEOPPINGER:  Sure.  Excuse me.  I
12 don't mean to reach across you there.
13       THE WITNESS:  Okay.  Exhibit 19, all
14 right.
15 BY MR. TORBORG:
16   Q.  Mr. Reid, this is a copy of the
17 complaint, the initial complaint that was filed
18 by the United States against Abbott Laboratories.
19 I'd like to read to you some of the first
20 paragraph --
21   A.  Uh-huh.
22   Q.  -- the first page, if you'd follow

Page 221

1  along.
2    A.  Okay.
3    Q.  It states, "The United States brings
4  this fraud action against Abbott Laboratories,
5  Inc., and Hospira, collectively Abbott, to
6  recover losses sustained by the Medicare and
7  Medicaid programs.  Over the course of several
8  years, Abbott reported inflated pharmaceutical
9  prices that it knew Medicare and Medicaid relied
10 upon to set reimbursement rates for Abbott's
11 pharmaceutical products.  Abbott's actual sales
12 prices for its pharmaceutical products were far
13 less than the prices reported by Abbott.  By
14 knowingly reporting inflated prices, often 1,000
15 percent higher than Abbott's actual prices,
16 Abbott ensured its customers received inflated
17 reimbursements and profits from Medicare and
18 Medicaid".
19       Do you see that?
20   A.  I see that.
21   Q.  Now, here Ohio did not pay prices
22 that were 1,000 percent higher than Abbott's

56 (Pages 218 to 221)