# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:   PHARMACEUTICAL INDUSTRY | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE LITIGATION | Civil Action: |
| | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO U.S. | Judge Patti B. Saris |
| Ex rel. Ven-A-Care of the Florida | Magistrate Judge |
| Keys, No. 06-CV-11337-PBS | Marianne B. Blower |

/

The Videotaped Deposition of SANDRA KRAMER,

Taken at 2860 Eyde Parkway,

East Lansing, Michigan,

Commencing at 9:08 a.m.,

Tuesday, March 25, 2008,

Before Cynthia A. Chyla, CSR 0092.

Page 30

1    Q.   And what was your Bachelor's in?
2    A.   Also in education and dental hygiene.
3    Q.   When did you first begin working for
4  Michigan Medicaid?
5    A.   In 1974.
6    Q.   Was that your first job out of college?
7    A.   No.
8    Q.   Okay.  Was that your first job in the
9  healthcare field?
10   A.   No.
11   Q.   Okay.  Describe the other jobs that you had
12 in the healthcare field before starting with Michigan
13 Medicaid in 1974?
14   A.   I was a dental hygienist.
15   Q.   Any other positions in the healthcare field?
16   A.   In high school I was a dental assistant.
17   Q.   Okay.  We don't have to go all the way back
18 to high school.
19   A.   Okay.
20   Q.   Any others?
21   A.   Not that I -- I don't recall anything else.
22   Q.   Okay.  And, so, you began working for

Page 31

1  Michigan Medicaid in 1974.  How long did you work for
2  Michigan Medicaid?
3    A.   I worked for Michigan Medicaid to
4  approximately 2000.
5    Q.   Did you hold the same position from 1974 to
6  2000?
7    A.   No, I did not.
8    Q.   Okay.  What was your first position?
9    A.   I was a dental health consultant.
10   Q.   Okay.  And what was your second position?
11   A.   I was a policy analyst.
12   Q.   When did you take the position as a policy
13 analyst?
14   A.   I believe it was around 1978.
15   Q.   Could you briefly describe the job
16 responsibilities of a policy analysis -- or a policy
17 analyst?  I'm sorry.
18   A.   Develop policy, analyze regulations,
19 implement policies, evaluate the policies.
20   Q.   And was one of the policies that you were
21 responsible for the drug payment policies to providers
22 who were administering under Michigan Medicaid?

Page 32

1    A.   Yes.
2    Q.   Were you responsible for that beginning in
3  1978?
4    A.   There probably was a short period that I was
5  not.  I don't exactly remember when I started doing
6  pharmacy policy.
7    Q.   So at least by sometime in the early 1980s
8  you were in charge of that area?
9         MR. HENDERSON:  Objection.
10   A.   Probably even into 1979.
11 BY MR. GABEL:
12   Q.   Okay.  And were you responsible for drug
13 payments to providers, at least the policy area, from
14 '79 through the time you left in 2000?
15   A.   Could you define --
16        MR. HENDERSON:  Objection.
17   A.   -- responsible?
18 BY MR. GABEL:
19   Q.   I guess better to ask you:  What was your
20 involvement in -- in the drug payment policies to
21 providers under -- who were administering under
22 Michigan Medicaid?

Page 33

1    A.   I would at management's direction research
2  reimbursement technology -- or research reimbursement
3  techniques and make recommendations.
4    Q.   And were you responsible for that from the
5  entire period of sometime in the late '70s-early '80s
6  until you left in 2000?
7    A.   Yes.
8    Q.   Were you responsible for drafting the
9  portion of the state plan that dealt with drug payments
10 to providers?
11        MR. HENDERSON:  Objection.
12        MR. MATUS:  I'm objecting to your
13 question.  You're using the term responsible; I think
14 it's vague.  It's not clear whether this is one of her
15 responsibilities, or if you are trying to assert that
16 she is principally the principal person responsible
17 for --
18 BY MR. GABEL:
19   Q.   Were you the principal person responsible?
20   A.   I am also confused by that, because it makes
21 like -- I feel like it's coming across that that's the
22 only thing I did.

