# EXHIBIT 5

## Affidavit of Sandy Kramer

STATE OF MICHIGAN  )
                   ) ss
COUNTY OF INGHAM   )

Sandy Kramer, first being duly sworn, deposes and says:

1. From about 1978 to 2000, I was employed by the Medical Services Administration ["MSA"], while it was part of both the Department of Social Services and the Department of Community Health

2. For almost all of this period, I was a policy analyst, assigned to work on pharmacy reimbursement under the Medicaid program. I regularly engaged in discussion of this issue, at the state and national levels.

3. I make this Affidavit based on my personal recollection and on files I maintained at MSA. If called upon to do so, can testify competently to the matters herein.

4. In 1994, I convened a workgroup to discuss the different options to change from the prior "actual acquisition cost" method of reimbursing pharmacies. I invited both the Michigan Pharmacists Association ["MPA"] and the Michigan Retailers Association ["MRA"] to participate. There were several meetings of the workgroup during 1994 and 1995. As I recall, the MRA representative attended only one of these meetings.

5. In my deposition on May 1 and 2, 2001, I agreed with the Walgreens attorney's suggestion that, in general, MRA represented the chain pharmacies and MPA represented independent pharmacies. But I also advised him that at least one chain, Arbor Drugs, was active in the MPA.

6. MSA might have considered commissioning a study of pharmacy rates by an independent firm. But since we had ready computer access to the data within the state's Medicaid Management Information System coupled with excellent relationship with the entire pharmacy community, we concluded that it was appropriate to develop the new policy "in-house," with the help of the interested pharmacies.

7. During my deposition, the Walgreens attorney was very concerned with whether the costs shown in our computer system included warehousing or shipping costs. Because pharmacies were told to bill their actual acquisition costs in 1994 through the effective date of the new two-tiered policy, and because if they incurred warehousing and shipping costs, those costs could be included on the bill. It is probable that any such costs *were* included in the amounts they billed and thus in the figures we used to calculate reimbursement rates.

8. During implementation of the new policy in 1995, I performed simulation studies on Medicaid expenditures to assure that the new policy would maintain budget neutral. The first study focused on pharmacy charges for acquisition costs. The second, conducted after computer processing enhancements, focused on pharmacy approved payments for the acquisition costs. MPA requested the second study that subsequently resulted <u>raising</u> chain pharmacy reimbursement from an Average Wholesale Price discount level of 16.2% to 15.1% (1.1%). However, the independent pharmacy EAC reimbursement was <u>lowered</u> from an Average Wholesale Price discount level of 13.1% to 13.5% (0.4%).

9. During my deposition, the Walgreens attorney asked questions regarding Michigan Medicaid reimbursement for generic drugs. From a recent analysis, generic drugs account for nearly 16% of prescription payments and 50% of the prescriptions. Instead of using payments based on Average Wholesale Price, MSA sets maximum allowable cost prices for selected generic drugs because generic Average Wholesale Prices are generally inflated significantly over pharmacy purchase costs. The Health Care Financing Administration, also, requires that state Medicaid agencies pay selected generic drugs in aggregate below their publish Federal Upper Limits. MSA proposes target maximum allowable cost prices are based on the Federal Upper Limits, other payer rates, and more importantly common purchasing prices of pharmacies. The target prices are revised before implementation based on pharmacy comments from a 30-day consultation process. Pharmacies alert MSA when maximum allowable cost prices are not obtainable and revision to the price is needed or that a generic is not interchangeable with the patented drug and price limit should not be place.



DEPOSITION EXHIBIT
655 Abbott
3/25/08

10. My telephone number was available to the pharmacy community, and I maintained regular contact with the pharmacies before and after we implemented the policy. I would thus have been aware if any pharmacy had any difficulty with the two-tiered system. For the five-year period until I left DCH in July 2000, I heard no complaints whatsoever about the system.

11. In fact, as I testified in my deposition, more chains currently receive payments from Medicaid than in 1995, resulting in a smaller percentage of the independent pharmacies receiving payments.

12. In 2000, DCH contracted with First Health to review bills using a nationally standardized format for which pharmacies seek Medicaid reimbursement. It also began a "point of sale" procedure, by which a pharmacy can quickly determine Medicaid patient eligibility and coverage for a particular prescription before dispensing it. Both of these factors tend to reduce the pharmacies' dispensing costs.

13. At different times in the legislative budget cycle, I checked to assure MSA that its dispensing fees were in line with that paid by other states and by Michigan third party payers.

14. My experience with the Health Care Financing Administration ["HCFA"] was that, if one of its officials believed that Michigan Medicaid was not complying with a statute, regulation or other HCFA policy, regarding coverage of pharmacies, he or she would promptly let me know. None of my contacts at HCFA stated any concern with our 1995 State Plan Amendment or with the two-tiered policy, which we submitted to HCFA during the consultation phase and in final form.

FURTHER, AFFIANT SAYETH NOT.

_____
Sandy Kramer

Subscribed and sworn to before me
this ____ th day of _____, 2001.

_____
Notary Public, Ingham County.
My comm'n expires: