# EXHIBIT 7

OK Health Care Authority (Nancy Nesser)                    December 12, 2008
                              Oklahoma City, OK

                                                                    Page 1

              THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

    ----------------------------------X
    In Re:  PHARMACEUTICAL INDUSTRY    ) MDL No. 1456
    AVERAGE WHOLESALE PRICE LITIGATION ) Master File No.
    ----------------------------------) 01-CV-12257-PBS
    THIS DOCUMENT RELATES TO:          )
    United States of America ex rel.   ) Hon. Patti B.
    Ven-A-Care of the Florida Keys,    )   Saris
    Inc., et al., v. Dey, Inc., et al.,)
    Civil Action No. 05-11084-PBS;     )
    and United States of America ex    ) DEPOSITION OF
    rel. Ven-A-Care of the Florida     )  THE OKLAHOMA
    Keys, Inc., et al., v. Boehringer  )  HEALTH CARE
    Ingelheim Corp., et al., Civil     )   AUTHORITY
    Action No. 07-10248-PBS;           )   by NANCY
    and United States ex rel. Ven-A-Care)   NESSER
    of the Florida Keys v. Abbott      )
    Laboratories, Inc., Civil Action   ) DECEMBER 12,
    Nos. 06-CV-11337 and 07-CV-11618   )    2008
    ----------------------------------X

Page 222

1    Q.  Does Oklahoma Medicaid use a point-of-
2  sale system?
3    A.  You mean to pay the claims?
4    Q.  Uh-huh.
5    A.  Yes.
6    Q.  AWP is not defined in Oklahoma
7  regulations, is it?
8    A.  I don't think it's specifically
9  defined.  It's referred to.
10   Q.  AWP is not defined in Oklahoma
11 statutes, is it?
12   A.  Oh, not in Oklahoma statutes, I don't
13 believe so, no.
14   Q.  Oklahoma could have defined AWP as
15 actual acquisition costs, if it had wanted to;
16 correct?
17   A.  I suppose so.
18   Q.  When Oklahoma makes decisions regarding
19 reimbursement methodology for prescription drugs,
20 it draws upon various sources of information that
21 are available to it; correct?
22   A.  Correct.

Page 223

1    Q.  The OIG reports we discussed are one of
2  the sources of information?
3    A.  Yes.
4    Q.  And surveys or reports conducted at the
5  direction of Oklahoma Medicaid would be other
6  sources of information that were considered?
7    A.  Yes.
8    Q.  Myers & Stauffer's report prepared at
9  Oklahoma Medicaid's discretion would be another
10 source of information it could consider?
11   A.  You mean, if we hired them or -- you
12 mean, in the past?
13   Q.  In the past when Oklahoma Medicaid did
14 hire Myers & Stauffer.
15   A.  Sure.
16   Q.  And when Oklahoma Medicaid makes
17 decision regarding its prescription drug payment
18 rates and dispensing fees, it also draws upon the
19 expertise of the people working for the state;
20 correct?
21   A.  Correct.
22   Q.  Ultimately the payment rate that is

Page 224

1  adopted is a decision that the state makes;
2  correct?
3    A.  Correct.
4    Q.  For instance, Oklahoma Medicaid chooses
5  for itself whether to reimburse providers based
6  on AWP minus a discount; correct?
7    A.  Correct.
8    Q.  Oklahoma Medicaid is not required to
9  use AWP as a bench mark in its reimbursement
10 formula?
11   A.  That's correct.
12   Q.  Oklahoma Medicaid could choose to
13 reimburse providers based on WAC, if it wanted
14 to; correct?
15   A.  Correct.
16   Q.  Oklahoma Medicaid could choose to
17 reimburse providers based on an actual
18 acquisition cost, if it wanted to; correct?
19   A.  Correct.
20   Q.  There are several constituencies
21 outside of the Medicaid agency that have strong
22 interests in what decisions are made within the

