# EXHIBIT 8

Page 1

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT OF ANCHORAGE

----------------------------------X

STATE OF ALASKA,                   )

    Plaintiff,                     )

vs.                                )

ALPHARMA BRANDED PRODUCTS DIVISION, )

INC., et al.,                      )

    Defendants.                    )

----------------------------------X

Case No. 3AN-06-12026 Civil        )

----------------------------------X

CAPTIONS CONTINUED ON FOLLOWING PAGE


VIDEOTAPED DEPOSITION OF DAVID L. CAMPANA

and STATE OF ALASKA 30(b)(6)

Taken August 19, 2008

Taken by the Defendants at

Captain Cook Hotel, Whitby Room

939 West 5th Avenue

Anchorage, Alaska

Reported by:  Mary A. Vavrik, RMR

Page 22

1    Q.  All right.  Now, sir, are you currently
2    employed by the agency in Alaska responsible for
3    the administration of the Medicaid program?
4    A.  The Medicaid pharmacy program.
5    Q.  How long have you been employed by the
6    Medicaid pharmacy program?
7    A.  Just a little over 18 years.
8    Q.  You started about 1990, is that right?
9    A.  That's correct.
10   Q.  Have you been continuously employed by
11   the Medicaid pharmacy program throughout those 18
12   years?
13   A.  Yes.
14   Q.  Does the agency in Alaska that
15   administers Medicaid go by any particular name?
16   A.  Initially we went by the name of
17   Division of Medical Assistance, and that was
18   changed about four years ago to the Division of
19   Health Care Services.
20   Q.  Have you ever been deposed before, sir?
21   A.  Yes.
22   Q.  How many times have you been deposed?

Page 23

1    A.  I believe it's four times.
2    Q.  Do you recall generally what the
3    context was for those depositions?
4    A.  Yes.
5    Q.  Okay.  Were any of them personal
6    matters as opposed to work-related?
7    A.  One was a personal matter.
8    Q.  Focusing on the work-related matters,
9    when did those three depositions take place?
10   A.  Approximately 1997 was one.  And --
11   actually, there were two -- two kind of semi-
12   personal and then the others were work-related.
13   So three -- or two that were work-related.  One
14   was about 1997, and then another one was last
15   fall.
16   Q.  Just for the record, were there two of
17   them work-related or three?
18   A.  Two were work-related.
19   Q.  And those were the ones in 1997 and
20   then last fall, right?
21   A.  Correct.
22   Q.  What was the deposition in 1997 about,

Page 24

1    generally speaking?
2    A.  About pricing of pharmaceuticals.
3    Q.  You recall who the plaintiffs and
4    defendants were in that case?
5    A.  Mylan was the defendant.
6        MR. MANGI:  Pardon the interruption.
7    We are still getting a lot of noise on the phone.
8    Let me remind folks to hit mute, please.
9    BY MR. MANGI:
10   Q.  Mylan was the defendant in '97.  Who
11   was the plaintiff, sir?
12   A.  State of -- actually I think it was
13   State of Alaska and other states.
14   Q.  Generally do you have an understanding
15   as to what that case was about --
16   A.  Yes.
17   Q.  -- with pricing?
18   A.  Well, it was about the pharmaceutical
19   manufacturer increased the price of several
20   generic drugs substantially.
21   Q.  When you say they increased the price,
22   which price are you referring to, sir?

Page 25

1    A.  I'm referring to the average wholesale
2    price.
3    Q.  Anything else?
4    A.  That was the main part of the suit.
5    Q.  Did you testify individually or as a
6    representative for the State?
7    A.  I testified as a representative of the
8    State.
9    Q.  Do you recall what the resolution was
10   of that litigation?
11   A.  There was a settlement settled out of
12   court.
13   Q.  Were you the only representative for
14   the State to testify in that case, or were there
15   a --
16   A.  I was the only representative.
17   Q.  Were there other State witnesses who
18   testified in their individual capacities?
19   A.  Not that I know of.
20   Q.  Second deposition you mentioned that
21   you did in a work capacity was last fall, so that
22   would be the fall of '07, correct?

