# EXHIBIT 9

Page 405

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT OF ANCHORAGE

-----------------------------------X

STATE OF ALASKA,                     )

    Plaintiff,                       )

vs.                                  )

ALPHARMA BRANDED PRODUCTS DIVISION, )

INC., et al.,                        )

    Defendants.                      )

-----------------------------------X

Case No. 3AN-06-12026 Civil          )

-----------------------------------X

CAPTIONS CONTINUED ON FOLLOWING PAGE

VOLUME II

VIDEOTAPED DEPOSITION OF DAVID L. CAMPANA

and STATE OF ALASKA 30(b)(6)

Taken August 20, 2008

Taken by the Defendants at

Captain Cook Hotel, Whitby Room

939 West 5th Avenue

Anchorage, Alaska

Reported by:  Mary A. Vavrik, RMR

43ed45aa-87f9-43bb-8fed-670c39e33709

Page 718

1    Health?
2        A.   That was first in 1989, I believe.
3        Q.   Okay.  First Health was acting on
4    behalf of the State of Alaska, right?
5        A.   Yes.
6        Q.   So if -- so if First Health has URAs,
7    in a sense so does the State of Alaska, right,
8    because they are acting on its behalf, right?
9        A.   Yes.
10       MR. BURNHAM:  Object to form.
11   BY MR. KATZ:
12       Q.   So Alaska had the URAs for Mylan
13   Pharmaceuticals' drugs, right?
14       MR. BURNHAM:  Objection, form.
15       THE WITNESS:  I don't know that.
16   BY MR. KATZ:
17       Q.   Well, First Health had the URAs for
18   Mylan Pharmaceuticals' drugs, right?  That you
19   know.
20       MR. BURNHAM:  Object to form.
21       THE WITNESS:  I would have to assume
22   that.  And based on looking at invoices,

Page 719

1    sometimes they had -- had URAs and sometimes they
2    didn't have URAs, depending on whether the
3    manufacturer actually submitted those.
4    BY MR. KATZ:
5        Q.   Assuming CMS received an AMP from Mylan
6    Pharmaceuticals and calculated a URA, that URA
7    would then be passed on to First Health who was
8    acting on behalf of Alaska, right?
9        MR. BURNHAM:  Objection, form.
10       THE WITNESS:  There is assumptions in
11   there.
12   BY MR. KATZ:
13       Q.   What assumptions?
14       A.   Well, the assumption is that we would
15   have to assume that Mylan passed on the AMP to
16   CMS, CMS received that AMP, and then calculated
17   the URA and then provided that to First Health.
18       Q.   Let me ask you this:  Did the State of
19   Alaska invoice Mylan Pharmaceuticals for rebates?
20       A.   I believe they did.
21       Q.   Okay.  In order to invoice Mylan
22   Pharmaceuticals, it needed the URAs, right?

Page 720

1        A.   I believe that.
2        Q.   So at least for some of the drugs and
3    for some of the times, Alaska had URAs for Mylan
4    Pharmaceuticals' drugs, right?
5        MR. BURNHAM:  Objection, form.
6        THE WITNESS:  I believe that Mylan did
7    provide URAs at periods of time and that we had
8    submitted rebates to Mylan.
9    BY MR. KATZ:
10       Q.   When you said that Mylan provided URAs,
11   you meant that Mylan provided AMPs, right?
12       A.   Yeah, right.  Rather Mylan provided
13   AMPs to CMS who calculated the URAs.
14       Q.   Okay.  We talked about the formula for
15   calculating the URA.  And before 1994 it was 10
16   percent of AMP, right?
17       A.   That's my recollection.
18       Q.   So if Alaska received a URA for, say,
19   $2.50, then Alaska would know that the AMP is
20   $25, right?
21       A.   If we reversed the calculation, we
22   would come up with that.

