# EXHIBIT 10

Page 336

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
-------------------------------x
In re: PHARMACEUTICAL INDUSTRY   )
AVERAGE WHOLESALE PRICE          )
LITIGATION                       )
-------------------------------)
United States of America ex rel.) MDL No. 1456
Ven-A-Care of the Florida Keys,  )
Inc. v. Abbott Laboratories,     ) Civil Action
Inc., Civil Action No. 06-       ) No. 01-12257-PBS
11337-PBS; and United States of  )
America ex rel. Ven-A-Care of    ) Honorable
the Florida Keys, Inc., v. Dey,  ) Patti B. Saris
Inc., et al., Civil Action No.   )
05-11084-PBS; and United States  )
of America ex rel. Ven-A-Care    )
of the Florida Keys, Inc., v.    )
Boehringer Ingelheim Corp., et   )
al., Civil Action No. 07-10248-  )
PBS                              )
-------------------------------x
```

Page 357

1  OIG's 1984 report that discussed the acquisition
2  cost of pharmacies in Arkansas.  Do you recall
3  that?
4      A.  I recall looking at a lot of documents
5  yesterday.  I can't say that I specifically
6  remember that particular one, but I know we
7  looked at a lot of documents referring to
8  acquisition costs yesterday.
9      Q.  Well, just so that you don't have to
10 take my word for it, let's pull that out so you
11 can see what I'm referring to.  This was -- I
12 believe was Roxane Exhibit 9.  Is that the
13 number you have?
14     A.  Yes.
15     Q.  Right.  And we examined Roxane Exhibit
16 9 yesterday --
17     A.  Okay.  We did.
18     Q.  -- which was the report that talked
19 about the acquisition costs of pharmacies in
20 Arkansas, among other states, do you recall that?
21     A.  I do.
22     Q.  And we looked at the various ranges of

Page 358

1  acquisition costs for pharmacies in Arkansas on
2  Page 9.
3      A.  Uh-huh.  Correct.
4      Q.  So now back to Roxane Exhibit 19.
5  This letter in March of 1988, the -- HCFA's
6  regional office states that the average
7  difference between AWP and what pharmacists
8  generally paid in Arkansas and Texas was 12.53
9  percent below AWP.  Do you agree that this
10 document reflects that?
11     A.  Generally, it was 12.53, not on all
12 drugs. I will agree that the document says that.
13     Q.  And, in fact, that the document says
14 that the survey performed by Dallas regional
15 office excluded antibiotic drugs, generic drugs
16 and drugs that were purchased directly from the
17 manufacturer?
18     A.  So this would be strictly for brand
19 name drugs.  This would not include any generics.
20     Q.  And based on what we've seen, you would
21 expect that the discounts available for
22 pharmacies, when purchasing generic drugs, are

Page 359

1  typically greater than the discounts when
2  purchasing branded drug?
3          MS. OBEREMBT:  Objection.
4      A.  I can only make that assumption based
5  on the survey findings.  The survey findings
6  generally show that -- and I'd have to look at
7  the survey again, that the variance on brand is
8  not as great on the variance on generics.  I
9  mean, that's common knowledge.  I'd guess you'd
10 say.
11         MR. REALE:  Let me mark the next one.
12     A.  A common assumption.  Excuse me.  Let
13 me rephrase that.
14     [Marked Exhibit Roxane 020]
15     Q.  (By Mr. Reale) Roxane Exhibit 20 has
16 just been passed out.  This is Bates Page
17 HHC011-2260 to 2268.  And this is a letter from
18 the Arkansas Department of Human Services, and it
19 appears to be dated June 22nd, 1988, and it's
20 from Kenny Whitlock, Director at DHS, to Don
21 Hearn at HCFA in the regional office at Dallas,
22 Texas.  This was another document, Ms. Bridges,

Page 360

1  that was produced to us by the Federal Government
2  in this lawsuit.  And if you look at the first
3  paragraph of this letter, it's a response from
4  Arkansas to concerns raised by HCFA.  Do you
5  agree with that?
6      A.  It's a clarification or a modification,
7  according to this.
