# EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION)

---------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:         ) Master File No.

United States of America ex rel.  ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,   ) Subcategory Case

Inc., et al. v. Dey, Inc., et al.,) No. 06-11337

Civil Action No. 05-11084-PBS     ) Hon. Patti B.

---------------------------------X Saris


VIDEOTAPED DEPOSITION OF:  ALLEN D. CHAPMAN

December 15, 2008

PURSUANT TO AMENDED NOTICE AND SUBPOENA,

the deposition of ALLEN D. CHAPMAN was taken on

behalf of Defendant Dey, Inc., at 1701 California

Street, Silverton Room, Denver, Colorado 80202, on

December 15, 2008, at 10:06 a.m., before Tammie E.

Singer, Professional Court Reporter and Notary

Public within Colorado.

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                    December 15, 2008
                          Denver, CO

Page 26

1      MR. ANDERSON:  Objection, form.
2      Q.  (BY MR. KATZ)  You can answer.
3      A.  Yes.
4      Q.  And so that $30 would then be charged
5  back to the drug manufacturer, and the drug
6  manufacturer would give that $30 back to the
7  wholesaler to make the wholesaler whole, right?
8      A.  That's correct.
9      Q.  Is that how you understood the charge-
10  back --
11      A.  Yes.
12      Q.  -- to work?
13      A.  Yes.
14      Q.  Okay.  And you understood the concept
15  of a charge-back while you were the director of
16  purchasing from 1980 to 1990?
17      A.  Yes.
18      Q.  Did you understand that wholesalers
19  would purchase the drugs from the drug
20  manufacturers at something called WAC, or
21  wholesale acquisition cost?
22      A.  I have heard that term, yes.

Page 27

1      Q.  And WAC is the invoice price from the
2  drug manufacturers to the wholesaler.  Have you
3  heard that?
4      A.  Yes.
5      Q.  Okay.  So based on your experience
6  purchasing drugs for the University Hospital,
7  University Hospital would be able to purchase
8  drugs at below WAC sometimes, right?
9      A.  Depending on the contract, yes.
10      Q.  Okay.  And there's also something
11  called average wholesale price, or AWP, right?
12      A.  Yes.
13      Q.  But the University Hospital didn't
14  purchase drugs at AWP, right?
15      MR. ANDERSON:  Objection, form.
16      Q.  (BY MR. KATZ)  Well, the University
17  Hospital had a contract --
18      A.  Right.
19      Q.  -- price --
20      A.  Right.
21      Q.  -- right?
22      A.  Right.

Page 28

1      Q.  And that was lower than the AWP, right?
2      A.  Hopefully.
3      MR. ANDERSON:  Objection, form.  And
4  Cliff, if he's in the middle of an answer, you've
5  got to let him finish his answer.  You can't cut
6  him off while he's answering.
7      Q.  (BY MR. KATZ)  If you have more to say,
8  you should feel free to.
9      A.  I have nothing else to talk about on
10  that.
11      Q.  Okay.  And you understood that AWP was
12  something that was above the actual acquisition
13  cost at that time, right?
14      A.  Hopefully.
15      Q.  Okay.  Other than purchasing, what else
16  -- what other responsibility -- responsibilities
17  did you have from 1980 to 1990 as a director in
18  the University Hospital?
19      A.  Hiring --
20      Q.  Okay.
21      A.  -- planning, supervision, essentially
22  running the whole operation.

Page 29

1      Q.  When drugs would come in, would the
2  invoices come to you?
3      A.  No.
4      Q.  That would be -- did you review
5  invoices for drugs at all?
6      A.  Not as a normal function.
7      Q.  While you were working with the
8  purchasing, had you seen invoices that had
9  contract price next to another price, like a WAC
10  or an AWP?
11      A.  I don't remember.
12      Q.  And while you were involved with the
13  purchasing, you became aware of -- that rebates
14  were offered in the pharmaceutical industry,
15  right?
16      A.  How do you define that?
17      Q.  Well, have you heard the term -- have
18  you heard of rebates in the pharmaceutical
19  industry before?
20      A.  Yes, but I wanted to know your
21  definition.
22      Q.  Well, there's a lot of different types

8 (Pages 26 to 29)

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                    December 15, 2008
                          Denver, CO

