# EXHIBIT 12

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

In Re: PHARMACEUTICAL INDUSTRY      ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION) CIVIL ACTION:

---------------------------------X 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:           )

U.S. ex rel. Ven-A-Care of the      ) Judge Patti B.

Florida Keys, Inc., v. Abbott       ) Saris

Laboratories, Inc., No.             )

06-CV-11337-PBS; U.S. ex rel.       ) Magistrate Judge

Ven-A-Care of the Florida Keys,     ) Marianne Bowler

Inc. v. Abbott Laboratories, Inc.,)

No. 07-CV-11618-PBS; U.S. ex rel. )

Ven-A-Care of the Florida Keys,     )   DEPOSITION OF

Inc. v. Dey, Inc., et al., No.      )    JERRY WELLS

05-11084-PBS; U.S. ex rel.          )

Ven-A-Care of the Florida Keys,     ) DECMEBER 15, 2008

Inc., et al. v. Boehringer          )   TALLAHASSEE, FL

Ingelheim Corp., et al., No.        )

07-10248-PBS                        )

---------------------------------X

Page 122

1    A.  I don't know that I had.
2    Q.  Do you recall reading this newspaper
3  article after it came out with -- with you being
4  quoted in it?
5    A.  I don't.  I do not.
6    Q.  You will agree with me that the
7  difference between acquisition cost and average
8  wholesale price was the reason that you urged
9  HCFA not to use average wholesale price as a
10 pricing mechanism, correct?
11       MS. ST. PETE-GRIFFITH:  Object to the
12 form.
13       MS. WALLACE:  Objection, form.
14       THE WITNESS:  The reason we encouraged
15 them to allow us to use a WAC plus reimbursement
16 basis was because I felt like AWP was being
17 manipulated.
18 BY MR. COOK:
19   Q.  And you had that belief back in 1987,
20 correct?
21   A.  I did.
22       MS. ST. PETE-GRIFFITH:  Object to form.

Page 123

1  BY MR. COOK:
2    Q.  And you communicated that to HCFA back
3  in the 1980s, correct?
4        MS. ST. PETE-GRIFFITH:  Object to the
5  form.
6        THE WITNESS:  I did.
7        MR. COOK:  This is a good time for a
8  break.
9        THE VIDEOGRAPHER:  The time is 11:27
10 a.m.  We are going off the record.
11       We are off the record.
12       (Thereupon, a recess was taken,
13 commencing at 11:27 a.m. and concluding at 11:37
14 a.m. of the same day.)
15       THE VIDEOGRAPHER:  This is the
16 beginning of Tape 3 of the videotaped deposition
17 of Jerry Wells taken on December 15, 2008.  The
18 time is 11:37 a.m. and we are back on the record.
19       (Exhibit Abbott-Wells 1006 was
20 marked for identification.)
21 BY MR. COOK:
22   Q.  Mr. Wells, I've handed you what we have

Page 124

1  marked as Exhibit 1006.  It is -- for the record,
2  it is a document entitled Legislative Proposal
3  Analysis dated October 1, 1998.  Do you recognize
4  this document?
5    A.  I think I do.
6    Q.  You are listed as the contact name on
7  this Legislative Proposal Analysis.  Do you see
8  that?
9    A.  I do.
10   Q.  Is it fair to assume that you probably
11 wrote this Legislative Proposal Analysis?
12   A.  I had something to do with writing it.
13   Q.  What's the subject matter of this
14 Legislative Proposal Analysis?
15   A.  This is parenteral and enteral
16 pharmacies.  It was, I think, drafted after or
17 before a meeting with parenteral and enteral
18 pharmacies and some legislators.
19   Q.  Was Ven-a-Care included in that
20 meeting?
21   A.  I don't know that for sure.  I think
22 they were.  They probably were.  Should have

Page 125

1  been.
2    Q.  Why were these pharmacies and
3  legislators and you meeting together in 1998?
4    A.  This was a discussion meeting to
5  establish reimbursement level for parenteral
6  nutrition and to entertain the idea of
7  establishing a new provider type in the pharmacy
8  program, which would be a parenteral or IV
9  provider to address some of the issues that
10 didn't fit the square peg into the round hole of
11 community pharmacy.
12   Q.  What are some of the issues that you're
13 referring to there when you talk about these
14 square peg/round hole problems between infusion
15 pharmacies and community pharmacies?
16   A.  Infusion pharmacies were involved in
17 preparation of sterile product for injectible
18 use, which is a little more involved than putting
19 prescription tablets or capsules into a vial and
20 dispensing in the community environment.  There
21 were some issues with disposal supplies that
22 providers would like to be reimbursed for that we

