# EXHIBIT 13

ILLINOIS DEPARTMENT OF PUBLIC AID
Robert Wright, Director

Description of Proposed FY'96 Budget Initiatives

**Initiative Name:** Expansion of Refill-Too-Soon Drug Program

**Division:** Division of Medical Programs

**Is this initiative MANDATED by:**

| | | |
|---|---|---|
| Federal Law | Yes ___ | No _X_ |
| State Law | Yes ___ | No _X_ |
| Fed/State Court Decision | Yes ___ | No _X_ |

If yes, provide statutory cite/court cite.

**Initiative Description/Justification:**

The Department has used the Prospective Drug Use Review (PRO DUR) component of the point of sale electronic claims processing (ECP) system for pharmacy billing to edit for and reject claims for prescriptions refilled too soon (RTS). Savings of $3 to $6 Million are realized annually from using the features built for PRO DUR to also perform these edits. This initiative proposes the expansion of the RationalMed licensed software currently used for retrospective DUR to obtain license to use components of the software applicable to prospective DUR editing thus permitting enhanced RTS in order to generate additional savings.

This enhancement would use the clinical and medical evaluation capabilities available with RationalMed software to hold up payment of prescriptions meeting other questionable criteria for Department review and authorization or denial.

**Estimated Costs/Benefits/Savings Offsets:**

The computer hardware currently used for retrospective DUR will require upgrades totalling approximately $150K and the licensing fee increases to obtain the additional software will be increased by approximately $42,760.00. These costs will offset the program saving generated by the expanded RTS or PRO DUR editing. Total additional savings is estimated at approximately $1.5 Million beyond the current RTS savings.

**Resources to be reallocated or redistributed to support initiative implementation.**

The number of additional licensed medical professionals required to support the expansion of RTS will depend upon which medical criteria available via RationalMed's PRO DUR component is used at any given time.

5923



9/10/94
Page 1 of 1

2

X

ILLINOIS DEPARTMENT OF PUBLIC AID
Robert Wright, Director

Description of Proposed FY'96 Budget Initiatives

**Initiative Name:** Mandate Pharmacies Bill at Lowest Third Party Rate

**Division:** Division of Medical Programs

**Is this initiative MANDATED by:**

| | | |
|---|---|---|
| Federal Law | Yes ___ | No X |
| State Law | Yes ___ | No X |
| Fed/State Court Decision | Yes ___ | No X |

If yes, provide statutory cite/court cite.

**Initiative Description/Justification:**

This initiative would change the definition of usual and customary for pharmacy billing to require that the Department be billed the lowest rate billed any third party or private paying customer. Department policy currently defines usual and customary to include discounts given to the general public and to exclude discounts limited to a special group of people. With the current definition, a pharmacy does not have to give Medicaid the same discounts given to groups such as State Employees, HMOs, or other employer groups. With special discounts increasingly becoming the business norm for pharmacy, several states have already redefined usual and customary and are realizing significant savings.

**Estimated Costs/Benefits/Savings Offsets:**

BOMB has estimated that if pharmacies were mandated to bill Medicaid at the limits established for the State Employee's prescription drug benefit, the annual savings would be $18 Million. Actual FY'96 savings would have to be reduced from the $18 Million by the percentage of recipients enrolling in capitated coverage programs.

**Resources to be reallocated or redistributed to support initiative implementation.**

BMQA audit activity would have to be expanded to include enhanced efforts to monitor compliance.

5923

9/10/94
Page 1 of 2

ILLINOIS DEPARTMENT OF PUBLIC AID
Robert Wright, Director

Description of Proposed FY'96 Budget Initiatives

**Initiative Name:** Redefine Maximum Allowable Rate for Drug Reimbursement

**Division:** Division of Medical Programs

**Is this initiative MANDATED by:**

| | | |
|---|---|---|
| Federal Law | Yes ___ | No _X_ |
| State Law | Yes ___ | No _X_ |
| Fed/State Court Decision | Yes ___ | No _X_ |

If yes, provide statutory cite/court cite.

**Initiative Description/Justification:**

This initiative changes the methodology for calculation of the maximum reimbursement amount for prescription drugs to a Wholesale Acquisition Cost-plus method (WAC-plus) and eliminated the current Average Wholesale Price-minus method (AWP-minus). AWP has become virtually meaningless as a real number, particularly for multi-source drugs. AWP is set by each drug manufacturer and reported to the various drug information services but in actuality it is no longer used by wholesalers in selling to pharmacies. Factors such as volume discounts and rebates by wholesalers or manufacturers are examples of changes that have made AWP meaningless. WAC prices are now being provided to drug information services as an additional data item by many manufacturers. Even with the additional staff effort required to collect WAC prices from the manufacturers not currently reporting them to the data services, the States who have already switched to the WAC-plus method are realizing significant savings.

Examples of the difference between AWP prices and WAC prices are:

| Lable Name (Gen. Name) | AWP | WAC | Difference |
|---|---|---|---|
| Nystatin+Triam Crm 15gm | $ 3.20 | $ 1.60 | $ 1.60 |
| Naproxen Tab 250mg | 67.08 | 8.95 | 58.13 |
| Diazepam Tab 2mg | 9.72 | 1.59 | 8.13 |
| Metoclopr Tab 10mg | 77.38 | 12.30 | 65.08 |
| Metoprol Tab 50mg | 46.01 | 19.30 | 26.71 |

**Estimated Costs/Benefits/Savings Offsets:**

BOMB estimates the annual savings to be approximately $5 Million. This savings will be offset by the $11K increased cost in the licensing fee for the purchase of drug pricing data and by an increase of $60K in consulting staff needed to collect WAC pricing data from manufacturers not providing it to the data service companies.

