# EXHIBIT 16

```
              IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

-----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    ) Magistrate Judge

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE ILLINOIS

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) HEALTHCARE AND

Ven-a-Care of the Florida Keys,    ) FAMILY SERVICES

Inc., v. Boehringer Ingleheim      ) by   JAMES PARKER

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) NOVEMBER 18, 2008

----------------------------------X
```

Page 14

1  to do it right after you've given an answer to a
2  question rather than while a question is pending,
3  that's helpful too.
4      MR. BERLIN:  Hey, Laurie, it's Eric
5  Berlin.
6      MS. OBEREMBT:  Yes.
7      MR. BERLIN:  And I just -- on the
8  phone, you're breaking up just a little bit, and
9  I was wondering if we could move the phone just a
10 little closer to you without sacrificing me
11 hearing the witness.
12     MS. OBEREMBT:  We just moved it a
13 little bit, Eric.  So let's give that a try.
14     MR. BERLIN:  Okay.  I apologize for
15 having to interrupt.  And the other thing, since
16 I -- since I have interrupted, let me just ask
17 whether we have our normal agreement that an
18 objection by one Defendant will be an objection
19 by all Defendants unless a Defendant speaks up
20 and waives out of that objection.
21     MS. OBEREMBT:  That's fine with me.
22     MR. BERLIN:  Thank you very much.

Page 15

1  BY MS. OBEREMBT:
2      Q.  If at any time you don't understand a
3  question, please let me know and I'll try to
4  rephrase it, and you should do the same for any
5  of the other lawyers.
6          If I ask you a question and you answer
7  it, I'll assume you did understand it.  If during
8  the course of the deposition you recall some
9  information in response to a question, please let
10 us know, and we'll put that on the record.
11         The first thing I want to do is mark as
12 Plaintiff's Exhibit 1 the United State's Amended
13 Notice of Deposition of Illinois Department of
14 Healthcare and Family Services.
15            (Plaintiff's Exhibit Parker 001
16 was marked for ID)
17 BY MS. OBEREMBT:
18     Q.  Mr. Parker, could you take a look at
19 what the court reporter has marked as Exhibit 1?
20     A.  (Witness reviewing document.)
21     Q.  Have you seen Exhibit 1 before?
22     A.  Yes, I have.

Page 16

1      Q.  All right.  And is Exhibit 1 a Notice
2  of Deposition?
3      A.  Yes.
4      Q.  And to what entity is the Notice of
5  Deposition directed at?
6      A.  I'm sorry, I don't understand your
7  question.
8      Q.  Sure.  Who is in the Amended Notice of
9  Deposition to?  What entity does the notice state
10 that it's directed at?
11     A.  Illinois Department of Healthcare and
12 Family Services.
13     Q.  And have you been designated by the
14 State of Illinois to testify today on behalf of
15 the Illinois Department of Healthcare and Family
16 Services?
17     A.  Yes, I have.
18     Q.  Are you here testifying in your
19 personal capacity?
20     A.  No, I am not.
21     Q.  What's your work address?
22     A.  201 South Grand Avenue, East

Page 17

1  Springfield, Illinois.
2      Q.  Just to go back for a second, could you
3  take a look on Exhibit 1 the topics that are to
4  be covered by the deposition?  It's entitled
5  "Subpoena Exhibit A:  Topics of Inquiry."
6      A.  (Witness reviewing document.)
7      Q.  Have you been designated by the State
8  to testify on all these topics?
9      A.  Yes, I have.
10     Q.  Where do you work?
11     A.  For the Department of Healthcare and
12 Family Services, the Division of Medical
13 Programs.
14     Q.  Okay, and what's your title there?
15     A.  Deputy Administrator of Medical
16 Programs.
17     Q.  If we use the term "HFS" to refer to
18 the Department of Healthcare and Family Services,
19 is that an acronym that we would all understand
20 to refer to that department?
21     A.  That is the common acronym we use.
22     Q.  How long have you been in the position

Page 202

1    A.  I got distracted.
2    Q.  So it states in here that, "We suspect
3  that the real problem with this initiative is
4  that the current methodologies for maximum
5  reimbursement create higher profits for generics
6  than for brand drugs," correct?
7    A.  Correct.
8    Q.  And that methodology, the methodology
9  of using AWP, remained in place up until December
10 2000?
11   A.  Correct.
12   Q.  And then for a six-month period, the
13 methodology also incorporated WAC?
14   A.  Correct.
15   Q.  Then the system moved back to the use
16 of just AWP?
17   A.  Correct.
18   Q.  And in so doing, Illinois Department of
19 Public Aid was aware that AWP as early as 1995
20 had become "most meaningless for generic drugs"?
21   A.  Yes.
22   Q.  And you have seen no evidence since

Page 203

1  that time to suggest that AWP has become
2  meaningful for generic drugs, correct?
3        MS. OBEREMBT:  Objection, form.
4        THE WITNESS:  It has become no more
5  accurate, that is correct.
6  BY MR. REALE:
7    Q.  It has become no more meaningful?
8    A.  If "meaningful" means does it mean what
9  it says, that is correct.
10   Q.  AWP is meaning --
11   A.  Average Wholesale Price.
12   Q.  Well, no, they're saying it's a
13 meaningless number, period.
14       MS. OBEREMBT:  Objection, form.
15       THE WITNESS:  That is the wording of
16 the document.
17 BY MR. REALE:
18   Q.  And this is a document that notifies
19 Robert Wright, Director of the IDPA, correct?
20   A.  Correct.
21   Q.  And does the approval authority for
22 payment methodologies in Illinois ultimately

