# EXHIBIT 18

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------X

IN RE: PHARMACEUTICAL          ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE     ) Master File No.

PRICE LITIGATION               ) 01-CV-12257-PBS

----------------------------) Subcategory Case

THIS DOCUMENT RELATES TO:    ) No. 06-11337

United States of America ex )

rel. Ven-A-Care of the       ) Hon. Patti B. Saris

Florida Keys, Inc., et al.   )

v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS, and) VIDEOTAPED DEPOSITION

United States of America ex ) OF THE INDIANA FAMILY

rel. Ven-A-Care of the       )   AND SOCIAL SERVICES

Florida Keys, Inc., et al.   )   ADMINISTRATION by

v. Boehringer Ingelheim      )       CARL MARK

Corp., et al., Civil Action )      SHIRLEY, R.Ph.

No. 07-10248-PBS              )       VOLUME I

----------------------------X

            DECEMBER 2, 2008

            INDIANAPOLIS, INDIANA

Page 6

   1         E X H I B I T S  (CONTINUED)
   2    NUMBER          DESCRIPTION           PAGE
   3    Exhibit Dey 509 - State Plan Amendment,
   4             IN-00000100 - 0120........... 246
   5    Exhibit Dey 510 - Medicaid Pharmacy - Actual
   6             Acquisition Cost of Generic
   7             Prescription Drug Products,
   8             HHD022-0318 - 0333........... 302
   9    Exhibit Dey 511 - Excessive Medicare
  10             Reimbursement for Ipratropium
  11             Bromide Report............... 339

Page 7

   1              P R O C E E D I N G S
   2
   3         VIDEOGRAPHER:  On the record at 9:07
   4    a.m. on December 2nd, 2008.  Here begins the
   5    videotaped deposition of Mark Shirley on behalf
   6    of the State of Indiana Family and Social
   7    Services Administration.
   8         This case regards the Pharmaceutical
   9    Industry Average Wholesale Price Litigation, MDL
  10    No. 1456, in the United States District Court,
  11    District of Massachusetts.
  12         This deposition is taking place at the
  13    Hilton Hotel, 8181 N. Shadeland Avenue,
  14    Indianapolis, Indiana.
  15         My name is James David, Certified Legal
  16    Video Specialist.  And our court reporter is Dana
  17    Miller.  We're both working with Henderson Legal
  18    Services.
  19         Will our counsel please state your
  20    appearance for the record.
  21         MR. JULIE:  My name is Douglas Julie
  22    from Kelley, Drye & Warren.  And I'm counsel for

Page 8

   1    defendants Dey, Inc., Dey L.P., Inc. and Dey,
   2    L.P.
   3         MR. BIPPUS:  And -- go ahead.
   4         MR. COOK:  I'm Christopher Cook from
   5    Jones Day representing Abbott.
   6         MR. BIPPUS:  And Gary Bippus from the
   7    Office of the Indiana Attorney General.
   8         MR. LINNEWEBER:  Scott Linneweber, L-I-
   9    N-N-E-W-E-B, as in boy, E-R, Family and Social
  10    Service Administration.
  11         MS. ST. PETER-GRIFFITH:  Ann St. Peter-
  12    Griffith from the United States Attorney's
  13    Office, Southern District of Florida on behalf of
  14    the United States.
  15         VIDEOGRAPHER:  Will our court reporter
  16    please swear or affirm the witness.
  17
  18         CARL MARK SHIRLEY, R.Ph.,
  19    having been first duly sworn to tell the truth,
  20    the whole truth, and nothing but the truth,
  21    relating to said matter, was examined and
  22    testified as follows:

Page 9

   1
   2                 EXAMINATION
   3    BY MR. DOUGLAS JULIE:
   4         Q.  Good morning, Mr. Shirley.  Thank you
   5    for making yourself available today.  Can I ask
   6    you to please state and spell your name for the
   7    record.
   8         A.  Yes.  My name is Carl Mark Shirley,
   9    that's C-A-R-L M-A-R-K S-H-I-R-L-E-Y.
  10         Q.  Thank you.  And are you here today to -
  11    - are you here today on behalf of the Indiana
  12    Family and Social Services Administration?
  13         A.  Yes.
  14         Q.  You're their corporate designee?
  15         A.  Yes.
  16         Q.  Thank you.  As I stated before, my name
  17    is Douglas Julie.  I'm counsel for Dey, Inc.,
  18    Dey, L.P., Inc.  and Dey, L.P.  I'll refer to
  19    those three collectively today as Dey.
  20         Are you currently on any medications
  21    which might affect your memory?
  22         A.  No.

