# EXHIBIT 19

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

In Re: PHARMACEUTICAL INDUSTRY     )

AVERAGE WHOLESALE PRICE LITIGATION )

----------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:          ) Master File No.

United States of America ex rel.   ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,    )

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,     ) Hon. Patti B.

and United States of America ex    ) Saris

rel. Ven-A-Care of the Florida     )

Keys, Inc., et al. v. Boehringer   )

Ingelheim Corp., et al., Civil     )

Action No. 07-10248-PBS            )

----------------------------------X

VIDEOTAPED DEPOSITION OF THE NORTH DAKOTA DEPARTMENT

OF HUMAN SERVICES-MEDICAID DIVISION by BRENDAN JOYCE

     DATE:           Friday, December 12, 2008

     PLACE:          Bismarck, North Dakota

     REPORTED BY:    Deanna L. Sager, R.P.R.

Page 18

 1      A.  Clinical pharmacy duties.  Drug dosage
 2   adjustments, Warfarin therapy, total parenteral
 3   nutrition, providing the products for the
 4   patients in the hospital.
 5      Q.  Did any of your responsibilities relate
 6   to the purchase of pharmaceuticals?
 7      A.  No.
 8      Q.  After your residency what was your next
 9   job?
10      A.  Worked for -- as a clinical pharmacist
11   at Medcenter One.
12      Q.  What is Medcenter One?
13      A.  Hospital.
14      Q.  And what were your responsibilities as
15   a clinical pharmacist at Medcenter One?
16      A.  All duties associated with staff,
17   hospital inpatient pharmacy, dosage adjustments,
18   total parenteral nutrition, all of the usual, as
19   long -- as well as contract drug studies.
20      Q.  Did any of your responsibilities relate
21   to the purchase of pharmaceuticals?
22      A.  If I was working as a staff pharmacist

Page 19

 1   and something had to be ordered, you would take
 2   the sticker off the vial and put it on the order
 3   book.
 4      Q.  Okay.  Did you see any invoices
 5   relating to the purchase of drugs while you
 6   worked at Medcenter One?
 7      A.  Yes.
 8      Q.  Did you ever see the prices for the
 9   products that were ordered on those invoices?
10      A.  Yes.
11          MS. THOMAS:  Objection to form.
12      Q.  Do you remember what those -- what kind
13   of prices were listed on those invoices?
14      A.  No.
15      Q.  Did you ever discuss those prices with
16   anybody at Medcenter One?
17      A.  Contract prices were discussed.
18      Q.  Did you ever negotiate those contract
19   prices?
20      A.  No.  Didn't have any authority to
21   discuss -- or to....
22      Q.  Were you aware of any discounts that

Page 20

 1   were available for these contract prices?
 2          MS. THOMAS:  Objection.
 3      A.  I knew that we had contracts through
 4   VHA and other types of contracts and market share
 5   agreements with variety of drug companies.
 6      Q.  Have you ever heard of the term AWP?
 7      A.  Yes.
 8      Q.  Do you know what AWP means?
 9      A.  Definition from where?
10      Q.  From your own knowledge.
11      A.  There's a variety of definitions.  I
12   know what AWP stands for, what the A and the W
13   and the P stand for, but then there's other
14   definitions depending upon if you want Blue Book,
15   Red Book, First DataBank, other types of AWPs.
16      Q.  Okay.  Well, what does AWP stand for?
17      A.  Average wholesale price.
18      Q.  What was your understanding of AWP, if
19   you had one, when you worked at Medcenter One?
20      A.  What my understanding was at that time?
21      Q.  Yeah.
22      A.  I never really paid attention to the

Page 21

 1   AWP as we were only involved in contract drug
 2   prices through VHA.  So AWP didn't have any
 3   relationship to any pricing that I ever came in
 4   touch with.
 5      Q.  Were you aware of AWP when you worked
 6   at Medcenter One?
 7      A.  Yes.
 8      Q.  What was your next job after your
 9   position as a clinical pharmacist at Medcenter
10   One?
11      A.  I should clarify I didn't just do the
12   Medcenter One.  That was my first job.  But I
13   also served as a relief pharmacist at a retail
14   pharmacy in a small town.
15      Q.  While you worked at Medcenter One?
16      A.  Yes.  And then I can't remember the --
17   during Medcenter One I also worked at a retail
18   pharmacy in Bismarck.
19      Q.  So you had three jobs essentially?
20      A.  Yeah.
21      Q.  The job as a relief pharmacist and the
22   pharmacy in a small town, what were your

