# EXHIBIT 20

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------X

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION:

PRICE LITIGATION              ) 01-CV-12257-PBS

------------------------------X

THIS DOCUMENT RELATES TO:     ) Judge Patti B. Saris

U.S. ex rel. Ven-A-Care of    )

the Florida Keys, Inc. v.     ) Magistrate Judge

Abbott Laboratories, Inc.,    ) Marianne B. Bowler

et al.                        )

Case No. 06-CV-11337-PBS      )

------------------------------X

--oOo--

WEDNESDAY, MARCH 19, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

JAMES KEVIN GOROSPE

Reported By:  JOANIE MURAKAMI, CSR No. 5199

              Registered Merit Reporter

              Certified Realtime Reporter

Page 66

1    A.  I don't know.
2    Q.  Any other publications, pharmacy-
3  related publications that you remember receiving?
4    A.  Pharmaceuticals Approval Monthly.  Pink
5  Sheet.  And I can't recall the actual names of
6  any of the other periodicals.
7    Q.  Let's move ahead.
8    A.  Uh-huh.
9    Q.  Are you doing okay?
10   A.  I'm fine.
11   Q.  Would you like -- okay.  Keep going.
12      Let's move ahead with your time to the
13 State of California.
14      What caused you to leave your position
15 at SDC and accept a job with the Department of
16 Health Care Services?
17   A.  The department -- Stockton
18 Developmental Center was closing and I was
19 looking for another job.
20   Q.  I see.  Why was the Stockton
21 Developmental Center closing?
22   A.  The patients at the Stockton

Page 67

1  Developmental Center were being moved into the
2  community; a large portion of them, anyway.  The
3  rest were being sent to other facilities.
4    Q.  And what was the closure of Stockton
5  Developmental Center prompted by budgetary
6  issues?
7    A.  No.
8    Q.  Okay.  I think you described sort of
9  the consequence of why it closed or --
10   A.  Uh-huh.
11   Q.  -- when it closed, but I'm trying to
12 figure out why the state decided to close the
13 facility and move the patients into the
14 community.
15   A.  My understanding of the situation was
16 there was a lawsuit brought by parents or family
17 members of patients in facilities throughout
18 California related to noncommunity placement.  I
19 don't know the details of that lawsuit or the
20 settlement.
21   Q.  In other words, your understanding is
22 parents or relatives of the patients that were

Page 68

1  being housed at Stockton were complaining about
2  the patients being housed there as opposed to in
3  the community?
4    A.  Yes.
5    Q.  And they filed a lawsuit --
6    A.  Yes.
7    Q.  -- on that basis?
8       When you went to work for the
9  Department of Health Care Services, at that time,
10 was it the Department of Health Services or the
11 Department of Health Care Services, if you
12 remember?
13   A.  Department of Health Services.
14   Q.  Okay.  Or DHS?
15   A.  Correct.
16   Q.  And when did the name change to the
17 Department of Health Care Services?  Is that a
18 recent change?
19   A.  Yes, it was.
20   Q.  Do you know when?
21   A.  July 2007.
22   Q.  Okay.  So from the time you started in

Page 69

1  '95 up till July of 2007, the department was
2  called the Department of Health Services or DHS?
3    A.  It was called the Department of Health
4  Services until the formation of the Department of
5  Homeland Security, at which point we were called
6  CDHS because the Department of Homeland Security
7  objected to the State using DHS as an acronym.
8    Q.  They had some copyright over those
9  three letters.  Okay.  Fair enough.
10      Who hired you for the position with
11 DHS?
12   A.  Leonard Terra.
13   Q.  And was he your direct supervisor when
14 you started there?
15   A.  Yes.
16   Q.  The duties that you have listed on your
17 resume, in your position as senior pharmaceutical
18 consultant, you said that you analyze state and
19 federal law regulation and policy changes for
20 potential impact on the Medi-Cal program.  Tell
21 me a little -- tell me what that means.
22   A.  Whenever there was a law change or a

