# EXHIBIT 21

Case 1:01-cv-12257-PBS   Document 6449-23   Filed 08/28/09   Page 2 of 3

Gorospe, Pharm. D., J. Kevin - Vol. II                                    September 22, 2008
Sacramento, CA

Page 591

1  A. Yes.
2  Q. Second to the last paragraph on that
3  page the first sentence reads "It is clear and well
4  documented that pharmacy reimbursement
5  methodologies that rely on AWP and a low dispensing
6  fee overpay pharmacies for drug ingredient costs
7  and underpay them for the cost of dispensing the
8  drug."
9      Did I read that correctly?
10 A. Yes.
11 Q. Is that consistent with your
12 understanding of pharmacy reimbursement methodology
13 that rely on AWP?
14 A. Yes.
15 Q. And how long have you had that
16 understanding?
17 A. Again, as I previously stated, the late
18 nineties.
19 Q. If you turn to page 2, you'll see that
20 under the heading "Drug Ingredient Costs" the first
21 paragraph goes through some of the findings of the
22 Myers and Stauffer study that we talked about

Page 592

1  earlier; correct?
2  A. Yes.
3  Q. And in the last sentence it reads "It's
4  clear from the information that the Department's
5  current rate of AWP minus 10 percent does not
6  accurately reflect the drug acquisition costs in
7  the marketplace;" correct?
8  A. Yes.
9  Q. Do you agree with that statement or is
10 that consistent with your understanding at the
11 time?
12 A. Yes.
13 Q. The rate referenced there, AWP minus 10
14 percent, was adopted after the study was performed;
15 correct?
16 A. I don't recall.
17 Q. The rate of AWP minus 10 percent was --
18 didn't become effective until after the Myers and
19 Stauffer study was released; correct?
20 A. That's correct.
21 Q. I take it you don't recall whether the
22 specific legislation or budget proposal that

Page 593

1  implemented minus 10 percent occurred before or
2  after June of 2002?
3  A. That is correct.
4  Q. You would agree with me, though, that
5  the rate study was referenced in the state's
6  attempts to -- in the state's communications with
7  CMS to seek approval of the AWP minus 10 percent?
8  A. Yes.
9  Q. The last paragraph on that page --
10     Scratch that.
11     The second to the last -- the second to
12 last paragraph in the page, last sentence, states
13 "Therefore, the Department proposed using a single
14 and differentiated rate equal to AWP minus 20
15 percent."
16     Do you understand that to mean that the
17 -- that they were not proposing to reimburse
18 generics differently?
19 A. That is correct.
20 Q. And then the first sentence of the
21 following paragraph states "A rate of AWP minus 20
22 percent is still significantly higher than the

Page 594

1  pharmacy acquisition cost of generic drugs."
2      Did I read that correctly?
3  A. Yes.
4  Q. Is that consistent with your
5  understanding at the time?
6  A. Yes.
7  Q. Did you have that understanding also
8  going back to the late nineties, that AWP minus 20
9  percent is significantly higher than pharmacy
10 acquisition costs for generic drugs?
11 A. Yes.
12 Q. Last sentence of that paragraph or that
13 page, I guess, going over to the next page, "The
14 reimbursement of generic drugs will still be
15 significantly above pharmacy's acquisition costs."
16     And then it goes on.
17     Did I read that correctly?
18 A. Yes.
19 Q. Do you understand that to --
20     Withdrawn.
21     So was it your understanding to the
22 extent you recall this proposal that the

51 (Pages 591 to 594)

Gorospe, Pharm. D., J. Kevin - Vol. II                         September 22, 2008
                              Sacramento, CA

Page 595

1  reimbursement rate of AWP minus 20 percent was made
2  knowing that reimbursement on that basis would be
3  significantly higher than acquisition costs for
4  generic drugs?
5      A.  Yes.
6      Q.  And then the -- further down on that
7  page there's a paragraph with the heading "Impact
8  on Access" that refers to stakeholder meetings.
9          Do you recall having stakeholder meetings
10 prior to this legislative proposal?
11     A.  Not that I can recall.
12     Q.  Do you recall during any discussions for
13 changing the reimbursement rate having meetings
14 with stakeholders?
15     A.  Not that I -- not that I can recall.
16     Q.  Do you have an understandings as to what
17 the document -- is referring to when it refers to a
18 "stakeholder"?
19     A.  Yes.
20     Q.  Would that be a reference to providers
21 of medical -- Medi-Cal?
22     A.  Yes, amongst others.

Page 596

1      Q.  And others might be beneficiaries, other
2  organizations that have some interest in the -- in
3  the Medi-Cal program?
4      A.  That's correct.
5      Q.  Would you agree that this paragraph
6  reflects consideration on the part of --
7          Or is it your understanding of this
8  paragraph that Medi-Cal was considering whether the
9  proposed change would affect beneficiaries' access
10 to care?
11     A.  Yes.
12     Q.  And do you recall in 2004 when rate
13 changes were discussed considering access to care
14 as a -- a policy matter?
15     A.  Yes.
16         MR. BENNETT:  I think we need to break
17 for a tape.  So --
18         MR. PAUL:  Okay.  Just to restate my
19 concern earlier with regard to this, I think I
20 stated on the record but I'm not sure I mentioned
21 that we were talking about Exhibit 52, although I'm
22 sure it's fairly obvious from the transcript, but I

Page 597

1  want to make sure that that objection's on the
2  record and while we would prevail on whatever
3  motion was required to retract this, I would ask
4  that all the testimony that was given in connection
5  with it be redacted, but, obviously, we'll take
6  that up later.
7          VIDEOGRAPHER:  This is the end of tape
8  two, volume two, of the deposition of Kevin
9  Gorospe.
10         We are off the record at 2:21 p.m.
11         (Thereupon a recess was taken at 2:21
12         p.m. and the deposition resumed at 2:31
13         p.m.)
14         VIDEOGRAPHER:  This is the beginning of
15 tape three, volume two, of the deposition of Kevin
16 Gorospe.
17         We are back on the record at 2:31 p.m.
18         MR. BENNETT:  I'd like to mark this
19 Exhibit 53, I think we're on.
20         (Exhibit Gorospe 053 was marked for
21         Identification.)
22 BY MR. BENNETT:

Page 598

1      Q.  Exhibit 53 has labeled CAAG/DHS 0084626
2  and 627.
3          Dr. Gorospe, do you recognize this
4  document?
5      A.  Yes.
6      Q.  Can you describe it for us?
7      A.  It appears to be a description of
8  Medi-Cal pharmacy reimbursement related to a
9  reimbursement proposal and various data related to
10 acquisition cost of drugs relevant to AWP, also
11 describes briefly points about the -- study of
12 Medi-Cal pharmacy reimbursement.
13     Q.  Did you draft this document?
14     A.  Not that I can recall, no.
15     Q.  Do you recall receiving a copy of the
16 document?
17     A.  Yes.
18     Q.  Do you know who would have drafted it,
19 if not yourself?
20     A.  Somebody within the Pharmacy Section.
21     Q.  And the Pharmacy Section, as you've
22 described with the previous document, encompasses

52 (Pages 595 to 598)