# EXHIBIT 22

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

--------------------------------X

             Videotaped deposition of

   THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

          ASSISTANCE by CYNTHIA DENEMARK

       December 9, 2008 - Newark, Delaware

Newark, DE

Page 142

1  14 percent or AWP minus 16 percent?
2    A.  Yes, I was.
3    Q.  What was your involvement in that
4  change?
5    A.  I worked with DMAA to find a vendor who
6  was Heritage.  EDS provided a subcontract via our
7  overall contract with DHSS to have an audit done
8  to find out what the relative cost of AWP to
9  actual acquisition cost was at the time.
10   Q.  And I'm sorry, you worked with -- there
11 was a -- you worked with an auditor to conduct
12 that study; is that correct?
13   A.  I didn't say an auditor.  There was a
14 company, Heritage.
15   Q.  Heritage.
16   A.  And they supplied a team of people to
17 help us do the audit for -- on the Delaware
18 pharmacies.
19   Q.  And you were involved in working on
20 that audit?
21   A.  I was.
22   Q.  And what was -- what were the findings

Page 143

1  of that audit?
2        MS. WOOLFOLK:  We have a pending
3  document request as you know.  We'll be providing
4  some of those documents.  Ms. Denemark hasn't
5  reviewed that or didn't bring that with her
6  today.
7        THE WITNESS:  I did review it and I
8  have some of the findings, but there were lots of
9  findings in that document.  I don't have them all
10 memorized.
11       MS. WOOLFOLK:  I'd ask that you -- that
12 you would take a look at the study when we
13 produce it pursuant to the Request for
14 Production.
15       We have not had the opportunity yet as
16 you know to review those documents for privilege
17 issues and I don't know if there's one associated
18 with that study or not.
19       MS. RAMSEY:  To the extent that she
20 knows the answers to the questions today she
21 should be able to provide testimony though,
22 correct?

Page 144

1        MS. WOOLFOLK:  If there were privilege
2  issues, no.
3        MS. RAMSEY:  Well, you can assert that
4  on a question-by-question basis, correct?
5        MS. WOOLFOLK:  I can do that, yes.
6        MS. RAMSEY:  Thank you.
7  BY MR. CYR:
8    Q.  So as best you can recall, what were
9  the findings of that audit?
10   A.  That 30 pharmacies were surveyed for a
11 period of time between November of 2000 and
12 November of 2001.  That traditional pharmacies
13 purchased their brand products at AWP minus 19.04
14 percent.  That in general their purchase of
15 multisource products was at AWP minus 56.29
16 percent.  That products that did not have a state
17 MAC could actually be purchased at AWP minus
18 63.93 percent.
19   Q.  Okay.
20   A.  Nontraditional pharmacies could
21 purchase brand products at AWP minus 24.32
22 percent.  Generic products with a MAC at AWP

Page 145

1  minus 63.2 percent.  Generic products without a
2  MAC at AWP minus 70.51 percent.  That in total,
3  if you combine the traditional and nontraditional
4  pharmacies, then the AWP minus 21.81 percent
5  would represent the brand products.  AWP minus
6  55.99 percent were products with a MAC.  AWP
7  minus 67.44 percent without a MAC.
8        MS. HEALY SMITH:  Can I just stop you?
9  Counsel, do you have a copy of what the witness
10 is consulting?
11       MS. RAMSEY:  Yes.
12       MR. CYR:  Yes.
13       MS. HEALY SMITH:  I do not.
14       MS. RAMSEY:  Counsel, this is the
15 document that the witness brought with her today.
16       MS. HEALY SMITH:  Right, and did you
17 make copies for other people?
18       MS. RAMSEY:  We made them to enter as
19 an exhibit which we'll do in a moment.
20       MS. HEALY SMITH:  Okay.
21       MS. RAMSEY:  Do you have any objection?
22       MS. HEALY SMITH:  No, I just saw

