# EXHIBIT 24

Atlanta, GA

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,    ) by JERRY

Inc., v. Boehringer Ingleheim      ) DUBBERLY

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) DECEMBER 15, 2008

----------------------------------X

dd23118e-9e82-4fd1-afbb-155015bf3b99

Page 74

1  authorized with our PBM.
2      Q.  Do you know of any court orders or
3  budget conditions, just any kind of a reason
4  where the reimbursement methodology set forth in
5  the state plan was not followed?
6      A.  No.
7      Q.  In connection with the MAC program,
8  have any Medicaid providers ever complained or --
9  or otherwise objected to the particular value
10 that was chosen -- chosen for reimbursement?
11     A.  Yes, they have.
12     Q.  How often does that happen?
13     A.  Fairly infrequently.  I've only had one
14 -- well, two providers who have raised the issue
15 to me in the last almost, well, four and a half,
16 five years.  But they've -- they've raised an
17 issue, and then we -- since those MACs are
18 proprietary to our -- or the method for
19 calculating those MACs are proprietary to our
20 vendor, we refer them back to our vendor where
21 they submit actual invoices, and the vendor
22 reviews and adjusts the MAC rates if -- if

Page 75

1  necessary or appropriate.
2      Q.  Are you aware of any time when the MAC
3  amount had to actually be changed as a result of
4  a provider submitting invoice information?
5      A.  Yes.  Yes.  There was -- there was one
6  instance which actually applied to a -- a larger
7  -- it wasn't -- it wasn't specific to one drug.
8  Our PBM was applying a method -- the methodology
9  that was more aggressive than what we had
10 authorized.
11         And so we had them readjust the
12 methodology to -- to suit what we had proposed to
13 them, which was an AWP of approximately -- AWP
14 minus 65 percent range is where we had looked for
15 most of our MACs to be set, 65 to 70 percent.
16     Q.  But what was the outcome of that
17 particular situation?  The MAC was set at a
18 higher level?
19     A.  Correct.
20     Q.  And that was the only time you can
21 think of where that happened?
22     A.  Right.

Page 76

1      Q.  Is it feasible to just set
2  reimbursement for all NDCs at AWP minus 65
3  percent?
4      A.  No.  The MAC rate typically applies to
5  generics, and generics are typically based upon
6  pricing studies that some of the government
7  entities have done.  There's a wider margin
8  between the published AWP and the actual
9  acquisition cost for those drugs.
10         (Whereupon a document was
11 identified as Exhibit Georgia 014.)
12     Q.  (By Mr. Lavine)  I just marked as
13 Exhibit 14 a two-page document.  It reflects at
14 the top "Department of Health and Human Services"
15 with a date of April 12th, 1994, with a document
16 number at the lower right-hand side of HHC902-
17 0878.
18         I'll just ask you to take a look at
19 that and then tell me if you recognize that
20 document.
21     A.  I have seen it before.
22     Q.  Can you take a look at the next-to-last

Page 77

1  paragraph on page 2 starting with, We would also
2  clarify our policy that a dispensing fee
3  determination must be separate and distinct from
4  the estimated acquisition cost determination --
5      A.  Yes.
6      Q.  -- and unrelated to the cost of the
7  drug product.
8      A.  Yes.
9      Q.  Is -- is the state plan for Georgia
10 Medicaid program consistent with that statement?
11         MR. COLE:  Object to the form.
12     A.  The acquisition cost and the dispensing
13 fee are separately approved by CMS and our state
14 plan.
15     Q.  (By Mr. Lavine)  And does Georgia also
16 have a policy known as a "most favored nation"
17 regarding -- that applies to dispensing fees?
18     A.  We do.
19     Q.  Can you explain that.
20     A.  The most favored nation requirement is
21 that a pharmacy must pass along to the department
22 the lowest reimbursement methodology that it

20 (Pages 74 to 77)

Page 226

1   A.  No.  No.
2   Q.  (By Mr. Robben)  Let's step back.
3       A few minutes ago I -- I asked you if
4   Georgia Medicaid knew that -- that the -- if --
5   if -- if the margin on the -- on the ingredient
6   cost reimbursement side of the equation wasn't
7   there, would the dispensing fee need to be
8   higher.
9       I think you said yes; right?
10  A.  I did.
11  Q.  So here, where they're trying to define
12  the relevant market for the study, they're saying
13  they focused on payers paying AWP minus 10
14  percent or greater; right?
15  A.  Yes.
16  Q.  Isn't that -- aren't they focusing on
17  payers that are paying what Atlanta -- what
18  Georgia Medicaid pays or more because they're
19  trying to find payers that are expecting the same
20  margin on the ingredient reimbursement side?
21      MR. LAVINE:  Object to form.
22  A.  I think there's a disconnect in the

Page 227

1   definition of "payers."  Payers are other payers
2   other than the State.
3   Q.  (By Mr. Robben)  Right.
4   A.  And so they're under no obligation to -
5   - under federal regulations or elsewhere to
6   adjust.  So if your question is specific to
7   Medicaid, that's different than the question you
8   asked.
9   Q.  Flip to page 13.
10      MR. ROBBEN:  Oh, we need to change the
11  tape.
12      THE VIDEOGRAPHER:  This is the end of
13  tape No. 3.  Going off the record at 2:27 p.m.
14         (Deposition in recess, 2:27 p.m.
15  to 2:30 p.m.)
16      THE VIDEOGRAPHER:  This is the
17  beginning of tape No. 4 in the deposition of
18  Jerry Dubberly.  Going on the record at 2:30 p.m.
19  Q.  (By Mr. Robben)  Mr. Dubberly, before
20  we broke to change the tape, I had asked you to
21  turn to page 13 of Exhibit 18.
22      Have you found the page?

