# EXHIBIT 25

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL

INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

                      MDL NO. 1456

                      NO. 01-CV-12257-PBS

                      JUDGE PATTI SARIS

                      MAG. MARIANNE BOWLER

THIS DOCUMENT RELATES

TO U.S. EX REL.

VEN-A-CARE OF THE FLORIDA

KEYS, INC. V. ABBOTT

LABORATORIES, INC., ET AL.,

NO. 06-CV-11337-PBS

VIDEOTAPED DEPOSITION OF MARY

JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

STREET, BATON ROUGE, LOUISIANA 70806, ON THE

31ST DAY OF MARCH, 2008.

Page 74

1  suspect it was because of budgetary issues.
2      Q.  Apart from the Southern Association and
3  the National Association of State Medicaid Pharmacy
4  Administrators, have you attended any other
5  meetings with your colleagues from other states
6  relating to pharmacy reimbursement?
7      A.  Occasionally I will attend a rebate
8  conference.
9      Q.  Do you recall anything else?
10     A.  I attended a 340B conference.
11     Q.  Anything else?
12     A.  Not that I recall.
13     Q.  I understand there is an association
14 called the National Association of State Medicaid
15 Distributors, and they have meetings as well.  Have
16 you ever attended any of those meetings?
17     A.  I have not.
18     Q.  Have you attended meetings with HCFA
19 officials, whether it be in person or over the
20 phone?
21     A.  Yes.
22     Q.  What can you tell me about those

Page 75

1  meetings?  Who is there, how many?
2      A.  Well, we talk to CMS over the phone.
3      Q.  How often do you talk to CMS over the
4  phone?
5      A.  I would say whenever.  I mean, no
6  frequency to that.  We have state plans, we have
7  questions, we talk to them on the phone.
8      Q.  Apart from getting state plan amendments
9  approved, have you had other conversations with
10 CMS?
11     A.  Probably so, yes.
12     Q.  I assume they have attended the rebate
13 conferences that you have attended?
14     A.  Occasionally there will be a CMS
15 representative at the conferences.
16     Q.  Do you recall any other types of meetings
17 with CMS outside of getting the state plan
18 amendments approved?
19     A.  We call them if we have any questions,
20 you know, if we have any co-payment questions or
21 Federal Upper Limit questions in the normal, I
22 guess, day-to-day business operations.

Page 76

1      Q.  Who do you call for Federal Upper Limit
2  questions, or who have you called?
3      A.  My staff normally does that.
4      Q.  Do you know who it is at CMS that they
5  call?
6      A.  I think it is Sue Gaston.  We may call
7  about rebate questions too.
8      Q.  Who would you call about those?
9      A.  I don't know.  I have to -- you would
10 have to ask my staff.
11     Q.  Have you had any discussions with Larry
12 Reed?
13     A.  I have spoken to Larry before, yes.
14     Q.  And in connection with what?
15     A.  Probably a state plan amendment.
16     Q.  Do you recall when those were? Recent or
17 going back in time?
18     A.  Well, he has been there a long time, so I
19 have probably had discussions with him over time.
20     Q.  What about Deirdra Duzor?
21     A.  I have had discussions with her as well.
22     Q.  How about a person named Kim Howell?

Page 77

1      A.  Kim, I have spoken to a couple of times.
2  I think Louisiana's contact for the state plan is
3  Bernadette Leeds.
4      Q.  And there are some individuals you speak
5  with at the regional office as well?
6      A.  Yes.
7      Q.  Do you recall their names?
8      A.  Our Louisiana representative is Sheryl
9  Ruffley.
10     Q.  As you know, Ms. Terrebonne, this case
11 concerns allegations relating to the subject of
12 something called average wholesale price, or AWP.
13 Right?  Are you familiar with the term average
14 wholesale price or AWP?
15     A.  Yes.
16     Q.  What does the term mean to you?
17     MR. FAUCI:  Objection, form.
18     THE WITNESS:  It is a benchmark that we use
19 for our pricing reimbursement.
20 BY MR. TORBORG
21     Q.  Where does one go to find something
22 called average wholesale price?

Page 114

1    Q.  And this is a 1999 report prepared by
2  Myers and Stauffer?
3    A.  Yes.
4    Q.  It notes at Bates page 165 appreciation
5  to you and others for your assistance in
6  determining the findings in the report.  Is that
7  correct?
8    A.  Yes.
9    Q.  And if we look at page 4, under
10  "Executive Summary," last paragraph indicates "Drug
11  acquisition cost comparisons were compiled and
12  analyzed for the top 600 drug products.  The actual
13  acquisition cost data shown on invoices obtained
14  from 43 Louisiana pharmacy providers was compared
15  to the standardized AWP."
16    Do you see that?
17    A.  Yes.
18    Q.  So, in this report, is Myers and Stauffer
19  using the term actual acquisition cost as one it is
20  comparing AWP to?
21    A.  That is what it says, yes.
22    Q.  When did you first learn that this AWPs

Page 115

1  reported in the compendia did not represent actual
2  acquisition cost?
3    MR. FAUCI:  Objection, form.
4    THE WITNESS:  I don't know when.
5  BY MR. TORBORG
6    Q.  As far as you can remember, the AWPs in
7  the compendia were inflated about actual
8  acquisition cost, correct?
9    MR. FAUCI:  Object to the form.
10    THE WITNESS:  Yes.
11  BY MR. TORBORG
12    Q.  And that was particularly true for
13  generic drugs, right?
14    MR. FAUCI:  Objection, form.
15    THE WITNESS:  I don't know if that is correct
16  or not.  I mean, I don't know the answer to that.
17  BY MR. TORBORG
18    Q.  Do you recall becoming aware that the
19  AWPs in the compendia were a particularly
20  unreliable source for actual acquisition cost?
21    MR. FAUCI:  Objection, form.
22    THE WITNESS:  I guess based upon looking at

