# EXHIBIT 26

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | * | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | * | MASTER FILE NO. |
| PRICE LITIGATION | * | 01-CV-12257-PBS |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE PATTI B. |
| U.S. EX REL. VEN-A-CARE OF | * | SARIS |
| THE FLORIDA KEYS, INC. V. | * | MAGISTRATE |
| DEY INC., ET AL | * | MARIANNE BOWLER |
| NO. 05-11084-PBS, AND | * | |
| U.S. EX REL VEN-A-CARE OF | * | |
| THE FLORIDA KEYS, INC., ET | * | |
| AL V. BOEHRINGER INGELHEIM | * | (Cross-noticed |
| CORP, ET AL | * | captions on |
| NO.07-10248-PBS | * | following pages.) |

* * * * * * * * * * * * * * *

November 7, 2008

Transcript of the videotaped Rule
30(b)(6) deposition of the LOUISIANA
DEPARTMENT OF HEALTH AND HOSPITALS through
MARY JULIA TERREBONNE

Page 46

1  is my understanding of the legislation."
2        Sitting here today as the
3  representative for the State of Louisiana, do you
4  agree with your prior testimony on this point?
5     A.  Yeah.
6     Q.  Turn to page 44 of this document,
7  please.  On page 171 of your deposition
8  transcript, you and Mr. Torborg are discussing
9  the Myers and Stauffer survey of dispensing
10 costs.  Do you recall the Myers and Stauffer
11 survey of dispensing costs that's being discussed
12 here?
13    A.  I'm assuming that's the one that goes
14 back to 1999.
15    Q.  I can pull it out for you if you'd like
16 me to.
17    A.  Yeah.
18    Q.  This is Abbott Exhibit 1051, "A Survey
19 of Dispensing and Acquisition Costs of
20 Pharmaceuticals in the State of Louisiana."  It's
21 been previously marked.
22        MR. FAUCI:  Are we introducing this

Page 47

1  today?
2        MS. RANKIN:  Excuse me?
3        MR. FAUCI:  Are we introducing this
4  today?
5        MS. RANKIN:  I'm just using it to
6  refresh her recollection.  It's been previously
7  marked, so --
8        MR. FAUCI:  Oh.  Okay.
9  BY MS. RANKIN:
10    Q.  This is the exhibit that was being
11 discussed on page 171 of your deposition there.
12    A.  (Witness examines documents.)
13    Q.  And there is a discussion that starts
14 on line 15 of page 171 about an excerpt in this
15 report on page 6 which notes the -- Myers and
16 Stauffer's conclusion that, quote, "The discounts
17 from AWP for multiple-source drugs exhibited much
18 greater variation but averaged 32.6 percent for
19 drugs without FUL pricing and 69.6 percent for
20 drugs with FUL pricing."
21        MS. RANKIN:  For your benefit, that's
22 F-U-L, big caps, F-U-L, not f-u-l-l.

Page 48

1  BY MS. RANKIN:
2     Q.  And on page 172 Mr. Torborg asked you
3  if you knew that there was a wider variation for
4  discounts from AWP for generic drugs, and on line
5  14 of page 172 you say "Yes."
6        Sitting here today as a representative
7  for the State of Louisiana, do you agree with and
8  adopt this -- your prior testimony on this point?
9     A.  Yes, based on the survey.
10    Q.  The survey from 1999?
11    A.  Correct.
12    Q.  Please turn to page 47 of this
13 document, page 185 of your testimony.  Let me
14 know when you get there.
15    A.  (Witness examines documents.) I'm
16 there.
17    Q.  On line 9 of page 185, Mr. Torborg asks
18 you:  As far as you can recall, you've always
19 been aware of the joke, quote, "AWP equals ain't
20 what's paid," unquote, and your response on line
21 13 is "Pretty much, yes.  It's a running joke,"
22 unquote.

