# EXHIBIT 27

Page 1

```
            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - -
IN RE:  PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )  CIVIL ACTION

PRICE LITIGATION                )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      )  Judge Patti B. Saris

the Florida Keys, Inc.          )

     v.                         )  Chief Magistrate

Abbott Laboratories, Inc.,      )  Judge Marianne B.

No. 06-CV-11337-PBS             )  Bowler
- - - - - - - - - - - - - - - -

         (captions continue on following pages)




         Videotaped deposition of FRANK T. TETKOSKI



                      Baltimore, Maryland

                      Thursday, December 11, 2008

                      9:00 a.m.
```

Tetkoski, Frank T.                                              December 11, 2008
                                  Baltimore, MD

Page 158

1   WAC plus 10 was generally equivalent to AWP minus 10,
2   right?
3      A.   At the time that was instituted.
4      Q.   And that's what Ms. Freeze says in the last
5   paragraph -- before that.  The second sentence, "The
6   current WAC plus 10 pricing is generally equivalent to
7   average wholesale price (AWP) less 10 percent," right?
8      A.   That was this -- right.  The rule of thumb
9   or whatever you want to call it.
10     Q.   And OIG had informed the department that it
11  found that for generic drugs this discount -- the
12  average discount off of AWP was about 42 percent,
13  correct?
14     A.   That's what they found, yes.
15     Q.   Right?
16          So if you take 42 percent minus 20 percent
17  or add 20 percent, what do you get?
18          MS. YAVELBERG:  Objection, form.
19     A.   What calculation are you performing?  What
20  are you trying to arrive at?
21     Q.   OIG told Maryland that on average the
22  discount from AWP for generic drugs was 41.9 percent,

Page 159

1   correct?
2      A.   That sounds like the figure that they've
3   got here.
4      Q.   Maryland knew that there was a 20 percent
5   difference between AWP and WAC, right?
6          MS. YAVELBERG:  Objection, form.
7      A.   That implies for brand names.  It might not
8   say it.  But that's how I understood it.
9      Q.   You're saying that they had a different
10  understanding for generic drugs?
11     A.   For brand-name drugs that holds more.  For
12  generic drugs -- they're a little more, right.  That
13  20 percent is not necessarily as consistent as it is
14  for brand-name drugs.
15     Q.   It could be even -- what was your
16  understanding as to generic drugs between the
17  relationship between AWP and WAC?
18     A.   That the AWP for generic drugs could be off
19  more than it is for brand names.
20     Q.   How about the relationship between AWP and
21  WAC for generic drugs?  What was the department's
22  understanding?

Page 160

1          MS. YAVELBERG:  Objection, form.
2      A.   You mean percentage-wise?
3      Q.   Yes.
4      A.   I don't know if we had a percentage that we
5   were going with, actually.  We just used -- we didn't
6   look too much at the AWP on the generics.  We had --
7   since we were using WAC we thought that was a lot more
8   stable and more reliable.
9      Q.   Ms. Freeze says in her memo "The current
10  WAC plus 10 pricing is generally equivalent to average
11  wholesale less 10 percent," right?  That's what she
12  says?
13     A.   That's what she's stating, yes.
14     Q.   She doesn't say the current WAC plus 10
15  pricing is generally equivalent to average wholesale
16  less 10 percent for brand name drugs?
17     A.   Right.  She doesn't say that.
18     Q.   She doesn't draw the distinction?
19          MS. YAVELBERG:  Objection, form.
20     A.   Right.  She doesn't draw the distinction.
21     Q.   In the first paragraph she stated that "The
22  WAC plus 10 methodology far exceeds the true

Page 161

1   acquisition cost to the pharmacy," right?
2      A.   That's what she states.
3      Q.   So at this time Maryland was aware that the
4   WAC plus 10 methodology far exceeds the true
5   acquisition cost to the pharmacy, right?
6          MS. YAVELBERG:  Objection, form.
7      A.   She is stating that.  Let me see what we've
8   got here.  (Reading).
9          It depends what you mean by "far exceeds."
10  That is her words, but --
11     Q.   They're not my words.
12     A.   No, no, no.  I said it was her words.
13     Q.   That's what she said?
14     A.   Yeah.  They were her --
15     Q.   Right?
16     A.   Far, I mean, I guess the question is what
17  do we mean by far.  WAC we look at as basically a
18  base.  So if 10 percent is the upper limit of --
19  outside of that is 10 percent plus that and that's
20  far.
21     Q.   In the third paragraph she says "The OIG
22  report specifically excluded drug acquisition costs

