# EXHIBIT 28

NE Dept of Health and Human Services (Gary Cheloha)                    December 2, 2008
                              Lincoln, NE

Page 1

                IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF MASSACHUSETTS

    -----------------------------------X

    IN RE:  PHARMACEUTICAL INDUSTRY     )

    AVERAGE WHOLESALE PRICE LITIGATION  ) MDL No. 1456

    -----------------------------------) Civil Action

    THIS DOCUMENT RELATES TO:           ) No. 01-12257-PBS

    United States of America, ex. rel.  ) Hon. Patti Saris

    Ven-a-Care of the Florida Keys,     )

    Inc., v. Dey, Inc., et. al., Civil  )

    Action No. 05-11084-PBS; and United )

    States of America, ex. rel.         ) December 2, 2008

    Ven-a-Care of the Florida Keys,     ) 8:57 a.m.

    Inc., v. Boehringer Ingleheim       )

    Corp. et. al., Civil Action         )

    No. 07-10248-PBS.                   ) VOLUME I

    -----------------------------------X

    Deposition of THE NEBRASKA DEPT. OF HEALTH AND HUMAN

    SERVICES by GARY CHELOHA, taken by Defendants, pursuant

    to Notice, held at the Cornhusker Hotel, Lincoln, Nebraska,

    before Shana W. Spencer, a Certified Shorthand Reporter

    and Notary Public of the State of Nebraska.

                    Henderson Legal Services, Inc.
    202-220-4158                           www.hendersonlegalservices.com

d98d776d-741f-454c-8c46-8fdf11028000

Page 78

1  transaction or one -- they don't fill it and then
2  later bill.  It's a point-of-sale, real-time
3  system so that they know immediately if the
4  client is eligible and if it's going to be paid,
5  et cetera.
6      Q.  Okay.  And is the point-of-sale system
7  managed by the fiscal agent or --
8      A.  It's managed by First Health --
9      Q.  Okay.
10     A.  -- Services of Richmond.  And they are
11 not -- from my perspective, they're not a fiscal
12 agent because they don't actually pay the
13 pharmacies.  They don't have Nebraska Medicaid
14 funds to pay the pharmacies.  So I don't define
15 them as a fiscal agent because of that non-fiscal
16 responsibility, which the State retains.
17     Q.  Okay.  And so what entity or division
18 within the department maintains that control?  Is
19 there a specific --
20     A.  Medicaid and long-term care.
21     Q.  Okay.  And is that the division, then,
22 that would make the payment to the provider for

Page 79

1  the claims?
2      A.  Yes.
3      Q.  Okay.
4      A.  Yes.
5      Q.  Is this all -- I'm sure now it's done
6  all electronically, for the most part?
7      A.  Yes.  The vast majority is done
8  electronically, although we do process some paper
9  claims, a small percentage, very small
10 percentage.
11     Q.  And so all of the Medicaid claims that
12 are paid by Nebraska Medicaid have been submitted
13 by the providers or the pharmacies?
14     A.  Yes.
15     Q.  The people that provide the drugs?
16     A.  Yes.
17     Q.  And drug manufacturers don't submit
18 claims to Nebraska Medicaid?
19     A.  No, they do not.
20     Q.  And the claims that are filed by the
21 providers are sent to Nebraska and not to the
22 Federal Government?

Page 80

1      A.  That's correct.
2      Q.  Okay.  And then the State is the one
3  that makes payments to the providers; correct?
4      A.  That's correct, yes.
5      Q.  And so Nebraska hasn't paid any money
6  to drug manufacturers for claims that are
7  submitted under Nebraska Medicaid?
8      A.  No, it does not.
9      Q.  And so we've touched a little bit on
10 Nebraska's reimbursement methodology.  Nebraska
11 uses a formula to determine the amount of money
12 that is reimbursed for a prescription drug under
13 Medicaid?
14     A.  Nebraska uses a formula to both
15 determine the upper limit of payment and to
16 determine the actual payment.
17     Q.  And the total payment for each claim
18 can be broken into, as I see it, two components,
19 the ingredient cost and the dispensing fee.
20 Would you agree with that?
21     A.  The Department uses both of those
22 numbers, yes, in calculating the upper limit.

