# EXHIBIT 30

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL NO. 1456

AVERAGE WHOLESALE PRICE          ) CIVIL ACTION:

LITIGATION                       ) 01-CV-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO         )

ALL CLASS ACTIONS                )

-------------------------------X


 VIDEOTAPED DEPOSITION OF THE NEW JERSEY DEPARTMENT

      OF HUMAN SERVICES by EDWARD J. VACCARO


     C O M P U T E R I Z E D   T R A N S C R I P T

of the stenographic notes of the proceedings in the

above-entitled matter as taken by and before MARY T.

NOVAK, a Certified Shorthand Reporter and Notary

Public of New Jersey, at the U.S. Attorney's Office,

402 East State Street, Trenton, New Jersey on

Tuesday, December 2, 2008 commencing at fifteen

minutes after nine o'clock in the forenoon.

9fdaca77-07c3-4a10-b060-958ff774dfcb

NJ Dept of Human Services (Edward J Vaccaro)                    December 2, 2008
Trenton, NJ

Page 66

```
 1      Q.  And when the, I think when you said in
 2  July of 1996 when it changed to 10 percent?
 3      A.  Yes.
 4      Q.  So was there any regression used at
 5  that time?
 6      A.  It became a flat percentage of 10
 7  percent.
 8      Q.  And did the discount change from 10
 9  percent subsequent to that time?
10      A.  Yes.  It went to 12 and a half percent.
11  I'm going to say somewheres around 2004.  Then
12  it's at the current rate of 15 percent based upon
13  last year's Appropriations Act.
14      Q.  And when you say based upon last year's
15  Appropriations Act, could you elaborate on that?
16      A.  Again, the Appropriations Act is the
17  means by which the state government allocates
18  funds for providing services.  The Appropriations
19  Act would have line items that basically allow
20  funding to be supplied to DMAHS and it has a
21  specific line item, and I'm a little vague on
22  this, for pharmaceutical services, I believe.  If
```

Page 67

```
 1  not separately, definitely included in the
 2  funding for division itself.
 3      Q.  And did the Appropriations Act actually
 4  set forth what the discount off AWP would be?
 5      A.  When there was a change in the discount
 6  it would be in the Appropriations Act and, yes,
 7  it was in last year's Appropriations Act that
 8  each of those that were timed to the discounts I
 9  mentioned earlier.
10      Q.  So just to clarify, I think you said
11  last year, approximately last year the discount
12  was changed to AWP minus 15 percent; is that
13  correct?
14      A.  For state fiscal year '08.
15      Q.  And that was in, the Appropriations Act
16  actually designated that the reimbursement rate
17  would be AWP minus 15 percent?
18          MR. KIM:  Objection to form.
19      A.  Correct.
20      Q.  And when you refer to the 12 and a half
21  percent discount in 1994 --
22      A.  Right.
```

Page 68

```
 1      Q.  -- would that have been in the
 2  Appropriations Act?
 3      A.  Yes.
 4      Q.  And what about the 10 percent, the flat
 5  10 percent discount that you were referring to?
 6      A.  Yes.  That was in the Appropriations
 7  Act as well.
 8      Q.  Could DMAHS change the discount on its
 9  own?
10      A.  No, it cannot.
11          MR. KIM:  Objection to form.
12          MS. YAVELBERG:  What's the objection?
13          MR. KIM:  There's no foundation and you
14  didn't, well, it's vague.  It's a vague question.
15  What do you mean by on its own?
16      Q.  Could DMAHS use a discount that
17  differed from what was in the Appropriations Act?
18      A.  No.
19      Q.  And when the discount off of AWP was --
20  why was the discount off of AWP changed in these
21  instances that you've described?
22      A.  The market changed in terms of general
```

Page 69

```
 1  reimbursement to pharmacies, particularly, on the
 2  private side when they dispense medications.  The
 3  discount was increasing and the agency felt it
 4  appropriate to keep pace with the industry and
 5  also to respond to the need, typically, for cost
 6  savings during an appropriations period.
 7      Q.  And were changes in the reimbursement
 8  rate for pharmacies contested?
 9      A.  Yes.
10      Q.  And by whom?
11      A.  The pharmaceutical associations
12  typically contested it.
13      Q.  Any other entities?
14      A.  That's the only one I can think of at
15  the moment.  There might be others but nothing
16  comes to mind.
17      Q.  In 1991, I think you said that the, was
18  that the beginning of the Medicaid Management
19  Information System in 1991?
20      A.  Yes.
21      Q.  And was that also the first time that
22  the state started using an automated First
```

