# EXHIBIT 31

Page 1

UNITED STATES DISTRICT COURT

OF THE DISTRICT OF MASSACHUSETTS

-----------------------------x

IN RE: PHARMACEUTICAL         :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :   CIVIL ACTION

PRICE LITIGATION              :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-A-Care of    :   Judge Patti B.

The Florida Keys, Inc.,       :        Saris

          Plaintiff,          :

     vs.                      :

ABBOTT LABORATORIES, INC.,    :   Chief Magistrate

No. 06-CV-11337-PBS           :   Judge Marianne B.

          Defendants.         :        Bowler

-----------------------------x

                        VOLUME I

                  Baltimore, Maryland

               Wednesday, September 26, 2007

Videotape Deposition of:

          LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

Reed, Larry                                                September 26, 2007
                            Baltimore, MD

Page 38

1    Q.  Have you taken any -- have you taken
2  any courses on business?
3    A.  Some courses on business.
4    Q.  Which courses have you taken relating
5  to business?
6    A.  After college, I took a business law
7  course, and that's all I can recall.
8    Q.  Okay.  Do you have any degrees other
9  than your political science degree from
10 University of Wisconsin --
11   A.  No.
12   Q.  -- Platteville?
13   A.  No.
14   Q.  Okay.  But I take it, from your
15 previous response, that you have taken some
16 coursework after graduating from college?
17   A.  A small amount.
18   Q.  Okay.  And what coursework have you
19 taken?
20   A.  Just odd classes here and there, not
21 towards any type of postgraduate degree.
22   Q.  And you mentioned one of those courses

Page 39

1  was business law.
2    A.  Correct.
3    Q.  And why did you take a course in
4  business law?
5    A.  I just found it interesting.
6    Q.  What other courses have you taken since
7  graduating from college?
8    A.  Again, just an odd course here and
9  there.  I honestly don't recall what type of
10 courses they were, just community college type
11 courses.
12   Q.  Have you taken any courses either in
13 college or post college relating to economics?
14   A.  In college would have been the only
15 time I would have taken those courses.  I don't
16 recall.
17   Q.  Okay.  What was your first job after
18 graduating from college?
19   A.  After I graduated from college, I
20 worked for the D.C. Government in the D.C.
21 Unemployment Board.
22   Q.  And what did you do in that position?

Page 40

1    A.  I was a claims examiner.
2    Q.  Tell me what a claim examiner does.
3    A.  Claims examiner basically interviews
4  persons who have become unemployed to determine
5  their eligibility for unemployment benefits.
6    Q.  Do you have a resume?
7    A.  I do not.
8    Q.  And did you start that job in 1976 upon
9  graduating?
10   A.  I did.
11   Q.  And how long did you serve in that
12 position?
13   A.  I worked in that position for
14 approximately two years.
15   Q.  And what did you do after that?
16   A.  After that, I worked for the Chicago
17 regional office of then HCFA.
18   Q.  And HCFA is the acronym for the Health
19 Care Financing Administration, correct?
20   A.  That's correct.
21   Q.  Which was renamed in 2000, 2001, CMS?
22   A.  That's correct.

Page 41

1    Q.  Okay.  I'll probably use those terms
2  interchangeably today.
3    A.  Okay.
4    Q.  I'll probably use it at times when it
5  isn't right technically, but when I say CMS, I
6  mean HCFA --
7    A.  Okay.
8    Q.  -- and when I say HCFA, I mean CMS.
9    A.  Okay.
10   Q.  Fair enough?
11   A.  That's fair enough.
12   Q.  Okay.  What did you do at the Chicago
13 regional office of HCFA starting in 1978?
14   A.  I worked in quality control, Medicaid
15 quality control.
16   Q.  Can you tell me a little bit more about
17 what you did in that position?
18   A.  Medicaid quality control basically
19 involved reviewing eligibility status, claims
20 processing and third party liability for
21 individuals found eligible under a state Medicaid
22 program.

