# EXHIBIT 32

Page 329

UNITED STATES DISTRICT COURT

OF THE DISTRICT OF MASSACHUSETTS

------------------------------x

IN RE:  PHARMACEUTICAL         :    MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     :    CIVIL ACTION

PRICE LITIGATION               :    01-CV-12257-PBS

THIS DOCUMENT RELATES TO       :

U.S. ex rel. Ven-A-Care of     :    Judge Patti B.

The Florida Keys, Inc.,        :        Saris

         Plaintiff,            :

    vs.                        :

ABBOTT LABORATORIES, INC.,     :    Chief Magistrate

No. 06-CV-11337-PBS            :    Judge Marianne B.

         Defendants.           :        Bowler

------------------------------x

VOLUME II

Baltimore, Maryland

Thursday, September 27, 2007

Continued Videotape Deposition of:

LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

Reed, Larry - Vol. II                                     September 27, 2007
Baltimore, MD

Page 362

1    MR. HERNANDEZ: Objection to form.
2    THE WITNESS: The expectation would be
3  both for the federal upper limits program and for
4  looking at state plan amendments that would use a
5  discounted AWP.
6  BY MR. TORBORG:
7    Q. It was not based upon any HCFA
8  regulation directing manufacturers what to report
9  or cause to be reported for AWPs, correct?
10   A. HCFA's regulation of manufacturers was
11 limited to the rebate program. There was no
12 regulation on the payment side that was directed
13 directly to manufacturers.
14   Q. And you don't recall any discussions
15 with manufacturers about what HCFA believed that
16 the manufacturers should be reporting or cause to
17 be reporting as their AWPs; is that fair to say?
18   MS. MARTINEZ: Objection to form.
19   THE WITNESS: And that's, again, a
20 fairly broad question. Can you --
21 BY MR. TORBORG:
22   Q. Did you have any conversations with

Page 363

1  Abbott about what prices Abbott should cause to
2  be reported in the pricing compendia?
3    MS. MARTINEZ: And, of course, you're
4  asking did Mr. Reed?
5    MR. TORBORG: Yes.
6    MS. MARTINEZ: Yes.
7    THE WITNESS: I don't recall any
8  conversation like that.
9  BY MR. TORBORG:
10   Q. Are you aware of anyone else at HCFA
11 who had any such discussions?
12   A. A discussion on the prices that would
13 be reported as their AWPs?
14   Q. Correct.
15   A. Over the course of the entire time that
16 I was there or for that time period?
17   Q. From 1988 through 2001.
18   A. There were discussions with other
19 manufacturers about prices, about the prices that
20 were to be reported in as AWPs.
21   Q. Okay. Tell me about those discussions.
22   A. There was some discussion about how

Page 364

1  those AWPs were reported from the manufacturer
2  through First DataBank and published.
3    Q. Were those discussions with First
4  DataBank or with a manufacturer?
5    A. Discussions were with both.
6    Q. Which manufacturers?
7    MS. MARTINEZ: If this is a discussion
8  that you had with the manufacturers, you can
9  answer.
10   THE WITNESS: Okay. One that I
11 remember with Johnson & Johnson, if I'm
12 remembering correctly. There was another
13 discussion; I don't remember the company.
14 BY MR. TORBORG:
15   Q. And in those discussions, was it the
16 fact that the manufacturers were telling HCFA
17 that the AWPs were not a reflection of the
18 average prices, correct?
19   A. I think the issue was more so the level
20 of inflation that First DataBank added to those
21 prices.
22   Q. HCFA did not expect Abbott or other

Page 365

1  manufacturers to cause to be reported in the
2  public pricing compendia the actual average
3  prices by which wholesalers sold their drugs to
4  customers, did it?
5    MS. MARTINEZ: Objection to form.
6    THE WITNESS: CMS did not have a
7  federal regulation or a policy instruction to
8  manufacturers on reporting average wholesale
9  prices.
10 BY MR. TORBORG:
11   Q. Nor did HCFA expect manufacturers would
12 do that, correct?
13   MS. MARTINEZ: Objection to form.
14   THE WITNESS: I don't know. I don't
15 think I could answer that question. You're
16 speaking of more than -- more than me.
17 BY MR. TORBORG:
18   Q. You yourself did not have any
19 expectation that Abbott or any other manufacturer
20 would cause the pricing compendia to report
21 average wholesale prices in the compendia that
22 reflected the actual average of prices sold by a

10 (Pages 362 to 365)

Reed, Larry - Vol. II                                                September 27, 2007
Baltimore, MD

Page 518

1   Q. Also I'd like to ask you to go to Bates
2   page ending 667, "Conclusions and
3   Recommendations," for this report.
4       The first paragraph states, "Based on
5   our review, we have determined that there is a
6   significant difference between AWP and pharmacy
7   acquisition costs. The difference between AWP
8   and pharmacy acquisition costs is significantly
9   greater for generic drugs than for brand name
10  drugs."
11      Do you recall becoming aware of that
12  comment in OIG's report?
13      A. Of this specific comment in this
14  specific report?
15      Q. Just the general notion, I guess, a
16  broader notion that OIG had found in its work
17  that there was a significantly greater difference
18  in the spread, if you will, between AWP and
19  acquisition costs for generic drugs.
20         MS. MARTINEZ: Objection, form.
21         THE WITNESS: That there is a
22  difference between the AWP discount for a brand

