EXHIBIT 34

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )   CIVIL ACTION

PRICE LITIGATION                )   01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      )   Judge Patti B. Saris

the Florida Keys, Inc.          )

     v.                         )   Chief Magistrate

Abbott Laboratories, Inc.,      )   Judge Marianne B.

No. 06-CV-11337-PBS             )   Bowler

- - - - - - - - - - - - - - - -

     (cross captions appear on following pages)



          Videotaped deposition of SUE GASTON

                    Volume I



                    Washington, D.C.

                    Thursday, January 24, 2008

                    9:00 a.m.

Gaston, Sue                                                              January 24, 2008
Washington, DC

```
                              Page 218
 1       A.  Yes.
 2       Q.  And did you understand that the average
 3   wholesale price for multiple source drugs in
 4   particular was not a reliable indicator of the cost
 5   at which pharmacies and physicians purchased drugs?
 6           MS. MARTINEZ:  Objection to form.
 7           MS. ALBEE:  Objection to the form.
 8           MR. WINGET-HERNANDEZ:  Objection, form.
 9       A.  As I stated before, my understanding is
10   that I looked at average wholesale price, direct
11   price, wholesale acquisition costs, the prices that
12   were available in the compendia, and generally
13   speaking the average wholesale price was a higher
14   price at that point others.
15       Q.  Did you have an understanding that the
16   difference between average wholesale price published
17   in the compendia and what people were buying the
18   drugs for was particularly variable when it came to
19   multiple source drugs as opposed to sole source
20   drugs?
21           MR. WINGET-HERNANDEZ:  Objection, form.
22           MS. ALBEE:  Objection, form.
```

```
                              Page 219
 1           MS. MARTINEZ:  Objection, form.
 2       A.  I can't say that.
 3       Q.  Is that something that you were made
 4   aware of in multiple OIG reports?
 5           MS. MARTINEZ:  Objection, form.
 6       A.  It's mentioned in the OIG reports, yes.
 7       Q.  Let me ask you to look at page 685 of
 8   this document, the Bates page ending in 685.  The
 9   last column, the first full paragraph starts with
10   "stage agencies."  Do you see that?
11       A.  Yes.
12       Q.  It says "State agencies should determine
13   independent of the 150 percent formula appropriate
14   payment levels for the listed multiple source drugs.
15   We would not expect a state agency to adopt directly
16   the upper limit methodology as a payment method
17   because it does not gear payments to markups
18   appropriate to the actual costs of acquiring and
19   dispensing these drugs."  Do you see that?
20       A.  Yes, I do.
21       Q.  Do you have an understanding of what that
22   means?
```

```
                              Page 220
 1       A.  Just what they're saying.
 2       Q.  What are they saying?
 3       A.  So independently I guess states on their
 4   own shouldn't apply the 150 percent markup.
 5       Q.  If you go to the next paragraph, the
 6   second full sentence starts with "since."  Do you
 7   see that?
 8       A.  No.
 9       Q.  "Since we are not placing" --
10       A.  Where are you?
11       Q.  The next paragraph down about eight lines
12   down.
13       A.  The next paragraph down?
14       Q.  Yeah.
15       A.  Okay.  "Since we are not"?  Okay.
16       Q.  "Since we are not placing maximum payment
17   limits on individual drugs, drugs with high
18   compendia prices could generate extremely high
19   payment levels.  Unless an agency's payment
20   methodology ensured otherwise, a Medicaid agency
21   could end up paying inappropriately high rates for
22   some drugs while still being in compliance with the
```

```
                              Page 221
 1   aggregate upper limit.
 2           "Nevertheless, we believe states may
 3   establish maximum payment limits in order to offset
 4   the minimum payment levels necessary to ensure
 5   reasonable compensation for very low priced drugs."
 6   Do you see that?
 7       A.  Yes.
 8       Q.  Do you have an understanding of what that
 9   last sentence means, establishing minimum payment
10   levels necessary to ensure reasonable compensation
11   for very low priced drugs?
12       A.  Well, my understanding of what they're
13   trying to say is that states have the flexibility to
14   set a MAC on drugs that they feel are not priced
15   appropriately.
16       Q.  Do you know what they're talking about or
17   how do you interpret the comment reasonable
18   compensation for very low priced drugs?
19       A.  That if they feel that the drug cannot be
20   obtained in their state because the price is low,
21   that they have the flexibility to set a MAC on a
22   drug so that it will be obtainable within their
```

