# EXHIBIT 36

Buto, Kathleen - Vol. II                    September 13, 2007
                        Washington, DC

Page 275

                    UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      ) CIVIL ACTION

PRICE LITIGATION                ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      ) Judge Patti B.

the Florida Keys, Inc.          ) Saris

     v.                         ) Chief Magistrate

Abbott Laboratories, Inc.,      ) Judge Marianne B.

No. 06-CV-11337-PBS             ) Bowler

- - - - - - - - - - - - - - - -

          (captions continue on following pages)




          Videotaped deposition of Kathleen Buto

                    Volume II



               Washington, D.C.

          Thursday, September 13, 2007

               9:00 a.m.

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                    September 13, 2007
                        Washington, DC

Page 304

1    Q.  And you indicated -- and HCFA indicated
2  in its rule that they received many comments on
3  this issue, correct?
4    A.  Correct.
5    Q.  And subsequent to those comments HCFA
6  changed its rule in some ways that included
7  paying the lower of EAC, estimated acquisition
8  cost, or 100 percent of average wholesale price,
9  correct?
10    A.  Right.
11    Q.  Why did HCFA change the AWP-based
12  formula from 85 percent of AWP to 100 percent of
13  AWP?
14    A.  And I think they use a different
15  terminology, don't they, or we did at the time.
16  So they didn't seem to use the same term,
17  although later -- but why did they go from one
18  proposed policy to the final policy?
19    Q.  Yes.
20    A.  Let me answer that.  Based on comments
21  and based on a lot of concern that was raised --
22  and I think you picked out a couple of the

Page 305

1  comments, but they weren't the only ones -- that
2  pointed to the fact that on the one hand HCFA
3  seemed to be saying there was going to be a
4  national -- I've forgotten what the term is --
5  but a national average wholesale price didn't
6  refer to published average wholesale price.  And
7  that in describing what HCFA planned to do it was
8  clear HCFA was going to try to get accurate price
9  data.
10      And they went on to say if HCFA gets
11  accurate price data if you pay at 85 percent of
12  an accurate price you're going to be
13  systematically underpaying.  So they pushed back
14  on that and there was a lot of logic to their
15  comment, that if you're going to pay accurately
16  and then lower the price to less than a 100
17  percent there's an issue.
18      So the compromise that was come up with
19  was the final rule position, which is 100
20  percent. However, that would be sort of the lower
21  of that or the acquisition cost and that the --
22  or the actual acquisition cost.  And that would

Page 306

1  be based on surveys.
2    Q.  But if we used the average wholesale
3  price method it would be based on what was
4  published in the Red Book, correct?
5    A.  Yes.  That was made clear later in one
6  of the other documents, that it was based on the
7  published.  But in the -- I think in the original
8  description they didn't refer to published.
9    Q.  Why did HCFA remove the 15 percent
10  discount from AWP?
11    A.  Again, because HCFA was concerned that
12  it conveyed -- what HCFA was really after was
13  getting an accurate reimbursement level or price
14  -- okay? -- what price should reimbursement be
15  set at. And the concern was that what we really
16  wanted to convey there is that we were going to
17  try to find out what that was.
18      And so the mechanism was getting or
19  conducting surveys of actual acquisition costs
20  and that the AWP was the fallback.  And actually
21  high-volume drugs were going to be a special
22  target for the surveys of actual acquisition

Page 307

1  costs because of the greater impact on Medicare.
2    Q.  Did some of the comments -- if we go
3  back to page 56 of the rule, the second paragraph
4  on payment for drugs states "Also a number of
5  comments from the oncologists indicated that we
6  should use an add-on to cover the cost of
7  breakage, wastage, shelf life limitations and
8  inventory costs associated with chemotherapy
9  agents.
10      "Some commentators also suggested that
11  this add-on payment was needed to account for
12  shortfalls in chemotherapy administration
13  payments. Without adequate compensation,
14  commenters suggested, many physicians would
15  performed the service in hospital outpatient
16  departments at substantially higher costs.
17      "Also some commenters suggested that
18  physicians would refuse to supply the drugs to
19  patients, forcing patients to purchase the drugs
20  themselves and bring them to the physician's
21  office to be administered.  In the latter case
22  the drugs would not be covered by Medicare since

9 (Pages 304 to 307)

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                September 13, 2007
                      Washington, DC

Page 308

1  the physician did not incur any costs for the
2  drug."
3        Was there any connection between the
4  removal of the 15 percent discount on AWP to
5  concerns about shortfalls in administrative
6  payments and the need to cover other costs
7  associated with the administration of drugs?
8     A.  I'm looking at -- if you'd give me a
9  couple seconds here, I'm looking at the response.
10  Because I don't recall that that was the reason.
11  But let me just look and see what we said in
12  response to that comment.  (Reading).
13        It looks to me as if we dodged the
14  question.  In other words, they didn't respond
15  one way or the other to whether that was at a
16  reason for going to the alternative methodology.
17  And I'm sure we discussed it.  As a general
18  matter, not related per se to this issue, the
19  government doesn't like to pay for some things
20  under one mechanism that was intended for one use
21  and sort of overpay there in order to compensate
22  for other costs.

