# EXHIBIT 37

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )   CIVIL ACTION

PRICE LITIGATION                )   01-CV-12257-PBS

- - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:       )

U.S. ex rel. Ven-A-Care of      )   Judge Patti B. Saris

the Florida Keys, Inc. v.       )

Boehringer Ingelheim Corp.,     )   Chief Magistrate

et al., Civil Action No.        )   Judge Marianne B.

07-10248-PBS                    )   Bowler

- - - - - - - - - - - - - - -

　　　　(Cross captions appear on following pages)


　　　Videotaped deposition of MILTON B. "BEN" JACKSON


　　　　　　　　　　Washington, D.C.

　　　　　　　Friday, December 12, 2008

　　　　　　　　　　　9:00 a.m.

3b292ebc-0451-432b-a513-4690e63a2144

Jackson, Milton B                                           December 12, 2008
                            Washington, DC

Page 214

1  some states discussed with you that excess
2  reimbursement or reimbursement above cost based
3  on AWP -- sorry, let me finish -- may be offset
4  to some degree by --
5      A.  No.
6      Q.  Well, I'm still not finished yet.
7          -- may be offset by the fact that
8  they're paying less than the dispensing cost with
9  their dispensing fee reimbursement?
10         MR. AZORSKY:  Objection to form.
11     A.  No.  They were looking at it as the two
12 being together.  And we discussed this at the
13 meeting in Richmond about was it a possibility of
14 us being able to do the two together.  And it was
15 decided, no, we can't, we're going to do the AWP.
16 And that was the decision.  And everybody in that
17 group, the eleven states, agreed with that.  All
18 of the medical directors or pharmacy directors in
19 that room agreed with it.  So we didn't include
20 that as a result or didn't include the dispensing
21 fees as part of it.
22     Q.  But the topic of dispensing fees came

Page 215

1  up, right?
2      A.  Yes.
3          MR. TORBORG:  Objection, asked and
4  answered.
5      Q.  And you recall some conversation along
6  the lines of discrepancies -- let me finish --
7  discrepancies for AWP-based reimbursement -- for
8  instance, AWP minus 5 percent -- would be more
9  than it cost for a pharmacy to acquire a drug?
10     A.  I'm not going to use the word
11 discrepancies, no.
12     Q.  All right.  Well, let me restart the
13 question then.  Some states indicated to you that
14 the ingredient cost portion of their
15 reimbursement may have been in excess of the
16 actual acquisition cost of the drug at the
17 pharmacy level, correct?
18     A.  No.  Some states could have said that
19 the way they set their reimbursement rates for
20 drugs could also have been tied in to how they
21 did their dispensing fees.
22     Q.  Tied in in what way?

Page 216

1      A.  They were together.  They looked at
2  them as a whole and not separate.
3          MR. HECK:  I'm kind of at a stopping
4  point.  Do you just want to take a five minute
5  break now?
6          THE VIDEOGRAPHER:  Going off the
7  record.  The time on the monitor is 13:53:12.
8          (Recess.)
9          (Exhibit Montana 001 and Exhibit
10 Montana 002 were marked for identification.)
11         THE VIDEOGRAPHER:  Going back on the
12 record.  The time on the monitor is 14:04:25.
13 Please continue.
14         MR. DRAYCOTT:  Can I just get on the
15 record, I understand that at this point we're
16 willing to suspend briefly the deposition that
17 counsel for Roxane was taking and that both
18 counsel for Dey and Roxane are willing to let
19 another attorney for a different drug company
20 defendant ask questions at this point?
21         MR. HECK:  To clarify for the record
22 what is occurring here, as a courtesy to counsel

Page 217

1  who's in from out of town and has an early
2  departure this afternoon, we are yielding the
3  floor for a matter of approximately ten minutes
4  for him to ask his questions before he has to
5  leave and then we will resume the deposition as
6  originally conducted.
7          MR. DRAYCOTT:  And again, counsel for
8  Dey is also yielding the floor to other counsel
9  for these ten minutes?
10         MS. LORENZO:  Correct.
11         MR. TORBORG:  Okay.  And of course by
12 allowing questioning by counsel on a cross notice
13 in a state action the United States of course
14 does not concede jurisdiction of the state court
15 over the United States or any witness of the
16 United States.
17         MR. SCHAU:  Thank you.
18
19          EXAMINATION BY COUNSEL FOR JOHNSON
20 & JOHNSON
21 BY MR. SCHAU:
22     Q.  My name is Andy Schau and I represent

55 (Pages 214 to 217)

Jackson, Milton B                                           December 12, 2008
                          Washington, DC

Page 386

1  was published in 1996 by Barron's called "Hooked
2  On Drugs"?
3      A.  Yes.
4      Q.  How did you become aware of that
5  article?
6      A.  I don't recall.  I recall reading it,
7  but I couldn't tell you what was in it now for
8  the life of me.
9      Q.  Did you discuss that article in the
10 meetings that you had with pharmacy
11 administrators across the country?
12     A.  We may have.  Again, I'm not -- I
13 couldn't give you a definite yes or no.
14     Q.  In fact it's been some time since you
15 had -- since you attended those meetings, right?
16     A.  Yes.
17     Q.  It's been over ten years, right?
18     A.  (Nods head).
19     Q.  For the most part?
20     A.  Many of them, yes.
21     Q.  Because of the passage of time you
22 can't remember much of anything, right, on a lot

