# EXHIBIT 38

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
|      v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - -

     (cross-captions on following pages)


                         Washington, D.C.

                         Tuesday, October 30, 2007

                         9:00 a.m.


     Videotaped deposition of DEIRDRE DUZOR

              Volume I

Page 110

1   what states pay for particular drugs that they put
2   on the list and establish a payment rate for.
3       Q.   And hours the amounts of the MACs
4   typically established in your experience?
5       A.   I have very limited knowledge of how
6   they're established. I think states like Texas that
7   get prices from manufacturers use that information
8   to establish them. Other states have contracts with
9   proprietary vendors that establish MACs for those
10  states, which is why I don't have much knowledge,
11  because those vendors do not want to say how they
12  establish their MACs.
13      Q.   Why do they not want to say how they
14  establish their MACs?
15      A.   Because they use formulas or algorithms
16  that they consider proprietary.
17      Q.   Do you know what generally speaking what
18  inputs are put into these algorithms or formulas?
19      A.   No, I don't.
20      Q.   What involvement does CMS have in
21  reviewing, overseeing or providing input into state
22  MAC programs?

Page 111

1       A.   Many states have state MACs stated, the
2   existence of them, in their state plans. So where
3   they're there their use has been approved by us.
4       Q.   Is it your understanding that state MAC
5   programs typically cover multiple source drugs?
6       A.   Yes.
7       Q.   And why is that the case?
8       A.   Because the opportunity is there for a
9   substitution of a lower priced product for one that
10  would cost -- where another version would cost more
11  money.
12      Q.   Is it also widely known that the reported
13  prices in publications such as Red Book, First
14  Databank and others that those prices are not
15  reliable for generic drugs?
16           MS. MARTINEZ:  Objection, form.
17      A.   I just don't have knowledge to answer
18  that question.
19      Q.   You don't have knowledge on whether or
20  not it's widely known that the reported prices for
21  generic drugs are not reliable?
22           MS. MARTINEZ:  Objection, form.

Page 112

1       A.   My understanding is that the reported
2   prices for drugs generally is not reliable. I don't
3   have further information to differentiate between
4   brands and generics.
5       Q.   Do you know if any of the products listed
6   on page 10 and 11 of the United States complaint
7   have state maximum allowable costs on them? Or had
8   from them 1991 to 2001, I should ask.
9       A.   I don't know.
10      Q.   How would I go about figuring that out?
11           MS. MARTINEZ:  Objection, form.
12      A.   You would have to talk to the states that
13  have state MACs.
14      Q.   You don't have copies of the state MACs
15  schedules yourself at CMS?
16      A.   No, we don't.
17      Q.   Could you ask states to collect the state
18  MAC schedules that they had from 1991 to 2001 and
19  send them to you?
20           MS. MARTINEZ:  Objection, form.
21      A.   We could ask them to do that.
22      Q.   And have you asked them to do that in the

Page 113

1   past?
2       A.   No, we have not.
3                (Exhibit Abbott 368 was
4                marked for
5                identification.)
6          BY MR. TORBORG:
7       Q.   For the record, what's been marked as
8   Exhibit Abbott 368 bears the Bates numbers HHD
9   086-0013 through 15.
10           Ms. Duzor, if you would take a look at
11  that first to the extent necessary to tell me
12  whether or not you recall this document or the event
13  giving rise to the document.
14           MR. WINGET-HERNANDEZ:  Objection to form.
15      Q.   I note that you're copied on the second
16  e-mail from the top on the first page.
17      A.   (Reading.) Could I ask you what your
18  question is again?
19      Q.   Whether or not you recall either this --
20  any portions of this document, including the e-mail
21  that you're copied on, or the subject matter that's
22  being discussed in the e-mails.

29 (Pages 110 to 113)

Duzor, Deirdre                                                    October 30, 2007
                          Washington, DC

Page 174

1  Q.  Was it your understanding that WAC was a
2  price that represented the actual price that
3  wholesalers purchased drugs from manufacturers?
4  A.  It was my understanding that that was the
5  original intent of WAC, not necessarily that that is
6  what WAC truly represented at the point that I
7  became involved in these issues.
8              (Exhibit Abbott 372 was
9              marked for
10             identification.)
11     BY MR. TORBORG:
12  Q.  For the record, what I've marked as
13 Exhibit Abbott 372 is a September 16th 2002 letter
14 from Janet Rehnquist to Thomas Scully attaching a
15 September 2002 report from OIG entitled Medicaid
16 pharmacy additional analysis of the actual
17 acquisition cost of prescription drug products.
18       If you would take a look at that, Ms.
19 Duzor, to the extent necessary to tell me if you
20 recall this document.
21  A.  (Reading.)  Yes, I do remember this
22 document.

