# EXHIBIT 39

Vladeck, Ph.D., Bruce C.                                       May 4, 2007
                          New York, NY

```
                                                               Page 1

           UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

-----------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

-----------------------------------X


            IN THE CIRCUIT COURT OF

         MONTGOMERY COUNTY, ALABAMA

-----------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

          Plaintiff,               :  CV-05-219

     v.                            :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

          Defendants.              :

-----------------------------------X
```

Vladeck, Ph.D., Bruce C.  May 4, 2007
New York, NY

Page 78

1   A.  That's correct.
2   Q.  When in 1997 did you resign?
3   A.  My last day in that position was
4  September 13th, 1997.
5   Q.  Is there any activity, prior to May of
6  1993, whether professional activity, employment,
7  in which you had some involvement in or you
8  studied Medicare or Medicaid reimbursement for
9  prescription drugs?
10      MS. BROOKER:  Objection.  Form.
11  A.  Other than the issues with AIDS drugs
12  that I've just described, no.
13  Q.  How did you come to be the
14  administrator for HCFA?
15  A.  Well, I can't entirely answer that
16  question.  I believe I was recommended to
17  Secretary Shalala by several mutual friends.  And
18  I believe, for a variety of reasons, the White
19  House in this case deferred to the Secretary for
20  a recommendation, although not on the final
21  decision.  And then I went through a variety of
22  vetting processes.  I came out the other end.

Page 79

1   Q.  What were your job responsibilities as
2  administrator of HCFA?
3   A.  Well, the major responsibilities are
4  administration of the Medicare and Medicaid
5  programs.  Under the Social Security Act, almost
6  all the administrative responsibilities are
7  delegated to the Secretary.  Almost all of those
8  -- for Titles 18 and 19, almost all of those are
9  redelegated to the administrator.
10  Q.  What are not delegated?  That was a
11  messy question.
12      What responsibilities for Medicare and
13  Medicaid administration are not delegated by the
14  Secretary to the administrator?
15  A.  Well, the --
16      MS. BROOKER:  Objection.  Form.
17  A.  -- the -- there is a -- a board of
18  trustees for the hospital insurance supplementary
19  medical insurance trust funds, which are
20  statutory.  The HCFA administrator serves as
21  Secretary to both of those boards.  Their only
22  actual authority is to issue reports, but that's

Page 80

1  an issue of some significance.
2      There are other issues of -- I think
3  that's -- there are -- there are certain issues
4  of -- having to do with legal matters that are
5  assigned directly to the Inspector General, or in
6  some cases -- and I don't know if this is by law
7  or regulation or just custom -- our reserve for
8  the Department of Justice.
9      So, for example, when the agency is
10  involved in civil litigation authority to enter
11  into a settlement, it belongs with the Department
12  of Justice.
13      Again, I don't know whether that's
14  statutory or regulatory.  Things of that sort.
15  Q.  To whom did you report as administrator
16  of HCFA?
17  A.  Secretary Shalala.
18  Q.  I assume that some people reported to
19  you as well?
20  A.  Yes.
21  Q.  How many?
22  A.  Well, the agency, in its entirety,

Page 81

1  employed just over 4,000 people during my period
2  as administrator.  The number of direct reports
3  was probably 10, plus or minus; 10 to 15,
4  counting personal staff.
5   Q.  Did you have, personally, much
6  interaction with the regional offices for HCFA?
7   A.  I tried to, yes.
8   Q.  And how about state Medicaid agencies?
9      MS. BROOKER:  Objection.  Form.
10  A.  We met quarterly with the Executive
11  Committee of the Association of State Medicaid
12  Directors.  I tried to attend at least part of
13  all those meetings.  I also, for reasons ranging
14  from pre-existing personal relationships to
15  political sensitivities, had direct
16  communications from time to time with individual
17  state Medicaid directors.
18      In most instances, I had very little
19  interaction with state Medicaid officials below
20  the director level.
21  Q.  Would you have any interaction, while
22  you were administrator of HCFA, with

21 (Pages 78 to 81)

Vladeck, Ph.D., Bruce C.                                          May 4, 2007
                        New York, NY

Page 142

1  Q. And for a brand name drug, would you --
2  at the time, did you expect that there would be
3  much variation between various purchasers based
4  upon volume purchases of the brand name drug?
5  A. I believe we had a perception that the
6  bigger the purchaser, the larger the discount
7  they were likely to be able to achieve; that the
8  very largest pharmacy chains, for instance, or
9  hospital group purchasing operations, probably
10 received the most favorable prices, but that that
11 would be -- and that some small independent
12 pharmacies might actually pay average wholesale
13 price as described in the compendia; that there
14 would be a range below that in which most of the
15 prices would actually occur.
16 Q. Turning to generic drugs for a minute,
17 what do you understand to be the differences
18 between the market for brand name drugs and the
19 market for generic drugs?
20     MS. BROOKER: Objection. Form.
21 A. If we're going back to 1997 --
22 Q. Correct.

