# EXHIBIT 40

Page 313

```
              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - -x
IN RE:  PHARMACEUTICAL INDUSTRY     :  MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION  :  CIVIL ACTION

THIS DOCUMENT RELATES TO:           :  01-CV-12257-PBS

United States of America ex rel.    :

Ven-a-Care of the Florida Keys,     :

Inc., v. Boehringer Ingelheim       :

Corp., et al., Civil Action No.     :

07-10248-PBS and United States of   :

America, ex rel. Ven-A-Care of the  :  Hon. Patti B.

Florida Keys, Inc., v. Abbott       :    Saris

Laboratories, Inc., Civil Action    :

Nos. 06-11337-PBS and               :

07-CV-11618-PBS                     :
- - - - - - - - - - - - - - - - - -x
       (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

                      Washington, D.C.

                      Tuesday, October 28, 2008

                      VOLUME II

                      PAUL CHESSER
```

Chesser, Paul - Vol. II                                    October 28, 2008
                         Washington, DC

Page 626

1   A.   I don't know about that.  What I -- what I
2   recall about going painstakingly over every one of
3   those rows of data, that the injectables seemed to
4   have large discounts.  And it was a challenge to know
5   whether you were using the correct units.
6       Q.   Could you explain that to me?  How is --
7   how is that?  What was the challenge there?
8       A.   Well, I went back and reviewed everything
9   where the discount was over a certain -- I don't
10  remember what percent I used, or under a certain.
11  And without a doubt, I had to go back and look at
12  more NDCs that turned out to be injectables than
13  anything else.
14           And part of the problem -- it was even a
15  challenge to go back -- I used the Red Book as my
16  reference.  What they would show as the number of
17  units for a particular NDC.  That was the challenge,
18  was getting -- making sure you were using the right
19  units, because if I remember right at '94, we had
20  a -- I don't think we had the package price.  I think
21  we had the unit price.  I think we had to convert
22  everything to unit price to be able to compare it to

Page 627

1   AWP.
2            So the challenge, when you got to the
3   injectables, was there might be, say, a thousand
4   milligrams but it's -- are there 10 of them in the
5   package or not.  And that was -- and ultimately, what
6   proved to be the most reliable source for me was to
7   go to the actual invoice, and see -- read the
8   description of what the quantity was on that invoice.
9   I couldn't necessarily rely on what the Red Book
10  showed, or I think it was in 2000, '99 review, I was
11  actually trying to use First DataBank's quantity for
12  each NDC.  But I spent more time on injectables than
13  anything else in my review, investigating odd
14  numbers.
15      Q.   Because if it were a thousand milliliter
16  bag, you could be off by a factor of a thousand if
17  there were no --
18      A.   20 or -- I mean, the packaging of those is
19  -- it's not the same from one reference source to
20  another.  And plus, I had to look up a lot of them
21  because there were really significant discounts on
22  some of them.

Page 628

1       BY MR. COOK:
2       Q.   When you say significant discounts --
3       A.   90 plus percent.
4       Q.   The analysis that you conducted of the
5   invoices that were pulled in 1994, am I correct from
6   my review of the spreadsheets that you had largely
7   completed the analysis of those invoices and created
8   the spreadsheets and done the basic calculations by
9   April or May of -- of 1995?  Or would you have to go
10  back and look at the documents to see?
11      A.   Yeah.  I don't -- I don't remember.
12      Q.   Okay.  You had certainly collected all
13  your data by that point, right?
14      A.   I don't even know the answer to that for
15  sure.
16      Q.   But the documents would show presumably?
17      A.   Yes.
18      Q.   And just so we are clear, when you're
19  referring to injectables, can you give me some
20  examples of what types of drugs you're talking about
21  with -- or products you're talking about with respect
22  to injectables?

