# EXHIBIT 51



DEPARTMENT OF HEALTH& HUMAN SERVICES | Office of Inspector General

# Memorandum

**Date** AUG 13 1996

**From** June Gibbs Brown
Inspector General

**Subject** Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration (A-06-95-00065)

**To** Bruce C. Vladeck
Administrator
Health Care Financing Administration

Attached for your information and use is our final report entitled, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration." This review was conducted as part of a nationwide audit of pharmacy drug acquisition costs at the Health Care Financing Administration's request. Most States reimburse pharmacies for Medicaid prescriptions using a formula which generally discounts the average wholesale price (AWP) by 10.5 percent. The objective of our review was focused on developing an estimate of the difference between the actual acquisition costs of drugs of pharmacies and AWP for both brand name and generic drugs.

The Florida Agency for Health Care Administration (State Agency) was 1 of 11 States randomly selected as part of the nationwide review. Florida reported drug expenditures of $486.7 million in Calendar Year 1994.

Through statistical sampling, we obtained pricing information from 40 Florida pharmacies. We obtained 2,717 invoice prices for brand name drugs, and 1,061 invoice prices for generic drugs. The overall estimate of the extent that AWP exceeded pharmacy purchase invoice prices was 20.2 percent for brand name drugs and 41.5 percent for generic drugs. The national estimates are 18.3 percent and 42.5 percent, respectively. The estimates combine the results for four categories of pharmacies including rural-chain, rural-independent, urban-chain, and urban-independent. The estimates exclude the results obtained from non-traditional pharmacies (nursing home pharmacies, hospital pharmacies, home IV, etc.) because such pharmacies purchase drugs at substantially greater discounts than retail pharmacies, and including them would have inappropriately inflated our percentages.



Page 2- Bruce C. Vladeck

We are recommending that the State Agency consider the results of this review as a factor in any future changes to pharmacy reimbursement for Medicaid drugs.

In response to our draft report, the State Agency responded that they had compared the data from our review to their current reimbursement policy and concluded that a change at this time was not warranted.

We welcome any comments you have on this Florida State report. If you have any questions, call me or have your staff contact George M. Reeb, Assistant Inspector General for Health Care Financing Audits, at (410) 786-7104.

To facilitate identification, please refer to Common Identification Number A-06-95-00065.

Attachment

# Department of Health and Human Services

# OFFICE OF INSPECTOR GENERAL

## REVIEW OF PHARMACY ACQUISITION COSTS FOR DRUGS REIMBURSED UNDER THE MEDICAID PRESCRIPTION DRUG PROGRAM OF THE FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION



JUNE GIBBS BROWN
Inspector General

AUGUST 1996
A-06-95-00065

# SUMMARY

At the request of the Health Care Financing Administration (HCFA), the Office of Inspector General (OIG) conducted a nationwide review of pharmacy acquisition costs for drugs reimbursed under the Medicaid prescription drug program. Since most States reimburse pharmacies for Medicaid prescriptions using a formula which discounts the average wholesale price (AWP-), the objective of our review was to develop an estimate of the difference between the actual acquisition costs of drugs of the pharmacies and AWP for both brand name and generic drugs.

To accomplish our objective, we selected a random sample of 11 States from a universe of 48 States and the District of Columbia. Arizona was excluded from the universe of States because the Medicaid drug program is a demonstration project using prepaid cavitation financing and Temessee was excluded because of a waiver received to implement a statewide managed care program for Medicaid. Florida was one of the sample States selected, as well as California, Delaware, District of Columbia, Maryland, Missouri, Montana, Nebraska, New Jersey, North Carolina, and Virginia.

Additionally, we selected a sample of Medicaid pharmacy providers from each State and obtained invoices of their drug purchases. The pharmacies were selected from each of five categories--rural-chain, rural-independent, urban-chain, urban-independent and non-traditional pharmacies (nursing home pharmacies, hospital pharmacies, etc.). We included the non-traditional category so as to be able to exclude those pharmacies from our overall estimates. We believed such pharmacies purchase drugs at substantially greater discounts than retail pharmacies, and including them would have inflated our percentages.

