# EXHIBIT 54

Duzor, Deidre - Vol. III                    March 26, 2008
                    Washington, DC

Page 535

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

        v.                    )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -

        (cross-captions on following pages)


                    Washington, D.C.

                    Wednesday, March 26, 2008

                    9:22 a.m.


        Videotaped deposition of DEIRDRE DUZOR

                    Volume III

20f05866-234b-46da-bf0b-d8962eb8d876

Duzor, Deidre - Vol. III                    March 26, 2008
                Washington, DC

Page 644

1  generic reimbursement is allowed between 10 and
2  20 percent when, in fact, CMS is aware that on
3  average for all drugs, for all generic drugs,
4  pharmacists are obtaining them on average at AWP
5  minus 60 percent or higher?
6       MS. MARTINEZ: Objection. Form.
7       THE WITNESS: Because we're in
8  partnership with the states in running these
9  programs, so we don't dictate to states -- we
10 don't set the payment rates for states.
11 BY MR. MERKL:
12      Q.  Well, yes, but you approve or
13 disapprove the plan, right?
14      A.  Yes.
15      Q.  So if you felt the plan was
16 inappropriate for some reason, you would
17 disapprove it, right?
18      MS. MARTINEZ: Objection. Form.
19      THE WITNESS: Yes, but the consequence
20 of disapproval could be greater overpayments.
21 BY MR. MERKL:
22      Q.  Could you explain that?

Page 645

1       A.  If a state is requesting to go from AWP
2  minus 10 to AWP minus 15 and we disapprove it,
3  then they remain obligated to pay at AWP minus
4  10.
5       Q.  Well, you could disapprove that too,
6  couldn't you?
7       A.  Well, that's not on the table.  That
8  was approved at a prior point in time.
9       Q.  So there is no mechanism that you have
10 to go back and disapprove an existing rate?
11      A.  As I understand it, no.
12      Q.  So if a state in 1990 was reimbursing
13 at AWP flat, as long as they didn't come to you
14 and ask to change their rate, there is nothing
15 you could do to have them reimburse at a lower
16 rate?
17      A.  I don't believe -- there has never been
18 any discussion that I have been a part of to
19 indicate that we could unilaterally require them
20 to change their payment rates.
21      Q.  Now, notwithstanding that you can't
22 require them to change the rate, you can stop

Page 646

1  giving them the matching funds if you feel what
2  they're doing is inappropriate, right?
3       A.  I don't know if that's the case or not.
4  I have never had a discussion to that effect
5  either.
6       Q.  Okay.  But going back, though, to the
7  issue of when states come in and request to
8  change from AMP, say, minus 10 or 15 to AMP minus
9  20, why do you approve that if you know, in the
10 case of generic drugs, that generics are
11 available at AWP minus 60?
12      MR. KELLEY:  Objection to form.
13      MS. MARTINEZ:  Objection. Form.
14      MR. GORTNER:  Let me say something real
15 quick. This is Eric Gortner for Roxane.  Neil, I
16 think you said AMP instead of AWP.
17 BY MR. MERKL:
18      Q.  Okay.  I will rephrase the question.
19      If, in fact, you have reports from the
20 OIG indicating that generic drugs are available
21 at AWP minus 60 percent on average across the
22 board for all generics, why do you approve plans

Page 647

1  that allow reimbursement for generics at AWP
2  minus 15 or minus 20?
3       MS. MARTINEZ:  Objection. Form.
4       MR. KELLEY:  Objection. Form.
5       MS. ALBEE:  Objection. Form.
6       THE WITNESS:  Because they're moving in
7  the right direction.  They're reducing pharmacy
8  reimbursement and saving the states and the
9  federal government money by doing so.
10 BY MR. MERKL:
11      Q.  So you are aware, then, that the
12 pharmacies are making money on that difference
13 between what they're acquiring the drug for and
14 what they're reimbursing it at in the case of
15 generics?
16      MS. MARTINEZ:  Objection. Form.
17      MS. ALBEE:  Objection. Form.
18      THE WITNESS:  Yes.  Based upon the OIG
19 reports, we are aware of that.
20 BY MR. MERKL:
21      Q.  And you have been aware of it for some
22 time?

