# EXHIBIT 55

Page 994

```
                UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL         :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     :  CIVIL ACTION

PRICE LITIGATION               :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO:      :

U.S. ex rel. Ven-a-Care of     :  Hon.  Patti B. Saris

the Florida Keys, Inc.         :

     v.                        :

Dey, Inc., et al.              :

No. 05-11084-PBS               :

- - - - - - - - - - - - - - -x

        (captions continue on following pages)



           Videotaped deposition of LARRY REED

                        Volume V



                   Washington, D.C.

                   Thursday, October 2, 2008
```

Page 1191

1  Q. Okay. Number two under dispensing
2  fees, again, there is a national median, is there
3  a national median for dispensing fees that you
4  use to evaluate ingredient costs today?
5  A. No.
6  Q. Why not?
7      MS. OBEREMBT: Objection. I'm going to
8  instruct him not to answer on grounds of
9  deliberative process.
10 BY MR. MERKL:
11 Q. Now, in the course of these same
12 deliberations, have you ever discussed the
13 relationship between the ingredient cost and the
14 dispensing fee?
15     MS. OBEREMBT: Objection. I'm going to
16 instruct him not to answer on the grounds of
17 deliberative process.
18 BY MR. MERKL:
19 Q. And as a process, as a result of these
20 deliberations, have you ever -- has HCFA/CMS ever
21 formed a view on a relationship between
22 ingredient costs and the dispensing fee?

Page 1192

1      MS. OBEREMBT: You can answer.
2      THE WITNESS: Okay. I think most
3  recently, we have begun to look at --
4  BY MR. MERKL:
5  Q. It is a yes -- it's really a yes or no
6  question. Read the question back, please. I
7  don't want to get your lawyer all mad at me
8  again.
9      THE REPORTER: "Question: And as a
10 process, as a result of these deliberations, have
11 you ever -- has HCFA/CMS ever formed a view on a
12 relationship between ingredient costs and the
13 dispensing fee?"
14     THE WITNESS: That, for all time
15 period, for now back to --
16 BY MR. MERKL:
17 Q. At any point in time?
18 A. Yes.
19 Q. Okay. And who was involved in those
20 deliberations?
21     MS. OBEREMBT: Objection.
22 BY MR. MERKL:

Page 1193

1  Q. Who are the individuals? I just want
2  the names?
3      MS. OBEREMBT: That wasn't --
4      MR. MERKL: Then tell him, don't
5  answer. I don't care.
6      MS. OBEREMBT: That was a form
7  objection, Neil.
8  BY MR. MERKL:
9  Q. Who was involved in these
10 deliberations?
11 A. I was just trying to think of names. I
12 wasn't waiting for you guys to go back and forth.
13 Q. Okay.
14 A. Deirdre Duzor, myself, Kim Howell, Gail
15 Arden, Herb Kuhn, and the administrator, Kerry
16 Williams.
17 Q. What about Mr. Smith?
18 A. In the instance I'm thinking of, Mr.
19 Smith wasn't with the agency anymore.
20 Q. Were your views, did it -- it happened
21 after he left?
22 A. Correct.

Page 1194

1  Q. When did he leave?
2  A. Roughly a year ago.
3  Q. Okay. Now, during these deliberations,
4  did you also consider what we've been, I guess,
5  called in the past, the issues of cross-
6  subsidization?
7      MS. OBEREMBT: Objection. I'm going to
8  instruct him not to answer on the grounds of
9  deliberative process.
10 BY MR. MERKL:
11 Q. Okay. And did you ultimately form a
12 view as to the department's position on cross-
13 subsidization between ingredient costs and the
14 dispensing fee?
15     MS. OBEREMBT: Objection.
16     MR. DRAYCOTT: You're asking, did he
17 form a view about the --
18 BY MR. MERKL:
19 Q. Well, did the department form a view?
20     MR. DRAYCOTT: About policy result, is
21 that what you're asking?
22 BY MR. MERKL:

