UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re:  PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Hon. Patti B. Sarris |
| *United States of America, et rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.* CIVIL ACTION NO. 06-CV-11337-PBS | ) ) ) ) ) | |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.,* Civil Action No. 05-11084-PBS; and | ) ) ) ) | |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp., et al.,* Civil Action No. 07-10248-PBS | ) ) ) ) | |

**ABBOTT LABORATORIES INC.'S RESPONSE TO THE AMENDED STATEMENT OF
UNDISPUTED FACTS IN SUPPORT OF UNITED
STATES' MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO
ABBOTT LABORATORIES INC.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Abbott Laboratories Inc. ("Abbott"), for its response to the

United States' Amended Statement of Facts applicable to Abbott (Dkt. No. 6321) states as

follows:

1.      Abbott Corporation at all times material from 1991 until 2003 operated a division
it called the Hospital Products Division ("Abbott HPD").  (Amended Complaint ¶ 30)(Answer ¶
30)

**RESPONSE:** Disputed and incomplete.  There is no entity known as Abbott Corporation.  From

at least 1991 until April 2004, Abbott Laboratories operated a division known as the Hospital

Products Division.

2.      HPD sold all of the drug products that are at issue in this lawsuit.  These categories of products, which are sold under 44 different NDCS depending upon packaging size and volume, are Vancomycin; Dextrose; Saline; and Sterile Water ("Subject Drugs").  These products are used for hydration, irrigation and as diluents.  (Amended Complaint ¶ 30)(Answer ¶ 30)

**RESPONSE:**  Undisputed, except that Vancomycin is an antibiotic and is not used for hydration, irrigation or as a diluent.  (02/28/08 Baker Dep. 407:16-22, Ex.5.)[1]

3.      All of the Subject Drugs were "multi-source" drug products, which could be acquired from any number of competing pharmaceutical manufacturers, including Abbott HPD. (Amended Complaint ¶ 52)(Answer ¶ 52)

**RESPONSE:**  Undisputed, but incomplete.  At times during the relevant time period, there was only one competing manufacturer for certain of the Subject Drugs and at other times other manufacturers had supply issues, making Abbott the only manufacturer able to supply certain of the Subject Drugs.  (8/29/07 Karas Dep. 131:21-132:23, Ex. 39.)

4.      All of the Subject Drugs were generic products that are eligible for reimbursement under Medicare and Medicaid.  Sellers 30b6, 3/31/08 at 378:10-15 (Lavine Decl. Exh. 88 & 89)

**RESPONSE:**  Undisputed.

5.      Vancomycin, a potent antibiotic was an important product for Abbott HPD that was launched in 1989.  Sellers 30b6, 3/16/08 at 54:10-15; Sellers 30b6, 3/31/08 at 592 & Sellers 30b6 Exh. 27.  (Amended Complaint ¶ 53)(Answer ¶ 53) (Lavine Decl. Exh. 70, 88, 125)

**RESPONSE:**  Undisputed, except that Vancomycin was launched in 1988.  (02/14/07 Sellers Dep. 383:6-11, Ex. 73.)

6.      In 1996, HCFA stopped reimbursing Vancomycin as a Durable Medical Equipment pharmacy benefit under Medicare as accelerated use of Vancomycin caused concern that its overutilization could impact Vancomycin's effectiveness as an antibiotic of last resort.

---

[1] [1]  Evidentiary materials cited in this document are provided as attachments to the August 28, 2009 Declaration of Brian J. Murray, and are cited as (Ex. ___.).  Citations to *Abbott Laboratories Inc.'s Rule 56.1 Statement Of Additional Facts That Preclude Summary Judgment In Favor Of The Government*, filed herewith, are noted (AF ¶__.).  Citations to Abbott's original Rule 56.1 statement (Dkt. No. 6187) are noted (SOF ¶__.).  Citations to Defendants' combined 56.1 statement, filed herewith, are noted (CF ¶ __.).  Citations to the *Combined Memorandum Of Defendants Abbott Laboratories, Inc., Dey, Inc., And Boehringer Ingelheim, Corp. In Opposition To The United States' Cross-Motions For Partial Summary Judgment*, filed contemporaneously, are noted (C. Br. at ___.)

Sellers 30b6, 3/31/08 at 590:18-22; 591; 592:1-3; 611:11-22; 612:1 & Sellers 30b6 Exh. 27. (Lavine Decl. Exhs. 89, 70)

**RESPONSE:** Disputed. The content of the Medicare Part A Bulletin speaks for itself. That exhibit states: "(Effective for Services Beginning On or After September 1, 1996) Medicare coverage of Vancomycin as a durable medical equipment infusion pump benefit is not covered. There is insufficient evidence to support the necessity of using any external infusion pump, instead of a disposable elastomeric pump or the gravity drip method, to administer Vancomycin in a safe and appropriate manner." (03/05/97 Medicare Bulletin, Ex. 134.) The Government has not produced evidence of any overutilization of Vancomycin, much less evidence tying any alleged overutilization to Abbott's price reporting practices.

7.      Vancomycin's overall gross utilization was higher in the Alternate Site ("Alt Site") markets in or around 1996 than it was in hospitals, and by 1996 Abbott had acquired 60 percent share of the Vancomycin Alternate Site market. Sellers 30b6, 3/31/08 at 590:18-22; 591; 592:1-16; Sellers 30b6 Exh. 27. (Lavine Decl. Exs. 70, 89)

**RESPONSE:** Disputed and unsupported, in part, because the cited evidence does not indicate that Abbott had acquired a 60% share of the Vancomycin Alternative Site market. Rather, the evidence indicates that in 1996, 60% of Abbott's sales of Vancomycin were in Alternate Site. Undisputed in that Vancomycin's overall gross utilization was higher in the Alternate Site market in or around 1996 than in hospitals. (03/31/08 Sellers Dep. 592:13-16, Ex. 76.)

8.      Dextrose, Saline and Sterile Water, generic products which Abbott "launched" as new products offered by Abbott decades ago, are low cost (on average approximately $0.20 to $2.00), ubiquitous in the marketplace, and used in high volumes daily in the Alt Site market. Robertson Dep. 78:18-25; 79:1-25; 80:1-19; Kipperman Dep. 92:8-25; 93:1-5; Ormond Decl. Appendix A, Attachment 1-45 (Lavine Decl. Exhs. 1, 100, 101)

**RESPONSE:** Objection to the Ormond declaration as inadmissible. Plaintiffs have never disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony, and Abbott did not have the opportunity to depose him. Abbott disputes all factual statements made in Mr. Ormond's declaration. The Court should strike this out-of-time testimony. *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery," and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"); *see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

Disputed.  The "low cost" cited above is based on certain average price calculations made by Dr. Mark G. Duggan.  Abbott's expert, Steven J. Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as providers who purchased directly from Abbott or directly from a wholesaler or retailer at an unknown price.  (03/06/09 Young Expert Rep. 23, Ex. 94.)  Dr. Duggan's work cannot form the basis of any reliable calculations, because it is inherently defective and should be struck on *Daubert* grounds.  (*See* Dkt. No. 6177.)  The fatal flaws in Dr. Duggan's work necessarily taint the belated expert declaration offered by Mr. Ormond, providing another reason to strike that declaration.

9.     HPD was divided into two separate components: the Hospital Business Section ("HPD HBS"), which sold exclusively to the hospital market HPD Alt Site.  Mershimer Dep. 43:7-13; Sellers 3/16/08 30b6 at 97-98  (Lavine Decl. Exh. 88, 98)

**RESPONSE:** Undisputed, but incomplete.  HPD had two business units that sold the Subject Drugs.  (08/27/09 Sellers Decl. ¶ 6, Ex. 89.)

10.     Abbott's HPD Alt Site itself was further subdivided into three units, Alternate Site Product Sales ("HPD Alt Site"), which sold to the non-hospital market through contracts and group purchasing organization arrangements, and Alternate Site Home Infusion ("Home Infusion"), which sold products under consignment arrangements and also facilitated reimbursement and other operational aspects of Abbott's wholly owned home infusion pharmacies. The third unit was a Renal business unit. Mershimer Dep. 43:7-13  (Lavine Decl. Exh. 98)

**RESPONSE:** Disputed, however, that the Government has cited proper evidentiary support for the facts set forth in the remainder of this paragraph.  *See O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) (disregarding "purported statements of 'fact' not properly supported by citations to the record" in summary judgment pleadings as required by Local Rule 56.1).  Further responding, Home Infusion Services negotiated fees for the goods and services it provided.  Depending upon the nature of the services provided, Home Infusion Services was paid for its services based upon either a per diem amount or a percentage of the amounts collected by the customer from third-party payors.  Customers who utilized Abbott products paid a higher amount to account for the product costs.  (02/07/08 Kreklow Dep. 19:15-20:2, Ex. 44.)  Undisputed that Abbott's HPD Alternate Site was subdivided into three units, Alternate Site, Home Infusion Services and Renal Care.

11.     In or after 1991, Abbott operated its own home infusion pharmacies in New Jersey and Los Angeles, and Chicago, which closed in 1996, 1998, and 2001 respectively. Sellers 30b6, 3/31/08 at 485:4-22.  (Lavine Decl. Exh. 88)

**RESPONSE:** Undisputed.

12.     During the claims period, Abbott maintained a provider number and had a provider agreement with HCFA, which enabled Abbott to bill Medicare and Medicaid directly on its own behalf.  See Kreklow 02/07/08 Dep. at 121.  Abbott Answer at ¶ 117 (Dkt. 5232) (Lavine Decl. Exh. 116)

**RESPONSE:** Disputed and incomplete.  At certain times and for certain products, Abbott Home Care and later Home Infusion Services billed Medicare as well as some state Medicaid programs for certain products and services provided by the Home Infusion Services Pharmacies using

Abbott's EIN, Medicare provider number, and certain Medicaid provider numbers.  (07/18/07

Leone Dep. 70:10-25, Ex. 45.)

13.     Richard Gonzalez, served as the Senior Vice President and then President of HPD
from 1998 to 2000, and then vice president for Medical Products and the president of Abbott's
Medical Products, in 2000 and 2001.  Abbott's Medical Products had oversight over HPD in
2000 to at least 2003.  Gonzalez Dep. 25: 15-22; 26-28; 29:1-18; 44:4-11; 102:1-17; 113:2-19;
207:4-22; 208:1-14 & Exhs. 1 & 4.  (Lavine Decl. Exh. # 82, 87, 102)

**RESPONSE:**  Undisputed, except that the statement "Abbott's Medical Products had oversight

over HPD in 2000 to at least 2003" does not adequately reflect the cited testimony.

14.     The United States' expert, Mark G. Duggan, has analyzed the transaction data
produced by Abbott in this case.  The transaction data is a copy of the data used by Abbott in the
ordinary course of business. Among other things, Dr. Duggan has used Abbott's transaction data
to analyze the prices at which Abbott products were being sold directly by Abbott to customers
and the prices at which the Abbott products were being re-sold by wholesalers and distributors to
end customers.  The Abbott transaction data included rebates paid to customers for 1996 to 2001,
but no rebate information was included for any dates prior thereto.  The rebates reflected in the
Abbott data ranged from 5% to 7.5% and on average were approximately 6.3%.  Dr. Duggan did
not include the rebates in his calculations of the prices at which Abbott's products were sold.  Dr.
Duggan did not include prompt pay discounts in his calculations of the prices at which Abbott's
products were sold.  Abbott, DT p. 19, 36, 37, Table 7; Henderson Exh. 41, Declaration of Mark
Duggan ("Duggan Decl. ___"), ¶¶ 25, 31, 34, Attachment A.

**RESPONSE:**  Objection to the Duggan declaration as inadmissible.  Dr. Duggan's declaration is

out-of-time and Abbott has not had the opportunity to depose him about this new declaration.

Abbott also does not have Dr. Duggan's underlying calculations that support certain statements

made in his declaration.  Abbott disputes all factual statements made in Dr. Duggan's

declaration.  The Court should strike this out-of-time testimony.  *Lohnes v. Level 3 Comm'ns,*

*Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure

to unveil his expert until after [defendant] had moved for summary judgment deprived

[defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit

expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly

the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra,*

*Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed. Abbott's direct and indirect transaction data does not include "rebates paid to customers." Abbott's data includes a field called "Rebate" that is an accrual or approximation of the amount that may be paid to a customer should that customer achieve certain contract requirements. (03/07/08 Echevarria Dep. 100:18 – 101:8, 101:9-22, 135:4-22, Ex. 21.) Abbott's direct sales data also contains rebate accrual information from 1991-2001. (06/19/08 Duggan Report Table 6, Ex. 135.) Further responding, Abbott's expert, Steven J. Young, detailed the errors in Dr. Duggan's average prices. Mr. Young opines that Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers. Dr. Duggan failed to consider prices paid by other customers such as providers who purchased directly from Abbott or directly from a wholesaler or retailer at an unknown price. (03/06/09 Young Expert Rep. 23, Ex. 94.) Dr. Duggan's work cannot form the basis of any reliable calculations, because it is inherently defective and should be struck on *Daubert* grounds. (*See* Dkt. No. 6177.) Abbott does not, however, dispute that Dr. Duggan analyzed the transaction data produced by Abbott, that the transaction data is used by Abbott in the ordinary course of business, that the indirect sales data is missing rebate information from 1991-1995 and that Dr. Duggan did not include rebates and prompt pay discounts in his calculations.

15.    As part of his analysis, Dr. Duggan used Abbott's transaction data to calculate the average and 95th percentile prices at which the Abbott products were sold directly by Abbott to

all customers, to those customers identified by Abbott in its data as being in the retail pharmacy class of trade, and to those customers identified by Abbott in its data as wholesalers and distributors (net of chargebacks).  Dr. Duggan also used Abbott's transaction data to calculate the average and 95th percentile prices at which the Abbott products were re-sold by wholesalers and distributors to all customers and to end customers identified by Abbott in its data as being in the retail pharmacy class of trade.  Duggan Decl. ¶¶ 31, 34, Attachment A, Abbott 56.1 Exh. DT, Table 5, 10, 13b.

**RESPONSE:**  Objection to the Duggan declaration as inadmissible.  Dr. Duggan's declaration is out-of-time and Abbott has not had the opportunity to depose him about this new declaration. Abbott also does not have Dr. Duggan's underlying calculations that support certain statements made in his declaration.  Abbott disputes all factual statements made in Dr. Duggan's declaration.  The Court should strike this out-of-time testimony.  *Lohnes v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Abbott's expert, Steven J. Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as providers who purchased directly from Abbott or directly from a wholesaler or retailer at an

unknown price.  (03/06/09 Young Expert Rep. 23, Ex. 94.)  Dr. Duggan's work cannot form the

basis of any reliable calculations, because it is inherently defective and should be struck on

*Daubert* grounds.  (*See* Dkt. No. 6177.)

16.    On average there was a difference of approximately 2% between the prices at which Abbott sold its products to wholesalers and distributors as compared to the prices at which the wholesalers and distributors re-sold the Abbott products to end customers.  Abbott 56.1, Exh. DU, pp. 18-19, Table 6.

**RESPONSE:**  Undisputed.

17.    The customers identified by Abbott in its data as being in the retail pharmacy class of trade paid approximately 20% higher on average than the price paid by all of Abbott's customers both in the direct sales by Abbott and in the indirect sales by the wholesalers and distributors.  Duggan Decl. ¶ 31.

**RESPONSE:**  Objection to the Duggan declaration as inadmissible.  Dr. Duggan's declaration is

out-of-time and Abbott has not had the opportunity to depose him about this new declaration.

Abbott also does not have Dr. Duggan's underlying calculations that support certain statements

made in his declaration.  Abbott disputes all factual statements made in Dr. Duggan's

declaration.  The Court should strike this out-of-time testimony.  *Lohnes v. Level 3 Comm'ns,*

*Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure

to unveil his expert until after [defendant] had moved for summary judgment deprived

[defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit

expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly

the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra,*

*Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10,

2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery

period has ended and just 8 days before summary judgment motions were due"*); see e.g., Bevolo*

*v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary

judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Abbott's expert, Steven J.

Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan

limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain

pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as

providers who purchased directly from Abbott or directly from a wholesaler or retailer at an

unknown price.  (03/06/09 Young Expert Rep. 23, Ex. 94.)  Dr. Duggan's work cannot form the

basis of any reliable calculations, because it is inherently defective and should be struck on

*Daubert* grounds.  (*See* Dkt. No. 6177.)

18.     In his damage calculations, for each NDC in each quarter, Dr. Duggan replaced
the AWP in each state pharmacy reimbursement logarithm with a price equal to 125 percent of
the average pharmacy *indirect* price, he replaced the WAC by the average pharmacy-specific
price in Abbott's *indirect* transaction data, and he replaced the Direct Price with Abbott's
average, pharmacy-specific price in the *direct* transaction data. Abbott 56.1, Exh. DU, p. 9.

**RESPONSE:** Disputed in so far that  Abbott's expert, Steven J. Young, detailed the errors in

Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan limited his analysis to less than

2% of sales and selected only negotiated contract sales to certain pharmacy customers.  Dr.

Duggan failed to consider prices paid by other customers such as providers who purchased

directly from Abbott or directly from a wholesaler or retailer at an unknown price.  (03/06/09

Young Expert Rep. at 23, Ex. 94.)  Dr. Duggan's work cannot form the basis of any reliable

calculations, because it is inherently defective and should be struck on *Daubert* grounds.  (*See*

Dkt. No. 6177.)  Undisputed that Dr. Duggan made such replacements.

19.     Appendix A to the Declaration of Patrick Ormond lists the List prices, AWPs and
average transaction prices for the 44 NDCs at issue in this case.  Mr. Ormond is a Certified
Public Accountant and is currently employed as an Auditor in the United States Attorney's
Office, District of Massachusetts.  His responsibilities include the investigation into the financial
aspects of legal matters.  (Lavine Decl. Exh. 1, (Declaration of Patrick Ormond (Ormond Decl.),
Appendix A)).

**RESPONSE:** Objection to the Ormond declaration as inadmissible. Plaintiffs have never disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony and Abbott did not have the opportunity to depose him. Abbott disputes all factual statements made in Mr. Ormond's declaration. The Court should strike this out-of-time testimony. *Lohnes v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

20.     To prepare the appendices and attachments to his declaration, Mr. Ormond reviewed the list prices Abbott reported to the publishers of the Red Book and the Blue Book (also known as the National Drug Database File or the "NDDF database"), the prices published by Red Book and the NDDF database as the Average Wholesale prices ("AWPs"), and the average selling prices ("Average Prices") calculated by Dr. Mark Duggan using Abbott's transaction data. Ormond Decl., ¶¶ 3, 6.

**RESPONSE:** Objection to the Ormond declaration as inadmissible. Plaintiffs have never disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony and Abbott did not have the opportunity to depose him. Abbott disputes all factual statements made in Mr. Ormond's declaration. The Court should strike this out-of-time testimony. *Lohnes v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Abbott's expert, Steven J.

Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan

limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain

pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as

providers who purchased directly from Abbott or directly from a wholesaler or retailer at an

unknown price.  (03/06/09 Young Expert Rep. 23, Ex. 94.)  Dr. Duggan's work cannot form the

basis of any reliable calculations, because it is inherently defective and should be struck on

*Daubert* grounds.  (*See* Dkt. No. 6177.)  The fatal flaws in Dr. Duggan's work necessarily taint

the belated expert declaration offered by Mr. Ormond, providing another reason to strike that

declaration.

21.     Attachments A1 through A44 contained in Appendix A of the Ormond Decl.
graphically summarize four prices for each of the Subject Drugs over the time period of 1991
through 2002.  The prices are: the Abbott reported list prices, the RedBook published AWPs, the
NDDF published AWPs, and the Average Prices as calculated by Dr. Duggan.  The data points
in these attachments were based upon and accurately summarize the data contained in Appendix
B of the Ormond Decl., Schedules B1 through B4 which allow for a comparison between the
data sets.  Ormond Decl., ¶ 4.

**RESPONSE:** Objection to the Ormond declaration as inadmissible.  Plaintiffs have never

disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Abbott's expert, Steven J. Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as providers who purchased directly from Abbott or directly from a wholesaler or retailer at an unknown price.  (03/06/09 Young Expert Rep. 23, Ex. ___.)  Dr. Duggan's work cannot form the basis of any reliable calculations, because it is inherently defective and should be struck on *Daubert* grounds.  (*See* Dkt. No. 6177.)  The fatal flaws in Dr. Duggan's work necessarily taint the belated expert declaration offered by Mr. Ormond, providing another reason to strike that declaration.

22.    Attachment A45 contained in Appendix A of the Ormond Decl. calculates, for each quarter for each of the Abbott NDCs, the numerical percentage "spread" between the

13

NDDF published AWPs and the Transaction Based Average Prices as calculated by Dr. Duggan. These spreads are the numeric calculations of the spreads reflected graphically on Attachments 1 through 44.  Mr. Ormond calculated the spreads by the following formula:

(NDDF published AWP - Average Prices) / Average Prices

The numerical percentage spreads in Attachment A45 accurately summarize the data contained in Appendix B of the Ormond Decl., Schedules 1 through 4. Ormond Decl., ¶ 5.

**RESPONSE:**  Objection to the Ormond declaration as inadmissible.  Plaintiffs have never disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"); *see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Abbott's expert, Steven J. Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as providers who purchased directly from Abbott or directly from a wholesaler or retailer at an

unknown price.  (03/06/09 Young Expert Rep. 23, Ex. 94.)  Dr. Duggan's work cannot form the

basis of any reliable calculations, because it is inherently defective and should be struck on

*Daubert* grounds.  (*See* Dkt. No. 6177.)  The fatal flaws in Dr. Duggan's work necessarily taint

the belated expert declaration offered by Mr. Ormond, providing another reason to strike that

declaration.

23.    Mr. Ormond obtained most of the Abbott list prices from copies of Abbott
catalogs provided to us by Abbott during discovery, namely, catalogs for the years; 1990, 1991,
1992, 1993, 1994, 1995, 1996, 1997 (partial), 1998, 2001 and 2002.  The 1997 catalog Abbott
provided was missing the pages which contain all NDCs prior to NDC 2422-12.  One of the
NDCs listed in this matter, 1966-07, was among those missing.  For Abbott list prices for the
year 1999, Mr. Ormond used the prices as attached in an email from Abbott employee Jerrie
Cicerale to a Kathy (last name unknown) at First DataBank.  The email is dated April 15th, 1999,
is Bates Stamped ABT-DOJ0191058 and was produced by Abbott in discovery. There was no
price catalog produced for the year 2000.  Mr. Ormond also reviewed two email transmissions of
wholesale price data which were sent to FDB by Abbott with effective dates of May7, 2001 and
May 7, 2002 which are Bates Stamped CA-ABT006514 and ABT-DOJ-E 0219570 and were
produced by Abbott in discovery.  The Abbott list prices which Mr. Ormond identified in the
forgoing documents are truly and accurately summarized in Schedule B1 of Appendix B to the
Ormond Decl. ¶ 7.

