# EXHIBIT 1

Aldy, Gary Keith                                February 21, 2008
                         Sacramento, CA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE          )

LITIGATION                       )

-------------------------------X MDL No. 1456

United States of America, ex     ) Civil Action

rel. Ven-a-Care of the Florida   ) No. 01-12257-PBS

Keys, Inc. vs. Abbott            )

Laboratories, Inc.,              )

CIVIL ACTION No. 06-11337-PBS    )

-------------------------------X


        THURSDAY, FEBRUARY 21, 2008

      VIDEOTAPED DEPOSITION OF

         GARY KEITH ALDY



Reported By:      INA C. LeBLANC

               CSR No. 6713

Aldy, Gary Keith                                    February 21, 2008
                          Sacramento, CA

1    007, Exhibit Aldy 008, Exhibit Aldy 009, Exhibit
2    Aldy 010, Exhibit Aldy 011, Exhibit Aldy 012,
3    and Exhibit Aldy 014 WERE MARKED FOR
4    IDENTIFICATION.)
5    BY MR. SISNEROS:
6        Q.  All right, Mr. Aldy.  I'm going to be
7    asking you if you know what -- what some terms
8    mean.  The first term I want to ask you --
9            Have you ever heard of the term
10   "catalogue price"?
11       A.  It's typically our list price.
12       Q.  So list price and catalogue price are
13   the same?
14       A.  That's my understanding.
15       Q.  What is that price?
16       A.  It's our published list price.
17       Q.  How is it used?
18       A.  The only time that I would use list
19   price is if a customer didn't belong to a GPO or
20   have some other type of contract.
21       Q.  Did you make a lot of sales at list
22   price?

1        A.  No.
2        Q.  Most -- Well, let me ask you this:  In
3    your experience, were contract prices lower than
4    list price?
5        A.  Yes.
6        Q.  Were they significantly lower than list
7    price?
8            MR. COLE:  Object to the form.
9            THE WITNESS:  I could not tell you
10   percentage- wise, but they were lower than list
11   price, yes.
12   BY MR. SISNEROS:
13       Q.  And other than the use that you've just
14   identified for list price, do you know of any
15   other uses for list price?
16       A.  No.
17       Q.  Okay.  Have you heard of the term
18   wholesale acquisition cost, or WAC?
19       A.  I've heard of the term, yes.
20       Q.  What is that?
21       A.  I would -- I'm just assuming or -- You
22   know, I really don't -- I didn't work in that

1    arena where I was aware of that pricing, or
2    talked about that pricing, so just the wholesale
3    price.
4        Q.  And none of your customers involved
5    wholesalers.  That's correct, right?
6        A.  I'm sorry?
7        Q.  None of your customers were wholesaler
8    based?
9        A.  I didn't call them wholesalers, no.
10       Q.  Have you heard of a term called DAC?
11       A.  No.
12       Q.  D-A-C?
13       A.  No.  I'm not familiar with DAC.
14       Q.  Distributor acquisition cost?
15       A.  Previous to you saying that, I don't
16   think I have ever heard that term used.
17       Q.  Have you ever heard of a price called
18   Rx link price?
19       A.  I have heard of Rx link, yes.
20       Q.  And what is that?
21       A.  It was some pricing that was out there,
22   but I don't know -- I didn't use Rx link.

1        Q.  Okay.  Have you ever heard of a term
2    called average wholesale price, AWP?
3        A.  Yes.
4        Q.  What is that?
5        A.  Again, that's something that I didn't
6    participate in or work with, but -- other than it
7    being the average price of a wholesale product,
8    so I....
9        Q.  Okay.  I have to follow up on your
10   answer, because the way you answered was
11   "something I didn't participate in," but really
12   my question was more general.
13       A.  Okay.
14       Q.  My question was:  Do you know what AWP
15   is?
16       A.  I am not privy to AWP.
17       Q.  So you don't know what it is?
18       A.  Average wholesale price, is what you
19   told me, and I don't -- other than that....
20       Q.  Do you know how AWP was used?
21       A.  We didn't -- We didn't discuss AWP.
22       Q.  Okay.  I appreciate your answer, and,

Henderson Legal Services, Inc.

22f1d8a1-b074-40da-acb4-d64c02fe554

Aldy, Gary Keith                          February 21, 2008
                    Sacramento, CA

1   again, my question was more general.
2         Did you know how AWP was used?
3      A.  No.
4      Q.  Okay.  Have you heard of the term
5   direct price, or DP?
6      A.  No.
7      Q.  Have you heard of Red Book?
8      A.  I've heard of Red Book, yes.
9      Q.  What is Red Book?
10     A.  To the best of my knowledge, it's a
11  database that the -- my customers used.
12     Q.  For what?
13     A.  For whatever Red Book is for.
14     Q.  How do you know your customers used Red
15  Book?
16     A.  Because I've heard them mention Red
17  Book.
18     Q.  To you?
19     A.  I guess it would have been to me.
20     Q.  What did they say about Red Book?
21     A.  Probably would have just been a
22  reference to something in Red Book.

1      Q.  Have you ever heard of the word spread?
2      A.  I've heard of the word spread, yes.
3      Q.  And in your experience at Abbott, what
4   did spread mean?
5         MR. COLE:  Object to the form.
6         THE WITNESS:  That was not something
7   that I dealt with as far as products were
8   concerned.  I don't -- We just didn't do anything
9   with anything that incorporated spread in it.
10  BY MR. SISNEROS:
11     Q.  Okay.  And, again, I appreciate your
12  answer, but my question is broader.  Do you know
13  what spread is?
14     A.  I really don't know what spread is, no.
15     Q.  Okay.  You've testified several times
16  today that you didn't talk about reimbursement;
17  is that right?
18     A.  Um-hmm.
19     Q.  Is that a yes?
20     A.  Yes.
21     Q.  You didn't talk about AWP with your
22  customers?

1      A.  Correct.
2      Q.  And you didn't talk about reimbursement
3   with your customers?
4      A.  Correct.
5      Q.  Why is that?
6      A.  In my early training with Abbott, I
7   have a recall of just being told that those are
8   things that are not to be discussed with the
9   customers.
10     Q.  Who told you that?
11     A.  Best of my recollection, it would have
12  been my district manager, Debbie Paulson.
13     Q.  And you were hired in '97, so this is
14  something that you would have been told after
15  your hire date?
16     A.  Yes.
17     Q.  Do you recall with reference to your
18  hire date how long afterwards you were told this?
19     A.  No, I don't.
20     Q.  Do you have a recollection if you were
21  told this at the time of your hiring?
22     A.  No, I don't.

1      Q.  When you were told this, were you told
2   this one to one or in a group setting?
3      A.  I would have said -- I would say one to
4   one.
5      Q.  Were you told this over the telephone?
6      A.  I don't recall.
7      Q.  Was this ever communicated to you in
8   writing?
9      A.  Not that I recall.
10     Q.  Were you -- What is your understanding
11  of why you should not discuss reimbursement or
12  AWP with your customers?
13        MR. COLE:  Object to the form.
14        THE WITNESS:  Could you restate that?
15        MR. SISNEROS:  Sure.
16     Q.  Did Debbie Paulson tell you why you
17  should not be discussing reimbursement with
18  customers?
19     A.  Just that that was not anything that we
20  were involved in, and it wasn't a part of what I
21  do.
22     Q.  That's all?

41 (Pages 158 to 161)

22f1d8a1-b074-40da-acb4-d64cd02fe554

Aldy, Gary Keith                          February 21, 2008
                    Sacramento, CA

Page 330

BY MS. FORD:
1
2    Q.  Okay.  Is that same -- Is that also
3  true with respect to your hard copy files?
4    A.  Yeah.  I would go through and purge
5  files as -- from time to time, yes, ma'am.
6    Q.  Okay.  Mr. Aldy, I'm almost finished.
7  I appreciate your patience.  I am just quickly
8  looking through my notes to see if I have any
9  further questions for you.
10   A.  You're the one staying up late.
11      MS. FORD:  United States has no further
12  questions at this time.  We do reserve the right
13  to recall Mr. Aldy based upon pending document
14  production by Abbott and pending motion to compel
15  documents.
16      I also request that the documents
17  produced today by Mr. Aldy at his deposition be
18  sent to the United States in response to the
19  subpoena.
20      And I pass the witness.
21      MR. COLE:  Can we take a break?
22      MR. SISNEROS:  Sure.

Page 331

1       THE VIDEOGRAPHER:  Counsel on the
2  phone, just for the record, can you please state
3  your name?  I don't think we got your name at the
4  beginning of the deposition.
5       MS. FORD:  I did introduce myself on
6  the record, but, again, it's Rebecca Ford.
7       THE VIDEOGRAPHER:  Thank you very much.
8       MS. FORD:  You're welcome.
9       THE VIDEOGRAPHER:  We are now off the
10  video record.  The time is 5:13 p.m.
11      (Recess taken.)
12      THE VIDEOGRAPHER:  We are back on the
13  video record.  The time is approximately 5:20
14  p.m.
15      MR. SISNEROS:  Just a comment before we
16  get started.  I'm going to join in the
17  reservation made by the U.S. regarding any
18  pending document production as well as in the
19  California case.
20      MR. COLE:  Mr. Aldy, I just have a few
21  questions for you, and then we can finish this
22  deposition.

