# EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )     01-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                )
United States of America,       ) Hon. Patti Saris
ex rel. Ven-a-Care of the       )
Florida Keys, Inc., v.          )
Abbott Laboratories, Inc.,      )
and Hospira, Inc.               )
CIVIL ACTION NO. 06-11337-PBS   )

********************************************************

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                ) 01-CV-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                ) Judge Patti B.
                                ) Saris
State of Arizona v. Abbott      )
Labs., et al.                   )
Civil Action No. 06-CV-11069-PBS )

********************************************************

ORAL AND VIDEOTAPED CONFIDENTIAL DEPOSITION OF

DAVID E. BRINCKS

JUNE 12, 2007

********************************************************

Page 166

1   A.      I don't think when I was there that that
2   capability was in place.  I don't recall that when I
3   left in '95.
4   Q.      You just recall the more kind of
5   antiquated physical reference to the books?
6   A.      Pull out the book (indicating).
7   Q.      Was it your experience that Abbott had a
8   subscription to both First Data Bank and Red Book
9   publications?
10         MS. CITERA: Objection to form.
11  A.      I had them and Abbott paid for them.
12  Q.      And it was -- It probably wasn't just you
13  that had them, was it?  Did other Abbott personnel
14  have subscriptions to the books?
15  A.      Yeah.  I would imagine they did, but I
16  don't specifically recall who.  I can't imagine that
17  they didn't.
18  Q.      Right.  Okay.
19         Now looking at Page 2 of Exhibit 295,
20  which is actually the third page.  I think you're
21  already there actually.
22  A.      Oh, Page 2?
23  Q.      Yes, sir, that block.
24         And there's different services that Abbott
25  offered to home infusion pharmacies and hospital

Page 167

1   clinics, correct?
2   A.      Yes.
3   Q.      And the first one is reimbursement,
4   correct?
5   A.      Uh-huh.
6          MS. CITERA: Objection to form.
7   BY MR. ANDERSON:
8   Q.      Then Abbott product, non-Abbott product
9   and CHIP system, correct?
10  A.      Yes.
11  Q.      How did Abbott go about offering
12  non-Abbott product to home infusion clients of
13  Abbott's?
14  A.      I don't remember the details of how the
15  pharmacy operation did that and I can't recall if it
16  was simply in that one -- for clients that we
17  compounded product for, because obviously we didn't
18  make everything that you would need.  So you would --
19  They would have had to procure it, and I don't recall
20  the specifics of how they did that, the mechanics.
21  Q.      I'll read -- And maybe this will refresh
22  your memory.  Next to non-Abbott product, there's a
23  statement that I'll read for the record.  Quote, Care
24  Partners will be able to join a nationwide buying
25  group at no cost.  Did I read that correctly?

Page 168

1   A.      Uh-huh.
2   Q.      Does that jog your memory that there was
3   some type of buying group that Abbott offered to home
4   infusion clients to buy non-Abbott drugs?
5          MS. CITERA: Objection to form.
6   A.      I don't -- You know -- And this again was
7   after I left.  So I don't know if there was some kind
8   of a buying group relationship.  I don't -- I don't
9   recall.
10  Q.      Do you believe that the CHIP system was
11  online and operational before you left the home
12  infusion services group?
13  A.      Yes.
14  Q.      And do you recall that the CHIP system was
15  utilized in the filing of reimbursement claims?
16  A.      Yes.  I don't recall as to how extensively
17  when I left, but I know it was -- it certainly was
18  involved and had the capability.
19  Q.      And was that one of the primary reasons
20  why the CHIP computer system was actually created?
21         MS. CITERA: Objection to form.
22         MR. ANDERSON: I'll rephrase to be more
23  specific.
24  BY MR. ANDERSON:
25  Q.      Sir, is it true that one of the reasons

Page 169

1   why Abbott went to the trouble of creating the CHIP
2   computer system was to assist pharmacies in filing
3   reimbursement claims?
4          MS. CITERA: Objection to form.
5   A.      I don't recall the specific motivation,
6   but clearly it was an area that they requested and
7   were looking for help.
8   Q.      And when you say --
9   A.      The clients.
10  Q.      -- "it," you mean the reimbursement
11  submissions?
12  A.      Correct.
13  Q.      Okay.  Now, looking at what's titled as
14  the third page -- it's actually the fourth page of
15  Exhibit 295.  Were you ever involved or aware of any
16  training that home infusion provided to clients
17  concerning reimbursement?
18         MS. CITERA: Objection to form.
19  A.      I -- I know that Virginia and her team did
20  some.  I don't -- I don't remember specific details
21  of it.
22  Q.      And when you say "Virginia," just so the
23  record is clear, you're talking about Virginia
24  Tobiason, correct?
25  A.      Correct.

43 (Pages 166 to 169)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 270

```
 1            CERTIFICATE
 2              - - -
 3        The amount of time used by each party at
     the deposition is as follows:
 4
     MS. ST. PETER-GRIFFITH - 2 HRS: 28 MIN
 5
     MR. ANDERSON - 2 HRS: 55 MIN
 6
     MS. CITERA - 9 MIN
 7
 8              - - -
 9   State of Ohio   :
                SS:
10   County of Franklin:
11        I, Jody M. Theado, Notary Public in and
     for the State of Ohio, duly commissioned and
12   qualified, certify that the within-named DAVID E.
     BRINCKS was by me duly sworn to testify to the whole
13   truth in the cause aforesaid; that the testimony was
     taken down by me in stenotype in the presence of said
14   witness, afterwards transcribed upon a computer; that
     the foregoing is a true and correct transcript of the
15   testimony given by said witness taken at the time and
     place in the foregoing caption specified.
16        I certify that I am not a relative,
     employee, or attorney of any of the parties hereto,
17   or of any attorney or counsel employed by the
     parties, or financially interested in the action.
18        IN WITNESS WHEREOF, I have set my hand and
     affixed my seal of office at Columbus, Ohio, on this
19   19th day of June 2007.
20
21
     _____
22        JODY M. THEADO, Notary Public
          in and for the State of Ohio
23        and Professional Court
          Reporter.
24
25   My Commission expires January 5, 2009.
```

69 (Page 270)

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

# EXHIBIT 12

Cannon, Robert                                    February 26, 2008
                        Orlando, FL

                    UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF MASSACHUSETTS

----------------------------X

IN RE:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )

----------------------------X

THIS DOCUMENT RELATES TO:       )

State of California, ex rel.   )

Ven-A-Care v. Abbott            )

Laboratories, Inc., et al.     )

CASE #: 1:03-cv-11226-PBS       )

----------------------------X

          VIDEOTAPED DEPOSITION OF ROBERT CANNON

    Taken on Behalf of the U.S. Department of Justice

                    Volume I

        DATE TAKEN          February 26, 2008

        TIME:               9:10 a.m. – 6:20 p.m.

        PLACE:              Orlando, Florida  32801

            Stenographically Reported by:

                    Soon Britt

        Court Reporter and Notary Public

Henderson Legal Services, Inc.

881e5aa9-9b10-4d6f-98c2-24a7ef7f1d17

Cannon, Robert                                    February 26, 2008

Orlando, FL

Page 390

1    Q.  Well, what is -- what do you understand
2  the manufacturer data is that's referenced in
3  that paragraph?
4    A.  (Reading document.)  I -- I guess,
5  based -- the interpretation is First DataBank is
6  just going to use prices provided by the
7  investigators instead of the manufacturers.
8    Q.  Right.  Did you understand that
9  manufacturers provided prices to First DataBank?
10    A.  Based upon this, yes.
11    Q.  Does that refresh your memory that over
12  the years, you and others at Abbott knew that
13  manufacturers reported prices to First DataBank?
14        MS. GEISLER:  Objection to form.
15    A.  I believe so.
16    Q.  Why do you make drug manufacturers
17  report prices to First DataBank?
18    A.  I have no clue.  I -- I'd have to go
19  back --
20    Q.  What prices did Abbott report to First
21  DataBank?
22    A.  I don't know.

Page 391

1    Q.  Did -- do you know that Abbott reported
2  prices to Red Book?
3    A.  I was informed that they supplied
4  information to Red Book.
5    Q.  Did you understand that information
6  provided by Abbott to Red Book and First DataBank
7  led to the publication of AWP on Abbott products?
8        MS. GEISLER:  Objection to form.
9    A.  I was just told they submitted it.  And
10  then if I was asked about AWP, to tell them to go
11  back to Red Book.
12    Q.  Yes, sir.  I understand your prior
13  testimony on that.  But I'm asking:  Did you
14  understand that pricing information published by
15  Abbott to First DataBank and Red Book led to the
16  publication of AWP on Abbott drugs?
17        MS. GEISLER:  Objection to form.
18    A.  No.
19    Q.  Did you understand that Abbott had any
20  role whatsoever in the publication of AWP?
21    A.  No.
22    Q.  Did you understand if Abbott had any

Page 392

1  connection or input into the publication of AWP
2  on Abbott drugs?
3        MS. GEISLER:  Objection to form.
4    A.  No.
5    Q.  Did you have any -- what was your
6  understanding of how the AWPs for Abbott products
7  were published?
8    A.  I -- again, I was just under -- you
9  know, just under the assumption they sent the
10  information and Red Book developed the AWP and
11  was told to tell the customer, go to Red Book.
12    Q.  Did you find over the years that the
13  AWPs on Abbott's fluids or injectable products
14  exceeded the prices that you sold those products
15  to customers for by anywhere from 500 to a
16  thousand percent?
17    A.  I -- I wasn't privy to that
18  information.  I only did con- -- contracting on -
19  - on those products.
20    Q.  I -- I understand that, sir.  But did -
21  - but did you have an awareness that the AWPs
22  significantly exceeded the market prices?

Page 393

1    A.  No.
2    Q.  You never looked at the AWPs at all?
3    A.  No.
4    Q.  When you wrote this e-mail back in May
5  of 2000, did you gain an understanding that the
6  AWPs had previously been high?
7        MS. GEISLER:  Objection to form.
8    A.  I think my understanding, based upon
9  that for the customer, was that he was going to
10  lose business.
11        MR. ANDERSON:  Objection,
12  nonresponsive.
13  BY MR. ANDERSON:
14    Q.  I understand the -- what the customer
15  was telling, sir.
16        I'm asking:  Did you have an
17  understanding that prior to this decrease in the
18  AWPs in May of 2000, that the AWPs on some Abbott
19  products had been high?
20    A.  No.
21    Q.  How did you rectify the fact that they
22  had come down?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

881e5aa9-9b10-4d6f-98c2-24a7ef7f1d17

Cannon, Robert                                February 26, 2008

Orlando, FL

Page 482

1  does that sound familiar?
2    A.  Just from what was earlier from that
3  one document.
4    Q.  In your time at Abbott, do you have any
5  familiarity with the term "seating program"?
6    A.  No.
7    Q.  How did you win sales rep of the year
8  for ProHealth?  I believe you testified earlier
9  to --
10    A.  At Priority Healthcare.
11    Q.  Priority Healthcare?
12    A.  Manufacturer of the year.  The
13  manufacturer of the year.
14    Q.  And what was the award?
15    A.  Priority Healthcare not only gave
16  awards to their internal salespeople, but then
17  they also gave awards to their partners.  And so
18  I won as their "Manufacturer of the Year" for all
19  the due diligence and everything I'd done for
20  them.
21    Q.  So that was Priority Health's award?
22    A.  No.

