# EXHIBIT 21

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------x

In re:  PHARMACEUTICAL INDUSTRY    )  MDL DOCKET NO.

                                   )

AVERAGE WHOLESALE PRICE            )  CIVIL ACTION

                                   )

LITIGATION.                        )  01CV12257-PBS

-------------------------------x


VOLUME III

        The videotaped deposition of BARBARA

ECHEVARRIA, called by the United States for

examination, taken pursuant to subpoena and pursuant

to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before Rachel F. Gard,

Certified Shorthand Reporter, at 77 West Wacker

Drive, Suite 3500, Chicago, Illinois, commencing at

9:15 a.m. on the 7th day of March, A.D., 2008.

c6cee311-fc53-4ea9-9814-10860035591d

Page 98

1    Q.  -- for example?
2    A.  Yes.
3    Q.  So the COPN31 gives us -- it's part of
4  the COP system?
5    A.  Yes.
6    Q.  And the N31 explains it's Extract No. 31?
7    A.  Well, the N being the record layout and
8  there's like a T, I think, means a file.  So they
9  just all have meaning and --
10   Q.  So RMR helps to identify that with the
11  RMR system?
12   A.  Yes, yes.
13   Q.  Let's move to No. 30, which asks whether
14  any of the fields that were not extracted would
15  have had any affect on calculating unit prices.
16   A.  Well, my understanding of the unit price
17  statistics is that you're just trying to get to the
18  per-unit price.  And so if that's what that's
19  referring to, then you have everything you need to
20  get to the per-unit price.
21   Q.  Net of all discounts, rebates, or other
22  allowances?

Page 99

1    MS. GEISLER:  Objection to form.
2  BY THE WITNESS:
3    A.  The rebates are done outside of the
4  system. There -- Discounts, we don't do.  So yeah.
5    Q.  But when you say that the rebates are
6  done outside of the system, are you saying that
7  those rebates are not contained within the COP
8  data?
9    A.  Yeah.  I thought there was a rebate
10  system outside as far as someone else testified
11  where they calculate rebates.
12   Q.  Well, when you use the term "rebate," are
13  you meaning wholesale or charge-backs?
14   A.  No.  Charge-back data you have.
15   Q.  When you say "rebate," you're thinking of
16  --
17   A.  Whatever we're doing the accrual for,
18  those rebates.
19   Q.  Well, my understanding is there's
20  accruals for charge-backs as well.
21   A.  Yes, and we gave you the charge-back
22  data.

Page 100

1    Q.  So for -- the rebates we're talking about
2  right now are rebates that might -- that would
3  pertain to an end customer and not to a wholesaler;
4  is that right?
5    A.  That's correct.  For specific behaviors,
6  "Buy ten of these and you'll get a rebate for one,"
7  whatever the case may be.
8    Q.  So we won't -- We might see an accrual
9  for that rebate in the direct data, but we won't
10  see the actual final rebate that was paid?
11   A.  Correct.
12   Q.  Where's all that data?
13   A.  Where the -- the rebate that was finally
14  paid?
15   Q.  Yes.
16   A.  I don't know.  I can't speak to that.
17  It's not within our data.
18   Q.  In the ordinary course of business, do
19  Abbott employees rely upon the rebate accrual field
20  in order to estimate the net price after rebates?
21   A.  I don't --
22   MS. GEISLER:  Objection, beyond the scope of

Page 101

1  the notice.
2  BY THE WITNESS:
3    A.  I don't know what people do with that
4  value if they do anything with it.  I know that it
5  was used as an accrual by the -- by HPD for where
6  they thought they might pay rebates or
7  charge-backs.  But beyond that, I don't know if
8  other people at Abbott used it for anything.
9    Q.  All right.  Let's move to 31.  And this
10  is asking about the rebate accrual field.  Is it
11  your understanding that the value in that field is
12  based upon an average calculation derived from the
13  charge-back system?
14   A.  For the wholesaler customers, yes.
15   Q.  And what about for the end-user customer
16  rebates?
17   A.  My understanding is that it's -- it's the
18  -- it's an accrual for the amount that we think we
19  will pay them for rebates for whatever rebate
20  programs we have going at that time for that
21  customer for the products that they're buying.
22  It's also GPO management fees -- or can be.

c6cee311-fc53-4ea9-9814-10860035591d

Page 134

1  to those transactions, the file can be pushed
2  through the next night with those original
3  transactions.  But that would be their first time
4  through.  Otherwise, there are some -- like at
5  month end, if transactions reject, we like to close
6  the month with all the transactions in.  Vicky may
7  have to go in and do a manual entry into COP to
8  represent those transactions.  And then they would
9  have a bill type 12 -- I'm sorry, 11.
10     Q.  All right.  But what if down the road,
11 the customer came back and pointed out that there
12 was some type of an error in the quantity or the
13 amount.  When that correction is made, does that
14 generate a new transaction?
15     A.  Yes, it would be a credit coming through.
16     Q.  And it will reference the same invoice?
17     A.  If there's an invoice to reference, then
18 -- Well, in AES, they can issue it in reference to.
19 In OPS, I'm not sure.  I think it would have just
20 been some comments that they would have added,
21 which aren't captured in our data.
22     Q.  Also on the indirect data, Exhibit 2, the

Page 135

1  very last field, it's called the customer rebate
2  discount.
3     A.  Yes.
4     Q.  That's an accrual of the potential
5  performance rebate that might be earned by the
6  end-user customer, right?
7     A.  Correct.  And it could also have the GPO
8  fees in it as well.
9     Q.  Okay.  But the charge-back itself doesn't
10 go in there?
11    A.  No.
12    Q.  And then the ultimate process of
13 evaluating whether or not the rebate that was
14 accrued here should actually be paid to the
15 customer is a manual process done afterwards,
16 right?
17    A.  Yeah.  My understanding is it's done in
18 Excel or something.
19    Q.  Would those -- Once that money is
20 actually paid to the end customer as a rebate, does
21 it show up in the direct data?
22    A.  No.

Page 136

1     Q.  So we won't see, for example, an end-user
2  customer that bought all of their product during
3  the course of the year on an indirect basis,
4  through a wholesaler, and earning a 2 percent
5  performance rebate, we won't see the payment of
6  that 2 percent performance rebate as a direct
7  transaction reflecting the credit in the amount of
8  the rebate?
9     A.  No.
10    Q.  That's all -- Is that in the ARM system?
11    A.  I don't think so.  I don't know where
12 that would go because it would have to go through
13 COP to get into the ARM system.  I don't know how
14 the rebates are paid out.
15    Q.  But there must be a whole separate system
16 to track that we're expecting this kind of -- you
17 know, a particular payment from a customer, that
18 they paid on a timely basis so they get the 1
19 percent discount and then at the end of the year,
20 if a rebate is approved, a check is mailed to them
21 for the amount of the rebate.  Somewhere there's a
22 system that tracks all that?

Page 137

1     MS. GEISLER:  Objection to form.
2  BY THE WITNESS:
3     A.  I don't know if paid on a timely basis
4  has anything to do with the rebates -- but it is
5  all tracked.  My understanding is there's a couple
6  people, that's all they do, are the rebates,
7  tracking and managing that process.
8     Q.  All right.  And I didn't mean to mix the
9  two different things together.  But on -- A
10 standard term at Abbott is 1 percent net 30; is
11 that right?
12    A.  There --
13    MS. GEISLER:  Objection, beyond the scope of
14 the notice.
15 BY THE WITNESS:
16    A.  There's multiple terms codes.  There's
17 not a standard 1 percent 10 net 30; 2 percent net
18 30; net 30 only.  There's a lot of different terms
19 codes.
20    Q.  That customer rebate discount field that
21 we were just talking about, that's a field that's
22 populated by Abbott, isn't it?

35 (Pages 134 to 137)

c6cee311-fc53-4ea9-9814-10860035591d

# EXHIBIT 22

```
                 UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )     01-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                )
United States of America,       ) Hon. Patti Saris
ex rel. Ven-a-Care of the       )
Florida Keys, Inc., v.          )
Abbott Laboratories, Inc.,      )
and Hospira, Inc.               )
CIVIL ACTION NO. 06-11337-PBS   )


*******************************************************
                 UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )     01-CV-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                ) Judge Patti B. Saris
State of Arizona v. Abbott      )
Labs., et al.                   )
Civil Action No. 06-CV-11069-PBS )


*******************************************************
         ORAL AND VIDEOTAPED DEPOSITION OF
                 GERALD T. EICHHORN
                   April 24, 2007


               HIGHLY CONFIDENTIAL

*******************************************************
```

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

Page 38

1      MS. CITERA:  Objection to form.
2      A.   That does not -- price to distributor.
3   That -- that doesn't ring a bell.
4      Q.   (BY MR. ANDERSON)  Are you familiar with a
5   term known as "price to chain warehouse"?
6      A.   No.
7      MS. CITERA:  Objection to the form.
8      Q.   (BY MR. ANDERSON)  You're not familiar with
9   any kind of industry jargon or description for "price
10  to chain warehouse," are you?
11     MS. CITERA:  Objection to form.
12     A.   No.
13     Q.   (BY MR. ANDERSON)  Are you familiar with a
14  term known as "direct price to pharmacy"?
15     MS. CITERA:  Objection to form.
16     A.   No.
17     Q.   (BY MR. ANDERSON)  Are you familiar with any
18  kind of jargon or industry term of art that is
19  synonymous with "direct price to pharmacy"?
20     A.   Not to my --
21     MS. CITERA:  Objection to form.
22     A.   Not to my knowledge.
23     Q.   (BY MR. ANDERSON)  Are you familiar with a
24  term known as "direct price"?
25     MS. CITERA:  Objection to the form.

Page 39

1      A.   Direct price.  I think in our connotation we
2   use direct price from -- in the meaning price that the
3   hospital purchased directly from Abbott through our
4   customer service area.
5      Q.   (BY MR. ANDERSON)  Are you familiar with
6   direct price outside of the hospital context?
7      MS. CITERA:  Objection to form.
8      A.   No, not to the best of my recollection.
9      Q.   (BY MR. ANDERSON)  Are you familiar with a
10  term known as "list price"?
11     MS. CITERA:  Objection to form.
12     A.   I'm familiar with list price.
13     Q.   (BY MR. ANDERSON)  What does list price mean?
14     A.   List price would be the price in the Hospital
15  Products catalog.
16     Q.   Is "list price" synonymous with "direct
17  price"?
18     A.   I don't think it's -- in my -- in my
19  understanding, it's not synonymous with list price.
20     Q.   Is "list price" synonymous with "catalog
21  price"?
22     A.   I would say that list price would be
23  synonymous with catalog price.
24     Q.   Is "list price" synonymous with "trade
25  price"?

Page 40

1      MS. CITERA:  Objection to the form.
2      A.   To my knowledge, I don't think those are
3   synonymous terms.
4      Q.   (BY MR. ANDERSON)  Is "trade price"
5   synonymous with "direct price"?
6      MS. CITERA:  Objection to form.
7      A.   Is trade price synonymous -- you know, I
8   don't -- to my knowledge, I don't think so.  I
9   don't --
10     Q.   (BY MR. ANDERSON)  Are you --
11     A.   I couldn't say for sure.
12     Q.   Sorry.  I didn't mean to cut you off there.
13        Are you familiar with a term at Abbott
14  known as "trade price"?
15     MS. CITERA:  Objection to form.
16     A.   Trade price.  I think -- trade price, in my
17  mind, when I think of that, from that time frame, may
18  have been synonymous with wholesaler acquisition price
19  or wholesaler price.
20     Q.   (BY MR. ANDERSON)  Would you consider "trade
21  price" to be synonymous with "RxLink acquisition
22  price" or "RxLink WAC"?
23     MS. CITERA:  Objection to the form.
24     A.   To my knowledge, I -- RxLink price was always
25  a separate contracted price with the wholesaler.  So,

Page 41

1   to my knowledge, I don't think those were used
2   synonymously with other -- other type -- any of these
3   pricing terms that we're talking about.
4      Q.   (BY MR. ANDERSON)  Are you aware that
5   internally Abbott referred to WAC and RxLink WAC
6   interchangeably?
7      MS. CITERA:  Objection to form.
8      A.   To my knowledge, I don't think Abbott
9   referred to those terms interchangeably.
10     Q.   (BY MR. ANDERSON)  Are you aware that "trade"
11  was, basically, a term that referred to the wholesaler
12  class of trade?
13     MS. CITERA:  Objection to form.
14     A.   Was I aware that trade was used to refer to
15  wholesalers?
16     Q.   (BY MR. ANDERSON)  Yes.
17     A.   I think that was a -- it may have been a more
18  encompassing term.  I couldn't exactly tell you
19  what -- how everybody may have used that term.  It may
20  have been used by some folks as synonymous with
21  wholesaler.
22     Q.   How did you understand the term "trade" to
23  characterize Abbott customers?  Was it just
24  wholesalers or was it wholesalers and distributor or
25  other?

11  (Pages 38 to 41)

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

Page 74

1  Products segment that I worked on for our catalog
2  prices. We had a number of customers that purchased
3  at list price, so that would be an inflationary
4  increase that we had looked to get. And for our
5  government Federal Supply Schedule contract, there
6  were a number of steps that you would have to go
7  through to look for any inflationary increase from
8  what I recall. First you would have to make sure that
9  the government received all the best price
10  requirements and then if you took a catalog increase,
11  you were also eligible to ask for an increase on the
12  Federal Supply Schedule contract as well.
13     Q. (BY MR. ANDERSON) When you say that, "We had
14  a number of sales at list price," what are you
15  referring to?
16     A. In the Hospital Products Division we had
17  customers who bought product at list price or at
18  catalog price.
19     Q. Is it true that that was a relatively rare
20  phenomenon?
21        MS. CITERA: Objection to form.
22     A. I don't know if I would say it was rare. I
23  think at one point I remember the number being about
24  four million dollars in sales.
25     Q. (BY MR. ANDERSON) Out of what, about a

Page 75

1  billion dollars a year?
2        MS. CITERA: Objection to form.
3     A. I don't recall what the exact number was in
4  the mid-'90s. It was probably over a billion.
5     Q. (BY MR. ANDERSON) Right. So why was it that
6  Abbott was interested in those incremental sales of,
7  what, like maybe four percent?
8        MS. CITERA: Objection to form.
9     A. You know, again, speaking for the Hospital
10  Products business, I think it was important -- four
11  million dollars, or whatever the number, is still a
12  lot of money. It's a business. If we are looking to
13  maintain our profitability, we have to look at
14  existing business plus list price business.
15     Q. (BY MR. ANDERSON) Well, let's do the math.
16  If you had a hundred million dollars in sales and you
17  only did four million at list, that would be about
18  four percent of your sales, correct?
19     A. I think that sounds right.
20     Q. But Abbott in the mid-'90s was doing over a
21  billion dollars a year in Hospital Products sales. So
22  if they only did roughly four million at list price,
23  that would be like .4 percent of their sales, right?
24        MS. CITERA: Objection to form.
25     A. The math sounds correct. I think it's --

Page 76

1  again, it depends on which business or -- it's
2  difficult to look and say generalities. There were
3  certain products that may have had a lot of list price
4  sales that may have been more significant to that
5  actual business. So --
6     Q. (BY MR. ANDERSON) What about for products
7  where there were no list price sales, why did Abbott
8  go to the trouble of increasing list prices where they
9  had no sales?
10        MS. CITERA: Objection to form.
11     A. You know, I don't know. I couldn't -- I
12  couldn't say.
13     Q. (BY MR. ANDERSON) Can you think of any
14  business reason whatsoever to raise list prices
15  annually for products where there are no list price
16  sales?
17        MS. CITERA: Objection to form.
18     A. Can I think of any reasons why?
19     Q. (BY MR. ANDERSON) Yes, sir.
20     A. I think it would --
21        MS. CITERA: Objection to form.
22     A. In -- in -- I think it would be to keep all
23  of the products in a certain category aligned in a
24  certain product family.
25     Q. (BY MR. ANDERSON) I don't follow. Could you

Page 77

1  explain that? What do you mean keep them in line in a
2  certain product family?
3     A. Well, even within the Hospital Products
4  Division we probably had 30 different -- or more
5  different business sections. So they were broken down
6  into product families or product groups. So in order
7  to keep consistency between list prices, you would
8  increase all of the prices within a certain family or
9  within the entire product line.
10     Q. Why would it be important to raise all the
11  list prices if certain drugs within a product family
12  are not sold at list price?
13        MS. CITERA: Objection to form.
14     A. You know, I don't know. I couldn't say. I
15  couldn't recall exactly what the methodology or why
16  that would occur.
17     Q. (BY MR. ANDERSON) Isn't it true that when --
18  to the extent Abbott took annual price increases on
19  its list prices, that typically those price increases
20  were around four percent?
21        MS. CITERA: Objection to the form.
22     A. For my knowledge during the contract -- my
23  contract marketing era for the hospital-based catalog,
24  I recall the increases were approximately four percent
25  or close to CPI, or whatever the inflationary index

Page 78

1   was.
2       Q.   (BY MR. ANDERSON)  And so to the extent
3   Abbott went to the trouble each year of raising list
4   prices, those four percent annual increases presumably
5   would garner four percent incremental revenues if
6   there were any list sales, correct?
7           MS. CITERA:  Objection to form.
8       A.   That could -- that could occur as long as
9   those customers continued to buy at list price, unless
10  they switched to a contract --
11      Q.   (BY MR. ANDERSON)  And then --
12      A.   -- price.
13      Q.   -- if we wanted to look at the -- those
14  incremental annual revenues that were garnered through
15  a list price sale in relationship to overall HPD sales
16  of over a billion dollars, you would multiply that .4
17  percent times four percent and you'd get something
18  like one-thousandth percent incremental revenue,
19  right?
20          MS. CITERA:  Objection to form.
21      A.   I think -- I don't know that we looked at it
22  on a percent basis.  I think any incremental dollars
23  were important to the division.  So from a dollar
24  perspective, I think it contributed to each of the --
25  some businesses more than the other, but I think it

Page 79

1   was an important number.
2       Q.   (BY MR. ANDERSON)  So even a thousandth of a
3   percent of incremental revenue justified raising list
4   prices each year?
5           MS. CITERA:  Objection to form.
6       A.   I can't say that that's the only reason that
7   we adjusted list price.  I mean, those were the
8   reasons that I recall.
9       Q.   (BY MR. ANDERSON)  What was the other reason?
10          MS. CITERA:  Objection to form.
11      A.   Well, my understanding was that in order to
12  apply for our inflationary adjustment with our Federal
13  Supply Schedule contract, we also had to show that we
14  were taking catalog increases.
15      Q.   (BY MR. ANDERSON)  So is it true that taking
16  list price increases was a mechanism by which you
17  could raise the prices you charged the federal
18  government when the federal government bought directly
19  from Abbott, for instance, the veterans?
20          MS. CITERA:  Objection to form.
21      A.   Could you repeat that?
22      Q.   (BY MR. ANDERSON)  Is it true that you're
23  testifying that one of the reasons for increasing list
24  price beyond garnering a thousandth of a percent of
25  incremental revenue was to justify raising prices to

Page 80

1   the federal government when the federal government
2   bought drugs, such as through the veterans?
3           MS. CITERA:  Objection to form.
4       A.   I think one of the reasons, or one of the
5   reasons that I knew of, for taking that increase was
6   to then be able to apply for the Federal Supply
7   Schedule increase.  It didn't guarantee that we
8   received it.  There were a number of other parameters
9   that we would have to go through first.  My
10  understanding was, though, without showing a catalog
11  increase that we wouldn't be able to even apply or
12  look to take an increase on the government business.
13      Q.   (BY MR. ANDERSON)  How often, if at all, did
14  Abbott actually raise HPD product prices to the
15  federal government through, for instance, the Veterans
16  Administration?
17          MS. CITERA:  Objection to the form.
18      A.   You know, I can't -- I can't give -- I can
19  speak for my experience with the Hospital Products for
20  the -- for the three years or so that I worked in that
21  area.  I think we applied for the increases for at
22  least one of the years.  I think -- I don't recall the
23  outcome of that.
24      Q.   (BY MR. ANDERSON)  So you're not able to
25  testify that Abbott ever actually raised the HPD

Page 81

1   prices to the federal government, for instance,
2   through the Veterans Administration when the federal
3   government bought drugs directly?
4           MS. CITERA:  Object to the form.
5       A.   I don't know that -- I can't -- I don't
6   recall the outcome of those submissions.
7       Q.   (BY MR. ANDERSON)  Can you think of any other
8   business reason for raising list prices?
9           MS. CITERA:  Objection to form.
10      A.   No, nothing comes to mind.
11      Q.   (BY MR. ANDERSON)  Why is it that Abbott
12  reported its annual list price increases to the price
13  compendia, such as First DataBank?
14          MS. CITERA:  Objection to form.
15      A.   I don't know that I could say why.
16      Q.   (BY MR. ANDERSON)  Can you think of any
17  business reason at all why Abbott would report annual
18  list price changes that were causing the list prices
19  to go up to First DataBank?
20          MS. CITERA:  Objection to form.
21      A.   To the best of my knowledge, I don't know
22  why.
23      Q.   (BY MR. ANDERSON)  Are you aware that list
24  price being reported by Abbott to First DataBank
25  triggered new AWPs on Abbott products to be published

21  (Pages 78 to 81)

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

Page 82

1  by First DataBank?
2       MS. CITERA:  Objection to form.
3       A.  At this time I wasn't aware when I was
4  working in the contract marketing area.
5       Q.  (BY MR. ANDERSON)  Have you recently reviewed
6  documents that reflect that back in the '95 time frame
7  you were aware that list prices as reported by Abbott
8  to First DataBank caused new AWPs to be published by
9  First DataBank?
10       MS. CITERA:  Objection to form.
11       A.  I don't recall if I -- I haven't
12  specifically -- I haven't looked at documents.  I
13  reviewed information with counsel.
14       Q.  (BY MR. ANDERSON)  When you say "reviewed
15  information," you're distinguishing from reviewing
16  documents that were created at or near the time that
17  you were working in the Contract Marketing Department?
18       MS. CITERA:  Objection to form.
19       A.  I would say --
20       MS. CITERA:  And I would just counsel
21  you not to reveal any of our discussions.
22       THE WITNESS:  Sure.
23       A.  I would -- I would say that they were
24  documents.
25       Q.  (BY MR. ANDERSON)  Okay.  And in reviewing

Page 83

1  those documents, did you note that apparently back in
2  '95 you were aware that list prices reported by Abbott
3  caused new AWPs to be published on Abbott products by
4  First DataBank?
5       MS. CITERA:  Objection to form.
6       A.  I can't say that -- as I recall, that I knew
7  at that time that the -- that it caused -- reporting
8  those prices caused new information to be published.
9  What I recall, and without looking at the documents,
10  I'm recollecting what it said, that I think maybe that
11  it was a source.  I didn't necessarily know that, you
12  know, it was published or republished.
13       Q.  (BY MR. ANDERSON)  When you say it was a
14  source, you mean First DataBank was a source for AWPs
15  that were increased when Abbott reported increasing
16  list prices?
17       MS. CITERA:  Objection to the form.
18       A.  Could you state that again?
19       Q.  (BY MR. ANDERSON)  Is it true, sir, that you
20  just testified that you knew that AWP was a source --
21  I mean, pardon me.  I'll rephrase.
22       Is it true, sir, that you knew back in
23  '95 that First DataBank was a source for new AWPs that
24  were caused to be created when Abbott reported list
25  price increases to First DataBank?

Page 84

1       MS. CITERA:  Object to the form.
2       A.  I don't recall that I knew back in '95
3  that -- that that's how it worked.
4       Q.  (BY MR. ANDERSON)  Okay.  Well, we'll get to
5  some documents in a little while that may refresh your
6  recollection.
7       Now, you mentioned earlier that with
8  respect to Exhibit 731, you primarily focused on the
9  second page; is that correct?
10       A.  I referenced the second and third pages,
11  which had a number of the group purchasing
12  organization prices.
13       Q.  Right.  And specifically focusing on the
14  third page that you were familiar with, you see toward
15  the right-hand side two columns titled "All Group
16  High" and "All Group Low"?
17       A.  Yes.
18       Q.  And what do you understand those terms to
19  mean?
20       MS. CITERA:  Objection to form.
21       MR. ANDERSON:  What's the objection,
22  Toni?
23       MS. CITERA:  Is your -- are you asking
24  what does he know generally or what does he know as to
25  these documents what the term means?

Page 85

1       MR. ANDERSON:  I just asked him what the
2  terms mean.
3       MS. CITERA:  It's this document?
4       MR. ANDERSON:  It's straightforward
5  enough.
6       MS. CITERA:  In this document?
7       MR. ANDERSON:  It's not in the document.
8  It's what do the terms mean.
9       MS. CITERA:  Well, I'm going to object
10  then.
11       MR. ANDERSON:  Well, that's frivolous.
12       MS. CITERA:  Well ...
13       Q.  (BY MR. ANDERSON)  Sir, do you know what the
14  term "all group low" and "all group high" mean?
15       MS. CITERA:  Same objection.
16       A.  In this document it appears that they mean
17  what we would have wanted to look from the file was
18  what was the lowest GPO price and then what was the
19  highest GPO price.  So "all group low" being the low
20  and "all group high" being the highest price that we
21  had out there at that time.
22       Q.  (BY MR. ANDERSON)  And you limited your
23  answer to this document.  Do you have any reason to
24  believe that the terms "all group low" and "all group
25  high" were utilized differently in other resource

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

Page 142

1  or an add-on to a sheet that someone else had sent.
2     Q.  (BY MR. ANDERSON)  Well, sir, it's not just
3  it could have been a response, you actually did fax
4  this spreadsheet to Dave Brincks, correct?
5           MS. CITERA:  Objection to form.
6     A.  It appears that I faxed it to him.
7     Q.  (BY MR. ANDERSON)  Okay.  And you did that
8  because Dave needed help from you in setting new list
9  prices on these Vancomycin products, correct?
10          MS. CITERA:  Objection to the form.
11    A.  I don't know that it was because Dave wanted
12  to set list prices, other than that he had a request
13  to change them and wanted to know how we would go
14  about doing that.
15    Q.  (BY MR. ANDERSON)  And in turn, he relied
16  upon you as a person in contract marketing to know how
17  to do that, correct?
18          MS. CITERA:  Objection to form.
19    A.  Dave asked me for help with the process as to
20  who else we would need to contact in the -- in the
21  Hospital Products contract marketing area to -- to
22  facilitate this change.
23    Q.  (BY MR. ANDERSON)  And is the note that's
24  part of the spreadsheet on the third page of Exhibit
25  362 in essence the advice you provided to Dave as to

Page 143

1  how to set a new list price in AWP?
2           MS. CITERA:  Objection to form.
3     A.  Again, we were not involved with setting AWP
4  and I don't recall that part where I would have gotten
5  access to that information.  Again, this would have
6  been a document I may have sent to him with the
7  suggestion on where we should move the list price.
8     Q.  (BY MR. ANDERSON)  Okay.  Well, let's --
9     A.  Or how we should change it.
10    Q.  Given that limitation that you inserted, how
11  is it that you came to suggest to Dave that you would
12  set a list price at five percent over RxLink?
13          MS. CITERA:  Objection to form.
14    A.  You know, I don't recall what my exact
15  thought process was back then.
16    Q.  (BY MR. ANDERSON)  Well, was there a standard
17  rule of thumb that list price was set at five percent
18  over RxLink?
19          MS. CITERA:  Objection to form.
20    A.  I don't recall that there was a specific
21  process or a specific guideline to set price over
22  RxLink.
23    Q.  (BY MR. ANDERSON)  Did you have some basic
24  reason for suggesting that list price on these three
25  Vancomycin products be set at five percent over RxLink

Page 144

1  WAC?
2           MS. CITERA:  Objection to form.
3     A.  As I recollect back, the best of my knowledge
4  the thought process was to set it at a price higher
5  than any of our existing contracted customers had as
6  to not create any pricing discrepancies.
7     Q.  (BY MR. ANDERSON)  And in 1995, particularly
8  March of '95, the highest price that any customer was
9  charged on these three Vancomycin products was the
10  RxLink WAC, correct?
11          MS. CITERA:  Objection to form.
12    A.  You know, I don't know that.  I couldn't say
13  that.  I don't know what the highest price -- I don't
14  know that these prices were even correct at this time,
15  but I couldn't say what the highest price was.
16    Q.  (BY MR. ANDERSON)  I'm not asking you, sir,
17  to recite at the moment what the highest price was in
18  '99.  I'm asking that given your testimony here today,
19  isn't it true that you selected a list price at five
20  percent over RxLink WAC because the highest price that
21  was being charged to any customer on these three
22  Vancomycin products was most likely RxLink WAC?
23          MS. CITERA:  Objection to form.
24    A.  You know, I don't know that I could -- I
25  don't know that I could say that.  Could have been

Page 145

1  other customers that were billed at -- at direct
2  prices purchasing direct from Abbott, which would have
3  had -- which would have been billed at the current
4  list price.
5     Q.  Why do you say that?
6     A.  I mean, it's possible.  I don't -- I don't
7  recall.
8     Q.  Well, would you -- if there had been direct
9  prices that were higher than your suggested list
10  price, wouldn't that be a problem?
11          MS. CITERA:  Objection to form.
12    A.  Could you please state that again, please?
13    Q.  (BY MR. ANDERSON)  You wouldn't have
14  suggested a list price, sir, that was higher -- I
15  mean, pardon me.  I'll start over.  Strike that and
16  rephrase.
17          Sir, you wouldn't have suggested a new
18  list price that was lower than a direct price that was
19  actually sold to a customer, would you?
20          MS. CITERA:  Objection to form.
21    A.  You know, I don't know.  I can't say.
22    Q.  (BY MR. ANDERSON)  Well, isn't it true that
23  list price is the highest price that Abbott has on any
24  product?
25          MS. CITERA:  Objection to form.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

Page 146

1    A.  To the best of my knowledge, I think that's
2   true for the -- for the Hospital Products arena.
3    Q.  Right.  And so given that knowledge, there's
4   no way you would have suggested a list price that was
5   lower than any direct price, correct?
6       MS. CITERA:  Objection to form.
7    A.  You know, I can't say.  I don't recall
8   exactly what my thought process was.
9    Q.  (BY MR. ANDERSON) Can you ever recall any
10  instance where you suggested a list price or, for that
11  matter, any Abbott list price on any product was ever
12  set below a direct price?
13      MS. CITERA:  Objection to form.
14   A.  As I said, I wasn't involved with list price,
15  in setting those, so I don't know that I can answer
16  that.
17   Q.  (BY MR. ANDERSON) Why were you involved in
18  the setting or suggesting list price on these three
19  Vancomycin products in March of '95?
20   A.  As a request from a colleague, who I had
21  known and he knew I worked in the hospital area, and
22  asked me if I could follow up on this.
23   Q.  How did you know Dave Brincks prior to March
24  of '95?
25   A.  We went to graduate school together.

Page 147

1    Q.  So, basically, you-all knew one another
2   socially and he asked you for a favor, correct?
3       MS. CITERA:  Objection to form.
4    A.  I wouldn't say we knew each other socially.
5   We knew each other as classmates and he asked me how
6   we would go about adjusting the list price.
7    Q.  (BY MR. ANDERSON) And did you consult with
8   anybody in suggesting the new list price?
9    A.  To the -- to the best of my recollection, I
10  probably would have talked to the marketing manager to
11  get his feedback on if it would impact anything.
12   Q.  And that marketing manager would have been
13  Mark Sebree, correct?
14   A.  It may have been Mark at that -- based on
15  that time frame.
16   Q.  Did you review any information provided by
17  Mark Sebree to you?
18      MS. CITERA:  Objection to form.
19   A.  I don't recall if I reviewed any information
20  from Mark.  I may have.
21   Q.  (BY MR. ANDERSON) Look at the second page of
22  Exhibit 362, sir.  Are you familiar with that page in
23  any way?
24   A.  The second page?
25   Q.  Yes.

Page 148

1    A.  No, I am not.
2    Q.  Do you know whose handwriting that is?
3    A.  I do not know whose handwriting that is.
4    Q.  Are you familiar with Mark Sebree's
5   handwriting?
6    A.  No, I can't say I am.
7    Q.  Did you see the second page of Exhibit 362 in
8   preparing to testify?
9    A.  I believe I did.
10   Q.  Do you agree that the second page of Exhibit
11  362 appears to be a listing and comparison of AWPs on
12  various competitive Vancomycin products?
13      MS. CITERA:  Objection to form.
14   A.  It appears to be a listing.  Appears to be a
15  sheet generated.  You know, I couldn't determine the
16  source and tell you whose -- whose document it was.
17   Q.  (BY MR. ANDERSON)  I didn't ask you for the
18  source, sir.  Do you agree that it appears to be a
19  listing of competitive Vancomycin AWPs?
20      MS. CITERA:  Objection to the form.
21   A.  It appears that it has a number.  I'm not
22  sure it's comprehensive with all Vancomycin, but it
23  does list the AWPs by product.
24   Q.  (BY MR. ANDERSON)  Do you agree that the AWPs
25  listed for Abbott's products are the highest AWPs of

Page 149

1   all the Vancomycins?
2       MS. CITERA:  Objection to form.
3    A.  Yeah, without studying it in detail.  I mean,
4   it appears that Abbott has a higher AWP in certain --
5   in a number of cases there.
6    Q.  (BY MR. ANDERSON)  And isn't it true, also,
7   that the Vancomycin AWPs on Abbott's products are at
8   least roughly double and sometimes triple or quadruple
9   the competitive AWPs?
10      MS. CITERA:  Objection to form.
11   A.  It's difficult, without looking at the actual
12  one gram versus five gram versus half a milligram.
13  They do appear higher.  I don't know about the number
14  of times higher.
15   Q.  (BY MR. ANDERSON)  Do you ever recall seeing
16  documentation similar to the second page of Exhibit
17  362 in evaluating suggested list prices for
18  Vancomycin?
19      MS. CITERA:  Objection, overbroad.
20   A.  To the best of my knowledge, I don't recall
21  seeing this document when evaluating.
22   Q.  (BY MR. ANDERSON)  Looking at the third page
23  of Exhibit 362, do you believe that that is Dave
24  Brincks' handwriting, sir, up in the right-hand
25  portion of the page next to the --

38  (Pages 146 to 149)

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

Page 182

1          MS. CITERA: Objection to form.
2     A.  You know, I don't recall who the customer
3  was.
4     Q.  (BY MR. ANDERSON)  You understand what Abbott
5  Home Infusion Services does, don't you?
6          MS. CITERA: Objection to form.
7     A.  Understand what they did?
8     Q.  (BY MR. ANDERSON)  Yeah.
9     A.  I'm not extremely familiar with their
10  business model.
11    Q.  Well, you understood at a basic level that
12  Abbott Home Infusion partnered with providers and
13  submitted reimbursement claims and shared in the
14  proceeds, don't you?
15         MS. CITERA: Objection to form.
16    A.  I can't say with certainty that I knew that.
17  I knew they had -- that they worked on setting up
18  pharmacies and different partnerships with
19  organizations.  Other -- the exact detail, I don't
20  recollect.
21    Q.  (BY MR. ANDERSON)  Let's continue on in
22  Exhibit 286.  You write, "Please notify Redbook and
23  Medispan of these changes ASAP.  They are the sources
24  for creating the AWP that is important to Alternate
25  Site."

Page 183

1          Did I read that correctly?
2     A.  Yes.
3     Q.  And is it true that back in March of '95 you
4  knew that AWP was important to Alternate Site?
5          MS. CITERA: Objection to form.
6     A.  You know, I can't say that I knew that it was
7  important to Alternate Site.  As I read that -- this
8  note, I can't remember what I was thinking or what the
9  actual intent of what is written.
10    Q.  (BY MR. ANDERSON)  Well, is it true that
11  those two sentences I just read are true statements?
12    A.  You know, I don't know.
13         MS. CITERA: Objection to form.
14    A.  I don't know if they are true statements or
15  not.  I can't comment enough and don't know enough
16  about the Alternate Site business.
17    Q.  (BY MR. ANDERSON)  Do you believe that those
18  two sentences were false?
19         MS. CITERA: Objection to form.
20    A.  I don't know.  I can't say.  I don't recall.
21  It was 12 years ago when I wrote that note.
22    Q.  (BY MR. ANDERSON)  Do you agree that back in
23  1995 you knew that Redbook and Medi-Span were some of
24  the sources of AWP information?
25         MS. CITERA: Objection to form.

Page 184

1     A.  You know, I don't know if I knew that for a
2  fact or if someone had told me that and I put that in
3  the e-mail.
4     Q.  (BY MR. ANDERSON)  Did you believe that, in
5  fact, it was true that Redbook and Medi-Span were the
6  sources of AWP information?
7          MS. CITERA: Objection to form.
8     A.  You know, I don't know what I recall from
9  back then on what the sources were.
10    Q.  (BY MR. ANDERSON)  Well, you wouldn't have
11  simply parroted something you heard from someone else
12  if you thought it was false, would you?
13         MS. CITERA: Objection to the form.
14    A.  No, I can't say -- I don't think I would have
15  intentionally put anything false.
16    Q.  (BY MR. ANDERSON)  It certainly wasn't your
17  practice to include false statements in any e-mails,
18  was it?
19         MS. CITERA: Objection to form.
20    A.  You know, I can't say.  Oftentimes statements
21  are taken out of context or the exact meaning is not
22  communicated, so I can't say that I had a thorough
23  understanding, or even knowledge, of the Alternate
24  Site business.
25    Q.  (BY MR. ANDERSON)  Do you have any idea why

Page 185

1  AWPs were important to Alternate Site back in 1995?
2          MS. CITERA: Objection to form.
3     A.  Back at that point in time in 1995, I -- to
4  my knowledge, I don't recall why it was important.
5     Q.  (BY MR. ANDERSON)  Did Mark Sebree tell you
6  why AWPs were important to Alternate Site?
7          MS. CITERA: Objection to form.
8     A.  I can't speak to -- I don't recall Mark
9  Sebree saying anything to me or having --
10    Q.  (BY MR. ANDERSON)  Did Dave Brincks tell you
11  that AWPs were important to Alternate Site?
12         MS. CITERA: Objection to form.
13    A.  I don't know that Dave Brincks mentioned that
14  AWPs were important to Alternate Site.  I know he
15  mentioned that making this change was something that
16  came from one customer and it could have been
17  important to that one customer and that was pretty
18  much my understanding.
19    Q.  (BY MR. ANDERSON)  Would Abbott typically
20  make list price changes based on the complaints of one
21  single customer?
22         MS. CITERA: Objection to form.
23    A.  I don't think that we often -- or I don't
24  recall making any other list price adjustments outside
25  the normal process, annual process.

47  (Pages 182 to 185)

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

Page 186

1    Q.  (BY MR. ANDERSON)  And you were part of that
2  annual process, correct?
3         MS. CITERA:  Objection to form.
4    A.  I was part of that annual process for
5  different products at different times, yes.
6    Q.  (BY MR. ANDERSON)  Over the years from the
7  mid-'90s to, what, 2003?
8    A.  Approximately.
9         MS. CITERA:  Objection to form.
10    Q.  (BY MR. ANDERSON)  Yeah.  Now, if you could,
11  sir, take a look at what's been marked in this case as
12  Exhibit 69.
13         MS. CITERA:  Where is that?
14         MR. WINTER:  We are getting it here for
15  you now.
16         MS. CITERA:  Okay.
17    Q.  (BY MR. ANDERSON)  Do you recognize Exhibit
18  69?
19    A.  It appears to be an e-mail from Jerrie
20  Cicerale.
21    Q.  You're referring to the top of the page where
22  Jerrie Cicerale is sending an e-mail to Harry Adams
23  dated April 27, '95?
24    A.  Yes.
25    Q.  And it has -- this e-mail has the subject

Page 187

1  line forward "Vanco List price," correct?
2    A.  FYI "Vanco List price," right.
3    Q.  And then looking at 286, isn't it true that,
4  basically, 286 is the initial e-mail you sent with the
5  subject Vanco list price?
6    A.  It appears that that's the same e-mail.
7    Q.  And that's the same e-mail that's at the
8  bottom of this e-mail conversation that's shown on
9  Exhibit 69, too, correct?
10    A.  They appear to be the same.
11    Q.  And, in fact, Jerrie Cicerale responded to
12  your March 20th, '95 e-mail, correct?
13    A.  Yes.  Just a few minutes after.
14    Q.  And she notified you that, "All the other
15  price changes are effective 4/3/95 - I will be sending
16  Redbook/MediSpan the prices changes as soon as I get
17  the new catalog, hopefully sometime this week.  I will
18  include a change on these items effective on 4/3
19  also."
20         Did I read that correctly?
21    A.  Yes.
22    Q.  And then you respond in turn and say,
23  "Thanks, Jer, for your help on this issue," correct?
24    A.  Yes.
25    Q.  Did you have business dealings from time to

Page 188

1  time with Jerrie Cicerale?
2         MS. CITERA:  Objection to form.
3    Q.  (BY MR. ANDERSON)  Pardon?
4    A.  Yes, I did.  She was in the Contract
5  Marketing Department as well.
6    Q.  And you were relatively friendly with Jerrie,
7  correct?
8         MS. CITERA:  Objection to form.
9    A.  We had a cordial working relationship.
10    Q.  (BY MR. ANDERSON)  And to the extent you
11  could provide Jerrie with pricing information, from
12  time to time you did it, correct?
13         MS. CITERA:  Objection to form.
14    A.  I'm not sure I understand the question.
15    Q.  (BY MR. ANDERSON)  Well, I'll rephrase it.
16  Jerrie worked in your department and you worked with
17  her and you-all shared pricing information from time
18  to time, correct?
19         MS. CITERA:  Objection to form.
20    A.  Jerrie worked in the contracting department,
21  it was in our systems area, and was one of the
22  administrators that kept track of all of our list
23  numbers and pricing.
24    Q.  (BY MR. ANDERSON)  And, accordingly, given
25  that job duty, Jerrie was involved, for instance, in

Page 189

1  maintaining the pricing, such as the Resource File on
2  the system, correct?
3         MS. CITERA:  Objection to form.
4    A.  No, that's not correct.  Jerrie Cicerale did
5  not maintain the Resource File.
6    Q.  (BY MR. ANDERSON)  What -- what pricing files
7  did Jerrie Cicerale maintain?
8    A.  To my knowledge, Jerrie Cicerale kept track
9  of all of the prices within our contracting system for
10  the list price, the -- she also had the government
11  price.  She was in charge -- she could run price lists
12  for any of our hospital-based products.  So she would
13  have other various duties adding list numbers and
14  whatnot as well.
15    Q.  Did Jerrie Cicerale have job duties involving
16  maintaining parameter prices, group prices, et cetera?
17         MS. CITERA:  Objection, form.
18    A.  I would say Jerrie Cicerale's role was that
19  of the administrator of the system of ensuring that
20  the appropriate price lists were run.
21    Q.  (BY MR. ANDERSON)  Including price lists that
22  showed available parameter pricing, for instance,
23  correct?
24         MS. CITERA:  Objection to the form.
25    A.  I'm not sure if she would have run those

48  (Pages 186 to 189)

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

Page 198

1  contacted you about these list price changes, did you
2  feel like you were qualified to help him?
3        MS. CITERA:  Object to the form.
4     A.  Dave was looking for a source in the hospital
5  contract marketing area for HPD and he knew me and he
6  knew I could help identify how we could get those list
7  prices changed.
8     Q.  (BY MR. ANDERSON)  So all in all you did feel
9  like you were qualified to assist in changing the list
10 prices, correct?
11        MS. CITERA:  Object to the form.
12    A.  I would say I -- I -- since this was one of
13 the products within the injectable arena that was part
14 of my responsibility, that I would be able to find how
15 we could go -- who actually could make the changes and
16 how we could get those done.
17    Q.  (BY MR. ANDERSON)  And -- and who was it that
18 you thought you needed to contact to make sure these
19 list price changes were done correctly?
20    A.  Based on my recollection, I thought it was
21 the marketing manager that I would consult with and
22 get his approval and then run it through the system.
23 Actually have, then, the changes implemented by Jerrie
24 Cicerale.
25    Q.  And, in essence, that's what happened, you

Page 199

1  ended up communicating with Mark Sebree, he approved
2  of the list price changes, and in turn you
3  communicated those to Jerrie Cicerale and she reported
4  new list prices for the Vancos, correct?
5        MS. CITERA:  Object to the form.
6     A.  I don't recall what the end point was.  I do
7  remember sending the information to Jerrie.  I don't
8  recall if the changes were ever made or that they were
9  reversed back.
10    Q.  (BY MR. ANDERSON)  Well, you mentioned
11 reversed back.  Do you have some memory of the fact
12 that the prices did not stay at the lower levels that
13 you suggested?
14        MS. CITERA:  Object to the form.
15    A.  To the best of my knowledge, what I recall
16 was someone from the hospital side came back to me in
17 the Trade Relations area and said that we don't change
18 list price except through the annual change process.
19 So I said, okay.  I went back to Dave, from my
20 recollection, and told him that we need to change
21 these back.  And that was my recollection, that we
22 moved them back to where they were originally.
23    Q.  (BY MR. ANDERSON)  Who told you that?
24        MS. CITERA:  Object to the form.
25    A.  It may have been our Trade Relations manager.

Page 200

1     Q.  (BY MR. ANDERSON)  Harry Adams?
2     A.  It may have been Harry Adams.
3     Q.  Is there anybody else that you believe was
4  the one who contacted you and said that list prices
5  only changed on an annual basis?
6     A.  I -- you know, to my knowledge it was -- it
7  most likely would have been Harry.
8     Q.  And is that what you were doing in Exhibit
9  733 where you're writing to Harry and others and --
10 and proposing new Vanco list prices that are higher
11 than the ones that you initially suggested back in
12 March of '95?
13        MS. CITERA:  Objection to form.
14    A.  This Exhibit 733, this possible spreadsheet
15 that I did, it appears that the person was suggesting
16 the new list prices from a May 4th meeting.
17    Q.  (BY MR. ANDERSON)  And do you know, sir, why
18 it is that you were suggesting that the new list
19 prices be an average of the prior list prices and the
20 suggested prices that you had recommended back in
21 March of '95?
22        MS. CITERA:  Object to the form.
23    A.  You know, I don't recall what the thought
24 processes were or, again, if, in fact, that -- that
25 was my spreadsheet as to how that rationale came

Page 201

1  about.
2     Q.  (BY MR. ANDERSON)  If I understand your
3  testimony correctly, you're saying basically Harry, or
4  someone, most likely Harry, came to you and said,
5  "Mr. Eichhorn, we don't change list prices during the
6  middle of the year.  We only do that on an annual
7  basis"; is that correct?
8        MS. CITERA:  Objection to the form.
9     A.  That would have been my understanding that
10 someone would have come to me and said, you know, we
11 don't change the list prices, so we need to change
12 them back.
13    Q.  (BY MR. ANDERSON)  Well, if that were the
14 case, sir, why didn't you in or about May 5th of '95
15 just simply suggest that the prior list prices be
16 reinstituted as opposed to suggesting an average list
17 price?
18    A.  You know, I don't recall why or how those
19 conversations took place.
20    Q.  That doesn't really seem to add up, does it?
21        MS. CITERA:  Objection to form.
22    A.  What doesn't add up?
23    Q.  (BY MR. ANDERSON)  Your memory of Mr. Adams
24 telling you to reinstitute the list prices and yet
25 your -- your suggestion on May 5th, '95 to create new

51  (Pages 198 to 201)

05c3df4c-cae2-4440-8cd9-a79dafa3cc6b

# EXHIBIT 23

# Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

    v.                         )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -


    Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

    MENTAL HYGIENE BY JOSEPH L. FINE


              Baltimore, Maryland

              Tuesday, December 9, 2008

              9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008

## Baltimore, MD

Page 82

1     A.   Initially.  And then Lederley was bought
2 out by Pfizer and -- that's how that works, you know.
3     Q.   And you were on the advisory board of the
4 Medicaid Pharmacy Bulletin for a time?
5     A.   Yes, I was.
6     Q.   As best I understand, the first publication
7 was in 1987.  Does that sound right?
8     A.   That sounds about right.
9     Q.   And you were on the advisory panel for how
10 long?
11     A.   I believe three years.
12     Q.   Were you on it after the three years were
13 up at any time?
14     A.   Yes.  Another two years.  They did it in
15 rotation.  I don't recall the second time.
16     Q.   Now, where did the publishers of the
17 Medicaid Pharmacy Bulletin get their information?
18     A.   From the Medicaid pharmacy administrators.
19     Q.   So --
20     A.   The panel got together and they discussed
21 what topics would be important to the other pharmacy
22 Medicaid administrators and then the company that

Page 83

1 published it would do their editorial work and write
2 up an article on this, do the investigation on it.
3 And then it would be submitted back to the panel for
4 review, editing and whatever before it would be
5 released.
6     Q.   Did you find that those bulletins were a
7 useful source of information?
8     A.   Yes, they were.
9     Q.   They had very reliable information in them?
10     A.   Absolutely.
11     Q.   Do you know -- did you maintain copies of
12 those?
13     A.   I did.  Before I left I had a whole book on
14 it.  I don't know -- I think I threw them out.
15     Q.   When you left the department -- let me back
16 up.
17     A.   I don't think I left it with the
18 department.  I didn't.
19     Q.   Did you take it with you?
20     A.   I think I did and I think I then discarded
21 it.
22     Q.   When did you throw them away?

Page 84

1     A.   2005.
2     Q.   Why did you throw them away?
3     A.   I was just cleaning.  I just had a lot of
4 papers.
5     Q.   Do you know how someone can get copies of
6 past issues of this publication?
7     A.   You'd have to probably inquire with
8 Parexel.  That was the last one -- it's no longer in
9 publication, by the way.
10     Q.   Did anything take its place?
11     A.   No.
12     Q.   When you left the department what did you
13 do with your files that you had?
14     A.   I left the files there.
15     Q.   You didn't take anything with you?
16     A.   No.  Other than my own personal
17 information, personal articles.
18     Q.   So you got to clean out your office and
19 start over.  That sounds like a good idea to me.  Any
20 other publications you can recall?
21     A.   I don't know what you're asking.
22     Q.   Relating to Medicaid pharmacy issues apart

Page 85

1 from the Green Sheets, Medicaid Pharmacy Bulletins and
2 the other ones we discussed.
3     A.   No.  Not that I can think of.  Oh.  There
4 is a compendia that comes out from the National
5 Pharmaceutical Council that does a survey of all
6 Medicaid programs.  You may have --
7     Q.   I know what you're talking about.
8     A.   Right.  Every state gets that and we used
9 it for review.
10     Q.   I'd like to hand you what we've marked
11 previously as Abbott Exhibit 81.  Mr. Fine, Abbott
12 Exhibit 81 is a document titled "Prescription drug
13 prices:  Are we getting our money's worth?  A majority
14 staff report of the Special Committee On Aging, United
15 States Senate."  Do you see that?
16     A.   I guess it's right before me.
17     Q.   Okay.  And have you seen this document
18 yourself before?
19     A.   No.
20     Q.   Do you know if the department followed the
21 work of the Special Committee On Aging, United States
22 Senate?  To see if it helps your recollection at all

Henderson Legal Services, Inc.

0bd2b054-a753-a4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008

## Baltimore, MD

Page 326

1    Q.   Are you ready?
2    A.   Yes.
3    Q.   Mr. Fine, you testified a few minutes ago
4  that you generally expect AWP to change over time; is
5  that correct?
6    A.   Sure.  Yes.  From my experience I've seen
7  it.  Manufacturers always have price changes, either
8  annually or semi-annually over the years.
9    Q.   I'll represent to you that this chart
10 represents the AWPs reported by Dey to First Databank
11 for ipratropium 25, the NDC number that's at the top
12 here, between 1996 and 2005.
13   A.   I see it.
14   Q.   And do you see the blue line at the top?
15   A.   Yes, I do.
16   Q.   That number is Dey's AWP for ipratropium.
17   A.   Okay.
18   Q.   Do you see it remains constant at 71 cents?
19   A.   Yes.  That's remarkable.
20   Q.   And is that inconsistent with what your
21 understanding was?
22   A.   That's very much -- yes.  It's inconsistent

Page 327

1  with my understanding of pharmacy and drug pricing.
2    Q.   And do you see the red line below which
3  represents Dey's WAC for ipratropium.  That price
4  changes over time, correct?
5    A.   Yes, it did.
6    Q.   Is that more consistent with what you would
7  expect to happen to the price?
8       MS. YAVELBERG:  Objection, form.
9    A.   I don't normally see a downward spiral when
10 it comes to drug prices.  What I see for drug
11 prices -- unless the product was initially a single
12 source innovator product and the patent was lost do I
13 see the price could go down.  But normally a product
14 would not be reduced in price over time.  It would
15 increase.
16   Q.   And when you say the price, what price do
17 you mean?
18   A.   Okay.  Now, the issue is if we're talking
19 about a single source product, is what I'm talking
20 about.  Ipratropium that is multiple source, meaning
21 other vendors --
22   Q.   Correct.

Page 328

1    A.   -- when other vendors come into the
2  marketplace I have seen and it's regular to understand
3  that the price will go down because of the competitive
4  nature of pricing for generic products.
5       MS. MANGIARDI:  Thank you.  That's the only
6  questions I had.
7       THE VIDEOGRAPHER:  Any more?
8       This deposition concludes at 6:23 and
9  consists of five tapes.
10      (Whereupon, at 6:23 p.m. the videotaped
11 deposition was adjourned.)
12            * * * * *
13
14      _____
15      SIGNATURE OF THE WITNESS
16
17 Subscribed and sworn to and before me
18 this _____ day of _____, 20____.
19
20
21 _____
22    Notary Public

Page 329

1  UNITED STATES OF AMERICA   )
2
3  STATE OF MARYLAND          )
4       I, JONATHAN WONNELL, a Notary Public in and
5  for the State of Maryland, do hereby certify that the
6  within transcript is a true and accurate record of the
7  testimony under oath and other proceedings in the
8  above-entitled matter.
9       I further certify that I am not a relative,
10 employee, attorney or counsel of any of the parties to
11 this action and that I am in no way interested in the
12 outcome of this matter.
13      IN WITNESS WHEREOF, I have hereunto set my
14 hand this _____ day of _____, 2008.
15
16
17
18      _____
19      JONATHAN WONNELL
20
21 My Commission expires:
22 November 21, 2011

83 (Pages 326 to 329)

0bd2b054-a753-4e97-a066-e37ff7ee308f

# EXHIBIT 24

Page 1

                IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )  MDL No. 1456

----------------------------)  Civil Action

This document relates to:       )  No. 01-12257-PBS

United States of America,       )

ex. rel. Ven-a-Care of the      )

Florida Keys, Inc.,             )  Hon. Patti Saris

    vs.                         )

Abbott Laboratories, Inc.,      ) Magistrate Judge

CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler


           Videotaped 30(b)(6) deposition of DAVID S.

FISHMAN, called by the Plaintiffs for examination,

taken pursuant to notice, agreement and by the

provisions of the Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before DEBORAH HABIAN, a

Notary Public within and for the County of Cook,

State of Illinois, and a Certified Shorthand Reporter

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 14

1    Q.  I just wanted to make sure we were using
2  the same terminology.
3    A.  Yes.
4    Q.  What about Alternate Site?
5    A.  I did a little bit of work with Alternate
6  Site.
7    Q.  What work did you do with Alt Site?
8    MS. CITERA:  I'm just going to caution you to
9  obviously not to reveal any privileged discussions.
10   THE WITNESS:  Okay.
11        I served as legal counsel for Alter
12  Site in the contracting arena.
13
14  BY MS. ST. PETER-GRIFFITH::
15   Q.  And when you say "in the contracting
16  arena," what do you mean?
17   A.  Reviewing contracts.  Providing legal
18  advice with respect to contracts.
19   Q.  Did you provide any legal advice
20  concerning compliance matters to HPD?
21   A.  Yes.
22   Q.  Okay, and what advice did you provide?

Page 15

1    A.  That would be privileged.
2    MS. CITERA:  I'm going to caution the witness
3  that would be privileged.
4    MS. ST. PETER-GRIFFITH:  Okay, I just want to
5  confirm, you're not asserting any advice of counsel
6  defense in this case, right?
7    MS. CITERA:  I'm not going there, but what --
8    MS. ST. PETER-GRIFFITH:  Well, what --
9    MS. CITERA:  His -- I mean if you want to ask
10  what type of compliance activities he did with or if
11  he did any compliance activities with HPD or Alternate
12  Site, that's fine, but what advice he gave, that would
13  be privileged.
14   MS. ST. PETER-GRIFFITH:  What's the distinction
15  between the two?
16   MS. CITERA:  Well, I mean one is his legal
17  advice.  The other is what -- you know, what types of,
18  you know, training or things like that, that that's
19  the distinction.  What types of training he did versus
20  what type of legal advice he may have gave to a -- to
21  his client is not appropriate and is not, you know,
22  what he's here to do.

Page 16

1    MS. ST. PETER-GRIFFITH:  So you're instructing
2  him not to answer?
3    MS. CITERA:  Yes.
4    MS. ST. PETER-GRIFFITH:  Okay.  Well, we
5  disagree with that instruction.  I mean, obviously,
6  you've proffered a lawyer as a 30(b)(6) rep.  I'm
7  entitled to inquire into this area, but you've given
8  your instruction.
9    MS. CITERA:  I mean I just to want add he's
10  here to testify about facts.  He's not here to testify
11  about any legal advice he gave.  He's not here, you
12  know -- any privileged conversations, that's not what
13  he's here for.  He's here to testify about, you know,
14  subject to our limitations and objections, the topics
15  that you've set forth.
16
17  BY MS. ST. PETER-GRIFFITH:
18   Q.  Sir, what did you -- oh, did you work with
19  the Home Infusion Business Unit?
20   A.  Yes.
21   Q.  Okay, what work did you do with them?
22   A.  I provided training and legal advice

Page 17

1  regarding contract drafting and consulting on contract
2  matters.
3    Q.  Do you remember which contracts you
4  consulted on?
5    A.  No.
6    Q.  What training did you provide to Home
7  Infusion?
8    A.  I provided a series of training on fraud
9  and abuse -- the fraud and abuse laws and on antitrust
10  laws and generally on the code of conduct, Code of
11  Business Conduct.
12   Q.  Did you participate in the drafting of any
13  materials concerning the Code of Business Conduct or
14  fraud and abuse laws?
15   MS. CITERA:  Objection.
16   THE WITNESS:  That's two questions.  I did not
17  participate in the drafting of the Code of Business
18  Conduct.  I did participate in drafting language on
19  fraud and abuse compliance matters.
20
21  BY MS. ST. PETER-GRIFFITH:
22   Q.  And is that true for Alt Site as well?

5 (Pages 14 to 17)

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 18

1      A.  They wouldn't have been --
2      MS. CITERA:  Objection to form.
3      THE WITNESS:  They wouldn't have been
4   directed -- the types of things that I drafted
5   wouldn't have been directed solely to Alternate Site
6   other than a presentation I may have given.
7
8   BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay, do you recall a presentation to Alt
10  Site?
11     A.  Yes.
12     Q.  What presentations did you give to Alt
13  Site?
14     A.  I gave them a presentation on fraud and
15  abuse laws and antitrust laws generally.
16     Q.  And when was that?
17     A.  I don't recall.
18     Q.  Do you recall what decade it was?
19     A.  '90s.
20     Q.  Early '90s, late '90s?
21     A.  It would have been after 9 -- since I
22  didn't support that business until after the fall of

Page 19

1   '95, it would have been between the fall of '95 and
2   when they stopped having a business.
3      Q.  Okay.  Now, the training on fraud and
4   abuse and antitrust, was that the same training that
5   you gave to the Home Infusion Business Unit?
6      MS. CITERA:  Objection to form.
7      THE WITNESS:  That's -- I thought -- I'm
8   confused by the question.  I think that you asked that
9   question already.
10
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Sure.  Did you -- let me break this down.
13  You provided training to both Alt Site and Home
14  Infusion, is that right, on fraud and abuse?
15     A.  No, Alt Site -- Home Infusion was part of
16  Alt Site.
17     Q.  Okay.
18     A.  So and in that regarded, I'd say it
19  limited to Home Infusion for presentations.
20     Q.  So you only gave presentations to Home
21  Infusion?
22     A.  That I recall, yes.

Page 20

1      Q.  Okay.  You didn't -- you don't recall any
2   to the Alt Site group itself?
3      MS. CITERA:  Objection to form.
4      THE WITNESS:  I do not recall.
5
6   BY MS. ST. PETER-GRIFFITH:
7      Q.  What is your experience or what was the
8   bases of your information for your pre -- the
9   presentation that you gave on fraud and abuse and
10  antitrust matters to the Home Infusion Business Unit?
11     A.  What was the basis?
12     Q.  Yes.
13     MS. CITERA:  Objection to form.
14     THE WITNESS:  The antikickback statutes and
15  safe harbor regulations.
16
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Did you personally review those?
19     A.  Yes.
20     Q.  Did you -- what sources did you use for
21  the presentation, just the stat -- the statutes
22  themselves?

Page 21

1      MS. CITERA:  Objection to the form.
2      THE WITNESS:  The presentations that we have --
3   that are stacked in front of me now, I don't recall
4   being an initial, original drafter of them.  They are
5   very similar in content.  So the -- I think it was
6   more of a template that existed.
7      MS. ST. PETER-GRIFFITH:  Okay, you say that
8   that's in front of you.  Why don't we mark the
9   composite exhibit as Exhibit 1 that's in front of you.
10  That way, the record is clear.
11     THE REPORTER:  Do you want the witness's name
12  on it or just No. 1?
13     MS. ST. PETER-GRIFFITH:  Yeah, I think we
14  need --
15     MS. CITER:  Put the witness's name on.
16     MS. ST. PETER-GRIFFITH:  Yeah.
17     THE REPORTER:  Okay.
18        (Exhibit Fishman 001, containing
19        Sub Nos. 1 through 40 inclusive,
20        was marked for ID)
21
22  BY MS. ST. PETER-GRIFFITH:

6 (Pages 18 to 21)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 30

1    Q.  Where did you search?
2    A.  I searched my files.
3    Q.  Anyone else's files?
4    A.  I talked to people who were -- would have
5  been at Abbott at that time, and nobody had any
6  documents other -- other than what I had.
7    Q.  Do you know why Abbott didn't retain a
8  copy of its Code of Business Conduct --
9    MS. CITERA:  Objection to the form.
10
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  (Continuing) -- for this period from '91
13 through '93?
14   A.  I -- I didn't know that they didn't retain
15 it.
16   Q.  Okay, but your search for that document
17 only involved going to the Office of Ethics and
18 Compliance and going to several people within the
19 Legal Department, right, Miss Goldberg and Miss
20 Sensinoff?
21   A.  Szazdanoff.
22   MS. CITERA:  Szazdanoff.

Page 31

1    MS. ST. PETER-GRIFFITH:  Szazdanoff.
2    THE WITNESS:  That is --
3    MS. CITERA:  Objection to form.
4    THE WITNESS:  That is correct.
5
6  BY MS. ST. PETER-GRIFFITH::
7    Q.  Okay, going back, what other
8  responsibilities did you have for the time period of
9  the fall of '95 through to 2004?
10   A.  As Commercial Attorney for each of those
11 divisions, all the Commercial Attorneys were
12 responsible for providing commercial legal services to
13 those businesses, which ranged from drafting
14 contracts, discussing issues that arose, legal matters
15 that arose, strategic business matters that arose,
16 buying companies, drafting licenses, distribution
17 agreements, whatever -- again, the Commercial demands
18 of the businesses was -- it was providing support for
19 those divisions for the U.S. operations.
20   Q.  Did your responsibilities entail anything
21 pertaining to price reporting or Abbott's relationship
22 with the price reporting compendia?

Page 32

1    MS. CITERA:  Objection to the form.
2    THE WITNESS:  No.
3
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Did you provide any legal advice
6  concerning price reporting during this time period?
7    MS. CITERA:  Objection to form.  Also I'm
8  obviously going to caution you to reveal any --
9    THE WITNESS:  Right.  To the extent --
10   MS. CITERA:  -- any of your discussions that
11 are privileged.
12   THE WITNESS:  To the extent I did or didn't
13 would be covered by attorney-client privilege.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  You can answer "yes" or "no" though.  I'm
16 not asking you about communication --
17   A.  What's the question?
18   MS. ST. PETER-GRIFFITH:  Can you read the
19 question back, please?
20   THE REPORTER:  Sure.
21     (Record read.)
22   MS. CITERA:  You can answer "yes" or "no."

Page 33

1    THE WITNESS:  Yes.
2
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  What advice did you give?
5    MS. CITERA:  Objection, privileged.
6    THE WITNESS:  That's -- any advice I would have
7  given would be covered by --
8    MS. ST. PETER-GRIFFITH::  Toni, do you intend
9  to -- does Abbott intend to rely upon an advice of
10 counsel defense?
11   MS. CITERA:  I'm not going there.  You ask this
12 question every deposition.
13   MS. ST. PETER-GRIFFITH:  Yes, I did because I
14 want your -- you to answer.
15   MS. CITERA:  I'm not making any stipulations or
16 statements.  You're here to ask questions of the
17 witness.  You're not here to ask questions of me.
18 This -- your question is clearly privileged.  He's not
19 going to answer it.
20
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  What other responsibilities did you have

9  (Pages 30 to 33)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

---

Page 50

1  Abbott?
2      A.  No, I consulted with the law firms that I
3  mentioned.
4      Q.  Okay, did you consult with them concerning
5  compliance with Medicare and Medicaid fraud and abuse?
6      MS. CITERA:  Objection to the form.  Also
7  obviously don't reveal any of the subject matter of
8  your conversations.
9      THE WITNESS:  I believe I answered -- I believe
10 that's the answer to the previous question, which law
11 firms did I consult on the subject matters.  So, yes,
12 I did consult with them.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay, what else did you do in assisting
16 HPD with its Medicare and Medicaid fraud and abuse
17 compliance?
18     A.  We provided regular training and made
19 ourselves available for them to contact whenever there
20 was any questions or concerns they had.
21     Q.  Were you the only one providing assistance
22 to HPD concerning Medicare or Medicaid fraud and abuse

---

Page 51

1  compliance for this '95 through 2004 time frame?
2      A.  No.
3      Q.  Who else was?
4      A.  About 80% of the names I mentioned
5  previously.  You want a list of all the names that I
6  can recall?
7      Q.  Um-hum.
8      A.  Honey Lynn Goldberg, Jim Albrecht, Mark
9  Habeberger, Priscilla Porembski -- this was '94
10 to 2000 -- '95 to 2004?
11     Q.  Yes.
12     A.  (Continuing) -- Lisa Edmonds, the new name
13 I had mentioned previously, Lynn Boehringer, Kate
14 Collins, Peter Petros, and one other name I forgotten
15 Ngozi, N-g-o-z-i, Watts, Salina Thomas, Simi Chabria.
16 That's -- she may have been after 2004.  I don't know.
17 I don't remember.
18     Q.  Let's round this out.  After 2004, what
19 were your job responsibilities?
20     A.  My job responsibilities from 2004
21 through -- through August of 2006 remained the same,
22 although the -- again, the company structure was

---

Page 52

1  different.
2      Q.  Well, did -- you weren't working with HPD,
3  right?
4      A.  Well, HPD didn't exist, so no.
5      Q.  Okay, you weren't working with AHD?
6      A.  AHD didn't exist, but I was working with
7  the businesses that the -- the medical products -- the
8  Medical Products Group.
9      Q.  Okay.
10     A.  I supported the Medical Products Group.
11     Q.  Okay, did you work at all with PPD?
12     A.  Not until August of 2 -- August of 2006.
13     Q.  Okay, what were your job responsibilities
14 working with the Medical Products Group from '04 to
15 '06?
16     A.  Provide broad commercial legal services to
17 the businesses that were part of the Medical Products
18 Group.
19     Q.  Anything else?
20     A.  I was in a supervisory role, so managing
21 people.
22     Q.  And after August of 2006?

---

Page 53

1      A.  I became the sole client in -- on the
2  pharma side was the Business Development Group.  So I
3  did transactions for pharma.
4      Q.  Can you explain that?
5      A.  I did transactional work -- as opposed to
6  providing day-to-day legal services for an ongoing
7  business, I did transactional work.  M & A were -- was
8  lead attorney in the acquisition of Coast
9  Pharmaceuticals.  I did strategic alliance
10 arrangements, licensing deals, larger transactions
11 that came out of our Business Development Group on the
12 pharma side.
13     Q.  Okay, and when you say "pharma," you don't
14 mean the -- you mean -- that's just a term within
15 Abbott.  You're not referencing the -- the lobbying --
16     A.  Oh, no, no, I'm sorry.
17     Q.  Okay.
18     A.  It's -- the pharmaceutical products, P --
19 our Pharmaceutical Products Group.
20     Q.  Okay, I just wanted to clarify that.
21     A.  Yeah, different shades in the Medical
22 Products side.

14  (Pages 50 to 53)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 62

1     Q.  Oh, I'm sorry.  No.  If that's -- okay,
2  for AWP, that's what he told you?
3     A.  That's what he told me about AWP.
4     Q.  Okay.  And in terms of the OEC policy, if
5  you could pull out Tab 38 of Exhibit 1?
6     A.  (Witness so doing).
7     MS. CITERA:  Do you have a copy?  Oh, yeah, I'm
8  sorry.
9     MS. ST. PETER-GRIFFITH:  It's right in front of
10  you, Toni.  I tried to give it to you in advance.
11     MS. CITERA:  But the numbers don't correspond
12  or they do correspond?
13     MS. ST. PETER-GRIFFITH:  They do, they do.  The
14  numbers at the bottom do correspond.
15
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Sir, is that the policy that you're
18  referencing?
19     A.  No.
20     Q.  Okay, what --
21     A.  This is a procedure.
22     Q.  Okay, what OEC policy are you talking

Page 63

1  about?
2     A.  There was a corporate -- the corporate
3  policies and then division procedures, the corporate
4  policy on reimbursement information.
5     Q.  Is that in that stack right there?
6     A.  I don't know.
7     Q.  Is -- was it part of this production that
8  was made to me on the 7th, do you know?
9     A.  I don't know what was pro -- I don't know
10  what was produced.
11     Q.  What did the document look like?
12     A.  Similar to this, smaller print, smaller
13  font.  It is a policy, it had Charlie Brock's name on
14  the bottom, different dates.  It would have --
15     MS. CITERA:  And I'll just interject.  This
16  would have been produced to you previously.
17     MS. ST. PETER-GRIFFITH:  I don't think it was.
18  I've gotten every document, and I haven't seen that
19  document.
20     MS. CITERA:  And I swear I saw a Bates number
21  on it.  I'll --
22     MS. ST. PETER-GRIFFITH:  If you could check?

Page 64

1     MS. CITERA:  Yeah.
2     MS. ST. PETER-GRIFFITH:  And I have to tell
3  you, Toni, that I certainly would have remembered it
4  if Shelly Brock's name was on it.
5     THE WITNESS:  Charlie.
6     MS. CITERA:  Charlie Brock.
7     MS. ST. PETER-GRIFFITH:  Oh, Charlie.  I was
8  going to say that Shelly Brock was a name that I'd
9  never heard of before.
10     THE WITNESS:  I don't even think he has a
11  relative by that name.  These look like all
12  presentations.
13     MS. ST. PETER-GRIFFITH:  Yeah, the earlier ones
14  are presentations.
15     MS. CITERA:  No, I looked through it.  I didn't
16  see it.
17     THE WITNESS:  Oh, you saw it, okay.
18
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay, well, we'll go back to that.
21     A.  Okay.
22     Q.  Other than AWP, what additional matters

Page 65

1  did you discuss with Mr. Sellers?
2     A.  We talked about the compliance activities
3  in that time frame that were relevant -- that were
4  provided to -- to the division, and while I was
5  busy -- I was participating in providing a lot of that
6  training activity or would have been one of the
7  attorneys providing that training activity, it was
8  refreshing my recollection and confirming my
9  understandings.
10     Q.  What did he tell you that refreshed your
11  recollection and confirmed your understanding?
12     A.  That we gave presentations to various
13  internal client groups within Abbott, specifically
14  HPD, on fraud and abuse.
15     Q.  To various client groups, did you say?
16     A.  Internal client, my clients.  As an Abbott
17  attorney, it would be my clients.
18     Q.  Okay, not Abbott clients?
19     A.  Not Abbott customers.
20     Q.  Customers, okay.
21     A.  Clients as an attorney.  Mike was my
22  client.

17 (Pages 62 to 65)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 66

1    Q.  Okay, and presen -- what else did Mike
2  Sellers tell you?
3    A.  I'm having difficulty differentiating what
4  he told me versus what I knew.  The purpose of the
5  call was to talk about the compliance activities in
6  HPD in the relevant time frames.  So it would have
7  been -- as a broad matter, it would have been that.
8  So it was fraud and abuse, the guidelines, the
9  operating guidelines, the policy, procedures.  We
10  talked about the handbook that followed the
11  guidelines.
12    Q.  Is that the Handbook For Business
13  Executives?
14    A.  That's the Fraud and Abuse Handbook.  I
15  don't remember the exact -- that's the -- that might
16  be the business -- the proper name, but it was the
17  Fraud and Abuse Handbook from 2000 -- 2000.
18    Q.  From 2000?
19    A.  Yes.
20    Q.  Okay.  Well, we'll go over it later.  What
21  else -- what policies did you discuss with
22  Mr. Sellers?

Page 67

1    A.  We talked about the reimbursement poli --
2  corporate policy and the HPD procedure on
3  reimbursement.
4    Q.  Anything else?
5    A.  Not that I can recall.
6    Q.  Okay, is there anything else -- how long
7  did your conversation with Mr. Sellers last?
8    A.  Between thirty minutes and an -- and an
9  hour.
10    Q.  Is there anything else that you recall him
11  telling you?
12    A.  Retirement wasn't that fun.
13    Q.  Toni keeps him busy?
14    MS. CITERA:  Tina.
15    MS. ST. PETER-GRIFFITH:  Or Tina, okay.
16    MS. CITERA:  Or really you guys.
17    THE WITNESS:  I mean we had personal -- I
18  hadn't -- he had moved to Hospira in 2004.  I hadn't
19  seen him since, so -- I worked with him a long time,
20  so we also spent time just chatting.
21
22  BY MS. ST. PETER-GRIFFITH:

Page 68

1    Q.  Okay, anything else that you can recall
2  that -- other than the personal conversations that
3  educated in preparation for today's deposition?
4    A.  Not that I can recall.
5    Q.  Okay, what about your conversations with
6  Ms. Tobiason?  First, did you speak with her in
7  person?
8    A.  No, it was by phone.
9    Q.  How long was your phone call?
10    A.  They were scheduled an hour, and I
11  don't -- again, I would say a half hour to an hour.  I
12  don't recall any of the -- you know, for all of those,
13  they were all scheduled an hour, and I don't know that
14  we took the full hour for any of them.  We may have.
15    Q.  And what did you discuss with Miss
16  Tobiason?
17    A.  We talked about -- she described -- again,
18  generally she educated -- reeducated me on Medicare
19  pricing -- Medicare/Medicaid pricing arrangements, HIP
20  codes, DRGs, et cetera.
21    Q.  Did you say HIP codes?
22    A.  (Witness nodding).  I think there's -- HPT

Page 69

1  codes?
2    MS. CITERA:  I think he means HICPICs.
3    MS. ST. PETER-GRIFFITH:  HICPICs, okay.
4    THE WITNESS:  HICPICs?  Some -- okay, yeah,
5  I'm --
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  DRGs, okay.
9    A.  So we talked about just the regulatory
10  environment around reimbursement.
11    Q.  What about the regulatory environment
12  abound -- abound -- around reimbursement?
13    A.  Just she would have mentioned -- she would
14  have described the structure of it, like you said,
15  with HIP codes --
16    Q.  HICPICs?
17    A.  HICPICs, sorry.  (Continuing) -- DRGs,
18  billing codes.  We talked about AMP and best pricing.
19  We talked about her recollections of -- which were
20  similar to Mike's on the practice of -- of hand -- of
21  how AWP was handled within the division.
22    Q.  Okay, what did she tell you about how AWP

18 (Pages 66 to 69)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                        March 12, 2008

Page 70

1  was handled within the division?
2      A.  Her recollection was that AWP was not
3  something that they talked to customers about.
4      Q.  Okay, anything else?
5      A.  Talked about the process for her
6  involvement in formulating the -- ultimately the OEC
7  policies and procedures in 2003, in -- in 2004 and
8  beyond.
9      Q.  And what policies did she formulate?
10     A.  She was involved in -- in the
11 reimbursement information and support policy and
12 procedure.
13     Q.  Okay, what did she tell you about that?
14     A.  Just that she -- she was involved in
15 reviewing and pre -- reviewing and revising as
16 appropriate, to -- to reflect their understanding of
17 the policy.
18     Q.  To reflect whose understanding of the
19 policy?
20     A.  Well, hers would have been her
21 understanding of it.  I mean she was one -- she was --
22 there was input -- she was one input.  So it would

Page 71

1  have been hers.
2      Q.  Okay, anybody else that participated in
3  the drafting of that reimbursement policy?
4      A.  I don't know.
5      Q.  Did she mention anybody else?
6      A.  I know in the drafting -- in the
7  implementation -- in the formulation of it, Cliff
8  Berman would have been involved, Katherine Szazdanoff
9  would have been involved.
10     Q.  Okay, anything else?
11     A.  I don't think so.
12     Q.  Other than the OEC policy, was there
13 anything else that she discussed with you?
14     A.  Other than what I've mentioned, no.
15     Q.  Okay, what did she tell you about AMP and
16 best pricing?
17     A.  She would just have described how Abbott
18 would be responsible for providing AMP and best
19 pricing information in periodic reports that it had to
20 submit to the government.
21     Q.  During what period of time was that
22 referencing?

Page 72

1      A.  I don't know what -- I don't -- she -- she
2  left HPD at some point in time and became part of OEC.
3  So I don't -- I don't know what time frame she would
4  have been referring to.
5      Q.  You don't know whether it was her OEC
6  experience or her HPD experience?
7      A.  I don't know that -- how easily those are
8  differentiated.
9      Q.  So you don't know when she was talking
10 about AMP and best pricing whether she was talking
11 about, for example -- well, when was OEC created?
12     A.  OEC?  Charlie was appointed Chief
13 Compliance Officer late 2000.
14     Q.  In late 2000?  Okay.  Do you recall
15 whether or not she was involved with OEC then?
16     A.  Initially, she was -- she advised -- she
17 advised me that she was not.
18     Q.  She was not, okay.  So in --
19     A.  But she also -- she was not with HP -- she
20 had moved over to ADD at some point as well.
21     Q.  Okay, so the information that she gave you
22 concerning AMP and best pricing, you don't know if it

Page 73

1  was, say, post 2002 when she joined OEC or if she was
2  referencing her HPD experience?
3      A.  The information she provided was not --
4  was not year specific.  It was general information
5  about the process.
6      Q.  What about concerning HICPICs codes, DRGs
7  and the structure of the Medicare and Medicaid pricing
8  arrangements?
9      A.  It was a summary of that arrangement -- of
10 those arrangements.  It was not -- it would not have
11 been, In 1995, XY and Z, 1996 only X and Y.  It was
12 only a general summary of those pricing structures --
13     Q.  Do you --
14     A.  -- or coding structures.
15     Q.  Okay.  Did she -- well, what else do you
16 recall about the summaries that she provided?
17     A.  That -- in DRGs, that the vast
18 predominance of HPD's business were tied to DRGs
19 because it was -- it was a hospital
20 institutional-based sales customer base.
21     Q.  Okay, what else did she tell you?
22     A.  That's all that I can recall.

19 (Pages 70 to 73)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                                    March 12, 2008

Page 142

1  evaluate whether or not the Home Infusion consignment
2  arrangements and revenue share contracts were in
3  compliance with federal and state Medicare and
4  Medicaid fraud and abuse statutes and regulations?
5      MS. CITERA:  Objection, asked and answered.
6      THE WITNESS:  Abbott would have -- Abbott, the
7  Legal Department, obtained, reviewed, read statutes
8  directly and regulations and would have consulted with
9  outside counsel on a case-by-case basis.  We would
10 have educated ourselves through periodicals and other
11 advisory documents that would have been presented from
12 external sources.
13     MS. ST. PETER-GRIFFITH:  Okay, we will pick up
14 on this after the break, but there's five minutes left
15 on the tape.
16     MS. CITERA:  Okay.
17     MS. ST. PETER-GRIFFITH:  So why don't we take a
18 break.
19     THE VIDEOGRAPHER:  Going off the record at 1:19
20 a.m. -- 11:19 a.m.
21          (Recess taken.)
22     THE VIDEOGRAPHER:  Beginning of Videotape No. 3

Page 143

1  in the deposition of Mr. Fishman.  We're back on the
2  record at 11:30 a.m.
3
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Mr. Fishman, I'm going to get back on task
6  here a little bit.  I've got a couple of follow-up
7  questions though.
8          Prior to the break, we were
9  discussing what Abbott did to confirm that its Home
10 Infusion Business Unit basically business model of
11 consignment or risk sharing agreements complied with
12 state and federal Medicare and Medicaid laws.
13         Other than work done within the Legal
14 Department, did Abbott's Home Infusion Business Unit
15 do anything else to verify whether or not its Home
16 Infusion business model of consignment arrangements or
17 risk share contracts complied with or violated state
18 and federal Medicare/Medicaid fraud and abuse
19 statutes?
20     MS. CITERA:  Objection to the form.
21     THE WITNESS:  I'm not sure that was the same
22 question you asked before, but -- or a follow-up to

Page 144

1  the same question, but the business unit would not
2  have -- should not have made -- reached legal
3  conclusions about any of its practices.
4          As a general rule, again, Abbott had
5  business -- a Code of Business Conduct.  All Abbott
6  employees were obligated to adhere and comply with all
7  laws including federal healthcare laws, so they had an
8  overriding standard to adhere to.
9          What they would have done to ensure
10 compliance, is that the question?
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Yes.
14     A.  As managers, managers had responsibility
15 to supervise its employees.  So they would have been
16 working with employees, making sure they adhered --
17 they adhered to -- to the laws.
18     Q.  Okay, but my question is particular to the
19 Home Infusion Business Unit model of consignment
20 arrangements.
21     A.  Yes, my answer would have to be I'm not
22 aware of -- what I described would be applicable to

Page 145

1  all business units.
2      Q.  Okay.
3      A.  And I'm not aware that the Home
4  Business -- Home Infusion would have done anything
5  over and above that.
6      Q.  Okay, so ultimately then, the -- the
7  compliance check, if you will, on whether or not this
8  particular business model was in compliance with
9  federal and state Medicare/Medicaid fraud and abuse
10 statutes, that would rest with the in-house counsel?
11     MS. CITERA:  Objection to form.
12     THE WITNESS:  The determination of compliance,
13 the legal evaluation of facts as applied against
14 regulations and laws would have been a legal
15 determination.  Again, once the legal determination,
16 when given and communicated to the business,
17 compliance with that determination would be everyone's
18 obligation.
19
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay.  But in terms of doing that initial
22 evaluation, that would be done within the Legal Unit?

37 (Pages 142 to 145)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 146

1    A.  It should have been.
2    Q.  Okay.  And is that -- that's true for all
3  of HPD?
4    A.  That's true for all of Abbott.
5    Q.  Okay.  Another clean-up matter that I want
6  to get to --
7    A.  Okay.
8    Q.  -- is, sir, you referred earlier to an OEC
9  policy with Charles Brock's name on it.  I'd like to
10  mark this as Exhibit 2 and ask you, sir, if this is
11  the policy you were talking about?
12    MS. CITERA:  Do you have my copy?  I mean --
13  oh, I gave you four copies, right.
14    MS. ST. PETER-GRIFFITH:  Here you go.
15    MS. CITERA:  Thank you.
16    THE WITNESS:  This is the policy I was
17  referring to, yes.
18    MS. ST. PETER-GRIFFITH:  Okay, can we mark that
19  as Exhibit 2?
20    THE WITNESS:  Yeah.
21    MS. ST. PETER-GRIFFITH:  Could you just give
22  that to --

Page 147

1    THE WITNESS:  Oh, I'm sorry.  (Tendering
2  document).
3         (Exhibit Fishman 002 was
4         marked for ID)
5
6  BY MS. ST. PETER-GRIFFITH::
7    Q.  Okay, sir, going back to your
8  communications with Mr. Taylor, did you have any other
9  communications with Mr. Taylor?
10    A.  Can you re --
11    Q.  Sure.
12    A.  -- restate what you have so far that I've
13  said I said?
14    Q.  Sure.  You discussed two things with
15  Mr. Taylor, the communications with Mr. Fischer and
16  Mr. Tootell --
17    A.  Right.
18    Q.  -- and the operations or commercial advice
19  for the H -- for HPD when he held the position before
20  you did from '91 through '95?
21    A.  Right.  And then I would add a third
22  thing, which was the operating guidelines.  We worked

Page 148

1  in tandem from the Legal organization to issue the
2  operating guidelines, that each division had its own.
3  We were working to maintain consistency and
4  uniformity, where appropriate.  And he was supporting
5  Ross.  I was tasked with supporting and -- Lynn
6  Boehringer and I were tasked with supporting HPD.  So
7  we worked -- we talked about having worked together to
8  do -- to issue those guidelines back in '99.
9    Q.  Okay, in '99?
10    A.  Correct, August.
11    Q.  And did -- what specifically did Mr.
12  Taylor discuss with you about that?
13    A.  Mostly confirming it, and we joked how we
14  had a deadline and we were up 'til 3 in the morning
15  finishing it.
16    Q.  I see.  Anything else about that you can
17  recall of your conversation with Mr. Taylor?
18    A.  No.
19    Q.  What con -- what conversation did you
20  have -- is it Miss Pence-Leav, Miss Pence-Levy?
21    A.  Miss -- Ms. Pence-Levy, P-E-N-C-E -
22  L-E-V-Y, Melissa.

Page 149

1    Q.  Okay, and what did you --
2    A.  You can tell I've dictated documents
3  before.
4    Q.  What do you recall about your conversation
5  with Ms. Pence-Levy?
6    A.  My conversation with Ms. Pence-Levy
7  pertained to the questions -- the issues that Mike
8  Tootell apparently raised in deposition testimony
9  regarding concerns, specific concerns he had about
10  AWP.
11    Q.  And what did you dis -- what did Miss
12  Pence-Levy discuss with you about that?
13    A.  She reminded me that she came onboard in
14  May time frame of 2003.
15    Q.  Oh.
16    A.  So any conversations that would have been
17  prior to that, she can't talk to at all, but she had
18  no recollection of Mike coming to her regarding that
19  subject -- regarding AWP subject matter in any
20  concerned way.
21    Q.  Do you recall any -- did you discuss
22  anything else with Miss Pence-Levy?

38 (Pages 146 to 149)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 286

1 less, but I don't have to document them.
2     MS. ST. PETER-GRIFFITH:  Oh, I -- I don't doubt
3 that.
4
5 BY MS. ST. PETER-GRIFFITH:
6     Q.  Sir, did Abbott -- for purposes of
7 evaluating its HPD Medicaid/Medicare fraud and abuse
8 compliance obligations, did Abbott ever consider
9 whether it's pricing and its decision to report prices
10 that created spreads of fifty, a hundred, a thousand
11 percent or more implicated Medicaid or Medicare fraud
12 and abuse?
13     MS. CITERA:  Objection to the form.
14     THE WITNESS:  In the presen -- in the training
15 environment that I op -- that I operated in and other
16 Commercial Attorneys operated in, AWP and pricing was
17 not something that we addressed.
18         Again, back to -- I think I said
19 earlier, to the extent questions may have come in to
20 me about AWP, we would have referred them to
21 Litigation.
22

Page 287

1 BY MS. ST. PETER-GRIFFITH:
2     Q.  Did Litigation give any presentations
3 concerning pricing or AWP?
4     A.  Not to my knowledge.
5     Q.  Why not?
6     A.  I mean I can't answer why they didn't.
7     Q.  Did anyone within Abbott ever evaluate
8 whether or not its maintenance of spreads between what
9 it was actually selling to customers and its AWPs were
10 violative of Medicare or Medicaid fraud and abuse
11 laws?
12     MS. CITERA:  Objection to the form, outside the
13 scope.
14     THE WITNESS:  Any analysis that would or
15 wouldn't have occurred would be a legal privilege.
16     MS. CITERA:  Also privileged.
17
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Why would it be a legal privilege?  I'm
20 asking whether Abbott ever undertook that evaluation.
21     A.  I don't know whether they undertook that
22 evaluation.

Page 288

1     Q.  Who would undertake that evaluation on
2 behalf of Abbott?
3     A.  The Legal Department.
4     Q.  Anyone else?
5     A.  They -- no one else should.
6     Q.  Did Abbott's Legal Department ever
7 undertake that evaluation?
8     MS. CITERA:  Objection to form, also objection
9 to the extent it seeks privileged communications,
10 outside the scope.
11     THE WITNESS:  To my knowledge -- to my
12 knowledge, the Commercial -- the Commercial lawyers
13 did not.  I don't know whether the Litigation
14 attorneys did.
15
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Who would know that?
18     A.  Whoever was the head of Litigation.
19     Q.  Did you do anything to ascertain what
20 steps may have been taken to confirm Abbott's pricing
21 practice -- that confirmed that Abbott's pricing
22 practices were in conformity with Medicare and

Page 289

1 Medicaid fraud and abuse statutes within the
2 Litigation Department?
3     MS. CITERA:  Objection to form.
4     THE WITNESS:  I did not have a conversation
5 with Litigation.
6
7 BY MS. ST. PETER-GRIFFITH:
8     Q.  In 2001, did Abbott reduce its list prices
9 on certain HPD products for any reason pertaining to
10 Medicare or Medicaid fraud and abuse laws?
11     MS. CITERA:  Objection to the form, outside the
12 scope.
13     THE WITNESS:  Not to my knowledge.
14
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Okay, sir, we left off with you learned
17 laws through -- is there anything else -- other than
18 the presentations that you've described when you said
19 that we do not have all of them in front of us --
20     A.  I have to assume that these are not all of
21 them because most -- many of the -- I don't know if
22 things dated -- things that were given in 1994 would

73 (Pages 286 to 289)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                              March 12, 2008

Page 314

1  information to Abbott's -- no, to -- or to the
2  reporting compendia by Abbott.
3      MS. CITERA:  I'm just going to object to the
4  characterization as "false list prices."
5      THE WITNESS:  To my understanding, Abbott --
6  the third party created the spread.
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  But they created the spread based upon
10 information provided to them by Abbott, right?
11     MS. CITERA:  Objection to the form, outside the
12 scope.
13     THE WITNESS:  To my understanding, we would
14 have provided information to the compendia.
15
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Okay.  And what did Abbott do to ensure
18 that the information provided to the compendia did not
19 violate the Federal False Claims Act or Medicaid and
20 Medicare fraud and abuse statutes?
21     A.  To the extent --
22     MS. CITERA:  Object, to the form.

Page 315

1      THE WITNESS:  To the extent those laws
2  specifically defined those terms and addressed what
3  was expected of participants operating under the
4  statute, they would have complied with the law.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  How do you know that?
7      A.  Because they're instructed to comply with
8  the law.
9      Q.  What instructions were they given?
10     MS. CITERA:  Objection to the form.
11     THE WITNESS:  I don't have a specific
12 instruction.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay.  Because you testified earlier that
16 there was no training on pricing and AWP --
17     A.  Legal training.
18     Q.  No legal training?
19     A.  (Witness nodding).
20     Q.  Okay.  Was there another resource that HPD
21 employees had available to them to -- that they could
22 go to to ensure that their practices concerning

Page 316

1  pricing and price reporting didn't violate federal or
2  state Medicare or Medicaid fraud and abuse laws?
3      A.  They should not have gone to any source
4  other than Legal.
5      Q.  Okay, did they go to Legal with questions
6  concerning pricing and Medicare or Medicaid fraud and
7  abuse statutes?
8      MS. CITERA:  Objection to the form, outside the
9  scope.  I also caution you not to reveal any
10 privileged discussions.
11     THE WITNESS:  Did they come -- again, the
12 breadth of the question, Did they come to Legal to
13 talk about Medicare or Medicaid pricing questions,
14 yes.
15
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Okay, who came to Legal and discussed it?
18     MS. CITERA:  Same objections, same instruction.
19     THE WITNESS:  I don't -- I don't -- I don't
20 know specific names.  It would have been part of --
21 anytime that people working within HPD had a question
22 that they felt raised legal questions in their mind or

Page 317

1  were uncertain as to what the legal call was as to how
2  you did something, they would have called Legal.  It
3  would have been part of everyday, and whether there
4  was a call everyday on pricing, the answer is no.  Was
5  there -- well, again, you're describing a time frame
6  '91 to 2002 or 2001.  The Legal Department served as
7  the legal advisor to the division and would have
8  answered questions on a periodic basis.
9
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  At any time did anyone within the Hospital
12 Products Division raise a question with Abbott Legal
13 Division about its pricing conduct and the compliance
14 of its pricing conduct with Medicare and Medicaid
15 fraud and abuse statutes?
16     MS. CITERA:  Same objections and instructions.
17     THE WITNESS:  Not to my knowledge.  I can't
18 speak to what Litigation might have known.
19
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  What did you do to investigate whether or
22 not any such inquiry was made?

80 (Pages 314 to 317)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 330

1      MS. CITERA: Objection to the form.
2      THE WITNESS: All people were required to
3  follow Medicare and Medicaid fraud and abuse laws.
4
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  And that's true for those individuals that
7  worked with Abbott's AWPs?
8      A.  That would be --
9      MS. CITERA: Objection to form.
10     THE WITNESS: That would be true of all
11  employees.
12
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Okay.  And from any time including from
15  1991 to the 2000?
16     MS. CITERA: Objection to form.
17     THE WITNESS: It would be as long as the law
18  was in effect, which even predated '91, but yes.
19
20  BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay.  If that's the case, how did Abbott
22  as a matter of policy permit its list or catalog

Page 331

1  prices to receive annual price increases on drugs when
2  the market prices decreased?
3      MS. CITERA: Objection to the form, outside the
4  scope.
5      MS. ST. PETER-GRIFFITH: It's not outside the
6  scope.
7      THE WITNESS: That's -- that would be a
8  business decision, and I couldn't address pricing that
9  I'm aware of was tied to CPI.
10
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Okay, pricing -- what pricing?
13     A.  Pricing generally.
14     Q.  List pricing, catalog pricing?
15     A.  Well, price -- the business practice was
16  looking at pricing and considering CPI is what I
17  understand.
18     Q.  Okay, were there any implications
19  concerning Abbott policy and Abbott's policy that
20  employees comply with Medicare and Medicaid fraud and
21  abuse statutes implicated through that business
22  practice of pricing?

Page 332

1      A.  I --
2      MS. CITERA: Objection to form, outside the
3  scope to the extent you're asking him to give a legal
4  opinion.
5      THE WITNESS: I believe when you talk about
6  whether a particular activity is implicated by a
7  statute, you're asking me to reach a legal conclusion.
8
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Well, did Abbott consider Medicaid and
11  Medicare compliance in its decision making concerning
12  the business practice of setting its annual catalog
13  and list prices and decreasing its market product
14  prices?
15     MS. CITERA: Same objections.
16     THE WITNESS: Abbott considered compliance with
17  all laws in -- in each of its activities that it would
18  have conducted.
19
20  BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay, what did it do to evaluate
22  compliance with Medicaid and Medicare laws in the

Page 333

1  context of its decision to increase annually its
2  listing catalog prices, while at the same time it was
3  decreasing its prices to its customers?
4      MS. CITERA: The same objections, and also I
5  would caution you not to reveal any privileged
6  discussions.
7      THE WITNESS: Could you -- I'm not -- what's
8  the -- what the kind of predicate of the question?  I
9  understand -- would you repeat the question?
10     THE REPORTER: Sure.
11         (Record read.)
12     THE WITNESS: I believe an evaluation of
13  compliance with laws is what lawyers do, and I think
14  that's privileged, a privileged conclusion.
15
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  I want to know what Abbott did.
18     MS. CITERA: Same objections, same instruction.
19     THE WITNESS: Abbott through the conduct of its
20  Legal Department would have been making legal
21  determination of compliance with law, and that
22  conclusion is privileged.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

Page 362

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


----------------------------------x
In re:  PHARMACEUTICAL INDUSTRY    )   MDL DOCKET NO.
                                   )
AVERAGE WHOLESALE PRICE            )   CIVIL ACTION
                                   )
LITIGATION.                        )   01CV12257-PBS
-------------------------------  x
                     VOLUME II


        The videotaped 30(b)(6) deposition of ABBOTT

(DAVID FISHMAN), called by the United States for

examination, taken pursuant to subpoena and pursuant

to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before Rachel F. Gard,

Certified Shorthand Reporter, at 77 West Wacker

Drive, Suite 3500, Chicago, Illinois, commencing at

8:35 a.m. on the 20th day of March, A.D., 2008.

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 423

1  Medicare fraud and abuse statute or regulation?
2      MS. CITERA:  Objection to the form, outside
3  the scope.
4  BY THE WITNESS:
5      A.  As I understand reading deposition
6  testimony and talking with people, that Abbott did
7  not create spread.
8      Q.  How -- Why do you say that?
9      A.  My understanding is that Abbott would
10  have provided pricing information to the compendia,
11  and the compendia then ultimately issued -- issued
12  the pricing information.  To the extent the spread
13  would have been created, that would have created
14  the spread.
15      Q.  But Abbott understood that there was a
16  correlation between the provision of its list price
17  information to the price reporting compendia and
18  the calculation of AWP, correct?
19      MS. CITERA:  Objection, form, outside the
20  scope.
21  BY THE WITNESS:
22      A.  In reading deposition testimony, it

Page 424

1  appears that there were people within Abbott who
2  understood what the compendia did with list price
3  information; so understood the relationship.
4  "Relationship" is a very broad term.  In all
5  aspects of a relationship, I can't answer that.
6  Generally did they understand that that list
7  information was involved in creating AWP?
8  Deposition testimony suggests that there were
9  people within Abbott who understood that.
10      Q.  Did anyone within Abbott evaluate whether
11  or not the maintenance of high spreads or high
12  differentials between contract price and reported
13  list price implicated Medicare and Medicaid fraud
14  and abuse statutes?
15      MS. CITERA:  Objection to the form, outside
16  the scope.  I'm going to also caution you not to
17  reveal any legal information.
18  BY THE WITNESS:
19      A.  To the extent there was a legal analysis
20  prepared, that would be privileged.
21      Q.  Was there a legal analysis prepared?
22      MS. CITERA:  Same objections and instructions.

Page 425

1  BY THE WITNESS:
2      A.  To the extent there was one, it would be
3  privileged.
4      Q.  My question, sir -- You can answer
5  whether or not there was one prepared at a minimum
6  and listen to the instruction as to the content.
7  My question right now is, was there one prepared?
8      MS. CITERA:  I don't think he has to answer
9  that because I think that is privileged in and of
10  itself.
11      MS. ST. PETER-GRIFFITH:  No, it's not
12  privileged in and of itself.  The existence of a
13  document -- I mean, you folks haven't, I don't
14  think, given us a complete privilege log yet.  I
15  want to know whether or not there was such an
16  analysis done or document created.  That I'm
17  entitled to find out, Toni.
18      MS. CITERA:  Anything that would have been
19  done would have been subject to the privilege,
20  would have been subject to the work product.  By
21  the time we're speaking about, Abbott was obviously
22  being investigated and/or sued.  That all would

Page 426

1  have been privileged.
2      MS. ST. PETER-GRIFFITH:  Let me be clear.  I'm
3  not just talking about for the 2003 time period.
4  I'm talking about any time from '91 to 2003.
5      MS. CITERA:  And --
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Was any analysis done?
8      A.  To my --
9      MS. CITERA:  Objection to the form, outside
10  the scope.  Same caution to you.
11  BY THE WITNESS:
12      A.  To my knowledge, both personal knowledge
13  and speaking on behalf of Abbott, any questions
14  with respect to AWP would have been handled through
15  our litigation department.
16      Q.  Okay.  Well, did your litigation
17  department do an analysis?
18      MS. CITERA:  Same objections, same
19  instruction.
20  BY THE WITNESS:
21      A.  I don't know.
22      Q.  Who would know?

17 (Pages 423 to 426)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 635

1  reimbursement?
2      MS. CITERA:  Object to the form, outside the
3  scope. I also caution you not to reveal anything --
4  any privileged communications or analysis.
5  BY THE WITNESS:
6      A.  I mean, you're not reading the entire
7  phrase here. It's -- Again, this is -- this is
8  assertion -- this is guidance provided by the
9  government on information that otherwise hadn't
10 provided guidance on or it wouldn't be current
11 guidance.
12     Q.  Okay. Let me ask it this way:  The
13 statement reflected on this page, was this Abbott's
14 understanding of its obligation under the False
15 Claims Act with regard to price reporting that it
16 directly or indirectly made?
17     MS. CITERA:  Objection to the form, outside
18 the scope.  I also caution you not to reveal any
19 privileged communications or analysis.
20 BY THE WITNESS:
21     A.  I think it's a reflection of what OIG is
22 stating the requirements to be.

Page 636

1      Q.  Okay. But did Abbott follow the
2  requirements set forth on this page?
3      MS. CITERA:  Same objections.
4  BY THE WITNESS:
5      A.  I don't know that they didn't.
6      Q.  Okay. Well, do you know that they did?
7      A.  Back to the testimony I gave last
8  Wednesday, which is, this was an evolving
9  environment.  And once there was clearer guidance
10 as to how particular provisions within a statute or
11 regulations were being interpreted, Abbott would
12 have taken that very seriously and would have
13 evaluated its operations in connection with that
14 guidance.
15     Q.  From 1991 through 2003, did Abbott comply
16 with what is identified here as a manufacturer's
17 obligations under the False Claims Act?
18     A.  Identifies it as a possible obligation.
19     MS. CITERA:  Objection to form, outside the
20 scope.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  I'm sorry?

Page 637

1      A.  It identifies it as may be liable.
2      Q.  Well, did Abbott think that it wasn't
3  liable?
4      MS. CITERA:  Same objections.
5  BY THE WITNESS:
6      A.  You're asking for a legal conclusion.
7      Q.  What I'm asking for, sir, is did Abbott
8  believe or understand that it was required to
9  follow what is set forth on this page as a -- an
10 obligation of a manufacturer under the False Claims
11 Act?
12     MS. CITERA:  Objection to the form, outside
13 the scope.
14 BY THE WITNESS:
15     A.  Abbott absolutely believed that it was
16 obligated to follow the federal False Claims Act
17 and any other healthcare compliance obligations.
18     Q.  Okay. And from 1991 through 2003, did
19 Abbott follow this guidance that is set forth on
20 this page as to its obligations under the False
21 Claims Act?
22     MS. CITERA:  Same objections.

Page 638

1  BY THE WITNESS:
2      A.  That answer requires a legal conclusion,
3  now applying the facts of how Abbott did its --
4  conducted its business against the Act, federal
5  False Claims Act and reaching a conclusion whether
6  or not it complied.
7      Q.  I'm asking whether what is outlined here
8  -- Well, let me ask you, did Abbott with regard to
9  prices that it directly or indirectly reported, did
10 it ever knowingly or recklessly fail to report
11 accurate and complete information concerning its
12 discounts, rebates, free goods, upfront payments,
13 coupons, goods in kind, free or reduced prices or
14 services, grants, or other price concessions or
15 similar benefits?
16     MS. CITERA:  I'm going to object to the form.
17 It's clearly asking for a legal conclusion and
18 beyond the scope.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  I'm not asking -- I'm asking for Abbott's
21 practice.
22     A.  No, you're asking me did Abbott fail to

70  (Pages 635 to 638)

0f08cf8d-8dfa-4007-81db-29f9710803e3

# EXHIBIT 25

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


------------------------------X

In re:  PHARMACEUTICAL INDUSTRY)

AVERAGE WHOLESALE PRICE        )

LITIGATION                     ) MDL No. 1456

_____) Civil Action No.

                               ) 01-12257-PBS

THIS DOCUMENT RELATES TO:      )

United States of America, ex   ) Judge Patti B. Saris

rel. Ven-a-Care of Florida     ) Magistrate Judge

Keys, Inc., v. Abbott          ) Marianne B. Bowler

Laboratories, Inc.,            )

CIVIL ACTION NO. 06-11337-PBS  )

------------------------------X


Deposition of ERIC FRENCH, taken at 500 West

Jefferson Street, Louisville, Kentucky, commencing

at 9:03 a.m., Wednesday, September 26, 2007, before

Kimberley Ann Keene, RPR No. 041331.

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                         Louisville, KY

---

Page 2

1   APPEARANCES OF COUNSEL
2
3       FOR THE PLAINTIFF UNITED STATES OF AMERICA
4           BY:  REBECCA A. FORD, ESQ.
5           U.S. Department of Justice
6           Commercial Litigation, Fraud
7           Civil Division
8           601 D. Street, N.W.
9           Patrick Henry Building - 9133
10          Washington, D.C. 20044
11          202.514.1511
12          rebecca.ford@usdoj.gov
13
14      FOR THE STATE OF ARIZONA AND MDL PLAINTIFFS
15          WEXLER TORISEVA WALLACE LLP
16          BY:  AMBER NESBITT, ESQ.
17          55 West Monroe
18          Suite 3300
19          Chicago, Illinois  60603
20          (via telephone)
21
22

---

Page 3

1   APPEARANCES OF COUNSEL (CONTINUED)
2
3       FOR THE STATE OF CALIFORNIA
4           BY:  TIMOTHY FOOTE, ESQ.
5           Deputy Attorney General
6           Bureau of Medi-Cal Fraud and Elder Abuse
7           State of California Department of Justice
8           110 West A. Street, No. 1100
9           San Diego, California  92101
10          619.688.6043
11          (via telephone)
12
13      FOR THE DEFENDANTS ABBOTT LABORATORIES
14          JONES DAY
15          BY:  JEREMY P. COLE, ESQ.
16          77 West Wacker
17          Chicago, Illinois  60601-1692
18          jcole@jonesday.com
19          312.782.3939
20
21      ALSO PRESENT:
22          Butch Ellis, Video Operator

---

Page 4

1                    I N D E X
2
3   WITNESS: ERIC FRENCH                     PAGE
4   Examination by Ms. Ford............ 006, 231, 241
5   Examination by Ms. Nesbitt.................. 223
6   Examination by Mr. Foote................ 227, 248
7   Examination by Mr. Cole..................... 235
8
9
10               E X H I B I T S
11  NUMBER          DESCRIPTION          PAGE
12  Exhibit French 1375-ABT-DOJ-E 0007638 to 7639.. 029
13  Exhibit French 1376-ABT-DOJ-E 0008348 to 8349.. 036
14  Exhibit French 1377-ABT-DOJ 0251692 to 0251703. 043
15  Exhibit French 1378-ABGM-000130 to 000169...... 051
16  Exhibit French 1379-BMW 159-0016 to 0033....... 056
17  Exhibit French 1380-BMW 159-0486 to 0502....... 058
18  Exhibit French 1381-VTP 004-0895 to 0912....... 060
19  Exhibit French 1382-ABRX-000118 to 000159...... 069
20  Exhibit French 1383-ABGM-000065 to 000095...... 080
21  Exhibit French 1384-ABRX-000089 to 000117...... 085
22  Exhibit French 1385-ABT-DOJ 0184423............ 218

---

Page 5

1       E X H I B I T S  (PREVIOUSLY MARKED)
2   NUMBER          DESCRIPTION          PAGE
3   Exhibit Burchieri 1191-ABT072-0565 to 0567..... 193
4   Exhibit Burchieri 1192-ABT AWP/MDL 197141 to
5                  197162.................. 142
6
7   Plaintiff's Exhibit 1321-ABT-DOJ 0085415 to
8                  0085704............... 091
9
10  Exhibit Dawson 985-TXABT-E 0003873 to 3889..... 207
11
12
13
14
15
16
17
18
19
20
21
22

---

Henderson Legal Services
202-220-4158

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 6

1              P R O C E E D I N G S
2
3         THE VIDEOGRAPHER:  This is Butch Ellis,
4    videographer, with Henderson Legal Services.  The
5    names of all of the other parties present will be
6    reflected in the written record.
7         This will be the videotape deposition
8    of Mr. Eric French.  Today's date is September
9    26, 2007.  We're going on the record at 9:03
10   a.m., regarding Pharmaceutical Industry Average
11   Wholesale Price Litigation, MDL 1456, civil
12   action 01-12257-PBS.
13        Swear the witness.
14
15        ERIC FRENCH,
16   called on behalf of the United States, after
17   having been duly sworn, was examined and
18   testified as follows:
19
20             EXAMINATION
21   BY MS. FORD:
22        Q.  Good morning, Mr. French.

Page 7

1        A.  Good morning.
2        Q.  We met off the record, but for purposes
3    of the record, I'll introduce myself again.
4         My name is Rebecca Ford, and I
5    represent the United States in U.S. ex rel. Ven-
6    a-Care of the Florida Keys versus Abbott
7    Laboratories.
8         That is one of the cases in which
9    you're being deposed today.
10        Do you understand that?
11        A.  Yes.
12        Q.  Okay.  Do you understand that you're
13   testifying under oath today?
14        A.  Yes.
15        Q.  And that it's the same oath that you
16   would take in a court of law?
17        A.  Yes.
18        Q.  And that the penalties of perjury apply
19   if you do not tell the truth?
20        A.  Yes.
21        Q.  Very good.
22        Do you understand that if this case

Page 8

1    goes to trial, you could be called to be a
2    witness for the United States, for Abbott, or for
3    any of the other parties taking your deposition
4    today?
5        A.  Yes.
6        Q.  Are you taking any medications or
7    suffering from any conditions that would make it
8    difficult for you to give truthful and honest
9    testimony today?
10        A.  No.
11        Q.  So, is today as good a day as any to
12   take your deposition?
13        A.  Yes.
14        Q.  Have you been deposed before?
15        A.  No.
16        Q.  Okay.  I'm going to go over a few
17   ground rules with you, so that we're operating
18   with the same understanding this morning.
19        And the first and most important rule
20   is that we not speak over each other.  So, I -- I
21   will do my best to let you answer a question
22   before I ask you a new question, if you could do

Page 9

1    your best to let me get my question out before
2    you answer.
3        Do you understand?
4        A.  Yes, ma'am.
5        Q.  Great.
6        And that's important because the court
7    reporter is taking down every word that we say.
8    So, if we speak over each other, it's hard for
9    her to get all of the information on the record.
10        A.  Okay.
11        Q.  And the second rule, for a similar
12   reason, is that you answer my questions verbally.
13   So, rather than a head shake or a nod or "huh-
14   huh" or "uh-huh," if you could do your best to
15   answer with a "yes," "no," or a complete
16   sentence, that would be helpful.
17        A.  Yes.
18        Q.  From time to time, your attorney may
19   object today, and he'll typically be doing so for
20   purposes of the record. So, unless your attorney
21   objects and instructs you not to answer, you're
22   still required to answer the question.

3 (Pages 6 to 9)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                          Louisville, KY

---

Page 10

1       Do you understand that?
2    A.  Yes.
3    Q.  Okay.  We'll take breaks from time to
4  time, but if at any time you feel like you need a
5  break, just let me know and we'll be happy to
6  take a break.
7       I only ask that you -- if there's a
8  question pending, that you answer that question
9  before we take a break, okay?
10   A.  Okay.
11   Q.  And if at any time you don't understand
12  my question, let me know and I'll do my best to
13  restate it for you, okay?
14   A.  Okay.
15   Q.  And if during the course of the
16  deposition you recall some additional information
17  or different information relating to an earlier
18  answer or to one of my earlier questions, if you
19  would please volunteer that information.
20       Otherwise, I'm going to assume that the
21  questions -- or, excuse me, that the answers that
22  you give me are complete and correct; is that --

---

Page 11

1  do you understand?
2    A.  Yes.
3    Q.  Okay.  Did you bring any documents with
4  you today?
5    A.  No, I did not.
6    Q.  Okay.  Mr. French, do you have any
7  criminal convictions?
8    A.  No, I do not.
9    Q.  Okay.  Have you ever been arrested?
10   A.  No, I have not.
11   Q.  Okay.  Do you have an understanding of
12  what the cases that you're being deposed in today
13  are about?
14   A.  No.
15   Q.  So, other than anything that your
16  attorney may have told you, you don't know the
17  purpose of your deposition today?
18   A.  That is correct.
19   Q.  Okay.  Prior to being informed that you
20  would be deposed today, did you know that Abbott
21  was engaged in lawsuits?
22       Did you know that Abbott was a

---

Page 12

1  defendant in a lawsuit with the United States?
2    A.  No.
3    Q.  Okay.  Have you read anything in
4  newspapers or in trade publications about Abbott
5  being sued relating to average wholesale price
6  allegations?
7    A.  No, I have not.
8    Q.  Okay.  What did you do to prepare for
9  your deposition?
10   A.  I met with Mr. -- Mr. Cole yesterday.
11   Q.  Okay.  And about how long did you meet?
12   A.  Several hours.
13   Q.  Okay.  Did you review any documents in
14  preparation for your deposition?
15   A.  Yes.
16   Q.  What documents did you review?
17   A.  I reviewed one document.
18   Q.  Do you recall what that document was?
19   A.  Supply agreement.
20   Q.  Okay.  And who was the supply agreement
21  between?
22   A.  IVMed and Abbott Laboratories.

---

Page 13

1    Q.  Okay.  Do you recall the date of the
2  agreement?
3    A.  No, I do not.
4    Q.  Were you a signator on the agreement?
5    A.  Yes.
6    Q.  Okay.  Do you recall who signed the
7  agreement for IVMed?
8    A.  No, I do not.
9    Q.  Did you review any other documents in
10  preparation for your deposition?
11   A.  No.
12   Q.  Okay.  Did you review any deposition
13  transcripts?
14   A.  No.
15   Q.  Were any documents read to you during
16  your deposition?
17   A.  During my deposition?
18   Q.  I'm sorry.
19       Were any documents read --
20   A.  Okay.
21   Q.  -- to you during your preparation for
22  your deposition?

4 (Pages 10 to 13)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                    Louisville, KY

Page 14

1     A.  No.
2     Q.  Did you speak with any nonlawyers about
3  your deposition today?
4     A.  Yes.
5     Q.  And who were those individuals?
6     A.  My wife.
7     Q.  Okay.
8     A.  My manager, and my partner who works
9  the same sales territory with me.
10    Q.  Okay.  And what -- what were the nature
11 of your discussions with your manager about your
12 deposition today?
13    A.  That I would be out of the field for
14 two days.
15    Q.  Okay.  And with your coworker?
16    A.  That I would be out of the field for
17 two days and she would have to cover for me while
18 I was gone.
19    Q.  Okay.  Did you have any discussions
20 with any Abbott employees regarding why you may
21 be being deposed today?
22    A.  As to why?

Page 15

1     Q.  Yes.
2     A.  Yes.
3     Q.  Okay.  And who were those discussions
4  with?
5     A.  The person who set up the appointment
6  to be here today.
7     Q.  And who was that individual?
8     A.  It was someone from the legal side of
9  Abbott.  I don't remember her name.
10    Q.  Okay.  Aside from the person in the
11 legal department, did you have any discussions
12 with anyone at Abbott as to why you might be --
13 why you might be being deposed?
14    A.  No.
15    Q.  Mr. French, did you attend college?
16    A.  Yes.
17    Q.  Okay.  And where did you attend
18 college?
19    A.  Hampton University.
20    Q.  Okay.
21    A.  Wingett College, and Clark Atlanta
22 University.

Page 16

1     Q.  Did you receive an undergraduate --
2  undergraduate degree from any of those schools?
3     A.  Yeah.  Hampton University.
4     Q.  Okay.
5     A.  In 1991.
6     Q.  And what was your degree in?
7     A.  Marketing.
8     Q.  Have you received any other degrees?
9     A.  Yes.  I have an MBA from Clark Atlanta
10 University in 1994.
11    Q.  Okay.
12    A.  And I have a master of arts in
13 theological studies from the Southern Baptist
14 Theological Seminary in December of '06.
15    Q.  Okay.  When did you first become
16 employed by Abbott Laboratories?
17    A.  In 1997.
18    Q.  I guess prior to your job at Abbott
19 Laboratories, did you have any professional jobs?
20    A.  Yes.
21    Q.  And what was your first professional
22 job after college?

Page 17

1     A.  I worked for Ortho Pharmaceuticals from
2  1991 to 1992.
3     Q.  And what position did you hold there?
4     A.  Customer service supervisor.
5     Q.  And what was your next job?
6     A.  The next job would have been with Otis
7  Elevator Company, and that was 1994.
8     Q.  And how long did you hold that
9  position?
10    A.  Until I came to Abbott in 1997.
11    Q.  Okay.  And about what month did you
12 come to Abbott?
13    A.  January.
14    Q.  Okay.  And what was your first position
15 at Abbott?
16    A.  Sales rep.
17    Q.  And were you assigned to a particular
18 division of -- of Abbott?
19    A.  Yes.
20    Q.  Which division was that?
21    A.  Alternate site product sales.
22    Q.  And how long did you hold that

5  (Pages 14 to 17)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 18

1  position?
2      A.  Until 2000.
3      Q.  During that time period, of January
4  1st, 1997 to 2000, did you have a title?
5          Did you have any other titles other
6  than sales rep?
7      A.  No.
8      Q.  Okay.  And in 2000, what was -- after
9  2000, what was your next position?
10     A.  Contract marketing analyst.
11     Q.  Okay.  And do you recall when you took
12  that position?
13     A.  April of 2000.
14     Q.  And how long did you hold that
15  position?
16     A.  Until June of 2001.
17     Q.  Okay.  And you indicated that you were
18  a contract marketing analyst.
19          Was that still within the alternate
20  site product sales --
21     A.  Yes.
22     Q.  -- division of Abbott?

Page 19

1      A.  Yes.
2      Q.  Okay.  And are you still an Abbott
3  employee today?
4      A.  Yes.
5      Q.  Okay.  So, what was your next position
6  after June of 2001?
7      A.  Anesthesia specialist.
8      Q.  Okay.  And which division of Abbott was
9  that in?
10     A.  PPD.
11     Q.  Is that short for pharmaceutical --
12     A.  I'm sorry.  Yes.
13     Q.  -- products division?
14     A.  Yes, ma'am.
15     Q.  Okay.  And that would have been June of
16  2001; is that correct?
17     A.  Yes.
18     Q.  And how long -- how long were you an
19  anesthesia specialist?
20     A.  Until October of 2006.
21     Q.  Okay.  And then in October of 2006, did
22  you take another position within Abbott?

Page 20

1      A.  Yes.
2      Q.  And what was that position?
3      A.  Immunology sales representative.
4      Q.  And what division was that in?
5      A.  PPD.
6      Q.  Okay.
7      A.  Pharmaceutical products division.
8      Q.  And that was October of 2006?
9      A.  Yes.
10     Q.  Okay.  Is that the position you're
11  still in today?
12     A.  Yes.
13     Q.  Okay.  When you were a -- sales rep
14  in the alternate site product sales division of
15  Abbott, who did you report to?
16     A.  Mike Ramsey.
17     Q.  Okay.  And what was Mr. Ramsey's title?
18     A.  District manager.
19     Q.  And were there a number of district
20  managers within alternate site?
21     A.  Yes.
22     Q.  Okay.  Do you know who Mr. Ramsey

Page 21

1  reported to?
2      A.  It was a national sales director, but I
3  don't --
4      Q.  Do you recall his name?
5      A.  I don't recall the name.
6      Q.  Okay.  And who were -- who were other
7  sales reps in your district at that time?
8      A.  I don't recall the names.
9      Q.  Okay.  You've mentioned a district
10  manager, so I -- I assume that you were assigned
11  to a particular district; is that how it worked?
12     A.  Yes.
13     Q.  Okay.  And which district were you
14  responsible for, or were you assigned to?
15     A.  Well, Mike was based out of Kansas
16  City, so I guess it would be the Kansas City
17  district.
18     Q.  And within that district, did you have
19  an even smaller geographical region to cover?
20     A.  Yes.
21     Q.  And what was that region?
22     A.  The state of Kentucky.

6 (Pages 18 to 21)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                          September 26, 2007
                          Louisville, KY

| Page 22 | Page 24 |
|---|---|
| 1     Q.   Okay.  And what were your | 1   refresh your recollection that IVMed was an |
| 2   responsibilities as an alternate site sales rep? | 2   account that you had responsibility for as an |
| 3     A.   To maintain the accounts we had -- had | 3   alternate site sales rep? |
| 4   established in the state of Kentucky. | 4     A.   No, it did not.  No.  It didn't. |
| 5     Q.   Do you recall what the -- who -- who | 5     Q.   Was the IVMed agreement that you |
| 6   some of those accounts were? | 6   reviewed, was that a document that you signed on |
| 7     A.   The types or -- well, the types of | 7   behalf of Abbott when you were in alternate site |
| 8   accounts or specific accounts? | 8   contract marketing? |
| 9     Q.   Let's start with the types. | 9     A.   Yes. |
| 10     A.   The types of accounts?  Home infusion, | 10     Q.   Okay.  So, you joined the alternate |
| 11   close door pharmacies, and distributors. | 11   site marketing department in April of 2000; is |
| 12     Q.   And do you recall some of your accounts | 12   that right? |
| 13   during that 1997 to 2000 time period? | 13     A.   Yes. |
| 14     A.   Yes. | 14     Q.   Okay.  And did you go by any other |
| 15     Q.   And what were those accounts, or who | 15   title there other than analyst? |
| 16   were those accounts? | 16     A.   No. |
| 17     A.   Integrity Health Care is the one that I | 17     Q.   Did you maintain that alternate site |
| 18   recall. | 18   contract marketing analyst title during the |
| 19     Q.   Do you recall any others? | 19   entire time that you were in that department? |
| 20     A.   No. | 20     A.   Yes. |
| 21     Q.   About -- if you could estimate, about | 21     Q.   Okay.  Did you ever have the title of |
| 22   how many accounts did you have at any one time | 22   senior contract analyst? |

| Page 23 | Page 25 |
|---|---|
| 1   during your tenure in alternate site as a -- as a | 1     A.   No. |
| 2   sales rep? | 2     Q.   Okay.  What were your primary |
| 3     A.   I don't know specifically how many | 3   responsibilities as an alternate site contract |
| 4   there were.  Neighborhood of 30. | 4   marketing analyst? |
| 5     Q.   Okay.  Is there something -- is there a | 5     A.   They were twofold.  One was to support |
| 6   reason in particular that Integrity stands out as | 6   the sales representatives in the field, and the |
| 7   an account that you recall? | 7   second part was to support internal staff in |
| 8     A.   It was my largest account. | 8   dealing with contracts. |
| 9     Q.   Okay.  And when you say "largest | 9     Q.   And who did you report to during that |
| 10   account," do you mean by sales volume? | 10   time? |
| 11     A.   The number of pumps they would purchase | 11     A.   Lynn Leone. |
| 12   made them my largest account. | 12     Q.   Okay.  And was Ms. Leone the manager of |
| 13     Q.   And what types of products were you | 13   contract marketing? |
| 14   responsible for selling during that time period? | 14     A.   Yes. |
| 15     A.   We had the Abbott catalog, which had | 15     Q.   Was she the manager during your entire |
| 16   all of our products in it; injectables, tubing, | 16   tenure in that department? |
| 17   and pumps.  And I was responsible for covering | 17     A.   No. |
| 18   those. | 18     Q.   Okay.  At some point, she left and you |
| 19     Q.   Okay.  You had mentioned a few minutes | 19   -- you had another manager? |
| 20   ago reviewing an agreement that you had signed | 20     A.   Yes. |
| 21   for IVMed. | 21     Q.   Okay.  And who was that? |
| 22        Reviewing that agreement, did that | 22     A.   I don't recall the name. |

7 (Pages 22 to 25)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                          Louisville, KY

---

Page 26

1       Q.   Okay.  Do you recall about when Ms.
2   Leone left the department?
3       A.   A month before I did.  So, that would
4   make it May of 2001.
5       Q.   Okay.  Besides yourself and Ms. Leone,
6   who were the other members of the alternate site
7   contract marketing department while you were
8   there?
9       A.   I remember first names.
10      Q.   Okay.
11      A.   There was Michelle, there was Linda,
12  and there was Debbie.
13      Q.   Was Michelle an analyst?
14      A.   Yes.
15      Q.   Okay.  And you mentioned Linda.
16          Could that be Linda Ozark?
17      A.   I'm not sure.
18      Q.   Okay.  What was Linda's position?
19      A.   Analyst.
20      Q.   Okay.
21          And I'm sorry.  The last name that you
22  mentioned?

---

Page 27

1       A.   Debbie.
2       Q.   Debbie.  Okay.
3          Is it possible that was Debbie
4   Jonkowski?
5       A.   I'm not sure.
6       Q.   Okay.  So, those individuals were the
7   entirety of the contract marketing department
8   while you were there?
9       A.   I'm not sure if that's the entirety,
10  but --
11      Q.   Okay.  Those are the ones you recall?
12      A.   Those are the ones I remember, yes.
13      Q.   Okay.  Do you recall what accounts you
14  had responsibility for when you were in alternate
15  site contract marketing?
16      A.   No, I do not.
17      Q.   Okay.  You had mentioned IVMed as an
18  agreement that you signed while you were an
19  alternate site contract marketing analyst; is
20  that correct?
21      A.   Yes.
22      Q.   Okay.  Does that refresh your

---

Page 28

1   recollection that at least at some point in time,
2   you had responsibility for that account?
3       A.   No.
4       Q.   It did not?
5       A.   No.
6       Q.   Okay.  Can you think of any other
7   reason you might have signed an agreement on
8   behalf of Abbott for a customer for whom you
9   didn't have responsibility for?
10      A.   No.
11      Q.   So, just trying to understand:  If
12  there's not a reason for you to sign an agreement
13  on behalf of Abbott if it wasn't your account, is
14  it -- is it likely that -- that it was your
15  account at the time?
16      A.   I'm not sure.
17      Q.   Okay.  Can you think of any other
18  reason why you would have signed the agreement if
19  you weren't responsible for IVMed at the time?
20      A.   No.
21      Q.   Is that something that was routine?
22      A.   To be honest, I can't recall.

---

Page 29

1       Q.   Okay.  During -- going back to the time
2   that you were an alternate site sales rep, who
3   were some of the other sales reps that you worked
4   with?
5          MR. COLE:  Object to the form.
6          THE WITNESS:  I don't recall.
7   BY MS. FORD:
8       Q.   You don't recall the names of anyone
9   else that --
10      A.   No, ma'am.
11      Q.   Okay.  I'm going to hand you a document
12  that I'll ask the court reporter to mark as
13  Exhibit French 1375.
14          (Deposition Exhibit French 1375
15  was marked for identification and is annexed
16  hereto.)
17  BY MS. FORD:
18      Q.   Mr. French, do you recognize this
19  document?
20      A.   No.
21      Q.   For the record, this is ABT-DOJ-E
22  0007638 through 0007639.

8 (Pages 26 to 29)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                        September 26, 2007
Louisville, KY

Page 30

1        At the top, do you see it says,
2    "Selling Abbott Products by Specialties..."?
3        A.   Yes.
4        Q.   Do you see that?
5        A.   Yes, I do.
6        Q.   And then about halfway down the page,
7    the second heading says, "Selling with your
8    Abbott Infusion System Specialist."
9            Do you see that?
10       A.   Yes.
11       Q.   Okay.  And if you could turn to Page 2,
12   do you see your name on the list there?
13       A.   Yes.
14       Q.   And this is a list of infusion system
15   specialists; is that right?
16       A.   Yes.
17       Q.   Okay.  At what time period did you go
18   by the -- the title of infusion system
19   specialist?
20       A.   When I --
21           MR. COLE:  Object to the form.
22           Go ahead.  Sorry.

Page 31

1        THE WITNESS:  It's okay.
2        To my knowledge, the entire time I was
3    in this position.
4    BY MS. FORD:
5        Q.   Okay.  What position was this time
6    period?
7        A.   When I started in 1997.
8        Q.   Okay.  So, is infusion system
9    specialist another name for sales rep?
10       A.   Yes.
11       Q.   Okay.  Is -- is that in -- have you
12   seen infusion system specialist before?
13       A.   Yes.
14       Q.   Okay.
15       A.   Yes.
16       Q.   So, that was -- that was a terminology
17   that was known to you during that time?
18       A.   Yes.
19       Q.   Okay.  And that was sometimes how sales
20   reps were referred to; is that correct?
21       A.   Yes.
22       Q.   Okay.  Does this -- looking over this

Page 32

1    list, does it refresh your recollection of some
2    of the other sales reps that you worked with
3    between 1997 and 2000?
4        A.   Yes.
5        Q.   Okay.  Looking at the list, are there
6    any people in particular that you recall working
7    with?
8        A.   Doris Roach, on Page 2 --
9        Q.   Okay.
10       A.   -- the top, Indiana, we were in the
11   same district together.
12       Q.   Okay.
13       A.   Daryl Miser, in Kansas, on Page 2, we
14   were in the same district together.
15           Melissa Clark, in Wisconsin, became one
16   of my district managers.
17           Monte Dillow, in Florida, on the first
18   page --
19       Q.   Okay.
20       A.   -- became one of my district managers.
21           Joe Sweeney, Illinois, first page,
22   first column, bottom, was in contract marketing.

Page 33

1        And quite honestly, I recognize most of
2    these names as I look at the list.
3        Do you want me to go through the list
4    or --
5        Q.   No.  That's okay.
6        So, when would you have -- other than
7    those individuals, or those sales reps, that were
8    in your district, when would you have come in
9    contact with sales reps from outside of your
10   district?
11       A.   If we had a joint district meeting,
12   national sales meeting --
13       Q.   Okay.
14       A.   -- those would be the two times that I
15   would interact with them when I was a sales
16   representative.
17       Q.   Okay.  And you had mentioned that you
18   knew Joe Sweeney from contract marketing; is that
19   right?
20       A.   Yes.
21       Q.   And was Joe Sweeney in contract
22   marketing at the same time that you were?

9 (Pages 30 to 33)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                         Louisville, KY

|  | Page 34 |
|---|---|

1       A.  He was there before I got there.
2       Q.  Okay.  And when you got there, had he
3   already moved on to another position?
4       A.  No.  He was still there.
5       Q.  He was still there.
6       A.  Yes.
7       Q.  Okay.  And was Mr. Sweeney in contract
8   marketing the entire time that you were there?
9       A.  No.
10      Q.  Okay.  So, he left that job before you
11  did?
12          He left that position before you did?
13      A.  Yes.
14      Q.  Okay.  When you were a sales rep, did
15  you have an opportunity to work with national
16  account managers on any occasion?
17      A.  Directly, indirectly, or -- I'm not
18  sure.
19      Q.  Well, we'll start with directly.
20          Did you ever work directly with a
21  national account manager during your time as an
22  alternate site sales rep?

|  | Page 35 |
|---|---|

1       A.  No.
2       Q.  Okay.  And did you work with any
3   national account managers indirectly?
4       A.  Yes.  I would -- yes.
5       Q.  Okay.  And under what circumstances
6   would you work with the national account manager
7   indirectly?
8       A.  At national sales meetings, they would
9   come in and give presentations to the entire
10  sales force as to what they were doing with their
11  particular accounts.
12      Q.  Okay.  Do you know -- do you know a
13  person by the name of Jack Miller?
14      A.  I know the name, yes.
15      Q.  Okay.  Do you recall ever working with
16  Mr. Miller during the time that you were a sales
17  rep?
18      A.  I met Mr. Miller when I first joined
19  the sales force.
20      Q.  Okay.  Did you meet him at a national
21  sales meeting or something of that nature?
22      A.  I can't recall.

|  | Page 36 |
|---|---|

1       Q.  Okay.  But you don't recall any
2   particular working relationship with Mr. Miller?
3       A.  I don't believe we worked together.
4       Q.  Okay.  I'm going to hand you what I'll
5   ask the court reporter to mark as Exhibit French
6   1376.
7           (Deposition Exhibit French 1376
8   marked for identification and is annexed hereto.)
9   BY MS. FORD:
10      Q.  If you could take a look at that
11  document.
12          For the record, this is ABT-DOJ-E
13  0008348 through 0008349.
14          Mr. French, does this appear to be an
15  interoffice correspondence from Jack Miller to
16  Pete Baker?
17      A.  Yes.
18      Q.  And it's dated April 15th, 1997?
19      A.  Yes.
20      Q.  Do you see on the -- on the Re: line,
21  it says, "Significant Events."
22          Do you see that?

|  | Page 37 |
|---|---|

1       A.  Yes.
2       Q.  When you were in alternate site as a
3   sales rep, were you required to report
4   significant events on a routine basis?
5       A.  Yes.
6       Q.  Okay.  And did -- did that report or --
7   did that correspondence, was that referred to as
8   a significant events report?
9       A.  I don't recall the specific name of it.
10      Q.  Okay.
11      A.  But that's what they were.
12      Q.  Okay.  Does this look to be a similar
13  type of communication?
14          MR. COLE:  Object to the form.
15          THE WITNESS:  I'm not sure.
16  BY MS. FORD:
17      Q.  Okay.  How did your significant events
18  communications look?
19          Did you do it in written form?
20      A.  Yes.
21      Q.  Okay.  And did you provide a copy of
22  that written document to your supervisor?

                                    10  (Pages 34 to 37)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                        September 26, 2007
                          Louisville, KY

Page 38

1    A. Yes.
2    Q. And would that have been your district
3  manager?
4    A. Yes.
5    Q. Okay. And how often did you prepare a
6  significant event communication?
7    A. If I recall correctly, monthly.
8    Q. Okay. And so, here we see Mr. Miller
9  reporting to Mr. Baker about significant events
10  in the past 30 days; is that right?
11    A. Yes.
12    Q. Okay. So, that would -- would that be
13  similar to the approach that you would have taken
14  in reporting to your supervisor about significant
15  events?
16    A. Yes.
17    Q. Okay. If you turn to Page 2 of the
18  document, and not quite to the middle of the
19  page, you'll see the second paragraph above the -
20  - the heading "Next 30 Days."
21        It says, "Assisted Eric French and Mike
22  Ramsey with placement of six additional AIM plus

Page 39

1  pumps at Integrity, Louisville, Kentucky. That
2  makes Forty in this PBI/PAPA account."
3        Did I read that accurately?
4    A. Yes, you did.
5    Q. Okay. And I believe you testified
6  earlier that Integrity was one of your accounts
7  when you were a sales rep?
8    A. Yes.
9    Q. Okay. And who was Mike Ramsey?
10    A. My district manager.
11    Q. Oh, I'm sorry. That's right.
12    A. Yeah.
13    Q. You have already testified to that.
14  Okay.
15        Do you recall working with -- does this
16  refresh your recollection about working with Mr.
17  Miller, who at the time was a national account
18  manager? Is that right?
19    A. Two questions.
20    Q. Okay. Did you understand Mr. Miller to
21  be a national account manager?
22    A. Based on this, yes.

Page 40

1    Q. Okay. Does this refresh your
2  recollection about working with Mr. Miller any
3  time during your tenure as an --
4    A. No.
5    Q. -- alternate site sales rep?
6    A. No, it does not.
7    Q. Okay. Is the statement here in this
8  document consistent with your recollection that
9  Integrity was -- was a PBI member?
10        MR. COLE: Object to the form.
11        THE WITNESS: I don't recall if,
12  specifically, they were a PBI member.
13  BY MS. FORD:
14    Q. Okay. Does that appear to be what Mr.
15  Miller is conveying here?
16        MR. COLE: Object to the form.
17        THE WITNESS: Yes.
18  BY MS. FORD:
19    Q. Although you don't recall this
20  particular situation, would it have been atypical
21  for you to work with national account managers in
22  situations similar to this?

Page 41

1        MR. COLE: Object to the form.
2        THE WITNESS: No.
3  BY MS. FORD:
4    Q. Okay. So, can you think of a reason
5  why Mr. Miller would have been assisting in
6  placing AIM pumps at Integrity?
7        MR. COLE: Object to the form.
8        THE WITNESS: Could you restate that
9  again?
10  BY MS. FORD:
11    Q. Sure. Uh-huh.
12        Mr. Miller reported to his supervisor
13  that he assisted you and Mike Ramsey with
14  placement of AIM plus pumps at Integrity; is that
15  right?
16    A. Yes.
17    Q. That's what this is reporting?
18    A. Yes.
19    Q. Right.
20        Can you think of situations where a
21  national account manager's assistance would have
22  been necessary in placing pumps or other products

11 (Pages 38 to 41)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                        September 26, 2007
Louisville, KY

Page 42

1  with -- with your accounts?
2      A.   Given the number of pumps we're talking
3  about, that could be a situation where a national
4  account manager would get involved.
5      Q.   Is that because six pumps is a -- a
6  large number in that situation or -- I guess what
7  is it about the number of pumps that makes you
8  think that that would be a situation that would
9  involve a NAM?
10     A.   The total amount of pumps, which is 40.
11 It's not the six.  It's the 40.
12     Q.   Okay.
13     A.   And I would have gone to my manager and
14 said, you know, "This account now has 40 pumps in
15 it, so this account is becoming very large," to
16 which my manager would turn around to the
17 national account manager and say, "Hey, this is
18 becoming a large account, and this should come to
19 your attention."
20     Q.   Okay.
21     A.   So, I'm not necessarily talking to the
22 -- a national account manager, but my manager is

Page 43

1  talking to that individual.
2      Q.   Okay.
3      A.   The hierarchy is that you always go
4  through your district manager.  You don't jump
5  levels to talk to people.
6      Q.   Sure.
7          Thank you.  That helps me understand.
8      A.   Okay.
9      Q.   I'm going to hand you what I'll ask the
10 court reporter to mark as Exhibit French 1377.
11         (Deposition Exhibit French 1377
12 marked for identification and is annexed hereto.)
13 BY MS. FORD:
14     Q.   For the record, this is ABT-DOJ-0251692
15 through 0251703.
16         Mr. French, do you see, in the bottom
17 right-hand corner, a date of April 17th, 2002?
18     A.   Yes.
19     Q.   Okay.
20         MR. COLE:  Could he have a minute,
21 Becky, just to --
22         MS. FORD:  Sure.

Page 44

1          MR. COLE:  -- flip through the
2  document?  Thank you.
3          MS. FORD:  I was actually going to
4  direct you to a certain page.  I just wanted to
5  ask you a particular question about one item on -
6  - on the page, but --
7          MR. COLE:  Okay.  Do you mind if he --
8          MS. FORD:  No.
9          MR. COLE:  Okay.
10 BY MS. FORD:
11     Q.   Mr. French, if it helps you, on Page 3,
12 your name is listed in one of the columns, and a
13 title is listed next to it.  I was just going to
14 ask you about that particular position and title.
15         It's about halfway down the page, if
16 you see "Evansville, Indiana"?
17     A.   Yes.
18     Q.   And then "Eric C. French."
19         Is that you?
20     A.   Yes, it is.
21     Q.   Okay.  And it says, "Perioperative
22 Sales Specialist"; is that right?

Page 45

1      A.   Yes.
2      Q.   Okay.  And was that the -- a position
3  that you held in April of 2002?
4      A.   Yes.
5      Q.   Okay.  So, would that have been the
6  time that you were an anesthesia specialist?
7      A.   Yes.
8      Q.   Okay.  So, is this another title for
9  that position?
10     A.   Yes.
11     Q.   Okay.  What were your duties as an
12 anesthesia specialist or perioperative sales
13 specialist?
14     A.   My primary responsibility was to call
15 on hospital accounts selling a product called
16 Ultane.
17     Q.   Ultane; is that right?
18     A.   Yes.
19     Q.   Is that U-L-T-A-N-E?
20     A.   U-L-T-A-N-E, yes.
21     Q.   Okay.  And what is Ultane?
22     A.   It's a gas to help patients go to

12  (Pages 42 to 45)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                          Louisville, KY

Page 46

1  sleep.
2      Q.  And in what context is it used?
3      A.  For surgery.
4      Q.  Okay.  And I believe you testified that
5  -- that was in the pharmaceutical products
6  division; is that right?
7      A.  Yes.
8      Q.  Okay.  And who was your supervisor
9  there?
10     A.  Melissa Clark.
11     Q.  And what was her title?
12     A.  District manager.
13     Q.  Okay.
14     A.  Monte Dillow -- I had three.
15     Q.  Oh, okay.
16         Was he also a district manager?
17     A.  District manager.
18     Q.  Okay.
19     A.  Linda Fletcher.  Also a district
20  manager.
21     Q.  And I -- I presume these were all
22  district managers at varying times during your

Page 47

1  tenure in that department?
2      A.  Yes.
3      Q.  Okay.  I want to go back now to the
4  time period that you were in the alternate site
5  contract marketing department, and I believe that
6  you indicated for most of your tenure there, with
7  the exception of about a month, that Lynn Leone
8  was your manager; is that correct?
9      A.  Yes.
10     Q.  Aside from the individuals that you
11  worked with within alternate site contract
12  marketing, did you work with others, other
13  employees of alternate sites?
14     A.  Yes.
15     Q.  And what categories of employees would
16  you work with in alternate sites?
17     A.  Sales reps, marketing managers,
18  national account managers, contract marketing
19  coordinators, and the general manager.
20     Q.  Okay.  And what is a contract marketing
21  coordinator?
22     A.  The best description is, they're the

Page 48

1  persons who actually input the contracts into the
2  computer system.  They load the contracts --
3      Q.  Okay.
4      A.  -- into the system.
5      Q.  So, would it be the case that you were
6  providing information to the contract marketing
7  coordinator about the particular contract, and
8  they would actually be doing the data entry?
9      A.  Yes.
10     Q.  Okay.  And in what types of situations,
11  when you were -- when you were a contract
12  marketing analyst, would you work with national
13  account managers?
14     A.  On their -- on their larger accounts,
15  if they were, let's say, putting together a pump
16  deal for an account, they would involve a
17  contract marketing analyst.
18     Q.  And what would be your responsibility
19  in that situation?
20     A.  Pricing and actually writing the
21  contract.
22     Q.  Okay.  And would that have been a

Page 49

1  similar working relationship with the sales
2  representatives?
3      A.  Yes.
4      Q.  Providing pricing and writing the
5  contract for their accounts?
6      A.  For the pumps, yes.
7      Q.  Okay.  During your time in alternate
8  site contract marketing, were you only
9  responsible for the pump part of the business?
10     A.  No.
11     Q.  Okay.  With respect to injectables and
12  the other products that alternate site sold, what
13  were your job responsibilities?
14     A.  I also handled the contracts for buying
15  groups, in addition to working with the sales
16  reps.
17     Q.  Okay.  And what is a buying group?
18     A.  My definition of a buying group is when
19  a group of individuals come together and they use
20  their combined purchasing power to negotiate with
21  another entity.  So, that would be a buying group
22  --

13 (Pages 46 to 49)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

---

Page 50

1    Q.  Okay.
2    A.  -- to me.
3    Q.  So, they are groups of -- home infusion
4  pharmacies, for example, could form a buying
5  group?
6         Individual home infusion pharmacies
7  would --
8    A.  Could belong to a buying group?
9    Q.  Yeah.
10    A.  Yes.
11    Q.  Come together and -- and join a buying
12  group to get better buying power when they're
13  dealing with Abbott.
14       Is that --
15    A.  Yes.
16    Q.  -- an example?
17    A.  Yeah.  That's my understanding of it.
18    Q.  Okay.  And in what context would you
19  work with marketing managers as an analyst?
20    A.  Once again, concerning the pumps,
21  because a marketing manager would have a
22  responsibility for particular products.  Not just

---

Page 51

1  pumps, but any particular product.  And I would
2  interact with them if we were putting together
3  pump deals or pricing or something of that
4  nature.
5    Q.  Okay.  I'm going to hand you what I'll
6  ask the court reporter to mark as Exhibit French
7  1378.
8         (Deposition Exhibit French 1378
9  marked for identification and is annexed hereto.)
10       THE WITNESS:  Thank you.
11       THE REPORTER:  You're welcome.
12  BY MS. FORD:
13    Q.  And for the record, this is ABGM-000130
14  through 000169.
15       Mr. French, do you recognize this
16  document?
17    A.  Not this specific document, but what
18  the document is, yes, ma'am.
19    Q.  Okay.  And what is the document?
20    A.  It looks like it's an award to GeriMed
21  for Abbott products.
22    Q.  And how would this type of -- how would

---

Page 52

1  an award like this come about?
2    A.  Can I look at it for just a second?
3    Q.  Sure.  Absolutely.
4    A.  Two -- two ways:  The first would be if
5  they requested a proposal for a new contract, or
6  the second would be the contract anniversary,
7  which basically means every year, there's an --
8  there's a clause in the contract with the company
9  where we review it on a yearly basis, and we had
10  the right to take a price increase, if necessary.
11       So, for either one of those two
12  situations, a document like this would be sent to
13  the company.
14    Q.  So, it could either be a new award or
15  an annual update; is that --
16    A.  Correct.  Yes.
17    Q.  Is that a fair summary?
18    A.  Yes.
19    Q.  Okay.
20    A.  Yes, ma'am.
21    Q.  In an instance of a new award, would
22  you receive some specifications from the

---

Page 53

1  customers here, such as GeriMed, and -- and bid
2  on -- and bid for Abbott on getting that
3  contract?
4    A.  A company would tell us what they
5  wanted.  These are the products that we want to
6  purchase from you.
7    Q.  Okay.
8    A.  So, yes.
9    Q.  And how about in an annual update?
10       How would it come about that you would
11  prepare some sort of analyses or pricing for the
12  customer in an annual update situation?
13    A.  If I understand your question
14  correctly, it would be dictated by the contract.
15  They would have an anniversary date in their
16  contract, and when that came up, we would
17  initiate the process of reviewing all of their
18  products.  They wouldn't call us.  We would
19  initiate it from our side.
20    Q.  Okay.  So, for a new award, you may be
21  first contacted by the customer and asked to bid
22  on their contract; is that right?

---

14  (Pages 50 to 53)

French, Eric                                        September 26, 2007
Louisville, KY

Page 54

1     A.  Yes.
2     Q.  And then for an annual update, Abbott
3  would actually initiate the process of providing
4  new pricing; is that right?
5     A.  Yes.
6     Q.  Okay.  Looking at this letter, can you
7  tell whether this is an annual award -- I'm
8  sorry, new award or an annual update?
9     A.  From the cover letter, no.  But if you
10  go to the second page and look at -- it says,
11  "General Information, Manufacturer Name, Contract
12  Date."  It says, "August 1st, 2000, through
13  August 31st, 2001."
14     Q.  Or July 31st?
15     A.  I'm sorry.  July 31st.
16     Q.  Okay.
17     A.  And that's a one year time frame.
18     Q.  Okay.
19     A.  So, that would lead me to believe that
20  this is an anniversary opposed to a new contract.
21     Q.  Okay.  So, in this situation, then,
22  Abbott would have generated information about

Page 55

1  pricing and provided it to the customer, in this
2  instance, GeriMed; is that right?
3     A.  Yes.
4     Q.  Okay.  Does this format of the -- the
5  attachment to this letter look familiar to you?
6     A.  Yes.  Vaguely, it does.
7     Q.  So, do you recall this as a
8  format that was used in alternate site contract
9  marketing for things such as annual updates?
10        MR. COLE:  Object to the form.
11        THE WITNESS:  In this particular case,
12  yes.
13  BY MS. FORD:
14     Q.  Okay.
15     A.  I can't say if it was always used --
16     Q.  Okay.
17     A.  -- for everything.
18     Q.  Is it -- is it a form that you used on
19  more than one occasion?
20     A.  Now, that I don't recall.
21     Q.  Okay.  Do you recall the specific
22  letter and the -- and attachment here that we're

Page 56

1  looking at?
2     A.  No.
3        MR. COLE:  Object to the form.
4  BY MS. FORD:
5     Q.  Okay.  But you do recall that this is a
6  format that's familiar to you from being in
7  alternate site contract marketing; is that right?
8     A.  Yes.
9        MR. COLE:  Object to the form.
10  BY MS. FORD:
11     Q.  Okay.  I'm going to hand you what I'll
12  ask the court reporter to mark as Exhibit French
13  1379.
14        (Deposition Exhibit French 1379
15  marked for identification and is annexed hereto.)
16  BY MS. FORD:
17     Q.  And for the record, this is Bates
18  labeled BMW-1590016 through 1590033.
19        Mr. French, if you could turn several
20  pages back, and the number at the bottom right-
21  hand corner that I've been referring to is
22  1590022.

Page 57

1        Are you -- you're on that page?
2     A.  Yes.
3     Q.  Okay.  And do you see, at the bottom of
4  the page, this -- this appears to be the
5  signature page of an IVMed pharmaceutical supply
6  agreement; is that right?
7     A.  Yes.
8     Q.  And this is an agreement between Abbott
9  Laboratories and IVMed; is that right?
10     A.  Yes.
11     Q.  Okay.  And the page that we're looking
12  at now, do you see your name and signature there?
13     A.  Yes.
14     Q.  Okay.  And it appears that you signed
15  this agreement on behalf of Abbott; is that
16  right?
17     A.  Yes.
18     Q.  Okay.  And then if you look above the
19  signature block with your name, you see a Donald
20  L. Mays; is that correct?
21     A.  Yes.
22     Q.  And Mr. Mays appears to be signing the

15  (Pages 54 to 57)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 58

1  agreement on behalf of IVMed; is that right?
2      A.  Yes.
3      Q.  Okay.  Do you -- does Mr. Mays' name
4  sound familiar to you?
5          Do you recall working with him?
6      A.  No.
7      Q.  Okay.  Is this the agreement that you
8  looked at in preparation for your deposition?
9      A.  Yes.
10     Q.  Okay.  It appears to be?
11     A.  Yes.
12     Q.  Okay.  I'm going to hand you now what
13  I'll ask the court reporter to mark as Exhibit
14  French 1380.
15         (Deposition Exhibit French 1380
16  marked for identification and is annexed hereto.)
17         THE WITNESS:  Thank you.
18  BY MS. FORD:
19     Q.  And for the record, this is BMW159-0486
20  through 159-0502.
21         Mr. French, does this appear to be a
22  pharmaceutical supply agreement between Abbott

Page 59

1  Laboratories and RxMed?
2      A.  Yes.
3          MR. COLE:  Could he have a minute,
4  Becky, just to flip through the document?
5          MS. FORD:  Sure.
6  BY MS. FORD:
7      Q.  Have you had a chance to review it?
8      A.  Yes.
9      Q.  Okay.  If you could turn about four
10  pages back or five pages back.  It's Page 159-
11  0490.
12         And do you see your name as the
13  signator for Abbott Laboratories on this
14  agreement?
15     A.  Yes.
16     Q.  Okay.  And above that, the signator for
17  RxMed is Donald Mays; is that right?
18     A.  Yes.
19     Q.  Okay.  And that's the same individual
20  who signed the agreement on behalf of IVMed; is
21  that right?
22     A.  Yes.

Page 60

1      Q.  Exhibit French 1379?
2      A.  Yes.
3      Q.  Okay.  I'm going to hand you what I'll
4  ask the court reporter to mark as Exhibit French
5  1381.
6          (Deposition Exhibit French 1381
7  marked for identification and is annexed hereto.)
8  BY MS. FORD:
9      Q.  And for the record, this is Bates
10  labeled VTP004-0895 through 004-0912.
11         Mr. French, does this appear to be a
12  letter dated May 25th, 2001, from yourself to
13  Donald Mays of GeriMed?
14     A.  Yes.
15     Q.  Okay.  And is this -- does this appear
16  to be the same Donald Mays that signed the
17  agreements on behalf of RxMed and IVMed?
18     A.  Yes, it does.
19     Q.  Okay.  Did you understand GeriMed,
20  RxMed and IVMed to be somehow related?
21     A.  Sitting here right now, I don't recall.
22     Q.  Okay.  Sitting here today, does it --

Page 61

1  does it stand to reason that if the same
2  individual is signing contracts on behalf of
3  IVMed, RxMed, and GeriMed, that they're somehow
4  related?
5      A.  That I don't know for sure.
6      Q.  Okay.  But you do agree with me that
7  Mr. Mays is receiving correspondence and signing
8  agreements on behalf of IVMed, RxMed, and
9  GeriMed; is that right?
10     A.  Yes.
11     Q.  Okay.  And those are all accounts that
12  you had -- you had some responsibility for as a
13  contract analyst?
14     A.  Based upon my signature on these,
15  potentially, yes.
16     Q.  Okay.  Potentially or probably?
17     A.  I don't recall, to be honest, so --
18     Q.  Okay.  But, I mean, is it more than
19  just a possibility?
20         I mean, you've seen the agreements
21  here, and I can show you more, with IVMed, RxMed,
22  and GeriMed, and you're signing on behalf of

16  (Pages 58 to 61)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                        September 26, 2007
Louisville, KY

Page 62

1  Abbott.
2       So, doesn't --
3     A.  Yes.
4     Q.  -- that lead you to believe that --
5  that you had at least some responsibility for
6  these accounts during your time in contract
7  marketing?
8     A.  Yes.
9     Q.  Okay.  If you turn to Page 2 of this
10 Exhibit French 1381, this is a GeriMed
11 pharmaceutical supply agreement; is that right?
12    A.  Yes.
13       MR. COLE:  Could he have a moment to
14 look --
15       MS. FORD:  Sure.
16       MR. COLE:  -- through the document,
17 Becky?
18       THE WITNESS:  Okay.
19 BY MS. FORD:
20    Q.  And I believe the question that was
21 pending is:  This appears to be a pharmaceutical
22 supply agreement between Abbott and GeriMed; is

Page 63

1  that correct?
2     A.  Yes.
3     Q.  Okay.  And if you turn several pages
4  back, and the number on the bottom right-hand
5  side is 004-0903.
6     A.  What was that again?
7     Q.  004-0903.
8       And do you see your name in the
9  signature block at the bottom of the page?
10    A.  Yes.
11    Q.  And does it appear to you that you're
12 signing this GeriMed pharmaceutical supply
13 agreement on behalf of Abbott?
14    A.  Yes.
15    Q.  Okay.  If you could turn back to Page 1
16 of the exhibit.  The letters says, "Dear Mr.
17 Mays, thank you for an extension in submitting
18 this bid.  Please find enclosed disk one, disk
19 two," and then in parentheses, "(original disk
20 did not work)."
21       Do you see that?
22    A.  Yes.

Page 64

1     Q.  Okay.  Do you believe, through this
2  letter, you were transmitting bid information to
3  Mr. Mays for GeriMed?
4     A.  Yes.
5     Q.  So, it was actually Abbott pricing on -
6  - on the GeriMed bid?
7       MR. COLE:  Object to the form.
8       THE WITNESS:  According to this letter,
9  yes.
10 BY MS. FORD:
11    Q.  Okay.  And it references an -- an
12 enclosed disk one and disk two.
13       Do you see that?
14    A.  Yes.
15    Q.  During your time in alternate site
16 contract marketing, was it typical to provide
17 customers pricing information in electronic form?
18    A.  I'm not sure.
19    Q.  You don't recall?
20    A.  I don't recall.
21    Q.  Okay.  Looking at this letter, does it
22 refresh your recollection in any way about what

Page 65

1  type of information may have been contained on
2  the enclosed disks?
3     A.  It would have been pricing --
4     Q.  Okay.
5     A.  -- information, looking at this letter.
6     Q.  Okay.  And typically, when you conveyed
7  pricing information on a contract that you were
8  bidding on, an award that you were bidding on,
9  what would be included in that pricing
10 information?
11       What types of information would you
12 have included in -- in response?
13    A.  What I remember is, current price --
14 well, NDC, product name, current price, new
15 price, and usage.  And then there would be a
16 percent change between the current price and the
17 new price.
18    Q.  And in the scenario that you're just
19 describing, would that be for an annual -- an
20 annual update?
21    A.  Yes.
22    Q.  Okay.  So, you're comparing the old

17 (Pages 62 to 65)

Henderson Legal Services
202-220-4158

French, Eric                                            September 26, 2007
Louisville, KY

Page 66

1   prices that the customer paid with Abbott to the
2   new pricing increase that's going to take effect?
3        A.  Right.
4        Q.  Okay.  And what about for a new award?
5             What type of pricing information would
6   you provide in response to a bid request?
7        A.  Best of my recollection, it would be
8   NDC, it would be the product name, and the price
9   at which we're offering that particular product.
10       Q.  If you could look back at Exhibit
11  French 1378, which you should have in front of
12  you.
13            The first page of that exhibit is a
14  letter.
15            It's dated June 21st, 2000?
16       A.  Yes.
17       Q.  Okay.  And if you could turn to Page 2.
18            This is the attachment titled, "2000
19  Manufacturer Listing of Pharmaceutical Awards
20  GeriMed."
21            Do you see that?
22       A.  Yes.

Page 67

1        Q.  Okay.  So, here in this document, we've
2   got the generic name, the brand name, a column
3   for FDA, column for NDC, package size, contract
4   price, AWP, dollar dif AWP, type, effective date,
5   and pricing end date; is that right?
6        A.  Yes.
7        Q.  Okay.  Do you recall including AWP
8   information in your pricing?
9        A.  No.
10       Q.  Does this refresh your recollection
11  that at least in the instance of GeriMed, you
12  included AWP information in the pricing?
13       A.  Yes.
14       Q.  Okay.  And then what -- what does the
15  column "dollar dif AWP" stand for?
16       A.  I don't know.
17       Q.  Okay.  Looking at it, does it appear to
18  be the difference between the contract price and
19  the AWP?
20       A.  Yes.
21       Q.  Okay.  And then under the column of
22  "type," there are letters in that column, in the

Page 68

1   rows going down that column, "SMD," for example.
2             What -- do you know what those stand
3   for?
4        A.  No.
5        Q.  Do you know what that column -- what
6   type of information that column is trying to
7   convey?
8        A.  I don't recall what that is.
9        Q.  Okay.  And what about the column that's
10  titled "FDA"?
11       A.  No.
12       Q.  Okay.  Was providing AWP information in
13  pricing to Abbott's customers a common practice
14  when you were in contract marketing?
15       A.  I don't recall.
16       Q.  Okay.  You just don't recall one way or
17  the other whether that was --
18       A.  I don't -- I don't remember.
19       Q.  Okay.  Do you recall in dealing with
20  the GeriMed, RxMed, and IVMed accounts that they
21  were interested in the AWP on Abbott's products?
22       A.  No.  I don't recall if they were.

Page 69

1        Q.  Okay.  Can you think of a reason why
2   you would have included the AWP in -- in a column
3   for the difference between the contract price and
4   the AWP on the GeriMed award if it wasn't
5   something that the customer was interested in?
6        A.  No.
7        Q.  Okay.  Can't think of any other reason?
8        A.  No, ma'am.
9        Q.  Okay.  I'm going to hand you an exhibit
10  that I'll ask the court reporter to mark as
11  Exhibit French 1382.
12            (Deposition Exhibit French 1382
13  marked for identification and is annexed hereto.)
14            THE WITNESS:  Thank you.
15  BY MS. FORD:
16       Q.  For the record, this is ABRX-000118
17  through 000159.
18            Mr. French, does the first page of --
19  of this exhibit appear to be a letter dated March
20  7th, 2001, from you to Christian Kendall of
21  RxMed?
22       A.  Yes.

18 (Pages 66 to 69)

Henderson Legal Services
202-220-4158

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 70

1    Q.  Okay.  And it says, "Please find
2  enclosed the following: One copy of the new
3  RxMed price list, one copy of the current RxMed
4  membership list, and a list of killed products."
5        Do you see that?
6    A.  Yes.
7    Q.  And did I read that accurately?
8    A.  Yes.
9    Q.  Okay.  What is meant by a list of
10  killed products?
11        MR. COLE:  Can he have a minute just to
12  flip through the document?  It's about --
13        MS. FORD:  I'm only asking him about
14  Page 1.
15        If you need a minute to look -- I'm
16  just really asking you what -- if you know what's
17  meant by a list of killed products on item three
18  of your cover letter.
19        MR. COLE:  If you need -- if you want
20  to look at it.
21        MS. FORD:  But if you want -- if you
22  want him -- him to look at the document --

Page 71

1        MR. COLE:  It's about 30 pages long,
2  the whole document, so --
3        THE WITNESS:  Are we going to talk
4  about the whole document?
5        Are we going through the whole document
6  or --
7  BY MS. FORD:
8    Q.  No.
9    A.  My understanding is, these are
10  discontinued products.
11    Q.  So, this is a -- RxMed is a continuing
12  account for Abbott; is that right?
13        MR. COLE:  Object to the form.
14        THE WITNESS:  I don't know.
15  BY MS. FORD:
16    Q.  Okay.  We've seen some exhibits where
17  we're providing -- we've seen some contracts and
18  some annual pricing information.
19    A.  Just clarification real quick:
20  Continuing -- can you just restate the question
21  again?
22    Q.  Sure.  Sure.

Page 72

1        Does this appear to be list of products
2  that are being taken off of RxMed's contract with
3  Abbott?
4    A.  Yes.
5    Q.  So, it was an existing contract?
6        RxMed had an existing contract at this
7  time?
8        MR. COLE:  I'll object to the form.
9        THE WITNESS:  Yes.
10  BY MS. FORD:
11    Q.  Okay.  So, for example, in item one of
12  this letter, it says, a "copy of the new RxMed
13  price list."
14        So, does that lead you to believe there
15  was an old price list?
16    A.  Yeah.  That's what I was looking on
17  this for, just to make sure, yes.
18    Q.  Okay.
19        MR. COLE:  If you need time to look at
20  the document, Eric, feel free.
21        THE WITNESS:  Okay.
22        MR. COLE:  Flip through it.

Page 73

1  BY MS. FORD:
2    Q.  And a copy of the current RX membership
3  list, RxMed membership list, excuse me, is what
4  it's referencing in the cover letter?
5    A.  Yes.
6    Q.  And then the third item was a list of
7  killed products, and I think you've --
8  summarizing what I think you've told me is that
9  products that are being taken off of the contract
10  between Abbott and RxMed; is that right?
11    A.  Yes.
12    Q.  Okay.  And what do you mean by -- well,
13  that -- that answers the question.
14        Do you recall working with Christian
15  Kendall of RxMed?
16    A.  No.
17    Q.  After having seen these exhibits,
18  Exhibit French 1378 through Exhibit French 1381,
19  or Exhibit French 1382, does this refresh your
20  recollection about any of the individuals you may
21  have worked with at GeriMed?
22    A.  No.

                          19 (Pages 70 to 73)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 74

1    Q.  How about RxMed?
2    A.  No.
3    Q.  Or IVMed?
4    A.  No.
5    Q.  Okay.  Going back to Exhibit French
6  1378 for a minute and the -- if you turn to the
7  second page that we were just looking at?
8    A.  Yes.
9    Q.  And earlier you testified that this is
10  a format that looked familiar to you as one that
11  had been used in alternate site contract
12  marketing; is that right?
13      MR. COLE:  Object to the form.
14      THE WITNESS:  No.  I thought I said
15  that for this one, and that I wasn't sure if this
16  was the standard format that we used in contract
17  marketing.
18  BY MS. FORD:
19    Q.  I didn't say "standard."  I just said a
20  format that was familiar to you.
21      MR. COLE:  Object to the form.
22      I don't think there's a question

Page 75

1  pending.
2      THE WITNESS:  Okay.
3      MS. FORD:  Actually, there was.
4      MR. COLE:  He answered the -- the
5  previous question.
6      MS. FORD:  Okay.
7  BY MS. FORD:
8    Q.  You had testified earlier that this was
9  a format that looked familiar to you as having --
10  when you worked in alternate site contract
11  marketing; is that right?
12      MR. COLE:  Object to the form.
13      THE WITNESS:  I've seen something like
14  this before.
15  BY MS. FORD:
16    Q.  Okay.  Do you believe that you created
17  this format?
18    A.  Based upon my signature being on the
19  first page, yes.
20    Q.  Okay.  And other than just actually
21  having created this document, do you think this
22  is a format that -- format for the spreadsheet,

Page 76

1  for example, that you would have developed as a
2  contract marketing analyst?
3      MR. COLE:  Object to the form.
4      THE WITNESS:  Are you asking me if I
5  created the different column headings and
6  everything that went into the columns?
7  BY MS. FORD:
8    Q.  Yes.
9    A.  I don't believe I did that, no.
10    Q.  Okay.  Let me back up.
11      When you were in alternate site
12  contract marketing, was there a standard format
13  for this type of document?
14      MR. COLE:  Object to the form.
15      THE WITNESS:  That I don't recall.
16  BY MS. FORD:
17    Q.  You weren't the only contract marketing
18  analyst, right?
19    A.  No.
20    Q.  Okay.  Did all of the contract
21  marketing analysts provide pricing to customers
22  in the same way?

Page 77

1    A.  Yes.
2    Q.  Okay.  And was that through a standard
3  form?
4      MR. COLE:  I'll object to the form.
5  BY MS. FORD:
6    Q.  Did you use a standard format to -- to
7  convey pricing information to customers when you
8  were in contract marketing?
9    A.  I believe so.
10    Q.  Okay.  And who created that form?
11    A.  That I don't know.
12    Q.  Okay.  But was it, to the best of your
13  understanding, or your recollection, was it a
14  form that was given to you when you joined
15  alternate site contract marketing and someone
16  said --
17    A.  Yes.
18    Q.  -- this is "This is how we do it"?
19    A.  Yes.  When I came into the department,
20  the standards were already set.
21    Q.  Okay.
22    A.  I did not create documents on my own.

20  (Pages 74 to 77)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                              September 26, 2007
                    Louisville, KY

Page 78

1      Q.  Well, you -- you created some -- I
2  mean, you created documents on your own.
3      For example, you created cover letters,
4  like the cover letter to --
5      A.  Well, no.  I'm -- let me -- let me
6  clarify.
7      As far as what we were talking about
8  earlier, you know, the different column headings
9  and what should be on there --
10     Q.  Uh-huh.
11     A.  -- that's what I -- I meant.  I didn't
12  create column headings or things like --
13     Q.  Okay.
14     A.  -- that.
15     But did I do cover letters like this?
16  Yeah, I -- well, I -- I wrote cover letters.
17     Q.  Sure.
18     And -- and you would have created
19  documents -- but if I'm understanding you
20  correctly, you wouldn't have created the form or
21  the format, but you would have created documents
22  based -- using that form or format.

Page 79

1      Is that an accurate summary?
2      MR. COLE:  Object to the form.
3      THE WITNESS:  Yes.
4      MS. FORD:  Okay.
5      MR. COLE:  We've been going about an
6  hour and 15 minutes.
7      Do you -- is this a good time for a
8  break?
9      MS. FORD:  Maybe in about five minutes?
10     MR. COLE:  Are you --
11     THE WITNESS:  That's fine.
12     MR. COLE:  -- doing okay?
13     THE WITNESS:  Yeah.
14     MR. COLE:  Okay.
15  BY MS. FORD:
16     Q.  I'm going to hand you one more exhibit,
17  and then --
18     A.  Okay.
19     Q.  -- ask you a few questions, and then
20  we'll take a break.
21     A.  Okay.
22     Q.  I'll ask the court reporter to mark it

Page 80

1  as Exhibit French 1383.
2      (Deposition Exhibit French 1383
3  was marked for identification and is annexed
4  hereto.)
5      THE WITNESS:  Thank you.
6  BY MS. FORD:
7      Q.  On page -- for the -- for the record --
8      A.  Yes.
9      Q.  -- this is ABGM-00065 through -- sorry
10  about that -- through 00095.
11     Mr. French, does this appear to be a
12  July 8th, 1999 letter from Scott Moore to Susan
13  Rhodus?
14     A.  Yes.
15     MR. COLE:  I'm going to ask again,
16  Becky, if he could just have a few minutes to
17  read through the document. It's about 30 pages
18  long.
19  BY MS. FORD:
20     Q.  Mr. French, I'm not going to be asking
21  you detailed questions about the document --
22     A.  Okay.

Page 81

1      Q.  -- but take all of the time that you
2  need to review it.
3      A.  Okay.
4      Okay.
5      Q.  And if you turn to Page 2 of the
6  document, do you see the heading that says, "1995
7  Manufacturer Listing of Pharmaceutical Awards
8  GeriMed"?
9      A.  Yes.
10     Q.  Okay.  First of all, let me ask you:
11  Did you know Scott Moore?
12     A.  Yes.
13     Q.  And was he an alternate site contract
14  marketing analyst?
15     A.  Yes.
16     Q.  Okay.  Was he there during the same
17  time that you were, or at least some of the time
18  period you were in contract marketing?
19     A.  Some of the time, yes.
20     Q.  Did you understand Mr. Moore to have
21  responsibility for the GeriMed account at some
22  point?

21 (Pages 78 to 81)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 82

1    A.  I don't -- I don't recall --
2    Q.  Okay.
3    A.  -- what accounts he had.
4    Q.  Okay.  But here you see he's sending a
5  letter to Susan Rhodus and attached to the letter
6  is a 1995 (sic) manufacturer listing of
7  pharmaceutical awards for GeriMed; is that right?
8        MR. COLE:  Object to the form.
9        Did you say 1995, Becky?
10       MS. FORD:  If I did, I meant to say
11  1999.
12       THE WITNESS:  Yes.
13  BY MS. FORD:
14    Q.  Okay.  And if you would, compare that
15  to the exhibit -- Page 2 of the Exhibit French
16  1378, which is the 2000 manufacturer listing of
17  pharmaceutical awards for GeriMed.
18       Do you have those two together?
19    A.  Yes.
20    Q.  Does this appear to be the same general
21  format of the document?
22    A.  Yes.

Page 83

1    Q.  So, going -- looking at the columns and
2  reading the column headings from left to right,
3  generic name, brand name, FDA, NDC number,
4  package size, contract price, AWP, dollar dif
5  AWP, type, effective date, and pricing end date
6  are in both of these documents; is that right?
7    A.  Yes.
8    Q.  And this was -- with respect to Exhibit
9  French 1383, it also has a column titled
10  "contract number"; is that right?
11    A.  Yes.
12    Q.  Okay.  So, here we have, in 1999, Mr.
13  Moore is providing pricing information to
14  GeriMed, which includes the AWP and the dollar
15  difference AWP, similar to what you did in 2000;
16  is that right?
17    A.  Yes.
18    Q.  Okay.  Do you have any recollection of
19  inheriting this format from Mr. Moore?
20       MR. COLE:  Object to the form.
21       THE WITNESS:  I don't remember
22  specifically receiving this form from Scott.

Page 84

1  BY MS. FORD:
2    Q.  Okay.
3    A.  No.  I do not.
4        MS. FORD:  We can go ahead and take a
5  break now.
6        THE VIDEOGRAPHER:  We'll go off the
7  record at the conclusion of tape number one at
8  10:16 a.m.
9        (There was a brief recess.)
10       THE VIDEOGRAPHER:  Back on the record
11  at the beginning of tape number two at 10:32 a.m.
12  BY MS. FORD:
13    Q.  Mr. French, before we broke, we were
14  looking at Exhibit French 1378 and Exhibit French
15  1383.
16       Do you still have those in front of
17  you?
18    A.  Thank you.
19       Yes.  I do now.
20    Q.  Okay.  And Exhibit French 1378 was a
21  pricing spreadsheet that you provided to GeriMed;
22  is that right, in June of 2000?

Page 85

1    A.  According to the cover letter, yes.
2    Q.  Okay.  And Exhibit French 1383 is a
3  similar spreadsheet that Mr. Moore provided to
4  GeriMed in July of 1999; is that right?
5    A.  Yes.
6    Q.  I'm going to hand you now what I'll ask
7  the court reporter to mark as Exhibit French
8  1384.
9        (Deposition Exhibit French 1384
10  marked for  identification and is annexed
11  hereto.)
12  BY MS. FORD:
13    Q.  And for the record, this is ABRX-0089
14  through ABRX-000117.
15       I'm afraid I may have read those
16  numbers wrong. ABRX-000089 through 000117.
17       Mr. French, does this appear to be a
18  January 26th letter from Scott Moore to RxMed?
19    A.  Yes.
20    Q.  Okay.  If you could turn to Page 2 of
21  the exhibit.
22       Do you see at the top it says, "2000

22  (Pages 82 to 85)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 86

1  Manufacturer Listing of Pharmaceutical Awards
2  RxMed"?
3      A.  Yes.
4      Q.  Okay.  And you see the format of this
5  spreadsheet.
6          Does it appear to be similar to the
7  format of spreadsheets in Exhibit French 1382 and
8  Exhibit French 1378 -- excuse me, Exhibit French
9  1383 and Exhibit French 1378?
10     A.  Yes.
11     Q.  And again, in the columns we have
12  generic name, brand name, FDA, NDC number,
13  package size, contract price, AWP, dollar
14  difference AWP, type, effective date, pricing end
15  date, and contract number; is that right?
16     A.  Yes.
17     Q.  Okay.  So, you would agree with me,
18  then, that you weren't the first alternate site
19  contract marketing analyst to use this format; is
20  that right?
21         MR. COLE:  Object to the form.
22         THE WITNESS:  Yes.

Page 87

1  BY MS. FORD:
2      Q.  And you weren't the only analyst to use
3  this format; is that right?
4          MR. COLE:  Object to the form.
5          THE WITNESS:  Can you ask the question
6  again, please?
7  BY MS. FORD:
8      Q.  Sure.
9          You weren't the only analyst to use
10  this pricing format; is that right?
11     A.  It appears that Scott used that format
12  right there, too, yes.
13     Q.  Okay.  And you weren't the -- the first
14  analyst to provide AWP or dollar difference AWP
15  information to an Abbott customer; is that right?
16         MR. COLE:  Object to the form.
17         THE WITNESS:  Can you repeat it again,
18  please?
19  BY MS. FORD:
20     Q.  Sure.
21         You weren't the first analyst to
22  provide the AWP information to an Abbott

Page 88

1  customer; is that right?
2          MR. COLE:  Object to the form.
3          THE WITNESS:  No.
4  BY MS. FORD:
5      Q.  Okay.  And you weren't the only analyst
6  to provide AWP information to an Abbott customer;
7  is that right?
8          MR. COLE:  Object to the form.
9          THE WITNESS:  According to these two
10  documents, no, I wasn't.
11  BY MS. FORD:
12     Q.  Okay.  What does "AWP" stand for?
13     A.  My understanding is, average wholesale
14  price.
15     Q.  Okay.  And what is the average
16  wholesale price?
17     A.  That I'm not sure of.
18     Q.  Okay.  Do you know how AWP is
19  calculated?
20     A.  No.
21     Q.  Okay.  Do you know for what purpose AWP
22  is used?

Page 89

1      A.  By whom?
2      Q.  We'll start with Abbott.
3      A.  No.
4      Q.  How about contract marketing?
5      A.  No.
6      Q.  How about Abbott's customers, such as
7  GeriMed?
8      A.  No.
9      Q.  I would like to turn -- you can put
10  these exhibits away.
11         I'm going to turn --
12     A.  Okay.
13     Q.  -- now to training.
14         And I wanted to ask you if you received
15  any training when you joined the alternate site
16  contract marketing department.
17     A.  Yes.
18     Q.  And did you receive formal training?
19     A.  By "formal" you mean?
20     Q.  I'm trying to understand whether it
21  was, you know, a formal training program versus
22  hands-on training.

23 (Pages 86 to 89)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

                                                        Page 90
1       A.  It was hands-on.
2       Q.  Okay.  And who provided that training?
3       A.  My manager, Lynn Leone.
4       Q.  Okay.
5       A.  And then I would work with the
6    different contract marketing analysts that were
7    presently there.
8       Q.  Okay.  Do you recall any classroom-
9    style training?
10      A.  No.
11      Q.  Okay.  Do you recall receiving any
12   manuals when you joined alternate site contract
13   marketing?
14      A.  I don't recall any manuals.
15      Q.  Okay.  So, other than the hands-on type
16   of training that was provided by Ms. Leone or the
17   other analysts, do you recall any written
18   information that instructed you how to do your
19   job?
20      A.  I don't recall anything.  I'm not
21   saying that there wasn't.  I just don't recall
22   specifically what I was given.

                                                        Page 91
1       Q.  Okay.  I'm going to hand you what has
2    been previously marked as Plaintiff's Exhibit 1321
3    in a prior deposition.  And I'll give it first to
4    your counsel because I only have one copy.
5           MR. COLE:  Is this the whole thing,
6    Becky?
7           MS. FORD:  This is the entire exhibit
8    that was --
9           MR. COLE:  Okay.
10          MS. FORD:  -- introduced in the
11   Burchieri deposition.
12          MR. COLE:  Okay.
13          MS. FORD:  I will note that this
14   contract marketing -- this exhibit has redacted
15   pages that were provided to the United States in
16   redacted form, in which we've asked for
17   unredacted copies, but this is what we've
18   received to date.
19          MR. COLE:  Okay.
20   BY MS. FORD:
21      Q.  Mr. French, do you recognize this
22   document?

                                                        Page 92
1       A.  No.
2       Q.  Do you recall ever receiving a document
3    such as a Contract Marketing Basic Operating
4    Procedure Manual?
5       A.  I don't recall receiving it, no.
6       Q.  Okay.
7           MR. COLE:  You can take the rubber band
8    off if you want.
9           THE WITNESS:  Okay.
10   BY MS. FORD:
11      Q.  Whether or not it was called a Contract
12   Marketing Basic Operating Procedure Manual, does
13   this refresh your recollection about receiving
14   any written materials about how to do your job?
15      A.  Can I look at it for a second?
16      Q.  You certainly can.
17      A.  No, I don't recall this manual.
18      Q.  Okay.  If you could turn to Page 215 of
19   the document.
20          The first paragraph there says, "New
21   Contract Marketing -- the first paragraph says,
22   "New Contract Marketing Analysts need to absorb a

                                                        Page 93
1    considerable amount of information and develop a
2    strong analytical skill-set quickly.  While some
3    formal training is provided, it is the
4    responsibility of the new Analyst to insure that
5    they reach the level of competence needed to
6    bring themselves up to speed."
7           Did I read that accurately?
8       A.  Yes.
9       Q.  Okay.  And then at the bottom of the
10   second paragraph, the last sentence says, "The
11   New Analyst Training Manual is a training
12   outline" --
13      A.  I'm sorry.  Where are you at?
14      Q.  The second paragraph.
15      A.  Okay.
16      Q.  Last sentence.
17          "The New Analyst Training Manual is a
18   training outline for this portion of the training
19   process."
20          Did I read that accurately?
21      A.  Yes.
22      Q.  Do you recall receiving a New Analyst

                                          24  (Pages 90 to 93)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                          Louisville, KY

Page 94

1    Training MANUAL?
2       A.  No.
3       Q.  Okay.
4       A.  I don't.
5       Q.  Okay.  Does this -- reviewing this
6   refresh your recollection in any way about the
7   training that you may have received in alternate
8   site contract marketing?
9       A.  No.
10      Q.  Okay.  If you could turn now to Page
11  100 of the document.
12      A.  Can I -- can I point something out to
13  you or --
14      MR. COLE:  If you want to -- we can
15  take a break and -- and we can talk if you want,
16  or if -- if -- if you think it affects an earlier
17  answer, then you can --
18      THE WITNESS:  No.  No.
19      MR. COLE:  -- supplement your answer.
20      THE WITNESS:  No.  No.  It's not --
21  it's not that.  I'm --
22      MR. COLE:  Do you want to take a break?

Page 95

1       THE WITNESS:  Yeah.  Just for -- just
2   for a second.
3       MR. COLE:  Okay.
4   Is that okay with you?
5       MS. FORD:  That's fine.
6       THE VIDEOGRAPHER:  We'll go off the
7   record at 10:43 a.m.
8           (There was a brief recess.)
9       THE VIDEOGRAPHER:  We are back on the
10  record at 10:45 a.m.
11  BY MS. FORD:
12      Q.  You had asked to take a break.
13          Did you have a question or something
14  you needed to point out about the document?
15      A.  Just a clarification.  That's all.
16      Q.  Okay.  Anything that you want to put on
17  the record?
18      A.  Well, the -- I was just a little
19  confused because the dates of each page were
20  different.
21      Q.  Okay.
22      A.  And that just kind of threw me off.  I

Page 96

1   thought when you handed it to me, it was one
2   manual put together at one time, and it's like --
3   it's different -- it was put together at
4   different times.
5       Q.  Sure.
6       A.  And so, I was just kind of a little bit
7   confused, and that's why.
8       Q.  That's understandable.
9           And --
10      A.  Okay.  Sorry about that.
11      Q.  No.  That's a -- that's a -- a good
12  point.
13          And my understanding, this was provided
14  to the United States as one document labeled "The
15  Contract Marketing Basic Operating Procedures
16  Manual," and it does appear that there are
17  inserts in this document from different dates, so
18  --
19      A.  Yeah.  And I don't recall seeing it, so
20  --
21      Q.  Okay.  And are you on Page 100?
22      A.  I thought we were on 115.  I'm sorry.

Page 97

1       Q.  That's okay.
2       A.  Yes.  I'm on Page 100.
3       Q.  Okay.  And the heading at the top of
4   that page says "Deals"; is that correct?
5       A.  Yes.
6       Q.  Okay.  And the first sentence says,
7   "Deals are an important part of Abbott's everyday
8   life.  We commonly use them to introduce products
9   and to increase sales among slow moving
10  products."
11          Did I read that accurately?
12      A.  Yes.
13      Q.  Okay.  Is that consistent with your
14  recollection of the operation of alternate site
15  contract marketing, that you provided deals to
16  customers?
17      A.  No.
18      Q.  No?  Okay.
19      A.  No.
20      Q.  If you read further down, it says,
21  "They are also used to assist the field
22  organization at the end of campaigns and as a way

25  (Pages 94 to 97)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 98

1  to effect temporary price reductions at
2  individual accounts.  National or regional deals
3  are set up by marketing managers, while account
4  specific deals are set up by analysts."
5         Did I read that accurately?
6     A.  Yes, you did.
7     Q.  Okay.  Do you recall, during the time
8  that you were in contract marketing, any national
9  deals set up by the marketing department?
10    A.  No.
11    Q.  Okay.  Do you recall, as a contract
12 analyst, working on -- on any account specific
13 deals for customers?
14    A.  Yes.
15    Q.  Okay.  And what types of deals were
16 those?
17    A.  Pumps.
18    Q.  Okay.
19    A.  Well, I'm sorry.  Infusion pumps.
20    Q.  And how would -- how would -- how would
21 a deal be different from your -- your normal just
22 pricing activities?

Page 99

1     A.  I'm not sure I understand the question.
2     Q.  Okay.  For example, did you ever
3  discount pumps in order to get a large account?
4     A.  By "discount" you mean?
5     Q.  Provide special pricing to the
6  customer.
7     A.  Yes.
8     Q.  Okay.  Did you have any other kind of
9  deals?
10        I'm trying to understand the
11 terminology being used in the manual here and how
12 that was applied in alternate site contract
13 marketing, that deals were an important part of
14 everyday life.
15        MR. COLE:  I'll object to the form.
16        THE WITNESS:  To be perfectly honest,
17 I'm not sure about what this is speaking to on
18 this page.
19 BY MS. FORD:
20    Q.  Okay.
21    A.  But as far as what I did in contract
22 marketing, a customer would come to you and say,

Page 100

1  "I want to buy 20 pumps.  Can we negotiate a
2  price?"  And in my -- my terminology, that's a
3  deal, where we're negotiating a price for the
4  pumps, because they want a larger than normal
5  amount.
6         Someone buys two or three, that's one
7  thing.  Someone buys 20, that's something
8  different.  So, we would have to negotiate the
9  amount for those pumps.
10        So, my terminology, that's what I think
11 you asked about deals.
12    Q.  Okay.
13    A.  As far as this right here, I'm not sure
14 what they're speaking to.
15    Q.  Okay.  When negotiating with a
16 customer, for example, to use your example, over
17 the purchase of 20 pumps --
18    A.  Yes.
19    Q.  -- did you have any -- anything you
20 could offer the customer other than better
21 pricing?
22        MR. COLE:  Object to the form.

Page 101

1         THE WITNESS:  No.
2  BY MS. FORD:
3     Q.  So, for example, could you offer them
4  free goods?  By 20 pumps, we'll give you two free,
5  for example.
6         MR. COLE:  Object to the form.
7         THE WITNESS:  No.
8  BY MS. FORD:
9     Q.  Okay.  Could you offer them rebates?
10 If they purchased a certain amount of product --
11    A.  What do you mean by "rebates"?  I'm
12 sorry.
13    Q.  Okay.  Did you ever use rebates when
14 you were a contract marketing analyst?
15    A.  By -- by "rebates" you mean -- I just
16 want to make sure I answer your question --
17    Q.  Sure.
18    A.  -- correctly.
19        They buy something, and we give them
20 something back?
21    Q.  Yes.
22    A.  No.

                                26  (Pages 98 to 101)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                          Louisville, KY

Page 102

1    Q.  Okay.  So, are you familiar with
2  providing pricing structure where if the customer
3  purchases "X" amount of product, any sales over
4  "X," the customer would be eligible for a rebate?
5    A.  No.
6    Q.  Okay.  If you could turn to Page 176
7  now.
8       And the first paragraph says, "Many
9  proposals included provision for" initial -- an -
10  - excuse me, "an initial expense such as
11  conversion allowance.  Occasionally, these
12  expenses exceed 50 thousand or even 100 thousand
13  dollars.  We must plan for expenses of this
14  magnitude."
15       Did I read that accurately?
16    A.  Yes.
17    Q.  Then first let me ask you:  Were you --
18  did you work on any accounts in which a
19  conversion allowance was provided to a customer?
20    A.  I don't recall a specific account, but
21  it's possible, yes.
22    Q.  Okay.  Whether or not you can recall

Page 103

1  the specific account today, do you -- do you have
2  a recollection of using a conversion allowance
3  any time, either as an infusion system specialist
4  or as a contract marketing analyst, in providing
5  a conversion allowance to an Abbott customer?
6    A.  No, I don't remember any specific
7  incident of doing that.  No.
8    Q.  Do you -- do you recall that conversion
9  allowances -- excuse me -- that a conversion
10  allowance was one tool that you had to use in --
11  in working with your accounts?
12    A.  Yes.
13    Q.  Okay.
14    A.  Yes.
15    Q.  And do you recall hearing that --
16  whether or not you recall a specific situation,
17  whether -- excuse me -- whether or not you recall
18  a specific situation, do you recall Abbott
19  employees providing conversion allowances for
20  their --
21    A.  Yes.
22    Q.  -- for their contracts?

Page 104

1    A.  Yes.  I thought you were asking me, do
2  I remember a specific incident.  But conversion
3  allowances, yes.
4    Q.  Okay.  And how did a conversion
5  allowance work?
6    A.  Essentially, if a customer was using my
7  competitor's product and they wanted to start
8  using our product, they were going to have to
9  convert over to our system.  And there may be
10  instances where some things weren't compatible.
11  You know, it wasn't A to A.  Maybe they had two
12  white sides on their tubing, and maybe we had
13  three.  And so, there was cost incurred by that
14  customer to transition over to us.
15       And that's what the conversion
16  allowance would speak to.  That's what I remember
17  it being.
18    Q.  Okay.  And on a new contract, say a
19  contract that you were taking the business away
20  from a competitor, and a conversion allowance was
21  being offered, would that conversion allowance be
22  considered part of the deal?

Page 105

1       MR. COLE:  Object to the form.
2       THE WITNESS:  Going back to the word --
3  would it be part of the negotiations?  Yes, it
4  probably would be.
5  BY MS. FORD:
6    Q.  Okay.  And what form did a conversion
7  allowance usually take?
8       Was it a monetary award?
9       MR. COLE:  Object to the form.
10       THE WITNESS:  I don't recall --
11  BY MS. FORD:
12    Q.  Okay.
13    A.  -- to be honest.
14    Q.  I guess what are the range of
15  possibilities?
16       Could it have been money?
17       MR. COLE:  Object to the form.
18       THE WITNESS:  I don't recall.
19  BY MS. FORD:
20    Q.  Okay.
21    A.  And I don't recall if there was a
22  standard of how that was done.  I don't remember

27 (Pages 102 to 105)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                            September 26, 2007
                              Louisville, KY

---

Page 106

1  that.
2      Q.  Looking back at the manual, the second
3  sentence on the page says, "Occasionally, these
4  expenses exceed 50 thousand or even 100 thousand
5  dollars."
6      A.  Where we at?  Okay.
7      Q.  Yeah.
8          "Occasionally, these expenses exceed 50
9  thousand or even 100 thousand dollars.  We must
10 plan for expenses of this magnitude."
11         Did I read that accurately?
12     A.  Yes, you did.
13     Q.  Okay.  Does that seem to suggest that
14 it could have been a monetary award to the
15 customer to assist them with the conversion?
16         MR. COLE:  Object to the form.
17         THE WITNESS:  I don't know, and the
18 reason I don't know, this says these expenses
19 exceed 50,000 or even 100 thousand.  That
20 conversion allowance, that expense, is more than
21 the size of most of the customers in alternate
22 site.  So, to me, looking at this, this pertains

---

Page 107

1  to hospital products and not alternate site.  So,
2  I can't really speak to that.
3          That's -- that's a pretty large amount
4  of money, so --
5  BY MS. FORD:
6      Q.  Okay.
7      A.  -- I don't think that pertains to
8  alternate site.
9      Q.  But alternate site is part of the
10 hospital products division; is that right?
11     A.  Yes.
12     Q.  Okay.  The second paragraph on the page
13 says, "Once a proposal has become a contract
14 there may be expenses such as a rebate, dividend,
15 or management fee.  Here too, it is extremely
16 important that we plan and communicate
17 appropriately."
18         Did I read that accurately?
19     A.  Yes.
20     Q.  Okay.  Does this refresh your
21 recollection about the use of rebates, dividends,
22 or management fees in contract marketing?

---

Page 108

1      A.  Yes.
2      Q.  Okay.  And what is your understanding
3  of a rebate?
4      A.  When looking at this, because it's tied
5  to our management fee, this is dealing with a
6  buying group, and it would deal with the volume
7  that they purchase.
8          And that's what the rebate dividend and
9  management fee are speaking to.
10     Q.  Okay.  So, for example -- and when you
11 say "buying group," is that similar to or the
12 same as a group purchasing organization?
13         Have you heard that terminology?
14     A.  Yes.  Yes.
15     Q.  So, buying group and G.P.O., are they
16 one in the same?
17     A.  Yes.
18     Q.  Okay.  So, you had -- you just
19 mentioned volume with respect to a buying group;
20 is that right?
21     A.  Yes.
22     Q.  So, if a buying group reached a certain

---

Page 109

1  volume, would they be eligible for a rebate or a
2  dividend?
3          MR. COLE:  Object to the form.
4          THE WITNESS:  Not -- not everyone.
5  BY MS. FORD:
6      Q.  Okay.
7      A.  I can't say across the board that
8  everybody who hits a certain volume, because my
9  understanding of what was happening at the time
10 was, their -- everybody had their own agreement.
11 It wasn't like everyone had -- everyone gets a
12 management fee, everyone gets that.  I don't
13 think that was the case at the time.
14         So, I would have to answer no to the
15 question you asked.
16     Q.  Okay.  You had connected, in your
17 answer a few minutes ago, volume with the idea of
18 rebates, dividends, and management fees, and I'm
19 just -- I'm just trying to understand --
20     A.  Yeah.
21     Q.  -- when a customer might get a rebate.
22         In what situation would a customer be

---

28  (Pages 106 to 109)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                      September 26, 2007
                        Louisville, KY

Page 110

1  eligible for a rebate from Abbott?
2      A.  A customer and Abbott would negotiate
3  that in their agreement, or a customer would ask
4  for it when coming to us to get our products.
5  So, that would be the situation.
6      Q.  Okay.  And you had associated those, in
7  your earlier answer, with volume, and I -- I'm
8  just trying to understand the relationship --
9      A.  Uh-huh.
10     Q.  -- between the volume and the rebate.
11         So, if a customer had negotiated for a
12 rebate, would that be based upon achieving some
13 particular volume of purchases?
14     A.  Yes.
15     Q.  Okay.  And would that be also true for
16 dividends?
17     A.  Now, that I don't know.
18     Q.  Okay.
19     A.  That I don't know.
20     Q.  Do you have an understanding of how
21 dividends were used in contract marketing?
22     A.  No.

Page 111

1      Q.  Okay.  And how about management fees?
2      A.  Management fees were set in the
3  agreement during the negotiation.  If I remember
4  correctly, it was either two or three percent of
5  the usage.
6      Q.  And who would the management fee be
7  paid to?
8      A.  If I understand correctly -- well, if I
9  remember correctly, to the buying group.
10     Q.  Okay.  So, Abbott would pay the buying
11 group or the group purchasing organization --
12     A.  Yes.
13     Q.  -- a management fee; is that right?
14     A.  Yes.
15     Q.  And --
16     A.  They would request it.
17     Q.  Okay.  And was that for the buying
18 group's -- the services the buying group provided
19 to its members, such as negotiating the contract?
20         MR. COLE:  Object to the form.
21         THE WITNESS:  Now, that I don't know.
22 BY MS. FORD:

Page 112

1      Q.  Okay.
2      A.  I don't know -- I don't know what they
3  did with their management fee.
4      Q.  Okay.
5      A.  So, I can't answer that.
6      Q.  Did the buying group actually purchase
7  product from Abbott?
8         MR. COLE:  Object to the form.
9         THE WITNESS:  Are you asking me, did --
10 can you --
11 BY MS. FORD:
12     Q.  Sure.
13     A.  -- restate the question again?
14     Q.  You had testified earlier, I believe,
15 that in --
16     A.  Uh-huh.
17     Q.  -- contract marketing, some of the
18 accounts you were responsible for were buying
19 groups; is that right?
20     A.  Uh-huh.
21     Q.  Okay.  And maybe we should start more
22 simply:  What is a buying group?

Page 113

1      A.  Like I said before, it's just a -- my
2  definition, collection of individuals that come
3  together and just use their combined purchasing
4  power to negotiate with a company.
5          The reason I was a little bit confused,
6  on the previous question, you asked me, did the
7  buying groups purchase from Abbott?  Yeah, that's
8  pretty much how they work.
9      Q.  Okay.
10     A.  And I wasn't sure if you meant, did the
11 management portion of it or did the members
12 purchase from Abbott.
13     Q.  Okay.
14     A.  Because the members did.
15     Q.  The members of the buying group?
16     A.  Yes.
17     Q.  Right.
18     A.  Yes, they did.
19     Q.  Okay.  And the buying group was a
20 collection of members; is that right?
21     A.  Yes.
22     Q.  Okay.  And they -- were they

29  (Pages 110 to 113)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                          September 26, 2007
                        Louisville, KY

| Page 114 |
| --- |

1 individuals, or were they -- were they companies?
2     A.  The buying group or the --
3     Q.  The members.
4     A.  They did not own each other, if that's
5 what you're asking me.  They were individual --
6     Q.  You described them as individuals who
7 come together, and I'm trying to determine
8 whether they're individuals like you and I or
9 whether they're individual companies.
10     A.  No.  Like a home infusion company.
11     Q.  Okay.
12     A.  Like Greg's home infusion in
13 Louisville, Mike's home infusion in Louisville,
14 and Steve's home infusion in Louisville, but they
15 don't share ownership of one another, but they
16 belong to the same buying group.
17     Q.  And the buying group has some
18 management, or it's a company in and of itself,
19 or has some management, that negotiates with
20 Abbott and other --
21     A.  Yes.
22     Q.  -- pharmaceutical manufacturers?

| Page 115 |
| --- |

1     A.  My understanding is that the, quote,
2 unquote, "buying group" acts as one voice on
3 behalf of all of these independent members, and
4 they go to Abbott and say, "Hey, we have a
5 thousand members, and what we would like to do is
6 negotiate product pricing with you, and we
7 receive a management fee for doing this
8 negotiation."
9     Q.  Okay.
10     A.  That's my understanding of it.
11     Q.  Okay.  So, the management fee would not
12 be a fee that went to the members of the buying
13 group, it would go to the management of the
14 buying group?
15         MR. COLE:  Object to the form.
16         THE WITNESS:  That depends on the
17 groups.
18 BY MS. FORD:
19     Q.  Okay.
20     A.  Some groups may, some groups may not.
21 So, it just depends on how they want to do it.
22     Q.  Okay.  If you could turn to Page 262

| Page 116 |
| --- |

1 now.
2         And the heading on that page is
3 "Significant Events Monthly Report"; is that
4 right?
5     A.  Yes.
6     Q.  And we had looked at Exhibit French
7 1377 earlier -- I'm sorry, Exhibit French 1376,
8 and we had -- that was a significant event report
9 from Jack Miller to Pete Baker.
10     A.  Yes.
11     Q.  Do you remember that?  Okay.
12         And I believe you testified at that
13 time, when we were talking about Exhibit French
14 1376, that you also created significant events
15 reports when you were in alternate site; is that
16 right?
17     A.  As a sales rep, yes, I did.
18     Q.  Okay.  Did you also create them as a
19 contract marketing analyst?
20     A.  I don't recall, but I'm sure I did.
21     Q.  Okay.  What types of -- let's start
22 first when you were an alternate site sales rep.

| Page 117 |
| --- |

1     A.  Yes.
2     Q.  What types of information would you
3 convey in your monthly significant events report?
4     A.  The status of my largest accounts is
5 what would typically go in there.
6     Q.  Any other information?
7     A.  No.  Really an update on the largest
8 accounts.  Best I can remember, that's it.
9     Q.  Okay.  And in Exhibit French 1376, we
10 saw that Mr. -- we saw in that -- in Exhibit
11 French 1376, that what had happened in the past
12 30 days was being reported on and also what was
13 going to be happening in the next 30 days was
14 reported on.
15         Did you see that breakout there, in
16 Exhibit French 1376?
17     A.  Yes.
18         MR. COLE:  Object to the form.
19 BY MS. FORD:
20     Q.  Did you include similar information in
21 your reports, reporting on the past 30 days and
22 then what was -- what you expected to be

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                    Louisville, KY

Page 118

1    happening in the future?
2       A.  Yes.
3       Q.  Okay.  What types of information would
4    you have included in significant events reports
5    when you were in contract marketing?
6       A.  Okay.  In contract marketing?
7       Q.  Yes.
8       A.  It would be anniversaries that are
9    coming up that I need to work on.  As we talked
10   earlier, you know, most contracts had an
11   anniversary date.  So, for the current 30 days,
12   it's what contracts that I worked on, infusion
13   pumps, agreements that I did, and then the next
14   30 days are the ones I was planning to work on.
15      Q.  And you had just mentioned infusion
16   pumps, but you actually had a broader
17   responsibility than just pumps when you were in
18   contract marketing, right?
19      A.  Right.
20      Q.  So, would you also include information
21   about your buying group contracts?
22      A.  Yeah.  That's what I meant when I said

Page 119

1    contract anniversaries that were coming up --
2       Q.  Okay.
3       A.  -- and things of that nature.  So, I
4    would include that in the report.
5       Q.  Okay.  Did you maintain copies of the -
6    - of the significant events reports that you
7    created?
8       A.  Yes.
9       Q.  During the time that you were an
10   alternate site sales rep, you would provide a
11   copy of the significant event report to your
12   supervisor; is that right?
13      A.  Yes.
14      Q.  Mr. Ramsey?
15      A.  Yes.  Mike Ramsey, yes.
16      Q.  And was it your practice to also
17   maintain a copy of that for yourself?
18      A.  Yes.
19      Q.  Okay.  And where would you maintain
20   them?
21      A.  On the computer.
22      Q.  Okay.  And at any point, did you ever

Page 120

1    print out all of your significant event reports?
2       A.  No.
3       Q.  What happened when you left alternate
4    site as a sales rep to become a contract
5    marketing analyst?
6           What -- did you keep your same
7    computer?
8       A.  No.
9       Q.  Okay.  What did you do with your files
10   at that point?
11      A.  My -- my -- my customer files?
12      Q.  Uh-huh.
13      A.  I gave them to the person that replaced
14   me.
15      Q.  Okay.  And what about the files that
16   you maintained on the computer?
17      A.  They stayed on the computer.
18      Q.  And what happened to the computer?
19      A.  It was a personal computer, and so
20   eventually I got rid of it.
21      Q.  Okay.  At any time before getting rid
22   of your personal computer -- and I'm assuming you

Page 121

1    used this personal computer for work?
2       A.  Yes.
3       Q.  For your job responsibilities at
4    Abbott?
5       A.  Yes.
6       Q.  Okay.  Did you do anything when you got
7    rid of your computer to transfer the files off,
8    your work-related files?
9       A.  No.
10      Q.  So, I guess, when did you get rid of
11   your -- the computer that you had during the 1997
12   to 2000 time period?
13      A.  I don't remember the exact date.  The
14   hardware -- the hard drive --
15      Q.  Uh-huh.
16      A.  -- it died on it, so I just tossed it
17   out.  There was nothing I could do with it.
18      Q.  Okay.  Was it ever your practice,
19   during that 1997 to 2000 time period, to maintain
20   copies of the information on your computer?  A
21   backup, for example?
22      A.  Information that pertained to my

31 (Pages 118 to 121)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                        September 26, 2007
                        Louisville, KY

| | Page 122 |
|---|---|

1  accounts --
2      Q.  Uh-huh.
3      A.  -- I would print that off.  And I had a
4  -- a folder, and everything that pertained to
5  them, I put in the folder so I could pass it on
6  to the next rep.
7      Q.  Okay.  And what about other types of
8  work-related documents that wouldn't necessarily
9  be account specific?  For example, like the
10 significant events reports?
11     A.  No, I didn't -- I didn't print those
12 off.  Those are Word documents that just stayed
13 on my computer.
14     Q.  Okay.  And did you have an electronic
15 backup of all of the information on your
16 computer?
17     A.  No.
18     Q.  Okay.  And so, when your hard drive
19 died in -- sometime in 2000, did you get a new
20 computer?
21     A.  I'm not sure it was 2000.
22     Q.  Okay.

| | Page 123 |
|---|---|

1      A.  Yes, I did.
2      Q.  And is that the computer that you
3  maintain today?
4      A.  No.
5      Q.  No.  Okay.
6          Was it, again, a personal computer?
7      A.  Yes.
8      Q.  Okay.  And how long did you have that
9  computer?
10     A.  I don't recall how long I had that.
11 So, I don't -- I don't remember.
12     Q.  Okay.  When you worked in alternate
13 site contract marketing --
14     A.  Uh-huh.
15     Q.  -- where -- where were you based?
16         Where were you working from?
17     A.  In -- when I was in contract marketing?
18     Q.  Uh-huh.
19     A.  Abbott Park.  Abbott Park, Illinois.
20     Q.  Okay.  And did you have a physical
21 office there in Abbott Park?
22     A.  I had a cubicle.

| | Page 124 |
|---|---|

1      Q.  Okay.  Did you have file cabinets
2  there?
3      A.  Yes.
4      Q.  What types of documents did you
5  maintain related to the accounts you had
6  responsibility for?
7      A.  Each customer would have a file with
8  their name on it where all of their documents
9  would go into.
10     Q.  Did you have other types of files other
11 than account specific files?
12     A.  Yes.
13     Q.  And do you recall what those were?
14     A.  The ones I recall off the top of my
15 head, listings of products, interoffice memos,
16 things of that nature, vacation calendar, sick
17 days.  Just those type of things --
18     Q.  Okay.
19     A.  -- that I would keep there.
20     Q.  Did you maintain a copy of the
21 significant events reports that you created when
22 you were in contract marketing?

| | Page 125 |
|---|---|

1      A.  On the computer, yes.
2      Q.  And did you print those out and keep
3  those in a file?
4      A.  No.
5      Q.  Okay.  And at the time that you were
6  located, physically located, in Abbott Park, did
7  you have an Abbott issued computer?
8      A.  Yes.
9      Q.  Was that a desktop computer --
10     A.  Yes, it was.
11     Q.  -- or a laptop?
12        Desktop?
13     A.  Yes.
14     Q.  Okay.  And when you left alternate site
15 contract marketing to go to the pharmaceutical
16 products division, did you take that computer
17 with you?
18     A.  No.
19     Q.  Okay.  At the time that you left, did
20 you do anything to preserve the computer files on
21 the computer you were using in contract
22 marketing?

Henderson Legal Services
202-220-4158

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
Louisville, KY

Page 126

1        MR. COLE:  Object to the form.
2        THE WITNESS:  What do you mean by
3    "preserve" or --
4    BY MS. FORD:
5        Q.  Did you take those files with you,
6    those computer files with you?
7        A.  No.
8        Q.  Did you save them to a disk or a CD and
9    take them with you to your new job?
10       A.  No.
11       Q.  Okay.  Did you delete them from the
12   computer?
13       A.  No.
14       Q.  You just left them on the computer?
15       A.  Yes.
16       Q.  And the next person who inherited that
17   computer got your files?
18       A.  Yeah.  Not my personal files.
19       Q.  Uh-huh.
20       A.  But account specific, if there was
21   something on the computer, you left that for the
22   next person, along with the paper files.

Page 127

1        Q.  Okay.  And what about documents that
2    you created on your computer?
3        A.  Uh-huh.
4        Q.  Like significant events reports that
5    you didn't print out and put in a --
6        A.  Now, that --
7        Q.  -- hard copy file?
8        What happened to those files?
9        A.  Delete it.  There's no reason for me to
10   keep that part of it.
11       Q.  Okay.  So, you maintained them while
12   you were in alternate site contract marketing,
13   but then when you left to take a new job, you
14   deleted those kind of files if they weren't
15   account specific; is that --
16       A.  Correct.
17       Q.  Is that what I hear you saying?
18       A.  Yes.
19       Q.  Okay.
20       Okay.  Going back to the issue of
21   training, we've been talking about the training
22   that you received --

Page 128

1        A.  Uh-huh.
2        Q.  -- when you were in alternate site
3    contract marketing.
4        A.  Uh-huh.
5        Q.  In addition to the on-the-job training,
6    kind of the hands-on training you got when you
7    first started, did you receive any ongoing
8    training during that approximately year that you
9    were there?
10       A.  What do you mean "ongoing"?
11       Q.  Do you ever recall attending any
12   seminars that were put on for alternate site
13   contract marketing?
14       A.  I don't remember any seminars, no.
15       Q.  Okay.  Do you recall receiving any
16   written training materials?
17       A.  I don't -- yes.
18       Q.  And what were the nature of those
19   training materials?
20       A.  I don't know specifically.  Just how to
21   -- well, correct that.
22       What I do remember receiving is how to

Page 129

1    do the Excel spreadsheets, how to actually put
2    all of the information into the spreadsheets.
3    And there was an actual manual on how to do that.
4        Q.  And was it a particular type of
5    spreadsheet that this manual was addressing?
6        A.  No.  Just Excel spreadsheet.
7        Q.  Okay.  So, kind of like how to create
8    an Excel spreadsheet or --
9        A.  How to create an Excel spreadsheet, and
10   given that we're talking 2-, 300 products, just
11   how to manage that big of file and how to look at
12   all of that data.  That's what that manual was
13   about.
14       Q.  Okay.  And was that manual more focused
15   on the capabilities of Excel, or was it more
16   focused on the type of information as a contract
17   marketing analyst that you should be including in
18   such a spreadsheet?
19       A.  Excel.
20       Q.  Okay.
21       A.  Not the information.
22       Q.  So, it was kind of an Excel guide; is

33 (Pages 126 to 129)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                          September 26, 2007
                          Louisville, KY

Page 130

1  that --
2      A.  It was an Excel guide.  Just, for
3  instance, at the time I knew how to do this -- if
4  you were working with two separate worksheets,
5  how to change information on this worksheet and
6  have it automatically change on that.  That way
7  you didn't have to go with 200 products.  Go --
8  so, that's the type of training I remember,
9  because that was most important to the job I was
10 doing.
11     Q.  Okay.  Do you know if that written
12 material that you got regarding Excel, was that
13 generated by Excel?  Do you know?
14         Do you know if someone in Excel --
15     A.  Microsoft -- like if Microsoft produced
16 that?
17     Q.  Right.
18     A.  No.
19     Q.  You don't know or it wasn't?
20     A.  Oh, I'm sorry.
21         No, I was -- I was taught that by
22 another contract marketing analyst.

Page 131

1      Q.  Okay.  And so, the written materials --
2  I believe you said the written materials; is that
3  right?
4      A.  Yes.
5      Q.  Was that something that was created by
6  Abbott, to the best of your recollection?
7      A.  No.  Not to the best of my
8  recollection.
9      Q.  Okay.  So, it was a training guide that
10 was produced by Microsoft?
11     A.  No.  What I'm saying is this -- that a
12 contract marketing analyst figured out how to
13 make our jobs easier with these spreadsheets, and
14 they actually took the time -- a little project,
15 took the time to type it out, all right, and then
16 pass it on to other analysts; this is just how
17 you use Excel when you're using large
18 spreadsheets.
19         So, that's what I mean.
20     Q.  Okay.  So, someone within Abbott
21 created this training material --
22     A.  Yes.

Page 132

1      Q.  -- about Excel?
2      A.  About Excel.
3      Q.  Okay.
4      A.  Yes.
5      Q.  Very good.
6          Do you recall any other examples of
7  written training materials like that that you
8  received --
9      A.  No.
10     Q.  -- in contract marketing?
11         Okay.  Now, moving on to when you were
12 an infusion system specialist.
13         Did you receive any new hire training
14 when you first became a sales rep for alternate
15 site?
16     A.  Yes.
17     Q.  Okay.  And what was the nature of that
18 training?
19     A.  By "nature" you mean what did we talk
20 about, or where was it, or --
21     Q.  Was it hands-on training, or was it
22 formal training?

Page 133

1      A.  It was formal training.
2      Q.  Okay.  And who provided the training?
3      A.  Alternate -- alternate site product
4  sales trainers --
5      Q.  Okay.
6      A.  -- provided the training for us.
7      Q.  Do you recall their names?
8      A.  Trudy was one.  Dave Rots.
9      Q.  Is the Trudy that you're referring to,
10 could that be Trudy Burchieri?
11     A.  Yes.  She was a trainer --
12     Q.  Okay.
13     A.  -- in alternate site product sales.
14     Q.  So, you were provided formal-type
15 training from Dave Rots and Trudy Burchieri?
16     A.  Yeah.
17     Q.  Okay.
18     A.  Yes.
19     Q.  Okay.  About how long did that training
20 last?
21     A.  I don't remember how long it was.
22     Q.  Okay.  Was this classroom-style

34 (Pages 130 to 133)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                          Louisville, KY

Page 134

1    training?
2        A.  Yes.
3        Q.  Okay.  Do you recall if we're talking
4    about something in the nature of a half a day, or
5    was it more like two weeks of training?
6        A.  More like two weeks of training.
7        Q.  Okay.  Were you the only participant in
8    the training, or were there other members in the
9    training class?
10       A.  I believe there was more people in the
11   class.  I wasn't by myself.
12       Q.  Okay.  Do you recall who those others
13   were?
14       A.  No.
15       Q.  Okay.  To the best of your
16   recollection, were the other participants in the
17   training also alternate site sales reps?
18       A.  Yes.
19       Q.  Okay.  And were they new to Abbott as
20   well?
21       A.  Yes.
22       Q.  Or at least new to alternate site?

Page 135

1        A.  Yes.
2        Q.  Okay.  If you could look at Exhibit
3    French 1375.
4        A.  Are we done with this one so I can move
5    it?
6        Q.  Yes, we are.
7        A.  Okay.
8        Q.  In Exhibit French 1375, it says,
9    "Selling Abbott Products by Specialties" at the
10   top.
11       A.  Okay.
12       Q.  And at the bottom half of Page 1 and
13   then continuing on to Page 2, we had discussed
14   earlier that this was a listing of the alternate
15   site sales reps; is that right?
16       A.  Yes.
17       Q.  Okay.  Looking at the list here, do you
18   -- does -- does this refresh your recollection
19   about any of the other participants in the class?
20       A.  No.
21       Q.  So, if you read over the names, does it
22   refresh your recollection about who else may have

Page 136

1    attended the training or started around the same
2    time that you did?
3        A.  No, it doesn't.
4        Q.  Okay.  Physically, where was the
5    training held?
6        A.  Abbott Park.  Abbott Park, Illinois.
7        Q.  Okay.  Did you receive any written
8    materials during that training?
9        A.  Yes.
10       Q.  What kind of -- what kind of materials
11   did you receive?
12       A.  Product information.
13       Q.  Okay.  Were those more of the hand --
14   handout variety, or was it more like a manual or
15   a module?
16       A.  More like a module, like in a -- a
17   thick binder.
18       Q.  Okay.  And about how many of those did
19   you receive?
20       A.  I don't recall how many there were.
21       Q.  More than one?
22       A.  Yes.

Page 137

1        Q.  Okay.  Do you recall there being
2    several?
3        A.  Yes.
4        Q.  Okay.  Do you recall how those modules
5    were organized?
6        A.  Yes.
7        Q.  And how was that?
8        A.  The one I remember is Ultane, which was
9    our biggest product.  And basically, it was -- it
10   was a binder organized in sections, and it just
11   took you from just a -- a basic understanding of
12   physiology all the way to how the product is made
13   and how it interacts with patients.
14           And that's the type of training we were
15   receiving so we could go out in the field and
16   sell our product.
17       Q.  Okay.  Do you recall a similar module
18   relating to Abbott's pumps?
19       A.  I don't recall a specific module, but -
20   -
21       Q.  Okay.
22       A.  -- I'm sure we were trained on the

                              35  (Pages 134 to 137)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                September 26, 2007
                        Louisville, KY

---

Page 138

1  pumps.
2     Q.  Okay.  So, you had mentioned that
3  Ultane was one of the products that you can
4  remember having a manual or module related to; is
5  that right?
6     A.  Yes.
7     Q.  But you believe that there were others
8  as well?
9     A.  A pump manual, yes.
10    Q.  Okay.  Any other products that would
11 have been covered by a manual?
12    A.  To answer your question, I -- I don't
13 know if it was covered by a manual, but we went
14 through the injectable products.  Essentially, we
15 had a -- a catalog that we sold out of, and
16 during training, we covered the products in the
17 catalog, but more emphasis was put on Ultane
18 because it's a more complex product than a
19 butterfly needle, let's say.
20       So, we spent more time on Ultane and
21 more time on the pumps because we actually had to
22 train clinicians how to use the pumps.  I just

Page 139

1  don't remember the specific binder --
2     Q.  Sure.
3     A.  -- for the pumps, but we were trained
4  how to do that and how to talk to our customers
5  about it.
6     Q.  And I believe you said that there were
7  several modules.  You couldn't remember exactly
8  how many.
9     A.  I can't remember how many.
10    Q.  So -- and I was just trying to
11 understand.
12    A.  Yes.
13    Q.  You mentioned Ultane was one example of
14 a specific module that you could recall, or
15 manual that you could recall.
16    A.  I specifically recall that one, yes.
17    Q.  But there were others too?
18    A.  Yes.
19    Q.  Okay.  In addition to learning about
20 products during your training, did you have any
21 training on -- as a new hire, on selling skills?
22    A.  Yes.

Page 140

1     Q.  Okay.  Did you receive written
2  materials related to selling skills?
3     A.  Yes.
4     Q.  And what type of materials would they
5  have been?
6     A.  What do you mean?
7     Q.  Would you have received a handout, or
8  would you have received a separate manual or
9  module?
10    A.  It would have been handouts and role
11 playing.
12    Q.  Okay.  After you left the training, did
13 you keep a copy of those handouts and manuals?
14    A.  For a time, yes.
15    Q.  And what eventually happened to them?
16    A.  I tossed them out.
17    Q.  Okay.  During the training, do you
18 remember a discussion about average wholesale
19 price?
20    A.  No.  I do not.
21    Q.  During the new hire training, did you
22 receive any training on how contract marketing

Page 141

1  worked?
2     A.  Yes.
3     Q.  And who provided that training?
4     A.  I don't recall.
5     Q.  Okay.  Do you believe it was part of
6  the training that you received from Trudy and
7  Dave, or was it someone else?
8     A.  No.  During -- during training, they
9  bring in the different departments and have
10 people do presentations, like we're the marketing
11 department, this is what we do.
12    Q.  Okay.
13    A.  We're contract marketing, this is what
14 we do.  We're customer service, you know, we're
15 the benefits people.  So, all of those people
16 came through during training.
17    Q.  Okay.
18    A.  But I don't recall who actually did the
19 presentations.
20    Q.  Okay.  Do you recall what the focus of
21 the contract marketing training was?
22    A.  No.  I do not.

36 (Pages 138 to 141)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                          September 26, 2007
Louisville, KY

Page 142

1    Q.  For example, was it training on how to
2  work with contract marketing to get a contract
3  for your account?
4    MR. COLE:  Object to the form.
5    THE WITNESS:  Can you restate the
6  question, please?
7  BY MS. FORD:
8    Q.  Sure.
9        Were you provided training on how to
10  work with alternate site contract marketing to
11  get a contract for a new account?
12    A.  If you mean who do I need to call, what
13  -- what format do I need to send information to
14  contract marketing, yes.
15    Q.  And presumably, what information
16  contract marketing would need from you about the
17  account --
18    A.  Yes.
19    Q.  -- is that right?
20    A.  Yes.
21    Q.  Okay.  I'm going to hand you what has
22  been previously marked as Exhibit Burchieri 1192.

Page 143

1        For the record, this is ABT AWP/MDL
2  197141 through 197162.
3        Mr. French, do you recognize this
4  document?
5    A.  No, I do not.
6    Q.  Does it appear to be alternate site
7  sales training titled, "Abbott Alternate Site
8  Product Sales Account Assessment Strategies and
9  Contract Marketing Guidelines For A Proposal?"
10    A.  Yes.
11    Q.  Okay.  And you see listed there, under
12  "written by," the first name is Trudy Burchieri;
13  is that right?
14    A.  Yes.
15    Q.  And she's the -- one of the individuals
16  you identified as providing training at -- to you
17  when you were newly hired as a sales rep; is that
18  right?
19    A.  Yes.
20    Q.  Okay.  So -- I believe you said you
21  didn't recognize this document; is that right?
22    A.  No, I don't.

Page 144

1    Q.  Okay.  So, you don't know whether you
2  received this during your training about contract
3  marketing?
4    A.  No, I don't.
5    Q.  Okay.  If you turn to Page 2 of the
6  document, under -- at the top of the page, it
7  says, "Module Goal:  To provide the ASPS field
8  representative with the tools to probe and
9  profile accounts more" efficiently -- or, excuse
10  me, "more effectively."
11    THE REPORTER:  Probe what?
12    MS. FORD:  Profile accounts more
13  effectively.
14  BY MS. FORD:
15    Q.  Do you see that?
16    A.  Yes.
17    Q.  Top of the page?  Okay.
18    A.  Yes.
19    Q.  And then the next heading says,
20  "Objectives:  Upon completion of this module, the
21  representative will be able to:" and it lists
22  four stated objectives there.

Page 145

1        Do you see that?
2    A.  No.
3        Are you still on Page 2?
4    Q.  Uh-huh.
5        Under "Module Goals," and the next
6  heading is "Objectives"?
7    MR. COLE:  I think you're on Page 3,
8  Eric.
9    THE WITNESS:  Oh, I'm sorry.  This said
10  "Page 1" at the bottom.
11    MS. FORD:  Oh, I'm sorry.  Speaking of
12  Page 2 of the exhibit.
13    MR. COLE:  Second page of the exhibit.
14    THE WITNESS:  Okay.  I'm sorry.  I was
15  looking at the page number, so that's why I
16  couldn't see it.
17        Okay.  Yes.  I see -- I see what you're
18  talking about, yes.
19  BY MS. FORD:
20    Q.  So, the "Objectives"?
21    A.  Yes.
22    Q.  And it says, "Upon completion of this

37 (Pages 142 to 145)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                        September 26, 2007
                          Louisville, KY

---

Page 146

1    module, the representative will be able to:" and
2    it lists four stated objectives; is that right?
3        A.  Yes.
4        Q.  Okay.  And the fourth one says,
5    "Describe the information needed by contract
6    marketing when putting in a request for proposal
7    (RFP)"; is that right?
8        A.  Yes.
9        Q.  Okay.  Were you ever involved in
10   creating guidelines such as this when you were in
11   contract marketing?
12       A.  I don't recall any.
13       Q.  Okay.  Do you recall seeing any written
14   guidance to the field sales force when you were
15   in contract marketing about the types of
16   information you, as an analyst, would need?
17       A.  Yes.
18       Q.  Okay.  And what type of -- was it
19   written guidance?
20       A.  Yes.
21       Q.  And in what form was it?  Was it a
22   memo?

Page 147

1        A.  Yes.
2        Q.  Okay.  Do you recall who the memo was
3    from?
4        A.  No.
5        Q.  Okay.
6        A.  I can't say specifically, no.
7        Q.  Okay.  To the best of your
8    recollection, was it a memo that was created by
9    someone within alternate site contract marketing
10   and sent to the field sales reps?
11       A.  Yes.
12       Q.  And what types of information did it
13   convey that -- that alternate site needed from
14   the sales reps in responding to an RPF?
15       A.  Well, that's -- that's different.  Not
16   the RFP part.  You asked me about, did we send
17   correspondence out to the field.  And what I was
18   thinking was, we would send correspondence out,
19   you know, contracts are delayed because of
20   missing information, because people would send in
21   a request, but they wouldn't have all of the
22   pertinent information that we would look for.

Page 148

1        Q.  Okay.
2        A.  So, periodically, we would send out
3    reminders to the field, when submitting a request
4    for a pump proposal, we need this specific
5    information, so please do that for us so we won't
6    delay in getting your contract out.
7        Q.  Okay.
8        A.  That's what I was thinking about when
9    you were asking me the question.
10       Q.  Do you recall any similar
11   correspondence going out to the field about the
12   types of information that contract marketing
13   would need in responding to an RFP?
14       A.  Well, if it's a -- a pump proposal,
15   that's what I was talking about just now.
16       Q.  Okay.
17       A.  I just want to make sure I'm
18   understanding what you're asking.
19       Q.  When I said "RFP" earlier, you seemed
20   to distinguish, so I just am asking the question
21   again a little bit differently.
22       A.  Are you -- well, let me ask you this:

Page 149

1    Are you talking about an RFP from, let's say, a
2    buying group, or an RFP from a home care company
3    about pumps?
4        Which one are we talking about?
5        Q.  Well, I think you've already addressed
6    the situation regarding home care company and
7    pumps; is that right?
8        A.  Yes.
9        Q.  Okay.  Now let's talk about the buying
10   group.
11       A.  Okay.  To the -- to the best of my
12   memory, that wouldn't come from a representative.
13   An RFP would come from the buying group to
14   Abbott.  So, I'm not sure a sales rep would be
15   even involved in that.
16       Q.  Okay.  Do you know, then -- so -- so,
17   in this instance, do you believe that this --
18   this manual is talking about responding to RFPs
19   for pumps?
20       MR. COLE:  Object to the form.
21       THE WITNESS:  I'm not sure about
22   specifically what they had in mind when they put

38 (Pages 146 to 149)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                         September 26, 2007
                          Louisville, KY

Page 150

1  this together.
2  BY MS. FORD:
3      Q.  Okay.
4      A.  But number three, point number three,
5  is talking about home care and long-term care,
6  surgery centers, doctor's offices, and
7  distributors.  It's not talking about the buying
8  groups.
9      Q.  Okay.
10     A.  So, I'm not sure -- I'm not sure if
11  that was specifically pertaining to buying groups
12  with this right here that they're talking about.
13     Q.  Well, let's back up.
14        What I'm trying to understand is:  Do
15  you recall seeing any written correspondence to
16  the alternate site field representatives --
17     A.  Uh-huh.
18     Q.  -- describing to them what types of
19  information contract marketing would need to
20  respond to an RFP, if any kind?
21     A.  Yes.
22     Q.  Okay.  In addition to the memo that you

Page 151

1  just described relating to -- responding to a
2  pump proposal, do you recall any other types of
3  correspondence --
4      A.  No.
5      Q.  -- on that subject?
6      A.  No.  I don't.
7      Q.  And the correspondence that you recall,
8  was that specific to responding to pump
9  proposals, or was it more general in nature in
10  terms of responding to any type of RFP?
11     A.  What I have in mind is the pumps.
12  That's what I recall most, is pumps.  So, in my
13  mind, that's what I'm talking about.
14     Q.  Okay.  And when you worked in alternate
15  site contract marketing, what type of information
16  would you have needed from the field sales reps
17  to respond to an RFP?
18        MR. COLE:  Object to the form.
19        THE WITNESS:  Just your -- your basic
20  information of name, address, what particular
21  product are they talking about, how many products
22  -- how many of those do they want, at what price

Page 152

1  are they asking for, what time frame are they
2  asking for, how long do we have to get back to
3  them on this, is there -- and that's pretty much
4  it.
5  BY MS. FORD:
6      Q.  Okay.  If you could turn to Page 6.
7  It's actually numbered Page 6.
8        And you see the heading near the top of
9  the page? It says, "Universal Questions to Ask."
10        Do you see that?
11     A.  Yes.
12     Q.  And again, we're talking about -- this
13  is a guide to alternate site field sales reps
14  about questions to ask their customers --
15     A.  Yes.
16     Q.  -- is that right?
17     A.  Yes.
18     Q.  Okay.  So -- and then down at the
19  bottom of the page, there's a subheading,
20  "Homecare Pharmacy"; is that right?
21     A.  Yes.
22     Q.  And is that -- would that be the same

Page 153

1  as a home infusion pharmacy?
2        MR. COLE:  Object to the form.
3        THE WITNESS:  Looking at that now, I
4  would say it's a home -- it's a home infusion
5  center, yes.
6  BY MS. FORD:
7      Q.  Okay.  So, you see here, "The following
8  information is needed."
9        Do you see that?
10     A.  Yes.
11     Q.  "Name, address, phone number, contact
12  persons, decision makers."
13        Are you with me?
14     A.  Yes.
15     Q.  Okay.
16     A.  I'm -- I'm on Page 7.
17     Q.  Okay.  In reading down the list, is
18  this the type of information that you would have
19  needed as a contract marketing analyst to respond
20  to an RFP?
21     A.  Yes.
22     Q.  Okay.  About halfway down the page, one

39 (Pages 150 to 153)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                          Louisville, KY

Page 154

1    of the questions to ask the customer is the
2    "Reimbursement Mix, percent MediCare, MediCaid,
3    MediCal, HMO contracts, and private."
4        Do you see that?
5        A.  Yes.
6        Q.  What -- what's the purpose of finding
7    out about the reimbursement mix for home care
8    pharmacies in responding to an RFP?
9        A.  That I didn't know.
10       Q.  Okay.  Do you know what the
11   reimbursement mix information was used for by
12   alternate site contract marketing?
13       A.  No, I do not.
14       Q.  If you turn now to Page 8 of the
15   document, at the top, there's another subheading,
16   and this one is "Long Term Care Pharmacy."
17       Do you see that?
18       A.  Yes, I do.
19       Q.  And that was another type of category
20   of customer for alternate site; is that right?
21       A.  Yes.
22       Q.  Okay.  And again, the -- the questions

Page 155

1    to ask.
2        "The following information is needed:"
3    is -- is what it says; is that right?
4        A.  Yes.
5        Q.  And then about halfway down the page
6    again, you see "Reimbursement Mix, percent
7    MediCare, MediCaid, MediCal, HMO contracts, and
8    private"?
9        A.  Yes.
10       Q.  Okay.  And do you know why alternate
11   site contract marketing would need to know the
12   reimbursement mix in responding to an RFP for a
13   long-term care pharmacy?
14       A.  No.  I do not.
15       Q.  Okay.  So, we've talked about the --
16   the new hire training that you received as an
17   alternate site sales rep.
18       Did you also receive any -- did you
19   receive any ongoing training?
20       A.  Yes.
21       Q.  Okay.  And about how often would you
22   receive training after the new hire training?

Page 156

1        A.  After the new hire training?
2        Q.  Yes.
3        A.  At district meetings and national sales
4    meetings.
5        Q.  And how often were district meetings
6    held?
7        A.  It was up to the manager.  Like, two to
8    three times a year, we would get together as a
9    district.
10       Q.  Okay.  And how often were national
11   sales meetings held?
12       A.  Once a year.
13       Q.  Okay.  Do you recall the types of
14   training that you received at district meetings?
15       A.  Mostly sales training.  Just how to ask
16   questions, present information.  We would go over
17   new sales brochures, any updates on the products.
18       Q.  And who typically provided the training
19   at the district sales meetings, or district
20   meetings?
21       A.  The key person would be our manager,
22   Mike Ramsey.  And then he would appoint different

Page 157

1    people.  Do different role plays or do a
2    presentation on the actual sales brochures, and
3    things of that nature.
4        Q.  Did alternate site trainers ever come
5    to the district meetings and provide training?
6        A.  I don't recall them doing that.
7        Q.  Okay.  And what type of training would
8    you receive at the national sales meetings, sales
9    --
10       A.  That's -- that's when the trainers from
11   alternate site product sales, they would lead the
12   training.
13       And actually, it would be similar to
14   what I just described to you.  Because what would
15   happen, at the national sales meeting, the
16   alternate site product sales and the marketing
17   trainers and the marketing managers would get
18   together with the new brochures, and they would
19   present it to the sales force at the national
20   meetings.
21       And the purpose of the district
22   meetings was to follow up on what was presented

40 (Pages 154 to 157)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 158

1  at the national sales meetings to make sure we
2  were implementing what we had just been given.
3  And that's pretty much how it worked.
4     Q.  Okay.  Do you recall receiving any
5  sales training at the national sales meeting,
6  other than product specific training?
7     A.  What do you mean, "sales training"?
8     Q.  Selling skills.
9     A.  Yes.  Yes.
10    Q.  Okay.
11    A.  They were incorporated into both, if
12 that makes sense.
13    Q.  Okay.
14    A.  You wouldn't separate them.  You would
15 do your role playing while talking about your
16 product and the new features you're trying to
17 emphasize.  So, they did it kind of together.
18 It's like, you know, here's a new pump that we're
19 going to have.  These are the features.  Okay.
20 We do that in the morning.
21        The afternoon, now we want you to do a
22 role play with this new pump because we don't

Page 159

1  want you fumbling around when you're trying to
2  present it to a customer.  So, that's what the
3  training was.
4     Q.  Okay.  Do you recall any selling skills
5  training that was not product specific?
6     A.  No.
7     Q.  Do you --
8     A.  What --
9     Q.  -- do you remember a program such as
10 professional selling skills?
11    A.  Yes.
12    Q.  Okay.
13    A.  Yes.
14    Q.  And was that tied to a particular
15 product?
16    A.  It was --
17        MR. COLE:  Object to the form.
18        THE WITNESS:  The professional selling
19 skills was tied to all of the products.  My
20 definition of professional selling skills is just
21 how to probe and ask questions.
22        But you're asking questions in relation

Page 160

1  to the products you have, so you couldn't just
2  ask an abstract question.  You had to ask a
3  question related to the product you have.
4  BY MS. FORD:
5     Q.  Sure.
6     A.  Does that make --
7     Q.  Yeah.
8     A.  Okay.
9     Q.  I guess --
10    A.  That's what I mean.
11    Q.  -- the distinction I'm trying to make
12 is that:  So, you might have, in one instance, a
13 new pump, and so you spend a day learning about
14 the new pump --
15    A.  Correct.
16    Q.  -- and its features and, you know, what
17 products go in the pump.  And -- and then you
18 spend the afternoon learning how to sell that
19 pump to your customers.
20        And I'm trying to differentiate that
21 between training that's primarily about the pump,
22 which includes some selling skills, with separate

Page 161

1  professional selling skills training that is not
2  related to a new product, for example.
3     A.  If I'm understanding correctly, this
4  way:  You know, Eric, here's the new pump that we
5  have, and here's all of the features.  All right,
6  session one.
7        And then maybe that afternoon, you
8  know, we want to do professional selling skills,
9  along the lines of, don't be afraid if there is
10 silence, or don't ask close-ended questions.  And
11 we would cover that.
12        And then the next session would be,
13 okay, based upon training on the new product,
14 based upon the professional selling skills, I
15 want you to do a role play where you're actually
16 incorporating both.  And someone would play like
17 they're a customer, and you would do a role play
18 trying to remember, don't ask close-ended
19 questions and talk about the features of your
20 product.  "Doctor, wouldn't you agree that, you
21 know, having an I.V. pump with a whistle on it is
22 beneficial to your practice?"

41 (Pages 158 to 161)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 162

1      So, I'm using the information I know
2  about my product, and I'm also using professional
3  selling skills.
4      Q.  Okay.
5      A.  So, that's the type of training we
6  received at the national sales meeting, and then
7  it was followed up in the district --
8      Q.  Okay.
9      A.  -- sales meetings.
10     Q.  And then other than product specific
11 training and selling skills training, do you
12 recall any other types of training that you
13 received as a sales rep?
14     A.  Yes.
15     Q.  And what kind of training was that?
16     A.  Safety training, like hazmat, needle
17 disposal, that type of training.
18     Q.  Okay.  Do you recall receiving any
19 ethics training?
20     A.  Yes.
21     Q.  And what -- how was the ethics training
22 provided?

Page 163

1      A.  Abbott has an ethics program that
2  everyone has to participate in the company.  And
3  so, periodically, we have to go through that
4  training, and it's -- I can't recall at the time,
5  but now it's on -- it's modules on the computer
6  that you would do that.
7      Q.  Okay.  Does that training program have
8  a name?
9      A.  Yes.  It's called LERN, legal ethical
10 resource network.
11     Q.  Okay.  And when you participated in the
12 LERN training -- I guess, when was the first time
13 that you recall participating in -- in the LERN
14 training?
15     A.  The first time I recall?  It would --
16 it would be in contract marketing, is the first
17 time I remember hearing about LERN.
18     Q.  Okay.
19     A.  But that's my best understanding of it.
20     Q.  Okay.  And at the time that you recall
21 hearing about the LERN training --
22     A.  Uh-huh.

Page 164

1      Q.  -- when you were in contract marketing,
2  was it computer based at that point?
3      A.  I don't remember.
4      Q.  Okay.  Do you recall ever sitting in a
5  seminar regarding ethics?
6      A.  Yes.
7      Q.  Okay.  And when was that?
8      A.  That was during when I was in the field
9  as a sales rep.
10     Q.  Okay.  Did that --
11     A.  And also during new hire.  Also, we
12 talked about it there.
13     Q.  Okay.  So, a component of the new hire
14 training was about ethics?
15         Is that what I'm hearing you say?
16     A.  Uh-huh.
17     Q.  Okay.  And then you -- aside from the
18 new hire training, at some time when you were a
19 sales rep, you -- you recall being at a seminar,
20 or something, where ethics was discussed?
21     A.  Yes.
22     Q.  Would that have likely been at a

Page 165

1  national sales meeting?
2      A.  I don't know if it was a national or
3  district.  I'm --
4      Q.  Okay.
5      A.  I don't know for sure.
6      Q.  But one of the two?
7      A.  Yes.
8      Q.  It wasn't a separate event?
9          It wasn't a separate event that you
10 came just for this --
11     A.  No.
12     Q.  -- ethics training?
13     A.  I don't recall ever being brought to
14 Chicago just for an ethics --
15     Q.  Okay.
16     A.  -- training course.
17     Q.  Okay.  And then at some point, the
18 ethics training became computer based; is that
19 right?
20     A.  Yes.
21     Q.  Okay.  And when you participate in the
22 ethics training on the computer, are you doing it

42 (Pages 162 to 165)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 166

1    from your personal computer?
2        A.  No.
3        Q.  Okay.  Are you together in a room with
4    other people --
5        A.  No.
6        Q.  -- doing the same training?
7        A.  No.
8        Q.  Okay.  When I said "personal computer,"
9    I meant your personal Abbott issued computer.
10       A.  Oh, I'm sorry.  I thought you meant
11   like my home computer.
12           No.  Abbott computer.
13       Q.  Okay.  So, at your desk?
14       A.  Yes.
15       Q.  Okay.  And kind of on your own?
16       A.  Yes.
17       Q.  Okay.
18       A.  But we had time frames by which we
19   could complete the training, and we were also
20   graded on the training too.
21       Q.  Okay.  And at the end of the training,
22   did a message come up saying that you've

Page 167

1    successfully passed the training?
2        A.  Yes.
3        Q.  And did you have, like, a certificate
4    to print out or something?
5        A.  Yes.
6        Q.  Okay.  And did you maintain copies of
7    those certificates?
8        A.  No.  I didn't print the certificates.
9        Q.  Okay.  Did somehow someone responsible
10   for LERN training get notified that you had
11   completed the training?
12       A.  Yes.
13       Q.  Okay.  Do you know who that person was?
14       A.  I know my manager was one.
15       Q.  Okay.  Do you know who else besides
16   your manager?
17       A.  I -- I don't know specifically who saw
18   it, but other people did see this report.
19       Q.  Okay.  And was the LERN training
20   mandatory?
21       A.  Yes.
22       Q.  Okay.  And is that LERN training

Page 168

1    continuing today?
2        A.  Yes.
3        Q.  Okay.  So, during the time that you
4    were an alternate site sales rep --
5        A.  Yes.
6        Q.  -- do you recall any other types of
7    training that you participated in?
8           We've talked -- we've talked about new
9    hire training, ongoing product and selling skills
10   training, and then ethics training, and safety
11   training.
12       A.  Yes.
13       Q.  Do you recall any others?
14       A.  I don't recall anything specifically
15   beyond -- those are the ones that come straight
16   to mind.
17       Q.  Okay.
18       A.  But beyond that, no.
19       Q.  Okay.  Do you recall receiving any
20   other manuals while you were in alternate site as
21   a sales rep?
22       A.  Excluding product manuals or --

Page 169

1        Q.  Uh-huh.
2        A.  I don't remember receiving anything but
3    product manuals.
4        Q.  Okay.  Now, while you were in contract
5    marketing, do you recall receiving any other kind
6    of training than the -- the hands-on training
7    that we've discussed and the LERN training?
8        A.  No.  Most of it was hands-on training.
9        Q.  Okay.  And do you recall any other
10   types of manuals or modules you may have received
11   in that position?
12       A.  Beyond what I've already stated?
13       Q.  Right.
14       A.  Safety and just things like that.
15          I'm -- I don't want to make this
16   assumption:  You're not talking about human
17   resources and things like that, are you?
18       A.  Pertaining to my medical benefits or anything
19   like that?
20       Q.  You know -- no.  I'm not --
21       A.  Okay.
22       Q.  Yeah.  More job -- job specific

                          43 (Pages 166 to 169)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 170

1  training, not job benefit training, or job
2  benefit information.
3      A.  That -- okay.
4      Q.  Okay.
5      A.  No.
6      Q.  So, that's it?
7      A.  Uh-huh.
8      Q.  Okay.  Okay.  When you were in
9  alternate site contract marketing, what type of
10  pricing terms did you use in your day-to-day
11  work?
12      A.  What do you mean by "terms"?
13      Q.  For example, did you use list price?
14      A.  Yes.
15      Q.  And what does list price mean?
16      A.  List price, to me, means noncontract
17  price.
18      Q.  Okay.  Did some of the accounts that
19  you worked on get billed at list price?
20      A.  Yes.
21      Q.  And which accounts were those?
22      A.  I don't know specifically which

Page 171

1  accounts were billed at list price.
2      Q.  Okay.  Did most of the accounts that
3  you worked on have contract pricing?
4      A.  Yes.
5      Q.  Okay.  And if you could give me
6  percentage.
7          About how -- what percentage of your
8  accounts had contract pricing?
9          MR. COLE:  Object to the form.
10          THE WITNESS:  I can't answer that with
11  any certainty.  I -- so, I can't answer what -- I
12  think you're looking for a specific number as to
13  how many had contract, and I can't answer it.  I
14  don't know a specific number as to how many had
15  contracts.
16  BY MS. FORD:
17      Q.  Did the majority of your accounts have
18  contract pricing?
19      A.  Yes.
20      Q.  Okay.  Was it unusual for an account to
21  have list price?
22      A.  Yes.

Page 172

1      Q.  Okay.  And if an account had list
2  price, did they typically, at some point, change
3  to a contract price?
4      A.  Yes.
5      Q.  Okay.  Was list price also known as
6  catalog price?
7      A.  I never refer to it as that.
8      Q.  Okay.  Were the list prices published
9  anywhere?
10      A.  Published for -- for me, for customers,
11  for -- or just anywhere?
12      Q.  Were they -- were they published
13  anywhere?
14      A.  Yes.
15      Q.  Okay.  And were they published for you?
16      A.  Yes.
17      Q.  And what -- where would you go to find
18  list price?
19      A.  I would have a file next to my desk.
20  It would have all of the products on it with
21  their list price on it.
22      Q.  Okay.  And was that list published for

Page 173

1  -- were the list prices published for customers?
2      A.  I believe they could call in to
3  customer service and get that price.
4      Q.  Okay.  So, to the best of your
5  recollection, you didn't send out the list prices
6  to your accounts?
7      A.  No.
8      Q.  Either as a sales rep -- did you as a
9  sales rep?
10      A.  Not to my knowledge.
11      Q.  Okay.  And what about in contract
12  marketing?
13      A.  Yes.
14      Q.  Okay.  So, in contract marketing, you
15  would send out the list price to the accounts
16  that you worked on?
17      A.  No.  Not -- not to all of the accounts
18  --
19      Q.  Okay.
20      A.  -- that I worked on.
21      Q.  Which accounts?
22      A.  If there was a -- if there were an

44 (Pages 170 to 173)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 174

1   account that was a very small account, and they
2   wanted to order a product one time and did not
3   want to sign a contract, because they're only
4   going to order it one time for, let's say, a
5   special patient, to them you would provide them
6   list price, because I'm just buying one widget.
7        I don't need a five-year agreement or a
8   three-year agreement.  Just tell me what it's
9   going to be to buy this one product this one
10  time.  And so, that's the only occasion I
11  remember ever sending out a list price --
12       Q.  Okay.
13       A.  -- to anybody, for any reason.
14       Q.  So, it wasn't a complete list of
15  Abbott's list prices.
16       It was a list price for one particular
17  product; is that -- am I understanding you
18  correctly?
19       A.  No.  It would probably be just all of
20  the products, just -- I would give it to that
21  customer.
22       Q.  Okay.  And how -- how voluminous was

Page 175

1   that listing?
2        A.  I have no idea how -- but -- I don't
3   know how big the actual list is.  But if I recall
4   correctly, we had over 200 products, so that
5   gives you some idea --
6        Q.  Okay.
7        A.  -- of what we're talking about.
8        Q.  So, if a customer wanted to buy one
9   product on one occasion and didn't want a
10  contract --
11       A.  Uh-huh.
12       Q.  -- did I understand you correctly that
13  you would send them the entire list, price
14  listing, for all of Abbott's products?
15       A.  Yes.
16       Q.  Okay.  Do you know of any other use for
17  the list price other than the situation we just
18  discussed, when you have a customer who wants to
19  purchase a product without entering into a
20  contract?
21       A.  Yes.
22       Q.  And what's that?

Page 176

1        A.  If -- if, for some reason, there was a
2   malfunction with the computer or a contract fell
3   out of the system, for whatever reason, and a
4   customer purchased a product, it would show up as
5   list price.  And so, I would need the list then
6   to see that they were mistakenly overcharged.
7   So, I would use the -- the list price in that
8   situation.  That's the only other time I can
9   think of --
10       Q.  Okay.
11       A.  -- that I would need to do that.
12       Q.  And you just mentioned that, in that
13  situation that you just described, the customer
14  would have been overcharged if their contract had
15  fallen out of the system --
16       A.  Uh-huh.
17       Q.  -- and they were charged list price; is
18  that right?
19       A.  Uh-huh.
20       Q.  So, is list price higher than contract
21  price?
22       A.  Yes.

Page 177

1        Q.  Okay.  Have you heard of the term
2   RxLink pricing" before?
3        A.  Yes.
4        Q.  And what is RxLink pricing?
5        A.  I don't remember what it was, but I've
6   heard of the term before.
7        Q.  Okay.  Was it a term that you used in
8   alternate site contract marketing?
9        A.  Yes.
10       Q.  Okay.  Was it a term that you used as a
11  field sales rep?
12       A.  I don't recall that.
13       Q.  Okay.  If you take the --
14       A.  Yeah.
15       Q.  -- the basic operating procedures
16  manual back out again.
17       If you could turn to Page 254.  And
18  again, this is in Plaintiff's Exhibit 1321.
19       MR. COLE:  What page is that, Becky?
20       MS. FORD:  254.
21       THE WITNESS:  254.
22  BY MS. FORD:

                          45  (Pages 174 to 177)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

| Page 178 |
|---|
| 1    Q.  In the first paragraph there, it says, |
| 2  RxLink pricing is provided primarily to allow |
| 3  customers to buy product from wholesalers at less |
| 4  than list price and ensure that the wholesalers |
| 5  report the sale to Abbott for tracking purposes." |
| 6         Did I read that accurately? |
| 7    A.  Yes. |
| 8    Q.  Does that refresh your recollection |
| 9  about what RxLink pricing is? |
| 10        MR. COLE:  Object to the form. |
| 11        THE WITNESS:  No. |
| 12 BY MS. FORD: |
| 13   Q.  Did you understand RxLink pricing to be |
| 14 used in connection with sales through -- sales of |
| 15 Abbott's products through wholesalers? |
| 16   A.  Yes.  Reading this, yes. |
| 17   Q.  Okay.  It says, "There are two RxLink |
| 18 prices, RxLink wholesale acquisition," and then |
| 19 in parentheses, (RxLink WAC), and RxLink |
| 20 Customer.  Wholesalers buy product at the Abbott |
| 21 RxLink WAC price and sell it to customers that do |
| 22 not have a contract at RxLink customer prices." |

| Page 179 |
|---|
| 1         Did I read that accurately? |
| 2    A.  Yes. |
| 3    Q.  Okay.  Does that refresh your |
| 4  recollection about what RxLink pricing is? |
| 5    A.  No. |
| 6    Q.  Is it consistent with your |
| 7  understanding about what RxLink pricing was? |
| 8         MR. COLE:  Object to the form. |
| 9         THE WITNESS:  No.  I don't recall it, |
| 10 so no. |
| 11 BY MS. FORD: |
| 12   Q.  Okay.  So, you don't recall hearing or |
| 13 using RxLink WAC? |
| 14   A.  No. |
| 15   Q.  Or RxLink customer? |
| 16   A.  No. |
| 17   Q.  Okay.  Have you heard of the phrase |
| 18 "field generated contract pricing"? |
| 19   A.  Yes. |
| 20   Q.  And what is field generated contract |
| 21 pricing? |
| 22   A.  Field generated contract pricing, what |

| Page 180 |
|---|
| 1  I remember it to be, is just a standard field |
| 2  agreement that the reps had.  And if they went |
| 3  into a small mom and pop's account, that, let's |
| 4  say, wanted to order that one product but did not |
| 5  want to pay list price and did not want to join a |
| 6  buying group, then they had -- we had an |
| 7  individual contract that they could sign and send |
| 8  in, and they would be placed on that contract. |
| 9         That's what I remember the individual |
| 10 field contract to be. |
| 11   Q.  Okay.  So, would the price that that |
| 12 customer would get from the field generated |
| 13 contract -- |
| 14   A.  Uh-huh. |
| 15   Q.  -- be lower than list price? |
| 16   A.  Yes. |
| 17   Q.  Okay.  And we had discussed average |
| 18 wholesale price briefly earlier. |
| 19        Do you recall that discussion? |
| 20   A.  Yes. |
| 21   Q.  Okay.  And you were familiar with the |
| 22 term "average wholesale price," also referenced |

| Page 181 |
|---|
| 1  as AWP; is that right? |
| 2    A.  Yeah.  I had heard the term before, |
| 3  yes. |
| 4    Q.  Okay.  And what do you understand the - |
| 5  - the term "average wholesale price" to mean? |
| 6         MR. COLE:  Object to the form. |
| 7         THE WITNESS:  My definition of that? |
| 8         Average would probably be the tip-off, |
| 9  that it's an average.  That's pretty much -- I |
| 10 don't know the technical definition of it.  Just |
| 11 looking at the word, it's just an average of |
| 12 wholesale prices. |
| 13 BY MS. FORD: |
| 14   Q.  Would that be -- your understanding -- |
| 15 would your understanding be that it's an average |
| 16 of what your -- an average of what Abbott's |
| 17 commercial customers pay for product? |
| 18        MR. COLE:  Object to the form. |
| 19        THE WITNESS:  That I don't know. |
| 20 BY MS. FORD: |
| 21   Q.  Okay.  If you could turn to Page 247 of |
| 22 the manual. |

46 (Pages 178 to 181)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 182

1     A.  I do not have a Page 247.
2     Q.  Okay.
3     A.  I'm sorry.  I do.  It's just mixed up.
4  It's in the wrong spot.  I got it.
5        I got it.
6     Q.  Okay.  At the top of the page, it says,
7  "Reference Books."
8        Do you see that?
9     A.  Yes.
10    Q.  And then it says, "Contract Marketing
11 personnel frequently need drug reference books to
12 research drug topics. The department maintains
13 three books that have proven their worth over the
14 years."
15       Did I read that accurately?
16    A.  Yes.
17    Q.  Okay.  And the first book that's listed
18 is Drug Topics Redbook:  Pharmacy's Fundamental -
19 - Pharmacy's Fundamental Reference; is that
20 right?
21    A.  Yes.
22    Q.  And it says, "The Drug Topics Redbook

Page 183

1  details extremely limited data about the drug and
2  average wholesale price" -- in parentheses AW --
3  "(AWP).  AWP is calculated by Redbook as list
4  price minus 5 percent plus 25 percent.  Thus, a
5  product with a list price of 100 dollars would be
6  discounted by 5 percent, to 95, and then
7  increased by 25 percent, to 118.75, for an
8  overall increase of 18.75 percent."
9        Did I read that accurately?
10    A.  Yes.
11    Q.  Okay.  Did you understand there to be a
12 relationship between Abbott's list price and AWP?
13       MR. COLE:  Object to the form.
14       THE WITNESS:  No.
15 BY MS. FORD:
16    Q.  Did you have any understanding of how
17 AWP was calculated?
18    A.  No.
19    Q.  We saw earlier, in some of the
20 documents that we were looking at, for example,
21 Exhibit French 1378, that you included AWP
22 information on spreadsheets that you sent to

Page 184

1  GeriMed.
2     A.  Exhibit French 1378?
3     Q.  Uh-huh.
4        THE VIDEOGRAPHER:  Excuse me.  Can I
5  take about 30 seconds to swap tapes here?
6        MS. FORD:  Sure.
7        THE VIDEOGRAPHER:  We'll go off the
8  record at the conclusion of tape number two at
9  11:57 a.m.
10       THE VIDEOGRAPHER:  Back on the record
11 at the beginning of tape number three at 1:14
12 p.m.
13       MS. FORD:  Let's ask the court reporter
14 to read back the last question.
15       (Previous question was read back
16 by the court reporter commencing as follows:
17       Question:  We saw earlier, in some of
18 the documents that we were looking at, for
19 example, Exhibit French 1378, that you included
20 AWP information on spreadsheets that you sent to
21 GeriMed.
22       Answer:  Exhibit French 1378?

Page 185

1        Question:  Uh-huh.)
2  BY MS. FORD:
3     Q.  Okay.  Where did you obtain the AWP
4  information to include in documents such as
5  Exhibit French 1378?
6        MR. COLE:  Object to the form.
7        THE WITNESS:  I don't remember.
8  BY MS. FORD:
9     Q.  Okay.  Did you have, for example, a
10 Redbook?
11    A.  No.
12    Q.  Did you have -- do you know what a
13 Redbook is?
14    A.  No.
15    Q.  You see we were looking at the Basic
16 Operating Procedure Manual, Plaintiff's Exhibit
17 1321, you were last on Page 247.
18       And it says here in the Operating
19 Procedures Manual for contract marketing that,
20 "Contract Marketing personnel frequently need
21 drug reference book to research drug topics. The
22 department maintains three books that have proven

47  (Pages 182 to 185)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                      September 26, 2007
                          Louisville, KY

Page 186

1  their worth over the years."
2         And the first that it has listed is
3  Drug Topics Redbook:  Pharmacy's Fundamental
4  Reference.
5         Now, when I said the "Redbook," that's
6  the book I'm referring to.
7     A.  Yes.
8     Q.  Did you ever refer to the Redbook?
9     A.  No.
10    Q.  Did you ever go and look at it on the
11 shelf?
12    A.  I don't remember a Redbook being on the
13 shelf.
14    Q.  Okay.  Looking back at Exhibit French
15 1378, where would you have gotten the AWP
16 information to put in this spreadsheet?
17        MR. COLE:  Object to the form.
18        THE WITNESS:  I don't know.
19 BY MS. FORD:
20    Q.  Do you have any idea of what possible
21 sources there were for getting AWP information?
22        MR. COLE:  Object to the form.

Page 187

1         THE WITNESS:  No.
2  BY MS. FORD:
3     Q.  Did you calculate the AWP yourself?
4     A.  No.
5     Q.  Okay.  Looking back and at Page 247, we
6  previously talked about, before the break, there
7  is a formula here that describes using
8  manufacturer's list price to get to the AWP.
9         Do you recall that discussion?
10    A.  The discussion that you and I had?
11    Q.  Yes.
12    A.  Yes.
13    Q.  Okay.  So, according to Abbott's
14 analysts Basic Operating Procedures Manual, AWP
15 is calculated by Redbook as list price minus 5
16 percent plus 25 percent?
17        MR. COLE:  Object to form.
18 BY MS. FORD:
19    Q.  That's what the manual says?
20    A.  That's what the manual says.
21    Q.  But you don't recall going to the
22 Redbook to get the AWP information; is that

Page 188

1  right?
2     A.  I did not go to a Redbook to get any
3  information.
4     Q.  Okay.  And you don't recall using the
5  formula that is shown here of taking Abbott's
6  list price and applying the formula to get the
7  AWP; is that right?
8     A.  No, I do not.
9     Q.  So, as you're sitting here today, you
10 have no recollection of where you would have
11 gotten the AWP information?
12    A.  No, I do not.
13    Q.  And for what purpose would you have put
14 AWP information in the spreadsheet?
15    A.  I don't recall.
16    Q.  Do you believe it was information that
17 the customer was requesting?
18    A.  I don't -- I don't know.
19    Q.  Okay.  Would you typically put
20 information in pricing that you were sending out
21 to customers that they didn't want?
22        Would you typically include irrelevant

Page 189

1  information in pricing that was sent out to
2  customers?
3         MR. COLE:  Object to the form.
4         THE WITNESS:  Can you rephrase that, or
5  I don't --
6  BY MS. FORD:
7     Q.  I'm trying to understand the purpose
8  behind you putting the AWP column and numbers for
9  AWP in this spreadsheet that you sent to GeriMed
10 with the 2000 manufacturer's listing of
11 pharmaceutical awards and --
12    A.  But what I'm saying is, I don't recall
13 what -- I don't recall what that was in there
14 for.
15        And the question that you just asked
16 me, would I put informing in there if it wasn't
17 relevant to the customer, but I don't really know
18 what would be relevant from one customer to
19 another.  That's why I was kind of pausing in
20 answering that question because I didn't know how
21 to answer that.
22    Q.  Okay.  Even though customers may have

                              48 (Pages 186 to 189)

                    Henderson Legal Services
                         202-220-4158

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 190

1  different information that they find is relevant,
2  with any particular customer that you're dealing
3  with, at one point in time, in this instance,
4  GeriMed, would you have given them information
5  that was irrelevant either to Abbott or to
6  GeriMed?
7        MR. COLE:  Object to the form.
8        THE WITNESS:  I don't know.
9  BY MS. FORD:
10     Q.  Okay.
11     A.  Because I'm not sure I understand the
12  question.
13     Q.  Okay.  Do you think that somebody
14  wanted to know the AWP for Abbott's products?
15     A.  That I didn't know.
16     Q.  Okay.  Would you typically include
17  information in a spreadsheet that nobody cared
18  about?
19     A.  I don't know.  I guess as I'm hearing
20  this question, I'm thinking, okay, on this one,
21  right in front of me it, says "generic name,
22  brand name," one customer may not care about

Page 191

1  brand names, so that would be irrelevant to them.
2     Q.  Okay.
3     A.  But I may always include the brand and
4  generic names, so that's why I'm just struggling
5  with the way that you're asking me that question.
6     Q.  Did you always include you the AWP and
7  dollar difference AWP?
8     A.  That I don't know.  I don't recall.
9     Q.  Okay.  So, sitting here today, you have
10  no recollection of why, at least for GeriMed, you
11  would have provided -- and others in alternate
12  site contract marketing -- would have provided
13  AWP information to GeriMed?
14     A.  I don't know why that would be in
15  there.
16     Q.  Or where you would have gotten AWP
17  information?
18     A.  Correct.
19     Q.  Did you understand that AWP to have
20  some bearing on reimbursement that Abbott
21  customers would receive?
22     A.  Sitting here right now, no.

Page 192

1     Q.  Okay.  When I -- when I say
2  "reimbursement," do you understand that I'm
3  discussing reimbursement by Medicare, Medicaid,
4  or a third-party insurance company?
5     A.  Yes.
6     Q.  Okay.  Did you understand that that
7  Abbott customers who purchased products from
8  Abbott, would, in some instances, be reimbursed
9  by Medicare, for example?
10        MR. COLE:  Object to the form.
11        THE WITNESS:  I don't remember.
12  BY MS. FORD:
13     Q.  Do you recall -- at any time during
14  your tenure in alternate site, do you recall
15  discussions about Abbott customers receiving
16  reimbursement from third party payors such as
17  Medicare?
18     A.  I don't recall a conversation like
19  that.
20     Q.  Okay.  Do you recall any training about
21  reimbursement?
22     A.  No.

Page 193

1     Q.  During the time that you were an
2  alternate site sales rep, did any of your
3  customers ask you about reimbursement for Abbott
4  products?
5     A.  I don't remember anybody asking me
6  about that.
7     Q.  Okay.  I'm going to show you an exhibit
8  that has been previously marked as Exhibit
9  Burchieri 1191.
10     A.  Thank you.
11     Q.  And for the record, this is ABT072-0565
12  through ABT072-0567.
13        Mr. French, at the top of this exhibit,
14  there is an e-mail dated January 18th, 2002.
15        Do you see that?
16     A.  Can I have just a second to look at
17  this real quick?
18     Q.  Sure.
19     A.  Okay.
20     Q.  Okay.  So, at the top of the exhibit,
21  does this appear to be an e-mail from Dave
22  Harling -- I'm sorry, from Andy Crofoot to Dave

49 (Pages 190 to 193)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

|  | Page 194 |
|---|---|

1  Harling dated January 18th, 2002?
2      A.  Yes, it is.
3      Q.  Okay.  And is he forwarding an earlier
4  message?
5          And if you look at the bottom of the
6  page, the date of the earlier message is May
7  23rd, 2000; is that right?
8      A.  Yes.
9      Q.  Okay.  And on the earlier message, it's
10 from Carolyn Hanner; is that right?
11     A.  No.  Which -- I'm on the second -- go
12 ahead, please.
13         MR. COLE:  Go ahead.
14         MS. FORD:  Okay.
15         MR. COLE:  I think she's looking at the
16 first page still.
17 BY MS. FORD:
18     Q.  If you look at the -- where it says
19 "original message"?
20     A.  Says, original -- it's from Scott to
21 Caroline.
22     Q.  Okay.

|  | Page 195 |
|---|---|

1      A.  Not from Carolyn.
2      Q.  Well, I'm actually looking at -- still
3  on Page 1, where you see "original message," and
4  it says, "From Caroline Hanner to," and then
5  there's a whole list of "to's."
6      A.  Okay.  I see it.  I'm sorry.
7      Q.  Okay.
8      A.  I see where you're -- you're talking
9  about, yes.
10     Q.  And this is the actual message that's
11 dated -- message that is dated May 23rd, 2000,
12 right?
13     A.  Yes.
14         MR. COLE:  Down at the bottom?
15         THE WITNESS:  Yeah.
16 BY MS. FORD:
17     Q.  And then in the -- about the middle of
18 the page, do you see "Eric French," your name,
19 there?
20     A.  Yes, I do.
21     Q.  And it appears that you're a recipient
22 of -- one of the recipients of this e-mail

|  | Page 196 |
|---|---|

1  message sent by Caroline Hanner; is that right?
2      A.  Yes.
3      Q.  Okay.  And then now turning to Page 2,
4  to the message I think you were referring to,
5  also dated May 23rd. It's a message from Scott
6  Glover to Caroline Hanner; is that right?
7      A.  Yes.
8      Q.  Okay.  And at this point in time, May
9  of 2000, do you know what position Scott Glover
10 held?
11     A.  He would have been director of sales.
12     Q.  For alternate site?
13     A.  Yes.
14     Q.  Okay.
15     A.  Yes.  I'm sorry.
16     Q.  That's okay.
17         Is that -- did that position also go by
18 national sales manager as the title, or is that a
19 different title?
20     A.  No.  I'm sorry.  Same -- same thing.
21 I'm just --
22     Q.  Okay.  No.  That's okay.

|  | Page 197 |
|---|---|

1      A.  His -- I was speaking more towards his
2  function.  So, yes, you're right.
3      Q.  Okay.  So, his title was national sales
4  manager?
5      A.  Yes.
6      Q.  And that was over all of alternate
7  site; is that right?
8      A.  Yes.
9      Q.  Okay.  And in this message from 1:17
10 p.m., it's Scott Glover telling Caroline Hanner,
11 "Please forward on to the sales force.  Thanks,
12 Rob, for the very informative data on
13 Federal/State Medicaid AWP."
14         Did I read that accurately?
15     A.  Yes.
16     Q.  Okay.  So, does it appear, from this
17 chain of e-mails, that Mr. Glover received an e-
18 mail, and then he instructed Ms. Hanner to
19 forward it on to the alternate site sales force?
20     A.  Yes.
21     Q.  Okay.  And you were one of the sales
22 force members that received the forwarded

                        50 (Pages 194 to 197)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 198

1    message; is that right?
2       A.  No.
3       Q.  You were not?
4       A.  No.  I was in contract marketing.
5       Q.  Okay.  But Mr. Glover said, "Please
6    forward on to the sales force," and when Ms.
7    Hanner forwarded it on, she forwarded it on to
8    the sales force as well as at least you, who were
9    in contract marketing?
10      A.  Yeah.  She just hadn't -- evidently,
11   she hadn't taken me off the list.
12      Q.  Okay.
13      A.  The e-mail list.
14      Q.  Okay.
15      A.  But I was an analyst at that point.
16      Q.  Okay.  We see some other names on
17   there, like Scott Glover, Trudy Burchieri.
18          They weren't members of the sales
19   force, were they?
20      A.  Well, Scott was the person we just
21   talked about, the national sales director.
22      Q.  Was it trainer?  Was he a trainer?

Page 199

1       A.  No.  Scott Glover?
2       Q.  Okay.
3       A.  Scott Glover was the national sales
4    director.
5       Q.  Sure.
6       A.  I think you said Trudy's name?
7       Q.  Yes.
8       A.  I don't see her, but if Trudy's --
9    where's her name at on this -- oh, I see it.  I'm
10   sorry.  Yeah.  Trudy was a -- if you're asking me
11   was she a trainer?
12      Q.  Yes.
13      A.  Yes.
14      Q.  Okay.  So, you -- do you believe that
15   you would have received this message in the
16   ordinary course of business at Abbott?
17      A.  No.
18      Q.  You would not have?
19      A.  No.
20      Q.  And why is that?
21      A.  Because at that time, I was in contract
22   marketing.

Page 200

1       Q.  Uh-huh.
2       A.  And if you look at -- look at Trudy's
3    name, right after her name, it says "APX."
4       Q.  Okay.
5       A.  That's specific to Abbott Park.  That's
6    an Abbott Park e-mail address.
7       Q.  Okay.
8       A.  And if you look at my e-mail address,
9    it's still territory specific.  So, at that
10   point, I would have been receiving e-mails from
11   my Abbott Park e-mail address, so I don't know if
12   I got that or not.
13      Q.  Okay.  Were -- were your e-mails -- was
14   your e-mail address forwarded to your Abbott Park
15   once you --
16      A.  No.  You get new -- you get new e-mail
17   addresses when you come to the park.
18      Q.  Okay.  So, do you think that this e-
19   mail just got lost in --
20      A.  That I don't --
21      Q.  -- cyberspace?
22      A.  No.  I don't -- I don't know that.

Page 201

1       Q.  Okay.
2       A.  I'm just saying that I had an Abbott
3    Park e-mail address at this point, because this
4    is May of 2000, correct?
5       Q.  Right.
6       A.  Okay.
7       Q.  So, you're -- I'm just trying to
8    understand:  So, you're just saying you don't
9    know whether you received this or not?
10      A.  That's exactly what I'm saying.
11      Q.  Okay.  Now, if you go to the original
12   message, which starts about a third of the way
13   down on Page 2, the message is also from May
14   23rd, 2000, at 11:04 a.m., from Rob Cannon to
15   Scott Glover.
16          Do you see that?
17      A.  I'm sorry.  Where are we at?  It's just
18   kind of hard to read this.
19      Q.  Sure.
20          Page 2.
21      A.  Yes.
22      Q.  About a third of the way down?

Henderson Legal Services
202-220-4158

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

---

Page 202

1    A.  Okay.
2    Q.  It says, "Original message from Rob
3  Cannon to Scott Glover," and it's got a time
4  stamp of 11:04 a.m.?
5    A.  I do see that.
6    Q.  Okay.  And this appears to be the
7  original message in the chain.
8        Do you see that?
9    A.  Yes.
10   Q.  Okay.  And this is the message that was
11 forwarded on, eventually, to a number of people;
12 is that right?
13   A.  Yes.
14   Q.  Okay.  And it says, "Scott, I've
15 attached the new Federal and State Medicaid AWP
16 prices that went into effect as of May 1st, 2000.
17 This information was published in the May 2000
18 issue of INFUSION MAGAZINE on page 6."
19       Did I read that accurately?
20   A.  Yes.
21   Q.  Okay.  And it's the -- the magazine --
22 the article in the Infusion magazine that Mr.

---

Page 203

1  Glover is talking about is titled, "AWP Back in
2  the news."
3        Do you see that?
4    A.  Yes.
5    Q.  Okay.  And it says, "State programs are
6  slated to tighten Medicaid reimbursement made to
7  physician and home health providers for drugs."
8        Did I read that accurately?
9    A.  Yes.
10   Q.  And then the next paragraph down says,
11 "Investigators allege that some pharmaceutical
12 manufacturers deliberately set wholesale prices
13 high in order to" attack -- "attract providers to
14 their medications postulating that the providers
15 could purchase the drug below average wholesale
16 price and keep the difference."
17       Did I read that accurately?
18   A.  Yes.
19   Q.  Okay.  And then another paragraph down,
20 it starts, "In the attached spreadsheet..."
21       Do you see that?
22   A.  Yes.

---

Page 204

1    Q.  In the attached spread seat -- excuse
2  me, "In the attached spreadsheet, there are 429
3  drugs.  There are 100 Abbott drugs and 7 Gensia
4  drugs that I've highlighted. When I was informed
5  by my accounts of the situation, they stated" --
6  "they stated that they were not told by the state
7  or Federal government that this was going to
8  happen."
9        Did I read that accurately?
10   A.  Yes.
11   Q.  And then if you turn to the last page,
12 towards the bottom, in the paragraph that starts,
13 "We will have to monitor our sales in next few
14 months to see if there is a drop in business
15 because of certain Abbott drugs that have been
16 effected by the decrease in Medicaid AWPs."
17       Do you see that?
18   A.  Yes.
19   Q.  Do you recall learning, in about May
20 2000, about a decrease in Abbott's list prices?
21   A.  I do not.
22   Q.  Okay.  Do you recall learning, at any

---

Page 205

1  time, that in about May 2000, there were Federal
2  and state investigations into manufacturers'
3  pricing --
4    A.  I do not.
5    Q.  -- practices?
6        During this time, around May 2000, do
7  you recall customers complaining about the change
8  in Abbott's list prices?
9    A.  No, I do not.
10   Q.  Okay.  Do you recall customers
11 complaining about the change in AWPs on Abbott's
12 products?
13   A.  No, I do not.
14   Q.  If you turn back to Page 1, to the last
15 message in the chain, this is the one from
16 January 18th, 2002, from Andy Crofoot to Dave
17 Harling.
18       Do you see that?
19   A.  Yes, I do.
20   Q.  Do you know Dave Harling?
21   A.  Yes.  I do.
22   Q.  And have you worked with him in

---

52 (Pages 202 to 205)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 206

1    alternate site?
2        A.  Yes.
3        Q.  In what capacity?
4        A.  I replaced him in contract marketing.
5        Q.  Okay.  Do you know where Mr. Harling
6    went after that?
7        A.  To the East Coast to be a district
8    manager.
9        Q.  Still for Abbott?
10       A.  Yes.
11       Q.  Okay.  Are you in contact with him
12   today?
13       A.  No, I'm not.
14       Q.  Okay.  Do you know if he's still an
15   Abbott employee?
16       A.  No, I do not.
17       Q.  Okay.  In this message, Andy writes to
18   Dave, "Dave, you may have" -- "have to dust off
19   your memory banks and try to remember when we had
20   that big change in our list price and everyone
21   was complaining.  I was telling you that we
22   didn't change this on our own, Abbott was told to

Page 207

1    and I cited the e-mail that forewarned us about
2    it.  Not that it matters or anything, but I found
3    it and am sending it to you.  It's just an FYI."
4            Did I read that accurately?
5        A.  Yes, you did.
6        Q.   Having reviewed both the original
7    message and Mr. Crofoot's January 2002 message,
8    does it refresh your recollection about events
9    occurring in May of 2000 related to changes in
10   Abbott's list price?
11           MR. COLE:  Object to the form.
12           THE WITNESS:  No.  No.
13   BY MS. FORD:
14       Q.  Okay.  I'm going to hand you what has
15   been previously marked as Exhibit Dawson 985.
16       A.  Thank you.
17       Q.  Mr. French, you're welcome to review
18   the entire document, but I am going to be
19   reference -- or, referring you to a particular
20   paragraph on Page 13, if that helps you.
21       A.  Okay.
22       Q.  Just let me know when you're ready.

Page 208

1        A.  Can I ask what this is?
2        Q.  Sure.
3            It appears to be interoffice
4    correspondence from Pete Karas to C. Begley dated
5    November 5th, 2001.
6        A.  Okay.
7        Q.  Are you ready?
8        A.  Yes.
9        Q.  Do you know who Peter Karas is?
10       A.  He was in senior management on the
11   hospital products side --
12       Q.  Okay.
13       A.  -- of the business.
14       Q.  Okay.  Did you understand that the
15   alternate site product sales division reported up
16   through Mr. Karas?
17       A.  Yes.
18       Q.  Okay.  And I think -- if you could turn
19   to Page 13.
20       A.  Yes.
21       Q.  And see there the heading at the top of
22   the page, alternate -- "Alternate Site Product

Page 209

1    Sales"?
2        A.  Yes.
3        Q.  Okay.  And then the fourth bullet point
4    down says, "Coram Healthcare."
5            Do you see that?
6        A.  Yes.
7        Q.  It says, "Coram has moved some of their
8    high runners, such as Vancomycin, away from
9    Abbott APP."
10           In the context that it's used here, do
11   you know what -- what -- or, what does high
12   runners mean to you in this context?
13           MR. COLE:  Object to the form.
14           THE WITNESS:  I don't know what that
15   means.
16   BY MS. FORD:
17       Q.  Okay.  Is that a term that you heard
18   when you were in alternate site --
19       A.  No.
20       Q.  -- as a sales rep?
21       A.  No.  I don't recall that.
22       Q.  Okay.  And in contract marketing, you

53 (Pages 206 to 209)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                      September 26, 2007
                        Louisville, KY

---

Page 210

1  didn't hear someone refer to a product as a high
2  runner?
3      A.  No.
4      Q.  Okay.  The next sentence says, "We are
5  starting to see the results of this move.  Coram
6  was purchasing 800,000 annually of Vanco.  Their
7  purchases for the past quarter are 200,000 short
8  of their running rate.  They have indicated that
9  this was due to our list price changes."
10         Did I read that accurately?
11     A.  Yes, you did.
12     Q.  Do you recall, in May 2000, hearing --
13  May 2000 or after, hearing about alternate site
14  customers switching to other manufacturers due to
15  the -- Abbott's list price changes?
16     A.  No.
17     Q.  Okay.  Did you ever receive any verbal
18  instruction from anyone at Abbott not to discuss
19  average wholesale price information with Abbott
20  customers?
21     A.  I don't recall.
22     Q.  Okay.  You don't recall one way or the

---

Page 211

1  other?
2      A.  One way or the other.
3      Q.  Okay.  Do you recall receiving any
4  written instruction not to discuss AWP
5  information with customers?
6      A.  I don't recall one way or the other.
7      Q.  Okay.  Do you recall receiving any
8  written or verbal instruction from Abbott not to
9  discuss reimbursement with customers?
10     A.  I don't recall that, either.
11     Q.  You don't recall receiving any
12  instruction on that subject?
13     A.  Correct.
14     Q.  Okay.
15     A.  Either way.
16     Q.  Okay.  Do you ever recall hearing that
17  it was improper to market an Abbott product based
18  on the AWP for that product?
19     A.  I don't recall.
20     Q.  You don't recall ever hearing that?
21     A.  I don't recall hearing that.
22     Q.  Okay.  Did you ever have any

---

Page 212

1  discussions with any of your alternate site sales
2  rep colleagues about reimbursement issues?
3      A.  No.
4      Q.  And how about average wholesale price?
5      A.  No.
6      Q.  Now, earlier when we were referencing
7  Exhibit French 1378, this spreadsheet, it has a
8  column for AWP and dollar dif AWP?
9      A.  Yes.
10     Q.  You indicated that you don't recall, at
11  least for this spreadsheet, calculating the AWP
12  based on Abbott's list price; is that right?
13     A.  Yes.
14     Q.  Do you ever recall an occasion where
15  you were calculating or estimating AWP for an
16  Abbott product?
17     A.  No.
18     Q.  Okay.  When you were putting together
19  this Exhibit French 1378, do you recall having
20  any discussions with any other contract marketing
21  analyst about the purpose for AWP being included?
22     A.  No.

---

Page 213

1      Q.  And what about conversations with the
2  contract marketing manager, Ms. Leone?
3      A.  No.
4      Q.  And we see here that -- we've
5  established, I think earlier, that the dollar
6  difference AWP column is the result of taking the
7  AWP and subtracting the contract price; is that
8  right?
9      A.  Yes.
10     Q.  Okay.  Have you ever heard of that
11  number, the difference between contract price and
12  AWP, being referred to as the "spread"?
13     A.  No.
14     Q.  During your time in alternate site, did
15  you hear people use the term "spread"?
16     A.  No.
17     Q.  Did you hear any of your colleagues
18  refer to any terms to discuss the difference
19  between what a customer would pay, or the
20  contract price, and the AWP?
21     A.  I don't recall anybody saying that.
22     Q.  Did you understand that the difference

---

54 (Pages 210 to 213)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

| Page 214 |
|---|

1  between the contract price and the AWP was
2  information that was important to at least some
3  Abbott customers?
4      A.  No, I did not understand that.
5      Q.  Okay.  You have no knowledge of that
6  one way or the other?
7      A.  Correct.
8      Q.  Okay.  We've talked, at some points
9  today, about the various types of documents that
10 you created in your positions in Abbott, first in
11 -- as a sales rep and then as a -- in contract
12 marketing.
13         Did you ever receive -- at any time
14 during your employment with Abbott, have you ever
15 received notification to preserve documents in
16 your possession?
17     A.  Yes.
18     Q.  And when was that?
19     A.  It was -- I don't know the exact year,
20 but it was in my position as an anesthesia
21 specialist.
22     Q.  Okay.  And I believe earlier you said

| Page 215 |
|---|

1  that would have been between June of 2001 and
2  December of 2006; is that right?
3      A.  Yes.  That is correct.
4      Q.  Okay.  And do you know what that
5  preservation request was related to?
6      A.  Yes.  One of our products.
7      Q.  And which product was that?
8      A.  Oxycontin.
9      Q.  Okay.  And did you understand that to
10 be in relationship to a lawsuit or investigation
11 related to Oxycontin?
12     A.  I'm not sure at that point what it was
13 for.
14     Q.  Okay.  Did you ever receive any notice
15 to preserve documents related to average
16 wholesale price litigation that Abbott is engaged
17 in?
18     A.  No.
19     Q.  Okay.  And I believe you testified
20 earlier that when you moved from one job to
21 another -- well, let me -- let me back up.
22        When you were an alternate site sales

| Page 216 |
|---|

1  rep, you had your own home computer; is that
2  right?
3      A.  Yes.
4      Q.  And then at some point, the hard drive
5  on that computer failed and you threw it away; is
6  that --
7      A.  Correct.
8      Q.  Okay.  And then as an alternate site
9  contract marketing analyst, you actually had an
10 Abbott issued computer; is that right?
11     A.  Correct.
12     Q.  And when you left the job, you left the
13 computer there?
14     A.  Correct.
15     Q.  Okay.  And you didn't take any of the
16 computer files with you to your next position; is
17 that right?
18     A.  Only my personal files, like vacation
19 time --
20     Q.  Okay.
21     A.  -- and things of that nature.
22     Q.  Okay.

| Page 217 |
|---|

1      A.  That I did take.
2      Q.  And that would have been true for both
3  the hard copy files and the computer files?
4      A.  Yes.
5      Q.  Okay.  So, if it was related to your
6  accounts, you would have left it in contract
7  marketing?
8      A.  Yes.
9      Q.  And things like significant events
10 reports, you just left on the computer or you
11 deleted them; is that right?
12     A.  Correct.
13     Q.  Okay.  When you were an alternate site
14 sales rep, do you recall being notified, or -- or
15 learning in any way, of a civil investigative
16 demand that was issued to Abbott by the
17 Department of Health and Human Services'
18 Inspector General?
19     A.  No.
20     Q.  And do you recall learning about
21 subpoenas issued to Abbott by the United States
22 Department of Health and Human Services?

55 (Pages 214 to 217)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 218

1    A.  No.
2    Q.  Okay.  I have just a few more exhibits
3  to show you.
4    A.  Okay.
5    Q.  This one we'll mark as Exhibit French
6  1385.
7        (Deposition Exhibit French 1385
8  marked for identification and is annexed hereto.)
9        THE WITNESS:  Thank you.
10  BY MS. FORD:
11    Q.  And for the record, this is ABT DOJ
12  0184423.
13        Mr. French, does this appear to be an
14  e-mail from you to Pat Glas dated December 20th,
15  2000?
16    A.  Yeah.
17        Can I have just a second to --
18    Q.  Uh-huh.
19    A.  -- look through this?
20        Yes.  This is from -- if you're asking
21  was this from me to Pat Glas, yes.
22    Q.  Okay.  And it's an e-mail dated

Page 219

1  December 20th, 2000, right?
2    A.  Correct.
3    Q.  Okay.  And at that time, you were an
4  alternate site contract marketing analyst; is
5  that right?
6    A.  Correct.
7    Q.  Okay.  And what was -- where did Pat
8  Glas work?
9    A.  Alternate site product sales, contract
10  marketing.
11    Q.  She was in contract marketing as well?
12    A.  Yes.
13    Q.  Okay.  And what was her position?
14    A.  If my memory serves me correct, she was
15  a coordinator.
16    Q.  Okay.  So, in that role, she provided
17  administrative assistance and data entry for
18  contract analysts and the manager; is that right?
19    A.  Yes.
20    Q.  Okay.  And you write to -- you write to
21  Pat here, "Pat, we have two accounts to
22  transition over to alternate site before the end

Page 220

1  of the year.  The first one is Ball Home
2  Infusion.  The second one is Sacred Heart Home
3  Care."
4        Did I read that accurately?
5    A.  Yes, you did.
6    Q.  Okay.  Do you recall why these accounts
7  were being transferred from home infusion to
8  alternate site?
9    A.  Why they were being moved over?
10    Q.  Uh-huh.
11    A.  No.
12    Q.  Okay.  Do you recall transitioning
13  other accounts at that time?
14    A.  Yes.
15    Q.  And do you recall -- I guess, how many
16  other accounts do you recall transitioning?
17    A.  I don't remember the exact number.
18    Q.  Okay.  Was home infusion, was that
19  business unit closing at the time?
20    A.  I don't know -- I don't know if it was
21  closing, but the -- these accounts were
22  transitioning over.

Page 221

1    Q.  Okay.  If you don't recall the reason
2  for the specific accounts being converted over,
3  do you recall more generally why accounts were
4  being converted or transitioned from -- from home
5  infusion to alternate site?
6    A.  No.
7    Q.  And what did -- what did transitioning
8  an account from home infusion to alternate site
9  involve?
10    A.  From looking at this document, and from
11  what I recall, is we needed to create information
12  for these accounts in our system, because they
13  weren't currently in our system.  So, if they had
14  a pump in the home infusion system, we had to
15  create a pump profile in our system.
16        And it appears that's what I'm doing
17  right here, is just, you know, we need to create
18  this information in our system so we can track
19  these accounts.
20    Q.  Did you understand that these accounts
21  were being moved in their entirety from home
22  infusion to then become an alternate site

Henderson Legal Services
202-220-4158

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 222

1  account?
2      A.  Yes.  That's my understanding from
3  looking at this, yes.
4      Q.  Okay.  At the bottom of the page,
5  there's a handwritten note.  It says, "Eric,
6  looking good.  I ran an INET report.  It
7  matches."
8          Did I read that accurately?
9      A.  Yes.
10     Q.  What is an INET report?
11     A.  I don't remember what that is.
12     Q.  Okay.  Do you -- do you believe INET
13  stands for something?
14     A.  I don't know.
15     Q.  Is it an acronym?
16     A.  I don't know.
17     Q.  Okay.  So, today, sitting here today,
18  you don't have any recollection about what INET -
19  -
20     A.  No.
21     Q.  -- is?  Okay.
22         MS. FORD:  Okay.  I don't have any

Page 223

1  further questions at this time, but I just would
2  like to state that Abbott's  document production
3  is continuing in this case and, therefore, we
4  reserve the right to recall Mr. French should
5  additional documents warrant it.
6         So, I'll pass the witness.
7         MR. COLE:  Does anyone on the -- on the
8  phone have questions for Mr. French?
9         MS. NESBITT:  I do, actually, have a
10  few questions.
11         MR. COLE:  Amber, before you get
12  started, let me just get our usual objection on
13  the record.
14         Abbott objects to the presence of -- of
15  MDL Plaintiffs' counsel at the deposition and any
16  use of the testimony or information contained in
17  the deposition today on the basis that discovery
18  in that matter is closed.
19         MS. NESBITT:  Okay.  We have our
20  standard disagreement.
21
22             EXAMINATION

Page 224

1  BY MS. NESBITT:
2      Q.  But, Mr. French, my name is Amber
3  Nesbitt.  I represent the state of Arizona and
4  the MDL Plaintiffs, and I have a very few
5  questions for you.
6      A.  Yes, ma'am.
7      Q.  Going back to Exhibit French 1387, this
8  -- and I don't have the exact exhibit in front of
9  me, but I believe I have a very similar one.
10         Is this a 2000 spreadsheet that was
11  sent to GeriMed?
12         MR. COLE:  If you could just give us a
13  second, Amber, while --
14         MS. NESBITT:  Sure.
15         MR. COLE:  -- we can pull it and --
16         MS. FORD:  I --
17         MR. COLE:  -- get it in front of Mr.
18  French.
19         MS. FORD:  I believe it's Exhibit
20  French 1378.
21         MS. NESBITT:  Oh, I'm sorry.  Exhibit
22  French 1378.

Page 225

1  BY MS. NESBITT:
2      Q.  The one that you've been questioned on
3  at length today.
4         MS. FORD:  Right.  We don't have a 1387
5  yet, so I think it's --
6         MS. NESBITT:  Okay.
7         MS. FORD:  -- Exhibit French 1378.
8         THE WITNESS:  Yes.  I have it.
9  BY MS. NESBITT:
10     Q.  Okay.  And is this a document that was
11  sent to GeriMed by you?
12     A.  Yes.  According to the cover letter,
13  yes.
14     Q.  Okay.  Do you recall sending similar
15  spreadsheets to other clients?
16     A.  No, I do not.
17     Q.  Okay.  Is that because -- do you -- do
18  you have a specific recollection of not sending,
19  or you just don't recall?
20     A.  I don't --
21         MR. COLE:  Object to the form.
22         MS. NESBITT:  Okay.

Henderson Legal Services
202-220-4158

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                      September 26, 2007
                        Louisville, KY

Page 226

1        THE WITNESS: I don't recall.
2  BY MS. NESBITT:
3     Q.  Okay.  Do you know if other contract
4  marketing analysts sent similar documents to
5  their customers?
6     A.  I don't know.
7     Q.  Do you recall having any discussions
8  with any of them about similar spreadsheets or
9  documents?
10    A.  I don't recall.
11    Q.  Okay.  And during this time, as -- when
12  you were a contract marketing analyst, I believe
13  you testified that Lynn Leone was your boss?
14    A.  Yes.
15    Q.  Is that correct?  Okay.
16       Did she ever review documents that you
17  sent to customers?
18    A.  Yes.
19    Q.  Do you recall if she reviewed this
20  document that you sent to GeriMed?
21    A.  I don't -- I don't recall if she
22  reviewed this specific document.

Page 227

1     Q.  Okay.  Do you recall her ever reviewing
2  a document where you had AWP information and the
3  dollar difference AWP information provided to
4  customers?
5     A.  I don't recall.
6     Q.  Is that because -- is that -- you don't
7  recall it happening, or you don't recall -- well,
8  strike that.
9        MS. NESBITT:  I believe that's all I
10  have.
11       MR. COLE:  Tim, what about you?
12       MR. FOOTE:  Yeah.  This is Tim Foote,
13  Deputy Attorney General, California.  I just have
14  a couple of questions.
15
16          EXAMINATION
17  BY MR. FOOTE:
18    Q.  Mr. French, while you were working in
19  sales, did you ever acquire any new accounts?
20    A.  Yes.
21    Q.  Do you recall which ones those were?
22    A.  No, sir.

Page 228

1     Q.  Okay.  And when discussing those
2  accounts with your -- with those customers, did
3  you ever discuss reimbursement by Medicare or
4  Medicaid?
5     A.  No, sir.
6     Q.  Okay.  Was reimbursement by Medicare or
7  Medicaid ever discussed with any -- any of your
8  customers by you?
9     A.  No, sir.
10    Q.  Was the reimbursement differential,
11  which appears on that document, Exhibit French
12  1378, ever discussed with customers by you?
13    A.  No, sir.
14    Q.  Okay.  And GeriMed had members.  I
15  guess the -- the documents that I've looked at,
16  they refer to them as members, which would be
17  pharmacies and that sort of thing.
18       You're aware of that, right?
19    A.  Yes, sir.
20    Q.  Okay.  And did you ever have any
21  contact directly with those members?
22       MR. COLE:  I'll -- I'll object to the

Page 229

1  form.
2  BY MR. FOOTE:
3     Q.  Do you want me to reask the question or
4  --
5     A.  Yeah.  I'm -- I'm just not -- I'm just
6  not sure how to answer it.
7     Q.  Did you ever have any contacts directly
8  with the member, the provider members, of
9  GeriMed, or RxMed, or IVMed?
10    A.  I'm not sure.
11    Q.  Okay.  And the prices on -- back to
12  document Exhibit French 1378 -- the prices that -
13  - the contract prices, the prices that the --
14  that -- that GeriMed paid for the -- for those --
15  those pharmaceuticals, where -- where did those
16  prices come from?
17    A.  Where -- go ahead.
18       MR. COLE:  I'll just object.  Object to
19  the form.
20       MR. FOOTE:  I'm sorry.  I didn't hear
21  your answer.
22       What?

58  (Pages 226 to 229)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 230

1      MR. COLE:  I just -- I just inserted an
2  objection to the form of the question.
3      Can you read the question back?
4      MR. FOOTE:  I -- I -- I mean, Mr.
5  French --
6      What's your answer, Mr. French?
7      MR. COLE:  Could you read the question
8  again, so he --
9      MR. FOOTE:  I can repeat the question,
10 if you want.
11     MR. COLE:  Sure.  That would be great.
12 Thank you.
13 BY MR. FOOTE:
14  Q.  Okay.  On document Exhibit French 1378,
15 I believe it's the second page and then below,
16 there is -- there are prices that are the
17 customer -- they appear to be the customer prices
18 that GeriMed would pay, the contract prices for
19 GeriMed.
20     Where did those prices come from?
21  A.  Those prices came from the analysis I
22 did of their contract and the provision in there

Page 231

1  for price increases from year to year.
2  Q.  Okay.  And do you have any documents,
3  notes, or anything, regarding your analysis of
4  those prices?
5  A.  No, sir.
6  Q.  Okay.  Was there a computerized pricing
7  file that you used?
8  A.  Yes, sir.
9  Q.  And what's the formal name of that
10 file?  Do you know?
11  A.  No, sir.
12     MR. FOOTE:  Okay.  I don't have any
13 further questions.
14     MS. FORD:  I have just a few follow-up
15 questions.
16     MR. COLE:  Okay.
17
18        RE-EXAMINATION
19 BY MS. FORD:
20  Q.  Still looking at Exhibit French 1378,
21 Ms. Nesbitt asked you whether Lynn Leone would
22 have approved the -- the prices here.

Page 232

1      Do you recall that?
2  A.  The question?
3  Q.  Yes.
4  A.  Yes.
5  Q.  And I believe you stated that -- that
6  you don't know, you didn't recall if she reviewed
7  this particular spreadsheet; is that right?
8  A.  Yes.
9  Q.  In sending out pricing to Abbott
10 customers, did you -- did it routinely require
11 that you get the okay from the alternate site
12 contract marketing manager?
13  A.  Yes.
14  Q.  Okay.  So, in the normal course of
15 business, Ms. Leone, or whoever the manager was
16 at that time, would have reviewed spreadsheets
17 such as this that were going out to customers; is
18 that right?
19  A.  Yes.
20  Q.  Okay.  And Ms. Nesbitt also asked you
21 whether other alternate site contract marketing
22 analysts sent out similar spreadsheets to

Page 233

1  customers.
2      Do you recall that question?
3  A.  Yes.
4  Q.  And you said you didn't know; is that
5  right?
6  A.  Yes.
7  Q.  Okay.  But, in fact, we've seen today
8  at least two examples where Mr. Moore sent out
9  almost identical spreadsheets to customers; is
10 that right?
11  A.  Yes.
12  Q.  And so, you're not denying that -- that
13 you've seen those and that they appear to be
14 similar communications, similar analyses, being
15 sent by alternate site contract marketing
16 personnel; is that right?
17  A.  I've seen the one Scott sent and the
18 one I sent, yes.
19  Q.  And we've actually seen two that Mr.
20 Moore sent, right?
21     One from 2000, which is Exhibit French
22 1384, and one from 1999, which is Exhibit French

59  (Pages 230 to 233)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                         Louisville, KY

Page 234

1  1383; is that right?
2     A.  Yes.
3     Q.  Okay.  So, you know that at least that
4  yourself and Mr. Moore sent out these types of
5  analyses to Abbott customers; is that right?
6     A.  No.
7     Q.  You don't know that?
8     A.  No.  That we sent it to this customer,
9  not Abbott customers.  I only know that --
10    Q.  Okay.
11    A.  -- it went to this particular customer.
12    Q.  Well, there are actually two -- at
13  least two customers here, right?
14    A.  I thought it was the same one.  I'm
15  sorry if I made that mistake.
16    Q.  That's okay.
17        With respect to Exhibit French 1384,
18  Mr. Moore is sending an analysis to RxMed, and
19  Exhibit French 1383 and Exhibit French 1378 are
20  being sent to GeriMed; is that right?
21    A.  Yes.
22        MS. FORD:  Okay.  No further questions

Page 235

1  at this time.
2        MR. COLE:  Why don't we take a break
3  for five minutes.  I don't know if I'm going to
4  have any questions or not.  And then we can come
5  back and reconvene and either adjourn or I'll ask
6  a few questions and -- and then we can adjourn.
7        MS. FORD:  Okay.
8        THE VIDEOGRAPHER:  We'll go off the
9  record at 12:59 p.m.
10        (There was a brief recess.)
11        THE VIDEOGRAPHER:  We are back on the
12  record at 1:16 p.m.
13
14        EXAMINATION
15  BY MR. COLE:
16    Q.  Okay.
17    A.  Thank you.
18    Q.  Mr. French, I want to ask you just a
19  couple of questions about Exhibit French 1378.
20        And do -- do you remember Ms. -- Ms.
21  Ford and I believe Ms. Nesbitt and Mr. Foote
22  asked you some questions about this document?

Page 236

1     A.  Yes.
2     Q.  Do you remember those questions?
3     A.  Yes.
4     Q.  And -- and just so the record is clear,
5  you did not create the format -- I'll rephrase
6  it.
7        Did you create the format or structure
8  of the document attached to or enclosed with the
9  cover letter in Exhibit French 1378?
10    A.  No, I did not.
11    Q.  And did you generate or create the
12  column headings that are contained in the
13  attachment to Exhibit French 1378?
14    A.  No, I did not.
15    Q.  And do you know whether anyone at
16  Abbott created the structure or format of the
17  enclosure contained in Exhibit French 1378?
18    A.  No, I don't.
19    Q.  And do you know whether anyone at
20  Abbott created the column headings that are
21  indicated in the attachment to Exhibit French
22  1378?

Page 237

1     A.  No, I do not.
2     Q.  Ms. Ford asked you some questions about
3  documents that were -- that you had created on
4  your home computer while you were an alt site
5  product sales rep.
6        Do you remember those questions?
7     A.  Yes.
8     Q.  And I believe your testimony was that
9  you -- if there were any documents that you
10  created on your computer that related to a
11  specific account or customer, that you printed
12  that document off and put it in a hard copy file;
13  is that right?
14    A.  Yes.
15    Q.  And to the extent there were any
16  significant event reports on your home computer -
17  - let me back up.
18        Were the significant event reports
19  summaries of the activity on your -- your various
20  customers and accounts?
21    A.  Yes.
22        MS. FORD:  Object to form.

Henderson Legal Services
202-220-4158

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
                        Louisville, KY

Page 238

BY MR. COLE:
1
2    Q.   And is all of the information contained
3  -- would all of the information contained in your
4  significant event reports be contained in other
5  documents that were present in the paper files
6  for your various customers?
7        MS. FORD:  Object to form.
8        THE WITNESS:  Yes.
9  BY MR. COLE:
10   Q.   And when you prepared those significant
11 event reports, you -- you actually sent them to
12 your supervisor, correct?
13   A.   Yes.
14   Q.   And so, your supervisor, then, would
15 also have a copy of the various significant event
16 reports that you prepared over time as a sales
17 rep in alt site product sales, right?
18   A.   Yes.
19   Q.   And moving forward to your job in
20 contract marketing, Ms. Ford asked you some
21 questions about, you know, the documents that
22 were on your -- your desktop computer while you

Page 239

1  worked in contract marketing.
2        Do you remember those questions?
3    A.   Yes.
4    Q.   And any -- and I believe your testimony
5  was that any files or documents related to a
6  specific customer, you either left on your
7  computer or left in a hard copy file when you
8  left your job in contract marketing; is that
9  right?
10   A.   Yes.
11   Q.   And again, any significant event
12 reports that you created while you were an
13 employee in contract marketing, were those
14 summaries of the various contracts or customers
15 that you worked on at the time you were in
16 contract marketing?
17   A.   Yes.
18        MS. FORD:  Object to form.
19        THE WITNESS:  Yes.
20 BY MR. COLE:
21   Q.   And would all of the information
22 contained in those significant event reports also

Page 240

1  be reflected in some way in the customer files
2  that you kept, either on your computer or in a --
3  in a hard copy file?
4        MS. FORD:  Object to form.
5        THE WITNESS:  Yes.
6  BY MR. COLE:
7    Q.   And again, when you were in contract
8  marketing, any significant event report that you
9  created, you would have sent to your supervisor
10 at the time, correct?
11   A.   Yes.
12   Q.   And lastly, Ms. Ford asked you a
13 question, asked you some questions about AWP and
14 your understanding of AWP.
15        Do you remember those questions?
16   A.   Yes.
17   Q.   And I believe in one of your answers,
18 you said something about your understanding or
19 your -- your -- your personal understanding of --
20 of the term was that it was an average of
21 wholesale prices.
22        Do you know that to be true?

Page 241

1    A.   No.
2        MS. FORD:  Object to form.
3  BY MR. COLE:
4    Q.   Okay.  So, were you guessing or
5  speculating as to the -- as to the definition of
6  AWP when you answered that question?
7    A.   I was guessing to what the words meant,
8  yes.
9    Q.   Okay.
10       MS. FORD:  Object to form.
11       MR. COLE:  That's all I have.
12       MS. FORD:  One or two follow-up
13 questions.
14
15       RE-EXAMINATION
16 BY MS. FORD:
17   Q.   With respect to -- Mr. French, with
18 respect to the documents that Mr. Cole was asking
19 you about, that you would have created when you
20 were an alternate site sales rep and then, later,
21 in contract marketing, that would have been in
22 the files, your hard copy files -- do you recall

Henderson Legal Services
202-220-4158

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                    September 26, 2007
Louisville, KY

Page 242

1  that line of questioning?
2      A.   Yes.
3      Q.   With respect to those -- for example,
4  with respect to the customers that you had in
5  alternate site, would you have had cover letter
6  correspondence with your -- with your accounts?
7      A.   Yes.
8      Q.   And what other types of documents would
9  have been maintained in those hard copy files?
10     A.   Anything pertaining to that account.
11  So, I'm not sure.  Examples of what --
12     Q.   Sure.
13     A.   -- would be in there?
14          Previous contracts would be in there.
15  For example, any correspondence that I might have
16  received from a representative about their
17  account would be in there.  Any spreadsheets that
18  were printed out would be in there.  That's what
19  would be in those files.
20     Q.   Okay.  And did you, from time to time,
21  send information to your accounts?
22          Either electronically or via mail, did

Page 243

1  you send them information?
2      A.   Directly to the accounts or --
3      Q.   Yes.
4      A.   Yes.
5      Q.   When you were a sales rep?
6      A.   Oh, I'm sorry.  I -- which --
7      Q.   When you were a sales rep, did you send
8  any information to the accounts that you dealt
9  with?
10     A.   Yes.
11     Q.   Okay.  And would you have included some
12  type of cover letter or some information that
13  would have identified you as the provider of the
14  document?
15     A.   Yes.
16     Q.   Okay.  And would the same be true
17  during the time that you were in alternate site
18  contract marketing?
19          Did you send information out to
20  accounts?
21     A.   Yes.
22     Q.   Such as the cover letters we've seen

Page 244

1  here today for GeriMed?
2      A.   Yes.  That's what I'm thinking of right
3  now, the one you just showed me earlier today,
4  yes.
5      Q.   Okay.  So, for the other accounts that
6  you had responsibility for, there would have been
7  similar cover letters providing things such as
8  the spreadsheet that we've been looking at,
9  Exhibit French 1378 --
10     A.   Yes.
11     Q.   -- is that right?
12          And other cover letters that we saw
13  today providing price lists?
14     A.   For?
15     Q.   Or member lists?
16     A.   Can you restate the question?
17     Q.   Sure.
18     A.   I want to make sure I answer it
19  correctly.
20     Q.   Uh-huh.
21          I'm just trying to figure out:  You
22  would have -- you would have sent your other

Page 245

1  accounts, aside from GeriMed, but we've seen
2  today examples of you sending information to one
3  of the meds, I'll get it here, with a list of
4  killed products.
5          Do you remember that cover letter?
6      A.   Yes.  Yes.
7      Q.   So, you would have had other types of
8  correspondence --
9      A.   Yes.
10     Q.   -- with these accounts?
11     A.   Yes.
12     Q.   And you would have sent them a cover
13  letter which you would have signed?
14     A.   Yes.
15     Q.   Or some other type of indication that
16  was tying you as being the provider of the
17  information; is that right?
18     A.   Yes.
19     Q.   Okay.  And that would have covered the
20  periods from 1997 to 2000 when you were a field
21  sales rep; is that right?
22     A.   Yes.

62  (Pages 242 to 245)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                      September 26, 2007
                         Louisville, KY

Page 246

1    Q.  And then from about April of 2000 to
2  June of 2001, when you were a contract marketing
3  analyst; is that right?
4    A.  Yes.
5    Q.  Okay.  So, during that time period, if
6  we were to have your files with us today for all
7  of the accounts that you worked on during 1997 to
8  2001, you would expect us to find cover letters
9  with your name on it to the accounts that you had
10 responsibility for during this time period; is
11 that right?
12     MR. COLE:  Object to the form.
13     THE WITNESS:  Yes.
14 BY MS. FORD:
15   Q.  Okay.  And other information that you
16 would be providing, such as the spreadsheets and
17 price list, member list, and so forth; is that
18 right?
19   A.  I'm not sure as to what would actually
20 be in there, so --
21   Q.  But the type of documents that you
22 testified that would have been in your files?

Page 247

1    A.  Yes.  Yes.
2    Q.  Okay.
3    A.  Yes.
4    Q.  So, we would know, for example, when we
5  were looking at a customer file, the time period
6  when you were responsible for that account
7  because we would see correspondence between you
8  and that account; is that right?
9    A.  Yes.
10   Q.  Okay.  But you don't recall at any time
11 being asked to preserve those documents or
12 providing them to anyone within Abbott's legal
13 department, do you?
14   A.  I've never been asked to give it
15 to the legal department, no.
16   Q.  Okay.  And you're not aware of any fire
17 or any other incident which would have destroyed
18 those documents, are you?
19   A.  No.
20   Q.  Okay.  So, can you think of any reason
21 why, if you've maintained those documents and
22 passed them on to the person that took over the

Page 248

1  job after you, both in sales and in contract
2  marketing, why those documents wouldn't have been
3  produced to the United States?
4      MR. COLE:  Objection.
5  BY MS. FORD:
6    Q.  Do you have any reason to know -- do
7  you know -- know why?
8      MR. COLE:  Object to the form.
9      THE WITNESS:  No, I don't know why.
10 BY MS. FORD:
11   Q.  Okay.  So, as far as you know, they
12 existed, and you maintained them and you passed
13 them along to whoever took the job after you; is
14 that right?
15   A.  Yes.
16     MS. FORD:  Okay.  No further questions.
17     MR. COLE:  I don't have any other
18 questions.
19     MS. NESBITT:  No further questions.
20
21     RE-EXAMINATION
22 BY MR. FOOTE:

Page 249

1    Q.  Mr. French?
2    A.  Yes.
3    Q.  When we were discussing the -- the
4  Exhibit French 1378 again, previously, you
5  indicated that the contract price line, well, it
6  was something you calculated.
7      How did you -- how did you go about
8  calculating that?
9    A.  Well, to what I remember, each -- each
10 contract had a provision in it where we could
11 increase the price of the products on a yearly
12 basis.  And let's say we could increase up to
13 five percent on each account.  At the directive
14 of my manager, she would tell us where an account
15 needed to land -- land on their price increase.
16     So, for this anniversary, the prices
17 need to increase by two percent, and then I would
18 adjust the prices accordingly.
19   Q.  Okay.  And then the original price came
20 from a computerized price list; is that correct?
21   A.  Yes.
22     MR. FOOTE:  Okay.  Nothing further.

                              63 (Pages 246 to 249)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

French, Eric                                          September 26, 2007
                        Louisville, KY

Page 250

1    MS. FORD:  No.  I'll pass --
2    MR. COLE:  You looked like you were
3  going to ask.
4    MS. FORD:  No.  I'll pass the witness.
5    MR. COLE:  Okay.  I have no more
6  questions.  Think we're adjourned.
7    MS. FORD:  Again, the United States
8  resumes -- or, reserves its right to recall Mr.
9  French should additional documents being produced
10  in this case warrant it.
11    MR. COLE:  Okay.
12    MR. FOOTE:  California makes the same
13  motion to -- for right to recall.
14    MS. NESBITT:  And Arizona and MDL joins
15  in.
16    MR. COLE:  Okay.  Thanks, guys.
17    THE VIDEOGRAPHER:  We'll go off the
18  record and conclude this deposition at 1:28 p.m.
19  eastern time.
20       (Deposition concluded at 1:29
21  p.m.)
22

Page 251

1  STATE OF KENTUCKY   )
2                )
3  COUNTY OF JEFFERSON  )
4
5     I HAVE READ THE FOREGOING PAGES, AND THE
6  STATEMENTS CONTAINED THEREIN (SUBJECT TO
7  CORRECTIONS, ADDITIONS, AND DELETIONS CONTAINED IN
8  THE ADDENDUM ANNEXED HERETO, IF ANY), AND THEY ARE
9  TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.
10
11
12       _____
13       ERIC FRENCH
14
15     SUBSCRIBED AND SWORN BEFORE ME THIS DAY
16  BY _____, THIS ____ DAY
17  OF _____ , 2007.
18
19
20       MY COMMISSION EXPIRES:_____
21       _____
22       Notary Public

Page 252

1  STATE OF KENTUCKY   )
2                ) SS
3  COUNTY OF JEFFERSON  )
4     I, Kimberley Ann Keene, a notary public, within and for
5  the state at Large, do hereby certify that the foregoing
6  deposition of
7          ERIC FRENCH
8  was taken before me at the time and place and for the purpose
9  in the caption stated; that the witness was first duly sworn
10  to tell the truth, the whole truth and nothing but the truth;
11  that the deposition was taken before me stenographically and
12  transcribed by me; that the foregoing is a full, true and
13  complete transcript of the said deposition so given; that
14  there was no request that the witness read and sign the
15  transcript; that the appearances were as stated in the
16  caption.
17     I further certify that I am neither counsel or of kin to
18  any of the parties to this action, and am in no way interested
19  in the outcome of said action.
20     Witness my signature this 6th day of October,
21  2007.  My Commission Expires on August 29, 2011.
20       _____
21       Kimberley Ann Keene
22       Registered Professional Reporter

64  (Pages 250 to 252)

dcdedbfb-13a3-4f21-86b9-d5cc6c19544b

# EXHIBIT 26

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris

the Florida Keys, Inc.         )

        v.                     )  Chief Magistrate

Abbott Laboratories, Inc.,     )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

- - - - - - - - - - - - - - -

        (cross captions appear on following pages)

            Videotaped deposition of SUE GASTON

                    Volume I

                    Washington, D.C.

                    Thursday, January 24, 2008

                    9:00 a.m.

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                       Washington, DC

Page 38

1  division?
2      A.   Clerical.
3      Q.   After that what did you do?
4      A.   Disability operations in Social Security.
5      Q.   What was the nature of your job in that?
6      A.   Processing foreign claims.  Social
7  Security claims.
8      Q.   Was that a clerical or a --
9      A.   I was a benefit authorizer.
10     Q.   Okay.  So that's more than clerical?
11     A.   Correct.
12     Q.   So you were to look at the forms and
13 decide whether or not to -- or make recommendations
14 on whether or not to authorize benefits?
15     A.   No.  We just -- we did more of --we
16 didn't determine or authorize claims.  But we
17 processed the claims after the authorization
18 occurred.
19     Q.   What was the next job you had after that?
20     A.   With HCFA.
21     Q.   Okay.  Was this your first job with HCFA?
22     A.   Yes.

Page 39

1      Q.   And what was your position there?
2      A.   I don't recall the job title at that
3  time.
4      Q.   On the resume that you created for
5  purposes of this deposition -- I appreciate that --
6  the last one I have on the page runs the dates May
7  1988 to April 1991, post entitlement technical
8  expert, Social Security Administration, Office of
9  Disability and International Operations.  Have we
10 talked about that one yet?
11     A.   Well, I went in there as a benefit
12 authorizer and then I was promoted to the post
13 entitlement technical expert.  But it was still
14 foreign claims and it was -- from benefit authorizer
15 to the post entitlement job, it was all within those
16 years.
17     Q.   And you worked at the Social Security
18 Administration until April of 1991; is that right?
19     A.   Correct.
20     Q.   During your time at the SSA did you
21 confront issues relating to pharmacy?
22     A.   No.

Page 40

1      Q.   From 1991 to February of 2003 you were
2  health insurance specialist at HCFA; is that right?
3      A.   Yes.  Our actual title when I first
4  started was different than health insurance
5  specialist.  But it was all basically the same job.
6  They changed the name of the job.
7      Q.   But your duties and responsibility in
8  this job were the same from April of 1991 through
9  February of '03; is that right?
10     A.   Correct.
11     Q.   And tell me about your job at that time.
12 What were your doing?
13     A.   I was working with the Medicaid drug
14 rebate program pharmacy reimbursement and coverage
15 issues.
16     Q.   When you say pharmacy reimbursement, what
17 do you mean by that?
18     A.   It's drug reimbursement with the -- we
19 did state plan amendments and covered issues that
20 came up for drug coverage under Medicaid.
21     Q.   And when you say drug coverage under
22 Medicaid, you mean what drugs would be covered under

Page 41

1  Medicaid, correct?
2      A.   Right.
3      Q.   Not necessarily, in that category at
4  least, the level of payment to be paid; is that
5  right?
6      A.   Both.  Whether a drug was covered under
7  Medicaid and also any of the payment issues that
8  would come up, what states would pay by the state
9  planned amendments.
10     Q.   You also referenced the Medicaid drug
11 rebate program; is that right?
12     A.   Correct.
13     Q.   What was the nature of your involvement
14 in that during this time?
15     A.   The Medicaid drug rebate program
16 determines if drugs are covered under Medicaid.
17     Q.   What was the nature of your job with
18 respect to the Medicaid drug rebate program?  What
19 did you do?
20     A.   Overseeing the policy.
21     Q.   When you say overseeing policy, what do
22 you mean by that?

                                    11  (Pages 38 to 41)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

---

Page 42

1    A.   Working on any policy-related issues
2  concerning the Medicaid drug rebate program.
3    Q.   With respect to state plan amendments and
4  drug reimbursement, what was the nature of your work
5  in that area?
6    A.   Working with the regional office and
7  reviewing the state plan amendments that are
8  submitted by the states.
9    Q.   We'll talk about that a little bit more
10  today.  Who was your boss during this time from
11  April 1991 through February of 2003?
12    A.   Larry Reed.
13    Q.   What was Mr. Reed's title?  Do you know?
14    A.   In the beginning he was a branch chief.
15  At times he was a technical director.  Other times
16  he was a director.
17    Q.   Was there anyone sort of in the chain of
18  command between Mr. Reed and yourself or did you
19  report directly to Mr. Reed?
20    A.   I don't quite understand your question.
21    Q.   Have you seen an organizational chart
22  before that has little boxes and lines?

---

Page 43

1    A.   Yes.
2    Q.   Would there be a box between you and Mr.
3  Reed?
4    A.   A box between us?  No.
5    Q.   Or did you report directly to Mr. Reed?
6    A.   To Larry Reed.
7    Q.   Okay.  Who else did you work with --
8  well, let me strike that and back up.
9        On your resume you indicate that you
10  worked for CMS/CMSO.
11    A.   Correct.
12    Q.   Can you tell us what that means?
13    A.   Center for Medicaid and State Operations.
14    Q.   So as I understand it there are two broad
15  divisions within CMS, one for Medicare and one for
16  Medicaid; is that right?
17    A.   Correct.
18    Q.   And you worked in the Medicaid side?
19    A.   Correct.
20    Q.   Was that previously referred to as the
21  Medicaid Bureau, do you know?
22    A.   At one time.

---

Page 44

1    Q.   And CMSO is the predecessor name for the
2  Medicaid Bureau; is that right?
3    A.   Correct.
4        MS. MARTINEZ:  Objection, form.  I think
5  you said it backwards.
6        MR. TORBORG:  Yes.  Successor name.
7  You're right.
8        MS. MARTINEZ:  Okay.
9        BY MR. TORBORG:
10    Q.   Just so we're clear, CMSO is the
11  successor name to the Medicaid Bureau?
12    A.   Right.
13    Q.   And in February of 2003 you switched
14  jobs; is that right?
15    A.   Correct.
16    Q.   And that's your current job, right?
17    A.   Yes.
18    Q.   And what is the nature of your job there?
19    A.   I'm the team lead for dispute resolution
20  of the Medicaid drug rebate program.
21    Q.   Do you work on state plan amendments
22  anymore?

---

Page 45

1    A.   No.
2    Q.   I wanted to ask one other thing.  From
3  1991 to 2003, the previous job, did you work on
4  federal upper limits?
5    A.   Yes.
6    Q.   And can you tell us what those are?
7    A.   The federal government sets an upper
8  limit reimbursement amount on certain drugs.
9    Q.   What was the nature of your involvement
10  with the federal upper limit program?
11    A.   I took care of setting the upper limit
12  reimbursement amount on the drugs.
13    Q.   For all drugs?
14    A.   No.  There were just -- the regulations
15  indicate that they're set on -- there are certain
16  criteria, and they're the drugs that we would set an
17  upper limit reimbursement amount on.
18    Q.   I asked the wrong question.  What I meant
19  to ask was for drugs that HCFA did establish a
20  federal upper limit, you would have been involved in
21  that?
22    A.   Correct.

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 222

1  state.
2            (Exhibit Abbott 461 was
3            marked for
4            identification.)
5       MR. TORBORG:  I'm told that we have five
6  minutes left on the tape and it's within about an
7  hour.  So let's go ahead and take a break here.
8       THE VIDEOGRAPHER:  This is the end of
9  tape 4.  Off the record at 3:17.
10           (Recess.)
11      THE VIDEOGRAPHER:  This is the beginning
12 of tape 5 in the deposition of Ms. Gaston.  On the
13 record at 3:43.
14      MR. TORBORG:  Welcome back, Ms. Gaston.
15      THE WITNESS:  Thank you.
16      MR. TORBORG:  I wanted to cover
17 something, some housekeeping matters on the record
18 very quickly.  I understand from Ms. Martinez that
19 there are some additional documents from Ms.
20 Gaston's files or legacy files that are yet to be
21 produced.  Is that right?
22      MS. MARTINEZ:  Yes.

Page 223

1       MR. TORBORG:  And those are ones that
2  you're working on currently and we intend to
3  schedule a second day with Ms. Gaston so that we can
4  go over those documents.
5       MS. MARTINEZ:  I believe what you told me
6  is that you'd look at them and see if you need an
7  additional day.
8       MR. TORBORG:  That's true.
9       MS. MARTINEZ:  But naturally --
10      MR. TORBORG:  I will need an additional
11 day anyway.
12      MS. MARTINEZ:  Okay.  That's what I
13 thought.
14      MR. TORBORG:  Okay.
15   BY MR. TORBORG:
16   Q.   Okay.  Going back to the subject of
17 federal upper limits, Ms. Gaston, I want to ask just
18 a few very general background questions about how
19 the process worked at HCFA, who was involved in what
20 aspects and things of that nature.  Earlier you
21 testified or you identified three people at CMS who
22 were involved in establishing the FULs.  I believe

Page 224

1  you said from 1991 through 2003 when you were doing
2  that, correct?
3    A.   Correct.
4    Q.   And those three people were -- three
5  additional people were Peter Rodler, Cindy Bergin
6  and Gail Sexton?
7    A.   Gail Sexton worked on the FULs after
8  2003.
9    Q.   Did she have any involvement with FULs
10 prior to 2003?
11   A.   No.
12   Q.   What was she doing prior to 2003?
13   A.   I'm not sure.  She was employed by CMS
14 around that time, but I don't know exactly when she
15 started.
16   Q.   And Mr. Rodler I understand was somebody
17 who had been at HCFA and the Medicaid Bureau prior
18 to you being there?
19   A.   Correct.
20   Q.   And then at some point he retired or
21 moved on?
22   A.   Correct.

Page 225

1    Q.   Do you know when he retired or moved on?
2    A.   No.
3    Q.   Can you give me a sense?  Was it early
4  '90s, late '80s?
5    A.   I'm guessing it was in the '90s.  Not in
6  the late '90s, but I'm not sure.
7    Q.   And Cindy Bergin, when did she work at
8  CMS on the FUL issues?
9    A.   She was hired -- I'm not sure exactly the
10 date -- probably eight or nine years ago.  And I
11 mentored here on the FULs until I left in 2003.
12   Q.   So she would have been someone that was
13 working on FUL issues starting in the mid to late
14 '90s; is that fair to say?
15   A.   That's fair to say.
16   Q.   And did you work with Mr. Rodler on the
17 federal upper limit issues or did you sort of
18 succeed his duties?
19   A.   He taught me how to handle the federal
20 upper limit program.  And then when he left I took
21 it over.
22   Q.   And did Cindy Bergin take it over from

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 234

1    the prices.  It will have an AWP price, a direct
2    price or WAC price.  If there's not a price it'll
3    just be blank in any of those categories.  And then
4    the system, the application itself -- from my
5    recollection -- it's been a while since I've used
6    it.  But it will determine a FUL price where it can.
7            Then we apply some manual review just to
8    assure we have -- there's some edits and I can't
9    remember all of those.  But we want to make sure
10   that it's using -- because it's supposed to use the
11   lowest price in published compendia, and we want to
12   make sure that that lowest price is a true price,
13   that it's using a true price to establish a FUL.
14           So there's a manual review that's applied
15   to some of the drugs where the pricing might not
16   look right in there or there's missing pricing.  But
17   basically there's a lot of manual review that's
18   included before the final FUL listing will come out.
19       Q.   Okay.  I appreciate that.  I'm going to
20   try to follow up on each of those steps as best I
21   can.  You indicated that there was a system
22   involved.

Page 235

1        A.   It's an application.
2        Q.   I think I've seen some documents that
3    indicate the FUL process was computerized?
4        A.   Correct.
5        Q.   Right?  Is that what you're talking about
6    when you talk about the system?
7        A.   Yeah.  It's an application that they use.
8        Q.   And what kind of application is it?
9        A.   I'm not a techie person.  I don't know.
10   It's on the computer.  It's an application.  I don't
11   know what more -- how to describe it.
12       Q.   Was the application set up before you
13   started working on it or did you --
14       A.   No.
15       Q.   -- take part in setting it up?
16       A.   When I first started working on FULs it
17   was in our mainframe.  The activity would occur in
18   our mainframe.  They took it from the mainframe and
19   put it into an application that they can use on the
20   computer, if that helps.
21       Q.   And do you recall -- was there someone --
22   you mentioned systems folks.  Was there somebody at

Page 236

1    CMS in the systems department that was involved in
2    this?
3        A.   In the switch to the new application?
4        Q.   Yeah.  And basically the FUL program in
5    general.  Who was involved in loading data --
6        A.   The systems support was Dona Kaufman.
7    D-o-n-a.
8        Q.   Was there anyone else you recall or was
9    she the primary person?
10       A.   There was someone before her, but he no
11   longer works for CMS and I can't remember his name.
12   But she was the main one for the new application.
13       Q.   Do you know if she's still there today?
14       A.   Yes.
15       Q.   Do you recall when the new application --
16   when you moved from the mainframe to the new
17   application?
18       A.   Time?
19       Q.   Yes.  When that happened.
20       A.   After '95.
21       Q.   Prior to 1995 was the process still
22   computerized bringing in information from the

Page 237

1    compendia and that kind of information?
2        A.   It was brought into the mainframe.
3        Q.   Just brought into a different computer in
4    other words?  I'm not a techie either.
5        A.   I'm just saying mainframe because that's
6    what I know.
7        Q.   And do you know what the application is
8    called?
9        A.   FULs.
10       Q.   FULs.  Now, the Orange Book has a place
11   in this process, correct?
12       A.   Right.
13       Q.   And could you tell us what the Orange
14   Book is and what impact it had?
15       A.   The FDA Orange Book.  It lists the drugs
16   that are grouped by the FDA.  If you have an Orange
17   Book available, I think they have on the front
18   page -- yeah -- the Orange Book can explain it much
19   better than I can.  But -- yeah.
20       Q.   I'm handing you our only copy of the
21   Orange Book.
22       A.   But they get this electronically and it

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                    Washington, DC

Page 238

1   just has drugs by ingredient names. And they don't
2   have NDC numbers or anything in here. But they pull
3   data from the Orange Book where the criteria that's
4   in the regulation -- so it meets that criteria. And
5   they just pull what they can from there. There's
6   other type of system criteria in there that picks
7   the drugs that are selected for the FULs. But it
8   pulls it from the Orange Book first.
9       Q.   So they have an electronic version of the
10  Orange Book?
11      A.   They -- it's my understanding they do
12  now.
13      Q.   Do you know when they first started using
14  an electronic version of the Orange Book versus some
15  other method of getting the Orange Book data into
16  this computer?
17      A.   I really don't know.
18      Q.   Do you recall at some point somebody had
19  to go through the manual copy of the Orange Book --
20      A.   Oh, no. They wouldn't go through the
21  manual. They would just request the data from FDA.
22  I think the data now is available and they could go

Page 239

1   on the Web or someplace in FDA's website and obtain
2   the data now.
3       Q.   But it was all done to your knowledge --
4   as far as you can recall it was done electronically
5   in some way?
6       A.   Correct.
7       Q.   Somebody would set up a program that
8   would, say, identify the drugs that meet the FUL
9   criteria and then down those into a file, something
10  called Orange Book or something like that? Is that
11  how it worked?
12      A.   You would have to talk to our systems
13  folks. I just know that they would get -- they had
14  the criteria set in there and however it works, you
15  know. I mean, we're simplifying it, but I'm not a
16  data person. We just tell them what we need from
17  the Orange Book and they set up their criteria on
18  how they're going to get it and how it's selected.
19      Q.   And do you recall what the criteria was
20  for a drug to qualify for the FUL program?
21      A.   I'm going to read it from here. But it
22  says -- well, all the formulations of the drug

Page 240

1   products approved by the FDA are A-rated which are
2   therapeutically equivalent and then there must be
3   two rated A in the Orange Book. And then there's
4   another criteria where they can also allow a B-rated
5   drug when the A-rated drug products -- when there's
6   three A-rated drug products in the Orange Book.
7       Q.   Okay. So if not all the drugs within a
8   drug product group are rated A, then you have to
9   have three that are rated A?
10      A.   Correct, to allow a B-rated product.
11      Q.   Now, would the B-rated product or a
12  product that's not rated A, would that still be
13  governed by the FUL?
14      A.   If it's included in this, yes.
15      Q.   What involvement would you have in the
16  review of the Orange Book data and what gets on the
17  Orange Book lists in the computer?
18      A.   I have nothing to do with that.
19      Q.   Who was involved in that?
20      A.   If you're saying reviewing it --
21      Q.   Just who was involved in deciding which
22  drugs from the Orange Book, whether it be manual or

Page 241

1   electronic, get put into your FUL computer?
2       A.   The system folks would download the drugs
3   from the Orange Book. If further review is needed,
4   if some of the drugs are questionable, if they met
5   the criteria and maybe weren't on there before, then
6   we would look at those drugs to verify that they did
7   meet the criteria.
8       Q.   Let me ask you a specific question here.
9   And I'll give you my copy of this.
10          MR. TORBORG:  And Ms. Martinez, you can
11  look on with her if you'd like.
12          MS. MARTINEZ:  I'm going to try to stay
13  away from that videotape.
14          THE WITNESS:  Thanks.
15          BY MR. TORBORG:
16      Q.   Specifically, on this top page, the right
17  column is a drug under the prescription drug product
18  list by the name vancomycin hydrochloride.
19          MS. MARTINEZ:  Give me one second just to
20  glance at what it is.
21          Counsel, would you like to lay out a
22  little bit of foundation, like maybe the date of the

Gaston, Sue                                          January 24, 2008
                        Washington, DC

---

Page 246

1   that injectables and other products many times are
2   provided in a physician's office and other type of
3   settings where they might not be claimed separately.
4   They might be included in a payment, like a
5   physician payment.
6        Also, injectables, many times when
7   they're billed on the claim form they're not --
8   they're billed with codes rather than NDC numbers,
9   which means that the states may not be paying for
10  them through their pharmacy benefit but through
11  another means, such as a physician's visit or a
12  hospital or something like that.
13       So many times what we're trying to do
14  with the FULs is use most commonly used drugs and
15  covered outpatient drug type, so like tablets and
16  capsules.
17   Q.   Is there anything in the regulations or
18  statutes that limit the FUL program to tablets or
19  capsules or other drugs that are commonly
20  administered in the outpatient setting?
21   A.   Not that I know of.
22   Q.   That was just the -- when you started

---

Page 247

1   working on the FULs that was just the way that HCFA
2   approached it, you did not establish FULs on the
3   injectables?
4    A.   Correct.
5    Q.   And did you ever receive any explanation
6   about why that was?
7    A.   I can't say specifically there was an
8   explanation. I think you learn this as you work
9   with the program.
10   Q.   But you would agree with me that the
11  Orange Book page that I showed you does show that in
12  1996 there were at least two versions of vancomycin
13  that were rated A in the Orange Book?
14   A.   Correct.
15       MS. MARTINEZ:  Objection, form.
16   Q.   And so -- I want to get back to this
17  computer business. Was the computer program
18  specifically designed to not include injectables or
19  how did that work?
20   A.   You'd have to talk to the data folks. We
21  were not including injectables. I don't know what
22  criteria they put in there.

---

Page 248

1    Q.   Because if the initial identification of
2   drugs that satisfied the criteria was just two or
3   more A-rated drugs or three or more A-rated drugs if
4   one of them was not A-rated, and that was done by
5   computer presumably that would bring in injectable
6   drugs like vancomycin, right?
7        MS. ALBEE:  Objection.
8    A.   No.  There are still more criteria.  You
9   still have the Orange Book criteria, but there are
10  still criteria that the systems folks put in to look
11  for the type of drugs that the FUL prices are set
12  on.
13   Q.   So is it your understanding that HCFA
14  specifically set up the computer program to identify
15  and exclude injectable drugs?
16       MS. MARTINEZ:  Objection, form.
17   A.   In one part of the process, yes.
18   Q.   And do you know in what part of the
19  process that was done?
20   A.   No, I don't.
21   Q.   Did you have any part in that process of
22  either manually excluding the injectables drugs or

---

Page 249

1   setting up a computer program such that those drugs
2   would be moved aside?
3    A.   The basic criteria for the system was
4   developed before I got there.
5    Q.   Who would be the best person to ask about
6   why it was that injectables were specifically
7   excluded from the FUL program?
8        MR. WINGET-HERNANDEZ:  Objection, form.
9        MS. MARTINEZ:  Objection, form.
10   A.   I don't know.  Pete Rodler was the first
11  one I know that worked on FULs.  That's the only
12  person I could think of.
13   Q.   Are these other -- now, we've talked a
14  little bit about Exhibit 462 that talks about the
15  Orange Book data.  And we talked about the criteria
16  already, correct?  And now you've identified I think
17  another criteria, which is to exclude injectable
18  drugs, right?
19       MS. MARTINEZ:  Objection, form.
20   A.   Correct.
21   Q.   Is that criteria written down anywhere?
22       MR. WINGET-HERNANDEZ:  Objection, form.

63  (Pages 246 to 249)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

EXHIBIT 27

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 287

             UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - -

      (cross captions appear on following pages)


        Videotaped deposition of SUE GASTON


                 Volume II


                 Washington, D.C.

                 Wednesday, March 19, 2008

                 9:00 a.m.

Gaston, Sue - Vol. II                              March 19, 2008
                        Washington, DC

Page 316

1  or to the deposition.
2          MR. TORBORG:  What would you have me
3  do, Ms. Martinez?  Would you like me to question
4  about the testimony without providing her a copy
5  of it?  Would that be your preference?
6          MS. MARTINEZ:  No.  I'm going to object
7  to form either way.
8          MR. TORBORG:  Okay.  But would you ask
9  me to not show her that transcript because it's a
10 rough form?
11         MS. MARTINEZ:  No.  I'm just saying
12 both are improper.  So I'm going to object to
13 form.  The court can rule.  If you want to use
14 another approach just in case so you have the
15 opportunity to maintain whatever answers the
16 witness gives, you can use another approach.
17 It's your own judgment.
18         MR. TORBORG:  Is it your position that
19 -- would you have an objection if I showed her a
20 final copy of the transcript?
21         MS. MARTINEZ:  Yes.
22         MR. TORBORG:  Why?  I want to see if I

Page 317

1  can cure whatever the objection is.
2          MS. MARTINEZ:  I just don't think it's
3  a proper question.
4          MR. TORBORG:  It's not a proper
5  question to ask someone about a deposition
6  transcript?
7          MS. MARTINEZ:  I would object to the
8  form of your question when you ask one witness
9  about what another witness said.
10         MR. TORBORG:  You think that's
11 improper?
12         MS. MARTINEZ:  Yeah.  I would object to
13 it.
14         MR. TORBORG:  Okay.
15 BY MR. TORBORG:
16     Q.  You can go ahead and continue
17 reviewing.
18     A.  Do you want me to read the whole thing?
19     Q.  Yeah.  Through the end.
20     A.  Okay.  (Reading.)
21         Okay.  I'm finished.
22     Q.  Ms. Gaston, I believe we covered this

Page 318

1  last time, but you recall an individual by the
2  name of Zack Bentley, correct?
3      A.  Yes.
4      Q.  He's affiliated with the company called
5  Ven-A-Care?
6      A.  Yes.
7      Q.  And for the period 1991 through 2003
8  you were involved with the federal upper limit
9  program for Medicaid drugs; is that right?
10     A.  Correct.
11     Q.  And you recalled attending a meeting
12 with Ven-A-Care on or about -- you didn't
13 remember the exact date, but on or around the
14 date November 14th of 1995.  Is that fair to say?
15     A.  I don't remember the exact date.
16     Q.  You remember having a meeting with
17 representatives of Ven-A-Care in the mid-1990s;
18 is that fair to say?
19     A.  Yes.
20     Q.  That was a meeting in Baltimore that
21 was attended by a number of people, correct?
22     A.  Yes.

Page 319

1      Q.  Do you recall having conversations with
2  Mr. Bentley prior to that meeting?
3      A.  I know I had conversations with Zachary
4  Bentley.  I don't know if it was prior to the
5  meeting, after the meeting.  I don't know the
6  time period.
7      Q.  Do you recall what the substance of
8  those meetings was?
9      A.  The meetings or the calls?
10     Q.  I'm sorry.  The calls with Mr. Bentley.
11 Do you recall what was being discussed?
12     A.  I don't recall.
13     Q.  Do you recall Mr. Bentley advising you
14 of -- either in a meeting that you attended or in
15 a telephone call -- that there was a large
16 difference between acquisition costs and AWPs for
17 certain injectable and infusion drugs?
18         MS. MARTINEZ:  Objection, form.
19     A.  I don't remember Zachary Bentley
20 telling me that.
21     Q.  Do you recall becoming aware of that?
22     A.  Yes.

9 (Pages 316 to 319)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 320

1    Q.  How did you become aware of that?
2    A.  Because of the Ven-A-Care litigation.
3    Q.  And you recall becoming aware of the
4  Ven-A-Care litigation in the mid-1990s; is that
5  fair to say?
6    A.  Yes.
7    Q.  And you may have had conversations with
8  Mr. Bentley or others at Ven-A-Care prior to the
9  1995 meeting; is that fair to say?
10    A.  It's fair to say.
11    Q.  During the period in the mid-1990s --
12  or -- I'm sorry.  In the period from 1991 to,
13  say, 1997, did you have discretion on whether or
14  not to set a federal upper limit on drugs?
15        MS. MARTINEZ:  Objection, form.
16    A.  Yes.
17    Q.  So if you wanted to set a federal upper
18  limit on the injectable and infusion drugs that
19  Ven-A-Care advised you of a large difference
20  between acquisition cost and AWP, you were able
21  to do so; is that fair to say?
22        MS. ALBEE:  Objection, form.

Page 321

1    A.  No.
2    Q.  Why not?
3    A.  Because we didn't set federal upper
4  limit prices on injectable drugs or infusion
5  drugs.  We set them on drugs that were the most
6  commonly used such as tablets, capsules, creams.
7    Q.  But you're not aware of any written
8  statutory or regulatory guidance that prohibited
9  you from setting a FUL on infusion and injectable
10  drugs; is that right?
11    A.  That's right.
12    Q.  It was a policy of HCFA at the time you
13  started administering the FUL program not to set
14  FULs on those drugs; is that correct?
15        MS. MARTINEZ:  Objection, form.
16    A.  I think I would rather say that it was
17  the criteria that was established before I
18  started doing the federal upper limit program.
19    Q.  And when you say criteria, could you
20  explain what you mean by that?
21    A.  The criteria is how they determined
22  what federal upper limit prices would apply to

Page 322

1  what type of drugs and the criteria basically was
2  drugs that were considered outpatient drugs,
3  generally dispensed at the pharmacy level.
4    Q.  And we talked about this last time.
5  But you were aware that you specifically took
6  steps to exclude infusion and injectable drugs
7  from the mechanism by which the FULs were
8  calculated, correct?
9        MS. MARTINEZ:  Objection, form.
10    A.  Correct.
11    Q.  Do you recall any discussions about
12  perhaps changing the HCFA policy or criteria not
13  to establish FULs for injectable and infusion
14  drugs at any point in time?
15    A.  I know that the conversation was
16  probably discussed.  I don't know when.  But no
17  steps were taken to do that.
18    Q.  Can you tell me why not steps were
19  taken to do that?
20    A.  It's my understanding that the criteria
21  we were using is to set federal upper limit
22  prices on drugs that were most commonly used.

Page 323

1  When we stepped into the arena of injectable
2  drugs or other drugs that weren't most commonly
3  used, I think it was a little more difficult to
4  capture those drugs for various reasons.  So
5  that's why we stuck with the basic criteria that
6  we used.
7    Q.  But you believe that there were
8  discussions about possibly moving injectable
9  infusion drugs into the FUL program; is that fair
10  to say?
11    A.  I wouldn't say that specifically.
12  There could have been conversations.  I wouldn't
13  say that the conversations went as far as to say
14  let's move them into the FUL arena.  But the
15  conversations were there.  And I can only answer
16  that generally, because I only remember short
17  conversations maybe discussing the issue.
18    Q.  If there has been testimony from Mr.
19  Bentley that he -- his best recollection is that
20  he advised you of the large differences between
21  acquisition cost and AWPs for certain injectable
22  infusion drugs at least as early as 1990, could

10  (Pages 320 to 323)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                              Washington, DC

Page 324

1  you say that Mr. Bentley's recollection is
2  incorrect?
3          MS. ALBEE:  Objection, form.
4          MS. MARTINEZ:  Objection, form.
5      A.  I can't answer to his statements.
6      Q.  You just -- it's your testimony that
7  the conversations may have happened; you just
8  don't recall?
9      A.  I don't recall conversations like that
10 with Zachary Bentley.
11     Q.  But you recall conversations with Mr.
12 Bentley?
13     A.  Correct.
14     Q.  You just don't recall one way or the
15 other what the substance of the conversations
16 was, correct?
17     A.  Correct.
18     Q.  What other types of conversations would
19 you have had with Mr. Bentley apart from the
20 federal upper limit program?
21     A.  I don't remember the conversations that
22 I had with Zachary Bentley.  Specifically the

Page 325

1  conversations, I don't remember.
2      Q.  And my question is a touch different.
3      A.  Okay.
4      Q.  And it's based on what you were doing
5  at HCFA, what your responsibilities were and your
6  knowledge of how Mr. Bentley fit into the story.
7      A.  Okay.
8      Q.  Do you have a sense for -- apart from
9  the federal upper limit program, what other
10 topics you would have been discussing with Mr.
11 Bentley?
12         MS. ALBEE:  Objection, form.
13         MS. MARTINEZ:  Objection, form.
14     A.  I worked on state plan amendments.  If
15 he had an issue about something that was
16 occurring in Florida or another state, he could
17 have called me about that, what was in the state
18 plan amendment.  I don't even know if I was
19 handling Florida at the time.  Or whatever states
20 he might have questioned.  He could have asked
21 any kind of general questions about the Medicaid
22 drug rebate program or any kind of pharmacy

Page 326

1  reimbursement issues.
2      Q.  Do you recall Mr. Bentley ever raising
3  issues about the Medicaid drug rebate program?
4      A.  I can't remember specifically what I
5  discussed with Zachary Bentley.
6      Q.  Do you have any -- what is your best
7  guess about the substance of the conversations
8  that you had with Mr. Bentley and yourself?
9          MS. MARTINEZ:  Objection, form.
10     Q.  Do you believe it related to the FUL
11 program or something else?
12         MS. MARTINEZ:  Objection, form.
13     A.  My best guess would say it probably
14 related to the FUL program.
15     Q.  Ms. Gaston, is it your testimony that
16 even though you became aware of the large
17 differences between acquisition costs and AWPs
18 for certain injectable and infusion products, you
19 did not believe you had the authority or
20 discretion to place FULs on those drugs?
21         MS. MARTINEZ:  Objection, form.
22     Q.  Is that a fair summary of your

Page 327

1  testimony?
2          MS. MARTINEZ:  Objection, form.
3      A.  We did not set FUL prices on those
4  types of drugs.  Is it would be a matter of
5  changing the criteria.  And that wouldn't be
6  strictly my place to do that.
7      Q.  Okay.  Fair point.  Who had the
8  authority or whose place was it to change the
9  criteria?
10     A.  Specifically, I don't know.  I know I
11 would have to go to Larry.  I don't know whether
12 he would have to get authority from someone else
13 to do that.
14     Q.  And Mr. Reed was in attendance in at
15 least one of the meetings you had with Ven-A-Care
16 where they discussed the large difference between
17 acquisition cost and AWPs with Ven-A-Care,
18 correct?
19         MS. MARTINEZ:  Objection, form.
20     A.  He was present at the Ven-A-Care
21 meetings.
22     Q.  Do you recall any steps that were taken

11 (Pages 324 to 327)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                        Washington, DC

Page 328

1  at all to attempt to get FULs established for
2  infusion or injectable drugs?
3      A.  No, I don't.
4      Q.  Do you recall, Ms. Gaston, yourself
5  thinking in the mid-1990s when you were becoming
6  aware of the large differences between
7  acquisition cost and AWP for infusion and
8  injectable drugs why aren't we establishing FULs
9  for these drugs?
10     MS. MARTINEZ:  Objection, form.
11     Q.  Do you recall having that thought in
12 your head?
13     A.  I had the thought in my head.  But the
14 thought in my head is just trying to capture more
15 drugs for savings to the states.  Whether it was
16 injectables or unit dose or anything outside of
17 the basic criteria, I thought about trying to
18 expand it to include additional drugs just for
19 cost saving purposes.
20     Q.  Do you recall becoming aware of any
21 other classes of drugs outside of infusion and
22 injectable drugs where you were becoming aware of

Page 329

1  the large differences between acquisition cost
2  and AWPs?
3      MS. MARTINEZ:  Objection, form.
4      MS. ALBEE:  Objection, form.
5      A.  Here again, when I'm working with the
6  FUL program I'm looking at it just to try to
7  include more drugs.  I'm not looking at it -- at
8  a class of drugs and where there might be a
9  difference in the pricing.
10     Q.  You testified a second ago that you
11 were concerned or you wanted to try to achieve
12 more cost savings for Medicaid, correct?
13     A.  Correct.
14     Q.  And the FUL program was a tool that CMS
15 could use to do that, correct?
16     A.  Correct.
17     Q.  And you understood the purpose of the
18 FUL program was to mitigate against certain
19 manufacturers having high AWPs, correct?
20     MS. MARTINEZ:  Objection, form.
21     A.  Can you repeat that?
22     Q.  You understood that the purpose of the

Page 330

1  FUL program was to mitigate against certain
2  manufacturers having high AWPs on their drugs?
3      MS. MARTINEZ:  Objection, form.
4      A.  The purpose of the FUL program was to
5  set a reasonable reimbursement rate for states.
6      Q.  And do you have an understanding about
7  -- as the person who was in charge of the FUL
8  program from the early '90s through I think 2003,
9  2004 -- is that about --
10     A.  2003.
11     Q.  2003.  Do you have an understanding of
12 why was this program created?  Why not just take
13 the AWPs for each manufacturer's drugs straight
14 from the compendia?
15     A.  It was in regulations.  The FUL program
16 was in regulations.
17     Q.  But did you have an understanding of
18 the purpose behind it?
19     A.  Yes, I did.
20     Q.  And your understanding was what?
21     A.  It's to set -- the federal government
22 sets a reimbursement rate for states and is

Page 331

1  trying to achieve savings.  We're trying to set
2  reasonable reimbursement rates for certain
3  generic drugs.
4      Q.  Do you recall taking any steps, whether
5  it be merely a conversation with Mr. Reed or
6  someone else in your office to establish federal
7  upper limits for infusion and injectable drugs?
8      A.  The conversation could have come up.  I
9  know it was discussed about including those in
10 FULs, but it was just a conversation.
11     Q.  And the conversation, was that with Mr.
12 Reed?
13     A.  I can't say.  It probably included Mr.
14 Reed, because he was my supervisor.
15     Q.  Who else would have been included in
16 that?
17     A.  I don't know.  It depends on who I was
18 mentoring at the time.
19     Q.  Did you have conversations with anyone
20 outside of CMS about setting federal upper limits
21 for infusion and injectable drugs?
22     A.  I don't recall that, no.

12  (Pages 328 to 331)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 404

1     Q.  And originally it was Peter Rodler who
2  trained you?
3     A.  Correct.
4     Q.  So starting in about 1991 Mr. Rodler
5  would have trained you to set FULs?
6     A.  Yes.
7     Q.  And I think you said last time that
8  when Mr. Rodler left CMS in the mid-1990s you
9  became solely responsible for setting the FULs at
10  that point, subject obviously to approval kind of
11  up the chain?
12     A.  Correct.
13     Q.  But you were the person day-to-day that
14  would get the printouts from the FUL application
15  and do the manual review and actually set the
16  FUL, correct?
17     A.  Correct.
18         MS. MARTINEZ:  Objection, form.
19     A.  But also in that period of time there
20  were other individuals that I trained.
21     Q.  In a period '91 to 2003?
22     A.  Correct.

Page 405

1     Q.  Yeah.  Okay.  And let me -- let's see
2  if we can spell that out a little more clearly.
3  The other individual I know you trained was Cindy
4  Bergin?
5     A.  Correct.
6     Q.  And when did you begin training Ms.
7  Bergin on calculating or establishing FULs?
8     A.  When she started with the government in
9  '99.
10     Q.  So from 1999 until 2003 you and Ms.
11  Bergin would have worked on FULs setting FULs
12  together?
13     A.  Correct.
14     Q.  But you were involved in the process of
15  setting FULs through your departure from the
16  policy position in 2003, correct?
17     A.  Correct.
18     Q.  So as I understand it, there was a
19  period of time between, say, 1995 or the mid-
20  1990s when Mr. Rodler left and 1999 when Ms.
21  Bergin arrived where you were solely responsible
22  for setting the FULs?

Page 406

1         MS. MARTINEZ:  Objection, form.
2     A.  Correct.
3         MR. BUEKER:  I ask the court reporter
4  to mark this as New York Counties Exhibit 1.
5         (Exhibit NY Counties 001 was
6  marked for identification.)
7  BY MR. BUEKER:
8     Q.  It's a document that's an excerpt from
9  the Code of Federal Regulations.  I just want to
10  make sure we have a common understanding.  This
11  section 447.332 is the FUL regulation, correct?
12     A.  Correct.
13     Q.  And it's a regulation with which you're
14  familiar, right?
15     A.  Yes.
16     Q.  In fact you set the FULs under this
17  regulation for the better part of 12 years,
18  right?
19         MS. MARTINEZ:  Objection, form.
20     A.  Yes.
21     Q.  To your knowledge did the regulation
22  change at all during the period 1991 to 2003?

Page 407

1     A.  There was a period -- and I don't know
2  -- there was a period where we allowed the
3  federal upper limit drugs to be expanded to look
4  at at least three A-rated.
5     Q.  Let me see if I can help --
6     A.  As long -- and I can't remember the
7  dates.
8     Q.  Let me see if I can help you with the
9  dates, because I think we talked a little bit
10  about this the last time.  As I read this,
11  section (a)(1) talks about all formulations of
12  the drug needing to be therapeutically
13  equivalent, correct?
14     A.  Correct.
15     Q.  And at some point your recollection is
16  that CMS's approach to setting FULs expanded and
17  it wasn't that all drugs had to be A-rated, but
18  there had to be three A-rated equivalents,
19  correct?
20     A.  Correct.
21     Q.  And we looked at a document last time
22  that was a printout from the OBRA '90 statute.

31 (Pages 404 to 407)

96c95944-eee1-42b5-b77a-388fc0daf3d5

# EXHIBIT 28

Page 1

                    IN THE UNITED STATES

                  DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                ) MDL No. 1456

                                ) Civil Action No.

THIS DOCUMENT RELATES TO:       ) 01-CV-12257-PBS

                                )

ALL CASES                       )

                                ) Judge Patti B. Saris

****************************************************

          ORAL AND VIDEOTAPED DEPOSITION

            OF RICHARD A. GONZALEZ

                  June 3, 2008

               HIGHLY CONFIDENTIAL

****************************************************

     ORAL AND VIDEOTAPED DEPOSITION OF RICHARD A.

GONZALEZ, taken in the above-entitled cause pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts, pertaining to the taking of

depositions, taken before ROBIN M. CHIMNIAK, a Notary

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 86

1  about the Hospital Products Division?
2      A.  Well, typically the list price is -- is
3  similar, again, to what I described to you to be the
4  Diagnostics experience.  Is when you bring a product
5  to the marketplace, you determine what that -- what
6  that price should be, based on a number of different
7  factors.  Number of competitors; if there is a
8  competitive product on the market, where is it priced;
9  what kind of value can we bring that's above and
10  beyond what the competitor can bring.  And if there is
11  any of that, then obviously we believe we could
12  offer -- get a premium.
13      And so you look at all those parameters,
14  and you set a price.  And then from that point forward
15  that is typically the list price that you would make
16  adjustments off of.
17      Q.  When you say "adjustments," do you mean for
18  a contract price?
19      A.  For both contract, CPI increases.
20      Q.  Did -- was it your understanding that for
21  the Hospital Products Division, that the -- well, let
22  me ask you this.  Let me ask you this first.

Page 87

1      Did you have any responsibility for either
2  setting, reviewing, or approving list price?
3      A.  No.
4      Q.  Whose responsibility was that?
5      A.  Well, it would have gone up through that
6  hospital business sector and, you know, typically it
7  would be the senior person in that sector, depending
8  upon the products.
9      Q.  In your role as senior vice president of
10  HPD or president of HPD, did you have an understanding
11  as to the relationship between list price and what
12  actually was -- Abbott was selling the product for in
13  the market, or the contract price?
14      A.  Repeat the question one more time.
15      Q.  Sure.  Let me see if I can streamline it.
16      Did you have an understanding as to the
17  relationship between list price, an HPD products list
18  price, and the contract price, what Abbott was selling
19  it in the marketplace.
20      A.  I'd say the bulk of what I reviewed in our
21  financials would have been actual net revenue for the
22  division.  So it would primarily have been contract

Page 88

1  prices.  Although there were some list price sales
2  that were -- that were in that.
3      But the way we operated our financial
4  planning process, you'd roll all that in.  And
5  remember this is a division where 90-plus percent of
6  the revenues come out of the hospital market, and
7  probably 90-plus percent of those revenues come from,
8  you know, five or six major group purchasing
9  organizations.  And so -- but it's -- it's a broad
10  portfolio of products.
11      And so we typically -- I typically didn't
12  look at list price or individual prices, frankly, very
13  often.  You know, there is just too many of them to
14  focus on.
15      Q.  Did you have an understanding as to the
16  volume of sales that Abbott made at list price?
17      A.  I had a general understanding.
18      Q.  What percentage of sales did the Hospital
19  Products division make at list price?
20      A.  It was a relatively low percent.  I'd say
21  something less than a couple of percent.  Now, it
22  varied from time to time because if someone would go

Page 89

1  off the market on a certain product, then list price
2  sales in that product might rise because someone had
3  to buy, you know, from the competitor.
4      If the competitor was off the market, so
5  someone had to go in and buy your product at list
6  price, so it probably had little ebbs and flows in it
7  over a period of time, but in general I would say a
8  couple of percent.
9      Q.  Now for that approximate 2 percent market,
10  if you had a competitor, like, for example, for
11  vancomycin, Eli Lilly.
12      A.  Mm-hmm.
13      Q.  And Eli Lilly's list price was 25 or 50
14  percent lower than Abbott's list price, would you
15  expect that that -- that individuals or -- or entities
16  buying at the list price level, meaning they didn't
17  have a contract with Abbott, that they would be more
18  likely to purchase from the competitor with the lower
19  list price?
20      A.  All things being equal, I would say yes.
21  But there could be some differentiation between the
22  two products in way of delivery system, the purity of

23  (Pages 86 to 89)

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 94

1       A.  I think as I was describing to you, over
2   time you would see, as contract prices go down, okay,
3   because of competitive factors, and list price was
4   being nominally increased, you would actually -- in
5   the hospital market you would actually see some sort
6   of a widening gap between those two.
7           And -- and that, in this particular
8   business, sometimes happened at a faster pace because
9   in the generic injectable business, as new competitors
10  enter, sometimes prices, contract prices, can go down
11  more quickly.
12      Q.  If contract price is going down, why would
13  list price continue to go up?
14      A.  Well, I told you two reasons.  One is there
15  is a certain amount of sales that do exist at list.
16  So at the end of the day if someone has to buy our
17  product and they're not going to go on contract, you
18  know, we don't necessarily want to give them a better
19  deal.
20          Number 2, some contracts had this mechanism
21  built into them where list price actually helped you
22  get to that aggregate bundled increase that you were

Page 95

1   allowed to take in those contracts.
2       Q.  Okay.  At any time in your -- well, let me
3   ask you this.  Let's round this out.
4           Did you review the catalog list prices
5   before they were published in your capacity as Abbott
6   -- as senior vice president for HPD?
7       A.  No.
8       Q.  Did you review any contract pricing?
9       A.  Individual product pricing?
10      Q.  Or, you know, product lines.
11      A.  I would have reviewed, as an example, the
12  aggregate proposal to a large GPO, as an example.  Not
13  the individual pricing, but I would look at, you know,
14  if we sold X millions of dollars to the GPO last year,
15  what is the contract that we're offering this year and
16  what's the relative difference between those.  Not
17  individual prices, but it would actually be what the
18  overall contract was being offered, the value of that
19  contract.  I would have reviewed that.
20      Q.  I don't think I asked you this question
21  before.  What GPOs did you work with when you were
22  with AHD?

Page 96

1       A.  Essentially it was the ones I described.
2   You know, the big hospital ones are Premier, Novation,
3   Consorta, Catholic Group, Tenet, and Columbia/HCA.
4       Q.  Do you know whether they had alt site
5   components?
6       A.  If they did, they were relatively small.
7       Q.  Do you recall ever dealing with them or
8   discussing with them their alternate site components?
9       A.  No.
10      Q.  Same question for in your role as senior
11  vice president of HPD.  What GPOs did you work with?
12      A.  It roughly would have been the same group.
13  I'd say more emphasis on Novation and -- Novation and
14  Premier.
15      Q.  Did you work with any or deal with any GPOs
16  on their alternate site needs or market?
17      A.  No.
18      Q.  In your role either with HP- -- AHD or HPD,
19  did you work with Baylor?
20      A.  Can you be more specific?
21      Q.  Sure.
22      A.  I want to make sure I answer it accurately.

Page 97

1       Q.  Did -- Baylor is in Texas; right?
2       A.  I know where it's at.
3       Q.  Okay.  Well, did you sell to Baylor when
4   you -- earlier in your career, when you were --
5       A.  No.  No.
6       Q.  Okay.  Had a large -- it has a large health
7   system in Texas; is that fair?
8       A.  Mm-hmm.
9       Q.  Did you work with Baylor or the Baylor
10  account or any component of the Baylor account?
11      A.  I mean, I visited Baylor in some capacity.
12  I'm trying to remember where.
13          And the reason why I was being a little
14  more cautious is you probably know Boone Powell was on
15  our board, who was the CEO of Baylor for a period of
16  time.  So obviously I interacted with Boone.
17      Q.  Okay.
18      A.  But did -- did I actually do any kind of
19  contract negotiations?  Is that what you're asking?
20      Q.  Yeah.
21      A.  The answer is no.
22      Q.  Okay.  What about -- maybe not necessarily

25  (Pages 94 to 97)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 170

1  You can go ahead and answer that if you have an
2  answer.
3       THE WITNESS:  My basic understanding of the
4  Ross issue was one around bundling the disposable and
5  the device together.
6
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  Do you -- did you have an understanding as
9  to whether or not Ross was providing free devices to
10 entities?
11      A.  I think that is the bundling issue --
12      Q.  Okay.
13      A.  (Continuing) -- in and of itself.
14      Q.  If Abbott home infusion was providing
15 product basically free of charge, without -- without
16 charging fair market value for the product, for the
17 devices, do you see a parallel between the two -- you
18 know, the two conduct -- the conduct between Ross and
19 home infusion?
20      A.  No.
21      Q.  How come?
22      A.  Because in the Ross situation, at least as

Page 171

1  I understand it, we were charging for the disposable
2  and capturing a portion of that disposable cost to
3  offset the cost of the pump.  That has nothing to do
4  with consignment.
5       Q.  Okay.  But if no fair market value was
6  charged under these consignment arrangements, how does
7  Abbott's -- how would Abbott's home infusion
8  department identify what they actually charged for the
9  product, or whether or not they were actually charging
10 anything for the product?
11      A.  I -- unless I looked at the detail of it, I
12 can't answer your question.
13      Q.  Did anyone raise -- ever raise any concerns
14 about -- with you or anyone, to your knowledge, within
15 Hospital Products Division with the legality of the
16 home infusion business model?
17      A.  No.
18      Q.  Did you ever hear of any customers raising
19 legal concerns about the home infusion business model?
20      A.  No.
21      Q.  If customers had raised concerns about the
22 legality of the home infusion business model, as

Page 172

1  president of HPD would you expect that that's
2  something that you would learn about?
3       A.  I would expect that either I'd learn about
4  it or get some level of legal review to determine the
5  validity of it.
6       Q.  Do you know whether that ever took place?
7       A.  I've already testified I didn't know that
8  there were any.
9       Q.  Why did you make the decision to close the
10 home infusion business unit?
11      A.  We did an analysis of -- of that particular
12 business to look at whether or not it -- it fit in the
13 portfolio for where we wanted to take HPD, and, No. 2,
14 whether or not it was a reasonable business to be in
15 the portfolio.  And this happened relatively early on
16 in my tenure as the president of HPD.  So sometime I'd
17 say late '98, early '99 kind of time frame.
18      And we made the determination that if you
19 looked at the business and you fully burdened it,
20 it -- it had at best marginal profitability.  I think
21 you could probably argue it lost money.  But at best
22 probably marginal profitability.

Page 173

1       It clearly was more of a service-oriented
2  business than a product business, and we were -- we
3  were trying to take the business with us into more
4  differentiated kinds of products.  So it didn't fit
5  strategically where we wanted to go.  And so I made
6  the decision we should -- we should shut it down.
7       Q.  Do you know what Don Robertson's position
8  was with regard to whether or not the business should
9  be shut down?
10      A.  I don't recall specifically Don Robertson's
11 position, but there were -- there were people within
12 the group that had a different point of view.
13      Q.  Who?  Who?
14      A.  Well, I think Mike Sellers to some extent
15 had a different point of view.  They were typically
16 the people who were involved in the business.
17      Q.  Do you recall what Mike Sellers' objections
18 was to closing?
19      A.  Well, the areas that he agreed were
20 obviously the profitability side of it.
21      I think the concern was some of these
22 customers were large hospital customers who we were

44  (Pages 170 to 173)

Henderson Legal Services, Inc.

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 302

1 clarify.  Actually, let me back up.
2        When was the product launch for sterile
3 water, sodium chloride, dextrose?  I'm assuming it was
4 potentially decades ago?  Is that fair?
5    A.  Yeah, I would guess.  I don't know, but it
6 was a long time ago.
7    Q.  In terms of what you described as the
8 product launch providing the initial bases for
9 determining list price, was that applicable to sodium
10 chloride, dextrose, and sterile water?
11    A.  I don't know.
12    Q.  Would there be any reason to have -- for
13 the hospital market to have a list price for those
14 fluids that is multiple times higher than what the
15 actual contract price is?
16        MR. REIDY:  Asked and answered at least
17 twice this morning.
18        THE WITNESS:  Yeah, I -- I answered it in
19 this capacity issue that we -- that we've talked about
20 a couple of times about if somebody is going to use
21 your product off contract, the way you have to
22 manufacture it, typically you need overtime and other

Page 303

1 kinds of things, and therefore you want to recoup a
2 much higher investment.  And a high list price, if
3 someone is only going to buy it for a short period of
4 time, is a reasonable business approach.
5        MS. ST. PETER-GRIFFITH:  We are at -- we've
6 got approximately 10 minutes left.  Why don't we call
7 it a day for the day, and then we can move on to
8 another area in the morning, okay?  Thank you.
9        MR. REIDY:  9:00 a.m., everybody?
10        MS. ST. PETER-GRIFFITH:  That sounds good.
11        THE WITNESS:  Do you leave these documents
12 here?
13        MR. REIDY:  They'll take care of them.
14        MS. ST. PETER-GRIFFITH:  Yes.
15        THE VIDEOGRAPHER:  We're off the record at
16 4:48 p.m. with the conclusion of Part 1 deposition of
17 Richard Gonzalez.
18        (Whereupon this matter was
19          continued to Wednesday, June 4,
20          2008, at 9:00 o'clock a.m.)
21
22

Page 304

11 _____
11 SIGNATURE OF THE WITNESS
13 Subscribed and sworn to and before me
14 this _____ day of _____, 20____.
17 _____
18    Notary Public

Page 305

1 STATE OF ILLINOIS  )
2                    ) SS:
3 COUNTY OF DuPAGE   )
4    I, ROBIN M. CHIMNIAK, a notary public
5 within and for the County of DuPage and State of
6 Illinois, do hereby certify that heretofore, to wit,
7 on the 3rd day of June, 2008, personally appeared
8 before me RICHARD A. GONZALEZ, a witness in a certain
9 cause now pending and undetermined in the United
10 States District Court, For the District of
11 Massachusetts, In re:  Pharmaceutical Industry Average
12 Wholesale Price Litigation.
13    I further certify that the witness was by
14 me first duly sworn to testify the truth, the whole
15 truth and nothing but the truth in the cause
16 aforesaid; that the testimony then given by the said
17 witness was reported stenographically by me in the
18 presence of said witness and was thereafter
19 transcribed under my personal direction, and the
20 foregoing is a true and complete transcript of the
21 testimony so given by the said witness as aforesaid.
22        The signature of the witness to the

77  (Pages 302 to 305)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 306

1   foregoing deposition was not waived.
2        I further certify that the taking of this
3   deposition was pursuant to notice and that there were
4   present at the taking of said deposition the
5   appearances as heretofore noted.
6        I further certify that I am not a relative
7   or employee or attorney or counsel, nor a relative or
8   employee of such attorney or counsel for any of the
9   parties hereto, nor interested directly or indirectly
10  in the outcome of this action.
11       IN TESTIMONY WHEREOF, I have hereunto set
12  my hand and affixed my notarial seal this _____
13  day of _____, 2008.
14
15
16
17       _____
18       ROBIN M. CHIMNIAK, CSR
19       License No. 084-001999
20
21
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

# EXHIBIT 29

Gorospe, James Kevin                                March 19, 2008
                    Sacramento, CA

Page 1

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

----------------------------X

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION:

PRICE LITIGATION              ) 01-CV-12257-PBS

----------------------------X

THIS DOCUMENT RELATES TO:     ) Judge Patti B. Saris

U.S. ex rel. Ven-A-Care of    )

the Florida Keys, Inc. v.     ) Magistrate Judge

Abbott Laboratories, Inc.,    ) Marianne B. Bowler

et al.                        )

Case No. 06-CV-11337-PBS      )

----------------------------X

                        --oOo--

               WEDNESDAY, MARCH 19, 2008

                        --oOo--

               VIDEOTAPED DEPOSITION OF

                 JAMES KEVIN GOROSPE

Reported By:  JOANIE MURAKAMI, CSR No. 5199

                 Registered Merit Reporter

                 Certified Realtime Reporter

Henderson Legal Services, Inc.

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                                    March 19, 2008
                        Sacramento, CA

| Page 198 |
| --- |

1      Q.   And what was his position at that time?
2      A.   He was a pharmaceutical consultant, a
3   staff pharmaceutical consultant.
4      Q.   Similar to the position you had before
5   you took over the chief position?
6      A.   Yes.
7      Q.   And did he report to you or summarize
8   to you the conversations he had with other state
9   Medicaid pharmacy programs about why they were
10  not going to implement the Medicaid AWPs?
11     A.   Yes.
12     Q.   And he told you that the reason they
13  were not implementing the Medicaid AWPs was
14  because of concerns over access to care?
15         MR. GOBENA: Objection.  Form.
16  Foundation.
17         THE WITNESS:  Yes.
18  BY MR. COLE:
19     Q.   Do you keep in contact with Mr.
20  Hillblom?
21     A.   Yes.
22     Q.   How often do you talk to Mr. Hillblom?

| Page 199 |
| --- |

1      A.   Quarterly.
2      Q.   Where does -- what city does he live
3   in?
4      A.   Elk Grove.
5      Q.   California?
6      A.   Yes.
7      Q.   If you go to the last page -- I'm
8   sorry.
9          Going back to the previous page where
10  it says options, the memo looks like it lists
11  three options, A, B and C, and the first option,
12  A, says: The department could implement these
13  price changes, and then it says, as a positive,
14  or a pro, to this option: The Medi-Cal program
15  would save an undetermined amount of drug costs.
16  And then as a con, it says: Providers may choose
17  not to provide these services to Medi-Cal
18  beneficiaries.  Providers may hospitalize
19  patients to obtain the medically necessary
20  services resulting in increased program costs.
21         Do you see that?
22     A.   Yes.

| Page 200 |
| --- |

1      Q.   And is that consistent with your
2   understanding of why the department recommended
3   not to implement these AWPs; that there was not
4   only the access to care component but also that
5   if these AWPs were implemented, then Medi-Cal
6   beneficiaries might have to start going into a
7   hospital to receive services and that would
8   increase program costs?
9          MR. PAUL: Objection.  Form.
10         THE WITNESS:  Yes.
11         MR. GOBENA:  Same objection.
12         THE WITNESS:  Yes.
13  BY MR. COLE:
14     Q.   And then the memo goes on.  It lists,
15  as a second option, it says:  B:  The department
16  could delay implementation of these price changes
17  until a mechanism has been established to
18  transfer the drug cost savings to increased
19  provider professional fee reimbursement.
20         And then the last option is C.  It
21  says:  The department could not implement the new
22  price reporting mechanism.

| Page 201 |
| --- |

1          And then it ends with the
2   recommendation that Medi-Cal not implement the
3   new price reporting mechanism due to the serious
4   impact on both the providers and beneficiaries.
5          And so that was the recommendation from
6   DHS, to the Governor's office, that the Medicaid
7   AWPs not be implemented, correct?
8          MR. ZLOTNICK: Objection.  Form.
9          THE WITNESS:  That's correct.
10  BY MR. COLE:
11     Q.   And do you know -- I think we covered
12  this already but the Medicaid AWPs were never
13  implemented, correct?
14     A.   That's correct.
15     Q.   So would you agree with me that the
16  Governor's office accepted the recommendation of
17  DHS on this issue?
18         MR. ZLOTNICK: Object to the form.
19         THE WITNESS:  I don't recall if the
20  Governor's office ever responded.
21  BY MR. COLE:
22     Q.   Was it common for the Governor's office

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                                    March 19, 2008
Sacramento, CA

---

Page 390

1  for Roxanne?
2        MR. GIULIANA:  I'm speaking for Day.
3        MR. PAUL:  Does anybody here want to
4  speak for Roxanne?
5        They issued a subpoena.  You didn't
6  notice it.  I assume you will at some point.
7  Roxanne actually cross-noticed this in their
8  federal case.
9        MR. GOBENA:  For the federal Abbott
10 case, though, this deposition is closed, though,
11 and, you know, we'll object to any further
12 testimony being brought in.  I mean we may or may
13 not.  I'll leave that open but, you know, we're
14 not going to treat it necessarily as open ended
15 beyond March 31st for additional testimony for
16 Mr. Gorospe in that case.
17       MR. PAUL:  I thought that was
18 consistent with your --
19       MR. COLE:  It is.  I will say this,
20 though.  My only concern is to the extent there
21 are any documents that the state or that Dr.
22 Gorospe produces in response to the subpoena, or

---

Page 391

1  that may be covered to the subpoena, to the
2  extent there are additional documents that we
3  receive that we have not -- that we receive after
4  today, we would reserve the right to ask Dr.
5  Gorospe about those documents but that's the only
6  scenario --
7        MR. PAUL:  I just want add, to the
8  extent I just want to represent to you those
9  documents are all electronic; is that right,
10 John?
11       MR. FISHER:  Right.
12       MR. PAUL:  And I don't see you getting
13 them before March 31st, which I understand to be
14 your cutoff, just given -- I mean I know --
15       MR. COLE:  Sure.
16       MR. PAUL:  -- you've been --
17       MR. GOBENA:  In the federal case, but
18 obviously, in your state case --
19       MR. PAUL:  I'm just talking about the
20 federal cutoff.
21       MR. COLE:  Right.  And again, I don't
22 know how that would play out if we got documents

---

Page 392

1  covered by the subpoena after the discovery
2  cutoff and I guess we'll have to deal with that
3  issue at that time but I just want to make sure
4  that's the only scenario where we would foresee
5  having to bring him back for the DOJ case against
6  Abbott.
7        MR. GOBENA:  Understood.
8        THE VIDEOGRAPHER:  This is the end of
9  the deposition of Kevin Gorospe.  The time is
10 approximately 6:42 p.m.
11       (The deposition adjourned at 6:42
12 p.m.)
13
14
15 _____
16       JAMES KEVIN GOROSPE
17
18 Subscribed and sworn to and before me
19 this _____ day of _____, 20____.
20
21 _____
22       Notary Public

---

Page 393

1        I, JOANIE Y. MURAKAMI, a Certified Shorthand
2  Reporter of the State of California, duly authorized to
3  administer oaths, do hereby certify:
4        That I am a disinterested person herein; that
5  the witness, named in the foregoing deposition was by me
6  duly sworn to testify the truth, the whole truth, and
7  nothing but the truth; that the deposition was reported
8  in shorthand by me, JOANIE Y. MURAKAMI, a Certified
9  Shorthand Reporter of the State of California, and
10 thereafter transcribed into typewriting by computer.
11       That before completion of the deposition,
12 review of the transcript [ ] was  [ X ] was not
13 requested.  If requested, any changes made by the
14 deponent (and provided to the reporter) during the
15 period allowed are appended hereto.
16
17
18 _____
19       JOANIE Y. MURAKAMI, CSR No. 5199
20
21       --oOo--
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

7518707c-46aa-4bff-8eef-0c456891e081

# EXHIBIT 30

Page 1

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - -x

In re:  PHARMACEUTICALS INDUSTRY : MDL No. 1456

AVERAGE WHOLESALE PRICE          : Civil Action No.

LITIGATION                       : 01-12257-PBS

_____:

                                 :

THIS DOCUMENT RELATES TO:        : Judge Patti B.

                                 :    Saris

United States of America, ex     :

rel. Ven-a-Care of the Florida   : Magistrate Judge

Keys, Inc.,                      :  Marianne B.

CIVIL ACTION NO. 06-11337-PBS    :  Bowler

- - - - - - - - - - - - - - - -x

                        Washington, D.C.

                        Thursday, August 30, 2007

   HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

          Videotaped Deposition of ROSEMARY HAAS, a

witness herein, called for examination by counsel

for the United States of America in the

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

| Page 86 |
|---|

1  work that led up to passage of the Part D drug
2  benefit in 2002 and 2003.
3     Q.   Did part of that work involve tracking any
4  proposed changes in the way that Medicare was
5  reimbursing -- was going to be reimbursing for drugs
6  after passage of the Medicare Modernization Act?
7     A.   No.
8     Q.   So as we -- as you testified earlier,
9  you're aware that that was a transition from using
10 AWP to using ASP that was part of the Medicare
11 Modernization Act of 2003.  You remember that
12 testimony?
13    A.   Yes.
14    Q.   Okay.  And is it your testimony that you
15 weren't the one in the Washington affairs office who
16 was following that part of the legislation?
17    A.   That was not an issue we followed and
18 participated in as part of the Medicare Part D drug
19 benefit.
20    Q.   This has been previously marked,
21 Ms. Sensibaugh, as Plaintiff's 1123.
22        MS. TABACCHI:  Ms. Haas.

| Page 87 |
|---|

1        BY MR. GOBENA:
2     Q.   Oh, sorry.  Did I call you Ms. Sensibaugh?
3     A.   We're both short, so --
4     Q.   You guys do look kind of alike.
5     A.   She's from South Carolina.  I'm from
6  Pittsburgh, so --
7     Q.   Why don't you take a moment, Ms. Haas, to
8  look at the first three pages of this document that
9  I've handed you.  You've had a chance to review the
10 document?
11    A.   Yes.
12    Q.   If you look at the top, this piece of
13 interoffice correspondence is from Richard Rieger,
14 and it's dated January 15th, 1997, and there are a
15 bunch of addressees listed, among which we find you,
16 Ms. Haas.
17    A.   Uh-huh.
18    Q.   Taking a look at this document, do you
19 recall receiving it?
20    A.   My name is on it.  It probably arrived in
21 my in box.
22    Q.   Just based on your review of this document

| Page 88 |
|---|

1  and the subject matter, is this the kind of document
2  that you would have personally reviewed after
3  receiving it?
4     A.   Not necessarily.
5     Q.   And why do you say not necessarily?
6     A.   This was an internal activity to discuss
7  issues that were policy issues that were being
8  presented in Congress, and I might have -- I wasn't
9  working on these particular issues, so if I got
10 this, saw the cover, I might have just put it aside.
11    Q.   As you go to the re line, it says re
12 Medicare working group meeting.  Do you see that?
13    A.   Yes.
14    Q.   And we've already established that you
15 participated in multiple Medicare working group
16 meetings, correct?
17    A.   Yes.
18    Q.   And it says in the first paragraph the
19 next Medicare working group meeting will be held on
20 Tuesday January 21st, 1997 from 8:00 a.m. to 9:30
21 a.m. in a conference room.  Do you see that there?
22    A.   Yes.

| Page 89 |
|---|

1     Q.   It goes -- Mr. Rieger goes on to say,
2  "Based upon input from several of you, I am
3  proposing the following agenda for the meeting," and
4  the first bullet point is discuss the average
5  wholesale price versus actual cost issue.  Do you
6  see that there?
7     A.   Yes.
8     Q.   Okay.  Now, this is the second memorandum
9  that we've seen today, Ms. Haas, where there's been
10 a reference to a discussion by the Medicare working
11 group about average wholesale price, correct?
12    A.   Correct.
13    Q.   So it's fair to say based on these
14 memoranda that there were multiple conversations
15 about the issue of average wholesale price held by
16 the Medicare working group.
17        MS. TABACCHI:  Object to the form.
18    A.   I would say so.
19    Q.   Were you personally involved in more than
20 -- in meetings of the Medicare working group where
21 the issue of average wholesale price was discussed?
22        MS. TABACCHI:  Object to the form.

                                23  (Pages 86 to 89)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                          August 30, 2007
                        Washington, DC

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  of things, so I don't recall being asked anything
2  particularly related to e-mails.
3      Q.    Were you given multiple instructions over
4  the years to preserve documents related to AWP?
5      A.    I don't recall if there were multiples of
6  that.
7      Q.    Do you recall definitely at some point
8  being asked to preserve?
9      A.    Yes.
10     Q.    But it's your testimony that you don't
11  recall whether you were asked more than once to
12  preserve.
13     A.    Yes.
14     Q.    And once you started using e-mail more
15  frequently, what kinds of measures did you use to
16  save those e-mails as they related to AWP issues?
17     A.    I did not have significant e-mails on AWP
18  and I was never asked to preserve e-mails on AWP.
19  Ask me about drug importation.  I have a lot of
20  files I'm saving on drug importation.
21     Q.    Understood.  I'm going to hand you what's
22  been previously marked as Plaintiff's 1125, and I'm

**Page 108**

1          THE VIDEOGRAPHER:  We're going off the
2  record.  The time on the screen is 11:17:05.
3          (Discussion off the record)
4          THE VIDEOGRAPHER:  We're back on the
5  record, 11:18:05.
6          BY MR. GOBENA:
7      Q.    It's going to be -- actually, Ms. Haas,
8  can I have this document marked as 1351 and then
9  she'll hand it back to you and continue your review.
10     A.    So I need to give this to --
11     Q.    To the court reporter.
12                  (Plaintiff's Exhibit 1351
13                  was marked for
14                  identification.)
15          BY MR. GOBENA:
16     Q.    Have you had a chance to review the
17  document, Ms. Haas?
18     A.    Yes.
19     Q.    On the first page, you'll see it's a
20  distribution list of the Medicare working group, and
21  you're listed there on the first page, correct?
22     A.    Yes.

**Page 107**

1  just going to ask you a couple quick questions on
2  it.  We're not going to dwell on it.
3          MS. TABACCHI:  I'm sorry, Gejaa.  What
4  number is this?
5          MR. GOBENA:  It's 1125.
6          MS. TABACCHI:  Of course, it's right
7  there.
8          BY MR. GOBENA:
9      Q.    It's a short memorandum, Ms. Haas.  I just
10  want to know if you've ever seen this memorandum.
11     A.    No, I don't recall seeing this memo.
12     Q.    So I understood your testimony, because it
13  will help us go a lot faster, you didn't work at all
14  on the fiscal year '98 Clinton budget proposal that
15  would shift Medicare reimbursement for drugs from
16  AWP to actual costs?
17     A.    I did not work on that issue.
18     Q.    This has been marked as an exhibit
19  previously.  I just don't know the exact number
20  right now.  Let me take a moment here to check my
21  records and see if I can figure that out.  Why don't
22  we go off the record.

**Page 109**

1      Q.    And on the next page, we have a memorandum
2  from Mr. Rieger dated March 7th, 1997 that says --
3  that's to the distribution list, which you're on,
4  and it says, "Re Medicare working group meeting
5  minutes, March 6th, 1997," and it goes on to read,
6  "Due to my absence at the most recent working group
7  meeting, Jim Miller drafted the meeting minutes and
8  they're attached for your review.  As before, please
9  provide me with any changes that you would like
10  incorporated before we publish the final version of
11  the minutes."  Do you see that?
12     A.    Yes.
13     Q.    Do you recall reviewing drafts of minutes
14  prepared after Medicare working group meetings?
15     A.    I may have.
16     Q.    Did you ever provide any comments on any
17  drafts of Medicare working group meeting minutes?
18     A.    Not that I recall, and I would say that at
19  this point I was no longer really participating in
20  these meetings even though I'm on the distribution.
21     Q.    And why do you say that, Ms. Haas?
22     A.    Because I was involved in other issues and

28  (Pages 106 to 109)

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 262

1  warrant such questioning, and I will pass the
2  witness to my colleague, Mr. Rand, representing
3  Ven-a-Care of the Florida Keys.
4       MR. RIKLIN:  How much tape do we have
5  left?
6       THE VIDEOGRAPHER:  We have 19 minutes.
7  Would you like to change it now?
8       MR. RIKLIN:  Yeah, why don't we take a
9  break and then start with the new tape.
10      THE VIDEOGRAPHER:  Here marks the end of
11 Videotape Number 4.  We're going off the record.
12 The time is 15:32:35.
13          (Recessed at 3:32 p.m.)
14          (Reconvened at 3:41 p.m.)
15      THE VIDEOGRAPHER:  Here marks the
16 beginning of Videotape Number 5 in the deposition of
17 Rosemary Haas.  The time on the screen is 15:41:22.
18 You're on the record.
19      EXAMINATION BY COUNSEL FOR
20    VEN-A-CARE OF THE FLORIDA KEYS,  INC.
21      BY MR. RIKLIN:
22      Q.   Good afternoon, Ms. Haas.  How are you?

Page 263

1  Ms. Haas, my questioning won't be nearly as lengthy
2  as Mr. Gobena's because he's covered a lot of ground
3  I would have covered had I gone first, but there are
4  some things I'd like to clarify, and there probably
5  are -- I can tell you, there will be a few documents
6  that I want to talk to you that Mr. Gobena has not
7  -- did not introduce to you, present to you.
8  Earlier, you told us that you at least at some point
9  participated in the Medicare working group meetings
10 at least by telephone, correct?
11      A.   Yes, correct.
12      Q.   Was one of the purposes of the Medicare
13 working group to monitor any changes that Congress
14 was considering to Medicare reimbursement?
15      A.   Yes.
16      Q.   Okay.  Take a look at Exhibit 1170, which
17 is a December 13, 1996 memo from Richard Rieger to
18 the Medicare working group.
19      A.   I guess I should have kept these in order.
20      Q.   Yeah.  You were shown that document
21 earlier.
22      A.   I just didn't keep them in order.  Let's

Page 264

1  see.  Here's one from Rieger.  What exhibit did you
2  say?
3       Q.   1170.  It's one of the first documents
4  that was introduced this morning.
5       A.   Sorry.  I would have put them in order on
6  the break.
7       Q.   Not a problem.  It's a December 13, 1996
8  memo, interoffice correspondence from --
9       A.   Okay, we got it.
10      Q.   Okay, all right, and you're shown as a
11 recipient of that memo, correct?
12      A.   Yes.
13      Q.   At the time, you were a member of the
14 Medicare working group committee or group.
15      A.   Yes.
16      Q.   And the subject line says, "Medicare
17 working group meeting, 12/16/1996," and it -- and
18 Mr. Rieger starts off, "In preparation for next
19 week's meeting."  Does that indicate to you that
20 there was a Medicare working group meeting on
21 December 12 -- excuse me, December 16, 1996?
22      A.   That's what this says, yes.

Page 265

1       Q.   Okay, and I realize you don't recall
2  whether -- or did you say you thought you did
3  participate by telephone in connection with this
4  meeting?
5       A.   I don't recall.
6       Q.   Okay.
7       A.   I know I participated in some.
8       Q.   During this time period, you did
9  participate in at least some --
10      A.   Yes.
11      Q.   -- Medicare working group meetings by
12 telephone, correct?
13      A.   Yes, correct.
14      Q.   Because some of these people were in
15 Chicago at the time, and then you and your
16 colleagues in government affairs were in Washington.
17      A.   Correct.
18      Q.   Okay.  Mr. Rieger states that, "For next
19 week's meeting, we would like to propose the
20 following agenda," and then he has three bullet
21 points, correct?
22      A.   Yes.

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b