# EXHIBIT 31

Haines, Jeani Lee        CONFIDENTIAL        January 30, 2008
                        Nashville, TN

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------X

In re: PHARMACEUTICAL INDUSTRY ) MDL No. 1456

AVERAGE WHOLESALE PRICE          )

LITIGATION                       )

------------------------------)

THIS DOCUMENT RELATES TO:      ) Civil Action

United States of America, ex   ) No. 01-12257-PBS

rel. Ven-A-Care of the Florida ) Judge Patti B.

Keys, Inc. v. Abbott,          ) Saris

Laboratories, Inc.             ) Magistrate Judge

CIVIL ACTION NO. 06-11337-PBS  ) Marianne B. Bowler

------------------------------X


CONFIDENTIAL VIDEOTAPED DEPOSITION OF

JEANI LEE HAINES

Taken on behalf of the Relator, Ven-A-Care

of the Florida Keys, Inc.

January 30, 2008

Nashville, TN

(CAPTION CONTINUES ON FOLLOWING PAGE)

5d977d04-2773-4861-827d-52f73f5d9ec9

Haines, Jeani Lee          CONFIDENTIAL              January 30, 2008
                        Nashville, TN

Page 138

1  given the wholesaler EPIC numbers.
2  BY MR. RIKLIN:
3      Q.  Okay.
4      A.  So we provide those based on what
5  wholesaler they used.
6      Q.  Okay.  Did these price lists ever
7  contain AWP?
8      A.  No.
9      Q.  AWPs?
10     A.  No.
11     Q.  Okay.  Any other written -- other than
12  these price lists you referred to, any other
13  written materials that you provided to your
14  accounts at these meetings?
15         MR. SCANNAPIECO:  Objection, form.
16     A.  Literature, product literature.
17  BY MR. RIKLIN:
18     Q.  Okay.  And what did the product
19  literature consist of generally?
20         MR. SCANNAPIECO:  Objection, form.
21     A.  Photos, description.
22  BY MR. RIKLIN:

Page 139

1      Q.  Description of the product?
2      A.  Sometimes the package insert.
3      Q.  But not pricing information?
4      A.  No.
5      Q.  Okay.  Ms. Haines, as an account
6  manager, did you come to understand that Medicare
7  and Medicaid based reimbursement on a percentage
8  off of AWP; is that your understanding?
9         MR. SCANNAPIECO:  Objection, form.
10     A.  I didn't have an understanding of it.
11  BY MR. RIKLIN:
12     Q.  You never -- you never knew that?
13     A.  Didn't know that.
14     Q.  Did you ever hear that from any source
15  --
16         MR. SCANNAPIECO:  Objection, form.
17  BY MR. RIKLIN:
18     Q.  -- during the time that you were an
19  account manager?
20         MR. SCANNAPIECO:  Objection, form.
21     A.  There was a time when it was brought to
22  my attention.

Page 140

1  BY MR. RIKLIN:
2      Q.  Okay.  When was it brought to your
3  attention that Medicare and Medicaid based
4  reimbursement on a percentage off of AWP?
5         MR. SCANNAPIECO:  Objection, form.
6      A.  That was five or six years ago, five
7  years ago, when we were made aware of the change
8  in Vancomycin.
9      Q.  Okay.  And how were you made aware that
10  Medicare and Medicaid based reimbursement on a
11  percentage off of AWP?
12         MR. SCANNAPIECO:  Objection.
13  BY MR. RIKLIN:
14     Q.  You said it was in connection with a
15  price change for Vancomycin?
16         MR. SCANNAPIECO:  Objection, form.
17     A.  Can I clarify that?
18     Q.  Sure.
19     A.  I didn't -- I wasn't aware that it was
20  paid a percentage based on Medicare/Medicaid.
21     Q.  Well, maybe it would help -- maybe it
22  would be better if you just told us what it was

Page 141

1  you became aware of five or six years ago
2  relating to Medicare and Medicare reimbursement?
3         MR. SCANNAPIECO:  Objection, form.
4      A.  I had a customer tell me that the AWP
5  had changed on our Vancomycin.
6  BY MR. RIKLIN:
7      Q.  Okay.  What else did the customer tell
8  you?
9      A.  That exactly what you said, that it
10  impacted the reimbursement.
11     Q.  Okay.  And did your customer tell you
12  that as a result -- did your customer tell you
13  there was a decrease in the AWP for Vancomycin?
14         MR. SCANNAPIECO:  Objection, form.
15     A.  Yes.
16  BY MR. RIKLIN:
17     Q.  And did the customer tell you that that
18  affected the amount of the reimbursement by
19  Medicare or Medicaid for that -- for that
20  product?
21         MR. SCANNAPIECO:  Objection, form.
22  BY MR. RIKLIN:

36 (Pages 138 to 141)

5d977d04-2773-4861-827d-52f73f5d9ec9

Haines, Jeani Lee        CONFIDENTIAL        January 30, 2008
Nashville, TN

Page 142

1    Q.  What were you told?
2        MR. SCANNAPIECO:  Objection, form.
3    A.  I wasn't told the specifics, just that
4  it affected their reimbursement.
5  BY MR. RIKLIN:
6    Q.  Okay.  And when you say "affected their
7  reimbursement," did the customer tell you that it
8  decreased the amount of the reimbursement for
9  that product, Vancomycin?
10       MR. SCANNAPIECO:  Objection, form.
11   A.  Yes.
12  BY MR. RIKLIN:
13   Q.  Okay.  And do you recall whether the
14  customer was referring to Medicare reimbursement,
15  Medicaid reimbursement or other third party
16  reimbursement; do you recall?
17       MR. SCANNAPIECO:  Objection, form.
18   A.  I don't recall the specifics.
19  BY MR. RIKLIN:
20   Q.  What did you do with that information?
21  Let me back up.  Is that the first time that it
22  had ever come to your attention that Medicare and

Page 143

1  Medicaid based reimbursement in some form or
2  fashion on AWP?
3        MR. SCANNAPIECO:  Objection, form.
4    A.  Yes.
5  BY MR. RIKLIN:
6    Q.  Okay.  And did your customer indicate
7  to you that it was intended to take any action as
8  a result of the reduction in the reimbursement
9  from Vancomycin?
10       MR. SCANNAPIECO:  Objection, form.
11   A.  I don't recall.
12  BY MR. RIKLIN:
13   Q.  Okay.  Well, do you recall taking any
14  action after receiving that information from your
15  account?
16   A.  That I took action?
17   Q.  Yeah.  Did you take any action?
18       MR. SCANNAPIECO:  Objection, form.
19   A.  Well, there was -- no, I didn't.  I
20  mean, I -- of course, I mentioned it to my
21  manager.
22  BY MR. RIKLIN:

Page 144

1    Q.  Okay.  That's action.
2    A.  Okay.
3    Q.  You mentioned it to your district
4  manager?
5    A.  Yes.
6    Q.  Okay.  Did you mention it to anybody
7  else?
8        MR. SCANNAPIECO:  Objection, form.
9    A.  I believe he mentioned it to people
10  above him.
11  BY MR. RIKLIN:
12   Q.  Okay.
13   A.  Because we --
14   Q.  He took the information you conveyed
15  and he conveyed it to his superiors, correct?
16       MR. SCANNAPIECO:  Objection, form.
17   A.  Yes.
18  BY MR. RIKLIN:
19   Q.  Back at Abbott Park?
20   A.  Yes.
21   Q.  Okay.  And what did you tell your
22  general manager?

Page 145

1        MR. SCANNAPIECO:  Objection, form.
2    A.  Just what I had been told.
3  BY MR. RIKLIN:
4    Q.  Did -- did your -- what was your
5  general manager's response to you when you told
6  him -- is this Mr. Beck?
7        MR. SCANNAPIECO:  Objection, form.
8    A.  Yes.
9  BY MR. RIKLIN:
10   Q.  Okay.  When you told -- gave Mr. Beck
11  this information from your account regarding the
12  reduction and reimbursement for Vanco, what was
13  his response?
14       MR. SCANNAPIECO:  Objection, form.
15   A.  We don't set AWP.
16  BY MR. RIKLIN:
17   Q.  Okay.  And did he --
18   A.  Which --
19   Q.  Pardon me?
20   A.  Sorry.
21   Q.  I'm sorry.
22   A.  I didn't mean to interrupt.

37 (Pages 142 to 145)

5d977d04-2773-4861-827d-52f73f5d9ec9

Haines, Jeani Lee        CONFIDENTIAL        January 30, 2008
Nashville, TN

Page 146

1    Q.  No, that's okay.  Go ahead.  That was
2  his response, we don't set AWP?
3    A.  Correct, which was my response also.
4    Q.  That was your response to the customer?
5    A.  Uh-huh.
6    Q.  Okay.  Did you give -- did you make any
7  recommendations to the customer, I mean, other
8  than to say, we don't set AWP?
9        MR. SCANNAPIECO:  Objection, form.
10   A.  That was my understanding that the
11  First DataBank makes the AWP.
12   Q.  Okay.  And who is First DataBank?
13       MR. SCANNAPIECO:  Objection, form.
14   A.  I don't know.
15  BY MR. RIKLIN:
16   Q.  Well, you mentioned First DataBank, is
17  it your understanding that First DataBank is a
18  service that reports prices for drug products,
19  including Abbott's drug products?
20       MR. SCANNAPIECO:  Objection, form.
21   A.  I don't have a clear understanding of
22  First DataBank.

Page 147

1  BY MR. RIKLIN:
2    Q.  Okay.  Well, you mentioned a minute ago
3  that it was your understanding that First
4  DataBank determines AWPs?
5    A.  Uh-huh.
6    Q.  Okay.  What is your understanding about
7  how First DataBank determines AWPs?
8        MR. SCANNAPIECO:  Objection, form.
9    A.  I don't have an understanding of that.
10  BY MR. RIKLIN:
11   Q.  Well, what is your understanding of
12  what First DataBank is?
13   A.  I --
14       MR. SCANNAPIECO:  Objection, form.
15   A.  -- I don't have an understanding of
16  that.  I just know that, from my history with
17  Abbott, there was a policy that we don't discuss
18  AWP because we are the manufacturer and we don't
19  set it.
20  BY MR. RIKLIN:
21   Q.  Okay.  Did that policy -- did you ever
22  see that policy in writing?

Page 148

1        MR. SCANNAPIECO:  Objection, form.
2  BY MR. RIKLIN:
3    Q.  In written form?
4    A.  Not that I recall.
5    Q.  How was that policy first communicated
6  to you?
7        MR. SCANNAPIECO:  Objection, form.
8    A.  I don't recall how it was first
9  communicated to me.  I do know that from, you
10  know, that Vancomycin AWP decrease, there was
11  communication there.  As far as prior to that,
12  you know, we were just told that we don't set the
13  AWP.
14  BY MR. RIKLIN:
15   Q.  Who -- who told you, who first told you
16  that Abbott does not discuss AWP?  Do you recall
17  who that was?
18   A.  Who first told me?
19   Q.  Uh-huh.
20   A.  No, I don't.
21   Q.  Do you recall when it was?
22   A.  No. It's just always been out there.

Page 149

1    Q.  It's always been out there?
2    A.  That I can recall.
3    Q.  And was it told to you for the first
4  time before you became an account manager or do
5  you recall?
6        MR. SCANNAPIECO:  Objection, form.
7    A.  I don't recall when.
8  BY MR. RIKLIN:
9    Q.  You don't --
10   A.  I know when I was out in the field, I
11  knew that we don't set AWP.
12   Q.  Okay.  And you started out in the field
13  in 1997?
14   A.  Yes.
15   Q.  Okay.  So it -- logically, it was
16  sometime prior to that time when you went out
17  into the field that it was communicated to you
18  that Abbott doesn't set AWP?
19       MR. SCANNAPIECO:  Objection, form.
20   A.  Might have been.
21  BY MR. RIKLIN:
22   Q.  You're not sure?

