# EXHIBIT 41

Kelly, Dennis - Vol. I                    March 26, 2008
                    Hartford, CT

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

v.                            )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - -


(cross captions appear on following pages)


Videotaped deposition of DENNIS KELLY

Volume I

Hartford, Connecticut

Wednesday, March 26, 2008

    9:12 a.m.

5a076ac6-b203-4f6e-879a-e6bd7295970c

Kelly, Dennis - Vol. I                          March 26, 2008
                    Hartford, CT

Page 90

1    A   No.
2    Q   If you could turn to the next page,
3  please.  Under the heading "Invoice Analysis," I
4  believe it's the fourth sentence down that begins
5  with "These suggestions are made."
6        Can you find that sentence for me,
7  please?
8    A   Yes.
9    Q   And it reads, "These suggestions are made
10  to save money through lower contract pricing or
11  increase revenue through better spread between AWP
12  and contract price."
13        Did I read that sentence correctly?
14    A   Yes.
15    Q   What does that sentence mean to you?
16    A   I really don't know.
17        I'm not familiar with this document, so I
18  can't -- can't say what they meant by it.
19    Q   I understand that you've never seen this
20  document before.
21        And what I'm asking is your understanding
22  of what that sentence means?

Page 91

1        MR. SCANNAPIECO:  Objection to
2        form.
3    A   I don't really -- I don't really
4  know.
5  BY MS. STRAWN:
6    Q   Does the term "better spread between AWP
7  and contract price," does that phrase, just that
8  phrase alone, mean anything to you?
9        MR. SCANNAPIECO:  Objection to
10        form.
11    A   Not specifically, no.
12  BY MS. STRAWN:
13    Q   Generally?
14    A   No.
15    Q   Well, you told me earlier that you have an
16  understanding of what the term "AWP" is.
17        Right?
18    A   Right, I do.
19    Q   And what is that?
20    A   Average wholesaler price.
21    Q   Have you ever heard the term "spread"
22  before?

Page 92

1    A   I have heard it on occasion from a
2  customer.
3    Q   In what context did you hear it from a
4  customer?
5    A   In the context that they may not have been
6  buying one of my products because of AWP and
7  spread.
8    Q   And what did you understand that to
9  mean?
10    A   I didn't know exactly what that
11  meant.  All I knew was that that was something AWP
12  was something that we could not discuss and that was
13  against Abbott policy.
14        So anytime that ever came up, we would
15  have to say that we don't get involved in it, we
16  don't set it, and move on to another topic.
17    Q   Why is that?
18    A   Because we had -- because Abbott's policy
19  was that we were not to discuss AWP or reimbursement
20  issues with customers.
21    Q   And why?
22        MR. SCANNAPIECO:  Objection to

Page 93

1        form.
2    A   I don't know.  All I can say is that was
3  the Abbott policy.
4        And we were told that if we violated that
5  policy that there would be consequences for
6  that, up to and including termination.
7  BY MS. STRAWN:
8    Q   Termination for -- a penalty for
9  what?
10        I'm sorry.
11    A   Discussing reimbursement issues with
12  customers.
13    Q   And so if a customer raised the issue with
14  you, what did you -- how did you respond?
15    A   I would respond that that's something that
16  I have nothing to do with, that the company has
17  nothing to do with, and that we don't -- we don't
18  set that and we can't discuss it.
19    Q   Did you respond in any other fashion?
20    A   No, that's the way I would respond.
21    Q   Did you ever say anything else?
22        MR. SCANNAPIECO:  Objection to

24  (Pages 90 to 93)

5a076ac6-b203-4f6e-879a-e6bd7295970c

Kelly, Dennis - Vol. I                    March 26, 2008
                        Hartford, CT

Page 350

```
1
2
3
4
5        _____
6            DENNIS KELLY
7
8    Subscribed and sworn to
9    _____.
10   Before me this _____ day of _____,
11   2008.
12
13
14
15
16   _____
17   Notary Public
18   My Commission Expires:
19
20
21
22
```

Page 351

```
1          C E R T I F I C A T E
2        I hereby certify that I am a Notary Public,
3    in and for the State of Connecticut, duly
4    commissioned and qualified to administer oaths.
5        I further certify that the deponent named in
6    the foregoing deposition was by me duly sworn, and
7    thereupon testified as appears in the foregoing
8    deposition; that said deposition was taken by me
9    stenographically in the presence of counsel and
10   reduced to typewriting under my direction, and the
11   foregoing is a true and accurate transcript of the
12   testimony.
13        I further certify that I am neither of
14   counsel nor attorney to either of the parties to
15   said suit, nor am I an employee of either party to
16   said suit, nor of either counsel in said suit, nor
17   am I interested in the outcome of said cause.
18        Witness my hand and seal as Notary Public
19   this _____ day of _____ , 2008.
20              Clifford Edwards
21              Notary Public
22   My commission expires:  9/30/2011
```

89 (Pages 350 to 351)

5a076ac6-b203-4f6e-879a-e6bd7295970c

# EXHIBIT 42

```
                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


   In re:  PHARMACEUTICAL          )
   INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
   PRICE LITIGATION                ) Civil Action No.
                                   )    01-12257-PBS
                                   )
   THIS DOCUMENT RELATES TO:       )
                                   )
   United States of America,       ) Hon. Patti Saris
   ex rel. Ven-a-Care of the       )
   Florida Keys, Inc., v.          )
   Abbott Laboratories, Inc.,      )
   and Hospira, Inc.               )
   CIVIL ACTION NO. 06-11337-PBS   )



   *******************************************************

                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


   IN RE:  PHARMACEUTICAL          )
   INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
   PRICE LITIGATION                ) Civil Action No.
                                   )    01-CV-12257-PBS
                                   )
   THIS DOCUMENT RELATES TO:       )
                                   ) Judge Patti B. Saris
   State of Arizona v. Abbott      )
   Labs., et al.                   )
   Civil Action No. 06-CV-11069-PBS )



   *******************************************************
             ORAL AND VIDEOTAPED DEPOSITION OF
                      CLIFFORD KRAJEWSKI
                        April 26, 2007


                        CONFIDENTIAL

   *******************************************************
```

Page 114

1    Q.  And what did Michael Heggie tell you about
2  the spread?
3    A.  That that was -- I left the meeting with the
4  understanding that that was a component of their
5  reimbursement.
6    Q.  Now, the meeting that you're referring to, is
7  the meeting you had with Michael Heggie to follow up
8  on Susan Rhodus' questions; is that correct?
9    A.  Yes.
10   Q.  Okay.  And I just want to be clear that was
11 approximately at the beginning of your tenure as a NAM
12 in 1990; is that correct?
13   A.  That is an accurate statement.
14   Q.  And when you said that Michael Heggie
15 explained to you that it was a component of their
16 spread, who did you mean when you said "their"?
17        MR. WINCHESTER:  Objection,
18 mischaracterizes his testimony.
19   A.  Their would be -- specifically as it related
20 to GeriMed in that conversation with Michael, but I
21 applied that to all other Alternate Site customers as
22 well that were involved in Medicare and Medicaid.
23   Q.  (BY MS. BROOKER)  Why did you apply that to
24 all of their customers?
25   A.  I'm not sure, other than the fact that it

Page 115

1  seemed to be logical.
2    Q.  Okay.  Explain to me how it was logical.
3    A.  Being a GeriMed member was -- was no
4  different than being a nursing home, being a surgery
5  center, being a homecare pharmacy.
6    Q.  How was spread important to the customers --
7        MR. WINCHESTER:  Objection --
8    Q.  (BY MS. BROOKER)  -- from your understanding
9  based on your 25 years at Abbott?
10   A.  My understanding from --
11        MR. WINCHESTER:  Hold on.  Objection,
12 form to speculation.
13        Go ahead.
14   A.  I've shared with you what my understanding
15 of -- of what the spread was, was it was a component
16 of their reimbursement.
17   Q.  (BY MS. BROOKER)  No.  But what I asked this
18 time was based on your 25 years of experience at
19 Abbott, what was your understanding about how spread
20 was important to customers?
21        MR. WINCHESTER:  Objection, form.
22 Speculation.
23   A.  Again, it was a component of their
24 reimbursement.
25   Q.  (BY MS. BROOKER)  How was it used by

Page 116

1  customers?
2        MR. WINCHESTER:  Objection, form.
3  Speculation.
4    A.  I'm not a reimbursement specialist, so I
5  never got involved in that --
6    Q.  (BY MS. BROOKER)  Okay.
7    A.  -- nor do I have working knowledge of it.
8    Q.  What kinds of conversations did you have with
9  customers about spread?
10   A.  I did never have any customer conversations
11 about spread.
12   Q.  Did you have conversation about spread with
13 Susan Rhodus once you spoke to Michael Heggie?
14   A.  No.  The -- my reply to Susan Rhodus was,
15 "You can get the AWP information you're looking for.
16 It's public information and it's been published by the
17 Redbook."
18   Q.  Did other customers at any time after GeriMed
19 ask you questions about average wholesale prices or
20 where they could get access to them?
21   A.  No.  There were no other inquiries made of
22 me.
23   Q.  Okay.  Did you understand that most of your
24 customers knew where to go to to get average wholesale
25 prices?

Page 117

1        MR. WINCHESTER:  Objection, form.
2  Speculation.
3    A.  No.  I don't know what -- what my customers
4  were thinking.  I do know that they weren't asking
5  about it.
6    Q.  (BY MS. BROOKER)  Who -- with whom did you
7  speak about reimbursement issues other than Michael
8  Heggie?
9    A.  John Ward.
10   Q.  John Ward.  Okay.  Who was for a time your
11 direct supervisor, correct?
12   A.  Correct.
13   Q.  And that would have been during the 1994 to
14 July 1996 time period when you were the manager of
15 distributor relations; is that correct?
16   A.  No.  It would have been shortly after I spoke
17 with Susan Rhodus.
18   Q.  Oh, that you then went and spoke to John
19 Ward?
20   A.  Yes.
21   Q.  Okay.  Why did you speak with Michael
22 Heggie -- excuse me, John Ward after Michael Heggie?
23        MR. WINCHESTER:  Objection, form.
24 Mischaracterizes his testimony.  Assumes facts.
25   A.  I -- I spoke with John because I needed

30 (Pages 114 to 117)

c19a21ec-9382-40d2-8a58-8d9f10d7ed74

Page 306

CHANGES AND SIGNATURE

1
2  PAGE    LINE        CHANGE         REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 307

1      I, CLIFFORD KRAJEWSKI, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6                CLIFFORD KRAJEWSKI
7
8
9  THE STATE OF                )
10  COUNTY OF                   )
11    Before me,                     , on this day
12  personally appeared CLIFFORD KRAJEWSKI, known to me
13  (or proved to me under oath or through
14                      ) (description of identity
15  card or other document) to be the person whose name is
16  subscribed to the foregoing instrument and
17  acknowledged to me that they executed the same for the
18  purposes and consideration therein expressed.
19    Given under my hand and seal of office this
20      day of              , 2007.
21
22
23
24                NOTARY PUBLIC IN AND FOR
24                THE STATE OF
25

Page 308

1  STATE OF TEXAS  )
2  COUNTY OF TRAVIS  )
3
4
5      I, CYNTHIA VOHLKEN, CSR #1059, do hereby
6  certify that, pursuant to the agreement hereinabove
7  set forth, there came before me on the 26th day of
8  April, 2007, at 8:03 o'clock a.m., in the offices of
9  Jones Day, 77 W. Wacker, Suite 3500, Chicago,
10  Illinois, the following named person, to-wit:
11  CLIFFORD KRAJEWSKI, who was by me duly sworn to
12  testify to the truth and nothing but the truth of
13  witness' knowledge touching and concerning the matters
14  in controversy in this cause; that such witness was
15  thereupon examined under oath, and the examination
16  transcribed by computer-assisted transcription by me
17  or under my supervision, and that the deposition is a
18  true record of the testimony given by the witness.
19      I further certify that I am neither attorney
20  nor counsel for, nor related to or employed by, any of
21  the parties to the action in which this deposition is
22  taken and, further, that I am not a relative or
23  employee of any attorney or counsel employed by the
24  parties hereto, or financially interested in the
25  action.

Page 309

1      That the amount of time used by each party at
2  the deposition is as follows:
3      Ms. Renee Brooker - 03:39
4      Mr. Raymond Winter - 02:40
5
6      IN WITNESS WHEREOF I have hereunto set my
7  hand on this 11th day of May, A.D. 2007.
8
9
10
11
                Cynthia Vohlken, Texas CSR 1059
12              Expiration Date:  12/31/2008
                Firm Registration No. 82
13              Fredericks-Carroll Reporting
                7800 Shoal Creek Boulevard
14              Suite 200 W
                Austin, Texas 78757
15              Telephone: (512) 477-9911
                        (800) 234-3376
16              Fax:      (512) 345-1417
17
    JOB NO. 232
18
19
20
21
22
23
24
25

78 (Pages 306 to 309)

c19a21ec-9382-40d2-8a58-8d9f10d7ed74

Page 310

```
1              NO. D-1-GV-04-001286
2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                             )
3  ex rel.                   )
     VEN-A-CARE OF THE       )
4    FLORIDA KEYS, INC.,     )
        Plaintiffs,          )
5                            )
   VS.                       ) TRAVIS COUNTY, TEXAS
6                            )
   ABBOTT LABORATORIES INC., )
7  ABBOTT LABORATORIES,      )
   HOSPIRA, INC., and B. BRAUN )
8  MEDICAL INC.,             )
        Defendant(s).        ) 201ST JUDICIAL DISTRICT
9
10        REPORTER'S CERTIFICATION
        DEPOSITION OF CLIFFORD KRAJEWSKI
11            April 26, 2007
12    I, Cynthia Vohlken, Certified Shorthand Reporter
13  in and for the State of Texas, hereby certify to the
14  following:
15    That the witness, CLIFFORD KRAJEWSKI, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony
18  given by the witness;
19    That the deposition transcript was submitted on
20  May 11, 2007, to the witness or to the attorney for
21  the witness for examination, signature and return to
22  me by June 4, 2007;
23
24
25
```

Page 311

```
1     That the amount of time used by each party at the
2  deposition is as follows:
3       Ms. Renee Brooker - 03:39
        Mr. Raymond Winter - 02:40
4
5     That pursuant to information given to the
6  deposition officer at the time said testimony was
7  taken, the following includes counsel for all parties
8  of record:
9
10    MR. RAYMOND WINTER,
        Attorney for Plaintiff State of Texas;
11    MR. JARRETT ANDERSON,
        Attorney for the Relator;
12    MR. JASON WINCHESTER,
        Attorney for Defendants Abbott
13      Laboratories, Inc. and Hospira, Inc.
     MS. RENEE BROOKER,
14      Attorney for Plaintiff United States of
        America
15    MR. CHRISTOPHER STUART,
        Attorney for Plaintiff State of Arizona
16      and MDL Plaintiffs
     MR. ELISEO SISNEROS, Attorney for the
17      State of California
18
19    I further certify that I am neither counsel for,
20  related to, nor employed by any of the parties or
21  attorneys in the actions in which this proceeding was
22  taken, and further that I am not financially or
23  otherwise interested in the outcome of the action.
24
25
```

Page 312

```
1     Further certification requirements pursuant to
2  Rule 203 of TRCP will be certified to after they have
3  occurred.
4     Certified to by me this 11th day of May, 2007.
5
6
7                    [signature] Cynthia Vohlken
8
9              Cynthia Vohlken, Texas CSR 1059
               Expiration Date:  12/31/2008
10             Firm Registration No. 82
               Fredericks-Carroll Reporting
11             7719 Wood Hollow Drive, Suite 156
               Austin, Texas 78731
12             Telephone: (512) 477-9911
                        (800) 234-3376
13             Fax:     (512) 345-1417
14  JOB NO. 2328
15
16
17
18
19
20
21
22
23
24
25
```

Page 313

```
1     FURTHER CERTIFICATION UNDER RULE 203 TRCP
2     The original deposition was/was not returned to
3  the deposition officer on          , 2007;
4     If returned, the attached Changes and Signature
5  page contains any changes and the reasons therefor;
6     If returned, the original deposition was delivered
7  to Mr. Raymond Winter, Custodial Attorney;
8     That $      is the deposition officer's
9  charges to the Plaintiff(s) for preparing the original
10  deposition transcript and any copies of exhibits;
11    That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate
13  was served on all parties shown herein on and filed
14  with the Clerk.
15    Certified to by me this       day of
16         , 2007.
17
18
19
             Cynthia Vohlken, Texas CSR 1059
20           Expiration Date:  12/31/2008
             Firm Registration No. 82
21           Fredericks-Carroll Reporting
             7719 Wood Hollow Drive, Suite 156
22           Austin, Texas 78731
             Telephone: (512) 477-9911
23                    (800) 234-3376
             Fax:     (512) 345-1417
24  JOB NO. 2328
25
```

79 (Pages 310 to 313)

FREDERICKS-CARROLL REPORTING

The AUTHENTICITY of this E-Transcript file is electronically signed using real Legal technology.

c19a21ec-9382-40d2-8a58-8d9f10d7ed74

# EXHIBIT 43

```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL              )
INDUSTRY AVERAGE WHOLESALE          ) MDL No. 1456
PRICE LITIGATION                    ) Civil Action No.
                                    ) 01-12257-PBS
                                    )
THIS DOCUMENT RELATES TO:           )
                                    )
United States of America,           ) Hon. Patti Saris
ex rel. Ven-a-Care of the           )
Florida Keys, Inc., v.              )
Abbott Laboratories, Inc.,          )
and Hospira, Inc.                   )
CIVIL ACTION NO. 06-11337-PBS       )


*******************************************************

                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL              )
INDUSTRY AVERAGE WHOLESALE          ) MDL No. 1456
PRICE LITIGATION                    ) Civil Action No.
                                    ) 01-CV-12257-PBS
                                    )
THIS DOCUMENT RELATES TO:           )
                                    ) Judge Patti B. Saris
State of Arizona v. Abbott          )
Labs., et al.                       )
Civil Action No. 06-CV-11069-PBS    )



*******************************************************

           ORAL AND VIDEOTAPED DEPOSITION OF

                   KARLA KREKLOW

                  June 28, 2007

*******************************************************
```

b22327b2-186b-41d7-8544-5260172fb3f6

Page 54

1    Q.  Okay.  The same with the Loyola University
2  Medical Center account?
3    A.  Yes.
4    Q.  Was it preexisting before you became the Area
5  Business Manager?                              09:50
6    A.  Yes, it was.
7    Q.  And what about the Children's Memorial
8  Medical Center account?
9    A.  Yes, it was.
10   Q.  Okay.  What other major accounts do you    09:50
11 recall in your area that you interfaced with or had
12 responsibility for negotiations with?
13   A.  Advocate.
14   Q.  I'm sorry?
15   A.  Advocate.
16   Q.  Advrocate.  Could you spell it?
17   A.  A-d-v-o-c-a-t-e.
18   Q.  A-d-v-o --
19   A.  C-a-t-e.
20   Q.  C-a-t-e.  Advocate.  Okay.  I thought there  09:51
21 was an "r" in there somewhere.
22          And -- what kind of an account was
23 Advocate?
24   A.  Home infusion.
25   Q.  It was a home infusion pharmacy?        09:51

Page 55

1    A.  Yes.
2    Q.  And where was it located?
3    A.  Downers Grove, Illinois.
4    Q.  I'm sorry.  The first name?
5    A.  Downers Grove.               09:51
6    Q.  Downers Grove?
7    A.  D-o-w-n-e-r-s Grove.
8    Q.  Okay.  And where is Downers Grove, Illinois?
9    A.  It is southwest of O'Hare airport.
10   Q.  Okay.  So it's the Chicago area then?    09:51
11   A.  Correct.
12   Q.  Okay.  And who was it that -- which of your
13 sales reps had the responsibility primarily for the
14 Advocate home infusion account?
15   A.  Chris.                         09:51
16   Q.  Could you explain, please, the home infusion
17 business model.
18   A.  The home infusion business model intended to
19 work with large teaching institutions and assist them
20 in getting into the home infusion business to retain   09:52
21 their patients.
22   Q.  As I understand it, Abbott at one time
23 operated its own Abbott-owned home infusion
24 pharmacies, correct?
25   A.  Correct.                      09:52

Page 56

1    Q.  Did it have three?
2    A.  More.
3    Q.  How many?
4    A.  They had three when I was there.  Prior to
5  when I came on board, there were several, and I do not  09:52
6  know the number.
7    Q.  So by the time you came over to the Home
8  Infusion business unit in January of '96, that number
9  was down to three?
10   A.  Yes.
11   Q.  Where were they located?
12   A.  Chicago, New Jersey and L.A.
13   Q.  Did the Abbott home infusion pharmacies, the
14 Abbott-owned home infusion pharmacies, did they
15 utilize the CHIP system as part of the software that   09:53
16 they had available to them?
17   A.  Yes, they did.
18   Q.  Did they utilize any other computer program,
19 software program, that would identify product
20 information, pricing information besides the CHIP      09:53
21 system?
22   A.  Not to my knowledge.
23   Q.  Was the CHIP system in place when you came
24 over to Home Infusion in January of '96?
25   A.  Yes, it was.                    09:53

Page 57

1    Q.  Do you recall when Abbott first started up
2  its Home Infusion Services business unit?
3    A.  Either late 1975 or early 1976 to my
4  recollection.
5    Q.  And back in those days, that's when Abbott   09:54
6  was -- the function of the Home Infusion business unit
7  was to operate the Abbott home infusion pharmacies;
8  true?
9    A.  Yes.
10   Q.  Okay.  And at some point in time Abbott made  09:54
11 a decision that instead of competing with other home
12 infusion pharmacies it would enter into partnerships
13 with those home infusion pharmacies; true?
14          MR. WINCHESTER:  Objection, form.
15   A.  It wasn't partnerships, but we entered into a  09:54
16 different business model where we did assist hospitals
17 into getting into the home infusion business.
18   Q.  (BY MR. WINTER)  Okay.  So as part of this
19 business model of assisting hospitals in getting into
20 the home infusion business, Abbott would enter into a   09:54
21 business relationship with those hospitals where
22 Abbott would essentially run that home infusion
23 pharmacy at least in part on behalf of the hospital?
24 Is that a fair characterization?
25   A.  No.                           09:55

15  (Pages 54 to 57)

b22327b2-186b-41d7-8544-5260172fb3f6

Page 266

1  there.
2  Q.  And Mr. Heggie was there when you were in
3  Alternate Site Product Sales?
4  A.  In Home Infusion.
5  Q.  He -- when you were in Alternate Site Product  03:09
6  Sales, Mr. Heggie was in Home Infusion?
7  A.  Yes, he was.
8  Q.  And Chris Snead was somebody who was in
9  Alternate Site Product Sales when you were there,
10  right?                                          03:09
11  A.  Yes, that's true.
12  Q.  Steve Kipperman?
13  A.  Yes.
14  Q.  What kinds of discussions did you have with
15  customers when you were in Home Infusion about   03:09
16  reimbursement and spread issues?
17  A.  I did not have any discussions with regards
18  to that.
19  Q.  I'm sorry?
20  A.  I did not have any discussions with regards  03:09
21  to that.
22  Q.  Ah.  I thought you just told me a minute ago
23  that when you were in Home Infusion you did have
24  discussions with customers --
25  A.  About reim- -- definitely about       03:10

Page 267

1  reimbursement.
2  Q.  Oh, okay.
3  A.  That we offered reimbursement, not what
4  anyone would experience during the reimbursement
5  process.
6  Q.  Well, didn't you make available to your
7  customers in the home infusion area information
8  that -- from which the customers could clearly see
9  what the spread was and how much reimbursement they'd
10  be getting?                                     03:10
11  A.  I don't know what was on the CHIP system.  I
12  never had the CHIP system on my computer; I never
13  operated the CHIP system, nor did I want to.
14  Q.  So you were just completely in the dark about
15  the CHIP system?  You didn't have any idea what it  03:10
16  offered?
17  A.  I knew some of the benefits about inventory
18  management, reimbursement, that they had the forms on
19  it and that you could electronically process the
20  forms, which was a big advantage at that time.   03:10
21  Q.  So you knew that the CHIP system would assist
22  the customers in evaluating their reimbursement,
23  right?
24       MR. WINCHESTER:  Objection, form.
25  A.  It would assist customers in performing their  03:11

Page 268

1  reimbursement.
2  Q.  (BY MR. WINTER)  I'm sorry.  In performing --
3  A.  It would assist customers in performing the
4  reimbursement process.
5  Q.  Okay.  And as part of the portfolio of       03:11
6  serv- -- portfolio of services that Abbott Home
7  Infusion offered to the customers, Abbott would
8  actually take on that task for the customers and do
9  the third-party billing, right?
10  A.  In certain instances, yes, we did.         03:11
11  Q.  When the customer elected to --
12  A.  Have us do it.
13  Q.  -- to purchase that abilit- -- that -- that
14  product, right?
15  A.  Sure.  Exactly.                            03:11
16  Q.  Okay.  I'm showing you now what's marked as
17  Exhibit 294.
18       (Document tendered.)
19  Q.  (BY MR. WINTER)  Ma'am, do you recognize this
20  document?                                       03:11
21  A.  Let me look at it, please.
22       THE REPORTER:  We have to change our
23  videotape.
24       MR. WINTER:  Yeah.
25       THE REPORTER:  Change our videotape,       03:11

Page 269

1  please.
2       THE VIDEOGRAPHER:  The time is now
3  3:12 p.m.  This is the end of Tape 5.  We're going off
4  the record.
5       (Discussion off the record.)            03:14
6       THE VIDEOGRAPHER:  The time is now
7  3:14 p.m.  This is the beginning of Tape 6.  We are
8  back on the record.
9  Q.  (BY MR. WINTER)  All right, ma'am.  I've
10  asked you to take a look at what's been marked as   03:14
11  Exhibit 294.  For the record, it's a multi-page
12  document that was produced from Abbott's business
13  records, and the first Bates page that I have is the
14  second page of the document, TXABT 193771 through
15  TXABT 193787.                                   03:14
16       Do you recognize this, ma'am?
17  A.  Yes, I do.
18  Q.  What is it?
19  A.  It's a sales brochure for Home Infusion
20  service offerings.                              03:14
21  Q.  Okay.  And is this the type of sales material
22  that you would routinely share with your customers and
23  potential customers when you were an Area Business
24  Manager in Home Infusion?
25  A.  This was the brochure that was available when  03:15

68  (Pages 266 to 269)

b22327b2-186b-41d7-8544-5260172fb3f6

Page 270

1  I began as Area Business Manager.  It was later phased
2  out.
3     Q.  And did you have it -- did you update this
4  brochure?
5     A.  We replaced it with a different one.    03:15
6     Q.  Okay.  And did you have a hand in drafting
7  the replacement brochure?
8     A.  No.
9     Q.  Was that done by the marketing department
10 within Home Infusion?                    03:15
11    A.  It was either the marketing department --
12 either they did it or they oversaw it.  They could
13 have hired a firm.  But I don't know which.
14    Q.  And that was the department headed up by
15 Susan Rolf at one time?                  03:15
16    A.  It was the department headed up by her.  I
17 don't know if she did it, because I don't know when
18 this was done.  But like I said, it was in effect when
19 I started.
20    Q.  And how deep into your tenure was it updated? 03:15
21    A.  I'm just thinking of -- there was another
22 Marketing Manager before Susan Rolf.
23    Q.  Okay.
24    A.  So I don't know if she could have done it.
25 But I don't remember her name.  Mary something.   03:16

Page 271

1     Q.  And --
2     A.  What -- what was your second -- what was your
3  question?
4     Q.  My question was how far into your tenure in
5  Home Infusion --
6     A.  Uh-huh.
7     Q.  -- was this updated and replaced?
8     A.  Replaced?
9     Q.  Yes, ma'am.
10    A.  It was -- oh, probably in year two it was    03:16
11 replaced.
12    Q.  So you think sometime around 1998?
13    A.  Yes.  It's possible.
14    Q.  Okay.  So for the time period '96 to '98,
15 when you were the Area Business Manager, this would   03:16
16 have been the material that you would have used in
17 your calls on accounts and potential accounts?
18    A.  Yes.
19    Q.  Okay.  And if you look on the third page of
20 the document, the one with the Bates label 193772 --  03:16
21    A.  Yes.
22    Q.  -- Abbott is advertising that among the
23 products and services that it -- that it will offer
24 are billing and reimbursement services and the Client
25 Home Infusion Program or CHIP integrated information  03:17

Page 272

1  system.
2         Do you see that?
3     A.  Yes.
4     Q.  Okay.  And if you look at the testimonials on
5  the next page --                         03:17
6     A.  Yes.
7     Q.  -- you've got testimonials from Ken
8  Trowbridge from Intermountain Health Care Home
9  Services; Shay Fields from Baylor Home Care in Dallas;
10 Audrey Belk, Presbyterian Home Care; Jennifer       03:17
11 Huppenthal of LHS Home Care -- Home Community Care;
12 Renee Myers.
13        Do you see those?
14    A.  Yes.
15    Q.  Do you recognize those individuals?       03:18
16    A.  I recognize their names.  None of them were
17 my customers.
18    Q.  Who called on Baylor?
19    A.  It was -- I can't tell you the
20 representative's name, but it was under Shirley Beyer. 03:18
21    Q.  Shirley Beyer?
22    A.  Uh-huh.  My counterpart.
23    Q.  And she was one of your co -- one of the
24 three --
25    A.  Yes.  My counterpart.                  03:18

Page 273

1     Q.  -- area sales managers?
2     A.  Yes.
3     Q.  Okay.  Did she also have responsibility for
4  the last one that's listed there, the one in
5  Corpus Christi, Texas?                   03:18
6     A.  I would assume so.  I -- I don't remember
7  specific.  I would assume so.  If it was in Texas, she
8  had it.
9     Q.  And did your other -- your two colleagues,
10 your two counterparts, did they each have three sales  03:18
11 reps reporting to them?
12    A.  I -- approximately.  I can't tell you --
13    Q.  So you had approximately nine or -- I guess
14 12 personnel that were in sales all together?
15    A.  Right.  There was another Area Business    03:18
16 Manager that called on Texas, but I don't know -- I
17 don't remember if that was at the same time Shirley
18 was there or before she came in.  That was Kathy
19 Riddle.  So I don't know -- she could have called on
20 Spohn and Baylor as --                   03:19
21    Q.  Is that the name of it, Spohn?
22    A.  Spohn, uh-huh.
23    Q.  Approximately how many customers all together
24 did Home Infusion Services have?
25    A.  The max that we had when I was there was 28.  03:19

69 (Pages 270 to 273)

b22327b2-186b-41d7-8544-5260172fb3f6

Page 274

1   Q.  Did --
2   A.  Total.  Not all at one time.
3   Q.  So it fluctuated over time, is that --
4   A.  Sure.  Uh-huh.
5   Q.  Okay.  What was the most number of customers   03:19
6   you had at any one given point in time?
7   A.  That I had?  I mean, that we --
8   Q.  That you had as a unit.
9   A.  As I -- as I understand it, 20 -- 22,
10  something like that.  In the 20s.                  03:20
11  Q.  How did Home Infusion Services organize its
12  business records pertaining to those 22 customers?
13  A.  What does that mean?
14  Q.  Well, did you maintain records for each of
15  the -- if you --                                  03:20
16  A.  Yes.
17  Q.  At any one given point in time you had 22
18  customers, right?
19  A.  Yes.
20  Q.  How did the Home Infusion Services Department   03:20
21  organize its record-keeping pertaining to those
22  customers?
23  A.  The sales representative had a file; the Area
24  Business Manager had a file.  We -- if they were -- we
25  were doing reimbursement, we had numerous files, one   03:20

