# EXHIBIT 61

Page 1

                UNITED STATES DISTRICT COURT

                DISTRICT OF MASSACHUSETTS

------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE         )  Master File No.

LITIGATION                      )  01-CV-12257-PBS

------------------------------X

THIS DOCUMENT RELATES TO:       )  Judge Patti B.

United States of America ex     )  Saris

rel. Ven-A-Care of the Florida  )

Keys, Inc., et al.  v.  Dey,    )

Inc., et al., Civil Action No.  )

05-11084-PBS                    )

------------------------------X


          Video Deposition of C. BENNY RIDOUT,

taken by the Defendants, at the Hilton North

Raleigh, 3415 Wake Forest Road, Boardroom, Raleigh,

North Carolina, on the 5th day of December, 2008 at

9:10 a.m., before Marisa Munoz-Vourakis, Registered

Merit Reporter, Certified Realtime Reporter and

Notary Public.

Ridout, C. Benny                                    December 5, 2008
                         Raleigh, NC

Page 62

1  the gap on those.  Well, they went to ASP for
2  Medicare drugs in physician's office to get rid
3  of that type thing, average selling prices, they
4  changed the methodology of pricing because of
5  that.
6      Q.  You mentioned that it was common
7  knowledge that Vancomycin had a spread, do I have
8  that correct?
9          MS. HAYES:  Objection to form.
10     A.  Yes.
11     Q.  When was it common knowledge that
12  Vancomycin had a spread?
13     A.  I don't remember the year, just like it
14  was this, but I just remember that drug was one
15  of the antibiotics.
16     Q.  Do you recall whether it was similarly
17  common knowledge that infusion products had
18  spreads?
19         MS. YAVELBERG:  Objection, form.
20         MS. HAYES:  Objection, form.
21     A.  We had no idea what the specialty
22  pharmacists were paying for that drug, what kind

Page 63

1  of deals they struck with the manufacturers, but
2  it was of their opinion of us that there was some
3  kind of spread in there because of what they were
4  able to do that a regular pharmacist couldn't do
5  at AWP.  You see, we still paid at AWP.
6      Q.  What do you mean what they could do
7  that other pharmacists couldn't?
8      A.  Infusion drugs is a whole lot more than
9  just putting a pill in a bottle.  You got to
10  prepare.  In fact, the pharmacists wanted a
11  special fee to do this under-the-hood
12  preparation, you know, also injection takes
13  longer, you got to have syringe and all the stuff
14  to do that.  Of course they were shipping that on
15  top of the cost to ship the product.
16         So if you add up all that extra cost in
17  a regular pharmacy or regular pills, you know,
18  you think well, how in the world can they afford
19  to do this and accept that same price?
20     Q.  What was your conclusion?
21     A.  That somehow they were getting some
22  kind of special deal back or discount from the

Page 64

1  manufacturers to be able to do it or something.
2  That was just my own personal feeling.  How did
3  they do it?
4      Q.  And the significance of their ability
5  to get special deals would be that they could
6  make profit on the drug ingredient cost, right?
7          MS. YAVELBERG:  Objection to form.
8          MS. HAYES:  Objection to form.
9      A.  I have no idea what profit they made or
10  what they were doing.  I just know that nobody
11  does anything for a loss.  You wouldn't stay in
12  business.
13     Q.  Let's take a couple of steps back.
14         Could you describe for the jury when
15  you talk about specialty pharmacies, what are you
16  referring to?
17     A.  Well, there's pharmaceutical companies,
18  pharmaceutical providers, excuse me, they will
19  take drugs that will require a lot of attention
20  and effort that have to be mixed and have to be
21  stored and have to be administered by a highly-
22  trained person, such as the chemotherapy drugs,

Page 65

1  some of the asthmatic drugs, some of the
2  specialty diseases.  And they will go in and say,
3  you know, here's a niche, we will carve this out
4  and we will provide this to Medicaid as a service
5  because the local pharmacists can't do that.  He
6  doesn't go into a person's home.  He doesn't send
7  a nurse out.  They have a nurse on the team that
8  will go in and administer that drug for that
9  patient.
10         So it's more involved than just
11  dispensing a drug like a regular pharmacist does.
12  So they are called specialty pharmacists.
13     Q.  So the jury understands, when you refer
14  to these specialty drugs, are they in pill form?
15     A.  No, most of the time they are.
16     Q.  What form are they taken?
17     A.  They would either be injections or
18  infusions, inhalation drugs.
19     Q.  Could you explain to the jury what
20  infusion and inhalation are?
21     A.  Inhalation would be a drug that is
22  administered through breathing apparatus, like an

17 (Pages 62 to 65)

77907573-2dff-47a3-bd8c-719356f2d9e8

Ridout, C. Benny                                    December 5, 2008
                            Raleigh, NC

| Page 350 | Page 352 |
|---|---|

**Page 350**

1 implementing the MAC changes and stuff that we
2 were talking about with state MACs, which I
3 wasn't going to be involved in those later.
4        So I let the new person get involved
5 with those, and so I probably very well didn't
6 see this, seriously.
7    Q.  Who was the new person?
8    A.  Sharman Limewand, L-I-M-E-W-A-N-D; W-A-
9 N -- gosh, I can't spell her name, S-H-A-R-M-A-N,
10 Sharman, Limewand.
11   Q.  Limewand?
12   A.  Yeah, Limewand.  She's no longer there
13 now.  She didn't make it but a couple of years.
14 They replaced her with Tom D'Andre.
15   Q.  So while Ms. Limewand took over your
16 position, if mail came in addressed to you, she
17 would review it?
18   A.  That's right.
19        MS. YAVELBERG:  Objection to form.
20        MS. HAYES:  Objection to form.
21        MR. KATZ:  I don't have any further
22 questions.

**Page 351**

1    A.  She had the position.  She would have
2 forwarded it to me.  It was meant for the person
3 in that position, not to the person whose name on
4 it.  I wouldn't have had anything to do with it
5 at that point.
6        MR. KATZ:  I have no further questions.
7        MS. YAVELBERG:  No further questions,
8 Mr. Cook?
9        MR. COOK:  No.
10        MS. YAVELBERG:  Thank you, Mr. Ridout.
11 We are off the record.
12        THE VIDEOGRAPHER:  This concludes the
13 deposition of C. Benny Ridout.  The time is 5:18
14 p.m., we are off the record.
15        (Whereupon the deposition was
16 concluded at 5:18 p.m.)
17        (Signature reserved.)
18
19
20
21
22

**Page 352**

1        SIGNATURE OF THE WITNESS
2
3
4
5
6
7
8   _____
9        C. BENNY RIDOUT
10
11
12 SUBSCRIBED AND SWORN to before me this _____
13 day of _____, 2008.
14
15
16
17
18   _____
18        NOTARY PUBLIC
19
20 My Commission expires:_____
21
22

**Page 353**

1        C E R T I F I C A T E
2    I, Marisa Munoz-Vourakis, RMR, CRR and Notary Public,
3 the officer before whom the foregoing proceeding was
4 conducted, do hereby certify that the witness(es) whose
5 testimony appears in the foregoing proceeding were duly
6 sworn by me; that the testimony of said witness(es) were
7 taken by me to the best of my ability and thereafter
8 transcribed under my supervision; and that the foregoing
9 pages, inclusive, constitute a true and accurate
10 transcription of the testimony of the witness(es).
11    I do further certify that I am neither counsel for,
12 related to, nor employed by any of the parties to this
13 action in which this proceeding was conducted, and
14 further, that I am not a relative or employee of any
15 attorney or counsel employed by the parties thereof, nor
16 financially or otherwise interested in the outcome of the
17 action.
18 IN WITNESS WHEREOF, I have hereunto subscribed my name
19 this  of   , 2008.
20
21        MARISA MUNOZ-VOURAKIS
22 Notary #20032900127

                              89 (Pages 350 to 353)

77907573-2dff-47a3-bd8c-719356f2d9e8

# EXHIBIT 62

Rieger, Richard                                    August 9, 2007
Chicago, IL

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re: PHARMACEUTICAL        )  MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE   )  CIVIL ACTION

PRICE LITIGATION             )  01CV12257-PBS

_____


                    Videotaped Deposition of RICHARD

                    RIEGER, at 77 West Wacker Drive,

                    Chicago, Illinois, commencing at

                    9:00 a.m. on Thursday, August 9, 2007,

                    before Donna M. Kazaitis, RPR, CSR

                    No. 084-003145.

1e5a4ab5-b302-4f48-afa7-9b082a61301d

Rieger, Richard                                    August 9, 2007
                        Chicago, IL

---

Page 18

1  responsibility that was being given to me.
2      Q.   In earlier testimony you were describing
3  the Medicare Working Group and you used the word
4  it was brought together.  Do you recall that?
5      A.   I don't recall that specific language.
6      Q.   Okay.  Well, let me ask the question
7  this way:  Who brought the Medicare Working Group
8  together?
9      A.   So to give you the context of this, I
10  worked in corporate development and one of the
11  tasks that we had in corporate development was to
12  lead cross-divisional initiatives.
13           So, for instance, there was
14  initiatives in diabetes, in cardiovascular,
15  women's health, vaccines, there was a variety of
16  different areas.  And then in addition to that,
17  there was this Medicare Working Group.  So it was
18  brought together at a corporate level.
19           I don't know where it was initiated
20  in terms of whether it was Mr. Miller's boss or
21  his boss, but it was our responsibility given that
22  we were in a corporate function and we were tasked

---

Page 19

1  with running these cross-divisional teams.
2      Q.   So if I understand correctly, the
3  Medicare Working Group would have been initiated
4  at the corporate level?
5      A.   Yes.
6      Q.   Do you know the circumstances
7  surrounding the initiation of the Medicare Working
8  Group at the corporate level?
9      A.   If you could clarify what you mean by
10  "circumstances," I would appreciate that.
11      Q.   Why was the Medicare Working Group
12  formed at the corporate level?
13           MS. RUSSO:  Objection to form.
14           THE WITNESS:  Well, it was for the
15  reason I said.  It's hard to create
16  cross-divisional initiatives within a division.
17  So, for instance, if the Pharmaceutical Products
18  Division had wanted to create a cross-divisional
19  initiative, they weren't really in a position to
20  do that.  So at a corporate level, because we're
21  not part of a division, we were tasked with doing
22  that.

---

Page 20

1           The idea was to just basically tap
2  into the knowledge of people who had jobs that
3  related to Medicare and bring them together to
4  share and exchange information about their
5  experiences so that a colleague from Division A
6  may have knowledge that could help a colleague
7  from Division B.
8  BY MR. SISNEROS:
9      Q.   Who gave you your assignment?
10      A.   It was given to me by Jim Miller.
11      Q.   And Jim Miller was your supervisor?
12      A.   He was my direct supervisor, yes.
13      Q.   And Mr. Miller supervised you when you
14  first started in November of 1996?
15      A.   Yes.
16      Q.   For what time period was Mr. Miller your
17  supervisor?
18      A.   He was my supervisor until I moved to
19  the Pharmaceutical Products Division, which was in
20  the early part of 1998.  I think I moved in
21  January.  So it was around fifteen months where he
22  was my supervisor.

---

Page 21

1      Q.   All right.  Now, when was your last
2  involvement with the Medicare Working Group?
3      A.   It was sometime during 1997.
4      Q.   First part, middle part, last part of
5  1997?
6      A.   I don't recall exactly.  I know that the
7  group was losing momentum during the first half of
8  1997 and at some point it effectively disbanded.
9  So I would say it was the early, probably the
10  middle part of 1997.
11      Q.   Now, who was Mr. Miller's supervisor?
12      A.   Steve Weger.
13      Q.   You testified Miller is the one that
14  assigned you this job.
15      A.   Yes.
16      Q.   What were his instructions to you?
17      A.   His instructions were to basically lead
18  a cross-divisional initiative that we would call
19  the Medicare Working Group.  And, as I said, the
20  objective was largely information sharing between
21  the different divisional representatives.
22      Q.   Were there other identified objectives

---

6 (Pages 18 to 21)

1e5a4ab5-b302-4f48-afa7-9b082a61301d

Rieger, Richard                                    August 9, 2007
                        Chicago, IL

Page 26

1      A.   Yes.
2      Q.   If you could compare the first page of
3    that Exhibit Miller 1162 and the second page, the
4    same individuals are listed in both lists; is that
5    right?
6      A.   Yes.  That appears to be the case.
7      Q.   And as far as I can tell, would you
8    agree that the only difference between the top
9    page and the second page is that in the first page
10   the individuals are identified with the division
11   within Abbott from where they come or where they
12   work?
13         MS. RUSSO:  Objection, form.
14         MR. SISNEROS:  Let me restate it.
15   BY MR. SISNEROS:
16     Q.   The only difference between Page 1 and
17   Page 2 of Exhibit Miller 1162 is that the first page
18   identifies the division where these individuals
19   worked; is that correct?
20         MS. RUSSO:  Objection to form.  Go
21   ahead.
22         THE WITNESS:  No.  It doesn't identify

Page 27

1    the divisions where they, oh, I'm sorry, in the
2    left-hand side it does.
3    BY MR. SISNEROS:
4      Q.   Otherwise, they're the same individuals?
5      A.   It's the same individuals, it shows
6    their department numbers on both pages, and
7    buildings where they worked.  And the front page
8    indicates the divisions where they worked, which
9    is not indicated on the second page.
10     Q.   Okay.  And the folks listed in Exhibit
11   Miller 1162 were the folks that worked in the
12   Medicare Working Group; is that right?
13     A.   Yes.
14     Q.   Earlier testimony -- well, strike that.
15         Let me ask you these questions:
16   I'm going to go down the list member-by-member.
17   Jim Miller you identified as your supervisor; is
18   that right?
19     A.   Yes.
20     Q.   You remember Mr. Miller?
21     A.   Yes.
22     Q.   Of course you were a member of the group

Page 28

1    as well and you're listed second in there; right?
2      A.   Yes.
3      Q.   Cathy Babington, do you remember her?
4      A.   Yes.
5      Q.   What do you remember about her with
6    regard to her activities with the Medicare Working
7    Group?
8      A.   I remember that she was an occasional
9    participant in our Medicare Working Group
10   meetings.
11     Q.   What do you mean by "occasional"?
12     A.   Even though these were the key
13   participants, not every person attended every
14   meeting.
15     Q.   Okay.
16     A.   So in other words, we generally had a
17   subset of these people who would attend any
18   particular meeting.  The meetings were spaced out
19   about every thirty days to forty-five days or
20   thereabouts and we would get some subset of these
21   people depending on who was in town and who was
22   available.  So Ms. Babington participated in some

Page 29

1    meetings, she did not participate in other
2    meetings.
3      Q.   With regard to your participation with
4    the folks in the Medicare Working Group, were
5    there any activities relating to the work of the
6    Medicare Working Group that occurred outside of
7    these meetings?
8      A.   Yes.
9      Q.   What kind of activity?
10     A.   So people would do research.  So we
11   would come together as a working group.  We would
12   discuss a particular topic or topics.  Then there
13   was sometimes follow-up that was generated from
14   those meetings, and then that follow-up would be
15   assigned to one or more individuals within the
16   working group.
17         They would do that follow-up, and
18   then often times they would either distribute the
19   follow-up materials directly to the working group
20   or since I was the coleader at the time, they
21   would send the materials to me and then I would
22   distribute those materials out to the team.

8 (Pages 26 to 29)

1e5a4ab5-b302-4f48-afa7-9b082a61301d

Rieger, Richard                                                     August 9, 2007
                              Chicago, IL

Page 342

1    Q.   Okay.
2    A.   So he wrote this but he probably would
3  have walked me through it just to make sure that I
4  get caught up on what was discussed.  But I don't
5  remember a specific conversation, but I think that
6  it would have been the customary thing for him and
7  I to do.
8    Q.   Do you know what the significance of the
9  Medicare Working Group coming to a consensus about
10  an alternative to AWP-based reimbursement would be
11  if this consensus wasn't shared with anyone or
12  further steps weren't taken to act on it?
13    A.   No.
14        MS. RUSSO:  Objection to form.
15
16  BY MS. FORD:
17    Q.   Do you know if the acquisition cost plus
18  alternative remained Abbott's position, or the
19  Medicare Working Group's position I should say?
20        MS. RUSSO:  Objection to form.
21        THE WITNESS:  No.  I don't know what the
22  position was.

Page 343

1  BY MS. FORD:
2    Q.   I mean you understand that, well, going
3  back to the minutes, it says "The group consensus
4  was that 'acquisition cost plus' would be the
5  least unfavorable alternative to current
6  Abbott/TAP business."
7    A.   Yes.  That's what that says, yes.
8    Q.   Right.
9        So my question is do you know if
10  that remained the Medicare Working Group's
11  position, that of the alternatives that were
12  discussed and that are discussed in the memo, that
13  was the least unfavorable to current business?
14    A.   Yeah, and I don't know if that remained
15  the position or not.
16    Q.   You just don't recall one way or the
17  other?
18    A.   I don't recall one way or the other,
19  yes.
20    Q.   Okay.  If you can take a look at Exhibit
21  Miller 1166.  I believe that's the minutes of the
22  April 17, 1997 Medicare Working Group meeting.

Page 344

1    A.   Right.
2    Q.   The first heading is titled Lupron, is
3  that right, of the minutes?
4    A.   Yes, it is.
5    Q.   Then the first entry talks about TAP
6  filing a lawsuit as a result of potential
7  reimbursement changes to Lupron; is that correct?
8    A.   Yes.
9    Q.   And then it indicates that "for details
10  regarding the lawsuit, please see the attached
11  Question & Answer document which has been provided
12  by Abbott's Public Affairs department"; is that
13  right?
14    A.   Yes.
15    Q.   Do you know why Abbott's Public Affairs
16  department would be putting out information about
17  TAP and its lawsuit?
18    A.   No, I don't.
19        MS. RUSSO:  Objection, form.
20  BY MS. FORD:
21    Q.   Do you know, for example, whether TAP
22  had its own Public Affairs department or whether

Page 345

1  that was a shared resource?
2    A.   I am aware because I was a TAP employee,
3  TAP had a separate Public Affairs group.
4    Q.   Do you know at the time of these minutes
5  in April of '97 whether TAP had its own Public
6  Affairs group?
7    A.   Yeah, I should clarify that.  I'm aware
8  that when I went over to TAP in 2003 that they had
9  a Public Affairs group.  Whether that same
10  structure existed prior to that during this time
11  period, I don't know.
12    Q.   Okay.  And if you can take a look at
13  Exhibit Miller 1165, which is the handwritten note
14  from Mr. Miller to you, I believe you testified
15  earlier that you believe Mr. Miller was providing you
16  the information contained in this note; is that
17  correct?
18    A.   Yes.
19    Q.   Do you know for what purpose he was
20  providing you the information?
21    A.   Not specifically.
22    Q.   Is it possible that he was giving you

87 (Pages 342 to 345)

1e5a4ab5-b302-4f48-afa7-9b082a61301d

Rieger, Richard                                        August 9, 2007
                          Chicago, IL

Page 382

1  from secondary research; correct?
2        MS. FORD:  Objection to form.
3        THE WITNESS:  Yeah.  I'll restate just
4  to be crystal clear.  I did secondary research, I
5  had discussions with other Medicare Working Group
6  members, and I could have learned about that from
7  one or the other or both.
8        MS. RUSSO:  All right.  No further
9  questions.
10        And I'd just like to note for the
11  record our objection to the MDL plaintiffs' class
12  counsel asking questions after discovery has
13  closed, I'm sorry, participating in this
14  deposition after discovery has closed.  That's it.
15        What do you want to do about
16  signature?
17        MR. DE SANTO:  We'll reserve signature.
18  Will you make a copy available?  You don't need to
19  send it to me because I don't think I need to be
20  doing anything anymore.  (Indicating to Counsel
21  Russo.)
22        THE WITNESS:  Do I have to read it and

Page 383

1  sign it?
2        MR. DE SANTO:  Yes.  We're going to
3  reserve just to make sure that everything was
4  taken down accurately.
5        THE WITNESS:  All right.  Just give me a
6  little lead time for it.  Don't expect an
7  overnight read.
8        MS. RUSSO:  Okay.
9        THE VIDEOGRAPHER:  We are off the record
10  at 6:05 p.m. with the conclusion of the deposition
11  of Mr. Richard Rieger.
12        (WHEREUPON said deposition was so
13        concluded.)
14
15        _____
16        SIGNATURE OF THE WITNESS
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20_____.
19
20
21  _____
22        Notary Public

Page 384

1  STATE OF ILLINOIS )
2  COUNTY OF C O O K )
3        I, Donna M. Kazaitis, RPR, CSR No.
4  084-003145, do hereby certify:
5        That the foregoing deposition of RICHARD
6  RIEGER was taken before me at the time and place
7  therein set forth, at which time the witness was
8  put under oath by me;
9        That the testimony of the witness and all
10  objections made at the time of the examination
11  were recorded stenographically by me, and
12  thereafter transcribed under my direction and
13  supervision and that the foregoing is a true
14  record of same.
15        I further certify that I am neither counsel
16  for nor related to any party to said action, nor
17  in any way interested in the outcome thereof.
18        IN WITNESS WHEREOF, I have subscribed my name
19  this 19th day of August, 2007.
20
21        _____
22        Donna M. Kazaitis, RPR, CSR 084-003145

97 (Pages 382 to 384)

1e5a4ab5-b302-4f48-afa7-9b082a61301d

# EXHIBIT 63

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )    01-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                )
United States of America,       ) Hon. Patti Saris
ex rel. Ven-a-Care of the       )
Florida Keys, Inc., v.          )
Abbott Laboratories, Inc.,      )
and Hospira, Inc.               )
CIVIL ACTION NO. 06-11337-PBS   )


*********************************************************

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )    01-CV-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                ) Judge Patti B. Saris
State of Arizona v. Abbott      )
Labs., et al.                   )
Civil Action No. 06-CV-11069-PBS )


*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
BRUCE E. RODMAN
August 29, 2007

Volume 1

HIGHLY CONFIDENTIAL


*********************************************************

1  service that has to do -- that requires clinical
2  pharmacists, who are quite involved with advising the
3  physicians who are ordering the medications, in
4  monitoring and interpreting and advising physicians on
5  lab results, through sometimes others in the
6  organization or others outside, such as nurses or
7  people within the pharmacy that are following up with
8  patients and listening if there are particular
9  problems or issues that the patients are bringing up.
10         The pharmacy -- pharmacists do a lot of
11 quality control checking.  The drug themselves are
12 quite often compounded in a sterile clean room.  And
13 the -- the -- actually, the -- the -- the billing that
14 is the reimbursement process for home infusion therapy
15 is -- is very complicated and difficult.  And in order
16 to provide the home infusion therapy service to a
17 patient, it requires quite a few people on it.
18         And it also requires administration,
19 supplies, tubing, that sort of thing, needles and
20 equipment such as infusion pumps.  And those are not
21 free in terms of -- you know, obviously there's a high
22 cost.  If you were to tour a home infusion pharmacy
23 facility, it will depend clearly on the size of the
24 patients, you know, their census, if you will.  But if
25 you were to tour, you walk, you are going to see a ton

1  of people there and it's going to be a very different
2  experience from looking -- from walking into any
3  retail community pharmacy.
4          And so in order to provide the service,
5  there has to be reimbursement for them that is
6  adequate for them to provide the service and stay in
7  business.  And part of that service is -- part of --
8  part of providing that is a margin that would be
9  achieved, i.e., a profit, gross profit, if you will,
10 the difference between what they may have paid for a
11 drug as compared to what they were reimbursed for the
12 drug.
13         And it is -- there are -- there are
14 other ways, you know, other billing aspects of home
15 infusion therapy, also, in addition to billing for the
16 drug, but they all add up to provide a necessary
17 return for them to provide the service.  So that's
18 what I meant.
19    Q.  Okay.  And why did Mr. Sellers -- strike
20 that.
21         What did you mean when you said that
22 Mr. Sellers asked for an organization or entity that
23 would be helpful?
24    A.  You know, I can't tell you word for word our
25 conversation because I don't have that type of memory,

1  but generally I can tell you my recollections, which
2  were that he was wanting to see if it's possible to
3  get, either from the association or a provider, you
4  know, or whatever individuals that might be willing to
5  make some sort of statement to attest to the type of
6  information that I just said, which is that the margin
7  that would be made for -- by the provider from a drug
8  was one of the necessary aspects of being able to stay
9  in business.
10    Q.  Did he -- strike that.
11         When you say "margin," how is the margin
12 achieved?
13    A.  Well, I guess I would define the margin in
14 this case as gross margin being the difference between
15 what the drug when it's billed is reimbursed for as
16 compared to what it cost the provider.
17    Q.  And are you aware of drugs being billed at
18 AWP rates?
19    A.  The predominant methodology -- well, the
20 predominant methodology in -- in this -- in this
21 business of the aspect of the billing for billing of
22 the drugs has been based on an average wholesale price
23 figure.
24    Q.  And when you say "average wholesale price"
25 and I say "AWP," are we talking about --

1    A.  Yes, we are.
2    Q.  -- the same thing?
3    A.  Yes.
4    Q.  Okay.  One other thing I don't think I said
5  is -- is when I -- I'm going to try when you're giving
6  an answer not to talk over you.
7    A.  Okay.
8    Q.  If you could do the same for me just because
9  it's very difficult for our court reporter to take
10 down two people talking at the same time.  Okay?
11    A.  I will try.
12    Q.  Okay.
13         MR. STETLER:  You anticipated her
14 question, you got it right, but it may not always be
15 the case.  So let her -- just let her finish, that's
16 all.  You may sneak a nod in there at the end.
17    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  So you
18 understood that the predominant methodology for
19 reimbursement is based upon average wholesale price or
20 AWP.
21    A.  Well, I understand that extremely well now.
22    Q.  Okay.  What do you mean by that?
23    A.  Well, one of the things I want you to
24 understand is that in my experience at Abbott Home
25 Infusion, I started with that business unit in

6 (Pages 18 to 21)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 22

1  January of 1993 and spent approximately five years as
2  being a reimbursement supervisor and I was learning
3  the business.  And this is a -- this is not an easy
4  business to learn.  And after approximately 1998 I was
5  doing other things that were not directly related to
6  the reimbursement.
7          But in any event, when I left Abbott and
8  began consulting and ultimately took a position for
9  the National Home Infusion Association, you know, I
10  learn every day.  And, you know, my knowledge in
11  general about these aspects of reimbursement and other
12  aspects of the home infusion therapy business on the
13  provider side, at least, is far more than what I knew
14  in those five years as reimbursement supervisor at
15  Abbott.
16      So, I'm sorry, what was your question?
17  Q.  No.  Well --
18  A.  I related to it.
19  Q.  -- now I have another question for you.
20  A.  Okay.
21  Q.  How is it that -- that your knowledge now,
22  based upon the position that you're in now regarding
23  reimbursement, has either grown or changed from what
24  it was when you were reimbursement supervisor at
25  Abbott?

Page 23

1          MS. FUMERTON:  Objection, form.
2  Q.  (BY MS. ST. PETER-GRIFFITH)  Oh, I also --
3          MR. STETLER:  Ignore that.
4  Q.  (BY MS. ST. PETER-GRIFFITH)  Forgot to tell
5  you that she --
6          MR. STETLER:  She'll object.
7  Q.  (BY MS. ST. PETER-GRIFFITH)  That every once
8  in a while Ms. Fumerton might have an objection.
9  Unless Mr. Stetler instructs you not to answer, if you
10  could respond to my question that I asked.
11  A.  So what did we just say?  I am or am not --
12          MR. STETLER:  She'll object and unless I
13  say something, which would be rare, indeed, you just
14  kind of ignore it and answer the question.
15          MS. FUMERTON:  My objection --
16          MR. STETLER:  It's a legal thing.
17          MS. FUMERTON:  My objection is to her
18  questions, not to anything that you're saying.  So it
19  doesn't really actually involve you, but I just wanted
20  to explain that.
21  A.  Please ask the question again.
22          MS. ST. PETER-GRIFFITH:  Sure.  Can you
23  read it back, Cindy?
24          (Requested portion was read)
25  A.  I think I would like to answer that in two

Page 24

1  aspects.
2          One is that specifically with relating
3  to drug pricing in the industry and the importance of
4  that and, perhaps, the evolving mystery of it and an
5  understanding of just what AWP is at this point is far
6  more than I understood in those five years that I was
7  responsible for a portion of the reimbursement in
8  Abbott.
9          The second is I have, I think, a
10  better -- a much better appreciation of the importance
11  of all of the aspects of how providers bill, i.e., the
12  importance of, you know, how they do claims, what they
13  bill for and how that all adds up necessary for them
14  to have -- have appropriate margins so that they can
15  stay in business.
16          You know, can I give you specifics?
17  Maybe if you ask some real questions that are
18  specific, I might be able to answer something.  But in
19  general --
20  Q.  Okay.
21  A.  -- I just know a lot more now than I did
22  then.
23  Q.  Okay.  What is your understanding of what AWP
24  is?
25  A.  Now?

Page 25

1  Q.  Yes.
2  A.  It is a benchmark that is published by now
3  three drug compendiums that is identified with drugs
4  by NDC numbers, drug by drug by drug.  That it is
5  something that is -- been a mystery as to how those
6  compendiums actually develop AWP, that there's been
7  media controversy about it and lawsuits about it, but
8  it still is the predominant method throughout most
9  payers for home infusion providers through which the
10  billings that they submit on claims for drugs are paid
11  with and these days there's typically a steep discount
12  for most payers off of that published AWP price.
13  Q.  Do you know why there's a steep discount or
14  do you have an understanding as to why?
15  A.  I guess what I can tell you is it's my
16  general impression and -- and that's all that I can
17  give you, that there is reimbursement for home
18  infusion in general and that includes the drug
19  billings specifically has been ratcheted back by
20  various payers over the last 15 years and that
21  includes AWP.
22  Q.  Okay.  What was your understanding of AWP
23  prior to your having this understanding?
24          MS. FUMERTON:  Objection, form.
25  Q.  (BY MS. ST. PETER-GRIFFITH)  I mean --

7 (Pages 22 to 25)

1  strike.  Actually, let me ask this:  Your
2  understanding of AWP that you just described, when did
3  you come to have that understanding of what AWP was?
4     A.  Oh, that would be difficult to say, I guess.
5  I -- somewhere in the period of which -- and I think
6  it's the period that I was probably still a
7  reimbursement manager, but it could have been later.
8  I was reimbursement supervisor, but it could have been
9  later.  I came to an understanding that AWP was not
10  what I had thought it was, was what Bruce Rodman
11  thought it was from the name.
12     Q.  Okay.  And what did you think AWP was?
13     A.  I thought --
14          MS. FUMERTON:  Objection, form.
15     A.  -- from the name, not because anybody told
16  me, I just thought from the name that it was an
17  average based on statistical sampling or reporting or
18  something like that, but an average of what a
19  provider, in fact, would be paying to acquire a drug
20  from their source.  Specifically from their
21  wholesaler.
22     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  And
23  what -- when did you have that understanding?
24     A.  Well, certainly I would say through much of
25  those five years or so that I was the reimbursement

1  supervisor.
2     Q.  When you were the reimbursement supervisor
3  within the -- and we'll get into your employment
4  history for a second, but --
5     A.  Uh-huh.
6     Q.  -- when you were a reimbursement supervisor,
7  did you receive any training as to what AWP was or
8  what Abbott's understanding of AWP was?
9     A.  Not that I can recall.
10     Q.  Okay.  I would like to circle back and round
11  out my questions concerning Mister -- your
12  conversation with Mr. Sellers.  Do you remember
13  anything else concerning your conversation with
14  Mr. Sellers?
15     A.  Not at that conversation.  I did do some
16  follow up.
17     Q.  Okay.  And what did you do for follow up?
18     A.  Well, you know, I do remember one more
19  thing --
20     Q.  Sure.
21     A.  -- actually, which was that, you know, I was
22  briefly thinking, well -- our -- our association's
23  executive director actually had just been in the
24  process of resigning and a new one was starting and,
25  you know, my first thought was, well, possibly if

1  someone from the association was going to say
2  something, it was the executive director, and that
3  wouldn't be appropriate because the new executive
4  director was just starting to learn the business.  So
5  I -- at least in my own mind I briefly thought, well,
6  maybe I could say something.
7          And I don't recall whether Mike Sellers
8  brought it up first or whether I said something, but
9  in any event, he said, "Well, that probably wouldn't
10  be appropriate" given that I had worked with Abbott
11  and I agreed with that, so I concurred.
12          So I did provide the names of two
13  individuals to Mike Sellers that he might follow up in
14  contact with.
15     Q.  Okay.  And do you know whether he did?
16     A.  Yes.  I talked to one of them and I know that
17  he did with one of them.  And I do not know about the
18  other.
19     Q.  Okay.  What was your conversation with the
20  individual that you spoke with that Mr. Sellers
21  contacted?
22     A.  That -- well, then I get the phone call from
23  Ms. Citera and that occurred after.  So I did have a
24  conversation with this one individual at one point and
25  just said, you know, just -- just be careful that --

1  don't run into more grief then you really want to.  In
2  effect, that's what I said.  I don't recall the exact
3  words.
4     Q.  Who were you speaking to?
5     A.  His name is Larry Robinson.
6     Q.  Okay.  And what is -- who is Mr. Robinson
7  affiliated with?
8     A.  Well, he was affiliated at the time with the
9  home infusion business and I think some other home
10  businesses, also, for the Methodist Hospital in
11  Memphis, Tennessee.  Their business name is Methodist
12  Alliance.
13     Q.  And why did you make that comment to him?
14     A.  Because I just try to operate prudently as
15  general practice and I got this request to do the
16  deposition, which I -- was a surprise to me, frankly,
17  and that it would take up some time.  And I just
18  said -- you know, I just wanted to be -- you know,
19  Larry -- I consider Larry a friend.  I just wanted to
20  let him know that he -- he'd want to just be careful
21  in that sense because it may take him some time that
22  he doesn't want to be involved with.  It was that
23  simple.
24          You know, and, frankly, if -- if the
25  situation had been reversed and I had the phone call

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 258

1    Q.  Okay.  The next binder?
2    A.  4547 through 4800.  This is called "Insurance
3  Overview."  It's got a date scratched here of 1997,
4  originally 1996.  This also at times must have been
5  used for training Abbott staff and clients on aspects
6  of reimbursement is what I would say.
7    Q.  And the next one?  If you just give the Bates
8  range.
9    A.  Well, the numbers are 4801 through 5108.
10  It's also entitled "Insurance Overview."  This, also,
11  was probably used for the same purpose as the previous
12  one to train Abbott staff and, perhaps, clients on
13  reimbursement topics.
14    Q.  And the final?
15    MR. STETLER:  No, not the final.
16    MS. ST. PETER-GRIFFITH:  Oh, second to
17  last.
18    MR. STETLER:  Second to last.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  If you could --
20    A.  Okay.  Everything in the binder starts at
21  5521.  It ends at 5895.  Meaning some of it is
22  actually three-hole punched in the binder, others are
23  materials.
24    Q.  Okay.  And this binder is what?  If you could
25  describe it.  I think there's a name on the spine.

