# EXHIBIT 77

NO. D-1-GV-04-001286

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| ex rel. | ) |
|   VEN-A-CARE OF THE | ) |
|   FLORIDA KEYS, INC., | ) |
|      Plaintiffs, | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| ABBOTT LABORATORIES INC., | ) |
| ABBOTT LABORATORIES, | ) |
| HOSPIRA, INC., and B. BRAUN | ) |
| MEDICAL INC., | ) |
|     Defendant(s). | ) 201ST JUDICIAL DISTRICT |

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
CRAIG DOTSON SMITH
January 11, 2007

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF CRAIG DOTSON

SMITH, produced as a witness at the instance of the

Plaintiff(s), and duly sworn, was taken in the

above-styled and numbered cause on the 11th of

January, 2007, from 9:10 a.m. to 5:15 p.m., before

CYNTHIA VOHLKEN, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of Jones

Day, 717 Texas, Suite 3300, Houston, Texas, pursuant

to the Texas Rules of Civil Procedure and the

provisions attached previously.

Page 42

1  you from context.  I mean, if I did, it would be,
2  "This is what we talked about.  I'm putting it in
3  writing so there is no misunderstanding because if you
4  do this again, understand what your consequences will
5  be."  That would be the only time I would put
6  something like that in writing down because there is
7  not going to be any discussion if this happens again.
8        MR. BERLIN:  Remember, he's asking you
9  whether you recall something as opposed --
10        THE WITNESS:  Right.  I mean --
11        MR. BERLIN:  And let me just -- let me
12  just interject here.  We probably have a duty to
13  protect this sort of information on an employer/
14  former employee, so we'll mark this portion
15  confidential.  Given how the deposition has proceeded,
16  I would be surprised if we didn't end up marking the
17  transcript --
18        MR. WINTER:  Sure.
19        MR. BERLIN:  -- confidential, highly
20  confidential, but I just wanted to note that at that
21  point.
22        MR. WINTER:  Very good.
23     A.  What I'm trying to do, sir, is be honest with
24  you and make sure we are clear on your question.  The time frame
25  Sometimes the question is so broad and the time frame

Page 43

1  is so thick, I'm doing the best I can to let you
2  understand how and why.
3     Q.  (BY MR. WINTER)  I understand that and I'll
4  do -- try and do a better job of narrowing my
5  question.  Let's start with narrowing the time frame.
6  Mr. Lotz reported to you from approximately 1994, if I
7  recall correctly, until the time that you left to
8  become a national account manager; is that true?
9     A.  That's a fair timeline.
10    Q.  Roughly '94 to sometime in early 1998, I
11  believe?
12    A.  I'm not sure of his hire date, but he was
13  there when I left.
14    Q.  Okay.  And did you hire him into his
15  position?
16    A.  Yes.
17    Q.  Okay.  Did you ever counsel Mr. Lotz because
18  he used an inappropriate sales technique, not because
19  he -- and I want to make sure I'm clear now.  Not
20  because he was rude or made an inappropriate comment
21  or insinuation to a customer, but because he used an
22  inappropriate sales technique?
23        MR. BERLIN:  Objection, form.
24    A.  I don't recall that I did.
25    Q.  (BY MR. WINTER)  Do you recall any occasion

Page 44

1  where you thought that Mr. Lotz used an inappropriate
2  sales technique?  I'm not asking you if you counseled
3  him for it, but I'm asking you if you recall any time
4  where you thought he was doing something he shouldn't
5  be doing in the selling of Abbott's drugs.
6        MR. BERLIN:  Objection, form.
7     A.  I don't recall that.
8     Q.  (BY MR. WINTER)  When you were a district
9  manager, and let's -- let's narrow the time frame
10  here, from, say, 1993 -- January 1st, '93 through the
11  time period that you left being a district manager to
12  become a national account manager, during that window,
13  January 1, '93 to 1998, did you have knowledge of the
14  requirements for a drug company to have its products
15  eligible for reimbursement by Medicaid?
16    A.  Say that again.
17    Q.  Rather than me trying to recite it, I'm going
18  to ask her to read it back.
19        (Requested portion was read)
20    A.  No.
21    Q.  (BY MR. WINTER)  So is it your testimony that
22  at no time -- strike that.  Let me ask this question.
23        Prior to 1993 did you have any knowledge
24  of the requirements for a drug company to have its
25  products eligible for reimbursement by Medicaid?

Page 45

1     A.  '93?  Not to my knowledge.
2     Q.  As you sit here today do you have an
3  understanding as to how a drug manufacturer -- how a
4  drug manufacturer becomes eligible to have its
5  products reimbursed by Medicaid?
6     A.  I'm not real clear on that.
7     Q.  Do you have a vague understanding?
8     A.  Vague is probably a fair comment.
9     Q.  What is your vague understanding of how a
10  drug company has its products eligible for
11  reimbursement?
12        MR. BERLIN:  You're still referring to
13  Medicaid reimbursement?
14        MR. WINTER:  Yes, I am.  I'm sorry.
15  Medicaid reimbursement.
16    A.  There -- there's got to be a policy that
17  states have a formulary of some sort, products are
18  presented to that state by a manufacturer to ask if
19  they want to put those products on their state
20  formulary that would be reimbursed by Medicare,
21  et cetera.  Who does that?  I don't know.
22    Q.  (BY MR. WINTER)  Do you understand that drug
23  manufacturers, such as Abbott and Hospira, voluntarily
24  choose to participate in the Medicaid program or do
25  you believe it to be mandatory?

12 (Pages 42 to 45)

Page 46

1    A.  I don't know.
2    Q.  You don't know one way or the other?
3    A.  (Shakes head negatively).
4    Q.  During the time period that you were a
5  district manager did you have an understanding that
6  Medicaid and Medicare reimbursement was important to
7  your customers or the customers that your subordinates
8  called on?
9    A.  Not from a knowledge basis I didn't really
10  understand that.  I mean, I knew that
11  Medicare/Medicaid was like an insurance company, no
12  different than a private pay insurance company, but
13  no.  I mean, I really didn't understand that.
14    Q.  When you say you didn't understand that --
15    A.  Uh-huh.
16    Q.  -- it sounded to me like you had an emphasis
17  on the word "that."  Can you explain what you meant?
18    MR. BERLIN:  Objection, form.
19    A.  That would be -- "that" would be referring to
20  your question did I understand how the -- you know, is
21  it voluntary, involuntary, or whatever the question
22  was.  No.  I mean, what I'm saying is I'm not sure if
23  it is voluntary, if it's not.  I don't really know.
24  As a DM and even as a national account manager that's
25  not my responsibility.

Page 47

1    Q.  (BY MR. WINTER)  Okay.  Let me ask you this
2  question:  Did you have an awareness at any time when
3  you were a district manager that Medicaid or Medicare
4  reimbursement was important to your customers?
5    A.  Hard question.  Don't really remember that.
6    MR. BERLIN:  Actually, can I have the
7  question read back?  I'm sorry.
8    (Requested portion was read)
9    A.  That's a hard question.  What I will tell you
10  is when you did talk to them, your customers, they
11  were not taking many Medicare patients.  Now, what
12  does that tell you?  Good question.  Don't know.
13  Assuming that they're not a good source of income, I
14  would think.  Speculation, business.
15    Q.  (BY MR. WINTER)  Well, did you ever have an
16  occasion where any of your subordinates, your field
17  sales representatives, raised with you a concern that
18  a customer was not willing to purchase Abbott's
19  products because those products weren't reimbursable
20  by Medicaid?
21    A.  I'm sure.
22    Q.  Do you recall any specific instances where
23  that happened?
24    A.  Well, I know that there's -- there was
25  opportunity that certain products were not on certain

Page 48

1  formularies and the question is why.  So, yeah.  I
2  mean, to answer that question, yeah, that did come up.
3    Q.  Do you recall which sales reps that came up
4  with?
5    A.  Well, I know -- I know that there -- and this
6  goes back to my -- West Virginia, was shown a document
7  that said the products were not on the State of Texas
8  formulary and I wrote a letter asking why not.
9    Q.  You wrote a letter to whom?
10    A.  To Abbott.
11    Q.  To Abbott?
12    A.  Uh-huh.
13    Q.  To who at Abbott?
14    A.  Whoever was in charge of doing that, I guess.
15  I don't know.  I don't really remember who, but the
16  point was we were told products were not reimbursable.
17  Why?  Don't know.  Are they on a formulary, not on
18  formulary.  Then you call and ask.  "How come they're
19  not on formulary?"  Either they are or they aren't.
20  If they're not, then you know what, we're done.  If
21  they are, then why aren't they being paid for, I
22  guess.
23    Q.  When you say, "We were told," is that
24  information that was conveyed to you by your sales
25  representative or is that information that you

Page 49

1  personally obtained from some other source?
2    A.  No.  That's what I was told.
3    Q.  By the sales rep who was elevating the
4  complaint to you?
5    A.  Uh-huh.
6    Q.  Did you ever become aware of the unique
7  requirements for participation in the Texas Medicaid
8  program that drug manufacturers must report their
9  prices to the State of Texas Medicaid program?  Did
10  you ever know about that?
11    A.  No.  That's not -- that's not in my scope.
12    Q.  That was -- that's not in your scope now?
13    A.  Now is 2007?
14    Q.  Yes, sir.
15    A.  Do I understand more about how things work?
16  It's a good question.
17    Q.  Well, let me -- let me narrow my question to
18  the time period that you were a district manager.
19  Were you ever aware at any time while you were a
20  district manager that Texas Medicaid requires
21  manufacturers to report their pricing to the Texas
22  Medicaid program in order for a drug to get on the
23  Texas formulary?
24    A.  No.
25    Q.  Did you become aware of that fact at some

13 (Pages 46 to 49)

Page 50

1  point in time subsequent to you leaving the office of
2  district manager?
3      A.  Not for Texas.
4      Q.  Did you become aware of that fact for some
5  other state?
6      A.  I became aware of that fact for a drug that
7  was not on a formulary in New York and we asked why
8  and at that point I was somewhat informed that, you
9  know, this is the process you have to go through to
10 get a drug on.
11         Now, I don't know all the data that's
12 required to get a drug on, but it's just not automatic
13 that a drug comes on.  And so there was one drug that
14 was not being reimbursed that a lot of people were
15 buying in the state of New York, then they were
16 able -- New York goes, "Oh, we made a mistake.  We
17 need to add that drug."  That oop was added, no more
18 issue.
19     Q.  What is your understanding of what was
20 entailed in that process of adding the drug in New
21 York?
22     A.  Don't really know.  Speculation says they
23 sent data --
24         MR. BERLIN:  Well, he's not asking you
25 for your speculation.  I didn't mean to interrupt.

Page 51

1          MR. WINTER:  Okay
2          MR. BERLIN:  You can ask the question,
3  but --
4      Q.  (BY MR. WINTER)  Mr. Berlin is correct.  I'm
5  not asking you to speculate.  I'm asking you what your
6  understanding was.
7      A.  Well, I don't know.
8      Q.  You just have an understanding that somehow
9  the drug got added?
10     A.  Yes.  The drug gets added.  I mean,
11 there's -- in the corporate world there are gates.
12     Q.  Gates?
13     A.  Gates.  I'm a -- I'm a -- I'm a district
14 manager.  I'm a lieutenant.  I take orders, I
15 implement.  I don't make decisions.  I'm not in the
16 idea of understanding how stuff is done.  It's not in
17 my best interest.  I don't care.  You tell me it's not
18 on, fine.  Guess what, we don't sell it.  Is it on?
19 Good.  We sell it.  Next.
20     Q.  So you understood that if it was going to get
21 on, it would be taken care of by somebody up at
22 headquarters at Abbott Park?
23     A.  Yeah.  I mean, your point, was told this
24 isn't on a list.  Can it be added or can it not be
25 added?  You have customers going -- you have an issue.

Page 52

1  I'm the DM.  The rep brings the issue to me.  I call
2  corporate and go, "Here's the issue.  Who do I need to
3  talk to?  Is it, isn't.  Thank you.  We'll take care
4  of it.  Done.  Next."  Then you hear, A, you know, the
5  products were added.  It was a mistake.  They agreed
6  they needed to put them on the formulary.  Everything
7  is fine.  That's the way it works.
8      Q.  I asked you earlier if you knew at any time
9  when you were a district manager that Medicaid or
10 Medicare reimbursement was important to your customers
11 and I think ultimately after we read the question back
12 a few times your answer was, "No, I was not aware of
13 that"?
14     A.  Pretty much.  I mean, it's hard to say.  I
15 mean, is it or is it not?  I mean, as a district
16 manager you don't get involved in that.  That's not
17 my -- I don't get involved in the way they get paid or
18 what happens with them on that side.  I look at -- I
19 look at here is what we have to offer you.  Can it
20 help you do your business, yes or no?  If it can, then
21 we can move forward; if it can't, thank you very much.
22 It's pretty simple.
23         MR. BERLIN:  Ray, excuse me.  Can we
24 take a break when it's a convenient time for you?
25         MR. WINTER:  Sure.  I'm pretty close to

Page 53

1  being ready.  Do you need to go right this minute or
2  could we --
3          MR. BERLIN:  I can wait a minute.
4          MR. WINTER:  Okay.  Good.
5      Q.  (BY MR. WINTER)  I asked -- I was prefacing
6  my next question, which is:  As a national account
7  manager was there a time when you became aware, more
8  so than you had ever been as a district manager, that
9  Medicaid reimbursement was important to those national
10 accounts that you call on?
11     A.  I can't say that Medicaid reimbursement.
12     Q.  Okay.  Well, let's use third-party
13 governmental reimbursement.
14     A.  Same thing.  I think the customers get paid
15 is important.  For them to get paid by an independent
16 insurance company, or however they're getting paid, I
17 think that is important and definitely, you know, as a
18 national account manager you have run into that as far
19 as, you know, conversations.
20     Q.  Do you understand what the acronym "AWP"
21 means?
22     A.  Uh-huh.
23     Q.  What is your understanding of what that
24 acronym means?
25     A.  Average wholesale price.

14  (Pages 50 to 53)

Page 82

1  VHA, CAPS, Coram, Consorta, Broadlane, GeriMed,
2  Chartwell, Option Care and PBI?
3      A.  Fair.
4      Q.  Any of the accounts that you've called on
5  during that '98 to '07 time period that I didn't
6  mention that you can recall?
7      A.  Company called Innovatix, I-n-n-o-v-i-t-x
8  (sic).  Innovatix was mine.  Critical Care Systems.  I
9  had that for a while.  That's pretty much all of them.
10     Q.  Okay.  Are Innovatix -- is Innovatix still a
11 going concern today?
12     A.  It is a -- it is a business, correct.
13     Q.  And do you -- are they still one of your
14 accounts?
15     A.  No, sir.
16     Q.  Were they one of your accounts in 1998 when
17 you became a NAM?
18     A.  No, sir.
19     Q.  So sometime in the interim they were your
20 account?
21     A.  Right.
22     Q.  Okay.  Do you recall when?
23     A.  Maybe '4 or '5.
24     Q.  2004 or 2005?
25     A.  Yeah.  Maybe '3 and '4.  '3 and '4, '4 and

Page 83

1  '5, somewhere in there.  I had them for a couple of
2  years.
3      Q.  Is Innovatix a GPO?
4      A.  Yes, sir.
5      Q.  Are its -- is its membership long-term-care
6  facilities?
7      A.  They may have some.
8      Q.  What other kinds of facilities?
9      A.  Home infusion, surgery centers.
10     Q.  Is that fairly typical of your GPO accounts
11 that they typically have members that are home
12 infusion centers, surgery centers, those two types of
13 facilities?
14     A.  Yes.  The larger GPOs also have a number of
15 hospitals.
16     Q.  Have a number of hospitals, too?
17     A.  (Nodded head affirmatively).
18     Q.  VHA has hospital members, doesn't it?
19     A.  Correct.
20     Q.  So do I understand correctly that your
21 testimony is since 1998 to present you've called on
22 these accounts that we've mentioned over that time
23 period, but you've never gained an understanding from
24 any of them that Medicaid reimbursement was important
25 to them?

Page 84

1          MR. BERLIN:  Objection, form.
2      Q.  (BY MR. WINTER)  Is that true?
3      A.  That's true, yeah.
4      Q.  Have you ever had any -- let's go away from
5  the word "important" because maybe that's a code word
6  that -- that might be misleading.
7          Have you ever had occasion to discuss
8  Medicaid reimbursement, and more particularly the
9  reimbursement spread, with any of these accounts since
10 1998?
11     A.  No.
12     Q.  Is there any time period -- let me ask you
13 this question:  What does the reimbursement spread
14 mean to you?
15     A.  Reimbursement spread means there's a --
16 there's a difference -- a delta between Point A and
17 Point B and there's a pricing position.
18     Q.  If I define "reimbursement spread" as the
19 difference between what a provider gets reimbursed on
20 the one hand and what the provider pays to acquire the
21 drug on the other, does that make sense to you?
22     A.  It could.  I mean, yeah.  I mean -- but, once
23 again, it's not my scope.  I mean --
24     Q.  I understand that.  I understand.
25     A.  -- I don't -- I don't get into that.

Page 85

1      Q.  I'm just asking you to follow along my
2  hypothetical.  So let's talk about PBI.
3      A.  Okay.
4      Q.  Let's say PBI's contract allows PBI to buy
5  Abbott's drug for $10.
6      A.  Okay.
7      Q.  I don't care what drug we are talking about.
8  Any -- Vancomycin let's say.
9      A.  Okay.
10     Q.  Okay.  If their contract allows -- PBI's
11 contract allows PBI to purchase Vancomycin at $10 but
12 the reimbursement that PBI's members get for
13 dispensing that Vancomycin to a Medicaid patient is,
14 let's say, hypothetically $25.
15     A.  Okay.
16     Q.  The difference between 25 and 10 is 15,
17 right?
18     A.  Correct.
19     Q.  Would that be an example that you can
20 understand and relate to as a reimbursement spread?
21     A.  I can understand that.
22     Q.  Okay.  During any time that you were a
23 district manager between -- let's talk about the time
24 period 1993 to 1998.
25     A.  Okay.

