# EXHIBIT 91

**AFFIDAVIT OF RON GOTTRICH**

I, Ron Gottrich, declare under penalty of perjury:

1.      From February 1980 to March 2004, I worked in the Illinois Department of Public Health (IDPH).  From approximately 1981 to 1994, I also served as a Consultant Pharmacist with the Illinois Department of Public Aid (IDPA), the state agency which administered Illinois Medicaid's pharmacy benefit.  From approximately 1994 to the end of my tenure at IDPH, I continued to have discussions with IDPA officials on matters relating to Illinois Medicaid's pharmacy benefit.

2.      In my role as a Consultant Pharmacist, I worked extensively with IDPA staff.  Among other things, I was involved in setting maximum allowable costs for generic products, managing the program's drug file and formulary, and overseeing prior authorization requirements.  I was very familiar with the policies underlying Illinois's reimbursement to providers for dispensing prescription drugs to Illinois citizens eligible to receive Medicaid assistance.

3.      During the entirety of my time at IDPH, I was aware that the Average Wholesale Prices, or "AWPs," published in the drug compendia, such as *Red Book* and *Blue Book/First Databank*, were list prices not reflective of the actual prices – net of discounts, rebates, and chargebacks – paid by pharmacies in the marketplace.  In particular, I was aware that the differences between AWPs published in the compendia and the actual prices paid in the marketplace were significantly greater for generic drugs.  I was also aware that the difference between AWPs published in the compendia and the actual prices paid in the marketplace could be substantial for intravenous

1

solutions (such as sodium chloride and dextrose) and injectable drugs commonly infused or injected into patients.  Based on my discussions with them, I understand that these facts were well known among the IDPA staff who worked with Illinois Medicaid's pharmacy benefit.

4.     It was commonly discussed amongst those who administered Illinois Medicaid's pharmacy benefit that the dispensing fees paid by Illinois Medicaid were not sufficient to cover pharmacies' cost to dispense medication to Medicaid participants, much less provide a profit.  I recall discussions amongst those who administered Illinois Medicaid's pharmacy benefit that any updated cost of dispensing study would highlight the inadequacy of Illinois Medicaid's dispensing fee.

5.     It was also commonly discussed amongst those who administered Illinois Medicaid's pharmacy benefit that Illinois Medicaid's reimbursement formula for ingredient cost provided a margin relative to the cost of the drug, and that this margin served to both offset the inadequacy of the dispensing fee and compensate for the fact that Illinois Medicaid did not reimburse drug claims in a timely manner.

6.     In the course of my time at IDPH, I routinely spoke with pharmacists over the phone and at meetings around the state which I attended.  Often, I was asked to speak at meetings attended by Illinois pharmacists.  I recall specifically discussing with other Illinois pharmacists the fact that the margin paid on ingredient cost served to offset the acknowledged inadequacy of Illinois Medicaid's dispensing fee and the delay in receiving payments from Illinois Medicaid.

7.      Attached to this Declaration is a June 12, 2000 letter from John Carmody, President of Cottage Home Options/Option Care, to three Illinois legislatures.  Mr. Carmody's letter discusses Illinois Medicaid's reduction in reimbursements for the drug component of IV medications based on an investigation by the federal Department of Justice.  Mr. Carmody's letter refers to prior discussions he recalls having with me relating to Illinois's reimbursement of IV medications.  His letter states, in part:

> "Some years ago when the State of Illinois developed its current reimbursement mechanism, I had many discussions with the then pharmacy coordinator, Ron Gottrich concerning the mechanism for reimbursing IV medications. It is and was understood that the dispensing fee in NO WAY is able to compensate the pharmacy organization for the costs of preparing and delivering compounded IV solutions, HOWEVER, it was further understood that IV pharmacies were and are able to purchase pharmaceuticals at well below AWP pricing thus partially compensating them for their costs from the drug component."[1]

8.      While I do not recall the specifics of discussions with Mr. Carmody, I do recall having conversations with Mr. Carmody concerning Illinois Medicaid's pharmacy benefit.  The discussions referenced by Mr. Carmody in his letter are consistent with my recollection of numerous conversations with pharmacists over the years where it was recognized and understood that the margin paid on ingredient cost served to offset the acknowledged inadequacy of Illinois Medicaid's dispensing fee and the delay in receiving payment from Illinois Medicaid.  Furthermore, I would agree that pharmacies dispensing IV medications have higher costs that are not seen in the traditional retail pharmacy practice.  Finally, as noted, it was also well understood by pharmacists and

_____

[1] While I worked extensively with IDPA on Medicaid pharmacy issues, I never served as the pharmacy coordinator.

Medicaid officials with whom I spoke that the difference between AWPs published in the compendia and the actual prices paid in the marketplace could be substantial for intravenous solutions and other injectable and infusion drugs commonly used by IV pharmacies.  Based on my previous work in a hospital pharmacy, I was aware that published AWPs for these types of drugs could be several times greater than actual prices paid in the marketplace.

FURTHER AFFIANT SAYETH NAUGHT.

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, I certify that the statements set forth in this affidavit are true and correct.

_____
Ron Gottrich

6-21-09
_____
Date

4

JCAHO Accredited

**COTTAGE HOME** *options*                                    **option**care *

### SPECIALISTS IN HOME HEALTH SERVICES AND PRODUCTS

☒ 427 East Fremont Street          ☐ 952 East Eldorado          ☐ 4239 War Memorial Drive          ☐ 320 North Third Street
  Galesburg, IL 61401                Suite 200                    Suite 203                          Suite 416
  (309) 343-9031                     Decatur, IL 62521            Peoria, IL 61614                   Burlington, IA 52601
  (309) 343-8057 Fax                 (217) 423-6004               (309) 688-1780                     (319) 752-0483
                                     (217) 423-9882 Fax           (309) 688-1824 Fax                 (319) 752-0854 Fax

6-12-00

Congressman Lane Evans
✓ Senator Carl Hawkinson
Representative David Hultgren

Gentlemen:

Please allow me to thank you all in advance for what I assume will be your usual sympathetic attention to the item which I am bringing before you today.

Our company provides home health services through a broad area of central Illinois and eastern Iowa; these services include home health nursing and therapy, medical equipment and perhaps, most importantly, home infusion or home intravenous services. This last area is somewhat unique in that far fewer companies provide these services than do the aforementioned others and do to our lack of significant numbers of providers many times our voice is lost in the bureaucratic jungle of lobbyists and power brokers. A significant issue regarding governmental reimbursement for our services has suddenly occurred and it is one which I believe deserves your attention in order that access to care for our disadvantaged citizens does not occur.

On May 1st of this year the Illinois Department of Public Aid drastically reduced reimbursement for the "drug component" of IV medication services based upon an investigation which was promulgated by the Federal department of Justice. A copy of a memorandum from the State of New York Attorney General is enclosed along with news clippings from USA Today which offer an explanation of why the department has taken the step of drastically reducing reimbursement. For your edification, approximately 10 other states have also reduced reimbursement and Medicare has indicated its intention to follow later this year.

This issue resolves around the concept of AWP or average wholesale price of drugs, a concept which quite frankly has outlived its usefulness in today's marketplace. Prescription drugs are routinely priced via some multiple of AWP, sometimes with a fee for dispensing the medication. In the case of Medicaid, drugs are costed at AWP less either 10 or 12% and in the case of Medicare, a discount of 5% is attached. A minimal dispensing fee is added for Medicaid prescriptions and no dispensing fee for Medicare prescriptions.

Some years ago when the State of Illinois developed its current reimbursement mechanism, I had many discussions with the then pharmacy coordinator, Ron Gottrich concerning the mechanism for reimbursing IV medications. It is and was understood that the dispensing fee in NO WAY is able to compensate the pharmacy organization for the costs of preparing and delivering compounded IV

*"We have the solution for you"*

CONFIDENTIAL                                                    AWP-IL-00016908

solutions, HOWEVER, it was further understood that IV pharmacies were and are able to purchase pharmaceuticals at well below AWP pricing thus partially compensating them for their costs from the drug component. For your edification there are significant costs associated with the preparation and delivery of sterile intravenous products for patient home use that are NOT seen in the standard pharmacy "pour and count" practice, i.e. traditional pharmacy practice. Such costs include accreditation by JCAHO (Joint Commission on Accreditation of Homecare Organizations), which as an aside for our last accreditation was $27,000; significantly more pharmacist time which must be spent on professional activities, delivery costs and certainly far greater time spent in compounding activities - illustratively it takes less than a minute to count pills and label a vial while it may take hours to compound complex sterile IV products.

What I find incredibly interesting is that ONLY IV medications have been targeted for the reduction in AWP prices that is indicated in the attached memorandum. Oral medications, which surely account for the lion's share of pharmacy costs are NOT targeted. I can assure you that pharmacies receive every bit as deep of a discount on oral drugs as we IV providers do on IV products, yet general pharmacy products have been left untouched. I might also indicate to you that my pharmacy, which is one of the larger in the area is unable to purchase anything at the new revised pricing which has been issued. If we therefore assume that I am to cover my costs under the dispensing fee, which both sides agree is inadequate to do so, it should leave me with no rational business alternative than to reduce my services to Medicaid and Medicare patients. At this point we intend to allow our private business to subsidize the losses we will occur under Medicaid and Medicare, however, I am not certain that other providers will do the same, nor that we can do this forever.

Many states have NOT put into place the absurd price rollbacks that have created this crisis and I urge you learned gentlemen to persuade the Illinois department of Public Aid to either reverse the rollback on costs or greatly increase the dispensing fees. The alternative, I fear, is that many disadvantaged recipients of home intravenous services will be left without an alternative to institutionalization. The department should also remember their tacit agreement of years ago that allowed providers such as myself to service their clients and cover our costs. Perhaps the time has come to adequately reimburse pharmacy providers for the services associated with product dispensation, rather than to invent systems that rely on "devious" reimbursement methods which make great headlines but little or no sense.

I would be glad to discuss this serious issue with any of you at any time.

Thank you,

John Carmody BS, MS, RPh
President

CONFIDENTIAL

AWP-IL-00016909

# EXHIBIT 92

# EXPERT REPORT OF

# ELVIN MONTANEZ, PHARM.D.

I.   Qualifications ................................................................................................ 2

    A.   Current ................................................................................................ 2

    B.   Education ............................................................................................ 2

    C.   Experience .......................................................................................... 2

II.  Assignment ................................................................................................... 4

III. Home Infusion Industry ............................................................................... 5

    A.   Definition of Home Infusion Therapy Services ................................. 5

    B.   The Home Infusion Process ............................................................... 6

IV.  Home Infusion Cost Analysis .................................................................... 11

    A.   Staffing ............................................................................................. 13

    B.   Infusion Related Supplies ................................................................. 17

    C.   Equipment And Other Overhead ...................................................... 19

    D.   Biohazardous Materials .................................................................... 19

    E.   Accreditation Standards ................................................................... 20

V.   Home Infusion Reimbursement ................................................................. 21

VI.  Conclusions ............................................................................................... 23

## I. Qualifications

### A. Current

My name is Elvin Montanez. I am the Vice President of operations for a privately held company of home infusion and specialty pharmacies. Additionally, I am the President of a pharmaceutical and medical supply wholesale distribution company and President of a specialized group purchasing organization for home infusion, durable medical equipment, and specialty pharmacies. My work encompasses all aspects of the home infusion operation from patient services, procurement, contracting, sales, marketing, and administrative responsibilities. I am serving a second term as member of the Board of Review for the Community Health Accreditation Program, Inc. I am a member of the National Home Infusion Association and the American Society of Health-System Pharmacists.

### B. Education

I graduated from the University of Florida in 1991 with a Doctorate in Pharmacy where I received academic achievement awards in Pharmaceutics and Pharmacokinetics. I was one of ten national honor students selected to participate in clinical rotations under Jerome Schentag, Co-author of *Applied Pharmacokinetics*.

### C. Experience

I have 14 years of Home Infusion experience. My present responsibilities include executive level direction of a multi-site home infusion business that serves 4 metropolitan areas in the south. I have been employed with my current

employer for 14 years. My executive responsibilities include strategic developments, operational policies, accreditation, quality control, and contracting. I also work within an executive team to bridge operations with sales, marketing, finance, reimbursement, legal, and technology departments. I maintain my clinical pharmacy practice through direct contributions in the pharmacy as a clinician, during clinical audits, program implementations, and as needed. Prior to my present position, I was the director of a hospital pharmacy where I was responsible for all facets of the department including fiscal management, personnel, clinical services, inpatient technologies, outpatient services, procurement, contracting and vendor relations. Previous to this post, I was the clinical coordinator of pharmaceutical services for the same hospital, developing new startup pharmacokinetics programs for dosing and monitoring of aminoglycosides, vancomycin, and other pharmaceutical agents with narrow therapeutic ranges and substantial toxicities associated outside the therapeutic window.

I have co-authored 3 publications related to drug pharmacology and pharmaceutical economics. Details on my presentations related to hospital pharmacy, home infusion, and pharmacology can be reviewed via the attachment A of my CV. I have received a number of awards for my work, also listed in attachment A.

I am being compensated by Abbott Laboratories Inc. (Abbott) $400 hourly for my service.

## II.    Assignment

I understand that Abbott is a defendant in a lawsuit brought by the United States relating to the marketing, pricing, and reimbursement for certain products manufactured and sold by Abbott. I understand that the United States contends that Abbott was involved in alleged misconduct causing the State Medicaid and federal Medicare programs to pay excessive reimbursements to home infusion and other providers which administered certain Abbott products during a time period from 1991 to 2001. The specific Abbott products at issue are various NDC codes of vancomycin, and certain intravenous solutions such as dextrose, sodium chloride, and sterile water for injection. I will refer to the products collectively as the "complaint products" in this report. I am familiar with each of the complaint products from my work and education.

I have been asked by counsel for Abbott to assist the fact finder in understanding how the complaint products are used and reimbursed for in the home infusion setting. In particular, I have been asked to explain the level of care, manufacturing, equipment, and other costs necessary to provide the complaint products in the home infusion setting, including those provided to Medicare and Medicaid beneficiaries. I have also been asked to provide expert testimony, based on my experience in the industry, on the manner and extent to which providers in the home infusion setting are paid for the various costs involved in the use of the complaint products. Finally, I have been asked to express my opinion on the feasibility and fairness of limiting Medicare and Medicaid reimbursement for the complaint products to provider's acquisition

costs without providing adequate compensation for services related to the provision of the complaint products.

## III. Home Infusion Industry

### A. Definition of Home Infusion Therapy Services

The following definition of Home Infusion services is taken from the National Home Infusion Association website at www.nhianet.org. and is consistent with my experience in the industry. Infusion therapy involves the administration of medication through a needle or catheter. It is prescribed when a patient's condition is so severe that it cannot be treated effectively by oral medications. Typically, "infusion therapy" means that a drug is administered intravenously, but the term also may refer to situations where drugs are provided through other non-oral routes, such as intramuscular injections and epidural routes (into the membranes surrounding the spinal cord).

Diseases commonly requiring infusion therapy include infections that are unresponsive to oral antibiotics, cancer and cancer-related pain, dehydration, gastrointestinal diseases or disorders which prevent normal functioning of the gastrointestinal system, and more. Other conditions treated with specialty infusion therapies may include cancers, congestive heart failure, Crohn's Disease, hemophilia, immune deficiencies, multiple sclerosis, rheumatoid arthritis, and more.

Until the 1980s, patients receiving infusion therapy had to remain in the inpatient setting for the duration of their therapy. Heightened emphasis on cost-containment in health care, as well as developments in the clinical administration

of the therapy, led to strategies to administer infusion therapy in alternate settings. For individuals requiring long-term therapy, inpatient care is not only tremendously expensive but also prevents the individual from resuming normal lifestyle and work activities.

Home infusion has been proven to be a safe and effective alternative to inpatient care for many disease states and therapies. For many patients, receiving treatment at home or in an outpatient infusion suite setting is preferable to inpatient care. Many home infusion therapy providers operate one or more ambulatory infusion suites which are ideally suited for certain patient-therapy situations.

An infusion therapy provider is most normally a "closed-door", state-licensed pharmacy that specializes in provision of infusion therapies to patients in their homes or other alternate-sites—called a home infusion therapy pharmacy. The infusion therapy always originates with a prescription order from a qualified physician who is overseeing the care of the patient.

**B.      The Home Infusion Process**

The home infusion process begins with a referral from a physician (or an agent of the physician such as a nurse or case manager) that a patient requires medication for treatment via intravenous administration or injection. This referral initiates the intake coordination. The home infusion provider will need to gather all the clinical information regarding the medical history, current plan of care, medication profile, place of care, current condition, anticipated treatment endpoint, vascular access for treatment, provider participants, and monitoring

parameters. Third party benefits are established and verified during this phase to secure payment and provide patient financial obligations at the start of care. A planned start of care is coordinated between the pharmacy, patient and/or caregiver and the homecare nurse. A coordinated plan of care is developed between the pharmacy and nursing service to establish team roles and responsibilities for the provision of care, monitoring, and intervention. A medical chart is created in the process for the documentation of care.

The pharmacist initiates the clinical services by reviewing all the above information and compiling the proper regimen criteria. These activities include drug-drug, drug-disease, and dosage analysis. The pharmacist will then develop the care plan for laboratory procedures to include the type and frequency of assessments. These may also be provided by the physician or in coordination with physician oversight as the ordering primary care physician. The pharmacist will determine what delivery method will be used to provide the treatment modality safely, effectively, and with cost efficiency. Documentation occurs in the medical record of the plan of care to maintain continuity of care among other participants. All prescriptions are reduced from written materials to an electronic format for end product labels and compounding instructions. All activities are performed under the direct supervision and final inspection of a pharmacist.

Sterile product compounding occurs upon receipt of the order instructions from the pharmacist. This order will include all ingredients and materials required for production, the final number of units to produce, and the detailed quantities of each ingredient resulting in accurate dose and final concentrations.

All activities are performed under sterile conditions requiring the use of a biological safety cabinet designed to minimize particulate material in the environment during production. All compounding participants are required to engage in aseptic technique practices and use appropriate attire which includes gloves, mask, gown, hair bonnet, and other disposable coverings as appropriate.

While prescription medications are compounded, a delivery order is compiled to accompany the drug for administration. These supplies and materials include vascular access supplies such as flushes, syringes, needles, and dressing kits. Other supplies include valves for preventing the free flow of blood into the tubing system and free flow of drug or solution. Supplies used to secure the vascular access devices are sent to prevent disruption of care due to line manipulation. Often, as in the case of the complaint products, medical equipment is required to infuse the medication in a controlled manner as a condition of safety or therapeutic treatment. This equipment must be tested and certified as properly operational prior to use. Disposables such as batteries and proprietary tubing accompany each dispensing event to correspond with the amount dispensed.

Paperwork for the home infusion patient includes the patient drug information sheets, Medicare supplier standards, therapy consent form, receipt of products, equipment, and supplies delivered, biohazardous waste disposal instructions, ten month purchase equipment option, rights and responsibilities, a home insurance coverage information sheet, explanation of emergency contact procedures form, and a dwelling inspection for appropriateness of homecare

service. Presently other documents are required such as HIPAA information and consent.

Trained delivery personnel transport finished pharmaceutical goods under refrigeration to protect the integrity and stability of the sterile products. Consents, forms, and inspections are performed at the time of delivery and verbally communicated to the patient or caregiver.

The amount dispensed is driven by the plan of care developed by the pharmacist and can be influenced by the stability of the finished intravenous product. Vancomycin, one of the complaint products, is known to have a narrow therapeutic range and is associated with both acute and long-term toxicities. This agent requires the establishment of baseline levels for appropriate dose and weekly plasma levels for adjustment of the regimen based on the rate of elimination and desired response. Ineffective doses may lead to resistance and sub-therapeutic response. Excessive doses will cause damage to the renal system. Vancomycin also requires a controlled delivery of the infusion to prevent histamine-related vasodilatation which can be minimally uncomfortable to maximally life threatening. A pharmacist will only dispense the amount required until the plasma levels are evaluated. Once results are available, a pharmacist will conduct an analysis of the drug elimination rate and appropriateness of the dose to recommend any dose adjustments for maximum benefit with minimal toxicity. These analyses are communicated to the physician for consult and further orders. The pharmacist will also communicate with the patient or caregiver and the nurse to assess the response to treatment, vascular access patency, and supply

requirements. All information is documented and used to determine and produce the next dispensing cycle.

The billing department initially verifies the patient's insurance benefits. This information is communicated to the patient along with the delivery information and provides an estimate of the patient's financial responsibility.

After delivery of the items to the patient's home, the billing department will submit a claim (or invoice) for the items to the third party payor providing coverage to the patient, such as an insurance company, managed care organization, Medicare or Medicaid. Each payor has different guidelines or requirements for the formatting and submission of bills. For example, Medicare guidelines usually require various information be provided by the supplier in addition to the claim form. A CMN (Certificate of Medical Necessity) is a form that the physician completes for Medicare patients only in a format required by Medicare to certify that a patient has a documented medical need for the prescribed therapy. The supplier is required to have the original signed copy of this form and to provide this documentation and possibly more along with the claim.

Home infusion billing typically uses a form called a HCFA 1500. This form provides various information to the insurance company regarding the patient's personal information, condition and the medications and supplies provided in accordance with the physician's orders. Home infusion billing is considered specialized due to the compounding nature of the prescription drugs. Each prescription is unique and different based on the various medications used in

mixing the drugs to be administered to each individual patient. Depending on the relationship of the provider with the various third party payors, there may be a variety of different formulas for computing the claim for proper reimbursement for the medications and supplies.

After submission of the claim to the individual payers, the billing department must usually follow-up for payment to be sure the claim was received and in process for payment. If additional information is required, or the claim is sent for review, the billing department must gather and submit any information required by the payer in order for them to process the claim for payment. This process, especially before electronic claim submission can delay payment for services rendered anywhere from thirty to one hundred twenty days. Once payment is received, it is posted against the patient's account and any adjustments to the amount expected versus the amount received are made. If there are any shortages, the billing department must follow up with the payer for reprocessing the claim to correct the shortage. Once the explanation of benefits and payment is received, the patient is mailed an invoice for any amounts they are responsible for. Normally, when the supplier is contracted with the payer, they are not allowed to bill for anything in excess of the amount labeled the patient's responsibility on the explanation of benefits. At times, it can take up to six months to close a claim as paid in full.

**IV. Home Infusion Cost Analysis**

The home infusion industry differs significantly from retail pharmacy due to the severity of the illnesses treated, the medications used, and the route of

administration. As previously mentioned, home infusion pharmacies provide the following services:

- Comprehensive assessment that considers patient history, current physical and mental status, lab reports, cognitive and psychosocial status, family/care partner support, prescribed treatment, concurrent oral prescriptions, and over-the-counter medications;

- Maintenance of appropriate procedures for the compounding and distribution of sterile infusion products as outlined in the national standards and state and federal regulations;

- Drug interaction monitoring and identification of potential drug, dose or drug-catheter incompatibilities;

- Comprehensive admission procedures that include patient education of medical and disposable equipment use, medication storage and handling, emergency procedures, vascular access device management, recognition and reporting of adverse drug reactions;

- Comprehensive care planning that considers actual or potential drug or equipment-related problems, therapy monitoring with specific patient goals, and coordination of activities with other providers such as home health agencies and physicians;

- Ongoing patient monitoring and reassessment activities to continually assess for response to treatment, drug complications, adverse reactions, and patient compliance;

- Laboratory report reviews, as applicable and subsequent consults with care professionals to adjust medication orders if necessary;

- Maintenance of appropriate physical facilities for storage, preparation, dispensing, and quality control of all infusion medications and equipment;

- Ongoing employee education and competence validation activities; and

- Performance improvement programs that include collection of clinical outcomes data, patient perception data, trending and analysis of these and other performance measurement data, and root cause evaluations of all sentinel events.

The following staffing cost analysis is presented in flow chart fashion to account for the process and personnel involved. Time intervals are based on actual experience.

## A. Staffing

The average home infusion independent practice employs at least one pharmacist, one technician, one driver, one billing person, and one intake liaison or nurse. The processes are similar for various treatment modalities with variations in the time required to perform the services requested. Below is an example of the TPN activity-based cost analysis and a vancomycin study.

### Flow Diagram #1 – Process/Personnel/Time part 1

**Intake Coordination**
- Intake nurse
- Time = 60 minutes
- Includes all data gathering of the referral

**Care Planning**
- Pharmacist
- Time = 60 minutes
- Involves treatment plan, goals, labs, formulation, monitoring plan, delivery methods

**Order Entry**
- Pharmacist
- Time = 20 minutes
- Transfering plan to application software and compounding equipment, generating labels and mixing reports.

**Sterile Product Compounding**
- Technician
- Time = 45 minutes
- Preparing formula using aseptic technique under cleanroom conditions, labelling and documenting lot numbers and expiration dates.

**Gathering Supplies**
- Warehouse person
- Time = 10 minutes
- Gathering all equipment and supplies to fulfill the service and prescription

**Final Product Check**
- Pharmacist
- Time = 10 minutes
- Inspecting all products for accuracy of formulation

**Transportation**
- Driver
- Time = 60 minutes
- Delivering to alternate site, explaining and having all documents signed for start of care, home inspection.

Flow Diagram #2 – Process/Personnel/Time part 2

**Compound confirmation**
- Technician
- Time = 5 minutes
- Process that confirms in the system what ingredients were used and what quantities. Important process that drives inventory management and usage costs.

**Delivery Cost**
- Technician
- Time = 5 minutes
- Conforming what was accepted by the client in the system after delivery to create proper charges

**Claims processing**
- Reimbursement person
- Time = 35 minutes
- Transfering all charges onto compliant major medical claims format for paper or electronic transmition. This a highly variable process due to specific third party requirements, calculating bill units, perdiem rates or kits, etc.

**Collections**
- Reimbursement person
- Time = 15-30 minutes
- Even when claims are posted correctly, collections contacts are almost always required to get claims paid.

**Posting payments**
- Reimbursement person
- Time = 10 minutes
- posting payments to client accounts from payments recieved. adjudication of remaining balances.

Table 1 - Hourly Wage

| Hourly wage estimates (1991 - 2001) (Wage figures do not include taxes or benefits) | | | | |
|---|---|---|---|---|
| Pharmacist $28.85 | Nurse $19.23 | Technician $10.00 | Driver $9.00 | Reimbursement $12.00 |

Table 2 - Cost by personnel



| Pharmacist | |
|---|---|
| 1.5 hrs | $43.27 |
| Technician | |
| 0.92 hrs | $9.17 |
| Driver | |
| 1 hr | $9.00 |
| Intake Nurse | |
| 1 hr | $19.23 |
| Reimbursement | |
| 1.1 hrs | $13.20 |
| Warehouse Person | |
| 0.17 hrs | $1.50 |

Wage estimates above are based on my experience during the stated time period. The staffing cost to provide TPN product and services in a home infusion setting for a single dispensing episode of one client is approximately $95 dollars in labor (excluding taxes and benefits). It is important to note that this is a perfect case scenario. Often, a week supply cannot be dispensed due to acute changes in patient response that require adjustment. These costs can increase significantly when dispensed more frequently. Variables that influence pharmacy involvement include poor response to treatment, non-compliance, the presence and influence of other medications or diseases, and many others.

Using the same methodology as above, the staffing cost analysis for vancomycin for the same time period was approximately $61 dollars (excluding taxes and benefits) for a single dispensing episode. Again, the costs can increase

with more frequent dispensing cycles or complications (which are not uncommon with vancomycin treatment). The difference in cost from that of a TPN is primarily due to less pharmacist and technician time. Hydration fluids such as normal saline and dextrose are also manipulated within a cleanroom environment and have similar staffing costs as the production of other antibiotics like the vancomycin.

It is important to note that after-hours service calls are not included in this cost analysis. Pharmacy personnel must remain on-call and available 24 hours per day 7 days per week including holidays.

## B.    Infusion Related Supplies

In addition to personnel time, significant supplies are associated with dispensing home infusion therapies. The following illustrates the types and quantities of medical supplies required to provide TPN service for one week. Treatment cannot be provided without these supplies which are recurrent with each dispensing cycle.

