EXHIBIT 121

### Statement of the National Alliance for Infusion Therapy, and the National Home Infusion Association, Alexandria, Virginia

The National Alliance for Infusion Therapy (NAIT) and the National Home Infusion Association (NHIA) -- representing providers and manufacturers of home infusion drug therapy supplies, equipment and services -- submits this statement for the hearing record for consideration by the Subcommittee of Health.

### Home Infusion Drug Therapy

Home infusion drug therapy involves the administration of a drug through a needle or catheter. Typically, infusion drug therapy involves the full clinical management of patient care for those who require a drug therapy that is administered intravenously. It may also involve situations where drugs are provided through other parenteral (non-oral) routes. Infusion drug therapies are used only when less invasive means of drug administration are clinically unacceptable or less effective. Medications are administered by infusion only upon the prescription of a treating physician.

A team of clinical pharmacists, high-tech infusion nurses, patient service representatives and delivery and reimbursement professionals support patients and their caregivers throughout the treatment process. The services provided by the team are inextricably linked to the therapies and are often mandated by accrediting bodies whose standards ensure quality of care outside of the hospital setting, as well as by the professional standards of practice of the American Society of Health-System Pharmacists and the Intravenous Nurses Society. Due to the extremely sensitive and invasive nature of infusion therapies, the standards of practice are some of the most rigorous in the practice of pharmacy and nursing.

This high level of practice standards is also echoed in the facility requirements for the provision of home infusion drug therapies. Home infusion drug therapies must be prepared in high-tech, stringently controlled environments. Due to the nature of these therapies, in many cases the quality assurance standards even exceed hospital inpatient facility standards for preparation of intravenous medications.

In short, the professional pharmacy services, supportive staff infrastructure and practice expenses required to ensure the safe and effective administration of infusion therapies are extensive. Despite this extensive clinical infrastructure, home infusion drug therapy provides a safe, patient-preferred and extremely cost-effective alternative to inpatient treatment.

### Medicare Coverage and Payment for Home Infusion Drug Therapy

Providers and suppliers of infusion drug therapies in the home setting are not paid separately by Medicare for the critical services and practice expenses described above. Medicare does not have a separate benefit for infusion therapy, but instead, infusion drugs provided in the home setting are covered exclusively under Medicare's benefit for durable medical equipment. The only items that are explicitly covered and reimbursed under this limited benefit are the drugs, equipment and supplies. Unlike other health care professionals who administer infusion and injectable drugs currently covered under Medicare Part B, providers and suppliers of home infusion drug therapies do not have a mechanism under Medicare that provides them with reimbursement for the services and facilities necessary to provide these therapies.

This is an extremely important point for policymakers to consider as they seek to reform outpatient drug reimbursement. Since the Medicare program does not explicitly reimburse pharmacists for their practice expenses and professional services (including such home infusion services as compounding),

EXHIBIT
Abbott #18
1-11-07

pharmacists currently are "paid" for these costs and functions primarily through reimbursement for the drugs. Similarly, Medicare does not explicitly pay for nursing services provided by infusion therapy providers. A nurse performs many functions, including patient screening and assessment, patient training regarding administration of the pharmaceuticals and general monitoring of the patient's health status. To the extent that Medicare reimburses for such services, it is largely through the drug payment. As explained in greater detail below, reductions in drug payments must be accompanied by a contemporaneous re-allocation of payment for these necessary professional services. If drug payments are reduced drastically without such a re-allocation, Medicare beneficiaries will not be able to receive home infusion drug therapy because the costs of therapy will exceed by a large margin the available reimbursement for the therapy.

It is important to emphasize that none of the specialized pharmacy services are covered under any other Medicare benefit. In a minority of cases, Medicare home infusion patients may meet the "homebound" requirement and qualify for the home health benefit. In such instances, the nursing services described above might be covered under that benefit. For all other Medicare home infusion patients, the nursing services are not covered by the home health benefit. Likewise, the home health benefit does not cover the provision of drugs.

In contrast to Medicare, private sector insurance plans and private managed care plans have embraced home infusion drug therapy over the course of the last two decades, and commercially insured patients represent 70 to 80 percent of home infusion drug therapy patients. The private managed care community has recognized that infusion therapy administered in the home is a tremendous source of cost-savings, and the private sector provides coverage for a growing list of infusion therapies.

Private sector health plans and payers typically recognize the professional services and practice expenses necessary to provide infusion drug therapy in the outpatient setting through a separate "per diem" reimbursement that is paid for each day the patient is receiving therapy. This per diem payment is made in addition to the cost of the drug and nursing visit.

As home infusion drug therapy has become a staple of major medical coverage in the private sector, Medicare's refusal to see these therapies as anything other than the delivery of supplies and equipment is crossing a line from poor policy to surreal. Despite the uncontradicted and overwhelming evidence of the clinical need for these services, the Medicare program persists in defining these multifaceted drug therapies as requiring no greater effort than is involved in the delivery of a walker or wheelchair. Unless Medicare's coverage of these therapies is brought into line with the private sector, Medicare beneficiaries ultimately will suffer in two important ways. If the provision of therapy becomes limited to what Medicare actually covers, then the beneficiaries will suffer from seriously reduced levels of care. Or, more likely, suppliers will simply cease providing care to Medicare beneficiaries to avoid the consequences of providing substandard care.

**Reliance on AWP to Calculate Reimbursement**

NAIT and NHIA understand the criticism expressed by Members of this Subcommittee, as well as other Members of Congress, regarding the current practice of relying on average wholesale price (AWP) as a basis for calculating Medicare and Medicaid outpatient drug reimbursement. The imperfections of the AWP methodology are well-known and extensively documented.

It should be noted that the September 2001 General Accounting Office study highlighted that home infusion therapies represent only a small percentage of current Medicare Part B drug expenditures. As a result, the GAO "did not analyze the costs of infusion therapy drug provided in the home setting because

they do not account for a substantial share of Medicare drug spending or volume."

For the reasons stated above, at the present time the drug payments for infusion therapy subsidize other functions that the Medicare payment methodologies do not reflect appropriately. The costs of these services and functions far outweigh the costs of the drug product, but these costs are clearly lower than the charges that would be incurred if the patient received treatment in an alternate setting. For home infusion drug therapy, the drug payment is the only available payment mechanism for the services that are essential to providing good quality care. The long-standing use of AWP to determine reimbursement has masked the failure of Medicare and Medicaid payment policies to define and account for the service component.

