# EXHIBIT 130

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

```
CITIZENS FOR CONSUME, et al    .  CIVIL ACTION NO. 01-12257-PBS
         Plaintiffs            .
                               .
         V.                    .  BOSTON, MASSACHUSETTS
                               .  MAY 16, 2007
ABBOTT LABORATORIES, et al     .
         Defendants            .
. . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE MARIANNE B. BOWLER

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

```
For the United States:    Rene Brooker, Esquire
                          Justin Draycott, Esquire
                          United States Department of Justice
                          601 D Street, NW
                          Patrick Henry Building, Room 9028
                          Washington, DC  20004
                          202-307-1088


For Ven-A-Care:           James J. Breen, Esquire
                          The Breen Law Firm, P.A.
                          3562 Old Milton Parkway
                          Alpharetta, GA 30005
                          770-740-0008


For Abbott Laboratories:  James Daly, Esquire
                          Jason Winchester, Esquire
                          Jones Day Reavis & Pogue
                          77 West Wacker Drive
                          Chicago, IL  60601-1692
                          312-782-3939
```

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**240 Chestnut Street**
**Wrentham, Massachusetts 02093**
**(508) 384-2003**

1                          **I N D E X**

2    Proceedings                                          3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               <u>P R O C E E D I N G S</u>

2          (Court called into session)

3               THE CLERK:  The Honorable Marianne B. Bowler

4   presiding.  Today is May 16th, 2007 in the case of Citizens for

5   Consume, et al v. Abbott Laboratories, et al, Civil Action No.

6   01-12257 will now be heard.

7               Would counsel please identify themselves for the

8   record.

9               MS. BROOKER:  Rene Brooker on behalf of the United

10  States.

11              MR. BREEN:  Jim Breen on behalf of Ven-A-Care of the

12  Florida Keyes, the relator.

13              MR. DRAYCOTT:  Justin Draycott on behalf of the

14  United States.

15              MR. DALEY:  Good afternoon, Your Honor, Jim Daly on

16  behalf of Abbott Laboratories.

17              MR. WINCHESTER:  And Jason Winchester, also for

18  Abbott.  Your Honor, I filed an appearance, I believe

19  yesterday, and also a motion for admission pro hac vice.  I've

20  not appeared--

21              THE COURT:  I think I allowed it this morning.

22              MR. WINCHESTER:  --before the Court before.

23              THE COURT:  8:00.

24              MR. WINCHESTER:  Thank you, Judge.

25              THE COURT:  All right.  I have five motions that were

1    noticed, and I will deal with those in the order in which

2    they were filed.  And then there are a couple of additional

3    motions that are now ripe.  Whether or not we have time to get

4    to those, we will see when we deal with the ones that were

5    scheduled.

6              So, starting with docket entry number 3529, motion to

7    compel Abbott by the United States.

8              MS. BROOKER:  Good afternoon, Your Honor.  Again, I'm

9    Rene Brooker.  Just to remind the Court, I'm from the civil

10   division of the Department of Justice in Washington, and Justin

11   Draycott, who will argue two of the motions today, we're from

12   the same office.  And I do want to thank, Your Honor, for

13   putting these all on the docket all at the same time.  I think

14   both Abbott counsel and government counsel and relator's

15   counsel, we appreciate when you--

16             THE COURT:  Sure.

17             MS. BROOKER:  --accumulate them all so we come here

18   and hit as many in one day, so we appreciate that.

19             I think I can briefly set forth for the Court what

20   this motion is about and since I believe it was only last week

21   when Abbott filed, or excuse me, not with respect to this one,

22   let me just say, I just want to briefly lay out our position

23   and I will briefly address what I know Abbott counsel will

24   probably stand up and address and try to be most efficient.

25   Your Honor may recall that the last time we were before the

1  Court, we argued the issue of the, amending the MDL

2  protective order and particularly the big issue on Your Honor's

3  plate was the sharing provision.  Your Honor did amend the MDL

4  protective order and allowed us to share documents that Abbott

5  produces in this case with the states and Your Honor is

6  probably aware, Judge Saris signed that.  Abbott did not appeal

7  Your Honor's decision, and what we are here on on today's

8  motion is exactly the flip side of the Department of Justice

9  sharing Abbott documents with the states and that is it's a

10  pretty simple straight forward issue.  We also would like by

11  this motion for other government entities and relator, Ven-A-

12  Care, who is the same relator in the Texas case, to be able to

13  share the set of documents that Abbott has produced to again

14  other government agencies and to relator, Ven-A-Care, in Texas

15  with us.  So it's really just kind of the flip side which the

16  MDL protective order could not address head on so that's why we

17  filed this separate motion.  We do believe that allowing this

18  is as simple as enforcing Judge Saris' earlier CMO's in this

19  MDL proceeding on this very issue.  I think we set forth in our

20  brief CMO 5 and 10 and also CMO 9 address this very issue and

21  in fact ordered the defendants over the course of years to

22  produce to everyone as they joined the MDL proceeding

23  everything they had previously produced to other entities and

24  obviously the reasons for Judge Saris' opinion are apparent to

25  streamline the discovery process, to minimize the amount of

1   motions practice that come before the court.  We believe

2   that those same considerations and concerns are here.  You

3   know, obviously there is no burden to Abbott, and I don't

4   believe Abbott, counsel will speak for Abbott, but I don't

5   believe there's any real burden objection that's not the

6   objection by Abbott.  In fact, all we're really asking Abbott

7   to do at most is to burn some CD Roms and just produce to us

8   what they've already given to several other jurisdictions,

9   including again, Mr. Breen has this very set of documents, so

10  we could even minimize the burden to Abbott by asking Mr. Breen

11  just to give those CD Roms to us.  It's as simple as that.

12          We have a couple of practical problems.  I consider

13  this a very practical motion because we have some practical

14  problems that we had to date as a result of not having this

15  provision or this order in place.  We are working, obviously

16  with relator, Ven-A-Care.  We are obviously going to have some

17  of the same experts that appear in the Texas case, that appear

18  in our case.  To date, it has been extremely costly and onerous

19  for Mr. Breen himself to share documents with us and to discuss

20  documents, even those that we got from Abbott in this case

21  because he has to go through a very laborious process of trying

22  to determine what documents Abbott gave him in Texas and are

23  they on the list that Abbott gave us to be sure that we don't,

24  you know, mix the documents and to be sure, frankly, he has not

25  discussed with us any documents that he received in Texas that

1   Abbott hasn't yet produced us.  Its cost some costly

2   impractical problems for us.

3           Here's Abbott's arguments which we respond to and I

4   hope I capture them all.  You know, first I think that Abbott

5   would say this is a relevance issue.  For Abbott I think that's

6   what it comes down to.  They believe that from their

7   determination of the documents since some of the other

8   jurisdictions have sued on different drugs, which is true, then

9   what we've sued on in this case, Abbott would say, well, some

10  of the documents on those CD Roms are not directly relevant to

11  this case.  And that may be true.  There may be some documents

12  that, you know, we may get more documents than we need to or

13  care to review, but we've also learned in a separate motion

14  that may or may not at this time yet be before Your Honor,

15  relator, Ven-A-Care, has identified many documents in a subset

16  of highly relevant documents that Abbott produced in Texas but

17  has not produced to us.  Whether that is intentional or

18  inadvertent is sort of really beside the point.  And some of

19  those we're going to be start filing, you know, we're going to

20  be filing motions to compel on, we're going to have to argue

21  about those.  All of this can be completely streamlined if we

22  just get that set of documents.

23          The other point that Abbott may raise here today is

24  that recently Judge Saris, we held a hearing before Judge Saris

25  on the CMO, and I believe that was back in late February, and

1   pursuant to that CMO conference, this issue of sharing came

2   up because it was sort of a part of the CMO.  It did not get

3   addressed, however, and Judge Saris expressly said that she was

4   going to leave this issue to the Court.  She also asked in

5   order to I think assist the Court with determining at least

6   with respect to the subset of documents that relator has, not

7   with respect to the entire subset of documents we're trying to

8   get from all the jurisdictions, but at least with respect to

9   Vena-A-Care subset of documents, she asked Ven-A-Care to set up

10  a procedure which has happened and a motion has been filed.

11  It's been fully briefed, where Ven-A-Care and Abbott have

12  exchanged documents that were produced in Texas and not

13  produced here, and determined that there was significant sample

14  of documents that are highly relevant to us in this case that

15  we did not get.  That's a separate motion, and again I'm not

16  sure, that may be one of these ancillary motions--

17          THE COURT:  Uh-huh.

18          MS. BROOKER:  --which we'll get to.  The point being

19  there is nothing that Judge Saris said at the hearing which you

20  may hear from Abbott counsel that prevents the Court from

21  entering this order.  Judge Saris did recognize and it is true

22  that under the Federal Rules of Civil Procedure that have been

23  in effect for the last seven years, that parties are not

24  entitled to go on wide fishing expeditions at great expense and

25  burden to another party if the documents are not directly

I - 9

1   relevant to claims or defenses.  So one thing we would say

2   in response to that is we embrace Rule 26 as it exists today.

3   All of our briefing, we cite Rule 26, and we believe that all

4   the documents we're seeking are relevant to claims or defenses

5   in this case.

6          Also, I would say, Your Honor, you know, so to the

7   extent that Judge Saris' comments, you know, Abbott here,

8   counsel will argue today bar us from getting that relief.  I

9   don't believe that's true.  She was very adamant that she had

10  not read these briefs.  She was not prejudging this motion, and

11  also she did expressly state at the hearing that she recognizes

12  that even if documents do not relate directly to the subject

13  drugs at issue in this case, they may very well be relevant to

14  this case for 404(b) evidence as evidence of knowledge, intent

15  or other crimes.  We also would argue that they are, a lot of

16  the documents that Ven-A-Care has set aside as material, we

17  should be getting from Abbott's Texas production, also relate

18  to 406 under the Federal Rules of Evidence habit, you know, we

19  want all documents that have anything to do with AWP, with

20  reimbursement and that shows the force of conduct that we see

21  here today, even if they are not directly related to the four

22  subject drugs.

23         So, I believe I've addressed, and if not, I'm happy

24  to address once Abbott counsel stands up, the reasons for this

25  motion.

1        MR. BREEN:  One point.

2        MS. BROOKER:  I'm sorry, if I could just consult.

3        I don't know, Mr. Breen wants to make a point.  Is

4   that okay with Your Honor if he addresses you now?  He has--

5        THE COURT:  Sure.

6        MS. BROOKER:  --joined in this motion.

7        THE COURT:  Sure.

8        MS. BROOKER:  Okay.  But all of that being said, I

9   just wanted to summarize that I do believe that this would

10  streamline discovery in this case and greatly minimize the

11  motions practice we have before this Court because in large

12  measure, when we get that subset of materials, we will then

13  really be able to focus and troubleshoot on areas of documents

14  that are still remaining to be produced.  But we do believe

15  that probably what Texas received is significant in terms of

16  materials that we are trying to get Abbott to produce to us

17  right now, particularly because the Texas AG's office and

18  Mr. Breen spent a year before the Texas Appellate Court, the

19  Texas Supreme Court, litigating this issue, getting documents

20  released off of Abbott's privilege log that relate to the exact

21  same issues in this case.  So basically we're trying to avoid

22  this Court having to have the same battle all over again that

23  the Texas court has already engaged in, and that's all I'll say

24  at the moment, Your Honor.  Thank you for hearing me.

25        THE COURT:  All right.  I'll hear you now.

1          MR. BREEN:  Thank you, Your Honor.  Really

2    briefly, I just wanted to kind of point out one thing and that

3    is that I think this is a little simplified if we go back and

4    look at CMOs 5 and 10 because, and that's really what this

5    motion is based upon because there's really two universes of

6    documents that we're talking about here.  First off, we're only

7    talking about documents that Abbott has already produced and

8    one universe is documents produced to other government

9    litigants or investigative agencies.  The other universe is

10   documents they produced in the MDL, primarily in the class

11   cases.  And CMO 5 and CMO 10, which postdates 9, are very clear

12   that if Abbott or defendant turned over documents to a

13   government, they're supposed to share them with other

14   governments.  CMO 9, which Abbott raises as being different,

15   talks about documents that Abbott produced in the MDL and

16   that's the one that says if, they don't have to give to a

17   government documents from the MDL that may relate to drugs that

18   aren't pled or things of that nature.  We'd have to go back and

19   litigate the motions on those, the 404(b) and 406 motions, but

20   we're just talking about the documents that Abbott has given to

21   Texas already, Pennsylvania, California, any of these

22   government litigants, most of which Ven-A-Care and myself are,

23   I mean, I'm an attorney of record in all those cases, and we've

24   been litigating in advance in Texas.  As Ms. Brooker said,

25   we've been to the Supreme Court twice.  We've won every writ of

1    mandamus Abbott's filed.  They filed four of them out there,

2    and we're slowly hitting this stuff now because we're taking

3    joint depositions, but the problem is I can't show the

4    government a lot of these documents that were actually in a

5    joint deposition and that's when the documents are provided or

6    until we get, until Abbott agrees to turn over a transcript and

7    there are still a lot of outstanding transcript issues.  All we

8    want with this discrete motion is to enforce CMO 5 and 10, and

9    let the United States and Ven-A-Care as government litigants in

10   this MDL get exactly what those orders say, and that is

11   anything Abbott has given to another government entity, be it

12   in an investigation or in litigation and those CMO's cover

13   both.  That's all we're asking.  The flip side of what Your

14   Honor has already ruled, which is we can share with those same

15   government parties, that's what your protective order says.  We

16   can share with those same government parties, and now, but it's

17   got to work both ways or you can't have the cooperation that's

18   intended by the Manual for Complex Litigation among common

19   litigants and there's no more common litigant than Ven-A-Care

20   who is in all these cases.

21           Thank you, Judge.

22           THE COURT:  Mr. Daly, or your colleague?

23           MR. WINCHESTER:  Actually, it's me, Judge, Jason

24   Winchester.

25           With respect, Judge, our view is that this motion

1   completely dead in the water as a result primarily of the

2   proceedings before Judge Saris on February 27th.  Ms. Brooker is

3   correct the parties did appear before Judge Saris on that day

4   in conjunction with what was later entered as CMO 29 and the

5   plaintiffs for their own purposes on that day sort of jumped

6   the gun and raised this directly with Judge Saris.  This motion

7   asks you to direct that in this case where the government has

8   charged only four drugs, that they should be allowed and Abbott

9   should be forced to give them, every document that we've ever

10  produced in any other case, including in the Texas litigation

11  Mr. Breen referenced where there are 188 more MDCs at issue in

12  that case that are in issue here.  They raise that specific

13  point to Judge Saris.  We want everything from all the other

14  cases.  Please tell Abbott to give us everything from all the

15  other cases, and I'm happy to give the Court a transcript of

16  the February 27th proceedings, but Judge Saris says, and this is

17  at page 9, "You are not entitled to documents on any single

18  drug if you haven't charged it."  She goes on to state at page

19  15 that, "You cannot use this lawsuit as a fishing expedition

20  for 10 more drugs that you are interested in but have not

21  charged."  There are additional statements to this effect at

22  pages 16, 23, 24 and 25 of the transcript, and then on page 29

23  she states what I think is really the depth of this motion

24  before the Court, "I am not simply going to say you," the

25  government, "across the board are entitled to every document

1   produced in every suit even if it involves drugs that have

2   nothing to do with yours."  There is nothing left of this

3   motion.  Judge Saris took this up directly and said you,

4   government, are not entitled to all those documents that Abbott

5   had to produce in other cases about other drugs that are not at

6   issue here because they are at issue in those other cases.

7   This case is four drugs, all from the hospital products

8   division, vancomycin, sodium chloride, dextrose and sterile

9   water.  That's it.  The government chose to bring that case and

10  to bring it much more narrowly than the one that Mr. Breen is

11  involved with in Texas or in other places where he is

12  litigating.

13          To the extent, Your Honor, that there's anything left

14  of this motion and there really isn't, we think that it's

15  properly before Judge Saris because as counsel I think

16  accurately stated, once Judge Saris made clear, okay, you're

17  not entitled to everything, you've only charge four drugs here,

18  Mr. Breen brought up this issue of well, Judge, even setting

19  that aside, I still think there are some documents that we've

20  got in the other cases from Abbott that DOJ should get here,

21  and Judge Saris set up a platform for having that aired, which

22  was codified in CMO 29.  She said, bring me your 100 best most

23  representative documents, show them to Abbott, the ones that

24  they agree should be produced they'll produce.  If you guys

25  can't agree on certain other, then bring them to me, and that

1   motion was filed or that exercise was gone through.  We did

2   agree after a meet and confer with Mr. Breen that certain of

3   the documents he provided to us as not being produced, first of

4   all certain of them had been produced, and second, there were

5   certain other ones we agreed should be produced to the

6   government.  We produced those.  There are certain documents,

7   we believe, should not be produced, and that is the subject of

8   a separate motion which I believe is before Judge Saris,

9   although I could be wrong on that, but she invited it to be

10  filed before her.  It has been filed and has been briefed.

11          THE COURT:  Can you give me the docket number?

12          MR. WINCHESTER:  I don't know that, Your Honor.  I'm

13  not sure if Mr. Breen knows.  It was his motion.

14          MR. BREEN:  I was trying to find it but all my copies

15  don't have the docket number on it.  I was just looking for

16  that knowing that it might come up.  I think we were asking

17  before the hearing whether that was one of the ones that was

18  set before Your Honor also.

19          MS. BROOKER:  Your Honor, I can give you a docket

20  number.  I just need to go back to my bag--

21          THE COURT:  Sure.

22          MS. BROOKER:  --at the appropriate moment.  Would you

23  like me to do that right now?

24          THE COURT:  When it's convenient.

25          MR. WINCHESTER:  If I'm reading it correctly, Judge,

1  it may be document 4122.

2           THE COURT:  All right.

3           MR. BREEN:  Is that your response?

4           MR. WINCHESTER:  No, I'm reading your motion here.

5           THE COURT:  I think 4122 is a response.

6           MR. BREEN:  It is, Your Honor.  4122 is my memo of

7  law, so 4121 would have been the motion.

8           THE COURT:  And that is in my group of ripe today but

9  not noticed motions, so--

10           MS. BROOKER:  Yes, and it is correct.

11           MR. WINCHESTER:  So that's the other motion, Judge,

12  which I don't think is actually up before the Court today but

13  for this, this particular motion--

14           THE COURT:  It's your feeling Judge Saris should deal

15  with that motion?

16           MR. WINCHESTER:  I think that's completely up to the

17  Court.

18           THE COURT:  All right.  Okay.

19           MR. WINCHESTER:  It was my understanding just based

20  on her, the conversation initially was before her, she said

21  bring your motion to me.  She may well have discussed it off-

22  line with Your Honor and decided to have Your Honor take that

23  up, which is totally fine with us.

24           But I think based on those issues, this motion that's

25  before the Court right now, which is the give us everything

1   motion because we want it, is dead.   That the court has made

2   very clear the government is not entitled to all those

3   documents having only charged four.   And I would also point out

4   to Your Honor that that is a completely consistent position

5   with CMO 9 which has been on the books for a very long time

6   wherein the Court says a governmental entity plaintiff that is

7   a party to the MDL proceeding, which is the government here,

8   shall be entitled to documents, except that no such plaintiff

9   shall be entitled to have access to A) documents produced by a

10  defendant that is not a named defendant in the operative

11  complaint filed by such plaintiff; B) which is the one that is

12  at issue for us here, documents relating to drugs that are not

13  identified in the operative complaint filed by such plaintiff,

14  and C) documents produced by defendant that are not otherwise

15  relevant to the claims asserted.   So here, CMO 9 as applied in

16  this instance is very consistent with what Judge Saris said

17  back in February which is you get the documents for the drugs

18  you've brought in your case that's consistent with the post

19  2000 rules under Rule 26, which is you get the documents and

20  the discovery for the case you brought.   This is the

21  government's case.   We have agreed to give them all of the

22  relevant documents concerning the four drugs they brought.   We

23  even agreed to go beyond that and to give them documents that

24  would relate to those four drugs, even if they don't

25  specifically mention them, and we've agreed to go even further

1  beyond that and to produce any documents that would arguably

2  establish what counsel referred to as a pattern and practice

3  regardless of drugs.  So I think Abbott has agreed to give the

4  government everything to which it is rationally and

5  legitimately entitled in this case.  The further request, which

6  is give us documents that have nothing to do with our case, we

7  submit has been denied by Judge Saris and should be denied by

8  this Court.

9          MS. BROOKER:  May I address, Your Honor?

10          THE COURT:  Briefly.

11          MS. BROOKER:  Yes, I will be brief.  Your Honor, may

12  I pass to your law clerk and to the Court so you have a copy of

13  Judge Saris' whole transcript.

14          THE COURT:  Certainly, that's helpful.

15          MS. BROOKER:  Thank you.  Your Honor, this was the

16  issue that I was directing, oh, excuse me, addressing in my

17  direct argument. I think that what the Court will find and I'll

18  cite this so your law clerk can find these cites as well, the

19  portions that were just read to you were incomplete snippets of

20  what Judge Saris said at the hearing, and even some of them on

21  the same exact page.  What Judge Saris said, and I just want to

22  point out a couple of her comments to give you the more

23  complete picture, when this issue came up, first of all, she

24  made it very clear that she had not read the briefs in this

25  case and she repeatedly said at the hearing, you are all

1   talking about my prior CMOs and I don't recall at all what I

2   said in any CMO.  I don't have them committed to memory and I

3   just don't recall.  You may be right but I don't recall what my

4   CMOs say, so I won't repeat what I said at the outset.  The

5   CMOs which are the basis of the government's motion allow this

6   kind of sharing.  CMO 9, which we directly address, which,

7   along time ago, counsel has raised this today, but it's been

8   addressed already, CMO 9 was only talking specifically about

9   documents Abbott produced to the private plaintiffs.  The CMO

10  that preceded 9 and came after 9 made it very clear that the

11  government gets all documents Abbott produced to all other

12  government entities, including investigations and whatnot.

13  Also, these are two separate motions before the Court.  I do

14  believe, and obviously I'm not going to speak for Judge Saris,

15  she says in this transcript that she's going to decide when the

16  motion comes in, whether she's going to decide it or send it to

17  you and she said I'm probably going to send it to Judge Bowler,

18  but I'm not going to speak for her.  She never said definitely.

19  I guess I'm not surprised that it ended up on your docket, but

20  just to complete the snippets, on pages 9 and 15, when this

21  issue came up and Abbott counsel said exactly what was just

22  said now, four drugs, you get nothing more than the four drugs,

23  she said, "You're not entitled to documents on any single drug

24  if you have—"

25              THE COURT:  What page are you on?

1              MS. BROOKER:  I'm sorry, page 9 at the bottom,

2      lines 18 to 23, where the Court says, "I generally believe the

3      following," and again, she made it clear she was talking not

4      based on anything she had recalled about the CMOs or read in

5      the motion, "you're not entitled to documents on any single

6      drug if you haven't charged it.  You are entitled to do

7      discovery beyond the four drugs to the extent it shows that

8      there is some practice or pattern of conduct."  Then you flip

9      to another page that was just read, page 15, lines 6 through

10     16.  You know, Judge Saris was saying, "So one possibility

11     would be an agreement that you're not going to sue for the

12     other drugs and I'll order you to turn over all the CDs right

13     now.  You can't use discovery as a fishing expedition.  That's

14     the big bottom line.  On the other hand, you can't barnstorm

15     and just say it's just the four drugs.  If in fact they show

16     some overarching business principle and I, because they get to

17     prove their case as to what management was thinking and doing,

18     you know, prior bad acts kind of evidence," and, you know,

19     Judge Saris went on also on pages 31 and 33 to talk, again,

20     anything coming out of the sales and marketing team, talking

21     about how you market stuff during the relevant time period,

22     should be produced.  But again, much more important than this

23     is that Judge Saris said, we were citing her CMOs but she

24     hadn't read them.  She didn't remember what they said, and I'm

25     telling the Court that they do say that the government gets to

1  have access to all of these documents.  And one final point

2  I would make about Judge Saris' comments, Judge Saris, since

3  she hadn't read the brief, she was talking about in general

4  Rule 26, and it is absolutely true that Rule 26 seven years ago

5  said you can't overly burden a party with this huge fishing

6  expedition for documents that don't relate to claims or

7  defenses.  No burden is implicated here, so Rule 26, contrary

8  to what I've seen defendant argue in their brief, does not

9  adjudicate substantive rights of a party and tell a party what

10  it is they can or cannot do based upon documents that they

11  received legitimately in discovery.  We're not asking Abbott to

12  even give us the CDs.  We're just asking that we be allowed to

13  share what's already been produced.  If Abbott has some larger

14  concern about charges that we later bring in a complaint, if

15  that were to happen, they could deal with that issue at the

16  time.  Again, the issue is streamlining.  I do believe that

17  this brief is ripe for the Court to decide and particularly

18  because I do want the Court to understand that if the only

19  issue that's decided is Mr. Breen's motion, then we have to

20  come back to the Court again and ask the Court, well, what

21  about our larger motion, which asks for us to get documents

22  that Pennsylvania shares with us and other states. And again,

23  it doesn't make any sense that we can now share with states but

24  states cannot share back with us, and I think it doesn't make

25  sense because it's not consistent with what Judge Saris had in

1    mind in this MDL proceeding and I thank you for hearing me

2    out.

3            THE COURT:  Okay, just a minute.

4            MR. WINCHESTER:  Very, very briefly, Judge.  They can

5    dance around it all they probably want.  I'd invite the Court

6    to read the transcript.  Those were quotes I read to you.

7    Judge Saris says fully knowing this case, you don't get

8    documents about drugs you haven't sued on unless they go to

9    pattern and practice.  As I represent to the Court and counsel

10   know as well, we have agreed to give them documents beyond just

11   the four drugs, not just documents that mention the four drugs,

12   any documents that deal with the four drugs even if not

13   mentioned and any documents that would arguably relate to

14   pattern and practice.  Beyond that, Judge Saris could not be

15   more clear, you do not get 100 other drugs when you've sued on

16   four.  That should end the issue.

17           THE COURT:  All right.  I'll take 2529 under

18   advisement.  Moving on to 3540, which is the motion for a

19   protective order relating to the deposition of government

20   counsel.

21           MR. DRAYCOTT:  Thank you, Your Honor.  Again, Justin

22   Draycott on behalf of the United States.  Just to refresh Your

23   Honor's recollection, the notice of deposition states that

24   pursuant to Rule 31(b)(1) of the Federal Rules of Civil

25   Procedure, Abbott will take the deposition of, and I'm quoting,

1   "One or more employees of the Department of Health and Human

2   Services who reviewed, approved or were consulted regarding the

3   brief of the United States as amicus curia that was admitted by

4   the Department of Justice on behalf of the Secretary of HHS in

5   response to the Court's request that the secretary explain his

6   views on the term average wholesale price as reflected in the

7   Medicare Act and federal regulations."  This is a deposition

8   notice that calls for the deposition of government counsel.  As

9   you would expect the consultation between the Department of

10  Justice and HHS was about a legal brief that addressed a legal

11  question.  It is unquestionably, goes to the deposition of

12  government counsel.  That in and of itself is highly

13  disfavored.

14          Separate and apart from that is any communication

15  that occurred is of course privileged.  This would be core

16  deliberative process and attorney-client communications

17  regardless of whether or not the employees were, at HHS were

18  attorneys or not, they'd still be privileged communications.

19  So it is 1) a highly disfavored deposition notice for

20  government attorney; 2) it goes to privileged communications,

21  and also it goes to an issue that is now been rendered moot by

22  the Court's order resolving the issue that was addressed by the

23  amicus brief.  The Court found that the term average wholesale

24  price, which was the issue addressed by the amicus brief, will

25  be construed pursuant to its plain meaning.  So the issue has

1  also been decided.  What's more, the issue is not decided or

2  the issue does not turn on the personal beliefs or personal

3  communications or the information that was provided in those

4  communications between government counsel and agency counsel.

5  This is decided it's a legal matter.  It was briefed as a legal

6  question.  There is no fact, there are no factual

7  representations in the government's brief, the citation to all

8  authority is a legal authority.  The case was brief in

9  accordance with the principals articulated by the First Circuit

10  in the *Lachman* case, which is that the, if the Court, first of

11  all the Court didn't actually go to agency interpretations

12  because it stopped at the plain meaning construction of the

13  statute, but had it gone and looked at the agency, and had the

14  issue come up of deference to the agency interpretation, the

15  deference is to the formal expressions of agency interpretation

16  and formal public pronouncements.  This is clearly a protective

17  order that should be issued, Your Honor.

18          THE COURT:  Mr. Daly, why is it not moot?

19          MR. DALY:  Why is it not moot?  It's not moot because

20  what Judge Saris asked the government to do or asked CMS to do

21  is to file an amicus brief that set forth the position of the

22  secretary of HHS and the administrator of CMS as to what their

23  understanding of the term AWP means as used in the statutes and

24  regulations.  This was actually over my objection when it first

25  came up because I said, Your Honor, they've sued us.  They're

1  litigants.  I object to litigants filing a friend of the

2  court brief with Your Honor and the Court said, well, I'll take

3  that under consideration and I am interested in what the agency

4  has to say.  After all, I'm talking about a regulation, first

5  of all prior to 1997, and I'm talking about a statute from 1997

6  on, and counsel for the government indicated that CMS was the

7  client of DOJ and the Court said, well, great.  I want to hear

8  what the government's position is.  So they come in and they

9  write a brief, which in the first line says that it is the,

10 filed on behalf of the secretary of HHS and Mr. Draycott says

11 in his argument today that it contains no factual assertions.

12 I beg to differ, and I'm just going to read very briefly from

13 our brief, page 9, Your Honor.  On page 13 of the amicus brief,

14 they state, "The final rule continued to reflect the

15 secretary's intention to limit Part B drug payments to an

16 amount related to supplier acquisition cost."  They have a

17 factual assertion of the secretary's intent.  They have in the,

18 on page 15 of the brief, they say, "The secretary understood

19 that Redbook and other wholesale price tags updated their

20 information monthly and thus for me, the secretary believed

21 that they published wholesale prices were a source of

22 acquisition costs of some physicians and therefore could be

23 used to calculate Part B drug reimbursement."  They say on page

24 13 and 14, "Rather, the published data was a resource to the

25 secretary in setting the agency's national average wholesale

Case 1:01-cv-12257-PBS   Document 6465-16   Filed 08/31/09   Page 27 of 475

I - 26

1  price for payment purposes." And there are other quotes of

2  factual assertions that are in the amicus brief.  Now, why do

3  we want to know about that?  We want to know about that because

4  what the agency knew and understood about AWP is central to

5  this case.  They have sued us for hundreds of millions of

6  dollars saying that we're entitled to the spread between the

7  published AWP on the one hand and the actual acquisition cost

8  on the other.  They file a brief as a friend of the court

9  saying out loud what the secretary of HHS and the administrator

10 of CMS knew and believed and what those people knew and what

11 those agency's knew is critical to the case.  What Judge Saris

12 has said over and over again, after her summary judgment

13 ruling, and we cited this in the brief, but after her summary

14 judgment ruling, she says, and this is in February 27th, the

15 same hearing that was cited and I guess maybe you have it, page

16 35 to 36, but it's cited in our brief as well, Your Honor, on

17 page 12, the court says, "Everyone has a right to understand

18 what the government was doing during the time period."  And

19 then court also recognized that, "What the Centers for Medicaid

20 and Medicaid Services", I'm sorry, "Medicare and Medicaid

21 Services, understood and knew and what they agreed to and what

22 they didn't are things that the court was very interested in

23 hearing."  And this is when we were going to go out and start

24 taking the depositions of current and former administrators of

25 CMS.  So the court has made it very clear, and now I'm coming

*YOUNG TRANSCRIPTION SERVICES*
**(508) 384-2003**

1  full circle to your mootness point, that the issues of what

2  HCMS and its people and its administrators knew and understood

3  and what they believe and what they thought AWP meant and

4  whether they knew there was a spread or not is critical to the

5  issues per Judge Saris.  They go to causation, they go to

6  scienter, they go to the statute of Limitations.  This is a

7  fraud case after all.  They sued us for common law fraud.  It

8  goes to reliance.  It goes to misrepresentation.  It goes to

9  falsity.  It goes to all kinds of issues after the Court's

10  decision on summary judgment.  You can have a plain meaning and

11  the Court has construed a plain meaning, but first of all, it's

12  not a final order.  Secondly, even if that remains Judge Saris'

13  ruling, you can still have a plain meaning but in order to

14  prove fraud, in order to prove that the government was misled,

15  they have to prove that they were misled.  They have to prove

16  that they were deceived.  They have to prove that they didn't

17  know and that is, goes to the core of our defense.

18          So back to our little motion hearing.  The key to the

19  motion I think is in footnote 1 on page 5 of their brief, Your

20  Honor, and there it says, this is after saying that the only

21  people who fit the description of our request for a deposition

22  person are lawyers.  They drop a footnote and they say, to the

23  extent that CMS attorneys in turn conferred with other agency

24  personnel, those communications are plainly protected by the

25  attorney-client privilege and attorney work product doctrine.

1   If you look at that carefully, it says, to the extent.

2   They're not even willing to tell us that they actually

3   conferred with anybody.  They're leaving it – it's very crafty

4   and to this day, and we've asked them over and over again, did

5   you in fact talk to anybody or was this simply a lawyer driven

6   litigation posturing brief that you filed in front of Judge

7   Saris and they won't tell us, and they craft a footnote that

8   says, well, to the extent we did, and we're not telling you, we

9   won't tell you whether we did or not, that of course would be

10  privileged.  Well, you know what, it's not privileged if they

11  went and talked to people inside of CMS or HHS or anywhere else

12  in the government and got information about these factual

13  assertions that I just read to you from the amicus brief, we're

14  entitled to find out who those people are and what they knew.

15  We told them the first time that they raised this issue of, oh,

16  well, then you're just asking for a lawyer thing.  This is an

17  exhibit, one of the exhibits to our brief is a letter from my

18  colleague, Mr. Torborge, who wrote I believe to Mr. Draycott

19  and said, no, no, no.  Let's be absolutely clear.  I don't want

20  a lawyer dep.  If it's just lawyers, tell me that and then we

21  know that it's just a litigation brief.  But in response what

22  they do is they craft this crafty little footnote where we do

23  not know today whether or not they actually talked to anybody

24  and it's critical to--

25              THE COURT:  By the way, is the government willing to

1    put that in affidavit form who they conferred with?

2            MR. DRAYCOTT:  We'll certainly consider.  I did not

3    prepare the amicus brief, Your Honor, so I will respond to

4    that, but I think there's a couple of other points.  I don't

5    know if Mr. Daly was done.

6            THE COURT:  Well, that was just my question.  I don't

7    think he's finished.

8            MR. DRAYCOTT:  Okay.

9            THE COURT:  That was just a question that I throw out

10   to you.

11           MR. DALY:  So I believe it is relevant, Judge.  It is

12   not moot.  It goes to the agency interpretation.  It goes to

13   what the agency knew and understood during these years which is

14   exactly what the quote I read from Judge Saris that she says

15   she's interested in finding out.  It goes to the merits of the

16   case.  It also goes to the weight that should be given to the

17   supposed agency position that's reflected in the amicus brief.

18   As the Court knows, courts look to what agencies say about the

19   regulations that they handles and it matters to courts.  It

20   matters to Judge Saris.  It matters to appellate courts.  It

21   matters to other courts who may look at this to say is this a

22   litigation posturing brief or is it actually something where

23   they went and talked to anybody and actually got their views of

24   the agency.  And we've cited a bunch of cases, I think on

25   pages--

1          THE COURT:  Well, I'm just asking them whether or

2   not they'd be willing to put in affidavit form who they

3   consulted.

4          MR. DRAYCOTT:  Two things, Your Honor.  One, we'll

5   certainly consider that and consider that request.  I would say

6   that under *Lachman*, such consultations would be irrelevant

7   because *Lachman* tells, is explicit.  It couldn't be a more

8   explicit case which says what the source of agency

9   interpretation must be and the brief was prepared in accordance

10  with the principles in *Lachman*.

11          If I can quickly respond to, which is why there are

12  no factual assertions here.  If it turned to Mr., the defense

13  brief at page 9 where there is a series of quotes from the

14  government's brief.  What is not included there is the citation

15  for every statement that's made.  For example, Mr. Daly read

16  you the first one.  The final rule reflected the secretary's

17  continue belief as in 1991 of the wholesale price date, et

18  cetera, et cetera.  The citation for that in the brief is 56

19  Federal Register at 59 524.  For the next excerpt which is –

20  actually I think you then jump down to number 15, the citation

21  in the brief to the, the secretary understood the redbook and

22  other wholesale price guides, et cetera, et cetera.  The

23  citation in the government's brief is 56 Federal Register 59

24  524.  With respect to the first, or the second excerpted quote

25  from the government's brief, the citation there was 56 Federal

1  Register 25 792 and 2580, and I can fill in.  In fact, I

2  don't have to do it because what defendants have had since the

3  brief was filed were citation to the Federal Register record

4  for each of the statements contained in the government's brief.

5  In other words, it was a brief that was prepared entirely in

6  accordance with *Lachman*.  That is, you don't go to personal

7  opinions or agency officials.  You go to formal statements in

8  the public record which is the way that statutes and

9  regulations are to be construed and the First Circuit couldn't

10  have been more explicit on that in the *Lachman* case.  So had we

11  done what Mr. Daly suggest and that we go out and we start

12  interviewing people as to their personnel views, that is not

13  one of the cannons of regulatory construction that the First

14  Circuit recognizes.  That's why this is a legal brief and of

15  why the consultation was with agency counsel.  And I'll

16  certainly say for the record, Your Honor, that our liaison with

17  the agency is through the Office of General Counsel for the

18  agency.  I mean, that's very clear.  When we want to talk to

19  the agency, we do it through the Office of General Counsel, and

20  I'm, that's the nature of this.  But the most important point I

21  think I have to make with Your Honor, is what relief that

22  we're, is the nature of the relief that we're requesting here.

23  What has been going on in this case, defendants have been

24  taking discovery and doing depositions of government witnesses

25  in terms of, and at this point, they've already taken the

1   depositions of three former HICFA administrators.  We're not

2   asking for a protective order that prohibits the line of

3   questioning that Mr. Daly is talking about.  In fact, in every

4   deposition that I've been to, I haven't been to every

5   deposition in this case, but at every deposition that I've

6   attended, there has been full questioning about the witness'

7   personal opinions.  We've objected but the witness has

8   consistently answered those questions.  So we're not shutting

9   down a whole avenue of discovery.  All that discovery is

10  ongoing, and as recently as yesterday when a former HICFA

11  administrator was being deposed, he was questioned extensively

12  about his personal views.  This is a very narrow motion for

13  protective order that goes to a very, very narrowly crafted,

14  very specific deposition notice.  We are just talking about the

15  consultations with the client with regard to the preparation of

16  a legal brief.  That's the only protective order that is at

17  issue by virtue of the government's motion.  We have not asked,

18  and we believe that everything that Mr. Daly just talked about

19  is irrelevant.  The personal opinions is clearly made relevant

20  by the *Lachman* decision, was made irrelevant by the Lachman

21  decision, but we're not asking this Court to shut that all down

22  or say, you know, hence force you may not inquire of the HICFA

23  administrator's personal opinion on any of these matters or any

24  of his understandings.  In fact, that discovery is ongoing and

25  it's crossed all levels of the agency, they've been asking

1   these questions of OIG personnel, that is Office of

2   Inspector General.  They've been asking it of former

3   administrators.  They've been asking it of program people.  All

4   of that's ongoing.  So there is no discovery that is being

5   denied except discovery relating to consultations between DOJ

6   attorneys and CNS, Office of General Counsel attorneys.  That,

7   the relief requested goes no broader than the deposition notice

8   that we've moved on.

9            THE COURT:  All right.  I'll take it under

10  advisement.  The next being 3849, which is the motion to compel

11  plaintiffs to provide an adequate response to interrogatories.

12           MR. DALY:  Your Honor, in my view, I think there's

13  been a lot of briefs filed on this particular motion that I

14  think really is, tries to make a very simple point.  I'm going

15  to try to bring it into focus.  As I stated, in the conference

16  with the other motion, this is a fraud case.  This is common

17  law fraud.  It's FCA.  We've cited all the cases that indicate

18  at pages 6 and 7 of the brief on this case, talk about how in

19  an FCA case the government has to prove that it was misled.

20  Actually, Judge, I am going to, if I may, just get some

21  materials from the exhibit that I refer to.  I can get you an

22  extra copy if you need one.

23           MR. BREEN:  Jim, just for the record, this is

24  directed at Ven-A-Care also, right, not just the government?

25           MR. DALY:  Yes.

1          MR. BREEN:  I'll also be arguing that.

2          MR. DALY:  So we cited in our brief the cases about

3    misleading.  I've also already made the argument and these

4    arguments are related, Judge, between the one we just did, I

5    think it's very clear that Judge Saris has put causation,

6    reliance, also the Statute of Limitations, latches, estoppel

7    are concepts that she herself has mentioned as perhaps being

8    applicable here.  They're all in play, and what they go to is

9    what does the government have to say about what it knew and

10   understood about AWP, and that's what this case is about.

11   That's what it's been about from the beginning.  That's what

12   our defense is based on.  That's what the claim is based on, so

13   that's why we're conducting all these depositions on the

14   subjects where those present and former administrators, Judge,

15   are telling us over and over and over again that they

16   understood AWP not to be some kind of actual average wholesale

17   price.  In fact, they knew every single one of them testified

18   that it was not.  I deposed Mr. Skully yesterday, the

19   administrator who was in charge when the MMA was finally

20   approved in 2003, and he says as far back as 1991 he knew that

21   AWP was nothing but air.  He says the entire system was sane

22   and everybody, insane and everybody knew about it, everybody at

23   CMS, everybody within the government that he talked to and

24   everybody in the private sector.  So the notion that anybody

25   was running around thinking that AWP was actually the actual

1   average wholesale price is just poppy cock from the mouths

2   of the heads of the agencies themselves as well as the people

3   that work for them.  So what happens?  We have paragraph 42 of

4   the complaint is what this goes to, and in paragraph 42, the

5   government alleges AWP is used to refer to the price at which a

6   pharmaceutical firm or a wholesaler sells a drug to a retail

7   customer who then administers it to a patient.  That's the

8   allegation.  It's the only allegation in the entire complaint

9   that says what AWP was supposed to be.  It's the only place in

10  the complaint where they say that that's what AWP represents in

11  the minds of the government.  So we ask, and when we read this

12  complaint, we said, okay, says who?  And so we sent them an

13  interrogatory that said essentially please tell us everybody

14  that, you know, in the government, that believes this or says

15  this or takes this position because we want to know.  We're

16  taking depositions and nobody said it yet, and we simply asked

17  that that be done, and we want to know who believed it and who

18  understood it and any evidence that Abbott ever made any

19  representation that that's what AWP was in accordance with

20  paragraph 42, and we think we're entitled to know that,

21  entitled to know if anyone in the government or at CMS believed

22  that, and in their initial response, and this is at Tab 3 of

23  what I gave you, Judge, they filed an initial response to this,

24  and on page 3 or tab 3, the last page, about halfway in, it's

25  at about page 35 at the bottom, Judge, if you look up at the

1    second full paragraph, the government said, the general

2    concept that the AWP refers to the price, the general concept

3    that the AWP refers to the price at which a pharmaceutical firm

4    or a wholesaler sells a drug to its customers is commonly

5    understood in the industry.  That's how they responded to the

6    interrogatory, and we said, okay, who understood it that way?

7    Who understood that commonly in the industry?  Who in the

8    industry thought that?  Who in the government thought that

9    that's they way the industry commonly understood it?  Remember,

10   we're getting all this testimony that says we didn't understand

11   it that way.  Far from it.  We thought it was, the system was

12   insane.  Administrator Skully says, AWP, I've known for 10 or

13   15 years that it's mostly air.  So we asked them about that and

14   they say that they're not going to provide any further

15   information and they're not going to verify this.  So when they

16   filed this response, it had no verification and we said, well,

17   you know, this is an interrogatory.  If that's the position

18   you're going to take, we want you to verify it so that we can

19   depose the person who verified it because we want to know who

20   on your side of the table is saying that this is the, how the

21   term is commonly understood in the industry.  They refused to

22   verify it.  So we filed a motion to compel asking for it to be

23   verified and asking for a fuller answer.  In other words, who

24   held this position.  So what they did was instead of responding

25   to that, they filed a supplemental answer where this language

1  that I just read you has been deleted, but it's still out,

2  it's deleted in the supplement.

3            THE COURT:  And is the supplemental answer verified?

4            MR. DALY:  It is verified.  And the commonly

5  understood language is deleted apparently or I think because

6  they couldn't find anybody who could verify that sentence, but

7  paragraph 42 of the complaint is still there.  In other words,

8  this allegation that we started with, which is that AWP is the

9  actual average wholesale price of drugs and that's what it is

10  understood to be, it's still there.  It's still the focal point

11  of their complaint against us and we're still trying to get

12  information about who has that.  And, you know, we want to know

13  if there are people who hold that belief.  That's going to go

14  to the proof of whether or not they were misled about anything.

15  And again, page 53 or paragraph 42 is the only--

16            THE COURT:  But can you narrow it a little bit as to

17  people in what positions?  I mean, it's pretty general.

18            MR. DALY:  Well, I mean we haven't asked for--

19            THE COURT:  You're starting with the White House

20  down?  I mean--

21            MR. DALY:  In our meet and confers with the

22  government on this point, it's been, we've been offered to let

23  it be somebody within CMS, somebody within HHS.  I mean,

24  obviously we don't want every agency of the government searched

25  on this but the critical agencies, yes.  Certainly, CMS,

1    certainly HHS and, you know, if there's somebody in the

2    legislative branch that's been involved in health care issues

3    that held this belief, we want to know.  And we've been, you

4    know, they haven't been willing to agree to that at least up to

5    this point.

6              And so that's kind of where we end up.  We end up

7    with, and I've given you this material in the attachments, but

8    I not only have the depositions of folks, but I have included

9    in the excerpts that I've given to you examples like Donna

10   Shalala, the former head of HHS, who talks about in several

11   excerpts that I gave you from her letters and reports where she

12   talks about AWP is the thing that is reported in the compendia,

13   and she comes right out and says it.  It's not, it's not the

14   actual average wholesale price, and I suppose it may be worth

15   taking a quick look at that, Your Honor.

16             Well, you start with Tab 5, Your Honor, of the

17   materials that I gave you.  This is actually Nancy-Ann Min

18   DeParle, who is the former administrator of CMS before

19   Mr. Skully took over, and at that bottom of the first page of

20   her letter, which is at page A-2 of Exhibit 5 that I've given

21   you, she writes, she is agreeing with something the OIG says,

22   and she says, "If given that the authority HICFA would like to

23   increase the discount we now take on the published average

24   wholesale price and base our price on the acquisition cost."

25   This is the head administrator of CMS telling us, telling the

1   world in this public document that we take our discount on

2   the published average wholesale price, the one that's published

3   in the compendia, not some paragraph like 42 of the complaint

4   that we're looking at where they say that it's some reference

5   to actual acquisition costs.

6           But my point in all this is to, just to bring it full

7   circle is that paragraph of the complaint is out there.  They

8   have made this critical allegation.  All we've asked for is to

9   identify for us somebody on your side of the table, and we can

10  limit that in a way that's appropriate, we offered to do that,

11  certainly, it has to begin with anybody in CMS.  I mean, I'd

12  like--

13          THE COURT:  Well, can we start with identifying one

14  person in CMS?

15          MR. DALY:  That would be a start.  I'm not sure they

16  can do it, but I'd like to see that.

17          MR. DRAYCOTT:  Your Honor--

18          THE COURT:  Why can't you do that?

19          MR. DRAYCOTT:  Your Honor, this, the first thing I

20  think we need to put this motion in context.  What I think has

21  become abundantly clear from everything I've just heard is the

22  purpose of this is to reargue a legal point that's actually

23  already been decided by Judge Saris in the November 2nd order.

24  She's ruled on the meaning of AWP.  But if we, I think the

25  first thing is to step back.  Their, this complaint is true to

1   form of most complaints.  It has a series of background

2   paragraphs including one on the jurisdiction of this court, and

3   then in Section 6 it describes by way of background the

4   operation of government health care programs.  The allegations

5   against Abbott actually begin on paragraph 51.  In paragraph 42

6   there is a legal statement which says what AWP is.  It is

7   exactly consistent with they way this, with the way Judge Saris

8   ruled.  It is a legal statement in the complaint providing a

9   background statement and a citation in most of these sections

10  of the brief, I'm sorry, of the complaint, are to the program

11  regulations which control as to why the government asserts that

12  AWP is not just any price that can be reported and can't

13  certainly be a price that was constructed to act as a kickback

14  to physicians or providers that were purchasing drugs, that's

15  been laid out in the brief of the United States' amicus curiae.

16          The one issue that Abbott has to understand by now in

17  this case is the government's position with respect to the

18  meaning of AWP.  What's more the issue has now been laid to

19  rest by Judge Saris' order which expressly adopts a plain

20  language construction.  So it is, you know, now with respect to

21  again, the, Mr. Daly has gone on a wide range in discourse of

22  the fight that he wants to have with the government regarding

23  the result reached by Judge Saris in her November 2nd order, but

24  an interrogatory directed to sort of a preambled paragraph in

25  the complaint is just not the way that the bait is going to

1    move forward.   I mean, technically at some point could be I

2    guess a motion for consideration of Judge Saris' November 2nd

3    order, but with respect to who in the government knew what, the

4    one thing that certainly defendants, one issue the defendants

5    are taking discovery on right now, is this, these are issues

6    that are being discussed with every government deponent that's

7    being caught out there.   It's been discussed with three former

8    HICFA administrators.   It's being discussed with every program

9    person that's being deposed.   With respect to the people in the

10   Office of Inspector General who are not part of CMS but are

11   doing studies analyzing reimbursement, it's being addressed

12   with all of those witnesses.   This is just not an area where,

13   that's properly subject to a motion to compel with respect to

14   the background and legal statement in a complaint.   It's, I'm

15   trying to put this in context.   It's as if we had put, you

16   know, when, if and when Abbott files an answer, it's as if we

17   noticed every interrogatory with respect to every legal

18   contention in their complaint or every legal contention in a

19   brief they filed.   Identify everybody at Abbott that believes

20   that this case may be subject to the Statute of Limitations.

21   It's just not going to, it's irrelevant because it's not going

22   to drive the resolution of the legal issues that lie at the

23   core of the issue they're looking at.   The issue of what any

24   individual thought or believed, ultimately is irrelevant and

25   *Lachman* again makes that clear.   They issue her is this is a

1   statute, it's a term that appears in statute and

2   regulations, it's been resolved as a legal question.  To the

3   extent that they wish to take discovery on what individuals

4   thought, again, we've noted our objections to that line of

5   questioning, but we certainly haven't ever instructed a witness

6   not to answer those questions.  So they're fully developing a

7   record.  There is also an abundant record in the public record

8   already in terms of the Federal Register of published OIG

9   reports.  There is, and certainly Abbott has made this point

10  since the motion to dismiss which is, there is a voluminous

11  public record about the agency interpretation of this term,

12  what they knew.  It doesn't get resolved by a motion to compel

13  on a background statement--

14          THE COURT:  Okay.

15          MR. DRAYCOTT:  --in a complaint which states a legal

16  definition which has been, which is absolutely consistent with

17  the court's holding.  What's more, we've cited to industry

18  publications in the answer as to why, and just to make one

19  thing very clear, we don't believe that verification is

20  necessary on a straight legal term.  Notwithstanding that, we

21  agreed to verify before they filed their motion, and the

22  question, why did they move to compel?  That's the mystery.

23          THE COURT:  Okay.  I'm going to take it under

24  advisement.  I want to go back and look some of the things

25  Judge Saris has said.

1          MR. BREEN:  Your Honor, can I make one point on

2  this--

3          THE COURT:  Sure.

4          MR. BREEN:  --because he's shooting at me too on

5  this, so, and it's--

6          MR. DALY:  I object to that, Your Honor.

7          THE COURT:  We don't like to talk about shooting in

8  here.

9          MR. BREEN:  Poor choice of words, Judge.  But anyway,

10  number one, I just would reiterate and I'm not going to go over

11  the argument, but AWP is the issue, and it's our right to find

12  it's average wholesale price.  Now, what happened as far as

13  what was reported in those facts, that's really a separate

14  issue, but they're asking us to put up a, give a factual

15  interrogatory about what is in fact a legal term at this point.

16  Well, that's one.

17          But the main purpose for my jumping in here, this is,

18  I think we can all agree, this is basically a contention

19  interrogatory and we need to address this now early on in the

20  case because this is a, my client is a qui tam relator under

21  the False Claims Act and we filed a separate memorandum on

22  this--

23          THE COURT:  Uh-huh.

24          MR. BREEN:  --and I can't speak for the government.

25  I'm precluded by the statute--

1          THE COURT:  Right.

2          MR. BREEN:  -- from speaking for the government, and

3  I think it would be a waste of time for me to have to make that

4  objection every time they serve a contention interrogatory on

5  Ven-A-Care.  What Ven-A-Care thinks the government's position

6  is on the definition of average wholesale or rather AWP is

7  irrelevant, and even if I said something that was crazy, I

8  couldn't bind the government because I can't prejudice the

9  government's rights.  So it's really overly burdensome and I'm

10  using harassing not in a preserved term with the adversary, Mr.

11  Daly, but it is harassing to have to keep filing motions and

12  objections on that basis.

13          So I would ask that the Ven-A-Care specific portion

14  also be taken under advisement so that we don't keep getting

15  these contention interrogatories.  We're bound by law not to

16  answer.

17          MR. DALY:  Your Honor, may I say two very quick

18  things?

19          THE COURT:  Very quick.

20          MR. DALY:  Okay.  One, counsel for the government I

21  think mixing apples and oranges talking about *Lachman*.  This

22  motion isn't about statutory construction of AWP.  It's about

23  the allegation in paragraph 42 which says AWP is used in a

24  certain way.  It's a factual allegation that we're trying to

25  get to.  *Lachman* says in any event that you can in certain

1   circumstances be looking to the intent and how things were

2   used in industry parlance in the appropriate circumstances.  So

3   even if it were a statutory construction argument, it would

4   allow us to get into this.  And finally, all we want is for

5   them to identify somebody who can support this.  It's not a

6   moot issue.  If it were moot, why would Judge Saris be talking

7   about this on February 27th, the last time we were in front of

8   her.  I mean clearly, these issues are very much alive in the

9   case.

10          Thank you, Your Honor.

11          THE COURT:  All right.  Moving on to docket entry

12   4047, which is the government's second motion to compel.

13          MS. BROOKER:  Thank you, Your Honor.  Your Honor,

14   this is a fairly straight forward request for production of

15   documents in that the United States has outlined five specific

16   targeted categories of documents that we believe Abbott has not

17   yet produced and should produce in this case.  These five

18   categories are based directly on Abbott's defenses, testimony

19   that we've gotten already in the fairly short amount of time

20   that we've been taken deposition of, depositions of Abbott's

21   witnesses.  I will tell the Court that this is one in a long

22   series of motions to compel that are coming with respect to

23   Abbott.  We've got a whole bunch more in the pipeline.  After

24   Abbott produced its initial disclosures back in august, it has

25   bickered with us on just about every single category of

1   documents that we come across, again, either through witness

2   testimony or their defenses.  And again, we haven't really

3   gotten their answer yet, which makes their withholding

4   documents early on very problematic.  We know that they're

5   going to be filing an answer I think in the next six weeks

6   because Judge Saris did just deny their motion to dismiss, but

7   I will say, again, we set out and I have personally written

8   more than a dozen letters outlining these categories of

9   documents, trying to get Abbott to respond to the letters and

10  we have not hid the ball at all.  We tell them exactly why the

11  categories are relevant.  It's not a game we're engaged in.  we

12  have long discourse over why they're relevant, but they bicker

13  with every single category.  Some of it is downright silly.

14  And let me just say, the second thing besides wanting those

15  five categories of documents, we have not gotten a single

16  privilege log from Abbott in this case and we know they're

17  withholding documents on the basis of privilege.  We know that.

18          THE COURT:  Well, have they said it?

19          MS. BROOKER:  Yes.  I mean, we know it from the Texas

20  case.  We were just told very recently in our last phone call

21  with them that we would get a privilege log, but it's really

22  late in coming given that these are documents that should have

23  been disclosed to us like eight months ago when they made their

24  initial disclosures and long since past the deadline that Judge

25  Saris set for a CMO.  I mean, arguably, I guess--

1     THE COURT:  When are they going to get it, Mr.

2  Daly?  Mr. Winchester?

3     MR. WINCHESTER:  As we explained to counsel in our

4  last phone call and also by letter last night, they will have a

5  privilege log by this coming Monday.  It's not part of the

6  motion so I don't know why it's up, but they will have a

7  privileged log by this coming Monday.

8     MS. BROOKER:  Yes, it is part of our motion, but I

9  would ask is that going to include all documents to date for

10  all categories of documents we've requested that they're

11  withholding as privileged or is it some smaller subset of

12  privileged materials?

13     THE COURT:  Can you enlighten us on that?

14     MR. WINCHESTER:  I'm happy to, Judge, although we

15  just did have this out by way of conversation between us but

16  I'm happy to tell the Court as well.  As I told counsel, we are

17  crafting a privilege log for this case, so it will

18  be--

19     THE COURT:  In it's entirety.

20     MR. WINCHESTER:  Yes, for this case.  In other words,

21  there are four drug cases--

22     THE COURT:  Four drugs.

23     MR. WINCHESTER:  --and the additional documents that

24  I talked to you about, which are documents that don't

25  necessarily talk directly about these drugs but would relate to

1  them and documents that would arguably suggest some pattern

2  of practice relating to other drugs.  We will do our best to

3  make sure that the privilege log is current as of the time that

4  we turn it over.  We're working very hard to do that, obviously

5  understanding that we have an obligation to seasonably

6  supplement the log as other things come in.  I think what

7  counsel's question is is are we going to take their view of the

8  universe, which is every document Abbott has about any of its

9  products ever and do a privilege log on that?  No, we're not.

10 We are doing a privilege log for this case, which will cover

11 the documents that are the body of documents at issue at this

12 case and we will describe for them the documents that are being

13 withheld on grounds of privilege.

14              THE COURT:  All right. You are going to get it

15 Monday.

16              MS. BROOKER:  Yes.

17              THE COURT:  You'll look at it then and we'll go from

18 there.

19              MS.BROOKER:  All right, Your Honor.  At any rate, I

20 will just briefly go over because I think I thoroughly laid

21 this out in the motion, the five categories of documents and

22 why they are relevant and briefly address Abbott's responses to

23 them.   Average manufacturer price data or AMP data that we

24 refer to, it's all over Abbott's defenses.  It's disgusted in

25 their motion to dismiss.  They go to each government witness

1   deposition and ask this question about isn't it a fact that

2   you got our AMP data?  They are representing in depositions and

3   they are representing in their motion to dismiss, and I presume

4   we're going to see it in their answer as well, that their AMP

5   data was accurate and that the government could have relied

6   upon it.  Now, setting aside for the moment because I don't

7   think we need to resolve this here, we believe that issue is

8   irrelevant and it's a red herring, but nonetheless, it's

9   ridiculous for them to say that this is an issue in this case

10  and to be proceeding full speed ahead clearly intent to try and

11  get this issue before a jury and to tell the government, but

12  we're not going to give you our calculations on AMP.  As a

13  matter of fact, Abbott served us with requests for admission

14  and asked us to admit that their AMP data was accurate, which

15  is initially why we asked for their AMP data in addition to the

16  fact that it's all over their briefs and all over their

17  deposition question of witnesses.  Now, granted they've

18  withdrawn only the request for admission at the moment, they

19  have non pending.  They're obviously going to be reserving

20  them.  I don't know if that specific request will be in there

21  but it's even beside the point.  This is something that they

22  are putting forth.  They need to produce that AMP data to us.

23  It's not sufficient for them to say you already have it.  We

24  gave it to you and we don't have to have our underlying price

25  information or how we got that information or all of the

1   details which we do need for this case for their defenses at

2   the very least.  So that I put forth, Your Honor, as a

3   ridiculous basis to bicker with us over providing that AMP

4   data.  Also, I would submit to the Court that we've asked only

5   at this time for the AMP data for the subject drug.  So that's

6   not even an issue.  It should not be a burden for them to

7   produce that, and even if it is, there's going to be some

8   burden to defend it in this case for producing material.

9           The second category of documents--

10          THE COURT:  Well, let's do one at a time.

11          MS. BROOKER:  Okay.

12          MR. WINCHESTER:  Thank you, Your Honor.

13          There's I think a quality distinction that counsel is

14   glossing over here and I think misstating how we're using AMP.

15   Average manufacturer's price or AMP is a creature of statute

16   that Abbott and every other pharmaceutical company is required

17   to report to the government.  It is used by the government for

18   purposes of relating to calculation of Medicaid rebates.  So,

19   just so the Court has that background, it should also be

20   pointed out there is no claim in this case that relates in any

21   way to AMP or to Medicaid rebates.  The government has not

22   brought those claims.  It had every opportunity.  It has not

23   brought those claims.  They're not in the case, so under the

24   rules that have been in place since 2000, they are entitled to

25   discovery about their case.  This is not their case.  The

1    contention always has been that well, you, Abbott, put AMP

2    in play by, either through your request for admission or by

3    pointing out the fact that the government gets AMP data.  Both

4    of those are not true.  First of all as counsel states, there

5    is no request for admission.  That's just a red herring.  There

6    isn't one.  As to the I think more pertinent issue, which is,

7    has our defense somehow put this at issue, I think the answer

8    is unquestionably no.  Our defense and our use of AMP has

9    nothing to do with how the AMP gets calculated.  That's a

10   statutory calculation.  The use we make of AMP is simply to

11   say, look government, when you come to this court and say I was

12   defrauded in overpaying for drugs because I thought as we see

13   in their complaint and we've heard hear at least from the

14   lawyers and not from the actual people who ran the show, I

15   thought AWP was the actual price people were paying in the

16   marketplace.  When they come to the Court and say that, I think

17   it's relevant for us to show and we've said, wait a minute, you

18   were getting the AMP submissions that showed you for these

19   drugs and every other drug in every case that the average

20   manufacturer price was substantially below this AWP that you

21   were supposedly relying on as the street price of the drug.  So

22   it's what we liken to a hearsay statement that comes in to show

23   effect on a listener.  It doesn't matter how the statement was

24   made, whether it's true or anything else.  It matters for the

25   effect on the listener.  In this case, we haven't said, you,

1   government have an issue here because here's how we

2   calculate AMP.  We say, you have an issue in saying that you

3   thought AWP was the real price when you're sitting there

4   getting reported to you an average manufacturer's price that

5   was much lower, regardless of how it's calculated.  That's the

6   only issue we made of it.  So we have not put the calculation

7   in issue.  There's no claim in this case relating to

8   calculation and for that reason we would oppose their motion.

9           MS. BROOKER:  Your Honor, I would just briefly

10  respond.  Their AMP data, first of all their legal arguments on

11  AMP data we completely disagree with.  Again, I think that will

12  be briefed at a later time.  Their AMP data that they submit is

13  their actual prices, that's at the very heart of this case, and

14  again, as you will see, defendants bicker with every single,

15  solitary cat, this is a very discrete specific category of

16  documents.

17          THE COURT:  To be produced.

18          MS. BROOKER:  Thank you, Your Honor.

19          The next category of documents, again, very discrete

20  and finite.  The alternate site sales force, that particular

21  group within Abbott, hospital products divisions, there's no

22  doubt, there's no dispute I don't think at all between the

23  parties that the focus of that particular group is relevant.

24  We've been taking a lot of depositions in that area, and

25  there's a finite set of individuals.  We have been asking now

1    for probably six months that Abbott tell us how many

2    individuals are in that group, in that sales force.  We have

3    not gotten a response.  I had to depose somebody to find out

4    the answer to that and learned recently a couple of weeks ago

5    at a deposition of Cliff Krajewski, who is in that particular

6    group for a number of years, that at any given point in time,

7    at least from 1990 to `96, and it suggests that this is

8    probably true for all the time period that we're talking about,

9    that there were no more than 30 field sales persons in here.

10   So we're talking about a small finite group of people, and from

11   among those materials at this time, all we're talking about are

12   specifically their written goals and evaluations that they

13   received in terms of how they received, you know, their

14   end-of-the-year evaluation, how they were compensated and so

15   forth.

16           THE COURT:  How many people are we talking about?

17           MS. BROOKER:  We're talking about, again, 30 sales

18   persons a year for over the course of at least, you know, a 10-

19   year time period for starters.  And it depends on what we see

20   in those documents whether we have to trouble shoot and, you

21   know, and ask for something broader than that.  Very finite.  I

22   also deposed two people, Cliff Krajewski and another person,

23   again both of these occurred two days in a row, a couple of

24   weeks ago.  Their testimony was very clear.  Even though

25   neither one of those are the sales people, they testified that

1   each of them in different parts of Abbott have written very,

2   very specific written goals that they must meet each year and

3   then they have an evaluation that is in writing.  Both of them

4   have those.  Of course people save their written evaluations.

5   One man testified that all the years he's been at Abbott, I

6   think it was 25 years, he has his whole stack sitting on his

7   desk.  So not necessarily, you know, bringing this to Your

8   Honor's attention to talk about those two individuals' files,

9   but the point is, clearly the documents exist.  Clearly they're

10  probably not that hard to obtain, and again, we've been very

11  specific with Abbott.  They're relevant to show what marketing

12  incentives the sales persons were offered to receive their

13  compensation and their evaluation.  Whether spread marketing

14  was encouraged or rewarded, whether there were any changes

15  during the relevant time period to the policy or practice in

16  Abbott's marketing its drugs, what their recognition was, and

17  it does matter and particularly Daryl Dorsey, granted he is a

18  lobbyist, but he testified his goals would be very specific,

19  that he would maintain, for example that he would see to it

20  that a particular law went into effect or didn't go into effect

21  and at the end of the year his performance would be measured

22  against that very specific goal.  Presumably, the sales persons

23  are going to have no more or less specific goals than the other

24  witnesses that we've deposed.

25          Now, the only real objection Abbott has to this, it

1   can't really realistically be burdensomeness.  First of all,

2   they never really undertook other than the deposition that I

3   took to find out what the burdensome nature of it was, they say

4   the documents are confidential personnel records, but I direct

5   the Court to the MDL protective order and the one that this

6   Court entered in this case, and the protective order expressly

7   anticipates that this type of information might be produced,

8   and it specifically allows for "past or current company

9   personnel or employee information."  Abbott produces almost

10  everything in this case as highly confidential or confidential.

11  So confidentiality, you know, is just not an issue in this

12  case.  And again, for Abbott to say that this is irrelevant is,

13  I would say another category that's ridiculous.  The only last

14  thing I will say is that what Abbott did offer to produce,

15  which we still haven't even gotten, are the policies.  They

16  think that's sufficient that we get whatever their policy was.

17  Of course we want to see what the policy was, but it doesn't

18  matter until we see how it was implemented with respect to any

19  one particular employee and the policy is going to presumably

20  say something broad such as employees will have goals and they

21  will be evaluated according to those goals.  It's not going to

22  tell us whether they met those goals and whether they had to do

23  with marketing incentives and marketing the spread and so

24  forth.  So I can see no reason at all that these materials do

25  not get searched for and produced in this case.

1          Thank you.

2          THE COURT:  To be produced.

3          MR. WINCHESTER:  Your Honor, could I inquire just

4  briefly about that.  Is it the Court's ruling that the

5  personnel files be produced in their entirety or simply that we

6  review them and produce any material that would be responsive?

7          THE COURT:  No, I think what is responsive to the

8  interrogatory because people have all other kinds of

9  information that's totally irrelevant.

10         MS. BROOKER:  Yeah, I mean, there may be, we don't

11 want irrelevant stuff, Your Honor, and we're happy to, it's a

12 document request, not an interrogatory, but we're happy to

13 specify that.

14         THE COURT:  You don't need copies of peoples' degrees

15 and--

16         MS. BROOKER:  Exactly.

17         THE COURT:  --things like that.

18         MR. WINCHESTER:  But to the extent if we review a

19 personnel file and there's absolutely nothing in there from

20 which you could possibly argue that somebody was talking about

21 marketing based on spread or compensated based on marketing,

22 based on spread, it wouldn't be the Court's view they'd be

23 entitled to that file, would it?

24         MS. BROOKER:  I'd like to respond to that and

25 Mr. Breen is saying he would like to respond.  Your Honor, I

 1   would say we will be the judge of that.  It's a finite set

 2   of materials.  How they were evaluated may be inculpatory or

 3   exculpatory, but it is important to see whether there are

 4   specific goals involved, reimbursement, AWP.  We don't want to

 5   leave this.  This is Abbott's position throughout which is

 6   making discovery like pulling teeth.

 7              THE COURT:  I've ruled, that which is not relevant

 8   should not be produced and if there is no information in the

 9   file relating to the request, the file is not produced.

10              MR. WINCHESTER:  Thank you, Judge.

11              THE COURT:  The time is getting short, so--

12              MS. BROOKER:  Yes, Your Honor, the next category of

13   documents, again, finite discrete set of documents, and

14   specifically they are, there was a Tap settlement in this case.

15   Tap was a joint venture between Abbott and another entity.  We

16   are not asking that the Court require Abbott to produce

17   everything they produced in the Tap case or everything relevant

18   to the TAP case.

19              THE COURT:  the Tap case in this Court?

20              MS. BROOKER:  Yes, Your Honor.  Very specific, at the

21   time that the Tap settlement took place, Abbott, around that

22   same exact time changed dramatically its prices which is in

23   large part the reason for the cutoff of the year 2001 for this

24   lawsuit.  When we say okay your damages is stop, we believe

25   that the Tap settlement, which again it related to a different

I - 58

1  drug, it was Lupron, but it was the same exact conduct, we

2  believe that there were high level discussions within Abbott

3  which caused them to start reporting accurate prices, which is

4  the very crux of this case.  So what we asked for, and I guess

5  there's generally two categories, but the first category, which

6  is specifically laid out, what we call Tap impact documents,

7  and all we mean by that are any, I don't want to mis-cite what

8  we wrote, but it was basically very specific, any documents

9  that relate to discussions within Abbott not limited to

10 hospital products division but among high level corporate

11 individuals anything from their Medicare working group or

12 wherever the documents come from that discuss how they reacted

13 basically to the Tap settlement because we do believe it may

14 have impacted the price reporting changes that they made in

15 this case which again is the crux of this--

16      THE COURT:  How are they reactive?  I mean, be a

17 little more specific than that, I'm afraid.

18      MS. BROOKER:  Yeah, I mean, Mr. Breen said he can

19 help with that if he's allowed, if he's permitted to respond to

20 that, but here's what, here's how we've drafted it, all

21 documents relating to or otherwise regarding the impact of the

22 2001 Tap pharmaceuticals criminal plea and civil settlement on

23 the prices or practices, excuse me, or pricing practices for

24 Abbott's pharmaceuticals.  So, you know, it's broad.  Abbott

25 has to interpret just like any document request.  We don't know

1   what they have internally so we can't be more specific than

2   that.  But again, it goes, we're not asking for everything that

3   was produced in Tap to be produced here.  We're asking for that

4   finite set.  And the second set of Tap documents that I will

5   mention relating back to the earlier argument that we had on

6   the first motion before the Court, there are documents produced

7   by Abbott and produced by Tap that other states have received

8   from Abbott or from another entity in the Tap litigation that

9   have very highly relevant witnesses in this case working for

10  Abbott, have their name on those documents.  One witness, Ms.

11  Tobiason, who was just deposed for a second time yesterday, and

12  she was shown Tap documents which show that Tap was consulting

13  with hospital product division personnel on reimbursement and

14  spread and average wholesale prices very relevant to this case.

15  So there's also another set of documents.  We're not asking

16  Abbott to go back and search for that set.  We're just asking

17  that they be again allowed to be shared, some of which are

18  being shared because they're used at depositions.  But

19  obviously at a deposition, you can't ask a witness about, you

20  know, 100 documents, because there's just no time.  We want all

21  the documents that they produced related to these issues that

22  impact our case to be shared with us.  Again, there's no burden

23  to Abbott, and I don't know if Mr. Breen--

24        MR. BREEN:  Just a quick point here, Judge, and it

25  shows, I know a lot about Tap from the other litigation, and we

1  know, and we've got a little bit of corroboration already

2  that we could get even with the documents we got from Abbott in

3  this case, that they restructured their entire way of doing

4  business on the heels of the Tap and Ross settlements.  They

5  paid well over a billion dollars already for the same kind of

6  conduct and to a great degree we're talking about here, but

7  also for example Abbott's former president, Thomas Hodgson,

8  went over to run Tap.  He gave me highly relevant deposition in

9  the Tap case.  We had to move to compel to get it in the Texas

10  case.  It talks about the spread and knowledge – (inaudible –

11  #3:29:58) – about it.

12         In this case, Abbott, I too the 30(b)(6) document

13  witness, Ellen Klauss, she says they hadn't even searched

14  Abbott's corporate hierarchy for documents responsive to the

15  government's request in this case ever.  She testified to that.

16  Now, Thomas Hodgson, I got his deposition in the Texas case.  I

17  can't turn, I can't show it to Ms. Brooker because it's

18  declared confidential in the Texas case.  It wasn't taken in

19  the Texas case.  We got it through a motion to compel in the

20  Texas case.  We've already been over that ground.  So the Tap

21  and Ross reactions, Miles White, their CEO, got a letter from

22  Pete Stark, the ranking member--

23         THE COURT:  We know who he is.

24         MR. BREEN:  Well, weighs and means, okay, there was

25  all kinds of reactions going on about that time where Abbott

I - 61

1   changed their policy and they had to change it from

2   something and we all, you know, subsequent other measures may

3   not be admissible at trial but they're certainly discoverable

4   so that we can get a feel for and work back from what they did

5   to establish the truth and the facts in this case.  That's all

6   we're trying to do.

7           Thank you.

8           THE COURT:  Mr. Winchester.

9           MR. WINCHESTER:  Briefly, Your Honor.  Obviously

10  let's bring this back to what this case is and what it isn't.

11  Tap is not a defendant in this case.  Lupron is not a drug at

12  issue in this case.  The 2001 settlement that they want to talk

13  about is a criminal plea for Tap where it pled guilty, Tap, not

14  Abbott pled guilty to one single count having to do with--

15          THE COURT:  I remember this well.

16          MR. WINCHESTER:  Okay.  So this is the three samples

17  that were then billed for, not AWP.  Okay?  So this case is not

18  about Tap, it's not about Lupron.  I think Your Honor hit the

19  nail on the head.  There isn't anything even vaguely focused or

20  pointed about this request nor relevant to this case.

21  Mr. Breen talks about Texas, and I think that actually is

22  relevant because what they did in Texas was request this very

23  same information from Judge Jenkins.  We objected and he

24  sustained that objection.  They did not get a 30(b)(6) witness

25  to talk about--

1    THE COURT:  This is what happens when you get to

2  4:00.  Everybody--

3    MR. BREEN:  That's right.  I'm sorry.

4    MR. WINCHESTER:  --but we attached those papers to

5  our response.  Your Honor can see that.  They asked to have

6  Abbott designate a 30(b)(6) witness to talk about this, what

7  impact did the Tap settlement have on Abbott, whatever that

8  means, and the judge said, no, you don't get that.  It's not at

9  issue in the case.  It's no more at issue here than it is

10  there.

11    In terms of I guess counsel's statements which is

12  well, Abbott may have changed the way it did business as a

13  result of seeing what happened in Tap, to the extent they're

14  trying to discovery things about this reduction of price in

15  2001, which by the way is where their complaint ends, then

16  we've already told them we're giving them all the non-privilege

17  documents that have to do with the reduction of prices for

18  these drugs that happen in 2001.  They're getting those

19  documents.  This class of things--

20    THE COURT:  All right.

21    MR. WINCHESTER:  --class of things they're talking

22  about is outside the case.

23    THE COURT:  Denied without prejudice at this time,

24  maybe to be renewed upon at further showing down the road.

25  Right now I don't see the relevance.

1           MS. BROOKER:  Okay.  Thank you, Your Honor.  I

2    appreciate that.

3           THE COURT:  How much more do we have?

4           MS. BROOKER:  Two more categories of documents and

5    then a motion to compel 20 interrogatories, which I hopefully

6    can summarize for you, interrogatory responses.

7           Okay.  The next category of documents are all

8    documents relating to the drug vancomycin, one of the four

9    subject drugs in this case.  We have gone around and around

10   with Abbott on this issue.  Frankly, Your Honor, we never feel

11   as though we have any firm representation from them that we

12   have received all the vancomycin documents.  The drug was first

13   marketed I believe around 1988, so we've asked for the

14   documents to be produced relative to vancomycin back to 1988.

15   It's not too far prior to 1991.  Obviously, you know, launch

16   documents and other types of documents would be relevant.  I

17   know that Abbott has represented most recently in its

18   opposition to this specific request what they've already

19   searched for and produced to us and that they searched for them

20   back in 1996 pursuant to the government's first civil

21   investigative demand, and if I understand, maybe I don't, but

22   if I understand correctly their position is that they're not

23   going back and searching again.  And I will say that their

24   corporate designee on this issue, Ellen Klauss, who just

25   testified in this case maybe four weeks ago, maybe a little bit

1  longer, my understanding of her testimony on this issues is

2  that at that time they did not search back as far as 1988.

3  Now, I know Abbott's counsel is going to stand up here and say,

4  for the group of documents we produced in other cases that we,

5  that relate to vancomycin back to 1998, we'll give you those,

6  and maybe they're going to represent they already have because

7  we just got a small number of documents in the last week or

8  two, but that's not a representation that they had searched for

9  and produced all those documents.  The other bit of testimony I

10  believe from Ms. Klauss is that they never searched for

11  documents relevant to that drug outside of the hospital

12  products division, and for Abbott to stand up here and say that

13  only documents in the hospital product division are relevant,

14  that's not true either.  We have seen in other cases where

15  Abbott's produced documents that, a lot of relevant documents

16  from corporate offices and not just that one single operating

17  division are relevant, so we want a representation that Abbott

18  either has or is going to produce to us and search again for

19  all documents relevant to the drug vancomycin, particularly

20  because it is one of the four subject drugs.

21          Thank you.

22          MR. WINCHESTER:  Judge, we're not sure why this

23  motion got filed for vancomycin.  They talk about back and

24  forth, but I've been clear in every letter, every conversation,

25  clear in our brief.  They've asked for documents on the

1    marketing, pricing and sale of vancomycin.  That is one of

2    the subject drugs.  We've agreed to give them those documents.

3    That's not at issue.  Why they moved, I have no idea other than

4    to reach this point of pre `91 documents.  For the pre `91 let

5    me state very briefly, if they serve a CIB on Abbott back in

6    1996 that requested documents dating back to 1986, Abbott

7    responded.  They have or if they don't have them already we've

8    agreed to give them, any document pre `91 on vancomycin that's

9    been produced in any other case.  They're going to get those.

10   They have documents pre `91.  I've been in depositions where

11   they've used documents pre `91.  The question is should we in

12   this case now have to go back and research again, and it isn't

13   as simple as just saying, oh, grab that box of pre `91 stuff.

14   It's literally going back and looking in every place we ever

15   looked before.  There's no reason to do it here.  Judge Saris

16   has set in the MDL discovery starting in `91 as far as we're

17   aware of all these 25 or so AWP related cases nobody has forced

18   discovery prior to 1991, that's years before the act on which

19   they're complaint is based was even enacted.  It's before the

20   time that they've alleged specifically in their complaint as

21   when the misconduct they've charge occurred.  There is no

22   reason to force Abbott to go back through this.  It's not an

23   easy undertaking.  The burden clearly outweighs the benefit of

24   getting these ancient documents, whatever additional ones there

25   might be that they don't already have, let me make that clear.

1      MS. BROOKER:  Your Honor, again, we--

2      THE COURT:  I'm inclined to agree with Abbott on this

3 one.

4      MS. BROOKER:  Your Honor, we have - I'm sorry.  Do

5 you want to say something, Jim, you should stand up, but we

6 have concerns about the testimony of their corporate designee.

7 We don't believe that the representations that were just made

8 are consistent with her testimony.  We do not believe that

9 there were ever thorough searches done, and I will tell the

10 Court that since we have been involved with Abbott in this

11 discovery, according to the corporate designee and frankly

12 according to the representations of counsel, Abbott has done

13 very little, if any, additional searches.  They are producing,

14 everything that we've gotten is pretty much by and large what

15 they said we should expect to get other than a few trickling

16 little documents, but we have new document requests.  We are

17 not bound by whatever we put in a CID at an investigative stage

18 in 1996.  Abbott is not spending very much time at all

19 searching for documents.  They say, look, whatever we gave

20 everyone else cherry picked, we're giving to you and hardly

21 any, and new searches were being done and that was confirmed by

22 Ms. Klauss.  We have sued Abbott on these drugs.  They are very

23 relevant.  They can't run from the fact that it's a subject

24 drug.  They have not stated any burden.  You can't just vaguely

25 state burden without more than that.  They should be in a

1   position to go back and search for documents, no different

2   than the government is having to search ancient files to

3   produce documents to Abbott even though we believe most of what

4   they're asking for is irrelevant.  You don't, you know, I have

5   to represent, Your Honor, you don't see Abbott here with a

6   bunch of motions against the government because we have been

7   running circles around ourselves trying to give them everything

8   that they ask for no matter how irrelevant it is, while on our

9   end they bicker with ever set of categories that we set forth

10  even though they're specific.  So I would say Abbott is

11  obligated in this litigation to go back and search for

12  vancomycin documents.

13          THE COURT:  Denied at this time.

14          Now, as to the next motion--

15          MS. BROOKER:  There's one last category--

16          THE COURT:  Is there one more?

17          MS. BROOKER:  Yes, alternate site customers, Abbott

18  has agreed, and I'm trying to shortcut this for Your Honor,

19  Abbott has agreed to produce documents with regard to its

20  largest customers, which is 80 percent of its customers, we

21  accept that representation they've made to us.  The 20 percent,

22  there are, granted thousands of customers, so we, without

23  knowing more Abbott has stated that that would be burdensome.

24  But again, Abbott is not giving us any detail about the burden.

25  We have always just like with respect to vancomycin and other

1   categories, made ourselves open to discussing and weighing

2   the burden, but for them to come forward and say we're not

3   doing any searches at all for specific categories because it's

4   burdensome without more, we need more than that.  If they're

5   going to tell us, well, we can search current files or we can

6   search, you know, this subset, we may be able to go back and

7   forth with them, but they just basically said no.  You're not

8   getting documents on the 20 percent of customers, and, you

9   know, we believe that those documents are relevant.  Now, the

10  one thing that I will say that we will accept here today, if

11  Abbott wants to stipulate, which I doubt seriously it's

12  prepared to do, that it is not going to be producing testimony

13  or evidence or seeking to do that at trial of any of those

14  customers that relate to the 20 percent that they say they're

15  not producing and that are not burdensome, and if they're

16  willing to stipulate that we're not going to hear from any of

17  those customers at trial, then we're willing to consider

18  withdrawing our document request, but as far--

19          THE COURT:  All right.  Denied without prejudice at

20  this time.  They're given 14 days to make a decision.

21          MS. BROOKER:  I'm sorry, Abbott is given 14 days to

22  make a decision about that stipulation?

23          THE COURT:  Exactly.

24          MS. BROOKER:  Okay.

25          MR. BREEN:  Can I just add one point to that, Your

1  Honor?  The key thing in that stipulation too is not only

2  hearing from those customers but they're not going to put their

3  customer's prices into evidence.  That's critical because I

4  don't want to hear about some customer paid some high price

5  that I didn't know about before trial.

6        THE COURT:  All right.  I'm not going to get to 4060,

7  docket entry 4060 simply because it's after 4:00, and I have

8  some commitments upstairs.  That leaves at least four motions

9  for the next hearing.  What I suggest you do after we adjourn

10  here today is to confer with Mr. Duffy and see if you can pick

11  a mutually convenient date.

12        MS. BROOKER:  Thank you for that, Your Honor.

13        THE COURT:  I will take under advisement 3529, 3540,

14  3849 and on 4047, the ruling will reflect as ruled in open

15  court.

16        MR. DALY:  Your Honor, may I raise one important

17  issue as a result of one of your rulings?  On the AMP issue,

18  Judge, AMP is a very confidential thing.  It's not shared among

19  companies.  It's not shared, states don't have that

20  information.  Even when we give it to Medicaid or to CMS,

21  Medicaid doesn't share it with Medicare, the two divisions.

22  The problem I want to raise is that if we give it to them

23  pursuant to your order, remember you've ordered that the

24  government can then share that with everybody.  So boom, all of

25  our confidential AMP information goes out from the government

1    to everybody.  Meanwhile, Mr. Breen is in the Texas case,

2    he'll have the information.  He's got a protective order in

3    that case that allows him to share it with anybody who comes in

4    and signs an undertaking, so the issue quickly is, we've got

5    real confidentiality concerns and I guess I would ask the court

6    to at least maybe subject to additional paper, although I hate

7    to bring the court, that we don't allow your order to say that

8    they can transmit it to everybody else.

9              THE COURT:  All right.  Can you work out a

10   stipulation as to these particular documents?

11             MS. BROOKER:  Well, they should be allowed to be

12   provided to any states if what we're talking about is other

13   defendants, that's another matter, and I do believe that that

14   is something that is really something that Abbott counsel

15   should be working out with the other defendants.

16             MR. DALY:  Judge, none of the other states have sued

17   us, and for the Medicaid rebates are not in the cases except in

18   the couple where they have suits.  This allows them a wholesale

19   sharing of any state they want.

20             THE COURT:  I'll give you 14 days to try to work out

21   a stipulation.

22             MR. DALY: Thank you, Your Honor.

23             THE COURT:  And if you can't, come back and—

24             MS. BROOKER:  Thank you, Your Honor.

25             THE COURT:  All right.  All right.  We stand in

1    recess.

2              MR. DALY:  Thanks for your time, Your Honor.

3              MS. BROOKER:  Have a good day, Your Honor.

4    //

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.


_____                    May 21, 2007
                                                  _____

Maryann V. Young_____

# EXHIBIT 131

Talking Points on Reduction of Medicaid Rebate Exposure


Federal Program started in 1991

We went from $91,000 liability in 1991 to $700,000 in 1994

Reasons:

We were not monitoring the program closely enough.

We were not disputing claims from the individual states

States were learning that this was an effective money maker and expanded the program to pull in more hospital products thus generating more money for the state

(We are working with the Washington office to clarify legislatively what is a covered drug under this program)

We were supplying the states with incorrect AMP's   AMP's are the unit of measure the states use to bill us.  We were not using our  Average Selling Price to Calculate the AMP (Average Manufacturers Price)

All of the above have been remedied and we should see minimal growth in the liability.  To date we have recovered $94,000 in overpayments from the states

Congress may repeal this program as of 1998 but the bad news is that individual states can implement programs of their own, which could mean 50 programs instead of one


Because of these corrections we have received claims from the states of $139,000 in 1Q95 vs $216,000 1Q 94, and with incomplete claims approx $120,000 2Q95 vs $165,000 2Q94

Confidential
AB0018688

EXHIBIT 132

Examples of the Best Price and AMP differentials

| Product NDC | Best Price | AMP | % Dif |
|---|---|---|---|
| 00074-1083-05 | 0.0042090 | 0.0144050 | 70.781% |
| 00074-1086-03 | 0.0087930 | 0.0138200 | 36.375% |
| 00074-1088-03 & 05 | 0.0077790 | 0.0139090 | 44.072% |
| 00074-1089-03 | 0.0087960 | 0.0126130 | 30.262% |
| 00074-1090-03 & 05 | 0.0088110 | 0.0180680 | 51.234% |
| 00074-1108-03 & 05 | 0.0579150 | 0.0997540 | 41.942% |
| 00074-2989-05 | 0.0042080 | 0.0170080 | 75.259% |
| 00074-2990-03 & 05 | 0.0093410 | 0.0160970 | 41.971% |
| 00074-2991-03 & 05 | 0.0091640 | 0.0180310 | 49.176% |
| 00074-2992-03 | 0.0087930 | 0.0160970 | 45.375% |

These AMP's are totally distorted because in our calculation of the AMP we did not figure in the charge backs, discounts to the wholesaler class of trade, etc. The calculation of AMP *including discounts and charge backs* is what we will be correcting.

Confidential
AB0018676

ABT006256

# EXHIBIT 133

W/P Reference ___CF-18___

_(signature)_ 04/05/01
Prepared by                Date

_(signature)_ 4.5.4
Reviewed by               Date


**Medicaid Pharmacy Actual Acquisition Cost**
**CIN: A-06-00-00023**
**Documentation of Prior Audit Kick-off Conference**


Purpose:    To document the prior audit kick-off conference, in which discussions were held concerning non-traditional pharmacies


Source:     HHS generated/prior audit workpapers





Exhibit: Abbott 581
Wit: Sullivan
Date: 3/12/08
Rptr: FJ

1/3

HHD022-0201

CIN: A-06-94-00070,

C F-18

A-06-00-00023

## RECORD OF DISCUSSION

**DATE:**   August 30-31, 1994

**PLACE:**   Radisson Hotel, Richmond, Virginia

**PARTICIPANTS:**

OIG

George Reeb, AIGA, HCFAD
Ben Jackson, Audit Manager
Gordon Sato, Audit Manager
Bill Shrigley, Senior Auditor
Paul Chesser, Auditor

HCFA

Dave McNally
Mike Keogh

Medicaid Pharmacy Reps.

Susan McCann, Missouri
Susan McCleod, Florida
Donna Bovell, D.C.
David Shepherd, Virginia
Elizabeth Miller, Virginia
Joe Fine, Maryland
Allen Fung, California
Ed Vaccaro, New Jersey
Cindy Denemark, Delaware
Benny Ridout, North Carolina
Terry Krantz, Montana

**PURPOSE:**

To discuss and plan our natiowide review of the difference
between the invoice price for drugs and AWP, for Medicaid
pharmacy providers.

**COMMENTS:**

We informed the States that they were 1 of 12 randomly selected
States to be used to develop a nationwide estimate of the
difference between invoice price of drugs and AWP.  We stated
that HCFA had requested us to perform this review as the
moratorium on pharmacy reimbursement would expire on December,
31, 1994.  We further explained that we would be requesting the
largest invoice for a designated month from 48 pharmacies in each
State, with 12 pharmacies being selected from 4 categories of
pharmacies -- Rural-Chain, Rural-Independent, Urban-Chain, and
Urban-Independent.  We indicated that each State would receive a
report showing the results for their State and that the combined
results would be reported to HCFA.

The State officials expressed concern that our review was limited
to one aspect of pharmacy reimbursement.  They said that any
effort to lower the reimbursement for acquisition cost should
also include some review of dispensing fees.  They stated that we
should include a fifth category of pharmacies to include non-

2/3

CF-10
CF-18

A-06- 0 0 - 0 0 0 2 5

traditional retail pharmacies such as hospitals, home IV, nursing
homes, physicians etc... The State officials believed that these
pharmacies purchased at substantially bigger discounts than
traditional retail pharmacies* They also stated that we should
request the largest invoice from each different type of supplier
rather than just the largest invoice.

We agreed to add the fifth category of pharmacies. We also
agreed to request the largest invoice from each different type of
supplier. We decided that the types of suppliers would be
identified as; 1) wholesaler, 2) chain warehouse, 3)
manufacturer, and 4) generic distributors. Additionally, we
determined together, that for the purposes of this review, chain
pharmacies would include all pharmacies with four or more stores.
We also composed the letter to be sent to each pharmacy
requesting the invoices.

The State officials agreed to provide us with a listing of the
pharmacy providers in their State. The listing would identify
the pharmacies as chain, independent or other (non-traditional).
We would determine whether the pharmacy was rural or urban by
comparing the county location of the pharmacy to an MSA listing.

We agreed to meet upon the completion of the review to discuss
the reporting of our results.

\* The State officials believed that including
the non-traditional pharmacies would
overstate the estimate of the difference.
We agreed to exclude the non-traditional
pharmacies from the overall estimates. Most
state was/were never interested in
seeing what the non-traditional paid
for drugs so we decided to calculate
an estimate for them.

P _____
12-4-95

3/3

# EXHIBIT 134

# MEDICARE PART A BULLETIN

March 5, 1997                                    General Medicare Bulletin G-276

TO:         All Medicare Providers

FROM:       Andy DePirro, Director, Program Relations

SUBJECT:    **VARIOUS COVERAGE ISSUES HCFA-PUBLICATION 6: SECTIONS 35-20, 35-48, 35-94, 35-95, 35-96, 35-97, 60-14 and 65-7.**

**ATTENTION MEDICARE BUSINESS OFFICE MANAGER**: Please distribute to all appropriate health care facility personnel.

The Health Care Financing Administration (HCFA) published these coverage clarifications and/or new implementing instructions, via the Medicare Coverage Issues Manual (HCFA-Publication 6), Transmittals 92 and 93.  Even though these instructions were issued to providers via the HCFA manual revision process, the purpose of this bulletin is to ensure providers are aware of these Medicare coverage issue regulations.

**Section 35-20,  Treatment of Motor Function Disorders with Electric Nerve Stimulation- Effective for Services On and After April 3, 1997**

This section is  revised to reflect that the present instruction relating to electrical nerve stimulation does not apply to deep brain stimulation provided by an implanted stimulator device.  Therefore, deep brain stimulation provided via an implanted deep brain stimulator is subject to Medicare coverage at the discretion of the carrier.

**Section 35-48, Osteogenic Stimulation: New Implementing Instruction - Effective for Services On and After April 3, 1997**

This section indicates that ultrasonic osteogenic stimulators are not covered under Medicare because there is insufficient evidence to support the medical necessity of using these devices.

**Section 35-94, Transmyocardial Revascularization With Laser - Not Covered- Effective for Services On and After May 19, 1997**

This section indicates that Transmyocardial Revascularization (TMR) with laser is not covered. Because of the lack of scientific evidence available at this time concerning the safety and effectiveness of TMR, this procedure is not considered reasonable and necessary under §1862(a)(1)(A) of the Social Security Act.

**Section 35-95, Partial Ventriculectomy (Also known as Ventricular Reduction, Ventricular Remodeling or Heart Volume Reduction Surgery) - Effective for Services On and After  April 15, 1997**

This section is added to explain that this procedure is not covered.  Because the mortality rate is high and there are no published scientific articles or clinical studies, the procedure is not considered reasonable and necessary within §862(a)(1) of the Act.


**Section 35-96,  Cryosurgery of  Prostate- Effective for Services On and After April 15, 1997**

This section explains that cryosurgical ablation of the prostate is not covered based upon evidence which is not yet sufficient to demonstrate the effectiveness of the procedure. Therefore, it is not considered to be reasonable and necessary under §1862(a)(1)(A) of the Act.


**Section 35-97,  Vertebral Axial Decompression (VAX-D)- Effective for Services On and After April 15, 1997**

VAX-D is performed for symptomatic relief of pain associated with lumbar disk problems.  The treatment combines pelvic and/or cervical traction connected to a special table that permits the traction application.  There is insufficient scientific data to support the benefit of this technique.  VAX-D is not covered by Medicare.


**Section 60-14,  Infusion Pumps- Effective for Services On and After April 15, 1997**

This section is amended to specify that implantable infusion pumps for the delivery of insulin to treat diabetes is not covered.  The data do not demonstrate that the pump provides effective administration of insulin.


**Section 65-7, Intraocular Lenses (IOLs)- Effective for Services On and After May 19, 1997**

This section is being revised because the Food and Drug Administration (FDA) no longer uses the categories identified in this section to classify IOLs.  Additionally, the FDA no longer has adjunct studies for IOLs.  This manual revision does not represent a change in Medicare coverage of IOLs.  FDA-approved IOLs continue to be covered if the reasonable and necessary requirements are not met.  Refer to the Medicare Carriers Manual, §2130.


Questions regarding this bulletin may be addressed to the Medicare Part A Customer Service Department by calling (904) 355-8899.

**SECTION 35-20      TREATMENT OF MOTOR FUNCTION DISORDERS WITH ELECTRIC NERVE STIMULATION-NOT COVERED**

While electric nerve stimulation has been employed to control chronic intractable pain for some time, its use in the treatment of motor function disorders, such as multiple sclerosis, is a recent innovation, and the medical effectiveness of such therapy has not been verified by scientifically controlled studies. Therefore, where electric nerve stimulation is employed to treat motor function disorders, no reimbursement may be made for the stimulator or for the services related to its implantation since this treatment cannot be considered reasonable and necessary.

See §§35-27 and 65-8.

NOTE:      Medicare coverage of deep brain stimulation by implantation of a stimulator device is not prohibited. Therefore, coverage of deep brain stimulation provided by an implanted deep brain stimulator is at the carrier's discretion.


**SECTION 35-48      OSTEOGENIC STIMULATION (EFFECTIVE FOR SERVICES PERFORMED ON AND AFTER SEPTEMBER 15, 1980.)**

A. Electrical Osteogenic Stimulators: Electrical stimulation to augment bone repair can be attained either invasively or noninvasively.  Invasive devices provide electrical stimulation directly at the fracture site either through percutaneously placed cathodes or by implantation of a coiled cathode wire into the fracture site.  The power pack for the latter device is implanted into soft issue near the fracture site and subcutaneously connected to the cathode, creating a self-contained system with no external components.  The power supply for the former device is externally placed and the leads connected to the inserted cathodes.  With the noninvasive device, opposing pads, wired to an external power supply, are placed over the cast.  An electromagnetic field is created between the pads at the fracture site.

> 1.  Noninvasive Stimulator: The noninvasive stimulator device is covered only for the following indications:
>
> o Nonunion of long bone fractures;
> o Failed fusion, where a minimum of nine months has elapsed since the last surgery;
> o Congenital pseudarthroses; and
> o As an adjunct to spinal fusion surgery for patients at high risk of pseudarthrosis due to previously failed spinal fusion at the same site or for those undergoing multiple level fusion. A multiple level fusion  involves 3 or more vertebrae (e.g., L3-L5, L4-S1,etc).
>
> 2.  Invasive (Implantable) Stimulator:  The invasive stimulator device is covered only for the following indications:
>
> o Nonunion of long bone fractures;
> o As an adjunct to spinal fusion surgery for patients at high risk of pseudarthrosis due to previously failed spinal fusion at the same site or for those undergoing multiple

level fusion. A multiple level fusion involves 3 or more vertebrae (e.g., L3-L5, L4-S1,etc).

Nonunion, for all types of devices, is considered to exist only after six or more months have elapsed without healing of the fracture.

B.    Ultrasonic Osteogenic Stimulators:  An ultrasonic osteogenic stimulator is a non-invasive device that emits low intensity, pulsed ultrasound.  The ultrasound signal is applied to the skin surface at the fracture location via ultrasound, conductive, coupling gel in order to accelerate the healing time of the fracture.  The device is intended for use with cast immobilization.

There is insufficient evidence to support the medical necessity of using an ultrasonic osteogenic stimulator.  Therefore, the device is not covered, because it is not considered reasonable and necessary.


## SECTION 35-94    TRANSMYOCARDIAL REVASCULARIZATION WITH LASER - NOT COVERED

Transmyocardial Revascularization with laser, abbreviated as **TMR**, is a surgical process whereby 15 to 30 channels are bored into the myocardium of the beating heart in an attempt to restore perfusion to areas of the heart not being reached by weakened or clogged arteries.  Because of the lack of scientific evidence available concerning the safety and effectiveness of **TMR**, this procedure is not covered. When additional scientific evidence becomes available, this policy will
be reevaluated.


## SECTION 35-95    PARTIAL VENTRICULECTOMY (ALSO KNOWN AS VENTRICULAR REDUCTION, VENTRICULAR REMODELING, OR HEART VOLUME REDUCTION SURGERY) - NOT COVERED

Partial Ventriculectomy, also known as ventricular reduction, ventricular remodeling, or heart volume reduction surgery, was developed by a Brazilian surgeon and has been performed only on a limited basis in the United States.  This procedure is performed on patients with enlarged hearts due to end-stage congestive heart failure.  Partial Ventriculectomy involves reducing the size of an enlarged heart by excising a portion of the left ventricular wall followed by repair of the defect.  It is asserted that this procedure makes the failing heart pump better by improving the efficiency of the remaining left ventricle.

Since the mortality rate is high and there are no published scientific articles or clinical studies regarding partial Ventriculectomy, this procedure cannot be considered reasonable and necessary within the meaning of §1862(a)(1) of the Act.  Therefore, partial Ventriculectomy is not covered by Medicare.

## SECTION 35-96      CRYOSURGERY OF PROSTATE - NOT COVERED

Cryosurgery of the prostate gland, a.k.a. cryosurgical ablation of the prostate (CSAP), destroys prostate tissue by applying extremely cold temperatures in order to reduce the size of the prostate gland.  The evidence is not yet sufficient to demonstrate the effectiveness of this procedure.  Therefore, cryosurgery of the prostate cannot be considered reasonable and necessary under §1862(a)(1)(A) of the Social Security Act.

## SECTION 35-97      VERTEBRAL AXIAL DECOMPRESSION (VAX-D) - NOT COVERED

Vertebral axial decompression is performed for symptomatic relief of pain associated with lumbar disk problems.  The treatment combines pelvic and/or cervical traction connected to a special table that permits the traction application.  There is insufficient scientific data to support the benefits of this technique.  Therefore, VAX-D is not covered by Medicare.

## SECTION 60-14      INFUSION PUMPS

**THE FOLLOWING INDICATIONS FOR TREATMENT USING INFUSION PUMPS ARE COVERED UNDER MEDICARE:**

A.    External Infusion Pumps

1.    Iron Poisoning (Effective for Services Performed On or After 9/26/84).  When used in the administration of deferoxamine for the treatment of acute iron poisoning and iron overload, only external infusion pumps are covered.

2.    Thromboembolic Disease (Effective for Services Performed On or After 9/26/84). When used in the administration of heparin for the treatment of thromboembolic disease and/or pulmonary embolism, only external infusion pumps used in an institutional setting are covered.

3.    Chemotherapy for Liver Cancer (Effective for Services Performed On or After 1/29/85). The external chemotherapy infusion pump is covered when used in the treatment of primary hepatocellular carcinoma or colorectal cancer where this disease is unresectable or where the patient refuses surgical excision of the tumor.

4.    Morphine for Intractable Cancer Pain (Effective for Services Performed On or After 4/22/85). Morphine infusion via an external infusion pump is covered when used in the treatment of intractable pain caused by cancer (in either an inpatient or outpatient setting, including a hospice).

Other uses of external infusion pumps are covered if the contractor's medical staff verifies the appropriateness of the therapy and of the prescribed pump for the individual patient.

NOTE: Payment may also be made for drugs necessary for the effective use of an external infusion pump as long as the drug being used with the pump is itself reasonable and necessary for the patient's treatment.

B. Implantable Infusion Pumps

1. Chemotherapy for Liver Cancer (Effective for Services Performed On or After 9/26/84). The implantable infusion pump is covered for intra-arterial infusion of 5-FUdR for the treatment of liver cancer for patients with primary hepatocellular carcinoma or Duke's Class D colorectal cancer, in whom the metastases are limited to the liver, and where (1) the disease is unresectable or (2) where the patient refuses surgical excision of the tumor.

2. Anti-Spasmodic Drugs for Severe Spasticity.—An implantable infusion pump is covered when used to administer anti-spasmodic drugs intrathecally (e.g., baclofen) to treat chronic intractable spasticity in patients who have proven unresponsive to less invasive medical therapy as determined by the following criteria:

o  As indicated by at least a 6-week trial, the patient cannot be maintained on noninvasive methods of spasm control, such as oral anti-spasmodic drugs, either because these methods fail to control adequately the spasticity or produce intolerable side effects, and

o  Prior to pump implantation, the patient must have responded favorably to a trial intrathecal dose of the anti-spasmodic drug.

3. Opioid Drugs for Treatment of Chronic Intractable Pain. An implantable infusion pump is covered when used to administer Opioid drugs (e.g., morphine) intrathecally or epidurally for treatment of severe chronic intractable pain of malignant or nonmalignant origin in patients who have a life expectancy of at least 3 months and who have proven unresponsive to less invasive medical therapy as determined by the following criteria:

o  The patient's history must indicate that he/she would not respond adequately to non-invasive methods of pain control, such as systemic opioids (including attempts to eliminate physical and behavioral abnormalities which may cause an exaggerated reaction to pain); and

o  A preliminary trial of intraspinal opioid drug administration must be undertaken with a temporary intrathecal/epidural catheter to substantiate adequately acceptable pain relief and degree of side effects (including effects on the activities of daily living) and patient acceptance.

4. Coverage of Other Uses of Implanted Infusion Pumps.  Determinations may be made on coverage of other uses of implanted infusion pumps if the contractor's medical staff verifies that:

o  The drug is reasonable and necessary for the treatment of the individual patient;

o  It is medically necessary that the drug be administered by an implanted infusion pump; and

o  The FDA approved labeling for the pump must specify that the drug being administered and the purpose for which it is administered is an indicated use for the pump.

5.    Implantation of Infusion Pump Is Contraindicated.  The implantation of an infusion pump is contraindicated in the following patients:

o  Patients with a known allergy or hypersensitivity to the drug being used (e.g., oral baclofen, morphine, etc.);

o  Patients who have an infection;

o  Patients whose body size is insufficient to support the weight and bulk of the device; and

o  Patients with other implanted programmable devices since crosstalk between devices may inadvertently change the prescription.

NOTE: Payment may also be made for drugs necessary for the effective use of an implantable infusion pump as long as the drug being used with the pump is itself reasonable and necessary for the patient's treatment.

**THE FOLLOWING INDICATIONS FOR TREATMENT USING INFUSION PUMPS ARE NOT COVERED UNDER MEDICARE:**

A.    External Infusion Pumps

1.    Diabetes (Effective for Services Performed On or After 1/29/85).  The use of an external infusion pump for the subcutaneous infusion of insulin in the treatment of diabetes is not covered.

2.    Vancomycin (Effective for Services Beginning On or After September 1, 1996). Medicare coverage of vancomycin as a durable medical equipment infusion pump benefit is not covered.  There is insufficient evidence to support the necessity of using an external infusion pump, instead of a disposable elastomeric pump or the gravity drip method, to administer vancomycin in a safe and appropriate manner.

B.    Implantable Infusion Pump

1.    Thromboembolic Disease (Effective for Services Performed On or After 9/26/84). According to the Public Health Service, there is insufficient published clinical data to support the safety and effectiveness of the heparin implantable pump.  Therefore, the

use of an implantable infusion pump for infusion of heparin in the treatment of recurrent thromboembolic disease is not covered.

2.     Diabetes:  Implanted infusion pumps for the infusion of insulin to treat diabetes is not covered.  The data do not demonstrate that the pump provides effective administration of insulin.

## SECTION 65-7          INTRAOCULAR LENSES (IOLs)

An intraocular lens, or pseudophakos, is an artificial lens which may be implanted to replace the natural lens after cataract surgery.  Intraocular lens implantation services, as well as the lens itself, may be covered if reasonable and necessary for the individual. Implantation services may include hospital, surgical, and other medical services, including pre-implantation ultrasound (A-scan) eye measurement of one or both eyes.

Cross-refer:  HCFA Pub. 13-3, §§3110.4, 3151, and 3157;  HCFA Pub.14-3, §2130; HCFA Pub. 10, §228.4

# EXHIBIT 135



20344293

Jun 20 2008
4:12PM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*,<br>CIVIL ACTION NO. 06-CV-11337-PBS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 1456<br>Civil Action No. 01-12257-PBS<br><br>Hon. Patti B. Saris |
| | | |

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                        1

**Executive Summary**

1. This Report calculates a **$108.2 million difference** between (1) what the federal government reimbursed for certain pharmaceutical products provided to Medicaid and Medicare recipients during the eleven-year period 1991 to 2001 and (2) what the federal government would have reimbursed for the same products during the same time period if prices reflective of the actual prices at which Abbott was transacting business had been used for the AWP, WAC, and Direct Price of Abbott products. The report analyzes Abbott internal transaction data from the relevant time period, as well as paid claims data from the Medicaid and Medicare programs. The $108.2 million difference does not include the $48.0 million impact on state governments' Medicaid spending or the $10.6 million impact on Medicare recipients' co-payments.

2. The Report also calculates that **2.30 million payments to health care providers would have been lower and 13.21 million claims would have resulted in lower Medicare or Medicaid spending** had alternative prices been used for the AWP, WAC, and Direct Price of certain Abbott products during the relevant time period. This information along with the information reported in paragraph (1) is summarized in the following table, with dollar amounts listed in millions and the number of claims and provider payments reported in thousands:

| Category | Difference | | | Amount Paid | Reference Table | Claims | Provider Payments |
|---|---|---|---|---|---|---|---|
| | Federal | State | Total | | | | |
| Medicaid | $65.8 | $48.0 | $113.8 | $157.1 | 25 | 3146.9 | 521.7 |
| Medicare DME | $11.1 | $0.0 | $11.1 | $23.5 | 33 | 101.7 | 54.1 |
| Medicare Part B1 | $15.6 | $0.0 | $15.6 | $68.0 | 43 | 4726.3 | 720.6 |
| Medicare Part B2 | $15.7 | $0.0 | $15.7 | $94.2 | 44 | 5234.6 | 1002.2 |
| Total | $108.2 | $48.0 | $156.2 | $342.8 | - | 13209.5 | 2298.6 |

3. The empirical methods that I employed to calculate Abbott prices for the subject drugs are consistent with those that I and other economists typically use in academic research.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                    2

Additionally, the empirical methods that I used for calculating the payment amounts that the Medicaid and Medicare programs would have made are consistent with those that I and other economists typically use in academic research.  And finally, the empirical methods that I used to extrapolate my results from a sample of state Medicaid programs or Medicare insurance carriers to other state Medicaid programs or Medicare insurance carriers are also consistent with those used by myself and other economists in academic research.  The empirical methods that I employed and the assumptions that I made are set forth in exacting detail in the Report so that my results can be replicated and so that any changes in data or assumptions about the data can be readily accommodated in the analysis.

4. At various stages in my analysis – indeed at virtually every step where I believed that there were two or more acceptable ways to proceed in analyzing the Abbott, Medicaid, and Medicare data – I deliberately chose the conservative approach, that is, the approach that minimized the dollar difference and the number of provider payments and claims reported in the preceding table.  Additionally, I have excluded 6 of the 11 J-codes listed in the Complaint from my analyses, with these 6 J-codes accounting for more than 10 percent of Medicare spending on Complaint J-codes from 1991 to 2001. For Medicaid I considered only NDC-based claims, thus excluding Medicaid HCPCS claims from my analyses.  Both of these adjustments will serve to reduce the dollar values, the number of provider payments, and the number of claims reported in the preceding table below what they otherwise would be.

5. All of my conclusions were reached using methods that are generally accepted within the field of economics.  I hold these conclusions with a reasonable degree of professional certainty.

**I. Qualifications**

My name is Mark G. Duggan.  I am a Professor in the Department of Economics at the University of Maryland, College Park.  I received my Bachelor of Science in Electrical Engineering from M.I.T. in 1992 and my Master of Science in Electrical Engineering from M.I.T. in 1994.  I obtained my doctorate in Economics from Harvard University in 1999.

I was an Assistant Professor in the University of Chicago's Department of Economics and a Visiting Assistant Professor in M.I.T.'s Department of Economics before joining the University of Maryland's Department of Economics in 2003.  I was awarded a two-year Alfred P. Sloan Foundation Fellowship in 2004, an award that is made each year to only six to eight economists who are selected from those in the entire profession who are within six years of receiving their Ph.D.

I have served on several committees at the University of Maryland and have received teaching and/or advising awards at Harvard University, M.I.T., the University of Chicago, and the University of Maryland.  I have served as an advisor to approximately 20 Ph.D. students at the University of Chicago and the University of Maryland, with recent advisees of mine accepting positions at the College of William and Mary, Cornell University, Syracuse University, University of Houston, and the World Bank.

My professional activities include serving as a Research Associate at the National Bureau of Economic Research in the Health Care and Public Economics programs.  I was also recently a Visiting Fellow at the Brookings Institution and I am a member of the American Economic Association and the American Society of Health Economists.  I serve as an Associate Editor of the *Journal of Public Economics* and on the Board of Editors of the *American Economic*

*Journal: Economic Policy*.  I have been the Principal or co-Principal Investigator on numerous research grants, including current ones from the National Science Foundation and the Social Security Administration.  The National Science Foundation-funded grant is for a project with Fiona Scott Morton, Ph.D., and is titled "Government Procurement of Pharmaceuticals."

I have published more than a dozen papers and have presented my research at numerous professional conferences and at dozens of academic institutions, including Columbia University, Harvard University, M.I.T., Princeton University, Stanford University, University of Chicago, and Yale University.  One paper of mine was published as the lead article in the January 2005 issue of the *Journal of Health Economics* and was titled "Do New Prescription Drugs Pay for Themselves?  The Case of Second Generation Antipsychotics."  Another recent paper, jointly authored with Dr. Scott Morton, was titled "The Distortionary Effects of Government Procurement: Evidence for Medicaid Prescription Drug Purchasing" and was published as the lead article in the February 2006 issue of the *Quarterly Journal of Economics*.  A more recent paper of mine on the Supplemental Security Income program, jointly authored with my colleague Melissa Kearney, Ph.D. and published in the Autumn 2007 issue of the *Journal of Policy Analysis and Management*, received the Raymond Vernon Memorial Prize for being voted the best research article in that journal in 2007.

Other papers of mine that focus on the Medicaid program have been published in some of the leading journals of my profession, including the *Journal of Public Economics*, the *Quarterly Journal of Economics*, and the *RAND Journal of Economics*.  I have published empirically-oriented papers on other topics in leading journals including the *American Economic Review, Forum for Health Economics and Policy, Journal of Economic Perspectives, Journal of Political Economy, Journal of Policy Analysis and Management*, and the *Journal of Public Economics*.  In

two of my current projects, I am analyzing the impact of Medicare Part D on pharmaceutical

prices (with Dr. Scott Morton) and the effect of state governments' Medicaid managed care

policies on Medicaid expenditures (with Tamara Hayford).

My research is empirically oriented and focuses on the impact of government expenditure

programs such as Medicaid, Medicare, and Social Security.  I have conducted several studies in

which I apply advanced quantitative methods to large-scale data sets to investigate questions in

applied microeconomics that are of interest to academics and policymakers.  A central issue in

most of these studies is determining whether a causal relationship exists between one variable

and another.  For example, in my *Journal of Health Economics* paper on pharmaceutical

treatments, I investigate the impact of certain new treatments on Medicaid spending and health

outcomes.

Much of this work has included the aggregation of highly complex encounter level data

to the individual level, which is then often merged with other data.  For example in a paper

published in the *Journal of Public Economics*, I aggregate Medicaid claims and expenditure data

to the individual level and then merge this with data on individual-level HMO enrollment.

Similarly, in a recent paper on Medicare Part D with Dr. Scott Morton, I am utilizing encounter-

level data from the Medical Expenditure Panel Survey to estimate the "Medicare market share"

for every one of the top 1000 drugs in the U.S.

In carrying out this research, I have followed the methods that are generally applied and

accepted in my profession to ensure that the data sets that are constructed are as accurate as

possible.  I have then applied the most appropriate microeconometric methods to investigate

causal relationships.  For example, in the *Journal of Health Economics* paper referred to above, I

utilize instrumental variables methods to estimate the effect of new pharmaceutical treatments on

Medicaid expenditures. In a *Journal of Public Economics* paper on Medicaid managed care, I utilize a differences-in-differences methodology that exploits the differential timing of county level Medicaid managed care mandates to estimate the effect of HMOs on Medicaid expenditures. And in the *Quarterly Journal of Economics* paper, we estimate multivariate regression models that are grounded in economic theory to estimate the effect of Medicaid market shares on pharmaceutical prices.

The most appropriate methodologies for the construction of data sets and the analysis of these data sets depend on many factors. My training and experience as an economist have provided me with a diverse arsenal of microeconometric methods and an understanding of how optimally to respond to the many obstacles that one confronts when analyzing and processing multiple complex, large-scale data sets in the same project.


## II. Overview

In this report, I use data from several different sources to determine the amount by which spending by the federal Medicare and federal-state Medicaid programs would have changed if alternative prices had been used for Abbott products' Average Wholesale Prices (AWPs), Wholesaler Acquisition Costs (WACs), and Direct Prices (DPs). For my analyses of the Medicaid program, I focus on the 44 NDCs listed in the United States' Complaint and for my analysis of the Medicare program I focus on the 11 J-codes listed in the Complaint.

In the first two main sections, I provide a detailed description of Abbott's direct and indirect transaction data. I consider how Abbott's sales and prices vary across products, over time, across classes of trade, and across transaction types. I also provide comparisons of

Abbott's actual transaction prices and the AWPs, WACs, and DPs published by pricing compendia such as First DataBank (FDB) and Red Book.

For example, Figure 1 displays the average price for all customers in Abbott's direct transaction data in each quarter from 1991Q1 to 2001Q4 for the Vancomycin 74653301 product, which is a natural one to focus on given that it accounts for more Medicaid spending than any other Complaint NDC.  The Figure also depicts the FDB Direct Price for that same product in each quarter.  As the Figure reveals, the discrepancy between actual and published prices increases steadily over time.  In the first quarter of 1991, the DP is $38.00 versus an average price of 5.864.  During the next ten years, the DP increased by 69.3 percent to $64.35 while the actual average price declined by 26.1 percent to $4.33.  During that ten-year period, the ratio of the DP to Abbott's average direct price increased from 6.5 to 1 to 14.9 to 1.  Figure 2 displays a similar pair of series for the pharmacy-specific average price in Abbott's indirect transaction data, which represent sales of Abbott products to pharmacies by wholesalers and distributors, versus the FDB AWP in each quarter.  In this case, the ratio of the published to the actual price increases from 5.9 to 1 in the first quarter of 1991 to 17.5 to 1 by the first quarter of 2001.

Using Abbott's direct and indirect transaction data, I determine how spending by both the Medicaid and Medicare programs would have changed if alternative prices had been used for the AWP, WAC, and DP when adjudicating claims for both programs.  For example, I replace the WAC by the average pharmacy-specific price in Abbott's indirect transaction data, and determine how spending by Medicaid programs that use the WAC would have changed if this alternative price had been used.  This average price will overstate the actual average cost to wholesalers and distributors of acquiring Abbott products because it does not include wholesalers' prompt pay discounts, for example.  Additionally, by focusing on the pharmacy

classes of trade rather than considering the average price to wholesalers of acquiring products for all classes of trade, the discrepancy between actual and published prices will tend to be lower. This is because, as I demonstrate below, pharmacy prices in both Abbott's direct and indirect transaction data tend to exceed prices to other customers (most notably hospitals for the products in this Complaint).

An examination of the published prices for the Abbott products listed in the Complaint indicates that the AWP is typically 125 percent of the WAC. My own analysis of Abbott's indirect and direct transaction data reveals the difference between the price at which wholesalers and distributors acquire Abbott products and the corresponding price at which they sell the products is on average much less than 25 percent. Despite this, I take the conservative approach of replacing the AWP with 125 percent of the average pharmacy indirect price for each NDC in each quarter, and determine how spending by the Medicaid and Medicare programs would have changed if these alternative prices had been used when adjudicating claims for both programs. I do the same for the Direct Price, though in this case I replace it with Abbott's average, pharmacy-specific price in the direct transaction data.

There are approximately 3.354 million NDC-based Medicaid claims for the Abbott products listed in the Complaint.[1] In the analyses below, I find that Medicaid spending for 3.147 million of these claims (93.8 percent) would have been lower if the alternative prices described above had been used for the AWP, WAC, and DP. Similarly, my results indicate that there were 521,695 payments to pharmacies and other health care providers with at least one NDC-based Medicaid claim that would have been paid at a lower amount. Additionally, I find that Medicaid spending would have been lower by $113.8 million, with this representing 72.4 percent of the

---

[1] It is important to note that I exclude Medicaid HCPCS claims from my analyses. Thus when I refer to Medicaid claims in the sections that follow, this represents NDC-based Medicaid claims.

$157.1 million in spending for these products during the 1991 to 2001 period.  Because Medicaid is financed both by the federal government and by the individual state governments, part of this spending represents that paid by state governments.  I determine that the federal share of the $113.8 million is $65.8 million.

I perform a similar set of analyses for the federal Medicare program.  During the 1991 to 2001 period, I find that the Medicare program spent more than $211.6 million on the 11 J-codes listed in the Complaint.  I focus exclusively on the 5 (out of 11) J-codes that account for approximately 90 percent of this spending, and find that Medicare spending would have been lower by approximately $42.4 million if alternative values had been used for Abbott products' AWPs as described above.  My results further indicate that Medicare spending would have been lower for 10.063 million of the 15.684 million claims that I consider, and that the total number of provider payments with at least one claim with a reduced payment amount is equal to 1.777 million.  To the extent that there was a similar effect for the six J-codes that I do not consider, the number of claims, payments, and the total impact on Medicare spending would be greater.

Taken together, my results indicate that spending by the federal government for both the Medicaid and Medicare programs would have been lower by at least $108.2 million during the 1991 to 2001 period if alternative prices had been used for the AWP, WAC, and DP of Abbott products as described above.  The total number of payments to health care providers that would have had lower Medicaid or Medicare spending is approximately 2.30 million and the total number of claims on which spending would have been lower is 13.21 million.  The expenditure impact for the federal government does not include the $48 million impact on Medicaid spending by state governments.  Additionally, it does not include the impact on Medicare recipients' co-

payment amounts, which are typically one-fourth of spending by the Medicare program (20 versus 80 percent) for the J-codes considered, which would represent an additional $10.6 million.

## III. Abbott's Direct Transaction Data

The first main set of data that I use in my analysis was provided by Abbott on December 14, 2007, and includes direct transaction data for products listed in the United States' Complaint. The direct transaction data includes detailed information on sales by Abbott to wholesalers, distributors, hospitals, pharmacies, and many other types of health care providers. Data was provided for transactions occurring during the 1991 through 2003 calendar years, though I focus on just the first eleven years (1991 to 2001) in the analyses that follow.

In this section, I describe Abbott's direct transaction data. In preparing this, I have drawn on the deposition of Bruce Stowell, other documents including many provided by Abbott, and my own analysis of the Abbott data. I have also made use of the description of Abbott's data in my previous report for the Texas case against Abbott (see Duggan, 11/12/2007). This is because the format of the direct transaction data provided by Abbott for the federal case is very similar to that provided by Abbott in the Texas case.

### A. The Breakdown by Product and Time Period

Table 1 provides an initial summary of the Abbott direct transaction data used in my analyses by listing the number of observations along with several other pieces of information for each product. The identifier used for each product is the national drug code (NDC), all 44 of which are listed in the United States' Complaint. As the second column of this table shows, there exists substantial variation across products in the number of transactions, ranging from a

high of 1,019,182 (for 74798309) to a low of 13,125 (for 74653401).  The total number of observations is 12,672,670, with all 44 products represented.

The third column of Table 1 lists total gross sales (EXTPRICE) in thousands of dollars for each NDC, with the sum of this variable across all observations equal to $3.451 billion.[2]  The next column in the table lists the sum of the REBATE-ACCRUAL field for each NDC.  As described by Mr. Bruce Stowell in July 19, 2006 deposition, the Hospital Products Division (HPD) uses this field to account for chargebacks, which typically represent credits or transfers of funds from Abbott back to the customer and thus the dollar amounts for this are negative.  Aggregated across all observations, total chargebacks in the direct transaction data for the products in the Complaint are equal to $1.142 billion.  The fifth column lists the average per-package price for each NDC.  To calculate this average price, I divide the sum of total sales and chargebacks for each NDC by the sum of the total quantity (ICQTY) transacted for that NDC.[3]

The final two columns of the table compare this average per-package price with Abbott's Direct Price and Average Wholesale Price (as published by First DataBank) in effect during the third quarter of 1996, which is roughly halfway through the 11-year time period of interest.[4]  Specifically, in the sixth column I report the ratio of the Direct Price in the third quarter of 1996 to Abbott's average price during the 11-year period, while in the seventh column I report the analogous ratio using the Average Wholesale Price (AWP) in the third quarter of 1996 in the numerator.  The average values of these ratios across all products are 10.07 and 11.95, respectively.  While I examine this issue more thoroughly in the analyses that follow, this first-

---

[2] See Stowell Exhibit 13 for a list of the variable names and Stowell Exhibit 14 for a list of the variable labels.  The EXTPRICE variable was also in some cases labeled LN-XTN (for line extension).  For the purposes of this report, I use the terms revenues and sales interchangeably.
[3] When calculating this average price, I exclude the 67,863 transactions (0.54 percent of the total) that are returns because the units in the ICQTY variable may not be consistent.
[4] It is my understanding that the prices published by First DataBank and other pricing compendia such as Red Book are based on price representations by Abbott.

pass comparison suggests that the published prices for the Abbott products in the Complaint exceeded their actual transaction prices by an average of approximately 10-to-1 (for the Direct Price) or 12-to-1 (for the AWP).

Table 2 lists the number of observations, total sales, and total chargebacks by year and quarter in the direct data during the eleven year period that I consider. The final column of the table lists the number of NDCs with one or more direct transactions in that quarter, which increases from a low of 35 in early 1991 to 44 by the fourth quarter of 1998, where it remains for the next twelve quarters.

*B. The Instruction and Transaction Codes*

There are many different types of transactions that are included in the direct data, and these are described in Abbott's COP Transaction Matrix (Stowell Exhibit 28).[5] The final two columns of this matrix provide numerical values for the instruction code and the transaction code, both of which are included in the direct data. For example the first row of this matrix lists a "normal billing" transaction, which would have an instruction code of 0 and a transaction code of 1. As Table 3 shows, this transaction type is the most common one for the products in the Complaint, accounting for 80 percent of the 12.673 million transactions and 82 percent of the $3.451 billion in gross sales (EXTPRICE).

Table 3 lists 21 other transaction types, which are sorted in descending order of the absolute value of total net sales across all 44 products. The final two columns of this table list the instruction and transaction codes for each row. Many of the transactions listed in the COP Transaction Matrix do not appear in the direct data and thus I do not include them. Transaction

---

[5] A shorter version of this information is also contained in Stowell Exhibit 16.

types with an instruction code between 0 and 18 are labeled as debits in the COP Transaction

Matrix whereas those between 60 and 90 and the blank instruction code are labeled as credits.

I include virtually all of the transaction types that appear in Abbott's direct transaction

data when calculating average prices and related price statistics in my subsequent analyses.  For

example, in addition to normal billing transactions, I consider manual splits, price adjustments,

and additional product charge transactions.  However, because Mr. Stowell noted in his

deposition that the units for returns (instruction codes of 60 through 64) might not be

comparable, I exclude them.  These returns account for just 0.54 percent of transactions and 0.76

percent of total net sales.

*C. Customer Class of Trade*

Among the more than 50 variables included in the direct data is one that can be used to

determine the customer's class of trade (CLAS), which are listed in Exhibit 15 of Mr. Stowell's

deposition.  Table 4 lists the number of observations, total gross sales, and total rebate accruals

by class of trade, which are sorted in descending order of total net sales.  Only the 27 largest

classes of trade in terms of total net sales are listed, with the remaining 81 for which there is data

grouped into the final category.  The top 27 classes of trade account for 99.4 percent of net sales

and 99.2 percent of transactions in Abbott's direct data.

As this table shows, non-profit hospitals are the most common class of trade in the direct

data, accounting for 56.3 percent of transactions and 36.8 percent of net sales.  The two next

most common are Wholesalers and HPD Distributors, which between them account for 10.9

percent of transactions, 39.2 percent of net sales, and 91.1 percent of rebate accruals.  These two

classes of trade also account for virtually all of the sales in Abbott's indirect transaction data, which I describe in more detail in Section IV.

An examination of the direct transaction data reveals that the price per package of a product in a specific quarter does vary to some extent across classes of trade.[6]  To shed light on this issue, I calculate the class of trade specific average price for each product in every quarter and divide that by the product's overall average price in the same quarter.  I then average this ratio for each class of trade across all NDC-quarter combinations, weighting by the number of transactions for the class of trade – product – quarter combination.

Given that Abbott provided data for all 44 products and there are 44 quarters, the maximum number of ratios for each class of trade is 1,936.  When one accounts for the fact that not all products have sales in every quarter (see the sixth column of Table 2), the actual maximum number of ratios for each class of trade is 1,832.  To the extent that prices tend to be lower (higher) than the average for a particular class of trade, one would expect this ratio to fall below (above) one.

The second-to-last column of Table 4 lists the average ratio of the class of trade specific price to the overall average price, with the final column listing the number of ratios for each class of trade.  The average ratio of 0.953 for Non-Profit Hospitals indicates that prices for this class of trade tend to be lower than for other classes of trade.  The same is true for City or County Hospitals (ratio of 0.969), For-Profit Hospitals (0.995), and State Hospitals (.983).  Average prices to Retail Pharmacies and Closed Pharmacies tend to exceed the overall average price, with average ratios of 1.199 and 1.269, respectively.  Average prices to Wholesalers and HPD Distributors tend to fall between these two ranges, with average ratios of 1.125 and 1.016, respectively.

---

[6] I define the price to be equal to the net amount paid divided by total quantity.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                    15

*D. A Comparison of Actual and Published Prices: The Case of Vancomycin (74653301)*

Using Abbott's direct transaction data, one can calculate the average price or other price statistics such as the median or the 95th percentile for a specific product in a given time period. To calculate the average price, I first exclude all returns (instruction codes between 60 and 64 inclusive) because their units might not be comparable to the other transactions in the direct data as described above. I then aggregate net sales and quantity across all transactions. I define the time period to be a quarter (January-March, April-June, July-September, October-December) and thus the unit of observation is the NDC-quarter.[7]

The third and fourth columns of Table 5 list the First DataBank Direct Price (hereafter Direct Price or DP) and Abbott's actual average price for all classes of trade for the Abbott product with an NDC of 00074653301. As shown in Section V below, this Abbott product accounts for more Medicaid spending during the eleven-year period of interest than any other product included in the United States' Complaint. In the first quarter of 1991, the average per-package price for this product was $5.864 versus a published Direct Price of $38.000. Thus the published price was 6.5 times greater than the average price at the beginning of the study period.

For two reasons, this ratio of the Direct Price to Abbott's actual average price then increases substantially during the next ten years. First, the Direct Price for this product increases by an average of 5.4 percent per year from the first quarter of 1991 to the first quarter of 2001. Second, Abbott's actual average price decreases by an average of 3.0 percent per year during the same period. Thus in the first quarter of 2001, the ratio of the Direct Price to the actual average price was 14.9 to 1. The Direct Price then declined by 76.9 percent so that the ratio in the final

---

[7] I drop any NDC-quarter observations with total net sales or total quantity that is negative. I also drop NDC-quarter-customer observations that do not have a strictly positive number of purchase units. The customer number that I use is the BILL-TO customer number.

quarter of 2001 was 3.4 to 1.  This decline in the ratio is driven by the change in the published DP for this product. These quarterly price data – the Direct Price and Abbott's actual average price - are depicted graphically in Figure 1.

The fifth column of Table 5 lists the 95th percentile price for this same Abbott product. As the table shows, these prices are fairly similar to the average price in each quarter and have similar trends over time.  For example the ratio of the Direct Price to the 95th percentile price increases from 6.1 in the first quarter of 1991 to 14.0 in the first quarter of 2001 and then declines sharply to 3.4 to 1 in the fourth quarter of 2001.  The next two columns of this same table list the total number of customers and the number of transactions in each quarter for this Abbott Vancomycin product.

In the final four columns of Table 5, I report analogous information for transactions involving only the retail pharmacy (class of trade A003), chain pharmacy (A007), and closed pharmacy (M070) classes of trade.[8]  Both the level and the trend in Abbott's average and 95th percentile prices are similar for these classes of trade as for all transactions.   Because of this, the ratio of the Direct Price to the actual average price increases from 5.6 in the first quarter of 1991 to 15.3 by the first quarter of 2001.

## IV. Abbott's Indirect Transaction Data

The second main set of data that I use in my analysis was provided by Abbott on November 5, 2007, and includes indirect transaction data for products listed in the United States' Complaint during the 1991 through 2001 calendar years.  The indirect transaction data includes

---

[8] The number of transactions and the total net revenues for the A007 class of trade are 1,258 and $84,167, respectively.  This class of trade is not listed in Table 4 because it is not one of the leading classes of trade and is therefore grouped into the "Remaining 81 Classes of Trade" category.

detailed information on sales by wholesalers and HPD distributors to pharmacies, hospitals, and many other types of health care providers.

In this section, I describe Abbott's indirect transaction data. In preparing this, I have drawn on the testimony of Ms. Nancy Lee Carlson in her July 20, 2006 deposition, other documents including many provided by Abbott, and my own analysis of the Abbott data.

*A. The Breakdown by Product and Time Period*

Table 6 provides an initial summary of the Abbott indirect transaction data used in my analyses by listing the number of observations along with several other pieces of information for each product. The identifier used for each product is the national drug code (NDC), all 44 of which are listed in the United States' Complaint. As the second column of this table shows, there exists substantial variation across products in the number of transactions, ranging from a high of 1,552,124 (for 74196607) to a low of 8,817 (for 74613922). The total number of observations is 16,131,540, with all 44 products represented.

The third column of Table 6 lists the total amount paid by the end customers (END-CUSTOMER-INVOICE-TOTAL) in thousands of dollars for each NDC, with the sum of this variable across all observations equal to $876.6 million. The next column in the table lists the total number of packages purchased by end customers (PURCHASE-UNITS) for each NDC.[9] The fifth column includes the sum of customer rebates, discounts, and management fees for each NDC (CUSTOMER-REBATE-DISCOUNT-ETC-TOTAL), though as demonstrated below this

---

[9] While the label for this variable is units, the values are in terms of packages, which must be multiplied by the number of units per package to arrive at the number of units (e.g milliliters).

variable is not populated until the beginning of 1996 in the indirect data.[10]  The sixth column lists the average per-package price for each NDC.  To calculate this average price, I divide the sum of the total amount paid for each NDC by the sum of the total quantity transacted for that NDC.  Because I exclude the customer rebates from my average price calculation, these calculated average prices will tend to exceed the actual average prices during the time period of interest.

The next column of this table lists the corresponding average product-specific price during the same 1991 to 2001 period for the Wholesaler (W050) and HPD Distributor (M061) classes of trade in Abbott's direct transaction data.  As I show in the next section, virtually all of the transactions summarized in the indirect data represent sales from wholesalers or HPD distributors, which have the W050 and M061 classes of trade, respectively.  A comparison of the average prices for the W050 and M061 classes of trade in the direct data with the corresponding end customer average prices in Abbott's indirect data reveals that for 28 out of 44 products they are within one percent of one another and for 40 out of 44 products the difference in the average prices is less than five percent (the remaining four are within ten percent).

Table 7 lists the number of observations, total sales, and total customer rebates by year and quarter in the indirect data during the eleven year period that I consider.  As the table shows, the customer rebate variable is equal to zero in every quarter from 1991 through 1995, suggesting that the rebate data for this earlier period are missing.  These rebates were 6.3 percent of sales from 1996 to 2001, ranging from a low of 5.0 percent in the third quarter of 1996 to a high of 7.7 percent in the fourth quarter of 2000.  The final column of the table lists the number of NDCs with one or more indirect transactions in that quarter, which increases from a low of 34 in early 1991 to 44 by the first quarter of 1999.

---

[10] According to Nancy Lee Carlson's deposition, "this field is for potential payments should contractual negotiations be met." (page 120 of ABT-DOJ 0227180)  The final row of the table in Exhibit 33 of this same deposition suggests that in addition to customer rebates and discounts, this field may also include management fees.

*B. The Wholesaler Customer Number and Name*

Abbott's indirect transaction data includes two variables labeled WHLSR-NAME and WHLSR-CUSTOMER-NUMBER that provide the name and customer number, respectively, of the selling organization for each transaction. The WHLSR-CUSTOMER-NUMBER can then be used to determine the class of trade for the selling organization by linking with Abbott's direct transaction data. For 74.6 percent of the 16.132 million indirect transactions, the wholesaler customer number does appear in the direct transaction data. Within this set of matched indirect transactions, 56.4 percent have W050 (Wholesaler) as the class of trade and 43.6 percent have M061 (HPD Distributor) as the class of trade.[11] By examining the WHLSR-NAME for the 25.4 percent of the indirect transactions with a customer number that does not appear in the direct data, I can determine the class of trade for the selling organization.[12] For example, 7 customer numbers with a WHLSR-NAME of "AMERISOURCE CORP" do not appear in the direct data. However, another 16 customer numbers with the same WHLSR-NAME do appear in Abbott's direct transaction data and all 16 have W050 as the class of trade.

Table 8 lists the total number of indirect transactions and the total amount of end customer sales (excluding rebates) by the selling organization's name. In constructing this table, I have grouped together similar customer names. Thus for example, "AMERISOURCE", "AMERISOURCE CORP", "AMERISOURCEBERG DRUG", "AMERISOURCE BERGEN DR", and 13 other customer names that appear in the Abbott data and begin with

---

[11] In some cases, there is more than one class of trade for a customer number in the direct transaction data. In those cases I simply use the most common class of trade for that customer number. For a very small number of transactions (less than 0.05 percent) the customer number has a different class of trade. Specifically 0.040 percent have M060 as the class of trade and 0.001 percent have P040 as the class of trade.

[12] One complication is that from 1991 to 1995 the WHLSR-NAME variable is typically missing in the indirect data. In those cases if the customer number does not appear in the direct data, I can link with the indirect data from 1996 to 2001 to determine the WHLSR-NAME.

"AMERISOURCE" are all grouped into the "AMERISOURCE" category.  The final column of the table lists the class of trade for this category.  As above, when there is more than one class of trade in a category I list the most common one.[13]

As mentioned above and shown in Table 6, the average product-specific end customer prices in Abbott's indirect data are very similar to the average prices for the W050 and M061 classes of trade in Abbott's direct data.  Similarly, an examination of Table 4 and Table 8 reveals that total sales are quite similar as well.  More specifically, total net sales in Abbott's direct transaction data to the W050 and M061 classes of trade amount to $904.7 million while total sales to end customers in the indirect data are equal to $876.6 million, which represents a difference of 3.1 percent.

*C. End Customer Class of Trade*

Among the variables included in Abbott's indirect data is one that can be used to determine the end customer's class of trade (SHIP-TO-CUSTOMER-CLASS-OF-TRADE).  Table 9 lists the number of observations, total sales, and total customer rebates by class of trade, which are sorted in descending order of total sales.  Only the 21 largest classes of trade in terms of total sales are listed, with the remaining 68 for which there is data grouped into the final category.  The top 21 end customer classes of trade account for 99.2 percent of sales and 99.0 percent of transactions in Abbott's indirect data.

As this table shows, non-profit hospitals are the most common end customer class of trade in Abbott's indirect data, accounting for 64.3 percent of transactions and 58.9 percent of sales.  The two next most common are City or County Hospitals and Profit Hospitals, which

---

[13] In two cases (PRO HOSP SPLY and PRIORITY HEALTHCARE), none of the customer numbers from the indirect data in a category appear in the direct data.  In those cases I simply use the wholesaler name from the indirect data and determine the most common class of trade in the direct data with the same names.

between them account for 20.3 percent of transactions and 21.1 percent of sales.  If one excludes the "Missing Class of Trade" category, retail pharmacies (A003), closed pharmacies (M070), and chain pharmacies (A007) are numbers 6, 8, and 20, respectively, in terms of total sales in Abbott's indirect transaction data.

　　　　An examination of Abbott's indirect transaction data reveals that the price per package of a product in a specific quarter does vary to some extent across classes of trade.  To shed light on this issue, I calculate the class of trade specific average price for each product in every quarter and divide that by the product's overall average price in the same quarter.  I then average this ratio for each class of trade across all NDC-quarter combinations, weighting by the number of transactions for the class of trade – product – quarter combination.

　　　　Given that Abbott provided data for 44 products and there are 44 quarters in the time period of interest, the maximum number of ratios for each class of trade is 1,936.  When one accounts for the fact that not all products have sales in every quarter (see the seventh column of Table 7), the actual maximum number of ratios for each class of trade is 1,827.  To the extent that prices tend to be lower (higher) than the average for a particular class of trade, one would expect this ratio to fall below (above) one.

　　　　The second-to-last column of Table 9 lists the average ratio of the class of trade specific price to the overall average price, with the final column listing the number of ratios for each class of trade.  The average ratio of 0.988 for Non-Profit Hospitals indicates that prices for this class of trade tend to be lower than for other classes of trade.  The same is true for For-Profit Hospitals (0.993), V.A. Hospitals (0.925), and Military Hospitals (0.970), though not for City or County Hospitals (1.003) and State Hospitals (1.021).  As this same table shows, average prices to Retail

Pharmacies, Closed Pharmacies, and Chain Pharmacies tend to exceed the overall average price, with average ratios of 1.200, 1.093, and 1.369, respectively.

*D. A Comparison of Actual and Reported Prices: The Case of Vancomycin (74653301)*

Using Abbott's indirect transaction data, one can calculate the average price or other price statistics such as the median or the 95th percentile for a specific product in a given time period.  To calculate the average price, I aggregate total sales as measured by the END-CUSTOMER-INVOICE-TOTAL variable and divide this by the total of the PURCHASE-UNITS variable.  I define the time period to be a quarter (January-March, April-June, July-September, October-December) and thus the unit of observation is an NDC-quarter.

The third and fourth columns of Table 10 list the AWP and the actual average price in Abbott's indirect data for all end customer classes of trade for the Abbott product with an NDC of 00074653301.  As shown in Section V below, this Abbott product accounts for more Medicaid spending during the 1991 to 2001 period than any other product included in the United States' Complaint.  In the first quarter of 1991, the average per-package price for this product in the indirect data was $6.062 versus an AWP of $45.125.[14]  Thus the AWP was 7.4 times greater than the average price at the beginning of the study period.

For two reasons, this ratio of the AWP to the actual average price then increases substantially during the next ten years.  First, the AWP for this product increases by an average of 5.4 percent per year from the first quarter of 1991 to the first quarter of 2001.  Second, the actual average price for this product decreases by an average of 2.9 percent per year during the same period.  Thus in the first quarter of 2001, the ratio of the AWP to the actual average price in

---

[14] The First DataBank AWP for this product is 18.75 percent greater than the First DataBank Direct Price from the first quarter of 1991 through the second quarter of 2001. This ratio changes slightly in the middle of 2001 to 1.1904.

Abbott's indirect data was 16.9 to 1.  The AWP then declined by 77 percent so that the corresponding ratio in the final quarter of 2001 was 4.0 to 1.

The fifth column of this same table lists the 95th percentile price for this same Abbott product.  As the table shows, these prices are fairly similar to the average price in each quarter and have similar trends over time.  For example the ratio of the AWP for 00074653301 to the product's 95th percentile price increases from 6.6 in the first quarter of 1991 to 15.5 in the first quarter of 2001 and then declines sharply to 3.9 to 1 in the fourth quarter of 2001.  The next two columns of this same table list the total number of customers and the number of transactions in each quarter in Abbott's indirect data for this Vancomycin product.

In the final five columns of Table 10, I report similar information for transactions involving only the retail pharmacy, chain pharmacy, and closed pharmacy classes of trade. Both the level and the trend in the average price are similar for these classes of trade as for all transactions.   Because of this, the ratio of the AWP to Abbott's actual average price for these classes of trade in the indirect data increases from 5.9 in the first quarter of 1991 to 17.5 by the first quarter of 2001.  These quarterly price data – the AWP published by First DataBank and Abbott's average price for the three pharmacy classes of trade - are depicted graphically in Figure 2.  The 95th percentile price is somewhat higher for these three classes of trade than for all customers early in the study period, though as the next column shows, even the maximum price for these three pharmacy classes of trade is substantially lower than the AWP in every quarter during the 1991 to 2001 period.

## V. CMS Medicaid State Drug Utilization Data

The third main set of data that I utilize in my analysis consists of Medicaid NDC-based claims data[15] for the 44 Abbott products listed in the Complaint for the years 1991 through 2001. These claims provide detailed information about drugs dispensed by pharmacies and reimbursed on an NDC basis by the Medicaid program. Before proceeding to a description of Medicaid individual-level claims data, in this section I summarize the aggregate data on NDC-specific Medicaid spending and utilization that is available on the CMS website.  This aggregate data provides a useful overview of how Medicaid spending varied across products, time, and states for the 44 NDCs in the Complaint during the eleven year period of interest.

Each state administers its own Medicaid program and virtually every state provides periodic updates to CMS regarding the total number of prescriptions filled and the total amount paid for each NDC in every quarter.  This information on NDC-state-quarter-specific Medicaid spending and utilization for the 1991 through 2007 time period is publicly available on the CMS website at the page headed *State Drug Utilization Data* (hereafter SDUD).[16]

The information listed in Table 11 summarizes Medicaid spending and the number of NDC-based prescriptions reimbursed by Medicaid as reported on the CMS website for the 44 products listed in the Complaint from the first quarter of 1991 through and including the fourth quarter of 2001.[17]  As the first four columns of this table show, Medicaid spending for these products varied substantially across states during the 1991 to 2001 period, from a low of $44,000 in Washington, D.C., to a high of $16.483 million in Florida.[18]  The number of prescriptions reimbursed by Medicaid also varied across states, from a low of 1,234 in Idaho, to a high of

---

[15] This does not include Medicaid HCPCS (Healthcare Common Procedure Coding System) claims.

[16] See http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp.

[17] This information was downloaded from the CMS website on October 3, 2007.  The one revision to this data is that I exclude the one observation for the 74653301 product in Texas in the first quarter of 2000 because of an apparent data error.  Specifically the amount of SDUD Medicaid spending for this one product in Texas is 6.2 times greater in this one quarter than in the other 43 quarters combined in Texas for the same product.

[18] Arizona does not cover drugs through the Medicaid Drug Rebate program and thus they do not have Medicaid utilization data listed on the CMS site during the eleven year period. Thus Arizona is not listed in Table 11.

505,076 in Illinois.  Aggregating across all states, this aggregate CMS data indicates that the total number of prescriptions filled and the amount reimbursed by Medicaid for the Complaint products during the eleven-year period of interest are equal to 3.254 million and $146.837 million, respectively.

The next three columns of Table 11 provide a breakdown of the number of prescriptions and total Medicaid spending by NDC.  As the table shows, Medicaid spending varies substantially across the products listed in the Complaint, with a high of $38.951 million for the Vancomycin 74653301 product discussed above and a low of $276,000 for the Sterile Water product 74488750.  The number of prescriptions also varies substantially, with just 3,816 prescriptions filled for the product 74613922 compared with a high of 778,607 for the Sodium Chloride 74196607 product.

The final three columns of Table 11 list the total number of prescriptions and total Medicaid spending in each of the 44 quarters from 1991 through and including 2001.  Medicaid spending for the Complaint products increases steadily during the first ten years of the period, reaching a maximum of $6.218 million in the first quarter of 2001.  Spending then declines by 59.1 percent (to $2.543 million) during the next two quarters, despite the fact that the number of prescriptions declines by just 11.6 percent during this same period.  This decline is primarily driven by the change in the published prices (such as the AWP) for the Abbott products listed in the Complaint that occurred in 2001 and was described and depicted graphically for the Vancomycin 74653301 product above.

## VI. CMS Medicaid SMRF / MAX Data

In addition to the aggregate Medicaid data described above, CMS also maintains a large amount of Medicaid claims data, much of which is summarized on the CMS website at the page with the heading *Medicaid Analytic eXtract (MAX) General Information*.[19]  For the 1999 to 2004 data, the MAX data summarized at this site consists of five sets of files (person summary, inpatient hospital, long-term care, prescription drugs, and other services) for all fifty states and the District of Columbia.  The prescription drug claim files are the ones that I summarize in this section.  Similar data for prescription drug claims are also available for 30 states in one or more years from 1991 through 1998, with the data referred to as the State Medicaid Research Files (SMRF) during this earlier period.

Table 12A provides a summary of Medicaid spending and the number of claims for the 44 Complaint NDCs for each state from 1999 through 2001.  This table also lists state-level Medicaid spending and the number of prescriptions for Complaint products during the same three-year period as reported in the SDUD data described above.  Before comparing these two sets of data, it is worth noting that my summary of the claims data is based on service dates whereas the SDUD data are based on the date of payment.  Thus one would not expect an exact correspondence between the two sets of data.

As the table shows, for most of the states with relatively high Medicaid spending, there is a close correspondence between Medicaid spending in the two sets of files.  The one exception is Indiana, for which spending in the MAX data is 28.5 percent greater than in the SDUD data.  My examination of the SDUD data for Indiana indicates that it is incomplete during this period, with for example Medicaid spending of just $49,274 in the third quarter of 2000 versus an average of $631,918 per quarter in the second and fourth quarters of the same year.  Quarterly Medicaid

---

[19] See http://www.cms.hhs.gov/MedicaidDataSourcesGenInfo/07_MAXGeneralInformation.asp.

spending for Indiana is much more consistent in the MAX data, with spending of $526,456 in the third quarter of 2000 versus an average of $651,325 in the surrounding two quarters.

An examination of Medicaid spending in the two data sets for the remaining states reveals that some other states have large discrepancies.  For example, in Mississippi, Medicaid spending in the MAX data is 49.3 percent higher than in the SDUD data.  But as Table 12A shows, only 8 quarters of data were available for Mississippi in the SDUD data.  If Mississippi's SDUD Medicaid spending is accurate for these 8 quarters, then one would expect a difference of approximately 50 percent.  In other states with large discrepancies, such as Colorado, Maryland, South Carolina, and Iowa, my examination of both sets of data suggest the discrepancies are typically due to incomplete SDUD data. Overall, total Medicaid spending for Complaint products from 1999 to 2001 is very similar in the two data sets, with $61.9 million in the SDUD data versus $62.9 million in the MAX data.

Table 12B repeats this comparison for the 1996 – 1998 period.  The key difference between this table and the previous one is that SMRF data (the name used from 1991 to 1998, the name MAX was used from 1999 to 2001) is only available for 28 states during this three-year period.  Additionally, only two years of data are provided for the state of California.  Once again with the exception of Indiana, there is a close correspondence between Medicaid spending in the two data sets for states with relatively high Medicaid spending during this three-year period.  For example, in Florida according to the SMRF data, there was $7.432 million in Medicaid spending on Complaint products from 1996 to 1998 versus $7.240 million in the SDUD data.  SMRF Medicaid spending is 32.9 percent lower in California than in the SDUD data, though this is approximately what one would expect given there are just two years of SMRF data for this state.

Medicaid spending for Indiana in the SMRF is more than four times greater than is implied by the SDUD data, though this is primarily driven by the fact that this state has just four quarters of utilization data in the SDUD data set versus 12 in the SMRF.  If one excludes this one state, Medicaid spending for the 27 states in the SMRF is $29.636 million versus $29.571 million in the SDUD for these same states for a difference of just 0.2 percent.

In Table 12C I report state-level SDUD Medicaid spending and prescriptions versus SMRF Medicaid spending and claims for the 1991 – 1995 period.  Because almost none of the states have SMRF data for all five years, the correspondence between Medicaid spending in the two data sets is not as close.   For example, Medicaid spending in the state of New Jersey, which is first in both data sets in terms of Medicaid spending on Complaint products during this five-year period, is 23.6 percent lower in the SMRF than in the SDUD data.  This is primarily because there is no SMRF data for New Jersey in 1991.   If one instead compares spending in New Jersey during the four years from 1992 to 1995, when I have both SDUD and SMRF data, the difference is just 2.7 percent.

To sum up, Medicaid spending in the SDUD and SMRF/MAX data for the Complaint products from 1991 to 2001 yields a similar picture.  The most striking difference is for the state of Indiana, which according to the SMRF/MAX data has spending of $14.808 million (for 1992 to 2001) versus $8.147 million in the SDUD data (for 1991 to 2001).  This discrepancy appears to be driven by incomplete SDUD data for this state.  Most of the other differences among states with relatively high Medicaid spending in Tables 12A, 12B, and 12C are also driven by incomplete data, either because the SMRF/MAX file is not available in a particular year for a state or because the SDUD data for a state in a certain year is incomplete.

**VII. Illinois Medicaid**

According to the CMS SDUD data, the state of Illinois was second among all states in terms of total Medicaid spending from 1991 to 2001 on Abbott products in the Complaint. Because the state-level Medicaid claims data are somewhat more complete for Illinois than for Florida (the state ranked first), I begin my state-level Medicaid analyses with Illinois.

The Illinois Department of Health and Family Services provided the United States with Medicaid claims data. The data were provided in two different formats, one including claims adjudicated from 1991 through 1996 and the other including claims adjudicated in 1996 through 2007. The data included claims with an adjudication date of May 6, 1991 and later, with the first service date in the files of April 1, 1991. I restrict attention to those Medicaid claims with a service date during the eleven-year period of interest.

The Illinois Medicaid NDC-based claims data are summarized in Table 13A. There are 535,493 claims for one of the 44 Complaint NDCs with a service date during the relevant period, with Medicaid spending for these claims equal to $16.589 million. The first panel of this table lists the number of claims and total Medicaid spending by NDC. All 44 Complaint NDCs appear in the Illinois Medicaid claims data. Consistent with the data for the U.S. as a whole, Illinois Medicaid spending is greater for the 74653301 product than for any other one in the Complaint.

The second panel lists the number of claims and total Medicaid spending by year and quarter. When assigning claims to time periods, I use the service date instead of, for example, the prescription date or the adjudication date. As the table shows, there are no claims in the first

quarter of 1991.  The similarity between the utilization for the second and third quarters of 1991

suggests that the data are relatively complete for the second quarter of 1991.[20]


*A. Illinois Medicaid Reimbursement*

During the eleven-year period of interest, the Illinois Medicaid program used the AWP

for each product to determine the amount that would be allowed for each Medicaid claim.  More

specifically, from 1991 through June of 1995, Illinois used 90 percent of a product's AWP as its

estimated acquisition cost, which was then multiplied by the number of allowed units to

determine the amount that would be paid for the ingredient.  This scaling factor of 90 percent

was reduced to 88 percent in July of 1995 for generic products, where it remained[21] until July of

2001, when it was reduced to 80 percent.  This final scaling factor was in effect for the remainder

of the 2001 calendar year.[22]

Consistent with the method used by many other states when adjudicating Medicaid

claims, Illinois Medicaid took the sum of the estimated ingredient cost and a dispensing fee,

which for generic products ranged between $3.58 and $15.00 from 1991 through June of 1998.

More specifically, the dispensing fee was set equal to ten percent of the ingredient cost, though if

the calculated amount fell below $3.58 or above $15.00 then the dispensing fee was set to $3.58

and $15.00, respectively.  This algorithm used to calculate the dispensing fee for each claim can

be summarized in the following equation:

$$(1) \quad D_{jkt} = \min\{\$15.00, \max(\$3.58, 0.10 * S_t * AWP_{kt} * U_{jkt})\}$$

---

[20] This is also suggested by the sharp increase in the number of claims from a service date of March 31, 1991 (when there were zero) to April 1, 1991 (when there were 102, which is similar to the daily average number of claims paid in that same month).

[21] From December 15, 2000 through June 30, 2001, the state used the lesser of 88 percent of the AWP and 112 percent of the Wholesale Acquistion Cost (WAC).  Because the AWPs were 25 percent greater than the WACs for Abbott Complaint products during this period, the AWP would continue to be used.

[22] See Myers and Stauffer state summaries for more details on Illinois and other states' Medicaid adjudication calculations.

in which $D_{jkt}$ is equal to the dispensing fee for claim j for product k in period t, $S_t$ is the AWP

scaling factor in effect in period t, $AWP_{kt}$ is the average wholesale price for product k in period t,

and $U_{jkt}$ is the number of units for product k on claim j in period t.  The minimum and maximum

dispensing fees increased to $3.69 and $15.45, respectively, in July of 1998, and then again to

$3.75 and $15.70 in July of 1999.  In both instances, ten percent of the ingredient cost would be

paid if the resulting amount fell within the reported range.[23]  On December 15, 2000, the

dispensing fee was set to a flat rate of $4.17 that was unrelated to the ingredient cost, with this

amount increasing to $5.10 on July 1, 2001, where it stayed until the end of 2001.

The sum of the estimated ingredient cost and the dispensing fee is compared with the

provider charged amount, with the Illinois Medicaid program paying the lesser of the two.  This

adjudication algorithm is summarized in the following equation:

$$(2) \quad PAID_{jkt} = \min\{(S_t * AWP_{kt} * U_{jkt}) + D_{jkt}, CHARGED_{jkt}\}$$

For approximately 27.4 percent of the claims for Complaint products during the eleven-year

period of interest, the amount paid was equal to the provider charged amount.  It is worth noting

that in Illinois as in most other states, the scaled AWP was sometimes compared with an FUL

(federal upper limit) or SMAC (state maximum allowable cost).  This would typically occur if a

product had an FUL and/or SMAC in effect and either one of them was lower than the scaled

AWP.  In these cases the algorithm described in equation (2) is the same, except that the scaled

AWP would be replaced by the FUL or the SMAC.

*B. The Impact of Alternative Price Parameters on Illinois Medicaid Spending*

Of the 535,493 claims summarized in Table 13, there are 368 that have a paid amount

that is equal to zero (there are no claims with a negative amount paid).  There are an additional

---

[23] From July of 1999 through December 14, 2000, Illinois Medicaid used 10.46 percent instead of 10 percent.

942 claims for which I am unable to replicate the amount paid or in which there appears to be some data error such as an implausibly large dispensing fee.  I exclude these 1,384 claims from my analysis sample, which leaves me with a sample of 534,183 claims with service dates from 1991 to 2001 for the 44 remaining products in the complaint.

I then link each claim to the NDC-quarter-specific prices described in the preceding sections to determine how the use of alternative values for the AWP would have affected Illinois Medicaid spending.[24]  Because Medicaid payments for outpatient drugs are typically made to pharmacies, I focus on the three pharmacy classes of trade (A003, A007, M070) in the Abbott transaction data.  As shown in Tables 4 and 9, prices for these three classes of trade tend to exceed those for the average Abbott customer, which will tend to reduce the discrepancy between the AWP and the actual prices of Abbott products.  I further focus on Abbott's indirect transaction data, which provides information on the price per unit paid to wholesalers and HPD distributors for Abbott products.

One issue that arises in linking the claims to the NDC-quarter price statistics is that there are no transactions for the three pharmacy classes of trade in the indirect data for certain NDC-quarter combinations.  In these cases, I take the maximum of the most recent previous and the closest subsequent price statistic for that NDC for the three pharmacy classes of trade.[25]  Claims affected by this first adjustment account for 5.2 percent of the $16.528 million in Illinois Medicaid spending in the analysis sample.  If there is no price statistic within 4 quarters either before or after the NDC-quarter, I instead use the price statistic for all customers for that product

---

[24] It is worth noting that in some cases Illinois or other states may not have used an AWP, WAC, or Direct Price. For example, some states used SMAC prices for one or more Complaint products at some time during the period of interest.  This frequently occurred in the Texas Medicaid program for Abbott products (see Duggan 11/12/2007).  In these cases, the comparison is therefore between parameters such as the average price and this other price, which would have been used if it resulted in a lower paid amount.

[25] Thus for example if I were missing transaction data for a specific product in the fourth quarter of 1994, I would take the maximum of the corresponding price statistic in the third quarter of 1994 and the first quarter of 1995.  If there is only a price before or after, then I use that price.

in the same quarter in Abbott's indirect data.  To account for the fact that pharmacy prices tend to exceed prices for other customers, I multiply this price statistic by 1.3.  Claims affected by this latter adjustment account for 3.3 percent of the $16.528 million in Illinois Medicaid spending.

I begin with the average NDC-quarter-specific price from the indirect data for the three pharmacy classes of trade to determine whether Medicaid spending for each claim would have been different if this price statistic had been used as the price $P_{kt}$ in Illinois' Medicaid adjudication calculations.  I begin by calculating the ingredient cost that would have been calculated if this price statistic had been used.   I next determine whether this calculated amount would have affected the dispensing fee, which is a function of the ingredient cost.  Additionally, if the amount originally paid was equal to the provider charged amount, I must determine if the sum of the estimated ingredient cost and dispensing fee fell below this amount.

Taking this algorithm to the 534,183 claims in my Illinois Medicaid analysis sample, I find that Illinois Medicaid spending would have been lower for 521,338 (97.6 percent of the total) of them.  I define the variable DIFFERENCE$_{sjkt}$ to equal the difference between what Illinois Medicaid actually paid and what they would otherwise have paid with this alternative price statistic s for claim j for product k in time period t.  Aggregating this variable across the claims with a strictly positive value of DIFFERENCE$_{sjkt}$, I find that Illinois Medicaid spending would have been lower by $12.528 million.  This represents a reduction of 75.8 percent from the actual amount paid of $16.528 million for the claims in my analysis sample.  The total number of payments to pharmacies with one or more claims with a value of DIFFERENCE greater than zero is 58,891.  This information is summarized in Table 13B.

One can repeat this algorithm for alternative price statistics.  For example, instead of restricting attention to just the pharmacy classes of trade, one could consider all classes of trade

in the indirect data when calculating average NDC-quarter specific prices.  Not surprisingly given that pharmacy prices tend to be higher than those for other classes of trade, the number of claims with a strictly positive value of DIFFERENCE is larger in this case (521,918) as is the sum of DIFFERENCE aggregated across all claims with a strictly positive value of DIFFERENCE ($12.781 million).  The number of pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero is also higher in this case (58,994).  In other words, the aggregate DIFFERENCE would be even greater if I included all classes of trade when calculating average prices.

The average prices used in these two sets of calculations essentially divide total net revenues for an NDC in a quarter by the total quantity sold of that same product in the quarter.  Thus customers with relatively large quantities will tend to "matter more" in this calculation.  An alternative would be to calculate the average per-customer price, treating every customer with strictly positive sales in the quarter equally.  Using this alternative NDC-quarter-specific price statistic, the number of claims with a value of DIFFERENCE greater than zero declines to 520,839.  Similarly, the total value of DIFFERENCE and the number of pharmacy payments also decline, to $12.434 million and 58,845, respectively.  But in all three cases, the amounts are less than one percent different from those obtained using the weighted average.

If instead of using the pharmacy-specific average price from the indirect data, I use the 95th percentile price, the number of claims with a strictly positive value of difference is very similar at 519,198 while the total value of DIFFERENCE is $11.943 million (58,638 pharmacy payments).  Similarly, if one were to scale Abbott's actual average price for the pharmacy classes of trade in the indirect data by 1.25, the number of claims with DIFFERENCE greater than 0 is 519,450 and the total value of DIFFERENCE is $12.029039 million (58,631 pharmacy

payments).  Thus even if one uses these alternative price statistics, the total value of

DIFFERENCE declines by less than 4.7 percent and the number of claims and provider

payments decline by less than 0.5 percent.

All of this information is summarized in Table 13B.  As this table makes clear, all three

outcome variables of interest are very similar under all five scenarios considered.  And when

considering the values in this table, one should bear in mind that the average and the 95th

percentile prices are likely to be overstated given that I have not included the rebates, discounts,

and management fees (some of which are summarized in the fifth column of Table 7) when

calculating prices.  This will serve to reduce the aggregate value of DIFFERENCE below what it

otherwise would be.

For the analyses that follow, rather than using Abbott's direct data to calculate the cost to

wholesalers and HPD distributors of acquiring Abbott products, I use pharmacy-specific

transactions in the indirect data.  This will typically lead to a substantially higher price than

would obtain if I instead used Abbott's direct transaction data, as it for example excludes

wholesalers' transactions to non-profit hospitals.  This is conservative in that it will serve to

reduce the discrepancy between Abbott's actual prices and the published prices such as the

AWP.  Furthermore, because I do not include management fees, wholesalers' prompt pay

discounts, and rebates in the calculation of average pharmacy-specific prices in the indirect data,

I will overstate the actual cost to wholesalers and HPD distributors of acquiring the products that

are at issue in the Complaint.[26]  This will also serve to reduce the discrepancy between actual and

published prices.

---

[26] In addition to the management fees listed in Table 7, testimony by Barbara Echevarria in her deposition indicates that wholesaler prompt pay discounts are not included in the direct or indirect transaction data provided by Abbott.

The First DataBank AWP is typically 125 percent of the First DataBank Wholesaler Acquisition Cost (WAC) and 118.75 percent of the First DataBank Direct Price (DP) for Abbott products (and thus the FDB WAC is 95 percent of the FDB Direct Price).   According to the data provided by Abbott, the difference between what wholesalers and HPD distributors sell the products for and the cost to them of acquiring the product is substantially lower than 25 percent.

Despite this, in the analyses that follow, I take 125 percent of the average pharmacy indirect price in Abbott's indirect data as the benchmark for AWP, which is the price used in most states when adjudicating Medicaid claims during the time period of interest.  This is a quite conservative approach for two reasons.  First as described above, the cost to the wholesaler of acquiring the product is lower than the pharmacy indirect average price given my exclusion of management fees, prompt pay discounts, and so forth when calculating prices.  And second, the average actual markup on this cost is substantially lower than the 25 percent difference implied by the relationship between the WAC and the AWP for Abbott products.

**VIII. Florida Medicaid**

According to the CMS SDUD data described above, the state of Florida was first among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001.  Florida provided the United States with Florida Medicaid claims data for the NDCs in the Complaint.  This data included claims with an adjudication date of October 25, 1993 and later, and thus data for the 1991 to 1993 period are likely to be incomplete.

The Florida Medicaid claims data are summarized in Table 14A.  There are 291,576 claims for the 44 Complaint NDCs with a service date during the 1991 to 2001 period, with Medicaid spending for these claims equal to $15.665 million.  The first panel of this table lists

the number of prescriptions and total Medicaid spending by NDC.  All 44 Complaint NDCs appear in the Florida Medicaid claims data, and consistent with the data for the U.S. as a whole, Florida Medicaid spending is greatest for the 74653301 Vancomycin product.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter of service.  As the table demonstrates, there are very few prescriptions with a service date in 1991 and 1992, and data for the first three quarters of 1993 appear to be incomplete as well.  Even the data for the final quarter of 1993 is likely to be incomplete, as the lag between the service and adjudication date is often less than a week[27] and thus many claims for early October, 1993 may not appear in this data given that October 25, 1993 is the first adjudication date.

Because the Florida Medicaid claims data are incomplete early in the study period, I instead rely on the SDUD data described above for the first 11 quarters (1991Q1 – 1993Q3).  These Florida-specific SDUD data for the first 11 quarters are summarized in Table 14B, and I discuss my analyses of them in more detail below.  Even though the Florida Medicaid claims that I utilize may be missing some claims in the fourth quarter of 1993 (those with a service date in October of 1993 and adjudication date of October 24, 1993 or earlier), an examination of Table 14A suggests that only approximately 1,000 are missing (out of more than 290,000 in the entire study period) and I ignore these in the analyses that follow.  And because the SDUD data are assigned to quarters based on date of payment rather than date of service, I will exclude those claims with a service date of September 30, 1993 or earlier and an adjudication date on October 1, 1993 or later.  These omissions will serve to reduce the aggregate value of DIFFERENCE for the state of Florida below what it otherwise would be.

---

[27] For example, of the 299 claims with adjudication dates from October 25-31, 1993, 92 (more than 30 percent) had a lag of 7 or fewer days between the service date and adjudication date.

*A. Florida Medicaid Reimbursement*

For the first 8.5 years of the 1991 to 2001 period, the Florida Medicaid program used the Wholesaler Acquisition Cost for each product to determine the amount that would be paid for each Medicaid claim.  More specifically, from 1991 through April 18, 1999, Florida used 107 percent of a product's WAC as its estimated acquisition cost, which was then multiplied by the number of allowed units to determine the amount that would be paid for the ingredient.  On April 19, 1999, this methodology was changed to pay the minimum of 88.5 percent of the AWP, 107 percent of the Direct Price (DP), and 107 percent of the WAC, with this algorithm remaining in effect until July 2, 2000.  Given that the WAC for Abbott products was typically 20 percent lower than the AWP and 5 percent lower than the DP, 107 percent of the WAC would typically have been the lowest of these three.[28]  Thus until July 2, 2000, the state of Florida would use 107 percent of the WAC for NDCs in the Complaint.  From July 3, 2000 until the end of the study period, Florida Medicaid paid 86.75 percent of the AWP.  This estimated ingredient cost was then added to a dispensing fee, which was typically equal to $4.23 throughout the study period.[29]

The sum of the estimated ingredient cost and the dispensing fee is compared with the provider charged amount, with the Florida Medicaid program paying the lesser of the two.  The adjudication algorithm in effect until July 2, 2000 is summarized in the following equation:

$$(3) \quad PAID_{jkt} = \min\{(1.07 * WAC_{kt} * U_{jkt}) + D_{jkt}, CHARGED_{jkt}\}$$

while the formula used from July 3, 2000 through December of 2001 was:

$$(4) \quad PAID_{jkt} = \min\{(0.8675 * AWP_{kt} * U_{jkt}) + D_{jkt}, CHARGED_{jkt}\}$$

---

[28] Suppose that the WAC was equal to 100.  This would typically be associated with a Direct Price of 105 and an AWP of 125.  The amount used would be the minimum of (107, 112.35, 110.63).
[29] In approximately 2.9 percent of claims the dispensing fee was 50 cents higher at exactly $4.73.

For approximately 20.0 percent of the Florida NDC-based Medicaid claims for Complaint products with service dates from October of 1993 to December of 2001, the amount paid was equal to the provider charged amount.

*B. The Impact of Alternative Price Parameters on Florida Medicaid Spending*

Of the 291,576 Florida NDC-based Medicaid claims summarized in Table 14A, there are 1,588 with a service date on or before September 30, 1993.  As mentioned above, I exclude these claims from my first set of Florida analyses.  There are an additional 457 claims with a paid amount of zero (none with a negative payment amount), 677 claims with a non-zero third party payment amount, and 895 for which I am unable to replicate the amount paid.  I exclude these 3,617 claims from my analysis sample, which leaves me with a sample of 287,959 claims with service dates from October of 1993 through December of 2001 for the NDCs in the Complaint.  I then link each claim to the NDC-quarter-specific prices described in the preceding sections to determine how the use of alternative values for the WAC and the AWP would have affected Florida Medicaid spending.

One intuitively appealing set of price statistics to use for the WAC would be the average price paid by wholesalers and HPD distributors in Abbott's direct data.  One concern with this, however, is that most of the indirect sales by these organizations are to hospitals, which as shown in Tables 4 and 9 tend to have substantially lower prices than do pharmacies.  Thus these price statistics might tend to understate the prices paid by wholesalers and distributors for sales to the three pharmacy classes of trade, leading to an increase in the average value of DIFFERENCE above what would occur if wholesaler / HPD distributor acquisition costs for pharmacy specific transactions were instead used.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                        40

To account for this issue, I instead use the prices paid by the three pharmacy classes of trade to wholesalers and HPD distributors in the indirect data.  This is a conservative approach in that it will lead me to on average overstate the actual price paid by wholesalers and HPD distributors for Complaint products sold to the three pharmacy classes of trade, as it does not account for some of their management fees, discounts, rebates and so forth.  And as mentioned above, by focusing on pharmacy classes of trade, the prices that I calculate from Abbott transaction data will on average be substantially greater than it would if I considered all customers, with this serving to reduce the value of DIFFERENCE below what it otherwise would be.  Thus in the first 9.5 years of the period, I use 1.07 times the average pharmacy price in Abbott's indirect transaction data and for the subsequent 1.5 years I use 1.084375 (= 1.25 * 0.8675) times this number.

Using this methodology, I find that 278,623 of the 287,959 claims have a value of DIFFERENCE that is strictly greater than zero.  The aggregate value of DIFFERENCE across these 278,623 claims is $11.700 million and the total number of pharmacy payments with at least one claim with a DIFFERENCE greater than zero is 67,077.  This aggregate DIFFERENCE represents 75.2 percent of the $15.561 million in Medicaid spending for the claims in my analysis sample, which is similar to the ratio found for Illinois above.

Suppose that instead of using prices from the indirect data to calculate the WAC, I use the average amount paid by the W050 and M061 classes of trade in Abbott's direct data for each NDC-quarter.  Not surprisingly given the discussion above, this leads to an increase in the total value of DIFFERENCE to $11.912 million, while the number of claims and the number of pharmacy payments also both rise to 279,356 and 67,168, respectively.

Taken together, the results summarized in this section reveal a total value of DIFFERENCE of approximately $11.700 million for Florida Medicaid claims during the October 1993 to December 2001 period.  Additionally, I find that the value of DIFFERENCE is greater than zero for approximately 96.8 percent of Florida's Medicaid claims.  In the next section, I combine my findings from the claims data with the SDUD described above to calculate corresponding values of DIFFERENCE for the first 2.75 years of the study period.

*C. The 1991Q1 to 1993Q3 Period*

As described above, the Florida Medicaid claims data are incomplete for the first 2.75 years of the study period.  According to the SDUD data displayed in Table 14B, Florida's Medicaid program spent approximately $1.379 million on Complaint products during this period. To determine the amount that the state would have paid if, for example, Abbott's indirect pharmacy average price had been used as the WAC when adjudicating Medicaid claims, I take the following three step approach.  First, I calculate the ratio of DIFFERENCE to the total amount that was actually paid for each NDC in the fourth quarter of 1993 and call this value DIFF_FRAC$_{j,934}$ for NDC j in the fourth quarter of 1993.  This is the quarter that is closest to the 2.75 year period of interest under consideration.

Rather than simply multiplying this fraction by Medicaid spending for each NDC in the preceding 11 quarters, I account for the possibility that the WAC was lower and/or the average pharmacy price was higher (as the data for Vancomycin 74653301 in Table 10 above suggested), which would serve to reduce the DIFF_FRAC in earlier periods below the 1993 quarter 4 values by applying the following two formulas to SDUD Medicaid spending for each NDC-quarter combination during the 1991Q1 – 1993Q3 period:

$$(5) \ \text{DIFFERENCE}_{j,t} = \text{PAID}_{j,t} * \text{DIFF\_FRAC}_{j,934} * \text{RATIO}_{j,t}$$

$$(6) \ \text{RATIO}_{j,t} = \text{MIN} \ \{1.00, \ (\text{AWP}_{j,t} / \text{AVGPRICE}_{j,t}) / (\text{AWP}_{j,934} / \text{AVGPRICE}_{j,934}) \ \}$$

In this equation, $\text{DIFFERENCE}_{j,t}$ represents my estimate of the difference between what Medicaid spending actually was and what it would have been if the average indirect pharmacy price had been used as the WAC for NDC j in quarter t. $\text{PAID}_{j,t}$ is equal to the amount of Medicaid spending for that NDC in quarter t. $\text{RATIO}_{j,t}$ is a "ratio of ratios" that accounts for the possibility that spreads may have been lower in the first 2.75 years of the period than they were in the fourth quarter of 1993. In calculating this, I divide the quarter-specific AWP (1.25 times the WAC) by the average pharmacy price in each quarter. I then divide this ratio by the corresponding ratio in 1993 quarter 4. To the extent that the percentage "spread" between the WAC and the average pharmacy price was lower in earlier periods, multiplying by $\text{RATIO}_{j,t}$ will reduce DIFF_FRAC below the 1993 quarter 4 value. If the calculated $\text{RATIO}_{j,t}$ exceeds 1, I take the conservative approach of replacing it with 1 so as to never arrive at a value of DIFF_FRAC in an earlier period for an NDC that is greater than the 1993 quarter 4 value.

It is perhaps most instructive to summarize this approach with an example. In the fourth quarter of 1993, the DIFF_FRAC for the 74653301 product, which is calculated from the Florida Medicaid claims data, was .8007. Additionally the ratio of the AWP to the pharmacy average price was 8.30. In the fourth quarter of 1992, the ratio of the AWP to the pharmacy average price was lower at 6.92, implying a lower spread in this earlier period. I therefore multiply the 1993 quarter 4 DIFF_FRAC for this product by the RATIO of 0.834 (= 6.92 / 8.30) to obtain a DIFF_FRAC for 74653301 in the fourth quarter of 1992 of 0.6678 (and if RATIO had exceeded 1 I would replace it with 1). I then take this scaled value of DIFF_FRAC and multiply it by the

$18,983 in Florida Medicaid spending for the 74653301 product in the second quarter of 1992 to obtain a value of DIFFERENCE of $12,677 for this NDC-quarter.

Repeating this algorithm for all NDC-quarter observations from 1991Q1 to 1993Q3, I calculate a total value of DIFFERENCE of $939,551, which is 68.1 percent of Florida Medicaid spending on Complaint products in the first 11 quarters of the period.  I use an analogous algorithm to estimate that there were 34,802 prescriptions from January of 1991 through September of 1993 with a value of DIFFERENCE in excess of zero.  Taken together, my results for Florida for the 1991 to 2001 period indicate a total value of DIFFERENCE of approximately $12.640 million along with 313,425 claims and at least 67,076 pharmacy payments with a value of DIFFERENCE greater than zero.

## IX. California Medicaid

According to the CMS SDUD data described above, the state of California was third among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $10.002 million paid.  The State of California's Department of Health Services provided the United States with Medicaid claims data.  The data included NDC-based claims with adjudication dates from March 19, 1994 through and including December 29, 2001.  Because of this, data for 1991, 1992, 1993, and part of 1994 are likely to be incomplete.  Similarly, because there is often a lag of one month or more in processing claims, data for 2001 is also likely to be incomplete.

The California NDC-based Medicaid claims data are summarized in Table 15A.  There are 296,193 claims for the 44 Complaint NDCs with a service date during the eleven-year study period, with Medicaid spending for these claims equal to $9.204 million.  The first panel of this

table lists the number of prescriptions and total Medicaid spending by NDC.  All 44 Complaint NDCs appear at least once in the California Medicaid claims data.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As the table shows, there are zero claims with service dates in 1991 and 1992 and just 25 in all of 1993.  The first quarter of 1994 also appears to be incomplete, with just 840 claims versus 5,112 in the subsequent quarter.  Additionally, the last two quarters of 2001 seem to be incomplete, with a total of 17,035 claims versus 23,531 in the preceding two quarters.

Because the California Medicaid claims data are incomplete early in the study period, I instead rely on the SDUD data described above for the first 13 quarters (1991Q1 – 1994Q1). These California-specific SDUD data for the first 13 quarters are summarized in Table 15B, and I discuss my analyses of them in more detail below.  Even though the California Medicaid claims appear to be missing some claims in the latter half of 2001, an examination of Table 15A suggests that only approximately 6,500 are missing (out of almost 300,000 in the entire study period) and I ignore these in the analyses that follow.  This omission will serve to reduce the aggregate value of DIFFERENCE for the state of California below what it otherwise would be.

*A. California Medicaid Reimbursement*

According to Medicaid State Plan Amendments, the California Medicaid program employed an adjudication formula that utilized the Direct Price (DP) as its estimate of per-unit acquisition costs.  This was then multiplied by the number of allowed units to determine the amount that would be paid for the ingredient.  During this period the dispensing fee for generic products was $4.05, though in a small number of cases this was reduced by 25 or 50 percent to $3.03 and $2.02, respectively.

The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.   For approximately 26.9 percent of the California NDC-based Medicaid claims for Complaint products with service dates from April of 1994 to December of 2001 and in the analysis sample described below, the amount paid was equal to the provider charged amount.  For more than 94 percent of these claims, the actual amount paid by California's Medicaid program was either 25 or 50 cents less than this minimum amount, reflecting policy-induced reductions in reimbursement amounts.

*B. The Impact of Alternative Price Parameters on California Medicaid Spending*

Of the 296,193 California NDC-based Medicaid claims summarized in Table 15A, there are 13,620 that represent reversals of previous claims or claims that are later reversed.  Because the net amount paid for these claim pairs is on average just -$0.07, I exclude them from my analysis.[30]  There are an additional 859 claims with a service date on or before March 31, 1994, and as I mentioned above, I exclude these claims from my first set of California analyses as well. I exclude an additional 423 claims with a paid amount of zero (none with a negative payment amount), 261 claims with a third party payment amount or patient liability and 36 claims for which I am unable to replicate the amount paid.  With these changes, my final analysis sample consists of 280,994 claims with service dates from April of 1994 through December of 2001 for the 44 products listed in the Complaint.

I then apply an algorithm analogous to the ones used above for Illinois and Florida, though in this case I use the average pharmacy price in the direct data for the early part of the

---

[30] For example, the California Medicaid program might pay $10.00 for a claim and later determine that the payment was for the incorrect amount or should not have been paid in the first place.  A new claim would then be generated with a paid amount of -$10.00.  I do not include these transactions in my analyses because the net payment is in virtually every case equal to zero.

study period and the average pharmacy price in the indirect data for the last 7 years of the period.[31]  Applying these prices claim by claim, I find that 267,167 out of the 280,994 claims (95.1 percent) have a value of DIFFERENCE that is strictly greater than zero and that there are 56,269 pharmacy payments with at least one claim with a DIFFERENCE value that is greater than zero.  I also find that the total value of DIFFERENCE is equal to $7.044 million, which represents 76.8 percent of the $9.172917 million for the 280,994 claims in my analysis sample.

Per instructions from the U.S. Department of Justice, I am not considering claims prior to April of 1994.  Taken together, my analyses for California Medicaid suggest a total value of DIFFERENCE during the 1991 to 2001 period of approximately $7.044 million.  My results further indicate that more than 267,167 claims and 56,269 pharmacy payments had a DIFFERENCE that exceeded zero.

Table 15B provides a summary from CMS SDUD data of California's Medicaid spending and utilization for Complaint NDCs during the 1991Q1 to 1994Q1 period.  Following instructions from the United States, I do not consider this period in my analyses.

## X. New Jersey Medicaid

According to the CMS SDUD data described above, the state of New Jersey was fourth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $9.642 million paid.  New Jersey provided the United States with Medicaid claims data.  The data included claims with adjudication dates of December 4th of 1991 through late 2003 (though with service dates through just December 31, 2001).  Because of this, the claims for the early part of 1991 are likely to be incomplete.

---

[31] For 2134 claims in the 1995 to 2001 period without an average pharmacy-specific price in the direct data, I use the average pharmacy-specific price in the indirect data.  The two averages are typically very similar, with the average price in the indirect data slightly higher for the claims in the analysis sample.

The New Jersey Medicaid data are summarized in Table 16A.  There are 129,282 claims for the Complaint NDCs with a service date during the eleven-year study period, with Medicaid spending for these claims equal to $8.629 million.  The first panel of the table lists the number of prescriptions and total Medicaid spending by NDC.  All of the 44 Complaint NDCs appear in the New Jersey Medicaid claims data.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As the table shows, there are relatively few claims in the first three quarters of 1991 and substantially less in the fourth quarter of the same year than in any quarter in the following year.  Thus data for all four quarters of 1991 appears to be incomplete.  Medicaid spending peaks in early 1992, declines steadily during the next three years, and then rises again during the last half of the study period before declining sharply after the first quarter of 2001.

Because the New Jersey Medicaid claims data are incomplete early in the study period, I instead rely on the SDUD data described above for the first 4 quarters (1991Q1 – 1991Q4).  These New Jersey-specific SDUD data for the first 4 quarters are summarized in Table 16B, and I discuss my analyses of them in more detail below.

*A. New Jersey Medicaid Reimbursement*

According to Medicaid State Plan Amendments, throughout the 1991 to 2001 period, the New Jersey Medicaid program employed an adjudication formula that utilized the AWP.  The amount by which this AWP was scaled varied across time periods and also across claims within a time period.[32]  An examination of the claims data reveals that from 1992 to 1995, the most common scaling factor was 1.00, with this accounting for 71.3 percent of claims.  An additional

---

[32] An examination of the Medicaid State Plan Amendments reveals that the scaling factor depended on the pharmacy's prior year prescription volume, with high volume pharmacies having somewhat lower scaling factors.

22.0 percent were adjudicated using a scaling factor of 0.94.  From 1996 to 2001, the most common scaling factor was 0.90, with this accounting for 86.3 percent of claims.  An additional 8.1 percent had 0.92 as the scaling factor and 2.1 percent used a scaling factor of 1.00.  In my analyses for New Jersey, I account for the claim-specific scaling factor when determining the amount that would have been paid if the 125 percent of Abbott's average pharmacy price in the indirect data had been used as the AWP.

During this time period, the baseline dispensing fee was equal to 3.73, though additional increments could be made to this depending on whether there was 24-hour emergency availability at the pharmacy ($0.11 extra), patient consultation ($0.08 extra), and an "impact allowance" ($0.15 extra).  An examination of the claims data reveals that the most common dispensing fee paid for Complaint claims during the 1992 to 2001 period was actually $0.00, with this fee used on 87.4 percent of claims.  One possible reason for this is that dispensing fees were often adjusted down on those claims for Medicaid recipients residing in long-term care facilities.  The three next most common dispensing fees were $3.92, $3.73, and $4.07, with these three accounting for an additional 12.3 percent of claims.

The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.   For approximately 9.7 percent of New Jersey's NDC-based Medicaid claims for Complaint products with service dates from 1992 to 2001, the amount paid was equal to the provider charged amount.

*B. The Impact of Alternative Price Parameters on New Jersey Medicaid Spending*

Of the 129,282 New Jersey NDC-based Medicaid claims summarized in Table 16A, there are 2,018 with a service date on or before December 31, 1991, and as I mentioned above, I

exclude these claims from my first set of New Jersey analyses.  I exclude an additional 153 claims with a paid amount of zero (none with a negative payment amount), 304 claims with a third party payment amount, and 734 claims with an AWP scaling factor of less than 0.88 or greater than 1.00.  I exclude an additional 6 claims with dispensing fees between $0.01 and $3.72.  This leaves me with an analysis sample of 126,067.

I then apply an algorithm analogous to the ones used above for Illinois, Florida, and California, determining for each individual claim whether the amount paid by New Jersey Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the NDC-quarter average indirect pharmacy price,[33] I find that 124,513 out of the 126,067 claims (98.8 percent) have a value of DIFFERENCE that is strictly greater than zero and that there are 11,446 pharmacy payments with at least one claim with a DIFFERENCE value that is greater than zero.  My results further indicate that the total value of DIFFERENCE is equal to $7.191 million, which represents 85.1 percent of the $8.453921 million for the 126,067 claims in my analysis sample.  This ratio of the total DIFFERENCE to total Medicaid spending is somewhat higher than for the three previous states, with this to some extent driven by the fact that most New Jersey Medicaid claims for Complaint products during the time period of interest had a dispensing fee of zero.


*C. The 1991Q1 to 1991Q4 Period*

As described above, the New Jersey Medicaid claims data are incomplete for the first year of the study period.  According to the SDUD data displayed in Table 16B, New Jersey's Medicaid program spent approximately $915,760 on Complaint products during this period.  To

---

[33] For the 5.7 percent of claims for which I do not have an indirect pharmacy average price for the relevant NDC-quarter, I estimate this with 1.3 times the all customer average price in Abbott's indirect data.  This is a relatively conservative adjustment given that on average prices for all customers are just 20 percent greater for pharmacies.

estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for Florida and California above, and determine that New Jersey Medicaid spending would have been at least[34] $727,856 lower during the first year of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in New Jersey's Medicaid adjudication calculations.   I also find that 12,374 prescriptions during the first year of the study period had a DIFFERENCE that exceeded zero.

Taken together, my results for New Jersey Medicaid reveal a total DIFFERENCE during the study period of approximately $7.919 million along with 136,887 claims and at least 11,446 pharmacy payments that had a DIFFERENCE that exceeded zero.


## XI. New York Medicaid

According to the CMS SDUD data described above, the state of New York was fifth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $8.748 million paid.  The Office of the Attorney General in New York State provided the United States with Medicaid claims data.  The data included claims with service dates from January 2, 1993 through and including December 31, 2001.  Because of this, the data for 1991 and 1992 are likely to be incomplete.

The New York Medicaid claims data are summarized in Table 17A.  There are 120,794 claims for the Complaint NDCs with a service date during the time period of interest.  Medicaid spending for these claims was equal to $8.938 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are zero claims for 2 of the 44 NDCs in the complaint (74712007 and 74790209).

---

[34] I exclude 6 out of 94 NDC-quarter combinations with $0.014 million in Medicaid spending because of missing data and this will serve to reduce the value of DIFFERENCE below what it otherwise would be.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As the table shows, there are zero claims with service dates in 1991 and 1992. Consistent with the other states, Medicaid spending tends to increase throughout the period until declining in 2000 and 2001.

*A. New York Medicaid Reimbursement*

According to Medicaid State Plan Amendments and to New York state statutes, throughout the 1991 to 2001 period, the New York Medicaid program employed an adjudication formula that utilized the AWP.  The amount by which this AWP was scaled varied over time, with a value of 1.00 during the first 4 years of the study period (1991 to 1994) and a value of 0.90 during the last seven years (1995 to 2001).  In my analyses for New York, I account for the time period-specific scaling factor when determining the amount that would have been paid if 125 percent of the average pharmacy-specific price in Abbott's indirect data had been used as the AWP for Complaint NDCs.

During 1991 to 1994 period, the dispensing fee for generic drugs was equal to $2.60, with this increasing to $5.50 in January of 1995 and then declining to $4.50 in mid-July of 1998.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.   It is worth noting that for approximately 43.9 percent of claims paid from January of 1995 through December of 2001, there was a co-pay of $0.50.  Thus for these claims the amount paid by New York Medicaid was $0.50 lower than it otherwise would have been.

*B. The Impact of Alternative Price Parameters on New York Medicaid Spending*

Of the 120,794 New York NDC-based Medicaid claims summarized in Table 17A, there are 445 claims with a third party payment amount and 34 claims for which I am unable to replicate the amount paid.  I drop these claims and thus my analysis sample has 120,315 claims. For the 16 claims for which I do not have an indirect pharmacy average price for the relevant NDC-quarter, I replace this with 1.3 times the overall average price in Abbott's indirect data.

I then apply an algorithm analogous to the ones used for the four states above, determining for each claim whether the amount paid by New York Medicaid would have been lower if an alternative price had been used as the AWP.  Using the average indirect pharmacy price, I find that 108,386 out of the 120,315 claims (90.1 percent) have a value of DIFFERENCE that is strictly greater than zero and that the total value of DIFFERENCE is equal to $6.878 million, which represents 77.1 percent of the $8.922 million[35] for the 120,315 claims in my analysis sample.  I also find that there are 38,184 pharmacy payments with at least one claim with a DIFFERENCE value that is greater than zero.

### C. The 1991Q1 to 1992Q4 Period

As described above, the New York Medicaid claims data are incomplete for the first two years of the study period.  According to the SDUD data displayed in Table 17B, New York's Medicaid program spent approximately $192,898 on Complaint products during this period.  To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for Florida, California, and New Jersey above, and determine that New York Medicaid spending would have been $149,690 lower during the first two years of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in

---

[35] It is worth noting that the amount paid in the sample is actually slightly greater than suggested by the SDUD data summarized in Table 11.  This could for example be driven by incomplete SDUD reporting or by the difference between the dates in the two data sets (date of service versus date of payment).

New York's Medicaid adjudication calculations.   My results further indicate that 5,263 prescriptions during the first two years of the study period had a DIFFERENCE that exceeded zero.

Taken together, my results for New York Medicaid reveal a total DIFFERENCE during the study period of approximately $7.027 million along with 113,649 claims and at least 38,184 pharmacy payments that had a DIFFERENCE that exceeded zero.


## XII. Indiana Medicaid

According to the CMS SDUD data described above, the state of Indiana was sixth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $8.146 million paid.   But as discussed in Section VI above, the SDUD data appears to be quite incomplete for Indiana, with no spending reported in certain years for example.  An examination of the claims data from the CMS SMRF/MAX files suggests that from 1992 to 2001, Indiana Medicaid spending on Complaint products was substantially greater at $14.808 million.  It therefore appears that Indiana was third among all states (behind only Florida and Illinois) in terms of spending on Complaint products during the eleven-year period of interest.

Indiana provided the United States with Medicaid claims data.  The data included claims with service dates from 1998 through 2001, though an inspection of this data as summarized in Table 18A suggests that it is incomplete in many of these later quarters.  For example, according to this data, there were only 171 claims for Complaint products in all of 1999 versus 22,403 claims according to the CMS SMRF/MAX data.  Additionally, the data provided by Indiana did not contain a units or quantity field, which represents the main advantage of the state-level claims data over the SMRF/MAX claims data in the typical state.

I therefore instead use the SMRF/MAX data for my analysis of Complaint products in Indiana, with this data summarized in Table 18B. As this table shows, all 44 Complaint products have some utilization in Indiana during the eleven-year period of interest. Additionally, Medicaid spending is generally increasing over time until it declines sharply from the first quarter of 2001 to the final two quarters of 2001.

### A. Indiana Medicaid Reimbursement

According to Medicaid State Plan Amendments, throughout the 1991 to 2001 period, the Indiana Medicaid program employed an adjudication formula that utilized the Average Wholesale Price (AWP). Specifically, the state paid an amount that was equal to 90 percent of the Average Wholesale Price. This was then added to the dispensing fee, which was equal to $4.00 throughout the period of interest, to determine the amount that Medicaid would pay. Indiana then took the lesser of this sum and the provider charged amount.

### B. The Impact of Alternative Price Parameters on Indiana Medicaid Spending

The algorithm that I utilize for Indiana is necessarily somewhat different from the one that I use for the five preceding states because the SMRF/MAX claims data for Indiana do not have a reliable units variable during the time period of interest. I therefore take the following approach. Because the adjudication method for Indiana is very similar to the one used in Illinois (both used AWP throughout the eleven-year period of interest), I use the Illinois experience to estimate the total DIFFERENCE and the number of claims with DIFFERENCE greater than zero in Indiana. Specifically, I calculate the fraction of Illinois claims with a value of DIFFERENCE greater than zero in each NDC-quarter. I then multiply this by the number of claims in Indiana

to determine how many Medicaid claims in each NDC-quarter had a value of DIFFERENCE that exceeded zero. This method can be summarized by the following formula:

$$(7) \text{ IN-CLAIMS-DIFF>0}_{jt} = \text{IL-POS-DIFF}_{jt} * \text{IN-CLAIMS}_{jt}$$

In this equation, $\text{IL-POS-DIFF}_{jt}$ equals the fraction of claims for NDC j in period t in Illinois with a value of DIFFERENCE greater than zero and $\text{IN-CLAIMS}_{jt}$ is the number of claims in Indiana for NDC j in quarter t.

I use a similar approach to calculate the total dollar value of DIFFERENCE in Indiana in each NDC-quarter. One key difference between the two states' reimbursement methodologies is that Indiana paid a fixed dispensing fee whereas Illinois' could increase with the ingredient cost. To account for this difference, I ignore any reduction in the dispensing fee when calculating the ratio of the total value of DIFFERENCE to the total amount paid for those claims with a value of DIFFERENCE greater than zero in each NDC-quarter.[36] I then multiply this ingredient cost reduction ratio by IL-POS-DIFF (the fraction of Illinois claims with DIFFERENCE greater than zero) and then by the amount spent for that NDC-quarter in Indiana (less dispensing fees).

Using this algorithm, I estimate that 175,577 of the 182,154 claims[37] in Indiana for Complaint products had a value of DIFFERENCE that was strictly greater than zero and that the total value of DIFFERENCE was $11.214 million, which represented 75.7 percent of the $14.812 million in Indiana Medicaid spending on Complaint NDCs in my analysis sample from

---

[36] Suppose that Medicaid spending for claims with a value of DIFFERENCE greater than zero in an NDC-quarter in Illinois is $1.0 million and that $0.2 million of this is dispensing fees. Suppose further that the total value of DIFFERENCE is $0.5 million and that $0.05 million of this is attributable to a decline in dispensing fees. I then calculate that the amount paid for the ingredient fell by 56.25 percent (= (0.5 - .05) / (1.0 − 0.2)) and multiply this by the fraction of claims with a value of DIFFERENCE greater than zero and then by the amount paid for that NDC-quarter in the state of Indiana.

[37] I excluded claims with a paid amount of zero, with a non-zero third party payment amount, and with a paid amount greater than the charged amount, and thus the total number of claims is slightly lower than in Table 18B.

1992 to 2001.  My results further indicate that there are 28,880 pharmacy payments with at least

one claim with a value of DIFFERENCE that is strictly greater than zero.[38]

One concern with this approach is that Illinois and Indiana are not exactly identical.  For

example as mentioned above, Illinois' dispensing fee can vary with the ingredient cost.  I

therefore probe the robustness of my results by taking an alternative approach in which I

calculate the amount spent by Indiana Medicaid on dispensing fees and on ingredient costs for

each NDC-quarter.  I do this by multiplying the number of claims in the SMRF/MAX data by

$4.00 (the per-prescription dispensing fee) to account for dispensing fees and then ingredient

costs account for the remainder.  I multiply these aggregate NDC-quarter-specific ingredient

costs by the ratio of 125 percent of Abbott's average indirect pharmacy price to the AWP for that

same NDC quarter.  Taking the implied amount that would have been paid on the ingredient cost,

I then add this to dispensing fees.  Comparing this with the actual amount spent for each NDC-

quarter, I find that Medicaid spending would have been lower by $12.449 million in Indiana

during the time period of interest.  This value of DIFFERENCE is 11.0 percent greater than the

corresponding one that uses Illinois above.  It therefore appears that, if anything, my use of

Illinois as a comparison serves to bias down my estimate of the total value of DIFFERENCE.


*C. The 1991Q1 to 1991Q4 Period*

In this final section I investigate the results for Medicaid spending and the number of

claims in the first year of the study period, which is not included in the Indiana SMRF claims

data.  According to the SDUD data displayed in Table 18C, Indiana's Medicaid program spent

---

[38] To estimate this, I assign each claim a probability of having DIFFERENCE that is greater than zero that is equal
to the corresponding probability for claims within the same NDC-quarter.  Approximately 97 percent of these claims
are estimated to have DIFFERENCE greater than zero.  I then use the provider id and the payment date as I did for
the previous states.

approximately $249,529 on Complaint products during 1991. To estimate the total value of DIFFERENCE during this period, I merge Indiana's aggregate NDC-quarter level SDUD data in 1991 with data from Illinois on the fraction of claims with a value of difference greater than zero and the ratio of DIFFERENCE to the total amount paid for each NDC-quarter.[39]

Using this algorithm, I find that Indiana Medicaid spending would have been $137,297 lower during 1991 if 125 percent of Abbott's average pharmacy indirect price had been used as the AWP in Indiana's Medicaid adjudication calculations. My results also reveal that 8,572 prescriptions during 1991 had a DIFFERENCE that exceeded zero.

Taken together, my results for Indiana Medicaid indicate a total DIFFERENCE during the 1991 to 2001 period of approximately $11.352 million. I also find that 184,149 claims and at least 28,880 pharmacy payments had a DIFFERENCE that exceeded zero.


## XIII. Kentucky Medicaid

According to the CMS SDUD data described above, the state of Kentucky was seventh among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $7.402 million paid. Kentucky provided the United States with Medicaid claims data. The data included claims with services dates from January 1, 1995 through and including December 31, 2001. Because of this, the data for 1991 through and including 1994 are likely to be incomplete.

The Kentucky Medicaid claims data are summarized in Table 19A. There are 100,561 claims for the Complaint NDCs from 1995 through 2001 and Kentucky Medicaid spending for these claims was equal to $6.203 million. The first panel of this table lists the number of

---

[39] Because Illinois does not have claims for the first quarter of 1991, I use each NDC's second quarter values.

prescriptions and total Medicaid spending by NDC.  As this table shows, there are zero claims for 1 of the 44 NDCs in the complaint (74797305).

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991, 1992, 1993, and 1994.   Quarterly Medicaid spending reaches its peak in the first quarter of 2001 and then declines during the next three quarters.

*A. Kentucky Medicaid Reimbursement*

According to Medicaid State Plan Amendments and to data from the Pharmaceutical Benefits Survey published by the National Pharmaceutical Council, throughout the 1991 to 2001 period, the Kentucky program employed an adjudication formula that utilized the Average Wholesale Price (AWP).  The amount by which this AWP was scaled varied over time, with a value of 0.95 during the first two quarters of the study period (1991Q1 to 1991Q2) and a value of 0.90 during the last 10.5 years (1991Q3 to 2001Q4).

For the first six months of the study period, the dispensing fee for generic drugs was equal to $3.25.  From July of 1991 through January 15, 2001, the dispensing fee was typically either $4.75 or $5.75, with the latter amount paid when the beneficiary was in a skilled nursing facility.  From January 16, 2001 until the end of the time period of interest, the dispensing fee was typically $4.51.  In certain cases throughout much of the study period, the dispensing fee was 0.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

*B. The Impact of Alternative Price Parameters on Kentucky Medicaid Spending*

Of the 100,561 Kentucky NDC-based Medicaid claims summarized in Table 19A, there are 18 claims for which the amount paid was less than the charged amount and I drop these claims from my sample. I drop an additional 536 claims with a third party payment amount. After imposing these inclusion criteria, the number of claims in my analysis sample is equal to 100,007, with 21.8 percent of them paying the provider charged amount.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Kentucky Medicaid would have been lower if an alternative price had been used as each Abbott product's AWP. Using 125 percent of the average indirect pharmacy price, I find that 96,452 out of the 100,007 claims (96.4 percent) have a value of DIFFERENCE that is strictly greater than zero and that the total value of DIFFERENCE for these 96,452 claims is equal to $4.737 million, which represents 76.5 percent of the $6.191 million for the 100,007 claims in my analysis sample. I also find that there are 16,044 pharmacy payments with at least one claim with a DIFFERENCE value that is greater than zero.

### C. The 1992Q1 to 1994Q4 Period

As described above, the Kentucky Medicaid claims data are incomplete for the first four years of the study period. According to the SMRF/MAX data displayed in Table 19B, Kentucky's Medicaid program spent approximately $914,414 on Complaint NDCs during the 1992 to 1994 period. To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for Florida, California, and New Jersey above, though in this case I use the individual-level claims data instead of the aggregate SDUD data. Of the 20,820 claims summarized in Table 19B, I drop 9 with a Medicaid paid amount that exceeds

the amount charged by the provider, 36 with a strictly positive other third party payment amount, and 50 with an undefined RATIO as defined above in equation (6).

Using the algorithm described above for SDUD data though in this case on a claim-by-claim basis with the SMRF/MAX data, I determine that 17,559 of the 20,725 claims remaining in my sample have a value of DIFFERENCE that is greater than zero.  My results also indicate that there are 3,589 pharmacy payments with at least one claim having a DIFFERENCE greater than zero and that the total value of DIFFERENCE across the 17,559 claims is $545,830.

*D. The 1991Q1 to 1991Q4 Period*

In this final section I investigate the effect on Medicaid spending and the number of claims in the first year of the study period, which is not included in either the Kentucky or the SMRF/MAX data.  According to the SDUD data displayed in Table 19C, Kentucky's Medicaid program spent approximately $129,244 on Complaint products during 1991.  To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for Florida, California, and New Jersey above, and determine that Kentucky Medicaid spending would have been $77,795 lower during the first year of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in Kentucky's Medicaid adjudication calculations.   My results also reveal that 2,961 prescriptions during the first year of the study period had a DIFFERENCE that exceeded zero.

Taken together, my analyses for Kentucky Medicaid indicate a total DIFFERENCE during the study period of approximately $5.361 million along with 116,972 claims and at least 19,633 pharmacy payments that had a DIFFERENCE that exceeded zero.

**XIV. Missouri Medicaid**

According to the CMS SDUD data described above, the state of Missouri was eighth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $7.337 million paid.  Missouri provided the United States with Medicaid claims data that included claims with service dates from February 1, 1998 through and including December 31, 2001.  Because of this, the data for January of 1991 through and including January of 1998 are likely to be incomplete.

The Missouri Medicaid claims data are summarized in Table 20A.  There are 82,976 claims for the Complaint NDCs from 1998 through 2001 and Missouri Medicaid spending for these claims was equal to $4.264 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are zero claims for 1 of the 44 NDCs in the complaint (74712007).

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991 through 1997.  Quarterly Medicaid spending peaks in the first quarter of 2000.   It then declines gradually during the following four quarters and sharply late in 2001.

*A. Missouri Medicaid Reimbursement*

According to Medicaid State Plan Amendments, the Missouri Medicaid program used the AWP for most of the time period of interest.  The scaling factor changed over time, from 1.00 through September of 1991 to .8957 for the next nine years.  During the 2000 year, this changed to the lesser of 110 percent of the WAC and 89.57 percent of the AWP.  Because Abbott's WAC is typically 80 percent of the AWP, these two amounts are almost identical.  The dispensing fee

was equal to $3.15 until September of 1991 and then increased to $4.09.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

*B. The Impact of Alternative Price Parameters on Missouri Medicaid Spending*

Of the 82,976 Missouri NDC-based Medicaid claims summarized in Table 21A, there are 81 claims with a positive other third party payment amount and 7506 claims that represent a reversal of an earlier claim or the claim that was itself reversed.  I drop these 7587 claims, which leaves me with an analysis sample of 75,389, with 26.5 percent of these claims paying the provider's charged amount.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Missouri Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the average pharmacy price from Abbott's indirect transaction data as the AWP throughout the 1998 to 2001 period, I find that 70,680 of the 75,389 claims (93.8 percent) in the Missouri sample have a value of DIFFERENCE that is greater than zero and that the total value of difference for these claims is $3.448 million.  This dollar amount represents 80.9 percent of the $4.263 million spent on the claims in the Missouri sample.

There is no date of payment or pharmacy identifier in the Missouri Medicaid claims.  I therefore use the SMRF / MAX claims data for the 1998 to 2001 period to estimate the number of pharmacy payments with at least one claim with a value of DIFFERENCE that is greater than zero.  To do this, I use the Missouri Medicaid claims data to calculate the fraction of claims in each NDC-quarter with a value of DIFFERENCE that is greater than zero.  I then apply this

NDC-quarter-specific probability to each NDC-based Indiana Medicaid claim in the SMRF / MAX data and find that there were 8,304 unique pharmacy payments with at least one claim with a value of DIFFERENCE that exceeds zero.

## C. The 1992Q1 to 1997Q4 Period

As described above, the Missouri Medicaid claims data do not include claims with service dates in the 1991 to 1997 period. According to the SMRF/MAX data displayed in Table 20B, Missouri's Medicaid program spent $3.188 million on Complaint NDCs during the 1992 to 1997 period. To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for the state of Kentucky. Of the 66,860 claims summarized in Table 20B, I drop 15 with a strictly positive other third party payment amount, and 161 with an undefined RATIO as described in equation (6) above.

Using the algorithm described above for SDUD data though in this case on a claim-by-claim basis with the SMRF/MAX data, I find that 61,884 of the 66,684 claims remaining in my sample have a value of DIFFERENCE that is greater than zero. My results further indicate that there are 8,418 pharmacy payments with at least one claim having a DIFFERENCE greater than zero and that the total value of DIFFERENCE across the 61,997 claims is $2.459 million.

## D. The 1991Q1 to 1991Q4 Period

In this final section I investigate the effect on Medicaid spending and the number of claims in the first year of the study period, which is not included in either the Missouri or the SMRF/MAX data. According to the SDUD data displayed in Table 20C, Missouri's Medicaid program spent $63,533 on Complaint products during 1991. To estimate the total value of

DIFFERENCE during this period, I utilize an algorithm that is analogous to the ones described for other states above, and find that Missouri Medicaid spending would have been $35,736 lower during the first year of the study period if 125 percent of the average pharmacy price in Abbott's indirect data had been used as the AWP in the state's Medicaid adjudication calculations.   My results further reveal that 1,568 prescriptions during the first year of the study period had a DIFFERENCE that exceeded zero.

Taken together, my analyses for Missouri Medicaid suggest a total DIFFERENCE during the study period of approximately $5.944 million along with 134,132 claims and at least 17,725 pharmacy payments that had a DIFFERENCE that exceeded zero.


## XV. Ohio Medicaid

According to the CMS SDUD data described above, the state of Ohio was ninth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $5.836 million paid.  Ohio provided the United States with Medicaid claims data that included claims with service dates from January 1st of 1991 through and including December 31st of 2001.

The Ohio Medicaid claims data are summarized in Table 21.  There are 331,440 claims for the Complaint NDCs in the 1991 to 2001 period and Medicaid spending for these claims was equal to $6.563 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are claims for all 44 of the NDCs in the complaint.  Consistent with the pattern for the U.S. as a whole, Ohio Medicaid spending is greatest for the 74653301 product.  The second panel lists the number of prescriptions and total

Medicaid spending by year and quarter.  As this table shows, Medicaid spending is increasing throughout the end of 1998 and then trends up gradually after that.

*A. Ohio Medicaid Reimbursement*

According to Medicaid State Plan Amendments and data from the NPC's Pharmaceutical Benefits Survey, the Ohio Medicaid program used the Average Wholesale Price through June of 1998, with the AWP scaling factor declining from 0.93 to 0.925 on January 1, 1996.  Beginning in July of 1998, the state took the lower of 88.8 percent of the AWP and 111 percent of the WAC, with the latter being slightly lower for products in the Complaint product given that AWP was typically 125 percent of the WAC for Abbott products.  The dispensing fee also changed over time, rising from $3.23 to $3.50 in July of 1994 and again to $3.70 in July of 1998.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

The state of Ohio also frequently substituted a state MAC for generic products.  This price (adjusted by the appropriate scaling factor) was used in place of the AWP or WAC if the paid amount would be lower than that obtained using one of these published prices.

*B. The Impact of Alternative Price Parameters on Ohio Medicaid Spending*

Of the 331,440 Ohio NDC-based Medicaid claims summarized in Table 21, there are 5192 claims with a paid amount of zero and 1394 with some other third party payment.  I drop these claims, leaving me with an analysis sample of 324,854 claims.  I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the

amount paid by Ohio Medicaid would have been lower if an alternative price had been used as the AWP (from 1991Q1 to 1998Q2) or WAC (from 1998Q3 to 2001Q4).

Using 125 percent of the average NDC-quarter-specific indirect pharmacy price as the AWP and the average indirect pharmacy price as the WAC, I find that 276,856 out of 324,854 claims (85.2 percent) in the Ohio sample have a value of DIFFERENCE that is greater than zero and that the total value of difference for these claims is $3.208 million.  This dollar amount represents 48.9 percent of the $6.556 million spent on the claims in the Ohio sample.  Additionally, I find that there are 37,695 pharmacy payments with at least one claim that has a value of DIFFERENCE greater than zero.

It is worth noting that the ratio of DIFFERENCE to the total amount of Medicaid spending is substantially lower in Ohio than in the preceding states.  This is largely driven by the state's more frequent use of MACs, which serves to reduce the discrepancy between Abbott's actual prices and those used by the state when adjudicating Medicaid claims.


**XVI. Michigan Medicaid**

According to the CMS SDUD data described above, the state of Michigan was tenth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $4.903 million paid.  Michigan provided the United States with Medicaid data that included claims with payment dates from October 1, 2000 through and including December 31, 2001.  Because of this, the data for January of 1991 through and including September of 2000 are likely to be incomplete.

The Michigan Medicaid claims data are summarized in Table 22A.  There are 17,966 claims for the Complaint NDCs in 2000 and 2001 and Medicaid spending for these claims was

equal to $902,664.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are zero claims for 2 of the 44 NDCs in the complaint (74613902 and 74712007).

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991 through 1999.  The data also appear to be incomplete for the first three quarters of 2000, which is to be expected given that only those claims paid in or after October of 2000 are included.

*A. Michigan Medicaid Reimbursement*

According to Medicaid State Plan Amendments, the Michigan Medicaid program used the Average Wholesale Price throughout the time period of interest.  The scaling factor changed over time, from 0.90 during the 1991 to 1994 period to either .849 or .865 thereafter, depending on the type of pharmacy.  The dispensing fee was equal to $3.72 throughout much of the study period until increasing to $3.77 in late 2000.  However, the amount paid for the dispensing fee was often $11.22 or $11.27 because of the addition of $7.50 for intravenous drugs.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.  Additionally until August of 1995, Michigan Medicaid considered the pharmacy's reported actual acquisition cost, and paid this amount (plus the dispensing fee) if it was lower than the calculated or charged amount.

*B. The Impact of Alternative Price Parameters on Michigan Medicaid Spending*

Of the 17,966 Michigan NDC-based Medicaid claims summarized in Table 22A, there are 120 claims with a paid amount of zero, 9 claims with the amount paid exceeding the charged

amount, 793 with some other third party payment, and 1058 remaining claims with service dates on or before September 30, 2000.  I drop all of these claims, leaving me with an analysis sample of 15,986 claims.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Michigan Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the average indirect pharmacy price as the AWP throughout the October 2000 to December 2001 period, I find that 14,389 of the 15,986 claims (90.0 percent) in the Michigan sample have a value of DIFFERENCE that is greater than zero and that the total value of difference for these claims is $537,789.  This dollar amount represents 67.9 percent of the $792,346 spent on the claims in the Michigan sample.  Additionally, I find that there are 4,479 pharmacy payments with at least one claim that has a value of DIFFERENCE greater than zero.

*C. The 1994Q1 to 2000Q3 Period*

As described above, the Michigan Medicaid claims data do not include claims with service dates in the 1991 to 1999 period and the claims are incomplete for the first three quarters of 2000.  According to the SMRF / MAX data displayed in Table 22B, Michigan's Medicaid program spent $4.227 million on Complaint NDCs during the January 1994 to September 2000 period.[40]  To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for the states of Kentucky and Missouri.  Of the 81,545 claims summarized in Table 22B, I drop 326 with an undefined RATIO as defined in equation (6) above, leaving me with an analysis sample of 81,219 claims.

---

[40] Because the state considered pharmacies' reported actual acquisition costs until August of 1995, I considered excluding these claims from my analysis sample.  However, an examination of the Michigan SMRF / MAX claims data suggests there was only a slight increase in the average amount paid around that time and thus I include them.

Using the algorithm described above for SDUD data though in this case on a claim-by-claim basis with the SMRF/MAX data, I find that 73,749 of the remaining 81,219 claims remaining in my sample have a value of DIFFERENCE that is greater than zero. My results further indicate that there are 14,845 pharmacy payments with at least one claim having a DIFFERENCE greater than zero and that the total value of DIFFERENCE across the 73,749 claims is $3.109 million.

*D. The 1991Q1 to 1993Q4 Period*

In this final section I investigate the effect on Medicaid spending and the number of claims in the first three years of the study period, which is not included in either the Michigan claims or the SMRF/MAX data. According to the SDUD data displayed in Table 22C, Michigan's Medicaid program spent approximately $157,114 on Complaint products during this three-year period. To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for other states above, and determine that Michigan Medicaid spending would have been $66,162 lower during the first three years of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in Michigan's Medicaid adjudication calculations. My results also reveal that 6,844 prescriptions during the first year of the study period had a DIFFERENCE that exceeded zero.

Taken together, my results for Michigan Medicaid indicate a total DIFFERENCE during the study period of approximately $3.713 million along with 94,982 claims and 19,324 pharmacy payments that had a DIFFERENCE that exceeded zero.

**XVII. Louisiana Medicaid**

According to the CMS SDUD data described above, the state of Louisiana was twelfth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $4.282 million paid.  Louisiana provided the United States with data that included NDC-based Medicaid claims with payment dates from January 4, 1995 through and including December 26, 2001, with a small number of claims having payment dates in 2002 and 2003 because of service dates in 2001.  Because of this, the data for 1991 through 1994 are likely to be incomplete.

The Louisiana Medicaid claims data are summarized in Table 23A.  There are 95,705 claims for the Complaint NDCs in the period of interest and Medicaid spending for these claims was equal to $3.912 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are zero claims for 1 of the 44 NDCs in the complaint (74397703) and consistent with the experience for the U.S. overall, the 74653301 product accounts for more Medicaid spending than any other Complaint NDC.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991 through the second quarter of 1993.  Data for the last two quarters of 1993 and all four quarters of 1994 appear to be incomplete and I therefore exclude them from my analysis.

*A. Louisiana Medicaid Reimbursement*

According to Medicaid State Plan Amendments, the Louisiana Medicaid program used the AWP throughout the 1991 to 2001 period.  The scaling factor changed over time, from 0.895 from 1991 through January of 2000 to 0.850 through August 5, 2001 and 0.865 thereafter.  From July of 1999 forward, the scaling factor was slightly lower for chain pharmacies.  The dispensing

fee was equal to $4.68 in the first 9 months of 1991 and then increased to $5.00 on October 1, 1991, to $5.54 on July 1, 1993, and to $5.77 on July 1, 1994, where it remained through the end of the study period. The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

*B. The Impact of Alternative Price Parameters on Louisiana Medicaid Spending*

Of the 95,705 Louisiana NDC-based Medicaid claims summarized in Table 23A, there are 1666 with a service date on or before December 31, 1994, 276 claims with a paid amount of zero, 37 claims with the amount paid exceeding the charged amount, and 171 claims with some other third party payment.  I drop these claims from my analysis sample while also excluding 17,035 that represent reversals of previous claims or claims that were themselves later reversed. This leaves me with a sample of 76,520 Louisiana NDC-based Medicaid claims.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Louisiana Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the average indirect pharmacy price as the AWP throughout the 1995 to 2001 period, I find that 73,705 of the 76,520 claims (96.3 percent) in the Louisiana sample have a value of DIFFERENCE that is greater than zero and that the total value of DIFFERENCE for these claims is $2.971 million. This dollar amount represents 77.5 percent of the $3.835 million spent on the claims in the Louisiana sample.

There is no pharmacy identifier in the Louisiana Medicaid claims.  I therefore use the SMRF / MAX claims data for the 1995 to 2001 period to estimate the number of pharmacy payments with at least one claim with a value of DIFFERENCE that is greater than zero.  To do

this, I follow an algorithm analogous to the one used for Missouri above in which I use Louisiana's Medicaid claims data to calculate the fraction of claims in each NDC-quarter with a value of DIFFERENCE that is greater than zero. I then apply this NDC-quarter-specific probability to each NDC-based Louisiana Medicaid claim in the SMRF / MAX data and find that there were 7,211 unique pharmacy payments with at least one claim with a value of DIFFERENCE that exceeded zero.

*C. The 1991Q1 to 1994Q4 Period*

In this final section I investigate the effect on Medicaid spending and the number of claims in the first four years of the study period, which is not included in either the Louisiana or the SMRF/MAX Medicaid claims data. According to the SDUD data displayed in Table 23B, Louisiana's Medicaid program spent approximately $411,653 on Complaint products during the 1991 to 1994 period. To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the ones described for other states above, and find that Louisiana Medicaid spending would have been $257,830 million lower during the first four years of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in the state's Medicaid adjudication calculations. My results also reveal that 8,417 out of 9,408 prescriptions during the 1991 to 1994 period had a DIFFERENCE that exceeded zero.

Taken together, my analyses for Louisiana Medicaid indicate a total DIFFERENCE during the study period of approximately $3.229 million along with 82,122 claims and more than 7,211 pharmacy payments that had a DIFFERENCE that exceeded zero.

**XVIII. Wisconsin Medicaid**

According to the CMS SDUD data described above, the state of Wisconsin was seventeenth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $2.574 million paid.  Wisconsin provided the United States with data that included NDC-based Medicaid claims with payment dates from 1992 to 2001. However, an examination of the claims data indicates that the data for 1992 and for early 1993 are incomplete.

The Wisconsin Medicaid claims data are summarized in Table 24A.  There are 72,131 claims for the Complaint NDCs in the period of interest and Medicaid spending for these claims was equal to $2.482 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are claims for all 44 of the NDCs in the complaint and consistent with the experience for the U.S. overall, the 74653301 product accounts for more Medicaid spending than any other Complaint NDC.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991 and the data for 1992 and the first quarter of 1993 appear to be incomplete and I therefore exclude them from my initial analyses.

*A. Wisconsin Medicaid Reimbursement*

According to Medicaid State Plan Amendments and the NPC's Pharmaceutical Benefits Survey, the Wisconsin Medicaid program used the AWP throughout the 1991 to 2001 period. The scaling factor changed over time, from 0.900 from 1991 through June of 2001 to 0.8875 thereafter.  The most common dispensing fee was $4.69 until June of 1998, with this changing to

$4.88 as of July of 1998.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

*B. The Impact of Alternative Price Parameters on Wisconsin Medicaid Spending*

Of the 72,131 Wisconsin NDC-based Medicaid claims summarized in Table 24A, there are 1,018 with a service date on or before March 31, 1993, 552 claims with a paid amount of zero, 1 claim with the amount paid exceeding the charged amount, 255 claims with some other third party payment, and 160 claims for which I am unable to replicate the amount paid.  I drop these claims, leaving me with a sample of 70,145 Wisconsin NDC-based Medicaid claims.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Wisconsin Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the average indirect pharmacy price as the AWP throughout the 1993Q2 to 2001Q4 period, I find that 63,647 of the 70,145 claims (90.7 percent) in the Wisconsin sample have a value of DIFFERENCE that is greater than zero and that the total value of DIFFERENCE for these claims is $1.683 million. This dollar amount represents 69.0 percent of the $2.440 million spent on the claims in the Wisconsin sample.  Additionally, I find that there are 13,988 pharmacy payments with at least one claim that has a value of DIFFERENCE greater than zero.

*C. The 1991Q1 to 1993Q1 Period*

In this final section I investigate the effect on Medicaid spending and the number of claims in the 1991Q1 to 1993Q1 period, when the Wisconsin Medicaid claims data are incomplete.  According to the SDUD data displayed in Table 24B, Wisconsin's Medicaid

program spent approximately $107,302 on Complaint products during the 1991Q1 to 1993Q1 period.  To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the ones described for other states above, and find that Wisconsin Medicaid spending would have been $73,335 lower during the first four years of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in the state's Medicaid adjudication calculations.   My results further indicate that 2976 prescriptions during the 1991Q1 to 1993Q1 period had a DIFFERENCE that exceeded zero.

Taken together, my analyses for Wisconsin Medicaid reveal a total DIFFERENCE during the study period of approximately $1.756 million along with 73,393 claims and more than 13,988 pharmacy payments that had a DIFFERENCE that exceeded zero.

## XIX. Medicaid Summary for the First Twelve States

The results for the twelve states considered so far, which account for approximately 70 percent of total Medicaid spending on Abbott's Complaint products from 1991 to 2001, are summarized in Table 25.  For each state, the table provides information on results from state-specific claims data, SMRF / MAX claims data, and/or CMS SDUD data.  The table also lists the time period that is relevant for each data source.  For example for the state of Florida I utilized state claims data from 1993Q4 to 2001Q4 and SDUD data for the 1991Q1 to 1993Q3 period.

The next two columns of the table list the number of NDC-based Medicaid claims with a value of DIFFERENCE greater than zero and the total number of claims considered.  As the table shows, the Medicaid program would have paid less for 2.306 million out of 2.459 million claims (93.8 percent) if Abbott's actual transaction prices as described above had been used for the Complaint products' AWP, WAC, or DP during the 1991 to 2001 period.  The next two

columns list the corresponding information for the total value of DIFFERENCE and the total amount of Medicaid spending.  My results indicate that Medicaid spending would have been lower by $81.222 million out of $109.444 million paid.  This value of DIFFERENCE is 74.2 percent of total Medicaid spending.

In the next column, I report the federal share of this DIFFERENCE. In calculating this, I use the federal matching rate in effect for each state in each year.[41]  As shown in the table, the federal share of DIFFERENCE for these first twelve states is $45.786 million.  The final column lists the number of pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero.  My results indicate that there were at least 375,059 unique pharmacy payments with at least one Medicaid claim with a value of DIFFERENCE greater than zero in these twelve states during the 1991 to 2001 period.

## XX. Medicaid for the Remaining 38 States

For analyses for the remaining 38 states, I utilize the SMRF / MAX data and SDUD data described above.  When it is available I use the SMRF / MAX claims data, which allows me to construct analysis samples analogous to those described above with the state-level claims data.  When this data is not available for a state in a particular year, I instead use the SDUD data.

Table 26A summarizes Medicaid spending on Abbott's 44 Complaint products by state and year for these 38 states in the SMRF / MAX data.  States are sorted in descending order of SDUD Medicaid spending as listed in Table 11.  Total NDC-based Medicaid spending in the SMRF / MAX data for these 38 states (including the District of Columbia but excluding

---

[41] This information was downloaded from the CMS website, which provides the Federal Medicaid Assistance Percentage for each state in each year from 1985 through 2004 at: http://aspe.hhs.gov/health/fmap.htm.

Arizona) during the 1992 to 2001 period[42] is $34.432 million while the total number of claims is 632,673.  Table 26B provides a similar summary of these same states from the SDUD data. However in this table, a state-year cell is only populated if there is not SMRF / MAX data for the state in the same year.[43]  Total NDC-based Medicaid spending summarized in this table is $13.944 million with the total number of claims equal to 286,259.

I begin my analysis of each state's SMRF / MAX data by applying inclusion criteria analogous to those described above for the twelve preceding states.  For example, I drop claims with a paid amount of zero or with a strictly positive third party payment amount.  I then aggregate the number of claims and total Medicaid spending for each state by NDC-quarter.

I then merge this claims data for each of the remaining 38 states to a data set in which the unit of observation is the NDC-quarter and that is constructed using the eleven states' Medicaid claims data described above.[44]  For each NDC-quarter, I first calculate the average fraction of claims with DIFFERENCE greater than zero across all eleven states (fewer if not all eleven have data).  I also calculate the average value of the ratio of DIFFERENCE to the amount of Medicaid spending on these claims.  In calculating these averages, I weight each of the eleven states that have data for that NDC-quarter equally, while states with no claims data for that NDC-quarter have a weight of zero.  I subsequently refer to these averages for NDC j in quarter t as POS-DIFF11$_{jt}$ and DIFF-FRAC11$_{jt}$, respectively.

My comparison of the Medicaid adjudication algorithms used by the 11 states described above with the 38 remaining states suggests that the two groups are very similar.[45]  The vast

---

[42] Only Hawaii and Alabama had SMRF data in 1991 and I rely on SDUD data for both of these states in 1991.
[43] Neither SDUD nor SMRF data is available for Tennessee from 1995 to 1998 and for Idaho in 1993.
[44] I do not include Indiana because as described above I used SMRF / MAX and SDUD data for that state.
[45] The same is true for Medicaid reimbursement per claim.  For example from 1999 to 2001 when all 50 states have SMRF / MAX claims, the average amount spent per claim is actually higher in the remaining 38 states than it is in the 11 states for which we use claims data.   Considering this one NDC at a time, in 24 of 44 cases, the average per claim Medicaid spending is higher for the remaining 38 states and these 24 NDCs account for 74.6 percent of

majority of states in both groups use AWP during the eleven-year period, though some also use the WAC and the DP.  More specifically, of the 11 states for which I use state Medicaid claims data above, 8 used AWP for most or all of the period with the remaining three primarily using either the WAC or the DP.  During this same period, 30 of the remaining 38 states primarily relied on AWP while the remaining 8 used either the WAC or the DP.  Additionally virtually all of the states consider the provider charged amount, taking the lesser of this and the amount that results from applying the adjudication formula.

Additionally as suggested by my analyses above, the fraction of claims with a value of DIFFERENCE greater than zero and the ratio of DIFFERENCE to the total amount paid is quite similar across states, whether the state uses the AWP, the WAC, or the DP.   The most striking outlier is Ohio, which has a low value of DIFFERENCE relative to the total amount paid.[46] Because Ohio is the only state to have provided data for all forty-four quarters (Illinois provided it for 43 quarters), it will have a greater weight than other states which provided data for fewer years.  This will serve to reduce the value of DIFFERENCE for the remaining 38 states below what it would be if I had data for all eleven states in each year.

To estimate the number of claims with a value of DIFFERENCE greater than zero in a state-NDC-quarter, I multiply the number of claims in that cell by POS-DIFF11$_{jt}$.  I employ a similar algorithm for the total value of DIFFERENCE for each state-NDC-quarter, multiplying Medicaid spending in that cell by DIFF-FRAC11$_{jt}$.  To estimate the number of provider payments with at least one claim with a value of DIFFERENCE greater than zero, I merge the individual claims data from each state's analysis sample with the NDC-quarter data on POS-DIFF11$_{jt}$.  I then use an algorithm similar to the one used for other states' SMRF / MAX data

---

Medicaid spending.  It therefore is not the case that these 38 states had on average have very low reimbursement per claim as the state of Ohio did during this period.
[46] This is primarily because of Ohio's more frequent use of MAC prices.

above, assigning each claim a probability of POS-DIFF11$_{jt}$ of having a value of DIFFERENCE greater than zero and then calculating the implied number of provider payments with at least one claim with a DIFFERENCE greater than zero.

I follow a similar algorithm for the SDUD data.  Specifically I multiply the number of claims in each state-NDC-quarter cell by POS-DIFF11$_{jt}$ to estimate the number of claims with DIFFERENCE greater than zero.  Similarly, I multiply Medicaid spending in the state-NDC-quarter cell by DIFF-FRAC11$_{jt}$.

The results from these analyses for the remaining 38 states are summarized in Tables 27A and 27B.  For virtually every state, I list two sets of information – one that uses the SMRF / MAX data and the other using the SDUD data.  The format of these two tables is identical to the format of Table 25 above.  Consistent with my approach for the twelve states discussed above, I do not estimate provider payments when using SDUD data.

Aggregating across these 38 states and employing the algorithms described above, I find that 840,500 out of 894,567 claims (94.0 percent) have a value of DIFFERENCE that is greater than zero.  The fraction with a value of DIFFERENCE greater than zero is almost identical to the corresponding fraction of 93.9 percent for the 12 states considered above.

My results further indicate that the total value of DIFFERENCE for Complaint products during the 1991 to 2001 period is $32.598 million.  This represents 68.3 percent of the $47.702 million in Medicaid spending on Complaint products.  This ratio is considerably lower than the corresponding ratio of 74.3 percent for the twelve preceding states.  Furthermore, it is lower than the state-specific ratio for all but one of the twelve states (with Ohio's 48.9 percent the only one that is lower).  Thus if anything it appears that my results understate the total value of DIFFERENCE in these 38 states.  The federal share of this DIFFERENCE is $19.990 million

and the number of pharmacy payments with at least one claim with a value of DIFFERENCE that exceeds zero is 146,636.

The final row of Table 25 summarizes the results of my NDC-based Medicaid analyses for all 50 states (with Arizona excluded and DC included).  My results indicate that 3,146,914 claims (93.8 percent of the total) have a value of DIFFERENCE greater than zero.  I also find a total value of DIFFERENCE of $113.820 million (72.4 percent of NDC-based Medicaid spending) with the federal share of this equal to $65.776 million.  The total number of unique pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero is at least 521,695.  This final number is substantially understated because it does not consider pharmacy payments for those state-NDC-quarter cells in which I use aggregate SDUD data.

## XXI. CMS Medicare DME Claims Data

The fourth[47] main set of data that I utilize in my analysis consists of Medicare claims data for the 11 J-codes[48] listed in the United States' Complaint.  In this section I focus on a subset of these claims known as Medicare Durable Medical Equipment (DME) claims.

Whereas the Medicaid program reimburses drugs on an NDC basis, the Medicare program typically uses the Healthcare Common Procedure Coding System ("HCPCS").  Each HCPCS code typically refers to several different NDCs.  Additionally, the payment amounts for each HCPCS code are determined by each insurance carrier (e.g. Palmetto), with the typical carrier using the median AWP of the NDCs included in the carrier's array as the per-unit allowed amount, with this changing to 95 percent of the median on January 1, 1998.[49]  The NDCs that are

---

[47] Sixth if one counts the SDUD, SMRF/MAX, and state-specific Medicaid datasets separately.
[48] These are HCPCS codes in the Complaint that are located in the procedure code field of the Medicare claims data.
[49] In the latter part of the study period, carriers would instead pay the lowest price for a brand name version of a drug if it was lower than the allowed amount resulting from the median of generic products.

included in an array vary across carriers and can vary within the same carrier over time.  I describe the process that is used to determine payment amounts in a subsequent section.

Another key difference between the Medicaid NDC-based claims and the Medicare HCPCS code claims is that Medicare recipients are typically responsible for 20 percent of the total amount paid to the provider.  Thus if the Medicare program pays $40 for a particular claim, typically the Medicare recipient or her other insurer will pay the provider an additional $10. Thus to the extent that alternative prices for Abbott products would reduce Medicare spending, it would also reduce spending by Medicare recipients and their other insurers.

The goal of my analysis in this section is to determine the amount by which spending by the Medicare program on DME claims would have changed if alternative prices had been used for Abbott products.  The mechanism for such a price effect is straightforward.  If, for example, Abbott had one product in a particular carrier's array for one of the HCPCS codes listed in the complaint, then the median price from that array could change with an alternative price.

Suppose for example there are three prices of 8, 10, and 12 in an array for three different products.  If the price of 10 were to decline then the median would be certain to fall.  If the price of 12 were to decline by more than 2 then the median would also fall.  If however the price of 8 were to fall there would be no decline in the median.  Thus to the extent that Abbott prices included in carriers' arrays tend to equal or exceed the median, it is more likely that the amount paid by Medicare would be affected by the use of alternative AWPs.

Using carrier array documents along with Medicare claims data, in this section I examine how alternative AWPs for Abbott products would have affected the median price for Medicare HCPCS codes and thus the amount paid for Medicare DME claims.

*A. Summary of Medicare DME Claims for Complaint HCPCS Codes*

CMS maintains several different types of Medicare claims data, and the DME claims for Complaint HCPCS codes are the ones that I summarize in this section. This data was provided by CMS to the United States. Table 28 provides a summary of Medicare spending in the U.S. on DME claims for Complaint HCPCS codes. As the top of the panel on the left side shows, the vast majority of Medicare DME spending is accounted for by the J3370 Vancomycin HCl HCPCS code. More specifically, the $24.495 million spent on this treatment represents 93.9 percent of the total Medicare DME amount paid for Complaint HCPCS codes.

At the bottom on the left hand side of that same table, I list DME Medicare spending and the number of Medicare claims for each of the five different insurance carriers that processed DME claims for Complaint products. The largest one in terms of spending is Palmetto (885), which accounts for 45.4 percent of the Medicare DME spending. The next three make up virtually all of the rest, with AdminaStar (635), CIGNA (5655), and Travelers (10555) accounting for 27.9, 13.9, and 12.8 percent, respectively, of Medicare DME spending on Complaint HCPCS codes during the 1991 to 2001 period.

The panel on the right side of this same table lists Complaint Medicare DME claims and spending by year and quarter. As the table shows, there are very few claims in the first two years of the period, with the number of claims accelerating rapidly beginning in early 1993. Spending on DME claims is greater than $2.3 million in every quarter during the two year period from the third quarter of 1994 through and including the second quarter of 1996, and then declines by more than 90 percent to just $0.169 million in the fourth quarter of 1996. It then remains persistently low relative to the preceding years until the end of 2001.

B. *Palmetto-Administered Medicare DME Claims and Spending*

The left-side panel of Table 29 lists Medicare spending administered by Palmetto by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for the U.S. as a whole, Palmetto-administered Medicare spending for the J3370 code accounts for the vast majority of spending.  Similarly, Palmetto-administered Medicare DME spending was very low in the first two years of the study period, peaked during the late 1994 to early 1996 period, and then declined sharply in late 1996.

To determine the effect on DME Medicare spending of using alternative prices, such as 125 percent of Abbott's average pharmacy indirect price, for the AWP for Abbott products, I begin by utilizing arrays that were created using Palmetto documents for the J3370 code.  For example, for the latter half of 1995, Palmetto used an array for this J3370 code that included five products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|-----|-----|-----------------|
| 00074-6534-01 | **10.88** | 5.08 |
| 00074-4332-01 | 30.23 | 4.46 |
| 00641-2778-43 | 18.81 | 18.81 |
| 00205-3154-88 | 5.76 | **5.76** |
| 00364-2472-33 | 7.00 | 7.00 |

Prices in this table represent the per-package price.  Given that there are five prices, the median price (in bold) is the one that is less than two prices and greater than two prices - $10.88, which is the price for the Abbott 74653401 product.  This NDC and the one other Abbott NDC (74433201) are both in the Complaint.

Now suppose that one were to replace the Abbott products' AWPs with 125 percent of the products' average pharmacy indirect price in that same time period, which is listed in the

next column of the same table above.  In this case, the median price would fall substantially, from $10.88 to $5.76.

I repeat this exercise for all of the Palmetto J3370 arrays derived from Palmetto documents, and this allows me to estimate how Medicare spending would have changed if alternative prices had been used for Abbott products' AWPs.  More specifically, if using 125 percent of Abbott's average indirect pharmacy price as the AWP for Abbott NDCs would reduce the median, I replace the per-package price used by Palmetto in adjudicating the claim with the revised median.  Thus Palmetto Medicare DME claims with a per-unit cost of $10.88 during the time period this array is in effect would be replaced by $5.76.  And similar to the approach used by the Medicaid program, the calculated amount would be compared with the provider charged amount, with the carrier paying the lesser of the two.

To construct the sample of Palmetto J3370 claims, I begin by excluding 63,149 claims with a paid amount of zero from the full set of 108,388 J3370 claims.[50]  I next drop the 253 claims with a third party payment amount or with a deductible and I also drop 13 claims for which I am unable to replicate the amount paid.  Of the 44,972 claims still in the sample at this point, there are 67 claims with a very rare per-package price and I therefore exclude them from my analysis.

With these changes, just 5 per-package prices remain for the claims that do not pay the provider charged amount.  The most common is 10.88 (41.2 percent) and then 11.32 (23.0 percent), 18.66 (17.08 percent), 14.69 (10.9 percent), and 18.81 (7.9 percent).  All five of these prices are observed as medians in the arrays that were recreated in excel spreadsheets using Palmetto documents by Myers and Stauffer.  Moreover, all five of these medians end up being replaced by lower medians, and thus every claim that did not simply pay the provider charged

---

[50] I also drop one J3370 claim that is in the 2004 file year.

amount has a value of DIFFERENCE that exceeds zero.  For the claims on which the provider

charged amount is paid, I cannot calculate a per-package price analogous to the one for the other

claims.  Thus I simply use the one that was most common during the quarter of the claim.  Thus

for example from 1995Q2 to 1996Q1, $10.88 was the most common per package price.  I use

this price for any claims on which the provider charged amount was paid and determine whether

the amount that results falls below the amount that was actually paid.  If it does then I estimate a

value of DIFFERENCE greater than zero.

Taking this algorithm to the data, I find that 44,020 of the 44,905 (98.0 percent) Palmetto

DME J3370 claims have a DIFFERENCE that is greater than zero.  The total value of

DIFFERENCE for these 44,020 claims is equal to $4.711 million, which represents 43.1 percent

of the $10.939 million on Palmetto-administered DME claims for code J3370.  It is worth noting

that this value of DIFFERENCE does not include the associated effect on Medicare recipient co-

payment amounts.  And finally, I use the provider identifier along with the payment date to

determine that there are 24,961 unique payments to health care providers that have one or more

claims with a value of DIFFERENCE greater than zero.

*C. AdminaStar-Administered Medicare DME Claims and Spending*

The left-side panel of Table 30 lists Medicare spending administered by the carrier

AdminaStar by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for

the U.S. as a whole, AdminaStar-administered Medicare spending for the J3370 code accounts

for the vast majority of spending.  Similarly, Medicare DME spending for claims administered

by the carrier AdminaStar was very low in the first two years of the study period, peaked during

the late 1994 to early 1996 period, and then declined sharply in late 1996.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                                      86

To determine the effect on DME Medicare spending of using alternative prices, such as 125 percent of Abbott's average pharmacy indirect price, for the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets using Wisconsin Physician Services[51] documents for the J3370 code by Myers and Stauffer.  For example, for the latter half of 1998, AdminaStar used an array for this J3370 code that included three products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-6534-01 | **12.48** | **4.15** |
| 00074-4332-01 | 34.66 | 3.06 |
| 00364-2472-33 | 7.00 | 7.00 |

Prices in this table represent the per-package price.  Given that there are three prices, the median price (in bold) is the one that is less than one price and greater than one price - $12.48, which is the price for the Abbott 74653401 product.  This product and the one other Abbott product (74433201) are both in the Complaint.

Now suppose that one were to replace the Abbott NDCs' AWPs with 125 percent of the products' average pharmacy indirect price in that same time period, which is listed in the next column of the same table above.  In this case, the median price would fall from $12.48 to $4.15.

I then take this algorithm to the AdminaStar arrays that prevailed in earlier periods for the J3370 DME claims.  For this array and for the preceding years from 1994 through 1998, AdminaStar used the arrays of Wisconsin Physician Services.  The allowed amounts for the J3370 code were 10.88, 11.32, and 11.89 in the three preceding years' arrays.  These three account for 57.9 percent of all AdminaStar J3370 DME claims in my AdminaStar sample, which I describe in more detail below.  The $10.88 price was the most common one from 1995Q3 to

---

[51] Beginning in 1994, AdminaStar used WPS arrays for Medicare DME claims.

1996Q1 while $11.32 was most common from 1996Q2 to 1997Q1 and $11.89 was most common from 1997Q2 forward.  Replacing the AWPs for the two Abbott products in that array with 125 percent of their average pharmacy indirect prices leads to a reduction in the allowed amounts to $5.76, $4.39, and $4.23.  I also have the AdminaStar array used immediately prior to this, which was also a WPS array, when the allowed amount was $18.81.  This median falls to $7.00 when I replace the AWPs for the two Abbott NDCs as in the previous arrays.

One other relatively common per-package price in the AdminaStar J3370 claims was $7.80, the most common one from 1993Q1 to 1993Q4 accounting for 4.9 percent of claims in my analysis sample.  This was actually the AWP for Lilly's 2144410 NDC in the 1993 Red Book.  However, because the Abbott 74653401 NDC is not listed in the 1993 Red Book and this allowed amount does not otherwise follow from the adjacent array, I exclude claims with this per-package price from my DIFFERENCE calculations below.

To construct the sample of AdminaStar J3370 claims, I begin by excluding the 51,593 claims that have a paid amount of zero.  I next drop the 119 claims with a third party payment amount or with a deductible and I also drop 14 claims for which I am unable to replicate the amount paid.  Of the 31,413 claims still in the sample at this point, there are 258 claims with a very rare per-package price and I therefore exclude them from my analysis, leaving me with a sample of 31,155 claims.[52]

With these changes, just 5 per-package prices remain for the claims that do not pay the provider charged amount.  The most common is 18.81 (36.5 percent) and then 10.88 (35.8 percent), 11.32 (22.3 percent), 7.80 (5.0 percent), and 11.89 (0.4 percent).  As explained above, I exclude the 1,314 claims with a per-package price of 7.80 from my analyses below, leaving me with a final sample of 29,841 claims.  All four of the remaining medians end up being replaced

---

[52] I also drop four J3370 claims that are in the 2002 file.

by lower medians, and thus every claim that did not simply pay the provider charged amount has a value of DIFFERENCE that exceeds zero.

Taking an algorithm analogous to the one defined above for Palmetto to the AdminaStar Medicare DME claims data, I find that 29,325 of the 29,841 (98.3 percent) of the DME J3370 claims have a DIFFERENCE that is greater than zero. The total value of DIFFERENCE for these 29,325 claims is equal to $3.686 million, which represents 54.8 percent of the $6.731 million on AdminaStar-administered DME claims in my sample for code J3370. As above, this does not include the effect on Medicare recipients' co-payment amounts. Additionally, I use the provider identifier along with the payment date to determine that there are 14,531 unique payments to health care providers that have one or more claims with a value of DIFFERENCE greater than zero.

*D. CIGNA-Administered Medicare DME Claims and Spending*

The left-side panel of Table 31 lists Medicare spending administered by the carrier CIGNA by HCPCS code for the 11 codes in the Complaint. Consistent with the pattern for the U.S. as a whole, CIGNA-administered Medicare spending for the J3370 code accounts for the vast majority of spending. Similarly, Medicare DME spending for claims administered by CIGNA was very low in the first two years of the study period, peaked during the late 1994 to early 1996 period, and then declined sharply in late 1996.

To estimate the effect on DME Medicare spending of using alternative prices, such as 125 percent of Abbott's average pharmacy indirect price, for the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets using CIGNA documents for

the J3370 code by Myers and Stauffer.  For example, for the early part of 1996, CIGNA used an array for this J3370 code that included four products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-6534-01 | **10.88** | 4.33 |
| 00205-3154-88 | 5.76 | 5.76 |
| 00364-2472-33 | 7.00 | **7.00** |
| 00641-2778-43 | 18.81 | 18.81 |

Prices in this table represent the per-package price.  Given that there are four prices, and that CIGNA during this period used the convention of taking the higher of the two middle prices rather than their average, the median price (in bold) is the one that is less than one price and greater than two prices - $10.88, which is the price for the Abbott NDC.  Now suppose that one were to replace the Abbott product's AWP with 125 percent of the product's average pharmacy indirect price in that same time period, which is listed in the next column of the same table above.  In this case, the median price would fall from $10.88 to $7.00.

I then take this algorithm to the CIGNA arrays that prevailed in earlier periods.  The first array has information on the first quarter of 1994 through early 1996, and had a median price of 10.56.  This per-package price accounted for 67.8 percent of the claims in my eventual analysis sample.  Another common price for which I have array information is $9.16 (19.3 percent), which was the most common price from the second quarter of 1996 through the second quarter of 1997.  The third most common is $10.88 (discussed above) and the sixth most common is $9.45, which was in effect in late 1997. I do not have array information for 1993 when the most common price was $5.47 (the per-package price for Lederle's 205315488 NDC), and I exclude claims using this price from my eventual analysis sample.

To construct the sample of CIGNA J3370 claims, I begin by excluding the 27,864 claims that have a paid amount of zero.  I next drop the 51 claims with a third party payment amount or

with a deductible and I also drop 1 claim for which I am unable to replicate the amount paid. Of the 15,510 claims still in the sample at this point, there are 37 claims with a very rare per-package price and I therefore exclude them from my analysis, leaving me with a sample of 15,473 claims.[53]

With these changes, just 6 per-package prices remain for the claims that do not pay the provider charged amount. The most common is 10.56 (68.0 percent) and then 9.16 (19.3 percent), 10.88 (7.3 percent), 5.47 (3.9 percent), 5.58 (1.2 percent), and 9.45 (0.3 percent). As explained above, I exclude the claims with a per-package price of 5.47 and also the claims with a per-package price of 5.58 from my analyses below, leaving me with a final sample of 14,729 claims. All four of the remaining medians end up being replaced by lower medians, and thus every claim in my sample that did not simply pay the provider charged amount has a value of DIFFERENCE that exceeds zero.

Taking an algorithm analogous to the one defined above for Palmetto and AdminaStar to the CIGNA Medicare DME claims data, I find that 14,469 out of the 14,729 (98.2 percent) of the DME J3370 claims have a DIFFERENCE that is greater than zero. The total value of DIFFERENCE for these 14,469 claims is equal to $1.372 million, which represents 43.0 percent of the $3.190 million on CIGNA-administered DME claims in my sample for code J3370 during the time period of interest. As above, this does not include the effect on Medicare recipients' co-payment amounts. Additionally, I use the provider identifier along with the payment date to determine that there are 8,580 unique payments to health care providers that have one or more claims with a value of DIFFERENCE greater than zero.

*E. Travelers-Administered Medicare DME Claims and Spending*

---

[53] I also drop one J3370 claim that was in the 2002 file and one J3370 claim that was in the 2004 file.

The left-side panel of Table 32 lists Medicare spending administered by the carrier Travelers by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for the U.S. as a whole, Travelers-administered Medicare spending for the J3370 code accounts for the vast majority of spending.  Similarly, Medicare DME spending for claims administered by Travelers was very low in the first two years of the study period, peaked during the late 1994 to early 1996 period, and then declined sharply in late 1996.

To estimate the effect on DME Medicare spending of using alternative prices, such as 125 percent of Abbott's average pharmacy indirect price, for the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets using Travelers documents for the J3370 code by Myers and Stauffer.  For example, for much of 1994, Travelers used an array for this J3370 code that included six products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|-----|-----|-----------------|
| 00002-1444-01 | 7.80 | **7.80** |
| 00074-4332-01 | 29.36 | 4.54 |
| 00205-3154-88 | 5.58 | 5.58 |
| 00364-2472-33 | 7.00 | 7.00 |
| 00469-2210-30 | **10.97** | 10.97 |
| 00641-2778-43 | 18.81 | 18.81 |

Prices in this table represent the per-package price.  Given that there are six prices, and that Travelers during this period used the convention of taking the higher of the two middle prices rather than their average, the median price (in bold) is the one that is less than two prices and greater than three prices - $10.97.  Now suppose that one were to replace the Abbott product's AWP with 125 percent of the product's average pharmacy indirect price in that same time period, which is listed in the next column of the same table above.  In this case, the median price would fall from $10.97 to $7.80.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                        92

I then take this algorithm to the Travelers arrays that prevailed in other time periods.  The first array was described above, and has a median price of 10.97.  This per-package price accounted for 6.3 percent of the claims in my eventual analysis sample.   Another common allowed amount in the claims data in early 1995 is 9.39, which is the amount that resulted when Travelers took the average rather than the higher of the two middle prices (7.80 and 10.97) when there is an even number of NDCs in the array.

The next Travelers array for which I have information was in effect in early 1999, with a median among the three generic products (two of which are Abbott) of 12.48, which is the price of the Abbott 74653401 product using data from the 1998 Red Book.  If an array with these products had been in effect in the previous years then the resulting medians would have been 11.89 (1997 Red Book), 11.32 (1996), and 10.88 (1995), all three of which are Abbott prices. An examination of the Travelers DME claims data reveals that 10.88 is the most common allowed amount from 1995Q2 to 1996Q2 and that 11.32 is most common from 1996Q3 to 1997Q1.  Replacing these Abbott AWPs with 125 percent of the average pharmacy indirect price yields an allowed amount of 4.85 and 4.36, respectively.   Additionally, the price of 9.16 (the average of Abbott's 11.32 and Schein's 7.00) is in effect for part of the period and accounts for 0.6 percent of claims in the sample.  Two relatively common per-package prices that I do not consider are 7.80 (18.3 percent of claims) and 18.51 (1.6 percent).

To construct the sample of Travelers J3370 claims, I begin by excluding the 25,214 claims that have a paid amount of zero.  I next drop the 58 claims with a third party payment amount or with a deductible and I also drop 154 claims for which I am unable to replicate the amount paid.  Of the 17,578 claims still in the sample at this point, there are 83 claims with a

very rare per-package price and I therefore exclude them from my analysis, leaving me with a sample of 17,495 claims.

With these changes, just 7 per-package prices remain for the claims that do not pay the provider charged amount.  The most common is 10.88 (51.6 percent) and then 7.80 (18.4 percent), 11.32 (16.2 percent), 10.97 (6.3 percent), 9.39 (5.2 percent), 18.51 (1.6 percent), and 9.16 (0.6 percent).  As explained above, I exclude the claims with a per-package price of 7.80 and also the claims with a per-package price of 18.51 from my analyses below, leaving me with a final sample of 14,145 claims.  All five of the remaining medians end up being replaced by lower medians, and thus every claim in my sample that did not simply pay the provider charged amount has a value of DIFFERENCE that exceeds zero.

Taking an algorithm analogous to the one defined above for Palmetto, AdminaStar, and CIGNA to the Travelers Medicare DME claims data, I find that 13,861 out of the 14,145 (98.0 percent) of the DME J3370 claims have a DIFFERENCE that is greater than zero.  The total value of DIFFERENCE for these 13,861 claims is equal to $1.334 million, which represents 49.9 percent of the $2.671 million on Travelers-administered DME claims in my sample for code J3370 during the time period of interest. As above, this does not include the effect on Medicare recipients' co-payment amounts.  Additionally, I use the provider identifier along with the payment date to determine that there are 6,028 unique payments to health care providers that have one or more claims with a value of DIFFERENCE greater than zero.

*F. Medicare J3370 DME Summary*

To sum up, I calculate that 101,675 of the 103,620 (98.1 percent) DME claims in my Medicare DME analysis sample for J3370 have a value of DIFFERENCE that is greater than

zero.  I exclude 5408 claims from consideration because I cannot generate the per-package price with the available array information.  Aggregating across these 101,675 claims, the total value of DIFFERENCE is $11.103 million.  This represents 47.2 percent of the $23.532 million spent on the Medicare DME claims for the J3370 code in my analysis sample.  And finally, I find that there are 54,100 unique payments to health care providers with at least one Medicare DME claim with a value of DIFFERENCE that exceeds zero.  The information for each of the four carriers along with the sum across the four carriers is summarized in Table 33.

It is important to emphasize that the dollar figure for DIFFERENCE does not account for the effect on the co-payments of Medicare recipients.  Given that co-payments are typically 20 percent of the cost of Part B claims, my results above suggest an increase in co-payments of approximately $2.776 million.   Additionally in this section I have restricted attention to just the J3370 code, which will serve to reduce the value of DIFFERENCE below what it would be if I considered the other ten J-codes (especially J7051) as well.

## XXII. CMS Medicare Carrier Claims Data

In this section I perform analyses similar to those in the preceding section for Medicare Part B Carrier (hereafter Carrier) claims.  As I demonstrate below, the number of insurance carriers that administer these claims is substantially greater than for Medicare DME claims.  Just as in the preceding section, the goal of my analysis in this section is to determine the amount by which spending by the Medicare program on Carrier claims would have changed if alternative prices had been used for Abbott products.  I begin with a summary of Medicare Carrier claims and how this varies over time, across HCPCS codes in the Complaint, and across Part B carriers.

*A. Summary of Medicare Carrier Claims for Complaint HCPCS Codes*

Medicare Carrier claims data were provided by CMS to the United States. Table 34 provides a summary of Medicare spending in the U.S. on Carrier claims for Complaint HCPCS codes. As the top of the panel on the left side shows, the majority of Medicare Carrier claim expenditures are accounted for by the J7050 Sodium Chloride HCPCS code. More specifically, the $97.710 million spent on this J-code represents 52.7 percent of the total Medicare amount paid for carrier claims for Complaint HCPCS codes. All together there are 22.450 million claims with total Medicare spending of $185.531 million. And as before, it is important to emphasize that this Medicare spending does not include Medicare recipients' co-payments.

The panel on the right side of this same table lists Complaint Medicare Carrier claims and spending by year and quarter. As the table shows, spending increases steadily over time, rising from $0.680 million in 1991Q1 to $1.303 million in 1994Q1 to $4.789 million in 1997Q1 and reaches a peak of $8.638 million in the second quarter of 2001. This contrasts with the pattern for Medicare DME claims, for which spending declined sharply in late 1996 and remained relatively low in subsequent quarters.

In Table 35, I list Medicare spending on Carrier claims and the number of Medicare Carrier claims for each of the insurance carriers that processed Carrier claims for Complaint products. The number of Carrier codes listed is 92, though in many cases the same carrier has multiple codes. For example, Wisconsin Physician Services has four different codes – one for Illinois, another for Michigan, a third for Wisconsin, and one final one for Minnesota.

I next perform analyses similar to the ones in the preceding section, in which I use array information for insurance carriers to estimate the effect on Medicare spending if alternative values had been used for the AWPs of Abbott products.

*B. Connecticut General - Administered Medicare Carrier Claims and Spending*

The left-side panel of Table 36 lists Medicare spending administered by Connecticut General[54] (carrier numbers 5440, 5535, and 5130) by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for the U.S. as a whole, Connecticut General (hereafter CG) administered Medicare spending for the J7050 code accounts for approximately half of spending.  Similarly, CG-administered Medicare Carrier claims spending increases throughout most of the time period and reaches its peak in early 2001.

*1. Connecticut General Arrays for J-Codes*

To estimate the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets by Myers and Stauffer using CG documents.  For example, for the latter half of 2000 and the first half of 2001, CG used an array for the J7050 code (the HCPCS code for the 250 milliliter Sodium Chloride solution) that included three products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-7983-02 | 11.61 | 1.13 |
| 00264-7800-20 | **10.69** | 10.69 |
| 00338-0049-02 | 9.11 | **9.11** |

Prices in the second column of this table represent the per-package price as listed in the Red Book.  Given that there are three prices, the median price (in bold) is the one that is less than one price and greater than one price - $10.69.  The alternative AWP (125 percent of the average

---

[54] Connecticut General and INA merged in 1982 to form CIGNA.

pharmacy indirect price) for Abbott's 74798302 product was $1.13, as compared with the $11.61 price that was published for this product. Replacing the Abbott product's AWP with 125 percent of the average pharmacy indirect price during this same period yields a median price of 9.11. Because Medicare started in 1998 to pay 95 percent of the median, the actual allowed amount for CG-administered J7050 carrier claims would have fallen from 10.16 (95 percent of 10.69) to 8.65 (95 percent of 9.11).

Comparing this with the Medicare claims data for Connecticut General, I observe that $10.16 is the most frequent allowed amount per package for the J7050 code from the third quarter of 2000 through and including the second quarter of 2001. I therefore replace this price with $8.65 for those claims with this per-unit price to estimate the effect on Medicare spending. It is important to note, however, that Medicare frequently paid an amount that depended on the provider charged amount. Similar to the many state Medicaid programs described above, Medicare takes the lesser of the provider charged amount and the calculated amount (allowed amount per package times number of packages) when determining the amount paid for a claim. Thus for claims that paid the provider charged amount (as opposed to the calculated amount using the median above) from the third quarter of 2000 through and including the second quarter of 2001 (when $10.16 was the most common allowed amount), I determine whether Medicare spending would have fallen if the per-package price had been $8.65.

I repeat this exercise for CG arrays in other time periods and for other products. For CG and for all subsequent carriers in this section, I restrict attention to the four products with the highest Medicare spending (J7050, J7040, J7030, J7060) and also consider J3370, which was the top seller for DME claims above. According to the data summarized in Table 34, these five products account for 88.5 percent of Medicare Carrier claim spending for the 11 J-codes listed in

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                                    98

the Complaint.  To the extent that the use of alternative prices – such as 125 percent of Abbott's

average pharmacy indirect price – for the AWP for the other 6 J-code products would have

reduced Medicare spending, my subsequent analyses will understate the total value of

DIFFERENCE for this category of Medicare claims.

The array that Connecticut General used in late 2001 contained five Abbott products

instead of just one.  As shown in the following table, this array also included three products

made by other firms.  Of the five Abbott products in the array, two are included in the list of 44

| NDC | AWP | Alternative AWP |
| --- | --- | --- |
| 00074-7985-02 | 12.35 | 1.44 |
| 00074-7132-02 | 16.95 | 2.33 |
| 00074-1583-02 | 12.35 | 3.02 |
| 00074-7101-02 | 16.95 | 2.33 |
| 00074-7983-02 | 11.61 | 1.18 |
| 00264-7800-20 | 10.69 | 10.69 |
| 00338-0044-03 | 9.67 | 9.67 |
| 00338-0049-03 | 9.11 | 9.11 |

NDCs in Table 1, and I therefore use the indirect transaction data described above for these two

products.  I obtain the corresponding average price for the 74158302 product from Abbott's

indirect data that was provided to me for the Texas case and for 74798502 from Cardinal and

McKesson wholesaler transaction data.  The final Abbott product (74713202) listed in this CG

7050 array is not observed in any of these data sets and I therefore use the average price for a

very similar product (74710102) that has an identical AWP in the same period.  The key

difference between these two products is that the 74710102 product has a higher concentration

(0.9 percent) than does 74713202 (0.45 percent).  My examination of price data for other very

similar Abbott products suggests that, if anything, this method will overstate the true price for

74713202 and thus reduce the effect on the allowed amount and thus on the ultimate value of

DIFFERENCE below what it otherwise would be.  Replacing these AWPs with the prices as

described above, the median allowed amount declines from 11.38 to 2.54 (the average of the fourth and fifth highest prices given that there is an even number of products).

I follow this same algorithm for the other CG J7050 arrays that pertain to earlier years and for the other four J-codes under consideration. The earliest array that I have for the J7030, J7040, J7050, or J7060 codes pertains to the 1997 period, and thus in this section I focus on the 1997 to 2001 period. For the four primary J-codes, there is one gap in the series of arrays for late 1998 and early 1999. However, if I simply use an adjacent array and replace the AWPs with those from the previous year's Red Book, I can replicate the most common per-unit allowed amounts that appear in the data during that period.

It is worth noting that all of the 20 Part B CG arrays that I observe for these 5 J-codes during the 1997 to 2001 period contain at least one Abbott product. In 18 out of 20 cases, the median allowed amount declines when I replace Abbott's AWPs with 125 percent of the actual average prices as described above. In the next section, I summarize a claim-by-claim analysis of the CG Medicare claims for these five J-codes.

*2. Claims Level Analysis for CG J-Codes: 1997Q1 to 2001Q4*

As shown in Table 36, there are 1,457,552 CG claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest. I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 1,182,693 claims. Initially I restrict attention to only those claims with service years from 1997 through and including 2001, which reduces the number of claims in my analysis sample to 761,549.

I next impose similar inclusion criteria on the claims that I did for the Medicaid and Medicare DME claims above. Specifically I drop the 193,773 claims with a Medicare paid

amount of zero, the 6343 claims with a payment from a primary payer other than Medicare, and the 433 claims on which the Medicare recipient pays a non-zero deductible. And finally, I drop the 18,536 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 542,464 claims. Total Medicare spending for these claims is equal to $6.614198 million.

Applying an algorithm analogous to the one described above for Medicare DME claims, I find that 466,987 of the 542,464 claims (86.1 percent) have a value of DIFFERENCE that is greater than zero. Similarly, my results indicate that the total value of DIFFERENCE is equal to $1.860 million, with this representing 28.1 percent of spending on the claims under consideration. And finally, I use the provider identifier along with the payment date to determine that there are 81,991 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for CG J-Codes: 1991Q1 to 1996Q4*

While I do not have CG Medicare Part B arrays that were used during the 1991 to 1996 period, I can use the Medicare claims data to investigate whether Abbott NDCs were being used in the CG arrays during this earlier period. As discussed above, in some cases when an Abbott NDC is included in an array, its price (or 95 percent of its price) is the median and is therefore the allowed amount in the claims data. Thus if I see one of the Abbott NDC's prices used for a particular product in a certain time period, I conclude that this product was included in the array. And because Abbott's AWP would decline if one were to replace it with 125 percent of the average pharmacy indirect price, the median would fall for these arrays.

In many cases, however, the Abbott product could be in a Carrier's array, would affect the median if its AWP were replaced with 125 percent of the average pharmacy indirect price, and yet is not the median price. The first array summarized in the preceding section is one example. Similarly, if there were an even number of products in an array, the median price would typically be equal to an average of two prices, and thus not equal to an Abbott price even if an Abbott product were one of the two included in the average. My examination of the Medicare claims data reveals that the number of claims with an Abbott price as the median greatly understates the number of claims with a DIFFERENCE greater than zero.

Examining the Medicare claims data administered by CG during the 1991 to 1996 period, I find that Abbott prices were used for relatively many claims beginning in the second quarter of 1995. For example, from 1994Q2 to 1995Q1, the Abbott price was used in just 1.2 percent of claims versus 9.2 percent during the subsequent four quarters. I therefore conclude that CG was using Abbott products in its arrays at least as far back as 1995Q2 and consider Medicare claims for this period. While it seems likely that CG was using Abbott products in its arrays even prior to this period, I take the conservative approach of ignoring claims from the 1991Q1 to 1995Q1 period from my CG analyses.

For claims from 1995Q2 to 1996Q4, I apply the same set of inclusion criteria as described above, leading me to (for example) exclude all claims with a paid amount of zero. I then aggregate the number of claims and the total amount paid by Medicare for each J-code during this seven quarter period. I then estimate the number of claims for each J-code (indexed by j) with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE from 1995Q2 to 1996Q4 using the following two equations:

(8) $\text{CG-CLAIMS-DIFF>0}_{j,95q2\text{-}96q4} = \text{CG-POS-DIFF}_{j,97q1\text{-}01q4} * \text{CG-CLAIMS}_{j,95q2\text{-}96q4}$

(9) $\text{CG-DIFFERENCE}_{j,95q2\text{-}96q4} = \text{CG-DIFF-FRAC}_{j,97q1\text{-}01q4} * \text{CG-PAID}_{j,95q2\text{-}96q4}$

To calculate the number of claims for J-code j with a value of DIFFERENCE greater than zero, I multiply the total number of claims from 1995Q2 to 1996Q4 by the fraction of CG claims for that same J-code from 1997 to 2001 with a value of DIFFERENCE greater than zero. I do the same for the total value of DIFFERENCE, though in this case I multiply the amount paid for J-code j during the 1995Q2 to 1996Q4 period by the ratio of DIFFERENCE to the total amount paid during the five subsequent years.

Taking this algorithm to the data, I find that 115,582 out of the 133,683 (86.5 percent) CG Medicare Part B claims from 1995Q2 to 1996Q4 for the J7050, J7040, J7060, J7030, and J3370 products have a value of DIFFERENCE greater than zero and that there are 23,257 provider payments with at least one claim with a value of DIFFERENCE greater than zero.[55] Similarly, my results indicate a total value of DIFFERENCE of $0.388 million, which represents 25.4 percent of CG Part B Medicare spending for these products during this 1.75 year period. I ignore the $1.695 million spent by Medicare on the 189,259 CG-administered claims from 1991Q1 to 1995Q1, with all of this information summarized in the first three rows of Table 43.

Taken together, my results indicate a total value of DIFFERENCE for CG-administered Part B claims of $2.248 million along with 105,248 provider payments with at least one claim with a value of DIFFERENCE greater than zero. As noted above, the dollar value of DIFFERENCE does not include the associated reduction in co-payments by Medicare recipients and their insurers. Additionally, in my analyses I have not considered six other J-codes (J7070, J7042, J7051, J2912, J7110, J7130) that accounted for 10.5 percent of CG spending on Medicare

---

[55] To calculate this, I multiply the total number of provider payments during this 1.75 year period (26,877) by .865, the fraction of claims with a value of DIFFERENCE greater than zero. This is considerably lower than the number that I would calculate if I assigned each claim a .865 probability of having DIFFERENCE greater than zero, but it accounts for the fact that there will be some correlation in the probability within time periods given the use of the same array. It essentially assumes a correlation of 1 and is therefore conservative.

Part B claims during the 1991 to 2001 period. This will serve to reduce the value of DIFFERENCE below what it would be if I considered all J-codes listed in the Complaint.

*C. Wisconsin Physician Services Administered Medicare Carrier Claims and Spending*

The left-side panel of Table 37 lists Medicare spending administered by Wisconsin Physician Services (hereafter WPS with carrier numbers 952, 953, 951, and 954) by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for the U.S. as a whole, WPS-administered Medicare spending for the J7050 code accounts for more than half of spending.  Similarly, WPS-administered Medicare Carrier claims spending increases throughout most of the time period and reaches its peak in early 2001.  The rapid increase from the second quarter of 1998 to the third quarter of 1998 is largely driven by a shift in the states of Illinois and Michigan to WPS, which previously were serviced by Illinois Blue Shield.  Minnesota was later added to WPS in 2000, with all of this apparent in Table 39.

*1. Wisconsin Physician Services Arrays for J-Codes*

To estimate the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets by Myers and Stauffer using WPS documents for the J7050 code. For example, for the latter half of 2000 and the first half of 2001, WPS used an array for this J7050 code that included six products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-1583-02 | 12.35 | 2.53 |
| 00074-7101-02 | 16.95 | 2.41 |
| 00074-7983-02 | 11.61 | 1.13 |
| 00264-7800-20 | 10.69 | 10.69 |
| 00338-0044-02 | 9.67 | 9.67 |

| 00338-0049-02 | 9.11 | 9.11 |
|---|---|---|

Prices in the second column of this table represent the per-package price as listed in the Red Book.  Given that there are six prices, the median price is equal to the average of the third and fourth highest prices - $11.15.  Replacing the three Abbott products' AWPs, all of which exceed the median price, with 125 percent of the average pharmacy indirect price during this same period yields a median price of 5.82.  Because Medicare started in 1998 to pay 95 percent of the median, the actual allowed amount for WPS-administered J7050 carrier claims would have fallen from 10.59 (95 percent of 11.15) to 5.53 (95 percent of 5.82).

Comparing this with the Medicare claims data for WPS, I observe that $10.59 is the most frequent allowed amount per package for the J7050 code from the third quarter of 2000 through and including the second quarter of 2001.  I therefore replace this price with $5.53 for those claims with this per-unit price to estimate the effect on Medicare spending.  For claims that paid the provider charged amount (as opposed to the calculated amount using the median above) from the third quarter of 2000 through and including the second quarter of 2001 (when $10.59 was the most common allowed amount), I determine whether Medicare spending would have fallen if the per-package reimbursement had been $5.53.

I repeat this exercise for WPS arrays in other time periods and for other products, once again restricting attention to the J7050, J7040, J7060, J7030, and J3370 codes.  The earliest array that I have for the J7030, J7040, J7050, or J7060 codes pertains to the 1996Q3 to 1997Q2 period, and thus in this section I focus on the 1996Q3 to 2001Q4 period for these four J-codes.  For the J3370 code I have two earlier arrays and I therefore consider the effect on Medicare spending for this code from 1994Q1 to 2001Q4.

It is worth noting that 27 of the 32 WPS arrays that I observe for these 5 J-codes during the 1996Q3 to 2001Q4 period (1994Q1 to 2001Q4 for J3370) contain at least one Abbott product. Additionally, in the 27 arrays that do have at least one Abbott NDC, the median allowed amount declines when I replace Abbott's AWPs with 125 percent of the actual pharmacy average indirect prices as described above. In the next section, I summarize a claim-by-claim analysis of the WPS Medicare claims for these five J-codes.

*2. Claims Level Analysis for WPS J-Codes: 1996Q3 to 2001Q4*

As shown in Table 37, there are 1,505,315 WPS claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest. I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 1,218,492 claims. Initially I restrict attention to only those claims with service dates from July 1, 1996 through and including December 31, 2001 (starting on January 1, 1994 for J3370 because I have an earlier array for this product), which reduces the number of claims in my analysis sample to 1,123,096.

I next impose similar inclusion criteria on the claims that I did for the CG Medicare claims above. Specifically I drop the 73,302 claims with a Medicare paid amount of zero, the 3,341 claims with a payment from a primary payer other than Medicare, the 697 claims on which the Medicare recipient pays a non-zero deductible, and the 213 claims for which I am unable to replicate the amount paid by Medicare. And finally, I drop the 5,056 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 1,040,487 claims. Total Medicare spending for these claims is equal to $11.543 million.

Applying an algorithm analogous to the one described above for Medicare CG claims, I find that 912,197 of the 1,040,487 claims (87.7 percent) have a value of DIFFERENCE that is greater than zero.  Similarly, my results indicate that the total value of DIFFERENCE is equal to $4.139 million, with this representing 35.9 percent of Medicare spending of the claims considered.  As noted above, this dollar value does not include the associated reduction in co-payments by Medicare recipients and their insurers.  And finally, I use the provider identifier along with the payment date to determine that there are 116,330 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for WPS J-Codes: 1991Q1 to 1996Q2*

I employ an analogous algorithm to the one described for CG in Section B3 above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the period from 1991Q1 to 1996Q2 (1991Q1 to 1993Q4 for J3370).  I consider only the six quarters from 1995Q1 to 1996Q2 because very few claims in the preceding four years have an Abbott price as the median.[56]  As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 36,543 out of 42,507 (86.0 percent) WPS Medicare Part B claims from 1995Q1 to 1996Q2 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 6,911 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  Similarly, my results indicate a total value of DIFFERENCE of $0.100 million, which represents 30.4 percent of WPS Part B

---

[56] For example, in 1995 an Abbott price is the allowed amount for 29.9 percent of WPS-administered Part B claims for the five J-codes considered versus 1.2 percent in 1994.

Medicare spending for these products during this 1.75 year period.  I ignore the $0.346 million spent by Medicare on the 40,320 WPS-administered claims from 1991Q1 to 1994Q4, with all of this information summarized in Table 43.

Taken together, my results indicate a total value of DIFFERENCE for WPS-administered Part B claims of $4.238 million along with 123,241 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  This information is summarized in Table 43. As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 10.4 percent of WPS Medicare Part B spending.  This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

*D. Other Carriers in CMS Region Five Administered Medicare Carrier Claims and Spending*

The left-side panel of Table 38 lists Medicare spending administered by seven other carriers operating in CMS Region 5 (Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin) by HCPCS code for the 11 codes in the Complaint.  During the latter several years of the study period, these carriers used the allowed amounts from the WPS arrays described above. The carriers that operated in each state during each quarter are summarized in Table 39.[57]  As the Table shows, the states of Indiana, Ohio, and Wisconsin used just one carrier each during the eleven year period of interest.  However, the other three states (Illinois, Michigan, and Minnesota) used multiple carriers, with all three states switching to WPS in either 1998 or 1999. For a period even before this switch, these states' carriers were using WPS allowed amounts.

---

[57] Recall that quarters in the table refer to service dates rather than payment dates.  This explains why in certain cases for several consecutive quarters there are two carriers with claims.

Consistent with the pattern for the U.S. as a whole, Other Region 5 (hereafter OR5) administered Medicare spending for the J7050 code accounts for more than half of spending for the 11 J-codes in the Complaint. However, in contrast to the pattern for the entire U.S., spending peaks for this set of carriers in late 1997 and early 1998. This is because the states of Illinois and Michigan (and later Minnesota) switched to Wisconsin Physician Services around this time and thus claims after the switch are not considered here. Ohio's insurance carrier (16360, which is Nationwide) accounts for 42.2 percent of spending for these seven carriers, with Illinois Blue Shield (621 and 623 in Illinois and Michigan, respectively) accounting for 37.1 percent and the other four carriers (630, 10240, 710, and 720) accounting for the remaining 20.7 percent.

*1. Other Region Five Carrier Arrays for J-Codes*

To estimate the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I proceed as in the preceding section by utilizing arrays that were recreated by Myers and Stauffer using WPS documents for the 1996Q3 to 2001Q4 period (1994Q1 to 2001Q4 for J3370). I first verify that the allowed amounts from the WPS arrays are typically observed for these carriers and find that for the 5.5 years that is the case. For example, as was true for WPS above, $10.59 is the most frequent allowed amount per package for the J7050 code from the third quarter of 2000 through and including the second quarter of 2001. In the next subsection, I summarize a claim-by-claim analysis of the OR5 Medicare claims for these J-codes during the 1991 to 2001 period.

*2. Claims Level Analysis for Other Region Five J-Codes: 1996Q3 to 2001Q4*

As shown in Table 38, there are 2,192,109 other Region Five claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 1,729,323 claims.  Initially I restrict attention to only those claims with service dates from July 1, 1996 through and including December 31, 2001 (starting on January 1, 1994 for J3370), which reduces the number of claims in my analysis sample to 1,029,032.

I next impose similar inclusion criteria on the claims that I did for the CG and WPS Medicare claims above.  Specifically I drop the 152,318 claims with a Medicare paid amount of zero, the 3,321 claims with a payment from a primary payer other than Medicare, the 620 claims on which the Medicare recipient pays a non-zero deductible, and the 214 claims for which I am unable to replicate the amount paid by Medicare.  And finally, I drop the 27,141 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 845,418 claims.  Total Medicare spending for these claims is equal to $9.312 million.

Applying an algorithm analogous to the one described above for Medicare CG and WPS claims, I find that 596,609 of the 845,362 OR5 claims (70.6 percent) have a value of DIFFERENCE that is greater than zero.  Similarly, my findings indicate that the total value of DIFFERENCE is equal to $2.996 million, with this representing 32.2 percent of Medicare spending on the claims under consideration.  And finally, I use the provider identifier along with the payment date to determine that there are 94,492 unique payments to health care providers that have one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for Other Region 5 J-Codes: 1991Q1 to 1996Q2*

I employ an analogous algorithm to the one described for CG and WPS above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the period from 1991Q1 to 1996Q2. I consider only the three years from 1993Q3 to 1996Q2 because very few claims in the preceding 2.5 years have an Abbott price as the median.[58] As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 259,509 out of 370,614 (70.0 percent) OR5 Medicare Part B claims from 1993Q3 to 1996Q2 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 49,260 provider payments with at least one claim with a value of DIFFERENCE greater than zero. Similarly, my results indicate a total value of DIFFERENCE of $0.969 million, which represents 29.7 percent of WPS Part B Medicare spending for these products during this three year period. I ignore the $1.302 million spent by Medicare on the 176,468 Other Region Five administered claims from 1991Q1 to 1993Q2, with all of this information summarized in Table 43.

Taken together, my results indicate a total value of DIFFERENCE for Other Region Five administered Part B claims of $3.965 million along with 143,752 provider payments with at least one claim with a value of DIFFERENCE greater than zero. This information is summarized in Table 43. As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 12.5 percent of OR5 Medicare Part B spending. This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

---

[58] For example, from 1993Q3 to 1994Q2, an Abbott price is the allowed amount for 21.3 percent of other region five administered Part B claims for the five J-codes considered versus 0.9 percent in the preceding year.

*E. Kentucky AdminaStar and WV – Nationwide*

The left-side panel of Table 40 lists Medicare spending administered by the West Virginia Nationwide and Kentucky AdminaStar carriers.  Both of these carriers employed WPS allowed amounts for much of the sample period.  This is most likely because Nationwide also served Ohio while AdminaStar also served Indiana, with both of these states in CMS Region 5.  An examination of the Medicare carrier claims data reveals that Kentucky's AdminaStar did not start to use these prices until the middle of 1998 while West Virginia's Nationwide was using them prior to this.  Thus in my analyses below I focus on 1996Q3 to 2001Q4 for Nationwide (as I did for CMS Region 5 [59]) and 1998Q3 to 2001Q4 for Kentucky AdminaStar.

Consistent with the pattern for the U.S. as a whole, Medicare spending by Kentucky AdminaStar and West Virginia Nationwide for the J7050 code accounts for more than half of spending for the 11 J-codes in the Complaint.  Additionally, spending trends up throughout the study period and reaches a peak in 2001.  Kentucky's AdminaStar (660) accounts for 75.5 percent of spending for these two carriers, with West Virginia Nationwide accounting for the remaining 24.5 percent.

*1. WV Nationwide and KY AdminaStar Carrier Arrays for J-Codes*

To estimate the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I proceed as in the preceding section by utilizing arrays that were recreated in excel spreadsheets by Myers and Stauffer using WPS documents for the 1996Q3 to 2001Q4 period.  I first verify that the allowed amounts from the WPS arrays are typically observed for these carriers and find that for the 5.5 years considered for

---

[59] Consistent with my Region 5 analyses, I consider Nationwide J3370 claims from January 1, 1994 forward.

Nationwide that is the case. However, Kentucky AdminaStar begins to use these prices in the middle of 1998, and I therefore initially exclude claims prior to July 1, 1998. In the next subsection, I summarize a claim-by-claim analysis of the West Virginia Nationwide and Kentucky AdminaStar claims for these five J-codes during the time periods specified above.

*2. Claims Level Analysis for WV Nationwide and KY AdminaStar J-Codes*

As shown in Table 40, there are 483,663 claims for these two carriers for the 11 J-codes listed in the Complaint during the eleven-year time period of interest. I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 416,669 claims. Initially I restrict attention to only those West Virginia Nationwide claims with service dates from July 1, 1996 through and including December 31, 2001 and those Kentucky AdminaStar claims with service dates from July 1, 1998 to December 31, 2001. This reduces the number of claims in my analysis sample to 232,872.

I next impose similar inclusion criteria on the claims as I did for the CG, WPS, and OR5 Medicare claims above. Specifically I drop the 15,740 claims with a Medicare paid amount of zero, the 1318 claims with a payment from a primary payer other than Medicare and the 142 claims on which the Medicare recipient pays a non-zero deductible. And finally, I drop the 123 claims with an allowed amount that is not in one of the arrays described above or for which I cannot replicate the paid amount, leaving me with a final sample of 215,549 claims. Total Medicare spending for these claims is equal to $2.817 million.

Applying an algorithm analogous to the one described above for Medicare CG, WPS, and OR5 claims, I find that 196,131 of the 215,549 claims (91.0 percent) have a value of DIFFERENCE that is greater than zero. Similarly, my findings indicate that the total value of

DIFFERENCE is equal to $0.978 million, with this representing 34.7 percent of Medicare spending on the claims under consideration.  And finally, I use the provider identifier along with the payment date to determine that there are 28,446 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for WV Nationwide and KY AdminaStar J-Codes: 1991Q1 to 1996Q2*

I employ an analogous algorithm to the one described for the other carriers above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the preceding years.  I consider only the 1993Q4 to 1998Q2 period for Kentucky Administar because very few claims in the preceding 3.75 years have an Abbott price as the median.[60]  For the same reason, I focus on just the 1993Q4 to 1996Q2 period for WV Nationwide.  As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 110,785 out of 121,310 (91.3 percent) KY Administar claims from 1993Q4 to 1998Q2 and West Virginia Nationwide claims from 1993Q4 to 1996Q2 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 17,438 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  Similarly, my results indicate a total value of DIFFERENCE of $0.319 million, which represents 29.0 percent of Medicare spending for these products during the period considered.  I ignore the $0.321 million spent by Medicare on the 38,567 claims administered by these two carriers from 1991Q1 to 1993Q3, with all of this information summarized in Table 43.

---

[60] For example, from 1993Q4 to 1994Q3, an Abbott price is the allowed amount for 21.3 percent of Kentucky AdminaStar administered claims versus 0.2 percent in the preceding year.  For WV Nationwide the ratios are 9.4 percent and 0.2 percent, respectively.

Taken together, my results indicate a total value of DIFFERENCE for Part B claims for Kentucky AdminaStar and West Virginia Nationwide of $1.297 million along with 45,961 provider payments with at least one claim with a value of DIFFERENCE greater than zero. As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 4.9 percent of Medicare Part B spending on Complaint J-Codes for these two carriers during the 1991 to 2001 period.  This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

*F. Metra Health Administered Medicare Carrier Claims and Spending*

The left-side panel of Table 41 lists Medicare spending administered by Metra Health (hereafter MH with carrier numbers 10490, 10250, and 10230) by HCPCS code for the 11 codes in the Complaint.[61]  As the table shows, consistent with the pattern for the U.S. as a whole, MH-administered Medicare spending for the J7050 code accounts for approximately half of spending. Similarly, MH-administered Medicare Carrier claims spending increases throughout most of the time period and reached its peak in early 2000, though declined rapidly to zero in the fourth quarter of 2000 as the states of Virginia, Mississippi, and Connecticut shifted to other carriers.

*1. Metra Health Arrays for J-Codes*

To determine the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets by Myers and Stauffer using MH documents.  For example, for

---

[61] I exclude the Minnesota (10240) Metra Health carrier as it was included in the other CMS Region Five section above because it followed the WPS prices for most of the latter part of the study period.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                        115

the latter half of 1998 and the first half of 1999, MH used an array for this J7050 code that included three products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|-----|-----|-----------------|
| 00074-7983-02 | **10.53** | 1.14 |
| 00264-7800-20 | 12.30 | 12.30 |
| 00338-0049-02 | 9.11 | **9.11** |

Prices in the second column of this table represent the per-package price as listed in the Red Book. Given that there are three prices, the median price is equal to the second highest price. Replacing the Abbott product's AWP, which is the median price, with 125 percent of the average pharmacy indirect price during this same period yields a median price of 9.11. Because Medicare started in 1998 to pay 95 percent of the median, the actual allowed amount for MH-administered J7050 carrier claims would have fallen from 10.00 (95 percent of 10.53) to 8.65 (95 percent of 9.11).

Comparing this with the Medicare claims data for Metra Health, I observe that $10.00 is the most frequent allowed amount per package for the J7050 code from the third quarter of 1998 through and including the second quarter of 2000. I therefore replace this price with $8.65 for those claims with this per-unit price to estimate the effect on Medicare spending. For claims that paid the provider charged amount (as opposed to the calculated amount using the median above) from the third quarter of 1998 through and including the second quarter of 2000 (when $10.00 was the most common allowed amount), I determine whether Medicare spending would have fallen if the per-package reimbursement had been $8.65.

I repeat this exercise for MH arrays in other time periods and for other products, once again restricting attention to the J7050, J7040, J7060, J7030, and J3370 codes. The earliest array that I have for the J7030, J7040, J7050, or J7060 codes pertains to the 1996Q3 to 1997Q2 period.

However, if I use these same arrays for the preceding year I can replicate the allowed amounts for the J7050 and J7040 codes and I therefore focus on the 1995Q4 to 2000Q3 period (recall that there are zero claims from 2000Q4 to 2001Q4).

It is worth noting that all 22 of the MH arrays that I observe for these 5 J-codes during the study period contain at least one Abbott product.  Additionally, in 20 out of 22 cases, the median allowed amount declines when I replace Abbott's AWPs with 125 percent of the actual pharmacy average indirect prices as described above.  In the next section, I summarize a claim-by-claim analysis of the MH Medicare claims for these five J-codes.

*2. Claims Level Analysis for Metra Health J-Codes: 1995Q4 to 2000Q3*

As shown in Table 41, there are 832,102 MH claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 625,218 claims.  Initially I restrict attention to only those claims with service dates from October 1, 1995 through and including September 30, 2000, which reduces the number in my sample to 493,725.

I next impose similar inclusion criteria on the claims that I did for the other Carrier claims above.  Specifically I drop the 69,493 claims with a Medicare paid amount of zero, the 2609 claims with a payment from a primary payer other than Medicare, the 438 claims on which the Medicare recipient pays a non-zero deductible, and the 1200 claims for which I am unable to replicate the amount paid by Medicare.  And finally, I drop the 11,349 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 408,636 claims.  Total Medicare spending for these claims is equal to $4.614714 million.

Applying an algorithm analogous to the one described above for Medicare claims, I find that 385,961 of the 408,636 claims (94.5 percent) have a value of DIFFERENCE that is greater than zero. Similarly, my findings indicate that the total value of DIFFERENCE is equal to $1.084 million, with this representing 23.5 percent of Medicare spending on the claims under consideration. And finally, I use the provider identifier along with the payment date to determine that there are 53,652 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

3. *Claims Level Analysis for Metra Health J-Codes: 1991Q1 to 1995Q3*

I employ an analogous algorithm to the one described for the other carriers above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the period from 1991Q1 to 1995Q3. I consider only the 2.75 years from 1993Q1 to 1995Q3 because very few claims in the preceding two years have an Abbott price as the median.[62] As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 77,147 out of 81,168 (95.0 percent) Metra Health Medicare Part B claims from 1993Q1 to 1995Q3 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 14,812 provider payments with at least one claim with a value of DIFFERENCE greater than zero. Similarly, my results indicate a total value of DIFFERENCE of $0.200 million, which represents 27.5 percent of Metra Health Part B Medicare spending for these products during this 2.75 year period. I ignore the $0.194

---

[62] For example, from 1993Q1 to 1993Q4, an Abbott price is the allowed amount for 11.8 percent of other Metra Health administered Part B claims for the five J-codes considered versus 0.7 percent in the preceding year.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                        118

million spent by Medicare on the 23,170 Other Region Five administered claims from 1991Q1 to 1992Q4, with all of this information summarized in Table 43.

Taken together, my results indicate a total value of DIFFERENCE for Metra Health administered Part B claims of $1.283 million along with 68,464 provider payments with at least one claim with a value of DIFFERENCE greater than zero. As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 19.9 percent of Medicare Part B spending on Complaint J-Codes for these two carriers during the 1991 to 2001 period.  This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

*G. Florida Blue Shield Administered Medicare Carrier Claims and Spending*

The left-side panel of Table 42 lists Medicare spending administered by Florida Blue Shield (hereafter FBS with carrier numbers 590 and 591) by HCPCS code for the 11 codes in the Complaint.[63]  As the table shows, consistent with the pattern for the U.S. as a whole, FBS-administered Medicare spending for the J7050 code accounts for more than half of spending. Similarly, FBS-administered Medicare Carrier claims spending increases throughout most of the time period and reached its maximum value in 2001.

*1. Florida Blue Shield Arrays for J-Codes*

To determine the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I begin by utilizing arrays that were

---

[63] I exclude the Minnesota (10240) Metra Health carrier as it was included in the other CMS Region Five section above because it followed the WPS prices for most of the latter part of the study period.

created by Myers and Stauffer using FBS documents. For example, from the fourth quarter of 1996 through the second quarter of 1998, FBS used an array for this J7050 code that included three products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-7983-02 | **10.03** | 1.22 |
| 00264-7800-20 | 12.30 | 12.30 |
| 00338-0044-02 | 9.67 | **9.67** |

Prices in the second column of this table represent the per-package price as listed in the Red Book. Given that there are three prices, the median price is equal to the second highest price. Replacing the Abbott product's AWP, which is the median price, with 125 percent of the average pharmacy indirect price during this same period yields a median price of 9.67.

Comparing this with the FBS Medicare claims data, I observe that $10.03 is the most frequent allowed amount per package for the J7050 code from the fourth quarter of 1996 through and including the fourth quarter of 1997. For the next two quarters this same median is used, though it is replaced by 9.53 because in 1998 Medicare paid 95 percent of the median. I therefore replace 10.03 and 9.53 with 9.67 and 9.19, respectively, for those claims with this per-unit price to estimate the effect on Medicare spending. For claims that paid the provider charged amount (as opposed to the calculated amount using the median above) from the fourth quarter of 1996 through and including the second quarter of 1998 (when $10.03 or $9.53 was the most common allowed amount), I determine whether Medicare spending would have fallen if the per-package reimbursement had been 9.67 from 1996Q4 to 1997Q4 and 9.19 in the first half of 1998.

I repeat this exercise for FBS arrays for other products, once again restricting attention to the J7050, J7040, J7060, J7030, and J3370 codes. My array information for FBS is restricted to the 1995Q3 to 1998Q2 period, and I therefore focus my FBS analyses on these three years. As

above, if I do not have an array for a specific period, I investigate whether I can replicate the amount paid in that period by simply updating the AWPs in adjacent arrays.

It is worth noting that all 11 of the FBS arrays that I observe[64] for these 5 J-codes during the 1995Q3 to 1998Q2 period contain at least one Abbott product.  Additionally, in 9 out of 11 cases, the median allowed amount declines when I replace Abbott's AWPs with 125 percent of the actual average pharmacy indirect prices as described above.  In the next section, I summarize a claim-by-claim analysis of the FBS Medicare claims for these five J-codes.

*2. Claims Level Analysis for Florida Blue Shield J-Codes: 1995Q3 to 1998Q2*

As shown in Table 42, there are 2,793,386 FBS claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above and restricting attention to Carrier 590 (excluding 591 which operates in Connecticut[65]), which leaves me with a sample of 2,147,129 claims. Initially I restrict attention to only those claims with service dates from July 1, 1995 through and including June 30, 1998, which reduces the number in my sample to 598,185.

I next impose similar inclusion criteria on the claims that I did for the other Carrier claims above.  Specifically I drop the 30,485 claims with a Medicare paid amount of zero, the 637 claims with a payment from a primary payer other than Medicare, the 608 claims on which the Medicare recipient pays a non-zero deductible, and the 859 claims for which I am unable to replicate the amount paid by Medicare.  And finally, I drop the 28,384 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 537,212 claims.  Total Medicare spending for these claims is equal to $6.637356 million.

---

[64] Myers and Stauffer provided me with 5 of these arrays while I recreated the other six using FBS documents.
[65] I do this because an examination of the Medicare claims reveals that the Connecticut FLBS is using different prices during this period.

Applying an algorithm analogous to the one described above for Medicare claims, I find that 473,122 of the 537,212 claims (88.1 percent) have a value of DIFFERENCE that is greater than zero.  Similarly, my findings indicate that the total value of DIFFERENCE is equal to $0.783 million, with this representing 11.8 percent of Medicare spending on the claims under consideration.  And finally, I use the provider identifier along with the payment date to determine that there are 75,686 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for Florida BS J-Codes: 1991Q1 to 1995Q2 and 1998Q3 to 2001Q4*

I employ an analogous algorithm to the one described for the other carriers above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the period from 1991Q1 to 1995Q2 and from 1998Q3 to 2001Q4. I ignore the 1991 and 1992 years because very few claims in these two years have an Abbott price as the median.[66]  As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 1,095,699 out of 1,242,943 (88.2 percent) Florida Blue Shield Medicare Part B claims from 1993Q1 to 1995Q2 and from 1998Q3 to 2001Q4 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 158,227 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  Similarly, my results indicate a total value of DIFFERENCE of $1.765

---

[66] For example, from 1992Q1 to 1992Q4, an Abbott price is the allowed amount for 0.0 percent of Florida Blue Shield administered Part B claims for the five J-codes considered versus 16.0 percent in 1993Q1.  While Abbott prices are rarely the per-unit allowed amount from 1998Q3 to 2001Q4, my examination of the arrays for other carriers suggests this is because Abbott's prices are increasing relative to other firms during this latter period.  For example, virtually none of the CG or WPS administered claims have an Abbott price as the median in 2001 despite the fact that virtually all of them have a value of DIFFERENCE that is greater than zero.

million, which represents 11.9 percent of Florida Blue Shield Part B Medicare spending for these products during this 2.75 year period.  I ignore the $0.773 million spent by Medicare on the 121,823 Florida Blue Shield administered claims from 1991Q1 to 1992Q4, with all of this information summarized in Table 43.

Taken together, my results indicate a total value of DIFFERENCE for Florida Blue Shield administered Part B claims of $2.548 million along with 233,913 provider payments with at least one claim with a value of DIFFERENCE greater than zero. As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 10.9 percent of Medicare Part B spending on Complaint J-Codes for these two carriers during the 1991 to 2001 period.  This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

*H. Medicare Part B Claims for all other Carriers*

Table 43 summarizes the results for the Carriers considered so far.  As the final row of this table indicates, the value of DIFFERENCE exceeds zero for 4.726 million claims and there are 720,579 pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero.  The total value of DIFFERENCE is $15.580 million, which represents 22.9 percent of the $67.954 million in Medicare spending administered by these carriers for the five products considered during the 1991 to 2001 period.

In this section, I use my results from the carriers for which I have array information to conduct analyses analogous to those in the preceding sections for the remaining carriers.  Before doing this, I first considered the Medicare Part B claims for all carriers to determine whether the

two groups were comparable.  An examination of the data suggests that the amount paid per

claim for each J-code, the pattern of spending over time, and the proportion of claims accounted

for by each of the five J-codes is quite similar.

I next determined the frequency with which each of the two groups has an Abbott NDC's

AWP (or 95 percent of its AWP) as the allowed amount per unit.  I do this to investigate whether

other carriers used Abbott NDC's as frequently in their arrays during the time period of interest.

Weighting each claim by the total amount paid, I find that 24.41 percent of Medicare claims

administered by CG and the other carriers described above had an Abbott AWP as the allowed

amount during the 1995Q3 (the first quarter for which I have arrays for multiple products) to

2001Q4 period.  The corresponding fraction for all other carriers is 18.44 percent.  In the

analyses for the total value of DIFFERENCE that follow, I adjust my estimates for the remaining

carriers to account for the fact that the Medicare claims data indicates they use Abbott NDCs

somewhat less frequently than CG and the other carriers above.

I perform an analogous adjustment for the fraction of claims with DIFFERENCE greater

than zero and the number of provider payments with at least one claim with a value of

DIFFERENCE above zero.  From 1995Q3 to 2001Q4, 24.04 percent of claims for CG and the

other carriers above have an Abbott AWP as the allowed amount per unit versus 16.53 percent

for the remaining carriers.  From 1993Q1 to 1995Q2, these remaining carriers are even more

likely to have an Abbott AWP as the allowed amount per unit than in the latter period, with the

fraction of claims with an Abbott AWP equal to 21.46 percent.

To estimate the number of claims for these remaining carriers with a value of

DIFFERENCE that is greater than zero and the total value of DIFFERENCE, I use an algorithm

analogous to the ones described above.  Specifically, for the total value of DIFFERENCE, I

multiply J-code-specific total Medicare spending by these carriers by the ratio of DIFFERENCE to the total amount of Medicare spending for the carriers for this same J-code. I then deflate this value to account for the fact that these other carriers less frequently had Abbott AWPs as their allowed amounts. This algorithm and the corresponding one for the number of claims for J-code j and carrier k are summarized in the following two equations:

$$(10) \ \text{CLAIMS-DIFF} > 0_{j,k,93q1\text{-}01q4} = \text{POS-DIFF}_j * \text{CLAIMS}_{j,k,93q1\text{-}01q4} * (.1653 / .2404)$$

$$(11) \ \text{DIFFERENCE}_{j,k,93q1\text{-}01q4} = \text{DIFF-FRAC}_j * \text{PAID}_{j,k,93q1\text{-}01q4} * (.1844 / .2441)$$

In this equation, $\text{POS-DIFF}_j$ represents the fraction of claims for J-code j for the preceding carriers with a value of DIFFERENCE greater than zero and $\text{DIFF-FRAC}_j$ represents the ratio of DIFFERENCE to the total amount paid. I consider the 1993Q1 to 2001Q4 period for these remaining carriers (thus ignoring 1991 and 1992), and calculate the number of provider payments with at least one claim with a value of DIFFERENCE that exceeds zero as described for the other Medicare carriers above.

The results from my analyses for the remaining carriers are summarized in Table 44. In this table, I list information on the total value of DIFFERENCE, the number of claims with a value of DIFFERENCE greater than zero, and so forth, separately by carrier. Additionally, I list two rows for each carrier, one for the results from the 1993 to 2001 period and the second one that summarizes spending and the number of claims for the first two years of the study period, which I do not include in my estimation of DIFFERENCE.

The results in the final row of this table summarize my findings for the remaining carriers. The total value of DIFFERENCE is $15.708 million, which represents 16.7 percent of the total amount spent by these carriers. This is lower than the corresponding ratio of 22.9 percent from Table 43 because I have scaled down the DIFFERENCE as described above.

Similarly, I find that 5.235 million claims have a DIFFERENCE of more than zero and that 1.002 million provider payments have a value of DIFFERENCE that exceeds zero.

As above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments amounts.  Additionally, I have excluded 6 of the 11 J-codes from consideration, with these six accounting for approximately 11.3 percent of Medicare spending for the remaining carriers. This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

## XXIII. Conclusion

In this report I use data from several different sources to determine the amount by which spending by the federal Medicare and federal-state Medicaid programs would have changed if prices reflective of the actual prices at which Abbott was transacting business had been used for the AWP, WAC, and Direct Price of Abbott products.  For my analyses of the Medicaid program, I focus on the 44 NDCs listed in the United States' Complaint and for my analysis of the Medicare program I focus on the 11 J-codes listed in the Complaint.

The results that I summarize above indicate that federal government expenditures for the Medicare and Medicaid programs during the 1991 to 2001 period would have been $108.2 million lower during the 1991 to 2001 period for these 44 NDCs and the 11 J-codes.  This dollar amount does not include the $48.0 million impact on state governments' Medicaid expenditures nor does it include the $10.6 million impact on Medicare recipients' co-payments.  Additionally, my findings indicate that that 2.30 million payments to health care providers would have been lower and 13.21 million claims would have had lower Medicare or Medicaid spending had the

alternative values described above been used for the AWP, WAC, and Direct Price of certain Abbott products during the relevant time period.

At various stages in my analysis – indeed at virtually every step where I believed that there were two or more acceptable ways to proceed in analyzing the Abbott, Medicaid, and Medicare data – I deliberately chose the conservative approach, that is, the approach that minimized the dollar difference and the number of provider payments and claims reported in the Executive Summary Section on page 2 of this Report.  My results are also conservative because I have excluded 6 of the 11 J-codes listed in the Complaint and all Medicaid HCPCS claims from my analyses.


_____

Mark G. Duggan, Ph.D.

June 19, 2008

Figure 1: Abbott's FDB Direct Price vs. Abbott's Direct Avg Price for Vancomycin (74653301)



Figure 2: Abbott's FDB AWP vs. Indirect Avg Price for Pharmacy COTs for Vancomycin (74653301)

**Table 1: Abbott Direct Transaction Data 1991-2001: Revenues, # of Transactions, and Average Prices**

| | | | | | Ratio Using: | |
|---|---|---|---|---|---|---|
| NDC | # Observations | Sum of Extprice | Sum of Rebate | Avg Price | 96Q3 Direct | 96Q3 AWP |
| 74196607 | 243,694 | $135,449 | -$54,888 | $0.239 | 6.81 | 8.11 |
| 74397703 | 90,859 | $13,202 | -$5,422 | $0.235 | 7.06 | 8.38 |
| 74433201 | 50,273 | $117,259 | -$70,873 | $2.984 | 9.32 | 11.06 |
| 74488710 | 106,869 | $55,179 | -$21,544 | $0.204 | 6.08 | 7.20 |
| 74488720 | 74,187 | $21,828 | -$12,378 | $0.267 | 5.80 | 6.89 |
| 74488750 | 65,418 | $17,188 | -$5,430 | $0.555 | 4.04 | 4.79 |
| 74488810 | 198,015 | $234,735 | -$106,969 | $0.191 | 7.27 | 8.63 |
| 74488820 | 101,468 | $47,306 | -$22,093 | $0.259 | 6.26 | 7.42 |
| 74613802 | 152,011 | $16,429 | -$2,442 | $0.812 | 13.22 | 15.69 |
| 74613803 | 366,553 | $40,969 | -$6,683 | $0.764 | 14.05 | 16.68 |
| 74613822 | 48,069 | $9,472 | -$1,668 | $0.804 | 15.46 | 18.36 |
| 74613902 | 58,413 | $4,356 | -$621 | $0.796 | 13.03 | 15.48 |
| 74613903 | 182,868 | $15,768 | -$3,448 | $0.748 | 13.88 | 16.49 |
| 74613922 | 17,556 | $2,395 | -$318 | $0.815 | 14.75 | 17.51 |
| 74650901 | 49,729 | $139,053 | -$62,492 | $24.381 | 5.13 | 6.09 |
| 74653301 | 71,249 | $311,262 | -$193,224 | $5.536 | 10.04 | 11.92 |
| 74653401 | 13,125 | $9,055 | -$3,909 | $3.390 | 2.95 | 3.51 |
| 74653501 | 30,280 | $65,192 | -$27,110 | $6.144 | 3.26 | 3.87 |
| 74710013 | 325,888 | $213,104 | -$63,399 | $1.270 | 8.01 | 9.52 |
| 74710023 | 282,983 | $128,272 | -$38,163 | $1.285 | 7.92 | 9.40 |
| 74710102 | 125,739 | $27,266 | -$10,696 | $1.722 | 7.15 | 8.50 |
| 74710113 | 296,782 | $142,498 | -$49,996 | $1.291 | 7.88 | 9.35 |
| 74710123 | 419,458 | $214,735 | -$75,023 | $1.312 | 7.75 | 9.21 |
| 74712007 | 111,774 | $27,669 | -$6,681 | $7.052 | 8.21 | 9.75 |
| 74713809 | 696,317 | $111,092 | -$23,873 | $0.800 | 16.44 | 19.51 |
| 74713909 | 603,503 | $79,737 | -$16,399 | $0.771 | 16.51 | 19.60 |
| 74790209 | 552,396 | $114,399 | -$29,630 | $1.158 | 13.59 | 16.14 |
| 74792202 | 466,015 | $47,202 | -$9,270 | $0.616 | 13.94 | 16.56 |
| 74792203 | 395,324 | $29,856 | -$6,402 | $0.620 | 13.86 | 16.45 |
| 74792209 | 426,937 | $23,145 | -$4,840 | $0.750 | 13.38 | 15.89 |
| 74792336 | 244,019 | $96,551 | -$26,312 | $0.954 | 9.50 | 11.28 |
| 74792337 | 245,901 | $80,097 | -$19,126 | $0.961 | 9.43 | 11.20 |
| 74792409 | 293,320 | $15,153 | -$3,409 | $0.801 | 13.68 | 16.24 |
| 74792609 | 873,076 | $144,252 | -$36,104 | $0.786 | 13.94 | 16.55 |
| 74794109 | 541,614 | $38,343 | -$8,362 | $0.802 | 13.67 | 16.23 |
| 74797205 | 45,796 | $4,066 | -$575 | $2.044 | 3.24 | 3.85 |
| 74797305 | 108,339 | $8,975 | -$1,496 | $1.929 | 3.44 | 4.08 |
| 74798302 | 667,459 | $78,682 | -$17,274 | $0.612 | 13.80 | 16.38 |
| 74798303 | 652,034 | $73,356 | -$15,920 | $0.599 | 14.11 | 16.75 |
| 74798309 | 1,019,182 | $272,189 | -$37,742 | $0.668 | 13.72 | 16.28 |
| 74798436 | 268,327 | $75,586 | -$12,307 | $0.964 | 9.39 | 11.16 |
| 74798437 | 338,718 | $100,964 | -$18,584 | $0.964 | 9.40 | 11.16 |
| 74798509 | 570,418 | $37,806 | -$6,954 | $0.752 | 13.43 | 15.95 |
| 74799009 | 180,715 | $9,676 | -$2,206 | $1.011 | 9.16 | 10.88 |
| Total | 12,672,670 | $3,450,764 | -$1,142,253 | Average | 10.07 | 11.95 |

Describes Abbott direct transaction data for the 1991-2001 years. Data in the second, third, and fourth columns includes all transactions for these 11 years of data. Data in the third and fourth columns are in thousands of dollars. In calculating the price data reported in the fifth column, returns (instruction code from 60 to 64) are excluded because units may not be comparable. These returns represent 0.54 percent of all transactions in the 1991-2001 direct data. The final two columns represent the ratio of the Direct Price and the Average Wholesale Price in effect in the third quarter of 1996 (though for 74613822 and 74613922 the third quarter of 1999 is used because it is the first one with a Direct or Average Wholesale price) to this average price.

**Table 2: Abbott Direct Transaction Data: # Observations and Sales by Year-Quarter**

| Year | Quarter | # Obs | Extprice | Rebate | # NDCs |
|------|---------|-------|----------|--------|--------|
| 1991 | 1 | 284,623 | $64.160 | -$25.022 | 35 |
| 1991 | 2 | 293,312 | $69.317 | -$30.671 | 35 |
| 1991 | 3 | 285,865 | $75.360 | -$34.451 | 35 |
| 1991 | 4 | 301,355 | $82.904 | -$36.470 | 36 |
| 1992 | 1 | 284,294 | $61.768 | -$21.381 | 36 |
| 1992 | 2 | 289,979 | $63.569 | -$20.806 | 37 |
| 1992 | 3 | 320,881 | $76.405 | -$23.807 | 40 |
| 1992 | 4 | 329,426 | $80.769 | -$24.362 | 40 |
| 1993 | 1 | 324,592 | $84.811 | -$24.363 | 42 |
| 1993 | 2 | 324,928 | $79.813 | -$23.541 | 42 |
| 1993 | 3 | 319,793 | $80.482 | -$24.272 | 42 |
| 1993 | 4 | 313,098 | $75.588 | -$21.968 | 42 |
| 1994 | 1 | 312,421 | $75.297 | -$22.275 | 42 |
| 1994 | 2 | 302,340 | $72.563 | -$20.054 | 42 |
| 1994 | 3 | 307,235 | $67.033 | -$18.069 | 42 |
| 1994 | 4 | 302,628 | $70.667 | -$19.986 | 42 |
| 1995 | 1 | 311,997 | $77.287 | -$22.801 | 42 |
| 1995 | 2 | 302,122 | $78.525 | -$24.151 | 42 |
| 1995 | 3 | 281,931 | $78.505 | -$25.585 | 42 |
| 1995 | 4 | 285,408 | $79.772 | -$25.443 | 42 |
| 1996 | 1 | 291,960 | $81.738 | -$26.957 | 42 |
| 1996 | 2 | 292,558 | $80.139 | -$25.642 | 42 |
| 1996 | 3 | 291,848 | $80.085 | -$25.489 | 42 |
| 1996 | 4 | 304,344 | $87.811 | -$27.511 | 42 |
| 1997 | 1 | 294,723 | $86.248 | -$27.518 | 42 |
| 1997 | 2 | 295,157 | $82.097 | -$25.769 | 42 |
| 1997 | 3 | 290,067 | $83.683 | -$26.890 | 42 |
| 1997 | 4 | 298,082 | $89.028 | -$28.904 | 42 |
| 1998 | 1 | 294,001 | $94.907 | -$32.256 | 42 |
| 1998 | 2 | 285,646 | $83.522 | -$27.109 | 42 |
| 1998 | 3 | 285,868 | $79.965 | -$25.515 | 42 |
| 1998 | 4 | 293,296 | $89.527 | -$29.452 | 44 |
| 1999 | 1 | 291,763 | $86.809 | -$28.281 | 44 |
| 1999 | 2 | 275,059 | $80.849 | -$27.773 | 44 |
| 1999 | 3 | 261,553 | $77.415 | -$25.835 | 44 |
| 1999 | 4 | 271,782 | $84.751 | -$28.204 | 44 |
| 2000 | 1 | 263,226 | $80.662 | -$27.386 | 44 |
| 2000 | 2 | 265,384 | $83.904 | -$29.305 | 44 |
| 2000 | 3 | 254,949 | $78.246 | -$27.554 | 44 |
| 2000 | 4 | 263,673 | $80.290 | -$28.525 | 44 |
| 2001 | 1 | 236,338 | $67.055 | -$24.301 | 44 |
| 2001 | 2 | 234,879 | $71.529 | -$25.556 | 44 |
| 2001 | 3 | 230,152 | $74.466 | -$26.347 | 44 |
| 2001 | 4 | 228,134 | $71.442 | -$24.698 | 44 |
| | Total | 12,672,670 | $3,450.764 | -$1,142.253 | 44 |

Dollar amounts in the fourth and fifth columns are in millions of dollars. The final column represents the number of NDCs with one or more transactions in the quarter.

**Table 3: Direct Transaction Data: # of Obs, Revenues, and Rebate Accruals by Instruction and Transaction Codes**

|  | # Obs | Extprice | Rebate | Net | InstrCode | TransCode |
|---|---|---|---|---|---|---|
| Normal Billing 1 | 10,131,641 | $2,829,850 | -$939,176 | $1,890,674 | 0 | 1 |
| Manual Split 1 | 2,140,447 | $446,564 | -$123,643 | $322,921 | 4 | 1 |
| Special Price Deal | 9,688 | $66,721 | $0 | $66,721 | 0 | 4 |
| B.O. Shipment 2 | 124,400 | $143,444 | -$79,423 | $64,021 | 1 | 2 |
| Adjust Product Price | 67,358 | -$20,932 | $4 | -$20,928 | 70 | 1 |
| Return Goods Regular | 52,806 | -$17,848 | $229 | -$17,619 | 60 | 1 |
| Add. Prod. Charge | 22,723 | $5,814 | -$3 | $5,811 | 7 | 1 |
| Mdse Td By Sales Rep | 9,623 | -$3,395 | $3 | -$3,392 | 83 | 1 |
| Mch. Td By Sales Rep | 51,115 | $3,395 | -$12 | $3,383 | 6 | 1 |
| Customer Allowance | 13,940 | -$2,282 | $19 | -$2,263 | 74 | 1 |
| Short Ship | 6,948 | -$2,058 | $3 | -$2,055 | 84 | 1 |
| Bill-Do-Not-Ship | 4,275 | $880 | -$6 | $874 | 5 | 1 |
| Missing | 19,738 | $504 | $0 | $504 |  | 1 |
| B.O. Shipment 1* | 302 | $555 | -$249 | $306 | 1 | 1 |
| Cancel - Regular | 336 | -$273 | $0 | -$273 | 80 | 1 |
| Field Destruction | 2,141 | -$172 | $0 | -$172 | 90 | 1 |
| Ret. Gds. Reg. Act. | 15,057 | -$24 | $0 | -$24 | 63 | 1 |
| Man. Split Special Deal | 41 | $22 | $0 | $22 | 4 | 4 |
| Adjust Non-Prod Lines | 36 | -$2 | $0 | -$2 | 71 | 1 |
| Reverse Return or Allowance | 10 | $1 | $0 | $1 | 13 | 1 |
| Normal Billing 2 | 3 | $0 | $0 | $0 | 0 | 2 |
| Expense Account | 42 | $0 | $0 | $0 | 11 | 1 |
| Total | 12,672,670 | $3,450,764 | -$1,142,253 | $2,308,511 | - | - |

Dollar amounts in columns 3, 4, and 5 are in thousands of dollars.  Rows are sorted in descending order of the absolute value of net sales.  Includes data for 1991 through and including 2001.

**Table 4: 1991-2001 Direct Transaction Data: Revenues, Rebate Accruals, and # Observations by Class of Trade**

| COT Code Meaning | COT | # Obs | Revenues | RebateAccrual | Net | Cumulative % of Net | Avg COT Price / Overall Price | # of Ratios |
|---|---|---|---|---|---|---|---|---|
| Non-Profit Hospital | H021 | 7,128,919 | $922,239 | -$73,451 | $848,788 | 36.77% | 0.953 | 1,795 |
| Wholesaler | W050 | 927,871 | $1,421,817 | -$810,198 | $611,619 | 63.26% | 1.125 | 1,783 |
| HPD Distributor | M061 | 454,092 | $523,280 | -$230,184 | $293,096 | 75.96% | 1.016 | 1,691 |
| City or County Hospital | T022 | 2,062,606 | $198,791 | -$13,608 | $185,183 | 83.98% | 0.969 | 1,730 |
| Fresenius | M034 | 8,506 | $76,095 | $0 | $76,095 | 87.28% | 0.979 | 153 |
| Profit Hospital | M021 | 743,149 | $71,473 | -$4,142 | $67,331 | 90.19% | 0.995 | 1,716 |
| Distributor | M060 | 232,478 | $60,516 | -$2,625 | $57,891 | 92.70% | 1.250 | 1,756 |
| Home Care Distribution | P040 | 521,844 | $56,432 | -$1,730 | $54,702 | 95.07% | 1.253 | 1,782 |
| State Hospital | TP25 | 69,061 | $15,768 | -$1,060 | $14,708 | 95.71% | 0.983 | 1,616 |
| Research Foundation & Pharm. Mfg. | A073 | 3,931 | $11,384 | -$32 | $11,352 | 96.20% | 2.324 | 886 |
| Retail Pharmacy | A003 | 79,203 | $7,971 | -$260 | $7,711 | 96.53% | 1.199 | 1,665 |
| State Teaching Institutions | TP28 | 29,146 | $7,888 | -$563 | $7,325 | 96.85% | 0.984 | 1,183 |
| Public Health Service Hosp | US31 | 26,264 | $5,711 | -$32 | $5,679 | 97.10% | 1.012 | 1,534 |
| V.A. Depot | US65 | 275 | $5,199 | $0 | $5,199 | 97.32% | 0.917 | 56 |
| Kaiser Hospital Inpatient Pharmacy | HK21 | 4,411 | $5,141 | -$36 | $5,105 | 97.54% | 1.014 | 268 |
| Physician Office and Clinics | A010 | 56,936 | $5,164 | -$173 | $4,991 | 97.76% | 1.252 | 1,548 |
| Misc Profit Hospital - Admin Offices | M026 | 42,453 | $4,790 | -$230 | $4,561 | 97.96% | 1.155 | 1,508 |
| Animal Health, Etc. Distributors | C043 | 21,738 | $4,441 | $0 | $4,441 | 98.15% | 1.876 | 655 |
| Non-Profit Medical Facility | H026 | 9,347 | $4,011 | -$143 | $3,868 | 98.32% | 1.149 | 948 |
| Closed Pharmacy | M070 | 38,727 | $3,726 | -$110 | $3,616 | 98.47% | 1.269 | 1,264 |
| Military Hospitals | US32 | 11,598 | $3,493 | -$1 | $3,492 | 98.62% | 1.008 | 1,272 |
| Dialysis Centers | H050 | 6,240 | $3,517 | -$142 | $3,375 | 98.77% | 1.021 | 168 |
| Surgery Center (Profit) | M044 | 72,745 | $3,367 | -$95 | $3,272 | 98.91% | 1.183 | 1,458 |
| V.A. Hospitals | US30 | 11,274 | $3,232 | -$4 | $3,229 | 99.05% | 1.066 | 1,078 |
| Defense Personnel Support Ctr Depot | US60 | 660 | $3,108 | $0 | $3,108 | 99.19% | 0.965 | 157 |
| Dialysis Centers | M033 | 3,302 | $3,248 | -$322 | $2,926 | 99.31% | 1.271 | 127 |
| Physicians Supply Houses | A012 | 3,260 | $2,754 | -$208 | $2,546 | 99.42% | 1.277 | 788 |
| Remaining 81 Classes of Trade | - | 102,634 | $16,209 | -$2,907 | $13,302 | 100.00% | 1.548 | 1,646 |
| Total | - | 12,672,670 | $3,450,764 | -$1,142,253 | $2,308,511 | - | Average | 1,151 |

Table 5: Comparison of Price Statistics with Direct Price for Vancomycin 74653301

| Year | Quarter | Direct Price | All Direct Customers | | | | Pharmacy Direct Customers | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Avg Price | 95th Pctile | # Customers | # Transactions | Avg Price | 95th Pctile | # Customers | # Transactions |
| 1991 | 1 | 38.000 | 5.864 | 6.186 | 228 | 1183 | 6.750 | 7.332 | 2 | 6 |
| 1991 | 2 | 44.410 | 6.418 | 7.411 | 224 | 1183 | 7.295 | 7.295 | 1 | 2 |
| 1991 | 3 | 44.410 | 6.202 | 6.402 | 290 | 1772 | 6.420 | 10.653 | 3 | 10 |
| 1991 | 4 | 44.410 | 8.173 | 19.334 | 260 | 1431 | 7.744 | 14.944 | 5 | 8 |
| 1992 | 1 | 44.410 | 6.016 | 6.746 | 235 | 1301 | 6.881 | 7.791 | 4 | 9 |
| 1992 | 2 | 47.070 | 6.410 | 6.574 | 252 | 1561 | 7.117 | 7.791 | 11 | 26 |
| 1992 | 3 | 47.070 | 6.851 | 6.900 | 256 | 1759 | 7.117 | 13.515 | 17 | 49 |
| 1992 | 4 | 47.070 | 6.596 | 6.672 | 298 | 1751 | 6.574 | 13.514 | 22 | 56 |
| 1993 | 1 | 47.070 | 7.941 | 13.110 | 319 | 1717 | 6.892 | 7.664 | 21 | 40 |
| 1993 | 2 | 47.070 | 6.600 | 6.704 | 287 | 1647 | 6.889 | 7.791 | 17 | 34 |
| 1993 | 3 | 49.420 | 6.523 | 6.695 | 293 | 1719 | 6.736 | 7.791 | 21 | 50 |
| 1993 | 4 | 49.420 | 6.646 | 6.696 | 291 | 1657 | 6.555 | 7.450 | 26 | 75 |
| 1994 | 1 | 49.420 | 6.647 | 6.693 | 279 | 1680 | 6.687 | 7.500 | 24 | 83 |
| 1994 | 2 | 49.420 | 7.458 | 12.931 | 283 | 1443 | 8.772 | 7.325 | 23 | 50 |
| 1994 | 3 | 50.900 | 6.379 | 6.914 | 288 | 1466 | 6.094 | 8.632 | 24 | 60 |
| 1994 | 4 | 50.900 | 6.577 | 6.796 | 284 | 1436 | 6.294 | 7.166 | 27 | 51 |
| 1995 | 1 | 50.900 | 6.485 | 6.597 | 265 | 1447 | 6.411 | 6.900 | 24 | 41 |
| 1995 | 2 | 50.900 | 6.369 | 6.419 | 263 | 1752 | 6.316 | 6.880 | 25 | 49 |
| 1995 | 3 | 52.940 | 6.234 | 6.272 | 263 | 1683 | 6.940 | 6.880 | 26 | 50 |
| 1995 | 4 | 52.940 | 6.007 | 6.064 | 261 | 1625 | 6.814 | 6.900 | 25 | 51 |
| 1996 | 1 | 52.940 | 5.887 | 5.919 | 255 | 1743 | 4.729 | 6.880 | 23 | 53 |
| 1996 | 2 | 55.590 | 5.903 | 5.919 | 276 | 1742 | 5.951 | 6.270 | 24 | 57 |
| 1996 | 3 | 55.590 | 5.813 | 5.919 | 249 | 1760 | 5.949 | 6.283 | 18 | 49 |
| 1996 | 4 | 55.590 | 5.761 | 5.874 | 247 | 1606 | 5.455 | 5.820 | 25 | 58 |
| 1997 | 1 | 55.590 | 5.871 | 7.658 | 233 | 1463 | 6.584 | 6.880 | 24 | 47 |
| 1997 | 2 | 55.590 | 5.423 | 5.465 | 270 | 1422 | 4.326 | 5.419 | 29 | 41 |
| 1997 | 3 | 58.370 | 5.037 | 5.200 | 227 | 1514 | 4.789 | 4.812 | 17 | 32 |
| 1997 | 4 | 58.370 | 4.846 | 4.901 | 206 | 1482 | 4.613 | 5.320 | 14 | 35 |
| 1998 | 1 | 58.370 | 4.883 | 4.902 | 212 | 1503 | 4.498 | 4.812 | 13 | 27 |
| 1998 | 2 | 58.370 | 4.926 | 4.813 | 241 | 1498 | 4.143 | 4.734 | 19 | 37 |
| 1998 | 3 | 61.290 | 4.726 | 4.787 | 221 | 1539 | 4.498 | 4.812 | 14 | 42 |
| 1998 | 4 | 61.290 | 4.744 | 4.814 | 207 | 1622 | 4.415 | 4.812 | 12 | 38 |
| 1999 | 1 | 61.290 | 4.907 | 5.371 | 209 | 1421 | 4.430 | 4.889 | 13 | 29 |
| 1999 | 2 | 61.290 | 4.671 | 4.699 | 190 | 1400 | 5.789 | 5.320 | 11 | 25 |
| 1999 | 3 | 64.350 | 4.683 | 4.718 | 202 | 1553 | 3.248 | 4.889 | 11 | 32 |
| 1999 | 4 | 64.350 | 4.820 | 5.221 | 218 | 1643 | 4.309 | 4.912 | 14 | 34 |
| 2000 | 1 | 64.350 | 4.771 | 4.732 | 217 | 1689 | 4.245 | 4.988 | 14 | 36 |
| 2000 | 2 | 64.350 | 4.494 | 4.626 | 224 | 1723 | 4.302 | 4.988 | 14 | 32 |
| 2000 | 3 | 64.350 | 4.414 | 4.484 | 216 | 1784 | 4.053 | 4.988 | 12 | 36 |
| 2000 | 4 | 64.350 | 4.334 | 4.387 | 312 | 1675 | 4.093 | 4.963 | 15 | 41 |
| 2001 | 1 | 64.350 | 4.331 | 4.595 | 221 | 1525 | 4.200 | 4.937 | 11 | 45 |
| 2001 | 2 | 64.350 | 4.321 | 4.381 | 223 | 1750 | 4.279 | 4.937 | 12 | 32 |
| 2001 | 3 | 14.890 | 4.941 | 9.118 | 203 | 1505 | 4.365 | 4.937 | 10 | 34 |
| 2001 | 4 | 14.890 | 4.320 | 4.390 | 214 | 1474 | 4.176 | 4.937 | 14 | 44 |
| Average | | 52.551 | 5.710 | 6.477 | 248 | 1,574 | 5.669 | 6.756 | 17 | 40 |

**Table 6: Summary of Abbott Indirect Transaction Data by NDC for 1991-2001**

| NDC | # Obs in Indirect Data | Sum of End Cust Inv Total | Sum of Purch Units | Sum of Cust Rebate | Avg Price in Indirect Data | Av W050,M061 Price in Direct | Ratio |
|---|---|---|---|---|---|---|---|
| 74196607 | 1,552,124 | $57,725 | 239,938 | $1,694 | $0.241 | $0.239 | 1.008 |
| 74397703 | 260,757 | $4,281 | 18,693 | $88 | $0.229 | $0.229 | 1.002 |
| 74433201 | 405,130 | $35,579 | 12,302 | $634 | $2.892 | $2.993 | 0.966 |
| 74488710 | 646,170 | $20,058 | 104,845 | $552 | $0.191 | $0.194 | 0.986 |
| 74488720 | 273,747 | $6,654 | 25,235 | $128 | $0.264 | $0.263 | 1.003 |
| 74488750 | 222,671 | $6,500 | 11,816 | $122 | $0.550 | $0.549 | 1.002 |
| 74488810 | 1,434,646 | $91,475 | 477,013 | $3,076 | $0.192 | $0.191 | 1.002 |
| 74488820 | 462,788 | $18,528 | 72,018 | $486 | $0.257 | $0.257 | 1.001 |
| 74613802 | 68,741 | $1,735 | 2,050 | $76 | $0.846 | $0.922 | 0.918 |
| 74613803 | 355,060 | $7,042 | 8,972 | $482 | $0.785 | $0.820 | 0.958 |
| 74613822 | 46,728 | $1,330 | 1,626 | $103 | $0.818 | $0.808 | 1.012 |
| 74613902 | 14,960 | $343 | 403 | $12 | $0.851 | $0.921 | 0.925 |
| 74613903 | 141,543 | $2,245 | 2,922 | $173 | $0.768 | $0.781 | 0.984 |
| 74613922 | 8,817 | $222 | 266 | $14 | $0.834 | $0.812 | 1.027 |
| 74650901 | 311,027 | $64,883 | 2,750 | $2,225 | $23.595 | $24.283 | 0.972 |
| 74653301 | 682,165 | $100,710 | 18,877 | $2,498 | $5.335 | $5.553 | 0.961 |
| 74653401 | 67,100 | $4,582 | 1,402 | $160 | $3.269 | $3.359 | 0.973 |
| 74653501 | 191,424 | $34,325 | 5,627 | $1,613 | $6.100 | $6.117 | 0.997 |
| 74710013 | 267,093 | $49,947 | 37,502 | $2,152 | $1.332 | $1.333 | 0.999 |
| 74710023 | 202,183 | $28,266 | 20,963 | $1,072 | $1.348 | $1.350 | 0.999 |
| 74710102 | 122,121 | $7,625 | 4,256 | $322 | $1.792 | $1.786 | 1.003 |
| 74710113 | 254,536 | $34,675 | 25,661 | $1,390 | $1.351 | $1.352 | 1.000 |
| 74710123 | 396,373 | $55,290 | 40,290 | $2,088 | $1.372 | $1.371 | 1.001 |
| 74712007 | 65,781 | $6,251 | 841 | $439 | $7.429 | $7.465 | 0.995 |
| 74713809 | 744,584 | $20,053 | 24,554 | $1,304 | $0.817 | $0.877 | 0.931 |
| 74713909 | 540,250 | $12,878 | 16,168 | $803 | $0.797 | $0.816 | 0.976 |
| 74790209 | 534,048 | $22,891 | 18,702 | $1,662 | $1.224 | $1.236 | 0.990 |
| 74792202 | 322,459 | $7,763 | 12,222 | $528 | $0.635 | $0.639 | 0.994 |
| 74792203 | 234,610 | $3,929 | 6,137 | $223 | $0.640 | $0.643 | 0.996 |
| 74792209 | 246,774 | $3,420 | 4,329 | $208 | $0.790 | $0.791 | 0.999 |
| 74792336 | 120,352 | $15,644 | 15,697 | $981 | $0.997 | $0.990 | 1.007 |
| 74792337 | 119,251 | $14,148 | 14,144 | $882 | $1.000 | $1.001 | 0.999 |
| 74792409 | 162,657 | $2,256 | 2,661 | $123 | $0.848 | $0.846 | 1.002 |
| 74792609 | 809,698 | $20,743 | 25,055 | $1,277 | $0.828 | $0.838 | 0.988 |
| 74794109 | 405,244 | $6,331 | 7,466 | $418 | $0.848 | $0.851 | 0.996 |
| 74797205 | 14,616 | $493 | 233 | $28 | $2.114 | $2.277 | 0.928 |
| 74797305 | 33,111 | $1,277 | 640 | $76 | $1.995 | $2.006 | 0.995 |
| 74798302 | 683,435 | $13,415 | 21,552 | $947 | $0.622 | $0.624 | 0.997 |
| 74798303 | 712,651 | $13,174 | 21,670 | $963 | $0.608 | $0.611 | 0.995 |
| 74798309 | 1,149,048 | $35,394 | 52,243 | $2,718 | $0.677 | $0.679 | 0.997 |
| 74798436 | 144,768 | $14,004 | 13,952 | $899 | $1.004 | $1.002 | 1.002 |
| 74798437 | 192,450 | $19,343 | 19,231 | $1,228 | $1.006 | $1.009 | 0.997 |
| 74798509 | 418,943 | $7,453 | 9,445 | $548 | $0.789 | $0.797 | 0.991 |
| 74799009 | 88,906 | $1,754 | 1,657 | $117 | $1.059 | $1.085 | 0.976 |
| Total | 16,131,540 | $876,635 | 1,424,025 | $37,532 | Average Ratio | | 0.987 |

Dollar amounts in thousands of dollars and purchase units in thousands of units.

**Table 7: Abbott Indirect Transaction Data: # Observations and Sales by Year-Quarter**

| Year | Quarter | # Obs | EndCustInvTotal | CustomerRebate | Rebate / Sales | # NDCs |
|------|---------|-------|-----------------|----------------|----------------|--------|
| 1991 | 1 | 112,759 | $8,087 | $0 | 0.0% | 34 |
| 1991 | 2 | 101,709 | $7,624 | $0 | 0.0% | 35 |
| 1991 | 3 | 104,184 | $7,664 | $0 | 0.0% | 35 |
| 1991 | 4 | 135,265 | $9,492 | $0 | 0.0% | 36 |
| 1992 | 1 | 124,196 | $9,032 | $0 | 0.0% | 36 |
| 1992 | 2 | 152,205 | $11,337 | $0 | 0.0% | 36 |
| 1992 | 3 | 146,227 | $11,118 | $0 | 0.0% | 40 |
| 1992 | 4 | 165,856 | $13,424 | $0 | 0.0% | 40 |
| 1993 | 1 | 207,614 | $17,106 | $0 | 0.0% | 42 |
| 1993 | 2 | 200,962 | $16,987 | $0 | 0.0% | 42 |
| 1993 | 3 | 250,073 | $17,548 | $0 | 0.0% | 42 |
| 1993 | 4 | 237,733 | $17,794 | $0 | 0.0% | 42 |
| 1994 | 1 | 206,366 | $16,313 | $0 | 0.0% | 42 |
| 1994 | 2 | 242,236 | $16,667 | $0 | 0.0% | 42 |
| 1994 | 3 | 137,492 | $10,076 | $0 | 0.0% | 42 |
| 1994 | 4 | 241,783 | $15,623 | $0 | 0.0% | 42 |
| 1995 | 1 | 202,466 | $12,876 | $0 | 0.0% | 42 |
| 1995 | 2 | 322,871 | $20,647 | $0 | 0.0% | 42 |
| 1995 | 3 | 346,897 | $20,713 | $0 | 0.0% | 42 |
| 1995 | 4 | 344,084 | $20,617 | $0 | 0.0% | 42 |
| 1996 | 1 | 403,513 | $25,158 | $1,286 | 5.1% | 42 |
| 1996 | 2 | 390,225 | $22,690 | $1,160 | 5.1% | 42 |
| 1996 | 3 | 469,327 | $25,673 | $1,274 | 5.0% | 42 |
| 1996 | 4 | 435,387 | $23,876 | $1,220 | 5.1% | 42 |
| 1997 | 1 | 438,299 | $24,653 | $1,390 | 5.6% | 42 |
| 1997 | 2 | 436,947 | $23,316 | $1,297 | 5.6% | 42 |
| 1997 | 3 | 506,107 | $24,854 | $1,413 | 5.7% | 42 |
| 1997 | 4 | 484,448 | $24,784 | $1,481 | 6.0% | 42 |
| 1998 | 1 | 510,961 | $27,077 | $1,592 | 5.9% | 42 |
| 1998 | 2 | 484,248 | $25,326 | $1,433 | 5.7% | 42 |
| 1998 | 3 | 474,240 | $25,545 | $1,484 | 5.8% | 42 |
| 1998 | 4 | 547,065 | $26,519 | $1,697 | 6.4% | 43 |
| 1999 | 1 | 532,552 | $26,777 | $1,738 | 6.5% | 44 |
| 1999 | 2 | 552,200 | $26,933 | $1,807 | 6.7% | 44 |
| 1999 | 3 | 527,820 | $25,542 | $1,741 | 6.8% | 44 |
| 1999 | 4 | 515,955 | $24,953 | $1,775 | 7.1% | 44 |
| 2000 | 1 | 542,211 | $26,022 | $1,913 | 7.4% | 44 |
| 2000 | 2 | 542,184 | $25,334 | $1,862 | 7.3% | 44 |
| 2000 | 3 | 570,992 | $25,149 | $1,879 | 7.5% | 44 |
| 2000 | 4 | 536,971 | $25,207 | $1,936 | 7.7% | 44 |
| 2001 | 1 | 530,453 | $22,702 | $1,522 | 6.7% | 43 |
| 2001 | 2 | 582,736 | $23,780 | $1,607 | 6.8% | 44 |
| 2001 | 3 | 580,775 | $20,743 | $1,443 | 7.0% | 44 |
| 2001 | 4 | 552,946 | $23,281 | $1,582 | 6.8% | 43 |
| | Total | 16,131,540 | $876,635 | $37,532 | 4.3% | 44 |

**Table 8: Wholesalers and HPD Distributors in Abbott's Indirect Transaction Data**

| "Wholesaler Customer Name" | # Obs | Revenues | Class-of-Trade |
|---|---|---|---|
| AMERISOURCE | 2,870,047 | $213,966 | W050 |
| OWENS & MINOR | 4,344,110 | $163,637 | M061 |
| CARDINAL | 2,745,347 | $123,766 | W050 |
| MCKESSON | 1,705,531 | $108,275 | W050 |
| BERGEN BRUNSWIG | 899,277 | $65,652 | W050 |
| WHITMIRE DIST | 469,795 | $38,432 | W050 |
| MORRIS & DICKSON | 316,697 | $23,028 | W050 |
| GENERAL MED | 612,073 | $17,939 | M061 |
| STUART MEDICAL | 193,943 | $17,715 | M061 |
| NEUMAN DIST | 81,200 | $12,090 | W050 |
| BINDLEY WESTERN | 120,873 | $9,315 | W050 |
| DURR DRUG | 82,153 | $8,463 | W050 |
| HARDIN'S SYSCO | 153,981 | $6,997 | M061 |
| HUMISTON KEELING | 48,789 | $4,900 | W050 |
| ALLEGIANCE | 311,689 | $4,398 | M061 |
| BURROWS | 192,881 | $4,012 | M061 |
| COMMONS BROS INC | 17,675 | $3,797 | W050 |
| WALSH-LUMPKIN | 54,772 | $3,236 | M061 |
| SMITH DRUG | 41,600 | $3,190 | W050 |
| D & K HEALTHCARE | 41,189 | $2,880 | W050 |
| F DOHMEN CO | 51,032 | $2,874 | W050 |
| PRO HOSP SPLY | 122,976 | $2,711 | M061 |
| FOXMEYER | 25,466 | $2,648 | W050 |
| TENN WHOLESALE | 17,778 | $2,286 | W050 |
| HD SMITH | 40,854 | $1,975 | W050 |
| SUN CHOICE | 5,920 | $1,788 | M061 |
| H D SMITH WHLSE DG CO | 25,908 | $1,712 | W050 |
| SOLOMONS COMPANY | 14,885 | $1,510 | W050 |
| MEYERS & CO | 13,809 | $1,417 | W050 |
| KAY WHOLESALE | 11,883 | $1,310 | W050 |
| US MEDICAL | 1,867 | $1,275 | M061 |
| MD OF BEAUMONT | 17,609 | $1,254 | W050 |
| ALBERS INC | 14,321 | $1,229 | W050 |
| OHIO VLY/CLARKSBURG INC | 12,724 | $1,149 | W050 |
| WHITE & WHITE | 10,028 | $1,098 | M061 |
| AMERICAN MATERIAL MGNMT | 184,232 | $1,071 | M061 |
| PRIORITY HLTHCARE | 25,194 | $1,009 | M060 |
| ALL OTHERS | 231,432 | $12,635 | W050 |
| TOTAL | 16,131,540 | $876,635 | - |

**Table 9: 1991-2001 Indirect Transaction Data: Revenues, Rebates, and # Obs by End Customer Class of Trade**

| COT Code Meaning | COT | # Obs | Revenues | Cust Rebate | Cumulative % of Revenues | AvgRatio | # Ratios |
|---|---|---|---|---|---|---|---|
| Non-Profit Hospital | H021 | 10,368,993 | $516,165 | $24,647 | 58.88% | 0.988 | 1817 |
| City or County Hospital | T022 | 1,846,621 | $108,241 | $4,794 | 71.23% | 1.003 | 1804 |
| Profit Hospital | M021 | 1,421,210 | $76,415 | $2,309 | 79.94% | 0.993 | 1766 |
| Home Care Distribution | P040 | 435,777 | $41,573 | $1,550 | 84.69% | 1.041 | 1533 |
| State Hospital | TP25 | 241,581 | $21,219 | $1,281 | 87.11% | 1.021 | 1505 |
| Retail Pharmacy | A003 | 285,217 | $14,758 | $429 | 88.79% | 1.200 | 1550 |
| V.A. Hospitals | US30 | 101,851 | $12,742 | $26 | 90.24% | 0.925 | 1078 |
| Missing Class of Trade | - | 179,621 | $12,679 | $141 | 91.69% | 1.067 | 1449 |
| Closed Pharmacy | M070 | 195,761 | $12,266 | $376 | 93.09% | 1.093 | 1521 |
| State Teaching Institutions | TP28 | 127,854 | $11,435 | $392 | 94.39% | 0.968 | 1010 |
| Long Term Care Providers | M072 | 179,417 | $11,250 | $468 | 95.68% | 1.044 | 1437 |
| Distributor | M060 | 176,309 | $6,224 | $138 | 96.39% | 1.269 | 1695 |
| Physician Office and Clinics | A010 | 85,455 | $4,869 | $198 | 96.94% | 1.099 | 1249 |
| Military Hospitals | US32 | 42,895 | $3,670 | $3 | 97.36% | 0.970 | 1199 |
| Disproportionate Share Hospitals | GV11 | 50,634 | $3,602 | $145 | 97.77% | 1.042 | 1365 |
| Misc Tax Supported Hosp Admin | T026 | 12,718 | $2,647 | $84 | 98.07% | 1.032 | 926 |
| Misc State Tax Supported Hosp Admin | TP26 | 15,750 | $2,178 | $60 | 98.32% | 1.095 | 1064 |
| Dialysis Centers | M033 | 39,429 | $2,165 | $92 | 98.57% | 0.974 | 436 |
| Misc Profit Hospital - Admin Offices | M026 | 39,072 | $2,163 | $64 | 98.82% | 1.036 | 1188 |
| Surgery Center (Profit) | M044 | 97,273 | $1,866 | $88 | 99.03% | 1.027 | 1233 |
| Chain Pharmacy | A007 | 28,294 | $1,083 | $31 | 99.15% | 1.369 | 1210 |
| Remaining 68 Classes of Trade | - | 159,808 | $7,424 | $217 | 100.00% | 1.086 | 1499 |
| Total | - | 16,131,540 | $876,635 | $37,532 | Total | - | 1826 |

**Table 10: Comparison of Price Statistics with Average Wholesale Price for Vancomycin 74653301**

| Year | Quarter | AWP | All Indirect Customers | | | | Pharmacy Indirect Customers | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Avg Price | 95th Pctile | # Customers | # Transactions | Avg Price | 95th Pctile | Maximum | # Customers | # Transactions |
| 1991 | 1 | 45.125 | 6.062 | 6.820 | 830 | 4,735 | 7.608 | 13.312 | 13.312 | 13 | 46 |
| 1991 | 2 | 52.737 | 6.156 | 7.000 | 868 | 5,339 | 8.430 | 13.790 | 13.790 | 12 | 55 |
| 1991 | 3 | 52.737 | 6.316 | 6.857 | 979 | 5,175 | 7.673 | 12.816 | 15.249 | 18 | 54 |
| 1991 | 4 | 52.737 | 6.467 | 7.000 | 1,099 | 6,309 | 7.002 | 8.925 | 15.249 | 27 | 72 |
| 1992 | 1 | 52.737 | 6.496 | 7.000 | 1,153 | 6,659 | 7.354 | 13.790 | 15.249 | 29 | 93 |
| 1992 | 2 | 55.896 | 6.559 | 7.430 | 1,283 | 8,512 | 8.094 | 13.790 | 13.790 | 42 | 120 |
| 1992 | 3 | 55.896 | 6.650 | 7.020 | 1,376 | 8,553 | 7.929 | 12.800 | 13.790 | 55 | 146 |
| 1992 | 4 | 55.896 | 6.627 | 7.228 | 1,432 | 9,014 | 8.075 | 12.800 | 14.204 | 65 | 215 |
| 1993 | 1 | 55.896 | 6.139 | 6.900 | 1,677 | 11,305 | 8.131 | 13.312 | 14.342 | 81 | 269 |
| 1993 | 2 | 55.896 | 6.628 | 7.510 | 1,793 | 11,735 | 9.212 | 13.790 | 14.342 | 86 | 309 |
| 1993 | 3 | 58.686 | 6.699 | 8.497 | 2,011 | 13,081 | 7.693 | 13.312 | 14.342 | 89 | 346 |
| 1993 | 4 | 58.686 | 6.633 | 7.310 | 2,115 | 14,075 | 7.071 | 8.703 | 13.312 | 116 | 437 |
| 1994 | 1 | 58.686 | 6.579 | 6.977 | 2,095 | 12,692 | 6.954 | 8.665 | 13.312 | 122 | 512 |
| 1994 | 2 | 58.686 | 6.792 | 8.138 | 2,020 | 12,019 | 7.040 | 7.266 | 13.500 | 144 | 579 |
| 1994 | 3 | 60.444 | 6.890 | 13.500 | 1,618 | 7,657 | 7.339 | 13.500 | 13.500 | 127 | 416 |
| 1994 | 4 | 60.444 | 6.673 | 9.063 | 1,978 | 10,995 | 7.131 | 11.485 | 13.500 | 167 | 681 |
| 1995 | 1 | 60.444 | 6.188 | 6.850 | 1,571 | 7,161 | 6.692 | 7.020 | 13.500 | 166 | 629 |
| 1995 | 2 | 60.444 | 6.190 | 6.850 | 1,916 | 11,750 | 6.574 | 6.850 | 13.500 | 220 | 1,084 |
| 1995 | 3 | 62.866 | 6.085 | 6.850 | 2,062 | 11,830 | 6.705 | 7.166 | 13.500 | 224 | 1,111 |
| 1995 | 4 | 62.866 | 5.899 | 6.830 | 2,348 | 13,310 | 6.639 | 8.357 | 13.500 | 248 | 1,136 |
| 1996 | 1 | 62.866 | 5.877 | 6.750 | 2,639 | 16,260 | 6.245 | 6.600 | 16.250 | 308 | 1,503 |
| 1996 | 2 | 66.013 | 5.795 | 6.441 | 2,611 | 15,911 | 6.220 | 6.480 | 13.500 | 341 | 1,494 |
| 1996 | 3 | 66.013 | 5.904 | 7.950 | 2,886 | 18,742 | 6.170 | 6.660 | 13.500 | 362 | 1,957 |
| 1996 | 4 | 66.013 | 5.542 | 6.825 | 2,738 | 18,030 | 5.840 | 6.532 | 13.500 | 354 | 1,844 |
| 1997 | 1 | 66.013 | 5.378 | 6.100 | 2,800 | 17,310 | 5.849 | 7.531 | 13.900 | 383 | 1,784 |
| 1997 | 2 | 66.013 | 4.991 | 5.780 | 2,926 | 16,454 | 5.606 | 7.660 | 13.900 | 381 | 1,711 |
| 1997 | 3 | 69.314 | 4.897 | 5.650 | 3,352 | 18,967 | 5.274 | 6.200 | 13.900 | 405 | 2,036 |
| 1997 | 4 | 69.314 | 4.889 | 5.558 | 3,197 | 18,595 | 5.191 | 6.350 | 13.900 | 420 | 2,022 |
| 1998 | 1 | 69.314 | 4.796 | 5.310 | 3,244 | 19,780 | 4.911 | 5.276 | 13.900 | 432 | 2,250 |
| 1998 | 2 | 69.314 | 4.810 | 5.204 | 3,541 | 21,041 | 4.852 | 5.001 | 13.900 | 470 | 2,381 |
| 1998 | 3 | 72.782 | 4.709 | 5.100 | 3,516 | 20,665 | 4.992 | 5.310 | 13.900 | 455 | 2,292 |
| 1998 | 4 | 72.782 | 4.723 | 5.117 | 3,722 | 22,313 | 4.880 | 5.117 | 13.900 | 487 | 2,485 |
| 1999 | 1 | 72.782 | 4.671 | 5.069 | 3,608 | 21,857 | 4.805 | 5.152 | 13.900 | 481 | 2,294 |
| 1999 | 2 | 72.782 | 4.676 | 4.947 | 3,794 | 23,630 | 4.710 | 4.940 | 13.900 | 518 | 2,748 |
| 1999 | 3 | 76.416 | 4.744 | 5.700 | 3,666 | 21,556 | 4.756 | 5.700 | 13.900 | 499 | 2,579 |
| 1999 | 4 | 76.416 | 4.642 | 4.950 | 3,516 | 21,056 | 4.546 | 4.830 | 13.900 | 464 | 2,482 |
| 2000 | 1 | 76.416 | 4.612 | 4.878 | 3,458 | 20,845 | 4.462 | 4.620 | 13.900 | 478 | 2,511 |
| 2000 | 2 | 76.416 | 4.427 | 4.664 | 3,527 | 22,674 | 4.470 | 4.820 | 13.900 | 521 | 2,996 |
| 2000 | 3 | 76.416 | 4.378 | 4.646 | 3,609 | 22,534 | 4.305 | 4.550 | 13.900 | 526 | 3,018 |
| 2000 | 4 | 76.416 | 4.431 | 4.830 | 3,887 | 17,826 | 4.414 | 5.347 | 13.900 | 532 | 2,494 |
| 2001 | 1 | 76.416 | 4.516 | 4.930 | 3,901 | 22,229 | 4.376 | 5.219 | 13.900 | 561 | 2,977 |
| 2001 | 2 | 76.416 | 4.270 | 4.500 | 3,892 | 23,956 | 4.281 | 4.420 | 13.900 | 556 | 3,406 |
| 2001 | 3 | 17.725 | 4.318 | 4.683 | 4,062 | 23,266 | 4.390 | 6.350 | 13.900 | 579 | 3,430 |
| 2001 | 4 | 17.725 | 4.381 | 4.560 | 4,412 | 24,762 | 4.584 | 9.429 | 13.900 | 591 | 3,289 |
| Average | | 62.407 | 5.571 | 6.407 | 2,608 | 15,504 | 6.124 | 8.217 | 13.911 | 299 | 1,507 |

**Table 11: Medicaid Spending on Complaint NDCs by State, NDC, and Yr-Quarter: CMS SDUD Data**

|  | A. Breakdown by State | | | B. Breakdown by NDC | | | C. Breakdown by Year-Quarter | | |
|---|---|---|---|---|---|---|---|---|---|
| State | # Scripts | Paid | Cumulative | NDC | # Scripts | Paid | YrQuart | # Scripts | Paid |
| Florida | 316,734 | $16,483 | 11.23% | | | | | | |
| Illinois | 505,076 | $15,861 | 22.03% | | | | | | |
| California | 321,277 | $10,002 | 28.84% | | | | | | |
| New Jersey | 139,805 | $9,642 | 35.41% | 74653301 | 182,481 | $38,951 | 1991,1 | 13,210 | $434 |
| New York | 121,068 | $8,748 | 41.36% | 74613802 | 374,208 | $13,584 | 1991,2 | 20,900 | $685 |
| Indiana | 127,132 | $8,146 | 46.91% | 74650901 | 39,220 | $10,385 | 1991,3 | 34,655 | $927 |
| Kentucky | 127,921 | $7,402 | 51.95% | 74196607 | 778,607 | $8,716 | 1991,4 | 34,865 | $908 |
| Missouri | 138,074 | $7,337 | 56.95% | 74713809 | 255,610 | $7,208 | 1992,1 | 34,270 | $906 |
| Ohio | 292,317 | $5,836 | 60.92% | 74710123 | 64,826 | $6,190 | 1992,2 | 35,978 | $1,290 |
| Michigan | 103,552 | $4,903 | 64.26% | 74792609 | 105,075 | $4,733 | 1992,3 | 37,990 | $1,297 |
| North Carolina | 45,070 | $4,294 | 67.19% | 74433201 | 33,622 | $4,690 | 1992,4 | 38,286 | $1,315 |
| Louisiana | 85,309 | $4,257 | 70.09% | 74713909 | 52,609 | $4,133 | 1993,1 | 42,392 | $1,463 |
| Georgia | 36,571 | $3,251 | 72.30% | 74798437 | 55,808 | $3,702 | 1993,2 | 40,470 | $1,564 |
| Pennsylvania | 50,642 | $2,920 | 74.29% | 74613822 | 67,325 | $3,518 | 1993,3 | 59,323 | $2,113 |
| Arkansas | 32,738 | $2,724 | 76.14% | 74488810 | 134,236 | $3,174 | 1993,4 | 50,251 | $1,973 |
| Virginia | 63,736 | $2,599 | 77.91% | 74613803 | 128,338 | $2,890 | 1994,1 | 52,659 | $2,060 |
| Wisconsin | 72,254 | $2,574 | 79.67% | 74798302 | 74,818 | $2,870 | 1994,2 | 48,521 | $1,919 |
| Washington | 57,647 | $2,510 | 81.38% | 74798309 | 87,971 | $2,832 | 1994,3 | 52,118 | $2,150 |
| Alabama | 38,912 | $2,138 | 82.83% | 74613902 | 20,567 | $2,629 | 1994,4 | 54,720 | $2,259 |
| Texas | 73,856 | $2,110 | 84.27% | 74653501 | 22,451 | $2,534 | 1995,1 | 44,948 | $2,162 |
| Connecticut | 34,487 | $1,972 | 85.61% | 74710113 | 25,526 | $1,902 | 1995,2 | 49,043 | $1,890 |
| Massachusetts | 39,652 | $1,931 | 86.93% | 74792337 | 34,284 | $1,849 | 1995,3 | 59,633 | $2,658 |
| Mississippi | 18,000 | $1,893 | 88.22% | 74488710 | 176,093 | $1,835 | 1995,4 | 62,883 | $2,652 |
| Colorado | 34,121 | $1,794 | 89.44% | 74798436 | 26,164 | $1,736 | 1996,1 | 68,637 | $2,918 |
| South Carolina | 19,958 | $1,792 | 90.66% | 74790209 | 17,929 | $1,260 | 1996,2 | 78,644 | $3,726 |
| Maryland | 65,977 | $1,736 | 91.84% | 74792202 | 31,171 | $1,205 | 1996,3 | 85,986 | $4,110 |
| Oklahoma | 41,966 | $1,619 | 92.94% | 74798509 | 43,579 | $1,189 | 1996,4 | 78,475 | $3,589 |
| West Virginia | 16,417 | $1,283 | 93.82% | 74792209 | 34,065 | $1,152 | 1997,1 | 76,145 | $3,825 |
| Minnesota | 43,115 | $1,197 | 94.63% | 74710023 | 15,326 | $1,054 | 1997,2 | 84,210 | $3,956 |
| Oregon | 25,233 | $1,028 | 95.33% | 74792336 | 18,157 | $964 | 1997,3 | 87,815 | $4,671 |
| Utah | 26,399 | $887 | 95.94% | 74613903 | 12,615 | $876 | 1997,4 | 85,831 | $4,732 |
| Nevada | 6,103 | $824 | 96.50% | 74798303 | 26,805 | $869 | 1998,1 | 89,283 | $4,643 |
| Nebraska | 20,129 | $760 | 97.02% | 74710102 | 20,672 | $839 | 1998,2 | 98,936 | $5,590 |
| Kansas | 21,261 | $615 | 97.43% | 74794109 | 17,841 | $816 | 1998,3 | 97,095 | $5,239 |
| Iowa | 18,158 | $602 | 97.84% | 74712007 | 11,697 | $774 | 1998,4 | 96,617 | $5,283 |
| South Dakota | 11,234 | $437 | 98.14% | 74488720 | 44,285 | $707 | 1999,1 | 100,876 | $5,275 |
| Rhode Island | 6,408 | $415 | 98.42% | 74710013 | 9,289 | $676 | 1999,2 | 106,919 | $5,571 |
| Hawaii | 11,708 | $328 | 98.65% | 74488820 | 35,281 | $670 | 1999,3 | 102,534 | $5,504 |
| Montana | 7,289 | $327 | 98.87% | 74397703 | 79,503 | $521 | 1999,4 | 106,528 | $6,268 |
| Maine | 5,548 | $300 | 99.07% | 74613922 | 3,816 | $507 | 2000,1 | 120,348 | $5,993 |
| Wyoming | 4,895 | $256 | 99.25% | 74797205 | 15,402 | $503 | 2000,2 | 101,324 | $6,234 |
| Tennessee | 6,327 | $244 | 99.41% | 74799009 | 20,819 | $456 | 2000,3 | 108,688 | $5,462 |
| Delaware | 5,276 | $244 | 99.58% | 74792409 | 9,068 | $419 | 2000,4 | 116,861 | $5,753 |
| North Dakota | 3,571 | $210 | 99.72% | 74797305 | 4,592 | $378 | 2001,1 | 128,975 | $6,218 |
| Idaho | 1,234 | $103 | 99.79% | 74792203 | 10,625 | $358 | 2001,2 | 128,372 | $4,552 |
| New Hampshire | 2,733 | $84 | 99.85% | 74653401 | 4,877 | $308 | 2001,3 | 113,993 | $2,543 |
| New Mexico | 2,093 | $62 | 99.89% | 74488750 | 27,099 | $276 | 2001,4 | 124,145 | $2,555 |
| Alaska | 2,579 | $61 | 99.94% | | | | | | |
| Vermont | 1,433 | $51 | 99.97% | | | | | | |
| Washington, D.C. | 1,357 | $44 | 100.00% | | | | | | |
| Total | 3,254,352 | $146,837 | 100.00% | Total | 3,254,352 | $146,837 | Total | 3,254,352 | $146,837 |

Dollar amounts are in thousands of dollars.

**Table 12A: Comparison of CMS State Drug Utilization and MAX Claims Data: 1999-2001**

| State | State Drug Utilization Data | | | MAX Data | | | |
| | Paid (in $1000) | Scripts | # Quarters | Paid (in $1000) | Claims | # Quarters | % Paid Diff |
|---|---|---|---|---|---|---|---|
| IL | $5,485.12 | 167,756 | 12 | $5,340.28 | 175,249 | 12 | -2.6% |
| FL | $5,471.85 | 113,919 | 12 | $5,237.22 | 113,190 | 12 | -4.3% |
| IN | $4,686.27 | 64,755 | 12 | $6,021.49 | 73,935 | 12 | 28.5% |
| CA | $4,383.94 | 136,390 | 12 | $4,018.46 | 135,419 | 12 | -8.3% |
| NY | $4,324.84 | 63,337 | 12 | $4,016.00 | 62,661 | 12 | -7.1% |
| MO | $3,354.55 | 59,210 | 12 | $3,175.30 | 56,940 | 12 | -5.3% |
| KY | $3,017.40 | 48,700 | 12 | $2,919.16 | 48,415 | 12 | -3.3% |
| OH | $2,980.96 | 150,555 | 12 | $2,879.90 | 147,091 | 12 | -3.4% |
| NC | $2,750.40 | 26,571 | 11 | $2,826.31 | 27,754 | 12 | 2.8% |
| NJ | $2,510.36 | 40,582 | 12 | $2,365.12 | 42,450 | 12 | -5.8% |
| LA | $2,161.75 | 42,139 | 12 | $2,078.44 | 42,010 | 12 | -3.9% |
| MI | $2,032.19 | 35,790 | 11 | $2,150.61 | 39,020 | 12 | 5.8% |
| GA | $1,619.16 | 19,596 | 12 | $1,596.61 | 19,825 | 12 | -1.4% |
| MA | $1,316.56 | 25,700 | 12 | $1,316.90 | 25,179 | 12 | 0.0% |
| PA | $1,281.94 | 28,601 | 11 | $1,327.47 | 28,386 | 12 | 3.6% |
| VA | $1,219.91 | 22,929 | 12 | $1,153.62 | 21,471 | 12 | -5.4% |
| AR | $1,185.05 | 12,917 | 11 | $1,250.22 | 13,867 | 12 | 5.5% |
| WI | $1,051.20 | 29,228 | 12 | $972.62 | 28,637 | 12 | -7.5% |
| AL | $978.26 | 20,453 | 12 | $972.87 | 20,989 | 12 | -0.6% |
| CT | $953.12 | 17,134 | 12 | $905.26 | 16,473 | 12 | -5.0% |
| WA | $945.54 | 21,015 | 12 | $885.64 | 20,957 | 12 | -6.3% |
| MS | $941.88 | 7,280 | 8 | $1,406.04 | 10,837 | 12 | 49.3% |
| OK | $862.19 | 21,922 | 12 | $891.93 | 20,906 | 12 | 3.5% |
| WV | $815.15 | 8,908 | 11 | $865.36 | 9,557 | 12 | 6.2% |
| CO | $762.92 | 16,328 | 11 | $1,090.13 | 16,545 | 12 | 42.9% |
| TX | $725.44 | 38,942 | 12 | $711.04 | 27,663 | 12 | -2.0% |
| NV | $497.00 | 3,502 | 12 | $420.03 | 3,332 | 12 | -15.5% |
| MN | $392.41 | 12,526 | 11 | $403.22 | 16,277 | 12 | 2.8% |
| MD | $316.19 | 18,579 | 12 | $453.99 | 24,933 | 12 | 43.6% |
| SC | $288.23 | 16,641 | 12 | $400.65 | 2,979 | 12 | 39.0% |
| NE | $275.65 | 6,645 | 12 | $258.15 | 6,626 | 12 | -6.3% |
| IA | $260.53 | 4,527 | 6 | $523.38 | 9,021 | 12 | 100.9% |
| UT | $250.17 | 9,008 | 11 | $289.34 | 10,098 | 12 | 15.7% |
| OR | $233.98 | 5,387 | 12 | $220.14 | 5,363 | 12 | -5.9% |
| KS | $175.49 | 7,968 | 10 | $211.33 | 9,365 | 12 | 20.4% |
| RI | $173.77 | 2,783 | 12 | $165.26 | 2,822 | 12 | -4.9% |
| WY | $171.61 | 2,739 | 12 | $174.61 | 2,890 | 12 | 1.7% |
| SD | $166.76 | 3,418 | 12 | $173.16 | 3,716 | 12 | 3.8% |
| ME | $158.85 | 2,993 | 12 | $154.59 | 3,036 | 12 | -2.7% |
| MT | $127.53 | 2,646 | 12 | $126.37 | 2,908 | 12 | -0.9% |
| TN | $127.51 | 5,409 | 6 | $0.17 | 6,941 | 12 | -99.9% |
| DE | $112.25 | 2,921 | 12 | $185.19 | 4,207 | 12 | 65.0% |
| HI | $112.13 | 4,862 | 11 | $55.66 | 3,997 | 12 | -50.4% |
| ND | $110.56 | 1,339 | 8 | $106.77 | 1,342 | 12 | -3.4% |
| ID | $41.80 | 999 | 12 | $38.19 | 1,029 | 12 | -8.6% |
| NH | $29.54 | 775 | 11 | $56.26 | 1,403 | 12 | 90.4% |
| VT | $25.99 | 808 | 12 | $35.15 | 1,270 | 12 | 35.2% |
| NM | $25.56 | 1,043 | 11 | $27.56 | 1,089 | 12 | 7.8% |
| AK | $19.04 | 1,025 | 12 | $17.87 | 926 | 12 | -6.1% |
| DC | $18.25 | 363 | 12 | $23.46 | 466 | 12 | 28.5% |
| AZ | $0.00 | 0 | 0 | $41.36 | 4,691 | 12 | - |
| Total | $61,928.72 | 1,359,563 | - | $62,935.84 | 1,376,153 | - | 1.6% |

**Table 12B: Comparison of CMS State Drug Utilization and SMRF Claims Data: 1996-1998**

| State | State Drug Utilization Data | | | SMRF Data | | | |
| | Paid (in $1000) | Scripts | # Quarters | Paid (in $1000) | Claims | # Quarters | % Paid Diff |
|---|---|---|---|---|---|---|---|
| FL | $7,240.46 | 107,044 | 12 | $7,432.02 | 110,743 | 12 | 2.6% |
| IL | $6,316.94 | 163,101 | 12 | | | | |
| CA | $3,961.35 | 121,906 | 12 | $2,657.78 | 84,252 | 8 | -32.9% |
| NY | $3,285.97 | 35,997 | 12 | | | | |
| KY | $2,880.53 | 43,997 | 12 | $2,762.16 | 41,990 | 12 | -4.1% |
| NJ | $2,877.07 | 41,878 | 12 | $3,024.58 | 42,869 | 12 | 5.1% |
| MO | $2,291.49 | 42,727 | 12 | $2,413.80 | 44,893 | 12 | 5.3% |
| MI | $2,191.23 | 42,131 | 12 | $2,215.45 | 41,273 | 12 | 1.1% |
| IN | $1,664.95 | 17,958 | 4 | $6,737.56 | 64,141 | 12 | 304.7% |
| OH | $1,629.47 | 76,950 | 10 | | | | |
| LA | $1,463.03 | 28,976 | 12 | | | | |
| GA | $1,144.23 | 11,328 | 12 | $1,275.76 | 12,653 | 12 | 11.5% |
| PA | $1,074.61 | 14,739 | 12 | $1,118.56 | 15,164 | 12 | 4.1% |
| AR | $1,072.77 | 12,472 | 11 | $1,121.55 | 13,466 | 12 | 4.5% |
| NC | $1,019.93 | 12,663 | 10 | | | | |
| WA | $981.13 | 22,405 | 12 | $962.71 | 21,723 | 12 | -1.9% |
| SC | $899.35 | 1,972 | 12 | | | | |
| WI | $818.20 | 22,542 | 12 | $858.95 | 23,101 | 12 | 5.0% |
| TX | $781.44 | 19,629 | 12 | | | | |
| AL | $780.57 | 11,629 | 12 | | | | |
| VA | $778.57 | 20,532 | 12 | | | | |
| CT | $761.21 | 10,824 | 12 | | | | |
| MS | $708.88 | 6,414 | 12 | $903.70 | 8,554 | 12 | 27.5% |
| CO | $658.38 | 10,184 | 9 | $844.34 | 13,299 | 12 | 28.2% |
| MD | $630.25 | 22,910 | 12 | | | | |
| OK | $597.36 | 14,978 | 12 | | | | |
| MA | $537.91 | 11,424 | 12 | | | | |
| WV | $372.45 | 5,333 | 12 | | | | |
| UT | $363.11 | 8,654 | 12 | $366.34 | 8,584 | 12 | 0.9% |
| MN | $348.97 | 13,319 | 12 | $377.00 | 12,749 | 12 | 8.0% |
| OR | $256.16 | 5,585 | 12 | | | | |
| KS | $245.35 | 7,404 | 10 | $302.70 | 8,732 | 12 | 23.4% |
| NE | $222.85 | 7,757 | 11 | | | | |
| NV | $197.58 | 1,343 | 9 | | | | |
| RI | $191.31 | 2,703 | 11 | | | | |
| HI | $158.52 | 3,793 | 12 | | | | |
| SD | $152.06 | 3,760 | 12 | | | | |
| MT | $145.56 | 2,674 | 12 | $148.16 | 2,495 | 12 | 1.8% |
| IA | $143.68 | 7,410 | 11 | $363.06 | 7,947 | 12 | 152.7% |
| ME | $107.37 | 1,808 | 12 | $104.60 | 1,706 | 12 | -2.6% |
| DE | $72.36 | 1,131 | 11 | $76.98 | 1,257 | 12 | 6.4% |
| WY | $70.49 | 1,532 | 12 | $117.95 | 1,553 | 12 | 67.3% |
| ND | $63.46 | 1,141 | 12 | $68.17 | 1,164 | 12 | 7.4% |
| NM | $28.30 | 597 | 12 | $27.28 | 590 | 12 | -3.6% |
| ID | $23.52 | 150 | 10 | $27.04 | 180 | 12 | 14.9% |
| AK | $23.20 | 809 | 12 | $23.41 | 806 | 12 | 0.9% |
| NH | $21.38 | 876 | 9 | $22.14 | 1,163 | 12 | 3.5% |
| DC | $15.69 | 397 | 11 | | | | |
| VT | $13.58 | 188 | 11 | $20.64 | 309 | 12 | 52.0% |
| Total-Partial | $31,235.62 | 565,418 | - | $36,374.37 | 587,356 | - | 16.5% |
| Total-All | $52,284.25 | 1,027,674 | - | - | - | - | - |

**Table 12C: Comparison of CMS State Drug Utilization and SMRF Claims Data: 1991-1995**

| State | State Drug Utilization Data | | | SMRF Data | | | |
|---|---|---|---|---|---|---|---|
| | Paid (in $1000) | Scripts | # Quarters | Paid (in $1000) | Claims | # Quarters | % Paid Diff |
| NJ | $4,255.06 | 57,345 | 20 | $3,249.11 | 42,780 | 16 | -23.6% |
| IL | $4,058.98 | 174,219 | 17 | | | | |
| FL | $3,770.69 | 95,771 | 19 | $2,560.08 | 58,686 | 8 | -32.1% |
| IN | $1,795.14 | 44,419 | 18 | $2,049.26 | 44,766 | 16 | 14.2% |
| MO | $1,690.57 | 36,137 | 19 | $1,759.96 | 37,910 | 16 | 4.1% |
| CA | $1,656.31 | 62,981 | 20 | $1,429.15 | 42,869 | 12 | -13.7% |
| KY | $1,504.35 | 35,224 | 20 | $1,465.80 | 32,519 | 16 | -2.6% |
| OH | $1,225.97 | 64,812 | 19 | | | | |
| NY | $1,137.30 | 21,734 | 18 | | | | |
| MD | $789.16 | 24,488 | 20 | | | | |
| WI | $704.97 | 20,484 | 20 | $627.33 | 18,298 | 16 | -11.0% |
| MI | $679.74 | 25,631 | 19 | $677.22 | 18,152 | 8 | -0.4% |
| LA | $631.91 | 14,194 | 19 | | | | |
| SC | $604.16 | 1,345 | 20 | | | | |
| TX | $603.57 | 15,285 | 20 | | | | |
| VA | $600.85 | 20,275 | 20 | | | | |
| WA | $583.32 | 14,227 | 18 | $556.66 | 13,837 | 16 | -4.6% |
| PA | $563.75 | 7,302 | 20 | $554.60 | 7,472 | 16 | -1.6% |
| OR | $537.74 | 14,261 | 20 | | | | |
| NC | $523.93 | 5,836 | 20 | | | | |
| GA | $487.28 | 5,647 | 20 | $493.93 | 6,092 | 12 | 1.4% |
| AR | $465.85 | 7,349 | 20 | $489.14 | 7,228 | 16 | 5.0% |
| MN | $455.88 | 17,270 | 20 | $270.13 | 8,613 | 12 | -40.7% |
| AL | $379.65 | 6,830 | 20 | $411.92 | 7,700 | 18 | 8.5% |
| CO | $372.81 | 7,609 | 16 | $325.43 | 5,793 | 8 | -12.7% |
| UT | $273.51 | 8,737 | 18 | $234.27 | 8,452 | 16 | -14.3% |
| NE | $261.87 | 5,727 | 17 | | | | |
| CT | $257.79 | 6,529 | 20 | | | | |
| MS | $241.73 | 4,306 | 18 | $245.39 | 3,921 | 12 | 1.5% |
| IA | $197.39 | 6,221 | 18 | $168.28 | 5,954 | 16 | -14.8% |
| KS | $193.76 | 5,889 | 16 | $274.93 | 7,819 | 16 | 41.9% |
| OK | $159.04 | 5,066 | 20 | | | | |
| NV | $129.87 | 1,258 | 20 | | | | |
| SD | $117.71 | 4,056 | 20 | | | | |
| TN | $116.41 | 918 | 12 | | | | |
| WV | $95.55 | 2,176 | 19 | | | | |
| MA | $76.38 | 2,528 | 19 | | | | |
| DE | $59.18 | 1,224 | 19 | $42.85 | 919 | 12 | -27.6% |
| HI | $56.96 | 3,053 | 18 | $17.09 | 1,312 | 9 | -70.0% |
| MT | $54.00 | 1,969 | 20 | $46.54 | 1,804 | 16 | -13.8% |
| RI | $50.21 | 922 | 16 | $55.42 | 738 | 4 | 10.4% |
| ID | $38.05 | 85 | 13 | | | | |
| ND | $36.03 | 1,091 | 20 | $32.47 | 967 | 16 | -9.9% |
| ME | $34.18 | 747 | 20 | $101.17 | 675 | 16 | 196.0% |
| NH | $33.46 | 1,082 | 20 | $33.81 | 1,045 | 16 | 1.0% |
| AK | $19.06 | 745 | 20 | $18.56 | 729 | 16 | -2.7% |
| WY | $13.85 | 624 | 18 | $68.69 | 834 | 16 | 396.1% |
| VT | $11.67 | 437 | 19 | $8.29 | 247 | 16 | -29.0% |
| DC | $9.95 | 597 | 20 | | | | |
| NM | $7.92 | 453 | 16 | | | | |
| Partial-Total | $20,640.33 | 481,273 | | $18,267.45 | 388,131 | - | -11.5% |
| Total | $32,624.44 | 867,115 | - | | | | |

**Table 13A: Breakdown of Illinois Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 79,726 | $430,761 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,539 | $16,038 | 1991 | 2 | 11,138 | $147,748 |
| 74433201 | 3,757 | $342,674 | 1991 | 3 | 10,375 | $120,166 |
| 74488710 | 18,860 | $199,309 | 1991 | 4 | 9,164 | $129,952 |
| 74488720 | 3,614 | $42,505 | 1992 | 1 | 9,636 | $145,466 |
| 74488750 | 3,791 | $30,813 | 1992 | 2 | 9,410 | $151,165 |
| 74488810 | 21,730 | $362,477 | 1992 | 3 | 9,791 | $168,957 |
| 74488820 | 4,280 | $95,067 | 1992 | 4 | 10,106 | $197,484 |
| 74613802 | 135,146 | $2,342,979 | 1993 | 1 | 12,651 | $298,538 |
| 74613803 | 50,875 | $629,083 | 1993 | 2 | 13,056 | $307,918 |
| 74613822 | 32,934 | $545,838 | 1993 | 3 | 14,342 | $355,775 |
| 74613902 | 512 | $18,318 | 1993 | 4 | 10,501 | $322,476 |
| 74613903 | 431 | $16,917 | 1994 | 1 | 9,759 | $292,113 |
| 74613922 | 93 | $13,034 | 1994 | 2 | 9,220 | $272,849 |
| 74650901 | 4,920 | $1,383,826 | 1994 | 3 | 8,669 | $263,141 |
| 74653301 | 27,692 | $4,186,597 | 1994 | 4 | 8,823 | $293,907 |
| 74653401 | 413 | $17,899 | 1995 | 1 | 9,811 | $326,904 |
| 74653501 | 4,343 | $254,654 | 1995 | 2 | 10,065 | $350,192 |
| 74710013 | 418 | $29,217 | 1995 | 3 | 9,731 | $324,270 |
| 74710023 | 1,073 | $89,465 | 1995 | 4 | 10,431 | $381,397 |
| 74710102 | 3,126 | $111,724 | 1996 | 1 | 10,846 | $392,798 |
| 74710113 | 7,995 | $316,687 | 1996 | 2 | 11,151 | $458,808 |
| 74710123 | 8,296 | $782,167 | 1996 | 3 | 12,919 | $513,288 |
| 74712007 | 7,780 | $561,971 | 1996 | 4 | 12,760 | $511,253 |
| 74713809 | 28,747 | $848,189 | 1997 | 1 | 12,796 | $480,631 |
| 74713909 | 7,433 | $256,177 | 1997 | 2 | 13,199 | $526,359 |
| 74790209 | 1,209 | $59,432 | 1997 | 3 | 13,352 | $526,154 |
| 74792202 | 3,235 | $114,597 | 1997 | 4 | 13,408 | $526,291 |
| 74792203 | 1,023 | $36,161 | 1998 | 1 | 13,732 | $547,575 |
| 74792209 | 3,270 | $98,727 | 1998 | 2 | 13,673 | $558,440 |
| 74792336 | 2,328 | $84,577 | 1998 | 3 | 18,112 | $682,827 |
| 74792337 | 4,634 | $205,537 | 1998 | 4 | 18,478 | $702,324 |
| 74792409 | 908 | $33,517 | 1999 | 1 | 16,025 | $651,443 |
| 74792609 | 13,096 | $530,409 | 1999 | 2 | 15,946 | $694,784 |
| 74794109 | 1,968 | $78,066 | 1999 | 3 | 15,362 | $694,007 |
| 74797205 | 1,008 | $30,994 | 1999 | 4 | 14,442 | $646,554 |
| 74797305 | 546 | $6,771 | 2000 | 1 | 14,782 | $698,474 |
| 74798302 | 9,345 | $292,364 | 2000 | 2 | 15,115 | $474,921 |
| 74798303 | 2,437 | $65,477 | 2000 | 3 | 13,330 | $290,705 |
| 74798309 | 12,743 | $364,546 | 2000 | 4 | 14,219 | $311,912 |
| 74798436 | 4,028 | $183,839 | 2001 | 1 | 14,325 | $285,880 |
| 74798437 | 7,137 | $342,753 | 2001 | 2 | 13,358 | $202,601 |
| 74798509 | 2,022 | $73,793 | 2001 | 3 | 13,363 | $175,693 |
| 74799009 | 4,032 | $63,500 | 2001 | 4 | 14,121 | $185,308 |
| Total | 535,493 | $16,589,445 | Total | | 535,493 | $16,589,445 |

**Table 13B: The Impact of Alternative Price Statistics on Medicaid Spending in Illinois**

| Price Statistic Used | # w/DIFF > 0 | % w/DIFF > 0 | Aggregate DIFF | # Pharm. Payments |
|---|---|---|---|---|
| Average Pharmacy | 521,338 | 97.60% | $12,528,320 | 58,891 |
| Average All Customer | 521,918 | 97.70% | $12,781,370 | 58,994 |
| Average Pharmacy Unweighted | 520,839 | 97.50% | $12,434,203 | 58,845 |
| 95th Percentile Pharmacy Price | 519,198 | 97.19% | $11,933,859 | 58,638 |
| 1.25 * Average Pharmacy | 519,450 | 97.24% | $12,029,039 | 58,631 |

**Table 14A: Breakdown of Florida Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 68,253 | $970,751 | 1991 | 1 | 1 | $11 |
| 74397703 | 7,738 | $54,562 | 1991 | 2 | 1 | $13 |
| 74433201 | 2,420 | $408,281 | 1991 | 3 | 0 | $0 |
| 74488710 | 13,524 | $164,386 | 1991 | 4 | 2 | $94 |
| 74488720 | 5,200 | $102,732 | 1992 | 1 | 3 | $96 |
| 74488750 | 2,260 | $24,552 | 1992 | 2 | 4 | $138 |
| 74488810 | 4,580 | $130,051 | 1992 | 3 | 5 | $134 |
| 74488820 | 3,252 | $70,290 | 1992 | 4 | 41 | $851 |
| 74613802 | 56,430 | $2,158,183 | 1993 | 1 | 183 | $5,604 |
| 74613803 | 8,081 | $227,864 | 1993 | 2 | 387 | $17,478 |
| 74613822 | 153 | $5,366 | 1993 | 3 | 961 | $47,502 |
| 74613902 | 1,025 | $54,745 | 1993 | 4 | 6,148 | $255,153 |
| 74613903 | 893 | $79,232 | 1994 | 1 | 7,219 | $285,736 |
| 74613922 | 61 | $2,130 | 1994 | 2 | 7,649 | $313,422 |
| 74650901 | 3,310 | $560,850 | 1994 | 3 | 7,881 | $317,176 |
| 74653301 | 15,712 | $3,120,851 | 1994 | 4 | 7,237 | $315,478 |
| 74653401 | 329 | $28,862 | 1995 | 1 | 7,125 | $323,508 |
| 74653501 | 1,953 | $232,486 | 1995 | 2 | 7,117 | $318,124 |
| 74710013 | 1,024 | $142,757 | 1995 | 3 | 7,349 | $342,809 |
| 74710023 | 1,819 | $143,363 | 1995 | 4 | 7,681 | $378,283 |
| 74710102 | 1,578 | $114,060 | 1996 | 1 | 7,994 | $398,554 |
| 74710113 | 1,025 | $115,255 | 1996 | 2 | 8,983 | $461,071 |
| 74710123 | 4,500 | $645,821 | 1996 | 3 | 9,438 | $568,627 |
| 74712007 | 9 | $627 | 1996 | 4 | 8,940 | $592,667 |
| 74713809 | 13,997 | $635,819 | 1997 | 1 | 8,284 | $594,485 |
| 74713909 | 8,648 | $1,872,961 | 1997 | 2 | 8,666 | $661,227 |
| 74790209 | 1,306 | $129,139 | 1997 | 3 | 8,920 | $709,839 |
| 74792202 | 4,949 | $210,763 | 1997 | 4 | 9,483 | $788,968 |
| 74792203 | 1,637 | $67,356 | 1998 | 1 | 9,264 | $694,939 |
| 74792209 | 1,944 | $85,112 | 1998 | 2 | 9,572 | $714,971 |
| 74792336 | 1,256 | $85,285 | 1998 | 3 | 10,744 | $682,912 |
| 74792337 | 6,226 | $300,033 | 1998 | 4 | 11,529 | $672,349 |
| 74792409 | 292 | $18,216 | 1999 | 1 | 8,877 | $525,601 |
| 74792609 | 8,181 | $497,363 | 1999 | 2 | 8,240 | $490,093 |
| 74794109 | 1,391 | $82,875 | 1999 | 3 | 7,316 | $511,900 |
| 74797205 | 942 | $22,655 | 1999 | 4 | 8,175 | $628,026 |
| 74797305 | 52 | $1,988 | 2000 | 1 | 9,359 | $629,261 |
| 74798302 | 9,528 | $451,196 | 2000 | 2 | 8,860 | $491,719 |
| 74798303 | 4,587 | $218,481 | 2000 | 3 | 10,411 | $434,982 |
| 74798309 | 6,634 | $221,799 | 2000 | 4 | 10,693 | $419,219 |
| 74798436 | 2,393 | $230,863 | 2001 | 1 | 10,832 | $406,467 |
| 74798437 | 8,490 | $835,329 | 2001 | 2 | 9,836 | $256,425 |
| 74798509 | 2,556 | $112,184 | 2001 | 3 | 9,908 | $204,734 |
| 74799009 | 1,438 | $27,680 | 2001 | 4 | 10,258 | $204,509 |
| Total | 291,576 | $15,665,151 | | Total | 291,576 | $15,665,151 |

Includes Florida Medicaid claims with one of the 44 complaint NDCs and with a service date between January 1, 1991 and December 31, 2001 inclusive.

**Table 14B: Florida SDUD Medicaid Spending by NDC and Year-Quarter through 1993Q3**

*Breakdown by National Drug Code*  　　　　*Breakdown by Service Year and Quarter*

| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
|---|---|---|---|---|---|---|
| 74196607 | 3,735 | $59,612 | 1991 | 1 | 1,337 | $38,945 |
| 74397703 | 775 | $4,941 | 1991 | 2 | 2,280 | $69,328 |
| 74433201 | 189 | $41,015 | 1991 | 3 | 2,645 | $80,938 |
| 74488710 | 2,605 | $35,569 | 1991 | 4 | 3,026 | $95,855 |
| 74488720 | 415 | $7,023 | 1992 | 1 | 3,675 | $110,461 |
| 74488750 | 162 | $1,200 | 1992 | 2 | 3,572 | $113,078 |
| 74488810 | 638 | $12,338 | 1992 | 3 | 3,866 | $138,960 |
| 74488820 | 297 | $10,160 | 1992 | 4 | 3,538 | $139,658 |
| 74613802 | 16,339 | $573,636 | 1993 | 1 | 4,811 | $164,453 |
| 74613803 | 4,990 | $99,939 | 1993 | 2 | 5,822 | $214,937 |
| 74613822 | 0 | $0 | 1993 | 3 | 5,290 | $212,706 |
| 74613902 | 122 | $3,475 | | | | |
| 74613903 | 538 | $47,097 | | | | |
| 74613922 | 0 | $0 | | | | |
| 74650901 | 18 | $4,138 | | | | |
| 74653301 | 297 | $118,239 | | | | |
| 74653401 | 0 | $0 | | | | |
| 74653501 | 0 | $0 | | | | |
| 74710013 | 21 | $1,994 | | | | |
| 74710023 | 24 | $3,139 | | | | |
| 74710102 | 667 | $13,615 | | | | |
| 74710113 | 97 | $11,649 | | | | |
| 74710123 | 251 | $34,876 | | | | |
| 74712007 | 0 | $0 | | | | |
| 74713809 | 4,558 | $93,869 | | | | |
| 74713909 | 759 | $104,605 | | | | |
| 74790209 | 37 | $3,280 | | | | |
| 74792202 | 218 | $9,325 | | | | |
| 74792203 | 202 | $4,251 | | | | |
| 74792209 | 122 | $3,389 | | | | |
| 74792336 | 0 | $0 | | | | |
| 74792337 | 0 | $0 | | | | |
| 74792409 | 34 | $918 | | | | |
| 74792609 | 229 | $10,729 | | | | |
| 74794109 | 34 | $2,019 | | | | |
| 74797205 | 276 | $3,742 | | | | |
| 74797305 | 1 | $18 | | | | |
| 74798302 | 558 | $24,665 | | | | |
| 74798303 | 312 | $13,621 | | | | |
| 74798309 | 232 | $7,333 | | | | |
| 74798436 | 14 | $4,436 | | | | |
| 74798437 | 38 | $7,072 | | | | |
| 74798509 | 47 | $2,214 | | | | |
| 74799009 | 11 | $178 | | | | |
| Total | 39,862 | $1,379,319 | | Total | 39,862 | $1,379,319 |

**Table 15A: Breakdown of California Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 152,833 | $2,061,844 | 1991 | 1 | 0 | $0 |
| 74397703 | 10,271 | $76,968 | 1991 | 2 | 0 | $0 |
| 74433201 | 719 | $118,099 | 1991 | 3 | 0 | $0 |
| 74488710 | 15,387 | $192,451 | 1991 | 4 | 0 | $0 |
| 74488720 | 298 | $4,827 | 1992 | 1 | 0 | $0 |
| 74488750 | 766 | $7,173 | 1992 | 2 | 0 | $0 |
| 74488810 | 34,116 | $1,198,612 | 1992 | 3 | 0 | $0 |
| 74488820 | 478 | $9,785 | 1992 | 4 | 0 | $0 |
| 74613802 | 14,166 | $1,222,712 | 1993 | 1 | 0 | $0 |
| 74613803 | 4,968 | $151,491 | 1993 | 2 | 1 | $32 |
| 74613822 | 499 | $19,844 | 1993 | 3 | 3 | $135 |
| 74613902 | 23 | $2,327 | 1993 | 4 | 21 | $1,162 |
| 74613903 | 18 | $246 | 1994 | 1 | 840 | $24,225 |
| 74613922 | 6 | $788 | 1994 | 2 | 5,112 | $166,019 |
| 74650901 | 242 | $59,204 | 1994 | 3 | 5,425 | $170,983 |
| 74653301 | 4,163 | $949,830 | 1994 | 4 | 5,370 | $178,631 |
| 74653401 | 99 | $20,384 | 1995 | 1 | 5,496 | $181,510 |
| 74653501 | 705 | $88,932 | 1995 | 2 | 6,215 | $214,223 |
| 74710013 | 779 | $78,838 | 1995 | 3 | 6,917 | $228,539 |
| 74710023 | 136 | $11,647 | 1995 | 4 | 7,225 | $253,934 |
| 74710102 | 246 | $17,591 | 1996 | 1 | 8,138 | $244,400 |
| 74710113 | 1,924 | $221,895 | 1996 | 2 | 8,606 | $263,652 |
| 74710123 | 895 | $136,707 | 1996 | 3 | 9,112 | $282,929 |
| 74712007 | 14 | $856 | 1996 | 4 | 10,390 | $315,292 |
| 74713809 | 21,649 | $947,419 | 1997 | 1 | 10,364 | $318,936 |
| 74713909 | 456 | $46,483 | 1997 | 2 | 10,280 | $330,893 |
| 74790209 | 2,434 | $168,999 | 1997 | 3 | 10,732 | $341,521 |
| 74792202 | 663 | $34,161 | 1997 | 4 | 11,579 | $346,852 |
| 74792203 | 377 | $20,266 | 1998 | 1 | 11,779 | $357,745 |
| 74792209 | 1,687 | $69,943 | 1998 | 2 | 11,120 | $342,932 |
| 74792336 | 665 | $38,155 | 1998 | 3 | 10,641 | $316,459 |
| 74792337 | 1,417 | $121,394 | 1998 | 4 | 11,186 | $326,576 |
| 74792409 | 586 | $29,330 | 1999 | 1 | 11,015 | $321,507 |
| 74792609 | 7,609 | $378,402 | 1999 | 2 | 11,110 | $362,903 |
| 74794109 | 1,662 | $93,371 | 1999 | 3 | 10,767 | $386,159 |
| 74797205 | 2,274 | $117,248 | 1999 | 4 | 10,881 | $391,117 |
| 74797305 | 23 | $1,429 | 2000 | 1 | 10,879 | $442,063 |
| 74798302 | 1,976 | $80,479 | 2000 | 2 | 10,907 | $452,581 |
| 74798303 | 1,652 | $60,386 | 2000 | 3 | 11,576 | $462,966 |
| 74798309 | 3,637 | $128,988 | 2000 | 4 | 11,940 | $415,863 |
| 74798436 | 972 | $76,949 | 2001 | 1 | 12,015 | $409,639 |
| 74798437 | 1,024 | $70,591 | 2001 | 2 | 11,516 | $205,214 |
| 74798509 | 1,607 | $65,943 | 2001 | 3 | 9,795 | $89,013 |
| 74799009 | 72 | $1,471 | 2001 | 4 | 7,240 | $57,849 |
| Total | 296,193 | $9,204,455 | Total | | 296,193 | $9,204,455 |

Includes California Medicaid claims with one of the 44 complaint NDCs and with a service date between January 1, 1991 and December 31, 2001 inclusive.

**Table 15B: California SDUD Medicaid Spending by NDC and Year-Quarter through 1994Q1**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 10,729 | $181,820 | 1991 | 1 | 1,697 | $31,326 |
| 74397703 | 1,061 | $9,877 | 1991 | 2 | 1887 | 40284.1 |
| 74433201 | 63 | $9,083 | 1991 | 3 | 2,360 | $48,266 |
| 74488710 | 700 | $10,652 | 1991 | 4 | 897 | $17,987 |
| 74488810 | 3,642 | $95,075 | 1992 | 1 | 1,308 | $26,520 |
| 74613802 | 4,827 | $127,516 | 1992 | 2 | 1,606 | $49,405 |
| 74613803 | 2,487 | $66,672 | 1992 | 3 | 2,361 | $70,109 |
| 74650901 | 5 | $2,972 | 1992 | 4 | 2,640 | $63,289 |
| 74653401 | 14 | $2,767 | 1993 | 1 | 3,163 | $68,091 |
| 74653501 | 18 | $6,392 | 1993 | 2 | 3,478 | $86,751 |
| 74712007 | 20 | $625 | 1993 | 3 | 2,511 | $60,071 |
| 74713809 | 7,531 | $182,133 | 1993 | 4 | 3,583 | $67,519 |
| 74792336 | 93 | $4,189 | 1994 | 1 | 3,910 | $82,132 |
| 74798437 | 211 | $11,978 | | | | |
| Total | 31,401 | $711,750 | Total | | 31,401 | $711,750 |

**Table 16A: Breakdown of New Jersey Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 10,397 | $103,802 | 1991 | 1 | 65 | $3,031 |
| 74397703 | 3,043 | $7,702 | 1991 | 2 | 119 | $5,800 |
| 74433201 | 555 | $58,477 | 1991 | 3 | 135 | $7,097 |
| 74488710 | 2,331 | $18,274 | 1991 | 4 | 1,699 | $132,293 |
| 74488720 | 1,067 | $8,024 | 1992 | 1 | 4,032 | $322,746 |
| 74488750 | 60 | $433 | 1992 | 2 | 3,182 | $251,956 |
| 74488810 | 2,340 | $25,356 | 1992 | 3 | 2,744 | $228,448 |
| 74488820 | 432 | $5,514 | 1992 | 4 | 2,856 | $235,026 |
| 74613802 | 32,302 | $2,748,255 | 1993 | 1 | 3,022 | $252,028 |
| 74613803 | 2,914 | $202,632 | 1993 | 2 | 3,138 | $270,353 |
| 74613822 | 7,168 | $235,097 | 1993 | 3 | 2,845 | $244,784 |
| 74613902 | 6,959 | $1,073,690 | 1993 | 4 | 2,376 | $185,608 |
| 74613903 | 72 | $2,281 | 1994 | 1 | 2,365 | $163,425 |
| 74613922 | 1,302 | $135,779 | 1994 | 2 | 2,333 | $162,856 |
| 74650901 | 188 | $85,507 | 1994 | 3 | 2,106 | $154,500 |
| 74653301 | 3,903 | $845,701 | 1994 | 4 | 2,268 | $163,078 |
| 74653401 | 55 | $3,762 | 1995 | 1 | 2,069 | $130,344 |
| 74653501 | 288 | $64,466 | 1995 | 2 | 2,032 | $123,240 |
| 74710013 | 461 | $29,844 | 1995 | 3 | 2,036 | $120,747 |
| 74710023 | 430 | $56,212 | 1995 | 4 | 2,969 | $167,893 |
| 74710102 | 122 | $22,261 | 1996 | 1 | 3,796 | $205,046 |
| 74710113 | 188 | $22,979 | 1996 | 2 | 3,384 | $212,427 |
| 74710123 | 586 | $98,661 | 1996 | 3 | 3,698 | $218,876 |
| 74712007 | 84 | $6,066 | 1996 | 4 | 4,371 | $257,396 |
| 74713809 | 12,930 | $615,859 | 1997 | 1 | 4,731 | $286,569 |
| 74713909 | 4,494 | $464,417 | 1997 | 2 | 4,542 | $304,257 |
| 74790209 | 1,100 | $65,999 | 1997 | 3 | 3,860 | $271,896 |
| 74792202 | 3,059 | $106,078 | 1997 | 4 | 2,842 | $204,091 |
| 74792203 | 314 | $11,533 | 1998 | 1 | 2,726 | $181,221 |
| 74792209 | 1,651 | $61,448 | 1998 | 2 | 3,208 | $244,650 |
| 74792336 | 2,807 | $129,408 | 1998 | 3 | 2,942 | $260,396 |
| 74792337 | 3,850 | $194,676 | 1998 | 4 | 3,125 | $289,941 |
| 74792409 | 360 | $11,862 | 1999 | 1 | 3,196 | $248,824 |
| 74792609 | 5,308 | $222,371 | 1999 | 2 | 3,537 | $258,436 |
| 74794109 | 819 | $30,318 | 1999 | 3 | 3,489 | $275,045 |
| 74797205 | 439 | $13,643 | 1999 | 4 | 3,010 | $232,774 |
| 74797305 | 3,036 | $322,739 | 2000 | 1 | 3,463 | $244,646 |
| 74798302 | 1,486 | $67,761 | 2000 | 2 | 3,713 | $204,933 |
| 74798303 | 342 | $11,132 | 2000 | 3 | 4,004 | $182,201 |
| 74798309 | 1,836 | $62,548 | 2000 | 4 | 3,733 | $244,469 |
| 74798436 | 1,233 | $64,444 | 2001 | 1 | 4,042 | $299,654 |
| 74798437 | 3,775 | $201,590 | 2001 | 2 | 3,492 | $90,333 |
| 74798509 | 2,924 | $100,191 | 2001 | 3 | 3,110 | $42,374 |
| 74799009 | 272 | $10,127 | 2001 | 4 | 2,877 | $43,205 |
| Total | 129,282 | $8,628,913 | | Total | 129,282 | $8,628,913 |

**Table 16B: New Jersey SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-Q4**

| *Breakdown by National Drug Code* | | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 1 | $3 | | 1991 | 1 | 4038 | $228,439 |
| 74397703 | 10 | $113 | | 1991 | 2 | 3,164 | $230,217 |
| 74433201 | 2 | $50 | | 1991 | 3 | 3,837 | $274,835 |
| 74488710 | 67 | $410 | | 1991 | 4 | 2,769 | $182,270 |
| 74488720 | 2 | $14 | | | | | |
| 74488750 | 2 | $15 | | | Total | 13,808 | $915,760 |
| 74488810 | 5 | $188 | | | | | |
| 74488820 | 7 | $57 | | | | | |
| 74613802 | 7,856 | $529,133 | | | | | |
| 74613803 | 88 | $1,934 | | | | | |
| 74613902 | 930 | $110,089 | | | | | |
| 74710013 | 11 | $1,150 | | | | | |
| 74710023 | 20 | $426 | | | | | |
| 74710113 | 3 | $129 | | | | | |
| 74710123 | 4 | $2 | | | | | |
| 74713809 | 2,810 | $148,935 | | | | | |
| 74713909 | 245 | $39,851 | | | | | |
| 74790209 | 136 | $8,709 | | | | | |
| 74792202 | 41 | $2,298 | | | | | |
| 74792203 | 44 | $1,110 | | | | | |
| 74792209 | 175 | $7,252 | | | | | |
| 74792409 | 64 | $1,639 | | | | | |
| 74792609 | 823 | $37,791 | | | | | |
| 74794109 | 48 | $1,165 | | | | | |
| 74797205 | 15 | $748 | | | | | |
| 74797305 | 110 | $13,292 | | | | | |
| 74798302 | 24 | $2,172 | | | | | |
| 74798303 | 35 | $518 | | | | | |
| 74798309 | 124 | $3,520 | | | | | |
| 74798509 | 106 | $3,048 | | | | | |
| Total | 13,808 | $915,760 | | | | | |

**Table 17A: Breakdown of New York Medicaid Spending by NDC and by Year-Quarter**

*Breakdown by National Drug Code*  *Breakdown by Year and Quarter*

| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
|---|---|---|---|---|---|---|
| 74196607 | 28,896 | $477,913 | 1991 | 1 | 0 | $0 |
| 74397703 | 1,090 | $12,566 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,415 | $363,148 | 1991 | 3 | 0 | $0 |
| 74488710 | 11,510 | $135,971 | 1991 | 4 | 0 | $0 |
| 74488720 | 2,463 | $48,158 | 1992 | 1 | 0 | $0 |
| 74488750 | 2,178 | $26,595 | 1992 | 2 | 0 | $0 |
| 74488810 | 3,624 | $74,218 | 1992 | 3 | 0 | $0 |
| 74488820 | 738 | $21,152 | 1992 | 4 | 0 | $0 |
| 74613802 | 3,763 | $98,572 | 1993 | 1 | 1,150 | $57,040 |
| 74613803 | 3,934 | $88,204 | 1993 | 2 | 1,329 | $62,971 |
| 74613822 | 547 | $17,688 | 1993 | 3 | 1,277 | $79,015 |
| 74613902 | 182 | $10,990 | 1993 | 4 | 1,430 | $67,666 |
| 74613903 | 138 | $12,069 | 1994 | 1 | 1,639 | $79,421 |
| 74613922 | 8 | $768 | 1994 | 2 | 1,708 | $91,390 |
| 74650901 | 3,018 | $1,016,202 | 1994 | 3 | 1,809 | $99,173 |
| 74653301 | 8,010 | $3,360,631 | 1994 | 4 | 1,991 | $146,183 |
| 74653401 | 123 | $20,017 | 1995 | 1 | 2,025 | $168,631 |
| 74653501 | 1,267 | $270,624 | 1995 | 2 | 1,767 | $107,718 |
| 74710013 | 2 | $45 | 1995 | 3 | 1,847 | $140,309 |
| 74710023 | 1,127 | $121,656 | 1995 | 4 | 1,904 | $158,314 |
| 74710102 | 423 | $25,543 | 1996 | 1 | 2,120 | $155,773 |
| 74710113 | 561 | $126,881 | 1996 | 2 | 2,324 | $183,938 |
| 74710123 | 2,462 | $555,109 | 1996 | 3 | 2,559 | $184,988 |
| 74712007 | 0 | $0 | 1996 | 4 | 2,960 | $201,213 |
| 74713809 | 17,570 | $511,363 | 1997 | 1 | 2,911 | $216,487 |
| 74713909 | 1,473 | $79,293 | 1997 | 2 | 3,045 | $271,665 |
| 74790209 | 0 | $0 | 1997 | 3 | 3,080 | $296,478 |
| 74792202 | 3,008 | $125,148 | 1997 | 4 | 3,335 | $334,942 |
| 74792203 | 163 | $1,609 | 1998 | 1 | 3,420 | $416,436 |
| 74792209 | 364 | $6,459 | 1998 | 2 | 3,600 | $399,364 |
| 74792336 | 961 | $52,335 | 1998 | 3 | 4,064 | $490,179 |
| 74792337 | 3,460 | $226,005 | 1998 | 4 | 4,413 | $501,985 |
| 74792409 | 23 | $1,510 | 1999 | 1 | 4,182 | $410,929 |
| 74792609 | 688 | $34,934 | 1999 | 2 | 4,339 | $466,490 |
| 74794109 | 422 | $18,988 | 1999 | 3 | 4,815 | $595,487 |
| 74797205 | 349 | $4,087 | 1999 | 4 | 5,201 | $598,988 |
| 74797305 | 27 | $466 | 2000 | 1 | 5,328 | $531,920 |
| 74798302 | 3,044 | $192,859 | 2000 | 2 | 5,078 | $493,981 |
| 74798303 | 1,952 | $49,580 | 2000 | 3 | 5,195 | $197,965 |
| 74798309 | 2,347 | $56,768 | 2000 | 4 | 6,467 | $193,995 |
| 74798436 | 2,153 | $176,732 | 2001 | 1 | 7,120 | $202,182 |
| 74798437 | 4,750 | $508,867 | 2001 | 2 | 5,186 | $119,289 |
| 74798509 | 45 | $1,699 | 2001 | 3 | 4,558 | $114,327 |
| 74799009 | 516 | $4,434 | 2001 | 4 | 5,618 | $101,026 |
| Total | 120,794 | $8,937,854 | | Total | 120,794 | $8,937,854 |

**Table 17B: New York SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1992Q4**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 448 | $6,180 | 1991 | 1 | 530 | $5,307 |
| 74397703 | 84 | $527 | 1991 | 2 | 646 | $9,823 |
| 74433201 | 82 | $33,989 | 1991 | 3 | 774 | $17,599 |
| 74488750 | 85 | $411 | 1991 | 4 | 835 | $25,962 |
| 74488810 | 159 | $3,564 | 1992 | 1 | 847 | $43,271 |
| 74488820 | 34 | $467 | 1992 | 2 | 849 | $37,950 |
| 74613802 | 211 | $2,621 | 1992 | 3 | 69 | $4,406 |
| 74613803 | 1,688 | $41,644 | 1992 | 4 | 1,243 | $48,580 |
| 74613902 | 10 | $45 | | | | |
| 74613903 | 22 | $1,393 | | Total | 5,793 | $192,898 |
| 74653301 | 83 | $54,628 | | | | |
| 74710113 | 7 | $476 | | | | |
| 74710123 | 18 | $3,945 | | | | |
| 74713809 | 2,568 | $33,327 | | | | |
| 74713909 | 8 | $172 | | | | |
| 74792202 | 13 | $577 | | | | |
| 74792409 | 10 | $333 | | | | |
| 74792609 | 31 | $1,207 | | | | |
| 74794109 | 4 | $200 | | | | |
| 74797205 | 28 | $220 | | | | |
| 74798302 | 68 | $2,472 | | | | |
| 74798303 | 58 | $1,974 | | | | |
| 74798309 | 72 | $2,527 | | | | |
| 74799009 | 2 | $0 | | | | |
| Total | 5,793 | $192,898 | | | | |

**Table 18A: Breakdown of Indiana Medicaid Spending by NDC and by Year-Quarter**

| | Breakdown by National Drug Code | | | Breakdown by Year and Quarter | | |
| --- | --- | --- | --- | --- | --- | --- |
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 7,556 | $68,451 | 1991 | 1 | 0 | $0 |
| 74397703 | 342 | $1,916 | 1991 | 2 | 0 | $0 |
| 74433201 | 270 | $5,385 | 1991 | 3 | 0 | $0 |
| 74488710 | 1,796 | $12,000 | 1991 | 4 | 0 | $0 |
| 74488720 | 111 | $558 | 1992 | 1 | 0 | $0 |
| 74488750 | 366 | $1,035 | 1992 | 2 | 0 | $0 |
| 74488810 | 1,847 | $32,792 | 1992 | 3 | 0 | $0 |
| 74488820 | 134 | $2,791 | 1992 | 4 | 0 | $0 |
| 74613802 | 877 | $53,490 | 1993 | 1 | 0 | $0 |
| 74613803 | 762 | $15,874 | 1993 | 2 | 0 | $0 |
| 74613822 | 7,355 | $1,330,546 | 1993 | 3 | 0 | $0 |
| 74613902 | 110 | $11,472 | 1993 | 4 | 0 | $0 |
| 74613903 | 1,584 | $15,988 | 1994 | 1 | 0 | $0 |
| 74613922 | 994 | $242,089 | 1994 | 2 | 0 | $0 |
| 74650901 | 582 | $13,981 | 1994 | 3 | 0 | $0 |
| 74653301 | 1,807 | $74,647 | 1994 | 4 | 0 | $0 |
| 74653401 | 23 | $34 | 1995 | 1 | 0 | $0 |
| 74653501 | 315 | $3,034 | 1995 | 2 | 0 | $0 |
| 74710013 | 60 | $428 | 1995 | 3 | 0 | $0 |
| 74710023 | 87 | $102 | 1995 | 4 | 0 | $0 |
| 74710102 | 337 | $1,084 | 1996 | 1 | 0 | $0 |
| 74710113 | 456 | $584 | 1996 | 2 | 0 | $0 |
| 74710123 | 869 | $10,053 | 1996 | 3 | 0 | $0 |
| 74712007 | 142 | $21 | 1996 | 4 | 0 | $0 |
| 74713809 | 1,345 | $56,209 | 1997 | 1 | 0 | $0 |
| 74713909 | 316 | $9,309 | 1997 | 2 | 0 | $0 |
| 74790209 | 328 | $18,347 | 1997 | 3 | 0 | $0 |
| 74792202 | 296 | $1,585 | 1997 | 4 | 0 | $0 |
| 74792203 | 45 | $85 | 1998 | 1 | 186 | $8,744 |
| 74792209 | 265 | $4,837 | 1998 | 2 | 201 | $9,542 |
| 74792336 | 68 | $564 | 1998 | 3 | 343 | $20,861 |
| 74792337 | 79 | $2,048 | 1998 | 4 | 321 | $18,962 |
| 74792409 | 76 | $3,122 | 1999 | 1 | 10 | $558 |
| 74792609 | 1,189 | $18,260 | 1999 | 2 | 5 | $19 |
| 74794109 | 221 | $2,946 | 1999 | 3 | 29 | $477 |
| 74797205 | 101 | $1,870 | 1999 | 4 | 127 | $1,055 |
| 74797305 | 2 | $41 | 2000 | 1 | 419 | $1,875 |
| 74798302 | 827 | $3,007 | 2000 | 2 | 1,258 | $12,231 |
| 74798303 | 347 | $2,472 | 2000 | 3 | 2,437 | $50,714 |
| 74798309 | 1,114 | $10,624 | 2000 | 4 | 8,310 | $682,567 |
| 74798436 | 321 | $5,316 | 2001 | 1 | 8,945 | $845,487 |
| 74798437 | 945 | $2,099 | 2001 | 2 | 6,358 | $317,146 |
| 74798509 | 514 | $10,504 | 2001 | 3 | 4,830 | $45,631 |
| 74799009 | 132 | $1,388 | 2001 | 4 | 3,534 | $37,123 |
| Total | 37,313 | $2,052,992 | Total | | 37,313 | $2,052,992 |

**Table 18B: Indiana SMRF-MAX Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 28,675 | $322,831 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,583 | $18,578 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,899 | $338,088 | 1991 | 3 | 0 | $0 |
| 74488710 | 7,134 | $73,414 | 1991 | 4 | 0 | $0 |
| 74488720 | 713 | $5,725 | 1992 | 1 | 2,472 | $79,955 |
| 74488750 | 1,567 | $42,583 | 1992 | 2 | 2,235 | $77,631 |
| 74488810 | 6,587 | $156,965 | 1992 | 3 | 2,109 | $70,890 |
| 74488820 | 767 | $19,553 | 1992 | 4 | 2,207 | $83,731 |
| 74613802 | 25,641 | $1,077,579 | 1993 | 1 | 2,537 | $117,962 |
| 74613803 | 3,295 | $79,264 | 1993 | 2 | 2,778 | $122,417 |
| 74613822 | 12,624 | $2,394,077 | 1993 | 3 | 2,372 | $111,877 |
| 74613902 | 14,475 | $3,358,450 | 1993 | 4 | 2,461 | $129,321 |
| 74613903 | 4,021 | $178,740 | 1994 | 1 | 2,952 | $155,270 |
| 74613922 | 1,344 | $338,187 | 1994 | 2 | 3,569 | $182,459 |
| 74650901 | 2,057 | $474,790 | 1994 | 3 | 3,332 | $148,863 |
| 74653301 | 9,267 | $2,306,145 | 1994 | 4 | 3,130 | $120,190 |
| 74653401 | 289 | $25,087 | 1995 | 1 | 3,532 | $160,514 |
| 74653501 | 1,955 | $237,606 | 1995 | 2 | 2,888 | $151,083 |
| 74710013 | 442 | $29,006 | 1995 | 3 | 2,010 | $118,240 |
| 74710023 | 369 | $24,136 | 1995 | 4 | 4,182 | $218,855 |
| 74710102 | 663 | $33,808 | 1996 | 1 | 4,822 | $300,490 |
| 74710113 | 908 | $95,173 | 1996 | 2 | 5,274 | $424,255 |
| 74710123 | 4,102 | $445,834 | 1996 | 3 | 5,510 | $427,218 |
| 74712007 | 98 | $49,118 | 1996 | 4 | 5,811 | $476,645 |
| 74713809 | 14,077 | $397,368 | 1997 | 1 | 4,777 | $474,317 |
| 74713909 | 6,194 | $533,648 | 1997 | 2 | 4,006 | $377,065 |
| 74790209 | 2,206 | $172,187 | 1997 | 3 | 4,763 | $550,518 |
| 74792202 | 812 | $50,153 | 1997 | 4 | 6,461 | $843,614 |
| 74792203 | 174 | $65,520 | 1998 | 1 | 6,116 | $724,119 |
| 74792209 | 2,292 | $100,311 | 1998 | 2 | 5,408 | $667,908 |
| 74792336 | 140 | $7,875 | 1998 | 3 | 6,030 | $781,312 |
| 74792337 | 541 | $52,329 | 1998 | 4 | 5,163 | $690,100 |
| 74792409 | 771 | $42,944 | 1999 | 1 | 6,480 | $596,867 |
| 74792609 | 8,326 | $396,972 | 1999 | 2 | 5,232 | $472,268 |
| 74794109 | 1,161 | $51,135 | 1999 | 3 | 5,157 | $386,299 |
| 74797205 | 481 | $15,965 | 1999 | 4 | 5,530 | $525,997 |
| 74797305 | 10 | $262 | 2000 | 1 | 6,621 | $628,725 |
| 74798302 | 2,404 | $161,214 | 2000 | 2 | 6,648 | $552,477 |
| 74798303 | 943 | $27,445 | 2000 | 3 | 6,230 | $526,456 |
| 74798309 | 4,061 | $147,575 | 2000 | 4 | 7,513 | $750,173 |
| 74798436 | 973 | $77,560 | 2001 | 1 | 8,544 | $935,666 |
| 74798437 | 2,424 | $216,089 | 2001 | 2 | 6,115 | $381,311 |
| 74798509 | 2,771 | $114,360 | 2001 | 3 | 4,895 | $126,474 |
| 74799009 | 606 | $52,656 | 2001 | 4 | 4,970 | $138,773 |
| Total | 182,842 | $14,808,305 | | Total | 182,842 | $14,808,305 |

**Table 18C: Indiana SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1991Q4**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 454 | $3,956 | 1991 | 1 | 1,454 | $34,614 |
| 74397703 | 420 | $2,508 | 1991 | 2 | 2,495 | $66,310 |
| 74433201 | 25 | $11,080 | 1991 | 3 | 2,067 | $53,468 |
| 74488710 | 352 | $4,000 | 1991 | 4 | 3,028 | $95,137 |
| 74488720 | 28 | $275 | | | | |
| 74488750 | 122 | $945 | | Total | 9,044 | $249,529 |
| 74488810 | 105 | $1,574 | | | | |
| 74488820 | 25 | $804 | | | | |
| 74613802 | 1,737 | $43,220 | | | | |
| 74613803 | 488 | $7,793 | | | | |
| 74613902 | 232 | $12,205 | | | | |
| 74613903 | 392 | $4,239 | | | | |
| 74653301 | 53 | $22,103 | | | | |
| 74710013 | 1 | $85 | | | | |
| 74710023 | 36 | $3,396 | | | | |
| 74710113 | 8 | $632 | | | | |
| 74710123 | 213 | $16,113 | | | | |
| 74713809 | 2,139 | $35,628 | | | | |
| 74713909 | 572 | $22,897 | | | | |
| 74790209 | 165 | $7,649 | | | | |
| 74792202 | 23 | $1,878 | | | | |
| 74792203 | 25 | $1,024 | | | | |
| 74792209 | 224 | $7,371 | | | | |
| 74792409 | 114 | $5,656 | | | | |
| 74792609 | 445 | $16,012 | | | | |
| 74794109 | 53 | $1,598 | | | | |
| 74797205 | 114 | $1,642 | | | | |
| 74797305 | 3 | $26 | | | | |
| 74798302 | 29 | $2,238 | | | | |
| 74798303 | 10 | $162 | | | | |
| 74798309 | 236 | $6,218 | | | | |
| 74798509 | 168 | $4,156 | | | | |
| 74799009 | 33 | $443 | | | | |
| Total | 9,044 | $249,529 | | | | |

**Table 19A: Breakdown of Kentucky Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
| --- | --- | --- | --- | --- | --- | --- |
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 21,150 | $259,534 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,289 | $17,699 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,545 | $266,694 | 1991 | 3 | 0 | $0 |
| 74488710 | 3,742 | $36,051 | 1991 | 4 | 0 | $0 |
| 74488720 | 1,821 | $23,104 | 1992 | 1 | 0 | $0 |
| 74488750 | 2,615 | $29,892 | 1992 | 2 | 0 | $0 |
| 74488810 | 2,719 | $95,613 | 1992 | 3 | 0 | $0 |
| 74488820 | 1,843 | $38,640 | 1992 | 4 | 0 | $0 |
| 74613802 | 11,994 | $386,095 | 1993 | 1 | 0 | $0 |
| 74613803 | 3,358 | $84,148 | 1993 | 2 | 0 | $0 |
| 74613822 | 2,265 | $87,747 | 1993 | 3 | 0 | $0 |
| 74613902 | 77 | $8,370 | 1993 | 4 | 0 | $0 |
| 74613903 | 142 | $8,058 | 1994 | 1 | 0 | $0 |
| 74613922 | 36 | $7,879 | 1994 | 2 | 0 | $0 |
| 74650901 | 1,615 | $497,247 | 1994 | 3 | 0 | $0 |
| 74653301 | 6,921 | $2,060,230 | 1994 | 4 | 0 | $0 |
| 74653401 | 251 | $29,155 | 1995 | 1 | 2,465 | $109,085 |
| 74653501 | 623 | $102,641 | 1995 | 2 | 2,118 | $104,440 |
| 74710013 | 482 | $53,339 | 1995 | 3 | 2,940 | $147,611 |
| 74710023 | 491 | $29,791 | 1995 | 4 | 3,572 | $179,476 |
| 74710102 | 479 | $47,101 | 1996 | 1 | 4,135 | $212,024 |
| 74710113 | 1,584 | $200,459 | 1996 | 2 | 3,785 | $193,370 |
| 74710123 | 4,111 | $353,570 | 1996 | 3 | 3,621 | $203,795 |
| 74712007 | 700 | $46,948 | 1996 | 4 | 3,617 | $232,469 |
| 74713809 | 2,701 | $103,804 | 1997 | 1 | 3,553 | $233,859 |
| 74713909 | 880 | $34,136 | 1997 | 2 | 3,598 | $243,642 |
| 74790209 | 946 | $57,286 | 1997 | 3 | 3,474 | $260,945 |
| 74792202 | 413 | $19,994 | 1997 | 4 | 3,455 | $243,960 |
| 74792203 | 260 | $9,617 | 1998 | 1 | 3,608 | $268,216 |
| 74792209 | 1,473 | $67,099 | 1998 | 2 | 3,034 | $217,311 |
| 74792336 | 171 | $9,068 | 1998 | 3 | 3,220 | $238,428 |
| 74792337 | 115 | $5,419 | 1998 | 4 | 3,034 | $230,526 |
| 74792409 | 690 | $35,243 | 1999 | 1 | 3,144 | $215,849 |
| 74792609 | 5,535 | $282,525 | 1999 | 2 | 3,120 | $211,617 |
| 74794109 | 585 | $38,188 | 1999 | 3 | 2,824 | $203,146 |
| 74797205 | 1,172 | $89,456 | 1999 | 4 | 2,749 | $196,068 |
| 74797305 | 0 | $0 | 2000 | 1 | 3,560 | $280,756 |
| 74798302 | 3,087 | $138,034 | 2000 | 2 | 3,759 | $293,693 |
| 74798303 | 639 | $28,045 | 2000 | 3 | 4,006 | $319,860 |
| 74798309 | 3,916 | $196,347 | 2000 | 4 | 4,438 | $367,319 |
| 74798436 | 954 | $77,098 | 2001 | 1 | 4,989 | $417,834 |
| 74798437 | 1,826 | $134,877 | 2001 | 2 | 4,926 | $163,590 |
| 74798509 | 2,196 | $100,817 | 2001 | 3 | 4,691 | $102,618 |
| 74799009 | 149 | $6,166 | 2001 | 4 | 5,126 | $111,715 |
| Total | 100,561 | $6,203,220 | Total | | 100,561 | $6,203,220 |

**Table 19B: Kentucky SMRF Medicaid Spending by NDC and by Year-Quarter: 1992Q1-1994Q4**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 1,142 | $13,341 | 1991 | 1 | 0 | $0 |
| 74397703 | 614 | $4,279 | 1991 | 2 | 0 | $0 |
| 74433201 | 533 | $90,837 | 1991 | 3 | 0 | $0 |
| 74488710 | 997 | $11,106 | 1991 | 4 | 0 | $0 |
| 74488720 | 724 | $10,007 | 1992 | 1 | 1,203 | $50,981 |
| 74488750 | 325 | $3,814 | 1992 | 2 | 1,397 | $53,913 |
| 74488810 | 278 | $6,942 | 1992 | 3 | 1,163 | $44,666 |
| 74488820 | 90 | $2,226 | 1992 | 4 | 1,286 | $47,539 |
| 74613802 | 3,004 | $61,490 | 1993 | 1 | 1,293 | $53,155 |
| 74613803 | 1,151 | $16,244 | 1993 | 2 | 1,232 | $63,926 |
| 74613822 | 0 | $0 | 1993 | 3 | 1,415 | $85,345 |
| 74613902 | 12 | $525 | 1993 | 4 | 1,410 | $83,461 |
| 74613903 | 12 | $352 | 1994 | 1 | 2,259 | $100,075 |
| 74613922 | 0 | $0 | 1994 | 2 | 2,740 | $112,179 |
| 74650901 | 31 | $9,131 | 1994 | 3 | 2,356 | $84,906 |
| 74653301 | 688 | $175,444 | 1994 | 4 | 3,066 | $134,268 |
| 74653401 | 27 | $2,674 | | | | |
| 74653501 | 18 | $3,026 | | | | |
| 74710013 | 204 | $19,571 | | | | |
| 74710023 | 272 | $40,590 | | | | |
| 74710102 | 68 | $4,079 | | | | |
| 74710113 | 819 | $46,225 | | | | |
| 74710123 | 1,064 | $100,063 | | | | |
| 74712007 | 23 | $2,789 | | | | |
| 74713809 | 1,252 | $32,155 | | | | |
| 74713909 | 96 | $3,619 | | | | |
| 74790209 | 149 | $5,398 | | | | |
| 74792202 | 98 | $9,487 | | | | |
| 74792203 | 128 | $2,716 | | | | |
| 74792209 | 815 | $21,009 | | | | |
| 74792336 | 5 | $62 | | | | |
| 74792337 | 4 | $290 | | | | |
| 74792409 | 410 | $20,732 | | | | |
| 74792609 | 1,802 | $62,390 | | | | |
| 74794109 | 361 | $18,743 | | | | |
| 74797205 | 533 | $22,247 | | | | |
| 74797305 | 38 | $821 | | | | |
| 74798302 | 946 | $10,875 | | | | |
| 74798303 | 165 | $5,388 | | | | |
| 74798309 | 1,073 | $43,704 | | | | |
| 74798436 | 21 | $1,004 | | | | |
| 74798437 | 24 | $1,806 | | | | |
| 74798509 | 716 | $22,549 | | | | |
| 74799009 | 88 | $4,664 | | | | |
| Total | 20,820 | $914,414 | | Total | 20,820 | $914,414 |

**Table 19C: Kentucky SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1991Q4**

| *Breakdown by National Drug Code* | | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 68 | $511 | | 1991 | 1 | 293 | $10,752 |
| 74397703 | 84 | $510 | | 1991 | 2 | 966 | $33,731 |
| 74433201 | 13 | $1,333 | | 1991 | 3 | 1,147 | $46,205 |
| 74488710 | 50 | $457 | | 1991 | 4 | 995 | $38,556 |
| 74488720 | 44 | $302 | | | | | |
| 74488750 | 45 | $456 | | | Total | 3,401 | $129,244 |
| 74488810 | 22 | $532 | | | | | |
| 74488820 | 3 | $5 | | | | | |
| 74613802 | 677 | $14,494 | | | | | |
| 74613803 | 282 | $3,813 | | | | | |
| 74613902 | 2 | $59 | | | | | |
| 74613903 | 2 | $40 | | | | | |
| 74653301 | 92 | $23,487 | | | | | |
| 74710013 | 29 | $1,001 | | | | | |
| 74710023 | 23 | $4,350 | | | | | |
| 74710102 | 25 | $110 | | | | | |
| 74710113 | 16 | $1,929 | | | | | |
| 74710123 | 68 | $7,234 | | | | | |
| 74713809 | 245 | $5,416 | | | | | |
| 74713909 | 4 | $15 | | | | | |
| 74790209 | 29 | $245 | | | | | |
| 74792202 | 11 | $779 | | | | | |
| 74792203 | 6 | $59 | | | | | |
| 74792209 | 161 | $3,518 | | | | | |
| 74792409 | 102 | $6,966 | | | | | |
| 74792609 | 480 | $20,814 | | | | | |
| 74794109 | 115 | $5,069 | | | | | |
| 74797205 | 327 | $11,805 | | | | | |
| 74797305 | 23 | $371 | | | | | |
| 74798302 | 26 | $1,206 | | | | | |
| 74798303 | 24 | $404 | | | | | |
| 74798309 | 163 | $6,891 | | | | | |
| 74798509 | 118 | $4,190 | | | | | |
| 74799009 | 22 | $874 | | | | | |
| Total | 3,401 | $129,244 | | | | | |

**Table 20A: Breakdown of Missouri Medicaid Spending by NDC and by Year-Quarter**

| | *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | |
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
|---|---|---|---|---|---|---|
| 74196607 | 23,070 | $253,728 | 1991 | 1 | 0 | $0 |
| 74397703 | 1,411 | $8,508 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,895 | $131,196 | 1991 | 3 | 0 | $0 |
| 74488710 | 3,041 | $27,739 | 1991 | 4 | 0 | $0 |
| 74488720 | 3,875 | $26,409 | 1992 | 1 | 0 | $0 |
| 74488750 | 260 | $1,331 | 1992 | 2 | 0 | $0 |
| 74488810 | 1,581 | $28,715 | 1992 | 3 | 0 | $0 |
| 74488820 | 685 | $5,135 | 1992 | 4 | 0 | $0 |
| 74613802 | 608 | $14,999 | 1993 | 1 | 0 | $0 |
| 74613803 | 710 | $111,987 | 1993 | 2 | 0 | $0 |
| 74613822 | 609 | $14,924 | 1993 | 3 | 0 | $0 |
| 74613902 | 96 | $2,090 | 1993 | 4 | 0 | $0 |
| 74613903 | 695 | $169,088 | 1994 | 1 | 0 | $0 |
| 74613922 | 23 | $925 | 1994 | 2 | 0 | $0 |
| 74650901 | 3,242 | $821,130 | 1994 | 3 | 0 | $0 |
| 74653301 | 9,728 | $1,599,257 | 1994 | 4 | 0 | $0 |
| 74653401 | 190 | $5,287 | 1995 | 1 | 0 | $0 |
| 74653501 | 643 | $61,619 | 1995 | 2 | 0 | $0 |
| 74710013 | 39 | $2,173 | 1995 | 3 | 0 | $0 |
| 74710023 | 30 | $3,150 | 1995 | 4 | 0 | $0 |
| 74710102 | 712 | $33,795 | 1996 | 1 | 0 | $0 |
| 74710113 | 421 | $23,652 | 1996 | 2 | 0 | $0 |
| 74710123 | 2,532 | $271,396 | 1996 | 3 | 0 | $0 |
| 74712007 | 0 | $0 | 1996 | 4 | 0 | $0 |
| 74713809 | 2,061 | $64,199 | 1997 | 1 | 0 | $0 |
| 74713909 | 667 | $25,446 | 1997 | 2 | 0 | $0 |
| 74790209 | 340 | $15,304 | 1997 | 3 | 0 | $0 |
| 74792202 | 696 | $12,270 | 1997 | 4 | 0 | $0 |
| 74792203 | 279 | $3,112 | 1998 | 1 | 3,044 | $145,994 |
| 74792209 | 811 | $21,222 | 1998 | 2 | 5,048 | $305,809 |
| 74792336 | 188 | $8,776 | 1998 | 3 | 4,510 | $256,660 |
| 74792337 | 305 | $13,345 | 1998 | 4 | 4,426 | $283,798 |
| 74792409 | 320 | $4,097 | 1999 | 1 | 5,193 | $299,568 |
| 74792609 | 2,034 | $83,381 | 1999 | 2 | 5,075 | $297,842 |
| 74794109 | 648 | $24,401 | 1999 | 3 | 4,958 | $299,693 |
| 74797205 | 35 | $411 | 1999 | 4 | 5,524 | $323,521 |
| 74797305 | 11 | $297 | 2000 | 1 | 5,637 | $373,044 |
| 74798302 | 8,905 | $136,619 | 2000 | 2 | 7,823 | $352,651 |
| 74798303 | 2,868 | $30,750 | 2000 | 3 | 5,321 | $312,937 |
| 74798309 | 3,938 | $80,803 | 2000 | 4 | 5,504 | $299,728 |
| 74798436 | 680 | $33,456 | 2001 | 1 | 5,705 | $281,711 |
| 74798437 | 1,070 | $54,391 | 2001 | 2 | 5,151 | $255,250 |
| 74798509 | 701 | $28,615 | 2001 | 3 | 4,656 | $81,345 |
| 74799009 | 323 | $4,649 | 2001 | 4 | 5,401 | $94,227 |
| Total | 82,976 | $4,263,776 | Total | | 82,976 | $4,263,776 |

Table 20B: Missouri SMRF Medicaid Spending by NDC and by Year-Quarter: 1992Q1-1997Q4

| | *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 15,455 | $153,958 | 1991 | 1 | 0 | $0 |
| 74397703 | 1,138 | $6,584 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,110 | $118,875 | 1991 | 3 | 0 | $0 |
| 74488710 | 2,225 | $20,486 | 1991 | 4 | 0 | $0 |
| 74488720 | 2,221 | $18,139 | 1992 | 1 | 1,198 | $48,590 |
| 74488750 | 224 | $1,404 | 1992 | 2 | 1,113 | $50,705 |
| 74488810 | 2,136 | $51,926 | 1992 | 3 | 1,044 | $69,394 |
| 74488820 | 1,404 | $13,111 | 1992 | 4 | 1,248 | $74,171 |
| 74613802 | 2,706 | $53,051 | 1993 | 1 | 1,722 | $80,142 |
| 74613803 | 3,806 | $170,863 | 1993 | 2 | 1,821 | $109,220 |
| 74613822 | 0 | $0 | 1993 | 3 | 2,041 | $93,239 |
| 74613902 | 364 | $10,035 | 1993 | 4 | 2,282 | $97,291 |
| 74613903 | 1,468 | $238,923 | 1994 | 1 | 2,489 | $124,639 |
| 74613922 | 0 | $0 | 1994 | 2 | 2,505 | $122,029 |
| 74650901 | 1,989 | $540,508 | 1994 | 3 | 2,531 | $131,321 |
| 74653301 | 3,461 | $638,695 | 1994 | 4 | 3,079 | $146,102 |
| 74653401 | 24 | $1,077 | 1995 | 1 | 3,685 | $160,026 |
| 74653501 | 190 | $17,468 | 1995 | 2 | 3,909 | $169,624 |
| 74710013 | 348 | $9,043 | 1995 | 3 | 3,475 | $130,052 |
| 74710023 | 98 | $5,511 | 1995 | 4 | 3,768 | $153,416 |
| 74710102 | 271 | $13,852 | 1996 | 1 | 4,292 | $193,022 |
| 74710113 | 232 | $22,894 | 1996 | 2 | 3,902 | $180,510 |
| 74710123 | 2,630 | $200,688 | 1996 | 3 | 3,486 | $169,887 |
| 74712007 | 111 | $2,791 | 1996 | 4 | 3,626 | $169,169 |
| 74713809 | 3,207 | $106,031 | 1997 | 1 | 3,494 | $169,017 |
| 74713909 | 597 | $10,482 | 1997 | 2 | 3,466 | $167,434 |
| 74790209 | 329 | $30,045 | 1997 | 3 | 3,500 | $189,688 |
| 74792202 | 854 | $34,027 | 1997 | 4 | 3,184 | $189,297 |
| 74792203 | 605 | $14,930 | | | | |
| 74792209 | 953 | $45,088 | | | | |
| 74792336 | 1,030 | $32,211 | | | | |
| 74792337 | 366 | $14,230 | | | | |
| 74792409 | 112 | $3,253 | | | | |
| 74792609 | 3,034 | $174,709 | | | | |
| 74794109 | 666 | $28,388 | | | | |
| 74797205 | 50 | $619 | | | | |
| 74797305 | 0 | $0 | | | | |
| 74798302 | 3,851 | $82,935 | | | | |
| 74798303 | 1,061 | $31,133 | | | | |
| 74798309 | 2,744 | $78,825 | | | | |
| 74798436 | 919 | $63,791 | | | | |
| 74798437 | 1,645 | $84,385 | | | | |
| 74798509 | 823 | $32,477 | | | | |
| 74799009 | 403 | $10,544 | | | | |
| Total | 66,860 | $3,187,985 | Total | | 66,860 | $3,187,985 |

**Table 20C: Missouri SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1991Q4**

*Breakdown by National Drug Code*

| NDC | # of Claims | Paid Amount |
|---|---|---|
| 74196607 | 74 | $777 |
| 74397703 | 25 | $114 |
| 74433201 | 11 | $2,804 |
| 74488710 | 211 | $1,347 |
| 74488720 | 22 | $165 |
| 74488750 | 9 | $54 |
| 74488810 | 45 | $300 |
| 74488820 | 6 | $165 |
| 74613802 | 243 | $2,346 |
| 74613803 | 182 | $1,414 |
| 74613902 | 20 | $102 |
| 74613903 | 10 | $506 |
| 74653301 | 41 | $16,000 |
| 74710023 | 2 | $161 |
| 74710113 | 3 | $399 |
| 74710123 | 23 | $983 |
| 74713809 | 294 | $7,637 |
| 74713909 | 58 | $558 |
| 74790209 | 8 | $89 |
| 74792202 | 26 | $1,369 |
| 74792203 | 40 | $2,017 |
| 74792209 | 74 | $1,927 |
| 74792409 | 1 | $23 |
| 74792609 | 224 | $9,888 |
| 74794109 | 59 | $1,294 |
| 74797205 | 4 | $15 |
| 74798302 | 119 | $2,259 |
| 74798303 | 26 | $952 |
| 74798309 | 266 | $7,588 |
| 74798509 | 10 | $281 |
| Total | 2,136 | $63,533 |

*Breakdown by Service Year and Quarter*

| Year | Quarter | # of Claims | Paid Amount |
|---|---|---|---|
| 1991 | 1 | 39 | $1,239 |
| 1991 | 2 | 261 | $6,380 |
| 1991 | 3 | 734 | $15,010 |
| 1991 | 4 | 1,102 | $40,904 |
| Total | | 2,136 | $63,533 |

**Table 21: Breakdown of Ohio Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 115,612 | $701,969 | 1991 | 1 | 1,429 | $15,550 |
| 74397703 | 16,028 | $95,429 | 1991 | 2 | 1,436 | $17,271 |
| 74433201 | 8,423 | $366,719 | 1991 | 3 | 1,745 | $18,814 |
| 74488710 | 25,055 | $161,184 | 1991 | 4 | 1,822 | $25,218 |
| 74488720 | 2,836 | $17,617 | 1992 | 1 | 2,522 | $38,471 |
| 74488750 | 5,113 | $35,841 | 1992 | 2 | 2,462 | $39,901 |
| 74488810 | 11,784 | $110,697 | 1992 | 3 | 2,984 | $53,872 |
| 74488820 | 4,367 | $38,163 | 1992 | 4 | 3,430 | $64,783 |
| 74613802 | 13,164 | $182,660 | 1993 | 1 | 3,697 | $68,541 |
| 74613803 | 4,092 | $39,969 | 1993 | 2 | 3,568 | $82,053 |
| 74613822 | 869 | $11,660 | 1993 | 3 | 3,572 | $88,906 |
| 74613902 | 515 | $7,758 | 1993 | 4 | 4,372 | $101,330 |
| 74613903 | 684 | $10,852 | 1994 | 1 | 4,541 | $96,092 |
| 74613922 | 19 | $537 | 1994 | 2 | 4,389 | $85,381 |
| 74650901 | 2,878 | $479,588 | 1994 | 3 | 4,739 | $82,710 |
| 74653301 | 33,357 | $2,175,491 | 1994 | 4 | 4,932 | $88,285 |
| 74653401 | 214 | $17,566 | 1995 | 1 | 6,082 | $109,805 |
| 74653501 | 1,179 | $166,454 | 1995 | 2 | 6,326 | $121,647 |
| 74710013 | 1,573 | $88,048 | 1995 | 3 | 5,508 | $127,412 |
| 74710023 | 1,261 | $57,683 | 1995 | 4 | 5,433 | $133,112 |
| 74710102 | 6,716 | $115,704 | 1996 | 1 | 6,325 | $143,400 |
| 74710113 | 2,660 | $84,699 | 1996 | 2 | 6,884 | $143,801 |
| 74710123 | 4,193 | $169,323 | 1996 | 3 | 7,651 | $160,860 |
| 74712007 | 2,595 | $39,267 | 1996 | 4 | 7,546 | $164,194 |
| 74713809 | 18,488 | $158,684 | 1997 | 1 | 7,214 | $152,307 |
| 74713909 | 2,926 | $51,222 | 1997 | 2 | 7,347 | $168,349 |
| 74790209 | 729 | $31,557 | 1997 | 3 | 7,544 | $172,099 |
| 74792202 | 3,272 | $74,388 | 1997 | 4 | 7,933 | $165,828 |
| 74792203 | 1,199 | $29,845 | 1998 | 1 | 9,778 | $180,598 |
| 74792209 | 2,470 | $51,416 | 1998 | 2 | 9,731 | $200,030 |
| 74792336 | 1,190 | $69,712 | 1998 | 3 | 12,997 | $232,146 |
| 74792337 | 2,070 | $134,132 | 1998 | 4 | 11,226 | $248,293 |
| 74792409 | 493 | $14,525 | 1999 | 1 | 11,508 | $236,053 |
| 74792609 | 4,324 | $126,224 | 1999 | 2 | 11,510 | $228,289 |
| 74794109 | 1,288 | $22,361 | 1999 | 3 | 11,201 | $219,580 |
| 74797205 | 2,302 | $32,918 | 1999 | 4 | 11,939 | $247,925 |
| 74797305 | 32 | $553 | 2000 | 1 | 13,510 | $228,678 |
| 74798302 | 6,048 | $158,959 | 2000 | 2 | 12,389 | $233,139 |
| 74798303 | 1,701 | $23,218 | 2000 | 3 | 12,809 | $250,797 |
| 74798309 | 7,989 | $146,436 | 2000 | 4 | 12,981 | $249,291 |
| 74798436 | 1,425 | $39,296 | 2001 | 1 | 14,052 | $250,726 |
| 74798437 | 5,067 | $174,259 | 2001 | 2 | 13,580 | $257,370 |
| 74798509 | 2,107 | $31,851 | 2001 | 3 | 13,325 | $274,153 |
| 74799009 | 1,133 | $16,187 | 2001 | 4 | 15,471 | $295,562 |
| Total | 331,440 | $6,562,620 | Total | | 331,440 | $6,562,621 |

**Table 22A: Breakdown of Michigan Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 6,184 | $63,497 | 1991 | 1 | 0 | $0 |
| 74397703 | 688 | $2,940 | 1991 | 2 | 0 | $0 |
| 74433201 | 149 | $17,565 | 1991 | 3 | 0 | $0 |
| 74488710 | 765 | $7,218 | 1991 | 4 | 0 | $0 |
| 74488720 | 187 | $2,485 | 1992 | 1 | 0 | $0 |
| 74488750 | 199 | $2,830 | 1992 | 2 | 0 | $0 |
| 74488810 | 684 | $4,605 | 1992 | 3 | 0 | $0 |
| 74488820 | 186 | $3,965 | 1992 | 4 | 0 | $0 |
| 74613802 | 4 | $29 | 1993 | 1 | 0 | $0 |
| 74613803 | 144 | $3,294 | 1993 | 2 | 0 | $0 |
| 74613822 | 427 | $9,280 | 1993 | 3 | 0 | $0 |
| 74613902 | 0 | $0 | 1993 | 4 | 0 | $0 |
| 74613903 | 8 | $244 | 1994 | 1 | 0 | $0 |
| 74613922 | 5 | $230 | 1994 | 2 | 0 | $0 |
| 74650901 | 672 | $143,168 | 1994 | 3 | 0 | $0 |
| 74653301 | 2,341 | $471,672 | 1994 | 4 | 0 | $0 |
| 74653401 | 48 | $4,002 | 1995 | 1 | 0 | $0 |
| 74653501 | 93 | $8,140 | 1995 | 2 | 0 | $0 |
| 74710013 | 29 | $843 | 1995 | 3 | 0 | $0 |
| 74710023 | 24 | $793 | 1995 | 4 | 0 | $0 |
| 74710102 | 72 | $3,844 | 1996 | 1 | 0 | $0 |
| 74710113 | 47 | $2,377 | 1996 | 2 | 0 | $0 |
| 74710123 | 254 | $14,269 | 1996 | 3 | 0 | $0 |
| 74712007 | 0 | $0 | 1996 | 4 | 0 | $0 |
| 74713809 | 795 | $20,629 | 1997 | 1 | 0 | $0 |
| 74713909 | 181 | $9,521 | 1997 | 2 | 0 | $0 |
| 74790209 | 16 | $330 | 1997 | 3 | 0 | $0 |
| 74792202 | 146 | $5,649 | 1997 | 4 | 0 | $0 |
| 74792203 | 10 | $260 | 1998 | 1 | 0 | $0 |
| 74792209 | 73 | $2,052 | 1998 | 2 | 0 | $0 |
| 74792336 | 123 | $10,201 | 1998 | 3 | 0 | $0 |
| 74792337 | 189 | $11,383 | 1998 | 4 | 0 | $0 |
| 74792409 | 14 | $154 | 1999 | 1 | 0 | $0 |
| 74792609 | 248 | $6,172 | 1999 | 2 | 0 | $0 |
| 74794109 | 38 | $906 | 1999 | 3 | 0 | $0 |
| 74797205 | 241 | $2,634 | 1999 | 4 | 0 | $0 |
| 74797305 | 17 | $1,017 | 2000 | 1 | 211 | $23,103 |
| 74798302 | 512 | $13,467 | 2000 | 2 | 212 | $21,700 |
| 74798303 | 185 | $3,268 | 2000 | 3 | 679 | $54,250 |
| 74798309 | 511 | $13,549 | 2000 | 4 | 3,023 | $208,497 |
| 74798436 | 325 | $13,510 | 2001 | 1 | 3,503 | $256,887 |
| 74798437 | 725 | $13,627 | 2001 | 2 | 3,376 | $127,435 |
| 74798509 | 60 | $1,172 | 2001 | 3 | 3,469 | $103,944 |
| 74799009 | 347 | $5,873 | 2001 | 4 | 3,493 | $106,848 |
| Total | 17,966 | $902,664 | Total | | 17,966 | $902,664 |

**Table 22B: Michigan SMRF-MAX Medicaid Spending by NDC and by Year-Quarter: 1994Q1-2000Q3**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 23,374 | $285,964 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,094 | $9,644 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,072 | $160,499 | 1991 | 3 | 0 | $0 |
| 74488710 | 6,784 | $83,674 | 1991 | 4 | 0 | $0 |
| 74488720 | 2,150 | $28,387 | 1992 | 1 | 0 | $0 |
| 74488750 | 1,382 | $11,307 | 1992 | 2 | 0 | $0 |
| 74488810 | 1,376 | $16,013 | 1992 | 3 | 0 | $0 |
| 74488820 | 1,024 | $17,785 | 1992 | 4 | 0 | $0 |
| 74613802 | 3,610 | $68,811 | 1993 | 1 | 0 | $0 |
| 74613803 | 1,202 | $23,300 | 1993 | 2 | 0 | $0 |
| 74613822 | 253 | $6,840 | 1993 | 3 | 0 | $0 |
| 74613902 | 18 | $202 | 1993 | 4 | 0 | $0 |
| 74613903 | 368 | $8,303 | 1994 | 1 | 1,934 | $85,610 |
| 74613922 | 12 | $340 | 1994 | 2 | 2,147 | $81,279 |
| 74650901 | 2,160 | $768,456 | 1994 | 3 | 2,027 | $66,026 |
| 74653301 | 7,006 | $1,922,148 | 1994 | 4 | 2,168 | $59,247 |
| 74653401 | 310 | $19,579 | 1995 | 1 | 2,385 | $66,946 |
| 74653501 | 811 | $71,466 | 1995 | 2 | 2,337 | $87,896 |
| 74710013 | 937 | $28,233 | 1995 | 3 | 2,646 | $106,195 |
| 74710023 | 512 | $14,466 | 1995 | 4 | 2,508 | $124,025 |
| 74710102 | 440 | $8,472 | 1996 | 1 | 2,950 | $150,662 |
| 74710113 | 518 | $27,320 | 1996 | 2 | 2,930 | $143,389 |
| 74710123 | 1,937 | $107,826 | 1996 | 3 | 2,934 | $126,952 |
| 74712007 | 0 | $0 | 1996 | 4 | 3,161 | $154,037 |
| 74713809 | 4,056 | $66,479 | 1997 | 1 | 3,324 | $167,505 |
| 74713909 | 1,026 | $25,742 | 1997 | 2 | 3,388 | $172,709 |
| 74790209 | 92 | $3,189 | 1997 | 3 | 3,636 | $216,573 |
| 74792202 | 568 | $21,234 | 1997 | 4 | 3,608 | $208,448 |
| 74792203 | 308 | $3,829 | 1998 | 1 | 4,095 | $239,625 |
| 74792209 | 1,099 | $33,379 | 1998 | 2 | 3,942 | $206,241 |
| 74792336 | 794 | $47,743 | 1998 | 3 | 3,800 | $222,796 |
| 74792337 | 926 | $53,845 | 1998 | 4 | 3,505 | $206,518 |
| 74792409 | 61 | $1,518 | 1999 | 1 | 3,397 | $200,599 |
| 74792609 | 1,451 | $22,472 | 1999 | 2 | 3,447 | $220,630 |
| 74794109 | 404 | $8,942 | 1999 | 3 | 3,467 | $206,103 |
| 74797205 | 1,590 | $17,963 | 1999 | 4 | 3,064 | $147,395 |
| 74797305 | 237 | $3,425 | 2000 | 1 | 3,036 | $171,175 |
| 74798302 | 2,045 | $60,771 | 2000 | 2 | 2,797 | $205,509 |
| 74798303 | 477 | $8,357 | 2000 | 3 | 2,912 | $182,723 |
| 74798309 | 1,471 | $33,815 | | | | |
| 74798436 | 1,139 | $49,917 | | | | |
| 74798437 | 1,470 | $45,701 | | | | |
| 74798509 | 386 | $5,954 | | | | |
| 74799009 | 2,595 | $23,503 | | | | |
| Total | 81,545 | $4,226,813 | Total | | 81,545 | $4,226,813 |

**Table 22C: Michigan SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1993Q4**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 2,250 | $20,901 | 1991 | 2 | 1,325 | $18,684 |
| 74397703 | 393 | $2,061 | 1991 | 3 | 965 | $16,442 |
| 74433201 | 62 | $7,960 | 1991 | 4 | 624 | $8,661 |
| 74488710 | 715 | $7,739 | 1992 | 1 | 520 | $8,158 |
| 74488720 | 190 | $1,330 | 1992 | 2 | 554 | $7,697 |
| 74488750 | 103 | $603 | 1992 | 3 | 627 | $8,831 |
| 74488810 | 270 | $2,966 | 1992 | 4 | 835 | $11,588 |
| 74488820 | 311 | $3,747 | 1993 | 1 | 838 | $9,389 |
| 74613802 | 903 | $11,361 | 1993 | 2 | 852 | $11,052 |
| 74613803 | 738 | $5,220 | 1993 | 3 | 1,182 | $24,069 |
| 74613902 | 3 | $12 | 1993 | 4 | 1,400 | $32,541 |
| 74613903 | 104 | $1,354 | | | | |
| 74650901 | 31 | $6,197 | | Total | 9,722 | $157,114 |
| 74653301 | 130 | $28,101 | | | | |
| 74653401 | 16 | $601 | | | | |
| 74653501 | 25 | $1,489 | | | | |
| 74710013 | 59 | $2,517 | | | | |
| 74710023 | 79 | $1,906 | | | | |
| 74710102 | 20 | $354 | | | | |
| 74710123 | 45 | $1,495 | | | | |
| 74713809 | 1,629 | $18,227 | | | | |
| 74713909 | 132 | $1,668 | | | | |
| 74790209 | 12 | $444 | | | | |
| 74792202 | 111 | $4,515 | | | | |
| 74792203 | 59 | $904 | | | | |
| 74792209 | 154 | $2,736 | | | | |
| 74792336 | 8 | $350 | | | | |
| 74792337 | 4 | $186 | | | | |
| 74792409 | 68 | $1,049 | | | | |
| 74792609 | 568 | $10,794 | | | | |
| 74794109 | 30 | $786 | | | | |
| 74797205 | 133 | $1,623 | | | | |
| 74797305 | 2 | $23 | | | | |
| 74798302 | 94 | $1,558 | | | | |
| 74798303 | 35 | $317 | | | | |
| 74798309 | 151 | $2,677 | | | | |
| 74798509 | 81 | $1,274 | | | | |
| 74799009 | 4 | $71 | | | | |
| Total | 9,722 | $157,114 | | | | |

**Table 23A: Breakdown of Louisiana Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 10,769 | $124,647 | 1991 | 1 | 0 | $0 |
| 74397703 | 0 | $0 | 1991 | 2 | 0 | $0 |
| 74433201 | 583 | $88,299 | 1991 | 3 | 0 | $0 |
| 74488710 | 10,066 | $67,572 | 1991 | 4 | 0 | $0 |
| 74488720 | 760 | $10,737 | 1992 | 1 | 0 | $0 |
| 74488750 | 135 | $981 | 1992 | 2 | 0 | $0 |
| 74488810 | 3,560 | $48,102 | 1992 | 3 | 0 | $0 |
| 74488820 | 807 | $15,401 | 1992 | 4 | 0 | $0 |
| 74613802 | 4,684 | $328,131 | 1993 | 1 | 0 | $0 |
| 74613803 | 1,630 | $33,559 | 1993 | 2 | 0 | $0 |
| 74613822 | 3,410 | $162,422 | 1993 | 3 | 2 | -$156 |
| 74613902 | 1,723 | $116,162 | 1993 | 4 | 5 | $45 |
| 74613903 | 260 | $16,574 | 1994 | 1 | 9 | $3,966 |
| 74613922 | 1,174 | $35,943 | 1994 | 2 | 49 | $7,540 |
| 74650901 | 598 | $116,477 | 1994 | 3 | 503 | $18,973 |
| 74653301 | 7,312 | $1,506,881 | 1994 | 4 | 1,098 | $43,685 |
| 74653401 | 597 | $7,036 | 1995 | 1 | 1,946 | $73,423 |
| 74653501 | 1,210 | $57,246 | 1995 | 2 | 2,566 | $104,497 |
| 74710013 | 105 | $10,293 | 1995 | 3 | 1,142 | $68,835 |
| 74710023 | 2,169 | $59,494 | 1995 | 4 | 1,354 | $61,794 |
| 74710102 | 234 | $9,974 | 1996 | 1 | 1,710 | $70,998 |
| 74710113 | 172 | $16,731 | 1996 | 2 | 2,275 | $105,014 |
| 74710123 | 998 | $65,431 | 1996 | 3 | 1,981 | $92,447 |
| 74712007 | 6 | $319 | 1996 | 4 | 2,284 | $99,477 |
| 74713809 | 16,555 | $138,527 | 1997 | 1 | 2,680 | $123,464 |
| 74713909 | 1,310 | $68,624 | 1997 | 2 | 2,357 | $111,501 |
| 74790209 | 134 | $6,140 | 1997 | 3 | 2,802 | $142,665 |
| 74792202 | 2,977 | $70,319 | 1997 | 4 | 2,877 | $138,037 |
| 74792203 | 577 | $9,964 | 1998 | 1 | 3,406 | $150,295 |
| 74792209 | 487 | $10,857 | 1998 | 2 | 2,701 | $118,822 |
| 74792336 | 361 | $15,971 | 1998 | 3 | 2,733 | $137,956 |
| 74792337 | 4,725 | $174,328 | 1998 | 4 | 3,016 | $162,185 |
| 74792409 | 7 | $154 | 1999 | 1 | 3,379 | $163,396 |
| 74792609 | 2,185 | $63,897 | 1999 | 2 | 2,795 | $173,040 |
| 74794109 | 459 | $16,632 | 1999 | 3 | 2,776 | $141,249 |
| 74797205 | 103 | $1,611 | 1999 | 4 | 3,999 | $216,435 |
| 74797305 | 6 | $26 | 2000 | 1 | 5,413 | $196,785 |
| 74798302 | 3,909 | $119,705 | 2000 | 2 | 11,120 | $279,157 |
| 74798303 | 1,333 | $29,683 | 2000 | 3 | 4,931 | $270,462 |
| 74798309 | 2,460 | $72,545 | 2000 | 4 | 4,693 | $229,671 |
| 74798436 | 896 | $46,744 | 2001 | 1 | 5,142 | $207,781 |
| 74798437 | 2,323 | $139,015 | 2001 | 2 | 3,511 | $81,737 |
| 74798509 | 488 | $15,224 | 2001 | 3 | 3,560 | $55,215 |
| 74799009 | 1,448 | $13,879 | 2001 | 4 | 4,890 | $61,872 |
| Total | 95,705 | $3,912,258 | Total | | 95,705 | $3,912,258 |

**Table 23B: Louisiana SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1994Q4**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 941 | $13,169 | 1991 | 1 | 160 | $4,028 |
| 74433201 | 190 | $38,719 | 1991 | 2 | 261 | $6,014 |
| 74488810 | 337 | $6,632 | 1991 | 3 | 159 | $9,084 |
| 74488820 | 346 | $6,826 | 1991 | 4 | 151 | $5,687 |
| 74613802 | 1,694 | $118,715 | 1992 | 1 | 214 | $9,344 |
| 74613803 | 23 | $374 | 1992 | 2 | 277 | $12,898 |
| 74613902 | 243 | $9,795 | 1992 | 3 | 246 | $12,358 |
| 74613903 | 25 | $547 | 1992 | 4 | 336 | $18,814 |
| 74650901 | 79 | $6,482 | 1993 | 1 | 305 | $15,535 |
| 74653301 | 404 | $76,848 | 1993 | 2 | 263 | $14,117 |
| 74653401 | 610 | $9,951 | 1993 | 3 | 376 | $19,819 |
| 74653501 | 7 | $1,565 | 1993 | 4 | 470 | $30,525 |
| 74710013 | 60 | $3,778 | 1994 | 1 | 545 | $38,253 |
| 74710023 | 801 | $18,958 | 1994 | 2 | 500 | $35,515 |
| 74710102 | 3 | $46 | 1994 | 3 | 2,348 | $83,498 |
| 74710113 | 7 | $748 | 1994 | 4 | 2,934 | $96,164 |
| 74710123 | 121 | $7,855 | | | | |
| 74713809 | 215 | $7,208 | | Total | 9,545 | $411,653 |
| 74713909 | 62 | $1,719 | | | | |
| 74792202 | 569 | $13,316 | | | | |
| 74792203 | 637 | $9,727 | | | | |
| 74792209 | 50 | $1,237 | | | | |
| 74792336 | 17 | $1,267 | | | | |
| 74792337 | 1,092 | $25,126 | | | | |
| 74792609 | 169 | $6,792 | | | | |
| 74794109 | 11 | $263 | | | | |
| 74797205 | 49 | $628 | | | | |
| 74798302 | 283 | $9,321 | | | | |
| 74798303 | 281 | $8,179 | | | | |
| 74798309 | 74 | $1,806 | | | | |
| 74798436 | 9 | $509 | | | | |
| 74798437 | 60 | $2,112 | | | | |
| 74798509 | 76 | $1,438 | | | | |
| Total | 9,545 | $411,653 | | | | |

**Table 24A: Breakdown of Wisconsin Medicaid Spending by NDC and by Year-Quarter**

| | *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 15,307 | $147,417 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,512 | $12,444 | 1991 | 2 | 0 | $0 |
| 74433201 | 468 | $30,355 | 1991 | 3 | 0 | $0 |
| 74488710 | 5,607 | $48,196 | 1991 | 4 | 0 | $0 |
| 74488720 | 2,778 | $30,479 | 1992 | 1 | 17 | $198 |
| 74488750 | 1,252 | $7,901 | 1992 | 2 | 8 | $84 |
| 74488810 | 1,414 | $28,730 | 1992 | 3 | 11 | $102 |
| 74488820 | 1,429 | $14,040 | 1992 | 4 | 213 | $10,712 |
| 74613802 | 6,171 | $182,003 | 1993 | 1 | 769 | $25,593 |
| 74613803 | 770 | $17,232 | 1993 | 2 | 1,254 | $51,834 |
| 74613822 | 749 | $21,118 | 1993 | 3 | 1,193 | $41,572 |
| 74613902 | 156 | $12,309 | 1993 | 4 | 1,457 | $46,850 |
| 74613903 | 117 | $1,029 | 1994 | 1 | 1,744 | $51,209 |
| 74613922 | 39 | $1,395 | 1994 | 2 | 1,770 | $51,230 |
| 74650901 | 1,706 | $304,603 | 1994 | 3 | 1,665 | $59,346 |
| 74653301 | 4,198 | $404,673 | 1994 | 4 | 1,805 | $83,966 |
| 74653401 | 36 | $1,894 | 1995 | 1 | 1,647 | $60,860 |
| 74653501 | 148 | $13,549 | 1995 | 2 | 1,647 | $55,793 |
| 74710013 | 124 | $4,703 | 1995 | 3 | 1,689 | $54,492 |
| 74710023 | 360 | $19,016 | 1995 | 4 | 1,884 | $58,520 |
| 74710102 | 201 | $9,438 | 1996 | 1 | 1,996 | $56,217 |
| 74710113 | 144 | $11,659 | 1996 | 2 | 1,827 | $44,575 |
| 74710123 | 1,062 | $188,380 | 1996 | 3 | 1,754 | $51,906 |
| 74712007 | 489 | $25,424 | 1996 | 4 | 1,929 | $62,222 |
| 74713809 | 4,321 | $94,430 | 1997 | 1 | 1,781 | $59,391 |
| 74713909 | 1,100 | $49,300 | 1997 | 2 | 1,846 | $73,184 |
| 74790209 | 789 | $73,349 | 1997 | 3 | 1,801 | $70,864 |
| 74792202 | 585 | $24,647 | 1997 | 4 | 2,097 | $95,279 |
| 74792203 | 95 | $3,423 | 1998 | 1 | 2,490 | $97,259 |
| 74792209 | 1,836 | $50,310 | 1998 | 2 | 2,038 | $84,079 |
| 74792336 | 370 | $27,359 | 1998 | 3 | 2,031 | $81,431 |
| 74792337 | 782 | $44,136 | 1998 | 4 | 2,171 | $83,831 |
| 74792409 | 736 | $43,096 | 1999 | 1 | 2,393 | $90,636 |
| 74792609 | 3,136 | $161,388 | 1999 | 2 | 2,183 | $93,397 |
| 74794109 | 660 | $30,853 | 1999 | 3 | 1,978 | $86,948 |
| 74797205 | 169 | $2,902 | 1999 | 4 | 2,231 | $92,879 |
| 74797305 | 11 | $143 | 2000 | 1 | 2,632 | $99,865 |
| 74798302 | 1,311 | $54,489 | 2000 | 2 | 2,448 | $77,982 |
| 74798303 | 638 | $17,094 | 2000 | 3 | 2,694 | $93,042 |
| 74798309 | 3,406 | $94,746 | 2000 | 4 | 2,528 | $90,136 |
| 74798436 | 610 | $42,696 | 2001 | 1 | 2,969 | $91,015 |
| 74798437 | 1,201 | $86,697 | 2001 | 2 | 2,717 | $60,929 |
| 74798509 | 623 | $29,048 | 2001 | 3 | 2,210 | $42,723 |
| 74799009 | 2,515 | $14,203 | 2001 | 4 | 2,614 | $50,143 |
| Total | 72,131 | $2,482,297 | Total | | 72,131 | $2,482,297 |

**Table 24B: Wisconsin SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1993Q1**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 486 | $5,110 | 1991 | 1 | 14 | $3,273 |
| 74397703 | 118 | $566 | 1991 | 2 | 169 | $8,899 |
| 74433201 | 66 | $10,716 | 1991 | 3 | 353 | $15,225 |
| 74488710 | 269 | $1,970 | 1991 | 4 | 304 | $7,244 |
| 74488720 | 630 | $4,403 | 1992 | 1 | 508 | $11,270 |
| 74488750 | 38 | $259 | 1992 | 2 | 399 | $11,970 |
| 74488810 | 92 | $1,199 | 1992 | 3 | 497 | $15,144 |
| 74488820 | 212 | $3,107 | 1992 | 4 | 605 | $16,967 |
| 74613802 | 24 | $258 | 1993 | 1 | 569 | $17,310 |
| 74613803 | 46 | $731 | | | | |
| 74613903 | 1 | $15 | | Total | 3,418 | $107,302 |
| 74650901 | 3 | $577 | | | | |
| 74653301 | 98 | $22,561 | | | | |
| 74710013 | 10 | $944 | | | | |
| 74710023 | 29 | $1,201 | | | | |
| 74710113 | 2 | $386 | | | | |
| 74710123 | 59 | $13,410 | | | | |
| 74713809 | 732 | $13,897 | | | | |
| 74713909 | 143 | $12,464 | | | | |
| 74790209 | 55 | $1,897 | | | | |
| 74792202 | 116 | $5,842 | | | | |
| 74792203 | 1 | $4 | | | | |
| 74792209 | 8 | $209 | | | | |
| 74792409 | 17 | $483 | | | | |
| 74792609 | 120 | $3,951 | | | | |
| 74794109 | 5 | $99 | | | | |
| 74798302 | 10 | $463 | | | | |
| 74798303 | 6 | $137 | | | | |
| 74798309 | 5 | $96 | | | | |
| 74798437 | 2 | $131 | | | | |
| 74798509 | 5 | $125 | | | | |
| 74799009 | 10 | $93 | | | | |
| Total | 3,418 | $107,302 | | | | |

**Table 25: Medicaid Summary for Top Ten States, Louisiana (#12), and Wisconsin (#17)**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| Illinois | State Claims | 1991Q2-2001Q4 | 519,450 | 534,183 | $12,029,039 | $16,527,505 | $6,014,519 | 58,631 |
| Florida | State Claims | 1993Q4-2001Q4 | 278,623 | 287,959 | $11,700,280 | $15,561,037 | $6,532,311 | 67,076 |
| Florida | SDUD Data | 1991Q1-1993Q3 | 34,802 | 39,861 | $939,551 | $1,379,301 | $514,820 | - |
| California | State Claims | 1994Q2-2001Q4 | 267,167 | 280,994 | $7,044,315 | $9,172,917 | $3,585,421 | 56,269 |
| New Jersey | State Claims | 1992Q1-2001Q4 | 124,513 | 126,067 | $7,191,020 | $8,453,921 | $3,595,511 | 11,446 |
| New Jersey | SDUD | 1991Q1-1991Q4 | 12,374 | 13,798 | $727,856 | $915,392 | $363,928 | - |
| New York | State Claims | 1993Q1-2001Q4 | 108,386 | 120,315 | $6,877,666 | $8,921,858 | $3,438,833 | 38,184 |
| New York | SDUD | 1991Q1-1992Q4 | 5,263 | 5,791 | $149,690 | $192,898 | $74,845 | - |
| Indiana | SMRF / MAX | 1992Q1-2001Q4 | 175,577 | 182,042 | $11,214,412 | $14,812,193 | $6,936,732 | 28,880 |
| Indiana | SDUD | 1991Q1-1991Q4 | 8,572 | 9,044 | $137,297 | $249,529 | $86,826 | - |
| Kentucky | State Claims | 1995Q1-2001Q4 | 96,452 | 100,007 | $4,737,344 | $6,190,786 | $3,331,076 | 16,044 |
| Kentucky | SMRF / MAX | 1992Q1-1994Q4 | 17,559 | 20,725 | $545,830 | $910,013 | $390,572 | 3,589 |
| Kentucky | SDUD | 1991Q1-1991Q4 | 2,961 | 3,401 | $77,795 | $128,833 | $56,759 | - |
| Missouri | State Claims | 1998Q1-2001Q4 | 70,680 | 75,389 | $3,448,247 | $4,263,226 | $2,087,491 | 8,304 |
| Missouri | SMRF / MAX | 1992Q1-1997Q4 | 61,884 | 66,684 | $2,459,315 | $3,184,492 | $1,480,343 | 8,418 |
| Missouri | SDUD | 1991Q1-1991Q4 | 1,568 | 2,136 | $35,736 | $63,533 | $21,377 | - |
| Ohio | State Claims | 1991Q1-2001Q4 | 276,856 | 324,854 | $3,208,340 | $6,556,337 | $1,899,148 | 37,695 |
| Michigan | State Claims | 2000Q4-2001Q4 | 14,389 | 15,986 | $537,789 | $792,346 | $300,440 | 4,479 |
| Michigan | SMRF / MAX | 1994Q1-2000Q3 | 73,749 | 81,219 | $3,109,367 | $4,222,782 | $1,703,230 | 14,845 |
| Michigan | SDUD | 1991Q1-1993Q4 | 6,844 | 9,722 | $66,162 | $157,114 | $36,565 | - |
| Louisiana | State Claims | 1995Q1-2001Q4 | 73,705 | 76,520 | $2,970,914 | $3,834,631 | $2,102,350 | 7,211 |
| Louisiana | SDUD | 1991Q1-1994Q4 | 8,417 | 9,408 | $257,830 | $407,099 | $190,429 | - |
| Wisconsin | State Claims | 1993Q2-2001Q4 | 63,647 | 70,145 | $1,683,017 | $2,440,008 | $998,395 | 13,988 |
| Wisconsin | SDUD | 1991Q1-1993Q1 | 2,976 | 3,248 | $73,335 | $105,891 | $44,110 | - |
| Total for First 12 States | | 1991-2001 | 2,306,414 | 2,459,498 | $81,222,147 | $109,443,642 | $45,786,034 | 375,059 |
| Total for Remaining 38 States | | | 840,500 | 894,567 | $32,597,636 | $47,701,979 | $19,989,558 | 146,636 |
| **Total for All 50 States** | | | **3,146,914** | **3,354,065** | **$113,819,783** | **$157,145,620** | **$65,775,591** | **521,695** |

Table 26A: SMRF / MAX Medicaid Spending and Utilization for the Other 38 States

| State | Rank | Total Paid | Total Clms | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 | 1995 | 1994 | 1993 | 1992 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North Carolina | 11 | $2,826,311 | 27,754 | $725,682 | $1,256,144 | $844,485 | | | | | | | |
| Georgia | 13 | $3,366,299 | 38,570 | $448,494 | $617,949 | $530,162 | $520,883 | $436,798 | $318,083 | $214,428 | $169,374 | $110,128 | |
| Pennsylvania | 14 | $3,000,627 | 51,022 | $353,285 | $456,363 | $517,822 | $430,876 | $416,621 | $271,065 | $233,988 | $183,603 | $81,284 | $55,720 |
| Arkansas | 15 | $2,860,904 | 34,561 | $297,699 | $545,795 | $406,726 | $365,113 | $373,510 | $382,926 | $225,452 | $154,887 | $73,143 | $35,653 |
| Virginia | 16 | $1,153,624 | 21,471 | $275,114 | $468,092 | $410,418 | | | | | | | |
| Washington | 18 | $2,405,010 | 56,517 | $138,848 | $324,555 | $422,238 | $312,231 | $215,126 | $435,354 | $167,992 | $157,464 | $141,685 | $89,517 |
| Alabama | 19 | $1,382,100 | 28,681 | $285,938 | $383,800 | $303,136 | | | | $160,879 | $134,685 | $85,736 | $27,926 |
| Texas | 20 | $711,035 | 27,663 | $194,040 | $243,426 | $273,569 | | | | | | | |
| Connecticut | 21 | $905,260 | 16,473 | $123,657 | $269,635 | $511,968 | | | | | | | |
| Massachusetts | 22 | $1,316,903 | 25,179 | $470,458 | $475,184 | $371,261 | | | | | | | |
| Mississippi | 23 | $2,555,123 | 23,312 | $304,662 | $611,198 | $490,180 | $481,837 | $266,232 | $155,626 | $117,913 | $85,520 | $41,955 | |
| Colorado | 24 | $2,259,903 | 35,637 | $275,921 | $444,437 | $369,774 | $270,738 | $313,614 | $259,987 | $164,307 | $161,125 | | |
| South Carolina | 25 | $400,646 | 2,979 | $71,554 | $128,369 | $200,723 | | | | | | | |
| Maryland | 26 | $453,987 | 24,933 | $165,791 | $121,772 | $166,424 | | | | | | | |
| Oklahoma | 27 | $891,933 | 20,906 | $170,312 | $328,495 | $393,126 | | | | | | | |
| West Virginia | 28 | $865,361 | 9,557 | $89,835 | $486,140 | $289,386 | | | | | | | |
| Minnesota | 29 | $1,050,355 | 37,639 | $96,596 | $177,504 | $129,124 | $139,008 | $121,210 | $116,780 | $112,409 | $115,581 | $42,143 | |
| Oregon | 30 | $220,142 | 5,363 | $52,265 | $53,865 | $114,012 | | | | | | | |
| Utah | 31 | $889,949 | 27,134 | $61,414 | $99,521 | $128,407 | $155,904 | $120,226 | $90,211 | $99,170 | $51,448 | $35,204 | $48,444 |
| Nevada | 32 | $420,031 | 3,332 | $41,850 | $153,781 | $224,400 | | | | | | | |
| Nebraska | 33 | $258,153 | 6,626 | $48,659 | $99,241 | $110,253 | | | | | | | |
| Kansas | 34 | $788,957 | 25,916 | $78,975 | $52,064 | $80,293 | $87,729 | $127,260 | $87,710 | $83,457 | $79,795 | $67,298 | $44,376 |
| Iowa | 35 | $1,047,543 | 22,917 | $109,616 | $193,400 | $220,360 | $192,651 | $103,407 | $59,831 | $42,058 | $39,965 | $54,246 | $32,009 |
| South Dakota | 36 | $173,158 | 3,716 | $34,685 | $62,906 | $75,567 | | | | | | | |
| Rhode Island | 37 | $220,677 | 3,560 | $40,280 | $84,291 | $40,684 | | | | $55,422 | | | |
| Hawaii | 38 | $72,715 | 5,305 | $18,333 | $19,480 | $17,843 | | | | | | $9,849 | $7,210 |
| Montana | 39 | $321,062 | 7,207 | $18,489 | $43,911 | $63,972 | $59,601 | $62,869 | $25,685 | $10,219 | $12,618 | $15,125 | $8,573 |
| Maine | 40 | $360,351 | 5,417 | $23,186 | $53,556 | $77,844 | $50,606 | $36,160 | $17,834 | $76,267 | $5,452 | $16,736 | $2,710 |
| Wyoming | 41 | $361,243 | 5,277 | $39,168 | $64,911 | $70,526 | $42,664 | $21,514 | $53,773 | $27,654 | $24,709 | $13,433 | $2,891 |
| Tennessee | 42 | $168 | 6,941 | $168 | $0 | $0 | | | | | | | |
| Delaware | 43 | $305,028 | 6,383 | $75,431 | $72,662 | $37,100 | $24,233 | $20,032 | $32,717 | $24,474 | $11,125 | $7,254 | |
| North Dakota | 44 | $207,405 | 3,473 | $10,582 | $62,091 | $34,098 | $26,137 | $26,381 | $15,647 | $10,392 | $6,428 | $5,227 | $10,422 |
| Idaho | 45 | $65,222 | 1,209 | $20,016 | $12,520 | $5,650 | $12,638 | $5,038 | $9,360 | | | | |
| New Hampshire | 46 | $112,206 | 3,611 | $21,816 | $17,379 | $17,064 | $8,329 | $4,329 | $9,477 | $20,252 | $4,447 | $5,624 | $3,489 |
| New Mexico | 47 | $54,842 | 1,679 | $8,712 | $11,246 | $7,600 | $3,667 | $4,912 | $18,705 | | | | |
| Alaska | 48 | $59,843 | 2,461 | $4,921 | $6,360 | $6,593 | $6,771 | $9,546 | $7,095 | $7,725 | $6,501 | $3,676 | $655 |
| Vermont | 49 | $64,079 | 1,826 | $10,000 | $12,994 | $12,153 | $16,729 | $2,996 | $919 | $3,807 | $1,968 | $949 | $1,564 |
| Washington, D.C. | 50 | $23,455 | 466 | $5,996 | $12,453 | $5,006 | | | | | | | |
| Arizona | - | $41,361 | 4,691 | $6,101 | $24,258 | $11,002 | | | | | | | |
| Total | - | $34,472,971 | 637,364 | $5,218,549 | $8,551,748 | $7,990,949 | $3,208,345 | $2,687,781 | $2,368,785 | $1,858,265 | $1,406,695 | $810,695 | $371,159 |

Table excludes 1991 data when Alabama and Hawaii have $2,695 and $35, respectively, in Medicaid spending for the Complaint products in the SMRF-Max data and all other states have zero.

**Table 26B: SDUD Medicaid Spending and Utilization for Remaining State-Years**

| State | Rank | Paid 91-98 | Clms 91-98 | 1998 | 1997 | 1996 | 1995 | 1994 | 1993 | 1992 | 1991 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| North Carolina | 11 | $1,543,854 | 18,499 | $538,405 | $267,599 | $213,925 | $194,512 | $161,567 | $113,206 | $38,500 | $16,141 |
| Georgia | 13 | $22,313 | 202 | | | | | | | $20,072 | $2,241 |
| Pennsylvania | 14 | $28,360 | 113 | | | | | | | | $28,360 |
| Arkansas | 15 | $20,205 | 527 | | | | | | | | $20,205 |
| Virginia | 16 | $1,381,656 | 40,808 | $294,944 | $232,493 | $253,370 | $201,908 | $182,743 | $104,877 | $79,500 | $31,822 |
| Washington | 18 | $92,451 | 2,063 | | | | | | | | $92,451 |
| Alabama | 19 | $800,957 | 11,629 | $261,291 | $267,171 | $252,113 | | | | | $20,383 |
| Texas | 20 | $1,385,016 | 34,914 | $302,873 | $282,694 | $195,877 | $240,827 | $203,989 | $75,451 | $54,681 | $28,624 |
| Connecticut | 21 | $1,020,758 | 17,355 | $390,245 | $260,312 | $112,415 | $97,409 | $73,780 | $53,301 | $25,538 | $7,759 |
| Massachusetts | 22 | $614,293 | 13,952 | $247,108 | $181,862 | $108,943 | $27,716 | $21,907 | $14,949 | $8,105 | $3,703 |
| Mississippi | 23 | $23,900 | 761 | | | | | | | $18,223 | $5,677 |
| Colorado | 24 | $177,121 | 4,235 | | | | | | $119,972 | $44,246 | $12,902 |
| South Carolina | 25 | $1,503,505 | 3,317 | $360,716 | $251,261 | $287,371 | $299,880 | $175,530 | $84,170 | $38,950 | $5,627 |
| Maryland | 26 | $1,419,412 | 47,398 | $100,633 | $283,898 | $245,721 | $202,494 | $181,086 | $85,035 | $193,505 | $127,041 |
| Oklahoma | 27 | $756,404 | 20,044 | $265,852 | $199,266 | $132,243 | $70,392 | $36,939 | $41,254 | $6,343 | $4,115 |
| West Virginia | 28 | $467,998 | 7,509 | $221,573 | $91,497 | $59,383 | $46,515 | $33,864 | $9,873 | $4,885 | $409 |
| Minnesota | 29 | $106,800 | 5,366 | | | | | | | $52,573 | $54,227 |
| Oregon | 30 | $793,901 | 19,846 | $84,076 | $94,523 | $77,558 | $129,759 | $137,210 | $142,879 | $76,539 | $51,358 |
| Utah | 31 | $37,817 | 701 | | | | | | | | $37,817 |
| Nevada | 32 | $327,451 | 2,601 | $130,699 | $31,809 | $35,076 | $43,536 | $37,803 | $40,783 | $6,435 | $1,309 |
| Nebraska | 33 | $484,720 | 13,484 | $90,619 | $78,368 | $53,865 | $71,810 | $127,778 | $34,028 | $26,971 | $1,281 |
| Kansas | 34 | $10,510 | 733 | | | | | | | | $10,510 |
| Iowa | 35 | $32,121 | 864 | | | | | | | | $32,121 |
| South Dakota | 36 | $269,774 | 7,816 | $50,289 | $62,324 | $39,450 | $50,132 | $32,591 | $16,058 | $12,870 | $6,059 |
| Rhode Island | 37 | $205,523 | 3,054 | $74,846 | $60,864 | $55,600 | | $4,845 | $6,403 | $2,352 | $614 |
| Hawaii | 38 | $198,849 | 5,110 | $76,501 | $49,622 | $32,394 | $14,791 | $20,851 | | | $4,690 |
| Montana | 39 | $7,883 | 171 | | | | | | | | $7,883 |
| Maine | 40 | $3,021 | 81 | | | | | | | | $3,021 |
| Wyoming | 41 | $615 | 21 | | | | | | | | $615 |
| Tennessee | 42 | $116,412 | 918 | | | | | $10,025 | $43,542 | $53,667 | $9,178 |
| Delaware | 43 | $8,418 | 221 | | | | | | | $1,894 | $6,524 |
| North Dakota | 44 | $2,628 | 95 | | | | | | | | $2,628 |
| Idaho | 45 | $38,046 | 85 | | | | $16,104 | $12,214 | | $4,133 | $5,595 |
| New Hampshire | 46 | $2,151 | 89 | | | | | | | | $2,151 |
| New Mexico | 47 | $7,921 | 453 | | | | $3,333 | $1,076 | $574 | $1,907 | $1,032 |
| Alaska | 48 | $765 | 38 | | | | | | | | $765 |
| Vermont | 49 | $4,702 | 192 | | | | | | | | $4,702 |
| Washington, D.C. | 50 | $25,640 | 994 | $11,884 | $2,213 | $1,593 | $1,367 | $1,071 | $1,589 | $3,273 | $2,650 |
| Arizona | - | $0 | 0 | | | | | | | | |
| Total | - | $13,943,873 | 286,259 | $3,502,552 | $2,697,775 | $2,156,896 | $1,712,484 | $1,456,868 | $987,945 | $775,163 | $654,190 |

**Table 27A: Medicaid Summary for States 11 through 31 (excluding LA and WI)**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| North Carolina | SMRF / MAX | 1999-2001 | 25,609 | 27,745 | $1,910,915 | $2,857,012 | $1,197,752 | 4,785 |
| North Carolina | SDUD | 1991-1998 | 17,358 | 18,499 | $1,090,550 | $1,543,854 | $699,295 | |
| Georgia | SMRF / MAX | 1993-2001 | 36,134 | 38,431 | $2,361,978 | $3,359,367 | $1,437,914 | 2,382 |
| Georgia | SDUD | 1991-1992 | 186 | 202 | $13,832 | $22,313 | $8,538 | |
| Pennsylvania | SMRF / MAX | 1992-2001 | 46,414 | 50,006 | $2,064,556 | $2,957,576 | $1,107,918 | 15,402 |
| Pennsylvania | SDUD | 1991 | 110 | 113 | $21,991 | $28,360 | $12,456 | |
| Arkansas | SMRF / MAX | 1992-2001 | 32,357 | 34,413 | $2,016,946 | $2,861,483 | $1,477,829 | 9,483 |
| Arkansas | SDUD | 1991 | 459 | 527 | $12,194 | $20,205 | $9,160 | |
| Virginia | SMRF / MAX | 1999-2001 | 19,815 | 21,369 | $777,101 | $1,171,164 | $401,601 | 4,732 |
| Virginia | SDUD | 1991-1998 | 38,077 | 40,808 | $933,092 | $1,381,656 | $474,572 | |
| Washington | SMRF / MAX | 1992-2001 | 52,763 | 56,109 | $1,652,202 | $2,418,868 | $858,617 | 12,358 |
| Washington | SDUD | 1991 | 1,825 | 2,063 | $46,503 | $92,451 | $25,209 | |
| Alabama | SMRF / MAX | 1992-95,1999-01 | 26,717 | 28,514 | $915,906 | $1,402,565 | $640,809 | 4,840 |
| Alabama | SDUD | 1991,1996-98 | 11,184 | 11,778 | $587,926 | $800,957 | $409,415 | |
| Texas | SMRF / MAX | 1999-2001 | 25,610 | 27,633 | $426,132 | $711,035 | $263,022 | 10,849 |
| Texas | SDUD | 1991-1998 | 33,691 | 34,914 | $973,413 | $1,385,016 | $613,417 | |
| Connecticut | SMRF / MAX | 1999-2001 | 15,551 | 16,532 | $652,917 | $952,276 | $326,459 | 1,660 |
| Connecticut | SDUD | 1991-1998 | 16,467 | 17,355 | $743,110 | $1,020,758 | $371,555 | |
| Massachusetts | SMRF / MAX | 1999-2001 | 23,407 | 25,027 | $863,595 | $1,314,523 | $431,798 | 7,161 |
| Massachusetts | SDUD | 1991-1998 | 13,421 | 13,952 | $458,839 | $614,293 | $229,420 | |
| Mississippi | SMRF / MAX | 1993-2001 | 21,906 | 23,262 | $1,838,235 | $2,556,485 | $1,420,321 | 5,804 |
| Mississippi | SDUD | 1991-1992 | 728 | 761 | $14,945 | $23,900 | $11,952 | |
| South Carolina | SMRF / MAX | 1999-2001 | 2,781 | 2,982 | $282,323 | $428,294 | $197,528 | 1,167 |
| South Carolina | SDUD | 1991-1998 | 3,117 | 3,317 | $1,019,022 | $1,503,505 | $720,126 | |
| Colorado | SMRF / MAX | 1994-2001 | 32,614 | 34,589 | $1,520,235 | $2,214,308 | $783,779 | 6,599 |
| Colorado | SDUD | 1991-1993 | 3,999 | 4,235 | $119,482 | $177,121 | $65,057 | |
| Maryland | SMRF / MAX | 1999-2001 | 23,215 | 24,517 | $274,032 | $453,759 | $137,016 | 3,232 |
| Maryland | SDUD | 1991-1998 | 44,968 | 47,398 | $960,343 | $1,419,412 | $480,171 | |
| Oklahoma | SMRF / MAX | 1999-2001 | 19,583 | 20,675 | $621,364 | $892,326 | $441,131 | 4,442 |
| Oklahoma | SDUD | 1991-1998 | 19,228 | 20,044 | $541,024 | $756,404 | $379,672 | |
| West Virginia | SMRF / MAX | 1999-2001 | 8,897 | 9,554 | $579,278 | $885,134 | $432,778 | 2,658 |
| West Virginia | SDUD | 1991-1998 | 7,176 | 7,509 | $337,486 | $467,998 | $248,789 | |
| Minnesota | SMRF / MAX | 1993-2001 | 30,595 | 32,459 | $662,930 | $1,009,694 | $350,631 | 11,909 |
| Minnesota | SDUD | 1991-1992 | 4,940 | 5,366 | $55,115 | $106,800 | $29,765 | |
| Oregon | SMRF / MAX | 1999-2001 | 4,965 | 5,360 | $149,338 | $222,648 | $90,063 | 1,735 |
| Oregon | SDUD | 1991-1998 | 18,896 | 19,846 | $546,655 | $793,901 | $338,964 | |
| Utah | SMRF / MAX | 1992-2001 | 25,131 | 27,122 | $590,522 | $892,038 | $429,372 | 4,616 |
| Utah | SDUD | 1991 | 643 | 701 | $25,815 | $37,817 | $19,333 | |
| Total | | 1991-2001 | 710,537 | 755,687 | $28,661,842 | $41,757,276 | $17,573,204 | 115,814 |

**Table 27B: Medicaid Summary for States 32 through 50**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| Nevada | SMRF / MAX | 1999-2001 | 3,102 | 3,333 | $305,435 | $422,338 | $152,806 | 704 |
| Nevada | SDUD | 1991-1998 | 2,413 | 2,601 | $219,973 | $327,451 | $110,655 | |
| Nebraska | SMRF / MAX | 1999-2001 | 6,226 | 6,629 | $177,184 | $273,719 | $108,217 | 2,263 |
| Nebraska | SDUD | 1991-1998 | 12,736 | 13,484 | $328,857 | $484,720 | $200,453 | |
| Kansas | SMRF / MAX | 1992-2001 | 24,070 | 25,749 | $512,508 | $826,369 | $303,890 | 5,404 |
| Kansas | SDUD | 1991 | 606 | 733 | $4,215 | $10,510 | $2,417 | |
| Iowa | SMRF / MAX | 1992-2001 | 21,139 | 22,714 | $719,272 | $1,061,276 | $455,289 | 8,233 |
| Iowa | SDUD | 1991 | 818 | 864 | $20,524 | $32,121 | $13,014 | |
| South Dakota | SMRF / MAX | 1999-2001 | 3,480 | 3,716 | $117,277 | $173,158 | $80,201 | 1,009 |
| South Dakota | SDUD | 1991-1998 | 7,506 | 7,816 | $189,949 | $269,774 | $128,334 | |
| Rhode Island | SMRF / MAX | 1995,1999-01 | 3,279 | 3,544 | $142,379 | $224,157 | $77,244 | 550 |
| Rhode Island | SDUD | 1991-94,1996-98 | 2,922 | 3,054 | $154,502 | $205,523 | $82,806 | |
| Montana | SMRF / MAX | 1992-2001 | 6,743 | 7,204 | $222,865 | $327,431 | $157,710 | 1,907 |
| Montana | SDUD | 1991 | 139 | 171 | $4,527 | $7,883 | $3,247 | |
| Hawaii | SMRF / MAX | 1999-01,1992-93 | 4,631 | 5,003 | $40,998 | $72,730 | $21,043 | 456 |
| Hawaii | SDUD | 1991,1994-98 | 5,149 | 5,527 | $135,933 | $198,849 | $68,058 | |
| Maine | SMRF / MAX | 1992-2001 | 5,054 | 5,419 | $247,269 | $364,368 | $160,690 | 2,439 |
| Maine | SDUD | 1991 | 73 | 81 | $1,538 | $3,021 | $977 | |
| Wyoming | SMRF / MAX | 1992-2001 | 4,946 | 5,235 | $245,884 | $360,392 | $155,375 | 1,855 |
| Wyoming | SDUD | 1991 | 15 | 21 | $345 | $615 | $235 | |
| Tennessee | SDUD | 1991-1994 | 856 | 918 | $74,016 | $116,412 | $50,299 | |
| Delaware | SMRF / MAX | 1993-2001 | 5,907 | 6,381 | $196,402 | $305,021 | $98,277 | 1,298 |
| Delaware | SDUD | 1991-1992 | 177 | 221 | $4,320 | $8,418 | $2,162 | |
| North Dakota | SMRF / MAX | 1992-2001 | 3,159 | 3,362 | $141,548 | $222,881 | $98,981 | 1,921 |
| North Dakota | SDUD | 1991 | 84 | 95 | $1,314 | $2,628 | $920 | |
| Idaho | SMRF / MAX | 1996-2001 | 175 | 180 | $19,674 | $27,036 | $13,578 | 186 |
| Idaho | SDUD | 1991-1995 | 80 | 85 | $25,069 | $38,046 | $17,884 | |
| New Hampshire | SMRF / MAX | 1992-2001 | 3,411 | 3,607 | $71,603 | $112,152 | $35,801 | 1,488 |
| New Hampshire | SDUD | 1991 | 84 | 89 | $1,372 | $2,151 | $686 | |
| New Mexico | SMRF / MAX | 1996-2001 | 551 | 590 | $18,907 | $27,284 | $13,764 | 564 |
| New Mexico | SDUD | 1991-1995 | 419 | 453 | $4,503 | $7,921 | $3,320 | |
| Alaska | SMRF / MAX | 1992-2001 | 2,261 | 2,456 | $35,236 | $59,789 | $18,483 | 579 |
| Alaska | SDUD | 1991 | 35 | 38 | $309 | $765 | $154 | |
| Vermont | SMRF / MAX | 1992-2001 | 1,662 | 1,797 | $40,684 | $63,732 | $25,187 | 429 |
| Vermont | SDUD | 1991 | 176 | 192 | $2,111 | $4,702 | $1,308 | |
| Washington, D.C. | SMRF / MAX | 1999-2001 | 432 | 458 | $14,900 | $23,509 | $7,450 | 241 |
| Washington, D.C. | SDUD | 1991-1998 | 962 | 994 | $17,800 | $25,640 | $8,900 | |
| Total | | 1991-2001 | 129,963 | 138,880 | $3,935,794 | $5,944,703 | $2,416,354 | 30,822 |

**Table 28: Summary of Medicare DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|---------|-----------|-----------|---------|-----------|
| J3370 | 284,572 | $24,495,216 | 19911 | 2 | $0 |
| J7051 | 149,811 | $1,540,660 | 19912 | 3 | $0 |
| J2912 | 93,194 | $19,623 | 19913 | 1 | $0 |
| J7030 | 19,567 | $7,605 | 19914 | 2 | $0 |
| J7070 | 8,534 | $6,937 | 19921 | 34 | $85 |
| J7050 | 42,326 | $6,639 | 19922 | 36 | $0 |
| J7060 | 15,267 | $6,636 | 19923 | 38 | $6 |
| J7040 | 11,881 | $2,671 | 19924 | 221 | $3,932 |
| J7042 | 17,449 | $126 | 19931 | 697 | $10,684 |
| J7130 | 380 | $4 | 19932 | 1,176 | $26,322 |
| J7110 | 33 | $0 | 19933 | 2,411 | $57,896 |
|  |  |  | 19934 | 6,730 | $276,292 |
| Total | 643,014 | $26,086,119 | 19941 | 15,000 | $995,684 |
|  |  |  | 19942 | 19,793 | $1,704,857 |
|  |  |  | 19943 | 20,578 | $2,331,864 |
|  |  |  | 19944 | 21,534 | $2,441,013 |
|  |  |  | 19951 | 23,219 | $2,654,761 |
|  |  |  | 19952 | 23,219 | $2,589,107 |
|  |  |  | 19953 | 23,214 | $2,377,620 |
|  |  |  | 19954 | 23,559 | $2,327,443 |
|  |  |  | 19961 | 27,415 | $2,456,958 |
|  |  |  | 19962 | 28,490 | $2,519,795 |
|  |  |  | 19963 | 24,659 | $1,831,696 |
|  |  |  | 19964 | 13,249 | $168,784 |
|  |  |  | 19971 | 12,903 | $61,730 |
|  |  |  | 19972 | 19,341 | $138,287 |
|  |  |  | 19973 | 17,827 | $123,316 |
|  |  |  | 19974 | 17,774 | $107,871 |
|  |  |  | 19981 | 19,346 | $88,786 |
|  |  |  | 19982 | 18,220 | $81,025 |
|  |  |  | 19983 | 18,708 | $63,374 |
|  |  |  | 19984 | 18,552 | $58,251 |
|  |  |  | 19991 | 19,143 | $53,670 |
|  |  |  | 19992 | 18,745 | $55,058 |
|  |  |  | 19993 | 17,212 | $48,349 |
|  |  |  | 19994 | 16,886 | $46,279 |
|  |  |  | 20001 | 18,369 | $35,098 |
| Carrier # | # Claims | Medicare $ | 20002 | 17,951 | $53,702 |
|  |  |  | 20003 | 19,375 | $53,168 |
| 885 | 257,015 | $11,841,587 | 20004 | 18,974 | $52,001 |
| 635 | 184,090 | $7,265,433 | 20011 | 19,600 | $47,238 |
| 5655 | 115,639 | $3,612,608 | 20012 | 18,595 | $47,975 |
| 10555 | 72,862 | $3,347,291 | 20013 | 19,505 | $46,731 |
| 811 | 13,408 | $19,199 | 20014 | 20,708 | $49,411 |
| Total | 643,014 | $26,086,119 | Total | 643,014 | $26,086,119 |

**Table 29: Summary of Medicare Palmetto (885) DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|-----------|----------|-----------|
| J3370 | 108,388 | $11,020,106 | 19911 | 0 | $0 |
| J7051 | 72,770 | $821,426 | 19912 | 0 | $0 |
| J7060 | 5,286 | $55 | 19913 | 0 | $0 |
| J7042 | 5,221 | $0 | 19914 | 1 | $0 |
| J7110 | 5 | $0 | 19921 | 9 | $0 |
| J7070 | 2,606 | $0 | 19922 | 14 | $0 |
| J7030 | 7,486 | $0 | 19923 | 5 | $0 |
| J7050 | 20,510 | $0 | 19924 | 73 | $1,617 |
| J7130 | 273 | $0 | 19931 | 213 | $5,892 |
| J7040 | 3,951 | $0 | 19932 | 377 | $15,497 |
| J2912 | 30,519 | $0 | 19933 | 734 | $32,658 |
|  |  |  | 19934 | 2,010 | $156,582 |
| Total | 257,015 | $11,841,587 | 19941 | 4,929 | $505,622 |
|  |  |  | 19942 | 6,955 | $893,386 |
|  |  |  | 19943 | 6,888 | $1,164,659 |
|  |  |  | 19944 | 6,954 | $1,158,498 |
|  |  |  | 19951 | 8,073 | $1,203,175 |
|  |  |  | 19952 | 8,830 | $1,031,990 |
|  |  |  | 19953 | 9,570 | $981,771 |
|  |  |  | 19954 | 9,383 | $1,008,886 |
|  |  |  | 19961 | 11,897 | $1,050,583 |
|  |  |  | 19962 | 11,953 | $1,054,470 |
|  |  |  | 19963 | 10,967 | $825,053 |
|  |  |  | 19964 | 6,325 | $102,468 |
|  |  |  | 19971 | 5,960 | $34,008 |
|  |  |  | 19972 | 7,411 | $47,288 |
|  |  |  | 19973 | 6,934 | $45,069 |
|  |  |  | 19974 | 6,588 | $43,748 |
|  |  |  | 19981 | 7,434 | $39,650 |
|  |  |  | 19982 | 7,418 | $37,776 |
|  |  |  | 19983 | 7,539 | $31,101 |
|  |  |  | 19984 | 7,465 | $32,191 |
|  |  |  | 19991 | 8,140 | $31,236 |
|  |  |  | 19992 | 7,362 | $31,371 |
|  |  |  | 19993 | 6,976 | $27,231 |
|  |  |  | 19994 | 7,165 | $27,561 |
|  |  |  | 20001 | 7,711 | $20,983 |
|  |  |  | 20002 | 7,679 | $33,318 |
|  |  |  | 20003 | 8,548 | $31,090 |
|  |  |  | 20004 | 8,099 | $30,572 |
|  |  |  | 20011 | 8,460 | $27,651 |
|  |  |  | 20012 | 7,791 | $26,547 |
|  |  |  | 20013 | 7,864 | $24,813 |
|  |  |  | 20014 | 8,311 | $25,576 |
|  |  |  | Total | 257,015 | $11,841,587 |

**Table 30: Summary of Medicare AdminaStar (635) DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J3370 | 83,142 | $6,959,594 | 19911 | 1 | $0 |
| J7051 | 29,482 | $269,429 | 19912 | 0 | $0 |
| J2912 | 33,848 | $19,036 | 19913 | 0 | $0 |
| J7050 | 13,752 | $6,185 | 19914 | 0 | $0 |
| J7060 | 4,667 | $5,760 | 19921 | 4 | $85 |
| J7070 | 3,233 | $2,343 | 19922 | 12 | $0 |
| J7030 | 5,563 | $1,628 | 19923 | 18 | $0 |
| J7040 | 4,070 | $1,455 | 19924 | 76 | $2,201 |
| J7130 | 34 | $4 | 19931 | 264 | $4,676 |
| J7042 | 6,276 | $0 | 19932 | 428 | $9,132 |
| J7110 | 23 | $0 | 19933 | 1,021 | $17,520 |
| | | | 19934 | 2,924 | $71,484 |
| Total | 184,090 | $7,265,433 | 19941 | 5,641 | $290,419 |
| | | | 19942 | 6,796 | $469,898 |
| | | | 19943 | 7,123 | $663,628 |
| | | | 19944 | 7,913 | $749,915 |
| | | | 19951 | 8,165 | $784,950 |
| | | | 19952 | 7,138 | $824,503 |
| | | | 19953 | 6,643 | $678,446 |
| | | | 19954 | 6,835 | $610,029 |
| | | | 19961 | 7,393 | $666,374 |
| | | | 19962 | 7,729 | $693,640 |
| | | | 19963 | 6,745 | $495,421 |
| | | | 19964 | 3,469 | $33,502 |
| | | | 19971 | 3,480 | $17,156 |
| | | | 19972 | 4,454 | $31,111 |
| | | | 19973 | 4,700 | $28,001 |
| | | | 19974 | 4,908 | $18,460 |
| | | | 19981 | 4,956 | $10,946 |
| | | | 19982 | 4,849 | $9,194 |
| | | | 19983 | 5,095 | $7,478 |
| | | | 19984 | 5,100 | $6,954 |
| | | | 19991 | 4,811 | $5,561 |
| | | | 19992 | 5,329 | $6,745 |
| | | | 19993 | 4,814 | $5,168 |
| | | | 19994 | 4,431 | $4,921 |
| | | | 20001 | 4,719 | $4,202 |
| | | | 20002 | 4,567 | $6,418 |
| | | | 20003 | 5,084 | $7,205 |
| | | | 20004 | 5,093 | $6,502 |
| | | | 20011 | 5,390 | $5,623 |
| | | | 20012 | 4,637 | $5,872 |
| | | | 20013 | 5,304 | $6,121 |
| | | | 20014 | 6,031 | $5,974 |
| | | | Total | 184,090 | $7,265,433 |

**Table 31: Summary of Medicare CIGNA (5655) DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J3370 | 43,428 | $3,285,355 | 19911 | 1 | $0 |
| J7051 | 35,150 | $314,349 | 19912 | 0 | $0 |
| J7030 | 4,527 | $5,915 | 19913 | 0 | $0 |
| J7070 | 1,788 | $4,595 | 19914 | 1 | $0 |
| J7040 | 2,563 | $1,207 | 19921 | 8 | $0 |
| J2912 | 16,035 | $547 | 19922 | 6 | $0 |
| J7050 | 4,738 | $343 | 19923 | 1 | $6 |
| J7060 | 3,272 | $298 | 19924 | 35 | $114 |
| J7110 | 5 | $0 | 19931 | 110 | $63 |
| J7130 | 64 | $0 | 19932 | 196 | $1,547 |
| J7042 | 4,069 | $0 | 19933 | 386 | $4,371 |
|  |  |  | 19934 | 1,212 | $23,958 |
| Total | 115,639 | $3,612,608 | 19941 | 2,746 | $112,547 |
|  |  |  | 19942 | 3,147 | $173,077 |
|  |  |  | 19943 | 3,053 | $269,917 |
|  |  |  | 19944 | 3,133 | $297,581 |
|  |  |  | 19951 | 3,452 | $340,330 |
|  |  |  | 19952 | 3,286 | $363,368 |
|  |  |  | 19953 | 3,331 | $366,818 |
|  |  |  | 19954 | 3,636 | $362,418 |
|  |  |  | 19961 | 3,945 | $375,437 |
|  |  |  | 19962 | 4,026 | $344,589 |
|  |  |  | 19963 | 3,355 | $231,379 |
|  |  |  | 19964 | 1,711 | $17,854 |
|  |  |  | 19971 | 1,791 | $4,736 |
|  |  |  | 19972 | 5,088 | $40,733 |
|  |  |  | 19973 | 3,948 | $32,454 |
|  |  |  | 19974 | 4,073 | $27,228 |
|  |  |  | 19981 | 4,350 | $22,748 |
|  |  |  | 19982 | 3,625 | $21,051 |
|  |  |  | 19983 | 3,689 | $18,714 |
|  |  |  | 19984 | 3,553 | $15,427 |
|  |  |  | 19991 | 3,641 | $13,254 |
|  |  |  | 19992 | 3,581 | $13,704 |
|  |  |  | 19993 | 3,450 | $13,345 |
|  |  |  | 19994 | 3,283 | $10,970 |
|  |  |  | 20001 | 3,981 | $8,008 |
|  |  |  | 20002 | 3,445 | $11,360 |
|  |  |  | 20003 | 3,642 | $12,262 |
|  |  |  | 20004 | 3,682 | $11,883 |
|  |  |  | 20011 | 3,736 | $10,389 |
|  |  |  | 20012 | 4,219 | $12,048 |
|  |  |  | 20013 | 4,092 | $12,493 |
|  |  |  | 20014 | 3,993 | $14,430 |
|  |  |  | Total | 115,639 | $3,612,608 |

**Table 32: Summary of Medicare Travelers (10555) DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J3370 | 43,004 | $3,230,099 | 19911 | 0 | $0 |
| J7051 | 10,057 | $116,318 | 19912 | 3 | $0 |
| J7060 | 1,768 | $524 | 19913 | 1 | $0 |
| J7042 | 1,403 | $126 | 19914 | 0 | $0 |
| J7050 | 2,970 | $112 | 19921 | 13 | $0 |
| J7030 | 1,511 | $62 | 19922 | 4 | $0 |
| J2912 | 10,471 | $40 | 19923 | 14 | $0 |
| J7040 | 877 | $10 | 19924 | 37 | $0 |
| J7130 | 9 | $0 | 19931 | 110 | $53 |
| J7070 | 792 | $0 | 19932 | 175 | $145 |
| | | | 19933 | 270 | $3,347 |
| Total | 72,862 | $3,347,291 | 19934 | 584 | $24,270 |
| | | | 19941 | 1,684 | $87,097 |
| | | | 19942 | 2,895 | $168,496 |
| | | | 19943 | 3,514 | $233,659 |
| | | | 19944 | 3,534 | $235,018 |
| | | | 19951 | 3,529 | $326,306 |
| | | | 19952 | 3,965 | $369,246 |
| | | | 19953 | 3,670 | $350,584 |
| | | | 19954 | 3,705 | $346,111 |
| | | | 19961 | 4,180 | $364,563 |
| | | | 19962 | 4,782 | $427,097 |
| | | | 19963 | 3,592 | $279,843 |
| | | | 19964 | 1,744 | $14,960 |
| | | | 19971 | 1,672 | $5,830 |
| | | | 19972 | 2,388 | $19,154 |
| | | | 19973 | 2,245 | $17,794 |
| | | | 19974 | 2,203 | $18,435 |
| | | | 19981 | 2,602 | $15,442 |
| | | | 19982 | 2,325 | $12,969 |
| | | | 19983 | 2,382 | $6,011 |
| | | | 19984 | 2,419 | $3,679 |
| | | | 19991 | 2,479 | $3,620 |
| | | | 19992 | 2,417 | $3,228 |
| | | | 19993 | 1,880 | $2,605 |
| | | | 19994 | 1,831 | $2,806 |
| | | | 20001 | 1,688 | $1,581 |
| | | | 20002 | 1,693 | $2,197 |
| | | | 20003 | 633 | $1,144 |
| | | | 20004 | 0 | $0 |
| | | | 20011 | 0 | $0 |
| | | | 20012 | 0 | $0 |
| | | | 20013 | 0 | $0 |
| | | | 20014 | 0 | $0 |
| | | | Total | 72,862 | $3,347,291 |

**Table 33: Summary for Medicare DME Claims: J3370**

| Carrier | # Clms w/DIFF>0 | # Claims | % of Claims | Aggregate DIFF | Total MCR Paid | % of MCR Paid | # Prov Payments |
|---|---|---|---|---|---|---|---|
| Palmetto | 44,020 | 44,905 | 98.0% | $4,710,809 | $10,939,132 | 43.1% | 24,961 |
| AdminaStar | 29,325 | 29,841 | 98.3% | $3,685,842 | $6,731,020 | 54.8% | 14,531 |
| CIGNA | 14,469 | 14,729 | 98.2% | $1,372,475 | $3,190,253 | 43.0% | 8,580 |
| Travelers | 13,861 | 14,145 | 98.0% | $1,334,128 | $2,671,129 | 49.9% | 6,028 |
| Total | 101,675 | 103,620 | 98.1% | $11,103,254 | $23,531,534 | 47.2% | 54,100 |

**Table 34: Summary of Medicare Carrier Claims Category 1: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|---|---|---|---|---|---|
| J7050 | 9,647,324 | $97,710,493 | 19911 | 120,163 | $680,035 |
| J7040 | 3,422,070 | $25,943,107 | 19912 | 131,205 | $803,635 |
| J7030 | 2,526,793 | $17,542,997 | 19913 | 138,739 | $849,036 |
| J7060 | 2,023,911 | $17,331,264 | 19914 | 146,696 | $907,204 |
| J7042 | 727,921 | $6,962,715 | 19921 | 184,394 | $914,887 |
| J7070 | 712,505 | $6,508,680 | 19922 | 202,607 | $1,103,032 |
| J3370 | 367,540 | $5,718,976 | 19923 | 213,469 | $1,190,901 |
| J7051 | 1,810,064 | $4,168,155 | 19924 | 227,487 | $1,279,459 |
| J2912 | 1,163,968 | $3,447,680 | 19931 | 248,450 | $1,457,619 |
| J7130 | 47,371 | $161,243 | 19932 | 251,771 | $1,611,063 |
| J7110 | 914 | $35,621 | 19933 | 244,606 | $1,644,059 |
| | | | 19934 | 258,329 | $1,706,615 |
| Total | 22,450,381 | $185,530,931 | 19941 | 307,213 | $1,303,070 |
| | | | 19942 | 294,432 | $1,466,909 |
| | | | 19943 | 314,295 | $2,177,990 |
| | | | 19944 | 337,569 | $2,351,863 |
| | | | 19951 | 393,673 | $2,775,599 |
| | | | 19952 | 409,426 | $3,121,357 |
| | | | 19953 | 418,084 | $3,243,635 |
| | | | 19954 | 428,113 | $3,247,975 |
| | | | 19961 | 471,037 | $3,613,674 |
| | | | 19962 | 479,667 | $3,884,295 |
| | | | 19963 | 503,110 | $4,191,517 |
| | | | 19964 | 527,271 | $4,492,160 |
| | | | 19971 | 574,703 | $4,789,608 |
| | | | 19972 | 600,840 | $5,129,165 |
| | | | 19973 | 610,478 | $5,306,164 |
| | | | 19974 | 625,975 | $5,455,621 |
| | | | 19981 | 673,842 | $5,494,836 |
| | | | 19982 | 682,068 | $5,724,863 |
| | | | 19983 | 695,431 | $5,980,674 |
| | | | 19984 | 698,740 | $6,005,275 |
| | | | 19991 | 764,763 | $6,451,015 |
| | | | 19992 | 784,584 | $6,880,465 |
| | | | 19993 | 798,722 | $7,145,975 |
| | | | 19994 | 796,880 | $7,127,959 |
| | | | 20001 | 835,468 | $7,539,907 |
| | | | 20002 | 808,093 | $7,530,438 |
| | | | 20003 | 808,272 | $7,490,096 |
| | | | 20004 | 816,109 | $7,640,531 |
| | | | 20011 | 899,691 | $8,182,848 |
| | | | 20012 | 907,208 | $8,637,891 |
| | | | 20013 | 898,673 | $8,487,003 |
| | | | 20014 | 918,035 | $8,513,009 |
| | | | Total | 22,450,381 | $185,530,931 |

**Table 35: Medicare Carrier Claims and Medicare Spending by Carrier Number**

| Carrier # | Carrier Name | # Claims | Medicare $ | Carrier # | Carrier Name | # Claims | Medicare $ |
|---|---|---|---|---|---|---|---|
| 590 | Florida BS | 2,727,819 | $25,899,070 | 826 | Iowa - North Dakota BS | 91,830 | $847,162 |
| 900 | Texas BS | 2,023,834 | $17,484,679 | 834 | Nevada - North Dakota BS | 115,246 | $844,453 |
| 16360 | Ohio - Nationwide Insurance Co. | 874,231 | $6,874,933 | 904 | Virginia - Texas BS | 99,077 | $839,573 |
| 803 | New York - Empire BS | 912,930 | $6,325,406 | 1030 | Arizona - AETNA | 114,094 | $813,987 |
| 31140 | California - National Heritage Ins. | 756,656 | $5,982,213 | 580 | District of Columbia - Pennsylvania BS | 99,408 | $798,594 |
| 865 | Pennsylvania BS | 664,563 | $5,909,024 | 591 | Connecticut - Florida BS | 65,567 | $790,489 |
| 5440 | Tennessee - Connecticut General | 838,684 | $5,864,826 | 31143 | Massachusetts - National Heritage Ins. | 68,729 | $701,759 |
| 5535 | North Carolina - Connecticut General | 583,483 | $5,160,167 | 882 | RRB - South Carolina PGBA | 93,073 | $697,998 |
| 952 | Illinois - Wisconsin Phy Svc | 475,006 | $4,746,578 | 640 | Iowa - Wellmark, Inc. | 83,013 | $679,439 |
| 953 | Michigan - Wisconsin Phy Svc | 490,396 | $4,596,695 | 1290 | Nevada - AETNA | 93,628 | $637,605 |
| 801 | New York - Western BS | 467,029 | $4,319,178 | 512 | Mississippi - Alabama BS | 76,808 | $579,019 |
| 951 | Wisconsin - Wisconsin Phy Svc | 489,333 | $3,958,860 | 710 | Michigan BS | 108,085 | $521,452 |
| 511 | Georgia - Alabama BS | 456,648 | $3,926,952 | 910 | Utah BS | 59,556 | $496,465 |
| 2050 | California - TOLIC | 623,878 | $3,838,842 | 954 | Minnesota - Wisconsin Phy Svc | 50,580 | $446,335 |
| 621 | Illinois BS - HCSC | 449,971 | $3,738,357 | 1390 | Washington - AETNA | 66,989 | $436,813 |
| 805 | New Jersey - Empire BS | 317,003 | $3,561,663 | 1380 | Oregon - AETNA | 50,583 | $427,173 |
| 660 | Kentucky - AdminaStar | 361,137 | $3,378,646 | 870 | Rhode Island BS | 44,918 | $414,469 |
| 510 | Alabama BS | 333,857 | $3,093,427 | 31142 | Maine - National Heritage Ins. | 37,082 | $399,704 |
| 880 | South Carolina BS | 460,437 | $3,012,938 | 902 | Delaware - Texas BS | 36,196 | $313,620 |
| 10490 | Virginia - Metra Health | 391,812 | $2,978,284 | 14330 | New York - GHI | 35,901 | $313,612 |
| 860 | New Jersey - Pennsylvania BS | 302,912 | $2,743,402 | 550 | Colorado BS | 57,909 | $284,076 |
| 542 | California BS | 491,251 | $2,702,111 | 700 | Massachusetts BS | 35,010 | $253,509 |
| 973 | Triple-S, Inc. - Puerto Rico | 223,173 | $2,412,843 | 5130 | Idaho - Connecticut General | 35,385 | $240,915 |
| 623 | Michigan - Illinois Blue Shield | 255,220 | $2,291,903 | 522 | Oklahoma - Arkansas BS | 70,573 | $238,531 |
| 10250 | Mississippi - MetraHealth | 247,939 | $2,202,423 | 10074 | Unlisted | 56,847 | $221,835 |
| 520 | Arkansas BS | 190,394 | $2,132,730 | 31144 | New Hampshire - National Heritage Ins. | 14,466 | $209,228 |
| 820 | North Dakota - North Dakota BS | 234,211 | $2,129,561 | 570 | Delaware - Pennsylvania BS | 28,449 | $205,058 |
| 523 | Missouri - Arkansas BS | 202,218 | $2,035,069 | 31145 | Vermont - National Heritage Ins. | 19,377 | $184,547 |
| 824 | Colorado - North Dakota BS | 249,382 | $1,943,450 | 21200 | Maine - BS of Massachusetts | 22,862 | $173,677 |
| 10230 | Connecticut - MetraHealth | 192,351 | $1,932,539 | 720 | Minnesota BS | 33,436 | $172,157 |
| 528 | Louisiana - Arkansas BS | 239,327 | $1,923,506 | 1370 | Oklahoma - AETNA | 57,177 | $147,707 |
| 836 | Washington - North Dakota BS | 193,983 | $1,763,752 | 780 | New Hamp / Verm - Massachusetts BS | 19,103 | $140,750 |
| 630 | Indiana - AdminaStar | 336,308 | $1,684,826 | 831 | Alaska - North Dakota BS | 13,914 | $138,821 |
| 832 | Arizona - North Dakota BS | 185,426 | $1,630,769 | 833 | Hawaii - North Dakota BS | 18,775 | $132,534 |
| 11260 | Missouri - General American Life | 245,098 | $1,619,978 | 932 | Unlisted | 22,324 | $128,758 |
| 10072 | Unlisted | 293,954 | $1,543,195 | 825 | Wyoming - North Dakota BS | 13,862 | $89,015 |
| 1040 | Georgia - AETNA | 187,385 | $1,523,131 | 521 | New Mexico - Arkansas BS | 29,168 | $76,892 |
| 650 | Kansas BS | 182,474 | $1,369,556 | 1020 | Alaska - AETNA | 6,531 | $50,350 |
| 31146 | So. California - NHIC | 191,620 | $1,358,371 | 1360 | New Mexico - AETNA | 10,328 | $31,678 |
| 655 | Nebraska - Kansas BS | 134,516 | $1,355,106 | 1120 | Hawaii - AETNA | 8,996 | $28,125 |
| 901 | Maryland - Texas BS | 137,496 | $1,119,560 | 883 | Maryland BS | 1,966 | $15,793 |
| 903 | District of Columbia - Texas BS | 123,026 | $1,117,218 | 690 | Maryland BS | 6,982 | $10,152 |
| 835 | Oregon - North Dakota BS | 123,033 | $1,105,436 | 884 | Unlisted | 209 | $692 |
| 16510 | West Virginia - Nationwide Insurance Co. | 122,526 | $1,098,888 | 974 | Triple-S, Inc. - Virgin Islands | 42 | $398 |
| 740 | Missouri - BS Kansas City | 115,802 | $1,039,237 | 524 | Unlisted | 4 | $0 |
| 10240 | Minnesota - MetraHealth | 134,858 | $989,150 | | | | |
| 751 | Montana BS | 116,091 | $939,566 | Total | | 22,450,381 | $185,530,931 |

**Table 36: Summary of Medicare Connecticut General Carrier Claims Category 1: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J7050 | 529,927 | $5,616,009 | 19911 | 13,076 | $72,188 |
| J7060 | 193,920 | $1,657,276 | 19912 | 14,140 | $91,517 |
| J7040 | 239,106 | $1,565,848 | 19913 | 14,818 | $99,938 |
| J7030 | 209,456 | $1,125,915 | 19914 | 14,258 | $98,520 |
| J7070 | 77,255 | $544,441 | 19921 | 17,816 | $110,696 |
| J7042 | 55,709 | $496,226 | 19922 | 18,465 | $123,614 |
| J3370 | 10,284 | $114,805 | 19923 | 19,077 | $131,148 |
| J7051 | 87,475 | $83,104 | 19924 | 18,984 | $123,402 |
| J2912 | 54,279 | $58,125 | 19931 | 19,271 | $132,263 |
| J7110 | 72 | $3,978 | 19932 | 18,894 | $141,100 |
| J7130 | 69 | $179 | 19933 | 18,218 | $131,886 |
| | | | 19934 | 19,624 | $139,117 |
| Total | 1,457,552 | $11,265,907 | 19941 | 24,887 | $87,481 |
| | | | 19942 | 22,146 | $93,999 |
| | | | 19943 | 21,763 | $166,197 |
| | | | 19944 | 22,911 | $174,695 |
| | | | 19951 | 24,972 | $185,365 |
| | | | 19952 | 24,278 | $190,163 |
| | | | 19953 | 25,187 | $196,010 |
| | | | 19954 | 25,949 | $214,212 |
| | | | 19961 | 27,934 | $253,638 |
| | | | 19962 | 29,889 | $292,621 |
| | | | 19963 | 32,778 | $314,853 |
| | | | 19964 | 32,987 | $312,271 |
| | | | 19971 | 36,015 | $316,589 |
| | | | 19972 | 37,589 | $322,412 |
| | | | 19973 | 39,083 | $335,082 |
| | | | 19974 | 39,670 | $329,071 |
| | | | 19981 | 44,589 | $329,592 |
| | | | 19982 | 44,666 | $330,115 |
| | | | 19983 | 44,849 | $332,251 |
| | | | 19984 | 45,589 | $321,139 |
| | | | 19991 | 49,717 | $339,098 |
| | | | 19992 | 46,438 | $336,006 |
| | | | 19993 | 45,226 | $343,177 |
| | | | 19994 | 46,299 | $360,565 |
| | | | 20001 | 50,588 | $392,066 |
| | | | 20002 | 50,411 | $411,276 |
| | | | 20003 | 50,435 | $416,403 |
| Carrier # | # Claims | Medicare $ | 20004 | 48,844 | $407,214 |
| | | | 20011 | 56,236 | $453,602 |
| 5440 | 838,684 | $5,864,826 | 20012 | 54,270 | $441,765 |
| 5535 | 583,483 | $5,160,167 | 20013 | 53,757 | $442,865 |
| 5130 | 35,385 | $240,915 | 20014 | 50,959 | $428,730 |
| Total | 1,457,552 | $11,265,907 | Total | 1,457,552 | $11,265,907 |

**Table 37: Summary of Medicare Wisconsin Phy Svc Carrier Claims Category 1: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | | Yr-Quarter | # Claims | Medicare $ |
|---|---|---|---|---|---|---|
| J7050 | 702,175 | $8,134,858 | | 19911 | 2,314 | $19,740 |
| J7040 | 254,023 | $1,980,228 | | 19912 | 3,157 | $23,033 |
| J7030 | 125,860 | $936,239 | | 19913 | 3,603 | $26,283 |
| J7060 | 89,735 | $722,573 | | 19914 | 3,436 | $26,794 |
| J3370 | 46,699 | $550,556 | | 19921 | 3,612 | $23,632 |
| J7051 | 135,857 | $405,583 | | 19922 | 3,942 | $29,899 |
| J7042 | 41,926 | $393,785 | | 19923 | 4,194 | $31,667 |
| J7070 | 31,865 | $332,684 | | 19924 | 4,342 | $33,181 |
| J2912 | 77,121 | $291,438 | | 19931 | 4,219 | $29,801 |
| J7110 | 12 | $518 | | 19932 | 4,666 | $35,859 |
| J7130 | 42 | $5 | | 19933 | 4,531 | $36,341 |
| | | | | 19934 | 4,601 | $36,466 |
| Total | 1,505,315 | $13,748,467 | | 19941 | 4,592 | $11,968 |
| | | | | 19942 | 3,796 | $29,164 |
| | | | | 19943 | 4,928 | $45,211 |
| | | | | 19944 | 3,849 | $34,894 |
| | | | | 19951 | 6,166 | $48,786 |
| | | | | 19952 | 8,399 | $67,134 |
| | | | | 19953 | 8,921 | $67,766 |
| | | | | 19954 | 8,348 | $64,874 |
| | | | | 19961 | 9,195 | $68,898 |
| | | | | 19962 | 10,464 | $77,493 |
| | | | | 19963 | 11,179 | $85,924 |
| | | | | 19964 | 12,075 | $94,641 |
| | | | | 19971 | 12,794 | $98,187 |
| | | | | 19972 | 13,742 | $102,141 |
| | | | | 19973 | 14,217 | $103,474 |
| | | | | 19974 | 14,728 | $113,772 |
| | | | | 19981 | 17,414 | $125,382 |
| | | | | 19982 | 22,640 | $172,174 |
| | | | | 19983 | 64,200 | $562,640 |
| | | | | 19984 | 73,226 | $662,618 |
| | | | | 19991 | 74,069 | $644,401 |
| | | | | 19992 | 80,896 | $741,039 |
| | | | | 19993 | 85,259 | $819,207 |
| | | | | 19994 | 84,553 | $829,279 |
| | | | | 20001 | 85,652 | $808,659 |
| | | | | 20002 | 90,664 | $873,056 |
| Carrier # | # Claims | Medicare $ | | 20003 | 98,153 | $911,902 |
| | | | | 20004 | 99,734 | $962,091 |
| 952 | 475,006 | $4,746,578 | | 20011 | 102,080 | $970,414 |
| 953 | 490,396 | $4,596,695 | | 20012 | 109,052 | $1,051,093 |
| 951 | 489,333 | $3,958,860 | | 20013 | 111,357 | $1,068,847 |
| 954 | 50,580 | $446,335 | | 20014 | 112,356 | $1,078,646 |
| Total | 1,505,315 | $13,748,467 | | Total | 1,505,315 | $13,748,467 |

0.10357612

**Table 38: Summary of Medicare Other Region 5 Carrier Claims Category 1: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J7050 | 1,001,619 | $8,637,316 | 19911 | 16,413 | $74,490 |
| J7040 | 313,532 | $2,132,895 | 19912 | 18,384 | $95,275 |
| J7030 | 190,189 | $1,415,865 | 19913 | 19,589 | $107,820 |
| J7060 | 182,964 | $1,223,928 | 19914 | 20,003 | $117,898 |
| J3370 | 41,018 | $826,043 | 19921 | 24,203 | $113,039 |
| J7070 | 88,743 | $725,465 | 19922 | 28,542 | $155,356 |
| J7042 | 62,845 | $549,618 | 19923 | 29,151 | $190,759 |
| J7051 | 205,758 | $397,696 | 19924 | 31,855 | $215,011 |
| J2912 | 103,513 | $358,195 | 19931 | 34,473 | $247,554 |
| J7130 | 1,836 | $3,318 | 19932 | 35,969 | $267,083 |
| J7110 | 92 | $2,440 | 19933 | 37,654 | $327,890 |
|  |  |  | 19934 | 38,568 | $291,294 |
| Total | 2,192,109 | $16,272,778 | 19941 | 47,444 | $143,329 |
|  |  |  | 19942 | 42,275 | $176,242 |
|  |  |  | 19943 | 43,618 | $282,382 |
|  |  |  | 19944 | 43,303 | $297,950 |
|  |  |  | 19951 | 50,432 | $305,420 |
|  |  |  | 19952 | 54,743 | $348,357 |
|  |  |  | 19953 | 59,847 | $431,515 |
|  |  |  | 19954 | 59,743 | $401,693 |
|  |  |  | 19961 | 65,429 | $428,625 |
|  |  |  | 19962 | 69,601 | $489,707 |
|  |  |  | 19963 | 74,334 | $601,021 |
|  |  |  | 19964 | 77,582 | $653,146 |
|  |  |  | 19971 | 81,648 | $660,366 |
|  |  |  | 19972 | 88,003 | $733,684 |
|  |  |  | 19973 | 90,555 | $745,360 |
|  |  |  | 19974 | 87,855 | $725,821 |
|  |  |  | 19981 | 89,046 | $701,706 |
|  |  |  | 19982 | 91,930 | $735,865 |
|  |  |  | 19983 | 55,379 | $443,367 |
|  |  |  | 19984 | 43,972 | $325,054 |
|  |  |  | 19991 | 44,579 | $329,677 |
|  |  |  | 19992 | 47,125 | $356,770 |
|  |  |  | 19993 | 48,895 | $378,093 |
| Carrier # | # Claims | Medicare $ | 19994 | 46,320 | $347,684 |
|  |  |  | 20001 | 48,461 | $370,121 |
| 16360 | 874,231 | $6,874,933 | 20002 | 48,451 | $385,884 |
| 621 | 449,971 | $3,738,357 | 20003 | 45,624 | $362,623 |
| 623 | 255,220 | $2,291,903 | 20004 | 40,836 | $328,359 |
| 630 | 336,308 | $1,684,826 | 20011 | 43,775 | $365,658 |
| 10240 | 134,858 | $989,150 | 20012 | 43,747 | $397,869 |
| 710 | 108,085 | $521,452 | 20013 | 43,325 | $415,807 |
| 720 | 33,436 | $172,157 | 20014 | 39,428 | $400,158 |
| Total | 2,192,109 | $16,272,778 | Total | 2,192,109 | $16,272,778 |

**Table 39: Number of Claims by Carrier and Year-Quarter in CMS Region 5**

| State | Illinois | | Indiana | Michigan | | | Minnesota | | | Ohio | Wisconsin |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Carrier # | 621 | 952 | 630 | 710 | 623 | 953 | 720 | 10240 | 954 | 16360 | 951 |
| 19911 | 4,425 | 0 | 957 | 4,097 | 0 | 0 | 1,295 | 743 | 0 | 4,896 | 2,314 |
| 19912 | 5,251 | 0 | 1,409 | 4,029 | 0 | 0 | 1,636 | 749 | 0 | 5,310 | 3,157 |
| 19913 | 5,399 | 0 | 958 | 4,542 | 0 | 0 | 1,785 | 758 | 0 | 6,147 | 3,603 |
| 19914 | 5,974 | 0 | 911 | 4,101 | 1 | 0 | 1,865 | 890 | 0 | 6,261 | 3,436 |
| 19921 | 7,172 | 0 | 1,125 | 6,273 | 3 | 0 | 1,383 | 933 | 0 | 7,314 | 3,612 |
| 19922 | 9,501 | 0 | 1,390 | 6,811 | 6 | 0 | 1,374 | 956 | 0 | 8,504 | 3,942 |
| 19923 | 10,098 | 0 | 1,489 | 6,496 | 23 | 0 | 1,293 | 1,053 | 0 | 8,699 | 4,194 |
| 19924 | 11,083 | 0 | 1,741 | 7,139 | 12 | 0 | 1,318 | 1,054 | 0 | 9,508 | 4,342 |
| 19931 | 12,524 | 0 | 1,566 | 7,613 | 197 | 0 | 1,474 | 1,157 | 0 | 9,942 | 4,219 |
| 19932 | 12,312 | 0 | 1,643 | 8,269 | 137 | 0 | 1,566 | 1,089 | 0 | 10,953 | 4,666 |
| 19933 | 11,554 | 0 | 1,609 | 9,807 | 412 | 0 | 1,635 | 953 | 0 | 11,684 | 4,531 |
| 19934 | 11,325 | 0 | 1,855 | 9,643 | 530 | 0 | 1,848 | 1,044 | 0 | 12,323 | 4,601 |
| 19941 | 12,816 | 0 | 4,446 | 10,427 | 1,745 | 0 | 1,815 | 1,519 | 0 | 14,676 | 4,592 |
| 19942 | 11,111 | 0 | 4,133 | 9,093 | 2,285 | 0 | 1,411 | 1,453 | 0 | 12,789 | 3,796 |
| 19943 | 12,046 | 0 | 4,637 | 8,632 | 1,516 | 0 | 1,891 | 1,713 | 0 | 13,183 | 4,928 |
| 19944 | 12,790 | 0 | 3,961 | 1,113 | 9,238 | 0 | 1,664 | 1,760 | 0 | 12,777 | 3,849 |
| 19951 | 14,543 | 0 | 5,594 | 0 | 10,137 | 0 | 1,831 | 1,695 | 0 | 16,632 | 6,165 |
| 19952 | 16,083 | 0 | 5,462 | 0 | 11,633 | 5 | 1,983 | 1,547 | 0 | 18,035 | 8,394 |
| 19953 | 15,537 | 0 | 8,737 | 0 | 11,820 | 2 | 2,086 | 1,999 | 0 | 19,668 | 8,919 |
| 19954 | 15,820 | 14 | 10,260 | 0 | 11,014 | 1 | 1,747 | 2,007 | 0 | 18,895 | 8,346 |
| 19961 | 17,226 | 15 | 10,797 | 0 | 12,532 | 4 | 536 | 3,965 | 0 | 20,373 | 9,180 |
| 19962 | 18,936 | 20 | 10,657 | 0 | 13,595 | 12 | 0 | 4,945 | 0 | 21,468 | 10,445 |
| 19963 | 21,162 | 30 | 9,024 | 0 | 15,676 | 11 | 0 | 5,238 | 0 | 23,694 | 11,147 |
| 19964 | 20,702 | 88 | 10,554 | 0 | 16,853 | 47 | 0 | 4,926 | 0 | 24,436 | 12,034 |
| 19971 | 22,886 | 139 | 10,656 | 0 | 18,971 | 106 | 0 | 4,831 | 0 | 26,559 | 12,659 |
| 19972 | 25,518 | 195 | 10,080 | 0 | 20,149 | 157 | 0 | 5,121 | 0 | 24,790 | 13,497 |
| 19973 | 26,122 | 715 | 10,479 | 0 | 23,162 | 320 | 0 | 5,588 | 0 | 25,500 | 13,865 |
| 19974 | 25,160 | 1,515 | 10,311 | 0 | 22,047 | 775 | 0 | 5,313 | 0 | 25,603 | 13,693 |
| 19981 | 24,516 | 4,255 | 11,089 | 0 | 21,321 | 3,176 | 0 | 5,772 | 0 | 26,482 | 15,115 |
| 19982 | 24,572 | 25,104 | 11,134 | 0 | 24,340 | 23,565 | 0 | 5,890 | 9 | 26,039 | 15,208 |
| 19983 | 5,837 | 31,876 | 11,478 | 0 | 5,865 | 27,031 | 0 | 6,273 | 1 | 26,270 | 15,530 |
| 19984 | 0 | 31,536 | 10,587 | 0 | 0 | 26,041 | 0 | 6,558 | 2 | 26,557 | 14,657 |
| 19991 | 0 | 34,624 | 11,813 | 0 | 0 | 28,762 | 0 | 7,018 | 13 | 27,434 | 16,139 |
| 19992 | 0 | 35,932 | 12,674 | 0 | 0 | 31,090 | 0 | 6,907 | 56 | 29,314 | 17,454 |
| 19993 | 0 | 34,170 | 10,807 | 0 | 0 | 32,312 | 0 | 6,817 | 54 | 28,284 | 18,183 |
| 19994 | 0 | 34,074 | 12,172 | 0 | 0 | 32,428 | 0 | 7,374 | 177 | 28,696 | 17,894 |
| 20001 | 0 | 34,140 | 13,255 | 0 | 0 | 36,988 | 0 | 7,473 | 295 | 28,915 | 18,855 |
| 20002 | 0 | 35,152 | 12,746 | 0 | 0 | 37,995 | 0 | 3,840 | 715 | 27,723 | 18,821 |
| 20003 | 0 | 33,194 | 12,271 | 0 | 0 | 37,182 | 0 | 0 | 5,206 | 29,038 | 19,800 |
| 20004 | 0 | 33,872 | 12,621 | 0 | 0 | 37,732 | 0 | 0 | 8,481 | 28,565 | 20,877 |
| 20011 | 0 | 34,950 | 12,682 | 0 | 0 | 43,315 | 0 | 0 | 8,141 | 31,154 | 22,335 |
| 20012 | 0 | 34,484 | 12,497 | 0 | 0 | 45,795 | 0 | 0 | 9,045 | 31,065 | 21,742 |
| 20013 | 0 | 34,912 | 12,190 | 0 | 0 | 45,541 | 0 | 0 | 9,003 | 30,828 | 22,075 |
| 20014 | 0 | | | 0 | 0 | | 0 | 0 | 9,381 | 27,238 | 22,522 |
| Carrier Total | 449,971 | 475,006 | 336,308 | 108,085 | 255,220 | 490,396 | 33,436 | 134,858 | 50,580 | 874,231 | 489,333 |
| State Total | 924,977 | | 336,308 | 853,701 | | | 218,874 | | | 874,231 | 489,333 |

**Table 40: Summary of Medicare KY Administar & WV Nationwide Carrier Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J7050 | 231,293 | $2,429,802 | 19911 | 3,757 | $22,843 |
| J7060 | 30,972 | $589,242 | 19912 | 3,821 | $24,404 |
| J7030 | 72,975 | $586,944 | 19913 | 3,878 | $22,242 |
| J7040 | 79,432 | $577,216 | 19914 | 4,056 | $22,326 |
| J7070 | 13,977 | $80,750 | 19921 | 4,384 | $25,758 |
| J7042 | 10,737 | $78,123 | 19922 | 5,225 | $35,508 |
| J3370 | 1,997 | $75,640 | 19923 | 6,218 | $35,026 |
| J2912 | 15,513 | $42,388 | 19924 | 5,447 | $34,199 |
| J7051 | 26,409 | $15,092 | 19931 | 5,669 | $44,215 |
| J7110 | 69 | $2,272 | 19932 | 5,751 | $52,641 |
| J7130 | 289 | 63.86 | 19933 | 5,484 | $47,995 |
| | | | 19934 | 5,726 | $50,240 |
| Total | 483,663 | $4,477,534 | 19941 | 7,023 | $20,590 |
| | | | 19942 | 6,560 | $30,146 |
| | | | 19943 | 6,427 | $37,391 |
| | | | 19944 | 6,787 | $39,725 |
| | | | 19951 | 7,103 | $42,440 |
| | | | 19952 | 7,940 | $49,076 |
| | | | 19953 | 7,770 | $50,613 |
| | | | 19954 | 8,378 | $56,481 |
| | | | 19961 | 10,105 | $67,119 |
| | | | 19962 | 10,538 | $69,880 |
| | | | 19963 | 11,056 | $78,380 |
| | | | 19964 | 10,924 | $84,653 |
| | | | 19971 | 13,397 | $118,911 |
| | | | 19972 | 13,426 | $124,352 |
| | | | 19973 | 13,287 | $128,543 |
| | | | 19974 | 12,487 | $118,401 |
| | | | 19981 | 12,323 | $112,866 |
| | | | 19982 | 13,422 | $127,360 |
| | | | 19983 | 12,987 | $136,047 |
| | | | 19984 | 14,142 | $151,149 |
| | | | 19991 | 15,818 | $159,433 |
| | | | 19992 | 16,528 | $175,056 |
| | | | 19993 | 17,233 | $184,524 |
| | | | 19994 | 17,213 | $183,588 |
| | | | 20001 | 17,660 | $186,602 |
| | | | 20002 | 18,350 | $204,579 |
| | | | 20003 | 18,510 | $206,340 |
| | | | 20004 | 18,390 | $206,540 |
| Carrier # | # Claims | Medicare $ | 20011 | 19,672 | $225,748 |
| | | | 20012 | 19,388 | $226,264 |
| 660 | 361,137 | $3,378,646 | 20013 | 19,821 | $230,467 |
| 16510 | 122,526 | $1,098,888 | 20014 | 19,582 | $226,873 |
| Total | 483,663 | $4,477,534 | Total | 483,663 | $4,477,534 |

**Table 41: Summary of Medicare Other Metra Health Carrier Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J7050 | 333,128 | $3,445,379 | 19911 | 3,648 | $35,529 |
| J7040 | 153,213 | $1,122,232 | 19912 | 3,985 | $49,938 |
| J7070 | 71,759 | $942,263 | 19913 | 4,334 | $54,061 |
| J7030 | 79,919 | $578,544 | 19914 | 5,027 | $63,971 |
| J7060 | 54,252 | $478,326 | 19921 | 6,818 | $64,871 |
| J7042 | 20,244 | $179,430 | 19922 | 7,906 | $72,349 |
| J7051 | 62,120 | $157,846 | 19923 | 8,822 | $81,968 |
| J2912 | 52,428 | $131,126 | 19924 | 8,968 | $85,499 |
| J3370 | 4,706 | $72,691 | 19931 | 11,073 | $107,099 |
| J7110 | 17 | $3,500 | 19932 | 11,918 | $115,697 |
| J7130 | 316 | $1,909 | 19933 | 11,139 | $107,065 |
| | | | 19934 | 11,858 | $115,211 |
| Total | 832,102 | $7,113,246 | 19941 | 13,419 | $50,181 |
| | | | 19942 | 13,370 | $57,312 |
| | | | 19943 | 13,243 | $116,743 |
| | | | 19944 | 14,560 | $133,559 |
| | | | 19951 | 15,938 | $142,510 |
| | | | 19952 | 17,329 | $159,907 |
| | | | 19953 | 18,543 | $171,032 |
| | | | 19954 | 19,155 | $170,742 |
| | | | 19961 | 21,965 | $189,858 |
| | | | 19962 | 23,781 | $181,332 |
| | | | 19963 | 23,917 | $191,807 |
| | | | 19964 | 24,231 | $192,900 |
| | | | 19971 | 25,812 | $195,294 |
| | | | 19972 | 27,834 | $227,509 |
| | | | 19973 | 30,396 | $260,412 |
| | | | 19974 | 31,814 | $266,213 |
| | | | 19981 | 34,129 | $259,861 |
| | | | 19982 | 34,372 | $281,125 |
| | | | 19983 | 36,147 | $307,051 |
| | | | 19984 | 36,625 | $312,701 |
| | | | 19991 | 38,381 | $316,650 |
| | | | 19992 | 40,136 | $340,771 |
| | | | 19993 | 41,359 | $364,613 |
| | | | 19994 | 41,145 | $371,282 |
| | | | 20001 | 42,298 | $374,479 |
| | | | 20002 | 35,931 | $326,495 |
| | | | 20003 | 20,776 | $197,652 |
| Carrier # | # Claims | Medicare $ | 20004 | 0 | $0 |
| | | | 20011 | 0 | $0 |
| 10490 | 391,812 | $2,978,284 | 20012 | 0 | $0 |
| 10250 | 247,939 | $2,202,423 | 20013 | 0 | $0 |
| 10230 | 192,351 | $1,932,539 | 20014 | 0 | $0 |
| Total | 832,102 | $7,113,246 | Total | 832,102 | $7,113,246 |

**Table 42: Summary of Medicare Florida Blue Shield Carrier Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J7050 | 1,327,934 | $15,333,032 | 19911 | 21,928 | $152,584 |
| J7060 | 334,660 | $3,253,771 | 19912 | 20,911 | $145,485 |
| J7040 | 240,344 | $2,138,356 | 19913 | 19,524 | $140,821 |
| J3370 | 125,779 | $1,971,312 | 19914 | 23,026 | $167,583 |
| J7051 | 346,712 | $1,078,256 | 19921 | 28,327 | $152,641 |
| J7030 | 118,412 | $1,088,226 | 19922 | 27,099 | $161,527 |
| J7042 | 68,249 | $688,867 | 19923 | 25,310 | $143,532 |
| J7070 | 59,493 | $622,531 | 19924 | 29,642 | $179,659 |
| J2912 | 161,877 | $470,056 | 19931 | 33,841 | $207,249 |
| J7130 | 9,814 | $40,673 | 19932 | 31,205 | $202,266 |
| J7110 | 112 | $4,477 | 19933 | 28,367 | $176,801 |
| | | | 19934 | 32,359 | $201,060 |
| Total | 2,793,386 | $26,689,559 | 19941 | 42,129 | $255,230 |
| | | | 19942 | 36,603 | $202,872 |
| | | | 19943 | 37,242 | $220,909 |
| | | | 19944 | 41,643 | $237,065 |
| | | | 19951 | 52,878 | $339,196 |
| | | | 19952 | 49,107 | $447,930 |
| | | | 19953 | 44,235 | $425,836 |
| | | | 19954 | 49,005 | $478,697 |
| | | | 19961 | 61,964 | $597,500 |
| | | | 19962 | 56,914 | $603,774 |
| | | | 19963 | 54,653 | $581,414 |
| | | | 19964 | 64,206 | $700,534 |
| | | | 19971 | 76,170 | $796,202 |
| | | | 19972 | 71,085 | $763,530 |
| | | | 19973 | 64,993 | $705,341 |
| | | | 19974 | 73,684 | $797,821 |
| | | | 19981 | 86,529 | $843,916 |
| | | | 19982 | 80,166 | $797,135 |
| | | | 19983 | 75,924 | $775,940 |
| | | | 19984 | 80,219 | $814,720 |
| | | | 19991 | 102,498 | $1,031,582 |
| | | | 19992 | 91,339 | $917,788 |
| | | | 19993 | 83,677 | $859,829 |
| | | | 19994 | 94,159 | $971,519 |
| | | | 20001 | 109,246 | $1,128,529 |
| | | | 20002 | 93,550 | $980,390 |
| | | | 20003 | 90,074 | $959,249 |
| | | | 20004 | 109,252 | $1,137,226 |
| **Carrier #** | **# Claims** | **Medicare $** | 20011 | 132,642 | $1,253,240 |
| | | | 20012 | 123,378 | $1,336,586 |
| 590 | 2,727,819 | $25,899,070 | 20013 | 112,157 | $1,245,595 |
| 591 | 65,567 | $790,489 | 20014 | 130,526 | $1,451,260 |
| Total | 2,793,386 | $26,689,559 | Total | 2,793,386 | $26,689,559 |

**Table 43: Summary for Medicare Carrier Claims for CG et al: J7050, J7040, J7060, J7030, J3370**

| Carrier | Period | # Clms w/DIFF>0 | # Claims | % of Claims | Aggregate DIFF | Total MCR Paid | % of MCR Paid | # Prov Payments |
|---|---|---|---|---|---|---|---|---|
| Connecticut General | 1997Q1-2001Q4 | 466,987 | 542,464 | 86.1% | $1,860,048 | $6,614,198 | 28.1% | 81,991 |
| Connecticut General | 1995Q2-1996Q4 | 115,582 | 133,683 | 86.5% | $387,723 | $1,526,688 | 25.4% | 23,257 |
| Connecticut General | 1991Q1-1995Q1 | - | 189,259 | - | - | $1,695,009 | - | - |
| WPS | 1996Q3-2001Q4* | 912,197 | 1,040,487 | 87.7% | $4,138,847 | $11,543,402 | 35.9% | 116,330 |
| WPS | 1995Q1-1996Q2 | 36,543 | 42,507 | 86.0% | $99,539 | $327,031 | 30.4% | 6,911 |
| WPS | 1991Q1-1994Q4 | - | 40,320 | - | - | $346,021 | - | - |
| Other Reg 5 | 1996Q3-2001Q4* | 596,609 | 845,362 | 70.6% | $2,996,325 | $9,312,389 | 32.2% | 94,492 |
| Other Reg 5 | 1993Q3-1996Q2 | 259,509 | 370,614 | 70.0% | $969,004 | $3,264,826 | 29.7% | 49,260 |
| Other Reg 5 | 1991Q1-1993Q2 | - | 176,468 | - | - | $1,302,946 | - | - |
| KY AdminaStar | 1998Q3-2001Q4 | 133,840 | 144,163 | 92.8% | $687,250 | $1,978,146 | 34.7% | 18,391 |
| KY AdminaStar | 1993Q4-1998Q2 | 100,953 | 109,936 | 91.8% | $290,354 | $1,005,267 | 28.9% | 14,795 |
| KY AdminaStar | 1991Q1-1993Q3 | - | 30,764 | - | - | $244,611 | - | - |
| WV Nationwide | 1996Q3-2001Q4* | 62,291 | 71,386 | 87.3% | $290,729 | $839,126 | 34.6% | 10,132 |
| WV Nationwide | 1995Q1-1996Q2 | 9,832 | 11,374 | 86.4% | $28,518 | $98,056 | 29.1% | 2,643 |
| WV Nationwide | 1991Q1-1994Q4 | - | 7,803 | - | - | $76,383 | - | - |
| Other Metra Health | 1995Q4-2001Q4 | 385,961 | 408,636 | 94.5% | $1,083,857 | $4,614,714 | 23.5% | 53,652 |
| Other Metra Health | 1993Q1-1995Q3 | 77,147 | 81,168 | 95.0% | $199,630 | $725,336 | 27.5% | 14,812 |
| Other Metra Health | 1991Q1-1992Q4 | - | 23,170 | - | - | $193,774 | - | - |
| Florida Blue Shield | 1995Q3-1998Q2 | 473,122 | 537,212 | 88.1% | $782,623 | $6,637,356 | 11.8% | 75,686 |
| Florida Blue Shield | 93Q1-95Q2, 98Q3-01Q4 | 1,095,699 | 1,242,943 | 88.2% | $1,765,240 | $14,835,432 | 11.9% | 158,227 |
| Florida Blue Shield | 1991Q1-1992Q4 | - | 121,823 | - | - | $773,188 | - | - |
| Total | 1991Q1-2001Q4 | 4,726,272 | 6,171,542 | 76.6% | $15,579,687 | $67,953,899 | 22.9% | 720,579 |

* WPS, Other Region 5, and WV Nationwide consider J3370 from 1994Q1-2001Q4 in the first analyses and exclude this NDC for 1994Q1 and later in subsequent analyses such as WPS 1995Q1-1996Q2, WPS 1991Q1-1994Q4, and so forth.

**Table 44: Summary for Medicare Carrier Claims for Remaining Carriers: J7050, J7040, J7060, J7030, J3370**

| Carrier | Period | # Clms w/DIFF>0 | # Claims | % of Claims | Aggregate DIFF | Total MCR Paid | % of MCR Paid | # Prov Payments |
|---|---|---|---|---|---|---|---|---|
| Texas Blue Shield | 1993Q1–2001Q4 | 1,033,437 | 1,781,416 | 58.0% | $2,986,658 | $18,335,527 | 16.3% | 171,505 |
| Texas Blue Shield | 1991Q1–1992Q4 | - | 62,546 | - | - | $326,545 | - | - |
| North Dakota Blue Shield | 1993Q1–2001Q4 | 505,989 | 865,855 | 58.4% | $1,688,957 | $9,386,067 | 18.0% | 88,073 |
| North Dakota Blue Shield | 1991Q1–1992Q4 | - | 10,725 | - | - | $73,237 | - | - |
| Pennsylvania Blue Shield | 1993Q1–2001Q4 | 473,236 | 802,315 | 59.0% | $1,448,248 | $8,416,902 | 17.2% | 84,880 |
| Pennsylvania Blue Shield | 1991Q1–1992Q4 | - | 44,259 | - | - | $331,244 | - | - |
| Empire Blue Shield | 1993Q1–2001Q4 | 449,046 | 765,546 | 58.7% | $1,440,369 | $8,247,082 | 17.5% | 97,137 |
| Empire Blue Shield | 1991Q1–1992Q4 | - | 26,605 | - | - | $118,561 | - | - |
| National Heritage | 1993Q1–2001Q4 | 473,910 | 805,465 | 58.8% | $1,393,897 | $7,863,487 | 17.7% | 81,570 |
| National Heritage | 1991Q1–1992Q4 | - | 0 | - | - | $0 | - | - |
| Alabama Blue Shield | 1993Q1–2001Q4 | 354,570 | 609,892 | 58.1% | $1,180,673 | $6,743,991 | 17.5% | 48,681 |
| Alabama Blue Shield | 1991Q1–1992Q4 | - | 10,174 | - | - | $140,454 | - | - |
| Arkansas Blue Shield | 1993Q1–2001Q4 | 274,248 | 471,242 | 58.2% | $1,045,772 | $5,816,889 | 18.0% | 47,835 |
| Arkansas Blue Shield | 1991Q1–1992Q4 | - | 7,845 | - | - | $114,697 | - | - |
| Western Blue Shield | 1993Q1–2001Q4 | 190,334 | 318,986 | 59.7% | $712,948 | $3,749,798 | 19.0% | 27,053 |
| Western Blue Shield | 1991Q1–1992Q4 | - | 22,285 | - | - | $135,037 | - | - |
| Kansas Blue Shield | 1993Q1–2001Q4 | 183,956 | 315,219 | 58.4% | $577,932 | $3,417,743 | 16.9% | 32,988 |
| Kansas Blue Shield | 1991Q1–1992Q4 | - | 13,093 | - | - | $103,977 | - | - |
| AETNA | 1993Q1–2001Q4 | 201,839 | 340,740 | 59.2% | $563,454 | $3,200,483 | 17.6% | 44,852 |
| AETNA | 1991Q1–1992Q4 | - | 60,219 | - | - | $330,027 | - | - |
| TOLIC | 1993Q1–2001Q4 | 229,896 | 398,379 | 57.7% | $455,001 | $3,097,014 | 14.7% | 56,645 |
| TOLIC | 1991Q1–1992Q4 | - | 294 | - | - | $7,683 | - | - |
| South Carolina Blue Shield | 1993Q1–2001Q4 | 173,317 | 298,625 | 58.0% | $360,836 | $2,390,481 | 15.1% | 24,067 |
| South Carolina Blue Shield | 1991Q1–1992Q4 | - | 9,705 | - | - | $133,396 | - | - |
| California Blue Shield | 1993Q1–2001Q4 | 148,396 | 252,557 | 58.8% | $332,751 | $1,915,344 | 17.4% | 29,489 |
| California Blue Shield | 1991Q1–1992Q4 | - | 92,458 | - | - | $489,426 | - | - |
| All Others | 1993Q1–2001Q4 | 542,401 | 926,582 | 58.5% | $1,520,950 | $8,848,577 | 17.2% | 167,444 |
| All Others | 1991Q1–1992Q4 | - | 95,274 | - | - | $469,894 | - | - |
| Total | 1991Q1–2001Q4 | 5,234,575 | 9,408,301 | 55.6% | $15,708,446 | $94,203,563 | 16.7% | 1,002,219 |

# EXHIBIT 136

**Federal Register** / Vol. 68, No. 86 / Monday, May 5, 2003 / Notices **23731**

Dated: April 18, 2003.

**Elizabeth M. Duke,**

*Administrator.*

[FR Doc. 03–10934 Filed 5–2–03; 8:45 am]

**BILLING CODE 4165–15–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of Inspector General

### OIG Compliance Program Guidance for Pharmaceutical Manufacturers

**AGENCY:** Office of Inspector General (OIG), HHS.

**ACTION:** Notice

**SUMMARY:** This **Federal Register** notice sets forth the recently issued Compliance Program Guidance for Pharmaceutical Manufacturers developed by the Office of Inspector General (OIG). Through this notice, the OIG is setting forth its general views on the value and fundamental principles of compliance programs for pharmaceutical manufacturers and the specific elements that pharmaceutical manufacturers should consider when developing and implementing an effective compliance program.

**FOR FURTHER INFORMATION CONTACT:** Mary E. Riordan or Nicole C. Hall, Office of Counsel to the Inspector General, (202) 619–2078.

**SUPPLEMENTARY INFORMATION:**

### Background

Compliance program guidance is a major initiative of the OIG in its effort to engage the health care community in preventing and reducing fraud and abuse in federal health care programs. The purpose of the compliance program guidance is to encourage the use of internal controls to efficiently monitor adherence to applicable statutes, regulations and program requirements. In the last several years, the OIG has developed and issued compliance program guidance directed at the following segments of the health care industry: the hospital industry; home health agencies; clinical laboratories; third-party medical billing companies; the durable medical equipment, prosthetics, orthotics and supply industry; Medicare+Choice organizations offering coordinated care plans; hospices; nursing facilities; individual and small group physician practices; and ambulance suppliers.

Copies of these compliance program guidances can be found on the OIG Web site at *http://oig.hhs.gov/fraud/complianceguidance.html.*

### Developing the Compliance Program Guidance for Pharmaceutical Manufacturers

On June 11, 2001, the OIG published a solicitation notice seeking information and recommendations for developing compliance program guidance for the pharmaceutical industry (66 FR 31246). In response to that solicitation notice, the OIG received eight comments from various outside sources. We carefully considered those comments, as well as previous OIG publications, such as other compliance program guidances and Special Fraud Alerts. In addition, we have taken into account past and ongoing fraud investigations conducted by the OIG's Office of Investigations and the Department of Justice, and have consulted with the Centers for Medicare and Medicaid Services (CMS) (formerly known as the Health Care Financing Administration). In an effort to ensure that all parties had a reasonable opportunity to provide input into a final product, draft compliance program guidance for the pharmaceutical industry was published in the **Federal Register** on October 3, 2002 (67 FR 62057) for further comments and recommendations.

### Elements for an Effective Compliance Program

This compliance program guidance for pharmaceutical manufacturers contains seven elements that have been widely recognized as fundamental to an effective compliance program:

• Implementing written policies and procedures;

• Designating a compliance officer and compliance committee;

• Conducting effective training and education;

• Developing effective lines of communication;

• Conducting internal monitoring and auditing;

• Enforcing standards through well-publicized disciplinary guidelines; and

• Responding promptly to detected problems and undertaking corrective action.

These elements are included in previous guidances issued by the OIG. As with previously issued guidances, this compliance program guidance represents the OIG's suggestions on how pharmaceutical manufacturers can establish internal controls to ensure adherence to applicable rules and program requirements. The contents of this guidance should not be viewed as mandatory or as an exclusive discussion of the advisable elements of a compliance program. The document is intended to present voluntary guidance

to the industry and not to represent binding standards for pharmaceutical manufacturers.

### Office of Inspector General's Compliance Program Guidance for Pharmaceutical Manufacturers

### I. Introduction

The Office of Inspector General (OIG) of the Department of Health and Human Services is continuing in its efforts to promote voluntary compliance programs for the health care industry. This compliance guidance is intended to assist companies that develop, manufacture, market, and sell pharmaceutical drugs or biological products (pharmaceutical manufacturers) in developing and implementing internal controls and procedures that promote adherence to applicable statutes, regulations, and requirements of the federal health care programs[1] and in evaluating and, as necessary, refining existing compliance programs.

This guidance provides the OIG's views on the fundamental elements of pharmaceutical manufacturer compliance programs and principles that each pharmaceutical manufacturer should consider when creating and implementing an effective compliance program. This guide is not a compliance program. Rather, it is a set of guidelines that pharmaceutical manufacturers should consider when developing and implementing a compliance program or evaluating an existing one. For those manufacturers with an existing compliance program, this guidance may serve as a benchmark or comparison against which to measure ongoing efforts.

A pharmaceutical manufacturer's implementation of an effective compliance program may require a significant commitment of time and resources by various segments of the organization. In order for a compliance program to be effective, it must have the support and commitment of senior management and the company's governing body. In turn, the corporate leadership should strive to foster a culture that promotes the prevention, detection, and resolution of instances of problems. Although an effective compliance program may require a reallocation of existing resources, the long-term benefits of establishing a compliance program significantly outweigh the initial costs.

In a continuing effort to collaborate closely with the pharmaceutical industry, the OIG published a notice in

---

[1] (Endnotes appear at end of document)

the **Federal Register** soliciting comments and recommendations on what should be included in this compliance program guidance.[2] Following our review of comments received in response to the solicitation notice, we published draft compliance guidance in the **Federal Register** in order to solicit further comments and recommendations.[3] In addition to considering the comments received in response to that solicitation notice and the draft compliance guidance, in finalizing this guidance we reviewed previous OIG publications, including OIG advisory opinions, safe harbor regulations (including the preambles) relating to the federal anti-kickback statute,[4] Special Fraud Alerts, as well as reports issued by the OIG's Office of Audit Services and Office of Evaluation and Inspections relevant to the pharmaceutical industry. (These materials are available on the OIG Web page at *http://oig.hhs.gov*.) In addition, we relied on the experience gained from investigations of pharmaceutical manufacturers conducted by OIG's Office of Investigations, the Department of Justice, and the state Medicaid Fraud Control Units. We also held meetings with four groups of industry stakeholders—Pharmaceutical Research and Manufacturers of America (PhRMA) and pharmaceutical manufacturer representatives; health plan and health plan association representatives; representatives of pharmacy benefit managers (PBMs) and representatives of the American Medical Association (AMA) and its member organizations.

*A. Benefits of a Compliance Program*

The OIG believes a comprehensive compliance program provides a mechanism that addresses the public and private sectors' mutual goals of reducing fraud and abuse; enhancing health care provider operational functions; improving the quality of health care services; and reducing the cost of health care. Attaining these goals provides positive results to the pharmaceutical manufacturer, the government, and individual citizens alike. In addition to fulfilling its legal duty to avoid submitting false or inaccurate pricing or rebate information to any federal health care program or engaging in illegal marketing activities, a pharmaceutical manufacturer may gain important additional benefits by voluntarily implementing a compliance program. The benefits may include:

• A concrete demonstration to employees and the community at large of the company's commitment to honest and responsible corporate conduct;

• An increased likelihood of preventing, or at least identifying, and correcting unlawful and unethical behavior at an early stage;

• A mechanism to encourage employees to report potential problems and allow for appropriate internal inquiry and corrective action; and

• Through early detection and reporting, minimizing any financial loss to the government and any corresponding financial loss to the company.

The OIG recognizes that the implementation of a compliance program may not entirely eliminate improper conduct from the operations of a pharmaceutical manufacturer. However, a good faith effort by the company to comply with applicable statutes and regulations as well as federal health care program requirements, demonstrated by an effective compliance program, significantly reduces the risk of unlawful conduct and any penalties that result from such behavior.

*B. Application of Compliance Program Guidance*

Given the wide diversity within the pharmaceutical industry, there is no single "best" pharmaceutical manufacturer compliance program. The OIG recognizes the complexities of this industry and the differences among industry members. Some pharmaceutical manufacturers are small and may have limited resources to devote to compliance measures. Conversely, other companies are well-established, large multi-national corporations with a widely dispersed work force. Some companies may have well-developed compliance programs already in place; others only now may be initiating such efforts. The OIG also recognizes that pharmaceutical manufacturers are subject to extensive regulatory requirements in addition to fraud and abuse-related issues and that many pharmaceutical manufacturers have addressed these obligations through compliance programs. Accordingly, the OIG strongly encourages pharmaceutical manufactures to develop and implement or refine (as necessary) compliance elements that uniquely address the areas of potential problems, common concern, or high risk that apply to their own companies (or, as applicable, to the U.S. operations of their companies).

For example, although they are not exhaustive of all potential risk areas, the OIG has identified three major potential risk areas for pharmaceutical manufacturers: (1) Integrity of data used by state and federal governments to

establish payment; (2) kickbacks and other illegal remuneration; and (3) compliance with laws regulating drug samples. The risk areas are discussed in greater detail in section II.B.2. below. The compliance measures adopted by a pharmaceutical manufacturer should be tailored to fit the unique environment of the company (including its organizational structure, operations and resources, as well as prior enforcement experience). In short, the OIG recommends that each pharmaceutical manufacturer should adapt the objectives and principles underlying the measures outlined in this guidance to its own particular circumstances.[5]

**II. Compliance Program Elements**

*A. The Basic Compliance Elements*

The OIG believes that every effective compliance program must begin with a formal commitment by the pharmaceutical manufacturer's board of directors or other governing body. Evidence of that commitment should include the allocation of adequate resources, a timetable for the implementation of the compliance measures, and the identification of an individual to serve as a compliance officer to ensure that each of the recommended and adopted elements is addressed. Once a commitment has been undertaken, a compliance officer should immediately be chosen to oversee the implementation of the compliance program.

The elements listed below provide a comprehensive and firm foundation upon which an effective compliance program may be built. Further, they are likely to foster the development of a corporate culture of compliance. The OIG recognizes that full implementation of all elements may not be immediately feasible for all pharmaceutical manufacturers. However, as a first step, a good faith and meaningful commitment on the part of the company's management will substantially contribute to the program's successful implementation. As the compliance program is implemented, that commitment should filter down through management to every employee and contractor of the pharmaceutical manufacturer, as applicable for the particular individual.

At a minimum, a comprehensive compliance program should include the following elements:

(1) The development and distribution of written standards of conduct, as well as written policies, procedures and protocols that verbalize the company's commitment to compliance (*e.g.*, by including adherence to the compliance

program as an element in evaluating management and employees) and address specific areas of potential fraud and abuse, such as the reporting of pricing and rebate information to the federal health care programs, and sales and marketing practices;

(2) The designation of a compliance officer and other appropriate bodies (*e.g.*, a corporate compliance committee) charged with the responsibility for developing, operating, and monitoring the compliance program, and with authority to report directly to the board of directors and/or the president or CEO;

(3) The development and implementation of regular, effective education and training programs for all affected employees;

(4) The creation and maintenance of an effective line of communication between the compliance officer and all employees, including a process (such as a hotline or other reporting system) to receive complaints or questions, and the adoption of procedures to protect the anonymity of complainants and to protect whistleblowers from retaliation;

(5) The use of audits and/or other risk evaluation techniques to monitor compliance, identify problem areas, and assist in the reduction of identified problems;

(6) The development of policies and procedures addressing the non-employment or retention of individuals or entities excluded from participation in federal health care programs, and the enforcement of appropriate disciplinary action against employees or contractors who have violated company policies and procedures and/or applicable federal health care program requirements; and

(7) The development of policies and procedures for the investigation of identified instances of noncompliance or misconduct. These should include directions regarding the prompt and proper response to detected offenses, such as the initiation of appropriate corrective action and preventive measures and processes to report the offense to relevant authorities in appropriate circumstances.

*B. Written Policies and Procedures*

In developing a compliance program, every pharmaceutical manufacturer should develop and distribute written compliance standards, procedures, and practices that guide the company and the conduct of its employees in day-to-day operations. These policies and procedures should be developed under the direction and supervision of the compliance officer, the compliance committee, and operational managers.

At a minimum, the policies and procedures should be provided to all employees who are affected by these policies, and to any agents or contractors who may furnish services that impact federal health care programs (*e.g.*, contractors involved in the co-promotion of a manufacturer's products).

1. Code of Conduct

Although a clear statement of detailed and substantive policies and procedures is at the core of a compliance program, the OIG recommends that pharmaceutical manufacturers also develop a general corporate statement of ethical and compliance principles that will guide the company's operations. One common expression of this statement of principles is the code of conduct. The code should function in the same fashion as a constitution, *i.e.*, as a document that details the fundamental principles, values, and framework for action within an organization. The code of conduct for a pharmaceutical manufacturer should articulate the company's expectations of commitment to compliance by management, employees, and agents, and should summarize the broad ethical and legal principles under which the company must operate. Unlike the more detailed policies and procedures, the code of conduct should be brief, easily readable, and cover general principles applicable to all employees.

As appropriate, the OIG strongly encourages the participation and involvement of the pharmaceutical manufacturer's board of directors, CEO, president, members of senior management, and other personnel from various levels of the organizational structure in the development of all aspects of the compliance program, especially the code of conduct. Management and employee involvement in this process communicates a strong and explicit commitment by management to foster compliance with applicable federal health care program requirements. It also communicates the need for all employees to comply with the organization's code of conduct and policies and procedures.

2. Specific Risk Areas

This section is intended to help prudent pharmaceutical manufacturers identify areas of their operations that present potential risk of liability under several key federal fraud and abuse statutes and regulations.[6] This section focuses on areas that are currently of concern to the enforcement community and is not intended to address all potential risk areas for pharmaceutical manufacturers. Importantly, the identification of a particular practice or activity in this section is not intended to imply that the practice or activity is necessarily illegal in all circumstances or that it may not have a valid or lawful purpose underlying it.

This section addresses the following areas of significant concern for pharmaceutical manufacturers: (1) Integrity of data used by state and federal governments to establish payment amounts; (2) kickbacks and other illegal remuneration; and (3) compliance with laws regulating drug samples.

This guidance does not create any new law or legal obligations, and the discussions that follow are not intended to present detailed or comprehensive summaries of lawful and unlawful activity. Rather, these discussions should be used as a starting point for a manufacturer's legal review of its particular practices and for development of policies and procedures to reduce or eliminate potential risk.

a. Integrity of Data Used To Establish or Determine Government Reimbursement. Many federal and state health care programs establish or ultimately determine reimbursement rates for pharmaceuticals, either prospectively or retrospectively, using price and sales data directly or indirectly furnished by pharmaceutical manufacturers. The government sets reimbursement with the expectation that the data provided are complete and accurate. The knowing submission of false, fraudulent, or misleading information is actionable. A pharmaceutical manufacturer may be liable under the False Claims Act[7] if government reimbursement (including, but not limited to, reimbursement by Medicare and Medicaid) for the manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, directly or indirectly, and the manufacturer has knowingly (as defined in the False Claims Act) failed to generate or report such information completely and accurately. Manufacturers may also be liable for civil money penalties under various laws, rules and regulations. Moreover, in some circumstances, inaccurate or incomplete reporting may be probative of liability under the federal anti-kickback statute.

Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or

other price concessions or similar benefits offered to some or all purchasers. Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues). Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements.

Given the importance of the Medicaid Rebate Program, as well as other programs that rely on Medicaid Rebate Program benchmarks (such as the 340B Program [8]), manufacturers should pay particular attention to ensuring that they are calculating Average Manufacturer Price and Best Price accurately and that they are paying appropriate rebate amounts for their drugs.[9]

In sum, pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.

b. Kickbacks and Other Illegal Remuneration—*A. General Considerations.* Pharmaceutical manufacturers, as well as their employees and agents, should be aware of the federal anti-kickback statute and the constraints it places on the marketing and promotion of products reimbursable by the federal health care programs, including, but not limited to, Medicare and Medicaid. In the health care sector, many common business activities, including, for example, sales, marketing, discounting, and purchaser relations, potentially implicate the anti-kickback statute. Pharmaceutical manufacturers and their employees and agents should be aware that the anti-kickback statute prohibits in the health care industry some practices that are common in other business sectors. In short, practices that may be common or longstanding in other businesses are not necessarily acceptable or lawful when soliciting federal health care program business.

The anti-kickback statute is a criminal prohibition against payments (in any form, whether the payments are direct or indirect) made purposefully to induce or reward the referral or generation of federal health care business. The anti-kickback statute addresses not only the offer or payment of anything of value for patient referrals, but also the offer or payment of anything of value in return for purchasing, leasing, ordering, or

arranging for or recommending the purchase, lease, or ordering of any item or service reimbursable in whole or part by a federal health care program. The statute extends equally to the solicitation or acceptance of remuneration for referrals. Liability under the anti-kickback statute is determined separately for each party involved. In addition to criminal penalties, violators may be subject to civil monetary sanctions and exclusion from the federal health care programs. Under certain circumstances, a violation of the anti-kickback statute may give rise to liability under the False Claims Act.

Although liability under the anti-kickback statute ultimately turns on a party's intent, it is possible to identify arrangements or practices that may present a significant potential for abuse. Initially, a manufacturer should identify any remunerative relationship between itself (or its representatives) and persons or entities in a position to generate federal health care business for the manufacturer directly or indirectly. Persons or entities in a position to generate federal health care business include, for example, purchasers, benefit managers, formulary committee members, group purchasing organizations (GPOs), physicians and certain allied health care professionals, and pharmacists. The next step is to determine whether any *one* purpose of the remuneration may be to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program. Importantly, a lawful purpose will not legitimate a payment that also has an unlawful purpose.

Although any arrangement satisfying both tests requires careful scrutiny from a manufacturer, the courts have identified several potentially aggravating considerations that can be useful in identifying arrangements at greatest risk of prosecution. In particular, manufacturers should ask the following questions, among others, about any problematic arrangements or practices they identify:

• Does the arrangement or practice have a potential to interfere with, or skew, clinical decision-making? Does it have a potential to undermine the clinical integrity of a formulary process? If the arrangement or practice involves providing information to decision-makers, prescribers, or patients, is the information complete, accurate, and not misleading?

• Does the arrangement or practice have a potential to increase costs to the federal health care programs, beneficiaries, or enrollees? Does the

arrangement or practice have the potential to be a disguised discount to circumvent the Medicaid Rebate Program Best Price calculation?

• Does the arrangement or practice have a potential to increase the risk of overutilization or inappropriate utilization?

• Does the arrangement or practice raise patient safety or quality of care concerns?

Manufacturers that have identified problematic arrangements or practices can take a number of steps to reduce or eliminate the risk of an anti-kickback violation. Detailed guidance relating to a number of specific practices is available from several sources. Most importantly, the anti-kickback statute and the corresponding regulations establish a number of "safe harbors" for common business arrangements, including personal services and management contracts, 42 CFR 1001.952(d), warranties, 42 CFR 1001.952(g), discounts, 42 CFR 1001.952(h), employment, 42 CFR 1001.952(i), GPOs, 42 CFR 1001.952(j), and certain managed care and risk sharing arrangements, 42 CFR 1001.952(m), (t), and (u). *Safe harbor protection requires strict compliance with all applicable conditions set out in the relevant safe harbor.* Although compliance with a safe harbor is voluntary and failure to comply with a safe harbor does not mean an arrangement is illegal, many arrangements can be structured to fit in safe harbors, and we recommend that pharmaceutical manufacturers structure arrangements to fit in a safe harbor whenever possible. Other available guidance includes special fraud alerts and advisory bulletins issued by the OIG identifying and discussing particular practices or issues of concern and OIG advisory opinions issued to specific parties about their particular business arrangements. Parties may apply for an OIG advisory opinion using the procedures set out at 42 CFR part 1008. The safe harbor regulations (and accompanying **Federal Register** preambles), fraud alerts and bulletins, advisory opinions (and instructions for obtaining them), and other guidance are available on the OIG web site at *http://oig.hhs.gov.*

*B. Key Areas of Potential Risk.* The following discussion highlights several known areas of potential risk. The propriety of any particular arrangement can only be determined after a detailed examination of the attendant facts and circumstances. *The identification of a given practice or activity as "suspect" or as an area of "risk" does not mean it is necessarily illegal or unlawful, or that it*

*cannot be properly structured to fit in a safe harbor.* Nor does it mean that the practice or activity is not beneficial from a clinical, cost, or other perspective. Rather, the areas identified below are those areas of activity that have a potential for abuse based on historical law enforcement experience and that should receive close scrutiny from manufacturers. The discussion highlights potential risks under the anti-kickback statute arising from pharmaceutical manufacturers' relationships with three groups: purchasers (including those using formularies) and their agents; persons and entities in a position to make or influence referrals (including physicians and other health care professionals); and sales agents.

(1) Relationships with Purchasers and their Agents—(a) Discounts and Other Remuneration to Purchasers. Pharmaceutical manufacturers offer purchasers a variety of price concessions and other remuneration to induce the purchase of their products. Purchasers include direct purchasers (*e.g.*, hospitals, nursing homes, pharmacies, some physicians), as well as indirect purchasers (*e.g.*, health plans). Inducements offered to purchasers potentially implicate the anti-kickback statute if the purchased products are reimbursable to the purchasers, in whole or in part, directly or indirectly, by any of the federal health care programs. Any remuneration from a manufacturer provided to a purchaser that is expressly or impliedly related to a sale potentially implicates the anti-kickback statute and should be carefully reviewed.

Discounting arrangements are prevalent in the pharmaceutical industry and deserve careful scrutiny particularly because of their potential to implicate the Best Price requirements of the Medicaid Rebate Program. Because the Medicaid Rebate Program in many instances requires that states receive rebates based on the Best Price offered by a pharmaceutical manufacturer to other purchasers, manufacturers have a strong financial incentive to hide *de facto* pricing concessions to other purchasers to avoid passing on the same discount to the states. Because of the potential direct and substantial effect of such practices on federal health care program expenditures and the interest of some manufacturers in avoiding price concessions that would trigger rebates to the states, any remuneration from a manufacturer to a purchaser, however characterized, should be carefully scrutinized.

*Discounts.* Public policy favors open and legitimate price competition in

health care. Thus, the anti-kickback statute contains an exception for discounts offered to customers that submit claims to the federal health care programs, if the discounts are properly disclosed and accurately reported. *See* 42 U.S.C. 1320a–7b(b)(3)(A); 42 CFR 1001.952(h). However, to qualify for the exception, the discount must be in the form of a *reduction in the price* of the good or service based on an arms-length transaction. In other words, the exception covers only reductions in the product's price. Moreover, the regulations provide that the discount must be given at the time of sale or, in certain cases, set at the time of sale, even if finally determined subsequent to the time of sale (*i.e.*, a rebate).

Manufacturers offering discounts should thoroughly familiarize themselves, and have their sales and marketing personnel familiarize themselves, with the discount safe harbor at 42 CFR 1001.952(h) (and, if relevant, the safe harbors for price reductions in the managed care context, 42 CFR 1001.952(m), (t), and (u)). In particular, manufacturers should pay attention to the discount safe harbor requirements applicable to "sellers" and "offerors" of discounts. Under the safe harbor, sellers and offerors have specific obligations that include (i) informing a customer of any discount and of the customer's reporting obligations with respect to that discount, and (ii) refraining from any action that would impede a customer's ability to comply with the safe harbor. To fulfill the safe harbor requirements, manufacturers will need to know how their customers submit claims to the federal health care programs (*e.g.*, whether the customer is a managed care, cost-based, or charge-based biller). Compliance with the safe harbor is determined separately for each party.

*Product Support Services.* Pharmaceutical manufacturers sometimes offer purchasers certain support services in connection with the sale of their products. These services may include billing assistance tailored to the purchased products, reimbursement consultation, and other programs specifically tied to support of the purchased product. Standing alone, services that have no substantial independent value to the purchaser may not implicate the anti-kickback statute. However, if a manufacturer provides a service having no independent value (such as limited reimbursement support services in connection with its own products) in tandem with another service or program that confers a benefit on a referring provider (such as a reimbursement guarantee that

eliminates normal financial risks), the arrangement would raise kickback concerns. For example, the anti-kickback statute would be implicated if a manufacturer were to couple a reimbursement support service with a promise that a purchaser will pay for ordered products only if the purchaser is reimbursed by a federal health care program.

*Educational Grants.* Pharmaceutical manufacturers sometimes provide grant funding for a wide range of educational activities. While educational funding can provide valuable information to the medical and health care industry, manufacturer grants to purchasers, GPOs, PBMs and similar entities raise concerns under the anti-kickback statute. Funding that is conditioned, in whole or in part, on the purchase of product implicates the statute, even if the educational or research purpose is legitimate. Furthermore, to the extent the manufacturer has any influence over the substance of an educational program or the presenter, there is a risk that the educational program may be used for inappropriate marketing purposes.

To reduce the risks that a grant program is used improperly to induce or reward product purchases or to market product inappropriately, manufacturers should separate their grant making functions from their sales and marketing functions. Effective separation of these functions will help insure that grant funding is not inappropriately influenced by sales or marketing motivations and that the educational purposes of the grant are legitimate. Manufacturers should establish objective criteria for making grants that do not take into account the volume or value of purchases made by, or anticipated from, the grant recipient and that serve to ensure that the funded activities are *bona fide.* The manufacturer should have no control over the speaker or content of the educational presentation. Compliance with such procedures should be documented and regularly monitored.

*Research Funding.* Manufacturers often contract with purchasers of their products to conduct research activities on behalf of the manufacturer on a fee-for-service basis. These contracts should be structured to fit in the personal services safe harbor whenever possible. Payments for research services should be fair market value for legitimate, reasonable, and necessary services. Post-marketing research activities should be especially scrutinized to ensure that they are legitimate and not simply a pretext to generate prescriptions of a drug. Prudent manufacturers will develop contracting procedures that

clearly separate the awarding of research contracts from marketing. Research contracts that originate through the sales or marketing functions—or that are offered to purchasers in connection with sales contacts—are particularly suspect.

Pharmaceutical manufacturers sometimes provide funding to their purchasers for use in the purchasers' own research. In many cases, the research provides valuable scientific and clinical information, improves clinical care, leads to promising new treatments, promotes better delivery of health care, or otherwise benefits patients. However, as with educational grants, if linked directly or indirectly to the purchase of product, research grants can be misused to induce the purchase of business without triggering Medicaid Best Price obligations. To reduce risk, manufacturers should insulate research grant making from sales and marketing influences.

*Other remuneration to purchasers.* As already noted, any remuneration from a manufacturer provided to a purchaser that is expressly or impliedly related to a sale potentially implicates the anti-kickback statute and should be carefully reviewed. Examples of remuneration in connection with a sale include, but are not limited to, "prebates" and "upfront payments," other free or reduced-price goods or services, and payments to cover the costs of "converting" from a competitor's product. Selective offers of remuneration (*i.e.*, offers made to some but not all purchasers) may increase potential risk if the selection criteria relate directly or indirectly to the volume or value of business generated. In addition, manufacturers may contract with purchasers to provide services to the manufacturer, such as data collection services. These contracts should be structured whenever possible to fit in the personal services safe harbor; in all cases, the remuneration should be fair market value for legitimate, reasonable, and necessary services.

(b) Formularies and Formulary Support Activities. To help control drug costs while maintaining clinical appropriateness and quality of patient care, many purchasers of pharmaceutical products, including indirect purchasers such as health plans, have developed drug formularies to promote rational, clinically appropriate, safe, and cost-effective drug therapy. Formularies are a well-established tool for the effective management of drug benefits. The formulary development process—typically overseen by a committee of physicians, pharmacists, and other

health care professionals—determines the drugs that are covered and, if tiered benefit levels are utilized, to which tier the drugs are assigned. So long as the determination of clinical efficacy and appropriateness of formulary drugs by the formulary committee precedes, and is paramount to, the consideration of costs, the development of a formulary is unlikely to raise significant issues under the anti-kickback statute.

Formulary support activities, including related communications with patients and physicians to encourage compliance, are an integral and essential component of successful pharmacy benefits management. Proper utilization of a formulary maximizes the cost-effectiveness of the benefit and assures the quality and appropriateness of the drug therapy. When provided by a PBM, these services are part of the PBM's formulary and benefit management function—a service provided to its customers—and markedly different from its purchasing agent/price negotiator role. Most importantly, the benefits of these formulary support activities inure directly to the PBM and its customers through lower costs.

To date, Medicare and Medicaid involvement with outpatient drug formularies has been limited primarily to Medicaid and Medicare managed care plans. In light of the safe harbors under the anti-kickback statute for those managed care arrangements, the financial arrangements between health plans and pharmaceutical manufacturers or, where the pharmacy benefit is managed by a PBM, the arrangements among the three parties, have received relatively little scrutiny. However, as federal program expenditures for, and coverage of, outpatient pharmaceuticals increase, scrutiny under the anti-kickback statute has also increased. Several practices appear to have the potential for abuse.

• *Relationships with formulary committee members.* Given the importance of formulary placement for a manufacturer's products, unscrupulous manufacturers and sales representatives may attempt to influence committee deliberations. Any remuneration from a manufacturer or its agents directly or indirectly to person in a position to influence formulary decisions related to the manufacturer's products are suspect and should be carefully scrutinized. Manufacturers should also review their contacts with sponsors of formularies to ensure that price negotiations do not influence decisions on clinical safety or efficacy.

• *Payments to PBMs.* Any rebates or other payments by drug manufacturers

to PBMs that are based on, or otherwise related to, the PBM's customers' purchases *potentially* implicate the anti-kickback statute. Protection is available by structuring such arrangements to fit in the GPO safe harbor at 42 CFR 1001.952(j). That safe harbor requires, among other things, that the payments be authorized in advance by the PBM's customer and that all amounts actually paid to the PBM on account of the customer's purchases be disclosed in writing at least annually to the customer. In addition, arrangements with PBMs that assume risk may raise different issues; depending on the circumstances, protection for such arrangements may be available under the managed care safe harbors at 42 CFR 1001.952(m), (t) and (u).

• *Formulary placement payments.* Lump sum payments for inclusion in a formulary or for exclusive or restricted formulary status are problematic and should be carefully scrutinized.

In addition, some manufacturers provide funding for purchasers' or PBMs' formulary support activities, especially communications with physicians and patients. While the communications may indirectly benefit the manufacturer, the primary economic beneficiary is typically the formulary sponsor. In other words, the manufacturer's dollars appear to replace dollars that would or should be spent by the sponsor. To the extent the manufacturers' payments are linked to drug purchases directly or indirectly, they potentially implicate the anti-kickback statute. Among the questions that should be examined by a manufacturer in connection with these activities are: Is the funding tied to specific drugs or categories? If so, are the categories especially competitive? Is the formulary sponsor funding similar activities for other drug categories? Has funding of PBM activities increased as rebates are increasingly passed back to PBM customers?

(c) Average Wholesale Price. The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer. In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed. To the extent that a manufacturer controls the "spread," it controls its customer's profit.

Average Wholesale Price (AWP) is the benchmark often used to set reimbursement for prescription drugs under the Medicare Part B program. For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o). Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP. Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated. Unlike *bona fide* discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser (the federal or state government). Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral of program business. In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.

In the light of this risk, we recommend that manufacturers review their AWP reporting practices and methodology to confirm that marketing considerations do not influence the process. Furthermore, manufacturers should review their marketing practices. The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute. Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product.

(2) Relationships with Physicians and Other Persons and Entities in a Position to Make or Influence Referrals. Pharmaceutical manufacturers and their agents may have a variety of remunerative relationships with persons or entities in a position to refer, order, or prescribe—or influence the referral, ordering, or prescribing of—the manufacturers' products, even though the persons or entities may not themselves purchase (or in the case of

GPOs or PBMs, arrange for the purchase of) those products. These remunerative relationships potentially implicate the anti-kickback statute. The following discussion focuses on relationships with physicians, but the same principles would apply when evaluating relationships with other parties in a position to influence referrals, including, without limitation, pharmacists and other health care professionals.

Manufacturers, providers, and suppliers of health care products and services frequently cultivate relationships with physicians in a position to generate business for them through a variety of practices, including gifts, entertainment, and personal services compensation arrangements. These activities have a high potential for fraud and abuse and, historically, have generated a substantial number of anti-kickback convictions. There is no substantive difference between remuneration from a pharmaceutical manufacturer or from a durable medical equipment or other supplier—if the remuneration is intended to generate any federal health care business, it potentially violates the anti-kickback statute.

Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturer's product, the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals. For example, if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (*i.e.*, have independent value to the physician), or if items or services are sold to a physician at less than their fair market value, the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer. Moreover, under the anti-kickback statute, neither a legitimate purpose for an arrangement (*e.g.*, physician education), nor a fair market value payment, will necessarily protect remuneration if there is also an illegal purpose (*i.e.*, the purposeful inducement of business).

In light of the obvious risks inherent in these arrangements, whenever possible prudent manufacturers and their agents or representatives should structure relationships with physicians to fit in an available safe harbor, such as the safe harbors for personal services and management contracts, 42 CFR 1001.952(d), or employees, 42 CFR 1001.952(i). *An arrangement must fit*

*squarely in a safe harbor to be protected.* In addition, arrangements that do not fit in a safe harbor should be reviewed in light of the totality of all facts and circumstances, bearing in mind the following factors, among others:

• *Nature of the relationship between the parties.* What degree of influence does the physician have, directly or indirectly, on the generation of business for the manufacturer? Does the manufacturer have other direct or indirect relationships with the physician or members of the physician's group?

• *Manner in which the remuneration is determined.* Does the remuneration take into account, directly or indirectly, the volume or value of business generated (*e.g.*, is the remuneration only given to persons who have prescribed or agreed to prescribe the manufacturer's product)? Is the remuneration conditioned in whole or in part on referrals or other business generated? Is there any service provided other than referrals?

• *Value of the remuneration.* Is the remuneration more than trivial in value, including all gifts to any individual, entity, or group of individuals?[10] Do fees for services exceed the fair market value of any legitimate, reasonable, and necessary services rendered by the physician to the manufacturer?

• *Potential federal program impact of the remuneration.* Does the remuneration have the potential to affect costs to any of the federal health care programs or their beneficiaries or to lead to overutilization or inappropriate utilization?

• *Potential conflicts of interest.* Would acceptance of the remuneration diminish, or appear to diminish, the objectivity of professional judgment? Are there patient safety or quality of care concerns? If the remuneration relates to the dissemination of information, is the information complete, accurate, and not misleading?

These concerns are addressed in the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code"), adopted on April 18, 2002, which provides useful and practical advice for reviewing and structuring these relationships. (The PhRMA Code is available through PhRMA's Web site at *http://www.phrma.org.*) Although compliance with the PhRMA Code will not protect a manufacturer as a matter of law under the anti-kickback statute, it will substantially reduce the risk of fraud and abuse and help demonstrate a good faith effort to comply with the applicable federal health care program requirements.

The following paragraphs discuss in greater detail several common or problematic relationships between manufacturers and physicians, including "switching" arrangements, consulting and advisory payments, payments for detailing, business courtesies and other gratuities, and educational and research activities.

• *Switching"* arrangements. As noted in the OIG's 1994 Special Fraud Alert (59 FR 65372; December 19, 1994), product conversion arrangements (also known as "switching" arrangements) are suspect under the anti-kickback statute. Switching arrangements involve pharmaceutical manufacturers offering physicians or others cash payments or other benefits each time a patient's prescription is changed to the manufacturer's product from a competing product. This activity clearly implicates the statute, and, while such programs may be permissible in certain managed care arrangements, manufacturers should review very carefully any marketing practices utilizing "switching" payments in connection with products reimbursable by federal health care programs.

*Consulting and advisory payments.* Pharmaceutical manufacturers frequently engage physicians and other health care professionals to furnish personal services as consultants or advisers to the manufacturer. In general, fair market value payments to small numbers of physicians for *bona fide* consulting or advisory services are unlikely to raise any significant concern. Compensating physicians as "consultants" when they are expected to attend meetings or conferences primarily in a passive capacity is suspect.

Also of concern are compensation relationships with physicians for services connected directly or indirectly to a manufacturer's marketing and sales activities, such as speaking, certain research, or preceptor or "shadowing" services. While these arrangements are potentially beneficial, they also pose a risk of fraud and abuse. In particular, the use of health care professionals for marketing purposes—including, for example, ghost-written papers or speeches—implicates the anti-kickback statute. While full disclosure by physicians of any potential conflicts of interest and of industry sponsorship or affiliation may reduce the risk of abuse, disclosure does not eliminate the risk.

At a minimum, manufacturers should periodically review arrangements for physicians' services to ensure that: (i) The arrangement is set out in writing; (ii) there is a legitimate need for the services; (iii) the services are provided;

(iv) the compensation is at fair market value; and (v) all of the preceding facts are documented prior to payment. In addition, to further reduce their risk, manufacturers should structure services arrangements to comply with a safe harbor whenever possible.

*Payments for detailing.* Recently, some entities have been compensating physicians for time spent listening to sales representatives market pharmaceutical products. In some cases, these payments are characterized as "consulting" fees and may require physicians to complete minimal paperwork. Other companies pay physicians for time spent accessing web sites to view or listen to marketing information or perform "research." All of these activities are highly suspect under the anti-kickback statute, are highly susceptible to fraud and abuse, and should be strongly discouraged.

*Business Courtesies and Other Gratuities.* Pharmaceutical companies and their employees and agents often engage in a number of other arrangements that offer benefits, directly or indirectly, to physicians or others in a position to make or influence referrals. Examples of remunerative arrangements between pharmaceutical manufacturers (or their representatives) and parties in a position to influence referrals include:

• Entertainment, recreation, travel, meals, or other benefits in association with information or marketing presentations; and

• Gifts, gratuities, and other business courtesies.

As discussed above, these arrangements potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business for the pharmaceutical company. While the determination of whether a particular arrangement violates the anti-kickback statute depends on the specific facts and circumstances, compliance with the PhRMA Code with respect to these arrangements should substantially reduce a manufacturer's risk.

*Educational and Research Funding.* In some cases, manufacturers contract with physicians to provide research services on a fee-for-service basis. These contracts should be structured to fit in the personal services safe harbor whenever possible. Payments for research services should be fair market value for legitimate, reasonable, and necessary services. Research contracts that originate through the sales or marketing functions—or that are offered to physicians in connection with sales contacts—are particularly suspect. Indicia of questionable research include, for example, research initiated or

directed by marketers or sales agents; research that is not transmitted to, or reviewed by, a manufacturer's science component; research that is unnecessarily duplicative or is not needed by the manufacturer for any purpose other than the generation of business; and post-marketing research used as a pretense to promote product. Prudent manufacturers will develop contracting procedures that clearly separate the awarding of research contracts from marketing or promotion of their products.

In addition, pharmaceutical manufacturers also provide other funding for a wide range of physician educational and research activities. Manufacturers should review educational and research grants to physicians similarly to educational and research grants to purchasers (described above). As with grants to purchasers, the OIG recognizes that many grant-funded activities are legitimate and beneficial. When evaluating educational or research grants provided by manufacturers to physicians, manufacturers should determine if the funding is based, in any way, expressly or implicitly, on the physician's referral of the manufacturer's product. If so, the funding plainly implicates the anti-kickback statute. In addition, the manufacturer should determine whether the funding is for *bona fide* educational or research purposes. Absent unusual circumstances, grants or support for educational activities sponsored and organized by medical professional organizations raise little risk of fraud or abuse, provided that the grant or support is not restricted or conditioned with respect to content or faculty.

Pharmaceutical manufacturers often provide funding to other sponsors of continuing medical education (CME) programs. Manufacturers should take steps to ensure that neither they, nor their representatives, are using these activities to channel improper remuneration to physicians or others in a position to generate business for the manufacturer or to influence or control the content of the program.[11] In addition, manufacturers and sponsors of educational programs should be mindful of the relevant rules and regulations of the Food and Drug Administration. Codes of conduct promulgated by the CME industry may provide a useful starting point for manufacturers when reviewing their CME arrangements.

(3) Relationships with Sales Agents. In large part, a pharmaceutical manufacturer's commitment to an effective fraud and abuse compliance program can be measured by its

commitment to training and monitoring its sales force. A pharmaceutical manufacturer should: (i) Develop a regular and comprehensive training program for its sales force, including refresher and updated training on a regular basis, either in person or through newsletters, memoranda, or the like; (ii) familiarize its sales force with the minimum PhRMA Code standards and other relevant industry standards; (iii) institute and implement corrective action and disciplinary policies applicable to sales agents who engage in improper marketing; (iv) avail itself of the advisory opinion process if it has questions about particular practices used by its sales force; and (v) establish an effective system for tracking, compiling, and reviewing information about sales force activities, including, if appropriate, random spot checking.

In addition, manufacturers should carefully review their compensation arrangements with sales agents. Sales agents, whether employees or independent contractors, are paid to recommend and arrange for the purchase of the items or services they offer for sale on behalf of the pharmaceutical manufacturer they represent. Many arrangements can be structured to fit in the employment or personal services safe harbor. Arrangements that cannot fit into a safe harbor should be carefully reviewed. Among the factors that should be evaluated are:

• The amount of compensation;
• The identity of the sales agent engaged in the marketing or promotional activity (*e.g.*, is the agent a "white coat" marketer or otherwise in a position of exceptional influence);
• The sales agent's relationship with his or her audience;
• The nature of the marketing or promotional activity;
• The item or service being promoted or marketed; and
• The composition of the target audience.

Manufacturers should be aware that a compensation arrangement with a sales agent that fits in a safe harbor can still be evidence of a manufacturer's improper intent when evaluating the legality of the manufacturer's relationships with persons in a position to influence business for the manufacturer. For example, if a manufacturer provides sales employees with extraordinary incentive bonuses and expense accounts, there may well be an inference to be drawn that the manufacturer intentionally motivated the sales force to induce sales through lavish entertainment or other remuneration.

c. *Drug Samples.* The provision of drug samples is a widespread industry practice that can benefit patients, but can also be an area of potential risk to a pharmaceutical manufacturer. The Prescription Drug Marketing Act of 1987 (PDMA) governs the distribution of drug samples and forbids their sale. 21 U.S.C. 353(c)(1). A drug sample is defined to be a unit of the drug "that is not intended to be sold * * *" and is intended to promote the sale of the drug." 21 U.S.C. 353(c)(1). Failure to comply with the requirements of PDMA can result in sanctions. In some circumstances, if the samples have monetary value to the recipient (*e.g.*, a physician) and are used to treat federal health care program beneficiaries, the improper use of samples may also trigger liability under other statutes, including the False Claims Act and the anti-kickback statue.

Pharmaceutical manufacturers should closely follow the PDMA requirements (including all documentation requirements). In addition, manufacturers can minimize their risk of liability by: (i) Training their sales force to inform sample recipients in a meaningful manner that samples may not be sold or billed (thus vitiating any monetary value of the sample); (ii) clearly and conspicuously labeling individual samples as units that may not be sold (thus minimizing the ability of recipients to advertently or inadvertently commingle samples with purchased product); and (iii) including on packaging and any documentation related to the samples (such as shipping notices or invoices) a clear and conspicuous notice that the samples are subject to PDMA and may not be sold. Recent government enforcement activity has focused on instances in which drug samples were provided to physicians who, in turn, sold them to the patient or billed them to the federal health care programs on behalf of the patient.

## C. Designation of a Compliance Officer and a Compliance Committee

### 1. Compliance Officer

Every pharmaceutical manufacturer should designate a compliance officer to serve as the focal point for compliance activities.[12] This responsibility may be the individual's sole duty or added to other management responsibilities, depending upon the size and resources of the company and the complexity of the task. If the individual has additional management responsibilities, the pharmaceutical manufacturer should ensure that the individual is able to dedicate adequate and substantive time and attention to the compliance functions. Similarly, if the compliance

officer delegates some of the compliance duties, he or she should, nonetheless, remain sufficiently involved to fulfill the compliance oversight function.

Designating a compliance officer with the appropriate authority is critical to the success of the program, necessitating the appointment of a high-level official with direct access to the company's president or CEO, board of directors, all other senior management, and legal counsel. The compliance officer should have sufficient funding, resources, and staff to perform his or her responsibilities fully. The compliance officer should be able to effectuate change within the organization as necessary or appropriate and to exercise independent judgment. Optimal placement of the compliance officer within the organization will vary according to the particular situation of a manufacturer.[13]

Coordination and communication with other appropriate individuals or business units are the key functions of the compliance officer with regard to planning, implementing or enhancing, and monitoring the compliance program. The compliance officer's primary responsibilities should include:

• Overseeing and monitoring implementation of the compliance program;[14]
• Reporting on a regular basis to the company's board of directors, CEO or president, and compliance committee (if applicable) on compliance matters and assisting these individuals or groups to establish methods to reduce the company's vulnerability to fraud and abuse;
• Periodically revising the compliance program, as appropriate, to respond to changes in the company's needs and applicable federal health care program requirements, identified weakness in the compliance program, or identified systemic patterns of noncompliance;
• Developing, coordinating, and participating in a multifaceted educational and training program that focuses on the elements of the compliance program, and seeking to ensure that all affected employees and management understand and comply with pertinent federal and state standards;
• Ensuring that independent contractors and agents, particularly those agents and contractors who are involved in sales and marketing activities, are aware of the requirements of the company's compliance program with respect to sales and marketing activities, among other things;
• Coordinating personnel issues with the company's Human Resources/

Personnel office (or its equivalent) to ensure that the List of Excluded Individuals/Entities [15] has been checked with respect to all employees and independent contractors;

• Assisting the company's internal auditors in coordinating internal compliance review and monitoring activities;

• Reviewing and, where appropriate, acting in response to reports of noncompliance received through the hotline (or other established reporting mechanism) or otherwise brought to his or her attention (e.g., as a result of an internal audit or by corporate counsel who may have been notified of a potential instance of noncompliance);

• Independently investigating and acting on matters related to compliance. To that end, the compliance officer should have the flexibility to design and coordinate internal investigations (e.g., responding to reports of problems or suspected violations) and any resulting corrective action (e.g., making necessary improvements to policies and practices, and taking appropriate disciplinary action) with various company divisions or departments;

• Participating with the company's counsel in the appropriate reporting of any self-discovered violations of federal health care program requirements; and

• Continuing the momentum and, as appropriate, revision or expansion of the compliance program after the initial years of implementation.[16]

The compliance officer must have the authority to review all documents and other information relevant to compliance activities. This review authority should enable the compliance officer to examine interactions with government programs to determine whether the company is in compliance with federal health care program reporting and rebate requirements and to examine interactions with health care professionals that could violate kickback prohibitions or other federal health care programs requirements. Where appropriate, the compliance officer should seek the advice of competent legal counsel about these matters.

## 2. Compliance Committee

The OIG recommends that a compliance committee be established to advise the compliance officer and assist in the implementation of the compliance program.[17] When developing an appropriate team of people to serve as the pharmaceutical manufacturer's compliance committee, the company should consider a variety of skills and personality traits that are expected from the team members. The

company should expect its compliance committee members and compliance officer to demonstrate high integrity, good judgment, assertiveness, and an approachable demeanor, while eliciting the respect and trust of company employees. These interpersonal skills are as important as the professional experience of the compliance officer and each member of the compliance committee.

Once a pharmaceutical manufacturer chooses the people who will accept the responsibilities vested in members of the compliance committee, the company needs to train these individuals on the policies and procedures of the compliance program, as well as how to discharge their duties. The OIG recognizes that some pharmaceutical manufacturers (e.g., small companies or those with limited budgets) may not have the resources or the need to establish a compliance committee. However, when potential problems are identified at such companies, the OIG recommends the creation of a "task force" to address the particular issues. The members of the task force may vary depending upon the area of concern. For example, if the compliance officer identifies issues relating to improper inducements to the company's purchasers or prescribers, the OIG recommends that a task force be organized to review the arrangements and interactions with those purchasers or prescribers. In essence, the compliance committee is an extension of the compliance officer and provides the organization with increased oversight.

### D. Conducting Effective Training and Education

The proper education and training of officers, directors, employees, contractors, and agents, and periodic retraining of personnel at all levels are critical elements of an effective compliance program. A pharmaceutical manufacturer must take steps to communicate effectively its standards and procedures to all affected personnel by requiring participation in appropriate training programs and by other means, such as disseminating publications that explain specific requirements in a practical manner. These training programs should include general sessions summarizing the manufacturer's compliance program, written standards, and applicable federal health care program requirements. All employees and, where feasible and appropriate, contractors should receive the general training. More specific training on issues, such as (i) the anti-kickback statute and how it

applies to pharmaceutical sales and marketing practices and (ii) the calculation and reporting of pricing information and payment of rebates in connection with federal health care programs, should be targeted at those employees and contractors whose job requirements make the information relevant. The specific training should be tailored to make it as meaningful as possible for each group of participants.

Managers and employees of specific divisions can assist in identifying specialized areas that require training and in carrying out such training. Additional areas for training may also be identified through internal audits and monitoring and from a review of any past compliance problems of the pharmaceutical manufacturer or similarly situated companies. A pharmaceutical manufacturer should regularly review its training and, where appropriate, update the training to reflect issues identified through audits or monitoring and any relevant changes in federal health care program requirements. Training instructors may come from outside or inside the organization, but must be qualified to present the subject matter involved and sufficiently experienced in the issues presented to adequately field questions and coordinate discussions among those being trained. Ideally, training instructors should be available for follow-up questions after the formal training session has been conducted.

The pharmaceutical manufacturer should train new employees soon after they have started working. Training programs and materials should be designed to take into account the skills, experience, and knowledge of the individual trainees. The compliance officer should document any formal training undertaken by the company as part of the compliance program. The company should retain adequate records of its training of employees, including attendance logs, descriptions of the training sessions, and copies of the material distributed at training sessions.

The OIG suggests that all relevant personnel (i.e., employees as well as agents of the pharmaceutical manufacturer) participate in the various educational and training programs of the company. For example, for sales representatives who are responsible for the sale and marketing of the company's products, periodic training in the anti-kickback statute and its safe harbors should be required. Employees should be required to have a minimum number of educational hours per year, as appropriate, as part of their employment responsibilities.

The OIG recognizes that the format of the training program will vary depending upon the size and resources of the pharmaceutical manufacturer. For example, a company with limited resources or whose sales force is widely dispersed may want to create a videotape or computer-based program for each type of training session so new employees and employees outside of central locations can receive training in a timely manner. If videos or computer-based programs are used for compliance training, the OIG suggests that the company make a qualified individual available to field questions from trainees. Also, large pharmaceutical manufacturers may find training via the Internet or video conference capabilities to be a cost-effective means of reaching a large number of employees. Alternatively, large companies may include training sessions as part of regularly scheduled regional meetings.

The OIG recommends that participation in training programs be made a condition of continued employment and that failure to comply with training requirements should result in disciplinary action. Adherence to the training requirements as well as other provisions of the compliance program should be a factor in the annual evaluation of each employee.

### E. Developing Effective Lines of Communication

#### 1. Access to Supervisors and/or the Compliance Officer

In order for a compliance program to work, employees must be able to ask questions and report problems. Supervisors play a key role in responding to employee concerns and it is appropriate that they serve as a first line of communications. Pharmaceutical manufacturers should consider the adoption of open-door policies in order to foster dialogue between management and employees. In order to encourage communications, confidentiality and non-retaliation policies should also be developed and distributed to all employees.[18]

Open lines of communication between the compliance officer and employees are equally important to the successful implementation of a compliance program and the reduction of any potential for fraud and abuse. In addition to serving as a contact point for reporting problems and initiating appropriate responsive action, the compliance officer should be viewed as someone to whom personnel can go to get clarification on the company's policies. Questions and responses should be documented and dated and,

if appropriate, shared with other staff so that compliance standards or polices can be updated and improved to reflect any necessary changes or clarifications. Pharmaceutical manufacturers may also consider rewarding employees for appropriate use of established reporting systems as a way to encourage the use of such systems.

#### 2. Hotlines and Other Forms of Communication

The OIG encourages the use of hotlines, e-mails, newsletters, suggestion boxes, and other forms of information exchange to maintain open lines of communication. In addition, an effective employee exit interview program could be designed to solicit information from departing employees regarding potential misconduct and suspected violations of company policy and procedures. Pharmaceutical manufacturers may also identify areas of risk or concern through periodic surveys or communications with sales representatives about the current marketing environment. This could provide management with insight about and an opportunity to address conduct occurring in the field, either by the company's own sale representatives or those of other companies.

If a pharmaceutical manufacturer establishes a hotline or other reporting mechanism, information regarding how to access the reporting mechanism should be made readily available to all employees and independent contractors by including that information in the code of conduct or by circulating the information (*e.g.*, by publishing the hotline number or e-mail address on wallet cards) or conspicuously posting the information in common work areas. Employees should be permitted to report matters on an anonymous basis.

Reported matters that suggest substantial violations of compliance policies or applicable Federal health care program requirements should be documented and investigated promptly to determine their veracity and the scope and cause of any underlying problem. The compliance officer should maintain a detailed log that records such reports, including the nature of any investigation, its results, and any remedial or disciplinary action taken. Such information, redacted of individual identifiers, should be summarized and included in reports to the board of directors, the president or CEO, and compliance committee. Although the pharmaceutical manufacturer should always strive to maintain the confidentiality of an employee's identity, it should also make clear that there might be a point where

the individual's identity may become known or need to be revealed in certain instances. The OIG recognizes that protecting anonymity may be infeasible for small companies. However, the OIG believes all employees, when seeking answers to questions or reporting potential instances of fraud and abuse, should know to whom to turn for a meaningful response and should be able to do so without fear of retribution.

### F. Auditing and Monitoring

An effective compliance program should incorporate thorough monitoring of its implementation and an ongoing evaluation process. The compliance officer should document this ongoing monitoring, including reports of suspected noncompliance, and provide these assessments to company's senior management and the compliance committee. The extent and frequency of the compliance audits may vary depending on variables such as the pharmaceutical manufacturer's available resources, prior history of noncompliance, and the risk factors particular to the company. The nature of the reviews may also vary and could include a prospective systemic review of the manufacturer's processes, protocols, and practices or a retrospective review of actual practices in a particular area.

Although many assessment techniques are available, it is often effective to have internal or external evaluators who have relevant expertise perform regular compliance reviews. The reviews should focus on those divisions or departments of the pharmaceutical manufacturer that have substantive involvement with or impact on federal health care programs (such as the government contracts and sales and marketing divisions) and on the risk areas identified in this guidance. The reviews should also evaluate the company's policies and procedures regarding other areas of concern identified by the OIG (*e.g.*, through Special Fraud Alerts) and federal and state law enforcement agencies. Specifically, the reviews should evaluate whether the: (1) Pharmaceutical manufacturer has policies covering the identified risk areas; (2) policies were implemented and communicated; and (3) policies were followed.

### G. Enforcing Standards Through Well-Publicized Disciplinary Guidelines

An effective compliance program should include clear and specific disciplinary policies that set out the consequences of violating the law or the pharmaceutical manufacturer's code of

conduct or policies and procedures. A pharmaceutical manufacturer should consistently undertake appropriate disciplinary action across the company in order for the disciplinary policy to have the required deterrent effect. Intentional and material noncompliance should subject transgressors to significant sanctions. Such sanctions could range from oral warnings to suspension, termination or other sanctions, as appropriate. Disciplinary action also may be appropriate where a responsible employee's failure to detect a violation is attributable to his or her negligence or reckless conduct. Each situation must be considered on a case-by-case basis, taking into account all relevant factors, to determine the appropriate response.

### H. Responding to Detected Problems and Developing Corrective Action Initiatives

Violation of a pharmaceutical manufacturer's compliance program, failure to comply with applicable federal or state law, and other types of misconduct threaten the company's status as a reliable, honest, and trustworthy participant in the health care industry. Detected but uncorrected misconduct can endanger the reputation and legal status of the company. Consequently, upon receipt of reasonable indications of suspected noncompliance, it is important that the compliance officer or other management officials immediately investigate the allegations to determine whether a material violation of applicable law or the requirements of the compliance program has occurred and, if so, take decisive steps to correct the problem.[19] The exact nature and level of thoroughness of the investigation will vary according to the circumstances, but the review should be detailed enough to identify the root cause of the problem. As appropriate, the investigation may include a corrective action plan, a report and repayment to the government, and/or a referral to criminal and/or civil law enforcement authorities.

### Reporting

Where the compliance officer, compliance committee, or a member of senior management discovers credible evidence of misconduct from any source and, after a reasonable inquiry, believes that the misconduct may violate criminal, civil, or administrative law, the company should promptly report the existence of misconduct to the appropriate federal and state authorities[20] within a reasonable period, but not more than 60 days,[21] after determining that there is credible

evidence of a violation.[22] Prompt voluntary reporting will demonstrate the pharmaceutical manufacturer's good faith and willingness to work with governmental authorities to correct and remedy the problem. In addition, reporting such conduct will be considered a mitigating factor by the OIG in determining administrative sanctions (e.g., penalties, assessments, and exclusion), if the reporting company becomes the subject of an OIG investigation.[23]

When reporting to the government, a pharmaceutical manufacturer should provide all information relevant to the alleged violation of applicable federal or state law(s) and the potential financial or other impact of the alleged violation. The compliance officer, under advice of counsel and with guidance from the governmental authorities, could be requested to continue to investigate the reported violation. Once the investigation is completed, and especially if the investigation ultimately reveals that criminal, civil or administrative violations have occurred, the compliance officer should notify the appropriate governmental authority of the outcome of the investigation, including a description of the impact of the alleged violation on the operation of the applicable federal health care programs or their beneficiaries.

### III. Conclusion

In today's environment of increased scrutiny of corporate conduct and increasingly large expenditures for prescription drugs, it is imperative for pharmaceutical manufacturers to establish and maintain effective compliance programs. These programs should foster a culture of compliance that begins at the executive level and permeates throughout the organization. This compliance guidance is designed to provide assistance to all pharmaceutical manufacturers as they either implement compliance programs or re-assess existing programs. The essential elements outlined in this compliance guidance can be adapted to the unique environment of each manufacturer. It is the hope and expectation of the OIG that the resulting compliance programs will benefit not only federal health care programs and their beneficiaries, but also pharmaceutical manufacturers themselves.

Dated: April 23, 2003.

**Janet Rehnquist,**
*Inspector General.*

### Endnotes

1. The term "Federal health care programs," as defined in 42 U.S.C. 1320a–

7b(f), includes any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States government or any state health plan (e.g., Medicaid or a program receiving funds from block grants for social services or child health services). In this document, the term "federal health care program requirements" refers to the statutes, regulations and other laws governing Medicare, Medicaid, and all other federal health care programs.

2. *See* 66 FR 31246 (June 11, 2001), "Notice for Solicitation of Information and Recommendations for Developing a Compliance Program Guidance for the Pharmaceutical Industry."

3. *See* 67 FR 62057 (October 3, 2002), "Draft OIG Compliance Program Guidance for Pharmaceutical Manufacturers."

4. 42 U.S.C. 1320a–7b(b).

5. In addition, the compliance program elements and potential risk areas addressed in this compliance program guidance may also have application to manufacturers of other products that may be reimbursed by federal health care programs, such as medical devices and infant nutritional products.

6. In addition, pharmaceutical manufacturers should be mindful that many states have fraud and abuse statutes—including false claims, anti-kickback and other statutes—that are not addressed in this guidance.

7. The False Claims Act (31 U.S.C. 3729–33) prohibits knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval. Additionally, it prohibits knowingly making or using (or causing to be made or used) a false record or statement to get a false or fraudulent claim paid or approved by the federal government or its agents, like a carrier, other claims processor, or state Medicaid program.

8. The 340B Program, contained as part of the Public Health Services Act and codified at 42 U.S.C. 256b, is administered by the Health Resources and Services Administration (HRSA).

9. 42 U.S.C. 1396r–8. Average Manufacturer Price and Best Price are defined in the statute at 42 U.S.C. 1396r–8(k)(1) and 1396r–8(c)(1), respectively. CMS has provided further guidance on these terms in the National Drug Rebate Agreement and in Medicaid Program Releases available through its Web site at *http://www.hcfa.gov/medicaid/drugs/drug.mpg.htm.*

10. In this regard, pharmaceutical manufacturers should note that the exception for non-monetary compensation under the Stark law (42 U.S.C. 1395nn; 42 CFR 411.357(k)) is not a basis for protection under the anti-kickback statute.

11. CME programs with no industry sponsorship, financing, or affiliation should not raise anti-kickback concerns, although tuition payments by manufacturers (or their representatives) for persons in a position to influence referrals (e.g., physicians or medical students) may raise concerns.

12. It is also advisable to designate as a compliance officer an individual with prior experience or knowledge of compliance and

operational issues relevant to pharmaceutical manufacturers.

13. The OIG believes it is generally not advisable for the compliance function to be subordinate to the pharmaceutical manufacturer's general counsel, or comptroller or similar financial officer. Separation of the compliance function helps to ensure independent and objective legal reviews and financial analysis of the company's compliance efforts and activities. By separating the compliance function from the key management positions of general counsel or chief financial officer (where the size and structure of the pharmaceutical manufacturer make this a feasible option), a system of checks and balances is established to more effectively achieve the goals of the compliance program.

14. For companies with multiple divisions or regional offices, the OIG encourages coordination with each company location through the use of a compliance officer located in corporate headquarters who is able to communicate with parallel compliance liaisons in each division or regional office, as appropriate.

15. As part of its commitment to compliance, a pharmaceutical manufacturer should carefully consider whether to hire or do business with individuals or entities that have been sanctioned by the OIG. The List of Excluded Individuals and Entities can be checked electronically and is accessible through the OIG's Web site at: *http:// oig.hhs.gov.*

16. There are many approaches the compliance officer may enlist to maintain the vitality of the compliance program. Periodic on-site visits of regional operations, bulletins with compliance updates and reminders, distribution of audiotapes, videotapes, CD ROMs, or computer notifications about different risk areas, lectures at management and employee meetings, and circulation of recent articles or publications discussing fraud and abuse are some examples of approaches the compliance officer may employ.

17. The compliance committee benefits from having the perspectives of individuals with varying responsibilities and areas of knowledge in the organization, such as operations, finance, audit, human resources, legal, and sales and marketing, as well as employees and managers of key operating units. The compliance officer should be an integral member of the committee. All committee members should have the requisite seniority and comprehensive experience within their respective departments to recommend and implement any necessary changes to policies and procedures.

18. In some cases, employees sue their employers under the False Claims Act's *qui tam* provisions after a failure or apparent failure by the company to take action when the employee brought a questionable, fraudulent, or abusive situation to the attention of senior corporate officials. Whistleblowers must be protected against retaliation, a concept embodied in the provisions of the False Claims Act. *See* 31 U.S.C. 3730(h).

19. Instances of noncompliance must be determined on a case-by-case basis. The existence or amount of a *monetary* loss to a federal health care program is not solely determinative of whether the conduct should be investigated and reported to governmental authorities. In fact, there may be instances where there is no readily identifiable monetary loss, but corrective actions are still necessary to protect the integrity of the health care program.

20. Appropriate federal and state authorities include the OIG, the Criminal and Civil Divisions of the Department of Justice, the U.S. Attorney in relevant districts, the Food and Drug Administration, the Federal Trade Commission, the Drug Enforcement Administration and the Federal Bureau of Investigation, and the other investigative arms for the agencies administering the affected federal or state health care programs, such as the state Medicaid Fraud Control Unit, the Defense Criminal Investigative Service, the Department of Veterans Affairs, HRSA, and the Office of Personnel Management (which administers the Federal Employee Health Benefits Program).

21. In contrast, to qualify for the ''not less than double damages'' provision of the False Claims Act, the provider must provide the report to the government within 30 days after the date when the provider first obtained the information. 31 U.S.C. 3729(a).

22. Some violations may be so serious that they warrant immediate notification to governmental authorities prior to, or simultaneous with, commencing an internal investigation. By way of example, the OIG believes a provider should report misconduct that: (1) Is a clear violation of administrative, civil, or criminal laws; (2) has a significant adverse effect on the quality of care provided to federal health care program beneficiaries; or (3) indicates evidence of a systemic failure to comply with applicable laws or an existing corporate integrity agreement, regardless of the financial impact on federal health care programs.

23. The OIG has published criteria setting forth those factors that the OIG takes into consideration in determining whether it is appropriate to exclude an individual or entity from program participation pursuant to 42 U.S.C. 1320a–7(b)(7) for violations of various fraud and abuse laws. *See* 62 FR 67392 (December 24, 1997).

[FR Doc. 03–10949 Filed 5–2–03; 8:45 am]

**BILLING CODE 4152–01–P**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Substance Abuse and Mental Health Services Administration

## Agency Information Collection Activities: Submission for OMB Review; Comment Request

Periodically, the Substance Abuse and Mental Health Services Administration (SAMHSA) will publish a summary of information collection requests under OMB review, in compliance with the Paperwork Reduction Act (44 U.S.C. Chapter 35). To request a copy of these documents, call the SAMHSA Reports Clearance Officer on (301) 443–7978.

*National Evaluation of the Comprehensive Community Mental Health Services for Children and Their Families Program: Phase Three*—(OMB No. 0930–0209, revision)—SAMHSA's Center for Mental Health Services is conducting Phase III of the national evaluation of the Comprehensive Community Mental Health Services for Children and Their Families Program. Phase III collects data on child mental health outcomes, family life, and service system development and performance. Data are being collected on 22 funded systems of care, and approximately 5,100 children and families. Data collection for this evaluation will be conducted over a 5½-year period.

The core of service system data are currently collected every 18 months throughout the evaluation period. Service delivery and system variables of interest include the following: Maturity of system of care development, adherence to the system of care program model, and client service experience. The length of time that individual families will participate in the study ranges from 18 to 36 months depending on when they enter the evaluation.

Child and family outcomes of interest will be collected at intake and during subsequent follow-up sessions at six-month intervals. The outcome measures include the following: Child symptomatology and functioning, family functioning, material resources, and caregiver strain. In addition, a treatment effectiveness study will examine the relative impact of an evidence-based treatment within one system of care.

The average annual respondent burden is estimated below. The estimate reflects the average number of respondents in each respondent category, the average number of responses per respondent per year, the average length of time it will take for each response, and the total average annual burden for each category of respondent, and for all categories of respondents combined.

This revision to the currently approved information collection activities involves: (1) Extension of the data collection period for an additional 18 months to cover an additional sixth year of grant funding in the 22 currently funded systems of care (and a six-month no-cost extension for the evaluation), (2) the addition of a family-driven study to assess the extent of family involvement in service planning, (3) the elimination of the longitudinal comparison study and the addition of a treatment effectiveness study in two sites

# EXHIBIT 137

JONES, DAY, REAVIS & POGUE

77 WEST WACKER

CHICAGO, ILLINOIS 60601-1692

TELEPHONE: 312-782-3939 • FACSIMILE: 312-782-8585

312-269-1562

177138:tac
080015-024238                              August 28, 2000

**VIA FACSIMILE & FEDERAL EXPRESS**

Ms. Linda Hillier
Regional Inspector General for Investigations
Department of Health & Human Services
Office of Inspector General
Office of Investigations
8100 Oak Lane, Suite 306
Miami, FL 33016

Mr. Mark Lavine
Assistant U.S. Attorney
United States Attorneys Office
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132

Re:  Subpoena Served on Abbott Laboratories

Dear Ms. Hillier and Mr. Lavine:

This letter is written on behalf of our client, Abbott Laboratories ("Abbott"), in response to the subpoena dated July 25, 2000, issued by the Department of Health and Human Services, Office of Inspector General and served by the Department of Justice.  You should treat both this letter and the attached Objections to the Subpoena as our formal objections to the subpoena.

This subpoena apparently was issued as a result of a *qui tam* suit filed under seal in 1995 in the Southern District of Florida, United States ex rel. Ven-A-Care v. Abbott Laboratories, Inc., et al., Civil Action No. 95-1354-CIV-GOLD (Under Seal).  In 1997, the government served its first subpoena on Abbott in connection with this same matter.  The subpoena requested voluminous records relating to the pricing and marketing of certain of Abbott's pharmaceutical products.  In response to this subpoena, Abbott produced thousands of pages of documents.  Now, almost three years after the first subpoena, Abbott has received a second subpoena in connection with this matter.  This recent subpoena requests even more

CH: 1120282.4

ATLANTA • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • GENEVA • HONG KONG • IRVINE • LONDON • LOS ANGELES
NEW DELHI (AN ASSOCIATE FIRM) • NEW YORK • PARIS • PITTSBURGH • RIYADH • SHANGHAI • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES, DAY, REAVIS & POGUE

Mr. Mark Lavine
August 28, 2000
Page 2

voluminous records from Abbott from a much longer time period--both years earlier and years later--than the first subpoena.

This subpoena raises several issues that I would like to discuss with your office. In an attempt to discuss these issues and to obtain an extension of the response date, I telephoned you shortly after receiving the subpoena. To date, I have been unsuccessful in reaching you directly, although I attempted to do so several times while I was traveling on vacation with my family. We have, however, exchanged voice messages. In a voice message on August 16, 2000, you indicated that the government was not willing to extend the response date for the subpoena. While it is obvious that a production of documents covering the breadth of this subpoena would take months of effort to make, I am disappointed that we could not agree to an extension of time that would permit us to discuss these issues prior to the subpoena's return date.

Among the issues that we should discuss are the following:

- The new subpoena, containing 23 separate requests, is extremely broad and unduly burdensome. The subpoena calls for documents that predate your 1997 subpoena by four years, adds another three years after the date of your last subpoena, and, in total, covers a period of more than ten years. Complying with this subpoena would take months and would require an enormous amount of work and expense.

- By requiring the production of "all" documents in each of the requests, the subpoena is overly broad and unduly burdensome. Abbott cannot be certain that "all" documents and things have been identified that are responsive to the categories enumerated in the subpoena. The number of past and present employees whose files could conceivably contain documents responsive to these requests number in the thousands. For any document subpoena of this length and breadth, Abbott can only conduct a reasonable search for the requested documents and produce responsive, non-privileged documents located as a result of such a search.

- The scope of the subpoena, while difficult to ascertain, could be construed as requiring documents relating to all of Abbott's hundreds of pharmaceutical products, thereby expanding, to an unreasonable degree, the scope of the original subpoena, which for the most part was limited to 13 pharmaceutical products.

- It is difficult to understand what information the government is seeking in many of the requests. Several of the terms used in the subpoena are ambiguous and confusing. For example, the term "Spread" is defined as "the difference between the actual acquisition cost or purchase price of a Pharmaceutical (paid by purchasers for the Pharmaceuticals) and the price or cost set, published or arranged by the manufacturer or the reimbursement rate paid by third party payors (to purchasers of the Pharmaceuticals)." This definition sheds little light on what the "Spread" means. Indeed, it appears from this definition that the "Spread" could be calculated in a number of different ways using a number of

JONES, DAY, REAVIS & POGUE

Mr. Mark Lavine
August 28, 2000
Page 3

different prices.  This is only one example of the difficulty we have encountered in interpreting the subpoena.

- The subpoena, though dated July 25, 2000, was not served upon Abbott's counsel until it was sent by Federal Express on August 3, 2000.  In a telephone conversation on July 21, 2000, where I agreed to accept service of this subpoena, you declined to send the subpoena to me via facsimile.  Instead, I first received the subpoena when I returned to the office from business engagements on August 9, 2000. As a result, Abbott lost over a week of time in responding to the subpoena.  Moreover, my long-scheduled family vacation began shortly after we received the subpoena, further hindering our ability to respond by August 28, 2000.

- To the extent that the subpoena seeks documents containing confidential or proprietary information, I would like to discuss with you an appropriate agreement to protect the confidentiality of these documents.

In addition to these general issues, Abbott submits the attached objections to the subpoena.

Abbott requests an opportunity to discuss these issues and to determine if we can reach an agreement on a reasonable way in which this subpoena can be substantially narrowed so that Abbott might respond to it.

I look forward to speaking with you at your earliest convenience.

Very truly yours,

R. Christopher Cook

Attachment

cc:     Stacey Chronis, Esq.
        Daniel E. Reidy, Esq.
        Toni-Ann Citera, Esq.

## ABBOTT LABORATORIES' OBJECTIONS TO THE SUBPOENA
## ISSUED BY THE DEPARTMENT OF HEALTH AND HUMAN SERVICES,
## OFFICE OF INSPECTOR GENERAL AND BY THE DEPARTMENT OF JUSTICE

Abbott Laboratories ("Abbott") objects as follows to the Subpoena Duces Tecum served by the Department of Health and Human Services, Office of Inspector General and by the Department of Justice on Abbott, dated July 25, 2000.  By making these objections, Abbott does not waive its right to challenge the subpoena on any additional grounds, nor does Abbott waive any defense that may be raised in response to an action to enforce the subpoena.

### GENERAL OBJECTIONS

1.     Abbott objects to the subpoena because it is overly broad and unduly burdensome.

2.     Abbott objects to the subpoena and, specifically, to the definitions of terms contained in the subpoena as vague, ambiguous and confusing.

3.     Abbott objects to the length of the time frame for which documents are sought.

4.     Abbott objects to the subpoena to the extent that it seeks the production of documents containing confidential and/or proprietary information.

5.     Abbott objects to the subpoena to the extent that it seeks documents protected by any privilege, including documents covered by the attorney-client privilege or the work product doctrine.

6.     Abbott objects to the subpoena to the extent it seeks documents outside Abbott's possession, custody or control.

7.     Abbott objects to the response date of the subpoena as it does not provide sufficient time in which to collect, review, copy and produce responsive, non-privileged documents.

8.     Abbott objects to the subpoena to the extent that it infringes on the right of Abbott, its employees or its shareholders to exercise any rights protected by the Constitution of the United States, including the First Amendment right to petition the government and to speak to Congress.

### SPECIFIC OBJECTIONS

**Request 1.**     All documents (excluding invoices) which mention, evidence or reflect any Price Representations for a Listed Pharmaceutical sent or directed by you or on your behalf to any government office or official (or their privately contracted agents) responsible for receiving, processing, and/or paying claims for Medicaid or Medicare reimbursement for the Listed Pharmaceuticals, setting the rates of reimbursement for the Listed Pharmaceuticals, or for calculating Medicaid rebates for the Listed Pharmaceuticals.

**OBJECTION:** Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  The Request, as written, would require Abbott to search Medicaid rebate files as well

as Medicaid and Medicare reimbursement files for all fifty states.  Abbott further objects to this Request on the grounds that it is vague, ambiguous and confusing.

**Request 2.**    All documents transmitted between you and any organization, trade group, committee, lobbyist or consultant (including entities such as the American Society of Clinical Oncologists) which mention, evidence or reflect any explanation or definition of any terms commonly used to describe Price Representations or charge-back arrangements.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Abbott product in every Abbott division.

**Request 3.**    All documents transmitted between you and any organization, trade group, committee, lobbyist or consultant (including entities such as the American Society of Clinical Oncologists) which mention, evidence or reflect any Price Representations regarding the Listed Pharmaceuticals.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is duplicative of Request 2 and on the grounds that it is overly broad and unduly burdensome.  .

**Request 4.**    All documents transmitted between you and any organization, trade group, committee, lobbyist or consultant (including entities such as the American Society of Clinical Oncologists) which mention, evidence or reflect any reimbursement information regarding the Medicare Program or any Medicaid Program.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Abbott product in every Abbott division.   Abbott also objects to this Request on the grounds that the terms "reimbursement information" are vague and ambiguous.

**Request 5.**    All documents which mention, evidence or reflect any Price Representation for a Listed Pharmaceutical sent or provided by you or on your behalf to any elected official of any State or the United States.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.

**Request 6.**    All documents which mention, evidence or reflect any explanation or definition of any terms commonly used to describe Price Representations, AMP, Best Price or charge-back arrangements sent or provided by you or on your behalf to any elected official of any State or the United States.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Abbott product in every Abbott division.

CH: 1120125.4                                                        2

**Request 7.**    All documents which mention, evidence or reflect any Price Representations sent to or received from any Publishers for any of the Listed Pharmaceuticals, including but not limited to new product submissions, data requests or price updates.

**OBJECTION:** Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome in that it seeks Price Representations for the List Pharmaceuticals sent to any Publisher over the course of ten years.

**Request 8.**    All documents which mention, evidence or reflect the purpose, goal or reason for the transmittal of the information described in paragraphs 1 - 7, including internal memoranda, cover letters, analysis or strategy discussions.

**OBJECTION:** Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome. Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Abbott product in every Abbott division. Abbott also objects to this Request on the grounds that it is vague, ambiguous and confusing. Abbott further objects to this Request to the extent it seeks information that is confidential and proprietary to Abbott and that is protected by the attorney-client privilege and the work-product doctrine.

**Request 9.**    All documents which mention, evidence or reflect the reimbursement rates set or methodologies used by any state's Medicaid program, the Medicare program, or any private insurance program, including all documents which mention, evidence or reflect how those reimbursement rates affect your marketing or sale of any of your Pharmaceuticals.

**OBJECTION:** Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome. Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Pharmaceutical that Abbott sells. Abbott further objects to this Request on the grounds that it seeks information that is not primarily in Abbott's possession, custody or control.

**Request 10.**   All documents which mention, evidence or reflect the Price Representations of any of your Pharmaceuticals in comparison to or in connection with the reimbursement rates of any state's Medicaid program, the Medicare program, or any private insurance program.

**OBJECTION:** Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome. Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Pharmaceutical that Abbott sells. Abbott further objects to this Request on the grounds that it is vague, ambiguous and confusing.

**Request 11.**   All documents which mention, evidence or reflect other drug manufacturers' Price Representations in comparison to or in connection with (a) your Price Representations or (b) the reimbursement rates of any state's Medicaid program, the Medicare program, or any private insurance program.

**OBJECTION:** Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome. Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Abbott product in every Abbott division.

**Request 12.**   All "Applications for Inclusion of a New Product and the Recertification of Products Presently Included in the Texas Vendor Drug Program" sent to the Texas Medicaid Program and all other similar forms or applications, and drafts thereof.

**OBJECTION:**   Abbott objects to this Request on the grounds that it is vague and ambiguous.  The phrase "all other similar forms or applications" is neither explained in the Request itself nor defined in the Definitions section of the subpoena.  This Request, as written, could be construed to seek similar forms or applications submitted to Medicaid programs in other states.  To the extent that the Request calls for such forms or applications, Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.

**Request 13.**   All documents, not otherwise described in paragraph 12, transmitted to the Texas Medicaid Program which contained any Price Representations regarding any of your Pharmaceuticals, and drafts thereof.

**OBJECTION:**   Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome. Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Pharmaceutical that Abbott sells.

**Request 14.**   All documents which mention, evidence or reflect any discussions or analysis regarding supplying or otherwise reporting the information described in paragraphs 12 and 13.

**OBJECTION:**   Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Abbott further objects to this Request to the extent it seeks information that is confidential and proprietary to Abbott and that is protected by the attorney-client and work product privileges.

**Request 15.**  All documents that mention, evidence or reflect any impact upon the net purchase or sale price of any Listed Pharmaceutical due to any payment or proposed payment in cash or in kind directly or indirectly, including charge backs, discounts, the Spread, rebates, free pharmaceuticals, administrative fees, sponsorship of meetings, drug studies, educational or research grants or off-invoice pricing.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Without any limitation to particular customers, this Request, as written, would require Abbott to search every single customer contract and customer file.   Abbott further objects to this Request on the grounds that it is vague, ambiguous and confusing.  The phrases "net purchase price" and "sale price" are neither explained in the Request itself nor defined in the Definitions section of the subpoena.

**Request 16.**   All documents that mention, evidence or reflect any impact of the Spread upon the sale of your Pharmaceuticals to any purchaser, including any documents analyzing the gross profit or estimated gross profit of any purchaser.

**OBJECTION:**   Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Pharmaceutical that Abbott sells.  Furthermore, without any limitation to particular customers, this Request, as written, would require Abbott to search every

single customer contract and customer file.  Abbott further objects to this Request on the grounds that it is vague, ambiguous and confusing.

**Request 17.**   All documents that mention, evidence or reflect the gross profits or estimated gross profits for any purchaser with respect to any of the Listed Pharmaceuticals.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Without any limitation to particular customers, this Request, as written, would require Abbott to search every single customer contract and customer file.  Abbott further objects to this Request on the grounds that it is vague, ambiguous and confusing.

**Request 18.**   All documents that summarize or describe the function of any system for connecting or interfacing with physicians' billing systems or practice management systems.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is vague, ambiguous and confusing.  The term "system" is neither explained in the Request itself nor defined in the Definitions section of the subpoena.

**Request 19.**   All documents that mention, evidence or reflect any payment in cash or in kind directly or indirectly to any employee of any agency involved in the administration of any Medicaid program or the Medicare program, or to any of their family members.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is vague, ambiguous and confusing.  The term "indirectly" is neither explained in the Request itself nor defined in the Definition section of the subpoena.  Furthermore, as written, this Request, could be broadly construed to require documents relating to any rebate payment that Abbott has made to any Medicaid program.  Abbott also objects to this Request to the extent that it suggests that Abbott engaged in improper conduct.

**Request 20.**   All documents that mention, evidence or reflect any communications directed by you or on your behalf to any purchaser which mention, evidence or reflect either reimbursement amounts for the Listed Pharmaceuticals or the Spread, including documents which reference AWP or WAC.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is vague, ambiguous and confusing.  As written, it is unclear whether the term "Spread" is limited to the Listed Pharmaceuticals.  To the extent that the Request seeks documents that mention, evidence, or reflect the Spread of non-Listed Pharmaceuticals, Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Furthermore, without any limitation to particular customers, this Request, as written, would require Abbott to search every single customer contract and customer file.

**Request 21.**   All documents which mention, evidence or reflect any occasion whereby the net price or cost to a purchaser was less than that reflected on the invoice to the purchaser, including any arrangement whereby payments were made directly to the purchaser or free goods were delivered directly to the purchaser thereby resulting in a reduction of the net price or net cost of the purchaser.

**OBJECTION:**  Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Without any limitation to the Listed Pharmaceuticals, this Request, as written, would

require Abbott to search the files of every Abbott product in every Abbott division.  Furthermore, without any limitation to particular customers, this Request, as written, would require Abbott to search every single customer contract and customer file.

**Request 22.**    All documents which mention, evidence or reflect any price changes or changes in Price Representations to any of your Pharmaceuticals from April 30, 2000 to the present.

**OBJECTION:**   Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome. Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Pharmaceutical that Abbott sells.

**Request 23.**    All documents which mention, evidence or reflect the reason for any price change or changes in Price Representations described in paragraph 22.

**OBJECTION:**   Abbott objects to this Request on the grounds that it is overly broad and unduly burdensome.  Without any limitation to the Listed Pharmaceuticals, this Request, as written, would require Abbott to search the files of every Pharmaceutical that Abbott sells.  Abbott further objects to this Request to the extent it seeks information that is confidential and proprietary to Abbott and that is protected by the attorney-client privilege and the work-product doctrine.

# EXHIBIT 138

Page 1

                    C O N F I D E N T I A L

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - -x

In re: PHARMACEUTICAL INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

- - - - - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:          MDL No. 1456

UNITED STATES OF AMERICA ex rel.    Civil Action

VEN-A-CARE OF THE FLORIDA KEYS,     No.01-12257-

INC., v. DEY, INC., et al., Civil   PBS

Action No. 05-11084-PBS; and UNITED

STATES OF AMERICA ex rel. VEN-A-CARE

OF THE FLORIDA KEYS, INC., v.

BOEHRINGER INGELHEIM CORP., et al.,

Civil Action No. 07-10248-PBS

- - - - - - - - - - - - - - - - - - -x

(Cross-noticed captions on following pages.)

                    November 18, 2008

                    9:10 a.m.

            Videotaped deposition of Thomson

PDR Inc., by KRISTEN MINNE

Page 2

1    IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI
2            FIRST JUDICIAL DISTRICT
3    - - - - - - - - - - - - - x
4    THE STATE OF MISSISSIPPI,  :
5        Plaintiff,   :
6    vs.   : Civil Action No.
7    ABBOTT LABORATORIES, INC.,  : G2005-2021
8    et al.,   :
9        Defendants.   :
10   - - - - - - - - - - - - - x
11
12        UNITED STATES DISTRICT COURT
13        FOR THE DISTRICT OF MASSACHUSETTS
14   - - - - - - - - - - - - - x
15   IN RE: PHARMACEUTICAL   : MDL NO. 1456
16   INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION
17   PRICE LITIGATION   : 01-CV-12257-PBS
18   THIS DOCUMENT RELATES TO:   : Hon. Patti B. Saris
19   The City of New York, et al. :
20        v.   :
21   Abbott Laboratories, et al. :
22   - - - - - - - - - - - - - x

Page 3

1        UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - x
4    IN RE: PHARMACEUTICAL   : MDL NO. 1456
5    INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION
6    PRICE LITIGATION   : 01-CV-12257-PBS
7    THIS DOCUMENT RELATES TO:   : Hon. Patti B. Saris
8    The State of California,   :
9    ex rel. Ven-A-Care   :
10        v.   :
11   Abbott Laboratories, et al. :
12   Case No. 03-cv-11226-PBS   :
13   - - - - - - - - - - - - - x
14
15
16
17
18
19
20
21
22

Page 4

1        IN THE CIRCUIT COURT OF
2    THE SECOND JUDICIAL CIRCUIT IN AND FOR LEON COUNTY
3            FLORIDA
4    - - - - - - - - - - - - - - x
5    THE STATE OF FLORIDA        :
6    ex rel.   :
7    VEN-A-CARE OF THE FLORIDA KEYS, :
8    INC., a Florida Corporation, by  :
9    and through its principal   :
10   officers and directors, ZACHARY  :
11   T. BENTLEY and T. MARK JONES,   :
12        Plaintiffs,:
13        v.   :
14   BOEHRINGER INGELHEIM CORPORATION;:
15   BOEHRINGER INGELHEIM   :
16   INTERNATIONAL, GmbH, a/k/a   :Case No.
17   BOEHRINGER INGELHEIM   :98-3032A
18   AUSLANDSBETEILGUNGS GmbH;   :
19   BOEHRINGER INGELHEIM   :Judge
20   PHARMACEUTICALS, INC.; C.H.   :William L. Gary
21   BOEHRINGER SOHN; DEY, INC., DEY,  :
22   LP; EMD PHARMACEUTICALS, INC.,   :

Page 5

1    LIPHA, S.A., MERCK, KGaA, MERCK- :
2    LIPHA, S.A., SCHERING CORP.;   :
3    SCHERING-PLOUGH CORPORATION;   :
4    ROXANE LABORATORIES, INC., n/k/a :
5    BOEHRINGER INGELHEIM ROXANE, INC.:
6    and WARRICK PHARMACEUTICALS CORP.:
7        :
8        Defendants.   :
9    - - - - - - - - - - - - - - - - x
10        November 18, 2008
11        9:10 a.m.
12        Videotaped deposition of Thomson
13   PDR Inc., by KRISTEN MINNE, taken by attorneys
14   for United States of America, pursuant to
15   notice, held at the offices of Saterlee Stephens
16   Burke & Burke, 230 Park Avenue, New York, New
17   York, before Helen Mitchell, a Shorthand
18   Reporter and Notary Public.
19
20
21
22

2 (Pages 2 to 5)

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com
a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 6

1  A P P E A R A N C E S :
2
3     GEJAA T. GOBENA, ESQ.
4       United States Department of Justice
5       Civil Division
6       Commercial Litigation - Fraud Section
7         Attorney for United States of
8           America
9         601 D Street, NW
10        PHB-9028/P.O. Box 261
11        Washington, D.C. 20044
12        Phone: (202)307-1088
13        E-mail: gejaa.gobena@usdoj.gov
14
15
16
17
18
19
20
21
22

Page 7

1  A P P E A R A N C E S (Cont'd.):
2     SATERLEE STEPHENS BURKE & BURKE LLP
3       Attorneys for Thomson PDR Inc.
4       230 Park Avenue
5       New York, New York 10169
6     BY:  THOMAS J. CAHILL, ESQ.
7       Phone: (212)404-8716
8       E-mail: tcahill@ssbb.com
9         -and-
10    JOAN L. ROSENSTOCK, ESQ.
11      Phone: (212)818-9200
12      E-mail: jrosenstock@ssbb.com
13
14    ANDERSON LLC
15      Attorneys for Ven-A-Care of the
16        Florida Keys
17      208 West 14th Street, Suite 3-B
18      Austin, Texas 78701
19    BY:  C. JARRETT ANDERSON, ESQ.
20      Phone: (512)469-9191
21      E-mail: jarrett@anderson-llc.com
22

Page 8

1  A P P E A R A N C E S (Cont'd.):
2     NICHOLAS N. PAUL, ESQ.
3       Supervising Deputy Attorney General
4       State of California Department of
5         Justice
6       Civil Prosecutions Unit
7         Attorney for State of California
8       P.O. Box 85266
9       110 West A Street, #1100
10      San Diego, California 92186
11      Phone: (619)688-6099
12      E-mail: nicholas.paul@doj.ca.gov
13
14    KIRBY McINERNEY LLP
15      Attorneys for City of New York,
16        various New York counties and
17        State of Iowa
18      101 College Street
19      Dripping Springs, Texas 78620
20    BY:  JAMES P. CARROLL, JR., ESQ.
21      Phone: (512)858-1800
22      E-mail: jcarroll@kmllp.com

Page 9

1  A P P E A R A N C E S (Cont'd.):
2
3     DIANA SHUMANS, ESQ.
4       Office of Attorney General
5       State of Florida
6         The Capitol PL-01
7         Tallahassee, Florida 32399-1050
8         Phone: (850)414-3300
9         (Via telephone)
10
11    HOGAN & HARTSON LLP
12      Attorneys for Bristol-Myers and
13        Squibb
14      875 Third Avenue
15      New York, New York  10022
16    BY:  THOMAS J. SWEENEY, III, ESQ.
17      Phone: (212)918-3523
18      E-mail: tjsweeney@hhlaw.com
19
20
21
22

3  (Pages 6 to 9)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 10

```
 1    A P P E A R A N C E S (Cont'd.):
 2
 3        HYMAN, PHELPS & McNAMARA, P.C.
 4            Attorneys for Watson
 5             Pharmaceuticals, Inc.
 6            700 Thirteenth Street, N.W.
 7            Suite 1200
 8            Washington, D.C. 20005
 9        BY:   DOUGLAS B. FARQUHAR, ESQ.
10            Phone: (202)737-5600
11            E-mail: dfarquhar@hpm.com
12
13        KIRKLAND & ELLIS LLP
14            Attorneys for Boehringer and
15             Roxane
16            200 East Randolph Drive
17            Chicago, Illinois 60601
18        BY:   SETH A. GASTWIRTH, ESQ.
19            Phone: (312)861-2464
20            E-mail: sgastwirth@kirkland.com
21
22
```

Page 12

```
 1    A P P E A R A N C E S (Cont'd.):
 2
 3        JONES DAY
 4            Attorneys for Abbott Laboratories
 5             and TAP Pharmaceuticals
 6            222 East 41st Street
 7            New York, New York 10017-6702
 8        BY:   TONI-ANN CITERA, ESQ.
 9            Phone: (212)326-8376
10            E-mail: tcitera@jonesday.com
11
12        KIRKLAND & ELLIS LLP
13            Attorneys for Teva Pharmaceuticals
14             USA, Inc., Ivax Corporation,
15             Ivax Pharmaceuticals, Inc. and
16             Sicor Inc.
17            655 Fifteenth Street, N.W.
18            Washington, D.C. 20005
19        BY:   JASON PARISH, ESQ.
20            Phone: (202)879-5066
21            E-mail: jparish@kirkland.com
22
```

Page 11

```
 1    A P P E A R A N C E S (Cont'd.):
 2
 3        KELLEY DRYE & WARREN LLP
 4            Attorneys for Dey, Inc., Dey,
 5             L.P., Dey, L.P., Inc. and
 6             Mylan, Inc.
 7            101 Park Avenue
 8            New York, New York 10178
 9        BY:   MARISA A. LORENZO, ESQ.
10            Phone: (212)808-7697
11            E-mail: mlorenzo@kelleydrye.com
12
13        MORGAN, LEWIS & BOCKIUS LLP
14            Attorneys for Pfizer, Inc. and
15             Pharmacia Corp.
16            1701 Market Street
17            Philadelphia, Pennsylvania 19103
18        BY:   ABBY J. KAPLAN, ESQ.
19            Phone: (215)963-5834
20            E-mail: akaplan@morganlewis.com
21
22
```

Page 13

```
 1    A P P E A R A N C E S (Cont'd.):
 2
 3        DAVIS POLK & WARDWELL
 4            Attorneys for Astra Zeneca
 5             Pharmaceuticals LP
 6            450 Lexington Avenue
 7            New York, New York 10017
 8        BY:   KRISTI PRINZO, ESQ.
 9            Phone: (212)450-4741
10            E-mail: kristi.prinzo@dpw.com
11
12        WHITE & CASE LLP
13            Attorneys for Sandoz Inc.
14             and TAP Pharmaceuticals
15            1155 Avenue of the Americas
16            New York, New York 10036-2787
17        BY:   KARA PAGLIARULO, ESQ.
18            Phone: (212)819-7593
19            E-mail: kpagliarulo@whitecase.com
20
21
22
```

4  (Pages 10 to 13)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008
New York, NY

| Page 14 |
|---|
| 1   A P P E A R A N C E S (Cont'd.): |
| 2 |
| 3        LOCKE LORD BISSELL & LIDDELL LLP |
| 4          Attorneys for Schering Corp., |
| 5            B. Braun Medical and |
| 6            Warrick Pharmaceutical |
| 7          2200 Ross Avenue - Suite 2200 |
| 8          Dallas, Texas 75201 |
| 9        BY:   KARIN B. TORGERSON ESQ. |
| 10         Phone: (214)740-8725 |
| 11         E-mail: ktorgerson@lockelord.com |
| 12 |
| 13 |
| 14      KAYE SCHOLER LLP |
| 15        Attorneys for Novartis |
| 16          Pharmaceuticals Corp. |
| 17        425 Park Avenue |
| 18        New York, New York 10022 |
| 19      BY:   SAMUEL LONERGAN, ESQ. |
| 20        Phone: (212)836-7591 |
| 21        E-mail: slonergan@kayescholer.com |
| 22 |

| Page 16 |
|---|
| 1   A P P E A R A N C E S (Cont'd.): |
| 2        DICKSTEIN SHAPIRO LLP |
| 3          Attorneys for Baxter |
| 4            Healthcare Corp. |
| 5          1825 I Street, N.W. |
| 6          Washington, D.C. 20006-5403 |
| 7        BY:   JASON D. WALLACH, ESQ. |
| 8          Phone: (202)420-2668 |
| 9          E-mail: wallachj@ |
| 10            dicksteinshapiro.com |
| 11          (Via telephone) |
| 12 |
| 13        DORNBUSH SCHAEFFER STRONGIN |
| 14          & VENAGLIA, LLP |
| 15          Attorneys for Forest Pharmaceuticals |
| 16        BY:   CYNTHIA L. EBBS, ESQ. |
| 17          Phone: (212) 759-3300 |
| 18          E-mail: ebbs@dssvlaw.com |
| 19          (via telephone) |
| 20 |
| 21   ALSO PRESENT: |
| 22        MARK BRADY - Videographer |

| Page 15 |
|---|
| 1   A P P E A R A N C E S (Cont'd.): |
| 2 |
| 3        HUGHES, HUBBARD & REED LLP |
| 4          Attorneys for Merck & Co., Inc. |
| 5          1775 I Street, N.W. |
| 6          Washington, D.C. 20006-2401 |
| 7        BY:   ROBERT B. FUNKHOUSER, ESQ. |
| 8          Phone: (202)721-4780 |
| 9          E-mail: funkhous@hugheshubbard.com |
| 10          (Via telephone) |
| 11 |
| 12        SONNENSCHEIN NATH & ROSENTHAL LLP |
| 13          Attorneys for Ethex Corporation |
| 14          2000 McKinney Avenue - Suite 1900 |
| 15          Dallas, Texas 75201-1858 |
| 16        BY:   MARGARET D. HALL, ESQ. |
| 17          Phone: (214)259-0945 |
| 18          E-mail: pdhall@Sonnenschein.com |
| 19          (Via telephone) |
| 20 |
| 21 |
| 22 |

| Page 17 |
|---|
| 1            I N D E X |
| 2   WITNESS          EXAMINATION BY        PAGE |
| 3   KRISTEN MINNE     Mr. Gobena        34 |
| 4            Mr. Anderson      129 |
| 5            Mr. Carroll       232 |
| 6            Mr. Paul          329 |
| 7            Mr. Farquhar       337 |
| 8 |
| 9          E X H I B I T S |
| 10   FOR IDENTIFICATION              PAGE |
| 11   Exhibit Minne 001 August 5, 2008 subpoena     46 |
| 12        and notice of deposition |
| 13        with attachments |
| 14   Exhibit Minne 002 Revised notice of      46 |
| 15        deposition |
| 16   Exhibit Minne 003 Second revised notice of    46 |
| 17        deposition |
| 18   Exhibit Minne 004 Excerpts from 1990 Red      59 |
| 19        Book |
| 20   Exhibit Minne 005 Excerpts from 1996 Red      72 |
| 21        Book |
| 22 |

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 18

EXHIBITS
(Continued)

| FOR IDENTIFICATION | PAGE |
|---|---|
| Exhibit Minne 006 Document bearing Bates Nos. HHD 812-006 through 812-009 | 83 |
| Exhibit Minne 007 Document bearing Bates Nos. Red Book 06983 | 94 |
| Exhibit Minne 008 October 2000 product listing verification for Roxane Laboratories | 103 |
| Exhibit Minne 009 Price listing verification for Abbott Hospital Products, the first page bearing Bates No. Red Book 01172 | 110 |
| Exhibit Minne 010 Excerpts from 2001 and 2002 Red Books | 116 |
| Exhibit Minne 011 Document bearing Bates Nos. TH 0598 through 0601 | 132 |

Page 19

EXHIBITS
(Continued)

| FOR IDENTIFICATION | PAGE |
|---|---|
| Exhibit Minne 012 Document bearing Bates Nos. TH 0256 through 0262 | 138 |
| Exhibit Minne 013 Document bearing Bates No. RGX 0189707 | 143 |
| Exhibit Minne 014 Document bearing Bates Nos. RGX 0189708 through 0189712 | 153 |
| Exhibit Minne 015 Document bearing Bates Nos. TH 353 | 161 |
| Exhibit Minne 016 PowerPoint presentation entitled "Micromedex AQP analysis, October 15th, 2002" | 168 |
| Exhibit Minne 017 Document bearing Bates No. TH 463 | 184 |
| Exhibit Minne 018 Document bearing Bates Nos. TH269 through 280 | 187 |

Page 20

EXHIBITS
(Continued)

| FOR IDENTIFICATION | PAGE |
|---|---|
| Exhibit Minne 019 Document dated July 29, 2003 | 188 |
| Exhibit Minne 020 Document describing electronic file of Red Book | 193 |
| Exhibit Minne 021 Revision to AWP policy | 195 |
| Exhibit Minne 022 Document bearing Bates Nos. Red Book 00595 through 600 | 196 |
| Exhibit Minne 023 October 2000 verification forms for Abbott Pharmaceuticals | 206 |
| Exhibit Minne 024 Document with first page entitled "Abbott Pharmaceutical Markup History" | 208 |

Page 21

EXHIBITS
(Continued)

| FOR IDENTIFICATION | PAGE |
|---|---|
| Exhibit Minne 025 January 1, 1995 through September 18, 2003 records of Roxane pricing/markup history | 212 |
| Exhibit Minne 026 Form letter to Abbott/Ross Data Vendor | 218 |
| Exhibit Minne 027 Price change notification sent to Red Book by Abbott | 221 |
| Exhibit Minne 028 Documentation for Abbott Pharmaceuticals verification form | 223 |
| Exhibit Minne 029 1995 price change notification by Abbott Pharmaceuticals | 227 |
| Exhibit Minne 030 1999 price change notification by Abbott Pharmaceuticals | 228 |

6 (Pages 18 to 21)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                     November 18, 2008
New York, NY

---

Page 22

```
 1          E X H I B I T S
 2            (Continued)
 3  FOR IDENTIFICATION              PAGE
 4  Exhibit Minne 031 Previously used format   229
 5          of Red Book product
 6          verification list
 7  Exhibit Minne 032 Document bearing Bates    232
 8          Nos. Red Book 04693 and
 9          04694
10  Exhibit Minne 033 July 6, 2004 Bayer        237
11          Corporation product
12          listing verification
13  Exhibit Minne 034 Document bearing Bates    240
14          Nos. Red Book 07589
15          through 07597
16  Exhibit Minne 035 July 6, 2004 Ethex        232
17          Corporation product
18          listing verification
19  Exhibit Minne 036 October 11, 2002 Forest   245
20          Pharmaceuticals product
21          listing verification
22
```

Page 23

```
 1          E X H I B I T S
 2            (Continued)
 3  FOR IDENTIFICATION              PAGE
 4  Exhibit Minne 037 July 25, 2003 Fujisawa    247
 5          Healthcare product
 6          listing verification
 7  Exhibit Minne 038 July 6, 2004 Eli Lilly &  249
 8          Company product listing
 9          verification
10  Exhibit Minne 039 October 1, 2001           251
11          Glaxo-Wellcome product
12          listing verification
13  Exhibit Minne 040 August 16, 2001 Roche     253
14          Laboratories product
15          listing verification
16  Exhibit Minne 041 Boehringer Ingelheim      255
17          Pharmaceuticals product
18          listing verification
19          signed August 22, 2002
20
21
22
```

Page 24

```
 1          E X H I B I T S
 2            (Continued)
 3  FOR IDENTIFICATION              PAGE
 4  Exhibit Minne 042 September 18, 2001        258
 5          Bedford Laboratories
 6          product listing
 7          verification
 8  Exhibit Minne 043 October 1, 2001 Barr      260
 9          Laboratories product
10          listing verification
11  Exhibit Minne 044 October 2, 2001 Merck &   262
12          Company product listing
13          verification
14  Exhibit Minne 045 Document bearing Bates    266
15          No. Red Book 09936
16  Exhibit Minne 046 Document bearing Bates    269
17          Nos. Red Book 14957
18          through 14961
19  Exhibit Minne 047 Document bearing Bates    271
20          Nos. Red Book 13418
21          through 13426
22
```

Page 25

```
 1          E X H I B I T S
 2            (Continued)
 3  FOR IDENTIFICATION              PAGE
 4  Exhibit Minne 048 July 25h, 2003 Pfizer     274
 5          USA Pharma Group product
 6          listing verification
 7  Exhibit Minne 049 July 25, 2003             276
 8          Greenstone product
 9          listing verification
10  Exhibit Minne 050 October 11, 2002          278
11          Pharmacia Corporation
12          product listing
13          verification
14  Exhibit Minne 051 Document bearing Bates    280
15          Nos. Red Book 13003 and
16          13002
17  Exhibit Minne 052 Document bearing Bates    280
18          Nos. Red Book 13199 and
19          13200
20  Exhibit Minne 053 Document bearing Bates    280
21          Nos. Red Book 13198 and
22          13197
```

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 26

E X H I B I T S
(Continued)
FOR IDENTIFICATION                    PAGE
Exhibit Minne 054 Document bearing Bates    280
        No. Red Book 13196
Exhibit Minne 055 Document bearing Bates    281
        No. Red Book 13015
Exhibit Minne 056 Document bearing Bates    281
        Nos. Red Book 13109
        through 13113
Exhibit Minne 057 Document bearing Bates    281
        Nos. Red Book 13090 and
        13091
Exhibit Minne 058 Document bearing Bates    281
        No. Red Book 13086
Exhibit Minne 059 Document bearing Bates    281
        No. Red Book 13087
Exhibit Minne 060 September 26, 1997        283
        Schering Corporation
        product listing
        verification

Page 28

E X H I B I T S
(Continued)
FOR IDENTIFICATION                    PAGE
Exhibit Minne 067 July 25, 2003 Par        303
        Pharmaceuticals product
        listing verification
Exhibit Minne 068 December 6, 2005 Amgen    305
        USA product listing
        verification
Exhibit Minne 069 Document bearing Bates    308
        Nos. Red Book 02938
        through 02962
Exhibit Minne 070 Document bearing Bates    310
        Nos. Red Book 01802
        through 1805
Exhibit Minne 071 Document bearing Bates    312
        Nos. Red Book 13581
        through 13593
Exhibit Minne 072 Document bearing Bates    314
        Nos. Red Book 02073
        through 02095

Page 27

E X H I B I T S
(Continued)
FOR IDENTIFICATION                    PAGE
Exhibit Minne 061 October 27, 2000 Warrick    286
        Pharmaceuticals product
        listing verification
Exhibit Minne 062 October 2, 2001 TAP        289
        Pharmaceuticals product
        listing verification
Exhibit Minne 063 September 24, 1999 King    291
        Pharmaceuticals product
        listing verification
Exhibit Minne 064 July 25, 2003 Monarch    293
        Pharmaceuticals product
        listing verification
Exhibit Minne 065 Document bearing Bates    298
        Nos. Red Book 11649
        through 11673
Exhibit Minne 066 October 24, 2001 ESI    301
        Lederle product listing
        verification

Page 29

E X H I B I T S
(Continued)
FOR IDENTIFICATION                    PAGE
Exhibit Minne 073 Document bearing Bates    317
        Nos. Red Book 10863,
        10868, 10876, 10877,
        10878
Exhibit Minne 074 Document bearing Bates    320
        Nos. Red Book 11421,
        11432, 11436, 11439
Exhibit Minne 075 Document bearing Bates    323
        Nos. Red Book 15827,
        15838, 15839, 15841
Exhibit Minne 076 Document bearing Bates    325
        Nos. Red Book 09294,
        09302, 09306, 09329
Exhibit Minne 077 Document bearing Bates    329
        Nos. California Mylan
        03471964 through
        03472033
Exhibit Minne 078 Document bearing Bates    340
        No. WATMA 005202

8  (Pages 26 to 29)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 30

```
 1           E X H I B I T S
 2           (Continued)
 3  FOR IDENTIFICATION              PAGE
 4  Exhibit Minne 079 Document bearing Bates    342
 5         Nos. RB00803 through
 6         00874
 7  Exhibit Minne 080 Document bearing Bates    346
 8         No. WATED 021725
 9  Exhibit Minne 081 August 30, 2000 letter   353
10         from Watson Pharma
11         Incorporated to Linda
12         Panke, with attachment
13
14     REQUEST FOR PRODUCTION
15         PAGE   LINE
16         350    9
17
18
19
20
21
22
```

Page 31

```
 1         S T I P U L A T I O N S
 2
 3       IT IS HEREBY STIPULATED AND AGREED
 4  by and among counsel for the respective
 5  parties hereto, that the filing, sealing
 6  and certification of the within
 7  deposition shall be and the same are
 8  hereby waived;
 9       IT IS FURTHER STIPULATED AND
10  AGREED that all objections, except as to
11  the form of the question, shall be
12  reserved to the time of the trial.
13       IT IS FURTHER STIPULATED AND
14  AGREED that the within deposition may be
15  signed and sworn to before any officer
16  authorized to administer an oath with
17  the same force and effect as if signed
18  and sworn to before the Court.
19
20
21
22
```

Page 32

```
 1       THE VIDEOGRAPHER:  We're on the
 2  record.
 3       The time is 9:10 on November 18th,
 4  2008.  This is the case of the U.S. District
 5  Court for the District of Massachusetts, and the
 6  case is In Re:  Pharmaceutical Industry Average
 7  Wholesale Price Litigation, and the case numbers
 8  are MDL 1456 and CV 01-12257-PBS.  And today's
 9  witness is Kris -- Kristin Minne.
10       At this time counsel will identify
11  themselves.
12       MR. GOBENA:  Gejaa Gobena, United
13  States Department of Justice, on behalf of the
14  United States.
15       MR. CAHILL:  I'm Thomas Cahill, from
16  Satterlee Stephens.  We represent the corporate
17  witness here today.
18       MS. ROSENSTOCK:  Joan Rosenstock,
19  Satterlee Stephens, also representing the
20  corporate witness.
21       MR. GASTWIRTH:  Seth Gastwirth, from
22  Kirkland & Ellis, representing Roxane and
```

Page 33

```
 1  Boehringer defendants.
 2       MS. LORENZO:  Marisa Lorenzo, from
 3  Kelley Drye & Warren, representing the Dey
 4  defendants and Mylan Incorporated.
 5       MR. SWEENEY:  Tom Sweeney, from Hogan &
 6  Hartson, representing Bristol-Myers Squibb.
 7       MS. KAPLAN:  Good morning, I'm Abby
 8  Kaplan from Morgan Lewis, representing Pfizer and
 9  Pharmacia.
10       MR. LONERGAN:  Sam Lonergan, with Kaye
11  Scholer, Novartis Pharmaceuticals Corporation.
12       MS. TORGERSON:  Karin Torgerson, with
13  Locke Lord Bissell & Liddell, for Warrick,
14  Schering and B. Braun.
15       MS. CITERA:  Toni-Ann Citera, from
16  Jones Day, representing Abbott Laboratories and
17  TAP Pharmaceutical.
18       MR. PAUL:  Nicholas Paul, the
19  California Department of Justice, for California.
20       MR. CARROLL:  James Carroll, Kirby
21  McInerney, on behalf of the City of New York and
22  various New York counties and the State of Iowa.
```

9  (Pages 30 to 33)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 34

1         MR. ANDERSON:  Jarrett Anderson,
2   counsel for Ven-A-Care.
3         MR. PARISH:  Jason Parish, Kirkland &
4   Ellis, for Teva, Ivax and Sicor.
5         MS. PAGLIARULO:  Kara Pagliarulo, of
6   White & Case, representing Sandoz Inc.
7         THE VIDEOGRAPHER:  At this time I'll
8   have the court reporter swear in the witness.
9         We didn't identify the person on the
10  phone.
11        THE COURT REPORTER:  Miss Hall, could
12  you please state your appearance for the record?
13        MS. HALL:  Sure.  It's Peg Hall, with
14  Sonnenschein Nath & Rosenthal, for Ethex
15  Corporation.
16        K R I S T E N   M I N N E, having been
17  first duly sworn by the Notary Public (Helen
18  Mitchell), was examined and testified as follows:
19            EXAMINATION
20  BY MR. GOBENA:
21     Q.  Good morning, Miss Minne.
22     A.  Good morning.

Page 35

1      Q.  As I mentioned earlier, my name's
2   Gejaa Gobena, I'm an attorney with the Department
3   of Justice.  And you're here this morning in a
4   connection of variety of cases, one of which --
5   or three of which actually being cases involving
6   the United States having sued several
7   pharmaceutical companies, and you've been also
8   presented here as a 30(b)(6) witness or designee
9   on behalf of Thomson.
10        You understand that; correct?
11     A.  Yes, I do.
12     Q.  Have you ever been deposed before?
13     A.  No, I have not.
14        MR. CAHILL:  Mr. Gobena, if I can just
15  state for the record, as we'd discussed before,
16  that we'd like to deem the transcript of this
17  deposition confidential to the extent provided
18  for in the governing protective order in the
19  case.
20        MR. GOBENA:  Understood.
21     Q.  So you have not been deposed before?
22     A.  No.

Page 36

1      Q.  Let me go over a couple of ground
2   rules.
3         It's relatively a straightforward
4   process, but there's a few things you probably
5   should keep in mind, one of which is that we have
6   a court reporter here who's taking down all your
7   testimony.  And it's important that we do two
8   things:  One is to give sort of affirmative
9   verbal answers to questions.  Head nods don't
10  come across on the transcript, "uh-huh" is a very
11  ambiguous term, so if you could sort of state
12  something affirmatively, that would be helpful to
13  the court reporter and all of us who are going to
14  be looking at this transcript down the road.
15        Another thing is we should both try not
16  to talk each over other.  It's a tendency people
17  have to anticipate a question's going and
18  wanting to answer it quickly, and -- and
19  sometimes there's a tendency on the part of the
20  questioner to interrupt the witness, and so we'll
21  both try and hopefully work on that so we don't
22  talk over each other and garble up the

Page 37

1   transcript.
2         And then the other thing to keep in
3   mind is that from time to time you'll hear
4   various objections, either lodged by your counsel
5   or by various other parties in the room today.
6   Unless you're instructed by your counsel not to
7   answer the question, you're supposed to answer
8   the question.  So just keep that in mind as we're
9   going through the deposition today.
10        First of all, why don't you again state
11  your name for the record for us.
12     A.  My name is Kristen Minne.
13     Q.  And Miss Minne, where are you
14  employed?
15     A.  I'm employed at Thomson Reuters.
16     Q.  And how long have you been employed at
17  Thomson Reuters?
18     A.  Since 1997.
19     Q.  And what's your current job title?
20     A.  My current job title is senior
21  manager.
22     Q.  What are your job responsibilities?

10  (Pages 34 to 37)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 38

1     A.   I oversee the day-to-day operations of
2  the editorial department at Thomson Reuters, the
3  healthcare division of Thomson Reuters.
4         MR. GOBENA:  Did someone just join the
5  call?
6         If you have, if you could identify
7  yourself for the record, that would be great.
8         Miss Hall, are you still there?
9         MS. HALL:  Yes, I am.
10        MR. GOBENA:  There's no one else.
11    Q.   Sorry.  So you're now -- you're a
12 senior manager overseeing the editorial
13 department of the healthcare division of Thomson
14 Reuters; is that correct?
15    A.   Correct.
16    Q.   And what publications are you
17 responsible for overseeing?
18    A.   Currently I'm overseeing the drug
19 decs, drug points, drug consults publications, so
20 basically the drug information.
21    Q.   And how long have you been a senior
22 manager overseeing these particular publications

Page 39

1  at Thomson Reuters?
2     A.   Since April of this year.
3     Q.   And before April of this year, what
4  was your job title?
5     A.   Prior to April of this year, my job
6  title was manager of the Red Book database.
7     Q.   And what did your job responsibilities
8  entail as the manager of the Red Book database?
9     A.   I oversaw the staff that was in charge
10 of collecting the information for Red Book, as
11 well as inputting the information for the Red
12 Book.
13    Q.   And how long did you hold that title
14 as the manager of the Red Book database?
15    A.   I had that title from 2002 until 2004,
16 and then again from 2006 to -- until April of
17 this year.
18    Q.   What did you do in that two-year gap
19 between 2004 and 2006?
20    A.   I was still a manager over what we
21 call the integrated content.  So I did not at
22 that time have direct responsibility for any of

Page 40

1  the Red Book content.
2     Q.   What's the difference between being
3  the manager of integrated content versus being
4  manager for the Red Book database?
5     A.   The integrated content is the content
6  that's used for screening, for DUR screening in a
7  pharmacy system, such as drug interactions, drug
8  allergy screening.
9     Q.   So it's clinical information?
10    A.   Yes, clinical information.
11    Q.   And in your position in 2002 to 2004
12 as the manager for the Red Book database, were
13 you not involved in the collection or publication
14 of clinical information?
15    A.   No, I was only involved in the
16 collection of the information for the Red Book.
17    Q.   And the Red Book -- what kind of
18 information is published in the Red Book, just
19 generally?
20    A.   Generally, NDCs, you know, drug names,
21 manufacturer names, prices, package sizes.
22    Q.   Prices?

Page 41

1     A.   Prices, yes.  Physical characteristics
2  of that product, therapeutic classifications of
3  that product.
4     Q.   So there's a separation -- in other
5  words, Red Book doesn't really publish
6  clinical-type information; is that correct?
7     A.   Correct.
8     Q.   We'll get into a little bit more
9  detail about what is published in the Red Book
10 over the course of the day.
11        And prior to 2002, when you became the
12 manager for sort of those two different times of
13 the Red Book database, what were your job
14 responsibilities at Thomson?
15    A.   From 2000 to 2002 I was a manager,
16 again over the -- what I call the integrated
17 content, the clinical content.  And from my start
18 of my employment in '97 until the year 2000, when
19 I became a manager, I was what we call an
20 individual contributor.  My job title was
21 actually an editor, and I wrote the clinical
22 information.

11  (Pages 38 to 41)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 42

1      Q.   I want to ask you, what did you do to
2  prepare for your testimony today?  Did you review
3  any documents, talk to any people?  What did you
4  do?
5      A.   I reviewed documents that have been
6  made available for this deposition, and met with
7  Tom yesterday.
8      Q.   And I'm not interested in your
9  conversations with Mr. Cahill, but did you have
10 any conversations with people other than counsel
11 in preparation for this deposition today?
12     A.   I had some conversations with people
13 back at the Thomson Reuters office, in the legal
14 department, regarding this deposition.
15     Q.   So these were lawyers?
16     A.   Correct.
17     Q.   You didn't talk to any non-lawyers at
18 Thomson to help you prepare for your deposition
19 today?
20     A.   No, I did not.
21     Q.   You mentioned that you reviewed some
22 documents.  Do you recall generally what types of

Page 43

1  documents you reviewed?
2      A.   Generally documents on Red Book, page
3  matter, front matter, pricing sheets that we had
4  received from various manufacturers.
5      Q.   Did you review any internal e-mails or
6  internal documents?
7      A.   Yes, internal e-mails, internal
8  presentations.
9          MR. CAHILL:  I should state for the
10 record that the materials she reviewed were
11 materials that were produced by Thomson in
12 connection with this litigation.
13         MR. GOBENA:  Okay.
14     Q.   Let me make it simpler, then.
15         Did you have a chance to review all the
16 materials that were produced by Thomson or was it
17 a selection of materials you reviewed?
18         MR. CAHILL:  I would just clarify with
19 respect to materials produced by Thomson,
20 Thomson's produced hundreds of boxes of documents
21 because the manufacturer files were made
22 available --

Page 44

1          MR. GOBENA:  Right, understood.
2          MR. CAHILL:  -- so she wouldn't have
3  reviewed those, and Thomson's also produced
4  documents that relate to certain particular drugs
5  in certain particular litigations, and she
6  wouldn't have -- we wouldn't have made those
7  documents available, you know, as part of the
8  preparation as well.
9          MR. GOBENA:  Understood.  Okay, thank
10 you, Mr. Cahill, appreciate that.
11     Q.   We'll go over specific documents, and
12 either you will have reviewed them or not have,
13 during the course of the deposition.
14         I'm going to start first by introducing
15 a few exhibits here.
16         MR. GOBENA:  Unfortunately, I didn't
17 realize we were going to be this large a cast of
18 characters here so I don't have tons of copies
19 for everyone. I do have a couple extra copies
20 here. And the first three exhibits are going to
21 be the United States' notice of deposition and
22 the subpoena that we issued, and the other

Page 45

1  exhibits are -- we're not really going to spend
2  much time on them but they're basically the
3  revised notices that set the new date for the
4  deposition, so -- I'd like to have the court
5  reporter mark this as --
6          MR. CAHILL:  And, Mr. Gobena, I should
7  interject, there is one additional document that
8  I believe that the witness reviewed in preparing
9  for the deposition that wasn't produced, and
10 that's the 1990 version of the Red Book, and
11 we've made copies with excerpts.
12         MR. GOBENA:  Right.
13         MR. CAHILL:  So I just note, maybe at a
14 break we can address that.
15         MR. GOBENA:  Understood.  Probably at
16 the first break, it makes sense to do it then.
17         And here is Exhibit 2.  Exhibit 2 is
18 the revised notice of deposition, which was
19 issued subsequent to the first notice, and then
20 the third exhibit's just going to be the
21 subsequent revised notice, which is the operative
22 one in some respects that got us here today.

12  (Pages 42 to 45)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 46

1  That's going to be Exhibit 3.
2       (August 5, 2008 subpoena and notice of
3  deposition with attachments marked Exhibit Minne
4  001 for identification.)
5       (Revised notice of deposition marked
6  Exhibit Minne 002 for identification.)
7       (Second revised notice of deposition
8  marked Exhibit Minne 003 for identification.)
9       Q.  Miss Minne, I'm going to ask you to
10  sort of quickly look through them and see if you
11  recognize the documents that are before you.
12       A.  I have seen Exhibit 1.
13       Q.  Actually, we're going to focus on
14  Exhibit 1 anyway, so why don't you hold off on
15  looking at the other two right now.
16       I want to turn your attention -- and
17  Exhibit 1, of course, is the original notice that
18  we issued here in the subpoena as well, and I'm
19  going to spend most of my time right now on a
20  couple of exhibits.  It's Exhibit A and Exhibit B
21  to the subpoena.
22       I want to first direct your attention

Page 47

1  to Exhibit A.  Have you reviewed Exhibit A to the
2  August 5th, 2008 subpoena issued by the United
3  States?
4       A.  I have reviewed it, yes.
5       Q.  And you'll see there that there are
6  seven areas of inquiry identified.
7       A.  (Nodding).
8       Q.  Let's look at the first area of
9  inquiry, which reads the area of inquiry is going
10  to be "Thomson PDR Inc.'s search for and
11  production of documents in response to the
12  subpoena duces tecum issued on behalf of the
13  plaintiff United States of America on or about
14  August 5th, 2008."
15       Miss Minne, are you prepared to testify
16  about Thomson's PDR Inc.'s search and -- for and
17  production of documents in response to the
18  subpoena duces tecum issued by the United States
19  on August 5th, 2008?
20       A.  Yes.
21       Q.  And what did you do to prepare
22  yourself to testify on -- about the topic number

Page 48

1  one?
2       A.  I performed a search of both my
3  printed files and e-mail records, looking for
4  information related to this deposition.
5       Q.  Let's spend a little time on this
6  topic.
7       Do you know -- you mentioned what you
8  just did.  Were other people involved in the
9  search and collection efforts in response to the
10  August 5th subpoena?
11       A.  Yes.
12       Q.  Do you know who was involved in the
13  search?
14       A.  I asked the existing manager of the
15  Red Book database to also search for any
16  information she might have.
17       Q.  And who was the existing manager of
18  the Red Book database?
19       A.  Her name is Deborah Siegfried.
20       Q.  And does Miss Siegfried report to you
21  as --
22       A.  She does not now.  She did in the

Page 49

1  past.
2       Q.  At some point in your current position
3  as senior manager did you have responsibility for
4  the Red Book and then lose it?  Or why does she
5  no longer report to you?
6       MR. GASTWIRTH:  Objection to form.
7       MR. GOBENA:  You could answer.
8       A.  We did a reorganization and she was
9  moved under a different senior manager.
10       MR. SWEENEY:  Can we have a stipulation
11  that if one defendant objects that would cover
12  all defendants?
13       MR. GOBENA:  Yes.
14       MR. SWEENEY:  All plaintiffs' counsel
15  agree to that?
16       MR. ANDERSON:  Yes.
17       MR. CARROLL:  Yes.
18       Q.  And under which senior manager -- you
19  mentioned she's working for another senior
20  manager.  Which senior manager is she reporting
21  to now?
22       A.  Her senior manager's name is Joanne

13  (Pages 46 to 49)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

## New York, NY

Page 50

1 Brownhill.
2    Q.   And what are Miss Brownhill's
3 responsibilities, to the extent you know?
4    A.   They are very similar to mine except
5 that she oversees different content areas.
6    Q.   What's the different content areas
7 that Miss Brownfeld --
8    A.   Brownhill.
9    Q.   -- that Miss Brownhill oversees?
10    A.   She oversees the toxicology content
11 and the Red Book content now, as well as library
12 services.
13    Q.   Would you just state one more time
14 what content you oversee again?
15    A.   It is the drug information content.
16    Q.   Okay.
17       So Miss Siegfried did a search.  Were
18 there any other people involved in searching and
19 collecting documents in response to the August
20 5th subpoena?
21    A.   I did not ask anyone else to.  I -- it
22 is my understanding that our legal department had

Page 51

1 other people searching as well.
2    Q.   But you don't know who those people
3 are?
4    A.   No, I...
5    Q.   But it's your understanding that aside
6 from you, folks in the legal department at
7 Thomson Reuters had asked additional people to
8 collect documents?
9    A.   Correct.
10    Q.   What do you base that understanding
11 on?  I want to be careful not to get into your
12 privileged conversations, but if it involves you
13 revealing privileged conversations, you don't
14 have to answer it -- okay.
15    A.   (Nodding)
16    Q.   I take it by your nod that's how you
17 found out?
18    A.   The reason I say I believe other
19 people were searching is because I did see
20 e-mails from people who are no longer employed at
21 Thomson, so it is my assumption that the legal
22 department somehow came up with that

Page 52

1 documentation.
2    Q.   So -- you mentioned e-mails.  I want
3 to go through this kind of systematically.
4       Were there paper, hard copies of
5 documents that were collected during the search
6 and collection efforts in response to the
7 subpoena?
8    A.   My understanding is yes.
9    Q.   Do you know whose paper documents were
10 searched in order to respond to the August 5th
11 subpoena?
12    A.   Lauri Moore, who was the director of
13 drug information at the time, which was a manager
14 of Red Book.  And she is no longer employed at
15 Thomson Reuters.
16    Q.   Do you know where she is -- she's
17 currently employed?
18    A.   Yes.
19    Q.   And where is that?
20    A.   At MediSpan.
21    Q.   Small world.
22    A.   Yeah, it sure is.

Page 53

1    Q.   And other than Miss Moore's files, do
2 you know of any other person's hard paper files
3 that were searched?
4    A.   I do not know.
5    Q.   Did you look through your own paper
6 files?
7    A.   Yes, I did.
8    Q.   How about, do you know whether Miss
9 Siegfried's, you know, paper hard copy files were
10 searched as well?
11    A.   I asked her to search them.  I can
12 only assume she did.
13    Q.   But other than the people we've
14 discussed, you don't have any knowledge of other
15 people's hard copy files that were searched?
16    A.   No, I don't.
17    Q.   How about electronic files, do you
18 know whether an electronic file search was
19 conducted in response to the subpoena?
20    A.   I do not know.  Again, it's my
21 assumption that legal would have performed some
22 type of electronic search for people who are no

14  (Pages 50 to 53)

Page 54

1  longer there, but I don't have knowledge of that.
2      Q.  Were you asked personally to go
3  through your e-mails and your computer hard drive
4  to see if there were documents responsive to the
5  August 5th subpoena?
6      A.  Not responsive to the August 5th
7  subpoena.
8      Q.  So have you been asked previously to
9  look at your e-mail and computer hard drive for
10  documents responsive to a subpoena?
11      A.  Yes.
12      Q.  And do you recall what that subpoena
13  was?
14      A.  Um --
15          MR. CAHILL:  If you recall.
16      A.  It was when another Thomson employee
17  came out here for a deposition.
18      Q.  Do you recall who that Thomson
19  employee was?
20      A.  Gail Luka.
21      Q.  And she gave a deposition.  Do you
22  know in what case?

Page 55

1      A.  I do not know.
2      Q.  Do you recall approximately when --
3          MR. CAHILL:  If it's helpful, I could
4  state for the record, Gail Luka gave a deposition
5  authenticating documents and Jeff Archibald was
6  the attorney who took the deposition.  So Thomson
7  had already produced somebody to authenticate
8  documents.  I think those documents -- the chief
9  inquiry was the manufacturer file.
10      Q.  Why don't we look at area of inquiry
11  number two in Exhibit A to the notice and
12  subpoena.  You're going to be asked today to
13  testify "From January 1, 1990 to the present
14  about the business practices concerning the
15  procedure or means by which Thomson PDR Inc.
16  determined the content, including prices
17  published, whether by print or electronically,
18  and Thomson PDR's Red Book and Red Book Update in
19  published form, including all updates of related
20  database versions."
21      Are you prepared to testify on that
22  area of inquiry?

Page 56

1      A.  Yes, I am.
2      Q.  What did you do to prepare yourself to
3  testify about this particular area of inquiry?
4      A.  I didn't do anything particular except
5  that -- my years of tenure as manager over the
6  content.
7      Q.  And during your years of tenure as a
8  manager of the content of Red Book database, did
9  you accumulate knowledge of what was done in
10  terms of the publication of the Red Book prior to
11  your tenure?  In other words, this request asks
12  for going back to 1990.  Did you develop a
13  historical knowledge based on your tenure?
14      A.  Yes, I did.
15      Q.  Topic number three, "From January 1,
16  1990 to the present, the business practices
17  concerning the procedure or means used by Thomson
18  PDR Inc. to solicit, gather, verify or confirm
19  pricing information from manufacturers for use in
20  determining the contents (including prices)
21  published, whether by print or electronically, in
22  Thomson PDR Inc.'s Red Book and Red Book Update

Page 57

1  in published form, including all updates and
2  related database versions."  That was a mouthful.
3      Are you prepared to provide testimony
4  on that area of inquiry?
5      A.  Yes, I am.
6      Q.  And what did you do to prepare to
7  provide testimony on that particular area of
8  inquiry?
9      A.  Again, just my tenure as a manager of
10  that content.
11      Q.  And just to confirm, during your
12  tenure you were able to acquire some historical
13  knowledge that allows you to testify about
14  practices that predate your tenure as manager?
15      A.  (Nodding).
16          MR. GASTWIRTH:  Objection to form.
17          MR. GOBENA:  You could answer.
18      A.  Yes.
19      Q.  And topic number four -- let me ask
20  you -- let's make it easier.
21      Are there any of the areas of inquiry
22  that you're not prepared to testify about today?

15  (Pages 54 to 57)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                 November 18, 2008

New York, NY

Page 58

1      A.  No.
2      Q.  And aside from your time as a manager
3  of the Red Book database, were there -- is there
4  any other sources of information that you're
5  going to be using to testify about any of the
6  other four topics that we haven't covered
7  specifically?
8      A.  No.
9      Q.  Let me ask, other than the subpoena
10  issued by the United States on August 5th, 2008,
11  are you aware of any other subpoenas that have
12  been issued to Thomson Reuters related to drug
13  pricing matters?
14      A.  Just the one mentioned previously that
15  Gail Luka was involved with.
16      Q.  So you're not aware of any other
17  subpoenas that might have been issued to Thomson
18  Reuters or --
19      A.  No.
20      MR. GOBENA:  Why don't we go off the
21  record now.
22      MR. CAHILL:  Sure.

Page 59

1      THE VIDEOGRAPHER:  This is the
2  videographer.  Off the record at 9:35.
3      (Recess taken)
4      MR. GOBENA:  Mark this Exhibit 4.
5      (Excerpts from 1990 Red Book marked
6  Exhibit Minne 004 for identification.)
7      THE VIDEOGRAPHER:  This is the
8  videographer.  Back on the record, 9:38.
9  BY MR. GOBENA:
10      Q.  We've had -- I just asked the court
11  reporter while we were off the record to mark
12  Exhibit 4, a copy of this 1990 Red Book.  And
13  before we even get to the substance of the
14  exhibit, why don't you explain for the record,
15  what exactly is the Red Book?
16      A.  The Red Book is a compilation of
17  pharmaceuticals, both prescription and
18  non-prescription drugs, also some
19  healthcare-related items, including their
20  identifier, which can be an NDC, UPC, HRI,
21  manufacturer, the price associated with that
22  product, package size, again, physical

Page 60

1  characteristics are sometimes displayed, Orange
2  Book codes, which are equivalency codes.
3      Q.  And how long has the Red Book been
4  published for, to your knowledge?
5      A.  To my understanding, historically it
6  goes back to 1890s.
7      Q.  And so going back as far as the 1890s,
8  was the same type of information published, or
9  how --
10      A.  I --
11      Q.  I'm asking you, to the best of your
12  knowledge, for a sense of how it's evolved over
13  time.
14      A.  I do not know what it was in the
15  beginning years.
16      Q.  How far back does your historical
17  knowledge go in terms of what was actually
18  published inside the Red Book?
19      A.  Probably to the mid-'80s, when I used
20  it as a pharmacy student, was my first exposure.
21      Q.  I probably should have gone over your
22  background a little bit further earlier.

Page 61

1      You said you were a pharmacy student.
2  Are you a pharmacist?
3      A.  Yes, I'm a licensed pharmacist.
4      Q.  And just to get the record clear, when
5  did you get your pharmacy license?
6      A.  In 1988.
7      Q.  You mentioned that in the mid-'80s as
8  a pharmacy student you first became aware of the
9  Red Book.  In what capacity did you use it?
10      A.  In the capacity of working in a
11  hospital and looking for available strengths.  I
12  did not use the pricing data since in a hospital
13  setting you're not concerned with the pricing
14  data, but just looking to see what other
15  strengths were available when trying to fill an
16  order that, you know, we didn't have in stock.
17      Q.  But in the mid-'80s, when you first
18  became aware of the Red Book, there was pricing
19  data that was published in there, to the best of
20  your recollection?
21      A.  Honestly, I don't recall, because that
22  was not what I was using the publication for.

16  (Pages 58 to 61)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 62

1    Q.   So you said you worked in the hospital
2  setting as a student.  When you graduated, did
3  you continue to work in the hospital setting, or
4  did you go somewhere else?
5    A.   I continued in the hospital setting.
6    Q.   And -- and where -- when you
7  graduated, what hospital were you working at as a
8  pharmacist?
9    A.   My first place of employment was
10 Rochester Methodist Hospital, in Rochester,
11 Minnesota, which is part of the Mayo medical
12 system.
13   Q.   And you were working there starting in
14 1988?
15   A.   Correct.
16   Q.   And where did you -- how long did you
17 work at the Rochester Medical Center?
18   A.   I worked there until 1990.
19   Q.   And where did you go after that?
20   A.   I worked at St. Mary's Hospital, also
21 in Rochester, and also part of the Mayo Medical
22 Center.

Page 63

1    Q.   And were you working there in the
2  hospital context as well, or were you working
3  outpatient?  Where were you working?
4    A.   Inpatient pharmacy in both.
5    Q.   And after -- and how long did you work
6  at St. Mary's?
7    A.   I worked there until 1991.
8    Q.   And where did you go after that?
9    A.   Then I went to Rose Medical Center in
10 Denver.
11   Q.   Let me just backtrack to St. Mary's.
12       In that context, did you at any point
13 start to become aware of any of the pricing
14 information in Red Book, or was it still not
15 important to you?
16   A.   Not important to me.
17   Q.   So you went to the Rose Medical Center
18 in Denver, and, again, were you working in an
19 inpatient capacity?
20   A.   Yes, I was.
21   Q.   So I take it you continued to be
22 uninterested in the pricing component of the Red

Page 64

1  Book at that stage?
2    A.   Correct.
3    Q.   And how long did you work at the Rose
4  Medical Center?
5    A.   I worked there until 1997.
6    Q.   And that's when you went to Red Book?
7  I'm sorry, not Red Book, Thomson Reuters.
8    A.   Right, correct.
9    Q.   And if I understood your testimony
10 earlier correctly, your first direct work on Red
11 Book in a pricing context was in 2002; is that
12 correct?
13   A.   Correct.
14   Q.   So prior to 2002 did you have any kind
15 of knowledge or awareness of the pricing
16 information that was being published in the Red
17 Book?
18   A.   No.
19   Q.   Just to clarify, though, in the
20 mid-1980s, when you first got exposed to Red
21 Book, you knew -- there was pricing information
22 published, you just didn't pay attention to it;

Page 65

1  is that an accurate reflect of your testimony;
2  earlier?
3    A.   I --
4         MR. GASTWIRTH:  Objection to form.
5    A.   I honestly don't know there was
6  pricing.  I'm assuming there was, but, yeah,
7  that's not what I was using the publication for.
8    Q.   And let me just sort of go
9  historically and clarify who exactly it was that
10 published the Red Book.
11       The Red Book is now a publication
12 that's published at least on a macro level by
13 Thomson Reuters; is that correct?
14   A.   Correct.
15   Q.   Is it published by a particular unit
16 within Thomson Reuters?
17   A.   The healthcare division.
18   Q.   And has Thomson Reuters always been
19 the entity that published the Red Book?
20       MR. CAHILL:  Or a predecessor?
21       MR. GOBENA:  Or a predecessor, yeah.
22   A.   Originally it was Medical Economics,

17 (Pages 62 to 65)

Page 66

1    and at some point Thomson purchased Medical
2    Economics.  I don't know when that was.
3        Q.   And I've also seen an entity
4    identified as Micromedex as well.
5            What's Micromedex?
6        A.   Micromedex is a company in Denver that
7    was started in the mid-'70s, and then Thomson at
8    some point in the '90s came in and bought
9    Micromedex.
10       Q.   Do you know when Thomson purchased
11   Micromedex?
12       A.   I believe it was the early '90s.  I
13   know it was prior to my employment there.
14       Q.   And do you know when Thomson acquired
15   Medical Economics?
16       A.   I do not know.
17       Q.   That predated your employment as well?
18       A.   Either predated my employment or
19   predated my understanding of the larger Thomson
20   corporation at that point.
21       Q.   Do you know whether there is any kind
22   of relationship between Micromedex and Medical

Page 67

1    Economics?
2        A.   Other than they were both owned by
3    Thomson, no.
4        Q.   Okay, why don't we take a look at
5    Exhibit 4, which is this 1990 Red Book.  Well,
6    it's the cover page -- one of the cover pages
7    from the Red Book and some excerpts.  And I'm
8    actually going to be using excerpts of the Red
9    Book as well today when I go through other Red
10   Books, you know, and I'll represent to you that
11   at least the Red Books that I -- the excerpts
12   that I've provided, we verified that they match
13   up with the years and everything, so they're
14   accurate.
15           And let's take a look at this version
16   of the 1990 Red Book.
17           Take a look at the last page of the
18   exhibit that we printed out here.  And let me ask
19   you first, have you seen the 1990 Red Book prior
20   to your deposition today?
21       A.   No.
22       MR. GASTWIRTH:  And I'll object to

Page 68

1    form, too, that to the extent that during your
2    colloquy before the question you referred to the
3    Red Book being accurate.
4        MR. GOBENA:  Okay.
5        Q.   Sorry, I missed the answer to your
6    question.
7        MR. CAHILL:  Is the question before
8    today --
9        MR. GOBENA:  Yeah.
10       MR. CAHILL:  -- or before yesterday?
11       MR. GOBENA:  It was before today,
12   actually.
13       A.   Yesterday was when I first saw the
14   1990 Red Book.
15       Q.   Prior to yesterday, did you review any
16   other Red Books in preparation for your testimony
17   today?
18       A.   No.
19       Q.   Just in the normal course of your work
20   as the manager of sort of overseeing the Red
21   Book, broken up -- is it a four or six-year
22   period?

Page 69

1        A.   Four.
2        Q.   Four, okay.
3            Yeah, the four-year period, had you had
4    an opportunity to look at historical Red Books?
5        A.   No.
6        Q.   I want to turn your attention to sort
7    of an entry here on the right side of Exhibit 4,
8    page -- it's on page 479 of the exhibit, last
9    page.  There's a box in there, and it discusses
10   -- it mentions average wholesale prices.
11           Do you see that?
12       A.   Yes, I do.
13       Q.   And the box reads, "This average
14   wholesale price (AWP) reported is the result of
15   prices independently obtained from a
16   representative group of wholesalers located in
17   different areas of the country and then averaged
18   by the Red Book's editorial staff."
19           Do you see that there?
20       A.   Yes, I do.
21       Q.   Is this entry here in this 1990 Red
22   Book an accurate reflection of what the editorial

18  (Pages 66 to 69)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 70

1  policy of Red Book was with respect to average
2  wholesale pricing in 1990?
3          MR. SWEENEY:  Object to the form.
4      A.  I do not have knowledge of what the
5  policy was in 1990.
6      Q.  How far back does your knowledge of
7  Red Book's editorial policy with respect to the
8  reporting and AWP go?
9      A.  The Denver office took over Red Book
10  in 2002, so at that point is when I received the
11  -- any historical information that I have.
12      Q.  So you can't testify today whether
13  this excerpt in the 1990 Red Book reflected the
14  actual editorial policy at the time?
15      A.  I cannot verify that.
16          MR. GOBENA:  I'm going to have marked
17  as Exhibit 5 some excerpts -- not the whole thing
18  -- some excerpts of the 1996 Red Book, but before
19  I get to that, let's go back to Exhibit 4.
20      Q.  Does that statement of AWP editorial
21  policy -- is it consistent with any understanding
22  you've ever had at any time of Red Book's AWP

Page 71

1  policy?
2          MR. GASTWIRTH:  Objection to form.
3          MR. SWEENEY:  Objection to form.
4      A.  Not prior -- yesterday was the first
5  time I had any knowledge of this definition of
6  how they obtained AWP.
7      Q.  In 1990?
8      A.  In 1990.
9      Q.  I'm asking you, though, based on your
10  historical knowledge, is that -- that description
11  of AWP editorial policy from 1990 consistent with
12  any AWP editorial policy that Red Book's had
13  during your tenure?
14          MR. GASTWIRTH:  Objection to form.
15      A.  No.
16      Q.  And we'll get to what that AW policy
17  was for Red Book in due time.
18          MR. GOBENA:  Let's have this marked as
19  Exhibit 5.
20          MR. FARQUHAR:  I'm sorry, what year is
21  that?
22          MR. GOBENA:  1996.

Page 72

1          MR. GASTWIRTH:  This is all the copies
2  you have?
3          MR. GOBENA:  Yes.  I didn't anticipate
4  all these people.
5          (Excerpts from 1996 Red Book marked
6  Exhibit Minne 005 for identification.)
7      Q.  And just to shorten the amount of time
8  it will take to look through this, I'm going to
9  ask you about the key to product listing, which
10  is the fourth page of this exhibit, in particular
11  -- you can read the whole page if you want, but
12  I'm going to ask you about sort of the section
13  that reads "How to read the listings."
14          So if you could just take a moment to
15  look at that.  And again, if you want to look at
16  the whole page you're welcome to, if you want to
17  look at the whole exhibit you're welcome to, but
18  it probably will just be a waste of time.  So just
19  let me know when you're ready.
20          MR. GASTWIRTH:  And I'll just state on
21  the record that this appears to be a copy of a
22  Red Book that -- perhaps that wasn't published as

Page 73

1  a result of this case.
2          MR. ANDERSON:  By "published," you mean
3  produced?
4          MR. GASTWIRTH:  Wasn't produced in
5  connection with this case.
6          Do we have a Bates labeled version of
7  this?
8          MR. GOBENA:  I don't, no.
9          MR. SWEENEY:  Can you tell us where you
10  got it?
11          MR. GOBENA:  I think, actually, the
12  government had copies of Red Books.
13          MR. SWEENEY:  So it's from the
14  government's files?
15          MR. GOBENA:  Yeah, but I'm -- are you
16  saying that you've never had a Red Book produced
17  -- copies in litigation? If not, in the
18  government case anyways, we can remedy that.
19          MR. ANDERSON:  I believe Ven-A-Care has
20  made their Red Books available for inspection
21  over the years. I also believe that every drug
22  company in this room has copies of Red Books, so

19  (Pages 70 to 73)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 74

1    I doubt the Red Book is too noteworthy.
2         MR. SWEENEY:  I'm just trying to figure
3    out where the exhibit came from.
4      A.  I'm ready.
5      Q.  Let me ask you first, have you ever
6    reviewed a copy of the 1996 Red Book?
7      A.  Not prior to yesterday.
8      Q.  So yesterday you did have a chance to
9    review it?
10     A.  Yes.
11     Q.  But you testified earlier, though,
12   that you did develop some historical knowledge
13   that predates your tenure as the manager for Red
14   Book; isn't that correct?
15     A.  Correct.
16         MR. GASTWIRTH:  Objection to form.
17     Q.  Let's take a look at the section that
18   reads "How to read the listings," and I'm going
19   to go through it in some detail.
20         Let me just read it into the record,
21   and then ask you what your knowledge and
22   understanding is of the information contained

Page 75

1    herein.
2         "The first" -- it reads, "The first
3    line of an entry features the product or generic
4    name.  HCFA federal upper limit price information
5    is provided for all applicable multi-source
6    product categories.  The HCFA symbol can be found
7    immediately following the generic product name.
8    A complete listing of federal upper limit prices
9    appears in Section 8 (Third Party/Government
10   Information)."
11         Do you see that entry there?
12     A.  Yes, I do.
13     Q.  There's a mention of federal upper
14   limit prices being contained within the Red Book.
15         Was that true during your tenure
16   overseeing the publication of the Red Book?
17     A.  Yes.
18     Q.  And do you know whether that federal
19   upper limit price information was contained in
20   the Red Book prior to your tenure as a manager
21   overseeing Red Book?
22     A.  My understanding is yes, it was.

Page 76

1      Q.  Do you know where the federal upper
2    limit price information was collected from, and
3    then ultimately published in Red Book?
4         MR. GASTWIRTH:  Objection to form.
5      A.  It was collected from the CMS website.
6    It's called CMS now, it might have been called
7    something else at the time.
8      Q.  Are you familiar with the phrase
9    "HCFA"?
10     A.  Yes, I am.
11     Q.  It goes on to read, "Manufacturers are
12   listed alphabetically with generic listings.
13   Repackagers of products feature the 'repack'
14   symbol next to their names.  For trade name
15   listings, generic cross-references appear in
16   lower case on the following line."
17         It goes on to say, "A three-letter
18   abbreviation indicates the form of the drug."
19         And moving on to the next paragraph,
20   "Route of administration, product descriptive
21   information, strength, quantity and drug class
22   symbol (where applicable) appear next, followed

Page 77

1    by the National Drug Code number. The Average
2    Wholesale Price (AWP), Direct Price (DP) and the
3    Orange Book code complete the entry for each
4    product."
5         Is that basically still the same type
6    information that's being published in the Red
7    Book?
8         MR. SWEENEY:  Objection to the form.
9      A.  Yes, it is.
10     Q.  And I notice that there's -- it
11   mentions that AWP and DP, or direct price
12   information, are published.  There's no mention
13   of publication of WAC information.
14         Do you know why that is?
15     A.  I do not.
16         MR. CAHILL:  And all these questions
17   are about the hard copy --
18         MR. GOBENA:  Yeah.
19         MR. CAHILL:  -- version of the Red
20   Book, just to clarify?
21     Q.  Do you know whether -- whether WAC has
22   ever been published in the hard copy of the Red

20  (Pages 74 to 77)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 78

1  Book?
2      A.   To the best of my knowledge, no, it
3  has not.
4      Q.   Is WAC copied in any electronic
5  version of the Red Book?
6      A.   Yes, it is.
7      Q.   Let's go on to the text beneath that
8  graphic there on this page, and it reads, "All
9  prices are current as of the date Red Book went
10 to press.  However, actual prices paid by
11 retailers may vary, and all prices are subject to
12 change without notice.  The prices shown here are
13 based on data obtained from manufacturers,
14 distributors and other suppliers.  While great
15 care has been exercised in compiling this
16 information, the publisher of Red Book does not
17 warrant its accuracy."
18      Is it consistent with your
19 understanding of what -- the source of
20 information for the prices published in Red Book,
21 that that information, pricing information, came
22 from either manufacturers, distributors or other

Page 79

1  suppliers?
2      MR. GASTWIRTH:  Objection to form.
3      A.   Yes.
4      Q.   And let's focus on each of those
5  entities.
6      What kind of -- so pricing information
7  would be provided by manufacturers and then used
8  in the publication of the Red Book; is that
9  correct?
10     A.   Correct.
11     MR. GASTWIRTH:  Objection to form.
12     Q.   Would distributors provide pricing
13 information that would ultimately be published
14 somewhere in the Red Book, the hard copy anyways?
15     A.   If they are labeling the product with
16 their own label and NDC, then, yes.
17     Q.   So without labeling, you wouldn't be
18 getting pricing information from distributors?
19     A.   No.
20     Q.   How about suppliers, what kind of
21 pricing information would they provide that
22 ultimately would be used in the publication of

Page 80

1  the Red Book?
2      A.   My understanding of this definition of
3  suppliers is, again, someone who is labeling the
4  product with their own NDC, so that could involve
5  a repacker.
6      Q.   But it's safe to say, though, that the
7  vast majority of the pricing information that
8  would be provided and ultimately published in the
9  Red Book, that would come from manufacturers;
10 correct?
11     MR. GASTWIRTH:  Objection to form.
12     A.   Correct.
13     Q.   I want to shift gears slightly here,
14 but we'll come back to the Red Books, to figure
15 out exactly who was purchasing the Red Book and
16 actually using it.
17     Who actually were the Red Book's -- who
18 were the customers who purchased the Red Book?
19     A.   Currently customers include
20 manufacturers, third-party payors.  I'm assuming
21 -- I don't have direct knowledge of this -- but
22 assuming still the small pharmacies would use

Page 81

1  this publication.
2      Q.   You mentioned that small pharmacies
3  may still use the publication.  Why did you paren
4  the qualification?
5      A.   There's not a lot of small pharmacies
6  left, and probably most of them are on some type
7  of automated or direct link to payors, so claims
8  would be submitted electronically versus
9  manually.
10     Q.   What about large pharmacies, would
11 they be purchasers of the Red Book?
12     A.   Potentially.
13     Q.   You mentioned third-party payors as
14 being customers.  Can you identify certain -- any
15 specific third-party payors that you know were
16 purchasers of the Red Book?
17     A.   I know of purchasers of the electronic
18 files.
19     Q.   Okay.  Why don't we talk about that,
20 then.
21     Which third-party payors purchased the
22 electronic file version of the Red Book?

21  (Pages 78 to 81)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 82

1    A.  I know --
2        MR. GASTWIRTH:  Objection to form.
3        What time period are we talking about?
4    Q.  Give me your historical -- just --
5        MR. GOBENA:  That's a fair objection.
6    Q.  From 1990 to the present, to the best
7  of your knowledge, what third-party payors were
8  using the electronic version of Red Book?
9        MR. GASTWIRTH:  Objection.
10    A.  I can speak from 2002 --
11    Q.  Okay.
12    A.  -- to present, and the ones I've been
13  aware of that have in that point or still are
14  using include Merck MedCo, EDS, Express Scripts.
15    Q.  Do you know of any governmental
16  entities that either directly or through
17  contractors use Red Book pricing information?
18    A.  I do not know.
19    Q.  What's your understanding --
20        MR. GOBENA:  Actually, strike that.
21    Q.  Are you aware of any communications or
22  discussions that have ever occurred between

Page 83

1  officials at Red Book and officials at what was
2  previously called HCFA, the Healthcare Financing
3  Administration, about the pricing information
4  that is provided in the information?
5    A.  I am not aware of any conversations.
6        MR. GOBENA:  I'll have this marked as
7  Exhibit 6.
8        (Document bearing Bates Nos. HHD
9  812-006 through 812-009 marked Exhibit Minne 006
10  for identification.)
11    Q.  Why don't you just take a quick moment
12  to review the document.
13        MR. GOBENA:  The document is Bates
14  labeled HHD 812-006 through 009, it's a memo
15  drafted by -- within HHS about chemo drugs, drug
16  pricing, memorandum of discussion, dated October
17  28th through November 4th, 1991.
18        (Pause)
19    Q.  Now, I understand, Miss Minne, this
20  probably predates your tenure at Red Book, so
21  what I'm going to do is ask you some questions
22  about what's stated in the document, and ask

Page 84

1  whether it's consistent with your historical
2  understanding of Red Book's editorial practices.
3        First of all, do you by any chance know
4  who Mr. Steve Sorkenn of Red Book is?
5    A.  I do not.
6    Q.  So he was -- to the best of your
7  knowledge, he was no longer employed at Thomson
8  or Medical Economics from the beginning of your
9  tenure?
10    A.  Correct.
11    Q.  Well, there's a section of this
12  document I want to focus in on in particular. And
13  -- again, this is an internal HHS memo where
14  Elliot Hirschon from DHHS-OIG, OAS Region II, was
15  having a discussion with Mr. Sorkenn, and
16  memorialized that discussion.
17        I want to direct your attention to the
18  section that reads "Sources of Information." And
19  in particular we'll start with that first
20  paragraph.
21        Mr. Hirshon writes -- and, again, he's
22  memorializing his conversation with Mr. Sorkenn

Page 85

1  -- he says, "Mr. Sorkenn stated that the average
2  wholesale price, AWP, is based on data from
3  several sources.  He explained that Red Book goes
4  through the same basic processes as its
5  competitors, MediSpan, First Data, Blue Book, to
6  develop the AWP as well as the published direct
7  price and suggested retail price."
8        The next sentence reads, "He indicated
9  that the primary source of information is the
10  manufacturer."
11        Is that sort of -- again, this is Mr.
12  Hirschon reflecting his conversation with Mr.
13  Sorkenn, but is that statement, that the primary
14  source of pricing information is the
15  manufacturer, consistent with your historical
16  knowledge as to where Red Book collected its
17  pricing data?
18        MR. GASTWIRTH:  Objection to form.
19    A.  Yes, it is.
20    Q.  He says -- he goes on to say, "This
21  information is obtained either from surveys,
22  questionnaires, which Red Book sends to the

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 86

1  manufacturers, or the manufacturers may
2  voluntarily send the information to Red Book."
3  And he goes on to say that "Mr. Sorkenn felt that
4  a blank copy of the questionnaire could not be
5  forwarded since it represents proprietary
6  information."
7        Are you aware of any questionnaires or
8  surveys that were sent to Red Book by
9  manufacturers to collect pricing information that
10 would ultimately be published in the Red Book?
11       MR. GASTWIRTH:  Objection to form.
12    A.  My assumption is he's referring to
13 something we call a PLV, product listing
14 verification form.
15    Q.  Why don't you describe what that is.
16    A.  A PLV is a listing of what Red Book
17 currently has listed for a manufacturer;
18 products, package size, NDC, also pricing, and
19 it's a form that's sent to manufacturers on a
20 yearly basis, asking them to verify and confirm
21 that the product is still available and that that
22 price, with its effective date, is still

Page 87

1  accurate.
2     Q.  We'll go over some of those -- I think
3  the product listing verifications a little bit
4  later.
5        It says, "According to Mr. Sorkenn, Red
6  Book's questionnaires ask manufacturers to supply
7  AWP as well as DP."
8        Is that consistent with your historical
9  understanding of what kind of information would
10 be asked of manufacturers by Red Book?
11       MR. GASTWIRTH:  Objection to form.
12    A.  Yes.
13       MR. SWEENEY:  Can you read back the
14 question, please.
15       (Record read)
16    Q.  Mr. Hirschon goes on to say in this
17 memo, "While he" -- and he's referring to Mr.
18 Sorkenn -- "felt that most manufacturers are
19 cooperative and supply all the requested
20 information, Red Book can use alternative sources
21 to either develop or corroborate this
22 information."

Page 88

1        I'm going to ask you first about the
2  first clause of that sentence.
3        Is it your understanding, based on your
4  experience and tenure, both overseeing Red Book
5  and at Thomson generally, that manufacturers were
6  generally cooperative about providing price
7  information that ultimately would be published in
8  the Red Book?
9        MR. GASTWIRTH:  Object to form.
10       MR. CAHILL:  Yeah, we object to form as
11 well, without a clarification of the time period.
12       MR. GOBENA:  A time period, okay.
13    Q.  Let me ask you, based on your tenure,
14 the four-year tenure -- let's at least start with
15 that -- overseeing the publication, as a manager
16 overseeing the publication of Red Book, is the
17 statement that the manufacturers were cooperative
18 in supplying requested pricing information, is
19 that consistent with your understanding?
20       MR. GASTWIRTH:  Objection to form.
21    A.  I guess -- I'm not sure what the
22 definition of "most" is.  The majority.

Page 89

1     Q.  He goes on to say, "Red Book can use
2  alternative sources to either develop or
3  corroborate pricing information," and he gives
4  some examples.  He says, "For example, Red Book
5  receives information on tape from wholesalers
6  each month."
7        Now, that might have been true in 1991.
8  I want to get your best recollection based on
9  your historical knowledge and your direct tenure
10 as a manager for Red Book.
11       Do you recall at any point wholesalers
12 providing tapes of pricing information to
13 Thomson?
14       MR. GASTWIRTH:  Objection to form.
15    A.  Not during my tenure.  We did not
16 receive tapes from wholesalers.
17    Q.  Did you receive any other kind of
18 information from wholesalers that contained
19 pricing information that would ultimately be
20 published in the Red Book, during your tenure as
21 the manager?
22    A.  Not during my tenure, we did not.

23  (Pages 86 to 89)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 90

1    Q.   If a manager was not cooperative and
2  provide --
3         MR. GOBENA:  Manager?
4    Q.   If a manufacturer was not cooperative
5  in providing pricing information to Red Book --
6  again, I'm focusing on your tenure as manager of
7  Red Book, that four-year period -- if they
8  weren't cooperative, were there alternative
9  sources of information that you could go to to
10 collect pricing information for a product listed
11 in the Red Book?
12   A.   No.
13        MR. CAHILL:  Objection to form.
14   Q.   No, okay.
15        So the sole source would be the
16 manufacturer --
17        MR. GASTWIRTH:  Objection to form.
18   Q.   -- for pricing information?
19   A.   Up until the point where we
20 implemented the AWP policy.
21   Q.   So you say up until you implemented
22 the AWP policy.  What's the start date of your

Page 91

1  knowledge and what's the end date of your
2  knowledge that the sole source of information
3  would be the manufacturers for pricing
4  information?
5         MR. GASTWIRTH:  Objection to form, and
6  I believe that's inconsistent with this witness'
7  prior testimony.
8    A.   Okay, I'm sorry, can you repeat the
9  question?
10   Q.   Sure.
11        You testified that prior to the
12 implementation of an AWP policy, the
13 manufacturers were the sole source of pricing
14 information that was ultimately published in the
15 Red Book.
16        Is that an accurate reflection of your
17 testimony?
18   A.   Yes.
19        MR. GASTWIRTH:  Objection to form.
20   Q.   And what's the start date of that
21 understanding?  I want to get a time period of
22 when you had that understanding so that the

Page 92

1  record is clear.
2    A.   My understanding is that the sole
3  source of pricing information from manufacturers
4  -- that manufacturers were the sole source of
5  pricing information up until the time we
6  implemented the Red Book policy, which was early
7  2003 -- I'm sorry, the AWP policy, which was
8  2003.
9    Q.   So the beginning date of that
10 understanding, was that when you started as the
11 manager of Red Book or can it precede that?
12 Because I remember you said you started in 2000
13 for a two-year block as manager of the Red Book
14 database.
15        MR. GASTWIRTH:  Objection to form.
16   A.   I started in 2002 as manager of the
17 Red Book database.
18   Q.   But even before 2002, based on your
19 tenure and the historical knowledge that you've
20 collected, was it true that, you know, prior to
21 the AWP policy in early 2003, was it true that
22 the manufacturers were really the primary or the

Page 93

1  sole source of pricing information that was
2  ultimately published in the Red Book?
3         MR. GASTWIRTH:  Objection to form --
4    A.   Yes.
5         MR. GASTWIRTH:  -- I believe that's
6  inconsistent with the witness' prior testimony.
7         MR. GOBENA:  We don't need a speaking
8  objection.
9         MR. ANDERSON:  Particularly when she
10 says "yes."
11        MR. GOBENA:  There's only a few minutes
12 left on the tape, so why don't we go off the
13 record then.
14        THE VIDEOGRAPHER:  This is the
15 videographer.
16        This ends tape number one of the record
17 at 10:13.  We're off the record.
18        (Recess taken)
19        THE VIDEOGRAPHER:  This is the
20 videographer.
21        This begins tape number two at 10:31.
22 We're back on the record at this time.

24  (Pages 90 to 93)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 94

1      MR. GOBENA:  I'm going to have another
2  document here marked as Exhibit 7.
3      (Document bearing Bates Nos. Red Book
4  06983 marked Exhibit Minne 007 for
5  identification.)
6      MR. GOBENA:  Since we have a shortage
7  of copies, let me just describe what the document
8  is and the Bates number.
9      It is a Red Book product listing
10  verification dated September -- well, the top
11  says September 29th, 1999, and the Bates number
12  is Red Book 06983.
13  BY MR. GOBENA:
14    Q.  Miss Minne, if you could have a chance
15  to sort of look through the document generally,
16  that would be great.  And just let me know when
17  you're ready.
18      (Pause)
19    A.  I'm ready.
20    Q.  This is a product listing
21  verification, and at the top left corner you'll
22  see it says "Dey," it has an address for Dey, and

Page 95

1  it's nine pages of product listings.
2      First, if you could tell me what
3  exactly -- we talked about this a little bit
4  earlier, but explain in detail, what exactly is a
5  product listing verification?
6    A.  A product listing verification is a
7  printout of all of the manufacturer's products
8  that the Red Book currently has in their
9  database.
10      Let me qualify that with saying it's a
11  listing of all the active products, meaning
12  products that we have listed that we believe are
13  still currently manufactured.
14    Q.  So who generates this printout that
15  we're looking at here?
16    A.  This is generated by the Red Book
17  staff.
18    Q.  And once they generate this printout,
19  what do they do with it?
20    A.  This printout is mailed once a year to
21  the manufacturer.
22    Q.  And are these product listing

Page 96

1  verification printouts, are they sent to every
2  manufacturer that has a drug listed in the Red
3  Book?
4    A.  Yes, they are.
5      MS. LORENZO:  Objection, form.
6    Q.  And why is -- why is Red Book sending
7  out this product listing verification form to
8  these manufacturers?
9      MS. LORENZO:  Objection, form.
10    A.  It is a process by which we attempt
11  to, first of all, verify that we have all the
12  correct products listed for that manufacturer,
13  and also to verify that the prices are still
14  accurate.
15    Q.  So when you're sending out these
16  tables or charts that are generated, you're
17  sending it out hoping that the manufacturers will
18  correct any errors, whether it's pricing or
19  listing of a product that's no longer active; is
20  that correct?
21      MR. GASTWIRTH:  Objection to form.
22    A.  We hope that they will return it to us

Page 97

1  with any price changes, along with their
2  effective dates, or, you know, mark things that
3  are no longer manufactured.
4    Q.  Let's take a look at this particular
5  product listing verification.  There seem to be
6  several columns here.  The first column is NDC.
7      I assume that's meant for the
8  manufacturer's NDC to be listed on the chart; is
9  that correct?
10    A.  Correct.
11    Q.  And then you have a product name
12  listed there.
13      Is that just the sort of -- the name by
14  which that particular NDC is listed?
15    A.  Correct.
16    Q.  There's a column that says "OB."  What
17  does that stand for?
18    A.  That is a column that describes the
19  Orange Book code.
20    Q.  Let's take a look at the second
21  listing.  For example, there's AN listed --  AN
22  listed in that OB column that's on that first

25  (Pages 94 to 97)

New York, NY

Page 98

1  page.
2      What does AN stand for?
3      A.  I would -- I don't recall off the top
4  of my head; I would have to look at the list of
5  Orange Book codes.
6      Q.  There's a column that says "PT."
7  What's PT?
8      A.  That is a column I am not familiar
9  with as it no longer exists on the PLV form.
10     Q.  What does the column titled "DEA"
11 stand for?
12     A.  That is a column that designates
13 whether a product is a prescription or
14 over-the-counter item.
15     Q.  And there's a column that says "UD."
16 What does that stand for?
17     A.  That stands for unit dose, meaning
18 that the product would be packaged in unit dose
19 form.
20     Q.  And then the next column says "AWP,"
21 and there -- if you look down the column there
22 are various prices listed there.

Page 99

1      Let's take a look at the second row on
2  this first page of this exhibit.  There is a --
3  originally there was a price listed of 67.80 for
4  Acetylcysteine -- I'm probably mispronouncing
5  that -- the NDC is 49502-0181-04.
6      For this product there is a price there
7  of 67.80 and a line through it, and beneath that
8  handwritten in a price of 56.50.
9      Do you see that?
10     A.  Yes, I do.
11     Q.  That original, sort of printed price
12 that's on there, who would have generated that
13 price on this chart?
14     MS. LORENZO:  Objection to form.
15     A.  That 67.80 is the price that would
16 have been listed at the time that the PLV was
17 printed, the price that was listed in the Red
18 Book database.
19     Q.  And the handwriting -- to the best of
20 your knowledge or understanding, whose
21 handwriting would be on a PLV changing a price?
22     MS. LORENZO:  Objection to form.

Page 100

1      A.  That handwriting would be from the
2  manufacturer, from the person who signed it at
3  the bottom.
4      Q.  And let's take a look at that
5  signature at the bottom.  There's some -- on the
6  bottom left of the first page of this exhibit it
7  says, "Instructions:  Please make corrections
8  directly on this printout."
9      So those instructions, those are from
10 the Red Book staff to the manufacturers?
11     A.  Correct.
12     Q.  And that appears to be what's happened
13 in that second row with respect to the AWP for
14 Acetylcysteine --
15     MS. LORENZO:  Objection.
16     Q.  -- correct?
17     A.  Correct.
18     Q.  And then there's two -- beneath the
19 instructions there's a line that says, you know,
20 "Okay as is" or "Okay with changes."  Although
21 there are changes on this first page, it looks
22 like the "Okay as is" box is checked.

Page 101

1      Do you see that there?
2      A.  Yes.
3      Q.  And then a signature as well.
4      Do you see that?
5      A.  Yes, I do.
6      Q.  And that signature, that would not be
7  a Red Book employee's signature, would it?
8      MS. LORENZO:  Object to form.
9      A.  It should not be.  I do not know that
10 name.
11     Q.  But it should be an employee of the
12 manufacturer; correct?
13     A.  Correct, it should be --
14     MS. LORENZO:  Objection to form.
15     A.  -- a representative of the
16 manufacturer.
17     Q.  Now, Dey -- Dey Labs, to your
18 knowledge, has products listed in the Red Book;
19 isn't that correct?
20     A.  Correct.
21     Q.  And to the extent to which Dey had
22 products listed in the given year, they would

26 (Pages 98 to 101)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 102

1  always receive a product listing verification; is
2  that correct?
3        MS. LORENZO:  Object to the form.
4     A.   Correct.
5     Q.   And you'd expect Dey to correct any
6  mistakes with respect to the pricing information
7  -- their pricing information in the Red Book
8  through the product listing verification process;
9  correct?
10       MS. LORENZO:  Object to form.
11    A.   Correct.  They could also provide any
12 updates to us via e-mail or any other printed
13 communication throughout the year.
14    Q.   To your knowledge, did they ever
15 refuse to engage in the process of verifying
16 their prices through the product listing
17 verification --
18       MS. LORENZO:  Object to form.
19    Q.   -- form?
20    A.   I am not aware of whether they
21 objected or -- participated or not.
22       MR. GOBENA:  I'll have that marked as

Page 103

1  Exhibit 8.
2        (October 2000 product listing
3  verification for Roxane Laboratories marked
4  Exhibit Minne 008 for identification.)
5     Q.   Just take a moment, Miss Minne, just
6  to quickly skim through it.
7        MR. GOBENA:  Just for the people who
8  don't have copies, it's an October 5th, 2000
9  price verification -- price listing verification
10 from Roxane Laboratories.  Actually, my copy has
11 a Roxane Bates number, I know that there's a Red
12 Book Bates number -- I believe it's 14216.
13       MR. GASTWIRTH:  Where do you see the
14 October 5th date?
15       MR. GOBENA:  If you go a little bit
16 further into the document, you'll see October --
17 oh, sorry, there's October -- there's various
18 dates, it's in October 2000.
19       MR. ANDERSON:  October 5th on the --
20       MR. GOBENA:  First.
21       MR. ANDERSON:  -- cover page.
22       MR. GOBENA:  It's an October 17th

Page 104

1  letter, you're right, there's a document signed
2  October 5th, and then there's signatures October
3  11th.
4        MR. ANDERSON:  The second page is dated
5  October 5th, 2000.
6  BY MR. GOBENA:
7     Q.   Miss Minne, having looked at this
8  document, do you recognize it as a product
9  listing verification for Roxane Laboratories?
10       MR. GASTWIRTH:  Objection to form.
11    A.   Yes, I do.
12    Q.   To your knowledge, did Roxane
13 Laboratories ever refuse to provide a product
14 listing verification for its entries in the Red
15 Book?
16       MR. GASTWIRTH:  Objection to form.
17    A.   I do not have knowledge of whether
18 they did or did not.
19    Q.   But every year Red Book would send out
20 product listing verifications, again, to
21 manufacturers, such as Roxane, that published
22 information in the Red Book; correct?

Page 105

1     A.   Correct.
2        MR. GASTWIRTH:  Objection to form.
3     Q.   Take a look at -- let's turn to a
4  particular page here.  If you look at the top
5  right corner there's page 1 of 31, 2, 3 -- the
6  one I'm looking at is page 13 of 31.
7        Go down to the fourth entry on page 13
8  of 31 of this 2000 Roxane product listing
9  verification.  I'm looking at the line NDC
10 00054-8402-21, it's for Ipratropium Bromide.  And
11 do you see the various columns that are somewhat
12 similar to, if not exactly the same as, the
13 columns in the previous exhibit, and we see
14 there's a column there for AWP and there's a
15 price listed there of 105.74?
16       Do you see that?
17    A.   Yes, I do.
18    Q.   I notice here that there is no price
19 listed under DIRP.
20       Is that -- was that unusual, for a
21 manufacturer not to list a price under DIRP?
22       MR. GASTWIRTH:  Objection to form.

27 (Pages 102 to 105)

New York, NY

Page 106

1      A.  No.
2      Q.  Why was it not unusual?
3      A.  Umm --
4          MR. GASTWIRTH:  Objection to form.
5      A.  Many manufacturers do not provide
6  direct pricing.
7      Q.  That's what the DIRP stands for,
8  direct price?
9      A.  Correct.  And they are not required
10  to.
11     Q.  At this time period, October 2000, did
12  Red Book have that electronic version of the
13  database that we were talking about earlier?
14     A.  Yes, they did.
15     Q.  Is it possible that the direct price
16  for this product would have been listed -- if
17  there was any -- in that electronic database?
18         MR. GASTWIRTH:  Objection to form.
19     A.  If there was a direct price in the
20  electronic database, it should be on this list as
21  well.
22     Q.  So the hard copy of the price listing

Page 107

1  verification corresponds with what's both in the
2  hard copy Red Book as well as in the electronic
3  database?
4      A.  Yes.
5      Q.  If you look at the last column to the
6  right, it says, "Effective Date."
7          What does effective date mean?
8      A.  The effective date represents the date
9  that that price went into effect.
10     Q.  So this a document that appears to
11  be dated October of 2000, yet the effective date
12  is December 10th, 1997.  Why would there be a
13  discrepancy between the two dates?
14         MR. GASTWIRTH:  Objection to form.
15     A.  What this means is that this price of
16  105.74 became effective on 12/10 of '97, and we
17  had not received any price changes since that
18  time.
19     Q.  And between December 10th, '97 and
20  this particular price listing verification of
21  October 2000, approximately how many price
22  listing verification -- product listing

Page 108

1  verification would have been sent to Dey asking
2  about that particular price?
3          MS. LORENZO:  Objection, form.
4          MR. GOBENA:  I'm sorry, Roxane.  I
5  apologize.
6          MR. GASTWIRTH:  Objection to form.
7          MR. GOBENA:  That's why you objected?
8  That's how I knew I had the question wrong.
9          MR. CAHILL:  Do you understand the
10  question?
11         THE WITNESS:  Yes.
12     A.  There should have been a PLV for 1998
13  and 1999, and this is the 2001.
14     Q.  So there would have been two PLVs sent
15  to Roxane regarding that price?
16     A.  Correct.
17         MR. GASTWIRTH:  Objection to form.
18     Q.  Before this particular --
19     A.  Correct.
20     Q.  Outside of the --
21         MR. GOBENA:  Sorry.
22     Q.  If we go to the bottom of the page,

Page 109

1  you'll see a signature there.
2          I don't suppose you recognize the
3  signature?
4      A.  No, I don't.
5      Q.  Okay.  But it's fair to say that that
6  signature would not be a Red Book employee's
7  signature; correct?
8          MR. GASTWIRTH:  Objection to form.
9      A.  Correct.
10     Q.  It would be in all likelihood a
11  manufacturer's signature; correct?
12         MR. GASTWIRTH:  Objection to form.
13     A.  Correct, it should be the person at
14  the manufacturer -- manufacturer company that's
15  listed on the page here that we have as the
16  contact person, it should be their signature.
17     Q.  And the contact person here for this
18  Roxane product listing verification is someone
19  identified as Michelle Summers.
20         Do you know Miss Summers by any chance?
21         MR. GASTWIRTH:  Objection to form.
22     A.  No, I don't.

28  (Pages 106 to 109)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 110

1        MR. GOBENA:  I'll have this marked as
2   Exhibit 9.
3        (Price listing verification for Abbott
4   Hospital Products, the first page bearing Bates
5   No. Red Book 01172 marked Exhibit Minne 009 for
6   identification.)
7        Q.  I just want you to take a moment to
8   skim through it, Miss Minne, and I'll describe it
9   for the record.
10       MR. GOBENA:  It's a document with the
11  Bates number Red Book 01172, it's a Red Book
12  price listing verification, and at the top left
13  corner indicates that the company at issue is
14  Abbott Hospital Products, and it's 133 pages
15  long.
16       MR. FARQUHAR:  What's the date, please,
17  Counselor?
18       MR. GOBENA:  Sorry, it's December --
19  there's a date stamp on the top right corner,
20  which may be when it was received, of December
21  17th, 2002.
22       Q.  I mean, you could skim through it, but

Page 111

1   really the pages I'm going to -- I'm going to
2   focus on one page in particular, maybe another
3   one, and that's 106 of 133.
4        MS. CITERA:  I'm just going to put my
5   objection on the record to Mr. Gobena asking
6   questions with respect to my client.  This
7   deposition is not noticed in the Abbott DOJ case
8   and is outside the scope of the Thomson notice.
9        Q.  Let me ask you first, though, before I
10  ask about page 106, you'll notice that some of
11  these pages -- skipping through it, for example,
12  page 106 has a signature and some changes, and
13  some of the pages don't have signatures at the
14  bottom.
15       Do you see that there?
16       A.  Yes, I do.
17       Q.  Have you seen any other product
18  listing verifications from other manufacturers
19  where some pages were signed and other pages were
20  not?
21       A.  Yes, I have.
22       MS. CITERA:  Objection to form.

Page 112

1        Q.  And do you have an understanding as to
2   why certain manufacturers would sign certain
3   pages and not sign certain pages of the price
4   listing verification?
5        MS. CITERA:  Objection to form.
6        A.  Certain manufacturers will only sign
7   -- because of the thickness, the number of pages
8   of this document, they will only sign the ones
9   where they actually make changes on.
10       Q.  On a particular listing?
11       A.  Yeah, if they make a change on the
12  page they'll sign that change, but if they make
13  no changes they won't bother to sign it.
14       Q.  And turning to page 106, which also
15  has the Bates number Red Book 01279, you'll see
16  there are some changes being made there for a
17  couple of listings for Sodium Chloride.
18       Do you see that?
19       A.  Yes, I do.
20       Q.  And the manufacturer here is changing
21  what appears to be the direct price and the WAC.
22       Do you see that there?

Page 113

1        A.  Yes, I do.
2        MS. CITERA:  Objection to form.
3        Q.  Is it true that some manufacturers
4   will change AWP and other prices and some
5   manufacturers will only change WAC and direct
6   prices?
7        MS. CITERA:  Objection to form.
8        A.  Yes.
9        Q.  In an instant here -- instance here
10  where you have a manufacturer changing a direct
11  and a WAC price but not the AWP price, what, if
12  anything, would Red Book do with respect to the
13  AWP listed in this product listing verification,
14  or in the database?
15       MS. CITERA:  Objection, form.
16       MR. CAHILL:  For what period of time?
17       MR. GOBENA:  The time period covered by
18  the deposition.
19       MR. GASTWIRTH:  I'll object to form
20  also.
21       MR. CAHILL:  The only clarification
22  because the AWP policy comes in 2003.

29  (Pages 110 to 113)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 114

1         MR. GOBENA:  Okay, predating -- this
2   document predates the AWP policy.
3         Q.   So predating the AWP policy, if a
4   manufacturer such as here changed only direct
5   price and the WAC in the product listing
6   verification, what, if anything, would Red Book
7   do to the AWP listed for that product?
8         MR. GASTWIRTH:  Objection.
9         MS. CITERA:  Objection to form.
10        A.   Red Book would have updated the direct
11  price and the WAC price but would not have
12  altered the AWP price.
13        MR. SWEENEY:  I'm sorry, I missed the
14  end of that.  Can you read it back, please?
15        (Record read)
16        Q.   And that's your understanding of what
17  happened prior -- Red Book would do prior to the
18  implementation of the AWP policy in early 2003?
19        A.   Correct.
20        MS. CITERA:  Objection to form.
21        Q.   Based on this document, you'll agree
22  with me that Abbott Hospital Products did review

Page 115

1   the pricing listing verification and make changes
2   where appropriate, wouldn't you?
3         MS. CITERA:  Objection to form.
4         A.   Yes, I would agree with that.
5         Q.   Do you have any recollection or
6   understanding of Abbott Hospital Products not
7   complying with Red Book's policy of seeking
8   product listing verifications from manufacturers
9   who list in the Red Book?
10        A.   I do not have --
11        MS. CITERA:  Objection to form.
12        A.   -- recollection of whether...
13        Q.   You have no reason to believe that
14  they didn't comply, though?
15        A.   Right --
16        MS. CITERA:  Objection, form.
17        A.   -- I don't know whether they did or
18  not.
19        Q.   I'm going to shift gears here and go
20  back to the Red Books themselves and have marked
21  as Exhibit 10 what actually ended up being
22  excerpts of the 2001 and 2002 Red Book, but I'm

Page 116

1   only going to ask you about the 2001 Red Book, so
2   once the court reporter's able to mark that, I'll
3   have you take a look at it.
4         (Excerpts from 2001 and 2002 Red Books
5   marked Exhibit Minne 010 for identification.)
6         MR. GASTWIRTH:  I'm sorry, what exhibit
7   number is this?
8         MR. GOBENA:  Ten.
9         MR. GASTWIRTH:  And I'll just note an
10  objection on the record that this document does
11  not appear to be produced because there's no
12  Bates label on this document.
13        MR. GOBENA:  Are you going to represent
14  that Roxane does not possess copies of the Red
15  Book?
16        MR. GASTWIRTH:  I stated my objection
17  on the record.
18        MR. SWEENEY:  Did this come from the
19  government's files again?
20        MR. GOBENA:  It might have, yes.
21        MR. SWEENEY:  It might have?
22        MR. GOBENA:  I'm not going to enter

Page 117

1   into a colloquy with you about this.  If you want
2   to talk about it off the record, fine, but I
3   don't want to waste deposition time on this.
4         MR. SWEENEY:  I want to know the Red
5   Book -- what the source of the document is.  And
6   if you won't tell me, I'll object.
7         MR. GOBENA:  Then object.
8   BY MR. GOBENA:
9         Q.   Actually, I mean, I don't want you to
10  look at the whole document, I'm only going to ask
11  you about the forward on the third page of the
12  exhibit.
13        MR. GASTWIRTH:  And I'll just object on
14  the record that this document appears to be
15  components of two -- 2002 drug topics from Red
16  Book with just portions of these Red Books
17  attached here, and I have no idea who compiled
18  this document, pulled these pages, I don't know
19  if the government did this, we're missing a lot
20  of pages.
21        MR. GOBENA:  This is definitely a
22  forward, though, from the 2001 copy.  We verified

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Page 118

1    that, and that's what I'm going to be asking
2    about, so...
3        Q.   Whenever you've had a chance to read
4    the forward, let me know.
5        (Pause)
6        A.   I'm ready.
7        Q.   First I wanted to find out whether or
8    not you've had a chance to review the 2001 Red
9    Book prior to -- prior to your deposition today.
10       A.   I did yesterday.
11       Q.   And was yesterday the first time you
12   looked at the 2001 Red Book?
13       A.   Yes.
14       Q.   And did you have a chance to read the
15   whole thing or parts of it?
16       A.   I read the forward.
17       Q.   So you're, at least as of yesterday,
18   familiar with the forward?
19       A.   Yes.
20       Q.   Why don't we go through it, and why
21   don't we see if you have any historical knowledge
22   of any of the information contained herein.

Page 119

1        Let me -- I'm going to -- well, I'll
2    read the first paragraph anyways.
3        "Dear Reader:  We take considerable
4    pride in presenting this edition of Red Book.  It
5    marks the 105th year of publication for this
6    trusted annual companion for pharmacists and
7    other decision makers involved in the provision
8    of pharmaceuticals and pharmaceutical care.
9        "Through the decades, the Red Book team
10   of writer, editors, data specialists, researchers
11   and designers has worked hard to produce a
12   valuable reference tool that would meet the many
13   needs of healthcare professionals in the service
14   of their patients.  Therefore, we were concerned
15   when the average wholesale price designation --
16   one of several pieces of data that Red Book
17   collects from manufacturers -- came under fire at
18   federal and state levels this past year."
19       Let me ask you first, do you have any
20   knowledge or understanding of what was being
21   referred to there in that last sentence I just
22   read?

Page 120

1        MR. GASTWIRTH:  Objection to form, the
2    document speaks for itself.
3        MR. CAHILL:  And I was just going to
4    add, outside of communications with counsel.
5        MR. GOBENA:  Okay, fair enough.
6        A.   Not outside of communication with
7    counsel.
8        Q.   But the statement that, you know --
9    the middle part of that statement that reads,
10   "the average wholesale price designation -- one
11   of several pieces of data that Red Book collects
12   from manufacturers" dash, that excerpt, that's
13   accurate?  That is, Red Book has data that's
14   collected -- I'm sorry, the AWP is data that's
15   collected from the manufacturers; correct?
16       MR. GASTWIRTH:  Objection to form.
17       MR. SWEENEY:  Objection to form.
18       A.   Correct.
19       Q.   The next paragraph reads, "Based on
20   charges that some manufacturers were inflating
21   their wholesale prices to gain a competitive
22   advantage, the Health Care Financing

Page 121

1    Administration was prepared to implement new AWPs
2    derived by the Department of Justice for some
3    outpatient drugs covered by Medicare."
4        Are you aware of the charges being
5    referred to in this paragraph?
6        MR. GASTWIRTH:  Objection to form.
7        Q.   Again, outside of counsel --
8    discussions with counsel.
9        A.   I am not.
10       Q.   It goes on to read, "That plan was
11   shelved indefinitely when it became clear that
12   Congress, responding to protests from pharmacy,
13   medical and patient groups, was not going to
14   reduce the current formula.  However, some states
15   have recalculated AWPs for certain drugs under
16   Medicaid following a survey of wholesale prices."
17       Are you aware of any of the factual
18   events that are stated here in this paragraph?
19       MR. GASTWIRTH:  Objection to form.
20       A.   I am not.
21       Q.   Is there anyone who's currently at
22   Thomson that you think would have had some --

31 (Pages 118 to 121)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 122

1  some knowledge of what was being referred to in
2  these paragraphs?
3        MR. GASTWIRTH:  Objection to form.
4        MR. CAHILL:  Objection to form.
5     A.  No one -- this was still done out of
6  the Montvale office, and I am not aware of who
7  was still in the Montvale Thomson office that
8  would have -- that may have had knowledge of
9  this.  I am not aware of anyone.
10    Q.  At the bottom it looks like the
11 forward was being -- not necessarily signed, but
12 there's a name there at the bottom left that says
13 "Valentine Cardinale," with an E at the end,
14 "editor."
15       Is Miss Cardinale still employed by
16 Thomson?
17    A.  I do not have knowledge.  I do not
18 recognize that name.  I have no history with that
19 person.
20    Q.  Let's read the next paragraph and see
21 if you have any knowledge about what's contained
22 therein.

Page 123

1        It starts, "As noted in the 'Rx product
2  listing section,' all prices are current as of
3  the date Red Book went to press and are based on
4  data obtained from manufacturers, distributors
5  and other suppliers."  Stop there.
6        Based on your knowledge, is that a
7  correct description of how Red Book was
8  collecting the pricing data in this -- in or
9  around 2001?
10       MR. GASTWIRTH:  Objection to form.
11    A.  Yes.  Again, going back to my previous
12 definition of what a distributor and supplier
13 was; as long as they were packaging the product.
14    Q.  Okay.
15       The next sentence reads, "While we
16 cannot vouch for the accuracy of all pricing
17 information, great care has been exercised in
18 compiling the data."
19       Let me stop there.
20       Is that an accurate statement of the
21 effort that Red Book went through to compile data
22 -- Red Book staff went through to compile data in

Page 124

1  the Red Book itself?
2        MR. GASTWIRTH:  Objection to form.
3     A.  Are you asking about -- I guess I
4  don't understand.
5     Q.  Let me change it, that was an awkward
6  question.
7        It says in the sentence basically great
8  care is exercised in compiling the data that's in
9  the Red Book.
10       Do you see that?
11    A.  Yes.
12    Q.  Do you agree that great care was
13 exercised in compiling the data?
14    A.  Yes.
15    Q.  And what great care was exercised in
16 making sure that the data was as accurate as Red
17 Book's staff could possibly get it to be?
18       MR. GASTWIRTH:  Objection to form.
19    A.  My belief is what they're referring to
20 is the process they had as far as entering the
21 content and then -- the pricing information and
22 dates and then that being verified or double

Page 125

1  checked, if you want to call it that, by another
2  staff person.
3     Q.  Is that also a reference to the
4  product listing verification process that we were
5  talking about a little bit earlier?
6        MR. GASTWIRTH:  Objection.
7     A.  All prices were double checked --
8  entered by one person and double checked by
9  another.
10    Q.  What do you mean by "double checked"?
11 I just want to make sure we're clear on that.
12    A.  One person would enter the information
13 into the system, and then hand it off to someone
14 else, who would then just verify that the correct
15 price and date were entered, as listed on the PLV
16 or whatever communication we received from the
17 manufacturer.
18    Q.  Part of that double checking process
19 was going back to the manufacturer and double
20 checking that the AWP listed for their product
21 was accurate?
22       MR. GASTWIRTH:  Objection to form.

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 126

1     A.  No, the double checking was just that
2  it was entered as it was given to the staff.
3     Q.  By the manufacturers?
4     A.  By the manufacturer.
5     Q.  The next sentence reads, "We continue
6  to regard AWP as one guideline in the Rx pricing
7  mix and to encourage the provision and
8  dissemination of fair, accurate prices by all
9  suppliers."
10        What is -- who are the suppliers that
11  are being referenced in that sentence, to the
12  best of your knowledge?
13        MR. CAHILL:  If you know.
14     Q.  If you know.
15     A.  I would assume, again, suppliers
16  meaning the people who are supplying the
17  information.
18     Q.  And that being the --
19     A.  Being a manufacturer or a repackager.
20     Q.  So the statement here, then, by Miss
21  Cardinale is that she's encouraging manufacturers
22  to disseminate fair and accurate prices; is that

Page 127

1  a fair sort of summary of what she's saying
2  there?
3        MR. GASTWIRTH:  Objection to form. The
4  document speaks for itself.
5     A.  It's an assumption I would make.
6        MR. GOBENA:  Why don't we go off the
7  record here for a second.
8        THE VIDEOGRAPHER:  This is the
9  videographer.
10        Off the record, 11:03.
11        (Recess taken)
12        THE VIDEOGRAPHER:  This is the
13  videographer.
14        The time is 11:12.  We're back on the
15  record.
16        MR. GOBENA:  I realize that there are a
17  variety of people here who want to ask questions
18  of this witness and we only have one day
19  identified in the notice.  I don't know whether
20  people are going to be seeking an additional day
21  down the road, but for the sake of efficiency
22  what I'm going to do at this point is pass the

Page 128

1  witness to my colleague, Jarrett Anderson, who's
2  going to ask some questions.
3        Our goal on the plaintiff side is to
4  ask questions as quickly as possible, to reserve
5  some time at the end of the day for defendants to
6  be able to ask questions.  And if it's not
7  enough, we'll have to take it up.
8        I do have a conflict tomorrow, I don't
9  know about other counsel here, what their
10  situation is, but we can work that out later on.
11  Our goal is to try and move this as quickly as
12  possible. For that purpose I'll pass the witness
13  now to my colleague.
14        We are hopeful that we can get this
15  entire deposition finished today.
16        MR. SWEENEY:  And we agree with that,
17  but a number of defendants do have questions, and
18  plaintiffs' counsel originally saying they were
19  going to go until three or four o'clock, which
20  would put us in a bind, that's why we discussed
21  tomorrow.
22        And so you're done for the moment, in

Page 129

1  other words?
2        MR. GOBENA:  I'm reserving the right to
3  ask questions later on, but for right now I'm
4  done.
5        MR. SWEENEY:  Okay.
6        MR. ANDERSON:  And we're all going to
7  try to move quickly, and hopefully we will finish
8  this today and y'all will have plenty of time to
9  ask your questions.
10        EXAMINATION
11  BY MR. ANDERSON:
12     Q.  Good morning, ma'am.
13     A.  Good morning.
14     Q.  How are you?
15     A.  Fine.
16     Q.  My name's Jarrett Anderson, I
17  represent a plaintiff in this case, Ven-A-Care of
18  the Florida Keys.
19        I understand from your testimony this
20  morning that over the years Red Book has taken
21  steps to verify the prices that it publishes for
22  drugs; correct?

33 (Pages 126 to 129)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 130

1       MR. GASTWIRTH:  Objection to form.
2    A.  Correct.
3    Q.  And that primary mechanism for price
4  verification is through what's known as a PLV,
5  price listing verification form; correct?
6       MR. GASTWIRTH:  Objection to form.
7    A.  Correct.
8    Q.  And those were forms that were
9  presented annually by Red Book staff and
10  transmitted to drug manufacturers --
11       MR. GASTWIRTH:  Objection to form.
12    Q.  -- correct?
13    A.  Correct.
14    Q.  Was that historically, I'm assuming,
15  back in the '90 -- early '90s, for which is part
16  of the time period that you're here today as the
17  corporate representative, I take it those were
18  transmitted by mail; correct?
19    A.  I'm assuming.  I know that today they
20  are still transmitted by hard copy mail.
21    Q.  All right.  Well, you kind of
22  anticipated my next question.

Page 131

1       Are they only transmitted by mail or
2  are they also transmitted electronically?
3    A.  They are printed in our Denver office
4  and transmitted by hard copy mail, U.S. mail.
5    Q.  And Red Book in turn expects to
6  receive hard copies back?
7    A.  Correct.
8       MR. GASTWIRTH:  Objection to form.
9    Q.  Why is it that Red Book desires to
10  receive hard copies of the completed verification
11  forms from drug manufacturers?
12       MR. GASTWIRTH:  Objection to form.
13    A.  They would like the -- that the bottom
14  of the PLV is signed by a representative of the
15  company.
16    Q.  Does Red Book rely upon the
17  manufacturer's signature of the verification
18  forms in Red Book's publication of pricing
19  information?
20       MR. GASTWIRTH:  Objection to form.
21    A.  I don't understand your question.
22    Q.  I'll rephrase.

Page 132

1    A.  Okay.
2    Q.  Does Red Book rely upon the
3  verifications signified by the signatures by drug
4  manufacturers in publishing drug pricing
5  information?
6       MR. GASTWIRTH:  Objection to form.
7       MR. CAHILL:  Objection to form.
8    A.  Yes.
9       (Document bearing Bates Nos. TH 0598
10  through 0601 marked Exhibit Minne 011 for
11  identification.)
12    Q.  Miss Minne, if you could take a look
13  at what's been marked as deposition Exhibit 11.
14       MR. GASTWIRTH:  We're on 12.
15       MR. ANDERSON:  The next sticker in line
16  was 11.
17       MS. ROSENSTOCK:  It's 11.
18       MR. GASTWIRTH:  It's 11?  Sorry about
19  that.
20       MR. ANDERSON:  That's okay.
21       (Pause)
22  BY MR. ANDERSON:

Page 133

1    Q.  Do you recognize this type of
2  document?
3    A.  Only since yesterday.
4       MR. FARQUHAR:  Mr. Anderson, I'm sorry,
5  for the rest of us, could you please describe
6  what the document is?
7       MR. ANDERSON:  Sure, it's a four-page
8  document, Bates labeled TH 0598 through 0601, it
9  appears to be a description of general
10  information concerning Red Book and Red Book
11  circulation.
12       MR. FARQUHAR:  Does it have a date?
13       MR. ANDERSON:  It appears it's back
14  from the early '90s -- I mean, pardon me,
15  mid-'90s.
16       MR. FARQUHAR:  Thank you.
17  BY MR. ANDERSON:
18    Q.  What is this document?
19    A.  It appears to be some type of
20  marketing information.
21    Q.  Marketing information that Red Book
22  would provide to potential subscribers or

Henderson Legal Services, Inc.

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 134

1  existing subscribers?
2          MR. GASTWIRTH:  Objection to form.
3      A.  Probably to advertisers.
4      Q.  To -- oh, I see, okay.  Because -- is
5  it true that Red Book, in addition to selling
6  information, such as the electronic or printed
7  publications of information, also placed
8  advertisements in those publications?
9      A.  Yes, that is correct.
10     Q.  And in turn sold those -- that space
11  for those advertisements to advertisers; correct?
12     A.  That is my understanding.
13     Q.  Including drug manufacturers?
14         MR. GASTWIRTH:  Objection to form.
15     A.  That is my understanding.
16     Q.  And so Exhibit 11 appears to you to be
17  some marketing materials that Red Book would have
18  provided to potential advertisers; is that right?
19         MS. CITERA:  Objection to form.
20     A.  That is what it appears to be.
21     Q.  All right, now, focusing your
22  attention on the third page of Exhibit 11, I see

Page 135

1  toward the upper portion of the document there's
2  some circulation statistics by classification;
3  correct?
4      A.  Correct.
5      Q.  And the number of independent
6  drugstores is listed as over 34,000; is that
7  right?
8      A.  That's what's listed.
9      Q.  Is that consistent with your
10  understanding as the corporate representative of
11  Red Book that independent drugstores, somewhere
12  in the range of 34,000 stores, received Red Book?
13         MR. GASTWIRTH:  Objection to form.
14     A.  I can't verify that number of 34,000,
15  but it is my understanding that that's who they
16  are advertising to or marketing, yes.
17     Q.  And you have no reason to distrust or
18  otherwise question the accuracy of the
19  circulation numbers that are set forth in Exhibit
20  11, do you?
21         MR. GASTWIRTH:  Objection to form.
22     A.  I do not know where these numbers came

Page 136

1  from, so I cannot verify whether they are
2  accurate or not.
3      Q.  Well, I'm not asking you to verify
4  them, I'm asking you do you have any reason to
5  question the accuracy of the data?
6      A.  I have no reason to question the
7  accuracy --
8          MS. CITERA:  Objection to form.
9      A.  -- of these circulation numbers.
10     Q.  Is it true that over the years many
11  independent drugstores have subscribed to Red
12  Book?
13     A.  That is true.
14     Q.  Is it true that over the years many
15  chain drugstores have subscribed to Red Book?
16     A.  That is true.
17     Q.  I also notice that you have, in
18  Exhibit 11, a reference to 2300 manufacturers
19  receiving Red Book.
20         Is that what's shown in Exhibit 11?
21     A.  Yes, it is.
22     Q.  Is that generally consistent with your

Page 137

1  understanding as the corporate representative of
2  Red Book?
3          MR. GASTWIRTH:  Objection to form.
4      A.  Yes, it is.
5          MR. CAHILL:  For this period of time,
6  though.
7          THE WITNESS:  For this period of time.
8          MR. CAHILL:  In other words, the
9  circulation numbers are tied back into the period
10  of time of Exhibit 11.
11         MR. ANDERSON:  I appreciate that.
12     Q.  Which appears to be sometime in '94 or
13  '95?
14     A.  Correct.
15     Q.  Likewise, there's government agencies
16  listed as classification of subscribers; correct?
17     A.  Correct.
18     Q.  And it appears that over 1300
19  government agencies are subscribing to Red Book
20  information; is that true?
21         MR. GASTWIRTH:  Objection to form.
22     A.  That's what it states.

35  (Pages 134 to 137)

New York, NY

Page 138

1     Q.   And isn't it true that for all of
2  these different classifications of subscribers,
3  whether they be independent drugstores or chain
4  drugstores or manufacturers or government
5  agencies, they would be receiving the pricing
6  information that Red Book supplied in addition to
7  the other NDC-related information?
8         MR. GASTWIRTH:  Objection to form.
9     A.   Correct.
10    Q.   Including AWP information; correct?
11        MR. GASTWIRTH:  Objection to form.
12    A.   If AWP is listed, yes.
13    Q.   And now, if you could, I'd like you to
14 take a look at what's going to be marked as
15 Exhibit 12.
16        (Document bearing Bates Nos. TH 0256
17 through 0262 marked Exhibit Minne 012 for
18 identification.)
19        MR. ANDERSON:  For the record, Exhibit
20 12 is Bates labeled TH 0256 through 0262.  It's
21 titled "1994 Red Book, Pharmacy's Fundamental
22 Resource."

Page 139

1     Q.   Does this type of document look
2  familiar to you, Miss Minne?
3     A.   I saw this type of document only as of
4  yesterday.
5     Q.   And what is it?
6     A.   This appears, again, to be some type
7  of marketing information.
8     Q.   Marketing information that would have
9  been provided to potential subscribers or
10 potential advertisers or both?
11    A.   This is --
12        MR. GASTWIRTH:  Objection to form.
13    A.   -- would be to potential subscribers
14 of the product.
15    Q.   So a slightly different focus on this
16 marketing material than what we saw in Exhibit
17 11?
18        MR. GASTWIRTH:  Objection to form, and
19 I'll object to the leading nature of your
20 questions to this witness.
21    Q.   Is that correct?
22    A.   That is what it would appear -- that

Page 140

1  is what it appears, yes.
2     Q.   Now, if you could, I'd like you to
3  focus on the third page of Exhibit 12, and I had
4  it folded there for you.
5     A.   Thank you.
6     Q.   It's -- toward the bottom of the page,
7  I'm focusing on the section that's titled "Get
8  the maximum return on third-party claims."
9         Do you see that?
10    A.   Yes, I do.
11    Q.   Reading for the record, "The Red Book
12 Update average wholesale price has become the
13 standard for many large insurance companies,
14 state and local governments and drug benefit
15 plans.  Pharmacists everywhere use the update to
16 find the latest drug price changes before they
17 file a reimbursement claim, thus maximizing the
18 return on third-party payments."
19        Did I read that correctly?
20    A.   Yes, you did.
21    Q.   As the Red Book corporate
22 representative, is that information accurate?

Page 141

1         MR. GASTWIRTH:  Objection to form.
2     A.   At the time it would have been
3  accurate.
4     Q.   And again, this is dated 1994;
5  correct?
6     A.   Correct.
7     Q.   To the extent a drug manufacturer
8  would verify or otherwise report AWPs that were
9  higher than competitive products' AWPs, would
10 that provide a reimbursement maximization
11 potential for customers?
12        MR. GASTWIRTH:  Objection to form, and
13 may I hear the question back, please.
14        MR. CAHILL:  Objection to form as well.
15        MR. ANDERSON:  I'll rephrase it.
16    Q.   Miss Minne, do you understand that
17 subscribers to Red Book, such as pharmacies,
18 could maximize reimbursement by dispensing one
19 generic that had an AWP much higher than a
20 competitive product's AWP?
21        MR. GASTWIRTH:  Objection to form.
22        MS. KAPLAN:  Objection to form.

36  (Pages 138 to 141)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 142

1    A.  I -- I have no knowledge of how
2  pharmacies dispense their products.
3    Q.  What is your understanding of the
4  statement provided by Red Book in Exhibit 12
5  concerning maximization of reimbursement?
6    MR. GASTWIRTH:  Objection to form.
7    A.  My understanding is they are talking
8  about the Red Book Update, which is a monthly
9  supplement to the annual published book, and the
10  way I interpret what they're saying is that by
11  getting the update they will see that prices have
12  changed throughout the year, so that when they
13  submit a claim, they can use the most current
14  price, which may have well been what they paid
15  for it as well.
16    Q.  All right.  And accordingly, for
17  instance, if the Red Book Update for a given
18  month happens to reflect an AWP increase taken by
19  a manufacturer, would that provide a mechanism in
20  Red Book's understanding for a pharmacy to
21  maximize reimbursement?
22    MR. GASTWIRTH:  Objection to form,

Page 143

1  calls for speculation.
2    MR. CAHILL:  If you understand.
3    A.  Again, how a pharmacy would submit
4  their claim and what price they would use to
5  submit that claim is not within the control of
6  Red Book.
7    Q.  I recognize it's not within your
8  control.  I'm asking is that within the
9  understanding of Red Book as to how a pharmacy
10  could maximize reimbursement.
11    MR. GASTWIRTH:  Objection to form,
12  calls for speculation.
13    A.  Yes.
14    (Document bearing Bates No. RGX 0189707
15  marked Exhibit Minne 013 for identification.)
16    Q.  Miss Minne, if you could take a look
17  at what's been marked as Exhibit 13.
18    MR. ANDERSON:  I apologize, I'm a
19  little short on extra copies of this one.
20    Q.  It's a one-page document, Bates
21  labeled RGX 0189707.
22    Do you recognize this type of document,

Page 144

1  ma'am?
2    MS. KAPLAN:  Could you describe it
3  again?
4    MR. ANDERSON:  Yeah, it's a single-page
5  exhibit, Bates labeled RGX 0189707, it's a Red
6  Book form letter dated July 16th, 1999 to "Dear
7  Pharmaceutical Manufacturer."
8    MS. KAPLAN:  Thank you.
9    MR. SWEENEY:  What are the Bates
10  numbers on this?  Where did this come from?
11    MR. ANDERSON:  Ropes & Gray for
12  Schering Warrick and Schering Plough.
13    MR. GASTWIRTH:  Can we just -- off the
14  record?  Could we just get a couple copies of
15  this document?
16    MR. ANDERSON:  Sure.  You want to go
17  off the record now and --
18    MR. GASTWIRTH:  Yeah, that might be --
19    THE VIDEOGRAPHER:  Off the record at
20  11:29.
21    (Pause)
22    THE VIDEOGRAPHER:  This is the

Page 145

1  videographer.
2    Back on the record at 11:31.
3    MR. ANDERSON:  Everyone has copies now.
4  BY MR. ANDERSON:
5    Q.  Miss Minne, have you had a chance to
6  review Exhibit 13?
7    A.  Yes, I have.
8    Q.  Are you familiar with this type of
9  document?
10    A.  Yes, I am.
11    Q.  What is it?
12    A.  It is a cover letter to the PLV that
13  is sent out annually.
14    Q.  And I appreciate your acronym for the
15  PLV, and that's what's known as the product
16  listing verification forms; correct?
17    A.  Correct.
18    Q.  For ease of reference, I may refer to
19  them as the verification forms.
20    Is that okay?
21    A.  Yes.
22    Q.  So this is a standard letter that

37 (Pages 142 to 145)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 146

1  would have gone out to pharmaceutical companies
2  with the printed verification forms annually from
3  Red Book; correct?
4      MR. GASTWIRTH:  Objection to form.
5      A.  Correct.
6      Q.  And why did Red Book send cover
7  letters such as Exhibit 13 to manufacturers?
8      MR. GASTWIRTH:  Objection to form.
9      A.  It provided some direction on what was
10 in the packet that was, you know, being sent, and
11 also on how to complete the information.
12     Q.  And was this type of letter one
13 mechanism by which Red Book was trying to ensure
14 the accuracy of the published pricing
15 information?
16     MR. GASTWIRTH:  Objection to form.
17     A.  It was a --
18     MR. ANDERSON:  What's the basis for the
19 objection?
20     MR. GASTWIRTH:  Can I hear the question
21 back, please.
22     MR. ANDERSON:  Well, you should know

Page 147

1  the basis without hearing the question.
2      MR. GASTWIRTH:  I want to base my
3  objection --
4      MR. ANDERSON:  I think, frankly, you're
5  just doing knee jerk objections without any
6  foundation.
7      MR. GASTWIRTH:  That is not correct,
8  Counsel.
9      MR. ANDERSON:  Well, provide the basis.
10     MR. GASTWIRTH:  You asked me to provide
11 a basis, I'm asking to hear the question.
12     MR. ANDERSON:  Well, fire away.
13     MS. TORGERSON:  Let's read it back.
14     (Record read)
15     MR. GASTWIRTH:  And I'll object because
16 the witness has not established in her prior
17 testimony that Red Book has attempted to
18 establish accurate pricing through any
19 communications that they sent out to anybody.
20     MS. TORGERSON:  And in addition to
21 that, the term that you're using, "accurate" is
22 vague and ambiguous.

Page 148

1      Accurate as to what?
2      MR. FARQUHAR:  And it's a leading
3  question.
4      MR. ANDERSON:  I would ask that if
5  someone's going to pose an objection, they need
6  to have the basis set forth, and they need to be
7  ready to explain that objection.  And, frankly,
8  even after you had the question read back, the
9  basis for your objection is not valid.
10     MR. GASTWIRTH:  The federal rules --
11     MS. TORGERSON:  Jarrett, you're not the
12 judge, okay.  Let's stop this, we're wasting the
13 witness' time.  You're not the judge, we will
14 object as proper under the federal rules.
15     MR. ANDERSON:  As long as they are
16 well-founded.
17     MS. TORGERSON:  We will make the
18 objections we will make.  You are not the judge.
19     Please continue with your questions.
20     MR. ANDERSON:  I'd like my question
21 answered, as a matter of fact.
22     MR. GASTWIRTH:  And I'll note my

Page 149

1  objection.
2      MR. CAHILL:  We'll have the question
3  read back.
4      MR. GASTWIRTH:  Again.
5      (Record read)
6      A.  Yes, it was a mechanism by which we
7  were trying to get the most current prices from
8  the manufacturer.
9      Q.  And looking in the first sentence
10 that's in bold and offset, Red Book writes, "Dear
11 Pharmaceutical Manufacturer:  Help us update your
12 free product listings in the 2000 Red Book to
13 ensure they are as comprehensive and accurate as
14 possible."
15     Did I read that correctly?
16     A.  Yes, you did.
17     Q.  What type of accuracy was Red Book
18 seeking?
19     MR. GASTWIRTH:  Objection to form.
20     A.  Accuracy that the NDCs are correct,
21 the product name is correct, the prices are
22 listed as the manufacturer wanted us to, the

38  (Pages 146 to 149)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 150

1  effective date was -- was as the manufacturer
2  wanted us to list it as well.
3      Q.  So as to pricing, the accuracy was
4  completely dependent on the drug manufacturer;
5  correct?
6          MR. GASTWIRTH:  Objection to form.
7          MR. SWEENEY:  Objection to form.
8      A.  Yes.
9      Q.  Looking down toward the middle of the
10  document, there's a paragraph that begins with
11  the word "complete."  And I'll read for the
12  benefit of the record -- are you with me?
13      A.  Yes, I am.
14      Q.  Okay, thank you.
15          "Complete and up-to-date WAC (wholesale
16  acquisition cost) pricing is also requested for
17  our electronic database."
18          Did I read that correctly?
19      A.  Yes, you did.
20      Q.  Is it true that over the years Red
21  Book has published WAC pricing in its electronic
22  database?

Page 151

1      A.  Yes, it has.
2      Q.  And that, again, was pricing that was
3  derived from manufacturers; correct?
4      A.  That was received --
5          MR. GASTWIRTH:  Objection to form.
6      A.  -- from manufacturers, correct.
7      Q.  And annually verified by drug
8  manufacturers; correct?
9          MR. GASTWIRTH:  Objection to form.
10      A.  Correct.
11          MR. ANDERSON:  Ma'am, I appreciate your
12  answers, but if you could just hesitate a split
13  second because there are objections being lodged
14  and that way your answer's not drowned out by the
15  objection, okay.
16          THE WITNESS:  Okay.
17      Q.  Your last answer was yes; correct?
18      A.  My last answer was correct, yes.
19          Yes, you are correct, my last answer
20  was yes.
21          MR. ANDERSON:  All right.  We could do
22  a Laurel and Hardy routine...

Page 152

1      Q.  And then the closing sentence in this
2  form letter from Red Book to drug companies says,
3  "Thank you for your assistance and we look
4  forward to continuing a successful partnership in
5  maintaining the most up-to-date and accurate
6  listing for your company in the Red Book."
7          Did I read that correctly?
8      A.  Yes, you did.
9      Q.  And is that a true statement as to Red
10  Book's efforts over the years to maintain
11  accurate pricing?
12          MR. GASTWIRTH:  Objection to form. The
13  document speaks for itself.
14      A.  Accurate as far as -- that's what the
15  manufacturer wants us to list.
16      Q.  And to your knowledge, as the Red Book
17  representative, this type of form letter would
18  have gone out to all drug companies having their
19  NDC numbers published by Red Book from 1990 to
20  the present; correct?
21          MR. GASTWIRTH:  Objection.
22      A.  Correct.

Page 153

1          (Document bearing Bates Nos. RGX
2  0189708 through 0189712 marked Exhibit Minne 014
3  for identification.)
4      Q.  Now, if you could, Miss Minne, take a
5  look at what's been marked as Exhibit 14.
6          MS. CITERA:  Jarrett, could you just
7  describe it?
8          MR. ANDERSON:  Well, I've given my copy
9  to defense counsel for the moment.
10          It's a -- I think it's five pages,
11  Bates labeled RGX 0189708 through 712. It appears
12  to be a document titled "Manufacturer Directory
13  Information Form," and then the next pages are
14  some instructions.
15          MS. TORGERSON:  Can we take a break and
16  get a copy?
17          MR. ANDERSON:  Why don't we --
18          MS. TORGERSON:  Is now a good time to
19  break for lunch and make copies?
20          MR. SWEENEY:  Let's just make copies of
21  everything you've got so we won't have to do it
22  every time.

39 (Pages 150 to 153)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 154

1        MR. ANDERSON:  Let's take a lunch break
2   and we'll try to make copies of everything.
3        THE VIDEOGRAPHER:  This is the
4   videographer.
5        Off the record at 11:39.  End of tape
6   two.
7        (Luncheon recess:  11:39 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 155

1        AFTERNOON SESSION
2        12:49 p.m.
3        THE VIDEOGRAPHER:  This begins tape
4   number three at 12:49.  We're back on the record
5   at this time.
6     K R I S T E N   M I N N E, having been
7   previously duly sworn, was examined and testified
8   further as follows:
9        EXAMINATION (Continued)
10  BY MR. ANDERSON:
11     Q.   Welcome back from lunch, Miss Minne.
12        Have you had a chance to review Exhibit
13  14?
14     A.   Yes, I have.
15     Q.   And are you familiar with this type of
16  document?
17     A.   Yes, I am.
18     Q.   What is it?
19     A.   It is again some information that is
20  sent out with a PLV.
21     Q.   And the PLVs are the verification
22  forms that Red Book would send to direct

Page 156

1   companies; correct?
2     A.   Correct.
3     Q.   All right.  And looking at the third
4   page of Exhibit 14, it appears that there are
5   some instructions set forth; is that correct?
6     A.   Correct.
7     Q.   And Mr. Gobena with the Department of
8   Justice walked you through one of the PLVs
9   earlier, and this is a document that basically
10  provides information about how manufacturers
11  should complete or verify the PLVs; correct?
12     A.   Correct.
13     Q.   Looking at the middle of the page,
14  there's a kind of depiction of a screenshot or a
15  page of a PLV, and I'm focusing your attention,
16  ma'am, on the field that's titled "AWP."
17        Do you see it?
18     A.   Yes, I do.
19     Q.   And then there's a parenthetical there
20  that says "required."  What is meant by that?
21     A.   At this time -- this was from 2000.
22  At the time the database where these prices were

Page 157

1   entered required an AWP price.
2     Q.   Why did Red Book require manufacturers
3   to report AWPs?
4        MR. LONERGAN:  Object to the form.
5        MS. CITERA:  Object to the form.
6     A.   I do not know why the database was set
7   up that way.
8     Q.   To your knowledge, did drug
9   manufacturers report AWP?
10        MR. LONERGAN:  Objection to form.
11        MR. SWEENEY:  Objection to form.
12        MS. CITERA:  Objection to form.
13     A.   To the best of my knowledge, they did.
14     Q.   And when you say "my knowledge," you
15  mean --
16     A.   My historical knowledge.
17     Q.   As Red Book's corporate
18  representative?
19        MS. TORGERSON:  Objection, form.
20     A.   Of the year 2000.
21     Q.   Only for that year, or as best you can
22  testify for the time period for which you've been

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 158

1 noticed as the corporate representative?
2      MS. TORGERSON: Objection to form.
3      MR. SWEENEY: Object to the form.
4      Only for that time period what?
5      MR. ANDERSON: It's from 1990 to the
6 present.
7      A.  For the time period prior to 2002,
8 when I was not involved with the Red Book data.
9      Q.  I see.  So prior to 2002 -- for the
10 time period prior to 2002 you are testifying on
11 behalf of Red Book; correct?
12      A.  Correct.
13      Q.  All right.  And you do understand that
14 prior to 2002 drug manufacturers were reporting
15 AWP information to Red Book?
16      MS. TORGERSON: Objection.
17      MR. SWEENEY: Object to the form.
18      A.  That is my understanding.
19      Q.  And in turn that reported AWP
20 information was being published by Red Book?
21      MS. TORGERSON: Object to the form.
22      MR. SWEENEY: Object to the form.

Page 159

1      A.  Correct.
2      Q.  Now, there's been some mention today
3 of what's known as an AWP policy that was
4 implemented; is that correct?
5      A.  Correct.
6      Q.  And that policy was implemented
7 sometime around 2002?
8      MR. GASTWIRTH: Objection to form.
9      A.  Very early in 2003.
10      Q.  Very early -- okay.
11      Can you provide a brief description of
12 what the Red Book AWP policy is that was
13 instituted in early 2003?
14      A.  The policy states that in a case where
15 a manufacturer will not supply an AWP, that Red
16 Book will calculate an AWP using a percentage
17 markup from WAC or direct.
18      Q.  And how does Red Book ascertain that
19 percentage markup?
20      A.  The policy is just a -- it's the same
21 for every manufacturer.  So every manufacturer
22 who will not supply it will -- their prices will

Page 160

1 be calculated using the same formula.
2      Q.  Did Red Book experience manufacturers
3 choosing to not publish an AWP, or refuse to
4 publish an AWP in the early 2000s?
5      MS. TORGERSON: Objection to form.
6      A.  Yes.
7      Q.  And was that a relatively new
8 experience in Red Book's business practices?
9      MR. SWEENEY: Objection to form.
10      A.  Yes.
11      Q.  Do you have any understanding as the
12 Red Book corporate representative as to why some
13 drug manufacturers were refusing to publish AWP?
14      MS. TORGERSON: Objection, form.
15      MR. SWEENEY: Objection, foundation.
16      A.  I do not know why they would not
17 supply AWP.
18      Q.  Did Red Book communicate to drug
19 manufacturers the standard markup that Red Book
20 would utilize to publish an AWP when drug
21 companies refused to report AWP?
22      MR. CAHILL: Under the new policy?

Page 161

1      MR. ANDERSON: Yes.
2      A.  Under the new policy, yes.
3      Q.  Why did Red Book notify manufacturers
4 of the markup?
5      A.  It allowed manufacturers a chance to
6 -- if they didn't like what we were going to
7 publish, it still allowed them an opportunity to
8 provide it to us if they chose.
9      Q.  And did some drug manufacturers choose
10 to report an AWP rather than allow Red Book to
11 utilize the markup?
12      A.  I am not aware of any.
13      Q.  So as a general matter, as the Red
14 Book corporate representative, Red Book's
15 experience was that if a manufacturer refused to
16 publish an AWP, they would allow Red Book to
17 utilize the markup in setting the AWP?
18      MR. GASTWIRTH: Objection, form.
19      MR. SWEENEY: Object to the form.
20      A.  Correct.
21      (Document bearing Bates Nos. TH 353
22 marked Exhibit Minne 015 for identification.)

41 (Pages 158 to 161)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

---

Page 162

1     Q.  If you could, take a moment and review
2  the one-page exhibit marked Minne Exhibit 15,
3  Bates labeled TH 353.
4        (Pause)
5     Q.  Have you had an opportunity to review
6  this e-mail?
7     A.  Yes.
8     Q.  And does this appear to be an e-mail
9  written by Michael Soares to Lauri Moore, with
10  copies to you and Karen Eckert, around October
11  14th, 2002?
12        MR. CAHILL:  Objection.
13        I think it's the other way around.
14        THE WITNESS:  Yeah.
15        MR. ANDERSON:  Oh, pardon.  I might
16  have misspoke, I'll rephrase to address that.
17     Q.  Does this appear to be an e-mail
18  written by Lauri Moore to Michael Soares, with
19  copies to you and Karen Eckert, around October
20  14th, 2002?
21     A.  Yes.
22     Q.  And the subject is "AWP Policy";

---

Page 163

1  correct?
2     A.  Correct.
3     Q.  And it sets forth some information
4  about Red Book's experience with drug
5  manufacturers reporting AWP; correct?
6     A.  Correct.
7        MR. SWEENEY:  Object to the form.
8     Q.  Specifically in the first paragraph it
9  describes how AWP used to be a required element;
10  correct?
11     A.  Correct.
12     Q.  And NDCs would not be added to the
13  database without AWP information; is that right?
14        MR. SWEENEY:  Object to the form.
15     A.  Correct.
16     Q.  And is that true?
17     A.  To the best of my knowledge, I was not
18  involved with these products at that point that
19  that was a requirement.
20     Q.  I see.
21        Do you -- reading the next sentence in
22  that paragraph, it reads, "At the request of

---

Page 164

1  Micromedex, the system was changed to make AWP an
2  optional data element."
3        Did I read that correctly?
4     A.  Yes, you did.
5     Q.  Did you, as Red Book's corporate
6  representative, understand why AWP was made an
7  optional data element?
8     A.  Yes, I do.
9     Q.  Why?
10     A.  The Red Book database, the NDCs that
11  are in the Red Book database, are used for
12  clinical screening on products.  So if an AWP was
13  required but we could not get an AWP, then we
14  couldn't enter that NDC into the database.  So
15  that product could not be screened for such
16  things as drug interactions and drug allergies.
17     Q.  And so there was an effort made in or
18  about 2000 to allow products to be input into the
19  system for clinical reasons without pricing, such
20  as AWP pricing information?
21     A.  Correct.
22     Q.  And when that decision was made, is it

---

Page 165

1  true that only 200 products or fewer were
2  actually input with a zero price in the AWP
3  field?
4     A.  That's what this says.  I cannot
5  confirm that number, I was not involved in the
6  analysis of how many zero prices there were.
7     Q.  Does that approximately sound correct?
8     A.  That would sound approximately
9  correct, yes.
10     Q.  And how many drug products total are
11  in the Red Book database today?
12     A.  Today, including in -- deactive and
13  active products, there are around 210,000 NDCs.
14     Q.  How many active NDCs, roughly, are in
15  the database today?
16     A.  My best guess would be 40 to 50,000.
17     Q.  So if you're comparing, roughly, 200
18  or less products with a zero price as AWP,
19  compared to 40 or 50,000 active NDC numbers,
20  obviously we're talking about a very small
21  fraction; is that right?
22     A.  Correct.

42  (Pages 162 to 165)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                November 18, 2008

New York, NY

Page 166

1    Q.   Then there's -- in this Exhibit 15
2 there is a description of three ways in which AWP
3 is derived; is that correct?
4    A.   Correct.
5    Q.   And have you read those three
6 paragraphs?
7    A.   Yes, I have.
8    Q.   And does that accurately set forth how
9 Red Book has published AWP over the years?
10        MR. CAHILL:  Objection to form.
11        MR. SWEENEY:  Object to the form.
12    A.   At the point -- at the time this was
13 written in 2002, yes.
14    Q.   And is it true that in all three of
15 those mechanisms the manufacturer of a given NDC
16 is aware of the mechanism by which their AWP is
17 being published?
18        MR. GASTWIRTH:  Objection to form.
19        MR. SWEENEY:  Objection to form.
20        MS. TORGERSON:  Objection.
21    A.   Yes, they would have been aware.
22    Q.   And was that a purposeful --

Page 167

1        MR. ANDERSON:  Strike that.
2    Q.   Was that the purpose behind Red Book
3 formulating an AWP policy?
4        MR. GASTWIRTH:  Objection to form.
5        MS. TORGERSON:  Objection to form.
6        MR. ANDERSON:  I'll rephrase it.
7    Q.   Was the purpose behind Red Book
8 formulating that AWP policy to make sure that
9 drug manufacturers continued to be aware of the
10 mechanism by which their AWPs were being
11 published?
12        MR. CAHILL:  Objection.
13        MS. TORGERSON:  Object to form.
14    A.   That would have been one of the
15 purposes.
16    Q.   Back on Exhibit 14, I've got a
17 question about this, the bottom of the page, the
18 first page.
19    A.   Um-hum.
20    Q.   It says, "If you have any questions,
21 please call the Red Book hunt line."
22        What is the -- what is that?

Page 168

1    A.   I have no idea what the hunt line is.
2 Again, this was prior to my involvement with Red
3 Book.  I assume it's a hotline of some type.
4    Q.   Yeah, yeah.
5        So you don't know -- I was just curious
6 what that might mean.
7    A.   (No response)
8    Q.   Okay.
9        If you could, take a look at what's
10 being marked as Exhibit 16.
11        (PowerPoint presentation entitled
12 "Micromedex AQP analysis, October 15th, 2002"
13 marked Exhibit Minne 016 for identification.)
14        (Pause)
15    Q.   Have you had an opportunity to review
16 Exhibit 16?
17    A.   Yes, I have.
18    Q.   Are you familiar with this document?
19    A.   Yes, I am.
20    Q.   Were you a part of the creation of
21 this document?
22    A.   No, I was not.

Page 169

1    Q.   Can you describe generally what this
2 document is?
3    A.   This document pretty much is a
4 PowerPoint presentation of the e-mail from the
5 previous day, which is Exhibit 15, that again
6 describes where we get our pricing information
7 from.
8    Q.   Were you present when this PowerPoint
9 presentation was provided?
10    A.   No, I was not.
11    Q.   How did you become familiar with this
12 presentation?
13    A.   Through the documents made available
14 for this deposition.
15    Q.   Do you know who the audience was for
16 the presentation?
17    A.   I do not.
18    Q.   It's titled "Micromedex AQP Analysis,
19 October 15th, 2002"; correct?
20    A.   Correct.
21    Q.   And this -- if you look at the second
22 page, that page reads, "How do we gather MDX AWP

43  (Pages 166 to 169)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 170

1  information"; correct?
2      A.  Correct.
3      Q.  What does MDX stand for?
4      A.  Micromedex.
5      Q.  And is that a shorthand description of
6  the AWPs that were published by Red Book both
7  electronically and in printed publications?
8          MR. CAHILL:  The reference to
9  Micromedex, is that --
10         MR. ANDERSON:  Yes.
11     A.  What was happening at this time was
12  that Red Book was being moved from its base in
13  Montvale, New Jersey to the Denver office.  So,
14  yes, Micromedex, meaning Red Book, at that time.
15     Q.  I see.
16         And the first bullet reads,
17  "Manufacturer supplies AWP"; correct?
18     A.  Correct.
19     Q.  Can you describe just generally what
20  that means?
21     A.  It would be an AWP -- an AWP that was
22  supplied to us by the manufacturer for their

Page 171

1  product.
2      Q.  All right.  And then there's a second
3  bullet that reads, "Manufacturer supplies
4  wholesale acquisition cost (WAC) or direct price
5  (DP)."
6          Did I read that correctly?
7      A.  Yes, you did.
8      Q.  And then there's a subbullet that
9  reads, "Manufacturer supplies an AWP markup
10  formula."
11         Did I read that correctly?
12     A.  Yes, you did.
13     Q.  Can you describe generally what that
14  concept is?
15     A.  That concept refers to when the
16  manufacturer would supply us with a WAC or a DP
17  price and verbally would tell us to create a WP,
18  add this merge.
19     Q.  So as opposed to providing the exact
20  numerical figure for the AWP, instead the
21  manufacturer would provide guidance on how the
22  AWP would be calculated?

Page 172

1      A.  Correct.
2      Q.  And then there's a second subbullet
3  that reads, "Manufacturer does not supply an AWP
4  markup formula."
5          Did I read that correctly?
6      A.  Yes.
7      Q.  How frequent was it that a
8  manufacturer would not provide Red Book with an
9  AWP, and not provide Red Book with markup
10  instructions to create a AWP?
11     A.  At this time -- at the time of this
12  presentation, put together in 2002 --
13     Q.  Yes.
14     A.  -- it was not very frequent.
15     Q.  Do you have an approximate number of
16  manufacturers in mind who would refuse to provide
17  either markup information or AWP information?
18     A.  It was between five and ten.
19     Q.  Do you know the names of any of those
20  manufacturers?
21     A.  I recall some of them.  I couldn't
22  list all of them.

Page 173

1      Q.  I understand.
2          As best you can, can you provide the
3  names of those manufacturers?
4      A.  Bedford, TAP, I believe Pharmacia.
5      Q.  Can you recall any others?
6      A.  Not off the top of my head.
7      Q.  Were the three that you named,
8  Bedford, TAP and Pharmacia, the larger drug
9  manufacturers who were refusing to provide AWP or
10  AWP markup information?
11         MR. GASTWIRTH:  Objection.
12         MR. SWEENEY:  Object to the form.
13     A.  Not being able to recall what the
14  other ones are, I can't answer that.
15     Q.  All right.  I'm going to go through a
16  list of some of the companies that are
17  represented here today, and ask you if they were
18  some of the companies who refused to provide both
19  AWP information and AWP markup information.  All
20  right?
21     A.  Okay.
22     Q.  Schering?

44  (Pages 170 to 173)

Page 174

1         MS. TORGERSON:  Object to the form.
2     A.  I don't recall.
3     Q.  Schering Plough?
4         MS. TORGERSON:  Object to the form.
5     A.  I don't recall.
6     Q.  Warrick?
7         MS. TORGERSON:  Object to the form.
8     A.  I don't recall.
9     Q.  So providing you with the names isn't
10 going to assist you in recalling at all?
11    A.  No.
12    Q.  Is there some records kept -- because
13 I've been through Red Book's production, and I
14 can't find a listing.  I saw a reference to five
15 drug companies, but I couldn't find any listing
16 of the actual names of the companies.
17        Does Red Book have that information?
18    A.  Yes.
19    Q.  Would you provide that information?
20    A.  Yes.  It's actually currently on our
21 website.
22    Q.  Oh, really?

Page 175

1     A.  Yes.
2     Q.  Well, I should have just looked on the
3 web, then, rather than digging through all of the
4 produced documents.
5         All right.  When you say "our website,"
6 you mean if I just go to the website I'll be able
7 to find it fairly easily?
8     A.  It's the same website that lists our
9 AWP policy.
10    Q.  Okay, thank you.  I've got that web
11 address in the documents.
12    A.  Okay.
13    Q.  And that holds true not only as to the
14 manufacturers who were refusing to do -- report
15 AWP or AWP markup information today as well as
16 the names of the companies who refused to produce
17 AWP or AWP markup information back in the 2002
18 time frame; correct?
19    A.  It lists seven manufacturers, who were
20 the original seven that we applied the AWP policy
21 to, back starting in March of '03 --
22    Q.  Yes.

Page 176

1     A.  -- and then it lists more
2 manufacturers or specific products of a
3 manufacturer, and the date that the AWP was no
4 longer given to Red Book, so that we applied the
5 AWP policy.
6     Q.  Okay, thank you.
7         All right, now, continuing on with
8 Exhibit 16, looking at the third page now,
9 there's a bullet that reads, "Manufacturer" --
10        MR. ANDERSON:  Well, strike that.
11    Q.  The slide itself is titled
12 "Manufacturer-supplied AWP"; correct?
13    A.  Correct.
14    Q.  And then the first bullet reads, "As
15 policy, require manufacturer to supply written
16 information."
17        Did I read that correctly?
18    A.  Yes.
19    Q.  And is that Red Book's policy?
20    A.  That a manufacturer, for any price
21 that they supply to us, it has to be written, it
22 cannot be just a verbal communication.

Page 177

1     Q.  Why does Red Book require the
2 documentation to be written rather than provided
3 verbally?
4     A.  Again, to verify or make sure that
5 what we have entered into the database is what
6 the manufacturer requested that we list.
7     Q.  And then the second bullet reads,
8 "Documentation maintained indefinitely."
9         True?
10    A.  True.
11    Q.  And is that an accurate statement?
12    A.  Yes.
13    Q.  Why does Red Book maintain the
14 documentation of AWP indefinitely?
15    A.  So there's a record of why a price was
16 listed a certain way.
17    Q.  And is it true that ultimately that
18 enables Red Book to rely on the manufacturer for
19 the AWP, as opposed to any claims that Red Book
20 was controlling the AWP?
21        MS. LORENZO:  Object to the form.
22        MR. SWEENEY:  Object to the form.

45  (Pages 174 to 177)

New York, NY

Page 178

1         MR. GASTWIRTH:  Object to the form.
2     A.  Can you repeat the question?  I'm
3  sorry.
4     Q.  Is it true that ultimately that policy
5  enables Red Book to rely on the manufacturer as
6  opposed to any claims that Red Book was
7  controlling the AWP?
8         MR. SWEENEY:  Object to the form.
9         MR. GASTWIRTH:  Object to the form.
10     A.  Yes.
11     Q.  The third bullet reads, "Approximately
12  80 percent of Micromedex AWP information is
13  provided by manufacturers."
14         Correct?
15     A.  At the time that was correct.
16     Q.  And the time being back in around
17  2002?
18     A.  Correct.
19     Q.  What's the percentage today,
20  approximately?
21     A.  I would estimate 50 percent now.
22     Q.  Do you have any understanding -- and

Page 179

1  when I say "you" I mean Red Book -- does Red Book
2  have any understanding as to why fewer drug
3  companies are publishing AWP directly to Red Book
4  today?
5     A.  Yes.
6     Q.  Why?
7     A.  Our understanding is they don't want
8  to supply it because they don't want to be caught
9  up in entanglements such as this.
10     Q.  You mean this litigation?
11     A.  Correct.
12     Q.  Is there something wrong with the AWPs
13  that are published by manufacturers?
14         MS. TORGERSON:  Objection to form.
15         MR. LONERGAN:  Objection.
16         MR. GASTWIRTH:  Objection.
17         MR. SWEENEY:  Objection.
18     A.  Wrong?  I don't understand what you
19  mean by "wrong."
20     Q.  Why would drug companies back in the
21  '90s publish AWPs but not today?  Do you know, or
22  --

Page 180

1     A.  I --
2         MR. SWEENEY:  Object to form.
3         MS. TORGERSON:  Object to form.
4         MR. GASTWIRTH:  Object to form.
5         MR. FARQUHAR:  Lack of foundation.
6     A.  I don't work for a manufacturer, I
7  can't answer that question.
8     Q.  All right.  That's all I want, is just
9  Red Book's best testimony.
10         The next page, looking at the third
11  subbullet, that begins with the acronym MDX.
12         "MDX writes up verbal communication and
13  maintains it is files indefinitely."
14         Did I read that correctly?
15     A.  Yes, you did.
16     Q.  Why does Micromedex and Red Book write
17  up verbal communication of AWP for manufacturers?
18     A.  At the time the practice was if the
19  manufacturer would only supply the information as
20  far as what to -- the formula to use for creating
21  AWP, obviously that communication had to be
22  documented, so that we didn't have to continually

Page 181

1  go back to the manufacturer and ask "What would
2  you like us to do."
3     Q.  And did Red Book notify manufacturers
4  that they would be documenting the verbal
5  communication concerning AWP from the
6  manufacturer?
7     A.  I don't know.
8     Q.  Well, we'll get into some specific
9  examples in a little bit that may refresh your
10  memory.
11         Do you recall any manufacturers by name
12  who would only provide AWP markup information
13  verbally?
14     A.  No.
15     Q.  Was it a relatively small group of
16  manufacturers?
17     A.  Again, relatively, yes.
18     Q.  Can you approximate the number?  Was it
19  more than ten or less than ten?
20         MR. CAHILL:  Objection.
21     A.  It would have been more than ten.
22     Q.  More than ten?

46 (Pages 178 to 181)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 182

1    A.   (Nodding)
2    Q.   What about more than 20?
3    A.   Probably more than 20.
4    Q.   Is there some documentation that's
5   maintained by Red Book about the identity of the
6   drug companies who began only providing AWP
7   information verbally?
8    A.   Yes.
9    Q.   Is that also on the website?
10    A.   No.
11    Q.   Has that information been produced?
12   Because if it has, I haven't located it.
13        MR. CAHILL:  It's up to you, I could
14   respond.  If you want the witness to respond, I'm
15   not trying to interject.
16        MR. ANDERSON:  Okay.
17    Q.   First, do you know, ma'am, has it been
18   produced?
19    A.   Has it been produced for this
20   deposition?
21    Q.   Yes.
22    A.   That I do not know.

Page 183

1    Q.   Okay.
2        MR. ANDERSON:  Tom, I don't want to get
3   into a long --
4        MR. CAHILL:  And I don't want it
5   either, so I'll -- yeah.
6        MR. ANDERSON:  Do you know, has it been
7   produced?  Did I miss it?
8        MR. CAHILL:  My point was going to be
9   we produced the manufacturer files.  So, in other
10   words, if there were, to the extent there's
11   written --
12        MR. ANDERSON:  You're right, and I've
13   got some examples of those, but I'm asking more
14   as a summary.
15    Q.   Is there --
16        MR. ANDERSON:  And I'll clarify the
17   record.  Thank you, Tom.
18    Q.   Is there a document or some
19   documentation that provides a listing of the
20   identity of the manufacturers who only provide
21   AWP information verbally?
22    A.   Not that I'm aware of.

Page 184

1    Q.   So instead it's -- that information
2   about AWP communication is reflected in each
3   manufacturer's file?
4    A.   Correct.
5    Q.   Okay.  And we're going to get to some
6   examples of that, but is it true that Red Book
7   keeps a so-called "AWP policy file" on each
8   manufacturer name by name?
9        MS. TORGERSON:  Object to form.
10        MR. SWEENEY:  Object to form.
11    A.   If -- Red Book is implementing their
12   AWP policy since 2003, yes.
13    Q.   All right.  A couple of final
14   questions on Exhibit 16.
15        Do you believe as the Red Book
16   representative that Exhibit 16 was primarily an
17   internal document to Red Book and Micromedex?
18    A.   Yes.
19    Q.   Okay.  Now, if you could, take a look
20   at what's been marked as Exhibit 17.
21        (Document bearing Bates No. TH 463
22   marked Exhibit Minne 017 for identification.)

Page 185

1    Q.   Are you familiar with the one-page
2   document marked Exhibit 17, Bates labeled TH 463?
3    A.   Yes.
4    Q.   And what is this document?
5    A.   This is the AWP policy.
6    Q.   And was this information provided by
7   Red Book externally?
8    A.   This information was created by
9   Thomson.
10    Q.   Yes, I know it was created by Red
11   Book, Thomson, but I'm saying was it then in turn
12   provided external to Red Book?
13    A.   Yes.
14    Q.   And do you know how it was
15   disseminated?
16    A.   It's listed on our website, and all
17   manufacturers who were no longer supplying AWP
18   were then sent this communication to let them
19   know.
20    Q.   Thank you.
21        So this letter, marked Exhibit 17, was
22   literally sent to drug manufacturers who were

47 (Pages 182 to 185)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 186

1  refusing to --
2      MR. ANDERSON:  Well, strike that, I'll
3  ask a broader question.
4      Q.  Was Exhibit 17 sent to every drug
5  manufacturer who had NDCs published in Red Book?
6      A.  Not to my knowledge.
7      Q.  Okay.  Who was the --
8      MR. ANDERSON:  Strike that.
9      Q.  Which types of drug manufacturers did
10  receive what's marked as Exhibit 17?
11      A.  The manufacturers who no longer
12  supplied us with AWP or a markup formula to
13  create the AWP were sent this communication.
14      Q.  Okay.
15      And again, without beating a dead
16  horse, this just conveys the same information we
17  went over in the PowerPoint presentation marked
18  Exhibit 16; correct?
19      MR. GASTWIRTH:  Objection to form.
20      A.  Exhibit 16 is an internal -- Exhibit
21  16 --
22      Q.  I realize that.

Page 187

1      A.  -- was not shared.
2      Exhibit 16 explains where we're at and
3  why we need to create the policy.  Exhibit 17 is
4  the policy.
5      Q.  I see.
6      Has the policy changed any from May
7  22nd, 2003 to the present?
8      A.  I believe there was an update in '04,
9  just a few footnotes were updated or something
10  like that.
11      Q.  All right.  Moving right along, we'll
12  get to that update.
13      (Document bearing Bates Nos. TH269
14  through 280 marked Exhibit Minne 018 for
15  identification.)
16      Q.  If you could, take a look at what's
17  been marked as Exhibit 18.
18      MR. ANDERSON:  For the record, Exhibit
19  18 is titled "Red Book and Ready Price Average
20  Wholesale Price Communication Policy," dated July
21  23rd, 2003, and it's labeled TH269 through 280.
22      Q.  Are you familiar with this document?

Page 188

1      A.  Yes, I am.
2      Q.  And can you describe it generally?
3      A.  This document describes how we will
4  respond to customers and non-customers and
5  manufacturers when they call the company to ask
6  about our AWP policy or specific prices.
7      Q.  So this was a mechanism where Thomson
8  and Red Book could guide their representatives'
9  communications with drug manufacturers?
10      A.  Correct.
11      Q.  And looking at the second-to-last page
12  of this Exhibit 18, I see that there's the AWP
13  policy set forth; correct?
14      A.  Correct.
15      Q.  With the same effective date as the
16  policy itself, which was previously marked as
17  Exhibit 17; correct?
18      A.  Correct.
19      Q.  All right.
20      Now I've got a similar document, but
21  it's dated a few days later.
22      (Document dated July 29, 2003 marked

Page 189

1  Exhibit Minne 019 for identification.)
2      Q.  Are you familiar with this document?
3      A.  Yes, I am.
4      Q.  And just to streamline matters, can
5  you describe to me what differences, if any,
6  exist between Exhibit 19, which is dated July
7  29th, 2003, and Exhibit 18, which is dated July
8  23rd, 2003?
9      A.  My understanding between the two
10  documents is that Exhibit 19 was specific for the
11  salespeople.
12      Q.  So this was for Red Book personnel
13  involved in the promotion and sales of Red Book's
14  products and services?
15      MR. GASTWIRTH:  Objection.
16      A.  Correct.
17      Q.  The answer was "correct"?
18      A.  Correct.
19      Q.  Who was the intended audience within
20  Red Book of Exhibit 18?
21      A.  For Exhibit 18 who was the intended
22  audience?

48  (Pages 186 to 189)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 190

1      Q.   Yes, Miss Minne.
2      A.   It would have included our editorial
3   staff, our -- what we call our ETS, external tech
4   support.
5      Q.   I see.  And the person -- the entities
6   that editorial staff would be dealing with, for
7   instance, would be drug manufacturers; correct?
8          MR. GASTWIRTH:  Objection to form.
9      A.   Correct.
10     Q.   Who would be the typical type of
11  entity that the sales personnel would be
12  interacting with?
13     A.   They would be the customers.
14     Q.   Which could be subscribers such as
15  manufacturers, but it could also include
16  pharmacies, chain pharmacies and third-party
17  payors; correct?
18     A.   Correct.
19     Q.   As well as specifically government
20  agencies that subscribe to Red Book; correct?
21     A.   Correct, if they're a customer.
22     Q.   All right.

Page 191

1          And again, the second-to-last page of
2   Exhibit 19 also sets forth the AWP policy;
3   correct?
4      A.   Correct.
5      Q.   And is it true that that policy
6   basically states that the manufacturers are the
7   ones who are controlling the AWPs that are
8   published?
9          MR. GASTWIRTH:  Objection to form.
10         MR. SWEENEY:  Objection to form.
11         MS. LORENZO:  Objection to form.
12     A.   It's stating if a manufacturer won't
13  supply the AWP, we will calculate it using our
14  formula.
15     Q.   And notify the manufacturer of such?
16     A.   That we are doing such, exactly.
17     Q.   Has any manufacturer ever prevented
18  Red Book from publishing an AWP in accordance
19  with the AWP policy?
20         MS. TORGERSON:  Objection to form.
21     A.   Yes.
22     Q.   Which company?

Page 192

1      A.   Glaxo.
2      Q.   When did Glaxo take that action?
3      A.   It was only for one product, and it
4   was either the fall of '07 or the fall of '06, I
5   don't recall.
6      Q.   And how did Glaxo take that action?
7      A.   They would not provide any type -- any
8   price of any type.
9      Q.   Other than that one instance with
10  Glaxo, is there any other instance where a drug
11  company has prevented Red Book from publishing
12  pricing information in accordance with the AWP
13  policy?
14     A.   Not that I'm aware of.
15     Q.   And you're the corporate
16  representative who would be most knowledgeable
17  about that; correct?
18         MR. SWEENEY:  Object to the form.
19     A.   I'm the corporate representative, yes.
20     Q.   And -- I mean, you were in charge of
21  the editorial group during all the recent years,
22  generally?

Page 193

1          MR. SWEENEY:  Object to the form.
2      A.   With a few exceptions as noted earlier
3   --
4      Q.   Yes.
5      A.   -- a few years, yes.
6          (Document describing electronic file of
7   Red Book marked Exhibit Minne 020 for
8   identification.)
9      Q.   Now, if you could, take a look at
10  what's been marked as Minne Exhibit 20.
11         (Pause)
12     Q.   Are you familiar with this --
13         MR. ANDERSON:  I'm sorry, Doug, I know
14  you're over there and not able to see the
15  document.
16         MR. FARQUHAR:  We're getting copies
17  over here, we're fine.
18         MR. ANDERSON:  Oh, you're good now?
19  Okay.
20         MR. FARQUHAR:  Thank you, Jarrett.
21         MR. ANDERSON:  My pleasure.
22     Q.   Are you familiar with Exhibit 20, Miss

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 194

1  Minne?
2      A.  Yes.
3      Q.  What is it?
4      A.  It's a document that describes the
5  electronic or one of the electronic files
6  available of the Red Book.
7      Q.  And who would be the intended audience
8  of Exhibit 20?
9      A.  The intended audience would be a
10  customer who either has purchased or is
11  interested in purchasing the electronic files.
12     Q.  Subscribers who receive the electronic
13  pricing data, for instance?
14     A.  Correct.
15     Q.  And again, that could include
16  manufacturers, as well -- or does include
17  manufacturers as well as pharmacies, chain
18  pharmacies and third-party payors, like the
19  government?
20     A.  Yes.  Could include anyone.
21     Q.  And on the back page of Exhibit 20,
22  the AWP policy is set forth; correct?

Page 195

1      A.  Yes.
2      Q.  And this appears to have been sent out
3  around November 2003; correct?
4      A.  It appears that way.
5      Q.  Okay.
6          (Revision to AWP policy marked
7  Exhibit Minne 021 for identification.)
8      Q.  Now, if you could take a look at
9  what's been marked Minne 21.
10         Are you familiar with this document?
11     A.  Yes.
12     Q.  And this is the revision to the AWP
13  policy from early 2004 that you referenced
14  previously; correct?
15     A.  Correct.
16     Q.  And what is the revision that's
17  reflected in 21 -- in Exhibit 21 that's somehow
18  different than the preceding AWP policy?
19     A.  I believe it has to do with the
20  second-to-last paragraph, where we talk about
21  websites to go for more information.
22     Q.  And is that the web address that you

Page 196

1  mentioned earlier which contains the identity of
2  drug manufacturers who refused to provide AWP or
3  AWP markup information?
4      A.  Yes.
5      Q.  Miss Minne, I'm now going to be going
6  into some manufacturer-specific information.
7          (Document bearing Bates Nos. Red Book
8  00595 through 600 marked Exhibit Minne 022 for
9  identification.)
10     Q.  If you could, take a look at what's
11  been marked as Exhibit 22.
12         MR. ANDERSON:  For the record, Exhibit
13  22 is a document Bates labeled Red Book 00595
14  through 600.
15         (Pause)
16     Q.  Have you had an opportunity to review
17  Exhibit 22?
18     A.  Yes.
19     Q.  Are you familiar with Exhibit 22?
20     A.  Yes.
21     Q.  What is generally Exhibit 22?
22     A.  This exhibit is demonstrating a

Page 197

1  manufacturer who we have -- who will not supply
2  AWP or a markup, so we applied the AWP policy.
3          It's also showing that every year we
4  reconfirm that that is still what the
5  manufacturer -- that they will not supply, and we
6  -- every year we send out the communication, the
7  policy, and verification that "this is what we're
8  doing with your products."
9      Q.  And this particular company happens to
10  be Abbott Pharmaceuticals; correct?
11     A.  Correct.
12     Q.  So I take it, then, that Abbott
13  Pharmaceuticals will be one of the seven
14  companies that's listed on the website?
15         MS. CITERA:  Object to the form.
16     A.  I don't know if they were one of the
17  original seven, but they would be listed now with
18  the date that they stopped supplying AWP.
19     Q.  Can you ascertain from Exhibit 22 what
20  date Abbott Pharmaceutical chose to stop
21  reporting AWP or AWP markup information?
22     A.  No.  It would have been prior to July

50  (Pages 194 to 197)

Page 198

1   13th of 2004.
2       Q.   You're looking at the fourth page?
3       A.   The last page.
4       Q.   The last page.
5           And why do you say it would have been
6   before July 14th?
7       A.   Because it says, "I faxed you the Red
8   Book AWP policy back on July 13th, '04; AWP
9   equals WAC plus 20 percent per policy," so that's
10  indicating that in July of '04 that policy was
11  already in effect.
12      Q.   I see.
13          If you could, take a look at the third
14  page of Exhibit 22.
15          Do you agree that appears to be a
16  letter from Micromedex/Red Book dated August 9th,
17  2005 to April Gerzel, Abbott Pharmaceuticals?
18      A.   Yes.
19      Q.   And Traci Kellam, I take it's an
20  employee of Red Book; correct?
21      A.   Correct.
22      Q.   Was Traci actually within the

Page 199

1   editorial services department?
2       A.   Yes.
3       Q.   Working under you; correct?
4       A.   Correct.
5       Q.   And Traci writes, "This letter is in
6   regards to our verbal conversation concerning AWP
7   for Abbott Pharmaceutical's products on August
8   9th, 2005 at 11:50 a.m.  In the absence of a
9   manufacturer provided AWP or a manufacturer
10  calculated markup to establish an AWP, we will be
11  implementing a 20 percent markup above WAC to
12  calculate AWP.  We will not report a third
13  party's determination of AWP for your products.
14  As discussed in our conversation, this markup
15  will apply to all Pharmaceutical's products" --
16  "to all Abbott Pharmaceutical's products.  This
17  is in accordance with our company policy for
18  calculation of AWP."
19          Did I read that correctly?
20      A.   Yes.
21      Q.   Why did Red Book go to the trouble of
22  notifying Abbott of this information?

Page 200

1           MS. CITERA:  Objection to form.
2       A.   Again, documentation so the
3   manufacturer knows exactly how we're getting
4   those AWPs for their products.
5       Q.   Is there a historical basis for the 20
6   percent markup to calculate AWP?
7       A.   That's based on the policy.
8       Q.   And did Red Book base that policy on
9   historical information about how drug
10  manufacturers reported AWP?
11      A.   They came up with that percentage
12  based on analysis of the data that they currently
13  had in the database.
14      Q.   Right.
15          And so, simply put, over the years
16  there has been recognition that AWPs were
17  generally about 20 percent higher than WACs --
18          MS. TORGERSON:  Objection to form.
19      Q.   -- correct?
20          MS. TORGERSON:  Objection to form.
21      A.   Correct.
22      Q.   Has Abbott Pharmaceuticals, to your

Page 201

1   knowledge -- and I mean Red Book's knowledge --
2   ever sought to prevent Red Book from publishing
3   an AWP for Abbott drugs?
4           MS. CITERA:  Objection to form.
5       A.   I am not aware of that.
6       Q.   Then if you could, look at the next
7   page of Exhibit 22.  It's titled "Abbott
8   Pharmaceutical Company Pricing/Markup History,"
9   and it's dated January 1st, '95 through August
10  9th, 2005; correct?
11      A.   Correct.
12      Q.   Does Red Book keep records such as
13  this for all companies, drug companies, that have
14  NDCs published by Red Book?
15      A.   Yes.
16      Q.   Why?
17      A.   Again, documentation of dates where
18  things occurred, and also documentation of verbal
19  communications between manufacturers and Red Book
20  staff.
21      Q.   And is one of the purposes behind this
22  documentation to ultimately enable Red Book to

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 202

1  establish that manufacturers are controlling the
2  pricing that's published?
3        MR. CAHILL:  Objection.
4        MS. CITERA:  Object to form.
5     A.  No, the purpose behind this is to know
6  what we're doing and why we're doing it.
7     Q.  Couldn't Red Book notify manufacturers
8  without going to the steps of documenting all the
9  notifications to the manufacturers?
10    A.  It could, but it wouldn't be smart
11 practice.
12    Q.  Why?
13    A.  Pure business sense; you document why
14 you do what you do.
15    Q.  Yeah.  Because then if it wasn't
16 documented, maybe a manufacturer could dispute it
17 later?
18       MS. CITERA:  Objection to form.
19    Q.  Is that right?
20    A.  Anyone could dispute it.
21    Q.  Are these records kept in the ordinary
22 course of Red Book's business?

Page 203

1     A.  Yes.
2     Q.  And are they maintained in such a way
3  that they are believed to be reliable?
4     A.  Yes.
5     Q.  I notice on this page, Bates labeled
6  Red Book 00598 of Exhibit 22, there are multiple
7  notations about communication by Red Book to
8  Abbott concerning the AWP policy.
9        Would you agree with me?
10       MS. CITERA:  Objection.
11    A.  Yes.
12    Q.  Why is it that Red Book would make
13 efforts to repeatedly notify manufacturers of the
14 AWP policy?
15       MS. CITERA:  Objection to form?
16    A.  It's our internal company policy to
17 reconfirm every year with the manufacturer that
18 our AWP policy is still in existence.
19    Q.  Looking down at the last entry of this
20 chronology, it's dated August 20th, 2002, and
21 I'll read it for the benefit of the record: "AWP
22 equal WAC plus 25 percent (previously provided)."

Page 204

1        What does that information indicate to
2  you as Red Book's corporate representative?
3        MS. CITERA:  Objection, form.
4     A.  That indicates that at that time,
5  which was before implementation of the AWP
6  policy, the Abbott prices were being determined
7  by WAC plus 25 percent.  Previously provided
8  meaning Abbott would have provided that markup
9  percentage to Red Book.
10    Q.  So prior to or, frankly, potentially
11 after August 20th, 2002 as well, the AWPs that
12 were published by Red Book for Abbott
13 Pharmaceuticals' products were based on a WAC
14 plus 25 percent formula that had been provided to
15 Red Book by Abbott; correct?
16       MS. CITERA:  Object to the form.
17    A.  Correct.
18    Q.  Is there any possibility that that
19 formula was created by Red Book and Red Book
20 alone?
21       MS. CITERA:  Object to the form.
22       MR. CAHILL:  Objection.

Page 205

1     A.  I have no knowledge.
2     Q.  Okay.
3        Looking at the entry dated March 5th,
4  2003, reading, "Effective 3/3/03 price list from
5  Abbott did a 25 percent markup from previous
6  notes," and then there's several drug names
7  listed.
8        Did I read that correctly?
9     A.  Yes.
10    Q.  What does that phrase, "effective
11 3/3/03 price list from Abbott did a 25 percent
12 markup," indicate to you as Red Book's corporate
13 representative?
14       MS. CITERA:  Objection, form.
15    A.  It indicates to me that we received a
16 price list from Abbott on that date, and per the
17 previous notes from 8/20/02, AWP was calculated
18 using the 25 percent formula that was provided.
19    Q.  Provided by who?
20    A.  By Abbott.
21    Q.  To Red Book; correct?
22    A.  To Red Book.

52  (Pages 202 to 205)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

## New York, NY

Page 206

1    Q.   And in turn Red Book published that
2 information; correct?
3        MS. CITERA:  Objection to the form.
4    A.  Correct.
5    (October 2000 verification forms for
6 Abbott Pharmaceuticals marked Exhibit Minne 023
7 for identification.)
8    Q.   Now, if you could, Miss Minne, take a
9 look at what's been marked as Exhibit 23.
10     Are you familiar with documents such as
11 Exhibit 23?
12        MS. CITERA:  Object to the form.
13    (Pause)
14    A.  I'm familiar that this is a PLV, yes.
15    Q.   PLV, again, being the verification
16 forms; correct?
17    A.  Correct.
18    Q.   And this one happens to be for Abbott
19 Pharmaceuticals dated in October of 2000;
20 correct?
21    A.  Correct.
22    Q.   And there's AWPs listed; correct?

Page 207

1    A.  Correct.
2    Q.   As well as direct prices and WACs;
3 correct?
4    A.  Correct.
5    Q.   And then throughout the document,
6 apparently Krista Kleidon, an Abbott
7 representative, has signed each page; correct?
8        MS. CITERA:  Objection, form.
9    A.  Correct.
10    Q.   So this would be a practical example
11 of how a drug manufacturer would verify the
12 prices being published by Red Book on an annual
13 basis?
14       MS. CITERA:  Object to the form.
15       MR. SWEENEY:  Object to the form.
16    A.  Correct.
17       MR. ANDERSON:  Let's go off the record
18 for just a second.  We're not taking a break
19 necessarily, unless you need one.
20       THE WITNESS:  I'm fine.
21       THE VIDEOGRAPHER:  This is the
22 videographer.

Page 208

1     Off the record at 13:41.
2    (Pause)
3       THE VIDEOGRAPHER:  This is the
4 videographer.
5     This begins tape number four at 13:51.
6 We're back on the record at this time.
7    (Document with first page entitled
8 "Abbott Pharmaceutical Markup History" marked
9 Exhibit Minne 024 for identification.)
10 BY MR. ANDERSON:
11    Q.   Okay, Miss Minne, before I move on to
12 some other documents, I wanted to mark a couple
13 of other markup history documents.
14     This is Exhibit 24.  And I'm going to
15 particularly be focusing on the second page of
16 this one.
17     Do you agree the second page of Exhibit
18 24 appears to be titled "Abbott Hospital Products
19 Company Pricing/Markup History"?
20    A.  Correct.
21    Q.   And the first page is "Abbott
22 Pharmaceutical Markup History" that we had

Page 209

1 already talked about; correct?
2    A.  Correct.
3    Q.   All right.  And then this page, the
4 second page, of Exhibit 24 sets forth the
5 chronology of communications between Red Book and
6 Abbott Hospital Products concerning the
7 publication of drug prices; is that right?
8       MS. CITERA:  Object to the form.
9    A.  Correct.
10    Q.   For instance, looking at the entry
11 dated May 16th, 2002, it reads, "FDB changed
12 markup to 25 percent on January '02 for all price
13 changes.  Per manufacturer we are to continue
14 using their usual markup, 18.75 percent, per
15 Jerrie."
16     Did I read that correctly?
17    A.  Yes.
18    Q.   Are you familiar with a woman who used
19 to work at Abbott known as Jerrie Cicerale?
20    A.  No, I'm not.
21    Q.   Do you believe that this entry in the
22 Red Book markup history for Abbott Hospital

## Henderson Legal Services, Inc.

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 210

1 Products is referring to a person at Abbott
2 providing direction to Red Book as to how to
3 publish AWP?
4          MS. CITERA:  Object to the form.
5     A.   Yes.
6          MS. CITERA:  Also object as outside the
7 scope.
8     A.   That would be my assumption.
9     Q.   Then looking at the entry dated April
10 3rd, 2003, it reads, "Spoke to Jerrie Cicerale on
11 April 3rd, 2003 at 1:50 p.m.  Would not confirm
12 AWP.  Sent her a fax confirming the Red Book
13 policy on AWP of 20 percent markup (MDX applied
14 markup)."
15          Did I read that correctly?
16     A.   Yes.
17     Q.   Was there sometime around 2003 when
18 some companies were more hesitant to publish AWP
19 information than they had been before?
20          MS. CITERA:  Object to the form.
21          MR. SWEENEY:  Object to the form.
22          MR. GASTWIRTH:  Object to the form.

Page 211

1     A.   Starting in the early 2000s, it became
2 much more common.
3     Q.   Does Red Book have any understanding
4 why that is?
5          MS. CITERA:  Object to the form.
6          MR. GASTWIRTH:  Object to the form.
7     A.   No.
8     Q.   Look at the entry dated May 16th,
9 2002.  It reads, "AWP equal inner pack dollar
10 (trade) less 5 percent plus 25 percent (solid
11 size equal units per inner pack (18.75 percent)
12 April '97, per Michael Heggie."
13          Did I read that correctly?
14     A.   Yes.
15     Q.   Are you familiar with the fact that
16 there was a markup percentage known by Red Book
17 concerning Abbott Hospital Products of 18.75
18 percent to create an AWP?
19          MS. CITERA:  Object to the form.
20     A.   My only knowledge of that would be
21 what's written here.
22     Q.   All right.

Page 212

1     Q.   Do you have any reason to question the
2 accuracy of these entries about the pricing
3 representations?
4     A.   No.
5          MS. CITERA:  Object to the form.
6          (January 1, 1995 through September 18,
7 2003 records of Roxane pricing/markup history
8 marked Exhibit Minne 025 for identification.)
9     Q.   Now, similarly, Miss Minne, take a
10 look at what's been marked as Minne Exhibit 25,
11 which is another markup history for Roxane.
12          Do you agree that this appears to be
13 Red Book's records of the Roxane company
14 pricing/markup history?
15          MR. GASTWIRTH:  Objection.
16     A.   Yes.
17     Q.   And this is dated January 1st, '95
18 through September 18th, '03; correct?
19     A.   Correct.
20     Q.   And looking, for instance, at the
21 entry -- the last entry, which is also dated
22 September 18th, 2003, it reads, "Clarification:

Page 213

1 Per Lesli Paoletti, for all products Roxane
2 supplies AWP.  E-mail confirmation filed."
3          Did I read that correctly?
4     A.   Yes.
5     Q.   Does that statement indicate to you
6 that Roxane was directly providing AWP
7 information to Red Book for publication?
8          MR. GASTWIRTH:  Objection to form.
9     A.   Yes.
10     Q.   Looking at the last entry shown on
11 Exhibit 25, which is dated May 14th, 2001, it
12 reads, "Manuf provides AWP.  Do not list WAC even
13 if provided."
14          Did I read that correctly?
15     A.   Correct.
16     Q.   The statement "Manuf provides AWP" is
17 just reflecting that, at least according to Red
18 Book's records, Roxane was directly providing AWP
19 for Red Book's publication; correct?
20          MR. GASTWIRTH:  Objection to form.
21     A.   Correct.
22     Q.   All right.  What does the statement

54 (Pages 210 to 213)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 214

1   "Do not list WAC even if provided" indicate to
2   you, as Red Book's corporate representative?
3        A.   It indicates to me that there were
4   some, maybe all, products that WAC was -- where
5   Roxane was providing WAC.  However, they did not
6   -- it does not appear that they wanted it listed
7   in our electronic files, so we would have honored
8   that request.
9        Q.   All right.  So not only with Roxane in
10  this particular instance, but just as a general
11  matter, if a drug company directed Red Book to
12  not publish WAC pricing, whether in print form or
13  electronic form, Red Book would honor that
14  request?
15       MR. CAHILL:  Objection to form.
16       A.   Yes.
17       Q.   Do you have an understanding, as Red
18  Book's corporate representative, why some drug
19  manufacturers did not want their WACs published?
20       MS. CITERA:  Objection to form.
21       MR. GASTWIRTH:  Objection to form.
22       A.   I do not know.

Page 215

1        Q.   Is there any instance where Red Book
2   disregarded a manufacturer's instructions
3   concerning the publication of WAC, whether in
4   print form or electronic form?
5        MR. CAHILL:  Objection to form.
6        They don't publish WAC in the print, is
7   my understanding.
8        MR. ANDERSON:  Well, I know, I
9   understand that, Tom.  That's why I'm including
10  both categories.
11       MR. CAHILL:  Okay.
12       A.   Can you repeat the question?
13       Q.   Yes, I will.
14       Is there any instance to Red Book's
15  knowledge of Red Book disregarding a drug
16  company's instructions with respect to the
17  publication of WAC pricing, whether it be in
18  print form or electronic form?
19       MR. GASTWIRTH:  Objection to form.
20       A.   Not that I'm aware of.
21       Q.   So to the extent any WACs were being
22  published in electronic form over the years by

Page 216

1   Red Book, that was pursuant to a direct
2   instruction by a drug company?
3        MR. GASTWIRTH:  Objection to form.
4        MR. SWEENEY:  Object to the form.
5        A.   They might not have directly told us
6   to print them, but the fact that they were
7   supplying them to us was our understanding that
8   they were okay that we did publish them unless
9   otherwise stated, as it says here.
10       Q.   I see your distinction.  But if a drug
11  company had caused a WAC to be reported to Red
12  Book, but then in turn gone the next step and
13  said, "By the way, though, don't publish the
14  WACs," Red Book would have honored that drug
15  company's request?
16       MR. GASTWIRTH:  Objection to form.
17       A.   Yes.
18       Q.   Is there any list summarizing the
19  identities of the manufacturers who requested
20  that WAC not be published for their drugs?
21       A.   Not that I'm aware of.
22       Q.   So that information would only be

Page 217

1   reflected in the company files such as, for
2   instance, this example of the company
3   pricing/markup history marked Exhibit 25?
4        A.   Correct.
5        Q.   Okay.
6        Do you, as Red Book's company
7   representative, understand that Red Book has
8   company pricing/markup histories for all of the
9   companies that have NDCs published by Red Book?
10       A.   There would be markup or pricing
11  information in this type of format only if the
12  manufacturer was not supplying AWP directly, you
13  know, if they had supplied us instead with a
14  formula or wouldn't supply anything, in which
15  case we applied the AWP policy.
16       Q.   Oh, I see.  Okay.
17       So if a drug company is directly
18  reporting AWPs, and in turn Red Book's publishing
19  those AWPs, there may not be a company
20  pricing/markup history; is that correct?
21       A.   That's very possible.
22       Q.   The reason I ask is I've looked for

55 (Pages 214 to 217)

New York, NY

Page 218

1  the Dey Laboratories pricing history in Red
2  Book's records, and I can't find it.
3        Does the absence of a company pricing
4  history or markup history indicate to you, as the
5  company representative for Red Book, that that
6  drug manufacturer is most likely directly
7  reporting AWP to Red Book?
8        MS. LORENZO:  Objection to form.
9     A.   That would be my assumption.
10        MR. ANDERSON:  Tom, to your knowledge,
11  have any records concerning a drug company's
12  pricing history been withheld?
13        MR. CAHILL:  No.  I'm not aware of any
14  --
15        MS. ROSENSTOCK:  No.
16        MR. CAHILL:  -- withholding of such
17  information.
18        MR. ANDERSON:  Thanks.
19        (Form letter to Abbott/Ross Data Vendor
20  marked Exhibit Minne 026 for identification.)
21     Q.   Now I'm going to really move quickly.
22        If you could, take a look, Miss Minne,

Page 219

1  at Exhibit 26.
2        Does this exhibit appear to be a form
3  in which a drug company would report the pricing
4  of products upon launch?
5        MS. CITERA:  Objection to form.
6        MR. GASTWIRTH:  Objection to form.
7        MS. ROSENSTOCK:  Do you have another
8  copy?
9        MR. ANDERSON:  I don't.  I don't even
10  have a copy right now.
11     A.   This front page is something that
12  internally the Red Book staff in Montvale
13  created.
14     Q.   Yes.
15     A.   So the manufacturer did not supply
16  this page.
17     Q.   I understand that.  I need to phrase
18  my question better, so I'll do that.
19        The first page of Exhibit 26 is what,
20  ma'am?
21     A.   It is simply a cover sheet with the
22  information -- it looks like this was a new

Page 220

1  product that was coming on the market, so
2  information regarding form, route, that type of
3  stuff, that would have been entered into the
4  database, and then along with some verifications
5  that all the pieces at the bottom -- the people
6  signed off when it had been completed.
7     Q.   To assist Red Book in keeping records
8  of all of its data input?
9     A.   Correct.
10        MS. CITERA:  Object to the form.
11     Q.   And then the second page of Exhibit 26
12  is what, ma'am?
13     A.   This is a communication from the
14  manufacturer telling us their product, size, NDC,
15  and then the prices associated with that product.
16     Q.   And does that appear to be one of the
17  standard ways in which Red Book's made aware of
18  product pricing upon launch by a drug company?
19        MS. CITERA:  Objection.
20        MR. LONERGAN:  Objection.
21        MR. GASTWIRTH:  Objection to form.
22     A.   Yes, very standard.

Page 221

1     Q.   And, in fact, it looks like it's a
2  form letter to "Abbott/Ross Data Vendor";
3  correct?
4     A.   Correct.
5     Q.   And I've got some more examples of
6  these, Miss Minne.
7        (Price change notification sent to Red
8  Book by Abbott marked Exhibit Minne 027 for
9  identification.)
10     Q.   Do you agree Exhibit 27 appears to be
11  another example of a launch or, for that matter,
12  potentially a price change sent to data vendors
13  such as Red Book?
14        MS. CITERA:  I'm sorry, which is
15  Exhibit 27, this one (indicating)?
16        MR. ANDERSON:  It is, yeah.
17        MS. CITERA:  Can you repeat the
18  question?
19        MR. ANDERSON:  I will.  In fact, I'll
20  slow it down in just a second.
21     Q.   Miss Minne, if you would, take a look
22  at Exhibit 27.

56 (Pages 218 to 221)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 222

1    Does this appear to be a price change
2  notification sent to Red Book by Abbott?
3         MS. CITERA:  Objection to form.
4    A.  Yes, it does.
5    Q.   And it's apparently a form letter
6  titled "Dear Abbott/Ross Data Vendor"; correct?
7    A.  Correct.
8         MR. CAHILL:  Objection.
9    Q.   And does this look like a standard
10  mechanism, or an example of a standard mechanism,
11  by which Red Book would be made aware of price
12  changes?
13        MR. GASTWIRTH:  Object to the form.
14        MS. CITERA:  Object to the form.
15    A.  Yes.
16    Q.   And this, for instance, includes trade
17  prIce, wholesale price and AWP price; correct?
18        MS. CITERA:  Object to the form.
19    A.  Correct.
20    Q.   And in instances where Red Book could
21  be receiving direct representations of AWP
22  prices, such as those shown in Exhibit 27 from a

Page 223

1  drug company, would Red Book in turn publish
2  those AWPs?
3         MR. GASTWIRTH:  Objection to form.
4         MS. CITERA:  Object to the form.
5    A.  Yes.
6         (Documentation for Abbott
7  Pharmaceuticals verification form marked
8  Exhibit Minne 028 for identification.)
9    Q.   Miss Minne, could you take a look,
10  briefly, at Exhibit 28.
11       Miss Minne, I've got a copy problem
12  here.  You're welcome to look at the entire
13  document, but I only intended to mark the pages
14  01132 through 01145, which is the 21 of 21 pages
15  of the PVL.
16        MR. ANDERSON:  Tony, if you don't have
17  a problem, I'm going to rip off the back pages
18  and remove them from this exhibit.  They just --
19  they got mistakenly attached.  It's not part of
20  that PVL, it's part of Abbott's file, but it's
21  not part of the PVL.
22        MS. CITERA:  Just let me look for just

Page 224

1  one second.
2         MR. ANDERSON:  Sure.
3  PLV.
4         MS. CITERA:  I mean, they are
5  consecutive, the numbers on the bottom --
6         MR. ANDERSON:  Well, we can keep it --
7         MS. CITERA:  That's fine.
8         MR. ANDERSON:  -- I'm going to focus
9  primarily my questions on the PLV.
10        MS. CITERA:  Okay.
11  BY MR. ANDERSON:
12    Q.   Miss Minne, if you could, after
13  looking at the exhibit, confirm for me that the
14  first few pages, specifically the first three
15  pages, and then the next 21 pages, are an example
16  of PLV, which is a verification form, completed
17  by Abbott Pharmaceuticals?
18        MS. CITERA:  Object to the form.
19    A.  Correct.
20    Q.   And then the first three pages are
21  just some Red Book documentation that pertains to
22  the completion of the PLV; correct?

Page 225

1         MS. CITERA:  Object to the form.
2    A.  The first two are, yes.
3    Q.   Right, thank you.
4         And these pages that comprise this
5  verification form all include AWP information,
6  direct price information and WACs; correct?
7         MS. CITERA:  Object to the form.
8    A.  Correct.
9    Q.   And these were -- these prices, AWP,
10  direct and WAC, were printed and provided to
11  Abbott for verification by Red Book; correct?
12        MS. CITERA:  Object to the form.
13    A.  Correct.
14    Q.   And look, if you could, at what's
15  labeled Red Book 01139.  On that page there are
16  several Erythromycin products listed; correct?
17    A.  Correct.
18    Q.   And then in the lower right-hand
19  corner someone has handwritten "Verified changes
20  not made"; correct?
21    A.  Correct.
22    Q.   Do you believe that that would be a

57 (Pages 222 to 225)

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

---

Page 226

1    notation made by Abbott's personnel?
2        A.  No.
3            MS. CITERA:  Object to the form.
4        Q.  This would be a data entry notice -- I
5    mean, a notation made by Red Book personnel?
6        A.  Yes.
7            MS. CITERA:  Object to the form.
8        Q.  What does that notation, "Verified
9    changes not made," indicate to you?
10           MS. CITERA:  Object to the form.
11       A.  I do not know what she meant by that
12   statement.
13       Q.  In the WAC column, do you see how
14   there's several tick marks?
15       A.  Yes.
16       Q.  What do the tick marks indicate to
17   you?
18           MS. CITERA:  Object to the form.
19       A.  I do not know if those were from the
20   manufacturer or those were made internally by Red
21   Book staff.
22       Q.  If Abbott Pharmaceuticals had chosen

---

Page 227

1    to update or otherwise change any of the pricing
2    published on this page for these Erythromycin
3    products and had crossed out the printed price
4    and written in another price, would Red Book have
5    input those changes and published those prices
6    accordingly?
7            MS. CITERA:  Object to the form.
8        A.  Yes.
9            (1995 price change notification by
10   Abbott Pharmaceuticals marked Exhibit Minne 029
11   for identification.)
12       Q.  Miss Minne, if you could, take a look
13   at what's been marked as Exhibit 29.
14           Does this appear to be a price change
15   notification by Abbott Pharmaceuticals?
16           MS. CITERA:  Object to the form.
17       A.  Yes.
18       Q.  And the cover letter's addressed to
19   "Dear Abbott/Ross Data Vendor"; correct?
20       A.  Correct.
21       Q.  And the prices that are listed are
22   titled "Trade price," "Wholesale price" and "AWP

---

Page 228

1    price"; correct?
2        A.  Yes.
3            MS. CITERA:  Objection to the form.
4        Q.  In situations such as this where Red
5    Book would receive price change notifications,
6    specifically, for instance, the AWP prices, would
7    Red Book input those?
8            MR. GASTWIRTH:  Object to the form.
9            MS. CITERA:  Object to the form.
10       A.  Yes.
11       Q.  And in turn publish those prices?
12           MS. CITERA:  Object to the form.
13       A.  Yes.
14           (1999 price change notification by
15   Abbott Pharmaceuticals marked Exhibit Minne 030
16   for identification.)
17       Q.  Does Exhibit 30 look like another
18   example of AWP price reporting by Abbott
19   Pharmaceuticals to Red Book?
20           MS. CITERA:  Object to the form.
21       A.  Yes.
22       Q.  And that one's dated '99; correct?

---

Page 229

1        A.  Correct.
2        Q.  And the other one was dated '95;
3    correct?
4        A.  Correct.
5            (Previously used format of Red Book
6    product verification list marked Exhibit Minne
7    031 for identification.)
8        Q.  All right.  Now, if you could, take a
9    look at what's been marked as Exhibit 31.
10           Are you familiar with this type of
11   document?
12       A.  Yes.
13       Q.  What is it?
14       A.  It is -- my understanding, from my
15   historical knowledge, this is the old format of
16   the PLV.
17       Q.  That's what I thought.
18           When was the change made from this
19   format of the PLV, or also known as the
20   verification forms, to the more standard format
21   that we've seen in the other exhibits?
22           MR. GASTWIRTH:  Objection to form.

58  (Pages 226 to 229)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 230

1       A.  I don't know the exact date.
2       Q.  Something that's kind of curious to me
3    is, you see in that upper left-hand corner how
4    there's a date --
5       A.  Yes.
6       Q.  -- what appears to be a date listed,
7    but the last digit in the year is cut off on
8    every page.
9          Do you know why that is?
10      A.  No, I don't.
11      Q.  But nonetheless, this was a -- this
12   was the format in which Red Book notified
13   manufacturers of the pricing on the drugs for
14   their labeler code, and in turn sought
15   verification from the manufacturers for those
16   prices; correct?
17          MR. GASTWIRTH:  Object to form.
18          MS. CITERA:  Objecting to form.
19      A.  That is my understanding of this form.
20      Q.  And this form, which is marked as
21   Exhibit 31, includes a standard data field titled
22   "AWP"; right?

Page 231

1       A.  Correct.
2       Q.  "Direct price"; correct?
3       A.  Correct.
4       Q.  And "WAC"?
5       A.  Correct.
6       Q.  And at least with respect to this
7    company, Abbott Pharmaceuticals, every single one
8    of those fields is populated?
9          MS. CITERA:  Object to the form.
10      A.  It appears that way, yes.
11      Q.  Oh -- switching gears on you slightly,
12   Miss Minne, to the extent that there's a spread
13   between WAC and AWP in the pricing published by
14   Red Book which exceeds 20 percent, is it fair to
15   say that that spread must have been generated by
16   the manufacturers or the manufacturers'
17   instructions?
18          MS. CITERA:  Objection to form.
19          MR. GASTWIRTH:  Objection to form.
20      A.  If there's a greater than 20 percent
21   difference, it would indicate to me that both of
22   those prices had been supplied by the

Page 232

1    manufacturer and were not a result of AWP policy.
2       Q.  Thank you.  I think your answer was
3    more clear than my question.
4          MR. ANDERSON:  At this point I'll pass
5    the witness.
6          MR. CARROLL:  Why don't we go off the
7    record.
8          THE VIDEOGRAPHER:  This is the
9    videographer.
10         Off the record at 14:16.
11         (Pause)
12         THE VIDEOGRAPHER:  Back on the record,
13   14:18.
14            EXAMINATION
15   BY MR. CARROLL:
16      Q.  Good afternoon, Miss Minne.  My name's
17   James Carroll.  I represent the City of New York
18   and various New York counties, as well as the
19   State of Iowa.  I have a few documents that I'd
20   like to put in front of you and ask you a couple
21   questions.
22         (Document bearing Bates Nos. Red Book

Page 233

1    04693 and 04694 marked Exhibit Minne 032 for
2    identification.)
3       Q.  And the first document, as Exhibit 32.
4          Are you familiar with Exhibit 32?
5       A.  Familiar just in the fact that it's a
6    PL -- product verification list.
7       Q.  And the product verification list was
8    a document that Red Book routinely used in the
9    ordinary course of its business from 1990 to the
10   present; is that correct?
11         MR. GASTWIRTH:  Objection to form.
12      A.  I believe it was used as far back as
13   1990.  I can't verify.
14         MR. SWEENEY:  Hold on, one minute.
15         Who's representing Baxter?  Anybody?
16         MR. CARROLL:  For the record, Exhibit
17   32 is a document with the Bates numbers Red Book
18   06 -- 04693 to 04694, dated October 11th, 2002.
19   It's a two-page document, Red Book product
20   listing verification to Baxter Healthcare.
21      Q.  And this product listing verification
22   would have been provided to Baxter to verify the

Page 234

1  accuracy of Baxter's AWPs, WACs and other pricing
2  information included on the product listing
3  verification for products that were to be
4  published in Red Book or Red Book Update; is that
5  correct?
6       MR. WALLACH:  Objection.
7    A.  Correct.
8    Q.  And if you look, at the bottom on each
9  page indicates that this document was signed on
10  -- by an individual on 9/16/02.
11       And I believe you testified that the
12  signature would correspond to the company, and in
13  this case Baxter; is that correct?
14       MR. WALLACH:  Objection.
15    A.  Correct.
16    Q.  And the signature on the product
17  listing verification indicates that Baxter in
18  fact verified the accuracy of the pricing for
19  Baxter's drugs to Red Book; is that correct?
20       MR. WALLACH:  Objection.
21    A.  It indicates to me that they saw this
22  form, and had the opportunity to make changes if

Page 235

1  they wished, and they chose not to make changes.
2    Q.  On this form they chose -- I would ask
3  -- it indicates "Okay with changes."
4    A.  Well, I mean, I guess I'm talking just
5  specific to prices.
6       MR. SWEENEY:  Objection, that's not
7  what it says.
8       MR. WALLACH:  Objection if there was a
9  question there.
10    Q.  In fact, if Baxter had made changes on
11  this form, Red Book would change the price to
12  reflect Baxter's changes; is that correct?
13    A.  Correct.
14    Q.  And Red Book, in the ordinary course
15  of its business, relied on Baxter to verify the
16  accuracy of AWPs and WACs for all Baxter drugs
17  that were published in Red Book or Red Book
18  Update; is that correct?
19       MR. WALLACH:  Object to the form.
20       MR. CAHILL:  Object to the form.
21    A.  Baxter would have been our source of
22  pricing information for their products, yes.

Page 236

1    Q.  And Red Book would have relied on
2  Baxter for the accuracy of those prices; is that
3  correct?
4       MR. WALLACH:  Object to the form.
5    A.  We would have relied on them to supply
6  the prices.
7    Q.  Is it fair to say that if a price for
8  Baxter drugs products was published in Red Book
9  from 1990 to the present, that the prices were
10  verified by Baxter?
11       MR. WALLACH:  Objection.
12    A.  I do not know if Baxter would have
13  verified that the prices were accurate because I
14  don't know what your definition of accurate is.
15    Q.  Would it be fair to say that they --
16  that Baxter verified the prices per a product
17  listing verification if the pricing for Baxter's
18  drugs were published in the Red Book?
19       MR. WALLACH:  Objection.
20    A.  Yes, this signature indicates to me
21  that they had the opportunity to look at the
22  prices.

Page 237

1    Q.  Do you have any reason to doubt the
2  accuracy of the prices verified in the product
3  listing verifications by Baxter?
4       MR. WALLACH:  Objection.
5    A.  I have no reason to doubt that these
6  prices are not what Baxter supplied to us.
7    Q.  Okay.
8       (July 6, 2004 Bayer Corporation product
9  listing verification marked Exhibit Minne 033 for
10  identification.)
11    Q.  Miss Minne, what I'm handing to you
12  that's been marked as Exhibit 33 is a Red Book
13  product listing verification dated 7 -- July 6,
14  2004 to Bayer Corporation.
15       Are you familiar with Exhibit 33?
16    A.  Just to the extent that it is another
17  product listing verification.
18    Q.  And is this a product listing
19  verification that Red Book routinely used in the
20  ordinary course of its business from 1990 to the
21  present?
22       MR. GASTWIRTH:  Objection to form.

60  (Pages 234 to 237)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

## New York, NY

Page 238

1     A.   Again, not knowing when they
2  implemented this process, if it went back to '90
3  or not, but, yes.
4     Q.   And I'm sorry if I misheard the
5  testimony earlier, but how far back do you know
6  -- are you familiar, as the corporate rep for Red
7  Book, that a product listing verification was
8  used?
9        MS. TORGERSON:  Objection, form.
10     A.   I know they went back to the late
11  '90s.  I don't know how much farther back than
12  that they went.
13     Q.   Would it be fair to say that they were
14  used from 1997 on?
15        MS. TORGERSON:  Objection, form.
16     A.   I think that would be fair, yes.
17     Q.   And this is a product listing
18  verification that Red Book provided to Bayer to
19  verify the AWP, direct price and WAC prices for
20  Bayer products that were to be published in Red
21  Book and Red Book Update; is that correct?
22     A.   Correct.

Page 239

1     Q.   And the signature indicates that, in
2  fact, Bayer verified those prices; is that
3  correct?
4        MS. TORGERSON:  Objection to form.
5     A.   Correct.
6     Q.   And the fact that there are changes
7  made, I believe you testified that Red Book would
8  have made those changes per Bayer's instructions;
9  is that correct?
10     A.   Yes.
11     Q.   And in the ordinary course of Red
12  Book's business, Red Book relied on Bayer to
13  verify the accuracy of its AWPs and WACs for all
14  Bayer drugs that were published in the Red Book;
15  is that correct?
16        MR. CAHILL:  Objection, form.
17     A.   We would have relied on Bayer to
18  supply that information, yes.
19     Q.   And you have no reason to doubt the
20  accuracy of the information supplied by Bayer; is
21  that correct?
22     A.   Correct.

Page 240

1     Q.   And is it fair to say that for any
2  pricing of Bayer products published in the Red
3  Book from at least 1997 to the present, that the
4  prices were verified by Bayer?
5     A.   They would have been verified via this
6  form, yes.
7        (Document bearing Bates Nos. Red Book
8  07589 through 07597 marked Exhibit Minne 034 for
9  identification.)
10     Q.   What I'm handing to you, which is
11  marked as Exhibit 34, is a Red Book product
12  listing verification with the Bates numbers Red
13  Book 07589 through 07597, to Endo Generic
14  Products, dated October 11th, 2001.
15        And do you recognize this as the Red
16  Book product listing verification?
17     A.   Yes.
18     Q.   And is this product listing
19  verification to Endo Generic Products a document
20  that Red Book routinely used in the ordinary
21  course of its business?
22        MS. TORGERSON:  Objection, form.

Page 241

1     A.   Yes.
2     Q.   And this product listing verification
3  was provided to Endo Generic Products to verify
4  the accuracy of Endo's AWPs and WACs that were to
5  be published in Red Book and Red Book Update; is
6  that correct?
7        MR. FARQUHAR:  Objection, leading.
8     A.   It was provided to them so they could
9  see what we had listed for their products, right.
10     Q.   And the signature on the verification
11  indicates that Endo, in fact, verified the AWP
12  and WAC pricing for Endo drugs in the Red Book;
13  is that correct?
14        MR. FARQUHAR:  Objection, leading.
15     A.   I can only assume they looked at them.
16  I can't, I can't --
17     Q.   Well, what does that -- what does the
18  signature at the bottom indicate to you?
19     A.   It indicates they had the document.
20  Now, whether they went through every single price
21  and looked at it, I can't verify that.
22     Q.   Okay.  But from Red Book's

61  (Pages 238 to 241)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 242

1   perspective, the fact that they signed this
2   product listing verification and did or did not
3   change prices, Red Book followed those
4   indications in the product listing verification;
5   is that correct?
6           MR. FARQUHAR:  Objection, leading.
7       A.  Correct.
8       Q.  And in the ordinary course of its
9   business, Red Book relied on Endo to verify the
10  AWPs and WACs for all Endo products for which it
11  supplied pricing information to be published in
12  the Red Book; is that correct?
13          MR. FARQUHAR:  Objection, leading.
14      A.  Correct.
15      Q.  And is it fair to say that a price for
16  Endo's drugs that was published in the Red Book
17  from at least 1997 to the present were verified
18  by product listing verifications?
19          MR. FARQUHAR:  Objection, leading.
20  Objection, lack of foundation.
21      A.  Yes.
22          (July 6, 2004 Ethex Corporation product

Page 243

1   listing verification marked Exhibit Minne 035 for
2   identification.)
3       Q.  Miss Minne, what I'm handing to you,
4   which is Exhibit 35, is a Red Book product
5   listing verification dated July 6, 2004 for Ethex
6   Corporation.
7           MR. CARROLL:  Somebody from Ethex?
8           MR. SWEENEY:  There's somebody on the
9   phone from Ethex.
10      Q.  Do you recognize this as a Red Book
11  product listing verification?
12      A.  Yes.
13      Q.  And is this a product listing
14  verification that Red Book routinely used in the
15  ordinary course of its business?
16          MS. TORGERSON:  Objection, form.
17      A.  Yes.
18      Q.  And this was a Red Book form --
19  product listing verification that was provided to
20  Ethex Corporation to verify the accuracy of its
21  AWPs that were -- and WAC prices that were
22  published in the Red Book; is that correct?

Page 244

1       A.  Yes.
2       Q.  And at the bottom of each page you'll
3   notice that there's a signature.  And is it fair
4   to say that the signature indicates that the
5   prices were in fact verified by Endo -- Ethex
6   Corporation, excuse me?
7       A.  As far as Red Book is concerned, yes.
8       Q.  And in -- and Red Book, in the
9   ordinary course of its business, relied on Ethex
10  to verify the pricing supplied to Red Book for
11  all Ethex products that were published in the Red
12  Book; is that correct?
13          MS. TORGERSON:  Objection, form.
14      A.  Yes.
15      Q.  And is it fair to say that for a price
16  for Ethex drugs that was published in the Red
17  Book from at least 1997 to the present, that the
18  prices were, in fact, verified by Ethex
19  Corporation?
20          MS. LORENZO:  Objection.
21          MS. TORGERSON:  Objection, form.
22      A.  It's the assumption that Red Book

Page 245

1   makes when they sign this PLV form.
2           (October 11, 2002 Forest
3   Pharmaceuticals product listing verification
4   marked Exhibit Minne 036 for identification.)
5       Q.  Miss Minne, what I'm handing you,
6   which is marked as Exhibit 36, is a Red Book
7   product listing verification dated October 11th,
8   2002 to Forest Pharmaceuticals.
9           MR. CARROLL:  Anyone?  Anyone?
10      Q.  And is this a Red Book product listing
11  verification that you're familiar with?
12      A.  Yes.
13      Q.  And is it a product listing
14  verification that Red Book routinely used in the
15  ordinary course of its business?
16          MR. GASTWIRTH:  Objection, form.
17      A.  Yes.
18      Q.  And is this the product listing --
19  type of product listing verification form that
20  was provided to Forest Pharmaceuticals to verify
21  the accuracy of its AWPs and WACs that were
22  published in the Red Book?

62  (Pages 242 to 245)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 246

1          MS. EPPS:  Objection to form.
2     A.   Yes.
3     Q.   And I draw your attention to the
4  bottom, it shows there is a signature dated -- on
5  each page.  And my question is, the signature on
6  the verification indicates that Forest
7  Pharmaceuticals in fact verified the AWP and WAC
8  pricing information for Forest Pharmaceutical
9  drugs that were published in the Red Book; is
10 that correct?
11         MS. EPPS:  Objection to form.
12    A.   That is the Red Book assumption.
13    Q.   And if there was a change indicated,
14 would Red Book make the change reflecting Forest
15 Pharmaceuticals' instructions?
16    A.   Yes.
17    Q.   And Red Book in the ordinary course of
18 its business relied on Forest Pharmaceuticals to
19 verify the accuracy of AWPs and WACs for all
20 Forest Pharmaceutical drugs that were published
21 in the Red Book; is that correct?
22         MS. EPPS:  Objection to form.

Page 247

1     A.   Yes.
2     Q.   And if, in fact, the price for Forest
3  Pharmaceutical products was published in the Red
4  Book from at least 1997 to the present, the
5  prices would have been verified by Forest; is
6  that correct?
7          MS. EPPS:  Objection to form.
8     A.   That is Red Book's assumption.
9          MR. CAHILL:  Is there any way we can --
10 obviously we sent questions.  Is there a way we
11 can try to do these all at once so that -- in
12 other words, if the questions are the same and
13 the answers are going to be the same?  If there's
14 no way to do it, there's no way to do it...
15         MR. FARQUHAR:  Well, we don't know who
16 we're going to trial with and who we're not going
17 to trial with.
18         MR. CAHILL:  So you need each one
19 separately?
20         MR. CARROLL:  Yes.
21         I'll go as far as I can.
22         (July 25, 2003 Fujisawa Healthcare

Page 248

1  product listing verification marked Exhibit Minne
2  037 for identification.)
3     Q.   Miss Minne, what has been handed to
4  you as Exhibit 37 is a Red Book product listing
5  verification dated July 25th, 2003 to Fujisawa
6  Healthcare.
7          Are you familiar with this as a Red
8  Book product listing verification?
9     A.   Yes.
10    Q.   And is this a product -- type of
11 product listing verification that Red Book
12 routinely used in the ordinary course of its
13 business?
14         MR. GASTWIRTH:  Objection to form.
15    A.   Yes.
16    Q.   And is this a product listing
17 verification Red Book provided to Fujisawa to
18 verify the accuracy of Fujisawa AWP and WAC
19 pricing for Fujisawa drugs that were published in
20 the Red Book?
21    A.   Yes.
22    Q.   And if you'll look at the bottom of

Page 249

1  each page, it indicates that it is signed by a
2  Carol Robey.
3          Does that signature indicate to you
4  that Fujisawa in fact verified the pricing of its
5  products that was published in the Red Book?
6     A.   Yes.
7     Q.   And in the ordinary course of its
8  business, Red Book relied on Fujisawa to verify
9  the accuracy of the AWPs and WACs for Fujisawa
10 drugs that were published in the Red Book; is
11 that correct?
12         MS. LORENZO:  Objection to form.
13    A.   Yes.
14    Q.   And if a Fujisawa -- if a price for a
15 Fujisawa drug was published in the Red Book from
16 at least 1997 to the present, that price would
17 have been verified by Fujisawa; is that correct?
18    A.   That is the Red Book assumption.
19         (July 6, 2004 Eli Lilly & Company
20 product listing verification marked Exhibit Minne
21 038 for identification.)
22    Q.   Miss Minne, what I'm handing you,

63  (Pages 246 to 249)

Page 250

1  which has been marked as Exhibit 38, is a Red
2  Book product identification listing dated 7 --
3  July 6, 2004 to Eli Lilly & Company.
4       Do you recognize this as a product --
5  Red Book product listing verification?
6       A.  Yes.
7       Q.  Is this a product listing verification
8  that Red Book routinely used in the ordinary
9  course of its business?
10       MR. GASTWIRTH:  Objection to form.
11       A.  Yes.
12       Q.  And this is a product listing
13  verification provided to you to verify the
14  accuracy of Eli Lilly's AWPs and WACs that were
15  to be published for Eli Lilly products in the Red
16  Book; is that correct?
17       A.  Yes.
18       MR. FARQUHAR:  Objection, leading.
19       Q.  And I draw your attention to the
20  bottom of each page, and it indicates that there
21  is a signature by Carol Butterfield.
22       Does that signature on the verification

Page 251

1  indicate that Eli Lilly in fact verified the
2  accuracy of the AWP and WAC pricing for Eli Lilly
3  drugs to be published in the Red Book?
4       MR. FARQUHAR:  Objection, leading.
5  Objection, foundation.
6       A.  Yes.
7       Q.  And Red Book, in the ordinary course
8  of its business, relied on Eli Lilly to verify
9  the accuracy of the AWPs and WACs for all Eli
10  Lilly drugs that were published in the Red Book;
11  is that correct?
12       MR. FARQUHAR:  Objection, leading.
13       A.  Yes.
14       Q.  And if a price for an Eli Lilly drug
15  was published in the Red Book, it would have been
16  verified by Eli Lilly from at least 1997 to the
17  present; is that correct?
18       MR. FARQUHAR:  Objection, leading.
19  Objection, lack of foundation.
20       A.  That is our assumption.
21       (October 1, 2001 Glaxo-Wellcome product
22  listing verification marked Exhibit Minne 039 for

Page 252

1  identification.)
2       Q.  Miss Minne, what I'm handing to you as
3  Exhibit 39 is a Red Book product listing
4  verification dated October 1st, 2001 to
5  Glaxo-Wellcome.
6       Are you familiar with Exhibit 39?
7       A.  Yes, in that it's a form provided by
8  Red Book.
9       Q.  Okay.  And it's a document that Red
10  Book routinely used in the ordinary course of its
11  business; is that correct?
12       MR. GASTWIRTH:  Objection to form.
13       A.  Yes.
14       Q.  And this was a product listing
15  verification that was provided to Glaxo-Wellcome
16  to verify of the accuracy of Glaxo-Wellcome AWPs
17  and WACs that were published in the Red Book; is
18  that correct?
19       A.  Yes.
20       Q.  And if you notice at the bottom of
21  each page there is a signature, and that
22  signature -- does that signature indicate that --

Page 253

1  does that signature indicate to Red Book that
2  Glaxo-Wellcome did, in fact, verify the pricing
3  contained in Exhibit 39?
4       A.  Yes.
5       Q.  And in the ordinary course of its
6  business, Red Book relied on Glaxo-Wellcome to
7  verify the accuracy of AWPs and WACs for all
8  Glaxo-Wellcome drugs that were published in the
9  Red Book; is that correct?
10       MR. FARQUHAR:  Objection, leading.
11       A.  Yes.
12       Q.  And to the extent that there was --
13       MR. CARROLL:  Excuse me.
14       Q.  -- there was a price in the Red Book
15  for a Glaxo-Wellcome drug, it was Red Book's
16  assumption that it was in fact verified by Glaxo;
17  is that correct?
18       MR. FARQUHAR:  Objection, leading.
19       A.  Yes.
20       (August 16, 2001 Roche Laboratories
21  product listing verification marked Exhibit Minne
22  040 for identification.)

64  (Pages 250 to 253)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 254

1    Q.  Miss Minne, what I'm handing you,
2  which has been marked as Exhibit 40, is a Red
3  Book product listing verification dated August
4  16th, 2001 to Roche Laboratories, a Division of
5  Hoffman-La Roche.
6        Are you familiar with this as a Red
7  Book product listing verification?
8    A.  Yes.
9    Q.  And is this a product listing
10  verification that Red Book routinely used in the
11  ordinary course of its business?
12        MR. GASTWIRTH:  Objection to form.
13        MS. LORENZO:  Objection to form.
14    Q.  And this was a product listing
15  verification that was provided to Roche
16  Laboratories to verify the accuracy of Roche AWP
17  and WAC pricing that was to be published in the
18  Red Book; is that correct?
19        MS. LORENZO:  Objection to form.
20    A.  Yes.
21    Q.  And if you'll notice at the bottom of
22  each page there's a signature dated August 9th,

Page 255

1  2001.
2        Does that signature indicate to you
3  that in fact Roche Laboratory verified the
4  accuracy of the AWP and WAC pricing for Roche
5  drugs that were published in the Red Book?
6    A.  Yes.
7    Q.  And in the ordinary course of its
8  business, Red Book relied on Roche Laboratories
9  to verify the accuracy of the AWP and WACs for
10  Roche drugs that were published in the Red Book;
11  is that correct?
12    A.  Yes.
13    Q.  And in fact, if a drug price for Roche
14  products was published in the Red Book from at
15  least 1997 to the present, it would have been
16  verified by Roche Laboratories; is that correct?
17    A.  It's our assumption.
18        (Boehringer Ingelheim Pharmaceuticals
19  product listing verification signed August 22,
20  2002 marked Exhibit Minne 041 for
21  identification.)
22    Q.  Miss Minne, what I'm handing you,

Page 256

1  which has been marked as Exhibit 41, is a Red
2  Book product listing verification to Boehringer
3  Ingelheim Pharmaceuticals, and requesting that
4  the response be by October 11th, 2002.
5        MR. GASTWIRTH:  Objection to form.
6  What's your question?
7        MR. CARROLL:  Pardon?
8        MR. GASTWIRTH:  If there's a question
9  pending, objection to form.
10        MR. CARROLL:  Great.
11    Q.  Are you familiar with this as a Red
12  Book product listing verification?
13        MR. GASTWIRTH:  Objection to form.
14    A.  Yes.
15    Q.  And is this a document that Red Book
16  routinely used in the ordinary course of its
17  business?
18        MR. GASTWIRTH:  Objection to form.
19    A.  Yes.
20    Q.  And is this a product listing
21  verification that Red Book provided to Boehringer
22  Ingelheim Pharmaceuticals to verify the accuracy

Page 257

1  of Boehringer AWPs and WACs that were published
2  in Red Book?
3        MR. GASTWIRTH:  Objection to form.
4    A.  Yes.
5    Q.  And if you'll please look at the
6  bottom of each page, there is a signature dated
7  August 22nd, 2002.
8        Does that signature indicate to you, as
9  representative of Red Book, that Boehringer
10  Ingelheim Pharmaceutical in fact verified the
11  accuracy of AWP and WAC pricing for Boehringer
12  drugs published in Red Book?
13        MR. CAHILL:  Objection to form.
14    A.  Yes.
15    Q.  And in fact, Red Book, in the ordinary
16  course of its business, relied on Boehringer
17  Ingelheim Pharmaceuticals to verify the accuracy
18  of AWPs and WACs for all Boehringer Ingelheim
19  pharmaceuticals published in the Red Book; is
20  that correct?
21        MR. GASTWIRTH:  Objection to form.
22    A.  Yes.

65  (Pages 254 to 257)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 258

1    Q.   And if, in fact, a Boehringer
2  Ingelheim drug -- if a price for a Boehringer
3  Ingelheim Pharmaceuticals drug was published in
4  the Red Book from at least 1997 to the present,
5  Red Book would assume that the price had been
6  verified by Boehringer Ingelheim Pharmaceuticals;
7  is that correct?
8        MR. GASTWIRTH:  Objection to form,
9  calls for speculation.
10   A.   Yes.
11       (September 18, 2001 Bedford
12  Laboratories product listing verification marked
13  Exhibit Minne 042 for identification.)
14   Q.   Miss Minne, what I'm putting in front
15  of you, which has been marked as Exhibit 42, is a
16  Red Book pricing verification with a stamped date
17  of September 18th, 2001 to Bedford Laboratories.
18       Are you familiar with this as a pricing
19  list -- a price -- a product listing verification
20  --
21       MR. CARROLL:  I'm sorry.
22   Q.   -- a product listing verification?

Page 259

1        MR. GASTWIRTH:  Objection to form.
2    A.   Yes.
3    Q.   And is this a document that Red Book
4  routinely uses in the ordinary course of its
5  business?
6        MR. GASTWIRTH:  Objection to form.
7    A.   Yes.
8    Q.   And is this a product listing
9  verification form that was provided to Bedford
10  Laboratories to verify the accuracy of Bedford
11  AWP and WAC pricing that were published in the
12  Red Book?
13       MR. GASTWIRTH:  Objection to form.
14   A.   Yes.
15   Q.   And I draw your attention to the
16  bottom of -- to the various pages.  And to the
17  extent there are signatures, do those signatures
18  indicate that Bedford Laboratories in fact
19  verified the price accuracy of the AWP and WAC
20  pricing for Bedford Laboratory products that were
21  published in the Red Book?
22       MR. GASTWIRTH:  Objection to form.

Page 260

1    A.   Yes.
2    Q.   And in the ordinary course of its
3  business, Red Book relied on Bedford Laboratories
4  to verify the accuracy of AWPs and WACs for all
5  Bedford Laboratory drugs that were published in
6  the Red Book?
7        MR. GASTWIRTH:  Objection to form.
8    Q.   Is that correct?
9    A.   Yes.
10   Q.   And if, in fact, a price for a Bedford
11  Laboratory product was published in the Red Book
12  from at least 1997 to the present, it is Red
13  Book's assumption that the price was, in fact,
14  verified by Bedford Laboratories; is that
15  correct?
16       MR. GASTWIRTH:  Objection to form,
17  calls for speculation.
18   A.   Yes.
19       (October 1, 2001 Barr Laboratories
20  product listing verification marked Exhibit Minne
21  043 for identification.)
22   Q.   Miss Minne, I've placed in front of

Page 261

1  you, which has been marked as Exhibit 43, a
2  product -- a Red Book product listing
3  verification, requesting a response by October
4  1st, 2001, to Barr Laboratories.
5        Are you familiar with this as a Red
6  Book products listing verification?
7        MR. PARISH:  Objection, form.
8    A.   Yes.
9    Q.   Is this a document that Red Book
10  routinely used in the ordinary course of its
11  business?
12       MR. PARISH:  Objection, form.
13   A.   Yes.
14   Q.   And was this a -- is this a product
15  listing verification form that Red Book provided
16  to Barr Laboratories to verify the accuracy of
17  Barr AWP and WAC prices that were published in
18  Red Book?
19       MR. PARISH:  Objection to form.
20   A.   Yes.
21   Q.   And you'll notice there's a signature
22  at the bottom of the page.

66 (Pages 258 to 261)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 262

1        Does that signature indicate to you
2   that Barr Laboratories in fact verified the
3   accuracy of AWP and WAC pricing for Barr drugs
4   that were published in the Red Book?
5        MR. PARISH:  Objection, form.
6     A.  Yes.
7     Q.  And in the ordinary course of its
8   business did Red Book in fact rely on Barr
9   Laboratories to verify the accuracy of AWP and
10  WAC pricing for Barr drugs that were published in
11  the Red Book?
12       MR. PARISH:  Objection to form.
13    A.  Yes.
14    Q.  And if in fact a price for a Barr
15  Laboratories product was published in the Red
16  Book from at least 1997 to the present, the
17  product -- the price would have been verified by
18  Barr Laboratories; is that correct?
19       MR. PARISH:  Objection, form, calls for
20  speculation.
21    A.  Yes.
22       (October 2, 2001 Merck & Company

Page 263

1   product listing verification marked Exhibit Minne
2   044 for identification.)
3     Q.  Miss Minne, what I'm handing you,
4   which is marked as Exhibit 44, is a product
5   listing verification with a stamp date of October
6   2nd, 2001 to -- addressed to Merck & Company.
7        Are you familiar with this as a Red
8   Book product listing verification?
9        MR. GASTWIRTH:  Objection to form.
10    A.  Yes.
11    Q.  And is this --
12       MR. FUNKHOUSER:  This is Rob
13  Funkhouser.
14       Can you give me the Bates number?
15       MR. CARROLL:  Yeah.  I'm sorry, Rob.
16  It's Red Book 10281 through 10389.
17       MR. FUNKHOUSER:  And does this form
18  relate to NDCs for which you're asserting spreads
19  in excess of 30 percent?
20       MR. CARROLL:  Yes, I believe there are
21  some on here.
22       MR. FUNKHOUSER:  Well, have you done

Page 264

1   anything to confirm that?  Because there was some
2   issue with discovery being stayed as to NDCs that
3   did exceed that threshold.
4        MR. CARROLL:  No, I have not. However
5   -- hmmm...
6        I'm happy to look it up in a break, but
7   I'm sure they are, because I've been told that
8   there are drugs from our revised Exhibit B that
9   are in this exhibit.  In fact, all of our drugs
10  that are in our revised Exhibit B are in this
11  exhibit, and if you want me to -- I could happily
12  pull up one drug that's over 30 percent, to which
13  we are entitled to discovery.
14       MR. FUNKHOUSER:  All right, that's
15  fine, I just want to make sure you confirm your
16  compliance with CMO 33.
17       If you've done that, go ahead and
18  proceed.
19       MR. CARROLL:  Well, I personally
20  haven't done that, so --
21       MS. KAPLAN:  I think revised Exhibit D
22  includes allegations for drugs with spreads above

Page 265

1   30 --
2        MR. CARROLL:  Yes, above and below.
3   BY MR. CARROLL:
4     Q.  Are you familiar with this as a Red
5   Book product listing verification?
6     A.  Yes.
7     Q.  And is this a document that Red Book
8   routinely used in the ordinary course of its
9   business?
10       MR. CAHILL:  Objection to form.
11    A.  Yes.
12    Q.  And is this a product listing
13  verification that Red Book provided to Merck to
14  verify the accuracy of Merck AWP and WAC pricings
15  that were published in the Red Book?
16       MR. FUNKHOUSER:  Objection to form.
17    A.  Yes.
18    Q.  And if you'll look at the bottom,
19  there's a signature on each page of the exhibit.
20       Does that signature indicate to Red
21  Book that Merck in fact verified the accuracy of
22  the AWP and WAC pricing for Merck products that

67  (Pages 262 to 265)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                November 18, 2008
New York, NY

Page 266

1  were published in -- pricing of Merck products
2  were published in Red Book?
3         MR. FUNKHOUSER:  Objection, form,
4  foundation.
5     A.  Yes.
6     Q.  And Red Book, in the ordinary course
7  of its business, relied on Merck to verify the
8  accuracy of AWP and WAC pricing for all Merck
9  products for which pricing was published in the
10 Red Book; is that correct?
11        MR. FUNKHOUSER:  Same objections.
12    A.  Yes.
13    Q.  And in fact, if a price for a Merck
14 product was published in the Red Book from at
15 least 1997 to the present, the prices would have
16 been verified by Merck; is that correct?
17        MR. FUNKHOUSER:  Objection, move to
18 strike.
19    A.  Yes, that is our assumption.
20        (Document bearing Bates No. Red Book
21 09936 marked Exhibit Minne 045 for
22 identification.)

Page 268

1         Does this signature indicate to you
2  that MedImmune in fact verified the accuracy of
3  the AWP and WAC pricing for MedImmune drugs
4  published in Red Book?
5         MR. FARQUHAR:  Objection, leading.
6     A.  Yes.
7     Q.  And in the ordinary course of its
8  business, Red Book relied upon MedImmune to
9  verify the accuracy of AWP and WAC pricing for
10 all MedImmune products that were published in the
11 Red Book?
12        MR. FARQUHAR:  Objection, leading --
13    Q.  Is that correct?
14        MR. FARQUHAR:  -- objection, lack of
15 foundation.
16    Q.  And in fact, if a price for a
17 MedImmune product was published in the Red Book
18 from at least 1997 to the present, the prices
19 were in fact verified by MedImmune; is that
20 correct?
21        MR. FARQUHAR:  Objection, leading.
22 Objection, lack of foundation.

Page 267

1     Q.  Miss Minne, what I've handed you as
2  Exhibit 45 is a one-page document with Bates Red
3  Book 09936, a product listing verification, the
4  Bates -- stamp date of September 9, 1999, to
5  MedImmune.
6         Are you familiar with this as a Red
7  Book product listing verification form?
8     A.  Yes.
9     Q.  And is this a document that Red Book
10 routinely used in the ordinary course of its
11 business?
12        MR. GASTWIRTH:  Objection to form.
13    A.  Yes.
14    Q.  And is this a product listing
15 verification form provided to MedImmune to verify
16 the accuracy of MedImmune AWP and WAC pricing
17 that was published in the Red Book for MedImmune
18 products?
19    A.  Yes.
20        MR. FARQUHAR:  Objection, leading.
21    Q.  I draw your attention to the signature
22 at the bottom of the page.

Page 269

1     A.  Yes, that is our assumption.
2         (Document bearing Bates Nos. Red Book
3  14957 through 14961 marked Exhibit Minne 046 for
4  identification.)
5     Q.  Miss Minne, what I'm handing you,
6  which has been marked as Exhibit 46, is a product
7  -- Red Book product listing verification with a
8  stamp date -- it says September 18th, with no
9  year, but it appears to be in 1998.  The Bates
10 number is Red Book 14957 through 14961, to Serono
11 Labs.
12        Are you familiar with this as a product
13 -- Red Book product listing verification?
14    A.  Yes.
15    Q.  And is it a document that Red Book
16 routinely used in the ordinary course of its
17 business?
18        MR. GASTWIRTH:  Objection, form.
19    A.  Yes.
20    Q.  And is this a product listing
21 verification that Red Book provided to Serono
22 Labs to verify the accuracy of Serono AWP and WAC

68  (Pages 266 to 269)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 270

1  pricing that was published in the Red Book?
2      MR. FARQUHAR:  Objection, leading.
3  Objection, lack of foundation.
4      A.  Yes.
5      Q.  And if you notice, there's a signature
6  at the bottom of each page.
7      Does -- do -- does the signature
8  indicate that Serono Labs in fact verified the
9  accuracy of AWP and WAC pricing for Serono Lab
10  drugs that were published in the Red Book?
11      MR. CAHILL:  Same objections.
12      A.  Yes.
13      Q.  And Red Book, in the ordinary course
14  of its business, relied upon Serono Labs to
15  verify the accuracy of AWP and WAC pricing for
16  all Serono Lab products for which pricing was
17  published in the Red Book; is that correct?
18      MR. FARQUHAR:  Same objections.
19      A.  Yes.
20      Q.  And if in fact a price for a Serono
21  Labs product was published in the Red Book from
22  at least 1997 to the present, the prices were

Page 271

1  verified by Serono Labs; is that correct?
2      MR. CAHILL:  Same objection.
3      A.  That is our assumption.
4      (Document bearing Bates Nos. Red Book
5  13418 through 13426 marked Exhibit Minne 047 for
6  identification.)
7      Q.  Miss Minne, what I'm handing you is
8  marked as Exhibit 47.  It is a Red Book product
9  listing verification with a stamped date of
10  August 20th, 2001, Bates stamped Red Book 13418
11  through 13426, sent to the Purdue Frederick
12  Company.
13      Are you familiar with this as a Red
14  Book product listing verification form?
15      A.  Yes.
16      Q.  Is it a document that Red Book
17  routinely used in the ordinary course of its
18  business?
19      MR. GASTWIRTH:  Objection to the form.
20      A.  Yes.
21      Q.  And is this a product listing
22  verification form that Red Book provided to the

Page 272

1  Purdue Frederick Company to verify the accuracy
2  of Purdue Frederick Company's AWP and WACs that
3  were published in Red Book?
4      MR. FARQUHAR:  Objection, leading.
5  Objection, lack of foundation.
6      A.  Yes.
7      Q.  And you'll notice that there is a
8  signature on the bottom of each page of this
9  exhibit.
10      Does the signature indicate that the
11  Purdue Frederick Company in fact verified the
12  accuracy of AWP and WAC pricing for the Purdue
13  Frederick Company pricing for drugs published in
14  the Red Book?
15      MR. FARQUHAR:  Same objections.
16      A.  Yes.
17      Q.  And within the ordinary course of its
18  business, Red Book relied on the Purdue Frederick
19  Company to verify the accuracy of AWP and WAC
20  pricing for all Purdue Frederick drugs for which
21  pricing was published in Red Book.
22      Is that correct?

Page 273

1      MR. FARQUHAR:  Same objections.
2      A.  Yes.
3      Q.  And if a price was published for a
4  Purdue Frederick Company drug in the Red Book
5  from at least 1997 to the present, the prices
6  were, in a fact, verified by the Purdue Frederick
7  Company; is that correct?
8      MR. FARQUHAR:  Same objections.
9      A.  That is our assumption.
10      MR. GASTWIRTH:  Do you think you might
11  be going for a bit longer?  Do we need to take a
12  break soon?
13      MR. CARROLL:  I don't need to take a
14  break, I'm fine.  I have a couple more there, and
15  then more in there, but they're not as many.
16  They're mostly in this box (indicating).
17      You guys need a break?
18      Why don't we take -- off the record.
19      THE VIDEOGRAPHER:  Off the record at
20  15:08.  Ends tape number four.
21      (Recess taken)
22      THE VIDEOGRAPHER:  This is the

69 (Pages 270 to 273)

Page 274

1   videographer.  Back on the record at 15:24.
2        (July 25h, 2003 Pfizer USA Pharma Group
3   product listing verification marked Exhibit Minne
4   048 for identification.)
5   BY MR. CARROLL:
6        Q.   Miss Minne, what I've handed you as
7   Exhibit 48 is a product listing verification
8   dated July 25th, 2003 to Pfizer USA Pharma Group.
9             Do you recognize this -- are you
10  familiar with this as a Red Book product listing
11  verification?
12       A.   Yes.
13       Q.   Is this a document that Red Book
14  routinely used in the ordinary course of its
15  business?
16            MS. KAPLAN:  Objection to form.
17       A.   Yes.
18       Q.   And is this a product listing
19  verification form that read --
20            MR. CARROLL:  Strike that.
21       Q.   Did Red Book provide this product
22  listing verification form to Pfizer?

Page 275

1        A.   Yes.
2        Q.   And was this product listing
3   verification form provided to Pfizer to verify
4   the accuracy of Pfizer AWP and WAC pricing for
5   its products that were published in the Red Book?
6            MS. KAPLAN:  Objection to form.
7        A.   Yes.
8        Q.   And if you'll notice it, there is a
9   signature on the bottom of each page.
10            Does that signature indicate to you
11  that Pfizer in fact did verify the AWP and WAC
12  pricing for the Pfizer products for which pricing
13  was published in the Red Book?
14            MS. KAPLAN:  Objection.
15       A.   Yes.
16       Q.   And did Red Book in the ordinary
17  course of its business rely upon Pfizer to verify
18  the accuracy of AWP and WAC pricing for all
19  Pfizer drugs that were published in the Red Book?
20            MS. KAPLAN:  Objection to form.
21       A.   Yes.
22       Q.   And if, in fact, a price for a Pfizer

Page 276

1   drug was published in a -- in the Red Book from
2   at least 1997 to the present, did Pfizer verify
3   the prices per a product listing verification?
4            MS. KAPLAN:  Objection to form.
5        A.   That is our assumption.
6        (July 25, 2003 Greenstone product
7   listing verification marked Exhibit Minne 049 for
8   identification.)
9        Q.   What I'm handing you, which is marked
10  as Exhibit 49, is a Red Book product listing
11  verification dated July 25th, 2003, addressed to
12  Greenstone.
13            Is this a product listing verification
14  form that you're familiar with --
15            MR. CARROLL:  Strike that.
16       Q.   Are you familiar with this Red Book
17  product listing verification form?
18       A.   Yes.
19       Q.   And is it a document that Red Book
20  routinely used in the ordinary course of its
21  business?
22            MR. GASTWIRTH:  Objection to form.

Page 277

1        A.   Yes.
2        Q.   And did Red Book provide this product
3   listing verification form to Greenstone to verify
4   the accuracy of Greenstone AWP and WAC pricing
5   that was published in the Red Book?
6            MS. KAPLAN:  Objection to form.
7            MS. LORENZO:  Objection to form.
8        A.   Yes.
9        Q.   And you'll notice there is a signature
10  on each page, at the bottom of each page.
11            Does the signature indicate that
12  Greenstone, in fact, verified the AWP and WAC
13  pricing for its products that were published in
14  the Red Book?
15            MS. KAPLAN:  Objection to form, lack of
16  foundation.
17       A.   Yes.
18       Q.   And in the ordinary course of its
19  business did Red Book rely upon Greenstone to
20  verify the accuracy of AWP and WAC pricing for
21  the Greenstone products published in the Red
22  Book?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 278

1        MS. KAPLAN:  Objection to form, lack of
2   foundation.
3        A.  Yes.
4        Q.   And if a price for a Greenstone
5   product was published in the Red Book from at
6   least 1997 to the present, did Red Book rely upon
7   Greenstone to verify the accuracy of that price?
8        MS. KAPLAN:  Object to the form, lack
9   of foundation.
10       A.  Yes, that was their assumption.
11       (October 11, 2002 Pharmacia Corporation
12   product listing verification marked Exhibit Minne
13   050 for identification.)
14       Q.   What I've handed you as Exhibit 50 is
15   a Red Book product listing verification form with
16   a respond date by October 11th, 2002 to Pharmacia
17   Corporation.
18       Are you familiar with Exhibit 50?
19       A.   Yes, as a document that we produced.
20       Q.   And is Exhibit 50 a document that Red
21   Book routinely used in the ordinary course of its
22   business?

Page 279

1        MS. KAPLAN:  Objection, form.
2        A.  Yes.
3        Q.   And is this Red Book product listing
4   verification --
5        MR. CARROLL:  Strike that.
6        Q.   Did Red Book provide the Red Book
7   product listing verification to Pharmacia
8   Corporation to verify the accuracy of Pharmacia
9   Corporation AWPs and WACs that were published in
10   the Red Book?
11       MS. KAPLAN:  Object to the form.
12       A.  Yes.
13       Q.   And to the extent there were any
14   changes made at the request of Pharmacia, did Red
15   Book make those changes?
16       MS. KAPLAN:  Objection, form.
17       A.  Yes.
18       Q.   And did Red Book rely on Pharmacia
19   Corporation to verify the accuracy of AWP and WAC
20   pricing for Pharmacia drugs that were published
21   in the Red Book?
22       MS. KAPLAN:  Objection, form, lack of

Page 280

1   foundation.
2        A.  Yes.
3        Q.   And to the extent a price for a
4   Pharmacia drug was published in the Red Book from
5   at least 1997 to the present, did Red Book rely
6   on Pharmacia to verify the accuracy of that
7   pricing?
8        MS. KAPLAN:  Objection to form, lack of
9   foundation.
10       A.  Yes.
11       (Document bearing Bates Nos. Red Book
12   13003 and 13002 marked Exhibit Minne 051 for
13   identification.)
14       (Document bearing Bates Nos. Red Book
15   13199 and 13200 marked Exhibit Minne 052 for
16   identification.)
17       (Document bearing Bates Nos. Red Book
18   13198 and 13197 marked Exhibit Minne 053 for
19   identification.)
20       (Document bearing Bates No. Red Book
21   13196 marked Exhibit Minne 054 for
22   identification.)

Page 281

1        (Document bearing Bates No. Red Book
2   13015 marked Exhibit Minne 055 for
3   identification.)
4        (Document bearing Bates Nos. Red Book
5   13109 through 13113 marked Exhibit Minne 056 for
6   identification.)
7        (Document bearing Bates Nos. Red Book
8   13090 and 13091 marked Exhibit Minne 057 for
9   identification.)
10       (Document bearing Bates No. Red Book
11   13086 marked Exhibit Minne 058 for
12   identification.)
13       (Document bearing Bates No. Red Book
14   13087 marked Exhibit Minne 059 for
15   identification.)
16       Q.  I'm going to hand you a group of
17   exhibits.
18       (Pause)
19       MR. CARROLL:  Can we go off the record
20   for a second.
21       THE VIDEOGRAPHER:  This is the
22   videographer.  Off the record at 15:32.

71  (Pages 278 to 281)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                      November 18, 2008
New York, NY

Page 282

1      (Pause)
2      THE VIDEOGRAPHER:  This is the
3   videographer.  Back on the record, 15:33.
4      Q.  Miss Minne, I've handed you exhibits
5   marked 51 through 59.
6      If you could please review each one,
7   and each should have a Bates label Red Book at
8   the bottom, with a specific Bates number.
9      Can you confirm that for each of the
10  Exhibits 51 through 59?
11     A.  I confirm that.
12     Q.  And were these Exhibits 51 through 59
13  produced from Red Book's files?
14     A.  It appears that way, yes.
15     Q.  And were these documents, Exhibit 51
16  through 59, regularly maintained business records
17  of Red Book?
18     A.  Yes, they are.
19     Q.  And were they kept in the ordinary
20  course of business?
21     A.  Yes.
22     Q.  Is there any reason to question the

Page 283

1   authenticity of these exhibits as records
2   maintained in Red Book's records?
3      A.  No.
4      Q.  Did you understand the question?
5      A.  I did.
6      MS. KAPLAN:  Objection.
7      MR. CARROLL:  That's all I have for
8   those exhibits.
9      (September 26, 1997 Schering
10  Corporation product listing verification marked
11  Exhibit Minne 060 for identification.)
12     Q.  Miss Minne, what I'm handing you,
13  which has been marked as Exhibit 60, is a Red
14  Book product listing verification that requests a
15  response by September 26, 1997, to Schering
16  Corporation.
17     Are you familiar with Exhibit 60?
18     MS. TORGERSON:  Objection, form and
19  leading.
20     A.  Yes, that is a product verification
21  listing.
22     Q.  Is this a document that Red Book

Page 284

1   routinely used in the ordinary course of its
2   business?
3      MS. TORGERSON:  Objection, form.
4   Objection, leading.
5      A.  Yes.
6      Q.  Did Red Book provide this product
7   listing verification form to Schering Corporation
8   to verify the accuracy of Schering Corporation
9   AWPs and WACs that were published in the Red
10  Book?
11     MS. TORGERSON:  Objection, form and
12  leading, and misstates the document and
13  mischaracterizes the record.
14     A.  Yes.
15     Q.  If you'll notice, there is a signature
16  at the bottom of each page.
17     Does that signature indicate to you
18  that Schering Corporation in fact verified the
19  accuracy of AWP and WAC pricing for Schering
20  products for which pricing was published in the
21  Red Book?
22     MS. TORGERSON:  Objection, form.

Page 285

1   Objection, leading, mischaracterizes the
2   document, mischaracterizes the testimony.
3      A.  Yes.
4      Q.  And in the ordinary course of its
5   business did Red Book rely on Schering
6   Corporation to verify the accuracy of AWP and WAC
7   pricing for all Schering Corporation drugs for
8   which pricing was published in the Red Book?
9      MS. TORGERSON:  Objection, form.
10  Objection, leading, mischaracterizes the
11  document, mischaracterizes the evidence.
12     A.  Yes.
13     Q.  And if a price for a Schering
14  Corporation product was published in the Red
15  Book, from at least 1997 to the present, did Red
16  Book rely upon Schering Corporation to verify the
17  accuracy of that pricing?
18     MS. TORGERSON:  Objection, form.
19  Objection, leading, mischaracterizes the
20  document, mischaracterizes the evidence and
21  assumes facts not in evidence.
22     A.  Yes.

72  (Pages 282 to 285)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 286

1        MR. CARROLL:  That's all I have on
2    that.
3        (October 27, 2000 Warrick
4    Pharmaceuticals product listing verification
5    marked Exhibit Minne 061 for identification.)
6        Q.   Miss Minne, what I've handed you as
7    Exhibit 61 is a Red Book product listing
8    verification with a "please respond by" date of
9    October 27th, 2000, addressed to Warrick
10   Pharmaceuticals.
11       Are you familiar with Exhibit 61?
12       MS. TORGERSON:  Objection, form.
13   Objection, leading.
14       A.   Yes.
15       Q.   Is this a document that Red Book
16   routinely used in the ordinary course of its
17   business?
18       MS. TORGERSON:  Objection, form.
19   Objection, leading.
20       A.   Yes.
21       Q.   Did Red Book provide this product
22   listing verification form to Warrick

Page 287

1    Pharmaceuticals to verify the accuracy of Warrick
2    AWP and WAC pricings that were published in the
3    Red Book?
4        MS. TORGERSON:  Objection, form.
5    Objection, leading.  Mischaracterizes the
6    document, mischaracterizes the evidence.
7        A.   Yes.
8        Q.   And I draw your attention to the fact
9    that there is a signature at the bottom of each
10   page.
11       Does that signature indicate that
12   Warrick -- indicate to Red Book that Warrick, in
13   fact, verified the accuracy of AWP and WAC
14   pricing for Warrick products for which pricing
15   was published in the Red Book?
16       MS. TORGERSON:  Objection, form.
17   Objection, leading.  Mischaracterizes the
18   document, mischaracterizes the evidence, and
19   assumes facts not in evidence.
20       A.   Yes.
21       Q.   And to the extent a change was
22   requested by Warrick, did Red Book in fact make

Page 288

1    that change?
2        MS. TORGERSON:  Objection, form.
3    Objection, leading, assumes facts not in
4    evidence, and it mischaracterizes the document,
5    mischaracterizes the evidence.
6        A.   Yes.
7        Q.   And did Red Book in the ordinary
8    course of its business rely on Warrick to verify
9    the accuracy of AWP and WAC pricing for all
10   Warrick products for which pricing was published
11   in the Red Book?
12       MS. TORGERSON:  Objection, form.
13   Objection -- get the routine going -- objection,
14   form.  Objection, leading, mischaracterizes the
15   document, mischaracterizes the evidence, assumes
16   facts not in evidence, and calls for speculation.
17       A.   Yes.
18       Q.   To the extent a price for a Warrick
19   Pharmaceutical product was published in the Red
20   Book from at least 1997 to the present, did Red
21   Book rely on Warrick Pharmaceutical to verify the
22   pricing?

Page 289

1        MS. TORGERSON:  Objection, form.
2    Objection, leading.  Assumes facts not in
3    evidence and calls for speculation.
4        A.   Yes.
5        MR. CARROLL:  Thank you.
6        (October 2, 2001 TAP Pharmaceuticals
7    product listing verification marked Exhibit Minne
8    062 for identification.)
9        Q.   Miss Minne, what I've handed you as
10   Exhibit 62 is a Red Book product listing
11   verification with a stamped date of October 2nd,
12   2001 to TAP Pharmaceuticals.
13       Are you familiar with Exhibit 62?
14       A.   Yes, in that it's a form supplied by
15   Red Book.
16       Q.   And was this a document that Red Book
17   routinely used in the ordinary course of its
18   business?
19       MS. CITERA:  Object to the form.
20       A.   Yes.
21       Q.   Did Red Book in fact provide the
22   product listing verification to TAP

73 (Pages 286 to 289)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 290

1  Pharmaceuticals to verify the accuracy of TAP
2  Pharmaceuticals' AWP and WAC pricing for its
3  products?
4        MS. CITERA:  Objection, form.
5     A.  Yes.
6     Q.  If you'll notice, there's a signature
7  on the page, on the bottom of each page.
8        Does that signature indicate to Red
9  Book that TAP Pharmaceutical in fact verified the
10 accuracy of the AWP and WAC pricing for TAP
11 Pharmaceutical products that were published in
12 the Red Book?
13       MS. CITERA:  Objection, form.
14    A.  Yes.
15    Q.  And in the ordinary course of its
16 business did Red Book rely on TAP Pharmaceuticals
17 to verify the accuracy of AWP and WAC pricing for
18 all TAP products that were published in the Red
19 Book?
20       MS. CITERA:  Object to form.
21    A.  Yes.
22    Q.  And to the extent a price for a TAP

Page 291

1  Pharmaceutical product was published in the Red
2  Book from at least 1997 to the present, did Red
3  Book rely on TAP Pharmaceuticals to verify the
4  accuracy of that pricing?
5        MS. CITERA:  Object to the form.
6     A.  Yes.
7        (September 24, 1999 King
8  Pharmaceuticals product listing verification
9  marked Exhibit Minne 063 for identification.)
10    Q.  Miss Minne, what I've handed you as
11 Exhibit 63 is a Red Book product listing
12 verification form dated September 24th, 1999 to
13 King Pharmaceuticals.
14       Are you familiar with Exhibit 63?
15    A.  Yes.
16    Q.  Is this a document that Red Book
17 routinely used in the ordinary course of its
18 business?
19       MR. GASTWIRTH:  Objection to form.
20    A.  Yes.
21    Q.  Did Red Book provide this product
22 listing verification to King Pharmaceuticals to

Page 292

1  verify the accuracy of King AWP and WAC pricing
2  for drugs for which pricing was published in the
3  Red Book for King --
4        MR. CARROLL:  Strike that.  That was a
5  terrible question.  I said it so many times.
6     Q.  Did Red Book provide this product
7  listing verification form to King Pharmaceuticals
8  to verify the accuracy of King AWP and WAC
9  pricing that was published in the Red Book?
10       MR. FARQUHAR:  Objection, leading.
11    A.  Yes.
12    Q.  And you'll see that at the bottom of
13 each page there is a signature.
14       Does this signature at the bottom of
15 each page indicate to you that King
16 Pharmaceuticals in fact verified the accuracy of
17 the AWP and WAC pricing for King Pharmaceutical
18 drugs that were published in the Red Book?
19       MR. FARQUHAR:  Objection, leading.
20 Objection, lack of foundation.
21    A.  Yes.
22    Q.  And did Red Book in the ordinary

Page 293

1  course of its business rely on King
2  Pharmaceuticals to verify the accuracy of AWP and
3  WAC pricing for King Pharmaceutical products that
4  were published in the Red Book?
5        MR. FARQUHAR:  Same objections.
6     A.  Yes.
7     Q.  And to the extent a price for a King
8  Pharmaceutical drug was published in the Red Book
9  from at least 1997 to the present, did Red Book
10 rely on King Pharmaceuticals to verify the
11 accuracy of the pricing?
12       MR. FARQUHAR:  Same objections.
13    A.  Yes.
14       MR. CARROLL:  That's all I have for
15 that one.
16       (July 25, 2003 Monarch Pharmaceuticals
17 product listing verification marked Exhibit Minne
18 064 for identification.)
19    Q.  Now, Miss Minne, what I've handed you
20 as Exhibit 64 is a Red Book product listing
21 verification dated July 25th, 2003 to Monarch
22 Pharmaceuticals.

74  (Pages 290 to 293)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 294

1        Are you familiar with Exhibit 64?
2    A.  Yes.
3    Q.  Is this a document that was routinely
4  used in the ordinary course of its business, of
5  Red Book's business?
6    A.  Yes.
7    Q.  Did Red Book provide this product
8  listing verification to Monarch Pharmaceuticals
9  to verify the accuracy of Monarch AWP and WAC
10  pricing that was published in the Red Book?
11       MR. FARQUHAR:  Objection, leading.
12    A.  Yes.
13    Q.  I draw your attention to the fact that
14  each page of Exhibit 64 is signed with a date
15  September 24th, 2003.
16       Does this signature, in fact, indicate
17  that Monarch verified the accuracy of AWP and WAC
18  pricing for Monarch products for which pricing
19  was published in the Red Book?
20       MR. FARQUHAR:  Objection, leading.
21  Objection, lack of foundation.
22    A.  Yes.

Page 295

1    Q.   In the ordinary course of its
2  business, did Red Book rely on Monarch
3  Pharmaceuticals to verify the accuracy of AWP and
4  WAC pricing for Monarch products that was
5  published in the Red Book?
6       MR. FARQUHAR:  Same objections.
7    A.  Yes.
8    Q.  Is it fair to say --
9       MR. CARROLL:  Strike that.
10    Q.  If a price for a Monarch
11  Pharmaceutical product was published in the Red
12  Book from at least 1997 to the present, did Red
13  Book rely on Monarch Pharmaceuticals to verify
14  the accuracy of that pricing?
15       MR. FARQUHAR:  Same objections.
16    A.  Yes.
17       (July 6, 2004 Ivax Pharmaceuticals
18  product listing verification marked Exhibit Minne
19  065 for identification.)
20    Q.  Miss Minne, what I've handed you,
21  what's been marked as Exhibit 65, is a Red Book
22  product listing verification for July 6 -- dated

Page 296

1  July 6, 2004 to Ivax Pharmaceuticals.
2       Are you familiar with Exhibit 65?
3    A.  Yes.
4       MR. PARISH:  Objection to form.
5    Q.  Is this a document that Red Book
6  routinely used in the course of its business?
7       MR. PARISH:  Object to form.
8       MR. CAHILL:  Jim, could you just check
9  the pages again, 65.
10       MR. CARROLL:  Oh, you know...
11       I see what you're saying.  It's a
12  copying issue.
13       MS. ROSENSTOCK:  Do you have a complete
14  document?
15       MR. CARROLL:  I do not.  Not here.
16       I'll note for the record that Exhibit
17  65 is Bates number Red Book 09294 -- whoa.
18       Let's -- can we just -- why don't we
19  withdraw this, it's the wrong exhibit, I
20  apologize.  Or we could take it...
21       I could take it back.
22       MR. PARISH:  Are you withdrawing the

Page 297

1  exhibit?
2       MR. CARROLL:  Yes.  I apologize for
3  that.
4       (Exhibit 065 withdrawn)
5       (Document marked Exhibit Minne 066 for
6  identification.)
7    Q.  Miss Minne --
8       MR. PAUL:  Could we go off the record
9  just for a second?
10       THE VIDEOGRAPHER:  This is the
11  videographer.
12       Off the record at 15:55.
13       (Pause)
14       THE VIDEOGRAPHER:  Back on the record,
15  15:56.
16  BY MR. CARROLL:
17    Q.  Miss Minne, what has been handed to
18  you as Exhibit 66 --
19       MR. LONERGAN:  This is Exhibit 65.
20  Whatever you want to do.
21       Why don't we do a new 65?  Is that okay
22  with you?

Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 298

1        MR. CAHILL:  Sure.
2        (Document bearing Bates Nos. Red Book
3    11649 through 11673 marked Exhibit Minne 065 for
4    identification.)
5    Q.  Miss Minne, what I've handed to you as
6    Exhibit 65 is a Red Book product listing
7    verification dated November 1st -- stamped dated
8    November 1st, 2000 to Novartis Pharmaceuticals.
9        Are you familiar with Exhibit 65?
10        MR. LONERGAN:  I object to the use of
11    this document to the extent it's not a complete
12    document as produced by Red Book.  I don't know
13    if it is.
14        MR. CARROLL:  I would state for the
15    record that it is -- contains Bates Red Book
16    11649 through 11673, and states at the top that
17    it is page 1 through 22.
18    Q.  Could you please review the document
19    to see if it, in fact, is a complete document.
20        (Pause)
21    A.  It is a complete product listing
22    verification.  It does not contain any cover

Page 299

1    sheets that we would have sent with it.
2    Q.  Okay.  The cover letter that you
3    testified to -- about earlier?
4    A.  Correct, or the manufacturer
5    information form.
6    Q.  But this is a document that Red Book
7    routinely used in the ordinary course of its
8    business?
9        MR. PARISH:  Objection to form.
10    A.  Yes.
11    Q.  Did, in fact, Red Book provide this
12    product listing verification form to Novartis
13    Pharmaceuticals to verify the accuracy of
14    Novartis AWP and WAC pricing that was published
15    in Red Book?
16        MR. LONERGAN:  Objection to form.
17    A.  Yes.
18    Q.  I draw your attention to review at the
19    bottom of each page, you'll see that each page is
20    signed by -- it looks like a Michael Conley, on
21    October 30th, 2000.
22        Does that indicate -- the signature

Page 300

1    indicate that Novartis in fact verified the
2    accuracy of the AWP and WAC pricing for Novartis
3    products for which a pricing was published in Red
4    Book?
5        MR. LONERGAN:  Objection to form, lack
6    of foundation.
7    A.  Yes.
8    Q.  And did Red Book, in the ordinary
9    course of its business, rely on Novartis
10    Pharmaceuticals to verify the accuracy of the AWP
11    and WAC pricing for Novartis products for which
12    pricing was published in the Red Book?
13        MR. LONERGAN:  Objection to form, lack
14    of foundation.
15    A.  Yes.
16    Q.  And did it -- and to the extent a
17    price for a Novartis product was published in the
18    Red Book from at least 1997 to the present, did
19    Red Book rely on Novartis to verify the accuracy
20    of that pricing?
21        MR. LONERGAN:  Object to the form, lack
22    of foundation.

Page 301

1    A.  Yes.
2        (October 24, 2001 ESI Lederle product
3    listing verification marked Exhibit Minne 066 for
4    identification.)
5    Q.  Miss Minne, what I've handed you as
6    Exhibit 66 is a Red Book product listing
7    verification form dated -- stamped dated October
8    24, 2001 to ESI Lederle.
9        Are you familiar with Exhibit 66?
10    A.  Yes.
11    Q.  Is this a product listing verification
12    form to which you've been testifying to today?
13    A.  Yes.
14    Q.  And is this a document that Red Book
15    routinely used in the ordinary course of its
16    business?
17    A.  Yes.
18    Q.  Did Red Book in fact provide this
19    product listing verification form to ESI Lederle
20    to verify the accuracy of ESI Lederle AWP and WAC
21    pricing for the ESI Lederle products that were
22    published in Red Book?

76 (Pages 298 to 301)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                November 18, 2008

New York, NY

Page 302

1        MR. FARQUHAR: Objection, leading.
2     A.   Yes.
3     Q.   Did Red Book rely on ESI Lederle to
4   verify the accuracy of AWP and WAC pricing for
5   ESI Lederle products -- pricing for its products
6   published in Red Book?
7        MR. FARQUHAR: Objection, leading.
8   Objection, lack of foundation.
9     A.   Yes.
10    Q.   Do you see the handwriting on Exhibit
11  66?
12    A.   Yes.
13    Q.   Is that something -- do you recognize
14  that handwriting?
15    A.   I do not.
16    Q.   Would that handwriting come from
17  someone at Red Book or someone at ESI Lederle?
18        MR. FARQUHAR: Same objections.
19    A.   It could be either.
20    Q.   It could be either.
21        To the extent that --
22        MR. CARROLL: Strike that.

Page 303

1     Q.   If a price was published for an ESI
2   Lederle drug in the Red Book from at least 1997
3   to the present, did Red Book in fact rely on ESI
4   Lederle to verify the accuracy of that pricing?
5        MR. FARQUHAR: Same objections.
6     A.   Yes.
7        (July 25, 2003 Par Pharmaceuticals
8   product listing verification marked Exhibit Minne
9   067 for identification.)
10    Q.   Miss Minne, what I've handed you as
11  Exhibit 67 is a Red Book product listing
12  verification dated July 25th, 2003 to Par
13  Pharmaceuticals, Red -- the Bates number is Red
14  Book 12343 through 12363.  It appears that the
15  second digit of the page, at the top right, it
16  says "page 1 of," the second digit is cut off,
17  but it appears to be 21 pages.
18        Can you, please, verify that this is
19  the complete document for the record?
20    A.   I verify it's complete.
21    Q.   Thank you.
22        Are you familiar with Exhibit 67?

Page 304

1     A.   Yes.
2     Q.   And this is a product listing
3   verification form that Red Book routinely used in
4   the ordinary course of its business?
5        MR. LONERGAN: Objection to form.
6     Q.   Did Red Book provide this product
7   listing verification form to Par Pharmaceuticals
8   to verify the accuracy of Par AWP and WACs for
9   Par products that were published in the Red Book?
10        MR. FARQUHAR: Objection, leading.
11    A.   Yes.
12    Q.   And I draw your attention to the
13  bottom of each page, and you'll -- to see that
14  it's in fact signed by a Marissa Caputo.
15        Do you see that?
16    A.   Yes.
17    Q.   And does that signature indicate to
18  you that, as representative of Red Book, that Par
19  Pharmaceuticals in fact verified the accuracy of
20  the AWP and WAC pricing for Par products that
21  were published in the Red Book?
22        MR. FARQUHAR: Objection, leading.

Page 305

1   Objection, lack of foundation.
2     A.   Yes.
3     Q.   Did Red Book, in the ordinary course
4   of its business, rely on Par Pharmaceuticals to
5   verify the accuracy of AWP and WAC pricing for
6   all Par products for which pricing was published
7   in Red Book?
8        MR. FARQUHAR: Same objections.
9     A.   Yes.
10    Q.   And if a price for a Par
11  Pharmaceutical product was published in the Red
12  Book from at least 1997 to the present, did Red
13  Book rely on Par Pharmaceutical to verify the
14  accuracy of that pricing?
15        MR. FARQUHAR: Same objections.
16    A.   Yes.
17    Q.   Thank you.
18        MR. CARROLL: That's all I have on
19  that.
20        (December 6, 2005 Amgen USA product
21  listing verification marked Exhibit Minne 068 for
22  identification.)

77 (Pages 302 to 305)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 306

1     MR. CAHILL:  Getting near the end?
2     MR. CARROLL:  Getting near the end.
3     Q.  Miss Minne, what I've handed you as
4  Exhibit 68 is a Red Book product listing
5  verification form dated December 6, 2005 to Amgen
6  USA.
7     Are you familiar with Exhibit 68?
8     A.  Yes.
9     Q.  Is this a product listing verification
10  form that Red Book routinely used in the ordinary
11  course of its business?
12     MR. SWEENEY:  Object to the form.
13     Q.  Did Red Book provide this product
14  listing verification form to Amgen to verify the
15  accuracy of Amgen WACs and AWPs that were
16  published in the Red Book?
17     MR. SWEENEY:  Object to the form.
18     A.  Yes.
19     Q.  I draw your attention to the bottom of
20  each page, and that it is, in fact, signed on
21  each page by a Brianette McPolin -- MacPolin.
22     Does the signature on the bottom of

Page 307

1  each page indicate that Amgen in fact verified
2  the accuracy of the AWP and WAC pricing for --
3     MR. SWEENEY:  Object to the form.
4     Q.  -- the Amgen products --
5     MR. SWEENEY:  Sorry.
6     Q.  -- published in the Red Book?
7     MR. SWEENEY:  Object to the form,
8  foundation.
9     A.  Yes.
10     Q.  Did Red Book in the ordinary course of
11  its business rely on Amgen to verify the accuracy
12  of AWPs and WACs for all Amgen products --
13     MR. SWEENEY:  Object to the form.
14     Q.  -- that were published in the Red
15  Book?
16     A.  Yes.
17     Q.  And if a price for an Amgen product
18  was published in the Red Book from at least 1997
19  to the present, did Red Book rely on Amgen to
20  verify the accuracy of that pricing?
21     MR. SWEENEY:  Objection, form,
22  foundation.

Page 308

1     A.  Yes.
2     (Document bearing Bates Nos. Red Book
3  02938 through 02962 marked Exhibit Minne 069 for
4  identification.)
5     Q.  Miss Minne, what I've handed you that
6  has been marked as Exhibit 69 is a Red Book
7  product listing verification with a date stamp of
8  September 10, 2001, Bates number is Red Book
9  02938 through 02962, and it was sent to Astra
10  Zeneca.
11     Are you familiar with Exhibit 69?
12     A.  Yes.
13     Q.  Is this a product -- Red Book product
14  listing verification that Red Book routinely used
15  in the ordinary course of its business?
16     MS. PRINZO:  Objection as to form.
17     A.  Yes.
18     Q.  Did Red Book in fact provide this
19  product listing verification to Astra Zeneca to
20  verify the accuracy of Astra Zeneca AWPs and WACs
21  that were published in the Red Book?
22     MS. PRINZO:  Objection as to form.

Page 309

1     A.  Yes.
2     Q.  And if you'll look at the bottom of
3  each page, there is a signature.
4     Does that signature at the bottom of
5  each page indicate that Astra Zeneca in fact is
6  verifying the accuracy of AWP and WAC pricing for
7  its products that were published in the Red Book?
8     MS. PRINZO:  Objection as to form.
9     A.  Yes.
10     Q.  And to the extent that Astra Zeneca
11  asked Red Book to make any corrections or
12  changes, did Red Book make those changes?
13     MS. PRINZO:  Objection as to form.
14     A.  Yes.
15     Q.  Did Red Book in the ordinary course of
16  its business rely on Astra Zeneca to verify the
17  accuracy of AWPs and WACs for all Astra Zeneca
18  products that were published in the Red Book?
19     MS. PRINZO:  Objection as to form,
20  leading.
21     A.  Yes.
22     Q.  And if a price for an Astra Zeneca

78  (Pages 306 to 309)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                     November 18, 2008

New York, NY

Page 310

1  product was published in the Red Book from at
2  least 1997 through the present, did Red Book rely
3  on Astra Zeneca to verify the pricing?
4          MS. PRINZO:  Objection as to form.
5      A.  Yes.
6          (Document bearing Bates Nos. Red Book
7  01802 through 1805 marked Exhibit Minne 070 for
8  identification.)
9      Q.  Miss Minne, what I've handed you as
10 Exhibit 70 is a Red Book product listing
11 verification form stamped dated September 1st,
12 1999 to Alpha Therapeutic Corporation, with a
13 Bates stamp Red Book 01802 through 1805.
14         Are you familiar with Exhibit 70?
15     A.  Yes.
16     Q.  Is this a product listing verification
17 form that Red Book routinely used in the ordinary
18 course of its business?
19         MR. GASTWIRTH:  Objection, form.
20     A.  Yes.
21     Q.  Did Red Book provide this product
22 listing verification form to Alpha Therapeutics

Page 311

1  to verify the accuracy of Alpha Therapeutics'
2  AWPs and WACs that were to be published in the
3  Red Book?
4          MR. FARQUHAR:  Objection, leading.
5      A.  Yes.
6      Q.  You'll notice there is a signature at
7  the bottom of each page of the exhibit.
8          Does that signature indicate that Alpha
9  Therapeutic in fact verified AWP and WAC pricing
10 for Alpha Therapeutic products that were
11 published in the Red Book?
12         MR. FARQUHAR:  Objection, leading.
13 Objection, lack of foundation.
14     A.  Yes.
15     Q.  Did Red Book in the ordinary course of
16 its business rely on Alpha Therapeutic to verify
17 the accuracy of AWP and WAC pricing for all Alpha
18 Therapeutic products that -- for which pricing
19 was published in the Red Book?
20         MR. FARQUHAR:  Same objections.
21     A.  Yes.
22     Q.  And to the extent a price for an Alpha

Page 312

1  Therapeutic product was published in the Red Book
2  from at least 1997 to the present, did Red Book
3  rely on Alpha Therapeutic to verify the accuracy
4  of that pricing?
5          MR. FARQUHAR:  Same objections.
6      A.  Yes.
7          (Document bearing Bates Nos. Red Book
8  13581 through 13593 marked Exhibit Minne 071 for
9  identification.)
10     Q.  Miss Minne, what I've handed you as
11 Exhibit 71 is a Red Book product listing
12 verification with the date July 25th, 2003 to
13 Purepac Pharmaceuticals.  The Red -- the Bates
14 stamp is Red Book 13581 through 13593.
15         Are you familiar with Exhibit 71?
16     A.  Yes.
17     Q.  Is it a product listing verification
18 that Red Book routinely used in the ordinary
19 course of its business?
20         MR. GASTWIRTH:  Objection to form.
21     A.  Yes.
22     Q.  Did Red Book, in fact, send --

Page 313

1          MR. CARROLL:  Strike that.
2      Q.  Did Red Book provide this product
3  listing verification form to Purepac
4  Pharmaceuticals to verify the accuracy of Purepac
5  AWP and WACs that were to be published in the Red
6  Book?
7          MR. FARQUHAR:  Objection, leading.
8  Objection, lack of foundation.
9      A.  Yes.
10     Q.  I draw your attention to the bottom of
11 each page where there -- this is signed by John
12 Reed.
13         Does the signature in fact indicate
14 that Purepac Pharmaceuticals did verify the
15 accuracy of the AWP and WAC pricing for Purepac
16 drugs that were published in Red Book?
17         MR. FARQUHAR:  Same objections.
18     A.  Yes.
19     Q.  Did Red Book in the ordinary course of
20 its business rely on Purepac Pharmaceuticals to
21 verify the accuracy of AWP and WACs for all
22 Purepac products --

79 (Pages 310 to 313)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 314

1      MR. GOBENA:  Strike that.
2      Q.  -- for all Purepac drugs that were
3  published in the Red Book?
4      MR. FARQUHAR:  Same objections.
5      A.  Yes.
6      Q.  And if a price for a Purepac
7  Pharmaceutical drug was published in the Red Book
8  from at least 1997 to the present, did Red Book
9  rely on Purepac Pharmaceuticals to verify the
10 accuracy of that pricing?
11     MR. FARQUHAR:  Same objections.
12     A.  Yes.
13     (Document bearing Bates Nos. Red Book
14 02073 through 02095 marked Exhibit Minne 072 for
15 identification.)
16     Q.  What I've handed you as Exhibit 72 is
17 a Red Book product listing verification with the
18 stamped date of October 26, 2000, Bates stamp Red
19 Book 02073 through 02095.  It was addressed to
20 Alpharma USPD.
21     Are you familiar with Exhibit 72?
22     A.  Yes.

Page 315

1      Q.  Is this a product listing verification
2  that Red Book routinely used in the ordinary
3  course of its business?
4      A.  Yes.
5      Q.  Did Red Book provide this product
6  listing verification to Alpharma USPD to verify
7  the accuracy of Alpharma AWPs and WACs that were
8  published in the Red Book?
9      MR. FARQUHAR:  Objection, leading.
10     A.  Yes.
11     Q.  I draw your attention to the bottom of
12 each page, and it indicates that a signature is
13 on each page dated October 25th, 2000.
14     Does the signature indicate that
15 Alpharma USPD in fact verified the accuracy of
16 the AWP and WAC pricing for Alpharma drugs that
17 were published in the Red Book?
18     MR. FARQUHAR:  Objection, leading.
19 Objection, lack of foundation.
20     A.  Yes.
21     Q.  To the extent that Alpharma USPD
22 requested that something on the product listing

Page 316

1  verification form be changed, did Red Book make
2  that requested change?
3      MR. FARQUHAR:  Objection -- same
4  objections.
5      A.  Yes.
6      Q.  Did Red Book, in the ordinary course
7  of its business, rely on Alpharma USPD to verify
8  the accuracy of AWP and WAC pricing for all
9  Alpharma drugs that were published in the Red
10 Book?
11     MR. FARQUHAR:  Same objections.
12     A.  Yes.
13     Q.  If a price for an Alpharma drug was
14 published in Red Book from at least 1997 to the
15 present, did Red Book rely on Alpharma to verify
16 that pricing?
17     MR. FARQUHAR:  Same objections.
18     A.  Yes.
19     MR. ANDERSON:  Are those the last two,
20 James?
21     MR. CARROLL:  I have to take a break
22 and check two things.

Page 317

1      MR. CAHILL:  You've got two more?
2      MR. CARROLL:  Two more, and then I need
3  a break to verify, and I may have two more after
4  that.
5      (Document bearing Bates Nos. Red Book
6  10863, 10868, 10876, 10877, 10878 marked
7  Exhibit Minne 073 for identification.)
8      Q.  Miss Minne, what I've handed you as --
9      MR. CARROLL:  Why don't we go off the
10 record.
11     THE VIDEOGRAPHER:  This is the
12 videographer.
13     This ends tape number five at 16:24.
14     (Recess taken)
15     THE VIDEOGRAPHER:  This begins tape
16 number six at 16:41.
17 BY MR. CARROLL:
18     Q.  Miss Minne, what I've placed in front
19 of you as Exhibit 73 are excerpts, they're Red
20 Book product listing verifications and they're
21 excerpts, and they're all dated July 6, 2004,
22 with varying Bates stamps, 10863, 10868, 10876,

80  (Pages 314 to 317)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 318

1   10877, and 10878.  They're all from the same
2   product listing verification to Mylan
3   Pharmaceuticals.
4        MS. LORENZO:  I would just like to note
5   my objection that this is just portions of a
6   32-page document and that the witness does not
7   have the full document to review.
8     Q.   And do you agree that this is a
9   six-page -- five-page excerpt from a 32-page
10  document?
11    A.   Yes --
12       MS. LORENZO:  Objection.
13    A.   Yes, I do.
14    Q.   Do you recognize these excerpts?
15    A.   Yes.
16    Q.   And are these excerpts from a product
17  listing verification that Red Book routinely used
18  in the ordinary course of its business?
19       MS. LORENZO:  Objection, form.
20    A.   Yes.
21    Q.   And did Red Book in fact send these
22  excerpts, in addition to the entire document, to

Page 319

1   Mylan Pharmaceuticals to verify the accuracy of
2   Mylan AWPs and WACs that were published in Red
3   Book?
4        MS. LORENZO:  Objection, leading,
5   foundation.
6     A.   I can assume, yes.
7     Q.   Now, if you notice at the bottom of
8   each page, they're all signed by a Connie
9   Hatcher.
10       Do the signatures of Connie Hatcher
11  indicate that Mylan Pharmaceuticals in fact
12  verified the accuracy of AWP and WAC pricing for
13  Mylan drugs that were published in Red Book?
14       MS. LORENZO:  Objection, form,
15  foundation.
16    A.   Yes.
17    Q.   And did Red Book, in the ordinary
18  course of its business, rely on Mylan
19  Pharmaceuticals to verify the accuracy of AWP and
20  WAC pricing for Mylan Pharmaceutical drugs that
21  were published in Red Book?
22       MS. LORENZO:  Objection, form,

Page 320

1   foundation.
2     A.   Yes.
3     Q.   And if a price for a Mylan
4   pharmaceutical drug was published in the Red Book
5   from at least 1997 to the present, did Red Book
6   rely on Mylan Pharmaceuticals to verify that
7   pricing?
8        MS. LORENZO:  Objection, form,
9   foundation, calls for speculation.
10    A.   Yes.
11       (Document bearing Bates Nos. Red Book
12  11421, 11432, 11436, 11439 marked Exhibit Minne
13  074 for identification.)
14    Q.   Miss Minne, what I've handed you as
15  Exhibit 74 is a Red Book product listing
16  verification excerpts, four-page excerpt from a
17  37-page document, Red Book -- Bates stamp Red
18  Book 11421, 11432, 11436 and 11439.  The product
19  listing verification was to UDL Laboratories.
20       Do you recognize Exhibit 74?
21       MS. LORENZO:  Objection, form.
22    A.   Yes.

Page 321

1        MS. LORENZO:  And please note my
2   objection to the fact that this is an incomplete
3   document.
4     Q.   Is this the -- are these excerpts the
5   type -- is this product listing verification
6   excerpts the type of document that Red Book
7   routinely used in the ordinary course of its
8   business?
9        MS. LORENZO:  Objection, form.
10    A.   Yes.
11    Q.   And did Red Book provide UDL
12  Laboratories this product listing verification,
13  at least these excerpts, and probably the whole
14  document in its entirety, to UDL Laboratory to
15  verify the accuracy of UDL Laboratory's AWPs and
16  WACs to be published in Red Book?
17       MS. LORENZO:  Objection, form,
18  foundation.
19    A.   Yes.
20    Q.   And I draw your attention to the
21  bottom of each page of Exhibit 74, and there are
22  signatures.

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 322

1      Does the signature on the bottom of
2  each page indicate to Red Book that UDL
3  Laboratories in fact verified the AWP and WAC
4  pricing for UDL Laboratory products that were
5  published in Red Book?
6        MS. LORENZO:  Objection, form,
7  foundation.
8      A.  Yes.
9      Q.  Did Red Book, in the ordinary course
10  of its business, rely on UDL Laboratories to
11  verify the accuracy of AWPs and WACs for all UDL
12  Laboratory drugs for which pricing was published
13  in the Red Book?
14        MS. LORENZO:  Objection, form,
15  foundation.
16      A.  Yes.
17      Q.  And if a price for a UDL Laboratory
18  drug was published in Red Book from at least 1997
19  to the present, did Red Book rely on UDL
20  Laboratories to verify that pricing?
21        MR. CAHILL:  Objection, form,
22  foundation, calls for speculation.

Page 323

1      A.  Yes.
2        (Document bearing Bates Nos. Red Book
3  15827, 15838, 15839, 15841 marked Exhibit Minne
4  075 for identification.)
5      Q.  Miss Minne, what I've handed you as
6  Exhibit 75 is -- are four pages excerpted from a
7  Red Book product listing verification dated July
8  25th, 2003, bearing the Bates stamp Red Book
9  15827, 15838, 15839 and 15841, sent to Watson
10  Pharma.
11      Do you recognize Exhibit 75?
12      A.  Yes.
13      Q.  And is that a price listing --
14  excerpts of a product listing verification
15  routinely used in the ordinary course of Red
16  Book's business?
17        MS. LORENZO:  Objection.
18        MR. FARQUHAR:  I object to the use of
19  an incomplete document.
20      A.  Yes.
21      Q.  Did Red Book provide these excerpts
22  for -- from this -- did --

Page 324

1        MR. CARROLL:  Strike that.
2      Q.  Did Red Book provide a product listing
3  verification dated 7/25/2003 to Watson
4  Pharmaceuticals to verify the accuracy of Watson
5  Pharmaceuticals' AWPs and WACs that were
6  published in the Red Book?
7        MR. FARQUHAR:  Objection, leading.
8      A.  Yes.
9      Q.  You'll notice that there's a signature
10  on the bottom of each page.  Does that signature
11  indicate that Watson Pharmaceuticals in fact
12  verified the AWP and WAC pricing for Watson
13  products that were published in the Red Book?
14        MR. FARQUHAR:  Objection, leading.
15  Objection, lack of foundation.
16      A.  Yes.
17      Q.  Did Red Book, in the ordinary course
18  of its business, rely on Watson Pharmaceuticals
19  to verify the accuracy of AWP and WAC pricing for
20  Watson products that were published in Red Book?
21        MR. FARQUHAR:  Same objections.
22      A.  Yes.

Page 325

1      Q.  And if a price for a Watson
2  Pharmaceutical product was published in the Red
3  Book from at least 1997 to the present, did Red
4  Book rely on Watson Pharmaceuticals to verify the
5  accuracy of that pricing?
6        MR. FARQUHAR:  Same objections.
7      A.  Yes.
8        (Document bearing Bates Nos. Red Book
9  09294, 09302, 09306, 09329 marked Exhibit Minne
10  076 for identification.)
11      Q.  Miss Minne, what I handed you marked
12  as Exhibit 76 are excerpts of a product listing
13  verification dated July 6, 2004, bearing the
14  Bates stamp Red Book 09294, 09302, 09306 and
15  09329, to Ivax Pharmaceuticals.
16        MR. PARISH:  I object on the grounds
17  that this is an incomplete document.
18      Q.  These excerpts are from a 57-page --
19  appear to be from a 57-page product listing
20  verification.
21      Are you familiar with Exhibit 76?
22      A.  Yes.

82  (Pages 322 to 325)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 326

1      Q.   And is this a product listing
2  verification used in the ordinary course of Red
3  Book's business?
4           MR. PARISH:  Object to the form of the
5  question.
6      A.   Yes.
7      Q.   Did Red Book provide the product
8  listing verification dated July 6, 2004 to Ivax
9  Pharmaceutical to verify the accuracy of Ivax AWP
10  and WACs that were to be published in Red Book?
11          MR. PARISH:  Object to the form of the
12  question.
13     A.   Yes.
14     Q.   And I draw your attention to the
15  bottom of each page, which indicates they are all
16  signed by a Joyce Jones.
17          Do those signatures indicate that Ivax
18  Pharmaceutical in fact verified the accuracy of
19  AWP and WACs pricing for Ivax drugs for which
20  pricing was published in the Red Book?
21          MR. PARISH:  Object to the form of the
22  question.  Object to lack of foundation.

Page 327

1      A.   Yes.
2      Q.   And to the extent that Ivax
3  Pharmaceutical requested that Red Book make a
4  change to the information included on the product
5  listing verifications, did Red Book make that
6  change?
7           MR. PARISH:  Object to the form of the
8  question, lack of foundation.
9      A.   Yes.
10     Q.   Did Red Book, in the ordinary course
11  of its business, rely on Ivax Pharmaceutical to
12  verify the accuracy of AWPs and WACs for all Ivax
13  Pharmaceutical drugs that -- for which pricing
14  was published in the Red Book?
15          MR. PARISH:  Object to the form of the
16  question.
17     A.   Yes.
18     Q.   To the extent that a price for Ivax
19  Pharmaceuticals for a --
20          MR. CARROLL:  Strike that.
21     Q.   To the extent a price for an Ivax
22  Pharmaceutical drug was published in the Red Book

Page 328

1  from at least 1997 to the present, did Red Book
2  rely on Ivax Pharmaceutical to verify that
3  pricing?
4           MR. PARISH:  Object to the form of the
5  question.
6      A.   Yes.
7      Q.   To the extent that there was pricing
8  for Teva Pharmaceutical products published in the
9  Red Book from at least 1997 to the present, did
10  Ivax --
11          MR. CARROLL:  Strike that.
12     Q.   -- did Red Book rely on Teva
13  Pharmaceuticals to verify that pricing?
14          MR. PARISH:  Object to the form of the
15  question.
16     A.   Yes.
17     Q.   To the extent there was pricing for
18  Johnson & Johnson drugs that was published in the
19  Red Book from 1997 to the present, did Red Book
20  rely on Johnson & Johnson to verify the accuracy
21  of that pricing?
22          MS. TORGERSON:  Objection, form, and

Page 329

1  objection, leading.
2      A.   Yes.
3           MR. CARROLL:  I have no further
4  questions.
5           (Pause)
6           (Document bearing Bates Nos. California
7  Mylan 03471964 through 03472033 marked
8  Exhibit Minne 077 for identification.)
9               EXAMINATION
10  BY MR. PAUL:
11     Q.   Miss Minne, I'm Nick Paul.  I
12  represent the State of California.  We have a
13  case alleging substantially the same allegations
14  that have been described previously by
15  plaintiffs' counsel to you today in California
16  and cross-noticed this deposition, and I'd like
17  to ask you some questions about this document
18  that's been marked as Exhibit 77.  Actually, just
19  four pages of it.  I know it's been a long day,
20  and I'll try to move quickly.
21          MR. PAUL:  For the record, the title
22  page here says "Micromedex Incorporated, Red Book

83  (Pages 326 to 329)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 330

1  Database Services, Database Overview Manual," and
2  at the bottom right, in small letters it says,
3  "Red Book database, revised April 14th, 2000."
4       Q.  Did I read that correctly?
5       A.  Yes.
6       Q.  Are you familiar with this manual?
7       A.  Yes.
8       Q.  Could you describe the purpose of it?
9       A.  The purpose of this manual is to
10  describe the electronic Red Book file to a
11  potential customer.
12      Q.  Is that the same electronic file
13  that's been mentioned many times earlier today?
14      A.  Yes.
15      Q.  The first two pages I'd like you to
16  turn to are --
17      MR. PAUL:  And for the record, this is
18  Bates -- this is Bates number California Mylan
19  03471964 through 03472033.  I believe it's a
20  complete document.
21      Q.  And I just want to turn to pages 1968
22  and 1969, which are in the introduction.

Page 331

1       And looking at the bottom of page 1968,
2  there's a sentence that I'll read that begins,
3  "Similar," it continues, "to other advanced
4  information systems, the Red Book database is a
5  rapidly evolving knowledge base.  Current uses for
6  the database include:" and then on the next page,
7  1969, there are some bulletized examples, one of
8  which, the second one, is "Claims adjudication."
9       Do you have any knowledge as to how the
10  data in this database are used for claims
11  adjudication?
12      A.  I have a general knowledge.
13      Q.  Could you tell us what that is?
14      A.  A -- a company performing claims
15  adjudication purchases pricing information, such
16  as the Red Book database, and then uses that when
17  determining what the claim -- what the claims
18  are.
19      Q.  So to the extent that a company
20  purchasing this database for the purposes of
21  claims adjudication and relying on the prices in
22  the database --

Page 332

1       MR. PAUL:  Strike that.
2       Q.  So I think earlier today you described
3  three purchasers you were aware of of the
4  electronic database, Merck MedCo and EDS and
5  Express Scripts.
6       A.  (Nodding)
7       Q.  Are there any others that come to
8  mind?
9       A.  No.  Not at this time.
10      Q.  What about the fourth bullet, which
11  reads, "Establishing and maintaining
12  reimbursement levels," do you have any knowledge
13  as to how the database is used in that
14  connection?
15      A.  No, I do not.
16      Q.  All right, if you turn, please, to --
17  the last four of the Bates are 2010.
18      MR. FARQUHAR:  I'm sorry, Counselor,
19  could you also read the page number in the upper
20  right-hand corner, because I have a different
21  version of that?  I may be able to refer to it.
22      MR. PAUL:  Sure.  With respect to the

Page 333

1  previous questions, it was "Introduction 1/2",
2  and "Introduction 1/3."
3       MR. FARQUHAR:  Thank you.
4       MR. PAUL:  And in connection with my
5  questions regarding Bates pages 2010 and 2011,
6  the top number reads "Available Fields 4-34" and
7  35.
8  BY MR. PAUL:
9       Q.  Page 2010 provides a description of a
10  field name described as average wholesale price
11  sector.  And the description reads, "Provides the
12  product's nationally recognized suggested
13  wholesale price as determined by surveys of
14  manufacturers and wholesalers.  The AWP sector
15  contains fields for the current, first previous
16  and second previous average wholesale prices."
17      Did I -- did I read that correctly?
18      A.  Yes.
19      Q.  And where would the surveys that are
20  described in there, how would they take place?
21      A.  That would be -- going back to the
22  product listing verification that we would send

84  (Pages 330 to 333)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 334

1  to manufacturers.
2      Q.  The same product listing verifications
3  that were discussed at length today?
4      A.  Correct.
5      Q.  So in particular, the AWP data that
6  was obtained through those product listing
7  verifications would be entered into this
8  database?
9      A.  Correct.
10         MR. GASTWIRTH:  Objection to form.
11     Q.  So is it fair to say that the AWPs
12  which were entered into the Red Book database
13  which are the subject of this manual, at least
14  until the 2003 AWP policy change, would have come
15  from drug manufacturers?
16         MR. SWEENEY:  Object to the form.
17         MS. TORGERSON:  Object to the form.
18         MR. GASTWIRTH:  Object to the form.
19         MR. CAHILL:  Do you want the question
20  read back?
21         THE WITNESS:  Please.
22         (Record read)

Page 335

1         MS. TORGERSON:  Same objections.
2      A.  Yes, the AWP would have come from the
3  manufacturers, or they would have supplied us the
4  formula to calculate that AWP.
5      Q.  And with the proviso you just
6  mentioned, you're referring to the AWP policy
7  period after 2003?
8         MS. TORGERSON:  Objection, form.
9      A.  Prior to 2003.  The manufacturers,
10  some manufacturers, would not provide an AWP
11  price but would provide a formula to calculate an
12  AWP.
13     Q.  All right.  And could you tell us --
14  if you did tell us today, I missed the inception
15  date, but could you tell us approximately when
16  this attribute of pricing at which AWPs were
17  entered based on a markup began?
18         MR. GASTWIRTH:  Objection, form.
19     A.  Are you asking when manufacturers
20  started supplying us a formula?
21     Q.  Yes.
22     A.  I do not know the exact date of when

Page 336

1  the first manufacturer was -- or who it was or
2  when it was that that became a practice.
3      Q.  All right.
4         Are there any manufacturers, to your
5  knowledge, whose prices are not featured in the
6  Red Book electronic database?
7      A.  None that I am aware of.
8      Q.  I think you confirmed that one of the
9  purchasers of the electronic database -- one of
10  the subscribers is EDS.
11         Do you -- is that correct?
12     A.  I know they were at one point.  I do
13  not know if they still are.
14     Q.  Do you have any knowledge as to the
15  type of customers that EDS services?
16     A.  I do not know.
17     Q.  And I think you've already been asked
18  this once earlier today, but could you confirm
19  either way, do you know if any government
20  Medicaid programs are purchasers of electronic
21  database, the Red Book electronic database?
22     A.  I do not know.

Page 337

1      Q.  Do you know who in Red Book might know
2  the answer to that?
3      A.  Probably the salespeople, who are more
4  familiar with the customers.
5      Q.  Any names in particular that --
6      A.  Marc Mussato would be a good person to
7  know that answer.
8         MR. PAUL:  That's all I have, thanks.
9         MS. TORGERSON:  Any other plaintiffs?
10         MR. ANDERSON:  Is there any plaintiff
11  on the phone who would like to ask questions?
12         All right, we're now passing the
13  witness to the defense bar.
14         MR. FARQUHAR:  Why don't we go off the
15  record just for a second so we can --
16         THE VIDEOGRAPHER:  This is the
17  videographer.  Off the record at 17:03.
18         (Pause)
19         THE VIDEOGRAPHER:  On the record at
20  17:05.
21         EXAMINATION
22  BY MR. FARQUHAR:

85 (Pages 334 to 337)

Page 338

1      Q.   Thank you.
2          My name is Doug Farquhar, I represent
3  Watson Pharmaceuticals in a whole mess of the
4  cases that have been cross-noticed here.
5          So I'd like to start, actually, with
6  Exhibit 77, which you were looking at earlier,
7  and I'll ask you to turn back to the page where
8  the definition of AWP was included.
9          The description there has already been
10 read into the record, so I won't reread it, I
11 think it was on the Bates number 2010.
12     A.   (Nodding)
13     Q.   Okay.  And I just wanted to confirm
14 that the AWP that was provided by some of the
15 manufacturers, as you indicated, was intended to
16 be what's listed here; that is, the nationally
17 recognized suggested wholesale price; is that
18 correct?
19         MR. GOBENA:  Object to form.
20     A.   That is my assumption.
21     Q.   Now, I would ask you to turn -- it's
22 probably going to be two pages, to the definition

Page 339

1  of wholesale acquisition cost.
2          Okay.  What's the Bates number in the
3  bottom right-hand corner?  What does it end with?
4  211?
5      A.   Correct.
6      Q.   Okay.  If you would -- well, why don't
7  I read it into the record, it would probably be
8  easier that way.
9          The description for the WAC sector
10 says, "Provides manufacturer-quoted list prices
11 to wholesale distributors, alternatively referred
12 to as 'net wholesale' or 'list price' within the
13 pharmaceutical industry.  This field may be used
14 in lieu of or in conjunction with AWP for product
15 comparisons and trend analysis.  This field is not
16 reflective of bids, rebates, volume purchase
17 agreements or other types of exclusive contracts
18 which may alter the price charged on an
19 account-specific basis."
20         Did I read that paragraph accurately?
21     A.   Yes.
22     Q.   And is that consistent with the Red

Page 340

1  Book editorial policy about what a WAC is, in
2  your experience?
3          MR. CAHILL:  Objection to form.
4          MR. CARROLL:  Objection to form.
5      A.   Yes, that is our understanding of what
6  a WAC price represents.
7      Q.   Very good.
8          All right, I'd like to have you take a
9  look at what I'm going to ask to be marked as
10 Exhibit 78.
11         (Document bearing Bates No. WATMA
12 005202 marked Exhibit Minne 078 for
13 identification.)
14         MR. FARQUHAR:  And for those on the
15 phone, or those in this room that don't get a
16 copy of it, let me describe this as a letter from
17 Red Book dated April 6th, 1995 to Jesse Childs at
18 Watson Laboratories.  It bears a Bates number
19 WATMA 005202.
20     Q.   Let me start by asking you if you
21 recognize this document.
22     A.   Yes, I have not seen this document

Page 341

1  before.
2      Q.   All right.  Does this document appear
3  to be a letter on Red Book letterhead, based on
4  your knowledge and experience at Red Book?
5      A.   Yes, it does.
6      Q.   Do you have any reason to believe that
7  this was anything other than a letter from Red
8  Book on this date to Watson Laboratories?
9      A.   No.
10     Q.   It's signed by Beverly, it looks like
11 Pfohl, P-f-o-h-l.
12         Are you familiar with Miss Pfohl?
13     A.   I am not.
14     Q.   Now, the second paragraph, it says,
15 "WAC on the Red Book database refers to the
16 manufacturer's quoted list price to wholesale
17 distributors and does not reflect any deal terms
18 or specialized contract pricing."
19         Did I read that paragraph correctly?
20     A.   Yes.
21     Q.   And is that consistent with your
22 understanding of what the Red Book definition is

86 (Pages 338 to 341)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 342

1  for WAC?
2      MR. GOBENA:  Objection to form.
3      A.  Yes.
4      Q.  Okay, I'm going to show you now what I
5  will ask to have marked as Exhibit No. 79.
6      (Document bearing Bates Nos. RB00803
7  through 00874 marked Exhibit Minne 079 for
8  identification.)
9      MR. FARQUHAR:  Now, this bears Bates
10  numbers RB00803 through 874, but I will note for
11  the record it is not a complete document.  The
12  part of this document that interests me,
13  actually, begins on the third page, which is
14  Bates numbered 805, but I didn't have the benefit
15  of having seen Exhibit 77 when I saw this
16  document in the Red Book documents, so I included
17  the first two pages because they were sequential
18  before 805, and I couldn't understand what 805
19  was.
20      Q.  So I'm going to ask -- actually, ask
21  you to ignore the first two pages of this
22  document, and look at 805, and ask you is this

Page 343

1  basically the same document as Exhibit 77, just
2  an earlier iteration of it?
3      A.  That is what it appears to be to me.
4      Q.  All right, great.
5      And on -- I'm sorry, I can't remember
6  if you mentioned this, but who did this document
7  go to?  Did it go to customers?  Was it purely an
8  internal document?
9      A.  If this document, 805, is the same as
10  or an earlier revision of Exhibit 77, it would
11  have been going to customers or potential
12  customers.
13      Q.  Okay.
14      And the purpose of -- can you tell us
15  what the purpose of this document was?  Why was
16  it developed and sent to customers?
17      A.  This document is describing the fields
18  included in the electronic Red Book file, so it
19  would just be a source of information for a
20  customer or potential customer to know what was
21  being offered in that file.
22      Q.  All right.  And where definitions are

Page 344

1  included of the fields, what is the purpose of
2  providing those definitions to the customers?
3      A.  My assumption would be just because
4  these are industry standard terms, so by calling
5  them the same term as what it is known in the
6  industry, it would make sense to a customer.
7      Q.  Okay.  So they would understand what
8  the definitions are --
9      A.  Correct.
10      Q.  -- that Red Book is using?
11      A.  Correct.
12      Q.  I would just ask you to turn to the
13  page that's marked at the bottom 807.  It's about
14  the fifth page in.
15      And it's true, is it not, that the
16  table of contents here included a reference to
17  average wholesale price, or AWP?
18      A.  Correct.
19      Q.  And then on the next page -- I'm
20  sorry, at the bottom of that same page -- or not.
21      Oh, I'm sorry, up at the top -- thank
22  you -- of the same page, wholesale acquisition

Page 345

1  cost, or WAC sector, there's an indication of
2  where you would find information about WAC in
3  this table of contents?
4      A.  Correct.
5      Q.  Okay.
6      Now, I'd ask you to turn to the very
7  last two pages in this exhibit.
8      This is the index for the document that
9  we've been referring to; correct?
10      A.  Yes.
11      Q.  All right.
12      And on the next-to-last page, 873,
13  again, if someone wanted to look at what the
14  average wholesale price was intended to be, all
15  they would have to do is turn to the index, look
16  it up and see that it is defined on page 4-34?
17      MR. GOBENA:  Objection to form.
18      Q.  Is that correct?
19      MR. GOBENA:  Same objection.
20      A.  That appears to be correct.
21      Q.  Same question with regard to WAC, or
22  wholesale acquisition cost, on the last page?

87  (Pages 342 to 345)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

## New York, NY

---

Page 346

1        MR. GOBENA:  Same objection.
2    A.  That appears to be correct.
3    Q.  Okay.
4        And the definitions that we read from
5   Exhibit 77 with regard to AWP and WAC are the
6   same on page 853 and 855 as the definitions that
7   were in Exhibit 77; correct?
8        MR. GOBENA:  Objection, form.
9    A.  That appears to be correct.
10   Q.  Okay.  Thank you.
11       I'd like to show you now what's been
12  marked, or will be marked, as Exhibit 80.
13       (Document bearing Bates No. WATED
14  021725 marked Exhibit Minne 080 for
15  identification.)
16       MR. FARQUHAR:  And for the record, I
17  will describe this as a document that was
18  produced by Watson in electronic form in at least
19  Kentucky, and I believe in other states, or will
20  be soon, and it bears the Bates number in
21  electronic form of WATED 021725.  It's a letter
22  dated August 23rd, 2000 to Ronnie Lane at Red

---

Page 347

1   Book.
2    Q.  Let me start by asking you if you're
3   familiar with this document.
4    A.  No.
5    Q.  Do you know who Ronnie Lane is?
6    A.  I did meet Ronnie Lane.
7    Q.  And she's -- who is she?
8    A.  She was what they called a data
9   analyst on the Red Book side in Montvale.
10   Q.  So she was in --
11       MR. SWEENEY:  I'm sorry, can you read
12  that back?  I didn't hear it.
13       MR. FARQUHAR:  She was a data analyst
14  in Montvale.
15       MR. SWEENEY:  Okay.
16   Q.  And she was an employee of Red Book;
17  correct?
18   A.  Correct.
19   Q.  Would -- well, let me try that again.
20       Would her responsibilities have
21  included communicating with drug manufacturers?
22   A.  Yes.

---

Page 348

1    Q.  Now, this letter appears to be a
2   letter from Schein to Ronnie Lane dated August
3   23rd, 2000.
4        Do you have any reason to believe that
5   this letter was not, in fact, sent by Schein and
6   received by Red Book?
7    A.  No, I do not.
8    Q.  You'll notice that the second
9   paragraph states, in relevant part -- well, I'm
10  sorry, let me start with the first -- first
11  paragraph, the last sentence.  In talking about
12  WAC, it says, "As you are aware, rebates or other
13  adjustments which, if granted, may result in an
14  effective net price to some purchasers of less
15  than the listed WAC."
16       Would that description of WAC be
17  consistent with your understanding on behalf of
18  Red Book of the definition of WAC?
19       MR. GOBENA:  Objection to form.
20   A.  The Red Book definition does state
21  that WAC does not reflect any rebates or other
22  adjustments or contract pricing, so, yes, this

---

Page 349

1   would be consistent with my -- with the Red Book
2   understanding of WAC.
3    Q.  Okay.
4        And the second paragraph starts with
5   the sentence, "While custom and usage by industry
6   and government entities has, for over 20 years,
7   designated manufacturer-suggested list prices to
8   providers as 'AWP,' several manufacturers have,
9   in recent years, come under investigation for
10  reporting AWP consistent with this practice."
11       My question is whether -- well, my
12  first is whether the definition of AWP as
13  manufacturer-suggested list prices to providers
14  would be consistent with Red Book's definition of
15  AWP under its editorial policy?
16       MR. GOBENA:  Objection to the form.
17   A.  Yes.
18   Q.  And my second question is whether Red
19  Book did anything with this information that was
20  provided to Red Book in this letter on August
21  23rd, 2000?
22   A.  I do not know.  Any -- any action or a

---

88  (Pages 346 to 349)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 350

1  response to this letter would be contained within
2  the manufacturer files.
3      Q.  Okay.
4          And I assume you can't confirm for us
5  that this letter was, in fact, received by Red
6  Book?
7      A.  I cannot confirm that.
8      Q.  Okay.
9          MR. FARQUHAR:  I would ask counsel for
10  Red Book if they can try and locate a copy of
11  this letter from within the files of Red Book.
12         MR. CAHILL:  We'll take the request
13  under advisement.
14         MR. FARQUHAR:  Thank you.
15     Q.  All right.
16         Are you aware that some manufacturers
17  and labelers reported an SWP, or suggested
18  wholesale price, in lieu of an AWP, or average
19  wholesale price?
20         MR. GOBENA:  Objection to form.
21     A.  I have seen manufacturers list prices
22  termed something other than AWP, yes.

Page 351

1      Q.  Okay.
2          Including suggested wholesale price, or
3  SWP?
4      A.  Off the top of my head, I don't know
5  --
6      Q.  Okay.
7      A.  -- if that was a term I've seen
8  before.
9      Q.  All right.
10         MR. FARQUHAR:  I have a document that I
11  don't have extra copies of, but I think it will
12  be sufficient for me to describe this document so
13  that everybody will understand what it is.  If
14  anybody objects to that, just let me know and
15  we'll stop the deposition and get copies of it.
16         It's a letter from Watson Pharma
17  Incorporated, it's dated 8/30 of 2000, it's from
18  an employee of Watson Pharma to Miss Linda Panke,
19  P-a-n-k-e, a data specialist in Montvale for Red
20  Book.
21     Q.  Let me start by asking you, do you
22  know who Ms. Panke is?

Page 352

1      A.  I did meet her once.
2      Q.  And again -- she's an employee of Red
3  Book, or was?
4      A.  She was an employee, yes.
5      Q.  And as a data specialist, would her
6  responsibilities include communicating with drug
7  companies?
8      A.  Yes.
9      Q.  All right.
10         Now, this letter, which I will have
11  marked as an exhibit, No. 81, is a cover letter
12  that says in the text, "Please see attached
13  InfoLert" -- that's I-n-f-o, capital L, e-r-t,
14  all one word -- "regarding NDC and SWP changes to
15  BAC" -- B-A-C -- "tablets, USP. Please note that
16  this product is 'AB' rated.  If you have any
17  questions, please feel free to call us at," and
18  then it gives a phone number.
19         Attached is an InfoLert that includes
20  two -- well, it's got one, two, three, four --
21  five columns, the last two columns say "New SWP"
22  and "New WAC" and then it lists the new SWPs and

Page 353

1  new WACs for two different products.
2          MR. FARQUHAR:  I'll ask now that we
3  mark this as Exhibit No. 81.
4          (August 30, 2000 letter from Watson
5  Pharma Incorporated to Linda Panke, with
6  attachment marked Exhibit Minne 081 for
7  identification.)
8          MR. CARROLL:  Does it have a Bates
9  stamp on it, Doug?
10         MR. FARQUHAR:  It does not.
11         MR. CARROLL:  Has it been produced?
12         MR. FARQUHAR:  It's been produced
13  electronically.  I will try to track down the
14  electronic data number.
15     Q.  Showing you this Exhibit No. 81, do
16  you have any reason to believe that that was
17  anything other than a document that was actually
18  sent by my client to Red Book in the form that's
19  presented to you there?
20     A.  No, I do not.
21         MR. GOBENA:  Objection, form.
22     Q.  Okay.

89  (Pages 350 to 353)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 354

1    A.  No.
2    Q.  And if, in fact, this is the letter as
3  it was submitted, that would confirm, would it
4  not, that at least some manufacturers reported
5  SWP in lieu of AWP to Red Book; correct?
6        MR. CAHILL:  Objection to form.
7        MR. GOBENA:  Same objection.
8    A.  Correct.
9    Q.  All right.
10       And do you know what Red Book's policy
11  was when manufacturers reported SWPs? How would
12  they handle that information?  For example, would
13  they take the SWP and put it into the AWP field,
14  or would they do something different with the
15  SWP?
16   A.  I am not aware if there was a policy.
17  I would assume that in the manufacturer notes for
18  Watson there would be a note that would describe
19  what SWP -- what is done with an SWP price.
20   Q.  Okay.
21       MR. FARQUHAR:  I don't think I have any
22  other questions.

Page 356

1
2
3
4
5
6    _____
7         KRISTEN MINNE
8
9
10  Signed and subscribed to before me
11  this_____day of_____, 2008.
12
13
14  _____
15      Notary Public
16
17
18
19
20
21
22

Page 355

1        MR. ANDERSON:  I would ask that we do
2  have a copy of that exhibit made for us to review
3  this evening.
4        MR. FARQUHAR:  Sure, why don't we do
5  that right now.
6        MR. ANDERSON:  And, Doug, it would be
7  appreciated, in fact it is a formal request, that
8  you track down the CD with the Bates number.
9        MR. FARQUHAR:  I will try to do that
10  right now.
11       MR. ANDERSON:  Thanks.
12       THE VIDEOGRAPHER:  This is the
13  videographer.  This ends our deposition for today
14  at 17:24 on November 18th, 2008.
15       We're off the record at this time.
16       (Time noted:  5:24 p.m.)
17
18
19
20
21
22

Page 357

1        C E R T I F I C A T E
2
3        I, HELEN MITCHELL, a Shorthand
4  Reporter and Notary Public, do hereby
5  certify:
6        I reported the proceedings in the
7  within-entitled matter, and that the
8  within transcript is a true record of
9  such proceedings.
10       I further certify that I am not
11  related, by blood or marriage, to any of
12  the parties in this matter and that I am
13  in no way interested in the outcome of
14  this matter.
15       IN WITNESS WHEREOF, I have
16  hereunto set my hand this_____day
17  of_____, 2008.
18
19  _____
20         HELEN MITCHELL
21
22  November 18th, 2008

90 (Pages 354 to 357)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

EXHIBIT 139

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CITIZENS FOR CONSUME, et al     .   CIVIL ACTION NO. 01-12257-PBS
        Plaintiffs             .
                               .
        V.                     .   BOSTON, MASSACHUSETTS
                               .   MAY 16, 2007
ABBOTT LABORATORIES, et al     .
        Defendants             .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the United States:    Rene Brooker, Esquire
                          Justin Draycott, Esquire
                          United States Department of Justice
                          601 D Street, NW
                          Patrick Henry Building, Room 9028
                          Washington, DC  20004
                          202-307-1088


For Ven-A-Care:           James J. Breen, Esquire
                          The Breen Law Firm, P.A.
                          3562 Old Milton Parkway
                          Alpharetta, GA 30005
                          770-740-0008


For Abbott Laboratories:  James Daly, Esquire
                          Jason Winchester, Esquire
                          Jones Day Reavis & Pogue
                          77 West Wacker Drive
                          Chicago, IL  60601-1692
                          312-782-3939


Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

_____

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**240 Chestnut Street**
**Wrentham, Massachusetts 02093**
**(508) 384-2003**

1                          **<u>I N D E X</u>**

2    Proceedings                                              3

1              P R O C E E D I N G S

2         (Court called into session)

3              THE CLERK:  The Honorable Marianne B. Bowler

4  presiding.  Today is May 16th, 2007 in the case of Citizens for

5  Consume, et al v. Abbott Laboratories, et al, Civil Action No.

6  01-12257 will now be heard.

7              Would counsel please identify themselves for the

8  record.

9              MS. BROOKER:  Rene Brooker on behalf of the United

10  States.

11             MR. BREEN:  Jim Breen on behalf of Ven-A-Care of the

12  Florida Keyes, the relator.

13             MR. DRAYCOTT:  Justin Draycott on behalf of the

14  United States.

15             MR. DALEY:  Good afternoon, Your Honor, Jim Daly on

16  behalf of Abbott Laboratories.

17             MR. WINCHESTER:  And Jason Winchester, also for

18  Abbott.  Your Honor, I filed an appearance, I believe

19  yesterday, and also a motion for admission pro hac vice.  I've

20  not appeared--

21             THE COURT:  I think I allowed it this morning.

22             MR. WINCHESTER:  --before the Court before.

23             THE COURT:  8:00.

24             MR. WINCHESTER:  Thank you, Judge.

25             THE COURT:  All right.  I have five motions that were

 1   noticed, and I will deal with those in the order in which

 2   they were filed.  And then there are a couple of additional

 3   motions that are now ripe.  Whether or not we have time to get

 4   to those, we will see when we deal with the ones that were

 5   scheduled.

 6           So, starting with docket entry number 3529, motion to

 7   compel Abbott by the United States.

 8           MS. BROOKER:  Good afternoon, Your Honor.  Again, I'm

 9   Rene Brooker.  Just to remind the Court, I'm from the civil

10   division of the Department of Justice in Washington, and Justin

11   Draycott, who will argue two of the motions today, we're from

12   the same office.  And I do want to thank, Your Honor, for

13   putting these all on the docket all at the same time.  I think

14   both Abbott counsel and government counsel and relator's

15   counsel, we appreciate when you--

16           THE COURT:  Sure.

17           MS. BROOKER:  --accumulate them all so we come here

18   and hit as many in one day, so we appreciate that.

19           I think I can briefly set forth for the Court what

20   this motion is about and since I believe it was only last week

21   when Abbott filed, or excuse me, not with respect to this one,

22   let me just say, I just want to briefly lay out our position

23   and I will briefly address what I know Abbott counsel will

24   probably stand up and address and try to be most efficient.

25   Your Honor may recall that the last time we were before the

1   Court, we argued the issue of the, amending the MDL

2   protective order and particularly the big issue on Your Honor's

3   plate was the sharing provision.  Your Honor did amend the MDL

4   protective order and allowed us to share documents that Abbott

5   produces in this case with the states and Your Honor is

6   probably aware, Judge Saris signed that.  Abbott did not appeal

7   Your Honor's decision, and what we are here on on today's

8   motion is exactly the flip side of the Department of Justice

9   sharing Abbott documents with the states and that is it's a

10  pretty simple straight forward issue.  We also would like by

11  this motion for other government entities and relator, Ven-A-

12  Care, who is the same relator in the Texas case, to be able to

13  share the set of documents that Abbott has produced to again

14  other government agencies and to relator, Ven-A-Care, in Texas

15  with us.  So it's really just kind of the flip side which the

16  MDL protective order could not address head on so that's why we

17  filed this separate motion.  We do believe that allowing this

18  is as simple as enforcing Judge Saris' earlier CMO's in this

19  MDL proceeding on this very issue.  I think we set forth in our

20  brief CMO 5 and 10 and also CMO 9 address this very issue and

21  in fact ordered the defendants over the course of years to

22  produce to everyone as they joined the MDL proceeding

23  everything they had previously produced to other entities and

24  obviously the reasons for Judge Saris' opinion are apparent to

25  streamline the discovery process, to minimize the amount of

1   motions practice that come before the court.  We believe

2   that those same considerations and concerns are here.  You

3   know, obviously there is no burden to Abbott, and I don't

4   believe Abbott, counsel will speak for Abbott, but I don't

5   believe there's any real burden objection that's not the

6   objection by Abbott.  In fact, all we're really asking Abbott

7   to do at most is to burn some CD Roms and just produce to us

8   what they've already given to several other jurisdictions,

9   including again, Mr. Breen has this very set of documents, so

10  we could even minimize the burden to Abbott by asking Mr. Breen

11  just to give those CD Roms to us.  It's as simple as that.

12          We have a couple of practical problems.  I consider

13  this a very practical motion because we have some practical

14  problems that we had to date as a result of not having this

15  provision or this order in place.  We are working, obviously

16  with relator, Ven-A-Care.  We are obviously going to have some

17  of the same experts that appear in the Texas case, that appear

18  in our case.  To date, it has been extremely costly and onerous

19  for Mr. Breen himself to share documents with us and to discuss

20  documents, even those that we got from Abbott in this case

21  because he has to go through a very laborious process of trying

22  to determine what documents Abbott gave him in Texas and are

23  they on the list that Abbott gave us to be sure that we don't,

24  you know, mix the documents and to be sure, frankly, he has not

25  discussed with us any documents that he received in Texas that

1    Abbott hasn't yet produced us.  Its cost some costly

2    impractical problems for us.

3           Here's Abbott's arguments which we respond to and I

4    hope I capture them all.  You know, first I think that Abbott

5    would say this is a relevance issue.  For Abbott I think that's

6    what it comes down to.  They believe that from their

7    determination of the documents since some of the other

8    jurisdictions have sued on different drugs, which is true, then

9    what we've sued on in this case, Abbott would say, well, some

10   of the documents on those CD Roms are not directly relevant to

11   this case.  And that may be true.  There may be some documents

12   that, you know, we may get more documents than we need to or

13   care to review, but we've also learned in a separate motion

14   that may or may not at this time yet be before Your Honor,

15   relator, Ven-A-Care, has identified many documents in a subset

16   of highly relevant documents that Abbott produced in Texas but

17   has not produced to us.  Whether that is intentional or

18   inadvertent is sort of really beside the point.  And some of

19   those we're going to be start filing, you know, we're going to

20   be filing motions to compel on, we're going to have to argue

21   about those.  All of this can be completely streamlined if we

22   just get that set of documents.

23          The other point that Abbott may raise here today is

24   that recently Judge Saris, we held a hearing before Judge Saris

25   on the CMO, and I believe that was back in late February, and

1    pursuant to that CMO conference, this issue of sharing came

2    up because it was sort of a part of the CMO.  It did not get

3    addressed, however, and Judge Saris expressly said that she was

4    going to leave this issue to the Court.  She also asked in

5    order to I think assist the Court with determining at least

6    with respect to the subset of documents that relator has, not

7    with respect to the entire subset of documents we're trying to

8    get from all the jurisdictions, but at least with respect to

9    Vena-A-Care subset of documents, she asked Ven-A-Care to set up

10   a procedure which has happened and a motion has been filed.

11   It's been fully briefed, where Ven-A-Care and Abbott have

12   exchanged documents that were produced in Texas and not

13   produced here, and determined that there was significant sample

14   of documents that are highly relevant to us in this case that

15   we did not get.  That's a separate motion, and again I'm not

16   sure, that may be one of these ancillary motions--

17          THE COURT:  Uh-huh.

18          MS. BROOKER:  --which we'll get to.  The point being

19   there is nothing that Judge Saris said at the hearing which you

20   may hear from Abbott counsel that prevents the Court from

21   entering this order.  Judge Saris did recognize and it is true

22   that under the Federal Rules of Civil Procedure that have been

23   in effect for the last seven years, that parties are not

24   entitled to go on wide fishing expeditions at great expense and

25   burden to another party if the documents are not directly

1  relevant to claims or defenses.  So one thing we would say

2  in response to that is we embrace Rule 26 as it exists today.

3  All of our briefing, we cite Rule 26, and we believe that all

4  the documents we're seeking are relevant to claims or defenses

5  in this case.

6           Also, I would say, Your Honor, you know, so to the

7  extent that Judge Saris' comments, you know, Abbott here,

8  counsel will argue today bar us from getting that relief.  I

9  don't believe that's true.  She was very adamant that she had

10 not read these briefs.  She was not prejudging this motion, and

11 also she did expressly state at the hearing that she recognizes

12 that even if documents do not relate directly to the subject

13 drugs at issue in this case, they may very well be relevant to

14 this case for 404(b) evidence as evidence of knowledge, intent

15 or other crimes.  We also would argue that they are, a lot of

16 the documents that Ven-A-Care has set aside as material, we

17 should be getting from Abbott's Texas production, also relate

18 to 406 under the Federal Rules of Evidence habit, you know, we

19 want all documents that have anything to do with AWP, with

20 reimbursement and that shows the force of conduct that we see

21 here today, even if they are not directly related to the four

22 subject drugs.

23          So, I believe I've addressed, and if not, I'm happy

24 to address once Abbott counsel stands up, the reasons for this

25 motion.

1           MR. BREEN:  One point.

2           MS. BROOKER:  I'm sorry, if I could just consult.

3           I don't know, Mr. Breen wants to make a point.  Is

4    that okay with Your Honor if he addresses you now?  He has--

5           THE COURT:  Sure.

6           MS. BROOKER:  --joined in this motion.

7           THE COURT:  Sure.

8           MS. BROOKER:  Okay.  But all of that being said, I

9    just wanted to summarize that I do believe that this would

10   streamline discovery in this case and greatly minimize the

11   motions practice we have before this Court because in large

12   measure, when we get that subset of materials, we will then

13   really be able to focus and troubleshoot on areas of documents

14   that are still remaining to be produced.  But we do believe

15   that probably what Texas received is significant in terms of

16   materials that we are trying to get Abbott to produce to us

17   right now, particularly because the Texas AG's office and

18   Mr. Breen spent a year before the Texas Appellate Court, the

19   Texas Supreme Court, litigating this issue, getting documents

20   released off of Abbott's privilege log that relate to the exact

21   same issues in this case.  So basically we're trying to avoid

22   this Court having to have the same battle all over again that

23   the Texas court has already engaged in, and that's all I'll say

24   at the moment, Your Honor.  Thank you for hearing me.

25          THE COURT:  All right.  I'll hear you now.

1        MR. BREEN:  Thank you, Your Honor.  Really

2    briefly, I just wanted to kind of point out one thing and that

3    is that I think this is a little simplified if we go back and

4    look at CMOs 5 and 10 because, and that's really what this

5    motion is based upon because there's really two universes of

6    documents that we're talking about here.  First off, we're only

7    talking about documents that Abbott has already produced and

8    one universe is documents produced to other government

9    litigants or investigative agencies.  The other universe is

10   documents they produced in the MDL, primarily in the class

11   cases.  And CMO 5 and CMO 10, which postdates 9, are very clear

12   that if Abbott or defendant turned over documents to a

13   government, they're supposed to share them with other

14   governments.  CMO 9, which Abbott raises as being different,

15   talks about documents that Abbott produced in the MDL and

16   that's the one that says if, they don't have to give to a

17   government documents from the MDL that may relate to drugs that

18   aren't pled or things of that nature.  We'd have to go back and

19   litigate the motions on those, the 404(b) and 406 motions, but

20   we're just talking about the documents that Abbott has given to

21   Texas already, Pennsylvania, California, any of these

22   government litigants, most of which Ven-A-Care and myself are,

23   I mean, I'm an attorney of record in all those cases, and we've

24   been litigating in advance in Texas.  As Ms. Brooker said,

25   we've been to the Supreme Court twice.  We've won every writ of

1  mandamus Abbott's filed.  They filed four of them out there,

2  and we're slowly hitting this stuff now because we're taking

3  joint depositions, but the problem is I can't show the

4  government a lot of these documents that were actually in a

5  joint deposition and that's when the documents are provided or

6  until we get, until Abbott agrees to turn over a transcript and

7  there are still a lot of outstanding transcript issues.  All we

8  want with this discrete motion is to enforce CMO 5 and 10, and

9  let the United States and Ven-A-Care as government litigants in

10  this MDL get exactly what those orders say, and that is

11  anything Abbott has given to another government entity, be it

12  in an investigation or in litigation and those CMO's cover

13  both.  That's all we're asking.  The flip side of what Your

14  Honor has already ruled, which is we can share with those same

15  government parties, that's what your protective order says.  We

16  can share with those same government parties, and now, but it's

17  got to work both ways or you can't have the cooperation that's

18  intended by the Manual for Complex Litigation among common

19  litigants and there's no more common litigant than Ven-A-Care

20  who is in all these cases.

21          Thank you, Judge.

22          THE COURT:  Mr. Daly, or your colleague?

23          MR. WINCHESTER:  Actually, it's me, Judge, Jason

24  Winchester.

25          With respect, Judge, our view is that this motion

1    completely dead in the water as a result primarily of the

2    proceedings before Judge Saris on February 27th.  Ms. Brooker is

3    correct the parties did appear before Judge Saris on that day

4    in conjunction with what was later entered as CMO 29 and the

5    plaintiffs for their own purposes on that day sort of jumped

6    the gun and raised this directly with Judge Saris.  This motion

7    asks you to direct that in this case where the government has

8    charged only four drugs, that they should be allowed and Abbott

9    should be forced to give them, every document that we've ever

10   produced in any other case, including in the Texas litigation

11   Mr. Breen referenced where there are 188 more MDCs at issue in

12   that case that are in issue here.  They raise that specific

13   point to Judge Saris.  We want everything from all the other

14   cases.  Please tell Abbott to give us everything from all the

15   other cases, and I'm happy to give the Court a transcript of

16   the February 27th proceedings, but Judge Saris says, and this is

17   at page 9, "You are not entitled to documents on any single

18   drug if you haven't charged it."  She goes on to state at page

19   15 that, "You cannot use this lawsuit as a fishing expedition

20   for 10 more drugs that you are interested in but have not

21   charged."  There are additional statements to this effect at

22   pages 16, 23, 24 and 25 of the transcript, and then on page 29

23   she states what I think is really the depth of this motion

24   before the Court, "I am not simply going to say you," the

25   government, "across the board are entitled to every document

1    produced in every suit even if it involves drugs that have

2    nothing to do with yours."  There is nothing left of this

3    motion.  Judge Saris took this up directly and said you,

4    government, are not entitled to all those documents that Abbott

5    had to produce in other cases about other drugs that are not at

6    issue here because they are at issue in those other cases.

7    This case is four drugs, all from the hospital products

8    division, vancomycin, sodium chloride, dextrose and sterile

9    water.  That's it.  The government chose to bring that case and

10   to bring it much more narrowly than the one that Mr. Breen is

11   involved with in Texas or in other places where he is

12   litigating.

13         To the extent, Your Honor, that there's anything left

14   of this motion and there really isn't, we think that it's

15   properly before Judge Saris because as counsel I think

16   accurately stated, once Judge Saris made clear, okay, you're

17   not entitled to everything, you've only charge four drugs here,

18   Mr. Breen brought up this issue of well, Judge, even setting

19   that aside, I still think there are some documents that we've

20   got in the other cases from Abbott that DOJ should get here,

21   and Judge Saris set up a platform for having that aired, which

22   was codified in CMO 29.  She said, bring me your 100 best most

23   representative documents, show them to Abbott, the ones that

24   they agree should be produced they'll produce.  If you guys

25   can't agree on certain other, then bring them to me, and that

1    motion was filed or that exercise was gone through.  We did

2    agree after a meet and confer with Mr. Breen that certain of

3    the documents he provided to us as not being produced, first of

4    all certain of them had been produced, and second, there were

5    certain other ones we agreed should be produced to the

6    government.  We produced those.  There are certain documents,

7    we believe, should not be produced, and that is the subject of

8    a separate motion which I believe is before Judge Saris,

9    although I could be wrong on that, but she invited it to be

10   filed before her.  It has been filed and has been briefed.

11            THE COURT:  Can you give me the docket number?

12            MR. WINCHESTER:  I don't know that, Your Honor.  I'm

13   not sure if Mr. Breen knows.  It was his motion.

14            MR. BREEN:  I was trying to find it but all my copies

15   don't have the docket number on it.  I was just looking for

16   that knowing that it might come up.  I think we were asking

17   before the hearing whether that was one of the ones that was

18   set before Your Honor also.

19            MS. BROOKER:  Your Honor, I can give you a docket

20   number.  I just need to go back to my bag--

21            THE COURT:  Sure.

22            MS. BROOKER:  --at the appropriate moment.  Would you

23   like me to do that right now?

24            THE COURT:  When it's convenient.

25            MR. WINCHESTER:  If I'm reading it correctly, Judge,

1   it may be document 4122.

2           THE COURT:  All right.

3           MR. BREEN:  Is that your response?

4           MR. WINCHESTER:  No, I'm reading your motion here.

5           THE COURT:  I think 4122 is a response.

6           MR. BREEN:  It is, Your Honor.  4122 is my memo of

7   law, so 4121 would have been the motion.

8           THE COURT:  And that is in my group of ripe today but

9   not noticed motions, so--

10          MS. BROOKER:  Yes, and it is correct.

11          MR. WINCHESTER:  So that's the other motion, Judge,

12  which I don't think is actually up before the Court today but

13  for this, this particular motion--

14          THE COURT:  It's your feeling Judge Saris should deal

15  with that motion?

16          MR. WINCHESTER:  I think that's completely up to the

17  Court.

18          THE COURT:  All right.  Okay.

19          MR. WINCHESTER:  It was my understanding just based

20  on her, the conversation initially was before her, she said

21  bring your motion to me.  She may well have discussed it off-

22  line with Your Honor and decided to have Your Honor take that

23  up, which is totally fine with us.

24          But I think based on those issues, this motion that's

25  before the Court right now, which is the give us everything

1   motion because we want it, is dead.  That the court has made

2   very clear the government is not entitled to all those

3   documents having only charged four.  And I would also point out

4   to Your Honor that that is a completely consistent position

5   with CMO 9 which has been on the books for a very long time

6   wherein the Court says a governmental entity plaintiff that is

7   a party to the MDL proceeding, which is the government here,

8   shall be entitled to documents, except that no such plaintiff

9   shall be entitled to have access to A) documents produced by a

10  defendant that is not a named defendant in the operative

11  complaint filed by such plaintiff; B) which is the one that is

12  at issue for us here, documents relating to drugs that are not

13  identified in the operative complaint filed by such plaintiff,

14  and C) documents produced by defendant that are not otherwise

15  relevant to the claims asserted.  So here, CMO 9 as applied in

16  this instance is very consistent with what Judge Saris said

17  back in February which is you get the documents for the drugs

18  you've brought in your case that's consistent with the post

19  2000 rules under Rule 26, which is you get the documents and

20  the discovery for the case you brought.  This is the

21  government's case.  We have agreed to give them all of the

22  relevant documents concerning the four drugs they brought.  We

23  even agreed to go beyond that and to give them documents that

24  would relate to those four drugs, even if they don't

25  specifically mention them, and we've agreed to go even further

1  beyond that and to produce any documents that would arguably

2  establish what counsel referred to as a pattern and practice

3  regardless of drugs.  So I think Abbott has agreed to give the

4  government everything to which it is rationally and

5  legitimately entitled in this case.  The further request, which

6  is give us documents that have nothing to do with our case, we

7  submit has been denied by Judge Saris and should be denied by

8  this Court.

9           MS. BROOKER:  May I address, Your Honor?

10           THE COURT:  Briefly.

11           MS. BROOKER:  Yes, I will be brief.  Your Honor, may

12  I pass to your law clerk and to the Court so you have a copy of

13  Judge Saris' whole transcript.

14           THE COURT:  Certainly, that's helpful.

15           MS. BROOKER:  Thank you.  Your Honor, this was the

16  issue that I was directing, oh, excuse me, addressing in my

17  direct argument. I think that what the Court will find and I'll

18  cite this so your law clerk can find these cites as well, the

19  portions that were just read to you were incomplete snippets of

20  what Judge Saris said at the hearing, and even some of them on

21  the same exact page.  What Judge Saris said, and I just want to

22  point out a couple of her comments to give you the more

23  complete picture, when this issue came up, first of all, she

24  made it very clear that she had not read the briefs in this

25  case and she repeatedly said at the hearing, you are all

1    talking about my prior CMOs and I don't recall at all what I

2    said in any CMO.  I don't have them committed to memory and I

3    just don't recall.  You may be right but I don't recall what my

4    CMOs say, so I won't repeat what I said at the outset.  The

5    CMOs which are the basis of the government's motion allow this

6    kind of sharing.  CMO 9, which we directly address, which,

7    along time ago, counsel has raised this today, but it's been

8    addressed already, CMO 9 was only talking specifically about

9    documents Abbott produced to the private plaintiffs.  The CMO

10   that preceded 9 and came after 9 made it very clear that the

11   government gets all documents Abbott produced to all other

12   government entities, including investigations and whatnot.

13   Also, these are two separate motions before the Court.  I do

14   believe, and obviously I'm not going to speak for Judge Saris,

15   she says in this transcript that she's going to decide when the

16   motion comes in, whether she's going to decide it or send it to

17   you and she said I'm probably going to send it to Judge Bowler,

18   but I'm not going to speak for her.  She never said definitely.

19   I guess I'm not surprised that it ended up on your docket, but

20   just to complete the snippets, on pages 9 and 15, when this

21   issue came up and Abbott counsel said exactly what was just

22   said now, four drugs, you get nothing more than the four drugs,

23   she said, "You're not entitled to documents on any single drug

24   if you have—"

25            THE COURT:  What page are you on?

1        MS. BROOKER:  I'm sorry, page 9 at the bottom,

2   lines 18 to 23, where the Court says, "I generally believe the

3   following," and again, she made it clear she was talking not

4   based on anything she had recalled about the CMOs or read in

5   the motion, "you're not entitled to documents on any single

6   drug if you haven't charged it.  You are entitled to do

7   discovery beyond the four drugs to the extent it shows that

8   there is some practice or pattern of conduct."  Then you flip

9   to another page that was just read, page 15, lines 6 through

10  16.  You know, Judge Saris was saying, "So one possibility

11  would be an agreement that you're not going to sue for the

12  other drugs and I'll order you to turn over all the CDs right

13  now.  You can't use discovery as a fishing expedition.  That's

14  the big bottom line.  On the other hand, you can't barnstorm

15  and just say it's just the four drugs.  If in fact they show

16  some overarching business principle and I, because they get to

17  prove their case as to what management was thinking and doing,

18  you know, prior bad acts kind of evidence," and, you know,

19  Judge Saris went on also on pages 31 and 33 to talk, again,

20  anything coming out of the sales and marketing team, talking

21  about how you market stuff during the relevant time period,

22  should be produced.  But again, much more important than this

23  is that Judge Saris said, we were citing her CMOs but she

24  hadn't read them.  She didn't remember what they said, and I'm

25  telling the Court that they do say that the government gets to

1   have access to all of these documents.  And one final point

2   I would make about Judge Saris' comments, Judge Saris, since

3   she hadn't read the brief, she was talking about in general

4   Rule 26, and it is absolutely true that Rule 26 seven years ago

5   said you can't overly burden a party with this huge fishing

6   expedition for documents that don't relate to claims or

7   defenses.  No burden is implicated here, so Rule 26, contrary

8   to what I've seen defendant argue in their brief, does not

9   adjudicate substantive rights of a party and tell a party what

10  it is they can or cannot do based upon documents that they

11  received legitimately in discovery.  We're not asking Abbott to

12  even give us the CDs.  We're just asking that we be allowed to

13  share what's already been produced.  If Abbott has some larger

14  concern about charges that we later bring in a complaint, if

15  that were to happen, they could deal with that issue at the

16  time.  Again, the issue is streamlining.  I do believe that

17  this brief is ripe for the Court to decide and particularly

18  because I do want the Court to understand that if the only

19  issue that's decided is Mr. Breen's motion, then we have to

20  come back to the Court again and ask the Court, well, what

21  about our larger motion, which asks for us to get documents

22  that Pennsylvania shares with us and other states. And again,

23  it doesn't make any sense that we can now share with states but

24  states cannot share back with us, and I think it doesn't make

25  sense because it's not consistent with what Judge Saris had in

I - 22

1    mind in this MDL proceeding and I thank you for hearing me

2    out.

3             THE COURT:  Okay, just a minute.

4             MR. WINCHESTER:  Very, very briefly, Judge.  They can

5    dance around it all they probably want.  I'd invite the Court

6    to read the transcript.  Those were quotes I read to you.

7    Judge Saris says fully knowing this case, you don't get

8    documents about drugs you haven't sued on unless they go to

9    pattern and practice.  As I represent to the Court and counsel

10   know as well, we have agreed to give them documents beyond just

11   the four drugs, not just documents that mention the four drugs,

12   any documents that deal with the four drugs even if not

13   mentioned and any documents that would arguably relate to

14   pattern and practice.  Beyond that, Judge Saris could not be

15   more clear, you do not get 100 other drugs when you've sued on

16   four.  That should end the issue.

17            THE COURT:  All right.  I'll take 2529 under

18   advisement.  Moving on to 3540, which is the motion for a

19   protective order relating to the deposition of government

20   counsel.

21            MR. DRAYCOTT:  Thank you, Your Honor.  Again, Justin

22   Draycott on behalf of the United States.  Just to refresh Your

23   Honor's recollection, the notice of deposition states that

24   pursuant to Rule 31(b)(1) of the Federal Rules of Civil

25   Procedure, Abbott will take the deposition of, and I'm quoting,

1    "One or more employees of the Department of Health and Human

2    Services who reviewed, approved or were consulted regarding the

3    brief of the United States as amicus curia that was admitted by

4    the Department of Justice on behalf of the Secretary of HHS in

5    response to the Court's request that the secretary explain his

6    views on the term average wholesale price as reflected in the

7    Medicare Act and federal regulations."  This is a deposition

8    notice that calls for the deposition of government counsel.  As

9    you would expect the consultation between the Department of

10   Justice and HHS was about a legal brief that addressed a legal

11   question.  It is unquestionably, goes to the deposition of

12   government counsel.  That in and of itself is highly

13   disfavored.

14          Separate and apart from that is any communication

15   that occurred is of course privileged.  This would be core

16   deliberative process and attorney-client communications

17   regardless of whether or not the employees were, at HHS were

18   attorneys or not, they'd still be privileged communications.

19   So it is 1) a highly disfavored deposition notice for

20   government attorney; 2) it goes to privileged communications,

21   and also it goes to an issue that is now been rendered moot by

22   the Court's order resolving the issue that was addressed by the

23   amicus brief.  The Court found that the term average wholesale

24   price, which was the issue addressed by the amicus brief, will

25   be construed pursuant to its plain meaning.  So the issue has

1   also been decided.  What's more, the issue is not decided or

2   the issue does not turn on the personal beliefs or personal

3   communications or the information that was provided in those

4   communications between government counsel and agency counsel.

5   This is decided it's a legal matter.  It was briefed as a legal

6   question.  There is no fact, there are no factual

7   representations in the government's brief, the citation to all

8   authority is a legal authority.  The case was brief in

9   accordance with the principals articulated by the First Circuit

10  in the *Lachman* case, which is that the, if the Court, first of

11  all the Court didn't actually go to agency interpretations

12  because it stopped at the plain meaning construction of the

13  statute, but had it gone and looked at the agency, and had the

14  issue come up of deference to the agency interpretation, the

15  deference is to the formal expressions of agency interpretation

16  and formal public pronouncements.  This is clearly a protective

17  order that should be issued, Your Honor.

18          THE COURT:  Mr. Daly, why is it not moot?

19          MR. DALY:  Why is it not moot?  It's not moot because

20  what Judge Saris asked the government to do or asked CMS to do

21  is to file an amicus brief that set forth the position of the

22  secretary of HHS and the administrator of CMS as to what their

23  understanding of the term AWP means as used in the statutes and

24  regulations.  This was actually over my objection when it first

25  came up because I said, Your Honor, they've sued us.  They're

1   litigants.  I object to litigants filing a friend of the

2   court brief with Your Honor and the Court said, well, I'll take

3   that under consideration and I am interested in what the agency

4   has to say.  After all, I'm talking about a regulation, first

5   of all prior to 1997, and I'm talking about a statute from 1997

6   on, and counsel for the government indicated that CMS was the

7   client of DOJ and the Court said, well, great.  I want to hear

8   what the government's position is.  So they come in and they

9   write a brief, which in the first line says that it is the,

10  filed on behalf of the secretary of HHS and Mr. Draycott says

11  in his argument today that it contains no factual assertions.

12  I beg to differ, and I'm just going to read very briefly from

13  our brief, page 9, Your Honor.  On page 13 of the amicus brief,

14  they state, "The final rule continued to reflect the

15  secretary's intention to limit Part B drug payments to an

16  amount related to supplier acquisition cost."  They have a

17  factual assertion of the secretary's intent.  They have in the,

18  on page 15 of the brief, they say, "The secretary understood

19  that Redbook and other wholesale price tags updated their

20  information monthly and thus for me, the secretary believed

21  that they published wholesale prices were a source of

22  acquisition costs of some physicians and therefore could be

23  used to calculate Part B drug reimbursement."  They say on page

24  13 and 14, "Rather, the published data was a resource to the

25  secretary in setting the agency's national average wholesale

1    price for payment purposes." And there are other quotes of

2    factual assertions that are in the amicus brief. Now, why do

3    we want to know about that? We want to know about that because

4    what the agency knew and understood about AWP is central to

5    this case. They have sued us for hundreds of millions of

6    dollars saying that we're entitled to the spread between the

7    published AWP on the one hand and the actual acquisition cost

8    on the other. They file a brief as a friend of the court

9    saying out loud what the secretary of HHS and the administrator

10   of CMS knew and believed and what those people knew and what

11   those agency's knew is critical to the case. What Judge Saris

12   has said over and over again, after her summary judgment

13   ruling, and we cited this in the brief, but after her summary

14   judgment ruling, she says, and this is in February 27th, the

15   same hearing that was cited and I guess maybe you have it, page

16   35 to 36, but it's cited in our brief as well, Your Honor, on

17   page 12, the court says, "Everyone has a right to understand

18   what the government was doing during the time period." And

19   then court also recognized that, "What the Centers for Medicaid

20   and Medicaid Services", I'm sorry, "Medicare and Medicaid

21   Services, understood and knew and what they agreed to and what

22   they didn't are things that the court was very interested in

23   hearing." And this is when we were going to go out and start

24   taking the depositions of current and former administrators of

25   CMS. So the court has made it very clear, and now I'm coming

1   full circle to your mootness point, that the issues of what

2   HCMS and its people and its administrators knew and understood

3   and what they believe and what they thought AWP meant and

4   whether they knew there was a spread or not is critical to the

5   issues per Judge Saris.  They go to causation, they go to

6   scienter, they go to the statute of Limitations.  This is a

7   fraud case after all.  They sued us for common law fraud.  It

8   goes to reliance.  It goes to misrepresentation.  It goes to

9   falsity.  It goes to all kinds of issues after the Court's

10  decision on summary judgment.  You can have a plain meaning and

11  the Court has construed a plain meaning, but first of all, it's

12  not a final order.  Secondly, even if that remains Judge Saris'

13  ruling, you can still have a plain meaning but in order to

14  prove fraud, in order to prove that the government was misled,

15  they have to prove that they were misled.  They have to prove

16  that they were deceived.  They have to prove that they didn't

17  know and that is, goes to the core of our defense.

18          So back to our little motion hearing.  The key to the

19  motion I think is in footnote 1 on page 5 of their brief, Your

20  Honor, and there it says, this is after saying that the only

21  people who fit the description of our request for a deposition

22  person are lawyers.  They drop a footnote and they say, to the

23  extent that CMS attorneys in turn conferred with other agency

24  personnel, those communications are plainly protected by the

25  attorney-client privilege and attorney work product doctrine.

1    If you look at that carefully, it says, to the extent.

2    They're not even willing to tell us that they actually

3    conferred with anybody.  They're leaving it - it's very crafty

4    and to this day, and we've asked them over and over again, did

5    you in fact talk to anybody or was this simply a lawyer driven

6    litigation posturing brief that you filed in front of Judge

7    Saris and they won't tell us, and they craft a footnote that

8    says, well, to the extent we did, and we're not telling you, we

9    won't tell you whether we did or not, that of course would be

10   privileged.  Well, you know what, it's not privileged if they

11   went and talked to people inside of CMS or HHS or anywhere else

12   in the government and got information about these factual

13   assertions that I just read to you from the amicus brief, we're

14   entitled to find out who those people are and what they knew.

15   We told them the first time that they raised this issue of, oh,

16   well, then you're just asking for a lawyer thing.  This is an

17   exhibit, one of the exhibits to our brief is a letter from my

18   colleague, Mr. Torborge, who wrote I believe to Mr. Draycott

19   and said, no, no, no.  Let's be absolutely clear.  I don't want

20   a lawyer dep.  If it's just lawyers, tell me that and then we

21   know that it's just a litigation brief.  But in response what

22   they do is they craft this crafty little footnote where we do

23   not know today whether or not they actually talked to anybody

24   and it's critical to--

25             THE COURT:  By the way, is the government willing to

1   put that in affidavit form who they conferred with?

2          MR. DRAYCOTT:  We'll certainly consider.  I did not

3   prepare the amicus brief, Your Honor, so I will respond to

4   that, but I think there's a couple of other points.  I don't

5   know if Mr. Daly was done.

6          THE COURT:  Well, that was just my question.  I don't

7   think he's finished.

8          MR. DRAYCOTT:  Okay.

9          THE COURT:  That was just a question that I throw out

10  to you.

11         MR. DALY:  So I believe it is relevant, Judge.  It is

12  not moot.  It goes to the agency interpretation.  It goes to

13  what the agency knew and understood during these years which is

14  exactly what the quote I read from Judge Saris that she says

15  she's interested in finding out.  It goes to the merits of the

16  case.  It also goes to the weight that should be given to the

17  supposed agency position that's reflected in the amicus brief.

18  As the Court knows, courts look to what agencies say about the

19  regulations that they handles and it matters to courts.  It

20  matters to Judge Saris.  It matters to appellate courts.  It

21  matters to other courts who may look at this to say is this a

22  litigation posturing brief or is it actually something where

23  they went and talked to anybody and actually got their views of

24  the agency.  And we've cited a bunch of cases, I think on

25  pages--

1          THE COURT:  Well, I'm just asking them whether or

2     not they'd be willing to put in affidavit form who they

3     consulted.

4          MR. DRAYCOTT:  Two things, Your Honor.  One, we'll

5     certainly consider that and consider that request.  I would say

6     that under *Lachman*, such consultations would be irrelevant

7     because *Lachman* tells, is explicit.  It couldn't be a more

8     explicit case which says what the source of agency

9     interpretation must be and the brief was prepared in accordance

10    with the principles in *Lachman*.

11          If I can quickly respond to, which is why there are

12    no factual assertions here.  If it turned to Mr., the defense

13    brief at page 9 where there is a series of quotes from the

14    government's brief.  What is not included there is the citation

15    for every statement that's made.  For example, Mr. Daly read

16    you the first one.  The final rule reflected the secretary's

17    continue belief as in 1991 of the wholesale price date, et

18    cetera, et cetera.  The citation for that in the brief is 56

19    Federal Register at 59 524.  For the next excerpt which is –

20    actually I think you then jump down to number 15, the citation

21    in the brief to the, the secretary understood the redbook and

22    other wholesale price guides, et cetera, et cetera.  The

23    citation in the government's brief is 56 Federal Register 59

24    524.  With respect to the first, or the second excerpted quote

25    from the government's brief, the citation there was 56 Federal

1  Register 25 792 and 2580, and I can fill in.  In fact, I

2  don't have to do it because what defendants have had since the

3  brief was filed were citation to the Federal Register record

4  for each of the statements contained in the government's brief.

5  In other words, it was a brief that was prepared entirely in

6  accordance with *Lachman*.  That is, you don't go to personal

7  opinions or agency officials.  You go to formal statements in

8  the public record which is the way that statutes and

9  regulations are to be construed and the First Circuit couldn't

10  have been more explicit on that in the *Lachman* case.  So had we

11  done what Mr. Daly suggest and that we go out and we start

12  interviewing people as to their personnel views, that is not

13  one of the cannons of regulatory construction that the First

14  Circuit recognizes.  That's why this is a legal brief and of

15  why the consultation was with agency counsel.  And I'll

16  certainly say for the record, Your Honor, that our liaison with

17  the agency is through the Office of General Counsel for the

18  agency.  I mean, that's very clear.  When we want to talk to

19  the agency, we do it through the Office of General Counsel, and

20  I'm, that's the nature of this.  But the most important point I

21  think I have to make with Your Honor, is what relief that

22  we're, is the nature of the relief that we're requesting here.

23  What has been going on in this case, defendants have been

24  taking discovery and doing depositions of government witnesses

25  in terms of, and at this point, they've already taken the

1    depositions of three former HICFA administrators.  We're not

2    asking for a protective order that prohibits the line of

3    questioning that Mr. Daly is talking about.  In fact, in every

4    deposition that I've been to, I haven't been to every

5    deposition in this case, but at every deposition that I've

6    attended, there has been full questioning about the witness'

7    personal opinions.  We've objected but the witness has

8    consistently answered those questions.  So we're not shutting

9    down a whole avenue of discovery.  All that discovery is

10   ongoing, and as recently as yesterday when a former HICFA

11   administrator was being deposed, he was questioned extensively

12   about his personal views.  This is a very narrow motion for

13   protective order that goes to a very, very narrowly crafted,

14   very specific deposition notice.  We are just talking about the

15   consultations with the client with regard to the preparation of

16   a legal brief.  That's the only protective order that is at

17   issue by virtue of the government's motion.  We have not asked,

18   and we believe that everything that Mr. Daly just talked about

19   is irrelevant.  The personal opinions is clearly made relevant

20   by the *Lachman* decision, was made irrelevant by the Lachman

21   decision, but we're not asking this Court to shut that all down

22   or say, you know, hence force you may not inquire of the HICFA

23   administrator's personal opinion on any of these matters or any

24   of his understandings.  In fact, that discovery is ongoing and

25   it's crossed all levels of the agency, they've been asking

1    these questions of OIG personnel, that is Office of

2    Inspector General.  They've been asking it of former

3    administrators.  They've been asking it of program people.  All

4    of that's ongoing.  So there is no discovery that is being

5    denied except discovery relating to consultations between DOJ

6    attorneys and CNS, Office of General Counsel attorneys.  That,

7    the relief requested goes no broader than the deposition notice

8    that we've moved on.

9              THE COURT:  All right.  I'll take it under

10   advisement.  The next being 3849, which is the motion to compel

11   plaintiffs to provide an adequate response to interrogatories.

12             MR. DALY:  Your Honor, in my view, I think there's

13   been a lot of briefs filed on this particular motion that I

14   think really is, tries to make a very simple point.  I'm going

15   to try to bring it into focus.  As I stated, in the conference

16   with the other motion, this is a fraud case.  This is common

17   law fraud.  It's FCA.  We've cited all the cases that indicate

18   at pages 6 and 7 of the brief on this case, talk about how in

19   an FCA case the government has to prove that it was misled.

20   Actually, Judge, I am going to, if I may, just get some

21   materials from the exhibit that I refer to.  I can get you an

22   extra copy if you need one.

23             MR. BREEN:  Jim, just for the record, this is

24   directed at Ven-A-Care also, right, not just the government?

25             MR. DALY:  Yes.

1           MR. BREEN:  I'll also be arguing that.

2           MR. DALY:  So we cited in our brief the cases about

3    misleading.  I've also already made the argument and these

4    arguments are related, Judge, between the one we just did, I

5    think it's very clear that Judge Saris has put causation,

6    reliance, also the Statute of Limitations, latches, estoppel

7    are concepts that she herself has mentioned as perhaps being

8    applicable here.  They're all in play, and what they go to is

9    what does the government have to say about what it knew and

10   understood about AWP, and that's what this case is about.

11   That's what it's been about from the beginning.  That's what

12   our defense is based on.  That's what the claim is based on, so

13   that's why we're conducting all these depositions on the

14   subjects where those present and former administrators, Judge,

15   are telling us over and over and over again that they

16   understood AWP not to be some kind of actual average wholesale

17   price.  In fact, they knew every single one of them testified

18   that it was not.  I deposed Mr. Skully yesterday, the

19   administrator who was in charge when the MMA was finally

20   approved in 2003, and he says as far back as 1991 he knew that

21   AWP was nothing but air.  He says the entire system was sane

22   and everybody, insane and everybody knew about it, everybody at

23   CMS, everybody within the government that he talked to and

24   everybody in the private sector.  So the notion that anybody

25   was running around thinking that AWP was actually the actual

1   average wholesale price is just poppy cock from the mouths

2   of the heads of the agencies themselves as well as the people

3   that work for them.  So what happens?  We have paragraph 42 of

4   the complaint is what this goes to, and in paragraph 42, the

5   government alleges AWP is used to refer to the price at which a

6   pharmaceutical firm or a wholesaler sells a drug to a retail

7   customer who then administers it to a patient.  That's the

8   allegation.  It's the only allegation in the entire complaint

9   that says what AWP was supposed to be.  It's the only place in

10  the complaint where they say that that's what AWP represents in

11  the minds of the government.  So we ask, and when we read this

12  complaint, we said, okay, says who?  And so we sent them an

13  interrogatory that said essentially please tell us everybody

14  that, you know, in the government, that believes this or says

15  this or takes this position because we want to know.  We're

16  taking depositions and nobody said it yet, and we simply asked

17  that that be done, and we want to know who believed it and who

18  understood it and any evidence that Abbott ever made any

19  representation that that's what AWP was in accordance with

20  paragraph 42, and we think we're entitled to know that,

21  entitled to know if anyone in the government or at CMS believed

22  that, and in their initial response, and this is at Tab 3 of

23  what I gave you, Judge, they filed an initial response to this,

24  and on page 3 or tab 3, the last page, about halfway in, it's

25  at about page 35 at the bottom, Judge, if you look up at the

1   second full paragraph, the government said, the general

2   concept that the AWP refers to the price, the general concept

3   that the AWP refers to the price at which a pharmaceutical firm

4   or a wholesaler sells a drug to its customers is commonly

5   understood in the industry.  That's how they responded to the

6   interrogatory, and we said, okay, who understood it that way?

7   Who understood that commonly in the industry?  Who in the

8   industry thought that?  Who in the government thought that

9   that's they way the industry commonly understood it?  Remember,

10  we're getting all this testimony that says we didn't understand

11  it that way.  Far from it.  We thought it was, the system was

12  insane.  Administrator Skully says, AWP, I've known for 10 or

13  15 years that it's mostly air.  So we asked them about that and

14  they say that they're not going to provide any further

15  information and they're not going to verify this.  So when they

16  filed this response, it had no verification and we said, well,

17  you know, this is an interrogatory.  If that's the position

18  you're going to take, we want you to verify it so that we can

19  depose the person who verified it because we want to know who

20  on your side of the table is saying that this is the, how the

21  term is commonly understood in the industry.  They refused to

22  verify it.  So we filed a motion to compel asking for it to be

23  verified and asking for a fuller answer.  In other words, who

24  held this position.  So what they did was instead of responding

25  to that, they filed a supplemental answer where this language

1    that I just read you has been deleted, but it's still out,

2    it's deleted in the supplement.

3              THE COURT:  And is the supplemental answer verified?

4              MR. DALY:  It is verified.  And the commonly

5    understood language is deleted apparently or I think because

6    they couldn't find anybody who could verify that sentence, but

7    paragraph 42 of the complaint is still there.  In other words,

8    this allegation that we started with, which is that AWP is the

9    actual average wholesale price of drugs and that's what it is

10   understood to be, it's still there.  It's still the focal point

11   of their complaint against us and we're still trying to get

12   information about who has that.  And, you know, we want to know

13   if there are people who hold that belief.  That's going to go

14   to the proof of whether or not they were misled about anything.

15   And again, page 53 or paragraph 42 is the only--

16             THE COURT:  But can you narrow it a little bit as to

17   people in what positions?  I mean, it's pretty general.

18             MR. DALY:  Well, I mean we haven't asked for--

19             THE COURT:  You're starting with the White House

20   down?  I mean--

21             MR. DALY:  In our meet and confers with the

22   government on this point, it's been, we've been offered to let

23   it be somebody within CMS, somebody within HHS.  I mean,

24   obviously we don't want every agency of the government searched

25   on this but the critical agencies, yes.  Certainly, CMS,

1   certainly HHS and, you know, if there's somebody in the

2   legislative branch that's been involved in health care issues

3   that held this belief, we want to know.  And we've been, you

4   know, they haven't been willing to agree to that at least up to

5   this point.

6           And so that's kind of where we end up.  We end up

7   with, and I've given you this material in the attachments, but

8   I not only have the depositions of folks, but I have included

9   in the excerpts that I've given to you examples like Donna

10  Shalala, the former head of HHS, who talks about in several

11  excerpts that I gave you from her letters and reports where she

12  talks about AWP is the thing that is reported in the compendia,

13  and she comes right out and says it.  It's not, it's not the

14  actual average wholesale price, and I suppose it may be worth

15  taking a quick look at that, Your Honor.

16          Well, you start with Tab 5, Your Honor, of the

17  materials that I gave you.  This is actually Nancy-Ann Min

18  DeParle, who is the former administrator of CMS before

19  Mr. Skully took over, and at that bottom of the first page of

20  her letter, which is at page A-2 of Exhibit 5 that I've given

21  you, she writes, she is agreeing with something the OIG says,

22  and she says, "If given that the authority HICFA would like to

23  increase the discount we now take on the published average

24  wholesale price and base our price on the acquisition cost."

25  This is the head administrator of CMS telling us, telling the

1  world in this public document that we take our discount on

2  the published average wholesale price, the one that's published

3  in the compendia, not some paragraph like 42 of the complaint

4  that we're looking at where they say that it's some reference

5  to actual acquisition costs.

6         But my point in all this is to, just to bring it full

7  circle is that paragraph of the complaint is out there.  They

8  have made this critical allegation.  All we've asked for is to

9  identify for us somebody on your side of the table, and we can

10  limit that in a way that's appropriate, we offered to do that,

11  certainly, it has to begin with anybody in CMS.  I mean, I'd

12  like--

13         THE COURT:  Well, can we start with identifying one

14  person in CMS?

15         MR. DALY:  That would be a start.  I'm not sure they

16  can do it, but I'd like to see that.

17         MR. DRAYCOTT:  Your Honor--

18         THE COURT:  Why can't you do that?

19         MR. DRAYCOTT:  Your Honor, this, the first thing I

20  think we need to put this motion in context.  What I think has

21  become abundantly clear from everything I've just heard is the

22  purpose of this is to reargue a legal point that's actually

23  already been decided by Judge Saris in the November 2nd order.

24  She's ruled on the meaning of AWP.  But if we, I think the

25  first thing is to step back.  Their, this complaint is true to

1   form of most complaints.  It has a series of background

2   paragraphs including one on the jurisdiction of this court, and

3   then in Section 6 it describes by way of background the

4   operation of government health care programs.  The allegations

5   against Abbott actually begin on paragraph 51.  In paragraph 42

6   there is a legal statement which says what AWP is.  It is

7   exactly consistent with they way this, with the way Judge Saris

8   ruled.  It is a legal statement in the complaint providing a

9   background statement and a citation in most of these sections

10  of the brief, I'm sorry, of the complaint, are to the program

11  regulations which control as to why the government asserts that

12  AWP is not just any price that can be reported and can't

13  certainly be a price that was constructed to act as a kickback

14  to physicians or providers that were purchasing drugs, that's

15  been laid out in the brief of the United States' amicus curiae.

16          The one issue that Abbott has to understand by now in

17  this case is the government's position with respect to the

18  meaning of AWP.  What's more the issue has now been laid to

19  rest by Judge Saris' order which expressly adopts a plain

20  language construction.  So it is, you know, now with respect to

21  again, the, Mr. Daly has gone on a wide range in discourse of

22  the fight that he wants to have with the government regarding

23  the result reached by Judge Saris in her November 2nd order, but

24  an interrogatory directed to sort of a preambled paragraph in

25  the complaint is just not the way that the bait is going to

1   move forward.   I mean, technically at some point could be I

2   guess a motion for consideration of Judge Saris' November 2nd

3   order, but with respect to who in the government knew what, the

4   one thing that certainly defendants, one issue the defendants

5   are taking discovery on right now, is this, these are issues

6   that are being discussed with every government deponent that's

7   being caught out there.   It's been discussed with three former

8   HICFA administrators.   It's being discussed with every program

9   person that's being deposed.   With respect to the people in the

10  Office of Inspector General who are not part of CMS but are

11  doing studies analyzing reimbursement, it's being addressed

12  with all of those witnesses.   This is just not an area where,

13  that's properly subject to a motion to compel with respect to

14  the background and legal statement in a complaint.   It's, I'm

15  trying to put this in context.   It's as if we had put, you

16  know, when, if and when Abbott files an answer, it's as if we

17  noticed every interrogatory with respect to every legal

18  contention in their complaint or every legal contention in a

19  brief they filed.   Identify everybody at Abbott that believes

20  that this case may be subject to the Statute of Limitations.

21  It's just not going to, it's irrelevant because it's not going

22  to drive the resolution of the legal issues that lie at the

23  core of the issue they're looking at.   The issue of what any

24  individual thought or believed, ultimately is irrelevant and

25  *Lachman* again makes that clear.   They issue her is this is a

1 statute, it's a term that appears in statute and

2 regulations, it's been resolved as a legal question.  To the

3 extent that they wish to take discovery on what individuals

4 thought, again, we've noted our objections to that line of

5 questioning, but we certainly haven't ever instructed a witness

6 not to answer those questions.  So they're fully developing a

7 record.  There is also an abundant record in the public record

8 already in terms of the Federal Register of published OIG

9 reports.  There is, and certainly Abbott has made this point

10 since the motion to dismiss which is, there is a voluminous

11 public record about the agency interpretation of this term,

12 what they knew.  It doesn't get resolved by a motion to compel

13 on a background statement--

14         THE COURT:  Okay.

15         MR. DRAYCOTT:  --in a complaint which states a legal

16 definition which has been, which is absolutely consistent with

17 the court's holding.  What's more, we've cited to industry

18 publications in the answer as to why, and just to make one

19 thing very clear, we don't believe that verification is

20 necessary on a straight legal term.  Notwithstanding that, we

21 agreed to verify before they filed their motion, and the

22 question, why did they move to compel?  That's the mystery.

23         THE COURT:  Okay.  I'm going to take it under

24 advisement.  I want to go back and look some of the things

25 Judge Saris has said.

1            MR. BREEN:  Your Honor, can I make one point on

2   this--

3            THE COURT:  Sure.

4            MR. BREEN:  --because he's shooting at me too on

5   this, so, and it's--

6            MR. DALY:  I object to that, Your Honor.

7            THE COURT:  We don't like to talk about shooting in

8   here.

9            MR. BREEN:  Poor choice of words, Judge.  But anyway,

10   number one, I just would reiterate and I'm not going to go over

11   the argument, but AWP is the issue, and it's our right to find

12   it's average wholesale price.  Now, what happened as far as

13   what was reported in those facts, that's really a separate

14   issue, but they're asking us to put up a, give a factual

15   interrogatory about what is in fact a legal term at this point.

16   Well, that's one.

17            But the main purpose for my jumping in here, this is,

18   I think we can all agree, this is basically a contention

19   interrogatory and we need to address this now early on in the

20   case because this is a, my client is a qui tam relator under

21   the False Claims Act and we filed a separate memorandum on

22   this--

23            THE COURT:  Uh-huh.

24            MR. BREEN:  --and I can't speak for the government.

25   I'm precluded by the statute--

1           THE COURT:  Right.

2           MR. BREEN:  -- from speaking for the government, and

3  I think it would be a waste of time for me to have to make that

4  objection every time they serve a contention interrogatory on

5  Ven-A-Care.  What Ven-A-Care thinks the government's position

6  is on the definition of average wholesale or rather AWP is

7  irrelevant, and even if I said something that was crazy, I

8  couldn't bind the government because I can't prejudice the

9  government's rights.  So it's really overly burdensome and I'm

10 using harassing not in a preserved term with the adversary, Mr.

11 Daly, but it is harassing to have to keep filing motions and

12 objections on that basis.

13          So I would ask that the Ven-A-Care specific portion

14 also be taken under advisement so that we don't keep getting

15 these contention interrogatories.  We're bound by law not to

16 answer.

17          MR. DALY:  Your Honor, may I say two very quick

18 things?

19          THE COURT:  Very quick.

20          MR. DALY:  Okay.  One, counsel for the government I

21 think mixing apples and oranges talking about *Lachman*.  This

22 motion isn't about statutory construction of AWP.  It's about

23 the allegation in paragraph 42 which says AWP is used in a

24 certain way.  It's a factual allegation that we're trying to

25 get to.  *Lachman* says in any event that you can in certain

1  circumstances be looking to the intent and how things were

2  used in industry parlance in the appropriate circumstances.  So

3  even if it were a statutory construction argument, it would

4  allow us to get into this.  And finally, all we want is for

5  them to identify somebody who can support this.  It's not a

6  moot issue.  If it were moot, why would Judge Saris be talking

7  about this on February 27th, the last time we were in front of

8  her.  I mean clearly, these issues are very much alive in the

9  case.

10           Thank you, Your Honor.

11           THE COURT:  All right.  Moving on to docket entry

12  4047, which is the government's second motion to compel.

13           MS. BROOKER:  Thank you, Your Honor.  Your Honor,

14  this is a fairly straight forward request for production of

15  documents in that the United States has outlined five specific

16  targeted categories of documents that we believe Abbott has not

17  yet produced and should produce in this case.  These five

18  categories are based directly on Abbott's defenses, testimony

19  that we've gotten already in the fairly short amount of time

20  that we've been taken deposition of, depositions of Abbott's

21  witnesses.  I will tell the Court that this is one in a long

22  series of motions to compel that are coming with respect to

23  Abbott.  We've got a whole bunch more in the pipeline.  After

24  Abbott produced its initial disclosures back in august, it has

25  bickered with us on just about every single category of

1  documents that we come across, again, either through witness

2  testimony or their defenses.  And again, we haven't really

3  gotten their answer yet, which makes their withholding

4  documents early on very problematic.  We know that they're

5  going to be filing an answer I think in the next six weeks

6  because Judge Saris did just deny their motion to dismiss, but

7  I will say, again, we set out and I have personally written

8  more than a dozen letters outlining these categories of

9  documents, trying to get Abbott to respond to the letters and

10  we have not hid the ball at all.  We tell them exactly why the

11  categories are relevant.  It's not a game we're engaged in.  we

12  have long discourse over why they're relevant, but they bicker

13  with every single category.  Some of it is downright silly.

14  And let me just say, the second thing besides wanting those

15  five categories of documents, we have not gotten a single

16  privilege log from Abbott in this case and we know they're

17  withholding documents on the basis of privilege.  We know that.

18            THE COURT:  Well, have they said it?

19            MS. BROOKER:  Yes.  I mean, we know it from the Texas

20  case.  We were just told very recently in our last phone call

21  with them that we would get a privilege log, but it's really

22  late in coming given that these are documents that should have

23  been disclosed to us like eight months ago when they made their

24  initial disclosures and long since past the deadline that Judge

25  Saris set for a CMO.  I mean, arguably, I guess--

1        THE COURT:  When are they going to get it, Mr.

2   Daly?  Mr. Winchester?

3        MR. WINCHESTER:  As we explained to counsel in our

4   last phone call and also by letter last night, they will have a

5   privilege log by this coming Monday.  It's not part of the

6   motion so I don't know why it's up, but they will have a

7   privileged log by this coming Monday.

8        MS. BROOKER:  Yes, it is part of our motion, but I

9   would ask is that going to include all documents to date for

10  all categories of documents we've requested that they're

11  withholding as privileged or is it some smaller subset of

12  privileged materials?

13       THE COURT:  Can you enlighten us on that?

14       MR. WINCHESTER:  I'm happy to, Judge, although we

15  just did have this out by way of conversation between us but

16  I'm happy to tell the Court as well.  As I told counsel, we are

17  crafting a privilege log for this case, so it will

18  be--

19       THE COURT:  In it's entirety.

20       MR. WINCHESTER:  Yes, for this case.  In other words,

21  there are four drug cases--

22       THE COURT:  Four drugs.

23       MR. WINCHESTER:  --and the additional documents that

24  I talked to you about, which are documents that don't

25  necessarily talk directly about these drugs but would relate to

1   them and documents that would arguably suggest some pattern

2   of practice relating to other drugs.  We will do our best to

3   make sure that the privilege log is current as of the time that

4   we turn it over.  We're working very hard to do that, obviously

5   understanding that we have an obligation to seasonably

6   supplement the log as other things come in.  I think what

7   counsel's question is is are we going to take their view of the

8   universe, which is every document Abbott has about any of its

9   products ever and do a privilege log on that?  No, we're not.

10  We are doing a privilege log for this case, which will cover

11  the documents that are the body of documents at issue at this

12  case and we will describe for them the documents that are being

13  withheld on grounds of privilege.

14          THE COURT:  All right. You are going to get it

15  Monday.

16          MS. BROOKER:  Yes.

17          THE COURT:  You'll look at it then and we'll go from

18  there.

19          MS.BROOKER:  All right, Your Honor.  At any rate, I

20  will just briefly go over because I think I thoroughly laid

21  this out in the motion, the five categories of documents and

22  why they are relevant and briefly address Abbott's responses to

23  them.   Average manufacturer price data or AMP data that we

24  refer to, it's all over Abbott's defenses.  It's disgusted in

25  their motion to dismiss.  They go to each government witness

1 deposition and ask this question about isn't it a fact that

2 you got our AMP data?  They are representing in depositions and

3 they are representing in their motion to dismiss, and I presume

4 we're going to see it in their answer as well, that their AMP

5 data was accurate and that the government could have relied

6 upon it.  Now, setting aside for the moment because I don't

7 think we need to resolve this here, we believe that issue is

8 irrelevant and it's a red herring, but nonetheless, it's

9 ridiculous for them to say that this is an issue in this case

10 and to be proceeding full speed ahead clearly intent to try and

11 get this issue before a jury and to tell the government, but

12 we're not going to give you our calculations on AMP.  As a

13 matter of fact, Abbott served us with requests for admission

14 and asked us to admit that their AMP data was accurate, which

15 is initially why we asked for their AMP data in addition to the

16 fact that it's all over their briefs and all over their

17 deposition question of witnesses.  Now, granted they've

18 withdrawn only the request for admission at the moment, they

19 have non pending.  They're obviously going to be reserving

20 them.  I don't know if that specific request will be in there

21 but it's even beside the point.  This is something that they

22 are putting forth.  They need to produce that AMP data to us.

23 It's not sufficient for them to say you already have it.  We

24 gave it to you and we don't have to have our underlying price

25 information or how we got that information or all of the

1    details which we do need for this case for their defenses at

2    the very least.  So that I put forth, Your Honor, as a

3    ridiculous basis to bicker with us over providing that AMP

4    data.  Also, I would submit to the Court that we've asked only

5    at this time for the AMP data for the subject drug.  So that's

6    not even an issue.  It should not be a burden for them to

7    produce that, and even if it is, there's going to be some

8    burden to defend it in this case for producing material.

9              The second category of documents--

10              THE COURT:  Well, let's do one at a time.

11              MS. BROOKER:  Okay.

12              MR. WINCHESTER:  Thank you, Your Honor.

13              There's I think a quality distinction that counsel is

14    glossing over here and I think misstating how we're using AMP.

15    Average manufacturer's price or AMP is a creature of statute

16    that Abbott and every other pharmaceutical company is required

17    to report to the government.  It is used by the government for

18    purposes of relating to calculation of Medicaid rebates.  So,

19    just so the Court has that background, it should also be

20    pointed out there is no claim in this case that relates in any

21    way to AMP or to Medicaid rebates.  The government has not

22    brought those claims.  It had every opportunity.  It has not

23    brought those claims.  They're not in the case, so under the

24    rules that have been in place since 2000, they are entitled to

25    discovery about their case.  This is not their case.  The

1   contention always has been that well, you, Abbott, put AMP

2   in play by, either through your request for admission or by

3   pointing out the fact that the government gets AMP data.   Both

4   of those are not true.   First of all as counsel states, there

5   is no request for admission.   That's just a red herring.   There

6   isn't one.   As to the I think more pertinent issue, which is,

7   has our defense somehow put this at issue, I think the answer

8   is unquestionably no.   Our defense and our use of AMP has

9   nothing to do with how the AMP gets calculated.   That's a

10  statutory calculation.   The use we make of AMP is simply to

11  say, look government, when you come to this court and say I was

12  defrauded in overpaying for drugs because I thought as we see

13  in their complaint and we've heard hear at least from the

14  lawyers and not from the actual people who ran the show, I

15  thought AWP was the actual price people were paying in the

16  marketplace.   When they come to the Court and say that, I think

17  it's relevant for us to show and we've said, wait a minute, you

18  were getting the AMP submissions that showed you for these

19  drugs and every other drug in every case that the average

20  manufacturer price was substantially below this AWP that you

21  were supposedly relying on as the street price of the drug.   So

22  it's what we liken to a hearsay statement that comes in to show

23  effect on a listener.   It doesn't matter how the statement was

24  made, whether it's true or anything else.   It matters for the

25  effect on the listener.   In this case, we haven't said, you,

I - 52

1  government have an issue here because here's how we

2  calculate AMP.  We say, you have an issue in saying that you

3  thought AWP was the real price when you're sitting there

4  getting reported to you an average manufacturer's price that

5  was much lower, regardless of how it's calculated.  That's the

6  only issue we made of it.  So we have not put the calculation

7  in issue.  There's no claim in this case relating to

8  calculation and for that reason we would oppose their motion.

9        MS. BROOKER:  Your Honor, I would just briefly

10  respond.  Their AMP data, first of all their legal arguments on

11  AMP data we completely disagree with.  Again, I think that will

12  be briefed at a later time.  Their AMP data that they submit is

13  their actual prices, that's at the very heart of this case, and

14  again, as you will see, defendants bicker with every single,

15  solitary cat, this is a very discrete specific category of

16  documents.

17        THE COURT:  To be produced.

18        MS. BROOKER:  Thank you, Your Honor.

19        The next category of documents, again, very discrete

20  and finite.  The alternate site sales force, that particular

21  group within Abbott, hospital products divisions, there's no

22  doubt, there's no dispute I don't think at all between the

23  parties that the focus of that particular group is relevant.

24  We've been taking a lot of depositions in that area, and

25  there's a finite set of individuals.  We have been asking now

1    for probably six months that Abbott tell us how many

2    individuals are in that group, in that sales force.  We have

3    not gotten a response.  I had to depose somebody to find out

4    the answer to that and learned recently a couple of weeks ago

5    at a deposition of Cliff Krajewski, who is in that particular

6    group for a number of years, that at any given point in time,

7    at least from 1990 to `96, and it suggests that this is

8    probably true for all the time period that we're talking about,

9    that there were no more than 30 field sales persons in here.

10   So we're talking about a small finite group of people, and from

11   among those materials at this time, all we're talking about are

12   specifically their written goals and evaluations that they

13   received in terms of how they received, you know, their

14   end-of-the-year evaluation, how they were compensated and so

15   forth.

16            THE COURT:  How many people are we talking about?

17            MS. BROOKER:  We're talking about, again, 30 sales

18   persons a year for over the course of at least, you know, a 10-

19   year time period for starters.  And it depends on what we see

20   in those documents whether we have to trouble shoot and, you

21   know, and ask for something broader than that.  Very finite.  I

22   also deposed two people, Cliff Krajewski and another person,

23   again both of these occurred two days in a row, a couple of

24   weeks ago.  Their testimony was very clear.  Even though

25   neither one of those are the sales people, they testified that

I - 54

1    each of them in different parts of Abbott have written very,

2    very specific written goals that they must meet each year and

3    then they have an evaluation that is in writing.  Both of them

4    have those.  Of course people save their written evaluations.

5    One man testified that all the years he's been at Abbott, I

6    think it was 25 years, he has his whole stack sitting on his

7    desk.  So not necessarily, you know, bringing this to Your

8    Honor's attention to talk about those two individuals' files,

9    but the point is, clearly the documents exist.  Clearly they're

10   probably not that hard to obtain, and again, we've been very

11   specific with Abbott.  They're relevant to show what marketing

12   incentives the sales persons were offered to receive their

13   compensation and their evaluation.  Whether spread marketing

14   was encouraged or rewarded, whether there were any changes

15   during the relevant time period to the policy or practice in

16   Abbott's marketing its drugs, what their recognition was, and

17   it does matter and particularly Daryl Dorsey, granted he is a

18   lobbyist, but he testified his goals would be very specific,

19   that he would maintain, for example that he would see to it

20   that a particular law went into effect or didn't go into effect

21   and at the end of the year his performance would be measured

22   against that very specific goal.  Presumably, the sales persons

23   are going to have no more or less specific goals than the other

24   witnesses that we've deposed.

25          Now, the only real objection Abbott has to this, it

1  can't really realistically be burdensomeness.  First of all,

2  they never really undertook other than the deposition that I

3  took to find out what the burdensome nature of it was, they say

4  the documents are confidential personnel records, but I direct

5  the Court to the MDL protective order and the one that this

6  Court entered in this case, and the protective order expressly

7  anticipates that this type of information might be produced,

8  and it specifically allows for "past or current company

9  personnel or employee information."  Abbott produces almost

10 everything in this case as highly confidential or confidential.

11 So confidentiality, you know, is just not an issue in this

12 case.  And again, for Abbott to say that this is irrelevant is,

13 I would say another category that's ridiculous.  The only last

14 thing I will say is that what Abbott did offer to produce,

15 which we still haven't even gotten, are the policies.  They

16 think that's sufficient that we get whatever their policy was.

17 Of course we want to see what the policy was, but it doesn't

18 matter until we see how it was implemented with respect to any

19 one particular employee and the policy is going to presumably

20 say something broad such as employees will have goals and they

21 will be evaluated according to those goals.  It's not going to

22 tell us whether they met those goals and whether they had to do

23 with marketing incentives and marketing the spread and so

24 forth.  So I can see no reason at all that these materials do

25 not get searched for and produced in this case.

1        Thank you.

2        THE COURT:  To be produced.

3        MR. WINCHESTER:  Your Honor, could I inquire just

4   briefly about that.  Is it the Court's ruling that the

5   personnel files be produced in their entirety or simply that we

6   review them and produce any material that would be responsive?

7        THE COURT:  No, I think what is responsive to the

8   interrogatory because people have all other kinds of

9   information that's totally irrelevant.

10       MS. BROOKER:  Yeah, I mean, there may be, we don't

11   want irrelevant stuff, Your Honor, and we're happy to, it's a

12   document request, not an interrogatory, but we're happy to

13   specify that.

14       THE COURT:  You don't need copies of peoples' degrees

15   and--

16       MS. BROOKER:  Exactly.

17       THE COURT:  --things like that.

18       MR. WINCHESTER:  But to the extent if we review a

19   personnel file and there's absolutely nothing in there from

20   which you could possibly argue that somebody was talking about

21   marketing based on spread or compensated based on marketing,

22   based on spread, it wouldn't be the Court's view they'd be

23   entitled to that file, would it?

24       MS. BROOKER:  I'd like to respond to that and

25   Mr. Breen is saying he would like to respond.  Your Honor, I

1   would say we will be the judge of that.  It's a finite set

2   of materials.  How they were evaluated may be inculpatory or

3   exculpatory, but it is important to see whether there are

4   specific goals involved, reimbursement, AWP.  We don't want to

5   leave this.  This is Abbott's position throughout which is

6   making discovery like pulling teeth.

7           THE COURT:  I've ruled, that which is not relevant

8   should not be produced and if there is no information in the

9   file relating to the request, the file is not produced.

10          MR. WINCHESTER:  Thank you, Judge.

11          THE COURT:  The time is getting short, so--

12          MS. BROOKER:  Yes, Your Honor, the next category of

13  documents, again, finite discrete set of documents, and

14  specifically they are, there was a Tap settlement in this case.

15  Tap was a joint venture between Abbott and another entity.  We

16  are not asking that the Court require Abbott to produce

17  everything they produced in the Tap case or everything relevant

18  to the TAP case.

19          THE COURT:  the Tap case in this Court?

20          MS. BROOKER:  Yes, Your Honor.  Very specific, at the

21  time that the Tap settlement took place, Abbott, around that

22  same exact time changed dramatically its prices which is in

23  large part the reason for the cutoff of the year 2001 for this

24  lawsuit.  When we say okay your damages is stop, we believe

25  that the Tap settlement, which again it related to a different

1   drug, it was Lupron, but it was the same exact conduct, we

2   believe that there were high level discussions within Abbott

3   which caused them to start reporting accurate prices, which is

4   the very crux of this case.  So what we asked for, and I guess

5   there's generally two categories, but the first category, which

6   is specifically laid out, what we call Tap impact documents,

7   and all we mean by that are any, I don't want to mis-cite what

8   we wrote, but it was basically very specific, any documents

9   that relate to discussions within Abbott not limited to

10  hospital products division but among high level corporate

11  individuals anything from their Medicare working group or

12  wherever the documents come from that discuss how they reacted

13  basically to the Tap settlement because we do believe it may

14  have impacted the price reporting changes that they made in

15  this case which again is the crux of this--

16          THE COURT:  How are they reactive?  I mean, be a

17  little more specific than that, I'm afraid.

18          MS. BROOKER:  Yeah, I mean, Mr. Breen said he can

19  help with that if he's allowed, if he's permitted to respond to

20  that, but here's what, here's how we've drafted it, all

21  documents relating to or otherwise regarding the impact of the

22  2001 Tap pharmaceuticals criminal plea and civil settlement on

23  the prices or practices, excuse me, or pricing practices for

24  Abbott's pharmaceuticals.  So, you know, it's broad.  Abbott

25  has to interpret just like any document request.  We don't know

1   what they have internally so we can't be more specific than

2   that.  But again, it goes, we're not asking for everything that

3   was produced in Tap to be produced here.  We're asking for that

4   finite set.  And the second set of Tap documents that I will

5   mention relating back to the earlier argument that we had on

6   the first motion before the Court, there are documents produced

7   by Abbott and produced by Tap that other states have received

8   from Abbott or from another entity in the Tap litigation that

9   have very highly relevant witnesses in this case working for

10  Abbott, have their name on those documents.  One witness, Ms.

11  Tobiason, who was just deposed for a second time yesterday, and

12  she was shown Tap documents which show that Tap was consulting

13  with hospital product division personnel on reimbursement and

14  spread and average wholesale prices very relevant to this case.

15  So there's also another set of documents.  We're not asking

16  Abbott to go back and search for that set.  We're just asking

17  that they be again allowed to be shared, some of which are

18  being shared because they're used at depositions.  But

19  obviously at a deposition, you can't ask a witness about, you

20  know, 100 documents, because there's just no time.  We want all

21  the documents that they produced related to these issues that

22  impact our case to be shared with us.  Again, there's no burden

23  to Abbott, and I don't know if Mr. Breen--

24          MR. BREEN:  Just a quick point here, Judge, and it

25  shows, I know a lot about Tap from the other litigation, and we

1  know, and we've got a little bit of corroboration already

2  that we could get even with the documents we got from Abbott in

3  this case, that they restructured their entire way of doing

4  business on the heels of the Tap and Ross settlements.  They

5  paid well over a billion dollars already for the same kind of

6  conduct and to a great degree we're talking about here, but

7  also for example Abbott's former president, Thomas Hodgson,

8  went over to run Tap.  He gave me highly relevant deposition in

9  the Tap case.  We had to move to compel to get it in the Texas

10 case.  It talks about the spread and knowledge – (inaudible -

11 #3:29:58) – about it.

12             In this case, Abbott, I too the 30(b)(6) document

13 witness, Ellen Klauss, she says they hadn't even searched

14 Abbott's corporate hierarchy for documents responsive to the

15 government's request in this case ever.  She testified to that.

16 Now, Thomas Hodgson, I got his deposition in the Texas case.  I

17 can't turn, I can't show it to Ms. Brooker because it's

18 declared confidential in the Texas case.  It wasn't taken in

19 the Texas case.  We got it through a motion to compel in the

20 Texas case.  We've already been over that ground.  So the Tap

21 and Ross reactions, Miles White, their CEO, got a letter from

22 Pete Stark, the ranking member--

23             THE COURT:  We know who he is.

24             MR. BREEN:  Well, weighs and means, okay, there was

25 all kinds of reactions going on about that time where Abbott

1    changed their policy and they had to change it from

2    something and we all, you know, subsequent other measures may

3    not be admissible at trial but they're certainly discoverable

4    so that we can get a feel for and work back from what they did

5    to establish the truth and the facts in this case.  That's all

6    we're trying to do.

7            Thank you.

8            THE COURT:  Mr. Winchester.

9            MR. WINCHESTER:  Briefly, Your Honor.  Obviously

10   let's bring this back to what this case is and what it isn't.

11   Tap is not a defendant in this case.  Lupron is not a drug at

12   issue in this case.  The 2001 settlement that they want to talk

13   about is a criminal plea for Tap where it pled guilty, Tap, not

14   Abbott pled guilty to one single count having to do with--

15           THE COURT:  I remember this well.

16           MR. WINCHESTER:  Okay.  So this is the three samples

17   that were then billed for, not AWP.  Okay?  So this case is not

18   about Tap, it's not about Lupron.  I think Your Honor hit the

19   nail on the head.  There isn't anything even vaguely focused or

20   pointed about this request nor relevant to this case.

21   Mr. Breen talks about Texas, and I think that actually is

22   relevant because what they did in Texas was request this very

23   same information from Judge Jenkins.  We objected and he

24   sustained that objection.  They did not get a 30(b)(6) witness

25   to talk about--

I - 62

1        THE COURT:  This is what happens when you get to

2   4:00.  Everybody--

3        MR. BREEN:  That's right.  I'm sorry.

4        MR. WINCHESTER:  --but we attached those papers to

5   our response.  Your Honor can see that.  They asked to have

6   Abbott designate a 30(b)(6) witness to talk about this, what

7   impact did the Tap settlement have on Abbott, whatever that

8   means, and the judge said, no, you don't get that.  It's not at

9   issue in the case.  It's no more at issue here than it is

10  there.

11        In terms of I guess counsel's statements which is

12  well, Abbott may have changed the way it did business as a

13  result of seeing what happened in Tap, to the extent they're

14  trying to discovery things about this reduction of price in

15  2001, which by the way is where their complaint ends, then

16  we've already told them we're giving them all the non-privilege

17  documents that have to do with the reduction of prices for

18  these drugs that happen in 2001.  They're getting those

19  documents.  This class of things--

20        THE COURT:  All right.

21        MR. WINCHESTER:  --class of things they're talking

22  about is outside the case.

23        THE COURT:  Denied without prejudice at this time,

24  maybe to be renewed upon at further showing down the road.

25  Right now I don't see the relevance.

1          MS. BROOKER:  Okay.  Thank you, Your Honor.  I

2  appreciate that.

3          THE COURT:  How much more do we have?

4          MS. BROOKER:  Two more categories of documents and

5  then a motion to compel 20 interrogatories, which I hopefully

6  can summarize for you, interrogatory responses.

7          Okay.  The next category of documents are all

8  documents relating to the drug vancomycin, one of the four

9  subject drugs in this case.  We have gone around and around

10  with Abbott on this issue.  Frankly, Your Honor, we never feel

11  as though we have any firm representation from them that we

12  have received all the vancomycin documents.  The drug was first

13  marketed I believe around 1988, so we've asked for the

14  documents to be produced relative to vancomycin back to 1988.

15  It's not too far prior to 1991.  Obviously, you know, launch

16  documents and other types of documents would be relevant.  I

17  know that Abbott has represented most recently in its

18  opposition to this specific request what they've already

19  searched for and produced to us and that they searched for them

20  back in 1996 pursuant to the government's first civil

21  investigative demand, and if I understand, maybe I don't, but

22  if I understand correctly their position is that they're not

23  going back and searching again.  And I will say that their

24  corporate designee on this issue, Ellen Klauss, who just

25  testified in this case maybe four weeks ago, maybe a little bit

1  longer, my understanding of her testimony on this issues is

2  that at that time they did not search back as far as 1988.

3  Now, I know Abbott's counsel is going to stand up here and say,

4  for the group of documents we produced in other cases that we,

5  that relate to vancomycin back to 1998, we'll give you those,

6  and maybe they're going to represent they already have because

7  we just got a small number of documents in the last week or

8  two, but that's not a representation that they had searched for

9  and produced all those documents.  The other bit of testimony I

10  believe from Ms. Klauss is that they never searched for

11  documents relevant to that drug outside of the hospital

12  products division, and for Abbott to stand up here and say that

13  only documents in the hospital product division are relevant,

14  that's not true either.  We have seen in other cases where

15  Abbott's produced documents that, a lot of relevant documents

16  from corporate offices and not just that one single operating

17  division are relevant, so we want a representation that Abbott

18  either has or is going to produce to us and search again for

19  all documents relevant to the drug vancomycin, particularly

20  because it is one of the four subject drugs.

21        Thank you.

22        MR. WINCHESTER:  Judge, we're not sure why this

23  motion got filed for vancomycin.  They talk about back and

24  forth, but I've been clear in every letter, every conversation,

25  clear in our brief.  They've asked for documents on the

1   marketing, pricing and sale of vancomycin.  That is one of

2   the subject drugs.  We've agreed to give them those documents.

3   That's not at issue.  Why they moved, I have no idea other than

4   to reach this point of pre `91 documents.  For the pre `91 let

5   me state very briefly, if they serve a CIB on Abbott back in

6   1996 that requested documents dating back to 1986, Abbott

7   responded.  They have or if they don't have them already we've

8   agreed to give them, any document pre `91 on vancomycin that's

9   been produced in any other case.  They're going to get those.

10  They have documents pre `91.  I've been in depositions where

11  they've used documents pre `91.  The question is should we in

12  this case now have to go back and research again, and it isn't

13  as simple as just saying, oh, grab that box of pre `91 stuff.

14  It's literally going back and looking in every place we ever

15  looked before.  There's no reason to do it here.  Judge Saris

16  has set in the MDL discovery starting in `91 as far as we're

17  aware of all these 25 or so AWP related cases nobody has forced

18  discovery prior to 1991, that's years before the act on which

19  they're complaint is based was even enacted.  It's before the

20  time that they've alleged specifically in their complaint as

21  when the misconduct they've charge occurred.  There is no

22  reason to force Abbott to go back through this.  It's not an

23  easy undertaking.  The burden clearly outweighs the benefit of

24  getting these ancient documents, whatever additional ones there

25  might be that they don't already have, let me make that clear.

1        MS. BROOKER:  Your Honor, again, we--

2        THE COURT:  I'm inclined to agree with Abbott on this

3    one.

4        MS. BROOKER:  Your Honor, we have - I'm sorry.  Do

5    you want to say something, Jim, you should stand up, but we

6    have concerns about the testimony of their corporate designee.

7    We don't believe that the representations that were just made

8    are consistent with her testimony.  We do not believe that

9    there were ever thorough searches done, and I will tell the

10   Court that since we have been involved with Abbott in this

11   discovery, according to the corporate designee and frankly

12   according to the representations of counsel, Abbott has done

13   very little, if any, additional searches.  They are producing,

14   everything that we've gotten is pretty much by and large what

15   they said we should expect to get other than a few trickling

16   little documents, but we have new document requests.  We are

17   not bound by whatever we put in a CID at an investigative stage

18   in 1996.  Abbott is not spending very much time at all

19   searching for documents.  They say, look, whatever we gave

20   everyone else cherry picked, we're giving to you and hardly

21   any, and new searches were being done and that was confirmed by

22   Ms. Klauss.  We have sued Abbott on these drugs.  They are very

23   relevant.  They can't run from the fact that it's a subject

24   drug.  They have not stated any burden.  You can't just vaguely

25   state burden without more than that.  They should be in a

I - 67

1   position to go back and search for documents, no different

2   than the government is having to search ancient files to

3   produce documents to Abbott even though we believe most of what

4   they're asking for is irrelevant.  You don't, you know, I have

5   to represent, Your Honor, you don't see Abbott here with a

6   bunch of motions against the government because we have been

7   running circles around ourselves trying to give them everything

8   that they ask for no matter how irrelevant it is, while on our

9   end they bicker with ever set of categories that we set forth

10  even though they're specific.  So I would say Abbott is

11  obligated in this litigation to go back and search for

12  vancomycin documents.

13          THE COURT:  Denied at this time.

14          Now, as to the next motion--

15          MS. BROOKER:  There's one last category--

16          THE COURT:  Is there one more?

17          MS. BROOKER:  Yes, alternate site customers, Abbott

18  has agreed, and I'm trying to shortcut this for Your Honor,

19  Abbott has agreed to produce documents with regard to its

20  largest customers, which is 80 percent of its customers, we

21  accept that representation they've made to us.  The 20 percent,

22  there are, granted thousands of customers, so we, without

23  knowing more Abbott has stated that that would be burdensome.

24  But again, Abbott is not giving us any detail about the burden.

25  We have always just like with respect to vancomycin and other

1    categories, made ourselves open to discussing and weighing

2    the burden, but for them to come forward and say we're not

3    doing any searches at all for specific categories because it's

4    burdensome without more, we need more than that.  If they're

5    going to tell us, well, we can search current files or we can

6    search, you know, this subset, we may be able to go back and

7    forth with them, but they just basically said no.  You're not

8    getting documents on the 20 percent of customers, and, you

9    know, we believe that those documents are relevant.  Now, the

10   one thing that I will say that we will accept here today, if

11   Abbott wants to stipulate, which I doubt seriously it's

12   prepared to do, that it is not going to be producing testimony

13   or evidence or seeking to do that at trial of any of those

14   customers that relate to the 20 percent that they say they're

15   not producing and that are not burdensome, and if they're

16   willing to stipulate that we're not going to hear from any of

17   those customers at trial, then we're willing to consider

18   withdrawing our document request, but as far--

19           THE COURT:  All right.  Denied without prejudice at

20   this time.  They're given 14 days to make a decision.

21           MS. BROOKER:  I'm sorry, Abbott is given 14 days to

22   make a decision about that stipulation?

23           THE COURT:  Exactly.

24           MS. BROOKER:  Okay.

25           MR. BREEN:  Can I just add one point to that, Your

1    Honor?  The key thing in that stipulation too is not only

2    hearing from those customers but they're not going to put their

3    customer's prices into evidence.  That's critical because I

4    don't want to hear about some customer paid some high price

5    that I didn't know about before trial.

6           THE COURT:  All right.  I'm not going to get to 4060,

7    docket entry 4060 simply because it's after 4:00, and I have

8    some commitments upstairs.  That leaves at least four motions

9    for the next hearing.  What I suggest you do after we adjourn

10   here today is to confer with Mr. Duffy and see if you can pick

11   a mutually convenient date.

12          MS. BROOKER:  Thank you for that, Your Honor.

13          THE COURT:  I will take under advisement 3529, 3540,

14   3849 and on 4047, the ruling will reflect as ruled in open

15   court.

16          MR. DALY:  Your Honor, may I raise one important

17   issue as a result of one of your rulings?  On the AMP issue,

18   Judge, AMP is a very confidential thing.  It's not shared among

19   companies.  It's not shared, states don't have that

20   information.  Even when we give it to Medicaid or to CMS,

21   Medicaid doesn't share it with Medicare, the two divisions.

22   The problem I want to raise is that if we give it to them

23   pursuant to your order, remember you've ordered that the

24   government can then share that with everybody.  So boom, all of

25   our confidential AMP information goes out from the government

1  to everybody.  Meanwhile, Mr. Breen is in the Texas case,

2  he'll have the information.  He's got a protective order in

3  that case that allows him to share it with anybody who comes in

4  and signs an undertaking, so the issue quickly is, we've got

5  real confidentiality concerns and I guess I would ask the court

6  to at least maybe subject to additional paper, although I hate

7  to bring the court, that we don't allow your order to say that

8  they can transmit it to everybody else.

9          THE COURT:  All right.  Can you work out a

10  stipulation as to these particular documents?

11          MS. BROOKER:  Well, they should be allowed to be

12  provided to any states if what we're talking about is other

13  defendants, that's another matter, and I do believe that that

14  is something that is really something that Abbott counsel

15  should be working out with the other defendants.

16          MR. DALY:  Judge, none of the other states have sued

17  us, and for the Medicaid rebates are not in the cases except in

18  the couple where they have suits.  This allows them a wholesale

19  sharing of any state they want.

20          THE COURT:  I'll give you 14 days to try to work out

21  a stipulation.

22          MR. DALY: Thank you, Your Honor.

23          THE COURT:  And if you can't, come back and—

24          MS. BROOKER:  Thank you, Your Honor.

25          THE COURT:  All right.  All right.  We stand in

1   recess.

2            MR. DALY:  Thanks for your time, Your Honor.

3            MS. BROOKER:  Have a good day, Your Honor.

4   //

5   //

6   //

7   //

8   //

9   //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

I - 72

<u>CERTIFICATION</u>

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.


_____                May 21, 2007

Maryann V. Young_____

EXHIBIT 140

Page 362

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


----------------------------------x

In re:  PHARMACEUTICAL INDUSTRY    )  MDL DOCKET NO.

                                   )

AVERAGE WHOLESALE PRICE            )  CIVIL ACTION

                                   )

LITIGATION.                        )  01CV12257-PBS

------------------------------- x

VOLUME II


        The videotaped 30(b)(6) deposition of ABBOTT

(DAVID FISHMAN), called by the United States for

examination, taken pursuant to subpoena and pursuant

to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before Rachel F. Gard,

Certified Shorthand Reporter, at 77 West Wacker

Drive, Suite 3500, Chicago, Illinois, commencing at

8:35 a.m. on the 20th day of March, A.D., 2008.

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 423

1  Medicare fraud and abuse statute or regulation?
2      MS. CITERA:  Objection to the form, outside
3  the scope.
4  BY THE WITNESS:
5      A.  As I understand reading deposition
6  testimony and talking with people, that Abbott did
7  not create spread.
8      Q.  How -- Why do you say that?
9      A.  My understanding is that Abbott would
10 have provided pricing information to the compendia,
11 and the compendia then ultimately issued -- issued
12 the pricing information.  To the extent the spread
13 would have been created, that would have created
14 the spread.
15     Q.  But Abbott understood that there was a
16 correlation between the provision of its list price
17 information to the price reporting compendia and
18 the calculation of AWP, correct?
19     MS. CITERA:  Objection, form, outside
20 scope.
21 BY THE WITNESS:
22     A.  In reading deposition testimony, it

Page 424

1  appears that there were people within Abbott who
2  understood what the compendia did with list price
3  information; so understood the relationship.
4  "Relationship" is a very broad term.  In all
5  aspects of a relationship, I can't answer that.
6  Generally did they understand that that list
7  information was involved in creating AWP?
8  Deposition testimony suggests that there were
9  people within Abbott who understood that.
10     Q.  Did anyone within Abbott evaluate whether
11 or not the maintenance of high spreads or high
12 differentials between contract price and reported
13 list price implicated Medicare and Medicaid fraud
14 and abuse statutes?
15     MS. CITERA:  Objection to the form, outside
16 the scope.  I'm going to also caution you not to
17 reveal any legal information.
18 BY THE WITNESS:
19     A.  To the extent there was a legal analysis
20 prepared, that would be privileged.
21     Q.  Was there a legal analysis prepared?
22     MS. CITERA:  Same objections and instructions.

Page 425

1  BY THE WITNESS:
2      A.  To the extent there was one, it would be
3  privileged.
4      Q.  My question, sir -- You can answer
5  whether or not there was one prepared at a minimum
6  and listen to the instruction as to the content.
7  My question right now is, was there one prepared?
8      MS. CITERA:  I don't think he has to answer
9  that because I think that is privileged in and of
10 itself.
11     MS. ST. PETER-GRIFFITH:  No, it's not
12 privileged in and of itself.  The existence of a
13 document -- I mean, you folks haven't, I don't
14 think, given us a complete privilege log yet.  I
15 want to know whether or not there was such an
16 analysis done or document created.  That I'm
17 entitled to find out, Toni.
18     MS. CITERA:  Anything that would have been
19 done would have been subject to the privilege,
20 would have been subject to the work product.  By
21 the time we're speaking about, Abbott was obviously
22 being investigated and/or sued.  That all would

Page 426

1  have been privileged.
2      MS. ST. PETER-GRIFFITH:  Let me be clear.  I'm
3  not just talking about the 2003 time period.
4  I'm talking about any time from '91 to 2003.
5      MS. CITERA:  And --
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Was any analysis done?
8      A.  To my --
9      MS. CITERA:  Objection to the form, outside
10 the scope.  Same caution to you.
11 BY THE WITNESS:
12     A.  To my knowledge, both personal knowledge
13 and speaking on behalf of Abbott, any questions
14 with respect to AWP would have been handled through
15 our litigation department.
16     Q.  Okay.  Well, did your litigation
17 department do an analysis?
18     MS. CITERA:  Same objections, same
19 instruction.
20 BY THE WITNESS:
21     A.  I don't know.
22     Q.  Who would know?

17 (Pages 423 to 426)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                      March 20, 2008

Chicago, IL

Page 635

1  reimbursement?
2      MS. CITERA:  Object to the form, outside the
3  scope. I also caution you not to reveal anything --
4  any privileged communications or analysis.
5  BY THE WITNESS:
6      A.  I mean, you're not reading the entire
7  phrase here.  It's -- Again, this is -- this is
8  assertion -- this is guidance provided by the
9  government on information that otherwise hadn't
10 provided guidance on or it wouldn't be current
11 guidance.
12     Q.  Okay.  Let me ask it this way:  The
13 statement reflected on this page, was this Abbott's
14 understanding of its obligation under the False
15 Claims Act with regard to price reporting that it
16 directly or indirectly made?
17     MS. CITERA:  Objection to the form, outside
18 the scope.  I also caution you not to reveal any
19 privileged communications or analysis.
20 BY THE WITNESS:
21     A.  I think it's a reflection of what OIG is
22 stating the requirements to be.

Page 636

1      Q.  Okay.  But did Abbott follow the
2  requirements set forth on this page?
3      MS. CITERA:  Same objections.
4  BY THE WITNESS:
5      A.  I don't know that they didn't.
6      Q.  Okay.  Well, do you know that they did?
7      A.  Back to the testimony I gave last
8  Wednesday, which is, this was an evolving
9  environment.  And once there was clearer guidance
10 as to how particular provisions within a statute or
11 regulations were being interpreted, Abbott would
12 have taken that very seriously and would have
13 evaluated its operations in connection with that
14 guidance.
15     Q.  From 1991 through 2003, did Abbott comply
16 with what is identified here as a manufacturer's
17 obligations under the False Claims Act?
18     A.  Identifies it as a possible obligation.
19     MS. CITERA:  Objection to form, outside the
20 scope.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  I'm sorry?

Page 637

1      A.  It identifies it as may be liable.
2      Q.  Well, did Abbott think that it wasn't
3  liable?
4      MS. CITERA:  Same objections.
5  BY THE WITNESS:
6      A.  You're asking for a legal conclusion.
7      Q.  What I'm asking for, sir, is did Abbott
8  believe or understand that it was required to
9  follow what is set forth on this page as a -- an
10 obligation of a manufacturer under the False Claims
11 Act?
12     MS. CITERA:  Objection to the form, outside
13 the scope.
14 BY THE WITNESS:
15     A.  Abbott absolutely believed that it was
16 obligated to follow the federal False Claims Act
17 and any other healthcare compliance obligations.
18     Q.  Okay.  And from 1991 through 2003, did
19 Abbott follow this guidance that is set forth on
20 this page as to its obligations under the False
21 Claims Act?
22     MS. CITERA:  Same objections.

Page 638

1  BY THE WITNESS:
2      A.  That answer requires a legal conclusion,
3  now applying the facts of how Abbott did its --
4  conducted its business against the Act, federal
5  False Claims Act and reaching a conclusion whether
6  or not it complied.
7      Q.  I'm asking whether what is outlined here
8  -- Well, let me ask you, did Abbott with regard to
9  prices that it directly or indirectly reported, did
10 it ever knowingly or recklessly fail to report
11 accurate and complete information concerning its
12 discounts, rebates, free goods, upfront payments,
13 coupons, goods in kind, free or reduced prices or
14 services, grants, or other price concessions or
15 similar benefits?
16     MS. CITERA:  I'm going to object to the form.
17 It's clearly asking for a legal conclusion and
18 beyond the scope.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  I'm not asking -- I'm asking for Abbott's
21 practice.
22     A.  No, you're asking me did Abbott fail to

70 (Pages 635 to 638)

0f08cf8d-8dfa-4007-81db-29f9710803e3