Page 34

1  Q.  No, no, I certainly -- no. I want to focus
2  on that because that is most relevant for our purposes
3  of this litigation, at least in my mind, and I know you
4  had other areas of responsibility, but in that
5  particular area, drug payments to providers under
6  Michigan Medicaid, were you the primary person
7  responsible for that topic?
8     A.  I still need further clarification on it,
9  the term responsible. Because I mentioned to you
10 before that I would make recommendations for the
11 management team and then it would be their approval,
12 and then I would act upon what they would approve. So
13 it wasn't that I was the sole person; it was more as
14 much as a state government could be more of a
15 collaboration.
16    Q.  Okay. Were you the individual at Michigan
17 Medicaid who was most -- focused most of your time on
18 that topic area?
19           MR. HENDERSON:  Objection.
20    A.  Again, that's unclear, because any other
21 task would be somewhat related to reimbursement, but
22 would not totally be reimbursement issues.

Page 35

1  BY MR. GABEL:
2     Q.  Okay. Did you draft the state plan language
3  that dealt with drug reimbursement to providers?
4     A.  We --
5            MR. HENDERSON:  Objection.
6     A.  That's confusing to me, because --
7  BY MR. GABEL:
8     Q.  Did you draft portions of the state plan?
9            MR. HENDERSON:  Objection; form.
10    A.  I would -- I had drafted state plan language
11 before.
12 BY MR. GABEL:
13    Q.  And which portions of the state plan had you
14 drafted previously?
15           MR. HENDERSON:  Objection to the
16 form.
17    A.  I would need --
18           MR. GABEL:  I'm sorry, what's the
19 objection?
20           MR. HENDERSON:  As I understand it,
21 there probably way back when there was a state plan,
22 probably in the early stages of the Medicaid program,

Page 36

1  long before Ms. Kramer started to work there, and there
2  have been amendments over time. So your reference to
3  the state plan is vague and ambiguous.
4            MR. GABEL:  Okay.
5            MR. HENDERSON:  Also lacks
6  specificity.
7  BY MR. GABEL:
8     Q.  Did you help draft amendments to the state
9  plan?
10    A.  Yes.
11    Q.  And which amendments to the state plan had
12 you drafted?
13    A.  They have various numbers related to the
14 state plan, and I would have to look at the state plan
15 to determine the sections. I don't recall the numbers.
16    Q.  Did you draft any state plan amendments
17 dealing with drug payments to providers?
18    A.  Yes.
19    Q.  From the period of 1978 through 2000, was
20 there anyone else aside from you that you're aware of
21 who drafted state plan amendments relating to drug
22 payments to providers?

Page 37

1     A.  I'm uncertain.
2     Q.  Were you the primary person responsible for
3  drafting those state plan amendments?
4            MR. HENDERSON:  Objection.
5     A.  I would think so, but I'm uncertain.
6  BY MR. GABEL:
7     Q.  Have you ever worked for a pharmacy?
8     A.  No.
9     Q.  Have you ever worked for a drug
10 manufacturer?
11    A.  I already addressed that question.
12    Q.  In any role aside from a consultant. Have
13 you ever been an employee of a drug manufacturer?
14    A.  No.
15    Q.  Okay. Never worked for a wholesaler?
16    A.  No.
17    Q.  Am I right that you held the position of a
18 policy analyst from 1978 straight to 2000?
19    A.  Those sound -- yes, those sound like the
20 right dates.
21    Q.  Okay. Did you work in any particular
22 division of Michigan Medicaid as a policy analyst?

Page 82

1  cost."
2         Do you see that?
3     A.  Um-hmm.  Yes.
4     Q.  What did you mean when you stated average
5  wholesale prices are generally inflated significantly
6  over pharmacy purchase costs?
7         MR. HENDERSON:  Objection.
8     A.  It was my understanding that for generic
9  drugs that the state would have to set maximum
10 allowable cost rates to represent pharmacy costs.
11 BY MR. GABEL:
12    Q.  And did you understand that AWPs did not
13 reflect pharmacy costs?
14    A.  I understood that they were frequently not
15 updated, and, yes, we would have to set maximum
16 allowable costs.
17    Q.  And, in fact, you stated they were inflated
18 significantly over pharmacy purchase costs; right?
19    A.  That's what it says, yes.
20    Q.  Is there anything that you see in this
21 affidavit today that you believe was inaccurate now?
22        MR. MATUS:  She hasn't had a chance