Page 225

1  agency about prescription drugs; correct?
2    A.  Correct.
3    Q.  In the case of Oklahoma Medicaid, some
4  of those constituency groups are providers;
5  correct?
6    A.  Correct.
7    Q.  And that includes pharmacists; correct?
8    A.  Correct.
9    Q.  Does Oklahoma consult with any pharmacy
10 associations in general when setting policies or
11 rates for reimbursement of prescription drugs?
12   A.  Yes.
13   Q.  Which pharmacy associations?
14   A.  We consult with the Oklahoma
15 Pharmacists Association, and there's another
16 group called Pharmacy Providers of Oklahoma.
17   Q.  And how does Oklahoma consult with the
18 Oklahoma Pharmacists Association and Pharmacy
19 Providers of Oklahoma?
20   A.  We usually have a meeting with them, a
21 face-to-face.
22   Q.  And what's discussed at those meetings

57 (Pages 222 to 225)

Page 54

1  just thinking about acquisition.
2      Q.  Okay.  When did you first become aware
3  of the difference between AWP and actual
4  acquisition costs for generic drugs?
5      A.  That probably would have been later
6  than that.  I mean, not all the way to '99, but
7  maybe '95, '96, somewhere in there.
8      Q.  And in '95, '96 what was your
9  understanding of the difference between AWP and
10 actual acquisition costs for generic drugs?
11     A.  That sometimes there was a wide
12 difference.  Not always.
13     Q.  Can you describe what you mean by "wide
14 difference"?
15     A.  Just that it was -- it was variable.
16 It wasn't a standard.  It wasn't, like, with the
17 brand name where you could -- you can see it's
18 consistent.  If you pulled two manufacturers
19 brand-name products off the shelf, the markup is
20 going to be about the same.  If you pulled two --
21 even of the same generic drug, the -- there's no
22 consistency between the AWP and the acquisition.

Page 55

1      Q.  So is it your understanding that there
2  was no particular formula or specified markup
3  between AWP and actual acquisition costs for
4  generic drugs starting in, you know, around 1995?
5      A.  That would -- that would be a fair
6  statement, yes.
7      Q.  Okay.  You mentioned earlier that -- at
8  least with reference to the brand drugs, you
9  might, in purchasing drugs, consider the gap
10 between the AWP and the actual acquisition cost.
11 Did you choose who to buy your prescription drugs
12 from based on that spread between AWP and actual
13 acquisition costs?
14     A.  Not typically.  You know, there were a
15 few products where -- for example, I'm not going
16 to be able to -- Prinivil and Zestril were both
17 Lisinopril made by two different companies.  But
18 they typically were priced almost to the penny
19 the same.
20         So when there were brand drugs where
21 you had two manufacturers, they seemed like they
22 would just price them pretty close.  So there's

Page 56

1  no benefit to getting one over the other.
2      Q.  While you were working at any of the
3  pharmacies prior to working for Oklahoma
4  Medicaid, were you aware of anyone marketing the
5  spread?
6      A.  I think I -- I remember being sort of
7  told, not exactly, but -- that was pointed out to
8  me.  Not by a sales person, but by my boss.
9      Q.  Okay.  And what was pointed out to you
10 by your boss, exactly?
11     A.  Just that -- just that -- that certain
12 -- certain generics had this lower price and that
13 we've got paid -- not necessarily based on AWP,
14 but we would get paid based on a maximum
15 allowable cost.  And so you -- you wanted to find
16 the least expensive one because payors were
17 starting to put in maximum allowable cost
18 programs.  And so you wanted to make sure you
19 were getting the best deal.
20     Q.  Was it ever discussed, not just in
21 relation to maximum allowable costs, but in
22 relation to the difference between the price at

Page 57

1  which you could acquire drugs and the AWP-based
2  reimbursement?
3      A.  I don't remember that specifically.
4      Q.  Okay.  I would like to start with a
5  picture of how the Medicaid program works in
6  Oklahoma.
7      A.  Okay.
8      Q.  And in the federal government.
9  Medicaid in generally is partnership between the
10 federal government and the state governments;
11 correct?
12     A.  Correct.
13     Q.  Are you familiar with the term federal
14 matching assistance percentage?
15     A.  Yes.
16     Q.  What is federal matching assistance
17 percentage?
18     A.  That is the amount that the federal
19 government contributes to a state's Medicaid
20 program.
21     Q.  Essentially the federal government pays
22 a part of Oklahoma's expenditures under its

15 (Pages 54 to 57)