David L Campana and State of Alaska 30(b)(6)                                   August 19, 2008
                                    Anchorage, AK

Page 90

1  competition have anything to do with patent
2  protection?
3       A.  Yes.
4           MR. BURNHAM:  Objection, foundation.
5  BY MR. MANGI:
6       Q.  What is the relationship between those
7  two things?
8           MR. BURNHAM:  Objection, foundation.
9           THE WITNESS:  A brand named drug, when
10 it's an innovator, comes out onto the market and
11 with its patent, there is a certain amount of
12 protection on that patent.  When that patent is
13 up, then a generic manufacturer can bring that
14 drug in.  And when they bring it in, they bring
15 it in at a discount off of the brand name's
16 selling price.
17 BY MR. MANGI:
18      Q.  Do you have an understanding as to why
19 they do that?
20      A.  Because of competition.
21      Q.  And when a generic manufacturer is able
22 to enter the market, in other words, when patent

Page 91

1  protection is expired, is it fair to say, sir,
2  that whoever wants to can enter that market
3  space?
4       A.  Well, what time period are you asking
5  about?
6       Q.  Well, let's talk about today, to begin
7  with.
8       A.  Okay.  Today there is a period of
9  exclusivity where it's given to one or two
10 manufacturers that they can produce that drug.
11 And that's about six months.
12      Q.  And that is to provide an incentive for
13 entry into the market, correct, sir?
14          MR. BURNHAM:  Objection, foundation.
15          THE WITNESS:  I don't know that.
16 BY MR. MANGI:
17      Q.  Fair enough.  After that period
18 expires, then any number of generic manufacturers
19 can enter the market space, correct?
20      A.  That's right.
21      Q.  And if you go back further in time,
22 similarly when generics enter the market and more

Page 92

1  than one enters, and then they start to compete
2  with each other, as well as with the brand
3  manufacturer if they remain in the space, right?
4       A.  Yes.
5           MR. HENDERSON:  Objection.
6  BY MR. MANGI:
7       Q.  And it's that competition that results
8  in prices going down, right?
9           MR. BURNHAM:  Objection, foundation.
10          THE WITNESS:  That competition should
11 make prices go down.
12 BY MR. MANGI:
13      Q.  Now, throughout this time period, sir,
14 when you were in pharmacy school right up until
15 1990, was it generally your understanding that in
16 most cases generic drugs were going to be cheaper
17 than branded drugs?
18      A.  Yes.
19      Q.  Now, they will be cheaper for both a
20 cash paying-customer as well as for a third-party
21 payer, such as a private insurer or a Medicaid
22 entity, correct?

Page 93

1       A.  Yes.
2       Q.  Is it your understanding, sir, that
3  generally payers for drugs prefer the use of
4  generics versus branded drugs when clinically
5  appropriate?
6           MR. BURNHAM:  Objection, foundation.
7           THE WITNESS:  Yes.  They try to push
8  the generic drugs.
9  BY MR. MANGI:
10      Q.  Why is that?
11      A.  Because --
12          MR. BURNHAM:  Same objection.
13          THE WITNESS:  -- of a money saving.
14 BY MR. MANGI:
15      Q.  Now, we have spoken about benchmark
16 prices.  Did you come to an understanding, sir,
17 at any point during this time period, from 1960s
18 right up until 1990, whether the differential
19 between the benchmark price and the actual price
20 being paid by a pharmacy for drugs was greater
21 for generic drugs than it was for branded drugs?
22      A.  Yes, I've come across that information.

24 (Pages 90 to 93)

David L Campana and State of Alaska 30(b)(6)                                August 19, 2008
Anchorage, AK

Page 94

1    Q.  What is your understanding of what
2  happens in that area?
3         MR. BURNHAM:  During what time period?
4  BY MR. MANGI:
5    Q.  Let's start with -- well, back up.
6  When you say you have come across that
7  information, when did you first become aware of
8  that phenomenon?
9    A.  I don't remember time period.
10   Q.  Would it be fair to say it's a long
11 time ago?
12   A.  Yeah.
13        MR. HENDERSON:  Objection.
14 BY MR. MANGI:
15   Q.  In other words, would you say that's --
16 perhaps bucketed by decades, would it be fair to
17 say that's perhaps sometime in the '60s or the
18 '70s as opposed to the '80s or the '90s?
19   A.  It's hard to say when I became aware of
20 that.
21   Q.  Well, would it be fair to say it was
22 before 1990?