Page 721

1        Q.   And it's a simple calculation, right?
2        A.   Yes.
3        Q.   And have you ever done that?
4        A.   Not that I can remember.
5        Q.   Do you know if anyone else at Alaska
6    Medicaid has ever done that?
7        A.   I don't know.
8        Q.   Have you ever looked at the URAs
9    received for any drugs and compared them to any
10   other prices available to Alaska Medicaid?
11       A.   I had looked at some of the URAs
12   received for generic drugs and compared them to
13   the AWP and noticed that there was a huge
14   difference.
15       Q.   When did you do that?
16       A.   Somewhere along the line.
17       Q.   Was it ten years ago?
18       A.   It was somewhere during the initial
19   period of the rebates.
20       Q.   So that would be in the early '90s?
21       A.   1991 to 1995.
22       Q.   And when you compared the URAs to the

80 (Pages 718 to 721)

43ed45aa-87f9-43bb-8fed-670c39e33709

David L Campana and State of Alaska 30(b)(6) - Volume II                    August 20, 2008
                                    Anchorage, AK

Page 750

1        MR. MANGI:  Go ahead.
2        MR. BURNHAM:  Why don't we take a break
3   because we have to switch around here.
4        THE VIDEOGRAPHER:  We will move off
5   record at 5:40.
6            (Off the record.)
7        THE VIDEOGRAPHER:  We are on record,
8   5:44.
9
10           EXAMINATION
11  BY MR. BURNHAM:
12     Q.  Mr. Campana, as you know, I'm Richard
13  Burnham.  I'm one of the counsel representing the
14  State in this action.
15     A.  Yes.
16     Q.  Has any drug manufacturer since 1990
17  ever informed you that its published AWP was
18  simply a number that they made up?
19        MS. WITT:  Object to the form.  And I
20  assume we can have the same agreement from the
21  plaintiffs' counsel that will cover everyone?  Is
22  that all right with the Department of Justice as

Page 751

1   well?
2        THE WITNESS:  I don't remember.
3        MR. HENDERSON:  Yes, that's fine.
4   BY MR. BURNHAM:
5      Q.  Do we have Exhibit 16 handy, please?
6   Do you have Exhibit 16?
7      A.  Yes.
8      Q.  If you go to the second page, please,
9   the fourth paragraph, you were asked about this
10  earlier.  The representation is made there that
11  it is the intent of the State of Alaska "to pay
12  no more than documented, estimated acquisition
13  cost on a statewide average basis for
14  ingredients."  Do you see that?
15     A.  Yes.
16     Q.  To your knowledge, did that intention
17  of the State ever change since this document was
18  written in 1988?
19     A.  No.
20     Q.  Since you became employed by the State,
21  have you ever been provided with a study of
22  actual acquisition costs applicable to Alaska

Page 752

1   pharmacies, other than that Verme study?
2      A.  No.
3      Q.  Look at Exhibit 37, please.  Exhibit 37
4   is the Verme study, is that correct?
5      A.  Yes.
6      Q.  Look down in paragraph 1.4.1 where they
7   describe the survey that they sampled.  You see
8   that?
9      A.  Yes.
10     Q.  And you understood that they surveyed a
11  total of 12 providers?
12     A.  Yes.
13     Q.  And they surveyed 22 drugs?
14     A.  Yes.
15     Q.  How many providers were there in Alaska
16  at that time, approximately?
17     A.  There was approximately 100 providers.
18     Q.  And about how many prescription drugs
19  NDCs were there at that time?
20     A.  I believe at that time there was in
21  excess of 140 drugs, drug NDCs.
22     Q.  So did anyone in your department