8      Q.  And it has been your experience, hasn't
9  it, that when Arkansas has submitted Plan
10 Amendments to CMS, from time to time they may ask
11 for additional information from the State, either
12 to support certain aspects of the Plan Amendment
13 or for other aspects.
14     A.  For a State Plan Amendment, they can
15 request additional information.  Is this in
16 reference to a State Plan Amendment?  I don't
17 know the -- I mean, I don't know if this is in
18 reference to a State Plan Amendment.  Let me
19 rephrase that.
20     Q.  Now, if you would turn to the second
21 page of the cover letter, or excuse me, of the
22 letter.  And at the top, there's something that

Page 373

1   survey.
2       Q.  On Page 4, we see the response of
3   Arkansas to a question regarding what has helped
4   or would help Arkansas overcome barriers to
5   Medicaid drug cost containment listed above.  Do
6   you see that?
7           MS. MOSLEY-SIMS:  Objection, form.
8       A.  I'm sorry.  Would do you repeat?
9       Q.  (By Mr. Reale) Sure.  And Question 12
10  has asked of the Respondent, "What has helped or
11  would help your state to overcome barriers to
12  Medicaid drug cost containment listed above?"
13  And it refers to "potential barriers" listed
14  above in the table.  Do you see that?
15          MS. OBEREMBT:  Excuse me.  This is
16  Laurie.  John, what's the day on this exhibit?
17          MR. REALE:  Laurie, it is undated.
18          THE WITNESS:  It doesn't have a date.
19          MR. REALE:  But it came out at or
20  obviously before the OIG Report on cost
21  containment strategies.
22          MS. OBEREMBT:  What was the date of

Page 374

1   that report?
2           MR. REALE:  It was in the 2000.  I
3   don't know off the top of my head.
4           MS. OBEREMBT:  Thank you.
5           MR. REALE:  You're welcome.
6       Q.  (By Mr. Reale) All right.  Back to Ms.
7   Bridges.
8       A.  Okay.  It's hard to read this
9   handwriting.  I'm sorry.
10      Q.  Sure.  But I want to first point out
11  that the potential barriers that this Respondent
12  has indicated with respect to drug cost
13  containment are opposition from pharmacies.  Do
14  you see that?  D is selected as yes.  Has your
15  program --
16      A.  I'm sorry.  I was trying to read down
17  below.
18          MS. MOSLEY-SIMS:  Objection.
19      A.  You said 11, and now you're -- you said
20  Question 12, but you're reading off of 11, so
21  you've got me confused.
22      Q.  (By Mr. Reale) Okay.  Well, let me

Page 375

1   start from the top.  Question 11 asks the
2   Respondent to indicate whether or not the program
3   has encountered each of the following barriers in
4   seeking to implement drug cost containment
5   strategies.  Do you see that?
6       A.  I see No. 11, yes.
7       Q.  And one of the oppositions that has
8   faced the Arkansas Medicaid Agency, according to
9   this Respondent, has been opposition from
10  pharmacies.  Do you see that?
11          MS. MOSLEY-SIMS:  Objection.
12      A.  I do see it marked, yes.
13      Q.  (By Mr. Reale) And do you agree there
14  has been, from time to time, opposition from
15  pharmacies regarding drug cost containment
16  strategies?
17          MS. MOSLEY-SIMS:  Objection.
18      A.  I can only say that whenever we tried
19  to implement -- when we implemented the new
20  reimbursement formula, there was opposition from
21  pharmacies.
22      Q.  (By Mr. Reale) And if we look down to

Page 376

1   Question 12, which asks, and I will repeat my
2   earlier question -- what has helped or would help
3   your State to overcome barriers to Medicaid cost
4   containment listed above, we see a response from
5   somebody purporting to act on Arkansas' behalf.
6   Do you see that?
7           MS. MOSLEY-SIMS:  Objection.
8       A.  And again, this only shows AR.  It
9   doesn't show who filled it out or a date or who
10  completed the survey, so what I'm going to say is
11  I can only respond to yes, I see an answer on
12  this page by whomever completed this survey.
13      Q.  And the answer that was provided was
14  that CMS should be more aggressive about the
15  measures they approve.  Do you see that language?