Page 46

1    Q.  (BY MR. KATZ) Okay.  And when Colorado
2  set its reimbursement rate for prescription
3  drugs, it had to set its reimbursement rate high
4  enough to ensure that enough providers
5  participated, right?
6        MR. ANDERSON:  Objection, form.
7     A.  I'm sure that was one of the criteria.
8  It wasn't the only criteria.
9     Q.  (BY MR. KATZ) Okay.  What were some of
10  the other criteria?
11    A.  Studies that were done within the
12  state, negotiation.
13    Q.  And when you say studies, you're
14  referring to studies regarding dispensing costs
15  and acquisition costs?
16    A.  Correct.
17    Q.  And when you say negotiations, you're
18  referring to negotiations with the pharmacy
19  community, right?
20        MR. ANDERSON:  Objection, form.
21    A.  And other parties.
22    Q.  (BY MR. KATZ) Well, let's start with

Page 47

1  the pharmacy community.  Okay?
2     A.  Okay.
3     Q.  So the state would consider what the
4  pharmacy community had to say about what the
5  reimbursement rate should say, right?
6     A.  That's correct.
7     Q.  And the pharmacy community had advocacy
8  groups to assist them in this process, right?
9     A.  That's correct.
10    Q.  What are those pharmacy associations in
11  Colorado?
12    A.  At the present time, the main one is
13  the Colorado Pharmacists Association.
14    Q.  Okay.  Any others?
15    A.  I'm not sure how active -- there used
16  to be another one that I don't remember the
17  acronym for that was for the independent
18  pharmacies.
19    Q.  Okay.  And these pharmacy associations,
20  they would lobby the Colorado Medicaid agency
21  when reimbursement rate changes were being
22  discussed, right?

Page 48

1        MR. ANDERSON:  Objection, form.
2     A.  I'm not sure I would use the word
3  lobby, but --
4     Q.  (BY MR. KATZ)  Well, they would discuss
5  --
6     A.  They -- they would have input.
7     Q.  Okay.  And are you aware that the --
8  that these pharmacy associations would lobby
9  branches of government?
10    A.  I'm sure they did.
11    Q.  Like they lobbied the legislature --
12    A.  Correct.
13    Q.  -- and maybe the governor?
14        Did you ever -- did the governor's
15  office -- did the legislature ever discuss things
16  that they heard from the pharmacists with the
17  Medicaid agency?
18    A.  I don't remember any direct
19  conversations like that with the governor.
20    Q.  But you were aware that these pharmacy
21  associates were talking to the elected officials
22  of Colorado, right?

Page 49

1     A.  Yes.
2        MR. ANDERSON:  Objection, form.
3     Q.  (BY MR. KATZ)  And that's part of the
4  process, and there's nothing wrong with that,
5  right?
6        MR. ANDERSON:  Objection, form.
7     A.  I don't know the --
8     Q.  (BY MR. KATZ)  You didn't think there
9  was anything wrong with the pharmacy associations
10  expressing their opinion as to what the rate
11  should be, right?
12    A.  I guess I'm not sure I know the
13  definition of "anything wrong."
14    Q.  Well, it was allowed, right?
15    A.  There were discussions -- we were open
16  to the public.
17    Q.  Okay.
18        MR. GOBENA:  Before you go on, can I
19  just have a standing objection to all these
20  leading questions?  I don't want to make the
21  objection over and over again.  But as far as I
22  can tell, it's as if you're doing the testifying

13 (Pages 46 to 49)

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                          December 15, 2008
                                   Denver, CO

Page 58

1    Q.  Okay.  Did you understand that
2  different pharmacies purchased drugs at different
3  amounts?
4    A.  Yes.
5    Q.  And that different pharmacies had
6  different costs of dispensing?
7    A.  I'm sure they did.
8    Q.  Okay.  And so when I say costs, I'm
9  referring to acquisition costs for the purchase
10  of the drug and dispensing costs.  Do you
11  understand that?
12    A.  Okay.
13      MR. ANDERSON:  Objection, form.
14    Q.  (BY MR. KATZ)  All right.  Now, going
15  back to my question --
16    A.  Okay.
17    Q.  -- since Colorado Medicaid had to
18  ensure adequate access to care and different
19  pharmacies had different costs, Colorado Medicaid
20  had to take this into account when trying to
21  ensure adequate access to care, right?
22      MR. ANDERSON:  Objection, form.