Page 206

 1  for single source brands.
 2      Q.  And for innovator multisource products,
 3  what was the discount they were able to receive?
 4      A.  It was 43.41 percent.
 5      Q.  What are innovator multisource
 6  products?
 7      A.  That is a product whose patent has
 8  expired but is still marketed by the original NDA
 9  applicant.
10      Q.  Do you have an expectation for what the
11  discounts from AWP would be for noninnovator
12  multisource products?
13      A.  Because those manufacturers and
14  suppliers tend to overstate their AWPs, you can
15  see 80 or 90 percent in some cases.
16      Q.  And you've known that since at least
17  1995, right?
18          MS. ST. PETER-GRIFFITH:  Object to the
19  form.
20          MS. WALLACE:  Objection to form.
21          MR. BREEN:  Objection, form.
22          THE WITNESS:  I don't know that I know

Page 207

 1  that to that extent in 1995.  Certainly in 2001 I
 2  knew that.
 3  BY MR. COOK:
 4      Q.  The sentence after you discussed the
 5  discounts from single source brands and innovator
 6  multisource products reads, quote, "These are
 7  predictable, confirm the ability of closed shop
 8  pharmacies to negotiate pricing concessions from
 9  pharmaceutical manufacturers that may not be
10  available to community-based pharmacies," closed
11  quote.
12          Do you see that?
13      A.  Yes.
14      Q.  That was true in 2001, correct?
15          MS. ST. PETER-GRIFFITH:  Object to
16  form.
17          MS. WALLACE:  Objection, form.
18          THE WITNESS:  I believed it to be true.
19  That's why I put it in the letter.
20  BY MR. COOK:
21      Q.  And that was the same phenomenon that
22  you had observed in 1998 with the Legislative

Page 208

 1  Proposal Analysis we looked at, right?
 2          MS. ST. PETER-GRIFFITH:  Object to the
 3  form.
 4          THE WITNESS:  That was a little
 5  different issue, but it would still apply.
 6  BY MR. COOK:
 7      Q.  And that was the same issues that you
 8  saw discussed in response to the 1996 Florida-
 9  specific report about pricing for IV drugs and IV
10  fluids, correct?
11          MS. ST. PETER-GRIFFITH:  Object to the
12  form.
13          THE WITNESS:  That was a presumption
14  that we had made in the 1996 period.
15  BY MR. COOK:
16      Q.  Other than the meeting in Richmond in
17  September of 1995, have you had discussions with
18  anybody from HCFA about the deeper level of
19  discounts that are available to purchasers of IV
20  fluids and IV drugs via the pharmacy market?
21      A.  Very likely I have.
22      Q.  Is it fair to say you don't recall the

Page 209

 1  specifics of those conversations from years ago,
 2  correct?
 3          MS. ST. PETER-GRIFFITH:  Object to the
 4  form.
 5          THE WITNESS:  Right.  I have
 6  conversations with lots of people, or I did when
 7  I was working.
 8  BY MR. COOK:
 9      Q.  Do you recall what the reaction of
10  anybody from HCFA was to you describing these
11  deeper discounts for home IV pharmacies?
12      A.  I don't recall reactions.
13      Q.  Do you recall how far back those
14  conversations with individuals at HCFA go?
15      A.  No.
16      Q.  Have you discussed that issue with
17  anyone from other state Medicaid programs?
18      A.  Yes.
19      Q.  Do you recall who in other state
20  Medicaid programs you have had specific levels of
21  conversation with?
22      A.  I don't recall specific instances, but

Page 226

1    MR. COOK: Jim, do not interrupt the
2  witness when he's about to give his answer.
3    MR. BREEN: Well, I think he needs to
4  hear the question because I think it's chopped
5  up, and I think I can get it read back any time I
6  want.
7    But if you don't want to read it back,
8  I object to that.
9    MR. COOK: I will ask the question --
10   MR. BREEN: I think it's improper.
11   MR. COOK: -- again. I'll ask the
12 question again.
13 BY MR. COOK:
14   Q. If the -- is that consistent; that is,
15 this distribution, consistent with your
16 understanding of the way generic drugs have been
17 priced in the marketplace going back in the mid-
18 1990s?
19   MS. ST. PETER-GRIFFITH: Object to
20 form.
21   MR. BREEN: Objection, form.
22   MS. WALLACE: Objection, form.