**Estimated Costs/Benefits/Savings Offsets (Continued):**

Actual FY'96 savings would have to be reduced from $5 Million by the percentage of recipients enrolling in capitated coverage programs. Savings will also be impacted if this initiative is implemented in conjunction with other pharmacy initiatives.

**Resources to be reallocated or redistributed to support initiative implementation.**

Other states have found that resources needed to collect WAC pricing from those manufacturers who will not report it to data services can be handled in a few hours each month by a panel of consulting pharmacists who have a background in drug purchasing or drug wholesaler operations. Consulting pharmacist support is reimbursed as a component of ongoing Distributive Line costs.

5923

ILLINOIS DEPARTMENT OF PUBLIC AID
Robert Wright, Director

Description of Proposed FY'96 Budget Initiatives

**Initiative Name:** Enhanced Drug Rebate Collection

**Division:** Division of Medical Programs

**Is this initiative MANDATED by:**

| | | |
|---|---|---|
| Federal Law | Yes x | NO |
| State Law | Yes | NO |
| Fed/State Court Decision | Yes | NO |

If yes, provide statutory cite/court cite.

OBRA '90

**Initiative Description/Justification:**

The Department implemented the Medicaid Prescription Drug Rebate Program during FY '91 as mandated by OBRA '90. Since FY '91, rebate disputes totaling approximately $18 Million have been filed by drug manufacturers. The majority of manufacturer disputes are because they question whether their product or something manufactured by a competitor was actually dispensed. BMQA follow-up of a sampling of disputes has determined that, while purchasing documentation does not always identify the manufacturer, in some instances documentation sufficient to argue our case is available. Staff resources to pursue these cases and obtain recovery are requested with this initiative.

The Drug Rebate Program consists of over 500 pharmaceutical companies being eligible to participate in the program. There are also over 75,000 national drug codes (NDCs) being rebated in the program. OBRA '90 mandates that each state submit calendar quarterly invoices to pharmaceutical manufacturers whose products have been dispensed by pharmacy providers and reimbursed by the state. Manufactures have 38 days to submit payments to the state. States are mandated to respond to manufacturer's disputes within 60 days. The requested staff resources will provide the ability to defend the Department's rebate billing and to respond to these manufacturer disputes within this timeframe.

**Estimated Costs/Benefits/Savings Offsets:**

It is estimated that over $18 million is outstanding for this program in disputes with manufacturers. By staffing to address disputes it is estimated that documentation to support at least 25% or this amount, or $4.5 Million can be obtained. Additionally, it is estimated that out year benefits will be in the neighborhood of $1 to $2 Million annually. Although estimates are not currently available, this cost will be further offset by interest charges which OBRA '90 permits to be charged to manufacturers.

**Resources to be reallocated or redistributed to support initiative implementation.**

It is estimated that 3 MAC IIs and an Administrative Clerk will be required with an estimated cost of $81,000.00. Additional consulting pharmacist support equaling approximately 1000 hours annually will also be required.

5923

9/10/94


ILLINOIS DEPARTMENT OF PUBLIC AID
Robert Wright, Director

Description of Proposed FY'96 Budget Initiatives

**Initiative Name:** Redesign LTC Pharmacy Policy and Reimbursement

**Division:** Division of Medical Programs

**Is this initiative MANDATED by:**

| | | |
|---|---|---|
| Federal Law | Yes ___ | No X |
| State Law | Yes ___ | No X |
| Fed/State Court Decision | Yes ___ | No X |

This initiative is supported by an FY'95 Internal Audit recommendation.

**Initiative Description/Justification:**

With this initiative the Department would review the current policy and reimbursement for pharmacies serving persons in nursing homes for the purpose of making changes to differentiate these pharmacies from community pharmacies. There is now a separate license category for nursing home pharmacy, different Public Health requirements, and these pharmacies' record keeping and billing practices are different from community pharmacy. As an example of the impact of this specialization, the Department's drug costs for nursing home patients are 20 to 25 per cent of total drug spending (BPRA-1992) however less than 30 of the 2,200 pharmacies in Illinois provide the vast majority of these prescriptions. A recent federal audit of these businesses revealed that some of them are so large that their purchasing power (volume discount ability) is greater than that of many hospital and HMO buying groups. Additionally, since most nursing home residents are Medicaid eligible, this industry does not have the competitive pressure that exists with community pharmacy for keeping usual and customary charges reasonable.

Current practice in this industry is to destroy all the drugs for patients each time the patient enters the hospital and then redispense the drugs upon readmission to the nursing home. Consulting pharmacist staff estimate this practice costs the Department as much as $10 Million in some years. However, frequently some of the medications ordered upon readmission are the same as those which were being taken prior to the discharge to the hospital. While changes are required to encourage nursing home drugs to be packaged such that return or reuse without violating Public Health safety standards is more practical, savings from these changes will easily exceed the additional costs.

**Estimated Costs/Benefits/Savings Offsets:**

BOMB estimated savings to be $3-6 Million depending upon the final policy and reimbursement changes made. Included in this savings number is the increase needed in the Medical Management line for securing external expertise to research and redesign Department policy and reimbursement ($200K-approximate).

**Resources to be reallocated or redistributed to support initiative implementation.**

BIS priorities will have to be adjusted based upon the changes decided upon to accomplish the needed MMIS updating. Because of the provider profits that will be effected, it is also likely that legislative resources will also have to be focused to address challenges to whatever changes are proposed. Challenges will be forthcoming from both nursing home owners and pharmacy owners.

5923