Page 204

1  reside at this point in time with Mr. Wright?
2    A.  Correct.
3        MR. LIBMAN:  John, want to change the
4  tape if you're at a good place?
5  BY MR. REALE:
6    Q.  Now, the fact that there may be higher
7  profits for generic drugs is -- doesn't
8  necessarily translate into a greater dollar
9  profit, correct?  The idea that there's a greater
10 generic profit to be had doesn't translate
11 necessarily into a greater dollar profit?
12       MR. LIBMAN:  Objection to form.
13       MR. REALE:  Let me ask that again.
14 BY MR. REALE:
15   Q.  The fact that there's a higher profit
16 percentage for generic drugs than for brand
17 doesn't necessarily mean that it costs Illinois
18 any more money --
19       MR. LIBMAN:  Objection.
20 BY MR. REALE:
21   Q.  (Continuing) -- for a generic drug?
22       MR. LIBMAN:  I'm sorry.  Objection to

Page 205

1  form.
2  BY MR. REALE:
3    Q.  Do you -- let me try it.  Generic -- it
4  states here that there is a higher profit for
5  generic drugs, correct?
6    A.  Yes, it does.
7    Q.  And that doesn't translate necessarily
8  into a higher dollar amount, correct?
9        MR. LIBMAN:  Objection to form.
10       THE WITNESS:  If what you're trying to
11 ask me does the -- you know, a --
12       MR. REALE:  Generic drugs --
13       THE WITNESS:  The same percentage or
14 even a higher percentage profit on a generic drug
15 may not be dollar-wise greater than a smaller
16 profit percentage on a brand name drug, that is
17 true, it may not.
18 BY MR. REALE:
19   Q.  Generics are cheaper than their branded
20 equivalents, correct?
21   A.  Correct.
22       MR. REALE:  Okay.

52 (Pages 202 to 205)

Page 242

1          If you weighted our reimbursement today
2   on generics and compared our aggregate spend to
3   AWP, you would get a number somewhere in the 50
4   to 60 range as a discount off of AWP, but you
5   can't do that on every single drug because not
6   every single drug is available at that price.
7       Q.  And the regulations, the federal
8   regulations themselves permit Illinois Medicaid
9   to pay more than Estimated Acquisition Cost on
10  some drugs, correct?
11          MR. LIBMAN:  Objection to form.
12          THE WITNESS:  No.
13  BY MR. REALE:
14      Q.  Well, let's look at the language to the
15  regulations that you have out in front of you.
16  It states, 447.331 --
17          MR. LIBMAN:  Jeff, for the record, what
18  exhibit number are you looking at?
19          MR. REALE:  DOJ Exhibit 2.
20          MR. LIBMAN:  Exhibit 2,okay.
21  BY MR. REALE:
22      Q.  In paragraph (b) Other drugs, "The

Page 243

1   agency payments for brand name drugs certified in
2   accordance with paragraph (c) of this section and
3   drugs other than multiple source drugs for which
4   a specific limit has been established under
5   447.332 must not exceed, in the aggregate,
6   payment levels that the agency has determined by
7   applying the lower of the Estimated Acquisition
8   Costs plus reasonable dispensing fees established
9   by the agency; or providers' usual and customary
10  charges to the general with public."
11      A.  That is correct.
12      Q.  This regulation doesn't require
13  Illinois to pay on a claim-by-claim basis only
14  the Estimated Acquisition Cost for drugs.  It is
15  the total payments for all drugs that are either
16  not subject to the Federal Upper Limit or brand
17  name drugs certified in accordance with paragraph
18  (c)?
19          MR. LIBMAN:  Objection to form.
20          THE WITNESS:  I'm sorry, I have to ask
21  you could you repeat the question?
22  BY MR. REALE:

Page 244

1       Q.  There's nothing in these regulations
2   that prohibit Illinois Medicaid from paying more
3   than Estimated Acquisition Cost for a particular
4   drug?
5           MR. LIBMAN:  Same --
6           MS. OBEREMBT:  Objection.
7           MR. LIBMAN:  Same objection.
8           THE WITNESS:  It could be read that
9   way, yes.
10  BY MR. REALE:
11      Q.  And the Federal -- you're familiar with
12  the Federal Upper Limits program generally?
13      A.  Yes.
14      Q.  And in the regulations that govern the
15  Federal Upper Limits, they refer to "in the
16  aggregate," correct?
17      A.  Clearly, for Federal Upper Limits.
18      Q.  Right, the Federal --
19      A.  You can -- it's an aggregate
20  calculation.  You can pay on a particular drug
21  greater than the Federal Upper Limit, if in the
22  aggregate.  That, I agree.

Page 245

1       Q.  And the same language appears here, the
2   same language being the "in the aggregate"
3   language referring to the total payments made for
4   drugs that have no FUL or brand name drugs as
5   specified in this regulation?
6       A.  Yes, it does appear that you could pay
7   on a particular drug higher than the Estimated
8   Acquisition Cost.
9       Q.  Let's go back to Roxane Illinois
10  Exhibit 9.
11      A.  (Witness so doing).
12      Q.  All right, let's turn to the very last
13  page of this document.  It's 2 of 2, Appendix 3,
14  Bates page HHD014-0460, and this is Bruce
15  Vladeck, Administrator at HCFA's response to the
16  OIG's report.  It's entitled, "HCFA Comments on
17  Office of Inspector General Draft Report
18  Entitled: 'Medicaid Pharmacy -- Actual Cost of
19  Generic Prescription Drug Products.'"
20          In the last paragraph, he states, "We
21  believe the findings in this report are
22  significant and warrant the attention of all