3 (Pages 6 to 9)

Page 30

 1       MR. JULIE:  Yes.
 2       MR. BIPPUS:  All right.
 3   BY MR. JULIE:
 4       Q.  Are you, Mr. Shirley, are you prepared
 5   to testify to all of the topics contained in
 6   Exhibit 1 of this subpoena?
 7       A.  Yeah.
 8       MS. ST. PETER-GRIFFITH:  Object to the
 9   form.  Go ahead.
10       A.  Again, to the extent I have knowledge.
11       Q.  And I guess going back to what Gary
12   said, have you seen that the State of Indiana has
13   designated portions of Mr. Sharp's testimony as
14   responsive to the -- from his prior deposition as
15   responsive to the subpoena?
16       A.  I do not understand your question.
17       Q.  I received a document this weekend from
18   Mr. Bippus stating that the State of Indiana was
19   designating portions of Mr. Sharp's testimony as
20   responsive to this deposition (sic) in addition
21   to your testimony here today being responsive to
22   this subpoena.

Page 31

 1       A.  Okay.
 2       Q.  Do you understand that?
 3       A.  Now that you've told me.
 4       Q.  Okay.  Well, having not -- had you not
 5   heard that before?
 6       A.  No, I was not aware of that.
 7       Q.  Okay.  So do you -- you have not been
 8   told that your designation as Indiana Medicaid's
 9   witness is limited by -- in any way by the
10   designation of Mr. Sharp's testimony?
11       A.  Again, I'll ask you to restate that
12   question.
13       Q.  Sure.  You have not been instructed by
14   counsel that your designation as the witness for
15   Indiana Medicaid here is in any way limited by
16   Indiana's decision to designate Mr. Sharp's
17   testimony?
18       A.  That was not communicated to me.
19       Q.  Thank you.  What is your position with
20   Indiana Medicaid?
21       A.  It's Pharmacy Operations Manager, is
22   the title.  I believe the job description calls

Page 32

 1   it chief pharmacist.
 2       Q.  And what does your job entail?
 3       A.  As the title implies, it's operations
 4   management.  And myself with other staff have
 5   oversight of contractors.
 6           We have contractors that perform a
 7   variety of services.  In fact, the Indiana
 8   Medicaid pharmacy benefit is heavily contracted
 9   out.  So a lot of it has to do with oversight and
10   management of contractors, making sure that we
11   get deliverables on time, monitoring for quality.
12           My position also calls for oversight of
13   the state's drug utilization review board and
14   therapeutics committee meetings.  And those are
15   meetings of advisory bodies to the office.
16           There's also a quality advisory
17   committee which has to do with policy pertaining
18   to mental-health drugs.  I have an assisting role
19   in that.
20           I'm over the oversight of the federal
21   and state supplemental rebate programs.  And that
22   is, once again, back to the contractor oversight

Page 33

 1   function.  That is handled on a day-to-day basis
 2   by our contractor, ACS.
 3       Q.  I'm sorry, is ACS an acronym or is --
 4       A.  Stands for Affiliated Computer Systems.
 5       Q.  Thank you.  And what does ACS do for
 6   the state?
 7       A.  ACS is our designated PBM services
 8   vendor.  And in that capacity, they provide for
 9   prior authorization services, preferred drug
10   lists support, related report development, and
11   the federal and state supplemental rebate
12   programs administration.
13       Q.  Has ACS served in that role for the
14   last 20 years for Indiana?
15       A.  No.  I believe since 2003, if memory
16   serves me correctly.
17       Q.  Was there another company that served
18   in that role prior to 2003?
19       A.  EDS had been our claims processor, some
20   people refer to it as PBM function, I don't
21   believe it was necessarily a PBM function in the
22   conventional sense, but they did handle our

Page 34

 1  claims processing for us and fiscal agent
 2  contractor responsibilities.
 3     Q.  Thank you.  Does Indiana Medicaid still
 4  contract with EDS for any functions?
 5     A.  Yes, yes.
 6     Q.  What does Indiana Medicaid contract
 7  with EDS for currently?
 8     A.  In the sense of pharmacy, it's claims
 9  processing and provider relations support.  They
10  handle provider enrollment functions.  And it's
11  basically a claims-functioning process.
12     Q.  And for how long has EDS, generally has
13  EDS provided claims-processing services to
14  Indiana?
15     A.  I can't tell you any specific number of
16  years.  EDS has been a claims processor for
17  Indiana Medicaid for some time.
18         There was a period of time during which
19  ACS at the beginning of their contract as PBM
20  services vendor did provide claims support, and
21  that was subsequently then returned backed back
22  to EDS.