Page 74

1  formula was changed.
2      A.  Yes.
3      Q.  And did North Dakota consider the
4  adequacy of reimbursement when it made those
5  changes?
6      A.  The changes that we made with the, for
7  instance, the MAC pricing, we used the private
8  sector MAC pricing.  So any evaluation of
9  adequacy was solely based on the fact that this
10 is what they get paid by Blue Cross Blue Shield
11 of North Dakota which accounts for 80 percent of
12 the claims in the state.  Therefore, we assume it
13 must be accurate.  Or adequate.  Because we were
14 then paying the exact rates as Blue Cross Blue
15 Shield of North Dakota.
16     Q.  So North Dakota Medicaid did not
17 consider the acquisition cost of pharmaceuticals
18 in determining the adequacy of reimbursement.
19         MS. THOMAS:  Objection.  Form.
20     A.  The acquisition cost?
21     Q.  The -- a pharmacy's cost to acquire
22 drugs -- I'll restart.

Page 75

1         During your tenure as the Administrator
2  of Pharmacy Services with North Dakota Department
3  of Human Services, North Dakota Medicaid did not
4  consider pharmacies' cost to acquire prescription
5  drugs in setting its reimbursement formula.  Is
6  that accurate?
7         MS. THOMAS:  Objection.
8      A.  We didn't have access to the
9  acquisition costs.
10     Q.  And during --
11     A.  Therefore, we couldn't use those in
12 determinations.
13     Q.  And during your time as the
14 Administrator of Pharmacy Services for the
15 department, North Dakota Medicaid did not seek to
16 conduct a survey of pharmacies' acquisition costs
17 in setting its reimbursement formula, correct?
18     A.  I'm trying to remember if we -- I'm not
19 aware of any survey that was done to determine
20 acquisition cost.
21     Q.  And during your time as the
22 Administrator of Pharmacy Services for the

Page 76

1  department North Dakota Medicaid did not seek
2  records from pharmacies regarding their
3  acquisition costs when evaluating changes to the
4  reimbursement formula, correct?
5      A.  Not that I'm aware of.
6         MR. MALONEY:  Why don't we take a
7  break.
8         THE VIDEOGRAPHER:  We are now going off
9  the record.
10        (Whereupon, a break was taken from
11 10:42 a.m. to 10:44 a.m.)
12        THE VIDEOGRAPHER:  We are now back on
13 the record.
14     Q.  (Mr. Maloney continuing)  All right.
15 I'd like to talk a little more about the
16 reimbursement formula used by North Dakota to pay
17 claims for prescription drugs.  Generally the
18 formula has been a lesser of formula, correct?
19     A.  Yes.
20     Q.  And the formula pays the lesser of
21 certain rates so that it pays the lowest of those
22 possible reimbursement rates, correct?

Page 77

1      A.  Yes.
2      Q.  And as we discussed earlier, when North
3  Dakota changed its reimbursement formula it would
4  submit a -- actually let me restart.
5         When North Dakota Medicaid changed its
6  reimbursement formula it would submit a state
7  plan amendment to CMS for approval, correct?
8      A.  Yes.
9      Q.  And upon approval of a state plan
10 amendment, North Dakota would then revise any
11 provider manuals or other documents that reflect
12 its current reimbursement formula, correct?
13        MS. THOMAS:  Objection.  Form.
14     A.  Mostly, correct.  As we can submit the
15 state plan amendment any time in the quarter in
16 which the change has happened.  So
17 chronologically they don't necessarily happen in
18 that exact order.
19     Q.  Okay.  But once -- but North Dakota
20 Medicaid does update its provider manuals and/or
21 other documentation to reflect the reimbursement
22 formula that's currently in effect, correct?