Page 110

1  Q.  Okay.  When did you have that belief?
2  A.  In the early '80s.
3  Q.  Okay.  And at what point did you learn
4  that that was not true?
5      MR. PAUL:  Objection.  Form.
6      MR. GOBENA:  Same objection.
7      THE WITNESS:  Sometime in the '80s when
8  I actually saw the actual prices, purchase prices
9  of products.
10 BY MR. COLE:
11 Q.  For instance, during your time at Myers
12 Apothecary, when you had involvement for
13 purchasing drugs, you learned that providers were
14 able to acquire drugs for less than AWP?
15     MR. PAUL:  Objection.  Form.
16     MR. GOBENA:  Same objection.
17     THE WITNESS:  Yes.
18 BY MR. COLE:
19 Q.  During your time at Medi-Cal, were you
20 ever told by anyone that the AWPs published in
21 Red Book or by First DataBank were an accurate
22 reflection of providers' actual acquisition cost?

Page 111

1      MR. PAUL:  Objection.  Form.
2      MR. GOBENA:  Same objection.
3      THE WITNESS:  Could you repeat that,
4  please?
5  BY MR. COLE:
6  Q.  Sure.  During the time that you were at
7  Medi-Cal --
8  A.  Yes.
9  Q.  -- did anyone ever tell you that the
10 AWPs published in the pricing compendia
11 accurately reflected providers' actual
12 acquisition costs?
13     MR. PAUL:  Objection.  Form.
14     MR. GOBENA:  Same objection.
15     THE WITNESS:  Not that I can recall.
16 BY MR. COLE:
17 Q.  Are you aware of any instance in which
18 a manufacturer told you or represented to you
19 that the AWP published in the pricing compendia
20 reflected what providers were actually paying to
21 acquire the drug?
22     MR. PAUL:  Objection.  Form.

Page 112

1      MR. GOBENA:  Same objection.
2      THE WITNESS:  Not that I can recall.
3  BY MR. COLE:
4  Q.  Dr. Gorospe, I realize this is somewhat
5  of a broad question but what would you consider
6  the goals of the Medicaid program -- I'm sorry --
7  the Medi-Cal program to be?  What do you consider
8  the goals of the Medi-Cal program to be?
9  A.  To deliver medically needed care to
10 beneficiaries of the program.
11 Q.  Would you agree with me that one of the
12 primary goals of Medi-Cal is to ensure that its
13 beneficiaries have access to care?
14 A.  Yes.
15 Q.  Would you agree with me that another
16 goal of the Medi-Cal program is to encourage
17 provider enrollment and participation in the
18 Medi-Cal program?
19 A.  No.
20 Q.  You wouldn't agree with that?
21 A.  No.
22 Q.  If -- you don't believe that the goal

Page 113

1  of access to care and the encouragement of
2  provider participation in the program are related
3  somehow?
4      MR. PAUL:  Objection.  Form.
5      MR. GOBENA:  Same objection.
6      THE WITNESS:  No.
7  BY MR. COLE:
8  Q.  Well, if a substantial number of
9  providers decided to stop participating in the
10 Medi-Cal program and there were Medi-Cal
11 beneficiaries in areas where those providers were
12 the only providers around to provide care, would
13 you agree with me that that would be a problem
14 for Medi-Cal?
15     MR. GOBENA:  Objection.  Form.
16     THE WITNESS:  Yes.
17 BY MR. COLE:
18 Q.  So maybe this is a better way to put
19 it.  One of the ways that Medi-Cal, over the
20 years, has tried to reach its goal of providing
21 access to care is to make sure that there's an
22 adequate number of providers participating in the

Page 198

1   Q. And what was his position at that time?
2   A. He was a pharmaceutical consultant, a
3   staff pharmaceutical consultant.
4   Q. Similar to the position you had before
5   you took over the chief position?
6   A. Yes.
7   Q. And did he report to you or summarize
8   to you the conversations he had with other state
9   Medicaid pharmacy programs about why they were
10  not going to implement the Medicaid AWPs?
11  A. Yes.
12  Q. And he told you that the reason they
13  were not implementing the Medicaid AWPs was
14  because of concerns over access to care?
15      MR. GOBENA: Objection. Form.
16  Foundation.
17      THE WITNESS: Yes.
18  BY MR. COLE:
19  Q. Do you keep in contact with Mr.
20  Hillblom?
21  A. Yes.
22  Q. How often do you talk to Mr. Hillblom?