Page 146

1   everyone looking at it and thought, Wouldn't it
2   be nice if I had one, too.  That's all.
3       MS. RAMSEY:  Well, we just in the
4   moment learned that what we have is what she's
5   talking about, so as soon as we get our documents
6   together, we'll enter it as an exhibit, if that's
7   satisfactory.
8       THE WITNESS:  I can't read my own
9   writing.  I have one more comment on here but I'm
10  not sure what it says so --
11  BY MR. CYR:
12      Q.  But the --
13      A.  I know what it says.  Okay.  So at the
14  time of the study -- oh, this is the OIG notes.
15  This is not the AAC study so it's a different
16  subject.
17      MR. CYR:  Mark this as Exhibit Dey 607.
18      (Exhibit Dey 607 was marked for
19  identification.)
20  BY MR. CYR:
21      Q.  The court reporter has just handed you
22  Dey 607.  Is that a copy of the note that you

Page 147

1   were just looking at?
2       A.  Yes.
3       Q.  And you had said there's also a comment
4   on this note about an OIG report.
5       Is that the -- the that's the
6   handwriting -- there's a -- there are three
7   columns with numbers.  Is that the handwriting
8   below the three columns with numbers, is that the
9   comment?
10      A.  Yes.
11      Q.  But the things above that, those refer
12  to the audit that was performed, that DMAA had
13  performed; is that correct?
14      A.  Correct.
15      Q.  And this audit was performed in -- was
16  this -- this audit was considered when DMAA made
17  the switch from AWP minus 12.9 percent to AWP
18  minus 14 percent and AWP minus 16 percent; is
19  that correct?
20      A.  Yes.
21      Q.  So you -- the DMAA had conducted an
22  audit that found that providers could purchase

Page 148

1   drugs at discounts or purchase generic drugs at
2   discounts off of -- generic drugs without a MAC
3   at discounts off AWP averaging 67.44 percent; is
4   that correct?
5       A.  That's correct.
6       Q.  But under the reimbursement formula
7   that Medicaid implemented, those drugs would be
8   reimbursed at AWP minus 14 percent; is that
9   correct?
10      A.  At the time of conversion that would be
11  correct, if there was no FUL.
12      Q.  If there was no FUL and if there was no
13  MAC, then the generic drugs would be reimbursed
14  at AWP minus 14 percent, if it was a traditional
15  pharmacy?
16      A.  Yes.
17      Q.  Did you consider at the time
18  reimbursing for generic drugs at a larger
19  discount off of AWP?
20      A.  I don't believe there was any
21  consideration of using AWP at the NDC level for
22  establishing a generic pricing.

Page 149

1       Q.  What do you mean by that?
2       A.  If I understood your last question
3   correctly, you wanted to know if DMAA considered
4   using AWP and a larger percent.
5       Q.  Right.
6       A.  So I'm assuming that you meant that it
7   would be based on the AWP associated with an NDC.
8       Q.  That's correct.
9       A.  So no, we did not.
10      Q.  So there wouldn't be any -- there was
11  never a consideration that you would use one AWP
12  minus percentage for -- for reimbursement for
13  brand name drugs and a separate AWP minus
14  percentage for reimbursing for generic drugs?
15      A.  That was not a consideration.
16      Q.  Why wasn't that a consideration?
17      MS. HEALY SMITH:  Objection.
18      THE WITNESS:  Because the AWPs varied
19  widely between the NDCs within a product.
20  BY MR. CYR:
21      Q.  So there was a concern that if the
22  discount for a generic drug, the discount off of

Page 150

1  AWP for a generic drug was too large, some of the
2  -- some of the pharmacists would be reimbursed at
3  an amount below their actual cost, their cost to
4  acquire the drug; is that correct?
5      A.  That is not correct.
6          MS. HEALY SMITH:  Objection.
7  BY MR. CYR:
8      Q.  Could you explain why that isn't
9  correct.
10     A.  Yes.  It's not correct because the
11 program was concerned that if a pharmacy
12 purchased a generic product simply based on the
13 AWP of that NDC, that the manufacturer might
14 inflate it, and so we wanted to bring into
15 consideration what the overall product was and
16 not reward smart purchasing by the providers.
17     Q.  So how was the AWP minus 14 percent and
18 the AWP minus 16 percent, how were those decided?
19 Why were those decided as the rates?
20     A.  The -- those were not actually the
21 published rate for what the program was willing
22 to pay the providers.  At the time that the