Page 228

1   A.  I have.
2   Q.  Do you see the second paragraph -- full
3   paragraph on the page?  It starts with the,
4   "Results of the."
5   A.  I do.
6   Q.  It says, "Results of the Market
7   Analysis reveal that the Georgia Medicaid program
8   currently pays a dispensing fee significantly
9   higher than the regional and national PBMs and
10  HMOs.
11      "The Market Analysis indicates that the
12  highest rates being paid by National" -- "by
13  National and Regional HMOs is $2.50 and $2.25,
14  respectively.
15      "While some pharmacy providers charged
16  the Georgia Medicaid program the lowest price
17  reimbursed to the pharmacy by other third party
18  payers (including HMOs), the average dispensing
19  fee paid" -- "paid in fiscal year 1999 of $3.25
20  indicates that not all pharmacy providers billed
21  the program according to Section 602.1 of the
22  state's Policies and Procedures for Pharmacy

Page 229

1   Services."
2       Did I read that correctly?
3   A.  You did.
4   Q.  And section 602.1 of the State's
5   policies and procedures for pharmacy services is
6   the usual and customary charge definition we
7   looked at a little while ago; correct?
8   A.  Correct.
9       MR. LAVINE:  Object to form.
10  Q.  (By Mr. Robben)  Did this survey, do
11  you know, play any part in Georgia's decision to
12  implement a specific MFN reporting requirement?
13      MR. LAVINE:  Object to form.
14  A.  I don't have firsthand knowledge of
15  that.
16  Q.  (By Mr. Robben)  Okay.  Then if you go
17  down to the final sentence of the next paragraph,
18  it says, "By increasing efforts to enforce
19  Section 602.1, the Medicaid program could
20  potentially save between nine and twenty-nine
21  million dollars."
22      Do you see that?

Page 254

1     Do you see that?
2     A. I'm sorry. Could you repeat that.
3     Q. Sure. It was not a good question.
4        Part 2 from the second page of Exhibit
5  27 appears to be reproduced --
6     A. Oh, from 27?
7     Q. Yeah. 27 was the letter to Mark Trail.
8        Do you see -- does it appear to you
9  that point 2 on the second page of 27 is
10 reproduced here with some additions?
11       MR. LAVINE: Objection to form.
12    A. So your question is on page 1 of
13 Exhibit 27 --
14    Q. (By Mr. Robben) Page 2 of Exhibit 27.
15    A. Okay.
16    Q. Sorry. The part I read from the bottom
17 of the page.
18    A. Yes.
19    Q. Okay.
20    A. I apologize.
21    Q. No problem.
22       So it -- it appears that that -- that

Page 255

1  the letter to Mark Trail -- at least that part of
2  it has been reproduced here, and some additional
3  language has been inserted; is that fair?
4        MR. LAVINE: Object to form.
5     A. That's true.
6     Q. (By Mr. Robben) Okay. And then the
7  original language from the letter to Mark Trail
8  in part was, "Why does the State believe a
9  reduction in the estimated acquisition cost was
10 not necessary"; right?
11    A. Yes.
12    Q. And then someone has inserted after
13 that in an underlined text, "Politics?"
14       And then that appears to have been
15 crossed out, and in pen in the margin is written
16 "Price based on AWP not," underlined, "WAC.
17 Result of agreement made with state legislature."
18       Do you see that?
19    A. I do.
20    Q. Do you have any understanding of what
21 that means?
22       MR. SULLIVAN: Object to the form.

Page 256

1     A. I wasn't privy to this discussion at
2  this time.
3     Q. (By Mr. Robben) Has -- it refers to an
4  agreement made with the state legislature; right?
5        MR. SULLIVAN: Object to the form.
6     A. It does state that.
7     Q. (By Mr. Robben) Has -- is -- is that a
8  common phrasing of the -- of the relationship
9  between the Georgia Medicaid program and the
10 state legislature --
11       MR. LAVINE: Object to form. Sorry.
12       MR. ROBBEN: Strike that.
13    Q. (By Mr. Robben) Is it common for
14 people who work for the Georgia Medicaid program
15 to refer to having made an agreement with the
16 state legislature?
17       MR. LAVINE: Object to form.
18    A. I can't think of an example where we
19 have made an agreement with the legislature. I
20 guess for that to be common practice, it would
21 have to be something I would be familiar with,
22 and I'm not familiar with that practice.