Page 116

1  OIG reports and that type of thing, that would be
2  my awareness.
3  BY MR. TORBORG
4    Q.  And did you have an understanding of why
5  it was that the AWPs reported in the compendia for
6  generic drugs were a particularly unreliable source
7  for actual acquisition cost?
8    MR. FAUCI:  Objection, form.
9    THE WITNESS:  I don't know.
10  BY MR. TORBORG
11    Q.  Do you have an understanding of how it is
12  that First DataBank sets the average wholesale
13  price that they report?
14    A.  Do I have an understanding?
15    Q.  Yes.
16    A.  No.
17    Q.  In your position as a pharmacy consultant
18  and later pharmacy director for the state of
19  Louisiana, what were your expectations regarding
20  whether or not the AWPs reported in the compendia
21  represented actual acquisition costs for generic
22  drugs?

Page 117

1    A.  What were my expectations of --
2    Q.  Yes.  Stated another way, did you expect
3  that the AWPs reported in the compendia for generic
4  drugs would actually represent the actual
5  acquisition cost of pharmacies net of discounts,
6  rebates and charge-backs?
7    MR. FAUCI:  Is there a time frame on the
8  question?
9  BY MR. TORBORG
10    Q.  From 1991 through 2001.
11    A.  Did I expect it?  No.
12    Q.  Why not?
13    A.  Because I think both of those have two
14  different definitions.  AWP has a different
15  definition than actual acquisition cost, and we
16  were getting AWPs from First DataBank, not actual
17  acquisition cost.
18    Q.  Your understanding of the definition of
19  AWP is it is something that does not include the
20  impact of rebates, discounts and charge-backs,
21  correct?
22    A.  Correct.  It would be the average from

Page 118

1  the wholesalers, as I understand it. They were
2  supposed to do surveys from wholesalers and
3  determine an average.  But how they did that, I
4  don't know.
5      Q.  But you didn't think that the prices
6  reported in the compendia were the actual average,
7  net of all rebates, charge-backs and discounts,
8  that pharmacies were actually paying from 1991
9  until 2001, did you?
10     A.  That's correct, I did not.
11     Q.  And were there any classes of drugs in
12  particular for which you knew AWPs were not a
13  reliable indicator of actual acquisition costs?
14     MR. FAUCI:  Objection.
15     THE WITNESS:  No.
16 BY MR. TORBORG
17     Q.  But you became aware of, through your
18  review of reports like Myers and Stauffer's and the
19  OIG, that generic drugs, there was a larger
20  variability between AWP and actual acquisition
21  costs for generic drugs?
22     A.  I don't recall that.  It may be in here,

Page 119

1  I just don't remember.
2      Q.  What you -- your testimony here today is
3  that your knowledge is probably best reflected --
4  what you knew when is best reflected in the reports
5  that were put in front of you?
6      MR. FAUCI:  Objection.
7      THE WITNESS:  Yes, we sought out to get the
8  expertise to conduct these surveys.
9  BY MR. TORBORG
10     Q.  Did you have any expectations of
11  manufacturers regarding what the AWPs in the
12  compendia would represent?
13     A.  No.
14     Q.  Have you had any discussions with either
15  First DataBank or Red Book regarding what AWP
16  prices reported in those publications represented?
17     A.  I'm sorry.  In this report?
18     Q.  Strike that.  Let me ask an easier
19  question.
20         Have you ever spoken with anyone from
21  First DataBank?
22     A.  Minimally.

Page 120

1      Q.  What were your discussions about?
2      A.  I don't recall, but our staff doesn't
3  speak to First DataBank directly because our fiscal
4  intermediary has a contract with First DataBank. So
5  they discussed issues with First DataBank.
6      Q.  Do you recall any discussions with First
7  DataBank concerning what they were doing to come up
8  with the average wholesale price in the compendia?
9      A.  No.
10     Q.  Was it your practice, Ms. Terrebonne, to
11  review reports that were published by the Office of
12  Inspector General concerning Medicaid pharmacy
13  issues?
14     A.  I occasionally look at them, yes.
15     Q.  How would those come to your attention?
16     A.  I think sometimes maybe they were sent to
17  the Medicaid director and he would forward them to
18  me.  Or if there were any kind of issues coming up,
19  I may have gone to the site.
20     Q.  The OIG Web site?
21     A.  Yes.
22     Q.  What is the last OIG report you looked

Page 121

1  at?
2      A.  I don't know.
3      Q.  Was it in the last year?
4      A.  It is possible I looked at one in the
5  last year.
6      Q.  Do you recall receiving OIG reports that
7  compared, much like the Myers and Stauffer report
8  here, AWP with some actual acquisition cost?
9      A.  I'm sure I looked at it.  I don't
10 remember.
11     Q.  Did Louisiana have any reason to doubt
12  the -- let me strike that.
13         Did you have any reason to doubt the
14  accuracy of the findings in any OIG report?
15     A.  No.
16     Q.  Did the department receive reports,
17  studies or audits conducted by other states on drug
18  pricing or dispensing fees?
19     A.  Yes.
20     Q.  Which ones did you receive, just
21  generally speaking, what do you recall?
22     A.  Probably, if Myers and Stauffer did one

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 126

1  manufacturers.  (See appendices H9.)  DVA achieves
2  an average discount of 41 percent off the
3  manufacturer's published 'average end sale price'
4  for single source drugs (those still under patent)
5  and an average of 67 percent off of published AWP
6  for multiple source drugs."
7      Do you see that?
8      A.  Yes.
9      Q.  Do you recall becoming aware that the
10  Department of Veterans Affairs was achieving better
11  pricing than state Medicaid programs?
12     A.  We became aware of that when the
13  inception of the rebate program came into effect.
14     Q.  Tell me what you remember about that.
15     A.  I think we probably had heard in
16  discussion, perhaps at a rebate conference, that
17  their pricing structure and acquisition to drugs
18  were different.
19     Q.  What would that have to do with a rebate
20  conference?
21     A.  I don't know.  I'm just kind of, like,
22  brainstorming when I may have heard that because