Page 49

1        Sitting here today as the
2  representative for the State of Louisiana, is it
3  fair to say that the joke "AWP equals ain't
4  what's paid" is a running joke that's been known
5  for some time for the State of Louisiana?
6        MR. FAUCI:  Object to the form.
7        THE WITNESS:  I wouldn't say just for
8  the State of Louisiana.  It's just a common
9  statement.
10 BY MS. RANKIN:
11    Q.  But you're a representative for the
12 state -- you're a representative for the State of
13 Louisiana, and here you're acknowledging that
14 you've been aware of the AWP ain't what's paid
15 joke for as long as you can remember?
16    A.  Yes.
17    Q.  Is that right?
18    A.  Yes.
19    Q.  Sitting here today, would you like to
20 correct your testimony here?  Is there anything
21 erroneous in your testimony on this point?
22    A.  No.

13 (Pages 46 to 49)

Page 50

1    Q.  Do you know of others who work for the
2  State of Louisiana who are also aware of this
3  joke?
4    A.  I would say yes.
5    Q.  And would it be fair also to say for
6  those individuals that it's an -- it's kind of an
7  old joke --
8        MR. FAUCI:  Object to the form.
9  BY MS. RANKIN:
10   Q.  -- to use your phrase, a running joke?
11   A.  It's been a while.
12   Q.  If you turn to page 51 of this
13  document, page 198 of your deposition transcript,
14  line 20, the question posed to you is, quote,
15  "Did Louisiana want to pay a margin between --
16  would it pay the reimbursement for ingredient
17  cost and what providers pay?"  And your response
18  is -- on line 2 of page 199 is "I would say yes."
19       Sitting here today as the
20  representative for the State of Louisiana, is it
21  -- would you agree with your testimony that
22  Louisiana would want to pay a margin between the

Page 51

1  ingredient cost and what providers actually pay
2  for the drug?
3    A.  Yes.
4    Q.  If you turn, please, to page 55 of this
5  document, page 214 of your testimony, on that
6  page you're discussing with Mr. Torborg an
7  exhibit that's marked on page 213 of your
8  testimony, Abbott Exhibit 1058. I'm going to pass
9  that to you just so you've got it in front of
10  you.
11       On page 214 of your testimony a
12  question is posed to you where he is reading from
13  page 1419 of this report.  If you'd like, you can
14  turn to it.  That would be the pagination of the
15  numbers that are on the far lower right-hand
16  corner.  Under "Conclusions" in the second
17  paragraph, line 17 of your testimony shows that
18  he's reading this -- part of this paragraph into
19  the record, and so let's read it together.  Line
20  17 on page 214, quote, "The department's current
21  maximum pharmacy dispensing fee is lower than the
22  average cost of dispensing prescriptions.

Page 52

1  However, on average, Myers and Stauffer estimates
2  that pharmacies realize positive net margins on
3  Medicaid prescriptions due to margins on
4  ingredient cost," and he asks if you see that
5  paragraph.  You say "Yes."
6        And then the questioner continues "That
7  wasn't news to you; is that fair to say?"  And
8  your answer is "Right."
9        Sitting here today as the
10  representative for the State of Louisiana, would
11  you agree that the State of Louisiana, at least
12  as of the time of this Myers and Stauffer report
13  knew that pharmacies were realizing positive net
14  margins on Medicaid prescriptions due to margins
15  on ingredient cost?
16   A.  Yes, based on the survey results.
17   Q.  On page 215 the discussion continues:
18  Because Myers and Stauffer had noticed that there
19  is an average margin on drug ingredient cost
20  approximately in the range of 8 to $12
21  prescription -- per prescription.  Do you recall
22  that conclusion from Myers and Stauffer?