41 (Pages 158 to 161)

Tetkoski, Frank T.                                                December 11, 2008
                            Baltimore, MD

Page 190

1  limitations."
2        And then it continues "The state officials
3  were concerned that without the above disclaimer that
4  uninformed state officials might overreact to our
5  report and adjust pharmacy reimbursement without
6  considering the other aspects of reimbursement."  Do
7  you see that?
8     A.   Yes.
9     Q.   Do you recall that those kind of comments
10 were made in the meeting?
11       MS. YAVELBERG:  Objection, form.
12    A.   Those type of comments?  This reflects on
13 what was at the meeting.  That is, the idea being that
14 you would cut the ingredient cost without affecting
15 the -- adjusting the dispensing fee.
16    Q.   And what's being talked about here is a
17 possibility of having to adjust the fee upwards if you
18 were going to cut the ingredient cost, right?
19       MS. YAVELBERG:  Objection, form.
20    A.   Right.  Adjustments have to be made as more
21 and more it evolved where the prescription was a part
22 of the ingredient cost and the fee would need to be --

Page 191

1  if you just unilaterally cut the ingredient cost it
2  would be hard to put through as well as just a flat
3  cut which as we discussed before it would be very hard
4  to even put through.
5     Q.   What the state officials said is you can't
6  just look at one side of the equation and adjust it
7  without looking it other side, right?
8        MS. YAVELBERG:  Objection, form.
9     A.   Well, you have to look at everything.  Yes.
10    Q.   Let me ask you about a couple of the
11 specifics here.  There's mention of "the effect of
12 Medicaid business as a contribution to other store
13 sales."  What does that mean?
14    A.   Where are you --
15    Q.   I'm back on the notes here.  The last
16 paragraph on the first page.  "The effect of Medicaid
17 business as a contribution to other store sales."
18 What that's saying, is it not, Mr. Tetkoski, is that
19 generally speaking pharmacies don't get as much
20 crossover business from Medicaid patients as you might
21 from a regular customer?
22       MS. YAVELBERG:  Objection, form.

Page 192

1     A.   That's one interpretation.
2     Q.   And then the next is "the cost to provide
3  professional services other than dispensing a
4  prescription such as therapeutic interventions" --
5  what are therapeutic interventions?  Do you know?
6     A.   If the pharmacist sees a prescription or a
7  problem with a therapy, whether there's a drug
8  interaction or something, and calls the physician to
9  change or address it or informs the physician that
10 there might be a problem.  That takes time.
11    Q.   So this is talking about the costs that
12 pharmacies incur that's above just your normal
13 dispensing a prescription, putting the pills into a
14 container, right?
15       MS. YAVELBERG:  Objection, form.
16    A.   It's a pharmacist's responsibility and he's
17 required to do that.  So that's all part of the
18 pharmacist's job.  He's required to do it.  So when he
19 sees that problem that's part of the pharmacy cost.
20    Q.   And states weren't paying --
21    A.   Dispensing costs.
22    Q.   -- a separate fee for that, right?  They

Page 193

1  were paying a dispensing fee?
2        MS. YAVELBERG:  Objection, form.
3     A.   I'm trying to think if there was some way
4  they reimbursed for that separately, if some ever even
5  did that.  But really, you're a pharmacist, when you
6  fill a prescription all that is a package deal.
7  That's why a pharmacist has to be on duty.
8        MR. TORBORG:  Why don't we go ahead and
9  take a break here and I'll take a look at what I have
10 and I'll give you an estimate of what I've got left.
11       THE VIDEOGRAPHER:  Off the record at 2:55.
12       (Recess.)
13          (Exhibit Abbott Maryland 032
14          was marked for
15          identification.)
16       THE VIDEOGRAPHER:  On the record at 3:05.
17       BY MR. TORBORG:
18    Q.   Welcome back.
19    A.   Thank you.
20    Q.   What I've marked as Abbott Maryland 32
21 bears the Bates number MD 0003813 through 3855.  It's
22 a collection of documents that was produced to us in