Page 81

1      Q.  Okay.  And so we're going to probably
2  be using those terms a lot today.  So ingredient
3  -- what is your understanding of ingredient cost
4  just so --
5      A.  The ingredient cost represents the
6  Department's calculation of the drug cost
7  component of its payment.
8      Q.  Okay.  And the dispensing fee?
9      A.  The dispensing fee is assigned by the
10 Department to each participating pharmacy.
11     Q.  And what is that intended to cover?
12     A.  That's the -- what's the term?  To
13 cover the professional services of the
14 pharmacist, including counseling.
15     Q.  And when Nebraska determines whether or
16 not its reimbursement methodology is adequate to
17 providers, it has to consider both the ingredient
18 cost and the dispensing fee together; correct?
19     A.  It considers them separately and
20 together, yes.
21     Q.  Okay.  Could you explain what you mean
22 by that?

Page 82

1    A.  Well, we calculate both, with pay based
2  on the total of the two.
3    Q.  Okay.  So in order to find out how much
4  a particular provider is being paid for a
5  particular claim, you would have to add the
6  ingredient cost and the dispensing fee?
7    A.  That's correct.
8    Q.  Okay.  And we're going to look at some
9  of the state plan amendments and other materials.
10 But to the best of your knowledge, would you
11 agree that Nebraska's reimbursement methodology
12 formula has always been kind of a lesser of
13 formula where you pay the lesser of certain
14 components?
15   A.  Yes.
16   Q.  And whenever Nebraska has changed its
17 reimbursement methodology, it would submit a
18 state plan amendment to CMS to be approved?
19       MR. DUNNING:  Object to form.
20       THE WITNESS:  The Department has
21 submitted several state plan amendments to assure
22 that they get the federal match based on how

Page 83

1  payments are currently being made, or will be
2  made.
3    Q.  (BY MS. LORENZO)  So were changes to
4  reimbursement methodology made that were not
5  accompanied by a state plan amendment, to your
6  knowledge?
7    A.  The Department reimbursed on a formula
8  developed by a contractor in the mid-1980s until
9  -- and that was AWP minus 8.71 percent, or direct
10 for seven or eight companies.  And we made a -- a
11 calculated -- based on calculations, the
12 Department changed the wording to say -- or the
13 calculation to be AWP minus 10 percent without
14 the direct companies being considered.  And that
15 was a cost neutral change.  And to the best of my
16 knowledge, a SPA was not submitted for that.
17   Q.  And could you tell me what you mean by
18 cost neutral?
19   A.  We did detailed calculations using our
20 already-paid claims with that formula and then
21 substituting the AWP minus 10 percent for the
22 cost component and looked at the overall

Page 84

1  reimbursement to the pharmacies and overall cost
2  to the State.  And they were approximately -- I
3  would not say they were exactly the same but
4  nearly identical.
5    Q.  Did some other component of the
6  reimbursement change, or was it just the change
7  from direct price and AWP minus 8.71 that caused
8  it to -- the AWP minus 10 percent to be somewhat
9  equivalent?
10   A.  The AWP minus 10 was a calculated
11 number so that it would be cost neutral to the
12 State.
13   Q.  We're going to look at some documents
14 about that change a little bit later.
15   A.  All right.
16   Q.  So we'll go back to some of those in a
17 few.  But, to the best of your knowledge, is that
18 the only instance in which a state plan amendment
19 was not submitted along with the change in
20 reimbursement?
21   A.  Yes.
22   Q.  Okay.  That --

Page 85

1    A.  Yes.
2    Q.  And that was because it was cost
3  neutral?
4    A.  Yes.
5    Q.  Would you agree that Nebraska kind of
6  communicates to its providers through a series of
7  documents?  I've seen -- there's provider
8  manuals; is that correct?
9    A.  Yes.  It uses the provider manual
10 information to communicate to the pharmacies.
11   Q.  As well as provider bulletins?
12   A.  Yes.  And provider bulletins as well.
13   Q.  Okay.  And then there's state
14 regulations that are also reflective of what is
15 contained in the provider bulletins and --
16       MR. DUNNING:  Object to form.
17       THE WITNESS:  The provider --
18       MR. DUNNING:  If you understand the
19 question, you can answer.
20       THE WITNESS:  The provider -- the
21 regulations are the -- are interpreted or
22 explained in greater detail by the provider

22 (Pages 82 to 85)