18 (Pages 66 to 69)

NJ Dept of Human Services (Edward J Vaccaro)                    December 2, 2008
Trenton, NJ

Page 82

1   standard for a day's use of a drug that shouldn't
2   exceed a certain upper limit.  So we might be
3   talking two doses a day, three doses a day, four
4   doses a day.  If that standard is exceeded then
5   the system would flag it and require the
6   pharmacist to contact Unisys and request prior
7   authorization.
8       Q.   And these cost containment measures
9   that you've refer to, have they been successful?
10      A.   Yes.
11      Q.   In what way?
12      A.   They were probably averaging between 12
13  and $20,000,000 a year in cost saving from MEP.
14      Q.   Now, did the general assembly adopt all
15  the cost containment measures proposed by DMAHS
16  over the years?
17      A.   No.
18      Q.   And why didn't the general assembly
19  adopt all of the cost contain measures proposed
20  by DMAHS?
21      A.   We work in a very strong political
22  environment in New Jersey that's sensitive to the

Page 83

1   wants and needs of constituents, typically,
2   demonstrated to the legislature through lobbying
3   efforts.  Inevitably, these efforts would result
4   in certain initiatives that we would propose
5   being turned down.
6       Q.   And were, I think you mentioned
7   pharmacy associations?
8       A.   Yes.
9       Q.   What are the names of some of those
10  pharmacy associations?
11      A.   Garden State Pharmacy Owners.  New
12  Jersey Pharmacists Association.  Pharma.
13  Pharmaceutical Manufacturers Association.  IPA,
14  Independent Pharmacy Association.  1, 2, 3, 4.
15  Of course, the Association of Long Term Care
16  Pharmacy Providers.  That's pretty well it.
17      Q.   In that list there you mentioned
18  Pharma.  Are they a pharmacy association?
19      A.   They are a manufacturer organization.
20      Q.   And did they also play a role with the
21  general assembly in these measures?
22      A.   Very large role.

Page 84

1       Q.   And in what way?
2       A.   They had the resources to lobby.
3   Legislatives, representatives to discourage
4   passage of certain bills that would impact their
5   marketplace.
6       Q.   And would the reimbursement rate impact
7   their marketplace?
8       A.   Absolutely.
9       Q.   And did they lobby on reimbursement
10  rates?
11      A.   Oh, sure.  They would try to discourage
12  any reduction in reimbursement.
13      Q.   And are there any pharmaceutical
14  companies located in New Jersey?
15      A.   Many.
16      Q.   Can you name some of them?
17      A.   Merck, you're going to get me on this
18  one.  Merck is one.  Lily is another one.  Lily
19  is Annapolis.  That's not it.  The only one that
20  sticks in my mind is Merck.
21      Q.   Is there more than one?
22      A.   There's many.  At this point they're

Page 85

1   not coming to my head.
2       MS. YAVELBERG:  Do you want to take a
3   short break?
4       THE WITNESS:  Yeah, that would be good.
5       MS. YAVELBERG:  Okay.  Let's say five
6   minutes.
7       MR. BERLIN:  Let me comment before we
8   go off the record, I apologize.  My objection to
9   one of the questions did not come out which was
10  the objection to the question of whether
11  pharmaceutical manufacturers lobby with respect
12  to reduction of rates and there was an objection
13  to form to that.  So let the record note that,
14  please.
15      MR. KIM:  Are you okay with that?
16      MS. YAVELBERG:  I didn't hear you make
17  an objection.
18      MR. BERLIN:  I could tell you didn't
19  hear it because we spoke over each other so it
20  didn't come out on the other end is what I
21  suspected.
22      MS. YAVELBERG:  Okay.  Well, we would

22 (Pages 82 to 85)

9fdaca77-07c3-4a10-b060-958ff774dfcb

NJ Dept of Human Services (Edward J Vaccaro)                    December 2, 2008
Trenton, NJ

Page 170

1   they contain spreads that might be in the range
2   of a thousand percent.
3        A.   Yes.
4            MR. KIM:  Objection to form.
5        A.   Yes.
6        Q.   Do you agree that that's what those
7   Complaints, at least, represented?
8        A.   Yes.
9            MR. KIM:  Objection to form.
10       Q.   Now, did New Jersey know that the
11  spreads that are claimed in those Complaints that
12  Abbott and Dey and Roxane may have had were as
13  much as a thousand percent?
14           MR. KIM:  Objection to form.
15       A.   For certain products we were aware of a
16  significant difference between possible
17  acquisition costs and AWP.
18       Q.   And if I draw your attention back to
19  Exhibit 6, which is the 1996 Office of Inspector
20  General Report.  And the third paragraph on the
21  front page of that document.
22       A.   Yes.