11 (Pages 38 to 41)

Reed, Larry                                                September 26, 2007
Baltimore, MD

Page 42

1  Q.  Was it a claims -- let me rephrase
2  that.
3      Were you looking at data at the claims
4  level, or was it a broader policy type position?
5  A.  Part of that would be to look at some
6  claims.
7  Q.  How long did you stay in that position?
8  A.  In the Chicago regional office,
9  approximately two years.
10 Q.  Did you come into contact during that
11 job with the issue of how states were reimbursing
12 prescription drugs?
13 A.  It's possible that I would have looked
14 at some of those claims.
15 Q.  What did you do after that job?
16 A.  After working in the Chicago regional
17 office, I moved to Baltimore to work for still
18 then HCFA in the central office quality control,
19 Medicaid quality control function.
20 Q.  What was your title, if you recall?
21 A.  Analyst.
22 Q.  And how long did you hold that

Page 43

1  position?
2  A.  Longer than 10 years.  It could be as
3  long as 15 -- 15 years, as long as 15 years.
4  Q.  So your best guess, 1980 to 1995,
5  roughly?
6  A.  Approximately there.
7  Q.  And what type of work did you do in
8  that position?
9  A.  That was more of an oversight position
10 of regional offices on policies and procedures
11 for quality control.
12 Q.  What kind of policy issues would you be
13 dealing with?
14 A.  Reviewing policies for Medicaid
15 eligibility and how the determination of whether
16 that -- of that eligibility determination was
17 made correctly.
18 Q.  Just to back up a step, when you say
19 "eligibility," what do you mean by that?
20 A.  I mean beneficiary eligibility.  When
21 somebody applies for Medicaid, the state will
22 make a determination of whether or not they're

Page 44

1  eligible for the program, and the federal
2  government then oversees that eligibility
3  determination to make sure that it was done
4  correctly, and at that -- it will also be -- at
5  that point determine an error rate for the state
6  of incorrect eligibility determinations.
7  Q.  In this position, did you have exposure
8  to the issue of how Medicaid programs reimbursed
9  prescription drugs?
10 A.  We would have looked at claims, but is
11 your question did we look at pharmacy claims?
12 Q.  My question's a little broader than
13 that, and that is --
14 A.  Okay.
15 Q.  -- generally, did you come in contact
16 with the issue of how state Medicaid programs
17 reimbursed drugs in your position as analyst?
18 A.  Not as I recall.
19 Q.  Okay.  At some point, did you take a
20 different position within HCFA's Baltimore
21 office?
22 A.  I did.

Page 45

1  Q.  And Baltimore is the headquarters of
2  CMS?
3  A.  Baltimore is the -- right.  Baltimore
4  is the headquarters of CMS.  It also has a
5  Washington office.
6  Q.  What was your next position at HCFA?
7  A.  I was in a leadership development
8  program and worked on the Medicare Catastrophic
9  Coverage Act.
10 Q.  Now, my understanding is that the
11 Medicare Catastrophic Coverage Act was something
12 that was passed in 1988.
13 A.  That's correct, and as I think about
14 it, I do want to correct my answer because I
15 worked on it as legislation was -- after the
16 legislation was developed.  So I didn't -- I
17 didn't work in quality control until 1995.
18 Q.  So you took a different position before
19 1995 is what you're saying?
20 A.  Right, that's correct.
21 Q.  Right.  And then as I understand it,
22 the Medicare Catastrophic Coverage Act was

12 (Pages 42 to 45)

Henderson Legal Services
202-220-4158

6beda74d-d4ef-4589-b133-19d88d943a5d

Reed, Larry						September 26, 2007
Baltimore, MD

Page 54

1  Q.  And do you know how it was that you
2  came to work on the Medicaid Drug Rebate
3  legislation?
4  A.  I believe because I had worked on the
5  Medicare Catastrophic Coverage Act and had some
6  experience with legislation on prescription
7  drugs.
8  Q.  Were you recruited to this position?
9  A.  I was working in that -- again, I was
10 working on the Medicaid side of the house, again,
11 HCFA at that point, and I was asked to work on
12 that.  I'm not sure by "recruited" what -- if you
13 mean anything more than that?
14 Q.  That's good enough.
15 A.  Okay.
16 Q.  Now, the Medicaid rebate legislation --
17 drug rebate legislation was passed in 1990; is
18 that right?
19 A.  November of 1990, as I remember.
20 Q.  Okay.  And so you would have been
21 working in this position sometime before that?
22 A.  Beginning in the summer of 1990.