Page 519

1   and generic drug, yes.
2   BY MR. TORBORG:
3       Q. You recall having those -- you recall
4   observing that in the reports or having
5   discussions with HCFA, or what do you recall
6   about that subject?
7       A. Observing the report, observing that in
8   the reports.
9       Q. Did you have discussions about the
10  significantly greater difference between AWP and
11  acquisition costs for generic drugs as opposed to
12  branded drugs?
13         MS. MARTINEZ: Objection, form.
14         MS. POLLACK: Objection, form.
15         THE WITNESS: I believe we had those
16  discussions.
17  BY MR. TORBORG:
18      Q. Who were those discussions with?
19         MS. MARTINEZ: Objection, privilege.
20         MR. TORBORG: We have to decide who the
21  discussions were with before we can decide what
22  privilege applies.

Page 520

1          MS. MARTINEZ: No, the discussions were
2   within HCFA, and if they related to an
3   anticipated decision by HCFA, then it would be
4   privileged and then you would be instructed not
5   to answer.
6          If you had a discussion with somebody
7   in the outside that's not related to a policy
8   decision like that, you can -- you can answer.
9          THE WITNESS: I can't answer.
10  BY MR. TORBORG:
11      Q. So you had discussions within HCFA
12  about the significantly greater difference
13  between acquisition costs and AWP for generic
14  drugs as compared to branded drugs, correct?
15         MS. MARTINEZ: Objection, form.
16         THE WITNESS: We did have those
17  discussions.
18  BY MR. TORBORG:
19      Q. And I'm not permitted to probe your
20  memory here today because you've been instructed
21  not to answer, correct?
22      A. Correct.

Page 521

1       Q. And did your discussions have any
2   impact on the amount at which HCFA approved state
3   Medicaid plans for payment of drugs?
4       A. I'm not sure I understand your
5   question.
6       Q. Okay. Let me see if I understand.
7          We agree we had -- you had discussions
8   within HCFA about the significantly greater
9   difference between acquisition costs and AWP for
10  generic drugs.
11         MS. MARTINEZ: Objection, form.
12  BY MR. TORBORG:
13      Q. You had those discussions, right?
14         MS. MARTINEZ: Objection, form.
15         THE WITNESS: There were discussions.
16  BY MR. TORBORG:
17      Q. And in your office, you are responsible
18  for determining whether or not to approve or
19  disapprove state Medicaid plans in the -- at
20  least in the area of prescription drug
21  reimbursement, correct?
22      A. No, that's not correct.

49 (Pages 518 to 521)

Page 522

1   Q.  This regional offices -- the regional
2   offices had that responsibility?
3   A.  It was a shared responsibility.
4   Q.  Okay.  And if I understand the basis
5   for the insertion of privilege and your
6   observation of the privilege is that those
7   discussions related to some sort of policy,
8   correct?
9       MR. HERNANDEZ:  Objection to form.
10      MS. MARTINEZ:  Decision -- decision by
11  HCFA.
12  BY MR. TORBORG:
13  Q.  A decision or a policy, correct?
14  A.  A decision or a policy, correct.
15  Q.  Okay.  What decision or policy was
16  that?
17      MS. MARTINEZ:  Objection, form.
18      THE WITNESS:  And, I'm sorry, I'm not
19  sure what you're looking -- what you're --
20  BY MR. TORBORG:
21  Q.  The deliberative process privilege is
22  supposed to apply to deliberations leading to a

Page 523

1   decision or a policy.
2   A.  Right.
3   Q.  I'm trying to decide -- trying to
4   figure out what decision or policy those
5   discussions related to.
6   A.  The decision would be how to look at
7   this and reviewing a state plan.
8   Q.  And whether or not to approve or
9   disapprove the plan?
10  A.  That could be part of that decision.
11  Q.  Which would ultimately determine how
12  much providers were paid for drugs, correct?
13  A.  Correct.
14  Q.  I'd like to ask you to go to the last
15  page of the document -- second to last page and
16  the last page, which are the letter response from
17  the state of Minnesota to OIG's report.
18      MS. MARTINEZ:  Montana?
19      MR. TORBORG:  Come again?
20      MS. MARTINEZ:  Montana?
21      MR. TORBORG:  Montana report, yes,
22  Bates 673, 674.

Page 524

1       Let me ask you, after you've had a
2   chance to review those two pages, whether you
3   recall this response from the state of Montana.
4       THE WITNESS:  I don't recall this
5   response.
6   BY MR. TORBORG:
7   Q.  In the first paragraph, Montana's Peter
8   Blouke -- I'm sure I'm not pronouncing that right
9   -- indicated that, "Montana currently pays the
10  lesser of AWP minus 10 percent, federal upper
11  limit for multisource generic products.  In
12  addition to the product cost, Medicaid also
13  reimburses a dispensing fee not to exceed $4.08
14  per script," then it continues.
15      And that's consistent, is it not, with
16  the NPC report that I marked as Exhibit Abbott
17  326, the 1996 page?
18      MS. MARTINEZ:  Sorry, are you -- is it
19  Exhibit Abbott 327?
20      MR. TORBORG:  Exhibit Abbott 326 is the
21  NPC reports.
22      MS. MARTINEZ:  Oh, right, right.