56 (Pages 218 to 221)

Gaston, Sue                                                           January 24, 2008
                              Washington, DC

Page 222

1  state.
2         (Exhibit Abbott 461 was
3          marked for
4          identification.)
5         MR. TORBORG:  I'm told that we have five
6  minutes left on the tape and it's within about an
7  hour.  So let's go ahead and take a break here.
8         THE VIDEOGRAPHER:  This is the end of
9  tape 4.  Off the record at 3:17.
10        (Recess.)
11        THE VIDEOGRAPHER:  This is the beginning
12 of tape 5 in the deposition of Ms. Gaston.  On the
13 record at 3:43.
14        MR. TORBORG:  Welcome back, Ms. Gaston.
15        THE WITNESS:  Thank you.
16        MR. TORBORG:  I wanted to cover
17 something, some housekeeping matters on the record
18 very quickly.  I understand from Ms. Martinez that
19 there are some additional documents from Ms.
20 Gaston's files or legacy files that are yet to be
21 produced.  Is that right?
22        MS. MARTINEZ:  Yes.

Page 223

1         MR. TORBORG:  And those are ones that
2  you're working on currently and we intend to
3  schedule a second day with Ms. Gaston so that we can
4  go over those documents.
5         MS. MARTINEZ:  I believe what you told me
6  is that you'd look at them and see if you need an
7  additional day.
8         MR. TORBORG:  That's true.
9         MS. MARTINEZ:  But naturally --
10        MR. TORBORG:  I will need an additional
11 day anyway.
12        MS. MARTINEZ:  Okay.  That's what I
13 thought.
14        MR. TORBORG:  Okay.
15        BY MR. TORBORG:
16    Q.   Okay.  Going back to the subject of
17 federal upper limits, Ms. Gaston, I want to ask just
18 a few very general background questions about how
19 the process worked at HCFA, who was involved in what
20 aspects and things of that nature.  Earlier you
21 testified or you identified three people at CMS who
22 were involved in establishing the FULs.  I believe

Page 224

1  you said from 1991 through 2003 when you were doing
2  that, correct?
3     A.   Correct.
4     Q.   And those three people were -- three
5  additional people were Peter Rodler, Cindy Bergin
6  and Gail Sexton?
7     A.   Gail Sexton worked on the FULs after
8  2003.
9     Q.   Did she have any involvement with FULs
10 prior to 2003?
11    A.   No.
12    Q.   What was she doing prior to 2003?
13    A.   I'm not sure.  She was employed by CMS
14 around that time, but I don't know exactly when she
15 started.
16    Q.   And Mr. Rodler I understand was somebody
17 who had been at HCFA and the Medicaid Bureau prior
18 to you being there?
19    A.   Correct.
20    Q.   And then at some point he retired or
21 moved on?
22    A.   Correct.