Page 309

1        In reality it happens.  It looks to me
2  as if what we decided to do is avoid that whole
3  issue, but try to say, okay, here's a compromise
4  approach that we think will address general
5  concerns about the 85 percent but also get us
6  where we want to go, which is to pay accurately
7  for drugs that Medicare is paying for.  And that
8  would be the survey approach that the carriers
9  would use and the estimated acquisition cost or
10  the actual acquisition cost.
11     Q.  You stated in your answer that you
12  thought you dodged the question, right?
13     A.  Yup.
14     Q.  Is it your experience during your time
15  at HCFA that there were times when HCFA did not
16  put its -- all of its rationales in its decision-
17  making in a published document such as a
18  regulation?
19     A.  No, I wouldn't say that.  I would say
20  that if we thought the response and the change in
21  the regulation addressed the concern we would
22  basically put that out there as the overall

Page 310

1  response to a range of comments on an issue.  So
2  basically what the oncologists were saying was
3  this was an unfair cut.
4        Our response, we're going to go back to
5  100 percent of AWP and for high volume drugs
6  we're going to look at a methodology for going
7  after actual acquisition costs.  So that was
8  believed to be a valid response to the overall
9  concerns about the cut.
10     Q.  Are HCFA's determinations and
11  rationales for decisions that they make or don't
12  make always in a published document?
13     A.  Well, you know, I can only speak to my
14  experience.  We would try to to the best of our
15  ability respond to the comments that were raised.
16  It may not be every specific, but the rationale
17  for taking the position is what we tried to put
18  in responses to comments.  So always?  You know,
19  I can only speak from my own experience.
20     Q.  But this was a situation where the
21  oncologists, perhaps others, had raised the issue
22  that the 15 percent was perhaps too much of a

Page 311

1  cut. And those were concerns that you heard,
2  correct?
3     A.  Right.
4     Q.  And you responded to?
5     A.  Right.  In the final policy.
6     Q.  And you would agree with me that this
7  particular regulation -- and I think you said
8  earlier by using the word "dodge" -- doesn't
9  exactly articulate that rationale?
10        MR. DRAYCOTT:  Objection.  You can
11  answer.
12     A.  My reason for using that word was we
13  didn't directly answer the question, but we
14  answered the question.
15     Q.  By the policy?
16     A.  By the policy.
17     Q.  So the policy itself sort of
18  demonstrated what HCFA's thinking was itself?
19     A.  Yes.  The policy responded to the range
20  of comments we got, in our view.
21     Q.  If I could ask you to go back to
22  Exhibit Abbott 299.  That was the public comment

10 (Pages 308 to 311)

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                    September 13, 2007
                    Washington, DC

Page 360

```
 1  December 13th 1997.
 2       I'd ask that you review the fourth
 3  paragraph and then the final paragraph carrying
 4  over to the next page of this document to see if
 5  it refreshes your recollection at all regarding
 6  whether you proposed legislation on this issue.
 7      A.  (Reading)  Yes.  I do remember.  We
 8  developed the proposal.  I just wasn't sure
 9  whether it actually got sent to Congress.  I
10  couldn't remember that.
11      Q.  Do you recall who was involved in
12  developing the proposal?
13      A.  It was a group within HCFA.  So the
14  office of legislation and policy.  And that
15  likely included people like Bernie Patashnik --
16  I'm sorry. Bernie Patashnik may have been
17  involved.  But Ira Virney as well as the staff of
18  the bureau of policy development under
19  Bernadette's division dealt with drug
20  reimbursement.
21      Q.  So if there were proposed legislation
22  that was developed by HCFA it would involve both
```

Page 361

```
 1  the office of legislation and the bureau of
 2  policy development?
 3      A.  That's correct.  And in this case we
 4  may even have involved the regional offices
 5  because of their involvement and understanding of
 6  what was going on in real practice in some of the
 7  surveys that we've looked at such as the one from
 8  Dallas. So we may have involved -- once in a
 9  while the regional offices would get involved if
10  there was actual practice that was relevant to
11  the proposal.
12      Q.  Do you recall what happened with HCFA's
13  proposal?
14      A.  It didn't pass.
15      Q.  Was HCFA upset that it didn't pass?
16      MR. DRAYCOTT:  Objection.  You can
17  answer.
18      Q.  Were you upset that it didn't pass?
19      A.  I was upset that it didn't pass.  I was
20  upset, you know, just over time that we couldn't
21  -- frustrated I guess is a better way to put it -
22  - that we couldn't get this change made.
```