Page 387

1  of those meetings?
2          MR. DRAYCOTT:  Objection.
3      Q.  What was told to the states?
4          MR. AZORSKY:  Objection, form.
5      A.  You remember the subject matters
6  basically.  Discussing the details a lot of
7  times, no, I can't remember them.
8      Q.  If I had been able to ask you about
9  what was talked with those states ten years ago
10 you would be able to give me a better
11 recollection of those meetings; fair to say?
12         MR. AZORSKY:  Objection.
13     A.  What was talked about with the states
14 ten years ago?
15     Q.  If I had been able to ask you about
16 those meetings ten years ago --
17     A.  Oh, ten -- yes, absolutely.
18     Q.  But because the DOJ sat on this case
19 for ten years now I can't really ask you about
20 that, right?
21         MR. AZORSKY:  Objection to form.
22         MR. DRAYCOTT:  Objection.

Page 388

1      Q.  Fair?
2      A.  About what I recollect ten years ago?
3      Q.  Yes.
4      A.  I think I've expressed that throughout
5  this today that I didn't recollect a lot of the
6  direct discussion.
7      Q.  I believe you testified that in
8  conversations with legislators and their staffs
9  you indicated that you were at times critical of
10 CMS, right?
11     A.  In what respect?
12     Q.  That was going to be my follow-up
13 question.
14     A.  Well, I mean, we're critical of CMS a
15 lot from the audit side.  So, I mean, in what
16 respect?  In respect to Medicaid drug rebates?
17     Q.  Medicaid reimbursement and AWP.
18     A.  I think we felt as an agency that CMS
19 could have done more with the states, yes.
20     Q.  Are you familiar with an organization
21 called the Department of Health and Human
22 Services Departmental Appeals Board?

Page 389

1      A.  Oh, yes.
2      Q.  That's an entity that decides disputes
3  between HCFA and the states relating to payments,
4  correct?
5      A.  Yes.
6      Q.  And did you review any of those reports
7  during your time at OIG?  Or any of those
8  opinions.  I'm sorry.
9      A.  The opinions?
10     Q.  Yeah.  Did you follow when was going on
11 with those?
12     A.  I didn't personally, but there may be
13 some of my staff that did depending on what
14 issues they were involved in with audits and so
15 forth.
16     Q.  You made some statements or gave some
17 testimony about your understanding of what the
18 law required when it came to Medicaid drug
19 payments, right?
20         MR. DRAYCOTT:  Objection.
21     Q.  Throughout the day you stated a number
22 of times the law required this, right?

98 (Pages 386 to 389)

3b292ebc-0451-432b-a513-4690e63a2144

Jackson, Milton B                                                December 12, 2008
                              Washington, DC

Page 390

1    A.  Yes.  Reimbursement based on
2    acquisition cost?
3    Q.  Yeah.
4    A.  Yes.
5    Q.  Were you aware that in 1992 in an
6    opinion number 1315 the Departmental Appeals
7    Board stated -- and I quote -- "The regulation" -
8    - that's referring to the federal estimated
9    acquisition cost regulation -- "can reasonably be
10   read to permit states to pay more than
11   appropriately determined EAC for a drug
12   ingredient cost but less than a reasonable
13   dispensing fee so long as the payments did not in
14   the aggregate exceed the upper limit."  I'll be
15   happy to read that back if you'd like.
16   A.  Am I aware of that?  Is that --
17   Q.  Yes.
18   A.  No.  I'm not.
19   Q.  So your testimony about what the law
20   required when it came to estimated acquisition
21   cost payments was not informed by that decision,
22   correct?

Page 391

1    A.  Say that again.
2    Q.  Your testimony about what the law
3    required when it came to estimated acquisition
4    cost was not informed by that statement that I
5    just read from the opinion?
6    A.  No.
7        MR. DRAYCOTT:  Objection.
8    Q.  Now, we reviewed some of this earlier.
9    But there was an idea or you had thought that it
10   may be a good idea to have a two-tiered
11   reimbursement structure for ingredient cost, one
12   for generic drugs and one for brand drugs, right?
13       MR. DRAYCOTT:  Objection.
14   A.  Yes.
15   Q.  When did that idea start developing?
16   A.  After the results of the first round of
17   audits that we did back in the early '90s.
18   Q.  And no states did that after the first
19   round of audits, right?
20   A.  No.  I think some did.
21   Q.  Which ones are you aware of?
22   A.  I don't recall.  But I do know -- I do

Page 392

1    believe that some did change.  It wasn't many.
2    But I think a couple did.
3    Q.  But most -- the vast majority of states
4    did not?
5    A.  The vast didn't, no.
6    Q.  And what is your view, Mr. Jackson, as
7    someone who has been very involved in this issue
8    in the 1990s about why it is that the state
9    Medicaid programs did not change their
10   reimbursement formulas to match or get closer to
11   your findings?
12   A.  I think I've answered that question
13   already.  I mean, I think you've got state
14   legislatures you've got to contend with.  You've
15   got lobby groups.  You've got state budgets.  I
16   mean, there's a lot of things that could play
17   into that.
18   Q.  It's not your view given what you've
19   told the states that the states didn't know about
20   the fact that they were paying more than
21   acquisition cost for drugs?
22       MR. DRAYCOTT:  Objection.