Page 175

1  Q.  And the first sentence of Ms. Rehnquist's
2  letter, the first page of the exhibit, indicates
3  that it's a follow-up to the previous work, two
4  reports; is that right?
5  A.  Yes, it does.
6  Q.  Do you know why it is that OIG did this
7  additional report?
8  A.  Well, in this analysis the IG looked at
9  whether drugs -- it separately evaluated drugs for
10 which there was a FUL established and those that did
11 not have -- multiple drugs without those.  So I
12 think that was the distinction.  They were looking
13 at categorizing drugs by whether they have a FUL or
14 not.
15  Q.  Did CMS request that OIG prepare this
16 report?
17  A.  Not to my knowledge.
18  Q.  Do you know if this report was shared
19 with state Medicaid program?
20  A.  As a fact, no, I don't recall.
21  Q.  Generally speaking in your time at CMS in
22 the division of pharmacy has it been the practice

Page 176

1  that OIG reports relating to Medicaid payment for
2  drugs have been shared with states?
3  A.  Yes.
4      MR. TORBORG:  What do you think?  Should
5  we remark this document or keep the original exhibit
6  number?  I know you guys recalled it at one point
7  and then changed your mind.  So do you have any
8  thoughts of whether we should mark it as a new
9  exhibit?
10     MS. MARTINEZ:  No.  I mean, the exhibit
11 number --
12     MR. TORBORG:  328?
13     MS. MARTINEZ:  -- does not seem to be an
14 issue.
15     BY MR. TORBORG:
16  Q.  Ms. Duzor, I've handed you a copy of what
17 we've marked previously as Exhibit Abbott 328, a
18 document entitled Review of Medicaid Drug State Plan
19 Amendments.  I ask you to take some time and look at
20 that document.
21  A.  Okay.  (Reading.)
22  Q.  Ms. Duzor, have you had a chance to look

Page 177

1  at that document?
2  A.  Yes, I have.
3  Q.  Can you tell us what this document is?
4  A.  This document --
5  Q.  Let me strike that.  Are you familiar
6  with this document first?
7  A.  Yes.  I recall the document.
8  Q.  Can you tell us what it is?
9  A.  I believe it is a draft of a decision
10 memo seeking guidance from policymakers in CMS on
11 approaches to reviewing state plan amendments that
12 were proposing to revise either the ingredient cost
13 payment for drugs or the dispensing fees.
14  Q.  What is a decision memo?
15  A.  A decision memo is an issue paper with
16 recommendations to take to policy decision makers.
17 Options and recommendations generally.
18  Q.  Who are the policy decision makers to
19 which this document would go?
20  A.  Certainly to Dennis Smith and perhaps
21 beyond him.  Dennis reports to the administrator.
22 So it could be for Dennis or it could be something

                                                    45 (Pages 174 to 177)

Duzor, Deirdre   October 30, 2007
Washington, DC

Page 190

1  legislatures were talking up the issue of pharmacy
2  reimbursement.  And we commonly did not have
3  documentation as to what their reasoning was in
4  picking a particular figure or rate.
5       So we were getting state plan amendments
6  that would say we'd like to go to AWP minus 13
7  without any solid documentation that that did --
8  that that was a good estimate of acquisition cost.
9  And yet it was determined by the elected body, you
10 know, of the people of the state.  So that gave it
11 some legitimacy.
12     Q.   And CMS had every reason to believe that
13 a reimbursement methodology like AWP minus 13 would
14 not result in a payment by the state for generic
15 drugs that was the price generally and currently
16 paid by providers; isn't that right?
17          MR. WINGET-HERNANDEZ:  Objection to form.
18          MS. MARTINEZ:  Objection to form.
19     A.   Could you state that again?
20     Q.   Sure.  CMS had every reason to believe
21 that a reimbursement methodology like AWP minus 13
22 percent would not result in a payment by a state for

Page 191

1  generic drugs that was the price generally and
2  currently paid by providers; isn't that right?
3          MS. MARTINEZ:  Objection to form.
4     A.   I'm sorry.  I'm still having trouble with
5  the question.
6     Q.   I'll try it again.  CMS had every reason
7  to believe that a reimbursement methodology like AWP
8  minus 13 percent would not result in a payment by a
9  state for generic drugs that was the price generally
10 and currently paid by providers; isn't that right?
11         MS. MARTINEZ:  Objection to form.
12    A.   Okay.  So can I restate the question to
13 see if I understand it?
14    Q.   Okay.
15    A.   That CMS could have concluded that AWP
16 minus 13 was not a good estimate of estimated
17 acquisition cost?  Is that what you're saying?  Is
18 that what you're asking?
19    Q.   What did you believe on a national level
20 was the rate of discounts from AWP for generic
21 drugs?
22         MS. MARTINEZ:  Objection to form.