Page 143

1  A. -- I think it's fair to say that I had
2  really only a very limited understanding of the
3  marketplace for generic drugs and an even more
4  limited understanding of the difference between
5  the market for generic drugs and for brand drugs.
6     And, again, my perception at the time
7  was that that was likely more like a commodity
8  market in which there was probably more
9  purchasing power on the part of the large
10 purchasers, but not the same ability to raise
11 prices on the up-side to small purchasers that
12 prevailed on the brand name side.
13 Q. I'd like to focus you just for a
14 minute, before we turn to a specific document,
15 about a particular generic drug. I think you
16 mentioned commodities. Are you familiar with
17 sodium saline solution?
18 A. Yes.
19 Q. It's a bag of salt water, essentially.
20 Correct?
21 A. That's correct.
22 Q. Would you agree with me that you can't

Page 144

1  get much more commoditized in a bag of salt water
2  in the drug market?
3  A. The only quibble I would provide to
4  that question is I never really thought of it as
5  classically being part of the pharmaceutical
6  market. It was such a -- it was really a
7  hospital supply kind of market. It was such a
8  standard product that even though it was FDA
9  regulated and -- and sterility issues were so
10 forth, it tended to be -- hospitals tend to stock
11 it, for example, in sterile supplies, put it on
12 their cost report as part of sterile supplies
13 rather than through their pharmacies.
14 Q. But a home infusion provider reimbursed
15 under Part B, for example, might be reimbursed
16 for sodium saline solution.
17     Was that your understanding in '97?
18     MS. BROOKER: Objection. Form.
19 A. Yes, but whether that was as a supply
20 or a drug, I honestly couldn't tell you. I would
21 have thought of it as a supply.
22 Q. Turning to the market of it, whether we

Page 145

1  call it a drug or -- or a supply, did you have an
2  understanding, in 1997, of what the market would
3  look like for a product such as sodium saline
4  solution?
5     MS. BROOKER: Objection. Form.
6     MR. BREEN: Objection. Form.
7  A. Yes, I did.
8  Q. And what was your understanding?
9  A. Well, I actually -- in the 1980s, I
10 believe, when I was first becoming involved in
11 some of these issues in health care economics was
12 the first development of hospital group
13 purchasing operations, and I recall -- and the
14 first widespread circulation of the -- of "Modern
15 Healthcare," the magazine, and I recall monthly
16 headlines in "Modern Healthcare" about group
17 purchasing operations being -- achieving
18 discounts of 98 and 99 percent in their purchase
19 of basic infusion products and sterile supplies.
20     So, my perception was that on the
21 supply market, which, again, I understood and
22 still would contend is actually a separate market

37 (Pages 142 to 145)

Henderson Legal Services
202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.  May 4, 2007
New York, NY

Page 146

1   from the pharmaceutical market that list prices,
2   are essentially entirely meaningless and that
3   only the weakest and smallest scale buyers pay
4   anything close to it.
5       Q.  And so, as of 1993, for example, would
6   you be surprised if a single bag of sodium saline
7   solution sold to a provider who bought maybe five
8   would pay $10 per bag, and a large purchaser who
9   bought a very large volume would pay less than a
10  dollar?
11          MS. BROOKER:  Objection.  Form.
12      A.  I would not have been surprised.
13      Q.  Okay.  So, to that extent that --
14  President Clinton referring to a 10-to-1 ratio is
15  something that would be consistent with your
16  understanding of that particular market.
17  Correct?
18          MS. BROOKER:  Objection.  Form.
19      Q.  I'm sorry.  You have to verbalize.
20      A.  Again, I would have thought that market
21  was a subset of the supplies market rather than
22  the drug market.

Page 147

1       Q.  That was my question.  But you would
2   have distinguished between the drug market, where
3   10-to-1 would not -- you would not expect to see.
4   Correct?
5       A.  That's correct.
6       Q.  And the supply market, where sodium
7   saline solution would be found, where there could
8   be a huge variation between a small purchaser
9   purchasing at list price and a very large
10  purchaser purchasing at 99 percent off of list
11  price?
12          MS. BROOKER:  Objection.  Form.
13      A.  I would have made such a distinction,
14  and I would not have been surprised to see those
15  sorts of differentials of the supply market.
16      Q.  And in between the commodities supply
17  market of sodium saline and the patent-protected
18  market of a brand name drug, would you expect
19  generic drugs to be somewhere between those two
20  extremes?
21          MS. BROOKER:  Objection.  Form.
22          MR. BREEN:  Objection.  Form.