Page 629

1       A.   Saline solution.
2       Q.   So dextrose solution, for example, would
3   be an injectable?  Would you agree that sterile water
4   would be an injectable?
5       A.   Yes.
6       Q.   If it were an IV bag, an IV solution
7   antibiotic would be an injectable?
8       A.   Yes.
9       Q.   Do you know who Dr. Bruce Vladeck is?
10      A.   He was the administrator at CMS for a
11  little while.
12      Q.   He was the administrator from 1992 to
13  1997.  Does that sound right?
14      A.   Close enough.
15      Q.   Close enough.  He testified earlier in
16  this case, and testified that with respect to
17  infusion products, injectable products, such as
18  sodium saline solution, that his expectation was that
19  he would see discounts of 99 percent obtainable
20  through GPOs.  Would that be consistent with the
21  empirical data that you reviewed in 1994?
22           MR. DRAYCOTT:  Objection.

80 (Pages 626 to 629)

Page 630

1     THE WITNESS: I don't -- I don't know that
2  I looked at the data sufficiently to be able to draw
3  that conclusion.
4     BY MR. COOK:
5     Q.   Would it surprise you to see discounts in
6  the 90 percent plus range for these injectables?
7     A.   No. It was very common.
8     Q.   Did you find that these products tended to
9  be expensive products?
10    MR. DRAYCOTT: Objection.
11    THE WITNESS: No. I don't think they
12 were.
13    BY MR. COOK:
14    Q.   So a bag of saline, based upon your review
15 of actual tens of thousands of pages of actual data,
16 what would you expect to pay for a bag of saline
17 solution?
18    A.   Not much.
19    MS. ALBEE: Objection. Form.
20    BY MR. COOK:
21    Q.   70 cents, a dollar?
22    A.   Oh, I don't -- it's been too long.

Page 631

1     Q.   I'm told that we need to change the tape,
2  so it's a good time for a break.
3     THE VIDEOGRAPHER: This concludes volume
4  II, tape three, in the deposition of Paul Chesser.
5  Off the record at 4:29.
6     (Recess.)
7     THE VIDEOGRAPHER: Here begins volume II,
8  tape four, in the deposition of Paul Chesser. On the
9  record at 4:34.
10    BY MR. COOK:
11    Q.   Just in terms of timing, so I can place us
12 in time, Mr. Chesser, the OAS investigation into the
13 difference between average wholesale price and
14 pharmacy acquisition cost was begun sometime prior to
15 August of 1994, correct?
16    A.   August of '94 is when we had the meeting
17 with the state folks in Richmond, so sometime barely
18 before that.
19    Q.   All right. So I'm just trying to get sort
20 of a starting point of when the investigation
21 commenced. Is there a formal commencing of an
22 investigation, a document or an event that you sort

Page 632

1  of look at as commencing an investigation?
2     MR. BEIMERS: Objection.
3     THE WITNESS: In this case, no. And at
4  that time no. When we do -- we do audit start
5  notices a lot currently. I don't know that we did
6  them always at that time.
7     BY MR. COOK:
8     Q.   Certainly by August 30th of 1994, in this
9  case, you had commenced your audit, correct?
10    A.   Correct.
11    Q.   Is there a difference, and I don't know
12 the answer, is there a difference between an audit
13 and an investigation in OIG parlance?
14    A.   Yes.
15    Q.   What is the difference?
16    A.   Well, we have in addition to the Office of
17 Audit Services, we have an Office of Investigations.
18 These are all special agents who are criminal
19 investigators who work on criminal as well as civil
20 cases. And a lot of times in conjunction with the
21 Department of Justice.
22    Q.   And what's an audit as opposed to an

Page 633

1  investigation?
2     A.   An audit is just looking to see whether
3  some criteria has -- is being complied with or not.
4  Not necessarily whether it's legal or illegal. It's
5  just whether it's economic -- economical and
6  efficient way to provide services, or something along
7  those lines.
8     Q.   So you're still investigating it in the
9  sense that you're looking at facts, but you're not
10 necessarily investigating it because someone has made
11 an accusation of improper conduct?
12    A.   Correct. We are not looking for criminal
13 or civil.
14    Q.   Do you have any procedure that you -- that
15 you use when you come across evidence of fraud or
16 abuse in the course of an audit?
17    A.   Yes. I personally haven't had to deal
18 with that, but we are supposed to contact OI
19 immediately because the rules of evidence are
20 different when you're in a criminal environment than
21 they are during an audit.
22    Q.   In the course of your 1994 investigation,

81 (Pages 630 to 633)