We compared each invoice drug price to AWP for that drug and calculated the percentage, if any, by which AWP exceeded the invoice price. We then projected those differences to the universe of pharmacies in each category for each State and calculated an overall estimate for each State. Additionally, we projected the results from each State to estimate the nationwide difference between AWP and invoice price for each category.

In Florida, we obtained pricing information from 40 pharmacies. Specifically, we obtained 2,717 invoice prices for brand name drugs, and 1,061 invoice prices for generic drugs. For Florida, the overall estimate of the extent that AWP exceeded invoice prices was 20.2 percent for brand name drugs and 41.5 percent for generic drugs. The national estimates are 18.3 percent and 42.5 percent, respectively. The estimates combine the results for four categories of pharmacies including rural-chain, rural-independent, urban-chain and urban-independent and exclude the results obtained from non-traditional pharmacies.

Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration

i

We are recommending that the Florida Agency for Health Care Administration (State Agency) consider the results of this review as a factor in any future changes to pharmacy reimbursement for Medicaid drugs. We will share the information with HCFA from all 11 States in a consolidation report for their use in evaluating the overall Medicaid drug program.

The Director of the State Agency responded to our draft report in a letter dated May 23, 1996. The Director stated that the State Agency had reviewed the OIG data files relevant to the Florida portion of this review and compared the invoice prices on those data files to their current reimbursements limits. The State Agency concluded that 74 percent of the drugs in the review are currently reimbursed at less than 10 percent above the invoice price. The Director also asserted that the State Agency believed that the OIG had incorrectly calculated values for oral contraceptives. The full text of the Director's comments are included in Appendix 4.

We reviewed the calculated values for every oral contraceptive on the data file and concluded that those values were calculated correctly. In subsequent discussions with a State Agency official, the official agreed that the values were calculated correctly.

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| INTRODUCTION | 1 |
| BACKGROUND | 1 |
| SCOPE | 2 |
| FINDINGS AND RECOMMENDATIONS | 4 |
| CONCLUSIONS AND RECOMMENDATION | 6 |

APPENDICES

    APPENDIX 1- SAMPLE DESCRIPTION

    APPENDIX 2- FLORIDA SAMPLE RESULTS

    APPENDIX 3- NATIONWIDE SAMPLE RESULTS

    APPENDIX 4- STATE AGENCY'S COMMENTS

# INTRODUCTION

At the request of HCFA, OIG, Office of Audit Services (OAS) conducted a review of pharmacy acquisition costs for drugs reimbursed under the Medicaid prescription drug program of the Florida Agency for Health Care Administration (State Agency). The objective of our review was to develop an estimate of the difference between the actual acquisition costs of drugs and AWP. This review was conducted as a part of a nationwide review of pharmacy acquisition costs. Florida was 1 of 11 States randomly selected as part of the nationwide review.

## *BACKGROUND*

Medicaid regulations provide for the reimbursement of drugs using two methods. If a drug is a multiple source (generic) drug, then reimbursement is based on the lower of the pharmacist's usual and customary charge to the general public or an upper limit amount plus a dispensing fee. The Federal upper limit amounts are established by HCFA. If a drug is a single source (brand name) drug, or a generic drug for which an upper limit amount has not been established, then the reimbursement is the lower of the pharmacist's usual and customary charge to the general public or the estimated acquisition cost (EAC) plus a reasonable dispensing fee. The State agencies are responsible for determining the EAC and the dispensing fee.

The EAC for most States is calculated by using AWP for a drug less some percentage. The AWP is the price assigned to the drug by its manufacturer and is listed in either the ***Red Book***, ***Medispan*** or the ***Blue*** Book--publications universally used in the pharmaceutical industry. Prior to 1984, most States used 100 percent of AWP for reimbursement of acquisition costs. However, OIG issued a report in 1984 which stated that, on average, pharmacies purchased drugs for 15.9 percent below AWP. In 1989, OIG issued a follow-up report which concluded that pharmacies were purchasing drugs at discounts of 15.5 percent below AWP. Both the 1984 and 1989 reports combined brand name and generic drugs in calculating the percentage discounts and included a comparison of 3,469 and 4,723 purchases, respectively.

In 1989, HCFA issued a revision to the State Medicaid Manual which pointed out that a preponderance of evidence demonstrated that AWP overstated prices that pharmacies actually paid for drugs by as much as 10 to 20 percent. The Manual further provided that, absent valid documentation to the contrary, it would not be acceptable for a State to make reimbursements using AWP without a significant discount.