29 (Pages 644 to 647)

20f05866-234b-46da-bf0b-d8962eb8d876

Duzor, Deidre - Vol. III                      March 26, 2008
                    Washington, DC

Page 648

1        MS. MARTINEZ: Objection. Form.
2        THE WITNESS: Yes, we have.
3   BY MR. MERKL:
4     Q.  Since at least 2002?
5     A.  Yes.
6     Q.  Possibly much longer, although you
7   yourself aren't aware of that?
8        MS. MARTINEZ: Objection. Form.
9        THE WITNESS: I'm not aware of that.
10  BY MR. MERKL:
11    Q.  And that difference between what the
12  pharmacist acquires -- what the provider acquires
13  the drug at and what it gets reimbursed at,
14  that's sometimes referred to as the spread,
15  right?
16    A.  Yes, it is.
17    Q.  So, in fact, it is existing policy at
18  CMS to allow pharmacists to make a spread on the
19  ingredient costs of generic drugs?
20       MR. KELLEY: Objection. Form.
21       MS. ALBEE: Objection. Form.
22       THE WITNESS: I would not say that's

Page 649

1   our policy. That's the reality.
2   BY MR. MERKL:
3     Q.  Okay. Well, let's try it this way. In
4   fact, the -- CMS is approving plans that allow
5   for pharmacists earning a spread on the
6   ingredient cost of generic drugs.
7        MS. MARTINEZ: Objection. Form.
8        THE WITNESS: CMS is approving plans
9   that reduces the spread that pharmacists are
10  making on drugs.
11  BY MR. MERKL:
12    Q.  But they are allowing pharmacists to be
13  reimbursed on spreads as high as 40 percent in
14  some cases, correct?
15       MS. MARTINEZ: Objection. Form.
16       THE WITNESS: Unfortunately, that is --
17  that continues to be the case.
18  BY MR. MERKL:
19    Q.  Have you ever considered in your group
20  at CMS whether you should stop approving plans
21  that allowed reimbursement of 40 percent spreads
22  on generics?

Page 650

1        MS. MARTINEZ: Objection. Form.
2        THE WITNESS: There's never been a
3   discussion that I have been involved in on that
4   topic.
5   BY MR. MERKL:
6     Q.  Can you give me some reasons why you
7   believe it's not a good idea to disapprove plans
8   that allow for 40 percent spreads on generics?
9        MS. MARTINEZ: Objection. Form.
10       THE WITNESS: It's not a matter of what
11  I think is a good idea or not. It's a matter of
12  what we would have the authority to do in that
13  case.
14  BY MR. MERKL:
15    Q.  Do you ever discuss the existence of
16  the spread with any of the states in the context
17  of plan approvals?
18    A.  Not that I can recall, no.
19    Q.  Do you ever discuss the existence of
20  the spread with state Medicaid officials in other
21  contexts or settings?
22       MS. MARTINEZ: Objection. Form.

Page 651

1        THE WITNESS: I don't recall any
2   discussions.
3   BY MR. MERKL:
4     Q.  Do you have any understanding of why
5   these state Medicaid officials prefer to submit
6   reimbursement formulas for reimbursement costs
7   that allow the existence of the spread?
8        MS. MARTINEZ: Objection. Form.
9        THE WITNESS: I believe that they, like
10  us, are trying to reduce the amount of the
11  reimbursement, but there are economic and
12  political realities in a state that make it
13  difficult.
14  BY MR. MERKL:
15    Q.  What are those economic and political
16  realities?
17    A.  That the pharmacies that are
18  benefitting from the spread are politically
19  powerful and oppose any reductions.
20    Q.  And how do they go about doing that?
21    A.  Frequently through lobbying their
22  elected representatives.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

20f05866-234b-46da-bf0b-d8962eb8d876

Duzor, Deidre - Vol. III                    March 26, 2008
                    Washington, DC

Page 652

1    Q.  And there is nothing wrong with that,
2  right; that's legal?
3    A.  Well, it's legal, yes.
4    Q.  So the state legislatures are making a
5  political decision to continue reimbursing at a
6  rate that allows a 40 percent spread in some
7  cases for generic drugs?
8        MS. MARTINEZ: Objection. Form.
9        MS. ALBEE: Objection. Form.
10       THE WITNESS:  I don't know what the
11  knowledge base or the understanding of state
12  legislatures are.  I don't know whether they
13  understand how much pharmacies are making.
14  BY MR. MERKL:
15    Q.  Well, the OIG report that shows 60
16  percent or higher spreads on average for generic
17  drugs is a public document, right?
18    A.  Yes, it is.
19    Q.  And you do deal with state Medicaid
20  directors, correct?
21       MR. WINGET-HERNANDEZ: Objection.
22  Form.