Page 1195

1  Q. No. I'm asking whether they actually
2  came to a result.
3  A. Yes.
4  Q. Can you tell me what those
5  deliberations were that led you to come to the
6  result that you came to?
7  MS. OBEREMBT: Objection. I'm going to
8  instruct him not to answer on the grounds of
9  deliberative process.
10 BY MR. MERKL:
11 Q. And who was it who was involved in
12 arriving at the view on the cross-subsidization
13 issues?
14 MS. OBEREMBT: Objection. I'm going to
15 instruct him not to answer because he hasn't said
16 that anyone arrived at a view on cross-
17 subsidization.
18 MR. MERKL: Okay. We can stop here.
19 THE VIDEOGRAPHER: This is the end of
20 tape three. Off the record at 12:39.
21 (Whereupon, at 12:39 p.m., the
22 deposition in the above-entitled matter was

Page 1196

1  recessed, to reconvene at 1:40 p.m., this same
2  day.)

Page 1197

1  AFTERNOON SESSION
2  (1:35 p.m.)
3  Whereupon,
4  LARRY REED,
5  the witness on the stand at the time of recess,
6  having been previously duly sworn, was further
7  examined and testified as follows:
8
9  (Exhibit Dey 180 was marked for
10 identification.)
11 THE VIDEOGRAPHER: This is the
12 beginning of tape four in the deposition of Larry
13 Reed, Volume IV. On the record at 1:35.
14
15 EXAMINATION BY COUNSEL FOR DEY
16 (RESUMED) BY MR. MERKL:
17 Q. Good afternoon, Mr. Reed.
18 A. Good afternoon.
19 Q. Would you take a look at what we've
20 marked as Dey Exhibit 180. Dey Exhibit 180 is a
21 copy of an email chain with counsel stamp HHC
22 0090976. Do you see your name is on the top on

Page 1198

1  the email there, Mr. Reed?
2  A. I do.
3  Q. And this is an email chain, meaning
4  there is more than two messages on this, correct?
5  A. Two messages.
6  Q. The one on the bottom is one to you and
7  the one on the top is one from you?
8  A. Correct.
9  Q. And you see where it says Pamela
10 Carson?
11 A. Yes.
12 Q. Who is Pamela Carson?
13 A. She's a national account rep from --
14 she is a national account rep in Chicago.
15 Q. What's a national account rep?
16 A. At that time, there were different
17 persons assigned to different states for -- for
18 purposes of sort of looking at their issues,
19 looking at their CMSR related issues.
20 Q. So who does she work for?
21 A. She worked for the regional office.
22 But I don't know her immediate supervisor.

52 (Pages 1195 to 1198)

Reed, Larry - Vol. V  October 2, 2008
Washington, DC

Page 1091

1        MS. OBEREMBT:  Objection.
2        THE WITNESS:  Not specific information.
3   BY MR. MERKL:
4        Q.  Was there any general type of
5   information, other than what we've covered.  I'm
6   not trying to make you repeat yourself.
7        A.  No.
8        Q.  Well, then, why would you approve plans
9   that were inconsistent with the prevailing
10  information you had in the OIG reports?
11       MS. OBEREMBT:  Objection.
12       THE WITNESS:  And to repeat my prior
13  answers, the information the state submitted
14  would be -- would be looked at, and if that
15  information were sufficient to approve the plan,
16  then we could approve the plan.
17  BY MR. MERKL:
18       Q.  But you're telling me there is no
19  information, right?
20       A.  No.  I'm telling you I don't recall the
21  information they submitted.
22       MS. OBEREMBT:  Objection.

Page 1092

1   BY MR. MERKL:
2        Q.  You've been reviewing state plans for
3   how long?
4        MS. OBEREMBT:  Objection.  Asked and
5   answered.
6   BY MR. MERKL:
7        Q.  You can't remember a single thing a
8   state submitted to support a plan change, besides
9   adjoining states and the handful of instances of
10  surveys and third party information?
11       A.  Just not off the top of my head.  No.
12       Q.  If you wanted to go back and figure
13  that out, what would you look at?
14       A.  The only way to -- the way that -- to
15  look at that would be to look at the actual state
16  plan submissions.
17       Q.  So you'd have to go plan by plan?
18       A.  Yes.
19       Q.  State by state?
20       A.  Correct.
21       Q.  Change by change?
22       A.  Yes.