**RESPONSE:** Objection to the Ormond declaration as inadmissible.  Plaintiffs have never

disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due"); *see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  In Appendix B, Schedules B1 –

B7, Mr. Ormond labels column H as the Abbott catalog price per unit.  The prices listed in that

column are the Abbott catalog prices per *package*, not per unit.

24.     Mr. Ormond obtained the published Red Book prices published annually by
Thomson Publishing (and in the early years, Medical Economics) by looking the prices up in
copies of the actual Red Books. Mr. Ormond used Red Books published in 1991 through 2004.
He prepared a summary of the prices listed in the Red Books as being the AWPs for the Abbott
Drugs.  The Red Book AWPs which Mr. Ormond identified in the published Red Books are truly
and accurately summarized in Schedule B2 of Appendix B of the Ormond Decl. Ormond Decl., ¶
8.

**RESPONSE:**  Objection to the Ormond declaration as inadmissible.  Plaintiffs have never

disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due"); *see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed).

25.     Mr. Ormond obtained the published BlueBook (FDB) prices from the First Databank NDDF database, which he was provided by Ian Dew of Steck Consulting.  A true and accurate copy of the NDDF prices provided to Mr. Ormond by Mr. Dew is printed out in Schedule B3 of Appendix B of the Ormond Decl. Ormond Decl. ¶ 9.

**RESPONSE:** Objection to the Ormond declaration as inadmissible.  Plaintiffs have never disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

26.     Mr. Ormond obtained from Mr. Dew a copy of the Average Prices calculated by Dr. Duggan using Abbott's transaction data.  Ormond Decl., ¶ 10.

**RESPONSE:** Objection to the Ormond declaration as inadmissible.  Plaintiffs have never disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due")*; see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Abbott's expert, Steven J. Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as providers who purchased directly from Abbott or directly from a wholesaler or retailer at an unknown price.  (03/06/09 Young Expert Rep. 23, Ex. 94.)  Dr. Duggan's work cannot form the basis of any reliable calculations, because it is inherently defective and should be struck on *Daubert* grounds.  (*See* Dkt. No. 6177.)  The fatal flaws in Dr. Duggan's work necessarily taint the belated expert declaration offered by Mr. Ormond, providing another reason to strike that declaration.

27.     Mr. Ormond calculated the percentage differences between the Abbott list prices found in the Abbott catalogs and the AWPs published in the Red Books and in the FDB NDDF database.  From 1991 to 2000, Mr. Ormond found that the vast majority of the published AWPs were approximately 18.75% higher than the Abbott list prices contained in the Abbott catalogs and e-mails.  Schedules B5 and B6 of Appendix B of the Ormond Decl. lists these comparisons.  Ormond Decl. ¶ 11.

**RESPONSE:** Objection to the Ormond declaration as inadmissible.  Plaintiffs have never disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving its objections, disputed.  In Appendix B, Schedules B1 –

B7, Mr. Ormond labels column H as the Abbott catalog price per unit.  The prices listed in that

column are the Abbott catalog prices per *package*, not per unit.

28.     For the years 2001 and 2002, Mr. Ormond compared the published FDB NDDF
database prices to the Abbott wholesale prices as reported to NDDF in emails dated April 30,
2001 and May 7, 2002.  During this time period, Mr. Ormond found that the majority of the FDB
NDDF database AWPs were approximately 25% higher than the wholesale prices provided by
Abbott.  Schedule B7 of Appendix B lists these comparisons.  Ormond Decl.¶ 12.

**RESPONSE:** Objection to the Ormond declaration as inadmissible.  Plaintiffs have never

disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving its objections, disputed.  In Appendix B, Schedules B1 – B7, Mr. Ormond labels column H as the Abbott catalog price per unit.  The prices listed in that column are the Abbott catalog prices per *package*, not per unit.

29.     From 1991 until at least 2001, Abbott HPD defined "List price" as "the highest price published for a product in the catalog and/or submitted to the industry clearinghouses (Redbook and First Databank) for general distribution."  Sellers 30b6, 3/16/08 at 261:1-14 & Sellers 30b6 Exh. 15. (Lavine Decl. Exh. 88 & 69)

**RESPONSE:** Disputed and unsupported.  Paragraph 29 does not accurately reflect the exhibit cited therein.  Abbott also disputes that the Government has cited proper evidentiary support to show that the definition for "List price" provided in Exhibit 15 was in effect from 1991 until at least 2001.  *See O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) (disregarding "purported statements of 'fact' not properly supported by citations to the record" in summary judgment pleadings as required by Local Rule 56.1).  *See O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) (disregarding "purported statements of 'fact' not properly supported by citations to the record" in summary judgment pleadings as required by Local Rule 56.1).

30.     Abbott understood that the provision of AWP information to customers could constitute a component of what was needed to establish a spread, and that it was an essential

component to spread marketing.  Fishman 30(b)(6), 3/20/08 at 673:18-22; 674; 675:1-6.  (Lavine Decl. Exh. 91)

**RESPONSE:**  Disputed and unsupported.  Before 2003, as part of the Abbott Code of Conduct, there was an obligation of employees to comply with the law.  To the extent the law required or precluded activities to be in compliance, then Abbott's employees would be expected to be in compliance with the law.  Abbott had an understanding of the law as it was written and continued to gain insight into the law as more attention was placed on the law and more information became available.  (03/12/08 Fishman Dep. 96:16-22, 233:6-12, Ex. 24.) Unsupported, in that the cited testimony was speculative, and outside the scope of the deposition, as he was responding to hypothetical questions.

31.     Abbott employees knew that there was or may have been a relationship between AWP and Medicare and Medicaid reimbursement.  Snead Dep. 24:25: 25:1-2; 72:10-15; 73:24-25; 74:1-5; 124:12-17; Heggie 5/17/07 Dep. 40:11-13; 48: 1-16; 156:7-19; 158:13-17; 162:1-11; 165:4-22; 166:1-22; 168:6-22; 169:1; 219:3-8; Brincks Dep. 44:19-25: 45:1-4; 53:9-25; 54:1-3; 62: 21-25; 63:1-24; 144:24-25; 145: 1-23; 164:1-25; 216:14-25; 262:18-25: 263:1. (Lavine Decl. Exh. 103; 104)

**RESPONSE:**  Abbott objects to paragraph 31 because the above statement is misleading in that the plaintiff has selectively cited out-of-context excerpts of testimony by certain former employees.

Subject to and without waiving this objection, disputed and incomplete.  Abbott further disputes any implication that Abbott's employees generally knew that there may have been a relationship between AWP and Medicare and Medicaid reimbursement.  Record evidence establishes that numerous Abbott employees stated that they were not aware of such a relationship or that their knowledge of reimbursement in general is extremely limited, vague, or nonexistent because reimbursement played no part in their sales and marketing activities.  (*See*, *e.g.*, 01/11/07 Smith Dep. 44:23-46:24, 52:8:22, 83:30-84:3, Ex. 77; 06/01/07 DeGrace Dep. 46:21-47:16, Ex. 17; 03/28/08 Young Dep. 67:19-68:14, Ex. 86; 10/30/07 Harling Dep. 40:11-13,

Ex. 32; 03/13/08 Johnson Dep. 80:19-82:3, Ex. 37; 03/18/08 Blackwell Dep. 196:2-198:9, Ex. 9;

02/26/08 Cannon Dep. 172:16-173:19, Ex. 12; 02/15/08 Loughman Dep. 90:13-91:7; 127:14-

128:22, Ex. 48; 09/26/07 French Dep. 183:11-18, Ex. 25; 10/30/07 Harling Dep. 39:22-40:13, Ex.

32; 02/28/08 Miser Dep. 229:15-230:16, Ex. 57; 02/21/08 Aldy Dep. 332:11-333:7, Ex. 1.)

Abbott does not dispute, however, that a small number of individual Abbott employees

understood that there may have been a relationship between AWP and certain reimbursement.

Abbott notes that Ms. Snead, Mr. Heggie and Mr. Brincks left Abbott HPD in 1995, 1997, and

2000 respectively.  (04/19/07 Snead Dep. 26:25-27:10, Ex. 78; 05/17/07 Heggie Dep. 137:15-19,

268:12-14, Ex. 34; 06/12/07 Brincks Dep. 93:22-94:11, Ex. 11.)

     32.     National Accounts manager Christine Snead testified that it was common knowledge among the Abbott sales representatives and anyone in the marketplace that Abbott's customers used AWP for reimbursement.  Ms. Snead further understood that AWP was involved in reimbursement.  She could not think of any other reason why a customer would want AWP information other than to do an analysis on reimbursement spread.  Snead Dep. 24:25: 25:1-2; 72:10-15; 73:24-25; 74:1-5; 124:12-17 (Lavine Decl. Exh. 105)

**RESPONSE:**  Disputed.  Paragraph 32 does not accurately reflect the testimony of former

employee Christine Snead.  Ms. Snead testified that she did not "know the detail" regarding the

relationship of AWP to reimbursement and she did not know the percentage mark-up used by the

compendia to calculate AWP.  She further testified that she had no understanding as to how the

AWP for Abbott's drugs was selected and she had no awareness of the fact that the AWP on

Abbott's products was an up-charge from Abbott's published list prices.  In addition, others in

her position at Abbott were not aware that Abbott's customers used AWP in reimbursement.

(04/19/09 Snead Dep. 744-5, 167:15-20, 200:1-4, Ex. 78; 05/17/05 Balzer Dep. 38:23–39:3, Ex.

6; 03/19/08 Bukaty Dep. 31:1-33:7, Ex. 10; 05/30/07 Cicerale Dep. 212:11-214:8, Ex. 13;

02/19/08 Drake Dep. 257:4-22, Ex. 19; 02/19/08 Harsh Dep. 81:13-83:21, Ex. 33; 01/30/08

Haines Dep. 139:5-10, Ex. 31; 02/14/08 Jessup Dep. 26:17-27:8, Ex. 36; 03/26/08 Kelly Dep.

95:1-97:10, Ex. 41; 06/27/07 Lyman Dep. 122:12-124:3, Ex. 50; 02/28/08 Miser Dep. 216:9-14,

Ex. 54; 09/07/07 Rotz Dep. 38:11-39:3, Ex. 67; 03/13/08 Steenolsen Dep. 198:08-200:14, Ex.

80.)  Abbott also disputes the materiality of the referenced testimony.  Further responding, Ms.

Snead left her position in Abbott Alternative Site in 1995, more than 10 years before giving her

deposition.  (04/19/07 Snead Dep. 26:25-27:10, Ex. 78.)

33.     An Alternate Site reimbursement manager, Michael Heggie, testified that "AWP
is a function of list."  Mr. Heggie further testified that he would agree that the AWP for a drug is
relevant to the pharmacies, to insurance companies, to Medicare and Medicaid.  He further
testified that Abbott knew Redbook information, including AWPs, was transmitted to Medicaid
and Medicare programs and that he understood that the price reporting compendium Redbook
added an 18.75 percent markup to the list to publish AWP.  Testifying further, Mr. Heggie
acknowledged that he knew that there was a discrepancy between list price and sales price, that
list price was higher, and that the compendia used the list price to come up with the published
AWP.  Heggie 5/17/07 Dep. 40:11-13; 48: 1-16; 156:7-19; 158:13-17; 162:1-11; 165:4-22;
166:1-22; 168:6-22; 169:1; 219:3-8.  (Lavine Decl. Exh. 103)

**RESPONSE:** Disputed.  Paragraph 33 does not accurately reflect the testimony of former

employee Michael Heggie.  Abbott also disputes the materiality of the referenced testimony.  Mr.

Heggie left Abbott in 1997, approximately 10 years before giving his deposition.  Moreover, the

cited testimony is refuted by numerous HPD witnesses, who testified that they did not have an

understanding of AWP, how it was calculated, or how it was used.  (*e.g.*, 02/28/08 Miser Dep.

201:4-17, 214:3-4, 230:9-15, Ex. 54; 02/13/08 Rayford Dep. 104:7-17, Ex. 57; 02/21/08 Aldy

Dep. 157:1-158:3, 332:2-337:7, Ex. 1; 03/13/08 Johnson Dep. 81:9-82:3, Ex. 37; 09/07/07 Rotz

Dep. 152:5-8, Ex. 67.)  Further responding, the record in this case shows that the Government

knew full well that the compendia AWPs were not representative of (and were far higher than)

actual market prices, and yet Medicare and the state Medicaid programs intentionally used AWP

as the benchmark for payments to providers in order to further various policy goals, including

encouraging provider use of generic drugs, subsidizing inadequate or non-existent dispensing

fees, and ensuring beneficiaries access to care.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C.

Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary Judgment* at 13-19).

34.     Mr. Heggie testified that AWP-based reimbursement was "senseless" based in part on certain prices being reported by manufacturers.  Mr. Heggie thought it was "senseless" to use a list price that was significantly higher than sales price for these drugs because "everyone knew that it was not the most economical way to pay for drugs or to pay for whatever they were marking up" .  Heggie 5/17/07 Dep. 40:11-13; 48: 1-16; 156:7-19; 158:13-17; 162:1-11; 165:4-22; 166:1-22; 168:6-22; 169:1; 219:3-8.  (Lavine Decl. Exh. 103)

**RESPONSE:** Disputed.  Paragraph 34 does not accurately reflect the testimony cited therein of former employee Michael Heggie, as plaintiffs have selectively, incompletely and in some places misleadingly quoted and/or paraphrased the cited testimony.  Mr. Heggie testified that the AWP based reimbursement system was senseless because it was an "antequated system" that focused on a list price, i.e., AWP, rather than an actual sales price for the reimbursement formula.  (05/17/07 Heggie Dep. 162:1-11, 68:6-169:6, Ex. 34.)  Abbott also disputes the materiality of Mr. Heggie's "opinions" on AWP based reimbursement.  Further, Mr. Heggie left Abbott in 1997, approximately 10 years before giving his deposition.  (05/17/07 Heggie Dep. 137:15-19, 268:12-14, Ex. 34.)  Further responding, the record in this case shows that the Government knew full well that the compendia AWPs were not representative of (and were far higher than) actual market prices, and yet Medicare and the state Medicaid programs intentionally used AWP as the benchmark for payments to providers in order to further various policy goals, including encouraging provider use of generic drugs, subsidizing inadequate or non-existent dispensing fees, and ensuring beneficiaries access to care.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary Judgment* at 13-19).

35.     David Brincks, who was the manager of Alt Site Home Infusion contracting marketing, testified that Abbott Home Infusion used AWP and that he understood that a basic relationship existed where personnel from Abbott hospital products reported information to the pricing services such as First Data Bank and Red Book.  Brincks Dep. 62: 21-25; 63:1-24. (Lavine Decl. Exh. 104)

**RESPONSE:** Disputed.  Paragraph 35 does not accurately reflect the testimony cited therein of

former employee David Brinks, as plaintiffs have selectively, incompletely and in some places

incorrectly quoted and/or paraphrased the cited testimony.  Abbott further disputes paragraph 35

because Mr. Brincks testified that during his time at Abbott Home Infusion, the "mechanics

behind the submission" of prices were "not a central part of what our responsibilities were."

(06/12/07 Brincks Dep. 164:8-10, Ex. 11.)  Mr. Brincks further testified that during the time he

was working in home infusion he was not "consistently aware" that there was any relationship

between list price and AWP.  (*Id*. at 263:2-10.)  Further responding, the record in this case shows

that the Government knew full well that the compendia AWPs were not representative of (and

were far higher than) actual market prices, and yet Medicare and the state Medicaid programs

intentionally used AWP as the benchmark for payments to providers in order to further various

policy goals, including encouraging provider use of generic drugs, subsidizing inadequate or

non-existent dispensing fees, and ensuring beneficiaries access to care.  (*See* AF ¶ 27, 62-63, 83;

CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum In*

*Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support*

*Of Abbott's Motion For Partial Summary Judgment* at 13-19).  Abbott does not dispute,

however, that Mr. Brincks was the manager of Alternate Site Home Infusion contract marketing

during the time period 1992-1995 but does dispute the materiality of the statement.  (06/12/07

Brincks Dep. 30:8-24, 88:3-6, Ex. 11.)  Abbott disputes the materiality of the above statement.

Mr. Brincks left Abbott's HPD in 2000, approximately seven years before he was deposed.  (*Id.*

at 93:22-94:11.)

36.     Mr. Brincks agreed that at least in the context of the Vancomycin price change. In 1995 which he was involved with, he had an understanding that there was a formulaic relationship between the list prices set by Abbott and the AWPs that were published for those Abbott products.  The formula involved multiplying list times 1.1875 to arrive at AWP.  Brincks Dep. 216:14-25; 262:18-25: 263:1.  (Lavine Decl. Exh. 104)

**RESPONSE:** Disputed.  Paragraph 36 does not accurately reflect the testimony cited therein of former employee David Brincks.  Abbott does not dispute that for some time during the relevant time period, AWP for the Subject Drugs was calculated by the pricing compendia by applying a markup factor of 1.875 to the published list price.  Indeed, the record in this case shows that the Government knew full well that the compendia AWPs were not representative of (and were far higher than) actual market prices, and yet Medicare and the state Medicaid programs intentionally used AWP as the benchmark for payments to providers in order to further various policy goals, including encouraging provider use of generic drugs, subsidizing inadequate or non-existent dispensing fees, and ensuring beneficiaries access to care.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary Judgment* at 13-19).  The remainder of paragraph 36 is disputed because it is unsupported and immaterial.  Abbott also objects to this statement as misleading.  Mr. Brincks testified that during his time at Abbott Home Infusion, the "mechanics behind he submission" of prices were "not a central part of what our responsibilities were." (06/12/07 Brincks Dep. 164:8-10, Ex. 11.)  Mr. Brincks further testified that he did not understand at the time that there was a formulaic relationship between list price and AWP.  (*Id.* at 263:2-10.)  According to Michael Sellers, Abbott's 30(b)(6) designee on this topic, within Abbott's Hospital Products Division "there wasn't an appreciation of a relationship between the prices we reported and the AWP that was published by the agencies, nor the importance or significance of AWP to anyone."  (03/16/08 Sellers Dep. 163:10–165:22, Ex. 75.)  Mr. Eichhorn

testified that in 1995 he was not aware of any relationship between list price and AWP.

(04/24/07 Eichhorn Dep. 83:22–84:3, Ex. 22.)  Peter Baker also testified that he did not know

that there was a relationship between the prices that Abbott reported and the AWP.  (04/23/07

Baker Dep. 64:12-17; 341:22–342:2, Ex. 4.)  Peter Karas also testified that he had no

understanding that list prices impacted reimbursement.  (08/29/07 Karas Dep. 223:5-11, Ex. 39.)

Abbott also disputes the materiality of the above statement, as Mr. Brincks left Abbott HPD in

2000, approximately seven years before he was deposed.

     37.    Home Infusion was never involved in the process of list price setting.  Brincks
Dep. 164:1-25.  (Lavine Decl. Exh. 104)

**RESPONSE:** Undisputed.

     38.    Mr. Brincks knew home infusion customers cared about AWP because AWP
"was the standard process that was used to actually bill in the industry. AWP was a common
reference point accepted and used in – broadly in the home infusion market to bill patients and
insurance companies".  Brincks Dep. 53:9-25; 54:1-3.  (Lavine Decl. Exh. 104)

**RESPONSE:** Disputed.  Paragraph 38 does not accurately reflect the testimony of former

employee David Brincks.  On other occasions witnesses testified contrary to the alleged

undisputed facts in paragraph 38.  (03/19/08 Bukaty Dep. 31:1-33:7, Ex. 10; 05/30/07 Cicerale

Dep. 212:11-214:8, Ex. 13; 02/19/08 Drake Dep. 257:4-22, Ex. 19; 02/19/08 Harsh Dep. 81:13-

83:21, Ex. 33; 01/30/08 Haines Dep. 139:5-10, Ex. 31; 02/14/08 Jessup Dep. 26:17-27:8, Ex. 36;

03/26/08 Kelly Dep. 95:1-97:10, Ex. 41; 06/27/07 Lyman Dep. 122:12-124:3, Ex. 50; 02/28/08

Miser Dep. 216:9-14, Ex. 54; 09/7/07 Rotz Dep. 38:11-39:3, Ex. 67; 03/13/08 Steenolsen Dep.

198:08-200:14, Ex. 80.)  Further responding, the record in this case shows that the Government

knew full well that the compendia AWPs were not representative of (and were far higher than)

actual market prices, and yet Medicare and the state Medicaid programs intentionally used AWP

as the benchmark for payments to providers in order to further various policy goals, including

encouraging provider use of generic drugs, subsidizing inadequate or non-existent dispensing

fees, and ensuring beneficiaries access to care.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary Judgment* at 13-19).

39.     For Abbott HPD, the setting of catalog and list prices was usually an annual process for the period from 1991 until 2001.  The setting of catalog prices was a process led by the HBS Contract Marketing managers.  Sellers 30b6, 3/16/08 at 35:22; 36:1-10; 39:8-16; Abbott response to U.S. Second RFAs 32 & 33.  (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed.  Paragraph 39 does not accurately reflect the testimony cited therein and the cited discovery responses were made subject to objection.  Abbott does not dispute, however, that from 1991 through 1999 there was a general inflationary price adjustment for the list prices or catalog prices of around three to five percent, based in part on the Consumer Price Index, and that those price adjustments were made by HBS (not Alternate Site).  (03/16/08 Sellers Dep. 100:17-22, Ex. 75; 04/24/07 Eichhorn Dep. 77:17–78:1, Ex. 22; 08/23/07 Mershimer Dep. 319:2-7, Ex. 51.)  List prices for HPD products did not change in 2000 and were decreased in 2001.  Abbott also does not dispute that the setting of list/catalog prices for HPD products, like the Subject Drugs, was controlled by HBS, which set those prices without input from or influence by Alternate Site, and without any intention to influence Government payments under the Medicare or Medicaid programs.  (See AF ¶ 37-39.)