Page 332

1            EXAMINATION
2  BY MR. COLE:
3    Q.  Mr. Sisneros asked you some questions
4  earlier today about your understanding of certain
5  pricing terms.  Do you remember those questions?
6    A.  Yes.
7    Q.  And I believe you -- he asked you some
8  questions about AWP.  Do you remember those
9  questions?
10   A.  Yes.
11   Q.  And I believe you testified that you
12  understood that AWP stood for average wholesale
13  price; is that right?
14   A.  Yes.
15   Q.  Other than standing -- Other than
16  standing for the words "average wholesale price,"
17  do you have any understanding of what AWP means?
18   A.  I do not.
19      MS. FORD:  Objection to form.
20  BY MR. COLE:
21   Q.  Do you know how AWP is or has ever been
22  calculated?

Page 333

1    A.  No, I don't.
2    Q.  Do you know who calculates or has
3  calculated AWP?
4    A.  No.
5    Q.  Do you know anything about the formula
6  used or the input used for how AWP is calculated?
7    A.  No.
8       MS. FORD:  Objection to form.
9  BY MR. COLE:
10   Q.  Do you -- Let me start over.  Have you
11  ever marketed --
12      In all your time at Abbott and Hospira,
13  did you ever market any of Abbott's products that
14  you sold to a customer based on the product's
15  AWP?
16   A.  No, I didn't.
17   Q.  In all of your time at Abbott and
18  Hospira, did you ever market a product to a
19  customer based on the difference between the
20  acquisition cost of that product and what the
21  customer might receive in reimbursement?
22   A.  No, I didn't.

84 (Pages 330 to 333)

22f1d8a1-b074-40da-acb4-d64cd02fe554

Aldy, Gary Keith                        February 21, 2008
                    Sacramento, CA

| Page 334 | Page 336 |
|---|---|

Page 334

1    Q.  Ms. Ford asked you some questions about
2  some -- a laptop computer that you used from time
3  to time during your employment with either Abbott
4  or Hospira.
5        MS. FORD:  Objection to form.
6        MR. COLE:  I haven't asked a question
7  yet, but that's fine.
8        Q.  Do you remember those questions about a
9  laptop computer?
10      A.  Yes.
11      Q.  Are you certain that the laptop --
12      MS. FORD:  I'm objecting to your
13  characterization "from time to time."  I don't
14  believe that's consistent with the witness's
15  testimony.
16  BY MR. COLE:
17      Q.  Do you remember the questions that Ms.
18  Ford asked you about a laptop computer?
19      A.  Yes, I do.
20      Q.  Are you certain -- As you testify here
21  today, are you certain that you received a laptop
22  computer from Abbott?

Page 335

1    A.  I do not -- There's some question as to
2  whether it was before or after the transition
3  time with Hospira.  I don't recall.
4    Q.  So is it possible that the company-
5  issued laptop that you have in mind was -- that
6  you did not receive it until the spinoff of
7  Hospira?
8    A.  That's --
9        MS. FORD:  Objection to form.  Calls
10  for speculation.
11      THE WITNESS:  That is possible, that it
12  was given to me by Hospira and not Abbott.
13  BY MR. COLE:
14      Q.  Ms. Ford asked you some questions about
15  the collection of documents or the gathering of
16  documents and what you remember about that topic.
17  Is it possible that you received an instruction
18  to either preserve or gather documents while you
19  were an Abbott employee?
20      A.  Yes, it is possible that I could have
21  received that.
22      MS. FORD:  Objection to form with

Page 336

1  respect to the last question.
2  BY MR. COLE:
3    Q.  You just don't recall such an
4  instruction as you sit here today?
5    A.  I don't remember the specifics of it at
6  this time.  I don't recall.
7        MR. COLE:  Those are all the questions
8  I have.
9        MS. FORD:  I have a few follow-up
10  questions.
11
12          FURTHER EXAMINATION
13  BY MS. FORD:
14      Q.  Mr. Aldy, although you don't recall
15  whether you received a laptop computer issued to
16  you by Abbott or whether it was by Hospira, you
17  were using e-mail in communicating during the
18  time that you were employed by Abbott; is that
19  correct?
20      A.  Yes.  There was a period of time at
21  Abbott when I used e-mail to communicate, yes.
22      Q.  During the period of time that you were

Page 337

1  using your home computer for e-mail, at least
2  part of that time you had an Abbott-issued e-mail
3  address; is that correct?
4    A.  Yes, ma'am.
5    Q.  And we've seen, for example, a document
6  from 2000 when you were receiving e-mail from
7  Abbott; is that correct?
8    A.  Yes, ma'am.
9    Q.  And during that time were you also
10  sending e-mail to the various groups that we
11  spoke about within Abbott?
12      A.  Yes, I would have.
13      Q.  And also with customers?
14      A.  Yes.
15      MS. FORD:  I have no further -- Oh, I
16  actually do have another question.
17      Q.  You also testified that after the
18  spinoff of Abbott's Hospira products division to
19  Hospira, you maintained your Abbott files; is
20  that correct?
21      A.  Yes.
22      Q.  And those files then became Hospira

22f1d8a1-b074-40da-acb4-d64cd02fe554

Aldy, Gary Keith                    February 21, 2008
                    Sacramento, CA

Page 338

1  files; is that correct?
2      A.  Yes, ma'am.
3      Q.   At that time did you provide copies of
4  your Abbott files to anyone at Abbott?
5      A.  No, because we were spun off into
6  Hospira.  Basically, the same business.
7      Q.   But no one within Abbott requested from
8  you copies of all of your files for their own
9  corporate records; is that correct?
10      MR. COLE:  Object to the form.
11      THE WITNESS:  Could you clarify your
12  meaning? When we were spun off into Hospira, did
13  I provide copies of my Abbott files to Abbott at
14  that time?
15      MS. FORD:  That's correct.  That's my
16  question.
17      THE WITNESS:  No, I did not.
18  BY MS. FORD:
19      Q.   So to the extent that you still had
20  Abbott files when you left Hospira's employment,
21  were those files provided to your district
22  manager?

Page 339

1      A.  Yes, they were.
2      MS. FORD:  Thank you.  I have no
3  further questions at this time.
4      MR. COLE:  Thanks everyone.
5      THE WITNESS:  Thank you.
6      MS. FORD:  Thank you very much for your
7  time.
8      THE VIDEOGRAPHER:  This is the end of
9  tape five, volume one.  This also concludes
10  today's deposition of Gary Keith Aldy.  The time
11  is approximately 5:28 p.m.
12          (Thereupon the deposition was
13  adjourned at 5:28 p.m.)
14
15
16
17      Signed under penalty of perjury:
18  _____
19      GARY KEITH ALDY
20
21  _____
22      Date

Page 340

1          --o0o--
2      I, INA C. LeBLANC, a Certified Shorthand
3  Reporter of the State of California, duly authorized to
4  administer oaths, do hereby certify:
5      That I am a disinterested person herein; that
6  the Witness, GARY KEITH ALDY, named in the foregoing
7  deposition was by me duly sworn to testify the truth,
8  the whole truth, and nothing but the truth; that the
9  deposition was reported in shorthand by me,
10  INA C. LeBLANC, a Certified Shorthand Reporter of the
11  State of California, and thereafter transcribed into
12  typewriting.
13      That before completion of the deposition,
14  review of the transcript [  ] was [ X ] was not
15  requested.  If requested, any changes made by the
16  deponent (and provided to the Reporter) during the
17  period allowed are appended hereto.
18
19      Dated:_____
20      _____
21      INA C. LeBLANC
22      CSR No. 6713

86 (Pages 338 to 340)

# EXHIBIT 2

Page 1

                    IN THE UNITED STATES

                 DISTRICT OF MASSACHUSETTS


    IN RE:  PHARMACEUTICAL           )

    INDUSTRY AVERAGE WHOLESALE       )

    PRICE LITIGATION                 ) MDL No. 1456

                                     ) Civil Action No.

    THIS DOCUMENT RELATES TO:        ) 01-CV-12257-PBS

                                     )

    ALL CASES                        )

                                     ) Judge Patti B. Saris

    **************************************************

            ORAL AND VIDEOTAPED DEPOSITION OF

                CATHERINE V. BABINGTON

                  August 28, 2007


            CONFIDENTIAL, ATTORNEYS' EYES ONLY


    **************************************************

a1a63459-6f8b-47a7-bbe6-e4b762a3187b

Babington, Catherine V.CONFIDENTIAL - ATTORNEYS' EYES ONLY          August 28, 2007
Chicago, IL

Page 66

1  reason to question his, his statement in that
2  regard; do you?
3       MR. DALY:  Object to the form.
4       THE WITNESS:  You know, I'm not going
5  to speculate on whether he may or may not have
6  remembered.  I don't know.
7       MR. GOBENA:  I don't believe this was
8  previously marked in a deposition, so I guess
9  we'll have it marked here now.  I can't recall
10  what the next number is.
11       THE REPORTER:  Plaintiff's Exhibit 1302.
12       MR. GOBENA:  Plaintiff's Exhibit 1302.
13            (Plaintiff's Exhibit 1302
14             for Identification
15             was so marked.)
16  BY MR. GOBENA:
17       Q.  I'm actually not going to ask you about
18  the attachment.  I'm just going to ask you about
19  the cover memo, so why don't you just look at
20  that.
21       A.  Okay.  Okay.
22       Q.  Okay.  You'll see on the top right

Page 67

1  corner this is a memorandum from Richard Rieger,
2  and it says here his title is Manager for
3  Strategic Planning.
4       Does this all -- at all, that title at
5  all refresh your recollection any more about who
6  Mr. Rieger was?
7       A.  It does not.
8       Q.  The memorandum is dated December 6th,
9  1996 and there's a bunch of addressees there
10  listed, including yourself?
11       A.  Yes.
12       Q.  And there's some other -- there's some
13  names that we've seen from other documents that
14  may be familiar, such as Mr. Buell?
15       A.  Yes.
16       Q.  Ms. Tobiason?
17       A.  Yes.
18       Q.  Mr. Tootell, Mr. Landsidle and
19  Ms. Haas.  Do you see those names there?
20       A.  Yes, uh-huh.
21       Q.  And if you go to the re line, it says,
22  "Re:  Medicare Working Group Update"?