Page 483

1    Q.  That was -- was not an Abbott award?
2    A.  No.  Priority.
3    MS. STRAWN:  All right.  Well, I'm just
4  in time.  Did you want to put anything else on
5  the record?
6    MS. GEISLER:  There's a couple of spots
7  in the -- in the transcript that we're going to
8  designate as confidential that refer -- there was
9  an -- a spot around 9:15 this morning and another
10  spot around 10:15 and then another one around
11  10:40, which are -- include Mr. Cannon's personal
12  information.
13    Once we get the transcript, we'll
14  designate those specific lines as confidential.
15    MS. STRAWN:  Okay.  I want to go ahead
16  and put on the record now that -- that Judge
17  Saris has already issued four separate orders
18  expressing concerns about improper designation of
19  materials as confidential and -- and highly
20  confidential, and so -- and -- and even
21  frivolous.  And so I guess, will you provide --
22  when you provide the sections that you want to be

Page 484

1  designated, will you provide the bases for those
2  designations?
3    MS. GEISLER:  All of the designations
4  that I just mentioned refer to personal
5  information relating to the witness.  That's the
6  information we're going to mark confidential.
7  That has nothing to do with Judge Saris' order.
8    MS. STRAWN:  Gentlemen on the phone, is
9  there anything else?  I intend to --
10    MR. ANDERSON:  Well, nothing here.
11    MR. SISNERO:  Nothing here.
12    MS. STRAWN:  I guess as -- as a
13  standard procedure, we'll keep the deposition
14  open.  My -- my intention is that I -- I've asked
15  the questions I wanted to ask, but Abbott is
16  continuing to produce more documents.  And so it
17  may be necessary, but it's not our -- my current
18  intention to -- to recall you at all.
19    THE WITNESS:  Okay.  Thank you.
20    THE VIDEOGRAPHER:  We're off the video
21  record.
22    (Deposition concluded at 6:20

Page 485

1  p.m.)
2
3
4         STIPULATIONS
5
6    IT WAS STIPULATED BETWEEN counsel for the
7  respective parties, with the consent of the witness,
8  that reading and signing of the foregoing deposition by
9  the witness will be reserved.
10    THEREUPON, the videotaped deposition of ROBERT
11  CANNON, taken at the instance of the United States
12  Department of Justice, was concluded at 6:20 p.m.
13
14
15  _____
16       ROBERT CANNON
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20____.
19
20
21  _____
22       Notary Public

122 (Pages 482 to 485)

881e5aa9-9b10-4d6f-98c2-24a7ef7f1d17

Cannon, Robert                                   February 26, 2008
                        Orlando, FL

---

                                                Page 486

1        REPORTER'S VIDEOTAPED DEPOSITION CERTIFICATE
2    STATE OF FLORIDA
3    COUNTY OF ORANGE
4         I, Soon Britt, Shorthand Reporter and
5    Notary Public in and for the State of Florida at large,
6    hereby certify that the witness appeared before me for
7    the taking of the foregoing deposition, and that I was
8    authorized to and did stenographically and
9    electronically report the deposition, and that the
10   transcript is a true and complete record of my
11   stenographic notes and recordings thereof.
12        I FURTHER CERTIFY that I am neither an
13   attorney nor counsel for the parties to this cause, nor
14   a relative or employee of any attorney or party
15   connected with this litigation, nor am I financially
16   interested in the outcome of this action.
17        DATED THIS _____, at Orlando,
18   Orange County, Florida.
19
20        _____
21        Soon Britt, Court Reporter
22

---

                                          123 (Page 486)

881e5aa9-9b10-4d6f-98c2-24a7ef7f1d17

# EXHIBIT 13

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


    In re:  PHARMACEUTICAL          )
    INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
    PRICE LITIGATION                ) Civil Action No.
                                    )    01-12257-PBS
                                    )
    THIS DOCUMENT RELATES TO:       )
                                    )
    United States of America,       ) Hon. Patti Saris
    ex rel. Ven-a-Care of the       )
    Florida Keys, Inc., v.          )
    Abbott Laboratories, Inc.,      )
    and Hospira, Inc.               )
    CIVIL ACTION NO. 06-11337-PBS   )


    ********************************************************

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


    IN RE:  PHARMACEUTICAL          )
    INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
    PRICE LITIGATION                ) Civil Action No.
                                    )    01-CV-12257-PBS
                                    )
    THIS DOCUMENT RELATES TO:       )
                                    ) Judge Patti B. Saris
    State of Arizona v. Abbott      )
    Labs., et al.                   )
    Civil Action No. 06-CV-11069-PBS )


    ********************************************************

            ORAL AND VIDEOTAPED DEPOSITION OF

                    JERALDINE CICERALE

                      May 30, 2007

    ********************************************************

36182266-7c50-47fe-9423-7b2843292aab

Page 14

1  duties -- of the general titles of the functions that
2  you had at Abbott?
3      A.  Yes, that's correct.
4      Q.  Okay.  What's an R/D Secretary?
5      A.  Research and development secretary.  I worked
6  in the -- that area for 18 different engineers and
7  scientists.
8      Q.  Okay.  And was that -- what division was that
9  R/D Secretary position in?
10     A.  That was Hospital Products.
11     Q.  At all times that you worked at Abbott, all
12 25 years, were you an employee of the Hospital
13 Products Division?
14     A.  Yes.
15     Q.  And if I refer to that as HPD, is that okay
16 with you?  We have the understanding that means
17 Hospital Products Division?
18     A.  Yes.
19     Q.  Okay.  And at all times when you were an
20 employee of HPD, did you work in the Hospital Business
21 Sector?
22     A.  Yes.
23     Q.  Okay.  And did you generally understand that
24 Abbott's HPD had two business units, the Hospital
25 Business Sector, which was sometimes referred to as

Page 15

1  HBS, and then the Alternate Site Business Sector?
2      A.  Yes.
3      Q.  Okay.  And did you know the difference
4  between the two business sectors, HPD -- HBS and
5  Alternate Site?
6      A.  Well, I knew what HBS was.
7      Q.  What was HBS?
8      A.  The hospital products.  We dealt with
9  hospital products.
10     Q.  Who did Abbott sell its hospital products to?
11     A.  Hospitals.
12     Q.  Who did the Alternate Site Business Sector
13 sell their products to?
14          MR. COLE:  Object to the form.
15     A.  I don't know.  I didn't work in that area.
16     Q.  (BY MR. WINTER)  Did you have interaction
17 with the Alternate Site Business Sector?
18     A.  Not really.
19     Q.  You never had interaction with Tena Brown or
20 Michael Heggie?
21          MR. COLE:  Object to the form.
22     A.  Other than -- no, not really.  Just sending
23 catalogs to them.
24     Q.  (BY MR. WINTER)  Your sole interaction with
25 Tena Brown and Michael Heggie was to send catalogs to

Page 16

1  them?
2      A.  From what I recall, yes.
3      Q.  What is a Catalog Specialist Assistant?
4      A.  Are you asking me what my job function was?
5      Q.  Yes, ma'am.
6      A.  I put together catalogs to send out to the
7  customers, and then I also would put the list price,
8  the wholesale price and government price into our
9  computer system, which was at the time called OPS.
10 And then I would put new products in that database and
11 update them when there were price changes.
12     Q.  And that was the function that you had as a
13 Catalog Specialist Assistant?
14     A.  Yes.
15     Q.  Okay.  How did your job change when you
16 transitioned from being a Catalog Specialist Assistant
17 to a Master Database Coordinator in or about May of
18 1976?
19     A.  Well, we had an internal department database,
20 which was just used by our Contract Marketing
21 Department, and that -- I would also add products to
22 that and keep up the pricing on it, the list pricing,
23 and send out -- when I got updates, I'd send out
24 the notif- -- you know, the different updates to
25 department people and enter that information into that

Page 17

1  internal database, which the department used for
2  using -- writing contracts.
3      Q.  When you refer to "the department," are you
4  referring to the Hospital Products Division Contract
5  Marketing Department?
6      A.  Correct.
7      Q.  And who was in charge of the Hospital
8  Products Division Contract Marketing Department when
9  you first started working there?
10     A.  There were many of them.  Are you talking
11 about the director, the person that -- the highest?
12     Q.  Who was -- what was the -- well, let's start
13 with the organization.
14          What was the name of the person who was
15 in charge of the Hospital Products Division Contract
16 Marketing Department?  Was that a director position?
17     A.  Right.
18     Q.  Okay.
19     A.  Correct.
20     Q.  Is that the organization that you went to
21 work for in May of 1976?
22     A.  Right.  Correct.
23     Q.  Prior to May of 1976, were you in a different
24 organization besides Contract Marketing?
25     A.  Yes.  I was in the HPD Marketing Department.

Page 58

1    A.  No.
2    Q.  Did the resource file that you had
3  responsibility for updating and maintaining include
4  markers for parameter pricing?
5    A.  No.
6    Q.  Were there any other price points that you
7  recall maintaining or updating besides list price,
8  wholesale price and government price?
9    A.  No.
10    Q.  Now, is it true that from time to time you
11  also had responsibility to communicate certain pricing
12  points to not only the people who published the
13  catalog but also to external publishing houses known
14  as --
15    A.  Correct.
16    Q.  -- price compendia?
17    A.  Pardon me?
18    Q.  You're familiar with the term --
19    A.  Yes.
20    Q.  -- phrase "price reporting compendia"?
21    A.  Well, I'm not familiar with that term.
22    Q.  Okay.  What -- do you know what First
23  DataBank is?
24    A.  Yes.
25    Q.  Okay.  And you're familiar with Medi-Span?

Page 59

1    A.  Yes.
2    Q.  Okay.  And Redbook?
3    A.  Correct.
4    Q.  Okay.  What -- what's your phrase, what's
5  your terminology for those three companies?
6        MR. COLE:  Object to the form.
7    A.  I just -- they were outside companies that
8  published our --
9    Q.  (BY MR. WINTER)  Price publish --
10    A.  -- our -- our list prices and that.
11    Q.  I just want to use some language you're
12  familiar with.  So would you call them the
13  price-publishing companies?
14    A.  Yes.
15    Q.  Okay.  So from 1976 all the way through
16  December, 2003, did you have the responsibility of
17  reporting to the price-publishing companies?
18    A.  I don't know if it was that long.  I don't
19  think in 1976 I did things like that.
20    Q.  In -- in the middle 1980s, were you
21  responsible for reporting Abbott's prices to the
22  price-publishing companies?
23    A.  I could have been.
24    Q.  Certainly as early as the early 1990s
25  until --

Page 60

1    A.  Correct.
2    Q.  -- you left in December, 2003, you had that
3  duty, correct?
4    A.  Right.
5    Q.  Okay.  What was the information that you
6  would transmit to the price-publishing companies?
7    A.  I would give them pretty much what I fed into
8  OPS, which would be the list price, the wholesale
9  price, the product description, the NDC number and the
10  case size.
11    Q.  So it was essentially the same information
12  that you fed into OPS via the CPP, correct?
13    A.  What was that?
14    Q.  The infor-- you said you -- your answer
15  just a minute ago was I gave the price-publishing
16  companies pretty much the same thing that I gave --
17  that I fed into OPS, correct?
18    A.  Correct.
19    Q.  Okay.  And the way you fed information to OPS
20  was via your memo to Bruce Stowell or your e-mail to
21  Bruce Stowell, and he would update the CPP, correct?
22    A.  Correct.
23    Q.  And then the CPP had a -- had a feed to OPS?
24    A.  Correct.
25    Q.  Okay.  Is that the only way that you fed

Page 61

1  information to OPS?
2    A.  Yes.
3    Q.  There was no direct link between your
4  database and OPS, correct?
5    A.  No, there was no...
6    Q.  Okay.  But essentially the same information
7  that you would transmit from time to time to
8  Mr. Stowell that he would download to CPP and then
9  feed to OPS you would provide from time to time to the
10  price-publishing companies?
11    A.  Correct.
12    Q.  Okay.  And that came -- did you provide it to
13  them electronically; did you send them spreadsheets?
14  How would you do that?
15    A.  Well, towards the latter years it was through
16  e-mail.  Prior to that, it was either a fax or through
17  the mail.
18    Q.  Was there a form that you created on your own
19  that you would fill out and submit to the
20  price-publishing services or did you fill out a form
21  that they gave you?
22        MR. COLE:  Object to the form.
23    A.  I would just basically give them those -- you
24  know, those four or five fields.  Say here's a new
25  product.  Here's the list price; wholesale price;

16  (Pages 58 to 61)

36182266-7c50-47fe-9423-7b2843292aab

1   product description.
2   Q.  (BY MR. WINTER)  So you would do --
3   A.  And the introduction date, you know, when we
4   put it in our system.
5   Q.  So you're specifically referring now to a new
6   product launch, correct?
7   A.  Correct.
8   Q.  Okay.  You've testified this morning about
9   the fact that Abbott took an annual price increase,
10  correct?
11  A.  Correct.
12  Q.  Okay.  What prices were increased annually?
13  A.  The list price, and then -- sometimes at the
14  same time the wholesale price, but sometimes that was
15  at a different time.
16  Q.  Was the government price increased annually?
17  A.  Yeah, but that was handled by the government
18  area.
19  Q.  Do you know why Abbott took a list price
20  increase on an annual basis?
21  A.  No.
22  Q.  These annual price increases would be across
23  the board for all the HPD products, correct?
24  A.  Correct.
25  Q.  Okay.  When you had a massive amount of

1   products to update such as with an annual price
2   increase, how did you transmit that information to the
3   price-reporting services?
4   A.  I think -- towards the end I gave them a
5   spreadsheet, an Excel spreadsheet, but prior to that
6   it would just be, you know, the catalog.  Send them
7   the catalog, and so here is our new products, our new
8   prices.
9   Q.  So sometimes you would just physically mail
10  them a bound catalog?
11  A.  Correct.
12  Q.  And that's what you did in the early days
13  before you had the capability to transmit the
14  information electronically?
15  A.  Correct.
16  Q.  How many different catalogs did Abbott have?
17  A.  Well, HPD had the list price catalog, the
18  wholesale catalog and then the federal government
19  catalog.
20  Q.  Have you ever heard a catalog described as a,
21  quote, "customer catalog"?
22  A.  Yeah, I've heard that term.
23  Q.  What would that mean to you?
24  A.  To me, I would interpret that as being a list
25  price catalog.