38  (Pages 146 to 149)

5d977d04-2773-4861-827d-52f73f5d9ec9

# EXHIBIT 32

Harling, David          CONFIDENTIAL          October 30, 2007
                    Fort Wayne, IN

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL INDUSTRY    )  MDL DOCKET NO.

AVERAGE WHOLESALE PRICE            )  CIVIL ACTION

LITIGATION.                        )  01CV12257-PBS

------------------------------    )  CONFIDENTIAL



        The videotaped deposition of DAVID

HARLING, called by the United States for examination,

taken pursuant to subpoena and pursuant to the

Federal Rules of Civil Procedure for the United

States District Courts pertaining to the taking of

depositions, taken before Rachel F. Gard, Certified

Shorthand Reporter, at 111 East Wayne Street, Suite

800, Fort Wayne, Indiana, commencing at 9:10 a.m. on

the 30th day of October, A.D., 2007.

ee01f746-50a3-4845-917c-cda222794e35

Harling, David          CONFIDENTIAL          October 30, 2007
Fort Wayne, IN

Page 38

1  a field rep between '92 and '97?
2      A.  I was hired into the position by Bob
3  Curtis, and I believe he -- they realigned
4  territories.  And very shortly after, probably
5  eight months after I took on the position, I then
6  reported to Craig Smith.
7      Q.  And was Craig Smith your supervisor when
8  you left this position in '97?
9      A.  Yes.
10     Q.  Would it have been your practice that if
11 you brought an issue from the field that you would
12 have taken it to your immediate supervisor?
13     A.  Most likely.
14     Q.  So is it most likely that with regard to
15 this particular reimbursement issue with this
16 customer, you would have taken it to your immediate
17 supervisor?
18     MR. WINCHESTER:  Objection, form.
19 BY THE WITNESS:
20     A.  I don't recall particularly who I brought
21 it to, but I may very well have brought it to
22 Craig.

Page 39

1      Q.  And do you recall what discussion you had
2  regarding the reimbursement issue?
3      A.  I don't recall the particular discussion.
4  I remember the basic result was, you know, we don't
5  have control or ability to affect the reimbursement
6  for a customer.  All we can sell on is our line of
7  product, the service that we provide, and the
8  quality of our product and our price.
9      Q.  With regard to Exhibit -- your Exhibit
10 Harling 003 which is before you and the attached
11 spreadsheet, if you could look to the first page --
12 There you go.
13     A.  This page?
14     Q.  Uh-huh.  Do you believe that the
15 information in this spreadsheet would have been
16 useful to a sales representative regarding any
17 customer questions on reimbursement?
18     MR. HANLON:  Objection, form, calls for
19 speculation.
20 BY THE WITNESS:
21     A.  I have no idea.
22     Q.  Did a customer -- Other than that one

Page 40

1  experience as a field sales rep, did a customer
2  ever ask you any questions regarding reimbursement
3  of Abbott's products?
4      A.  No.
5      Q.  Exhibit Harling 003, the spreadsheet
6  that's attached to Exhibit Harling 003, would this
7  have been of any use to you as a field sales rep?
8      MR. HANLON:  Objection, form.
9  BY THE WITNESS:
10     A.  I don't believe so.
11     Q.  Why is that?
12     A.  I don't believe that AWP was something
13 that was important to my role as a sales position.
14     Q.  Do you think that AWP was important to
15 the customer?
16     MR. HANLON:  Objection, form.
17     MR. WINCHESTER:  Objection, form.
18 BY THE WITNESS:
19     A.  I don't know.
20     Q.  Okay.  All right.  So after working five
21 years as an infusion sales specialist in
22 Scottsdale, Arizona, you relocated to Chicago,

Page 41

1  Illinois, where you took on a new position as a
2  contract marketing analyst; is that right?
3      A.  Yes.
4      Q.  And that would have been in April of '97?
5      A.  I relocated in April of '97, yes.
6      Q.  Okay.  Now, what was your job and what
7  did you do as a contract marketing analyst?
8      A.  Worked on the contracts and the pricing
9  for customers.
10     Q.  Okay.  And if I understood your testimony
11 earlier, your duties would -- you would become
12 involved in contracting and pricing for customers
13 only when the price was at a discount off of list,
14 correct?
15     A.  Correct.
16     Q.  So your duties did not involve you when a
17 sale was made at list, correct?
18     MR. WINCHESTER:  Objection, form.
19 BY THE WITNESS:
20     A.  Correct.
21     Q.  All right.  Okay.  Can you take us
22 generally through how you did your job?

11  (Pages 38 to 41)

ee01f746-50a3-4845-917c-cda222794e35

Harling, David                CONFIDENTIAL            October 30, 2007
                              Fort Wayne, IN

Page 342

1   5:33 p.m. with the conclusion of the October 30th
2   deposition of David Harling.
3           (WHEREUPON, the deposition was
4           adjourned.)
5
6
7
8       _____
9       SIGNATURE OF THE WITNESS
10
11  Subscribed and sworn to and before me
12  this _____ day of _____, 20_____.
13
14
15  _____
16      Notary Public
17
18
19
20
21
22

Page 343

1   UNITED STATES OF AMERICA      )
    NORTHERN DISTRICT OF ILLINOIS  )
1   EASTERN DIVISION          ) SS.
    STATE OF ILLINOIS          )
1   COUNTY OF COOK          )
2       I, Rachel F. Gard, Certified Shorthand
3   Reporter, do hereby certify that DAVID HARLING was first
4   duly sworn by me to testify to the whole truth and that
5   the above videotaped deposition was reported
6   stenographically by me and reduced to typewriting under
7   my personal direction.
8       I further certify that the said videotaped
9   deposition was taken at the time and place specified and
10  that the taking of said videotaped deposition commenced
11  on the 30th day of October, A.D., 2007, at 9:10 a.m. at
12  the offices of Baker & Daniels, 111 East Wayne Street,
13  Suite 800, Fort Wayne, Indiana.
14      I further certify that I am not a relative or
15  employee or attorney or counsel of any of the parties,
16  nor a relative or employee of such attorney or counsel,
17  nor financially interested directly or indirectly in
18  this action.
19      In witness whereof, I have hereunto set my
20  hand and affixed my seal of office this 7th day of
21  November, A.D., 2007.
        _____
21          RACHEL F. GARD, CSR
22          CSR No. 084-003324

87 (Pages 342 to 343)

Henderson Legal Services
202-220-4158

ee01f746-50a3-4845-917c-cda222794e35

# EXHIBIT 33

Harsh, Harold                          February 19, 2008
                    Pittsburgh, PA

Page 1

            IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

    --------------------------------X

    In re:  PHARMACEUTICAL INDUSTRY   ) MDL 1456

    AVERAGE WHOLESALE PRICE LITIGATION) Civil Action

    --------------------------------) No. 01-12257-PBS

    THIS DOCUMENT RELATES TO:         )

    United States of America, ex rel. )

    Ven-a-Care of the Florida Keys,   )

    Inc. v. Abbott Laboratories, Inc.,)

    CIVIL ACTION NO. 06-11337-PBS     )

    --------------------------------X

        (CAPTION CONTINUED ON FOLLOWING PAGE)

            DEPOSITION OF:  HAROLD HARSH

                    DATE:   February 19, 2008

                            Tuesday, 10:11 a.m.

                LOCATION:   JONES DAY REAVIS & POGUE

                            31 One Mellon Bank Center

                            Pittsburgh, PA  15219

                TAKEN BY:   Ven-A-Care

             REPORTED BY:   G. Donavich, RPR, CRR

                            Notary Public

Harsh, Harold                              February 19, 2008
                        Pittsburgh, PA

Page 78

1    Q.  Were there national meetings that you
2  attended?
3    A.  Not every year, but there were national
4  meetings.
5    Q.  What, if anything, do you recall about
6  the presentations made at national meetings?
7    A.  Basically the same thing as district
8  and regional meetings.  You just rehash the same
9  things over and over again about the products,
10  and we talked about new products and sales goals
11  and things like that.
12    Q.  To the extent that you received
13  training that you would characterize as selling
14  skills, what can you tell me about that type of
15  training?
16    A.  Just how to talk to a customer, probe
17  them to see what their needs are when promoting
18  the product.
19    Q.  What discussion, if any, did you have
20  in the course of training about selling skills
21  about prices of Abbott products?
22      MR. SCANNAPIECO:  Objection.  Form.

Page 79

1      THE WITNESS:  I don't recall.
2  BY MS. THOMAS:
3    Q.  You don't recall whether the topic came
4  up or you don't recall what was said?
5    A.  I just don't remember if they did that.
6    Q.  Do you have any recollection at all of
7  price being discussed during any district,
8  regional, or national meetings?
9      MR. SCANNAPIECO:  Objection.  Form.
10      THE WITNESS:  There could have been
11  price discussed, yeah, on pumps, what kind of
12  different programs they had for the pumps, but I
13  don't recall.
14  BY MS. THOMAS:
15    Q.  When you say what types of programs
16  they had, promotional-type programs Abbott had to
17  sell its pumps?  Is that what you're referring
18  to?
19    A.  Yes.
20    Q.  How about pertaining to drug products?
21      MR. SCANNAPIECO:  Objection.  Form.
22      THE WITNESS:  I can't remember.

Page 80

1      MS. THOMAS:  Do you remember anything
2  during the time you were at Abbott Alt Site where
3  you engaged in discussions about pricing of
4  Abbott's drug products?
5      MR. SCANNAPIECO:  Objection.  Form.
6      THE WITNESS:  I can't remember.
7      MS. THOMAS:  Do you recall any
8  discussions with other Abbott employees or at
9  these meetings or training sessions about
10  reimbursement of Abbott's products?
11      MR. SCANNAPIECO:  Objection.  Form.
12      THE WITNESS:  No.
13  BY MS. THOMAS:
14    Q.  You have no recollection during your
15  nine years there of ever having talked about
16  reimbursement of Abbott's products?
17    A.  I don't remember.
18    Q.  Do you recall any discussion to the
19  effect that one should not talk about
20  reimbursement issues pertaining to Abbott
21  products?
22    A.  No.

Page 81

1    Q.  Do you recall one of the things that
2  you were taught to do in working with a customer
3  involved learning what that customer's payor mix
4  was?
5    A.  No.
6    Q.  Do you recall ever being told that one
7  of the things you ought to know as an Abbott
8  sales representative was the manner in which your
9  customers were reimbursed for products that they
10  were buying from Abbott?
11      MR. SCANNAPIECO:  Objection.  Form.
12      THE WITNESS:  No.
13      MS. THOMAS:  Did you ever know anything
14  about any of your customers' means of getting
15  reimbursed for product that you were promoting to
16  them?
17      MR. SCANNAPIECO:  Objection.  Form.
18      THE WITNESS:  No.
19      MS. THOMAS:  So you encouraged them to
20  buy product, which they then bought from Abbott,
21  but there was never any discussion about the
22  manner or level at which they would be reimbursed

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Harsh, Harold                          February 19, 2008
                    Pittsburgh, PA

Page 82

1  for the product when it was dispensed to a
2  patient?
3          MR. SCANNAPIECO: Objection. Form.
4          THE WITNESS:  No.  I sold the product
5  to the company.
6  BY MS. THOMAS:
7      Q.  Right.
8      A.  I didn't know like where it was going.
9      Q.  Where did you think it was going?
10     A.  To a patient.
11     Q.  And how --
12     A.  Go ahead.  I'm sorry.
13     Q.  I'm sorry.  I didn't mean to cut you
14  off.
15          How, if at all, did you understand that
16  your customers who were providing or dispensing
17  this product to patients, how were your customers
18  getting paid?
19          MR. SCANNAPIECO: Objection to form.
20          THE WITNESS:  I don't know.
21          MS. THOMAS:  You had no idea?  All nine
22  years that you were promoting product, you had no