Page 275

1   for each patient.  If we were doing mixing, the
2   pharmacy would have files.
3   Q.  The Abbott pharmacy?
4   A.  Yes.
5   Q.  And was there an electronic file that was     03:20
6   maintained by the reimbursement department, like Ginny
7   Tobiason's department?
8   A.  If it was on CHIP, yes.
9   Q.  Were there some Abbott home infusion
10  customers that were not on CHIP system?           03:21
11  A.  Yes.
12  Q.  How many?
13  A.  I -- again, I can only speak to my -- for
14  myself.  One -- the largest one was called
15  PharmaThera.                                      03:21
16  Q.  PharmaThera?
17  A.  Uh-huh.
18  Q.  How do you spell that?
19  A.  P-h-a-r-m-a-T-h-e-r-a in Memphis.
20  Q.  And they were a home infusion pharmacy?      03:21
21  A.  Yes.
22  Q.  Who were they owned by?
23  A.  Larry Robinson.
24      THE REPORTER:  Larry?
25      THE WITNESS:  Larry Robinson.               03:21

Page 276

1   Q.  (BY MR. WINTER)  And was this an account that
2   was one of your accounts?
3   A.  Yes.  Became one of my accounts.
4   Q.  And -- in other words, did it pre-exist
5   before you -- as an Abbott account before you came   03:21
6   into Home Infusion Services in January, '96?
7   A.  Yes.
8   Q.  So you took over the account?
9   A.  Yes.
10  Q.  Okay.  And they weren't enrolled in the CHIP   03:21
11  system?
12  A.  They -- they did their own reimbursement
13  utilizing the CHIP system.
14  Q.  Okay.  So they purchased the CHIP system from
15  Abbott?  True?                                    03:22
16  A.  They didn't purchase it, but they leased it.
17  Q.  They had a license agreement?
18  A.  Yes, they did.
19  Q.  Okay.  Which means they had access to the
20  CHIP system on their computers?                   03:22
21  A.  Yes, they did.
22  Q.  Okay.  And they utilized the CHIP system in
23  order to process their own reimbursement claims?
24  A.  Yes, they did.
25  Q.  Okay.  So they were not one of the customers   03:22

Page 277

1   where Abbott did the third-party billing on behalf of
2   the customers?
3   A.  That's correct.
4   Q.  But there were other customers for whom
5   Abbott actually did the third-party billing?      03:22
6   A.  Yes.
7   Q.  Okay.  Mr. Sellers testified that for all of
8   the customers that participated in the Home Infusion
9   business model, Abbott shared in the reimbursement
10  proceeds.                                         03:22
11      MR. WINCHESTER:  Objection, form.
12  Q.  (BY MR. WINTER)  Is that consistent with your
13  understanding?
14  A.  I -- I can't guar-- -- I can't be assured of
15  that.  If we did reimbursement, we typically did risk   03:22
16  share.  If we did not do reimbursement, we were paid
17  per diem.
18  Q.  So if you did risk share -- a risk share in
19  your understanding of the way that was used within
20  Abbott Home Infusion Services, that was a situation   03:23
21  where Abbott provided Abbott product to the customers
22  on consignment?
23  A.  Yes.
24  Q.  And Abbott did the third-party billing and
25  collections?                                      03:23

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b22327b2-186b-41d7-8544-5260172fb3f6

Page 358

```
 1
 2
 3
 4
 5     I, KARLA KREKLOW, have read the foregoing
 6  deposition and hereby affix my signature that same is
 7  true and correct, except as noted above.
 8
 9         KARLA KREKLOW
10  THE STATE OF              )
11  COUNTY OF                 )
12    Before me,                           ,
13  on this day personally appeared KARLA KREKLOW,
14  known to me (or proved to me under oath or through
15                          (description of
16  identity card or other document) to be the person
17  whose name is subscribed to the foregoing instrument
18  and acknowledged to me that the executed the same for
19  the purposes and consideration therein expressed.
20    Given under my hand and seal of office this
21  day of              , 2007.
22
23
          NOTARY PUBLIC IN AND FOR
24
          THE STATE OF
25
```

Page 359

```
 1  STATE OF TEXAS )
 2  COUNTY OF TRAVIS )
 3      I, WILLIAM M. FREDERICKS, CSR No. 2392, do
 4  hereby certify that, pursuant to the agreement
 5  hereinabove set forth, there came before me on the
 6  28th day of June, 2007, at 9:03 o'clock a.m., in the
 7  offices of Jones Day, 77 West Wacker Drive,
 8  Suite 3500, Chicago, Illinois, the following named
 9  person, to-wit: KARLA KREKLOW, who was by me duly
10  sworn to testify to the truth and nothing but the
11  truth of witness' knowledge touching and concerning
12  the matters in controversy in this cause; that such
13  witness was thereupon examined under oath, and the
14  examination transcribed by computer-assisted
15  transcription by me or under my supervision, and that
16  the deposition is a true record of the testimony given
17  by the witness.
18      I further certify that I am neither attorney
19  nor counsel for, nor related to or employed by, any of
20  the parties to the action in which this deposition is
21  taken and, further, that I am not a relative or
22  employee of any attorney or counsel employed by the
23  parties hereto, or financially interested in the
24  action.
25      That the amount of time used by each party at
```

Page 360

```
 1  the deposition is as follows:
 2      Mr. Raymond C. Winter - 05:40
 3      Mr. Rand J. Riklin -   00:46
 4
 5      IN WITNESS WHEREOF I have hereunto set my
 5  hand on this 12th day of July, A.D. 2007.
 6
 7
          WILLIAM M. FREDERICKS, Texas CSR 2392
 8     Expiration Date:  12/31/2007
      Firm Registration No. 82
 9     Fredericks-Carroll Reporting
      7800 Shoal Creek Boulevard
10     Suite 200 W
      Austin, Texas 78757
11     Telephone: (512) 477-9911
              (800) 234-3376
12     Fax:      (512) 345-1417
13
      JOB NO. 2494
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 361

```
 1         NO. D-1-GV-04-001286
 2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                              )
 3  ex rel.                   )
      VEN-A-CARE OF THE       )
 4     FLORIDA KEYS, INC.,    )
           Plaintiffs,        )
 5                            )
      VS.                     ) TRAVIS COUNTY, TEXAS
 6                            )
    ABBOTT LABORATORIES INC., )
 7   ABBOTT LABORATORIES,     )
    HOSPIRA, INC., and B. BRAUN )
 8   MEDICAL INC.,            )
          Defendant(s).       ) 201ST JUDICIAL DISTRICT
 9
10        REPORTER'S CERTIFICATION
         DEPOSITION OF KARLA KREKLOW
11            June 28th, 2007
12   I, WILLIAM M. FREDERICKS, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15    That the witness, KARLA KREKLOW, was duly sworn by
16  the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19    That the deposition transcript was submitted on
20  July 12, 2007, to the witness or to the attorney for
21  the witness for examination, signature and return to
22  me by August 2, 2007;
23    That the amount of time used by each party at the
24  deposition is as follows:
25      Mr. Raymond C. Winter - 05:40
```

91 (Pages 358 to 361)

b22327b2-186b-41d7-8544-5260172fb3f6

Page 362

1     That pursuant to information given to the
2  deposition officer at the time said testimony was
3  taken, the following includes counsel for all parties
4  of record:
5         MR. RAYMOND WINTER,
           Attorney for Plaintiff State of Texas;
6       MR. RAND J. RIKLIN,
           Attorney for the Relator;
7       MR. JASON WINCHESTER,
           Attorney for Defendants Abbott
8         Laboratories Inc. and Hospira, Inc.;
        MS. ANN M. ST. PETER-GRIFFITH,
9        Attorney for Plaintiff United States of
          America;
10      MS. AMBER M. NESBITT,
           Attorney for Plaintiff State of Arizona
11        and MDL Plaintiffs;
        MR. ELISEO SISNEROS, Attorney for the
12        State of California;
13    I further certify that I am neither counsel for,
14  related to, nor employed by any of the parties or
15  attorneys in the actions in which this proceeding was
16  taken, and further that I am not financially or
17  otherwise interested in the outcome of the action.
18    Further certification requirements pursuant to
19  Rule 203 of TRCP will be certified to after they have
20  occurred.
21
22
23
24
25

Page 363

1     Certified to by me this 12th day of July, 2007.
2
3
           WILLIAM M. FREDERICKS, Texas CSR 2392
4         Expiration Date:  12/31/2007
          Firm Registration No. 82
5         Fredericks-Carroll Reporting
          7719 Wood Hollow Drive, Suite 156
6         Austin, Texas 78731
          Telephone: (512) 477-9911
7                (800) 234-3376
          Fax:     (512) 345-1417
8
9   JOB NO. 2494 wmf
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 364

1     FURTHER CERTIFICATION UNDER RULE 203 TRCP
2     The original deposition was/was not returned to
3   the deposition officer on August 2, 2007;
4     If returned, the attached Changes and Signature
5   page contains any changes and the reasons therefor;
6     If returned, the original deposition was delivered
7   to Mr. Raymond C. Winter, Custodial Attorney;
8     That $      is the deposition officer's
9   charges to the Plaintiff(s) for preparing the original
10  deposition transcript and any copies of exhibits;
11    That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate
13  was served on all parties shown herein on and filed
14  with the Clerk.
15  Certified to by me this      day of
16         , 2007.
17
18
19
           WILLIAM M. FREDERICKS, Texas CSR 2392
20        Expiration Date:  12/31/2007
          Firm Registration No. 82
21        Fredericks-Carroll Reporting
          7719 Wood Hollow Drive, Suite 156
22        Austin, Texas 78731
          Telephone: (512) 477-9911
23               (800) 234-3376
          Fax:     (512) 345-1417
24
25  JOB NO. 2494 wmf

92 (Pages 362 to 364)

b22327b2-186b-41d7-8544-5260172fb3f6

# EXHIBIT 44

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                              Chicago, IL

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


----------------------------X

In re:  PHARMACEUTICAL        )  MDL No. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  No. 01-12257-PBS

----------------------------X


HIGHLY CONFIDENTIAL


VIDEOTAPED DEPOSITION OF KARLA KREKLOW

FEBRUARY 7, 2008

CHICAGO, ILLINOIS


Videotaped Deposition of KARLA KREKLOW,

at 77 West Wacker Drive, 35th Floor, Chicago,

Illinois, commencing at 9:00 a.m. on Thursday,

February 7, 2008, before Donna M. Kazaitis, RPR,

CSR No. 084-003145.

Kreklow, Karla       HIGHLY CONFIDENTIAL     February 7, 2008
Chicago, IL

Page 70

1  force would be familiar with the terms?
2        MR. WINCHESTER: Objection, form,
3  speculation.
4        THE WITNESS: Yes, they should.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Would you expect that the contract
7  marketing unit would be familiar with the terms
8  of the various contracts that they proposed?
9     A.  Yes.
10       MR. WINCHESTER: Objection,
11  speculation.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  Would anyone within the Hospital
14  Business Sector have any involvement in the
15  negotiation or approval of or putting together
16  the contract proposals?
17       MR. WINCHESTER: Objection, form.
18       THE WITNESS: I don't know that.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  In terms of pricing, where did either
21  your sales force, you, or the contract marketing
22  division, get their pricing information in

Page 71

1  putting together these contract proposals?
2     A.  The salespeople received the pricing
3  information from contract marketing.
4     Q.  Is that Home Infusion contract
5  marketing?
6     A.  Yes.
7     Q.  Do you know where the Home Infusion
8  contract marketing individuals received their
9  pricing information?
10    A.  Where they received it?  I can tell you
11  they developed it based on how much Abbott
12  product was utilized by the client.
13    Q.  And in developing that pricing, do you
14  know what prices for Abbott product they used?
15    A.  I do not.
16    Q.  Did you ever discuss with anyone how
17  they came up with the figures that they did?
18    A.  No.
19    Q.  Would that have been something that
20  would have been important for your sales force to
21  know or for you to know in negotiating these
22  contracts?

Page 72

1     A.  No.
2        MR. WINCHESTER: Objection, form,
3  speculation.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Did you have any other responsibilities
6  during this '96 through 2000 time period when you
7  were the business manager for Home Infusion?
8     A.  No.
9     Q.  What were the business models for Home
10  Infusion?
11       I know the counsel from Texas touched
12  upon that, but I wanted you to explain what were
13  -- first of all, was it more than one business
14  model for Home Infusion during your tenure there?
15       MR. WINCHESTER: Objection, form.
16       THE WITNESS: We had the same products
17  to offer during the time I was there.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Did you have different business models
20  for selling those products?
21    A.  Sure.
22    Q.  What were the business models that you

Page 73

1  used for selling those products?
2     A.  It would depend on what the needs of
3  the customer were.
4     Q.  Well, how many different business
5  models did you have?
6        MR. WINCHESTER: Objection, form.
7        THE WITNESS: It could be an infinite
8  number depending on how many people wanted, if
9  they wanted one item or five items that we
10  offered or two or three of this and two, you
11  know. It's just different.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  When you say "items," do you mean
14  different services that you offered?
15    A.  Yes, yes.
16    Q.  Okay.  Let's start with that.
17    A.  Okay.
18    Q.  During your tenure when you were the
19  business manager in Home Infusion, were all of
20  the contracts consignment arrangements?
21    A.  To my memory, yes.
22    Q.  When I say "consignment arrangements" -

19 (Pages 70 to 73)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                              Chicago, IL

Page 130

1        MR. WINCHESTER:  Well, that's not the
2    federal rules, Ann.  I'm entitled to state a
3    basis for the objection.
4        MS. ST. PETER-GRIFFITH:  When I ask
5    you.
6        MR. WINCHESTER:  One word is not a
7    speaking objection.
8        MS. ST. PETER-GRIFFITH:  Go ahead.
9        MR. WINCHESTER:  No, not when you ask
10   me.  My objections are proper.  Move on.
11   BY MS. ST. PETER-GRIFFITH:
12       Q.  You can answer the question.
13       A.  I do not remember, but that would have
14   more to do with reimbursement, with the
15   reimbursement group than me.
16       Q.  Why do you see it would have more to do
17   with the reimbursement group than you?
18       A.  Are you referring to AWP?
19       Q.  Well, this litigation concerns AWP.
20   But why do you feel that a litigation hold memo
21   concerning this litigation is more properly
22   directed to reimbursement as opposed to your

Page 131

1    sales force?
2        A.  Well, neither I nor the sales force had
3    any AWP information.
4        Q.  Well, you negotiated the contracts;
5    didn't you?
6        A.  Yes.  But that didn't include AWP
7    information.
8        Q.  Let me ask you this:  Did your sales,
9    did the individuals that you were responsible for
10   as well as yourself, did any of you retain
11   records pursuant to a litigation hold memo
12   concerning the AWP litigation?
13       A.  We didn't have anything to retain.
14       Q.  Why do you say you didn't have anything
15   to retain?
16       A.  Because there was no need for us to
17   have any AWP information.
18       Q.  Well, how do you know whether or not
19   your documents were responsive to litigation
20   requests in this matter?
21       A.  How do I know?  Because it didn't
22   mention AWP.  My documents didn't mention AWP.

Page 132

1        Q.  Well, do you know whether a document
2    had to mention AWP in order to be responsive to a
3    litigation hold memo or discovery requests in
4    this case?
5        A.  I wasn't aware of this case until
6    earlier in the year.
7        Q.  So you and your staff then did nothing
8    to preserve records or documents concerning or
9    incident to a litigation hold memo relating to
10   the AWP litigation?
11       A.  Reimbursement would have.  They were
12   the only ones that had AWP information.
13       Q.  But "Yes" or "No," your department did
14   or did not?
15       MR. WINCHESTER:  Objection,
16   speculation.
17       THE WITNESS:  Yes.  They retained it.
18   BY MS. ST. PETER-GRIFFITH:
19       Q.  Yes, your department retained it?
20       A.  Yes.
21       Q.  How do you know your department
22   retained it?

Page 133

1        A.  Because there was a letter that was
2    sent to the managers and possibly the field, I
3    don't remember, instructing that to occur.
4        Q.  What did you and your staff do in order
5    to retain documents after receiving the
6    litigation hold memoranda?
7        A.  I didn't throw anything away.
8        Q.  What did you do with those documents?
9        A.  They went to corporate records.
10       Q.  Did you at any time verify that
11   information was being retained in compliance with
12   the litigation hold memoranda by you or your
13   staff?
14       A.  No.
15       Q.  What kind of computers did you have or
16   did you utilize within the Home Infusion business
17   unit -- let me ask it this way:  Did you have a
18   personal computer on your desk?
19       A.  Yes.
20       Q.  What happened to that computer when you
21   left Home Infusion?
22       A.  It went to salvage.

34  (Pages 130 to 133)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL   February 7, 2008
                      Chicago, IL

Page 346

1     MR. WINCHESTER: Objection, asked and
2  answered.
3     THE WITNESS: No.
4  BY MR. ANDERSON:
5     Q.  Were you or your colleagues ever
6  involved in discussions about AWP?
7     MR. WINCHESTER: Objection, form, asked
8  and answered, speculation.
9     THE WITNESS: With customers?
10 BY MR. ANDERSON:
11    Q.  Yes.
12    A.  No.
13    Q.  Were you involved in internal
14 discussions about AWP?
15    MR. WINCHESTER: Objection, asked and
16 answered.
17    THE WITNESS: Certainly the
18 reimbursement group spoke about it amongst
19 themselves.
20 BY MR. ANDERSON:
21    Q.  Were you ever involved in the setting
22 of a list price?

Page 347

1     A.  No.
2     Q.  Were you ever involved in the setting
3  of an AWP?
4     A.  No one at Abbott is involved in that.
5     Q.  How do you know that?
6     A.  Because we don't set AWP.  No
7  manufacturing company does.
8     Q.  How do you know that?
9     A.  I've been told that.
10    Q.  By who?
11    A.  Mike Sellers.
12    Q.  Other than Mr. Sellers, do you have any
13 information whatsoever that Abbott does not
14 control the setting of AWP?
15    A.  I've seen several documents, but I
16 can't tell you which ones.
17    Q.  Do you recall being involved back in
18 1995 with the setting of the list price on
19 vancomycin?
20    A.  No.  I was not.
21    Q.  You're confident of that?
22    A.  Positive.

Page 348

1     Q.  Do you recall looking at Exhibit 999 in
2  your prior deposition which involved the setting
3  of a list price on vancomycin in 1995?
4     MR. WINCHESTER: Objection, asked and
5  answered.
6     THE WITNESS: I'm not sure which
7  document that is, but I did not set the price for
8  vancomycin or any other product.
9  BY MR. ANDERSON:
10    Q.  Were you involved in the setting of the
11 price?
12    A.  No.
13    Q.  Did you discuss with Mr. Sellers or
14 others at Abbott customer inquiries about changes
15 in AWP on vancomycin in 1995?
16    MR. WINCHESTER: Objection, asked and
17 answered.
18    THE WITNESS: I did in one instance.
19 BY MR. ANDERSON:
20    Q.  And what was that instance?
21    MR. WINCHESTER: Objection, asked and
22 answered.

Page 349

1     THE WITNESS: A customer called Abbott
2  Park and wanted to know why the AWP had changed.
3  And I went over and talked with someone about
4  that.
5  BY MR. ANDERSON:
6     Q.  What customer?
7     A.  I have no idea.
8     Q.  What was the basic focus of your
9  discussion?
10    MR. WINCHESTER: Objection, asked and
11 answered.
12    THE WITNESS: What is AWP, did AWP go
13 up or did it go down.
14 BY MR. ANDERSON:
15    Q.  Who did you talk to?
16    A.  Dave Brincks.
17    Q.  And what did you learn?
18    MR. WINCHESTER: Objection, asked and
19 answered.
20    We spent a long time on this in the
21 first day, Jarrett.
22    THE WITNESS: I eventually learned that

88  (Pages 346 to 349)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

# EXHIBIT 45

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL           )
INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
PRICE LITIGATION                 ) Civil Action
                                 ) No. 01-12257-PBS
                                 )
THIS DOCUMENT RELATES TO:        )
                                 )
United States of America,        ) Hon. Patti Saris
ex rel. Ven-a-Care of the        )
Florida Keys, Inc., v.           )
Abbott Laboratories, Inc.,       )
and Hospira, Inc.                )
CIVIL ACTION NO. 06-11337-PBS    )


*******************************************************

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL           )
INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
PRICE LITIGATION                 ) Civil Action
                                 ) No. 01-CV-12257-PBS
                                 )
THIS DOCUMENT RELATES TO:        )
                                 ) Judge Patti B. Saris
State of Arizona v. Abbott       )
Labs., et al.                    )
Civil Action No. 06-CV-11069-PBS )



*******************************************************

              ORAL AND VIDEOTAPED DEPOSITION OF

                          LYNN LEONE

                        July 18, 2007

*******************************************************

Page 146

1  in the marketplace at list price?
2          MS. CITERA:  Objection to form.
3      A.  I can only speak for during the period of
4  time in the 1990s for what we were doing in Alternate
5  Site Product Sales when I was a part of that group,    11:56
6  which was we were negotiating contracts with customers
7  for the Hospital Products Division prod-- cus- --
8  contract -- products, the entire breadth of the
9  product line, not just drugs; and that in return for
10  those customers giving us a commitment to purchase    11:56
11  those products, there was a price that they -- we were
12  going to give them that was going to be less than
13  catalog price.
14     Q.  (BY MR. WINTER)  Okay.
15     A.  List price.  The catalog list price.    11:56
16     Q.  Okay.  And your experience and, indeed, your
17  expectation would be that for the HPD portfolio of
18  drugs and products, the prevailing market prices were
19  substantially discounted from list price, correct?
20          MS. CITERA:  Objection to form.    11:56
21     A.  I know that there was a difference.  I can't
22  say that it was substantially -- substantially
23  reduced, nor can I speak for the Hospital Products
24  Division in general.  I can only speak for the period
25  of time that I was in Alternate Site Product Sales and    11:57

Page 147

1  what we did during our contract negotiations with
2  customers.
3      Q.  (BY MR. WINTER)  Well, during the time period
4  that you were in Alternate Site Product Sales -- and
5  just so there's no confusion, the products that    11:57
6  Alternate Site Product Sales was marketing and
7  selling, those were HPD products, correct?
8      A.  Correct.
9      Q.  Okay.  So in your experience, during the time
10  period that you were in ASPS, the prices that you    11:57
11  would negotiate with Abbott's customers, those prices
12  deteriorated over time, correct?
13          MS. CITERA:  Objection to form.
14     A.  Each contract that we negotiated for one of
15  our customers was unique unto itself based on the    11:57
16  commitment, what the customer was going to be
17  purchasing and what we were doing with that specific
18  customer.  So -- and almost every one of those
19  contracts had clauses written into them that there
20  was -- we had the ability to take price increases on    11:58
21  anniversaries because they were always -- they were
22  most frequently multi-year contracts.  So I don't know
23  how we can say -- how -- how you can say that they
24  were deteriorating over time.
25     Q.  (BY MR. WINTER)  Okay.  Well, I understand    11:58

Page 148

1  that the specific deal available to a specific
2  customer would be dependent upon the size of the
3  customer and the volume of its purchases of Abbott
4  product, correct?
5      A.  Of the Hospital Products Division products --    11:58
6      Q.  Yes.
7      A.  -- for Alternate Site Product Sales, yes.
8      Q.  As well as their history, their relationship
9  with Abbott and how reliable they are, things of that
10  nature, correct?    11:59
11     A.  Yes, for the hospital product -- for
12  Alternate Site for Hospital Products Division
13  products.
14     Q.  Right.  But isn't it true that for all of
15  Abbott's alternate site customers, the prices at which    11:59
16  you would negotiate for a specific product -- and
17  let's go back to our old friend Vancomycin -- we're
18  going to fall within a pretty narrow range.  One
19  customer, if they are a large-volume purchaser, say,
20  for example, PBI, who, as I understand it, was one of    11:59
21  Abbott's largest customers in ASPS, so they probably
22  moved a lot of product through to their members,
23  correct?
24          MS. CITERA:  Objection to form.
25     A.  PBI was one of the largest customers that    11:59

Page 149

1  Alternate Site Product Sales had, and PBI was a GPO.
2      Q.  (BY MR. WINTER)  Right.
3      A.  They had -- they had a large base of members,
4  and due to that fact, we were -- there was a great
5  deal of business that we felt was there for buying the    12:00
6  Alternate Site Product Sales products.  Because of
7  that, they were able to probably negotiate a better
8  price for us -- with us for those products than
9  another customer who wasn't going to be able to bring
10  as much business.    12:00
11     Q.  Exactly.
12          THE REPORTER:  We have to change our
13  videotape.  I'm sorry.  Stand by, please.
14          THE VIDEOGRAPHER:  The time is
15  11:58 a.m.  This is the end of Tape 3.  We're going
16  off the record.
17          (Recess.)
18          THE VIDEOGRAPHER:  The time is now
19  12:02 p.m.  This is the beginning of Tape 4.  We're
20  back on the record.    12:03
21     Q.  (BY MR. WINTER)  Okay.  Ms. Lelon -- Leone.
22  Pardon me.  I'll try it again.
23          Ms. Leone, you were just describing for
24  me the fact that PBI was -- was a GPO --
25     A.  Uh-huh.    12:03

38  (Pages 146 to 149)

d7ea3c58-a864-4962-9fbc-7b8e869d5479

Page 338

```
1              CHANGES AND SIGNATURE
2    PAGE    LINE              CHANGE   REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 339

```
1
2
3
4
5       I, LYNN LEONE, have read the foregoing deposition
6    and hereby affix my signature that same is true and
7    correct, except as noted above.
8
9            LYNN LEONE
10   THE STATE OF                )
11   COUNTY OF                   )
12     Before me,                          ,
13   on this day personally appeared LYNN LEONE,
14   known to me (or proved to me under oath or through
15                          (description of
16   identity card or other document) to be the person
17   whose name is subscribed to the foregoing instrument
18   and acknowledged to me that the executed the same for
19   the purposes and consideration therein expressed.
20     Given under my hand and seal of office this
21   day of              , 2007.
22
23
         NOTARY PUBLIC IN AND FOR
24
         THE STATE OF
25
```

Page 340

```
1    STATE OF TEXAS )
2    COUNTY OF TRAVIS )
3        I, WILLIAM M. FREDERICKS, CSR No. 2392, do
4    hereby certify that, pursuant to the agreement
5    hereinabove set forth, there came before me on the
6    18th day of July, 2007, at 9:02 o'clock a.m., in the
7    offices of Jones Day, 77 West Wacker Drive, Chicago,
8    Illinois, the following named person, to-wit: LYNN
9    LEONE, who was by me duly sworn to testify to the
10   truth and nothing but the truth of witness' knowledge
11   touching and concerning the matters in controversy in
12   this cause; that such witness was thereupon examined
13   under oath, and the examination transcribed by
14   computer-assisted transcription by me or under my
15   supervision, and that the deposition is a true record
16   of the testimony given by the witness.
17       I further certify that I am neither attorney
18   nor counsel for, nor related to or employed by, any of
19   the parties to the action in which this deposition is
20   taken and, further, that I am not a relative or
21   employee of any attorney or counsel employed by the
22   parties hereto, or financially interested in the
23   action.
24       That the amount of time used by each party at
25   the deposition is as follows:
```

Page 341

```
1        MR. RAYMOND WINTER - 04:31
         MR. JARRETT ANDERSON - 02:05
2
3        IN WITNESS WHEREOF I have hereunto set my
4    hand on this 8th day of August, A.D. 2007.
5
6
7
             WILLIAM M. FREDERICKS, Texas CSR 2392
8            Expiration Date: 12/31/2007
             Firm Registration No. 82
9            Fredericks-Carroll Reporting
             7800 Shoal Creek Boulevard
10           Suite 200 W
             Austin, Texas 78757
11           Telephone: (512) 477-9911
                      (800) 234-3376
12           Fax:     (512) 345-1417
13
     JOB NO. 2529
14
15
16
17
18
19
20
21
22
23
24
25
```

86 (Pages 338 to 341)

FREDERICKS-CARROLL REPORTING

Page 342

```
1            NO. D-1-GV-04-001286
2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                             )
3  ex rel.                   )
   VEN-A-CARE OF THE         )
4  FLORIDA KEYS, INC.,       )
        Plaintiffs,          )
5                            )
   VS.                       ) TRAVIS COUNTY, TEXAS
6                            )
   ABBOTT LABORATORIES INC., )
7  ABBOTT LABORATORIES,      )
   HOSPIRA, INC., and B. BRAUN )
8  MEDICAL INC.,             )
        Defendant(s).        ) 201ST JUDICIAL DISTRICT
9
10       REPORTER'S CERTIFICATION
         DEPOSITION OF LYNN LEONE
11        July 18th, 2007
12    I, WILLIAM M. FREDERICKS, Certified Shorthand
13 Reporter in and for the State of Texas, hereby certify
14 to the following:
15    That the witness, LYNN LEONE, was duly sworn by
16 the officer and that the transcript of the oral
17 deposition is a true record of the testimony given by
18 the witness;
19    That the deposition transcript was submitted on
20 August 8, 2007, to the witness or to the attorney for
21 the witness for examination, signature and return to
22 me by August 29, 2007;
23    That the amount of time used by each party at the
24 deposition is as follows:
25       MR. RAYMOND WINTER - 04:31
```

Page 343

```
1     That pursuant to information given to the
2  deposition officer at the time said testimony was
3  taken, the following includes counsel for all parties
4  of record:
5        MR. RAYMOND WINTER,
            Attorney for Plaintiff State of Texas;
6        MR. JARRETT ANDERSON,
            Attorney for the Relator;
7        MS. TONI-ANN CITERA,
            Attorney for Defendants Abbott
8        Laboratories, Inc. and Hospira, Inc.;
         MS. ANN M. ST. PETER-GRIFFITH,
9           Attorney for Plaintiff United States of
            America;
10       MS. JENNIFER CONNOLLY,
            Attorney for Plaintiff State of Arizona
11          and MDL Plaintiffs;
         MR. ELISEO SISNEROS, Attorney for the
12          State of California.
13    I further certify that I am neither counsel for,
14 related to, nor employed by any of the parties or
15 attorneys in the actions in which this proceeding was
16 taken, and further that I am not financially or
17 otherwise interested in the outcome of the action.
18    Further certification requirements pursuant to
19 Rule 203 of TRCP will be certified to after they have
20 occurred.
21
22
23
24
25
```

Page 344

```
1   Certified to by me this 8th day of August, 2007.
2
3
4
          WILLIAM M. FREDERICKS, Texas CSR 2392
5         Expiration Date: 12/31/2007
          Firm Registration No. 82
6         Fredericks-Carroll Reporting
          7719 Wood Hollow Drive, Suite 156
7         Austin, Texas 78731
          Telephone: (512) 477-9911
8              (800) 234-3376
          Fax:    (512) 345-1417
9
10 JOB NO. 2529
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 345