Page 259

1    MS. MOORE:  On the spine.
2    A.  Well, I'm not seeing it yet.  Oh.  Well, it
3  says "Medicare Enteral Billing."  I'm not sure that's
4  what it is, though.
5    Q.  Okay.  And if you could just describe the
6  next binder really quickly.
7    A.  Okay.
8    MR. STETLER:  No, this is (indicating)
9  the next one.
10    THE WITNESS:  This being the next one?
11  Okay.
12    MR. STETLER:  Let me hand you 5111
13  through 5519.
14    THE WITNESS:  So I'm giving you this
15  back.  Thank you.
16    Q.  (BY MS. ST. PETER-GRIFFITH)  And what --
17  what -- if you could just describe what this is.
18    A.  This says "Medicare Part B PEN Manual."
19    MS. ST. PETER-GRIFFITH:  And this is the
20  last binder, Mr. Stetler?
21    MR. STETLER:  It's the last binder.
22    MS. ST. PETER-GRIFFITH:  Okay.
23    A.  This also is a training manual having to do
24  with aspects of reimbursement.
25    MS. ST. PETER-GRIFFITH:  Why don't we

Page 260

1  adjourn for the day because I know Mr. Stetler has to
2  leave and we're out of tape.
3    MR. STETLER:  Good.
4    THE VIDEOGRAPHER:  We're off the record
5  at 4:15 p.m.  The conclusion of this session of the
6  deposition of Mr. Bruce E. Rodman.
7
8    (Deposition adjourned at 4:15 p.m.)
9    (Signature waived)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 261

1  STATE OF TEXAS )
2  COUNTY OF TRAVIS )
3
4    I, CYNTHIA VOHLKEN, CSR #1059, do hereby
5  certify that, pursuant to the agreement hereinabove
6  set forth, there came before me on the 29th day of
7  August, 2007, at 8:47 o'clock a.m., in the offices of
8  Stetler & Duffy, LLP, 11 S. La Salle, Suite 1200,
9  Chicago, Illinois, the following named person, to-wit:
10  BRUCE E. RODMAN, who was by me duly sworn to testify
11  to the truth and nothing but the truth of witness'
12  knowledge touching and concerning the matters in
13  controversy in this cause; that such witness was
14  thereupon examined under oath, and the examination
15  transcribed by computer-assisted transcription by me
16  or under my supervision, and that the deposition is a
17  true record of the testimony given by the witness.
18    I further certify that I am neither attorney
19  nor counsel for, nor related to or employed by, any of
20  the parties to the action in which this deposition is
21  taken and, further, that I am not a relative or
22  employee of any attorney or counsel employed by the
23  parties hereto, or financially interested in the
24  action.
25

66  (Pages 258 to 261)

3d8b0dbb-837a-4faf-875f-bf00722949fc

Page 262

1    That the amount of time used by each party at
2  the deposition is as follows:
3        Ms. Ann St. Peter-Griffith - 05:50
4
5      IN WITNESS WHEREOF I have hereunto set my
6  hand on this 10th day of September, A.D. 2007.
7
8
9
10
       Cynthia Vohlken, Texas CSR 1059
11     Expiration Date: 12/31/2008
       Firm Registration No. 82
12     Fredericks-Carroll Reporting
       7800 Shoal Creek Boulevard
13     Suite 200 W
       Austin, Texas 78757
14     Telephone: (512) 477-9911
          (800) 234-3376
15     Fax:    (512) 345-1417
16
   JOB NO. 2639
17
18
19
20
21
22
23
24
25

Page 264

1    That $_____ is the deposition officer's
2  charges to the Plaintiffs for preparing the original
3  deposition transcript and any copies of exhibits;
4    That pursuant to information given to the
5  deposition officer at the time said testimony was
6  taken, the following includes counsel for all parties
7  of record:
8    MS. ANN M. ST. PETER-GRIFFITH,
         Attorney for Plaintiff United States of
9    America
     MS. AMBER M. NESBITT,
10       Attorney for Plaintiff State of Arizona
         and MDL Plaintiffs
11   MS. MARGARET MOORE, Attorney for Plaintiff
         State of Texas
12   MR. TIMOTHY C. FOOTE, Attorney for
         Plaintiff State of California
13   MS. TARA FUMERTON,
         Attorney for Defendants Abbott
14   Laboratories, Inc. and Hospira, Inc.
15   That a copy of this certificate was served on
16  all parties shown herein on September 10, 2007 and
17  filed with the Clerk pursuant to Rule 203.3.
18   I further certify that I am neither counsel
19  for, related to, nor employed by any of the parties or
20  attorneys in the action in which this proceeding was
21  taken, and further that I am not financially or
22  otherwise interested in the outcome of the action.
23
24
25

Page 263

1        NO. D-1-GV-04-001286
   THE STATE OF TEXAS      ) IN THE DISTRICT COURT
2                          )
   ex rel.                 )
3    VEN-A-CARE OF THE     )
       FLORIDA KEYS, INC., )
4      Plaintiffs,         )
                           )
5  VS.                     ) TRAVIS COUNTY, TEXAS
                           )
6  ABBOTT LABORATORIES INC.,  )
   ABBOTT LABORATORIES,       )
7  HOSPIRA, INC., and B. BRAUN )
   MEDICAL INC.,           )
8    Defendant(s).         ) 201ST JUDICIAL DISTRICT
9        REPORTER'S CERTIFICATION
       DEPOSITION OF BRUCE E. RODMAN
10         August 29, 2007
11     I, Cynthia Vohlken, Certified Shorthand
12  Reporter in and for the State of Texas, hereby certify
13  to the following:
14     That the witness, BRUCE E. RODMAN, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18     That examination and signature of the witness
19  to the deposition transcript was waived by the witness
20  and agreement of the parties at the time of the
21  deposition.
22     That the amount of time used by each party at
23  the deposition is as follows:
24     Ms. Ann St. Peter-Griffith - 05:50
25

Page 265

1    Certified to by me this 10th day of
2  September, 2007.
3
4
5
     CYNTHIA VOHLKEN, TX CSR 1059
6    Expiration Date: 12/31/2009
     Firm Registration No. 82
7    Fredericks-Carroll Reporting
     7800 Shoal Creek Boulevard
8    Suite 200 W
     Austin, Texas 78757
9    Telephone: (512) 477-9911
        (800) 234-3376
10   Fax:    (512) 345-1417
11  Job No. 2639
12
13
14
15
16
17
18
19
20
21
22
23
24
25

67 (Pages 262 to 265)

3d8b0dbb-837a-4faf-875f-bf00722949fc

# EXHIBIT 64

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL         )
INDUSTRY AVERAGE WHOLESALE     ) MDL No. 1456
PRICE LITIGATION               ) Civil Action No.
                               )    01-12257-PBS
                               )
THIS DOCUMENT RELATES TO:      )
                               )
United States of America,      ) Hon. Patti Saris
ex rel. Ven-a-Care of the      )
Florida Keys, Inc., v.         )
Abbott Laboratories, Inc.,     )
and Hospira, Inc.              )
CIVIL ACTION NO. 06-11337-PBS  )


*******************************************************

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL         )
INDUSTRY AVERAGE WHOLESALE     ) MDL No. 1456
PRICE LITIGATION               ) Civil Action No.
                               )    01-CV-12257-PBS
                               )
THIS DOCUMENT RELATES TO:      )
                               ) Judge Patti B. Saris
State of California, ex rel.   )
Ven-A-Care v. Abbott           ) Magistrate
Laboratories, et al.           ) Judge Marianne Bowler
Cause Nos. 03-cv-11226-PBS     )



*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
BRUCE E. RODMAN
October 11, 2007
Volume 2

*******************************************************

Page 523

1   A.  I don't recall that that was -- I mean, do I
2  recall ever being told that that would be advantageous
3  and we should be doing that periodically?  No, I don't
4  recall that.
5       MR. STETLER:  I think her question was
6  did you suggest.
7   A.  Did I suggest?
8   Q.  (BY MS. THOMAS)  Yes.
9   A.  Oh, I don't recall suggesting that.
10  Q.  Well, I mean, did it ever occur to you while
11 you were working there that, "Hey, we have people
12 selling to customers just like the ones we're getting
13 to know so well.  We ought to tell them what we've
14 learned and -- and help them in their sales and
15 marketing effort"?
16      MR. COLE:  Object to the form.
17  A.  Not -- not -- certainly not as a primary or
18 even a secondary function of my job responsibility.  I
19 talked earlier about how I talked about the
20 standardization of coding in the per diem area.  It
21 occurred to me that that would be something that they
22 probably ought to understand, but also it was tooting
23 my horn a little bit, frankly, because it was an
24 industry accomplishment.  So in that instance I could
25 have initiated that.  But, no, not generally.

Page 524

1   Q.  (BY MS. THOMAS)  Do you have any recollection
2  while you worked in the Home Infusion Services
3  business of ever thinking that it might make sense for
4  someone at Abbott to communicate expertise gained from
5  Home Infusion Services to the people that were trying
6  to sell to some very similar types of clients?
7   A.  I don't.
8       MR. COLE:  Object.  He's answered that
9  multiple times.
10  Q.  (BY MS. THOMAS)  Looking back at your time at
11 Abbott, do you have any idea why that didn't occur to
12 you?
13      MR. COLE:  Object to the form.
14  A.  The Home Infusion Services business unit
15 operated in many ways as a small business.  We were
16 our own entity.  We really didn't work with anybody
17 else in Abbott in particular to achieve our
18 objectives.  So it was -- you know, call it a cultural
19 thing, call it whatever, we had our objectives.
20  Q.  (BY MS. THOMAS)  And, again, did you --
21  A.  I mean, frankly, in some ways we competed
22 with them, so -- because some of -- you know.  Their
23 customers would have been our customers.  And if it
24 was their customers, then it would be through their
25 profit line.  If it was our customers, it would be

Page 525

1  through Home Infusion Services, so ...
2   Q.  Again, do you -- do you have any recollection
3  that type of cross communication was discouraged?
4   A.  I do not have that recollection.
5   Q.  Now, you indicated with regard to these notes
6  that you think there's a couple of things on them that
7  are wrong.  What jumped out at you?
8   A.  "Medicare (Federal Aid Programs) have adopted
9  reimbursement to Per Diem" is incorrect.  That's the
10 one that jumps out.
11  Q.  You stated earlier in your answer that
12 Mr. Snouffer was quite involved in some analysis about
13 the decision made by Abbott to change its pricing?
14      MR. COLE:  Object to the form.
15  A.  I did state that earlier.
16  Q.  (BY MS. THOMAS)  Okay.  Could you elaborate
17 on what you're referring to?
18  A.  Well, I was really not very involved in that
19 because I was responsible for the CHIP system product
20 management types of things at the time, but he was
21 the -- the head person in the reimbursement at this
22 time.  And there was a concern in terms of managing
23 the customers of what the impact might be of their
24 revenues, and, hopefully, their profitability,
25 obviously.  And he -- he was looking at that and I

Page 526

1  think he was running reports, and that sort of thing,
2  to try and determine that so that the business unit
3  could determine how best to manage the customer issues
4  that it created.
5   Q.  Do you recall if there was any written
6  product generated by him or his staff?
7   A.  I do not recall.
8   Q.  Do you recall if there were any meetings
9  addressing the topic?
10  A.  I do not recall.
11  Q.  To your knowledge, was Mr. Snouffer doing
12 this analysis with respect to just Abbott Home
13 Infusion Services or also with respect to other
14 customers of Abbott's and thus the rest of Abbott's
15 business?
16      MR. COLE:  Object to the form.
17  A.  No.  It would be respect to the Abbott Home
18 Infusion Services business relationships.
19  Q.  (BY MS. THOMAS)  Okay.  As far as you know --
20  A.  Only.  As far as I know.
21  Q.  Do you know whether anyone else at Abbott was
22 evaluating what impact it might have on Abbott's
23 business other than Home Infusion Services?
24  A.  I have no specific knowledge of that.
25  Q.  Now, when you identified the first factor

66  (Pages 523 to 526)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

Page 559

1       That the amount of time used by each party at
2  the deposition is as follows:
3           Ms. Ann St. Peter-Griffith - 04:01
4           Ms. Susan Thomas - 02:03
5           Mr. Jeremy Cole - 00:01
6
7       IN WITNESS WHEREOF I have hereunto set my
8  hand on this 21st day of October, A.D. 2007.
9
10
11
12
            Cynthia Vohlken, Texas CSR 1059
13          Expiration Date: 12/31/2008
            Firm Registration No. 82
14          Fredericks-Carroll Reporting
            7800 Shoal Creek Boulevard
15          Suite 200 W
            Austin, Texas 78757
16          Telephone: (512) 477-9911
                    (800) 234-3376
17          Fax:    (512) 345-1417
18
   JOB NO. 2771
19
20
21
22
23
24
25

Page 560

1           NO. D-1-GV-04-001286
2  THE STATE OF TEXAS      ) IN THE DISTRICT COURT
                           )
3  ex rel.                 )
      VEN-A-CARE OF THE    )
4     FLORIDA KEYS, INC.,  )
         Plaintiffs,       )
5                          )
   VS.                     ) TRAVIS COUNTY, TEXAS
6                          )
   ABBOTT LABORATORIES INC.,  )
7  ABBOTT LABORATORIES, and   )
   HOSPIRA, INC.           )
8      Defendants.         ) 201ST JUDICIAL DISTRICT
9           REPORTER'S CERTIFICATION
            DEPOSITION OF BRUCE E. RODMAN
10          October 11, 2007
11      I, Cynthia Vohlken, Certified Shorthand
12  Reporter in and for the State of Texas, hereby certify
13  to the following:
14      That the witness, BRUCE E. RODMAN, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18      That examination and signature of the witness
19  to the deposition transcript was waived by the witness
20  and agreement of the parties at the time of the
21  deposition.
22      That the amount of time used by each party at
23  the deposition is as follows:
24      Ms. Ann St. Peter-Griffith - 04:01
        Ms. Susan Thomas - 02:03
25      Mr. Jeremy Cole - 00:01

Page 561

1       That $        is the deposition officer's
2  charges to the Plaintiffs for preparing the original
3  deposition transcript and any copies of exhibits;
4       That pursuant to information given to the
5  deposition officer at the time said testimony was
6  taken, the following includes counsel for all parties
7  of record:
8           MS. ANN M. ST. PETER-GRIFFITH,
               Attorney for Plaintiff United States of
9               America
            MR. ELISEO SISNEROS, Attorney for
10             Plaintiff State of California
            MS. MARGARET MOORE, Attorney for Plaintiff
11             State of Texas
            MR. JEREMY COLE,
12             Attorney for Defendants Abbott
               Laboratories, Inc. and Hospira, Inc.
13
14      That a copy of this certificate was served on
15  all parties shown herein on October 22, 2007 and filed
16  with the Clerk pursuant to Rule 203.3.
17      I further certify that I am neither counsel
18  for, related to, nor employed by any of the parties or
19  attorneys in the action in which this proceeding was
20  taken, and further that I am not financially or
21  otherwise interested in the outcome of the action.
22
23
24
25

Page 562

1       Certified to me this 22nd day of October,
2  2007.
3
4
            CYNTHIA VOHLKEN, TX CSR 1059
5           Expiration Date: 12/31/2008
            Firm Registration No. 82
6           Fredericks-Carroll Reporting
            7800 Shoal Creek Boulevard
7           Suite 200 W
            Austin, Texas 78757
8           Telephone: (512) 477-9911
                    (800) 234-3376
9           Fax:    (512) 345-1417
10
   Job No. 2771
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

75 (Pages 559 to 562)

eac33b4c-807b-4388-aa68-bf67ecb0bae2

# EXHIBIT 65

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE        )
LITIGATION                     )   MDL No. 1456
_____ )   Civil Action No. 01-12257
                               )
THIS DOCUMENT RELATES TO:      )   Judge Patti B. Saris
_____ )
                               )
United States of America,      )
ex res. Ven-A-Care of the      )
Florida Keys, Inc. v. Abbott   )
Laboratories, Inc.             )
CIVIL ACTION NO. 06-11337-PBS  )
                               )
                               )


VIDEO DEPOSITION OF DONALD C. ROBERTSON


        DATE TAKEN:      Thursday, September 13, 2007

        TIME:            8:54 a.m. to 4:28 p.m.

        BEHALF OF:       The United States

        PLACE TAKEN:     United States Attorney's Office
                         2110 First Street,
                         Fort Myers, Florida

        REPORTER:        Lisa L. Rios, Court Reporter,
                         and Notary Public, State of
                         Florida at Large

_____

           MARTINA REPORTING SERVICES
         Courtney Building, Suite 201
               2069 First Street
         Fort Myers, Florida  33901
               (239) 334-6545
            FAX  (239) 332-2913

Page 142

1    important.
2    Q   Rx link.
3    A   Rx link?
4    Q   Mm-hmm.
5    A   I've heard that term before, and it maybe involved
6    the Hospital Business Sector.
7        I don't remember its connection to Alternate Site,
8    though.
9    Q   Catalog price.
10   A   Catalog price is, I assume, a list price for a
11   product.
12   Q   And what is a list price?  That was my next term.
13   A   Catalog price.
14       It's the price that appears in published material
15   from a company or organization of the list price that they
16   charge or --
17   Q   That who charges?
18   A   The company publishing the pricing charges.  That's
19   their list price.
20   Q   Would Abbott have list prices?
21   A   Yes, ma'am.
22   Q   What would be the purpose of the list price?
23       MS. CITERA:  Objection to form.
24       THE WITNESS:  Well, list price is sort of a
25   negotiating - a start of a negotiating position with a

Page 143

1    customer - not sort of, it is --
2        MS. ST. PETER-GRIFFITH:  Okay.
3        THE WITNESS:  -- the start of a negotiating position
4    with a customer.
5    BY MS. ST. PETER-GRIFFITH:
6    Q   Would Alt Site charge list price to anybody?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  Very few, if any, people paid list
9    price for product.
10   Q   How come?
11   A   It was very -- It was highly competitive and
12   people, through buying groups, or -- You know, we sold
13   mainly through contracts - buying groups or distributors or
14   wholesalers - and they would negotiate a price and people
15   would become members of those buying groups and have
16   privilege to access those prices.
17       Very few people part were part of no group, and
18   therefore, coming up and paying list price.  It was
19   infrequent.  I'm sure it happened, but just not very
20   frequent.
21   Q   Okay.
22       Do you understand under what circumstances it might
23   happen?
24   A   If I wanted to -- I don't -- No, I can't -- I don't
25   know what circumstances it might happen.  Someone just -

Page 144

1    someone is starting a business who has no affiliation or an
2    individual wants a solution for a specific reason - I don't
3    know.
4        Certainly, and individuals, if they didn't have the
5    proper licenses wouldn't be able to acquire drugs.
6        But very few, if any, people bought off list price.
7        Just, once again, it was a start of a negotiating
8    position with customers.
9    Q   Other than being the start of a negotiating
10   position, did you have any understanding as to what purpose
11   a list price might have served?
12   A   Well, I mean --
13       MS. CITERA:  Object to form.
14       THE WITNESS:  -- it's part of the start of a
15   negotiation.
16   Q   Do you know why Abbott published a catalog that
17   listed these prices?
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  To give our customers a starting point
20   for negotiation.
21   Q   Okay.
22       Resource file, is that a term you've ever heard?
23   A   I have no idea what that term means.
24   Q   Okay.
25       Direct price.

Page 145

1    A   I don't know what that term means.
2        It may have been used, I may have heard it in the
3    past but I don't recall what it means.
4    Q   ASP.
5    A   Is Average Selling Price.
6    Q   And what is Average Selling Price?
7    A   Average Selling Price is the total units shipped
8    out the door, divided by the total revenue received for
9    those products - oh, excuse me - the total revenue received
10   divided by the number of units that went out the door -
11   pardon me, I had that backwards, didn't I?
12       What I gave you was the Reciprocal of Average
13   Selling Price.
14   Q   I got you.
15       What would the purpose of an Average Selling Price
16   be or why would Abbott be concerned or Abbott Alt Site be
17   concerned about Average Selling Price?
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  Well, directionally, it tells you many
20   things.  It's not always bad news to have an average
21   unit selling price go down.  That mean - That may mean
22   you're getting larger customers who may pay less per
23   unit but buy a potload of units and so the Average
24   Selling Price will go down.
25       It allows you, by examining that, to challenge your

37 (Pages 142 to 145)

Page 290

1    A   (Shaking head.)
2    Q   If Abbott's customers, as part of their RFQ
3  required Abbott Alt Site to provide information so that
4  spread could be calculated, would there be any prohibition
5  for the Alt Site personnel - or would there be any
6  prohibition prohibiting the Alt Site personnel from
7  furnishing that information?
8        MS. CITERA: Objection.
9        THE WITNESS: Would there be any prohibition?
10   That would rest with the general managers, and I
11   don't know what their response would be. But I would
12   rather not be -- I would rather not do that.
13   Q   Okay.
14       You would rather not do that, but do you know
15   whether your general managers would have prohibited it?
16   A   In this particular case --
17       MS. CITERA: Objection.
18       THE WITNESS: -- I don't know what happened to it.
19   Q   Okay.
20       Well, would it be fair to say that if you're
21   looking to get the contract and Gerimed is requiring the
22   information that it's likely that the Alt Site person not
23   provided the information?
24       MS. CITERA: Objection.
25       THE WITNESS: That may be; I have no way of knowing

Page 291

1    that. I mean, I don't know that.
2    Q   Did you ever express to anyone that you would
3  prefer that Alt Site personnel not provide information so
4  that customers could calculate spread?
5        MS. CITERA: Objection.
6        THE WITNESS: Once again, spread was not something
7    which we commonly discussed. I mean, I -- It's just not
8    how we marketed our product.
9    Q   But if your customers were asking for the
10   information, would you provide it to them?
11       MS. CITERA: Objection.
12       THE WITNESS: If they asked for information on this,
13   I don't know. I'd prefer not to and I probably would
14   not.
15       It's $3.4M - that's a lot of money, but our sales
16   were only $600,000; there's not a lot of downside there.
17   Q   Okay.
18       So would it be then your opinion that Alt Site
19   should forego bidding on the Gerimed project?
20       MS. CITERA: Objection.
21       THE WITNESS: I don't know. I don't know. This
22   seems to be if they're asking to market products through
23   spread and that was not our orientation, that was not
24   our goal, that was not the way we wanted to do it.
25   Q   But you think it's possible that the Alt Site

Page 292

1  personnel may have provided that information.
2        MS. CITERA: Objection.
3        THE WITNESS: When I see this information, it's
4    poss- -- If all the information's been provided, it's
5    possible.
6        MS. ST. PETER-GRIFFITH: What time do we have?
7        MS. CITERA: 4:25.
8        MS. ST. PETER-GRIFFITH: You know what, why don't we
9    stop here for the day. We've got to pack up.
10       And then if we could get another date from you,
11   Mr. Robertson, as to when you might be available,
12   perhaps in early October, if everyone could check their
13   schedules, that would be great.
14       MR. STETLER: Yeah. I'll check.
15       VIDEOGRAPHER: That includes the deposition.
16       The time is 4:28 p.m.
17       (Whereupon, at about 4:28 p.m., the deposition was
18   adjourned.)
19       (The Witness waived reading and signing the
20   transcript.)
21
22
23
24
25

Page 293

1  STATE OF FLORIDA   )
2  COUNTY OF LEE      )
3
4    I, Lisa L. Rios, Court Reporter, and Notary Public,
5  State of Florida at Large, do certify that I was authorized
6  to and did stenographically report the foregoing deposition
7  of DONALD C. ROBERTSON, and that the foregoing typewritter
8  transcript, consisting of pages 1 through 292, is a true
9  record of the testimony given by the witness.
10   I further certify that I am not a relative, employee,
11  attorney or counsel of any of the parties, nor am I a
12  relative or employee of any of the parties' attorney or
13  counsel connected with the action, nor am I financially
14  interested in the action.
15
16
17       Dated this 19th day of September, 2007.
18
19
20       _____
         Lisa L. Rios
21       Court Reporter
         Notary Public
22       State of Florida at Large
23
24
25

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 294

```
1
2              CERTIFICATE OF OATH
3
4    STATE OF FLORIDA    )
5    COUNTY OF LEE       )
6       I, Lisa L. Rios, Court Reporter, and Notary Public,
7    State of Florida at Large, certify that DONALD C. ROBERTSON
8    appeared before me and was duly sworn.
9       WITNESS my hand and official seal this 19th day of
10   September, 2007.
11
12
13          _____
            Lisa L. Rios
14          Court Reporter
            Notary Public
15          State of Florida at Large
16
17
18
19
20
21
22
23
24
25
```

9d08c905-b265-4985-b6be-b8c9e568b1fc

# EXHIBIT 66

Page 297

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE      )
LITIGATION              ) MDL No. 1456
_____ ) Civil Action No. 01-12257
                        )
THIS DOCUMENT RELATES TO:    ) Judge Patti B. Saris
_____ )
                        )
United States of America,    )
ex res. Ven-A-Care of the    )
Florida Keys, Inc. v. Abbott )
Laboratories, Inc.       )
CIVIL ACTION NO. 06-11337-PBS )
                        )
                        )

CONTINUED VIDEO DEPOSITION OF DONALD C. ROBERTSON

DATE TAKEN:   Tuesday, October 9, 2007
TIME:     9:06 a.m. to 4:58 p.m.
BEHALF OF:   The United States
PLACE TAKEN:  United States Attorney's Office
           2110 First Street,
           Fort Myers, Florida
REPORTER:   Lisa L. Rios, Court Reporter,
           and Notary Public, State of
           Florida at Large

MARTINA REPORTING SERVICES
Courtney Building, Suite 201
2069 First Street
Fort Myers, Florida  33901
(239) 334-6545
FAX  (239) 332-2913

CONFIDENTIAL

---

1
2         A P P E A R A N C E S  (Continued)
3
4    Appearing via Telephone:
5
6      AMBER NESBITT, Attorney at Law,
       Wexler, Toriseva, Wallace,
7      55 West Monroe Street, Suite 3300
       Chicago, Illinois  60603;
8      representing MDL and the State of Arizona
9      SHARON LAHEY, Attorney at Law,
       Goodwin, Proctor
10     representing TAP Pharmaceutical Products, Inc.
11
12   Also Present:
13
     Mike Sturdevant, Videographer
14
     John Lockwood, Ven-A-Care of the Florida
15   Keys, Inc., Relator
16
17
18            I N D E X
19                       PAGE
20
21   Cont'd Direct Examination by Ms. St. Peter-Griffith   305
22   Cross-Examination by Mr. Haviland           348
23   Cross-Examination by Mr. Anderson          434
24
25

---

Page 296

1
2         A P P E A R A N C E S
3
4    ANN ST. PETER-GRIFFITH, Attorney at Law,
     Special Attorney for the Attorney General
5    99 N.E. 4th Street, 3rd Floor,
     Miami, Florida  33132
6    representing the United States Attorney,
     Southern District of Florida
7
8    DONALD E. HAVILAND, JR., Attorney at Law,
     The Haviland Law Firm, LLC,
9    740 S. Third Street, Third Floor
     Philadelphia, Pennsylvania  19147
10   representing the Commonwealth of Pennsylvania
11
     TONI-ANN CITERA, Attorney at Law,
12   Jones Day,
     222 East 41st Street
13   New York, New York  10017-6702
     representing Abbott Laboratories, Inc.
14
15   DAVID J. STETLER, Attorney at Law,
     Stetler & Duffy, Ltd.,
16   11 South LaSalle Street, Suite 1200
     Chicago, Illinois  60603;
17   representing the Witness, Donald C. Robertson
18
     C. JARRETT ANDERSON, Attorney at Law,
19   Anderson, LLC
     1300 Guadalupe, Suite 103
20   Austin, Texas  78701
     representing the Relator, Ven-A-Care of the Florida
21         Keys, Inc.
22
23   ELISEO SISNEROS, Deputy Attorney General,
     State of California Department of Justice
24   110 West A Street, #1100
     San Diego, California  92101
25

---

Page 298

1
2            I N D E X (Cont'd)
3            E X H I B I T S
4
     ROBERTSON      DESCRIPTION       PAGE
5
     11   One-page Interoffice Correspondence
6         dated June 22, 1994 from Virginia
          Tobiason stamped ABT212120        306
7
     12   One-page Interoffice Correspondence
8         dated December 3, 1993 from Jeff Hamlin   313
9    13   Two-page document with first page being
          an Interoffice Correspondence dated
10        December 6, 1993 from R. Emmet Harrigan   316
11   14   two-page document with first page being an
          Interoffice Correspondence dated December
12        21, 1993 from Jeffrey L. Hamlin       317
13   15   16-page Interoffice Correspondence dated
          March 8, 1999 from Marianne Sutcliffe    319
14
     16   30-page document with first page stamped
15        ABT006588                  323
16   17   33-page composite exhibit with first page
          dated January 26, 2000 from Michelle
17        Scarpelli and Jim Watson          328
18   18   45-page composite exhibit with first page
          dated February 20, 1997 from Jack Miller  330
19
20   19   16-page document with first page dated
          September 25, 1997 from Lynn E. Leone    334
21
     20   21-page document with first page being a
22        facsimile cover sheet to Chuck Santora
          from Lynn Leone               338
23
     21   Five-page document from Jack Miller
24        with first page dated December 8, 1997   340
     22   Two-page Unanimous Consent dated
25        September 13, 2001             366

2  (Pages 296 to 298)

Page 527

1       MS. CITERA:  Objection to form.
2       THE WITNESS:  I don't recall specifically.
3       Did I come away with it with a sense that the list
4    prices were significantly higher?  I don't recall data.
5    That was a long time ago.
6       I mean, specific numbers, I don't remember that.
7    Q   Given the logic that you've just testified about
8    that list prices should be in relation to market prices --
9    A   That's my philosophy - excuse me.
10   Q   Yes, sir; philosophy.  Thank you.
11      Given that philosophy, did you gain an
12   understanding of why the list prices on many Abbott products
13   were not similar or somehow related to market price?
14   A   No.
15      MS. CITERA:  Objection to form.
16   Q   Did you ask?
17   A   No.
18   Q   Why not?
19   A   I just didn't.
20   Q   Was that considered like a taboo?
21   A   No.
22      MS. CITERA:  Objection to form.
23      THE WITNESS:  Was I discouraged from asking, is that
24   your question?
25      MR. ANDERSON:  Yes, sir.

Page 528

1       THE WITNESS:  No, I was not discouraged from asking
2    that question.
3    Q   Did you ever discourage anyone from analyzing that
4    issue?
5    A   No.
6    Q   Now looking back in hindsight, do you think that
7    would have been a sound business practice to analyze why the
8    list prices on some Abbott prices were so much higher than
9    the market prices?
10      MS. CITERA:  Objection to form.
11      THE WITNESS:  Well, there were -- I didn't have the
12   data from all businesses.  I just didn't pay any
13   attention to it.
14   Q   Well, with respect to Alt Site --
15      THE WITNESS:  In other words, if there's a
16   hospital -- You know, we're all out of the same catalog.
17   If there's a reason for -- I never got into a discussion
18   with Hospital Products to why that was, to answer your
19   question.  I just never - I never did.
20   Q   I understand your testimony about that,
21   Mr. Robertson, I'm asking a slightly different question, and
22   that is, now looking back in '91, '92, '93 and so on, do
23   you think it would have been a sound business practice to
24   investigate why it was that some Abbott products had list
25   prices that were three, four, five, seven, ten times higher

Page 529

1    than actual market price?
2       MS. CITERA:  Objection to form.
3       THE WITNESS:  You know, it's tough to go back in
4    time like that.
5       Could it have been, I suppose, but we didn't do
6    it -- I didn't do it.
7    Q   Are you aware of -- Well, first of all, let's read
8    the section in Exhibit 37 titled, Medicaid?
9    A   Mm-hmm.
10   Q   And this is what Michael Heggie wrote back in April
11   of '95, quote, Medicaid:  Medicaid pays for the most part
12   from NDC numbers.  Having a published list price which is
13   high allows a provider to bill at that list price.  Some
14   providers - pardon me - some customers who are buying our
15   vanco at a deep discount off list may ask about the price
16   change.
17      Did I read that correctly?
18   A   Yeah.
19   Q   Do you agree with the principle that having a high
20   list price will allow providers to bill at those prices?
21   A   That's what Mr. Heggie says.  I don't -- You know,
22   I don't know.
23      Once again, in the business, too, what you bill and
24   what you get paid are two different things.
25   Q   Well, let's focus upon what you did or didn't know.