22  (Pages 82 to 85)

Page 86

1    Q.  Did you ever have occasion to speak, along
2  with any of your subordinate representatives, with any
3  of the customers within your region about the
4  reimbursement spread --
5    A.  No.
6    Q.  -- with a customer?
7    A.  No.
8    Q.  Never.  Okay.  And you never gained an
9  awareness or understanding that reimbursement spread
10 was in any way or shape or form important to those
11 customers while you were a DM?
12   A.  No.
13   Q.  Did you have an awareness that Abbott enjoyed
14 some success selling many of its injectable products
15 vis-a-vis its competitors because Abbott had a
16 favorable reimbursement spread?
17        MR. BERLIN:  Objection, form.
18   A.  No.  Not --
19   Q.  (BY MR. WINTER)  You never had that
20 awareness --
21   A.  No.
22   Q.  -- that Abbott had success vis-a-vis
23 competitors in selling its products because of its
24 better spread?
25        MR. BERLIN:  Objection, form.

Page 87

1    Q.  (BY MR. WINTER)  No?
2    A.  Not as a DM, no.
3    Q.  Let's forget about the success part of my
4  question.
5    A.  Okay.
6    Q.  Let me ask this question:  At any time when
7  you were a district manager between 1993 and 1998 did
8  you have any knowledge that Abbott's reimbursement
9  spreads were better than its competitors for some
10 drugs?
11   A.  No.
12   Q.  At any time when you were a district manager
13 did you ever have an occasion where you learned of an
14 account telling your sales rep, who was responsible
15 for that account, that they wouldn't buy Abbott's
16 products because Abbott's spreads weren't as good as
17 weren't as competitive with, for example, Baxter or
18 McGaw?
19   A.  I don't recall that.
20   Q.  You don't recall that?
21   A.  (Shakes head negatively).
22   Q.  Now let's shift gears to when you were a
23 national account manager --
24   A.  Okay.
25   Q.  -- from 1998 through the present.  Have you

Page 88

1  ever had an awareness that Abbott has a favorable
2  spread vis-a-vis its competitors?
3    A.  Don't know that I've ever had that.
4    Q.  You say you don't know that you've ever had
5  that awareness.  Is there something that you're
6  thinking of that is some -- gives you pause in that
7  answer because it's a little -- I'm just curious about
8  your answer.  So is there something that you're
9  thinking of that is sort of close to that but not
10 quite?
11        MR. BERLIN:  Objection, form.
12   A.  I think that, you know, as you come through
13 the other case all of a sudden, you know, there's data
14 that was asked of me then that, you know, is that --
15 that's confusing me.  Did I -- no.  I mean, I
16 didn't -- if I didn't know then, I don't know now and
17 now there is, to your point, awareness of AWP.  There
18 is awareness now.  But was there?  No.
19   Q.  (BY MR. WINTER)  But you say you have an
20 awareness of AWP now?
21   A.  Well, you just told me.  Yeah.
22   Q.  Do you recall at what point in time you
23 gained this awareness of AWP?
24   A.  Probably the last few years.
25   Q.  Was there any precipitating event that caused

Page 89

1  this awareness in your mind?
2    A.  Well, I think the West Virginia deposition
3  opened, you know, to the AWP issues that -- brought it
4  up.
5    Q.  Prior to giving your testimony in the West
6  Virginia litigation is it your testimony today that
7  you had no awareness of AWP?
8    A.  "Awareness" is a big word.  Did I know --
9  have I heard AWP?  Yeah.  Did I know what it meant?
10 No.
11   Q.  So you learned what AWP meant after the
12 deposition that you gave in West Virginia or in the
13 course of preparing to give that deposition testimony?
14   A.  Yeah.  Understanding what the issue is with
15 AWP.
16   Q.  You gained an understanding of what the issue
17 is with respect to AWP in the course of preparing to
18 give your deposition testimony in West Virginia, is
19 that what you're telling me?
20   A.  During that time frame, yes.
21   Q.  I'm just trying --
22   A.  If that's what you're asking.  I'm trying to
23 be clear, too.
24   Q.  I appreciate that and I'm not trying to be
25 argumentative with you.  I'm just trying to make sure

23  (Pages 86 to 89)

# EXHIBIT 78

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )    01-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                )
United States of America,       ) Hon. Patti Saris
ex rel. Ven-a-Care of the       )
Florida Keys, Inc., v.          )
Abbott Laboratories, Inc.,      )
and Hospira, Inc.               )
CIVIL ACTION NO. 06-11337-PBS   )


*******************************************************

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )    01-CV-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                ) Judge Patti B. Saris
State of Arizona v. Abbott      )
Labs., et al.                   )
Civil Action No. 06-CV-11069-PBS )


*******************************************************
               ORAL AND VIDEOTAPED DEPOSITION OF
                        CHRISTINE SNEAD
                       April 19th, 2007


                     HIGHLY CONFIDENTIAL

*******************************************************

b66cc43c-5092-4127-9266-2a482f299285

Page 130

1  morning that you attended with Tom Hodgson and Kris
2  Kringel and with Coram?
3      A.  Yes.  I think it's the same meeting.
4      Q.  So you believe that you attended this meeting
5  sometime in November of 1994?
6      A.  Yes.
7      Q.  Did you -- if I asked you this previously,
8  then I apologize, but let me ask it again now.
9          Did you attend any other meetings
10  regarding any of your other accounts with Mr. Hodgson
11  or Mr. Kringel?
12      A.  Not that I recall.
13      Q.  Does that -- do you, as you sit here today,
14  have the sense that that would be somewhat unusual for
15  high-level executives like Mr. Hodgson and Mr. Kringel
16  to be participating in a meeting with you on one of
17  your accounts?
18      A.  Yes.
19          MS. GEISLER:  Objection to the form.
20      Q.  (BY MR. WINTER)  Do you have any sense of why
21  it is that Mr. Hodgson and Mr. Kringel participated
22  with you in meeting with Coram on the issue of this
23  Coram RFP?
24          MS. GEISLER:  Objection to the form.
25      A.  As I said, they were a merger of several

Page 131

1  entities, so they were a very, very large home
2  infusion customer, so I think that's why they were
3  involved.
4          The other kind of interesting thing is
5  Jim Sweeney used to -- I believe used to head up McGaw
6  IV solutions, who was a competitor to Abbott in the
7  past, so ...
8      Q.  (BY MR. WINTER)  You think he had been the
9  head of McGaw before he went to Coram?
10      A.  Yes.
11          MS. GEISLER:  Objection to the form.
12      Q.  (BY MR. WINTER)  Do you know that for a fact
13  or is that just vague recollection?
14      A.  Vague recollection.
15      Q.  And McGaw was one of Abbott's competitors on
16  the infusion products?
17      A.  Yes.  IV solutions.
18      Q.  The IV solution, the Dextrose and the sodium
19  chlorides, correct?
20      A.  Yes.
21          MR. WINTER:  Okay.  Why don't we take a
22  short break.  It's 11 o'clock.  And want to take about
23  10 minutes?
24          MR. STETLER:  Whatever fits your --
25          THE VIDEOGRAPHER:  We are off the record

Page 132

1  at 10:56 a.m.
2          (Recess from 10:56 to 11:07)
3          THE VIDEOGRAPHER:  We're back on the
4  record at 11:07 a.m.
5      Q.  (BY MR. WINTER)  Ms. Snead, I'm going to hand
6  you now what we've marked as Exhibit 708 and this
7  purports to be a memo.  It's got a couple different
8  Bates labels on it.  One is Ross 334959.  And it's on
9  Abbott interoffice correspondence dated December 15,
10  1994 from Gerald J. Martin, Divisional Vice President,
11  AHD.  And it's addressed to several people, including
12  Chris Bleck, who you and I spoke about a moment ago.
13          And it reads, "The Coram visit to Abbott
14  Park has been postponed due to new acquisition
15  activity.  Jim Sweeney the CEO of Coram, has committed
16  that he does want to visit Abbott Park in October or
17  November.  The invitation for this visit was a
18  personal one from Tom Hodgson and Kris Kringel.
19          "This delay has afforded us the
20  opportunity to gather more data.  Specifically, we are
21  trying to find out what business we are currently
22  doing with Coram and what potential business we could
23  be doing.  Coram is primarily in the home infusion
24  business, but they ... have a mail order pharmacy and
25  an ambulatory infusion center (for chemotherapy)" and

Page 133

1  "they want to expand.  A current as of 9/1/94 list of
2  their facilities is attached.
3          "When Coram does visit, it is our
4  intention to have the framework" for "an agreement to
5  present to Jim Sweeney thus the need for this data.
6          "Chris Snead from HPD Alternate Site
7  Sales has volunteered to compile all the data.  Please
8  send your information to her at:" and it has your name
9  and address.
10          "Coram is a major target for Abbott in
11  the alternate care market.  Your cooperation is
12  greatly appreciated.
13          "Gery Martin."
14          Did I read that accurately?
15      A.  Yes.
16      Q.  Do you remember who Gerry Martin is?
17      A.  Yes.
18      Q.  Did you interact with Mr. Martin in this
19  response in or about the fall of 1994 and early 1995
20  to the Coram RFP?
21      A.  I don't remember if he was involved with the
22  RFP response specifically.
23      Q.  Was he one of the executives at the corporate
24  level who was interested in sealing the deal between
25  Abbott corporate and Coram?

34 (Pages 130 to 133)

b66cc43c-5092-4127-9266-2a482f299285

Page 286

1  Kipperman.  I've gotten cards from Mary Beth Manso in
2  the past, but not for probably three or four years.
3  That's all I can think of.
4      Q.  Okay.  Are you aware that -- that Mr. Stetler
5  represents other Abbott employees?
6          MR. STETLER:  Other than through
7  discussions with me?
8      Q.  (BY MS. ST. PETER-GRIFFITH)  Yeah.  Other
9  than through discussions --
10          MS. ST. PETER-GRIFFITH:  Yes.  I'm
11  sorry.  Thank you, Mr. Stetler.
12      A.  No.
13      Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Has
14  anyone ever told you about any of the lawsuits, other
15  than -- other than Mr. Stetler, through your
16  conversations with counsel --
17      A.  Yes.
18      Q.  -- has anyone discussed with you any of the
19  AWP litigation?
20      A.  No.
21          MS. ST. PETER-GRIFFITH:  Why don't we --
22  this is a good breaking point for me, before we get
23  into my book of documents, so why don't -- why don't
24  we take a break for today.
25          THE WITNESS:  Okay.

Page 287

1          MS. ST. PETER-GRIFFITH:  Okay.
2          THE VIDEOGRAPHER:  Off the record?
3          MS. ST. PETER-GRIFFITH:  Yes, we're off
4  the record.  What time?
5          THE VIDEOGRAPHER:  We are off the record
6  at 3:40 p.m.  This concludes Tape Number 5.
7
8          (Deposition adjourned at 3:40 p.m.)
9          (Signature waived)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 288

1          NO. D-1-GV-04-001286
2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                             )
3  ex rel.                   )
    VEN-A-CARE OF THE        )
4    FLORIDA KEYS, INC.,     )
        Plaintiffs,          )
5                            )
  VS.                        ) TRAVIS COUNTY, TEXAS
6                            )
  ABBOTT LABORATORIES INC.,  )
7  ABBOTT LABORATORIES,      )
  HOSPIRA, INC., and B. BRAUN )
8  MEDICAL INC.,             )
        Defendant(s).        ) 201ST JUDICIAL DISTRICT
9
         REPORTER'S CERTIFICATION
10       DEPOSITION OF CHRISTINE SNEAD
            April 19, 2007
11
12      I, Cynthia Vohlken, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15      That the witness, CHRISTINE SNEAD, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony
18  given by the witness;
19      That examination and signature of the witness
20  to the deposition transcript was waived by the witness
21  and agreement of the parties at the time of the
22  deposition.
23      That the amount of time used by each party at
24  the deposition is as follows:
25

Page 289

1      Mr. Raymond Winter - 03:01
       Mr. Jarrett Anders ton - 00:49
2      Ms. Ann St. Peter-Griffith -    01:27
3      That $       is the deposition officer's
4  charges to the Plaintiffs for preparing the original
5  deposition transcript and any copies of exhibits;
6      That pursuant to information given to the
7  deposition officer at the time said testimony was
8  taken, the following includes counsel for all parties
9  of record:
10      MR. RAYMOND WINTER,
          Attorney for Plaintiff State of Texas;
11      MR. JARRETT ANDERSON,
          Attorney for the Relator;
12      MS. CAROL GEISLER,
          Attorney for Defendants Abbott
13        Laboratories, Inc. and Hospira, Inc.
       MS. ANN M. ST. PETER-GRIFFITH,
14        Attorney for Plaintiff United States of
          America
15      MR. CHRISTOPHER STUART,
          Attorney for Plaintiff State of Arizona
16        and MDL Plaintiffs
       MR. ELISEO SISNEROS, Attorney for the
17        State of California
18      That a copy of this certificate was served on
19  all parties shown herein on May 4, 2007 and filed with
20  the Clerk pursuant to Rule 203.3.
21      I further certify that I am neither counsel
22  for, related to, nor employed by any of the parties or
23  attorneys in the action in which this proceeding was
24  taken, and further that I am not financially or
25  otherwise interested in the outcome of the action.