Table #3 – Supply cost analysis of TPN therapy

| Code/Description | | Current Qty | Unit Cost | Value |
|---|---|---|---|---|
| 000339 | ALCOHOL PAD (BD) | 100 | $0.02 | $2.00 |
| 888122 | ANGEL WING COLLECTION SET | 1 | $1.02 | $1.02 |
| 327718 | ANTIBACTERIAL SCRUB 4OZ | 1 | $3.23 | $3.23 |
| 008132 | BAG EMPTY 3000ML TPN | 7 | $6.23 | $43.61 |
| 001500 | BATTERY AA PROCELL | | | |
| 000001 | BIOHAZARD BAG (RED) | 1 | $0.12 | $0.12 |
| 003150 | DRESSING BIOPATCH 4MM (3150) | 2 | $7.39 | $14.78 |
| 005070 | DRESSING KIT W/ CHLOROPREP | 2 | $5.76 | $11.52 |
| 999998 | DRUG INFORMATION SHEET | | $0.00 | $0.00 |
| 003024 | GLOVE EXAM LATEX P/F MEDIUM | 17 | $0.04 | $0.68 |

| 285262 | NEEDLE 22G X 1" HYPODERMIC | 10 | $0.03 | $0.30 |
|---------|----------------------------|-----|--------|--------|
| 999999 | NEW PATIENT ADMISSION PAPERWORK | 8 | $0.01 | $0.08 |
| 999997 | PUMP MANUAL | 1 | $0.10 | $0.10 |
| 013593 | PUMP POUCH DISP 3000ML | 1 | $25.00 | $25.00 |
| 401000 | SET EXT 7" (MEDSTREAM) | 2 | $0.53 | $1.06 |
| 000182 | SHARPS 6.2QT (MAXXIM) | 1 | $2.83 | $2.83 |
| 003015 | SKIN PREP WIPE | 2 | $0.12 | $0.24 |
| 200308 | STATLOCK PICC PLUS | 1 | $4.81 | $4.81 |
| 107104 | STOCKING NET #4 PER FOOT (DEROYAL) | 2 | $0.39 | $0.78 |
| 280008 | SYRINGE 10ML (TERUMO) | 10 | $0.09 | $0.90 |
| 123110 | TAPE CLOTH 1" | 1 | $0.58 | $0.58 |
| 132650 | TUBING GEMSTAR W/ 1.2 MIC FIL | 7 | $7.85 | $54.95 |
| 201590 | VALVE ULTRASITE | 2 | $1.02 | $2.04 |
| 500001 | TPN PUMP RENTAL IN DAYS | 7 | $3.00 | $21.00 |
| TOTAL | | | | $194.58 |

For other intravenous treatments such as vancomycin, the supplies
required for a week period are indicated on Table #4. The time frame of one
week is a standard dispensing cycle to coincide with labs and other treatment
assessments.

Table #4 – Supply cost analysis of Vancomycin therapy

| Code/Description | | Current Qty | Unit Cost | Value |
|------------------|--|-------------|-----------|--------|
| 000339 | ALCOHOL PAD (BD) | 100 | $0.02 | $2.00 |
| 888122 | ANGEL WING COLLECTION SET | 1 | $1.02 | $1.02 |
| 327718 | ANTIBACTERIAL SCRUB 4OZ | 1 | $2.23 | $2.23 |
| 008132 | ELASTOMERIC DEVICE | 7 | $7.25 | $50.75 |
| 000001 | BIOHAZARD BAG (RED) | 1 | $0.12 | $0.12 |
| 003150 | DRESSING BIOPATCH 4MM (3150) | 2 | $7.39 | $14.78 |
| 005070 | DRESSING KIT W/ CHLOROPREP | 2 | $5.76 | $11.52 |
| 999998 | DRUG INFORMATION SHEET | 1 | $0.01 | $0.01 |
| 003024 | GLOVE EXAM LATEX P/F MEDIUM | 16 | $0.04 | $0.64 |
| 285262 | NEEDLE 22G X 1" HYPODERMIC | 5 | $0.03 | $0.15 |
| 999999 | NEW PATIENT ADMISSION PAPERWORK | 8 | $0.01 | $0.08 |
| 401000 | SET EXT 7" (MEDSTREAM) | 2 | $0.53 | $1.06 |
| 000182 | SHARPS 6.2QT (MAXXIM) | 1 | $2.83 | $2.83 |
| 003015 | SKIN PREP WIPE | 2 | $0.12 | $0.24 |
| 200308 | STATLOCK PICC PLUS | 1 | $4.81 | $4.81 |
| 107104 | STOCKING NET #4 PER FOOT (DEROYAL) | 2 | $0.39 | $0.78 |
| 280008 | SYRINGE 10ML (TERUMO) | 5 | $0.09 | $0.45 |

| 123110 | TAPE CLOTH 1" | 1 | $0.58 | $0.58 |
| 201590 | VALVE ULTRASITE | 4 | $1.22 | $4.88 |
| TOTAL | | | | $98.97 |

## C. Equipment And Other Overhead

The home infusion patient is being provided a service in lieu of further

hospitalization or admission. The operations of the home infusion pharmacy

closely resemble that of a hospital-based or inpatient pharmacy. Significant home

infusion overhead costs include the clean room environment required for sterile

product compounding, maintenance of biological safety cabinets and high

efficiency particulate matter filters known as HEPA filters, rigorous quality

control standards for temperature, humidity, and decontamination procedures, and

proper attire used when compounding sterile products. Table #5 lists the items

used by personnel in the clean room prior to the adoption of United States

Pharmacopeia 797 guidelines in 2003.

Table #5 – Clean room attire

| Item Description | Quantity | Cost per unit | Extended Cost |
|---|---|---|---|
| Disposable Gown | 1 | $0.88 | $0.88 |
| Shoe covers | 2 | $0.02 | $0.04 |
| Hair cover | 1 | $0.02 | $0.02 |
| Facial Mask | 1 | $0.05 | $0.05 |
| Gloves (one pair) | 1 | $0.73 | $0.73 |
| Total cost per compounding session | | | $1.72 |

## D. Biohazardous Materials

Medical supplies that are used and exposed to human contaminants such

as body fluids become biohazardous waste that must be disposed of properly.

This includes a manifest of the actual disposal. Home infusion facilities contract with various waste companies for proper disposal and production of disposal manifests for the home infusion facility records retention. At minimum, the waste must be contained in marked containers with provision of proper protective gear for all employees handling the waste. Other systems include shipping systems that create manifest records to a central disposal system. The cost varies by system but can range from $25 dollars per disposal event or $45 per cubic meter disposed.

### E.    Accreditation Standards

Home infusion therapy providers must meet state board of pharmacy regulations and all state and federal regulations established for providers of home health care. In order to assure quality healthcare for their beneficiaries, most public and private payers require that the home infusion therapy provider is accredited. Accreditation bodies, including CHAP, JCAHO, and ACHC, set quality standards for home infusion therapy providers. Surveyors monitor the organization for compliance with these standards of care. The standards are designed to ensure sterility, safety, and maintaining a minimum standard of practice in providing intravenous and other parenteral drug products for home care patients. The cost of accreditation is two-fold. Membership costs are assessed based on size and scope of the practice and can range from several thousand dollars per year to well over ten thousand dollars. The ongoing cost to meet and maintain the standards for compliance add to the operating overhead in the industry, uncommon to community pharmacy practices.

## V.    Home Infusion Reimbursement

In the early era of home infusion, there were little or no guidelines for reimbursement in home infusion billing. Independent insurance companies usually paid one hundred percent of billed charges. The formulas used to compute these charges were usually based on a function of AWP and cost of supplies. Formulas for drug reimbursement billing would be anywhere from 1.5 to 2.5 times AWP and two times cost for supplies. Due to the high cost of hospital inpatient treatment, this was still a considerable savings to payers to provide infusion therapies in the home or outpatient setting.

As home infusion became a more utilized treatment alternative in the 1990's, private payors created other formulas for reimbursement. They began to alter their payment rates based on a percentage of AWP like governmental payors. They also paid for supplies as billed, and began to formulate payments for home infusion based on a per diem charge for days of therapy prescribed and frequency of administration. Those therapies requiring more supplies and variable costs were reimbursed at higher per diem rates than others. In the past few years there have been specific codes added to the recognized published codes to cover the services associated with home infusion therapy.

Medicare has never had a separate medical benefit for home infusion drug therapy. Medicare part B has provided some payment for limited selection of drugs infused through durable medical equipment. Part B is an elective program in which beneficiaries pay a monthly premium for certain outpatient care. Medicare will cover these certain charges at eighty percent of a published

allowable. The beneficiary is responsible for a twenty percent co-payment. Certain drugs that are required to be administered via an electronic pump are considered covered with the durable medical equipment and, therefore, Medicare would cover these drugs and supplies under the Medicare coverage guidelines. In the early 1990's certain intravenous antibiotics, including the complaint drug vancomycin, were only able to be administered via an electronic pump and were therefore eligible for reimbursement through Medicare Part B. The guidelines for reimbursement have changed little over the years. A CMN (certificate of medical necessity) was required and the reimbursement for prescription drugs is based on a percentage of AWP. The pump, the reason for Medicare coverage to begin with, is billed and reimbursed based on published rates of a monthly rental basis for a certain period of time.

Medicare also provided some reimbursement for supplies and administration through kits.[1] But there has been no separate payment for the services (such as compounding and monitoring) and the significant overhead costs associated with home infusion therapy. There was also no payment for nursing or delivery services.

Medicaid's payment for home infusion therapies has traditionally included only a payment for actual prescription drugs (at a formula price) and a very small dispensing fee. During the late 1980s and throughout the 1990s, some Medicaid

---

[1] A kit for supplies is allowed to be billed as one kit per week of therapy. The supply kit is to include all dressings and flush solutions not directly related to the drug infusion itself for maintaining the infusion catheter and catheter site. The payment for a kit has increased over time from approximately $15.00 per kit to approximately $23.00 per kit. The provider can also bill one administration kit per dose of the prescription therapy. The administration kit is for supplies associated with the external drug infusion pump. This kit is to include the diluting solutions, tubing, and administration supplies. The payment for the administration kit has increased over time from approximately $20 per kit to approximately $47.00 per kit.

programs began to formulate payment structures which recognized some of the additional costs of the infusion therapies, but most did not. For example, in the state of Florida, the payment methodology for prescription drugs was the lower of billed charges or WAC plus a certain percent or AWP minus a certain percent. Florida paid the same minor dispensing fee (approximately $4) designed for community pharmacy-based prescriptions. Only for patients under the age of twenty one would Florida Medicaid pay for supplies at a published allowable price. In sum, Medicaid has traditionally not recognized home infusion as an alternate treatment to inpatient coverage but, rather, as a neighborhood community "open door" pharmacy. Therefore, home infusion providers must carefully analyze whether or not they can provide for a Medicaid patient on a case by case basis.

**VI.    Conclusions**

This report describes the industry of home infusion, how services and pharmaceutical products are provided, and the specific cost associated with home infusion therapy. It is an evolving industry that has proven real value to the healthcare system by reducing hospitalization days and associated costs, along with improvements in patient productivity and satisfaction. As discussed in this report and elsewhere, however, the cost associated with home infusion drug therapy (including those therapies using the complaint products) are not comparable to the cost of typical pharmacy services. Home infusion is much more involved and is akin to bringing the necessities of hospital care into the patient's home.

The evolution and expansion of home infusion in the late 1980's and 1990's presented challenges in how to reimburse appropriately for these complex treatments. Billing standards were undeveloped and rates were non-existent. Commercial plans were the first to recognize the value of alternative site services, and initially paid usual and customary charges. Commercial plans later developed per diem and other payment mechanisms to more appropriately compensate providers of home infusion. Because those commercial plans recognized the value of home infusion therapy and paid for them more appropriately, home infusion providers directed their efforts to expand their offerings to these payors.

By contrast, Medicare and Medicaid have been slow to develop payment methodologies that recognize the necessity of providing compensation for the cost associated with home infusion. In the 1990's, Medicare coverage was limited to only a few medications which required controlled pump devices under the durable medical equipment coverage plan. Payments were based on an AWP, or AWP minus a percent, plus an available kit fee. Medicare's payment amounts were significantly less than the commercial equivalent. Medicare's method was not an effective reimbursement model because there was no mechanism to account for the service component variables or quantities of medical supplies required. Similarly, most Medicaid programs during the 1990's, including Florida, did not provide for sufficient compensation for the cost necessary to provide home infusion.

During the time period of 1991 – 2001, home infusion providers relied upon the differential between the actual cost of the medication and the AWP to

subsidize the cost of infusion drug therapy that Medicare and Medicaid payment methodologies did not recognize. This was well recognized in the industry. This differential has allowed home infusion providers to provide infusion services and maintain a modest profit margin. In my opinion, this differential was accepted as the method that CMS and state programs would keep the provider whole while providing access to care. In fact, even to this day-in recognizing the insufficiency of compensation for services-Medicare Part B continues to base it's allowable for infusion drugs administered through DME on AWP rather than the lower ASP. This payment system was not perfect but, as previously stated, no coding or billings standards were available in this new service. This differential was the only payment mechanism available from Medicare and many Medicaid programs to compensate for the higher costs necessary to provide good quality care. As a home infusion provider, I could not have afforded to treat these patients without compensation necessary to cover my cost.

Elvin Montanez, Pharm.D.                    3/6/09
                                             Date

# EXHIBIT 93

<u>**EXPERT REPORT OF DR. BRIAN REISETTER**</u>

**I.   BACKGROUND AND EXPERIENCE**

1.  My name is Dr. Brian Charles Reisetter.  I am submitting this report at the request of Abbott Laboratories Inc.

2.  I graduated in 1980 with a Bachelor of Science (BS) degree in Pharmacy at Drake University in Des Moines, IA.  I graduated from Drake University in 1987 with a Master of Business Administration (MBA).  I completed extensive graduate work at the University of Illinois at Chicago (UIC) in the Doctor of Philosophy (PhD) program from 1993 until 2000.  The emphasis of this graduate work was social science and communication as they relate to the profession of pharmacy.

3.  In 2002, I graduated from the University of Mississippi with a Doctor of Philosophy (PhD) in Pharmacy Administration with an emphasis in Pharmaceutical Marketing.

4.  In conjunction with my graduate academic work, I was a teaching assistant (TA) at both the University of Illinois at Chicago and the University of Mississippi in several courses, including Pharmacy Law and Pharmacy Communications.

5.  I am currently an instructor for one course at the University of Mississippi, College of Pharmacy, entitled The Techniques of Pharmaceutical Sales.  I have taught this course for six consecutive years.

6.  I have been licensed as a pharmacist in the State of Iowa since 1985.  I was also licensed to practice pharmacy in the State of Illinois from 1992 until 2000.  I am currently licensed as a pharmacist in the State of Mississippi.

7.  Since licensed in 1985, I have practiced pharmacy full-time (1985-1987, 1992-1998) and part-time (1998-2000) in retail pharmacy (chain and independent) and in hospital pharmacy (inpatient and outpatient) in the states of Illinois and Iowa.  My experience as a pharmacist included Long-Term Care (LTC).  As a retail pharmacist, my duties included purchasing and claims submissions to public and private third party payers of drugs, including Medicaid, for the stores where I was contracted or employed.

8.  I was a professional sales representative for Eli Lilly and Co., Inc., from 1987 until 1992.  My territory was based out of Des Moines, IA.

9.  I served as Director of Pharmacy at Chicago Lakeshore Hospital Pharmacy in Chicago, IL, from 1992 until 1998 in conjunction with my previous corporation, Reisetter Pharmacy Health Services, Inc. (RPHS).  During that time, I was fully responsible for prescription and non-prescription pharmaceutical product purchasing for the hospital.  I was also a member of the Pharmacy and Therapeutics (P&T) Committee and the Risk Management Committee as part of my normal duties.

10.    Through RPHS, I have consulted for several clients regarding marketing issues in the pharmaceutical industry.  RPHS was active as a corporation from 1994 through 2001.

11.    I was a contracted "relief" pharmacist in both Illinois and Iowa through RPHS for independent and chain pharmacies needing pharmacists for limited amounts of time.  I would often manage or operate independent pharmacies for the owners while they were sick or on vacation.  My activities in this role included product purchasing and claims submission for all prescriptions dispensed.

12.    I am a founding partner of Medical Marketing Economics, LLC (MME), where we work extensively with the pharmaceutical industry in the areas of pricing, marketing strategy and market research.  MME also provides limited litigation support and expert witness testimony.

13.    Through my education, research, professional experiences in the pharmaceutical industry and in the practice of pharmacy, and my work with MME, I have extensive knowledge of pharmaceutical marketing and promotion.

14.    My experience, publications, and prior testimony are provided in detail in my CV.

15.    Medical Marketing Economics (MME) is being compensated at a rate of $450 per hour for my work in this matter.

## II.    TASKS REQUESTED

16.    I have been asked to testify on the following subject matters:

    a.    How pharmaceutical companies market their products, specifically:

        i.    How companies develop an overall marketing strategy for their products, and how those strategies are implemented.

        ii.    The frequency and modes of communication companies use to implement an overall marketing strategy for a product, both to internal members of the company and to the market participants (*e.g.*, customers).

    b.    How any strategy to market the difference between acquisition cost and the reimbursement amount ("the spread") for products would be implemented, and what sources of evidence would exist if such a strategy were designed and implemented.

    c.    The methodology employed by Dr. Matthew Perri in his expert report submitted in this matter and the conclusions that he draws.

17.    To complete this task, I have relied upon my education, knowledge, experience, and a review of the materials that are provided in the attached schedule.

- 2 -

## III.   FINDINGS AND OPINIONS

*Pharmaceutical Marketing and Marketing Theory*

18.   Pharmaceutical companies are sophisticated businesses that utilize organized marketing efforts to support their products.  Pharmaceutical marketing is well developed, systematic, and consistent.  Corporate marketing decisions are not made in a simplistic or arbitrary fashion, but are part of a systematic process in which all marketing activities are consistent with a specific strategy for a product or product line.

19.   Pharmaceutical marketing activities are typically presented in four distinct categories:  1) product, 2) promotion, 3) placement (distribution) and 4) price.[1] These categories are not specific to pharmaceutical marketing, but are standard in overall marketing theory.  In the pharmaceutical industry, marketing activities in these four categories interact, complement each other, and are part of an overall marketing strategy for a particular product or product line.

20.   For example, if a company had an overall marketing strategy to create value through being the "lowest cost, quality alternative," the marketing of that value would be consistent throughout each of the "Ps" of marketing.  Setting the ***price*** lower than the alternative products alone would not suffice within this strategy. The ***product*** must be of similar or equal quality before this strategy could be employed.  Distribution ***(placement)*** would have to be designed to make the product equally available as an alternative.  As important, this message of the "low cost, quality alternative" would be consistently ***promoted*** to potential customers, typically through multiple promotion and advertising media.

*What "Marketing the Spread" Would Entail*

21.   Dr. Perri, in his report, concludes that Abbott marketed the products in question based upon the spread.  I disagree that any such conclusion can be drawn from the evidence cited in Dr. Perri's report.

22.   The idea of "marketing the spread" is akin to creating an overall product goal to maximize profits for providers through reimbursement by third parties.  If a company employed a strategy to market the spread, product managers, sales representatives, and other marketers would incorporate that goal explicitly and continuously into all the activities of the product.  These activities would span all areas of marketing (*e.g.*, the 4-Ps of marketing); therefore, one would expect to see consistent, explicit, systematic and continuous evidence that such a marketing plan were in place.  Evidence of such a marketing strategy would exist in several forms, including internal discussions of the specific marketing plan, training materials explicitly outlining the goals and activities, research to determine if this

---

[1] Mickey C. Smith, *Pharmaceutical Marketing: Strategy and Cases*, 1st ed. (1991), p. 11-13.

plan was the appropriate course of action, and promotional materials to aid account representatives in presenting this explicit message to customers.

23.    A strategy to market the spread, if implemented, would be communicated consistently and persistently throughout the company or relevant business unit. Because the process of marketing includes all four elements of price, product, placement, and promotion, an expert in pharmaceutical marketing would expect to see evidence of this overall strategy from multiple sources consistently over time in each of these discrete categories.

24.    A marketing plan does not just "happen" at large pharmaceutical companies, and it is not dictated or defined by the isolated actions of individuals.  The marketing strategies and resultant marketing plans are discussed, researched extensively, presented at internal meetings, then eventually (if approved) built in to a part of the overall product plan.   Once approved, promotional messages are tested, promotional materials are created, representatives are trained, potential customers for the message are identified, and the message is delivered as planned. Throughout the process, there are constant feedback mechanisms and each component is evaluated for refinement or abandonment based on evolving market conditions or competitive response.   Evidence of these activities would include (but not be limited to):

   a.    Consistent documentation as to how to best market the message of provider profitability.

   b.    Continuous process of building a product strategy and core message around the topic of marketing the spread.

   c.    Consistent and continuous research on the issue of provider profitability as a potential driver of sales.

   d.    Extensive and explicit research on the correct messages and materials to be used by representatives to promote the spread.

   e.    Evidence of continuous competitive intelligence research in the area of competitor pricing and "spread."

   f.    Continuous internal training on how providers are compensated as a basis for making decisions on marketing the spread, including specific training on provider compensation by payer type and geographical region.

   g.    On-going and explicit development of training materials needed for marketing the spread.

25.    Once past the planning stage and entering the implementation stage, companies must train their representatives as to how this message should be conveyed.  That process would include both training personnel and developing the tools necessary for delivering the message.  These activities would include (but not be limited to):

a. Explicit dissemination of the goal of maximizing provider reimbursement continuously over time.

b. Consistent use of this strategy as a metric for sales representative evaluation and performance goals.

c. Training materials for account representatives that are continuously revised for training existing and new hires. This information would include specific training for each sales representative and account managers on (at a minimum):

    i. Regional and State differences in reimbursement and how that would affect the promotional message.

    ii. How reimbursement has changed over time and how changes in promotion must change as a result.

d. Multiple versions of promotional materials including advertising pieces explaining to customers how Abbott products increased profits through maximizing reimbursement

e. Lectures, presentations, and internal training materials consistently and explicitly outlining the strategy of profit maximization for the provider as a goal of each sales presentation.

f. Internal correspondence and feedback as to the success of the strategy in the field—resulting in potential refining of the message

26. A strategy that focused on maximizing the spread for customers would drive all product pricing decisions as well. As such, one would expect to see consistent and continuous internal discussions of pricing actions, in the context of maximizing payer reimbursement. Pricing decisions based on this strategy would rely on extensive market research specifically designed to determine how to structure prices to maximize profitability based on the spread.

27. Based on the evidentiary material that Dr. Perri presented in his report, I disagree with his conclusion that Abbott had a marketing strategy based upon the spread. The evidence simply does not reveal the type of continuous, systematic and explicit indicia of a marketing strategy as outlined above.

28. To the contrary, the evidence that Dr. Perri presented and I reviewed is most consistent with Abbott employing a marketing strategy as outlined in the training materials prepared for sales representatives. These representatives were trained to market the products based upon:

a. Breadth of product line.

b. Breadth of available packaging within that product line.

c.     Reliability of supply and multiple sources from which to purchase products (distribution options).

d.     Competitive pricing.

e.     Customer service.[2]

*"Case Study" Method Employed by Dr. Perri*

29.    Dr. Perri purports to utilize a case study methodology to draw conclusions regarding Abbott's corporate conduct as well as its perceptions, knowledge, and intentions.

30.    The case study methodology is a seldom employed methodology that is utilized when preferred standard experimental design or quasi-experimental design are not possible. A leading publication acknowledges that "as a research endeavor, case studies have been viewed as a less desirable form of inquiry than other experiments or surveys."[3] Because this type of research usually involves a single occurrence of an event, standard statistical comparisons between groups are not possible.

31.    Because of the inherent nature of the design and data collection within standard case study methods, it is particularly important that these studies be properly designed and implemented with the utmost scientific rigor. If one fails to comply with standard methods, the study results are inherently unreliable.

32.    The case study methodology is commonly known to be susceptible to bias, meaning that the evaluator "has allowed equivocal evidence or biased views to influence the directions of the findings and conclusions."[4] If such bias is present, then the study results will be compromised.

33.    The case study methodology requires more than a researcher simply reviewing evidence and providing a subjective opinion regarding what that evidence means.

34.    When properly employed to prevent such bias, any case study research that is intended to yield conclusions (*e.g.*, whether Abbott had a strategy of marketing the spread) should, prior to any data collection, include the following processes:

a.     Identify the theoretical framework or underpinnings on which evidence will be evaluated.

b.     Identify the research hypotheses or propositions, based on the above theoretical framework.

---

[2] *See, e.g.*, Rayford deposition, Ex. 10.

[3] Robert K. Yin, *Case Study Research: Design and Methods*, 3d ed., p. 10.

[4] Yin, p. 10.

     c.     Identify the pattern of evidence that one would expect to see that would support or not support the research hypotheses or propositions.

     d.     Develop a protocol for data collection that identifies how data should be reviewed and coded, and how themes will be identified, categorized and analyzed.

35.     Based on his report and deposition, Dr. Perri did not utilize these generally accepted processes known to be standard within case study methodology.  Dr. Perri did not identify a theoretical framework for this research[5], did not identify hypotheses or propositions, did not *a priori* identify the patterns of evidence one would expect to see if Abbott had a strategy of marketing the spread, and did not provide a structured system of analysis for the data he reviewed.

36.     Of most concern were the methods Dr. Perri employed during the analysis phase of his research.  Case study methodology requires that investigators "attend to *all* the evidence, display and present the evidence separate from any interpretation, and show adequate concern for exploring alternative interpretations." (emphasis in original)[6] Rather than following this crucial principle, Dr. Perri has been selective in the facts he uses to support his opinion that Abbott's strategy was one of marketing the spread.

37.     For example, Dr. Perri identifies only one Abbott sales representative (Mr. Lotz) who claims to have affirmatively marketed the spread to customers as support for his conclusion that Abbott had a corporate strategy of marketing the spread.  He places little or no weight on the testimony of all the other Abbott employees who denied marketing the spread and who testified that they understood it was Abbott's policy not to do so.  He also fails to take into account that Mr. Lotz had a limited sales territory, marketed the spread only for a short period of time, was instructed by his manager to stop this activity when the manager found out what he had been doing, and immediately stopped the activity as his manager instructed.[7]

38.     Due to these flaws in methodology, Dr. Perri's conclusions regarding Abbott's corporate conduct, and its intentions, knowledge and perceptions, cannot be considered scientifically reliable or valid.

39.     I reserve the right to amend or supplement my opinions as new information is provided in this matter.

---

[5] Deposition of Dr. Matthew Perri, February 4, 2009, p. 197.

[6] Yin, p. 109.

[7] Deposition of William G. Lotz, August 9, 2006, p. 97.

Dated:  March 5, 2009

_____

Dr. Brian Reisetter

# EXHIBIT 94

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>Civil Action No. 1-12257-PBS |
| THIS DOCUMENT RELATES TO:<br>*United States of America ex rel.*<br>*Ven-a-Care of the Florida Keys,*<br>*Inc., v. Abbott Laboratories, Inc.* | MASTER FILE NO.<br><br>Judge Patti B. Saris |

# EXPERT REPORT OF STEVEN J. YOUNG

**Table of Contents**

I.    Qualifications and Compensation.................................................1

II.   Scope of My Report .........................................................3

III.  Summary of Opinions ......................................................4

IV.   Abbott Products at Issue..................................................5

      A.    How Abbott Sold the Products........................................ 6

      B.    Abbott's Primary Customers ........................................7

V.    Product Administration and Reimbursement..................................8

      A.    Medicare and Medicaid Reimbursement ..............................8

            1.    The Medicare Program.........................................8

            2.    The Medicaid Program .........................................9

            3.    Medicare and Medicaid Hospital Reimbursement....................... 10

      B.    Compensation to Providers for Dispensing and
            Administration Costs .................................................10

VI.   Dr. Duggan's Methodology ................................................11

VII.  Dr. Duggan's Analysis of Reimbursement Paid for These Products......12

      A.    Dr. Duggan's Medicaid Reimbursement Calculation ..................12

            1.    Dr. Duggan Did Not Consider the Interrelationship of Product
                  Cost and Dispensing Fees ......................................... 12

            2.    Dr. Duggan Limited His Review of Actual Claims Data................ 14

            3.    Dr. Duggan Extrapolated To Unanalyzed Populations.................. 16

                  a) Dr. Duggan's Methodology Did Not Consider the
                     Variability of Medicaid Reimbursement Across States .............. 17

                  b) Dr. Duggan's Methodology Did Not Consider the
                     Variability of Dispensing Fees................................. 19

      B.    Dr. Duggan's Medicare Reimbursement Calculations .................. 21

VIII. Dr. Duggan's Analysis of "But For" Reimbursement for These
      Products....................................................................22

A.     Dr. Duggan's Creation of His "Calculated Price" to
       Contracted Pharmacies........................................................ 23

B.     Dr. Duggan's Medicaid "But For" Reimbursement
       Calculations ........................................................................ 25

C.     Dr. Duggan's Medicare "But For" Reimbursement
       Calculations ........................................................................ 26

IX.    Dr. Duggan's "DIFFERENCEs" Are Also Impacted By Various Other
       Factors .......................................................................................... 29

A.     Analysis of Dr. Duggan's "DIFFERENCE" Period.......................... 29

B.     Dr. Duggan's "DIFFERENCE" Includes Claims That Have
       Been Resolved ..................................................................... 30

C.     Dr. Duggan's "DIFFERENCE" Does Not Account for the
       Rebates Paid by Abbott to Every State Medicaid Program ......... 31

X.     Other Opinions............................................................................... 31

A.     Available Sources of Product Pricing Information ..................... 31

B.     Context for Spread Allegations................................................ 33

C.     Analysis of Unit Sales............................................................ 34

D.     Annual Price Changes ........................................................... 34

## I.   Qualifications and Compensation

1)      I have been a consultant to the health care industry for approximately twenty five years.  I have substantial experience with health insurance reimbursement, pharmaceutical pricing and the related distribution channels.  My Curriculum Vitae and listing of testimony is attached as Exhibit 1.

2)      I have substantial experience related to pharmaceutical manufacturer pricing for both branded and generic products.  I have worked with pharmaceutical companies in performing detailed analyses of their pricing, charge-backs, and rebate data.