If changes to the methodology used to calculate drug reimbursement result in substantially reduced drug payments, without corresponding changes to ensure adequate reimbursement for the service component of providing infusion therapies, the end result will virtually guarantee an inability of providers to continue to provide these services. Without the availability of home infusion services, Medicare beneficiaries will be treated in more costly settings.

**Recommendations**

We urge Congress to recognize the need for a meaningful analysis of all of the drugs, items, professional services, and facility requirements necessary to provide various types of drug therapies to beneficiaries in a manner that is consistent with the standard of care in this country and private accreditation standards. To restrict the analysis to the difference between drug acquisition cost and Medicare reimbursement is to examine only one small piece of the equation. Such a narrow analysis would fail to meet the overarching goal of using Medicare resources as judiciously as possible.

Before instituting drug payment reform, Medicare must accurately define infusion therapy and create quality standards based on the standards currently and widely used in the private sector. Medicare should then establish a fee schedule that reflects all the covered components of the therapies to accompany the AWP-based drug payment changes.

We look forward to working cooperatively with the Subcommittee to explore solutions that are in the best interests of the financial integrity of the Medicare program, as well as the best interests of the health care needs of the Medicare beneficiaries that rely on home infusion drug therapies.

---

# EXHIBIT 122

I                    Ver 5

TO:        Kevin Thurm
           Deputy Secretary
           Through: ES_____
                    COS_____

FROM:      Michael M. Hash
           Deputy Administrator

SUBJECT:   Use of Department of Justice (DOJ) Data in Pricing of Drugs Currently
           Covered by Medicare -- INFORMATION

**Issue**  We have been considering options for using the alternative average wholesale price
(AWP) data provided by DOJ.  While we believe that Medicare overpays for the drugs
identified by DOJ, we also must assure continued beneficiary access to these drugs.  Per
your request, we have met with physician and provider groups who furnish Medicare
beneficiaries with the drugs on the DOJ list, and conducted some impact analyses.  A
dilemma arises from the fact that delivery systems have developed around overpriced
drugs.  Reductions in the reimbursement, particularly in the magnitude contemplated by
the DOJ, could disrupt these systems of care.  As you know, we have received
Congressionals both to release these drug prices and to take no action.  In sum, we plan to
release the data -- carriers can choose to use it, except for data on chemotherapeutic and
hemophilac drugs.  We also plan to delay the impact until January 1, 2001, and pursue
legislative proposals this fall addressing some of the administrative cost concerns.  This
memo presents the strategy we plan to pursue.

**Background**  We recently met with organizations representing: oncologists; urologists;
the end-stage renal disease community; hemophilia suppliers; and suppliers of asthma
equipment/drugs and home infusion therapy, to discuss their concerns about our use of
the DOJ alternative AWP data as a basis for determining Medicare's outpatient drug
allowances (which are currently based on 95 percent of the AWP).  Attachment A
provides a brief summary of the concerns raised by these organizations, some of our
countervailing concerns, and estimated savings if the DOJ data would be implemented.

These organizations argued that: 1)  a high profit margin on drugs is necessary to cross-
subsidize costs that are underfunded, such as drug administration; 2)  beneficiaries would
have limited access, as they would possibly have to receive care in more costly, less
convenient settings; 3)  quality of care could deteriorate, since the DOJ list does not cover
all drugs and there would be substitution of potentially less effective drugs for which the
inflated payment could still be obtained; 4)  there is insufficient time and information to
successfully implement the change, and the policy was announced without adequate
comment from stakeholders -- a transition period was seen as critical; and 5)  in exploring
an option to pay for drugs based on acquisition costs, there was a view that acquisition

HHC902-0214

RELEASED

User Name:     XL02
File Name:
Directory:
Server:        HCFABPD2
Queue:
Printer:       !LEX03FB4D_INT
Description:   C:\TEMP\~DE31919.TMP
Submitted:     May  14, 1999          8:13:19 am
Printed:       May  14, 1999          8:13:25 am

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0215

RELEASED

2

costs should include an adjustment for spillage and additional paperwork, and there should not be a national limit, such as the median actual acquisition costs in Medicare in a prior year.

While some of the arguments raised by these organizations appear to have merit, we do not think it is clear in every case made that Medicare payment is inadequate to cover drug administration costs, and that access and quality of care would suffer if we implement the DOJ data. Also, we can not loose sight of the fact that lower drug payments would result in lower cost-sharing and Part B premiums for beneficiaries. We continue to believe that Medicare payment for outpatient drugs is excessive; and that our payment systems should be calibrated to pay correctly for covered drugs and for delivery of those drugs.

Medicare carrier payments in 1999 for the approximately 50 drugs on the DOJ list totaled roughly $1.8 billion. If carriers were to fully use the DOJ data immediately, instead of the AWP data from the *Red Book* (the source used by all by one carrier), full year savings of roughly $650 million would be achieved. However, this savings estimate needs to be reduced because of substitute drugs that are not on the DOJ list, and due to the effect of lowering Medicare drug prices through an administrative action (rather than through a statutory or regulatory change) on the sustainable growth rate system (SGR). This would allow physicians, rather that the Medicare program or beneficiaries, to receive the savings from drug price reductions through higher future physician fee schedule updates.

**Plan of Action and Timeline** In our desire to calibrate our payment systems to correct high Medicare drug payments and to adjust payments as may be needed for delivery of those drugs, we plan to pursue a two part policy strategy to address both. Our strategy would:

- Send to Medicare carriers the DOJ data for all drugs. Instruct carriers not to implement the DOJ data for oncology and hemophilia drugs at this time while we consider related Medicare payment policies which could affect access for beneficiaries. Carriers would determine what, if any, of the DOJ data for the remaining drugs should be used. Delay the effective date until January 1, 2000 to provide more time for necessary systems changes and transitioning. Require carriers to assess access to the drugs and report to us in November on the data source they use for setting Medicare drug allowances.