Page 83

1  to read the whole thing.  Are you asking her to verify
2  every word of this as accurate?
3         MR. GABEL:  Yes.
4  BY MR. GABEL:
5     Q.  Is there anything that you believe is
6  inaccurate about this document?
7         MR. MATUS:  If you need to look at
8  it, Sandy, go ahead.
9     A.  I think, you know, in the section -- in
10 point 9 are generally inflated significantly, and
11 looking back on it now my interpretation of
12 significant, you know, is that 25 percent, you know, 50
13 percent, you know, or is that 1000 percent.  I think at
14 the time I was thinking that it was greater than the 13
15 percent, 13.5 and the 15.1 that I was conveying in
16 point 8 related to the brand name drugs.
17 BY MR. GABEL:
18    Q.  Okay.  And that's something I'd like to
19 discuss.
20        Did you understand that the
21 difference -- well, let's back up.
22        The difference between what a

Page 84

1  pharmacy purchased a drug for and AWP, do you
2  understand that to be termed as the spread sometimes?
3     A.  I didn't at the time that this was written
4  or at the time when I was working for the Michigan
5  Medicaid program.
6     Q.  All right.  Do you now understand that --
7     A.  Yeah.
8     Q.  -- that sometimes is referred to as the
9  spread?
10    A.  Yes.
11    Q.  Can I refer to that in the deposition today
12 and you'll know what I'm talking about?
13    A.  Yes.
14    Q.  Okay.  Did you understand that the spread
15 for generics was larger than the spread for brand name
16 drugs?
17    A.  Yes.
18    Q.  Okay.  What was that understanding based
19 upon?
20    A.  Probably at the time that I was at Michigan
21 Medicaid, input from the pharmacists.
22    Q.  So you would discuss AWP with pharmacists?

Page 85

1     A.  Actually, I -- my responsibility included,
2  as we mentioned before, setting the MACs.
3     Q.  Um-hmm.
4     A.  The state MACs.  And as part of that I was
5  chair of what we called the Pharmacy Reimbursement
6  Advisory Committee, or they call it PRAC -- P-R-A-C --
7  for short.
8     Q.  Were pharmacists on PRAC?
9     A.  Yes.  So I would have gotten that
10 information from them --
11    Q.  Okay.
12    A.  -- is my best recollection of it.
13    Q.  And what was the source of information for
14 your statement that AWPs are generally inflated
15 significantly over pharmacy purchase costs?
16    A.  As I mentioned, setting the maximum
17 allowable cost prices and comparing those to the AWP
18 that was -- I guess we're using the term significant
19 spread.  And that's why I would have felt comfortable
20 putting that statement.
21    Q.  Now, this Affidavit was dated sometime in
22 2001.  But am I right to say that you understood that

22 (Pages 82 to 85)

Page 90

1   A.   At the time that this was written who was
2   he?
3   Q.   Yes.
4   A.   I'm uncertain.  He probably was a bureau
5   director at the time.
6   Q.   Was he --
7   A.   Management to me.
8   Q.   So someone you reported to?
9   A.   Probably not directly.
10  Q.   But he was higher on the Michigan Medicaid
11  hierarchy?
12  A.   Yes.
13  Q.   And in your memos to Mr. Smith or others
14  higher on the Michigan Medicaid hierarchy, did you
15  attempt to be as accurate as possible?
16  A.   I would try to.
17  Q.   You see the subject of this is elimination
18  of actual acquisition costs reimbursement.
19       Do you see that?
20  A.   Yes.
21  Q.   What does that refer to?
22  A.   I think it would refer to switching the

Page 91

1   reimbursement technique from AAC to EAC.
2   Q.   And that switch was actually made in 1995;
3   right?
4   A.   Yes.
5   Q.   So this is approximately three years before
6   the switch was made?
7   A.   Yes.
8   Q.   Do you know why this was being discussed in
9   1992?
10  A.   It explains here that the pharmacy
11  association's newsletter published that there was going
12  to be a change from AAC reimbursement for Michigan
13  Medicaid.
14  Q.   And it's dated -- it actually states that
15  Mr. Smith agreed to move way from actual acquisition
16  costs; is that right?
17  A.   Yeah.
18  Q.   Did you have a discussion with him regarding
19  whether he did, in fact, agree to move away from AAC?
20  A.   I don't recall.
21  Q.   Did you ever have any discussions with
22  Mr. Smith about moving away from AAC to EAC?