Page 95

1    A.  Yes.
2    Q.  And what generally did you become aware
3  of, sir?
4    A.  That the net cost to the pharmacy for
5  generics that have been out for a long time was
6  very low compared to the benchmark.
7    Q.  And benchmark that we are talking about
8  here, so the record is clear, is AWP, correct?
9    A.  Correct.
10   Q.  So in other words, at some point prior
11 to 1990, you became aware that when generics come
12 into the market, there is increased competition,
13 correct?
14        MR. BURNHAM:  Objection, foundation.
15        THE WITNESS:  There is increased
16 competition the longer the generic is available.
17 BY MR. MANGI:
18   Q.  And one manner in which that increased
19 competition manifests itself in the market is
20 increasing discounts, correct?
21        MR. BURNHAM:  Objection, foundation.
22        THE WITNESS:  Yes.

Page 96

1  BY MR. MANGI:
2    Q.  In other words, it's price competition
3  between the different manufacturers of the
4  generic product?
5    A.  Yes.
6    Q.  And as a result of that price
7  competition, there becomes a greater differential
8  between that benchmark AWP and the actual price
9  that pharmacies are paying than exists for
10 branded drugs, correct?
11        MR. HENDERSON:  Objection.
12        THE WITNESS:  Yes, there is a greater
13 differential.
14 BY MR. MANGI:
15   Q.  And indeed, the extent of that
16 differential will depend on the number of
17 generics and the extent of competition, correct?
18        MR. HENDERSON:  Objection.
19        THE WITNESS:  The number of
20 manufacturers making that drug.
21 BY MR. MANGI:
22   Q.  Absolutely.  And to put it another way,

Page 97

1  then, if there is just one generic manufacturer
2  that's in the market competing only with the
3  manufacturer of the brand, that's a different
4  situation from where, let's say, there are five
5  generic manufacturers all putting the same drug
6  in the marketplace, correct?
7    A.  Correct.
8    Q.  In the latter situation where you have
9  many manufacturers selling what's essentially the
10 same drug, there will be a greater degree of
11 competition because they are all competing with
12 each other for the same market space, correct?
13   A.  Correct.
14   Q.  And in that situation, there will be
15 more discounts and a greater differential between
16 the published AWP and the actual price pharmacies
17 are paying than there would be where there is
18 little competition, correct?
19        MR. BURNHAM:  Objection, foundation.
20        MR. HENDERSON:  Objection.
21        THE WITNESS:  Yes.
22 BY MR. MANGI:

25 (Pages 94 to 97)

Page 98

1    Q.  And is it fair to say, sir, that the
2  extent of the differential, therefore, is a
3  product of and a function of marketplace
4  competition?
5        MR. BURNHAM:  Same objection.
6        THE WITNESS:  Yes.
7  BY MR. MANGI:
8    Q.  Is it fair to say, sir, that there is,
9  therefore, no predictable relationship between
10 the AWP of a generic drug and the actual price
11 that a pharmacy is paying to purchase that
12 generic drug?
13       MR. BURNHAM:  Objection, form.
14       MR. HENDERSON:  Objection.
15       THE WITNESS:  I have never seen a
16 formula to exactly determine that.
17 BY MR. MANGI:
18   Q.  In other words, you understand that
19 it's just something that's going to vary for
20 generic drugs depending on the extent of
21 competition, correct?
22       MR. BURNHAM:  Objection.