Page 753

1   consider this Verme survey to be a sufficient
2   sampling to permit you to use a reimbursement
3   formula of AWP minus 13 percent?
4        MS. WITT:  Objection.
5        THE WITNESS:  It was not an adequate
6   sample.
7   BY MR. BURNHAM:
8      Q.  Take a look at Exhibit 41, please.  And
9   Verme's -- Verme found, from what they did
10  survey, the pharmacies seemed to be obtaining
11  drugs at AWP minus 13 percent, correct?
12     A.  For those 12 pharmacies.
13     Q.  And those 22 drugs?
14     A.  For those 22 drugs.
15     Q.  Look at Exhibit 41, please.  And turn
16  to page 6 of that document.
17        MR. HENDERSON:  I'm sorry, which
18  exhibit is that?
19        MR. BURNHAM:  I'm sorry.  It's Exhibit
20  41.  Bates number starts with 68.
21        THE WITNESS:  Okay.
22  BY MR. BURNHAM:

88 (Pages 750 to 753)

43ed45aa-87f9-43bb-8fed-670c39e33709

David L Campana and State of Alaska 30(b)(6) - Volume II                          August 20, 2008

Anchorage, AK

Page 754

1      Q.   Page 6, paragraph (f).  This is a
2   document that I understood was in your files when
3   you showed up for employment at the State of
4   Alaska?
5      A.   Yes.
6      Q.   And it's represented there in paragraph
7   (f) that "Many of the pharmacies" received
8   financing "on the condition that these pharmacies
9   buy their drugs from this wholesaler at no
10  discount from AWP." You see that?
11     A.   Yes.
12     Q.   So when you showed up for work at the
13  State of Alaska, you had an inadequate sampling
14  suggested -- suggesting a reimbursement rate of
15  AWP minus 13 percent, and you had representations
16  from your medical director that other pharmacies
17  purchased at full AWP, correct?
18        MS. WITT:  Objection, leading.
19        MR. KATZ:  Leading.
20        MR. TORBORG:  Leading.
21        THE WITNESS:  I had information in my
22  files that showed that there was a small sample,

Page 755

1   and then there was information that was provided
2   to CMS that showed that there was -- some
3   pharmacies purchased at AWP without discount.
4   BY MR. BURNHAM:
5      Q.   And the Alaska formula in place when
6   you arrived was AWP minus five percent, right?
7        MR. KATZ:  Objection, form.
8        THE WITNESS:  That is correct.
9   BY MR. BURNHAM:
10     Q.   Prior to filing this -- or this lawsuit
11  being filed, did you receive any data for Alaska
12  pharmacies causing you to conclude that AWP minus
13  five percent was an inappropriate figure to use
14  as a statewide average EAC for Alaska?
15     A.   I did not receive any.
16     Q.   We talked about profits in your
17  testimony yesterday.  Other than the Verme report
18  showing that some small number of pharmacies were
19  able to purchase at AWP minus 13 percent, did you
20  have any data indicating that Alaska's
21  methodology for estimating acquisition costs paid
22  a profit to any pharmacies not included in the

Page 756

1   Verme report?
2      A.   No.
3      Q.   Did you have any information indicating
4   that Alaska's methodology provided a profit for
5   any drugs not included in the Verme report?
6      A.   No.
7      Q.   Let's look at Exhibit 32, please.  You
8   have that?
9      A.   Yes.
10     Q.   If you turn to page 12, please, at the
11  bottom.  You were asked some questions about Mr.
12  Ron Sedgwick's testimony reflected in this
13  document.  Indicated that he was a pharmacist
14  from Juneau, a member of the pharmacy association
15  and a member of the pharmacy steering committee.
16  Remember being asked about that?
17     A.   Yes.
18     Q.   And the pharmacy steering committee was
19  the group that formulated Alaska's reimbursement
20  methodology?
21     A.   Yes.
22     Q.   Okay.  Let's look at what Mr. Sedgwick

Page 757

1   had to say in his testimony.  Do you see where he
2   reports that "AWP is the actual price that he
3   pays the wholesaler before discounts"?
4      A.   Yes.
5      Q.   Okay.  And then he goes on to identify
6   two discounts, correct?
7      A.   Yes.
8      Q.   Indicates one discount can be gained by
9   ordering certain quantities of drugs, correct?
10     A.   Correct.
11     Q.   And one discount can be obtained by
12  paying in advance?
13     A.   That's correct.
14     Q.   And then he reported to the legislature
15  the result is, if you get both of those
16  discounts, a cost savings to the pharmacist of
17  AWP minus 10 percent, correct?
18     A.   Correct.
19     Q.   Okay.  Did he disclose any information
20  in his testimony regarding actual acquisition
21  costs for rural pharmacies?
22     A.   Not that I remember.