16          MS. MOSLEY-SIMS:  Objection.
17      A.  I see that language.
18      Q.  (By Mr. Reale) And do you agree that
19  CMS should be more aggressive about the measures
20  they approve?
21          MS. MOSLEY-SIMS:  Objection.
22      A.  I don't even know how to answer that.

Page 493

1   Q.  And can you think of any reason why
2  that has not been considered?
3   A.  As I testified yesterday, there are
4  25,000 NDCs in our payment base that we reimburse
5  on. There's -- it's not feasibly possible to even
6  expect the pharmacies to submit those or for us
7  to police that. It would be more feasible if the
8  -- if a more accurate price was reported, and
9  then that would not be of concern, but to
10 anticipate the State to be able to obtain those
11 to -- to -- for payment and then to audit that is
12 just not feasible.
13  Q.  Well, if the pharmacies are reporting
14 their usual and customary charge on every single
15 claim and the State is considering the usual and
16 customary charge for determining the payment of
17 every single claim, why is it any less feasible
18 to use -- to have the pharmacies report the
19 acquisition costs and for the State to use that
20 in its payment than having -- than relying on the
21 usual and customary charge?
22      MS. MOSLEY-SIMS:  Objection.

Page 494

1       MS. OBEREMBT:  Laurie, objection. She
2  testified at length about this yesterday in
3  response to the identical question. And we know
4  we're short of time here. Please, could we move
5  on?
6       MR. BERLIN:  No. I want an answer to
7  the question.
8    A.  Okay. Usual and customary is more
9  consistent, number one. AWPs, as you know, our
10 product prices fluctuate. They fluctuate. So
11 the pharmacies price to us daily would be
12 different. There would not be a way for the -- I
13 mean, again, it would not be feasible for us to
14 even begin to audit for this, to be able to track
15 it or to be able to police it.
16   Q.  (By Mr. Berlin) Is there anything that
17 -- is there any reason why auditing the
18 acquisition cost would be more difficult than
19 auditing the usual and customary charge?
20   A.  That's what I just stated.
21      MS. OBEREMBT:  Objection, Laurie.
22 Asked and answered.

Page 495

1    A.  That was what I just answered. Again,
2  the usual and customary is a more consistent
3  amount.
4    Q.  (By Mr. Berlin) How do you know it's
5  more consistent than the acquisition costs for
6  the pharmacy?
7    A.  Well, the -- I'm going to make the
8  assumption, which I feel is fairly accurate, that
9  the acquisition costs are going to change more
10 frequently than the usual and customary is going
11 to change.
12   Q.  And I'm asking you what's your basis
13 for that statement?
14   A.  Well, we get weekly updates from First
15 DataBank with price changes weekly.
16   Q.  Yeah, but we're not talking about the
17 AWP. What I'm asking you is the acquisition cost
18 versus the usual and customary charge, and I'm
19 asking you for your basis -- for your belief that
20 the acquisition cost is going to be moving more
21 frequently than the usual and customary charge?
22   A.  I just feel that the acquisition cost

Page 496

1  is going to be more fluctuation -- there's going
2  to be more fluctuation with the acquisition cost
3  than there would be with the usual and customary
4  charge. And I'll repeat. If there was a better
5  -- if there was a more accurate reporting of the
6  AWP, then this would not be an issue.
7    Q.  Well, I mean, let's go back and talk
8  about the AWP. And -- and Laurie, I know you
9  don't want me to retread, but we're going to go
10 have different trials, and there were objections
11 to some of John's questions, so I'm entitled to
12 ask them my way and get the answers that I want.
13      MS. OBEREMBT:  No. You're entitled to
14 get truthful testimony. You're not entitled to
15 get the answers you want to get.
16      MR. BERLIN:  That's -- that's true. I
17 agree with that.
18   Q.  (By Mr. Berlin) The State of Arkansas
19 has known since at least the '80s that AWP was
20 not an actual average of wholesale prices, right?
21      MS. OBEREMBT:  Objection, Laurie.
22   A.  I was not involved with the State prior

06db8d46-1900-438e-b5fa-9bac07802652