Page 59

1    A.  Colorado Medicaid had to determine a
2  pricing structure that would keep the providers'
3  access there for the patients, yes.
4    Q.  (BY MR. KATZ)  Right.  And so to keep
5  providers, it would have to keep those providers
6  with the higher costs as well as the providers
7  with the lower costs, right?
8    A.  You have to have a mixture, yes.
9    Q.  Okay.  Let's talk about how the
10  reimbursement methodology was actually set.  So
11  the way it would work would be that Colorado
12  Medicaid would come up with a reimbursement
13  methodology and submit what's called a state plan
14  to the Medicaid agency that runs the Medicaid
15  program, which was call -- which was called HCFA,
16  right?
17    A.  You're -- the Medicaid's methodology
18  was outlined in the state plan, yes.
19    Q.  And the methodology -- well, strike
20  that.  Colorado Medicaid could only use that
21  methodology if HCFA approved the state plan,
22  right?

Page 60

1    A.  HCFA approved every state plan or they
2  disapproved it, yes.
3    Q.  But Colorado Medicaid could only use
4  the reimbursement methodology that it decided on
5  if HCFA approved it, right?
6      MR. GOBENA:  Objection, form.
7    Q.  (BY MR. KATZ)  Let me withdraw that.
8  Did HCFA have to -- did HCFA have to approve the
9  state plan used by Colorado?
10    A.  The state plan for Colorado was
11  approved by HCFA for reimbursement, yes.
12    Q.  Okay.  And it was, but I'm asking you
13  whether or not that was a requirement.
14      MR. ANDERSON:  Objection, form.
15    A.  You submitted a state plan to HCFA.  It
16  was either approved or disapproved.  And then you
17  went through a process until you ended up with an
18  approved state plan.  And there was a period of
19  time that you had to do that.
20    Q.  (BY MR. KATZ)  Okay.  But ultimately
21  the reimbursement methodology used by Colorado
22  Medicaid was in an approved state plan, right?

Page 61

1    A.  Yes.
2    Q.  Okay.  And drug manufacturers were not
3  involved in setting the reimbursement
4  methodology, right?
5    A.  Drug manufacturers had their own
6  lobbyists and their own organization that -- that
7  were interested in that because of the
8  reimbursement for their drugs.
9    Q.  But they didn't set the reimbursement
10  methodology in the state plan, right?
11    A.  The Medicaid program did that.
12    Q.  And the drug manufacturers didn't have
13  any power to approve or disapprove of the state
14  plan, right?
15    A.  Correct.
16    Q.  That was the Colorado Medicaid agency
17  and the federal Medicaid agency called HCFA,
18  right?
19    A.  Correct.
20    Q.  Okay.  If a pharmacy chooses to
21  voluntarily participate in the Medicaid program,
22  it must enter into a provider agreement with the

16 (Pages 58 to 61)

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                    December 15, 2008
                              Denver, CO

Page 106

```
 1        MR. ANDERSON:  Objection, form.  I --
 2     Q.  (BY MR. KATZ)  Take a look at that, and
 3  let me know if that's accurate.
 4        MR. ANDERSON:  Cliff, I gotta tell you
 5  what's going on is beginning to become abusive
 6  because you are literally testifying in every
 7  single question.
 8        This man has no connection to this
 9  letter.  He's had no connection to a 1984 report.
10  If you have exhibits that he's involved in,
11  perhaps you want to use those.
12        I'm going to have questions for the
13  guy.  And at this rate, there's no way you're
14  going to be able to pass the witness in a timely
15  manner so that we can complete the deposition
16  today.
17     Q.  (BY MR. KATZ)  You can look at the
18  paragraph.
19     A.  But wouldn't Medicaid drug rebates be
20  rebates that are supplements that are
21  subsequently paid?
22     Q.  Okay.  You're right.  So in the sense
```

Page 107

```
 1  that rebates are paid subsequent to the
 2  transaction --
 3     A.  Right, irregardless of who they are
 4  paid to.
 5     Q.  Right.  Okay.  And that was something
 6  that you were aware of in the 1980s about these
 7  rebates subsequently paid, right?
 8     A.  Correct.
 9     Q.  Now I would like you to take a look at
10  the last page of this letter.  And if you look at
11  the second-to-the-last paragraph, second
12  sentence, it says, "For multiple-source drugs, I
13  would make extensive use of state upper limits as
14  neither the FUL or AWP mean anything for generic
15  drugs."
16        Do you agree with Mr. Hazelwood's
17  statement that the AWP does not mean anything for
18  generic drugs?
19        MR. ANDERSON:  Objection, form.
20     A.  I guess my comment was there's probably
21  more of a variation between AWP and actual cost
22  with generic than there are the other.
```