Page 227

1    THE WITNESS: If I understand your
2  question, I think the answer is yes to that.
3  BY MR. COOK:
4    Q. And it has been your understanding that
5  this is the way generic drug prices were priced
6  in the 1990s, correct?
7    MS. ST. PETER-GRIFFITH: Object to the
8  form.
9    MS. WALLACE: Objection to form.
10    (Simultaneous conversation
11 interrupted by the court reporter.)
12 BY MR. COOK:
13   Q. That is, you had that understanding in
14 the 1990s?
15   A. In the late '90s, yes.
16   Q. And you obtained that understanding
17 from, in part, the review of invoice prices that
18 the OIG conducted, correct?
19   MS. ST. PETER-GRIFFITH: Object to the
20 form.
21   MS. WALLACE: Objection to form.
22   THE WITNESS: I don't know the answer

Page 228

1  to that. I think I came to that conclusion from
2  other sources because I don't think I focused on
3  the generic data from the OIG report.
4  BY MR. COOK:
5    Q. Upon coming to that conclusion, what
6  steps did you take to change the reimbursement
7  methodologies at Florida Medicaid?
8    A. As I mentioned, when this information
9  became available, we were focused very heavily on
10 brand name drugs and implementing a preferred
11 drug list and contracting for supplemental
12 rebates, which was all brand name product
13 related, and we were not focusing on generic
14 products at that time, and it was kind of an all-
15 consuming exercise. We later on implemented some
16 more broadly-based state MAC pricing to address
17 some of the generic issues, but the dollars where
18 we got the most return for our effort were on
19 brand name drugs.
20   Q. When you implement a MAC in Florida, do
21 you attempt to estimate precisely what it is that
22 providers are paying for that product or do you

Page 229

1  try to set the MAC at a point somewhat above the
2  acquisition cost of providers?
3    MS. WALLACE: Mr. Cook, could you
4  please provide a time frame for that as since
5  retired?
6    MR. COOK: Absolutely.
7  BY MR. COOK:
8    Q. When you were working for the state
9  Medicaid program, you had personal responsibility
10 for establishing, to some degree, the dollar
11 amount for various state MACs, correct?
12   MS. ST. PETER-GRIFFITH: Object to the
13 form.
14   THE WITNESS: That's correct.
15 BY MR. COOK:
16   Q. And that was true from 1992 to 2007,
17 correct?
18   MS. ST. PETER-GRIFFITH: Object to the
19 form.
20   THE WITNESS: That is correct.
21 BY MR. COOK:
22   Q. When you established those MACs, were

Page 230

1  you trying to set the MAC at exactly the
2  acquisition cost of providers or at some point
3  above or below the acquisition cost for
4  providers?
5      A.  We would not have tried to set
6  acquisition or the reimbursement level below
7  acquisition cost.  We would try to set the
8  reimbursement level at a point where 95 percent
9  of the providers could purchase the drug at or
10 below that price.
11     Q.  Now, the dispensing fee in Florida has
12 remained the same in Florida, of course, from
13 1986 until 2007, correct?
14     A.  That's correct.
15         MS. ST. PETER-GRIFFITH:  Object to the
16 form.
17 BY MR. COOK:
18     Q.  And that's primarily relevant to the
19 retail pharmacy, correct?
20         MS. WALLACE:  Objection to form.
21         MS. ST. PETER-GRIFFITH:  Object to the
22 form.

Page 231

1          THE WITNESS:  No.
2  BY MR. COOK:
3      Q.  I can ask that in a better way.  That
4  same -- while that same -- forget it.
5          Costs have gone up at the retail
6  pharmacy from 1986 to 2007, correct?
7      A.  I'm sure they have.
8      Q.  In setting state MACs, do you make an
9  effort to set the ingredient costs at a point
10 where the total reimbursement, the ingredient
11 cost plus the dispensing fee, covers pharmacies'
12 costs for dispensing that product?
13         MS. ST. PETER-GRIFFITH:  Object to the
14 form.
15         MS. WALLACE:  Objection to form.
16         THE WITNESS:  No.
17 BY MR. COOK:
18     Q.  What is your goal in setting the MAC?
19     A.  I just stated that, I think, but I'll
20 restate it.  The goal of setting a MAC price is
21 to set the price as low as you can set it where
22 somewhere in the neighborhood of 95 percent of