Page 35

 1         So EDS has processed and adjudicated
 2  claims for some time with the interruption during
 3  which -- or the period of time during which ACS
 4  handled the claims processing.
 5     Q.  Thank you.  How long have you been in
 6  your current position at Indiana Medicaid?
 7     A.  Since November of 1981.
 8     Q.  Prior to November 1981, did you have a
 9  different position at Indiana Medicaid?
10     A.  Yeah, I should probably clarify that.
11  Since November of '81, I've been an employee of
12  the State.  Had always been with the pharmacy
13  benefit under the state Medicaid program.
14     Q.  So have you had different titles since
15  -- during that time?
16     A.  Initially the title I came on as,
17  quote/unquote, chief pharmacist.  And I think
18  that was primarily due to a position, just fill-
19  in-the-block-type thing.
20         I don't think the state had ever had a
21  pharmacist with the state Medicaid pharmacy
22  benefit.  I think the personnel situation called

Page 36

 1  for pharmacists' positions primarily at state-
 2  operated facilities.  And in those facilities,
 3  they would have had pharmacists and chief
 4  pharmacists.  And in order to accommodate my
 5  salary needs at the time, they were able to get
 6  me in the position of chief pharmacist.
 7         So while chief pharmacist was the block
 8  at the personnel level, I had been referred to as
 9  the pharmacist, the pharmacy consultant, and
10  pharmacy director.
11     Q.  Okay.  And in that role as chief
12  pharmacist, what were your responsibilities?
13     A.  From the beginning, basically to handle
14  anything regarding pharmacy.  And that was at the
15  outset retail pharmacy relations with retail
16  pharmacies as providers.  The state had just
17  started a prior authorization program in 1981.  I
18  came on at the advent of that.  I think that was
19  one of the reasons for the creation of the
20  position, was that they had prior authorization
21  for certain services rendered by pharmacies.
22         So they needed a pharmacist to oversee

Page 37

 1  and manage that.  And anything having to do with
 2  pharmacy, per se, was in my scope of
 3  responsibilities.
 4     Q.  Okay.  And did your -- has your title
 5  changed at any point?
 6     A.  Other than what I mentioned, no, it's
 7  been substantially the same.
 8     Q.  Thank you.  Have you been employed
 9  continuously by Indiana Medicaid --
10     A.  Yes.
11     Q.  -- since 1981?  Do you understand the
12  time period that you're designated to testify to
13  here today?
14     A.  December '91 to present.
15     Q.  Are you available to testify regarding
16  facts that might have occurred in the 1980s?
17         MS. ST. PETER-GRIFFITH:  I'm going to
18  object to the form.
19     Q.  You can still answer.
20     A.  My answer to that would be no.  I would
21  not want to testify to something that would go
22  that far back.

10 (Pages 34 to 37)

548a9681-96d2-4dcf-8485-93facc782aa5

Page 142

 1  reimbursement amounts into ingredient portion and
 2  a dispensing-fee portion?
 3      A.  The reimbursement for pharmacy
 4  reimbursement is comprised of estimated
 5  acquisition cost plus dispensing fee, if
 6  applicable, MAC plus dispensing fee, if
 7  applicable, and usual and customary charge.
 8          So you had said aside from the state
 9  MAC -- or excuse me, the usual and customary
10  piece, set that aside, then your two remaining
11  possible pieces of the algorithm would be EAC and
12  state MAC.
13      Q.  Okay.  And on usual and customary-based
14  reimbursement, there is no dispensing fee paid to
15  providers?
16      A.  It's very important to understand that
17  the providers submit a charge, which is his usual
18  and customary charge, may or may not at that
19  provider's discretion include a dispensing fee.
20  That's totally up to the provider.
21      Q.  And if a provider submitted a claim
22  that contains a usual and customary charge, that

Page 143

 1  -- I'm sorry.  A provider can submit a claim that
 2  expresses its usual and customary charge in two
 3  parts, a part with a dispensing fee and another
 4  part?
 5      A.  No, we do not allow for that.  The only
 6  thing the program accepts and has instructed
 7  providers is to submit their usual and customary
 8  charge, which if the provider has a dispensing
 9  fee of their own, that is part of their usual and
10  customary charge.
11      Q.  I'm not sure I understand what you mean
12  by dispensing fee with respect to usual and
13  customary charge.
14      A.  If a provider has a charge to you as a
15  customer, they're going to typically make that
16  charge up out of what they pay for the drug in
17  some fashion somehow, and something that they use
18  to cover their overhead and everything else
19  associated with the running of the pharmacy.
20  They blend that all together, and that becomes
21  their usual and customary charge.
22          That's what we have told them to