20 (Pages 74 to 77)

                                                        Page 94
 1    A.  Over-the-counter.
 2    Q.  And a legend drug is a prescription
 3  drug, correct?
 4    A.  Correct.
 5    Q.  So this sentence indicates that the
 6  dispensing fee for legend drugs is $4.60 at this
 7  time, correct?
 8    A.  Yes.
 9    Q.  Do you know that the dispensing fee at
10  that time was, in fact, $4.60 for legend drugs?
11    A.  Yes.
12    Q.  Can you take a look at the third
13  paragraph under item 13?  This states that,
14  "Estimated acquisition cost will be this agency's
15  best estimate of the price generally and
16  currently paid by providers for a drug marketed
17  or sold by a particular manufacturer or labeler,"
18  correct?
19    A.  Yes.
20    Q.  Do you know if North Dakota Medicaid
21  ever conducted a survey to estimate the price
22  generally and currently paid by providers for a

                                                        Page 95
 1  drug marketed or sold by a particular
 2  manufacturer or labeler?
 3    A.  As mentioned before, I'm not aware of
 4  any.
 5    Q.  Okay.  And you're also not aware of any
 6  requests by North Dakota Medicaid to pharmacies
 7  to produce invoices or other records that would
 8  show the prices they paid by -- for drugs
 9  marketed or sold by any particular manufacturer
10  or labeler?
11        MS. THOMAS:  Objection.  Form.
12    A.  As mentioned before, no.
13    Q.  And this reimbursement formula also
14  provides for an additional fee of 15 cents per
15  pill to be added to the dispensing fee for the
16  service of pill splitting, correct?
17    A.  Correct.
18    Q.  What is pill splitting?
19    A.  When a dose can be achieved by
20  splitting a higher strength tablet.
21    Q.  And that's performed by the pharmacist,
22  correct?

                                                        Page 96
 1    A.  Yes.
 2    Q.  Can you take a look at the next page
 3  which is identified as Transmittal No. 02-022.
 4  Now this version of this page of the North Dakota
 5  state plan superseded the page that was
 6  identified as Transmittal No. 02-013, correct?
 7    A.  Correct.
 8    Q.  And the language for the reimbursement
 9  formula as set out in item 13 has changed again,
10  correct?
11    A.  Correct.
12    Q.  And the reimbursement formula is still
13  a lower of formula, but now it pays the lower of
14  the provider's usual and customary charge, the
15  ingredient cost, which is generic upper payment
16  limit or estimated acquisition cost plus a
17  reasonable dispensing fee, or North Dakota
18  Medicaid's established maximum allowable cost for
19  that drug, correct?
20    A.  Correct.
21    Q.  And what is the established maximum
22  allowable cost?

                                                        Page 97
 1    A.  Whatever we chose.
 2    Q.  That's a price set by North Dakota
 3  Medicaid for a drug?
 4    A.  When it did not involve a vendor for
 5  that service, correct.  Or actually even when it
 6  did involve a vendor we also had the option of
 7  still setting our own price.
 8    Q.  And by a vendor you mean a contractor
 9  who will determine a MAC price for the
10  department?
11    A.  Correct.
12    Q.  And at what times did the department
13  use a vendor to set MAC prices?
14    A.  I'm not -- I can't state the exact time
15  frame specifically.
16    Q.  But there were certain times where the
17  department set MAC prices itself and other times
18  where it used a vendor?
19    A.  The MAC program started with just the
20  department setting prices ourselves.
21    Q.  Okay.
22    A.  And then we completed the RFP and had a

25 (Pages 94 to 97)

Page 98

1  vendor come in to augment it, make it easier.
2     Q.  Okay. And how did the department set
3  MAC prices when the department was in charge of
4  setting those prices?
5     A.  Called pharmacies and asked them what
6  their prices, actual acquisition costs were. And
7  then chose a price to allow comparable
8  reimbursement to brands where AWPs were not
9  inflated.
10    Q.  What brand drugs would that be?
11    A.  Most brand drugs AWPs were appropriate.
12 The MACs are typically for generics.
13    Q.  Okay.
14    A.  And the generic AWPs were inflated and
15 not rational or relative to any actual
16 acquisition cost. So we contacted the pharmacies
17 to determine what the actual acquisition cost was
18 for the product. For instance, Prozac, when
19 Prozac came on the market generically.
20    Q.  Um-hum.
21    A.  The AWP for the product was still at
22 $4, or something along those lines. Whereas, the