Page 199

1   A. Quarterly.
2   Q. Where does -- what city does he live
3   in?
4   A. Elk Grove.
5   Q. California?
6   A. Yes.
7   Q. If you go to the last page -- I'm
8   sorry.
9       Going back to the previous page where
10  it says options, the memo looks like it lists
11  three options, A, B and C, and the first option,
12  A, says: The department could implement these
13  price changes, and then it says, as a positive,
14  or a pro, to this option: The Medi-Cal program
15  would save an undetermined amount of drug costs.
16  And then as a con, it says: Providers may choose
17  not to provide these services to Medi-Cal
18  beneficiaries. Providers may hospitalize
19  patients to obtain the medically necessary
20  services resulting in increased program costs.
21      Do you see that?
22  A. Yes.

Page 200

1   Q. And is that consistent with your
2   understanding of why the department recommended
3   not to implement these AWPs; that there was not
4   only the access to care component but also that
5   if these AWPs were implemented, then Medi-Cal
6   beneficiaries might have to start going into a
7   hospital to receive services and that would
8   increase program costs?
9       MR. PAUL: Objection. Form.
10      THE WITNESS: Yes.
11      MR. GOBENA: Same objection.
12      THE WITNESS: Yes.
13  BY MR. COLE:
14  Q. And then the memo goes on. It lists,
15  as a second option, it says: B: The department
16  could delay implementation of these price changes
17  until a mechanism has been established to
18  transfer the drug cost savings to increased
19  provider professional fee reimbursement.
20      And then the last option is C. It
21  says: The department could not implement the new
22  price reporting mechanism.

Page 201

1       And then it ends with the
2   recommendation that Medi-Cal not implement the
3   new price reporting mechanism due to the serious
4   impact on both the providers and beneficiaries.
5       And so that was the recommendation from
6   DHS, to the Governor's office, that the Medicaid
7   AWPs not be implemented, correct?
8       MR. ZLOTNICK: Objection. Form.
9       THE WITNESS: That's correct.
10  BY MR. COLE:
11  Q. And do you know -- I think we covered
12  this already but the Medicaid AWPs were never
13  implemented, correct?
14  A. That's correct.
15  Q. So would you agree with me that the
16  Governor's office accepted the recommendation of
17  DHS on this issue?
18      MR. ZLOTNICK: Object to the form.
19      THE WITNESS: I don't recall if the
20  Governor's office ever responded.
21  BY MR. COLE:
22  Q. Was it common for the Governor's office

Page 202

1  not to respond to memos such as this?
2       MR. PAUL:  Objection.  Form.  No
3  foundation.
4       MR. GOBENA:  Same objection.
5  BY MR. COLE:
6    Q.  If you know.
7    A.  No, I don't know.
8    Q.  The State of California is not required
9  to use AWP in its reimbursement formula, correct?
10      MR. PAUL:  Objection.  Form.
11      MR. GOBENA:  Same objection.
12      THE WITNESS:  I don't understand the
13 question.
14 BY MR. COLE:
15   Q.  Well, the directive or the mandate from
16 -- under federal law, the Medicaid program, is
17 that -- and again, tell me if this matches your
18 understanding -- is that the state Medicaid
19 program has to come up with what it believes to
20 be an estimated acquisition cost, correct?
21   A.  That's correct.
22   Q.  And then the state programs have some

Page 203

1  flexibility in proposing what they believe is an
2  appropriate estimated acquisition cost, right?
3       MR. GOBENA:  Objection.  Form.
4       THE WITNESS:  That's correct.
5  BY MR. COLE:
6    Q.  And there's no requirement that AWP be
7  part of that formula.
8    A.  That is correct.
9    Q.  States can estimate acquisition costs
10 in different ways, correct?
11   A.  That's correct.
12   Q.  Some use AWP, or a percentage off AWP,
13 and some don't?
14      MR. PAUL:  Objection.  No foundation.
15      MR. GOBENA:  Same objection.
16      THE WITNESS:  I don't know if there are
17 programs that don't use AWP.
18 BY MR. COLE:
19   Q.  You're not aware of any states that
20 reimburse on a WAC plus a percentage basis?
21   A.  I'm aware of states that reimburse on a
22 WAC plus a percentage basis.