Page 151

1  published rates were available for comment,
2  several of the large chains that supported the
3  Medicaid program or provide services to the
4  eligibles gave notice that they would terminate
5  being Medicaid providers if our reimbursement was
6  set at the proposed rate.
7          I do not know what the proposed rate is
8  off the top of my head.  I didn't look at it
9  because it became a moot point.  We looked after
10 the chains notified us that they were going to be
11 nonparticipating whether we had an access issue.
12 It was determined with the number of pharmacies
13 that would be left to provide services that we
14 would have an access issue, and so the secretary
15 worked with the provider community leaders to
16 establish a rate that would allow -- would permit
17 them to continue being our providers.
18     Q.  You said before access issue.  What do
19 you mean by that?
20     A.  We are required as a Medicaid program
21 that if we offer a benefit to our eligibles and
22 by regulations the drug benefit is an optional

Page 152

1  benefit, so we don't have to offer it and -- to
2  be a Medicaid program, but if we opt to provide
3  that service, the clients must be able to within
4  reason, and I don't know what the definition of
5  reason, but they must be able to access those
6  services.
7      Q.  Okay.  And the concern with access, the
8  concern that the providers were expressing to
9  DMAA, and the reason that -- the reason that
10 created a concern within DMAA about access was
11 providers would drop out of the program and
12 beneficiaries would not have access to
13 prescription drugs?
14     A.  That's correct.
15     Q.  And do you know, is there -- is there -
16 - strike that.
17         And the provider's specific concern was
18 that they would not receive adequate
19 reimbursement under the proposed changes?
20         MS. HEALY SMITH:  Objection.
21         THE WITNESS:  I don't know what their
22 perception might have been.  I just know for fact

Page 153

1  that they weren't going to be part of the
2  program.
3  BY MR. CYR:
4      Q.  And the reason they gave for
5  withdrawing from the program was the proposed
6  changes?
7      A.  Yes.
8      Q.  And so am I correct in assuming you
9  don't remember the proposed changes but were they
10 greater discounts off of AWP?
11     A.  Yes, they were.
12     Q.  And so you reduced the discounts off of
13 AWP to meet the concerns of those providers?
14     A.  Yes.
15     Q.  And that was addressing the access
16 issue?
17     A.  Yes.
18     Q.  Do you know is there a federal law or a
19 federal rule concerning -- concerning -- strike
20 that.
21         Is there a federal statute or a
22 regulation that requires DMAA to reimburse

Page 178

1  had a recollection of --
2     Q.  Okay.  The ingredient portion of the
3  reimbursement formula, that's intended to cover
4  the cost of acquiring the drug; is that correct?
5        MS. HEALY SMITH:  Objection.
6        THE WITNESS:  My understanding of the
7  definition of the ingredient cost is what does it
8  cost the pharmacy to purchase the drug.
9  BY MR. CYR:
10    Q.  Now, when you consider the adequacy of
11 reimbursement to a provider, you need to consider
12 both the dispensing fee and the ingredient
13 portion and the ingredient cost portion; is that
14 correct?
15    A.  Can you ask that question again?
16    Q.  If you want to evaluate the adequacy of
17 a reimbursement to a Medicaid provider for
18 dispensing a drug, you need to consider both the
19 ingredient portion, the ingredient cost portion
20 and the dispensing fee portion of the
21 reimbursement payment; is that correct?
22       MS. HEALY SMITH:  Objection.