Page 257

1     Q. (By Mr. Robben) Is it fair to say that
2  the reimbursement rate -- strike that.
3        Is it fair to say that the
4  reimbursement formula that Georgia Medicaid
5  applies has been shaped at least in part by
6  political considerations?
7        MR. LAVINE: Object to form.
8     A. Yes.
9     Q. (By Mr. Robben) And is that because
10 providers have lobbied Georgia Medicaid and the
11 state legislature and the governor when
12 reimbursement hasn't been to their liking?
13       MR. LAVINE: Object to form.
14       MR. SULLIVAN: Object to form.
15    A. The reason is that rate changes are
16 included in the budget which is included in the
17 bill which goes through the legislative process.
18       I'm not aware of a situation where we
19 have pulled back on reimbursement changes due to
20 some agreement or other consideration made with
21 the legislature.
22    Q. (By Mr. Robben) Has it ever -- strike

65 (Pages 254 to 257)

Page 282

1  I just want to confirm.
2  MR. LAVINE:  Object to form.
3  A.  That was the answer, but we're talking
4  about two different things.
5  Q.  (By Mr. Robben)  We are talking about
6  two different things?
7  A.  Uh-huh.
8  Q.  What -- what -- what was -- putting
9  aside my prior questions, has Georgia Medicaid
10 ever made a comparison between the URA or the AMP
11 of a product and its A -- AWP?
12 A.  Not to my recollection.
13 Q.  Has it -- has Georgia Medicaid ever
14 performed a comparison between URA or AMP for a
15 drug product and its WAC?
16 A.  No.
17 Q.  Has Georgia Medicaid ever performed a
18 comparison between URA and AMP and any component
19 of the Medicaid reimbursement formula?
20 MR. LAVINE:  Object to form.
21 A.  Not that I can recall right now.
22 Q.  (By Mr. Robben)  Can you locate Exhibit

Page 283

1  16.
2  Do you remember Mr. Lavine asking you
3  some questions about this document?
4  A.  I do.
5  Q.  At the -- toward the end of the
6  document, there's an Attachment A.
7  A.  Okay.
8  Q.  And it says "Covered Pharmaceuticals,"
9  and then it lists two NDCs with product
10 descriptions.
11 Do you see that?
12 A.  I do.
13 Q.  Is the -- is this contract and the
14 provisions of this contract limited to these
15 pharmaceuticals on this Attachment A?
16 A.  It is.
17 MR. ROBBEN:  Why don't we go off the
18 record for a second.
19 THE VIDEOGRAPHER:  Going off the record
20 at 4:06 p.m.
21 (Deposition in recess, 4:06 p.m.
22 to 4:07 p.m.)

Page 284

1  THE VIDEOGRAPHER:  This is the
2  continuation of tape No. 5.  Going on the record
3  at 4:07 p.m.
4  Q.  (By Mr. Robben)  A few minutes ago I
5  asked you about -- about --
6  MR. LAVINE:  Why don't we go back off
7  the record for a second.
8  THE VIDEOGRAPHER:  Going off the record
9  at 4:07 p.m.
10 (Deposition in recess, 4:07 p.m.
11 to 4:08 p.m.)
12 THE VIDEOGRAPHER:  This is a
13 continuation of tape No. 5.  Going on the record
14 at 4:08 p.m.
15 Q.  (By Mr. Robben)  Mr. Dubberly, have you
16 ever heard of AWP referred to as "ain't what's
17 paid"?
18 A.  Yes.
19 Q.  Is that a fairly common phrase?
20 A.  Yes, it is.
21 Q.  Common in the Medicaid director
22 circles?

Page 285

1  A.  In Medicaid as well as other pharmacy
2  circles.
3  Q.  Are you a pharmacist?
4  A.  I am.
5  Q.  Is that something that you've heard
6  throughout your pharmacy career?
7  A.  Yes.
8  Q.  Is that something that's been well
9  known to Georgia Medicaid?
10 A.  Yes.
11 MR. LAVINE:  Object to form.
12 Q.  (By Mr. Robben)  For how long has that
13 been well known to Georgia Medicaid?
14 MR. LAVINE:  Object to form.
15 MR. SULLIVAN:  Object to form.
16 A.  I don't know when the department first
17 had knowledge of that as an entity, but it has
18 been common knowledge in the industry for quite
19 some time.
20 Q.  (By Mr. Robben)  Has it been common
21 knowledge at least since the 1980s?
22 MR. LAVINE:  Object to form.

72 (Pages 282 to 285)

Page 286

1    A.  Are you asking about with the
2  department or --
3    Q.  (By Mr. Robben)  Well, you said that
4  you couldn't speak specifically to the
5  department, but it's been common knowledge for
6  some time.  So I'm just trying to get a
7  quantification of -- of that, "some time."
8    A.  It's --
9       MR. LAVINE:  Object to form.
10   A.  It's been common knowledge to me since
11 the mid-'90s.
12   Q.  (By Mr. Robben)  Excuse me?
13   A.  Early to mid-'90s.
14   Q.  Have you ever heard of someone named
15 Leo Sullivan?
16   A.  Yes.
17   Q.  I understand that he was the Medicaid
18 director for Tennessee.
19       Is that your understanding?
20   A.  He was.
21   Q.  Had you personally met him at some
22 point?

Page 287

1    A.  Many times.
2    Q.  In -- in what circumstances would you
3  have come in contact with Mr. Sullivan?
4    A.  He was a client of mine in a previous
5  employment arrangement.
6    Q.  Oh, so this is in your personal life
7  you've met him.
8       MR. LAVINE:  Object to form.
9    A.  In my professional life.
10   Q.  (By Mr. Robben)  Oh, but, I mean, not
11 your -- not in your role as Georgia Medicaid
12 director.
13   A.  Correct.
14   Q.  Did you have any contact with him while
15 you've been at Georgia Medicaid?
16   A.  Yes.
17   Q.  And was that as part of your duties as
18 an employee of the Georgia Medicaid department?
19   A.  Yes.
20   Q.  Have you -- did you ever come in
21 contact with Mr. Sullivan in connection with a
22 meeting or a conference?