Page 127

1  there were so many things going on when rebates
2  came into place with 3040B and the VA pricing.
3      Q.  Has your brainstorm got any additional
4  information?
5      A.  No.  Maybe there is a drug for it, but
6  not today.
7      Q.  The rebate program calls for
8  manufacturers to report something called average
9  manufacture price.  Correct?
10     A.  Yes.
11     Q.  And do you have an understanding of how
12  that is defined?
13     A.  Only if I see it in writing.  I could not
14  recite it.
15     Q.  But it is something that you understand
16  is defined by federal statute, correct?
17     A.  Yes.
18     Q.  And tells manufacturers that they must
19  report AMP in accordance with this definition,
20  correct?
21     A.  Yes.
22     Q.  Are you aware of any statute in Louisiana

Page 128

1  that informs manufacturers or regulates how
2  manufacturers should report average wholesale
3  prices?
4      A.  Not to my knowledge.
5      Q.  Are you aware of any federal institute
6  that regulates or defines average wholesale prices?
7      A.  Any federal institute?  Not to my
8  knowledge.
9      Q.  Has Louisiana received AMP information
10  from the federal government at any point in time?
11     A.  Yes.
12     Q.  When did that start?
13     A.  It started sometime last year, as I
14  recall.
15     Q.  Was it something that was dictated by
16  Congress under the Deficit Reduction Act, is that
17  your understanding?
18     A.  I'm like, brainwaves -- the average
19  manufacture price was going to be submitted to the
20  states, I believe it is per the DRA, in accordance
21  with the Federal Upper Limits change in definition.
22     Q.  But you were also provided the

Page 129

1  information, the state of Louisiana was also
2  provided the AMP data starting sometime roughly in
3  2006.  Is that consistent with your recollection?
4      A.  It is terrible when the years start
5  blending, but I want to say it was last year.
6      Q.  Do you recall being interviewed by or
7  contacted by someone from the Office of Inspector
8  General to determine whether or not the state of
9  Louisiana would use the AMP information as its
10  basis for reimbursement of ingredient cost?
11     A.  I do not recall that.
12     Q.  Has the department given any
13  consideration to changing the ingredient
14  reimbursement basis from AWP minus something to
15  AMP, some AMP-based measure?
16     A.  No.
17     Q.  Do you know why that hasn't happened at
18  all since you got the AMP information?
19     MR. FAUCI:  Objection, form.
20     THE WITNESS:  It has not been discussed.
21  BY MR. TORBORG:
22     Q.  What would happen, Ms. Terrebonne, if

Page 130

1  Louisiana attempted last year to use the AMP basis
2  as its basis for AWP reimbursement?
3      MR. FAUCI:  Objection, form.
4      THE WITNESS:  What would happen?  A lot would
5  have to happen.  We would have to do rule making, a
6  state plan amendment, get with the providers,
7  probably a lawsuit.
8  BY MR. TORBORG
9      Q.  Why do you say lawsuit?
10     A.  Because I'm sure the providers would want
11  to know why we are changing our reimbursement.
12     Q.  Would it be fair to say, Ms. Terrebonne,
13  that changing or basing reimbursement on AMP would
14  be a politically challenging thing to do in the
15  State of Louisiana?
16     MR. FAUCI:  Objection, form.
17     THE WITNESS:  It would be, yes.
18  BY MR. TORBORG
19     Q.  And?
20     A.  Just anytime you change reimbursement,
21  that is why you do surveys, so we have
22  documentation to support any changes in the

Page 131

1  reimbursement.
2      Q.  And you know from your experience with
3  the potential for using AMP in the full program,
4  separate and apart from using it as a basis for
5  reimbursement for other drugs, that providers in
6  Louisiana have had a lot to say about that.  Fair
7  to say?
8      A.  Yes.
9      Q.  It has been a very politically divisive
10  issue, correct?
11     A.  Yes.
12     Q.  And you expect the same type of reaction
13  if AMP were used as the basis for reimbursement as
14  well?
15     A.  Yes.
16     Q.  Do you believe that anyone in their right
17  mind can assume that if the state had AMP
18  information and could use it from the period 1991
19  through 2001, that it actually would have been
20  used?
21     MR. FAUCI:  Objection, form.
22     THE WITNESS:  I'm sorry, could you repeat it?

Page 132

1  BY MR. TORBORG
2      Q.  If the AMP information had been available
3  to the state for the period 1991 through 2001, and
4  they could have used it as its basis for
5  reimbursement.  You follow me so far?
6      A.  Yes.
7      Q.  Do you believe it would be a fair
8  assumption to assume that reimbursement would have
9  been based on AMP?
10     MR. FAUCI:  Objection, form.
11     THE WITNESS:  That is a difficult question.  I
12  think had it been based with appropriate percentage
13  plus, percentage minus with the right survey, you
14  know, saying that it was reasonable, perhaps it
15  could have been used.
16  BY MR. TORBORG
17     Q.  Would you say, based on your experience
18  with AWP and what you know about AMP versus AWP,
19  would it be fair to say you would expect a
20  percentage add-on to AMP to be necessary to go to
21  that basis of reimbursement?
22     A.  I don't know.  I wouldn't answer that