Page 53

1    A.  No.
2    Q.  If I draw your attention to that second
3  paragraph on page 1419 of Exhibit 1058 -- Do you
4  see that --
5    A.  Yes.
6    Q.  -- set -- that -- that conclusion set
7  forth on this page from Myers and Stauffer?
8    A.  Yeah.
9    Q.  You were asked on page 216 of your
10  deposition testimony, quote, "Does a payment of a
11  margin of 8 to $12 per prescription, Miss
12  Terrebonne, concern you at all?"  And your
13  response is, quote, "I would say no, not based on
14  the current reimbursement methodology."
15       And the question -- follow-up question
16  is "And why is that?"  And your response is
17  "Because that's perhaps the pharmacists are
18  making a profit on the ingredient cost rather
19  than the dispensing fee because the dispensing
20  fee may be lower than their ingredient cost."
21       Sitting here today as a representative
22  of the State of Louisiana, would you adopt your

30(b)(6) LA Dept of Health and Hospitals (Terrebonne, Mary Julia)                                   November 7, 2008
Baton Rouge, LA

Page 66

1  -- these are divided up by the units as opposed
2  to by the package.
3      A.  Okay.
4      Q.  And it says that for each unit of Dey's
5  cromolyn, the AWP is 35 cents.  Do you see that?
6      A.  Yeah.
7      Q.  And you see that it also says the
8  average actual acquisition cost for Dey's
9  cromolyn is about 16 cents.  Do you see that?
10     A.  Yes.
11     Q.  So I would like to use the DOJ's
12 formula and figure out what the spread is based
13 upon the Myers and Stauffer report.  Okay.  So let
14 me walk you through that.  So that -- that would
15 be AWP, which is 35 cents, minus the average
16 actual acquisition cost, which is 16 cents,
17 equals, divided by the cost, which is, again, 16
18 cents -- Okay -- and then to express it in the
19 form of -- of a percentage, you multiply that by
20 a hundred.  And what have you got?
21     A.  113.67.
22     Q.  So about a hundred and thirteen

Page 67

1  percent; right?
2      A.  Yes.
3      Q.  So based on this Myers and Stauffer
4  report, based upon how the Department of Justice
5  calculates the term spread, Louisiana would know
6  that there would be a hundred and thirteen
7  percent spread between Dey's AWP and the average
8  actual acquisition cost; right?
9          MR. FAUCI:  Objection to form.
10         THE WITNESS:  Based upon this
11 calculation, yes.
12 BY MR. KATZ:
13     Q.  Okay.  Let's turn to the next page. I'd
14 like you to look down until you get to
15 ipratropium bromide.
16         THE COURT REPORTER:  I'm sorry.
17         MR. KATZ:  Ipratropium bromide.
18 BY MR. KATZ:
19     Q.  It's actually abbreviated ipratropium
20 BR, but as a pharmacist, you understand that to
21 mean ipratropium bromide; right?
22     A.  Yes.

Page 68

1      Q.  Okay.  And it's near the bottom. Do you
2  see it?
3      A.  Yes.
4      Q.  And do you see the one for Dey's NDC?
5      A.  Yes.
6      Q.  And which one would that be, if you
7  could read it into the record, the NDC?
8      A.  49502068503.
9      Q.  Okay.  And I would like to do the same
10 thing for this drug.  So according to Myers and
11 Stauffer, the AWP per unit for this ipratropium
12 bromide manufactured by Dey would be about 71
13 cents; right?
14     A.  Yes.
15     Q.  And the average actual acquisition
16 cost, according to this, would be about 29 cents;
17 right?
18     A.  Yes.
19     Q.  Okay.  Let's calculate what the spread
20 would be according to how the DOJ calculates the
21 spread.  So that would be 71 cents minus 29 cents
22 divided by 29 cents multiplied by a hundred.