49 (Pages 190 to 193)

Tetkoski, Frank T. December 11, 2008
Baltimore, MD

Page 198

1  meant by "realizes a net cost for drugs"?
2      MS. YAVELBERG: Objection, form.
3  A.   With the rate we just subtract the cost of
4  the rebate out as a cost to us.  We get the rebate.
5  Q.   From the Medicaid drug rebate program?
6  A.   Rebate program.
7  Q.   Directly from the manufacturers?
8  A.   From the manufacturers.
9  Q.   And when Maryland considered what it was
10 paying providers for drugs, it was considering the
11 impact of the rebates, right?
12     MS. YAVELBERG: Objection, form.
13 A.   For purposes here.
14 Q.   Well, I mean, generally speaking when you
15 all were considering what you were paying for drugs
16 you considered the impact of the rebate, right?
17     MS. YAVELBERG: Objection, form.
18 A.   I'm not sure what different funds they went
19 into.  When we would look at cost containment and we
20 did it for fiscal, I'm trying to think how we worked
21 the rebate into that.
22 Q.   And I'm not asking you here what funds they

Page 199

1  went into.  I'm just asking you in the policy division
2  when you considered what you were paying for drugs you
3  would consider the amount this you got back from the
4  drug manufacturers via the rebate, right?
5      MS. YAVELBERG: Objection, form.
6  A.   Rebate would be a consideration.
7  Q.   Then if we can go on with that paragraph it
8  states "The dispensing fee that is assessed by the
9  pharmacy itself is a fixed amount.  Both" -- this is
10 in italics.  "Both components, estimated acquisition
11 costs and actual dispensing fees, must be considered
12 when determining whether pharmacists are paid
13 appropriately."  Right?
14     MS. YAVELBERG: Objection, form.
15 A.   Right.
16 Q.   Was that a fair characterization of how the
17 department viewed this?
18     MS. YAVELBERG: Objection, form.  He's not
19 testifying on behalf of the department.
20 Q.   You can testify based on your knowledge.
21 There's no magic to being a 30(b)(6) witness.  You
22 were there too.

Page 200

1  A.   You obviously have to consider everything
2  when you're looking at appropriate payment.
3  Q.   And this was along the lines of what we saw
4  back in the 1995 notes of the OIG meeting when the
5  state officials had said if you're going to cut the
6  ingredient side you need to look at the other side,
7  namely, dispensing fees and other costs, right?
8      MS. YAVELBERG: Objection, form.
9  A.   Mm-hmm.  You have to look at everything.
10 Q.   And this is just repeating that you can't
11 just put a blind eye to what's going on with the
12 dispensing fee side when you're looking at what the
13 appropriate payments ought to be for the ingredient
14 side, right?
15     MS. YAVELBERG: Objection, form.
16 A.   Again, you have to look at everything.
17 Q.   If you go to the next page -- this is
18 3817 -- the section says "dispensing fees."  And it
19 summarizes the dispensing fees being paid as of this
20 time, 2007, right?
21 A.   Right.  To this point.
22 Q.   It says the dispensing fee is 3.69 for the

Page 201

1  generic drugs, 2.69 brand-name drugs, and then there's
2  a $1 higher fee for long term care pharmacies, right?
3  A.   Yes.
4  Q.   And then there is still in 2007 this
5  special home IV fee, right?
6  A.   Yes.
7  Q.   And then the next section, cost of
8  dispensing survey, this is summarizing the survey that
9  had been done by the University of Maryland School of
10 Pharmacy, right?
11 A.   Yeah.  That's what it looks like.  I didn't
12 read this.
13 Q.   And if you look at it it indicates that the
14 average cost of dispensing per prescription is $11.71
15 with a median cost of $10.67, right?
16 A.   That's what it's stating, yes.
17 Q.   And then it end of this paragraph it states
18 "Again, this does not mean that pharmacists are not
19 receiving adequate payment.  One needs to examine the
20 profit levels that are obtained with the acquisition
21 costs."  Do you see that?
22 A.   Yes.