Page 126

1  drugs in Nebraska had to be able to obtain prices
2  -- or drugs at that price?
3      A.  The pharmacies -- the concern -- No. 1,
4  if they could not buy it at that price, they
5  would let us know.  They're a very vocal group,
6  and they're actually dispensing the medications.
7  I mean, they just -- they would let us know.
8      Q.  So in order to avoid having complaints
9  or comments from pharmacists, you would, before
10 implementing a certain price, try to ascertain
11 whether or not those prices were reasonable?
12     A.  Yes.  That's correct.
13     Q.  Okay.  Would you also -- you said that
14 pharmacists were a vocal group.  Would you
15 receive letters and other -- phone calls you
16 mentioned, but letters and correspondence like
17 that?
18     A.  Yes.  We received written
19 correspondence as well.
20     Q.  Have you -- would you save those, or
21 what would you do with that correspondence?
22     A.  If they were saved, I did not come

Page 127

1  across any of them in my review of all of those
2  files.  So they were saved for some length of
3  time, because we're always subject to audit.  And
4  -- but they -- I didn't find any in the records
5  that I went through.
6      Q.  Okay.  And is it accurate to say that
7  the complaints and comments by pharmacists and
8  other providers were taken into consideration by
9  Nebraska Medicaid?
10     A.  Yes, they were.  Yes.  That's correct.
11     Q.  So that's one of the pieces we talked
12 about that kind of plays a role in setting
13 reimbursement?
14     A.  Yes.
15     Q.  And would you agree that if there was a
16 federal upper limit in place that is used as a
17 price for a particular claim, that average
18 wholesale price is not a factor in the payment of
19 that claim; it's paid at FUL?
20         MR. MAO:  Objection.  Form.
21         THE WITNESS:  It's possible that an EAC
22 could be lower than the FUL, depending -- on an

Page 128

1  NDC-by-NDC basis.
2      Q.  (BY MS. LORENZO)  If the claim was
3  actually paid out at the FUL, it was paid out at
4  the level that was set by CMS or by Nebraska
5  Medicaid?
6      A.  That's correct.
7      Q.  So you don't have to refer back to it,
8  but back on 904, it says the next kind of factor
9  in product costs is the state MAC, or SMAC?
10     A.  Yes.
11     Q.  So could you describe to me your
12 understanding of what a state MAC is?
13     A.  Yes.  A state MAC is a price set by the
14 Department for almost all -- I mean, almost
15 entirely for generic drugs.  It's a way to set an
16 upper limit on the cost portion of the
17 calculation which is determined by the -- by the
18 State.
19     Q.  To your knowledge, how long has
20 Nebraska been setting state MAC?
21     A.  I'm sorry.  I don't know the begin
22 date.  I'm sorry.  I don't know for sure.

Page 129

1      Q.  Okay.  Well, we'll probably look at
2  some documents to get a sense of that.  But could
3  you tell me, at least today, how does the State
4  determine what drugs to set state MACs for?
5      A.  Okay.  Because the database is between
6  the current FULs and state maximum allowable
7  cost, as new generic versions of drugs become
8  available, we concentrate on those.  And when --
9  generally, when the six-month period of
10 exclusivity for the first generic is past, we
11 determine the state maximum allowable cost,
12 although sometimes it can be done immediately.
13 And we look at the availability of the product
14 and the pricing and the net pricing as much as
15 possible to see whether it's cost effective to
16 move the market share to the generic version
17 versus the brand.
18     Q.  Okay.  And so that's for drugs that are
19 currently entering into the generic market.  I
20 guess, previously, before -- or when Nebraska
21 first implemented its MAC, how did it kind of
22 determine what drugs to take MACs on?

Page 130

1  A.  The same general process, looking at
2  the availability and the difference between the
3  price of the brand and the generic.  We would
4  receive recommendations or information from
5  providers, from Pace, mailings from the drug
6  companies about the availability of their generic
7  version of a brand name.  Really, from any
8  source, we would consider, and we'd look at the
9  product for determining its MAC.
10     Q.  And once you determined -- I guess,
11 let's start currently.  Once you determined that
12 there's a particular drug that you'd like to set
13 a maximum allowable cost for, how do you go about
14 setting that actual price?
15     A.  Ask for a recommendation from Pace
16 Alliance.  We'll also call pharmacies to
17 determine the range of costs or range of
18 recommended -- recommendations for SMAC pricing.
19     Q.  Okay.  So if you find out from Mr.
20 Woods at Pace that, for a particular prescription
21 drug, that he can purchase it for, say, 50 cents
22 for that particular dosage, I mean, do you use