Page 171

1        Q.   Is there a discussion about the
2   differences between acquisition cost and average
3   wholesale price in New Jersey pharmacies?
4        A.   Yes.
5        Q.   And what was the difference there?
6        A.   Depending upon the type of drug for
7   generic it was 18.3 percent and for brands it
8   was, I'm sorry, other way around.  For brands it
9   was 18.3 percent and generics was 42.5 percent.
10       Q.   And what about specifically for New
11  Jersey?
12           THE REPORTER:  I'm sorry.  18 point --
13           THE WITNESS:  18.3 percent for brands.
14  And 42.5 percent for generics.
15           That was a national estimate.  For New
16  Jersey it was 19.8 percent for brand and 39.9
17  percent for generics.
18       Q.   And we've already looked at the last
19  two pages of this document which represent the
20  New Jersey --
21       A.   Right.
22       Q.   -- letter in response to that report,

Page 172

1   correct?
2        A.   Correct.
3        Q.   And is this, the differences between
4   acquisition price and average wholesale price
5   represented in this report, is that consistent
6   with what New Jersey knew at that time?
7        A.   Yes.
8        Q.   Now, does New Jersey have any way, have
9   a way of knowing from the prices that are listed
10  in the First DataBank database which ones might
11  have AWPs that are more than, for example, the
12  39.9 percent for generic drugs?
13       A.   No.
14           MR. KIM:  Objection to form.
15       Q.   And which ones may not --
16           MS. YAVELBERG:  I'm sorry.  What was
17  the objection?
18           MR. KIM:  It's, first of all, vague.
19  Are you talking about particular drugs?
20           MS. YAVELBERG:  No.  Let me try to
21  rephrase the question.
22           MR. KIM:  Please do.

Page 173

1        Q.   Now, I think you testified earlier that
2   New Jersey used the First DataBank drug reference
3   file; is that correct?
4        A.   Correct.
5        Q.   And New Jersey covers about 50,000
6   drugs?
7        A.   Correct.
8        Q.   So based on the drug reference file
9   that New Jersey used for, and it did use for
10  reimbursement purposes; is that correct?
11       A.   Correct.
12       Q.   Did New Jersey have any way of knowing,
13  from the database that it received, which AWPs in
14  the database might exceed the, for example, 39.9
15  percent that's listed in this OIG report?
16       A.   No, we did not.
17       Q.   Could you tell from looking at the
18  database?
19       A.   No.
20       Q.   If a manufacturer reported inflated
21  prices to First DataBank --
22           MR. KIM:  Objection to form.

44 (Pages 170 to 173)

9fdaca77-07c3-4a10-b060-958ff774dfcb

NJ Dept of Human Services (Edward J Vaccaro)                    December 2, 2008
Trenton, NJ

Page 238

1    Q.  So what I'm asking is, as long as it's
2  approved in the State Plan, the states have the
3  authority to propose state plans, would you
4  agree?
5    A.  Yes.
6    Q.  And part of the State Plan proposals
7  include reimbursement methodology?
8    A.  Yes.
9    Q.  Correct?
10    A.  Yes.
11    Q.  And choosing a benchmark such as WAC or
12  AWP is within the power of the states to do so
13  within the State Plan; is that correct?
14    A.  Yes.
15      MS. YAVELBERG:  Objection.  Form.
16    Q.  And different states have the ability
17  to do this; is that correct?
18    A.  That's correct.
19    Q.  And each state had to set its
20  reimbursement rates high enough to insure an
21  adequate number of providers that participate in
22  the program; is that correct?

Page 239

1      MS. YAVELBERG:  Objection.  Form.
2    A.  Correct.
3    Q.  Actually, let's stick with that same
4  exhibit.  The first paragraph that I read to you
5  on the second page says, "without incurring the
6  wrath of National Pharmacy Associations."
7      Do you see that?
8    A.  Yes.
9    Q.  During your time at Medicaid -- I'm
10  sorry.  Let me clarify it.
11      During the 1990's, was that a concern
12  to not incur the wrath of National Pharmacy
13  Associations when you were developing
14  reimbursement methodology?
15      MS. YAVELBERG:  Objection.  Form.
16    A.  I think there was a strategy
17  implemented by the agency starting in the early
18  90's and forward that brought interested parties,
19  advocates to the table before they made decisions
20  that impacted, for example, reimbursement.
21    Q.  When you say agency, which --
22    A.  Advocates.  We're talking about whether