Page 55

1  Q.  What was your -- do you recall what
2  your title was in that position?
3  A.  For the first part of that position, I
4  was still a branch chief for the claims
5  processing branch.
6  Q.  I think you said that for the first
7  part of this assignment, you were still the
8  branch chief of a processing policy division?
9  A.  That's correct.
10 Q.  Did that change?
11 A.  That did change.
12 Q.  And what was your next position?
13 A.  The next position was as the branch
14 chief of the Medicaid Non-Institutional Payment
15 Policy Branch.
16 Q.  That's a mouthful.  Branch chief of the
17 Medicaid Non-Institutional -- I'm going to write
18 this down.
19 A.  Okay.
20 Q.  Give me one second --
21 A.  Sure.
22 Q.  -- because I won't remember it.

Page 56

1  Non-Institutional -- can you give me
2  the rest of it again?
3  A.  Payment Policy --
4  Q.  Payment Policy?
5  A.  -- Branch.
6  Q.  And when we say "non-institutional,"
7  we're talking about non-hospital?
8  A.  Correct, non-hospital, and I don't
9  recall -- I don't believe we worked on nursing
10 facility issues either, non-institutional issues.
11 Q.  After the Medicaid Drug Rebate
12 legislation was passed and you were no longer
13 advising on legislation, what did you do then?
14 A.  At that point, our job was to implement
15 the law.
16 Q.  And you were the -- where did you fit
17 in in terms of implementing that law?  Were you
18 the head of the division in charge of doing it,
19 second in command, third in command?  Where were
20 you?
21 A.  I was the branch chief for the branch
22 that had that area of responsibility.  Above the

Page 57

1  branch would be a division, and above the
2  division would be an office.  Above the office
3  would be a bureau, and on from there.
4  Q.  Okay.  Who did you report to in your
5  position as the branch chief of the Medicaid Non-
6  Institutional Payment Policy Branch?
7  A.  Bill Hickman was the office director.
8  There was a division director, Bernie Trueffer,
9  in between.
10 Q.  And how was Mr. Trueffer's name
11 spelled?
12 A.  Trueffer, T-R-U-E-F-F-E-R, I believe.
13 I might have the E and the U mixed around.
14 Q.  What is Mr. Hickman doing today, do you
15 know?
16 A.  Bill Hickman is retired.
17 Q.  Do you know when he retired, roughly?
18 A.  A number of years ago.  I don't
19 remember exactly the year he retired.
20 Q.  More than 10 years ago?
21 A.  Again, probably in the area of 5 or 10
22 years.  I don't -- I don't recall any more

15 (Pages 54 to 57)

Henderson Legal Services
202-220-4158

6beda74d-d4ef-4589-b133-19d88d943a5d

Page 58

1  specifically than that.
2     Q.  Did you have anyone who reported to you
3  who was involved in implementing the Medicaid
4  Drug Rebate legislation?
5     A.  Yes.
6     Q.  Who is that?
7     A.  Several analysts that did work on the
8  program.
9     Q.  Do you recall the names?
10    A.  I do.
11    Q.  Would you state them for me?
12    A.  Sure.  I'm giving myself some time to
13 try to recall them, not to be difficult.
14    Q.  Okay.
15    A.  Estelle Chisholm, Mike Keogh, Pete
16 Rodler.  Those were the initial analysts, as I
17 recall.
18    Q.  Did individuals take their place at
19 some point?
20    A.  There are a number of analysts that
21 have worked in the program since that time.
22    Q.  Who was particularly involved in the

Page 59

1  Medicaid Drug Rebate implementation that you
2  recall?
3     A.  In the initial implementation of the
4  program?
5     Q.  No, just as time went on.
6     A.  Up until the current time?
7     Q.  Yes.
8     A.  Okay.
9     Q.  Give me your top five names.
10    A.  At this point --
11    Q.  Throughout that time period.
12    A.  Throughout that time period?  The
13 division director now is Deirdre Duzor; lead
14 analyst, Kim Howell; Marge Watchorn.
15        There may be others, but I -- there's
16 other analysts that have come more recently or
17 had us -- a different part of implementing the
18 program maybe not to the same extent as some of
19 those individuals.
20    Q.  Now, I've seen in the documents that
21 have your name on them that have been produced
22 that, at some point, you also got involved with

Page 60

1  the issue of what state Medicaid programs were
2  paying for drugs.
3     A.  And let me correct -- if I can, go back
4  and add one other name to the initial list of
5  individuals.  Sue Gaston.
6        And, I'm sorry, I thought about that
7  and didn't listen to your question.
8     Q.  Okay.  In looking at the documents that
9  were produced in this case, your name's on quite
10 a few documents, and it appears, looking at the
11 documents, that, at some point, you became
12 involved with the issue of what state Medicaid
13 programs were paying for drugs.
14    A.  That's correct.
15    Q.  And when did that issue come within
16 your realm of responsibility?
17    A.  Because that was a non-institutional
18 payment policy issue, it would have been
19 approximately the same time as I took over the
20 branch chief for that branch.
21    Q.  So 1990?
22    A.  Approximately that, right.