Page 525

1       THE WITNESS:  The NPC 1996 report
2   references AWP minus 10.  It doesn't reference a
3   federal upper limit price.
4   BY MR. TORBORG:
5   Q.  Okay.  The federal upper limit price
6   was a -- was that a mandatory price?
7       MR. HERNANDEZ:  Objection, form.
8       MS. MARTINEZ:  Objection, form.
9       MR. TORBORG:  Actually, strike that.
10  That's probably not a very good way to ask that
11  question.  It doesn't matter.
12      And the NPC report also showed a
13  dispensing fee of between $2 and $4.08, correct,
14  which is consistent with the Montana letter?
15      MR. HERNANDEZ:  Objection, form.
16      THE WITNESS:  You're referring to the
17  NPC 1996?  I put it away, so I had to go back to
18  it.
19  BY MR. TORBORG:
20  Q.  Yes.
21  A.  The dispensing fee is listed for
22  Montana as $2 to 4.08.

Page 586

```
 1  available through other cases, other litigation.
 2  I don't know how I can speak to that.
 3  BY MR. TORBORG:
 4     Q.  And that's not something that you
 5  expect to testify to the jury about --
 6        MS. MARTINEZ:  Objection, form.
 7        MR. HERNANDEZ:  Objection, form.
 8  BY MR. TORBORG:
 9     Q.  -- correct?
10     A.  I don't even know what that question
11  means.
12     Q.  If Abbott had called you up, Mr. Reed,
13  and told you here are the actual average selling
14  prices for these NDCs listed in the United States
15  complaint against Abbott, what would the United
16  States have done differently in approving or
17  disapproving state plan amendments for
18  reimbursement?
19        MR. HERNANDEZ:  Objection to form.
20        MS. MARTINEZ:  Objection, form.
21        THE WITNESS:  And, in fact, we had --
22  they weren't called average sales prices, but
```

Page 587

```
 1  they were called AMPs that were produced by every
 2  manufacturer that we couldn't use.
 3        I think the issue was that you just
 4  couldn't -- you probably could not get to a good
 5  pricing mechanism.  You need -- you need AMPs.
 6  BY MR. TORBORG:
 7     Q.  And that's something that CMS itself
 8  had, correct?
 9     A.  CMS had confidentially.  If Abbott
10  would have reported those prices -- I mean, if
11  Abbott would have reported those prices through
12  another pricing mechanism, then those prices
13  could have been used like through the pricing
14  compendia for the federal upper limits program.
15     Q.  It wasn't a lack of -- I mean, if
16  Abbott had told you here are the prices for the
17  actual average selling prices for these drugs,
18  say, in 1995, would that have changed the way in
19  which HCFA approved or disapproved state plan --
20  state plans for reimbursement of drugs?
21        MR. HERNANDEZ:  Objection, form.
22        MS. MARTINEZ:  Objection, form.
```

Page 588

```
 1        THE WITNESS:  The drug pricing
 2  mechanism that the states used would have been at
 3  a higher level than that.  If Abbott would have
 4  reported those prices through the pricing
 5  compendia, again, they would have had an effect
 6  on the price paid for Abbott's drugs, but I don't
 7  know if they would have affected our approval or
 8  disapproval of a state plan.
 9  BY MR. TORBORG:
10     Q.  And we talked about this earlier, but
11  you didn't -- did you have any expectation that
12  Abbott would cause to be reported in the public
13  pricing compendia the confidential pricing
14  information of the type that you protected at
15  CMS?
16        MS. MARTINEZ:  Objection, form.
17        MS. POLLACK:  Objection to form.
18  BY MR. TORBORG:
19     Q.  What was HCFA's expectations of Abbott?
20        MS. MARTINEZ:  Objection, form.
21        MR. HERNANDEZ:  Same objection.
22        THE WITNESS:  And are you talking for
```

Page 589

```
 1  the AMP pricing mechanism, are you talking for
 2  the AWP pricing mechanism, are you talking for
 3  both?
 4  BY MR. TORBORG:
 5     Q.  The AWP pricing mechanism.
 6     A.  I think we did talk about that earlier
 7  today.  Our expectation would be that that --
 8  that would -- that is a price that we would use
 9  ourselves for the federal upper limits, and it
10  would be used in approval -- in actions on state
11  plan amendments.
12     Q.  But it wasn't an expectation that was
13  based on any discussions that you had with
14  Abbott, was it?
15        MR. HERNANDEZ:  Objection, form.
16        MS. MARTINEZ:  Objection, form.
17        THE WITNESS:  There was no -- there was
18  no policy guidance, no regulation to any
19  manufacturer on the definition of AWP for the
20  Medicaid program.
21  BY MR. TORBORG:
22     Q.  And did you have discussions within
```

66 (Pages 586 to 589)