Page 225

1     Q.   Do you know when he retired or moved on?
2     A.   No.
3     Q.   Can you give me a sense?  Was it early
4  '90s, late '80s?
5     A.   I'm guessing it was in the '90s.  Not in
6  the late '90s, but I'm not sure.
7     Q.   And Cindy Bergin, when did she work at
8  CMS on the FUL issues?
9     A.   She was hired -- I'm not sure exactly the
10 date -- probably eight or nine years ago.  And I
11 mentored here on the FULs until I left in 2003.
12    Q.   So she would have been someone that was
13 working on FUL issues starting in the mid to late
14 '90s; is that fair to say?
15    A.   That's fair to say.
16    Q.   And did you work with Mr. Rodler on the
17 federal upper limit issues or did you sort of
18 succeed his duties?
19    A.   He taught me how to handle the federal
20 upper limit program.  And then when he left I took
21 it over.
22    Q.   And did Cindy Bergin take it over from

57 (Pages 222 to 225)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Page 226

1  you --
2      A.  Yes.
3      Q.  And then at some point is it your
4  understanding that Gail Sexton took it over from
5  Cindy Bergin or were they both working on it?
6      A.  She -- Cindy trained Gail and then Gail
7  took it over when Cindy left the area.
8      Q.  So it sounds to me -- and please tell me
9  if I'm mischaracterizing this or misunderstanding
10 this -- that the mechanics of the FUL program were
11 handled primarily by one person, but there was some
12 overlap in training.  Is that right?
13         MS. MARTINEZ:  Objection, form.
14     A.  Generally speaking.  There were periods
15 when it was just one person.  And then when there
16 were two, even though one was training they were
17 both working on it.
18     Q.  And did you first get involved -- is it
19 your recollection that a transition between yourself
20 and Mr. Rodler happened in the early '90s; is that
21 fair to say?
22     A.  When Pete retired then I took it over.

Page 227

1      Q.  And was there anyone else working on the
2  FUL issues besides yourself from that point until
3  Cindy Bergin came on in the mid to late '90s?
4      A.  There was a period of time where I
5  trained Altamease Arnold, but --
6      Q.  Was she in your office?
7      A.  She was in our office.  But she was
8  never -- she never really worked on the program per
9  se.
10     Q.  When you say per se, what do you mean by
11 that?  Officially or what does that mean?
12     A.  She never really learned the program to
13 work on it.
14     Q.  What does it mean to learn the program?
15     A.  When you try to teach someone the program
16 but they choose not to absorb what you're teaching.
17     Q.  Got it.  Is she still working at CMS?
18     A.  No.
19     Q.  When did she leave CMS?
20     A.  She retired last year.
21     Q.  What was her position at CMS?
22     A.  Health insurance specialist.

Page 228

1      Q.  Was that the same position that you had?
2      A.  Yes.
3      Q.  So you were equals, so to speak?
4      A.  Most of the analysts in our area are all
5  health insurance specialists.
6      Q.  Okay.  And you indicated that Mr. Reed
7  would have some input into the FULs and I think you
8  used the word even the final say.
9      A.  Correct.
10     Q.  What does that mean?
11     A.  He's the division director.
12     Q.  So what would the extent of his
13 involvement be with FULs?  When would he get
14 involved?
15     A.  Throughout -- whenever necessary he was
16 there to discuss issues that might need to be
17 discussed.  The final publication he was aware of
18 and would have to give his okay in order to send it
19 through or any letters that would go through
20 generally were from an authority higher than me.
21     Q.  Can you tell me what kind of issues would
22 come up in the FUL program that would necessitate

Page 229

1  his involvement?
2      A.  Maybe just general discussion.
3  Especially when I was the only one working on the
4  FUL program, just a general discussion of maybe
5  particular drugs, the pricing just somebody to have
6  an open discussion about how we're setting the
7  prices, because there's manual review involved.
8      Q.  What do you mean when you say there's
9  manual review involved?  And we'll get into a little
10 bit more the mechanics, but generally speaking what
11 do you mean by that?
12     A.  Generally you have paper that you work
13 from.  You have the compendia with all the drug
14 numbers on it and the pricing.  And sometimes you
15 have to make determinations if it looks like a drug
16 is truly available or not, whether you should follow
17 up and see if it's available.  Sometimes it's better
18 to discuss it with someone to see that you're
19 looking at it the same way that they might be
20 looking at it.
21     Q.  When you say truly available, do you
22 remember is the product available from a particular