Page 362

```
 1      Q.  And what was stopping HCFA from getting
 2  this change made?
 3      A.  In this case Congress didn't pass it.
 4      Q.  HCFA was well aware of the fact that
 5  published prices -- AWP in this case -- were not
 6  a reliable indicator of acquisition cost,
 7  correct?
 8      MR. DRAYCOTT:  Objection.  You can
 9  answer.
10      A.  HCFA had repeatedly tried to move away
11  from the published AWPs to a better method of
12  computing actual acquisition costs.  So we were
13  aware that AWP was not a good basis.
14      Q.  And in your personal view what stopped
15  HCFA from succeeded in that effort?
16      MR. DRAYCOTT:  Objection.  You can
17  answer.
18      A.  It was probably two or three things.
19  Politics, so a lot of concern on the part of
20  physician groups, particularly oncologists, that,
21  you know, they preferred the current AWP-based
22  system for a number of reasons, didn't want to go
```

Page 363

```
 1  to the burdensome and intrusive practice of
 2  having their acquisition cost collected by the
 3  agency. The lack of -- except for the OIG
 4  studies, the lack of good data that the agency
 5  could bring forward to show the extent.  And
 6  concern broadly across a variety of groups that a
 7  change would impede access to important
 8  treatment.
 9       So it was a number of things and --
10  there's also an underlying concern of government
11  getting into much more regulated pricing.  And
12  this would be a first step toward doing that.
13      MR. TORBORG:  Ms. Buto, I have no
14  further questions.  I do reserve the right to
15  question you again should we get some documents
16  from you that were previously withheld in
17  privilege or they have not been produced.  Thank
18  you very much for your time.
19      THE WITNESS:  Thank you.
20      MR. TORBORG:  We'll go off the record.
21      THE VIDEOGRAPHER:  Off the record at
22  11:09.
```

23 (Pages 360 to 363)

Henderson Legal Services
202-220-4158

Buto, Kathleen - Vol. II                September 13, 2007
                    Washington, DC

Page 432

1  submitted a plan based upon solely AWP you would
2  have expected that HCFA would have also
3  disapproved those plans, right?
4        MR. DRAYCOTT:  Objection.
5        A.  I guess the nuance to me is if it's AWP
6  minus 40 percent would I have disapproved it?  I
7  don't know.  It really had to do with AWP as a
8  basis and AWP unmodified.
9        Q.  Fair enough.  Now, let's go to 1991.
10  And I want to turn your attention to the proposed
11  rule that you submitted in 1991 or that HCFA
12  submitted regarding Medicare reimbursement.
13       A.  Yes.
14       Q.  And as you recall HCFA submitted a
15  proposed rule that it would be 85 percent of AWP,
16  correct?
17       A.  Correct.
18       Q.  But that wasn't adopted, right?
19       A.  Right.
20       Q.  And what ended up occurring is that
21  HCFA or ultimately Congress adopted 100 percent
22  AWP reimbursement for Medicare drugs or actual

Page 433

1  acquisition cost, right?
2        A.  It wasn't Congress now.  It was HCFA in
3  the final rule.
4        Q.  That's right.  Now, there's no doubt
5  that as of 1991 HCFA knew that unmodified AWP, a
6  hundred percent AWP, did not represent actual
7  acquisition cost, right?
8        A.  Yes.
9        Q.  And there was no doubt that in 1991
10  HCFA knew that there was no predictable
11  relationship between AWP and actual acquisition
12  cost, right?
13       A.  Based on the surveys from the IG,
14  that's correct.  That was our belief.  Again, we
15  didn't have independent data.
16       Q.  Right.  That was your belief at that
17  time, right?
18       A.  That's correct.
19       Q.  And it's fair to say that when HCFA
20  adopted the final rule in 1991 paying 100 percent
21  AWP, it knew that if it paid 100 percent AWP it
22  was not paying actual acquisition cost, right?

Page 434

1        MR. DRAYCOTT:  Objection.
2        A.  We -- that's correct.  We did not
3  intend for that to be the sole method, as you
4  know.
5        Q.  You didn't spend to pay 100 percent AWP
6  forever because you intended to do the actual
7  surveys of acquisition costs, right?
8        A.  That's correct.
9        Q.  But that never happened, right?
10       A.  That's also correct.
11       MR. GORTNER:  I have no further
12  questions.  Thank you for your time.
13       THE WITNESS:  Thank you.
14       MR. DRAYCOTT:  Unless I hear an
15  objection right now I'm assuming we're concluded.
16  With the reservation by Mr. Torborg stated
17  earlier.
18       THE VIDEOGRAPHER:  This concludes
19  volume 2 tape 3 in the deposition of Kathleen
20  Buto.  The deposition concludes at 12:40 p.m.
21       (Whereupon, at 12:40 p.m. the
22  deposition was adjourned.)

Page 435

1
2
3
4
5        _____
6            KATHLEEN BUTO
7
8
9  Subscribed and sworn to and before me
10  this _____ day of _____, 20____.
11
12  _____
13       Notary Public
14
15
16
17
18
19
20
21
22

41 (Pages 432 to 435)

Henderson Legal Services
202-220-4158

7b157f28-df3f-40ae-bc12-b3227fef509e