Page 393

1        MR. AZORSKY:  Objection to form.
2    A.  Well, I don't know whether CMS informed
3    all the states about the audits that we did.  We
4    don't know if they shared those reports with the
5    states or not.
6    Q.  Assuming that they did share them with
7    the states.
8    A.  Then the states should have -- if they
9    read them they should have seen what the results
10   were, yes.
11   Q.  Now, do you have an understanding that
12   in this lawsuit the federal government is trying
13   to recover from Abbott, Dey and Roxane the
14   difference between what it is the state Medicaid
15   programs paid for drugs, actually paid for drugs
16   on the ingredient cost side, and an amount that
17   very closely equals acquisition cost?  Do you
18   have that understanding?
19       MR. DRAYCOTT:  Objection.
20       MR. AZORSKY:  Objection.
21   A.  I don't know anything about the
22   lawsuit, the specificity of what the government

99 (Pages 390 to 393)

Jackson, Milton B                                                    December 12, 2008
                                   Washington, DC

Page 394

1  is going after at all.  I have not seen it.
2     Q.  You were not consulted --
3     A.  No.
4     Q.  -- at all?
5     A.  Absolutely not.
6     Q.  Even though you were one of the leading
7  people at OIG during the 1990s in this area no
8  one even asked you whether you thought this
9  lawsuit had any merit, right?
10        MR. AZORSKY:  Objection, form.
11    A.  No.  But they wouldn't.
12    Q.  Why wouldn't they want to hear what
13 people who were there thought before they filed a
14 lawsuit?
15    A.  That's a good question.  I mean, I
16 think our reports kind of speak for themselves.
17 I mean, the thoughts are in the reports, the
18 writing of the reports.  So, I mean, it's there.
19 It is what it is.
20    Q.  What do you mean by that?
21    A.  Well, it's documented in these reports.
22 I mean, we've got, what, eleven state reports in

Page 395

1  one batch and we've got eight in the next.  We've
2  got four roll-up reports and we've got follow-up
3  reports to those.  So, I mean, it's pretty well
4  documented what the findings were, right?  So --
5     Q.  And the findings are that states are
6  paying more than acquisition cost, particularly
7  for generic drugs, right?
8         MR. AZORSKY:  Objection to form.
9         MR. DRAYCOTT:  Objection.
10    A.  Yes.
11    Q.  And yet now the government is trying to
12 recover from pharmaceutical manufacturers for
13 that same amount, right?
14        MR. AZORSKY:  Objection to form.
15    A.  I don't know what they're trying to
16 recover, sir.  Like I said, I've not privy to any
17 of that information.
18    Q.  If you accept my representation to you
19 that that's what they're doing, does that seem a
20 little odd to you?
21        MR. DRAYCOTT:  Objection.
22        MR. AZORSKY:  Objection to form.

Page 396

1     A.  I'm not going to answer that question.
2     Q.  Now, there are procedures at OIG that
3  someone like yourself have to follow if they
4  become aware of fraud on the Medicaid program or
5  the Medicare program, correct?
6     A.  Correct.
7     Q.  What are those procedures?
8     A.  From an audit perspective or from --
9     Q.  If you become aware of a fraud on the
10 Medicare and Medicaid program in your work what
11 are you to do?
12    A.  If I come across what I believe to be a
13 fraudulent situation we are instructed to stop
14 the audit and report our findings to an OI
15 investigator.
16    Q.  Now, starting in 1994 the OIG team was
17 looking at thousands of invoices for drugs,
18 correct?
19    A.  Mm-hmm.  That's correct.
20    Q.  And they were comparing invoice price
21 to AWP, right?
22    A.  That's correct.

Page 397

1     Q.  And on average OIG found that in the
2  first round nationally the difference was about
3  42 and a half percent for generic drugs, correct?
4     A.  Right.
5     Q.  And there would be instances where the
6  difference was larger, right?
7     A.  (Nods head).
8     Q.  You were aware of that?
9     A.  Yes.
10    Q.  There would be instances where the
11 difference was smaller, AWP minus 20, say, for
12 some generic drugs, right?
13    A.  Correct.
14    Q.  And you became aware of instances where
15 there were drugs where the AWP was several times
16 higher than the invoice price, right?
17    A.  Correct.
18    Q.  And did you ever report any fraud as
19 required under your guidelines?
20    A.  No.
21        MR. AZORSKY:  Objection to form.
22        MR. TORBORG:  I have no further

100 (Pages 394 to 397)