Page 192

1     A.   We knew that for generic drugs that AWP
2  minus 13 was a generous payment based upon the IG's
3  findings.
4     Q.   OIG had found on a national level that
5  generic drugs were selling at AWP minus 66 percent?
6     A.   Based on their sample, that's what they
7  showed.
8     Q.   And did you have any reason to believe
9  that sample was not representative of the price the
10 generic drugs were generally selling in the
11 marketplace?
12         MR. BATES:  Object to the form.
13    A.   I didn't know enough about their sample.
14 I certainly again would not say that their
15 conclusion was the right answer for all generic
16 drugs.  Most states were doing AWP minus across the
17 board not differentiating between generic and
18 non-generic.  So they were not giving us the state
19 plan amendments that we could align neatly with the
20 OIG report.  They were proposing it in a different
21 way.
22    Q.   And do you recall having discussions

Page 193

1  about that problem at CMS about the need to
2  differentiate between -- about the need to have a
3  reimbursement methodology that was different for
4  brand name drugs than for generic drugs?
5     A.   We didn't have a role or a policy that
6  states had to do that.  That was an approach they
7  could have followed and that was suggested by the
8  inspector general's reports.  But it wasn't an
9  agency policy that states should be doing that.
10 They could do a blended average.  That was not -- it
11 was not inconsistent with anything we had said.
12    Q.   Did you have any reason to believe that a
13 reimbursement methodology like AWP minus 10, AWP
14 minus 15 percent, could serve as a best estimate of
15 the blended average at which generic and branded
16 drugs were selling in the marketplace?
17         MS. MARTINEZ:  Objection to form.
18    A.   To my knowledge we never did the analysis
19 that would really be necessary to come to that
20 conclusion.
21    Q.   If you would go to the next paragraph on
22 Exhibit Abbott 328, it states "It is proving

49 (Pages 190 to 193)

Duzor, Deirdre  October 30, 2007
Washington, DC

Page 238

1  isn't that right?
2       MR. BATES: Object to the form.
3       MS. MARTINEZ: Objection, form.
4    A.   The state of Washington is doing pretty
5  well at AWP minus 50. But they are the exception
6  for generics.
7    Q.   And that's only for drugs that have five
8  or more labelers or manufacturers, correct?
9    A.   Yes. That's true.
10   Q.   Not for all generic drugs?
11   A.   Right.
12   Q.   And they're the exception.
13   A.   Yes, they are.
14   Q.   So what makes you think that a
15 reimbursement methodology for all other drugs at AWP
16 minus, say, 10 percent is getting to the best
17 estimate of that state's -- or that state's best
18 estimate of what providers are currently and
19 generally paying for drugs?
20      MS. MARTINEZ: Objection, form?
21   Q.   Am I just making this up or does that
22 seem like a big problem to you?

Page 239

1       MR. BATES: Object to the form.
2       MS. MARTINEZ: Objection, form.
3    A.   I think it was a problem which is what
4  eventually led to changing provisions in federal
5  statute. That because of changes in the marketplace
6  and in pricing that we came to realize that Medicaid
7  was paying too much for drugs and that there needed
8  to be -- that that needed to be remedied.
9    Q.   Could the states make the assurances
10 called for by 447.333(b)(1) romanette 2 based on
11 your understanding of the price at which
12 pharmaceuticals are really sold in the marketplace?
13      MR. BATES: Objection, form.
14      MS. POLLACK: Objection, form.
15      MS. MARTINEZ: Objection, form.
16   A.   Yes, because the upper limits --
17   Q.   I'm asking about romanette 2.
18   A.   Roman 2. Oh, in the aggregate.
19      MS. MARTINEZ: Objection, form.
20   A.   I think that, again, estimated
21 acquisition cost was something that was difficult
22 for states to know and virtually impossible for us

Page 240

1  to know other than based upon the IG survey. So
2  absent good information it's all we had to work
3  with.
4    Q.   Isn't it a fact that the reason CMS is
5  not requiring the assurances called for by
6  447.333(b)(1) romanette 2 is because CMS knows that
7  states could not provide that assurance?
8       MS. MARTINEZ: Objection, form.
9       MR. BATES: Object to the form.
10   A.   No. I've never heard that said,
11 participated in any discussion. I could not say
12 that because that has never been stated or discussed
13 in the five and a half years that I've been working
14 in this area.
15   Q.   If CMS had required those assurances
16 would it have changed the amount that state Medicaid
17 programs paid for drugs?
18      MS. MARTINEZ: Objection, form.
19   A.   I don't believe it would, because they
20 would make assurances based upon the payment rates
21 in their approved state plans, which we did approve.
22   Q.   Based on a consideration of other

Page 241

1  factors?
2    A.   It almost a tautology.
3    Q.   I agree it's very circular. That's what
4  I'm trying to get at.
5       MR. WINGET-HERNANDEZ: Objection, form.
6       MR. BATES: Object to the form. Move to
7  strike. Argumentative.
8    A.   We approved the state plan at these
9  payment rates based upon whatever information was
10 available, albeit limited. And therefore they paid
11 at these rates. And therefore by definition I
12 believe they could have made these assurances. And
13 we wouldn't have had any more information in
14 evaluating the assurances than we did in evaluating
15 the state plans.
16   Q.   And one of the reasons that CMS chose to
17 approve state plans was a consideration of other
18 factors that included the rates set by state
19 legislatures and negotiations that occur between
20 states and pharmacy representatives; isn't that
21 right?
22      MR. BATES: Object to the form.

61 (Pages 238 to 241)