Page 148

1       A.  That would be a question I never
2   thought about before today.  But today I would
3   say that we always made the distinction between -
4   - between drugs and -- and supplies.  And, again,
5   I would fall back on the Medicare green eyeshade
6   distinction between what's sterile supplies and
7   what's pharmacy.
8           MR. COOK:  Let's take a break.
9           THE VIDEOGRAPHER:  The time is 11:28
10  a.m.  We're going off the record, concluding Tape
11  No. 2 in the deposition of Dr. Bruce Vladeck in
12  the matter of In re Pharmaceutical Average
13  Wholesale Price Litigation.
14          (Recess taken.)
15          THE VIDEOGRAPHER:  The time is 11:46
16  a.m.  We're going back on the record, starting
17  Tape No. 3 of the deposition of Dr. Bruce Vladeck
18  in the matter of In re Pharmaceutical Average
19  Wholesale Price Litigation.
20      Q.  Doctor, based upon what we were talking
21  about just before the break, would it be fair to
22  say that while you were administrator of HCFA,

Page 149

1   you did not understand published average
2   wholesale price to be the average of prices at
3   which wholesalers were selling their drugs to
4   their customers?
5       A.  It would -- it would be fair to say
6   that I did not believe it was, in fact, an
7   empirical estimate, that rather it was a -- an
8   amount reported by the manufacturer to -- of the
9   compendium compilers or whatever, yes.
10      Q.  And, again, akin to a sticker price?
11      A.  That's correct.
12      Q.  Where did you get that understanding?
13      A.  I believe that was probably what my
14  staff explained to me when I first encountered
15  the concept sometime after I took office.
16      Q.  Do you recall anybody within HCFA who
17  was under the belief that average wholesale price
18  was an average of prices at which wholesalers
19  sold drugs to customers?
20          MS. BROOKER:  Object to form.  And I
21  would just instruct the witness, just, you know,
22  be mindful of not disclosing deliberations,

38 (Pages 146 to 149)

Vladeck, Ph.D., Bruce C.                                        May 4, 2007
                         New York, NY

Page 186

1   probably other members of the staff of the office
2   administrator probably would have been involved,
3   as would additional staff in the Office of
4   Legislation and Policy, in addition to the
5   individuals I named earlier.
6        Q.   And it involved numerous meetings at
7   which the -- the -- the possibilities were
8   discussed; I take it?
9             MS. BROOKER:  Objection.  Form.
10       A.   I would say we were, in 1996 and 1997 -
11  - certainly probably beginning in 1995, there
12  were very frequent conversations about budgetary
13  issues and policies with potential budgetary
14  impacts of one kind or another, and there was
15  always a list of potential policies and changes
16  to Part B drug reimbursement was frequently on
17  those lists, and was not discussed at every
18  meeting, but was frequently discussed.
19       Q.   How many alternatives were discussed?
20            MS. BROOKER:  Objection.  You should
21  not discuss exactly what -- you should not
22  discuss any of your deliberations, so you

Page 187

1   shouldn't talk about -- I mean, that's -- that's
2   prohibited.
3             MR. COOK:  Well, are you instructing
4   him not to answer?
5             MS. BROOKER:  You can talk about what
6   official policy was.
7             MR. COOK:  All right.  I'll make it
8   easy.
9        Q.   In your internal deliberations at HCFA,
10  how many alternative methods of reimbursement did
11  you consider?
12       A.   I couldn't say.  I -- it's not a
13  question of privilege.  I couldn't say.
14       Q.   Okay.  But within your internal
15  deliberations, you did consider alternative
16  methods of reimbursement.  Correct?
17       A.   That is correct.
18       Q.   And, again, to -- to make the record as
19  sharp as possible, what did you discuss in those
20  deliberations?
21            MS. BROOKER:  Objection.  You cannot
22  discuss exactly what your deliberations were.