In November 1990, the Omnibus Budget Reconciliation Act of 1990 was passed which placed a 4-year moratorium on changes to States' reimbursement policies. The moratorium expired on December 31, 1994 and HCFA requested that we, once again, determine the difference between AWP and actual pharmacy acquisition cost.

The State Agency reported drug expenditures of $486.7 million in Calendar Year (CY) 1994.

## SCOPE

Our review was performed in accordance with generally accepted government auditing standards. The objective of our review was to develop an estimate of the difference between AWP and the actual invoice prices of both brand name and generic prescription drugs to Medicaid pharmacy providers. Our objective did not require that we identify or review any internal control systems.

Our review was limited to ingredient acquisition costs and did not address other areas such as: the effect of Medicaid business as a contribution to other store sales; the cost to provide professional services other than dispensing a prescription such as therapeutic interventions, patient education, and physician consultation; and the cost of dispensing which includes costs for computers, multi-part labels, containers, technical staff, transaction fees, Medicaid specific administrative costs, and general overhead. We also did not take into consideration the effect of Federal upper limit amounts on generic drug reimbursements or usual and customary charge limitations. We plan to evaluate the effect of the Federal upper limit amounts on generic drug reimbursements in a subsequent review.

We obtained a listing of all Medicaid pharmacy providers from the State Agency. The State Agency was responsible for classifying each pharmacy as chain, independent or non-traditional. For purposes of this review, a chain was defined as four or more pharmacies with common ownership. We determined whether each pharmacy was rural or urban by comparing the county location for each pharmacy to a December 31, 1992 listing of metropolitan areas and their components. We selected a stratified random sample of 60 pharmacies with 12 pharmacies selected from each of 5 strata--rural-chain, rural-independent, urban-chain, urban-independent, and non-traditional (nursing home pharmacies, hospital pharmacies, home IV, etc.). We included the non-traditional category so as to be able to exclude those pharmacies from our estimates. We believed that such pharmacies are able to purchase drugs at substantially greater discounts than a retail pharmacy and would inflate our estimate.

We requested, from each pharmacy selected, the largest invoice from each different source of supply for a specified month in CY 1994. We identified the sources of supply as wholesalers, chain warehouse distribution centers, generic distributors, and direct manufacturer purchases. Each pharmacy was initially assigned a month from January through September in order to provide a cross-section of this 9-month time period. However, we permitted some pharmacies to provide invoices from October and November as invoices were not available from the earlier period.

Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration

2

We reviewed every line item on the invoices supplied by the sample pharmacies to ensure that the invoices contained the information necessary for our review. We eliminated over-the-counter items. Some invoices did not include National Drug Codes (NDC), which were needed to obtain AWP for the drug. We attempted to obtain NDCS in those instances. We used the 1994 *Red Book,* a nationally recognized reference for drug product and pricing information, to obtain NDCS or identify over-the-counter items. One prominent wholesaler, whose invoices contained that wholesaler's item number rather than NDCS, provided us with a listing that converted their item number to an NDC. If we were unable to identify the NDC for a drug, we eliminated the drug. This was a common occurrence for generic drugs where there was no indication on the invoice as to the manufacturer of the drug.

We obtained a listing from HCFA that indicated whether a drug is a brand name or generic drug. We used that listing to classify each drug on the invoices as brand or generic. If a drug was not on the HCFA listing, we used the *Red Book* to determine whether the drug was brand or generic. Additionally, we obtained drug expenditure information from HCFA-64 Reports.

The State of Missouri provided us with a pricing file for the purpose of obtaining the AWP for each drug. We compared the invoice drug price to AWP for each drug and calculated the percentage, if any, by which AWP exceeded the invoice price. If a drug from an invoice was not on the pricing file we eliminated that drug.

An initial meeting was held in Richmond, Virginia on August 30-31, 1994, with Medicaid pharmacy representatives from the sample States. At this meeting, we presented a methodology for performing the review and the methodology was refined with input from the State representatives. At a follow-up meeting held in Richmond, Virginia, on September 27-28, 1995, we presented the results of our review with the sample States.