Page 653

1        THE WITNESS:  I deal more with state
2  Medicaid pharmacy directors, but sometimes with
3  state Medicaid directors.
4  BY MR. MERKL:
5    Q.  Well, is it your understanding that the
6  state pharmacy directors are generally aware
7  about these -- of these OIG reports?
8    A.  Oh, yes.
9        MS. MARTINEZ:  Object to form.
10       THE WITNESS:  I do believe they are.
11  We have sent them to state Medicaid directors.
12  BY MR. MERKL:
13    Q.  So the reports showing the 60 percent
14  you have sent to state Medicaid directors?
15    A.  Yes.
16    Q.  So then it's fair to say that the state
17  officials responsible for state Medicaid policy
18  that deal with the legislatures are aware of
19  these 40 percent and potentially higher spreads
20  on generic drugs, correct?
21       MS. MARTINEZ: Objection. Form.
22       MS. ALBEE: Objection. Form.

Page 654

1        THE WITNESS:  I believe that the state
2  pharmacy directors are, and probably most state
3  Medicaid directors are.
4  BY MR. MERKL:
5    Q.  So it's fair to say, though, then, when
6  these states are submitting plans showing AWP
7  minus 10, AWP minus 15, they do so with the
8  awareness that they're allowing a spread to be
9  paid for generic drugs?
10       MS. MARTINEZ: Objection. Form.
11       THE WITNESS:  I believe the Medicaid
12  agency understands that.  I don't know that the
13  entire state government understands that.
14  BY MR. MERKL:
15    Q.  Why do you believe the state Medicaid
16  agency chooses to recommend plans that allow
17  spreads to be paid for generic drugs --
18       MS. MARTINEZ: Objection. Form.
19  BY MR. MERKL:
20    Q.  -- on the order of 40 percent or
21  higher?
22       MS. MARTINEZ: Objection. Form.

Page 655

1        MS. ALBEE: Objection. Form.
2        THE WITNESS:  Because they have to have
3  the approval in their executive branch and
4  frequently in their legislative branch to change
5  the way they pay pharmacists.  And they don't get
6  support for dramatically lower reimbursement
7  rate.
8  BY MR. MERKL:
9    Q.  Now, are you aware of the reasons why
10  pharmacists and other organizations lobby to
11  continue to pay at higher reimbursement rates?
12    A.  I just can't imagine.  Of course,
13  anyone wants to be paid more rather than less.
14  It's --
15    Q.  But do they claim --
16    A.  It's a nice gig.
17    Q.  Well, do they claim that the reason
18  they need to be paid more is because their costs
19  of doing business are high?
20       MS. MARTINEZ: Objection. Form.
21       THE WITNESS:  Their cost of doing
22  business should be reflected in their dispensing

Duzor, Deidre - Vol. III                          March 26, 2008
                    Washington, DC

Page 668

1  manufacturer or that drug.
2      Q.  And in the case of a generic where
3  another company might also make albuterol, they
4  would have a different NDC number?
5      A.  Yes, they would.
6      Q.  Now, is there any reporting required of
7  manufacturers under the rebate agreement?
8      A.  Yes, there's -- they must report to CMS
9  on a quarterly basis their AMP, their average
10 manufacturer price, and their best price if
11 they're an innovator drug, not for generics.
12     Q.  Now, what's an innovator?
13     A.  A drug that is -- basically a brand
14 name drug versus a generic drug.
15     Q.  So a generic drug -- what does a
16 generic manufacturer have to report?
17     A.  They have to report their average
18 manufacturer price.
19     Q.  And they do that for each drug?
20     A.  They do that for each drug.
21     Q.  And they report it by NDC number?
22     A.  Yes.

Page 669

1      Q.  So if you wanted to know what the AMP
2  for any drug made by any generic manufacturer,
3  you could look up their AMP, right?
4          MS. MARTINEZ:  Objection.  Form.
5          THE WITNESS:  I could, but --
6  BY MR. MERKL:
7      Q.  Okay.  You could?
8      A.  It's a confidential number.
9      Q.  But you could do that, right?
10     A.  I could.
11     Q.  And how often do they report an AMP?
12     A.  Prior to the -- prior to -- now I am
13 getting confused myself.  Prior to the
14 requirements of the Deficit Reduction Act, they
15 reported quarterly.  They currently report
16 monthly.
17     Q.  So since 1990, or whenever it is the
18 rebate program started --
19     A.  Again --
20     Q.  -- to today --
21     A.  They reported quarterly their AMP and,
22 if applicable, best price.