Page 1093

1        Q.  There really is no way you could ever
2   sit here and explain why a state decided to enact
3   the EAC that it chose to do?
4        MS. OBEREMBT:  Objection.
5        THE WITNESS:  Other than by looking at
6   it on the state plan by plan basis, I can't think
7   of a way at this point that I could go back and
8   know that information.
9   BY MR. MERKL:
10       Q.  Now, in terms of approving state plans,
11  do manufacturers or information from
12  manufacturers play any role at all?
13       A.  I'm sorry.  In what way?
14       Q.  That's what I'm asking you.  I mean, do
15  you ever get any information from manufacturers
16  at all that you look at in evaluating a state
17  plan or a state plan change?
18       MS. OBEREMBT:  Objection.
19       THE WITNESS:  Not that I'm aware of.
20  BY MR. MERKL:
21       Q.  So again, in your whole history of
22  looking at and evaluating state plans, you never

Page 1094

1   relied on any information that came from the
2   manufacturers?
3        MS. OBEREMBT:  Objection.
4        THE WITNESS:  The information that we
5   would get from manufacturers would not be part of
6   the reimbursement system.  The information that
7   we get from the manufacturers would be part of
8   the rebate program, the AMP data, the best price
9   data.  So within -- answering your question, we
10  do not look at the AMP or best price data when
11  looking at a state plan.
12  BY MR. MERKL:
13       Q.  When you sat down and would evaluate,
14  you wouldn't necessarily pull it out, is that
15  what you're saying?
16       A.  Yes.  So we would not look at that --
17  the manufacturer data would be manufacturer
18  specific.  The state plan would be generally for
19  all drugs.
20       Q.  But you yourself had access to the AMP
21  information, correct?
22       A.  Yes.

26 (Pages 1091 to 1094)

Page 1311

1  Secretary or state Medicaid agency.
2     Q.  So the state has to keep it secret and
3  the Feds have to keep it secret, right?
4     A.  To the extent that they would get it.
5     Q.  Now, does this provision say that the
6  Secretary cannot give AMP information to the
7  states?
8         MS. OBEREMBT:  Objection.
9         THE WITNESS:  No.
10 BY MR. MERKL:
11    Q.  Okay.  Now, does it -- is it anywhere
12 in the legislation or in this agreement that says
13 that the Secretary cannot give AMP information to
14 the states?
15        MS. OBEREMBT:  Objection.
16 BY MR. MERKL:
17    Q.  Can you point to me where it says that?
18    A.  In the rebate agreement or in the
19 statute?
20    Q.  Yes.
21    A.  Not that I'm aware of.
22    Q.  Is there some other place in the

Page 1312

1  federal regulations that says the Secretary
2  cannot share AMP information with the states?
3         MS. OBEREMBT:  Objection.
4         THE WITNESS:  Not that I'm aware of.
5  BY MR. MERKL:
6     Q.  Now, why did you want to get the AMP
7  information?  What was the purpose of getting it?
8         MS. OBEREMBT:  Objection.  Calls for
9  deliberative process.  Instruct you not to
10 answer.
11 BY MR. MERKL:
12    Q.  What was the AMP information used for?
13    A.  Under the -- under the law, eventually
14 the AMP information would be used by the
15 manufacturer to compute the correct rebate.
16    Q.  But why did the manufacturer have to
17 report it to you if the manufacturer was going to
18 use it to report the correct rebate?
19    A.  A provision of the law, I believe,
20 required the manufacturer to report it to HCFA.
21    Q.  And what was the reason for that
22 provision, why did HCFA want it?