40.     Abbott asserts that in setting its pricing, Abbott HPD only considered the product investment and customer needs and that the following were never considered or factored in any way into setting its List price setting the following: a) Medicare or Medicaid reimbursement; b) waste, breakage, drug procurement costs, or bad debts; c) inventory carrying costs; d) dispensing fees or administration fees; e) co-pay risks to the provider; or, f) complaints from providers about needing AWPs to recover dispensing fees.  Abbott HPD price setting employees never considered whether any complaint about provider dispensing fees or administration fees justified reporting inflated List prices.  Sellers 30b6, 3/16/08 at 375:8-20; 362:22; 347:19-22; 348:1-17; 350:13-17; 363:1-6; Sellers 30b6, 3/31/08 at 350:9-12; 607:13-17; 608:1-11. (Lavine Decl. Exh. 88 & 127)

**RESPONSE:** Disputed and unsupported. Paragraph 40 contains several compound statements that do not accurately reflect the testimony cited therein. List prices for the Subject Drugs were set by HBS. (03/16/08 Sellers Dep. 97:20-99:12, Ex. 75; 08/23/07 Mershimer Dep. 81:11-22, Ex. 51; 05/17/07 Heggie Dep. 202:6-18, Ex. 34.) Additionally, Alternate Site had no role in setting List prices. (03/16/08 Sellers Dep. 273:18-275:2, Ex. 75; 08/23/07 Mershimer Dep. 81:11-22, Ex. 51; 05/17/07 Heggie Dep. 202:6-18, Ex. 34.) List prices were not set by reference to, or in order to influence, the AWPs for the Subject Drugs. (03/16/08 Sellers Dep. 163:10-165:22, 169:17-170:14, 207:2-19, 216:20-217:3, 369:17-370:14, 391:1-12, 421:2-11; Ex. 75; 04/24/07 Eichhorn Dep. at 83:22-84:3, Ex. 22.) Further responding, no cited testimony supports the statement that Abbott had "price setting employees. Abbott does not dispute, however, that product investment and customer needs were two of the factors considered when setting prices and that any complaints, to the extent they occurred, about provider dispensing fees were not considered when setting prices. HBS also monitored the CPI inflation index when determining list price adjustments. (03/31/08 Sellers Dep. 354:6-355:6, Ex. 76.)

41.     Abbott never considered medical concerns about the overutilization of Vancomycin in its decision making concerning the setting of its Vancomycin list prices. Sellers 30b6, 3/31/08 at 612:3-8; Sellers 11/1/07 Dep. 229:17-22; 230:1. (Lavine Decl. Exh. 89 & 126)

**RESPONSE:** Disputed and unsupported. Paragraph 41 does not accurately reflect the testimony cited therein, as the testimony was based on the witnesses' personal recollection. Further responding, Abbott disputes any implication that there was an overutilization of Vancomycin, and that any such overutilization was related to Vancomycin list prices, as there is no support for any such contentions.

42.     From 1991 until 1999, Abbott took an inflationary price increase each year at a rate of three to five percent on its list prices while at the same time its contract prices decreased on its HPD drugs as a result of market competitive forces. Sellers 30b6, 3/16/08 at 58:21-22; 59:1-22; 60:1-3; 97:9-19; 104:1-12; 354:6-22; 355:1-6. (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed.  Paragraph 42 does not accurately reflect the testimony cited therein.

During the time period 1991-2001, contract prices remained flat or decreased, due to a number of

factors including increased generic competition and the increated bargaining power of large

provider GPOs.  (03/16/08 Sellers Dep. 100:17-22, 103:16-20, Ex. 75; 04/24/07 Eichhorn Dep.

77:17–78:1, Ex. 22; 08/23/07 Mershimer Dep. 319:2-7, Ex. 51; 03/31/08 Sellers Dep. 354:20-

355:5, Ex. 76.)   Abbott does not dispute, however, that from 1991 through 1999 there was an

approximately annual inflationary price adjustment for the list prices or catalog prices taken by

HBS of around three to five percent, based in part on the Consumer Price Index.  (03/16/08

Sellers Dep. 100:17-22, Ex. 75; 04/24/07 Eichhorn Dep. 77:17–78:1, Ex. 22; 08/23/07

Mershimer Dep. 319:2-7, Ex. 51.)  Further responding, list prices for HPD products did not

change in 2000 and were decreased in 2001.

     43.    Abbott HPD admits that it could have at any time from 1995 until 2001 dropped
its list prices on Vancomycin.  Sellers 30b6, 3/31/08 at 577:7-22; 578:1-21.  (Lavine Decl. Exh.
89)

**RESPONSE:** Undisputed.

     44.    Despite the fact that HBS took annual list prices increases, over the period from
1991 to 2000, the HPD contract prices decreased, which, in turn, increased the disparities
between list and contract prices on HPD products.  Sellers 30b6, 3/16/08 at 103:8-21.  (Lavine
Decl. Exh. 88)

**RESPONSE:** Disputed.  Paragraph 44 does not accurately reflect the testimony cited therein.

During the time period 1991-2001, contract prices remained flat or decreased, due to a number of

factors including increased generic competition and the increased bargaining power of large

provider GPOs.  (03/16/08 Sellers Dep. 100:17-22, 103:16-20, Ex. 75; 04/24/07 Eichhorn Dep.

77:17–78:1, Ex. 22; 08/23/07 Mershimer Dep. 319:2-7, Ex. 51; 03/31/08 Sellers Dep. 354:20-

355:5, Ex. 76.)  Abbott does not dispute, however, that for the time period of 1991 through 1999

there was an approximately annual inflationary price adjustment taken by HBS for the list prices

or catalog prices of around three to five percent, based in part on the Consumer Price Index.

(03/16/08 Sellers Dep. 100:17-22, Ex. 75; 04/24/07 Eichhorn Dep. 77:17–78:1, Ex. 22; 08/23/07

Mershimer Dep. 319:2-7, Ex. 51.)  List prices for HPD products did not change in 2000 and were

adjusted down in 2001.

     45.    The increase of list prices annually was controlled by the HBS product management, who had sole responsibility for taking the annual inflationary increases in list price that caused the disparities from 1991 until 2000.  Sellers 30b6, 3/16/08 at 98:20-22; 99:1-12. Sellers 30b6, 3/16/08 at 213:4-22; 214:1-33; 215:1-19  (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed and unsupported.  Paragraph 45 does not accurately reflect the testimony

cited therein.  There was no adjustment of list prices in 2000, and the adjustment of list prices

was not the sole cause of the disparity between list and contract prices.  (*See* AF ¶ 68-76.)

Abbott does not, however, dispute that list prices for the Subject Drugs were set by HBS.

(03/16/08 Sellers Dep. 97:20-99:12, Ex. 75; 08/23/07 Mershimer Dep. 81:11-22, Ex. 51;

05/17/07 Heggie Dep. 202:6-18, Ex. 34.)  Additionally, neither Alternate Site Product Sales nor

Home Infusion Services had a role in setting List prices.  (03/16/08 Sellers Dep. 273:18-275:2,

Ex. 75; 08/23/07 Mershimer Dep. 81:11-22, Ex. 51; 05/17/07 Heggie Dep. 202:6-18, Ex. 34.)

Abbott HBS did monitor the CPI inflation index when determining list price adjustments.

(03/31/08 Sellers Dep. 354:6-355:6, Ex. 76.)  HBS set list prices without any intention to

influence Government payments under the Medicare or Medicaid programs.  (*See* AF ¶ 37-39.)

     46.    Even though the HPD HBS set list prices on all the HPD products sold by Alt Site, Abbott claims that its HPD HBS managers were not aware of information regarding HPD Alt. Site payors, including Medicare and Medicaid.  Sellers 30b6, 3/16/08 at 96:2-22, 97:1-7. (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed and unsupported.  Paragraph 46 does not accurately reflect the testimony

cited therein.  Abbott does not, however, dispute that list prices for the Subject Drugs were set by

HBS.  (03/16/05 Sellers Dep. 97:20-99:12, Ex. 75; 08/23/07 Mershimer Dep. 81:11-22, Ex. 51;

05/17/07 Heggie Dep. 202:6-18, Ex. 34.)  Additionally, neither Alternate Site Product Sales nor

Home Infusion Services had a role in setting List prices.  (03/16/08 Sellers Dep. 273:18-275:2, Ex. 75; 08/23/07 Mershimer Dep. 81:11-22, Ex. 51; 05/17/07 Heggie Dep. 202:6-18, Ex. 22.)  Abbott HBS did monitor the CPI inflation index when determining list price adjustments.  (3/31/08 Sellers Dep. 354:6-355:6, Ex. 76.)   Furthermore, Abbott HBS's decisions were not made based on Alternate Site payors, including Medicare and Medicaid.  (03/16/08 Sellers Dep. 97:2-7, Ex. 75.)  HBS set list prices without any intention to influence Government payments under the Medicare or Medicaid programs.  (*See* AF ¶ 37-39.)

47.     The pricing guidelines implemented by Abbott HPD in 2001, which required list price to be set at 5% above its real average wholesale price is the same policy Abbott's Pharmaceutical Products division had maintained since before 1991.  Sellers 30b6 Exh. 33 & 34 (Lavine Decl. Exh. 73 & 74)

**RESPONSE:**  Abbott objects to paragraph 47 to the extent that it references issues relating to Abbott's Pharmaceutical Products Division, which is a separate division of Abbott.  PPD products are almost exclusively branded drugs and are not at issue in this case.  As the record in this case plainly shows, the Government has long understood that the pricing of branded drugs (like those marketed and sold by PPD) is markedly different than that for generic drugs (like the Subject Drugs here).  (*See* C. Br. at 1-3.)  For these reasons, the business practices within PPD are irrelevant to this case and cannot be considered in evaluating summary judgment.  *See, e.g., Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003) ("This evidence was not admissible and could not be considered in the summary judgment analysis"); *Horne v. City of Boston*, 509 F. Supp. 2d 97, 111 n.19 (D. Mass. 2007) ("A court will not consider inadmissible evidence in ruling on a motion for summary judgment.") (citation omitted).

Subject to and without waiving these objections, Abbott does not dispute that the list price for PPD's branded drugs is approximately 5% above the Wholesale Acquisition Cost for those products.  Further responding, Abbott does not dispute that, as part of an internal review of

HPD pricing undertaken in and around 2000 (and described in AF ¶ 67-76), Abbott developed and implemented a practice of more closely aligning its list price for HPD products with the Wholesale Acquisition Cost for those products.  Pursuant to that practice, and with certain exceptions, the list price for HPD products is set approximately 5% over the Wholesale Acquisition Cost.  Moreover, Abbott does not dispute that list prices for the Subject Drugs were set by HBS.  (03/16/08 Sellers Dep. 97:20-99:12, Ex. 75; 08/23/07 Mershimer Dep. 81:11-22, Ex. 51; 05/17/07 Heggie Dep. 202:6-18, Ex. 34.)  Additionally, neither Alternate Site Product Sales nor Home Infusion Services had a role in setting List prices.  (03/16/08 Sellers Dep. 273:18-275:2, Ex. 75; 08/23/07 Mershimer Dep. 81:11-22, Ex. 51; 05/17/07 Heggie Dep. 202:6-18, Ex. 34.)  HBS set list prices without any intention to influence Government payments under the Medicare or Medicaid programs.  (*See* AF ¶ 37-39.)

48.     By 2001, a large disparity between contract price and list price existed for a number of HPD products, including the Subject Drugs.  Sellers 30b6, 3/16/08 at 98:11-15; Ormond Decl., Appendix A.  (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed.  Paragraph 48 does not accurately reflect the testimony cited therein. Record evidence establishes that for certain products there was very little disparity between contract price and list price.  (03/16/08 Sellers Dep. 53:19-54:1, Ex. 75.)  Abbott does not dispute, however, that in 2000, an inadvertent disparity existed between contract prices and list prices of certain products due, in part, to the decline in contract prices due to generic competition and other factors versus an annual inflationary price adjustment on the list prices.  (03/16/08 Sellers Dep. 58:21-60:3, Ex. 75.)  The notion that any of these disparities was "large" is overstated, however, since the disparities typically amounted to only a few dollars.  (03/06/09 Young Expert Rep. ¶¶ 64-65 and Figure 14, Ex. 94.)

Abbott also objects to the Ormond declaration as inadmissible.  Plaintiffs have never disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

\*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due"*); see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed).

     49.     There was no HPD HBS business reason for the existence of large disparities or "spreads" on the HPD products, including the Subject Drugs.  Sellers 30b6, 3/16/08 at 98:16-19. (Lavine Decl. Exh. 88)

**RESPONSE:**  Disputed.  Paragraph 49 does not accurately reflect the testimony cited therein.

Record evidence establishes that for certain products there was very little disparity between

contract price and list price.  (03/16/08 Sellers Dep. 53:19-54:1, Ex. 75.)  Record evidence also

establishes that there were numerous business reasons for maintaining a relatively high list price,

including capturing higher margins on non-contract sales and encouraging customers to enter

into contracts with Abbott; the business reason for having lower contract prices was to compete

with other manufacturers.  (03/16/08 Sellers Dep. 213:12-214:12, 216:7-10, Ex. 75.)  Abbott

further disputes the use of the term "spreads" when comparing list price and contract prices as

vague and confusing.  Moreover, the notion that any of these disparities was "large" is overstated

since the disparities typically amounted to only a few dollars.  (03/06/09 Young Expert Rep.

¶¶ 64-65 and Figure 14, Ex. 94).

50.     The HPD HBS management that controlled prices did not monitor the "differential," or spread, between list price and contract price from 1991 to 1999.  Sellers 30b6, 3/16/08 at 213:4-22; 214:1-33; 215:1-19.  (Lavine Decl. Exh. 88)

**RESPONSE:**  Undisputed, but Abbott objects to the use of the term "spread" when comparing

list price and contract prices as vague and confusing.

51.     Abbott testified that HPD HBS managers from 1991 until 1999 were not trying to reconcile the difference, or "spread" between list price and contract price.  Sellers 30b6, 3/16/08 at 98: 16-22; 99:5-22; 100:1-6; 215:21-22; 216:2-18.  (Lavine Decl. Exh. 88)

**RESPONSE:**  Disputed.  Paragraph 51 does not accurately reflect the testimony cited therein.

Abbott further disputes the use of the term "spread" when comparing list price and contract

prices as vague and confusing.  Abbott does not dispute, however, that Abbott made separate

adjustments to the list price and contract price of certain product lines that contributed to an

inadvertent disparity between the two over time.  (03/16/08 Sellers Dep. 213:17-215:19, Ex.75.)

52.     The HPD HBS had sole responsibility for taking the annual inflationary increases in list price from 1991 until 2000 that contributed to the growing disparities between contract and list prices on HPD products.  Sellers 30b6, 3/16/08 at 98:20-22; 99:1-12.  (Lavine Decl. Exh. # 88)

**RESPONSE:**  Disputed.  *See* Response to ¶ 45.

53.     Abbott testified that HPD HBS maintained HPD list prices to have a price to use to sell to non-contract customers.  Abbott further testified that its managers setting these prices from 1991 until 1999 did not focus on the large disparities or attempt to reconcile them.  Sellers 30b6, 3/16/08 at 98:16-22; 99:5-22; 100:1-6; 215:21-22; 216:2-18.  (Lavine Decl. Exh. 88)

**RESPONSE:**  Disputed.  Paragraph 53 does not accurately reflect the testimony cited therein.

Record evidence establishes that for certain products there was very little disparity between

contract price and list price.  (03/16/08 Sellers Dep. 53:19-54:1, Ex 75.)  Record evidence also

establishes that there were numerous business reasons for maintaining a relatively high list price,

including capturing higher margins on non contract sales and encouraging customers to enter

into contracts with Abbott; the business reason for having lower contract prices was to compete with other manufacturers.  (03/16/08 Sellers Dep. 213:12-214:12, 216:7-10, Ex. 75.)  Abbott further disputes the use of the term "spreads" when comparing list price and contract prices as vague and confusing.  Moreover, the notion that any of these disparities was "large" is overstated since the disparities typically amounted to only a few dollars.  (03/06/09 Young Expert Rep. ¶¶ 64-65 and Figure 14, Ex. 94.)  Abbott also does not dispute that it sold certain products at list price to non contract customers, and that one of the reasons for maintaining a list price was to encourage customers to enter into negotiated contracts with Abbott.  (03/16/08 Sellers Dep. 213:12-214:12, 216:7-10, Ex. 75.)

54.     After undertaking an evaluation in 2001, Abbott HPD determined that other than to capture elevated prices on non-contract sales, there was no business purpose for having a list price that was one hundred, two hundred, three hundred, or up to a thousand percent higher than what the contract price was, and, in 2001, Abbott HPD decided it should bring its list prices more in line with its contract prices.  Sellers 30b6, 3/16/08 at 98:11-19; 216:1-19; 215:21-22.  (Lavine Decl. Exh. 88)

**RESPONSE:**  Disputed.  Paragraph 54 does not accurately reflect the testimony cited therein.  Record evidence establishes that for certain products there was very little disparity between contract price and list price.  (03/16/08 Sellers Dep. 53:19-54:1, Ex. 75.)  Record evidence also establishes that there were numerous business reasons for maintaining a relatively high list price, including capturing higher margins on non contract sales and encouraging customers to enter into contracts with Abbott; the business reason for having lower contract prices was to compete with other manufacturers.  (03/16/08 Sellers Dep. 213:12-214:12, 216:7-10, Ex. 75.)  Abbott further disputes the use of the term "spreads" when comparing list price and contract prices as vague and confusing.  Moreover, the notion that any of these disparities was "large" is overstated since the disparities typically amounted to only a few dollars.  (03/06/09 Young Expert Rep. ¶¶ 64-65 and Figure 14, Ex. 94).

55.     As early as June 1991, the HPD Alt Site Vice President Donald Robertson conceded sending a memo to the then HPD President Kris Kringel, among others, that if the government abandons AWP as a good indicator of product acquisition cost, it would have significant implications for HPD's Alt Site business.  Mr. Robertson sent the memo to the HPD President to keep him informed. Abbott response to U.S. Second RFAs 49; Robertson 9/13/07 Dep at 37:11-25; 38:1-4;169:15-25; 170:1-11; 171:1-25; 172: 1-25;174:23-25; 175:1-4 & Robertson Exh. 2.  (Lavine Decl. Exh. 83, 100 & 127)

**RESPONSE:** Disputed.  Plaintiffs have selectively and incompletely cited and/or paraphrased Exhibit 2.  Abbott does not dispute that former employee Donald Robertson assumed that he sent the memo marked as Robertson Exhibit 2.  Mr. Robertson did not testify that he had actual knowledge that he sent the memo, nor could he recall writing the memo.  Abbott also does not dispute that Mr. Robertson indicated that it was his job at the time to keep his supervisor informed.  (09/13/07 Robertson Dep. 171:18-25, Ex. 65.)  Abbott disputes that plaintiffs have established that Exhibit 2 is all one document.  (09/13/07 Robertson Dep. 176:20-184:15, Robertson Ex. 2 & Robertson Ex. 3, Ex. 65.)  It is undisputed, however, that, during the claims period 1991-2001, the Government did not view AWP as a "good indicator of product acquisition cost."  To the contrary, the Government understood that the compendia AWP was unrelated to and indeed far higher than actual average market prices.  (*See* C. Br. at 1-18)

56.     After receiving word of the 2000 HHS-OIG subpoena, Richard Gonzalez, HPD President, requested in-house counsel review and investigate the disparities between list prices and contract prices hoping it would "reduce the controversy."  As a result, beginning in 2000, Abbott evaluated its list pricing for HPD products, including the Subject Drugs.  Sellers 30b6, 3/16/08 at 48:22; 49:1; 52:2-22; 53:1-22; 54:1-7; 57:1-4; 68:1-5. 72:5-22; 73: 1-23; Sellers 30b6 Exh. 35-36; Gonzalez Dep. 123:15-22; 124; 125:1-14; 134:3-11. (Lavine Decl. Exh. 75, 76, 88 102, & 102)

**RESPONSE:** Disputed and unsupported.  Paragraph 56 does not accurately quote or reflect the witnesses' testimony cited therein.  Beginning in or about late 2000, Abbott undertook a comprehensive review of pricing practices within HPD, and consequently discovered the difference that had gradually grown over the years between list prices and negotiated contract prices for HPD products.  (03/16/08 Sellers Dep. 50:11–16; 60:14–17; 68:4–5; 74:5–10, Ex. 75.)

This disparity was unintentional and was not designed by Abbott to influence Government

payment levels under the Medicare or Medicaid programs.  (03/16/18 Sellers Dep. 58:21–59:13,

59:19–60:3, Ex. 75.)  Disputed further because Abbott's review included consideration of many

factors, including its own business, the industry generally, and the overall discourse in Congress

and elsewhere about pharmaceutical issues.  Only after considering the totality of the

circumstances, Abbott decided to reduce the List prices for certain HPD products, which were

made effective in or about May 2001.  (03/16/08 Sellers Dep. 66:16–17, 67:13–15, 69:6–14,

70:9–12, 71:5–10. 80:13–81:2, Ex. 75.)

57.     In April 2001, Abbott lowered its list prices that it both reported in its price
catalog and that it reported to the pricing compendia.  The List price changes included drastic
reduction of up to 70 to 90 percent in the catalog and compendia reported list prices for the
Subject Drugs.  (Sellers 30b6, 3/16/08 at 66:1-10 & Sellers 30b6 Exh. 34-36; Sellers 30b6,
3/31/08 at 662:6-22; 663:1-17 & Sellers 30b6 Exh. 35) (Lavine Decl. Exh. 74, 75, 76, 88 & 89)

**RESPONSE:**  Disputed and unsupported.  Paragraph 57 does not accurately reflect the

witnesses' testimony cited therein.  (03/16/08 Sellers Dep. 66:16–17; 67:13–15; 69:6–14; 70:9–

12; 71:5–10; 80:13–81:2, Ex. 75.)  Abbott does not dispute that in or about May 2001, certain

changes in list prices were made effective for certain HPD products and that those prices were

reported to the compendia.

58.     Abbott HPD's public explanation for its 2001 List price changes was that it
wanted to bring its list prices more in line with prevailing market prices.  Mr. Gonzalez made the
final decision to change the prices due to Congressional inquiries and press concerns.  Sellers
30b6, 3/16/08 at 81:13-16 & Sellers 30b6 Exhs. 34-36; Gonzalez Dep. 123:15-22; 124; 125:1-14;
327:3-22; 328:1-6.  (Lavine Decl. Exhs. 74, 76, 88, 102)

**RESPONSE:**  Disputed.  Abbott disputes the first sentence of paragraph 58 to the extent it

implies that Abbott's public reason was somehow different from its actual reason.  Abbott

disputes the second sentence of paragraph 58 because it does not accurately reflect the testimony

cited therein.  As is apparent from reading Mr. Gonzalez's cited testimony, he testified that that

he ultimately approved a recommendation to lower certain list prices for many reasons other than

the reason stated in paragraph 58. (*See also* 03/16/08 Sellers Dep. 66:16–17; 67:13–15; 69:6–14; 70:9–12; 71:5–10; 80:13–81:2, Ex. 75.)