Page 68

1       A.  Uh-huh.
2       Q.  Do you see that?
3       A.  Yes.
4       Q.  Do you know what the Medicare Working
5  Group was, as referenced here in the December '96
6  memorandum?
7       A.  No.
8       Q.  Do you recall ever being a member of an
9  entity at Abbott known as the Medicare Working
10  Group?
11       A.  I do not recall that.
12       Q.  But you are listed here in the "to"
13  line, though, in a discussion about the Medicare
14  Working Group; isn't that correct?
15       A.  That is correct.
16       Q.  Do you recall ever participating in
17  meetings with some of the individuals listed here
18  where Medicare issues were ever discussed in this
19  time frame?
20       A.  No, I don't.
21       Q.  And if you received this memorandum
22  from Mr. Rieger, would you have reviewed it?

Page 69

1       MR. DALY:  Object to the form.
2       THE WITNESS:  I don't know.
3  BY MR. GOBENA:
4       Q.  Did you generally as a matter of course
5  review documents that were addressed to you when
6  you're -- during your time of employ at Abbott?
7       MR. DALY:  Object to the form.  Go
8  ahead.
9       THE WITNESS:  I get, you know,
10  thousands of documents a week.  I don't review
11  every one of them.
12  BY MR. GOBENA:
13       Q.  Okay.  This document has been
14  previously marked as Exhibit 1170.  And I'm not
15  going to spend much time on the attachment.  I
16  want you to sort of to, to look at the cover
17  memorandum here.
18       A.  Okay, okay, uh-huh.
19       Q.  Again, if, if you go to the center of
20  this document, which is dated December 13th, '96,
21  there's a reference to the Medicare Working Group
22  meeting on December 16th, 1996.

18 (Pages 66 to 69)

a1a63459-6f8b-47a7-bbe6-e4b762a3187b

# EXHIBIT 3

Page 1

IN THE CIRCUIT COURT OF KANAWHA COUNTY,
WEST VIRGINIA

STATE OF WEST VIRGINIA, EX REL
DARRELL V. MC GRAW, JR.,
ATTORNEY GENERAL,

Plaintiffs,
vs.
No.  01-C-3011

WARRICK PHARMACEUTICALS
CORPORATION, SCHERING-PLOUGH
CORPORATION, DEY, INC.,
ABBOTT LABORATORIES and
ABBOTT LABORATORIES, INC.,

Defendants.


        The discovery deposition of PETER BAKER,

taken on the date of July 12, A.D., 2005 at the

location of 77 West Wacker Drive, 35th Floor, Chicago,

Illinois pursuant to notice.



            HUDSON REPORTING & VIDEO, INC.

              124 WEST 30TH STREET

            NEW YORK, NEW YORK 10001



Reported By:  Dawn M. Lombardo, C.S.R.

License No:  084001879

Page 6

PETER BAKER

1
2     A.  Commercial Service Operations.
3     Q.  What is Commercial Service Operations?
4     A.  It has National Accounts, Contracting, Market
5  Research, and what we call Marketing Services, and
6  Customer Service.
7     Q.  Who do you answer to directly in the chain of
8  command?
9        MS. TABACCHI:  I'm going to object to the
10  extent that you intend to inquire further about Mr.
11  Baker's employment at Hospira.  He's here in his
12  capacity as a former Abbott employee.
13        MR. BARRETT:  I understand.
14  BY MR. BARRETT:
15     Q.  Who do you answer directly to in the chain of
16  command?
17     A.  John Arnott.
18     Q.  And what is his title?
19     A.  Corporate Vice President of Commercial
20  Operations.
21     Q.  What was your job before becoming Vice
22  President?
23     A.  I was a Vice President with Abbott
24  Laboratories prior to our spin.
25     Q.  Okay.  Before I get into your background on

Page 7

PETER BAKER

1
2  employment, let me ask you quickly how far did you go
3  in your education?
4     A.  I have a Bachelor's degree in Marketing,
5  Southern Illinois University.
6     Q.  What year?
7     A.  '81.
8     Q.  Do you have any graduate level work?
9     A.  No.
10     Q.  What's your current title with Abbott, Vice
11  President --
12     A.  Vice President and General Manager of
13  Commercial Service Operations.
14     Q.  Okay.
15        MS. KIM:  At Hospira you mean?  I think your
16  question was Abbott.
17  BY MR. BARRETT:
18     Q.  I'm sorry.  I think you just told me, and I
19  meant to ask you what your last job was, your last
20  title at Abbott.
21     A.  Abbott.  It was Vice President, Major Health
22  Care Systems.
23     Q.  Was that in the Hospital Products Division?
24     A.  Yes.
25     Q.  Did you have direct reports in that position?

Page 8

PETER BAKER

1
2     A.  Yes, I did.
3     Q.  Who were they?
4     A.  Mike Sellers, the National Account Managers,
5  Chuck Marcaccio, Jerry Besh.  It's been a while and
6  it's changed.  Barry Warzen in our Marketing Services
7  area and Meredith Durant in Market Research.
8     Q.  This isn't meant to be a memory test, but let
9  me go through these names as quickly as I can to just
10  get their titles.  You just gave me the last two.  Mark
11  Sellers, what was his title?
12     A.  Mike Sellers.
13     Q.  Mike Sellers.
14     A.  Director of Contract Marketing.
15     Q.  And the National Account Managers, what
16  individuals were those?
17     A.  Chuck Marcaccio and Jerry Besh.
18     Q.  Okay.  And then --
19     A.  Gary Galinski was --
20     Q.  Was he a National Account Manager also?
21     A.  Yes.
22     Q.  When did you become Vice President at Abbott?
23     A.  Three years ago.
24     Q.  2002?
25     A.  Yes.

Page 9

PETER BAKER

1
2     Q.  What was your position immediately before
3  that?
4     A.  I was the General Manager for Alternate Site
5  Product Sales within the Hospital Products Division.
6     Q.  Just for the record, tell me what Alternate
7  Site Product Sales is.
8     A.  It is contracting with customers outside of
9  the hospital environment.
10     Q.  As General Manager did you have customers
11  that you called on, in other words, would deal with
12  directly?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  Could you clarify what --
15  BY MR. BARRETT:
16     Q.  Let's break it down a little bit more and
17  we'll get to it.  Who were your direct reports when you
18  were General Manager of Alternate Site Product Sales?
19     A.  I had National Accounts, Marketing, a dotted
20  line to our contracting area, and the Sales
21  organization.
22     Q.  You say you had "a dotted line to our
23  contracting area", what does that mean?
24     A.  Mike Sellers managed the contracting function
25  for HPD, but the contracting area also had a dotted

3 (Pages 6 to 9)

Page 78

```
 1          PETER BAKER
 2   THIS DEPOSITION WILL BE SIGNED UNDER THE RULES AND LAWS
 3   OF THE STATE OF WEST VIRGINIA.
 4
 5   SIGNATURE: _____
 6
 7   SIGNED AT: _____
 8
 9          _____
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Hudson Reporting & Video, Inc.

1-800-310-1769   www.hudsonreporting.com        New York

d454eda1-fc85-43e9-9a8e-46bf496edd99

EXHIBIT 4

```
                 UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL            )
INDUSTRY AVERAGE WHOLESALE        ) MDL No. 1456
PRICE LITIGATION                  ) Civil Action No.
                                  )     01-12257-PBS
                                  )
THIS DOCUMENT RELATES TO:         )
                                  )
United States of America,         ) Hon. Patti Saris
ex rel. Ven-a-Care of the         )
Florida Keys, Inc., v.            )
Abbott Laboratories, Inc.,        )
and Hospira, Inc.                 )
CIVIL ACTION NO. 06-11337-PBS     )


*******************************************************

                 UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL            )
INDUSTRY AVERAGE WHOLESALE        ) MDL No. 1456
PRICE LITIGATION                  ) Civil Action No.
                                  )     01-CV-12257-PBS
                                  )
THIS DOCUMENT RELATES TO:         )
                                  ) Judge Patti B. Saris
State of Arizona v. Abbott        )
Labs., et al.                     )
Civil Action No. 06-CV-11069-PBS  )


*******************************************************
            ORAL AND VIDEOTAPED DEPOSITION OF
                      PETER BAKER
                    April 23, 2007