1   Q.  And would that catalog house or contain the
2   same list prices that you and I have been talking
3   about this morning, the ones that you got from the
4   marketing managers that you'd input into the internal
5   database?
6   A.  Yes.
7       MR. COLE:  Object to the form.
8   Q.  (BY MR. WINTER)  Those are the same list
9   prices that were increased annually?
10  A.  Yes.
11  Q.  Okay.  And those are the same list prices
12  that you don't have any idea whether anybody actually
13  bought product at those list prices, right?
14  A.  Correct.
15      MR. COLE:  Object to the form.
16  Q.  (BY MR. WINTER)  The wholesaler catalog,
17  would it include the wholesale prices that you have
18  referred to?
19  A.  Correct.
20  Q.  Did it also include WAC prices?
21  A.  No.
22  Q.  Have you ever heard of a catalog described as
23  a field catalog?
24  A.  Yes.  It would be probably a sales rep
25  catalog.

1   Q.  A sales rep catalog.  Okay.  Is that the same
2   as either the wholesaler catalog or the -- or the
3   customer catalog, or is it a different catalog?
4   A.  That's a different one, but that -- you know,
5   that was years ago.  They discontinued making that
6   one.
7   Q.  When?
8   A.  I don't know what year it was.
9   Q.  Well, do you -- do you think that Abbott
10  still -- is it your recollection that Abbott still had
11  field sales rep catalogs in the middle 1990s, say
12  1995?
13  A.  I can't be sure.
14  Q.  Is it your best recollection and your sense
15  that they had phased it out prior to that?
16  A.  I can't be sure on the date.
17  Q.  What information was included in a sales rep
18  catalog?
19  A.  It was just a small version of the list price
20  catalog.  It was a little pocket one so they could
21  carry it, you know, when they did their sales calls or
22  whatever.
23  Q.  So it had the same information, the list
24  prices; it was just in a reduced format so it was
25  easier to carry around?

36182266-7c50-47fe-9423-7b2843292aab

Page 86

1    Q.   And there are three attachments?
2    A.   Uh-huh.
3    Q.   And do you see that the third one to the far
4  right there says "AWP.TXT"?
5    A.   Correct.
6    Q.   Okay.  Do you recall maintaining on the
7  database that you had responsibility for a file or a
8  compilation of data known as AWP or AWP text files?
9    A.   No, I didn't have a file -- a field called
10  AWP.
11    Q.   Where did you --
12    A.   I had a field called wholesale price.
13    Q.   Where did you get the information that you
14  utilized to create the AWP text file that you
15  submitted to Roni Lane?
16    A.   I took it from that HPD products file,
17  database, and it was the wholesale price that I sent
18  to her.
19    Q.   So it's your testimony that when you provided
20  information for Roni on or about April 23rd, 1996, and
21  you transmitted it under a file that you called the
22  AWP text file, that what you were providing her was
23  the same information that you maintained in your
24  databases in your wholesaler -- wholesale price --
25    A.   Field.

Page 87

1    Q.   -- field?
2    A.   Yes.
3    Q.   Why is it that you believe when she was
4  asking for AWP information that what she wanted from
5  you was information that you called wholesale?
6    A.   Because the only fields I ever sent to the
7  databanks was the list price and the wholesale price.
8  I never sent them any other kind of prices.
9    Q.   So in your understanding and in Abbott's
10  language, "AWP" means the wholesale price that was
11  charged by Abbott to wholesalers?
12        MR. COLE:  Object to the form.
13    A.   Yes.
14    Q.   (BY MR. WINTER)  So is it your belief then
15  that AWP and wholesale price are synonymous?
16    A.   Yes.
17        MR. COLE:  Object to the form.
18    Q.   (BY MR. WINTER)  Do you believe that AWP and
19  wholesale price are also synonymous with the phrase
20  WAC?
21        MR. COLE:  Object to the form.
22    A.   That I don't know.
23    Q.   (BY MR. WINTER)  Let's go back and look at
24  Exhibit 920 for a second, the one we just got through
25  looking at.  Page 2.

Page 88

1        And we talked about that column that
2  says "Wholesale," right?
3    A.   Correct.
4    Q.   And this is an example of where Abbott is
5  representing to a price-publishing company the price
6  at which Abbott sells to wholesalers, right?
7    A.   Correct.
8    Q.   And is that the same as the WAC price?
9        MR. COLE:  Object to the form.
10    A.   That I don't know.
11    Q.   (BY MR. WINTER)  You stated in response to
12  one of my questions earlier that you didn't believe or
13  you didn't -- I don't think you used the word
14  "believe."  You just stated as a matter of fact that
15  you did not receive AWP information from Redbook ever,
16  correct?
17    A.   I received what they published in their
18  publications.
19    Q.   And did you receive AWP information from
20  Redbook?
21    A.   I don't remember what the columns were in
22  their books, what they were labeled.
23    Q.   Well, does looking at Exhibit 926 refresh
24  your recollection that among other things Redbook
25  published AWP for Abbott drugs?

Page 89

1        MR. COLE:  Object to the form.
2    A.   Well, it looks like it from this memo.
3    Q.   (BY MR. WINTER)  Okay.  So is your
4  recollection now, your memory, refreshed that Redbook
5  did, in fact, publish AWP information on Abbott drugs,
6  and from time to time Roni Lane would submit that to
7  you and ask you to look at it and verify its accuracy?
8        MR. COLE:  Object to the form.
9    A.   Yes.
10    Q.   (BY MR. WINTER)  Okay.  So you just were a
11  little fuzzy on your memory this morning when you
12  testified that you never looked at AWP information
13  from Redbook?  Your recollection now --
14    A.   Well, AWP to me is the wholesale price, the
15  direct wholesale price, which was all the fields that
16  I've always updated.
17    Q.   Do you believe that Redbook used "AWP"
18  synonymously with "wholesale price"?
19        MR. COLE:  Object to the form.
20    A.   I don't know that.
21    Q.   (BY MR. WINTER)  Okay.  Earlier you testified
22  that you never looked at any AWP information that was
23  submitted on Abbott drugs back to you by Redbook, but
24  now after looking at Exhibit 926, your memory is
25  refreshed and that earlier testimony that you gave, it

23  (Pages 86 to 89)

36182266-7c50-47fe-9423-7b2843292aab

Page 134

1    Q.  Okay.  But you would look physically at your
2  printed catalog?  You wouldn't look at your own
3  computer database?
4    A.  No.
5    Q.  What if there had been a price change that
6  had taken effect in the middle of the year?
7    A.  Well, this must have been one of them.
8    Q.  But if you were looking at your catalog, what
9  would be printed in the catalog would be whatever the
10  change -- the price was before the change, right?
11    A.  Well, I might have printed the list prices
12  out of the computer.
13    Q.  Okay.  So it might not have been the catalog.
14    A.  Yeah.
15    Q.  You might have printed a current listing of
16  the pricing that you carried on your computer, and you
17  might have been looking at that?
18    A.  Right.
19    Q.  Okay.  So if that's the case, then whatever
20  you had on your computer was updated on a daily basis,
21  right?
22    A.  Right.
23    Q.  So you should have the most current and
24  accurate and complete, truthful information on your
25  computer, right?

Page 135

1    A.  Right.
2    Q.  Okay.
3        MR. COLE:  Object to the form.
4    Q.  (BY MR. WINTER)  So that would have been your
5  process.  You would have taken what they sent you, and
6  you just would have gone page by page and done a
7  comparison?
8    A.  Correct.
9    Q.  Okay.  Would your computer tell you that
10  there had been a change to the dextrose -- if you
11  were -- if you were undertaking this process in or
12  about October of 2002 -- let me ask you this:  Is
13  that -- is that a fair assumption --
14    A.  Yes.
15    Q.  -- based upon the date of the document, that
16  you would have been doing this comparison process in
17  or around October --
18    A.  Sometime in October, yes.
19    Q.  Okay.  And if you were looking at your print
20  of the most current, updated, accurate and truthful
21  information from your database, would it tell you that
22  there had been a price change on May 7, '02, on the
23  dextrose?
24    A.  It would have had a different price.
25    Q.  Would it have the effective date of the

Page 136

1  change or is that something you would have had to go
2  to some other source to find?
3    A.  I probably would have had to gone to another
4  source.
5    Q.  Would -- would you be accessing your resource
6  file for a particular drug in order to generate this
7  list or could you just --
8    A.  No.  From that HPD product catalog or product
9  file.
10    Q.  HPD product file?
11    A.  Yeah.
12    Q.  Okay.  Was --
13    A.  The internal one.
14    Q.  Was that the name of the file for all the
15  list prices and all the wholesale prices?
16    A.  That was the internal, you know, department
17  file.
18    Q.  The internal department file, the actual file
19  that was maintained --
20    A.  Database.
21    Q.  Okay.  A database includes multiple files,
22  right?
23    A.  Multiple -- this one had multiple fields.
24    Q.  Okay.
25    A.  It could have had a hundred different fields

Page 137

1  in it.
2    Q.  Okay.  What -- what other pricing points were
3  included -- what other pricing fields were included
4  besides list, direct -- list and direct are the same,
5  right?
6    A.  Uh-huh.  Right.
7    Q.  -- wholesale and government?
8    A.  The unit price was in there.
9    Q.  Was factory cost in there?
10    A.  Factory cost was in there.
11    Q.  Were there contract prices in there that were
12  inputted by the contract analysts?
13    A.  No, not that in that database.
14    Q.  That database didn't have any of the market
15  contract prices?  Is that your testimony?
16    A.  Correct.
17    Q.  Okay.  You mentioned that -- that you never
18  had any responsibility for reporting AWP to the
19  price-publishing companies, right?
20    A.  Correct.
21    Q.  Okay.  But you saw -- and we've looked at
22  several examples of documents -- from time to time
23  that price-publishing companies provided you
24  information which would indicate to you that the
25  price-publishing companies published AWP on Abbott

35 (Pages 134 to 137)

36182266-7c50-47fe-9423-7b2843292aab

Page 158

1    A. Correct.
2    Q. (BY MR. WINTER) Okay. Do you recall -- does
3  this ring a bell with you now where there had been --
4  first of all, let me ask you this question: Do you
5  recall a time period in the spring of 2001 when Abbott
6  took significant price decreases across the board on a
7  number of products and that you communicated those
8  price changes to the price-publishing services?
9        MR. COLE: Object to the form.
10       MR. STETLER: I apologize, Ray, and this
11 is intended to be helpful. Do you mean 2002?
12       MR. WINTER: No, I mean 2001.
13       MR. STETLER: Okay. I guess I wasn't.
14 Sorry.
15       MR. COLE: I'll object to the form. I
16 think I already did, but just to make sure.
17    A. Yeah, I remember, you know, vaguely.
18    Q. (BY MR. WINTER) Okay. What -- what do you
19 remember vaguely that happened in or about May of
20 2001?
21       MR. STETLER: Oh, I see.
22    A. That the prices, you know, went down, and,
23 you know, the databank was questioning the changes.
24    Q. (BY MR. WINTER) And so based upon your
25 review of this e-mail thread and especially starting

Page 159

1  with the communication from you to Redbook, does it
2  appear in your mind that this communication was
3  concerning those questions that came from the
4  price-reporting services after that across-the-board
5  price decrease?
6        MR. COLE: Object to the form.
7    A. Yeah, it looks like it from this e-mail.
8    Q. (BY MR. WINTER) Okay. And, in fact, when
9  you submitted the e-mail with the new information on
10 NDC 6533-01, you reported the new information on the
11 direct and the wholesale, right?
12    A. Correct.
13    Q. And Redbook got back to you, and they said we
14 need the AWP information also, right?
15       MR. COLE: Object to the form. That's
16 not what this document says.
17    A. Well, they're asking for it.
18    Q. (BY MR. WINTER) Okay.
19    A. But --
20    Q. Did you provide the AWP information or did
21 you verify the AWP information that Redbook had
22 listed?
23    A. No.
24       MR. COLE: Object to the form.
25    Q. (BY MR. WINTER) Do you have a present

Page 160

1  recollection today of having responded to Redbook and
2  telling them, I'm not going to provide a verification
3  for the AWP?
4        MR. COLE: Object to the form.
5    A. Well, I think I said it back here.
6    Q. (BY MR. WINTER) Could you show me where you
7  said it, please?
8    A. Well, I must have on -- you know, on the
9  phone or something because it says "I asked her if
10 there had been an update since 5/1 they do not provide
11 AWP we use markup from" direct.
12    Q. Would you continue reading that paragraph.
13    A. "So is she saying her email that there has
14 been no change to" direct "since 5/1 the customer
15 thinks that there has been a change in price on 4/1
16 which is probably the price change from 5/1 looks like
17 the price went down. I am not quite sure the WAC has
18 an effective date of 5/2 and the AWP and" direct "have
19 effective date of 5/1."
20    Q. So does this indicate to you from reading it
21 that there was some confusion within First DataBank as
22 to which prices were current, accurate, updated prices
23 for this drug?
24       MR. COLE: Object to the form.
25    A. Yes, it looks like there was confusion.