Page 83

1  idea how they got -- like what happened after
2  they gave a product to a patient?
3          MR. SCANNAPIECO: Objection. Form.
4          THE WITNESS:  No.  I can't remember.
5          MS. THOMAS:  Did you deal exclusively
6  with charitable organizations who probably
7  provided product for free to patients?
8          MR. SCANNAPIECO: Objection. Form.
9          THE WITNESS:  No.
10  BY MS. THOMAS:
11     Q.  So to the best of your understanding,
12  the customers that you were calling on were for-
13  profit companies that were looking to be paid
14  when they dispensed or administered a product to
15  a patient.  Correct?
16     A.  Yes.
17     Q.  But you never engaged in any
18  conversation with anyone about how they would get
19  paid or the level at which they would get paid?
20          MR. SCANNAPIECO: Object to the form.
21          THE WITNESS:  No.
22          MS. THOMAS:  Did you engage in

Page 84

1  discussions with your customers about the prices
2  at which they were obtaining Abbott products?
3  And I'm switching gears here.  We're talking
4  about the price they paid to obtain the Abbott
5  products.
6          THE WITNESS:  Yes.
7          MS. THOMAS:  Was that a frequent topic
8  of discussion in your sales and marketing
9  efforts?
10          MR. SCANNAPIECO: Objection. Form.
11          THE WITNESS:  For pumps, yes.
12  BY MS. THOMAS:
13     Q.  How about for Abbott drug products?
14     A.  No.
15     Q.  Nobody seemed to care what the price of
16  the product was when you were marketing it?
17          MR. SCANNAPIECO: Objection. Form.
18          THE WITNESS:  I'm sure they did.
19  BY MS. THOMAS:
20     Q.  Did they just know what the price was
21  independent of your conversation so it didn't
22  have to come up in conversation with you?  Is

Page 85

1  that your understanding?
2      A.  Yes.
3      Q.  How did your customers know what the
4  prices were --
5          MR. SCANNAPIECO: Objection. Form.
6          MS. THOMAS:  -- for Abbott drug
7  products?
8          MR. SCANNAPIECO: Objection. Form.
9          THE WITNESS:  If they --
10  BY MS. THOMAS:
11     Q.  I'll rephrase the question.
12          What understanding, if any, did you
13  have as to how your customers knew what the
14  prices were for Abbott drug products?
15     A.  I'm sure that they would have a GPO
16  that they would get prices from.
17     Q.  A GPO refers to?
18     A.  Like a group purchasing organization.
19     Q.  And it's your understanding that by
20  virtue of your customers being members of a GPO,
21  the price at which they would obtain Abbott drug
22  products was essentially predetermined by the

cf8eb90c-0e80-42bc-ac95-8096c339188c

# EXHIBIT 34

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - -

IN RE:  PHARMACEUTICAL      : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION

PRICE LITIGATION           : 01-CV-12257-PBS

            vs.            :

THIS DOCUMENT RELATES TO   : CONFIDENTIAL

U.S. ex rel. Ven-A-Care of :

The Florida Keys, Inc.     :

v. Abbott Laboratories,    :

Inc., No. 06-CV-11337-PBS  :

            And            :

State of California, ex    :

Rel. Ven-A-Care vs. Abbott :

Laboratories, Inc., et al  :

Case No. 1:03-cv-11226-PBS :

            And            :

State of Texas ex rel.     :

Ven-A-Care of the Florida  :

Keys, Inc. vs. Abbott      :

Laboratories, et al,       :

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 202

1   ultimate authority and control over the Medicaid
2   rebate submissions for HPD products; correct?
3          MS. CITERA:  Objection to form.
4          THE WITNESS:  Yes.
5   BY MR. ANDERSON:
6      Q.   Likewise, did Mr. Ward or other general
7   managers of Alternate Site product sales have
8   ultimate control and authority over the list prices
9   that were reported for HPD products to the
10  compendia?
11         MS. CITERA:  Objection to form.
12         THE WITNESS:  To my knowledge, no,
13  they did not.
14  BY MR. ANDERSON:
15     Q.   Why not?
16     A.   Because -- we have actually gone over
17  this before.  The list prices were established at a
18  corporate level.
19     Q.   Why were the rebate submissions not
20  approved at the corporate level?
21     A.   Approved?  The rebate submissions
22  approved?  I don't understand what you mean by

Page 203

1   approved.
2      Q.   You said John Ward had control and
3   authority as the general manager of Alternate Site
4   product sales for the HDP rebate submissions;
5   correct?
6          MS. CITERA:  Objection to form.
7          THE WITNESS:  He had responsibility
8   for that program, I mean, yes, and it was charged
9   to his budget, yes.
10  BY MR. ANDERSON:
11     Q.   So why was that control and authority
12  located in Alternate Site when these were products
13  that were being sold to hospitals as well as
14  Alternate Site customers?
15         MS. CITERA:  Objection to form.
16         THE WITNESS:  But they weren't, the
17  Medicaid program, that Medicaid Drug Rebate Program
18  is not a hospital program at all.  It has nothing
19  to do with hospitals.
20  BY MR. ANDERSON:
21     Q.   Well, you understand that hospitals also
22  have outpatient pharmacies, don't you?

Page 204

1      A.   Yes.
2      Q.   And in fact, over the years, Abbott has
3   actively partnered with such pharmacies and sought
4   to help them in filing reimbursement claims;
5   correct?
6          MS. CITERA:  Objection to form.
7          THE WITNESS:  Correct.
8   BY MR. ANDERSON:
9      Q.   And shared in the proceeds of those
10  claims, including claims that were submitted to
11  Medicare and Medicaid; correct?
12     A.   Yes, correct.
13     Q.   So why was it that if these products
14  were being sold through hospitals, as well as
15  Alternate Site customers, that John Ward was given
16  the authority and control over the Medicaid rebate
17  submissions?
18         MS. CITERA:  Objection to form.
19         THE WITNESS:  Because hospitals are
20  hospitals, and they are inpatient entities.
21  Outpatient entities came over to Alternate Site.
22  So anything that was outpatient was over in

Page 205

1   Alternate Site.  That's how Ward got it.
2   BY MR. ANDERSON:
3      Q.   And were those outpatient pharmacies
4   purchasing under contracts that they had obtained
5   from the hospital business sector?
6      A.   I don't know.  I don't know anything
7   about the contracting.  I knew contracts exist,
8   existed, and I knew there were discounts in
9   contracts, and I knew the contracts went for
10  periods of time, and that's my total knowledge of
11  contracts.
12     Q.   You mentioned that you have attended
13  industry meetings concerning reimbursement; is that
14  correct?
15     A.   Sure, yes.
16     Q.   And you said that you would attend,
17  what, a couple of those per year?
18     A.   In the early days, when I was learning,
19  I went to several.  I would go to maybe three a
20  year.  Lately, I don't go to very many.
21     Q.   And the audience of these industry
22  meetings are fellow drug company personnel and

52 (Pages 202 to 205)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 298

```
 1          Have you had any other discussions
 2   with the Department of Justice or the State of
 3   Texas, since then other than in the deposition
 4   context?
 5      A.  No.
 6          MS. CITERA:  Okay, that's all I
 7   have.
 8          THE VIDEO TAPE OPERATOR:  This
 9   concludes the video tape deposition of Michael
10   Heggie.  We are now going off the video record.
11   The time is 8:51.
12          - - -
13          MR. ANDERSON:  I just want to state
14   for the record that we have searched high and low
15   for selling materials, and to my knowledge, the AIM
16   reimbursement guide or related selling materials
17   have not been produced in this case, and to the
18   extent they are subsequently produced, I reserve
19   the right to question Mr. Heggie about those, as he
20   is the author of that, and I certainly contend that
21   those materials should have been produced by now,
22   alleviating the need to recall Mr. Heggie.
```

Page 299

```
 1          MS. CITERA:  I object to your
 2   characterization or that we are going to come back
 3   here again.
 4          MR. GOBENA:  Do you think it would
 5   be possible maybe to identify whether it is federal
 6   production or California or Texas where that module
 7   might be?  Are you saying it was produced?
 8          MS. CITERA:  I thought it was, but I
 9   have been looking at these documents for --
10          THE WITNESS:  It was a looseleaf
11   binder.
12          - - -
13          (Whereupon the deposition was
14   concluded at 8:52 p.m.)
15          - - -
16          _____
17          MICHAEL HEGGIE
18   Subscribed and sworn to and before me
19   this _____ day of _____, 20_____.
20
21   _____
22          Notary Public
```

Page 300

```
 1          C E R T I F I C A T E
 2              - - -
 3   STATE OF NEW JERSEY      :
 4                   :  SS
 5   COUNTY OF BURLINGTON      :
 6          I, Jeanne Christian, Court
 7   Reporter-Notary Public within and for Burlington
 8   County, Commonwealth of New Jersey, do hereby
 9   certify that the foregoing testimony of Michael
10   Heggie was taken before me at 1622 Locust
11   Street, Philadelphia, Pennsylvania on Thursday,
12   May 17, 2007; that the foregoing testimony was
13   taken in shorthand by myself and reduced to
14   typing under my direction and control, that the
15   foregoing pages contain a true and correct
16   transcription of all of the testimony of said
17   witness.
18          .....................
19          JEANNE CHRISTIAN
20          Notary Public
21          My Commission expires
22          May 21, 2007
```

76 (Pages 298 to 300)

5afab192-6713-4ee2-bafb-e982083564b2

# EXHIBIT 35

Page 1

NO. GV401286

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| ex rel. | ) |
|   VEN-A-CARE OF THE | ) |
|   FLORIDA KEYS, INC., | ) |
|       Plaintiffs, | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| ABBOTT LABORATORIES INC., | ) |
| HOSPIRA, INC., B. BRAUN | ) |
| MEDICAL INC., AND BAXTER | ) |
| HEALTHCARE CORPORATION, | ) |
|      Defendant(s). | ) 201ST JUDICIAL DISTRICT |

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
MICHAEL THOMAS HEGGIE
August 22, 2006

*********************************************************


ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL THOMAS

HEGGIE, produced as a witness at the instance of the

Plaintiff(s), and duly sworn, was taken in the

above-styled and numbered cause on the 22nd of August,

2006, from 9:08 a.m. to 5:02 p.m., before CYNTHIA

VOHLKEN, CSR in and for the State of Texas, reported

by machine shorthand, at the offices of Berger &

Montague, P.C., 1622 Locust Street, Philadelphia,

Pennsylvania, pursuant to the Texas Rules of Civil

Procedure and the provisions attached previously.

e54f0fb0-f900-4143-b5c5-e13fe4212cc4

Page 22

1    Q.   What was your discipline in your graduate
2  courses?
3    A.   That was Elizabethan literature.
4    Q.   I'm sorry?
5    A.   That was Elizabethan literature.
6    Q.   Elizabethan literature.  Okay.  So you don't
7  have an MBA?
8    A.   No.
9    Q.   But you did teach business math?
10   A.   Uh-huh.
11   Q.   What level?
12   A.   About ninth grade, I think it was.  It might
13  have been eighth or ninth.
14   Q.   And did I read that you came to work for
15  Abbott Laboratories in 1989; is that true?
16   A.   Uh-huh.  Yep.
17   Q.   Do you recall what year?  What month, excuse
18  me?
19   A.   I believe July.
20   Q.   What was your first duty at Abbott
21  Laboratories?
22   A.   Answering the phone.
23   Q.   You were hired as a receptionist?
24   A.   No.  I was hired to answer a telephone from
25  physicians who would phone in orders for a homecare

Page 23

1  operation that Abbott had at the time.
2    Q.   Was this in the Home Infusion Services --
3    A.   Yep --
4    Q.   -- department?
5    A.   -- it was.
6    Q.   Okay.  And how long did you work in Home
7  Infusion Services, do you recall?
8    A.   Don't recall.
9    Q.   I believe I read in your prior testimony that
10  it was a number of years and that you transferred from
11  Home Infusion Services into Renal Care; is that true?
12   A.   Well, it wasn't a transfer per se.  It was a
13  transition.
14   Q.   Could you explain to me what you mean -- how
15  you're distinguishing between transfer and transition?
16   A.   Well, in a corporation, in a large
17  corporation, if you're going to transfer there's a
18  formality to it.  In this particular case these things
19  were all sort of in one area within Abbott and they
20  all resided within a division and I happened to have
21  some interest in this claims processing and so -- I
22  appeared to be good at it and so Renal had some issues
23  with some claims processing and I worked on those
24  issues and that was sort of the transition rather than
25  transfer.