```
1      FURTHER CERTIFICATION UNDER RULE 203 TRCP
2     The original deposition was/was not returned to
3  the deposition officer on August 29, 2007;
4     If returned, the attached Changes and Signature
5  page contains any changes and the reasons therefor;
6     If returned, the original deposition was delivered
7  to MR. RAYMOND WINTER, Custodial Attorney;
8     That $      is the deposition officer's
9  charges to the Plaintiff(s) for preparing the original
10 deposition transcript and any copies of exhibits;
11    That the deposition was delivered in accordance
12 with Rule 203.3, and that a copy of this certificate
13 was served on all parties shown herein on and filed
14 with the Clerk.
15    Certified to by me this      day of
16       , 2007.
17
18
19
          WILLIAM M. FREDERICKS, Texas CSR 2392
20        Expiration Date: 12/31/2007
          Firm Registration No. 82
21        Fredericks-Carroll Reporting
          7719 Wood Hollow Drive, Suite 156
22        Austin, Texas 78731
          Telephone: (512) 477-9911
23             (800) 234-3376
          Fax:    (512) 345-1417
24
25 JOB NO. 2529
```

87 (Pages 342 to 345)

d7ea3c58-a864-4962-9fbc-7b8e869d5479

# EXHIBIT 46

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

            IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS


    --------------------------------X

    In re:  PHARMACEUTICAL INDUSTRY   )   MDL DOCKET NO.

    AVERAGE WHOLESALE PRICE            )   CIVIL ACTION

    LITIGATION.                        )   01CV12257-PBS

    --------------------------------X


            DEPOSITION OF LYNN E. LEONE

                 JANUARY 17, 2008


         The videotaped deposition of LYNN E.

    LEONE, called by the United States for examination,

    Taken pursuant to subpoena and pursuant to the

    Federal Rules of Civil Procedure for the United

    States District Courts pertaining to the taking of

    depositions, taken before Rachel F. Gard, Certified

    Shorthand Reporter, at 77 West Wacker Drive, Suite

    3500, Chicago, Illinois, commencing at 9:05 a.m. on

    the 17th day of January, A.D., 2008.

Leone, Lynn E.                                          January 17, 2008
                          Chicago, IL

---

Page 194

1  insurers and Medicaid.  Is that also true for
2  Medicare as well?
3         MS. CITERA:  Objection to form.
4  BY THE WITNESS:
5     A.  Children's Memorial had no Medicare
6  patients because they were all kids.
7     Q.  Okay.  Can you explain Item 7, then?
8         MS. CITERA:  Objection to form.
9  BY THE WITNESS:
10    A.  I believe that part of the reason that
11 they changed -- that it was changing was that
12 they wanted to expand their services to be -- to
13 cover more than just children.  So that's why the
14 name was CM Healthcare Resources when previously
15 it had been Children's Memorial.  And they
16 changed it to CM Healthcare Resources so that it
17 wouldn't be just focused on kids, and they were
18 then going to start expanding their home infusion
19 services and try to expand their patient
20 population and not just be focused on a pediatric
21 population.
22    Q.  Okay.  Did Abbott ever use its provider

---

Page 195

1  number to bill Medicare on behalf of CM
2  Healthcare Resources, to your recollection?
3     A.  To my recollection, that never
4  happened.
5     Q.  Okay.  But Abbott did use its provider
6  number to bill Medicaid?
7     A.  But they billed in Abbott's name, not
8  in CM Healthcare Resources' name.  So those bills
9  were in Abbott's name.  Abbott submitted the
10 claims as Abbott for those patients.
11    Q.  Okay.  And then paid a fee to
12 Children's Memorial?
13        MS. CITERA:  Objection to form.
14 BY THE WITNESS:
15    A.  If I recall the contract correctly,
16 there was -- there was something that went back
17 to Children's, although I don't remember what it
18 was or how the contract was structured.
19    Q.  Prior to approving this arrangement,
20 did you check with anyone concerning the legality
21 of Abbott's ability to do that?
22        MS. CITERA:  Objection to form.

---

Page 196

1  BY THE WITNESS:
2     A.  Again, I was not involved in the
3  renegotiation of the contract with Children's
4  where all of this changed.  But as I said before,
5  when we -- when we did contracts -- we worked
6  with our legal counsel when we did these
7  contracts.  And this was -- All I was -- All I
8  was working on at this point was the
9  implementation of the change.
10    Q.  Did you ask any questions about whether
11 or not this was -- whether or not Abbott's
12 provider number could be used in such a way?
13        MS. CITERA:  Objection to form.
14 BY THE WITNESS:
15    A.  Since the billings were being done in
16 Abbott's name using Abbott's provider number to
17 Illinois Medicaid, and based on -- based on the
18 renegotiations and what we did -- Well, to answer
19 your question, I did not have any discussions
20 with anyone.
21    Q.  Okay.  You relied upon the people who
22 negotiated the contract to verify that -- I

---

Page 197

1  apologize for the horn out there -- to verify
2  that everything was kosher under this
3  arrangement?
4         MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6     A.  Yes.  I relied that during that
7  negotiation process, our -- the people who were
8  negotiating the contracts were working with our
9  legal counsel.
10    Q.  Do you recall who negotiated the
11 contract?
12    A.  No, I do not.
13    Q.  Who was -- Who would have been some of
14 the folks who may have been negotiating the
15 contract at that point in time?  Who was in the
16 Contract Marketing component of Home Infusion at
17 that time?
18        MS. CITERA:  Objection to form.
19 BY THE WITNESS:
20    A.  It would have been either Dave Brincks
21 or Kathy Riddle as my manager, and I can't
22 remember when Dave left and Kathy came in.  And

---

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 302

1   Average Wholesale Price (AWP) information to non-
2   managed care customers."  Did I read that
3   correctly?
4       A.  Correct.
5       Q.  Given that statement, is your memory
6   refreshed that sharing AWP information with
7   customers by Abbott personnel is a violation of
8   Abbott's current policies?
9           MS. CITERA:  Same objections as before.
10  BY THE WITNESS:
11      A.  It was their policies in December of
12  2003, so ...
13      Q.  So at least as of that time, it became
14  a violation of their policies to share AWP,
15  correct?
16      A.  Yes.
17      Q.  Was sharing AWP information with
18  customers a violation of any Abbott policy prior
19  to December of 2003?
20          MS. CITERA:  Objection, form.
21  BY THE WITNESS:
22      A.  When I was in Alternate Site Product

Page 303

1   Sales we told our sales force not to discuss or
2   talk about AWP with their customers.  As I
3   previously said, I don't recall that we had it
4   documented in a procedure or policy anywhere.
5       Q.  When you told these personnel not to
6   discuss AWP, did you also tell them not to
7   include AWP in the context of a bid response or
8   response to a request for proposal?
9       A.  Well -- And, again, my understanding
10  had always been that we only provided AWP in our
11  Contract Marketing department when it was
12  something that was specifically requested as a
13  condition of completing the bid proposal and if
14  we did not complete -- include AWP, then we would
15  not be able to -- we would not be considered.
16          The other piece of this is Debbie
17  Longley left Alternate Site Product Sales 19- in
18  late 1996 -- I'm sorry, late -- sometime in 1997.
19  And she may have provided AWP prior to my being
20  in the department.  But after I came into the
21  department, the rule of thumb was that we would
22  not include AWP unless it was a specific

Page 304

1   requirement of the bid.
2           MR. ANDERSON:  Objection,
3   nonresponsive.
4   BY MR. ANDERSON:
5       Q.  When you instructed personnel not to,
6   quote, discuss AWP, did you instruct them not to
7   share AWP information with customers in the
8   context of a bid response or a response to a
9   request for proposal?
10      A.  What I told my team was the only time
11  to include AWP was if it was a requirement of
12  completing the bid.  Otherwise, if it was an
13  optional field, not to complete it.
14      Q.  So in the instances where a customer of
15  Abbott's required that AWP information be
16  submitted, Abbott did provide AWP and doing so
17  was not considered a violation of any Abbott
18  policy, correct?
19          MS. CITERA:  Objection to form.
20  BY THE WITNESS:
21      A.  I don't -- I don't -- I did not know if
22  there was a policy in place at that time that

Page 305

1   said not to.
2       Q.  Accordingly, providing AWP was not a
3   violation, correct?
4           MS. CITERA:  Objection to form.
5   BY THE WITNESS:
6       A.  It was not part of our standard
7   business practices to discuss AWP, so the only
8   time it happened was if it was a requirement for
9   completing a bid.
10      Q.  When you say "standard practices," what
11  do you refer to?
12      A.  It wasn't part of how we were trying to
13  sell our products.  We were trying to sell our
14  products based on the depth and breadth of the
15  product line, what buying products from Abbott --
16  the whole idea of the services, the service and
17  products that -- quality that Abbott could bring
18  to the table and not based on the spread of the
19  AWP.
20      Q.  So the standard practices were, so to
21  speak, the aspirations of Abbott in selling
22  products, correct?

77 (Pages 302 to 305)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

# EXHIBIT 47

Martins, Deborah Longley                    August 31, 2007
                    Chicago, IL

                    IN THE UNITED STATES

                DISTRICT OF MASSACHUSETTS


    IN RE:  PHARMACEUTICAL          )

    INDUSTRY AVERAGE WHOLESALE      )

    PRICE LITIGATION                ) MDL No. 1456

                                    ) Civil Action No.

    THIS DOCUMENT RELATES TO:       ) 01-CV-12257-PBS

                                    )

    ALL CASES                       )

                                    ) Judge Patti B. Saris

    ***************************************************

            ORAL AND VIDEOTAPED DEPOSITION

            OF DEBORAH LONGLEY MARTINS

                August 31, 2007

    ***************************************************

859fe9b0-6bc2-4936-87d1-cd4df9649387

Martins, Deborah Longley                         August 31, 2007
                    Chicago, IL

Page 246

1      THE WITNESS: I don't recall any
2  particular visits, no.
3  BY MR. ANDERSON:
4      Q.  Does this document appear to be slides
5  from a PowerPoint presentation?
6      A.  Looks that way, yes.
7      Q.  And it looks like, from the title, that
8  it was a presentation to Abbott Labs by PBI;
9  correct?
10     A.  Yes.
11     Q.  Then if you could, flip to the last --
12  second-to-last -- no, last page of the document.
13     A.  Second-to-last page?
14     Q.  The last page.
15     A.  Last page?
16     Q.  Do you see a page there titled "Member
17  Savings Report"?
18     A.  Yes.
19     Q.  And it appears to be in a section of some
20  software or potentially a spreadsheet; correct?
21     A.  Looks that way.
22     Q.  And there is a column titled "AWP" toward

Page 247

1  the right-hand side; correct?
2      A.  Yes.
3      Q.  And then next to that is a column titled
4  "Spread"; correct?
5      A.  Yes.
6      Q.  Do you ever recall having an
7  understanding that customers of Abbott or members
8  of buying groups that were customers of Abbott's
9  conducted this type of analysis?
10     MR. COLE:  Object to the form.
11     THE WITNESS:  No.
12  BY MR. ANDERSON:
13     Q.  Are you able to testify that back in the
14  '90s you were not aware that customers of Abbott or
15  members of buying group customers of Abbott's
16  conducted this type of analysis?
17     MR. COLE:  I'll object to the form.
18     THE WITNESS:  I don't remember being
19  presented stuff like this.
20  BY MR. ANDERSON:
21     Q.  I understand that you're saying you don't
22  remember.  I'm saying can you say one way or the

Page 248

1  other as to whether you had an understanding of
2  this type of analysis back when you were in
3  contract marketing?
4      A.  No, I didn't.
5      Q.  You're -- you're fairly certain that you
6  did not have that understanding?
7      A.  I don't believe I did, no.
8      Q.  Did you ever become aware of any policy
9  at Abbott, whether written or unwritten, to not
10  discuss AWPs or reimbursement with customers?
11     A.  I don't believe there has ever been any
12  written policy.  I know there has been verbal
13  communication that you should not be discussing
14  this with customers, yes.
15     Q.  Can you recall generally when that verbal
16  instruction was first provided?
17     A.  I don't remember when it was first
18  provided.  I know I've had it provided in other
19  jobs that I've had at Abbott.
20     Q.  Do you believe you received that type of
21  instruction back in '95, '96, or '97, when you were
22  in contract marketing?

Page 249

1      A.  I can't pinpoint to it, but I would want
2  to say yes.
3      Q.  And what were you told as to why those
4  types of discussions about AWP or reimbursement
5  should not occur between Abbott and customers?
6      A.  And, again, I'm getting fuzzy as to when
7  I've had these discussions, but my understanding is
8  you can't advertise for the purpose of making a
9  sale what someone is going to make off of buying
10  your product through the reimbursement process.
11     Q.  That's the basic substance of what you
12  learned about this instruction not to discuss AWP
13  or reimbursement?
14     A.  Yes.
15     Q.  Do you recall who provided this
16  instruction?
17     A.  Again, I've heard it in different
18  formats.
19     Q.  Let me limit it back in the '95, '96, or
20  potentially '97 time frame, when you were in
21  contract marketing.  Do you remember who would have
22  provided that instruction, if anyone?

Henderson Legal Services
202-220-4158

859fe9b0-6bc2-4936-87d1-cd4df9649387

Martins, Deborah Longley                    August 31, 2007
                    Chicago, IL

Page 250

1    A.  I don't know.
2    Q.  Did you ask any questions about that
3  instruction?
4    A.  No.
5    Q.  When you received that instruction, did
6  you stop including AWPs on the bids or other
7  communications to customers?
8        MR. COLE:  Object to the form.
9        THE WITNESS:  No.
10 BY MR. ANDERSON:
11   Q.  Why not?
12   A.  I couldn't tell you; just was part of the
13 format, so I had never questioned the format.
14   Q.  So despite instruction not to discuss
15 AWPs or reimbursement, as far as you know, Abbott
16 continued including AWP information in written
17 communications?
18       MR. COLE:  Object to the form.
19       THE WITNESS:  As far as I know.
20 BY MR. ANDERSON:
21   Q.  I think you testified this morning that
22 you recall preparing some documents known as

Page 251

1  proposal analyses; is that correct?
2    A.  Yes.
3    Q.  Can you describe as a general matter what
4  a proposal analyses consisted of?
5    A.  Depends on what type of proposal you're
6  talking about, but I think we had some examples
7  here that showed volumes purchased previous year,
8  and these would be anniversary increases that I'm
9  talking about, but what the price was, what we were
10 proposing it to be, what the net effect is on the
11 overall contract based on those increases.
12   Q.  And was it your testimony this morning
13 that -- that those proposal analyses included AWP
14 information as well?
15   A.  Yes.
16   Q.  Does Exhibit 364 look like an example of
17 a proposal analyses that was prepared in Abbott
18 contract marketing?
19       MR. COLE:  Object to the form.
20       Do you have an extra copy, Jarrett?
21       MR. ANDERSON:  I do.  It's there, Jeremy.
22       MR. COLE:  Oh, thank you.

Page 252

1        MR. ANDERSON:  You're welcome.
2        (Witness examines document.)
3        THE WITNESS:  Does it look like the
4  format?  Is that what you're asking me?
5  BY MR. ANDERSON:
6    Q.  Yes, ma'am.
7    A.  Looks like one of the formats, sure.
8        MR. ANDERSON:  This is good news for you.
9        Let's go off the record.  I'm going to
10 review my notes and other documents, and we may be
11 getting close.  At least I'm going to be passing
12 the witness shortly.
13       THE WITNESS:  Okay.
14       THE VIDEOGRAPHER:  We are off the record
15 at 2:24 p.m.
16       (Brief pause.)
17       THE VIDEOGRAPHER:  We are back on the
18 record at 2:32 p.m.
19 BY MR. ANDERSON:
20   Q.  Just a couple of last questions, ma'am.
21 If you could, take a look at what's been marked in
22 this case as Plaintiff's Exhibit 1337, a one-page

Page 253

1  document Bates-labeled TXABT 061729.
2        (Whereupon Deposition Plaintiff's
3  Exhibit 1337 was marked as requested.)
4        (Witness examines document.)
5        THE WITNESS:  Okay.
6  BY MR. ANDERSON:
7    Q.  Now, if I could -- I apologize, but I've
8  got to share this with you because it's the only
9  copy.
10   A.  Okay.
11   Q.  Looking at the bottom of this document,
12 will you agree that appears to be like an original
13 e-mail as a part of this e-mail thread?
14   A.  I'm sorry.
15       (Witness examines document.)
16       THE WITNESS:  Looks like it, yes.
17 BY MR. ANDERSON:
18   Q.  And specifically it's an e-mail from
19 Annemarie Renick to Harry Adams, with a copy to
20 you, titled "RX WAC & LINK CHANGES," August 14,
21 1996; correct?
22   A.  Yes.

64 (Pages 250 to 253)

859fe9b0-6bc2-4936-87d1-cd4df9649387

Martins, Deborah Longley                    August 31, 2007
                        Chicago, IL

Page 270

1
2        I, DEBORAH LONGLEY MARTINS, state that I
3    have read the foregoing transcript of the testimony
4    given by me at my deposition on the 31st day of
5    August, 2007, and that said transcript constitutes a
6    true and correct record of the testimony given by me
7    at said deposition except as I have so indicated on
8    the errata sheets provided herein.
9
10   _____
11        DEBORAH LONGLEY MARTINS
12   No corrections (Please initial)_____
13   Number of errata sheets submitted_____
14
15   SUBSCRIBED AND SWORN to
16   before me this _____ day
17   of _____, 2007.
18
19
20   _____
21     Notary Public
22

Page 271

1    STATE OF ILLINOIS   )
2                        ) SS:
3    COUNTY OF DuPAGE   )
4        I, ROBIN M. CHIMNIAK, a notary public
5    within and for the County of DuPage and State of
6    Illinois, do hereby certify that heretofore, to wit,
7    on the 31st day of August, 2007, personally appeared
8    before me DEBORAH LONGLEY MARTINS, a witness in a
9    certain cause now pending and undetermined in the
10   United States District Court.
11       I further certify that the witness was by
12   me first duly sworn to testify the truth, the whole
13   truth and nothing but the truth in the cause
14   aforesaid; that the testimony then given by the said
15   witness was reported stenographically by me in the
16   presence of said witness and was thereafter
17   transcribed under my personal direction, and the
18   foregoing is a true and complete transcript of the
19   testimony so given by the said witness as aforesaid.
20       The signature of the witness to the
21   foregoing deposition was not waived.
22       I further certify that the taking of this

Page 272

1    deposition was pursuant to notice and that there were
2    present at the taking of said deposition the
3    appearances as heretofore noted.
4        I further certify that I am not a relative
5    or employee or attorney or counsel, nor a relative or
6    employee of such attorney or counsel for any of the
7    parties hereto, nor interested directly or indirectly
8    in the outcome of this action.
9        IN TESTIMONY WHEREOF, I have hereunto set
10   my hand and affixed my notarial seal this 10th day of
11   September, 2007.
12
13
14
15   _____
16        ROBIN M. CHIMNIAK, CSR
17        License No. 084-001999
18
19
20
21
22

Page 273

1

2

3

69 (Pages 270 to 273)

Henderson Legal Services
202-220-4158

859fe9b0-6bc2-4936-87d1-cd4df9649387

# EXHIBIT 48

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL NO. 1456

Master File No. 01-12257-PBS

Judge Patti B. Saris

Magistrate Judge - Marianne Bowler

IN RE:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

_____

THIS DOCUMENT RELATES TO:

State of California, ex rel. Ven-A-Care v.

Abbott Laboratories, Inc., et al.,

CASE #1-03-cv-11226-PBS

_____

VIDEOTAPE DEPOSITION OF:

MARY (MOLLY) LOUGHMAN

Friday, February 15, 2008

9:00 AM to 3:30 PM

Columbia, South Carolina


Reported by:  Jane G. LaPorte

            Registered Professional Reporter

Loughman, Mary (Molly)                    February 15, 2008

Page 90

1  wanted to know what it meant and what it was about?
2      A.   It could have been, yes.
3      Q.   But one way or the other, the -- either
4  Ms. Haines brought it up to you, or you heard it at
5  some point from the time that you joined Abbott
6  Labs, until the date of the conversation, and asked
7  her about it; is that fair?
8      A.   I guess the reason why I -- because
9  heard -- heard.
10     Q.   Uh-huh.
11     A.   Yeah.  I don't -- I just don't -- I don't
12  remember, to be exact, I don't remember.
13     Q.   And what did -- what did Ms. Haines tell
14  you about AWP?
15     A.   Just what the initials stood for and then
16  that was it.
17     Q.   Did that answer your questions?
18     A.   At that point I was so new, yes.
19     Q.   Okay.
20     A.   Uh-huh.
21     Q.   And did you understand, at that point,
22  that AWP was a basis for reimbursement?

Page 91

1          MR. SCANNAPIECO:  Objection; form.
2      A.   No.
3      Q.   When was the next time that you heard
4  about AWP?
5      A.   (No response.)
6      Q.   Or heard AWP discussed?
7      A.   I don't even recall.
8      Q.   Is it a term that you have heard
9  throughout your career at Abbott?
10         MR. SCANNAPIECO:  Objection; form.
11     A.   Yes.  I had heard that, yes.
12     Q.   So, from time to time, it would come up
13  in conversations; is that your testimony?
14         MR. SCANNAPIECO:  Objection; form.
15     A.   Yes.
16     Q.   Do you recall any discussions with your
17  district manager -- we'll start with Mr. Elliott --
18  any discussions with Mr. Elliott about AWP?
19     A.   Yes.
20     Q.   And about how many occasions do you
21  recall discussions with Mr. Elliott?
22     A.   Rare.  It was rare.  Very, very, very

Page 92

1  little.
2      Q.   And what do you recall discussing with
3  Mr. Elliott about AWP?
4      A.   Actually, he brought it up.
5      Q.   And what did he say?
6      A.   And -- it was just told to  -- it wasn't
7  just me as an individual, it was not -- it was as a
8  group, as a Southeast district group, that we were
9  not to talk about AWP with our customers; end of
10  story.
11     Q.   Did Mr. Elliott tell you why you couldn't
12  talk about AWP?
13     A.   No.
14     Q.   Did anyone ask:  Why can't we talk about
15  AWP?
16     A.   I guess it was his tone, a tone in one's
17  voice.
18         It was kind of like:  This is what I say
19  and -- no.  I do not recall anyone questioning:
20  Well why?
21         No, you will not.
22     Q.   Okay.

Page 93

1      A.   So, okay.  No is no.
2      Q.   And by that point, did you have an
3  understanding of what he meant when he said:  You
4  will not talk about AWP with customers?
5          MR. SCANNAPIECO:  Objection; form.
6      A.   Other than the answer -- other than the
7  communication to us, was -- is that you don't talk
8  about it.  It's not something that you discuss.
9      Q.   Had you had occasions between or before
10  Mr. Elliott gave that instruction to the sales rep
11  in your district, to discuss AWP with customers?
12     A.   To discuss --
13         THE WITNESS:  I'm sorry, Becky, you will
14  have to repeat that.
15         MS. FORD:  Sure.
16     Q.   Before Mr. Elliott gave you the
17  instruction -- you and the other sales reps in your
18  district not to discuss AWP with customer --
19     A.   Before.
20     Q.   -- had you had occasions to discuss AWP
21  with customers?
22     A.   I am not sure of the timeline; so, I

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

f694514d-b132-404d-882f-0f628be47100

Loughman, Mary (Molly)                    February 15, 2008

Page 126

1  -- I can't say if it was Jeani Haines or not, I
2  cannot say that.
3     Q.   When you say:  One or the other, do you
4  know Ms. Haines or Ms. Finkel?
5     A.   Yes.
6     Q.   So, you learned about the red book from
7  one of those two individuals?
8     A.   In other words, you -- I want you to
9  clarify "learned" for me.
10    Q.   Well, when you first heard of the Red
11 Book and gained some understanding of what it was,
12 was that from Ms. Haines or Ms. Finkel?
13    A.   I never really understood exactly at that
14 time.
15    Q.   Okay.
16    A.   You know, in other words, -- no.  So,
17 yes; that is correct.  One or the other; Chris
18 Finkel or Jenny Haines.
19    Q.   Was where you heard the term from?
20    A.   Correct.
21    Q.   And you see here that sentence that we
22 just read from Mr. Kipperman to the sales force, it

Page 127

1  says that:  Red Book quotes AWP for reimbursement
2  purposes.
3     A.   Uh-huh.
4     Q.   Was that your understanding of Red Book?
5        MR. SCANNAPIECO:  Objection; form.
6     A.   No.
7     Q.   Did you know that Red Book quoted AWP for
8  reimbursement purposes?
9        MR. SCANNAPIECO:  Objection; form.
10    A.   I only knew that Red Book listed average
11 wholesale price.
12       I did not and do not know, if -- that
13 there is a correlation with reimbursement.
14    Q.   The beginning of that sentence says:
15 That in the beginning of April, Abbott took a list
16 price increase, this also has an affect on our AWP.
17       Did you understand that Abbott's list
18 price had an affect on the AWP on Abbott's products?
19       MR. SCANNAPIECO:  Objection; form.
20    A.   No, no.
21    Q.   When you indicated that you did not know
22 that AWP was quoted for reimbursement purposes, did

Page 128

1  you also mean that you don't have that understanding
2  today?
3        MR. SCANNAPIECO:  Objection; form.
4     A.   I don't know anything about
5  reimbursement; so, I don't know if there is a
6  correlation, other than what you just read to me.
7     Q.   But have you learned, at some point
8  during your career with Abbott or Hospira, that
9  there is a correlation between AWP and
10 reimbursement?
11       MR. SCANNAPIECO:  Objection; form.
12    A.   No.
13    Q.   Okay.
14    A.   No.
15    Q.   For what reason would a customer be
16 interested in the AWP on an Abbott product, a
17 customer such as MediHome Infusion?
18    A.   That, I don't know.  Why would they be
19 interested?
20       That is that side of business, if you
21 will, meaning that they are running their own
22 business, that they know about, I do not.

Page 129

1     Q.   Okay.
2     A.   I don't know why MediHome Infusion, or to
3  what extent that that would be for them how -- I
4  have no idea.
5     Q.   When you had your discussions with
6  Ms. Haines and Ms. Finkel --
7     A.   Uh-huh.
8     Q.   -- is it fair to characterize those
9  discussions that you testified about today as you
10 were learning the Alternate Site business?
11       MR. SCANNAPIECO:  Objection; form.
12    A.   I was new; yes, yes.
13    Q.   And you testified that you asked
14 questions about:  What is a AWP; is that right?
15    A.   I did ask the question what the initials
16 meant, yes.
17    Q.   Did you ask similar questions about terms
18 that you had heard as you came into the inside sales
19 rep job?
20       MR. SCANNAPIECO:  Objection; form.
21    A.   Similar terms, did you say?
22    Q.   Terms used by your customers or other --

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

f694514d-b132-404d-882f-0f628be47100

# EXHIBIT 49

Page 1

```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

In re:  PHARMACEUTICAL             )
INDUSTRY AVERAGE WHOLESALE         ) MDL No. 1456
PRICE LITIGATION                   ) Civil Action No.
                                   )    01-12257-PBS
                                   )
THIS DOCUMENT RELATES TO:          )
                                   )
United States of America,          ) Hon. Patti Saris
ex rel. Ven-a-Care of the          )
Florida Keys, Inc., v.             )
Abbott Laboratories, Inc.,         )
and Hospira, Inc.                  )
CIVIL ACTION NO. 06-11337-PBS      )


*******************************************************

                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL             )
INDUSTRY AVERAGE WHOLESALE         ) MDL No. 1456
PRICE LITIGATION                   ) Civil Action No.
                                   )    01-CV-12257-PBS
                                   )
THIS DOCUMENT RELATES TO:          )
                                   ) Judge Patti B. Saris
State of Arizona v. Abbott         )
Labs., et al.                      )
Civil Action No. 06-CV-11069-PBS   )



*******************************************************

           ORAL AND VIDEOTAPED DEPOSITION OF

                  TED DENNIS LYJAK

                   May 31, 2007

*******************************************************
```

9b8b8489-a76f-4580-b66f-3fc05922193a

Page 86

1   negotiated our contract and award at the contract
2   price.
3       Q.  And did PharMerica respond to that?
4       A.  I recall them saying that they would not be
5   able to convert as much business as they committed to.
6       Q.  And what did you do as a result?
7       A.  We told them that they need to act in the
8   best interest of their own company and we would not be
9   able to even discuss the subject of AWP going forward.
10      Q.  Did you report the incident to your
11  supervisor?
12      A.  Yes, I did.
13      Q.  Okay.  And is that -- was that still
14  Mr. Baker?
15      A.  Yes, it was.
16      Q.  Okay.  And how did you report that
17  information to him?
18      A.  I verbally told him of the conversation.
19      Q.  And what was his response?
20      A.  We're not to talk about AWP.
21      Q.  That was his response to you?
22      A.  Yes.
23      Q.  Okay.  Following your conversation with
24  Mr. Baker, did you do anything else as a result of
25  learning that PharMerica was not going to convert as

Page 87

1   much of their business as originally anticipated?
2       A.  No, I -- I took no further action.
3       Q.  Okay.  And I believe that you mentioned also
4   that MHA had discussed AWP with you, is that correct?
5       A.  That is correct.
6       Q.  Okay.  And what was the context in which that
7   conversation took place?
8       A.  I recall seeing it in an RFP, request for
9   bid, on MHA, and they included a column for AWP; and
10  when I was reviewing the requirements of the RFP, the
11  director of purchasing said that we'll be required to
12  fill out the AWP column, at which point I said that
13  Abbott's policy and practice is not to have any
14  discussions on AWP, and we basically eliminated that
15  column from our bid.
16      Q.  So to the best of your recollection, when the
17  request for proposal was completed by Abbott and
18  returned to MHA, it did not contain the AWP
19  information, is that --
20      A.  I know that for a fact.
21      Q.  Okay.  Other than the discussions you've told
22  me about with Mr. Baker and Ms. Dawson, do you recall
23  any other discussions with your colleagues at Abbott
24  about AWP?
25      A.  I recall a discussion with one of my other

Page 88

1   NAMs in regards to a letter that Abbott received from
2   Omni Care.
3       Q.  And who was the NAM?
4       A.  Jeff Balzer.
5       Q.  And was Omni Care one of Mr. Balzer's
6   customers?
7       A.  Yes.
8       Q.  Okay.  And when did the discussion with
9   Mr. Balzer take place?
10      A.  To the best of my recollection, it would be
11  that 2002 time period.
12      Q.  And how did the discussion of AWP come up in
13  your conversation with Mr. Balzer?
14      A.  We were sent a letter -- Jeff was sent a
15  letter by Omni Care telling Abbott that as a result of
16  some changes that Abbott did to their price, WAC
17  price, that -- that basically they were entitled to
18  compensation.
19      Q.  Did Mr. Balzer come to you for advice on how
20  to handle the situation?
21      A.  No.
22      Q.  Okay.  In what context did Mr. Balzer bring
23  this to your attention?
24      A.  It was in casual conversation as we discussed
25  accounts.

Page 89

1       Q.  Did he seem concerned about the letter from
2   Omni Care?
3           MS. TABACCHI:  Object to the form.
4       A.  Yes.
5       Q.  (BY MS. FORD)  What was your response to him?
6       A.  It's out of our control.
7       Q.  Is that the only other conversation that you
8   recall with a colleague about AWP?
9       A.  Yes.
10      Q.  Do you understand there to be a relationship
11  between Abbott's list price and AWP?
12          MS. TABACCHI:  Object to the form.
13      A.  I do not understand any relationship between
14  Abbott's list price and their AW -- and AWP.
15      Q.  (BY MS. FORD)  Have you heard the term "the
16  spread"?
17      A.  Yes, I have.
18      Q.  And what -- what do you understand the term
19  "the spread" to mean?
20      A.  My understanding is that it is the difference
21  between AWP and contract price.
22      Q.  And when do you first recall hearing the term
23  "the spread"?
24      A.  I -- in the same conversation when I first
25  heard about it from Option Care.

23  (Pages 86 to 89)

9b8b8489-a76f-4580-b66f-3fc05922193a

Page 90

1     Q.  Did you understand customers -- that some of
2  your customers were making purchasing decisions based
3  upon the spread?
4          MS. TABACCHI:  Object to the form.
5     A.  Yes.
6     Q.  (BY MS. FORD)  And which customers were
7  those?
8     A.  Option Care, MHA and PharMerica.
9     Q.  Any others?
10    A.  No.
11    Q.  Did the term "the spread" come up in your
12 conversation with Mr. Baker about AWP?
13         MS. TABACCHI:  Object to the form.
14    A.  Yes.
15    Q.  (BY MS. FORD)  And what did you discuss about
16 the spread?
17    A.  Basically his instructions were that as
18 representatives of Abbott, we not to discuss or
19 get in any conversation -- or avoid conversations
20 about AWP or spread.
21    Q.  Did you ask him why?
22    A.  No.
23    Q.  Did you inquire of anyone within Abbott why
24 you couldn't talk about AWP with your customers?
25    A.  No.

Page 91

1     Q.   Were you curious at all if your customers
2  were interested in AWP and they're asking you about
3  AWP why Abbott can't talk about it?
4     A.  When Pete first explained it to me, he said
5  it had something to do with reimbursement, which is
6  something that we never got involved in.  We only
7  offered contract pricing and were awarded business, or
8  at least felt we could control getting awards on
9  business based on our product offering at the contract
10 price.
11    Q.  I'm just trying to understand.  If it's
12 important to your customers and -- and customers are
13 asking you for this information and it's going to make
14 your job easier in selling products to them, why you
15 wouldn't be curious as to why you couldn't discuss it?
16         MS. TABACCHI:  Object to the form.
17    A.  The messages that I delivered to my customers
18 periodically were both good and bad, and as a
19 representative of the company, I just felt that it was
20 part of the rules under which we needed to play.
21    Q.  (BY MR. FORD)  I understand it was part of
22 the rules.  I'm just trying to inquire whether you
23 ever questioned that decision or questioned that
24 directive?
25    A.  I never questioned that decision or

Page 92

1  directive.
2     Q.  Okay.  I'm going to switch gears for just a
3  minute, and I think we can probably finish up in the
4  next 30 minutes or so and then take our lunch break.
5          I want to ask --
6          THE REPORTER:  We have 14 minutes on the
7  videotape.
8          MS. FORD:  Okay.  Let's see if --
9          MS. TABACCHI:  Or 14.
10         MS. FORD:  -- we can do it in 14.
11    Q.  (BY MS. FORD)  When you first started with
12 Abbott as the Manager of Distributor Relations in
13 1996, did you receive any formal training?
14         MS. TABACCHI:  Object to the form.
15    A.  No.
16    Q.  (BY MR. FORD)  Okay.  During your time period
17 as Manager of Distributor Relations, did you receive
18 any training, formal training?
19    A.  Yes.
20    Q.  And what types of training?
21    A.  I recall receiving training as a National
22 Account Manager from Lynn Leone, our manager of
23 Contract Marketing, in regards to new government
24 regulations and the way Abbott would interpret those
25 that would affect the way we offered incentives to

Page 93

1  distributors in the form of free goods.
2     Q.  And when did that training occur?
3     A.  2000.  And then, secondly, I recall a formal
4  training by Abbott on Abbott's position on AWP.  It
5  was a required webcast that we needed to take and, in
6  essence, explained the relationship, or at least in
7  general terms that there was a relationship between
8  AWP and reimbursement and the fact that as
9  representatives of the company we were not to engage
10 in any discussions on that or ever use that in any of
11 our business transactions.
12    Q.  And when did that training take place?
13    A.  2002.  The 2001, 2002 time period.
14    Q.  Okay.  And you indicated that it was a
15 webcast.  Does that mean that you watched it on a
16 computer?
17    A.  Yes, we watched it on a computer.  It may not
18 have been called a webcast at the time --
19    Q.  Okay.
20    A.  -- but we watched it on the computer.  It was
21 a computer training module.
22    Q.  Okay.  So it wasn't a presentation being
23 given by someone live that you were watching on the
24 computer, is that correct?
25    A.  That is correct.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

9b8b8489-a76f-4580-b66f-3fc05922193a

Page 238