Page 530

1       Did you ever become aware that having a high
2    published list price would allow providers to bill at higher
3    prices --
4    A   No.
5    Q   -- when they sought reimbursement?
6    A   No.
7    Q   Never had an awareness about that.
8    A   No -- About list prices?  No.
9    Q   Did you ever have an awareness that having a high
10   published list price would, in fact, allow providers to bill
11   at higher AWPs on those products?
12   A   I thought -- My impression, AWP and list price were
13   two independent issues - that was my perception - but they
14   were not connected.
15   Q   But you understood there was a formula between the
16   two.
17      MS. CITERA:  Objection to form.
18   Q   You've already testified to that.
19   A   Yeah; that AWP was a calculation.
20   Q   From list.
21      MS. CITERA:  Objection to form.
22      THE WITNESS:  That the list was a component of the
23   calculation.
24   Q   Yes, sir.
25      So did you have an understanding then that the

60e5726b-bc69-475a-8c51-36591ea203d2

Page 531

1  published list price would, in fact, allow providers to bill
2  at higher AWPs?
3      A   I don't remember considering that issue.  I may
4  have - maybe I should have.  But I don't remember.
5      Q   Do you agree with the statement in the first
6  paragraph under the actual prices that are set forth on
7  Exhibit 37 that reads, quote, These price changes will
8  affect reimbursement and so customers may question us.  This
9  change will affect three types of payors or insurers and I
10  will outline the effect.  The reimbursement effect is
11  probably why customers will bring this issue up.
12       Do you agree that customers would raise
13  reimbursement issues with Abbott?
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  If I read this memo, the Medicaid
16  would.
17      Q   Do you agree that just as a general matter
18  customers would raise reimbursement issues with Abbott
19  personnel?
20      MS. CITERA:  Objection to form.
21      THE WITNESS:  As I recall, we weren't asked
22  frequently about reimbursement from customers.  As I
23  recall.
24      Q   Would you think it appropriate if the training
25  manual for Abbott Alternate Site personnel included a

Page 532

1  requirement to ask questions about reimbursement?
2      A   To ask questions --
3      MS. CITERA:  Objection to form.
4      THE WITNESS:  -- of whom?
5      Q   Customers.
6      A   I would have to have context.
7      Q   Well, assume with me, sir, that the training manual
8  for Abbott Alternate Site sales personnel included a request
9  that customers be asked about reimbursement; do you think
10  that that would be an appropriate sales technique?
11      MS. CITERA:  Objection to form.
12      THE WITNESS:  Well, if they were asking about
13  reimbursement, I don't know why they were asking about
14  reimbursement, what their payor mix was; that may be an
15  issue, I don't know.
16      Q   Are you aware of any situation where --
17      THE WITNESS:  I haven't see the manual, either.
18      Q   Did you ever discipline anyone or did anyone ever
19  get disciplined to your knowledge for creating a sales
20  manual that was unauthorized?
21      A   Not to my knowledge.
22      MS. CITERA:  Objection to form.
23      (Whereupon, Robertson Exhibit No. 38 was marked for
24  identification.)
25      Q   Mr. Robertson, does Exhibit 38 look to be an e-mail

Page 533

1  thread where, basically, Jerrie Cicarele was forwarding to
2  Harry Adams the prior e-mail about the setting of new list
3  prices on vanco?
4      A   It appears to be.
5      Q   So it's very similar in that regard to Exhibit 36,
6  correct?
7      A   That portion is; yes.
8      Q   Now, you'll agree with me, also, won't you, that
9  this foreword from Jerrie Cicerale to Harry Adams is dated
10  April 27th, '95 which is one day after Michael Heggie's --
11      A   Right.
12      Q   -- memo, correct?
13      A   Mm-hmm.
14      Q   And Harry Adams was over in HPD, HPS that had
15  authority over list prices, correct?
16      MS. CITERA:  Objection to form.
17      THE WITNESS:  I don't know Harry's specific
18  responsibilities, but I know he worked over there.
19      Q   And that was the basic business unit that had
20  authority to --
21      A   Hospital Business Systems.
22      Q   -- set and publish list prices --
23      A   Okay.
24      Q   -- correct?
25      A   I don't remember that specifically.  I remember

Page 534

1  that he was part of the Hospital Business Systems
2  organization or Hospital Business Sector organization.
3      Q   And you knew as a general matter that that
4  organization also is the one that published list prices,
5  correct?
6      A   Yes -- The division did; yeah.
7      (Whereupon, Robertson Exhibit No. 39 was marked for
8  identification.)
9      Q   Mr. Robertson, if you could now review what's been
10  marked as Exhibit 39 - Robertson 39, also known as Heggie
11  No. 79?
12      A   Mm-hmm.
13      Q   Does this appear to be an e-mail from Gerry
14  Eichhorn to Harry Adams, Jerrie Cicerale and John Ward?
15      A   (Referring.)
16       To me, it appears to be either a fax or a memo -
17  yeah; it's communication.
18      Q   And John Ward's part of that communication,
19  correct?
20      A   Yeah; he's an addressee.
21      Q   And so is Mr. Adams, correct?
22      A   He's an addressee.
23      Q   And this is dated May 5th, 1995 which is several
24  days after late April, 1995, correct?
25      A   This is dated May 5th.

Page 619

1   him a copy so that he has them in front of him.  So I'm
2   more than willing to do that.
3       MR. ANDERSON:  We'll try to work on the logistics.
4       MS. CITERA:  Okay.
5       MS. ST. PETER-GRIFFITH:  And the United States has
6   no objection to doing it by phone, either.
7       And, you know, to the extent that we can help
8   facilitate something down here in this office, we're
9   happy to work through that as well.
10      MS. CITERA:  That would be great.  Thank you.
11      MR. ANDERSON:  And at least I, on behalf of the
12  Relator, continue to reserve my right to further
13  questions after your questioning and supplement
14  production that directly impacts the questioning of this
15  Witness.
16      MS. ST. PETER-GRIFFITH:  The United States asserts
17  the same reservation.
18      MR. SISNEROS:  Same reservation for California.
19      MS. NESBITT:  Same reservation for Arizona and MDL.
20      VIDEOGRAPHER:  That concludes the deposition.
21  The time is 4:58 p.m.
22      (Whereupon, at about 4:58 p.m., the deposition was
23  adjourned.)
24      (The Witness waived reading and signing the
25  transcript.)

Page 620

1   STATE OF FLORIDA   )
2   COUNTY OF LEE      )
3
4       I, Lisa L. Rios, Court Reporter, and Notary Public,
5   State of Florida at Large, do certify that I was authorized
6   to and did stenographically report the foregoing deposition
7   of DONALD C. ROBERTSON, and that the foregoing typewritten
8   transcript, consisting of pages 1 through 616, is a true
9   record of the testimony given by the witness.
10      I further certify that I am not a relative, employee,
11  attorney or counsel of any of the parties, nor am I a
12  relative or employee of any of the parties' attorney or
13  counsel connected with the action, nor am I financially
14  interested in the action.
15
16
17      Dated this 24th day of October, 2007.
18
19
20      _____
        Lisa L. Rios
21      Court Reporter
        Notary Public
22      State of Florida at Large
23
24
25

Page 621

1
2           CERTIFICATE OF OATH
3
4   STATE OF FLORIDA   )
5   COUNTY OF LEE      )
6       I, Lisa L. Rios, Court Reporter, and Notary Public,
7   State of Florida at Large, certify that DONALD C. ROBERTSON
8   appeared before me and was duly sworn.
9       WITNESS my hand and official seal this 24th day of
10  October, 2007.
11
12
13      _____
        Lisa L. Rios
14      Court Reporter
        Notary Public
15      State of Florida at Large
16
17
18
19
20
21
22
23
24
25

60e5726b-bc69-475a-8c51-36591ea203d2

# EXHIBIT 67

Rotz, David G.                          September 7, 2007
                      Chicago, IL

Page 1

                    IN THE UNITED STATES

                  DISTRICT OF MASSACHUSETTS


    IN RE:  PHARMACEUTICAL INDUSTRY     )

    AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

    THIS DOCUMENT RELATES TO:          ) Civil Action No.

    United States of America, Ex rel.  ) 01-CV-12257-PBS

    Ven-a-Care of the Florida Keys,    ) Hon. Patti Saris

    Inc., v. Abbott Laboratories,      )

    Inc., And Hospira, Inc.,           )

    CIVIL ACTION NO. 06-11337-PBS      )

    ******************************************************


    ******************************************************

                ORAL AND VIDEOTAPED DEPOSITION

                     OF DAVID G. ROTZ

                    September 7, 2007

                      Chicago, IL

    ******************************************************



    (CAPTIONS CONTINUED)

4f6e7559-aa94-4f1e-a170-474e279dfb23

Rotz, David G.                                September 7, 2007
                        Chicago, IL

Page 150

1    my cubicle, yes.
2        Q.  Do you recall how, for example, you
3    kept your files?  Did you keep them by subject or
4    by training course or how you might have arranged
5    your files?
6        A.  I really don't remember how they were
7    organized.
8        Q.  Okay.  During the time that both you
9    and Ms. Burchieri were working together, did you
10   have joint files for these materials, or did you
11   have your separate files?
12       A.  We had separate files.  We were -- we
13   were located in different geographic locations.
14   So yes, we had separate files.  Many of the items
15   would have been the same in both of our files.
16       Q.  Okay.  And to the extent that Ms.
17   Burchieri would have created something -- and she
18   was in California; is that right?
19       A.  Correct.
20       Q.  Would she have sent a copy to you to
21   keep in the alternate site offices?
22       A.  I don't remember.  She may have.

Page 151

1        Q.  Okay.  Do you recall a specific
2    importance placed on maintaining a file copy or a
3    -- a pristine copy of the materials that were
4    generated for training purposes?
5        MR. COLE:  Object to the form.
6        THE WITNESS:  Any of the work we did,
7    we would have needed to maintain a copy.  How it
8    was done, I don't know.
9    BY MS. FORD:
10       Q.  Okay.  You indicated earlier this
11   morning that you have heard of the term "average
12   wholesale price"; is that right?
13       A.  I have heard the term, yes.
14       Q.  Okay.  And what is your best
15   understanding of what that phrase means?
16       MR. COLE:  Object to the form.
17       THE WITNESS:  Only that it would be an
18   average price.  Because the term "wholesale" is
19   in there, I assume that it's wholesalers, the
20   price to wholesalers for the product.
21   BY MS. FORD:
22       Q.  And would that be the average price to

Page 152

1    wholesalers for products purchased from Abbott?
2        MR. COLE:  Object to the form.
3        THE WITNESS:  I -- I think it's the
4    industry in general.  I think any manufacturer of
5    pharmaceuticals would have an average wholesale
6    price.  That's my best understanding.
7    BY MS. FORD:
8        Q.  Do you know how AWP -- if I say AWP to
9    mean average wholesale price, do you understand
10   what I mean?
11       A.  Yeah, I understand the term, yes.
12       Q.  So do you know how AWP was used?
13       A.  No, I don't.
14       MR. COLE:  Object to the form.
15   BY MS. FORD:
16       Q.  Do you recall ever providing training
17   to alternate site employees about AWP?
18       MR. COLE:  Object to the form.
19       THE WITNESS:  I recall that AWP would
20   have been part of the training.  Whether I
21   provided it myself, I don't know.
22   BY MS. FORD:

Page 153

1        Q.  If you didn't provide it yourself,
2    would Ms. Burchieri have provided it?
3        A.  Ms. Burchieri, possibly somebody in
4    contract marketing; Lynn Leone, for example.
5        Q.  Okay.
6        A.  I don't remember specifically though.
7        Q.  And if you didn't provide it yourself,
8    and, for example, you invited someone from
9    contract marketing to present that portion of the
10   training, would you have been present during that
11   portion of the training?
12       A.  Trudy or I would have been present,
13   yes.
14       Q.  Okay.  Do you recall questions ever
15   coming up during the course of your new-hire
16   training, for example, about AWP?
17       A.  I don't remember specific questions
18   being asked.  I -- I think it's possible that
19   they were asked, yes.
20       Q.  Okay.  Would it have been your -- would
21   it have been your practice to attempt to respond
22   to those questions?

Henderson Legal Services
202-220-4158

4f6e7559-aa94-4f1e-a170-474e279dfb23

Rotz, David G.                                September 7, 2007
                          Chicago, IL

```
                                              Page 178
 1   STATE OF ILLINOIS  )
                        ) SS:
 1   COUNTY OF DuPAGE   )
 2          I, ROBIN M. CHIMNIAK, a notary public
 3   within and for the County of DuPage and State of
 4   Illinois, do hereby certify that heretofore, to wit,
 5   on the 7th day of September, 2007, personally appeared
 6   before me DAVID ROTZ, a witness in a certain cause now
 7   pending and undetermined in the United States District
     Court.
 8          I further certify that the witness was by
 9   me first duly sworn to testify the truth, the whole
10   truth and nothing but the truth in the cause
11   aforesaid; that the testimony then given by the said
12   witness was reported stenographically by me in the
13   presence of said witness and was thereafter
14   transcribed under my personal direction, and the
15   foregoing is a true and complete transcript of the
16   testimony so given by the said witness as aforesaid.
17          The signature of the witness to the
18   foregoing deposition was not waived.
19          I further certify that the taking of this
20   deposition was pursuant to notice and that there were
21   present at the taking of said deposition the
22   appearances as heretofore noted.
```

```
                                              Page 179
 1          I further certify that I am not a relative
 2   or employee or attorney or counsel, nor a relative or
 3   employee of such attorney or counsel for any of the
 4   parties hereto, nor interested directly or indirectly
 5   in the outcome of this action.
 6          IN TESTIMONY WHEREOF, I have hereunto set
 7   my hand and affixed my notarial seal this _____
 8   day of September, 2007.
 9
10
11
12          _____
13          ROBIN M. CHIMNIAK, CSR
14          License No. 084-001999
15
16
17
18
19
20
21
22
```

46 (Pages 178 to 179)

Henderson Legal Services
202-220-4158

4f6e7559-aa94-4f1e-a170-474e279dfb23

# EXHIBIT 68

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL          :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      :   CIVIL ACTION

PRICE LITIGATION                :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO        :

U.S. ex rel. Ven-a-Care of      :   Judge Patti B. Saris

the Florida Keys, Inc.          :

     v.                         :

Abbott Laboratories, Inc.,      :   Chief Magistrate

No. 06-CV-11337-PBS             :   Judge Marianne B.

- - - - - - - - - - - - - -x      Bowler

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                       Washington, DC

Page 362

1  be a level that was much higher than the ASP for
2  Vancomycin, correct?
3          MR. GOBENA: Objection. Form. Also going
4  to object to the previous question. I didn't get a
5  chance to get in there. Object to the form on that.
6  You can answer the question.
7          THE WITNESS: Yes. My guess would be
8  obviously it was a transition for one year to 85
9  percent of AWP for all drugs, 95 percent for clotting
10 factor and some other drugs. And I'm sure they
11 didn't go through drug by drug and look at the
12 margins. I assume there were other home health
13 infusion drugs, for which they felt the margins for
14 that one year may have been sensitively narrow, and
15 so they kept it at 95 percent.
16         I'm just guessing -- just remember, my
17 testimony for Vancomycin, the spread was pretty big
18 and there probably wasn't a whole lot of worry about
19 85 percent not being big enough to cover it, so it's
20 probably not the reason that drove the policy.
21         (Exhibit Abbott 194 was
22           marked for identification.)

Page 363

1          BY MR. DALY:
2    Q.   And Mr. Scully, I've handed you what the
3  court reporter has marked as Exhibit Abbott 194,
4  which is a copy of at least portions of the MMA
5  itself. And I would ask you to turn to page 23 of
6  that document. And you had asked whether this was a
7  carveout in the legislation itself, and I just want
8  to direct you to page 23 at the bottom, subparagraphs
9  D-1 and 2.
10   A.   Okay.
11   Q.   And does that appear to be the legislative
12 carveout for the rule that we were just looking at?
13   A.   Refreshing my memory, I had forgotten we
14 did that.
15         MR. GOBENA: While Mr. Daly is getting his
16 exhibit out, I'll note the first page, it says that
17 this piece of legislation was effective December 8,
18 2003 to December 31, 2004.
19         MR. DALY: Anything else you want to point
20 out?
21         THE WITNESS: Yes. This was a one-year
22 transition. It went to ASP plus 6 in 2004, is that

Page 364

1  right?
2          BY MR. DALY:
3    Q.   I believe that's right.
4          (Exhibit Abbott 195 was
5           marked for identification.)
6          THE WITNESS: Good heavy one. I can take
7  care of the rest of those if you like.
8          BY MR. DALY:
9    Q.   And you mentioned that, you know, this
10 might have been a one-year carveout. And Mr. Gobena
11 seems anxious to point that out. Taking a look at
12 Exhibit Abbott 195, which I've handed you, this is
13 certain amendments that went into effect with respect
14 to the MMA effective December 20, 2006. Do you see,
15 do you see that?
16   A.   Yes.
17   Q.   And if you would turn to page 21 of this
18 document, and subparagraphs D-1 and D-2. Do you see
19 that the carveout that we identified that was in
20 effect for 2004 remains in effect today?
21         MR. GOBENA: Object to the form. Excuse
22 me.

Page 365

1          THE WITNESS: Yes. I wasn't aware of
2  that, so there is still -- they're still 95 percent
3  of AWP today?
4          BY MR. DALY:
5    Q.   That's what the statute says, isn't it?
6    A.   Yes. I wasn't aware of that. That's what
7  the statute says.
8          MR. BREEN: Just for clarification,
9  Mr. Daly, are you referring to subparagraph D little
10 I, which ends with 95 percent of the average
11 wholesale price for such drug in effect on October 1,
12 2003?
13         MR. DALY: And D-2.
14         MR. BREEN: Say again?
15         MR. DALY: And the next paragraph, D
16 Romanette i and D Romanette ii.
17         THE WITNESS: Until they froze it at the
18 date of passage, October -- they picked the -- 95
19 percent of the AWP in place in October 2003, and
20 froze it. I had forgotten that.
21         BY MR. DALY:
22   Q.   And so at least for the drugs that are

92 (Pages 362 to 365)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                         May 15, 2007
                        Washington, DC

Page 366

1  subject to this carveout in the home infusion
2  setting, Congress has kept the reimbursement of those
3  drugs at 95 percent of AWP as of --
4      A.   As of October 2003.
5      Q.   That's correct, isn't it?
6      A.   I guess it is.  That's what the statute
7  says.  Another piece of sausage.  I have just
8  forgotten that we did that, to be honest with you,
9  which I assume is why they don't have a dispensing
10 fee for anything but respiratory drugs, because they
11 didn't do that for respiratory drugs.
12     Q.   So it would appear that Congress, at least
13 for these drugs and in that setting of home infusion,
14 has determined to continue to subsidize the provision
15 of the services by overpaying for the drugs, correct?
16         MR. GOBENA:  Object to the form.  The
17 legislation speaks for itself.
18         MR. BREEN:  Objection to the form.
19         BY MR. DALY:
20     Q.   You can go ahead.
21     A.   Yes.  I was surprised to see this.  I
22 forgot we did it.  It was certainly never discussed

Page 367

1  by members.  I'm sure the staff -- staff person who
2  wrote it works with me at Alston & Bird, so I'll go
3  back and ask him, but I'm sure that it's probably,
4  they froze it to freeze it, and some level of
5  cross-subsidy apparently.  I'm not sure what the
6  congressional intent there was, but I think it was
7  Senator Grassley's staff that did that provision.  So
8  I had totally forgotten we did it.  That it was in
9  the bill.  It wasn't something that was widely
10 discussed at all.
11     Q.   And are you aware of whether the drugs
12 that DOJ is suing Abbott for, many of those drugs are
13 used in the home infusion context and using DME?
14         MR. GOBENA:  Objection to form.
15         THE WITNESS:  As of today, I'm aware of
16 it.  I wasn't aware of it before.
17         BY MR. DALY:
18     Q.   But as of today, you are?
19     A.   Yes.  Obviously looking at the drug list.
20     Q.   Page 27 of Exhibit Abbott 191, which is
21 your 10-3 -- yes, your October 3 -- excuse me,
22 October 3, 2002 testimony.  I just want to direct you

Page 368

1  to page 27.
2      A.   27?
3      Q.   Yes.
4      A.   Okay.
5      Q.   And in your testimony in response to
6  Mr. English, you indicate that you think -- well, you
7  state, "I think there are a lot of different provider
8  areas that may have small impacts from AWP, and we
9  are certainly willing to work with the committee to
10 identify those."  And then you mentioned oncology
11 as -- oncology and dialysis and hematology being sort
12 of the big three, right?
13     A.   Yes.
14     Q.   And then you say, "I think almost every
15 physician to some degree that administers drugs
16 probably has some beneficial cost shifting benefit
17 from AWP, I think those are the three big areas," you
18 see that language?
19     A.   Yes.
20     Q.   And that was a true statement, correct?
21     A.   Yes.
22     Q.   On page 31, I just want to get a fix for

Page 369

1  -- and we may have covered this in some part in the
2  sort of background section that we did at the
3  beginning, but you state at the bottom of the page,
4  "I had been working on Medicare for over 20 years and
5  there has never been any law passed more complicated
6  than this one."  How far back does your work on
7  Medicare go?
8      A.   In a minor way, probably 1982.  But in a
9  full time way, 1989.
10     Q.   And what were you doing with respect to
11 Medicare in 1982?
12     A.   Not much.  Occasional staff work for
13 Senator Gorton, but very, you know, minor.
14     Q.   And '89 would have started your work with
15 the Bush Administration?
16     A.   And OMB.  Yes.
17     Q.   And if you would turn to page 34.  If you
18 -- actually, if you look at 33, the page before, it
19 looks like you finished up your testimony, and then
20 George Reeb, R-E-E-B, got in the hot seat.  And began
21 to talk a little bit about Medicare and Medicaid.
22 And on page 34 of Mr. Reeb's testimony, he states

93 (Pages 366 to 369)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

| Page 438 |
| --- |

1    Mr. Scully's testimony.  However, I would prefer, the
2    United States would prefer to do as much questioning
3    as possible tonight, and then reserve the issue of
4    his second day.
5          MR. ESCOBAR:  I'd be happy to do that,
6    subject to nobody waiving their rights, including
7    Abbott.
8          MR. GOBENA:  You said it repeatedly that
9    you're not waiving your --
10          MR. ESCOBAR:  I'd be happy to spend an
11   hour if that's what we have available right now.
12          MR. DALY:  And just for my part, can I say
13   that if I agree to sort of pass the witness, that
14   that's not going to be used to prejudice my ability
15   to come back.
16          MR. GOBENA:  Yes.  I think -- yeah, we can
17   agree to that.
18          MR. ESCOBAR:  What is your position on a
19   second day?  You said you haven't stated it.  State
20   it.
21          MR. GOBENA:  We don't have one right now.
22          MR. ESCOBAR:  Let's start asking

| Page 439 |
| --- |

1    questions.  Let's make use of the time.
2          THE VIDEOGRAPHER:  If I can recommend if
3    we are going to need another reporter, we're going to
4    need to go off the record so I can call my office.
5          MR. DALY:  If you're just going for
6    another hour, do you need that?
7          THE VIDEOGRAPHER:  I have to check with
8    Sue.
9          MR. DALY:  And I just want to be clear, I
10   want to make sure you picked up Mr. Gobena that my
11   passing the witness would not be used to say that I
12   don't get to complete my examination.  You can have
13   other arguments.
14          MR. GOBENA:  You reserved your right to
15   ask him further questions.
16          MR. DALY:  Thank you.  I think we can go
17   off.
18          THE VIDEOGRAPHER:  The time is 6:21 p.m.
19   We are going off the record, concluding tape number 7
20   in the deposition of Thomas Scully in the matter of
21   In Re Pharmaceutical Industry Average Wholesale Price
22   Litigation.

| Page 440 |
| --- |

1          (Recess.)
2          THE VIDEOGRAPHER:  The time is 6:33 p.m.
3    We are going back on the record, starting tape number
4    8 in the deposition of Thomas Scully in the matter of
5    In Re Pharmaceutical Industry Average Wholesale Price
6    Litigation.
7          MR. NEAL:  Mr. Escobar?
8          MR. ESCOBAR:  Well, we have had an
9    off-the-record discussion, and as I said earlier, I'm
10   willing to go for an hour or so.  The reality is we
11   do not have a court reporter available right now.
12   The court reporter has been here since 8:30, so it's
13   about 10 hours.  And as people have said before, this
14   deposition was not noticed to go beyond what would be
15   a normal working day.  And in fact, we have gone
16   longer than a normal deposition day.
17          While we understand the witness's
18   position, the reality is other people here have
19   questions to ask, and there is no way to complete the
20   deposition today, even by the party that noticed it.
21   So --
22          MR. COOK:  Mr. Breen has left to go to the

| Page 441 |
| --- |

1    airport.
2          MR. ESCOBAR:  Mr. Breen had to go to the
3    airport.  Other counsel had planes to make.
4          THE WITNESS:  Just for the record, I did
5    request to go as long as possible today, early and
6    often, said it repeatedly all day, we just took a
7    half-hour break to discuss whether we should have a
8    half-hour break.  And I would be petitioning not to
9    come back for a second day.  So we'll see what
10   happens, but I have no intention of coming back for a
11   second day unless the court orders me to.
12          MR. NEAL:  Mr. Escobar, I think you've
13   made your position clear.  Mr. Scully has made his
14   position clear.  As a practical matter, we can't go
15   forward today.  We understand that.  Why don't we go
16   ahead and go off the record, and we'll address this
17   issue, you know, in the ensuing days.  Off the
18   record.
19          THE VIDEOGRAPHER:  The time is 6:34 p.m.
20   We are going off the record, this ends tape number 8
21   in the deposition of Thomas Scully in the matter of
22   In Re Pharmaceutical Industry Average Wholesale Price

Henderson Legal Services
202-220-4158

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

Page 442

1   Litigation.  This deposition consists of eight tapes.
2   Master tapes will be held by Henderson Legal
3   Services, in Washington, D.C.
4           (Whereupon, at 6:34 p.m., the taking of
5   the instant deposition ceased.)
6
7           _____
8               Signature of the Witness
9
10  SUBSCRIBED AND SWORN to before me this _____ day
11  of _____, 2007.
12
13          _____
14              NOTARY PUBLIC
15  My Commission expires: _____
16
17
18
19
20
21
22

112 (Page 442)

934268fd-66d9-4c40-b8d6-725605bc72fb

# EXHIBIT 69

Sebree, Mark                  CONFIDENTIAL                  May 17, 2007
                         Philadelphia, PA

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

                            - - -

IN RE:  PHARMACEUTICAL     : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION

PRICE LITIGATION           : 01-CV-12257-PBS

             vs.           :

THIS DOCUMENT RELATES TO   : CONFIDENTIAL

U.S. ex rel. Ven-A-Care of :

The Florida Keys, Inc.     :

v. Abbott Laboratories,    :

Inc., No. 06-CV-11337-PBS  :

             And           :

State of California, ex    :

Rel. Ven-A-Care vs. Abbott :

Laboratories, Inc., et al  :

Case No. 1:03-cv-11226-PBS :

             And           :

State of Texas ex rel.     :

Ven-A-Care of the Florida  :

Keys, Inc. vs. Abbott      :

Laboratories, et al        :

71c81a69-3496-44c0-90a9-66c513fad16e

Sebree, Mark                    CONFIDENTIAL                May 17, 2007
                            Philadelphia, PA

Page 50

1      Q.  So going back to the previous exhibit --
2   I can't recall what the exhibit number it is for
3   this, but there was a February 9, 1995 memorandum
4   that we looked at?
5      A.  I have got it.  It is Number Exhibit Sebree
6   779.
7      Q.  Exhibit Sebree 779.  And it says that --
8   this is a memo from Tim Harris, and there is a
9   proposed four percent increase on catalog prices.
10           When you would get a proposed
11   increase -- strike that.
12           Do you recall getting proposed --
13   proposals presented to you about catalog price
14   increases for the drugs that you were responsible
15   for when you were at HPD?
16      A.  In the position as marketing manager?
17      Q.  Yes.
18      A.  No, I don't.
19      Q.  Well, you are listed here as product
20   manager.
21           Wouldn't you have gotten these
22   proposed price increases?

Page 51

1           MS. CITERA:  Objection, form.
2           THE WITNESS:  It is possible.  I
3   just don't recall.
4   BY MR. GOBENA:
5      Q.  So you don't recall whether or not you
6   did any kind of analysis of the catalog prices --
7   proposed increases to catalog prices while you were
8   a product manager for, let's say, Vancomycin, for
9   example?
10           MS. CITERA:  Objection to form.
11           THE WITNESS:  Not that I recall.
12   BY MR. GOBENA:
13      Q.  You testified earlier that catalog
14   prices was synonymous with list price.
15           Do you recall that testimony?
16      A.  Yes, I do.
17      Q.  Do you know how list price was used by
18   Abbott Labs while you were the product manager?
19      A.  Yes, I do.
20           MS. CITERA:  Objection to form.
21   BY MR. GOBENA:
22      Q.  How was it used?

Page 52

1           MS. CITERA:  Objection to form.
2           THE WITNESS:  There were a certain
3   percentage of these products that were purchased at
4   list price.  Usually, when -- some customers did
5   not have a contract but would buy the product.
6   Other customers would pay contract price as a
7   function of a program called RxLink.  And in that --
8   in those two ways, the contract price had an impact
9   on -- I'm sorry, the catalog price, list price, had
10   an impact on overall profitability.
11   BY MR. GOBENA:
12      Q.  Explain to me the RxLink price that you
13   just referred to.
14      A.  This is a long time ago, but my memory
15   of RxLink is that when a customer would order a
16   competitor's product, and the wholesaler did not
17   have that product in stock, the wholesaler, through
18   the RxLink contract, would substitute one of the
19   Abbott products, and they would pay list price for
20   that product.
21      Q.  So the price that would be listed in the
22   RxLink system would have been the list price?

Page 53

1           MS. CITERA:  Objection to form.
2   BY MR. GOBENA:
3      Q.  I'm trying to figure out --
4      A.  That's the best of my memory, yes.
5      Q.  So if there is a particular NDC, let's
6   take Vancomycin, 6533, if you were going -- if I
7   asked you what the list price was, you would tell
8   me it is a certain price, and if I asked you what
9   the RxLink price was, would it be the same price as
10   the list price?
11      A.  My memory is that it would have either
12   been the same price or a price very close to that,
13   very close to list price.  I can't say for sure
14   that it was exactly the list price, but it was a
15   significant -- it was a higher price than the
16   general contract prices.
17      Q.  Was there any other function that -- or
18   any other purpose for which list price was used,
19   other than the ones that you have just mentioned to
20   us just now?
21      A.  Not that I recall.
22      Q.  Not that you recall, okay.

14  (Pages 50 to 53)

71c81a69-3496-44c0-90a9-66c513fad16e

Sebree, Mark                    CONFIDENTIAL                    May 17, 2007
                          Philadelphia, PA

Page 162

1   questioning and then --
2            MR. STETLER:  As long as we can
3   comfortably finish tomorrow, that's fine with me.
4            MR. GOBENA:  We expect to.
5            MS. CITERA:  And I might need a few
6   minutes at the end at least tomorrow.
7            MS. MOORE:  Sure.
8            MR. GOBENA:  Let's go off the record
9   then.
10           THE VIDEO TAPE OPERATOR: This
11  concludes this deposition for today.  We are now
12  going off the video record.  The time is 1:41.
13
14       _____
15              MARK SEBREE
16
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20_____.
19
20
21  _____
22       Notary Public

Page 163

1            C E R T I F I C A T E
2   STATE OF NEW JERSEY      :
3                        :  SS
4   COUNTY OF BURLINGTON     :
5            I, Jeanne Christian, Court
6   Reporter-Notary Public within and for Burlington
7   County, Commonwealth of New Jersey, do hereby
8   certify that the foregoing testimony of Mark
9   Sebree was taken before me at 1622 Locust
10  Street, Philadelphia, Pennsylvania on Thursday,
11  May 17, 2007; that the foregoing testimony was
12  taken in shorthand by myself and reduced to
13  typing under my direction and control, that the
14  foregoing pages contain a true and correct
15  transcription of all of the testimony of said
16  witness.
17           .....................
18              JEANNE CHRISTIAN
19              Notary Public
20
21              My Commission expires
22              May 21, 2007

42 (Pages 162 to 163)

71c81a69-3496-44c0-90a9-66c513fad16e

# EXHIBIT 70

1        MICHAEL SELLERS – CONFIDENTIAL

2     IN THE CIRCUIT COURT OF KANAWHA COUNTY

                 WEST VIRGINIA

3

4   STATE OF WEST VIRGINIA, ex rel., )

     DARRELL V. MC GRAW, JR.,      )

5   Attorney General.           )

                          )

6           Plaintiff,      )

                          ) Civil No.