73 (Pages 286 to 289)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 290

```
 1        Certified to by me this 4th day of May, 2007.
 2
 3
 4                    Cynthia Vohlken
 5
          CYNTHIA VOHLKEN, TX CSR 1059
 6        Expiration Date:  12/31/2006
          Firm Registration No. 82
 7        Fredericks-Carroll Reporting
          7800 Shoal Creek Boulevard
 8        Suite 200 W
          Austin, Texas 78757
 9        Telephone: (512) 477-9911
                     (800) 234-3376
10        Fax:       (512) 345-1417
11  Job No. 2321
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

# EXHIBIT 79

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

                                                            Page 1

                  UNITED STATES DISTRICT

            FOR THE DISTRICT OF MASSACHUSETTS


       --------------------------X

       IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

       INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

       PRICE LITIGATION            )  01-CV-12257-PBS

       THIS DOCUMENT RELATES TO    )

       U.S. ex rel. Ven-a-Care of  )

       of the Florida Keys, Inc.   )

            v.                     )  No.06-CV-11337-PBS

       ABBOTT LABORATORIES, INC.,  )

       --------------------------X


         (cross captions appear on following pages)


            Deposition of HARRY LEO SULLIVAN

                      Volume I

               Nashville, Tennessee

              Tuesday, March 12, 2008

                    9:05 a.m.

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

---

Page 150

1  concerns on whether or not the payment for these
2  kind of therapies was, was adequate?
3      A.  Well, my opinion, particularly in the,
4  in the home health arena, was -- and during this
5  specific time period, the growth in Tennessee was
6  such of those type of providers that it wouldn't
7  -- that wouldn't -- not lead you to believe that
8  the reimbursement for Medicaid was inadequate.
9          When people are hollering and screaming
10 or you have trouble getting providers to take
11 care of your patients is when that was more
12 likely a concern.
13     Q.  Well, do you know when the home
14 infusion business really started taking off?
15     A.  Well, it certainly took off in the
16 early Nineties.  And I can't remember -- and
17 Tennessee was a little bit different because we
18 very purposely avoided expansion of home
19 community based services under the Medicaid
20 program because the vast majority of the patients
21 who would receive those services were dual
22 eligibles, which meant they had Medicaid and

Page 151

1  Medicare.  And Medicare home health was, was
2  truly exploding.  We had hundreds of providers in
3  Tennessee of home health services.  I dare say
4  there's, you know, maybe 20 now.  Because there
5  was, there was indeed a bonanza on the Medicare
6  side in Tennessee.  Other states didn't face it
7  quite as -- if they had chosen to expand or had
8  very aggressive home community-based services
9  through Medicaid, might have had a little bit
10 different policy issues.  We purely shifted to
11 Medicare, cost shifted to Medicare, with the
12 duals.  And so it wasn't maybe not as, as intense
13 on a Medicaid issue in Tennessee as it might be
14 elsewhere is what I'm saying.
15     Q.  The page starting with -- at 425 and
16 then going over to 426, there is a discussion of
17 what some states are doing in the home IV
18 reimbursement area, Minnesota indicates
19 compounding or a dispensing fee of $8 for IV
20 drugs, and then Washington indicates that they're
21 paying a compounding amount, Ohio as well.
22         Do you have an understanding of what

Page 152

1  they're talking about when they talk about a
2  compounding fee?
3      A.  Yes.
4      Q.  And what, what is that?
5      A.  Well, certain, be it -- I mean you can
6  compound IV drugs if you have the right equipment
7  and filters and hoods to keep it, make it a
8  sterile product.
9          And you can compound drugs for
10 inhalation.  If you have, again, the right
11 equipment, similar to what would be in a
12 hospital, to, to handle sterile products.
13         And you take the raw ingredient and
14 mimic whatever, generally, the brand name or the
15 innovator product was.
16     Q.  And do you know in Tennessee, either
17 before TennCare or after TennCare was paying a
18 compounding fee for IV?  Do you know if that was
19 something that was being paid?
20     A.  Ah, no.  But there's, there's ways to
21 pay it without, without having a separate -- you
22 know, I noticed on here that one form is for

Page 153

1  payment, one form is for reimbursement of
2  supplies, one form is for -- you know, they're,
3  they're making a variety to submit multiple
4  forms.  And I wouldn't -- I can't tell you a
5  specific product or specific time period, but one
6  of my strategies was in issues like this, where
7  compounding was involved, I didn't want to go
8  down the road, at least in the early Nineties, of
9  getting into paying for compounded prescriptions,
10 because that can -- that could range from a
11 sterile product all the way down to an ointment,
12 okay?
13         And, and our claims reimbursement
14 system hadn't evolved to the current NCPDP
15 sophistication of today.  So it was very hard to
16 put in a, a set compounding fee for what, what
17 products?
18         One may take a minute to make, one may
19 take an hour and a half.
20         So getting back to, to the MAC issue,
21 some, sometimes for certain products in this
22 arena, you would take that into account for the

39 (Pages 150 to 153)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                              March 12, 2008
                        Nashville, TN

---

Page 154

1   MAC.
2        For example, I might say, I'm not
3   paying for the tape that you use to hold the IV
4   needle into place. I'm not paying for the IV
5   needle or the tube set. I'm not going to -- I
6   don't want bills for that. I know you've got to
7   do it to administer this drug. So we're going to
8   add on the cost of this drug X, because I know
9   this, this and this always goes with it, and I
10  know there is a fixed cost for that, but I don't
11  want five bills. I want 10 different places.
12  Bill me for the drug. And I'll make sure that
13  the -- whatever the MAC is incorporates all your
14  other costs. And you have to talk with providers
15  and know what that is. I mean, you know.
16      Q.  So, in short, you would use the payment
17  for the drug itself to cross-subsidize other
18  things that might need to be paid to fairly --
19      A.  And that would include compounding.
20      Q.  And it may include nursing services
21  that were not included, things of that nature?
22      A.  (Nodding yes.)

---

Page 155

1       Q.  Did anyone in the federal government
2   ever tell you that you were not allowed to do
3   that?
4       A.  No.
5       Q.  And if they had told you that, what
6   would you have said?
7       A.  That I wasn't allowed to pay for
8   compounding or --
9       Q.  That you weren't allowed to use the
10  payment for the drug to cross-subsidize those
11  other services or supplies.
12      A.  If they had told me I couldn't do it,
13  what would I do?
14      Q.  Yes.
15      A.  I would have had to have found another
16  way to, to handle the billing.
17      Q.  But they never told you that.
18      A.  No.
19      Q.  Do you know if other states were doing
20  -- were adopting similar type strategies to run
21  the programs?
22      A.  No, I don't -- I mean it may be

---

Page 156

1   addressed in this letter. I don't know. It
2   seems to talk about different states, but I'm
3   sure there were varying levels of complexity in
4   the billing process, and what was and wasn't
5   billable and what was and wasn't included, but I
6   don't know it and I didn't discuss it with folks.
7       Q.  Have you heard the term cross-subsidy
8   or cross-subsidization in the context of pharmacy
9   reimbursement?
10      A.  No, not -- no, I haven't.
11      Q.  I'm going to show you another, another
12  -- going to mark that as another exhibit.
13          MR. TORBORG: I think this is 578.
14          (Exhibit Abbott 578 marked.)
15  BY MR. TORBORG:
16      Q.  For the record, what we have marked as
17  Exhibit 578 bears the Bates numbers HHC 002-0400
18  through 407. It's another Medicaid pharmacy
19  bulletin. This one dated January-February of
20  1988.
21          Mr. Sullivan, if I could ask you to go
22  to Bates page ending in 402. In particular the

---

Page 157

1   discussion on the first full paragraph about
2   Montana Medicaid. Do you see that?
3       A.  Yes.
4       Q.  Where it says, Similarly, Montana
5   Medicaid compensates for the additional time and
6   expense of dispensing compounded drugs by
7   allowing the provider's usual and customary
8   charge up to 2.5 times the cost of ingredients,
9   paren, reimbursement for other outpatient drugs
10  is a lower of AWP minus 10 percent, or the cost
11  of the drug, end paren. Do you see that?
12      A.  Yes.
13      Q.  Is that the, the type of thing that
14  Tennessee was doing?
15      A.  It's a different approach to -- yeah.
16  Make -- paying the provider for the, for the
17  compounding without -- and setting a limit on
18  what I will pay up to two and a half percent.
19  It's just a different, different twist.
20      Q.  Does it -- does this refresh your
21  recollection about any other types of approaches
22  like this that other states were using?

---

40 (Pages 154 to 157)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                         Nashville, TN

Page 330

1     A.  Yes.
2     Q.  And before this lawsuit, have you ever
3  heard of anyone talking about the, what the legal
4  definition of average wholesale price would be?
5     A.  I, I don't remember that.
6     Q.  And --
7     A.  And I don't claim to know what the
8  legal definition of AWP is.  If I ever implied
9  that, I didn't mean to.
10    Q.  Well, this is -- this paragraph says
11 AWP is used to refer.  Do you see that?
12    A.  Yes.
13    Q.  It goes on.
14        And so that means somebody is referring
15 to AWP in a way that is calculated -- that is
16 indicated in this complaint.  Is that fair to
17 say?
18        MR. DRAYCOTT:  Objection.  Objection.
19    A.  That's the way I would read it.
20 BY MR. TORBORG:
21    Q.  That's not the way -- you did not refer
22 to AWP as the price at which a pharmaceutical

Page 331

1  firm or wholesaler sold drugs to retail
2  customers, did you?
3        MR. DRAYCOTT:  Objection.
4     A.  Yeah, I don't believe it to be true,
5  but the previous statement you made, that is the
6  way I would read it, too, is it is used by some
7  people, or by the Blue Book, or the industry as,
8  you know, the price that it's -- I believe people
9  would say that, but that's not actually true
10 sometimes.
11    Q.  And that's not how -- you never used
12 AWP to refer to the price at which pharmaceutical
13 firms or wholesalers sold drugs to customers?
14    A.  Actually paid for it, no.
15    Q.  So Mr. Draycott and the other
16 Department of Justice lawyers may use it to refer
17 to that, but that's not what you use to refer to
18 it; is that right?
19        MR. DRAYCOTT:  Objection.
20    A.  I don't think AWP is the price a
21 drugstore pays for, for a drug.
22 BY MR. TORBORG:

Page 332

1     Q.  And from your interactions with other
2  state pharmacy administrators, do you believe
3  that they use AWP to refer to the actual price at
4  which pharmaceutical firms or wholesalers sold
5  drugs to customers?
6        MR. DRAYCOTT:  Objection.
7     A.  I would just say globally that I don't
8  think any pharmacist practicing retail pharmacy
9  in particular ever believed AWP to be what people
10 paid for drugs.
11        MR. TORBORG:  That's all the questions
12 I have.  Thank you very much.
13        MR. DRAYCOTT:  We are concluded.
14        THE WITNESS:  Thank you.
15        MR. DRAYCOTT:  Thank you very much.
16        VIDEOGRAPHER:  This concludes the
17 deposition of Leo Sullivan, Volume 1.  The number
18 of tapes used was five.  Going off the record.
19 Time now is 16:47.
20        (Deposition concluded at 4:47
21 p.m.)
22

Page 333

1        SIGNATURE OF THE WITNESS
2
3
4
5
6        _____
7        HARRY LEO SULLIVAN
8
9  Subscribed and sworn to and before me
10 this _____ day of _____, 20____.
11
12
13 _____
14    Notary Public
15
16
17
18
19
20
21
22

84  (Pages 330 to 333)

Henderson Legal Services, Inc.

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 334

1          REPORTER'S CERTIFICATE
2
3          I, Fred W. Jeske, Court Reporter and
4    State of Tennessee at-large Notary Public, do
5    hereby certify that I recorded to the best of my
6    skill and ability by machine shorthand all the
7    proceedings in the foregoing transcript, and
8    that said transcript is a true, accurate, and
9    complete transcript to the best of my ability.
10         I further certify that I am not an
11   attorney or counsel of any of the parties, nor a
12   relative or employee of any attorney or counsel
13   connected with the action, nor financially
14   interested in the action.
15         SIGNED this 19th day of March, 2008.
16
17   _____
18   Fred W. Jeske, Court Reporter
19   State of Tennessee
20   At-large Notary Public
21   My Commission Expires:  November
22   14, 2009

85 (Page 334)

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

# EXHIBIT 80

Steenolsen, Scot A.    CONFIDENTIAL         March 31, 2008
Los Angeles, CA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


-----------------------------)
In re:  PHARMACEUTICAL        )MDL No. 1456
INDUSTRY AVERAGE WHOLESALE    )CIVIL ACTION
PRICE LITIGATION             )01-12257-PBS
-----------------------------)
THIS DOCUMENT RELATES TO:     )Judge Patti B. Saris
United States of America,     )
ex rel. Ven-A-Care of the     )Chief Magistrate
Florida Keys, Inc.,          )Judge Marianne B.
CIVIL ACTION NO. 06-11337-PBS )Bowler
-----------------------------)


             Videotaped Deposition of
SCOT A. STEENOLSEN, held at 555 South Flower Street,
Los Angeles, California, commencing at 9:23 a.m.,
Monday, March 31, 2008, before Janice Schutzman, CSR
No. 9509.

Steenolsen, Scot A.    CONFIDENTIAL              March 31, 2008
                    Los Angeles, CA

Page 194

1      Again, this -- I think this was done
2  after I -- obviously I went through training
3  already.
4      THE REPORTER:  I'm sorry.  After?
5      THE WITNESS:  After this -- after I was
6  -- I had went through training already.
7  BY MS. FORD:
8      Q.  This document indicates, does it not,
9  that you contributed to it?
10     A.  That's what it says.  But again, I
11 don't know what my contributions were.
12     MS. FORD:  Hand you what we'll mark
13 Exhibit 15.
14         (Exhibit Steenolsen 015 was marked
15 for identification.)
16 BY MS. FORD:
17     Q.  Do you recognize this document?
18     A.  Yeah.  It looks like an email that I
19 had sent to Mike Novak.
20     Q.  And what was Mr. Novak's position in
21 March of 2003?
22     A.  I think -- I'm not sure.  I think he

Page 195

1  was marketing manager.
2      Q.  And it says, "Mike, can you let me know
3  the reimbursement" and then in parenthesis,
4  "medi-cal/medi-caid for the gem sets?  Thanks,
5  Scot."
6          Is that right?
7      A.  Yes.
8      Q.  Do you recall -- do you recall this
9  situation or this --
10     A.  No.
11     Q.  -- circumstance?
12     A.  I don't.
13     Q.  And here you're emailing Mike Novak of
14 the marketing department directly; is that right?
15     A.  Yes.
16     Q.  You're not going through Debbie
17 Paulson?
18     A.  No.
19     Q.  Were -- I guess in terms of Abbott
20 procedure, was it okay for you to have direct
21 contact with the marketing department?
22     A.  Yeah, I guess you could.  Usually if a

Page 196

1  manager was easier to get ahold of.
2      Q.  You mean your district manager was
3  easier to get ahold of?
4      A.  Yes.
5      Q.  Okay.  If it's a matter of sending an
6  email, though, don't you just hit send and it
7  goes where it goes?
8      MR. SCANNAPIECO:  Objection, form.
9      THE WITNESS:  If you're in front of a
10 computer.  A lot of the time I was out in the
11 field.
12 BY MS. FORD:
13     Q.  Okay.
14         Do you recall customers or a customer
15 being interested in the reimbursement for the Gem
16 set?
17     A.  Yeah, I don't -- I don't remember it
18 coming up much.  Because by, you know -- I don't
19 know.  I don't remember.  Because I had already
20 been working with Abbott for six years and I -- I
21 don't ever remember doing it before, asking a
22 marketing manager for -- a question like this.

Page 197

1      Q.  Did you ask marketing managers other
2  types of questions?
3      A.  Yeah.  Usually I ask them when products
4  were coming off back order, inventory status.
5  Customers didn't like to -- buy things that
6  weren't readily available.  So that's generally
7  what I communicated with.
8      Q.  In those situations, did you usually
9  just call them or email them directly?
10     A.  I usually called if I could get them.
11 And if not, I usually would call somebody else,
12 you know, another sales rep or my manager.
13     Q.  The second email in the chain is from
14 Mike Novak to Robert Lyman and with a CC to you
15 and to Debbie Paulson.
16         Do you see that?
17     A.  Yes.
18     Q.  Do you know Bob Lyman?
19     A.  No, I don't.
20     Q.  And after you sent this message to Mike
21 Novak, do you recall having a conversation with
22 him about the customer's interest in

50 (Pages 194 to 197)

Henderson Legal Services, Inc.

8d4c776c-6fa0-4583-8182-5c83219b632e

Steenolsen, Scot A.     CONFIDENTIAL          March 31, 2008
                      Los Angeles, CA

Page 198

1  reimbursement information on Gem sets?
2      A.  I don't remember specifically.  I know
3  the -- the Gemstar pump, in which the Gem set, I
4  guess, that I'm referring to here, was a new
5  product.  So I'm just guessing that that's
6  probably why it hadn't been -- I don't know if it
7  was out and available at this time or what.
8      Q.  Were customers typically interested in
9  whether an Abbott product was reimbursable?
10         MR. SCANNAPIECO:  Objection, form.
11         THE WITNESS:  No.  It never --
12  reimbursement really wasn't an issue.
13  BY MS. FORD:
14     Q.  What do you mean, it wasn't an issue?
15     A.  Well, it -- I'd only had, I think, one
16  or two customers complain to me about it, and I
17  would always explain to them that I had nothing
18  to do with it, and I'd let, you know, our people
19  know that they were unhappy.  But it was
20  something that I didn't understand how it worked,
21  and I wasn't involved in anything about it.  So -
22  - but it wasn't a very common, you know,

Page 199

1  discussion.  Didn't come up often at all.
2      Q.  In the situations where it did come up,
3  why did -- what was your understanding of why
4  your customers weren't happy about reimbursement?
5      A.  Well, again, I --
6          MR. SCANNAPIECO:  Objection --
7          THE WITNESS:  Go ahead.
8          MR. SCANNAPIECO:  Objection, form.
9          THE WITNESS:  I usually tried to cut
10  them off because it wasn't something that I was
11  really supposed to communicate or talk to them
12  about at all.  And they were -- they were
13  passionate -- some of them were passionate about,
14  you know, trying to keeping their costs down and
15  what have you, and they would try to talk to me
16  about it, and that's why I would kind of, you
17  know, decline the discussion with them.
18  BY MS. FORD:
19     Q.  You understood, though, didn't you,
20  that reimbursement was how your customers got
21  paid?
22     A.  No.  I didn't -- I didn't really

Page 200

1  understand specifically how they got paid.
2      Q.  Well, here you're talking about MediCal
3  and Medicaid reimbursement; right?
4      A.  Right.
5      Q.  Did you understand that your customers
6  would be reimbursed for the products that they
7  purchased from Abbott by Medicaid?
8          MR. SCANNAPIECO:  Objection, form.
9          THE WITNESS:  I didn't understand
10  that's, I guess, how reimbursement worked at all,
11  and I never really wanted to know.  It wasn't
12  something I spent time looking for.  So it was --
13  that's why -- you can see here that I didn't know
14  really where to go with this.
15  BY MS. FORD:
16     Q.  We deposed Ms. Paulson on Friday, and
17  she testified that she provided training on
18  reimbursement at district meetings and district
19  conference calls and in ride-alongs and coaching
20  sessions.  And we specifically asked her whether
21  she provided that information to you, and she
22  said yes.

Page 201

1          Do you disagree with Ms. Paulson's
2  testimony?
3          MR. SCANNAPIECO:  Objection, form.
4          THE WITNESS:  I don't understand in
5  regards to training on reimbursement.  What does
6  that mean?  Training on what?
7  BY MS. FORD:
8      Q.  On the importance of reimbursement to
9  customers, for one?
10         MR. SCANNAPIECO:  Objection, form.
11         THE WITNESS:  I don't recall ever being
12  trained on the importance of reimbursement.
13  BY MS. FORD:
14     Q.  And that, depending on the market
15  channel, customers are reimbursed differently for
16  products?
17         MR. SCANNAPIECO:  Objection, form.
18         THE WITNESS:  Again, I couldn't tell
19  you what -- what they were reimbursed and how it
20  was calculated.
21  BY MS. FORD:
22     Q.  I'm not asking if you could tell me how

8d4c776c-6fa0-4583-8182-5c83219b632e

# EXHIBIT 81

Baton Rouge, LA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL         *  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  *  MASTER FILE NO.

PRICE LITIGATION              *  01-CV-12257-PBS

                              *

THIS DOCUMENT RELATES TO:  *  JUDGE PATTI B.

U.S. EX REL. VEN-A-CARE OF  *  SARIS

THE FLORIDA KEYS, INC. V.   *  MAGISTRATE

DEY INC., ET AL             *  MARIANNE BOWLER

NO. 05-11084-PBS, AND       *

U.S. EX REL VEN-A-CARE OF   *

THE FLORIDA KEYS, INC., ET  *

AL V. BOEHRINGER INGELHEIM  *  (Cross-noticed

CORP, ET AL                 *   captions on

NO.07-10248-PBS             *   following pages.)

* * * * * * * * * * * * * *

        November 7, 2008

        Transcript of the videotaped Rule

30(b)(6) deposition of the LOUISIANA

DEPARTMENT OF HEALTH AND HOSPITALS through

MARY JULIA TERREBONNE

4f51dae7-223c-46dc-90f5-5835e793cf26

30(b)(6) LA Dept of Health and Hospitals (Terrebonne, Mary Julia)                                November 7, 2008

Baton Rouge, LA

Page 90

1      A.   Right.
2      Q.   How was it that -- And that dispensing
3  fee is significantly lower than at least what
4  Myers and Stauffer is indicating it cost to
5  dispense the home I.V. drug; is that right?
6      A.   I'm sorry.  Could you state your
7  question again?
8           MR. TORBORG:  Could I ask the court
9  reporter to read that one back?
10           (Whereupon the previous question was
11  read back by the court reporter.)
12           THE WITNESS:  I still don't get it.
13           The -- the report shows that it cost
14  more to dispense I.V.s [sic] prescriptions than
15  non-I.V. prescriptions.
16  BY MR. TORBORG:
17      Q.   And it's showing an unweighted mean
18  cost for pharmacies dispensing home I.V.
19  prescriptions of $18.57; correct?
20      A.   Correct.
21      Q.   But Louisiana is only paying at this
22  time $5.77; right?

Page 91

1      A.   Right.
2      Q.   How is it that Louisiana is able to
3  compensate the providers of home I.V. therapy
4  their cost to dispense those drugs?
5           MR. FAUCI:  Objection to the form.
6           THE WITNESS:  How is it?
7  BY MR. TORBORG:
8      Q.   Yes.
9      A.   Well, we do.  We pay them in accordance
10  with our current reimbursement methodology.
11      Q.   If you look to the footnote 8 on page
12  21 of the Myers and Stauffer report --
13      A.   Right.
14      Q.   -- that states -- Would you read that
15  into the record?
16      A.   "Although typical dispensing fees
17  reimburse less than the dispensing cost of I.V.
18  pharmacies, they are generally able to break even
19  based on the margin allowed on ingredient cost
20  reimbursement."
21      Q.   And do you have an understanding of --
22  of what that's saying?

Page 92

1      A.   I believe what he's saying is that
2  there's a margin on the ingredient side, so
3  that's how they're generally able to dispense.
4      Q.   And this is something that -- that you
5  would have read back in 1999; correct?
6           MR. FAUCI:  Objection to form.
7           THE WITNESS:  Probably.
8  BY MR. TORBORG:
9      Q.   Okay.  And if you disagreed with that
10  footnote, would you have told Myers and Stauffer
11  that?
12      A.   Well, they were the surveyors, so they
13  had the information.  We were relying on --
14      Q.   Well, was it your understanding, Miss
15  Terrebonne, that because of the higher cost to
16  dispense home I.V. drugs and the fact that
17  Louisiana was only paying a $5.77 dispensing fee
18  for those drugs, that the margin being earned on
19  the ingredient cost was covering that cost to
20  dispense?
21           MR. FAUCI:  Objection to form.
22           THE WITNESS:  Based upon the survey

Page 93

1  results, yes.
2  BY MR. TORBORG:
3      Q.   Let's go to Abbott topic -- the Abbott
4  cross-notice, topic number 16.  This is titled
5  "DOJ AWPs," and the area of inquiry reads "Your
6  implementation of revised average wholesale price
7  information developed by the United States
8  Department of Justice and NAMFCU, the dates when
9  you did or did not implement the revised pricing
10  information, and the reasons why you did or did
11  not implement the revised pricing information."
12  Do you see that?
13      A.   Yes.
14      Q.   And do you have an understanding of
15  what we're getting at there?
16      A.   No.
17      Q.   Are you aware of the so-called DOJ AWP
18  effort?
19      A.   No.
20      Q.   Do you recall, just to see if it
21  refreshes your recollection at all, that around
22  1999 to 2000, there was an effort by the National

24  (Pages 90 to 93)

Henderson Legal Services, Inc.

202-220-4158                                    www.hendersonlegalservices.com

## Baton Rouge, LA

Page 222

1          WITNESS' CERTIFICATE
2
3          I, MARY JULIA TERREBONNE, read or
4    have had the foregoing testimony read to me
5    and hereby certify that it is a true and
6    correct transcription of my testimony, with
7    the exception of any attached corrections or
8    changes.
9
10
11
12
13
14          MARY JULIA TERREBONNE
15
16
17
18
19
20
21
22

Page 223

1          REPORTER'S CERTIFICATE
2          I, CATHERINE C. GAUDET, CCR,
3    Certified Court Reporter for the State of
4    Louisiana, do hereby certify that the
5    above-mentioned witness, after having been
6    first duly sworn by me to testify to the
7    truth, did testify as hereinabove set forth;
8          That the testimony was reported by me
9    in shorthand and transcribed under my personal
10   direction and supervision, and is a true and
11   correct transcript, to the best of my ability
12   and understanding;
13          That I am not of counsel, not related
14   to counsel or the parties hereto, and not in
15   any way interested in the outcome of this
16   matter.
17
18
19          CATHERINE C. GAUDET, CCR
20          Certified Court Reporter
21          State of Louisiana
22          Certificate No. 84108

4f51dae7-223c-46dc-90f5-5835e793cf26

# EXHIBIT 82