3)      I have advised clients in various industries that sell commercial products to the government, including furniture, security equipment, durable medical equipment, secure communications systems, pharmaceuticals and satellite telephones.  My work with these clients has included extensive analysis of pricing, discounting and rebate data for disclosure to the government.

4)      I have substantial experience in analyzing private insurance companies' claims data and reimbursement schedules.  For example, I have worked with health insurance companies to analyze their claims and membership data to assess their Medicare coordination of benefits processes.

5)      I have extensive experience assisting insurance and managed care companies with their reimbursement processes and practices, the related claims processing systems and output, contractual agreements, claims system assessments and validation procedures, and assessments of medical management practices.

6)    I have experience working with Medicare Fiscal Intermediaries and Medicare Carriers to assist them with various government contracting requirements and the transitioning of Medicare claims processing activities to a successor contractor.  I am therefore familiar with the operating structure of these organizations and their reimbursement processes.

7)    I have experience assisting insurance and managed care companies in structuring and preparing proposals to perform managed care support contracts for the Department of Defense under the TRICARE program, which provides health insurance to active duty and retired military personnel and their families.  My work has focused on assisting managed care companies structure and price operations to perform all requirements of the contract, including claims processing, customer service, provider relations, provider contracting, utilization management, and quality management.  As part of these engagements, I have worked closely with the insurance companies' management as well as their actuarial and technical experts to make overall strategic pricing assessments relating to the various components of health care pricing and their related administrative costs.

8)    I am being compensated at an hourly rate of $425.00.  No portion of my firm's compensation is dependent on the nature of my findings or on the outcome of this matter.  A list describing the data and information I relied upon is attached as Exhibit 2.

## II.    Scope of My Report

9)      The United States has brought suit against Abbott Laboratories Inc.

("Abbott") relating to the pricing and marketing of certain pharmaceutical products

manufactured and sold by Abbott, and the payments made by the Medicare and

Medicaid programs to providers for those products.  It is my understanding that the

United States contends that Abbott caused the Medicare and Medicaid programs to pay

"excessive reimbursements" to providers that dispensed or administered certain

products from 1991 to 2001.[1]  The products at issue are certain national drug codes

(NDCs) of vancomycin, dextrose, sodium chloride and sterile water.

10)      In support of its claims that Abbott caused the Medicare and Medicaid

programs to pay "excessive reimbursements" to providers, the United States has served

two expert reports from Dr. Mark G. Duggan.  Using a variety of data sets, and relying

upon certain work conducted by two firms (Myers & Stauffer and Steck Consulting), Dr.

Duggan has described his work as follows:

> This Report calculates a $108.2 million difference between (1) what
> the federal government reimbursed for certain pharmaceutical
> products provided to Medicaid and Medicare recipients during the
> eleven-year period 1991 to 2001 and (2) what the federal
> government would have reimbursed for the same products during the
> same period if prices reflective of the actual prices at which Abbott
> was transacting business had been used for the AWP, WAC and Direct
> Price of Abbott's products.[2]

---

[1] See The United States' First Amended Complaint, Case 1:01-cv-12257-PBS, Document 4281
Filed June 4, 2007.

[2] See Dr. Duggan's Report dated June 19, 2008, p. 2.

11)     Dr. Duggan later revised his calculation to $107.1 million in a

supplemental report dated January 23, 2009.[3]

12)     I have been asked by counsel for Abbott to review, evaluate, and

comment upon the analysis conducted by Dr. Duggan that led to his $107.1 million

"DIFFERENCE" calculation.

13)     Finally, given my experience in the health care field, I have been asked to

comment upon certain assertions made in the United States First Amended Complaint.

## III.   Summary of Opinions

14)     My primary (but not exhaustive) concerns with Dr. Duggan's approach

and his conclusions fall within the following categories:

- Dr. Duggan calculated his "DIFFERENCE" by limiting his analysis to a small sub-population of Medicare and Medicaid reimbursement data (limited in both time and scope).

    o Dr. Duggan extrapolated this limited information to other sub-populations including other states (Medicaid), other geographic regions (Medicare) and other time periods (eleven years) that he chose not to analyze, in spite of the variability over time and among these populations.

    o Dr. Duggan calculated a "DIFFERENCE" for Medicare payments during the relevant time period, acknowledging that he included units sold not by Abbott but by other manufacturers.

- Dr. Duggan created his "Calculated Price"[4] by limiting his analysis to less than 2% of sales, selecting only negotiated contract sales to certain pharmacy customers.[5]

---

[3] See Dr. Duggan Report dated January 23, 2009, Section I.

[4] I have been unable to find a single defined term used by Dr. Duggan in his report (e.g., he uses "pharmacy average price," "average pharmacy specific price," "average pharmacy indirect price," "alternative price," etc.).  For convenience, I use the term Dr. Duggan's "Calculated Price."

[5] I compared the direct and indirect sales for the customer categories analyzed by Dr. Duggan (A003, A007, and M070) found in Dr. Duggan's Table 4 and Table 9 to total sales for these products.

- Dr. Duggan ignored the important relationship between ingredient cost and dispensing/administration fees in arriving upon the total reimbursement for a Medicare and Medicaid provider.

- Beyond these fundamental problems, Dr. Duggan's "DIFFERENCE" is overstated due to certain other assumptions he appears to have made and certain calculation errors.

15)   I disagree with Dr. Duggan both in concept (i.e., that his proposed approach is appropriate) and in application (i.e., that he properly implemented his proposed methodology).  I will expand on my concerns below.

16)   I have also been asked to provide additional opinions related to the allegations in this matter.  These opinions are included in Section X. of this report and relate to:

- Available sources of product pricing information

- Context for spread allegations

- Analysis of unit sales

- Annual price changes

## IV.   Abbott Products at Issue

17)   The four Abbott Products named in this complaint – dextrose, sodium chloride, sterile water and vancomycin (referred to collectively as "products") -- are generic hospital solutions and intravenous antibiotics.  Unlike self-administered drugs, most of these products are bulky solutions that typically involve unique storage, mixing, maintenance, and distribution requirements.  In addition, the products require administration by a healthcare professional rather than the patient.

18)   These products have been on the market for decades and face extensive competition.  Abbott marketed and sold the products through its former Hospital

Products Division to customers that negotiate a contract with Abbott ("Contract" purchases).[6]  The products were also available for purchase by end purchasers without a negotiated contract with Abbott ("Non-contract" purchases).  Abbott's primary customers included hospitals, wholesalers, distributors and government purchasers.

## A.    How Abbott Sold the Products

19)    Healthcare providers were able to purchase these products directly from Abbott or through a wholesaler or distributor.  When the provider purchased directly from Abbott, Abbott distributed the product to the customer.  Some customers were able to negotiate a contract with Abbott but arrange to take delivery of the products through a wholesaler.  This allowed customers ordering many products from many different manufacturers to streamline inventory and delivery.  For those purchases, the wholesaler would honor the negotiated contract price with Abbott's customer, and seek from Abbott any difference between the customer contract price and the amount originally paid by the wholesaler to Abbott for the product.[7]

20)    Providers that did not have a negotiated contract with Abbott purchased Abbott's product either directly from Abbott, or indirectly from a wholesaler or distributor.  Situations in which a customer might purchase a product without negotiating a contract could include small customers that purchase in small volumes or customers that had contracts with other manufacturers but experienced supply problems.  Wholesalers and distributors made Non-contract sales of Abbott's products

---

[6] On May 1, 2004, Abbott divested its Hospital Products Division and is no longer in this business.

[7] This amount is referred to as a "chargeback."

at whatever price the market would bear.  Abbott had no visibility to the price paid by

these providers.  Figure 1 illustrates the distribution process.



## B.    Abbott's Primary Customers

21)    Abbott's primary customers for these products were hospitals.  My review

of Abbott's sales data during the relevant time period in this case reflects that

approximately 83% of sales for these particular products were to hospitals.  The

remaining sales of these products were to other customers including wholesalers,

distributors, government programs, and other non-hospital healthcare providers (e.g.

home health care services, outpatient clinics and other pharmacies).

22)    Figure 2 below illustrates Abbott's sales for the products at issue during

the relevant time period.



### V.    Product Administration and Reimbursement

### A.    Medicare and Medicaid Reimbursement

23)    When a provider administers these products to a patient, it seeks

reimbursement.  Some patients have private insurance or are covered by certain

government programs like Medicare and Medicaid.  This case involves reimbursement

by Medicare and Medicaid to providers.  The Medicare and Medicaid programs are

administered by the Centers for Medicare and Medicaid Services ("CMS") (formerly

known as the Health Care Financing Administration ("HCFA")), which is part of the

United States Department of Health and Human Services ("HHS").

#### 1. The Medicare Program

24)    The Medicare program provides health care coverage for people over the

age of 65, individuals with certain disabilities or with End Stage Renal Disease ("ESRD").

During the relevant time period, Medicare reimbursed for these products under

Medicare Part B.[8]  In order to administer the day to day operations and process the claims for Medicare Part B throughout the United States, CMS contracted with commercial insurance companies, such as Blue Cross Blue Shield plans ("Carriers").  For example, there were 28 different carriers in 1997.[9]

25)     Under Medicare Part B, physician claims for drug reimbursement are not based on the drug manufacturer's National Drug Code (NDC), but are instead based on "J-codes."  The J-code claim submission system is the established industry-wide basis for coding, billing, processing and paying for physician-administered drugs.  This universal structure was established through the Healthcare Common Procedure Coding System ("HCPCS") maintained by CMS.  For products that are sourced from more than one manufacturer (e.g. multi-source or generic drugs), J-codes are based on the category of drug.  In those circumstances, many manufacturers' products are included within a single J-code.

### 2. The Medicaid Program

26)     The Medicaid program provides health care benefits to certain low-income individuals and families fitting into an eligibility group defined by federal and state law. The federal government outlines general guidelines for the program, and each state establishes, with approval of CMS, the requirements for their own program.  During the period at issue, each Medicaid program provided reimbursement to providers under a prescription drug benefit.

---

[8] Medicare Part B covers reimbursement for physician administered drugs outside of the hospital setting.  Medicare Part A, which covers hospital inpatient reimbursement, is not at issue in this case.

[9] See CMS, Part B Carrier Locality Codes after December 31, 1996. Report Prepared By CMS September 17, 2004.

27)    CMS also administers the Medicaid Drug Rebate Program which requires a drug manufacturer to enter into a national rebate agreement with the Department of Health and Human Services (HHS) for states to receive Federal funding for outpatient drugs dispensed to Medicaid patients.[10]  The Drug Rebate Program was designed to allow the state Medicaid programs to decrease drug expenditures by requiring manufacturers to pay a rebate to each state based on the state's utilization of the manufacturer's drugs.

### 3.  Medicare and Medicaid Hospital Reimbursement

28)    Under Medicare and Medicaid, Abbott's primary customers (hospitals) were generally reimbursed for the total service rendered (i.e., surgery) and not separately reimbursed for the drugs administered as part of the service.  Accordingly, the issues in this case do not apply in the hospital setting.  Dr. Duggan acknowledged this fact by excluding hospitals from his analyses.

## B.    Compensation to Providers for Dispensing and Administration Costs

29)    Both Medicare and Medicaid programs have recognized the need, when setting reimbursement, to evaluate both the costs associated with product purchases as well as the costs associated with both dispensing and administration of the product ("dispensing/administration").  Medicare reimbursement to providers has included a

---

[10] See Schondelmeyer report dated June 20, 2008, p. 16.

product reimbursement and a separate administration fee.[11]  Similarly, Medicaid has

reimbursed providers for both an ingredient cost and a dispensing/administration fee.[12]

30)     The Abbott products in this case are more expensive to administer and

dispense than other drugs such as self-administered outpatient drugs (e.g. pills)

because, for example:

- A medical professional must take extra steps to prepare and administer these products to the patient intravenously.

- Treatment occurs over an extended period of time (i.e., hours and sometimes days).

- A pharmacy professional must measure and/or mix the product with other products to allow for safe administration (e.g., vancomycin is an antibiotic that is mixed with a solution and administered intravenously).

- Because these products are primarily solutions, they are sold in bags and other large packages that require extra storage space and special delivery methods.[13]

## VI.   Dr. Duggan's Methodology

31)     Dr. Duggan calculated his "DIFFERENCE" by comparing the amount he

contends was reimbursed to providers, and an amount that he believes would have

been paid utilizing his "Calculated Price" to contracted pharmacies.  With this

"Calculated Price" Dr. Duggan created alternative published prices including AWP, WAC,

---

[11] See Payment for Medicare Part B Drugs, Herb Kuhn, Director, CMS testimony before House Subcommittee on Health of the Committee on Ways and Means, Thursday, July 13, 2006.

[12] See "Study of Medi-Cal Pharmacy Reimbursement" Prepared for the California Department of Health Services, prepared by Myers and Stauffer, June 2002, p. 12.

[13] See National Home Infusion Association FAQ at www.nhia.org/faqs.

and Direct Price that he then used to determine his "but for" reimbursement for Medicare and Medicaid.[14]

*Duggan's Reimbursement Paid – Duggan's "But For" Reimbursement = Difference*

## VII.   Dr. Duggan's Analysis of Reimbursement Paid for These Products

32)   Dr. Duggan attempted to quantify the actual reimbursement paid by Medicaid and Medicare by analyzing reimbursement claims information for a limited number of states and carriers and for limited time periods, and he extrapolated the results to other reimbursement populations for the entire country for the entire eleven year period that he chose not to analyze.[15]

## A.   Dr. Duggan's Medicaid Reimbursement Calculation

### 1. Dr. Duggan Did Not Consider the Interrelationship of Product Cost and Dispensing Fees

33)   The reimbursement paid to providers for these products is comprised of both product and dispensing/administration costs.  It is well established that payors and providers view both components together when assessing the adequacy of the reimbursement.  Dr. Duggan failed to consider the important interrelationship between these components of reimbursement.  The high cost of dispensing/administering these particular products increases the importance of this interrelationship.

34)   Myers & Stauffer performed an analysis of dispensing costs by reviewing data collected on over 100 surveys.

---

[14] Dr. Duggan calculated his alternative published prices for AWP by adding 25% to his "Calculated Price."

[15] Dr. Duggan has not calculated differences for Arizona or Ohio.  See footnote 18 on page 25 of Dr. Duggan's report dated June 19, 2008 and Section I in Dr. Duggan's report dated January 23, 2009.

35)     With respect to the higher cost of dispensing these products, Myers &

Stauffer reported that:

> The data suggests that dispensing cost ranging from $20 to $40
> per intravenous prescription would be considered typical. . . . It is
> therefore possible that some pharmacies could very well have
> dispensing costs in excess of $40 per prescription.[16]

36)     Myers & Stauffer noted the critical interrelationship between ingredient

cost reimbursement and dispensing fees:

> Based on the results of the acquisition cost study performed
> simultaneously with the dispensing cost survey and the assumption
> of the Department's current ingredient reimbursement formula of
> AWP minus 5%, it is estimated that such an average prescription
> would yield a margin on ingredients of approximately $42.  This
> margin typically allows for adequate reimbursement of the
> pharmacy's dispensing cost.   So long as the ingredient
> reimbursement rate remains at AWP minus 5% or any other
> relatively "high" level, the need for the Department to set a
> separate dispensing fee for intravenous drugs is somewhat
> mitigated by the margins realized on ingredient reimbursement.[17]

37)     The combined effect of the interrelationship and the magnitude of the

under-reimbursement for dispensing these drugs was proven in practice in the State of

Utah in 2000.  Myer & Stauffer explained this real world example as follows:

> In recent years, some states have dealt with the issue of
> intravenous prescription reimbursement rates *in light of reduced
> reimbursement*.  For example, the state of Utah recently adopted
> "revised AWPs" for certain products based on the recommendations
> of the United States Department of Justice and the National
> Association of Medicaid Fraud Control Units (NAMFCU). . . .
> Subsequent to the adoption of these prices, intravenous and home
> infusion pharmacies alleged that the margins on ingredient

---

[16] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement*.  Prepared for the
California Department of Health Services, June 2002, p. 59-60.

[17] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement*.  Prepared for the
California Department of Health Services, June 2002, p. 59-60.

reimbursement were no longer sufficient such that they could accept the typical Medicaid dispensing fee.  As a result of these allegations, the state of Utah created alternate dispensing fees. . .[18]

## 2. Dr. Duggan Limited His Review of Actual Claims Data

38)    Rather than analyzing actual claims data from every state at issue over the entire time period, Dr. Duggan chose to calculate his Medicaid "DIFFERENCE" by extrapolating from a limited number of states for a limited period of time.[19]  Dr. Duggan limited his analysis of actual detailed claims data to 10 states.

- In no state did he look at actual claims data over the entire 11 year time period (e.g., Dr. Duggan only analyzes 5 quarters of actual claims data for Michigan).

- Within the 10 states where Dr. Duggan chose to analyze some actual detailed claims data, he simply extrapolated the results from the earliest available quarter to all other quarters where he did not look at actual claims data at all.[20]

  o Setting aside the issues with his extrapolation, Dr. Duggan's analysis included numerous errors.  For example, Dr. Duggan improperly applied his "DIFFERENCE" amount to the states of Michigan and Missouri resulting in an overstatement of "DIFFERENCE" in excess of $500,000.

- Dr. Duggan ignored actual claims data for certain states with significant Medicaid utilization and enrollment such as Texas, Ohio and Pennsylvania.  (See Exhibit 3).

39)    Figure 3 identifies the limited actual Medicaid claims data reviewed by Dr. Duggan.

---

[18] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement,* prepared for the California Department of Health Services, June 2002, p. 59-60.

[19] Dr. Duggan was provided with actual claims data for at least 8 other states (which he chose not to review).

[20] Dr. Duggan also extrapolated the number of claims with a "DIFFERENCE" for periods that he did not analyze using a random number generator to determine those he counts as "DIFFERENCE" claims.

**Figure 3**
**Dr. Duggan's Actual Claims Data Reviewed**

### 3. Dr. Duggan Extrapolated To Unanalyzed Populations

40)     Dr. Duggan extrapolated his results from the 10 states to the unanalyzed 38 other states.  Dr. Duggan has not articulated a sufficient basis for assuming that the populations he extrapolated from are comparable to the populations he extrapolated to. Instead, he merely:

- Confirmed that the 38 states used AWP or WAC in some fashion in their reimbursement methodologies.[21]

- Dr. Duggan attempted to compare the average cost per claim (1999-2001) for the 10 states he chose to analyze to the other 38 states that he chose not to analyze.  Myers & Stauffer's reports, however, indicate that such comparisons would be meaningless due to the way that claims were submitted to Medicaid for these products.  Specifically, Myers & Stauffer finds:

> There is some difficulty, however, in determining an average dispensing cost . . . There is a significant inconsistency in the way in which pharmacies count the number of intravenous prescriptions dispensing.  A pharmacy may mix and deliver many "dispensings" of a daily intravenous solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions. Alternatively, some pharmacies count each daily dispensing individually. [22]

41)     Dr. Duggan has not articulated a sufficient basis for assuming that the reimbursement methodologies of his 10 states are similar to the 38 states to which he extrapolates.  A review of Myers & Stauffer's analyses would suggest that such

---

[21] See Dr. Duggan report dated June 19, 2008, p. 79.

[22] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement,* prepared for the California Department of Health Services, June 2002, p. 59-60.

extrapolation is not appropriate given the variability of reimbursement and dispensing fee methodologies implemented by different states at different times.[23]

### a) Dr. Duggan's Methodology Did Not Consider the Variability of Medicaid Reimbursement Across States

42)      Dr. Duggan made no attempt to determine the basis of payment for the claims for which he seeks recovery in this case but rather assumes liability for all of the claims for which he calculated a "DIFFERENCE". Figure 4 illustrates one of many examples of the variability in the per unit reimbursement for a single sodium chloride NDC for which Dr. Duggan calculates a "DIFFERENCE."



**Figure 4**
**Kentucky Claims:**
**Sodium Chloride .9% VIAL (NDC 000748810)**

---

[23] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology for all states provided.

43)    Dr. Duggan used actual claims data for the 10 states for limited periods.

Dr. Duggan then extrapolated from those 10 states to aggregate spending data for the

38 other states by NDC and by quarter.  It is important to note that the aggregate

spending data (i.e., SMRF and SDUD data) included dispensing fees.  I have identified a

number of problems arising from Dr. Duggan's extrapolation of actual Medicaid claims

data to his unanalyzed populations.  For example:

- For some quarters he extrapolated data from as little as one quarter of a single state to 38 other states. [24]  For example, as illustrated in Figure 3, Illinois was the only basis of extrapolation to all 38 other states in 1991.[25]

- Dr. Duggan did not consider the wide variation of product reimbursement formulas across states.[26]

  o For example, Dr. Duggan ignored data for certain high volume states (such as Texas) with lower Medicaid reimbursements as a result of MAC programs in arriving at his 10-state analyzed population.[27]  He also extrapolated to other lower volume states (such as Maryland) with lower Medicaid reimbursements as a result of MAC programs.[28]

  o In his revised report, Dr. Duggan has excluded Ohio claims data from his extrapolation.  Removing Ohio from the analysis increased Dr. Duggan's "DIFFERENCE" for the unanalyzed 38 states by $792,908.  This demonstrates the impact one state can have on Dr. Duggan's extrapolation.  Dr. Duggan has acknowledged that the

---

[24] Dr. Duggan also improperly duplicated "DIFFERENCE" for the states of Alabama and Hawaii in certain periods.

[25] In addition to the 38 other states, Dr. Duggan applied his "DIFFERENCE" ratio from Illinois to the state of Indiana for the entire period.

[26] See HHD006-0060.

[27] See Determination of the Cost of Dispensing Pharmaceutical Prescriptions For the Texas Vendor Drug Program Prepared for the Texas Health and Human Services Commission August 2002, p. 7.

[28] See Fine Dep. 12/9/08 MD Department of Health and Mental Hygiene Exhibit 13 (MD0021454 – MD0021497).

"DIFFERENCE" increase is due to the fact that Ohio used MACs which lowered the state's reimbursement for these products.[29]

o   Dr. Duggan did not consider individual states' definitions of Usual and Customary (U&C).  None of the 10 states that he analyzed defined U&C as the lowest price paid by Third Party Payors (TPPs), while at least five of the 38 states did (e.g., Massachusetts, Arkansas, Georgia, Rhode Island, and Vermont).[30]

o   Dr. Duggan ignored the impact of the publication of the Department of Justice AWP's (DOJ AWP's) by including a difference for claims paid after the implementation of the DOJ AWP's and claims paid using the DOJ AWP's. [31]

o   Dr. Duggan calculated a "DIFFERENCE" on transactions that were not paid based on the states' articulated reimbursement methodology (e.g., Dr. Duggan included a "DIFFERENCE" for Florida claims paid based on AWP when Florida's reimbursement methodology called for the use of a WAC).

•   Dr. Duggan ignored individual states' intentions to provide a margin to providers related to the reimbursement for drugs.[32]

### b) Dr. Duggan's Methodology Did Not Consider the Variability of Dispensing Fees

44)    One of the most significant problems in Dr. Duggan's extrapolations is his

failure to account for the differences across states in both amount and treatment of

dispensing fees for these products.

•   As discussed previously, Myers & Stauffer found that the average cost of dispensing these products ranged between $20 and $40 with various states addressing dispensing fees in various ways.  Myers & Stauffer's documentation indicates that at least 15 of the 38 states that Dr. Duggan chose not to analyze had enhanced dispensing and/or

---

[29] See Dr. Duggan report dated January 23, 2009, section I.

[30]  See HHD127-0023 – HHD127-0025 (For example, the state of Massachusetts defines Usual and Customary as "the lowest price for a given volume of drugs that a pharmacy charges to or accepts as payment from any purchaser or reimburser, including those with contracts that represent less than one percent of the pharmacy's total prescriptions revenue").

[31] See Program Memorandum Intermediaries/Carriers. Transmittal AB-00-86. September 8, 2000.

[32] See Dubberly Dep. December 15, 2008, p. 331.

compounding fees for these products during the relevant time period.[33]

- For each of his 10 states, Dr. Duggan calculated "the average value of the ratio of "DIFFERENCE" to the amount of the Medicaid spending on these claims" for each NDC and quarter.[34] This average represents the percentage by which total Medicaid spending would have allegedly decreased, had Dr. Duggan's revised prices been used in the 10 states' reimbursement calculations. He then applied his ratio of "DIFFERENCE" for the analyzed populations to unanalyzed populations. The "DIFFERENCE" calculation for the population he analyzed and the total Medicaid spending for the population he extrapolated to included both dispensing fee and product reimbursement.

45)     The unique nature of these products combined with the related variability of dispensing fees makes it inappropriate to assume consistency between the populations as it relates to dispensing fee. Dr. Duggan did nothing to establish that the ratio of dispensing fees to total payments was consistent between the analyzed and the unanalyzed populations.

46)     For example, Nevada (one of the 38 unanalyzed states) paid home health providers an enhanced dispensing fee of $16.80 per dose for the first medication and $5.60 per dose for second medication given concurrently.[35] Given the enhanced dispensing fee for home IV drugs paid by Nevada, it is not surprising that Nevada's average payment per claim is relatively high. Dr. Duggan's analysis ignored the impact of these types of dispensing fees and improperly applied the "DIFFERENCE" factor from

---

[33] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology for all states provided.

[34] Dr. Duggan's "ratio of DIFFERENCE" is calculated by giving equal weight to each NDC quarter for which he has actual claims data. States with no claims data in that NDC quarter have a weight of zero. See Dr. Duggan p. 78.

[35] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology – Nevada.

the 10 states to Nevada.  I can provide more examples of this phenomenon across the

38 states, where Dr. Duggan's "DIFFERENCE" is not based upon actual claims data.

47)     The significant variability of dispensing fees and the higher incidence of

enhanced dispensing fees for home IV drugs in the 38 states causes Dr. Duggan's

"DIFFERENCE" for the 38 states to be unreliable.

## B.     Dr. Duggan's Medicare Reimbursement Calculations

48)     Because J-codes used in Medicare reimbursement do not identify the

manufacturer of the drug for which the claim has been submitted, the Medicare claims

data does not identify claims submitted for any products manufactured by Abbott.  Dr.

Duggan has not identified any Medicare claims submitted for any products

manufactured by Abbott.  Dr. Duggan assigned 100% of the "DIFFERENCE" to Abbott

and does not consider the source of the product.

49)     Rather than analyzing reimbursement practices from every Medicare

carrier over the entire time period, Dr. Duggan chose to calculate his Medicare

"DIFFERENCE" by extrapolating from a limited number of carriers for a limited period of

time.  For example:

- Dr. Duggan analyzed the actual median calculations for a limited number of carriers and time periods and extrapolated the results to all carriers for eleven years.[36]

- For those J-codes and time periods for which Dr. Duggan calculated a Medicare Part B "DIFFERENCE" it appears that he only analyzed approximately 5% of the Medicare carrier median array calculations. Figure 5 identifies the quarters for which Dr. Duggan analyzed actual

---

[36] Dr. Duggan also extrapolated the number of claims with a "DIFFERENCE" for periods that he did not analyze using a random number generator to determine those he counts as "DIFFERENCE" claims.

carrier median array calculations for the J-codes at issue in arriving at his Medicare Part B "DIFFERENCE."

**Figure 5**
**Dr. Duggan's Actual Claims Data Reviewed**

| Carrier | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|
| AdminaStar | | | | | | | | | |
| AETNA | | | | | | | | | |
| Alabama Blue Shield | | | | | | | | | |
| All Others | | | | | | | | | |
| Arkansas Blue Shield | | | | | | | | | |
| BCBSFL | | | | | | | | | |
| California Blue Shield | | | | | | | | | |
| Cigna | | | | | | | | | |
| Empire Blue Shield | | | | | | | | | |
| Kansas Blue Shield | | | | | | | | | |
| Metra Health | | | | | | | | | |
| National Heritage | | | | | | | | | |
| Nationwide | | | | | | | | | |
| North Dakota Blue Shield | | | | | | | | | |
| Other Region 5 | | | | | | | | | |
| Pennsylvania Blue Shield | | | | | | | | | |
| South Carolina Blue Shield | | | | | | | | | |
| Texas Blue Shield | | | | | | | | | |
| TOLIC | | | | | | | | | |
| Western Blue Shield | | | | | | | | | |
| WPS | | | | | | | | | |

Key:  · Claims Only    ■ Claims and Array    □ No "DIFFERENCES"

- Dr. Duggan's assessment of reimbursement is limited to the product portion of the Medicare claims and ignored the administration fee.

## VIII.  Dr. Duggan's Analysis of "But For" Reimbursement for These Products

50)   As previously mentioned, Dr. Duggan calculated a difference by comparing his assessment and extrapolation of reimbursement paid to the reimbursement he contends should have been paid in his "but for" world.  Dr. Duggan creates a "Calculated Price" and uses that as part of his formula to generate a "but for" reimbursement amount.