- Submit legislation in September to set Medicare prices at the Average Manufacturers Price (AMP) plus a reasonable mark-up. We believe that instead of proposing to base Medicare payment on actual acquisition costs, we should propose AMP plus a reasonable mark-up. AMP is auditable and we currently have and use it in computing Medicaid drugs rebates.

- Submit legislation in September for targeted fixes in policies related to the provision of drugs which could not be addressed administratively. Such legislation would include increasing the ESRD composite rate, increasing payments for chemotherapy administration and establishing a hemophilia administration fee for certain entities.

HHC902-0216

RELEASED

User Name:      XL02
File Name:
Directory:
Server:         HCFAFHR5
Queue:
Printer:        ILEX0342E2_INT
Description:    WPMail Print
Submitted:      May   4, 1999          9:23:23 am
Printed:        May   4, 1999          9:24:39 am

# XL02

# LPT3

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0217

RELEASED

3

Submit legislation to reduce the physician SGR target by the amount of savings estimated to be achieved.

We would convey these plans through a Program Memorandum (PM) that will be released in late August or early September. This approach would be consistent with the commitment to Chairman Bliley. Exempting oncology and hemophilia drugs would focus on the drugs representing about 70 percent of the savings. Delaying until January would provide time for system changes and transition as well as time for carriers to assess access at the local level and report their findings to us. While, access problems for oncology and hemophilia drugs seem most compelling, it may be difficult to explain why the DOJ data are more accurate, but we are not implementing them for certain drugs at this time. As a result, there might be legal challenge. However, we would consider putting oncology and hemophilia drugs back on the table if legislation we propose on related policies were adopted.

We plan to prepare a letter to Congress and to meet with inquiring members when the PM is released, to explain our policy response to the DOJ data and recommendations.

HHC902-0218

RELEASED

User Name:      XL02
File Name:
Directory:
Server:         HCFABPD2
Queue:
Printer:        !LEX03FB4D_INT
Description:    WPMail Print
Submitted:      May  18, 1999           10:08:10 am
Printed:        May  18, 1999           10:08:20 am

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0219

RELEASED

4

## Attachment A

We recently met with organizations representing: oncologists; urologists; the end-stage renal disease community; hemophilia suppliers; and suppliers of asthma equipment/drugs and home infusion therapy. Based on our discussions with the groups and our analysis, the following major issues exist in using the DOJ data.

*Cross-Subsidies*. Notably, the groups generally agreed that these drugs could be obtained at the lower DOJ AWP levels. However, some groups indicated that the DOJ levels would be below their costs in certain situations. The groups generally argued that they needed to "profit" on their Medicare drug payments in order to compensate or "cross-subsidize" Medicare payments related to other aspects of provision of the service that they claim are either inadequate or not covered at all.

For example, oncologists argued that their Medicare drug profits cross-subsidize what they believe are inadequate Medicare payments for chemotherapy administration. About two-thirds of their Medicare revenues comes from drugs, and less than 10 percent is from chemotherapy administration. Similarly, hemophilia centers argued that since payment for drugs is the only payment they receive from Medicare, they use their Medicare drug profits to cover administration of drug. Providers of home infusion and asthma care argued that their Medicare drug profits were used to cover related services such as checking that the patient has an appropriate supply of drugs and is following the prescribed regime. This latter case was less compelling than others, as it is unclear that payment for these services is not included in Medicare's current payment for the equipment itself and equipment servicing fees.

ESRD facilities argued that their Medicare drug profits are used in part to compensate for cost-sharing bad-debts. They claim to experience a disproportionate share of bad-debt relative to other providers, and point out that Medicare recognizes bad-debt for other facilities.

*Access to Care*. All the groups expressed concern that beneficiaries would possibly have to receive their care in more costly, less convenient settings, such as hospital outpatient departments (e.g., chemotherapy) or emergency rooms (e.g., hemophilia or respiratory therapy). Oncologists argued that if they lost their Medicare drug profits, they could not cross-subsidize inadequate chemotherapy administration payments and would have to shift care from the office setting into hospitals and outpatient clinics. This could be more of a problem in rural settings where beneficiaries could face increased travel time and expenses. Apria, a company which furnishes home infusion and asthma care, reported a recent decision to refuse new Medicaid patients in twelve states when the DOJ data were implemented for Medicaid through First Data Bank.

*Quality of Care*. Groups expressed concern about two aspects of quality of care. First, since the DOJ list does not cover all drugs, there would be substitution of alternative and potentially less effective drugs for which the inflated payment could still be obtained. For example, there could be substitution of plasma-generated Factor IX for recombinant-

HHC902-0220

RELEASED

User Name:     XL02
File Name:
Directory:
Server:        HCFABPD2
Queue:
Printer:       !LEX03FB4D_INT
Description:   WPMail Print
Submitted:     May  18, 1999          3:06:08 pm
Printed:       May  18, 1999          3:06:14 pm

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0221

RELEASED

5

generated Factor IX, which is the drug of choice for beneficiaries with HIV.

Second, some groups argued that there would be deterioration in quality controls and related support services that are not covered. An example is the provision of Albuterol without intermittent monitoring of the beneficiary to ascertain if they are actually taking their respiratory treatments, and checking refill prescriptions against physician orders that may have been revised or having a 24-hour capacity for access to respiratory therapists if the need should arise. However, we are concerned that some of these additional services might be used more as marketing devices than as patient quality controls.

_Operational Constraints and Transition_. Groups expressed concern that there was insufficient time and information to successfully implement the change. Some groups complained that the policy was announced without adequate comment from stakeholders, and that significant reductions in prices could even possibly violate the law under this circumstance.

A longer lead-time than October 1, 2000 and a transition period were seen as critical to assure access to care and avoid confusion among providers and beneficiaries. Some groups pointed to the need to renegotiate contracts, make systems changes, and plan for the anticipated reductions in revenue.

_Actual Acquisition Costs_: We also heard concerns about basing Medicare payment for drugs on actual acquisition costs. There was a view that acquisition costs should include an amount for spillage, storage and taxes, and for paperwork to determine actual acquisition costs for drugs net of discounts. Also, there was concern that our prior legislative proposal had a national limit, i.e., our payment of actual acquisition costs was subject to a limit of the median actual acquisition costs in Medicare in a prior year.