Page 92

1   A.   Yes.
2   Q.   Okay.  How many -- how many times did you
3   have discussions with him about that topic?
4   A.   I don't know how many times.
5   Q.   Do you recall ever discussing with him what
6   AWPs were meant to represent?
7   A.   Not really.  Not -- no.
8   Q.   You state, and I'd like to focus here on the
9   second paragraph, the last sentence of that paragraph,
10  it states: "If such a proposal were adopted, there
11  could be tremendous cost implications for the program."
12       What did you mean by that?
13  A.   I meant that AWP minus 10 percent is --
14  would not have been what we were paying under AAC
15  reimbursement.
16  Q.   So fair to say that you thought there would
17  have to be a steeper discount off of AWP if you were
18  going to approximate AAC?
19  A.   Yes.
20  Q.   And when you say tremendous cost
21  implications, what did you mean by that phrase?
22       MR. HENDERSON:  Objection.

Page 93

1   A.   I guess I was trying to get his attention.
2   BY MR. GABEL:
3   Q.   Did you get his attention?
4   A.   I don't remember him responding.
5   Q.   Okay.  The next paragraph you say: "As an
6   example, I have attached the direct (or acquisition
7   cost) and AWP for several new products from a major
8   generic company.  The price differentials are enormous
9   with AWP ranging from 13 percent to 500 percent above
10  acquisition cost!!!"
11       With the three exclamations, were
12  you also trying to get his attention?
13       MR. HENDERSON:  Objection.
14  A.   I think it speaks for itself.
15  BY MR. GABEL:
16  Q.   Okay.  Fair enough.
17       You state: "The price differentials
18  are enormous --" well, actually, strike that.
19       It's fair to say that as early as
20  1992 you realized that in some instances AWPs were
21  upwards of 500 percent above acquisition costs?
22  A.   For the generic.

24 (Pages 90 to 93)

Kramer, Sandra                                                                          March 25, 2008

Page 94

1    Q.   For the generic specifically?
2    A.   That's what I'm referring to here.
3    Q.   Okay. And this is what you were conveying
4  to Mr. Smith in 1992?
5    A.   Right. In looking at this documentation
6  when I pulled it together here, too, I noted that the
7  attachment just refers to the differential between AWP
8  and -- or the spread I guess is the term we're using,
9  direct price, and direct price is not necessarily what
10 the pharmacist would have been paying.
11   Q.   Did you understand that the pharmacist could
12 be paying even less than direct price?
13   A.   At the time it may not have been my
14 understanding, but looking back at this documentation,
15 the direct price I know was not necessarily what the
16 pharmacist was paying.
17   Q.   They could have been paying lower than
18 direct price?
19   A.   Yes.
20   Q.   Okay. And let's look at this document that
21 you attach.
22        Well, first, let me make sure. Is

Page 95

1  this the document that you attached to the memo to
2  Mr. Smith?
3    A.   I'm thinking it is. I'm uncertain --
4    Q.   They were produced to us back to back, so
5  that's why I was putting them together.
6    A.   Right. I notice a lot of my documents got
7  shuffled.
8    Q.   Okay.
9    A.   So ....
10   Q.   Do you have any reason to believe that this
11 is not the document that you would have been forwarding
12 along to him?
13   A.   I think it is. It's date stamped the 13th
14 and this was written November 30th.
15   Q.   Okay. Thanks.
16        And you said it's date stamped
17 November 13th. That's 1992; right?
18   A.   Correct.
19   Q.   Okay. And this is from Geneva
20 Pharmaceuticals?
21   A.   Yes.
22   Q.   And did this come directly to you, or did

Page 96

1  you receive this from some other source?
2    A.   I don't recall exactly. I assume if it was
3  in my possession, it came directly to me.
4    Q.   Directly to you from Geneva?
5    A.   Yeah. Dear sir or Madam.
6    Q.   Okay. Did you ever have any discussions
7  with Mr. Ron Hartmann, the author of this?
8    A.   I believe I have.
9    Q.   Okay. Did you discuss in particular how AWP
10 compared to acquisition costs?
11   A.   No.
12   Q.   What were your discussions with Mr. Hartmann
13 about?
14   A.   I don't recall exactly what form, but I
15 believe he attended meetings, public meetings that were
16 held by the MSA.
17   Q.   And you see in this letter from
18 Mr. Hartmann, it lists AWP in one column and direct
19 prices in another column. And, in fact, there -- there
20 are spreads between those two prices; correct? And in
21 one instances -- in one instance you note that the
22 spread is approximately 500 percent; right?