Page 99

1        THE WITNESS:  Yes.
2  BY MR. MANGI:
3    Q.  And you have understood that going back
4  a number of years.  You are not sure when
5  exactly, but certainly since before 1990 you have
6  had that understanding, correct?
7    A.  Yes.
8    Q.  Now, are you familiar, sir, with --
9  withdraw that.  Let's turn to the area of branded
10 drugs now and focus on that for a moment.  As you
11 have testified this morning, sir, AWP has played
12 different roles in the marketplace at different
13 times, correct?
14       MR. BURNHAM:  Objection, foundation,
15 misstates his testimony.
16 BY MR. MANGI:
17   Q.  Let me clarify the question.  When you
18 first came into the pharmacy area, indeed when
19 you were in pharmacy school, one function that
20 AWP served was as a benchmark or a starting price
21 from which discounts were applied to get to the
22 actual price that a pharmacy would pay to

Page 100

1  purchase drugs, correct?
2    A.  Yes.
3        MR. BURNHAM:  Objection, misstates his
4  testimony.
5        MR. HENDERSON:  Objection.
6  BY MR. MANGI:
7    Q.  I'm sorry.  I didn't hear your answer,
8  sir.
9    A.  Please rephrase the question or ask the
10 question.
11   Q.  Sure.  A lot of objections makes it
12 hard to hear.  Let's back up.
13       When you were in pharmacy school, as
14 you have testified this morning, you came to
15 understand that one function that AWP served in
16 the marketplace was to serve as a benchmark price
17 or a starting price from which discounts would be
18 applied to get to the actual price that a
19 pharmacy would pay to purchase a drug, correct?
20       MR. BURNHAM:  Objection, misstates --
21       MR. HENDERSON:  Objection.
22       MR. BURNHAM:  Misstates his testimony.

Page 101

1        THE WITNESS:  The average wholesale was
2  a benchmark and discounts were taken off of that.
3  BY MR. MANGI:
4    Q.  Then you -- you continued with your
5  career, you came out of pharmacy school, you went
6  to work in a few different pharmacies.  And --
7  sorry.  Let me rephrase that question.  You then
8  came out of pharmacy school; you went to work in
9  a few different pharmacies in Montana and in
10 Alaska; and you saw that in practice; whereas,
11 you saw that the actual price being paid was
12 different from and lower than the AWP, correct?
13   A.  Yes.
14   Q.  And of course, the degree of
15 information you had about that was different from
16 pharmacy to pharmacy, correct?
17   A.  Yes.
18   Q.  In other words, at Turner Drugs in
19 Montana, you saw the actual invoices.  At Pay-N-
20 Save, purchasing was done centrally and you only
21 knew about some of discounts; but generally you
22 understood that that basic fact remained true,

26 (Pages 98 to 101)

Page 114

 1  the question.
 2        MR. MANGI:  Mr. Burnham already
 3  objected.
 4        MR. HENDERSON:  Okay.  Just for the
 5  detail, sometimes Mr. Burnham will object on one
 6  basis, and I may frequently have an additional
 7  basis for an objection.  We can either handle
 8  that by my making an independent and additional
 9  objection, or we can agree that my objection --
10  that Mr. Burnham's objection encompasses not only
11  the reason that he gives, but any additional
12  reason that I may subsequently choose to give.
13        MR. MANGI:  Well, I can't stipulate to
14  whatever objection may happen to be in your mind
15  somehow being incorporated into what Mr. Burnham
16  says, but if you feel the need to make a
17  particular unique objection, by all means do so.
18        MR. HENDERSON:  I will do so.  Thank
19  you.
20        THE WITNESS:  Okay.  And your question
21  again about this paragraph?
22  BY MR. MANGI:

Page 115

 1    Q.  So -- and it's just a general question,
 2  that we have spoken earlier about a change
 3  happening around the late 1980s from the GRM to
 4  what we call the Medicaid program.  This is the
 5  change that you were thinking of, correct?
 6    A.  This coincides with the change that I
 7  understand and have read about.
 8    Q.  Okay.  And is it your understanding,
 9  sir, that the change that you have read about
10  involved a transition from a system that was
11  purely State funded to a system that involved a
12  share of federal funding?
13    A.  Yes.
14    Q.  Now, this talks about 50 percent
15  federal financial participation.  Is it -- do you
16  have an understanding, sir, as to what the share
17  of federal funding was for the program when the -
18  - what we have been calling the Medicaid program
19  was first conceived?
20        MR. BURNHAM:  Objection, foundation.
21        THE WITNESS:  I do not.
22  BY MR. MANGI:

Page 116

 1    Q.  Do you know what that share is today?
 2    A.  I don't know the exact number.
 3    Q.  Is it in the percentage range of 50 to
 4  60, 60 to 70?
 5    A.  It's in the high 50 percent range.
 6    Q.  Has it varied over the years?
 7    A.  Yes.
 8    Q.  Do you have a sense of what the range
 9  has been?
10    A.  From 50 to 60 percent.
11    Q.  Now, if we move on to the third
12  paragraph starting in "Currently," the governor
13  talks about currently prescribed drugs being
14  prescribed under the GRM program.  He says it's
15  from State money.  And then he says "Because
16  federal financial participation for the cost of
17  prescribed drugs is available to the State if it
18  instead offers prescribed drugs through the State
19  Medicaid program, a substantial cost savings to
20  the State will be realized by simply offering
21  prescribed drugs through another assistance
22  mechanism."

Page 117

 1        So he's talking about this is going to
 2  save the State money because now the federal
 3  government is going to pay a share of the
 4  program, correct?
 5    A.  Yes.
 6        MR. BURNHAM:  Objection, foundation.
 7  BY MR. MANGI:
 8    Q.  Now, in the last paragraph, the
 9  governor says, "The benefit of this bill is the
10  substantial cost savings to the State with no
11  adverse impact [sic] on needy persons served."
12  Do you have an understanding, sir, as to whether
13  or not that was, in fact, an important policy
14  goal when this transition was made from the GRM
15  to the Medicaid program?
16        MR. BURNHAM:  Objection, foundation.
17        MR. HENDERSON:  Objection, leading.
18        THE WITNESS:  That was a goal of the
19  switchover.
20  BY MR. MANGI:
21    Q.  And when you say that was a goal, what
22  do you mean?

30 (Pages 114 to 117)

Page 154

1   towards betterment of pharmacy and then carry out
2   some continuing education courses.
3       Q.  Are they a trade group?
4       A.  Rather than being a trade group, I
5   would say a professional organization.
6       Q.  Is one of their roles to advocate for
7   the interests of pharmacists in the state?
8       A.  Yes.
9       Q.  Why was it important in the
10  contemplation of the new Medicaid program for a
11  pharmacist to work with that association in
12  relation to ensuring access was maintained?
13          MR. BURNHAM:  Objection, form.
14          THE WITNESS:  Because the association
15  did have some power in the marketplace.
16  BY MR. MANGI:
17      Q.  What do you mean by that?
18      A.  That most of the retail pharmacists in
19  the state belonged to that.
20      Q.  In other words, if they -- the
21  association could serve as a -- a -- a contact
22  point for many different pharmacists, is that

Page 155

1   correct?
2       A.  Yes.
3       Q.  And they wanted to have a pharmacist
4   for the program interact with that association to
5   ensure that pharmacists would continue to
6   participate in the new Medicaid program, correct?
7           MR. BURNHAM:  Objection.
8           MR. HENDERSON:  Objection, form.
9           MR. BURNHAM:  Form.
10          THE WITNESS:  Yes.
11  BY MR. MANGI:
12      Q.  And did that become eventually, sir,
13  one of the roles entrusted to you once you were
14  hired in 1990?
15      A.  Yes.
16      Q.  Showing you now the next document, sir.
17  This has been marked as Exhibit 5 to your
18  deposition.  This is another public document.
19  It's entitled Position Paper, Department of
20  Health and Social Services.
21          (Exhibit Campana 005 marked.)
22  BY MR. MANGI:

Page 156

1       Q.  Now, sir, we have spoken about Medical
2   Assistance, and here it's the Department of
3   Health and Social Services.  How do these
4   agencies relate to each other?
5       A.  The Division of Medical Assistance is
6   contained in the Department of Health and Social
7   Services.
8       Q.  Have you ever seen this document
9   before?
10      A.  I believe I have seen it before.
11      Q.  Now, I'd like you to turn, please, to
12  the second page of that document.  You will see
13  at the top it says, "Basically, four arguments
14  have been made against adding pharmacy services
15  to the Medicaid program."  Do you see that, sir?
16  Right at the top of that page.
17      A.  Yes.
18      Q.  Okay.  Now, the first argument it lists
19  says, "The Medicaid rules concerning payment for
20  drugs would cause Alaska pharmacies to lose
21  money."  And then the response is that "Medicaid
22  rules concerning payment for drugs were amended

Page 157

1   last October.  The new rules offered the State
2   substantial flexibility, including increased
3   freedom from Federal Rules in setting payment
4   rates for drugs."  Are you familiar, sir, with
5   the change that's being referred to there?
6       A.  No, I'm not.
7       Q.  But nonetheless, it is your
8   understanding, consistent with what we spoke
9   about this morning, that within the range of
10  reimbursement methodologies that would be
11  acceptable to the federal government, there is a
12  range of discretion left to State Medicaid
13  agencies, right?
14          MR. BURNHAM:  Objection, form.
15          THE WITNESS:  Yes, there is some
16  discretion allowed.
17  BY MR. MANGI:
18      Q.  And one of the reasons why that
19  discretion is allowed to State agencies is to
20  enable states to take account of local
21  circumstances, correct?
22          MR. HENDERSON:  Objection, form.

Page 158

1         THE WITNESS:  Yes.
2   BY MR. MANGI:
3      Q.  And those local circumstances could
4   include, for example, what's required to ensure
5   sufficient access to care, right?
6      A.  Yes.
7         MR. HENDERSON:  Objection.
8   BY MR. MANGI:
9      Q.  Indeed the requirement that a State
10  Medicaid agency provide access to care
11  commensurate with what's available to others in
12  an area, that comes from federal regulation, too,
13  correct?
14        MR. HENDERSON:  Objection, form.
15        THE WITNESS:  It's my understanding
16  that it does.
17  BY MR. MANGI:
18     Q.  And indeed, another aspect of a local
19  circumstance that a state can take account of and
20  must take account of are the political realities
21  in their area, correct?
22        MR. BURNHAM:  Objection, form.

Page 159

1         MR. HENDERSON:  Objection.
2         THE WITNESS:  I don't know that.
3   BY MR. MANGI:
4      Q.  Well, let's break it down.  One of the
5   functions that the Alaska Pharmacy Association
6   serves is as a lobbying group, correct?
7      A.  Yes.
8      Q.  And there is nothing inappropriate
9   about lobbying; that's just part of our political
10  system, correct?
11     A.  Yes.
12     Q.  And one way in which they are lobbied
13  is by reaching out to legislators and advocating
14  their position to them, correct?
15     A.  Yes.
16     Q.  And of course, some legislators are
17  more receptive to their positions than others,
18  correct?
19     A.  Yes.
20     Q.  And of course, legislators are also
21  part of our political system.  They need to be
22  responsive to the needs of their constituents,

Page 160

1   correct?
2      A.  That's their goal, I believe, to do
3   that.
4      Q.  All right.  And again, there is nothing
5   wrong with --
6         (Interruption in deposition.)
7         MR. MANGI:  I'm sorry.  You are dialed
8   into a conference call.  Please hang up.
9   BY MR. MANGI:
10     Q.  And again, there is nothing wrong or
11  inappropriate about that; that's the way our
12  political system is set up, correct?
13     A.  Yes.
14     Q.  Now, certainly pharmacists can often be
15  important constituents for legislators, correct?
16     A.  Yes.
17     Q.  And the pharmacists are respected,
18  often well-known members of their communities,
19  correct?
20     A.  Yes.
21     Q.  And pharmacists in some cases can also
22  be important financial contributors to political

Page 161

1   campaigns, correct?
2         MR. HENDERSON:  Objection.
3         THE WITNESS:  That's what I believe.
4   BY MR. MANGI:
5      Q.  So certainly there are some legislators
6   who are active proponents of pharmacists' causes,
7   correct?
8         MR. HENDERSON:  Objection.
9         MR. BURNHAM:  Form.
10        THE WITNESS:  I believe that.
11  BY MR. MANGI:
12     Q.  Now, if a professional such as yourself
13  working for the Medicaid program wanted at some
14  point to cut reimbursement rates, certainly one
15  of the issues you would be very concerned about
16  is access, right?
17     A.  That's right.
18     Q.  But in addition to that, another part
19  of the reality on the ground that you would need
20  to consider where your proposals have become
21  reality would be whether or not the political
22  capital exists to make such a change, correct?