89 (Pages 754 to 757)

43ed45aa-87f9-43bb-8fed-670c39e33709

David L Campana and State of Alaska 30(b)(6) - Volume II                    August 20, 2008

Anchorage, AK

Page 758

1    Q.  Did he disclose actual acquisition
2  costs for pharmacies that were unable to order
3  sufficient quantities of drugs to obtain this
4  discount he was referring to from AWP?
5    A.  No.
6    Q.  Did he give any information about the
7  discount that was obtained by paying in advance?
8    A.  No.
9    Q.  Did he give any indication of what
10 percentage of the providers in Alaska could
11 actually qualify for either one of these
12 discounts?
13   A.  No.
14   Q.  Now, when Alaska developed its
15 methodology for reimbursement of pharmacies and
16 other drug providers, it was required to provide
17 that to the federal government, is that accurate?
18   A.  That's accurate.
19   Q.  And was the State required to justify
20 that methodology in some fashion?
21   A.  It's my understanding that they did
22 have to justify it in letters to CMS; HCFA at

Page 759

1  that time.
2    Q.  They would have to provide sufficient
3  data for the federal government to approve the
4  methodology?
5    A.  At least sufficient description of --
6  of what they had determined or found.
7    Q.  Okay.  And the federal government has
8  approved Alaska's methodology of AWP minus five
9  percent?
10   A.  That is true.
11      MR. KATZ:  Objection, form.
12 BY MR. BURNHAM:
13   Q.  When did you first learn of an AWP --
14 strike that.  When did you first learn of drugs
15 that pharmacies could purchase for less than half
16 of the published AWP?
17   A.  I'm not sure where I picked that up,
18 but for generic drugs there was information that
19 you could purchase those at a -- at a very small
20 rate compared to AWP.
21   Q.  And is that something recent?
22   A.  I remember some of that information

Page 760

1  just based on what was provided back when I was
2  working in retail.
3    Q.  Exhibit 61, please.  You were asked
4  about the answer to Interrogatory No. 8.  Do you
5  recall being asked about that and you responded
6  that that was an untrue statement?
7    A.  Let's see.  Interrogatory 8.
8    Q.  The answer, the first sentence.
9    A.  Oh.
10   Q.  "Given Alaska did not know providers'
11 actual acquisition costs," you see that?
12   A.  Okay.
13   Q.  Did Alaska know all of the providers'
14 actual acquisition costs in the state?
15   A.  No.
16   Q.  Is it accurate to say, as is written
17 there, that therefore "no person knew at any time
18 that the described reimbursements exceeded
19 providers'" -- that's plural -- "actual
20 acquisition cost"?
21      MR. KATZ:  Objection, form.
22      THE WITNESS:  It's accurate to say that

Page 761

1  if you look at all providers.
2      MR. BURNHAM:  Okay.  Thank you.  I have
3  no more questions.
4
5      FURTHER EXAMINATION
6  BY MR. MANGI:
7    Q.  All right, sir.  You remember me.  I am
8  Adeel Mangi.  I'm going to ask you just few more
9  questions.  I appreciate the day is wearing on.
10 Mr. Burnham asked you a number of questions
11 today.  Did you have occasion to discuss those
12 questions with him before testifying now?
13      MR. BURNHAM:  Objection.  You don't
14 have to answer anything about what we discussed.
15 You don't have to answer.
16 BY MR. MANGI:
17   Q.  Did you meet with Mr. Burnham at the
18 break that took place prior to his questioning
19 you?
20   A.  No.
21   Q.  Now, Mr. Burnham showed you a number of
22 letters that were sent from Alaska to CMS.  You