Page 108

```
 1     Q.  (BY MR. KATZ)  "The other" would be
 2  brand?
 3     A.  Brand -- no -- the other would be
 4  brand, right, but --
 5     Q.  And that was something you were aware
 6  of going back to the 1980s?
 7     A.  I think that -- but I guess what I
 8  think he's -- what he was talking about in this
 9  memo was a push to try to have state MACs for
10  generic products that the federal government did
11  not have federal upper limits for and the basis
12  for that.
13     Q.  And the --
14     A.  This is what he's really trying to do
15  here.
16     Q.  And the reason for having state maximum
17  allowable cost or federal upper limits for
18  generic drugs is that it was known that the AWPs
19  for generic drugs exceeded the actual acquisition
20  costs of providers, right?
21     A.  I'm not sure that --
22        MR. ANDERSON:  Objection --
```

Page 109

```
 1     A.  I'm not sure that was his -- that -- in
 2  my mind, that wasn't his basis for doing that --
 3     Q.  (BY MR. KATZ)  Well, I'm asking you as
 4  someone who was formerly employed by Colorado --
 5     A.  I thought you were asking me what he
 6  was thinking.
 7     Q.  No, no, no.  The reason why state
 8  maximum allowable costs were used in federal
 9  upper limits was because it was known that the
10  AWPs for generic drugs were in -- exceeded the
11  actual acquisition costs of providers.
12        MR. ANDERSON:  Objection, form.
13     A.  I guess I would say it is that -- the
14  reason that one would want to do something like
15  this is to be able to sort of fine-tune the
16  system, to have a state -- have the states have
17  the ability to look at their individual state and
18  come up with methodologies that went beyond where
19  the feds were going at that time.
20     Q.  (BY MR. KATZ)  Okay.  And when you say
21  go beyond, do you mean have additional upper
22  limits for additional drugs?
```

28 (Pages 106 to 109)

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                        December 15, 2008
                              Denver, CO

Page 222

1    don't have a number, I'm asking just for a
2    general area.  I mean, was it your feeling it was
3    10 percent below or 50 percent below or 80
4    percent below?  Can you give any sort of an
5    estimate?
6        A.  No.
7        Q.  While you were working for the hospital
8    -- in other words, prior to your employment with
9    Medicaid, did you have an understanding that
10   there were substantial discounts below AWP?  And
11   by substantial, I mean it's not just 5 percent,
12   but there may be 20 or 30 or even 50 percent
13   below AWP?
14       MR. ANDERSON:  Objection, form.
15       A.  I guess I was -- I was aware of the
16   fact that different types of providers got
17   different pricing based on who they were,
18   nonprofit hospitals, governmental entities.  And
19   I had really spent very little if no thinking
20   about what happened in the retail marketplace
21   until I got to the Medicaid program.
22       Q.  (BY MR. BERLIN)  At the time that you

Page 224

1    was right before the drug rebate program that
2    OBRA 90 started.
3            And so -- and in that provision, there
4    was a provision for not effecting -- not reducing
5    reimbursement to our providers for four years.
6    And so there really wasn't much talk about
7    reimbursement during that period of time because
8    of the fact that we were preempted from doing
9    much of anything for four years.
10       Q.  And during that moratorium under OBRA,
11   did you -- during that time, did you have an
12   understanding that you, meaning the -- excuse me
13   -- the Medicaid program, was paying ingredient
14   costs to the pharmacies at higher than their
15   actual acquisition costs?
16       MR. ANDERSON:  Objection, form.
17       A.  I guess I don't -- I don't have an
18   answer to that.  I don't know what our thought
19   process was at that time.
20           The reimbursement was -- we were
21   working more on trying to get our systems updated
22   to work with the rebate program, you know, where

Page 223

1    were working for the hospital, was it your view
2    that AWP was essentially a list price and that
3    there were discounts below it for different
4    providers?
5        A.  I guess to probably characterize my
6    thought of that, it was something if you looked
7    up a product in the Red Book or the Blue Book,
8    whatever it was, you saw a price there, but it
9    had no relationship to the price that we might be
10   paying in our marketplace.
11       Q.  And then when you started with Colorado
12   Medicaid, you saw that part of their formula was
13   based on AWP minus a percent, right?
14       A.  That was one of the percentages -- that
15   was one of the factors, yes.
16       Q.  Did you raise with anyone in the
17   Medicaid program a concern about using AWP as
18   part of the reimbursement formula?
19       A.  I guess not on my first day or probably
20   -- I'm sure there were discussions about that.  I
21   don't recall -- you know, I think that -- to
22   point out the fact that when I got to Medicaid