Page 232

1  providers can purchase the product at or below
2  that price.
3      Q.  I'm not a statistician, so I don't know
4  that I can frame this right.  Do you know what
5  sort of --
6      A.  And I wouldn't know whether you did or
7  not, so that's okay.
8      Q.  Do you know what sort of variance there
9  tends to be in the amount that providers pay for
10 these products?  That is, when you're hitting the
11 95 percent level where 95 percent of providers
12 can purchase it, do you have a feel for how wide
13 the variation can be below that 95th percentage
14 point?
15     A.  Well, yes, because we would look
16 something like your histogram for AWP discounts
17 almost.  We looked at invoices and catalogs and
18 set state MAC prices when we were doing that
19 internally.  And I would usually email that
20 information to Walgreens or Wal-Mart or CVS and
21 to a half of dozen independents or to the Florida
22 Pharmacy Association and say, I'm looking at

Page 233

1  these pricing levels on these drugs, give me some
2  feedback, can you buy them at that level, this is
3  what we think it ought to be.
4      Q.  Uh-huh.
5      A.  And if I set it too low, they'd scream
6  a lot.  If I set it too high, they'd say, well,
7  that looks fine, we can just barely make it.
8      Q.  Have you gone through that process for
9  the infusion and IV drugs listed in the complaint
10 in this case?
11     A.  No.
12     Q.  So those are still being paid based
13 upon --
14     A.  They are being paid based upon the
15 provisions of the Deficit Reduction Act of 2005
16 at this point, which mandated the State of
17 Florida adopting those -- that pricing logic
18 based on manufacturer rebate levels to calculate
19 the average manufacturer price.
20     Q.  And that's at 250 percent of the
21 average manufacturer's price, correct?
22     A.  That's correct.

59 (Pages 230 to 233)

Page 266

 1  OIG had convinced HCFA that pharmacies were
 2  getting fairly substantial discounts below AWP,
 3  which was something everybody knew, but they
 4  wanted the states to adopt some methodology, some
 5  discount below AWP.
 6      Q.  And when you said everybody knew that,
 7  that was true of Florida Medicaid at that time?
 8      A.  It was.
 9      Q.  What was your understanding of what
10  discounts -- I'm sorry -- pharmacy providers were
11  paying?  And let me break that into two
12  questions.
13          What was your understanding of what
14  pharmacy providers were paying for single source
15  brand drugs, and, then secondly, what was your
16  understanding of what pharmacy providers were
17  paying for multisource generics?
18      A.  Single source brand drugs were
19  typically at 14 to 15 or even 16 percent discount
20  below the published AWP at that time.  And
21  generic products were all over the map; depended
22  on who you bought them from.  That was before, I

Page 267

 1  think, generic manufacturers had really started
 2  jacking up their published AWPs.  So, you know,
 3  some were fairly accurate and others were
 4  inflated to greater or lesser extents.
 5      Q.  Okay.  And if I'm not mistaken,
 6  discounts of -- speaking about branded drugs of
 7  14 to 16 percent off the reported AWP, that was
 8  what OIG was informing HCFA as well?
 9      A.  That's correct.  That's was their
10  focus.  And, again, that's because, as we talked
11  earlier, that's where all your money goes, is for
12  the branded products.  You don't spend a lot of
13  money on the generics.
14      Q.  Right.  And OIG -- so OIG was telling
15  HCFA that for branded drugs, discounts were in
16  the range of 14 to 16 percent off reported AWPs;
17  and that was your understanding separately from
18  OIG was telling HCFA?
19      A.  Well, I knew that already.
20      Q.  You knew that.  How did you know that?
21      A.  I'm a pharmacist and I actually came to
22  work in the Medicaid program from a retail

Page 268

 1  operation and I talked to pharmacists.  I know
 2  what the discounts are.
 3      Q.  Okay.
 4      A.  Or thought I did, anyway.
 5      Q.  And you probably covered this in a
 6  prior deposition, so I apologize.  When were you
 7  a practicing pharmacist?
 8      A.  I came to Medicaid in 1984 from a
 9  retail pharmacy operation.
10      Q.  Where was that pharmacy operation
11  located?
12      A.  Tallahassee, Florida.  I had worked
13  prior to that several years in central Florida,
14  Lakeland area, for Eckerd, which is a local chain
15  in the south.  CVS now owns them.
16      Q.  Okay.
17      A.  And in between those, I had a stint of
18  11 years with a pharmaceutical manufacturer.
19      Q.  Which manufacturer was that?
20      A.  Hoffmann-La Roche.
21      Q.  What did you do with Hoffmann-La Roche?
22      A.  I started out as a territory