Page 144

 1  submit.  We do not tell them bill us only for
 2  some amount having to do with the drug and we,
 3  Medicaid, will put a dispensing fee on top of
 4  that.  We never do that.
 5      Q.  Okay.  So -- all right, now I believe I
 6  understand.  So you're saying that when a
 7  provider -- you know, I think you've said it.
 8  There's no reason to summarize.
 9      A.  It's complicated.
10      Q.  You stated that one of the ways that
11  Indiana reimburses for pharmaceuticals, Indiana
12  Medicaid reimburses for pharmaceuticals, is that
13  there is reimbursement for EAC --
14      A.  Yes.
15      Q.  -- and a dispensing fee.  Is EAC
16  estimated acquisition cost?
17      A.  That's correct.
18      Q.  When considering the adequacy of reim -
19  - pardon me, strike that.
20          When considering whether the state is
21  providing adequate reimbursement for a covered
22  product, does the state consider both the

Page 145

 1  ingredient portion and the dispensing-fee portion
 2  as needing to be adequate?
 3          MS. ST. PETER-GRIFFITH:  Object to the
 4  form.
 5      Q.  Do you think of those issues together
 6  as providing that total reimbursement must be
 7  adequate, or does reimbursement for each
 8  individual component need to be adequate?
 9          MS. ST. PETER-GRIFFITH:  Object to the
10  form.
11      A.  Once again, my sense on this is that
12  ultimately your reimbursement for the service
13  must be adequate to ensure participation by
14  providers.  And my sense is that providers
15  probably don't much care one way or the other
16  which side of the equation is which, as long as
17  what they get from Medicaid is sufficient for
18  them to render service.
19          So I think, you know, we act
20  administratively in light of that.  It makes
21  sense to have a total reimbursement that is
22  sufficient to maintain provider participation.

37 (Pages 142 to 145)

548a9681-96d2-4dcf-8485-93facc782aa5

Page 234

1   A.  Yes.
2   Q.  Can you very briefly, because I may get
3   to this later, can you tell me your understanding
4   of the difference between brand and generic
5   drugs?
6       What was Indiana's understanding of the
7   difference between brand drugs and generic drugs?
8   A.  Difficult to answer that question.  The
9   difference between brand and generic drugs,
10  according to the FDA, is there is no difference.
11      Generic drugs that are therapeutically
12  substitutable for band-name drugs are the same.
13  But if you're talking about reimbursement, that's
14  a different issue.  So I'm trying --
15  Q.  I am talking about reimbursement, sir.
16  A.  -- to find where you're going.
17  Q.  Thank you.
18  A.  So would you clarify the question.
19  Q.  Sure.  This document, we've said,
20  distinguishes between brand-name drugs and
21  generic drugs for purposes of reimbursement;
22  that's correct?

Page 235

1   A.  Yes.
2   Q.  By generic drugs, does the plan mean to
3   reimburse at a separate rate for innovator drugs
4   and non-innovator drugs?
5   A.  In looking at this document, the only
6   thing I can say is that there is clearly a
7   difference in policy as to how the state is going
8   to reimburse for brand-name drugs and for generic
9   drugs.
10  Q.  Okay.  If I was a provider or I worked
11  for EDS and I wanted to know which drug fit the
12  brand-name formula and which drug fit in for the
13  generic formula, how would I go about determining
14  that?
15  A.  I believe that would come from the
16  First DataBank file that they use in claims
17  processing.
18  Q.  So the distinction here is a
19  distinction drawn on -- from First DataBank?
20  A.  First DataBank and if there is any
21  algorithm that would be developed to pay elements
22  from the First DataBank file that says if you

Page 236

1   look at this, this and this equals generic, if
2   you look at this, it's brand name.
3   Q.  Thank you.  On this document it also
4   appears that the state has instituted for the
5   first time a state Maximum Allowable Cost
6   program?
7   A.  Yes.
8   Q.  Is that -- is this your recollection as
9   to chronologically the origin of the state MAC
10  program?
11  A.  Yes.
12  Q.  And charges for federal upper limit and
13  usual and customary-based reimbursement have been
14  retained --
15  A.  Right.
16  Q.  -- in this plan?
17  A.  Yes.
18  Q.  Thank you.  I'm going to ask you about
19  the state MAC program a little later, but can I
20  ask you now, why did Indiana switch from an AWP
21  minus 10 EAC for all legend drugs to a bifurcated
22  AWP minus 13 for brand-name drugs and AWP minus