Page 99

1  actual cost to the pharmacy was 20 cents. We
2  found that out from the pharmacies and set the
3  reimbursement to where they would make the same
4  gross margin on a generic product as they do on
5  the brand products.
6        THE VIDEOGRAPHER: Can we just take a
7  quick break?
8        MR. MALONEY: Sure.
9        THE VIDEOGRAPHER: We are now going off
10 the record.
11       (Whereupon, a break was taken from
12 11:13 a.m. to 11:20 a.m.)
13       THE VIDEOGRAPHER: We are now back on
14 the record.
15    Q.  (Mr. Maloney continuing) Okay. I'd
16 like to talk a little bit more about MAC prices.
17 Now did North Dakota Medicaid's MAC prices apply
18 only to generic drugs?
19    A.  No.
20    Q.  What other types of drugs did they
21 apply to?
22    A.  Any products where the AWP was

Page 100

1  inflated.
2     Q.  And what products would those be?
3     A.  They include products like
4  immunoglobulin and hemophilia factors.
5     Q.  And are those generic products or brand
6  products?
7     A.  Brand products.
8     Q.  Now you mentioned that you give an
9  example of Prozac where after Prozac came out
10 generically the use of the AWP stayed the same.
11 Is that accurate?
12    A.  No.
13       MS. THOMAS: Objection. Form.
14    Q.  Okay. What did you state?
15    A.  Stated the AWPs were not reflective of
16 any actual acquisition costs or charges to the
17 pharmacies.
18    Q.  Okay. Did the AWPs change after Prozac
19 came out generically?
20    A.  The generics --
21       MS. THOMAS: Objection. Form.
22    A.  The generics were new drugs. They

Page 101

1  didn't have any baseline for their AWP.
2     Q.  Okay. And North Dakota Medicaid
3  contacted pharmacies to determine those
4  pharmacies' actual acquisition costs for the
5  generic forms of the drug?
6     A.  To confirm what the suspected
7  acquisition cost was.
8     Q.  And how did you come to a suspected
9  acquisition cost?
10    A.  Discussions with other pharmacists and
11 other pharmacy administrators throughout the
12 United States.
13    Q.  And what pharmacists did you talk to to
14 develop a suspected acquisition cost?
15    A.  It varied from just whenever somebody
16 said that they knew a price of a product that
17 pharmacies were actually paying.
18    Q.  And based on that knowledge of a
19 suspected acquisition cost, North Dakota Medicaid
20 contacted North Dakota pharmacies to determine
21 their -- to confirm their acquisition costs,
22 correct?

Page 106

1  a MAC price North Dakota Medicaid took steps to
2  make sure that pharmacies would earn the same
3  profit they would have earned on the equivalent
4  brand drug?
5       A.  No.
6       Q.  And --
7       A.  And the question one more time, though.
8       Q.  I -- North Dakota Medicaid -- when
9  North Dakota Medicaid set MAC prices it took
10 steps to make sure pharmacies would earn the same
11 profit that they would have on an equivalent
12 brand drug?
13          MS. THOMAS:  Objection.  Form.
14      A.  It's, unfortunately, too simplistic of
15 a....
16      Q.  Okay.  I think you mentioned earlier
17 that MAC -- the setting of MAC prices involved
18 consideration of the gross margin that a pharmacy
19 could earn on a brand product.  Is that accurate?
20      A.  Yes.
21      Q.  Could you explain that a little
22 further?

Page 107

1       A.  Well, let's say that a pharmacy earned
2  on average, for the brand products where the AWP
3  was not inflated, earned an average $12 per
4  prescription.
5       Q.  Okay.
6       A.  Then we would try to do the same on the
7  generic side as a whole.
8       Q.  Okay.
9       A.  To where if we could determine the
10 actual acquisition cost of the product then we
11 could determine how we could get them to make
12 that average of what they had been making on the
13 brand side.
14      Q.  And does that average profit that was
15 considered in setting MAC prices include the
16 dispensing fee?
17      A.  Yes.
18      Q.  And did it also include any copayments
19 that applied?
20      A.  No.  You need to make sure how you
21 mean.  Copayments are a part of the total.  So if
22 the AWP minus ten plus dispensing fee, you take