Page 204

1    Q.  And are you aware of states that have a
2  reimbursement formula where AWP is nowhere to be
3  seen?
4    A.  I'm not aware of that.
5    Q.  Okay.  Do you know of any law that
6  would prohibit DHS from proposing a reimbursement
7  formula that did not in any way include AWP or a
8  percentage off of AWP?
9       MR. GOBENA:  Objection.  Form.
10      MR. PAUL:  Same objection.
11      THE WITNESS:  I don't know of any law
12 that would do that.
13 BY MR. COLE:
14   Q.  Do you know of any law that would
15 prohibit the State of California from reimbursing
16 based on actual acquisition cost as it does for
17 blood clotting products?
18      MR. PAUL:  Objection.  Form.
19      MR. GOBENA:  Same objection.
20      THE WITNESS:  I don't know of any law
21 that would preclude that.
22 BY MR. COLE:

Page 205

1    Q.  Are there policy reasons that might
2  preclude that?
3       MR. GOBENA:  Objection.  Form.
4       THE WITNESS:  None that I can think of.
5          (Exhibit Gorospe 015 was marked
6  for identification.)
7  BY MR. COLE:
8    Q.  Okay.  This is Exhibit 15.  Do you
9  recognize this document?
10   A.  No, I don't.
11   Q.  It is a Report of the Office of
12 Inspector General, particularly the Office of
13 Audit dated October 3, 1989, and it's titled Use
14 of Average Wholesale Prices in Reimbursing
15 Pharmacies Participating in Medicaid and the
16 Medicare Prescription Drug Program, and again,
17 sir, I know this predates your time with Medi-
18 Cal, but would you agree with me that whoever in
19 DHS held your position -- when you started at DHS
20 in 1995, would you agree with me that whoever
21 held that position in 1989, that this would be
22 the type of report from a federal agency that

Gorospe, James Kevin                                                   March 19, 2008
                              Sacramento, CA

| Page 210 | Page 212 |
|---|---|
| 1  issues; is that fair?<br>2     A.   That's fair.<br>3     Q.   Did you -- so I take it you recall<br>4  reading this report when you took your first<br>5  position in DHS?<br>6     A.   That's correct.<br>7     Q.   And this report, it's titled Report by<br>8  the Auditor General of California.  How Medi-Cal<br>9  and Other Healthcare Providers Manage Their<br>10 Pharmaceutical Expenditures, and it's dated<br>11 August 1991 in the lower right-hand corner of the<br>12 first page.<br>13    A.   Uh-huh.<br>14    Q.   This document, obviously, if you read<br>15 it at DHS, it was sent to DHS at some point,<br>16 correct?<br>17    A.   That is correct.<br>18    Q.   And if you go to the last two pages of<br>19 the document, 71223 and 24, there's a letter from<br>20 a woman named Molly Joel Coye, who's the director<br>21 of DHS, to a gentleman named Kurt R. Sjoberg, S-<br>22 J-O-B-E-R-G, dated August 22, 1991. | 1     A.   Yes, I do.<br>2     Q.   In reference to the first report, the<br>3  January 1990 report, the California Auditor<br>4  General is noting that the United States Senate<br>5  report in January of 1990 concluded that federal<br>6  and state governments pay higher prescription<br>7  drug prices through their Medicaid programs than<br>8  any other major purchasers of prescription drugs,<br>9  correct?<br>10    A.   That's the statement made.<br>11    Q.   And then in reference to the August<br>12 1989 report, which we've already looked at today,<br>13 the California Auditor General, again, is noting,<br>14 in 1991, that the earlier Senate report -- let me<br>15 start over.<br>16         This document refers to the August 1989<br>17 report from the US Senate which reported that<br>18 organizations, such as the Department of Veterans<br>19 Affairs, hospitals and HMOs, are negotiating<br>20 prices directly with manufacturers at discounts<br>21 of 41 to 99 percent off the published average<br>22 wholesale price, correct? |
| Page 211 | Page 213 |
| 1       Do you see that letter?<br>2     A.   Yes.<br>3     Q.   And reading this letter, Ms. Coye<br>4  indicates that secretary Gould asked her to<br>5  respond to the August 1991 draft report that<br>6  appears earlier in the exhibit, correct?<br>7     A.   That is correct.<br>8     Q.   Okay.  If you could look at page seven<br>9  for me.  It's Bate Stamped 71171.  There's a<br>10 section there called Utilization and Price<br>11 Controls.<br>12    A.   I see it.<br>13    Q.   And that paragraph, it refers to two<br>14 United States Senate reports.<br>15        Do you see that?  One is titled<br>16 Skyrocketing Prescription Drug Prices:  Turning a<br>17 Bad Deal into a Fair Deal dated January of '90,<br>18 and then about halfway down the paragraph, it<br>19 refers to an August 1989 report, which we've<br>20 already looked at today, titled Prescription Drug<br>21 Prices:  Are We Getting Our Money's Worth.<br>22        Do you see that? | 1     A.   That's what it says, yes.<br>2     Q.   So DHS knew, no later than August of<br>3  1991, that certain pharmaceutical purchasers<br>4  received discounts of up to -- from anywhere from<br>5  41 to 99 percent off of the published AWP,<br>6  correct?<br>7          MR. PAUL:  Objection.  Form.  No<br>8  foundation to DHS.<br>9          MR. GOBENA:  Same objection.<br>10         THE WITNESS:  I would assume anybody<br>11 that read the report would have read this<br>12 passage.<br>13 BY MR. COLE:<br>14    Q.   Anyone who would have read the report<br>15 would have learned this information at that time,<br>16 correct?<br>17    A.   That is correct.<br>18    Q.   And is it your understanding, based on<br>19 your experience at Medi-Cal, that if a draft<br>20 report by the Auditor General was sent to a<br>21 particular department, such as DHS, that people<br>22 in DHS would read it and learn the information |