Page 179

1        THE WITNESS:  I'm not sure I would
2  agree with how you phrased what the approach
3  would be for consideration of a provider.  I
4  would look at the total fee that the provider is
5  compensated.
6  BY MR. CYR:
7     Q.  And what would the total fee include?
8     A.  The total fee would include the
9  ingredient cost and the dispensing fee.
10    Q.  So if a dispensing fee was inadequate
11 to cover a provider's cost of dispensing, those
12 costs could be covered by the ingredient portion
13 of the reimbursement payment; is that correct?
14       MS. HEALY SMITH:  Objection.
15       THE WITNESS:  Yes.
16 BY MR. CYR:
17    Q.  Was there knowledge among state
18 Medicaid officials at this time that dispensing
19 fees paid by state Medicaid programs were not
20 adequate to cover dispensing costs for drugs?
21       MS. HEALY SMITH:  Objection.
22       THE WITNESS:  And at this time you're

Page 180

1  referring to the time that the 1994 study was
2  done?
3  BY MR. CYR:
4     Q.  That is correct.
5     A.  My recollection of 1994 was that
6  Medicaid programs were answering to legislators
7  as to why our dispensing fees were higher than
8  other commercial payors.
9     Q.  So -- but that wasn't really my
10 question.
11       The question was whether dispensing
12 fees were adequate to cover dispensing costs or
13 whether there was knowledge among Medicaid
14 providers whether dispensing fees were adequate,
15 sufficient to cover dispensing costs?
16       MS. HEALY:  Objection.
17       THE WITNESS:  My recollection is that
18 Medicaid officials realized that current
19 dispensing fees of the time were not sufficient
20 to cover the dispensing function, the cost
21 associated with the dispensing function.
22 BY MR. CYR:

Page 181

1     Q.  Was that seen as a problem by Medicaid
2  officials at the time?
3        MS. HEALY SMITH:  Objection.
4  BY MR. CYR:
5     Q.  Strike that.
6        Was that seen as a problem in terms of
7  ensuring adequate participation in the Medicaid
8  program by providers?
9        MS. HEALY SMITH:  Objection.
10       THE WITNESS:  No.
11 BY MR. CYR:
12    Q.  And was that because the -- there was a
13 margin in the ingredient portion cost of the
14 reimbursement payment?
15    A.  Yes.
16    Q.  Have you ever heard of the term cross
17 subsidization in connection with the ingredient
18 portion as a way to make up for inadequate
19 dispensing fees?
20    A.  I'm not sure that I've heard that
21 specific term but I would agree that it probably
22 applies to the situation.

46 (Pages 178 to 181)

Page 182

1  Q.  Is that the concern that's being
2  expressed in this -- those two sentences in that
3  second paragraph under the Comments section?
4       MS. HEALY SMITH:  Objection.
5  BY MR. CYR:
6  Q.  You can answer the question.
7  A.  Yes.
8  Q.  So when the state Medicaid officials
9  you're talking about, when they state that
10 efforts to lower the reimbursement for
11 acquisition of drugs, the reimbursement payment
12 for acquisition of drugs should include some
13 review of the dispensing fee, they meant that a
14 study was needed to determine if the dispensing
15 fee needed to be raised to offset a reimbursement
16 in the ingredient portion; is that correct?
17      MS. HEALY SMITH:  Objection.
18      THE WITNESS:  That is the inference
19 that I get from reading the document, yes.
20 BY MR. CYR:
21 Q.  Was that a view that you held at the
22 time?

Page 183

1  A.  Yes.
2       (Ms. Purcell leaves the
3  deposition.)
4       MR. CYR:  Dey 610.
5       (Exhibit Dey 610 was marked for
6  identification.)
7  BY MR. CYR:
8  Q.  Do you recognize this document?
9  A.  I do.
10 Q.  What is this document?
11 A.  I think this is the original finding or
12 the original selection of the pharmacy providers
13 that were going to be included in the 1996 audit,
14 so this was making sure that the State was aware
15 of who the OIG was going to contact.
16 Q.  Did you provide this list of pharmacies
17 to the OIG?
18 A.  I don't recall.
19 Q.  Did --
20 A.  I believe I provided them with a full
21 list of the pharmacy providers in the program and
22 denoted what category of the five they would fall