Page 288

1    A.  I don't recall a conference we were
2  both at.  It's probably highly likely.
3    Q.  I take it that he's a -- he's a person
4  with a significant store of knowledge as to
5  pharmacy and pharmacy reimbursement issues.
6    A.  He --
7       MR. LAVINE:  Object to form.
8    A.  He has presented that way to me.
9    Q.  (By Mr. Robben)  I'd like to read you a
10 portion of Mr. Sullivan's testimony in a
11 deposition I believe in this case.  And
12 unfortunately I don't have a copy of it to show
13 you, but I'll read it slowly, and I'll reread it
14 if you want me to.
15   A.  Okay.
16   Q.  He was asked the following questions
17 and gave the following answers:
18       Question:  During the entirety of the
19 time that you were the director of pharmacy
20 services for Tennessee Medicaid, did you believe
21 that the AWPs and the compendia were a reliable
22 source of information regarding what pharmacies

Page 289

1  or physicians actually paid for drugs?
2       Answer:  No.
3       Question:  And from your interactions
4  with other state pharmacy administrators, in your
5  view, did other state pharmacy administrators
6  believe that AWPs were a reliable source for what
7  pharmacies and physicians actually paid for
8  drugs?
9       Answer:  Again, I don't ever remember
10 such a specific discussion with -- with those
11 peers because it just wouldn't come up.  I --
12 everybody knows the sky's blue.  I mean, it's
13 that basic to me.
14       I couldn't imagine some -- one of your
15 peers in that situation sitting down and saying,
16 Hey, did you know pharmacists really aren't
17 paying AWP.
18       Question:  So just as the sky -- just
19 as everyone knows the sky is blue, you think your
20 peers knew that average wholesale prices did not
21 represent a reliable source of the prices at
22 which physicians and pharmacies actually paid for

Page 290

1  drugs.
2       Answer: That's correct.
3       MR. ROBBEN: And the site for that is
4  Leo Sullivan's testimony at page 98, line 4 to
5  99, line 9.
6     Q.  (By Mr. Robben) Did you understand the
7  testimony I just read?
8       MR. LAVINE: Object to form.
9       MR. SULLIVAN: Object to form.
10    A.  I did.
11    Q.  (By Mr. Robben) Do you agree with Mr.
12 Sullivan's characterization of AWP?
13      MR. LAVINE: Object to form.
14    A.  I do.
15    Q.  (By Mr. Robben) Do you -- do you view
16 -- strike that.
17      MR. COLE: What was the answer to the
18 last question?
19      MR. ROBBEN: Can you read it back.
20      THE COURT REPORTER: "I do."
21      MR. COLE: Thank you.
22    Q.  (By Mr. Robben) Have you ever

Page 291

1  discussed with Mr. Sullivan whether AWP
2  approximated the acquisition cost of pharmacies?
3     A.  It's likely, but I don't recall a
4  specific conversation.
5     Q.  Do you agree with Mr. Sullivan's
6  testimony that just as everyone knows the sky is
7  blue, your peers in state Medicaid programs know
8  that AWP is not a reliable source for the prices
9  that physicians and pharmacies pay for drugs?
10      MR. LAVINE: Object to form.
11      MR. SULLIVAN: Object to form and asked
12 and answered.
13    Q.  (By Mr. Robben) You can answer.
14    A.  I certainly hope so.
15    Q.  What do you mean?
16    A.  I can't imagine a person performing the
17 job without that knowledge.
18    Q.  Without the knowledge that AWP is not a
19 reliable predictor?
20    A.  Exactly.
21      MR. LAVINE: Object to form.
22    Q.  (By Mr. Robben) So is it -- is it your

Page 292

1  testimony that a -- that a person couldn't hold a
2  job as a -- as a pharmacy director or a Medicaid
3  director in the United States and perform that
4  job reliably and effectively if they didn't know
5  that AWP wasn't a reliable predictor of
6  acquisition costs?
7       MR. LAVINE: Object to form.
8     A.  I think that's a personal judgment on -
9  - on my part. I would -- I would question
10 someone who did not have that knowledge.
11    Q.  (By Mr. Robben) So you would question
12 their -- their abilities and their -- their
13 skills if they didn't know that AWP wasn't a
14 reliable predictor --
15    A.  Yeah.
16    Q.  -- of acquisition cost?
17      MR. LAVINE: Object to form.
18    A.  Yes.
19    Q.  (By Mr. Robben) A little while ago I
20 had asked you if you had knowledge of the company
21 Dey, and you said that you had some familiarity
22 with them. You had heard of them at least.

Page 293

1       Do you have any recollection of any
2  communications with any representative of Dey?
3     A.  I have contact with a lot of different
4  manufacturers. I don't recall specifically right
5  off, but I'm sure at some point, I've had contact
6  with someone from Dey.
7     Q.  Nothing stands out in your mind,
8  though?
9     A.  Not right now.
10    Q.  Did -- to the best of your knowledge,
11 did Georgia Medicaid ever issue any instruction
12 to Dey as to how it should set or report or
13 otherwise calculate AWP?
14      MR. LAVINE: Object to form.
15    A.  No.
16    Q.  (By Mr. Robben) Has Georgia Medicaid
17 ever made any communication to Dey that indicated
18 that the way Dey set AWP or reported AWP was
19 incorrect or unlawful?
20      MR. LAVINE: Object to form.
21    A.  No.
22    Q.  (By Mr. Robben) Has Georgia Medicaid