Page 133

1  until I had the appropriate information before me.
2      Q.  What information would you need?
3      A.  I would need some justification to know
4  that the prices were accurate.
5      Q.  And would you assume that AMP, if the
6  state tried to go to an AMP reimbursement
7  methodology during the period 1991 through 2001,
8  that there would be provider complaints?
9      A.  I would assume so, yes.
10     Q.  And those provider complaints may have
11  prohibited or inhibited the state of Louisiana's
12  ability to go to an AMP-based reimbursement
13  methodology, correct?
14     MR. FAUCI:  Objection.
15     THE WITNESS:  I think if the data was correct
16  and there were appropriate surveys, perhaps it
17  would have been a structure that could have been
18  used, a benchmark that could have been used.
19  BY MR. TORBORG
20     Q.  Do you recall a time back in early 1989
21  when the department attempted to enact an emergency
22  rule to lower reimbursement from AWP minus 10.5

Page 134

1  percent to AWP minus 15 percent?
2      A.  Yes.
3      Q.  And what happened?
4      A.  Lots of things happened.
5      Q.  Tell me about what happened.
6      A.  I don't know that I can remember
7  everything that happened, but there was an
8  emergency rule to lower the ingredient cost, and
9  there were a lot of complaints and I can't tell you
10 the chronology of events, but Myers and Stauffer
11 conducted a survey, and they determined a
12 reasonable discount off of AWP, and the department
13 did rule making and a state plan amendment and
14 changed the reimbursement formula at that time.
15     Q.  To AMP minus 15 percent.  Is that
16 consistent with your recollection?
17     A.  Well, it was 13 and a half and 15 for
18 chains.  The chains have more than 15.
19     (Exhibit Abbott 1052 was marked.)
20     MR. TORBORG:  For the record, what I have
21 marked as Abbott Exhibit 1052 bears the Bates Nos.
22 JD-SUB-LA-000218 through 34.  It appears to be a

Page 135

1  memorandum from Myers and Stauffer to M. J.
2  Terrebonne dated March 23, 1999, subject,
3  preliminary acquisition cost study findings.
4  BY MR. TORBORG
5      Q.  Do you see that, Ms. Terrebonne?
6      A.  Yes.
7      Q.  Are you familiar with that document?
8      A.  Yes.
9      Q.  It says in the first paragraph, "At your
10 request, we have summarized preliminary findings
11 from the Pharmacy Acquisition Cost Study for the
12 Department of Health and Hospitals.  The
13 information presented is based on our initial
14 analysis and is part of a more comprehensive review
15 still in progress.  The scope of this review is
16 limited to brand name drugs that do not have a
17 Federal Upper Limit or Louisiana Maximum
18 Acquisition Cost."
19         Do you see that?
20     A.  Yes.
21     Q.  Do you recall requesting preliminary
22 findings from Myers and Stauffer?

Page 136

1      A.  I must have.  They are here.
2      Q.  You don't recall anything about that as
3  you sit here today?
4      A.  That was a busy time.  I think our
5  secretary was very involved in this, and he must
6  have wanted a preliminary report.
7      Q.  If you go to the second page of the
8  document under "Preliminary Findings," first
9  bullet, it notes that for brand name drugs, the
10 average acquisition cost was 83 percent of AWP.  Is
11 that right?
12     A.  Yes.
13     Q.  In other words, Myers and Stauffer found
14 that the discount for AWP brand name drugs in the
15 sample was 17 percent, correct?
16     A.  Yes.
17     (Exhibit Abbott 1053 was marked.)
18     MR. TORBORG:  For the record, what I have
19 marked as Abbott Exhibit 1053 bears the Bates No.
20 JD-SUB-LA-000235 through 49.  It appears to be a
21 collection of associated documents that were
22 produced to us in this order.  The first page is

Page 137

1  titled "LMMIS Design Change Request Form" dated
2  3-25-99.  The originator is listed as yourself.
3  BY MR. TORBORG
4      Q.  Right, Ms. Terrebonne?
5      A.  Correct.
6      Q.  Do you recall these documents?
7      A.  I do.
8      Q.  Does the first page appear to be a
9  request that you sent to someone to lower
10 reimbursement from AWP minus 10.5 percent, or
11 actually to lower reimbursement to AWP minus 15
12 percent?
13     A.  Yes.
14     Q.  The date 3-25-99 is two days after you
15 received the preliminary acquisition cost study
16 from Myers and Stauffer that we marked as Exhibit
17 1052.  Correct?
18     A.  Yes.
19     Q.  Do you recall why it was --
20     A.  Actually, it is the same day.  March 23
21 and March 23.  Yeah, it was written on March 23.
22     Q.  How do you know that?

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 138

1    A.  Because I wrote the date up here.
2    Q.  I see.  So, it is the same day?
3    A.  Right.
4    Q.  The same day as you received the findings
5  from Myers and Stauffer, finding AWP minus 17
6  percent for brand name drugs, you sought to change
7  the reimbursement to AWP minus 15 percent.  Is that
8  right?
9    A.  I'm sure I was directed to, yes.
10   Q.  Do you recall who directed you to do
11 that?
12   A.  I do not.
13   Q.  And is this -- who is this form going to?
14   A.  This form goes to our fiscal intermediary
15 to do the program changes.
16   Q.  And if we go to the page ending 237, this
17 is dated 4-7-99, correct?
18   A.  Correct.
19   Q.  "Project Title:  AWP minus 10.5 percent."
20 Do you see that?
21   A.  Yes.
22   Q.  And at the top it says, "Emergency Rule

Page 139

1  Reversal."  Do you see that?
2    A.  Yes.
3    Q.  Do you recall that the attempt to go to
4  AWP minus 15 percent after the preliminary Myers
5  and Stauffer findings came out was reversed?
6    A.  I see it here.
7    Q.  Do you recall why it was reversed?
8    A.  I do not.
9    Q.  Do you recall the reason for the
10 emergency rule was to meet a budgetary requirement?
11   A.  I would have presumed that at the time,
12 yes.
13   Q.  If we go to Bates page ending 245, toward
14 the back of the document, the title of the document
15 as produced by, I guess, you, titled "Louisiana
16 Pharmacy Association, Legislative Alert, Medicaid
17 emergency rule overturned."
18      Do you see that?
19   A.  Yes.
20   Q.  Are you familiar with this document?
21   A.  I'm sure I have seen it, I don't remember
22 it.