Page 69

1  What do you get?
2      A.  144.82.
3      Q.  Okay.  So based on the -- this Myers
4  and Stauffer report, the State of Louisiana would
5  know that there would be about a hundred and
6  forty-four percent spread between the AWP and the
7  average actual acquisition cost; right?
8          MR. FAUCI:  Object to the form.
9          THE WITNESS:  Based on this report and
10 that calculation.
11 BY MR. KATZ:
12     Q.  Okay.  Let's -- let's -- let's go to --
13 two pages more in.  And it's labeled KY_AWP_KRF
14 03260.  And this chart's labeled "Multi-Source
15 Drug Products with an FUL Price"; right?
16     A.  Yes.
17     Q.  Okay.  I'd like you to take a look at
18 -- find the albuterol drug for Dey.  Do you see
19 that there's one 49502069703?
20     A.  Yes.
21     Q.  And that says albuterol .83 milligrams
22 per a millimeter solution; right?

18 (Pages 66 to 69)

Page 90

1    A.  Right.
2    Q.  How was it that -- And that dispensing
3  fee is significantly lower than at least what
4  Myers and Stauffer is indicating it cost to
5  dispense the home I.V. drug; is that right?
6    A.  I'm sorry.  Could you state your
7  question again?
8        MR. TORBORG:  Could I ask the court
9  reporter to read that one back?
10       (Whereupon the previous question was
11 read back by the court reporter.)
12       THE WITNESS:  I still don't get it.
13       The -- the report shows that it cost
14 more to dispense I.V.s [sic] prescriptions than
15 non-I.V. prescriptions.
16 BY MR. TORBORG:
17   Q.  And it's showing an unweighted mean
18 cost for pharmacies dispensing home I.V.
19 prescriptions of $18.57; correct?
20   A.  Correct.
21   Q.  But Louisiana is only paying at this
22 time $5.77; right?

Page 91

1    A.  Right.
2    Q.  How is it that Louisiana is able to
3  compensate the providers of home I.V. therapy
4  their cost to dispense those drugs?
5        MR. FAUCI:  Objection to the form.
6        THE WITNESS:  How is it?
7  BY MR. TORBORG:
8    Q.  Yes.
9    A.  Well, we do.  We pay them in accordance
10 with our current reimbursement methodology.
11   Q.  If you look to the footnote 8 on page
12 21 of the Myers and Stauffer report --
13   A.  Right.
14   Q.  -- that states -- Would you read that
15 into the record?
16   A.  "Although typical dispensing fees
17 reimburse less than the dispensing cost of I.V.
18 pharmacies, they are generally able to break even
19 based on the margin allowed on ingredient cost
20 reimbursement."
21   Q.  And do you have an understanding of --
22 of what that's saying?

Page 92

1    A.  I believe what he's saying is that
2  there's a margin on the ingredient side, so
3  that's how they're generally able to dispense.
4    Q.  And this is something that -- that you
5  would have read back in 1999; correct?
6        MR. FAUCI:  Objection to form.
7        THE WITNESS:  Probably.
8  BY MR. TORBORG:
9    Q.  Okay.  And if you disagreed with that
10 footnote, would you have told Myers and Stauffer
11 that?
12   A.  Well, they were the surveyors, so they
13 had the information.  We were relying on --
14   Q.  Well, was it your understanding, Miss
15 Terrebonne, that because of the higher cost to
16 dispense home I.V. drugs and the fact that
17 Louisiana was only paying a $5.77 dispensing fee
18 for those drugs, that the margin being earned on
19 the ingredient cost was covering that cost to
20 dispense?
21       MR. FAUCI:  Objection to form.
22       THE WITNESS:  Based upon the survey

Page 93

1  results, yes.
2  BY MR. TORBORG:
3    Q.  Let's go to Abbott topic -- the Abbott
4  cross-notice, topic number 16.  This is titled
5  "DOJ AWPs," and the area of inquiry reads "Your
6  implementation of revised average wholesale price
7  information developed by the United States
8  Department of Justice and NAMFCU, the dates when
9  you did or did not implement the revised pricing
10 information, and the reasons why you did or did
11 not implement the revised pricing information."
12 Do you see that?
13   A.  Yes.
14   Q.  And do you have an understanding of
15 what we're getting at there?
16   A.  No.
17   Q.  Are you aware of the so-called DOJ AWP
18 effort?
19   A.  No.
20   Q.  Do you recall, just to see if it
21 refreshes your recollection at all, that around
22 1999 to 2000, there was an effort by the National