51 (Pages 198 to 201)

Tetkoski, Frank T.                                          December 11, 2008
                              Baltimore, MD

Page 202

1    Q.   What does that mean?
2         MS. YAVELBERG:  Objection, form.
3    A.   They may be making some money on the
4    acquisitions costs and that needed to be figured in.
5    Q.   And that's not something that just kind of
6    came out of the sky in 2007; this has been something
7    that Maryland has been looking at every since you've
8    been in the policy department, isn't it?
9         MS. YAVELBERG:  Objection, form.
10   A.   When we look at reimbursement, again, we
11   look at everything.  You've got to figure everything
12   in.
13   Q.   And that's something you've been doing
14   since you started in the policy department in 1994,
15   right?
16        MS. YAVELBERG:  Objection, form.
17   A.   I guess my answer is we look at everything.
18   Are you saying that -- I'm not specifically what
19   you're directing that at, but --
20   Q.   You consider the whole picture, the
21   dispensing fee adequacy and the ingredient cost
22   payments.

Page 203

1    A.   Yes, especially if you're trying to make
2    any kind of adjustments.
3    Q.   If we go to -- flip ahead to the Bates page
4    that ends with 21.  Is that a beginning of a copy of a
5    dispensing fee survey that was done by the State of
6    Maryland -- I'm sorry -- the University of Maryland
7    School of Pharmacy?
8    A.   That's what it looks like, yes.
9    Q.   Have you seen this document before?
10   A.   Again, this was something that Phil Cogan
11   was responsible for.  No.
12   Q.   Let me hand you -- let's mark this as
13   Abbott Maryland 33.
14              (Exhibit Abbott Maryland 033
15               was marked for
16               identification.)
17        BY MR. TORBORG:
18   Q.   We spent a little time on the home IV
19   dispensing fee that Maryland instituted in the
20   mid-1990s.  We've spoken about that a little bit
21   today?
22   A.   Right.  Yes.  Mm-hmm.

Page 204

1    Q.   This document bears the Bates number MD
2    0004847 through 49, right?
3    A.   Yes.
4    Q.   And this is a memo from you to Joe
5    Millstone and Patricia Burkholder that is discussing
6    proposals for what the home IV fee ought to be, right?
7    A.   Right.
8    Q.   And much of the discussion here is focused
9    on various calculations that would be needed to come
10   to various figures, right?
11        MS. YAVELBERG:  Objection, form.
12   A.   Yeah.  I'm trying to figure the main
13   purpose of this.  A lot of it is figure-driven.
14   Q.   For example, the first paragraph discusses
15   the need to save $1.8 million; is that right?
16   A.   Yes.
17   Q.   So the idea was the department wanted to
18   increase the dispensing fee for home IV but at the
19   same time needed to cut $1.8 million overall, right?
20   A.   Right.
21   Q.   And so that would necessitate a decrease in
22   the fee for other prescriptions, correct?

Page 205

1    A.   If we wanted to make it neutral with
2    respect to fee.
3    Q.   And that was a budgetary-driven calculus,
4    correct?
5    A.   Yeah.  A lot of your changes are budgetary-
6    driven.
7    Q.   And then if we go to the last page of the
8    exhibit the chart there shows the amount if you
9    increase the home IV fee by intervals by $1 it would
10   result in what you show there as a decrease in the
11   regular fee, right?
12   A.   Right.
13   Q.   So generally speaking a $1 increase in the
14   IV dispensing fee results in a one penny decrease in
15   the regular fee, right?
16   A.   Right.
17   Q.   That's --
18   A.   Decrease -- yeah.  They're about penny
19   increments.
20   Q.   That indicates then that there are a lot
21   more regular prescriptions than home IV, right?
22   A.   Right.

2b780c2e-7128-4fb7-bd4e-56a6dca08890