Page 131

1  that figure?  Or is there a calculation involved
2  in taking that number and turning it into a MAC?
3     A.  Into an actual SMAC price?
4     Q.  Uh-huh.
5     A.  There is no set formula, and he doesn't
6  provide us -- I think he has -- I believe he has
7  confidentiality agreements for the actual price
8  that the Alliance members can purchase the drug
9  for.  So -- and we rely mostly on the Pace
10 recommendations.
11    Q.  So he'll give you kind of a range, and
12 you'll --
13    A.  He'll generally quote a specific price.
14 He'll say 8 cents, 10 cents.  I recommend this
15 for the SMAC price on it.
16    Q.  And do you know -- you said that
17 there's some confidentiality provisions as far as
18 what they're actually paying.  Do you know if he
19 bills in some percentage or a few cents here or
20 there to make sure that other people can get that
21 or to account for profit or anything like that?
22    A.  All I would know for sure is that it's

Page 132

1  more than the contract price, but I don't know
2  whether he uses a specific formula or how he
3  specifically determines that.  He -- from time to
4  time, on a very limited basis, he and I have
5  discussed -- how will I say it -- the price that
6  the pharmacies pay.  And then I would -- when I
7  was doing it, I made a determination of where to
8  set the MAC price, at something above that.
9     Q.  And did you have a formula, or you were
10 just -- it was a case-by-case basis for --
11    A.  Generally, a case -- it was a case-by-
12 case basis.  I did not have a set formula.
13    Q.  And I'm assuming that the -- you said
14 that Pace is a purchasing organization that has
15 pharmacies in Nebraska, and those pharmacies are
16 participants in the Medicaid program?
17    A.  Yes.
18    Q.  Do you have a sense of how many
19 pharmacies obtain their drugs from Pace?
20    A.  I don't anymore.
21    Q.  Okay.
22    A.  It's -- when I was with the pharmacists

Page 133

1  association, I don't know that I could tell you
2  the number even then.  It's not what it was 20
3  years ago, and I do -- I'm sorry.  I don't know
4  the number in Nebraska.
5     Q.  Okay.  Is it a large percentage, small?
6  I mean, do you remember?
7     A.  I would -- it's a small percentage.
8     Q.  Small.  Okay.  And so I think we had
9  kind of narrowed that -- our previous
10 conversation to the current time period.  Is that
11 the similar process that has always taken place
12 as far as the setting of the actual rates that
13 were paid?
14    A.  I'm sorry.  I missed the first part of
15 what you said.  Is that the --
16    Q.  Has that always been the practice in
17 setting the particular prices for state MACs, or
18 has that changed over time?
19    A.  Many years ago, we had access to the
20 McKesson catalog.  And also, there was a
21 wholesaler in Lincoln, Lincoln Drug Company, and
22 we had access to their catalog information.  And

34 (Pages 130 to 133)

Page 186

1  Q.  Okay.
2  A.  I'm sorry.
3  Q.  That's okay.  And then if you go down
4  towards the end of that second paragraph, it
5  states: Changing the EAC calculation without
6  considering what acquisition and operating costs
7  currently are today, and then determining what is
8  fair and reasonable for all, is inappropriate.
9  A.  Yes.
10 Q.  Sitting here today, as a 30(b)(6), do
11 you agree that it is necessary to consider both
12 the acquisition and operating costs, which is the
13 dispensing and ingredient portion, prior to
14 making any changes in reimbursement?
15 A.  Yes.
16 Q.  And then if you turn to the second
17 page, it has a similar statement.  It says at the
18 very top: We are asking that the proposed change
19 to the calculation of the appropriate discount
20 for the EAC of drugs and the dispensing fee for
21 each pharmacy continue to be fact-based and that
22 neither be changed without consideration for the