Page 240

1  it be beneficiary advocacy groups or if we were
2  going to somehow impose changes on eligibility.
3      In the case of pharmacy we brought the
4  associations to the table, including Pharma, when
5  it was appropriate to do so, for the purpose of
6  taking in their recommendations regarding
7  reimbursement.  For example, if we were proposing
8  a certain level of reimbursement that we knew
9  would be antagonistic we would ask them for their
10  own proposals as alternatives to a change in
11  reimbursement if indeed a goal was to save
12  dollars.  That kind of thing.
13      So what I think you're looking at here
14  is in the 90's our efforts to try and, you know,
15  reduce the rhetoric, if you will, from the
16  various professional organizations, state or
17  national, they would bring their national
18  advocates in with them.  Okay.  And to try and
19  work things out with interested parties ahead of
20  time before we put something in place.
21    Q.  Okay.  It says National Pharmacy
22  Associations.

Page 241

1    A.  Right.
2    Q.  To your knowledge, they don't include
3  manufacturers; is that correct?
4    A.  (No verbal response.)
5    Q.  When you've heard the term National
6  Pharmacy Associations, have you typically
7  included manufacturers as part of that group of
8  National Pharmacy Associations?
9    A.  No.
10      MR. KIM:  Thank you.  Mark another
11  exhibit.  This was previously marked as Dey-81,
12  Exhibit Dey-81.
13      I think I'm just going to hand this to
14  the witness.  We don't have to remark it, right?
15      THE REPORTER:  No.
16      MR. KIM:  Okay.
17    Q.  This is a section of the CFR, Subpart
18  B, Payments for Services.  And Section 447.204
19  and it says, the brief title is Encouragement of
20  Provider Participation.  Are you familiar with
21  this regulation?
22    A.  Yes.

61 (Pages 238 to 241)

9fdaca77-07c3-4a10-b060-958ff774dfcb

Page 262

1     Q.  The billing manual, the fiscal agent
2  billing manual?
3     A.  The fiscal agent billing supplement.
4     Q.  The billing supplement, I'm sorry.
5     A.  It's a supplement.  It's a procedural
6  document on how to complete the claim form.
7     Q.  And the providers are required to
8  follow those billing supplements?
9     A.  Yes.
10    Q.  The directions that are contained in
11 those supplements?
12    A.  That's correct.
13    Q.  Now, New Jersey also posts provider
14 bulletins; is that correct?
15    A.  We generate newsletters and alerts.
16    Q.  For providers; is that correct?
17    A.  That's correct.
18    Q.  And the providers are required to
19 follow those bulletins and newsletters?
20    A.  Yes.
21       MS. YAVELBERG:  Objection to form.
22       MR. KIM:  What's the objection?

Page 263

1        MS. YAVELBERG:  Required to follow
2  what?
3        MR. KIM:  The provider bulletins.  I'm
4  sorry.  Let me rephrase the question.
5     Q.  New Jersey Medicaid publishes bulletins
6  directed at providers; is that correct?
7     A.  That's correct.
8     Q.  And are providers required to follow
9  the contents of those bulletins?
10    A.  Yes.
11       MS. YAVELBERG:  Objection to form.
12    Q.  Now, you testified earlier that there
13 are a variety of interests involved in whenever -
14 - let me rephrase the question.
15       You testified earlier that in certain
16 instances when New Jersey Medicaid had proposed
17 reimbursement policies there were a variety of
18 interests involved that were not affiliated with
19 New Jersey Medicaid; is that correct?
20       MS. YAVELBERG:  Objection to form.
21    A.  That's correct.
22    Q.  One of those interest groups were

Page 264

1  pharmacy associations; is that correct?
2     A.  Yes.
3     Q.  Would you agree that pharmacies had an
4  interest in keeping reimbursement high?
5     A.  Yes.
6     Q.  And would you also agree that pharmacy
7  advocacy groups place pressure on New Jersey
8  Medicaid to keep reimbursement high?
9     A.  Yes.
10       MS. YAVELBERG:  Objection.  Form.
11    Q.  You testified earlier also about the
12 New Jersey Pharmaceutical Association; is that
13 correct?
14    A.  Yes.
15    Q.  What types of, I'm sorry.  What kinds
16 of pharmacies do they represent?
17    A.  Non chain pharmacies.
18    Q.  Independent pharmacies; is that
19 correct?
20    A.  Yes.
21    Q.  And do they represent only pharmacies
22 located in New Jersey?