Page 61

1     Q.  Were there individuals -- we talked
2  earlier about individuals who were particularly
3  involved in implementing the Medicaid Drug Rebate
4  Program.  Similar question with respect to what
5  state Medicaid programs reimburse for drugs.
6        Do you recall particular individuals
7  under your direction who were involved in that
8  issue?
9        MS. MARTINEZ:  Objection to form.
10       THE WITNESS:  There were individuals
11 that worked both on state plans and rebate
12 programs.  There -- really at that point for the
13 analyst work, there wasn't a distinction.
14 BY MR. TORBORG:
15    Q.  The same individuals who worked in the
16 Medicaid Drug Rebate implementation also worked
17 on the issue of what state Medicaid programs were
18 paying for drugs; fair to say?
19    A.  Some might have worked a little bit
20 more in one or the other, but generally that's
21 correct.
22    Q.  In -- how long did you serve as the

Reed, Larry                                                                September 26, 2007
Baltimore, MD

Page 62

1  branch chief of the Medicaid Non-Institutional
2  Payment Policy Branch?  How long did you have
3  that position?
4      A.  Approximately until we moved into our
5  new headquarters, and that was in the mid '90s,
6  around 1995, our new headquarter building.
7      Q.  And what position did you take at that
8  point?
9      A.  There was a reorganization, and at that
10 point, the groups were -- I'm sorry, the -- they
11 were -- I'm trying to think of the right name,
12 teams, divisions, whatever they were called, were
13 reorganized and I became a technical director in
14 one of those areas.
15     Q.  Which area was that?
16     A.  It was generally the same area.  It did
17 pick up some added functions.  I don't remember -
18 - I don't recall the actual official name of that
19 area.
20     Q.  But it was the division that was
21 charged with both implementing the drug rebate
22 legislation and what -- and overseeing what

Page 63

1  states were paying for drugs?
2      A.  At that point, the legislation -- it
3  was 1995, so the legislation was fairly well
4  along in being implemented.  It was for the
5  ongoing operational policy issues as well as
6  state plan amendments for paying for drugs.
7      Q.  When did Mr. Rodler retire?
8      A.  I don't remember -- I don't recall Pete
9  moving to the new building, so it was likely
10 before 1995.  That's my recollection.
11     Q.  When did Sue Gaston start?
12     A.  Sue Gaston started fairly early on with
13 the -- after the law was passed.
14     Q.  Another name I've seen in some of the
15 documents is a -- I gather it's a woman -- Cindy
16 Pelter?
17     A.  Cindy Pelter.
18     Q.  What was her job?
19     A.  Cindy was an analyst that worked on --
20 again, on state plan amendments and the Drug
21 Rebate Program.  She works on the operations side
22 of the program now.  She doesn't work for our

Page 64

1  side any longer.  She doesn't work on the policy
2  side.
3      Q.  There's an operational side and a
4  policy side?
5      A.  That's correct.
6      Q.  And the issue of what state Medicaid
7  programs should be paying for drugs was a policy
8  issue, right?
9      A.  That issue of state plan amendments or
10 state payment for drugs was a policy issue,
11 that's correct.
12     Q.  Did Ms. Pelter work in the Baltimore
13 office?
14     A.  She did.
15     Q.  Okay.  Is she still there today?
16     A.  She is.
17     Q.  Is Ms. Gaston still there today?
18     A.  She is -- also on the operations side,
19 she is.
20     Q.  What are they doing on the operational
21 side?
22     A.  Cindy works on general operational

Page 65

1  issues, Sue Gaston -- Sue works on a dispute
2  resolution program.
3      Q.  Does the dispute resolution program
4  have anything to do with drugs?
5      A.  It does.
6      Q.  Okay.  Does it deal with the Medicaid
7  Drug Rebate law?
8      A.  That's correct.
9      Q.  Anything else?
10     A.  Do you want me to describe the program
11 further?
12     Q.  Yes.
13     A.  Okay.  The dispute resolution program
14 basically brings manufacturers and states
15 together where -- where there's not agreement on
16 how much rebate should be paid by that
17 manufacturer to the state, there's a question of
18 units, of some other question where they're not
19 in agreement.
20     Q.  What involvement does CMS have in that
21 program?  You said I think that it would bring
22 the manufacturers together with the states.