Page 188

1             And I also object that these questions
2   are incredibly vague.  So, I object to form.  I
3   don't know exactly what program we're even
4   talking about.  I don't know what time period
5   we're talking about.  I don't know what the
6   specifics are that you're talking about in this
7   whole line of questions.
8             MR. COOK:  But you understand enough
9   that you won't let him answer it?
10            MS. BROOKER:  If he's going to talk
11  about internal deliberations.  And -- and, again,
12  just for the record, it's not that I won't let
13  him talk about it.  I am here to protect on --
14  not on behalf of the witness, but on behalf of
15  the government, deliberative process privilege.
16  It's not my privilege. It's not the witness'
17  privilege.  It's the federal government's
18  privilege.
19            MR. COOK:  All right.  The United
20  States, who has sued my client, will not allow
21  the witness to talk about it.
22            Is that fair to say?

Page 189

1             MS. BROOKER:  I don't think that's a
2   fair characterization.
3             MR. COOK:  Okay.
4             MS. BROOKER:  Look, Chris --
5             MR. COOK:  I know.  I know.
6             MS. BROOKER:  We have this issue before
7   the Judge.  There's no reason to bicker about it
8   before the witness.  Let's just all be
9   professional about it.
10       Q.   And so, it is fair to say that during
11  the time you were the administrator of HCFA, the
12  agency did not choose to change the manner in
13  which it reimbursed Medicare Part B drugs?
14            MS. BROOKER:  Objection.  Form.
15       A.   I would -- I would frankly personally
16  object to that characterization because I had a
17  growing feeling -- again, I would put this in a
18  period probably beginning about 1995 through the
19  time I left the government -- of frustration that
20  we were significantly overpaying for Part B
21  drugs, and that because of some combination,
22  frankly, of political and legal constraints, we

48 (Pages 186 to 189)

Vladeck, Ph.D., Bruce C.                                        May 4, 2007
New York, NY

Page 190

1  were unable to change it.
2          Again, whether that was a matter of law
3  or a matter of political judgment, whether I was
4  clear then, I'm not clear now, but it was
5  certainly a source of very great frustration to
6  me that we continued to pay what I believed was
7  excessive amounts for the drugs.
8      Q.  And so, "choose" was a bad choice of
9  words?
10     A.  Yes.
11     Q.  Okay.  Did not, in fact, change the way
12 in which it reimbursed it, for several reasons?
13         MS. BROOKER:  Objection.  Form.
14     A.  Those methods were not, in fact,
15 changed until 2004, I believe.
16     Q.  You indicated that political
17 considerations were one of the bases -- let me
18 rephrase that.
19         You indicated the political pressures
20 were one of the reasons why the methodology was
21 not changed.  Correct?
22     A.  I did, yes.  That's correct.

Page 191

1      Q.  And it's possible that legislative
2  impediments were one of the reasons why the
3  methodology was not changed.  Correct?
4          MS. BROOKER:  Objection.  Form.
5      A.  Again, I would -- I would restate it.
6  What I was trying to say was that we believed
7  that -- there's sort of two parts to this -- that
8  any effort to change it through any mechanism
9  would create political objections and might well
10 prevent us from moving forward.  Some of those
11 barriers might have been legislative, but whether
12 we actually required legislation to make changes,
13 again, is something I'm a little bit unclear
14 about.
15     Q.  It is fair to say that one of -- it was
16 not a reason for the lack of a change in
17 methodology that you were relying upon average
18 wholesale price to represent an average of
19 acquisition prices?
20         MS. BROOKER:  Objection.  Form.
21     A.  Please restate that.
22     Q.  You're right.  That has way too many

Page 192

1  negatives in it.  I'm not even going to try to
2  clean that one up.  I apologize.
3          You had communications with Congress
4  during this time period about the issue of
5  Medicare Part B reimbursement for prescription
6  drugs?
7      A.  I don't know the extent to which I did
8  personally, but certainly at the staff level
9  there was continual conversation about this
10 issue.
11     Q.  Do you know the extent to which the
12 facts underlying these policy decisions were
13 communicated by your staff to Congress?
14         MS. BROOKER:  Objection.  Form.
15     A.  I don't know the extent to which I am a
16 reliable source of information in this regard,
17 but it is my perception, again, that the general
18 sense of a 15, 20 percent spread between average
19 wholesale price and actual acquisition or actual
20 market cost was very widespread within the policy
21 community in Washington, so that the
22 Congressional staff and the HCFA staff and other

Page 193

1  HHF staff and, frankly, industry representatives,
2  would have all seen the same documents, would all
3  have shared the same sort of gossip and
4  perceptions.
5          In addition to which certainly at the
6  time of the President's speech, I'm almost
7  certain in 1996, and it's possible in 1995 there
8  were official savings estimates from OMB and the
9  Congressional budget office of what an adoption
10 of, say, a proposal to go to 85 percent of AWP
11 would save the Medicare program.
12         So, there were numbers, quantitative
13 estimates, of the effect of this change that were
14 blessed by the official numbers blessers, so
15 there was sort of a common set of parlance
16 expectation and understanding about the magnitude
17 of these issues.
18     Q.  And from -- you mentioned political
19 pressures that -- that prevented changes, and a
20 change to methodology.
21         From where did those political
22 pressures come, in your experience?