We used OAS statistical computer software to calculate all estimates as well as to generate all random numbers. We did not independently verify any information obtained from third party sources. Our review was conducted by our Little Rock, Arkansas OAS field office with assistance from our OAS field offices in Baton Rouge, Louisiana and Austin, Texas from September 1994 to September 1995.

# FINDINGS AND RECOMMENDATIONS

## BRAND NAME DRUGS

We estimate that AWP exceeded invoice prices for *brand name drugs* by **20.2** percent. The estimate combined all pharmacy categories except non-traditional pharmacies and was based on the comparison to **AWP** of 2,668 invoice prices received from 35 pharmacies. The standard deviation for this estimate was 2.22 percent (see Appendix 2).

The estimates by individual categories for *brand name drugs* are summarized in the following table:



The following table shows the number of pharmacies sampled and the number of prices reviewed by individual category for *brand name drugs*.



---

**Review** of Pharmacy Acquisition Costs for Drugs **Reimbursed** Under the Medicaid Prescription Drug Program
of the Florida Agency for Health Care Administration
4

## GENERIC DRUGS

**We estimate** that AWP exceeded invoice prices for *generic drugs* by 41.5 percent. Once again the estimate combined all pharmacy categories except non-traditional pharmacies. The estimate was based on the comparison to AWP of 1,021 invoice prices received from 35 pharmacies. The standard deviation for this estimate was 2.19 percent (see Appendix 2).

The estimates that AWP exceeded invoice prices for *generic drugs* are summarized by individual categories in the following table:



The following table shows the number of pharmacies sampled and the number of prices reviewed by individual category for the *generic drugs*.



---

Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program
of the Florida Agency for Health Care Administration

5

# CONCLUSIONS AND RECOMMENDATION

Based on our review, we have determined that there is a significant difference between AWP and pharmacy acquisition costs. The difference between AWP and pharmacy acquisition costs is significantly greater for generic drugs than for brand name drugs. In general, State representatives believed that the review supported current State practices to establish pharmacy reimbursement for ingredient cost at levels below AWP.

We recognize that acquisition cost is just one factor in pharmacy reimbursement policy and that any change to that policy should also consider the other factors discussed in the Scope section of our report. Additionally, the effect of Federal upper limit amounts on generic drug reimbursements or usual and customary charge limitations should be taken into consideration. However, a change in any of the factors affecting pharmacy reimbursement could have a significant impact on expenditures because of the size of the program ($486.7 million) in Florida. We believe that the difference between AWP and pharmacy acquisition costs as determined by our review is significant enough to warrant consideration by the State in any evaluation of the drug program. Therefore, we recommend that the State Agency consider the results of this review in determining any future changes to pharmacy reimbursement for Medicaid drugs.

## *STATE AGENCY'S COMMENTS*

The Director of the State Agency responded to our draft report in a letter dated May 23, 1996. The Director stated that the State Agency had reviewed the OIG data files relevant to the Florida portion of this review and compared the invoice prices on those data files to their current reimbursements limits. The State Agency concluded that 74 percent of the drugs in the review are currently reimbursed at less than 10 percent above the invoice price. The Director also asserted that the State Agency believed that the OIG had incorrectly calculated values for oral contraceptives. The full text of the Director's comments are included in Appendix 4.

## *OIG'S RESPONSE*

We reviewed the calculated values for every oral contraceptive on the data file and concluded that those values were calculated correctly. In subsequent discussions with a State Agency official, the official agreed that the values were calculated correctly.

*APPENDICES*

## SAMPLE DESCRIPTION

*Sample Objectives:*

Develop an estimate of the extent that Average Wholesale Prices (**AWP**) exceed actual invoice prices to Medicaid pharmacies in Florida for brand name drugs and for generic drugs.

*Population:*

The sampling population was pharmacy providers participating in the Medicaid prescription drug program of the State Agency.

*Sampling Frame:*

The sampling frame was a listing of all pharmacy providers participating in the Medicaid prescription drug program.