Page 670

1      Q.  For every drug they made, correct?
2      A.  Yes.
3      Q.  That's reimbursed under Medicaid?
4      A.  Yes.
5      Q.  By NDC number?
6      A.  Yes.
7      Q.  And what is AMP?
8      A.  AMP is average manufacturer price.
9      Q.  Is that a computed number?
10     A.  It's computed by the drug manufacturer.
11     Q.  And does AMP include all their
12 discounts?
13     A.  It's basically the price to
14 wholesalers, and it does take into account
15 discounts.
16     Q.  They're supposed to compute it every
17 quarter?
18     A.  Every quarter.
19     Q.  And they're supposed to go back and
20 look up what discounts or cash rebates of any
21 kind they gave, to factor that in and figure out
22 what their rock bottom discounted cost for that

Page 671

1  quarter is, right?
2          MS. MARTINEZ:  Objection.  Form.
3  BY MR. MERKL:
4      Q.  Correct?
5      A.  Yes, basically.
6      Q.  And they tell you what their fully
7  discounted cost is in the form of AMP?
8      A.  Yes.
9      Q.  Now, once CMS -- and they report their
10 AMPs to CMS; is that who they go to?
11     A.  Yes.
12     Q.  How are they reported?
13     A.  Some of them report them
14 electronically.  Some on-line.  Some of them
15 report them on disk.  There's a variety of
16 formats they could use.
17     Q.  Now, is there some keeper of the AMPs
18 at CMS that gets all this stuff?
19     A.  Yes, there is.
20     Q.  Who is that?
21     A.  The group director in charge is Ed
22 Gendron, and the division director is Dona

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Duzor, Deidre - Vol. III                    March 26, 2008
                Washington, DC

Page 672

1  Coffman.  And we actually do have a contractor
2  that works with us in taking in that data.
3      Q.   Now, you said, kind of in an offhand
4  way before, that you have access to AMPs so if
5  you wanted to look at AMPs, you could.
6      A.   Yes, I can.
7      Q.   Other people at CMS, if they have a
8  legitimate business reason to look at AMPs, they
9  can look at them, right?
10         MS. MARTINEZ:  Objection.  Form.
11         THE WITNESS:  Generally, people in
12  Medicaid dealing with drugs have access to it.
13  BY MR. MERKL:
14     Q.   To AMP information?
15     A.   To AMP.
16     Q.   OIG, from time to time, has gotten AMP
17  information, correct?
18     A.   Yes, they have.
19     Q.   All right.  And, again, where they got
20  this information before 2002 you would have no
21  way of knowing one way or the other?
22     A.   I do know that, yes, that OIG has had

Page 673

1  it for at least certain manufacturers from before
2  2002.
3      Q.   Okay.  Congress, they can get the AMP
4  information, too, if they want to see it, right?
5         MS. MARTINEZ:  Objection.  Form.
6         THE WITNESS:  I don't know.
7  BY MR. MERKL:
8      Q.   How about the GAO?
9      A.   Yes, I think we have made it available
10  to the GAO.
11     Q.   Now, once you at CMS get the AMP
12  information, what do you use it for?
13     A.   In terms of the rebate program it was
14  used to -- it is used to calculate something
15  called a unit rebate amount.
16     Q.   The URA?
17     A.   The URA.
18     Q.   Okay.  And what is the URA?
19     A.   It is the rebate that would be due on
20  each unit of a drug.  And it's provided to the
21  states so that they can multiply the number of
22  units they paid for times this figure in order to

Page 674

1  invoice the drug manufacturers for the rebates.
2      Q.   And again, that's been going on since
3  1990?
4      A.   Right.
5      Q.   So if I understand this correctly, CMS
6  gets the AMP, right?
7      A.   Yes.
8      Q.   CMS then computes a number called the
9  URA, correct?
10     A.   Yes.
11     Q.   In the case of generic drugs, the URA
12  is used for calculating the rebate, right?
13     A.   For both generics and brands.
14     Q.   Okay.  CMS calculates the URA and it
15  sends the URA to all the states, right?
16     A.   Yes.
17     Q.   And each state gets URAs for all the
18  drugs that it reimburses for?
19     A.   Yes.
20     Q.   And it gets those URAs, again, by NDC
21  number?
22     A.   Yes.