Page 1313

1         MS. OBEREMBT:  Objection.  Calls for
2  deliberative process.  Instruct you not to
3  answer.
4  BY MR. MERKL:
5     Q.  Once HCFA got the AMP information, what
6  did HCFA use it for?
7     A.  It would be used for rebate purposes.
8     Q.  How did HCFA use it for requirement
9  purposes?  What did HCFA do with the information?
10    A.  The information, along with other
11 pricing information, would be used to transmit a
12 unit rebate amount to the states.
13    Q.  And what did the states do with that
14 unit rebate amount?
15    A.  Generally, it would use it to invoice a
16 manufacturer for -- for the rebate for that drug.
17    Q.  And besides reporting AMPs,
18 manufacturers also are supposed to report
19 something called best price, right?
20    A.  For certain drugs.  Correct.
21    Q.  And what kind of drugs do you have to
22 report best price for?

Page 1314

1     A.  Under the -- under the statute, they
2  were defined as single source or innovator
3  multiple source drugs, commonly referred to as
4  brand name drugs.
5     Q.  And what is the idea of best price?
6  Can you explain what that concept is?
7     A.  Best price would be, with exceptions,
8  the lowest price at which a manufacturer sold
9  that drug to entities with -- to certain entities
10 within the U.S.
11    Q.  That would be their absolute lowest
12 price they ever offered the drug to anyone?
13        MS. OBEREMBT:  Objection.
14 BY MR. MERKL:
15    Q.  Is that the idea of it?
16        MS. OBEREMBT:  Objection.
17        THE WITNESS:  As defined in the
18 statute, it might not be the lowest price because
19 there were exclusions to it, but it would be,
20 with those exceptions, the lowest price that they
21 sold the drug at.
22 BY MR. MERKL:

81 (Pages 1311 to 1314)

Page 1315

 1    Q.  Best price was also confidential?
 2    A.  That's correct.
 3    Q.  Okay.  And again, the existence of a
 4  best price as described in this agreement would
 5  again pretty much tell you that there are a lot
 6  lower prices available than the AWP and the WAC
 7  that were publicly reported, correct?
 8        MS. OBEREMBT:  Objection.
 9        THE WITNESS:  That best price would
10  tell you the lowest price.  Again, how to compare
11  that, I don't know what the comparisons are
12  specifically.
13  BY MR. MERKL:
14    Q.  Now, in the case of -- I'm sorry,
15  generic manufacturers, you mentioned that URAs
16  were created?  Well, URAs are created for
17  everyone, but in the case --
18    A.  Right.  For every drug.
19    Q.  But generic manufacturers, at the time
20  that the agreement first came into effect, how
21  were the URAs for generic drugs computed?
22    A.  For generic drugs, it would be the

Page 1316

 1  statutory rebate which was different over time.
 2  I don't remember what it was originally.
 3    Q.  Originally, it was 10 percent, right,
 4  and then it later became 11 percent?
 5    A.  Yes.  I don't remember the specifics,
 6  but around -- around those percentages.
 7  Currently it's 11 percent.
 8    Q.  Well, if you take a look at your
 9  covering memo here on page 3.
10    A.  Correct.
11    Q.  So that would tell you that initially
12  for generic drugs, the URAs the state got were 10
13  percent of the AMP, true?
14    A.  10 percent of the AMP up until calendar
15  year 1994.
16    Q.  And what did they become in calendar
17  year 1994?
18    A.  11 percent.
19    Q.  So up until calendar year '94, I guess
20  were, in fact, the states getting the URAs for
21  the generic drugs from CMS?
22    A.  I believe so.

Page 1317

 1    Q.  Who was in charge of seeing that that
 2  was done?
 3    A.  We have an operations side in HCFA that
 4  -- that's responsible for that.
 5    Q.  Did you set that up as part of your
 6  role in implementing the legislation?
 7    A.  I don't know.  I don't think so.  I
 8  think that was set up by a separate part.
 9    Q.  Do you know who did?
10    A.  No.  Not offhand.
11    Q.  So the URAs are sent to the state's
12  recorder, is that correct?
13    A.  Correct.
14    Q.  In the case of the generic drugs, they
15  go -- and I'm sorry, I'll withdraw it.  They also
16  were sent to the states for each NDC number,
17  correct?
18    A.  Correct.  And I'm trying to remember if
19  that's 11 digit or 9 digit, but whichever.
20    Q.  Right.  And the distinction between 11
21  and 9 digit is like the packet size, right?
22    A.  Correct.