59.     Abbott claims that it did not lower its list prices to more properly align its list prices with its prevailing contract prices prior 2001 because Abbott had not determined that these disparities were an issue until the fall of 2000.  Sellers 30b6, 3/16/08 at 68:1-5.  (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed and unsupported.  Beginning in or about late 2000, Abbott undertook a

comprehensive review of pricing practices within HPD, and consequently discovered the

difference that had gradually grown over the years between List prices and negotiated contract

prices for HPD products.  (03/16/08 Sellers Dep. 50:11–16; 60:14–17; 68:4–5; 74:5–10, Ex. 75.)

This disparity was unintentional and was not designed by Abbott to influence Government

payment levels under the Medicare or Medicaid programs.  (03/16/08 Sellers Dep. 58:21–59:13;

59:19–60:3, Ex. 75.)  Abbott's review included consideration of many factors, including its own

business, the industry generally, and the overall discourse in Congress and elsewhere about

pharmaceutical issues.  Only after considering the totality of the circumstances, Abbott decided

to reduce the List prices for certain HPD products, which were made effective in or about May

2001.  (03/16/08 Sellers Dep. 66:16–17; 67:13–15; 69:6–14; 70:9–12; 71:5 – 10; 80:13–81:2, Ex.

75.)

60.     Abbott's in-house counsel assigned responsibility for the 2000 pricing review to Michael Sellers.  The review took 5 months to complete and determined that for certain Abbott products there were large differences between List and Contract prices.  Sellers 30b6, 3/16/08 at 50:5-21; 52:1-22; 53:1-22; 54:1-7  (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed.  Mr. Sellers testified contrary to the alleged undisputed facts in

paragraph 60.  For example, Mr. Sellers testified that for certain products there was no disparity.

(03/16/08 Sellers Dep. 54:17-55:7; 96:1-17, Ex. 75.)  Further disputed, because the notion that

any of these disparities was "large" is overstated since the disparities typically amounted to only

a few dollars.  (03/06/09 Young Expert Rep. ¶¶ 64-65 and Figure 14, Ex. 94.)

61.     The analysis also demonstrated that less than one percent of Abbott's sales were actually at list price in 2001.  Prior to 2001, Abbott had never analyzed what percentage of the sales on the Subject Drugs were made at list price.  Sellers 30b6, 3/16/08 at 54:17-20; 55:3-7; 57:1-22; 58:1-19; 106:22; 107:1-22; Sellers 30b6, 3/31/08 at 585:13-17, and Sellers 30b6 Exh. 33 & 34.  (Lavine Decl. Exhs. 73, 74, 88, 89)

**RESPONSE:** Disputed and unsupported in that paragraph 61 does not accurately reflect the

witnesses' testimony cited therein.  For example, Mr. Sellers testified that, while he was certain

that a percentage of sales at list price existed, he could not remember the amount of that

percentage.  (03/16/08 Sellers Dep. 57:19-20; 58:12-114, Ex. 75.)  Abbott does not dispute,

however, that it sold certain products at list price to non contract customers, and that one of the

reasons for maintaining a list price was to encourage customers to enter into negotiated contracts

with Abbott.  (03/16/08 Sellers Dep. 213:12-214:12; 216:7-10, Ex. 75.)

62.     According to Abbott's sales data, with a single exception, less than two tenths of one percent of Abbott's sales were at list price each year from 1991 until 2001.  (Dew Decl. ¶¶ 7, 8, 9) (Lavine Decl. Exh. # 2)

**RESPONSE:** Objection to the Dew declaration as inadmissible.  Plaintiffs have never disclosed

Mr. Dew as a expert, his declaration is not the subject of proper expert testimony, and Abbott did

not have the opportunity to depose him.  Abbott also does not have Mr. Dew's underlying

calculations that support statements made in his declaration.  Abbott disputes all factual

statements made in Mr. Dew's declaration.  The Court should strike this out-of-time testimony.

*Lohnes v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony

because the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due"); s*ee e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Mr. Dew incorrectly represents

in paragraph 8 of his declaration that he analyzed sales at list price.  In fact, his analysis

determined the percentage of sales of Abbott's products at the published AWP.

63.    In 2001, Abbott lowered its HPD generic list prices, including the prices on the
Subject Drugs, because it wanted to more properly align its list prices with its prevailing contract
prices.  Sellers 30b6, 3/16/08 at 67:6-21.  (Lavine Decl. Exh. # 88)

**RESPONSE:** Disputed and unsupported.  Record evidence establishes other factors that caused

or contributed to Abbott's decision to change certain List prices in 2001, including its own

business, the industry generally, and the overall discourse in Congress and elsewhere about

pharmaceutical issues.  (*See e.g.*, 06/03/08 Gonzalez Dep. 123:15-125:14, Ex. 28; 03/16/09;

Sellers dep. 66:16-17; 67:13-15; 69:6-14; 70:9-12; 71:5-10; 80:13-81:2, Ex. 75.)

64.    In 2001, the decision to lower its HPD generic list prices, including the prices on
the Subject Drugs, because Abbott believed it was the right time and the right thing to do.
Sellers 30b6, 3/16/08 at 67:6-21.  (Lavine Decl. Exh. # 88)

**RESPONSE:** Undisputed that the allegation in paragraph 64 accurately paraphrases Mr.

Gonzalez's testimony, but paragraph 64 is incomplete.  Record evidence establishes other factors

that caused or contributed to Abbott's decision to lower certain List prices in 2001, including its

own business, the industry generally, and the overall discourse in Congress and elsewhere about

pharmaceutical issues.  (*See e.g.*, 06/03/08 Gonzalez Dep. 123:15-125:14, Ex. 28; 03/16/09;

Sellers dep. 66:16-17; 67:13-15; 69:6-14; 70:9-12; 71:5-10; 80:13-81:2, Ex. 75.)

65.    By 2000, Abbott knew that there was a significant level of discourse within the
U.S. Congress, as well as press write-ups, concerning the issue of disparities between list prices
and contract prices on pharmaceuticals.  Sellers 30b6, 3/16/08 at 69:1-22;70:1-22; 71:1-10
(Lavine Decl. Exh. 88)

**RESPONSE:** Disputed.  Paragraph 65 does not accurately reflect the witnesses' testimony cited

therein.  As is apparent from Mr. Sellers's cited testimony, he testified only as to what he could

remember, which was that in or about 2000 "[t]here was quite a bit of discourse, noise, whatever

you want to call it regarding this issue both in Congress and in the press and so on" and that he

thought "there was a lot of discussion going on in Congress around the fall of 2000 related to a

budget update and so on as well as, you know, more and more write-ups about the investigations

and so on and so forth."  (03/16/08 Sellers Dep. 69:6-9, Ex. 65.)

66.     In 2000, Abbott received a letter from Congressman Fortney "Pete" Stark
concerning Abbott's AWP spreads and price reporting.  Congressman Stark urged Abbott to stop
reporting inflated prices and asked that Abbott's CEO share the letter with Abbott's Board of
Directors and Corporate Integrity Committee.  Abbott never responded to the Stark Letter.  U.S.
Second Set of Requests for Admission (Second RFAs) to Abbott 6 & 7; Abbott response to U.S.
Second RFAs 6 & 7; Letter from Congressman Stark (Lavine Decl. Exh. 66, 127, 128)

**RESPONSE:** Disputed.  Paragraph 66 does not accurately reflect the contents of the exhibits

cited therein.  Also, the discovery responses cited in support of paragraph 66 were made subject

to objection.  Abbott does not dispute, however, that it received a letter from Congressman Stark,

but the content of that document speaks for itself.  It is also undisputed that Abbott was not

required to and did not respond to Congressman Stark's letter.

67.     Other than concern about Congressional scrutiny and press coverage, coupled
with Abbott's desire to align its list prices with its actual contract prices, no other factor caused
or contributed to Abbott's decision to lower its prices in 2001.  Sellers 30b6, 3/16/08 at 67:6-21;
68-71; 72:5-11.  (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed and unsupported.  Record evidence in addition to those noted in

paragraph 67 establishes other factors that caused or contributed to Abbott's decision to lower

certain List prices in 2001, including its own business, the industry generally, and the overall

discourse in Congress and elsewhere about pharmaceutical issues.  (*See e.g.*, 06/03/08 Gonzalez

Dep. 123:15-125:14 Ex. 28; 03/16/09; Sellers dep. 66:16-17; 67:13-15; 69:6-14; 70:9-12; 71:5-

10; 80:13-81:2, Ex. 75.)

68.     In 2001, Abbott HPD adopted new "pricing guidelines" which established a policy under which list prices were set at 5% above its actual WAC.  Sellers 30b6, 3/16/08 at 243:14-22 & Sellers 30b6 Exhs. 15, 33-36.  (Lavine Decl. Exhs. 69, 73, 74, 75, 76, 88)

**RESPONSE:** Disputed and unsupported.  Paragraph 65 does not accurately reflect the testimony cited therein.  Mr. Sellers's cited testimony is limited to a division of Abbott not at issue in this case: "Q. On your PPD discussion it says 'Standard WAC prices at five percent below list.' Do you see that?  A. Uh-huh.  Q. What did that mean?  A. This has been a few years. I think basically that their wholesale acquisition cost was five percent below what they publish as their list price, yes."  (03/16/08 Sellers Dep. 243:14-22, Ex. 75.)  Further disputed in that record testimony identifies additional amounts at which list prices could be set.  (03/16/08 Sellers Dep. 267:17-22, Ex. 75.)

Abbott does not dispute, however, that, as part of an internal review of HPD pricing undertaken in and around 2000 (and described AF ¶ 67-76), Abbott developed and implemented a practice of more closely aligning its list price for HPD products with the Wholesale Acquisition Cost for those products.  Pursuant to that practice, and with certain exceptions, the list price for HPD products is set approximately 5% over the Wholesale Acquisition Cost.

69.     After the price change in 2001 and adoption of Abbott's revised pricing policy, Abbott HPD's defined WAC in 2001 to mean "the price of a product when sold to a drug wholesaler who is eligible for chargeback processing after the end sale to a contract provider." Sellers 30b6, 3/16/08 at 262:15-22; 263; 264:1-16 & Sellers 30b6 Exh. 15  (Lavine Decl. Exhs. 69, 88)

**RESPONSE:** Disputed and unsupported.  The first part of paragraph 69 does not accurately reflect the testimony cited therein.  Abbott does not dispute, however, that paragraph 69 accurately reflects the quoted language from the cited exhibits.  Moreover, as part of an internal review of HPD pricing undertaken in and around 2000 (and described AF ¶ 67-76), Abbott developed and implemented a practice of more closely aligning its list price for HPD products with the Wholesale Acquisition Cost for those products.  Pursuant to that practice, and with

certain exceptions, the list price for HPD products is set approximately 5% over the wholesale

acquisition cost.

70.     The pricing guidelines implemented by Abbott HPD in 2001, which required list price to be set at 5% above its real average wholesale price is the same policy Abbott's separate Pharmaceutical Products division had maintained since before 1991.  Sellers 30b6 Exh. 33 & 34. (Lavine Decl. Exh. 73)

**RESPONSE:**  Abbott objects to paragraph 70 to the extent that it references issues relating to

Abbott's Pharmaceutical Products division, which is a separate division of Abbott.  PPD

products are almost exclusively branded drugs and are not at issue in this case.  As the record in

this case plainly shows, the Government has long understood that the pricing of branded drugs

(like those marketed and sold by PPD) is markedly different than that for generic drugs (like the

Subject Drugs here).  (*See* C. Br. at 1-3.)  For these reasons, the business practices within PPD

are irrelevant to this case and cannot be considered in evaluating summary judgment.  *See, e.g.,*

*Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003) ("This evidence was not

admissible and could not be considered in the summary judgment analysis"); *Horne v. City of*

*Boston*, 509 F. Supp. 2d 97, 111 n.19 (D. Mass. 2007) ("A court will not consider inadmissible

evidence in ruling on a motion for summary judgment.") (citation omitted).

Subject to and without waiving these objections, Abbott disputes paragraph 70 because it

does not accurately reflect the exhibits cited therein.  Abbott does not dispute, however, that the

list price for PPD's branded drugs is approximately 5% above the Wholesale Acquisition Cost

for those products.  Further responding, Abbott does not dispute that, as part of an internal

review of HPD pricing undertaken in and around 2000 (and described AF ¶ 67-76), Abbott

developed and implemented a practice of more closely aligning its list price for HPD products

with the Wholesale Acquisition Cost for those products.  Pursuant to that practice, and with

certain exceptions, the list price for HPD products is set approximately 5% over the Wholesale

Acquisition Cost.

71.     Abbott changed it prices for Vancomycin for a brief period in 1995.  Sellers 30b6, 3/31/08 at 425:5-22; 426:1 & Sellers 30b6 Exh. 27, 28 & 29.  (Lavine Decl. Exh. 70, 71, 72, 88)

**RESPONSE:**  Undisputed, but incomplete.  The reduction of list prices for a few NDCs of

Vancomycin in March 1995 was changed, among other reasons, because HBS's practice is to

make changes to list price only in accordance with the annual cycle and these changes were

outside that practice.  Thus, the changes were reversed in or about May 1995.  (AF ¶ 78-80.)

72.     Abbott's List price for its 1-gram Flip Top Vial Vancomycin, NDC 00074-6533-01, in its 1994 Price Catalog was $50.90.  (Lavine Decl. Exh. 7, p. 22)

**RESPONSE:**  Undisputed.

73.     The average indirect price to pharmacies for Abbott's 1-gram Flip Top Vial Vancomycin, NDC 00074-6533-01 in 1995Q2 was $6.57407.  Declaration of Pat Ormond, Schedule B4, page 15.

**RESPONSE:**  Objection to the Ormond declaration as inadmissible.  Plaintiffs have never

disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony,

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due");  *see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Abbott's expert, Steven J.

Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan

limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain

pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as

providers who purchased directly from Abbott or directly from a wholesaler or retailer at an

unknown price.  (03/06/09 Young Expert Report 23, Ex. 94.)  Dr. Duggan's work cannot form

the basis of any reliable calculations, because it is inherently defective and should be struck on

*Daubert* grounds.  (*See* Dkt. No. 6177.)

74.     The AWP published in the 1995 Red Book for a 1-gram Flip Top Vial
Vancomycin, NDC 00074-6533-01 was $604.44 for a package of 10 which is the equivalent of
$60.44 for a single 1-gram Flip Top Vial.  The AWP published in the NDDF for a 1-gram Flip
Top Vial Vancomycin, NDC 00074-6533-01 (with an effective date of 4/4/94) was $60.44.
Declaration of Pat Ormond, Schedule B3, page 4.  (Lavine Decl. Exh. 34, page 27)

**RESPONSE:**  Objection to the Ormond declaration as inadmissible.  Plaintiffs have never

disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony,

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due"); *see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed). Abbott

does not dispute that the paragraph sets forth an accurate quotation of the cited exhibit.

75.     On March 20, 1995, Abbott employees internally agreed to change the "list
(catalog)" price on three sizes of Abbott's vancomycin products, including its 1-gram Flip Top
Vial Vancomycin, NDC 00074-6533-01.  The internal e-mail used to communicate the
agreement indicated that Redbook and Medi-Span should be notified of the price changes
"ASAP" and that Redbook and Medi-Span "are the sources for creating the AWP that is
important to Alternate Site."  Sellers 30b6 Exh. 25 (Lavine Decl. Exh. 129)

**RESPONSE:**  The first sentence of paragraph 75 is undisputed, but incomplete.  The list prices

for a few NDCs of Vancomycin in March 1995 were changed, among other reasons, because

HBS's practice is to make changes to List price only in accordance with the annual cycle and

these changes were outside that practice.  Thus, the changes were reversed in or about May 1995.

(AF ¶ 78-80.)  As to the second sentence of paragraph 75, Abbott does not dispute that the

sentence sets forth an accurate quotation of the cited exhibit.  Further answering, however,

Abbott disputes any allegation that list price changes were made to benefit the Alternate Site

business.  HBS (whose hospital customers were not reimbursed based on AWP) controlled list

prices, and it set those prices without input from, or influence by, Alternate Site.  (AF ¶ 7-8, 37-

39.)  Abbott's list prices were set without any intention to influence Government payments under

Medicare and Medicaid.  (*Id.* ¶ 37-39.)

76.     Abbott employees prepared a spreadsheet which estimated the AWP that would
result from a "suggested list price" of $15.00 by multiplying the list price by 1.1875 (identified
as "awp as % of list").  Abbott employees thereby estimate that the AWP that would result from
their new list of $15.00 would be $17.81257.  (Lavine Decl. Exh. 55)

**RESPONSE:**  Disputed.  Paragraph 76 contains no evidentiary support for who created the cited

document therein, nor why the document was created.  Abbott does not dispute that paragraph 76

correctly quotes the document cited therein.

77.     On March 8, 1995, Abbott reported to Red Book, First DataBank and MediSpan that it List price for its 1-gram Flip Top Vial Vancomycin, NDC 00074-6533-01, was $15.00, with an effective date of April 3, 1995.  (Lavine Decl. Exh. 56)

**RESPONSE:**  Undisputed, but incomplete.  The list prices for a few NDCs of Vancomycin in

March 1995 were changed, among other reasons, because HBS's practice is to make changes to

List price only in accordance with the annual cycle and these changes were outside that practice.

Thus, the changes were reversed in or about May 1995.  (AF ¶ 78-80.)

78.     On May 30, 1995, Abbott reported to Red Book, First DataBank and MediSpan that its List price for its 1-gram Flip Top Vial Vancomycin, NDC 00074-6533-01, was $529.40 for a package of 10, equaling a price of $52.94 per 1-gram vial, with an effective date of April 3, 1995.  (Lavine Decl. Exh. 58)

**RESPONSE:**  Undisputed, but incomplete.  The list prices for a few NDCs of Vancomycin in

March 1995 were changed, among other reasons, because HBS's practice is to make changes to

List price only in accordance with the annual cycle and these changes were outside that practice.

Thus, the changes were reversed in or about May 1995.  (AF ¶ 78-80.)

79.     Abbott's List price for its 1-gram Flip Top Vial Vancomycin, NDC 00074-6533-01, in its 1995 Price Catalog was $52.94.  (Lavine Decl. Exh. 8, p. 22)

**RESPONSE:**  Undisputed.

80.     The AWP published in the 1996 Red Book for a 1-gram Flip Top Vial Vancomycin, NDC 00074-6533-01 was $628.66 for a package of 10 which is the equivalent of $62.87 for a single 1-gram Flip Top Vial.  (Lavine Decl. Exh. 35, p. 29) The AWP published in the NDDF for a 1-gram Flip Top Vial Vancomycin, NDC 00074-6533-01 (with an effective date of 4/3/95) was $62.87.  The average indirect price to pharmacies for Abbott's 1-gram Flip Top Vial Vancomycin, NDC 00074-6533-01 in 1996Q2 was $6.22023.  Decl. of Pat Ormond, Schedule B4, pages 4 & 15.  (Lavine Decl. Exh. 1)

**RESPONSE:**  Objection to the Ormond declaration as inadmissible.  Plaintiffs have never

disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony,

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery" and noting that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at *5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late disclosure after the discovery period has ended and just 8 days before summary judgment motions were due"); *see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's expert witness disclosure at the summary judgment stage because it was untimely filed).

Subject to and without waiving any objections, disputed.  Abbott's expert, Steven J. Young, detailed the errors in Dr. Duggan's average prices.  Mr. Young opines that Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers.  Dr. Duggan failed to consider prices paid by other customers such as providers who purchased directly from Abbott or directly from a wholesaler or retailer at an unknown price.  (03/06/09 Young Expert Report 23, Ex. 94.)  Dr. Duggan's work cannot form the basis of any reliable calculations, because it is inherently defective and should be struck on *Daubert* grounds.  (*See* Dkt. No. 6177.)  It is not disputed that the AWP published in the 1996 Red Book and the NDDF was $62.87.  Further responding, Abbott did not set or report an AWP or "Suggested AWP" for the Subject Drugs to the pricing compendia.  (03/16/08 Sellers Dep. 204:5-18, Ex. 75; 03/31/08 Sellers Dep. 370:4-14, Ex. 76; 05/30/07 Cicerale Dep. 87:6-8, 137:17-20, 159:20-23, Ex. 13.)

81.    A memorandum drafted by a reimbursement manager at HPD Alt Site warned "[h]aving a published list price which is high allows a provider to bill at that list price.  Some customers who were buying our Vanco at a deep discount off list may ask about the price change."  Sellers 30b6 Exh. 30 (4/26/95 Heggie Memo)  (Lavine Decl. Exh. 130)

**RESPONSE:** Abbott objects to the term "warned" as argumentative and not supported by the record. Subject to and without waiving its objections, Abbott does not dispute that paragraph 81 accurately quotes from the cited exhibit.

## ABBOTT'S PRICE REPORTING TO THE COMPENDIA

82. When Abbott received civil investigative demands from the Department of Justice regarding its HPD list pricing on the Subject Drugs Abbott HPD did not ask for information or submit questions of the Government concerning the investigative demands. Sellers 30b6, 3/31/08 at 390:2-12 (Lavine Decl. Exh. 89)

**RESPONSE:** Disputed. When Abbott received civil investigative demands, Abbott provided the documents and data requested.

83. Since 1991, Abbott has routinely reported list prices to three compendia: First Databank; Redbook; and Medispan. Sellers 30b6, 3/16/08 at 141:10-19; 142:1-16 (Lavine Decl. Exh. 1, 15-29, 88, 41-58)

**RESPONSE:** Undisputed.

84. Abbott provided its list prices to the compendia as opposed to some other price because it only reported its highest published prices. Sellers 30b6, 3/16/08 at 94:4-22; 95:1-3; 261:22; 262:1-14. (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed. Abbott accurately reported its list prices for the Subject Drugs to the compendia because it believed, in good faith, that this was the information being requested. In fact, when Abbott inquired of First DataBank about what prices to report, FDB representative Kay Morgan (who was responsible for the pricing information that FDB published) stated that FDB expected Abbott to report its highest, undiscounted price. (AF ¶ 47-48.)

85. Jerrie Cicerale was Abbott HPD's point of contact with the compendia from 1991 until 2001, and if she provided communications to any pricing compendia it can be authenticated as reflecting Abbott's list pricing, as reported in its catalogs. Sellers 30b6, 3/16/08 at 95: 4-9; 113:21-22; 114:1-6; 159:16-22; 160:1-16; 162:1-11; Cicerale 5/30/07 at 59:20-25; 60:1-4. (Lavine Decl. Exh. 88, 107)

**RESPONSE:** Abbott objects to the term "authenticated" to the extent it calls for a legal conclusion. Subject to and without waiving any objection, disputed and unsupported. Paragraph

85 does not accurately reflect the testimony cited therein.  Abbott does not dispute, however, that

Ms. Cicerale was employed in HBS (whose hospital customers were not reimbursed based on

AWP), and that one of her duties during her employment in this position was to report prices to

the compendia.  (AF ¶ 7-8.)