                   HIGHLY CONFIDENTIAL

*******************************************************
```

aad7a56c-f8d4-4133-96ec-f4ed52a63700

Page 278

1  that really pertains to the same thing.
2      Q.  Are you saying that they don't pertain to the
3  same thing or you just simply don't know?
4      A.  I don't know.
5      Q.  Okay.  And the reason you don't know is
6  because you've never really had to deal with the
7  nitty-gritty offer of a field-generated agreement, for
8  instance, correct?
9          MS. TABACCHI:  Object to the form.
10     A.  That is true that I have not, I don't think,
11 had to deal to that detail, but I'm not sure it
12 existed either.
13     Q.  (BY MR. ANDERSON)  In your leadership role
14 over all of the district managers and their reporting
15 field reps, did you get an understanding of why a
16 given field-generated agreement might be offered?
17     A.  Well, field-generated contracts, I think,
18 were mostly aimed at selling our devices and it was to
19 give a representative a range so that they would not
20 have to always check with the home office if they went
21 into one of their customers.
22     Q.  And when you say "devices," you don't mean to
23 limit this only to equipment.  It covered drugs as
24 well, including the fluids and the injectables, right?
25         MS. TABACCHI:  Object to the form.

Page 279

1      A.  I don't know that.  The majority of our --
2  our focus, I think, was on IV pumps in the ambulatory
3  setting and so the parameters were to give a price,
4  really, on where they could go with the device.
5      Q.  (BY MR. ANDERSON)  Do you believe that the
6  field-generated agreements were limited to devices and
7  excluded the drugs?
8          MS. TABACCHI:  Object to the form.
9      A.  I don't know.
10     Q.  (BY MR. ANDERSON)  Okay.  So you don't have
11 any testimony that -- I mean, any knowledge, pardon
12 me, and you're not here to testify today that the
13 field-generated agreements were always exclusive of
14 drugs?
15         MS. TABACCHI:  Object to the form.
16     A.  I -- I don't know if we had field-generated
17 contracts during the time I was in Alternate Site, so
18 I --
19     Q.  (BY MR. ANDERSON)  Do you know how it is that
20 a field rep, for instance, an infusion specialist,
21 would come to know that they could offer a
22 field-generated agreement to a given customer?
23         MS. TABACCHI:  Object to the form.
24     A.  I just told you, I didn't know if we had
25 them, so I don't know how they would go about

Page 280

1  utilizing it.
2      Q.  (BY MR. ANDERSON)  All right.
3      A.  Is that --
4      Q.  Are you familiar with any kind of mechanism
5  at Abbott where if a customer, for whatever reason,
6  rolled off of their contract or their contract became
7  outdated, that they would then be notified and offered
8  a field-generated agreement?
9          MS. TABACCHI:  Object to the form.
10     A.  I don't know that that's true.
11     Q.  (BY MR. ANDERSON)  This simply is something
12 you don't know anything about?
13     A.  No, I don't know.
14     Q.  All right.  You mentioned customer service.
15 Do you know how customer service was involved with
16 billing customers?
17         MS. TABACCHI:  Object to the form.
18     A.  At what period of time?
19     Q.  (BY MR. ANDERSON)  From '95 to 2003.
20     A.  No, I don't.
21     Q.  Do you have any awareness of how customer
22 service was involved in notifying field sales
23 representatives of customers who were no longer on
24 contract?
25         MS. TABACCHI:  Object to the form.

Page 281

1      A.  No, I don't.
2      Q.  (BY MR. ANDERSON)  Is it your experience that
3  Abbott Alternate Site ever offered list prices to any
4  customer?
5          MS. TABACCHI:  Object to the form.
6      A.  They offered?
7      Q.  (BY MR. ANDERSON)  Yes.
8      A.  They were available to anyone.
9          MR. ANDERSON:  Objection, nonresponsive.
10     Q.  (BY MR. ANDERSON)  I'm asking a different
11 question, sir, and I think you understood that because
12 you mentioned -- you questioned me about the word
13 "offer."  So I'll rephrase it.
14         To your knowledge, from 1995 through
15 2003 when you were in a sales leadership role at
16 Abbott Alternate Site, are you aware of Abbott ever
17 offering to sell its products to a customer at list
18 price?
19         MS. TABACCHI:  Object to the form.
20     A.  I'm -- I'm missing your point.  We have list
21 price available to customers who don't have contracts.
22 That's open to anyone who chooses to buy our product
23 that for whatever reason had not had a contract with
24 us.
25     Q.  (BY MR. ANDERSON)  And did you ever have any

71 (Pages 278 to 281)

FREDERICKS-CARROLL REPORTING

aad7a56c-f8d4-4133-96ec-f4ed52a63700

# EXHIBIT 5

Page 335

              UNITED STATES DISTRICT COURT

              DISTRICT OF MASSACHUSETTS


IN RE PHARMACEUTICAL            )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                ) MDL No. 1456

                                ) Civil Action

THIS DOCUMENT RELATES TO:       ) #01-12257-PBS

United States of America,       )

ex rel. Ven-A-Care of the       ) Judge Patti B. Saris

Florida Keys, Inc., v.          )

Abbott Laboratories, Inc.,      )

and Hospira, Inc.               )

CIVIL ACTION NO. 06-11337-PBS)


*****************************************************


              HIGHLY CONFIDENTIAL

Videotaped deposition of PETER D. BAKER - Volume II

              FEBRUARY 28, 2008


         (CAPTIONS CONTINUE ON FOLLOWING PAGE)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL                February 28, 2008
                                    Chicago, IL

Page 412

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Do you have any information or
3  knowledge or personal awareness of any lack of
4  fraud on behalf of Abbott?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  No.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Sir, are you aware -- are you familiar
9  with or aware of any transactions between the
10  United States and Abbott?
11          MS. TABACCHI:  Object to the form.
12          THE WITNESS:  No.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  All right, now that we've gone through
15  this list, I've got a couple more questions.
16          Sir, do you have any personal knowledge
17  or information or familiarity with the sale and
18  marketing of the subject drugs?
19      A.  I -- I may.  That's a very broad
20  statement, so --
21      Q.  Okay.  Well, let's -- I want to break
22  down -- I mean, I want you to answer the question

Page 413

1  as asked, but if we need to break it down, we can
2  do that as well.
3      A.  I would -- I would respond with I may,
4  depending upon how you --
5      Q.  Okay.  Well, what -- what -- what is
6  your familiarity with the marketing of any of the
7  subject drugs that are on that list in front of
8  you at any time during your tenure with HPD?
9      A.  I would say none from a marketing
10  perspective.
11      Q.  Okay.  What about from a sales
12  perspective?  What's your familiarity with the
13  sale of any of the subject drugs on that list?
14      A.  It -- it was one of Abbott's products,
15  and that that was part of a portfolio that we
16  would offer as -- as part of a potential contract
17  opportunity with customers.
18      Q.  Are you familiar with the sales --
19  Abbott sales history within its Hospital Products
20  Division of vancomycin?
21          MS. TABACCHI:  Object to the form.
22          THE WITNESS:  I know there is one.

Page 414

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Okay.
3      A.  But I don't -- I mean, other than that
4  it's a product that we've had for some time.
5      Q.  Okay, and is -- do you -- do you recall
6  what the dollar value -- volume of the sales was
7  for vancomycin?
8      A.  No, I do not.
9      Q.  Okay.  Is that something that you,
10  within any of the various positions that you've
11  held within HPD, would have had to have been
12  familiar with or would have had any
13  responsibility over?
14          MS. TABACCHI:  Object to the form.
15          THE WITNESS:  Only as part of a -- on a
16  broader context of overall sales, for example
17  within Alternate Site, how that fit in the
18  portfolio, but not -- I was responsible for the
19  total portfolio.  So no specific drugs
20  necessarily.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Do you recall whether there was a

Page 415

1  marketing plan for vancomycin?
2      A.  Not -- I -- not that I've ever seen.
3      Q.  Okay.  There may have been, but it
4  might have been something that you didn't see?
5      A.  No --
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  I would say there may
8  have been one for all overall portfolio of
9  injectable products, but I don't know that there
10  was ever one specifically for vancomycin, to my
11  recollection.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Okay.  What was the marketing plan for
14  your injectable products?
15          MS. TABACCHI:  Object to the form.
16          THE WITNESS:  I -- I don't remember any
17  details of any specific marketing plans for our
18  products.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  Can you identify how the Alt Site sales
21  force sold the subject drugs as part of Abbott's
22  product line?

21  (Pages 412 to 415)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 416

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  Well, the customer would
3  ask for or maybe send out a bid or would ask for
4  the subject drugs or our entire portfolio and ask
5  for pricing on those products, and the
6  representative would then talk to our contracting