Page 161

1    Q. (BY MR. WINTER) And if you continue to the
2  top of the page, the next e-mail from Traci Kellam
3  back to Laura Lovato says, "Yes, that is how I read
4  her e-mail (prior to" May 7, '02). "I looked in" the
5  "manufacturer notes, the note was ambiguous concerning
6  the mark-up, so I called Jerrie back, she is out until
7  Monday. I'll call her back then. The WAC it seems
8  from her email is effective" May 7 -- "5/7/02 of
9  $48.50 and prior to that date it was $141.80 (went
10 down). Concerning the AWP per the pricing notes the
11 Price of $764.16 was effective on 4/19/99 and the
12 price of $176.82" was "effective on 5/7/01, Right?"
13 She's asking the question.
14       Did I read that accurately?
15       MR. COLE: I'll just object again to you
16 asking her questions about internal Redbook
17 communications.
18    A. You read it correctly.
19    Q. (BY MR. WINTER) And it looks like the author
20 of that e-mail, Traci Kellam, made the same mistake as
21 Mr. Stetler in applying a 2002 effective date of the
22 change instead of a 2001 in at least part of the text
23 of her e-mail. Do you see that?
24    A. Yes.
25       MR. COLE: Object to the form.

41 (Pages 158 to 161)

36182266-7c50-47fe-9423-7b2843292aab

Page 350

1     Q.  (BY MR. ANDERSON)  Since you left the
2  employment of Abbott, have you had any conversations
3  or other communications with counsel representing
4  Abbott?
5     A.  Just Dave.
6         MR. STETLER:  Well, I don't represent
7  Abbott.
8     A.  Then no.
9         MR. STETLER:  Despite the face you just
10  made.  We're done.
11        THE REPORTER:  Off the record, please.
12        MR. ANDERSON:  Well, we -- before we go
13  off, I mean, obviously we don't feel like the
14  deposition is concluded.  We have many different lines
15  of questions we need to pursue with the witness.  But
16  I understand that we are stopping at 5:00 o'clock, but
17  the deposition is not concluded.
18        MR. COLE:  I'll just say --
19        MR. LEVINE:  I agree with that.
20        MR. COLE:  -- this is the second full
21  day of testimony that Ms. Cicerale has given in
22  AWP-related matters.  She was deposed in the
23  West Virginia AWP case I believe for a full day; she
24  was deposed here for a full day.  I'll let Mr. Stetler
25  make any representations about whether he's willing to

Page 351

1  bring her back.
2         MR. STETLER:  The only thing I'm going
3  to say is I understand your position, and I'll be back
4  to you with ours.
5         MR. COLE:  And if I could just briefly
6  state on the record --
7         MR. STETLER:  But it probably will be
8  something less than a million other areas.
9         MR. LEVINE:  Well, we need to sort this
10  issue out.
11        MR. STETLER:  Well, we're not going to
12  do it now.
13        MR. LEVINE:  Right.  I understand.
14        MR. STETLER:  As I've given everybody
15  warning every time, but once again Texas has to push
16  everything to the limit.
17        MR. COLE:  And if I could just briefly
18  state one objection on the record.  I talked to
19  Mr. Stuart about this off the record earlier, but it's
20  Abbott's position that they object to any use of this
21  deposition in the AMCC or the class action that's
22  pending in the MDL on the grounds that discovery in
23  that particular case is closed.
24        MR. STUART:  And our response is that we
25  consider the discovery dispute is open, and as a

Page 352

1  result the deposition remains open for us as well.
2         MR. COLE:  That's all.  Thank you.
3         THE REPORTER:  Off the record, please.
4         THE VIDEOGRAPHER:  The time is 5:02 p.m.
5  We're off the record.  This concludes Tape 6.
6         (Deposition Closed.)

Page 353

1  STATE OF TEXAS )
2  COUNTY OF TRAVIS )
3      I, WILLIAM M. FREDERICKS, CSR 2392, do hereby
4  certify that, pursuant to the agreement hereinabove
5  set forth, there came before me on the 30th day of
6  May, 2007, at 9:03 o'clock a.m., in the offices of
7  Jones Day, 77 West Wacker Drive, Suite 3500, Chicago,
8  Illinois, the following named person, to-wit:
9  JERALDINE CICERALE, who was by me duly sworn to
10  testify to the truth and nothing but the truth of
11  witness' knowledge touching and concerning the matters
12  in controversy in this cause; that such witness was
13  thereupon examined under oath, and the examination
14  transcribed by computer-assisted transcription by me
15  or under my supervision, and that the deposition is a
16  true record of the testimony given by the witness.
17      I further certify that I am neither attorney
18  nor counsel for, nor related to or employed by, any of
19  the parties to the action in which this deposition is
20  taken and, further, that I am not a relative or
21  employee of any attorney or counsel employed by the
22  parties hereto, or financially interested in the
23  action.
24      That the amount of time used by each party at
25  the deposition is as follows:

89  (Pages 350 to 353)

36182266-7c50-47fe-9423-7b2843292aab

Page 354

1      MR. RAYMOND WINTER - 04:19
       MR. JARRETT ANDERSON - 02:21
2
3      IN WITNESS WHEREOF I have hereunto set my
4  hand on this 18th day of June, A.D. 2007.
5
6
7
8          WILLIAM M. FREDERICKS, Texas CSR 2392
           Expiration Date: 12/31/2007
           Firm Registration No. 82
9          Fredericks-Carroll Reporting
           7800 Shoal Creek Boulevard
10         Suite 200W
           Austin, Texas 78757
11         Telephone: (512) 477-9911
                       (800) 234-3376
12         Fax:      (512) 345-1417
13
   JOB NO. 2425
14
15
16
17
18
19
20
21
22
23
24
25

Page 355

1          NO. D-1-GV-04-001286
2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                             )
3  ex rel.                   )
     VEN-A-CARE OF THE       )
4    FLORIDA KEYS, INC.,     )
       Plaintiffs,           )
5                            )
   VS.                       ) TRAVIS COUNTY, TEXAS
6                            )
   ABBOTT LABORATORIES INC., )
7  ABBOTT LABORATORIES,      )
   HOSPIRA, INC., and B. BRAUN )
8  MEDICAL INC.,             )
       Defendant(s).         ) 201ST JUDICIAL DISTRICT
9
10         REPORTER'S CERTIFICATION
           DEPOSITION OF JERALDINE CICERALE
11             May 30th, 2007
12     I, WILLIAM M. FREDERICKS, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15     That the witness, JERALDINE CICERALE, was
16  duly sworn by the officer and that the transcript of
17  the oral deposition is a true record of the testimony
18  given by the witness;
19     That examination and signature of the witness
20  to the deposition transcript was waived by the witness
21  and agreement of the parties at the time of the
22  deposition.
23     That the amount of time used by each party at
24  the deposition is as follows:
25     Mr. RAYMOND WINTER - 04:19

Page 356

1      That $      is the deposition officer's
2  charges to the Plaintiff(s) for preparing the original
3  deposition transcript and any copies of exhibits;
4      That pursuant to information given to the
5  deposition officer at the time said testimony was
6  taken, the following includes counsel for all parties
7  of record:
8
9          MR. RAYMOND WINTER,
             Attorney for Plaintiff State of Texas;
10         MR. JARRETT ANDERSON,
             Attorney for the Relator;
11         MR. JEREMY COLE,
             Attorney for Defendants Abbott
12           Laboratories, Inc. and Hospira, Inc.;
           MR. MARK LEVINE,
13           Attorney for Plaintiff United States of
             America;
14         MR. CHRISTOPHER STUART,
             Attorney for Plaintiff State of Arizona
15           and MDL Plaintiffs;
           MR. ELISEO SISNEROS, Attorney for the
16           State of California.
17     That a copy of this certificate was served on
18  all parties shown herein on June 18, 2007, and filed
19  with the Clerk pursuant to Rule 203.3.
20     I further certify that I am neither counsel
21  for, related to, nor employed by any of the parties or
22  attorneys in the action in which this proceeding was
23  taken, and further that I am not financially or
24  otherwise interested in the outcome of the action.
25     Certified to by me this 18th day of June,

Page 357

1  2007.
2
3
           WILLIAM M. FREDERICKS, TX CSR 2392
4          Expiration Date: 12/31/2006
           Firm Registration No. 82
5          Fredericks-Carroll Reporting
           7719 Wood Hollow Drive, Suite 156
6          Austin, Texas  78731
           Telephone: (512) 477-9911
7                      (800) 234-3376
           Fax:       (512) 345-1417
8
   Job No. 2425 wmf
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

90 (Pages 354 to 357)

36182266-7c50-47fe-9423-7b2843292aab

EXHIBIT 14

Chesser, Paul - Vol. II                    October 28, 2008
                    Washington, DC

Page 313

               UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL INDUSTRY     :   MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION :   CIVIL ACTION

THIS DOCUMENT RELATES TO:          :   01-CV-12257-PBS

United States of America ex rel.   :

Ven-a-Care of the Florida Keys,    :

Inc., v. Boehringer Ingelheim      :

Corp., et al., Civil Action No.    :

07-10248-PBS and United States of  :

America, ex rel. Ven-A-Care of the :   Hon. Patti B.

Florida Keys, Inc., v. Abbott      :    Saris

Laboratories, Inc., Civil Action   :

Nos. 06-11337-PBS and              :

07-CV-11618-PBS                    :

- - - - - - - - - - - - - - - - -x

      (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

                         Washington, D.C.

                         Tuesday, October 28, 2008

                         VOLUME II

                         PAUL CHESSER

659f3143-f1ba-497f-be0c-b04914cf5712

Chesser, Paul - Vol. II                    October 28, 2008
                    Washington, DC

Page 626

1      A.   I don't know about that.  What I -- what I
2  recall about going painstakingly over every one of
3  those rows of data, that the injectables seemed to
4  have large discounts.  And it was a challenge to know
5  whether you were using the correct units.
6      Q.   Could you explain that to me?  How is --
7  how is that?  What was the challenge there?
8      A.   Well, I went back and reviewed everything
9  where the discount was over a certain -- I don't
10 remember what percent I used, or under a certain.
11 And without a doubt, I had to go back and look at
12 more NDCs that turned out to be injectables than
13 anything else.
14      And part of the problem -- it was even a
15 challenge to go back -- I used the Red Book as my
16 reference.  What they would show as the number of
17 units for a particular NDC.  That was the challenge,
18 was getting -- making sure you were using the right
19 units, because if I remember right at '94, we had
20 a -- I don't think we had the package price.  I think
21 we had the unit price.  I think we had to convert
22 everything to unit price to be able to compare it to

Page 627

1  AWP.
2      So the challenge, when you got to the
3  injectables, was there might be, say, a thousand
4  milligrams but it's -- are there 10 of them in the
5  package or not.  And that was -- and ultimately, what
6  proved to be the most reliable source for me was to
7  go to the actual invoice, and see -- read the
8  description of what the quantity was on that invoice.
9  I couldn't necessarily rely on what the Red Book
10 showed, or I think it was in 2000, '99 review, I was
11 actually trying to use First DataBank's quantity for
12 each NDC.  But I spent more time on injectables than
13 anything else in my review, investigating odd
14 numbers.
15      Q.   Because if it were a thousand milliliter
16 bag, you could be off by a factor of a thousand if
17 there were no --
18      A.   20 or -- I mean, the packaging of those is
19 -- it's not the same from one reference source to
20 another.  And plus, I had to look up a lot of them
21 because there were really significant discounts on
22 some of them.