Page 24

1    Q.   By "claims processing" we're talking about
2  the process by which Abbott's customers had their cost
3  of obtaining drugs reimbursed by third-party payers
4  such as Medicare and Medicaid or private insurance?
5    A.   No, not at all.
6    Q.   Okay.
7    A.   That wasn't what I was alluding to at all.
8    Q.   What kind of claims processing are you
9  alluding to?
10   A.   The Renal division at Abbott at one time did
11  direct billing for -- of Medicare for patients who
12  received renal supplies in their house.  There's two
13  types of dialysis, renal dialysis.  There's
14  hemodialysis, which -- which you go to a center, and
15  there's peritoneal dialysis in which you do at home.
16   Q.   Okay.
17   A.   And in the home in those days, again, going
18  back to the early '90s, a lot of these home things
19  were very popular with companies and Abbott had a
20  group, called the Renal Group, in which they supplied
21  peritoneal dialysis solutions to patients at home and
22  then in turn billed for those.  And that's the billing
23  I'm talking about.
24   Q.   Billed who?
25   A.   Medicare mostly.

Page 25

1    Q.   Medicare.
2    A.   Yes.  When your kidneys fail, Medicare has a
3  specific program that you're allowed to seek
4  reimbursement from.  It's called the ESRD program.
5    Q.   And what specifically was your responsibility
6  in interacting with this reimbursement by Medicare?
7    A.   It was to submit the claims and collect the
8  money.
9    Q.   Did you have some involvement in making sure
10  that you got the right amount of money back?
11   A.   Yes.  I mean, certainly that's part of the
12  job.
13   Q.   And as part of the claim, what was the amount
14  of money that you were claiming?
15   A.   Well, it would depend on the amount of
16  supplies you got --
17   Q.   Okay.
18   A.   -- one got.
19   Q.   And was it also -- was -- have you heard of
20  an acronym "average wholesale price" or "AWP"?
21   A.   Yes.  Sure.
22   Q.   Was that involved in this claims process with
23  Medicare?
24        MR. BERLIN:  Object to the form.
25   A.   No.  No, not -- not in this because the way

7 (Pages 22 to 25)

e54f0fb0-f900-4143-b5c5-e13fe4212cc4

Page 26

1  in which Medicare operates the ESRD program, it's a
2  set amount of money you get -- one gets for a monthly
3  supply of goods.
4      Q.  Now, the goods we're talking about here, are
5  we talking about -- are you talking about durable
6  medical equipment or are you talking about drugs?
7      A.  Well, they're technically drugs, but they're
8  really not drugs in the sense when you think of a drug
9  like penicillin or something like that.  They are
10 solutions.  But, yes, they're drugs.
11     Q.  So you're talk -- now, you're talking
12 ensuring that Medicare is reimbursing the proper
13 amount for solutions, but what time period are you
14 referring to?
15     A.  Oh, man.  I don't know.  Maybe the late --
16 let's see.  I went there in July of '89, so I'd have
17 to -- probably '90, '91, maybe.  Couldn't tell you how
18 long I did it or how long it went on.
19     Q.  Were you still in Home Infusion Services at
20 this time?
21     A.  Yes.
22     Q.  Okay.  And as part of your job in ensuring
23 that Medicare is reimbursing the proper amount of
24 money, your testimony is that AWP was not a factor in
25 those discussions at that time?

Page 27

1      A.  AWP had nothing to do -- to the best of my
2  recollection, had nothing to do with renal solutions.
3      Q.  Let me ask you to look at a couple of
4  documents that have already been marked as exhibits
5  in -- deposition exhibits in prior depositions.
6      A.  Sure.
7      Q.  And these are organizational charts that I'm
8  hopeful can -- let's -- this has been previously
9  marked as Exhibit 45 in this case.
10     A.  Sure.
11     Q.  First of all, let me just ask you to take a
12 look at it and see if it looks familiar to you.
13         MR. STETLER:  Ray, do you happen to have
14 another one by any chance?
15         MR. WINTER:  Yeah, I think we do.
16         Do you have an extra one?
17         MS. MOORE:  Oh, sure.
18         MR. STETLER:  That's okay.  I just hate
19 to share with Eric.
20         THE WITNESS:  It's hard to read.  I can
21 read Kringel's name.  I can read Begley's name.
22         MR. STETLER:  Why don't you -- why don't
23 you wait for a question.
24     Q.  (BY MR. WINTER)  Okay, Mr. Heggie.  You're
25 looking at the first page that has a Bates number in

Page 28

1  the lower right corner that -- TXABT 00081?
2      A.  Yes.  Correct.
3      Q.  Okay.  And the first page you see
4  Mr. Kringel's name at the top as the senior
5  vice-president and -- of Hospital Products and
6  president of Hospital Products Division.  Do you see
7  that?
8      A.  Yep.
9      Q.  Do you recall Mr. Kringel?  Did you know him?
10     A.  Well, I recall Mr. Kringel and, no, is -- you
11 know, I mean --
12     Q.  It rings true that he was the big boss at
13 Hospital --
14     A.  Yeah.
15     Q.  -- Products Division?
16     A.  Yeah.
17     Q.  Okay.  And underneath that you see various
18 subordinate units underneath Hospital Products
19 Division?
20     A.  Right.
21     Q.  And underneath Mr. Kringel and to the right
22 you see division vice-president/general manager of
23 Alternate Site?
24     A.  Yes.
25     Q.  Do you see that?  Do you see Robertson?

Page 29

1      A.  Yep.
2      Q.  Do you know that to be Don Robertson?
3      A.  I do.
4      Q.  Okay.  Did you know Mr. Robertson or did you
5  interact with him professionally?
6      A.  Yes.
7      Q.  Okay.  And on the next page, if you'll turn
8  to the next page.  There's a Bates number 82.
9  Underneath Mr. Robertson that you have general manager
10 for Alternate Site Product Sales, do you see J.V.
11 Ward?  Is that John Ward?
12     A.  That's John Ward.
13     Q.  And then you have a general manager for Renal
14 Care.  That's P.L. Mershimer; is that true?
15     A.  Yes.
16     Q.  Would that be Loreen Mershimer?
17     A.  That's Loreen Mershimer.
18     Q.  Okay.  And then to her right you see a
19 general manager for Home Infusion Services and that's
20 Mike Sellers, right?
21     A.  Correct.
22     Q.  Okay.  Now, at this time, September 1995,
23 were you working in the Home Infusion Services area or
24 were you over in the Renal Care area?
25     A.  What time, again?

e54f0fb0-f900-4143-b5c5-e13fe4212cc4

Page 330

1  position, but before we re-read more documents that
2  we've read several times earlier today, we're out of
3  time
4          MR. WINTER:  Well, let me make my
5  position clear before you walk out, Dave.  Under our
6  first amended protective order we are allowed to
7  designate up to four witnesses as 16-hour witnesses
8  and we are reserving the right to designate this
9  witness as a 16-hour witness and we have not completed
10 our examination.  So if we have to take that up --
11         MR. STETLER:  I understand your
12 position.  I've got to go catch a plane.
13         MR. WINTER:  I understand.
14         MR. STETLER:  If anybody would have told
15 me, I would have made other arrangements.
16         MR. WINTER:  Well, I'm not talking about
17 continuing today, Dave.  We are talking about
18 continuing at another time.
19         MR. STETLER:  I know.  I know.
20         MR. WINTER:  Okay.
21         MR. STETLER:  I've got to go.
22         THE VIDEOGRAPHER:  It's now 5:02.  We
23 are going off the video record.  This completes
24 testimony for today.
25         (Deposition adjourned at 5:02)

Page 331

1           CHANGES AND SIGNATURE
2  PAGE   LINE        CHANGE        REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 332

1      I, MICHAEL THOMAS HEGGIE, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6           MICHAEL THOMAS HEGGIE
7
8
9  THE STATE OF                  )
10 COUNTY OF                     )
11    Before me,                      , on this day
12 personally appeared MICHAEL THOMAS HEGGIE, known to me
13 (or proved to me under oath or through
14                        ) (description of identity
15 card or other document) to be the person whose name is
16 subscribed to the foregoing instrument and
17 acknowledged to me that they executed the same for the
18 purposes and consideration therein expressed.
19    Given under my hand and seal of office this
20     day of                , 2006.
21
22
23
24           NOTARY PUBLIC IN AND FOR
24           THE STATE OF
25

Page 333

1          NO. GV401286
2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                             )
3  ex rel.                   )
   VEN-A-CARE OF THE         )
4  FLORIDA KEYS, INC.,       )
   Plaintiff(s),             )
5                            )
   VS.                       ) TRAVIS COUNTY, TEXAS
6                            )
   ABBOTT LABORATORIES INC., )
7  HOSPIRA, INC. B. BRAUN    )
   MEDICAL INC., AND BAXTER  )
8  HEALTHCARE CORPORATION,   )
   Defendant(s).       ) 201ST JUDICIAL DISTRICT
9
         REPORTER'S CERTIFICATION
10    DEPOSITION OF MICHAEL THOMAS HEGGIE
            August 22, 2006
11
12    I, Cynthia Vohlken, Certified Shorthand Reporter
13 in and for the State of Texas, hereby certify to the
   following:
14
15    That the witness, MICHAEL THOMAS HEGGIE, was duly
16 sworn by the officer and that the transcript of the
17 oral deposition is a true record of the testimony
18 given by the witness;
19    That the deposition transcript was submitted on
20 September 1, 2006, to the witness or to the attorney
21 for the witness for examination, signature and return
22 to me by September 25, 2006;
23    That the amount of time used by each party at the
24 deposition is as follows:
      Mr. Raymond Winter - 02:52
25    Mr. Jarrett Anderson - 03:23
      Mr. Eric Berlin - 07:50

84  (Pages 330 to 333)

e54f0fb0-f900-4143-b5c5-e13fe4212cc4

Page 334

```
 1    That pursuant to information given to the
 2  deposition officer at the time said testimony was
 3  taken, the following includes counsel for all parties
 4  of record:
 5      MR. RAYMOND WINTER and MS. MARGARET MOORE,
           Attorneys for Plaintiff;
 6      MR. JARRETT ANDERSON,
           Attorney for the Relator;
 7      MR. ERIC BERLIN,
           Attorney for Defendants Abbott
 8      Laboratories, Inc. and Hospira, Inc.
        MS. GINGER APPLEBERRY,
 9         Attorney for Defendant B. Braun Medical,
           Inc.
10
11    I further certify that I am neither counsel for,
12  related to, nor employed by any of the parties or
13  attorneys in the action in which this proceeding was
14  taken, and further that I am not financially or
15  otherwise interested in the outcome of the action.
16    Further certification requirements pursuant to
17  Rule 203 of TRCP will be certified to after they have
18  occurred.
19    Certified to by me this 1st day of September,
20  2006.
21
           Cynthia Vohlken, Texas CSR 1059
22         Expiration Date:  12/31/2006
           Firm Registration No. 82
23         Fredericks-Carroll Reporting
           7719 Wood Hollow Drive, Suite 156
24         Austin, Texas 78731
           Telephone: (512) 477-9911
25             (800) 234-3376
    JOB NO. 1782  Fax:    (512) 345-1417
```

Page 335

```
 1      FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2    The original deposition was/was not returned to
 3  the deposition officer on         , 2006;
 4    If returned, the attached Changes and Signature
 5  page contains any changes and the reasons therefor;
 6    If returned, the original deposition was delivered
 7  to Mr. Raymond Winter, Custodial Attorney;
 8    That $    is the deposition officer's
 9  charges to the Plaintiff(s) for preparing the original
10  deposition transcript and any copies of exhibits;
11    That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate
13  was served on all parties shown herein on and filed
14  with the Clerk.
15    Certified to by me this        day of
16         , 2006.
17
18
19
           Cynthia Vohlken, Texas CSR 1059
20         Expiration Date:  12/31/2006
           Firm Registration No. 82
21         Fredericks-Carroll Reporting
           7719 Wood Hollow Drive, Suite 156
22         Austin, Texas 78731
           Telephone: (512) 477-9911
23             (800) 234-3376
           Fax:    (512) 345-1417
24  JOB NO. 1782
25
```

85 (Pages 334 to 335)

e54f0fb0-f900-4143-b5c5-e13fe4212cc4

# EXHIBIT 36

Jessup, Kaye                    CONFIDENTIAL              February 14, 2008

Page 1

                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF MASSACHUSETTS


        IN RE:  PHARMACEUTICAL        *   MDL NO. 1456

        INDUSTRY AVERAGE WHOLESALE    *   CIVIL ACTION NO.