```
 1
 2
 3
 4
 5     I, TED DENNIS LYJAK, have read the foregoing
 6  deposition and hereby affix my signature that same is
 7  true and correct, except as noted above.
 8
 9          TED DENNIS LYJAK
10  THE STATE OF                    )
11  COUNTY OF                       )
12    Before me,                             ,
13  on this day personally appeared TED DENNIS LYJAK,
14  known to me (or proved to me under oath or through
15                          (description of
16  identity card or other document) to be the person
17  whose name is subscribed to the foregoing instrument
18  and acknowledged to me that the executed the same for
19  the purposes and consideration therein expressed.
20    Given under my hand and seal of office this
21  day of                  , 2007.
22
23
           NOTARY PUBLIC IN AND FOR
24
           THE STATE OF
25
```

Page 239

```
 1  STATE OF TEXAS )
 2  COUNTY OF TRAVIS )
 3       I, WILLIAM M. FREDERICKS, CSR 2392, do hereby
 4  certify that, pursuant to the agreement hereinabove
 5  set forth, there came before me on the 31st day of
 6  May, 2007, at 9:06 o'clock a.m., in the offices of
 7  Jones Day, 77 West Wacker Drive, Suite 3500, Chicago,
 8  Illinois, the following named person, to-wit: TED
 9  DENNIS LYJAK, who was by me duly sworn to testify to
10  the truth and nothing but the truth of witness'
11  knowledge touching and concerning the matters in
12  controversy in this cause; that such witness was
13  thereupon examined under oath, and the examination
14  transcribed by computer-assisted transcription by me
15  or under my supervision, and that the deposition is a
16  true record of the testimony given by the witness.
17       I further certify that I am neither attorney
18  nor counsel for, nor related to or employed by, any of
19  the parties to the action in which this deposition is
20  taken and, further, that I am not a relative or
21  employee of any attorney or counsel employed by the
22  parties hereto, or financially interested in the
23  action.
24       That the amount of time used by each party at
25  the deposition is as follows:
```

Page 240

```
 1     Ms. Rebecca Ford -  03:06
       Ms. Margaret Moore - 01:03
 2     Mr. Jarrett Anderson - 01:58
 3       IN WITNESS WHEREOF I have hereunto set my
    hand on this 14th day of June , A.D. 2007.
 4
 5
 6          WILLIAM M. FREDERICKS, Texas CSR 2392
            Expiration Date: 12/31/2008
 7          Firm Registration No. 82
            Fredericks-Carroll Reporting
 8          7800 Shoal Creek Boulevard
            Suite 200 W
 9          Austin, Texas 78757
            Telephone: (512) 477-9911
10              (800) 234-3376
            Fax:    (512) 345-1417
11
12  JOB NO. 2426
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 241

```
 1          NO. D-1-GV-04-001286
 2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                              )
 3  ex rel.                   )
      VEN-A-CARE OF THE       )
 4    FLORIDA KEYS, INC.,     )
        Plaintiffs,           )
 5                            )
    VS.                       ) TRAVIS COUNTY, TEXAS
 6                            )
    ABBOTT LABORATORIES INC., )
 7  ABBOTT LABORATORIES,      )
    HOSPIRA, INC., and B. BRAUN  )
 8  MEDICAL INC.,             )
        Defendant(s).         ) 201ST JUDICIAL DISTRICT
 9
10       REPORTER'S CERTIFICATION
         DEPOSITION OF TED DENNIS LYJAK
11            May 31, 2007
12    I, WILLIAM M. FREDERICKS, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15    That the witness, TED DENNIS LYJAK, was duly sworn
16  by the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19    That the deposition transcript was submitted on
20  June 14, 2007, to the witness or to the attorney for
21  the witness for examination, signature and return to
22  me by July 5, 2007;
23    That the amount of time used by each party at the
24  deposition is as follows:
25    Ms. Rebecca Ford - 03:06
```

61 (Pages 238 to 241)

9b8b8489-a76f-4580-b66f-3fc05922193a

Page 242

```
1        Mr. Jarrett Anderson - 01:58
2     That pursuant to information given to the
3   deposition officer at the time said testimony was
4   taken, the following includes counsel for all parties
5   of record:
6           MR. RAYMOND WINTER and
            MS. MARGARET MOORE,
7             Attorney for Plaintiff State of Texas;
            MR. JARRETT ANDERSON,
8             Attorney for the Relator;
            MS. TINA TABACCHI,
9             Attorney for Defendants Abbott
              Laboratories, Inc. and Hospira, Inc.
10          MS. REBECCA FORD,
              Attorney for Plaintiff United States of
11            America
            MR. CHRISTOPHER STUART,
12            Attorney for Plaintiff State of Arizona
              and MDL Plaintiffs
13          MR. ELISEO SISNEROS, Attorney for the
              State of California
14
15     I further certify that I am neither counsel for,
16   related to, nor employed by any of the parties or
17   attorneys in the actions in which this proceeding was
18   taken, and further that I am not financially or
19   otherwise interested in the outcome of the action.
20     Further certification requirements pursuant to
21   Rule 203 of TRCP will be certified to after they have
22   occurred.
23
24
25
```

Page 243

```
1     Certified to by me this 14th day of June, 2007.
2
3
            WILLIAM M. FREDERICKS, Texas CSR 2392
4           Expiration Date:  12/31/2007
            Firm Registration No. 82
5           Fredericks-Carroll Reporting
            7719 Wood Hollow Drive, Suite 156
6           Austin, Texas 78731
            Telephone: (512) 477-9911
7                   (800) 234-3376
            Fax:    (512) 345-1417
8
9   JOB NO. 2426
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 244

```
1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
2     The original deposition was/was not returned to
3   the deposition officer on July 5, 2007;
4     If returned, the attached Changes and Signature
5   page contains any changes and the reasons therefor;
6     If returned, the original deposition was delivered
7   to Ms. Rebecca Ford, Custodial Attorney;
8     That $    is the deposition officer's
9   charges to the Plaintiff(s) for preparing the original
10  deposition transcript and any copies of exhibits;
11    That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate
13  was served on all parties shown herein on and filed
14  with the Clerk.
15    Certified to by me this       day of
16         , 2007.
17
18
19
            WILLIAM M. FREDERICKS, Texas CSR 2392
20          Expiration Date:  12/31/2007
            Firm Registration No. 82
21          Fredericks-Carroll Reporting
            7719 Wood Hollow Drive, Suite 156
22          Austin, Texas 78731
            Telephone: (512) 477-9911
23                  (800) 234-3376
            Fax:    (512) 345-1417
24
25  JOB NO. 2426
```

62 (Pages 242 to 244)

9b8b8489-a76f-4580-b66f-3fc05922193a

# EXHIBIT 50

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | ) |
| INDUSTRY AVERAGE WHOLESALE | ) MDL No. 1456 |
| PRICE LITIGATION | ) Civil Action |
| | ) No. 01-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| United States of America, | ) Hon. Patti Saris |
| ex rel. Ven-a-Care of the | ) |
| Florida Keys, Inc., v. | ) |
| Abbott Laboratories, Inc., | ) |
| and Hospira, Inc. | ) |
| CIVIL ACTION NO. 06-11337-PBS | ) |

*********************************************************

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | ) |
| INDUSTRY AVERAGE WHOLESALE | ) MDL No. 1456 |
| PRICE LITIGATION | ) Civil Action |
| | ) No. 01-CV-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) Judge Patti B. Saris |
| State of Arizona v. Abbott | ) |
| Labs., et al. | ) |
| Civil Action No. 06-CV-11069-PBS | ) |

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

ROBERT JAMES LYMAN

June 27, 2007

*********************************************************

a386ab11-cb63-46dc-bdb5-78b9cc2c0e6b

Page 34

1    Q. (BY MR. RIKLIN) Okay. And -- and what other
2  responsibilities did you have in connection with
3  overseeing the contracts?
4          MS. TABACCHI: Object to the form.
5    A. Those were the primary responsibilities.    09:39
6    Q. (BY MR. RIKLIN) Okay. And with regard to
7  the critical-care products, what was your
8  responsibility from 1999 to 2001?
9    A. Oversaw the contracts for the critical-care
10  products.                              09:40
11   Q. The same -- the same responsibilities as with
12  the Berlex products?
13   A. Yes.
14   Q. Okay. And then your responsibility
15  overseeing government contracts, what did that -- what  09:40
16  did those responsibilities entail?
17   A. That's overseeing the Federal Supply Schedule
18  contract and the Federal Ceiling Price contract.
19   Q. Did you -- during that time period, 1999 to
20  2001, did you have a -- Abbott employees that you   09:40
21  supervised?
22   A. Yes.
23   Q. How many?
24   A. For the critical-care products, it was a
25  manager and two analysts.                 09:40

Page 35

1    Q. Who was the manager?
2    A. The manager actually came in fairly late. I
3  had two. One was Martine Cadichon.
4    Q. How do you spell that last name?
5    A. C-a-d-i-c-h-o-n.                      09:41
6    Q. Okay.
7    A. Roughly.
8    Q. And who were the two analysts?
9    A. Carol Felgenhauer, and I'm -- there was a
10  gentleman working for me, and his name escapes me at  09:41
11  this point in time.
12   Q. And what were the critical-care products that
13  you were selling?
14   A. It was capital equipment for Sv02, which is
15  blood oxygenation, and the catheters associated with  09:41
16  that and disposable transducers and pressure-tubing
17  kits.
18   Q. All right. And then -- okay. We've -- have
19  we covered your responsibilities regarding government
20  contracts? That included federal supply contracts and  09:42
21  Federal Ceiling Price contracts?
22   A. Up -- up through 2001, yes.
23   Q. All right. How did your responsibilities
24  change in 2001?
25   A. Well, they moved me over completely to   09:42

Page 36

1  government operations, and about the same time I
2  picked up responsibility for Medicaid.
3    Q. And when you say you picked up responsibility
4  for Medicaid, what were those responsibilities?
5    A. That was overseeing the Medicaid reporting,  09:43
6  which was AMP and best-price reporting on a quarterly
7  basis and the Public Health Service price reporting.
8    Q. Okay. The best-price reporting on a
9  quarterly basis. What was the other one?
10   A. Average manufacturer's price, best price and  09:43
11  Public Health Service pricing.
12   Q. What did Public Health Service pricing
13  include?
14          MS. TABACCHI: Object to the form.
15   A. That was a calculation to take AMP and any   09:43
16  rebates that are paid under the Medicaid program and
17  to calculate a price to report under the Public Health
18  Service agreement.
19   Q. (BY MR. RIKLIN) To report to the government?
20   A. Yes.                              09:44
21   Q. Who did you report to beginning in 1999 when
22  you assumed responsibility for Berlex products,
23  critical-care products and overseeing government
24  contracts?
25   A. It was Pat Keeley.                     09:44

Page 37

1    Q. Pat Keeley.
2          Did that change in 2001 when you moved
3  completely to government operations?
4    A. Yes.
5    Q. Who did you report to then?          09:44
6    A. It was Mike Sellers.
7    Q. Okay. What was his title?
8    A. He was general manager contract marketing.
9    Q. Okay. And you -- you had respons- --
10  complete responsibility for government operations   09:45
11  until 2004?
12          MS. TABACCHI: Object to the form.
13   Q. (BY MR. RIKLIN) Is that correct?
14   A. Yes.
15   Q. Until the spinoff?                    09:45
16          MS. TABACCHI: Object to the form.
17   Q. (BY MR. RIKLIN) When was the spinoff?
18   A. I'm -- about three years ago, or maybe it's
19  been four. I'm not really sure.
20   Q. 2003, 2004 time frame?                09:45
21   A. It was in that range, yes.
22   Q. Okay. Were -- were you involved in the --
23  was there a transition team in connection with the
24  Hos- -- Hospira spinoff?
25          MS. TABACCHI: Object to the form.   09:45

10  (Pages 34 to 37)

a386ab11-cb63-46dc-bdb5-78b9cc2c0e6b

Page 302

```
 1        CHANGES AND SIGNATURE
 2   PAGE    LINE         CHANGE   REASON
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 304

```
 1   STATE OF TEXAS )
 2   COUNTY OF TRAVIS )
 3        I, WILLIAM M. FREDERICKS, CSR No. 2392, do
 4   hereby certify that, pursuant to the agreement
 5   hereinabove set forth, there came before me on the
 6   27th day day of June, 2007, at 9:07 o'clock a.m., in
 7   the offices of Jones Day, 77 West Wacker Drive,
 8   Suite 3500, Chicago, Illinois, the following named
 9   person, to-wit: ROBERT JAMES LYMAN, who was by me duly
10   sworn to testify to the truth and nothing but the
11   truth of witness' knowledge touching and concerning
12   the matters in controversy in this cause; that such
13   witness was thereupon examined under oath, and the
14   examination transcribed by computer-assisted
15   transcription by me or under my supervision, and that
16   the deposition is a true record of the testimony given
17   by the witness.
18        I further certify that I am neither attorney
19   nor counsel for, nor related to or employed by, any of
20   the parties to the action in which this deposition is
21   taken and, further, that I am not a relative or
22   employee of any attorney or counsel employed by the
23   parties hereto, or financially interested in the
24   action.
25        That the amount of time used by each party at
```

Page 303

```
 1
 2
 3
 4
 5        I, ROBERT JAMES LYMAN, have read the foregoing
 6   deposition and hereby affix my signature that same is
 7   true and correct, except as noted above.
 8
 9            ROBERT JAMES LYMAN
10   THE STATE OF              )
11   COUNTY OF                 )
12     Before me,                        ,
13   on this day personally appeared ROBERT JAMES LYMAN,
14   known to me (or proved to me under oath or through
15                         (description of
16   identity card or other document) to be the person
17   whose name is subscribed to the foregoing instrument
18   and acknowledged to me that the executed the same for
19   the purposes and consideration therein expressed.
20     Given under my hand and seal of office this
21   day of              , 2007.
22
23
       NOTARY PUBLIC IN AND FOR
24
       THE STATE OF
25
```

Page 305

```
 1   the deposition is as follows:
 2        Mr. Rand J. Riklin - 04:45
 3        Mr. Raymond C. Winter - 01:26
 4
 5        IN WITNESS WHEREOF I have hereunto set my
 6   hand on this 9th day of July, A.D. 2007.
 7
 8
 9            WILLIAM M. FREDERICKS, Texas CSR 2392
             Expiration Date: 12/31/2007
             Firm Registration No. 82
10           Fredericks-Carol Reporting
             7800 Shoal Creek Boulevard
11           Suite 200 W
             Austin, Texas 78757
12           Telephone: (512) 477-9911
                       (800) 234-3376
13           Fax:      (512) 345-1417
14
     JOB NO. 2493
15
16
17
18
19
20
21
22
23
24
25
```

77 (Pages 302 to 305)

Page 306

```
 1        NO. D-1-GV-04-001286
 2  THE STATE OF TEXAS    ) IN THE DISTRICT COURT
                          )
 3  ex rel.               )
      VEN-A-CARE OF THE   )
 4    FLORIDA KEYS, INC., )
         Plaintiffs,      )
 5                        )
      VS.                 ) TRAVIS COUNTY, TEXAS
 6                        )
    ABBOTT LABORATORIES INC.,   )
 7  ABBOTT LABORATORIES,        )
    HOSPIRA, INC., and B. BRAUN )
 8  MEDICAL INC.,               )
         Defendant(s).   ) 201ST JUDICIAL DISTRICT
 9
10        REPORTER'S CERTIFICATION
       DEPOSITION OF ROBERT JAMES LYMAN
11           June 27, 2007
12     I, WILLIAM M. FREDERICKS, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15     That the witness, ROBERT JAMES LYMAN, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony
18  given by the witness;
19     That the deposition transcript was submitted on
20  July 9, 2007, to the witness or to the attorney for
21  the witness for examination, signature and return to
22  me by July 30, 2007;
23     That the amount of time used by each party at the
24  deposition is as follows:
25     Mr. Rand J. Riklin - 04:45
```

Page 307

```
 1     That pursuant to information given to the
 2  deposition officer at the time said testimony was
 3  taken, the following includes counsel for all parties
 4  of record:
 5        MR. RAYMOND WINTER,
            Attorney for Plaintiff State of Texas;
 6        MR. RAND RIKLIN,
            Attorney for the Relator;
 7        MS. TINA TABACCHI,
            Attorney for Defendants Abbott
 8        Laboratories, Inc. and Hospira, Inc.;
          MS. ANN M. ST. PETER-GRIFFITH,
 9          Attorney for Plaintiff United States of
            America;
10        MR. CHRISTOPHER STUART,
            Attorney for Plaintiff State of Arizona
11          and MDL Plaintiffs;
          MR. ELISEO SISNEROS, Attorney for the
12          State of California;
13     I further certify that I am neither counsel for,
14  related to, nor employed by any of the parties or
15  attorneys in the actions in which this proceeding was
16  taken, and further that I am not financially or
17  otherwise interested in the outcome of the action.
18     Further certification requirements pursuant to
19  Rule 203 of TRCP will be certified to after they have
20  occurred.
21
22
23
24
25
```

Page 308

```
 1     Certified to by me this 9th day of July, 2007.
 2
 3
          WILLIAM M. FREDERICKS, Texas CSR 2392
 4        Expiration Date:  12/31/2007
          Firm Registration No. 82
 5        Fredericks-Carol Reporting
          7719 Wood Hollow Drive, Suite 156
 6        Austin, Texas 78731
          Telephone: (512) 477-9911
 7              (800) 234-3376
          Fax:    (512) 345-1417
 8
 9  JOB NO. 2493
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 309