7        vs.            ) 01-C-3011

                          )

8   WARRICK PHARMACEUTICALS     )

     CORPORATION, SCHERING-PLOUGH  )

9   CORPORATION, DEY, INC., ABBOTT ) Hon. James C.

     LABORATORIES, and ABBOTT     ) Stucky, Judge

10  LABORATORIES, INC.,        )

                          )

11         Defendants.     )

12

13       The videotaped deposition of MICHAEL

14  SELLERS, called by the Plaintiff for examination,

15  taken pursuant to the provisions of the West

16  Virginia Rules of Civil Procedure pertaining to

17  the taking of depositions, taken before TAMARA M.

18  SEFRANEK, a Notary Public within and for the

19  County of DuPage, State of Illinois, and a

20  Certified Shorthand Reporter of said state, at the

21  Jones, Day Law Firm, 77 West Wacker Drive,

22  Suite 3500, Chicago, Illinois, on the 28th day of

23  October, A.D. 2004, at 9:37 a.m.

24

25

Page 42

MICHAEL SELLERS - CONFIDENTIAL

1     MICHAEL SELLERS - CONFIDENTIAL
2     Q   Did Abbott advise -- I'm sorry.  Were
3 you finished?
4     A   Yes, I'm done.
5     Q   Did Abbott advise its clients as to the
6 reimbursement methodologies used by various
7 insurers or State Medicaid programs?
8     A   We -- we developed with the client the
9 information with regard to the reimbursement
10 mechanisms.
11     Q   Is reimbursement important to Abbott's
12 customers?
13       MR. COOK:  Objection, vague.
14       THE WITNESS:  You know, I can't speak
15 for Abbott's customers, but --
16 BY MR. LANDAU:
17     Q   There was sufficient demand for the
18 service, though?
19       MR. COOK:  Objection, vague.
20       THE WITNESS:  Reimbursement services
21 weren't something that we -- that we marketed as a
22 separate entity.  It was all part of this overall.
23       So it wasn't that we were -- we were
24 contracting ourselves out as a billing agent for
25 any comer.

Page 43

1     MICHAEL SELLERS - CONFIDENTIAL
2 BY MR. LANDAU:
3     Q   They would need to be an Abbott customer
4 otherwise?
5     A   It would have to be within this -- that
6 business model, yeah.
7     Q   What's the responsibility of a pharmacy
8 manager as on this chart?
9     A   Home infusion services, as I said,
10 offered a variety of services across a full
11 continuum and, you know, one of them was billing
12 and collection; the other was running a home care
13 pharmacy.
14       So that's what our pharmacy managers did
15 was they ran regional pharmacies that prepared and
16 dispensed medications to specific prescriptions
17 for home care.
18     Q   Who were the -- to whom were those
19 products being dispensed by the pharmacy managers?
20     A   They would actually be dispensed in the
21 name of specific patients.
22     Q   To a particular entity or to the patient
23 directly?
24     A   Most of the time it was delivered to
25 whoever was delivering the service to the patient

Page 44

1     MICHAEL SELLERS - CONFIDENTIAL
2 home.
3     Q   You mentioned earlier that prior to May
4 2004 you were employed by Abbott Laboratories,
5 Incorporated, correct?
6     A   Yes.
7     Q   Is that a separate entity from Abbott
8 Laboratories?
9     A   No.
10     Q   Is there a reason that sometimes the
11 name appears Abbott Laboratories and sometimes
12 Abbott Laboratories, Incorporated?
13       MR. COOK:  Brent, just to clarify what
14 Mr. Sellers -- Abbott Laboratories, Inc., is a
15 separate corporation, is a separate entity.  I
16 don't want Mr. Sellers' lack of corporate legal
17 knowledge to make the record unclear.
18       Abbott Labs and Abbott Labs, Inc., are
19 two separate corporations and separate defendants
20 and entities.
21 BY MR. LANDAU:
22     Q   Are you familiar with the corporate
23 relationship between Abbott Laboratories and
24 Abbott Laboratories, Inc.?
25     A   To some extent.

Page 45

1     MICHAEL SELLERS - CONFIDENTIAL
2     Q   Can you give me your understanding of
3 that.
4     A   My understanding is that Abbott
5 Laboratories, Inc., is the marketing and sales --
6 domestic marketing and sales arm of Abbott
7 Laboratories, and so that Abbott Laboratories owns
8 Abbott laboratories, Inc., in its entirety.
9     Q   Prior to May 2004 was the Hospital
10 Products Division part of Abbott Laboratories,
11 Inc., or Abbott Laboratories? .
12     A   Actually, the Hospital Products Division
13 is not -- it's part of both.
14     Q   Can you explain how that works.
15     A   Again, Abbott Laboratories, Inc.,
16 encompasses marketing and sales.
17       MR. COOK:  Brent, I don't know that
18 Mr. Sellers is prepared to testify about the
19 corporate structure.  He's not a lawyer.  He works
20 in the business.
21       I'm hesitant to have Mr. Sellers testify
22 about something as to which I, as a litigator,
23 might not be qualified to testify about and have
24 him get it wrong just out of not knowing it.
25       THE WITNESS:  Yeah.

12 (Pages 42 to 45)

# EXHIBIT 71

Michael W. Sellers HIGHLY CONFIDENTIAL  December 20, 2005
Chicago, IL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - -

In Re: PHARMACEUTICAL        :  MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE    :  CIVIL ACTION

PRICE LITIGATION              :  #01CV12257-PBS

------------------------------------------------

THIS DOCUMENT RELATES TO:

ALL ACTIONS

------------------------------------------------

   HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

        The deposition of MICHAEL W. SELLERS, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions, taken before LAURA R. RENKE,

Certified Shorthand Reporter of the State of Illinois,

at 77 West Wacker Drive, 6th Floor, Chicago, Illinois,

on Tuesday, December 20, 2005, at 9:35 a.m.

b694dd8a-10b2-4b8a-a9e1-6854db6db517

Page 30

1    Q.  And who were Abbott's primary competitors
2  for Liposyn?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  Baxter, and at one time I
5  believe Fresenius, which is a Swedish -- I think a
6  Swedish company.
7  BY MS. CONNOLLY:
8    Q.  Do you know approximately when Fresenius
9  had a product on the market?
10   A.  It was -- it was in the late '70s or early
11 '80s.
12   Q.  And who was the target market for Liposyn?
13      MS. TABACCHI:  Objection.  Beyond the
14 scope.
15      THE WITNESS:  We sold it to hospitals and
16 to home care companies.
17 BY MS. CONNOLLY:
18   Q.  So again, alternate site did have some role
19 in selling Liposyn, correct?
20   A.  Yes.
21   Q.  Going back to Aminosyn, about what
22 percentage of the sales would have been home health

Page 31

1  care as opposed to hospitals?
2       MS. TABACCHI:  Objection.  Beyond the scope
3  of the notice.  Calls for speculation.  Object to the
4  form.
5       THE WITNESS:  I don't -- I don't have any -
6  - any data that's current on that.
7  BY MS. CONNOLLY:
8    Q.  Is the same thing true for Liposyn?  You
9  don't know?
10   A.  Yes.
11      MS. TABACCHI:  Same objection.
12 BY MS. CONNOLLY:
13   Q.  So other than Aminosyn and Liposyn that we
14 just went through, the remainder of the drugs below
15 that solid line are PPD drugs.  Is that correct?
16   A.  Yeah, except for one we had a -- an IV
17 version of erythromycin.  Had very small sales and
18 very small piece of the erythromycin market.  The
19 oral erythromycin was a PPD drug.
20   Q.  So when you say it was very small sales, do
21 you -- can you quantify that for me?
22      MS. TABACCHI:  Object to the form.  Beyond

Page 32

1  the scope of the notice.
2       THE WITNESS:  No.  But...
3  BY MS. CONNOLLY:
4    Q.  And to what types of customers was that
5  version of erythromycin sold?
6       MS. TABACCHI:  Same objections.
7       THE WITNESS:  Primarily hospitals.
8  BY MS. CONNOLLY:
9    Q.  Is there any alternate site use for that
10 drug?
11      MS. TABACCHI:  Same objections.
12      THE WITNESS:  To my knowledge, very --
13 very, very small.
14 BY MS. CONNOLLY:
15   Q.  So there was some alternate site use; it
16 was just minuscule?
17      MS. TABACCHI:  Object to the form.  Beyond
18 the scope of the notice.
19      THE WITNESS:  I don't know for sure.  I'm
20 just saying that it wasn't -- it wasn't a -- it
21 wasn't of a primary concern to alt site.
22 BY MS. CONNOLLY:

Page 33

1    Q.  Okay.  So let's go to the drugs that are
2  above the solid line.
3    A.  Okay.
4    Q.  First of all, can you confirm for me that
5  all of those drugs were marketed or sold by HPD?
6    A.  Yes, at some time during the period.
7    Q.  Sometime from 1991 to 2004?
8    A.  Yes.
9    Q.  Let's start with the first one.  Again, I'm
10 going to butcher these names, which at least will be
11 a source of humor.  Acetylcyst?  Is that how it's
12 pronounced?
13   A.  It's actually acetylcysteine.  You're
14 missing some letters on the end of it.
15   Q.  Acetylcysteine.  How long did HPD market or
16 sell acetylcysteine?
17      MS. TABACCHI:  Objection.  Beyond the
18 scope.
19      THE WITNESS:  Since before 1981.
20 BY MS. CONNOLLY:
21   Q.  Why did you pick out 1981 as your marker?
22      MS. TABACCHI:  Same objection.

9  (Pages 30 to 33)

b694dd8a-10b2-4b8a-a9e1-6854db6db517

Michael W. Sellers HIGHLY CONFIDENTIAL  December 20, 2005
Chicago, IL

Page 70

1  leave the company?
2      A.  I -- sometime in '01 or '02. I'm not sure.
3      Q.  After Mr. Glover left and that position was
4  no longer filled, who was responsible for the field
5  sales force?
6          MS. TABACCHI:  Same objections.
7          THE WITNESS:  They all reported to the
8  general manager directly.
9  BY MS. CONNOLLY:
10     Q.  Are you aware of any reasons other than Mr.
11 Glover's departure that that position was eliminated?
12         MS. TABACCHI:  Same objections.
13         THE WITNESS:  No.
14 BY MS. CONNOLLY:
15     Q.  If you can turn to the next page, which is
16 071265.  Down on left side, there is a director of
17 sales support services.  Mr. Hamlin is underneath.
18 Do you see that?
19     A.  Mm-hmm.  Mm-hmm.
20     Q.  What was that position for?
21         MS. TABACCHI:  Same objections.
22         THE WITNESS:  That was the position that I

Page 71

1  talked to you about with regard to what Phil Stone
2  had, same -- same position.
3  BY MS. CONNOLLY:
4      Q.  The sales administration?  Okay.
5          And then beneath that is a director of ACCS
6  sales.
7      A.  Yes.
8      Q.  What does that mean?
9          MS. TABACCHI:  Same objections.
10         THE WITNESS:  ACCS stands for Abbott
11 critical care.  It was a sales force that was
12 targeted to the ICU and critical care situations and
13 sold equipment for that, for that market.
14 BY MS. CONNOLLY:
15     Q.  So that was a hospital-specific position,
16 right?
17     A.  Yes.
18     Q.  And I was just curious on the next page,
19 071266.  This appears to be an outline of the sales
20 function, but there's no -- I don't see there a
21 position for alternate site.  Do you know why that's
22 the case on that -- this chart?

Page 72

1          MS. TABACCHI:  Same objections.
2          THE WITNESS:  Alternate site did not start
3  reporting to Pete Karas's position until the
4  retirement of Don Robertson, who was the VP/general
5  manager of alt site.
6  BY MS. CONNOLLY:
7      Q.  And when did Mr. Robertson retire?
8      A.  I want to say 2001.
9      Q.  Was there any reason other than Mr.
10 Robertson's retirement that alternate site was moved
11 beneath Mr. Karas's position rather than staying
12 beneath the position that Mr. Robertson held?
13         MS. TABACCHI:  Same objections.
14         THE WITNESS:  I think the only reason was
15 that we had made a decision to shut down home
16 infusion.  And so it really was a smaller business,
17 and they felt they could consolidate it.
18 BY MS. CONNOLLY:
19     Q.  I know you testified previously about the
20 home infusion shutdown, that I believe you said the
21 decision was made in about 1998 to do that.
22     A.  Mm-hmm.

Page 73

1      Q.  But it was actually not fully accomplished
2  until approximately 2001.  Is that correct?
3          MS. TABACCHI:  Same objections.
4          THE WITNESS:  Correct.
5          MS. TABACCHI:  This is all beyond the scope
6  of the notice.
7  BY MS. CONNOLLY:
8      Q.  The one question I had was whether -- was
9  home infusion rolled into alternate site, or did it
10 just cease to exist?
11         MS. TABACCHI:  Same objections.
12         THE WITNESS:  It ceased to exist.
13 BY MS. CONNOLLY:
14     Q.  So then was it the case that Abbott no
15 longer marketed the products that were once a part of
16 home infusion after 2001?
17         MS. TABACCHI:  Same objections.  Object to
18 the form of the question.
19         THE WITNESS:  We no longer used the
20 business model that was used in home infusion
21 services after 2001.
22 BY MS. CONNOLLY:

19 (Pages 70 to 73)

b694dd8a-10b2-4b8a-a9e1-6854db6db517

Michael W. Sellers HIGHLY CONFIDENTIAL  December 20, 2005
Chicago, IL

Page 150

1  successful in persuading them to reduce the list
2  price.
3  BY MS. CONNOLLY:
4      Q.  Did Mr. Brincks solicit your assistance in
5  trying to influence them?
6          MS. TABACCHI:  Same objections.
7          THE WITNESS:  I don't remember.  I don't
8  remember getting involved in that process.
9  BY MS. CONNOLLY:
10     Q.  Do you know if anyone else other than Mr.
11 Brincks was involved in trying to convince them to
12 lower list price?
13         MS. TABACCHI:  Same objections.
14         THE WITNESS:  I know that he was working
15 with Virginia Tobiason at the time.  But he was the
16 main contact.
17 BY MS. CONNOLLY:
18     Q.  Do you recall by what percentage Mr.
19 Brincks eventually convinced Mr. Sebree and Mr.
20 Eichhorn to lower list price?
21         MS. TABACCHI:  Same objections.
22         THE WITNESS:  No, I don't.

Page 151

1  BY MS. CONNOLLY:
2      Q.  Do you recall how quickly Abbott was able
3  to effectuate those changes in list prices for
4  vancomycin?
5          MS. TABACCHI:  Same objections.
6          THE WITNESS:  Not quick enough.  I know
7  that it took weeks, if not months, to -- to come to
8  that decision.
9  BY MS. CONNOLLY:
10     Q.  And I take it that this decision to change
11 list price and the ultimate changes to list price
12 occurred outside the normal list-price-setting
13 process that you testified about previously.
14         MS. TABACCHI:  Same objections.
15         THE WITNESS:  That's the way I remember it,
16 yes.
17 BY MS. CONNOLLY:
18     Q.  Was that unusual that list price was
19 changed outside of the normal list price evaluation
20 process that you've testified about previously?
21     A.  Highly unusual.
22     Q.  Do you have any understanding as to why Mr.

Page 152

1  Sebree and Mr. Eichhorn were willing to change list
2  price in this particular circumstance?
3          MS. TABACCHI:  Object to the form of the
4  question.  It's beyond the scope of the notice and
5  calls for speculation.
6          THE WITNESS:  No.
7  BY MS. CONNOLLY:
8      Q.  After Abbott lowered its list price, was it
9  your understanding that these payers were willing to
10 use Abbott's vancomycin again?
11         MS. TABACCHI:  Same objections.  Beyond the
12 scope of the notice.  Object to the form.
13         THE WITNESS:  I don't have any personal
14 knowledge of us going back to those payers.  I think
15 we were -- we were satisfied that it would help.
16 BY MS. CONNOLLY:
17     Q.  To your knowledge, did you receive any
18 subsequent complaints from your customers about the
19 list prices for vancomycin after the list price for
20 vancomycin was lowered?
21         MS. TABACCHI:  Same objections.
22         THE WITNESS:  We didn't receive any

Page 153

1  complaints from our home infusion services customers,
2  no.
3  BY MS. CONNOLLY:
4      Q.  What is your understanding of the meaning
5  of AWP?
6          MS. TABACCHI:  Object to the form of the
7  question.  Beyond the scope of the notice.
8          THE WITNESS:  My understanding is AWP
9  stands for average wholesale price.  And it is a --
10 it is a price that is somehow established by the
11 independent agencies that handle data with regard to
12 pharmaceuticals: Red Book, Blue Book, Medi-Span.
13 BY MS. CONNOLLY:
14     Q.  Do you have a more specific understanding
15 of how they set AWP?
16         MS. TABACCHI:  Same objections.  It's
17 beyond the scope of the notice.
18         THE WITNESS:  I do now.  I became aware of
19 what their specific formula was in 2001.
20 BY MS. CONNOLLY:
21     Q.  Is that in connection with one of the
22 attorneys general investigations?

39 (Pages 150 to 153)

b694dd8a-10b2-4b8a-a9e1-6854db6db517

Michael W. Sellers HIGHLY CONFIDENTIAL   December 20, 2005
Chicago, IL

Page 154

1      MS. TABACCHI:  Object to the form of the
2 question. Beyond the scope of the notice.  And I also
3 caution the witness not to reveal any attorney-client
4 communications.
5      THE WITNESS:  No.  It actually had to do
6 with a notice that was sent to us by First DataBank
7 that stated that they were changing the way that they
8 were calculating AWP based on market surveys.
9 BY MS. CONNOLLY:
10     Q.  What was your understanding of the nature
11 of those surveys?
12     MS. TABACCHI:  Object --
13     THE WITNESS:  I don't have any
14 understanding with regard to those surveys.  That was
15 as specific as the letter was.
16 BY MS. CONNOLLY:
17     Q.  So prior to receiving that letter in about
18 2001, did you have any understanding of how the
19 publishing companies set AWP?
20     MS. TABACCHI:  Object to the form of the
21 question. Beyond the scope of the notice.
22     THE WITNESS:  I had inferred based on some

Page 155

1 history -- and I'm not sure exactly when.  But I had
2 inferred that there was a relationship between list
3 price and AWP.
4 BY MS. CONNOLLY:
5     Q.  How had you made that inference?
6     MS. TABACCHI:  Same objections.
7     THE WITNESS:  Basically you see the change
8 in list price, and there would be a subsequent change
9 in AWP the next reporting period from the agencies.
10 BY MS. CONNOLLY:
11     Q.  And approximately when in your career at
12 Abbott were you able to make that inference?
13     MS. TABACCHI:  Same objections.
14     THE WITNESS:  It was somewhere between '92
15 and 2000.
16     (Brief interruption.)
17 BY MS. CONNOLLY:
18     Q.  So based on when you acquired the knowledge
19 of the relationship between list price and AWP, you
20 had an understanding at the time the vancomycin issue
21 occurred that by lowering your list price, it would
22 be lowering AWP.  Is that correct?

Page 156

1      MS. TABACCHI:  Object to the form.
2 Mischaracterizes the witness's testimony.  It's also
3 beyond the scope of the notice.
4      THE WITNESS:  I -- I personally may have.
5 BY MS. CONNOLLY:
6     Q.  Does Abbott have any documents that define
7 what AWP is?
8      MS. TABACCHI:  Object to the form.  Beyond
9 the scope of the notice.
10     THE WITNESS:  To my knowledge, there are no
11 official documents that have anything to do with AWP.
12 Whether someone did it on their own or not, I
13 wouldn't have any way of knowing that.
14 BY MS. CONNOLLY:
15     Q.  Do you know if sales representatives are
16 given any sort of instruction about what they're
17 supposed to tell their customers about AWP?
18     MS. TABACCHI:  Same objections.
19     THE WITNESS:  The instruction was that --
20 to the sales force was that we're not supposed to
21 talk about reimbursement nor AWP.
22 BY MS. CONNOLLY:

Page 157

1     Q.  And that was pursuant to Mr. Baker's verbal
2 instruction, right?
3     A.  Right.
4     MS. TABACCHI:  Same objections.
5 BY MS. CONNOLLY:
6     Q.  Prior to that time, were there any
7 instructions to the sales force about speaking to
8 customers about AWP?
9     MS. TABACCHI:  Same objections.
10     THE WITNESS:  The general practice was that
11 we weren't supposed to talk about AWP since we didn't
12 set AWP -- it wasn't an Abbott number -- that any
13 questions we -- we would refer them to Red Book, Blue
14 Book, whomever.
15 BY MS. CONNOLLY:
16     Q.  So I understand that it's your testimony
17 that Abbott didn't set the specific formula for AWP,
18 but is it likewise your testimony that Abbott had no
19 role whatsoever in influencing AWP?
20     MS. TABACCHI:  Same objections.  Object to
21 the form.  Beyond the scope of the notice.
22     THE WITNESS:  That would -- that would be

40 (Pages 154 to 157)

b694dd8a-10b2-4b8a-a9e1-6854db6db517

Michael W. Sellers HIGHLY CONFIDENTIAL  December 20, 2005
Chicago, IL

Page 158

1  my testimony, yes.
2  BY MS. CONNOLLY:
3      Q.  So regardless of your knowledge of the
4  known relationship between list price and AWP, it's
5  still your testimony that Abbott has no role in
6  controlling AWP one way or the other?
7          MS. TABACCHI:  Same objections.  The
8  question has been asked and answered by the witness.
9          THE WITNESS:  Abbott -- Abbott controlled
10 the prices that it had, list price and WAC.  What
11 effect that had once the reporting agencies did it
12 actually was different.  Blue Book was different from
13 Red Book and so on.  They were never exactly the same
14 anyway.  So those were outside of our control and
15 could have been changed at any point in time by
16 either of those agencies.
17 BY MS. CONNOLLY:
18     Q.  I understand that you mean that Red Book,
19 FDB, Medi-Span had different mechanisms for
20 calculating AWP.
21     A.  They got different answers.  Let me put it
22 that way.  I'm not sure what their mechanism was.

Page 159

1      Q.  And they had different AWPs, correct?
2          MS. TABACCHI:  Object to the form.  Beyond
3  the scope of the notice.
4          THE WITNESS:  I remember them as being
5  different, yes.
6  BY MS. CONNOLLY:
7      Q.  Are you aware of any time when Abbott
8  increased its list price and that, in turn, resulted
9  in a decrease in AWP?
10         MS. TABACCHI:  Same objections.  It's
11 beyond the scope of the notice.
12         THE WITNESS:  It didn't monitor it enough
13 to know whether that might or might not have happened
14 during the time period.
15 BY MS. CONNOLLY:
16     Q.  But you're not personally aware of any
17 circumstance when that occurred?
18     A.  I'm not aware of any.
19         MS. TABACCHI:  Same objections.
20 BY MS. CONNOLLY:
21     Q.  You had previously testified in your West
22 Virginia deposition that it was not HPD's policy to

Page 160

1  permit its sales reps to use AWP to market its
2  products.
3          MS. TABACCHI:  Can you refer us to a page,
4  please?
5          MS. CONNOLLY:  Yes.  Page 201, lines 8
6  through 18.
7          THE WITNESS:  Okay.  I'm sorry.
8  BY MS. CONNOLLY:
9      Q.  And my question was, setting aside that
10 general policy that Abbott had --
11     A.  Mm-hmm.
12     Q.  -- are you aware of any individual
13 circumstances where an Abbott sales representative
14 marketed the spread to one of Abbott's customers?
15         MS. TABACCHI:  Object to the form.  Beyond
16 the scope of the notice.
17         THE WITNESS:  I'm not aware of any
18 situation where someone marketed the spread with
19 regard to Abbott.
20 BY MS. CONNOLLY:
21     Q.  Is there someone who would have knowledge
22 of whether that had occurred more than you?

Page 161

1          MS. TABACCHI:  Same objections.
2          THE WITNESS:  I don't know.
3  BY MS. CONNOLLY:
4      Q.  I believe you have already testified that
5  there was -- prior to Mr. Baker's verbal notification
6  that there was no written policy prohibiting sales
7  representatives from marketing the spread.  Is that
8  correct?
9          MS. TABACCHI:  Same objections.  Beyond the
10 scope of the notice.
11         THE WITNESS:  That's correct.
12 BY MS. CONNOLLY:
13     Q.  Aside from having a policy per se, was
14 there any other way, to your knowledge, that this
15 unwritten policy was communicated to Abbott's sales
16 reps?
17         MS. TABACCHI:  Same objections.
18         THE WITNESS:  I'm not -- I'm not aware of
19 any formal program to communicate that.
20 BY MS. CONNOLLY:
21     Q.  Are you aware of that communication
22 occurring more in an informal context outside of Mr.

41 (Pages 158 to 161)

b694dd8a-10b2-4b8a-a9e1-6854db6db517

Michael W. Sellers HIGHLY CONFIDENTIAL   December 20, 2005
Chicago, IL

Page 234

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3                    - - -
4   In Re: PHARMACEUTICAL      : MDL DOCKET NO.
5   INDUSTRY AVERAGE WHOLESALE   : CIVIL ACTION
6   PRICE LITIGATION          : #01CV12257-PBS
7   ------------------------------------------------
8   THIS DOCUMENT RELATES TO:  ALL ACTIONS
9   ------------------------------------------------
10      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
11      I hereby certify that I have read the
12  foregoing transcript of my deposition given at the
13  time and place aforesaid, and I do again subscribe
14  and make oath that the same is a true, correct, and
15  complete transcript of my deposition so given as
16  aforesaid and includes changes, if any, so made by me.
17       _____
18          MICHAEL W. SELLERS
19  SUBSCRIBED AND SWORN TO
20  before me this _____ day of _____, A.D. 200__.
21  _____
22    Notary Public
```

Page 235

```
1   STATE OF ILLINOIS )
2            ) SS:
3   COUNTY OF C O O K )
4      I, LAURA R. RENKE, a Certified Shorthand Reporter within and
5   for the State of Illinois, do hereby certify:
6      That previous to the commencement of the examination of the
7   witness, the witness was duly sworn to testify the whole truth
8   concerning the matters herein;
9      That the foregoing deposition was reported stenographically by
10  me, was thereafter reduced to a printed transcript by me, and
11  constitutes a true record of the testimony given and the proceedings had;
12     That the said deposition was taken before me at the time and place
13  specified;
14     That the reading and signing by the witness of the deposition
15  transcript was agreed upon as stated herein;
16     That I am not a relative or employee or attorney or counsel, nor a
17  relative or employee of such attorney or counsel for any of the parties
18  hereto, nor interested directly or indirectly in the outcome of this action.
19       IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois
20  this 25th day of December, 2005.  _____
21               Certified Shorthand Reporter
22            State of Illinois - CSR License No. 084-003184
```

60 (Pages 234 to 235)

b694dd8a-10b2-4b8a-a9e1-6854db6db517

# EXHIBIT 72

Page 1

NO. D-1-GV-04-001286

```
THE STATE OF TEXAS            ) IN THE DISTRICT COURT
                             )
ex rel.                       )
   VEN-A-CARE OF THE          )
   FLORIDA KEYS, INC.,        )
        Plaintiffs,           )
                             )
VS.                           ) TRAVIS COUNTY, TEXAS
                             )
ABBOTT LABORATORIES INC.,     )
ABBOTT LABORATORIES,          )
HOSPIRA, INC., and B. BRAUN   )
MEDICAL INC.,                 )
        Defendant(s).         ) 201ST JUDICIAL DISTRICT
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

                ORAL AND VIDEOTAPED DEPOSITION OF
                        MICHAEL SELLERS
                          Volume 1
                      February 13, 2007

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

   ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL SELLERS,

produced as a witness at the instance of the

Plaintiff(s), and duly sworn, was taken in the

above-styled and numbered cause on the 13th of

February, 2007, from 9:07 a.m. to 5:10 p.m., before

CYNTHIA VOHLKEN, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of Jones

Day, 77 West Wacker, Suite 3500, Chicago, Illinois,

pursuant to the Texas Rules of Civil Procedure and the

provisions attached previously.

578cd796-2f41-40d6-9388-fa077af38326

Page 22

1 the same?
2          MS. TABACCHI:  Object to the form.
3     Q.  (BY MR. WINTER)  Do you understand my
4 question?
5     A.  I think I do.  I believe that the
6 responsibilities were consistent between the three of
7 us.
8     Q.  Okay.  So whoever held that position was
9 responsible for the field sales staff and Alternate
10 Site Product Sales; is that true?
11    A.  Yes.
12    Q.  As well as the national account managers; is
13 that true?
14    A.  Within Alternate Site, yes.
15    Q.  The NAMs in Alternate Site.  Okay.
16    A.  Yes.
17    Q.  As well as the Alternate Site contract
18 marketing personnel, they also reported through the
19 director of Alternate Site Product Sales; is that also
20 true?
21    A.  For most of that time period, yes --
22    Q.  Okay.
23    A.  -- that's true.
24    Q.  And how long were you in that position
25 beginning in 1988?

Page 23

1     A.  For a couple of years.
2     Q.  1990, '91?
3     A.  About 1990.
4     Q.  Okay.  And was your immediate successor
5 Mr. Ward?
6     A.  Yes.
7     Q.  Okay.  And was it in 1990 that you then moved
8 over to become the general manager of the Home
9 Infusion Services department?
10    A.  No.
11    Q.  What position did you take in 1990?
12    A.  In 1990 I took the position as director of
13 contract marketing.
14    Q.  For all of HPD or just for Alternate Site?
15    A.  For the hospital side of HPD --
16    Q.  For the hospital side of HPD.
17    A.  -- not including Alternate Site.
18    Q.  Okay.  Now, in the capacity as director of
19 contract marketing, is that the senior position within
20 the contract marketing department or is there somebody
21 that's above you in the chain of command?
22          MS. TABACCHI:  Object to the form.
23    A.  It was the senior position at that time.
24    Q.  (BY MR. WINTER)  And is that a position that
25 was subsequently filled by Mr. Mitchell?

Page 24

1          MS. TABACCHI:  Object to the form.
2     A.  I do believe so, yes.  I believe --
3     Q.  (BY MR. WINTER)  Charlie Mitchell?
4     A.  I believe he succeeded me in that position.
5     Q.  And I'm not necessarily asking you whether he
6 was your immediate successor, but at some point in
7 time he became --
8     A.  Yes.
9     Q.  -- the director of contract marketing for
10 HPD, true?
11    A.  Yes.
12    Q.  Okay.  Well, let's talk about the
13 relationship between contract marketing for HPD proper
14 and contract marketing within Abbott's Alternate Site.
15    A.  Okay.
16    Q.  Are we talking about the same personnel that
17 are performing those functions?
18          MS. TABACCHI:  Object to the form.
19    Q.  (BY MR. WINTER)  Or are there some people
20 that are devoted to Alt Site and some people who are
21 in HPD contract marketing proper?
22    A.  At that time there were two separate
23 organizations.
24    Q.  And when you say "that time," you're
25 referring to 1990?

Page 25

1     A.  Yes.
2     Q.  Okay.  Were these -- how many personnel were
3 in -- let me ask you this question:  When you became
4 the director of contract marketing for HPD, the
5 hospital side is how you characterized it, how many
6 personnel reported to you?
7          MS. TABACCHI:  Object to the form.
8     A.  I think within that department or around that
9 time it was about 65 or 70 people.
10    Q.  (BY MR. WINTER)  And were you all housed in a
11 building at Abbott Park?
12          MS. TABACCHI:  Object to the form.
13    A.  Yes.
14    Q.  (BY MR. WINTER)  Okay.  And did you share
15 space with the contract marketing personnel who were
16 performing functions with -- for Alternate Site?
17          MS. TABACCHI:  Objection.
18    A.  No.
19    Q.  (BY MR. WINTER)  Were they in -- in a
20 different floor or a different building or where were
21 they physically located?
22          MS. TABACCHI:  Objection.
23    A.  They were in a different building.
24    Q.  (BY MR. WINTER)  Okay.  And so the people who
25 were doing contract marketing for Alternate Site, did

7 (Pages 22 to 25)

578cd796-2f41-40d6-9388-fa077af38326

Page 26

1  they not report through you or through any of your
2  chain of command or responsibility?
3          MS. TABACCHI: Objection.
4      A. There was a -- there was nothing more than a
5  dotted -- what I'd call a dotted line relationship
6  between the two organizations. Contract marketing and
7  Alternate Site reported to the director or general
8  manager of Alternate Site Product Sales.
9      Q. (BY MR. WINTER) Who at this time in 1990, up
10 until sometime around '97 or '98, I believe, it would
11 be John Ward; is that true?
12          MS. TABACCHI: Objection.
13     A. Correct. So they organizationally reported
14 up through them. If there were any allied
15 responsibilities, there was a dotted line
16 responsibility to me. So, you know, I could ask them
17 to do things, but they -- they were still reporting
18 directly to John at the time.
19     Q. (BY MR. WINTER) Would you have to go through
20 Mr. Ward or could you go directly to the manager of
21 contract marketing who was in Alternate Site?
22     A. Either.
23     Q. Either way?
24     A. Either way.
25     Q. Okay. In 1990 who was the manager for

Page 27

1  contract marketing Alternate Site?
2      A. I don't -- I don't recall who that was.
3      Q. Was it Mr. Kipperman?
4          MS. TABACCHI: Objection.
5      A. I don't think it was Steve Kipperman at that
6  time. Later in -- in John Ward's tenure it was Steve
7  Kipperman.
8      Q. (BY MR. WINTER) Do you have a sense in your
9  mind as to approximately when Mr. Kipperman became the
10 manager of Alternate Site contract marketing?
11     A. No, I don't. It -- it was early '90s.
12     Q. Early '90s. Sometime prior to 1994?
13          MS. TABACCHI: Objection.
14     A. By "early '90s" I would assume that would be
15 the case, yes.
16     Q. (BY MR. WINTER) In your mind --
17     A. Yes.
18     Q. -- early '90s is '91 or '92?
19     A. '91, '92, '93, something like that.
20     Q. Approximately how many people worked in the
21 Alt Site contract marketing department underneath that
22 manager?
23     A. I would say less than --
24          MS. TABACCHI: Objection.
25     A. -- 10.