```
 1              C O N F I D E N T I A L

 2        IN THE CIRCUIT COURT OF KANAWHA COUNTY

 3                    WEST VIRGINIA

 4            CIVIL ACTION NO. 01-C-3011

 5

 6   ---------------------------------------X

 7   STATE OF WEST VIRGINIA ex rel

 8   DARRELL V. McGRAW, JR., ATTORNEY

 9   GENERAL,

10

                       Plaintiff,

11

12                  -against-

13   WARRICK PHARMACEUTICALS

14   CORPORATION, SCHERING-PLOUGH

15   CORPORATION, DEY, INC., ABBOTT

16   LABORATORIES, and ABBBOTT

17   LABORATORIES, INC.,

18

19                  Defendants.

20

21   ---------------------------------------X

22

23        DEPOSITION OF VIRGINIA TOBIASON

24           THURSDAY, JUNE 2, 2005

25
```

C O N F I D E N T I A L

1  I'm asking you whether it is true that Abbott would
2  receive -- let's start again.
3          Abbott would receive a percentage of
4  reimbursement for its service in submitting a claim for
5  reimbursement; isn't that true?
6      A    We would submit -- we would get paid for
7  our services.  The billing service we provided to clients.
8      Q    Okay.  And the way you would get paid for
9  submitting that service would, in some instances, be a
10 percentage of the reimbursement; isn't that true?
11     A    In some instances, depending on the client,
12 we would get paid a percentage of collections.
13     Q    Okay.  And if the -- if Abbott collected
14 based on a product acquisition as opposed to a per diem,
15 there would be a spread between what the customer paid for
16 the product and what the customer reimbursed; isn't that
17 true?
18     MS. TABACCHI:  Objection to the form, foundation,
19 mischaracterizes the witness's prior testimony, assumes
20 facts not in evidence.
21     THE WITNESS:  We got paid a percentage for -- we
22 got paid for our reimbursement services that included
23 submitting claims on behalf of patients and our customers
24 for products and services.  It was not solely product.

C O N F I D E N T I A L

1  BY MR. BARRETT:
2      Q    Okay.  If a patient -- if you submitted --
3  Abbott submitted a claim for Medicaid reimbursement based
4  on the acquisition of a product by your customer, okay,
5  your customer -- and let's rephrase it because I'm using
6  your term and I shouldn't.
7          When your customer purchased Vancomycin or
8  a sodium chloride solution, if a Medicaid claim was paid
9  for reimbursement on that purchase, the customer would
10 obtain a spread between -- meaning the difference between
11 what it paid and what was reimbursed; isn't that right?
12     MS. TABACCHI:  Objection to the form.
13     THE WITNESS:  The customer would receive the
14 reimbursement that was established by the payor.
15 BY MR. BARRETT:
16     Q    Okay.  And then Abbott would get a
17 percentage of that reimbursement?
18     A    Yes.
19     Q    Okay.
20     A    If that was what the contract stated.
21     Q    Okay.  We were provided a contract
22 yesterday, and I'm going to show it to you and, before we
23 make it an exhibit, I'm going to let you take a look --
24 tell you what, before we do that, I'm going to hand you a

C O N F I D E N T I A L

2  document which is Bates stamped ABTWV16864 dated December
3  10, 1996, and I'll just ask you whether you've ever seen
4  that document before?
5      MS. TABACCHI:  Do you have a copy of that?
6      MR. BARRETT:  I don't have another copy.
7      MS. TABACCHI:  Can we take a quick break so I can
8  --
9      MR. BARRETT:  We're going to.  Actually, I hadn't
10 decided whether to make it an exhibit or not.
11     MS. TABACCHI:  All right.  Go ahead.  We'll keep
12 going.  If you're going to elaborate on it, I'll go get a
13 copy.
14     MR. BARRETT:  That's right.  I just want to ask
15 her one question before we start so I have an idea.
16     THE WITNESS:  All right.  Yes.
17     MR. BARRETT:  Okay.  Let's go ahead and make a
18 copy of that document.
19     MS. TABACCHI:  Do you want to ask her when she saw
20 it?
21     MR. BARRETT:  Yes.
22
23 BY MR. BARRETT:
24     Q    When did you see that document?
25     A    Well, I may have seen it when it was

C O N F I D E N T I A L

1  signed, and I saw it yesterday.
2      MR. BARRETT:  Okay.  Let's go ahead and make a
3  copy of that.
4      THE VIDEOGRAPHER:  We're going off the record.
5  The time is 12:56.
6          (WHEREUPON, a recess was taken, after
7          which the proceedings resumed as
8          follows:)
9          (WHEREUPON, Exhibit Nos. 1 and 2 were
10         marked for Identification.)
11     THE VIDEOGRAPHER:  We're going back on the record.
12 The time is 1:06.
13 BY MR. BARRETT:
14     Q    Exhibit No. 1 should be the document dated
15 December 10, 1996.  Is that what you have?
16     A    I do.
17     Q    Okay.  And what is this document?
18     A    I would have to look at it.  I don't know.
19     Q    Well, let's see if we can help out a little
20 bit.  Was there a proposal of some kind?
21     A    This was a --
22     MS. TABACCHI:  Objection.
23     THE WITNESS:  This wasn't the area -- I was not in
24 contract marketing.

14 (Pages 50 to 53)

Page 86

C O N F I D E N T I A L

1  C O N F I D E N T I A L
2  your direction ever submitted ingredient costs as part of
3  a reimbursement claim?
4      A    If the payor required that, we would have.
5      Q    What did you use -- what would you use as
6  the ingredient cost?
7      MS. TABACCHI:  Object to the form of the question.
8      THE WITNESS:  You know, I really -- I don't know.
9  It would depend on what the payor required.  It would be
10 specific to a payor.
11 BY MR. BARRETT:
12     Q    All right.  Have you ever heard the term
13 estimated acquisition cost?
14     A    Yes.
15     Q    Do you know what that term means?
16     A    No.
17     MS. TABACCHI:  Object to the form.
18     THE WITNESS:  No, I don't.
19 BY MR. BARRETT:
20     Q    In what context have you heard it?
21     A    I just heard that there was an estimated
22 acquisition cost.
23     Q    In what context?
24     A    I don't remember.
25     Q    Did it have to do with Medicaid?

Page 87

1  C O N F I D E N T I A L
2      A    I don't -- I don't remember.
3      Q    Were you ever involved in any discussions
4  concerning estimated acquisition cost?
5      MS. TABACCHI:  Object to the form.
6      THE WITNESS:  Not that I remember.
7  BY MR. BARRETT:
8      Q    Have you ever heard the term ASP?
9      A    Yes.
10     Q    Okay.  What does that term mean?
11     A    Average selling price.
12     Q    All right.  Did you ever use the ASP in
13 your work?
14     A    You need to be specific as to the time
15 period.
16     Q    Okay.  Well, let me ask you generally.
17 Have you ever used it in your work?
18     A    Yes.
19     Q    And in what -- in what job did you use
20 that?
21     A    In my current job.
22     Q    Okay.  What do you use it for now?
23     A    We're required to report to Medicare our
24 ASPs on a quarterly basis.
25     Q    Is that the first time you used that ASP in

Page 88

1  C O N F I D E N T I A L
2  connection with your current job?
3      A    Yes.
4      Q    Okay.  Do you ever use the WAC or wholesale
5  acquisition cost?
6      A    No.
7      Q    Have you ever used WAC in your job or your
8  work?
9      MS. TABACCHI:  Object to the form.
10     THE WITNESS:  To the best of my knowledge, no.
11     MR. BARRETT:  I'm going to take a few minutes.  I
12 probably have a few -- a little bit more questioning, but
13 I have a lot of documents here that I don't want to ask
14 about, but I want to at least look at them and see if
15 there's something I need to cover.
16     MS. TABACCHI:  Sure.  How much time do you need?
17     MR. BARRETT:  Why don't you give me about ten
18 minutes.  Let's take about a ten-minute break.
19     THE VIDEOGRAPHER:  We are now going off the
20 record.  The time is 2:05.
21           FURTHER DEPONENT SAITH NOT.
22
23
24
25

Page 89

1        C O N F I D E N T I A L
2    IN THE CIRCUIT COURT OF KANAWHA COUNTY
          WEST VIRGINIA
3       CIVIL ACTION NO. 01-C-3011
4  ------------------------------------X
5
   STATE OF WEST VIRGINIA ex rel
6  DARRELL V. McGRAW, JR., ATTORNEY
   GENERAL,
7
          Plaintiff,
8
          -against-
9
10 WARRICK PHARMACEUTICALS
   CORPORATION, SCHERING-PLOUGH
11 CORPORATION, DEY, INC., ABBOTT
   LABORATORIES, and ABBOTTLABORATORIES, INC.,
12
          Defendants.
13
14 ------------------------------------X
      DEPOSITION OF VIRGINIA TOBIASON
15     THURSDAY, JUNE 2, 2005
16   I, VIRGINIA TOBIASON, state that I have read the
   foregoing transcript of the testimony given by me at my
17 deposition on the 2nd day of June, 2005, and that said
   transcript constitutes a true and correct record of the
18 testimony given by me at said deposition except as I have
   so indicated on the errata sheets provided herein.
19
20 ------------------------------------
      VIRGINIA TOBIASON
21 No corrections (Please initial) _____
   Number of errata sheets submitted _____
22 SUBSCRIBED AND SWORN to
   Before me this _____ day
23 Of _____, 2005
24
   _____
25 Notary Public

23 (Pages 86 to 89)

Page 90

C O N F I D E N T I A L

1
2  CASE NAME:  State of West Virginia vs. Warrick
   Pharmaceuticals
3
   Deposition of: Virginia Tobiason
4
   Date Taken:  June 2nd, 2005
5
6  Page    Line    Change:
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
   Date:
24
   Signature:
25

Page 92

C O N F I D E N T I A L

1
2  deposition was pursuant to agreement, and that there were
3  present at the deposition the attorneys hereinbefore
4  mentioned.
5        I further certify that I am not counsel for
6  nor in any way related to the parties to this suit, nor am
7  I in any way interested in the outcome thereof.
8
9
10
11
12                   Deborah A. Bridges
13                Certified Shorthand Reporter
14
15
16
17
18
19
20
21
22
23
24
25

Page 91

C O N F I D E N T I A L

1
2  STATE OF ILLINOIS   )
                   )  SS:
3  COUNTY C O O K    )
4
5        I, Deborah A. Bridges, CSR No.  84-002516,
6  do hereby certify that heretofore, to-wit, on the 2nd day
7  of June, 2005, personally appeared before me at 77 West
8  Wacker Street, Chicago, Illinois, VIRGINIA TOBIASON, in a
9  cause now pending and undetermined in the Circuit Court of
10 West Virginia, wherein Darrell McGraw, etal are the
11 Plaintiffs, and Warrick Pharmaceuticals, et al. are the
12 defendants.
13        I further certify that the said witness was
14 first duly sworn to testify the truth,  the whole truth
15 and nothing but the truth in the cause aforesaid; that the
16 testimony then given by said witness was reported
17 stenographically by me in the presence of the said
18 witness, and afterwards reduced to typewriting by
19 Computer-Aided Transcription, and the foregoing is a true
20 and correct transcript of the testimony so given by said
21 witness as aforesaid.
22        I further certify that the signature to the
23 foregoing deposition was not waived by counsel for the
24 respective parties.
25        I further certify that the taking of this

24 (Pages 90 to 92)

# EXHIBIT 83

```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


   In re:  PHARMACEUTICAL          )
   INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
   PRICE LITIGATION                ) Civil Action No.
                                   )    01-12257-PBS
                                   )
   THIS DOCUMENT RELATES TO:       )
                                   )
   United States of America,       ) Hon. Patti Saris
   ex rel. Ven-a-Care of the       )
   Florida Keys, Inc., v.          )
   Abbott Laboratories, Inc.,      )
   and Hospira, Inc.               )
   CIVIL ACTION NO. 06-11337-PBS   )



   ********************************************************

                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


   IN RE:  PHARMACEUTICAL          )
   INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
   PRICE LITIGATION                ) Civil Action No.
                                   )    01-CV-12257-PBS
                                   )
   THIS DOCUMENT RELATES TO:       )
                                   ) Judge Patti B. Saris
   State of Arizona v. Abbott      )
   Labs., et al.                   )
   Civil Action No. 06-CV-11069-PBS )



   ********************************************************
            ORAL AND VIDEOTAPED DEPOSITION OF
                    VIRGINIA TOBIASON