*Duggan's Reimbursement Paid – Duggan's "But For" Reimbursement = Difference*

**A.    Dr. Duggan's Creation of His "Calculated Price" to Contracted Pharmacies**

51)    In creating his "Calculated Price," Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers. [37]  By focusing only on this very limited set of transactions, Dr. Duggan failed to properly consider prices paid by other customers such as a provider who purchased either directly from Abbott at a different price or directly from a wholesaler or distributor at an unknown price.  Non-contract sales, for example, are at higher prices and have a significant impact.  Dr. Duggan incorrectly assumed that calculating an average by looking at less than 2% of Contract pharmacy sales is appropriate. [38]

52)    Figure 6 illustrates the significant number of wholesaler and distributor sales to Non-contract end purchasers compared to the retail pharmacy Contract sales Dr. Duggan analyzed.

---

[37] See footnote 5.

[38] Dr. Duggan relied on indirect contract sales to pharmacies in every state except California during the period 1995-2001.  See Dr. Duggan's report dated June 19, 2008, p. 47.



53)     In fact, according to Dr. Schondelmeyer, wholesalers and distributors "add a markup and fees to the manufacturer's drug product cost to cover the cost of distribution and other services they provide."[39]  Dr. Duggan's approach would therefore result in many providers, such as those without negotiated contracts with Abbott, who purchased from a wholesaler or distributor, being reimbursed below the price they paid for the product.

54)     Figure 7 provides two examples that would have been reimbursed less than the amount they paid under Dr. Duggan's methodology.

---

[39] See Schondelmeyer report dated June 20, 2008 page 17.

**Figure 7**

**Under-Reimbursement to Providers Under Dr. Duggan's Methodology**

| | Transaction #1 | | | | Transaction #2 | | | |
|---|---|---|---|---|---|---|---|---|
| | SODIUM CHLORIDE 0.9% SOLN NDC: 00074710113 Date of Service: 12/21/1998 Provider: MEMORIAL COMM HOSP PHARM Wisconsin (AWP Less 10%) | | | | DEXTROSE 5%/WATER IV SOLN. NDC: 00074792203 Date of Service: 6/14/2001 Provider: SPRINGVILLE PHARMACY INC New York (AWP Less 10%) | | | |
| | Price Per Unit | Units | Disp. Fee | Total | Price Per Unit | Units | Disp. Fee | Total |
| Dr. Duggan's "But For" Reimbursement | $  0.03247 | 100 | $4.88 | $   8.53 | $  0.00185 | 3500 | $4.50 | $   11.77 |
| Provider Reimbursed Amount | $   0.20 | 100 | $4.88 | $  24.50 | $  0.00280 | 3500 | $4.50 | $  14.30 |
| Difference | | | | $  (15.97) | | | | $  (2.53) |

## B.    Dr. Duggan's Medicaid "But For" Reimbursement Calculations

55)    Without any consideration for the adequacy of the total reimbursement to the provider, Dr. Duggan created his "but for" reimbursement by adding a 25% mark-up to his "Calculated Price" to contracted pharmacies for each NDC and substituting the result into each state's reimbursement methodology.[40]  Extrapolation of the results of Dr. Duggan's 10-state analysis to the remaining states, without analyzing the comparability of the analyzed and unanalyzed populations would lead to anomalous results.

- For example, inserting his "Calculated Price" to contracted pharmacies into the reimbursement methodology used by Kansas (AWP less 50%) would result in the majority of Kansas providers being reimbursed significantly less than the amount they paid. (See Figure 8 below).

- Similarly, Dr. Duggan's approach would lead to illogical results when MACs or other payment limits are in place even for the Contracted pharmacies he chose to analyze.  As just one example, Dr. Duggan's approach would have the state of Maryland paying much less than

---

[40] Dr. Duggan's "but for" reimbursement adjustment of 25% is inconsistent with Congress's decision to implement the Deficit Reduction Act of 2005 where a factor of 250% was added to the Average Manufacturer Price in arriving at the Federal Upper Limit (FUL) reimbursement level for drugs.

acquisition cost.[41]  Dr. Duggan acknowledged that he did not focus on the impact of this issue. [42] (See Figure 8 below).

| | State Reimbursement Methodology | | Dr. Duggan "Calculated Price" | State Reimbursement | | Dr. Duggan's "But For" Reimbursement | | Contracted Provider Loss |
|---|---|---|---|---|---|---|---|---|
| **Figure 8** "But For" Calculation 1995 Q1: for Vancomycin 1GM Vial (NDC 00074653301) | | | | | | | | |
| Kansas | AWP - 50% | $ | 6.69 | (6.69*1.25)*50% = 8.37 | | $ | 4.18 | $ (2.51) |
| Maryland | MAC | $ | 6.69 | $ | 9.63 | $ | 2.17 | $ (4.52) |

- Dr. Duggan ignored the important relationship between product cost and dispensing/administration fee in his "but for" world by employing his "all else equal" methodology.[43] Dr. Duggan failed to properly adjust dispensing/administration fees when he lowered his product reimbursement levels. The need for this adjustment has been recognized by State Medicaid Agencies and the consultants that advised them.

- Dr. Duggan did not consider any factors that states are required to assess in determining reimbursement levels (e.g., access to care issues, geographic differences, variability of prices paid by providers, etc.).

## C.  Dr. Duggan's Medicare "But For" Reimbursement Calculations

56)  Without any consideration for the adequacy of the total reimbursement to the provider, Dr. Duggan created his "but for" reimbursement by adding a 25% mark-up to his "Calculated Price" to contracted pharmacies for each NDC and substituted the result into each carrier's median array calculation.

- Dr. Duggan's "but for" reimbursement amount led to illogical results. For example, Dr. Duggan arrived at 9 different "but for"

---

[41] See Fine Dep. December 9, 2008 MD Department of Health and Mental Hygiene Exhibit 13 (MD0021454 – MD0021497).

[42] See Duggan Dep. February 17, 2009, p. 768 – 770.

[43] See Duggan Dep. February 17, 2009 p. 770 – 771.

reimbursement amounts for one J-code for the same period of time. (See Figure 9).[44]

| | Figure 9 | | |
| | Dr. Duggan's "But For" Array Medians for 1998 Q2 | | |
| Carrier | J-code | "But For" Median | Price Source |
|---|---|---|---|
| CIGNA | J3370 | $ 2.74 | Cigna array for 1999Q2 |
| Other Region 5 | J3370 | $ 3.74 | No carrier array identified |
| WPS<br>Other Region 5<br>Nationwide | J3370 | $ 3.94 | No carrier array identified |
| WPS<br>Other Region 5 | J3370 | $ 4.02 | No carrier array identified |
| Other Region 5 | J3370 | $ 4.23 | WPS array for 1997Q3 |
| BCBSFL | J3370 | $ 4.97 | No carrier array identified |
| Metra Health | J3370 | $ 5.31 | Metra Health array for 1998Q1 |
| CIGNA | J3370 | $ 5.42 | No carrier array identified |
| BCBSFL<br>Metra Health | J3370 | $ 6.06 | BCBSFL array for 1998Q2<br>Metra Health array for 1998Q2 |

- Dr. Duggan did not consider the relationship between product cost and administration fees in determining his "but for" Medicare reimbursement.  When Congress changed Medicare reimbursement to use a Medicare "Average Sales Price" ("ASP") method, it increased the administration fees to appropriately compensate providers.[45]  Figure 10 illustrates the increase in administration fees for three common administration codes associated with these products.

---

[44] Dr. Duggan's insertion of his "Calculated Price" into the carrier median arrays did not always produce a revised median.  For example, Dr. Duggan's "Calculated Price" resulted in no change in the median Medicare reimbursement for Metra Health's J7060 for quarter 2, 1997.  It should be noted that Dr. Duggan still did generate a "DIFFERENCE" for this J-code even though his array analysis indicated no "DIFFERENCE" should exist.

[45] See Payment for Medicare Part B Drugs, Herb Kuhn, Director, CMS testimony before House Subcommittee on Health of the Committee on Ways and Means, Thursday, July 13, 2006.

**Figure 10**

**Medicare Administration Fees - Post 2002**

| | Carrier: 80303 (BCBS/Empire NY) | | Non-Facility | | | | |
|---|---|---|---|---|---|---|---|
| Number | Description | HCPCS Code [1] | 2003 | 2004 | 2005 | 2006 | 2007 |
| 1 | Chemotherapy, infusion method | 96410, G0359, 96413 | $ 64.18 | $ 233.69 | $ 190.37 | $ 185.25 | $ 178.24 |
| 2 | IV Infusion therapy, 1 hour | 90780, G0345, 90760 | $ 46.31 | $ 126.59 | $ 69.44 | $ 67.83 | $ 65.90 |
| 3 | Chemotherapy, push technique | 96408, G0357, 96409 | $ 40.70 | $ 166.25 | $ 134.64 | $ 131.13 | $ 128.50 |

1) Changes in HCPCS as reported by American Society of Clinical Oncology, "2006 Coding Changes for Drug Administration Services".

- Looking at the difference in the administration fee, as seen in Figure 10, between 2003 and 2007 the increase in administration fee is significantly higher than Dr. Duggan's average per claim "DIFFERENCE" across all J-codes analyzed as seen in Figure 11 below.

**Figure 11**

**Average Dr. Duggan Medicare Part B "DIFFERENCE" per Claim**

| J-code (Part B) | "DIFFERENCE" Per Claim |
|---|---|
| J3370 | $8.44 |
| J7050 | $4.08 |
| J7030 | $1.68 |
| J7040 | $1.40 |
| J7060 | $1.14 |

- The Figure 12 below displays the example of combined drug and administration reimbursements associated with sodium chloride (J7050 and 90780) as a result of the Medicare Modernization Act (MMA) of 2003.  This figure illustrates that (1) the product reimbursement is relatively small in relationship to the administration fee reimbursement and (2) the total reimbursement to the provider actually increased after MMA adjusted product reimbursement to ASP and administration fee to full payment.



## IX. Dr. Duggan's "DIFFERENCEs" Are Also Impacted By Various Other Factors

### A. Analysis of Dr. Duggan's "DIFFERENCE" Period

57)    I have been asked by counsel to quantify the percentage of "DIFFERENCE" attributable to the time period before the filing of the complaint in this matter on June 23, 1995.  I have determined that amount is 18% of Dr. Duggan's "DIFFERENCE".  Stated another way, 82% of Dr. Duggan's "DIFFERENCE" is attributable to the time period after the filing of the original complaint.  I will be prepared to quantify other time periods as deemed appropriate.

58)    I was also asked to chart Dr. Duggan's calculated "DIFFERENCE" for the period from 1991-2000.  Figure 13 depicts this chart.



Figure 13

Dr. Duggan Total "DIFFERENCE" by Year

## B.   Dr. Duggan's "DIFFERENCE" Includes Claims That Have Been Resolved

59)   Dr. Duggan calculated the "DIFFERENCE" for the Federal share of Medicaid for all states.[46] I have been advised that certain settlements have been reached that resolve Medicaid claims for the products at issue.  I will be prepared at trial to quantify any offsets that should be made to the government's proposed "DIFFERENCE" on this basis.

60)   In addition, various Medicaid and Medicare providers have returned funds to the government related to incorrect or inappropriate claims during this eleven year period.  Dr. Duggan has not considered the impact of this recoupment.

---

[46] See Dr. Duggan's report dated June 19, 2008, p.77.

## C.   Dr. Duggan's "DIFFERENCE" Does Not Account for the Rebates Paid by Abbott to Every State Medicaid Program

61)   Dr. Duggan ignored Medicaid rebates in his calculations of "DIFFERENCE." As discussed earlier, Abbott made quarterly submissions to CMS of its AMP and issued rebate checks to each state Medicaid program resulting in a net reduction in the Medicaid expenditures for Abbott products.  For purposes of his calculations, he has not offset his "DIFFERENCE" by the Medicaid rebates paid by Abbott for the products for the relevant time period.

## X.   Other Opinions

62)   I have also been asked my opinion with the respect to the following issues:

## A.   Available Sources of Product Pricing Information

63)   During the relevant time period, there was a variety of pricing information available to the government.  For example:

- Myers & Stauffer conducted various provider purchase price and dispensing cost surveys on behalf of state Medicaid agencies during the relevant time period.  Some of these states in fact overlapped the states analyzed by Dr. Duggan including California, Kentucky, Florida, New Jersey, and Louisiana.  In addition, Myers & Stauffer performed similar projects for many of the states Dr. Duggan chose not to analyze.[47]

- On a quarterly basis, Abbott provided CMS with its Average Manufacturer Prices (AMP).  AMP is calculated based on a formula prescribed by the government and reflects prices to the retail class of trade.  In addition, each state Medicaid program had the ability to discern AMP from the various exchanges between the parties with respect to Abbott's Medicaid Rebate payments because the rebate is calculated as a percentage of AMP for these products.

---

[47] See KYDMSPL1022497.

- Abbott also provided the Veterans Administration with pricing information reflecting the discounted pricing available to some of its largest customers in the course of assisting the government in establishing the Federal Supply Schedule (FSS) pricing for Abbott's products.

- State Medicaid programs had visibility to transaction prices in the course of processing claims information.  For example, many claims were submitted and paid at amounts below the AWP-based reimbursement, and reflected discounts available to certain providers (See e.g., Figure 4).  In addition, some states required providers to submit information regarding their actual acquisition cost.[48]

- State Medicaid programs had visibility to transaction prices through the administration of 340B/Public Health Service programs where the providers were required to submit their actual acquisition costs to the state.

- The government had access to other market based pricing information (e.g., IMS Health).

- Starting in 1994, First DataBank began calculating and publishing a "BaseLine Price."  According to User Manual, "[t]he BaseLine concept involves all prices, shows the current market price and reflects changes in the market as they occur."[49]

- State Medicaid agencies determined their own state Maximum Allowable Cost ("MAC") to limit reimbursement of generic products for which the prices pharmacies paid differed significantly from the published prices.[50]  In certain cases states used the Federal Upper Limit (FUL) as their state MAC price.  These are generic products that the government could have implemented an FUL but the government elected not to do so.[51]

---

[48] See, e.g., HHD006-0060.

[49] See 2001 BMW032-0020 -0026.

[50] See "Study of Medi-Cal Pharmacy Reimbursement" Prepared for the California Department of Health Services. Prepared by Myers and Stauffer, June 2002, page 6.

[51] The majority of the NDCs in this matter met the requirements to have a FUL calculated, but the CMS did not do so.

## B.   Context for Spread Allegations

64)    In my view it is important to put into context the purported size of the alleged spreads by looking at those spreads not in terms of a percentage but rather in terms of dollars per package.  The complaint displays the dollars associated with the spreads on a case price; however, providers do not dispense the products to patients at the case level and Abbott's published prices for these products are reported at the package level.  I believe that a package (not per case) pricing is a more meaningful comparison when looking at provider reimbursement data.  I compared Dr. Duggan's "but for" price at the package level to the published price to quantify the variance between the AWP and Dr. Duggan's "but for" price at a package level.  This analysis indicates that large percentage spreads do not translate into large dollar spreads. Figure 14 below illustrates the spread associated with three of these products.

**Figure 14**

**Dollar Value of Spread Using Dr. Duggan's "But For"**

| NDC | Drug Name | Year | Quarter | AWP Per Package | "But For" Per Package | Dollar Spread | Spread % |
|-----|-----------|------|---------|-----------------|----------------------|---------------|----------|
| 00074798309 | SODIUM CHLORIDE 0.9% SOLN | 1997 | 1 | 10.87000 | 0.96685 | 9.90315 | 1024% |
| 00074792209 | DEXTROSE 5%/WATER IV SOLN. | 1997 | 2 | 12.51000 | 1.05939 | 11.45061 | 1081% |
| 00074799009 | STERILE WATER FOR INJECTION | 1998 | 2 | 12.12000 | 1.09990 | 11.02010 | 1002% |

65)    I have been asked to evaluate the dollar value difference for a product for which Judge Patti Saris found no liability after the Track 1 MDL trial.[52]  The spread percentage was approximately 30% and the dollar value of the spread per package was between $176 and $207 depending upon the NDC.  The dollar spread for Abbott's products were significantly lower than these amounts.

---

[52] See Findings of Fact and Conclusions of Law, Track 1 MDL-1456, June 21, 2007, p.167.

## C.    Analysis of Unit Sales

66)    I have been asked to compare Abbott's unit sales between 2001 and 2002.  As seen in Figure 15, I have found that the unit sales are higher in 2002 than 2001.

| Figure 15<br>Direct Sales Total Units | | |
|---|---|---|
| | **2002** | **2001** |
| **Total Units** | 335,866,492 | 315,801,246 |

## D.    Annual Price Changes

67)    I have been asked to quantify the number of price changes published by First DataBank ("FDB") for the products at issue.  I determined that FDB published at most eleven price changes for these products between 1991 and 2001 (approximately one change per year).

Executed on:  March 6, 2009                By: _____
                                               Steven J. Young
                                               Huron Consulting Services LLC

Exhibit 1A

## Steven J. Young
**Managing Director**

P 312 583 8763
F 312 583 8701
syoung@huronconsultinggroup.com

550 West Van Buren Street
Chicago, Illinois 60607

**Curriculum Vitae**

Steve began his career with Arthur Andersen in 1983 where he became a partner in 1995. He became a Managing Director in Huron Consulting Group's Healthcare practice in May of 2002.

Professional experience

Steve has 25 years of experience assisting healthcare clients with complex financial, contractual and regulatory compliance, systems and government contracting issues. His work focuses upon the quantification of the impact of historical contractual or regulatory compliance issues; Investigations and disputes associated with those contractual or regulatory issues, preparation of proposals and pricing submissions under cost based, competitive and commercial pricing contracts; and various operational consulting projects within the healthcare industry.  This work normally entails analyzing large data sets and/or statistical sampling to quantify the impact of the issue being addressed as part of the dispute, investigation of compliance review, working with operations personnel from various functional areas to understand the historic practices and governing contractual relationships and requirements, presenting of the results to outside counsel, arbitrators or the court.  In addition, Steve works with companies' management and general counsels to review compliance procedures of the company, assisting in the preparation and implementation of corrective actions through systems and related procedures improvements, and testing of the companies' processes and resulting outcomes to assess compliance with the contractual or regulatory requirements.  This work also includes voluntary disclosures to regulatory bodies or negotiated settlements to contractual disagreements by commercial entities.

Steve has an extensive background in serving the unique financial and operating needs of companies in the health care industry, but he has also done work in the office furniture, engineering, electronics, and communications.  Some of his specific areas of expertise are:

*Pharmaceutical and DME Experience*

Steve performed various projects for pharmaceutical manufacturers to analyze sales, chargeback, rebate and other pricing data to assess compliance with government regulations such as Medicaid Rebate Act, Veterans Healthcare Act, Medicare Part B ASP and FSS contract requirements and has worked with clients to quantify the financial aspects of contractual relationships related to managed care, distribution or co-promotion agreements entered into by his clients.

- Analyzed the companies historic practices and assessed inconsistencies with guidance letters issued by the applicable Federal Agency.
- Assessed a pharmaceutical company's cost allocation to product lines as a consulting expert in a litigation matter.
- Assisted a pharmaceutical company in performing a royalty audit under the provisions of their joint marketing agreement.
- Served as an expert witness for various pharmaceutical manufacturers related to class action litigation matters associated with pharmaceutical pricing and reimbursement issues.  This included extensive work and analysis of manufacturer, wholesaler, pharmacy benefit manager, provider and health insurance data involved in the distribution and reimbursement of pharmaceutical drugs.
- Served as an expert witness related to a dispute between two manufacturers regarding the proper payments under a co-promotion agreement including various revenue and cost issues associated with quantifying the appropriate payments required under the agreement.
- Downloaded historical sales, chargeback and rebate data for each of the companies NDCs to integrate the data from various sources to arrive at comprehensive best price and average manufacturer price in accordance with the specific Federal guidance, and Steve presented the results to the applicable Federal agency and provided the supporting work papers to the agency and its audit staff.

- Tested manufacturers recalculations of historic pricing submissions, identified findings that were corrected by the manufacturer and presented the results to the applicable Federal agency and provided the supporting work papers to the agency and its audit staff.
- Performed compliance reviews, voluntary disclosures and investigation support related to Federal Supply Schedule contracts including identification and differentiation of most favored customer pricing, commercial contract reviews to establish pricing and concessions disclosures, and quantification of potential issues in rebuttal to Federal audits or investigations.
- Assisted in the preparation of computer extracts, work flows and procedures to maintain compliance with the applicable pricing requirements.
- Served as an expert in an arbitration dispute between a Pharmaceutical Manufacturer and a PBM regarding the appropriateness of rebates billed by the PBM over the course of a two year contract.

_Healthcare Claims Processing and Reimbursement_

Steve has had various experience assisting health plans analyze historical claims processing and reimbursement issues to identify overpayment or underpayments related to those issues and prepare, execute and support the related refunds or recoveries.  Steve has:

- Assisted Health Plans extract large data sets to quantify the historic impact of certain system and process deficiencies related to compliance with Medicare Secondary Payment requirements.
- Assisted Health Plans analyze historical reimbursements for compliance with various provider contract, state regulatory requirements (such as prudent layperson and prompt pay) or subcontracted outsourcing agreements.
- Assisting a Health Plan in assessing a claims processing conversion to analyze claims data and the underlying data sources to identify incorrect payments under the new system and determine the root cause and propose corrective actions to the system logic or the underlying claims processor workflows.  Performing stratified statistical samples of paid and denied claims to quantify the historical impact and potentially restate medical cost trends for establishing premium increases.

_Other experience_

In addition to the areas discussed above Steve has experience related to various other regulatory and government contract issues including:

- Claims for equitable adjustment related to contract changes
- FSS Defective pricing and price reduction compliance reviews in numerous industries
- Defective pricing reviews
- Accounting, compliance and administrative procedure preparation and review
- Indirect Rate Determination and submission
- Performing attestation engagements related to various compliance and pricing areas.
- Labor reporting system reviews
- Contract administration control reviews
- Compliance training assessments and presentations
- Interpreting and complying with Cost Accounting Standards (CAS) and the cost principles of the Federal Acquisition Regulation (FAR)
- Preparing CASB Disclosure Statements and determining the cost impact of cost accounting changes and violations of the Standards
- Contract Accounting and Project Reporting system design and implementation

Education & certification
- Bachelor's Degree in Accounting, Northern Illinois University
- Certified Public Accountant (Illinois)

Professional associations
- American Institute of Certified Public Accountants
- Illinois CPA Society
- Associate Member of the Public Contract Law Section of the ABA and a co-chair of the healthcare public contract law committee
- Member of Health Care Compliance Association and National Contract Management Association

Exhibit 1B

# RECENT TESTIMONY OF STEVEN J. YOUNG AT DEPOSITION, HEARING OR TRIAL

HARRY E. STETSER, DALE E.NELSON, and MICHAEL de MONTBRUN, individually and on behalf of themselves and all others similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC.; ABBOTT LABORATORIES; TAKEDA CHEMICAL INDUSTRIES, LTD.; JOHNSON & JOHNSON; ETHICON ENDO-SURGERY, INC.; INDIGO LASER CORPORATION; DAVID JETT; CHRISTOPHER COLEMAN; SCOTT HIDALGO; and EDDY JAMES HACK, Defendants, STATE OF NORTH CAROLINA, NEW HANOVER COUNTY, SUPERIOR COURT DIVISION FILE NO. 1-CV-5268; Deposition taken on June 1 and 2, 2004.

IN RE: LUPRON MARKETING AND SALES PRACTICES LITIGATION (MDL 1430), U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, MASTER FILE NO. 01-CV-10861; Deposition taken on July 13, 2004.

BERNARD WALKER, individually and on behalf of those similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC., et. al., Defendants, STATE OF NEW JERSEY, CAPE MAY COUNTY, SUPERIOR COURT DIVISION FILE NO. CPM-L-682-01; Deposition taken on August 13, 2004.

IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION, U.S. DISTRICT COURT DISTRICT OF MASSACHUSETTS, MDL NO. 1456, CIVIL ACTION NO.01-12257; Testimony taken November 18 and 19, 2004.

BERNARD WALKER, individually and on behalf of those similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC., et. al., Defendants, STATE OF NEW JERSEY, CAPE MAY COUNTY, SUPERIOR COURT DIVISION FILE NO. CPM-L-682-01; Hearing Testimony on April 20, 2005.

ADVANCEPCS HEALTH L.P., Claimant, v. TAKEDA PHARMACEUTICALS AMERICA, INC., Respondent, AMERICAN ARBITRATION ASSOCIATION, COMMERCIAL ARBITRATION TRIBUNAL, CASE NO. 76 193 00202 04 JMLE; Deposition taken on August 26, 2005.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Deposition taken on December 9, 2005.

SACRED HEART HEALTH SYSTEM, INC., ET AL., Plaintiffs, vs. HUMANA MILITARY HEALTHCARE SERVICES, INC., Defendant, IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION, CASE NO. 3:07-cv-62-MCR/EMT; Deposition taken on December 21, 2007.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Deposition taken on September 30, 2008.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Testimony at trial on December 16, 2008.