_Savings Estimates and Impact Analysis_. Medicare carrier payments in 1999 for the approximately 50 drugs on the DOJ list totaled roughly $1.8 billion. If carriers were to fully use the DOJ data immediately, instead of the AWP data from the _Red Book_ (the source used by all by one carrier), full year savings of roughly $650 million would be achieved. (This is not an actuarial estimate and savings could be lower given assumptions about a variety of slipages). The savings occur because _Red Book_ AWPs are neither an average nor a wholesale price, but rather a manufacturer's list price whereas the DOJ data reflect prices from wholesaler catalogs. Where savings are generated, beneficiaries will benefit from lower cost-sharing and Part B premium payments.

However, this savings estimate needs to be reduced because of substitute drugs that are not on the DOJ list. Approximately three-quarters of carriers have implemented a least costly alternative policy that reduced the price of Lupron to the price of Zoladex, which is still less expensive than the DOJ price for Lupron. Albuterol also has substitutable drugs not on the DOJ list.

Savings also need to be considered in the context of the physician sustainable growth rate system (SGR). Medicare spending for some certain drugs (representing approximately

HHC902-0222

RELEASED

User Name:      XL02
File Name:
Directory:
Server:         HCFABPD2
Queue:
Printer:        !LEX03FB4D_INT
Description:    C:\OFFICE\WPWIN\WPDOCS\AMBUL\PARA-INT\ACT-MEMO.WPD
Submitted:      May  19, 1999              7:35:51 am
Printed:        May  19, 1999              7:35:58 am

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0223

RELEASED

6

half of the DOJ savings) are included in the measurement of performance under the SGR. Lowering Medicare payment for these drugs through administrative action (rather than through a statutory or regulatory change) would diminish savings going to the Medicare program and to beneficiaries, because physicians would receive the savings through higher future physician fee schedule updates. (This problem could be resolved by with a legislative fix.)

HHC902-0224

RELEASED

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFABPD2 |
| Queue: | |
| Printer: | ILEX03FB4D_INT |
| Description: | C:\OFFICE\WPWIN\WPDOCS\TIMS\Q-VIIA.PM |
| Submitted: | May  19, 1999                     7:16:00 am |
| Printed: | May  19, 1999                     7:16:05 am |

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0225

RELEASED

DOJ Drug Pricing Comparison Data - August 8, 2000

## DOJ AMP v. AWP Drug Pricing Comparison Data

| | New HCPCS | HCPCS | NDC | AMP | BP | 98 Red Book | AMP/RedBk #VALUE! |
|---|---|---|---|---|---|---|---|
| Etoposide | | J9182 | 00074 1485 48 | No Info Found | | | |
| EPO | | Q0136 | 55513 0126 10 | $19.48 | $16.66 | $24.00 | 81.2% |
| Lupron | | J9217 | 00300 3629 01 | $429.79 | $170.00 | $540.63 | 79.5% |
| | | J2430 | 00083 2601 04 | $172.662 | $166.10 | $218.24 | 79.1% |
| | | J1626 | 00029 4149 01 | $139.08 | $80.00 | $177.40 | 78.4% |
| Leucovorin | | J0640 | 00641 2369 41 | $43.98 | | $56.25 | 78.2% |
| Paclitaxil | | J9265 | 00015 3475 30 | $28.34 | $21.33 | $36.53 | 77.6% |
| | | J9045 | 00015 3213 30 | $72.39 | $69.45 | $93.46 | 77.5% |
| Zoladex | | J9202 | 00310 0960 36 | $246.12 | $167.48 | $439.24 | 56.0% |
| | | J1561 | 00944 2620 01 | $27.44 | $23.10 | $54.92 | 50.0% |
| Gama Globuli | | J1562 | 00026 0648 20 | $3.31 | $2.92 | $9.00 | 36.8% |
| | J7644 | K0518 | 49502 0685 03 | $0.240825 | | $0.71 | 34.1% |
| Doxorubicin | | J9000 | 00013 1136 91 | $3.09 | $1.34 | $10.24 | 30.2% |
| Albuterol | J7619 | K0505 | 49502 0697 03 | $0.083228 | $0.009155 | $0.40 | 20.6% |

HHC902-0226

RELEASED

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFAFHR5 |
| Queue: | |
| Printer: | !LEX0342E2_INT |
| Description: | C:\OFFICE\WPWIN\WPDOCS\AMBUL\PARA-INT\PI-OPTIO.429 |
| Submitted: | May  3, 1999                    8:47:53 am |
| Printed: | May  3, 1999                    8:47:54 am |