Page 97

1    A.   (Nods head.)
2    Q.   Is that referring to the last drug on this
3  list?
4    A.   I would have to do the math again.
5    Q.   But overall, you see there --
6    A.   It seems to be the biggest spread.
7    Q.   Okay. Now, in your experience as a policy
8  analyst for Michigan Medicaid, would you, when looking
9  at spreads, be more concerned about the percentage
10 differential or the dollar differential? For instance,
11 there's a 500 percent spread on that final drug, but
12 it's less than a $20 spread when it's expressed in
13 dollars.
14        For the top drug, we see that
15 there's about $100 spread. Would you be more concerned
16 about the dollar issue or the percentage issue?
17        MR. HENDERSON: Objection to the
18 form.
19   A.   I would be concerned about the percentage.
20 BY MR. GABEL:
21   Q.   Percentage. Okay.
22        Although even with a lower

25 (Pages 94 to 97)

Page 110

1    A.   Yes.
2    Q.   All right.  And, so, in that case there
3  would be a different discount below AWP that the small
4  volume provider would have in comparison to the large
5  volume provider?
6    A.   Some of that, though, would be dependent on
7  the actual purchase size that was associated with the
8  NDC.
9    Q.   Okay.  But there could be a variety of
10 percentages depending on what type of discounts
11 providers could take advantage of?
12   A.   I wasn't privy to how steep those discounts
13 were or what the range --
14   Q.   You didn't believe that all providers got
15 the same exact discount when they purchased drugs?
16 Providers purchased drugs for a variety of different
17 prices; right?
18         MR. HENDERSON:  Objection to the
19 form.
20   A.   I -- you know, no, I didn't believe that
21 they all purchased for the same price.
22 BY MR. GABEL:

Page 111

1    Q.   So, when you're attempting to establish an
2  estimated acquisition cost and you use a particular
3  percentage, whether it's 13.5 for independent
4  pharmacies or some other percentage for chain
5  pharmacies, you recognize that in certain instances
6  providers will receive drug payments that are higher
7  than their actual acquisition cost; right?
8         MR. HENDERSON:  Objection to the
9  form.
10   A.   It's difficult for me to respond to your
11 questions because the MSA set different price screens
12 depending on which type of drug you were referring to.
13 So, when you're --
14 BY MR. GABEL:
15   Q.   If the screen didn't come into play?
16   A.   When you're referring to EAC and -- you
17 know, so, it would be helpful if you could say for
18 brand name drugs and nonbrand drugs or generic drugs.
19   Q.   For generic drugs, assuming the screens did
20 not come into play, assuming it wasn't going to reach
21 the MAC, did you understand that certain providers
22 would be paid greater than their acquisition costs when

Page 112

1  Michigan used an EAC system?
2    A.   Yeah.
3    Q.   Did you believe that the providers receiving
4  those payments that were greater than their acquisition
5  costs were submitting false claims to Michigan
6  Medicaid?
7         MR. HENDERSON:  Objection.
8         MR. MATUS:  Objection.  Calls for a
9  legal conclusion.
10   A.   I -- I didn't monitor those kinds of issues.
11 BY MR. GABEL:
12   Q.   Did you believe they were committing fraud?
13        MR. HENDERSON:  Objection.
14        MR. MATUS:  Same objection; calls
15 for a legal conclusion.
16   A.   That was outside of my responsibilities.
17 BY MR. GABEL:
18   Q.   Did you personally believe, or considering
19 it now, did you believe that that was wrong for the
20 providers?
21        MR. MATUS:  Objection; vague.
22   A.   That wasn't my responsibility.