Page 162

1    A.  Yes.
2    Q.  In other words, you can expect that if
3  you wanted to cut reimbursement rates at any
4  point, you can expect pharmacists would mobilize
5  and advocate against such a cut, correct?
6        MR. BURNHAM:  Objection, form.
7        THE WITNESS:  I believe they would
8  mount some kind of campaign against it.
9  BY MR. MANGI:
10   Q.  And indeed, that's part of what the
11 pharmacy association's role is, to advocate on
12 behalf of the financial interests of their
13 members, correct?
14       MR. BURNHAM:  Same objection.
15       THE WITNESS:  Yes.
16 BY MR. MANGI:
17   Q.  Now, certainly in some states pharmacy
18 associations are stronger than in other states,
19 correct?
20       MR. BURNHAM:  Objection, form.
21       MR. HENDERSON:  Objection, foundation.
22       THE WITNESS:  I understand that to be

Page 163

1  correct.
2  BY MR. MANGI:
3    Q.  And do you have an understanding, sir,
4  as to whether or not the Alaska Pharmacy
5  Association is an entity that has strong lobbying
6  power in the state of Alaska?
7    A.  It has some lobbying power.
8    Q.  And certainly you would expect them to
9  bring that power to bear if cuts to reimbursement
10 were being contemplated, correct?
11   A.  Yes.
12       MR. HENDERSON:  Objection.
13 BY MR. MANGI:
14   Q.  So certainly within the realm of
15 deciding what a reimbursement methodology should
16 be in Alaska, like in any other state, one of the
17 realities that professionals such as yourself
18 have to account for are the political realities
19 in the state and whether or not you have the
20 political capital to force through a change you
21 may think appropriate in the face of potential
22 political opposition, correct?

Page 164

1        MR. BURNHAM:  Objection, form.
2        MR. HENDERSON:  Objection, form.
3        THE WITNESS:  There would be
4  opposition.  I'd have to work through that.
5  BY MR. MANGI:
6    Q.  Now, turning back to Exhibit 5, sir,
7  you will see towards the bottom half of that page
8  there is a section B entitled Other Drugs.  Do
9  you see that section, sir?
10   A.  Yes.
11   Q.  Now, in the middle of that paragraph
12 there is a sentence starting with "The
13 estimated."  It's five lines from the top of that
14 paragraph.
15   A.  I see it.
16   Q.  And it says, "The estimated acquisition
17 costs can be determined through a variety of
18 methods."  Now, what is your understanding, sir,
19 of what an estimated acquisition cost is,
20 generally speaking?
21   A.  Estimated acquisition cost is the
22 estimate of acquisition costs from the pharmacies

Page 165

1  -- or from the wholesaler or the suppliers to the
2  pharmacies.
3    Q.  And I appreciate that's what the term
4  EAC stands for, estimated acquisition cost.  Let
5  me focus my question.  Is it your understanding,
6  sir, that estimated acquisition cost is a term
7  that comes from regulations regarding the
8  Medicaid program?
9    A.  Yes.
10   Q.  And estimated acquisition cost is a
11 term that's used to refer to the formula that a
12 state uses to reimburse for drugs, correct?
13   A.  Yes.
14   Q.  So if a state is reimbursing at AWP
15 minus X percent, taking into account the access
16 issues, the political constraints, that's
17 referred to as that state's estimated acquisition
18 cost or EAC, correct?
19   A.  Yes.
20   Q.  Now, EAC is not -- it's not the actual
21 price that a pharmacist is paying to purchase a
22 drug, correct?