90 (Pages 758 to 761)

43ed45aa-87f9-43bb-8fed-670c39e33709

Page 762

1  remember that, or HCFA?
2      A.  Yes.
3      Q.  Now, as we discussed yesterday, when
4  Alaska was communicating with HCFA, it was
5  important and understood to be important that
6  Alaska use particular language and phrase things
7  in a particular way, correct?
8          MR. BURNHAM:  Objection, form.
9          THE WITNESS:  Alaska used certain --
10  certain language in the discussion with CMS, or
11  HCFA in those days.
12  BY MR. MANGI:
13      Q.  Now, one of the phrases used in --
14  which Mr. Burnham pointed you to is "documented
15  EAC," correct?
16      A.  EAC was -- was discussed.
17      Q.  Now, when Alaska used the term
18  "estimated acquisition cost," it understood that
19  that's something different from actual
20  acquisition cost, correct?
21      A.  If you look at those -- if I look at
22  those two terms now, I see a difference.

Page 763

1      Q.  And indeed, the folks who set up the
2  system in 1989, Mr. Hansen, Ms. Busch, they
3  certainly understood there was a difference, too.
4  That's obvious from the documents we looked at
5  yesterday, correct?
6          MR. BURNHAM:  Objection, form.
7          THE WITNESS:  I believe that they did
8  see a difference in those.
9  BY MR. MANGI:
10      Q.  And indeed, one of the key differences
11  that -- within the estimated acquisition cost
12  methodology, CMS affords states like Alaska
13  flexibility to take account of local
14  circumstances, correct?
15      A.  CMS did look at that, apparently, in
16  approving the state plan.
17      Q.  And those local circumstances you are
18  allowed to take account of in determining your
19  methodology include factors like what's required
20  to get access, political circumstances in the
21  state, things of that nature, correct?
22      A.  I don't know that.

Page 764

1          MR. BURNHAM:  Objection, form.
2  BY MR. MANGI:
3      Q.  Well, those are the factors that you
4  wrote up in your white paper which you sent to
5  CMS as justification for the methodology,
6  correct?
7      A.  Those were in my white paper.
8      Q.  So certainly you considered those
9  factors of importance to CMS when defending
10  Alaska's methodologies, yes?
11      A.  Yes.
12      Q.  Mr. Burnham also asked you a number of
13  questions about the Verme study.  You remember
14  those?
15      A.  Yes.
16      Q.  The Verme study is not the only source
17  of information you have ever come across relating
18  to AWP and acquisition costs, yes?
19      A.  It's the only one that was used in a
20  systematic function or a study form.
21      Q.  That's not what I asked you, sir.  It
22  is one source of information.  I appreciate it's

Page 765

1  the only study you have seen until the current
2  one pertaining to Alaska specifically.  My
3  question is different.  It's not your only source
4  of information about AWP, correct?
5      A.  It's not the only source about -- well,
6  I have other sources about AWP.
7      Q.  For example, one source is the classes
8  you took in pharmacy school in the 1960s, right?
9      A.  There were information about average
10  wholesale that I learned in college.
11      Q.  Another source of information are
12  people at the Medicaid agency like Mr. [sic]
13  Busch and Mr. Hansen, right?
14          MR. HENDERSON:  Objection.
15          THE WITNESS:  There was other sources,
16  but not complete.
17  BY MR. MANGI:
18      Q.  Another source -- there were other
19  sources of information, yes?
20      A.  There were --
21          MR. HENDERSON:  Objection.
22          THE WITNESS:  -- other sources of

91 (Pages 762 to 765)