Page 225

1    we had to, you know, make sure that people were
2    billing by the right NDC and that type of thing.
3    And issues of AWP was not on my A pile at that
4    time.
5        Q.  (BY MR. BERLIN)  So is it fair to say
6    that you knew there was a moratorium and that you
7    couldn't change reimbursement, so because of
8    that, you just didn't spend time thinking about
9    it?
10       A.  I guess what I'm saying is we -- we
11   were working on other issues at that point.  But
12   that doesn't answer your question about whether I
13   thought about whether AWP was the right
14   methodology or not.
15           It was -- it was one of the
16   methodologies we had.  And it was not the one
17   that -- that paid -- I don't remember what the
18   percentages were about paying, whether it was
19   usual and customary or federal upper limit or
20   what, but it was one of the factors.
21       Q.  And I wanted to follow up on that
22   point.  Do you have any recollection during any

57 (Pages 222 to 225)

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                        December 15, 2008
                              Denver, CO

Page 334

1  the federal definition of estimated acquisition
2  cost?
3         MR. KATZ:  Objection to form.
4      A.  To me this appears like that there was
5  a lot of negotiations with the pharmacy
6  community, with their input, and then the
7  concerns about that and . . .
8      Q.  (BY MR. ANDERSON)  Yeah, like the
9  pharmacy community --
10     A.  Yeah.
11     Q.  -- was setting forth some different
12 reasons why there should be some deductions --
13     A.  Uh-huh.
14     Q.  -- correct?
15        MR. KATZ:  Objection to form.
16     A.  They were -- they were -- some
17 deductions from the percent off --
18     Q.  (BY MR. ANDERSON)  Basically the
19 pharmacies --
20     A.  What they were saying is that the --
21 that the -- when you add in the Narcotics Class
22 II, you reduce it by .131 and that type of thing.

Page 335

1      Q.  And the pharmacies were saying if you
2  add in the Class II narcotics, that --
3      A.  Right.
4      Q.  -- adds a --
5      A.  Lowers it down --
6      Q.  -- little bit of --
7      A.  Yeah.
8      Q.  -- expense, right?
9      A.  Right.
10        THE COURT REPORTER:  I'm sorry.  You're
11 -- so where I left off with was "And the
12 pharmacies were saying if you add in the Class II
13 narcotics . . ."
14     Q.  (BY MR. ANDERSON)  -- it adds a little
15 expense; is that correct, sir?
16        MR. KATZ:  Objection to form.
17     A.  That's the .31 that was on the
18 percentage here.
19     Q.  (BY MR. ANDERSON)  And that .31
20 additional cost percentage, in turn, was deducted
21 from the potential discount off of AWP in setting
22 EAC reimbursement, correct?

Page 336

1         MR. KATZ:  Objection to form.
2      A.  And what was up here is the -- the 3.8
3  percent raw to AWP differential on 3.
4      Q.  (BY MR. ANDERSON)  Then looking at that
5  next paragraph in Section 6, Mr. Chapman --
6      A.  Okay.
7      Q.  -- do you see a paragraph there that
8  discusses the data sources used by the state of
9  Colorado Medicaid?
10     A.  I see that.
11     Q.  And one of those is First DataBank
12 electronic price updates, correct?
13     A.  I see that, but I don't remember that -
14 - when did this letter get written?  I didn't
15 remember that they had a contract with First
16 DataBank because when I arrived in July, then --
17 then two people were still manually doing the
18 updates.  But they might have just changed to
19 that.  I don't know.  But that was --
20     Q.  That was --
21     A.  It was short-lived.
22     Q.  Yes, sir.  And that's shortly after you

Page 337

1  arrived --
2      A.  That's right.
3      Q.  -- at Colorado Medicaid, the transition
4  to the electronic data took place?
5      A.  That's correct.
6      Q.  Oh, one last question about this
7  Exhibit Chapman 4.  In paragraph 3, there's some
8  discussion about wholesalers.  Do you see that?
9      A.  I see that.
10     Q.  And did Colorado Medicaid understand
11 that pharmacies were buying some drugs from
12 wholesalers?
13        MR. KATZ:  Objection to form.
14     A.  I knew they bought drugs from whole --
15 everybody knew that they bought drugs from
16 wholesalers, but I'm not sure what this question
17 is about.
18        (Deposition Exhibit Chapman 005
19 was marked.)
20     Q.  (BY MR. ANDERSON)  Well, that was just
21 leading me into this document, Mr. Chapman.  If
22 you could, take a look at Exhibit 5.

85 (Pages 334 to 337)

3a52829d-7e0c-4034-a0c1-5d44bd720e64