Page 269

 1  professional sales rep detailing doctors, then I
 2  spent a little time as a medical school rep at
 3  the Shands Teaching Hospital in Gainesville, and
 4  then came back and became the originator of
 5  government affairs for Hoffmann-La Roche in the
 6  state of Florida and spent most of my time
 7  working on the Medicaid and Medicare programs and
 8  other state initiatives rather than calling on
 9  doctors.
10      Q.  Now, Mr. Wells, perhaps in the ability
11  to save us a little time, have you covered all of
12  this -- your prior history, I assume, you've
13  covered in one of your prior depositions?
14      A.  Many times.
15      Q.  Okay.  I don't believe that for the
16  state of Idaho -- in fact, I'm almost certain
17  that your prior depositions were not cross-
18  noticed, but perhaps there's a way we can just
19  adopt the testimony that you have already given
20  and I can short-circuit all of this.  Is that
21  acceptable to you?
22      A.  That's fine.  I'm sure that there are

Page 338

        HIGHLY CONFIDENTIAL
 1
 2  customary charge.  That remains in the Federal
 3  Code of Federal Regulations today.
 4  BY MR. COOK:
 5      Q.  The 1987 article that Mr. Breen
 6  referred you to where you referred to AWP as a
 7  sticker price, you said that the sticker price
 8  analogy doesn't apply to generics, right?
 9          MS. ST. PETER-GRIFFITH:  Objection to
10  form.
11          MR. BREEN:  Objection to form.
12          THE WITNESS:  At this point that would
13  not be an appropriate analogy to use for generic
14  products.
15  BY MR. COOK:
16      Q.  And you said that it didn't apply to
17  generics because the pricing of generics is all
18  over the place, right?
19      A.  It is now, and probably was even, to
20  some extent, at that point.
21      Q.  And just so I can nail down the
22  distinction you're drawing here, are you drawing

Page 339

 1        HIGHLY CONFIDENTIAL
 2  a distinction between brands and generics in the
 3  sense that the relationship between published
 4  prices and acquisition prices for generics are
 5  not -- do not bear a predictable relationship?
 6          MR. BREEN:  Object to the form.
 7          MS. WALLACE:  Objection, form.
 8          THE WITNESS:  The analogy for the
 9  automobile window sticker that I used was
10  specifically related to brand name drugs in the
11  mid to late 1980s.
12  BY MR. COOK:
13      Q.  In the article, there are quotes
14  referring to AWP as, quote, "meaningless" and,
15  quote, "a joke."
16          MS. ST. PETER-GRIFFITH:  Object to
17  form.
18          MR. BREEN:  Objection to form.
19  BY MR. COOK:
20      Q.  Would that be a better characterization
21  for AWP with respect to generics?
22          MS. ST. PETER-GRIFFITH:  Object to

Page 340

 1        HIGHLY CONFIDENTIAL
 2  form.
 3          MS. WALLACE:  Object to form.
 4          THE WITNESS:  I don't know that that
 5  article said that.  There was a letter from Ven-
 6  a-Care that mentioned that AWP was a joke.
 7          AWP was a pricing reference point that
 8  is a reasonable indicator of approximate cost for
 9  brand name drugs.  It is no longer a reasonable
10  indicator for generic drugs and I don't know when
11  that diversion occurred.  At one point it
12  probably was a reasonable indicator for generic
13  drugs.
14  BY MR. COOK:
15      Q.  Certainly by 1990 it was no longer a
16  reasonable indicator of price for generic drugs,
17  correct?
18          MS. WALLACE:  Object to form.
19          MS. ST. PETER-GRIFFITH:  Object to the
20  form.
21          MR. BREEN:  Object to form.
22          THE WITNESS:  I think that by 1990 that

Page 341

 1        HIGHLY CONFIDENTIAL
 2  would be a valid statement.
 3          MR. COOK:  I don't have any more
 4  questions.
 5          MS. ST. PETER-GRIFFITH:  I have nothing
 6  further.
 7          MR. COOK:  I think we're done.  Thank
 8  you very much.
 9          MR. YOUNG:  Mr. Wells, just one or two
10  question to follow up.
11
12            EXAMINATION
13  BY MR. YOUNG:
14      Q.  Mr. Wells, just to follow up on some of
15  the questions Mr. Cook was just asking you, when
16  you were talking about average prices in response
17  to questions by Mr. Breen, were you responding
18  with respect to branded drugs as well?
19          MS. ST. PETER-GRIFFITH:  Object to the
20  form.
21          THE WITNESS:  I don't recall the
22  context of the question.

86 (Pages 338 to 341)