Page 237

1   20 for generic drugs?
2   A.  I believe at the time the perception
3   was that generic drugs, AWP information was not
4   as accurate for generic drugs as it was for
5   brand-name drugs, that is there was a greater
6   spread on generic drugs.
7       And if I also remember, it seems like
8   there was some input from other states that using
9   AWPs on generic drugs, you should have a higher
10  percentage off of your AWP for your EAC.
11  Q.  When you say generic drug -- I'm sorry,
12  strike that.
13      You had stated that AWP information was
14  not as accurate, though you didn't specify by
15  what reference you were measuring its accuracy.
16  Can you just tell me a little bit about what you
17  were --
18  A.  I think there was a general perception
19  that the AWPs for generic drugs were inflated.
20  Seems like there was also some information from
21  OIG or GAO or both or CMS or all three that
22  questioned the use of AWPs on generics.  And,

Page 238

 1   again, I'm going strictly by memory on this.
 2         It seems like that was part of the
 3   thrust behind the bifurcation of the
 4   reimbursement methodology for the two different
 5   types of legend drugs.
 6      Q.  But you had specifically used the word
 7   that it was not as accurate.  And it may very
 8   well be that you did not mean to use the word.
 9   But I'm just wondering whether when you said
10   accurate, if you were considering whether AWP --
11   when you think about AWP accuracy, with what are
12   you referencing it as a guidepost?  If something
13   is inaccurate, it must be --
14      A.  I think it all has to do with this
15   issue that people have called the spread, the
16   relationship between the published AWP of a drug
17   and an amount that a provider actually ends up
18   paying for the drug.
19         And it seemed like for generics, it was
20   the case that there was this greater spread
21   between the AWP and the actual acquisition cost.
22   And I think that was probably what was behind the

Page 239

 1   taking generics to go to a minus 20 percent as
 2   opposed to say the minus 13 1/2.
 3      Q.  Because Indiana wanted to get closer to
 4   -- get AWP-based reimbursement closer to the
 5   spread -- I'm sorry, strike that.
 6         Did you understand -- I'm sorry, did
 7   Indiana Medicaid understand at the time that it
 8   moved in 2002 from AWP to minus 10 to AWP minus
 9   20 for generics, did Indiana understand that it
10   was not necessarily capturing all of the spread
11   between average wholesale price and average
12   acquisition costs in discounting average
13   wholesale price?
14      A.  Repeat that question.
15      Q.  Did Indiana understand that when it
16   moved in -- I'm sorry, strike that.
17         Can you think of any other
18   considerations that Indiana made other than
19   information disclosed from CMS that caused it to
20   make this switch to -- both to bifurcate brand
21   and generic and to switch to generic minus 20?
22      A.  Looking at the time frame of this,

Page 240

 1   which would have been 2002, and again I'm
 2   thinking of Myers & Stauffer's role, they
 3   typically provided analytic support to the office
 4   on cost-containment initiatives.  And this was
 5   probably driven partially at least by some type
 6   of cost-containment initiative.  There may have
 7   been information provided by Myers & Stauffer one
 8   way or the other about, you know, this is where
 9   the other states are on generics, and this is
10   what the market looks like, and this is what this
11   study shows.  I don't know that for a fact one
12   way or the other.
13         It could be, possibly not, but that's
14   one possible source of additional information,
15   would have been input from Myers & Stauffer.
16      Q.  Can you think of any other
17   considerations that Indiana made at the time?
18      A.  Well, obviously, going through the
19   rule- promulgation process, we would have
20   considered all public comments.
21         And not knowing right here what the
22   public comments were that were made during the

Page 241

 1   public hearing for the initiative, it's possible
 2   that there would have been other comments from
 3   the public.  And the record of the public
 4   hearing, I'm sure, would show that.
 5      Q.  What role did Indiana's understanding
 6   of the prices at which pharmacies could obtain
 7   pharmaceutical products play into the decision to
 8   reduce the reimbursement for generic drugs to
 9   minus 20 percent?
10      A.  State that again, please.
11         MR. JULIE:  Can you re-read that.
12         (The requested material was read
13   back by the reporter.)
14      A.  I quite sincerely do not understand the
15   question.
16      Q.  Okay.  Then I'll reask it a different
17   way.  When Indiana decided to reimburse for
18   generic drugs at AWP minus 20 percent, did it
19   consider in that decision-making process its
20   knowledge of pharmaceutical prices available to
21   provider pharmacies?
22      A.  I'm not certain of the analytic

                                        61 (Pages 238 to 241)