Page 108

1  that total dollar amount, say it's 100, then it's
2  $97 paid to the pharmacy and a $3 copay by the
3  patient.
4       Q.  Okay.
5       A.  For a total of 100.  So it's not in
6  addition -- copays aren't in addition to, they
7  are part of that formula.
8       Q.  Okay.  Are MAC prices set for
9  individual drugs?
10      A.  Yes.
11      Q.  Are you familiar with the term NDC?
12      A.  Yes.
13      Q.  What does NDC stand for?
14      A.  National Drug Code.
15      Q.  And is it your understanding that each
16 individual drug has its own NDC?
17          MS. THOMAS:  Objection.  Form.
18      A.  Each individual package has its own
19 NDC.
20      Q.  Okay.  So are North Dakota Medicaid MAC
21 prices set by NDC?
22      A.  No.  Not all of them.

Page 109

1       Q.  Are some of them set --
2       A.  Some specific ones are.
3       Q.  Okay.  And for the drugs that are not
4  set for specific NDCs, how are they set for a
5  drug?
6       A.  They are set by the generic drug code.
7  Or generic -- GCN, generic code number.
8       Q.  Okay.  Is that a number provided by
9  First DataBank?
10      A.  Yes.  And it can also include package
11 size.
12      Q.  Okay.  What does a GCN indicate?
13      A.  It indicates all -- or it identifies --
14 it's an indicator on a field on a drug within the
15 First DataBank drug file, and it'll be that same
16 number for all drugs for that product strength
17 and form.  So all the tablets that are 10
18 milligrams would have the same GCN.  Where they
19 could have 100 different NDCs.
20      Q.  Okay.  Now MAC prices -- North Dakota's
21 MAC prices were lower than AWPs, correct?
22          MS. THOMAS:  Objection.  Form.

28 (Pages 106 to 109)

Page 126

1  as the payer that accounted for 80 percent of
2  North Dakota pharmacy activity.
3       Q.  Okay.
4       A.  Which is Blue Cross Blue Shield of
5  North Dakota which was paying AWP minus ten.
6       Q.  Okay.  You can set that aside.  Do you
7  know when Blue Cross Blue Shield of North Dakota
8  first implemented a MAC list?
9       A.  No.
10      Q.  When did you first learn that Blue
11 Cross Blue Shield of North Dakota had a MAC list?
12      A.  I honestly am not sure.
13      Q.  Okay.  You mentioned earlier that some
14 MAC prices are assigned to specific NDCs and
15 other MAC prices are assigned to GCNs, correct?
16      A.  And as well as a combination of package
17 sizes.
18      Q.  Okay.  Now a MAC price assigned to a
19 GCN would apply to any drug that has the same
20 GCN, correct?
21      A.  Correct.
22      Q.  And to the extent North Dakota Medicaid

Page 127

1  paid reimbursement based on MAC, it would not be
2  relying on AWP, correct?
3           MS. THOMAS:  Objection.  Form.
4       A.  The calculation of the MAC on the
5  vendor side may have been based on AWP.  I'm not
6  sure.
7       Q.  Do you have any knowledge as to how the
8  vendor calculates MAC prices for North Dakota
9  Medicaid?
10      A.  Prime Therapeutics?  No.
11      Q.  Does anyone at North Dakota know how
12 Prime Therapeutics calculates MAC prices for
13 North Dakota Medicaid?
14          MR. BAHR:  When you say North Dakota
15 you mean the state of --
16          MR. MALONEY:  I'm sorry.
17          MR. BAHR:  -- North Dakota Medicaid, or
18 do you mean anyone in the state of North Dakota?
19      Q.  (Mr. Maloney continuing)  Let me
20 rephrase.  Does anybody at the North Dakota
21 Department of Human Services know how Prime
22 Therapeutics calculates MAC prices for North

Page 128

1  Dakota Medicaid?
2       A.  At the time when they were doing it,
3  right?  They're not our current vendor.
4       Q.  Okay.  At the time Prime Therapeutics
5  was the vendor for North Dakota Department of
6  Human Services, did anyone at the department know
7  how Prime Therapeutics set MAC prices?
8       A.  No.  It was proprietary.
9       Q.  And who is the current vendor for MAC
10 prices?
11      A.  It's a independent contractor, Chad
12 Jones.
13      Q.  And was there any other vendor that the
14 department used to set MAC prices?
15      A.  No.  Oh, I'm sorry.  You're talking
16 about there's no vendor that we've hired --
17      Q.  Right.
18      A.  -- by any means.  There's still phone
19 calls once in a while between me and some
20 pharmacists to see what they're really paying.
21      Q.  Okay.  And do you know how Chad Jones
22 sets MAC prices for the department?