54 (Pages 210 to 213)

|   | Page 214 |
|---|---|
| 1 | contained in it? |
| 2 | MR. PAUL: Objection. Form. No |
| 3 | foundation. |
| 4 | MR. GOBENA: Same objections. |
| 5 | THE WITNESS: That is correct. |
| 6 | BY MR. COLE: |
| 7 | Q. Okay. In your time at Medi-Cal, if a |
| 8 | report was sent to the pharmacy policy unit, you |
| 9 | would have read it and considered the information |
| 10 | contained in it, correct? |
| 11 | A. That is correct. |
| 12 | Q. Dr. Gorospe, if you could turn to Page |
| 13 | 31 in this document. It's Bate Stamped 71195. |
| 14 | And just so you have a little bit of a frame of |
| 15 | reference, you might want to look back at the |
| 16 | prior two pages. |
| 17 | Table four, that appears on Page 31, is |
| 18 | part of a section called Variation in Amounts |
| 19 | Pharmacies Bill and are Reimbursed, and that |
| 20 | section starts on Page 29. |
| 21 | And if you look at the second |
| 22 | paragraph, it says: We surveyed six pharmacists |

|   | Page 215 |
|---|---|
| 1 | who obtained the amount their pharmacy would |
| 2 | charge Medi-Cal for a sample of six multiple |
| 3 | source prescription drugs, and multiple source is |
| 4 | another word for generic drugs; is that fair? |
| 5 | A. That is correct. |
| 6 | Q. Goes on to say: We then compared the |
| 7 | amounts that these pharmacies would charge to |
| 8 | Medi-Cal with the amounts for Medi-Cal |
| 9 | reimbursement limits to determine whether a |
| 10 | significant difference existed between the amount |
| 11 | that the pharmacies would have billed and the |
| 12 | amount that Medi-Cal would have reimbursed. |
| 13 | Table 3 shows the variation in pharmacy charges |
| 14 | to Medi-Cal, by drug and manufacturer, for each |
| 15 | of the six pharmacies in our sample. In |
| 16 | addition, the table reflects the difference in |
| 17 | Medi-Cal reimbursement limits. |
| 18 | So looking at Table 3 -- and I'm going |
| 19 | to focus on the tail end of Table 3, which is on |
| 20 | Page 31, and it appears to me -- and you can |
| 21 | correct me if you disagree -- that this table is |
| 22 | showing different estimated acquisition costs for |