Page 184

1  into.
2  Q.  Okay.  Do you know if this list that's
3  included in this letter, is it from that list of
4  pharmacies that you provided to OIG?
5  A.  It looks like it, yes.
6  Q.  And the third page of this report, it
7  appears to be a form letter.
8       Do you recognize this letter?
9  A.  I have to look at it.  It's been a
10 while.
11 Q.  Take your time.
12 A.  Okay.  Reacquainted myself with it,
13 yes.
14 Q.  What is this letter?
15 A.  This is a letter that went to the
16 pharmacy providers notifying them that they were
17 selected to participate in this OIG study, and
18 that they were required to provide the requested
19 documents.
20 Q.  And what were the requested documents?
21 A.  A copy of the largest invoice and then
22 it goes into great detail defining what the

Page 185

1  largest invoice was.  Copy of the billing
2  statement for that invoice.  And the completed
3  form, whatever the form was.  I guess it's on the
4  back here.  Yes.
5  Q.  And the things you're looking for in
6  this first two bullet points, those are -- that's
7  information concerning the prices the pharmacy
8  pays for drugs; is that correct?
9  A.  Yes.
10      MR. CYR:  Mark this as Dey 611, please.
11      (Exhibit Dey 611 was marked for
12 identification.)
13 BY MR. CYR:
14 Q.  Do you recognize this document?
15 A.  I don't recognize the document but I
16 did attend the meeting in 1995.
17 Q.  That was -- that was at the Radisson
18 Hotel in Richmond, Virginia; is that correct?
19 A.  Correct.
20 Q.  Could you read the first paragraph
21 under Comments?
22 A.  We presented the results of our AWP

Page 202

1  manufacturer could have multiple labeler codes.
2     Q.  Would you read the last paragraph of
3  this letter.  You don't have to read it out loud.
4         MS. HEALY SMITH:  On page one or the
5  last paragraph of the letter?
6         MR. CYR:  The last paragraph of the
7  letter.
8         THE WITNESS:  The letter?
9         MR. CYR:  The letter, yes.  I'm sorry.
10        Oh, no, I'm sorry, the last paragraph
11 of page one.
12        Thank you, Barbara.
13        THE WITNESS:  I've reacquainted myself
14 with the paragraph.
15 BY MR. CYR:
16    Q.  The second sentence that reads, As you
17 noted, the ingredient cost -- the ingredient
18 price is only one portion of pharmacy cost.
19        Is there another -- is the other --
20 strike that.
21        In this paragraph, is Miss Nazario
22 noting the importance of other aspects of

Page 203

1  pharmacy reimbursement?
2         MS. HEALY SMITH:  Objection.
3         THE WITNESS:  She alludes that
4  ingredient cost is not the full picture.
5  BY MR. CYR:
6     Q.  And to make it a full picture as it
7  were, would you have to include professional
8  services and transaction costs?
9         MS. HEALY SMITH:  Objection.
10        THE WITNESS:  She doesn't specify
11 transaction costs or any -- she does note a
12 couple of things to consider, so I think she is
13 reflecting that there is a service component that
14 has to go along with the ingredient component.
15 BY MR. CYR:
16    Q.  And is the concern that she's
17 discussing, is that that even though the
18 ingredient component of the reimbursement might
19 be more than the provider's actual acquisition
20 costs, the dispensing fee components of the
21 reimbursement is less than the provider's
22 dispensing costs?