74 (Pages 290 to 293)

Page 298

1   administrative functions of the -- the pharmacy
2   and purchasing medications, et cetera, and
3   oversight of the pharmacy operations.
4        I left the employment of Erlanger
5   Medical Center in July of 1996 and began work for
6   Consul Tech in Atlanta.  Consul Tech was a -- is
7   a pharmacy benefit management organization that
8   was later purchased by Affiliated Computer
9   Services.
10       My roles with Consul Tech included
11  clinical services manager as well as director of
12  clinical services and client relations, which was
13  -- I was basically responsible for all of their
14  nationwide accounts at the time that I left
15  employment there, which was primarily Medicaid
16  agencies and state-funded pharmacy programs.
17       I left ACS in April of 2004 to work for
18  the Georgia Department of Community Health as
19  director of pharmacy services.  And as we
20  discussed this morning, I moved to a deputy
21  director role June 1st of 2008 and then Medicaid
22  director October 1st of 2008.

Page 299

1        Q.  Thank you.
2            I believe you testified a few minutes
3   ago in response to some questions from Mr. Robben
4   that you understood dating back to the early to
5   mid-'90s that AWP was not an accurate reflection
6   of what physicians or providers paid to acquire
7   drugs.
8            Do you remember that question and
9   answer?
10       A.  Yes.
11           MR. SULLIVAN:  Object to the form.
12       A.  Yes, I do.
13       Q.  (By Mr. Cole)  And would you have
14  acquired that knowledge then while you were
15  working for the Erlanger Medical Center in
16  Chattanooga as a staff pharmacist?
17           MR. SULLIVAN:  Object to form.
18       A.  Actually, as -- while I was working as
19  the director of pharmacy that they outsourced me
20  to -- while I was working for Erlanger, yes.
21       Q.  So sometime in the 1990 to '96 time
22  frame, then.

Page 300

1        A.  Correct.
2            MS. TOWNES:  I think we need to
3   remember to clarify that he was not at the
4   department during the time that you're asking him
5   what his understanding was.
6            He's testifying as a representative of
7   the department.  So I think we just need to make
8   sure that that stays on the record, that you're
9   asking him about a time prior to his current
10  position.
11           MR. COLE:  Yeah.  I think the record is
12  -- is -- it's clear about that.  But thank you
13  for -- for pointing that out.
14           Philip, if you would, could you hand
15  Mr. Dubberly the -- Abbott's cross-notice of this
16  deposition.  It should be the bulkiest document
17  in the Redweld.
18           MR. ROBBEN:  I have it.
19           MR. COLE:  Thank you.
20           THE COURT REPORTER:  Do you want that
21  marked as the next exhibit?
22           MR. COLE:  Yes, please.

Page 301

1            (Whereupon a document was
2   identified as Exhibit Georgia 031.)
3            MR. SULLIVAN:  31?
4            THE COURT REPORTER:  31.
5        Q.  (By Mr. Cole)  Mr. Dubberly, you should
6   have in front of you Exhibit 31, which is a copy
7   of the -- of a cross-notice of -- of your
8   deposition for some cases involving Abbott.  I
9   know it's a bulky document.
10           I'm only going to ask you about a
11  couple of portions of it.
12           If you would go to Exhibit 1 of the
13  document -- Exhibit 1 of Exhibit 31 -- let me
14  back up for a second.
15           Have you seen this document before
16  today, sir?
17       A.  I've seen -- yes, I've seen this
18  document.
19       Q.  And do you see the topics listed in
20  Exhibit 1 to Exhibit 31?
21           I believe it's on approximately page 8
22  of the exhibit.  It has "Topics of Inquiry" at

Page 314

1  submits a claim.
2      A.  That is correct.
3      Q.  Mr. Robben asked you some questions
4  about the interplay between the -- the
5  reimbursement of ingredient costs and the
6  reimbursement for dispensing costs.
7          Do you remember those questions, sir?
8      A.  Yes.
9      Q.  And I believe you said that -- that the
10 Georgia Medicaid program understood that -- that
11 they were providing a -- a profit margin to
12 providers in reimbursing them for the ingredient
13 costs; is that right?
14         MR. LAVINE:  Object to form.
15     A.  Yes.  I acknowledged that there was
16 profit margin in the current ingredient cost
17 formula.
18     Q.  (By Mr. Cole)  And that if -- if that
19 margin were to be eliminated, then Georgia would
20 have to pay a higher dispensing fee to providers
21 to make up for the lost margin on the ingredient
22 cost side; is that fair?

Page 315

1          MR. LAVINE:  Object to form.
2      A.  That's fair.
3      Q.  (By Mr. Cole)  And would that approach
4  apply even more in the home infusion setting
5  where you have pharmacies incurring even greater
6  dispensing costs?
7          MR. SULLIVAN:  Object to form.
8      A.  No.  That equation that we spoke about
9  was only looking at the acquisition cost of the
10 drug, not the -- the overhead.
11     Q.  (By Mr. Cole)  What do you mean by
12 that?
13     A.  When we were talking about the fact
14 that there was margin in the ingredient cost of
15 the drug, the cost by which the pharmacy
16 purchased the drug -- when you're talking --
17 you're talking about an additional cost to
18 dispense.
19         So changing the ingredient cost and
20 getting that more in line with the actual
21 acquisition cost would not necessarily mean that
22 we would adjust and make a differential for home