Page 140

1    Q.  And it says there, in the first
2  paragraph, "Members of the House Health and Welfare
3  Committee overwhelmingly to overturn an
4  emergency rule issued by David Hood, secretary of
5  the Louisiana Department of Health and Hospitals,
6  which amended the reimbursement methodology to
7  limit payments for prescription drugs from AWP
8  minus 10.5 percent to AWP minus 15 percent."
9      Do you see that?
10   A.  Yes.
11   Q.  Do you recall that being the case?
12   A.  Yes.  There was a lot of activity in
13 1999.
14   Q.  And this activity that you refer to in
15 1999 was a result of simply attempting to reduce
16 reimbursement for brand name drugs from 10.5
17 percent to 15 percent, correct?
18   A.  As it is written here, yes.
19   Q.  Do you have a general idea, Ms.
20 Terrebonne, of what the difference between AWPs and
21 AMPs are?
22   A.  I do not.

Page 141

1    Q.  Do you believe it is more than 4.5
2  percent for brand name drugs?
3    A.  I don't know.
4    Q.  If it was larger than 4 percent, could
5  one presume that any attempt to use AWP information
6  in the reimbursement methodology would have
7  engendered the same type of activity that you saw
8  in 1999 when you attempted to go to AWP minus 15
9  percent?
10   MR. FAUCI:  Objection, form.
11   THE WITNESS:  Had they used AMP rather than
12 AWP?
13 BY MR. TORBORG:
14   Q.  Yes.
15   A.  Perhaps so, yes.
16   Q.  Why would you say that?
17   A.  Because it is always very much a provider
18 issue when there is any change in reimbursement.
19 Providers are very concerned.
20   Q.  Would it be fair to say, Ms. Terrebonne,
21 that one should not assume that the availability of
22 AMP information for the period 1991 through 2001,

36  (Pages 138 to 141)

Page 182

1    A.  That is what it appears to be.
2    Q.  Do you recall taking any action with
3  respect to information you received from
4  Ven-A-Care?
5    A.  I do not.
6    Q.  Is it possible that you did, you just
7  don't recall today?
8    A.  I would say we took action based on the
9  Myers and Stauffer survey.
10    Q.  If you had wanted to, you could have put
11  a maximum allowable cost on all the individual
12  drugs that are listed in the chart on 756 and 57,
13  correct?
14    MR. FAUCI:  Objection, form.
15    THE WITNESS:  I don't know.  Some of these
16  drugs are reimbursed through our physicians'
17  program, so we would not -- if they are
18  administered in the physicians' program, they are
19  generally reimbursed in the physician's program.
20  BY MR. TORBORG
21    Q.  Well, here, this document seems to be
22  indicating it is an example of the Louisiana

Page 183

1  Medicaid Pharmacy Program?
2    A.  Yes.
3    Q.  Do you know if the Louisiana Medicaid
4  Pharmacy Program provided a reimbursement for
5  vancomycin?
6    A.  I don't know without looking at the data.
7    THE VIDEOGRAPHER:  Off the record.  It is
8  2:22, the end of tape 2.
9    (Recess.)
10    THE VIDEOGRAPHER:  We're back on record, it is
11  2:36, the beginning of tape 3.
12  BY MR. TORBORG
13    Q.  Ms. Terrebonne, if I could ask you to
14  glance quickly at Abbott Exhibit 158, Bates page
15  ending 449.  This is the 1997 OIG report where they
16  combined their findings from the state surveys on
17  the difference between generic AWP and acquisition
18  cost for generic drugs.
19    At the last paragraph of this page, on
20  this report that you recalled, is reference to an
21  article dated June 10, from Behrens entitled
22  "Hooked on Drugs."

Page 184

1    Do you see that?
2    A.  Yes.
3    Q.  It notes that "Behrens compared about 300
4  dose forms of the top 20 Medicare drugs.  Included
5  in the true cost was ten to 20 percent AWP for
6  brand name drugs and 60 to 80 percent below AWP for
7  generic drugs." You see that?
8    A.  Yes.
9    Q.  Behrens also recorded the industry
10  insiders joke that "AWP really means 'ain't what's
11  paid.'"
12    Do you see that?
13    A.  Yes.
14    Q.  Have you heard that?
15    A.  Yes.
16    Q.  You have heard that joke regarding AWP
17  before.  Have you heard it?
18    A.  "Ain't what's paid"?
19    Q.  Yes.
20    A.  Yes.
21    Q.  When is the first time you heard that?
22    A.  I don't remember.

Page 185

1    Q.  It's been so long ago you can't even
2  remember?
3    MR. FAUCI:  Object to the form.
4    THE WITNESS:  Yes.
5  BY MR. TORBORG
6    Q.  Was it fairly early on in your career at
7  the Louisiana Medicaid --
8    A.  I don't recall exactly.
9    Q.  As far as you can recall, you have always
10  been aware of the joke "AWP equals ain't what's
11  paid"?
12    MR. FAUCI:  Object to the form.
13    THE WITNESS:  Pretty much, yes.  It's a
14  running joke.
15  BY MR. TORBORG
16    Q.  Abbott Exhibit 16 is a copy of the
17  Behrens "Hooked on Drugs" article.  Do you see
18  that?
19    A.  Yes.
20    Q.  Do you recall seeing this document before
21  today?
22    A.  I do not.