24 (Pages 90 to 93)

Page 174

1      MR. FAUCI:  Objection to form.
2      THE WITNESS:  That's what the letter
3  says.
4  BY MR. KATZ:
5      Q.  So I mean not only is Dey not keeping
6  it secret; Dey is affirmatively disclosing to the
7  Medicaid program that its AWP does not represent
8  actual wholesale prices; right?
9      A.  Per the letter, yes.
10     Q.  Okay.  And -- Now, if you look at the
11 top paragraph regarding WAC -- And why don't you
12 just read that to yourself?
13     A.  (Witness examines document.)
14     Q.  And in this letter Dey is disclosing to
15 the Louisiana Medicaid program and other Medicaid
16 programs that its WAC is its invoice price to
17 wholesalers that does not include the net effect
18 of discounts, rebates, chargebacks and other
19 price reductions; right?
20     A.  That's what it states.
21     Q.  Okay.  So Dey wasn't keeping that
22 secret from the Louisiana Medicaid program,

Page 175

1  right?
2      A.  Right.
3      Q.  And speaking of WAC, WAC is a -- is a
4  published price; right?
5      MR. FAUCI:  Objection to form.
6      THE WITNESS:  Yes.
7  BY MR. KATZ:
8      Q.  And it's available for purchase by
9  Medicaid programs; right?
10     A.  Yes.
11     Q.  And you've been aware for some time
12 that Medicaid programs like Massachusetts and
13 Alabama have used WAC going back to the '90s;
14 right?
15     MR. FAUCI:  Objection to form.
16     THE WITNESS:  I know some states use
17 WAC.
18 BY MR. KATZ:
19     Q.  Right.  And you've known that since the
20 '90s; right?
21     MR. FAUCI:  Objection to form.
22     THE WITNESS:  Probably.

Page 176

1  BY MR. KATZ:
2      Q.  So -- I mean you've known generally
3  that WAC is -- is a price available for purchase
4  from First DataBank by Medicaid programs since
5  the '90s?
6      MR. FAUCI:  Objection to form.
7      THE WITNESS:  Yes.  I know it's been
8  around a while, yes.
9  BY MR. KATZ:
10     Q.  Okay.  Before we do that, actually --
11 Now, generally speaking, would you agree with me
12 that when a generic drug is first launched and
13 then throughout a ten-year period after that, you
14 would expect the prices paid for that generic
15 drug to fluctuate over time?
16     MR. FAUCI:  Objection to form.
17     THE WITNESS:  I would expect it, yes.
18 BY MR. KATZ:
19     Q.  I mean that's --
20     A.  I've not measured it, but I would
21 expect it.
22     Q.  That's normally what happens when a --

Page 177

1  a generic drug is launched, and then it would
2  change over time after that; right?
3      A.  Right.
4      Q.  And that occurs because of competition
5  in the generic drug marketplace; right?
6      A.  Yeah.
7      MR. FAUCI:  Objection to form.
8      MR. KATZ:  226.
9      (Whereupon the document was marked as
10 Exhibit Dey 226 by the court reporter.)
11 BY MR. KATZ:
12     Q.  I'm handing you a document marked Dey
13 Exhibit 226, and this is a chart of the AWPs and
14 WACs published by First DataBank for Dey's
15 ipratropium bromide 49502-068503.  Okay.  Now, if
16 you -- You see the top line is the AWP; right?
17     A.  Yes.
18     Q.  And that stays constant from the time
19 the drug was launched in 1996 through 2005;
20 right?
21     A.  Yes.
22     Q.  And that would be inconsistent with