Page 187

1  total reimbursement allowed to those pharmacies
2  that choose to serve Medicaid clients.  We
3  request that HHS sponsor a new survey to
4  determine the overall reimbursement and then
5  implement its findings, as a number of other
6  states have done.
7      So once again, this sentence speaks to
8  the need to consider both the discount of EAC and
9  the dispensing fee?
10 A.  Yes.
11 Q.  And sitting here today, do you still
12 believe that that's an important consideration to
13 make?
14 A.  Yes, I do.
15 Q.  Okay.  Was there a new survey done for
16 overall reimbursement, as you had encouraged?
17 A.  The Department has contracted with Dr.
18 Jacobs to do a cost-of-dispensing survey, and
19 that was completed a year or more ago.  There was
20 not a drug cost or EAC type of component in that
21 survey.  It focused on the cost of dispensing.
22 Q.  Okay.  And did Dr. Jacobson (sic) or

Page 188

1  Jacobs issue a report or --
2  A.  Yes, he did.
3  Q.  Okay.  And if you could briefly
4  summarize, what was the finding or the overall
5  finding of the report?
6  A.  I believe the cost of dispensing in
7  Nebraska pharmacies was similar to that found in
8  other states, an approximate range of 8 point
9  some dollars to over 11 dollars per prescription.
10 Q.  And when -- you said a year ago.  Do
11 you know when the report was published or
12 finalized?
13 A.  I don't know the precise date.  It's
14 been at least a year.
15 Q.  Okay.
16     MS. CITERA:  Can I interrupt?  Has that
17 been produced?
18     THE WITNESS:  No.
19     MS. CITERA:  I just ask that we be able
20 to obtain a copy of that.
21     THE WITNESS:  We can do that.
22     MS. LORENZO:  Okay.

Page 189

1      MR. DUNNING:  Is that available?
2      THE WITNESS:  I'm sorry?
3      MR. DUNNING:  Is that easily
4  obtainable?
5      THE WITNESS:  I believe it's stored in
6  my computer, and I should be able to -- I think
7  that meets the definition of easily obtainable.
8  Otherwise, I have a paper copy.
9  Q.  (BY MS. LORENZO) Okay.  Has the
10 Department taken any action to make any changes
11 to its reimbursement as a result of that survey?
12 A.  No, it has not.
13 Q.  Okay.  Has it considered and rejected
14 any changes as a result of that survey?
15 A.  I'm sorry.  Has it considered?
16 Q.  Well, has it implemented any changes?
17 Has it considered or rejected any changes as a
18 result of that survey?
19 A.  No changes have been made as a result
20 of that survey.
21 Q.  And are there any changes planned as a
22 result of that survey?

Page 222

1  or lack of knowledge has been established.
2         THE WITNESS:  I did not have that
3  understanding.  I don't remember understanding or
4  knowing that, you know, this kind of a range --
5  I've, again, not seen this report.  I knew that
6  there was -- based on the Jacobs' survey, that
7  there were discounts available to pharmacies or
8  that pharmacies paid, what, 8.71 percent less
9  than AWP or were purchased directly on average.
10        Q.  (BY MS. LORENZO)  I know that you're
11 not familiar with this report, per se.  Was there
12 a time when Nebraska Medicaid came to understand
13 that there were ranges of discounts off AWP as
14 described in this document?
15        A.  As of the date of this report, I cannot
16 -- I just -- and somebody else was the pharmacy
17 consultant, and I did not know.  I don't remember
18 that I knew, and I don't know what Dan knew at
19 that time, Dan Snodgrass knew at that time.
20        Q.  Okay.  And this report is dated two
21 years before the Jacobs report; is that correct,
22 approximately?  The Jacobs report was in 1986?

Page 223

1         A.  That is correct.
2         Q.  Okay.  So Nebraska Medicaid would have
3  had this report prior to the --
4         A.  Yes.
5         Q.  -- Jacobs report?
6         A.  Yes.
7         Q.  Okay.  Are you aware that Nebraska was
8  one of 11 states selected for a nationwide review
9  of drug acquisition costs?
10        A.  Am I aware now today?  Yes, I am.
11        Q.  Okay.  That was in the 1994, 1995 time
12 period.  Were you employed at Nebraska Medicaid
13 at that time?
14        A.  I was not.
15            (Exhibit Dey 921 was marked for
16 identification.)
17        Q.  (BY MS. LORENZO)  I'm going to hand you
18 what we're marking as Dey Exhibit 921, which is a
19 copy of an OIG report from December 24th, 1996.
20 Have you seen this document before?
21        A.  Yes, I have.
22        Q.  Okay.  And when did you -- was that in