Page 265

1     A.  Yes.
2     Q.  Do you know how many members are in
3  that association?
4     A.  I do not.
5     Q.  Would it be in the hundreds?
6     A.  Yes.
7     Q.  Thousands?
8     A.  Likely the thousands.
9     Q.  So it's more than 50 percent of New
10 Jersey pharmacies, independent, sorry,
11 pharmacies?
12       MS. YAVELBERG:  Objection.  Form.
13    A.  It's not likely more than 50 percent
14 because there are, I think there are five
15 professional pharmacy organizations in the state.
16 They sort of share who's going to be a member of
17 what.  Some are members of two associations.
18 There's actually an association of chain drug
19 stores, just for chain stores.  That's only chain
20 stores.
21       Then you have New Jersey Pharmacists
22 Association, Garden State Pharmacy Owners,

67 (Pages 262 to 265)

9fdaca77-07c3-4a10-b060-958ff774dfcb

NJ Dept of Human Services (Edward J Vaccaro)                                December 2, 2008
                                    Trenton, NJ

Page 266

1  Independent Pharmacy Alliance.  Those three share
2  membership with, some pharmacies may be in some
3  associations and not in others, so it might be in
4  the hundreds, the high hundreds, maybe seven or
5  eight hundred members are part of the Pharmacists
6  Association.  Same number might be in the Garden
7  State Pharmacy Owners but there might be a
8  duplicate membership.
9      Q.  Okay.  So you mentioned five pharmacy
10 groups.  Did they exist in the 1990's?
11     A.  Yes.
12     Q.  Under those names?
13     A.  Yes.
14     Q.  Early 1990's?
15     A.  Definitely in mid 1990's.
16     Q.  In 1990's?
17     A.  I think they became stronger in the
18 early 90's because of our transition between
19 fiscal agents and the impact it had on the
20 pharmacy community.
21     Q.  I see.  Were they present during any of
22 the reimbursement proposals during the 1990, mid

Page 267

1  1990's?
2      A.  They would have been --
3         MS. YAVELBERG:  Objection.  Form.
4      A.  They would have been invited to sit
5  with the division to talk about prospective
6  proposals for the budget year coming up.  Whether
7  or not they actually were, you know, listened to
8  or worked with is a different story but at least
9  the invitation went out to have them talk to us
10 so we would try to minimize any kind of negative
11 impact to a policy change on them.
12     Q.  So did New Jersey Medicaid, in fact,
13 meet with any of these associations --
14     A.  I would say yes.
15     Q.  -- during the mid 1990's?
16     A.  Yes, we would.
17     Q.  Do you recall which ones specifically?
18     A.  I think we met with them all as a
19 group.  We actually got to the point of inviting
20 them all down together.  Representatives from
21 each organization would come down and sit and
22 talk to us.

Page 268

1      Q.  Do you recall whether any of those
2  meetings were recorded?
3      A.  No.  They weren't recorded.
4      Q.  Do you recall whether there were any
5  alternative proposals or correspondence submitted
6  by those associations?
7      A.  Over the course of 17 years there was a
8  back and forth.  I couldn't tell you what
9  particular budget year but, yeah, there was
10 always an exchange of information.
11     Q.  Let's focus on the mid 90's.  Were
12 there many correspondences, not correspondence,
13 were there many alternative proposals submitted
14 by those associations?
15     A.  Keep in mind that --
16        MS. YAVELBERG:  Objection.  Form.
17     A.  -- we didn't have much change in
18 reimbursement policy until '96.  So it was stable
19 between '91 and '96, so that wasn't the focus of
20 discussion.  The focus of discussion were
21 transitional issues with this change in fiscal
22 agent that was taking place.

Page 269

1      Q.  Under the Federal Rules, isn't it
2  correct, I'm sorry, let me repeat that.
3         Whenever there is a significant
4  proposal to change reimbursement, is New Jersey
5  Medicaid required to hold a comments period?
6      A.  That's part of the register process.
7  So if there was a proposal that got adopted
8  through the Appropriations Act as part of the
9  budget process what followed were regulations
10 that went into 10:51 and that allowed for a 60
11 day comment period.
12     Q.  And these comments would be submitted
13 from these associations that you mentioned
14 before?
15     A.  Whoever and including those, yes.
16     Q.  Okay.  And during the 1996
17 reimbursement change from, I believe it was the
18 tier reimbursement to AWP minus 10 percent flat.
19 Were there comments submitted from these
20 particular associations that you mentioned?
21     A.  I believe so.  You'd have to check the
22 register, Office of Administrative Law and see

68 (Pages 266 to 269)

9fdaca77-07c3-4a10-b060-958ff774dfcb