17 (Pages 62 to 65)

Henderson Legal Services
202-220-4158

6beda74d-d4ef-4589-b133-19d88d943a5d

Reed, Larry                                                          September 26, 2007
Baltimore, MD

Page 302

1  that are not necessarily included in the AWP
2  number --
3       MS. POLLACK: Objection to form.
4  BY MR. TORBORG:
5     Q.  -- such as discounts and rebates?
6     A.  That I don't know, again, because there
7  was no -- there is no definition of AWP that we
8  maintain.
9     Q.  So you had access to the AMP
10 information, correct?
11    A.  Yes.
12    Q.  And there's nothing in the law that
13 precluded you from using that information in
14 deciding whether or not to approve or disapprove
15 a state plan for reimbursement; is that right?
16      MR. DRAYCOTT: Objection. You can
17 answer.
18      THE WITNESS: Okay. In using that,
19 again, the confidentiality provisions would
20 prohibit us using that data in a way which would
21 make it public.
22 BY MR. TORBORG:

Page 303

1     Q.  Let me see if you can answer my
2  question.
3     A.  Sure.
4     Q.  Maybe you've done the best you can.
5        Do you know if there's anything in the
6  statute that would preclude HCFA from using the
7  AMP information in deciding whether or not to
8  approve or disapprove state plans?
9       MS. MARTINEZ: Objection to form. You
10 can answer.
11      THE WITNESS: And that is the best I
12 think I can answer. To use that AMP data to
13 judge a state plan amendment would mean to
14 disclose that AMP information to be able to say
15 here's the AMP for this drug, your AWP discount
16 is too low, or for this set of drugs. And, I
17 mean -- and, again, these are just completely
18 different systems.
19 BY MR. TORBORG:
20    Q.  Why would you have to disclose the AMP
21 information in order to disapprove a state plan?
22    A.  At that point, a methodology -- if a

Page 304

1  plan is disapproved, the state either goes back
2  to its prior methodology or it has to submit a
3  new state plan or, before the disapproval, revise
4  its state plan and come up with an acceptable
5  methodology.
6     Q.  But there's nothing in your HCFA
7  practice or regulations that would require you to
8  put forth the AMP information if you disapproved
9  a state plan, is there?
10    A.  I think the logical outcome there would
11 be to get an approvable state plan, you would
12 have to have a definition that reflected AMP.
13    Q.  So your understanding was that you
14 could not use AMP information in deciding whether
15 or not to approve or disapprove a state plan?
16    A.  We did not use AMP in deciding whether
17 to approve or disapprove a state plan.
18    Q.  Okay. And was that something that
19 Congress directed of HCFA or something that HCFA
20 determined itself?
21      MS. MARTINEZ: Objection to form.
22      THE WITNESS: Again, I think our -- our

Page 305

1  issue there would be having that AMP made public
2  through, again, sort of to get to the point where
3  you would have a payment rate that reflects AMP
4  would mean you would have to disclose AMP.
5       The other issue that does bear on that
6  is a state needed to make a reasonable estimate
7  on its own of what its payment rate should be.
8  BY MR. TORBORG:
9     Q.  Are you aware of any specific
10 legislation that prevented HCFA from using the
11 AMP information in deciding whether or not to
12 disclose -- or approve or disapprove a state
13 plan?
14      MS. MARTINEZ: Objection to form.
15      THE WITNESS: And here again, are you -
16 - if you're asking me is there something in
17 Section 1927 that says HCFA, do not use AMP to
18 approve or disapprove a state plan, there is
19 nothing like that.
20      If your question is is that how we
21 looked at it, then that is how we looked at it.
22 BY MR. TORBORG:

77 (Pages 302 to 305)

6beda74d-d4ef-4589-b133-19d88d943a5d