49 (Pages 190 to 193)

Vladeck, Ph.D., Bruce C.                                          May 4, 2007
New York, NY

Page 278

```
 1  make it through the House legislative process.
 2  Whether at the committee level or at the full
 3  House level I don't recall.
 4      Q.  And that would be for the proposed 1998
 5  budget?
 6      A.  That would be in the Balanced Budget
 7  Act which addressed the Fiscal 1998 budget.
 8      Q.  And that would be the legislation that
 9  legislated that Medicare Part B reimbursement
10  would be at 95 percent of AWP.  Correct?
11      A.  I don't recall what our original
12  proposal was, and I don't recall the details of
13  the legislative process.  I think it came out the
14  other end at 95 percent.
15      Q.  Right.  The ultimate legislation.
16      A.  The ultimate legislation called for 95
17  percent of AWP, yes.
18      Q.  And the AWP in that legislation, did
19  you understand that in the same way you
20  understood AWP in the regulation from 1992?
21      A.  Yes.
22          MS. BROOKER:  Objection.  Form.
```

Page 279

```
 1      Q.  And so that would refer to a published
 2  average wholesale price.  Correct?
 3      A.  That was our understanding of it, yes.
 4      Q.  And the next cc is Teruni, T-E-R-U-N-I,
 5  Rosengren, R-O-S-E-N-G-R-E-N, with the GAO.  Do
 6  you know who Mr. or Ms. Rosengren is?
 7      A.  No, I do not.
 8      Q.  There is Michael Hertz, United States
 9  Department of Justice.  Do you know who Mr. Hertz
10  is?
11      A.  Mr. Hertz was a senior person in the
12  civil litigation side of the Department of
13  Justice, from my understanding.  I, in fact, had
14  met Mr. Hertz and worked with him on an other
15  number of occasions.
16      Q.  And the next are Mr. Breen and Mr.
17  Wampler from the Wampler, Buchanan and Breen
18  firm, Mr. Breen here in the flesh, and Mr.
19  Wampler.  Do you -- and at the time did you know
20  who Mr. Wampler and Mr. Breen were?
21      A.  No.  I had not had the pleasure.
22      Q.  Okay.  I'd like to show you one last
```

Page 280

```
 1  exhibit, and then we'll let you go promptly at 4
 2  to your call.
 3          MR. COOK:  We will mark this, as soon
 4  as we go off the record, as Exhibit Abbott 165.
 5          For the record, it's a printout of a
 6  Wall Street Journal article dated May 12th, 2000,
 7  entitled "Medicare monitor, how a whistleblower-
 8  spurred pricing case involved drug makers."  And
 9  the second sub bullet, "Toilet seat as a talking
10  point."
11      Q.  I'll ask you to take a quick look that
12  and ask you, do you recall that?
13      A.  I recall the newspaper story.  I recall
14  being interviewed for it.
15      Q.  And tell me what you recall about the
16  interview for that newspaper story.
17      A.  Ms. McGinley, the reporter from the
18  Wall Street Journal, with whom I had worked with
19  quite a bit over the time, called me and told me
20  that she was asking about it.  She asked me if I
21  remembered the toilet seat, and I think she
22  probably pretty accurately reported in this
```

Page 281

```
 1  newspaper story my response to her.
 2      Q.  And that response on this Page 2 of
 3  this particular printout is on the fourth
 4  paragraph up from the bottom.  And I'll read it
 5  for the record, attributed to you:
 6          "I thought the toilet seat was clever,
 7  but the tone of the letter was so hostile that it
 8  took all the fun out of it.  We were not unaware
 9  of the problem, we were just moving slowly."
10          Do I understand correctly that you were
11  accurately quoted as saying that HCFA was not
12  unaware of the problem when you received the
13  letter in June of 1997?
14          MS. BROOKER:  Objection.  Form.
15      A.  We were not unaware of certainly the
16  Medicare problem, which was the one we were -- I
17  was focused on.
18      Q.  And the one described in the letter.
19  Correct?
20      A.  That is correct.
21          MR. COOK:  It's 4:02.  I have blown two
22  minutes past your prompt 4:00 adjournment time.
```

71 (Pages 278 to 281)

Henderson Legal Services
202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9