*Sample Design:*

A sample of 12 pharmacies was randomly selected from each of 5 strata. The five strata of pharmacies were rural-chain, rural-independent, urban-chain, urban-independent, and non-traditional (nursing home pharmacies, hospital pharmacies, home IV, etc.) Each pharmacy was assigned a month **from** 1994 for which to provide invoices. All pharmacies were initially assigned a month from January through September in a method designed to provide a cross-section of the 9-month period. However, some pharmacies were permitted to submit invoices from October and November as invoices were not available for the month originally assigned. The largest invoice from each of four different sources of supply was requested. The sources of supply were identified as wholesalers, chain warehouse distribution centers, generic distributors, and direct manufacturer purchases. All invoice prices were compared to AWP.

*Sample Size:*

Twelve pharmacies were selected from each stratum for a total of 60 pharmacies.

*Source of Random Numbers:*

OAS statistical sampling software was used to generate the random numbers.

*Characteristics to be Measured:*

From our review of the pharmacy invoices, we calculated the percentage that AWP exceeded actual invoice prices for all drugs on the invoices submitted.

*Treatment of Missing Sample Items:*

No spare was substituted for a pharmacy that did not provide information. If a pharmacy did not send an invoice for a particular type of supplier, we assumed that the pharmacy did not purchase drugs from that type of supplier during the month assigned to the pharmacy.

*Estimation **Methodology:***

We used OAS Statistical Software to project the percentage difference between AWP and actual invoice prices for each stratum, as well as an overall percentage difference. The overall percentage difference excluded the non-traditional pharmacies. The projections were done separately for brand name drugs and generics.

*Other Evidence:*

We obtained AWP from First DataBank.

*APPENDIX 2*

## FLORIDA SAMPLE RESULTS
## BRAND NAME AND GENERIC DRUGS

| | CATEGORY | SAMPLE UNIVERSE | SAMPLE SIZE | DRUG PRICES REVIEWED | POINT ESTIMATE | STANDARD DEVIATION | 90 PERCENT CONFIDENCE LEVEL | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LOWER LIMIT | UPPER LIMIT |
| **B R A N D** | RURAL-CHAIN | 131 | 8 | 854 | 20.3 | 2.23 | 19.02 | 21.53 |
| | RURAL-INDEPENDENT | 85 | 8 | 320 | 17.2 | 0.60 | 16.89 | 17.56 |
| | URBAN-CHAIN | 1,848 | 11 | 1,310 | 19.4 | 2.18 | 18.35 | 20.51 |
| | URBAN-INDEPENDENT | 809 | 8 | 184 | 22.4 | 21.97 | 9.70 | 35.12 |
| | NON-TRADITIONAL | 436 | 5 | 49 | 31.7 | 16.51 | 19.65 | 43.79 |
| | OVERALL (EXCL. NON-TRAD) | 2,873 | 35 | 2,668 | 20.2 | 2.22 | 16.59 | 23.89 |
| **G E N E R I C** | RURAL-CHAIN | 131 | 8 | 250 | 41.9 | 6.82 | 38.06 | 45.74 |
| | RURAL-INDEPENDENT | 85 | 8 | 184 | 41.0 | 12.03 | 34.30 | 47.62 |
| | URBAN-CHAIN | 1,848 | 11 | 398 | 39.5 | 10.22 | 34.43 | 44.54 |
| | URBAN-INDEPENDENT | 809 | 8 | 189 | 46.0 | 9.31 | 40.58 | 51.35 |
| | NON-TRADITIONAL | 436 | 5 | 40 | 63.0 | 13.04 | 53.46 | 72.54 |
| | OVERALL (EXCL. NON-TRAD) | 2,873 | 35 | 1,021 | 41.5 | 2.19 | 37.86 | 45.06 |