Page 675

1      Q.   So for each Dey drug, for instance,
2  they will get a URA for that Dey drug for that
3  quarter?
4      A.   That's right.
5      Q.   And then what do the states, once they
6  get those URAs for a Dey drug -- I'm sorry.  Once
7  the state gets the URA, they also get information
8  on utilization, right?
9      A.   They have their information on
10  utilization.
11     Q.   How many units of a drug they sold?
12     A.   Right.
13     Q.   So they --
14     A.   They have that data.
15     Q.   So they take --
16         MS. MARTINEZ:  Objection.  Form.  You
17  said sold; you probably meant reimbursed.
18  BY MR. MERKL:
19     Q.   All right.  Let me -- the states have
20  their own utilization data, right?
21     A.   Yes.
22     Q.   And that shows them how much -- how

36 (Pages 672 to 675)

20f05866-234b-46da-bf0b-d8962eb8d876

Duzor, Deidre - Vol. III                    March 26, 2008
                        Washington, DC

|                                              |                                              |
|----------------------------------------------|----------------------------------------------|

Page 676

1   many drugs they have been reimbursed for, right?
2      A.  How many units, yes.
3      Q.  They have sought reimbursement for
4   under the Medicaid program?
5      A.  Yes.
6      Q.  Okay.  They take that unit number and
7   they multiply it by the URA, right?
8      A.  That's right.
9      Q.  And that gives them how much they're
10  supposed to get their rebate for, right?
11     A.  That's right.
12     Q.  And they sit down and they take that
13  and they put it in a bill or an invoice and they
14  mail it to the manufacturers, right?
15     A.  That's right.
16     Q.  And then the manufacturers pay that
17  bill or are supposed to pay that bill?
18     A.  Yes.  We hope they do.
19     Q.  Okay.  So each month the state will
20  prepare an invoice that will list for each
21  manufacturer the URA, right, on an NDC number
22  basis and units sold, right?

Page 677

1      A.  I don't know what the invoice looks
2   like, but --
3      Q.  In theory.
4          MR. WINGET-HERNANDEZ:  Objection.
5   Form.
6          THE WITNESS:  Well, I don't know,
7   because the state knows how many units.  The
8   state knows the URA.  I think they are just
9   billing an amount to the manufacturer.
10  BY MR. MERKL:
11     Q.  Okay.  So the manufacturer might not
12  get a bill that shows the breakdown?
13     A.  Right.
14     Q.  Okay.  But the state certainly has the
15  information it needs to compute the bill?
16     A.  Yes.
17     Q.  So the state has a list somewhere that
18  has the URA for each NDC number and the amount of
19  reimbursement units that quarter, right?
20     A.  Right.  Yes, they would.
21     Q.  And someone has to sit down and do this
22  computation, right?

Page 678

1      A.  I assume it's electronic in most
2   states.
3      Q.  Someone actually will feed the computer
4   --
5      A.  Right.
6      Q.  -- right?
7          And then they send out a bill to every
8   manufacturer?
9      A.  That's right.
10     Q.  And they do this every quarter?
11     A.  They do.
12     Q.  Since 1990?
13     A.  Yes.
14     Q.  Now, in the case of a generic drug, how
15  is the URA computed?
16     A.  Well, in the case of a generic drug,
17  the rebate is 11 percent of AMP.
18     Q.  Today, right?
19     A.  Yes.  By statute.
20     Q.  Right.  It's in the statute.  From 1990
21  to 1994, the rebate was -- I'm sorry -- the URA
22  was 10 percent, right?

Page 679

1          MS. MARTINEZ:  Objection.  Form.
2          THE WITNESS:  It was a little different
3   in the early days of the program.  I don't know
4   the figures in my head.
5   BY MR. MERKL:
6      Q.  Ten percent then at some point changed
7   to 11 percent?
8      A.  It was different in the beginning.
9      Q.  Correct?
10     A.  Well, I'm just not sure if it was 10
11  percent.
12     Q.  Okay.  So if you had the URA and you
13  divided by .11, that would tell you what the AMP
14  is, right?
15         MS. MARTINEZ:  Objection.  Form.
16         THE WITNESS:  Yes.  The AMPs have been
17  fairly transparent for generic drugs.
18  BY MR. MERKL:
19     Q.  If you have the URA?
20     A.  Because -- right, because of the simple
21  formula.
22     Q.  And I guess in the case of actually

37 (Pages 676 to 679)

20f05866-234b-46da-bf0b-d8962eb8d876

Duzor, Deidre - Vol. III                          March 26, 2008
                    Washington, DC

Page 680

1  doing the division, really all you need to do is
2  move the decimal point over one space to figure
3  out what the AMP is based on the URA, right?
4        MS. MARTINEZ: Objection. Form.
5        THE WITNESS: If it were 10 percent.
6  BY MR. MERKL:
7     Q.  Correct?
8     A.  If it were 10 percent; 11 percent would
9  be a little different --
10    Q.  Right --
11    A.  Slightly different.
12    Q.  Right. You would have like a 1/100th
13 of a percent margin of error?
14    A.  Yes, it would be, right, a little
15 different.
16    Q.  But still, as a rule of thumb, you
17 could get a pretty good idea of the AMP from just
18 moving the decimal point over one spot on the URA
19 for generic drugs, correct?
20    A.  Right, for states it's -- the AMPs for
21 generics are very transparent.
22    Q.  So since 1990, states have had access