Page 1318

 1    Q.  But for each drug like Albuterol or
 2  cromolyn or ipratropium, to the extent there were
 3  different versions of those drugs, like 80
 4  percent solution, 5 percent solution, there is a
 5  separate AMP number, right?  I'm sorry, a
 6  separate NDC number, correct?
 7    A.  To the extent that they were different
 8  at the 9 digit level, there would be a separate
 9  AMP.
10    Q.  So you get an AMP for all those sales
11  of all those drugs, correct?
12    A.  Correct.
13    Q.  And every quarter, those prices would
14  go to the states, right, in the form of URAs?
15    A.  Correct.
16    Q.  And for the first two years, or I'm
17  sorry, for the first year and a half, the URA is
18  10 percent of the AMP, right?
19    A.  I'm sorry.  I don't understand your
20  math, for the first year and a half?
21    Q.  For the first calendar year, halfway
22  through '92, was it full calendar year '92 they

Reed, Larry - Vol. V                                      October 2, 2008
                              Washington, DC

Page 1323

 1  units, so they would know the rebate that they
 2  would get back.
 3  BY MR. MERKL:
 4      Q.  Right, but again, if you know the URA,
 5  you know what the AMP is, right?
 6          MS. OBEREMBT:  Objection.
 7          THE WITNESS:  There is a statutory
 8  formula here.  I mean, I don't --
 9  BY MR. MERKL:
10      Q.  Well, let's assume that the person at
11  the state Medicaid office can divide by 10 or 11,
12  or do simple mathematical operations of that
13  magnitude.  That person who got the URA
14  information will sit down and send out a bill to
15  each manufacturer which would break out for each
16  manufacturer each NDC number, right, and the
17  amount of rebate the state was claiming?
18      A.  Correct.
19      Q.  In the process of putting that bill
20  together to send to the manufacturer, the state
21  Medicaid person would see the URA, right?
22      A.  Correct.

Page 1324

 1      Q.  So next to the URA, they would see the
 2  NDC number, and they would pretty much know
 3  within say 5 percent, 10 percent what exactly the
 4  AMP for each of those drugs were, right?
 5          MS. OBEREMBT:  Objection.
 6          THE WITNESS:  They would know -- there
 7  would be a way to -- it's a simple calculation to
 8  go back to the AMP.
 9  BY MR. MERKL:
10      Q.  Now, also on a -- in a broader basis,
11  if we talk about -- are you familiar with the way
12  generic drugs decline in price over time?  Have
13  you heard of that?
14          MS. OBEREMBT:  Objection.
15  BY MR. MERKL:
16      Q.  Generic drugs are first introduced in
17  the market at a higher price and over time, as
18  competition comes in, the price erodes, is that
19  correct?
20          MS. OBEREMBT:  Objection.
21  BY MR. MERKL:
22      Q.  Have you heard of that?

Page 1325

 1          MS. OBEREMBT:  Objection.
 2  BY MR. MERKL:
 3      Q.  Have you heard of that phenomenon?
 4          MS. OBEREMBT:  Objection.
 5          THE WITNESS:  I have --
 6  BY MR. MERKL:
 7      Q.  She doesn't want you to answer the
 8  question.
 9      A.  I have heard of that.
10      Q.  So let's assume an extreme erosion over
11  time for a given drug, okay?  Isn't it true that
12  by simply going through the act of billing the
13  manufacturer the rebates due on a particular drug
14  like Albuterol, if you were just watching the
15  bills go out over time, you would see the amount
16  of rebate that the state was getting to those
17  sales would dwindle, right?
18          MS. THOMAS:  Objection.
19          THE WITNESS:  If the AMP of the drug
20  was going down, the URA of the drug would be
21  going down.
22  BY MR. MERKL:

Page 1326

 1      Q.  And the rebate you would collect would
 2  go down, right?
 3      A.  The times units would go down.
 4      Q.  Even if the number of sales stayed the
 5  same, the amount of rebate would go down, right?
 6      A.  Depending on the number of units.
 7      Q.  No, I'm saying assume the number of
 8  units is a constant, okay?
 9      A.  If the URA decreased, the rebate would
10  go down.
11      Q.  So if the price as reflected in AMP
12  from say 1992 to 2002 declined over the years,
13  the people sending out the rebate bills to the
14  manufacturers would see that just by looking at
15  the declining amount of money they are collecting
16  from the rebate, right?
17          MS. THOMAS:  Objection.
18          THE WITNESS:  To the extent they looked
19  at it.
20  BY MR. MERKL:
21      Q.  You don't think they look at the amount
22  of rebates they get?