86.     Jerrie Cicerale viewed the catalogs informing about list price that HPD published
as having no purpose and as constituting the equivalent of "junk mail."  Cicerale 5/30/07 295:11-
25; 296:1-5 (Lavine Decl. Exh. 107)

**RESPONSE:**  Disputed and unsupported.  Paragraph 86 does not accurately reflect the testimony

of former employee Jerrie Cicerale.  Ms. Cicerale testified that she did not understand why

Abbott sent catalogs with List prices to customers who had contracts with Abbott and thus paid

contract prices.  Abbott disputes the materiality of the statements in paragraph 86.  Further

responding, the record in this case shows that the Government has known since at least the early

1990's that multiple-source generic products were available in the marketplace at discounts well

below any published undiscounted prices (such as list price or AWP).  (*See* C. Br. at 1-3.)

Indeed, the Government had specific knowledge – acquired through its own invoice studies

among other things – that the Subject Drugs at issue in this matter were available in the

marketplace at discounts of 75% to over 90% below AWP.  (CF ¶ 3; AF ¶ 83; SOF ¶ 52-54.)

87.     HPD employees knew that the price reporting compendia used Abbott's list prices
to determine AWPs.  Heggie 5/17/07 Dep. at 36:2-7  (Lavine Decl. Exh. 103)

**RESPONSE:**  Disputed.  According to Michael Sellers, Abbott's 30(b)(6) designee on this topic,

within Abbott's Hospital Products Division "there wasn't an appreciation of a relationship

between the prices we reported and the AWP that was published by the agencies, nor the

importance or significance of AWP to anyone."  (03/16/08 Sellers Dep. 163:10 – 165:22, Ex.

75.)  Mr. Eichhorn testified that in 1995 he was not aware of any relationship between list and

AWP.  (04/24/07 Eichhorn Dep. 83:22-84:3, Ex. 22.)  Mr. Baker also testified that he did not

know that there was a relationship between the prices that Abbott reported and the AWP.
(04/23/07 Baker Dep. 64:12-17; 341:22-342:2, Ex. 4.)  Mr. Karas also testified that he had no
understanding that list prices impacted reimbursement.  (08/29/07 Karas Dep. 223:5-11, Ex. 39.)
Moreover, the record evidence shows that the Government knew full well that the compendia
AWPs were not representative of (and were far higher than) actual market prices, and yet
Medicare and the state Medicaid programs intentionally used AWP as the benchmark for
payments to providers in order to further various policy goals, including encouraging provider
use of generic drugs, subsidizing inadequate or non-existent dispensing fees, and ensuring
beneficiaries access to care.  (*See* C. Br. at 9-18.)  A few HPD employees were aware of a
mathematical relationship between list prices and AWPs; many others were not.  (AF ¶ 51-61.)

88.     The compendia determined Abbott's AWP by adding a mark-up of 18.75%.
Exhibit 24 to Redbook Deposition ("per Michael Heggie" mark up is 18.75% above direct/list);
January 31, 2001 email from Kay Morgan to Jerrie Cicerale.  (Sellers Exh. 586)(Lavine Decl.
Exh. 131)

**RESPONSE:** Abbott further objects to the use of this document because it does not reference
any of the Subject Drugs, and specifically applied only to one particular *branded* product
(Calcijex) that is not at issue in this case.  Subject to and without waiving any objections,
disputed.  Abbott disputes and the evidence does not support any suggestion that Abbott set or
reported AWP or "Suggested AWP" for the Subject Drugs and therefore the term "Abbott's
AWP" is incorrect, misleading and unsupported.   Further, paragraph 86 does not accurately
reflect the content of the exhibit cited therein.  Exhibit 24 contains the following notations:

5/16/02 [identified below as 5/16/02-AWP]
AWP = INNER PACK $(TRADE) -
5%+25% (SOLID SIZE = UNITS/INNER
PK) (18.75%) 4/97 per Michael Heggie
can now add DIRP(trade or inner pack
$ & WAC - SEE CALCIJEX NOTES.
See MISC note regarding FDB

5/16/02 [identified below as 5/16/02-FDB]
FDB changed m/u to 25% on 1/02 for
all price changes.  Per manufacturer we
are to continue using their usual M/U
(18.75%) per Jerrie

4/28/98
CALCIJEX & ZEMPLAR ONLY GET
AWP & WAC which are the same. No
DIRP per Michael Heggie.  ONLY USE
PRICES FROM TENA BROWN

The Government has mis-read the 5/16/02-AWP notation.  Read in conjunction with the 4/28/98

notation, the 5/16/02-AWP notation appears to contain two separate notes:

(1)  AWP = INNER PACK $(TRADE) -
5%+25% (SOLID SIZE = UNITS/INNER
PK) (18.75%)
(2)  4/97 per Michael Heggie
can now add DIRP(trade or inner pack
$) & WAC - SEE CALCIJEX NOTES.

In addition, the 4/28/98 and the 5/16/02-AWP notes referring to Michael Heggie were not

entered contemporaneously with receiving information from Michael Heggie because Mr.

Heggie left Abbott in December 1997.

Further responding, a 1993 letter from Michael Heggie to Red Book states that *Red Book*

*calculates the AWP* by applying a formula of "minus 5% plus 25%" to the list price.  (08/22/06

Heggie Exhibit 68, Ex. 35.)  Moreover, the record in this case shows that the Government knew

full well that the compendia AWPs were not representative of (and were far higher than) actual

market prices, and yet Medicare and the state Medicaid programs intentionally used AWP as the

benchmark for payments to providers in order to further various policy goals, including

encouraging provider use of generic drugs, subsidizing inadequate or non-existent dispensing

fees, and ensuring beneficiaries access to care.  (*See* C. Br. at 9-18.)

89.     Abbott directed Redbook as to what mark-up over list price to use to set AWPs
for Abbott's drugs.  Kristen Minne (Red Book 30b6) Deposition at 209-10.  Also Ex. 24 to

Minne Dep (AWP mark-up 1.1875% per Abbott employee Michael Heggie).  (Lavine Decl. Exh. 106 & 119)

**RESPONSE:** Abbott incorporates its response to paragraph 88.  Further responding, Abbott objects to Ms. Minne's testimony because it was speculative and without foundation.  Abbott also objects to the use of this cited document because it does not reference any of the Subject Drugs and is thus immaterial.  Ms. Minne testified that "My only knowledge of that [the 18.75% markup] would be what's written here." (11/18/08 Minnie Dep. 211:15-21, Ex. 138.)  Ms. Minne further testified that she did not have any conversations with Abbott about the markup and did not have actual knowledge that Abbott directed the markup.  (11/19/08 Minne Dep. 483:11-17; 484:15-485:11, Ex. 53.)  Abbott did not provide an AWP or suggested AWP for the Subject Drugs (*see* 3/16/08 Sellers Dep. 141:15-19, Ex. 75; 5/30/07 Cicerale Dep. 138:18-139:16, Ex. 13; 9/28/06 Chronis Dep. 97:19-98:10, Ex. 15; AF ¶ 45), and there is no evidence that Abbott directed the various publishing compendia regarding what markup they should apply for the Subject Drugs.

90.     Abbott employees were aware of the 18.75% markup.  Heggie 5/17/07 Dep. At 38-39; Cicerale Deposition 176:20- 178:7.  (Lavine Decl. Exhs. 88, 107)

**RESPONSE:** Disputed.  Abbott incorporates its response to paragraph 87.  A few HPD employees were aware of the 18.75% markup employed by the compendia (not Abbott) to calculate AWP; many were not.  (AF ¶ 51-61.)

91.     On April 3, 2003, Redbook changed to a 20% mark-up on list after consulting with Abbott.  Redbook 30b6 Deposition, Exhibit 24.  (Lavine Decl. Exh. 119)

**RESPONSE:** Disputed and unsupported.  Paragraph 91 does not accurately reflect the  exhibit cited therein.  Abbott does not, however, dispute that Red Book unilaterally changed its AWP policy in 2003.  When Redbook contacted Abbott about its new policy, Abbott did not respond; on another occasion when Redbook tried to contact Abbott about its policy, Abbott informed

Redbook that 'Abbott does not control how Red Book  conducts its business, nor does Abbott

provide AWP or calculated markup to establish an AWP.  (*See* 11/19/08 Minne Dep. Exs. 104, 105,

Ex. 53; 02/14/07 Sellers Dep. 537:15-538:17, Ex. 73.)  Moreover, the record in this case shows

that the Government knew full well that the compendia AWPs were not representative of (and

were far higher than) actual market prices, and yet Medicare and the state Medicaid programs

intentionally used AWP as the benchmark for payments to providers in order to further various

policy goals, including encouraging provider use of generic drugs, subsidizing inadequate or

non-existent dispensing fees, and ensuring beneficiaries access to care.  (*See* C. Br. at 9-18.)

92.     Abbott verified the prices reported for its products in the Redbook. *See* September
10, 1996 Price Listing Verification Transmittal from Jerrie Cicerale to Roni Lane at Redbook;
September 10, 2001 Price Listing Verification Transmittal from Jerrie Cicerale to Roni Lane at
Redbook (Ex. 931 to Cicerale Dep.) (Lavine Decl. Exh. 51, 52, 53, 108 and 140)

**RESPONSE:** Disputed.  Abbott, on some occasions, verified the prices that it reported – List

prices and Wholesale Acquisition Cost.  Abbott did not verify the prices that it did not report –

like AWP.  (03/16/08 Sellers Dep. 141:15-19, Ex. 75.)  On other occasions, particularly in 1998,

Abbott indicated that it would not return the Price Listing Verifications.  (11/19/08 Minnie Dep.

495:4-17, Ex. 53.)  Moreover, the record in this case shows that the Government knew full well

that the compendia AWPs were not representative of (and were far higher than) actual market

prices, and yet Medicare and the state Medicaid programs intentionally used AWP as the

benchmark for payments to providers in order to further various policy goals, including

encouraging provider use of generic drugs, subsidizing inadequate or non-existent dispensing

fees, and ensuring beneficiaries access to care.  (*See* C. Br. at 9-18.)

93.     From 1991 until at least 2001, Abbott HPD understood that the compendia would
publish its products and prices reported by HPD HBS.  Sellers 30b6, 3/16/08 at 163:14-22;
164:1-2. (Lavine Decl. Exh. 88)

**RESPONSE:** Undisputed but incomplete.  Abbott did not report an AWP or a "suggested

AWP" to the compendia for the Subject Drugs.  (3/16/08 Sellers Dep. 141:15-19, Ex. 75;

05/30/07 Cicerale Dep. 138:18-139:16, Ex. 13; 09/28/06 Chronis Dep. 97:19-98:10. Ex. 15.)

Moreover, the record in this case shows that the Government knew full well that the compendia

AWPs were not representative of (and were far higher than) actual market prices, and yet

Medicare and the state Medicaid programs intentionally used AWP as the benchmark for

payments to providers in order to further various policy goals, including encouraging provider

use of generic drugs, subsidizing inadequate or non-existent dispensing fees, and ensuring

beneficiaries access to care.  (*See* C. Br. at 9-18.)

94.     From 1991 until at least 2001, Abbott understood that the compendia would publish the information HPD reported concerning its products in the compendia databases and publications sold within the healthcare industry.  Sellers 30b6, 3/16/08 at 163:14-22; 164:1-2. (Lavine Decl. Exh. 88)

**RESPONSE:** Undisputed but incomplete.  Abbott did not report an AWP or a "suggested

AWP" to the compendia for the Subject Drugs.  (03/16/08 Sellers Dep. at 141:15-19, Ex. 75,

05/30/07 Cicerale Dep. at 138:18-139:16, Ex. 13; 09/28/06 Chronis Dep. at 97:19-98:10, Ex. 15.)

Moreover, the record in this case shows that the Government knew full well that the compendia

AWPs were not representative of (and were far higher than) actual market prices, and yet

Medicare and the state Medicaid programs intentionally used AWP as the benchmark for

payments to providers in order to further various policy goals, including encouraging provider

use of generic drugs, subsidizing inadequate or non-existent dispensing fees, and ensuring

beneficiaries access to care.  (*See* C. Br. at 9-18.)

95.     Abbott understood that a small group of employees within Home Infusion services reimbursement had information regarding how AWP or list price or WAC price factored into the Home Infusion reimbursement.  Sellers 30b6, 3/16/08 at 174:6-22; 175:1-10 (Lavine Decl. Exh. 88)

**RESPONSE:** Abbott objects and moves to strike paragraph 95 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment. (*See* Dkt. No. 6186 at 33-38.)

Subject to and without waiving any objection, disputed. A small group of people within

Home Infusion Services reimbursement had regional information with regard to whether AWP or

list price or WAC price might have been factors in reimbursement. (03/16/08 Sellers Dep. at

174:1-175:22, Ex. 75.) Abbott further disputes that it understood such matters. Abbott also

incorporates its response to paragraph 87.

96.     It was Abbott HPD's practice that if a customer or GPO demanded AWP as part
of the bid response, Abbott employees were authorized to provide that information. Sellers 30b6,
3/16/08 at 193:2-22; 194:1-12 (Lavine Decl. Exh. 88)

**RESPONSE:** Undisputed but incomplete. AWP was publicly available information that any of

Abbott's customers could obtain readily. It is also undisputed that, during the claims period

1991 – 2001, persons completing responses to requests for bid from customers were permitted to

pass along this publicly available AWP information if the customer specifically required it as

part of the bid. (01/17/08 Leone Dep. 291:20-292:9, Ex. 46.) Moreover, the record in this case

shows that the Government knew full well that the compendia AWPs were not representative of

(and were far higher than) actual market prices, and yet Medicare and the state Medicaid

programs intentionally used AWP as the benchmark for payments to providers in order to further

various policy goals, including encouraging provider use of generic drugs, subsidizing

inadequate or non-existent dispensing fees, and ensuring beneficiaries access to care. (*See* C. Br.

at 9-18.)

97.     Abbott understood that customers may have told them that spread was of interest
to Abbott's customers. Abbott also has seen documents where HPD Alt Site GPOS may have
represented that AWP was an important factor in their decisions. Sellers 30b6, 3/16/08 at
207:21- 22; 208; 209:1-9. (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed that "Abbott" understood these matters or saw such documents.  Mr.

Sellers, as the corporate designee, merely testified that certain Alternate Site customers may have

told some Alternate Site employees that a so-called spread was one factor they considered in

making purchasing decisions, and that certain GPOs may have created documents noting this

consideration.  (03/16/08 Sellers Dep. 209:1-9, 229:4-13, Ex. 75.)  Moreover, Abbott has a

practice not to and did not market its products based on AWP or the spread.  (03/18/08 Blackwell

Dep. 221:13-222:9, Ex. 9; 05/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8,

Ex. 32; 01/17/08 Leone Dep. 305:10-19, Ex. 46; 03/5/09 Reisetter Expert Rep. ¶ 28, Ex. 93;

Sales Training Module, Ex. 96.)  Instead, Alternate Site representatives marketed HPD products

as an entire portfolio and promoted the products based on factors such as quality, reliability of

supply customer service, breadth of product line and competitive pricing.  (03/18/08 Blackwell

Dep. 221:13-222:9, Ex. 9; 05/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8,

Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 03/06/09 Reisetter Expert Rep. ¶ 28, Ex. 93;

Sales Training Module, Ex. 96; 03/06/09 Reisetter Expert Rep. ¶ 28, Ex. 93; Sales Training

Module, Ex. 96.)   Moreover, the record in this case shows that the Government knew full well

that the compendia AWPs were not representative of (and were far higher than) actual market

prices, and yet Medicare and the state Medicaid programs intentionally used AWP as the

benchmark for payments to providers in order to further various policy goals, including

encouraging provider use of generic drugs, subsidizing inadequate or non-existent dispensing

fees, and ensuring beneficiaries access to care.  (*See* C. Br. at 9-18.)

98.     It was permissible under Abbott's practice to refer customers to Redbook or
Medispan for AWP information.  Sellers 30b6, 3/16/08 at 383:4-10.  (Lavine Decl. Exh. 88)

**RESPONSE:** Abbott does not dispute that it was permissible prior to 2001 for Abbott

employees to refer customers to the publicly available information published by the compendia.

99.     Abbott provided bids in response to Gerimed's bid requests, and was awarded contracts, including ones for the subject drugs.  Sellers 30b6, 3/16/08 at 231: 16-22; 232: 1-9 & Sellers 30b6 Exh. 12 (Lavine Decl. Exh. 88)

**RESPONSE:**  Undisputed.

100.     GPO Gerimed's bid requests to Abbott expressly stated that bids would be evaluated on a line by line basis, and that contract pricing would be evaluated based on lowest price and/or best spread for multi-source products.  Sellers 30b6, 3/16/08 at 233:6-22; 234:1-7, & Sellers 30b6 Exh. 11 (p. ABT 277701-02) (Lavine Decl. Exh. 88, 132)

**RESPONSE:**  Disputed.  Although the cited exhibit states that bid requests were analyzed on

line-by-line basis, GeriMed stated that "Companies demonstrating the best quality, policies,

programs and price will be favored (see above evaluated characteristics)."  The eight "evaluated

characteristics" were "Quality of products, Distribution methods, Availability of product,

Service, Guarantee supply, Medicaid Rebate Agreement, Performance Fee or Contract

Administration Fee."  (03/16/08 Sellers Ex. 11, Ex. 75; *see also* 1/23/08 Rhodus Dep. at 165:20-

166:22, 272:1-6.)  Similarly, Abbott's goals in its agreement with Gerimed were to "[r]educe

drug costs, deliver innovative quality products, provide field support, medical department

support."  (01/23/08 Rhodus Dep. at 242:1-21.)  Marketing products based on AWP was not

listed as a goal.  (*Id.*)  GeriMed also recognized: "While straight line by line contracting is

preferred by members and GeriMed, we see this type of contracting decreasing."  (03/16/08

Sellers Ex. 11, Ex. 75.)

Moreover, the record in this case shows that the Government knew full well that the

compendia AWPs were not representative of (and were far higher than) actual market prices, and

yet Medicare and the state Medicaid programs intentionally used AWP as the benchmark for

payments to providers in order to further various policy goals, including encouraging provider

use of generic drugs, subsidizing inadequate or non-existent dispensing fees, and ensuring

beneficiaries access to care.  (*See* C. Br. at 9-18.)  Further responding, Abbott did not market its

products to Gerimed or any other customer based on AWP or the spread. (03/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 05/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 01/17/08 Leone Dep. 305:10-19, Ex. 46; 03/06/09 Reisetter Expert Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96.)  Instead, Alternate Site representatives marketed HPD products as an entire portfolio and promoted the products based on factors such as quality, reliability of supply customer service, breadth of product line and competitive pricing.  (3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09 Reisetter Expert Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96; Reisetter Expert Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96.)

101. GPO Gerimed told Abbott HPD, and Abbott HPD understood, that AWP spread was a factor in Gerimed's bid award analysis.  Sellers 30b6, 3/16/08 at 230:17-20; 233:6-22; 234:1-7, & Sellers 30b6 Exh. 11 (p. ABT 277701) and Sellers 30b6 Exh. 12 (all pages).  (Lavine Decl. Exh. 88, 132)

**RESPONSE:** Disputed.  GeriMed indicated to certain Alternate Site employees (not to "Abbott HPD" generally) that AWP was one factor in its analysis of bids, but it was not on the list of characteristics by which companies were evaluated.  (1/23/08 Rhodus Dep. 242:1-21, Ex. 60.) Moreover, Abbott has a practice not to and did not market its products based on AWP or the spread.  (3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09 Reisetter Expert Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96.)  Instead, Alternate Site representatives marketed HPD products as an entire portfolio and promoted the products based on factors such as quality, reliability of supply customer service, breadth of product line and competitive pricing. (3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09 Reisetter Expert

Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96; Reisetter Expert Rep. ¶ 28, Ex. 93; Sales

Training Module, Ex. 96.)

102.    Abbott HPD Alt Site was awarded GPO contracts due to its AWP spreads. The bid awards with spread information were provided to HPD Alt Site sales force, who could use the information to approach the GPO's members.  Sellers 30b6, 3/16/08 at 231: 16-22; 232: 1-9 & Sellers 30b6 Exh. 12 (Lavine Decl. Exh. 88, 120)

**RESPONSE:** Disputed and unsupported.  Gerimed and other GPOs clearly indicated that

awards were made on the basis of several factors.  The bid awards containing the list of Abbott

products were not prepared by Abbott and were provided to the HPD Alternate Site sales force

responsible for calling on the particular GPOs so that the sales force would be able to inform the

GPO members which products were available from Abbott.  (3/18/08 Blackwell Dep. 221:13-

222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08

Leone Dep. 305:10-19, Ex. 46; 3/5/09 Reisetter Expert Rep. ¶ 28, Ex. 93; Sales Training

Module, Ex. 96.)  Moreover, Abbott has a practice not to and did not market its products based

on AWP or the spread.  (3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-

22, Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09

Reisetter Expert Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96.)  Instead, Alternate Site

representatives marketed HPD products as an entire portfolio and promoted the products based

on factors such as quality, reliability of supply customer service, breadth of product line and

competitive pricing.  (3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22,

Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09

Reisetter Expert Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96; Reisetter Expert Rep. ¶ 28,

Ex. 93; Sales Training Module, Ex. 96.)

103.    On May 26, 1994, Abbott's Steve Kipperman sent a memorandum to the Abbott's Alt Site Field Sales Force and District Managers with attached AWP information.  The memo stated:  "As you are aware, on at [sic] the beginning of April, Abbott took a list price increase. This also has an effect on our AWP (Average Wholesale Price) which Redbook quotes for

reimbursement purposes.  Therefore, Mike Heggie was able to get Red Book to send a listing of the "new" AWP's for all of our products, which will be effective through next April.  He stated: "I hope this information is helpful and if you have any questions, please feel free to contact me. (Kipperman Dep. Exh. 480) (Lavine Decl. Exh. 67)

**RESPONSE:**  Abbott does not dispute that paragraph 103 contains an accurate quote from the

referenced exhibit.  Abbott does dispute, however, any allegation that the Alternate Site Sales

Force and District Managers actually received Mr. Kipperman's memo, as the record does not

support that allegation.  To the contrary, numerous former sales representative were deposed and

indicated that they had no memory of ever receiving the memo.  (10/30/07 Harling Dep. 25:17-

27:7, Ex. 32; 10/9/07 Robertson Dep. 503:24-504:6, Ex. 66; 4/19/07 Snead Dep. 111:11-15, Ex.