7  area to determine what might be appropriate
8  pricing for that institution or customer, and
9  then they would put an offer together that
10  included a price list for those products.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   Were there parameters for the price
13  list? Like, was there sort of a ceiling and a
14  floor as to what could be offered?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  No, I don't -- not --
17  none that I recall, no.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   Who set the pricing?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  From -- from what
22  perspective?

Page 417

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   From -- from the perspective of --
3  well, let me ask you this.  That's a good
4  question.  Let me divide this up.
5        For the contract pricing for the
6  products, who would set the contract pricing?
7     A.   The contracting department would work
8  on trying to establish the relative size of the
9  customer and -- and the value and try to
10  determine appropriate price based on -- on those
11  types of criteria.
12     Q.   Were you at all involved with -- with
13  that type of contract pricing determinations?
14     A.   No, not -- not specifically, no.
15     Q.   Okay.  What about catalog pricing?
16        MS. TABACCHI:  Object to the form.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   Were you involved with catalog pricing?
19     A.   No.
20     Q.   Did catalog pricing -- how did catalog
21  pricing affect, if at all, your sale of the
22  subject drugs?

Page 418

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I -- I don't know, and I
3  don't -- I don't think there was any specific
4  impact.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   Okay.  Now, are you familiar with how
7  your home infusion department sold Abbott
8  product, including the subject drugs?
9        MS. TABACCHI:  Object to the form.
10        THE WITNESS:  Well, I have a,
11  again, dated memory of how I think it was done at
12  the time that I was part of that group --
13 BY MS. ST. PETER-GRIFFITH:
14     Q.   Okay.
15     A.   (Continuing) -- many, many years ago.
16     Q.   What's your memory?
17     A.   My memory was, I think as I already
18  stated, that we looked at the different
19  components of what Abbott could offer and do for
20  a customer from a home-care perspective, and
21  based on those components that we participated
22  in, we would establish a mech- -- a mechanism to

Page 419

1  get paid for the services that we provided.
2     Q.   Okay.  But in addition to providing
3  services, would Abbott also sell product or
4  provide product on a consignment basis to its
5  home infusion consignment partners?
6     A.   Well, I think we're saying the same
7  thing.  That was part of the overarching -- they
8  -- consignment was just a mechanism of having the
9  product available when it was needed for the
10  compounding.
11        The service it was provided may have
12  been the compounding, or if they took that, it
13  was the other things that we were providing.
14     Q.   Okay.
15     A.   Having the product was a component of
16  that.
17     Q.   Okay.  So when you -- when you say
18  "services," you include within that the provision
19  of Abbott product, to the extent it was needed --
20     A.   It --
21     Q.   (Continuing) -- to provide --
22     A.   It could have been part of it.

22  (Pages 416 to 419)

8b29a9b9-a086-45f7-9c61-b10a880eef09

# EXHIBIT 6

1      COURT OF COMMON PLEAS OF KANAWHA COUNTY,
          PENNSYLVANIA
2        CIVIL DIVISION

3
   STATE OF WEST VIRGINIA ex rel :  No. 01-C-3011
4  DARRELL V. McGRAW, JR.,    :
   ATTORNEY GENERAL,      :
5               :
        Plaintiffs  :
6               :
     vs.       :
7               :
   WARRICK PHARMACEUTICALS    :
8  CORPORATION, SCHERING-PLOUGH :
   CORPORATION, DEY, INC., ABBOTT:
9  LABORATORIES and ABBOTT    :
   LABORATORIES, INC.,      :
10         Defendants  :

11

12        DEPOSITION OF JEFFREY BALZER

13         Taken in the offices of ERSA of

14   Allentown, 5050 Tilghman Street, Allentown,

15   Pennsylvania, on Tuesday, May 17, 2005, commencing at

16   10:40 a.m., by Stacy S. Kercher, Registered Merit

17   Reporter, Notary Public.

18

19

20

21

22          * * *
         ERSA OF ALLENTOWN
23      Commerce Corporate Center
       5050 Tilghman Street
24       Allentown, PA  18104
        (610) 366-7119
25

1   an open discussion, like lunch table discussion.

2   Q.      Who were your colleagues at the time?

3   A.      Craig Smith, Ted Lyjack, Joe Sweeney,

4   others from alternate site, we generally had lunch

5   together as a group.

6   Q.      And what was the substance of your

7   conversation about AWP and the spread?

8   A.      I was given an understanding that AWP

9   stood for average wholesale price and that the spread

10   referred to the difference between the AWP and the

11   actual price that the end user facility would have

12   paid for a product and that that was not a subject

13   that -- I guess to paraphrase, the concept was, we

14   don't go there.

15   Q.      Was there any written instruction to that

16   effect?

17   A.      No.

18   Q.      You say we don't go there, what did you

19   mean by that?

20   A.      That -- I understood that to mean that we

21   don't discuss AWP in relation to our products and

22   selling our products or contracting for our products

23   or marketing.

24   Q.      Did you ever look at the AWPs of these

25   products?

1    A.       I have -- I have on rare occasions seen

2    an AWP, but we don't use it and I have no reason to

3    be concerned with it.  I didn't have a reason to be

4    concerned with it in the work that I was doing.

5    Q.       Well, if a customer said that the spread

6    was important to them, why wouldn't that be a reason

7    to pay attention to it?

8              MS. MAYER:  Objection.

9              MS. CITERA:  Objection to form.

10   A.       May I answer?

11   Q.       You can answer.  Let me just tell you, if

12   you haven't been told this, let me tell you that the

13   ground rules for the deposition are basically that

14   unless you are instructed not to answer by your

15   attorney, you have to answer these questions.

16   A.       Okay.

17   Q.       If somebody has a problem with your being

18   able to answer, I'm sure they will let us know and

19   whatever action needs to be taken will be taken.  But

20   you can answer these questions, even when there is an

21   objection.  Though I think it would be helpful for

22   the record is if you hear an objection, to stop

23   talking so that you don't talk over the objection.  I

24   think that's kind of a useful thing for the court

25   reporter.

1

2

3

4                              _____, 2005

5

6

7             I hereby certify that the evidence

8    and proceedings are contained fully and accurately in

9    the notes taken by me of the testimony of the within

10    witness who was duly sworn by me, and that this is a

11    correct transcript of the same.

12

13

14

15             _____
              Stacy S. Kercher,  RMR
16               Registered Merit Reporter
              Notary Public

17

18
      The foregoing certification does not apply to any
19     reproduction of the same by any means unless under
      the direct control and/or supervision of the
20     certifying reporter.

21

22

23

24

25

| 1 | PAGE | LINE | FROM | TO |
|---|------|------|------|-----|
| 2 | _____! | _____! | _____! | _____ |
| 3 | _____! | _____! | _____! | _____ |
| 4 | _____! | _____! | _____! | _____ |
| 5 | _____! | _____! | _____! | _____ |
| 6 | _____! | _____! | _____! | _____ |
| 7 | _____! | _____! | _____! | _____ |
| 8 | _____! | _____! | _____! | _____ |
| 9 | _____! | _____! | _____! | _____ |
| 10 | _____! | _____! | _____! | _____ |
| 11 | _____! | _____! | _____! | _____ |
| 12 | _____! | _____! | _____! | _____ |
| 13 | _____! | _____! | _____! | _____ |
| 14 | _____! | _____! | _____! | _____ |
| 15 | _____! | _____! | _____! | _____ |
| 16 | _____! | _____! | _____! | _____ |
| 17 | _____! | _____! | _____! | _____ |
| 18 | _____! | _____! | _____! | _____ |
| 19 | _____! | _____! | _____! | _____ |
| 20 | _____! | _____! | _____! | _____ |
| 21 | _____! | _____! | _____! | _____ |
| 22 | _____! | _____! | _____! | _____ |
| 23 | _____! | _____! | _____! | _____ |
| 24 | _____! | _____! | _____! | _____ |
| 25 | _____! | _____! | _____! | _____ |

1

2

3

4                         _____, 2005

5

6

7

8           I have read the foregoing transcript of

9    my deposition and, with the changes noted, find it to

10    be complete and accurate.

11

12

13

14              _____

15              RICHARD BALZER

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:  PHARMACEUTICAL      :   MDL No. 1456
INDUSTRY AVERAGE WHOLESALE  :   Civil Action No.
PRICE LITIGATION            :     01-12257-PBS
----------------------------:
                            :
THIS DOCUMENT RELATES TO:   :   Hon. Patti Saris
                            :
United States of America,   :
ex rel. Ven-a-Care of the   :
Florida Keys, Inc., v.      :
Abbott Laboratories, Inc.,  :
and Hospira, Inc.           :
CIVIL ACTION NO. 06-11337-  :
PBS                         :
*********************************************************
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:  PHARMACEUTICAL      :   MDL No. 1456
INDUSTRY AVERAGE WHOLESALE  :   Civil Action No.
PRICE LITIGATION            :     01-CV-12257-PBS
----------------------------:
                            :
THIS DOCUMENT RELATES TO:   :
                            :
State of Arizona v. Abbott  :   Judge Patti B. Saris