Page 628

1      BY MR. COOK:
2      Q.   When you say significant discounts --
3      A.   90 plus percent.
4      Q.   The analysis that you conducted of the
5  invoices that were pulled in 1994, am I correct from
6  my review of the spreadsheets that you had largely
7  completed the analysis of those invoices and created
8  the spreadsheets and done the basic calculations by
9  April or May of -- of 1995?  Or would you have to go
10 back and look at the documents to see?
11      A.   Yeah.  I don't -- I don't remember.
12      Q.   Okay.  You had certainly collected all
13 your data by that point, right?
14      A.   I don't even know the answer to that for
15 sure.
16      Q.   But the documents would show presumably?
17      A.   Yes.
18      Q.   And just so we are clear, when you're
19 referring to injectables, can you give me some
20 examples of what types of drugs you're talking about
21 with -- or products you're talking about with respect
22 to injectables?

Page 629

1      A.   Saline solution.
2      Q.   So dextrose solution, for example, would
3  be an injectable?  Would you agree that sterile water
4  would be an injectable?
5      A.   Yes.
6      Q.   If it were an IV bag, an IV solution
7  antibiotic would be an injectable?
8      A.   Yes.
9      Q.   Do you know who Dr. Bruce Vladeck is?
10      A.   He was the administrator at CMS for a
11 little while.
12      Q.   He was the administrator from 1992 to
13 1997.  Does that sound right?
14      A.   Close enough.
15      Q.   Close enough.  He testified earlier in
16 this case, and testified that with respect to
17 infusion products, injectable products, such as
18 sodium saline solution, that his expectation was that
19 he would see discounts of 99 percent obtainable
20 through GPOs.  Would that be consistent with the
21 empirical data that you reviewed in 1994?
22      MR. DRAYCOTT:  Objection.

80 (Pages 626 to 629)

659f3143-f1ba-497f-be0c-b04914cf5712

Chesser, Paul - Vol. II                        October 28, 2008
                    Washington, DC

Page 630

1        THE WITNESS:  I don't -- I don't know that
2   I looked at the data sufficiently to be able to draw
3   that conclusion.
4        BY MR. COOK:
5        Q.   Would it surprise you to see discounts in
6   the 90 percent plus range for these injectables?
7        A.   No.  It was very common.
8        Q.   Did you find that these products tended to
9   be expensive products?
10       MR. DRAYCOTT:  Objection.
11       THE WITNESS:  No.  I don't think they
12  were.
13       BY MR. COOK:
14       Q.   So a bag of saline, based upon your review
15  of actual tens of thousands of pages of actual data,
16  what would you expect to pay for a bag of saline
17  solution?
18       A.   Not much.
19       MS. ALBEE:  Objection.  Form.
20       BY MR. COOK:
21       Q.   70 cents, a dollar?
22       A.   Oh, I don't -- it's been too long.

Page 631

1        Q.   I'm told that we need to change the tape,
2   so it's a good time for a break.
3        THE VIDEOGRAPHER:  This concludes volume
4   II, tape three, in the deposition of Paul Chesser.
5   Off the record at 4:29.
6        (Recess.)
7        THE VIDEOGRAPHER:  Here begins volume II,
8   tape four, in the deposition of Paul Chesser.  On the
9   record at 4:34.
10       BY MR. COOK:
11       Q.   Just in terms of timing, so I can place us
12  in time, Mr. Chesser, the OAS investigation into the
13  difference between average wholesale price and
14  pharmacy acquisition cost was begun sometime prior to
15  August of 1994, correct?
16       A.   August of '94 is when we had the meeting
17  with the state folks in Richmond, so sometime barely
18  before that.
19       Q.   All right.  So I'm just trying to get sort
20  of a starting point of when the investigation
21  commenced.  Is there a formal commencing of an
22  investigation, a document or an event that you sort

Page 632

1   of look at as commencing an investigation?
2        MR. BEIMERS:  Objection.
3        THE WITNESS:  In this case, no.  And at
4   that time no.  When we do -- we do audit start
5   notices a lot currently.  I don't know that we did
6   them always at that time.
7        BY MR. COOK:
8        Q.   Certainly by August 30th of 1994, in this
9   case, you had commenced your audit, correct?
10       A.   Correct.
11       Q.   Is there a difference, and I don't know
12  the answer, is there a difference between an audit
13  and an investigation in OIG parlance?
14       A.   Yes.
15       Q.   What is the difference?
16       A.   Well, we have in addition to the Office of
17  Audit Services, we have an Office of Investigations.
18  These are all special agents who are criminal
19  investigators who work on criminal as well as civil
20  cases.  And a lot of times in conjunction with the
21  Department of Justice.
22       Q.   And what's an audit as opposed to an

Page 633

1   investigation?
2        A.   An audit is just looking to see whether
3   some criteria has -- is being complied with or not.
4   Not necessarily whether it's legal or illegal.  It's
5   just whether it's economic -- economical and
6   efficient way to provide services, or something along
7   those lines.
8        Q.   So you're still investigating it in the
9   sense that you're looking at facts, but you're not
10  necessarily investigating it because someone has made
11  an accusation of improper conduct?
12       A.   Correct.  We are not looking for criminal
13  or civil.
14       Q.   Do you have any procedure that you -- that
15  you use when you come across evidence of fraud or
16  abuse in the course of an audit?
17       A.   Yes.  I personally haven't had to deal
18  with that, but we are supposed to contact OI
19  immediately because the rules of evidence are
20  different when you're in a criminal environment than
21  they are during an audit.
22       Q.   In the course of your 1994 investigation,

                              81 (Pages 630 to 633)

659f3143-f1ba-497f-be0c-b04914cf5712

Chesser, Paul - Vol. II                    October 28, 2008
                        Washington, DC

Page 658

1
2
3
4
5
6        _____
7            PAUL CHESSER
8
9    SUBSCRIBED AND SWORN to before me this _____ day
10   of _____, 2008.
11
12       _____
13          NOTARY PUBLIC
14   My Commission expires: _____
15
16
17
18
19
20
21
22

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

# EXHIBIT 15

CAUSE NO. D-1-GV-04-001286

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| ex rel. | ) |
|   VEN-A-CARE OF THE | ) |
|   FLORIDA KEYS, INC., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| ABBOTT LABORATORIES INC., | ) |
| ABBOTT LABORATORIES, | ) |
| HOSPIRA, INC., and B. BRAUN | ) |
| MEDICAL INC., | ) |
| | ) |
|     Defendants. | ) 201ST JUDICIAL DISTRICT |

*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

STACEY CHRONIS

September 28, 2006

(DESIGNATED HIGHLY CONFIDENTIAL)

*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF STACEY CHRONIS,

produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 28th day of

September, 2006, from 9:19 a.m. to 1:15 p.m., before

WILLIAM M. FREDERICKS, CSR in and for the State of

Texas, reported by machine shorthand, at the offices

of Stetler & Duffy, Ltd., 11 South LaSalle Street,

Suite 1200, Chicago, Illinois, pursuant to the Texas

b22ad0b9-2749-4499-b479-924cf0899945

Page 94

1  poor in Texas, correct?
2      A.  Yes.
3      Q.  All right.  Now, when you sent this letter of
4  July 17th, 2000, to Mrs. McNeill, did you have any
5  idea how Abbott AWPs for HPD drugs were calculated or
6  determined?
7      A.  Yes.
8      Q.  And how did you -- how did you -- how did you
9  gather that information?
10     A.  With my outside counsel, Jones Day, I began
11  to interview a series of employees of Abbott mainly in
12  the pricing department, some of whom we've already
13  talked about this morning.  And so I interviewed them
14  and tried to educate ourselves on how they were
15  submitting pricing information to the state.
16     Q.  Did you educate yourself on how Abbott AW --
17  AWPs are determined?
18     A.  Yes, that also.
19     Q.  And how did you learn that Abbott AWPs were
20  determined?
21     A.  Through discussions with Mike Sellers and
22  Deb DeYoung, they explained it to me.  I can't tell
23  you right now what they said specifically, but I
24  remember that we interviewed them, both myself and my
25  outside counsel.

Page 95

1      Q.  Did you learn that Abbott submits a list
2  price to pricing -- pricing compendia like
3  First DataBank --
4      A.  Yes.
5      Q.  -- which then adds a percentage on to it to
6  get to AWP?
7      A.  Yes, I learned that.
8      Q.  Okay.  Now, having learned that, would you
9  please go to paragraph -- the second page where you
10  talk about "'Average of Suggested Wholesale Price to
11  Pharmacy ('AWP').'"
12         Do you see that?
13     A.  Yes.
14     Q.  And you say in there in the middle of the
15  first -- at the first sentence, "Abbott does not
16  suggest any prices at which its products should or
17  even might be sold to pharmacies."
18         Did you see that?
19     A.  Yes.
20     Q.  You wrote that to Mrs. McNeill, didn't you?
21     A.  Yes.
22     Q.  And a few -- one sentence -- two sentences
23  down, "Abbott does not set the formula used by the
24  various services in calculating that price."
25         Do you see that?

Page 96

1      A.  I do.
2      Q.  Okay.  Can you show us where in that
3  paragraph you -- you disclose to Mrs. McNeill that
4  Abbott's AWPs are, in fact, a result of list prices
5  that Abbott provides knowing that a formula -- a
6  specific formula will be applied to that list price to
7  get to AWP?
8         MR. BERLIN:  Objection, form.
9      A.  It doesn't say that anywhere.
10     Q.  (BY MR. BREEN)  Does it say that anywhere in
11  your letter at all?
12     A.  No.
13     Q.  Did you at any point in that letter disclose
14  to Mrs. McNeill that Abbott determines AWPs by
15  submitting list prices knowing what formula is going
16  to be applied to get to AWP?
17         MR. BERLIN:  Objection, form.
18         Make sure you've heard his --
19         THE WITNESS:  Uh-huh.
20         MR. BERLIN:  -- question.
21     A.  Well, Abbott doesn't determine the AWP, so
22  that's why it's not in the letter.
23     Q.  (BY MR. BREEN)  But you knew that it
24  determined a list price that it -- that it reported so
25  that a formula could be added to that to get to AWP,

Page 97

1  didn't you?
2      A.  Right.  That's correct.
3      Q.  So you knew that Abbott had the ability to
4  determine its AWP by submitting a specific list price?
5         MR. BERLIN:  Objection, form.
6      A.  No.
7      Q.  (BY MR. BREEN)  No?
8         MR. STETLER:  You heard her.  "No."
9      Q.  (BY MR. BREEN)  So explain to me then.  If --
10  if Abbott decides what list price it's going to
11  report --
12     A.  Right.
13     Q.  -- to a pricing compendia knowing that the
14  compendia is going to add a percentage to get to an
15  AWP and Abbott can report whatever list price it
16  wants, then how is it that Abbott does not determine
17  what its AWP is going to be?
18         MR. BERLIN:  Objection, form.
19     A.  Well, my understanding was that the
20  compendium set the AWP.  So Abbott was not determining
21  the AWP.  The compendiums were.  Yes, it's true that
22  Abbott set the list price, and the compendiums would
23  then come up with a formula for what the AWP would be
24  on a particular product.
25     Q.  (BY MR. BREEN)  Were you trying to

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911   -   HOUSTON (713) 572-8897   -   SAN ANTONIO (210) 222-9161

b22ad0b9-2749-4499-b479-924cf0899945

Page 98

1  communicate to Mrs. McNeill in this paragraph under
2  "'Average of Suggested Wholesale Price to Pharmacy
3  ('AWP')'" that Abbott had no control over its AWPs, or
4  the AWPs for its drugs?
5       MR. BERLIN: Objection, form.
6    A.  I don't think I -- I was trying to suggest
7  anything.  I think -- I mean, I stand on what the
8  letter says here, that Abbott does not submit AWPs and
9  that they can be obtained from Red Book or
10 First database (sic).
11   Q.  (BY MR. BREEN)  Now, if we go to the next
12 page -- actually, it starts on the bottom of this
13 second page where it says "'Price to Wholesaler and/or
14 Distributor.'"
15       Do you see that?
16   A.  Yes.
17   Q.  And then the last sentence on that page
18 begins "Please note that WAC is a published number
19 that represents the price at which Abbott sells its"
20 products "to wholesalers."
21       Do you see that?
22   A.  I do.
23   Q.  Did you conduct any kind of an inquiry, a
24 good faith inquiry to assure yourself that the WACs
25 that Abbott was reporting to Texas Medicaid were, in