        PRICE LITIGATION              *   01-12257-PBS

        _____*

        UNITED STATES OF AMERICA,     *

        ex rel. VEN-A-CARE OF THE     *

        FLORIDA KEYS, INC.            *   CIVIL ACTION NO.

                                      *    06-11337-PBS

        VS.                           *

                                      *

        ABBOTT LABORATORIES, INC.    *   CONFIDENTIAL

        ----------------------------------------------------

        (Caption continues on following page)


        *******************************************************

                  ORAL AND VIDEOTAPED DEPOSITION OF

                          KAYE JESSUP

                       FEBRUARY 14, 2008

        *******************************************************


                    Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

c2640c25-4e43-444e-8f17-454564a196f9

Jessup, Kaye                  CONFIDENTIAL              February 14, 2008

Page 26

1    Q.  Okay.  What was his explanation?
2    A.  That we do not set AWP, that the
3  difference is -- the spread is the difference
4  between AWP and what a business would be reimbursed
5  by a third party --
6    Q.  Okay.
7    A.  -- government, someone.  And that's
8  what's called the spread.
9    Q.  Okay.  Now, before you worked for Abbott,
10  you worked in private industry, correct?
11    A.  Yes.
12    Q.  And they had government contracts for
13  some of the patients, correct?
14    A.  Medicare?
15    Q.  Yes.
16    A.  Yes.
17    Q.  And you are aware that just because your
18  company paid a certain amount for a certain product
19  that was -- or drug that was passed on to a
20  patient, Medicare or Medicaid might reimburse you
21  at a different rate, correct?
22        MR. LEWIS:  Object to form.

Page 27

1    A.  I was not aware of that.
2    Q.  (By Mr. Black) Okay.  So your experience
3  in private industry was that if Baylor, for
4  example, paid $3.50 for an item, that they would
5  always be reimbursed $3.50 by Medicare or Medicaid?
6        MR. LEWIS:  Object to form.
7    A.  I was not aware of any of the
8  reimbursement information.
9    Q.  (By Mr. Black) Okay.
10    A.  Because I did not work in that area.
11    Q.  Okay.  But -- and as I understand, you
12  have a master's degree in nutrition?
13    A.  Public health.
14    Q.  Public health, okay.
15    A.  Uh-huh.
16    Q.  And in any of your -- your training in
17  the area of public health -- and I know it's been a
18  while. It's been a while since all of us have been
19  to school except for my colleague here. You did
20  not discuss the difference between what Medicare or
21  Medicaid might pay and the actual cost of providing
22  the services or drugs?

Page 28

1    A.  That is correct.
2        MR. LEWIS:  Object to form.
3    Q.  (By Mr. Black) Okay.  And in all your
4  listening to TV and the general media, that had
5  never come to your attention?
6    A.  No.
7    Q.  Okay.  So he explained the spread to you?
8    A.  Uh-huh.
9    Q.  Were you surprised?
10    A.  I wouldn't call it surprised.  It's just
11  informed.
12    Q.  Well, what he informed you of was, at
13  least the allegation was, the people that you sold
14  drugs to were actually being paid a different price
15  than what the price of the drug Abbott was selling
16  it for, correct?
17    A.  Right.
18    Q.  And all along, for years and years, you
19  had always thought that was the same?
20        MR. LEWIS:  Object to form.
21    Q.  (By Mr. Black) Is that correct?
22    A.  Can you say that again?

Page 29

1    Q.  For years you had always thought that the
2  government reimbursed precisely or near what the
3  actual cost was to that entity?
4    A.  I don't know.  I did not work with
5  government contracts.
6    Q.  Okay.  But you did work with nursing
7  homes, for example?
8    A.  No.
9    Q.  I thought you handled nursing homes and
10  institutions at some point in your career.
11    A.  No.
12    Q.  Okay.  What --
13        MR. LEWIS:  I don't understand what
14  you're talking about, Larry.
15        MR. BLACK:  In selling -- selling to
16  companies that ran nursing homes or had nursing
17  home type pharmacies.
18        MR. LEWIS:  Now, are you up to her
19  time with Abbott now or --
20        MR. BLACK:  At any time.
21    A.  Pharmacies that service long-term care
22  facilities?

c2640c25-4e43-444e-8f17-454564a196f9

EXHIBIT 37

Johnson, Deborah L.     CONFIDENTIAL           March 13, 2008
                        Chicago, IL

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------X

In re: PHARMACEUTICAL        )  MDL No. 1456

INDUSTRY AVERAGE WHOLESALE   )  Civil Action No.

PRICE LITIGATION             )  01-12257-PBS

----------------------------X

THIS DOCUMENT RELATES TO:    )  Judge Patti B.

United States of America,    )  Saris

ex rel. Ven-a-Care of the    )

Florida Keys, Inc. v.        )  Magistrate Judge

Abbott Laboratories, Inc.,   )  Marianne B. Bowler

CIVIL ACTION NO. 06-11337-PBS)

----------------------------X


(CAPTIONS CONTINUE ON FOLLOWING PAGE)


CONFIDENTIAL VIDEOTAPED DEPOSITION OF

DEBORAH L. JOHNSON

MARCH 13, 2008

CHICAGO, ILLINOIS

Johnson, Deborah L.    CONFIDENTIAL                March 13, 2008
                  Chicago, IL

Page 78

1    A.  My managers in both the inside sales
2  and then outside sales roles I know had talked
3  about it.  And I believe the trainers, Trudi
4  Burchieri and Dave Rotz as well.  I'm not sure at
5  which time and who did which one, but I know I
6  had received information about AWP not to discuss
7  it from these people.
8    Q.  You indicated that you had received the
9  instruction from your manager when you were a
10  sales rep.  So that would have been Mike Beck; is
11  that right?
12    A.  That's right.
13    Q.  Who was your manager when you were in
14  inside sales?
15    A.  Sherrie Mae.
16    Q.  During any of the times that you were
17  instructed not to discuss AWP, do you recall
18  anyone else asking why it was not allowed?
19    A.  I don't.
20    Q.  Or do you recall anyone explaining to
21  you the reasons that you shouldn't discuss AWP
22  with customers?

Page 79

1    A.  I don't remember.
2    Q.  Even if you don't recall the specific
3  words that someone said, do you recall the
4  general reason why, your understanding of why,
5  you weren't to discuss AWP with customers?
6        MR. SCANNAPIECO:  Objection, form.
7        THE WITNESS:  I don't.
8  BY MS. FORD:
9    Q.  So is it your testimony that you knew
10  not to discuss it but you didn't know why?
11    A.  That's correct.
12    Q.  Did you understand AWP to be something
13  that your customers were interested in?
14        MR. SCANNAPIECO:  Objection, form.
15        THE WITNESS:  No.
16  BY MS. FORD:
17    Q.  They weren't interested in it?
18    A.  One customer was.
19    Q.  Which customer was that?
20    A.  It was I believe a long-term care or
21  home care pharmacy in Oklahoma City.
22    Q.  Do you recall the name of the customer?

Page 80

1    A.  I don't.
2    Q.  How did you know that they were
3  interested in AWP?
4    A.  I was in there asking why they weren't
5  purchasing one of my products that was on their
6  contract, and they said the reason was because
7  our AWP was unfavorable for them.
8    Q.  Do you recall about what year that was?
9    A.  I don't.
10    Q.  Do you recall what the product was?
11    A.  I believe it was vancomycin.
12    Q.  Did you hear other sales reps, any
13  other sales reps that you worked with, indicated
14  that they were also experiencing that situation?
15    A.  No.
16    Q.  How did you respond to the customer?
17    A.  I told him we can't discuss AWP, and
18  that was the end of that conversation.
19    Q.  The time that you received the
20  instruction not to discuss AWP and someone held
21  up a Red Book, had you seen a Red Book before?
22    A.  No.  I had not.

Page 81

1    Q.  Did you ask what is a Red Book?
2    A.  I didn't because they were telling us.
3    Q.  So in that conversation they said this
4  is the Red Book, and did they say what the Red
5  Book was for?
6    A.  They just said it contained AWP prices,
7  and if we saw this from customers that we weren't
8  to discuss it.
9    Q.  And at that time did you understand
10  what AWP meant?
11    A.  I knew it was a price, and that was
12  all.
13    Q.  Did you understand that it stood for
14  average wholesale price?
15    A.  Yes.
16    Q.  Did you also understand that it was a
17  price at which your customers were reimbursed for
18  the products that they purchased from Abbott?
19        MR. SCANNAPIECO:  Objection, form.
20        THE WITNESS:  No.
21  BY MS. FORD:
22    Q.  What did you understand AWP to be used

21 (Pages 78 to 81)

1bb8d343-e4b9-451f-9d2f-580a7b8199f9

Johnson, Deborah L.    CONFIDENTIAL              March 13, 2008
                     Chicago, IL

Page 82

1  for?
2      A.  I didn't.  Again, I knew it was a
3  price, and that was it.
4      Q.  Any of the instructions that you
5  received about not discussing AWP, would you
6  characterize them as firm in tone or direct?
7      A.  Definitely, yes.
8      Q.  Did that cause you to wonder what's the
9  big deal about AWP, you know, why can't we
10 discuss it?
11     MR. SCANNAPIECO:  Objection, form.
12     THE WITNESS:  No.
13 BY MS. FORD:
14     Q.  Did you ask any of your coworkers about
15 AWP?
16     A.  No.
17     MR. SCANNAPIECO:  Objection, form.
18 BY MS. FORD:
19     Q.  After you were promoted to Contract
20 Marketing, did you become more familiar with AWP
21 at that point?
22     MR. SCANNAPIECO:  Objection, form.