```
 1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2     The original deposition was/was not returned to
 3  the deposition officer on July 30, 2007;
 4     If returned, the attached Changes and Signature
 5  page contains any changes and the reasons therefor;
 6     If returned, the original deposition was delivered
 7  to Mr. Rand J. Riklin, Custodial Attorney;
 8     That $    is the deposition officer's
 9  charges to the Plaintiff(s) for preparing the original
10  deposition transcript and any copies of exhibits;
11     That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate
13  was served on all parties shown herein on and filed
14  with the Clerk.
15     Certified to by me this     day of
16    , 2007.
17
18
19
          WILLIAM M. FREDERICKS, Texas CSR 2392
20        Expiration Date:  12/31/2007
          Firm Registration No. 82
21        Fredericks-Carol Reporting
          7719 Wood Hollow Drive, Suite 156
22        Austin, Texas 78731
          Telephone: (512) 477-9911
23              (800) 234-3376
          Fax:    (512) 345-1417
24
25  JOB NO. 2493 wmf
```

78 (Pages 306 to 309)

a386ab11-cb63-46dc-bdb5-78b9cc2c0e6b

# EXHIBIT 51

Page 1

                    THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL        )  MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01CV12257-PBS

_____


                    Videotaped Deposition of P. LOREEN

                    MERSHIMER, at 77 West Wacker Drive,

                    Chicago, Illinois, commencing at

                    9:00 a.m. on Thursday,

                    August 23, 2007, before Donna M.

                    Kazaitis, RPR, CSR  No. 084-003145.

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

Mershimer, P. Loreen                              August 23, 2007
                        Chicago, IL

Page 42

1  development of that compound.
2           In-licensing products, I spent a
3  considerable amount of time looking at products to
4  bring into our portfolio.
5           I had responsibility for the
6  marketing team and the sales team, well, the
7  marketing team was one person.
8      Q.   Who was that person?
9      A.   Bill, I don't remember his last name
10 right now.  He left the company.  I'd have to
11 think.
12     Q.   And how many people were on the sales
13 team?
14     A.   At that time it was probably
15 twenty-three people, thirty, thirty-five.  I don't
16 know.  It was small.
17     Q.   Do you remember their names?
18     A.   Gai Pelli, Dana Caller.  I'd have to
19 really think.
20     Q.   Was Mike Heggie one of your
21 subordinates?
22     A.   Mike Heggie was over on reimbursement,

Page 43

1  and he supported my business along with other
2  businesses.
3      Q.   Meaning he supported renal and other
4  components of the hospital business?
5      A.   No.  At that time he was over in
6  Alternate Site and I was in Alternate Site.
7      Q.   Was renal a component part of Alternate
8  Site?
9      A.   Yes.
10     Q.   So Mr. Heggie provided reimbursement
11 services for Alt Site as well as, for renal as
12 well as other components of Alt Site?
13     A.   Yes.
14     Q.   What were the other components of Alt
15 Site that he supported?
16     A.   You know, I don't remember in detail
17 because that was set up before I came in.  So I
18 don't remember.
19           I know he assisted Mike Sellers and
20 Pete Baker, but I'm not sure, you know, what, I
21 don't know the details behind that.
22     Q.   But he reported to you with regard to

Page 44

1  renal reimbursement issues?
2      A.   Yes.
3      Q.   Any other responsibilities?
4      A.   No.  I mean the big focus was really
5  R&D.  We had a new product to get through, and I
6  was working on, spent a lot of time with LaJolla
7  Pharmaceuticals because I was working on a drug
8  for lupus nephritis.
9      Q.   Approximately how many drugs was the
10 renal department responsible for?
11     A.   It was responsible for Calcijex, and
12 then we were working on Zemplar.
13     Q.   Were you at all involved in pricing of
14 products within the renal area?
15     A.   I was involved in thinking through price
16 increases for those products, yes.
17     Q.   What were your responsibilities with
18 regard to pricing or thinking through price
19 increases?
20     A.   As part of the forecasting, I would
21 determine or along with other people what would be
22 the percentage price increase we would take each

Page 45

1  year and when we might want to consider taking
2  that price increase.
3      Q.   Which price would be increased?
4      A.   Calcijex, we would increase the Calcijex
5  price.
6      Q.   Would that be Calcijex prices on
7  contracts?
8      A.   It would be increasing our list price.
9      Q.   And would the list price on Calcijex
10 increase every year?
11     A.   I believe so.  I mean most of our
12 proprietary products we increased our price every
13 year.
14     Q.   Well, when you were there during your
15 tenure in renal, do you recall whether it
16 increased every year?
17     A.   I don't recall if I increased it every
18 year or not.
19     Q.   Do you remember what factors were
20 considered in making a decision to increase the
21 price for Calcijex?
22     A.   Usually CPI, what was the Consumer Price

12 (Pages 42 to 45)

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

Mershimer, P. Loreen                        August 23, 2007
                        Chicago, IL

---

Page 46

1  Index going up, and what was the general
2  healthcare price index going up.
3      Q.   Did you have any responsibilities
4  regarding reporting Calcijex pricing?
5      A.   No.  I did not.
6          MR. DALY:  Object to the form.  Go
7  ahead.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   Who did?
10         MR. DALY:  Object to the form.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   Go ahead.  You can answer the question.
14 From time to time Mr. Daly may assert an
15 objection.  And unless he provides an instruction
16 to you not to answer, you can go ahead and answer
17 the question.
18     A.   I don't know who did.  I would -- I
19 don't know.
20     Q.   Was the list price for Calcijex the
21 price that was charged to contract customers of
22 Abbott?

---

Page 47

1      A.   Yes.  Most of the time that would be the
2  price, yes.  I don't think we had a lot of
3  products under contract.  I think we charged them
4  a list price, you know.  I don't remember the
5  details behind that.
6      Q.   Well, how did your sales force operate
7  in the renal department?
8      A.   Could you explain what you mean by
9  "operate"?
10     Q.   Sure.  Let me clarify.
11         Would your sales department enter
12 into sales contracts --
13     A.   Oh, no, because this was a proprietary
14 product.
15     Q.   Okay.  Can you explain what you mean by
16 that?
17     A.   Well, when you have a patent on a
18 product, it's very unusual that you would want to
19 discount that product, unless you had a lot of
20 competition.
21     Q.   So this wasn't a generic product?
22     A.   No.

---

Page 48

1      Q.   And I'm sorry, I don't think, did I ask
2  you who you reported to when you were the head of
3  renal?
4      A.   I reported to Don Robertson.
5      Q.   And what was Mr. Robertson's position?
6      A.   Vice president of Alternate Site.  As
7  you can guess, I just don't worry about formal
8  titles.
9      Q.   And then when you moved on to the
10 Hospital Business Sector to work with the IV
11 solutions, when you transitioned to that role were
12 you automatically promoted to divisional vice
13 president?
14     A.   Yes, I was.
15     Q.   And when you became a divisional vice
16 president, who did you report to?
17     A.   Rick Gonzalez.
18     Q.   And what was Mr. Gonzalez's position?
19     A.   He was the president of HPD.
20     Q.   So you reported directly up to the
21 president?
22     A.   Yes, I did.

---

Page 49

1      Q.   Did you supervise anyone in your
2  capacity as divisional vice president when you
3  oversaw the IV solutions?
4      A.   Yes.  I would have general managers
5  responsible for the various business.
6      Q.   Do you remember who those general
7  managers were?
8      A.   Bob Fellicelli was in charge of
9  solutions, Ed Hayman, Tom Moore.  And then some of
10 those people would move in and out of various
11 positions, and I'm not sure the times because I
12 was over them a number of different years.  So I'm
13 not sure when they moved if they moved when they
14 were reporting to me or reporting to Mary.
15     Q.   Okay.  For Mr. Hayman what products did
16 he oversee?
17     A.   Ed Hayman oversaw our electronic drug
18 delivery systems.
19     Q.   Can we call that EDDS?
20     A.   Yes.  We can call it EDDS.
21     Q.   For short.
22         And Mr. Moore?

---

13 (Pages 46 to 49)

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

Mershimer, P. Loreen                          August 23, 2007
                        Chicago, IL

---

Page 78

1  someone has said hey, here's common terms.  But I
2  don't remember.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Did you ever see the term in any
5  communications that you've received at Abbott?
6      A.   I've seen the general term "AWP" in
7  several communications.
8      Q.   Do you remember what they were, what the
9  communications were?
10     A.   I believe I would see it in an
11 overarching training, like here's how J codes are
12 and here's what DRGs are and here's what hospital
13 codes are.  So you would see it in that type of a
14 overarching presentation.
15     Q.   Any other communications that you can
16 think of?
17     A.   You know, we would submit our list
18 prices to the Contract Marketing team.  So I'm not
19 sure as you see things coming back from Contract
20 Marketing or you see things coming back from
21 government publications if I would see the
22 terminology.

Page 79

1      Q.   When you say you would submit your list
2  prices to the Contract Marketing team, what do you
3  mean?  Do you mean the general managers?
4      A.   The general managers would have list
5  prices you would submit to the Contract Marketing
6  team -- well, that's probably not the right
7  terminology.
8      Q.   Go ahead.
9      A.   I'm trying to think through what the
10 right terminology is.
11          I'm not sure because that was
12 really handled by the Contract Marketing team.
13     Q.   When you say that list prices were
14 submitted to the Contract Marketing team --
15     A.   Maybe I should really say price
16 increases.
17     Q.   Price increases, okay.
18          Who would be responsible for
19 setting price increases to list price?
20     A.   It depended upon the job you were in and
21 the time span and who you were with.
22          So for like Abbott International,

Page 80

1  it would have been the various country managers
2  who would submit prices to their, if you could get
3  a price increase to the governments of the
4  different countries.
5          For the marketing managers, it
6  depended upon if you were under a proprietary
7  product or if you were under the ones that were
8  bidded to hospitals.  Because if you were under
9  the big hospital bids, then Contract Marketing
10 would work on that.
11          If you were sitting there and you
12 had a proprietary product, then you might say I
13 want to take a three and a half, four percent
14 price increase, because that's what CPI is
15 running, you know.  And they would give you here's
16 the negotiations on CPI and you will say let's
17 take a three and a half, four percent, price
18 increase.
19     Q.   When you were the divisional vice
20 president overseeing the Hospital Business
21 Sector's IV solutions, would either you or your
22 general managers submit proposed list prices to

Page 81

1  the Contract Marketing team?
2      A.   No.  We were really focused only on our
3  net price and we were focused on bids to
4  hospitals.
5      Q.   When you say "net price," what do you
6  mean?
7      A.   We were focused on the price that we
8  were going to, minus the, you know, the price that
9  we would receive after the discount that we would
10 offer a hospital.
11     Q.   Do you know whether any of the pricing
12 decisions that were made by your staff when you
13 were overseeing the Hospital Business Sector IV
14 solutions and that grouping of products, do you
15 know whether any of the pricing decisions that you
16 made impacted the Home Infusion or Alternate Site
17 areas of HPD?
18     A.   No.  I mean they were small.  They
19 wouldn't have, you know, I would make -- no.  I
20 don't have any idea on that.  I'd make my
21 decisions based on what we needed to do to win the
22 bids against Baxter or McGaw.

21  (Pages 78 to 81)

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

Mershimer, P. Loreen                    August 23, 2007
                     Chicago, IL

---

Page 82

1    Q.   But your decisions did not -- when you
2  say you would make your decisions, you're talking
3  about decisions regarding net price as opposed to
4  list price?
5    A.   Correct.
6    Q.   I just want to make sure that we're
7  absolutely clear.  Did either you or your general
8  managers have any responsibility for setting list
9  prices when you were in the Hospital Business
10 Sector overseeing the IV solutions, EDDS, IV kits,
11 in that product line?
12       MR. DALY:  Object to the form.  Go
13 ahead.
14       THE WITNESS:  No.  We did not, with the
15 exception if we would have a new product, and the
16 new product usually the list price would be the
17 price that we would start off with a new
18 proprietary product.  We wouldn't offer a
19 discount.  So that would be a list price.
20 BY MS. ST. PETER-GRIFFITH:
21   Q.   Are you familiar with the term "WAC"?
22   A.   I've heard about it, but I don't really

---

Page 83

1  know it or understand it.
2    Q.   Do you have any understanding as to what
3  it means, or is it just a term that you've heard?
4    A.   My understanding is it means wholesaler
5  acquisition.
6        MS. ST. PETER-GRIFFITH:  We need to
7  change the tape.  So why don't we take a brief
8  minute here.
9        THE WITNESS:  Okay.
10       THE VIDEOGRAPHER:  We are off the record
11 at 10:38 a.m. with the end of Tape No. 1.
12       (WHEREUPON a recess was taken.)
13       THE VIDEOGRAPHER:  We are back on the
14 record at 10:39 a.m. with the start of Tape No. 2.
15       THE WITNESS:  Okay.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Ms. Mershimer, just before we had the
18 tape change we were discussing the definition of
19 the term "WAC," and you indicated that you
20 understood it to mean wholesaler acquisition cost?
21       MR. DALY:  Object to the form.
22       THE WITNESS:  I thought it was the

---

Page 84

1  wholesaler acquisition.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   Okay.  And what does that mean,
4  wholesaler acquisition?
5        MR. DALY:  Object to the form.
6        THE WITNESS:  You know, I'm not really
7  sure because we had people who specialized in
8  that.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.   Who were those individuals?
11   A.   They were over in the Contract Marketing
12 organization.
13   Q.   Do you remember their names?
14   A.   I figured you were going to ask me that
15 next.
16       I believe Harry Adams.  I'm trying
17 to think if I know anybody else.  I'm not, the
18 only one I can think of is Harry Adams.
19   Q.   Okay.  "List price," what is list price?
20   A.   That's the price I charge a customer who
21 doesn't have a contract or a price if I have a
22 proprietary product I charge everybody in the

---

Page 85

1  United States.
2    Q.   For nonproprietary products do you know
3  how often list price is charged?
4    A.   It would really vary by the product and
5  it would vary by when competitors would go in and
6  out of business.
7        So, for example, I might have a
8  product where the competitor goes out of business
9  and I only have half the hospitals and Baxter has
10 the other half of the hospitals.  In that case the
11 other hospitals would pay the list price when
12 Baxter would back order or if they would be out of
13 business for six months, nine months, twelve
14 months.
15   Q.   Any other time that you can think of
16 when Abbott would charge list price?
17   A.   Oh, I charge list price for most of the
18 proprietary products all the time.
19   Q.   I should have qualified.  I meant in a
20 nonproprietary product setting.
21   A.   When we're between contracts, if someone
22 has left our contract and they're going to go over

                              22  (Pages 82 to 85)

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

Mershimer, P. Loreen                     August 23, 2007
                        Chicago, IL

Page 86

1   to the competitor's products, you can't convert a
2   hospital very quickly, or if you have a large
3   hospital chain.  So we would definitely charge
4   them list prices.
5       Q.   Are list prices as --
6       A.   Small hospitals that are, you know,
7   fifty bed hospitals, small hospitals.  It costs a
8   lot of money to distribute to them and ship to
9   them, and you don't have, it's really expensive
10  for the freight.  You have to bring all these
11  products and different list numbers and freight
12  things down.
13      Q.   Does the list price include cost of
14  shipping and distribution?
15      A.   I'm not sure.  I don't know for sure.
16  We'd have to ask someone who's in our finance
17  department.
18      Q.   The next term is "direct price."  Is
19  that a term that you're familiar with?
20      A.   I'm not a hundred percent, I'm not about
21  like sixty percent sure.  I have a guess, but I'm
22  not sure.

Page 87

1           MR. DALY:  Objection, calls for
2   speculation.
3   BY MS. ST. PETER-GRIFFITH:
4       Q.   I don't want you to guess.
5       A.   Okay.  No, I don't.
6       Q.   "Catalog price"?
7       A.   No.
8       Q.   No, you don't have an understanding as
9   to that term?
10      A.   No.  My thought would be catalog price
11  and list price is just the same term.
12      Q.   Okay.  "RxLink price"?
13      A.   RxLink, I know a little bit about it but
14  not very much.
15          RxLink was a price where
16  wholesalers would keep extra inventory of our
17  products.  So if people went on back order, they
18  could offer an intermediate price.
19          And that was I think focused more
20  on, there were several groups of products and
21  several manufacturers, a company called Lyphomed,
22  that was always going in and out of production and

Page 88

1   always having quality problems and always having
2   the FDA shut them down.  So I think it was
3   associated mostly with the products that that
4   company, you know, that group of products.
5       Q.   "DOJ price"?
6           MR. DALY:  Object to the form.
7   BY MS. ST. PETER-GRIFFITH:
8       Q.   Is that a term that you've heard?
9       A.   No.
10      Q.   "Ven-A-Care price," is that a term that
11  you've heard?
12      A.   No, no.
13      Q.   "Resource list"?
14      A.   No.
15      Q.   "Spread"?
16      A.   It's not a terminology that I use.  I've
17  heard the terminology in the newspaper.
18      Q.   Okay.
19      A.   And the Pink Sheets.
20      Q.   Have you ever used it yourself?
21      A.   No.
22      Q.   Are you familiar with a 2002 DOJ Pricing

Page 89

1   Survey?
2       A.   I wouldn't know what a, no, I don't know
3   what that is.
4       Q.   Are you aware or were you -- strike
5   that.
6           In 2002 were you ever involved with
7   discussions concerning proposed pricing changes by
8   the Department of Justice in 2000?
9           MR. DALY:  Object to the form.
10          THE WITNESS:  Not to my knowledge.
11  You'd have to give me more information to know
12  what you're talking about.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   Well, I just want to know just generally
15  if you have an understanding.
16      A.   No.
17      Q.   In 2001 did Abbott make large scale
18  price adjustments to its generic products?
19      A.   I don't know.
20      Q.   Are you familiar with any price
21  adjustments that were made to generic products in
22  or about the spring of 2001?

23  (Pages 86 to 89)

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

Mershimer, P. Loreen                    August 23, 2007
                    Chicago, IL

Page 286

1       MR. DALY: I'm going to object.  This
2  question has been asked like ten times now, and
3  I'm going to instruct her not to answer.  I think
4  you're being harassing at this point.
5       MR. RICKLIN:  You're not going to answer
6  that question?
7       MR. DALY:  She's already answered it ten
8  times.
9       MR. RICKLIN:  No, never answered it, but
10  okay.
11          You're going to follow your
12  attorney's instruction?
13       THE WITNESS:  I'm going to follow my
14  attorney's instruction.
15  BY MR. RICKLIN:
16     Q.   Ms. Mershimer, are you aware that
17  third-party payors such as Medicaid determine
18  reimbursement at this point?
19       MR. DALY:  Object to the form.
20  BY MR. RICKLIN:
21     Q.   Is that something that you're aware of?
22     A.   No.  I'm not aware of that detail on

Page 287

1  Medicaid.
2     Q.   You've never heard that?
3     A.   I've never gotten involved in a lot of
4  issues with Medicaid, no.
5     Q.   But my question is have you ever heard
6  that third-party payors such as Medicaid determine
7  reimbursement from AWPs?
8       MR. DALY:  Object to the form.
9       THE WITNESS:  No.  I have not heard
10  that.
11  BY MR. RICKLIN:
12     Q.   Never heard that?
13     A.   No.  I have not.
14     Q.   Did Abbott increase its list prices
15  annually?
16     A.   We would increase our list prices
17  routinely.  It wouldn't always be on an annual
18  basis.
19     Q.   But on a regular basis; correct?
20     A.   Correct.
21     Q.   And generally was that annually?
22     A.   Sometimes it would be annually.  I

Page 288

1  increase my prices every two years, sometimes
2  every six months.
3     Q.   Earlier you told us that for proprietary
4  products the list price was generally the price
5  charged to the customer; correct?
6     A.   Correct.
7     Q.   What about for generic products?  Is the
8  list price for Abbott's generic products different
9  from the market price for those products?
10       MR. DALY:  Object to the form.  Go
11  ahead.
12       THE WITNESS:  The list price would be
13  paid by hospitals that weren't under contract with
14  us.  So those hospitals would pay the list price.
15  As well as any time there are back orders or
16  customers go out, people go out of business,
17  anybody would then pay that list price that wasn't
18  contracted with us.
19  BY MR. RICKLIN:
20     Q.   For the hospitals that did have
21  contracts with Abbott, did they pay less than list
22  price for generic products?

Page 289

1     A.   They would pay, we would negotiate a
2  discount.
3     Q.   They'd pay a contract price?
4     A.   They'd pay a contract price.
5     Q.   And would you agree that the contract
6  price was less than the list price for Abbott's
7  generic products?
8     A.   Yes.
9     Q.   And that was true for the hospital
10  customers; correct?
11     A.   Yes.
12     Q.   And that was true for the Alternate Site
13  customers; correct?
14     A.   I didn't have Alternate Site products,
15  so I don't know the details there.  But I know it
16  was true for the hospital products, I mean to the
17  hospitals.
18     Q.   I understand that you weren't
19  responsible for the Alternate Site customers.  But
20  is that your understanding, that the Alternate
21  Site customers that had contracts paid less than
22  list price for Abbott's generic products?

73 (Pages 286 to 289)

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

Mershimer, P. Loreen                                      August 23, 2007
                          Chicago, IL

Page 318

1  we have to do to get her back.  It's been a long
2  day.
3        MR. RICKLIN:  I understand.
4        MR. DALY:  We started at 9:00.
5        MR. RICKLIN:  I mean it's your call and
6  the witness' call.
7        MR. DALY:  Yeah, I don't think we could,
8  I mean I'd like to but I think it's just too much
9  to ask the witness to sit here for twelve hours of
10 deposition.  It's just not going to happen.
11       So what I would suggest is that, if
12 you want to, just finish that document or just
13 finish and we'll call it a day.
14       MR. RICKLIN:  Let me at least finish
15 the, we're not going to finish under those
16 constraints.
17       MR. DALY:  Right.
18       MR. RICKLIN:  But let me at least finish
19 the document.
20       MR. DALY:  That's what I'm offering up.
21       MR. RICKLIN:  That's great.
22

Page 319

1  BY MR. RICKLIN:
2     Q.   Ms. Mershimer, I believe you told us
3  earlier that the regular list price increases were
4  generally based at least in part upon the CPI, or
5  Consumer Price Index, at least in part; is that
6  right?
7     A.   Correct.
8     Q.   We're back on Exhibit Mershimer 052.  The
9  next sentence, before the break I had asked you about
10 the sentence in the second paragraph beginning
11 "Due to other considerations."  Do you recall
12 that?
13    A.   No, I don't.  Which paragraph are you
14 on?
15    Q.   Under Background.
16    A.   "Due to," is that the word it starts off
17 with?
18    Q.   Right.
19       MR. DALY:  Kind of in the middle of that
20 paragraph right there.
21       MR. RICKLIN:  Yeah, right in the middle.
22       THE WITNESS:  Oh, yeah, I've got it.

Page 320

1  BY MR. RICKLIN:
2     Q.   The next sentence in that paragraph
3  states "Increases that generally approximated the
4  change in Consumer Price Index change for the
5  urban market basket (CPI-U) exacerbating any
6  differential to real prices in the market."
7        Was that a true statement as of
8  January 2001 that the annual increases generally
9  approximated the change in Consumer Price Index
10 change for the urban market basket?
11       MR. DALY:  Object to the form.  Go
12 ahead.
13       THE WITNESS:  I don't have enough
14 knowledge of the urban market basket.  I thought
15 it would be a hospital basket.
16 BY MR. RICKLIN:
17    Q.   But as far as approximating the change
18 in the Consumer Price Index, you did testify
19 earlier that that was a factor --
20    A.   Yes, I did.
21       MR. DALY:  Let him finish.
22 BY MR. RICKLIN:

Page 321

1     Q.   -- in the regular list price increases;
2  correct?
3     A.   Yes.
4     Q.   Okay.  The next sentence states "Though
5  the majority of eventual sales dollars are
6  processed at steep discounts to the catalog
7  pricing under contractual commitments, there
8  continues to be a small portion of sales (less
9  than one percent) which are processed at these
10 elevated levels."
11       Earlier I believe you told us that
12 you did not know the percentage of prices in which
13 the sales -- excuse me.  Earlier I believe you
14 told us you didn't know the exact percentage of
15 sales of HPD products that were sold at list
16 price; correct?
17       MR. DALY:  Object to the form,
18 mischaracterizes.  Go ahead.
19       THE WITNESS:  I do not know the
20 percentage in aggregate.
21 BY MR. RICKLIN:
22    Q.   So do you have any reason or any

81 (Pages 318 to 321)

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

Mershimer, P. Loreen                      August 23, 2007
                        Chicago, IL

---

Page 326

1  the reduction in the list prices?
2      A.  No.  I'm not aware.
3      Q.  You had never heard anything about that?
4      A.  No, I didn't.
5          MR. RICKLIN:  I'm through with this
6  document, but I am not through with the
7  deposition, obviously.  And obviously we're going
8  to keep it open and reserve the right to ask
9  additional questions.  But I understand it's been
10 a long day.
11         MR. DALY:  And there's several hours
12 more based on what you told me and Mr. Sisneros.
13         MR. RICKLIN:  Well, that's right.  It's
14 reasonable to break now.
15         Thank you for your time,
16 Ms. Mershimer.
17         THE VIDEOGRAPHER:  We are off the record
18 at 5:25 p.m. with the conclusion of Day 1 in the
19 deposition of P. Loreen Mershimer.
20         (WHEREUPON said deposition was so
21           concluded.)
22

---

Page 327

1
2
3
4
5      _____
6      SIGNATURE OF THE WITNESS
7
8  Subscribed and sworn to and before me
9  this _____ day of _____, 20_____.
10
11
12 _____
13     Notary Public
14
15
16
17
18
19
20
21
22

---

Page 328

1  STATE OF ILLINOIS )
2  COUNTY OF C O O K )
3
4          I, Donna M. Kazaitis, RPR, CSR No.
5  084-003145, do hereby certify:
6      That the foregoing deposition of P. LOREEN
7  MERSHIMER was taken before me at the time and
8  place therein set forth, at which time the witness
9  was put under oath by me;
10     That the testimony of the witness and all
11 objections made at the time of the examination
12 were recorded stenographically by me, were
13 thereafter transcribed under my direction and
14 supervision and that the foregoing is a true
15 record of same.
16     I further certify that I am neither counsel
17 for nor related to any party to said action, nor
18 in any way interested in the outcome thereof.
19     IN WITNESS WHEREOF, I have subscribed my name
20 this 4th day of September, 2007.
21     _____
22     Donna M. Kazaitis, RPR, CSR 084-003145

---

83 (Pages 326 to 328)

Henderson Legal Services
202-220-4158

4fc9d2be-cc0f-4fcf-9f27-0afaa11b9233

# EXHIBIT 52

Miller, James E.                                July 30, 2007
Chicago, IL

              IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS


       ----------------------------X
       IN RE:  PHARMACEUTICAL        )
       INDUSTRY AVERAGE WHOLESALE    )
       PRICE LITIGATION             ) MDL No. 1456
       ----------------------------) Civil Action
       This document relates to:    ) No. 01-12257-PBS
       United States of America,    )
       ex. rel. Ven-a-Care of the   )
       Florida Keys, Inc.,          ) Hon. Patti Saris
            vs.                      )
       Abbott Laboratories, Inc.,   ) Magistrate Judge
       CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler
       ----------------------------X


                   VIDEOTAPED DEPOSITION OF

                      JAMES E. MILLER

                        CHICAGO, IL

                       JULY 30, 2007

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 54

1    way. Who picked the members of the Medicare
2    Working Group?
3        A.   The initial participants were suggested
4    by Mr. Moorehead.
5        Q.   And the individuals that are listed in
6    Exhibit Miller 1162, are those the individuals
7    that were suggested by Mr. Moorehead?
8        A.   I do not remember.
9        Q.   Are some of the individuals that are to
10   be found on the list of Exhibit Miller 1162 some
11   of the individuals that Mr. Moorehead suggested?
12       A.   Yes.
13       Q.   What individuals are those?
14       A.   I cannot answer with total accuracy.
15       Q.   To the best of your recollection.
16       A.   I mean there are people -- I don't
17   know. I mean ADD, Paul Landauer had -- well, I'm
18   not -- I'm not sure who was on the original list.
19   I mean that's ten years ago, guys.
20       Q.   From the best of your recollection,
21   were most of the individuals that Moorehead
22   suggested to you in fact the members of the

Page 55

1    Medicare Working Group?
2        A.   I remember there were people that
3    showed up for the initial meetings that said,
4    "Why am I here?"
5        Q.   When was that initial meeting?
6        A.   It would have to be in the fall of '96.
7        Q.   August, September, October, November of
8    '96?
9        A.   Somewhere after I was there.
10           MS. TABACCHI:  Object to form.
11   BY MR. SISNEROS:
12       Q.   And when these individuals asked, "Why
13   am I here," what did you tell them?
14       A.   "It's a working group to share
15   information on the reimbursement products.  If
16   you're responsible for that, you belong here.  If
17   you're not responsible for that, give me a name."
18       Q.   So at least in the -- in identifying
19   the members that were to be on the Medicare
20   Working Group, they were to be individuals that
21   were responsible for reimbursement issues in
22   their division?

Page 56

1            MS. TABACCHI:  Object to the form.
2            THE WITNESS:  Knowledgeable.
3    BY MR. SISNEROS:
4        Q.   Knowledgeable on reimbursement issues
5    in their division?
6        A.   Yes.
7        Q.   Since your name is on this list, then
8    you are an individual that is knowledgeable on
9    reimbursement issues?
10       A.   No, sir.
11       Q.   Why are you here?
12       A.   I was assigned a coordination role.
13       Q.   And what -- in coordination role, what
14   were your responsibilities?
15       A.   To get the individuals together for a
16   one-hour meeting once a month.
17       Q.   To discuss reimbursement?
18       A.   To discuss --
19           MS. TABACCHI:  Object to the form.
20           THE WITNESS:  To discuss coverage
21   issues for their products.  I'm going to
22   interchange "reimbursement" and "coverage" as the

Page 57

1    same word.
2    BY MR. SISNEROS:
3        Q.   Okay.  And "coverage," you mean
4    coverage by third-party payers?
5        A.   Any third-party payer.
6        Q.   Private health insurance?
7        A.   Hospitals, yeah, right.
8        Q.   Medicare/Medicaid?
9        A.   Any third-party payer.
10       Q.   Including Medicare and Medicaid?
11       A.   Yes, sir.
12       Q.   All right.  Was Rich Rieger someone who
13   was knowledgeable in reimbursement?
14           MS. TABACCHI:  Object to the form.
15           THE WITNESS:  I do not believe so.
16   BY MR. SISNEROS:
17       Q.   How about Cathy Babington?
18       A.   I do not believe so.
19       Q.   Hank Doyle?
20       A.   I do not believe so.
21       Q.   Don Buell?
22           MS. TABACCHI:  Object to the form.

15 (Pages 54 to 57)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

---

Page 342

1          MS. THOMAS:  This seems very
2   anticlimactic, but we are finished.  I have no
3   further questions unless anyone else does.
4          MR. STUART:  No.
5          MR. SISNEROS:  No.
6          MS. TABACCHI:  I will ask the court
7   reporter to mark the transcript under the
8   protective order, please.  Thank you.
9          THE VIDEOGRAPHER:  We are off the
10  record at 5:27 p.m. with the conclusion of the
11  deposition of James Miller.
12          (WHEREUPON, FURTHER DEPONENT
13  SAYETH NOT)
14
15
16
17
18
19
20
21
22

---

Page 344

1   STATE OF ILLINOIS   )
                        ) ss:
2   COUNTY OF C O O K   )
            I, Deborah Habian, a Certified Shorthand
3   Reporter within and for the State of Illinois, do
    hereby certify:
4          That previous to the commencement of the
    examination of the witness, the witness was duly sworn
5   to testify the whole truth concerning the matters
    herein;
6          That the foregoing deposition was reported
    stenographically by me, was thereafter reduced to
7   printed transcript by me, and constitutes a true
    record of the testimony given and the proceedings had;
8          That the said deposition was taken before
    me at the time and place specified;
9          That the reading and signing by the
10  witness of the deposition transcript was agreed upon
11  as stated herein;
12          That I am not a relative or employee of
13  attorney or counsel, nor a relative or employee of
14  such attorney or counsel for any of the parties
15  hereto, nor interested directly or indirectly in
16  the outcome of this action.
17          IN WITNESS WHEREOF, I do hereunto set my
18  hand this _____ day of _____, 2007.
19
20          DEBORAH HABIAN, CSR, RMR, CRR, CBC
21          Notary Public
22          CSR No. 084-022432

---

Page 343

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS

3   IN RE: PHARMACEUTICAL      )
4   INDUSTRY AVERAGE WHOLESALE   )
5   PRICE LITIGATION          ) MDL No. 1456
    ----------------------------) Civil Action
6   This document relates to:   ) No. 01-12257-PBS
7   United States of America,   )
8   ex. rel. Ven-a-Care of the   )
9   Florida Keys, Inc.,         ) Hon. Patti Saris
            vs.                 )
10  Abbott Laboratories, Inc.,   ) Magistrate Judge
11  CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler

12          I hereby certify that I have read the
13  foregoing transcript of my deposition given at the
14  time and place aforesaid, consisting of pages 1 to
15  283, inclusive, and I do again subscribe and make oath
16  that the same is a true, correct, and complete
17  transcript of my deposition so given as aforesaid and
18  includes changes, if any, so made by me.

18
    _____
19          JAMES E. MILLER
    SUBSCRIBED AND SWORN TO
19  before me this _____ day
20  of _____, A.D. _____.

21  _____
22      Notary Public

---

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

EXHIBIT 53

30(b)(6) Thomson PDR Inc (Minne, Kristen) - Vol. II      CONFIDENTIAL                    November 19, 2008
New York, NY

Page 358

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - -x

In re: PHARMACEUTICAL INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

- - - - - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:          MDL No. 1456

UNITED STATES OF AMERICA ex rel.    Civil Action

VEN-A-CARE OF THE FLORIDA KEYS,     No.01-12257-

INC., v. DEY, INC., et al., Civil   PBS

Action No. 05-11084-PBS; and UNITED

STATES OF AMERICA ex rel. VEN-A-CARE

OF THE FLORIDA KEYS, INC., v.

BOEHRINGER INGELHEIM CORP., et al.,

Civil Action No. 07-10248-PBS

- - - - - - - - - - - - - - - - - - -x

(Cross-noticed captions on following pages.)

                    November 19, 2008

                    9:10 a.m.

          Continued videotaped deposition of

Thomson PDR Inc., by KRISTEN MINNE

125a39a5-4062-4ab8-9223-4743282bdae6

New York, NY

Page 483

1      A.  I had not seen these documents prior
2  to yesterday.
3      Q.  And then my second question is,
4  therefore, is it correct that you do not have any
5  personal knowledge of those -- of the contents of
6  those documents?
7      A.  That is correct.
8      Q.  Okay.
9          You could put those aside except for
10  the last one, Exhibit 24.
11          Now, you testified earlier today that
12  you have never spoken to any manufacturers
13  regarding their pricing; is that correct?
14      A.  That is correct.
15      Q.  And is the same true for my client,
16  Abbott laboratories?
17      A.  Yes, it is.
18      Q.  Is the same also true for my other
19  client, TAP Pharmaceuticals?
20      A.  Yes, it is.
21      Q.  If you could look at the second page
22  of Exhibit 24.  And I believe yesterday Mr.

Page 484

1  Anderson directed you to some notes dated May
2  16th, '02 on page 2.
3          Do you see those?
4      A.  Yes, I see those.
5      Q.  Okay.
6          And I'm referring specifically to the
7  -- well, let me ask you this.
8          With respect to the first note, 5/16/02
9  by Flanagan, does that mean that person is the
10  person taking -- F. Flanagan or Flanagan, I'm not
11  sure which -- is that the person who recorded the
12  note?
13      A.  Yes, that's the person who recorded
14  that.
15      Q.  And you have no personal knowledge
16  that Abbott directed any markup of its products
17  in order to calculate the AWP, do you?
18      A.  I have no personal knowledge of that.
19      Q.  And you never had a conversation with
20  Abbott in which they directed you to calculate a
21  certain markup in order to calculate AWP?
22      A.  I have never had a conversation like

Page 485

1  that with Abbott.
2      Q.  And the second note, dated 5/16/02 by
3  Lane -- do you see that one?
4      A.  Yes, I do.
5      Q.  Similarly, you have no personal
6  knowledge as to whether or not Abbott indicated
7  that -- or anyone at Abbott indicated that Red
8  Book was to continue using an 18.75 percent
9  markup?
10      A.  I do not have personal knowledge of
11  that.
12      Q.  And, indeed, you don't know who Jerrie
13  is, do you?
14      A.  I do not.
15      Q.  And you had no conversation with
16  anyone at Abbott in which they indicated that Red
17  Book should continue to use an 18.75 percent
18  markup; is that correct?
19      A.  That is correct.
20      Q.  Okay.  Now, looking at the first page,
21  can you look at the note dated 4/16/2003.
22          Do you see that?

Page 486

1      A.  I see it.
2      Q.  And can you read that note aloud?
3      A.  "4/9/2003 rec" -- received --
4  "confirmation of fax sent to Abbott.  April
5  Gerzel at RB would add 20 percent to WAC to
6  obtain AWP on all Abbott pharmaceutical products.
7  KV."
8      Q.  What is your understanding of that
9  note?
10      A.  My understanding of that note is that
11  the Red Book person, KV, sent an AWP policy to
12  Abbott, letting them know what we would be doing
13  to calculate AWPs, and in return we received
14  confirmation of the fax that we had sent to
15  Abbott.
16      Q.  So your understanding is that the
17  confirmation is just that the fax went through?
18      A.  Correct, we keep all confirmation of
19  fax transmittals.
20      Q.  And just so you understand, it's not
21  confirmation by Abbott of the policy that Red
22  Book sent to them?

33 (Pages 483 to 486)

125a39a5-4062-4ab8-9223-4743282bdae6

viewitem [https://www.extranet.com/ics.search/prodDocs/viewitem.ics?docID=10189951eDocID=0tableID=1464]

Page 1 of

COMPANY NAME  Abbott Pharmaceuticals

DATE  07/13/2004

# AWP POLICY CORRESPONDENCE

Ready to file

**EXHIBIT**
Minne 104
1.1.19  Hu

Red Book MFR 0277029
Confidential

wItem [https://www.lextranet.com/lcs/search/prodDocs/viewItem.lcs?docID=10189951eDocID=0tableID=1464]



Ready to file

Red Book MFR 0277030
Confidential

viewitem [https://www.extranet.com/ics/search/prodDocs/viewitem.ics?docID=10189951eDocID=0tableID=1464]
Page 5 of

# AWP POLICY CORRESPONDENCE

COMPANY NAME _____ Abbott Pharmaceuticals

DATE _____ 07/13/2004

Red Book MFR 0277031
Confidential

wItem [https://www.lextranet.com/lcs/search/prodDocs/viewItem lcs?docID=10189951eDocID=0tableID=1464]

THOMSON MICROMEDEX
RED BOOK® Database Administration
6200 South Syracuse Way, Suite 300
Greenwood Village, CO 80111-4740
(303) 486-6796
(800) 724-9937 Toll Free
(303) 486-9297 Fax
www.mdx.Red_Book_data@thomson.com

07/13/2004


April Gerzel
Pricing Supervisor, Chargebacks/Membership Maintenance
Abbott Pharmaceuticals

This letter is in regards to our email conversations concerning AWP for (Abbott Pharmaceuticals)'s products, on (07/13/2004/6:26 A.M.). In the absence of a manufacturer provided AWP or a manufacturer calculated markup to establish an AWP, we will be implementing a 20 % markup above (WAC) to calculate AWP. We will not report a third party's determination of AWP for your products. As discussed in our conversation, this markup will apply to (all (Abbott Pharmaceuticals)'s products.). This is in accordance with our company policy for calculation of AWP.


Sincerely,

Traci Kellam
Red Book Industry Liaison

Red Book MFR 0277032
Confidential

**THOMSON**
**MICROMEDEX**

**RED BOOK® Database Administration**
6200 S. Syracuse Way, Suite 300
Greenwood Village, CO 80111-4740
Tel (303) 486-6796  (800) 724-9937  Fax (303) 486-9297
www.mdx.Red_Book_Data@thomson.com



# Fax Cover Sheet

| From | Traci Kellam | To | April Gerzel/Abbott Pharma. |
|---|---|---|---|
| Date | 07/13/2004 | Fax | 847-937-1862 |
| Subject | Red Book AWP | Tel | 847-937-6009 |
| | | Pages | 2 including cover sheet |

Hi April,
Please see attached fax for Abbott Pharmaceuticals. Attached is the new Red Book AWP policy for the
New Year. Please do not hesitate to contact me with any questions at, 800-724-9937 or direct
# 303-486-6585.
Thanks, Traci

IMPORTANT/CONFIDENTIAL: This message contains information that may be privileged, confidential, or exempt from disclosure under applicable law. If the reader of this
message is not the intended recipient, you are notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this
communication in error, please notify the sender immediately at the telephone number set forth above. CORP-20719 fax HC 4/02

**Red Book MFR 0277033**
**Confidential**

item_https://www.extranet.nom.lcs/searchiprodDocs.viewitem.lcs?docID=10189951-DocID=0tableID=1164]

```
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
X                                                                        X
X                           TRANSACTION REPORT                           X
X                                             JUL-13-2004 TUE 10:17 AM    X
X                                                                        X
X              FOR:                                                      X
X                                                                        X
X   SEND(M)                                                              X
X                                                                        X
X   DATE      START     RECEIVER            PAGES    TIME   NOTE    M#    X
X                                                                        X
X   JUL-13   10:16 AM   918479371862          2      36"    OK     80    X
X                                                                        X
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

**Red Book MFR 0277034**
**Confidential**

## Kellam, Traci

**From:** Kellam, Traci
**Sent:** Tuesday, July 13, 2004 9:39 AM
**To:** 'april.gerzel@abbott.com'
**Subject:** RE: Red Book AWP

Hi April,
Due to your confirmation below that there has been no changes to the established AWP policy, I have just faxed you at, 847-937-1862, the new AWP policy for the New Year.  Please do not hesitate to contact me with any questions.

Traci

> ——–Original Message——–
> **From:** april.gerzel@abbott.com [mailto:april.gerzel@abbott.com]
> **Sent:** Tuesday, July 13, 2004 6:26 AM
> **To:** Kellam, Traci
> **Cc:** Joe.Fiske@abbott.com
> **Subject:** Re: Red Book AWP
>
> Traci,
>
> I believe it is important for me to clarify what occurred in April 2003.  As you may be aware, in April 2003, Ms. Voeck wrote, "In the absence of a manufacturer provided AWP or a manufacturer calculated markup to establish an AWP, we will be implementing a 20 % markup above WAC to calculate AWP."  Later in that same letter, Ms. Voeck wrote, "This is in accordance with our company policy for calculation of AWP."  Of course, Abbott does not control how Red Book conducts its business, nor does Abbott provide AWP or a calculated markup to establish an AWP.  Consequently, Abbott concluded that there was no need to respond to Ms. Voeck's April 2003 letter.  Abbott trusts that Red Book will continue to conduct its own business as it sees fit and that it will get independent legal advice when Red Book deems it appropriate.  Thank you for your attention to this matter.
>
> Sincerely,
> April Gerzel
> Pricing Supervisor, Chargebacks/Membership Maintenance
> PPD Pricing
> (847) 937-6009
> fax (847) 937-1862
> April.Gerzel@abbott.com
>
> This message, including any attachments, is intended solely for the use of the named recipient(s) and may contain confidential and/or privileged information.  Any unauthorized review, use, disclosure or distribution of this communication(s) is expressly prohibited.
> If you are not the intended recipient, please contact the sender by reply email and destroy any and all copies of the original message.
> Thank you.