Page 28

1      Q. (BY MR. WINTER) Less than 10.
2          I'm going to ask you to look at what's
3  been marked as Exhibit 291.
4          MS. FUMERTON: Ray, are we skipping
5  exhibit numbers?
6          MR. WINTER: I'm just following orders
7  here. I'm going to the next one.
8          MS. MOORE: I'm sorry. I grabbed the
9  one.
10         MR. WINTER: We have a malfunction.
11         MS. MOORE: We have a malfunction. It
12 should have been 279.
13         MR. WINTER: What number?
14         MS. MOORE: I'll start with 279.
15         MR. ANDERSON: No. Just put -- put the
16 sticker on top.
17         MS. TABACCHI: This is the right
18 document --
19         MR. WINTER: It's the right document,
20 the wrong number. We'll sort it out.
21         MR. ANDERSON: Let's just put the
22 sticker on top.
23     Q. (BY MR. WINTER) 279 is what it is now.
24 There you go.
25     A. (Witness reviewing document).

Page 29

1      Q. And, if you would, sir, just look up after
2  you've had a chance to -- I'm not going to ask you a
3  bunch of questions about this, so you don't need to
4  read every line, but after --
5      A. Okay.
6      Q. -- you familiarize yourself with it, when
7  you're ready.
8      A. I'm ready.
9      Q. Great. What is it? 279.
10         MS. TABACCHI: Objection.
11     A. It is what we call our Certificate of
12 Incumbency. It basically identifies the people that
13 are delegated the responsibility or the authority to
14 sign contracts on behalf of Hospital Products
15 Division.
16     Q. (BY MR. WINTER) Is a Certificate of
17 Incumbency only used in that context as far as
18 describing persons -- only used by Abbott -- let me
19 rephrase the question.
20         Does Abbott only use a Certificate of
21 Incumbency for the purpose of delegating contract
22 signing authority?
23         MS. TABACCHI: Object to the form and to
24 the question as beyond the scope of the notice.
25     A. The -- that's what we used it for. What

8 (Pages 26 to 29)

578cd796-2f41-40d6-9388-fa077af38326

Page 46

1  record, that your questions to the extent they are of
2  Mr. Sellers in his corporate capacity are of
3  Mr. Sellers in his capacity as a former employee of
4  Abbott Hospital Products Division and not of Hospira?
5  Because when you speak in the present tense, I think
6  you're referring to things that are historical and
7  it's confusing for purposes of the record.
8          MR. WINTER: I think I understand what
9  you're saying. I'll try and be more clear.
10         MS. TABACCHI: Can we just agree that
11 unless we otherwise agree --
12         MR. WINTER: Yeah.
13         MS. TABACCHI: -- the testimony is being
14 given on behalf of Abbott Hospital Products Division?
15         MR. WINTER: I need to check your
16 responses to the -- to the notice again to confirm
17 that that's exactly how he's designated. My sense of
18 it was that he was -- well, that may be right. Let
19 me -- let me just look at it.
20         MS. TABACCHI: If you also have
21 questions with respect to Hospira, if we could
22 separate them --
23         MR. WINTER: I understand.
24         MS. TABACCHI: -- it would make it
25 easier because from a timing perspective, when you

Page 47

1  speak in the present tense --
2          MR. WINTER: Yeah.
3          MS. TABACCHI: -- you are actually, I
4  believe, asking a question of Mr. Sellers in his
5  capacity as a Hospital Products Division employee.
6  And so I just want to make sure that the record is
7  clear that that's the testimony that's being given.
8          MR. WINTER: Okay.
9      Q.  (BY MR. WINTER) I want to go back to some of
10 these pricing terms in a few minutes, Mr. Sellers, but
11 before we do that, I want to go back to this exhibit
12 that we started looking at.
13         What are the -- what -- during the 19 --
14 middle 1990s when you were at Abbott Labs, what were
15 the duties and responsibilities of a marketing
16 manager?
17         MS. TABACCHI: Object to the form of the
18 question as beyond the scope of the notice.
19     A.  It would -- it would depend on -- on what
20 area the marketing manager was in. But typically a
21 marketing manager, for their specific responsibility,
22 would be looking at putting together promotional
23 programs, assembling whatever support materials the
24 sales force needed in order to sell the products that
25 we had. And -- and, basically, you know, coordinating

Page 48

1  the specific promotion of the products --
2      Q.  (BY MR. WINTER) And I'm speaking --
3      A.  -- that they were responsible for.
4      Q.  Excuse me. I didn't mean to speak over you.
5      A.  That's fine.
6      Q.  I want to zero in on marketing manager in HPD
7  Alt Site so that we're clear that's what my question
8  is focused on. Right here on this organizational
9  chart we are looking at -- I believe this individual's
10 name is Karla Kreklow; is that correct?
11     A.  Well, there were marketing managers, I
12 believe, in all three segments of Alternate Site.
13     Q.  By "all three segments" you mean Alternate
14 Site Product Sales, Renal Care and Home Infusion
15 Services?
16     A.  Yes.
17     Q.  Okay. Under "Alternate Site Product Sales"
18 I'm looking at a box here underneath Mr. Krajewski
19 that says K.K. Kreklow as a marketing manager.
20     A.  Correct.
21     Q.  And is that a woman by the name of Karla
22 Kreklow?
23     A.  Yes, it is.
24     Q.  Okay. And then underneath her is an
25 individual by the name of M. Novak. Is that Mike

Page 49

1  Novak?
2      A.  Yes.
3      Q.  Okay. Are both Ms. Kreklow and Mr. Novak
4  still employees of Abbott or Hospira?
5      A.  Karla Kreklow is an employee of Abbott and
6  Mike Novak is an employee of Hospira.
7      Q.  Okay. And would it be Abbott's ordinary
8  course of business that a marketing manager had
9  responsibility over a drug or a number of drugs?
10         MS. TABACCHI: Objection as beyond the
11 scope of the notice.
12     A.  I think within this business area, because
13 Alternate Site Product Sales pretty much promoted
14 almost every product that we had in the catalog, yes,
15 they had designated that Mike would be responsible for
16 certain products and Karla would be responsible for
17 others.
18     Q.  (BY MR. WINTER) Were there any other
19 marketing managers within Alternate Site Product Sales
20 at this time besides Ms. Kreklow and Mr. Novak?
21         MS. TABACCHI: Objection.
22     A.  Not that I recall.
23     Q.  (BY MR. WINTER) And I believe your testimony
24 a moment ago you just told me was there were also
25 marketing managers who worked for Ms. Mershimer, is

13  (Pages 46 to 49)

578cd796-2f41-40d6-9388-fa077af38326

Page 138

1    Q.  (BY MR. WINTER)  Good afternoon, Mr. Sellers.
2    A.  Good afternoon.
3    Q.  Would you please look at Exhibit 281, which
4  we had handed to you shortly before the break.  Are
5  you familiar, sir, with nomenclature or something
6  known as the resource file within Abbott?
7         MS. TABACCHI:  Object to the form.
8  Beyond the scope of the notice.
9    A.  Yes.
10   Q.  (BY MR. WINTER)  What is the resource file?
11   A.  The resource file is a central file on our
12  shared server, which -- where we indicate a number of
13  things about the product, its price, its cost, any
14  relevant price points that need to be considered.
15  It's called the resource file because it is basically
16  a resource for our analysts to use and so everybody is
17  looking at the same data.
18   Q.  When you say "analysts," you mean the
19  contracting marketing analysts?
20   A.  Yes.
21   Q.  And those would be the contract marketing
22  analysts that -- that were within the Hospital
23  Products Division contract marketing department?
24         MS. TABACCHI:  Object to the form.
25   A.  Yes.

Page 139

1    Q.  (BY MR. WINTER)  Were -- were the contract
2  marketing analysts within Alternate Site contract
3  marketing also able to access the resource file?
4    A.  I believe they were.
5    Q.  You said it was on the shared system.  I
6  think you described that as a mainframe?
7    A.  Shared server.
8    Q.  Shared server.  Can you describe that in any
9  greater detail?  I understand you're not the designee
10  on computer matters, but to the best of your knowledge
11  what was this server?
12         MS. TABACCHI:  I'm going to object as
13  beyond the scope of the notice.
14   A.  It's -- it's just a file that -- or a -- how
15  do I characterize it?  It's a data storage mechanism
16  that can be accessed by multiple people through their
17  local PCs.
18   Q.  (BY MR. WINTER)  Okay.  Could be accessed by
19  Abbott employees from within HPD proper and within
20  Alternate Site from their desktop, from their PC?
21   A.  I believe they could, yes.
22   Q.  Okay.  Do you know if the resource file was
23  located within any specific database on Abbott's
24  server?
25         MS. TABACCHI:  Objection.  It's beyond

Page 140

1  the scope.
2    A.  No.  It was -- the resource file is basically
3  a large Excel file.
4    Q.  (BY MR. WINTER)  So it would stand alone and
5  not reside in, for example, the OPS, order processing,
6  database or in any of the other databases, to your
7  knowledge?
8         MS. TABACCHI:  Objection.
9    A.  Correct.
10   Q.  (BY MR. WINTER)  Okay.  I would like to
11  direct your attention to the document here in -- up in
12  the upper left-hand corner.  It says, "This is the
13  July 1995 Resource file.  It includes:
14         "1.  An updated list of products and
15  their identifiers from Jerri Cicerale,
16         "2.  Recently pulled group prices from
17  CPBMS."
18         And then it goes on.  But did I read one
19  and two correctly?
20   A.  Yes.
21   Q.  Who is Jerrie Cicerale?
22   A.  Jerrie Cicerale was the database management
23  person that we had in contract marketing.  She was
24  responsible for updating the resource file.  She was
25  also responsible for submitting prices to the pricing

Page 141

1  compendia and she was responsible to make sure that
2  OPS had the correct prices in them.
3    Q.  "OPS" being the order processing system?
4    A.  Yes.
5    Q.  Okay.  Now, looking at this particular
6  spreadsheet, can you identify the column where the
7  prices that were reported by Ms. Cicerale to the
8  database -- excuse me, to the price compendia are
9  listed?
10         MS. TABACCHI:  Object to the form.
11   Q.  (BY MR. WINTER)  And it's a two- or
12  three-page document, so take your time and look at the
13  whole thing, if you would like.
14   A.  (Witness reviewing document.)
15         MS. TABACCHI:  Can you please re-read
16  the question?
17   Q.  (BY MR. WINTER)  I'll ask a different one.
18         You've had an opportunity to look at the
19  document now, sir?
20   A.  Yeah.
21   Q.  And on this document do you find any column
22  where the prices that Abbott reported to the price
23  reporting compendia, such as Redbook, First DataBank,
24  MediSpan, any column where those prices are depicted?
25         MS. TABACCHI:  Object to the form.

36  (Pages 138 to 141)

578cd796-2f41-40d6-9388-fa077af38326

Page 166

1    Q.  Let me ask you this question.
2    A.  -- for this.
3    Q.  Are you aware of any circumstances where any
4  of Abbott's wholesaler customers who were enrolled in
5  the RxLink program and had RxLink pricing available to
6  them would have been billed at the $38 WAC --
7         MS. TABACCHI:  Object --
8    Q.  (BY MR. WINTER)  -- in the scenario that
9  we've described?
10        MS. TABACCHI:  -- to the form of the
11 question.  Beyond the scope of the notice.
12   A.  I'm not aware of any actual happenings with
13 regard to that.
14   Q.  (BY MR. WINTER)  Fair enough.  Thank you.
15 Did the wholesaler customers who signed
16 up in the RxLink program sign a contract with Abbott?
17        MS. TABACCHI:  Object to the form.
18   A.  Yes.
19   Q.  (BY MR. WINTER)  And would those contracts be
20 something that could be found today in Mr. Adams'
21 department?
22        MS. TABACCHI:  Object to the form.
23 Beyond the scope of the notice.
24   A.  Yes.
25   Q.  (BY MR. WINTER)  You -- you knew and

Page 167

1  understand that over time, beginning in the early
2  1990s and lasting throughout the late 1990s into the
3  early 2000s, at least, that Abbott would from time to
4  time do a review and an adjustment of its RxLink WAC
5  pricing in order to minimize its exposure on the two
6  percent prompt pay discount?
7         MS. TABACCHI:  Object to the form.
8    Q.  (BY MR. WINTER)  You understood that Abbott
9  did that from time to time over the years, correct?
10   A.  Yes.
11   Q.  And this is what was known within Abbott as
12 the WAC optimization process, correct?
13        MS. TABACCHI:  Object to the form.
14   A.  I've heard it titled that, yes.
15   Q.  (BY MR. WINTER)  And so if you hear WAC
16 optimization, you understand that to be that process
17 of reviewing Abbott's RxLink WAC pricing to ensure
18 that it is adjusted in order to minimize Abbott's
19 exposure on the two percent prompt pay, right?
20        MS. TABACCHI:  Object to the form.
21 Beyond the scope of the notice.
22   A.  Yes.
23   Q.  (BY MR. WINTER)  You mentioned that
24 Ms. Cicerale had the responsibility to report prices
25 to the price reporting compendia?

Page 168

1    A.  Yes.
2    Q.  Was she -- was that exclusively her duty?
3  Let me rephrase the question.  It was a poorly drafted
4  one.
5    A.  Please.
6    Q.  Is she the only person who had that
7  responsibility?
8    A.  Yes.
9    Q.  Okay.  And is that true for the time period
10 1992 until Ms. Cicerale retired from Abbott?
11   A.  Yes.
12   Q.  And how did Ms. Cicerale know which prices
13 she was to report to the price reporting compendia?
14        MS. TABACCHI:  Object to the form.
15   A.  Well, to begin with, she being -- before I
16 came into -- into a position to know that, she was
17 reporting our list prices to the compendia.  I
18 believe, according to her deposition, the addition of
19 WAC was at the request of the compendia.  So it was a
20 matter of her giving the compendia the prices that
21 they asked for.
22   Q.  (BY MR. WINTER)  So you -- your understanding
23 is that when Ms. Cicerale reported WAC pricing, she
24 was doing so at the request of the price reporting
25 committee?

Page 169

1         MS. TABACCHI:  Object to the form.
2    A.  I believe that's what she said in her
3  deposition.
4    Q.  (BY MR. WINTER)  Okay.  Well, my question is,
5  with -- setting aside the time period in the late
6  1990s when you've testified she began to report WAC
7  pricing -- and by the way, again, in the late 1990s,
8  the WAC pricing that Ms. Cicerale was reporting to the
9  compendia, you know and acknowledge, was pricing that
10 was not generally and currently available and was not
11 pricing at which Abbott's wholesaler customers were
12 routinely being charged --
13        MS. TABACCHI:  Object to the form of the
14 question.
15   Q.  (BY MR. WINTER)  -- true?
16        MS. TABACCHI:  Beyond the scope of the
17 notice.
18   A.  You and I disagree on the term "available."
19   Q.  (BY MR. WINTER)  Well, let's talk about --
20   A.  So --
21   Q.  Fair enough.  I appreciate your caveat.
22   A.  I think we've had --
23   Q.  Let's --
24   A.  -- plenty of --
25   Q.  Let's talk about --

43  (Pages 166 to 169)

578cd796-2f41-40d6-9388-fa077af38326

Page 170

1    A. -- conversation with regard to that.
2    Q. Sure. And let me -- let me try and be more
3 precise.
4         You understand and acknowledge that the
5 WAC pricing that Ms. Cicerale reported in the late
6 1990s is not pricing that would have routinely been
7 invoiced to the vast majority of Abbott's wholesaler
8 customers because those wholesaler customers had
9 available to them the RxLink pricing, which is what
10 they would have been routinely invoiced at --
11        MS. TABACCHI: Same --
12   Q. (BY MR. WINTER) -- true?
13        MS. TABACCHI: Same objections.
14   A. I would agree with that statement.
15   Q. Thank you.
16        MR. WINTER: Tell you what, why don't we
17 take a short break and come back in a few minutes.
18        THE VIDEOGRAPHER: Stand by. The time
19 is 2:05 p.m. We're off the record. This is the end
20 of Tape 3.
21        (Recess from 2:05 to 2:19)
22        THE VIDEOGRAPHER: Stand by. The time
23 is 2:19 p.m. Back on the record. Beginning of Tape
24 4.
25   Q. (BY MR. WINTER) Mr. Sellers, setting aside

Page 171

1 for a moment the time period in the late 1990s when
2 Ms. Cicerale began reporting WAC pricing to the price
3 reporting compendia, will you agree with me that for
4 the majority of the time period, 1992 forward through
5 2001, Ms. Cicerale reported Abbott's list price to the
6 compendia for the drugs marketed by HPD?
7    A. That's my understanding, yes.
8    Q. Okay. Now, my question is, although
9 Ms. Cicerale had the responsibility and it was
10 exclusively hers of making that report, who told her
11 which prices to report?
12        MS. TABACCHI: Object to the form.
13   A. I'm not sure what you're -- what you're
14 asking.
15   Q. (BY MR. WINTER) Well, did Ms. Cicerale have
16 the discretion to select which prices she wanted to
17 report to the price reporting compendia?
18   A. She reported to the price compendia the
19 prices that they wanted to have.
20   Q. So is it your testimony that the price
21 reporting compendia came to Abbott Labs and said,
22 "Dear Abbott, please give us your list prices"?
23        MS. TABACCHI: Object to the form.
24   A. Maybe not in that form or format, but over
25 the years they identified what prices they wanted

Page 172

1 and -- and we tried our best to comply with that.
2    Q. (BY MR. WINTER) So it is your belief, again,
3 based upon your investigation of facts reasonably
4 known to Abbott and based upon your experience with
5 Abbott Laboratories, that in providing your, Abbott's,
6 list prices, you were providing information that had
7 specifically been requested by the compendia?
8        MS. TABACCHI: Objection to the form.
9    A. Yes, I believe so.
10   Q. (BY MR. WINTER) And you knew that the price
11 reporting compendia, you, Abbott, knew that the price
12 reporting compendia would apply a markup to Abbott's
13 reported list prices to get the AWP for Abbott's
14 products, you knew that as well, correct?
15        MS. TABACCHI: Object to the form.
16   A. We knew that the price reporting compendia
17 published our prices, yes.
18        MR. WINTER: Well, objection,
19 nonresponsive.
20   Q. (BY MR. WINTER) Let me ask you this
21 question, sir: You just stated that you knew that the
22 price reporting compendia published your list prices,
23 right?
24   A. Yes.
25   Q. You also knew that the price reporting

Page 173

1 compendia applied a markup to your list prices to get
2 the AWP for Abbott products, correct?
3        MS. TABACCHI: Object to the form.
4 Beyond the scope of the notice.
5    A. We knew that they published an AWP.
6    Q. (BY MR. WINTER) You knew that the price
7 reporting compendia set an AWP. That's what you just
8 stated; is that correct?
9    A. Yes.
10   Q. You also knew that there was a relationship
11 between Abbott's reported list prices and AWP.
12        MS. TABACCHI: Object to the form.
13   Q. (BY MR. WINTER) You either knew that or you
14 didn't.
15        MS. TABACCHI: Well, no. It's not that
16 simple.
17        MR. WINTER: I think it is.
18   Q. (BY MR. WINTER) Sir, you knew -- I mean, did
19 you know, did Abbott know, that there was a
20 relationship between list prices it reported and the
21 AWPs published by the price reporting compendia for
22 Abbott drugs?
23   A. I can --
24        MS. TABACCHI: Object to the form.
25   A. I can say that we suspected that there was a

44  (Pages 170 to 173)

578cd796-2f41-40d6-9388-fa077af38326

Page 174

1 relationship.
2    Q.  (BY MR. WINTER)  That you suspected, but you
3 didn't know?
4       MS. TABACCHI:  Object to the form.
5    Q.  (BY MR. WINTER)  For the time period 1992
6 through the end of 1999, let's narrow the time period
7 here --
8    A.  Okay.
9    Q.  -- did you know that there was a relationship
10 between Abbott's reported list prices and AWP?
11       MS. TABACCHI:  Object to the form.
12    A.  To have known would mean that we would have
13 either been informed by them or we would have looked
14 at every price that they put out in AWP and deducted
15 that that was the case.  I don't think either one of
16 those are a true statement.  There was some inference
17 that there was a relationship between list price and
18 AWP, but that was it.
19    Q.  (BY MR. WINTER)  So your best testimony today
20 is that Abbott had an inference that there was a
21 relationship between the list prices it reported and
22 the AWPs for those products that were published by the
23 price reporting committee?
24       MS. TABACCHI:  Object to the form.
25 Beyond the scope of the notice.

Page 175

1    A.  Abbott HPD, yes.
2    Q.  (BY MR. WINTER)  Who was responsible for
3 setting the list prices that Ms. Cicerale reported to
4 the price reporting compendia?
5       MS. TABACCHI:  Object to the form.
6    A.  List prices were -- were defined pretty much
7 in a collaborative effort between contract marketing
8 and the individual product business unit.
9    Q.  (BY MR. WINTER)  The individual product
10 business unit?
11    A.  Right.
12    Q.  What do you mean by that?
13    A.  Each of -- or our products were broken into
14 separate business units and the marketing managers
15 for -- in the hospital area were within that business
16 unit and they were responsible for their products.
17    Q.  (BY MR. WINTER)  What about the marketing
18 managers within the Alternate Site area?
19    A.  They did not participate in setting list
20 price.
21    Q.  So it was only the list -- excuse me.  Only
22 the marketing managers that were within HPD proper
23 that participated in the setting of list prices?
24    A.  Within the hospital business sector, yes.
25    Q.  But those same products were also sold by the

Page 176

1 Alternate Site Product Sales and they were also sold
2 through Renal Care and also sold through Home Infusion
3 Services, true?
4       MS. TABACCHI:  Objection, form.
5    A.  No.
6    Q.  (BY MR. WINTER)  Not true.  Which part of
7 that was not true?
8    A.  Renal Care did not sell --
9    Q.  I'm sorry?
10    A.  Renal Care did not sell the products.
11    Q.  Renal Care didn't sell products.  But Home
12 Infusion Services did?
13    A.  Home Infusion Services used products within
14 their business model, but we did not sell products on
15 an invoice-by-invoice basis.
16    Q.  But Abbott Alternate Site Product Sales did?
17    A.  Yes.
18    Q.  And the contract marketing analysts within
19 Abbott's Alternate Site contract marketing department
20 did not have a role in the setting of the list prices
21 for the products that were sold?
22    A.  No, they did not.
23    Q.  Okay.  Which current and former Abbott
24 personnel were responsible for deciding the prices
25 that would be reported to the price reporting

Page 177

1 compendia?
2       MS. TABACCHI:  Object to the form.
3    A.  By the -- by the way you've stated the
4 question, I would have to say it would be the director
5 or general manager of contract marketing.
6    Q.  (BY MR. WINTER)  And that is somebody that
7 Ms. Cicerale would have reported to, correct?
8    A.  Up through another manager, but yes.
9    Q.  So at most times during the mid-1990s that
10 director would have been Charlie Mitchell?
11       MS. TABACCHI:  Object to the form.
12    A.  I believe so.
13    Q.  (BY MR. WINTER)  And who is the intermediate
14 manager between Mr. Mitchell and Ms. Cicerale that she
15 would have reported to?
16    A.  I think during that time there were actually
17 two, Seth Stearns, who retired sometime during that
18 time period, and Tom Turner, who took over for him.
19    Q.  Is it your -- is it Abbott's belief and
20 understanding that the two gentlemen that you just
21 mentioned, Mr. Stearns, and did you say Tom Turner?
22    A.  Turner.
23    Q.  And Mr. Turner in conjunction with
24 Mr. Mitchell would have been responsible for making
25 the determination that Abbott should report its list

45 (Pages 174 to 177)

578cd796-2f41-40d6-9388-fa077af38326

Page 178

1  prices to the price reporting compendia?
2         MS. TABACCHI:  Object to the form.
3     A.  I think should that have ever been thrown up
4  for question, yes, they would have made that decision.
5     Q.  (BY MR. WINTER)  Why would it have been in
6  their area of responsibility to make the determination
7  which prices to report to the price reporting
8  compendia?
9         MS. TABACCHI:  Object to the form.
10    A.  The responsibility of contract marketing is
11 to maintain price, so that would -- that is a price.
12 It is -- it -- it would fall under that
13 responsibility.
14    Q.  (BY MR. WINTER)  And why would they have
15 selected the list price instead of any of the other
16 pricing categories that were available in Abbott's
17 records, such as any of the prices that were in the
18 resource file?
19        MS. TABACCHI:  Object to the form.
20    A.  That's what we understood the compendia
21 wanted.
22    Q.  (BY MR. WINTER)  Abbott understood that the
23 compendia were publishing these prices, at least in
24 part -- strike that question.
25        Abbott understood that the prices that

Page 179

1  were published by the price reporting compendia were
2  relied upon by third-party payers who reimbursed
3  Abbott's customers, providers, for Abbott drugs, you
4  understood that, didn't you?
5         MS. TABACCHI:  Object to the form.
6  Beyond the scope of the notice.
7     A.  There was -- there was information available
8  through public reports, and so on, that -- that talked
9  about a relationship that a number of payers had using
10 AWP.
11    Q.  (BY MR. WINTER)  So Abbott knew that
12 third-party payers reimbursed providers based upon
13 AWPs for Abbott products that were published in the
14 compendia --
15        MS. TABACCHI:  Object to the form.
16    Q.  (BY MR. WINTER)  -- true?
17        MS. TABACCHI:  Beyond the scope of the
18 notice.
19    A.  Some of the products, yes.
20    Q.  (BY MR. WINTER)  Okay.  And let me show you
21 what's been marked previously as Exhibit 68.
22    A.  (Witness reviewing document).
23    Q.  All right, sir.  You ready?
24    A.  Uh-huh.
25    Q.  Okay.  Do you recognize this document?

Page 180

1     A.  No.
2     Q.  Would you agree with me that this appears to
3  be a letter dated December 13, 1993 from Michael
4  Heggie to Lisa at Redbook?
5         MS. TABACCHI:  Object to the form.
6  Beyond the scope of the notice.
7     A.  It appears that it is a letter that was
8  intended for Lisa, whoever that is, at Redbook, yes.
9     Q.  (BY MR. WINTER)  From Mr. Heggie?
10    A.  Yes.
11    Q.  Okay.  And you also testified this morning
12 that you reviewed Mr. Heggie's testimony in order to
13 prepare for today's deposition, correct?
14    A.  Some parts of it, yes.
15    Q.  You didn't read it -- read it in its
16 entirety?
17    A.  No.
18    Q.  Well, let's focus in on the second -- well,
19 it's a short letter.  Let me just read it and see
20 if -- sounds like I'm reading this correctly.
21 Beginning with the second paragraph.
22        "Enclosed is the information on a new
23 Abbott product for inclusion in the 1994 Red Book.  I
24 trust this will make the January update as well."
25        Did I read that correctly?

Page 181

1     A.  Yes.
2     Q.  Okay.  Next paragraph.
3         "As you told me on the phone Abbott has
4  a policy of allowing Red Book to establish the AWP.
5  That formula, as I understand it, is minus 5% plus
6  25%.  If my math is correct that will give us a
7  published AWP of $43.94."
8         Did I read that correctly?
9     A.  Yes.
10    Q.  Does this refresh your recollection that
11 Abbott Laboratories knew of the relationship between
12 the prices that Abbott reported as list prices and
13 AWP?
14        MS. TABACCHI:  Object to the form of the
15 question.
16    A.  No.
17    Q.  (BY MR. WINTER)  Doesn't refresh your
18 recollection?
19    A.  This -- this basically says that Michael
20 Heggie might have known that.
21    Q.  Well, Michael Heggie at the time held the
22 position of manager for reimbursement within Abbott's
23 Alternate Site, correct?
24    A.  He was manager of reimbursement and was --
25 had a split responsibility for Alternate Site Product

46  (Pages 178 to 181)

578cd796-2f41-40d6-9388-fa077af38326

```
                                      Page 210
 1      A.  Yes.
 2      Q.  (BY MR. WINTER)  Okay.  And you knew that and
 3  Abbott knew that.  You knew that by virtue of your
 4  position as the general manager of Abbott Home
 5  Infusion Services and that's also information that's
 6  reasonably available to Abbott HPD.
 7          MS. TABACCHI:  Object to the form.
 8  Beyond the scope of the notice.
 9      Q.  (BY MR. WINTER)  Don't you agree?
10      A.  No, I wouldn't agree with that because I
11  don't -- I don't believe it was general knowledge of
12  what the operating mode for Home Infusion Services was
13  across HPD.
14      Q.  Well, if that knowledge was --
15      A.  I mean, it was a very small business in a --
16  in a very big division.
17      Q.  Okay.  And I appreciate that.  But if that
18  knowledge was compartmentalized to the extent that you
19  suggest, how is it that Mr. Eichhorn, who was over in
20  HPD contract marketing proper, had the knowledge that
21  there was certainly a relationship between list
22  pricing and AWP?
23          MS. TABACCHI:  Object to the form.
24  Beyond the scope of the notice.
25      A.  Because of Dave Brincks.
```

```
                                      Page 211
 1      Q.  (BY MR. WINTER)  So it would be -- is it your
 2  belief that Mr. Brincks informed Mr. Eichhorn of that
 3  relationship?
 4          MS. TABACCHI:  Same objections.
 5      A.  Well, as you -- as you can see from this
 6  letter, it says "at the request of Dave Brincks."  So,
 7  obviously, he went and asked for these price changes.
 8      Q.  (BY MR. WINTER)  And Dave Brincks, at that
 9  time, was somebody who worked for you?
10      A.  Yes.
11      Q.  Why is it that the relationship between
12  Abbott's list prices that were reported by HPD
13  contract marketing to the price reporting compendia,
14  and AWP, which was used for reimbursement purposes, is
15  something that Mr. Brincks would have known or cared
16  about?
17          MS. TABACCHI:  Object to the form of the
18  question.  Beyond the scope of the notice.
19      A.  Yeah.  Can you rephrase that?  I'm not sure I
20  understood what you were asking.
21      Q.  (BY MR. WINTER)  Well, you suggested in
22  response to my earlier question that Mr. Brincks is
23  the individual who probably informed Mr. Eichhorn --
24          MS. TABACCHI:  Same objections.
25      Q.  (BY MR. WINTER)  -- of the relationship
```

```
                                      Page 212
 1  between list prices that were reported by contract
 2  marketing and AWP.  If I understood your testimony,
 3  that's what you stated.
 4      A.  Yes.  Right.
 5      Q.  Okay.  Why is that information something that
 6  would have been within the ambit of Mr. Brincks' body
 7  of knowledge?
 8          MS. TABACCHI:  Same objections.
 9      A.  He was -- he was the -- he was the marketing
10  manager for Home Infusion Services.  You've already
11  said Home Infusion Services as a -- as a whole
12  probably knew there was some relationship on some
13  payers for some products with regard to AWP.  I
14  don't -- I don't believe in this case that Mr. Brincks
15  actually talked about AWP, but that is, obviously, how
16  it came across in terms of the letter from -- from
17  Gerry Eichhorn.
18      Q.  (BY MR. WINTER)  You say you don't believe
19  Mr. Brincks talked about AWP.  What are you referring
20  to, sir?
21          MS. TABACCHI:  Same objections.
22      A.  We were -- we were looking for a change in
23  list price, so that -- that's what Dave Brincks would
24  have requested, a change in list price.
25      Q.  (BY MR. WINTER)  So do you believe that
```

```
                                      Page 213
 1  Mr. Brincks did not articulate for Mr. Eichhorn, for
 2  his edification, that there was relationship between
 3  list price and AWP?
 4          MS. TABACCHI:  Same objections.
 5      A.  I don't think that was -- that was his
 6  primary discussion with them.  It might have come out,
 7  but I'm, again, talking to something that I don't have
 8  any direct knowledge on.
 9      Q.  (BY MR. WINTER)  Did you participate in any
10  conversations between Mr. Brincks and Mr. Eichhorn on
11  this issue of adjusting the list price?
12      A.  No, I did not.
13      Q.  To your knowledge, was there ever any policy
14  or directive imparted by the managers within Alternate
15  Site to the people that worked underneath them not to
16  discuss AWP or reimbursement with customers?
17          MS. TABACCHI:  Object to the form of the
18  question.  Beyond the scope of the notice.
19      A.  Yes, I believe there were -- were
20  instructions not to engage in conversation with regard
21  to that.
22      Q.  (BY MR. WINTER)  Were those instructions
23  verbally disseminated or were they put down in
24  writing?
25          MS. TABACCHI:  Same objections.
```

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

578cd796-2f41-40d6-9388-fa077af38326

Page 294

```
 1            NO. D-1-GV-04-001286
 2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                              )
 3  ex rel.                   )
      VEN-A-CARE OF THE       )
 4    FLORIDA KEYS, INC.,     )
         Plaintiffs,          )
 5                            )
    VS.                       ) TRAVIS COUNTY, TEXAS
 6                            )
    ABBOTT LABORATORIES INC., )
 7  ABBOTT LABORATORIES,      )
    HOSPIRA, INC., and B. BRAUN )
 8  MEDICAL INC.,             )
         Defendant(s).        ) 201ST JUDICIAL DISTRICT
 9
10          REPORTER'S CERTIFICATION
            DEPOSITION OF MICHAEL SELLERS
11              Volume 1
            February 13, 2007
12
13     I, Cynthia Vohlken, Certified Shorthand Reporter
14  in and for the State of Texas, hereby certify to the
15  following:
16     That the witness, MICHAEL SELLERS, was duly sworn
17  by the officer and that the transcript of the oral
18  deposition is a true record of the testimony given by
19  the witness;
20     That the deposition transcript was submitted on
21  February 26, 2007, to the witness or to the attorney
22  for the witness for examination, signature and return
23  to me by March 21, 2007;
24     That the amount of time used by each party at the
25  deposition is as follows:
```

Page 295

```
 1     Mr. Raymond Winter - 05:42
 2     That pursuant to information given to the
 3  deposition officer at the time said testimony was
 4  taken, the following includes counsel for all parties
 5  of record:
 6     MR. RAYMOND WINTER,
        Attorney for Plaintiff;
 7     MR. JARRETT ANDERSON,
        Attorney for the Relator;
 8     MS. TINA M. TABACCHI,
        Attorney for Defendants Abbott
 9     Laboratories, Inc. and Hospira, Inc.
10     I further certify that I am neither counsel for,
11  related to, nor employed by any of the parties or
12  attorneys in the action in which this proceeding was
13  taken, and further that I am not financially or
14  otherwise interested in the outcome of the action.
15     Further certification requirements pursuant to
16  Rule 203 of TRCP will be certified to after they have
17  occurred.
18     Certified to by me this 26th day of February,
19  2007.
20
21     Cynthia Vohlken, Texas CSR 1059
        Expiration Date: 12/31/2008
22     Firm Registration No. 82
        Fredericks-Carroll Reporting
23     7719 Wood Hollow Drive, Suite 156
        Austin, Texas 78731
24     Telephone: (512) 477-9911
              (800) 234-3376
25     Fax:    (512) 345-1417
```

Page 296

```
 1     FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2     The original deposition was/was not returned to
 3  the deposition officer on          , 2007;
 4     If returned, the attached Changes and Signature
 5  page contains any changes and the reasons therefor;
 6     If returned, the original deposition was delivered
 7  to Mr. Raymond Winter, Custodial Attorney;
 8     That $    is the deposition officer's
 9  charges to the Plaintiff(s) for preparing the original
10  deposition transcript and any copies of exhibits;
11     That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate
13  was served on all parties shown herein on and filed
14  with the Clerk.
15     Certified to by me this       day of
16     , 2007.
17
18
19
        Cynthia Vohlken, Texas CSR 1059
20      Expiration Date: 12/31/2008
        Firm Registration No. 82
21      Fredericks-Carroll Reporting
        7719 Wood Hollow Drive, Suite 156
22      Austin, Texas 78731
        Telephone: (512) 477-9911
23           (800) 234-3376
        Fax:    (512) 345-1417
24  JOB NO. 2150
25
```

75 (Pages 294 to 296)

578cd796-2f41-40d6-9388-fa077af38326

# EXHIBIT 73

Page 297

NO. D-1-GV-04-001286

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| ex rel. | ) |
|   VEN-A-CARE OF THE | ) |
|   FLORIDA KEYS, INC., | ) |
|      Plaintiffs, | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| ABBOTT LABORATORIES INC., | ) |
| ABBOTT LABORATORIES, | ) |
| HOSPIRA, INC., and B. BRAUN | ) |
| MEDICAL INC., | ) |
|     Defendant(s). | ) 201ST JUDICIAL DISTRICT |

*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
MICHAEL SELLERS
Volume 2
February 14, 2007

*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL SELLERS,

produced as a witness at the instance of the

Plaintiff(s), and duly sworn, was taken in the

above-styled and numbered cause on the 14th of

February, 2007, from 9:06 a.m. to 4:58 p.m., before

CYNTHIA VOHLKEN, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of Jones

Day, 77 West Wacker, Suite 3500, Chicago, Illinois,

pursuant to the Texas Rules of Civil Procedure and the

provisions attached previously.