                    HIGHLY CONFIDENTIAL

                    March 28, 2007

                       Volume 1

   ********************************************************
```

4bee3001-1763-447c-9971-2ec60b39d527

Page 214

1  corporate had to do with reimbursement for devices?
2     A.  I'm saying I worked on things that need my
3  attention and at that time devices, we had -- I worked
4  on devices primarily.
5     Q.  All right.  So when you -- when you learned
6  from the newspaper, or whatever, that -- that Abbott's
7  being sued and there's these investigations going on
8  in Congress and by the government and the Justice
9  Department about Abbott's reporting of prices used for
10 reimbursement services involving drugs that you used
11 to be interested in when you were the manager of
12 reimbursement for Home Infusion Services, didn't it
13 cause you to stop and think that maybe you ought to
14 figure out what's going on there and why that is?
15         MS. TABACCHI:  Object to the form.
16    A.  We were not a provider of services at that
17 time.
18    Q.  (BY MR. BREEN)  At what time?
19    A.  When I was director of corporate
20 reimbursement.
21    Q.  Okay.  So back when you were a provider of
22 services, either you were provided the services or you
23 were paying somebody else to provide the services
24 because Abbott stopped submitting its own provider
25 claims in late -- in the late '80s, correct?

Page 215

1     A.  No.
2         MS. TABACCHI:  Object to the form.
3     Q.  (BY MR. BREEN)  Didn't you testify earlier
4  that at some point in the late '80s Abbott stopped
5  being the provider of HCFA 1500 forms and -- and --
6     A.  Yes.
7         MS. TABACCHI:  If you could allow
8  Mr. Breen to finish his question.
9     Q.  (BY MR. BREEN)  -- and allow -- allowed
10 contractors to be the providers, isn't that your
11 testimony?
12    A.  You're mischaracterizing my testimony.
13    Q.  All right.  Then correct me.
14    A.  Abbott provided -- billed for services in the
15 '80s as Abbott Homecare.
16    Q.  Right.
17    A.  Then after that our customers became
18 providers of service.  We provided subcontracted
19 services to them.  They were the providers of
20 services.
21    Q.  But you still had the four pharmacies, right?
22    A.  Yes.
23    Q.  Okay.  So they were Abbott pharmacies, but
24 you were -- you had providers that were billing in
25 those pharmacies, correct?

Page 216

1         MS. TABACCHI:  Object to the form.
2     A.  I don't understand the question.
3     Q.  (BY MR. BREEN)  Well, then maybe I didn't
4  understand your earlier testimony.  The four
5  pharmacies, remember?
6     A.  Yes.
7     Q.  The ones that were owned by Abbott all the
8  way up until the time you left Home Infusion Services
9  in 1998, those four pharmacies.
10    A.  Three pharmacies.
11    Q.  They became three at some point.  The one in
12 Atlanta, it was gotten rid of, right?
13        MS. TABACCHI:  Object to the form.
14    Q.  (BY MR. BREEN)  But you don't recall when
15 that happened, do you?
16    A.  I think it was in the '80s.
17    Q.  Sometime in the '80s.  All right.  There was
18 three pharmacies then that Abbott owned all the way
19 through the '90s, at least up until '98.  When it
20 billed the Medicare program in the '90s, was Abbott
21 identified as the provider on the HCFA 1500 form?
22        MS. TABACCHI:  Object to the form.
23    A.  No.
24    Q.  (BY MR. BREEN)  Okay.  Who was?
25    A.  The customer.

Page 217

1     Q.  Who owned the pharmacy?
2     A.  We did.
3     Q.  So you owned the pharmacy, Abbott did, and
4  had somebody called a customer that was a what, a
5  pharmacist?
6         MS. TABACCHI:  Object to the form.
7     Q.  (BY MR. BREEN)  Who was the customer?  If
8  Abbott owned the pharmacy, who was the customer for
9  the three pharmacies?
10    A.  It would have been one of our clients.  Could
11 have been one of our clients.
12    Q.  A client.  Okay.
13    A.  In some cases, yes.
14    Q.  We only have three pharmacies here.  So let's
15 just talk about those three pharmacies, okay?  Just
16 those three pharmacies.  Who had the license for those
17 pharmacies?
18    A.  Abbott.
19    Q.  Abbott did.  So Abbott had three licensed
20 infusion pharmacies in the '90s up until 1998 when you
21 left, at least, correct?
22    A.  Yes.
23    Q.  All right.  So Abbott was on the license.
24 Who did the pharmacist work for?
25    A.  Abbott.

55 (Pages 214 to 217)

4bee3001-1763-447c-9971-2ec60b39d527

Page 222

1  you for your patience.  I hope your -- your foot gets
2  better fast.
3        THE WITNESS:  Thank you.
4        MS. ST. PETER-GRIFFITH:  Before we go
5  off the record though, the government has a statement.
6        We have outstanding discovery requests
7  to Abbott and obviously -- and we took the deposition
8  of Ms. Klaus a couple of weeks ago concerning the
9  litigation hold on those -- on the various requests
10  that have been -- that have been served upon Abbott by
11  the government dating back to 1986.  To the extent
12  that this -- that this witness discussed the shredding
13  of documents, in addition, you know, just the general
14  production of this policy we have not seen and I would
15  ask that Ms. Tabacchi look into -- look into that
16  issue.
17        Additionally, this -- this witness
18  testified to the federal government office, which
19  obviously just from its title sounds like it might be
20  an entity that has documents responsive to our
21  production request, and I would ask that you look into
22  the production from that particular office as well.
23        MS. TABACCHI:  Any other statements from
24  anyone?
25        MR. HAVILAND:  Have a nice day.

Page 223

1        MR. BREEN:  Yeah.  Have a nice day and I
2  hope the weather gets better.
3        THE VIDEOGRAPHER:  This is the end of
4  Tape 4 in the deposition of Virginia Tobiason.  Going
5  off the record.  The time is now 4:21 p.m.
6
7        (Deposition closed at 4:21 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 224

1              CHANGES AND SIGNATURE
2  PAGE    LINE         CHANGE          REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 225

1      I, VIRGINIA TOBIASON, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6              VIRGINIA TOBIASON
7
8
9  THE STATE OF              )
10  COUNTY OF                 )
11    Before me,                , on this day
12  personally appeared VIRGINIA TOBIASON, known to me (or
13  proved to me under oath or through
14              ) (description of identity
15  card or other document) to be the person whose name is
16  subscribed to the foregoing instrument and
17  acknowledged to me that they executed the same for the
18  purposes and consideration therein expressed.
19    Given under my hand and seal of office this
20      day of              , 2007.
21
22
23              NOTARY PUBLIC IN AND FOR
24              THE STATE OF
25

57 (Pages 222 to 225)

Page 226

```
 1          NO. D-1-GV-04-001286
 2  THE STATE OF TEXAS      ) IN THE DISTRICT COURT
                            )
 3  ex rel.                 )
      VEN-A-CARE OF THE     )
 4    FLORIDA KEYS, INC.,   )
        Plaintiffs,         )
 5                          )
    VS.                     ) TRAVIS COUNTY, TEXAS
 6                          )
    ABBOTT LABORATORIES INC., )
 7  ABBOTT LABORATORIES,    )
    HOSPIRA, INC., and B. BRAUN )
 8  MEDICAL INC.,           )
        Defendant(s).       ) 201ST JUDICIAL DISTRICT
 9
10          REPORTER'S CERTIFICATION
         DEPOSITION OF VIRGINIA TOBIASON
11             March 28, 2007
12      I, Cynthia Vohlken, Certified Shorthand Reporter
13  in and for the State of Texas, hereby certify to the
14  following:
15      That the witness, VIRGINIA TOBIASON, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony
18  given by the witness;
19      That the deposition transcript was submitted on
20  April 2, 2007, to the witness or to the attorney for
21  the witness for examination, signature and return to
22  me by April 25, 2007;
23      That the amount of time used by each party at the
24  deposition is as follows:
25      Ms. Margaret Moore - 02:01
```

Page 227

```
 1      That pursuant to information given to the
 2  deposition officer at the time said testimony was
 3  taken, the following includes counsel for all parties
 4  of record:
 5      MS. MARGARET MOORE, Attorney for Plaintiff
          State of Texas;
 6      MR. JAMES JOSEPH BREEN, Attorney for the
          Relator;
 7      MS. TINA TABACCHI, Attorney for Defendants
          Abbott Laboratories, Inc. and Hospira, Inc.
 8      MS. ANN M. ST. PETER-GRIFFITH, Attorney for
          Plaintiff United States of America
 9      MS. AMBER M. NESBITT, Attorney for Plaintiff
          State of Arizona and MDL Plaintiffs
10      MR. DONALD E. HAVILAND, JR., Attorney for
          Plaintiff Commonwealth of Pennsylvania
11
12      I further certify that I am neither counsel for,
13  related to, nor employed by any of the parties or
14  attorneys in the action in which this proceeding was
15  taken, and further that I am not financially or
16  otherwise interested in the outcome of the action.
17      Further certification requirements pursuant to
18  Rule 203 of TRCP will be certified to after they have
19  occurred.
20
21
22
23
24
25
```

Page 228

```
 1  Certified to by me this 2nd day of April, 2007.
 2
 3
 4
 5
            Cynthia Vohlken, Texas CSR 1059
 6          Expiration Date:  12/31/2008
            Firm Registration No. 82
 7          Fredericks-Carroll Reporting
            7719 Wood Hollow Drive, Suite 156
 8          Austin, Texas 78731
            Telephone: (512) 477-9911
 9              (800) 234-3376
            Fax:    (512) 345-1417
10
11  JOB NO. 2272
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 229

```
 1      FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2      The original deposition was/was not returned to
 3  the deposition officer on         , 2007;
 4      If returned, the attached Changes and Signature
 5  page contains any changes and the reasons therefor;
 6      If returned, the original deposition was delivered
 7  to Ms. Margaret Moore, Custodial Attorney;
 8      That $     is the deposition officer's
 9  charges to the Plaintiff(s) for preparing the original
10  deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate
13  was served on all parties shown herein on and filed
14  with the Clerk.
15      Certified to by me this      day of
16        , 2007.
17
18
19
            Cynthia Vohlken, Texas CSR 1059
20          Expiration Date:  12/31/2008
            Firm Registration No. 82
21          Fredericks-Carroll Reporting
            7719 Wood Hollow Drive, Suite 156
22          Austin, Texas 78731
            Telephone: (512) 477-9911
23              (800) 234-3376
            Fax:    (512) 345-1417
24  JOB NO. 2272
25
```

58 (Pages 226 to 229)

EXHIBIT 84

Tootell, Michael                           October 25, 2007
                        Chicago, IL

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


----------------------------X

In re:  PHARMACEUTICAL          )  MDL No. 1456

INDUSTRY AVERAGE WHOLESALE      )  CIVIL ACTION

PRICE LITIGATION                )  No. 01-12257-PBS

----------------------------X


    VIDEOTAPED DEPOSITION OF MICHAEL TOOTELL

              OCTOBER 25, 2007

              CHICAGO, ILLINOIS


Videotaped Deposition of MICHAEL TOOTELL, at

71 South Wacker Drive, 32nd Floor, Chicago,

Illinois, commencing at 9:00 a.m. on Thursday,

October 25, 2007, before Donna M. Kazaitis, RPR,

CSR  No. 084-003145.

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
Chicago, IL

Page 78

1        MR. WINCHESTER:  Objection, form.
2        THE WITNESS:  Can you ask the question
3   again?
4   BY MS. ST. PETER-GRIFFITH:
5       Q.   Sure.  Let me see if I can rephrase it.
6            You indicated that there was a process
7   requiring multiple signatures for reporting
8   pricing to third-party compendia; right?
9       A.   For setting list prices and the list
10  prices were reported to.
11      Q.   And how is the process established for
12  setting list prices?
13      A.   I was not part of that process.
14      Q.   Who at Ross was responsible for that?
15      A.   I listed the names of the signatories,
16  the positions that would be responsible for
17  setting the price.
18      Q.   Do you recall who any of these
19  individuals were, like who the pricing head was?
20       MR. WINCHESTER:  Objection.  Timeframe?
21       THE WITNESS:  Which timeframe?
22  BY MS. ST. PETER-GRIFFITH:

Page 79

1       Q.   At any time.
2       A.   The problem is that those positions
3   were changing and people were changing.  We've
4   had seven Ross presidents in the seventeen years
5   I was there.  So many of the people have changed.
6            If you want any particular name, any
7   particular time, the most recent process would be
8   Kevin Garleb, who is director of contract
9   management, and then depending on which product,
10  the appropriate product manager, that would
11  differ depending upon which product.
12      Q.   Was the director of contract, did you
13  say director of contract marketing?
14      A.   Contract marketing.
15      Q.   Would that be the pricing head?
16      A.   He'd have responsibilities for that.  I
17  believe his signature was required in that
18  process.
19      Q.   What is a list price?
20      A.   A list price is the price for one to
21  nine cases of product sold to customers who are
22  without a contract.

Page 80

1       Q.   Why would the list prices be reported
2   to the pricing compendia?
3        MR. WINCHESTER:  Objection, form.
4        MR. FERGUSON:  Same objection.
5        THE WITNESS:  The policy of the
6   compendia was to request the highest published
7   price.
8   BY MS. ST. PETER-GRIFFITH:
9       Q.   How do you know that?
10      A.   It was common knowledge.  It was
11  specifically told to me by Kay Morgan, First
12  Databank vice president.
13      Q.   So you had a conversation with Kay
14  Morgan concerning reporting the highest published
15  price to First Databank?
16      A.   My conversation was about the policies
17  of the First Databank, which prices did they
18  want.  Her instruction to me was to provide the
19  highest published price available to customers, a
20  price without volume discounts or associated
21  other discounting that surround.
22      Q.   When did you have that conversation

Page 81

1   with her?
2       A.   I don't recall.
3       Q.   Do you recall any timeframe, what the
4   year might have been?
5       A.   It was in the '90s.
6       Q.   Did you memorialize this conversation
7   anywhere?
8       A.   I don't believe so.
9       Q.   What did you do with that information
10  that Kay Morgan gave to you?
11      A.   I instructed the Pricing Department
12  that the First Databank policy was to ask
13  manufacturers to provide their undiscounted
14  price, the highest published price.  And we
15  provided data consistent with the First Databank
16  request.
17      Q.   Do you know whether that was the policy
18  for other pricing compendia?
19      A.   I believe it was.
20      Q.   What do you base that belief upon?
21      A.   I don't have specific recollection of
22  how that happened.

21 (Pages 78 to 81)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                          October 25, 2007
                              Chicago, IL

Page 294

1    Q.  Now.
2    A.  Now, and then I didn't.  You used your
3  calendar for your appointments, and I don't know
4  what's happened to it after I left.
5    Q.  I know.  I mean I realize that you
6  don't know what's happened to it since you left.
7  But I'm asking as of the day you left, it was
8  your understanding that your calendar had been
9  preserved in this electronic Lotus Notes
10  software; correct?
11    A.  Yes.
12    Q.  And so, for instance, if you wanted to
13  go back and see what day you made the
14  presentation to Cardinal, you could do so even
15  though it would require you to go back to the
16  summer of 2000?
17    A.  I really don't know how far back Lotus
18  Notes goes in my desk, on my laptop on my desk.
19  And I don't know how that's archived.  But I do
20  know that there were document orders, and I would
21  expect it was archived in a place that's
22  acceptable.  But no, I do not know.

Page 295

1    Q.  When you say "document orders," do you
2  mean --
3    A.  Hold orders.
4    Q.  -- related to litigation or just
5  typical holds?
6    A.  They would show up and you'd hold
7  documents in a particular category.
8    Q.  Did you understand whether it pertained
9  to litigation or not?
10    A.  The inquiries came from Abbott
11  litigation.  I assumed so.
12    Q.  What would you say the overall
13  accomplishments were of the Medicare Working
14  Group of which you were a member?
15    A.  I don't recall that.  I'd have to
16  refresh my mind even on the contents of those
17  meetings.
18      (WHEREUPON Deposition Exhibit
19  Tootell 009 was marked as of 10/25/2007.)
20  BY MR. ANDERSON:
21    Q.  Mr. Tootell, please take a moment and
22  review what's been marked as Exhibit Tootell 009.

Page 296

1  It's also been marked in this case as I believe
2  Exhibit 551.  (Document tendered to the witness.)
3      MR. ANDERSON:  Let's change tapes while
4  the witness is reviewing the document.
5      THE VIDEOGRAPHER:  We are off the
6  record at 4:44 with the end of Tape No. 4.
7      (WHEREUPON a recess was taken.)
8      THE VIDEOGRAPHER:  We are back on the
9  record at 4:49 p.m. with the start of Tape No. 5.
10  BY MR. ANDERSON:
11    Q.  Sir, does Exhibit Tootell 009 appear to
12  be the notes of a Medicare Working Group meeting
13  that you attended?
14    A.  I don't recall it, but they appear to
15  be.
16    Q.  Looking at the third page of the
17  exhibit titled "Minutes for Medicare Working
18  Group Meeting" on January 21, 1997, do you see a
19  section entitled "Average Wholesale Price"?
20    A.  I do.
21    Q.  I'm going to read the first bullet
22  point.  Quote "Average wholesale price, AWP, is

Page 297

1  generally based upon the manufacturer's price
2  plus a mark-up of fifteen to twenty percent.  The
3  AWP is documented in the Red Book, Blue Book, and
4  Medi-Span book and is used by Medicare/Medicaid
5  and commercial insurance carriers to determine
6  reimbursement levels."  Did I read that
7  correctly?
8    A.  You read that accurately.
9    Q.  Is that a true statement?
10      MR. WINCHESTER:  Objection as to
11  timeframe.
12  BY MR. ANDERSON:
13    Q.  Back in 1997 was that a true statement?
14    A.  Yes.
15    Q.  Is there any question in your mind that
16  all the members of the Abbott Medicare Working
17  Group understood that issue in 1997?
18      MR. FERGUSON:  Object to form and
19  foundation.
20      MR. WINCHESTER:  Objection to form.
21      THE WITNESS:  I can't speak for others,
22  but I believe, I understood it this way.

75 (Pages 294 to 297)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                         Chicago, IL

Page 314

1        MR. WINCHESTER:  The same for Abbott as
2   well.
3        MR. SISNEROS:  And on behalf of
4   California we have yet to take our turn to ask
5   our questions.
6        MR. ANDERSON:  Let's go off the record.
7        THE VIDEOGRAPHER:  We are off the
8   record at 5:07 p.m. with the conclusion of
9   today's deposition of Michael Tootell.
10          (WHEREUPON said deposition was so
11   adjourned.)
12
13
14        _____
15           MICHAEL TOOTELL
16
17   Subscribed and sworn to and before me
18   this _____ day of _____, 20____.
19
20
21   _____
22        Notary Public

Page 315

1   STATE OF ILLINOIS )
2   COUNTY OF C O O K )
3        I, Donna M. Kazaitis, RPR, CSR No.
4   084-003145, do hereby certify:
5      That the foregoing deposition of MICHAEL
6   TOOTELL was taken before me at the time and place
7   therein set forth, at which time the witness was
8   put under oath by me;
9      That the testimony of the witness and all
10   objections made at the time of the examination
11   were recorded stenographically by me, were
12   thereafter transcribed under my direction and
13   supervision and that the foregoing is a true
14   record of same.
15      I further certify that I am neither counsel
16   for nor related to any party to said action, nor
17   in any way interested in the outcome thereof.
18      IN WITNESS WHEREOF, I have subscribed my name
19   this 29th day of October, 2007.
20
21        _____
22        Donna M. Kazaitis, RPR, CSR 084-003145

80 (Pages 314 to 315)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

# EXHIBIT 85

Wells, Jerry       PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
Tallahassee, FL

Page 1

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

        -------------------------------X

In Re: PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION) CIVIL ACTION:

        -------------------------------X 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:          )

U.S. ex rel. Ven-A-Care of the     ) Judge Patti B.