EXHIBIT 2

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| The United States' First Amended Complaint | Case 1:01-cv-12257-PBS | |
| Dr. Mark G. Duggan report dated June 19, 2008 | | PDF |
| Dr. Mark G. Duggan report dated January 23, 2009 | | PDF |
| Dr. Stephen W. Schondelmeyer report dated June 20, 2008 | | PDF |
| HHD108 | Abbott- 20071016-0001 | CD |
| HHD103 | Abbott- 20071002-0001 | CD |
| HHD145 | Abbott-20071127-0001 | CD |
| HHD153 | Abbott-20071210-0002 (Copy | CD |
| HHD150 | Abbott-20071210-0001 (Copy) | CD |
| HHD155 | 12/21/2007 | CD |
| HHD177 | Abbott-20080218-0002 (Copy) | CD |
| HHD201 | Abbott-20080325-0001 | CD |
| 1991 Direct Sales Data | ABT-DOJ 0351756 | CD |
| 1992 Direct Sales Data | ABT-DOJ 0351757 | CD |
| 1993, 1995, 1996 Direct Sales Data | ABT-DOJ 0351758 | CD |
| 1994 Direct Sales Data | ABT-DOJ 0351759 | CD |
| 1997-1999 Direct Sales Data | ABT-DOJ 0351760 | CD |
| 2000 & 2001 Direct Sales Data | ABT-DOJ 0351761 | CD |
| 2002 & 2003 Direct Sales Data | ABT-DOJ 0351762 | CD |
| 2003 Direct Sales | ABT-DOJ 0309999 | CD |
| 2002 Direct Sales | ABT-DOJ 0309998 | CD |
| 2001 Direct Sales | ABT-DOJ 0309997 | CD |
| 2000 Direct Sales | ABT-DOJ 0309996 | CD |
| 1999 Direct Sales | ABT-DOJ 0309995 | CD |
| 1998 Direct Sales | ABT-DOJ 0309994 | CD |
| 1997 Direct Sales | ABT-DOJ 0309993 | CD |
| 1996 Direct Sales | ABT-DOJ 0309992 | CD |
| 1995 Direct Sales | ABT-DOJ 0309991 | CD |
| 1994 Direct Sales | ABT-DOJ 0309990 | CD |
| 1993 Direct Sales | ABT-DOJ 0309989 | CD |
| 1991 & 1992 Direct Sales | ABT-DOJ 0309988 | CD |
| Indirect Sales- Jan-Dec (1991) | ABT-DOJ 0309974 | CD |
| Indirect Sales- Jan-Dec (1992) | ABT-DOJ 0309975 | CD |
| Indirect Sales- Jan-Dec (1993) | ABT-DOJ 0309976 | CD |
| Indirect Sales- Jan-Dec (1994) | ABT-DOJ 0309977 | CD |
| Indirect Sales- Jan-Dec (1995) | ABT-DOJ 0309978 | CD |
| Indirect Sales- Jan-Dec (1996) | ABT-DOJ 0309979 | CD |
| Indirect Sales- Jan-Dec (1997) | ABT-DOJ 0309980 | CD |
| Indirect Sales- Jan-Dec (1998) | ABT-DOJ 0309981 | CD |
| Indirect Sales- Jan-Dec (1999) | ABT-DOJ 0309982 | CD |
| Indirect Sales- Jan-Dec (2000) | ABT-DOJ 0309983 | CD |
| Indirect Sales- Jan-Dec (2001) | ABT-DOJ 0309984 | CD |
| Indirect Sales- Jan-Dec (2002) | ABT-DOJ 0309985 | CD |
| Indirect Sales- Jan-Jun (2003) | ABT-DOJ 0309986 | CD |
| Indirect Sales- Jul-Dec (2003) | ABT-DOJ 0309987 | CD |
| HHD124 | Abbott- 20071104-0001 (Copy) | CD |
| HHD229 | Abbott-20080423-0001 | CD |
| HHD235 | Abbott-20080515-5-0001 | CD |
| HHD237 | Abbott-20080520-S-0001 | CD |
| Abbott's AMP Data | ABT-DOJ 0236637 | CD |
| Idaho Medicaid Physicians Institutional | AWP- Idaho | CD |
| Report Definitions and Supplemental Information | AWP- Idaho | CD |
| 1997 Corrected Pharmacy (Medicaid Rx Claims) | AWP- Idaho | CD |
| 1993-2004 (Medicaid Rx Claims) | AWP- Idaho | CD |
| Idaho Medicare Claims Without Name & Date of Birth | AWP- Idaho | CD |
| 2005 (Medicaid Rx Claims) | AWP- Idaho | CD |
| HHD246 | Abbott-20080616-5-0001 | CD |
| Response by the State of Washington | | CD |
| HHD271 | Abbott- 20080814-5-0001 | CD |
| HHD277 | Abbott- 20080926-5-0001 | CD |
| AWP Claims- 2005-2006-Idaho | AWP- Idaho | CD |
| HHD314 | Abbott-20081212-S-0001 | CD |
| CO Pharmacy Reimbursement MethodologyRev12 02 08 | Myers and Stauffer | PDF |

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| California Pharmacy Reimbursement MethodologyRev12 03 08 | Myers and Stauffer | PDF |
| Arkansas Pharmacy Reimbursement MethodologyRev11 6 08 | Myers and Stauffer | PDF |
| Alaska Medicaid Pharmacy Reimbursement MethodologyRev10 28 08 | Myers and Stauffer | PDF |
| Alabama Medicaid Pharmacy Reimbursement MethodologyRev10 27 08(2) | Myers and Stauffer | PDF |
| WY Pharmacy Reimbursement MethodologyRev06 03 08(R) | Myers and Stauffer | PDF |
| WV Pharmacy Reimbursement MethodologyRev10 27 08 | Myers and Stauffer | PDF |
| WI Pharmacy Reimbursement MethodologyRev01 10 09) | Myers and Stauffer | PDF |
| WA Pharmacy Reimbursement MethodologyRev12 10 08 | Myers and Stauffer | PDF |
| VT Pharmacy Reimbursement MethodologyRev08 05 08(R) | Myers and Stauffer | PDF |
| VA Pharmacy Reimbursement MethodologyRev12 28 08 | Myers and Stauffer | PDF |
| Utah Medicaid Pharmacy Reimbursement MethodologyRev01 08 09 | Myers and Stauffer | PDF |
| TN Pharmacy Reimbursement MethodologyRev01 08 09 | Myers and Stauffer | PDF |
| Texas Medicaid Pharmacy Reimbursement MethodologyRev12 19 08 | Myers and Stauffer | PDF |
| SD Pharmacy Reimbursement MethodologyRev05 14 08(R) | Myers and Stauffer | PDF |
| SC Pharmacy Reimbursement MethodologyRev11 14 08 | Myers and Stauffer | PDF |
| RI Pharmacy Reimbursement MethodologyRev0725 | Myers and Stauffer | PDF |
| Pennsylvania Medicaid Pharmacy Reimbursement MethodologyRev12 16 08 | Myers and Stauffer | PDF |
| OR Pharmacy Reimbursement MethodologyRev08 19 08 | Myers and Stauffer | PDF |
| OK Pharmacy Reimbursement MethodologyRev10 31 08 | Myers and Stauffer | PDF |
| Ohio Medicaid Pharmacy Reimbursement MethodologyRev121208 | Myers and Stauffer | PDF |
| NY Pharmacy Reimbursement MethodologyRev12 01 08 | Myers and Stauffer | PDF |
| North Carolina Medicaid Pharmacy Reimbursement MethodologyRev12 20 08 | Myers and Stauffer | PDF |
| NM Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| New Jersey Medicaid Pharmacy Reimbursement MethodologyRev12 22 08 | Myers and Stauffer | PDF |
| New Hampshire Medicaid Pharmacy Reimbursement MethodologyRev10 17 08 | Myers and Stauffer | PDF |
| Nevada Medicaid Pharmacy Reimbursement MethodologyRev0604 | Myers and Stauffer | PDF |
| NE Pharmacy Reimbursement MethodologyRev11 17 08 | Myers and Stauffer | PDF |
| ND Pharmacy Reimbursement MethodologyRev12 02 08 | Myers and Stauffer | PDF |
| MT Pharmacy Reimbursement MethodologyRev10 24 08 | Myers and Stauffer | PDF |
| Missouri Medicaid Pharmacy Reimbursement MethodologyRev12 31 08 | Myers and Stauffer | PDF |
| Mississippi Medicaid Pharmacy Reimbursement MethodologyRev11 28 08 | Myers and Stauffer | PDF |
| Minnesota Medicaid Pharmacy Reimbursement MethodologyRev05 19 08(R) | Myers and Stauffer | PDF |
| Michigan Medicaid Pharmacy Reimbursement MethodologyRev12 28 08 | Myers and Stauffer | PDF |
| Massachusetts Medicaid Pharmacy Reimbursement MethodologyRev01 06 09 | Myers and Stauffer | PDF |
| Maryland Medicaid Pharmacy Reimbursement MethodologyRev06 09 08 | Myers and Stauffer | PDF |
| Maine Pharmacy Reimbursement MethodologyRev11 03 08(2) | Myers and Stauffer | PDF |
| Louisiana Medicaid Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| Kentucky Medicaid Pharmacy Reimbursement MethodologyRev11 03 08 | Myers and Stauffer | PDF |
| Kansas Medicaid Pharmacy Reimbursement MethodologyRev12 1 08 | Myers and Stauffer | PDF |
| Iowa Medicaid Pharmacy Reimbursement MethodologyRev10 31 | Myers and Stauffer | PDF |
| Indiana Medicaid Pharmacy Reimbursement MethodologyRev01 07 09 | Myers and Stauffer | PDF |
| Illinois Medicaid Pharmacy Reimbursement MethodologyRev01 06 09 | Myers and Stauffer | PDF |
| Idaho Medicaid Pharmacy Reimbursement11 17 08 | Myers and Stauffer | PDF |
| Hawaii Medicaid Pharmacy Reimbursement MethodologyRev10 06 08 | Myers and Stauffer | PDF |
| Georgia Medicaid Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| Florida Pharmacy Reimbursement MethodologyRev 12 05 08 | Myers and Stauffer | PDF |
| District of Columbia Medicaid Pharmacy Reimbursement MethodologyRev09 12 08 | Myers and Stauffer | PDF |
| Delaware Medicaid Pharmacy Reimbursement MethodologyRev12 08 08 | Myers and Stauffer | PDF |
| Connecticut Medicaid Pharmacy Reimbursement MethodologyRev11 28 08 | Myers and Stauffer | PDF |
| Myers & Stauffer LC (T. Allan Hansen) - Dep dated 12-10-08 and Exhibits | KYSMSPL1022485 | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AK, AR and CA (AK 199812) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 198906 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 199405 Sched D G | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 199405 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 199807 Sched F | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 199807 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 200106 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 200106 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - CA 2002 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - CA 2002 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - CA 2007 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - CT, ID, IN and KS Reports (CT 198702) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - ID 1998 | Myers and Stauffer | PDF |

EXHIBIT 2

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| 09_24_08  Myers & Stauffer Pharmacy Report - IN 2004 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - IN 2007 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199203 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199310 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199705 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199909 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 199808 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 199908 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200006 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200011 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200012 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200012 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200111 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200310 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY and LA (KY 199801) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 199909 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 200103 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 20070301 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - MN, NV, OK, TX, WY (MN 2006) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - NV 2007 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - OK 2000 OSEEGIB AUP | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - OK 2000 Pharmacy Benefit Design OSEEGIB | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - TX 200208 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199010 Sched F | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199010 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199508 Sched B C F | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199508 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199903 | Myers and Stauffer | PDF |
| Exhibit Abbott Maryland 13 (MD0021454 - MD0021497) | Duggan deposition | |
| HHD127-0023 - HHD127-0025 | | |
| Memorandum Intermediaries/Carriers. Transmittal AB-00-86. September 8, 2000 | | |
| http://www.pmewswire.co.uk/cgi/news/release?id=122086 | | |
| CMS, Part B Carrier Locality Codes After 12/31/1995 Report Prepared by CMS 9/17/04 | | |
| Testimony of Herb Kuhn before the House Subcommittee on Health of the Committee on Ways and Means July 13, 2006 | | |
| http://www.nhia.org/faqs.cfm | | |
| HHD006-0060 | | |
| Testimony of Jerry Dubberly on December 15, 2008 | | PDF |
| Testimony of Dr. Mark G. Duggan February 17, 2009 | | PDF |
| IMS Hospital Supply Index Data 1992 - 2003 | ABT-DOJ 0377285 | CD |
| Findings of Fact and Conclusions of Law, Track 1 MDL-1456, June 21, 2007, p.167. | | |
| BMW032-0020-0026 | | PDF |
| State of West Virginia vs. Warrick Pharm., et al. Civil Action No. 01-C-3011; Kanawha County (Stucky, J.) | | CD |

Exhibit 3

Exhibit 3

| State | Claims Data Received | CMS Utilization All Drugs [1] Paid Amount | Rank | Medicaid Fee for Service Enrollment 1997 [2] # of Enrollees | Rank | CMS Utilization Stipulated Drugs [1] Paid Amount | Rank |
|---|---|---|---|---|---|---|---|
| CALIFORNIA | X | $ 16,417,749,204 | 1 | 2,936,959 | 1 | $ 10,001,593 | 3 |
| NEW YORK | X | $ 13,807,473,246 | 2 | 1,635,754 | 3 | $ 8,748,113 | 5 |
| FLORIDA | X | $ 8,241,298,851 | 3 | 514,322 | 8 | $ 16,482,599 | 1 |
| TEXAS | X | $ 8,031,620,626 | 4 | 1,803,346 | 2 | $ 3,456,074 | 13 |
| OHIO | X | $ 6,248,293,493 | 5 | 742,435 | 5 | $ 5,836,390 | 9 |
| PENNSYLVANIA | X | $ 5,598,465,961 | 6 | 715,442 | 6 | $ 2,920,290 | 15 |
| ILLINOIS | X | $ 5,584,126,592 | 7 | 1,183,306 | 4 | $ 15,861,036 | 2 |
| MASSACHUSETTS | X | $ 4,391,802,312 | 8 | 254,476 | 16 | $ 1,930,850 | 22 |
| NORTH CAROLINA | X | $ 4,379,036,900 | 9 | 474,421 | 9 | $ 4,294,250 | 11 |
| NEW JERSEY | X | $ 4,171,671,273 | 10 | 300,236 | 14 | $ 9,642,486 | 4 |
| GEORGIA | X | $ 3,954,194,226 | 11 | 320,861 | 13 | $ 3,250,664 | 14 |
| LOUISIANA | X | $ 3,605,247,816 | 12 | 595,203 | 7 | $ 4,256,698 | 12 |
| MICHIGAN | X | $ 3,604,663,274 | 13 | 250,469 | 17 | $ 4,903,153 | 10 |
| KENTUCKY | X | $ 3,408,333,261 | 14 | 259,006 | 15 | $ 7,402,284 | 6 |
| MISSOURI | X | $ 3,269,943,106 | 15 | 350,287 | 12 | $ 6,360,406 | 8 |
| VIRGINIA | X | $ 2,739,334,082 | 16 | 215,276 | 20 | $ 2,599,335 | 17 |
| TENNESSEE [3] | | $ 2,499,227,518 | 17 | - | 49 | $ 243,918 | 42 |
| WASHINGTON [3] | X | $ 2,471,516,696 | 18 | - | 50 | $ 2,509,996 | 19 |
| WISCONSIN | X | $ 2,403,738,899 | 19 | 217,347 | 19 | $ 2,574,373 | 18 |
| ALABAMA | | $ 2,397,577,589 | 20 | 89,791 | 31 | $ 2,138,490 | 20 |
| SOUTH CAROLINA | X | $ 2,224,254,066 | 21 | 379,164 | 11 | $ 1,791,730 | 25 |
| INDIANA | X | $ 2,033,147,693 | 22 | 185,000 | 23 | $ 6,707,961 | 7 |
| MISSISSIPPI | | $ 2,004,932,074 | 23 | 462,305 | 10 | $ 1,892,501 | 23 |
| CONNECTICUT | X | $ 1,864,905,341 | 24 | 128,280 | 26 | $ 2,063,566 | 21 |
| MINNESOTA | X | $ 1,636,558,269 | 25 | 233,458 | 18 | $ 1,197,250 | 29 |
| MAINE | X | $ 1,537,944,918 | 26 | 143,013 | 24 | $ 300,399 | 40 |
| MARYLAND | | $ 1,506,745,317 | 27 | 117,496 | 27 | $ 1,735,601 | 26 |
| WEST VIRGINIA | | $ 1,461,160,998 | 28 | 185,189 | 22 | $ 1,283,144 | 28 |
| ARKANSAS | X | $ 1,389,789,038 | 29 | 108,067 | 28 | $ 2,723,668 | 16 |
| SOUTH DAKOTA | | $ 1,367,064,699 | 30 | 18,870 | 46 | $ 436,538 | 36 |
| OKLAHOMA | | $ 1,326,049,934 | 31 | 214,343 | 21 | $ 1,618,591 | 27 |
| OREGON | | $ 1,136,816,437 | 32 | 64,000 | 34 | $ 1,027,877 | 30 |
| IOWA | X | $ 927,844,495 | 33 | 129,386 | 25 | $ 601,602 | 35 |
| KANSAS | | $ 904,839,965 | 34 | 90,871 | 30 | $ 614,600 | 33 |
| NEBRASKA | | $ 892,935,884 | 35 | 51,153 | 37 | $ 760,370 | 32 |
| COLORADO | | $ 865,541,304 | 36 | 44,558 | 40 | $ 1,794,111 | 24 |
| UTAH | | $ 601,349,966 | 37 | 24,558 | 44 | $ 886,794 | 31 |
| RHODE ISLAND | | $ 587,096,408 | 38 | 43,218 | 42 | $ 415,287 | 37 |
| NEW MEXICO | | $ 488,235,374 | 39 | 103,108 | 29 | $ 61,788 | 47 |
| NEW HAMPSHIRE | | $ 425,889,194 | 40 | 61,820 | 36 | $ 84,390 | 46 |
| IDAHO | X | $ 416,754,352 | 41 | 48,125 | 39 | $ 95,856 | 45 |
| MONTANA | | $ 404,234,902 | 42 | 8,817 | 48 | $ 327,080 | 39 |
| HAWAII | X | $ 377,262,235 | 43 | 31,525 | 43 | $ 327,599 | 38 |
| DISTRICT OF COLUMBIA | | $ 369,205,769 | 44 | 44,279 | 41 | $ 43,888 | 50 |
| ALASKA | X | $ 330,494,681 | 45 | 87,475 | 32 | $ 61,299 | 48 |
| DELAWARE | | $ 309,673,884 | 46 | 15,500 | 47 | $ 243,786 | 43 |
| NEVADA | | $ 271,187,177 | 47 | 62,124 | 35 | $ 611,154 | 34 |
| VERMONT | | $ 264,417,769 | 48 | 74,039 | 33 | $ 48,139 | 49 |
| NORTH DAKOTA | | $ 264,096,811 | 49 | 21,008 | 45 | $ 210,056 | 44 |
| WYOMING | | $ 141,567,612 | 50 | 48,348 | 38 | $ 255,949 | 41 |
| Total | | $ 135,557,311,511 | | 16,088,034 | | $ 145,635,571 | |

Note - Dr. Duggan calculated damages on states shaded grey.
1) Source: http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp.
2) Source: http://www.cms.hhs.gov/MedicaidDataSourcesGenInfo/Downloads/mmcer97.pdf
3) Tennessee and Washington had waiver programs with no fee for service.

# EXHIBIT 95

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.,* CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | (Original Complaint Filed in the Southern District of Florida, Case No. 06-21303-CIV-GOLD/TURNOFF) |

## THE UNITED STATES' FIRST AMENDED COMPLAINT

The United States brings this fraud action against Abbott Laboratories, Inc. ("Abbott") to recover losses sustained by the Medicare and Medicaid programs. Over the course of several years, Abbott reported inflated pharmaceutical prices that it knew Medicare and Medicaid relied upon to set reimbursement rates for Abbott's pharmaceutical products. Abbott's actual sales prices for its pharmaceutical products were far less than the prices reported by Abbott. By knowingly reporting inflated prices – often 1000% higher than Abbott's actual prices – Abbott ensured its customers received inflated reimbursement and profits from Medicare and Medicaid. Abbott then used the public fisc as a marketing tool, actively promoting government-funded "spreads" between (1) its fraudulently inflated prices and (2) its actual sales prices as an inducement to its customers. In addition, Abbott operated its own home infusion pharmacies and entered into profit-sharing partnerships with health care providers that allowed Abbott to directly profit off Abbott's manipulation of third party reimbursements for its drugs. These efforts allowed Abbott to increase its profits by boosting sales for its drugs.

## I.  NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law or equitable theories of fraud and unjust enrichment.

2.      The United States bases its claims on Abbott having **submitted and** caused the submission of false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1), and having made and used false statements to get false or fraudulent claims paid by the United States in violation of 31 U.S.C. § 3729(a)(2).

3.      Within the time frames detailed below, Abbott engaged in a fraudulent scheme that caused the Medicare and Medicaid programs to pay excessive reimbursement to Abbott's customers, *e.g.*, pharmacies, physicians, hospitals, home health agencies, nursing homes, home infusion companies, clinics and physicians (hereafter referred to collectively as "Customers").  In furtherance of this scheme, Abbott reported false, fraudulent and inflated drug prices for certain drugs (listed in ¶¶ 30 and 34 below) to several price reporting compendia that the Medicare and Medicaid programs relied upon to set reimbursement rates for Abbott's customers.  A chart setting out examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**.  Abbott knew that the Medicare and Medicaid programs relied on Abbott's reported prices to those compendia to set reimbursement rates for claims submitted for Abbott's drugs.  Abbott then sold the drugs for far lower prices, and marketed to existing and potential Customers the government-funded

"spread" between the inflated reimbursement amounts and the actual acquisition costs of the
drugs to boost its sales and profits.

4.      Abbott knew that its false price reporting and marketing efforts would cause its
Customers to submit claims for fraudulently inflated Medicaid and Medicare reimbursement.

5.      Abbott's fraudulent scheme to induce Customers to purchase its products by
ensuring that federal reimbursement rates for those products would be set at artificially inflated
levels violated the FCA, the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), common law
and numerous state laws.

6.      To get fraudulent claims paid by the United States, Abbott also routinely made
false statements directly to state Medicaid programs by reporting these same fraudulently inflated
prices to the states.  These statements violated the FCA, common law and various state laws.

7.      The United States timely asserts the causes of action alleged herein based on the
filing of relator's complaint in this action.

## II. JURISDICTION

8.      The United States' original Complaint in this matter was filed on March 16, 2006
in the Southern District of Florida.[1]  The case was transferred to Multi-District Litigation
("MDL") No. 1456 on July 27, 2006.  The Court has subject matter jurisdiction to entertain this
action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common
law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise

---

[1]  This case originated in the Southern District of Florida as Case No. 06-21303-CIV-
GOLD/TURNOFF.  The United States understands that this matter will be transferred back to the
Southern District of Florida for trial upon the completion of these MDL proceedings.

personal jurisdiction over Abbott pursuant to 31 U.S.C. § 3732(a) because Abbott resides or

transacts business in the District of Massachusetts.

### III. VENUE

9.      Venue is proper in the District of Massachusetts under 31 U.S.C. § 3732 and 28

U.S.C. § 1391(b) and (c) because Abbott resides or transacts business in this District.[2]

### IV. PARTIES

10.     The United States brings this action on behalf of the Department of Health and

Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly

known as the Health Care Financing Administration), which administer the Medicare and

Medicaid programs.

11.     Relator Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care"), is a corporation

organized under the laws of Florida, with its principal offices in Key West, Florida.  Ven-A-Care

is a pharmacy licensed to provide the prescription drugs specified in this Complaint and has

been, during the relevant period of this Complaint, a Medicare and Florida Medicaid provider.

Ven-A-Care's principal officers and directors have included John M. Lockwood, M.D., Zachary

Bentley, Luis Cobo and T. Mark Jones, who are each citizens of the United States and reside in

Key West, Florida.  The FCA, 31 U.S.C. § 3730(b)(1), provides that private parties may bring a

lawsuit on behalf of the United States to recover damages for false claims.  Ven-A-Care brought

this action against Abbott on behalf of itself and the United States.

---

[2]  Abbott also resides or transacts business in the Southern District of Florida as well.
Thus, venue is also proper in that District.

4

12.     Defendant Abbott is a corporation organized under the laws of Illinois with its

principal offices in Abbott Park, Illinois.  At all times material to this civil action, Abbott has

transacted business throughout the United States, selling and distributing its drugs, including but

not limited to those identified in this Complaint, to purchasers within this District.

## V.  THE LAW

**A.     The False Claims Act**

13.     The FCA provides in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an
> officer or employee of the United States Government or a member of the Armed
> Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the Government
>
> * * *
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person . . . .
> (b) For purposes of this section, the terms  "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required.

31 U.S.C. § 3729.

14.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for

violations occurring on or after September 29, 1999.

**B.**     **The Federal Anti-Kickback Statute**

15.     Congress first enacted the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b),

in 1972 to protect the integrity of Medicare and Medicaid.  Congress strengthened the statute in

1977, and again in 1987, to ensure that kickbacks masquerading as legitimate transactions would

not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b)

and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L.

No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.

100-93.

16.     The anti-kickback statute prohibits any person or entity from making or accepting

payment to induce or reward any person for referring, recommending or arranging for federally-

funded medical items, including items provided under Medicare and Medicaid.  In pertinent part,

the statute provides:

> (b) Illegal remuneration
>
>> (1) whoever knowingly and willfully solicits or
>> receives any remuneration (including any kickback,
>> bribe, or rebate) directly or indirectly, overtly or
>> covertly, in cash or in kind –
>>
>>> (A) in return for referring an individual to a
>>> person for the furnishing or arranging for the
>>> furnishing of any item or service for which
>>> payment may be made in whole or in part
>>> under a Federal health care program, or
>>>
>>> (B) in return for purchasing, leasing,
>>> ordering, or arranging for or recommending
>>> purchasing, leasing, or ordering any good,
>>> facility, service, or item for which payment

6

> may be made in whole or in part under a
> Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than five
> years, or both.
>
> (2) whoever knowingly and willfully offers or pays any
> remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in kind
> to any person to induce such person --
>
> (A) to refer an individual to a person for the
> furnishing or arranging for the furnishing of any
> item or service for which payment may be made in
> whole or in part under a Federal health care
> program, or
>
> (B) to purchase, lease, order or arrange for or
> recommend purchasing, leasing or ordering any
> good, facility, service, or item for which payment
> may be made in whole or in part under a Federal
> health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).  Those who violate the statute also are subject to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of up to $50,000 per violation and up to three times the amount of remuneration paid.

42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

## VI.  THE FEDERAL HEALTHCARE PROGRAMS

17.      Medicaid and Medicare were created to provide access to healthcare for elderly, indigent or disabled residents of the United States.

### A.      <u>The Medicaid Program</u>

18.      Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

19.      The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  42 U.S.C. § 1396a.

20.      The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50%, and as high as 83%.

21.      The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

22.      The Medicaid programs of all states reimburse for prescription drugs.

23.      The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

24.     By becoming a participating supplier in Medicaid, suppliers agree to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

**B.     The Medicare Program**

25.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  42 U.S.C. §§ 426-426a, 1395o.

26.     HHS is responsible for the administration and supervision of the Medicare program.  CMS is an agency of HHS and directly administers the Medicare program.  The Medicare program has several parts, including Medicare Part B ("Supplementary Medical Insurance for the Aged and Disabled"), which covers physician services, as well as durable medical equipment ("DME") and certain drug products and supplies.  42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

27.     Medicare Part B generally covers drugs which are provided either:  (a) incident to a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26 (*e.g.*, certain oncology drugs)); or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit.  42 C.F.R. §§ 405.517, 414.701.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

28.     During the relevant time period, CMS contracted with private insurance carriers

("Contractors") to administer and pay Part B claims from the Medicare Trust Fund.  42 U.S.C.

§ 1395u.  In this capacity, the Contractors act on behalf of CMS.  42 C.F.R. § 421.5(b).

29.     Contractors receive, process and pay claims under Medicare Part B for drugs from

various Medicare providers and suppliers.  Typically, once a contractor approves a claim, the

contractor then submits a payment request to a Medicare bank account funded by federal funds.

**C.     Drug Reimbursement Under Medicaid and Medicare**

30.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97, requires

pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of

every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA provides for the

assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the

National Drug Code ("NDC").  FDA has assigned approximately 170,000 NDCs to drug

products.  The drugs and corresponding NDCs at issue in this case are listed below:

| DRUG | NDC# |
|------|------|
| Sodium Chloride Injection | 00074196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |
| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |

10

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

| | |
|---|---|
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |
| 5% Dextrose in Water 100 ml | 00074710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 00074798309 |
| Sodium Chloride Injection | 00074798436 |
| Sodium Chloride Injection | 00074798437 |
| Sodium Chloride Injection | 00074798509 |
| Water for Injection1000 ml | 00074799009 |
| Acyclovir Sodium 500 mg | 00074442701 |
| Acyclovir Sodium 1 gm | 00074445201 |

31.     Drug manufacturers, such as Abbott, have not typically submitted claims for
reimbursement to federal health care programs.  Instead, Abbott marketed its products to its
Customers, who then purchased the products either directly or through wholesalers based on a
price the Customers negotiated with Abbott.  In addition to using wholesalers, Customers also

11

purchased Abbott products through group purchasing organizations ("GPO"), who negotiated prices on behalf of Abbott's Customers.  However, as described in ¶¶ 111-138 below, Abbott also had a business unit that, among other activities, operated home infusion pharmacies and actually submitted reimbursement claims for drugs on behalf of various clients.

32.    Abbott's Customers then submitted claims for payment for Abbott products to Medicare and Medicaid after dispensing or administering Abbott drugs.  Medicare and Medicaid reimbursed some of the claims submitted by Abbott's home infusion pharmacies.  In other instances, Abbott administered reimbursement claims for certain home infusion clients and collected portions of those clients' Medicare and Medicaid reimbursements as compensation for those services.

33.    For the most part, in the Medicaid program, claims submitted by retail pharmacies are processed and tracked using the NDC of the drug.

34.    The Medicare program generally uses the Healthcare Common Procedural Coding System ("HCPCS") to reimburse for drugs.  The HCPCS utilize 5-digit alphanumeric codes to identify and bill for medical products and supplies.  The codes at issue here are listed below:

| HCPCS | Description |
|-------|-------------|
| J2912 | Sodium Chloride, .9 percent, per 2 ml |
| J3370 | Vancomycin HCl, 500 mg |
| J7030 | Normal Saline Solution, 1000 cc |
| J7040 | Normal Saline Solution, 500 ml |
| J7042 | 5 percent Dextrose/Normal Saline Solution, 500 ml |
| J7050 | Normal Saline Solution, 250 cc |
| J7051 | Sterile Saline or Water, up to 250 cc |
| J7060 | 5 percent Dextrose/Water, 500 ml |
| J7070 | D-5-W, 1000 cc |
| J7110 | Dextran 75, 1000 ml |
| J7130 | Hypertonic Saline Solution, 50 or 100 mEq, 20 cc vial |

35.     During the relevant period, Abbott usually reported prices to various price publishers and services on an annual basis.  The price publishers used the information to publish pricing compendia.

36.     The reimbursement amounts for claims submitted by Abbott or Abbott's Customers for the drugs at issue in this Complaint were directly influenced by Abbott's false price representations.  The information contained in the published pricing compendia was used by most third party payor insurance companies, including the Medicare and Medicaid programs, in determining the reimbursement rates for prescription drugs.  Abbott documents show that Abbott knew of the impact of its price representations on government reimbursement on claims submitted by its Customers for its drugs.  Abbott documents also show that the company actively marketed the government-funded profits or "spreads" on its drugs created by its false price representations.

37.     No governmental payor knew of or sanctioned Abbott's conduct as set forth in this Complaint, i.e., its deliberate manipulation of its published prices for certain of its products to induce its Customers to purchase those products.

**D.    Medicaid Reimbursement Formulas**

38.     When reimbursing for drugs, the State Medicaid programs' goal has been to pay an amount which, in the aggregate, reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public. To determine the EAC for a covered drug, State

Medicaid programs are required to develop reimbursement formulas that must be approved by the Secretary of HHS.  42 C.F.R. §§ 447.331, 447.332, and 447.333 (2005).

39.     While the specific reimbursement formulas vary from state to state, the various State Medicaid programs have generally reimbursed for each drug based on the lowest of (a) the EAC as set by the states,  (b) the maximum allowable cost ("MAC") set by the state Pharmaceutical Reimbursement Boards, or (c) the providers' usual and customary charge.  For multiple source drugs subject to a federal upper limit, states must in the aggregate not pay more than those limits. 42 C.F.R. §§ 447.331, 447.332 and 447.333 (2005).

40.     The states' methodology for arriving at EAC includes:

A.     discounting a percentage off of the Average Wholesale Price ("AWP");

B.     adding a percentage to the Wholesale Acquisition Cost ("WAC") ; and/or,

C.     requiring the drug companies to certify prices directly in writing to the Medicaid program in response to state requests for particular pricing information.

41.     AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient.  WAC is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail Customer.

42.     While the majority of states use published AWPs to calculate reimbursement, approximately six states (Alabama, Florida, Maryland, Massachusetts, Rhode Island and Texas) have used the wholesale acquisition cost ("WAC") to set the EAC.