# XL02

# LPT3

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0227

RELEASED

| | HCPCS Code(s) | HCPCS Description | Total Allowed Charges | Percentage AWP to Red Book | Total Dollars Saved |
|---|---|---|---|---|---|
| 1 | J9040 | Bleomycin sulfate injection | $2,678,439 | -32.5% | ($869,254) |
| 1 | J9060 | Cisplatin 10 MG injeciton | $7,434,950 | -32.0% | ($2,382,748) |
| 1 | J9062 | Cisplatin 50 MG injeciton | $10,363,407 | -32.0% | ($3,321,292) |
| 1 | J9091 | Cyclophosphamide 1.0 grm inj | $690,165 | -64.1% | ($442,256) |
| 1 | J9070 | Cyclophosphamide 100 MG inj | $1,568,915 | -64.1% | ($1,005,305) |
| 1 | J9092 | Cyclophosphamide 2.0 grm inj | $116,166 | -64.1% | ($74,435) |
| 1 | J9080 | Cyclophosphamide 200 MG inj | $210,512 | -64.1% | ($134,889) |
| 1 | J9090 | Cyclophosphamide 500 MG inj | $691,520 | -64.1% | ($443,101) |
| 1 | J9097 | Cyclophosphamide lyophilized | $417,095 | -56.5% | ($235,742) |
| 1 | J9096 | Cyclophosphamide lyophilized | $1,524,257 | -56.5% | ($861,510) |
| 1 | J9095 | Cyclophosphamide lyophilized | $1,095,089 | -56.5% | ($618,944) |
| 1 | J9094 | Cyclophosphamide lyophilized | $392,854 | -56.5% | ($222,041) |
| 1 | J9093 | Cyclophosphamide lyophilized | $2,174,036 | -56.5% | ($1,228,765) |
| 1 | J9100 | Cytarabine hcl 100 MG inj | $330,505 | -53.0% | ($175,146) |
| 1 | J9110 | Cytarabine hcl 500 MG inj | $168,504 | -53.0% | ($89,292) |
| 1 | J1260 | Dolasetron mesylate | $46,647,272 | -44.5% | ($20,766,281) |
| 1 | J9000 | Doxorubic hcl 10 MG vl chemo | $27,831,805 | -84.1% | ($23,406,989) |
| 1 | J9181 | Etoposide 10 MG inj | $7,971,562 | -91.4% | ($7,286,982) |
| 1 | J9182 | Etoposide 100 MG inj | $15,290,199 | -91.4% | ($13,977,202) |
| 1 | J9190 | Fluorouracil injection | $3,741,974 | -56.4% | ($2,111,901) |
| 1 | J1626 | Granisetron hydrochlor/100 mcg | $46,432,246 | -25.3% | ($11,764,258) |
| 1 | J0640 | Leucovorin calcium injection | $66,740,227 | -85.9% | ($57,319,561) |
| 1 | J9260 | Methotrexate sodium inj | $1,150,850 | -51.0% | ($586,823) |
| 1 | J9250 | Methotrexate sodium inj | $275,325 | -51.0% | ($140,396) |
| 1 | J2405 | Ondansetron hcl injection | $47,721,885 | -32.7% | ($15,616,369) |
| 1 | J9360 | Vinblastine sulfate inj | $608,183 | -75.2% | ($457,132) |
| 1 | J9370 | Vincristine sulfate 1 MG inj | $2,536,861 | -87.3% | ($2,214,338) |
| 1 | J9375 | Vincristine sulfate 2 MG inj | $1,361,596 | -86.3% | ($1,174,377) |
| 1 | J9380 | Vincristine sulfate 5 MG inj | $52,272 | -86.3% | ($45,085) |
| 2 | Q0160 | Factor IX non-recombinant | $3,130,782 | -31.0% | ($971,622) |
| 2 | Q0161 | Factor IX recombinant | $7,690,671 | -31.0% | ($2,386,760) |
| 2 | J7190 | Factor viii | $30,832,294 | -32.7% | ($10,093,213) |
| 2 | J7192 | Factor viii recombinant | $49,063,100 | -33.0% | ($16,208,346) |
| 3 | J7610 | Acetylcysteine 10% inhalation | $2,146 | -55.8% | ($1,198) |
| 3 | J7615 | Acetylcysteine 20% inhalation | $32 | -55.8% | ($18) |
| 3 | K0503 | Acetylcysteine inh sol u d | $35,908,222 | -55.8% | ($20,040,379) |
| 3 | K0504 | Albuterol inh sol con | $3,356,397 | -67.7% | ($2,271,136) |
| 3 | K0505 | Albuterol inh sol u d | $246,136,877 | -67.7% | ($166,524,613) |
| 3 | J7620 | Albuterol sulfate .083% inh | $13,539 | -67.7% | ($9,160) |
| 3 | J7625 | Albuterol sulfate .5% inh | $12,477 | -67.7% | ($8,441) |
| 3 | K0511 | Cromolyn sodium inh sol u d | $2,965,592 | -45.5% | ($1,348,285) |
| 3 | J7630 | Cromolyn sodium inhalaton | $130 | -45.5% | ($59) |
| 3 | J7670 | Metaproterenol sulfate .4% | $737 | -63.3% | ($466) |
| 3 | J7672 | Metaproterenol sulfate .6% | $84 | -63.3% | ($53) |
| 3 | J7675 | Metaproterenol sulfate 5% | $23 | -63.3% | ($15) |
| 4 | J1950 | Leuprolide acetate /3.75 MG | $1,166,135 | -19.6% | ($228,051) |
| 4 | J9218 | Leuprolide acetate inj | $45,931 | -19.6% | ($8,983) |
| 4 | J9217 | Leuprolide acetate suspnsion | $620,102,889 | -19.6% | ($121,270,840) |

HHC902-0228

RELEASED

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFABPD2 |
| Queue: | |
| Printer: | !LEX03FB4D_INT |
| Description: | WPMail Print |
| Submitted: | June  15, 1999 |
| Printed: | June  15, 1999 |