Page 113

1  BY MR. GABEL:
2    Q.   Did you ever have any discussions with
3  anyone on whether that would be wrong for providers to
4  receive payments above their actual acquisition costs?
5    A.   I don't recall that.
6    Q.   You've already mentioned that you understood
7  that the spread for generics would generally be greater
8  than the spread for brands; correct?
9    A.   Yes.
10   Q.   Were there any other classes of drugs that
11 you understood the spread would be greater than other
12 classes of drugs for?
13        MR. HENDERSON:  Objection to the
14 form.
15   A.   Not that I recall.
16 BY MR. GABEL:
17   Q.   Have any drug manufacturers communicated to
18 you that the AWPs published in the compendia reflected
19 actual acquisition costs to providers?
20   A.   I don't recall that.
21   Q.   When drug manufacturers would communicate to
22 you and send you the AWPs, did they ever tell you that

Page 142

1  BY MR. GABEL:
2      Q.   This AWP screen, whether it was AWP, AWP
3  minus 8 percent, AWP minus 10 percent, that would only
4  act as a cap if actual acquisition costs exceeded that
5  amount; right?
6      A.   Correct.
7      Q.   Okay.  So, AWP would only come into play to
8  lower Michigan Medicaid's payments in the event actual
9  acquisition costs or usual and customary costs exceeded
10 that AWP screen?
11     A.   Where I'm having the problem is the actual
12 acquisition costs.  It's really the provider's charge
13 representing the actual acquisition costs.  If that
14 exceeded the AWP, then they would be cut back on the
15 brand name drugs and drugs that didn't have a MAC on
16 it.
17     Q.   Okay.  For generic drugs that did have MACs,
18 AWP wouldn't come into play whatsoever with respect to
19 how the provider would be reimbursed for those drugs
20 prior to 1995?
21     A.   If the AWP discount was lower than the MAC,
22 it would come into play.

Page 143

1      Q.   Okay.  So the MAC wouldn't only act as a
2  screen, the AWP would be an additional screen
3  potentially?
4      A.   Yes.
5           MR. GABEL:  I think we're about to
6  run out of time on the tape.  Why don't we just break
7  now, get a quick lunch.  Can we do a quick lunch, is
8  that all right?
9           MR. MATUS:  Yeah, that's fine.
10          MR. GABEL:  Why don't we go off the
11 record and we'll discuss.
12          THE VIDEOGRAPHER:  Going off the
13 record at 11:51 and 51 seconds a.m.
14      (Lunch recess was taken from
15       11:51 a.m. to 12:35 p.m.)
16          THE VIDEOGRAPHER:  We're back on the
17 record at 12:35 and 15 seconds p.m.
18 BY MR. GABEL:
19     Q.   Ms. Kramer, how were MACs set when you
20 worked for Michigan Medicaid?
21          MR. HENDERSON:  Objection.
22     A.   Can you define a time period?

Page 144

1  BY MR. GABEL:
2      Q.   Were you responsible -- let me ask a
3  different question.
4           Were you responsible for setting
5  MACs?
6      A.   For a lot of the time that I was in the
7  policy area.
8      Q.   For what time period were you responsible?
9      A.   I don't remember the exact dates.
10     Q.   Were you responsible from 1990 through the
11 time you left for setting state MACs?
12     A.   Yes.
13     Q.   Okay.  How were those set during that time
14 period?
15     A.   During that time period, the best that I can
16 recall is that we had a pharmacist consultant with the
17 department.  I don't remember how frequently he came
18 in, but periodically he would come in and I would
19 provide him with utilization data on the generic drugs
20 and he would do research of maybe what other states or
21 another insurer would have priced MAC at, and then also
22 he would have availability of wholesaler information

Page 145

1  and would establish target MACs, and then I would take
2  those target MACs and publish them in drafts for
3  comment with the pharmacist and other people that were
4  interested in pharmacy issues.
5      Q.   And then after the comments came in?
6      A.   After the comments came in, those were
7  resolved and the prices were published with a 30-day
8  lead time.
9      Q.   When you published the target MACs for
10 comment, did you ever receive any comments from
11 manufacturers on the MACs?
12     A.   I don't recall whether there was or not.
13     Q.   Who was the pharmacist consultant that you
14 used to set MACs in the '90s?
15     A.   Robert Phetteplace, P-H-E-T-T-E-P-L-A-C-E.
16     Q.   And did this -- you stated this pharmacist
17 consultant had access to wholesale prices?
18     A.   He was a practicing pharmacist.
19     Q.   So he knew what his actual acquisition costs
20 would be for particular drugs?
21     A.   I assume so.  He never showed me the, you
22 know, his invoices or anything, but ....