Page 129

1       A.  He evaluates actual acquisition costs
2  from surveys that -- wholesalers that he's -- has
3  contacts with.  So he contacts wholesalers to get
4  the actual acquisition costs of products.
5  Compares his MAC pricing to other MAC price lists
6  that are out there and available.  And he tries
7  to set the MACs at a rate that will encourage
8  generic utilization, yet -- and also give
9  appropriate adequate reimbursement based on the
10 formula, the rest of the reimbursement formula
11 with the state.
12      Q.  During the time North Dakota Medicaid
13 set its own MAC prices it did not rely on AWP to
14 set those prices, correct?
15      A.  We still set some of our own MAC
16 prices.  So --
17      Q.  Okay.
18      A.  We do -- we have not -- never have and
19 never will care what the AWP is.  In the setting
20 of those MACs.
21      Q.  Okay.  Can you take a look at Dey
22 Exhibit 711 again, the state plan?

33 (Pages 126 to 129)

Page 158

1    Q.  Generally a percentage.
2    A.  Typically when we received or suspected
3  somebody of doing it is how it triggered our
4  actions.  And in those cases it's probably a 100
5  percent that has to be corrected.  For the secret
6  shopper kind of process I don't remember what
7  percentage that was.
8    Q.  Okay.  And generally what would cause
9  North Dakota Medicaid to suspect that a pharmacy
10 provider is not submitting its usual and
11 customary charge?
12   A.  Typical way for that to make it to us
13 is through a complaint from a neighboring
14 pharmacy.  Second way that it can occur is
15 inconsistencies in reports reviewed by the
16 department.
17   Q.  And what kind of reports were those?
18   A.  Typical report is -- it's just a
19 general desk auditing report that I get weekly.
20 And it includes claims that are priced at more
21 than 200 or $250 per prescription.  And as well
22 as claims that are submitted to where the

Page 159

1  pharmacy is billing us ten times more, or more,
2  than what our allowable is.  So it's -- there are
3  no reports specific looking at that exact issue.
4  It's reports for other purposes that, as I review
5  them, I can see where they're billing much more
6  than I would expect them to be billing the
7  general public.
8    Q.  Okay.  When you say claims that are
9  billing ten times more the allowable, do you mean
10 claims where the usual and customary charge
11 submitted is ten times the allowable?
12   A.  Correct.  The EAC.
13   Q.  Okay.
14   A.  So it does not include the dispensing
15 fee.
16   Q.  Okay.  And just for the record, EAC
17 means estimated acquisition cost, correct?
18   A.  Yes.
19   Q.  Do you know if every pharmacy provider
20 has established a usual and customary charge?
21       MS. THOMAS:  Objection.  Form.
22   A.  I can assume, since all pharmacies deal

Page 160

1  with all types of patients, I would assume some
2  have cash paying customers to some degree so they
3  would have to have a usual and customary charge
4  to the cash paying customers.
5    Q.  Do you see the first paragraph in the
6  second column of this usual and customary charge
7  article?  It begins, "For providers that"?
8    A.  Yes.
9    Q.  This states that, "For providers that
10 have not established usual and customary charges,
11 the charge should be reasonably related to the
12 provider's cost to provide the service."  Is that
13 an accurate representation of North Dakota
14 Medicaid's policy regarding usual and customary
15 charge?
16   A.  That was put in there due to the fact
17 some transportation providers were saying that
18 they didn't have usual and customary charges.
19   Q.  So this does not relate to usual and
20 customary charges for pharmacy providers?
21   A.  As mentioned, I had nothing to do with
22 any of the articles -- or I didn't write any of