|   | Page 216 |
|---|---|
| 1 | one generic product that six different pharmacies |
| 2 | bought from various manufacturers; is that right? |
| 3 | Take your time if you want to study it |
| 4 | for a while. It certainly took me a long time. |
| 5 | A. Under the heading of estimated |
| 6 | acquisition costs, yes, it shows -- |
| 7 | Q. It has different columns? |
| 8 | A. Different columns and different prices. |
| 9 | Q. And the columns are -- well, at least |
| 10 | the last four columns are components, or at one |
| 11 | time, components of the reimbursement formula in |
| 12 | California, right? |
| 13 | A. That's correct. |
| 14 | MR. PAUL: Objection. Form. No |
| 15 | foundation, if I can get that in before he |
| 16 | answered. |
| 17 | MR. COLE: Sure. |
| 18 | Q. You see this first column after the |
| 19 | manufacturer column, it says "amount pharmacy |
| 20 | would have charged Medi-Cal"? |
| 21 | A. Yes, I see that. |
| 22 | Q. Do you know what that means? |

|   | Page 217 |
|---|---|
| 1 | A. No, I do not. |
| 2 | Q. Looking at this document, and based on |
| 3 | your experience as a pharmacist, would you agree |
| 4 | with me that the acquisition cost for these |
| 5 | pharmacies likely would have been something less |
| 6 | than the amount listed in that column? |
| 7 | When I say "that column," I mean |
| 8 | "amount pharmacy would have charged Medi-Cal." |
| 9 | MR. PAUL: Objection. Form. |
| 10 | MR. GOBENA: Same objection. |
| 11 | Speculation. |
| 12 | THE WITNESS: Based on my knowledge as |
| 13 | a pharmacist and based on the sub-note listed in |
| 14 | the chart that says that that column includes a |
| 15 | dispensing fee, one could conclude that the price |
| 16 | for the drug was less than that price listed |
| 17 | there. |
| 18 | BY MR. COLE: |
| 19 | Q. The acquisition cost was less than that |
| 20 | price listed? |
| 21 | A. You could conclude that, yes. |
| 22 | Q. Okay. And again, I know that you |

55 (Pages 214 to 217)

Page 218

1  didn't prepare this report and you weren't even
2  working for Medi-Cal --
3     A.  Right.
4     Q.  -- at the time it was written.
5         In your experience, a pharmacy would
6  charge Medi-Cal -- start over.
7         In your experience, a pharmacy would
8  not charge Medi-Cal less than what the pharmacy
9  paid to acquire the drug; is that fair?
10        MR. ZLOTNICK:  Object to the form.
11        MR. GOBENA:  I'll join in the
12 objection.
13        THE WITNESS:  Yes, that's accurate.
14 BY MR. COLE:
15    Q.  And looking at this column, Amount
16 Pharmacy Would Have Charged Medi-Cal, as you
17 noted, there's a footnote or a sub-note --
18 whatever you want to call it -- that says it
19 includes a dispensing fee.
20        And if you were to back the dispensing
21 fee out of this column -- and again, the
22 dispensing fee around this time was approximately

Page 219

1  $4, or Footnote B says $4.05; do you see that?
2     A.  I see that.
3     Q.  If you back that $4.05 out of -- let's
4  look at Pharmacy B in this section.
5         If you back the $4 -- if you subtract
6  the $4.05 from the $5.70 that's listed there, you
7  get approximately 1.65.  $1.65, if my math is
8  right; is that fair?
9     A.  That makes the assumption that the
10 dispensing fee being charged -- that the pharmacy
11 is charging under that price was $4.05.
12    Q.  Correct.  Assuming that --
13    A.  I can't make that assumption based on
14 the information provided here.
15    Q.  I agree with you.  It doesn't say $4.05
16 in Footnote A, but if you -- let's assume that
17 the dispensing fee is the same.  That would put
18 the ingredient cost component of the product --
19 again, looking at Pharmacy B -- at a dollar --
20 $1.65.
21        MR. PAUL:  Objection.  Form.  No
22 foundation.