Page 204

1         MS. HEALY SMITH:  Objection.
2         THE WITNESS:  Yes.
3  BY MR. CYR:
4     Q.  Just turning to the last page of the
5  letter, there's a -- after Miss Nazario's
6  signature, there are three names and the last
7  name is yours; is that correct?
8     A.  That's correct.
9     Q.  Did you receive this letter?
10    A.  Probably.
11    Q.  Do you agree with the -- the statements
12 in the fourth paragraph of this letter concerning
13 AWP -- or strike that.
14        At the time this letter was written,
15 did you agree with the statements in the fourth
16 paragraph of this letter concerning AWP?
17    A.  Yes.
18        MR. CYR:  Could you mark this as Dey
19 613.
20        (Exhibit Dey 613 was marked for
21 identification.)
22 BY MR. CYR:

Page 205

1     Q.  Do you recognize this document?
2     A.  I do.
3     Q.  Is this a document that OIG sent to you
4  in 1996?
5     A.  I'm not sure if they sent it to me
6  directly or if I received it via the division but
7  I did receive a hard copy of it.
8     Q.  And did you receive it in 1996?
9     A.  Probably.
10    Q.  Okay.
11    A.  It's not recent that I had a hard copy
12 of it.
13    Q.  Okay.  And this report concerns
14 Albuterol sulfate inhalation solution; is that
15 correct?
16    A.  That's correct.
17    Q.  If you turn to the page marked Roman
18 numeral -- little Roman numeral i.
19    A.  I'm there.
20    Q.  Could you read the last paragraph that
21 starts on that page.
22    A.  The generic drug prices?

Page 206

1   Q.  Yes.  You don't have to read it out
2  loud.
3   A.  Okay.
4       Okay.
5   Q.  This paragraph states that Medicare
6  providers could purchase Albuterol at between 56
7  and 70 percent less than 43 cents per unit; is
8  that correct?
9       MS. HEALY SMITH:  Objection.
10      THE WITNESS:  That's what the report
11 says.
12 BY MR. CYR:
13  Q.  Do you know what the -- what the
14 reimbursement formula for Medicare was at this
15 time, drugs dispensed to Medicare beneficiaries?
16  A.  I do not.
17  Q.  Do you know, was AWP used as a basis to
18 calculate reimbursement by Medicare at this time?
19  A.  I can't testify to anything related to
20 Medicare.
21      MS. HEALY SMITH:  Objection.
22 BY MR. CYR:

Page 207

1   Q.  The last sentence of that paragraph
2  reads that Therefore, the average wholesale price
3  used to determine Medicare's allowance for
4  Albuterol sulfate was significantly higher than
5  the wholesale price paid by thousands of buying
6  groups member pharmacies; is that correct?
7       Did I read that correctly?
8   A.  That's what the report reads.
9       MS. HEALY SMITH:  Objection.
10 BY MR. CYR:
11  Q.  And the average wholesale price, is
12 that referring to AWP again?
13      MS. HEALY SMITH:  Objection.
14      THE WITNESS:  In the industry AWP
15 stands for average wholesale price.  What this
16 report is actually referring to since there is no
17 true and 100 percent definition of what AWP is
18 specifically defined as, I'm not sure that you
19 could say that this average wholesale price
20 refers to the acronym AWP.
21 BY MR. CYR:
22  Q.  So is it fair to say that Delaware was

Page 208

1  aware of this report in 1996?
2       MS. HEALY SMITH:  Objection.
3       THE WITNESS:  The Delaware Medicaid
4  program was.
5  BY MR. CYR:
6   Q.  Delaware Medicaid program.
7   A.  Yes.
8       More paper.
9       MR. CYR:  I've got plenty more paper.
10      This is going to be Dey 614.
11          (Exhibit Dey 614 was marked for
12 identification.)
13 BY MR. CYR:
14  Q.  Are you familiar with this report?
15  A.  I am vaguely familiar with this report.
16  Q.  Do you recall receiving this report?
17  A.  Not specifically for 2002, no.
18  Q.  Would DMAA have received a copy of this
19 report?
20  A.  Yes.
21  Q.  Could you turn to the eighth page of
22 the report.