Page 316

1  health or for long-term care or any other
2  provider.
3          We may review that, but it -- it would
4  actually be an additional exercise.
5      Q.  Going back to the let's say mid to late
6  '90s time period when the dispensing fee paid by
7  Georgia Medicaid was roughly in the $4 to $4.63
8  range, do you believe that the dispensing fee
9  paid by Georgia Medicaid during that time frame
10 was adequate to cover pharmacies' dispensing
11 costs?
12     A.  No.
13     Q.  And in the home infusion setting -- if
14 at that level -- if -- if the $4.63 was not
15 adequate to cover a retail pharmacy's dispensing
16 costs, then I assume you would agree with me that
17 it certainly did not cover the dispensing costs
18 of a home health pharmacy or some other pharmacy
19 that administered prescriptions in the home
20 infusion setting.
21         MR. SULLIVAN:  Object to the form.
22     A.  Agreed.

Page 317

1      Q.  (By Mr. Cole)  Is it fair to say, Mr.
2  Dubberly, that in assessing whether to increase
3  the dispensing fee, it has been the policy of the
4  Georgia Medicaid program to consider the margin
5  on ingredient cost?
6          MR. LAVINE:  Object to form.
7      A.  It's been the practice.
8      Q.  (By Mr. Cole)  And there's nothing
9  wrong with that practice as -- as far as you are
10 aware; is that fair?
11         MR. LAVINE:  Object to form.
12     Q.  (By Mr. Cole)  Did you answer that
13 question?  I'm sorry.  If you did --
14     A.  No.
15     Q.  -- I couldn't hear it on the
16 speakerphone.
17     A.  No.  I was trying to -- to reassess the
18 -- the language of your question.
19         Is it possible to restate it?
20     Q.  Well, earlier you testified that -- you
21 know, that the Georgia Medicaid program obviously
22 complies with -- in the day-to-day operation of

80 (Pages 314 to 317)

Page 330

1  that the, quote, underpayment on the dispensing
2  fee is a result of overpayment on the ingredient
3  cost.
4          THE COURT REPORTER:  Mr. Cole?
5          MR. COLE:  Yes?
6          THE COURT REPORTER:  We're about to run
7  out of videotape.  We need to --
8          MR. COLE:  Yes?
9          THE COURT REPORTER:  -- take a quick
10 break.
11         MR. COLE:  That's fine.
12         THE VIDEOGRAPHER:  This is the end of
13 tape No. 5.  Going off the record at 5:10 p.m.
14         (Deposition in recess, 5:10 p.m.
15 to 5:21 p.m.)
16         THE VIDEOGRAPHER:  This is the
17 beginning of tape No. 6 in the deposition of
18 Jerry Dubberly.  Going on the record at 5:21 p.m.
19    Q.  (By Mr. Cole)  Mr. Dubberly, when we
20 left off, we were talking about the -- the margin
21 on ingredient costs and how that fit in with an
22 underpayment to providers for dispensing costs.

Page 331

1          And I believe you said -- you took
2  issue with my last question and said that it
3  worked the other way around or something like
4  that.
5          Do you remember that question?
6     A.  I do.
7     Q.  Can you explain a little more -- when
8  you say it was the "other way around," what do
9  you mean by that?
10    A.  You were stating that we overpaid on
11 the ingredient portion because we underpaid on
12 the dispensing fee, and it's actually the
13 opposite.
14         We underpay on the dispensing fee
15 because we overpay on the ingredient.  It's a
16 subtle difference, but I think it's important.
17    Q.  That practice, as you just stated it --
18 and that is, if I have it correctly, underpaying
19 on dispensing costs because you overpay on
20 ingredient costs, has that practice been in place
21 at Georgia Medicaid as far back as you can
22 recall?

Page 332

1          MR. LAVINE:  Object to form.
2     A.  Yes.
3     Q.  (By Mr. Cole)  Do you have any reason
4  to believe that practice -- let me start over.
5          When you joined the Georgia Medicaid
6  program, is it your understanding that that
7  practice existed prior to your joining Georgia
8  Medicaid?
9     A.  Yes.
10         MR. LAVINE:  Let me object to form.
11    Q.  (By Mr. Cole)  Is it your understanding
12 that that practice, like some of the other topics
13 we've talked about today, was a practice employed
14 by other state Medicaid programs?
15         MR. LAVINE:  Object to form.
16    A.  Yes.
17    Q.  (By Mr. Cole)  In other words, Georgia
18 wasn't the only state that was overcompensating
19 providers on ingredient costs at the same time
20 that they were undercompensating providers for
21 their dispensing costs; correct?
22         MR. LAVINE:  Object to form.

Page 333

1          MR. SULLIVAN:  Object to form.
2     A.  Correct.
3     Q.  (By Mr. Cole)  Would you say that --
4  that most of the states, if not all of the states
5  that you communicated with or have communicated
6  with, given your position as the Georgia State
7  Medicaid director -- that the majority of those
8  states have employed a similar practice?
9          MR. LAVINE:  Object to form.
10         And I'd request you clarify whether
11 this is a question you're asking as an official
12 opinion of the Georgia department or his personal
13 opinion you're seeking now.
14         MR. COLE:  It's not a personal opinion.
15 I'm asking -- I'm asking him as the
16 representative of the Georgia Medicaid program if
17 it's his understanding, based on the
18 communications that he has had with other states,
19 that those other states had a similar practice of
20 overcompensating providers on the ingredient cost
21 while they undercompensated providers for their
22 dispensing costs.