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 210

1    Q.   Did you also send on the comments that
2  are at 689 through 92 to HCFA?
3    A.   Yes.  It was sent to HCFA.
4    Q.   And you wouldn't have sent those comments
5  on HCFA if you didn't agree with them.  Correct?
6    A.   Correct.
7    Q.   Go to Bates page ending 91.  This is the
8  section "Other Alternatives for the State of
9  Louisiana."  You see that?
10   A.   Yes.
11   Q.   It says, "It would appear that CMS is
12 strictly interpreting federal regulations which
13 govern pharmacy reimbursement for Medicaid
14 programs.  These regulations at CFR 447.3331
15 through 333, state that the ingredient cost for
16 single source drug products should be reimbursed
17 using the 'estimated acquisition cost.'  By
18 performing a study to determine the EAC in the
19 State of Louisiana, the department may have created
20 a situation which paints anything above the EAC not
21 in strict compliance with the law.  Clearly CMS is
22 enforcing the standards on states that have studied

Page 211

1  the EAC inter-state and yet have attempted to set
2  reimbursement above that level despite the reasons
3  for which a Medicaid program may wish to do so."
4      Do you see that?
5    A.   Yes.
6    Q.   Do you have an understanding of what is
7  being conveyed there?
8    A.   Oh, gosh.  Probably not right now.
9    Q.   You are familiar with the federal
10 regulations concerning estimated acquisition cost?
11   A.   Yes.
12   Q.   And this refers to strict compliance with
13 the law.  Do you have an understanding of what that
14 means?
15   MR. FAUCI:  Object to the form.
16   THE WITNESS:  I don't.  Not at this time, no.
17 BY MR. TORBORG
18   Q.   Next paragraph, someone wrote "In light
19 of this attitude at CMS, perhaps the department
20 should explore other alternatives to increase
21 reimbursement of pharmaceuticals.  The alternative
22 which is most obvious is to allow for an increase

Page 212

1  in the pharmacy dispensing fee."
2      Do you see that?
3    A.   I do.
4    Q.   Do you recall discussions about that?
5    A.   I don't.
6    Q.   Do you recall if at some point Louisiana
7  increased the dispensing fee paid to 340B
8  hospitals?
9    A.   We did.
10   Q.   Do you recall the increase was roughly
11 $8.10?
12   A.   Yes.
13   Q.   And that is considerably higher than the
14 dispensing fee paid to providers in the Medicaid
15 program, correct?
16   MR. FAUCI:  Object to the form.
17   THE WITNESS:  Yes.
18 BY MR. TORBORG
19   Q.   Why was there a difference between the
20 two dispensing fees?
21   A.   The secretary of the department felt that
22 because the 340B providers were getting paid at

Page 213

1  actual acquisition cost, that they should be
2  reimbursed a higher dispensing fee.
3    Q.   Now, we talked earlier about in 2007,
4  Louisiana proposed an amendment to HCFA to increase
5  the dispensing fees paid to pharmacies.  Is that
6  right?
7    A.   Yes.
8    Q.   And that was in response to a directive
9  from the Louisiana legislature.  Is that right?
10   A.   Yes.
11   Q.   And you prepared in connection with that
12 state plan approval amendment, or had prepared some
13 reports on dispensing fees.  That's right?
14   A.   Oh, yeah.  We did.  We did a Myers and
15 Stauffer.  Yes.
16   (Exhibit Abbott 1058 was marked.)
17   MR. TORBORG:  For the record, what I have
18 marked as Abbott Exhibit 1058 bears the Bates Nos.
19 JD-SUB-LA-001413 through 508.
20 BY MR. TORBORG
21   Q.   Ms. Terrebonne, does this appear to be
22 the report that Myers and Stauffer prepared for the

Page 214

1  State of Louisiana?
2     A.  Yes.
3     Q.  Go to Bates page 1419 of this report. Are
4  you there?
5     A.  Yes.
6     Q.  Under "Conclusions," second paragraph
7  states, "An overall evaluation of the adequacy of
8  current pharmacy reimbursement rates should
9  consider findings related to dispensing costs in
10 tandem with an analysis of ingredient reimbursement
11 rates and the costs pharmacy incur to acquire
12 prescription medications."
13       Do you see that?
14    A.  Yes.
15    Q.  Did you agree with that?
16    A.  Yes.
17    Q.  "The Department's current maximum
18 pharmacy dispensing fee is lower than the average
19 cost of dispensing prescriptions. However, on
20 average, Myers and Stauffer estimates that
21 pharmacies realize positive net margins on Medicaid
22 prescriptions due to margins on ingredient cost."

Page 215

1        You see that?
2     A.  Yes.
3     Q.  That wasn't news to you.  Is that fair to
4  say?
5     A.  Right.
6     Q.  And then they note later in there, "Based
7  on Myers and Stauffer's experience with drug
8  acquisition costs and Louisiana's current
9  reimbursement for drug ingredients, single source
10 drugs and multiple source drugs without a full
11 price or Louisiana Maximum Allowable Cost price,
12 may have average margins on drug ingredient costs
13 approximately in the range of 8 to $12 per
14 prescription."
15       Do you see that?
16    A.  Yes.
17    Q.  And was that something that was news to
18 you when you received this report?
19    A.  Well, they documented it.
20    Q.  Were you aware that Louisiana has been
21 paying margins in that range on ingredient cost
22 throughout the 1990s?