Page 224

1  preparation for your deposition?
2         A.  Yes.
3         Q.  Okay.  And had you seen it previous to
4  that?
5         A.  I should have seen it.  I was employed
6  by the department at this time as the pharmacy
7  consultant and, as part of my normal duties,
8  should -- I should have seen this.  Do I -- I
9  don't specifically remember at this time, but as
10 part of my normal duties, I should have seen
11 this, yes.
12        Q.  Okay.  And then the cover of the
13 letter, on the first page, it states that the
14 Nebraska Department of Social Services (state
15 agency) was 1 of 11 states randomly selected as
16 part of a nationwide review.  Nebraska reported
17 drug expenditures of 60.3 million in calendar
18 year 1994.
19            Through statistical sampling, we
20 obtained pricing information from 43 Nebraska
21 pharmacies.  We obtained 2,742 invoice prices for
22 brand name drugs and 1,114 invoice prices for

Page 225

1  generic drugs.  The overall estimate of the
2  extent that AWP exceeded pharmacy purchase
3  invoice prices was 18.7 percent for brand name
4  drugs and 44.9 percent for generic drugs.  The
5  national estimates are 18.3 percent and 42.5
6  percent, respectively.
7             So this report indicates that there's a
8  much higher discount off of AWP for generic drugs
9  than brand name drugs; is that correct?
10        MR. DUNNING:  I'm going to object to
11 form, foundation.  The document speaks for
12 itself.
13        THE WITNESS:  Repeat the question.  I'm
14 not sure that -- relatively, what this says, the
15 discount was different for brand than -- or the
16 difference was different for brand than it was
17 for the generic price.
18        Q.  (BY MS. LORENZO)  Right.  And for
19 generic drugs, the overall estimate was that AWP
20 exceeded purchase price invoices was (sic) 44.9
21 percent?
22        A.  That's correct.

Page 226

 1     Q.  And it was 18.7 percent for brand name
 2  drugs; correct?
 3     A.  That's correct.
 4     Q.  If you'd turn to the second page of the
 5  cover letter, it states:  In response to a draft
 6  report, the director of the state agency stated
 7  that our review was the first information of its
 8  type that the state agency has had access to in
 9  ten years.  The director also stated that the
10  information would be useful to the state agency
11  in setting adequate pharmacy reimbursement rates
12  in the future.  The complete text of the
13  director's comments are included in Appendix 4.
14         So would you agree that, as represented
15  here, Nebraska Medicaid had an opportunity to
16  review the draft report?
17     A.  Yes.
18     Q.  If we turn to Appendix 4, which I
19  believe is the last page of the document, there's
20  a letter here dated October 18th, 1996, from
21  Donald Leuenberger to Ben Jackson.  Who is Donald
22  Leuenberger?

Page 227

 1     A.  He was then the director of the
 2  Nebraska Department of Social Services.
 3     Q.  Do you know how long he held that
 4  position?
 5     A.  I do not know.
 6     Q.  Okay.  And he thanks Ben Jackson of the
 7  operational and program reviews for commissioning
 8  the report.  And it states:  I've asked my staff,
 9  including our pharmacy consultant, to review the
10  draft report.  It appears that your report is
11  reflective of Nebraska pharmacy practice and
12  purchasing.
13         Would you have been the pharmacy
14  consultant at the time that this letter was
15  written?
16     A.  Yes.  Yes, I was.
17     Q.  Okay.  And do you recall having any
18  conversations with Mr. Leuenberger or reviewing
19  the draft report?
20     A.  I have a vague recollection of
21  reviewing the report.  I do not believe that I
22  ever had a conversation with Mr. Leuenberger

Page 228

 1  about this letter or the response.
 2     Q.  Okay.  Would you agree with the
 3  sentence that says it appears that your report is
 4  reflective of Nebraska pharmacy practice and
 5  purchasing?  Would that have been a correct
 6  statement at the time?
 7     A.  Yes.
 8     Q.  And it goes on to state that your study
 9  is the first information regarding the difference
10  in costs between AWP and pharmacy's actual
11  acquisition costs that has been accessible to the
12  state since our former pharmacy consultant made
13  an acquisition cost, EAC, and dispensing fee
14  survey in 1986.  That's the survey that we've
15  been discussing today?
16     A.  Yes.
17     Q.  Okay.  Therefore, the information that
18  you've presented will be useful to us as a
19  reference plan in the future to assure that we
20  set adequate pharmacy reimbursement rates which
21  assure access for our recipients while
22  maintaining a prudent policy in terms of setting