Case 1:01-cv-12257-PBS   Document 6450-12   Filed 08/28/09   Page 18 of 20

*APPENDIX 3*

## NATIONWIDE SAMPLE RESULTS
## BRAND NAME AND GENERIC DRUGS

| | NATIONWIDE | SAMPLE UNIVERSE | SAMPLE SIZE | DRUG PRICES REVIEWED | POINT ESTIMATE | STANDARD ERROR | 90 PERCENT CONFIDENCE LEVEL | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LOWER LIMIT | UPPER LIMIT |
| **B R A N D** | RURAL CHAIN | 1,095 | 73 | 5,723 | 17.40 | 1.05 | 15.67 | 19.13 |
| | RUR=U.INDEPENDENT | 1,499 | 78 | 3,043 | 16.39 | 1.07 | 14.63 | 18.15 |
| | URBAN-CHAIN | 8,194 | 73 | 7,198 | 18.45 | 0.52 | 17.60 | 19.31 |
| | URBAN-INDEPENDENT | 6,242 | 91 | 3,009 | 18.71 | 0.90 | 17.22 | 20.19 |
| | NON-TRADITIONAL | 2,026 | 66 | 1,762 | 27.52 | 2.28 | 23.76 | 31.27 |
| | OVERALL (EXCL. NON-TRAJ) | 17,030 | 311 | 18,973 | 18.30 | 0.66 | 17.21 | 19.38 |
| **G E N E R I C** | RURAL-CHAIN | 1,095 | 73 | 2,963 | 47.51 | 1.63 | 44.82 | 50.20 |
| | RURAL-INDEPENDENT | 1,499 | 78 | 1,798 | 47.38 | 0.93 | 45.85 | 48.92 |
| | URBAN-CHAIN | 8,194 | 72 | 2,634 | 37.61 | 2.82 | 32.97 | 42.26 |
| | URBAN-INDEPENDENT | 6,242 | 91 | 1,680 | 46.72 | 2.44 | 42.70 | 50.73 |
| | NON-TRADITIONAL | 2,026 | 59 | 1,262 | 57.70 | 1.98 | 54.43 | 60.96 |
| | OVERALL (EXCL. NON-TRAJ) | 17,030 | 314 | 9,075 | 42.45 | 0.90 | 40.97 | 43.93 |

STATE OF FLORIDA
AGENCY FOR HEALTH CARE ADMINISTRATION

May 23, 1996

Ms. June Gibbs Brown
Inspector General
Department of Health and Human Services
Washington, DC 20201

Dear Ms. Brown:

Thank you for sharing the draft results of your review of acquisition costs for drugs reimbursed under Medicaid prescription drug programs.

As you are aware, Florida Medicaid does not reimburse pharmacies based on average wholesale prices (AWP), but use a reimbursement methodology based on our best estimate of the charge made by wholesalers to retail pharmacies, our estimated acquisition cost (EAC). Florida Medicaid EAC is an increase of *seven* percent above the prices charged to wholesalers and is based on audits conducted in 1986. At that time, this reimbursement methodology equated to a reduction of 11 to 12 percent below published AWP listings and precluded most gaming of the system through deliberate inflation of suggested AWP levels by wholesalers or manufacturers.

Comparing acquisition costs for Florida pharmacies to AWP, as an academic exercise, proves that pharmacies, like almost all retail businesses, purchase goods at some discount below suggested list prices, but does not provide an indication of need to change current reimbursement policy. We have reviewed OIG data files relevant to Florida Medicaid and find that 81 percent of the products surveyed are reimbursed at less than 10 percent above net acquisition cost with 74 percent of these between 90 and 110 percent of the net acquisition cost. We did find that the OIG files incorrectly calculated values for most oral contraceptives and that the data included what appear to be a few random data entry errors which resulted in abnormally high and low values, depending on the error. '

We can conclude from the survey results that some manufacturers do not correctly report promotional prices for competitive products and the reported EAC price may be inflated by as much as a factor of ten times actual cost. In most of these cases, Florida imposes the federal upper limit price which also does not fully capture all available discounts and pharmacies may still have significant markups. In most cases, the products are multi-source. Restricting reimbursement to actual cost might have the unintended effect of discouraging purchase of promotional products and eventually shifting the market to single-source products which are universally much more costly. The average multi-source prescription costs Medicaid less than $11 and the average single-source product averages over $45.

Ms. June Gibbs Brown
Page Two
May 23, 1996

Injectable products and associated intravenous fluids also continue to be problematic. Manufacturers offer contracts to most vendors providing very favorable pricing and terms, but manufacturers continue to market small quantities of these through conventional sources and report single unit pricing through the national data sources. Any assistance your office might offer in **standardizing** pricing in this market would be beneficial.

We will continue to monitor pharmacy acquisition costs and manufacturer reporting anomalies to ensure compliance with HCFA guidelines. If you have any questions or **further** comments, please contact Gary **Crayton,** Medicaid Director, at (904) 488-3560 or Jerry Wells, Pharmacy Program Manager, at (904) 922-0681.

Sincerely,

Douglas M. Cook
Director

DC/jw