Page 681

1  to the AMP information on generic drugs on a
2  quarterly basis for each NDC that they reimburse
3  on, correct?
4        MS. ALBEE: Objection. Form.
5        MS. MARTINEZ: Objection. Form.
6        THE WITNESS: It was available to them,
7  yes.
8  BY MR. MERKL:
9     Q.  And they could have looked at that
10 information, right?
11       MS. MARTINEZ: Objection. Form.
12       THE WITNESS: They could have.
13 BY MR. MERKL:
14    Q.  For all you know, they may have,
15 correct?
16       MS. ALBEE: Objection. Form.
17       THE WITNESS: They may have, yes.
18 BY MR. MERKL:
19    Q.  So when they were deciding how to set
20 up their reimbursement programs, they may have
21 done so fully aware of what the AMP information
22 and the difference between the AMP and the AWP

Page 682

1  pricing is, right?
2     A.  I don't know.
3     Q.  They could have done that, though,
4  right?
5        MR. WINGET-HERNANDEZ: Objection.
6  Form.
7        THE WITNESS: They would have had the
8  data to be able to do that.
9  BY MR. MERKL:
10    Q.  Well, it's -- fair enough. You don't
11 know what they actually did, but you do know they
12 had the data that would have allowed them to do
13 that?
14    A.  Right. Yes, I do.
15    Q.  Now, is there any federal rule or
16 anything that you're aware of that would have
17 prevented or barred them from doing that?
18    A.  We would have not approved -- I believe
19 we would not have approved a state plan that came
20 in and said we are going to pay based on AMP.
21    Q.  Well, no. On the other hand, if a
22 state decided to look at AMP and move from AWP

Page 683

1  minus 10 to AWP minus 30 based on what they knew
2  about AMP, they could do that as long as they
3  didn't put the AMP in the formula, right?
4        MS. MARTINEZ: Objection. Form.
5        THE WITNESS: Yes. If a state came in
6  with AWP minus 30 after the OIG studies, in my
7  opinion, that state plan would have probably been
8  approved.
9  BY MR. MERKL:
10    Q.  But even before, without regard to the
11 OIG studies, the AMP information was telling
12 anyone in the state who cared to look at it about
13 the size of the spreads on the generic NDC
14 numbers, right?
15       MS. MARTINEZ: Objection. Form.
16       THE WITNESS: If they looked at it,
17 yes.
18 BY MR. MERKL:
19    Q.  And there is no reason they couldn't
20 have looked at it, right?
21    A.  No.
22       MS. MARTINEZ: Objection. Form.

                          38  (Pages 680 to 683)

Duzor, Deidre - Vol. III                          March 26, 2008
                        Washington, DC

| Page 772 | Page 774 |

Page 772

1    Q.  Have you ever heard of that happening?
2    A.  I know that the State of Texas requests
3  AMPs from manufacturers.
4    Q.  Do they get them?
5    A.  They don't get all of them.  They get
6  some of them.  I'm not sure what proportion.
7    Q.  Is there anything wrong with Texas
8  doing that?
9    A.  No, we haven't -- no.
10    Q.  So any state would be free to request
11  AMP information from manufacturers?
12    A.  Any state would be free to.  They can't
13  -- there's no federal requirement, so they really
14  can't penalize manufacturers or not make their
15  drugs available to their beneficiaries for
16  failure of them to give them the AMPs.
17    Q.  And to the extent states do correspond
18  with manufacturers and obtain pricing information
19  or information about AMPs, WACs and things of
20  that nature, is that information that the states
21  could legitimately consider in the course of
22  determining what their reimbursement rates are?

Page 773

1       MS. ALBEE:  Objection.  Form.
2       MS. MARTINEZ:  Objection.  Form.
3       THE WITNESS:  Yes, I think they can.
4  BY MR. MERKL:
5    Q.  In fact, if a manufacturer was
6  disclosing pricing information, including AMPs,
7  to a state, is that something that you would
8  expect the state to look at and consider in the
9  course of setting its reimbursement rates?
10       MR. KELLEY:  Objection.  Form.
11       MS. ALBEE:  Objection.  Form.
12       MS. MARTINEZ:  Objection.  Form.
13       THE WITNESS:  I think we generally
14  wouldn't be aware of it unless, as in the case of
15  Texas, it's just kind of become widely known that
16  they request that information.
17  BY MR. MERKL:
18    Q.  How did that come to your attention?
19    A.  I don't recall, but -- actually, I do -
20  - I believe the State of Texas asked us if there
21  was something that they could do to penalize
22  manufacturers that didn't provide it.  And we