                                              84 (Pages 1323 to 1326)

Page 1371

1  to you anything in the state package that
2  referenced or referred to Dey, you would not have
3  relied on anything from Dey in determining
4  whether or not to approve a state formula change?
5       MS. OBEREMBT: Objection.
6  BY MR. MERKL:
7     Q.  True?
8     A.  We would have looked at the compendium,
9  the compendium prices in general. I don't think
10 that there would have been a look at any specific
11 drug.
12    Q.  Well, was it your practice to review
13 compendia prices generally in the course of
14 approving SPAs?
15    A.  We would look at the methodology that
16 the state chose for how it was going to set that
17 AWP -- AWP discount.
18    Q.  But would you actually get out the
19 compendia and start looking at prices to see what
20 the differences were between WAC and AWP, and
21 things like that?
22       MS. OBEREMBT: Objection.

Page 1372

1        THE WITNESS: I don't believe the
2  agency would have generally done that.
3  BY MR. MERKL:
4     Q.  You don't think you did that?
5     A.  I don't think the agency did.
6     Q.  Now, I'm also correct as to whether or
7  not the state relied on any information from Dey
8  to make a reimbursement decision, you have no way
9  of knowing that, right?
10       MS. OBEREMBT: Objection.
11       MS. THOMAS: Objection.
12       THE WITNESS: I don't know -- I don't
13 know what the state would have relied upon, other
14 than what they would have submitted in their
15 state plan.
16 BY MR. MERKL:
17    Q.  Dey would have submitted --
18       MS. OBEREMBT: They. They.
19 BY MR. MERKL:
20    Q.  Okay. All right. Now, Dey in fact
21 used to write letters directly to the states
22 telling them what their prices were from time to

Page 1373

1  time, correct, right?
2        MS. OBEREMBT: Objection.
3        THE WITNESS: I wasn't aware of that.
4  BY MR. MERKL:
5     Q.  Did you ever look at those letters?
6     A.  I don't remember seeing those letters.
7     Q.  If a manufacturer writes a letter to a
8  state telling them what their AWP was, and
9  defining what their AWP and their AMP -- I'm
10 sorry, what their AWP and their WAC was, was that
11 the sort of thing the states should consider in
12 making reimbursement decisions?
13       MS. OBEREMBT: Objection.
14       THE WITNESS: I think the states have a
15 fair amount of flexibility under the regulation
16 to look at a number of factors of what they were
17 considering in determining their EAC.
18 BY MR. MERKL:
19    Q.  True, but when a manufacturer actually
20 sends them a letter explaining how -- what it's
21 priced are, is that the sort of thing a state
22 should look at when it makes its decisions?

Page 1374

1        MS. OBEREMBT: Objection.
2        THE WITNESS: It could be something the
3  state looks at, but remember that they are
4  setting a reimbursement for generally 50,000
5  drugs at any given time period. And a
6  methodology that would be specific to a small
7  group of drugs or a manufacturer might not --
8  might be hard to do that within a barter scheme
9  of drug reimbursement.
10 BY MR. MERKL:
11    Q.  Have you ever looked at Medicaid claims
12 data?
13       MS. OBEREMBT: Objection.
14       THE WITNESS: Are you asking me as an
15 agency, have I ever looked at Medicaid claims
16 data?
17 BY MR. MERKL:
18    Q.  Actually, yes.
19    A.  Yes.
20    Q.  Has the agency done anything to
21 determine whether or not Dey prices were used to
22 pay Medicaid claims?