78.)  Moreover, Abbott has a practice not to and did not market its products based on AWP or

the spread.  (3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7;

10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09 Reisetter

Expert Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96.)  Instead, Alternate Site representatives

marketed HPD products as an entire portfolio and promoted the products based on factors such

as quality, reliability of supply customer service, breadth of product line and competitive pricing.

(3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07

Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09 Reisetter Expert

Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96; Reisetter Expert Rep. ¶ 28, Ex. 93; Sales

Training Module, Ex. 96.)

     104.   Abbott HPD HBS maintained a resource manual for its HPD HBS employees called the Basic Operating Procedures Manual (BOP).  The BOP at p. 247 included information for the HPD HBS employees concerning Redbook's formula of adding 18.75 percent to reported list prices to arrive at the AWP for the product.  Weibking Dep. Exh. 35 (excerpt) at p. 247 (Lavine Decl. Exh. 133)

**RESPONSE:** Disputed.  Abbott disputes any allegation that the BOP was an official corporate

document "maintained" as a "resource manual" by Abbott.  To the contrary, the document is an

unofficial collection of information amassed by numerous different persons over time.  (3/31/08

Sellers 497:12-500:17, Ex. 76.)

105.    Abbott HPD did not at any time make any inquiry of any federal or state government official, state or federal, to seek clarification of the relationship between its price reporting or AWPs and Medicare or Medicaid reimbursement.  Sellers 30b6, 3/16/08 at 179:6-10; 180:1-22 (Lavine Decl. Exh. 88)

**RESPONSE:** Undisputed.  Abbott was not required to and did not seek any "clarification" of

the issues described in paragraph 105.  It is also undisputed that federal and state officials knew

full well the so-called "spreads" on the Subject Drugs, including through direct purchases of the

Subject Drugs, Government investigations, the provision of AMP information on a quarterly

basis, media reports, OIG studies, and other means.  (AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54;

C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum In Opposition To The United*

*States' Motion For Partial Summary Judgment, And Reply In Support Of Abbott's Motion For*

*Partial Summary Judgment* at 13-19.)

106.    Other than officials in Texas, Abbott HPD never advised state or federal Medicare or Medicaid officials about the pricing of the Subject Drugs or about list prices or its knowledge that its customers were awarding contracts to Abbott based on the AWP spread for Abbott drugs.  Sellers 30b6, 3/31/08 at 487:2-22; 1-4; 491:14-22; 492:1-5.  (Lavine Decl. Exh. 89)

**RESPONSE:** Disputed.  Federal and state officials knew full well the so-called "spreads" on the

Subject Drugs, including through direct purchases of the Subject Drugs, government

investigations, the provision of AMP information on a quarterly basis, media reports, OIG

studies and other means.  (AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;;  *see also*

*Abbott Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For*

*Partial Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary*

*Judgment* at 13-19.)  Moreover, Abbott disputes the contention that its customers awarded

contracts to Abbott based upon spread.  Although some customers may have considered this

issue as part of their individual purchasing decisions, there were many factors that drove

purchasing decisions.  (*see e.g.*, 1/23/08 Rhodus Dep. at 165:20-166:22, 272:1-6, Ex. 60.)

Importantly, Abbott did not market its products based on the spread.  (9/13/07 Robertson Dep. at

153:3-24, 291:6-24, Ex. 65.)  Instead, Alternate Site representatives marketed HPD products as

an entire portfolio and promoted the products based on factors such as quality, reliability of

supply, customer service, breadth of product line, and competitive pricing.  (3/18/08 Blackwell

221:13-222:9, Ex. 9; 5/3/07 Balzer 51:14-22, Ex. 7; 10/30/07 Harling 39:1-8, Ex. 32; 1/17/08

Leone 305:10-19, Ex. 46; 3/5/09 Reisetter Rep. ¶ 28, Ex. 93; Sales Training Module, Ex. 96.)

Abbott customers considered numerous factors when awarding contracts to Abbott.  (*see e.g.*,

1/23/08 Rhodus Dep. at 165:20-166:22, 272:1-6, Ex. 60.)

107.    Abbott HPD believes that its Home Infusion Reimbursement employees
communicated with state medicaid payors and Medicare carriers so that it could understand how
Abbott's HI clients were reimbursed by a particular state or carrier, and the relationships
between WAC, AWP and Medicaid reimbursement.  Sellers 30b6, 3/16/08 at 180:1-22; 181;
182:1-7 (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed.  Certain Home Infusion Services (not "Home Infusion

Reimbursement") employees had communications with Medicaid payors and Medicare carriers

on a claim-by-claim basis or regarding a general question about claim reimbursement from a

particular state or region.  (3/16/08 Sellers 181:15-182:7, Ex. 75.)  Abbott further disputes the

statement that "Abbott HPD believes" as Abbott HPD has not existed since 2004.

108.    The Home Infusion Reimbursement Department communicated with Medicare
and Medicaid officials regarding the processing of claims.  Sellers 30b6, 3/16/08 at 180:1-22;
181:1-4. (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed.  Certain Home Infusion Services (not "Home Infusion

Reimbursement") employees had communications with Medicaid payors and Medicare carriers

on a claim-by-claim basis or regarding a general question about claim reimbursement from a

particular state or region.  (3/16/08 Sellers 181:15-182:7, Ex. 75.)  Abbott disputes the use of the

term "Reimbursement Department" as unsupported.

109.    Abbott claims that it cannot identify when it first noticed the large disparities between contract prices and list prices for some of its HPD products, except to say that Abbott looked at a number of products in the fall of 2000.  Sellers 30b6, 3/16/08 at 183:9-15. (Lavine Decl. Exh. 88)

**RESPONSE:** Disputed.  Paragraph 109 does not accurately reflect the testimony cited therein.

Record evidence establishes that for certain products there was very little disparity between

contract price and list price.  (Sellers 3/16/08 Dep. at 53:19-54:1, Ex. 75.)  Abbott does not

dispute, however, that in 2000, an inadvertent disparity existed between contract prices and list

prices of certain products due, in part, to the decline in contract prices due to generic competition

versus an annual inflationary price adjustment on the list prices.  (Sellers 3/16/08 Dep. at 58:21-

60:3, Ex. 75.)  The notion that any of these disparities was "large" is overstated, however, since

the disparities typically amounted to only a few dollars.  (03/06/09 Young Expert Rep. ¶¶ 64-65

and Figure 14, Ex. 94.)

110.    Abbott never notified any state or federal official about the disparities or "spreads" between the contract and list price on its HPD drugs. Fishman 30(b)(6), 3/20/08 at 643:2-9; Sellers 30b6, 3/16/08 at 183:17-22; 184:1-9.  (Lavine Decl. Exh. 88, 91)

**RESPONSE:** Disputed.  Federal and state officials knew full well the so-called "spreads" on the

Subject Drugs, including through direct purchases of the Subject Drugs, Government

investigations, the provision of AMP information on a quarterly basis, media reports, OIG

studies, and other means.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also*

*Abbott Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For*

*Partial Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary*

*Judgment* at 13-19.)

111.    Abbott received a number of inquiries from the federal government concerning its list price setting and AWPS, to wit:

a.    On January 22, 1996, the Attorney General issued a Civil Investigative Demand (CID) to Abbott seeking information pertaining to its HPD list price reporting and AWP spread maintenance practices for all of the Subject Drugs, except Sterile

Water.  In 1996 when Abbott received the CID from the Attorney General, it did not lower or consider lowering its list prices on the Subject Drugs, or other drugs referenced in the CID because when Abbott originally got the investigative demands, Abbott is not sure that anyone outside of its legal department understood what the issues were.

b.     On October 31, 1997, HHS-OIG issued a subpoena to Abbott requesting documents and information pertaining to its HPD list price reporting and AWP spread maintenance practices in HPD products, including for the Subject Drugs.

c.     On September 30, 1999, the Department of Justice issued a letter notifying Abbott of the Relator's *qui tam* suit and the allegations therein.

d.     On August 28, 2000, HHS-OIG issued a second subpoena to Abbott requesting additional documents and information pertaining to its HPD list price reporting and AWP spread maintenance practices.  Abbott refused to respond.

Klaus Exh. 3, 4, 6; Gonzalez Dep. Exh. 4; Sellers 30b6, 3/16/08 at 63:7-15; Sellers 30b6, 3/31/08 at 390:2-12.  (Lavine Decl. Exh. 82, 88, 89, 121, 122, 123)

**RESPONSE:** Disputed in part and undisputed in part, as outlined below:

a.     Abbott objects to the term "spread maintenance" as vague and argumentative.

Subject to and without waiving any objections, disputed in part.  Abbott does not dispute that the

Attorney General issued a CID to Abbott on or about January 22, 1996, nor that the CID

requested information relating to pricing and AWP for certain products, including Vancomycin,

saline, and dextrose.   Abbott also disputes the allegation that it maintained any spread for the

Subject Drugs; it did not do so.  Instead the spread was the result of compendia AWP

calculations and the Government's intentional choice to use AWP as the benchmark for

payments under Medicare and Medicaid, despite knowing that AWP was far higher than actual

market prices.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott*

*Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For Partial*

*Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary Judgment*

*at 13-19.*)  Abbott also disputes the allegation that it acted or did not act for any of the reasons

alleged in sub-paragraph (a).  As set forth in its summary judgment briefing, Abbott's price

reporting practices were perfectly appropriate.  (*See Abbott Laboratories Inc.'s Memorandum In*

*Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support*

*Of Abbott's Motion For Partial Summary Judgment* at 6-15.)


        b.  Abbott objects to the term "spread maintenance" as vague and argumentative.  Subject

to and without waiving any objections, disputed.  The subpoena in question was issued on

October 6, 1997, not October 31.  Abbott does not dispute that the subpoena sought information

relating to pricing and AWP for certain products, including the Subject Drugs.  Abbott also

disputes the allegation that it maintained any spread for the Subject Drugs; it did not do so.

Instead the spread was the result of compendia AWP calculations and the Government's

intentional choice to use AWP as the benchmark for payments under Medicare and Medicaid,

despite knowing that AWP was far higher than actual market prices  (*See* AF ¶ 27, 62-63, 83; CF

¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum In*

*Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support*

*Of Abbott's Motion For Partial Summary Judgment* at 13-19.)


        c.      Undisputed.


        d.      Disputed.  The subpoena in question was issued on July 25, 2000, not August 8.

Abbott does not dispute that the subpoena sought information relating to pricing and AWP for

certain products, including the Subject Drugs.  Abbott objects to the term "spread maintenance"

as vague and argumentative.  Abbott also disputes the allegation that it maintained any spread for

the Subject Drugs; it did not do so.  Instead the spread was the result of compendia AWP

calculations and the Government's intentional choice to use AWP as the benchmark for

payments under Medicare and Medicaid, despite knowing that AWP was far higher than actual

market prices.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott*

*Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For Partial*

*Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary Judgment*

at 13-19.)  Also, contrary to  plaintiffs' statement that "Abbott refused to respond," Abbott did

respond to this subpoena, raising objections and requesting a meeting to discuss the objections,

to which the Government never responded.  (Ex. 137, 8/28/00 Ltr from C. Cook to L. Hillier and

M. Lavine.)

112.    Abbott cannot explain why, when it received a CID in 1996, or the OIG
subpoenas in 1997 and 2000, or '99 DOJ letter, it did not further inquire of the federal
government whether Abbott's price reporting was appropriate or consistent with Medicare and
Medicaid policies.  The government met with Abbott and discussed its liability theories in
October and November 1999.

Abbott also communicated with DOJ regarding the 2000 subpoena.  Sellers 30b6, 3/16/08 at
188:5-22; 189; 190:1-18 August 28, 2000 Letter from Christopher Cook to Mark Lavine and
Linda Hiller; November 3, 1999 Letter from Reed Stephens to Dan Reidy (referencing a October
27' meeting) (Lavine Decl. Exh. 64, 65, 88)

**RESPONSE:** Disputed.  Paragraph 112 is pure argument, not facts.  Abbott, of course, has no

obligation to explain why it did or did not do anything in response to the Government's threats of

litigation.  As set forth in its summary judgment briefing, moreover, Abbott's price reporting

practices were perfectly appropriate.  (*See Abbott Laboratories Inc.'s Memorandum In*

*Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support*

*Of Abbott's Motion For Partial Summary Judgment* at 1-15.)  Further responding, the record in

this case shows that the Government is the one who failed to act in the face of multiple surveys,

audits, reports, investigations, analyses, etc. demonstrating that the compendia AWPs were not

representative of (and were far higher than) actual market prices.  The Government did so in

order to further various policy goals, including encouraging provider use of generic drugs,

subsidizing inadequate or non-existent dispensing fees, and ensuring beneficiaries access to care.

(C. Br. at 9-18.)

113.    Abbott joined in the March and August memorandum and letters from other qui
tam Defendants to the Department of Justice, arguing against intervention.  March 17, 2000
Letter from Defendants to Assistant Attorney General David Ogden; August 25, 2000 follow-up
letter Assistant Attorney General Ogden; September 1, 2000 letter from Dan Reidy to Reed
Stephens joining the Defendants' Position Paper; October 5, 2000 follow-up letter from
Defendants to Assistant Attorney General David Ogden.  (Lavine Decl. Exh. 61, 65, 134, 135)

**RESPONSE:**  Undisputed.

114.    Average Manufacturer Price or "AMP" as used by the HCFA and the Medicaid
programs and is defined as, with respect to a covered outpatient drug of a manufacturer for a
rebate period, the average price paid to the manufacturer for the drug in the United States by
wholesalers for drugs distributed to the retail pharmacy class of trade, as defined under 42 U.S.C
§1396r-8(k).  As a participant in Medicare and Medicaid, Abbott provided what it purported to
be AMP information from the implementation of OBRA 90 until after 2003.  Abbott Response to
First Set of Interrogatories by the United States Nos 21 6 20 (Lavine Decl Exh 136)

**RESPONSE:**  Abbott disputes any suggestion that it did not provide actual AMP data.  Abbott

provided AMP data for its products, including the Subject Drugs, directly to the Government

about forty times during the claims period in this case.  (AF ¶ 61-62.)  Abbott does not dispute,

however, that paragraph 114 accurately quotes the definition of AMP.

115.    Abbott HPD contends that its transactional prices could be inferred through
Abbott's submission of AMP and 340b price reporting to the United States.  Sellers 30b6,
3/16/08 at 315:8-22; 316:1-3.  (Lavine Decl. Exh. 88)

**RESPONSE:**  Abbott does not dispute that the Government had access to the actual market

prices for its products in a number of ways, including through the provision of AMP, 340b

pricing, direct purchases of product from Abbott by various Governmental agencies, and various

investigations undertaken over the years by the Office of the Inspector General, among others.

(*See, e.g.,* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories*

*Inc.'s Memorandum In Opposition To The United States' Motion For Partial Summary*

*Judgment, And Reply In Support Of Abbott's Motion For Partial Summary Judgment* at 13-19.)

116.    In 1995, Abbott determined that it was incorrectly calculating its AMPs for HPD "from the beginning" because it misunderstood the definition of Average Manufacturer Price as it appeared in OBRA 90 Part 1 Reductions in Spending 4401(k)(1) and did not commit the resources necessary to properly administer the AMP calculation program.  In some cases it was paying more in the rebate than it was being paid for the drug.  Heggie Dep. 54:9-22; 55-56; 57:1-14; 59:13-17 & Heggie Exh. 789, 790, 792 (Lavine Decl. Exh. 77, 78, 79, 103)

**RESPONSE:**  Abbott objects to paragraph 116 as irrelevant and immaterial, given that this case has nothing to do with the actual calculation of Abbott's AMP.  The Court should not consider irrelevant or immaterial information in evaluating summary judgment.  *Schneider v. Harrison Electrical Workers Trust Fund*, 382 F. Supp. 2d 261, 263 (D. Mass. 2005) ("Factual disputes that are irrelevant or unnecessary will not be counted" at the summary judgment stage)  Abbott does not dispute, however, the fact that, in or around 1993, it engaged CMS in a dialogue about Abbott's AMP calculations.  (05/17/07 Heggie Dep. 59:22-60:11; Ex. 792, Ex. 34.)  Abbott misunderstood certain of the complex requirements for calculating AMP, leading to a situation in which Abbott paid too much in rebates to the Government.  (*Id.*)  Abbott discussed these issues with the agency and it was agreed that Abbott would submit corrected AMP information.  (*Id.*)  Quite unlike AWP (which was and remains undefined by any statute or regulation), AMP requirements were set forth in detailed regulations.  This incident shows Abbott's willingness to approach CMS when it believes its obligations under established laws are unclear.  Further responding, it appears that the states were content to have manufacturers like Abbott be confused about AMP calculation (at least when it ran to the states' favor) because they regarded the rebate program as an "effective money maker."  (AB0018688, Ex. 131.)

117.    Abbott personnel generated a document identifying examples of the Best Price and AMP differentials, wherein Abbott personnel commented that "These AMPs are totally distorted because in our calculation of AMP we did not figure in the charge backs, discounts to wholesaler class of trade, etc." Abbott met with HCFA representatives to seek credit for its

rebate overpayments.  Abbott Doc ABT006256; Heggie Dep. 61:22; 62-71;72:1-14 & Heggie Exh. 795 & 796 (Lavine Decl. Exh. 80, 81, 103, 137)

**RESPONSE:** Abbott objects to paragraph 117 as irrelevant and immaterial, given that this case has nothing to do with the actual calculation of Abbott's AMP.  The Court should not consider irrelevant information in evaluating summary judgment.  (05/17/07 Heggie Dep 59:22-60:11; Ex. 795; Ex. 796, Ex. 24; ABT 006256, Ex. 132.)  Abbott does not dispute, however, the fact that, in or around 1994, it engaged CMS in a dialogue about Abbott's AMP calculations.  (*Id.*)  Abbott misunderstood certain of the complex requirements for calculating AMP, leading to a situation in which Abbott paid too much in rebates to the Government.  (*Id.*)  Abbott discussed these issues with the agency and it was agreed that Abbott would submit corrected AMP information.  (*Id.*)  Quite unlike AWP (which was and remains undefined by any statute or regulation), AMP requirements were set forth in detailed regulations.  This incident shows Abbott's willingness to approach CMS when it believes its obligations under established laws are unclear.  Further responding, it appears that the states were content to have manufacturers like Abbott be confused about AMP calculation (at least when it ran to the states' favor) because they regarded the rebate program as an "effective money maker."  (AB0018688, Ex. 131.)

118.    During the second quarter of 1999, Price Waterhouse Coopers[2] reviewed HPD's Medicaid and Public Health System Drug Pricing Programs (340B) to ensure compliance with the Medicaid drug rebate requirements of OBRA 90 and the Section 340B requirements under the Veterans Health Care Act of 1992, and determined that Abbott HPD should revise its Medicaid calculation process.  Abbott then attempted in 2000 and 2001 to develop systems to "rapidly bring" the division into compliance with Medicaid and other federal quarterly reporting requirements.  Patel Dep. 117:10-25;118:1-25 & Patel Exh. 991 at 4 of 20.  ABT-DOJ-E-1059745; ABT-DOJ-E-0445341; ABT-DOJ-E-0450594-5; ABT-DOJ-E-1059636-68 at p. 4 of 33; ABT-DOJ 0423051-66 at p. 4 of 16; Patel Dep. 117:10-25;118:1-25 & Patel Exh. 991 at 4-20.  (Lavine Decl. Exh. 84, 109, 138)

---

[2] Abbott has never produced the Price Waterhouse Coopers Medicaid and 340B program compliance audit to the United States or Relator.

**RESPONSE:** The contents of the audit are privileged and confidential. Abbott therefore objects to and moves to strike paragraph 118.

119. As early as 1996, Abbott established a group called the "Medicare Working Group", which was comprised of individuals from various parts of Abbott, including, HPD, PPD, Ross, and Abbott's government relations/lobbying group, among others, who met or conferred telephonically on a periodic monthly basis. Haas at 53:10-13; 56:4-6; 61:20-21; 62-65; 66:1-5 & Exh. 1121; J. Miller Dep at 52:8-22; 53:1; Tootell 73:3-16. (Lavine Decl. Exh. 110, 111, 112)

**RESPONSE:** Disputed. Abbott disputes the allegation that the group met or conferred on a monthly basis. Several of the putative members who were deposed in this matter described the group, if they remembered it at all, as a group of persons who would confer occasionally about pending issues, such as legislation, concerning Medicare and/or Medicaid. (8/30/2007 Haas Dep. 89:19-90:12, 109:13-11-:10, 263:12-15, Ex. 30; 7/30/2007 Miller Dep. 54:20-55:17, 105:4-10, 112:15-114:6, 175:7-176:10, Ex. 52; 10/25/2007 Tootell Dep. 55:13-57:9, 58:2-9, Ex. 84.) Abbott does not dispute that, for a short period of time in or around 1996, an informal group called the Medicare Working Group existed, nor that it consisted of persons from various divisions within Abbott.

120. In December 1996, Medicare Working Group received a document that had been referenced in a Medicare Working Group meeting by Michael Tootell. The document was entitled "Medicare Part B Payment For Drugs Average Wholesale Price Issue" and put the group on notice of the following:

    A. "Currently, Medicare pays for those drugs that are not reimbursed on a prospective basis or a cost basis at the lesser of the average wholesale price or the actual acquisition cost of the drug. . . Medicare pays at the average wholesale price level, because the program has not acquired acquisition cost information sufficient to establish reimbursement rates."

    B. "There have been several studies and investigations into the appropriateness of using AWP as the determining factor for payment. The common conclusion of these efforts is that the use of AWP as a payment measure results in excessive reimbursement that is far out of line with the estimated acquisition costs of the drugs . . . ."

    C. "[T]here is some evidence that often the AWP for a drug is set at a particular level to establish third-party reimbursement, but has no

relevance to any party beyond the third-party payer [sic].  For these reasons, the AWP issue is being presented and considered not as a program policy issue, but rather as an issue steeped in fraud, abuse and waste."

D.    "[N]umerous people from within the industry have conceded publicly that AWP makes little sense as a basis for reimbursement."

E.    "While AWP may be in excess of the acquisition cost of a drug (plus a reasonable markup), it does enable pharmacists to be reimbursed, albeit indirectly, for the necessary pharmaceutical services they do in fact provide.  Since Medicare does not acknowledge the existence of these services, and thus does not provide for separate or additional reimbursement for them, the current use of AWP is the only means of paying pharmacists for what they actually do for Medicare beneficiaries." Abbott Medicare Working Group document ABT 53263-53265.  (Lavine Decl. Exh. 97)

**RESPONSE:** Disputed.  Abbott disputes the assertion that each of those employees actually received the document, read it, and were somehow put "on notice" of its contents, since the record does not support such an assertion.  To the contrary, the Government deposed several alleged recipients who testified that they did not recognize the document and could not recall ever receiving or reading it.  (*See, e.g*., 07/30/07 Miller Dep. 83:8 – 85:3, Ex. 52; 08/28/07 Babington Dep. 68:4 – 65:11, Ex. 2; 08/09/07 Rieger Dep. 101:10-19, 106:13 – 107:17, Ex. 62.) Abbott objects to the document as irrelevant and inadmissible.