Labs., et al.               :
Civil Action No.            :
06-CV-11069-PBS             :

*********************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
JEFFREY F. BALZER - VOLUME I
MAY 3, 2007, 9:07 a.m.

HIGHLY CONFIDENTIAL
*********************************************************

1  Q.    So the bulk of your time was spent in
2  connection with PBI, Omnicare, and Lincare?
3  A.    Yes.                              09:42
4  Q.    Okay. Now, at some point while you were a 09:42
5  national account manager did you pick up additional
6  accounts or drop some of these?
7  A.    Yes.
8  Q.    When and who?               09:42
9  A.    I began calling on Neighborcare. And I'm
10 trying to remember when. That was in 2000 or 2001 I
11 think. I'm not sure. I just don't remember.
12       I did call on Walgreen's. And
13 actually I think I may have called on Walgreen's     09:43
14 earlier in my tenure in that position, and then I --
15 then I was later not calling on them. And when that
16 transition took place, 2001, you know, 2000 -- in
17 probably the same time frame.
18       And -- let's see. Let's see. And   09:43
19 that I stopped calling on Omnicare in 2000 -- early in
20 the 2000's, 2001, 2002. I'm sorry. I don't remember
21 exact dates.
22 Q.    That's okay. When you refer to
23 Walgreen's, is there a particular division or aspect  09:44
24 of their business with which you were connected?
25 A.    We did have -- they -- they had some

Page 34

1  used more -- how shall I say. The -- there were
2  different products that -- that they would use more
3  frequently in Alternate Site versus the hospital.   09:46
4  Q.    What came to be the primary products that  09:46
5  you worked with?
6  A.    Well, I was -- I was representing
7  substantially, you know, sig -- you know, significant
8  portion of the products in our catalogue. But we were 09:47
9  selling IV solutions, administration sets, needle
10 stick prevention systems, injectable drugs. IV --
11 IV -- IV pumps, ambulatory pumps and what we call
12 stationary pumps or pole-mounted pumps and their
13 related administration sets. And that's substantially 09:47
14 what we sold.
15 Q.    Did you discuss with anyone at Abbott as
16 you took over the position of national account manager
17 the business model or the operational model of the
18 customers that you would be calling on?        09:48
19       MS. CITERA: Objection to form.
20 A.    I don't recall necessarily discussing the
21 business model. I went about looking into the types
22 of contracts that we had with the customers and
23 looking at how much business we had with the       09:48
24 customers, and of course meeting with the customers.
25 Q.    You looked at the existing contracts that

Page 36

1  pharmacies that were involved in -- in home infusion I
2  believe.
3  Q.    What did you do to learn about Alternate  09:44
4  Site Product Sales when you switched into that    09:44
5  division?
6  A.    I talked to my peers and talked to other
7  people in Alternate Site, other employees of Alternate
8  Site. And I talked to my boss.            09:45
9  Q.    Who was your boss, sir?
10 A.    My boss was Pete Baker.
11 Q.    Does anything stand out in your mind that
12 you learned about Alternate Site that seemed
13 particularly different than Hospital Products     09:45
14 Division?
15       MS. CITERA: Objection to form.
16 A.    Well, I saw a difference in that in the
17 hos -- in the hospital -- in the hospital side of the
18 business we were calling on hospitals, and so that the 09:45
19 customers were different. We were calling on in
20 Alternate Site home infusion companies and surgery
21 centers and long-term care pharmacies and -- and other
22 what we would call non-acute care or non-hospital
23 types of facilities.                   09:46
24       So the customers were different.
25 There were different products that were -- that were

Page 35

1  Abbott had with the various accounts that were
2  assigned to you?
3  A.    Yes.                              09:48
4  Q.    Where did you look at those? Where did   09:48
5  you find them?
6  A.    They would be in contract files, or in the
7  files that I would have inherited.
8  Q.    Okay. What types of files did you      09:49
9  inherit?
10 A.    I don't know if this is what you're
11 asking, but files in a file cabinet. Like, you know,
12 paper files?
13 Q.    Um-hum.                      09:49
14 A.    And --
15 Q.    Divided up by customer? I mean were there
16 folders that pertained for example to PBI?
17 A.    Yes.
18 Q.    And what types of documents were contained 09:49
19 in the files that you inherited about your accounts?
20 A.    It would be various different kinds of
21 documents that would pertain to things that -- that
22 the person responsible for that facility had been
23 working on. And over what period of time I -- you    09:49
24 know, I don't know, but. But whatever -- whatever was
25 in the files that -- that were there at the time.

Page 37

10  (Pages 34 to 37)

1  products that way?
2              MS. CITERA: Objection to the form.
3  A.      I didn't talk about it. We -- I was -- it  10:07
4  was -- I was told this is not -- we don't use this in  10:07
5  selling our products, and so I didn't.
6  Q.      But since your customers cared about it,
7  did you understand that it would have been helpful to
8  have been allowed to talk about it?              10:08
9              MS. CITERA: Objection to form.
10  A.      I -- I really don't have an opinion on
11  that. I -- we -- we didn't sell that way; we don't
12  sell that way.
13  Q.      That's not my question, sir.      10:08
14  A.      And -- I'm sorry.
15  Q.      My question is from the fact that your
16  customers were asking you about it, did you have the
17  impression that it could have been something helpful
18  to you in selling to them?              10:08
19  A.      Well, it --
20              MS. CITERA: Objection to the form.
21  A.      It didn't matter to me. I didn't -- you
22  know, we don't use that, so I don't -- I don't go
23  there; I don't use that. And whether or not it's  10:08
24  helpful, you know, it's not -- I didn't and don't sell
25  that way.

Page 50

1  Q.      So you never formed an impression whether
2  it would have been helpful to you in your job to have
3  been able to respond to your customers' concerns?  10:08
4  A.      No. I don't think so.      10:09
5              MS. CITERA: Objection --
6  Q.      You just didn't think about that?
7              MS. CITERA: Objection to the form.
8  A.      I never formed an opinion? Is that      10:09
9  what -- I'm sorry.
10  Q.      You just didn't think about whether it
11  would have been helpful to be able to respond to them?
12              MS. CITERA: The same objection.
13  A.      No.              10:09
14  Q.      Now, when you say that you were told that
15  we don't go there, what did you understand the scope
16  of that prohibition to include?
17              MS. CITERA: Objection to the form.
18  A.      That we don't talk about reimbursement and  10:09
19  we don't use reimbursement in the way that we sell; we
20  don't use it in marketing; and we sell our products
21  based upon the quality and availability and the
22  service we provide and the value we provide.
23  Q.      Well, selling your products based on those  10:09
24  factors is not necessarily inconsistent with
25  addressing reimbursement issues, is it?

Page 51

1              MS. CITERA: Objection to the form.
2  A.      I don't know.
3  Q.      Did you ever ask anybody?              10:10
4  A.      Not that I recall.              10:10
5  Q.      Now, who was it as best you can recall who
6  conveyed the information to you that we don't go
7  there?
8  A.      As I said, as I recall it was like a lunch  10:10
9  table kind of discussion, and some of my peers and
10  other colleagues from Alternate Site were there.
11              VIDEOGRAPHER: Let me -- I need to
12  interject at this point. I do need to change tapes.
13  The time is 10:10 a.m., and this is the end of Tape  10:10
14  Number 1.
15              (A recess was taken.)
16              VIDEOGRAPHER: We are back on video,
17  and the time is 10:29 a.m., and this is the start of
18  Tape Number 2.              10:29
19  BY MS. THOMAS:
20  Q.      Okay. Mr. Balzer, we have been making
21  reference to a Mr. Pelanek at PBI, correct?
22  A.      I believe it's Pelanek.
23  Q.      Pelanek. Okay. And what is his first  10:30
24  name, sir?
25  A.      Paul.

Page 52

1  Q.      And what was his position at PBI when you
2  were dealing with him?
3  A.      He was a vice president, but I'm not sure  10:30
4  what the balance of his title was.              10:30
5  Q.      Okay. Do you recall ever having
6  conversations with anyone else from PBI about
7  reimbursement or spread?
8  A.      I think the issue came up. I believe the  10:30
9  issue came up, and -- I think probably came up, yes.
10  Q.      In what context or with whom, sir?
11  A.      I believe that it may have been mentioned
12  by Bob Korenblat or Richard Bulich.
13  Q.      I'm sorry. Who was the second name?      10:31
14  A.      Richard Bulich.
15  Q.      In what context that you can recall?
16  A.      I don't really recall specifics, but I do
17  remember explaining that -- that I would not engage in
18  any conversations regarding reimbursement.      10:31
19  Q.      But despite your efforts to tell these
20  people that Abbott didn't talk about reimbursement,
21  they continued to raise the issue with you on
22  occasion?
23              MS. CITERA: Objection to form.      10:31
24  A.      The subject was -- was brought up, yes, on
25  occasion.

Page 53

14  (Pages 50 to 53)