Page 99

1  fact, the prices it was charging to wholesalers?
2    A.  Yes.
3    Q.  Did you do that for Vancomycin?
4    A.  I don't remember what particular products.
5    Q.  So -- well, what did you do to assure
6  yourself that, in fact, the -- Abbott's WACs being
7  reported to Texas on this form or on this report that
8  you sent --
9       MR. BERLIN: The letter.
10   Q.  (BY MR. BREEN)  -- the letter were, in fact,
11 the prices Abbott was charging to wholesalers?
12   A.  Well, first and primarily I relied on my
13 outside counsel to gather the information from our
14 internal business people, from the pricing people, and
15 it was the pricing people who we went to and asked
16 them to provide us with the information that went into
17 the letter, all of the information.
18   Q.  So you just assumed they were correct?
19   A.  I know that -- I don't recall whether I
20 looked at the agreements myself, but I know that
21 Jones Day did.
22   Q.  So then based upon your best recollection
23 sitting here today, you didn't conduct the
24 investigation; Jones Day did, correct?
25   A.  No, that's not correct.  I along with Jones

Page 100

1  Day conducted the investigation.  It was a joint
2  effort.  Typically an in-house counsel probably has
3  50 to a hundred pending cases at any one time, so it's
4  not unusual for us to, you know, begin an
5  investigation, get it off the ground and running, or a
6  lawsuit, and then kind of let the outside counsel
7  continue on with the investigation and then report
8  back to me on what their findings are.
9       So it's not fair to say that only
10 Jones Day did the investigation.  I was involved with
11 it, but because this -- they probably did the lion's
12 share of the investigation.
13   Q.  Are you --
14   A.  And that's typical.
15   Q.  Are you aware that the price that you
16 represented to Martha McNeill as being the WAC for
17 Vancomycin, one gram, was, in fact, approximately
18 two-and-a-half times higher than the price you were
19 selling for -- that same drug for to wholesalers?
20       MR. BERLIN: Objection, form.
21   A.  No.
22   Q.  (BY MR. BREEN)  If that's -- if that turns
23 out to be the case, was it the responsibility of your
24 investigation or Jones Day investigation to determine
25 that, in fact, the WACs that were being represented

Page 101

1  here for Vancomycin were the WACs that were being
2  charged to wholesalers?
3       MR. BERLIN: Objection, form.
4       MR. BREEN: I'll restate the question.
5    Q.  (BY MR. BREEN)  Whose responsibility was it
6  to ensure that you were truthfully reporting the WAC
7  for Vancomycin, one gram, to Martha McNeill?  Whose
8  responsibility was it to ensure that that was, in
9  fact, the price being charged to wholesalers?
10   A.  It was --
11       MR. BERLIN: Objection to form.
12       THE WITNESS: Oh, I'm sorry.
13       MR. BERLIN: There are --
14       MR. BREEN: Two questions.
15       MR. BERLIN: -- two questions in there,
16 and the objection goes to the second question.
17   Q.  (BY MR. BREEN)  Whose job was it to make sure
18 that the WAC you reported for Vancomycin, one gram,
19 was, in fact, the WAC being charged to wholesalers?
20   A.  I think it was the responsibility of all the
21 parties involved, everyone on behalf of Abbott.
22 Primarily we relied on the information we obtained
23 from the pricing people.  That's their expertise,
24 that's what they do every day, so we rely on that
25 information from them.

EXHIBIT 16

Cobo, Luis E.                                January 18, 2008

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - -

        (captions continue on following pages)

        Videotaped deposition of LUIS E. COBO

                    Volume I

                    Washington, D.C.

                    Friday, January 18, 2008

                    8:00 a.m.

Cobo, Luis E.                                    January 18, 2008

Page 130

1  business perspective of what that would produce.
2      Q.   You would agree with me that there is
3  some price at which Abbott could sell a single bag
4  of saline and make money to somebody calling an 800
5  number and buying it, right?
6      A.   Sure.
7      Q.   And that is somewhere above Ven-A-Care's
8  cost, right?
9          MR. BREEN:  Objection to form.
10     A.   I wouldn't know.  I would suspect so.
11 But, I mean, I'm not an economist and I'm not going
12 to sit there and represent that.
13     Q.   That's my next question.
14     A.   Okay.
15     Q.   You have no idea what an appropriate
16 amount it would be for Abbott to charge that single
17 or two-bag customer for that direct sale, do you?
18         MR. BREEN:  Objection, form.
19     A.   I don't have -- I'm sorry.
20     Q.   You don't know what an appropriate price
21 would be for Abbott to charge in the marketplace for
22 that, do you?

Page 131

1      A.   I would not have that -- no.  I do not
2  have that cost, that price.
3      Q.   Are you familiar with the marketplace for
4  infusion drugs as a purchaser of infusion drugs over
5  the years?
6      A.   I don't know.  I don't know.  I mean,
7  I've got my insight, my perspective, and that's all
8  I have.  And what I've garnered from these cases and
9  what have you.
10     Q.   Would you agree with me that the order of
11 magnitude that these solutions cost to a purchaser
12 like Ven-A-Care was on the order of magnitude of a
13 dollar a bag?
14         MS. BROOKER:  Objection, form.
15     A.   The saline dextrose products that
16 Ven-A-Care was purchasing would be along that
17 magnitude of a dollar to two dollars a bag.
18     Q.   And the amount of saline in the bag
19 didn't much affect the cost of the product because
20 the saline really wasn't worth all that much, right?
21         MR. BREEN:  Objection, form.
22     A.   I don't know how or why it's valued the

Page 132

1  way that it is.  If you're asking me if the price of
2  saline water, I wouldn't think it cost that much.
3      Q.   Well, I'll ask you.  Did the volume of
4  the bag affect much the price?
5          MR. BREEN:  Objection, form.
6      A.   No.  I would say the price was in a
7  relatively close range with the different volumes of
8  product.
9      Q.   So a thousand milliliter bag didn't cost,
10 if I do my math right, twenty times a 50-milliliter
11 bag, for example?
12     A.   No.
13     Q.   And if you were paying in the order of
14 magnitude of a dollar or two a bag when you were
15 purchasing it in a case size, would you be surprised
16 if calling Abbott to order a single bag might cost
17 you $10 or $11 for that bag?
18         MR. BREEN:  Objection, form.
19     A.   Once again, it's a hypothetical.
20     Q.   Right.  Because you never did that,
21 right?
22     A.   You want to know if I called Abbott and I

Page 133

1  said I need one bag --
2      Q.   I'm Luis Cobo.
3      A.   -- and they said, okay, we're going to
4  sell you one bag.  And then they're going to tell me
5  what price?
6      Q.   Right.
7      A.   What price are they going to sell it to
8  you?
9      Q.   $13.
10     A.   $13.  For one bag?
11     Q.   Right.
12         MR. BREEN:  Objection, form.
13     A.   And I don't have a contract?
14     Q.   No, sir.  You are a stranger to Abbott.
15         MS. BROOKER:  Objection, form.
16     A.   I guess it would surprise me.
17     Q.   Because it's too low?
18     A.   Oh, I don't know.  I would have a --
19 under that scenario if I needed the product bad
20 enough and I realized I didn't have a contract or a
21 direct account or something and I had no other
22 resource to purchase it and I've got somebody out to

34 (Pages 130 to 133)

52709dae-dbd0-4e87-9d3a-d575eb26360f

Cobo, Luis E.                                           January 18, 2008

Page 134

1  take care of then I would pay it.  I don't know if
2  it would be too low or not by their standards.
3      Q.   You said --
4      A.   I would hope this they would give it to
5  me also.
6      Q.   You said that it would surprise you if
7  Abbott would be willing to sell it to you at $13.
8  Is that what would surprise you?
9          MR. BREEN: Objection, form.
10     A.   Correct.
11     Q.   You would expect them to charge even more
12 for that sort of a small sale?
13     A.   I wouldn't have any expectations under
14 that scenario, because it -- I mean, you're asking
15 me to comment on something, on a situation, that I
16 don't envision in the real world.  So --
17     Q.   Well, it never happened for you because
18 you were a large -- I mean, not a large.  But you
19 were a large purchaser relative to someone who might
20 need just one or two bags, right?
21         MR. BREEN: Objection, form.  This line
22 of questions has been asked and answered and asked

Page 135

1  and answered.  And how long are you going to go with
2  it?  The same question over and over again.
3          MR. COOK: Could you read back the last
4  question, please?
5          (Whereupon, the requested portion was
6  read by the reporter.)
7          MR. BREEN: Objection, form.
8      A.   Rather than the hypothetical, let me just
9  reflect on reality.  Instead of the one or two bags,
10 I had an incident in my practice many, many years
11 ago, Cobo Pharmacy -- this is after Abbott had
12 stopped having direct accounts with pharmacies.  I
13 don't know when that was, but that's how far back it
14 goes.  And I had a urologist that called me and
15 needed some -- a bag of irrigation solution and
16 couldn't get it at the hospital, couldn't get it
17 anywhere.  And he asked me to take care of it for
18 him and I did.
19         And I called Abbott and they told me, no,
20 we can't sell you just one or two bags.  You have to
21 buy an entire case.  And they sold me the entire
22 case.  But they sold me at some list price or

Page 136

1  whatever it was.  They did not give me any kind of a
2  discount or break or direct price or contract price
3  or wholesale cost or anything like that.
4          So that's the way that that transaction
5  was handled and I would assume it would be the same.
6  The problem I'm having trouble getting past is the
7  one bag scenario.  So I mean, I only have reality to
8  reflect on.
9      Q.   When did this call to Abbott take place?
10     A.   Years ago.  Years ago.  This was 20 years
11 ago at least.
12     Q.   So it was your understanding at least
13 that if you didn't have a contract with Abbott, if
14 you didn't have a direct account with Abbott, that
15 Abbott might not break up a case for you but it
16 would certainly charge you list price for that
17 product?
18         MR. BREEN: Objection, form.
19     A.   No.  That is not my understanding.
20     Q.   Well, Abbott did charge you list price?
21     A.   What they did under those circumstances
22 was unique for me.  They would not do that now.  And

Page 137

1  I'm not familiar with any case where they have done
2  that since.
3      Q.   Did they do it for you?
4      A.   At that time.  And like I say, we're
5  going back 20, 25 years ago.  It was right after the
6  time that we stopped having a direct account with
7  Abbott.  And I think for that reason they gave me
8  some consideration.  But it's just a practice that
9  wouldn't happen otherwise.
10     Q.   But today if you were to call Abbott to
11 purchase directly with no account and no contract,
12 you would expect to pay list price, correct?
13         MR. BREEN: Objection, form.  Wait a
14 minute.  Could you read that question back, please?
15 Excuse me.
16         (Whereupon, the requested portion was
17 read by the reporter.)
18         MR. BREEN: Objection, form.
19     A.   I don't believe so.  If I didn't have
20 that situation it would be a transaction that would
21 either be handled through my wholesaler.  They would
22 probably drop ship it through my wholesaler and then

35 (Pages 134 to 137)

52709dae-dbd0-4e87-9d3a-d575eb26360f

Cobo, Luis E.                                                    January 18, 2008

```
                                    Page 270
 1      Q.   And the money that resulted from the
 2   fraud that you've alleged, that went to Cobo
 3   Pharmacy, correct?
 4          MS. BROOKER:  Objection to form.
 5      A.   Initially it went to Cobo Pharmacy.  And
 6   then it was eventually sent back to the State of
 7   Florida, the Medicaid system.
 8      Q.   Approximately five years after your
 9   meeting with HCFA about this case, correct?
10      A.   I think it was more like six and a half,
11   to be accurate.  About six and a half.
12          MR. COOK:  I have no more questions, but
13   I do leave the deposition open and reserve the right
14   to ask more questions at our second day.
15          MR. BREEN:  As long as you don't ask him
16   about TPN again.
17          THE VIDEOGRAPHER:  This concludes tape 5
18   in the deposition of Luis Cobo.  We adjourn for the
19   day at 4:08.
20          (Whereupon, at 4:08 p.m. the deposition
21   was adjourned.)
22              * * * * *
```

```
                                    Page 271
 1
 2
 3
 4
 5
 6
 7          _____
 8            SIGNATURE OF THE WITNESS
 9
10   Subscribed and sworn to and before me
11   this _____ day of _____, 20_____.
12
13
14   _____
15       Notary Public
16
17
18
19
20
21
22
```