Page 83

1      THE WITNESS:  No.
2  BY MS. FORD:
3      Q.  Did you see documents where customers
4  would provide you price lists that would contain
5  AWP for the Abbott products that they were going
6  to purchase?
7      A.  No.
8      Q.  Do you recall anything else about the
9  instructions that you received not to discuss
10 AWP?
11     A.  No.  I do not.
12     Q.  Is it your testimony that you had not,
13 at that point you had not discussed AWP with
14 customers; is that correct?
15     A.  That's correct.
16     Q.  Do you know why Abbott would be
17 repeating this instruction four to five times
18 during the time you were a sales rep if it's not
19 something that you were doing?
20     MR. SCANNAPIECO:  Objection, form.
21     THE WITNESS:  No.  I do not.
22 BY MS. FORD:

Page 84

1      Q.  Did you understand that other sale reps
2  were discussing AWP with customers?
3      A.  No.
4      Q.  You didn't know one way or the other?
5      A.  I didn't know one way or the other.
6      Q.  Did the instruction not to discuss AWP,
7  was that only instruction not to discuss AWP with
8  customers?  Were you allowed to discuss it with
9  you coworkers?
10     A.  We were told not to discuss it with
11 customers.  I don't recall if we were instructed
12 to not talk to coworkers about it, but we didn't.
13     Q.  Did you understand average wholesale
14 price to have something to do with reimbursement?
15     MR. SCANNAPIECO:  Objection, form.
16     THE WITNESS:  When I came into Contract
17 Marketing, I did.
18 BY MS. FORD:
19     Q.  But prior to that time you didn't know
20 what AWP was used for?
21     A.  No.
22     Q.  So were you allowed to talk about

Page 85

1  reimbursement with customers?
2      A.  No.
3      Q.  If you didn't know they were related,
4  how did you know that you weren't supposed to
5  talk about reimbursement with customers?
6      A.  We were told we don't talk about
7  reimbursement, we don't talk about AWP.  We were
8  told not to talk about those things.  So I did
9  not.
10     Q.  Did you think that the instruction not
11 to talk about reimbursement was separate from the
12 instruction not to talk about AWP, or were they
13 all part of the same prohibition?
14     A.  From what I recall, they were separate.
15 Yeah, I think they were separate.
16     Q.  What instruction did you receive, what
17 was the detail of the instruction you received
18 not to discuss reimbursement?
19     A.  I don't recall specifically, I don't
20 recall specifically what we were given or told.
21     Q.  For example, if a customer asked you
22 whether a particular product was reimbursable,

22 (Pages 82 to 85)

1bb8d343-e4b9-451f-9d2f-580a7b8199f9

Johnson, Deborah L.      CONFIDENTIAL              March 13, 2008
                         Chicago, IL

| Page 426 |
|---|

1       MR. SCANNAPIECO: Objection, form.
2       THE WITNESS: No. I was not.
3       MS. FORD: The United States has no
4   further questions at this time and will pass the
5   witness. However, we reserve our right to recall
6   Ms. Johnson based upon Abbott's continuing
7   document production in this case and pending
8   motions to compel documents from Abbott.
9       MR. SCANNAPIECO: Abbott doesn't
10  necessarily agree to reproduce Ms. Johnson for
11  any of the areas of testimony documents that
12  she's testified on today.
13      In addition to that, Abbott would just
14  request that portions of the deposition testimony
15  and exhibits that are related specifically to Ms.
16  Johnson's job performance and/or her individual
17  financial payments from Abbott or her financial
18  relationship to Abbott in the form of stocks and
19  other items be marked "Highly Confidential."
20      We have provided a letter to both the
21  Department of Justice counsel and to the Court
22  Reporter as to that effect.

| Page 427 |
|---|

1       MS. FORD: The United States reserves
2   its right to object to the designation of
3   portions of the transcript as "Confidential" or
4   "Highly Confidential" once it actually obtains
5   the portions that counsel has so designated.
6       MR. SCANNAPIECO: I guess I have one
7   more clarification. Per the protocol outlined in
8   the letter, I don't believe that Abbott will be
9   able to either designate or de-designate any
10  items that were a portion of a production from a
11  third party as I guess those designations have
12  been made by third parties.
13      So any documents that are marked with
14  the Bates stamp, I think that come from either
15  MHA or you identified also a production from
16  GeriMed, I guess Abbott takes no position on
17  that. And I believe that those have already been
18  marked "Confidential." And until another party
19  takes an action, those should remain I guess
20  "Confidential" or "Highly Confidential," but
21  Abbott takes no position on designating them or
22  de-designating them.

| Page 428 |
|---|

1       MS. FORD: The United States agrees and
2   agrees to the extent that a third party has
3   designated a document as "Confidential" or
4   "Highly Confidential," that designation stands
5   and is in no way implicated by the letter
6   provided to counsel or the Court Reporter today.
7       THE VIDEOGRAPHER: We are off the
8   record at 5:40 p.m. with the conclusion of the
9   deposition of Deborah L. Johnson.
10      (WHEREUPON said deposition was so
11  adjourned.)
12
13
14      _____
15      DEBORAH L. JOHNSON
16
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20____.
19
20  _____
21      Notary Public
22

| Page 429 |
|---|

1   STATE OF ILLINOIS )
2   COUNTY OF C O O K )
3       I, Donna M. Kazaitis, RPR, CSR No.
4   084-003145, do hereby certify:
5       That the foregoing deposition of DEBORAH L.
6   JOHNSON was taken before me at the time and place
7   therein set forth, at which time the witness was
8   put under oath by me;
9       That the testimony of the witness and all
10  objections made at the time of the examination
11  were recorded stenographically by me, were
12  thereafter transcribed under my direction and
13  supervision and that the foregoing is a true
14  record of same.
15      I further certify that I am neither counsel
16  for nor related to any party to said action, nor
17  in any way interested in the outcome thereof.
18      IN WITNESS WHEREOF, I have subscribed my name
19  this 24th day of March, 2008.
20
21  _____
22  Donna M. Kazaitis, RPR, CSR 084-003145

108 (Pages 426 to 429)

1bb8d343-e4b9-451f-9d2f-580a7b8199f9

EXHIBIT 38

Peter Karas          HIGHLY CONFIDENTIAL   December 6, 2005
                      Chicago, IL

Page 1

              IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

                        - - -

   In Re:  PHARMACEUTICAL     : MDL DOCKET NO.

   INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION #

   PRICE LITIGATION           :  01CV12257-PBS

   --------------------------------------------

   THIS DOCUMENT RELATES TO:

   ALL ACTIONS

   --------------------------------------------

        CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

             The deposition of PETER KARAS, called

   by the Plaintiffs for examination, taken pursuant

   to the Federal Rules of Civil Procedure of the

   United States District Courts pertaining to the

   taking of depositions, taken before KIMBERLY

   WINKLER CHRISTOPHER, a Notary Public within and

   for the County of Kane, State of Illinois, and a

   Certified Shorthand Reporter of said State, taken

   at 77 West Wacker Drive, Suite 3500, Chicago,

   Illinois, on the 6th day of December, 2005, at

   the hour of 9:12 o'clock a.m.

fb48c03b-3e4f-422b-9eb0-6f29b58eb48e

Peter Karas          HIGHLY CONFIDENTIAL    December 6, 2005
                        Chicago, IL

Page 54

1     THE WITNESS:  Ultimately -- ultimately the
2  business unit that's got profit and loss
3  responsibility for the product offering.
4  BY MR. SIEVERT:
5     Q.  And just so I understand, what are some
6  examples of business units, as you're using the term
7  in that sentence?
8     A.  General manager of drugs and drug delivery.
9     Q.  And you had that position at some time; is
10  that right?
11     A.  Well, whatever position I had from '99 to -
12  - not '99, but '89 -- pardon me -- to 2005.
13     Q.  Sure.
14     A.  1995.
15     Q.  So in that position as general manager of
16  hospital injectable products from '89 to '96, you had
17  the authority to approve contract prices; is that
18  right?
19     A.  Yes.
20     MS. TABACCHI:  Object to the form.
21  BY MR. SIEVERT:
22     Q.  Was your approval required for a contract

Page 55

1  to go into effect?
2     MS. TABACCHI:  Object to the form.
3     THE WITNESS:  Other than -- certain
4  instances, yes; other instances, I would have
5  provided guidelines.
6  BY MR. SIEVERT:
7     Q.  Okay.  In what instances was your approval
8  required for a contract to go into effect?
9     MS. TABACCHI:  Object to the form.
10     THE WITNESS:  New products, major GPO
11  contracts or multiple inputs were received.  But I
12  was ultimately responsible for the final thing, so --
13  BY MR. SIEVERT:
14     Q.  Okay.  What did you mean
15  BY Multiple inputs received?
16     A.  National accounts, contract marketing.
17     Q.  Okay.  Do you mean that there were
18  circumstances in which your input, national accounts,
19  and contract marketing input were all required for a
20  contract to be approved?
21     MS. TABACCHI:  Object to the form.
22     THE WITNESS:  Not in a rubber stamp format,

Page 56

1  but from a standpoint of input.
2  BY MR. SIEVERT:
3     Q.  Okay.  So in those circumstances it's not
4  like there would be a document that exists that shows
5  the name on it or signature on it approving a
6  contract?
7     A.  No.
8     Q.  Okay.
9     A.  Other than the contract signatory from when
10  it's gone out from contract marketing.  I mean, there
11  would be a signatory on the front representing
12  hospital products division as the cosignatory on the
13  contract.
14     Q.  Would that be you?
15     A.  No.
16     Q.  Who would it be?
17     MS. TABACCHI:  Object to the form.
18     THE WITNESS:  It would have been the
19  contract -- whoever was running contract marketing at
20  the time.
21  BY MR. SIEVERT:
22     Q.  Okay.  And you said that there were other

Page 57

1  instances in which you would promulgate guidelines, I
2  guess, about the approval of contract prices; is that
3  right?
4     A.  Yes.
5     Q.  What kind of guidelines would you propose -
6  - did you propose?
7     A.  If supply was limited, I might instruct
8  them to try to raise prices.  If cost had gone up
9  because of raw materials, I might tell -- give them
10  different direction.  If supply was limited, I might
11  give them different direction in terms of, you know -
12  - any unique set of characteristics, I would provided
13  direction.  When I do a plan at the beginning of the
14  year, you might give guidelines that you'd like to
15  try to get your prices up 2 percent.
16     Q.  So far we've been -- in this context we've
17  been talking about the term "contract price."
18     Are there any other terms that you used to
19  describe contract price?
20     A.  No.
21     Q.  Are you familiar with the term "list
22  price"?

15 (Pages 54 to 57)

fb48c03b-3e4f-422b-9eb0-6f29b58eb48e

Peter Karas          HIGHLY CONFIDENTIAL   December 6, 2005
                        Chicago, IL

Page 58

1      A.  Yes.
2      Q.  What is it?
3      A.  It's catalog price.
4      Q.  So do you mean it's the price that's
5   published in catalogs offered by Abbott?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Hospital products, again,
8   please.
9   BY MR. SIEVERT:
10     Q.  Hospital products.
11     A.  It is our catalog published price.
12     Q.  Does hospital products have its own
13  catalogs separate from any other catalogs that are
14  created by Abbott?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  Yes.
17  BY MR. SIEVERT:
18     Q.  How often do those catalogs -- are those
19  catalogs created?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  Generally speaking, annually.
22  BY MR. SIEVERT:

Page 59

1      Q.  Okay.  What's the relationship between list
2   price and contract price?
3          MS. TABACCHI:  Object to the form.
4   BY MR. SIEVERT:
5      Q.  If any.
6      A.  List price would be what a person without a
7   contract would pay.  Contract price would be what a
8   person with a contract would pay.
9      Q.  You said earlier that the overwhelming
10  majority of HPD customers pay the contract price; is
11  that right?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  Yes.
14  BY MR. SIEVERT:
15     Q.  So conversely, very few people pay the list
16  price; is that right?
17         MS. TABACCHI:  Object to the form.
18  BY MR. SIEVERT:
19     Q.  How many customers pay the list price?
20         MS. TABACCHI:  Object to the form.
21  BY MR. SIEVERT:
22     Q.  What was the answer?

Page 60

1      A.  I don't know.
2      Q.  Is list price also called direct price?
3      A.  Not familiar with the term.
4      Q.  Are there any other names that you've heard
5   to -- for the term "list price"?
6      A.  No.
7      Q.  How does HPD determine the list price for
8   its drugs?
9      A.  Since we're in the generic drug business,
10  list price was generally a number less than
11  proprietary product in the range of 20 to 25, 30
12  percent.
13     Q.  Who at HPD determined what the list price
14  for a drug was?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  Initially it would have been
17  the business manager, general manager of the
18  business.
19  BY MR. SIEVERT:
20     Q.  When was that the case, that the general
21  manager of the business --
22     A.  I can only speak to when I was there, I was

Page 61

1   involved in that.
2      Q.  Okay.  So when you were the general manager
3   of hospital injectable products, you determined what
4   the list price of HPD's drugs were to be; is that
5   right?
6      A.  Yes.
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  Yes.
9   BY MR. SIEVERT:
10     Q.  Did you seek anyone's input to determine
11  what the list price of HPD drugs was to be?
12     A.  The marketing people that worked for you at
13  the time would provide input in terms of what the
14  proprietary products list price was, and we'd make a
15  determination from there.
16     Q.  Other than marketing people, was there
17  anyone else that you sought input from in determining
18  what list prices were to be?
19     A.  No, not generally.
20     Q.  How often did you reevaluate the list
21  prices for drugs within the HPD?
22         MS. TABACCHI:  Object to the form.