7/13/2004

**Red Book MFR 0277035**
**Confidential**

viltem (https://www.lextranet.com/lcs/search/prodDocs/viewltem.lcs?docID=10189951eDociD=0tableID=1464)

"Kellam, Traci" <Traci.Kellam@thomson.com>

07/08/2004 02:50 PM

To:    "april.gerzel@abbott.com" <april.gerzel@abbott.com>
cc:
Subject:    Red Book AWP

Hi April,
We here at the Red Book had established an AWP policy with you on 04/16/2003.  Since
this has been over a year we need to verify that the AWP policy that we had established of
AWP = WAC + 20%-per Red Book AWP policy, due to Abbott Pharmaceuticals no longer
supplying an AWP is still in effect.  Would you please verify this or make any changes at
this time, I need to do some price updates on your Depakene and Tarka products.

Thanks, Traci

Traci Kellam
Red Book Administration
Thomson MICROMEDEX
303-486-6585
303-486-9297 (fax)
traci.kellam@thomson.com
mdx.Red_Book_Data@thomson.com

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

7/13/2004

Red Book MFR 0277036
Confidential

viewitem [https://www.lextranet.com/lcs/search/prodDocs/viewitem.lcs?docID=1018995&eDocID=0&tableID=1464]                                Page 1 of 1



**THOMSON**

**MICROMEDEX**

# ABBOTT PHARMACEUTICAL
## Company Pricing/Markup History     1/1/1995 - 7/13/2004

| Company | Add Date | User | Note Type | Note Detail |
|---|---|---|---|---|
| **ABBOTT PHARMACEUTICAL** | | | | |
| | 7/13/2004 | tkellam | MKP | Confirmed through email with April Gerzel that there are no changes to the established AWP policy, For the New Year, continue using, AWP = WAC + 20%- per RB company policy. Email confirmation is filed with Log # 9696 |
| | 4/16/2003 | kvoeck | MKP | 4/9/2003 Rec confirmation of fax sent to Abbott: April Gerzel that RB would add 20% to WAC to obtain AWP, on all Abbott Pharmaceutical Products.kv |
| | 3/5/2003 | llovato | MKP | effective 3/3/03 price list from abbot did a 25% markup from previous notes Cartrol,Cecon,Cefol, Colchicine,dayalets,dical-d,enduronyl,fero-folic,fero-grad,hytrin,iberet,k-tabs,mavlk,meridia,optilets,pce,pediaflor,rythmol,surbex,viday,vi-daylin, |
| | 10/3/2002 | llovato | MKP | effective 10/3/02 blaxin,cartrol ft, cecon,cefol,colchicine,cylert,dayalets,di cal-d,enduron,endoronyl,enduronyl |
| | 8/20/2002 | lane | MKP | AWP = WAC + 25% (previously provided)  LIST/TRADE PRICE = DIRECT PRICE      WAC =CASE/ WHOLESALE PRICE            per Tina use date of e:mail for effective date of deacts |

Red Book MFR 0277037
Confidential

| From: | Cicerale, Jerrie        AP |
|-------|---------------------------|
| Sent: | Tuesday, November 24, 1998 7:36 AM |
| To: | 'REDBOOK(E-MAIL)' |
| Cc: | Adams, Harry   APX |
| Subject: | REDBOOK VERIFICATION KIT |

Attachments:       NEW.TXT; DELETES.TXT

Roni -- I will not be returning your verification package because I send you adds and deletes through the entire year.  I also send you our new catalog every year for your reference.   This letter should serve as your signoff for your next printing.  Below are some adds and deletes for your next update.

 

NEW.TXT (11 KB)  DELETES.TXT (9 KB)

Thanks,     Jerrie Cicerale
       HPD Contract Marketing
       Abbott Laboratories, Inc.



EXHIBIT   366
IT: Sellers
DATE: 2-14-07
Cynthia Vohlken



EXHIBIT
Minne 105
11.19

1

CONFIDENTIAL

TXTABT-E 0042264

# EXHIBIT 54

Page 1

                    UNITED STATES DISTRICT COURT

                     DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION ) Case No.

---------------------------------X 01-12257-PBS

THIS DOCUMENT RELATES TO:          )

UNITED STATES OF AMERICA, ex rel.  )

VEN-A-CARE OF THE FLORIDA KEYS,    ) PORTIONS OF

INC., v. ABBOTT LABORATORIES, INC.,) THIS DOCUMENT

CIVIL ACTION NO. 06-11337-PBS;     ) MARKED

  -and-                            ) HIGHLY

STATE OF CALIFORNIA, ex rel.       ) CONFIDENTIAL

VEN-A-CARE v. ABBOTT LABORATORIES, )

INC., et al.,                      )

CASE NO. 1:03-CV-11226-PBS         )

---------------------------------X

        VIDEOTAPED DEPOSITION OF DARYL MISER, a

Witness, taken on behalf of the Plaintiffs before

Robin Prouty, CCR No. 868, pursuant to Notice,

February 28th, 2008, at the offices of Shook, Hardy

& Bacon, 2555 Grand Boulevard, Kansas City, Missouri.

289a30f5-0cbc-4b3a-9c4f-361b123ea2b5

Miser, Daryl          HIGHLY CONFIDENTIAL  February 28, 2008
                      Kansas City, MO

Page 198

1  field would provide to corporate office.
2      Q.  (By Ms. Ford)  Okay.  If you look at
3  the Mole winner for the week, and it's actually -
4  - it says name, Michelle Thrawl, and territory,
5  and production was solutions, and it says Mole
6  tip?
7      A.  Yes.
8      Q.  Does this appear to be a tip to Abbott
9  sales reps about dealing with this particular
10 solution bag?
11     MR. SCANNAPIECO:  Objection, form.
12     A.  It appears to be a tip to help increase
13 Safe Flow sales, yes.
14     Q.  (By Ms. Ford)  Okay.  Then if you go to
15 the next page, you see the top, it says Other
16 Outstanding Entries?
17     A.  Yes.
18     Q.  The name of Dennis Kelly and the
19 product is Vancomycin?
20     A.  Yes.
21     Q.  Turn to the last page of the document
22 where it's still discussing the Vancomycin

Page 199

1  product.  The very last paragraph, it says,
2  Vancomycin is an extremely important product for
3  us and represents significant sales dollars.  Do
4  you see that?
5      A.  Yes, I do.
6      Q.  Would you agree that Vancomycin was an
7  important product for Alternate Site?
8      MR. SCANNAPIECO:  Objection, form.
9      A.  It was an important product for me, and
10 it was -- it's a big injectable, yes.
11     Q.  (By Ms. Ford)  And the last sentence
12 says, In the meantime, watch out for Baxter out
13 there and don't let them steal your Vancomycin
14 business.  Do you see that?
15     A.  Yes
16     Q.  Do you recall Baxter being one of
17 Abbott's competitors for the product Vancomycin?
18     A.  Yes.
19     Q.  Aside from the monthly Significant
20 Event Report that we looked at a few minutes ago,
21 do you recall reporting to your district manager
22 in writing on a regular basis, for example,

Page 200

1  through a weekly report?
2      MR. SCANNAPIECO:  Objection, form.
3      A.  It's been a long, long time, literally
4  back to the early 90's.  But we did at one point
5  for a short period of time report weekly in
6  written form.
7      Q.  (By Ms. Ford)  And what kind of
8  information would you include in your weekly
9  report?
10     A.  It would be identical information to
11 the monthly report, just obviously more frequent.
12     Q.  Okay.  At the time that you were
13 preparing a weekly report, did you also prepare a
14 monthly report?
15     MR. SCANNAPIECO:  Objection, form.
16     A.  I -- I can't answer.  I don't recall.
17 It's been so long since I did weeklies.  I'm
18 guessing yes would be the answer to that.  That's
19 speculation.  But I think I've always turned in
20 monthly reports and only briefly turned in weekly
21 reports.
22     Q.  (By Ms. Ford)  Okay.  Earlier, we -- we

Page 201

1  discussed the term AWP.  Do you recall that?
2      MR. SCANNAPIECO:  Objection, form.
3      A.  Yes, I remember that.  Yes.
4      Q.  (By Ms. Ford)  And what do you
5  understand AWP to be?
6      A.  Just the initials of AWP, what it --
7  the acronym --
8      Q.  What does AWP stand for?
9      A.  Average wholesale cost.  Average
10 wholesale price.
11     Q.  Okay.  And what do you understand
12 average wholesale price to be?
13     MR. SCANNAPIECO:  Objection, form.
14     A.  I don't -- I don't know specifically
15 what average wholesale price is as far as it
16 pertains to anything other than there's -- it's a
17 number.
18     Q.  (By Ms. Ford)  Okay.  Did you
19 understand -- let me ask you differently.  Did
20 any of the accounts that you called on -- were
21 any of the accounts that you called on interested
22 in AWP for Abbott's products?

51 (Pages 198 to 201)

289a30f5-0cbc-4b3a-9c4f-361b123ea2b5

Miser, Daryl        HIGHLY CONFIDENTIAL   February 28, 2008
Kansas City, MO

Page 214

1  has ever told me they've ever discussed AWP with
2  an account.
3      Q.  Do you know who sets AWP?
4      A.  I still don't have any clue how AWP is
5  achieved.  I don't know.
6      Q.  Okay.  So as you sit here today, you
7  don't know whether or not Abbott has any control
8  over the AWP on its products; is that correct?
9          MR. SCANNAPIECO:  Objection, form.
10     A.  I understand Abbott has no control over
11 AWP at all.
12     Q.  (By Ms. Ford)  That's your
13 understanding.
14     A.  That's my understanding, yes.
15         (Whereupon, Deposition Exhibit
16 Miser 011 was marked for identification.)
17     Q.  (By Ms. Ford)  I'm going to hand you a
18 document which I've marked as Exhibit 11.  And
19 for the record, this is -- the first two pages of
20 it, an exhibit that has previously been marked in
21 other depositions.
22     A.  Okay.

Page 215

1      Q.  And do you see the date on here of May
2  26, 1994?
3      A.  Yes.
4      Q.  And this is a memo from Alternate Site
5  Contract Marketing; is that correct?
6      A.  Yes.
7      Q.  And it's directed to field sales force
8  and district managers; is that correct?
9      A.  Yes, it is.
10     Q.  And you were a member of the Alternate
11 site field sales force in May of 1994; is that
12 correct?
13     A.  Yes.
14     Q.  The subject says Current Red Book AWPs?
15     A.  Yes.
16     Q.  And then it says, As you are aware, on
17 at the beginning of April, Abbott took a list
18 price increase.  This also has an effect on our
19 AWP -- and then in parentheses, average wholesale
20 price -- which Red Book quotes for reimbursement
21 purposes.  Did I read that accurately?
22     A.  I believe so.

Page 216

1      Q.  Therefore, Mike Heggie was able to get
2  Red Book to send a listing of the new AWPs for
3  all of our products which will be effective
4  through next April.  I hope this information is
5  helpful.  And if you have any questions, please
6  feel free to contact me.  Best regards, Steve
7  Kipperman.  Did I read that accurately?
8      A.  Yes.
9      Q.  Do you understand Red Book to quote
10 AWPs for reimbursement purposes?
11         MR. SCANNAPIECO:  Objection, form.
12     A.  I understand Red Book to quote AWP.
13 I'm not -- I'm not versed on how things are done
14 reimbursement-wise.
15     Q.  (By Ms. Ford)  Okay.  I believe you
16 testified earlier, though, that you knew that
17 your customers were interested in AWP because of
18 getting paid; is that --
19     A.  Yes.
20     Q.  -- correct?
21     A.  Yes.  I don't know how AWP plays to
22 that.  I know it's there.  I don't know how it's

Page 217

1  derived, but I know -- I know that companies use
2  that for their billing purposes -- or paying
3  purposes.
4      Q.  Okay.
5      A.  To get paid.
6      Q.  To get paid.  Okay.
7      A.  Yes, ma'am.
8      Q.  And I believe you also testified that
9  they would get paid -- you knew them to get paid,
10 for example, by Medicare; is that correct?
11     A.  I understand them -- that they -- yes,
12 that they have some Medicare -- they'll have
13 Medicare patients on occasion in their patient
14 mix, yes.
15     Q.  And they want to know the AWP
16 information with respect to Medicare; is that
17 correct?
18         MR. SCANNAPIECO:  Objection, form.
19     A.  I can just speculate that's what they
20 want to know AWP for is for billing particular
21 patients, yes.
22     Q.  (By Ms. Ford)  Okay.  Are you familiar

55 (Pages 214 to 217)

289a30f5-0cbc-4b3a-9c4f-361b123ea2b5

Miser, Daryl        HIGHLY CONFIDENTIAL  February 28, 2008
                    Kansas City, MO

Page 230

1  better price if I worked with them.
2      Q.  Okay.  And going back to Exhibit 11, it
3  says Abbott took a list price increase.  And the
4  next sentence says, This also has an effect on
5  our AWP.  Did you understand there to be a
6  connection or a correlation between list price
7  and AWP on Abbott's products?
8          MR. SCANNAPIECO:  Objection, form.
9      A.  I did not -- other than recent
10 discussions, I didn't know that it had any
11 effect.  I don't remember this document at all,
12 and I still didn't know the list price had any
13 effect on AWP.  And I look back and I go, gosh, I
14 should know something like this, I've been around
15 a long time.  But I did not know that list price
16 had an effect on AWP.
17     Q.  (By Ms. Ford)  Do you know how
18 receiving a copy of the Red Book product price
19 list for Abbott's products would be helpful to
20 you as a sales rep?
21         MR. SCANNAPIECO:  Objection, form.
22     A.  No, I wouldn't.

Page 231

1      Q.  (By Ms. Ford)  Have you ever seen a Red
2  Book before?
3      A.  I have seen a Red Book, yes.
4      Q.  And where have you seen Red Books?
5      A.  The only time I've seen Red Books, I've
6  seen them on shelves at Methodist, and I know
7  I've seen them at Pharmacare.  And I don't pay
8  any attention.  They're probably on the shelves
9  of a lot of the pharmacies that I call on.  I
10 don't pay attention.  But I know I've seen it on
11 those two shelves.
12     Q.  And did you understand that pharmacists
13 and pharmacies would look to Red Book for AWP
14 information?
15         MR. SCANNAPIECO:  Objection, form.
16     A.  Only -- that's what they would tell me
17 they used that book for.
18     Q.  (By Ms. Ford)  Other than the situation
19 that you just described with Mr. Glover, do you
20 recall other situations with your former Abbott
21 coworkers where AWP was discussed?
22     A.  I don't think so.  Other than in

Page 232

1  training, our office of ethics and compliance
2  training, in discussion or in tests that we've
3  taken.  Other than that, I don't recall any
4  discussion on it.
5      Q.  Do you recall a specific ethics and
6  compliance training while you were at Abbott that
7  instructed you not to discuss AWP?
8      A.  I don't recall any specific one.  I
9  know I -- I know we've -- we've had meetings.  I
10 couldn't tell you the years.  Meetings regarding
11 ethics and compliance where those type of issues
12 were covered.  It wasn't an only AWP type of
13 discussion.  And then I'm pretty certain we've
14 had at least one on-line test that -- maybe more
15 -- regarding conversations we can and cannot have
16 with accounts, and AWP would fall into that
17 category.
18     Q.  And the on-line training that you're
19 referencing, would that -- was that training that
20 you took while you were an Abbott employee?
21     A.  I believe we had -- we had gotten to
22 the point before we spun off where we were doing

Page 233

1  on-line training on certain things, you know, in-
2  between national meetings and such where not
3  everyone was getting together.  We had a certain
4  time frame to go out on-line and review the
5  information and take a test.
6      Q.  And do you currently take on-line
7  training in Hospira?
8      A.  Yes.
9      Q.  And do you know whether the on-line
10 training that you're recalling relating to AWP
11 was when you were an Abbott employee or a Hospira
12 employee?
13         MR. SCANNAPIECO:  Objection, form.
14     A.  I believe -- most certainly there was
15 Abbott.  We started with Abbott, and it's
16 happened since.  You know, the discussion has
17 gone on through Hospira as well.
18     Q.  (By Ms. Ford)  Okay.  And now I'm
19 specifically talking about the on-line training
20 related to AWP.  Do you know for sure that you
21 received that when you were an Abbott employee?
22         MR. SCANNAPIECO:  Objection, form.

59 (Pages 230 to 233)

289a30f5-0cbc-4b3a-9c4f-361b123ea2b5

Miser, Daryl       HIGHLY CONFIDENTIAL  February 28, 2008
                    Kansas City, MO

Page 246

1     MR. SCANNAPIECO: Objection, form.
2     A.  I would say it's handled out of
3  corporate office at some level.
4     Q.  (By Ms. Ford)  Okay.  And when it says
5  Abbott key executives, do you understand that to
6  be someone at Abbott corporate?
7     MR. SCANNAPIECO: Objection, form.
8     A.  I wouldn't know.  I assume key
9  executive means someone certainly above me.
10    Q.  (By Ms. Ford)  Okay.  This paragraphs
11  goes on to say, In a subsequent business review
12  meeting, OptionCare purchasing stated that they
13  will be sending out a letter to their branches to
14  switch Abbott from -- excuse me -- to switch from
15  Abbott Vancomycin and Clafaron to APP because
16  Abbott's differential between cost and AWP is
17  significantly lower, and thus, they will make
18  more money with APP?
19    A.  Yes, I see that.
20    Q.  Okay.  Do you recall your -- the
21  OptionCare branches in your territory switching
22  their purchases of Abbott Vancomycin to APP

Page 247

1  around this time?
2     A.  In 2002, the OptionCares I had were
3  doing a reasonably small amount of business with
4  me, so their Vancomycin sales, even if they would
5  half them would not affect my sales too much
6  because they were buying so little from me to
7  begin with.  So I understand that that's a
8  problem with most accounts was switching away
9  from Abbott Vanco, but specifically OptionCare, I
10  didn't have enough business with OptionCare to
11  really feel much impact.
12    Q.  And whether or not it was significant
13  business for you, do you recall that being the
14  case, that they were switching their Vancomycin
15  purchases to APP?
16    MR. SCANNAPIECO: Objection, form.
17    A.  I do not recall knowing that, no.
18    Q.  (By Ms. Ford)  And are you
19  distinguishing knowing that from hearing that or
20  something else?
21    A.  No.  That would be knowing it and
22  hearing it, fully aware of it, I wasn't.

Page 248

1     Q.  (By Ms. Ford)  Okay.  Are you saying
2  that because Option -- the OptionCare accounts in
3  your territory did such small business, you may
4  not have noticed or --
5     MR. SCANNAPIECO: Objection, form.
6     A.  Essentially, that's what I'm saying.
7  It didn't -- I have enough territory to pay
8  attention to my larger accounts and not so much
9  on lower business, smaller business.  All
10  business is important, but I can only do so much
11  with them.
12    MS. FORD:  Okay.  The United States has
13  no further questions at this time.  However, we
14  reserve the right to re-call Mr. Miser based upon
15  Abbott's continuing document production and
16  pending motion to his compel documents in this
17  case.  And we will now pass the witness.
18    MR. ROSS:  California has no questions
19  at this time.
20    MR. SCANNAPIECO: Okay.  Regarding the
21  -- I mean Abbott doesn't necessarily agree to
22  reproduce Mr. Miser for any further testimony on

Page 249

1  the documents that are already in the possession
2  of the United States or the State of California,
3  I guess including any documents you may have
4  received this week, as we already covered those
5  during this deposition, and there are
6  approximately two and a half hours remaining in
7  the day of the deposition.
8     Other than that, we would just like to
9  say on the record that we would like the portions
10  of the testimony that relate to Mr. Miser's
11  personal background and/or Mr. Miser's financial
12  ties to Abbott and specific financial
13  compensation from Abbott be marked highly
14  confidential.
15    THE VIDEOGRAPHER:  We are now going off
16  the record at 2:21 p.m.
17    _____
18         DARYL MISER
19  Subscribed and Sworn to before me this
20  _____ day of _____, 20__.
21    _____
22         Notary Public

63 (Pages 246 to 249)

289a30f5-0cbc-4b3a-9c4f-361b123ea2b5

Miser, Daryl      HIGHLY CONFIDENTIAL  February 28, 2008
Kansas City, MO

Page 250

```
 1        C E R T I F I C A T E
 2        I, Robin Prouty, a Certified Court
 3   Reporter in and for the State of Missouri, do hereby
 4   certify:
 5        That prior to being examined, the witness
 6   was by me duly sworn;
 7        That said deposition was taken down by me
 8   in shorthand at the time and place hereinbefore
 9   stated and was thereafter reduced to writing under
10   my direction;
11        That I am not a relative or employee or
12   attorney or counsel of any of the parties, or a
13   relative or employee of such attorney or counsel, or
14   financially interested in the action.
15        WITNESS my hand and seal this _____ day
16   of_____, 2008.
17
18      _____
19        Robin Prouty, CCR No. 868
20
21
22
```

64 (Page 250)

289a30f5-0cbc-4b3a-9c4f-361b123ea2b5

# EXHIBIT 55

Morgan, Patricia Kay                    August 27, 2007
                    Tampa, FL

                    IN THE CIRCUIT COURT OF

                 MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - -x

STATE OF ALABAMA,            :

     Plaintiff,              :

     vs.                     :   Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,   :   Judge Charles Price

 et al.                      :

     Defendants.             :

- - - - - - - - - - - - - -x

     UNITED STATES DISTRICT COURT

      DISTRICT OF MASSACHUSETTS

----------------------------X

In re:  PHARMACEUTICAL       :

INDUSTRY AVERAGE WHOLESALE    :  MDL No. 1456

PRICE LITIGATION             :  Civil Action No.

                             :  01-12257-PBS

THIS DOCUMENT RELATES TO:    :

                             :

ALL ACTIONS                  :

----------------------------X

          DEPOSITION OF PATRICIA KAY MORGAN

                  August 27, 2007

62b3fedf-4c61-45f1-a4f9-afec50e235f9

Morgan, Patricia Kay                                    August 27, 2007

Tampa, FL

---

Page 26

1         EXAMINATION
2    BY MR. EDWARDS:
3        Q.   By my watch it's around 1:15.  Thank you
4    for appearing today, Ms. Morgan.  I'm Steve
5    Edwards.  I represent Bristol-Myers Squibb in the
6    case by the State of Alabama against a number of
7    pharmaceutical manufacturers and many other cases
8    as to which your deposition has been noticed here
9    today.
10       Why don't we start by asking you to state your
11   name and address for the record.
12       A.   Patricia Kay Morgan, 700 South Harbour
13   Island Boulevard, Tampa, Florida 33602.
14       Q.   And is it correct that you're here today
15   pursuant to a subpoena?
16       A.   That's correct.
17       Q.   And is it also correct that you objected
18   to the subpoena?
19       A.   That's correct.
20       Q.   So you're not here today voluntarily;
21   you're here because a court ordered you to appear,
22   correct?
23       A.   That's correct.

---

Page 27

1        Q.   And you're represented by counsel here
2    today; is that correct?
3        A.   That's correct.
4        Q.   And that's Mr. Kern?
5        A.   Correct.
6        Q.   And he is also counsel for First
7    DataBank; is that your understanding?
8        A.   That's correct.
9        Q.   And First DataBank is your former
10   employer; is that correct?
11       A.   That's correct.
12       Q.   As I understand it, you graduated from
13   college in about 1975; is that correct?
14       A.   That's correct.
15       Q.   And you have a pharmacy degree?
16       A.   That's correct.
17       Q.   And then after college you worked at
18   Abbott Labs from 1975 to sometime in 1999; is that
19   correct?
20       A.   That's correct.
21       Q.   And then you worked at First DataBank
22   from 1999 till sometime in 2005?
23       A.   That's correct.

---

Page 28

1        Q.   First DataBank, as I understand it, is a
2    company that reports product and pricing
3    information on pharmaceutical products; is that
4    correct?
5        A.   That's correct.
6        Q.   Okay.  And First DataBank is owned by
7    Hearst Corporation, is that correct?
8        A.   That's correct.
9        Q.   And Hearst Corporation is a public
10   company; it's not owned by any of the
11   pharmaceutical manufacturers?  Is that true?
12       A.   I don't believe it's a public company.
13       Q.   Okay.  But it's not owned by any
14   pharmaceutical manufacturers; is that true?
15       A.   That's true.
16       Q.   It's independent of the pharmaceutical
17   manufacturers; is that fair?
18       A.   That's true.
19       Q.   Now, as I understand it, at First
20   DataBank you were the manager of editorial
21   services?
22       A.   That's correct.
23       Q.   And as such, you were responsible for

---

Page 29

1    populating the drug database; is that correct?
2        A.   As far as the product and the pricing
3    information.
4        Q.   And the pricing information that appeared
5    in that database included average wholesale prices
6    or AWPs; correct?
7        A.   We called it Blue Book AWP.  But yes,
8    there was that field.
9        Q.   And there were also wholesale net prices
10   or wholesale acquisition costs also known as WAC?
11       A.   That's correct.
12       MR. EDWARDS:  That's W-A-C for the reporter.
13       MR. KERN:  Steve, let just interpose that --
14   remind all the parties that the protective order
15   does prohibit parties from asking about subject
16   matter areas that were covered in prior depositions
17   except as necessary to reasonably lay foundation,
18   which I think you're doing.
19       MR. EDWARDS:  Which I'm trying to do.
20       MR. KERN:  Okay.
21   BY MR. EDWARDS:
22       Q.   And as I understand it, you have
23   testified about your work at First DataBank before;

---

8 (Pages 26 to 29)

62b3fedf-4c61-45f1-a4f9-afec50e235f9

Morgan, Patricia Kay                                    August 27, 2007

Tampa, FL

Page 226

1  suggest an AWP.
2      Q.  Any other factors that you think a
3  pharmaceutical manufacturer should consider when
4  reporting prices to First DataBank?
5      MS. TORGERSON:  Objection to form.
6      MR. KERN:  Same objection.
7      A.  That's all that I know of.
8      Q.  Do you think it would be okay for a drug
9  manufacturer to report prices to First DataBank
10 with the intention of manipulating state Medicaid
11 reimbursement formulas?
12     MR. EDWARDS:  Object to the form.
13     MR. KERN:  Same objection.
14     A.  You're asking me if I think that's okay?
15     Q.  Right.
16     A.  No, I do not.
17     Q.  That's improper, don't you agree?
18     MR. KERN:  Same objection.
19     MR. EDWARDS:  Objection.
20     MS. TORGERSON:  Object to form.
21     A.  I agree.
22     MR. CARTER:  That's all that I have.
23     MR. KERN:  Okay.

Page 227

1      MR. EDWARDS:  Thank you very much.
2          (THEREUPON, the deposition of PATRICIA KAY
3  MORGAN was concluded at 6:25 p.m.)
4
5
6
7
8          _____
9          SIGNATURE OF THE WITNESS
10
11 Subscribed and sworn to and before me
12 this _____ day of _____, 20____.
13
14
15 _____
16     Notary Public
17
18
19
20
21
22
23

Page 228

1          CERTIFICATE OF REPORTER OATH
2  STATE OF FLORIDA
3  COUNTY OF HILLSBOROUGH
4
5      I, the undersigned authority, hereby certify
6  that the witness named herein personally appeared before
7  me and was duly sworn.
8
9      WITNESS my hand and official seal this
10 _____.
11
12
13 _____
14 PATTY CARLSON, RPR, CRR
15 NOTARY PUBLIC - STATE OF FLORIDA
16 MY COMMISSION NO. DD232541
17 EXPIRES: 9-19-07
18
19
20
21
22
23

Page 229

1          REPORTER'S DEPOSITION CERTIFICATE
2  STATE OF FLORIDA
3  COUNTY OF HILLSBOROUGH
4
5      I, PATTY CARLSON, Registered Professional
6  Reporter, Certified Realtime Reporter and Notary Public
7  in and for the State of Florida at Large, hereby
8  certify that the witness appeared before me for the
9  taking of the foregoing deposition, and that I was
10 authorized to and did stenographically and
11 electronically report the deposition, and that the
12 transcript is a true and complete record of my
13 stenographic notes and recordings thereof.
14     I FURTHER CERTIFY that I am neither an attorney,
15 nor counsel for the parties to this cause, nor a
16 relative or employee of any attorney or party connected
17 with this litigation, nor am I financially interested in
18 the outcome of this action.
19     DATED THIS _____ at Tampa,
20 Hillsborough County, Florida.
21
22 _____
23 PATTY CARLSON, RPR, CRR

58 (Pages 226 to 229)

Henderson Legal Services
202-220-4158

62b3fedf-4c61-45f1-a4f9-afec50e235f9

# EXHIBIT 56

00001
1  NO. GV002327
   THE STATE OF TEXAS          ) IN THE DISTRICT COURT
2  EX REL.                     )
   VEN-A-CARE OF THE           )
3  FLORIDA KEYS, INC.,         )
   PLAINTIFF(S),               )
4                              )
   VS.                         ) TRAVIS COUNTY, TEXAS
5                              )
   DEY, INC.; ROXANE           )
6  LABORATORIES, INC., WARRICK )
   PHARMACEUTICALS CORPORATION,)
7  SCHERING-PLOUGH CORPORATION,)
   AND SCHERING CORPORATION,   )
8  DEFENDANT(S).               ) 53RD JUDICIAL DISTRICT

9
   *******************************************
10
   ORAL AND VIDEOTAPED DEPOSITION OF
11
   PATRICIA KAY MORGAN
12
   NOVEMBER 13TH, 2002
13
   (CONTAINS ATTORNEYS' EYES ONLY TESTIMONY)
14
   *******************************************
15

16    ORAL AND VIDEOTAPED DEPOSITION OF PATRICIA KAY

17  MORGAN, PRODUCED AS A WITNESS AT THE INSTANCE OF THE

18  PLAINTIFF(S), AND DULY SWORN, WAS TAKEN IN THE

19  ABOVE-STYLED AND NUMBERED CAUSE ON NOVEMBER 13TH,

20  2002, FROM 9:12 A.M. TO 7:03 P.M., BEFORE CYNTHIA

21  VOHLKEN, CSR IN AND FOR THE STATE OF TEXAS, REPORTED

22  BY MACHINE SHORTHAND, AT THE OFFICES OF PERKINS COIE,

23  LLP, 180 TOWNSEND STREET, 3RD FLOOR, SAN FRANCISCO,

24  CALIFORNIA PURSUANT TO THE TEXAS RULES OF CIVIL

25  PROCEDURE.

**Morgan, Patricia Kay 11/13/2002**          **Page 1**

---

00002
1        A P P E A R A N C E S

2  FOR THE PLAINTIFF(S):

3     MR. JOSEPH V. CRAWFORD
      MR. JARRETT ANDERSON
4     OFFICE OF THE ATTORNEY GENERAL
      STATE OF TEXAS
5     POST OFFICE BOX 12548
      AUSTIN, TEXAS 78711-2548
6
   FOR THE RELATOR:
7
      MR. JAMES JOSEPH BREEN
8     THE BREEN LAW FIRM, P.A.
      P. O. BOX 2289
9     PEMBROKE PINES, FLORIDA 33029-7470

10 FOR THE DEFENDANT(S) DEY, INC.:

11    MR. STEPHEN M. HUDSPETH
      COUDERT BROTHERS
12    1114 AVENUE OF THE AMERICAS
      NEW YORK, NEW YORK 10036-7703
13       -AND-

14    MR. STEVEN A. FLECKMAN
15    FLECKMAN & MCGLYNN, P.L.L.C.
      515 CONGRESS, SUITE 1800
16    AUSTIN, TEXAS 78701-3503

17 FOR THE DEFENDANT ROXANE LABORATORIES, INC.:

18    MR. R. ERIC HAGENSWOLD
      SCOTT, DOUGLASS & MCCONNICO, L.L.P.
19    ONE AMERICAN CENTER, FIFTEENTH FLOOR
      600 CONGRESS AVENUE
20    AUSTIN, TEXAS 78701