Page 414

1  '98.
2      Q.  Do you recall halting the circulation of
3  newsletters in '98 or '99?
4          MS. TABACCHI:  Object to the form.
5      A.  I don't remember halting the creation of
6  newsletters.
7      Q.  (BY MR. ANDERSON)  That was just when you
8  left your position in Home Infusion?
9      A.  No.  That was when we made the decision that
10 we were going to leave the business.
11     Q.  Oh, okay.  On that point just for a moment.
12 While you decided in '98 to leave the business, isn't
13 it true that Abbott stayed in the Home Infusion
14 Services business until at least 2001, 2002?
15         MS. TABACCHI:  Object to the form.
16     A.  We decided in 1998 to extract ourselves from
17 the business and -- but one of the decisions in doing
18 that was that we would uphold any contractual
19 arrangements we had with existing clients.  And so
20 there was a general phase down between 1998 and the
21 end of 2000.
22     Q.  (BY MR. ANDERSON)  And, accordingly, during
23 that phase down, of course, Abbott continued to
24 perform Home Infusion Services functions?
25         MS. TABACCHI:  Object to the form.

Page 415

1      A.  We continued to live up to our contractual
2  obligations, yes.
3      Q.  (BY MR. ANDERSON)  Now, looking at what's
4  been marked as Exhibit 296.  You see that --
5          MR. WINTER:  Seven.
6      Q.  (BY MR. ANDERSON)  Seven.  Pardon me.  You
7  see Paragraph 2?
8      A.  Yes.
9      Q.  And I'll read for the record.  "Know your
10 drug costs and Average Wholesale Price (AWP).  This is
11 the number one question case managers ask when
12 negotiating pricing."
13         Did I read that correctly?
14     A.  Yes.
15     Q.  Is it true that Home Infusion Services
16 personnel would negotiate with third-party payers on
17 reimbursement pricing?
18         MS. TABACCHI:  Object to the form.
19     A.  What this is -- this is an
20 informative note to our clients.  A lot of our clients
21 handled what I'd call prior authorization of their
22 patients and we are just trying to make them aware of
23 things that managed care case managers were going to
24 focus in on in that prior authorization.
25     Q.  (BY MR. ANDERSON)  Do you distinguish

Page 416

1  "managed care" from third-party reimbursement?
2      A.  No.  It's just a little -- it's a little more
3  involved, third-party reimbursement.
4      Q.  Other than in the context of managed care,
5  did Home Infusion reimbursement services personnel at
6  Abbott negotiate with other third-party payers
7  regarding reimbursement off of AWP?
8          MS. TABACCHI:  Objection, form.
9      A.  Not that I'm aware of.
10     Q.  (BY MR. ANDERSON)  Do you know why there was
11 not negotiation in that context?
12         MS. TABACCHI:  Object to the form.
13     A.  I said I wasn't aware of it, so I can't tell
14 you why it was or why it wasn't.  I wasn't aware.
15     Q.  (BY MR. ANDERSON)  You just can't testify one
16 way or the other about it?
17         MS. TABACCHI:  Object to the form.
18 Mischaracterizes the testimony.
19     A.  I told you, I wasn't aware of any
20 negotiations done on --
21     Q.  (BY MR. ANDERSON)  I know.  And I'm asking --
22     A.  -- any AWP.
23     Q.  Yes, sir.  And I'm asking you if you know why
24 there weren't any negotiations done.
25     A.  Again, I can't -- I can't answer that

Page 417

1  question if I didn't know that there was any going on.
2      Q.  You know, I think we're not communicating
3  with one another.  I'm not asking you to explain why
4  it was going on.  I appreciate that you're testifying
5  it was not happening.  I'm asking you if you could
6  explain why negotiation with third-party payers other
7  than managed care was not occurring?
8          MS. TABACCHI:  Object to the form.
9      A.  I'm saying I don't have any knowledge of it.
10     Q.  (BY MR. ANDERSON)  Okay.  I understand.  All
11 right.
12         Now reading from Bullet 3 immediately
13 under.  "When possible, ask the case manager what she
14 considers to be usual and customary for the services
15 being provided.  Compare that to your usual and
16 customary and if it is lower, ask the case manager for
17 an additional 15 to 20 percent over her U&C."
18         Did I read that correctly?
19     A.  Uh-huh.
20     Q.  How could -- how were Abbott personnel
21 involved in negotiating on usual and customary
22 charges?
23         MS. TABACCHI:  Object to the form of the
24 question.
25     A.  I would -- I would see us -- we were

31  (Pages 414 to 417)

ce2ce70e-183b-4da2-98af-55b6f8286eaf

Page 570

1    I, MICHAEL SELLERS, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6                MICHAEL SELLERS
7
8
9  THE STATE OF                )
10 COUNTY OF                   )
11    Before me,            , on this day
12 personally appeared MICHAEL SELLERS, known to me (or
13 proved to me under oath or through
14                 ) (description of identity
15 card or other document) to be the person whose name is
16 subscribed to the foregoing instrument and
17 acknowledged to me that they executed the same for the
18 purposes and consideration therein expressed.
19    Given under my hand and seal of office this
20     day of            , 2007.
21
22
23
              NOTARY PUBLIC IN AND FOR
24            THE STATE OF
25

---

Page 571

1            NO. D-1-GV-04-001286
2  THE STATE OF TEXAS          ) IN THE DISTRICT COURT
                               )
3  ex rel.                     )
   VEN-A-CARE OF THE           )
4  FLORIDA KEYS, INC.,         )
      Plaintiffs,              )
5                              )
   VS.                         ) TRAVIS COUNTY, TEXAS
6                              )
   ABBOTT LABORATORIES INC.,   )
7  ABBOTT LABORATORIES,        )
   HOSPIRA, INC., and B. BRAUN )
8  MEDICAL INC.,               )
      Defendant(s).            ) 201ST JUDICIAL DISTRICT
9
10       REPORTER'S CERTIFICATION
      DEPOSITION OF MICHAEL SELLERS
11          Volume 2
         February 14, 2007
12
13    I, Cynthia Vohlken, Certified Shorthand Reporter
14 in and for the State of Texas, hereby certify to the
15 following:
16    That the witness, MICHAEL SELLERS, was duly sworn
17 by the officer and that the transcript of the oral
18 deposition is a true record of the testimony given by
19 the witness;
20    That the deposition transcript was submitted on
21 February 26, 2007, to the witness or to the attorney
22 for the witness for examination, signature and return
23 to me by March 21, 2007;
24    That the amount of time used by each party at the
25 deposition is as follows:

---

Page 572

1        Mr. Jarrett Anderson - 05:41
2    That pursuant to information given to the
3  deposition officer at the time said testimony was
4  taken, the following includes counsel for all parties
5  of record:
6        MR. RAYMOND WINTER,
           Attorney for Plaintiff;
7        MR. JARRETT ANDERSON,
           Attorney for the Relator;
8        MS. TINA M. TABACCHI,
           Attorney for Defendants Abbott
9      Laboratories, Inc. and Hospira, Inc.
10    I further certify that I am neither counsel for,
11 related to, nor employed by any of the parties or
12 attorneys in the action in which this proceeding was
13 taken, and further that I am not financially or
14 otherwise interested in the outcome of the action.
15    Further certification requirements pursuant to
16 Rule 203 of TRCP will be certified to after they have
17 occurred.
18    Certified to by me this 26th day of February,
19 2007.
20
           Cynthia Vohlken, Texas CSR 1059
21         Expiration Date:  12/31/2008
           Firm Registration No. 82
22         Fredericks-Carroll Reporting
           7719 Wood Hollow Drive, Suite 156
23         Austin, Texas 78731
           Telephone: (512) 477-9911
24              (800) 234-3376
           Fax:     (512) 345-1417
25 JOB NO. 215

---

Page 573

1    FURTHER CERTIFICATION UNDER RULE 203 TRCP
2    The original deposition was/was not returned to
3  the deposition officer on          , 2007;
4    If returned, the attached Changes and Signature
5  page contains any changes and the reasons therefor;
6    If returned, the original deposition was delivered
7  to Mr. Raymond Winter, Custodial Attorney;
8    That $   is the deposition officer's
9  charges to the Plaintiff(s) for preparing the original
10 deposition transcript and any copies of exhibits;
11    That the deposition was delivered in accordance
12 with Rule 203.3, and that a copy of this certificate
13 was served on all parties shown herein on and filed
14 with the Clerk.
15    Certified to by me this      day of
16          , 2007.
17
18
19
           Cynthia Vohlken, Texas CSR 1059
20         Expiration Date:  12/31/2008
           Firm Registration No. 82
21         Fredericks-Carroll Reporting
           7719 Wood Hollow Drive, Suite 156
22         Austin, Texas 78731
           Telephone: (512) 477-9911
23              (800) 234-3376
           Fax:     (512) 345-1417
24 JOB NO. 2150
25

EXHIBIT 74

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


IN RE:  PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE          )

LITIGATION,                      )   Case No.

        Plaintiffs,              )   0112257-PBS

                                 )

  vs.                            )HIGHLY CONFIDENTIAL

                                 )

ABBOTT LABORATORIES, INC., and   )

HOSPIRA,                         )

        Defendants.              )

-------------------------------x


        The oral and videotaped deposition of

MICHAEL W. SELLERS, called by the Plaintiffs for

examination, taken pursuant to the Federal Rules of

Civil Procedure of the United States District Courts

pertaining to the taking of depositions, taken before

Janice M. Kocek, CSR, a Notary Public within and for

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL         November 1, 2007
Chicago, IL

Page 66

1  merged into the HBS Contract Marketing?
2      MS. TABACCHI:  Object to the form.
3      THE WITNESS:  Sometime around mid-2000.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay.
6      A.  The contract management piece of
7  Alternate Site was moved under my responsibilities
8  so that all of -- so that all of the contract
9  responsibilities for the Hospital Products Division
10 were in one organization.  But when I, when I first
11 took the position it was -- they were separate.
12     Q.  Did you take the position at the
13 beginning of 2000?
14     A.  Yes.
15     Q.  And then about six months later you got
16 the Alt. Site Contract Marketing?
17     A.  As I, as I recall it was around that
18 time.
19     Q.  And when was Home Infusion Services
20 phased out or shut down?
21     A.  We made the business decision to cease
22 taking new clients and to not renew any, any

Page 67

1  contracts in 1997.  We realized that it would
2  probably take another four or five years to fulfill
3  our contract responsibilities with our clients.
4      Q.  Okay.  And who made the decision in '97
5  to not take new customers for the Home Infusion
6  department or sector?
7      A.  Well --
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  It, it, it was a -- it was
10 a -- it was a consensus business decision of HPD
11 management.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Who specifically in HPD management made
14 that call?
15     MS. TABACCHI:  Object to the form.
16     THE WITNESS:  I can't, I can't say that
17 any one person made that call.  Don Robertson, and
18 I, and I recommended it.  And after some
19 consideration I -- it was, it was agreed upon.
20
21
22 BY MS. ST. PETER-GRIFFITH:

Page 68

1      Q.  Why did you recommend it?
2      A.  The market had changed considerably.  We
3  had originally had one profile that we had been
4  promoting and in the years prior to 1997 we were
5  seeing that we were having less success in that
6  business model and in terms of gaining new clients.
7  Our assessment of the general marketplace was that
8  we didn't believe that it was a viable business
9  longer term and so that's what led to the decision.
10     Q.  Did Mr. Robertson express any interest in
11 closing the Home Infusion business earlier than
12 '97?
13     A.  Not that I remember.
14     Q.  Okay.  And when you assumed the position
15 of general manager for Contract Marketing and Home
16 Infusion Services, did that title change after Home
17 Infusion was phased out in about 2000 or --
18     A.  2001.
19     Q.  -- 2001?
20     A.  Yeah, we struck the last --
21     Q.  I'm sorry?
22     A.  We struck the last few words off the end

Page 69

1  of it.
2      Q.  Okay.  And then your position then was
3  just with general manager for Contract Marketing?
4      A.  Yes.
5      Q.  Okay.  Were there any other general
6  managers for Contract Marketing --
7      A.  No.
8      Q.  -- during this time period?
9      Within the Hospital Products Division at
10 all?
11     A.  No.
12     Q.  And how long did you hold that position
13 as general manager for Contract Marketing?
14     A.  Until April of 2004.
15     Q.  And what happened in April of 2004?
16     A.  We ceased to become part of Abbott
17 Laboratories.  We were Hospira.
18     Q.  And is that when you ceased as an Abbott
19 employee?
20     A.  Yes.
21     Q.  Okay.  And what was your job after April
22 -- or in April of 2004?

18 (Pages 66 to 69)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                        Chicago, IL

Page 122

1   compendia and the calculation of AWP?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  No.
4   BY MS. ST. PETER-GRIFFITH:
5        Q.  You didn't have any understanding of that
6   relationship?
7        A.  I didn't have any understanding of it,
8   no.
9        Q.  Do you -- were there any resources that
10  you were familiar with that could have helped you
11  identify that understanding?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I have no idea.
14  BY MS. ST. PETER-GRIFFITH:
15       Q.  Did you have any other responsibilities
16  when you were the general manager for Home Infusion
17  Services?
18       A.  No.  That kept me pretty busy.
19       Q.  So we've exhausted your memory on what
20  you, what your responsibilities were?
21       A.  Yes, yes.
22       Q.  And then, sir, in 2000 you moved on to

Page 123

1   the general manager for Contract Marketing and then
2   for Home Infusions Services, and then ultimately
3   Home Infusions Services was phased out?
4        A.  Right.
5        Q.  During this period of time was your
6   responsibilities with regard to Home Infusion
7   Services to oversee the phasing out of that
8   business?
9        A.  Yes.
10       Q.  What was done with the CHIP system?
11       A.  As I, as I understand -- we, we tried to
12  work with our clients to get as many clients off
13  the CHIP system as possible.  And at some point we
14  decommissioned it.
15       Q.  Okay.  Did you license it?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  Did I license it?
18  BY MS. ST. PETER-GRIFFITH:
19       Q.  Well, did, did Abbott -- I'm sorry, did
20  Abbott license the CHIP system to, to any third
21  parties that you're aware of or former clients?
22       MS. TABACCHI:  Object to the form.

Page 124

1        THE WITNESS:  I, I believe we may have.
2   I, I can't tell you who.  We may have.
3   BY MS. ST. PETER-GRIFFITH:
4        Q.  Okay.  Did you have any other
5   responsibilities after 2000 for Home Infusion
6   Services?
7        A.  Well, it went into 2001.  We actually --
8   I don't -- I think we actually closed all the
9   things down at the end of 2001.
10       Q.  Let me ask you this, I meant to ask you
11  this before:  When you were -- for the seven-and-a-
12  half years that you were the general manager of
13  Home Infusion Services, did you have any
14  responsibilities with regard to Abbott's
15  pharmacies?
16       A.  Yes, they reported into that business
17  unit.
18       Q.  What were your responsibilities with
19  regard to Abbott's pharmacies?
20       A.  The operation of the pharmacies.
21       Q.  At -- at any point -- well, how many
22  pharmacies did Abbott have?

Page 125

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  When I, when I assumed the
3   position in '92 we had three pharmacies.
4   BY MS. ST. PETER-GRIFFITH:
5        Q.  Do you remember where they were located?
6        A.  One was in Fairfield, New Jersey, one was
7   in Abbott Park, Illinois, and one was in Santa Fe
8   Springs, California.
9        Q.  And did those pharmacies seek
10  reimbursement from or bill to the Medicaid --
11  Medicare or Medicaid programs?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  No.
14  BY MS. ST. PETER-GRIFFITH:
15       Q.  None at all?
16       A.  No.
17       Q.  I just want to make it clear.  The Abbott
18  pharmacies did not at any time during your tenure,
19  your seven-and-a-half years as the director
20  overseeing Home Infusion, bill to Medicaid or
21  Medicare?
22       A.  No, they didn't.

32 (Pages 122 to 125)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL        November 1, 2007
                    Chicago, IL

Page 130

1      Q.   What about catalog pricing, same
2  responsibilities as you had before?
3      A.   Yes.
4      Q.   Any additional responsibilities with
5  regard to catalog pricing?
6      A.   No.
7      Q.   Well, let me ask you, during this period
8  of time did you have increased responsibilities
9  because the Hospital Business Sector, Contract
10 Marketing had absorbed the Alt. Site Contract
11 Marketing?
12     A.   Well, I think I said that before that
13 around the middle of 2000 I was given the direct
14 responsibility for those contracting efforts.
15     Q.   And I -- you did say that before.  My
16 question is did that increase your workload and
17 your responsibilities, I guess?
18     A.   Yes.
19     Q.   Okay.  Was there any difference between
20 how Alt. Site Contract Marketing went about pricing
21 its contracts and how the Hospital Business Sector
22 priced its contracts?

Page 131

1      MS. TABACCHI:  Object to the form.
2      THE WITNESS:  I'm sure there were some
3  inherent differences, but I'm not aware of any, any
4  fundamental differences, no.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.   Well, was AWP important to the Alt. Site
7  customers, to your knowledge?
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  I have no idea whether it
10 was important to them or not.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   Do you know whether the sales force as
13 part of proposal analyses provided AWP information
14 to Alt. Site customers?
15     A.   That was not our practice.
16     Q.   You're certain of that?
17     A.   Yes.
18     Q.   Well, we've heard testimony in this case
19 that proposal analyses provided to customers
20 included an AWP analysis on a regular basis.  Were
21 you aware of that?
22     MS. TABACCHI:  Object to the form.

Page 132

1  Object to the form.
2      THE WITNESS:  It would be a surprise.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Why do you say that it was not our
5  practice?
6      A.   It just wasn't our practice.  In fact, I
7  believe the late, late '90s we had instructed the
8  sales force that it was not our practice.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   And how did you instruct the sales force
11 in the late '90s that it was not your practice?
12     A.   Pete Baker in his communication to me
13 said that there was some instruction given to them
14 around that time frame.
15     Q.   Do you know whether it was oral or
16 written?
17     A.   No, I don't.
18     Q.   Is your understanding that there was an
19 instruction based exclusively upon your
20 conversation with Pete Baker?
21     MS. TABACCHI:  Object to the form.
22     THE WITNESS:   Is my knowledge?

Page 133

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Yes.
3      A.   That specific knowledge, yes, with regard
4  to that.
5      Q.   Okay.  Do you have any other -- other
6  than your --
7      A.   Other than, other than that, it's just a
8  general haze somewhere back here that --
9      Q.   Well, you seem somewhat certain that that
10 was not your practice in Alt. Site to provide AWP
11 information to Alt. Site customers.  I want to know
12 why you're so certain of that?
13     MS. TABACCHI:  Object to the form.
14     THE WITNESS:  I just, I just -- my
15 general recollection is, is that, you know, we had
16 -- we had, we just didn't handle that.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   And what is the basis of that
19 recollection?
20     A.   Again, I don't --
21     MS. TABACCHI:  Object to the form.
22     THE WITNESS:  It's general recollection.

34 (Pages 130 to 133)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
                        Chicago, IL

Page 334

```
 1   STATE OF ILLINOIS  )
 2              ) SS:
 3   COUNTY OF C O O K  )
 4        I, JANICE M. KOCEK, a Certified Shorthand
 5   Reporter within and for the County of Cook and State
 6   of Illinois, do hereby certify that heretofore,
 7   to-wit, on the 1st day of November 2007, personally
 8   appeared before me MICHAEL SELLERS in a cause now
 9   pending and undetermined in the United States District
10   Court, in re the Pharmaceutical Industry Average
11   Wholesale Price Litigation are the Plaintiffs, and
12   Abbott Laboratories, Inc. and Hospira, Inc. are the
13   Defendants.
14        I further certify that the said witness was
15   first duly sworn to testify the truth, the whole truth
16   and nothing but the truth in the cause aforesaid; that
17   the testimony then given by said witness was reported
18   stenographically by me in the presence of the said
19   witness, and afterwards reduced to typewriting by
20   Computer-Aided Transcription, and the foregoing is a
21   true and correct transcript of the testimony so given
22   by said witness as aforesaid.
```

Page 335

```
 1        I further certify that the taking of this
 2   deposition was pursuant to notice, and that there were
 3   present at the deposition the attorneys hereinbefore
 4   mentioned.
 5        I further certify that I am not counsel for
 6   nor in any way related to the parties to this suit,
 7   nor am I in any way interested in the outcome thereof.
 8        IN TESTIMONY WHEREOF:  I have hereunto set
 9   my hand this 12th day of November, 2007.
10
11
12   _____
13   JANICE M. KOCEK, C.S.R.
14
15
16
17
18
19
20
21
22
```

85 (Pages 334 to 335)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

# EXHIBIT 75

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL         )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )   CIVIL ACTION

PRICE LITIGATION               )   01-CV-12257-PBS

_____


                    Videotaped Rule 30(b)(6) Deposition

                    of MICHAEL SELLERS, at 77 West Wacker

                    Drive, Chicago, Illinois, commencing

                    at 9:00 a.m. on Sunday, March 16,

                    2008, before Donna M. Kazaitis, RPR,

                    CSR No. 084-003145.

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 162

1  Abbott forms that I would not have expected to
2  have been in the hands of the compendia, all of
3  the other Abbott, the forms that we looked at that
4  were in what I would have considered the
5  communication format that we made to the
6  compendia, I would have no reason to think that
7  they were erroneous.
8        I think Jerrie was a very diligent
9  employee and took a lot of pride in what she did
10 and what she was responsible for.  And I valued
11 that.
12       MS. ST. PETER-GRIFFITH:  Okay.  Why
13 don't we take a lunch break.
14       THE VIDEOGRAPHER:  We are off the record
15 at 12:58 p.m. with the end of Tape No. 3.
16       (WHEREUPON a lunch recess was
17       taken, and said deposition
18       continued as follows:)
19
20
21
22

Page 163

1        THE VIDEOGRAPHER:  We are back on the
2  record at 1:45 p.m. with the beginning of Tape
3  No. 4.
4        MICHAEL SELLERS,
5  having been previously duly sworn, was examined
6  and testified as follows:
7            EXAMINATION
8            (Continuing)
9  BY MS. ST. PETER-GRIFFITH:
10   Q.   Mr. Sellers, before the break we went
11 through a series of documents concerning Abbott's
12 price reporting of its catalog and list prices to
13 the price reporting compendia.
14       What was Abbott's understanding of
15 what the price reporting compendia would do with
16 the prices that Abbott reported to them?
17   A.   They would publish those products and
18 those prices.  I believe there was some other data
19 that they published with regard to the product.
20 But they would publish that in their database that
21 they sold to various people within the industry as
22 well as within the actual hard copy books that

Page 164

1  they published to subscribers throughout the
2  country.
3    Q.   What was your, what is Abbott's
4  understanding of the correlation between the
5  prices it reported to the pricing compendia and
6  the calculation of average wholesale price or AWP?
7        MS. TABACCHI:  Object to the form.  I
8  have a problem with the lack of timeframe.  What
9  is Abbott's understanding today?
10       MS. ST. PETER-GRIFFITH:  No, I'm sorry.
11 Fair enough.
12 BY MS. ST. PETER-GRIFFITH:
13   Q.   '91 through 2003.
14   A.   I think.
15       MS. TABACCHI:  I still object to the
16 form as just overbroad in that sense.
17       THE WITNESS:  I think in general within
18 Abbott Hospital Products Division, there wasn't an
19 appreciation of a relationship between the prices
20 we reported and AWP that was published by the
21 agencies, nor the importance or significance of
22 AWP to anyone.

Page 165

1        So I think in general there wasn't
2  an appreciation within Abbott for that.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   Well, what did Abbott understand the
5  relationship to be, Abbott, at any portion of
6  Abbott?
7        MS. TABACCHI:  Object to the form.
8        Could you please read back the
9  question.
10       (WHEREUPON said record was read
11       back as requested.)
12 BY MS. ST. PETER-GRIFFITH:
13   Q.   When I say the relationship, I mean the
14 relationship between the calculation of AWP and
15 the prices reported by Abbott.
16   A.   Again, I think there were a very few,
17 especially the early part of the 1990s, there were
18 very few people within Abbott Hospital Products
19 Division that even knew an AWP existed.  And even
20 fewer people had any concept of what kind of
21 relationship AWP may or may not have had with the
22 prices we published.

42 (Pages 162 to 165)

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 166

1    Q.   Well, who within Abbott, and I don't
2  want to limit it necessarily to HPD, I'm
3  talking Abbott-wide, who within Abbott had an
4  understanding of the relationship between the
5  prices reported by Abbott to the pricing compendia
6  and the pricing compendia's calculations of AWP?
7         MS. TABACCHI:  I'm going to object to
8  the form.  Also it's beyond the scope of the
9  Notice.
10        To the extent that Mr. Sellers is
11  aware of communications among divisions on this
12  topic, that would be one thing.  But he's not here
13  to testify with respect to any other division
14  other than the Hospital Products Division.
15        I understand you're seeking
16  corporate testimony, but he can't testify on
17  behalf of the Pharmaceutical Products Division for
18  example.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.   Well, if any division, let me ask you
21  this, sir: If any division in Abbott had an
22  understanding of what AWP was, would that

Page 167

1  understanding be different in another division?
2         MS. TABACCHI:  Object to the form.  I
3  don't know how he can answer that.
4         THE WITNESS:  I can't answer it if I
5  don't have any knowledge of what others might have
6  known.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Well, my question to you is what did
9  Abbott as a corporation know about the correlation
10  between prices reported to the pricing compendia
11  and the pricing compendia's calculations of AWP?
12        MS. TABACCHI:  Object to the form,
13  beyond the scope of the Notice.
14        THE WITNESS:  Again, I can only speak to
15  the segment of Abbott which is the Hospital
16  Products Division that I was part of and that as I
17  understood was part of this proceedings.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.   Well, you understand that Abbott
20  Corporation is a defendant; don't you, sir?
21    A.   I do.
22    Q.   And it's not Abbott Corporation as

Page 168

1  segmented into the Hospital Products Division,
2  it's Abbott Corporation.
3    A.   Yes.
4         MS. ST. PETER-GRIFFITH:  If you read
5  that prior question back, please.
6         (WHEREUPON said record was read
7           back as requested.)
8         MS. TABACCHI:  Object to the form.
9         Mr. Sellers can provide testimony
10  on behalf of what the Hospital Products Division
11  knew.
12        MS. ST. PETER-GRIFFITH:  He's here as
13  Abbott's corporate rep.
14        MS. TABACCHI:  He is testifying on
15  behalf of the corporation.  But it's overly broad
16  to have expected him to go research fifteen years
17  of history in other divisions that are not related
18  to the issues in this case or the drugs that were
19  named in the Complaint.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   Sir, can you answer the question?
22    A.   No.

Page 169

1    Q.   How come?
2    A.   I can talk about the Hospital Products
3  Division.  I can't venture to speculate on what
4  other parts of Abbott knew or didn't know.
5    Q.   Well, if other parts of Abbott knew that
6  there was a correlation between the calculation of
7  AWP and the reporting of prices to the price
8  reporting compendia by Abbott, don't you think
9  that's something that should have been known
10  throughout the corporation?
11        MS. TABACCHI:  Object to the form,
12  beyond the scope.
13        THE WITNESS:  No.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.   Why not?
16        MS. TABACCHI:  Same objections.
17        THE WITNESS:  For one thing, within the
18  Hospital Products Division AWP had no significance
19  to anybody.  So it wasn't something that was
20  relevant to what we did day-to-day.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.   Was it relevant to the Home Infusion

43 (Pages 166 to 169)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 170

1  Business unit?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Remotely.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.   How so?
6    A.   Because it didn't necessarily define
7  reimbursement for Home Infusion customers.
8              It was a factor in some cases for
9  some payors for some period of time.  It's a very
10 fragmented component.
11             Even within the Home Infusion
12 Services, I don't think anybody spent a lot of
13 time wondering about whether AWP had any
14 mathematical relationship to other numbers.
15   Q.   For those individuals that did have an
16 understanding of the relationship between the
17 prices reported by Abbott to the pricing compendia
18 and the calculation of AWP by the pricing
19 compendia, what was that understanding?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  As I have been able to
22 piece together from both my working experience as

Page 171

1  well as reviewing depositions and documents, there
2  were maybe a handful of people that understood
3  again beginning in the early 1990s that AWP was
4  some function of our list price.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Who were those individuals?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  Probably Jerrie Cicerale,
9  Harry Adams.  I mean it was a pretty small list
10 that I would think might have known that.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.   So it's Abbott's position that it's only
13 aware that Harry Adams and Jerrie Cicerale may
14 have known of the correlation between the list
15 prices reported by Abbott to the pricing compendia
16 and the pricing compendia's calculations of AWP?
17       MS. TABACCHI:  Object to the form,
18 beyond the scope of the Notice.
19       THE WITNESS:  You asked me for some
20 specific people.  I can't, I don't have a roster
21 of people to go through.
22 BY MS. ST. PETER-GRIFFITH:

Page 172

1    Q.   Well, is Abbott aware of anyone else who
2  had this information?
3        MS. TABACCHI:  Object to the form,
4  beyond the scope.
5        THE WITNESS:  Again, I've not talked to
6  either one of those people.  I can't give you a
7  list of people that might have known something.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   Well, sir, what did you do to prepare
10 for today's deposition to educate yourself
11 concerning the company's understanding of the
12 relationship between AWP and the prices reported
13 by Abbott to the pricing compendia?
14       MS. TABACCHI:  What topic are you on,
15 Ann?
16       MS. ST. PETER-GRIFFITH:  I'm on a
17 variety of topics.  I'm on 12, I'm on 11, I'm on
18 9, I'm on 8.
19       MS. TABACCHI:  Object as beyond the
20 scope, object to the form.
21       THE WITNESS:  Again, I've done a number
22 of depositions, this subject has come up before

Page 173

1  I've looked at documents in the past.  I've also
2  looked at, as I said, I've looked at depositions.
3  And I can tell you that I have not seen a
4  prevalence of knowledge with regard to this
5  subject.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.   Well, what was Abbott's understanding of
8  the correlation between AWP and Medicare or
9  Medicaid reimbursement?
10       MS. TABACCHI:  Object to the form,
11 beyond the scope.
12       THE WITNESS:  I think Virginia Tobiason
13 and Lynn Leone have both testified that across
14 that time period AWP was one component of the
15 reimbursement for Home Infusion, and it was a
16 factor.  It wasn't absolute.
17             Across that time period the
18 functions of what was getting reimbursed may have
19 gone from AWP plus to AWP minus in terms of
20 percentage.  And it varied by state and it may
21 have even varied by Medicare payor or carrier.  I
22 don't know.  But it definitely varied by

44 (Pages 170 to 173)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 202

1      THE WITNESS:  Would permit on an
2  exception basis the AWP information.  And it was
3  my, I would have expected that to be a fairly rare
4  exception.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.   A fairly rare occurrence?
7      A.   Yes.
8      Q.   How would the exception be approved, or
9  would it need to be approved?
10      MS. TABACCHI:  Same objections.
11      THE WITNESS:  As I would understand, it
12  would need to be approved by the manager of
13  Alternate Site Product Sales -- Customer Service
14  -- Contract Marketing, I'll get it right.
15  Alternate Site Contract Marketing.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   So it's Abbott's testimony that in order
18  for -- well, first, it's Abbott's testimony that
19  it was never permissible or a practice within
20  Abbott for Abbott's Alt. Site staff to provide
21  spread information to Abbott customers?
22      A.   Correct.