Florida Keys, Inc., v. Abbott      ) Saris

Laboratories, Inc., No.            )

06-CV-11337-PBS; U.S. ex rel.      ) Magistrate Judge

Ven-A-Care of the Florida Keys,    ) Marianne Bowler

Inc. v. Abbott Laboratories, Inc.,)

No. 07-CV-11618-PBS; U.S. ex rel. )

Ven-A-Care of the Florida Keys,    ) DEPOSITION OF

Inc. v. Dey, Inc., et al., No.     )  JERRY WELLS

05-11084-PBS; U.S. ex rel.         )

Ven-A-Care of the Florida Keys,    ) DECMEBER 15, 2008

Inc., et al. v. Boehringer         ) TALLAHASSEE, FL

Ingelheim Corp., et al., No.       )

07-10248-PBS                       )

        -------------------------------X

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry      PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
Tallahassee, FL

Page 46

1     A.  No, that's not true.  Waterford
2  irrigation is not necessarily injectable, but the
3  others are.
4     Q.  Was it your understanding that the
5  federal upper limit program never had federal
6  upper limits for injectable drugs?
7     A.  At least, initially, it did not address
8  injectable drugs.
9     Q.  What's your basis for that
10  understanding?
11     A.  That was their policy.  They were
12  looking at controlling the cost the -- the
13  state's reimbursed for oral prescription drugs,
14  oral and topical.
15     MR. BREEN:  Chris, just so the record's
16  clear, when you -- when you or the witness use
17  the term "injectable," are you also using that to
18  include drugs that are infused by gravity or by
19  pump versus an injection, like a shot?
20     MR. COOK:  That would be my
21  understanding as well.
22     MR. BREEN:  I just want to make sure

Page 47

1  the witness is -- that you guys are talking about
2  the same thing.
3  BY MR. COOK:
4     Q.  How are you aware of what federal
5  policy was with respect to establishing federal
6  upper limits?
7     A.  They published it in the Code of
8  Federal Regulations, and I had a number of
9  conversations with staff at the Healthcare
10  Financing Administration.
11     Q.  Which staff at the federal -- when you
12  say the Healthcare Financing Administration,
13  that's HCFA, correct?
14     A.  That's HCFA, or what is now CMS.
15     Q.  Who at HCFA did you speak to regarding
16  the scope of the federal upper limit program?
17     A.  I remember some names.  I don't
18  remember the name of the individual who developed
19  the first administrative rule for federal upper
20  limit pricing, but he was an ex-Merck employee
21  that had gone to work for the Healthcare
22  Financing Administering, but I don't recall his

Page 48

1  name.  Larry Reid is still at the Healthcare
2  Financing, or CMS.  I talked with him at some
3  length about that and with some other people
4  whose names I don't recall.  That's many years
5  ago.
6     Q.  How many years ago -- that is my next
7  question.  Do you recall when it was that these
8  conversations took place?
9     A.  The late '80s, early '90s, ongoing,
10  until I left state employment.
11     Q.  Do you recall any specific
12  conversations that related to whether or not
13  injectable or infusion drugs, including those
14  listed on Pages 10 and 11 of Exhibit 1002, would
15  be included within the federal upper limit
16  program?
17     A.  No.  As I said, I think they excluded
18  them.  It was not their intent to put federal
19  upper limit prices on those drugs.
20     Q.  Do you know why it was that HCFA --
21  strike that.
22     Were you ever told by anyone at HCFA

Page 49

1  why it was that HCFA intended to exclude
2  injection and infusion drugs from the federal
3  upper limit program?
4     MS. ST. PETE-GRIFFITH:  Object to form.
5     THE WITNESS:  I don't recall.
6  BY MR. COOK:
7     Q.  From your conversations with Larry Reid
8  and others at HCFA, were you able to infer why it
9  was that the federal government excluded
10  injection and infusion drugs from the federal
11  upper limit program?
12     MS. WALLACE:  Objection.
13     MS. ST. PETE-GRIFFITH:  Objection.
14     THE WITNESS:  I don't think that I was
15  ever satisfied or got a satisfactory answer for
16  my purposes or that issue, but I just don't
17  recall.  That's many years ago.
18  BY MR. COOK:
19     Q.  Did you seek a satisfactory answer?
20     MS. ST. PETE-GRIFFITH:  Object to the
21  form.
22     THE WITNESS:  I think we had some

13 (Pages 46 to 49)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry          PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                      Tallahassee, FL

Page 50

1    discussions about it because I felt like they
2    should, and they had some reasons that, as I
3    said, I don't think I was ever satisfied with,
4    but I don't even recall what their reasons were.
5    BY MR. COOK
6        Q.  Do you recall expressing to individuals
7    at HCFA your belief that injection and infusion
8    drugs should be included within the federal upper
9    limit program?
10           MS. ST. PETE-GRIFFITH:  Object to the
11   form.
12           THE WITNESS:  I don't think it was
13   specific to injectable drugs.  They -- they chose
14   not to put federal upper limit prices on a number
15   of drugs that I felt like they should have; over-
16   the-counter products that sometimes we
17   reimbursed, for instance.  I felt like it should
18   be a more expansive program, and I felt like they
19   should update it more frequently than they
20   planned to update it.
21   BY MR. COOK:
22       Q.  What was the context in which you

Page 51

1    expressed these beliefs to representatives of
2    HCFA?
3            MS. ST. PETE-GRIFFITH:  Object to the
4    form.
5            THE WITNESS:  I don't understand your
6    question.
7    BY MR. COOK:
8        Q.  Sure.  Were these one-on-one telephone
9    conversations or were they group meetings in
10   which you expressed these beliefs?
11       A.  I probably would say both.
12       Q.  Would it also have included in-person
13   meetings with individuals from HCFA?
14           MS. ST. PETE-GRIFFITH:  Object to the
15   form.
16           THE WITNESS:  That would have been
17   group meetings, and several of us met with HCFA
18   staff in Atlanta and Washington on a number of
19   these issues.
20   BY MR. COOK:
21       Q.  Although you can't put a specific date
22   on the conversations relating to the federal

Page 52

1    upper limit program, can you give me a time range
2    in which these conversations, specifically with
3    respect to what should and should not be in the
4    federal upper limit program, took place?
5            MS. ST. PETE-GRIFFITH:  Object to the
6    form.
7            THE WITNESS:  I would think that that
8    started about 1987 and continued until I left.
9    BY MR. COOK:
10       Q.  Why did you urge the federal government
11   to expand the federal upper limit program beyond
12   simply oral and topical prescriptions?
13           MS. ST. PETE-GRIFFITH:  Object to form.
14           MS. WALLACE:  Objection.
15           THE WITNESS:  Because we did not have
16   staff at Florida Medicaid, and I felt like most
17   other states did not have the staff and the
18   expertise to gather all the necessary data and
19   establish those pricing restrictions, and I felt
20   like it should be the federal government's
21   responsibility to do it centrally rather than
22   have fifty individual efforts out there trying to

Page 53

1    do it.
2    BY MR. COOK:
3        Q.  In your experience, did the federal
4    upper limit program work as an effective cost
5    containment measure for oral and topical
6    prescriptions?
7            MS. ST. PETE-GRIFFITH:  Object to the
8    form.
9            THE WITNESS:  I felt like there was
10   some deficiencies in the program related to the
11   inability to get it updated in a timely manner.
12   BY MR. COOK:
13       Q.  Other than your belief that the
14   updating may not have been as quick as it could
15   have been, were there any other deficiencies in
16   the federal upper limit program --
17       A.  I had some --
18       Q.  -- that is, relating to oral and
19   topical?
20       A.  I had some personal reservations about
21   the way it was designed, but it was effective in
22   controlling or setting a ceiling on the

14 (Pages 50 to 53)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Page 54

1  reimbursement for some of those drugs.
2     Q.  Other than the resource issue of HCFA
3  having more resources than the states, did you
4  have a belief as to why it would be good policy
5  for the federal upper limit program to be
6  extended to drugs such as those contained or
7  listed in Exhibit 1002?
8         MS. ST. PETE-GRIFFITH:  Object to the
9  form.
10        MS. WALLACE:  Objection.
11        THE WITNESS:  You're going to have to
12  restate that.
13 BY MR. COOK:
14    Q.  Sure.  What was the purpose of the
15 federal upper limit program as you understood it
16 back in the 1980s?
17        MS. ST. PETE-GRIFFITH:  Object to the
18 form.
19        THE WITNESS:  The purpose was to
20 contain costs that prescription drug -- various
21 state prescription drug programs spent buying
22 generic prescription drugs.

Page 55

1  BY MR. COOK:
2     Q.  And did you understand that there was a
3  need to contain costs relating to generic drugs
4  beyond simply oral and topical prescriptions in
5  the 1980s?
6     A.  I felt like if you're going to have a
7  cost control program, you ought to make it
8  applicable to everything you reimburse, not just
9  isolate the oral tablets and capsules and
10 topicals.
11    Q.  You indicated that you never got a
12 satisfactory answer from HCFA.  Did you ever get
13 any answer from someone at HCFA as to why the
14 federal upper limit program was not expanded to
15 include injection and infusion products?
16        MS. WALLACE:  Objection.
17        MS. ST. PETE-GRIFFITH:  Object to the
18 form.
19        THE WITNESS:  I may have.  These were
20 philosophical discussions, and we had lots of
21 differences of opinion about what ought to and
22 ought not to be done in managing the prescription

Page 56

1  drug program.  I don't recall the answer.
2  Obviously, it didn't stick in my mind or I'd tell
3  you what it was.
4  BY MR. COOK:
5     Q.  And to be clear, the -- your inability
6  to testify about why it was that HCFA told you is
7  a function of the passage of time, correct?
8         MS. ST. PETE-GRIFFITH:  Object to the
9  form.
10        MS. WALLACE:  Objection.
11        THE WITNESS:  Yeah, I think the
12 function of the passage of time, and it wasn't --
13 apparently, wasn't satisfactory enough to stick.
14 BY MR. COOK:
15    Q.  Was one purpose for Florida
16 establishing its own state MAC to make up for the
17 shortcomings of the federal upper limit program?
18        MS. ST. PETE-GRIFFITH:  Object to the
19 form.
20        MS. WALLACE:  Objection.
21        THE WITNESS:  Specifically, I wanted to
22 have the ability to do a more timely update to be

Page 57

1  able to track the commodities nature of the
2  prescription drug generic market and to allow us
3  more flexibility in applying those cost controls
4  to additional products than that very narrow list
5  that the feds were using.
6  BY MR. COOK:
7     Q.  How did you go about establishing state
8  MACs once the program was authorized by the
9  Florida legislature?
10    A.  Actually, it wasn't authorized by the
11 Florida legislature initially.  We put it in the
12 administrative rule as part of our reimbursement
13 logic.
14    Q.  About when was that?
15    A.  I think that was in the early '90s when
16 I first came back to Medicaid.
17        MS. WALLACE:  Mr. Cook, I just, again,
18 want to reiterate, this has been covered quite
19 extensively in his prior transcripts.
20        MR. COOK:  All right.
21 BY MR. COOK:
22    Q.  How did you go about setting state MACs

15 (Pages 54 to 57)

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                     Tallahassee, FL

Page 122

1    A.  I don't know that I had.
2    Q.  Do you recall reading this newspaper
3  article after it came out with -- with you being
4  quoted in it?
5    A.  I don't.  I do not.
6    Q.  You will agree with me that the
7  difference between acquisition cost and average
8  wholesale price was the reason that you urged
9  HCFA not to use average wholesale price as a
10 pricing mechanism, correct?
11         MS. ST. PETE-GRIFFITH:  Object to the
12 form.
13         MS. WALLACE:  Objection, form.
14         THE WITNESS:  The reason we encouraged
15 them to allow us to use a WAC plus reimbursement
16 basis was because I felt like AWP was being
17 manipulated.
18 BY MR. COOK:
19   Q.  And you had that belief back in 1987,
20 correct?
21   A.  I did.
22         MS. ST. PETE-GRIFFITH:  Object to form.

Page 123

1  BY MR. COOK:
2    Q.  And you communicated that to HCFA back
3  in the 1980s, correct?
4          MS. ST. PETE-GRIFFITH:  Object to the
5  form.
6          THE WITNESS:  I did.
7          MR. COOK:  This is a good time for a
8  break.
9          THE VIDEOGRAPHER:  The time is 11:27
10 a.m.  We are going off the record.
11         We are off the record.
12         (Thereupon, a recess was taken,
13 commencing at 11:27 a.m. and concluding at 11:37
14 a.m. of the same day.)
15         THE VIDEOGRAPHER:  This is the
16 beginning of Tape 3 of the videotaped deposition
17 of Jerry Wells taken on December 15, 2008.  The
18 time is 11:37 a.m. and we are back on the record.
19         (Exhibit Abbott-Wells 1006 was
20 marked for identification.)
21 BY MR. COOK:
22   Q.  Mr. Wells, I've handed you what we have

Page 124

1  marked as Exhibit 1006.  It is -- for the record,
2  it is a document entitled Legislative Proposal
3  Analysis dated October 1, 1998.  Do you recognize
4  this document?
5    A.  I think I do.
6    Q.  You are listed as the contact name on
7  this Legislative Proposal Analysis.  Do you see
8  that?
9    A.  I do.
10   Q.  Is it fair to assume that you probably
11 wrote this Legislative Proposal Analysis?
12   A.  I had something to do with writing it.
13   Q.  What's the subject matter of this
14 Legislative Proposal Analysis?
15   A.  This is parenteral and enteral
16 pharmacies.  It was, I think, drafted after or
17 before a meeting with parenteral and enteral
18 pharmacies and some legislators.
19   Q.  Was Ven-a-Care included in that
20 meeting?
21   A.  I don't know that for sure.  I think
22 they were.  They probably were.  Should have

Page 125

1  been.
2    Q.  Why were these pharmacies and
3  legislators and you meeting together in 1998?
4    A.  This was a discussion meeting to
5  establish reimbursement level for parenteral
6  nutrition and to entertain the idea of
7  establishing a new provider type in the pharmacy
8  program, which would be a parenteral or IV
9  provider to address some of the issues that
10 didn't fit the square peg into the round hole of
11 community pharmacy.
12   Q.  What are some of the issues that you're
13 referring to there when you talk about these
14 square peg/round hole problems between infusion
15 pharmacies and community pharmacies?
16   A.  Infusion pharmacies were involved in
17 preparation of sterile product for injectible
18 use, which is a little more involved than putting
19 prescription tablets or capsules into a vial and
20 dispensing in the community environment.  There
21 were some issues with disposal supplies that
22 providers would like to be reimbursed for that we

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry      PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                      Tallahassee, FL

Page 126

1  had no provision to reimburse them for.
2        (Exhibit Abbott-Wells 1007 was
3  marked for identification.)
4  BY MR. COOK:
5    Q.  Let me hand you, in conjunction with
6  the document you are looking at, we will look at
7  them both at the same time, Exhibit 1007.  And
8  for the record, Exhibit 1007 is an August 24,
9  1990 letter from Zachary Bentley at Ven-a-Care to
10  you.  Do you recall this letter?
11    A.  I don't recall this letter, but I've
12  seen a copy of it before.  I don't recall when it
13  came to my office.
14    Q.  Does this refresh your memory -- let me
15  strike that.
16        Am I correct that this letter discusses
17  the square peg/round hole issues that you were
18  referring to about certain ancillary costs not
19  being covered by Medicaid for infusion
20  pharmacies?
21        MS. ST. PETER-GRIFFITH:  Object to the
22  form.

Page 127

1        MS. WALLACE:  Objection to form.
2        THE WITNESS:  This letter addresses
3  some of those issues.  If you'll give me a minute
4  to read the letter, because I think I've been
5  presented this letter before in depositions, but
6  I've not ever had a chance to read it because I
7  left Medicaid about the time that this letter
8  came, so I suspect Susan McCleod got this letter.
9  BY MR. COOK:
10    Q.  Got it.  If you could take your time
11  and read it, please.
12    A.  (Reading document).
13        Okay.
14    Q.  This letter describes a meeting that
15  you had with Luis Cobo and a telephone call that
16  you had with Zac Bennett, correct?
17        MS. ST. PETER-GRIFFITH:  Object to the
18  form.
19        MS. WALLACE:  Objection to form.
20        THE WITNESS:  I think this letter
21  describes a phone conversation.  I don't think I
22  had met with them.

Page 128

1  BY MR. COOK:
2    Q.  Okay.  So let me retract that.
3        This letter refers to, first, a
4  telephone conversation with Zac Bentley, correct?
5    A.  That's what the letter says.  I don't
6  recall --
7    Q.  And then the --
8    A.  -- the conversation.
9    Q.  And then in the fourth paragraph, it
10  refers to conversations you had had with Luis,
11  who owns a retail pharmacy, right?
12        MS. WALLACE:  Objection to form.
13        THE WITNESS:  And I think that was also
14  a phone conversation or it may have been a face-
15  to-face at a pharmacy meeting somewhere.
16  BY MR. COOK:
17    Q.  I think you probably already answered
18  this question, but do you recall the conversation
19  with either Mr. Bentley or Mr. Cobo?
20    A.  No.
21    Q.  Okay.  Do you recall receiving this
22  letter?