14

43.    The AWPs and WACs relied upon by the State Medicaid programs have generally been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the Hospital Formulary Pricing Guide.  Thompson Publishing, First Databank and Medi-Span, Inc. are hereafter referred to as the "Publishers" and their various publications and data services are hereinafter referred to as "Price Publications."

44.    In addition to relying on the manufacturers' reported prices as published in the Price Publications, some State Medicaid programs also received price representations directly from manufacturers, and relied on these representations to confirm the accuracy of the figures they use to determine state reimbursement amounts.  For example, the State of Texas required drug companies to submit their prices directly to the Texas Medicaid program in a signed certification attesting to the accuracy of the price information.

**E.    Medicare Reimbursement Formulas**

45.    From 1992 through 1997, Medicare based its reimbursement for multi-source generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic forms of a drug.  42 C.F.R. § 405.517 (1992-1998).  In general, Medicare relied on median AWPs to set reimbursement rates.

46.    From January 1, 1998, until December 31, 1998, Medicare based its reimbursement for all generic forms of a drug at 95% of the median AWP for the drug.  Balanced Budget Act of 1997, 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1998).

15

47.     From 1999 through 2004, Medicare based its reimbursement for all generic forms of a drug at the lower of (1) 95% of the median published AWP for the drug; or (2) the AWP of the least expensive brand-name drug.  42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).

48.     After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment.  If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

49.     Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium known as the *Drug Topics Red Book* ("*Red Book*"), as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

## VII.  ABBOTT'S SCHEME

50.     From at least on or before January 1, 1991, and continuing through 2001,  Abbott defrauded the United States by knowingly causing the Medicare and Medicaid programs to pay false or fraudulent claims for dextrose solutions, sodium chloride solutions, sterile water, Vancomycin and Acyclovir Sodium.

51.     The specific dextrose solutions, sodium chloride solutions, sterile water, Vancomycin and Acyclovir Sodium products at issue herein are identified by NDC or HCPCS Code in ¶¶ 30 and 34 above and are hereinafter referred to jointly as the "Drugs."

52.     Dextrose solutions, sodium chloride solutions, and sterile water are generic, water-based solutions used to facilitate the intravenous infusion of other drugs and for fluid replacement, and are commonly referred to as large volume parenterals ("LVPs").

16

53.     Vancomycin is a powerful, intravenous antibiotic that Abbott has sold as a generic drug since 1988.

54.     Acyclovir Sodium ("Acyclovir") is an antiviral drug used to treat several opportunistic viral infections, some of which are associated with HIV/AIDS.

55.     Abbott marketed and sold its products, including the Drugs, to Customers.

56.     The Customers purchased the products either directly from Abbott, through a GPO contract or through wholesalers.

57.     The amount paid by a Customer was typically based on a price negotiated with Abbott or the GPO.

58.     Regardless of the method of purchase, Abbott's Customers submitted claims for payment to Medicare and Medicaid when an Abbott product was administered to a program beneficiary.  The claims submitted by Abbott's Customers were paid at amounts directly influenced by Abbott's false and fraudulent prices.

59.     Abbott routinely disseminated false pricing information for the Drugs to the Pricing Publications.  Abbott employees typically reported the false and fraudulent prices to the Price Publications annually, although they sometimes did so more often.  On most occasions, Abbott reported inflated "List Prices" or "Direct Prices" (both referred to hereinafter as LP), WACs and/or AWPs.  A LP is supposed to reflect the price paid by a Customer that buys drugs directly from Abbott and not through a wholesaler.

60.     When Abbott reported a LP, some Price Publications (*e.g.*, *Blue Book*, which provided pricing information for the vast majority of the state Medicaid programs) calculated

17

Abbott's AWPs by applying a markup – usually 18.75% –  to the LPs.  Abbott was aware of how

the Price Publications set its AWPs and knew (1) that the markup remained constant and (2) that

its LPs ultimately controlled the AWP reported by the Price Publications for many of its

products.  Abbott reported WACs for several of its drugs as well, but during the time period

covered by the Complaint, the Price Publications used Abbott's LPs (plus the standard markup)

to set the AWPs used by the Medicaid and Medicare programs.

61.     In some circumstances, Abbott itself calculated and supplied the AWP which it

sought to have published.

62.     For example, in a January 16, 1996 letter from Abbott's Reimbursement Manager

to Medi-Span, Abbott directly reported AWPs for two of its products.

63.     Abbott documents also confirm its knowledge that the LPs it reported directly

impacted the AWP.  In a March 20, 1995 e-mail between Abbott employees regarding the

reporting of new Vancomycin LPs, one employee notes, "Please notify Red Book and Medi-Span

of these changes ASAP.  They are the sources for creating the AWP that is important to

[Abbott's] Alternate Site [sales division]."

64.     Abbott also submitted false and fraudulent prices directly to state Medicaid

programs.  In an October 1, 1997, Abbott "Medicaid Coordinator" Tena Brown represented in a

letter to the State of Texas Medicaid Program that the price on Abbott's Vancomycin 1 GM

Fliptop vial- sterile, NDC 00074-6533-01 ("Vancomycin 1 GM FTV") was $583.70 for a

package of 10, or $58.37 a unit.  That led the Texas Medicaid program to set reimbursement for

18

Vancomycin 1 GM FTV at that price ($58.37 a unit).  At the time, Abbott sold Vancomycin 1 GM FTV to certain Customers for $5.53 per unit, through a GPO called Oncology Solutions.

65.   With extremely few exceptions, Abbott reported increasingly higher prices for the Drugs from at least on or before January 1, 1991 through 2001.  At the same time, the prices Abbott actually charged to its Customers decreased or remained the same.

66.   Abbott knew that the prices which it reported to the Price Publications directly affected reimbursement amounts paid by the Medicaid and Medicare programs.  As Abbott's Manager for Reimbursement noted in an April 26, 1995 memorandum, "[h]aving a published [LP] that is high allows a provider to bill at that list price."  The false or fraudulent prices Abbott reported to the Price Publications inflated government reimbursement amounts on claims submitted by Abbott's Customers for the Drugs.  A chart setting out some examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**.

67.   Abbott manipulated its LPs, AWPs and WACs to induce its Customers to purchase Abbott's products, including the Drugs, by marketing the huge profits that would result to its Customers.

68.   Abbott was well aware of how the Government used its pricing information to reimburse Abbott products.  For example, Abbott organized an internal entity known as the "Medicare Working Group."  The group (1) was organized by high level Abbott executives, (2) involved representatives responsible for reimbursement issues from all major Abbott divisions, and (3) discussed and organized efforts to influence government reimbursement for drugs.

19

69.     Documents from the Medicare Working Group establish that Abbott knew that AWP is based upon Abbott's reported price plus, according to the Medicare Working Group documents, "a mark-up of 15-20%."  Minutes from a January 21, 1997 meeting note that this AWP based on Abbott's reported prices is subsequently reported in "the Red Book, Blue Book and Medispan Book and is used by Medicare, Medicaid and Commercial insurance carriers to determine reimbursement levels."

70.     Neither the Medicaid nor the Medicare programs knew of or sanctioned Abbott's conduct as set forth in this Complaint, *i.e.*, the deliberate manipulation of its published prices to induce its Customers to purchase the Drugs.  Abbott never disclosed the price reporting practices for the Drugs identified in this Complaint to the Medicaid or Medicare programs.

**A.     Vancomycin**

71.     Abbott first introduced its generic Vancomycin in 1988.  Abbott's scheme to defraud the United States by causing inflated Vancomycin reimbursements ran from approximately 1989 through 2001.  Over that time period, Medicare and Medicaid paid in excess of $75 million for Abbott's Vancomycin.

72.     During that time period, Abbott reported increasingly higher LPs and AWPs for Vancomycin to the Price Publications while the actual contract prices at which Abbott sold Vancomycin to its Customers decreased significantly.

73.     Abbott sold its Vancomycin in several doses and forms.  The Vancomycin 1 GM FTV was the most common dose of Vancomycin reimbursed by Medicare and Medicaid.

20

Abbott's false and fraudulent price reporting on its Vancomycin 1 GM FTV represents how

Abbott reported false and fraudulent prices on its other Vancomycin products.

74.     When Abbott first introduced its Vancomycin 1 GM FTV in 1988, the published

per unit AWP was $25.20.  By early 2001, Abbott reported false prices that drove the AWP for

Vancomycin 1 GM FTV to $76.42.  At the same time, the price at which Abbott's Vancomycin

was widely available to purchasers decreased to under $4.00 by early 2001; the difference (and

potential profit) between the reported price and the actual selling price for Vancomycin 1 GM

FTV was as great as $72.42 a dose, or more than 18 times the actual price at which Abbott sold

Vancomycin 1GM FTV.

75.     Abbott fully controlled and manipulated the AWPs for Vancomycin 1 GM FTV to

boost its Vancomycin sales at the expense of third party payors, including Medicare and

Medicaid.

76.     Abbott's manipulation of its reported Vancomycin prices between 1989 and 2001

created spreads sufficient to induce increased sales of that drug.  Internal memoranda from senior

Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on

several of its drugs, including Vancomycin.  Those efforts proved successful; the percentage of

Abbott's Vancomycin sales reimbursed by Medicaid increased from less than 10% in 1991 to

approximately 70% in 2000.

77.     Abbott's reporting of Vancomycin prices in 1995 exemplifies the manner in

which Abbott manipulated the price of Vancomycin to maintain and grow its market share.  In

March 1995, Abbott temporarily reported dramatically lower LPs and AWPs for Vancomycin.

Prior to the March 1995 LP/AWP price change, the Price Publications listed a per unit LP of $50.90 for Abbott's Vancomycin 1 GM FTV, and a per unit AWP of $60.44 for that drug.

78.     In late March 1995, Abbott reported a new LP of $15.00 for a unit of Vancomycin 1 GM FTV.  Based on this new information from Abbott, the Price Publications published revised per unit prices for Vancomycin 1 GM FTV.  They reported a LP of $15.00 and an AWP of $17.81.

79.      Abbott received numerous complaints from Customers over the resulting decrease in the spread.  Abbott deliberated internally on whether and by how much Abbott should again increase its spread so that it could reestablish the inducement that had come to be expected by its Customers.  Abbott documents show Abbott's pricing personnel carefully considering the additional profits they could generate for Abbott's Customers if they artificially re-inflated the reported prices for Vancomycin 1 GM FTV at various levels.

80.     Abbott subsequently reversed its earlier decision to lower its reported prices and instead raised its reported Vancomycin prices.  In early May 1995, Abbott reported a new per unit LP for its Vancomycin 1 GM FTV of $32.95.  The revised AWP for Abbott's Vancomycin 1 GM FTV became $39.13 (once the Price Publication applied the standard markup).

81.     That reported price increase proved insufficient.  Later that same month (May 1995), Abbott reported yet another set of prices for Vancomycin.  The LP Abbott reported for its Vancomycin 1 GM FTV rose to $52.94 and its AWP rose to $62.86 (once the Price Publication applied the standard markup).

82.    Thereafter, Abbott reported higher Vancomycin LPs and AWPs to the Publishers each year, despite decreases in its actual prices to Customers for Vancomycin over that same period.  The AWP for Abbott's Vancomycin 1 GM FTV peaked at $76.42 per unit in early 2001 at the same time that the actual sales price was less than $4 per unit.

83.    The false prices reported by Abbott directly impacted the amount Medicaid and Medicare reimbursed for Vancomycin.  For example, in 1999 Abbott's Vancomycin 1 GM FTV was widely available for approximately $4.75 a unit.  Yet, Abbott reported a per-unit Vancomycin LP in 1999 – which served as the baseline for determining the AWP – to First DataBank of $64.35.  As a result, the 1999 AWP for Vancomycin 1 GM FTV was set at $76.42.

84.    New York State's Medicaid program relied on the First DataBank prices to set its reimbursement rate for the Vancomycin 1 GM FTV.  New York State's Medicaid reimbursement rate for the Vancomycin 1 GM FTV in 1999 was $68.77; the AWP for Vancomycin 1 GM FTV was $76.42 at the time.  New York's reimbursement for Vancomycin 1 GM FTV was AWP minus 10%, a reimbursement formula generally similar to those of other states.  Abbott's false price representations created a profit spread of approximately $64.02 for Abbott's Customers, on a drug that Abbott sold to those same Customers for approximately $4.75 a unit.  The spread between the New York state Medicaid reimbursement for Vancomycin 1 GM FTV – directly influenced by Abbott's false price reporting – and the actual acquisition cost was 1,348%.  The profit to Abbott's Customers was 13.5 times the typical acquisition cost for the drug.

85.    Abbott's practice of price manipulation continued into early 2001.  At that time, Abbott reported new, lower WACs to the Price Publications for many of its drugs, including

Vancomycin, without also reporting new LPs or AWPs.  At the time Abbott submitted the new prices in early 2001, it had been under investigation by the Government for pricing fraud.  In addition, members of the House Ways and Means Committee accused Abbott of engaging in price reporting misconduct that threatened public safety in the fall of 2000; the Centers for Disease Control had expressed concerns that over-prescription of Vancomycin could lead to the growth in the population of Vancomycin-resistant bacteria.  Also,  in October 2001, an Abbott joint venture, TAP Pharmaceuticals, Inc. paid $875 million to the Government to resolve its criminal responsibility and civil liability for fraudulent pricing and kickbacks in connection with the marketing of a drug called Lupron. When Abbott submitted reduced WACs, First DataBank changed the way it calculated Abbott's AWP.  First Databank personnel set new AWPs for Abbott products by applying a 25% markup to the newly supplied WACs  instead of setting Abbott's AWPs by applying a 18.75% markup to Abbott's still inflated LPs.  Abbott tried to convince First DataBank personnel not to set Abbott's AWP by reference to these new, lower WACs;  Abbott wanted First DataBank to continue to use Abbott's then still inflated LPs to maintain its inflated AWPs.  First DataBank refused Abbott's request.  Ultimately, Abbott reduced its LPs and WACs to reflect the average sales price for the Drugs on April 30, 2001.

86.    The switch to using the lowered WACs drastically dropped Abbott's reported AWPs in 2001.  For Abbott's Vancomycin 1 GM FTV, the AWP dropped from $76.42 per unit in early 2001 (when AWP was determined using the inflated LPs) to $17.72 per unit in 2001 (when AWP was set using the revised, lowered WACs).  By 2002, the AWP for this product was down to $6.06 a unit.

24

87.     As a result of the drop in AWP, the spread on the reimbursement by Medicare and Medicaid was reduced from $60-$70 a unit to approximately $2.00 a unit.

88.     Abbott's Customers recognized that Abbott was responsible for creating and maintaining the spread.  Numerous Customers complained to Abbott or the group purchasing organizations (GPOs) who negotiated prices on behalf of Abbott's Customers.  A large Customer of Abbott went so far as to demand restitution for the almost $10.5 million in lost profits due to the decrease in spread resulting from Abbott's 2001 submission of lowered prices to the reporting agencies.

89.     Internal memoranda from senior Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on several of its drugs, including Vancomycin, as an inducement to purchase Abbott's drugs.

90.     Abbott's share of the Medicaid market has dropped steadily since the more accurate prices started being published in 2001 and thereafter went from approximately 70% in early 2001 to approximately 20% in 2004.

**B.      Large Volume Parenterals**

91.     In addition to false price reporting for Vancomycin, Abbott engaged in similar conduct with respect to its LVPs.

92.     LVPs are essentially sterile water, usually mixed with either salt (sodium chloride) or sugar (dextrose).  LVPs are cheap to produce and are sold at very low prices.

93.     One of the most commonly utilized Abbott LVPs was 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 ("5% Dextrose 500 ml").

25

94.    In 1993, Abbott's 5% Dextrose 500 ml could be widely purchased for as little as $1.80 for a 500ml bag.

95.    The Red Book AWP for 5% Dextrose 500 ml in 1993 was $8.72.

96.    Two years later, in 1995, the price for Abbott's 5% Dextrose 500ml was widely available for even less; one wholesaler was selling it at $1.50 for a 500 ml bag.

97.    During the same two year period from 1993 to 1995 that the actual prices dropped, Abbott twice reported higher prices to the Price Publications for 5% Dextrose 500 ml. The AWP – based on Abbott's representations –  increased by 5% in 1994 to $9.16 and was increased by an additional 3% in 1995 to $9.43.

98.    Thus, while Abbott's price to the wholesaler dropped by 20% between 1993 and 1995 (from $1.80 to $1.50), Abbott caused its AWP to increase by 8%.  By 1995, the spread between the AWP and the resale price of that wholesaler was 628%.

99.    Abbott sold these products directly to Customers at prices comparable to those offered by the wholesaler.

100.    Abbott continued to report increasing prices for 5% Dextrose 500 ml after 1995. By reporting increasingly inflated LPs, Abbott caused the Red Book AWP for 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 to increase in 1996 to $9.71, in 1997 to $10.20, in 1998 to $10.71, in 1999 to $11.25 and in 2000 to $11.80.  Medicaid and Medicare used these reported prices to set their reimbursement levels.  At the same time, Abbott regularly sold the product to its Customers for $1.50 or less per bag of the water-based solution.

101.    Abbott's reporting of increasingly false and fraudulent prices for its 5% Dextrose 500ml reflects the manner in which Abbott implemented its scheme for all of the LVPs during the relevant time period.  Abbott engaged in identical conduct with respect to the "prices" and marketing of the other LVP products and package sizes identified by NDC and HCPCS code in ¶¶ 30, 34 of this Complaint.

102.    Abbott used the false and fraudulent prices Abbott reported to the Price Publications for these water solutions to manipulate reimbursement; the reported prices did not reflect the actual prices Abbott was charging to its Customers.

103.    Due to Abbott's conduct, Abbott's Customers submitted inflated claims to Medicare and Medicaid and received millions of dollars in inflated reimbursement for these water and water-based solutions.  Abbott profited off the scheme by increasing its sales volume and profits.  Medicare and Medicaid have paid Abbott's Customers in excess of $100 million for Abbott's LVPs when the typical acquisition costs for those Customers were a fraction of that amount.

**C.    <u>Acyclovir Sodium</u>**

104.    Acyclovir Sodium (Acyclovir) is an antiviral drug used to treat several infections. The brand version, called Zovirax, was originally manufactured by Glaxo Welcome, Inc.  Abbott began selling its generic version of the drug on April 22, 1997.

105.     At the time Abbott launched its versions of Acyclovir in 1997, it reported a LP of $80.00 for the 500MG Dose of its generic version of Acyclovir (NDC#00074-4427-01).  The

1997 Blue Book AWP for Abbott's Acyclovir Sodium 500MG was $95.00 (reflecting the standard price publication mark up on Abbott products of 18.75%).

106.    By 1999, Abbott had raised its reported LP for its Acyclovir Sodium 500MG to $88.20; the AWP for that dose of Abbott's Acyclovir Sodium had risen to $104.74.

107.    Yet, competition among manufacturers of Acyclovir drove the contract prices for the drug down sharply.  In 1997, Abbott's Acyclovir Sodium 500MG could be purchased for $30.00.  By 2000, the typical purchase price for Abbott's Acyclovir Sodium 500MG had eroded to around $11.

108.    Thus, the spread on Abbott's Acyclovir went from as much as 316% at product launch in 1997 to as much as 960% by 2000.

109.    Abbott actively marketed the reimbursement spread on Acyclovir to Customers, including Ven-A-Care, the relator in this matter.  Ven-A-Care operated a home infusion pharmacy that largely serviced HIV/AIDS patients.  On or around May 30, 1997, an Abbott national account manager directly marketed the spread on its Acyclovir Sodium to Ven-A-Care. That national account manager sent documents reflecting the spread on Abbott's Acyclovir and had conversations with Ven-A-Care where he explicitly marketed the spreads on Abbott's Acyclovir products.

110.    On April 30, 2001, Abbott reported new LPs and WACs for its Acyclovir products.  As noted above, the price reporting compendia changed the method it used to calculate Abbott's AWP.  First Databank began using Abbott's WAC and applying a 25% markup.  The LP for Abbott's Acyclovir Sodium 500MG dropped from $88.20 to $4.00; the WAC dropped to

28

$3.81.  The per unit AWP – based on a 25% markup from the $3.81 WAC – for Abbott's

Acyclovir Sodium 500MG dropped from $104.74 to $4.76.  The revised LP, WAC and AWP

was in keeping with the actual contract price for Abbott's Acyclovir Sodium 500MG, which by

mid-2001 was around $4.00 a unit.

**D.**     **Abbott's Home Infusion Pharmacies, Home Infusion Partnerships and Consignment
          Arrangements.**

      **1.**     **Home Infusion Pharmacies**

111.     From approximately 1982 until, upon information and belief, 2003, Abbott owned

and operated its own Home Infusion Pharmacies ("Abbott HI Pharmacies") as part of its Hospital

Products Division's ("HPD"), Alternate Site Home Infusion Department.

112.     Abbott's HI Pharmacies were located at various times in Atlanta, Georgia,

Chicago, Illinois, Los Angeles, California, and in New Jersey.  At some point in that period, the

Abbott HI Pharmacy in Atlanta Georgia closed.

113.     Abbott billed Medicare and Medicaid for products and services dispensed by the

Abbott HI Pharmacies using Abbott's EIN number and Abbott's own Medicare and Medicaid

provider codes.

114.     Abbott HI Pharmacies stocked and dispensed Abbott products, including, without

limitation, products identified in this Amended Complaint in ¶ 30, as well as other products

produced and sold by Abbott and other manufacturers.  Upon information and belief, Abbott

stocked its own products at or near the manufacturing costs for those products.  Upon

information and belief, Abbott was able to acquire other manufacturers' drugs at reduced,

contracted prices.

29

115.    The Abbott HI Pharmacies billed Medicare and Medicaid through the "Abbott Reimbursement Department" in Abbott's HPD Alternate Site Home Infusion Department.

116.    Each of the Abbott HI Pharmacies would operate as follows:

A.    The Abbott HI Pharmacies would receive patient prescriptions from physicians, hospitals, outpatient clinics or other care providers.

B.    Abbott's Reimbursement Department would ascertain whether the referred patient was eligible for reimbursement for his or her prescription costs through Medicare, Medicaid or a third party insurer.

C.    Upon receipt of the prescriptions, the Abbott HI Pharmacies would fill the prescription and would, upon information and belief, at times provide pharmacist services.

D.    After the prescriptions were filled by an Abbott HI Pharmacy, the Abbott Reimbursement Department would bill either Medicare, Medicaid or a third-party insurer for the dispensed drug or product, depending upon patient eligibility.

E.    For those patients covered under Medicare or Medicaid, a reimbursement clerk in the Abbott Reimbursement Department would complete a paper or, at a later point, an electronic, Medicare HCFA 1500 form seeking reimbursement from Medicare or a Medicaid reimbursement form.

117.    The HCFA 1500 forms or Medicaid reimbursement forms submitted by the Abbott Reimbursement Department would reflect Abbott's EIN number and provider number as the entity to be reimbursed.

118.    Depending upon the drug and the state program, Medicaid would typically pay to Abbott the AWP or WAC-based reimbursement for drug or product for which Abbott's HI Pharmacy billed.   Medicare would typically pay to Abbott the AWP-based reimbursement for drug or product for which Abbott's HI Pharmacy billed.  Abbott would retain for itself as a profit the difference between the cost of the drug or product to Abbott and the amount of the AWP-based reimbursement ("Abbott HI Pharmacy spread").

119.    Upon information and belief, Abbott did not disclose the Abbott HI Pharmacy spreads to the Medicare or Medicaid programs when it submitted reimbursement forms.

120.    The amounts Abbott HI Pharmacies were reimbursed by Medicare and Medicaid regularly exceeded the cost to Abbott in stocking and dispensing the drugs and products dispensed by the Abbott HI Pharmacies – including its own.

121.    In the case of the Abbott Drugs identified in this Complaint, Abbott's HI Pharmacies were reimbursed inflated amounts for any claims they submitted for those Drugs due to Abbott's fraudulent price reporting scheme.

**2.    Abbott's Home Infusion Partnerships and Consignment Arrangements**

122.    From approximately 1984 until, upon information and belief, 2003, Abbott HPD's Alternate Site Home Infusion Department entered into home infusion partnerships ("HI Partnerships") with various hospitals, care facilities and other medical entities.  These HI Partnerships permitted Abbott's home infusion partners ("HI Partners") or – in some instances Abbott – to bill government health programs on behalf of its HI Partners for the Drugs identified in ¶ 30 at inflated reimbursement levels.

31

123.    Abbott had at least 20 to 25 home infusion partners ("HI Partners") in these partnerships including, but not limited to:[3] University of Michigan's HomeMed, Children's Memorial Hospital of Chicago, Care Partners, Baylor, Harris Methodist, UniHealth, Intermountain, Cedars Sinai, University of Virginia, Seattle Children's Hospital, Cleveland Clinic, and University Hospitals of Cleveland.

124.    Abbott entered into standard partnership agreements with the HI Partners and others.  Under the terms of the partnership agreements, Abbott would:

A.    Provide its HI Partners Abbott drugs and products free of charge on a consignment basis, including but not limited to, the Drugs identified in ¶ 30 of this Complaint;

B.    Provide its HI Partners agreed upon services, including, on occasion, "reimbursement services;" and

C.    Add the HI Partner to a group purchasing organization of which Abbott was a member, so that the HI Partner, or Abbott on behalf of the HI Partner, could purchase drugs and products that Abbott did not manufacture or sell ("Other Non-Abbott products") at a substantially reduced contract rate.

125.    The HI Partner would dispense the drugs or products from its pharmacy.  If the drug or product was an Abbott product, that product would be a consigned product that the HI

---

[3] These HI partners are described herein as identified by an Abbott witness.  For some of these HI partners, the witness did not provide full and complete name information.

32

Partner would not pay for on an individual basis, or at any time prior to when the HI Partner

billed Medicare or Medicaid.

126.    As part of its "reimbursement" services for some HI Partners, Abbott's

Reimbursement Department would submit claims to Medicare, Medicaid and other third party

payors for drugs, medical devices and medical services on the HI Partner's behalf, using the HI

Partner's EIN number and Medicare and Medicaid provider codes.

127.    For patients covered under Medicare or Medicaid, an Abbott reimbursement clerk

in the Reimbursement Department would complete a paper or, at a later point,  electronic,

Medicare HCFA 1500 form seeking reimbursement from Medicare, or the appropriate Medicaid

reimbursement form seeking reimbursement from a State Medicaid program on behalf of the HI

Partner.

128.    Abbott provided reimbursement services to, among others, Care Partners,

University of Michigan, Children's Hospital and the University of Virginia.

129.    If Abbott was providing reimbursement services to an HI Partner, Abbott's

Reimbursement Department would collect reimbursements from Medicare, Medicaid and other

third party payors for claims submitted on behalf of that HI Partner.  Those reimbursement

amounts were collected in lock box bank accounts that, upon information and belief, were

maintained in the name of the HI Partner or Abbott.

130.    Upon information and belief, Abbott would never bill the HI Partners for the

drugs and products it consigned to them, and would never expect payment for them.  Abbott's

payment for the consigned Abbott drugs would be some percentage of the HI Partner's entire pool

of collections from Medicare, Medicaid and third party payors, regardless of whether it was Abbott or the HI Partner that submitted the claim.

131.    Under the Consignment Partnership Agreements, the HI Partners would never pay Abbott individual amounts for the drugs or products consigned to the HI Partner.  The Medicare and Medicaid drug reimbursements were used by Abbott to compensate it for billing and consulting services not related to the provision of patient care.

132.    For example, a December 1996 Consignment Partnership Agreement, required a HI Partner to pay Abbott 45.1 % of its gross revenue collections for all of its IVIG treatment, including any administration fee and/or any drug ingredient cost.  Thus, Abbott would receive a percentage of any inflated reimbursement spreads for the Drugs identified in ¶ 30 of this Complaint that were provided to its HI Partners on consignment.

133.    Abbott never disclosed to the Medicare or Medicaid programs that it was directly profiting from the reimbursement spreads in the above-described arrangement with the HI Partners.

134.    If an HI Partner would not contract for reimbursement services, the HI Partner would submit the claims to Medicare and Medicaid and directly collect the reimbursements. However, Abbott would still consign its drugs and products to the HI Partner and still share in a percentage of the total collections collected by the HI Partner.

135.    Several state Medicaid programs would reimburse for Abbott drugs covered by this arrangement at amounts tied to the AWPs or WACs for those drugs.  Medicare also reimbursed for Abbott drugs covered by these arrangements at amounts tied to the AWPs for the

Abbott drugs. That amount would then be paid to the HI Partner, who in turn would provide a percentage share to Abbott of its entire collections as payment for various types of categories of services.

136.   The cost to Abbott in stocking the HI Partner's warehouses with Abbott and non-Abbott drugs and products was far less than the amounts reimbursed by Medicare and Medicaid for those drugs and products.

137.   Abbott did not disclose to the Medicare and Medicaid programs that the drugs and products it sought reimbursement for from Medicare or Medicaid actually cost Abbott far less to consign to the HI Partner than the ultimate Medicare or Medicaid reimbursement amount.

138.   In the case of the Abbott Drugs identified in this Complaint, Abbott's percentage of HI Partner reimbursements Abbott that collected was improperly inflated due to Abbott's fraudulent price reporting scheme.