10:05:25 am
10:05:32 am

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0229

RELEASED

| | | | | |
|---|---|---|---|---|
| 4 | J9290 | Mitomycin 20 MG inj | $3,651,955 | -66.7% | ($2,435,417) |
| 4 | J9291 | Mitomycin 40 MG inj | $9,755,500 | -66.7% | ($6,505,817) |
| 4 | J9280 | Mitomycin 5 MG inj | $2,434,904 | -66.7% | ($1,623,806) |
| 5 | J0635 | Calcitriol injection | 216,179,667 | -19.1% | ($41,320,514) |
| 5 | J1780 | Iron dextran 10 CC inj | 187,825,227 | -34.5% | ($64,837,268) |
| 5 | J1760 | Iron dextran 2 CC inj | 14,428,784 | -34.5% | ($4,980,816) |
| 5 | J1770 | Iron dextran 5 CC inj | $388,933 | -34.5% | ($134,260) |
| 6 | J0286 | Amphotercin B inj 50 MG, lipid | $970,000 | -50.9% | ($493,268) |
| 6 | J0285 | Amphotericin B injection 50 MG | $468,965 | -50.9% | ($238,480) |
| 6 | J7070 | D5w infusion | $660,605 | -80.8% | ($533,503) |
| 6 | J1095 | Dexamethosone acetate 8 MG | $1,069,618 | -81.3% | ($869,653) |
| 6 | J1100 | Dexamethosone sodium phos | $3,625,998 | -54.1% | ($1,961,302) |
| 6 | J7042 | Dextrose/normal saline 5% | $1,125,207 | -82.4% | ($926,717) |
| 6 | J7060 | Dextrose/water 5% | $2,459,708 | -80.8% | ($1,987,268) |
| 6 | J3360 | Diazepam injection | $77,654 | -63.4% | ($49,255) |
| 6 | J1940 | Furosemide injection | $170,987 | -82.0% | ($140,272) |
| 6 | J1580 | Garamycin gentamicin inj | $311,988 | -81.5% | ($254,298) |
| 6 | J1642 | Heparin sodium per 10 u inj | $3,950,275 | -73.7% | ($2,911,477) |
| 6 | J1644 | Heparin sodium per 1000u inj | $495,337 | -73.7% | ($365,079) |
| 6 | J1720 | Hydrocortisone sodium succi | $88,153 | -60.6% | ($53,378) |
| 6 | J1562 | Immune globulin 10% /5 grams | $43,239,398 | -19.1% | ($8,270,216) |
| 6 | J1561 | Immune globulin injection | $46,742,094 | -19.1% | ($8,940,444) |
| 6 | J2060 | Lorazepam injection | $503,102 | -66.9% | ($336,373) |
| 6 | J1020 | Methylprednisolone 20 MG inj | $136,604 | -59.4% | ($81,074) |
| 6 | J1030 | Methylprednisolone 40 MG inj | $2,416,108 | -59.4% | ($1,433,960) |
| 6 | J1040 | Methylprednisolone 80 MG inj | $3,755,325 | -59.4% | ($2,228,785) |
| 6 | J2930 | Methylprednisolone injection | $763,014 | -67.0% | ($511,213) |
| 6 | J2920 | Methylprednisolone injection | $193,816 | -67.0% | ($129,857) |
| 6 | J2545 | Pentamidine isethionte/300mg | $208,045 | -85.3% | ($177,370) |
| 6 | J2792 | Rho(D) immune globulin h, sd | $4,244,766 | -53.3% | ($2,262,733) |
| 6 | J2912 | Sodium chloride injection | $749,285 | -82.7% | ($619,821) |
| 6 | J1060 | Testosterone cypionate 1 ML | $94,124 | -44.6% | ($41,989) |
| 6 | J1090 | Testosterone cypionate 50 MG | $10,588 | -44.6% | ($4,723) |
| 6 | J3130 | Testosterone enanthate inj | $96,614 | 0.0% | $0 |
| 6 | J3120 | Testosterone enanthate inj | $12,295 | 0.0% | $0 |
| 6 | J0900 | Testosterone enanthate inj | $6,426 | 0.0% | $0 |
| 6 | J3260 | Tobramycin sulfate injection | $137,576 | -59.8% | ($82,227) |
| 6 | J3370 | Vancomycin hcl injeciton | $680,916 | -55.6% | ($378,881) |
| 7 | S0071 | Acyclovir Sodium | $0 | -49.3% | $0 |
| 7 | S0072 | Amikacin Sulfate | $0 | -58.9% | $0 |
| 7 | S0023 | Cimetidine Hydrochloride | $0 | -86.4% | $0 |
| 7 | S0077 | Clindamycin Phosphate | $0 | 0.0% | $0 |
| | | | $1,852,776,290 | Totals | ($668,465,565) |

Event
$2.3m

LiST-a. xLS

HHC902-0230

RELEASED

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFABPD2 |
| Queue: | |
| Printer: | !LEX03FB4D_INT |
| Description: | Regulations Team Schedule |
| Submitted: | June  15, 1999           10:09:58 am |
| Printed: | June  15, 1999           10:10:06 am |

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0231

RELEASED

**Specs for Legislation for Policies \*Related\* to the Use of DOJ AWP Data**

(1)  ESRD Facility Drugs.  In addition to the 1.2 percent increase that BBRA increased the composite rate for 2001, and on top of the additional 1.2 percent increase for 2001 that the Administration proposed in June, we would propose legislation to further increase the ESRD composite rate by 3 percent for 1/1/01 (the precise increase needs to be examined further).  Thus the composite rate would be increased in 2001 by a total of 5.4 percent.  The amount of the 3 percent additional increase would be approximately equal to the estimated savings from ESRD facilities that would occur by using the DOJ data.  Because of our concern with how the changes would affect ESRD facilities, propose a study and report to Congress on ESRD facility profitability, including Medicare revenues for items and services excluded from the composite rate, and growth in the supply of facilities.

(2)  Hemophilia Drug Administration Fee.  Propose to require the Secretary to establish, by 4/1/01, a fee to be paid to entities that administer drugs to hemophilia patients.

Should the proposal apply to whomever administers the drugs or apply only to certain types of entities which furnish the drugs?  Should the fee be limited to administration of factor drugs or would it also apply to any other drugs administered?  Would the administration fee be subject to normal Part B cost-sharing?

(3)  Oncology Drugs.  Propose legislation to increase the oncologists chemotherapy administration fee by an amount equal to their current aggregate Medicare drug profits (that would be eliminated by using the DOJ data).  Because some of the increased chemotherapy administration fees would pay physicians more to provide chemotherapy in their offices than in hospital outpatient departments, the increased physician office chemotherapy administration fees would be limited to the OPD PPS rates for chemotherapy administration.  Because of desire to create a level playing field between physician offices and OPDs, propose to lower OPD coinsurance for chemotherapy administration to 20 percent on 1/1/02.

(4)  SGR Related Amendment.  Since the DOJ AWP policy would be accomplished by administrative action rather than by a change in law or regulation, propose legislation to reduce the physician sustainable growth rate (SGR) target by the amount of the drug savings estimated to be achieved.  This would apply to drugs included in data used to determine SGR performance (e.g., incident to drugs), but exclude drugs furnished as part of the durable medical equipment benefit or drugs furnished by ESRD facilities.  This proposal would assure that the Medicare program and Medicare beneficiaries achieve the savings, rather than having the savings result in an increase in the update for all physicians.

**Specs for Legislation for Payment of Currently Covered Medicare Drugs**

Propose legislation, effective 7/1/01, to use the average manufacturers price (AMP), currently available to the Secretary for determining Medicaid drug rebates, plus a reasonable mark-up as the payment basis for currently covered Medicare drugs.