37 (Pages 142 to 145)

Page 174

1  commercial carriers had this approach to implementing
2  EAC, so as we -- basically I was researching the data,
3  I was looking to them for their lead and what they had
4  done customarily and, you know, discuss this with the
5  Michigan Pharmacists Association, ran various
6  simulation studies, and eventually the option that was
7  approved is the one that you see on this page.
8      Q.   Did you believe that pharmacies with a
9  larger number of stores could obtain drugs at cheaper
10 prices than those with just a few stores?
11     A.   The data showed the differential here based
12 on our actual acquisition cost payments -- or I
13 shouldn't say that.  Based on payments made during our
14 actual acquisition cost policy.
15     Q.   And those studies indicated that there would
16 be a difference on what providers --
17     A.   There was one.
18     Q.   There was one.
19     A.   Yeah.
20     Q.   Okay.  Now, under the section that is
21 entitled MACs -- do you see that?
22     A.   Yes.

Page 175

1      Q.   It says: "When actual acquisition costs are
2  lower than the AWP minus discount and the MAC, payment
3  will increase with EAC."
4      A.   Um-hmm.
5      Q.   What did you understand that to mean?
6           MR. HENDERSON:  Sorry, what page are
7  you on?
8           MR. GABEL:  First page, there's a --
9  it's Cost Analysis For Budget Neutrality, MACs.
10 BY MR. GABEL:
11     Q.   And -- let me restate the question.  In that
12 sentence: "When actual acquisition costs are lower
13 than the AWP minus discount and the MAC, payment will
14 increase with EAC."
15          Why did you understand that payments
16 would increase?
17     A.   This has been a really long time since 1995,
18 and I'm uncertain how the computer system was actually
19 set up in these kind of instances.  Because here it
20 says regardless of what NDC and what the AWP was that
21 they would guarantee the MAC, and I'm uncertain how the
22 computer system was actually set up.

Page 176

1      Q.   Aside from --
2      A.   This really isn't the policy nor is it the
3  logic in the computer, it's just a summary.
4      Q.   Setting aside the logistics of how the
5  computer system would do it, did you understand that
6  with an EAC-based payment system -- or, I'm sorry, an
7  EAC system that used AWP minus some discount that if a
8  provider were able to acquire drugs for lower than that
9  AWP minus the discount amount and that drug didn't hit
10 the MAC level that the provider's payment would be
11 higher than it was under the actual acquisition cost
12 system?  Am I saying that right?
13          MR. HENDERSON:  Objection to the
14 form.
15     A.   To look at the bulletin that's the actual
16 policy and what was published was that product costs
17 will be paid based on the lowest of, you know, and then
18 it lists, one, two, three.  So, if the AWP discounted
19 was lower than the MAC, then the AWP discounted would
20 be paid.
21 BY MR. GABEL:
22     Q.   Um-hmm.  And if the actual acquisition

Page 177

1  costs, in fact, were lower than the AWP minus discount,
2  then the provider would get some sort of margin on
3  their drug; is that right?
4      A.   Right.
5           MR. HENDERSON:  Objection.
6      A.   Right.
7  BY MR. GABEL:
8      Q.   And that was inequitable if you're going to
9  use a standardized system?
10     A.   Right.  But the problem is -- or the point
11 I'd like to make is that because we spent so much time
12 comparing the payment data under the old system to the,
13 you know, transitioning to EAC, there was that comfort
14 level that because we were using the 13.5 and the 15.1,
15 that those were representative of what those -- the
16 product costs would be.
17     Q.   Okay.  But we've looked at other documents
18 where you saw that spreads varied from 13 percent to
19 500 percent, and that was for generics?
20     A.   That was for generics, not for brand drugs.
21     Q.   Did you understand that there was some
22 consistent percentage for brand drugs on what the