Page 161

1  the articles in here.  This section was for
2  transportation providers.
3    Q.  Okay.  But, to your knowledge, this
4  paragraph doesn't relate to the usual and
5  customary charges for pharmacy providers.
6    A.  No.  It does not.
7    Q.  However, the other paragraphs that we
8  discussed is consistent with your understanding
9  of usual and customary charge as it applies to
10 North Dakota pharmacy providers, correct?
11   A.  As it applies to any provider.
12   Q.  And that would include North Dakota
13 pharmacy providers.
14   A.  It would include pharmacy providers.
15   Q.  Okay.  Set this aside.  To the extent a
16 pharmacy provider submits a usual and customary
17 charge to North Dakota Medicaid that is
18 inaccurate and is higher than the AWP for the
19 drug prescribed, that pharmacy would be receiving
20 an overpayment for its claim, correct?
21       MS. THOMAS:  Objection.  Form.
22   A.  If the department doesn't recoup it

Page 162

1  later then, yes, they would receive the
2  overpayment at the time of the claim being
3  processed and paid.
4      Q.  And in those circumstances the payment
5  would not be based on AWP, correct?
6          MS. THOMAS:  Objection.  Form.
7      A.  Not necessarily as the lesser of still
8  comes into play.
9      Q.  Okay.  Providers are obligated to
10 return to North Dakota Medicaid any overpayment
11 they receive, correct?
12         MS. THOMAS:  Objection.  Form.
13     A.  That is correct.
14     Q.  And providers are aware of -- I'm
15 sorry.  Strike that.
16         Are you aware of any circumstances
17 where a pharmacy provider ever returned an
18 overpayment to North Dakota Medicaid?
19     A.  Yes.
20     Q.  And do you recall the circumstances of
21 any of those instances where a provider returned
22 an overpayment to North Dakota Medicaid?

Page 163

1      A.  Yes.
2      Q.  Can you describe generally what those
3  circumstances were?
4      A.  Varying circumstances for many of my
5  recollections.  You just want one?
6      Q.  Did any of those returns of
7  overpayments -- I'm sorry.  Strike that.
8          Were any of those returns of
9  overpayments the result of inflated usual and
10 customary charges?
11     A.  Yes.
12     Q.  And of the instances you know of where
13 a provider returned overpayments to North Dakota
14 Medicaid, approximately what percentage were the
15 result of inflated usual and customary charges?
16     A.  We don't keep track of the reasons for
17 the overpayment.
18     Q.  Okay.  Based on your experience, do you
19 have a general idea of how many would be the
20 result of usual and customary charges that were
21 inflated?
22     A.  The usual and customary issue is the

Page 164

1  most common.
2      Q.  And in cases where a provider submits
3  an inflated usual and customary charge, North
4  Dakota Medicaid is not getting the benefit of the
5  market price to the general public for the
6  services provided by that provider, correct?
7          MS. THOMAS:  Objection.  Form.
8      A.  Could you ask again?
9      Q.  In circumstances where a provider
10 submits an inflated usual and customary charge to
11 the general public, North Dakota Medicaid is not
12 getting the benefit of an accurate market price
13 for the services provided by that pharmacy to the
14 general public, correct?
15         MS. THOMAS:  Objection.
16     A.  It depends upon the lesser of
17 calculation.  If they had submitted a inflated
18 usual and customary but we didn't pay it the
19 usual and customary anyway, it doesn't affect it
20 at all.
21     Q.  Okay.  To the extent a pharmacy
22 provider submitted an inflated -- I'm sorry.

Page 165

1  Hang on.  To the extent a pharmacy provider
2  submitted an inflated usual and customary charge
3  that caused North Dakota Medicaid to pay on
4  another basis where it would have otherwise paid
5  on an accurate usual and customary charge, North
6  Dakota Medicaid did not get the benefit of a
7  market price for the services provided by that
8  pharmacy provider, correct?
9          MS. THOMAS:  Objection.
10     A.  Only if their usual and customary --
11 accurate usual and customary is less than our MAC
12 or other methodology for calculating the
13 estimated acquisition cost.
14     Q.  Okay.
15         MS. THOMAS:  Could you mark that
16 question and answer so we can get back to it
17 later, please?
18         THE COURT REPORTER:  Sure.
19     Q.  (Mr. Maloney continuing)  Has a
20 pharmacy provider ever returned an overpayment to
21 North Dakota Medicaid because an AWP was
22 incorrect?

42 (Pages 162 to 165)