Page 220

1         THE WITNESS:  Given the conditions you
2  just stated, the math would indicate that, yes.
3  BY MR. COLE:
4     Q.  And then if you move over to the AWP
5  minus five percent column for that same product,
6  for Pharmacy B, you've got $20.64 listed.
7         Do you see that?
8     A.  Yes.
9     Q.  And again, the footnote there indicates
10 that that figure, built into it is a $4.05
11 dispensing fee; is that correct?
12    A.  That's what the footnote says.
13    Q.  So if you subtract $4.05 from that
14 figure, you get down to $16.59, if my math is
15 correct.  Do you agree?
16    A.  Yes, your math is correct.
17    Q.  Okay.  So -- and again, this is AWP
18 minus five percent.
19        So if you were to determine the AW --
20 the straight AWP of this particular product, you
21 would have to add five percent, correct?
22    A.  Actually, that isn't how the math would

Page 221

1  work but I understand what you're describing.
2         You would not add five percent to a
3  lower amount because that would not get you to
4  the AWP.
5     Q.  I agree with you.  But the number would
6  be slightly higher than $16.59, right?
7     A.  That is correct.
8     Q.  Okay.  So if you compared, for Pharmacy
9  B, what we have described as the acquisition
10 costs, what we earlier talked about as the
11 ingredient cost of the product being $1.65, the
12 AWP of that product would be at or around $17,
13 somewhere in that neighborhood?
14    A.  Approximately, that's correct.
15    Q.  Okay.  So anyone reading this report,
16 again, at DHS back in 1991, looking at this
17 particular table, could see that there was -- I
18 don't know what the percentage would be, but we
19 could certainly calculate it, but you have
20 Pharmacy B acquiring a generic drug product for
21 somewhere around $1.65 and the AWP of that
22 product being somewhere in the neighborhood of

Page 222

1   $17.
2       A.  Based on the information we've just
3   discussed, yes.
4       Q.  Are you familiar with the term
5   "spread"?
6       A.  Yes.
7       Q.  And what do you understand that to
8   mean?
9       A.  My understanding of spread, as it
10  relates to pharmaceuticals or prescription drugs,
11  is the difference between what a provider
12  purchases a product for and what they are
13  reimbursed for that same product.
14      Q.  Looking solely at this column, average
15  wholesale price minus five percent, would you
16  agree with me that there are wide variations in
17  the AWPs for this particular generic product?
18      A.  Yes.
19      Q.  And again, the numbers listed here
20  aren't the AWPs.  They're AWPs minus five
21  percent, but if you gave each one of them a boost
22  to compensate for that, you would have some of

Page 223

1   the products having an AWP of somewhere around,
2   in the $21 range, and some products having an AWP
3   of half of that, correct?
4       A.  As you previously discussed, the AWP
5   would be somewhere in the $17 range for the
6   upper, the higher priced products, and the other
7   products would be below, because these numbers
8   include the dispensing fee, as you previously
9   noted.
10      Q.  Good point.  The AWP, at least to that
11  second product, would be somewhere in the $17
12  range, and if we looked at this first product
13  listed, the one from Goldline, if you back out
14  the dispensing fee, that figure drops to $5.37?
15      A.  That's correct.
16      Q.  So the AWP would be somewhere between -
17  - somewhere around $6 roughly, maybe a little
18  less?
19      A.  Yes, that's correct.
20      Q.  I wasn't a math major.  So you would
21  have one product with an AWP of around $17, one
22  generic product, and a therapeutically equivalent

Page 224

1   product with an AWP of roughly one-third of that.
2       A.  That is accurate.
3       Q.  And again, anyone in DHS who you know
4   was pouring through or reading this report, would
5   be able to -- would have learned that there were
6   these wide variations in AWPs for generic
7   products --
8           MR. GOBENA:  Object to --
9   BY MR. COLE:
10      Q.  -- correct?
11          MR. GOBENA:  Sorry.  Objection.
12          THE WITNESS:  That is correct.
13          (Exhibit Gorospe 017 was marked
14  for identification.)
15  BY MR. COLE:
16      Q.  I marked Exhibit 17.
17          Dr. Gorospe, this is a Proposed Rule
18  excerpt from the Code of Federal Regulations,
19  Federal Register, Volume 39, Number 230, dated
20  November 27, 1974, and I'm reading from the
21  bottom of the document.
22          Have you ever referred to or seen this