Page 209

1   A.  The page number eight or the --
2   Q.  Page number eight, I'm sorry.
3       And once again, this is a report that
4  deals with the Albuterol sulfate inhalation
5  solution?
6   A.  It is.
7   Q.  If you look at the chart on page eight,
8  it shows the price that Medicare pays for -- the
9  unit price that Medicare pays for Albuterol on
10 the top left column?
11  A.  Yes.
12  Q.  And if you look down to supplier
13 invoices --
14  A.  Yes.
15  Q.  -- it shows a price available to
16 suppliers; is that correct?
17  A.  That's how the table is labeled.
18  Q.  So in other words, this -- strike that.
19      This report shows a significant
20 difference between what Medicare reimburses
21 providers for Albuterol sulfate and what
22 suppliers can purchase Albuterol sulfate for; is

Page 210

1  that correct?
2      MS. HEALY SMITH:  Objection.
3      THE WITNESS:  This chart reflects what
4  the author has defined as the purchase price of
5  the Department of Veterans Administration.  It
6  reflects wholesale acquisition costs which if we
7  go on the same assumption that average
8  manufacture -- average wholesale price equals
9  AWP, then wholesale acquisition cost in this
10 table might reflect what's commonly referred to
11 as WAC, and supplier invoices doesn't really
12 define what a supplier is, so I'm not sure what
13 exactly the authors are actually speaking to in
14 the table.
15 BY MR. CYR:
16     Q.  Assuming that the author is -- when the
17 author uses the word supplier it's referring to a
18 pharmacist or an entity that supplies drugs to
19 Medicare beneficiaries.  Would you agree that
20 this table represents a significant spread
21 between -- or a significant difference between
22 the price that Medicare reimburses a supplier and

Page 211

1  the price that the supplier can purchase the
2  drugs for?
3      MS. HEALY SMITH:  Objection.
4      THE WITNESS:  There's a significant
5  difference between the listing on Medicare,
6  median price per milligram, and the median price
7  per milligram based on supplier invoice.
8  BY MR. CYR:
9      Q.  Okay.
10     MR. CYR:  We're up to 615.
11         (Exhibit Dey 615 was marked for
12 identification.)
13 BY MR. CYR:
14     Q.  Do you recognize this report?
15     MS. HEALY SMITH:  Did you say this is
16 Exhibit 14 or 15?
17     MR. CYR:  15.
18     THE WITNESS:  I'm vaguely familiar with
19 this one, yes.
20 BY MR. CYR:
21     Q.  Do you remember -- do you recall
22 receiving this report?

Page 212

1      A.  Yes.
2      Q.  Do you recall receiving it in 2002?
3      A.  Yes.
4      Q.  And this report concerns ipratropium
5  bromide inhalation solution; is that correct?
6      A.  Correct.
7      Q.  Would you turn to page 11.  This is a
8  chart that's very similar to the chart we looked
9  at in the last report, and going on the same
10 assumptions we used when we looked at that chart
11 in the last report, would this chart reflect a
12 significant difference between the price Medicare
13 reimburses a provider who dispenses the
14 ipratropium bromide versus the supplier's actual
15 acquisition costs for the drug?
16     MS. HEALY SMITH:  Okay.
17     THE WITNESS:  I would use a different
18 adjective since the ratio between the difference
19 is different, I wouldn't use the same one -- same
20 adjective of significant to describe both tables,
21 but there is a major difference.
22 BY MR. CYR:

Page 213

1      Q.  What adjective would you use?
2      A.  I like major.  We'll go with major
3  difference.
4      Q.  Major, okay.
5      MR. CYR:  616.  This will be Dey 616.
6         (Exhibit Dey 616 was marked for
7  identification.)
8  BY MR. CYR:
9      Q.  Do you ever receive communications or
10 letters from drug manufacturers?
11     A.  I do.
12     Q.  Do you have a procedure that you follow
13 when you receive those letters?
14     A.  I do not have a written procedure, no.
15     Q.  Do you file -- do you have a practice
16 of filing those letters?
17     A.  Not always.
18     Q.  Is there some criteria you use to
19 determine which letters get filed and which
20 letters don't?
21     A.  I usually scan over the information
22 quickly to see if it has value or use, and if it

54 (Pages 210 to 213)