Atlanta, GA

Page 334

1      MR. SULLIVAN:  Object to the form.
2      A.  Yes, that is my understanding.
3      Q.  (By Mr. Cole)  Can you think of any
4   state that did not have that practice?
5      MR. LAVINE:  Object to form.
6      A.  No.
7      Q.  (By Mr. Cole)  Mr. Lavine asked you
8   some questions about whether Georgia has received
9   pricing information directly from manufacturers.
10     And I believe you testified, Mr.
11  Dubberly, that in certain instances, the Georgia
12  Medicaid program has received ASP information
13  from certain manufacturers in connection with
14  settlement agreements.
15     Do you remember that testimony?
16     A.  That's correct.  And then I was
17  refreshed with another document that reminded me
18  that we also have received other documentation as
19  well.
20     Q.  Referring to the -- the ASP information
21  that was supplied by certain manufacturers, I
22  believe you said that the program does not retain

Page 335

1   the ASP information because it's not part of the
2   state plan and that it's typically shredded; is
3   that right?
4      A.  That's correct.
5      Q.  If -- if Abbott or any of the other
6   defendants in these cases had submitted ASP
7   information to the State, would you have any
8   reason to believe that that information would
9   have been treated any differently?
10     MR. LAVINE:  Object to form.
11     A.  No.
12     Q.  (By Mr. Cole)  Do you believe it would
13  be treated in the same manner as the other ASP
14  information supplied by other manufacturers?
15     MR. LAVINE:  Object to form.
16     A.  Yes, it would be treated the same.
17     Q.  (By Mr. Cole)  Mr. Lavine asked you
18  some questions about how Georgia reimbursed for
19  compounded drugs versus admixture drugs.
20     Do you remember those questions?
21     A.  I do.
22     Q.  Could you explain that for me one more

Page 336

1   time.
2      And I apologize.  I was a little
3   confused when you gave your earlier answer, and I
4   don't believe I -- I understood what you were
5   trying to say regarding the reimbursement of
6   compounded drugs versus admixture drugs.
7      A.  Admixtures are not considered to be
8   compounded drugs, and compounded are reimbursed
9   using the sum of the average wholesale price of
10  each individual component.
11     Q.  Is that a -- a discounted average
12  wholesale price or an undiscounted average
13  wholesale price?
14     A.  It's an undiscounted.
15     Q.  And why is it that compounded drugs are
16  reimbursed in that manner?
17     A.  Compounded -- well, compounded drugs
18  are reimbursed in that manner because compounding
19  takes a pharmacist to actually mix the
20  medications, calculate the -- calculate the
21  individual components, weigh the components out,
22  often doing a process called "geometric dilution"

Page 337

1   with topical products.
2      It's much more involved than -- than
3   any of the other dispensing actions, including
4   simple admixtures.
5      Q.  Is there a dispensing fee that goes
6   along with compounded drugs?
7      A.  It's the same dispensing fee as the
8   normal reimbursement methodology we mentioned
9   before.
10     Q.  So let me see if I understand.
11     The Georgia Medicaid program for
12  compounded drugs reimburses providers at an
13  undiscounted AWP level --
14     A.  Correct.
15     Q.  -- correct?
16     A.  Correct.
17     Q.  And that would be higher than the
18  reimbursement level for noncompounded drugs;
19  correct?
20     A.  Correct.
21     Q.  And that -- that higher reimbursement
22  is actually given to the providers on the

Page 382

1  that language to you in his line of questioning.
2          Isn't it also a reasonable
3  interpretation of that language that the -- a
4  dispensing fee linked to EAC is what the -- is
5  what HCFA is disapproving?
6          MR. LAVINE:  Object to form.
7          MR. SULLIVAN:  Object to form.
8      A.  That could be, yes.
9      Q.  (By Mr. Robben)  In other words, the
10 situation that you described earlier today where
11 there's some margin on the ingredient side so
12 that affects the reimbursement of dispensing fees
13 isn't prohibited, but linking the dispensing fee
14 specifically to the cost of the product is.
15         MR. LAVINE:  Object to form.
16     A.  That could -- that could be the --
17 their intent in denying this.
18     Q.  (By Mr. Robben)  Regardless of how that
19 -- regardless of what these regulations meant or
20 what HCFA's interpretation of them was, any time
21 Georgia set its dispensing fee and set its
22 ingredient cost reimbursement, it submitted that

Page 383

1  state plan to HCFA for approval, didn't it?
2      A.  That's correct.
3      Q.  And if HCFA had questions about the
4  state plan, Georgia did the best it could to
5  answer all those questions; correct?
6      A.  Correct.
7      Q.  At the end of the day, HCFA approved a
8  state plan for Georgia; correct?
9      A.  That is correct.
10         MR. ROBBEN:  That's all the questions I
11 have.
12         MR. COLE:  Philip, could you do me a
13 favor and pull the -- the document that is --
14 it's a two-page memo from HHS regarding the
15 Arkansas state plan amendment transmittal No.
16 8924.
17         MR. ROBBEN:  Sure.  This is in your
18 exhibits?
19         MR. COLE:  Yeah.  It's from August
20 1989.
21
22              REEXAMINATION