Page 216

1     MR. FAUCI:  Object to the form.
2     THE WITNESS:  I would have relied on the
3  survey reports.
4  BY MR. TORBORG
5     Q.  Does a payment of a margin of 8 to $12
6  per prescription, Ms. Terrebonne, concern you at
7  all?
8     MR. FAUCI:  Object to the form.
9     THE WITNESS:  I would say no, not based on the
10 current reimbursement methodology.
11 BY MR. TORBORG
12    Q.  And why is that?
13    A.  Because that's perhaps the pharmacists
14 are making a profit on the ingredient cost rather
15 than the dispensing fee, because the dispensing fee
16 may be lower than their ingredient cost.
17    Q.  Was that something that was also the case
18 throughout the 1990s?
19    MR. FAUCI:  Object to the form.
20    THE WITNESS:  I don't know.  I don't recall
21 what was in the reports back then.
22 BY MR. TORBORG

Page 217

1     Q.  You agree that pharmacies should be able
2  to make a profit from dispensing a drug to a
3  Medicaid beneficiary, correct?
4     A.  They should make a reasonable profit.
5     Q.  And do you have -- what do you believe is
6  a reasonable profit?
7     A.  I think you would have to rely on survey
8  results, depending on how you structure the
9  reimbursement.
10    Q.  How would the survey results tell you
11 what a reasonable profit would be?
12    A.  Well, I would rely on an expert like
13 Myers and Stauffer to tell us that, what they
14 thought a reasonable profit would be.
15    Q.  And would that be something that is based
16 upon comparisons with what providers were making
17 from other third party payors?
18    A.  No.  I think that their plan has also
19 been to survey invoices and document those and
20 recommend different options.
21    Q.  Would you agree that a profit of 8 to $12
22 a prescription paid on the drugs at issue in this

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 218

1   case might have been appropriate during the 1990s?
2        MR. FAUCI:  Object to the form.
3        THE WITNESS:  I wouldn't comment on that.  I
4   wouldn't know if that is reasonable or over.  It
5   just depends on what stores do and how they bill
6   their claims.
7   BY MR. TORBORG
8        Q.   You don't have an opinion on that one way
9   or the other?
10       MR. FAUCI:  Object to the form.
11       THE WITNESS:  No.
12  BY MR. TORBORG
13       Q.   If I told you that the average margin on
14  ingredient cost reimbursement, assuming
15  reimbursement was actually based on the AWP for
16  these drugs, was in the range of 8 to $10 through
17  the 1990s, would that offend you?
18       MR. FAUCI:  Object to the form.
19       THE WITNESS:  Would that offend me?
20  BY MR. TORBORG
21       Q.   Yes.  Would you say, "We have been
22  cheated?  We have overpaid"?

Page 219

1        MR. FAUCI:  Object to the form.
2        THE WITNESS:  No.
3        MR. TORBORG:  Can we get one more document in,
4   or do you need to take your break and get ready for
5   your call?
6        THE VIDEOGRAPHER:  Off the record, it is 3:26.
7        (Recess.)
8        THE VIDEOGRAPHER:  We're back on record, it is
9   4:24.
10  BY MR. TORBORG
11       Q.   Welcome back, Ms. Terrebonne.
12       At the break, you retrieved, it appears,
13  a document that relates to the Louisiana Medicaid
14  Maximum Allowable Cost list.  Is that right?
15       A.   Yes.
16       (Exhibit Abbott 1059 was marked.)
17  BY MR. TORBORG
18       Q.   I have marked that as Abbott Exhibit
19  1059.  Would you take a look at it and tell me
20  exactly what it is?
21       A.   It is Appendix A of our manual and it
22  lists the generic descriptions on our drug file,

Page 220

1   the dosage, strength, effective date there on the
2   file, along with the current LMAC.  Some of these
3   are probably Federal Upper Limits as well.
4        Q.   Is that the current version of the LMAC
5   list?
6        A.   It is.
7        Q.   And did you have an opportunity to look
8   for any previous versions of it?
9        A.   I did not.
10       Q.   So we don't know if those exist or not?
11       A.   Right.
12       Q.   And I also asked you to look for a copy
13  of the Postlethwaite and Netterville dispensing fee
14  study done sometime prior to the 1999 Myers and
15  Stauffer, correct?
16       A.   Yes.
17       Q.   Do you have any idea of when that study
18  on ingredient cost and dispensing fee was done?
19       A.   Probably like 1989 or so.
20       Q.   Do you recall if they updated that report
21  in or around 199?
22       A.   I believe they did.

Page 221

1        Q.   And you searched for those but were not
2   able to find those.  Is that right?
3        A.   Right.  That's correct.
4        (Exhibit Abbott 1060 was marked.)
5   BY MR. TORBORG
6        Q.   I would like to mark as our next exhibit,
7   1060, a document bearing Bates Nos.
8   JD-SUB-LA-001307 through 12.  Ms. Terrebonne, if
9   you would take a look at that document for me.  Let
10  me know if you recognize it and I will have some
11  particular questions for you.
12       A.   Okay.
13       Q.   Do you recognize this document?
14       A.   I do.  We have had a lot of documents
15  regarding the dispensing cost survey.
16       Q.   Do you know if this was a document
17  prepared by NACDS, the National Association of
18  Chain Drugstores?
19       A.   It looks like it is, based on what is
20  written in the document.
21       Q.   Did you review this document in the
22  course of your work?

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 226

1   BY MR. TORBORG
2      Q.  Do you recall reviewing some or all of
3   the 2005 OIG report, the cover page of which is the
4   first page of Abbott Exhibit 1061?
5      A.  I do not recall.
6      Q.  Go to Bates pages 1370 to 1373. Could you
7   tell me what this document is?
8      A.  I don't recall the document, but --
9      Q.  If I --
10     A.  I don't recall the document.
11     Q.  If I can direct you to Bates page 1372,
12  see there under step 7, about ten lines down, you
13  see that?
14     A.  Yes.
15     Q.  "Calculate the average reduction per
16  prescription," and there is a calculation that
17  equals $7.16.  You see that?
18     A.  Yes.
19     Q.  Is that consistent with the language in
20  Abbott Exhibit 1060 where NACDS indicated in this
21  document that they provided information to DHH that
22  pharmacies could experience reimbursement cuts of