Page 229

 1  acquisition costs and total reimbursement.
 2         The Department will, in the near
 3  future, be surveying pharmacies across the state
 4  to determine their non-Medicaid average
 5  dispensing fee.  When we combine the results of
 6  that survey with the benchmark information that
 7  you have provided for us from your review, we
 8  will be able to make a well-informed decision on
 9  adequate and reasonable reimbursement rates for
10  Nebraska pharmacy providers.
11     A.  Yes.  That's accurate.
12     Q.  It says that the Department will be
13  surveying pharmacies for a dispensing fee survey.
14  Do you know if that was done?
15     A.  I know it was not done.
16     Q.  It was not done.  Do you know why it
17  was not done?
18     A.  Why it was not done?  I don't know that
19  -- I was the consultant, probably the only person
20  working in the program.  I know that I had to bid
21  the drug use review project, and this got
22  shuffled back due to -- as I recall, due to

Page 234

1  come about?
2      A.  That was a -- the gross margin was a
3  calculated number.  The pharmacy determined what
4  they charged for each prescription, and they were
5  instructed to get their actual cost of the drug.
6  And the difference between the two -- it was the
7  difference between those two and not necessarily
8  a number that they added consciously to the cost
9  of the drug.  It was a calculated number.  They
10 set the price that they sold the prescription
11 for.
12     Q.  Right.
13     A.  They were instructed to find their cost
14 of the drug to determine what their actual gross
15 margin was.
16     Q.  Okay.  So I think that's the piece --
17 they're the ones who set the --
18     A.  Selling --
19     Q.  -- selling price, set by the pharmacies
20 themselves?
21     A.  Yes.  That's correct.
22     Q.  Okay.  Thank you.  And do you have any

Page 235

1  idea what was taken into account by the
2  pharmacies in setting that selling price?
3      A.  That's the proprietor or owner's
4  determination, and I do not know how they set
5  their prices, what they took into consideration.
6  We know it was an actual price.
7          MS. LORENZO:  We've been going for
8  almost an hour.  Do you want to take another
9  break?
10         THE WITNESS:  Yes.  That would be --
11         MR. DUNNING:  Sure.  Why don't we go
12 off the record.
13         VIDEOGRAPHER:  Off the record.
14           (Short recess.)
15         VIDEOGRAPHER:  We're back on the
16 record.
17     Q.  (BY MS. LORENZO)  I think we had been
18 looking at Dey Exhibit 921, which is a 1996 OIG
19 report, and I just had a few additional questions
20 about that.
21         So at the time that Nebraska received
22 this report, which showed discounts off of AWP

Page 236

1  ranging for brand drugs at 18.7 percent and for
2  generic drugs at 44.9 percent, what was
3  Nebraska's EAC?
4      A.  EAC was AWP minus 8.71 percent for
5  direct.
6      Q.  Okay.  And I think that you've
7  testified previously that, several years later,
8  that was recalculated to be an EAC -- AWP minus
9  10 percent, and that was cost neutral?
10     A.  That's correct.
11     Q.  Okay.  Do you think that that would
12 have been the case if that calculation was
13 performed at that time?  We can --
14     A.  Well, part of that answer maybe goes
15 back to that -- you know, did we include the SMAC
16 drugs or not in the original survey, because
17 that's a large consideration.  Are you asking for
18 my opinion or knowledge of --
19     Q.  You know, why don't -- that was
20 probably not the best question to begin with, so
21 why don't I withdraw that.
22         Regardless of what it became at this

Page 237

1  point for certain drugs, Nebraska was reimbursing
2  at 8.71 percent off AWP?
3      A.  That is correct.
4      Q.  Okay.  And it received information that
5  -- the OIG calculated that, at least for generic
6  drugs, the discount was higher than 8.71 percent;
7  correct?
8      A.  Yes.
9      Q.  Okay.  And it was also higher,
10 approximately 10 percent higher, for brand name
11 drugs?
12     A.  Yes.
13     Q.  Okay.  And did Nebraska do anything
14 with this information that it received from the
15 OIG?
16     A.  In terms of implementing these actual
17 prices, I believe that was not done.
18     Q.  By actual prices, you're referring to
19 the percentage?
20     A.  Yes.  Or the prices for the products,
21 either, specific products.  This was used as a
22 reference point, as is said in the letter.  And