Page 774

1  told them no.  So that may have been how they
2  first found out about it.
3    Q.  Take a look at Abbott 328, please.  I
4  think we looked at this last time.  Do you recall
5  this document?
6    A.  Yes, I do.
7    Q.  On page 2 in the first full paragraph
8  there it says, "State studies vary on the level
9  of discount.  While an exact level of discount
10  cannot be determined, they appear to average in
11  the range of 20 percent to 35 percent off of
12  AWP."
13       Do you know what studies the writer was
14  referring to there?
15    A.  No, I do not.
16    Q.  And I guess it's fair to say, then,
17  that you've never yourself seen any such studies?
18    A.  I don't believe I have seen any
19  studies.
20    Q.  In analysis, the second paragraph under
21  analysis, it says, "It is proving increasingly
22  difficult to require the states to establish

Page 775

1  payment rates and adherence to regulatory
2  requirements."
3       Do you see that?
4    A.  Yes.
5       MS. MARTINEZ:  Objection.  Form.
6       THE WITNESS:  Yes, I see it.
7  BY MR. MERKL:
8    Q.  Do you know what regulatory
9  requirements the memo is referring to there?
10    A.  No, I don't.
11    Q.  Have you read this memo before?
12       MR. WINGET-HERNANDEZ:  Objection to
13  form.
14       THE WITNESS:  I believe this memo was
15  written shortly after I went to the pharmacy
16  division or pharmacy team, and I was not very
17  knowledgeable at that point, so I didn't write
18  the document and I'm not that familiar with
19  what's in it, with the basis for what's in it.
20  BY MR. MERKL:
21    Q.  Before today and the last session when
22  you were shown this document, had you ever read

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Duzor, Deidre - Vol. III                    March 26, 2008
                   Washington, DC

Page 780

1  I'm sorry.  Under 4, ingredient costs, it says,
2  "Approve SPAs to increase payment for ingredient
3  costs if they're less than the median
4  nationally."
5       Do you see that?
6    A.  The fourth -- the third --
7    Q.  Yes.
8    A.  -- provision?  Yes.
9    Q.  What is the national median; do you
10  know?
11   A.  I mean, a national median could be
12  calculated looking at the payment rates at the
13  time, although it's a little tricky because some
14  may be paying off of different sort of
15  benchmarks.
16   Q.  Well, I guess -- that's my question.
17  Do you guys at CMS have a calculated national
18  median that you look at as a benchmark?
19   A.  No, we don't.
20   Q.  How do you apply this criteria, then?
21   A.  We haven't seen many SPAs to increased
22  payments over the years since I have been there,

Page 781

1  so we have not had a need to try to apply this
2  criteria.
3    Q.  How about under -- for dispensing fees,
4  it says, the second one, "Approve SPAs when
5  dispensing fees increases when proposed fee is
6  less than the national median."
7       Is there a national median for
8  dispensing fees that you looked to?
9    A.  No.  We don't have -- we don't maintain
10  a calculated national median.
11   Q.  Then how would you apply the criteria?
12      MS. ALBEE:  Objection.  Form.
13      THE WITNESS:  I don't think we have
14  ever used that criteria.
15  BY MR. MERKL:
16   Q.  It says, "Approve any rate set in state
17  statute."
18      Do you see that, at the end of --
19   A.  Yes.
20   Q.  Is that CMS' policy today?
21   A.  No, I wouldn't say it's our policy.
22   Q.  So even if --

Page 782

1    A.  I think we would apply more criteria to
2  that.
3    Q.  Well, is it fair to say that you give
4  state legislatures some deference?
5    A.  Yes.
6       MS. MARTINEZ:  Objection.  Form.
7       THE WITNESS:  I think that's fair to
8  say.
9  BY MR. MERKL:
10   Q.  And can you think of any instance where
11  CMS ever disapproved a state statute setting an
12  ingredient cost?
13   A.  No.
14      MR. MERKL:  Is this a good time to take
15  a break, five minutes?
16      THE VIDEOGRAPHER:  This is the end of
17  tape 3.  Off the record at 2:35.
18      (Recess.)
19      THE VIDEOGRAPHER:  This is the
20  beginning of tape 4 in the deposition of Ms.
21  Duzor, volume 3.  On the record at 2:57.
22  BY MR. MERKL:

Page 783

1    Q.  Welcome back, Ms. Duzor.
2    A.  Thank you.
3    Q.  Could you take a look at Abbott Exhibit
4  381.  It's the Abt report that we looked at last
5  time.
6    A.  Yes.
7    Q.  I just have a couple of questions.
8  You, in fact, commissioned Abbott 381, right, the
9  preparation of the report; you hired the
10  consultant to do this?
11   A.  I was the project officer on the
12  project, yes.
13   Q.  And you read this report at the time?
14   A.  Yes.
15   Q.  Could you take a look at page 5?  There
16  is a graph there.  What does that graph show?
17      MR. WINGET-HERNANDEZ:  Say the page
18  number again, please.
19      MR. MERKL:  Page 5.
20      THE WITNESS:  It shows the change in
21  Medicaid drug expenditures from 1992 to 2002.
22  BY MR. MERKL:

63 (Pages 780 to 783)

20f05866-234b-46da-bf0b-d8962eb8d876

Duzor, Deidre - Vol. III                          March 26, 2008
                    Washington, DC

Page 836

1   way?
2         MS. MARTINEZ: Objection. Form.
3         THE WITNESS: Well, that we couldn't
4   initiate or set the reimbursement level for a
5   state.
6   BY MR. GORTNER:
7      Q.  Right. But you could disapprove state
8   health plans, couldn't you?
9      A.  When they're submitted to us, we can
10  disapprove --
11     Q.  Okay. But you didn't believe --
12     A.  -- the changes to them.
13     Q.  I'm sorry. Say that again.
14     A.  I said we could disapprove the change
15  that was submitted to us for our approval.
16     Q.  But at this time -- this is now looking
17  at the reimbursement rates for 2003 -- you knew
18  that the -- for generic drug products, the
19  discount off AWP that providers were paying, on
20  average, was about 65 percent, based on that OIG
21  report, right?
22     A.  That's right.

Page 837

1      Q.  And so you knew at this time that both
2   California and Colorado were paying significantly
3   more for prescription drugs, generic ones, than
4   what providers were actually paying to acquire
5   them?
6         MS. MARTINEZ: Objection. Form.
7         THE WITNESS: Yes, we did.
8   BY MR. GORTNER:
9      Q.  And the fact that providers were being
10  able to keep that difference between the
11  acquisition cost and what Medicaid was paying
12  them, you didn't believe that that was a
13  violation of the regs, did you -- of the
14  regulations, did you?
15        MS. ALBEE: Objection. Form.
16        THE WITNESS: We didn't believe it was
17  a violation of the regulations, but we didn't
18  think that it was a good thing. And there was
19  active discussions going to change the federal
20  statute related to this, to --
21  BY MR. GORTNER:
22     Q.  Okay. We will get to those in a

Page 838

1   second.
2      A.  -- bring these prices under control.
3      Q.  I'm sorry. Say that again.
4      A.  To bring Medicaid payments under
5   control.
6      Q.  Well, I wanted to go ahead and look at
7   2000 -- looking at the next -- the next year, in
8   2004 and 2005, the next couple of pages, just to
9   reinforce the point that you're making -- it
10  looks to me that over the next few years the
11  payment methodologies for most of the states
12  stays about the same, with a few exceptions. Is
13  that your view of it?
14        MS. MARTINEZ: Objection. Form.
15        THE WITNESS: I think over those years
16  -- I haven't done a count, but there were quite a
17  few states that did make some revision to their
18  payment amounts.
19  BY MR. GORTNER:
20     Q.  Now, did any state ever propose an AWP
21  discount greater than that 35 percent discount
22  for generics that Colorado proposed?

Page 839

1      A.  Yes. I believe the State of Washington
2   and -- showing on your chart for 2005 and 2006
3   Washington pays AWP minus 50 percent for
4   generics.
5      Q.  And did anybody else, aside from
6   Washington, propose an AWP discount greater than
7   35 percent for generics?
8      A.  I don't believe so.
9      Q.  If you bear with me for just a second,
10  Ms. Duzor, I have just a few more questions I
11  want to go through and make sure I don't ask you
12  anything that was already asked by Mr. Merkl.
13        I had a question about an individual
14  named Jim Frizzera that you mentioned earlier --
15     A.  Okay.
16     Q.  -- who might be the -- what's that?
17     A.  Yes. Okay.
18     Q.  And you mentioned that he might be the
19  best person to be able to discuss how the federal
20  matching funds worked; is that right?
21     A.  He is the head of our group that does
22  financial management and I believe issuing the

77 (Pages 836 to 839)