Moreover, the record in this case shows that the Government knew full well that the compendia AWPs were not representative of (and were far higher than) actual market prices, and yet Medicare and the state Medicaid programs intentionally used AWP as the benchmark for payments to providers in order to further various policy goals, including encouraging provider use of generic drugs, subsidizing inadequate or non-existent dispensing fees, and ensuring beneficiaries access to care.  (C. Br. at 9-18.)  (*See, e.g., AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18; see also Abbott Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support Of Abbott's Motion*

*For Partial Summary Judgment* at 13-19.)  Abbott does not dispute that subsections A-E of

paragraph 120 contain accurate quotes from a document entitled "Medicare Part B Payment For

Drugs Average Wholesale Price Issue," nor that this article was circulated in December 1996 by

Mr. Tootell to certain other Abbott employees.

121.    One Ross Products division employee, Mr. Michael Tootell expressed his concern
to Abbott in-house legal counsel about the legal exposure and potential negative consequence of
AWP spreads.  Tootell Dep. 199:17-22; 200:1-20; 202:1-11 (Lavine Decl. Exh. 112)

**RESPONSE:** Abbott does not dispute that Mr. Tootell is a former employee who worked in a

division formerly known as Ross Products.  At his deposition, Mr. Tootell testified that he had a

discussion with an Abbott attorney regarding certain issues relating to AWP.  (10/25/07 Tootell

Dep. 200:3-6, Ex. 84.)  The contents of that conversation, if it in fact ever happened, would be

privileged and confidential.  Abbott therefore objects to and moves to strike paragraph 121.

Further, David Fishman, Abbott's 30(b)(6) designee testified that he talked with Matt Fisher,

Michael Tootell's boss and Mr. Fisher does not recall any specific conversations with Mr.

Tootell where AWP was raised in an alarming manner.  (03/12/08 Fishman Dep. 121:5 – 122:11,

Ex. 24.)  Mr. Fishman also spoke with Brian Taylor and Melissa Pence-Levy, an in-house

attorney who worked with Ross Products.  Mr. Taylor did not recall having a conversation with

Matt Fisher or with Mike Tootell where AWP was raised in a concerning manner.  (03/12/08

Fishman Dep. 131:2-6, Ex. 24.)  Similarly, Ms. Pence-Levy had no recollection of Mike Tootell

coming to her regarding AWP subject matter in any concerned way.  (03/12/08 Fishman Dep.

149:4-20, Ex. 24.)

122.    Abbott testified that prior to 2003 it did not understand that False Claims Act's
reach included liability for reckless or inadvertent conduct in its price reporting.  Fishman
30(b)(6 ) 3/20/08 at 643:10-22; 64 4:1 1 0 (Lavine Decl Exh 91 )

**RESPONSE:** Disputed.  Paragrahp 122 does not accurately reflect the testimony cited therein.

Plaintiffs have selectively and incorrectly paraphrased Mr. Fishman's testimony.  Further

answering, David Fishman, Abbott's 30(b)(6) corporate designee testified that Abbott had a

policy within its code of business conduct to comply with all laws, statutes and regulations

including the Medicare and Medicaid fraud and abuse, False Claims Act and other Medicare-

related compliance statutes.  To the extent a statute identified and defined what the standards

were for providing information to the pricing compendia, Abbott complied with those standards.

(03/20/08 Fishman Dep. 393:18-394:21, Ex. 140.)  Mr. Fishman further testified that "Abbott

had a – an understanding of the law as written and continued to gain insight into the

interpretation . . . as more attention was placed on it and more information became – became

available."  (03/12/08 Fishman Dep. 233:6-12, Ex. 24.)

    123.    Abbott never sought guidance from HCFA or HHS-OIG about Abbott's pricing
activities or verify whether its pricing activities violated any law, including the federal False
Claims Act.  Abbott never asked Medicare or Medicaid officials whether it was permissible to
provide customers with spread or AWP information.  Fishman Rule 30b6, 3/12/06 at 224:4-22;
225:1-6; 234:14-20; 240:10-22; Fishman 30(b)(6), 3/20/08 at 644:11-14.  (Lavine Decl. Exh. 90,
91)

**RESPONSE:** Disputed. Paragraph 123 does not accurately reflect the testimony cited therein.

Plaintiffs have selectively and incorrectly paraphrased Mr. Fishman's testimony.  The entirety of

the transcript is the best evidence of Mr. Fishman's testimony.  David Fishman, Abbott's

30(b)(6) corporate designee testified that Abbott did not ask Medicare or Medicaid officials

whether it was it was permissible to provide customers with spread or AWP information because

it was a practice not to provide such information to customers.  (03/12/08 Fishman Dep. 240:21-

241:10, Ex. 24.)  Scores of witnesses also testified that it was Abbott's practice not to provide

such information to customers and that they did not in fact provide such information to

customers.  (*see e.g.*, 05/17/05 Balzer Dep. 38:1-39:20, Ex. 6; 03/25/08 Kassak Dep. 126:13-

127:8, Ex. 40; 03/26/08 Kelly Dep. 91:15-93:12, Ex. 41; 04/26/07 Krajewski Dep. 116:8-117:5,

Ex. 42; 08/31/07 Longley Dep. 248:8-250:4, Ex. 47; 05/13/07 Lyjak Dep. 89:10-91:10, Ex. 49;

03/17/08 Renick Dep. 90:13-92:9, Ex. 59.)  Undisputed that Abbott was not required to and did

not seek any "clarification" of the issues described in paragraph 123.  It is also undisputed that

Federal and state officials knew full well the so-called "spreads" on the Subject Drugs, including

through direct purchases of the Subject Drugs, Government investigations, the provision of AMP

information on a quarterly basis, media reports, OIG studies, and other means. (*See* AF ¶ 27, 62-

63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum*

*In Opposition To The United States' Motion For Partial Summary Judgment, And Reply In*

*Support Of Abbott's Motion For Partial Summary Judgment* at 13-19.)

     124.    To Abbott's knowledge, Abbott's in-house counsel did not give any presentations
to Abbott HPD concerning pricing or AWP, and Abbott cannot explain why in-house counsel did
not give such presentations.  Abbott's in-house counsel also did not give presentations
concerning the provisions of spread and spread marketing.  Fishman Rule 30b6, 3/12/08 at
95:12:15; 286:14-21; 287:2-6.  (Lavine Decl. Exh. 90)

**RESPONSE:** Disputed.  Paragraph 124 does not accurately reflect the testimony cited therein.

Plaintiffs have selectively and incompletely quoted and/or paraphrased Mr. Fishman's testimony.

Mr. Fishman testified that Abbott in-house counsel regularly made presentations to Abbott HPD

on fraud and abuse laws.  (03/12/08 Fishman Dep. 17:6-19; 18:9-19:9, Ex. 24.)  Mr. Fishman

also testified that there was a corporate policy to comply with all laws and to the extent the law

addressed AWP and spread activities, that it was Abbott's expectation that its employees would

comply with the law and to the extent they had any questions they could ask Abbott's in-house

counsel.  (03/12/08 Fishman Dep. 50:15-20, Ex. 24.)  Mr. Fishman further testified that it was

Abbott's practice not to discuss AWP or spread information to customers.  (03/12/08 Fishman

Dep. 62:22-70:3, Ex. 24.)  In 2003, Abbott provided further guidance to its employees on these

issues through its Office of Ethics and Compliance.  (03/12/08 Fishman Dep. 70:4-8, Ex. 24).  It

was not until 2003 that the OIG  provided guidance on these issues.  (OIG Compliance Program

Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003).)

125.    Abbott does not know whether prior to 2001 it took any steps to make sure that its reported HPD list prices approximated the prices paid by providers in its HPD Alt Site marketplace.  Fishman 30(b)(6), 3/20/08 at 647:18-22; 648-649; 650:1-15.  (Lavine Decl. Exh. 91)

**RESPONSE:** Disputed.  Abbott does not dispute that plaintiffs have selectively and

incompletely quoted and/or paraphrased Mr. Fishman's testimony.  Mr. Fishman testified that to

the extent there was guidance, Abbott would have complied with such guidance.  (03/12/08

Fishman Dep. 70:4-8, Ex. 24.)  Mr. Fishman also, testified that this was an evolving environment

and once there was clearer guidance, Abbott would have taken that very seriously and would

have evaluated its operations in connection with that guidance.  (03/20/08 Fishman Dep. 636:7-

14, Ex. 24.)  It was not until 2003, that the OIG  provided guidance on these issues.  (OIG

Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5,

2003).)

126.    Abbott claims that its HPD employees deferred to in-house counsel for ensuring HPD's compliance with Medicare and Medicaid and state and federal law and regulations. Abbott HPD employees never sought guidance from in-house counsel about Medicare and Medicaid compliance and legal and regulatory issues.  Fishman Rule 30b6, 3/12/08 at 94:10-22; 95:1-5; 104:8-12; 143:5-22; 144-145; 146:1-4; 225:13-16; 226-227:228:1-2; Tobiason 1/22/08 Dep. 692:9-22; 693-699; 768:1-22; 769-771; 772:1-4; Baker 2/28/08 Dep. 360:10-22; 361-362: 363:1-13; 440:4-20; 443:2-22; 444:1-5; 515:11-22; 516:1-22; 517:1-5); Brincks Dep. 69:13-25; 70:1 22; Robertson 9/13/07 Dep 130:1 1 25; 131:1 16; 137:11 25; 138:1 6; Robertson 10/9/07 Dep. 344:9-25; 345:1-16; Leone 1/17/08 Dep. 132:17-22; 133-136; 137:1-8; 245:5-22; 246:1-18; Kreklow 2/7/08 Dep. 101:7-22; 102-115: 116:1-15; Sellers 11/1/07 30(b)(1) Dep. 173:1-22; 174-175; 176:1-22.  (Lavine Decl. Exh. 90, 100, 104, 113, 114, 115, 116, 124 and 126)

**RESPONSE:** Disputed.  David Fishman, Abbott's 30(b)(6) corporate designee testified that

because of an on-going investigation and litigation, it was the practice within the Legal Division

that, if there were any questions regarding AWP, they would be directed to the Litigation group.

(03/12/08 Fishman Dep. 104:18-105:2; 426:12-15; 286:18-21; 317:17-18, Ex. 24.)  Further

answering, Mr. Fishman testified that any guidance sought by Abbott personnel would be

privileged conversations and, therefore, he could not reveal them.  (03/12/08 Fishman Dep. 32:5-

33:7, Ex. 24.)  In 2003, through its Office of Ethics and Compliance, Abbott provided further

guidance to its employees on these issues.  (03/12/08 Fishman Dep. 70:4-8, Ex. 24.)  Abbott does

not dispute that HPD employees deferred to in-house counsel for ensuring HPD's compliance

with Medicare and Medicaid and state and federal law and regulations.

127.    If Abbott contends that if employees had any questions about a statute or
regulatory requirement, they should not have attempted to refer to them on their own, but should
have consulted with the Legal Department.  To Abbott's knowledge, no employee within HPD
ever raised a concern to the Abbott Legal Department concerning HPD's pricing conduct and the
compliance of its pricing conduct with Medicare and Medicaid.  Abbott does not know if anyone
made such inquiries to its litigation department.  Fishman Rule 30b6, 3/12/08 at 104:8-12; 286:6-
21; 317:11-18.  (N-23).  (Lavine Decl. Exh. 90)

**RESPONSE:** Disputed.  Paragraph 127 does not accurately reflect the testimony cited therein.

Abbott disputes the other statements in paragraph 127 because they misstate the deponent's

testimony.  David Fishman, Abbott's 30(b)(6) corporate designee testified that because of an on-

going investigation and litigation, it was the practice within the Legal Division that, if there were

any questions regarding AWP, they would be directed to the Litigation group.  (03/12/08

Fishman Dep. 104:18-105:2; 426:12-15; 286:18-21; 317:17-18, Ex. 24.)  Any such inquiries

would be privileged.  (03/12/08 Fishman Dep. 32:5-33:7, Ex. 24.)

128.    The only review Abbott undertook to evaluate whether its pricing practices
complied with Medicare and Medicaid fraud and abuse laws was undertaken by its legal
department.  Abbott has claimed that the evaluation is privileged and instructed its counsel
instructed counsel not to answer questions concerning the evaluation.  Fishman 30(b)(6), 3/12/08
at 335:5-22; 336-343; 344:1-22.  (Lavine Decl. Exh. 90)

**RESPONSE:** Disputed.  Paragraph 128 does not accurately reflect the testimony cited therein.

Abbott disputes the statements in paragraph 128 because they misstate the deponent's testimony.

Mr. Fishman testified in response to plaintiffs questions that any evaluation as to whether

Abbott's pricing practices complied with Medicare and Medicaid Fraud and abuse laws would

have been undertaken by Abbott's legal department and that such evaluation would be

privileged.  (03/12/08 Fishman Dep. 145:6-146:1; 333:12-14, Ex. 24.)  Abbott disputes the

materiality of the second sentence in paragraph 128, but does not dispute that plaintiffs sought to

obtain privileged information from Abbott.

129.    Abbott also refused, on the grounds of privilege[3], to provide testimonial evidence from its corporate representative concerning:

a.    whether Abbott evaluated the legality of the spreads between its actual selling prices to customers and its AWPs;

b.    advice regarding AWP, spread or spread marketing provided by Abbott in-house counsel to Abbott employees (even though non-legal employees were not permitted to review or interpret federal and state statutes and regulations); and,

c.    advice regarding price reporting, Medicare and Medicaid fraud and abuse (including concerning the federal Anti-kickback statute and the federal False Claims Act) provided by Abbott in-house counsel to Abbott employees.

Fishman Rule 30b6, 3/12/08 at 31:20-22; 32:5-22; 33-1-19; 35:7-22; 36-39; 40:1-18; 42: 20-22; 43-46; 47:1-8; 110:8-22; 111:1-7; 287:7-16; 295:2-22; 296; 297:1-21. 332:10-22; 333:1-22 (Lavine Decl. Exh. 90).

**RESPONSE:**  Disputed.  Paragraph 128 does not accurately reflect the testimony cited therein.

Abbott disputes the materiality of the above statement and the footnote, but does not dispute that

the government sought to obtain privileged information from Abbott.  (03/12/08 Fishman 31:20-

32:13, Ex. 24.)

130.    By at least April of 2007, Abbott's in-house counsel understood the relationship between AWP and reimbursement for Medicare.  Abbott in-house counsels Mark Barmak and Anni Goldberg were involved in the litigation involving TAP Pharmaceuticals, Inc. ("TAP") and United States Department of Health and Human Services (HHS), in which TAP sought injunctive relief to preclude HHS from disallowing Medicare reimbursement for TAP's product Lupron at the Lupron's AWP.  Abbott's in-house counsel also served as lawyers for TAP from 1989 until at least 1999.  TAP was one client group for the Abbott legal department.  TAP Lupron Complaint, Civ-Case No. 3-97-96919, U.S. Dist. Court for the District of South Carolina, at pp. 3-6, 11, 15, and related filings.  Abbott response to U.S. Second RFAs 13; Trial Testimony of Mark Haberberger at 110-134; U. S. v. MacKenzie, et al, D. Mass. Criminal Case. No. CR-01 - 10350- DWP (Lavine Decl. Exh. 85, 86, 95, 127)

---

[3] The United States specifically sought a Rule 30(b)(6) designee from Abbott to testify on efforts undertaken by Abbott to comply with federal and state law. Abbott designated David Fishman, an in-house Abbott lawyer, who refused upon instruction of counsel to answer many questions on the grounds of attorney-client privilege or on the grounds that the question called for a legal conclusion.

**RESPONSE:** Abbott objects to and moves to strike paragraph 130 because issues surrounding

TAP Pharmaceuticals, Inc. are immaterial and irrelevant to this case (as this Court has

recognized).  (05/16/07 Hearing Transcript at 57-62, Ex. 130) (denying Government's motion to

compel discovery relating to TAP as irrelevant to this case).)  This is not the sort of evidence that

the Court may consider in ruling on summary judgment.  *See, e.g., Hillstrom v. Best Western*

*TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003) ("This evidence was not admissible and could not be

considered in the summary judgment analysis"); *Horne v. City of Boston*, 509 F. Supp. 2d 97,

111 n.19 (D. Mass. 2007) ("A court will not consider inadmissible evidence in ruling on a

motion for summary judgment.") (citation omitted).  Further responding, as to the issue of the

relationship between AWP and reimbursement s under Medicare, the record in this case shows that

the Government knew full well that the compendia AWPs were not representative of (and were

far higher than) actual market prices, and yet Medicare and the state Medicaid programs

intentionally used AWP as the benchmark for payments to providers in order to further various

policy goals, including encouraging provider use of generic drugs, subsidizing inadequate or

non-existent dispensing fees, and ensuring beneficiaries access to care.  (*See* AF ¶ 27, 62-63, 83;

CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s Memorandum In*

*Opposition To The United States' Motion For Partial Summary Judgment, And Reply In Support*

*Of Abbott's Motion For Partial Summary Judgment* at 13-19).

     131.     In 2001, TAP ultimately plead guilty to federal criminal charges ("TAP Criminal Case") in the District of Massachusetts, settled a civil action, and entered into a Corporate [Integrity] Agreement with HHS OIG as a result o f it s conduct in part in creating and marketing high spreads.  TAP paid a criminal fine of $290,000,000 and civil settlement payment of $559,482,560 incident to settling two related AWP lawsuits filed in the District of Massachusetts ("TAP Civil Actions").  In 2001, Abbott had to sign a letter agreement consenting to the criminal plea and settlement.  See Abbott Letter Agreement in TAP Case.  (Lavine Decl. Exh. 94)

**RESPONSE:** Abbott objects to and moves to strike paragraph 131 because issues surrounding

TAP Pharmaceuticals, Inc. are irrelevant to this case (as this Court has recognized).  (05/16/07

Hearing Transcript at 57-62, Ex. 130) (denying Government's motion to compel discovery

relating to TAP as irrelevant to this case).)  This is not the sort of evidence that the Court may

consider in ruling on summary judgment.  *See, e.g., Hillstrom v. Best Western TLC Hotel*, 354

F.3d 27, 32 (1st Cir. 2003) ("This evidence was not admissible and could not be considered in

the summary judgment analysis"); *Horne v. City of Boston*, 509 F. Supp. 2d 97, 111 n.19 (D.

Mass. 2007) ("A court will not consider inadmissible evidence in ruling on a motion for

summary judgment.") (citation omitted).

132.    For its own pharmacies, Abbott would bill and collect any AWP spreads on its
own products from third party payors such as Medicare and Medicaid.  Abbott's only out-of-
pocket expense was the cost of the product, and services carrying costs associated with storing
and dispensing the product.  Kreklow 121:4-22; Sellers 3/31/08 at 483:13-22; 484-485; 486:1-5
(Lavine Decl. Exh. 89, 116)

**RESPONSE:**  Abbott objects and moves to strike paragraph 132 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Subject to and without waiving this objection, Abbott does not dispute that, at certain times and

for certain products, Abbott Home Care and later Home Infusion Services billed Medicare as

well as some state Medicaid programs for certain products and services provided by the Home

Infusion Services Pharmacies using Abbott's EIN, Medicare provider number, and certain

Medicaid provider numbers.  (07/18/07 Leone Dep. 70:10 – 25, Ex. 45.)  Nor does Abbott

dispute that, again like other pharmacy providers, it incurred expenses in operating its three

pharmacies, including product costs and costs associated with storing and dispensing products.

133.    In addition to maintaining its own pharmacies, Abbott's Home Infusion business
model was predominantly to contract with hospitals to help get them into the home infusion
business.  Sellers 30b6, 3/31/08 at 459:20-22; 460:1-11.  (Lavine Decl. Exh. 89)

**RESPONSE:**  Abbott objects and moves to strike paragraph 133 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment. (*See* Dkt. No. 6186 at 33-38.)

Subject to and without waiving this objection, Abbott does not dispute that its Home Infusion

Services business offered a variety of services to customers, often hospitals, that were interested

in starting home infusion therapy businesses.

134.    Abbott entered into "revenue share" arrangements with customers, including hospitals.  Under these arrangements, Abbott offered a broad variety of services and options including:

    a)    the consignment of Abbott products and delivery to the revenue share partner's facilities without any upfront charge;

    b)    reimbursement services where Abbott employees would directly bill and collect from payors, including Medicaid and Medicare, on behalf of the revenue share partner;

    c)    pharmacy services and training;

    d)    the development of procedures that helped facilitate JCAHO accreditation;

    e)    engineering assistance for pharmacy build-out and warehouse and facilities start up;

    f)    case management on behalf of the revenue share partner for its patients; and,

    g)    access to the Abbott HPD "CHIPS" computer system.

Sellers 30b6, 3/31/08 at 460:19-22; 461; 462:1-22; 466:7-22; 467:1-5; Abbott response to U.S. Second RFAs 11 & 19.  (Lavine Decl. Exh. 89 & 139)

**RESPONSE:**  Abbott objects and moves to strike paragraph 134 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment. (*See* Dkt. No. 6186 at 33-38.)

Abbott further objects to the term "revenue share arrangements," as vague and argumentative.

Subject to and without waiving this objection, Abbott does not dispute that Home Infusion

Services offered a variety of services to customers interested in starting their own home infusion

therapy business, including at various times:  access to Abbott's proprietary CHIPs software

system, which helped with inventory management; business counseling and training; pharmacy

services and training; assistance securing accreditation; assistance with claim submission and

collection; assistance with facility start-up; and case management.  (03/31/08 Sellers Dep.

460:22–462:22, 470:1-13, Ex. 76.)  Customers could pick and choose which services to utilize

and would negotiate a contract with Home Infusion Services accordingly.  (*Id.*)  Depending upon

the nature of the services provided, Home Infusion Services was paid for its services based upon

either a per diem amount or a percentage of the amounts collected by the customer from third-

party payors.  Customers who utilized Abbott products paid a higher amount to account for the

product costs.  (02/07/08 Kreklow Dep. 19:15-20:2, Ex. 44.)  Home Infusion Services was a

small business that had fewer than 40 customers and was marginally profitable at best.  (AF ¶15.)

Abbott made the decision to close down Home Infusion Services in 1998.  (*Id.* ¶ 22.)