```
 1  -----|-----|------------------------------------
 2  -
 3  -----|-----|------------------------------------
 4  -
 5  -----|-----|------------------------------------
 6
 7
 8
 9
10                    _____, 2007
11
12
13
14
15              I hereby certify that I have read
16  the foregoing transcript of my testimony taken at the
17  within deposition and find it to be true and correct.
18
19
20
21        _____
              JEFFREY F. BALZER
22
23
24
25
```
Page 242

```
 1  Total: 06:00:17

 2

 3  BY MS. THOMAS:  04:43:29   (Q & A testimony only)

 4  Total: 04:43:29

 5

 6
```
Page 244

```
 1
 2
 3
 4
 5
 6
 7
 8
 9                    _____, 2007
10
11
12              I hereby certify that the evidence
13  and proceedings are contained fully and accurately in
14  the notes taken by me of the testimony of the within
15  witness who was duly sworn by me, and that this is a
16  correct transcript of the same.
17
18
19
20        _____
              Steven R. Mack
21            Registered Merit Reporter
              Notary Public
22
23              TIMEKEEPER REPORT
24  Unknown: 00:03:17
25  BY MS. THOMAS: 05:57:00 (Q & A testimony and colloquy)
```
Page 243

62  (Pages 242 to 244)

# EXHIBIT 8

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. MDL No. 1456

Civil Action No. 01-12257-PBS


In Re:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

------------------------------------------------

IN THE DISTRICT COURT OF

TRAVIS COUNTY, TEXAS

Cause No. GV401286


THE STATE OF TEXAS

Ex rel.

VEN-A-CARE OF THE FLORIDA KEYS,

INC.,

        Plaintiffs

v.

ABBOTT LABORATORIES, INC., et al.,

        Defendants.                    Volume 1

------------------------------------------------

(Captions continue on next pages.)

Page 322

1  assume everyone signed the sign-up sheet.  A lot of
2  these people I didn't know, so it would be hard for
3  me if I don't know somebody to know whether the
4  name, you know, whether somebody just passed it and
5  didn't sign in or not.  There was certainly -- I
6  have no reason to doubt that these people were all
7  in there.
8      Q.  Is there anybody on this list that you do
9  -- that you did know prior to September of 1995
10  other than your counsel and your colleagues at
11  Ven-A-Care?
12      A.  I had never met them, but I had had
13  previous conversations with I know Larry Reed and
14  Sue Gaston.  I don't think there was anyone else
15  that I'd had a prior conversation with other than
16  those two.
17      Q.  Tell me about your conversations with
18  Larry Reed and Sue Gaston.
19      A.  Sue Gaston, at this time, I don't know
20  what she does now, she was in charge of determining
21  the federal upper limit for Medicaid drugs, and
22  Larry Reed was, I believe, her boss.

Page 323

1      Q.  When did you speak to Ms. Gaston and Mr.
2  Reed?
3      A.  I spoke to Sue Gaston several times.  I
4  don't remember the dates or times.  I think Larry
5  Reed may have had one or two conversations with
6  prior to this meeting.
7      Q.  What was the occasion for your speaking
8  with Ms. Gaston and Mr. Reed?
9      A.  It would have had to have done with the
10  Medicaid payment for prescription drugs.
11      Q.  Approximately how long before September of
12  1995 did you first speak to Ms. Gaston or Mr. Reed?
13      A.  I don't remember.
14      Q.  Was it more than a year before this time?
15      A.  With Sue Gaston, I'm fairly confident that
16  it was probably several years prior.
17      Q.  How did you come to speak to Ms. Gaston at
18  HCFA?
19      A.  I got her name and telephone number from
20  somebody.  I don't know how, but certainly I got
21  her name and spoke to her.
22      Q.  Why did you want to speak to Ms. Gaston?

Page 324

1      A.  Like I say, it would have -- it would have
2  had to do with issues regarding Medicaid prices or
3  reimbursement for prescription drugs.
4      Q.  What was your purpose for calling Ms.
5  Gaston?
6      A.  I don't remember exactly, whether I was
7  seeking information, or whether I was wishing to
8  give her information.  I was probably asking her
9  for information.
10      Q.  What type of information were you asking
11  from Ms. Gaston?
12      A.  I think one of the questions that I was
13  curious about was how she went about formulating
14  the, or the methodology used in establishing the
15  federal upper limit or FUL.
16      Q.  Now, there were no FULs established for
17  infusion drugs as I recall.  Correct?
18      A.  That's correct.
19      Q.  Did you ask Ms. Gaston about that?
20      A.  Yes.  I can't remember her answer.  And I
21  also asked her who determines what drugs go on the
22  federal upper limit, because to my knowledge I

Page 325

1  couldn't find any rules or regulations that
2  articulated exactly how a drug got chosen to be on
3  the federal upper limit.  So I was curious as to
4  what that process was.  To the best of my
5  knowledge, I think she said it was within her
6  discretion.
7      Q.  Did Ms. Gaston give any indication as to
8  why she was exercising her discretion not to
9  establish a federal upper limit for infusion drugs?
10      A.  No.
11      Q.  Do you have under -- did you have any
12  understanding as this time about why it was that
13  HCFA had not established a federal upper limit for
14  infusion drugs?
15      A.  No, I don't -- I don't know why they
16  didn't.
17      Q.  You said you had several conversations
18  with Ms. Gaston.  Do you recall approximately how
19  many you had over the years?
20      A.  Maybe two or three.  Before this meeting.
21      Q.  What would the earliest likely have been
22  with her?

208e3b26-ba24-458c-acda-c73a539c9a54

# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

PRICE LITIGATION              ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-A-Care of    ) Judge Patti B. Saris

the Florida Keys, Inc.,       )

vs.                           ) Chief Magistrate

Abbott Laboratories, Inc.,    ) Judge Marianne B.

No. 06-CV-11337-PBS           ) Bowler

- - - - - - - - - - - - - - -

PORTIONS HIGHLY CONFIDENTIAL

Video Deposition of RON BLACKWELL

(Taken by Plaintiffs)

Raleigh, North Carolina

March 18, 2008

Reported by:    Marisa Munoz-Vourakis -

RMR, CRR and Notary Public

Blackwell, RonPORTIONS HIGHLY CONFIDENTIALMarch 18, 2008
Raleigh, NC

Page 218

1      Q.  What's a price differential?
2          MR. SCANNAPIECO:  Objection, form.
3      A.  I don't know.
4      Q.  Is it a difference in price?
5          MR. SCANNAPIECO:  Objection, form.
6      A.  It's just an assumption.  I don't know.
7      Q.  You've never used the term?
8      A.  Yes.
9      Q.  You have?
10     A.  Yes.
11     Q.  And in what context have you used it?
12     A.  The context that I've used price
13  differential is when a customer is paying this,
14  and then in order for me to gain the business, I
15  need to have the price at this.
16         When a customer's price is this, and in
17  order for me to gain the business or have a
18  viable option of gaining the business, the price
19  needs to be this, and that will be the price
20  differential.
21     Q.  So price differential no longer exists
22  means there's no difference in price?

Page 219

1          MR. SCANNAPIECO:  Objection, form.
2      A.  I don't know.
3      Q.  Well, was there a difference in price
4  in the products that you sold versus the Baxter
5  and BBraun, as you identified as your competitors
6  earlier?
7      A.  I believe there is differences.
8      Q.  There were differences in price?
9      A.  Yes.
10     Q.  And whose prices were lower?
11     A.  I don't know.
12     Q.  But you knew there was a difference in
13  price?
14     A.  Yes.
15     Q.  How did you know?
16     A.  It's just an assumption, knowing that
17  competitors can be having different price on
18  different items than Abbott.  So it's just a mere
19  assumption.
20     Q.  Well, why wouldn't you assume that the
21  prices were the same?
22     A.  That's just not the way things operate.

Page 220

1      Q.  An airline ticket from Raleigh to
2  Washington D.C. on American, is the same price
3  ticket to US Air, why wouldn't they be the same
4  in a competitive market?
5          MR. SCANNAPIECO:  Objection, form.
6      A.  You are going to find some prices that
7  are similar, and you are going to find some price
8  that are going to be different.  But all in all,
9  there's no price differences.  So my assumption
10  is there are price differences between the
11  BBraun, McGard, Baxter and Abbott.
12     Q.  But you are all selling Vancomycin, for
13  example?
14     A.  Yes.
15     Q.  And Vancomycin is a generic drug, is
16  that correct?
17     A.  Yes.
18     Q.  So it's the same product that all of
19  you are selling, is that correct?
20     A.  Yes.
21     Q.  At core, it does the same thing?  No
22  one's Vancomycin is better than someone else's

Page 221

1  Vancomycin, correct?
2          MR. SCANNAPIECO:  Objection, form.
3      A.  That's my assumption.
4      Q.  Well, if you are selling to a customer,
5  for example, you are not saying Abbott's
6  Vancomycin is better than Baxter's Vancomycin,
7  for example?  It's not the quality of the
8  product, is it?
9          MR. SCANNAPIECO:  Objection to form.
10     A.  Not specifically the quality of the
11  product, no.
12     Q.  Well, what do you mean then?
13     A.  There are some differences between the
14  products that Abbott provided and the
15  competition.
16     Q.  But let's look at one specific kind of
17  drug, for example, Vancomycin.  What would the
18  differences be?
19     A.  Packaging is one.  Customer service is
20  another.  Reliability, having the product at the
21  right time and place is another.  Bar coding of
22  our products versus the competition is another.

56  (Pages 218 to 221)

34185696-8a04-4200-ba7b-eb0228499107

Blackwell, RonPORTIONS HIGHLY CONFIDENTIALMarch 18, 2008
Raleigh, NC

Page 222

1   Sales representation, follow up is another.
2   There's a lot of factors out there.
3       Q.   Would it be fair to say a lot of those
4   are customer service related kinds of issues as
5   opposed to the functionability of the product
6   itself?
7       MR. SCANNAPIECO:  Objection to form.
8       A.   I think it would be fair to say that a
9   lot of it is customer service.
10      Q.   Did you have pharmacies as customers as
11  well?
12      A.   Yes.