69 (Pages 270 to 271)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

52709dae-dbd0-4e87-9d3a-d575eb26360f

EXHIBIT 17

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:  PHARMACEUTICAL              )
INDUSTRY AVERAGE WHOLESALE          ) MDL No. 1456
PRICE LITIGATION                    ) Civil Action No.
                                    )     01-12257-PBS
                                    )
THIS DOCUMENT RELATES TO:           )
                                    )
United States of America,           ) Hon. Patti Saris
ex rel. Ven-a-Care of the           )
Florida Keys, Inc., v.              )
Abbott Laboratories, Inc.,          )
and Hospira, Inc.                   )
CIVIL ACTION NO. 06-11337-PBS       )


*******************************************************

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL              )
INDUSTRY AVERAGE WHOLESALE          ) MDL No. 1456
PRICE LITIGATION                    ) Civil Action No.
                                    )     01-CV-12257-PBS
                                    )
THIS DOCUMENT RELATES TO:           )
                                    ) Judge Patti B. Saris
State of Arizona v. Abbott          )
Labs., et al.                       )
Civil Action No. 06-CV-11069-PBS    )




*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

PATRICK J. DeGRACE

June 1, 2007

*******************************************************

Page 46

1    A.  I -- I have almost no knowledge of that, but
2   I -- that's about as -- what you just said is about
3   what I know about it.
4      Q.  (BY MR. WINTER) Okay.  So you agree with my
5   statement that you have a general understanding that
6   AWP is a factor in reimbursement by Medicare and
7   Medicaid?
8      A.  I --
9          MR. WINCHESTER:  Objection to the form.
10  Also to the time frame.
11     A.  Yeah.  I don't agree with what you said as a
12  general understanding.  I would say I have a very
13  cursory understanding, and my experience with AWP was
14  only during the Trade Sales time, and it was something
15  that the -- it was something that the wholesalers
16  apparently reported.
17     Q.  (BY MR. WINTER) Okay.  And let's -- I want
18  to address your counsel's objection about the time
19  frame, that it was unclear.  So -- and you've helped
20  me out with your just -- your response just now.
21         So do I understand, then, from the time
22  you became the Director of Trade Sales in 1995, in or
23  around July of '95 forward -- so since July of 1995,
24  is it true that you have gained some cursory, I think
25  was the word you used, understanding that AWP was a

Page 47

1   factor used by third-party payers such as Medicare and
2   Medicaid in calculating reimbursement to providers?
3      A.  I understand that it's a very -- my
4   understanding is a very cursory understanding.  It's
5   not something I deal with at all.
6      Q.  And I appreciate that it's not something you
7   deal with.  My question, sir, is, as part of this
8   cursory understanding that you have gained since July
9   of 1995, did that include the understanding that AWP
10  was used by third-party payers, including Medicare and
11  Medicaid, in the reimbursement -- the calculation of
12  reimbursement to providers?
13     A.  I mean, not really.  Not really.  I -- my
14  understanding was that it was something that was
15  reported to the wholesalers, and that was my
16  understanding of how it was used.
17     Q.  Did you understand it -- that it had
18  something to do with third-party reimbursement?
19     A.  Not during my trade days, to be frank with
20  you.
21     Q.  When did you gain the understanding that AWP
22  had something to do with Medicare and Medicaid
23  reimbursement?
24     A.  In '05.
25     Q.  In 2005?

Page 48

1      A.  Yes, sir.
2      Q.  How did you gain that understanding?
3      A.  Through my deposition.
4      Q.  As -- as a result of the questions that were
5   asked of you by Mr. Barrett?
6      A.  Some of that, yes, sir.
7      Q.  And any other understanding you gained just
8   as a result of preparation and context of the
9   deposition?
10     A.  Yes, sir.
11     Q.  Have you ever heard of a pricing term called
12  J-I-T, JIT price?
13     A.  I've heard of it.  I've never heard of it as
14  price.  I've heard of JIT.
15     Q.  What does JIT mean to you, sir?
16     A.  It's just-in-time distribution.
17     Q.  Does that describe a price at which a
18  distributor customer of Abbott's could purchase Abbott
19  product?
20     A.  Well, the -- the distributor -- the hospital
21  products distributor would break down the products and
22  deliver it in piecemeal to a hospital, and that was
23  called JIT distribution.  That's my understanding.
24     Q.  So is it fair to say that your understanding
25  of JIT is sort of -- is a process by which Abbott

Page 49

1   products are distributed?
2      A.  Through a distributor correctly (sic).
3      Q.  But you have not heard it in connection with
4   any price point?
5      A.  No, sir.
6      Q.  What was the price at which Abbott's
7   distributor customers could purchase Abbott's product?
8      A.  The --
9          MR. WINCHESTER:  Objection, form.
10     A.  The hospital distributors, med/surg
11  distributors that I dealt were -- they purchased at
12  DAC, distributor acquisition cost.
13     Q.  (BY MR. WINTER) Would DAC typically be
14  higher or lower than WAC?
15     A.  I can't tell you.  There was a slight
16  difference, but I can't tell you what the difference
17  was, if it was higher or lower.
18     Q.  Is it true that your customers who purchased
19  Abbott's products at WAC typically processed
20  charge-backs?
21     A.  Yes, sir.
22     Q.  And is that because the ultimate contract
23  price at which that wholesaler in turn sold the
24  product would be lower than the WAC?
25     A.  Yes, sir.

13  (Pages 46 to 49)

f89ff52e-9260-4757-b761-ccba7daa2017

# EXHIBIT 18

Page 273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

-------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK - VOLUME II

December 10, 2008 - Newark, Delaware

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

DE Div of Medicaid and Medical Assistance (Denemark) - Vol. II                December 10, 2008

Newark, DE

Page 346

1  packaging, the staff is there.  So I'm not sure I
2  could agree there's a difference in cost, if you
3  go with my presumption that you have a baseline
4  staff.
5      Q.  What about the costs for a home IV
6  pharmacy to dispense a compounded prescription?
7  Would you agree that Delaware was aware that
8  those costs exceeded the standard costs to
9  dispense a bottle of pills from a traditional
10  pharmacy?
11      MS. HEALY SMITH:  Objection.
12      THE WITNESS:  So just to be clear,
13  you've changed the type of questions you're
14  asking and were asking, based on the Division's
15  policy, whether that there was a separate or a
16  different methodology for reimbursement on IV add
17  mixture.
18  BY MS. RAMSEY:
19      Q.  No, I wasn't asking about a separate
20  policy.  I was asking about knowledge of the
21  specific increased costs for a home IV company to
22  administer IV drugs?

Page 347

1      A.  I want to make sure that I'm answering
2  the question correctly, so I need it --
3      MS. SHUTTEE:  Do you need to have it
4  read back to you?
5      THE WITNESS:  -- read back to me.  I'm
6  sorry.
7      MS. RAMSEY:  Actually, I can go ahead
8  and have a document marked.
9  BY MS. RAMSEY:
10      Q.  Okay.  I am handing the witness what
11  has been previously marked as Abbott Exhibit 578.
12      A.  Do you want me to put this away now?
13      Q.  You can keep it handy.  We'll probably
14  be looking at it from time to time.
15      MS. HEALY SMITH:  You don't have one
16  more copy handy, do you?
17      MS. RAMSEY:  No.
18      THE COURT REPORTER:  Do you want this
19  marked again?
20      MS. RAMSEY:  No, it can stay marked as
21  Abbott 578.
22      THE COURT REPORTER:  Oh.  Okay.

Page 348

1      THE WITNESS:  Wow, something before my
2  time.
3      Sorry.  I couldn't help myself.  I know
4  we're on record still.
5      1988.
6      MS. SHUTTEE:  Yeah.
7  BY MS. RAMSEY:
8      Q.  Now, after you have a moment to review
9  this document, let me know, and I'll direct you -
10  - you don't have to read it page by page, but
11  just familiarize yourself.
12      And for the record this is a Medicaid
13  Pharmacy Bulletin that's dated January to
14  February, 1988, titled Developing an Effective
15  Reimbursement Methodology for Home IV Therapy.
16      First of all, are these Medicaid
17  Pharmacy Bulletins documents that you received in
18  your work with Delaware Medicaid?
19      A.  Not the ones that were sponsored by
20  Lederle, but the ones that came after Lederle.  I
21  think the first one I received were by Parke-
22  Davis.

Page 349

1      Q.  Do you know whether Delaware Medicaid
2  was provided with these pharmacy bulletins prior
3  to your arrival in 1993?
4      MS. HEALY SMITH:  Objection.
5      THE WITNESS:  My assumption is that the
6  manufacturers and labelers have a pretty good
7  national list and when they want to mail the
8  Medicaid Programs they have a contact for each
9  program.
10  BY MS. RAMSEY:
11      Q.  Is that a yes?
12      A.  What was the exact question again?
13      Q.  I believe that I asked whether you had
14  any knowledge as to whether Delaware Medicaid
15  received Medicaid Pharmacy Bulletins prior to
16  your arrival.
17      A.  Other than what I just stated, I would
18  say, no, I don't have specific knowledge.
19      Q.  Okay.  So they could have or they might
20  not have?
21      A.  Correct.
22      Q.  Okay.  But you indicated that you did

20 (Pages 346 to 349)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Newark, DE

---

Page 350

1  begin receiving these at some point?
2      A.  Yes.
3      Q.  Okay.  Do you recall when that was?
4          MS. SHUTTEE:  Strike that -- I'm sorry.
5  I said strike that.  That's not what I meant to
6  say.
7          Excuse me.  When you said receiving
8  these, did you --
9          MS. RAMSEY:  Medicaid Pharmacy
10  Bulletins.
11         MS. SHUTTEE:  -- mean these from
12  Lederle or these from Parke-Davis or these from
13  another provider.
14         MS. RAMSEY:  Any Medicaid pharmacy
15  provider.
16         MS. HEALY SMITH:  Any Medicaid.
17         Thank you very much.  Pardon for my
18  interruption.
19         THE WITNESS:  My recollection of
20  receiving Medicaid Pharmacy Bulletin goes fairly
21  back to when I first started.  They were valuable
22  publications, but exactly when I started to

---

Page 351

1  receive them, I don't know.
2  BY MS. RAMSEY:
3      Q.  Okay.
4      A.  It would have been in the early to mid-
5  '90s.
6      Q.  Now, the first column, the title is
7  home intravenous IV reimbursement is a complex
8  issue for Medicaid Pharmacy Programs.
9          And then the second paragraph it
10  states, because home IV therapy involves a host
11  of additional pharmacy services; storage,
12  preparation, delivery, patient instruction, et
13  cetera, it is generally agreed that it is more
14  expensive to dispense this type of medication
15  than to dispense other outpatient drugs.
16         Did I read that correctly?
17     A.  You read it correctly.
18     Q.  And do you agree with that sentence?
19     A.  No.
20     Q.  Why not?
21     A.  Because some of the functions that are
22  mentioned are not specific to the dispensing

---

Page 352

1  function and more subject to other facets of
2  delivering health care.
3      Q.  Such as what?
4      A.  Such as delivery.
5      Q.  And what about compounding?
6      A.  Preparation is what's listed here.  And
7  in some situations preparation may be longer,
8  yes.
9          I also would disagree with patient
10  instruction being part of the dispensing
11  application or function for these products.  In
12  most situations that I am aware of with IV-
13  administered drugs, you're going to have a home
14  health component, such as a visiting nurse, and,
15  therefore, I believe that the charges associated
16  with patient instructions would be done onsite at
17  the home or the facility where the person was
18  receiving the drug.
19     Q.  So you do agree that there are
20  additional costs and services that home IV
21  providers would incur versus a traditional retail
22  pharmacist dispensing a drug; is that correct?

---

Page 353

1          MS. HEALY SMITH:  Objection.
2          THE WITNESS:  Yes.  To some degree.
3  BY MS. RAMSEY:
4      Q.  How did Delaware reimburse provider of
5  home IV medications --
6          MS. HEALY SMITH:  Objection.
7  BY MS. RAMSEY:
8      Q.  -- during the relevant time period?
9      A.  Can you redefine the relevant time
10  period?
11     Q.  Beginning in 1991 and going through
12  approximately 2001.
13     A.  We reimbursed the pharmacy providers
14  for the ingredient costs plus a $3.65 dispensing
15  fee.
16     Q.  Were there any additional -- strike
17  that.
18         Did Delaware provide any additional
19  reimbursement or compensation other than the
20  ingredient costs and the $3.25 dispensing fee?
21     A.  We reimbursed a dispensing fee of
22  $3.65.