16 (Pages 58 to 61)

fb48c03b-3e4f-422b-9eb0-6f29b58eb48e

EXHIBIT 39

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL              )

INDUSTRY AVERAGE WHOLESALE  ) MDL No. 1456

PRICE LITIGATION                   ) Civil Action No.

_____)     01-122257-PBS

THIS DOCUMENT RELATES TO:     )

                                   )

United States of America,     )

ex rel. Ven-a-Care of the     )

Florida Keys, Inc., v.        )

Abbott Laboratories, Inc.,    )

and Hospira, Inc.             )

CIVIL ACTION NO. 06-11337-PBS)


***************************************************


ORAL AND VIDEOTAPED DEPOSITION OF

PETER KARAS

August 29th, 2007


***************************************************

EXHIBIT 39

Page 30

1  BY THE WITNESS:
2       A.    It was the price billed to wholesalers
3  when they purchased product, yes.
4  BY MR. ANDERSON:
5       Q.    And, accordingly, were the WAC prices
6  the prices that actually appeared on the invoices
7  from Abbott to the wholesalers?
8            MS. CITERA:  Objection to form.
9  BY MR. ANDERSON:
10      A.    Yes.
11 BY MR. ANDERSON:
12      Q.    Were there any other wholesale prices
13 that you were involved in setting or approving from
14 1988 through 1997?
15      A.    No, sir.
16      Q.    Were you aware of any other wholesale
17 prices from 1988 through 1997?
18      A.    No, sir.
19      Q.    What group of people were involved in
20 setting these WAC prices?
21           MS. CITERA:  Objection to form.
22 BY THE WITNESS:
23      A.    It would have been, you know, myself
24 as a general manager, my marketing people and then
25 contract marketing, as well.

Page 31

1  BY MR. ANDERSON:
2       Q.    Was Mr. Harry Adams involved in this
3  WAC setting or approval process?
4            MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6       A.    He was a conduit to the wholesaler.  I
7  can't recall that he was specifically involved in
8  the setting of those prices.
9  BY MR. ANDERSON:
10      Q.    Do you recall Mr. Adams being involved
11 in the process of notifying wholesalers of new WAC
12 pricing?
13      A.    Yes, sir.
14      Q.    And it's possible that he was involved
15 in the process of setting the prices but you're just
16 not sure; is that correct?
17           MS. CITERA:  Objection to form.
18 BY THE WITNESS:
19      A.    I can't really -- I can't comment to
20 that.
21 BY MR. ANDERSON:
22      Q.    Were there any other prices, other
23 than contract prices and WAC prices, that were set
24 or approved between 1988 and 1997 at Abbott, to your
25 knowledge?

Page 32

1            MS. CITERA:  Objection to the form.
2  BY THE WITNESS:
3       A.    Well, we had price -- there was a list
4  price, as well, that we had.
5  BY MR. ANDERSON:
6       Q.    And were you involved in the setting
7  and approval of list prices?
8       A.    It was my business, but it was not
9  something that I actively managed.
10      Q.    Who did?
11      A.    Basically, it was done primarily by
12 the contracting people on an annual basis, for
13 people that bought direct or did not have contracts
14 with us.
15      Q.    Who was the individual who ultimately
16 approved list prices between 1988 and 1997?
17           MS. CITERA:  Objection to form.
18 BY THE WITNESS:
19      A.    It was in my domain, so ultimately I
20 was responsible.  But it was not something that was,
21 I said, actively managed.
22 BY MR. ANDERSON:
23      Q.    What did you do to manage the list
24 price process?
25           MS. CITERA:  Objection to form.

Page 33

1  BY THE WITNESS:
2       A.    It was just done -- we just normally
3  raised, you know, list prices on an annual basis
4  commensurate with CPI or Consumer Price Index.
5  BY MR. ANDERSON:
6       Q.    Why?
7       A.    There was a subset of customers that
8  would buy product from Abbott and they paid list
9  price.  And it was an entire catalog that included
10 virtually all products that were sold and
11 manufactured by Abbott, hospital products division.
12      Q.    What type of customers were part of
13 this subset that paid list price?
14      A.    I cannot give you a specific customer
15 type, although, they were noncontracted customers,
16 that could be fired departments or, you know, small
17 pharmacies, that type of thing.  Things that were
18 not actively managed as part of the hospital
19 business.
20      Q.    What -- roughly, what percentage of
21 Abbott customers paid list price?
22           MS. CITERA:  Objection to form.
23 BY THE WITNESS:
24      A.    I cannot give you a specific
25 percentage, I'm not aware of a specific percentage.

9  (Pages 30 to 33)

9252e8b8-27ef-4a8b-a9c0-090e7a92b0aa

Page 62

1  exception or a new products, yes.  But on an
2  ongoing, normal basis, probably not.
3  BY MR. ANDERSON:
4      Q.    So who was really making the decision
5  as to what the price increases would be, you or the
6  product managers, such as Mr. Sebree and Ms.
7  Hernandez?
8          MS. CITERA:  Objection to form.
9  BY THE WITNESS:
10     A.    They would make the decisions, and
11  then, ultimately, I would be responsible.
12  BY MR. ANDERSON:
13     Q.    So they would make -- they would make
14  the decision as to what the catalog price should be,
15  and then you would approve it and, ultimately, be
16  responsible for it?
17          MS. CITERA:  Objection to the form.
18  BY THE WITNESS:
19     A.    I was running the business, I was,
20  ultimately, responsible.
21  BY MR. ANDERSON:
22     Q.    And you also mentioned they would, in
23  turn, be in charge of implementing the price change.
24  How would they go about doing that?
25     A.    They would not physically implement

Page 63

1  it.  They would go to contract marketing, and
2  contract marketing would, basically, fill these
3  kinds of forms out and implement it.
4      Q.    And when you're referring to these
5  types of forms, you're talking about --
6      A.    Like this thing, I'm guessing.  I
7  don't know.  Like I said, I'm not sure how forms --
8  how prices were implemented into the system.
9      Q.    You don't know the precise logistics,
10  but you know just conceptually it was done and it
11  looks like to you Exhibit 1160 and 1161 appear to be
12  the standard types of forms that were used to
13  implement the price changes?
14          MS. CITERA:  Objection to form.
15  BY THE WITNESS:
16     A.    In these two instances, yes, sir.
17  BY MR. ANDERSON:
18     Q.    Thank you.  And, just conceptually,
19  big picture, Mr. Karas, if the prices on the
20  hospital products that you managed were typically
21  going down in the market, why was it that you all
22  were taking the inflationary increases each year on
23  the list prices?
24          MS. CITERA:  Objection to form.
25

Page 64

1  BY THE WITNESS:
2      A.    I think I mentioned earlier to you
3  there were a subset of customers that paid list
4  prices, and it was a profitable business, and we
5  routinely raised the prices.
6  BY MR. ANDERSON:
7      Q.    And I don't want to belabor your prior
8  testimony, but given that no effort was made to
9  ascertain the level of list price sales, if Abbott
10  had determined that the level of list price sales
11  was extremely small, for instance, around one
12  percent or less, would that have impacted your
13  decision to approve annual price increases on the
14  products you were responsible for?
15          MS. CITERA:  Object to the form.
16  BY THE WITNESS:
17     A.    Like I mentioned earlier to you, you
18  know, even a small number, when you're running a
19  business is of value.  And a million dollars is a
20  million dollars.
21          And so, you know, that made it
22  worthwhile.
23  BY MR. ANDERSON:
24     Q.    So, in your view, even sales of one
25  percent or less, would justify annual price

Page 65

1  increases to garner that incremental revenue?
2          MS. CITERA:  Objection to the form.
3  BY THE WITNESS:
4      A.    Well, if you're running the business
5  and it's a profitable business, you try to maintain
6  it.
7  BY MR. ANDERSON:
8      Q.    Did you ever consider what the impact
9  was of Abbott's publication of these catalog prices?
10     A.    No, sir.
11          MS. CITERA:  Objection to the form.
12  BY MR. ANDERSON:
13     Q.    Did Mr. Adams ever explain to you that
14  these catalog prices were being published to price
15  reporting services, such as First Data Bank and
16  Red Book?
17     A.    No, sir.
18          MS. CITERA:  Objection as to form.
19  BY MR. ANDERSON:
20     Q.    Did Ms. Cicerale ever explain to you
21  that these catalog prices were being published to
22  pricing services, such as First Data Bank and
23  Red Book?
24     A.    No, sir.
25          MS. CITERA:  Objection to form.

17  (Pages 62 to 65)

9252e8b8-27ef-4a8b-a9c0-090e7a92b0aa

Page 346

```
 1      Q.    So FEB is February?
 2      A.    Yes, sir.
 3      Q.    Okay.
 4            And the last column that's
 5 weighted average, do you know what that calculates?
 6      A.    I'm guessing -- not guessing.  But it
 7 was a percentage of sales each of these groups
 8 represents, and then it's a weighted average of what
 9 our group average selling price is for this specific
10 product group.
11      Q.    And are you -- the ASP calculations,
12 are you familiar with the underlying basis -- let me
13 clarify that.
14            Are you familiar with the way ASP
15 is calculated on this chart?
16            MS. CITERA:  Objection to the form.
17 BY THE WITNESS:
18      A.    On this product, I'm not sure what's
19 included in the Dobutamine category.
20 BY MR. LAVINE:
21      Q.    Do you know who would perform these
22 calculations?
23      A.    For these documents, most likely it
24 would have been our financial analyst.
25      Q.    Is that financial analyst particular
```

Page 347

```
 1 to your unit?
 2      A.    Each business unit had a financial
 3 analyst that worked on their products and did plans
 4 and updates and monthly summaries.
 5      Q.    Do you remember who that was in March
 6 of 1995?
 7      A.    No, sir, I don't.
 8      Q.    But it would have been somebody within
 9 the hospital injectables business unit?
10      A.    It would have been somebody in --
11 within the hospital products division.
12      Q.    Part -- part of the separate financial
13 unit within --
14      A.    It was part of the controllers
15 organization, sir.
16            MR. LAVINE:  Okay.  Thank you.
17            THE WITNESS:  Is this it?
18            THE VIDEOGRAPHER:  This marks the end
19 of today's deposition of Pete Karas.  Going
20 off the record, the Time is now 5:08 p.m.
21            MS. CITERA:  We'll review.
22            FURTHER DEPONENT SAITH NAUGHT.
23
24
25
```

Page 348

```
 1            Cause No. D-1-GV-04-001286
 2 THE STATE OF TEXAS      ) IN THE DISTRICT COURT OF
 3 Ex rel.          )
 4    VEN-A-CARE OF THE   )
 5    FLORIDA KEYS, INC.  )
 6            Plaintiffs, )
 7 v.                ) TRAVIS COUNTY, TEXAS
 8 ABBOTT LABORATORIES INC.,)
 9 ABBOTT LABORATORIES, and )
10 HOSPIRA, INC.      )
11            Defendants. ) 201st JUDICIAL DISTRICT
12      I hereby certify that I have read the
13 foregoing transcript of my deposition given at the
14 time and place aforesaid, consisting of Pages 1 to
15 347, inclusive, and I do again subscribe and make
16 oath that the same is a true, correct and complete
17 transcript of my deposition so given as aforesaid,
18 and includes changes, if any, so made by me.
19
20            PETE KARAS
21 SUBSCRIBED AND SWORN TO before me
22 this      day of        , A.D. 200 .
23
24      Notary Public
25         WITNESS ERRATA SHEET   Page #1
```