21 FOR THE DEFENDANTS WARRICK PHARMACEUTICALS
   CORPORATION, SCHERING-PLOUGH CORPORATION AND
22 SCHERING CORPORATION:

23    MR. JOHN P. MCDONALD
      LOCKE LIDDELL & SAPP, LLP
24    2200 ROSS AVENUE, SUITE 2200
      DALLAS, TEXAS 75201-6776
25

**Morgan, Patricia Kay 11/13/2002**          **Page 2**

---

00003
1  FOR FIRST DATABANK AND THE WITNESS:

2     MS. NICOLE WONG
      MR. JOHN PALMER KERN
3     PERKINS COIE LLP
      180 TOWNSEND STREET, 3RD FLOOR
4     SAN FRANCISCO, CALIFORNIA  94107-1909

5
   ALSO PRESENT:
6
      MR. THOMAS A. TEMMERMAN AND
7     MR. WILLIAM S. SCHNEIDER,
      CALIFORNIA OFFICE OF THE
8     ATTORNEY GENERAL
      MR. ZACHARY TAYLOR BENTLEY, II
9     MS. ANNE ARNOLD
      MR. BRIAN BOBBITT, VIDEOGRAPHER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Morgan, Patricia Kay 11/13/2002**          **Page 3**

---

00004
1            INDEX

2  APPEARANCES.................................    2

3  PATRICIA KAY MORGAN
      EXAMINATION BY MR. ANDERSON............   6
4     EXAMINATION BY MR. BREEN...............  71
      EXAMINATION BY MR. FLECKMAN...........  239
5     EXAMINATION BY MR. MCDONALD...........  344
      EXAMINATION BY MR. HAGENSWOLD......... 355
6     EXAMINATION BY MR. ANDERSON...........  358
      EXAMINATION BY MR. BREEN..............  363
7
   SIGNATURE AND CHANGES.........................  374
8  REPORTER'S CERTIFICATE.......................  376

9  VIDEOTAPE NUMBER

10    1 ...............................     6
      2 ...............................    60
11    3 ...............................   128
      4 ...............................   180
12    5 ...............................   238
      6 ...............................   299
13    7 ...............................   355

14         EXHIBITS

15 NO.  DESCRIPTION                       PAGE

16 371 ........................   8
   STATE OF TEXAS' NOTICE OF INTENTION TO
17    TAKE ORAL DEPOSITIONS

18 372 ........................ 143
   NDDF USER MANUAL EXCERPTS
19
   373 ........................ 162
20    MAY 9, 2001 TELEFAX FROM KAREN STRELAU
      TO TERRI FACTORA
21
   374 ........................ 185
22    OCTOBER 2001 NEW PRODUCT ANNOUNCEMENT
   FROM DEY
23
   375 ........................ 189
24    SEPTEMBER 2002 NOTICE OF PRICE CHANGE
   FROM DEY
25

**Morgan, Patricia Kay 11/13/2002**          **Page 4**

00049
1 Q. WERE YOU THE PERSON AT ABBOTT THAT WAS
2 RESPONSIBLE FOR SUBMITTING PRICING INFORMATION TO
3 FIRST DATABANK?
4 A. I WAS PRIMARILY THE PERSON THAT SUBMITTED THE
5 INFORMATION TO THE MEDICAIDS BECAUSE I DID DO THE
6 MAILINGS, ALONG WITH THE CLINICAL INFORMATION, AND AS
7 PART OF THAT FIRST DATABANK ALWAYS GOT A COPY OF THAT
8 CORRESPONDENCE.
9 Q. BRIEFLY CAN YOU DESCRIBE WHAT YOUR JOB
10 RESPONSIBILITIES WERE AT ABBOTT IN PLACING ABBOTT
11 PRODUCTS ON MEDICAID FORMULARIES?
12 A. MEDICAIDS CHANGED OVER TIME BECAUSE YOU HAD
13 THE OBRA '90 LEGISLATION THAT REQUIRED THE REBATES TO
14 THE MANUFACTURERS, SO -- BUT PRIOR TO THAT TIME I WAS
15 ACTUALLY INVOLVED WITH THE STATES THAT HAD FORMULARIES
16 AND MAKING PRESENTATIONS TO THOSE STATES TO MAKE SURE
17 THE PRODUCTS WERE ON THE FORMULARY.
18 AFTER OBRA '90 IT WAS MORE OF A FACT OF
19 NOTIFYING THE STATES THAT WE HAD INTRODUCED A NEW
20 PRODUCT OR HAD ADDED A NEW DOSAGE FORM, A NEW PACKAGE
21 SIZE. I DIDN'T DO PRICE UPDATE COMMUNICATIONS TO
22 THEM. IT WAS SIMPLY ADDITIONS OF NEW PRODUCTS.
23 Q. COULD YOU EXPLAIN THE SIGNIFICANCE OF OBRA
24 '90 AND ITS IMPACT ON A MANUFACTURER'S ABILITY TO GET
25 ON A STATE MEDICAID FORMULARY AGAIN?

00050
1 A. WHEN OBRA '90 WAS FIRST PASSED THE
2 MANUFACTURERS WERE TO PAY REBATES TO THE STATE BASED
3 ON THE UTILIZATION OF THEIR PRODUCTS. IN EXCHANGE FOR
4 THOSE REBATES ALL PRODUCTS WERE TO BE REIMBURSED BY
5 THE STATE AT THAT POINT IN TIME. THAT HAS
6 SUBSEQUENTLY CHANGED.
7 Q. WHAT'S CHANGED?
8 A. IT'S MY UNDERSTANDING, I MEAN, I'VE MOVED
9 AWAY FROM THAT AREA, BUT STATES MAY NOW PLACE PRODUCTS
10 ON PRIOR AUTHORIZATIONS AND NOT JUST HAVE WHAT'S
11 CALLED OPEN FORMULARIES WHERE THEY PAY FOR EVERYTHING.
12 Q. DO YOU KNOW WHEN THAT PRIOR AUTHORIZATION
13 BEGAN BEING USED?
14 A. NO, I DON'T.
15 Q. WAS IT FAIRLY RECENTLY?
16 A. IT WAS PROBABLY AT LEAST FIVE OR SIX YEARS
17 AGO, BUT IT SEEMS LIKE IT WAS YESTERDAY.
18 MR. FLECKMAN: AFTER TODAY IT WILL SEEM
19 LIKE FIVE OR SIX YEARS AGO.
20 MR. BREEN: YEAH. OBJECTION, FORM.
21 MR. FLECKMAN: I'LL REPHRASE IT.
22 MR. ANDERSON: GO AHEAD.
23 Q. (BY MR. ANDERSON) WELL, AFTER THE
24 IMPLEMENTATION OF OBRA '90 CAN YOU DESCRIBE THE
25 INFORMATION THAT -- THE PRICING INFORMATION WHICH YOU

00051
1 SUBMITTED ON BEHALF OF ABBOTT LABS TO STATE MEDICAIDS?
2 A. I SUBMITTED INFORMATION ON NEW PRODUCTS,
3 INCLUDING THE CLINICAL INFORMATION. AS PART OF
4 SUBMITTING NEW PRODUCTS THE PRICING WAS INCLUDED
5 THERE, BUT I DID NOT SUBMIT ONGOING PRICING UPDATES TO
6 THE STATE MEDICAIDS OR FIRST DATABANK.
7 Q. WAS THERE SOMEONE ELSE AT ABBOTT THAT WAS
8 RESPONSIBLE FOR SUBMITTING UPDATED PRICING TO THE
9 STATE MEDICAIDS?
10 A. THEY HAD A PRICING DEPARTMENT THAT DID THAT.
11 Q. WHAT PRICING WOULD YOU SUBMIT FOR NEW
12 PRODUCTS THAT WERE BEING ADDED TO STATE MEDICAID
13 FORMULARIES?
14 A. WE WOULD SUBMIT OUR LIST PRICE AND OUR
15 WHOLESALE ACQUISITION COST.
16 Q. WOULD ABBOTT SUBMIT AWP?
17 A. THEY WOULD SUBMIT ONE THAT WAS SUGGESTED,
18 YES.
19 Q. WAS IT TITLED AWP?
20 A. IT WAS ALWAYS WITH AN ASTERISK. IT WOULD SAY
21 AWP WITH AN ASTERISK AFTER IT.
22 Q. AND WHAT DID THE ASTERISK EXPLAIN?
23 A. IT'S BEEN A LONG TIME, BUT IT WAS SOMETHING
24 TO THE EFFECT THAT THE COMPANY DID NOT SET AWP BUT
25 THAT WAS WHAT THEY HAD CALCULATED IT TO BE BASED ON

00052
1 HISTORICAL AWP.
2 Q. WAS THERE ANY EXPLANATION PROVIDED REGARDING
3 THE WAC THAT ABBOTT SUBMITTED TO THE STATE MEDICAIDS?
4 A. NO, SIR.
5 Q. AND I THINK FROM YOUR PRIOR TESTIMONY YOU'RE
6 SAYING THAT YOU SUBMITTED THE SAME WAC PRICING FOR
7 THOSE PRODUCTS TO FIRST DATABANK AS WELL?
8 A. THAT'S CORRECT.
9 Q. AND AT THE TIME DID YOU UNDERSTAND THAT THAT
10 WAC PRICING WAS BEING -- WELL, STRIKE THAT.
11 IT'S YOUR TESTIMONY THAT WAC AND
12 WHOLESALE NET PRICING ARE SYNONYMS, RIGHT?
13 A. THAT'S CORRECT.
14 Q. DID YOU UNDERSTAND THAT WAC AND WHOLESALE NET
15 WERE SYNONYMS WHEN YOU WERE AT ABBOTT?
16 A. I DON'T THINK I EVEN UNDERSTOOD THE TERM
17 "WHOLESALE NET" BEING USED AT THE TIME I WAS AT
18 ABBOTT BECAUSE I WAS VERY MUCH INTO THEIR VERNACULAR
19 AND WE ACTUALLY CALLED IT WHOLESALE PRICE AND LIST
20 PRICE.
21 Q. IS WHOLESALE PRICE ANOTHER ACRONYM FOR
22 WHOLESALE ACQUISITION COST?
23 A. MY UNDERSTANDING, YES.
24 Q. WHOLESALE PRICE -- I SAID ACRONYM, I MEANT
25 SYNONYM. PARDON ME. IS WHOLESALE PRICE ANOTHER

00053
1  SYNONYM -- I UNDERSTAND THAT YOU UNDERSTOOD WHAT I
2  SAID, BUT I'M GOING TO REPHRASE IT ALL --
3  A.  THAT'S GREAT.  THANK YOU.
4  Q.  -- SO THE RECORD IS CLEAR.
5  A.  THANK YOU.  I APPRECIATE THAT.
6  Q.  IS WHOLESALE PRICE A SYNONYM FOR WHOLESALE
7  ACQUISITION COST?
8  A.  MY UNDERSTANDING, YES.
9  Q.  IS WHOLESALE PRICE A SYNONYM FOR WHOLESALE
10  NET?
11  A.  IN MY UNDERSTANDING ALL THOSE TERMS ARE THE
12  SAME.
13  Q.  IN YOUR EMPLOYMENT AT FIRST DATABANK WHEN YOU
14  WOULD RECEIVE WAC PRICING FROM PHARMACEUTICAL
15  MANUFACTURERS DID YOU UNDERSTAND THAT THAT WAS
16  DISCOUNTED PRICING?
17  A.  DISCOUNTED FROM WHAT, SIR?
18  Q.  DID YOU UNDERSTAND THAT THAT PRICING HAD BEEN
19  DISCOUNTED?
20  MR. KERN:  OBJECTION, VAGUE AND
21  AMBIGUOUS.
22  A.  I'M NOT SURE WHAT YOU'RE ASKING ME.
23  Q.  (BY MR. ANDERSON)  ARE YOU AWARE OF ANY
24  DISCOUNT PRICES THAT ARE AVAILABLE IN THE
25  PHARMACEUTICAL INDUSTRY?

00054
1  A.  LIKE VOLUME DISCOUNTS?
2  Q.  VOLUME DISCOUNTS, YES.  ARE YOU AWARE OF
3  THOSE?
4  A.  I'M AWARE THAT THERE ARE VOLUME DISCOUNTS
5  OFFERED, YES.
6  Q.  ARE YOU AWARE OF ANY OTHER DISCOUNTS IN THE
7  PHARMACEUTICAL INDUSTRY?
8  A.  EARLY PAYMENT TERMS.
9  Q.  ANY OTHERS?
10  A.  NO, SIR.
11  Q.  HAVE YOU EVER HEARD OF REBATES?
12  A.  YES, SIR.
13  Q.  ARE YOU AWARE THAT REBATES LOWER PRICES?
14  A.  EARLIER WE WERE TALKING ABOUT THE REBATES
15  WITH OBRA WHERE THE MANUFACTURER GIVES BACK MONEY TO
16  THE STATE BASED ON THE UTILIZATION OF THEIR PRODUCTS.
17  SO YES, I'M AWARE THAT IT DOES LOWER THE PRICE TO THE
18  STATES.
19  Q.  YOU'RE AWARE OF MEDICAID REBATES, I TAKE IT?
20  A.  YES, I AM.
21  Q.  ARE YOU AWARE OF OTHER REBATES THAT ARE
22  GRANTED TO PURCHASERS OF PHARMACEUTICALS LIKE
23  WHOLESALERS?
24  A.  I HAVE NO SPECIFIC KNOWLEDGE, BUT I THINK
25  THERE'S THINGS REFERRED TO AS PERFORMANCE CONTRACTS

00055
1  THAT MAY BE BASED ON UTILIZATION AND I ASSUME THE
2  MECHANISM WOULD BE A REBATE, BUT I HAVE NO SPECIFIC
3  KNOWLEDGE OF THAT.
4  Q.  HAVE YOU EVER HEARD OF THE TERM "CHARGEBACK"?
5  A.  YES, SIR.
6  Q.  WHAT'S YOUR UNDERSTANDING OF A CHARGEBACK?
7  A.  MY UNDERSTANDING OF A CHARGEBACK IS WHERE THE
8  MANUFACTURER HAS A CONTRACT WITH A CUSTOMER SUCH AS A
9  HOSPITAL FOR A CERTAIN PRICE ON THE PRODUCT.  THE
10  HOSPITAL IS BUYING IT FROM A WHOLESALER, BUT THE
11  MANUFACTURER HAD SOLD IT TO THE WHOLESALER AT A HIGHER
12  PRICE.  SO THE WHOLESALER IN TURN SELLS IT TO THE
13  HOSPITAL AT THE PRICE THAT THE CONTRACT BETWEEN THE
14  MANUFACTURER AND THE HOSPITAL SAYS IT WILL BE SOLD AT
15  AND THE WHOLESALER CHARGES BACK TO THE MANUFACTURER
16  THE DIFFERENCE BETWEEN WHAT THEY PAID AND THE CONTRACT
17  PRICE TO THE HOSPITAL.
18  Q.  WHEN DID YOU FIRST LEARN ABOUT CHARGEBACKS?
19  A.  I BECAME AWARE OF THEM IN THE '80S.
20  Q.  AND IN THE '80S YOU WERE EMPLOYED BY ABBOTT,
21  CORRECT?
22  A.  THAT'S CORRECT.
23  Q.  AND YOU WERE AWARE THAT CHARGEBACKS WERE
24  OCCURRING AT ABBOTT?
25  MR. KERN:  OBJECTION, LEADING.

00056
1  A.  THE HOSPITAL PRODUCTS DIVISION OF WHICH I WAS
2  NOT A MEMBER I KNOW WAS INVOLVED WITH CHARGEBACKS, BUT
3  I DO NOT HAVE ANY SPECIFIC KNOWLEDGE OF WHAT THOSE
4  WERE.
5  Q.  (BY MR. ANDERSON)  OTHER THAN HOSPITAL SALES
6  WERE YOU AWARE OF ANY OTHER TYPES OF CHARGEBACKS THAT
7  WERE OCCURRING WHILE YOU WERE EMPLOYED BY ABBOTT?
8  A.  NO, SIR, I'M NOT.
9  Q.  DOES ABBOTT SELL GENERIC DRUGS?
10  A.  IT'S A VERY VAGUE TERM.  I KNOW A LOT OF
11  PEOPLE THINK BRAND AND GENERIC IS PRETTY
12  STRAIGHTFORWARD, BUT IT'S A PRETTY COMPLEX TERM.  THE
13  HOSPITAL PRODUCTS DIVISION OF ABBOT, WHICH I WAS NOT A
14  MEMBER OF, I THINK WOULD TRY TO SELL GENERIC DRUGS.
15  THE PHARMACEUTICAL DIVISION, OF WHICH I WAS A MEMBER,
16  WAS PRIMARILY A BRAND COMPANY OF WHICH PRODUCTS BECAME
17  GENERICS.
18  Q.  IN THE LATE '80S AND EARLY '90S WERE YOU
19  AWARE THAT ABBOTT WAS SELLING GENERIC DRUGS?
20  A.  I'M NOT TRYING TO BE DIFFICULT.  WHERE I HAVE
21  A PROBLEM WITH YOUR QUESTION IS DEFINE GENERIC DRUG.
22  THEY WERE SELLING IN THE LATE '80S AND '90S PRODUCTS
23  WHICH HAD GENERICS OR HAD BECOME NO LONGER SINGLE
24  SOURCE.
25  Q.  WELL, THIS MAY BE AN APPROPRIATE TIME.  DO

# EXHIBIT 57

Rayford, II, Aaron                          February 13, 2008

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In Re: PHARMACEUTICAL INDUSTRY        )

AVERAGE WHOLESALE PRICE LITIGATION    )MDL No. 1456

_____)Civil Action No.

United States of America, ex rel      )01-12257 PBS

Ven-a-Care of the Florida Keys, Inc,  )Civil Action No.

            v                         )06-11337 PBS

Abbott Laboratories, Inc.             )

                    - - -


        Videotaped Deposition of Aaron Rayford, II,

taken on behalf of the United States of America,

pursuant to the stipulations agreed to herein, before

Charisse Kitt, CCR and Registered Professional

Reporter and Notary Public, held at Jones Day, 1420

Peachtree Street, N.E., Atlanta, Georgia, Suite 800,

on the 13th day of February, 2008, commencing at

9:14 a.m.

Rayford, II, Aaron                                    February 13, 2008

Page 102

1  discussing Exhibit 5, right before we went off to
2  take a break and this is a September 2002
3  significant events report that you authored.
4        I want to go back to this bullet point on
5  the second page for Vital Care and ask you:  Now,
6  earlier I noted that there seemed to be a typo in
7  the sentence that reads:  Could loose business.
8  Loose, it says, L-O-O-S-E.  Is it your
9  understanding that what the account manager, who
10 put that together or you meant was could lose,
11 L-O-S-E, business because of this lower Abbott AWP
12 on Vancomycin?
13       MR. SCANNAPIECO:  Objection to form.
14     A.  Yes.
15     Q.  (By Mr. Scannapieco) And why is it that
16 Abbott might lose business with Vital Care due to
17 the $6 AWP for its Vanco versus $16 AWP for Lilly's
18 Vanco?
19       MR. SCANNAPIECO:  Objection to form.
20     A.  Well, it's known throughout the industry
21 that these guys purchase products based on AWP.
22 There is nothing we can do about it.

Page 103

1     Q.  (By Mr. Scannapieco) When you say "these
2  guys" you're talking about Alternate Site
3  customers, generally?
4     A.  Yes.
5     Q.  So since -- if Abbott's AWP is $10 less
6  than Lilly's, there's a strong likelihood that some
7  of these customers will decide not to buy Abbott's
8  Vancomycin; is that correct?
9        MR. SCANNAPIECO:  Objection to form.
10    A.  Yes.
11    Q.  (By Mr. Scannapieco) Now, you began in --
12 at Alternate Site in July of 2000, correct?
13    A.  Yes.
14    Q.  And Abbott's AWP for Vancomycin wasn't
15 always $6, was it?
16       MR. SCANNAPIECO:  Objection to form.
17    A.  I don't know.
18    Q.  (By Mr. Scannapieco) In fact, it was
19 significantly higher when you started in July of
20 2000, the Vancomycin -- the AWP for Vancomycin,
21 correct?
22       MR. SCANNAPIECO:  Objection to form.

Page 104

1     A.  I didn't have -- I wasn't privy to that
2  information.
3     Q.  (By Mr. Scannapieco) When you -- okay.
4  Well, you -- you're familiar with a term "AWP,"
5  correct?
6     A.  Correct.
7     Q.  What's your understanding of what AWP
8  means?
9     A.  Average wholesaler price.
10    Q.  Okay.  And what's your understanding of
11 who determines average wholesale price?
12       MR. SCANNAPIECO:  Objection to form.
13    A.  I don't know.
14    Q.  (By Mr. Gobena) Do you know where the
15 average wholesale price is reported?
16       MR. SCANNAPIECO:  Objection to form.
17    A.  No.
18    Q.  (By Mr. Gobena) Are you familiar with a
19 reporting competitor known as First Data Bank?
20    A.  Yes.
21    Q.  And are you familiar with the fact that
22 they publish a book called The Blue Book?

Page 105

1     A.  No.
2     Q.  Are you aware of the fact that First Data
3  Bank publishes AWP pricing information?
4        MR. SCANNAPIECO:  Objection to form.
5     A.  Yes.
6     Q.  (By Mr. Gobena) Are you familiar with a
7  price publication known as Red Book?
8     A.  Yes.
9     Q.  And are you aware that Red Book publishes
10 AWP price information?
11    A.  Yes.
12    Q.  Are you familiar with a price publication
13 known as -- or a publisher known as Medispin?
14    A.  No.
15    Q.  Now, the AWPs that First Data Bank and
16 Red Book report or publish, rather, include AWPs
17 for Abbott's products, correct?
18       MR. SCANNAPIECO:  Objection to form.
19    A.  Yes.
20    Q.  (By Mr. Gobena) Do you know whether or
21 not Abbott reported AWP price information to First
22 Data Bank?

27 (Pages 102 to 105)

65e46e52-ff27-4f9c-b70e-e09afcd6e31a

Rayford, II, Aaron                                    February 13, 2008

Page 118

1    Q.  (By Mr. Scannapieco) Okay.  Now, you
2  testified earlier that you're familiar with list
3  price and that was in connection with your
4  testimony about your time at the Hospital Business
5  Sector.  Do you recall that?
6        MR. SCANNAPIECO:  Objection to form.
7    A.  Yes.
8    Q.  (By Mr. Gobena) And the list price for a
9  Hospital Products Division drug is the same whether
10  it's sold to a Hospital Business Sector customer or
11  an Alternate Site customer, correct?
12    A.  I view this as Abbott Laboratories list
13  price across the board.
14    Q.  And your job as a divisional sales
15  manager, you are aware of the list prices for the
16  drugs that were being sold to your customers,
17  weren't you, generally?
18        MR. SCANNAPIECO:  Objection to form.
19    A.  No.
20    Q.  (By Mr. Scannapieco) Did you have access
21  to list price information, if you wanted it?
22        MR. SCANNAPIECO:  Objection to form.

Page 119

1    A.  I never requested it.  I don't know.
2    Q.  (By Mr. Gobena) Did your account managers
3  have access to list price information?
4        MR. SCANNAPIECO:  Objection to form.
5    A.  I don't know.
6    Q.  (By Mr. Gobena) Did you -- do you recall
7  whether any sales were done to customers within
8  your region, at list price, during your tenure as a
9  divisional sales manager?
10    A.  I doubt it.
11    Q.  Is that because almost all of your
12  customers in your region were on some sort of
13  contract?
14        MR. SCANNAPIECO:  Objection to form.
15    A.  Exactly.
16    Q.  (By Mr. Gobena) And if they weren't on
17  contract, would they use that RxLink price that we
18  were talking about earlier today, to purchase
19  Abbott products?
20        MR. SCANNAPIECO:  Objection to form.
21    A.  If they purchased it through the drug
22  wholesaler company.

Page 120

1    Q.  (By Mr. Gobena) RxLink is limited purely
2  to wholesale drug --
3    A.  Correct.
4    Q.  Okay.  Do you know whether list price for
5  Abbott products, as used by the price reporting
6  competitor that we talked about earlier, the Red
7  Books, First Data Bank, do you know whether
8  Abbott's list price is used to determine AWP?
9        MR. SCANNAPIECO:  Objection to form.
10    A.  No, I don't.
11    Q.  (By Mr. Gobena) But you did know -- you
12  do know or have known, since your time as a
13  divisional sales manager at Alternate Site, later,
14  Hospira, that the AWP for Abbott or Hospira
15  products is used by the Medicaid and Medicare
16  programs to reimburse for those drugs for the
17  customers, correct?
18        MR. SCANNAPIECO:  Objection to form.
19    A.  I know it's industry wide, how they get
20  reimbursed from Medicare/Medicaid is based on
21  the AWP.
22    Q.  (By Mr. Scannapieco) It's not just

Page 121

1  Abbott's AWP but everybody's AWP?
2    A.  Right.
3    Q.  And to the best of your knowledge, the
4  products that were being sold to the customers
5  within your region were being reimbursed sometimes
6  by the Medicaid and Medicare programs, correct?
7        MR. SCANNAPIECO:  Objection to form.
8    A.  Yes.
9    Q.  (By Mr. Scannapieco) Now, you said that
10  you -- sometimes customers would raise the issue of
11  AWP up with you and you told them that you didn't
12  talk about AWP.  Do you recall that?
13    A.  Yes.
14    Q.  Why is it that you didn't talk about AWP
15  with your customers when they raised it as an issue
16  with you?
17    A.  It was against our policies and
18  procedures.
19    Q.  Is there a specific written policy and
20  procedure that you're referencing, when you say it
21  was against your policies and procedures?
22    A.  It was based on our office ethics and

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

65e46e52-ff27-4f9c-b70e-e09afcd6e31a

Rayford, II, Aaron                    February 13, 2008

```
                                Page 218
 1          C E R T I F I C A T E
 2  G E O R G I A
 3  HENRY COUNTY:
 4          I hereby certify, that the
 5      foregoing deposition was reported, as
 6      stated in the caption and the questions
 7      and answers thereto were reduced to the
 8      written page under my direction; that
 9      the foregoing pages 1 through 192
10      represent a true and correct transcript
11      of the evidence given.  I further
12      certify that I am not in any way
13      financially interested in the result of
14      said case.
15          Pursuant to Rules and
16      Regulations of the Board of Court
17      Reporting of the Judicial Council of
18      Georgia, I make the following;
19      disclosure:
20          I am a Georgia Certified Court
21      Reporter.  I am here as an independent
22      contractor for Henderson Legal Services.
```

```
                                Page 219
 1          I was contacted by the offices
 2  of Henderson Legal Services. to provide court
 3  reporting services for this deposition.
 4  I will not be taking this deposition
 5  under any contract that is prohibited by
 6  O.C.G.A. 15-14-7 (a) or (b).
 7          I have no written contract to
 8  provide reporting services with any
 9  party to the case, any counsel in the
10  case or any reporter or reporting agency
11  from whom a referral might have been
12  made to cover this deposition.  I will
13  charge my usual and customary rates to
14  all parties in the case.
15          this, the 13th day of February,
16  2008.
17
18
19          _____
20          Charisse Kitt, CCR-B-2528.
21          My commission Expires.
22          May 2, 2010.
```

56 (Pages 218 to 219)

65e46e52-ff27-4f9c-b70e-e09afcd6e31a

# EXHIBIT 58

**EXPERT REPORT OF DR. BRIAN REISETTER**

## I.  BACKGROUND AND EXPERIENCE

1.  My name is Dr. Brian Charles Reisetter.  I am submitting this report at the request of Abbott Laboratories Inc.

2.  I graduated in 1980 with a Bachelor of Science (BS) degree in Pharmacy at Drake University in Des Moines, IA.  I graduated from Drake University in 1987 with a Master of Business Administration (MBA).  I completed extensive graduate work at the University of Illinois at Chicago (UIC) in the Doctor of Philosophy (PhD) program from 1993 until 2000.  The emphasis of this graduate work was social science and communication as they relate to the profession of pharmacy.

3.  In 2002, I graduated from the University of Mississippi with a Doctor of Philosophy (PhD) in Pharmacy Administration with an emphasis in Pharmaceutical Marketing.

4.  In conjunction with my graduate academic work, I was a teaching assistant (TA) at both the University of Illinois at Chicago and the University of Mississippi in several courses, including Pharmacy Law and Pharmacy Communications.

5.  I am currently an instructor for one course at the University of Mississippi, College of Pharmacy, entitled The Techniques of Pharmaceutical Sales.  I have taught this course for six consecutive years.

6.  I have been licensed as a pharmacist in the State of Iowa since 1985.  I was also licensed to practice pharmacy in the State of Illinois from 1992 until 2000.  I am currently licensed as a pharmacist in the State of Mississippi.

7.  Since licensed in 1985, I have practiced pharmacy full-time (1985-1987, 1992-1998) and part-time (1998-2000) in retail pharmacy (chain and independent) and in hospital pharmacy (inpatient and outpatient) in the states of Illinois and Iowa.  My experience as a pharmacist included Long-Term Care (LTC).  As a retail pharmacist, my duties included purchasing and claims submissions to public and private third party payers of drugs, including Medicaid, for the stores where I was contracted or employed.

8.  I was a professional sales representative for Eli Lilly and Co., Inc., from 1987 until 1992.  My territory was based out of Des Moines, IA.

9.  I served as Director of Pharmacy at Chicago Lakeshore Hospital Pharmacy in Chicago, IL, from 1992 until 1998 in conjunction with my previous corporation, Reisetter Pharmacy Health Services, Inc. (RPHS).  During that time, I was fully responsible for prescription and non-prescription pharmaceutical product purchasing for the hospital.  I was also a member of the Pharmacy and Therapeutics (P&T) Committee and the Risk Management Committee as part of my normal duties.

10.     Through RPHS, I have consulted for several clients regarding marketing issues in the pharmaceutical industry.   RPHS was active as a corporation from 1994 through 2001.

11.     I was a contracted "relief" pharmacist in both Illinois and Iowa through RPHS for independent and chain pharmacies needing pharmacists for limited amounts of time.   I would often manage or operate independent pharmacies for the owners while they were sick or on vacation.   My activities in this role included product purchasing and claims submission for all prescriptions dispensed.

12.     I am a founding partner of Medical Marketing Economics, LLC (MME), where we work extensively with the pharmaceutical industry in the areas of pricing, marketing strategy and market research.   MME also provides limited litigation support and expert witness testimony.

13.     Through my education, research, professional experiences in the pharmaceutical industry and in the practice of pharmacy, and my work with MME, I have extensive knowledge of pharmaceutical marketing and promotion.

14.     My experience, publications, and prior testimony are provided in detail in my CV.

15.     Medical Marketing Economics (MME) is being compensated at a rate of $450 per hour for my work in this matter.

## II.     TASKS REQUESTED

16.     I have been asked to testify on the following subject matters:

     a.     How pharmaceutical companies market their products, specifically:

          i.     How companies develop an overall marketing strategy for their products, and how those strategies are implemented.

          ii.     The frequency and modes of communication companies use to implement an overall marketing strategy for a product, both to internal members of the company and to the market participants (*e.g.*, customers).

     b.     How any strategy to market the difference between acquisition cost and the reimbursement amount ("the spread") for products would be implemented, and what sources of evidence would exist if such a strategy were designed and implemented.

     c.     The methodology employed by Dr. Matthew Perri in his expert report submitted in this matter and the conclusions that he draws.

17.     To complete this task, I have relied upon my education, knowledge, experience, and a review of the materials that are provided in the attached schedule.

III.   **FINDINGS AND OPINIONS**

*Pharmaceutical Marketing and Marketing Theory*

18.   Pharmaceutical companies are sophisticated businesses that utilize organized marketing efforts to support their products. Pharmaceutical marketing is well developed, systematic, and consistent. Corporate marketing decisions are not made in a simplistic or arbitrary fashion, but are part of a systematic process in which all marketing activities are consistent with a specific strategy for a product or product line.