Page 203

1      Q.   It's also Abbott's testimony that if a
2  customer demanded it, AWP information could be
3  provided to the customer?
4      A.   For our products.
5      MS. TABACCHI:  Object to the form.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   For Abbott's products.
8          But that provision would only be
9  the provision of AWP information and not
10  information concerning the spread?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  Correct.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   And if AWP information was provided by
15  an Alt. Site staff member, it would need to have
16  been approved by the manager of Contract
17  Marketing?
18      A.   I would have expected that, yes.
19      Q.   How many times did Abbott's manager of
20  Contract Marketing approve the provision of AWP
21  information to Abbott's Alt. Site customers for
22  the time period from '91 to 2001?

Page 204

1      MS. TABACCHI:  Object to the form,
2  beyond the scope.
3      THE WITNESS:  I don't know.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.   From Abbott's viewpoint, what's wrong
6  with providing AWP information --
7      MS. TABACCHI:  Object to the form.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   -- to the customer?
10      MS. TABACCHI:  Beyond the scope.
11      THE WITNESS:  From Abbott's point of
12  view, it's not a price that Abbott creates.  So we
13  are free and clear to present any price that
14  Abbott controlled.
15          So Abbott controlled list price,
16  Abbott controlled WAC, and Abbott controlled the
17  contract price.  So those were the three prices
18  that could be communicated.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.   Any other reason why it's problematic to
21  provide AWP information to Abbott Alt. Site
22  customers?

Page 205

1      MS. TABACCHI:  Object to the form,
2  beyond the scope of the Notice.
3      THE WITNESS:  That was it.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.   What's the problem with providing spread
6  information to Abbott's Alt. Site customers?
7      MS. TABACCHI:  Same objections.
8      THE WITNESS:  Again, it's not a number
9  that we control, it's not a number that we operate
10  on.  So it probably would not be appropriate for
11  us to put that number under a document with our
12  name on top of it.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   Any other reason?
15      MS. TABACCHI:  Same objections.
16      THE WITNESS:  No.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.   Sir, was it important to Abbott that its
19  Alt. Site personnel didn't market the spread?
20      MS. TABACCHI:  Object to the form,
21  beyond the scope of the Notice.
22      THE WITNESS:  It wasn't something that

52 (Pages 202 to 205)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                      March 16, 2008

Page 206

1   was important to us in terms of that.
2          We marketed our products based on
3   the breadth of the portfolio we had, on the
4   different delivery systems we had.  We were, or
5   are, in the generic drug market, so we weren't
6   trying to create a market for a new chemical
7   entity, we weren't trying to create a new
8   treatment for any malady that patients might have.
9          What we were trying to do was say
10  that we had a product that was equivalent to the
11  innovator's product that could be used
12  interchangeably with the innovator's product, and
13  it was economical to buy and it was efficient to
14  use based on the delivery system, and that we were
15  a quality manufacturer and a dependable
16  manufacturer.  Where as other companies ran in and
17  out of supply difficulties, our record was that we
18  consistently delivered to our customers.  That's
19  how we marketed our products.
20         Spread was not, again it wasn't a
21  number that we generated nor did we control.  So
22  no, it was not part of our marketing approach.

Page 207

1   BY MS. ST. PETER-GRIFFITH:
2      Q.   Well, to the extent that Abbott's AWPs
3   or the AWPs on Abbott's products had a direct
4   correlation to the list prices reported to the
5   pricing compendia, how can Abbott say that it
6   didn't control or have any influence over spreads?
7          MS. TABACCHI:  Object to the form,
8   beyond the scope of the Notice.
9          THE WITNESS:  We had no control over
10  whether it was a factor of list or whether it was
11  a factor of WAC, what factor it was, how those
12  factors might or might not have changed.
13         And the other was we had no
14  knowledge about how the product was going to be
15  used and what kind of patient might receive that
16  product.
17         What we were trying to do was
18  market a generic drug as competitively priced,
19  quality, delivery, dependability.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.   Did Abbott have an understanding of its
22  Alt. Site customers' interest in AWP spread?

Page 208

1          MS. TABACCHI:  Object to the form,
2   beyond the scope.
3          THE WITNESS:  I've seen a number of
4   documents during this process where our customer
5   may have told us things about what was of interest
6   to them.
7          So we're aware of what they were
8   looking for.  Their bid documents stated it quite
9   often as to what they were interested in.  They
10  were interested in low prices.  They were
11  interested in a full breadth of product, they were
12  interested in ability to get that product, did we
13  have delivery points that were close to all the
14  customers.  That was particularly important to
15  Alt. Site customers because they didn't have some
16  of the options that hospitals had at getting these
17  kind of products.
18         So those were the things that were
19  of interest to them, and those are the kind of
20  things that we tried to understand from our
21  customers as we prepared proposals for them.
22  BY MS. ST. PETER-GRIFFITH:

Page 209

1      Q.   So Abbott did have an understanding that
2   AWP spread on its products was important to its
3   Alt. Site customers?
4          MS. TABACCHI:  Object to the form,
5   beyond the scope.
6          THE WITNESS:  I think what I said was
7   that I've seen some documents where our Alt. Site
8   GPOs may have represented that AWP was an
9   important factor, a factor, in their decisions.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   Is that a "Yes"?
12         MS. TABACCHI:  Object to the form, asked
13  and answered.
14         THE WITNESS:  Not all of our customers
15  looked at it, no.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   How do you know that not all of your
18  customers looked at it?
19         MS. TABACCHI:  Same objections.
20         THE WITNESS:  Well, at least they didn't
21  represent it, and it wasn't a major topic of
22  conversation when we talked to our customers.

53 (Pages 206 to 209)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                          March 16, 2008

Page 214

1        That was controlled by the Hospital
2   Business Sector product management.  Their
3   customer base was the hospital.  If you asked
4   them, their concept was that that customer was
5   reimbursed by DRGs and what they were interested
6   in was a lower contract price.
7        The marketplace for generic drugs
8   is a very competitive one and much like any other
9   type of generic product where multiple companies
10  are offering the same service or the same product
11  to the marketplace, a lot of how that competition
12  evolves, it evolves into price.
13       And it was especially exacerbated
14  in this market because we were constantly
15  introducing new generic drugs.  And new generic
16  drugs come from an innovator price, which is up
17  here, and go down to a generic market price where
18  it finally stabilizes.  But it usually takes
19  eighteen to twenty-four months for that to happen.
20  So over that eighteen to twenty-four months you
21  see price decline.
22       So those are the kind of things

Page 215

1   that when you look at from 1991 through to 1999
2   contributed to this what we called an inadvertent
3   disparity because people weren't looking and
4   managing that differential.  What they were
5   managing was the top end and they were managing a
6   range at the bottom end.  So it creates that
7   disparity over time.
8        Again, it was not pervasive across
9   the entire product line.  It was across some of
10  the products, a good number of products I admit,
11  but some of the products.  Other products we
12  thought continued to have market relevant list
13  price.  In other words, a list price that was
14  within a reasonable range of what the prevailing
15  market prices were in contracts.
16       So that's what caused the
17  disparity.  And it was from 1991 through 1999.
18  That's when the catalog price increases were done
19  on an annual basis.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   Well, for Abbott's HPD products,
22  including the subject drugs which are identified

Page 216

1   in the Amended Complaint, what would be the
2   business purpose of having a list price that was
3   one hundred, two hundred, three hundred, a
4   thousand percent higher than what the contract
5   price was?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  Well, I think as we looked
8   at it in 2001, we said there doesn't appear to be
9   a purpose other than to capture elevated prices on
10  noncontract sales.  So in 2001 that's when we
11  decided that we should bring those prices more in
12  line.
13       But I don't believe that the people
14  that were operating on the prices in that '91
15  through 1999 timeframe were focusing on that.
16  They were focusing on one number here and they
17  were focusing on other numbers down here.  They
18  weren't trying to reconcile the two.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.   Well, did the individuals setting prices
21  in HBS have any understanding of the relationship
22  between list price and the AWP-based reimbursement

Page 217

1   of Medicare and Medicaid for the Alt. Site
2   customers?
3     A.   No.
4     Q.   How do you know that?
5     A.   I know it from having dealt with them, I
6   know it from Gerry Eikorn's testimony, Mark
7   Sebree's testimony, both of them being
8   representatives of the Hospital Business Sector.
9     Q.   Sir, previously you testified that you
10  had seen some documents that made you understand
11  or appreciate that some of Abbott's Alt. Site
12  customers requested as part of their bid process
13  or considered as part of their bid process AWP
14  information.
15       I'd like to show you some exhibits
16  now.
17       MS. ST. PETER-GRIFFITH:  Can we mark
18  this as the next exhibit.
19       (WHEREUPON Exhibit Sellers 008 was
20        marked as of 3/16/2008.)
21  BY MS. ST. PETER-GRIFFITH:
22    Q.   As you're flipping through the document,

55 (Pages 214 to 217)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 254

1  Medicare and Medicaid reimbursement?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Abbott Home Infusion's
4  customers' reimbursement would go down on
5  products, and therefore, our share would go down.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  So Abbott shared in the higher
8  reimbursements that were caused by Abbott's higher
9  list prices which in turn created higher AWPs?
10       MS. TABACCHI:  Object to the form,
11  beyond the scope.
12       THE WITNESS:  Abbott had a share in the
13  agreements that we had that we would get a share
14  of the collections for those contracts.  That
15  involved risk sharing on both our sides, both the
16  client as well as Abbott.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   What do you mean by "risk sharing"?
19    A.   Well, when you go into a business
20  there's always risk.  When you go into a business,
21  you risk whether you're going to get, especially
22  in a Home Infusion business, whether you're going

Page 255

1  to get the patient load that you need to keep
2  going.  There's risk as to what mix of patients
3  you get, both in terms of therapy and in terms of
4  the payors that are involved.
5        So each of us documented within our
6  agreements with our clients contributed to each of
7  those businesses and got some share of the revenue
8  from both of those businesses.
9     Q.   How did Abbott contribute?
10    A.   Abbott contributed through services,
11  getting the customer started, setting up
12  procedures and practices.
13           We helped the ones that wanted to
14  open their own pharmacy by designing their
15  pharmacy and using our engineers to help them
16  complete the projects.  We trained them in running
17  that pharmacy.  We shared with them the
18  experiences that we had in our own pharmacies.  We
19  also shared with them marketing training for their
20  salespeople.
21           We also had reimbursement services
22  that we offered them.  We had the CHIP system that

Page 256

1  we offered them.  And we had our products that
2  were available to them.
3     Q.   Other than the collection of
4  reimbursement that Abbott shared in for its Home
5  Infusion business all these services that you
6  described and the products that Abbott provided,
7  those were provided free of charge?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  No.
10  BY MS. ST. PETER-GRIFFITH:
11    Q.   Were there individual prices that were
12  charged to the Home Infusion clients for the
13  products that were consigned to them?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  No.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   Were there individual charges for the
18  services that Abbott provided incident to the
19  contractual agreement?
20    A.   No.
21    Q.   Abbott simply shared in the collection
22  of revenues that the Home Infusion partners were

Page 257

1  reimbursed from third-party payors?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Well, I'm not sure I would
4  agree with "simply."
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   Okay.
7     A.   There was a detailed contract between
8  both parties that detailed what each party was
9  going to do to guarantee the success of the
10  business.  And for that there was an agreement by
11  both parties that there would be a revenue split
12  by therapy so that each party was compensated
13  appropriately.
14    Q.   Well, what would Abbott charge as the
15  arm's length transactional price for the products
16  consigned to its revenue share partners?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  We didn't have a price
19  between us.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   Sir, what would Abbott charge as the
22  arm's length fair market value of the services it

65 (Pages 254 to 257)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 258

1  provide incident to the revenue share agreements?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  We didn't value those
4  services separately.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   How did you come up with the figures of
7  $0.6 million and $1.8 million?
8    A.   I don't recall.  But it was a similar,
9  if the assumption is correct, extending the logic
10  of that assumption, this is the impact we would
11  see.
12    Q.   Well, under Annualized it has
13  $1.8 million.  What did you mean by "Annualized"?
14    A.   For a full year.
15    Q.   So just it was 2001 only that at that
16  point in time in 2001 that you were estimating
17  that?
18       MS. TABACCHI:  Object to form.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.   I'm sorry.  Under 2001, you're just
21  talking about that that's the risk for the
22  remainder of 2001?

Page 259

1    A.   That was our estimate of a potential
2  risk for the remainder of the year, yes.
3    Q.   When was the decision made to close the
4  Home Infusion business unit?
5    A.   You've switched gears on me.
6    Q.   It has a relationship.
7       MS. TABACCHI:  Asked and answered.
8       THE WITNESS:  1997 I believe.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   And when was the decision made to
11  finally close the doors?
12       MS. TABACCHI:  Object to the form.
13
14  BY MS. ST. PETER-GRIFFITH:
15    Q.   Meaning what years would the doors be
16  closed on Home Infusion?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  I think it was either, I
19  think it was the end of 2001 or the, it was end of
20  2001 or end of 2002, something in that range.
21       I think we had a five-year
22  agreement in place or more when we made the

Page 260

1  decision to close.  So we planned it to tail out
2  at some point.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   Was the closure expedited because of the
5  projected potential impact of the reductions of
6  list prices contemplated in 2001?
7       MS. TABACCHI:  Object to the form.
8       THE WITNESS:  No.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   How much money did Home Infusion make on
11  an annual basis?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  It depends on the year.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.   Well, in 2000 how much did they make?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  I don't have those numbers
18  in front of me.
19       MS. TABACCHI:  Beyond the scope of the
20  Notice.
21       THE WITNESS:  Maybe $25 million.
22       (WHEREUPON Exhibit Sellers 015

Page 261

1       was marked as of 3/16/2008.)
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   Sir, do you recognize this document?
4  (Document tendered to the witness.)
5    A.   Yes.
6    Q.   Who drafted it?
7    A.   I believe I did.
8    Q.   Why was this document drafted?
9       MS. TABACCHI:  I'll caution the witness
10  not to reveal communications with counsel.
11       THE WITNESS:  It was documented to, it
12  was intended to document how we intended on
13  managing list price adjustments going forward from
14  2001.
15  BY MS. ST. PETER-GRIFFITH:
16    Q.   So was this sort of a plan of action for
17  what would occur once the 2001 price changes were
18  made?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  Yes.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.   Sir, can you explain under definition of

66 (Pages 258 to 261)

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 262

1  "list price" what that definition is?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  It says "the highest price
4  published for a product in the catalog and/or
5  submitted to the industry clearinghouses for
6  general distribution."
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Was that Abbott's understanding in 2001
9  of the definition or how it defined "list price"?
10    A.   Yes.
11    Q.   How long had it used that definition of
12  "list price"?
13    A.   I think that's always been our
14  definition of "list price."
15    Q.   What about WAC, where it says WAC
16  Wholesaler, or I'm sorry, Wholesale Acquisition
17  Cost, in 2001 was that Abbott's definition of
18  "WAC"?
19    A.   I was just reading this again.  Could
20  you repeat your question?
21    Q.   Sure.
22        MS. ST. PETER-GRIFFITH:  Could you read

Page 263

1  it back.
2        (WHEREUPON said record was read
3         back as requested.)
4        THE WITNESS:  Yes.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   How long had Abbott maintained that
7  definition of "WAC"?
8     A.   Since the price change.
9     Q.   Since 2001?
10    A.   Yes.
11    Q.   What was Abbott's definition of "WAC"
12  prior to the price change?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  Prior to that, WAC was the
15  noncontract price charged to wholesalers and
16  distributors.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   How long had Abbott maintained that
19  definition of "WAC"?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  Since the beginning of the
22  term of this.

Page 264

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   Pre '91?
3     A.   1991.
4     Q.   Okay.  So from 1991 to 2001, what you
5  just described was how Abbott defined "WAC"?
6     A.   Yes.
7     Q.   Charge-back.  In 2001 was that Abbott's
8  definition of "charge-back"?
9     A.   Yes.
10    Q.   How long had Abbott maintained this
11  particular definition of "charge-back"?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  That's always been our
14  definition of "charge-back."
15  BY MS. ST. PETER-GRIFFITH:
16    Q.   And ASP, or average selling price, do
17  you see that?
18    A.   Yes.
19    Q.   Was that Abbott's definition of "ASP" in
20  2001?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  It's one definition.  It's

Page 265

1  not, I would not say that that was the predominant
2  definition of "ASP."
3  BY MS. ST. PETER-GRIFFITH:
4     Q.   What was the predominant definition of
5  "ASP"?
6     A.   The predominant definition of "ASP," if
7  you were to look at it from a marketing point of
8  view, would be the sales price net of both
9  charge-backs as well as any rebates or after
10  invoice discounts.
11    Q.   And how long had Abbott maintained that
12  particular definition of "average selling price"?
13    A.   Since 1991.
14    Q.   Why did Abbott have two definitions for
15  "ASP"?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  I think what was defined
18  here is this is how ASP is used within this
19  document.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   Okay.
22    A.   So it's not, it wasn't intended to

67 (Pages 262 to 265)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 270

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   Okay.
3     A.   That's why NDC, NDA, and ANDA.
4     Q.   Did other divisions within Abbott adopt
5  the same policy?
6          MS. TABACCHI:  Object to the form,
7  beyond the scope.
8          THE WITNESS:  I don't know.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Then the next sentence reads "Efforts
11 will be made to apply this policy to products
12 under co-promotion or co-marketing agreements with
13 other manufacturers based upon mutual agreement of
14 both parties."
15         What does that mean?
16    A.   At the time we had a number of products
17 that were manufactured by other companies that we
18 sold.  Some were manufactured with our label on
19 it, some were manufactured with the other
20 company's label on it.  And some of those, those
21 agreements had varying terms in them.  Some we
22 could determine the price of the product, some the

Page 271

1  manufacturer of the product determined the prices
2  for the products.
3          So basically what we were trying to
4  catch in that sentence is in the first sentence
5  we've controlled everything Abbott makes, all
6  00074s, we've got that under control.  Anything we
7  don't make we will talk to the other companies and
8  try to get them in line with that same
9  arrangement.  But we couldn't say we would
10 definitively do it because we weren't privy to all
11 of the contracts that we might have with those
12 companies.
13         So it was intended to be this is
14 what we ought to try to do, we ought to try to get
15 them in line with what we were doing.
16         MS. ST. PETER-GRIFFITH:  Okay.  We've
17 got five minutes left on the tape.  Can we take a
18 brief break?
19         THE WITNESS:  Sure.
20         THE VIDEOGRAPHER:  We are off the record
21 at 4:16 p.m. with the end of Tape No. 5.
22         (WHEREUPON a recess was taken.)

Page 272

1          THE VIDEOGRAPHER:  We are back on the
2  record at 4:29 p.m. with the beginning of Tape
3  No. 6.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Mr. Sellers, we were looking at Exhibit
6  15, and I'd like to direct your attention to the
7  paragraph that begins with the bolded word
8  "Process," and it extends over to the next page.
9  Do you see that?
10    A.   Yes.
11    Q.   Was this as of 2001 the process that was
12 implemented by Abbott for calculating its HPD list
13 prices?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  This delineates the
16 intended steps that Contract Marketing would go
17 through in defining future changes to list price
18 and WAC.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.   So if in the future WAC or list price
21 needed to be changed, this is how the HPD Contract
22 Marketing personnel would go about doing it?

Page 273

1     A.   The intention, though it's not stated
2  here I don't believe, but the intention is that a
3  review of our list prices would remain an annual
4  process.  And as you went through that review,
5  whenever you did it you would go through these
6  steps to assure that the prices remained within a
7  relative proximity of the prevailing market
8  prices.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Prior to 2001 and the implementation of
11 this policy for list price adjustments, did Abbott
12 have such, Abbott's HBS or Contract Marketing,
13 have such a process in place?
14    A.   No.
15    Q.   So this was the first time this process
16 was implemented?
17    A.   Yes.
18    Q.   What process was in place for reviewing
19 list prices from 1991 until the implementation of
20 this policy?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  There wasn't a documented

69 (Pages 270 to 273)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 274

1  process.
2          The practice, as I've said before,
3  was one of looking at inflationary indices and
4  then applying those to the list prices, reviewing
5  those with the marketing folks to make sure that
6  there wasn't something that we had overlooked by
7  just doing a mathematical extension, or something
8  that was happening in the marketplace where the
9  marketing guys didn't want to take an increase for
10 instance.
11         So, you know, that was the prior
12 policy.  Again, we were focusing on one price.  We
13 weren't focusing on everything else.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  So as part of that prior process, there
16 was no consideration of the impact on list price
17 to Alt. Site Product Sales customers?
18     A.  Correct.
19     Q.  You said "we" in your explanation.  Do
20 you mean HBS Contract Marketing?
21     A.  Yes.
22     Q.  Would the process for annual list price

Page 275

1  evaluation initiate within HBS Contract Marketing?
2     A.  Yes.
3     Q.  And then typically there would be, as
4  you indicated, a three to five percent increase?
5         MS. TABACCHI:  Object to the form.
6         THE WITNESS:  Depending on the year.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Depending upon the year.
9     A.  It was purely inflationary, yeah.
10    Q.  But before that went forward, someone
11 within HBS tasked with the responsibility would go
12 to the product line manager and get their okay
13 that that was the appropriate increase?
14    A.  Correct.
15    Q.  Okay.
16    A.  More or less get their consensus that,
17 you know, they were in agreement with us.
18    Q.  Under what circumstances would a product
19 not receive a three to five percent list price
20 increase?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  Though this didn't, I

Page 276

1  don't remember this happening on a large number of
2  products, there were some products periodically
3  that the product manager for instance didn't want
4  to take an increase on.
5          There were other times where the
6  product manager wanted more of an increase than
7  the inflationary increase.  It all depended on how
8  they viewed the market and how they viewed the
9  reaction the market would have to price changes.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  How is it that the policy or the
12 practice in place prior to this policy change
13 that's reflected in this document, how is it that
14 on some products it resulted in differences
15 between the list price and the contract price of
16 multiples of a hundred, two hundred, three hundred
17 percent for some products but for other products
18 it didn't?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  In some cases, and I don't
21 think there was a general rule.  I mean it was, as
22 I remember, it was all over the map.  It wasn't

Page 277

1  necessarily one product line necessarily.  It was
2  some products within a product line, and some
3  varied.
4          Again, it depended on how dynamic
5  the contract market was, the contract price market
6  had been over that ten year period.
7          We didn't go back before 1991, so I
8  don't know, you know, I don't know how much of
9  that was legacy prior to 1991.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  When you say "that," you mean the
12 larger --
13    A.  The disparity.
14    Q.  -- the larger disparities?
15    A.  Yeah.
16    Q.  Okay.
17    A.  So I think it was primarily driven by
18 just how competitive the market for that
19 product been that might have driven the prevailing
20 market prices down.
21    Q.  Okay.  The next item on the second page
22 says "Administrator," and then it indicates "The

70 (Pages 274 to 277)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 286

1     THE WITNESS:  I think what I was saying
2  here is unadjusted down.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.   Okay.  So that doesn't mean that there
5  weren't inflationary increases that were taken, as
6  you've already testified to?
7     A.   No.  I think we cover that in a later
8  sentence.
9     Q.   Okay.  Which sentence?
10    A.   The sentence that says "increases that
11 generally approximated," that it exacerbated the
12 differential.
13    Q.   Just the sentence before that says "due
14 to other considerations related to contractual and
15 government regulatory demands, HPD prior to 2000
16 published annual increases once a year on the
17 catalog prices."  Do you see that?
18    A.   Uh-huh.
19    Q.   What government regulatory demands
20 caused the publication of annual increases of the
21 catalog prices?
22        MS. TABACCHI:  Object to the form,

Page 287

1  beyond the scope.
2        THE WITNESS:  The only thing I can think
3  of is, again, the requirement in the Federal
4  Supply Schedule, that to take an increase you have
5  to take an increase in your published price.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.   What were the contractual considerations
8  that led to the published annual increases once a
9  year on catalog prices?
10    A.   Basically a number of our contracts
11 allowed us to take inflationary increases.  It
12 would have been very difficult to justify taking
13 an inflationary increase if I hadn't taken it on
14 my list price.  So that connection is what I was
15 alluding to.
16    Q.   The next sentence reads "increases that
17 generally approximated the change in Consumer
18 Price Index change for the urban market basket
19 exacerbating any differentials to real prices in
20 the marketplace."
21        What are real prices in the market?
22        MS. TABACCHI:  Object to the form.

Page 288

1        THE WITNESS:  Again, I think I was
2  reflecting back on the actual national market
3  selling price ranges that I used up in the first
4  paragraph.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   The next sentence reads "though a
7  majority of eventual sales dollars are processed
8  at steep discounts to the catalog pricing under
9  contractual commitments, there continues to be a
10 small portion of sales, less than one percent,
11 which are processed at these elevated levels."  Do
12 you see that?
13    A.   Yes.
14    Q.   Does that refresh your recollection as
15 to what the annual sales volume was for
16 noncontractual sales at list price?
17        MS. TABACCHI:  Objection, beyond the
18 scope.
19        THE WITNESS:  Yes.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.   What's now your recollection?
22    A.   It says less than one percent, so I have

Page 289

1  no reason to doubt that that was true.
2     Q.   Was that true from 1991 through to 2001?
3        MS. TABACCHI:  Same objection.
4        THE WITNESS:  I don't believe so.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   Why not?
7        MS. TABACCHI:  Same objection, asked and
8  answered.
9        THE WITNESS:  I don't have a number but
10 I believe that that number was higher back in
11 1991.
12        Plus, I had said before the
13 quantity of noncontract sales actually could
14 fluctuate annually based on what our competitors
15 did or what they couldn't do that would force
16 their customers to buy products from us.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.   The next paragraph concerns the
19 published pricing for wholesalers and
20 distributors, wholesaler acquisition price, WAC.
21        Now, is it "wholesale" acquisition
22 price or "wholesaler" acquisition price?

73 (Pages 286 to 289)

30(b)(6) Abbott (Sellers, Michael)                       March 16, 2008

Page 310

1  be.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   If you could move on -- oh, let me ask
4  you, at any time from 1991 until 2001 did Abbott
5  ever notify any state or federal official about
6  what its actual contract prices were that it was
7  charging its customers?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10         MS. ST. PETER-GRIFFITH:  No, it's not.
11         THE WITNESS:  It was not our
12 understanding that that was a requirement of any
13 entity.
14         We thought the government had a
15 good picture of our nonlist price prices.  They
16 had quarterly publications of our AMP, they had
17 our Federal Supply Schedule prices, we had prices
18 negotiated with the DOD.
19         So we thought if a government
20 agency needed it, it was within the government
21 agency's purview already.
22 BY MS. ST. PETER-GRIFFITH:

Page 311

1      Q.   Were the DOD prices or the Federal
2  Supply Schedule prices that you disclosed to the
3  United States in line with Abbott's Alternate Site
4  catalog prices?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Alternate Site did not
7  have a catalog.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   HPD catalog prices.
10         MS. TABACCHI:  Object to the form,
11 beyond the scope of the Notice.
12         MS. ST. PETER-GRIFFITH:  It is not
13 beyond the scope of the Notice.
14         THE WITNESS:  Federal Supply Schedule
15 prices were contractually negotiated prices that
16 were below our published prices.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   But were they in line with your contract
19 prices that you were charging to your HPD
20 customers, including your Alt. Site customers?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  I think if you were to ask

Page 312

1  the VA contracting officers, they would tell you
2  yes, they were, because we actually had to
3  disclose across, whenever we either changed the
4  price or renegotiated prices or negotiated a new
5  contract, we had to disclose actual sales in that
6  negotiation.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   So you disclosed --
9      A.   Our lowest price.
10     Q.   Your lowest price, which is your lowest
11 HPD price that you charged your contractors --
12     A.   Uh-huh.
13     Q.   -- or your customers?
14     A.   Yes.
15     Q.   What indicated to the United States that
16 your Federal Supply Schedule prices or your DOD
17 prices were in line with your actual contract
18 prices that you were charging customers?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  I just went through that.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.   Okay.  So it's the fact that DOD and the

Page 313

1  VA received your lowest price?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Yes.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.   And what is it about the quarterly --
6      A.   Well, let me go back.
7          They may or may not have been given
8  on a contract our lowest price, but our disclosure
9  to them had to include the lowest prices that we
10 had billed for the products.
11     Q.   Did Abbott at any time ever go to the
12 United States and say hey, you know, our catalog
13 prices are much higher than the prices that we're
14 charging under the Federal Supply Schedule or the
15 DOD prices?
16         MS. TABACCHI:  Object to the form, asked
17 and answered.  He just testified about
18 communications with the government.
19         MS. ST. PETER-GRIFFITH:  Counsel, don't
20 coach the witness.  If you can just let him answer
21 the question, please.
22         MS. TABACCHI:  If you can stop asking

79 (Pages 310 to 313)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 330

1   another time.
2        MS. ST. PETER-GRIFFITH:  We are
3   concluded today subject to this deposition being
4   reconvened before the 31st.
5        THE VIDEOGRAPHER:  We are off the record
6   at 5:32 p.m.
7            (WHEREUPON said deposition was so
8            adjourned.)
9
10
11       _____
12       SIGNATURE OF THE WITNESS
13
14  Subscribed and sworn to and before me
15  this _____ day of _____, 20_____.
16
17
18  _____
19       Notary Public
20
21
22

Page 331

1   STATE OF ILLINOIS )
2   COUNTY OF C O O K )
3        I, Donna M. Kazaitis, RPR, CSR No.
4   084-003145, do hereby certify:
5      That the foregoing deposition of MICHAEL
6   SELLERS was taken before me at the time and place
7   therein set forth, at which time the witness was
8   put under oath by me;
9      That the testimony of the witness and all
10  objections made at the time of the examination
11  were recorded stenographically by me, were
12  thereafter transcribed under my direction and
13  supervision and that the foregoing is a true
14  record of same.
15     I further certify that I am neither counsel
16  for nor related to any party to said action, nor
17  in any way interested in the outcome thereof.
18     IN WITNESS WHEREOF, I have subscribed my name
19  this 18th day of March, 2008.
20
21       _____
22       Donna M. Kazaitis, RPR, CSR 084-003145

84 (Pages 330 to 331)

00c5aa93-b25b-40ff-b422-e7070d802fa9

# EXHIBIT 76

Page 332

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re: PHARMACEUTICAL        )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION

PRICE LITIGATION             )   01-CV-12257-PBS

_____   Volume II


              Continued Videotaped Rule 30(b)(6)

              Deposition of MICHAEL SELLERS, at

              77 West Wacker Drive, Chicago,

              Illinois, commencing at 9:00 a.m.

              On Monday, March 31, 2008, before

              Donna M. Kazaitis, RPR, CSR

              No. 084-003145.