Page 129

1    A.  I don't think I got this letter.  I
2  think this letter came as I was going out the
3  door and so I never saw it.
4    Q.  Do you recall infusion pharmacies --
5  well, let me back up one step.
6        Is it your understanding that Ven-a-
7  Care of the Florida Keys was an infusion
8  pharmacy?
9    A.  Yes.
10    Q.  Do you recall infusion pharmacies in
11  the 1990 time period coming to you in your
12  position with Florida Medicaid and asking that
13  ancillary supplies and pumps for the
14  administration of IV medication be added to
15  Florida Medicaid benefits?
16    A.  I had discussions with a number of
17  parenteral pharmacy vendors.  I don't recall this
18  specific discussion.
19    Q.  What do you recall about those
20  conversations with home infusion vendors in the
21  1990 time period?
22    A.  They were desirous of having infusion

33 (Pages 126 to 129)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                         Tallahassee, FL

Page 130

1  supplies, tubing, IV sets, butterflies, and that
2  sort of thing, added as a reimbursable item under
3  the prescription drug program, and because those
4  products frequently did not have a national drug
5  code, we didn't have any way to pay for them, and
6  the DME, durable medical equipment supply
7  program, would not pay for those by policy for
8  patients that were over the age of 21.
9      Q.  In this letter, Mr. Bentley states in
10 the first paragraph, quote, "I do not feel the
11 profits being generated by home infusion
12 pharmacies from the IV medications are
13 correlative, nor should they be viewed as any
14 potential offset for the cost provisions of the
15 supplies."
16      Do you see that?
17     A.  I see that.
18     Q.  Do you recall there being discussion
19 that profits being generated from IV medications
20 were acting as an offset for the provision of
21 supplies, such as pumps and tubing?
22         MS. ST. PETER-GRIFFITH:  Object to the

Page 131

1  form.
2          MS. WALLACE:  Objection to form.
3          THE WITNESS:  I don't know that I was
4  that involved with that at this time.  I know
5  that when I came back to Medicaid we had some of
6  those discussions.  I think that this was
7  probably right at the tail end of my time at
8  Medicaid and we didn't have a lot of those
9  discussions.  I knew that there was some margin
10 greater than we anticipated on fluids.  I didn't
11 know how much.
12 BY MR. COOK:
13     Q.  Okay.  Because the dispensing fee to
14 infusion pharmacies in 1990 was $4.23, correct?
15         MS. ST. PETER-GRIFFITH:  Object to
16 form.
17         THE WITNESS:  The dispensing fee was
18 the same for all pharmacies in 1990 with the
19 exception of I think we had by that time the unit
20 dose packaging differential that we offered.
21 BY MR. COOK:
22     Q.  And that didn't help infusion

Page 132

1  pharmacies, right?
2      A.  It would not have, no.
3      Q.  And so while you didn't know the
4  precise size of the margin on the drug ingredient
5  reimbursement for home infusion pharmacies as of
6  1990, were you aware that to some degree those
7  home infusion pharmacies were using profits on
8  the drug ingredient side to offset additional
9  costs in the dispensing of IV drugs?
10         MS. ST. PETER-GRIFFITH:  Object to the
11 form.
12         MS. WALLACE:  Objection to form.
13         MR. BREEN:  Objection to form.
14         THE WITNESS:  I had been told that by
15 two or three of those providers.
16 BY MR. COOK:
17     Q.  Did you believe them?
18         MS. ST. PETER-GRIFFITH:  Object to
19 form.
20         MS. WALLACE:  Objection to form.
21         THE WITNESS:  I had no reason not to
22 believe them.  I felt like they were being honest

Page 133

1  and...
2  BY MR. COOK:
3      Q.  And you would agree with me that it
4  makes logical sense that these IV pharmacies had
5  to be making up these additional costs somewhere,
6  correct?
7          MS. ST. PETER-GRIFFITH:  Object to the
8  form.
9          MS. WALLACE:  Objection to form.
10         THE WITNESS:  I don't think it's -- it
11 was not in our policy that that be happening, and
12 it was my desire that we address actual costs.
13 BY MR. COOK:
14     Q.  Right.  And that's what's reflected in
15 the October 1, 1998 Legislative Proposal
16 Analysis, correct?
17         MS. WALLACE:  Object to the form.
18         THE WITNESS:  That --
19         MS. ST. PETER-GRIFFITH:  Objection to
20 form.
21         THE WITNESS:  That would be correct.
22 BY MR. COOK:

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                      Tallahassee, FL

| Page 346 |
|---|
| 1    H I G H L Y   C O N F I D E N T I A L<br>2  responsibility for implementing supplemental<br>3  rebates and preferred drug list and prior<br>4  authorization program, which saved a lot more<br>5  money than we would save by micromanaging the<br>6  prices on some generic products.<br>7      Q.  I'm sorry.  On generic products?  Is<br>8  that what you said?<br>9      A.  That's what I said, yes.<br>10      Q.   So when you were talking about<br>11  providers who were paying too much, that was --<br>12  that testimony was with respect to generic<br>13  products?<br>14        MS. WALLACE:  Objection to form.<br>15        THE WITNESS:  I don't understand your<br>16  question.<br>17  BY MR. YOUNG:<br>18      Q.  I just want to try to understand what<br>19  you mean -- what you mean when you testified you<br>20  didn't want to micromanage generic products.<br>21      A.  I said that we were saving a good deal<br>22  more money through supplemental rebates and a |

| Page 348 |
|---|
| 1    H I G H L Y   C O N F I D E N T I A L<br>2  are going off the record.<br>3        (Signature reserved.)<br>4        (Thereupon, the videotaped<br>5  deposition was concluded at 4:43 p.m.)<br>6<br>7<br>8        _____<br>9          JERRY WELLS<br>10<br>11    Subscribed and Sworn to before me this<br>12  _____ day of _____, 20__.<br>13<br>14        _____<br>15    Notary Public<br>16<br>17    County of _____<br>18    State of _____<br>19<br>20<br>21<br>22 |

| Page 347 |
|---|
| 1    H I G H L Y   C O N F I D E N T I A L<br>2  preferred drug list and prior authorization<br>3  program on branded products than we would have<br>4  achieved savings-wise by micromanaging a few<br>5  generic products, although there were some<br>6  savings possibly to be had there as well.<br>7      Q.  What I'm trying to understand again<br>8  also is when you -- when you testified that you<br>9  thought you could do a better job, was that -- do<br>10  you feel -- were you referring specifically to<br>11  any branded drugs?<br>12      A.  I don't think so.  Most of the branded<br>13  products I felt like our reimbursement was pretty<br>14  reasonably accurate.<br>15      Q.  Okay.<br>16        MR. YOUNG:  That's all I have.  Thank<br>17  you very much.<br>18        THE WITNESS:  Thank you.<br>19        MS. WALLACE:  Thank you.<br>20        THE VIDEOGRAPHER:  This is the end of<br>21  the videotaped deposition of Jerry Wells taken on<br>22  December 15, 2008.  The time is 4:43 p.m. and we |

| Page 349 |
|---|
| 1        CERTIFICATE<br>2<br>3  STATE OF FLORIDA )<br>4  COUNTY OF DUVAL  )<br>5      I, Barbara J. Memory, Registered Professional<br>6  Reporter, certify that I was authorized to and did<br>7  stenographically report the deposition of Jerry Wells, that<br>8  a review of the transcript was requested, and that the<br>9  transcript is a true and complete record of my stenographic<br>10  notes.<br>11      I further certify that I am not a relative,<br>12  employee, attorney or counsel of any of the parties, nor am<br>13  I a relative or an employee of any of the parties' attorney<br>14  or counsel connected with this action, nor am I financially<br>15  interested in this action.<br>16      Dated this 24th day of December 2008.<br>17<br>18        _____<br>19        Barbara J. Memory, RPR<br>20<br>21<br>22 |

88  (Pages 346 to 349)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry          PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                          Tallahassee, FL

Page 350

1              CERTIFICATE OF OATH
2    STATE OF FLORIDA )
3    COUNTY OF DUVAL  )
4
5         I, the undersigned authority, certify that Jerry
6    Wells personally appeared before me and was duly sworn.
7         WITNESS my hand and official seal this 24th day of
8    December 2008.
9
10   _____
11              Barbara J. Memory
12              Notary Public - State of Florida
13              My Commission No. DD467680
14              Expires:  August 31, 2009
15
16
17
18
19
20
21
22

89 (Page 350)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

# EXHIBIT 86

Young, Diana   PORTIONS HIGHLY CONFIDENTIALMarch 28, 2008
Detroit, MI

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------X

IN RE PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE ) MDL No. 1456

PRICE LITIGATION,             ) Civil Action No

THIS DOCUMENT RELATES TO:  ) 01-12257-PBS

United States of America,  ) Judge Patti B.

ex rel. Ven-A-Care of the  ) Saris

Florida Keys, Inc., v.     ) Mag. Judge

Abbott Laboratories Inc.   ) Marianne Bowler

Civil Action No.              )

06-11337-PBS                  )

--------------------------X

        (cross-captions on following pages)

     PORTIONS DESIGNATED HIGHLY CONFIDENTIAL

     The  Videotape Deposition of DIANA YOUNG,

     Taken at 400 Renaissance Center,

     Detroit, Michigan,

     Commencing at 9:16 a.m.,

     Friday, March 28, 2008,

     Before Gay Ann Nosek, CSR 2515.

Young, Diana   PORTIONS HIGHLY CONFIDENTIAL    March 28, 2008
Detroit, MI

Page 66

1  Michigan, some of my customers have their own
2  GPO.
3      Q.  Okay.  Novation is the only one you
4  remember?
5      A.  Yes.
6      Q.  Were any of your customers members of
7  Gerimed (phonetic)?
8      A.  I don't believe so.
9      Q.  IV Med?
10     A.  I don't believe so.
11     Q.  RX Med?
12     A.  RX Med?
13     Q.  Um-hmm (affirmatively).
14     A.  No.
15     Q.  PBI?
16     A.  Yes.
17     Q.  MHA?
18     A.  I don't think so.
19         (Exhibit Young 007 WAS MARKED BY
20  MS. DAVIS FOR IDENTIFICATION.)
21  BY MS. DAVIS:
22     Q.  Take a look at what is being marked as

Page 67

1  Exhibit 7.  I'm going to use the MHA number down
2  in the corner.  Do you see that?
3      A.  Um-hmm (affirmatively).
4      Q.  And it's 30507.
5          MR. SCANNAPIECO:  I'm sorry, my hearing
6  is a little off.  Is it 30507?
7          MS. DAVIS:  Yeah.
8          MR. SCANNAPIECO:  Okay.  Thank you.
9          THE WITNESS:  Okay.
10  BY MS. DAVIS:
11     Q.  This -- the document is titled
12  Questionnaire Group Purchasing Organization, and
13  it appears to have been created by MHA which is a
14  group purchasing organization.
15     A.  Okay.
16     Q.  If you take a look at paragraph 11
17  there.
18     A.  Um-hmm (affirmatively), yes.
19     Q.  Where it says Therapeutic Class
20  Financial Analysis and it asks for information
21  from a company submitting an RFI for information
22  to compare spread based on either the average

Page 68

1  wholesale price, AWP, or on reimbursement.  And
2  then it says if you go down to the next
3  paragraph, financial data compared include:  AWP,
4  MAC, reimbursement, cost, and spread.
5          Were you aware that some of the GPO's
6  decided which products to use based on an
7  analysis of the spread between AWP and the cost
8  from a company?
9      A.  No.
10     Q.  Never knew that?
11     A.  I did not know that.
12     Q.  Did you ever see documents like this
13  from companies -- from GPO's?
14     A.  No.
15     Q.  Did you ever have customers whose GPO
16  was Chartwell?
17     A.  Yes.
18         (Exhibit Young 008 WAS MARKED BY
19  MS. DAVIS FOR IDENTIFICATION.)
20  BY MS. DAVIS:
21     Q.  I'll have you take a look at what is
22  being marked as Exhibit 8.  This is -- the

Page 69

1  document is titled Pharmaceutical Buyers, Inc.
2  We talked earlier about PBI.  Is that PBI?
3      A.  Yes.
4      Q.  You said you had customers who were a
5  member of this GPO?
6      A.  Correct.
7      Q.  Have you ever seen documents like this?
8      A.  Not specifically like this.
9      Q.  Have you seen documents with this kind
10  of information on them?
11         MR. SCANNAPIECO:  Object to form.
12         THE WITNESS:  Not like this.
13  BY MS. DAVIS:
14     Q.  Okay.  Just take a look at -- this
15  appears to be a price list to me.  And if you
16  look at the last column on just any page -- the
17  last column it says PBI contract?
18     A.  Yes.
19     Q.  And it says what looks to be a price
20  underneath it?
21     A.  Yes.
22     Q.  And it has AWP next to that?

18 (Pages 66 to 69)

7ce3b7b2-8838-4084-a1b6-be810c6dd473

Young, Diana   PORTIONS HIGHLY CONFIDENTIALMarch 28, 2008
Detroit, MI

Page 166

```
 1          SIGNATURE OF THE WITNESS
 2
 3
 4
 5
 6          _____
 7              DIANA YOUNG
 8
 9      SUBSCRIBED AND SWORN to before me this
10   _____ day of _____, 2008.
11
12          _____
13              Notary Public
14   My Commission expires: _____
15
16
17
18
19
20
21
22
```

Page 167

```
 1          CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN   )
 3              ) SS
 4   COUNTY OF OAKLAND   )
 5      I, Gay Ann Nosek, Certified Shorthand Reporter, a
 6   Notary Public in and for the above county and state, do
 7   hereby certify that the above deposition was taken
 8   before me at the time and place hereinbefore set forth;
 9   that the witness was by me first duly sworn to testify
10   to the truth, and nothing but the truth, that the
11   foregoing questions asked and answers made by the
12   witness were duly recorded by me stenographically and
13   reduced to computer transcription; that this is a true,
14   full and correct transcript of my stenographic notes so
15   taken; and that I am not related to, nor of counsel to
16   either party nor interested in the event of this cause.
17
18          _____
19              Gay Ann Nosek CSR 2515
20              Notary Public,
21              Oakland County, Michigan
22   My Commission expires:  02-11-13
```

43 (Pages 166 to 167)

7ce3b7b2-8838-4084-a1b6-be810c6dd473

# EXHIBIT 87

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                    New York, NY

```
                                                   Page 1

              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

    ---------------------------------X  MDL NO. 1456

    IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

    AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

    ---------------------------------X

    THIS DOCUMENT RELATES TO:          :

    U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

    Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

    Laboratories, Inc.                 :

    ---------------------------------X


             IN THE CIRCUIT COURT OF

           MONTGOMERY COUNTY, ALABAMA

    ---------------------------------X

    STATE OF ALABAMA,                  :  CASE NO.

            Plaintiff,                 :  CV-05-219

        v.                             :

    ABBOTT LABORATORIES, INC.,         :  JUDGE

    et al.,                            :  CHARLES PRICE

            Defendants.                :

    ---------------------------------X
```

                    Henderson Legal Services
                         202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                      New York, NY

Page 142

1    Q.   And for a brand name drug, would you --
2  at the time, did you expect that there would be
3  much variation between various purchasers based
4  upon volume purchases of the brand name drug?
5    A.   I believe we had a perception that the
6  bigger the purchaser, the larger the discount
7  they were likely to be able to achieve; that the
8  very largest pharmacy chains, for instance, or
9  hospital group purchasing operations, probably
10 received the most favorable prices, but that that
11 would be -- and that some small independent
12 pharmacies might actually pay average wholesale
13 price as described in the compendia; that there
14 would be a range below that in which most of the
15 prices would actually occur.
16   Q.   Turning to generic drugs for a minute,
17 what do you understand to be the differences
18 between the market for brand name drugs and the
19 market for generic drugs?
20      MS. BROOKER:  Objection.  Form.
21   A.   If we're going back to 1997 --
22   Q.   Correct.

Page 143

1    A.   -- I think it's fair to say that I had
2  really only a very limited understanding of the
3  marketplace for generic drugs and an even more
4  limited understanding of the difference between
5  the market for generic drugs and for brand drugs.
6      And, again, my perception at the time
7  was that that was likely more like a commodity
8  market in which there was probably more
9  purchasing power on the part of the large
10 purchasers, but not the same ability to raise
11 prices on the up-side to small purchasers that
12 prevailed on the brand name side.
13   Q.   I'd like to focus you just for a
14 minute, before we turn to a specific document,
15 about a particular generic drug.  I think you
16 mentioned commodities.  Are you familiar with
17 sodium saline solution?
18   A.   Yes.
19   Q.   It's a bag of salt water, essentially.
20 Correct?
21   A.   That's correct.
22   Q.   Would you agree with me that you can't

Page 144

1  get much more commoditized in a bag of salt water
2  in the drug market?
3    A.   The only quibble I would provide to
4  that question is I never really thought of it as
5  classically being part of the pharmaceutical
6  market.  It was such a -- it was really a
7  hospital supply kind of market.  It was such a
8  standard product that even though it was FDA
9  regulated and -- and sterility issues were so
10 forth, it tended to be -- hospitals tend to stock
11 it, for example, in sterile supplies, put it on
12 their cost report as part of sterile supplies
13 rather than through their pharmacies.
14   Q.   But a home infusion provider reimbursed
15 under Part B, for example, might be reimbursed
16 for sodium saline solution.
17      Was that your understanding in '97?
18      MS. BROOKER:  Objection.  Form.
19   A.   Yes, but whether that was as a supply
20 or a drug, I honestly couldn't tell you.  I would
21 have thought of it as a supply.
22   Q.   Turning to the market of it, whether we

Page 145

1  call it a drug or -- or a supply, did you have an
2  understanding, in 1997, of what the market would
3  look like for a product such as sodium saline
4  solution?
5      MS. BROOKER:  Objection.  Form.
6      MR. BREEN:  Objection.  Form.
7    A.   Yes, I did.
8    Q.   And what was your understanding?
9    A.   Well, I actually -- in the 1980s, I
10 believe, when I was first becoming involved in
11 some of these issues in health care economics was
12 the first development of hospital group
13 purchasing operations, and I recall -- and the
14 first widespread circulation of the -- of "Modern
15 Healthcare," the magazine, and I recall monthly
16 headlines in "Modern Healthcare" about group
17 purchasing operations being -- achieving
18 discounts of 98 and 99 percent in their purchase
19 of basic infusion products and sterile supplies.
20      So, my perception was that on the
21 supply market, which, again, I understood and
22 still would contend is actually a separate market

37 (Pages 142 to 145)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                    May 4, 2007
New York, NY

---

Page 146

1  from the pharmaceutical market that list prices,
2  are essentially entirely meaningless and that
3  only the weakest and smallest scale buyers pay
4  anything close to it.
5     Q.  And so, as of 1993, for example, would
6  you be surprised if a single bag of sodium saline
7  solution sold to a provider who bought maybe five
8  would pay $10 per bag, and a large purchaser who
9  bought a very large volume would pay less than a
10 dollar?
11       MS. BROOKER:  Objection.  Form.
12    A.  I would not have been surprised.
13    Q.  Okay.  So, to that extent that --
14 President Clinton referring to a 10-to-1 ratio is
15 something that would be consistent with your
16 understanding of that particular market.
17 Correct?
18       MS. BROOKER:  Objection.  Form.
19    Q.  I'm sorry.  You have to verbalize.
20    A.  Again, I would have thought that market
21 was a subset of the supplies market rather than
22 the drug market.