## FIRST CAUSE OF ACTION

### (False Claims Act: Presentation of False Claims)
### (31 U.S.C. § 3729(a)(1))

139.   Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

140.   Abbott knowingly caused or caused to be presented false or fraudulent claims for payment or approval to the United States for the Drugs for reimbursement that were substantially higher than providers' actual acquisition costs for the Drugs and based on reported prices that were fraudulently and artificially manipulated by Abbott. Abbott knowingly used the spread as an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false and fraudulent claims to be submitted.

141.    By virtue of the false or fraudulent claims that Abbott caused to be made, the

United States has suffered damages and therefore is entitled to multiple damages under the False

Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to

$10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up

to $11,000 for each violation occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False
Records or Statements to Cause Claims to be Paid)
(31 U.S.C. § 3729(a)(2))

142.    Plaintiff repeats and realleges  ¶¶ 1 through 138 as if fully set forth herein.

143.    Abbott knowingly made, used, or caused to be made or used, false records or

statements – *i.e.*, the false certifications and representations made or caused to be made by

defendants to state Medicaid programs when seeking to ensure that the Medicaid programs

would reimburse for the Drugs, and the false representations to the Publishers upon which

Medicare and Medicaid relied – to cause false or fraudulent claims paid or approved by the

United States.

144.    By virtue of the false records or false statements made by Abbott, the United

States suffered damages and therefore is entitled to treble damages under the False Claims Act,

to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each

violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for

each violation occurring on or after September 29, 1999.

36

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

145.    Plaintiff repeats and realleges  ¶¶ 1 through 138 as if fully set forth herein.

146.    This is a claim for the recovery of monies by which Abbott has been unjustly enriched, including (1) profits earned by Abbott through its HI Pharmacies and Consignment Partnership Agreements and (2) profits from increased sales resulting from the illegal inducements that Abbott arranged to be paid to its Customers.

147.    By obtaining monies as a result of its violations of federal and state law, Abbott was unjustly enriched, and is liable to account for and pay such amounts, which are to be determined at trial, to the United States.

148.    By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Abbott on sales to Customers to whom it arranged for unlawful inducements, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## FOURTH CAUSE OF ACTION

### (Common Law Fraud)

149.    Plaintiff repeats and realleges  ¶¶ 1 through 138 as if fully set forth herein.

150.    Abbott made material and false representations concerning the prices of the Drugs with knowledge of their falsity or reckless disregard for the truth, with the intention that the United States act upon the misrepresentations to its detriment.  The United States acted in justifiable reliance upon Abbott's misrepresentations by making payments on the false claims.

37

151.    Had the true facts of Abbott's false price reporting as set forth in this Complaint been known to the United States, the United States would not have paid for Abbott products.

152.    By reason of these payments, the United States has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Abbott, jointly and severally, as follows:

1.    On the First and Second Causes of Action, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On the Third Cause of Action, for the damages sustained and/or amounts by which Abbott was unjustly enriched, including an accounting of all revenues unlawfully obtained by Abbott, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Abbott, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.    On the Fourth Cause of Action, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney
General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

/s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088
Fax: (202) 307-3852

Dated: June 4, 2007

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' FIRST AMENDED COMPLAINT** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

/s/ Mark A. Lavine

Dated: June 4, 2007                     Mark A. Lavine

# EXHIBIT 96

99-6252



# SALES TRAINING

# ABBOTT ALTERNATE SITE PRODUCT SALES

## ACCOUNT ASSESSMENT STRATEGIES

### &

## CONTRACT MARKETING GUIDELINES FOR A PROPOSAL

WRITTEN BY:   TRUDI BURCHIERI
LYNNE LEONE
DAVE HARLING
ANGIE MASSARRO

DECEMBER, 1998

Confidential

TXABT172992

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



**SALES TRAINING**

*Module Goal:  To provide the ASPS field representative with the tools to probe and*
*profile accounts more effectively*

*Objectives:  Upon completion of this module, the representative will be able to:*

*1. List the 5 different types of FOCUS probes, giving examples of*
*each*

*2. Discuss the strategy behind good probing skills* ~~must~~ *in*
*                                   ~~an account~~*
*3. Describe the information needed for the ASPS market channels*
*including homecare, long-term care, surgery centers,*
*oncology/physician office practices and distributors.*

*4. Describe the information needed by contract marketing when*
*putting in a request for proposal (RFP).*

Confidential

TXABT172993

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



*The importance of good account profiling cannot be stressed enough. Skillful profiling/probing enables the sales representative to obtain valuable information from the customer. This information will help identify customer needs, issues and hot buttons. It will determine which products are appropriate and which features and benefits relate to the customer's needs.*

*Profiling begins with asking the right questions. Systema has an excellent probing model which will assist both the new and the seasoned representative with asking good questions.*

*Cue:*     *When you need information*

*Probes:*     *Exploratory—Open Ended Questions*
> *Who, what, where, when, why, how*
> *Draw the customer into a dialogue that produces a wealth of common ground*

*Confirming—Closed Questions*
> *Yes or no response to confirm assumptions and conclusions*
> *Pose questions starting with "do, is, are can, will, should"*

*Focus:*     *FOCUS model provides the seller with a guidance system for stimulating a productive discussion of customer problems and goals*

> *FACTS—about the customer's situation to give the seller a working knowledge of the customer and his organization*
> *OPINIONS—in regard to the current situation give the seller insights into problem areas*
> *CONSEQUENCES—factors which clarify the scope and complexity of the problems*
> *URGENCY—alerts the seller to time and priority issues involved in the buying decision*
> *SOLUTIONS—under consideration help the seller determine the appropriateness of his product in light of the customer's needs*

*Strategy:*     *Probing is valuable for gathering information about a new customer, exploring new problems and goals with existing*

Confidential

TXABT172994



customers, and for gathering additional information throughout the
sales process

➢ *Primary tool, along with listening, to establish common ground*
*between the customer's needs and the benefits your product*
*can provide*

➢ *Develop a full understanding of the customer's needs—not only*
*what the problems are, but why they are problems, how the*
*customer feels about them, how they impact them, how*
*important they are and what solutions have been attempted or*
*considered*

➢ *Customers appreciate sellers who ask thoughtful and well-*
*thought out questions in an effort to fully understand their*
*needs*

➢ *Information gathering becomes time well spent because*
*recommendations will be targeted to the customer's real needs*
*and concerns*

➢ *FOCUS probes are a checklist for gathering information; not all*
*of the questions may be needed to bring out information*

➢ *Confirming probes are easier to compose so they are often the*
*first question that comes to mind—pre-call planning will help*
*focus on asking exploratory probes*

*Clarification:*   *If the seller responds to questions with some or none of the*
*information, a follow-up strategy is needed*

➢ *Some of the information—use an exploratory probe to draw out*
*the remainder of the information*

➢ *None of the information—use a choice probe, asking the*
*customer to select an answer from 2 or 3 choices. This should*
*stimulate the customer to provide some or all of the*
*information and help move the dialog forward*

Confidential

TXABT172955

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*


**SALES TRAINING**

*EXAMPLES OF FOCUS PROBES:*

*^ FACTS*

❏ *WHAT Questions:*

*What (therapies, inhalation agents) are you currently doing (using)?*

*What are you currently paying for ...... ?*

*What is your current pump mix?*

*What types of patients are you seeing (home care, surgery centre)?*

*What is the status of your current (pump, S&E, injectable) contract?*

❏ *WHO Questions:*

*Who are the decision makers?*

*Who will be using the (pumps, inhalation agent, drugs etc.)?*

*Who will be programming the pumps?*

*Who is your current vendor?*

*Who is your GPO?*

❏ *WHERE Questions:*

*Where are your patients located?*

*Where do you keep your inventory now?*

❏ *HOW Questions:*

*How big an area do your nurses cover?*

*How many pumps are you renting?*

*How do you do it now?*

*How easy is it now?*

*How do you inservice your nurses?*

*^ OPINIONS*

*How does this fit in the big picture?*

*How do you feel about ........... ?*

*How do you think the nurses will react to ........(a change, a new pump, etc.) ?*

*How important is .............. to you?*

*How will this affect you clinically?*

*What do you like about .... (current situation)?*

*What obstacles do you think you might run into?*

*What has been your experience with your current ..........?*

Confidential

TXABT172996

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



**SALES TRAINING**

---

*What in your opinion is the most important characteristic of .......(pumps,*
*needleless   systems, inhalation agents, etc.)?*
*What is the most important feature of ...........?*
*Why are you considering ............(this process, a change)?*
*Why wouldn't you consider a change?*


*^ CONSEQUENCES*
*What will happen if you don't purchase devices and continue to rent?*
*What impact will .......... have on your business?*
*What issues might there be when the change is made?*
*How does this affect your ability to be competitive?*
*How will (a faster turnover time, multi-therapy device, needleless system) affect*
*your (bottom line, inventory control, productivity, clinically)?*
*If you were to mask induce adults, how would that affect the use of other*
*medications?*


*^ URGENCY*
*How soon do you plan to purchase devices/order product?*
*How soon will you need a (vaporizer, inservice, the devices)?*
*How soon do you want to proceed with this?*
*How soon will the request for funds go through?*
*When do you expect to make a decision?*
*When are you planning on starting the trials?*
*Where does standardization fit into your priorities?*
*What is your time frame for implementation?*
*Have you budgeted for new devices?*

*^ SOLUTIONS*
*What is your game plan/next step for moving ahead?*
*What would you like to do about this?*
*What kind of help/service will you need from me?*
*What actions do you need me to take in the implementation/conversion process?*
*What alternatives are you considering?*
*What capabilities are you looking for in a .......... (pump, inhalation agent)?*

---

Confidential

TXABT172997

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



*How do you plan to proceed?*

*How have you addressed this in the past?*

*Have you tried any other methods to make this easier?*

## UNIVERSAL QUESTIONS TO ASK:

### About Their Business

1. *What types of therapies do you do?*
2. *Tell me about your therapy mix.*
3. *How do you administer your IV therapies?*
    *(gravity, IV push, Dial-a-Flo, ADD-Vantage, pole-mount/ambulatory infusion devices)*
4. *How do you decide the method of administration?*
5. *What markets do you serve?*
6. *Do you have any affiliation with hospitals, HMO's?*

### About Their Purchasing Habits

1. *Do you have an Abbott customer number?*
2. *To which GPO's do you belong?*
3. *How do you purchase your product?*
    *(wholesaler, distributor, direct)*
4. *Do you have any direct contracts?*
5. *When do they expire?*
6. *What is the status of your _____  contract?*

### About Their Organization

1. *Tell me about your purchasing process.  Who makes the final decision?*
2. *Who else is involved in making decisions?*
3. *Is there anyone else that I should see about this?*
4. *When do you plan to purchase?*
5. *Do you have money in the budget for this now?*

*HOMECARE PHARMACY*

*THE FOLLOWING INFORMATION IS NEEDED:*

- *Name, Address, Phone Number*

Confidential

TXABT172998

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



- *Contact Persons/Decision Makers*
- *National Account/GPO Affiliation*
- *Wholesaler/Distributor*
- *Current Contracts with......*
   - Contract Expiration
   - Current S&E vendor
   - Primary injectables vendor
- *Patient/Therapy Mix*
- *Own RN's*
- *Nursing Agencies used*
- *Reimbursement Mix (% MediCare, MediCaid, MediCal, HMO contracts, private)*
- Infusion Devices--Ambulatory
   - *Type*
   - *Number*
   - *Own/Rent*
   - *Monthly cost*
   - *Disposable cost*
- Infusion Devices---Pole-Mount
   - *Type*
   - *Number*
   - *Own/Rent*
   - *Monthly cost*
   - *Disposable cost*
- *Needleless System Used*
- *TPN Compounder*
   - *Number of TPN patients*
   - *Brand*

Confidential

TXABT172999

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



*LONG TERM CARE PHARMACY*
*THE FOLLOWING INFORMATION IS NEEDED:*

- *Name, Address, Phone Number*
- *Contact Persons/Decision Makers*
- *National Account/GPO Affiliation*
- *Current Contracts with......*
    - *Contract Expiration*
    - *Current S&E vendor*
    - *Primary injectables vendor*
- *Wholesaler/Distributor*
- *Nursing Agencies Used*
- *Patient/Therapy Mix--% on IV therapy, types*
- *Number of skilled nursing facilities*
- *Number of beds serviced*
    - *Geography covered*
- *Reimbursement Mix (% MediCare, MediCaid, MediCal, HMO contracts, private)*
- *Infusion Devices--Ambulatory*
    - *Type*
    - *Number*
    - *Own/Rent*
    - *Monthly cost*
    - *Disposable cost*
- *Infusion Devices—Pole-Mount*
    - *Type*
    - *Number*
    - *Own/Rent*
    - *Monthly cost*
    - *Disposable cost*
- *Needleless System Used*
- *TPN Compounder*
    - *Number of TPN patients*
    - *Brand*

Confidential

TXABT173000

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



## SURGERY CENTERS

*THE FOLLOWING INFORMATION IS NEEDED:*

- *Name, Address, Phone Number*
- *Contact Persons/Decision Makers*
- *Anesthesia group*
- *Chief anesthesiologist/CRNA*
- *Hospital affiliation*
- *National Account/GPO Affiliation*
- *Distributor/Wholesaler*
- *Current Contracts with......*
    - *Contract Expiration*
    - *Current S&E vendor*
    - *Primary injectables vendor*
- *Number of surgical suites*
- *Types of surgical procedures*
- *Number of procedures performed per month*
    - *Regional*
    - *General*
- *Adult/pediatric mix*
- *Type of inhalation agents used*
- *23 hour stay capabilities*
- *Primary induction agent used*
- *Primary inhalation agents used*
    - *Adults*
    - *Pediatrics*
- *Primary anti-emetic used*
- *Type of regional anesthetic trays used*
    - *Number per month*
- *Needleless System used*
- *Infusion Devices—Pole-Mount*
    - *Type*
    - *Number*

Confidential

TXABT173001

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



     *Own/Rent*

     *Monthly cost*

     *Disposable cost*

- *Infusion Devices--Ambulatory*

     *Type*

     *Number*

     *Own/Rent*

     *Monthly cost*

     *Disposable cost*

Confidential

TXABT173002

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



*ALTERNATE SITE*
**SALES TRAINING**

## ONCOLOGY/MULTI-SPECIALTY CLINICS
*THE FOLLOWING INFORMATION IS NEEDED:*

- *Name, Address, Phone Number*
- *Contact Persons/Decision Makers*
- *Physician Group*
- *GPO Affiliation*
- *Distributor/Wholesaler*
- *Current Contracts with......*
     *Contract Expiration*
- *Current S&E vendor*
- *Types of services offered*
- *Number of IV therapies/month*
- *Most common methods of infusion*
- *Nursing agencies/outside pharmacies*
- *Needleless System used*
- *Infusion Devices—Pole-Mount*
     *Type*
     *Number*
     *Own/Rent*
     *Monthly cost*
     *Disposable cost*
- *Infusion Devices--Ambulatory*
     *Type*
     *Number*
     *Own/Rent*
     *Monthly cost*
     *Disposable cost*

Confidential

TXABT173003

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



*SALES TRAINING*

*DISTRIBUTORS*

*THE FOLLOWING INFORMATION IS NEEDED:*

- *Name, Address, Phone Number*
- *Contact Persons/Decision Makers*
- *GPO Affiliation*
- *Current Contracts with......*
    *Contract Expiration*
- *Market served/specialty*
- *Marketing information—telesales, direct reps, how many*
- *Geographical coverage*
- *Warehousing capabilities*
- *Infusion Devices—Pole-Mount*
    *Type*
    *Number*
- *Infusion Devices--Ambulatory*
    *Type*
    *Number*

Confidential

TXABT173004

*ACCOUNT ASSESSMENT STRATEGIES*
*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



**SALES TRAINING**

## BACKGROUND INFORMATION

*Profile your account.  The following questions will help establish a good foundation for any deal.*

| CATEGORY | QUESTIONS | REASON |
|---|---|---|
| Internal Structure | • Who is the decision-maker at the facility?<br>• Who will sign the contract?<br>• Will the contract need to be presented to a corporate office? | • Are we presenting the contract to the appropriate people?<br><br>• Eliminates having to present the same info to another person. |
| Relationship with Account | • How long have you called on this account?<br>• Do you have a strictly business relationship with the customer or are you pretty relaxed around them?<br>• How familiar is the customer with Abbott product, policies, etc.?<br>• Have they had Abbott contracts before? Customer #? | • Gives some foresight into what to expect from customer.<br><br>• We may be able to address some stumbling blocks before we hit them head on.<br><br>• Try to make sure customer is just not playing Abbott against current vendor for price. |
| Type of Account | • Are they an individual facility?<br>• Do they belong to a GPO?<br>• Do they have a corporate office to report to?<br>• How much power does corporate facility have over them and other facilities? | • Gives insight to potential sales, compliance issues, and background on the volumes that should be expected. |
| Market Place | • What markets are they penetrating: LTC, Oncology, Homecare, and Distribution?<br>• What do they specialize in: AIDS, diabetes, Wound care, etc.?<br>• Where do they intend to focus their business in the future? | • Helps us determine how aggressive we want to go after the business. Is this an opportunity to capture a good share of business in a new market place? |
| Competition | • Is the guy down the street that they are competing with Abbott's biggest customer?<br>• Shifting business from a current to a potential cust.? | • We don't want to take away our own business. |

Confidential

TXABT173005

*ACCOUNT ASSESSMENT STRATEGIES*

*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



**SALES TRAINING**

| CATEGORY | QUESTIONS | REASON |
|---|---|---|
| **Current Contract** | | |
| *Vendor* | • *Which vendor do they use? Baxter? McGaw? A little of everyone? Why?*<br>• *Do we already have some business and why?*<br>• *What kind of relationship do they have with their vendors?*<br>• *Are they buying direct or through a wholesaler or distributor? Which ones?*<br>• *Will they buy direct or do they want to keep that particular distributor?* | • *Want to make sure we can meet their needs. Do not just want to be played for price.*<br>• *Use of distributors can be a concern due to chargeback issues.* |
| *Term & Expiration* | • *Do they have an individual or corporate contract?*<br>• *When does it expire?*<br>• *Are there any penalties for canceling early?* | • *Don't want any surprises as far as penalties are concerned.*<br><br>• *By knowing ahead of time we can incorporate that into the strategies and financial analysis.* |
| *Volumes & Pricing* | • *Need to know units (eaches) of all products or at least high runners.*<br><br>• *Need current pricing per unit.* | • *Line item information is needed to determine overall or bottom line value to Abbott as well as to the customer.*<br><br>• *Often we do not win the bid if comparing something item by item on the line; however, the information will allow us to paint a detailed picture to the customer as the overall value as well as making sure our financial analysis is as accurate as possible.* |
| *Current Programs* | • *What kind of extra incentive programs are being offered in current contract? Rebates?*<br>• *Are there any programs unique to their current contract that Abbott can not offer?* | • *Important information b/c we need to factor in the value of these programs into the pricing comparison.*<br><br>• *Helps eliminate surprises* |
| | | |

Confidential

TXABT173006

*ACCOUNT ASSESSMENT STRATEGIES*

*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



**SALES TRAINING**

| CATEGORY | QUESTIONS | REASONS |
|---|---|---|
| Commitment Level | • Are the items on contract sole, dual or multi-source? <br> • If sole source, how do they ensure compliance? <br> • Do they pay all bills? <br> • Do they order electronically? | • The proposed agreement can either model the current contract – which is sometimes easier to role out. <br><br> • Assurance of compliance will lead to better pricing. |
| Facilities | • Number of Facilities? <br> • Do they order directly or drop ship? <br> • Do they purchase through wholesalers or distributors? | • Will help establish who this contract will affect regionally or nationally <br><br> • Help to establish potential market share gain. <br><br> • It's important to make sure facilities are willing to use eligible wholesalers and distributors on chargeback. |
| Market Share Potential | • How much new business? <br> • What are we stealing from the competition? | • If there is great potential to capture a significant portion of the market share, sometimes it is worth taking additional risks. |

Confidential

TXABT173007

*ACCOUNT ASSESSMENT STRATEGIES*

*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



**SALES TRAINING**

## REQUEST FOR PROPOSAL

*There are two parts to a request for proposal:*

*1) __Contract__ wants and needs*

*2) __Product__ wants/needs.*

*The following questions will help establish what the customer wants in terms of the*

*actual agreement as well as the product itself.*

Confidential

TXABT173008

**ACCOUNT ASSESSMENT STRATEGIES**
**CONTRACT MARKETING**
**GUIDELINES FOR A PROPOSAL (RFP)**



**SALES TRAINING**

| CATEGORY | QUESTIONS | REASONS |
|---|---|---|
| **CONTRACT** | | |
| *Length of Contract* | • *How long of an agreement?* | • *The longer the contract and the commitment the better profitability.* |
| | | |
| *Desired Programs* | CASH PROGRAMS: Education Grant Performance Dividend Signing Bonus Rebates | • *There are additional costs and values to each program.*<br><br>• *It is important that the program is of value to the customer, otherwise the cost is for nothing.* |
| *Line Item Pricing vs. Programs* | | • *Continuation of Desired Programs....Discuss value of programs.*<br><br>• *Have to look at big picture.* *More than likely will not win contract looking at item vs. item; however, when you factor in all the programs and their values we have a winner.* |
| *Current Contract vs. New* | • *What do they like about current contract?* • *What would they like to change about contract?* • *Review the Background information to find clues for the RFP.* | • *Here is the perfect opportunity to play up Abbott and add something new and better.*<br><br>• *There may be items the customer can not live without and its better to address those items up front than be surprised half way through negotiations.* |
| *Commitment Levels* | Two areas: 1) *Signature – will they sign if you meet the verbally agreed upon points in the contract.* 2) *If multiple facilities, How to ensure those facilities will purchase Abbott.* • *Does corporate office pay the bills?* • *Do they own the other facilities?* | • *Assurance of commitment will allow for the lowest prices and best programs.* |

Confidential

TXABT173009

**ACCOUNT ASSESSMENT STRATEGIES**

**CONTRACT MARKETING**
**GUIDELINES FOR A PROPOSAL (RFP)**



**SALES TRAINING**

| CATEGORY | QUESTIONS | REASONS |
|---|---|---|
| **PRODUCT** | | |
| *Volumes & Pricing* | *\*See "Current Contract"* | • *If a customer is unwilling to give line item pricing, at least gather TOTAL monthly or yearly costs as well as accurate volumes.* |
| *Cross Referencing* | | • *There is not always going to be a perfect match per item. It is important to discuss the customers wants and needs in order to match products based on **Preference and Need.*** |
| *Cross Referencing Format* | | • *Sometimes substitutions will have to be made. It will be easier if you understand how the benefits of your product relate to the needs of your customer.* <br><br>*Excel Spreadsheet would be the best.* <br>*Include:* <br>•*Current Vendor List #* <br>•*Vendor Description* <br>•*Abbott List #* <br>•*Abbott Description* <br>•*Usage – eaches per month or year* <br>•*Current Price - eaches* |
| *Product Hot Buttons* | • *Is there one product you must have a match on?* <br>• *Is there a product that could make or break the deal?* | • *Knowing this info ahead of time could help save the deal.* |
| *Compounder Preferences* | *Baxa vs. Nutrimix* <br><br>*\* REMINDER: All Baxa pricing and contracts are done by Baxa.* | • *If they do not want to use the Nutrimix Compounder, we must take the value of those purchases out of the picture* |
| *Disposable Infusers* | • *Do you currently use these devices? Whose?* | |

Confidential

TXABT173010

**ACCOUNT ASSESSMENT STRATEGIES**

**CONTRACT MARKETING**
**GUIDELINES FOR A PROPOSAL (RFP)**



**SALES TRAINING**

| CATEGORY | QUESTIONS | REASONS |
|---|---|---|
| *Non-PVC vs. PVC Bags* | • Do you have to use Non-PVC for oncology or another reason? | • If they absolutely need non-pvc it is important they know Abbott can not supply them at this time.<br>• Also, we will have to take those purchases out of the profitability analysis. |
| *Sets* | • Are they using needleless?<br>• Are they using a whole bunch of everything?<br>• Is consolidating an option?<br>• # of y-sites, length, option locks, luer locks, etc. | • Sometimes they say they want something until they hear what the difference in cost would be.<br><br>• Perhaps a different set would work just as well which is much more cost efficient.<br><br>• Perhaps the set they are currently using doesn't really meet their needs. They are just using it b/c they had nothing better. |
| *Bag Sizes* | • Can they substitute smaller bags for larger ones and vice versa?<br>• Is there a clinical or preference issue to using the sizes you use? | • Don't forget to adjust volumes if substituting a different size.<br>(i.e.: 1000 ml for 2000 ml – double volume in analysis) |
| *Part-fills* | • Quad packs vs. Singles<br>• Is there a clinical or preference issue to using the product you use? | • Sometimes they say they want something until they hear what the difference in cost would be.<br><br>• Quad packs are more cost effective than singles |
| *Needleless Systems* | • Pre-Pierced vs. CLAVE vs. Luer Locked | • Maybe they are using Baxter Interlink but CLAVE would better suit their needs?<br><br>• Sometimes they say they want something until they hear what the difference in cost would be. |

Confidential

TXABT173011

ACCOUNT ASSESSMENT STRATEGIES

CONTRACT MARKETING
GUIDELINES FOR A PROPOSAL (RFP)



**SALES TRAINING**

| CATEGORY | QUESTIONS | REASON |
|---|---|---|
| Injectables | • Sometimes Abbott provides the product but in different sizes: Is there a clinical or preference reason for using a product in a certain size? | • Make sure you have the customer's buy-in on substituting sizes. (i.e.: Leucovorin 100 mg and 250 mg instead of 350mg)<br><br>• Be sure to note such substitutions on cross-referencing for accurate analysis. |
| Opportunities | • Could they use Add-vantage? LifeShield? Clave? | • Adding in some of these items may improve favorability. |

| Contract Marketing | | |
|---|---|---|
| Finalize Financial Strategy | | • Discuss financial approach with analyst |
| | | |
| Pricing & Contract | | • Analyst develops pricing and contract language |

Confidential

TXABT173012

*ACCOUNT ASSESSMENT STRATEGIES*

*CONTRACT MARKETING*
*GUIDELINES FOR A PROPOSAL (RFP)*



**SALES TRAINING**

## PRESENTATION TO CUSTOMER

*Here is the opportunity to showcase Abbott.*

| CATEGORY | QUESTIONS | REASON |
|---|---|---|
| *Financial Piece:*<br><br>*Contract Marketing* | | *Analyst shall supply the following:*<br>• *Financial Analysis*<br>• *Contract*<br>• *Price List or Price Spreadsheet* |
| | | |
| *Explanation / Programs:*<br><br>*Sales Reps* | | *Combine Financial pieces with the following for a complete package presentation:*<br>• *Executive Summary*<br>• *Summary of Program Values*<br>• *Conversion Plan*<br>• *Key Abbott Contacts*<br>• *Misc. info: Baxa contacts, info important to account* |

Confidential

TXABT173013

# EXHIBIT 97

# GEORGE & BROTHERS, L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AND COUNSELORS AT LAW

1100 NORWOOD TOWER
114 WEST 7TH STREET
AUSTIN, TEXAS 78701

http://www.GeorgeandBrothers.com

TELEPHONE: (512) 495-1400
FACSIMILE: (512) 499-0094

October 18, 2007

## FACSIMILE COVER SHEET

| To: | Raymond C. Winter | Fax: | 499-0712 |
|-----|-------------------|------|----------|
| To: | James J. Breen | Fax: | 954-874-1705 |
| To: | Eric Berlin/Tara Fumerton | Fax: | 312-782-8585 |
| To: | John E. Clark | Fax: | 210-733-0330 |
| To: | C. Jarrett Anderson | Fax: | 532-0585 |
| From: | Kelly for Gary L. Lewis | Sender's phone: | 512-495-1400 |
| Re: | Abbott Labs | Total pages: | 7 |
| Client #: | 1132-001 | Time Sent: | |

NOTES/COMMENTS:

**PLEASE NOTE**

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY WORK PRODUCT, SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE, AND/OR CONFIDENTIAL. IT IS INTENDED ONLY FOR THE RECIPIENT NAMED ABOVE. YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION OTHER THAN BY THE INTENDED RECIPIENT IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND PLEASE RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

# GEORGE & BROTHERS, L.L.P.

LAW FIRM
1100 NORWOOD TOWER
114 WEST 7TH STREET
AUSTIN, TEXAS 78701

KELLY SEABOLT
(512) 495-1470
KSEABOLT@GEORGEANDBROTHERS.COM

TELEPHONE: (512) 495-1400
FACSIMILE: (512) 499-0094
GEORGEANDBROTHERS.COM

October 18, 2007

Mr. Raymond Winter, Esq.                              *via Facsimile: 499-0712*
Office of the Attorney General
300 West 15th Street
Austin, Texas 78701

Re: Cause No. GV401286, in the 201st District Court of Travis County, Texas; *State of Texas ex rel. v. Ven-A-Care for the Florida Keys, Inc. v. Abbott Laboratories, et al.*

Dear Mr. Winter:

Attached please find DEFENDANTS' RESPONSE TO PLAINTIFFS' AUGUST 21, 2007 INTERROGATORY NO. 12.