HHC902-0232

RELEASED

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFABPD2 |
| Queue: | |
| Printer: | !LEX03FB4D_INT |
| Description: | ChromaSound FAQ |
| Submitted: | May  19, 1999                8:16:12 am |
| Printed: | May  19, 1999                8:16:15 am |

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0233

RELEASED

X Cutting

Robin Feitta

– Operational issue for providers (Timing)

Drug markup ⇒ Cross-subsidence

Quality/Access ⇒ refer to ERS

Drug Substitutions

– Savings not recd – LCA ; drug substitution

– Lead Time from providers + Contractors

Options

○ Oct vs. Jan          Oct or Jan
○ Carriers later or discretion

○ Pick & choose

○ Delay Til Jan 1 + A-19

_____

1 – Do nothing – Retreat
    w/ A-19       more complicated dep. T Dumpy
                  Do a reg

2 – minimal
    – Delay Jan 1 – Systems, notification
    – Consider it in AWP    Carrier discretion - give disc to carriers
    – + A-19            Do a reg    .

4 – Blends Red BK + DOT    3 – Pick & choose based on Access
    2 ways                    Knowing legal challenge
  Clear instructions for Jan
    50-50 blend
    Bad precedent

**HHC902-0234**

RELEASED

## 8/10 Draft AWP Workplan

| Due Date | Task | Product | Lead/Support |
|---|---|---|---|
| 8/7 | Notify Dep Sec of NAMD decision (made 8/2) | 1) Info memo to OA | Lead: CHPP (TDecaro) Support: GC, OL, CMSO, CBS, OIS |
| 8/12 | | 2) Meeting | Lead: OA (PHarbage) |
| | Policy Development: | | |
| 8/11 8/18 | 1) Oncology PE (admin chg. Rerunning numbers?) | 1a) Briefing paper 1b) Decision memo 1c) Other? | Lead: CHPP (TKay) Support: GC, OL, CBS, OIS |
| Effect Date ?? | | | |
| 8/11 8/18 | 2) Oncology admin overhead costs (statutory fix) | 2a) Briefing paper 2b) A-19? | Lead: CHPP (TKay) Support: GC, OL |
| Effect Date?? | | | |
| 8/11 8/18 | 3) Hemophilia admin fee (statutory fix) | 3a) Briefing paper 3c) Other? | Lead: CHPP (TKay) Support: GC, OL |
| Effect Date ?? | | | |
| 8/11 8/18 | 4) ESRD composite rate (statutory fix) | 4a) Briefing paper 4c) A-19 | Lead: CHPP (THoyer) Support: GC, OL, CBS, OIS |
| Effect Date ?? | | | |
| 8/11 8/18 | 5) Average Manufacturers Price (AMP) w/ markup (statutory fix) | 5a) Briefing paper 5b) A-19 | Lead: CHPP (BNiemann) Support: GC, OL, CMSO |
| Effect Date ?? | | | |
| | 6) Other | | |
| 8/11 | 6a) Albuterol in Texas DME demo | 6a) Briefing paper | Lead: CHPP (SArnold) |
| 8/11 | 6b) Other agency experience/issues w/ AWP & other pricing strategies | 6b) Briefing paper | Lead: CHPP (BNiemann) Support: CMSO (LReid) |

HHC902-0235

RELEASED

| | Instruct carriers:<br>– on use of DOJ data<br>-- to report on current sources and use of data to set drug allowances, and on information they have about access to drugs on DOJ list | | |
|---|---|---|---|
| 8/25? | | 1a) PM clearance finished | Lead: CHPP (BNiemann)<br><u>Support</u>: GC, OL, CMSO, CBS, OIS<br><u>Clear thru Change Management process?</u> |
| 8/29 | | 1b) PM release<br>(see rollout below) | Lead: CBS?<br><u>Support</u>: CHPP, GC, OL, CMSO, OIS |
| <u>Carrier feedback</u>:<br>11/1/2000 | | | |
| <u>Effective Date (DOJ data)</u>:<br>1/1/2001 | | | |

HHC902-0236

RELEASED

| | | | |
|---|---|---|---|
| 8/18<br>8/25 | <u>Prep for Rollout</u> of PM on DOJ AWP data | Finalize:<br>◼ Press release<br>◼ clear w/ dept? | Lead: OL, Press Office<br>Support: CHPP, CMSO, CBS |
| 8/18<br>8/25 | Letter to Congress about AWP and leg proposals under consideration | ◼ Prepare<br>◼ Clear w/ dept? | |
| 8/21 -- 8/25 | | ◼ Q&As | |
| 8/21 – 8/25 | | ◼ Talking points | |
| | <u>Coordination of rollout</u> | | Lead: OA (PHarbage)<br>Support: CHPP, OL, Press Office, CMSO |
| Rollout:<br>8/29 | <u>Contacts:</u><br>1) Release PM | 1a) Send<br>1b) Post on web | Lead: CBS |
| 8/21<br>8/24 – 25 | 2) Department | 2a) Briefings w/ Assoc Dirs (e.g., Claxton)<br>2b) Brief Dep Sec | Lead: OA (PHarbage), w/ CHPP, OL, Press Office |
| 8/21 | 3) OMB | 3) Briefings | Lead: CHPP |
| 8/28 -30 | 4) Hill | 4a) Letter to Congress<br>4b) Briefings | Lead: OL w/ CHPP |
| 8/29 | 5) Providers | 5a) Notice/Calls to affected associations<br>5b) Other? | Lead: CHPP |
| 8/29 | 6) Benes | 6) Notice/Calls to advo | Lead: CBS |
| 8/29 - 30 | 7) Public/Press | 7) ?? | Lead: Press Office |

HHC902-0237

RELEASED

(2)  Hemophilia Drug Fee.  The current provision in the law for hemophilia drugs is:

1861(s)(2)(I)
blood clotting factors, for hemophilia patients competent to use such factors to control bleeding without medical or other supervision, and items related to the administration of such factors, subject to utilization controls deemed necessary by the Secretary for the efficient use of such factors;

We would propose to add the following to be effective April 1, 2001:

blood clotting factors, for hemophilia patients competent to use such factors to control bleeding without medical or other supervision, and items related to the administration of such factors, *and costs incurred by suppliers of such factors such as shipping, storage, inventory control, billing and other costs as specified by the Secretary,* subject to utilization controls deemed necessary by the Secretary for the efficient use of such factors;

We are currently obtaining data to show the allowed charges per beneficiary per month for these factors.  We have been old that it is $10,000-20,000 per month.  The DOJ prices represent about a 30 percent reduction.  The cost that I have not specified is "profit margin" to make this business worth doing for Medicare beneficiaries.