Page 225

1   regulation, proposed regulation before?
2       A.  Not that I can recall.
3       Q.  Okay.  You were probably in junior high
4   or high school at the time.
5       A.  High school.
6       Q.  Okay.  But since the time that you've
7   joined Medi-Cal, did you ever have occasion to
8   review this proposed rule?
9       A.  Not that I can recall, no.
10      Q.  If you look towards the top of the
11  middle column, it says -- there's a section
12  called "acquisition costs."
13      A.  I'm sorry.  Where?  Oh, I see it.
14      Q.  It says:  In referring to drug cost,
15  current regulations specify cost as determined by
16  the state.  Most states use average wholesale
17  price.  Red Book data, Blue Book data, survey
18  results or similar standard costs.  Such standard
19  prices are frequently in excess of actual
20  acquisition costs to the retail pharmacist.
21  Thus, to achieve maximum savings to the Medicaid
22  program, the proposal requires the use of actual

Page 238

1     A.  No.
2     Q.  Did you have occasion to read Barron's
3  during your time at DHS?
4     A.  No.
5     Q.  Okay.  Do you have any reason to
6  disagree with what's stated here, as reported by
7  Barron's, in that the true cost for the drugs
8  they looked at, that Barron's looked at, that the
9  acquisition cost was 60 to 85 percent below AWP
10 for generic drugs?
11        MR. PAUL:  Objection.  No foundation.
12        MR. GOBENA:  Same objection.
13        THE WITNESS:  I don't have a basis to
14 know whether or not the statement is accurate.
15 BY MR. COLE:
16    Q.  In your experience as a pharmacist,
17 before you joined Medi-Cal, was it your
18 understanding that the acquisition cost -- that
19 the percentage discount off of AWP was greater
20 for generic drugs than for brand name drugs?
21        MR. GOBENA:  Objection.  Form.
22        MR. PAUL:  Same objection.

Page 239

1         THE WITNESS:  Yes.
2  BY MR. COLE:
3     Q.  In other words, the spread on generic
4  drugs was greater than the spread on brand name
5  drugs?
6         MR. GOBENA:  Objection.  Form.
7  BY MR. COLE:
8     Q.  Is that fair?
9     A.  I can't speak to whether that's true or
10 not.
11    Q.  In your experience?
12    A.  I don't recall if the spread was
13 greater in one versus the other.
14    Q.  Okay.  But these reports that we've
15 looked at earlier today indicate that, correct?
16        MR. PAUL:  Objection.  No foundation.
17        MR. GOBENA:  Same objection.
18        THE WITNESS:  Given the definition of
19 "spread," I would have to know two points of fact
20 which would be the acquisition cost and the
21 reimbursement rate.
22 BY MR. COLE:

Page 240

1     Q.  Okay.  Fair enough.  If you were
2  looking at spread as simply the difference
3  between AWP and acquisition cost, would you --
4  has it been your experience, in your 25 years as
5  a pharmacist, that the spread for generic drugs
6  is greater than the spread for brand drugs?
7         MR. GOBENA:  Objection.  Form.
8         THE WITNESS:  Yes.
9  BY MR. COLE:
10    Q.  And that's what these reports that
11 we've looked at today seem to indicate, correct?
12        MR. PAUL:  Objection.  No foundation.
13        MR. GOBENA:  Same objection.
14        THE WITNESS:  Based on our previous
15 discussion, yes.
16 BY MR. COLE:
17    Q.  And this report notes, or at least in
18 reference to the Barron's article, that the
19 discount off of AWP for generic drugs was 10 to
20 20 percent while the discount off of AWP for
21 generic drugs -- do I need to start that over?
22 Yes, I do.

Page 241

1         Regarding this Barron's article, the
2  difference between true cost and AWP for brand
3  name drugs was 10 to 20 percent, while the
4  difference between the true cost and AWP for
5  generic drugs was 60 to 85 percent, correct?
6     A.  That's what this states, yes.
7     Q.  And if you go flip a few pages back to
8  the findings and recommendations page, it
9  indicates that the -- at least in the time period
10 covered by this report, that the invoice price
11 for brand name drugs was a national average of
12 18.3 percent below AWP.
13        Do you see that?
14    A.  Yes, I do.
15         (Exhibit Gorospe 020 was marked
16 for identification.)
17 BY MR. COLE:
18    Q.  Here's Exhibit 20.  This is another
19 HHS-OIG report.  It's dated August 1997 and it's
20 entitled Medicaid Pharmacy Actual Acquisition
21 Cost of Generic Drug Prescription Products.
22        Do you recognize this report?