Page 384

1  BY MR. COLE:
2      Q.  While he's looking for it, Mr.
3  Dubberly, Mr. Lavine asked you at one point if --
4  if this practice of overcompensating on the -- on
5  the ingredient cost and undercompensating on the
6  dispensing fee was -- was a secret practice, and
7  I believe you said (interruption); is that true?
8          THE COURT REPORTER:  I'm sorry.  You
9  cut out there.
10     Q.  (By Mr. Cole)  Mr. Lavine asked you
11 whether this practice of overcompensating on the
12 ingredient cost and undercompensating on the
13 dispensing cost was a secret practice, and you
14 said, "No, not at all"; correct?
15     A.  Correct.
16     Q.  Georgia never did anything to conceal
17 or hide this practice from CMS or HCFA; isn't
18 that true?
19         MR. LAVINE:  Object to form.
20     A.  That is correct.
21     Q.  (By Mr. Cole)  And it was -- you told
22 me that it was a -- a -- it was common among all

Page 385

1  of the states, at least the states that you
2  interacted with, that they also followed a
3  similar practice; correct?
4          MR. LAVINE:  Object to form.
5      A.  That is correct.
6      Q.  (By Mr. Cole)  And are you aware of any
7  discussions among the state Medicaid programs to
8  somehow conceal this practice from the federal
9  Medicaid administrators at HCFA or CMS?
10         MR. LAVINE:  Object to form.
11     A.  No, I'm not.
12     Q.  (By Mr. Cole)  And given your
13 experience in dealing with CMS and/or HCFA, do
14 you think that CMS or HCFA was aware of this
15 practice employed by not only Georgia but all of
16 the other states that you dealt with?
17         MR. LAVINE:  Object to form.
18     A.  It calls for me to identify what they
19 knew.  I would think that they would know, but I
20 don't have proof that they -- that was a --
21 something they were aware of.
22     Q.  (By Mr. Cole)  Let me put it this way:

Page 386

1  Would it surprise you for HCFA or CMS to say that
2  it had no idea that states, including Georgia,
3  were following this practice throughout the mid
4  to late '90s?
5        MR. LAVINE:  Object to form.
6    A.  I would be highly surprised by that
7  statement.
8        MR. COLE:  Do you have the document,
9  Philip?
10       MR. ROBBEN:  We have it.  It's being
11 marked.
12       (Whereupon a document was
13 identified as Exhibit Georgia 036.)
14   Q.  (By Mr. Cole) Mr. Dubberly, I'm about
15 to show you a -- or the court reporter is about
16 to hand you a memo dated August -- August of
17 1989.  It's from HCFA to the associate regional
18 administrator of Region VI regarding the Arkansas
19 state plan amendment.
20       I -- well, let me just ask you:  Have
21 you ever seen this document before?
22   A.  No, I have not.

Page 387

1    Q.  Have you ever seen the document that
2  Mr. Lavine had shown you, the August 12th, 1994
3  memo from HCFA to the regional administrators?
4        I'm sorry.  I don't have the exhibit
5  number handy, but it was the one that -- it was
6  Sally Richardson.
7        MR. COLE:  Do you remember the number,
8  Mark?
9        MR. LAVINE:  No.  Sorry.  I'm busy
10 trying to organize documents and --
11       MR. ROBBEN:  It was 14.
12       MR. COLE:  Thank you, Philip.
13   Q.  (By Mr. Cole) Had you seen Exhibit 14
14 before today's deposition?
15   A.  No, I had not.
16   Q.  Going back, sir, to the exhibit that
17 we've just marked -- and I'm sorry.  What -- what
18 number was that?
19       MS. TOWNES:  36.
20   Q.  (By Mr. Cole) 36.
21       If you look at the fourth paragraph,
22 sir, that -- that begins, "The dispensing fee

Page 388

1  also raises" -- do you see that paragraph?
2    A.  I do.
3    Q.  It reads, "The dispensing fee also
4  raises a number of issues and questions.  It
5  would appear that the proposed dispensing fee is
6  $4.39 plus .095 percent of the EAC.
7        "As we have explained previously, the
8  reasonable dispensing fee determination must be
9  separate and distinct from the EAC determination
10 and unrelated to the price of the drug."
11       Do you see that?
12   A.  I do.
13   Q.  Did I read that accurately?
14   A.  You did.
15   Q.  And that language from Exhibit 36
16 tracks the language in Exhibit 14 that Mr. Lavine
17 read to you, does it not?
18       MR. LAVINE:  Object to form.
19   A.  Let me look at 14.
20   Q.  (By Mr. Cole) If you go to Exhibit 14,
21 sir, the -- the second-to-last paragraph, I
22 believe Mr. Lavine read to you where it says, "We

Page 389

1  would also clarify our policy that a dispensing
2  fee determination must be separate and distinct
3  from the EAC determination and unrelated to the
4  cost of that" -- "of the drug product."
5        Those same words appear in Exhibit 36
6  in the fourth paragraph; isn't that right?
7    A.  Yes.  They're consistent.
8    Q.  And based on the context in which that
9  statement was made in Exhibit 36, would you agree
10 with me that this notion of separate and distinct
11 that HCFA is discussing here relates to whether
12 states should be basing the dispensing fee as a
13 percentage of the EAC?
14       MR. LAVINE:  Object to form.
15   A.  Can you rephrase the question.
16   Q.  (By Mr. Cole) Yes.
17       And I know I'm going fast, but I'm --
18 I'm just trying to get you out of here as soon as
19 possible.
20       My question is that:  Looking at the
21 context in which that statement is made in
22 Exhibit 36, would you agree with me that this

98 (Pages 386 to 389)