Page 227

1   over $7 for generic prescription on average due to
2   the DRA?
3      A.  Yes.
4      Q.  Does it appear that this is -- what we
5   see starting at Bates page 1370 of Abbott Exhibit
6   1061, that appear to be information that NACDS
7   supplied you?
8      A.  I don't recall.
9      Q.  If we go back to Abbott Exhibit 1060, the
10  third paragraph I was just referring to, the last
11  sentence of that paragraph states, "The additional
12  $5 for generic drug dispensing fee will maintain
13  the balance necessary for pharmacies to continue to
14  want to dispense generics."
15        Do you see that?
16     A.  Yes.
17     Q.  And this was substituting for a potential
18  cut in ingredient cost reimbursement, correct?
19     A.  Yes.
20     Q.  Prior to that, Louisiana -- prior to the
21  implementation of the rule, and even today, since
22  the AMP rule has not been implemented, Louisiana is

Page 228

1   knowingly paying a margin for generic drugs,
2   correct?
3      MR. FAUCI:  Objection.
4      THE WITNESS:  We are paying in accordance with
5   our current state plan.
6   BY MR. TORBORG
7      Q.  Well, you know you are paying a margin on
8   generic drugs, correct?
9      MR. FAUCI:  Objection.
10     THE WITNESS:  We are paying off of the formula
11  that is in the state plan off of AWP.
12  BY MR. TORBORG
13     Q.  Do you think for generic drugs that you
14  are paying actual acquisition cost to providers?
15     A.  No.
16     Q.  Would you agree with me that the $5
17  additional payment Louisiana is seeking to make for
18  generic drugs is designed to make up for a cut,
19  potential cut in ingredient-based reimbursement?
20     MR. FAUCI:  Objection.
21     THE WITNESS:  That was the intent of the
22  legislation.

Page 229

1   BY MR. TORBORG
2      Q.  Now, what has happened to that?  I
3   understand that state plan has not been approved by
4   CMS.  Is that correct?
5      A.  That is correct.
6      Q.  Did they provide you a reason why it was
7   not approved?
8      A.  They did.
9      Q.  What was the reason?
10     A.  As I recall, the surveys that were
11  submitted, the results of the surveys were not at
12  that level of the state plan submission.
13     Q.  The surveys, the average amount in the
14  surveys did not equal $15 and $10?
15     A.  Correct.
16     Q.  So was it your understanding that CMS was
17  taking the position that the dispensing fee had to
18  equal what was found in the survey?
19     MR. FAUCI:  Objection.
20     THE WITNESS:  I don't know exactly what was
21  written in the letter.
22  BY MR. TORBORG

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 270

1    Q.   Sure.  Would you agree that under
2  Louisiana's state plan, reimbursement for
3  acquisition cost, the ingredient cost in a drug,
4  was intended solely to reimburse for the cost of
5  acquiring the drug?
6       MR. TORBORG:  Object to the form.
7       THE WITNESS:  No.  We had a dispensing
8  component as well.
9  BY MR. FAUCI
10    Q.   Right.  We have two components, we have
11  the dispensing component and then the ingredient
12  component.  Correct?
13    A.   Correct.
14    Q.   And would you agree that under the state
15  plan, the ingredient reimbursement part of the
16  methodology, that was solely intended to compensate
17  a provider for its cost of acquisition?
18       MR. TORBORG:  Object to the form.
19       THE WITNESS:  For the ingredient component?
20  BY MR. FAUCI
21    Q.   Yes.
22    A.   Yes.

Page 271

1    Q.   And that under the state plan, the actual
2  cost of dispensing a drug and any profit to a
3  provider was to be reflected in the dispensing fee?
4       MR. TORBORG:  Object to the form.
5       THE WITNESS:  No.  There is some profit
6  reviewed in the ingredient cost as well.
7  BY MR. FAUCI
8    Q.   Under the state plan?
9    A.   Under the survey results.
10    Q.   No, but under the state plan, Louisiana
11  submitted a state plan to Medicaid or CMS or HCFA.
12  Correct?
13    A.   Yes.
14    Q.   And under that state plan as it was
15  submitted to what is now known as CMS, was it your
16  understanding that the dispensing fee was the only
17  part of the reimbursement methodology that was
18  intended to compensate for the cost of dispensing a
19  drug and any profit associated with dispensing a
20  drug?
21       MR. TORBORG:  Object to the form.
22       THE WITNESS:  I probably don't feel

Page 272

1  comfortable answering that because that happened in
2  1989 and I was not as involved in that submission
3  when it was initially discounted.
4  BY MR. FAUCI
5    Q.   You have indicated that you believe that
6  inflated reimbursement for ingredient costs may
7  have been appropriate to offset purportedly
8  inadequate dispensing fees.  Is that correct?  Is
9  that a correct statement of your testimony?
10    A.   I'm sorry.  Could you repeat your
11  question?
12    Q.   As I understand your testimony, you have
13  indicated that inflated reimbursements for
14  ingredient costs may have been appropriate in order
15  to offset purportedly inadequate dispensing fees.
16  Is that correct?
17    A.   I don't think I said that.
18    Q.   You don't?  Okay.
19       Do you think that under the state plan,
20  it is appropriate for the ingredient cost part of
21  the methodology to be used to cover a pharmacy's
22  dispensing costs?

Page 273

1       MR. TORBORG:  Object to the form.
2       THE WITNESS:  I said it is a double equation
3  with both ingredient cost and the dispensing fee,
4  and it should be looked at that way.  And it is
5  approved by CMS, so it is ultimately not my
6  decision.
7  BY MR. FAUCI
8    Q.   Just take a step back then, and at a very
9  general level, do you believe that the
10  determination of what a state pays in dispensing
11  fees should be something that is determined by
12  state officials?
13    A.   I think it should be conducted based on
14  survey results.
15    Q.   But that the final determination should
16  be made by a state official?
17    A.   Well, the final determination is made by
18  CMS.
19    Q.   In the form of an approval of a plan
20  submitted by a state?
21    A.   Correct.
22    Q.   Could you envision a fair and reasonable

2d9d517a-cf38-41c8-9c65-0424823ff391