>    135.    In exchange for providing its consigned goods and broad services at no separate
> fair market value charge, Abbott would receive a percentage of the revenue share partners'
> collected billings from third party payors, including Medicare and Medicaid.  Sellers 30b6,
> 3/31/08 at 466:1-6; 467:2-7.  (Lavine Decl. Exh. 89)

**RESPONSE:**  Abbott objects and moves to strike paragraph 135 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6138 at 33-38.)

Abbott further objects to the term "revenue share partners," as vague and argumentative.  Abbott

also objects to the term "fair market value charge" because it calls for a legal conclusion.

Subject to and without waiving these objections, Abbott disputes the allegations that it entered

into partnerships with any customers, or that Home Infusion Services provided goods and

services for no fair market value.  The arrangements with the few Home Infusion Services

customers were negotiated contracts, not partnerships.  (03/31/08 Sellers Dp. 459:20 – 461:17,

Ex. 76.)  Moreover, Home Infusion Services negotiated fees for the goods and services provided.

Home Infusions Services was paid for its services based upon either a per diem amount or a

percentage of the amounts collected by the customer from third-party payors.  Customers who

utilized Abbott products paid a higher amount to account for the product costs.  (02/07/08

Kreklow Dep. 19:15-20:2, Ex. 44.)  Abbott does not dispute, however, that Home Infusion

Services was not a successful enterprise.  It was a small business that had fewer than 40

customers and was marginally profitable at best.  (AF ¶ 15.)  Abbott made the decision to close

down Home Infusion Services in 1998.  (*Id.* ¶ 22.)

136.    If the revenue share partner was paid by Medicare or Medicaid for a product and
that product enjoyed a spread between its AWP and market price, Abbott shared in a percentage
of the spread that it collected from Medicare or Medicaid.  Sellers 30b6, 3/31/08 at 460:19-22.;
Brincks 212:1-24; Rodman 10/11/07 dep. at 338:5-14; 339:1-21.  (Lavine Decl. Exh. 89, 104 &
117)

**RESPONSE:**  Abbott objects and moves to strike paragraph 136 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Abbott further objects to the term "revenue share partner," as vague and argumentative.  Subject

to and without waiving these objections, Abbott disputes the allegation that it entered into

partnerships with any customers, or that Home Infusion Services improperly shared in a

"spread."  The arrangements with the few Home Infusion Services customers were negotiated

contracts, not partnerships.  (03/31/08 Sellers Dep. 459:20-461:17, Ex. 76.)  Depending upon the

nature of the services provided, Home Infusion Services was paid for its services based upon

either a per diem amount or a percentage of the amounts collected by the customer from third-

party payors.  If the latter, then Abbott was paid a negotiated percentage of the amount paid to

the customer.  That amount sometimes included a margin above the customer's acquisition cost.

As shown in Abbott's briefs, however, payors like Medicare and Medicaid knowingly and

intentionally paid this margin (the so-called "spread") to providers, especially home infusion

therapy providers, and so these payments (including the portions paid to Abbott by its provider

customers) were in no way improper.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-

18;  *see also Abbott Laboratories Inc.'s Memorandum In Opposition To The United States'*

*Motion For Partial Summary Judgment, And Reply In Support Of Abbott's Motion For Partial*

*Summary Judgment* at 13-19.)

     137.    Pursuant to some of the revenue share contracts, if the revenue share partner
elected to use a competitors' product for a particular therapy, instead of a product that Abbott
consigned, the revenue share partner would still need to pay Abbott its agreed-upon revenue
share for that therapy even though the revenue share partner paid for the competitor's product.
(Home Infusion Documents) (Lavine Decl. Exh. 118)

**RESPONSE:** Abbott objects and moves to strike paragraph 137 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Abbott further objects to the term "revenue share partner," as vague and argumentative.  Subject

to and without waiving these objections, Abbott disputes the allegation that it entered into

partnerships with any customers.  The arrangements with the few Home Infusion Services

customers were negotiated contracts, not partnerships.  (03/31/08 Sellers Dep. 459:20-461:17,

Ex. 76.)  Depending upon the nature of the services provided, Home Infusion Services was paid

for its services based upon either a per diem amount or a percentage of the amounts collected by

the customer from third-party payors.  Abbott does not dispute that, as part of the negotiated

relationship, the percentage payment made for Home Infusions Services' efforts sometimes

included amounts relating to products other than strictly Abbott products.

     138.    Abbott never communicated to its clients or separately charged them any fair
market value of the products it consigned or the services it provided.  Sellers 30b6, 3/31/08 at
463:1 22; 464 466; 467:1 22 (Lavine Decl Exh 89)

**RESPONSE:** Abbott objects and moves to strike paragraph 138 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Abbott also objects to the term "fair market value charge" because it calls for a legal conclusion.

Subject to and without waiving these objections, Abbott disputes the allegation that it provided

goods and services for no fair market value.  Home Infusion Services negotiated fees for the

goods and services it provided.  Depending upon the nature of the services provided, Home

Infusion Services was paid for its services based upon either a per diem amount or a percentage

of the amounts collected by the customer from third-party payors.  Customers who utilized

Abbott products paid a higher amount to account for the product costs.  Abbott does not dispute,

however, that Home Infusion Services was not a successful enterprise.  It was a small business

that had fewer than 40 customers and was marginally profitable at best.  (AF ¶ 15, 22-25.)

Abbott made the decision to close down Home Infusion Services in 1998.  (*Id.* ¶ 22.)

139.    The overall therapy category, and not the individual specific services provided to the patient, defined the revenue share percentage that Abbott collected.  Sellers 30b6, 3/31/08 at 469:9-22; 469:1-7; Home Infusion Documents (Lavine Decl. Exh. 89)

**RESPONSE:** Abbott objects and moves to strike paragraph 139 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Abbott further objects to the term "revenue share" as vague and argumentative.  Subject to and

without waiving these objections, Abbott disputes the allegation that it entered into any type of

partnership with any customers.  The arrangements with the few Home Infusion Services

customers were negotiated contracts, not revenue share partnerships.  (03/31/08 Sellers Dep.

459:20–461:17, Ex. 76.)  Further responding, the statement is misleading because the various

therapy categories encompassed different specific services (03/31/08 Sellers Dep. 468:14-469:7,

Ex. 76  Abbott further disputes the allegation made in paragraph 139.  The specific percentage

paid to Abbott was the result of arms-length negotiations between Home Infusion Services and

its customers, and it took into account a number of business factors, including but not limited to

the precise services that the customer requested (which would obviously impact the amount of

labor and other resources Abbott would be required to expend) and whether the customer would

be utilizing Abbott products and how much. (03/31/08 Sellers Dep. 460:2-462:22, Ex. 76.)

140.    If Medicare or Medicaid did not pay for a particular patient's reimbursement, then
under Abbott's Home Infusion model, Abbott would provide the cost of the products used for the
patients and for the cost of Abbott's services, and would recover nothing.  Sellers 30b6, 3/31/08
at 469:9-22.  (Lavine Decl. Exh. 89)

**RESPONSE:** Abbott objects and moves to strike paragraph 140 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Subject to and without waiving these objections, Abbott disputes the statement that Abbott

would provide the cost of the products.  The arrangements with the few Home Infusion Services

customers were negotiated contracts, not revenue share partnerships.  (03/31/08 Sellers Dep.

459:20-461:17, Ex. 76.)  Depending upon the nature of the services provided, Home Infusion

Services was paid for its services based upon either a per diem amount or a percentage of the

amounts collected by the customer from third-party payors.  Customers who utilized Abbott

products paid a higher amount to account for the product costs.  (02/07/08 Kreklow Dep. 19:15-

20:2, Ex. 44.)  Abbott does not dispute that, in situations where Home Infusion Services was paid

for its services based upon a negotiated percentage of payments made to a customer, then Home

Infusion Services did not get paid if the customer did not get paid.

141.    Abbott advertised in its promotional materials for its Home Infusion unit that the
arrangement was a "risk share"; if the revenue share partner did not collect, it did not have to pay
Abbott for its products and services provided.  (Home Infusion Documents) (Lavine Decl. Exhs.
118)

**RESPONSE:** *See* rsponse to paragraph 140.

142.    From its inception in 1983 through to its closure, Abbott Home Infusion's overall
general format for its revenue share arrangements did not change, though the array of services

provided may have varied from client to client.  Sellers 30b6, 3/31/08 at 470:1-13.  (Lavine Decl. Exh. 89)

**RESPONSE:**  Abbott objects and moves to strike paragraph 142 because the Government's claims relating to Home Infusion Services are untimely and should be dismissed for all of the reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)  Abbott further objects to the terms "revenue share" and "overall general format" as vague, undefined, and argumentative.  Subject to and without waiving these objections, Abbott disputes that it had a general revenue share arrangement and that it did not change.  Home Infusion Services negotiated fees for the goods and services it provided.  Depending upon the nature of the services provided, Home Infusion Services was paid for its services based upon either a per diem amount or a percentage of the amounts collected by the customer from third-party payors.  Customers who utilized Abbott products paid a higher amount to account for the product costs.  (02/07/08 Kreklow Dep. 19:15-20:2, Ex. 44.)  Abbott does not dispute, however, that Home Infusion Services was not a successful enterprise.  It was a small business that had fewer than 40 customers and was marginally profitable at best.  It was a small business that had fewer than 40 customers and was marginally profitable at best.  (AF ¶15, 22-25.)  Abbott made the decision to close down Home Infusion Services in 1998.  (*Id.* ¶ 22.)

143.     Abbott's Home Infusion reimbursement department operated as follows:

   a)     the prescription was filled by the Abbott pharmacy or the revenue share partner;

   b)     an Abbott Home Infusion reimbursement team member would develop a claim and contact the payor, including Medicare and/or Medicaid;

   c)     there was a general time frame when the payor would be expected to reimburse.  If the payor did not reimburse within that time period, Abbott would follow up;

   d)     if and when the payor paid, Abbott would get data from its pharmacies or revenue share partners' lockbox and document payment;

e)      thereafter, if there were co-pays to collect, Abbott's reimbursement personnel would bill for co-pays because upon payment it would know what the allowable amount was.  At times, Abbott would also send out collection letters;

f)      If Abbott or the revenue share partner did not accept a decision by a payor not to pay, or to disallow a portion of payment, upon agreement with the revenue share partner, Abbott would take an appeal through the payor's appeals process;

g)      Abbott's Home Infusion business employed reimbursement technicians, also engaged in collections.  In circumstances where a claim was denied by a third party payor, including Medicare and Medicaid, Home Infusion attempted to collect the entire amount which had been billed to the third party payor.  In many cases, the amount "charged" by Home Infusion was based on a multiple of the AWP for the product.

Sellers 30b6, 3/31/08 at 473:2-22; 474-475; 476:1-12.; Collection Letters. (Lavine Decl. Exh. 89, 92, and 93)

**RESPONSE:**  Abbott objects and moves to strike paragraph 143 because the Government's claims relating to Home Infusion Services are untimely and should be dismissed for all of the reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.) Abbott further objects to the term "revenue share" as vague and argumentative.  The arrangements with the few Home Infusion Services customers were negotiated contracts, not revenue share partnerships.  (03/31/08 Sellers Dep. 459:20-461:17, Ex. 44.)  Subject to and without waiving this objection, Abbott disputes paragraph 143 because the general statement of how Home Infusion Services "operated" does not accurately reflect the testimony cited therein. The cited testimony is replete with testimony regarding the differences in the services provided. Further responding, the testimony cited clearly indicates that in some cases, the customer did everything and in some cases, some of the items were part of the services offered by Abbott. Abbott offered a very flexible menu of services and the contract was negotiated in accordance with the services selected by the customer.  (03/31/08 Sellers Dep. 462:3-22, Ex. 76.)

144.    If the revenue partner used non-Abbott products for its patients, not only would the partner have to pay for that non-Abbott product, but by contract, that non-Abbott product cost to the revenue partner could not be was not deducted from the percentage share of the gross revenues that it was contractually required to pay Abbott.  (Home Infusion Documents) (Lavine Decl. Exh. 118)

**RESPONSE:**  Abbott objects and moves to strike paragraph 137 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Abbott further objects to the term "revenue partner" as vague and argumentative.  Subject to and

without waiving these objections, Abbott disputes the statement that it entered into partnerships

with any customers.  The arrangements with the few Home Infusion Services customers were

negotiated contracts, not partnerships.  (03/31/08 Sellers Dep. 459:20-461:17, Ex. 76.)

Depending upon the nature of the services provided, Home Infusion Services was paid for its

services based upon either a per diem amount or a percentage of the amounts collected by the

customer from third-party payors.  Abbott does not dispute that, as part of the negotiated

relationship, the percentage payment made for Home Infusions Services' efforts sometimes

included amounts relating to products other than strictly Abbott products.

145.    Under Abbott's Home Infusion business there was enough "profit" over and above ingredient cost for Abbott products that would permit both Abbott and its revenue partners to receive some form of return on investment.  This margin resulted from the existence of high spreads and the low cost of Abbott consigned product.  (Brincks Dep. 135:15-25; 136:1-5; 137-147; 148:1-3) (Lavine Decl. Exh. 104)

**RESPONSE:**  Abbott objects and moves to strike paragraph 145 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Abbott further objects to the terms "profit" and "revenue partners" as vague, argumentative and

thus incapable of being either admitted or disputed.  Subject to and without waiving these

objections, Abbott disputes paragraph 145 because the statements do not accurately reflect the

testimony cited therein.  Abbott further disputes the statement that it entered into partnerships

with any customers, or that Home Infusion Services improperly shared in a "spread."  The

arrangements with the few Home Infusion Services customers were negotiated contracts, not

partnerships.  (03/31/08 Sellers Dep. 459:20–461:17, Ex. 76.)  Depending upon the nature of the

services provided, Home Infusion Services was paid for its services based upon either a per diem

amount or a percentage of the amounts collected by the customer from third-party payors.  If the

latter, then Abbott was paid a negotiated percentage of the amount paid to the customer.  That

amount sometimes included a margin above the customer's acquisition cost.  As shown in

Abbott's briefs, however, payors like Medicare and Medicaid knowingly and intentionally paid

this margin (the so-called "spread") to providers, especially home infusion therapy providers,

and so these payments (including the portions paid to Abbott by its provider customers) were in

no way improper.  (*See* AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott*

*Laboratories Inc.'s Memorandum In Opposition To The United States' Motion For Partial*

*Summary Judgment, And Reply In Support Of Abbott's Motion For Partial Summary Judgment*

at 13-19.)

146.    Mr. Brincks testified that getting, for example, only 15 percent of a revenue
partners' collections would enable Abbott to cover both the cost of the product and some
incremental services if any were rendered.  He further acknowledged that Abbott had to be aware
that there were very significant spreads between the actual cost of the products and the
reimbursement that was generated on those products.  (Brincks Dep. 44:19-25: 45:1-4; 53:9-25;
54:1-3; 62: 21-25; 63:1-24; 144:24-25; 145: 1-23; 164:1-25; 216:14-25; 262:18-25; 263:1)
(Lavine Decl. Exh. 104)

**RESPONSE:**  Abbott objects and moves to strike paragraph 146 because the Government's

claims relating to Home Infusion Services are untimely and should be dismissed for all of the

reasons set forth in Abbott's motion for summary judgment.  (*See* Dkt. No. 6186 at 33-38.)

Abbott further objects to the term "revenue partners" as vague and argumentative.  Subject to

and without waiving these objections, Abbott disputes paragraph 146 because the statements do

not accurately reflect the testimony cited therein.  Mr. Brincks testified that the percentages

received by Abbott were based on gross contribution and not net so that many costs and

overheads had to be covered (6/12/2007 Brincks Dep. 135:9-136:5, Ex. 11.)  Further responding,

Mr. Brincks was a former employee whose testimony was speculative with regard to the

awareness by other employees or by the corporation.

Abbott further disputes the statement that it entered into partnerships with any customers,

or that Home Infusion Services improperly shared in a "spread."  The arrangements with the few

Home Infusion Services customers were negotiated contracts, not partnerships.  (03/31/08 Sellers

Dep. 459:20-461:17, Ex. 76.)  Depending upon the nature of the services provided, Home

Infusion Services was paid for its services based upon either a per diem amount or a percentage

of the amounts collected by the customer from third-party payors.  If the latter, then Abbott was

paid a negotiated percentage of the amount paid to the customer.  That amount sometimes

included a margin above the customer's acquisition cost.  As shown in Abbott's briefs, however,

payors like Medicare and Medicaid knowingly and intentionally paid this margin (the so-called

"spread") to providers, especially home infusion therapy providers, and so these payments

(including the portions paid to Abbott by its provider customers) were in no way improper.  (*See*

AF ¶ 27, 62-63, 83; CF ¶ 3; SOF ¶ 52-54; C. Br. at 1-18;  *see also Abbott Laboratories Inc.'s*

*Memorandum In Opposition To The United States' Motion For Partial Summary Judgment, And*

*Reply In Support Of Abbott's Motion For Partial Summary Judgment* at 13-19.)

147.    The following chart sets forth the range of spreads between the Average Price and
the AWP for the 44 NDCs at issue in this case.  It is derived from the information contained in
the spreads set forth in the Ormond Decl.  As the summary show, the spreads for the Subject
Drugs ranged 113% to 1685%:

| NDC | Lowest Spread 1991 to 2000 | Highest Spread 1991 | 2001 Spread (Post List/WAC |
|---|---|---|---|
| | | | |

| | | to 2000 | Reduction) |
|---|---|---|---|
| 00074-1966-07 | 340% | 783% | 102% |
| 00074-3977-03 | 479% | 805% | 91% |
| 00074-4332-01 | 527% | 1542% | 269% |
| 00074-4887-10 | 267% | 1105% | 100% |
| 00074-4887-20 | 297% | 731% | 240% |
| 00074-4887-50 | 164% | 443% | 102% |
| 00074-4888-10 | 223% | 811% | 121% |
| 00074-4888-20 | 282% | 638% | 109% |
| 00074-6138-02 | 744% | 1591% | n/a |
| 00074-6138-03 | 754% | 1351% | 36% |
| 00074-6138-22 | 1337% | 1420% | 64% |
| 00074-6139-02 | 740% | 1652% | n/a |
| 00074-6139-03 | 757% | 1301% | 58% |
| 00074-6139-22 | 1282% | 1491% | 55% |
| 00074-6509-01 | 204% | 708% | 64% |
| 00074-6533-01 | 493% | 1675% | 287% |
| 00074-6534-01 | 113% | 329% | 111% |
| 00074-6535-01 | 113% | 351% | 42% |
| 00074-7100-13 | 268% | 891% | 44% |
| 00074-7100-23 | 313% | 885% | 27% |
| 00074-7101-02 | 299% | 801% | 73% |
| 00074-7101-13 | 284% | 859% | 75% |
| 00074-7101-23 | 283% | 818% | 43% |
| 00074-7120-07 | 424% | 993% | 57% |
| 00074-7138-09 | 872% | 1535% | 43% |
| 00074-7139-09 | 868% | 1546% | 44% |
| 00074-7902-09 | 650% | 1310% | 101% |
| 00074-7922-02 | 540% | 1174% | 52% |
| 00074-7922-03 | 701% | 1148% | 40% |
| 00074-7922-09 | 540% | 1175% | 38% |
| 00074-7923-36 | 291% | 1071% | 73% |
| 00074-7923-37 | 581% | 1349% | 71% |
| 00074-7924-09 | 702% | 1450% | 28% |
| 00074-7926-09 | 685% | 1074% | 57% |
| 00074-7941-09 | 701% | 1274% | 46% |
| 00074-7972-05 | 112% | 264% | 49% |
| 00074-7973-05 | 101% | 329% | 61% |
| 00074-7983-02 | 478% | 1204% | 48% |
| 00074-7983-03 | 998% | 1240% | 36% |
| 00074-7983-09 | 446% | 1391% | 33% |
| 00074-7984-36 | 276% | 1082% | 71% |
| 00074-7984-37 | 510% | 1094% | 70% |
| 00074-7985-09 | 689% | 1378% | 32% |
| 00074-7990-09 | 424% | 1122% | 72% |

**RESPONSE:** Objection to the Ormond declaration as inadmissible.  Plaintiffs have never

disclosed Mr. Ormond as a expert, his declaration is not the subject of proper expert testimony,

and Abbott did not have the opportunity to depose him.  Abbott disputes all factual statements

made in Mr. Ormond's declaration.  The Court should strike this out-of-time testimony.  *Lohnes*

*v. Level 3 Comm'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (excluding expert testimony because

the plaintiff's "failure to unveil his expert until after [defendant] had moved for summary

judgment deprived [defendant] of the opportunity to depose the proposed expert, challenge his

credentials, solicit expert opinions of its own, or conduct expert-related discovery," and noting

that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed

to eradicate"); *Sutra, Inc. v. Iceland Express, EHF*, No. 04-11360-DPW, 2008 WL 2705580, at

*5 (D. Mass. July 10, 2008) (excluding plaintiff's expert report due to "unjustifiably late

disclosure after the discovery period has ended and just 8 days before summary judgment

motions were due"); *see e.g., Bevolo v. Carter*, 447 F.3d 979 (7th Cir. 2006) (striking party's

expert witness disclosure at the summary judgment stage because it was untimely filed).

Disputed.  The "low cost" cited above is based on certain average price calculations made by Dr.

Mark G. Duggan.  Abbott's expert, Steven J. Young, detailed the errors in Dr. Duggan's average

prices.  Mr. Young opines that Dr. Duggan limited his analysis to less than 2% of sales and

selected only negotiated contract sales to certain pharmacy customers.  Dr. Duggan failed to

consider prices paid by other customers such as providers who purchased directly from Abbott or

directly from a wholesaler or retailer at an unknown price.  (03/06/09 Young Report 23, Ex. 94.)

Dr. Duggan's work cannot form the basis of any reliable calculations, because it is inherently

defective and should be struck on *Daubert* grounds.  (*See* Dkt. No. 6177.)

Dated:  August 28, 2009                   Respectfully submitted,

                                          /s/  R. Christopher Cook
                                          Daniel E. Reidy
                                          James R. Daly
                                          Jason G. Winchester
                                          Brian J. Murray
                                          JONES DAY
                                          77 West Wacker Drive, Suite 3500
                                          Chicago, Illinois  60601
                                          Telephone:  (312) 782-3939
                                          Facsimile:   (312) 782-8585

                                          R. Christopher Cook
                                          David S. Torborg
                                          JONES DAY
                                          51 Louisiana Avenue, N.W.
                                          Washington, D.C.  20001-2113
                                          Telephone:  (202) 879-3939
                                          Facsimile:  (202) 626-1700

                                          *Counsel for Defendant Abbott Laboratories Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Carol P. Geisler, an attorney, hereby certify that I caused a true and correct copy of the foregoing to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 28th day of August, 2009.

/s/ Carol P. Geisler
Carol P. Geisler