13      MR. SCANNAPIECO:  Objection to form.
14      MS. YAVELBERG:  I'm sorry?
15      MR. SCANNAPIECO:  I objected to form.
16      MS. YAVELBERG:  What's the objection?
17      MR. SCANNAPIECO:  It's vague as what
18  you mean by pharmacies.  There are multiple
19  channels and trades that may contain that.  It's
20  not clear if you are asking about a specific
21  channel of trade or a concept of pharmacies.
22      Q.   Did you have a specific channel of

Page 223

1   trade that constituted pharmacies?
2       A.   There was multiple market channels that
3   had pharmacies a part of it.
4       Q.   Can you give me an example?
5       A.   Long term care, home care, oncology,
6   all three of those market channels had pharmacies
7   associated with it.
8       MS. YAVELBERG:  I ask the court
9   reporter to mark the next Exhibit No. 15.
10          (The document referred to was
11  marked Plaintiff's Exhibit Blackwell 015 for
12  identification.)
13      Q.   We had talked earlier about different
14  kinds of training that you received.  Do you
15  remember that?
16      A.   Yes.
17      Q.   And one of them was on selling skills.
18  Do you remember that?
19      A.   Yes.
20      Q.   This is called, the title of this
21  document Skills Module.  Would that be a typical
22  name for courses that you took through Abbott?

Page 224

1       A.   No.
2       Q.   Did they call them modules?
3       A.   No.
4       Q.   What were they called?
5       A.   I don't know.
6       Q.   Did you have to complete a certain
7   number of different kinds of trainings?
8       A.   Yes.
9       Q.   And what were those segments of
10  training called?
11      A.   I don't know.  I don't recall the word
12  modules.  I mean, it may have been called
13  modules, but it's almost like a checklist of
14  things that I had to get done in terms of
15  training.
16      Q.   It was or it was not?
17      A.   It was a checklist.
18      Q.   It was a checklist of things you had to
19  get done?
20      A.   Yes, but whether it was called modules,
21  I don't know.
22      Q.   As to this document specifically, I

Page 225

1   don't recall, did you say you recognized it or
2   not?
3       A.   I don't recognize this.
4       Q.   Do you see at the bottom at the very
5   back of the page:  D:/New Hire Selling
6   Injectables.doc?  Do you see that there?
7       A.   Yes.
8       Q.   Does that help your recollection as to
9   whether or not you might have received this
10  training?
11      A.   No.
12      Q.   Whether or not you recall this document
13  specifically, did you receive training on selling
14  injectables in the alternate site market?
15      A.   Yes.
16      Q.   And who would have conducted that
17  training?
18      A.   National sales training.
19      Q.   And would that have been at that annual
20  conference or something else?
21      A.   Almost immediately after hire date into
22  the sales force, all within the first three

57 (Pages 222 to 225)

Blackwell, RonPORTIONS HIGHLY CONFIDENTIALMarch 18, 2008
Raleigh, NC

Page 310

1  your supervisor?
2     A.  No.
3     Q.  Or, you know, worried, oh, I better not
4  get caught, I'm putting it in here?
5     A.  No.
6     Q.  So you didn't think at the time that
7  that violated company policy?
8     A.  No, I didn't.
9        MS. YAVELBERG:  Okay.  I have no more
10  questions, and I can pass the witness.
11        MR. SCANNAPIECO:  I don't have any
12  questions.
13        THE VIDEOGRAPHER:  That's the end of
14  tape No. 6 of this deposition --
15        MR. SCANNAPIECO:  Hold on, sorry.  For
16  the record, I just want to make the designation
17  of the deposition.
18        Just for the record, Abbott wants to
19  advise that it requests, it will be requesting
20  that portions of the transcript and/or exhibits
21  to the deposition of Ron Blackwell containing one
22  or more of the following types of information:

Page 311

1  Information about his individual financial
2  holdings; any specifics as to his actual
3  reimbursement from Abbott and any references to
4  like his level of performance, his address and
5  other personal identifying information, be marked
6  highly confidential, and Abbott will provide
7  those designations to the parties when the
8  attorney asks.
9        THE VIDEOGRAPHER:  That concludes this
10  deposition of Mr. Blackwell, and it is the end of
11  tape No. 6.  We are off the record at 4:22.
12        (Whereupon the deposition was
13  concluded at 4:22 p.m.)
14        (Signature reserved.)
15  _____
16        RON BLACKWELL
17  SUBSCRIBED AND SWORN to before me this _____
18  day of _____, 2008.
19
20        _____
21        NOTARY PUBLIC
22  My Commission expires:_____

Page 312

1        C E R T I F I C A T E
2     I, Marisa Munoz-Vourakis, RMR, CRR and Notary Public,
3  the officer before whom the foregoing proceeding was
4  conducted, do hereby certify that the witness(es) whose
5  testimony appears in the foregoing proceeding were duly
6  sworn by me; that the testimony of said witness(es) were
7  taken by me to the best of my ability and thereafter
8  transcribed under my supervision; and that the foregoing
9  pages, inclusive, constitute a true and accurate
10  transcription of the testimony of the witness(es).
11     I do further certify that I am neither counsel for,
12  related to, nor employed by any of the parties to this
13  action in which this proceeding was conducted, and
14  further, that I am not a relative or employee of any
15  attorney or counsel employed by the parties thereof, nor
16  financially or otherwise interested in the outcome of the
17  action.
18  IN WITNESS WHEREOF, I have hereunto subscribed my name
19  this    of    , 2008.
20        MARISA MUNOZ-VOURAKIS
21  Notary #20032900127
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

34185696-8a04-4200-ba7b-eb0228499107

# EXHIBIT 10

Bukaty, Kelly R.            CONFIDENTIAL            March 19, 2008
                              Chicago, IL

Page 1

          IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

    ----------------------------X

    In re: PHARMACEUTICAL       )  MDL NO. 1456

    INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

    PRICE LITIGATION            )  01-CV-12257-PBS

    ----------------------------X

    THIS DOCUMENT RELATES TO:   )

    United States of America, ex )

    rel. Ven-A-Care of the      )

    Florida Keys, Inc. v. Abbott )

    Laboratories, Inc., CIVIL   )

    ACTION NO. 06-11337-PBS     )

    ----------------------------X

         (CAPTIONS CONTINUED ON FOLLOWING PAGE)


                   CONFIDENTIAL

        Videotaped Deposition of KELLY R. BUKATY,

    at 77 West Wacker Drive, Chicago, Illinois,

    commencing at 9:00 a.m. on Wednesday, March 19,

    2008, before Donna M. Kazaitis, RPR, CSR No.

    084-003145.

Bukaty, Kelly R.          CONFIDENTIAL          March 19, 2008
                          Chicago, IL

|  | Page 30 |
|---|---|

1  caution the witness not to disclose any
2  communications between attorney and client.
3       THE WITNESS:  Just that I've been asked
4  these questions relative to reimbursement.
5  BY MR. ANDERSON:
6     Q.  Which questions?
7       MR. DEMONTE:  If I may, are you asking
8  the subject matter in which, I mean I can
9  represent to you that during our preparation
10 sessions we generally discussed issues that are
11 related to this case.  But anything specific --
12      MR. ANDERSON:  Well, I'll back up.
13 BY MR. ANDERSON:
14    Q.  Are you talking about you were asked
15 questions by your attorney?
16    A.  Well, just the questions that were read
17 to me from the Subpoena, if I'm understanding the
18 question correctly.
19    Q.  Well, I'm not necessarily asking about
20 questions in a Subpoena, ma'am, and I'm not
21 asking about questions necessarily that your
22 lawyer asked you.

|  | Page 31 |
|---|---|

1       I'm asking you what knowledge today do
2  you have about pharmaceutical reimbursement?
3     A.  I guess I would say I really don't.
4     Q.  You don't have any knowledge
5  whatsoever?
6       MR. DEMONTE:  Objection to the form.
7       THE WITNESS:  I mean until this came
8  up, no.  That was not something that was in my
9  vocabulary as part of my role at Abbott
10 Laboratories.
11 BY MR. ANDERSON:
12    Q.  From the beginning of your employment
13 with Abbott in 1992 through 2007, did you gain
14 any understanding about pharmaceutical
15 reimbursement?
16      MR. DEMONTE:  Objection to the form.
17      THE WITNESS:  No.
18 BY MR. ANDERSON:
19    Q.  Do you have any understanding about
20 providers' interest in pharmaceutical
21 reimbursement?
22      MR. DEMONTE:  Objection to the form.

|  | Page 32 |
|---|---|

1       THE WITNESS:  "Provider" meaning?
2  BY MR. ANDERSON:
3     Q.  Do you know what a provider is in the
4  medical field?
5     A.  "Provider" meaning the physician?  I
6  need you to clarify.
7     Q.  Well, are you familiar with providers?
8       MR. DEMONTE:  Objection.
9       THE WITNESS:  I need you to clarify
10 what you mean.  "Provider" can mean a lot of
11 things.
12 BY MR. ANDERSON:
13    Q.  In your work in the pharmaceutical
14 industry, what do you understand by the term
15 "provider"?
16    A.  I mean I'm speculating that what you're
17 asking me is "provider" meaning physician or a
18 caregiver.
19    Q.  Have you also known that pharmacies are
20 referred to as providers?
21    A.  I guess I really didn't think of them
22 that way, no.

|  | Page 33 |
|---|---|

1     Q.  From 1992 through 2007 while working
2  for Abbott and then Hospira, did you gain any
3  understanding that pharmacies were interested in
4  pharmaceutical reimbursement?
5       MR. DEMONTE:  Objection to the form.
6       THE WITNESS:  No.  I guess I wasn't,
7  no, I'll say no.
8  BY MR. ANDERSON:
9     Q.  You hesitated a little bit.  Why is
10 that?
11      MR. DEMONTE:  Objection to the form.
12      THE WITNESS:  I just wanted to think
13 through my answer.
14 BY MR. ANDERSON:
15    Q.  What would you say are the attributes
16 of a good Alternate Site sales representative?
17      MR. DEMONTE:  Objection to the form.
18      THE WITNESS:  I'd say they have to be
19 good listeners, they need to have mastered the
20 product knowledge, professional persistence.  I
21 guess those are the three that come to mind.
22 BY MR. ANDERSON:

9 (Pages 30 to 33)

a6c24cf2-822e-4fcc-90a4-e6bf5dc43321