---

21 (Pages 350 to 353)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Page 494

```
 1    right once those documents are produced to seek
 2    to re-open these depositions.
 3          MS. RAMSEY:  I believe we can go off
 4    the record.  Thank you very much, Ms. Denemark.
 5    We appreciate your time and patience.
 6          THE VIDEOGRAPHER:  We're off the record
 7    at 3:09.
 8          (Deposition concluded at 3:09
 9    p.m.)
10
11
12
13          _____
14          CYNTHIA DENEMARK
15
16    Subscribed and sworn to and before me
17    this _____ day of _____, 20_____.
18
19
20    _____
21          Notary Public
22
```

Page 495

```
 1          REPORTER'S CERTIFICATE
 2          I, Ryan K. Black, RPR, Court Reporter, and
 3    Undersigned Commissioner, do hereby certify that
 4    personally appeared before me, Cynthia Denemark, the
 5    witness, being first duly sworn or affirmed to
 6    testify to the truth, the whole truth and nothing
 7    but the truth, in answer to the oral questions
 8    propounded to Cynthia Denemark by the attorneys for
 9    the respective parties, testified as set forth in
10    the foregoing examination.
11          I further certify that before the taking
12    of said examination, the above witness was duly
13    sworn of affirmed, that the questions and answers
14    were taken down stenographically by the said Ryan K.
15    Black, RPR, Court Reporter, Lancaster, PA, approved
16    and agreed to, and afterwards reduced to print by
17    means of computer-aided transcription under the
18    direction of the aforesaid Reporter.
19          In testimony whereof, I have hereunto
20    subscribed my hand this 19th day of December, 2008.
21          _____
22          Ryan K. Black, RPR
```

57 (Pages 494 to 495)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

# EXHIBIT 19

Drake, Deborah      HIGHLY CONFIDENTIAL  February 19, 2008
                    San Francisco, CA

Page 1

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

-----------------------------------X

In re:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION,)

-----------------------------------X

UNITED STATES OF AMERICA, ex rel.  ) MDL No. 1456

VEN-A-CARE OF THE FLORIDA KEYS,    ) Civil Action

INC., vs. ABBOTT LABORATORIES,     ) No. 01-12257PBS

INC., CIVIL ACTION NO. 06-11337-PBS)

-----------------------------------X


                    HIGHLY CONFIDENTIAL TRANSCRIPT

                         --oOo--

                    TUESDAY, FEBRUARY 19, 2008

                         --oOo--

                    VIDEOTAPED DEPOSITION OF

                       DEBORAH DRAKE

                         --oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

              Registered Merit Reporter

Drake, Deborah        HIGHLY CONFIDENTIAL   February 19, 2008
                       San Francisco, CA

Page 254

1    A.  Sometimes.
2    Q.  Did your -- and what did you do to
3  achieve that objective, if anything?
4    A.  My job.
5    Q.  Okay.  Did you ever discuss with your
6  Manager going on to be, say, a National Account
7  Manager?
8    A.  Probably, yes.
9    Q.  And what did you do to pursue that
10  objective of becoming a National Account Manager?
11    A.  Umm --
12      MR. COLE:  I'll object to the form.
13      THE WITNESS:  Just my job and just
14  talking.
15  BY MS. YOUNTS:
16    Q.  Okay.  And you said you never took part
17  in the Contract Marketing Internship Program?
18    A.  That's correct.
19    Q.  Did you ever receive any training in
20  how Abbott products were reimbursed by third
21  party payers?
22    A.  No.

Page 255

1      MS. YOUNTS:  Okay.  I'm going to turn
2  your attention back to a document that we looked
3  at previously, and I have to double check what it
4  was marked as.
5  BY MS. YOUNTS:
6    Q.  Okay.  Directing your attention back to
7  an exhibit that was previously marked as Drake
8  Exhibit 6, which is a Power Point presentation,
9  and you may have already testified to this, and
10  I'm sorry if we go over some of this again, but
11  just take a moment to review that document and
12  tell me if -- if you have seen this document or
13  documents similar to this before.
14    A.  I don't recall.
15    Q.  Okay.  At your national sales meetings
16  do you recall -- umm -- having discussions, for
17  instance, about current market trends?
18    A.  I don't recall.
19    Q.  Okay.  Turn your attention to the page
20  that's been Bates stamped ADT-DOJ-E 0007255.
21      Under "Current Market Trends" there's a
22  bullet point that says "Reimbursement continues

Page 256

1  to influence how and where patients are treated."
2      Do you recall receiving any training or
3  discussing in any formal Abbott meeting
4  concerning how reimbursement continues to
5  influence how and where patients are treated?
6    A.  I don't.
7    Q.  As a member of the Alternate Site Sales
8  Force was it part of your job to stay aware of
9  current market trends in the alternate site
10  market?
11      MR. COLE:  Object to the form.
12      THE WITNESS:  What do you mean by
13  "current market trends"?
14  BY MS. YOUNTS:
15    Q.  Did you pay attention to what products
16  -- customers were interested in purchasing?
17      Did you pay attention to what products
18  your competition was beginning to offer but how
19  that was affecting your sales?
20    A.  Umm -- yes, I paid attention to -- umm
21  -- the products that my customers were requesting
22  and -- and what they needed.

Page 257

1    Q.  Okay.  And did you pay attention to
2  trends in pricing of those products?
3    A.  Sometimes.
4    Q.  Did you pay attention to trends in --
5  umm -- reimbursement for those products by third
6  party payers?
7    A.  No.
8    Q.  Did you attempt in any way to -- umm --
9  understand reimbursement trends of the products
10  you were marketing, the products you were selling
11  to your customers?
12      MR. COLE:  Object to the form.
13      THE WITNESS:  What do you mean by
14  "trying to understand"?
15  BY MS. YOUNTS:
16    Q.  Did you try to stay current with
17  changes in the reimbursement rates for the
18  various products that you were selling?
19    A.  No.  I had 2,000 products, and I was
20  not going to be able to keep up with that.
21    Q.  Okay.
22    A.  And I don't sell based on that.

65 (Pages 254 to 257)

a2bb6e19-d087-4b6b-ab7d-39afc78a4f7a

# EXHIBIT 20

Atlanta, GA

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

---------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,    ) by JERRY

Inc., v. Boehringer Ingleheim      ) DUBBERLY

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) DECEMBER 15, 2008

---------------------------------X

Atlanta, GA

Page 314

1  submits a claim.
2      A.   That is correct.
3      Q.   Mr. Robben asked you some questions
4  about the interplay between the -- the
5  reimbursement of ingredient costs and the
6  reimbursement for dispensing costs.
7          Do you remember those questions, sir?
8      A.   Yes.
9      Q.   And I believe you said that -- that the
10 Georgia Medicaid program understood that -- that
11 they were providing a -- a profit margin to
12 providers in reimbursing them for the ingredient
13 costs; is that right?
14         MR. LAVINE:  Object to form.
15     A.   Yes.  I acknowledged that there was
16 profit margin in the current ingredient cost
17 formula.
18     Q.   (By Mr. Cole)  And that if -- if that
19 margin were to be eliminated, then Georgia would
20 have to pay a higher dispensing fee to providers
21 to make up for the lost margin on the ingredient
22 cost side; is that fair?

Page 315

1          MR. LAVINE:  Object to form.
2      A.   That's fair.
3      Q.   (By Mr. Cole)  And would that approach
4  apply even more in the home infusion setting
5  where you have pharmacies incurring even greater
6  dispensing costs?
7          MR. SULLIVAN:  Object to form.
8      A.   No.  That equation that we spoke about
9  was only looking at the acquisition cost of the
10 drug, not the -- the overhead.
11     Q.   (By Mr. Cole)  What do you mean by
12 that?
13     A.   When we were talking about the fact
14 that there was margin in the ingredient cost of
15 the drug, the cost by which the pharmacy
16 purchased the drug -- when you're talking --
17 you're talking about an additional cost to
18 dispense.
19         So changing the ingredient cost and
20 getting that more in line with the actual
21 acquisition cost would not necessarily mean that
22 we would adjust and make a differential for home

Page 316

1  health or for long-term care or any other
2  provider.
3          We may review that, but it -- it would
4  actually be an additional exercise.
5      Q.   Going back to the let's say mid to late
6  '90s time period when the dispensing fee paid by
7  Georgia Medicaid was roughly in the $4 to $4.63
8  range, do you believe that the dispensing fee
9  paid by Georgia Medicaid during that time frame
10 was adequate to cover pharmacies' dispensing
11 costs?
12     A.   No.
13     Q.   And in the home infusion setting -- if
14 at that level -- if -- if the $4.63 was not
15 adequate to cover a retail pharmacy's dispensing
16 costs, then I assume you would agree with me that
17 it certainly did not cover the dispensing costs
18 of a home health pharmacy or some other pharmacy
19 that administered prescriptions in the home
20 infusion setting.
21         MR. SULLIVAN:  Object to the form.
22     A.   Agreed.

Page 317

1      Q.   (By Mr. Cole)  Is it fair to say, Mr.
2  Dubberly, that in assessing whether to increase
3  the dispensing fee, it has been the policy of the
4  Georgia Medicaid program to consider the margin
5  on ingredient cost?
6          MR. LAVINE:  Object to form.
7      A.   It's been the practice.
8      Q.   (By Mr. Cole)  And there's nothing
9  wrong with that practice as -- as far as you are
10 aware; is that fair?
11         MR. LAVINE:  Object to form.
12     Q.   (By Mr. Cole)  Did you answer that
13 question?  I'm sorry.  If you did --
14     A.   No.
15     Q.   -- I couldn't hear it on the
16 speakerphone.
17     A.   No.  I was trying to -- to reassess the
18 -- the language of your question.
19         Is it possible to restate it?
20     Q.   Well, earlier you testified that -- you
21 know, that the Georgia Medicaid program obviously
22 complies with -- in the day-to-day operation of

80  (Pages 314 to 317)

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                                    December 15, 2008

# Atlanta, GA

Page 398

1      Q.   And this is my last question, sir: Are
2   you aware of any such statements before the fall
3   of 2007 by HCFA that either criticized or
4   prohibited the practice of overcompensating
5   providers on the ingredient costs while they
6   undercompensated providers for dispensing costs?
7          MR. LAVINE:  Object to form.
8      A.   None that expressly prohibited or
9   admonished.
10          MR. COLE:  Thank you, sir.  I have
11   nothing further.
12          MR. SULLIVAN:  Can I go?
13
14          EXAMINATION
15   BY MR. SULLIVAN:
16      Q.   I want to clarify something about a
17   statement you made earlier today and that your
18   lawyer repeated earlier today in an objection.
19          Is it correct to say that the Georgia
20   Department of Community Health has taken no
21   position on any issue in the case we're here on
22   today?

Page 399

1          MR. ROBBEN:  Object to the form.
2      A.   That is true.
3          MR. SULLIVAN:  That's all I have.
4          THE VIDEOGRAPHER:  This is the end of
5   tape No. 7.  Going off the record at 6:48 p.m.
6          (Deposition concluded at 6:48 p.m.)
7
8
9
10
11
12
13   _____
14          JERRY DUBBERLY
15
16   SUBSCRIBED AND SWORN TO
17   before me this _____ day
18   of _____, A.D. _____.
19
20   _____
21      Notary Public
22

Page 400

1          C E R T I F I C A T E
   G E O R G I A:
2   COBB COUNTY:
       I hereby certify that the foregoing
3   deposition was reported, as stated in the
   caption, and the questions and answers
4   thereto were reduced to the written page
   under my direction; that the foregoing
5   pages 1 through 399 represent a true and
   correct transcript of the evidence given.
6   I further certify that I am not in any way
   financially interested in the result of
7   said case.
       Pursuant to Rules and Regulations of
8   the Board of Court Reporting of the
   Judicial Council of Georgia, I make the
9   following disclosure:
       I am a Georgia Certified Court
10   Reporter.  I am here as an independent
   contractor for Huseby, Inc.
11      I was contacted by the offices of
   Huseby, Inc. to provide court reporting
12   services for this deposition.  I will not
   be taking this deposition under any
13   contract that is prohibited by O.C.G.A.
   15-14-7 (a) or (b).
14      I have no written contract to
   provide reporting services with any party
15   to the case, any counsel in the case, or
   any reporter or reporting agency from whom
16   a referral might have been made to cover
   this deposition.  I will charge my usual
17   and customary rates to all parties in the
   case.
18      This, the 21st day of December,
   2008.
19
20   _____
   JENNIFER D. HAMON, CCR-B-2287
21   My Commission Expires
22   January 27th, 2010.

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

dd23118e-9e82-4fd1-afbb-155015bf3b99