Page 349

```
 1            Cause No. D-1-GV-04-001286
 2 THE STATE OF TEXAS      ) IN THE DISTRICT COURT OF
 3 Ex rel.          )
 4    VEN-A-CARE OF THE   )
 5    FLORIDA KEYS, INC.  )
 6            Plaintiffs, )
 7 v.                ) TRAVIS COUNTY, TEXAS
 8 ABBOTT LABORATORIES INC.,)
 9 ABBOTT LABORATORIES, and )
10 HOSPIRA, INC.      )
11            Defendants. ) 201st JUDICIAL DISTRICT
12      I wish to make the following changes for the
13 following reasons:
14 Page   Line
15 ____   ____   Change: _____
16            Reason: _____
17 ____   ____   Change: _____
18            Reason: _____
19 ____   ____   Change: _____
20            Reason: _____
21 ____   ____   Change: _____
22            Reason: _____
23
24 Signed _____
25
```

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

```
                                                Page 350
1          WITNESS ERRATA SHEET   Page #2
2          Cause No. D-1-GV-04-001286
3  THE STATE OF TEXAS     ) IN THE DISTRICT COURT OF
4  Ex rel.          )
5     VEN-A-CARE OF THE   )
6     FLORIDA KEYS, INC.  )
7          Plaintiffs, )
8  v.              ) TRAVIS COUNTY, TEXAS
9  ABBOTT LABORATORIES INC.,)
10 ABBOTT LABORATORIES, and )
11 HOSPIRA, INC.       )
12      Defendants. ) 201st JUDICIAL DISTRICT
13   I wish to make the following changes for the
14 following reasons:
15 Page   Line
16 ____  ____  Change: _____
17         Reason: _____
18 ____  ____  Change: _____
19         Reason: _____
20 ____  ____  Change: _____
21         Reason: _____
22 ____  ____  Change: _____
23         Reason: _____
24
25 Signed _____
```

```
                                                Page 352
1          WITNESS ERRATA SHEET   Page #4
2          Cause No. D-1-GV-04-001286
3  THE STATE OF TEXAS     ) IN THE DISTRICT COURT OF
4  Ex rel.          )
5     VEN-A-CARE OF THE   )
6     FLORIDA KEYS, INC.  )
7          Plaintiffs, )
8  v.              ) TRAVIS COUNTY, TEXAS
9  ABBOTT LABORATORIES INC.,)
10 ABBOTT LABORATORIES, and )
11 HOSPIRA, INC.       )
12      Defendants. ) 201st JUDICIAL DISTRICT
13   I wish to make the following changes for the
14 following reasons:
15 Page   Line
16 ____  ____  Change: _____
17         Reason: _____
18 ____  ____  Change: _____
19         Reason: _____
20 ____  ____  Change: _____
21         Reason: _____
22 ____  ____  Change: _____
23         Reason: _____
24
25 Signed _____
```

```
                                                Page 351
1          WITNESS ERRATA SHEET   Page #3
2          Cause No. D-1-GV-04-001286
3  THE STATE OF TEXAS     ) IN THE DISTRICT COURT OF
4  Ex rel.          )
5     VEN-A-CARE OF THE   )
6     FLORIDA KEYS, INC.  )
7          Plaintiffs, )
8  v.              ) TRAVIS COUNTY, TEXAS
9  ABBOTT LABORATORIES INC.,)
10 ABBOTT LABORATORIES, and )
11 HOSPIRA, INC.       )
12      Defendants. ) 201st JUDICIAL DISTRICT
13   I wish to make the following changes for the
14 following reasons:
15 Page   Line
16 ____  ____  Change: _____
17         Reason: _____
18 ____  ____  Change: _____
19         Reason: _____
20 ____  ____  Change: _____
21         Reason: _____
22 ____  ____  Change: _____
23         Reason: _____
24
25 Signed _____
```

```
                                                Page 353
1  STATE OF ILLINOIS )
2            ) SS:
3  COUNTY OF COOK   )
4       I, SHARON BERKERY, a Notary Public within
5  and for the County of Cook, State of Illinois, and a
6  Certified Shorthand Reporter of said state, do
7  hereby certify:
8       That previous to the commencement of the
9  examination of the witness herein, the witness was
10 duly sworn to testify the whole truth concerning the
11 matters herein;
12      That the foregoing deposition transcript
13 was reported stenographically by me, was thereafter
14 reduced to typewriting under my personal direction
15 and constitutes a true record of the testimony given
16 and the proceedings had;
17      That the said deposition was taken before
18 me at the time and place specified;
19      That I am not a relative or employee of
20 attorney or counsel, nor a relative or employee of
21 such attorney or counsel for any of the parties
22 hereto, nor interested directly or indirectly in the
23 outcome of this action.
24      IN WITNESS WHEREOF, I do hereunto set
25 my hand and affix my seal of office at Chicago,
```

89 (Pages 350 to 353)

```
                                          Page 354
1     Illinois, this 10th day of September, 2007.
2
3
4
5
6          Notary Public, Cook County,
7          Illinois.
8          My commission expires 7/22/2010.
9
10    C.S.R. Certificate No. 84-4327
11
12
13          Q & A TIME
14    Mr. Anderson - 4 hours, 35 minutes
15    Mr. Lavine   - 1 hour, 5 minutes
16    Mr. Sisneros - 17 minutes
17
18
19
20
21
22
23
24
25
```

FREDERICKS–CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

9252e8b8-27ef-4a8b-a9c0-090e7a92b0aa

EXHIBIT 40

Page 1

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS


    IN RE:  PHARMACEUTICAL

    INDUSTRY AVERAGE WHOLESALE

    PRICE LITIGATION                MDL NO. 1456

    -------------------------

                                Civil Action No.:

    THIS DOCUMENT RELATES TO:       01-12257-PBS

    United States of America,       Judge Patti B. Saris

    ex rel. Ven-a-Care of the

    Florida Keys, Inc., v. Abbott   Magistrate Judge

    Laboratories, Inc., CIVIL       Marianne B. Bowler

    ACTION NO. 06-11337-PBS

    -----------------------------------

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

                    (Cross Notice)

    IN RE:  PHARMACEUTICAL

    INDUSTRY AVERAGE WHOLESALE

    PRICE LITIGATION                MDL NO. 1456

    -------------------------

87216745-be25-41be-bd3d-868c90bf83c7

Kassak-Weiss, Lisa - Vol. I                     March 25, 2008
                        Tampa, FL

---

Page 126

1       MR. DEMONTE:  Objection to the form.
2       A.  For the most part, yes.
3       Q.   Why do you think in this time frame the
4   solutions and equipment business seems to be
5   popping up so frequently on your weekly reports?
6       A.   Well, it was specific to Amerinet.  They
7   might have had a new agreement just launched; and
8   while I was calling on the account, in order to
9   represent Abbott's agreement, which not only
10  included Ultane and Anzemet but also included
11  solutions and equipment, while I was there, I would
12  let them know of it.
13      Q.   Have you ever heard the term "spread"
14  used in connection with reimbursement for drugs?
15      A.   I've heard of it.
16      Q.   What do you understand it to mean?
17      A.   The amount of money that they would be
18  reimbursed for for the drug less what they spend to
19  acquire it.
20      Q.   Did you ever have any understanding that
21  Abbott had some unusually high spreads on certain
22  drugs?

Page 127

1       A.  No.
2       Q.   Did you ever have any understanding that
3   some other manufacturer had unusually high spreads
4   on certain drugs?
5       A.  No.
6       Q.   Did you ever find out what the AWP was of
7   any of the anesthesia drugs that you were selling?
8       A.  No.
9       Q.   Did you ever find out what the wholesale
10  acquisition cost was for any of the anesthesia
11  drugs you were selling?
12      A.  No.  I know what the wholesaler billed
13  the customer, but I don't know what the wholesale
14  acquisition cost was.
15      Q.   So you didn't know how much the
16  wholesaler paid Abbott to acquire the drugs --
17      A.  No.
18      Q.   -- is that correct?
19      MS. OBEREMBT:  I'd like to have this
20  marked as
21  Exhibit 16.
22      (Exhibit Kassak-Weiss 016 was marked for

Page 128

1   identification.)
2       MR. DEMONTE:  Thanks.
3       THE WITNESS:  Thank you.
4   BY MS. OBEREMBT:
5       Q.   Would you please review Exhibit 16, which
6   is a week-ending report dated April 17th, 1999,
7   with your name on the left, and it appears to have
8   been faxed on April 19th, 1999.
9       A.   Uh-huh.
10      THE VIDEOGRAPHER:  Do you want to change
11  the tape now?
12      MS. OBEREMBT:  Sure.  We're going to go
13  off the record and change the tape now while you're
14  looking at the document.
15      THE VIDEOGRAPHER:  We're going off the
16  video record.  It's 1:40 p.m.
17      (Pause)
18      THE VIDEOGRAPHER:  We're on the video
19  record. It's 1:42 p.m.
20  BY MS. OBEREMBT:
21      Q.   Have you had a chance to review Exhibit
22  16?

Page 129

1       A.   Yes.
2       Q.   Does this look like another one of your
3   weekly reports?
4       A.   Yes.
5       Q.   Would you look at Bullet Point No. 2
6   where you discussed in the spreadsheet for a
7   customer called North Point Surgery Center.
8       A.   Yes.
9       Q.   What were you attempting to do in the
10  spreadsheet there?
11      A.   To identify which of the Abbott IV sets
12  would be equivalent to their sets that they were
13  currently using that were manufactured by Baxter
14  and to list the price that was available to them
15  off the Amerinet contract.
16      Q.   Did you know what price Baxter was
17  offering them?
18      A.   I don't know.  They may have told me; I
19  don't know.
20      Q.   Did customers sometimes tell you what
21  prices they were getting from a competitor --
22      A.   Yes.

33 (Pages 126 to 129)

87216745-be25-41be-bd3d-868c90bf83c7

Kassak-Weiss, Lisa - Vol. I                    March 25, 2008
                        Tampa, FL

---

Page 198

1  specialist for, I think -- and I was the only
2  anesthesia specialist for about a year.  So the
3  other districts did not have these right away.
4      Q.  But they did incorporate the anesthesia
5  specialist later on in the other districts?
6      A.  Yes.
7        MR. SISNEROS:  Okay.  I don't have any
8  other questions.
9        MR. DEMONTE:  At this time I would like
10  to mark as Exhibit 29, Kassak-Weiss 29, a March
11  25th, 2008, letter to all counsel and all court
12  reporting staff advising that Abbott Laboratories
13  is requesting that portions of the deposition
14  transcript and/or exhibits to the deposition of
15  Lisa Kassak-Weiss containing -- and there are
16  different categories of information, certain
17  information will be deemed confidential or should
18  be deemed confidential, and Certain information
19  should be deemed highly confidential.
20        I would just request that the court
21  reporting staff review this exhibit, and I've
22  provided a copy to the government, who is here, and

---

Page 199

1  Mr. Sisneros is here via phone. Other than that, we
2  have no questions.
3        THE VIDEOGRAPHER:  We're going off the
4  video record.  It's 4:09 p.m.
5        THE REPORTER:  Would you like to read or
6  waive?
7        MR. DEMONTE:  No.  We never waive.
8        (Discussion off the record.)
9        THE VIDEOGRAPHER:  We're on the video
10  record. It's 4:10 p.m.
11        MR. DEMONTE:  We're back on the record.
12  This is Mark DeMonte.  I inadvertently labeled the
13      March 25th, 2008, letter as Exhibit 29.  It
14  should be Kassak-Weiss Exhibit 28.
15        (Exhibit Kassak-Weiss 028 was marked for
16      identification.)
17        THE VIDEOGRAPHER:  Now we're going to go
18  off the video record.  It's 4:10 p.m.
19        (Statement of counsel concluded at 4:10 p.m.)
20
21
22

---

Page 200

1
2
3
4  _____
5      LISA KASSAK-WEISS
6
7      SUBSCRIBED AND SWORN before and to me this
8  day of _____, 2008.
9
10
11
12
13
14
15  _____
16      NOTARY PUBLIC
17
18
19
20
21
22  My Commission expires:

---

Henderson Legal Services, Inc.
202-220-4158                www.hendersonlegalservices.com

87216745-be25-41be-bd3d-868c90bf83c7