19.   Pharmaceutical marketing activities are typically presented in four distinct categories: 1) product, 2) promotion, 3) placement (distribution) and 4) price.[1] These categories are not specific to pharmaceutical marketing, but are standard in overall marketing theory. In the pharmaceutical industry, marketing activities in these four categories interact, complement each other, and are part of an overall marketing strategy for a particular product or product line.

20.   For example, if a company had an overall marketing strategy to create value through being the "lowest cost, quality alternative," the marketing of that value would be consistent throughout each of the "Ps" of marketing. Setting the **price** lower than the alternative products alone would not suffice within this strategy. The **product** must be of similar or equal quality before this strategy could be employed. Distribution **(placement)** would have to be designed to make the product equally available as an alternative. As important, this message of the "low cost, quality alternative" would be consistently **promoted** to potential customers, typically through multiple promotion and advertising media.

*What "Marketing the Spread" Would Entail*

21.   Dr. Perri, in his report, concludes that Abbott marketed the products in question based upon the spread. I disagree that any such conclusion can be drawn from the evidence cited in Dr. Perri's report.

22.   The idea of "marketing the spread" is akin to creating an overall product goal to maximize profits for providers through reimbursement by third parties. If a company employed a strategy to market the spread, product managers, sales representatives, and other marketers would incorporate that goal explicitly and continuously into all the activities of the product. These activities would span all areas of marketing (*e.g.*, the 4-Ps of marketing); therefore, one would expect to see consistent, explicit, systematic and continuous evidence that such a marketing plan were in place. Evidence of such a marketing strategy would exist in several forms, including internal discussions of the specific marketing plan, training materials explicitly outlining the goals and activities, research to determine if this

---

[1] Mickey C. Smith, *Pharmaceutical Marketing: Strategy and Cases*, 1st ed. (1991), p. 11-13.

plan was the appropriate course of action, and promotional materials to aid account representatives in presenting this explicit message to customers.

23.   A strategy to market the spread, if implemented, would be communicated consistently and persistently throughout the company or relevant business unit. Because the process of marketing includes all four elements of price, product, placement, and promotion, an expert in pharmaceutical marketing would expect to see evidence of this overall strategy from multiple sources consistently over time in each of these discrete categories.

24.   A marketing plan does not just "happen" at large pharmaceutical companies, and it is not dictated or defined by the isolated actions of individuals. The marketing strategies and resultant marketing plans are discussed, researched extensively, presented at internal meetings, then eventually (if approved) built in to a part of the overall product plan. Once approved, promotional messages are tested, promotional materials are created, representatives are trained, potential customers for the message are identified, and the message is delivered as planned. Throughout the process, there are constant feedback mechanisms and each component is evaluated for refinement or abandonment based on evolving market conditions or competitive response. Evidence of these activities would include (but not be limited to):

   a.   Consistent documentation as to how to best market the message of provider profitability.

   b.   Continuous process of building a product strategy and core message around the topic of marketing the spread.

   c.   Consistent and continuous research on the issue of provider profitability as a potential driver of sales.

   d.   Extensive and explicit research on the correct messages and materials to be used by representatives to promote the spread.

   e.   Evidence of continuous competitive intelligence research in the area of competitor pricing and "spread."

   f.   Continuous internal training on how providers are compensated as a basis for making decisions on marketing the spread, including specific training on provider compensation by payer type and geographical region.

   g.   On-going and explicit development of training materials needed for marketing the spread.

25.   Once past the planning stage and entering the implementation stage, companies must train their representatives as to how this message should be conveyed. That process would include both training personnel and developing the tools necessary for delivering the message. These activities would include (but not be limited to):

- 4 -

    a.      Explicit dissemination of the goal of maximizing provider reimbursement continuously over time.

    b.      Consistent use of this strategy as a metric for sales representative evaluation and performance goals.

    c.      Training materials for account representatives that are continuously revised for training existing and new hires.  This information would include specific training for each sales representative and account managers on (at a minimum):

        i.      Regional and State differences in reimbursement and how that would affect the promotional message.

        ii.      How reimbursement has changed over time and how changes in promotion must change as a result.

    d.      Multiple versions of promotional materials including advertising pieces explaining to customers how Abbott products increased profits through maximizing reimbursement

    e.      Lectures, presentations, and internal training materials consistently and explicitly outlining the strategy of profit maximization for the provider as a goal of each sales presentation.

    f.      Internal correspondence and feedback as to the success of the strategy in the field—resulting in potential refining of the message

26.     A strategy that focused on maximizing the spread for customers would drive all product pricing decisions as well.  As such, one would expect to see consistent and continuous internal discussions of pricing actions, in the context of maximizing payer reimbursement.  Pricing decisions based on this strategy would rely on extensive market research specifically designed to determine how to structure prices to maximize profitability based on the spread.

27.     Based on the evidentiary material that Dr. Perri presented in his report, I disagree with his conclusion that Abbott had a marketing strategy based upon the spread. The evidence simply does not reveal the type of continuous, systematic and explicit indicia of a marketing strategy as outlined above.

28.     To the contrary, the evidence that Dr. Perri presented and I reviewed is most consistent with Abbott employing a marketing strategy as outlined in the training materials prepared for sales representatives.  These representatives were trained to market the products based upon:

    a.      Breadth of product line.

    b.      Breadth of available packaging within that product line.

c.   Reliability of supply and multiple sources from which to purchase products (distribution options).

d.   Competitive pricing.

e.   Customer service.[2]

*"Case Study" Method Employed by Dr. Perri*

29.   Dr. Perri purports to utilize a case study methodology to draw conclusions regarding Abbott's corporate conduct as well as its perceptions, knowledge, and intentions.

30.   The case study methodology is a seldom employed methodology that is utilized when preferred standard experimental design or quasi-experimental design are not possible. A leading publication acknowledges that "as a research endeavor, case studies have been viewed as a less desirable form of inquiry than other experiments or surveys."[3] Because this type of research usually involves a single occurrence of an event, standard statistical comparisons between groups are not possible.

31.   Because of the inherent nature of the design and data collection within standard case study methods, it is particularly important that these studies be properly designed and implemented with the utmost scientific rigor. If one fails to comply with standard methods, the study results are inherently unreliable.

32.   The case study methodology is commonly known to be susceptible to bias, meaning that the evaluator "has allowed equivocal evidence or biased views to influence the directions of the findings and conclusions."[4] If such bias is present, then the study results will be compromised.

33.   The case study methodology requires more than a researcher simply reviewing evidence and providing a subjective opinion regarding what that evidence means.

34.   When properly employed to prevent such bias, any case study research that is intended to yield conclusions (*e.g.*, whether Abbott had a strategy of marketing the spread) should, prior to any data collection, include the following processes:

a.   Identify the theoretical framework or underpinnings on which evidence will be evaluated.

b.   Identify the research hypotheses or propositions, based on the above theoretical framework.

---

[2] *See, e.g.*, Rayford deposition, Ex. 10.

[3] Robert K. Yin, *Case Study Research: Design and Methods*, 3d ed., p. 10.

[4] Yin, p. 10.

c.   Identify the pattern of evidence that one would expect to see that would support or not support the research hypotheses or propositions.

d.   Develop a protocol for data collection that identifies how data should be reviewed and coded, and how themes will be identified, categorized and analyzed.

35.   Based on his report and deposition, Dr. Perri did not utilize these generally accepted processes known to be standard within case study methodology. Dr. Perri did not identify a theoretical framework for this research[5], did not identify hypotheses or propositions, did not *a priori* identify the patterns of evidence one would expect to see if Abbott had a strategy of marketing the spread, and did not provide a structured system of analysis for the data he reviewed.

36.   Of most concern were the methods Dr. Perri employed during the analysis phase of his research. Case study methodology requires that investigators "attend to *all* the evidence, display and present the evidence separate from any interpretation, and show adequate concern for exploring alternative interpretations." (emphasis in original)[6] Rather than following this crucial principle, Dr. Perri has been selective in the facts he uses to support his opinion that Abbott's strategy was one of marketing the spread.

37.   For example, Dr. Perri identifies only one Abbott sales representative (Mr. Lotz) who claims to have affirmatively marketed the spread to customers as support for his conclusion that Abbott had a corporate strategy of marketing the spread. He places little or no weight on the testimony of all the other Abbott employees who denied marketing the spread and who testified that they understood it was Abbott's policy not to do so. He also fails to take into account that Mr. Lotz had a limited sales territory, marketed the spread only for a short period of time, was instructed by his manager to stop this activity when the manager found out what he had been doing, and immediately stopped the activity as his manager instructed.[7]

38.   Due to these flaws in methodology, Dr. Perri's conclusions regarding Abbott's corporate conduct, and its intentions, knowledge and perceptions, cannot be considered scientifically reliable or valid.

39.   I reserve the right to amend or supplement my opinions as new information is provided in this matter.

---

[5] Deposition of Dr. Matthew Perri, February 4, 2009, p. 197.

[6] Yin, p. 109.

[7] Deposition of William G. Lotz, August 9, 2006, p. 97.

Dated:  March 5, 2009

_____
Dr. Brian Reisetter

# EXHIBIT 59

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re: PHARMACEUTICAL INDUSTRY    )  MDL DOCKET NO.

AVERAGE WHOLESALE PRICE           )  CIVIL ACTION

LITIGATION.                       )  01CV12257-PBS

-------------------------------   )


          The videotaped deposition of ANNE MARIE

RENICK, called by the United States for examination,

taken pursuant to subpoena and pursuant to the Federal

Rules of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Rachel F. Gard, Certified Shorthand Reporter, at

11 South LaSalle Street, Suite 1200, Chicago, Illinois,

commencing at 9:08 a.m. on the 17th day of March, A.D.,

2008.

Renick, Anne Marie                                              March 17, 2008

Page 2

1  APPEARANCES:
2
3    U.S. DEPARTMENT OF JUSTICE
4    CIVIL DIVISION
5    MS. ANN ST. PETER-GRIFFITH
6    99 N.E. 4th Street
7    Miami, Florida  33132
8    Phone:  (305) 961-9003
9    Email:  ann.st.peter-griffith@usdoj.gov
10      On behalf of the United States;
11
12   STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
13   BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE
14   MR. RAYMOND LIDDY
15   110 West A Street
16   Suite 1100
17   San Diego, California 92101
18   Phone:  (619) 688-6043
19   Email:  raymond.liddy@doj.ca.gov
20      Telephonically on behalf of the State of
21      California;
22

Page 4

1  APPEARANCES:  (Continued)
2    STETLER & DUFFY, LTD.
3    MR. DAVID J. STETLER
4    11 South LaSalle Street
5    Suite 1200
6    Chicago, Illinois  60603
7    Phone:  (312) 338-0200
8      On behalf of the deponent.
9
10
11  ALSO PRESENT:  Anthony Micheletto, videographer
12
13
14       *  *  *  *  *  *
15
16
17
18
19
20
21
22

Page 3

1  APPEARANCES:  (Continued)
2
3    ANDERSON, LLC
4    MR. C. JARRETT ANDERSON
5    208 West 14th Street
6    Suite 3-B
7    Austin, Texas  78701
8    Phone:  (512) 469-9191
9    Email:  jarrett@anderson-llc.com
10      Telephonically on behalf of the Relator
11      Ven-A-Care of the Florida Keys, Inc.;
12
13   JONES DAY
14   MS. TARA FUMERTON
15   77 West Wacker Drive
16   Chicago, Illinois  60602
17   Phone:  (312) 782-3939
18   Email:  tfumerton@jonesday.com
19      On behalf of Abbott Laboratories;
20
21
22

Page 5

1            I N D E X
2  WITNESS                      PAGE
3  ANNE MARIE RENICK
4    Examination by Ms. St. Peter-Griffith    8
5    Examination by Mr. Anderson         189
6
7          E X H I B I T S
8  RENICK EXHIBIT                 PAGE
9  Exhibit Renick 001 AR 00001 - AR 00003      15
10 Exhibit Renick 002 Anne Renick produced documents 88
11    retained by Mr. Stetler
12 Exhibit Renick 003 ABT-DOJ 026779 -       106
13    ABT-DOJ 0267790
14 Exhibit Renick 004 TXABT 158511          108
15 Exhibit Renick 005 ABT-DOJ 0233926 -      111
16    ABT-DOJ 0233987
17 Exhibit Renick 006 ABT-DOJ 0228282 -      127
18    ABT-DOJ 0228287
19 Exhibit Renick 007 ABT-DOJ-E 0047744 -     132
20    ABT-DOJ-E 0047756
21 Exhibit Renick 008 ABT-DOJ-E 0047520 -     136
22    ABT-DOJ-E 0047525

2  (Pages 2 to 5)

Renick, Anne Marie                                    March 17, 2008

Page 90

1  prohibitions against discussing certain pricing
2  with Abbott's Alt Site customers?
3      MS. FUMERTON:  Objection, form.
4  BY THE WITNESS:
5      A.  A prohibition?  Not -- Not that I can
6  recall when I was a sales rep.
7      Q.  Okay.  Do you recall other training
8  concerning that?
9      A.  I mean, I -- I went through training at
10  various points in time with Abbott on, you know,
11  how you can sell your products, how you can price
12  them, how you can, you know, discuss pricing.
13      Q.  What -- Were there any prohibitions
14  against your discussing list pricing or AWP with
15  your clients at the time you were a sales rep in
16  Alt Site?
17      A.  Well, list price is a public price; so I
18  can't recall ever being told you can't discuss
19  something that is public.
20      Q.  Okay.
21      A.  AWP didn't come up.  It wasn't anything
22  that we talked about.

Page 91

1      Q.  Okay.  When you say that "we talked
2  about," who are you talking about?
3      A.  As a sales rep.
4      Q.  Do you remember there being any practice
5  or policy concerning the discussion -- discussing
6  AWPs or spread with Alternate Site customers?
7      MS. FUMERTON:  Objection, form.
8  BY THE WITNESS:
9      A.  Practice or policies?  I guess AWP was
10  not part of what we talked about.  It's not how we
11  sold our products.  We had contract prices.
12      Q.  Okay.  Do you have an understanding as to
13  what AWP spread is?
14      A.  Yes.
15      Q.  What is it?
16      A.  It is the difference between the
17  wholesale acquisition price, and then it is a --
18  how some customers are reimbursed based on AWP.
19      Q.  Okay.  So is it the difference between
20  the contract price and the AWP?
21      A.  For what?
22      Q.  For -- On a particular product for

Page 92

1  reimbursement purposes?
2      A.  It may be.
3      Q.  When you were working with the Alt Site
4  customers as a sales rep, did you discuss with them
5  contract price?
6      A.  Contract, yes.
7      Q.  Did you discuss with them reimbursement
8  issues?
9      A.  No.
10      Q.  Now, I'm going to fast-forward, okay, to
11  when you worked for that five-year period on the
12  various products as a general manager.  Is it
13  general manager?
14      A.  No, marketing.
15      Q.  Marketing.
16      A.  Marketing manager.
17      Q.  Marketing manager, yes, I'm sorry.
18      A.  I wish I was a general manager.
19      Q.  Okay.  Within HPD, excuse me.  As a
20  marketing manager for injectable -- or I'm sorry,
21  yeah.  As a marketing manager for injectable
22  products -- I almost called you a general manager

Page 93

1  again -- did you have an understanding of how list
2  pricing may impact or how AWP may impact the
3  Alternate Site market as compared to the hospital
4  market?
5      MS. FUMERTON:  Objection, form.
6  BY THE WITNESS:
7      A.  Yes.
8      Q.  Okay.  What was that understanding?
9      A.  At certain times, certain products were
10  sold more in the Alternate Site market, that it
11  could be a concern but it didn't matter.
12      Q.  Okay.  Let's break that down.  What do
13  you mean it could be a concern?
14      A.  That the Alt Site folks occasionally,
15  when we were launching a product, may be interested
16  in how we were doing it.
17      Q.  How come?
18      A.  Because they may have, you know, greater
19  sales or have customers who will buy that product.
20      Q.  Okay.  So why would that be of concern?
21      A.  I don't know.
22      Q.  When you say it didn't matter, what does

24  (Pages 90 to 93)

dee0c0c9-a197-46e8-9784-045f67f6b49f

Renick, Anne Marie                                    March 17, 2008

Page 226

1    UNITED STATES OF AMERICA        )
2    NORTHERN DISTRICT OF ILLINOIS  )
3    EASTERN DIVISION              )  SS.
4    STATE OF ILLINOIS            )
5    COUNTY OF COOK               )
6
7         I, Rachel F. Gard, Certified Shorthand
8    Reporter, do hereby certify that ANNE MARIE RENICK was
9    first duly sworn by me to testify to the whole truth and
10   that the above videotaped deposition was reported
11   stenographically by me and reduced to typewriting under
12   my personal direction.
13        I further certify that the said videotaped
14   deposition was taken at the time and place specified and
15   that the taking of said videotaped deposition commenced
16   on the 17th day of March, A.D., 2008, at 9:08 a.m. at
17   the offices of Stetler & Duffy, Ltd., 11 South LaSalle
18   Street, Suite 1200, Chicago, Illinois.
19        I further certify that I am not a relative or
20   employee or attorney or counsel of any of the parties,
21   nor a relative or employee of such attorney or counsel,
22   nor financially interested directly or indirectly in

Page 227

1    this action.
2
3         In witness whereof, I have hereunto set my
4    hand and affixed my seal of office this 31st day of
5    March, A.D., 2008.
6
7
8
9
10   _____
11        RACHEL F. GARD, CSR
12        CSR No. 084-003324
13
14
15
16
17
18
19
20
21
22

                           58 (Pages 226 to 227)

# EXHIBIT 60

## Louisville, KY

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


--------------------------------X

In re:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE            )

LITIGATION                         ) MDL No. 1456

_____ ) Civil Action No.

                                   ) 01-12257-PBS

THIS DOCUMENT RELATES TO:          )

                                   ) Judge Patti B.

                                   )        Saris

United States of America, ex rel.  )

Ven-a-Care of Florida Keys, Inc.,  ) Magistrate Judge

v. Abbott Laboratories, Inc.,      ) Marianne Bowler

CIVIL ACTION NO. 06-11337-PBS      )

--------------------------------X

*** HIGHLY CONFIDENTIAL ***

Deposition of GERIMED by

SUSAN M. RHODUS, R. Ph., CGP

JANUARY 23, 2008

LOUISVILLE, KENTUCKY

f97108fb-c137-4cc1-bf54-921aa04d9c5d

GeriMed (Susan M. Rhodus, R.Ph., CGP)   HIGHLY CONFIDENTIAL                    January 23, 2008

## Louisville, KY

Page 162

1  passing the -- the witness to Mr. Anderson, who's
2  representing the Relator.
3
4        EXAMINATION
5  BY MR. ANDERSON:
6     Q.  Good afternoon, ma'am.  I have some
7  questions for you, but I'll try to move quickly.
8        If I understand your prior testimony
9  correctly, GeriMed represents member pharmacies
10  that are primarily pharmacies in facilities such
11  as nursing homes; is that correct?
12     A.  They're not in the facilities.  They're
13  servicing facilities.
14     Q.  Okay.  Thank you.
15     A.  They don't necessarily have to be in
16  the facility themselves.
17     Q.  I see.
18        But they're closed-door pharmacies that
19  service facilities such as nursing homes; is that
20  correct?
21     A.  Correct.
22     Q.  Okay.  And then IVMed is a business

Page 163

1  name of GeriMed's, correct?
2     A.  Correct.
3     Q.  And IVMed typically represents member
4  pharmacies that are home infusion pharmacies; is
5  that correct?
6     A.  Correct.
7     Q.  And then GeriMed also does business
8  under the name RxMed, correct?
9     A.  Correct.
10     Q.  And RxMed is an organization or a
11  business name that represents member pharmacies
12  that are primarily retail pharmacies, correct?
13     A.  Correct.
14     Q.  And then under each of those business
15  names, GeriMed attempts to negotiate pricing with
16  drug companies on numerous drug products for
17  those member pharmacies, correct?
18     A.  Correct.
19     Q.  And in doing so, one of the benefits of
20  bringing all of these pharmacies together is to
21  have synergy with size and increased bargaining
22  power, correct?

Page 164

1     A.  Correct.
2     Q.  And in addition, GeriMed also strives
3  to determine which drug products will be most
4  profitable for member pharmacies to dispense,
5  correct?
6        MR. COOK:  Objection.
7        THE WITNESS:  For the contracts that we
8  have available, to tell them which of those
9  products would be the best for them to purchase
10  for profitability, yes.
11  BY MR. ANDERSON:
12     Q.  Right.
13        And part of the equation that GeriMed
14  utilizes to ascertain which products may be most
15  profitable is AWP, correct?
16     A.  It was -- it was -- yes, it was in the
17  past.  Today, the way the reimbursement is, it's
18  not necessarily something we look at as -- as
19  much.
20     Q.  In the past couple of years, some
21  payors have moved away from AWP as a -- a basis
22  for reimbursement?

Page 165

1     A.  The world has changed with Medicare
2  Part D.  And now you have insurance plans who are
3  involved in the marketplace who primarily pay
4  everything on MAC.
5     Q.  And --
6     A.  For generic products.
7     Q.  Right.
8        And you referenced Medicare Part D.
9        Did you reference that program because
10  it does not reimburse based on AWP?
11     A.  No.  I referenced that program because
12  the insurance companies use a MAC for a lot of
13  products, versus what happened in the past with
14  how the system was set up.
15     Q.  Okay.  Looking back in the past, how
16  did Abbott go about ensuring that member
17  pharmacies would comply with purchasing products
18  that GeriMed had identified as most profitable?
19        MR. COOK:  Objection.
20        THE WITNESS:  The -- the way that
21  GeriMed always did business is, we look at
22  several different pieces of -- pie.  We look

42 (Pages 162 to 165)

f97108fb-c137-4cc1-bf54-921aa04d9c5d

## Louisville, KY

Page 166

1  at -- we do not make a decision solely on one
2  thing.  We look at the efficacy of the drug,
3  which an AB rating would be efficacy in a generic
4  product.  We look at the cost of the drug, which
5  is extremely important.  If it's not a low cost
6  drug, then we don't award that product at all.
7      We do look at AWP spread as another
8  piece of what we look at.  And we also look at
9  the availability of the drug.  And -- and by
10 availability, I'm talking if -- if the
11 wholesalers don't stock the product, if you can't
12 get it anywhere, then you could have the cheapest
13 price or the best spread and it doesn't matter.
14 You can't get the product.
15      And then we looked at a relationship
16 with the companies that we did business with to
17 make sure that they were working with us on
18 education and other programs that we wanted to do
19 with other membership.
20      So, all of those things combined is how
21 we made our awards to determine which products
22 that we put on our contracts.

Page 167

1  BY MR. ANDERSON:
2      Q.  And in considering those factors, did
3  GeriMed ultimately strive to choose one generic
4  product in a given therapeutic class as the
5  preferred generic?
6      A.  It would depend on the product and
7  depend on the offer that we receive from the
8  pharmaceutical company.  Some products we did
9  that with, and some products we did not.  And I
10 would say in most cases, if you look at the
11 majority of them, we -- we did a lot of dual
12 awards.  Again, availability of the product and
13 making sure that we have a low cost product
14 available to people was extremely important.
15     Q.  Now, in evaluating these factors in
16 selecting a product or, in the case of a dual
17 award, two products, you'll agree that AWP, or
18 spread, was one of the factors, correct?
19     A.  One of the factors, yes.
20     Q.  How did GeriMed go about ensuring or
21 promoting compliance by its member pharmacies
22 with the GeriMed selected product?

Page 168

1      A.  We published our -- our binder that had
2  all of the information in it, and we also
3  published our EmphaSys program, the CD with all
4  of the information on it.  Both of those ways.
5      Q.  And would you consider those sources of
6  information, both the EmphaSys software and the
7  binders, to be methods of promotion of drug
8  products by GeriMed?
9      A.  For the products that were available on
10 contract, yes.
11     Q.  And were those mechanisms of promotion
12 funded by administration fees or marketing fees?
13     MR. COOK:  Objection.
14     THE WITNESS:  Part of the services that
15 we provide to the drug manufacturers is to
16 promote the contracts that we have available.
17 That is part of what we do.
18 BY MR. ANDERSON:
19     Q.  Right.
20     And in turn, the manufacturers pay
21 GeriMed what are known as administration fees or
22 marketing fees, correct?

Page 169

1      A.  Correct.
2      Q.  And would you consider the GeriMed
3  provided binders or software, such as EmphaSys,
4  to be aspects of that drug promotion?
5      A.  Yes.
6      Q.  Now, you testified this morning, and I
7  think previously, that the administration --
8  contract administration fees or marketing fees
9  range from -- anywhere from zero to 3 percent,
10 correct?
11     A.  Correct.
12     Q.  And then specifically, you recall that
13 Abbott pays somewhere between 2 and 3 percent,
14 correct?
15     A.  Correct.
16     Q.  In looking at some of the past contract
17 price sales totals, I noticed that Abbott was --
18 Abbott products were being purchased by GeriMed
19 members in the $1.3 million range.
20     Does that sound about right?
21     A.  Based on the numbers we looked at this
22 morning, yeah.

43 (Pages 166 to 169)

f97108fb-c137-4cc1-bf54-921aa04d9c5d

## Louisville, KY

Page 242

1    Q.  If you could turn, please, to the
2  second page of the slides, marked as Exhibit 6,
3  and it's the slide entitled, "The GeriMed
4  Agreement Goals."
5         Based upon your inferring that this
6  document was created by Abbott, would it be your
7  understanding that these are the four goals that
8  would be identified by Abbott for Abbott's
9  agreement with GeriMed?
10    A.  Yes.
11    Q.  What are the four goals that are
12  identified in Exhibit 6 as the goals of the
13  GeriMed agreement?
14    A.  Reduce drug costs, deliver innovative
15  quality products, provide field support, medical
16  department support.
17    Q.  Okay.  Anywhere on here does the author
18  of these slides indicate that marketing products
19  based upon AWP is one of the goals of the
20  agreement with GeriMed?
21    A.  No.
22    Q.  In fact, there is a reference to drug

Page 243

1  costs on this slide, correct?
2    A.  Correct.
3    Q.  And it refers only to the drug cost
4  side of that equation, not to the AWP side of
5  that equation, correct?
6    A.  Correct.
7    Q.  Is that consistent with your experience
8  with Abbott when it comes to Abbott's selling of
9  its product based upon cost?
10    A.  Again, I'm going to say it was a long
11  time ago, and I do not -- I mean, this is what's
12  in writing, but I do not remember exactly what
13  conversations that I had with Abbott
14  representatives.
15    Q.  Would Abbott representatives, in your
16  general recollection, attempt to sell its
17  products to GeriMed by offering the lowest cost
18  for the highest quality?
19    A.  Again, I -- it's hard for me to say
20  when I met with a lot of manufacturers, and it's
21  a lot -- a long time ago.
22    Q.  Can you say with some certainty that it

Page 244

1  was not one of the goals of Abbott's agreement
2  with GeriMed to somehow take advantage of Federal
3  health care programs such as Medicare and
4  Medicaid?
5         MR. GOBENA:  Objection.  Form.
6         THE WITNESS:  Again, I mean, I don't --
7  I can't say one way or the other.  I mean, it's
8  not something that anyone came up and said
9  anything to me about.
10  BY MR. COOK:
11    Q.  Standing just on the GeriMed side of
12  the agreement, is it fair to say that GeriMed did
13  not see its relationship with Abbott as being
14  simply a means of taking advantage of Federal
15  health care programs such as Medicare and
16  Medicaid?
17    A.  I would say --
18         MR. GOBENA:  Objection.  Form.
19         THE WITNESS:  -- that that's true.
20  That's not -- that was not the purpose of the
21  agreement.
22  BY MR. COOK:

Page 245

1    Q.  Has that ever been the purpose of any
2  of GeriMed's actions?
3    A.  No.
4    Q.  If you would, turn to Exhibit 7 that
5  Mr. Gobena discussed with you.
6         And for the record, Exhibit 7 is the
7  document labeled, "Strategies for Success" that
8  was previously marked Exhibit 340 in your Texas
9  deposition.
10        You see there's a list of -- of
11  companies that are sponsors and provided
12  educational grants for -- for this particular
13  presentation.
14    Q.  Do you see that?
15    A.  Yes.
16    Q.  Is Abbott one of those companies?
17    A.  No.
18    Q.  You testified that the mechanism for
19  pharmaceutical manufacturers to support these
20  seminars was through unrestricted grants.
21        Do you recall that?
22    A.  Yes.

62 (Pages 242 to 245)

f97108fb-c137-4cc1-bf54-921aa04d9c5d

Louisville, KY

Page 270

1  reflective of cost to the patient whether it's a
2  third-party payor or a private pay patient.
3      Q.   All right.
4      A.   So, we did change that wording in there
5  to be the -- the third-party payor.
6      Q.   So, it's the cost to the third-party
7  payor?
8      A.   Correct.
9      Q.   So, now the sentence for B is, the cost
10 to the third-party payor, such as, let's say, a
11 state Medicaid program?
12     A.   Correct.
13     Q.   That -- that's a significant criteria?
14     A.   That's a -- that is something to look
15 at, yes.  Absolutely.
16     Q.   But in the instance of this particular
17 list of criteria here, item B only really applies
18 to private pay patients; it doesn't apply to
19 government --
20     A.   In 1992, yes.
21     Q.   So, if you're talking about in 1992,
22 we're talking about -- and you have a generic

Page 271

1  drug that's being reimbursed by a governmental
2  third-party payor, really the two most -- and
3  that's -- and then really the last two criteria
4  are the ones that are going to be the most
5  significant; isn't that correct?
6      A.   The cost of the drug is always -- I
7  mean, it's -- that's always an important piece of
8  what you look at when you're making a
9  recommendation.  We never made a -- we never
10 chose a drug based on that it's the highest cost,
11 but it's got the best spread.  Oh, we'll pick
12 that drug.  We've never done that in here, ever.
13     Q.   What's more important to --
14     A.   Ever, ever, ever.
15     Q.   Sorry.  I didn't mean to interrupt.
16         What's -- what's more important to your
17 members?  Profitability or cost?
18     A.   Both.
19     Q.   But --
20     A.   I mean --
21     Q.   -- you're saying both are equally
22 important?

Page 272

1      A.   Yes.  Absolutely.  We never chose a
2  drug solely because it had the best AWP spread as
3  a drug that we would say to the member, "This is
4  the drug you should buy."  That is not part of
5  our philosophy.  It's never been that way in the
6  whole time I've been there.
7      Q.   I -- I'm sorry.  I want to make sure I
8  understand your -- your testimony.
9          Your testimony is that you never --
10 GeriMed never selected drugs to enter into
11 contracts on -- based on the -- a better
12 reimbursement spread?
13     A.   No.
14         MR. COOK:  Objection.
15         THE WITNESS:  That is not what I said.
16 BY MR. GOBENA:
17     Q.   Okay.  I --
18     A.   What I'm saying is, cost and AWP spread
19 were both considerations that we made when we
20 choose a drug.
21         If somebody came in with a drug --
22 let's talk about A versus B -- if somebody came

Page 273

1  in here and said they're charging a hundred
2  dollars for drug A and it's got a -- a $400
3  spread on it, and somebody comes in and
4  says, I got drug B and it's $50 and the spread is
5  $200, I wouldn't pick that drug that's a hundred
6  dollars because it's got a better spread, okay?
7          I could potentially put both of them on
8  the contract, but the one that the people would
9  be directed to would be the one that's $50
10 because that's a better cost for everybody.
11     Q.   When you're talking about the cost now,
12 with respect to generic drugs, let's say there's
13 a manufacturer of two generic -- the same generic
14 drug, two manufacturers.
15         Would the -- would the cost
16 differential really be that significant as -- as
17 laid out in your hypothetical?
18         MR. COOK:  Objection.
19         THE WITNESS:  It could be, yes.
20 Absolutely.
21 BY MR. GOBENA:
22     Q.   Could you give me an example where that

69 (Pages 270 to 273)

f97108fb-c137-4cc1-bf54-921aa04d9c5d