30(b)(6) Abbott (Sellers, Michael) - Vol II                              March 31, 2008

Page 345

1      Q.   Do you know what Mr. Gonzalez's role was
2   in setting prices, either contract prices or
3   catalog list prices?
4           MS. TABACCHI:  Object to the form.
5           THE WITNESS:  Starting in I believe '97,
6   '98, I'm not sure when he took over as the
7   president of Hospital Products Division, he was
8   responsible for the whole division.  He was
9   responsible for approving any catalog price
10  changes, but he wasn't involved in the actual
11  setting of the prices themselves.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   Did you see the need to discuss with
14  Mr. Gonzalez anything else concerning his
15  involvement with the Hospital Products Division?
16          MS. TABACCHI:  Object to the form.
17          THE WITNESS:  No.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   Why not?
20          MS. TABACCHI:  Objection, asked and
21  answered.
22          THE WITNESS:  I had personal knowledge

Page 346

1   of a number of things.  And what I was looking for
2   in the conversation with Mr. Gonzalez was his
3   perspective on a few items, not necessarily the
4   details of the transactions that were going on or
5   whatever.
6   BY MS. ST. PETER-GRIFFITH:
7      Q.   Well, how about just the subject matters
8   that are at issue in today's deposition, did you
9   feel the need to review with him the various
10  topics set forth in your deposition Notice?
11          MS. TABACCHI:  Object to the form.
12          THE WITNESS:  Again, I thought the
13  questions that were asked touched on the subjects
14  that we needed to talk about.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Do you think it would have been
17  important as the president of HPD to get
18  Mr. Gonzalez's perspective on the topics that are
19  at issue in this 30(b)(6) lawsuit?
20          MS. TABACCHI:  Object to the form,
21  beyond the scope of the Notice.
22          THE WITNESS:  Again, I thought we

Page 347

1   covered the topics adequately with him.
2
3   BY MS. ST. PETER-GRIFFITH:
4      Q.   Sir, when we left off at your last
5   deposition, we were still working through Topic 8
6   and pricing.
7      A.   Okay.
8      Q.   I'd like to go back to that.
9           Before I show you some documents,
10  I'd like to ask in terms of setting of pricing,
11  either list pricing or contract pricing, either
12  or, okay, so any pricing that impacted the
13  Alternate Site customers or the nonDRG reimbursed
14  customers.
15     A.   Okay.  For Alternate Site.
16     Q.   For HPD customers who are not DRG
17  reimbursed.  Does that make sense?
18     A.   Okay.
19     Q.   What role, if any, did factors like
20  dispensing fees or copays or other risks that the
21  provider might have impact Abbott's pricing
22  decisions?

Page 348

1           MS. TABACCHI:  Object to the form.
2           THE WITNESS:  I don't believe that any
3   of those affected or were factors in our pricing
4   decisions.
5
6   BY MS. ST. PETER-GRIFFITH:
7      Q.   Why not?
8           MS. TABACCHI:  Object to the form.
9           THE WITNESS:  Again, as I think I said
10  the last time, we marketed our products on the
11  basis of quality, breadth of portfolio, breadth of
12  delivery systems available, dependability of
13  supply, and on competitive prices.
14          So we were more intent on looking
15  at what our competitors were offering, not
16  necessarily what happened with the drugs after
17  they were procured.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   Well, as part of the competitive
20  pricing, would it have been important to
21  understand for those end users, those end
22  providers, would it have been important for Abbott

5 (Pages 345 to 348)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 349

1  to understand what costs they had to consider as
2  through their business?
3        MS. TABACCHI:  Object to the form,
4  beyond the scope.
5        THE WITNESS:  Well, while it's always
6  important to understand your customer and what
7  drives their or what gives them motivation,
8  whatever they did to process our products was the
9  same they were going to do when they processed
10 somebody else's products.  Ours were no different.
11       The only place where there was a
12 difference was where we had a delivery system that
13 would have obviated a certain process that they
14 would have had to do.
15       For instance, if we were selling a
16 pre-filled syringe product, that product could be
17 priced higher than just a vial or ampule product
18 because it eliminated steps that the provider had
19 to go through to draw up the syringe and so on.
20       So from that standpoint, it was
21 important to understand.  But if they bought a
22 vial of a certain drug from us and they bought a

Page 350

1  vial of a certain drug, of that same drug, from
2  one of our competitors, they'd have to go through
3  the same processes to prepare the drug, administer
4  the drug, whatever else needed to go on.
5        So we really didn't take that into
6  consideration because it was really what did we
7  need to remain competitive with other drug
8  suppliers on that drug.
9    Q.   Did dispensing fees for the end
10 providers ever factor into Abbott's pricing
11 decisions?
12   A.   No.
13   Q.   What about inventory carrying costs for
14 the end user providers, did that ever factor into
15 Abbott's pricing decisions?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  No.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.   Other than just the competitive price of
20 the actual product itself, was there any other
21 factor pertaining to the provider that factored
22 into Abbott's pricing decisions?

Page 351

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  The only other factor that
3  plays here is the size of the customer in terms of
4  what does the customer buy from Abbott or what
5  could the customer buy from Abbott.
6        So if, for instance, it was a large
7  GPO that brought to us two thousand members that
8  would then buy our products, they might be
9  eligible for a lower price than an individual
10 coming to us with two or three, four, or five
11 locations that might buy our drugs.
12       So the critical mass of the
13 customer may have played some role in the price
14 considerations at times.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.   Would it have been the contract price
17 considerations or the list price considerations or
18 both?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  Purely contract.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.   How did Abbott's marketing of product

Page 352

1  lines, meaning packaging more than just one
2  individual product, how did that impact pricing
3  for Abbott's individual products, if at all?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  Usually not in the subject
6  drugs that we're talking about here.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Okay.
9    A.   Primarily because the awards that would
10 be made by a GPO for instance often times ended up
11 being line item awards.  They weren't we're going
12 to give you every product that you bid, we're
13 going to give you, you know, instead they'd come
14 back and say no, we're going to give you a hundred
15 twenty out of the three hundred fifty products
16 that you bid we're going to give those to you and
17 we're going to give somebody else the other two
18 hundred some odd.
19       So it never was a practice to try
20 to link them together because we knew that our
21 customers, which were primarily pharmacists, not
22 professional purchasers, they liked to do a pick

30(b)(6) Abbott (Sellers, Michael) - Vol II                          March 31, 2008

Page 369

1    MS. TABACCHI:  I'm going to object to
2  this entire line of questioning as beyond the
3  scope of the Notice.
4    THE WITNESS:  It is a communication to
5  Mr. Kringel.  But whether Mr. Kringel felt that
6  way or not I can't tell by this.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Well, what was Abbott's position in 1991
9  as to whether AWP was a poor indicator of actual
10 drug acquisition cost?
11   MS. TABACCHI:  Object to the form,
12 beyond the scope of the Notice.
13   THE WITNESS:  As we've said before,
14 Abbott never set AWP, does not set AWP.  And so
15 it's something that was out of our control.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Well, Abbott did understand that its
18 list price reporting impacted AWP; didn't it?
19   MS. TABACCHI:  Object to the form,
20 beyond the scope, mischaracterizes the witness'
21 prior testimony.
22   THE WITNESS:  There may have been a few

Page 370

1  people within the division that understood that,
2  but in general they did not, Abbott did not.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   Why if in 1991 Abbott had an
5  understanding that AWP was a poor indicator of
6  actual drug costs, did it continue to report its
7  list prices at the levels that it did for the
8  subject drugs?
9    MS. TABACCHI:  Object to the form,
10 beyond the scope of the Notice.
11   THE WITNESS:  As I've said before, from
12 this time period through, you know, 1999 AWP and
13 reimbursement was not a consideration in terms of
14 what we did with our list prices.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.   Sir, if you could go to the second
17 paragraph, the second sentence from the bottom
18 beginning "The abandonment of AWP," do you see
19 that, "as a good indicator"?
20   A.   Uh-huh.
21   Q.   In 1991 did Abbott believe that AWP was
22 a good indicator of product acquisition cost?

Page 371

1    MS. TABACCHI:  Object to the form,
2  beyond the scope of the Notice, asked and
3  answered.
4    THE WITNESS:  I think in 1991 and
5  forward Abbott did not have necessarily an opinion
6  on what AWP was represented to be.  We didn't set
7  it, we weren't responsible for it.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   Did Abbott have any concerns that
10 changes to the AWP based reimbursement system
11 would impact its business?
12   MS. TABACCHI:  Object to the form,
13 beyond the scope of the Notice.
14   THE WITNESS:  I think the concern here
15 is not necessarily, as stated by Don Robertson, is
16 not necessarily one of AWP as much as it is of
17 looking at a national drug fee schedule and
18 looking ahead and saying a national fee schedule
19 was talked about a number of times in the 1990s,
20 and this may have been just the beginning of it,
21 but a number of times by both HCFA and Congress,
22 especially for generic drugs, had the potential of

Page 372

1  what's represented here is a continual downward
2  spiral of drug prices.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   Why would that impact, why would a
5  national drug fee schedule have a downward spiral
6  for Abbott's drug prices?
7    MS. TABACCHI:  Object to the form,
8  beyond the scope.
9    THE WITNESS:  Again, I can't speak
10 specifically to this because I haven't read what
11 all the rules were in the attachment, but many
12 times in government programs when they went to
13 look at price controls, there was a constant
14 update that would have driven prices lower in the
15 marketplace.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Would changes to Medicare and Medicaid
18 reimbursement and the methodology for Medicare and
19 Medicaid reimbursement have an impact on Abbott's
20 contract prices?
21   MS. TABACCHI:  Object to the form,
22 beyond the scope.

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 389

1        THE WITNESS:  No.
2
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   How come?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  It wasn't an operative
7  number for us.
8           (WHEREUPON Exhibit Sellers 022
9              was marked as of 3/31/2008.)
10 BY MS. ST. PETER-GRIFFITH:
11   Q.   Actually, sir, I think that last page,
12 is this the last page?
13   A.   Uh-huh.
14   Q.   Why don't we take that off because that
15 was inadvertently stapled.
16   A.   Okay.  All right.
17   Q.   Sir, does Abbott recognize this
18 document?
19       MS. TABACCHI:  Objection, beyond the
20 scope of the Notice.
21       THE WITNESS:  I don't recall seeing this
22 document before.

Page 390

1  BY MS. ST. PETER-GRIFFITH:
2    Q.   Why in 1996 in response to the Civil
3  Investigative Demand served by the United States
4  didn't Abbott lower or consider lowering its list
5  prices on the drugs that were referenced in the
6  Civil Investigative Demand?
7        MS. TABACCHI:  Objection, beyond the
8  scope, object to the form.
9        THE WITNESS:  When we originally got the
10 investigative demands, outside of maybe someone in
11 our legal department, I'm not sure we understood
12 what the issues were.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.   Why didn't you go to the United States
15 and ask what the issues were?
16       MS. TABACCHI:  Objection, beyond the
17 scope, object to the form.
18       THE WITNESS:  We depended on our legal
19 counsel, and it was a matter of litigation.  So
20 that would have been their responsibility if they
21 felt it was needed.
22 BY MS. ST. PETER-GRIFFITH:

Page 391

1    Q.   Is it fair to say that as early as 1996
2  Abbott had some indication that there was a
3  correlation between its list prices on the subject
4  drugs and the high spreads that were being paid as
5  part of Medicare and Medicaid reimbursement on the
6  subject drugs?
7        MS. TABACCHI:  Object to the form,
8  beyond the scope of the Notice.
9        THE WITNESS:  Again, I don't think
10 within the operating division that there was that
11 understanding or any understanding with regard to
12 that.
13          (WHEREUPON Exhibit Sellers 023
14             was marked as of 3/31/2008.)
15       MS. ST. PETER-GRIFFITH:  Tina, I'll
16 represent to you that those are a bunch of loose
17 documents that were produced as part of the Bruce
18 Rodman production.
19       MS. TABACCHI:  So they're stapled
20 together, but they don't all go together?
21       MS. ST. PETER-GRIFFITH:  Well, they're
22 stapled together because frankly that's sort of

Page 392

1  how they were produced to us.
2        MS. TABACCHI:  Okay.
3        MS. ST. PETER-GRIFFITH:  But in going
4  through the original box with Mr. Rodman, they
5  were all over the place and they were stamped all
6  over the place.  Believe, me I was equally
7  surprised.
8        MS. TABACCHI:  You're not representing
9  that it's one document?
10       MS. ST. PETER-GRIFFITH:  No, I'm not.
11       MS. TABACCHI:  It's just what Bruce
12 Rodman gave you?
13       MS. ST. PETER-GRIFFITH:  Right.
14       MS. TABACCHI:  Got it.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.   Sir, we're going to get into Home
17 Infusion a little bit more in a minute.  But
18 before I leave the pricing topic, I want to get
19 Abbott's understanding, I want you to testify as
20 to Abbott's understanding of how AWP factored into
21 usual and customary pricing or other pricing
22 utilized by the Home Infusion business unit.

16  (Pages 389 to 392)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 421

1  was done through our pharmacies.
2      Q.   What was the correlation, if any,
3  between the list price for Abbott Home Infusion on
4  the 50, we'll just assume that it was on the 50 --
5      A.   Okay.
6      Q.   -- and the catalog price or list price
7  published by AWP?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10         THE WITNESS:  I'm not sure that there
11  was any functional equivalent.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   Do you know what the relationship was
14  between AWP and Abbott Home Infusion list price
15  that's referenced here in this document?
16         MS. TABACCHI:  Object to the form,
17  beyond the scope of the Notice.
18         THE WITNESS:  Other than what this
19  document says, that's the extent of my knowledge.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.   Was AWP important to calculating the
22  list price for Abbott's Home Infusion -- strike

Page 422

1  that.
2          Was AWP important for calculating
3  the Abbott Home Infusion list price?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  It may have been.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Do you know whether there was a
8  particular formula that was utilized utilizing AWP
9  in calculating the list price?
10     A.   I'm not familiar with that detail.
11     Q.   But it's your testimony that Abbott
12  never consigned Lupron; is that fair?
13     A.   Yes.
14     Q.   If you could flip a few pages, maybe
15  eight or nine pages earlier, to BR02422.
16         Sir, this appears to be the same
17  memo we were just looking at, except there's some
18  handwriting under Product, do you see that, where
19  it says "AWP" --
20     A.   Yes.
21     Q.   -- "x 1.15"?
22     A.   Yes.

Page 423

1      Q.   Does that refresh Abbott's recollection
2  as to what the formula might have been between
3  Abbott's Home Infusion list price calculation and
4  AWP?
5          MS. TABACCHI:  Objection, beyond the
6  scope.
7          THE WITNESS:  I can only say that's what
8  it says on this memo.  I haven't done the
9  calculation.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   I think it would be mean at this stage,
12  sir, to have you do math in your head on the
13  record.
14     A.   Thank you.
15     Q.   Sir, are you familiar, is Abbott
16  familiar, with the 1995 change in the reporting of
17  its pricing for vancomycin?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  Familiar with a 1995 price
20  change done on vancomycin, yes.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.   What can you tell me about that price

Page 424

1  change?
2          MS. TABACCHI:  Object to the form.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Well, let's start with this:  Why was it
5  done?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Well, you'll have to share
8  with me some specifics.  I know that vancomycin
9  was part of a catalog price change in 1995.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   Why was it part of a catalog -- well,
12  let me ask you this:  How many other products had
13  catalog price changes in 1995?
14     A.   I'm not sure, but I think probably a
15  good majority of the --
16     Q.   Well, are you familiar with any --
17     A.   -- drugs that were in our catalog at the
18  time.
19     Q.   So let me ask you this:  When you talk
20  about the 1995 catalog price change, are you
21  talking about a change in Abbott's vancomycin
22  catalog price along with a whole bunch of other

24 (Pages 421 to 424)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 425

1  price changes for Abbott products?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Yes.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Are you aware of any individual price
6  change for vancomycin that occurred in 1995?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  I think there was a change
9  to the vancomycin prices for a short period of
10 time in the spring of 1995.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.   What were the circumstances concerning
13 that spring of '95 brief vanco price change?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  I believe that someone
16 from Home Infusion Services had requested of the
17 Hospital Business Sector a consideration to reduce
18 list price for a few versions of vancomycin.  By
19 "versions" I'm talking about concentrations,
20 delivery forms.
21          There was an agreement to reduce
22 the prices per that request.  That was

Page 426

1  subsequently rescinded.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   Why was it rescinded?
4     A.   I believe in referencing testimony by
5  Gerry Eichhorn, that it was rescinded primarily
6  because we did not have funds reserved to do a
7  price reduction for wholesalers.
8     Q.   What do you mean by that?
9     A.   If we were to reduce an acquisition
10 price for a wholesaler, we had a practice of
11 giving the wholesaler what we called shelf
12 adjustment payment.
13          So any of the product that we
14 reduced the acquisition cost on, whatever stocks
15 they had at the time we reduced the acquisition
16 cost, we would value the differential in the
17 reduction and pay the wholesaler that
18 differential.
19          The reason we did that was
20 otherwise the wholesaler would be penalized by our
21 price reduction because their charge-backs from
22 the point that we adjusted the price onward would

Page 427

1  be versus the lower acquisition cost, when in
2  reality they paid more for the product.
3          So it was an understanding that if
4  we took a reduction, we needed to make sure that
5  they were compensated for that reduction on the
6  stock they had on their shelves.  They should not
7  have been penalized because we decided to take a
8  reduction.
9     Q.   Would that occur any time that Abbott
10 made a decrease in their list prices?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  In the acquisition cost
13 for the wholesaler.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   Did Abbott have a particular policy or
16 procedure regarding ensuring that there were the
17 necessary reserves to cover those situations
18 whenever it reduced a price, a list price for a
19 product?
20       MS. TABACCHI:  Object to the form,
21 beyond the scope.
22       THE WITNESS:  It was something that was

Page 428

1  comprehended on any adjustment that we made.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   What testimony from Gerry Eichhorn were
4  you referencing that you can recall reviewing?
5     A.   I believe Gerry Eichhorn testified that
6  he had agreed to the price reduction, he had
7  communicated the price reduction on the HBS side,
8  he had communicated the price reduction to the
9  individual in Home Infusion.  And subsequent to
10 that communication, Harry Adams came in and talked
11 to him and instructed him that we couldn't reduce
12 the prices because we only did it once a year and
13 that it wasn't in the plans.
14    Q.   Why wasn't it in the plans?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  At that time price
17 reductions were not something that were
18 comprehended in our annual plans.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.   Okay.  You're talking about the August
21 or April update plans?
22       MS. TABACCHI:  Object to the form.

25 (Pages 425 to 428)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

| Page 457 | Page 459 |
|---|---|

Page 457

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Did anyone within Abbott understand
3  that?
4          MS. TABACCHI:  Objection, asked and
5  answered.
6          THE WITNESS:  There may have been a few
7  people within Home Infusion reimbursement that had
8  an understanding of how AWP might or might not
9  have been a factor, either plus or minus or an
10  average AWP, whatever, for a specific payor to a
11  specific provider.  But as far as Abbott and as
12  far as Abbott HPD is concerned, there wasn't
13  necessarily that understanding.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.   Well, someone within Abbott -- well,
16  Home Infusion is within Abbott HPD; is it not?
17          MS. TABACCHI:  Object to the form.
18          THE WITNESS:  Home Infusion was a very
19  small discreet business unit within HPD.  It
20  operated differently than any other business
21  segment.  So the vast majority of the HPD sales
22  were to hospitals.

Page 459

1          THE VIDEOGRAPHER:  We are back on the
2  record at 12:34 p.m. with the start of Tape No. 3.
3          MICHAEL SELLERS,
4  having been previously duly sworn, was examined
5  and testified further as follows:
6              EXAMINATION
7             (Continuing)
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   Mr. Sellers, I'd like to move on to the
10  Home Infusion operations.
11      A.   Okay.
12      Q.   Just in your personal capacity, how long
13  were you involved with Abbott's Home Infusion?
14      A.   I was the general manager from sometime
15  in 1992, I believe probably May or June, I can't
16  remember which, through to February of 2000.  And
17  then subsequent to Don Robertson retiring, I
18  picked up Home Infusion again I think sometime in
19  2001 through to its shutdown.
20      Q.   What were the business models for
21  Abbott's Home Infusion business unit from 1991
22  until its closure?

| Page 458 | Page 460 |
|---|---|

Page 458

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   But Abbott --
3      A.   So the vast majority of Abbott HPD
4  personnel understood hospitals.  Very, very few
5  even were aware that we were selling to anybody
6  other than hospitals.
7          MS. ST. PETER-GRIFFITH:  Why don't we
8  take a break at this point in time.  Why don't we
9  take a brief lunch break.
10          MS. TABACCHI:  Sure.  What time do you
11  want to come back?
12          MS. ST. PETER-GRIFFITH:  If we can come
13  back at 12:30, that would be great.
14          MS. TABACCHI:  Okay.
15          THE VIDEOGRAPHER:  We are off the record
16  at 11:55 with the end of Tape 2.
17          (WHEREUPON a lunch recess was
18          taken, and said deposition
19          continued as follows:)
20
21
22

Page 460

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  Our predominant business
3  model was a contract with hospitals which helped
4  them get into the Home Infusion business.  It was
5  intended to be an evolutionary program where
6  upfront we might have provided more services
7  because of the novelty of the program to the
8  hospital entity, and then over time the hospital
9  would gradually take on more and more of those
10  services, and we would take a lesser and lesser
11  role.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.   Was that the revenue share business
14  model?
15          MS. TABACCHI:  Object to the form.
16          THE WITNESS:  I've heard it referred to
17  as revenue share.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   Under the revenue share business model,
20  what would Abbott provide as part of the
21  contractual relationship?
22      A.   I believe that we offered a pretty broad

33 (Pages 457 to 460)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 481

1  White and Bob Parkinson.
2     Q.   What were the reasons behind the
3  decision to close the business unit?
4     A.   As I said, our revenue had plateaued,
5  the market for new clients was drying up.  We
6  started to use this business model in, as I said,
7  '84 I believe is what I told you before.
8        So by 1997 it had been thirteen
9  years.  In that time period, hospitals that wanted
10 to get into the business had gotten into the
11 business.  So we were seeing fewer and fewer
12 prospects for future businesses.  And those that
13 had gotten into the business wanted a more
14 independent approach.
15       So we saw as we looked at the
16 contracts that we had with our existing clients
17 that they were going to start that evolution, as I
18 said, of ticking away and taking more and more of
19 the responsibility.  So we were forecasting that
20 our sales were going to at best hold and most
21 probably decline and that the profitability of
22 business would decline.  So it didn't make sense

Page 482

1  to continue it.
2     Q.   Why didn't it just close in '97?  Why
3  the phased process?
4     A.   We talked about that, but to shut it
5  down clean, cold, cold turkey shutdown as I would
6  call it in '97, we would have had to have gone to
7  our clients and said hey, all of these services
8  that we're giving you, they're gone tomorrow.
9        In light of the fact that the
10 majority of our clients, in fact all of our
11 clients, were hospitals, hospitals were our
12 biggest customer.  The Hospital Products Division,
13 that's why we were called the Hospital Products
14 Division because ninety percent of what we sold
15 went to hospitals.  We didn't feel that leaving
16 our clients in a lurch by just saying we're
17 closing down, we're shutting down, was the right
18 thing to do.
19       So we made the decision that we
20 would live out the agreements we had.  There were
21 some that would expire across the next five years.
22 So we made that decision that we would work with

Page 483

1  our clients.  If they wanted to transition earlier
2  than the end of their agreement, we would help
3  them do that.  But if they wanted to live out
4  their agreement, we would live out the agreement
5  that we had in place.
6     Q.   From '84 until the closure, was the
7  revenue share model the only business model within
8  Abbott Home Infusion?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  No, but it was the
11 predominant one.
12 BY MS. ST. PETER-GRIFFITH:
13    Q.   What other business models were there?
14    A.   Well, we had an agreement in our New
15 Jersey pharmacy for a while.  We were dealing with
16 the Health Insurance Plan of New York, and we were
17 delivering for them daily doses of chemotherapy
18 for their physician clinics all throughout the New
19 York metropolitan area.  That wasn't a revenue
20 share, it was a purely a fee-for-service type of
21 arrangement operating out of our pharmacy.
22       There were also some handful of

Page 484

1  what I call holdover patients from back when home
2  care was purely a direct provider.
3     Q.   A direct pharmacy?
4     A.   Right.  And by a handful I mean probably
5  less than ten patients across the country that we
6  had not transitioned to our clients for one reason
7  or another.
8        Normally, for instance if we had a
9  patient in Michigan and we signed the agreement
10 with the University of Michigan, normally we would
11 transfer that patient and have the University of
12 Michigan handle them, they were much closer to the
13 patient, and it would make much more sense.  But,
14 like I said, there was some residual of long-term
15 infusion patients that we were still dealing with,
16 a handful, eight to ten at the most.
17    Q.   Other than the limited fee-for-service
18 arrangements that you had and the direct
19 pharmacies of less than ten patients, were there
20 any other business models for Home Infusion?
21    A.   The only other one we had was introduced
22 probably in '97.  And that was with a, again, a

Henderson Legal Services, Inc.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 485

1  very few number of customers, we had a licensing
2  agreement on the CHIP system that didn't include a
3  revenue share, it was a fixed price.
4     Q.   When did Abbott pharmacies -- let me ask
5  you this:  Did the Abbott pharmacies also close
6  down?
7     A.   Yes.
8          MS. TABACCHI:  Object to the form.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   When did they close down?
11    A.   Variety of time.  I believe we closed
12 the New Jersey pharmacy in 1996, and that
13 coincided with our loss of the Health Insurance
14 Plan contract.  It was either '96 or early '97,
15 but it was pre-shutdown decision.
16          LA, our pharmacy in LA, was shut
17 down in '98, '99.  And I believe our Chicago
18 pharmacy was shut down in 2001.
19    Q.   Was there an Atlanta pharmacy?
20    A.   The Atlanta pharmacy was shut down prior
21 to 1992 because it was not in operation when I
22 took over.

Page 486

1     Q.   Did Abbott continue to maintain its
2  pharmacy licenses?
3          MS. TABACCHI:  Objection, beyond the
4  scope.
5          THE WITNESS:  No.
6
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Do you know when Abbott surrendered its
9  pharmacy licenses?
10         MS. TABACCHI:  Same objection.
11         THE WITNESS:  I would assume it to be at
12 or close proximity to the closure.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.   To the closure of Home Infusion?
15    A.   No, to the closure of whatever specific
16 pharmacy.
17    Q.   Is there anything else that you can
18 think of about the Home Infusion business models
19 that we haven't discussed here today?
20         MS. TABACCHI:  Objection to the form and
21 beyond the scope.
22         THE WITNESS:  No.

Page 487

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   We talked earlier at your first day of
3  deposition about communications that Abbott had
4  with state or federal Medicare and Medicaid
5  officials about its pricing.  And you testified
6  that Abbott did not have any communications with
7  state or federal Medicare or Medicaid officials
8  about questions concerning how Medicare or
9  Medicaid reimbursement worked, is that fair, other
10 than the individual questions raised by the
11 reimbursement staff?
12         MS. TABACCHI:  Object to the form,
13 beyond the scope of the Notice.
14         THE WITNESS:  I believe that's the case.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.   Is there any other communication that
17 Abbott is aware of that it had with Medicare or
18 Medicaid officials concerning pricing of the
19 subject drugs or AWP related issues associated
20 with the subject drugs?
21         MS. TABACCHI:  Objection, beyond the
22 scope, object to the form.

Page 488

1          THE WITNESS:  Other than the required
2  communication for the State of Texas, I'm not
3  aware of any communications with regard to price
4  or AWP.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   What information is Abbott aware of that
7  provides the basis for its statement that it never
8  provided false or misleading information to any
9  state or federal Medicare or Medicaid official?
10         MS. TABACCHI:  Object to the form,
11 beyond the scope of the Notice.
12          Can you refer me to what topic do
13 you think it falls within?
14         MS. ST. PETER-GRIFFITH:  Sure.  It falls
15 within Topic 12, Items 1, 2, or 3.
16         MS. TABACCHI:  It's my understanding
17 that those topics were withdrawn.
18         MS. ST. PETER-GRIFFITH:  That they were
19 withdrawn?
20         MS. TABACCHI:  Yes, based on the
21 communications and the correspondence back and
22 forth with you, I believe, on these topics that

40 (Pages 485 to 488)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 601

1  situation to continue?
2          MS. TABACCHI:  Object to the form,
3  beyond the scope.
4          THE WITNESS:  Again, I think it
5  highlights the "inadvertent" that I used before.
6  It highlights the fact that the people that were
7  controlling the list price had no knowledge of
8  what relationship list price had to anything.  So
9  when Lily reduced its price, they wondered what
10 tactic Lily was using, they couldn't figure out
11 one, we were continuing to sell our product, so
12 they just let, it got dropped.
13 BY MR. ANDERSON:
14     Q.   And that's your testimony on behalf of
15 the corporation despite the analysis that was
16 conducted and the actions that were taken in
17 decreasing list prices on vanco in 1995 and then
18 subsequently re-increasing those list prices?
19         MS. TABACCHI:  Object to the form,
20 beyond the scope.
21         THE WITNESS:  Again, they were discreet
22 separate actions, probably handled by different

Page 602

1  people.
2  BY MR. ANDERSON:
3     Q.   Why do you say "probably"?
4          MS. TABACCHI:  Object to the form,
5  beyond the scope.
6          THE WITNESS:  Because we typically moved
7  managers through Contract Marketing pretty
8  regularly.  Contract Marketing was a management
9  training position.
10 BY MR. ANDERSON:
11     Q.   Harry Adams never left; did he?
12         MS. TABACCHI:  Objection, beyond the
13 scope.
14         THE WITNESS:  No.
15 BY MR. ANDERSON:
16     Q.   Jerrie Cicerale never left; did she?
17     A.   No.
18     Q.   They were there for well over a decade;
19 weren't they?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  Yes.
22 BY MR. ANDERSON:

Page 603

1     Q.   They were there from 1991 all the way
2  through 2003?
3     A.   Yes.
4     Q.   So there was some continuity there;
5  wasn't there?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  There was.  They weren't
8  price decision making decisions.
9  BY MR. ANDERSON:
10     Q.   Harry wasn't a price decision maker?
11     A.   No.
12     Q.   Jerrie was the point of contact when all
13 of the catalog and list prices were published;
14 wasn't she?
15     A.   Yes.
16     Q.   Sir, is it your testimony that Abbott's
17 reason for the list prices was to garner some
18 incremental sales albeit less than one percent
19 list price?
20         MS. TABACCHI:  Object to the form, asked
21 and answered.
22         THE WITNESS:  I'm not sure I understand

Page 604

1  your question.
2  BY MR. ANDERSON:
3     Q.   Well, is Abbott's purpose in having list
4  prices to sell at list price?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Our list price was
7  intended for customers who did not have a contract
8  with Abbott who bought directly from Abbott.  So
9  that was the purpose of our list price, yes.
10
11 BY MR. ANDERSON:
12     Q.   And you quantified it as less than one
13 percent of the sales; correct?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  In 2001.  I qualified it
16 as saying that was in a document that I authored
17 in 2001.
18         I also said in past testimony that
19 I believe that percentage changed.  If you look at
20 the period 1991 on, I believe it was higher in
21 around 1991.
22         It also changed year to year based

69 (Pages 601 to 604)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                     March 31, 2008

Page 665

1    AWPs?
2         MS. TABACCHI:  Object to the form,
3    beyond the scope.
4         THE WITNESS:  I don't necessarily think
5    we talked about cared here.  We were just, there
6    were some questions that came in with regard to
7    gee, the AWPs went down, is that what you intended
8    to do.
9    BY MR. ANDERSON:
10   Q.   And what was the response?
11        MS. TABACCHI:  Same objections.
12        THE WITNESS:  I think by virtue of this
13   letter what I was, or this voicemail, I was
14   telling people hey, be aware of it, these are the
15   prices that are going to be effective May 7th.  So
16   don't choke on it, respond that yes, we have
17   planned, we have changed prices and those are the
18   prices that are out there.
19   BY MR. ANDERSON:
20   Q.   And is Exhibit 36 the kind of follow-up
21   question and answer, or what's known as
22   "Frequently Asked Questions" that you created to

Page 666

1    help address customer concerns about decreased
2    reimbursement?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  Yes, I believe.  And this
5    was published May 1st, a week before the catalog
6    went out, and was intended to arm our people with
7    information.
8         It's always good that your
9    salespeople know something before the customers
10   know it.  So that's why we tried to do that.  The
11   catalog, as I said, came out May 7th, the official
12   prices would become effective May 7th.
13        I don't know what date this was
14   done, I can't tell from here, but it was before
15   the May 1st notice.
16        MR. ANDERSON:  I could go a long time.
17        MS. TABACCHI:  You could go forever, I
18   appreciate that, but it is after 5:00.  So do you
19   want to make a speech or --
20        MR. ANDERSON:  No.  If you want to stop
21   the deposition, that's your prerogative.
22        MS. TABACCHI:  We advised you this

Page 667

1    morning that we were going to end at 5:00, we took
2    a short lunch, and it's after 5:00.
3         MR. ANDERSON:  Well, we are reserving
4    all rights.
5         MS. TABACCHI:  Of course you are.
6         MR. ANDERSON:  We're not agreeing that
7    the deposition is concluded.
8         THE VIDEOGRAPHER:  We are off the record
9    at 5:04 p.m. with the conclusion of today's
10   deposition of Mike Sellers.
11        (WHEREUPON said deposition was so
12        adjourned.)
13
14
15   _____
16        SIGNATURE OF THE WITNESS
17   Subscribed and sworn to and before me
18   this _____ day of _____, 20____.
19
20
21   _____
22     Notary Public

Page 668

1    STATE OF ILLINOIS )
2    COUNTY OF C O O K )
3         I, Donna M. Kazaitis, RPR, CSR No.
4    084-003145, do hereby certify:
5         That the foregoing deposition of MICHAEL
6    SELLERS was taken before me at the time and place
7    therein set forth, at which time the witness was
8    put under oath by me;
9         That the testimony of the witness and all
10   objections made at the time of the examination
11   were recorded stenographically by me, were
12   thereafter transcribed under my direction and
13   supervision and that the foregoing is a true
14   record of same.
15        I further certify that I am neither counsel
16   for nor related to any party to said action, nor
17   in any way interested in the outcome thereof.
18        IN WITNESS WHEREOF, I have subscribed my name
19   this 4th day of April, 2008.
20
21   _____
22     Donna M. Kazaitis, RPR, CSR 084-003145

                              85  (Pages 665 to 668)

e038b3c0-d0a3-46fc-babc-a9296c2d1018