---

Page 147

1     Q.  That was my question.  But you would
2  have distinguished between the drug market, where
3  10-to-1 would not -- you would not expect to see.
4  Correct?
5     A.  That's correct.
6     Q.  And the supply market, where sodium
7  saline solution would be found, where there could
8  be a huge variation between a small purchaser
9  purchasing at list price and a very large
10 purchaser purchasing at 99 percent off of list
11 price?
12       MS. BROOKER:  Objection.  Form.
13    A.  I would have made such a distinction,
14 and I would not have been surprised to see those
15 sorts of differentials of the supply market.
16    Q.  And in between the commodities supply
17 market of sodium saline and the patent-protected
18 market of a brand name drug, would you expect
19 generic drugs to be somewhere between those two
20 extremes?
21       MS. BROOKER:  Objection.  Form.
22       MR. BREEN:  Objection.  Form.

---

Page 148

1     A.  That would be a question I never
2  thought about before today.  But today I would
3  say that we always made the distinction between -
4  - between drugs and -- and supplies.  And, again,
5  I would fall back on the Medicare green eyeshade
6  distinction between what's sterile supplies and
7  what's pharmacy.
8        MR. COOK:  Let's take a break.
9        THE VIDEOGRAPHER:  The time is 11:28
10 a.m.  We're going off the record, concluding Tape
11 No. 2 in the deposition of Dr. Bruce Vladeck in
12 the matter of In re Pharmaceutical Average
13 Wholesale Price Litigation.
14        (Recess taken.)
15        THE VIDEOGRAPHER:  The time is 11:46
16 a.m.  We're going back on the record, starting
17 Tape No. 3 of the deposition of Dr. Bruce Vladeck
18 in the matter of In re Pharmaceutical Average
19 Wholesale Price Litigation.
20    Q.  Doctor, based upon what we were talking
21 about just before the break, would it be fair to
22 say that while you were administrator of HCFA,

---

Page 149

1  you did not understand published average
2  wholesale price to be the average of prices at
3  which wholesalers were selling their drugs to
4  their customers?
5     A.  It would -- it would be fair to say
6  that I did not believe it was, in fact, an
7  empirical estimate, that rather it was a -- an
8  amount reported by the manufacturer to -- of the
9  compendium compilers or whatever, yes.
10    Q.  And, again, akin to a sticker price?
11    A.  That's correct.
12    Q.  Where did you get that understanding?
13    A.  I believe that was probably what my
14 staff explained to me when I first encountered
15 the concept sometime after I took office.
16    Q.  Do you recall anybody within HCFA who
17 was under the belief that average wholesale price
18 was an average of prices at which wholesalers
19 sold drugs to customers?
20       MS. BROOKER:  Object to form.  And I
21 would just instruct the witness, just, you know,
22 be mindful of not disclosing deliberations,

38 (Pages 146 to 149)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                        May 4, 2007
                    New York, NY

Page 282

1       THE WITNESS:  I appreciate your
2   indulgence relative to that.
3       MR. COOK:  And I think we are off the
4   record.
5       THE VIDEOGRAPHER:  The time is 4:02
6   p.m.  We're going off the record, concluding Tape
7   No. 5 in this day's testimony in the deposition
8   of Dr. Bruce Vladeck in the matter of In Re
9   Pharmaceutical Average Wholesale Price
10  Litigation.
11      Today's testimony consists of five
12  tapes.  The master tapes will be held by
13  Henderson Legal Services of Washington, D.C.
14      (Exhibit Abbott 165 marked for
15  identification.)
16      (The deposition was adjourned at
17  4:02 p.m.)
18
19
20
21
22

Page 283

1   SIGNATURE OF WITNESS
2
3
4
5
6
7   _____
8       BRUCE C. VLADECK, Ph.D.
9
10  Subscribed and sworn to and before me
11  this _____ day of _____, 20____.
12
13
14  _____
15      Notary Public
16
17
18
19
20
21
22

Page 284

1       C E R T I F I C A T I O N
2
3
4   I, JOMANNA DeROSA, a Certified Shorthand
5   Reporter and a Notary Public, do hereby certify
6   that the witness whose deposition is hereinbefore
7   set forth was duly sworn and that the within
8   transcript is a true record of the testimony given
9   by such witness.
10      I further certify that I am not
11  employed to any of the parties to this action by
12  blood or marriage and that I am in no way
13  interested in the outcome of this matter.
14      IN WITNESS WHEREOF, I have hereunto
15  set my hand this 9th day of May, 2007.
16      JOMANNA DeROSA, CSR
17
18
19
20
21
22

72 (Pages 282 to 284)

Henderson Legal Services
202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

EXHIBIT 88

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - -x

In Re: PHARMACEUTICAL INDUSTRY    :

AVERAGE WHOLESALE PRICE           :  MDL No. 1456

LITIGATION                        :  Civil Action No.

_____     :  01-12257-PBS

THIS DOCUMENT RELATES TO:         :

United States of America, ex rel.:

Ven-a-Care of the Florida         :

Keys, Inc. v. Abbott              :  CONFIDENTIAL

Laboratories, Inc.,               :

CIVIL ACTION NO. 06-11337-PBS     :

- - - - - - - - - - - - - - - - -x April 23, 2008

                              9:00 a.m.

     The Videotaped Deposition of DAVID J. ZACKOWSKI

held at the office of: McGuire Woods, Courts Square

Building 310 Fourth Street, N.E. Suite 300,

Charlottesville, Virginia. Pursuant to notice, before

Tina M. Hepburn, Certified Court Reporter, a Notary

Public in and for the Commonwealth of Virginia.

Zachowski, David J. - Vol. ICONFIDENTIAL                April 23, 2008
                     Charlottesville, VA

---

Page 146

1       A       No.  Probably not.
2       Q       Was the instruction not to
3  discuss AWP related only to customers?
4               MR. DEMONTE:  Objection to the
5  form.
6       A       I don't know who -- I don't know
7  what you mean.
8       Q       Were you allowed to discuss AWP
9  with your colleagues?
10      A       There would be no need to.  We
11 don't know what -- we didn't know what AWPs were.
12      Q       Well, you can only speak for
13 yourself, right?
14      A       Yes.
15      Q       So you don't know, for example,
16 what other sales reps may have known or not known
17 about AWP?
18      A       Correct.  I don't know if
19 anybody knew about AWP.
20      Q       Included in the instruction not
21 to discuss AWP with customers -- well, strike that.
22              The instruction not to discuss

---

Page 147

1  AWP related to not discussing with customers; is
2  that right?
3       A       That's correct.
4       Q       Did anyone ever tell you that
5  you were not allowed to discuss AWP within Abbott?
6               MR. DEMONTE:  Objection to the
7  form.
8       A       I don't know that they
9  instructed us to, but we did not.
10      Q       So your experience is that you
11 did not discuss AWP with your colleagues; is that
12 correct?
13      A       That's correct.  As you're
14 salesmen out there in the field, you're generally
15 alone.  I mean, you talk on the phone, but there's
16 not a whole lot of conversation back and forth.
17      Q       Well, you had, for example,
18 conference calls, right?
19      A       Yes.
20      Q       With your district?
21      A       Yes.
22      Q       And district meetings?

---

Page 148

1       A       Yes.
2       Q       And national sales meetings?
3       A       Yes.
4       Q       And from time to time, did you
5  call another sales rep outside of the conference
6  call context?
7       A       From time to time, correct.
8       Q       When a customer brought up AWP
9  to you, were you told how to respond?
10              MR. DEMONTE:  Objection to the
11 form.
12      A       Yes.
13      Q       And what were you told?
14      A       We were told that we do not
15 price our products on AWP.  We -- we do not -- we
16 sell our products based on the length and the breath
17 of our injectable portfolio.
18      Q       And practically speaking, when
19 you had customers bring up AWP to you, did that
20 satisfy them?
21              MR. DEMONTE:  Objection to the
22 form.

---

Page 149

1       A       No.
2       Q       So we've already talked about
3  the first situation; eight or 10 years ago where a
4  customer told you that she wasn't going to be able
5  to buy Abbott's product any longer because of a
6  change to Abbott's AWP; is that right?
7       A       Yes.
8       Q       Okay.  And then at some point a
9  few years later, you testified that another customer
10 told you about AWP and the spread; is that correct?
11      A       Yes.
12      Q       And in what context did that
13 conversation come up?
14      A       Probably -- again, it probably
15 had to do with them purchasing product or -- or how
16 the industry worked.  I think it was getting
17 education on probably how the industry worked, more
18 than anything, rather than a specific product.
19      Q       And did that customer indicate
20 to you that some customers made purchasing decisions
21 based on AWP?
22              MR. DEMONTE:  Objection to the

38 (Pages 146 to 149)

Zachowski, David J. - Vol. I CONFIDENTIAL                    April 23, 2008
                    Charlottesville, VA

Page 366

1  language of the protective order and the procedures
2  set forth in that protective order.
3            MR. DEMONTE:  I have nothing
4  further.
5            THE VIDEOGRAPHER:  The time is
6  4:40 p.m., April 23, 2008.  Going off the record.
7  Completing the videotape deposition.
8
9   (Whereupon, signature not having been waived, the
10  deposition concluded.)
11            * * *
12
13
14
15
16
17
18
19
20
21
22

Page 368

1            CERTIFICATE OF NOTARY PUBLIC
2       I, Tina M. Hepburn, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  shorthand and thereafter reduced to computerized
8  transcription under my direction; that said
9  deposition is a true record of the testimony given
10  by said witness; that I am neither counsel for,
11  related to, nor employed by any of the parties to
12  the action in which this deposition was taken; and
13  further, that I am not a relative or employee of any
14  attorney or counsel employed by the parties hereto,
15  nor financially or otherwise interested in the
16  outcome of the action. _____
17            TINA M. HEPBURN
18            Notary Public for the
19            Commonwealth of Virginia
20            at Large.
21  My Commission Expires: April 30, 2012
22  CCR No.:  0313059

Page 367

1       ACKNOWLEDGEMENT OF DEPONENT
2  I,  DAVID J. ZACKOWSKI, do hereby acknowledge I have
3  read and examined the foregoing pages of testimony,
4  and the same is a true, correct and complete
5  transcription of the testimony given by me, and any
6  changes or corrections, if any, appear in the
7  attached errata sheet signed by me.
8
9  _____        _____
10  DATE            DAVID J. ZACKOWSKI
11
12
13
14
15
16
17
18
19
20
21
22

93 (Pages 366 to 368)

8a6fef43-5e0c-475e-a00d-0743c0a8d151

# EXHIBIT 89

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

IN RE: PHARMACEUTICAL INDUSTRY<br>AVERAGE WHOLESALE PRICE<br>LITIGATION<br><br>——————————————————————<br><br><br>THIS DOCUMENT RELATES TO:<br><br>*U.S. ex rel. Ven-A-Care of the Florida*<br>*Keys, Inc. v. Abbott Laboratories, Inc.*<br>Civil Action No. 06-CV-11337

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

MDL NO. 1456<br><br>CIVIL ACTION: 1:01-CV-12257-PBS<br><br>Judge Patti B. Saris

</td></tr>
</table>

## <u>DECLARATION OF MICHAEL W. SELLERS</u>

I, Michael W. Sellers, hereby state that:

1.      My name is Michael W. Sellers.  I am over the age of twenty-one.

2.      I submit this declaration in support of Abbott Laboratories Inc.'s Opposition to the United States' Motion for Summary Judgment in this matter.

3.      This declaration is based on my own personal knowledge and my review of voluminous record materials in this case, which materials were detailed previously in my depositions.

4.      I began my employment with Abbott Laboratories Inc. ("Abbott") in 1974 and worked for Abbott until 2004.

5.      All of my career at Abbott was spent in various positions within Abbott's former Hospital Products Division ("HPD").

6.      HPD had two business units that sold the four drugs at issue in this case (the "Subject Drugs"):  the Hospital Business Sector ("HBS") and the Alternate Site Business Sector ("Alternate Site").

7.      From approximately 1990 to 1992, I was the Director of Contract Marketing for HBS.  From approximately 1992 to 2000, I was the General Manager of Home Infusion Services, which was a part of Alternate Site.  From approximately 2000 to 2004, I was the General Manager of Contract Marketing for all of HPD.

8.      I was deposed in the above-referenced matter on March 16 and 31, 2008 as Abbott's corporate designee relating to a number of topics, including pricing of HPD products and Abbott's reporting of prices to various third-party pricing compendia.

9.      I am informed that the United States has filed a motion for summary judgment in this matter claiming, among other things, that during the time period of 1991 to 2001 (the "relevant time period"), the Average Wholesale Price ("AWP") published in the compendia was intended to represent an actual average price that wholesalers would charge in the marketplace.

10.      Based on my own personal knowledge and the extensive records and transcripts I have reviewed, I am not aware of anyone in HPD, including myself, who understood the compendia AWP and who believed it was supposed to represent an actual average market price.

11.      During the relevant time period, although AWP was undefined and there was no uniform understanding within HPD of what it meant, those persons who understood how AWP was set by the compendia for Subject Drugs recognized that AWP was calculated for these drugs as a markup over Abbott's published undiscounted price, *i.e.,* the highest price available in the marketplace for these products.

12.     During the relevant time period, HPD did not report an AWP or "Suggested AWP" to the compendia for the Subject Drugs.

13.     At certain points during the relevant time period, HPD reported the published List Price and Wholesale Acquisition Cost for the Subject Drugs to the compendia.

14.     HPD reported these prices to the compendia because it believed that was the information being requested.

15.     HPD did not understand that it had any obligation to report to the compendia the confidential prices that it negotiated for its products with customers in the marketplace.

16.     I declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge, information and belief.

Dated: August 27, 2009

Michael W. Sellers

# EXHIBIT 90

## DECLARATION OF JOHN CARMODY

I, John Carmody, declare under penalty of perjury:

1.      My name is John Carmody.  My current address is 2 Nicholas Ct., White Health, Illinois 61884.  I have worked in the home health services industry since 1988.  From 1988 to 2004, I was the President of OptionCare of Western Illinois and, later, Cottage Home Options (a franchisee of OptionCare of Western Illinois).  During this time, OptionCare of Western Illinois/Cottage Home Options provided home health services to patients in central Illinois and eastern Iowa.  Those services included home health nursing and therapy, medical equipment and supplies, and home drug infusion therapy.

2.      OptionCare of Western Illinois and Cottage Home Options provided services to citizens of Illinois eligible to receive healthcare benefits under the Illinois Medicaid program. As President of OptionCare of Western Illinois and Cottage Home Options, I became very familiar with how the Illinois Medicaid program reimbursed healthcare companies for providing home infusion drug therapies to Illinois Medicaid beneficiaries.  I had several conversations with individuals who worked for the State of Illinois concerning the reimbursement paid to providers of home infusion drug therapies under Illinois's Medicaid program.  The reimbursement paid by Illinois Medicaid for home infusion drug therapies was an important consideration in deciding whether providing services to Medicaid patients was financially feasible.

3.      I recall having specific conversations with an individual named Ron Gottrich, who I understood worked in a policy position for the State of Illinois and had involvement with Illinois Medicaid's pharmacy benefit program.  I do not recall the exact dates or years of those conversations, but believe that they occurred sometime in the mid-1990s.

4.      During those conversations, I recall explaining to Mr. Gottrich that there were considerably higher costs associated with preparing and delivering compounded prescriptions in

the homecare setting.  Such prescriptions would include the antibiotic drug Vancomycin, as well as the diluents used in compounding Vancomycin and many other drugs that are commonly infused into patients over a course of treatment.  As a pharmacist, Mr. Gottrich understood this. He acknowledged that there were considerably higher costs associated with providing injectable and infusion drugs in the homecare setting, and that the dispensing fee paid by Illinois Medicaid (which he acknowledged was designed for retail pill prescriptions) did not come close to covering the costs to dispense home infusion drug therapies.

       5.      I advised Mr. Gottrich that home infusion providers such as OptionCare of Western Illinois and Cottage Home Options believed that the considerably higher costs associated with dispensing home infusion drug therapies warranted additional reimbursement, such as a per diem payment, from Illinois Medicaid.  Mr. Gottrich and I discussed the well-known fact that home infusion pharmacies were able to purchase pharmaceuticals at well below the published AWP pricing often used to set Illinois Medicaid's payment amount for the drugs.  I recall Mr. Gottrich indicating that the "split" between AWP and providers' acquisition cost on the drugs served to partially compensate home infusion providers for the extra costs associated with dispensing home infusion drug therapies.  I also recall Mr. Gottrich indicating that Illinois was reluctant to pay higher fees for home infusion drug therapies (which represented a small percentage of drug claims paid by Illinois Medicaid) because doing so might set a precedent of increased reimbursement for other drug therapies that required additional services.  It was well-understood and agreed that the split between AWP and actual acquisition cost was providing the payment necessary to cover the extra costs of home infusion drug therapy.

       6.      This was how Illinois Medicaid paid home infusion providers for dispensing home infusion drug therapies to Illinois Medicaid beneficiaries until early 2000.  At that time, in

2

response to an investigation by the United States Department of Justice and the state of New York Attorney General's office, the Illinois Department of Public Aid drastically reduced reimbursement for the "drug component" of several intraveneous therapies.  To the best of my knowledge, this change was done before providers could provide feedback on the impact of the drastic reimbursement cuts.  In response to the drastic reimbursement cuts, I drafted a letter to three Illinois legislators to express my concern over the change in policy.  A copy of that letter is attached as Exhibit A to this Declaration.  As stated in the letter, the drastic cuts in reimbursement occasioned by the Department of Justice and the New York Attorney General investigation represented a substantial and fundamental change in Illinois Medicaid's policy of reimbursing cost-intensive home infusion drug therapies, and were inconsistent with the understanding between Illinois Medicaid and home infusion providers on paying a fair reimbursement that would allow home infusion providers to both service their clients and cover their costs.

7.    Subsequent to this change in policy, I observed that Illinois Medicaid beneficiaries faced challenges obtaining access to home infusion drug therapies.  I am aware of several home infusion companies that quit providing services to Medicaid patients because doing so was no longer fiscally feasible.  This access difficulty has been somewhat mitigated by the creation of Medicare Part D.

FURTHER AFFIANT SAYETH NAUGHT.

_____
JOHN CARMODY