If you have any questions, please let us know.

Yours sincerely,

GEORGE & BROTHERS, L.L.P.

By _Kelly Seabolt_

Kelly Seabolt,
Assistant to Gary L. Lewis

Enclosures
cc:     John E. Clark *(via telecopier: 210/773-0330)*
        James J. Breen *(via telecopier: 954/874-1705)*
        Jarrett Anderson *(via telecopier: 512/532-0585)*
        Eric Berlin/Tara Fumerton (via telecopier: 312/782-8585)

Cause No. GV401286

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| *ex rel.* | § | |
| VEN-A-CARE OF THE | § | |
| FLORIDA KEYS, INC. | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ABBOTT LABORATORIES INC., et al. | § | |
| | § | |
| *Defendants.* | § | 201st JUDICIAL DISTRICT |

## DEFENDANTS' RESPONSE TO PLAINTIFFS'
## AUGUST 21, 2007 INTERROGATORY NO. 12

TO:   Plaintiff The State of Texas, by and through Raymond C. Winter, Assistant Attorney General, P.O. Box 12548, Austin, Texas 78711.

Plaintiff Ven-A-Care of the Florida Keys, Inc., by and through its attorneys of record, John E. Clark, Goode Casseb Jones Riklin Choate & Watson, 2122 North Main Avenue, P.O. Box 120480, San Antonio, Texas 78212-9680; James J. Breen, The Breen Law Firm, P.A., P.O. Box 297470, Pembroke Pines, Florida 33029-7470; C. Jarrett Anderson, Anderson LLP, 208 West 14th Street, Suite 3-B, Austin, Texas 78701.

Defendants Abbott Laboratories Inc. and Abbott Laboratories (collectively "Defendants") respond to Plaintiffs' Interrogatory No. 12 served via letter on August 21, 2007 as follows.

Defendants designate this answer as highly confidential under the protective order.

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

Defendants incorporate fully their preliminary statement and general objections to Interrogatory Nos. 1-11 and 13, served on September 20, 2007.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

12.   Please explain the basis for the change, and which of Defendants' employees were ultimately responsible for the change, in Defendants' price reporting behavior in May 2001, as evidenced by Attachment F.

**RESPONSE:** In addition to its General Objections, Abbott objects to Interrogatory No. 12 to the

extent it seeks information protected by the attorney-client privilege and the attorney work-product doctrine. In responding to this Interrogatory, Abbott does not intend to waive any applicable privileges. Instead, pursuant to the Court's direction, Abbott sets forth below the non-privileged business reasons for the May 2001 price changes. Abbott further objects to this Interrogatory because the phrases "basis for the change" and "price reporting behavior" are vague and ambiguous.

Subject to and without waiving its objections, Abbott states that, in the pharmaceutical industry (as in many other industries), there has long been a difference between the published list price for products and the prices negotiated with individual customers ("contract prices"). The Government has known about this price differential since at least the 1960's, and it purposefully set reimbursement under Medicare and Medicaid by reference to the higher prices published in various price-reporting compendia, so that providers were reimbursed more than they actually paid. Throughout the ensuing decades, the Government repeatedly acknowledged this fact; even the President of the United States publicly declared in 1997 that, "overpayments [for drugs] occur because Medicare reimburses doctors according to the published [AWP] – the so-called sticker price – for the drugs."

Public discourse about this issue significantly intensified by 2000, as Congress considered various legislative initiatives that would have changed Medicare and Medicaid reimbursement to discontinue any reference to compendia-published prices. At every turn, Congress elected to maintain the compendia-based system – going so far as to enact legislation in 2000 specifically barring the agency charged with administering the Medicare program from "directly or indirectly decreas[ing] the rates of reimbursement" for drugs covered by Medicare Part B. *See* Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000

("BIPA").

In light of the increasing attention to this issue, beginning in or about late 2000, Abbott undertook a review of pricing practices within its former Hospital Products Division ("HPD"), and compared the published list prices for certain of its multi-source, generic hospital products ("Hospital Products") with the negotiated contract prices. Abbott discovered that the differential between these prices had widened over the years, because the list price increased due to routine, modest adjustments, while at the same time market forces caused a gradual decline in contract prices. This price differential was unintended, and was not created or maintained to effect reimbursement.

To the contrary, the list price for Hospital Products was set by HPD's Hospital Business Sector – whose hospital customers (which accounted for the vast majority of Hospital Products sales) were generally not reimbursed based on any price set by Abbott or published in the pricing compendia. Instead, hospitals generally are reimbursed a total amount based upon the diagnosis of the patient. A small percentage of sales were made by HPD's Alternate Site Business Sector – a separate and much smaller group that sold to non-hospital customers, whose reimbursement could be based on compendia-published prices. The annual decisions whether and how much to raise the published list price were made by the Hospital Business Sector, without regard to any impact on reimbursement for Alternate Site customers.

As part of the internal review described above, Abbott considered many factors, including its own business, the industry generally, and the overall discourse in Congress and elsewhere about pharmaceutical issues. Viewing the totality of the circumstances, and in consultation with legal counsel, a decision was made to reduce list price for certain Hospital Products. This decision decreased the unintended disparity between list price and contract price,

which had become the focus of scrutiny by Congress and others. The decision resulted from a

consensus among those involved in the senior management of HPD, in consultation with

Abbott's legal counsel. Michael Sellers was involved in this consensus decision-making process,

was the person responsible for the implementation of the decision, and has extensive knowledge

about this issue. He has been deposed in this case (and others) about this decision-making

process. Relevant transcripts have been produced to Texas.

Dated: October 18, 2007                    Respectfully submitted,

Of Counsel:                                Gary L. Lewis (w/ permission)
James R. Daly                              Gary L. Lewis
Eric P. Berlin                             Texas State Bar No. 12277490
JONES DAY                                  GEORGE & BROTHERS, L.L.P.
77 W. Wacker Dr., Suite 3500               1100 Norwood Tower
Chicago, IL 60601-1692                     114 West 7th Street
Telephone: (312) 782-3939                  Austin, Texas 78701
Facsimile: (312) 782-8585                  Telephone: (512) 495-1400
                                           Facsimile: (512) 499-0094
                                           *ATTORNEYS FOR DEFENDANTS ABBOTT
                                           LABORATORIES INC AND ABBOTT
                                           LABORATORIES*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served *via* Facsimile on this 18th day of October, 2007, on the following:

Raymond C. Winter
Assistant Attorney General
State of Texas
P. O. Box 12548
Austin, Texas 78711
*Via* Facsimile: (512) 499-0712

Mr. John E. Clark
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P. O. Box 120480
San Antonio, Texas 78212-9680
*Via* Facsimile: (210) 773-0330

Mr. C. Jarrett Anderson
Anderson LLC
1300 Guadalupe, Suite 103
Austin, Texas 78701
*Via* Facsimile: (512) 532-0585

Mr. James J. Breen
The Breen Law Firm
P. O. Box 297470
Pembroke Pines, Florida 33029-7470
*Via* Facsimile: (954) 874-1705

*Gary L. Lewis (w/ permission)*
Gary L. Lewis

EXHIBIT 98

OFFICE OF INSPECTOR GENERAL
OFFICE OF AUDIT SERVICES

CIN: _____

DRUG:
Vancomycin / Vancocin

DOSAGE SIZE:
500 mg

MFG:                           AWP:
LILLY                          $ 7.80

ELKINS-SINN              • $ 18.81

LEDERLE   STD           • • $ 19.53

ABBOTT   HOSP.        • $ 24.88


•  18.81          19.17
•  19.53        2 ⟌ 38.34
   38.34


MEDIAN COST   -     $ 19.17


CODE _____ W/P **K-8** PAGE 6 OF 6

HHD200-0016

# EXHIBIT 99



**INVOICE**
**REMITTANCE COPY**

# METRO
## MEDICAL · SUPPLY · INC

1911 CHURCH STREET
NASHVILLE, TENNESSEE 37203
Phone: (615) 329-4647

| | DATE | NUMBER |
|---|---|---|
| | 04/03/91 | 8493 |

PAGE 1

B I L L T O:
DIALYSIS CLINIC, DICKSON
100 ACADEMY STREET
DICKSON, TN  37055

S H I P T O:
DIALYSIS CLINIC, DICKSON
100 ACADEMY STREET
DICKSON, TN 37055

| ORDER NO. | ORDER DATE | CUSTOMER NO. | SALES MAN NO. | PURCHASE ORDER NO. | SHIP VIA | SHIP DATE | TERMS |
|---|---|---|---|---|---|---|---|
| 5943 | 04/03/91 | 19057 | IP | 1069DK | | 04/03/91 | |

| QTY. ORDERED | QTY. SHIP | QTY. B.O. | ITEM NO. | DESCRIPTION | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|---|
| 2 | 2 | | 45-1444975 | BETADINE OINT. U/D PAKS 144/BX | 4.90 @ BX | 9.80 |
| 1 | 1 | | 45-1663335 | CALCIUM GLUCONATE 10% 10ML - VIAL | 0.79 @ EA | 0.79 |
| 25 | 25 | | 45-1668516 | HEPARIN 10,000U/ML 4ML | 1.79 @ EA | 44.75 |
| 3 | 3 | | 45-2185528 | HEPARIN BEEF LUNG 1000U/ML 30ML | 3.26 @ EA | 9.78 |
| 125 | 125 | | 45-2450450 | HEPARIN PORK 10000/ML 30ML | 0.79 @ EA | 99.75 |
| 3 | | 3 | 45-1318930 | IMFERON 50MG/ML 2ML (10/BX) | 103.93 @ BX | 0.00 |
| 1 | 1 | | 45-1444546 | INSULIN REGULAR 10ML (LILLY) | 10.95 @ EA | 13.99 |
| 3 | 3 | | 45-1138783 | KEFZOL 1GM INJ. | 2.19 @ EA | 6.57 |
| 25 | 25 | | 45-1744739 | LIDOCAINE 1% 50ML - PLAIN | 0.56 @ EA | 14.00 |
| 1 | 1 | | 45-1942598 | DARVON 65MG (EQUIV) #100 | 4.85 @ BT | 4.85 |
| 10 | 10 | | 45-2256717 | SODIUM CHLORIDE 23.4% 30ML | 0.79 @ EA | 7.90 |
| 20 | 20 | | 45-2505683 | VANCOMYCIN 500MG INJ. - ABBOTT | 4.59 @ EA | 91.80 |

NO CREDIT WILL BE ALLOWED FOR MERCHANDISE RETURNED WITHOUT PRIOR AUTHORIZATION

4-1, 91

| SALE AMOUNT | 294.98 |
|---|---|
| MISC. CHARGES | 0.00 |
| SALES TAX | 0.00 |
| FREIGHT | 5.71 |
| **PLEASE PAY** | 300.59 |

THANK YOU FOR YOUR BUSINESS

HHD200-1431

# EXHIBIT 100





**VEN-A-CARE**
OF THE FLORIDA KEYS, INC.
A Home I.V. and Nutritional Service

713 FLEMING ST.
KEY WEST, FLA 33040
(305) 292-1635
FAX: (305) 292-1739

## FAX TRANSMITTAL SHEET

### "PERSONAL AND CONFIDENTIAL"

TO: Mr Keith Lynn

AT: Senate Finance Committee

FAX NO: 202-228-3904

FROM: Zach Bentley

FAX NO: 305-292-1739

DATE: 6/25/96          TIME:

RE: Billion dollars + Annual Loss to the Medicare
& Medicaid programs thru fraud & Abuse while the
DOS & HHS stand by & watch the thieves "Rob
The Bank"

PAGES TO FOLLOW INCLUDING COVER SHEET: 7

NOTE: FORWARD THIS FAX IMMEDIATELY TO THE ADDRESSEE, AS THE
DOCUMENTS CONTAINED IN THIS FAX ARE PERSONAL AND CONFIDENTIAL!! IF
YOU DO NOT RECEIVE THIS FAX IN ITS ENTIRETY, PLEASE CALL SALLY SMITH AT
305-292-1635.

2306593

HIGHLY CONFIDENTIAL

R2-038152

AFTER A SHAKY EARLY FRIDAY, THE BULL ROARS BACK: PAGE MW3

**ALAN ABELSON • 3**
Al D'Amato says he's
no Hillary Clinton

**HOOKED, BIG-TIME • 15**
Why do insurers pay
so much for drugs?

**THE INTERVIEW • 22**
Boring stocks that
can double in price



# BARRON'S

THE DOW JONES BUSINESS AND FINANCIAL WEEKLY    JUNE 10, 1996

R2-038153

2306594

HIGHLY CONFIDENTIAL

# Hooked on Drugs

*Why do insurers pay such outrageous prices for pharmaceuticals?*

BY BILL ALPERT ● Jim Fanning saw the plaque in a doctor's splendid home: "This is the house that leucovorin built." Leucovorin is one of the cancer drugs that typifies a basic drug-industry pricing convention that, in Fanning's view, is a multibillion-dollar fraud. Fanning, the pharmacy director of Fort Worth-based ChemoLab, isn't alone in criticizing the published

wholesale prices that most insurers, public and private, use in determining how much to pay for pharmaceuticals. For many drugs, especially the growing number coming off patent and going generic, the drug providers actually pay wholesale prices that are 60%-90% below the so-called average wholesale price, or AWP, used in reimbursement claims.

But Medicare, one of the largest insurers that still reimburses at AWP, is about to demand a change. The huge federal health-insurance program, trying to forestall insolvency, soon will propose regulations aimed at cutting the amount it lays out for the nearly $2 billion in annual drug claims it covers outside of hospitals. The move – especially if it is followed by others now paying near AWP for drugs – will attack from a new direction the pricing practices of a drug industry already beset by antitrust suits from retail drugstores. It also could upset a large segment of the health-care industry, which has thrived on the huge spread between the published wholesale prices used in insurance claims and the far lower wholesale prices actually paid.

That segment includes oncology practices, respiratory therapy firms and home-infusion companies. It also includes the drug makers themselves, whose allegedly inflated price lists and the opportunity for profiteering that they afford to middlemen, gain them market share and encourage overuse of their products. Among the publicly traded companies that could be affected: **Apria Healthcare Group, Lincare Holdings, RoTech Medical, OmniCare, Abbott Laboratories and Baxter International.**

Most people don't even know that Medicare pays for pharmaceuticals and related products, but through piecemeal congressional authorizations, the program now covers certain drugs for emphysema, cancer, kidney dialysis and organ transplantation, often requiring injection. While still barely 1% of its nearly $184 billion in 1995 spending, Medicare's outpatient drug bill (not including co-payments) was $1.8 billion last year, double 1992's level.

Under its current regulations, Medicare provides reimbursement for those drugs at the lesser of either its estimate of what the drugs cost the doctors or the Average Wholesale Price.

But Medicare's attempts to survey

doctors for their costs have been stymied by federal paperwork rules, so it reimburses at the AWP.

Like most drug buyers focused on average wholesale price, Medicare looks to compendia such as the *Red Book*, put out monthly by Medical Economics, of Montvale, N.J., or the rival Blue Book published by First DataBank, a Hearst subsidiary in San Bruno, Calif. Only after Medicare's drug bill started to rocket did policy makers at the Department of Health and Human Services start closely scrutinizing their AWP payments.

They've asked the department's inspector general's office to examine how Medicare suppliers' true acquisition costs square with the program's reimbursement levels.

Claims for nebulizer drugs, which are in the inhalants used by many asthma and emphysema sufferers, were the first studied by the auditors. From under $80 million in 1992, Medicare's annual bill for inhalation drugs grew to $250 million last year, most of it for a

steroid called albuterol sulfate.

In a report released Thursday, the inspector general's office stated that the medical-equipment firms that Medicare reimburses at an average wholesale price-derived 40-43 cents per milliliter actually paid less than half that, on average: just 19 cents. These companies include Apria, LinCare and RoTech.

The report asserted that Medicare could have saved about $94 million if its reimbursements had been based on actual wholesale prices over the 14 months covered by the study.

Another report by the inspector general produced a similar finding for feeding-tube liquids, like the market-leading Ensure products of Abbott Labs. These, the IG found, cost nursing homes 42% less than the price that Medicare bases its reimbursements on. Such products cost Medicare and its beneficiaries several hundred million dollars a year.

The inspector general currently is looking at prices for big-ticket drugs and intravenous liquids, too. *Barron's*

## AWP: AIN'T WHAT'S PAID

► A sample of drugs whose published Average Wholesale Price is wildly above the wholesale price available to almost any buyer. Some of these AWPs actually have risen, while real wholesale prices have plummeted. Publishers say drug makers dictate AWPs.

| Drug | Use | Maker | '95 AWP | Wholesale Price | % Under AWP |
|---|---|---|---|---|---|
| Doxorubicin HCL powder, 10 mg injectable | Chemotherapy | Adria Labs* | $46.00 | $13.00 | 72% |
| Etoposide 100 mg in 5 ml for injection | Chemotherapy | Gensia | 141.97 | 34.00 | 76 |
| Gentamicin Sulfate, 100 mg in 10 ml injection | Antibiotic | Abbott | 6.18 | 1.26 | 80 |
| Intravenous Immune Globulin, 10 mg | Chemotherapy | Baxter | 640.71 | 266.00 | 58 |
| Leucovorin Calcium, 350 mg injection | Chemotherapy | Immunex | 137.94 | 22.50 | 84 |
| Methotrexate 250 mg injection | Chemotherapy | Chiron | 26.88 | 6.40 | 76 |
| Vancomycin HCL 5 gm in 100 ml injection | Antibiotic | Abbott | 135.99 | 36.00 | 74 |
| Vincristine Sulfate 1 mg injection | Chemotherapy | Eli Lilly | 34.62 | 6.72 | 81 |
| 8.5% Amino Acid sol., 1000 ml for parenteral nutr. | TPN | Abbott | 152.65 | 10.81 | 93 |
| 50% Dextrose Sol., 500 ml in glass | Intravenous Sol | Baxter | 27.03 | 2.56 | 91 |
| Lactated Ringer's Injection, 500 ml | Intravenous Sol | Baxter | 11.16 | 1.61 | 86 |
| Normasol 500 ml | Intravenous Sol | Abbott | 16.86 | 2.04 | 88 |
| Potassium Phosphate, 15 ml vial | Intravenous Sol | Abbott | 5.55 | 0.48 | 91 |

* Unit of Pharmacia-Upjohn

**2306595**

Sources: 1995 Red Book, Florida Infusion; LifeCare

HIGHLY CONFIDENTIAL

has done the same, in an examination of the top 20 Medicare drugs (which account for about 75% of the program's drug spending), as well as for various intravenous solutions. Our study shows that for many drugs coming off-patent, the average wholesale prices in no way represents the true wholesale price.

For about 300 dose forms of the drugs, *Barron's* got the AWPs from the *Red Book* and the *Blue Book*. Then, we collected current quotes or price lists from several leading wholesalers specializing in selling to doctors, home health firms, nursing homes and hospitals.

These wholesalers included: The Oncology Therapeutics Network, a South San Francisco-based joint venture of Bristol-Myers Squibb and Axion; Florida Infusion Services of Palm Harbor, Fla.; National Specialty Services, of Nashville; and UltraCare, of Overland Park, Kan. Prices also came in from the Boulder, Colo., hospital buying group Vista Purchasing Partners.

This sampling showed that for single-source drugs still enjoying patent protection, such as Bristol-Myers Squibb's Taxol or Platinol, true wholesale prices are generally 10%-20% below published AWPs.

But for generic drugs, nearly every manufacturer's price was 60%-85% below the published average wholesale price. Some of the generics account for significant spending by Medicare, claiming half of the top 20 slots. Two of them, albuterol and leukovorin, are in the No. 2 and No. 5 slots, respectively.

The pricing unreality is even worse for intravenous nutritionals and solutions, a category dominated by Abbott Laboratories and Baxter International. Catalog wholesale prices for these items are, on average, 80%-93% below those companies' AWPs.

The prices from the different wholesalers were closely bunched. "There are really no special deals out there," contends Fanning, who buys plenty of drugs at wholesale himself.

If most health-care providers can get these prices, is it any wonder an industry wag says that AWP really means "Ain't What's Paid"?

The high prices on generic drugs have led investigators to seek the source of the published AWPs. Back in 1992, major drug manufacturers told the inspector general's office that the *Red Book*, not the manufacturers, determined the AWP. But *Red Book* officials blamed the manufacturers.

The answers are the same today.

Phil Southerd, associate product manager of the *Red Book*, says it publishes prices that are faxed right from

2306596

HIGHLY CONFIDENTIAL

R2-038155

io          BARRON'S

the manufacturers. "They're not our prices," he insists.

Ed Edelstein, editor of the *Blue Book*, says that, while some brand-name firms don't give him prices, generic firms do. "The AWP is the manufacturer's suggested wholesale price," he says. "It's our editorial policy to go along with that."

But Immunex, with a thriving generic cancer-drug business, says its average wholesale prices aren't its own. "The drug manufacturers have no control over the AWPs published . . . ," says spokeswoman Valerie Dowell.

A maker of generic inhalants gives a different answer, but off the record: "The AWPs typically originate with the manufacturer."

More puzzling is the way generic AWPs stay at their lofty perches, or even rise, as competition forces a drug's true wholesale price into the abyss. "The reason this is happening," suggests Michael Neff, pharmacy program administrator of Medi-Cal, California's Medicaid agency, "is that most folks in a position to pay — even state Medicaid programs and HMOs — generally use AWP as a benchmark for reimbursement."

In 1993, the Bristol-Myers Squibb cancer drug Vepesid came off-patent, opening the market for a generic form called etoposide. A 100-milligram dose of Vepisid had an AWP of about $136. The first generic etoposide was Gensia Pharmaceutical's, with a market price of about $75, but the AWP of $142.

The second generic to market, from Pharmacia, pushed the market price to $60, but Pharmacia set an AWP around $140. Today, the market price for 100 milligrams of etoposide is around $35, but Gensia actually raised its AWP last year by about 10%.

When some drug salespeople visit a doctor, says another Medicaid administrator, the salesperson lets the doctor know that his product has a bigger spread between AWP and the real price than any other generic firm.

If manufacturers deliberately maintain lofty AWPs on their generic drugs, it directly profits their customers, not them. Of course, the drug makers might then gain market share and higher sales from their customers' over-utilization.

Indeed, for makers of generics, unreal average wholesale prices pose a classic social dilemma. If some, but not all, rectify their AWPs, the honest makers cut their own throats. "Manufacturers have told me that if they act on their own they'll dry up their own business," says Medi-Cal's Neff. "If I'm a buyer and one drug gives me 20% higher reimbursement, who am I going to go with?"

## FALSE CLAIMS?

▶Some of these firms make drugs, or bill insurers for drugs, that cost far less than the published Average Wholesale Price that Medicare and other insurers pay on claims. Says one wholesaler: "It may be legal, but it's certainly not ethical."

| Company | Symbol | Exchange | Recent Price | Medicare Reimbursement Change Might Affect |
|---|---|---|---|---|
| Abbott Labs | ABT | NYSE | 43³⁄₈ | Medicare buys $500 million of Lupron, also $100s-of-millions of nutritionals |
| American Home Prods | AHOM | NNM | 45¹⁄₂ | Medicare/Medicaid pay for 60% of firm's respiratory and infusion services revenues |
| American Oncology Resources | AORI | NNM | 44¹⁄₄ | One-third of revenues from Medicare/Medicaid; chemo drugs a big profit center |
| Amgen | AMGN | NNM | 60¹⁄₂ | $75 million in Medicare payments for Neupogen = 10% of drug's U.S. sales |
| Baxter International | BAX | NYSE | 46⁷⁄₈ | Government demands rationale for its published prices on intravenous products |
| Bristol-Myers Squibb | BMY | NYSE | 88³⁄₈ | Cancer drugs a mainstay; Medicare bought about 25% of U.S. sales of Taxol |
| Chiron | CHIR | NNM | 97 | Cancer drugs approx 5% of sales |
| Coram | CRH | NYSE | 4³⁄₄ | One-third of revenues from nutritional therapy; 27% of payments from Medicare/Medicaid |
| Gensia | GNSA | NNM | 5³⁄₄ | Largest product is generic etoposide; just got approval for generic doxorubicin |
| Immunex | IMNX | NNM | 15¹⁄₂ | Cancer collaboration with American Home Products; leucovorin a $20 million product |
| Lincare Holdings | LNCR | NNM | 41³⁄₄ | 60% of revenues from Medicare/Medicaid, who are after firm's 85% gross margins |
| Omnicare | OCR | NYSE | 56 | Nursing home pharmacy gets 50% of sales from Medicaid/Medicare, expanding in infusion business |
| Pharmacia-UpJohn | PNU | NYSE | 42⁵⁄₈ | Cancer drugs approx. 9% of drug sales |
| Physician Practice Management | PHYN | NNM | 49³⁄₄ | 45% of revenues from Medicare/Medicaid, chemo drugs a big profit center |
| RoTech | ROTC | NNM | 19³⁄₄ | 50% of revenues Medicare/Medicaid; 6% from chemo and nutrition therapy |

Source: Company reports

It's not rocket science; what's taken them so long?"

Some of the inspector general's investigators believe they've been played for fools. "We trusted the industry and the providers," says one investigator, off the record. "We didn't know how pervasive the discounting was. We thought it was available to just select providers."

Now, the Justice Department is serving "civil investigative demands" — a kind of subpoena in antitrust investigations—on manufacturers, asking them how those inaccurate AWPs wind up in the *Red Book* and *Blue Book*.

Baxter has received one, according to investigators, for its intravenous solutions, whose true wholesale prices—like those of rival Abbott — seem to be 90% below the average wholesale price. Baxter wouldn't comment to *Barron's*.

Some insurers, including Medicare, decree maximum prices for each generic drug, to avoid the alleged manipulation of AWPs. But it takes a year or so to establish a maximum price for new generics, and insurers haven't gotten around to setting prices for many doses.

"There definitely is over-utilization of these products," acknowledges a maker of inhalation drugs. "Because HCFA [the Health Care Financing Administration, the federal Medicare-Medicaid agency] is paying a somewhat arbitrary price, this has been discussed for almost three years.

**2306597**

HIGHLY CONFIDENTIAL

BARRON'S

*If most health-care providers can get much lower prices for*

*pharmaceuticals than insurers do, is it any wonder that an*

*industry wag says that "average wholesale price"*

*really stands for "ain't what's paid"?*

"The drug makers created false statements so that the doctors could make hundreds of millions of dollars," maintains an angry investigator. "If OIG doesn't get them, the Justice Department will."

Some investigators view the spreads guaranteed by extreme average wholesale prices as a kind of kickback to doctors, in violation of federal laws.

One group of infusion-industry veterans is reportedly considering attacking the problem by filing a private suit under the False Claims Act. This is the whistleblower law that allows citizens with knowledge of fraud against the government to sue on behalf of the government and share in the recovery.

Meanwhile, the cooler-headed policy-makers at the inspector general's office and in HCFA are reconsidering Medicare's drug reimbursement rules. They plan to propose their changes in the Federal Register soon.

"Medicare's been paying too much for our drugs," says deputy inspector general George Grob. "We're paying the window-sticker price when everybody else wants a discount and is getting it."

Tom Alt, of HCFA's Bureau of Policy Development, notes that any savings for Medicare will mean savings for beneficiaries, who are kicking in 20% co-payments at current Medicare prices.

Any reduction in reimbursement levels probably would have some effect on the firms that enjoy the spreads between everyday low wholesale prices and the average wholesale prices at which Uncle Sam reimburses them.

That includes oncology practice-management firms like American Oncology Resources and Physicians Reliance Network, which earn significant profits on the chemotherapy drugs they administer to cancer patients. Likewise, respiratory-therapy and infusion firms like American HomePatient, Apria Healthcare, Coram Healthcare, Lincare Holding and RoTech Medical, which owe their sensational profit margins, to various degrees, to their drug spreads.

Then, there are the drug makers themselves, including Abbott, Baxter, Chiron, Gensia and Immunex – all with wide AWP spreads on their generic offerings.

Dr. H. Merrick Reese, the CEO of Physician Reliance, says he doubts that HCFA plans to cut reimbursement rates for cancer drugs, which he says his firm marks up only modestly.

More likely, Medicare will go after the inhalation drugs like albuterol, said Dr. Joseph Bailes, who chairs the clinical practice committee of the American Society of Clinical Oncology.

ChemoLabs is doing what it can to ensure that the AWP tricksters start running out of fools. Located near Fort Worth Airport, Fanning's firm will supply chemotherapy drugs for insurers, shipping doses to oncologists as needed, and for a fraction of the average wholesale price.

And the most aggressive public insurers, including Medicaid programs in six states, are turning their backs on AWP.

They now base their drug payments on WAC – the Wholesale Acquisition Cost actually paid by medical-care providers.

*Blue Book* editor Edelstein warns, however, that this won't end the game. "Then the manufacturers will just start fooling around with that price," he warns.

For now, says Fanning, the ChemoLab pharmasist, the bonanza drug is etoposide. Someday, he expects to see a plaque saying : "This is the house that etoposide built." ∎

2306598

HIGHLY CONFIDENTIAL

R2-038157