Q. Should the proposal apply to whomever administers the drugs or apply only to certain types of entities which furnish the drugs?

ANS. It should be tied to the supplier of the drugs.  I think the possibility of creating a new class of provider for medical support services and home administration goes far beyond the immediate problem and should be given much more study.  (e.g., certification, scope of services)

Q. Should the fee be limited to administration of factor drugs or would it also apply to any other drugs administered?

A. The additional coverage would not be for "administration"; these factors are by and large self-administered in the home.  The additional coverage would be for overhead expenses and provide the program with a basis to pay some profit margin to the supplier.

Q. Would the administration fee be subject to normal Part B cost-sharing?

A. Yes.  There is still a need for utilization control as recognized by the current statute.  Furthermore, there should be cost sharing by the beneficiary where it is available.

HHC902-0239

RELEASED

User Name:     XL02
File Name:
Directory:
Server:        HCFABPD2
Queue:
Printer:       !LEX03FB4D_INT
Description:   C:\OFFICE\WPWIN\WPDOCS\AMBUL\PARA-INT\PI-RAM.521
Submitted:     May  21, 1999              2:19:38 pm
Printed:       May  21, 1999              2:19:42 pm

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0240

RELEASED

DOJ Drug Pricing Comparison Data - August 8, 2000

DOJ AMP v. AWP Drug Pricing Comparison Data

| | HCPCS | New HCPCS | NDC | AMP | BP | 98 Red Book | |
|---|---|---|---|---|---|---|---|
| Lupron | J9217 | | 00300 3629 01 | $429.79 | $170.00 | $540.63 | 79.5% |
| ALu+ | K0505 | J7619 | 49502 0697 03 | $0.083228 | $0.009155 | $0.40 | 20.6% |
| Zouder | J9202 | | 00310 0960 36 | $246.12 | $167.48 | $439.24 | 56.0% |
| | K0518 | J7644 | 49502 0685 03 | $0.240825 | | $0.71 | 34.1% |
| Paclitaxel | J9265 | | 00015 3475 30 | $28.34 | $21.33 | $36.53 | 77.6% |
| BPD | Q0136 | | 55513 0126 10 | $19.48 | $16.66 | $24.00 | 81.2% |
| Levovonin | J0640 | | 00641 2369 41 | $43.98 | | $56.25 | 78.2% |
| | J9045 | | 00015 3213 30 | $72.39 | $69.45 | $93.46 | 77.5% |
| | J1626 | | 00029 4149 01 | $139.08 | $80.00 | $177.40 | 78.4% |
| Gemar Glob | J1562 | | 00026 0648 20 | $3.31 | $2.92 | $9.00 | 36.8% |
| Etopoide | J9182 | | 00074 1485 48 | No Info Found | | | #VALUE! |
| Pexorubicin | J9000 | | 00013 1136 91 | $3.09 | $1.34 | $10.24 | 30.2% |
| | J1561 | | 00944 2620 01 | $27.44 | $23.10 | $54.92 | 50.0% |
| | J2430 | | 00083 2601 04 | $172.62 | $156.10 | $218.24 | 79.1% |

HHC902-0241

RELEASED

User Name:      XL02
File Name:
Directory:
Server:         HCFAFHR5
Queue:
Printer:        ILEX0342E2_INT
Description:    C:\OFFICE\WPWIN\WPDOCS\AMBUL\PARA-INT\HCF1813.429
Submitted:      May   3, 1999                8:09:40 am
Printed:        May   3, 1999                8:09:43 am

# XL02

# LPT3

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0242

RELEASED

Clotting factor 1999 - 5% Sample

| #Months | $Avg_Month | $Annual | $Annual |
|---|---|---|---|
| 2 | 97,048 | 194,096 | 267,180 |
| 5 | 53,436 | 267,180 | 257,076 |
| 5 | 51,415 | 257,076 | 214,471 |
| 4 | 49,892 | 199,568 | 199,568 |
| 2 | 45,693 | 91,386 | 194,096 |
| 1 | 36,816 | 36,816 | 185,684 |
| 3 | 30,689 | 92,068 | 184,984 |
| 6 | 28,440 | 170,640 | 182,703 |
| 4 | 27,093 | 108,371 | 170,640 |
| 7 | 26,100 | 182,703 | 166,812 |
| 4 | 24,146 | 96,584 | 108,371 |
| 4 | 21,510 | 86,039 | 103,447 |
| 2 | 21,206 | 42,413 | 96,584 |
| 9 | 20,632 | 185,684 | 95,417 |
| 9 | 20,554 | 184,984 | 92,068 |
| 5 | 18,165 | 90,825 | 91,386 |
| 12 | 17,873 | 214,471 | 90,825 |
| 10 | 16,681 | 166,812 | 86,039 |
| 6 | 15,903 | 95,417 | 63,340 |
| 4 | 15,835 | 63,340 | 56,188 |
| 2 | 14,363 | 28,727 | 45,400 |
| 4 | 14,047 | 56,188 | 42,413 |
| 3 | 12,504 | 37,512 | 37,512 |
| 10 | 10,345 | 103,447 | 36,816 |
| 2 | 9,362 | 18,724 | 32,166 |
| 5 | 9,080 | 45,400 | 28,727 |
| 1 | 8,352 | 8,352 | 18,724 |
| 2 | 7,392 | 14,784 | 14,784 |
| 1 | 7,000 | 7,000 | 13,095 |
| 2 | 6,548 | 13,095 | 8,352 |
| 6 | 5,361 | 32,166 | 7,000 |
| 1 | 5,262 | 5,262 | 5,262 |
| 1 | 3,724 | 3,724 | 3,724 |
| 1 | 2,155 | 2,155 | 2,155 |
| | 22,195 | Avg | |
| 145 | 22,090 | Wtd Avg | |

91,515 Avg_Patient

HHC902-0243

RELEASED

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFAFHR5 |
| Queue: | |
| Printer: | ILEX0342E2_INT |
| Description: | C:\OFFICE\WPWIN\WPDOCS\AWP-A19.WPD |
| Submitted: | April  30, 1999          2:50:09 pm |
| Printed: | April  30, 1999          2:50:15 pm |

# XL02

# LPT3

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0244

RELEASED