# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| PHARMACEUTICAL INDUSTRY | ) | Subcategory No. 06-11337 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | Hon. Patti B. Saris |
| _____ | ) | **LEAVE TO FILE GRANTED** |
| | ) | **ON SEPTEMBER 1, 2009** |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| *United States ex rel. Ven-A-Care of the* | ) | |
| *Florida Keys, Inc.* v. *Schering Corporation,* | ) | |
| *Schering-Plough Corporation and* | ) | |
| *Warrick Pharmaceuticals Corporation* | ) | |
| Civil Action No. 09-CV-10547 | ) | |
| MDL Action No. 1456 | ) | |
| | ) | |
| *United States ex rel. Ven-A-Care of the* | ) | |
| *Florida Keys, Inc.* v. *Schering Corporation,* | ) | |
| *Schering-Plough Corporation and* | ) | |
| *Warrick Pharmaceuticals Corporation* | ) | |
| Civil Action No. 00-CV-10698 | ) | |
| MDL Action No. 1456 | ) | |
| | ) | |
| *California ex rel. Ven-A-Care of the* | ) | |
| *Florida Keys, Inc.* v. *Schering Corporation,* | ) | |
| *Schering-Plough Corporation and* | ) | |
| *Warrick Pharmaceuticals Corporation* | ) | |
| Civil Action No. 03-CV-11226 | ) | |
| MDL Action No. 1456 | ) | |

## JOINT MEMORANDUM IN SUPPORT OF MOTION FOR APPROVAL OF THE SETTLEMENT BETWEEN CALIFORNIA, FLORIDA, AND RELATOR VEN-A-CARE OF THE FLORIDA  KEYS ON BEHALF OF ITSELF AND THE UNITED STATES AND <u>SCHERING-PLOUGH, SCHERING, AND WARRICK</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... iii

BACKGROUND ............................................................................................................1

HISTORY OF PROCEEDINGS.....................................................................................3

EXPLANATION OF THE KEY TERMS OF THE SETTLEMENT .............................5

      A.    This Settlement Is Intended to Extinguish Claims for the Federal-Share of Any Alleged Medicaid Overpayment Nationwide to the Fullest Extent Possible. ........................................................................................... 5

      B.    The Settlement Is Conditioned upon the Court Making Certain Factual Findings Concerning Schering's Brand Drugs. ...................................... 6

      C.    Schering/Warrick Have Not Had Any Input Into the Allocation of the $55 Million Settlement Amount. ........................................................... 9

ARGUMENT ................................................................................................................10

I.     THIS COURT HAS THE AUTHORITY TO, AND SHOULD, MAKE THE REQUESTED FINDINGS OF FACT AFTER HOLDING AN EVIDENTIARY HEARING AT WHICH OBJECTORS ARE AFFORDED THE OPPORTUNITY TO STATE THE BASIS FOR THEIR OPPOSITION. .............................................11

II.    AS SCHERING/WARRICK URGE, THE COURT SHOULD FIND AS A PART OF APPROVING THE PROPOSED SETTLEMENT THAT THE SETTLEMENT EXTINGUISHES ALL CLAIMS FOR THE FEDERAL-SHARE OF ANY ALLEGED MEDICAID OVERPAYMENT NATIONWIDE..............................................14

      A.    The Court Should Resolve Any Questions Presented Concerning the Preclusive Effect of the Proposed Settlement in the Context of this Case for at Least Two Reasons. .......................................................... 14

      B.    As Schering/Warrick Urge, the Court Should Find that the Proposed Settlement Extinguishes All Claims to the Federal-Share of Any Alleged Medicaid Overpayment Nationwide. ................................................... 15

III.   THE PROPOSED SETTLEMENT IS "FAIR, ADEQUATE, AND REASONABLE UNDER ALL THE CIRCUMSTANCES." ........................................................19

      A.    This Court Should Evaluate and Approve the Settlement at Issue. ...................... 19

      B.    The $55 Million Settlement Amount Is "Fair, Adequate, and Reasonable Under All the Circumstances." ........................................................... 19

IV.  IF DOJ WITHHOLDS ITS CONSENT TO THE SETTLEMENT, IT SHOULD BE
REQUIRED TO SET FORTH ITS REASONS IN WRITING, WHICH REASONS
ARE PRESUMED REVIEWABLE BY THE COURT. ......................................................24

    A.  DOJ Has Not Definitively Declined to Consent to the Settlement. ...................... 24

    B.  The False Claims Act Does Not Confer an Absolute Veto Power on DOJ in a
Non-Intervened Case. ......................................................................................... 25

    C.  If DOJ Ultimately Declines to Consent to the Settlement, the DOJ Decision
Is Subject to Judicial Review. ............................................................................ 26

CONCLUSION .....................................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

CASES

*Searcy* v. *Philips Electronics N. Am. Corp.*,
   117 F.3d 154 (5th Cir. 1997) ...................................................................25, 26, 27

*City of Detroit* v. *Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)...............................................................................20

*City of New York* v. *Exxon Corp.*,
   697 F. Supp. 677 (S.D.N.Y. 1988).....................................................................13

*Commonwealth of Massachusetts* v. *Mylan Labs.*,
   609 F. Supp.2d 127 (D. Mass. 2008) .................................................................21

*Gutierrez de Martinez* v. *Lamagno*,
   515 U.S. 417 (1995)............................................................................................28

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) .............................................................................11

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   491 F. Supp. 2d 20 (D. Mass. 2007)....................................................7, 13, 20, 21

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   520 F. Supp.2d 267 (D. Mass. 2007) .................................................................20

*In re Pharmaceutical Industry Avg. Wholesale Price Litig.*,
   538 F. Supp. 2d 392 (D. Mass. 2008) ................................................................26

*In re Schimmels*,
   127 F.3d 875 (9th Cir. 1997) .............................................................................18

*Jensen* v. *United States*,
   743 F. Supp. 1091 (D.N.J. 1990) .......................................................................13

*Larken, Inc.* v. *Wray*,
   189 F.3d 729 (8th Cir. 1999) .............................................................................16

*Minotti* v. *Lensink*,
   895 F.2d 100 (2d. Cir. 1990)..............................................................................26

*Montana* v. *United States*,
   440 U.S. 147 (1979)............................................................................................16

*New England Carpenters Health Benefit Fund* v. *First Databank, Inc.*,
   602 F. Supp.2d 277 (D. Mass. 2009) ......................................................... passim

*Osediacz* v. *City of Cranston*,
  414 F.3d 136 (1st Cir. 2005)..................................................................................13

*Overseas Military Sales Corp.* v. *Giralt-Armada*,
  503 F.3d 12 (1st Cir. 2007)....................................................................................13

*Plummer* v. *Chemical Bank*
  668 F.2d 654 (2d Cir. 1982)...................................................................................11

*Rhode Island* v. *Narragansett Indian Tribe*,
  19 F.3d 685 (1st Cir. 1994)....................................................................................13

*Richards* v. *United States*,
  369 U.S. 1 (1962)...................................................................................................25

*Taylor* v. *Sturgell*,
  553 U.S.__, 128 S.Ct. 2161 (2008).......................................................................16

*United States ex rel. Barajas* v. *Northrop Corp.*,
  147 F.3d 905 (9th Cir. 1999) ............................................................................17, 18

*United States ex rel. Eisenstein* v. *City of New York*,
  __ U.S. __, 129 S.Ct. 2230 (2009).....................................................................16, 17

*United States ex rel. Killingsworth* v. *Northrop Corp.*,
  25 F.3d 715 (9th Cir. 1994) ...........................................................................passim

*United States ex rel. Milam* v. *Univ. of Texas M.D. Anderson Cancer Ctr.*,
  961 F.2d 46 (4th Cir. 1992) ...................................................................................17

*United States ex rel. Pratt* v. *Alliant Techsystems, Inc.*,
  50 F. Supp. 2d 942 (C.D. Cal 1999) ................................................................17, 18

*United States ex rel. Sarafoglou* v. *Weill Medical College of Cornell Univ.*,
  51 F.Supp.2d 613 (S.D.N.Y. 2006)........................................................................17

*United States ex rel. Stillwell* v. *Hughes Helicopters, Inc.*,
  714 F. Supp. 1084 (C.D. Cal. 1989) ......................................................................18

*United States ex rel. Summit* v. *Michael Baker Corp.*,
  40 F. Supp. 2d 722 (E.D. Va. 1999) ......................................................................26

*United States* v. *Fruehauf*,
  365 U.S. 146 (1961)...............................................................................................12

*United States* v. *Health Possibilities, PSC*,
  207 F.3d 335 (6th Cir. 2000) .....................................................................25, 26, 27

*Vermont Agency of Nat. Res.* v. *United States ex rel. Stevens*,
    529 U.S. 765 (2000)..........................................................................................16, 17

*White* v. *Nat'l Football League*,
    836 F. Supp. 1458 (D. Minn. 1993)........................................................................12


**STATUTES**

31 U.S.C. § 3730(b)(1) .............................................................................2, 15, 19, 27

31 U.S.C. § 3730(b)(4) .........................................................................................25

31 U.S.C. § 3730(c)(5).........................................................................................22


**OTHER AUTHORITIES**

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE §
    1797.5 & n.12 (2009)..........................................................................................12

JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 4.07[B][2] (3d. ed. 2009) ..........26

Matthew H. Solomson & Sarah M. Brackney, *What Would Scalia Do?- A Textualist
    Approach to the Qui Tam Settlement Provision of the False Claims Act*, 36 PUB.
    CONT. L.J. 39, 49, 50-51, 52-53 (2006) ..............................................................26

Relator Ven-A-Care of the Florida Keys (the "Relator" or "Ven-A-Care"), the State of California, and Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation (collectively "Schering/Warrick") submit this joint memorandum in support of their motion to approve the Settlement Agreement and Release (the "Settlement").

## **BACKGROUND**

This Settlement, if approved, would resolve claims under the federal False Claims Act (the "FCA") concerning the utilization of Schering/Warrick's published prices by the Medicaid program (as well as claims under the laws of California and Florida).[1] With this settlement, the Settling Parties intend to resolve, to the fullest extent allowed under applicable law, the claims encompassed by Ven-A-Care's federal False Claims Act actions, and the California and Florida actions against Schering/Warrick. The States of California and Florida have joined in their respective actions and settlements and, accordingly, no issue exists as to the scope or extent of the releases and dismissals in those actions. However, the United States has declined to intervene in the actions brought under the federal False Claims Act, and the Settlement does not contemplate or require that the United States will be a party to the Settlement Agreement, the Release, or the Dismissal resolving Ven-A-Care's federal False Claims Act actions. Instead, Ven-A-Care has provided a release which is intended to be as broad as the law permits, and the Settling Parties contemplate that the Court will make a legal determination as to the preclusive effect of their Settlement.

Before this action can be dismissed, and the Settlement thus consummated, the False Claims Act requires that the Court provide its consent, in writing, to the dismissal and state its

---

[1] In particular, the Settlement would resolve four cases, three of which are pending before this Court. (*See* Settlement at ¶¶ E-H, III.1.)

reasons for providing its consent.  *See* 31 U.S.C. § 3730(b)(1).  To achieve the finality

contemplated by the Settlement, the Settling Parties propose that the Court proceed sequentially.

First, the Settling Parties suggest that the Court consider their request to enter findings of fact as

to Schering's liability under the False Claims Act arising out of the publication of AWPs and

WACs for its brand drugs.  Undoubtedly, the question of Schering's brand liability is an

important one to the Court's ultimate assessment of the fairness, adequacy, and reasonableness

of the settlement, and a question of great concern to certain of the objectors.  Next, the Settling

Parties propose that the Court consider and decide to what extent the proposed settlement

precludes future litigation of claims for the federal-share of any alleged Medicaid overpayment.

Again, this issue seems essential to a determination of the fairness, adequacy, and reasonableness

of the settlement, and is *the* central concern of many of the objectors.

Once the Court has addressed and decided each of these issues, the Settling Parties

suggest that the Court evaluate the overall fairness, adequacy, and reasonableness of the $55

million settlement amount.  At that point, if the Court is prepared to consent to the proposed

settlement, DOJ should be asked to state clearly:  (i) whether it will consent to the fairness,

adequacy, and reasonableness of the $55 million amount that is being paid to resolve the claims

that the Court determines would be precluded by the settlement and (ii) if so, whether it agrees

that the allocation of that amount among the various parties to the Settlement and the United

States is fair, adequate, and reasonable.  The proposed Order dismissing Schering/Warrick from

the case with prejudice contemplates that the Court might retain jurisdiction after Schering and

Warrick are dismissed "to determine how the settlement proceeds should be allocated in

accordance with 31 U.S.C. § 3730 and other applicable law."

As this Court knows, AWP litigation has been pending in state and federal courts for over a decade without any substantial progress in achieving comprehensive resolution through settlement.  One of the significant "roadblocks" to settlement has been how to resolve questions of the federal-share, which is sought both directly by the United States (through DOJ) and on behalf of the United States by the Relator and indirectly through various state litigations.  CMS demands that any state bringing a Medicaid claim seek not only the state-share of any alleged Medicaid overpayment, but also the federal-share of that alleged overpayment.  While CMS is entitled to sever the federal-share from the efforts to recover the state-share, CMS  ordinarily (but not always) refuses to do so, even when a proceeding has been brought directly on behalf of the United States to recover the federal-share.  If approved, this Settlement could serve as a "prototype" for nine other defendants in cases pending in this Court and facilitate settlement of the federal-share in those cases and state cases pending around the country.

## HISTORY OF PROCEEDINGS[2]

Ven-A-Care brought the first "AWP" case ever filed in 1995 when it commenced its federal False Claims Act action in the United States District Court for the Southern District of Florida focused on generic as well as brand biological, infusion, and injectible drugs.  Pursuant to the False Claims Act, in August 1995, Ven-A-Care began to share with the United States the information learned by Ven-A-Care about the inhalation drugs marketed by Schering/Warrick, which was formally added as a defendant with regard to certain of its generic drugs in the still sealed False Claims Act action in 1997.  At that time, based on Ven-A-Care's investigation, there was no basis to claim damages relating to Schering's brand drugs, although Ven-A-Care had

---

[2] The Affidavit of Mark Jones, filed herewith, provides a detailed recitation of Relator Ven-A-Care's efforts on behalf of the United States in pursuing these claims.

alleged False Claims Act violations with respect to certain branded injectable anti-emetics manufactured by Glaxo and Smith-Kline.[3]

Pursuant to its obligations under the False Claims Act, the United States Department of Justice ("DOJ") diligently investigated Ven-A-Care's allegations about Schering/Warrick, an investigation that extended some eleven years until DOJ declined to intervene in the litigation in November 2008.  During that timeframe, DOJ asked for and received sales data and pricing information on _all_ of the drugs that are the subject of the settlement, including the Schering-brand drugs that were recently added to the Amended Complaint.[4]  While DOJ continued its investigation of the federal damages claims, various state Attorneys General and Ven-A-Care, brought parallel state Medicaid cases, filed, in some instances, many years after the commencement of Ven-A-Care's 1995 suit and the institution of DOJ's AWP investigation.[5] Consistent with CMS mandates, these cases also seek to recover the federal-share of any damages relating to the allegedly false prices published for the Schering/Warrick drugs that are the subject of this Settlement.  Schering/Warrick are current defendants in eighteen such actions.

Contemporaneously, Ven-A-Care proceeded with the additional _qui tam_ actions that it had filed in Texas, Florida, and California (in which the respective states' Attorneys General have intervened) asserting claims against Schering/Warrick, among other defendants. Throughout the course of these state litigations, the Texas, Florida, and California Attorneys General, the other states' Attorneys General, and Ven-A-Care have remained in close communication with the United States Department of Justice, and have made considerable

---

[3] Ven-A-Care's federal False Claims Act actions against these defendants relating to their branded drugs were settled in 2005 resulting in dismissals with prejudice.

[4] Facts uniquely within the knowledge of Schering/Warrick, such as what information Schering/Warrick supplied to DOJ, are supported by the Affidavit of Beth Trent, filed herewith.

[5] To Schering/Warrick's knowledge, Ven-A-Care is the only private relator to commence a Medicaid-related action with regard to the AWPs and WACs reported for Schering/Warrick's various pharmaceutical products.

efforts to share with the United States, to the fullest extent permitted by the state courts, the abundant fruits of discovery in those cases.  In sharing the discovery in the Texas case with DOJ, Ven-A-Care presented the United States with a fully discovered case against Schering/Warrick, including Schering's brand drugs, as it was developed.  Even after this extensive discovery with regard to Schering's brand drugs, the Relator still found no basis for claims of damages with respect to the pricing of Schering's brand drugs.

Since the United States Department of Justice's declination, the Relator has continued the litigation on behalf of the United States through its federal False Claims Act actions to recover the federal-share of any damages incurred by the Medicaid program, and simultaneously has continued its statutory role in pursuing the Florida and California intervened *qui tam* actions that remain against Schering/Warrick.  While substantial discovery will have to be completed in the California action if this Settlement is not approved, the long and intense history of Ven-A-Care litigation with Schering/Warrick, which has generated a voluminous record that has been shared fully and consistently with DOJ, has made it possible for the adverse parties to reach a resolution that Ven-A-Care believes is in the interest of Florida, California, and the United States.  If this Settlement is approved, Ven-A-Care will continue to pursue, along with the Department of Justice, the pending actions in which DOJ has intervened and all of the remaining declined Ven-A-Care federal False Claims Act actions, as well as actions on behalf of state Medicaid programs in which the Attorneys General have intervened.

## EXPLANATION OF THE KEY TERMS OF THE SETTLEMENT

**A.     This Settlement Is Intended to Extinguish Claims for the Federal-Share of Any Alleged Medicaid Overpayment Nationwide to the Fullest Extent Possible.**

As a part of the Settlement, "the Relator on behalf of the United States and on behalf of the Relator" has agreed to release Schering and Warrick "from any claim" that "the Relator has

asserted or could have asserted on behalf of the United States or on its own behalf arising out of
or related to the Covered Conduct for the Covered Drugs (as defined in Paragraph III.6 below)
during the Relevant Period, including but not limited to the federal-share of any claim brought by
a state arising out of or related to the Covered Conduct or Covered Drugs."  (*See* Settlement
Agreement and Release (hereinafter "Settlement") at ¶ III.5.)

Ven-A-Care has expressed its intention to release, as part of this Settlement, all claims to
the fullest extent possible that it as a relator could bring on behalf of the United States for the
federal-share of any alleged Medicaid overpayment.  In the underlying actions being settled,
Ven-A-Care, on behalf of the United States, sought to recover for the federal-share nationwide
for any alleged Medicaid overpayment.  (*See* Amended Compl. at ¶¶ 32, 79-80.)  Accordingly,
Schering/Warrick contend, and various objecting parties apparently agree, that the settlement and
release of those claims that the Relator brought or could have brought on behalf of the United
States, if approved, would extinguish all rights to the recovery of the federal-share of any alleged
Medicaid overpayment brought by any state.

**B.      The Settlement Is Conditioned upon the Court Making Certain Factual
Findings Concerning Schering's Brand Drugs.**

The Settlement seeks to achieve finality in another significant regard.  The very same
Schering-brand drugs for which this Court found no liability in the MDL Class Action case are
routinely the subject of state court complaints.  In Schering/Warrick's view, these complaints
essentially adopt the strict liability theory that this Court expressly rejected in the MDL Class
Action case and seek to recover for even the standard twenty to twenty-five percent mark-up
over WAC that the pricing compendia imposed when publishing AWPs for brand-name drugs.
In fact, a full 85% of all alleged damages claimed against Schering/Warrick result from claims
made with regard to brand-name drugs, which have a pattern of "spreads" and sales at list

identical to those found not to result in "AWP inflation" or to give rise to liability in the MDL

Class Action case.  Accordingly, in structuring the settlement, Schering/Warrick sought to

achieve finality as to its brand-name drugs as well.

In addition to addressing Warrick's generic drugs, the Settlement therefore includes a

release of claims for Schering's brand drugs (the "Schering Covered Drugs") and is conditioned

on this Court independently issuing findings that the AWPs and WACs for the Schering Covered

Drugs do not give rise to liability (the "Proposed Findings").  (*See* Settlement at ¶ III.6.)  Ven-A-

Care, the Relator, thoroughly investigated the Schering Covered Drugs, which are the subject of

the Proposed Findings, and declined to include them in the original complaint for reasons

consistent with the "speed limit" standard eventually adopted by this Court in the MDL Class

Action, *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 39 (D.

Mass. 2007).[6]  (*Id.*)  The Relator determined, after evaluating the spreads on the Schering

Covered Drugs and confirming that their AWPs and WACs were consistent with the liability

standards set forth in the MDL Opinion, that such AWPs and WACs could not form the basis of

an FCA violation.  (Settlement at ¶ III.6.)  However, to achieve finality with regard to Schering's

brand drugs, the Complaint was amended to include the Schering Covered Drugs.  (*See* Relator

Ven-A-Care of the Florida Keys, Inc.'s Am. Compl. Against Schering Corp., Schering-Plough,

Corp., and Warrick Pharmaceuticals Corp. for Violations of the False Claims Act, 31 U.S.C. §

3729, *et seq.* at ¶ 76, Ex. E (July 24, 2009) (Dkt. 6292) (the "Am. Compl.").)  Schering

consented to that amendment, (*see* Consent to Amended Complaint (July 22, 2009) (Dkt. 6278)),

and the parties agree that the Amended Complaint, now the operative complaint in this action,

---

[6] California analyzed the spreads on each of  the Schering branded drugs utilized within Medi-Cal, California's
Medicaid program (which include all but a few of the Schering Covered Drugs), before filing its amended complaint
in August 2005, and determined, using its own "speed limit", that none were of such magnitude as to warrant
inclusion in its amended complaint; California accordingly elected to proceed only on certain Warrick generic drugs.

conforms the pleadings to the evidence.  Consistent with these goals and the evidence, this Settlement releases claims as to the Schering Covered Drugs.  (*See* Settlement at ¶ III.5.)

While the Relator and Schering/Warrick agree that the Schering Covered Drugs satisfy the liability standards established by this Court in its MDL Opinion, the Settlement asks the Court to conduct its own independent analysis of the evidence.  Thereafter, the Settling Parties request "the Court's independent concurrence that neither the WACs nor the AWPs for [the Schering Covered Drugs] constitute false statements within the meaning of the False Claims Act and that claims for reimbursement based on such WACs and AWPs are neither deceptive nor unfair."  (*Id.* ¶ III.6.)  Exhibit C, attached to the Settlement, is a proposed form of order approving the Settlement that embodies the Proposed Findings sought.  The Settlement, as currently structured, can only proceed if the Court makes those Proposed Findings, as the Amended Complaint and the Proposed Findings are designed to provide finality to Schering/Warrick on all drugs at issue in these litigations.

In addition to being a material part of the Settlement, the independent factual review contemplated by the settlement also will assist the Court in fulfilling its statutory obligation to determine the fairness, adequacy, and reasonableness of the Settlement.  Further, the concerns raised by various proposed objectors regarding the preclusive effect of the Settlement on other state cases[7] highlight the importance of the Court's analysis of the relevant evidence and independent concurrence in the Proposed Findings.[8]  Simply put, Schering/Warrick cannot and

---

[7] *See, e.g.*, Corrected United States' Objection to the Proposed Settlement Between Schering-Plough Corp., Schering Corp., Warrick Pharmaceuticals Corp. and Ven-A-Care of the Florida Keys, and Proposed Order at 5 (July 21, 2009) (Dkt. 6283) (the "U.S. Prelim. Br.") (objecting to settlement because release would "dismiss with prejudice the United States's claims against Schering/Warrick for the federal share of Medicaid damages arising from the Covered Conduct in states other than California and Florida") (emphasis in original).

[8] The Settlement also provides that, even after dismissal with prejudice of the four actions resolved by this agreement, this Court "would retain continuing jurisdiction over the enforcement of this Settlement Agreement and all releases provided for herein, including for purposes of issuing an injunction in protection of the Court's

will not enter into a settlement that, contrary to the analysis of the Relator and this Court's prior rulings, permits continued claims on Schering's brand drugs.

### C.   Schering/Warrick Have Not Had Any Input Into the Allocation of the $55 Million Settlement Amount.

Another aspect of the Settlement is worth noting: Schering/Warrick have had no input into the allocation of the $55 million settlement amount between and among California, Florida, the Relator, and the United States. (*Id.* at ¶ III.2.) In fact, Schering/Warrick are only aware of how the various other parties to the Settlement propose to allocate the settlement proceeds to the very limited extent revealed on the record by Relator's counsel at the July 24, 2009 scheduling conference. (*See* 7/24/09 Hrg. Tr. at 35:13-15.) This aspect of the proposed settlement is significant because it underscores the fact that Schering/Warrick agreed to pay $55 million to secure a *comprehensive* settlement and release of the federal-share claims nationwide *and* the state-share claims being brought by Florida and California. From Schering/Warrick's perspective, $55 million is fair, adequate, and reasonable consideration to pay to resolve all of these claims collectively, as Schering/Warrick state they are prepared to justify if called upon to do so. The amounts being allocated by the other parties to the Settlement to resolve any individual component of the liability that Schering/Warrick agreed to resolve comprehensively, if valued individually, might not be acceptable to Schering/Warrick. Put differently, Schering/Warrick likely would not be amenable to resolving only some of the claims that it seeks to extinguish as a part of this proposed comprehensive settlement.

---

jurisdiction to enforce the terms, conditions, and releases provided for in this Settlement Agreement." (Settlement at ¶ III.12.)

## **ARGUMENT**

As will be explained more fully below, this Court should consent to this Settlement for at least the following reasons.  *First*, the Court has the authority to make the requested findings of fact as a part of its independent evaluation of the fairness, adequacy, and reasonableness of the settlement.  The requested findings do not constitute an "advisory opinion" as certain objectors suggest, but rather are quite apparently "hotly contested" and a necessary prerequisite to the Court's consenting to the settlement.  *Second*, as this brief makes clear, it is Schering/Warrick's position that basic principles of res judicata and collateral estoppel plainly would bar subsequent litigation of claims as to the federal-share of any alleged Medicaid overpayment nationwide.[9] Deciding that question in the context of this case would not only help to resolve many of the objections at least preliminarily interposed to the Settlement, but also, again, seems necessary to the Court's discharging its statutory mandate to review and consent (or not) to the Settlement. *Third*, as this brief demonstrates, when considered in the context of this Court's prior rulings and all that has happened to date in AWP litigation involving these defendants, $55 million is a "fair, adequate, and reasonable" amount for Schering/Warrick to pay to resolve the federal-share of any damages allegedly incurred by the Medicaid program, as well as the state-shares in California and Florida.  In the following sections, the Settling Parties discuss in turn each of these issues, and then address the question of what they believe should happen if, in the end, the United States Department of Justice declines to consent to their proposed settlement.

---

[9] As the *qui tam* relator in this False Claims Act case, Ven-A-Care does not take any position as to the merits of Schering's argument regarding the preclusive effect of this settlement.  However, in light of DOJ's observation that the Settlement might be sufficient to extinguish the federal-share of all alleged Medicaid overpayments nationwide, *see* U.S. Prelim. Br. at 5-6 (objecting to settlement because release would "dismiss with prejudice the United States's claims against Schering/Warrick for the federal share of Medicaid damages arising from the Covered Conduct in states other than California and Florida") (emphasis in original), Ven-A-Care urges the Court to address the issue of the Settlement's preclusive effect in the course of these proceedings.

I.      **THIS COURT HAS THE AUTHORITY TO, AND SHOULD, MAKE THE REQUESTED FINDINGS OF FACT AFTER HOLDING AN EVIDENTIARY HEARING AT WHICH OBJECTORS ARE AFFORDED THE OPPORTUNITY TO STATE THE BASIS FOR THEIR OPPOSITION.**

As detailed above, the Settlement resolves claims as to the Schering Covered Drugs and is contingent on the Court's independent examination of the evidence relating to those drugs and independent concurrence that no substantial damages stem from claims for such drugs. (Settlement at ¶ III.6)  Given that various states have proposed to object to the scope of the Settlement, particularly the inclusion of the Schering Covered Drugs and the potential preclusive effects of the Settlement,[10] the Court should, prior to consenting to the Settlement, conduct an evidentiary hearing to determine whether, as the Proposed Findings indicate, there are no substantial damages attributable to claims for the Schering Covered Drugs.  Any objector who disagrees with those findings should be able, as the Court has indicated, to make a submission contesting the proposed findings concerning the Schering Covered Drugs.  (*See* 7/24/09 Hrg. Tr. at 21:6-14.)

Courts frequently take evidence and make factual findings in the course of approving settlements.  In approving class action settlements pursuant to Rule 23, for example, courts often enter findings of fact and conclusions of law concerning the fairness, adequacy, and reasonableness of the proposed settlement to the class.  *See Plummer* v. *Chemical Bank*  668 F.2d 654, 659 (2d Cir.  1982) (requiring district courts analyzing class settlements "to explore the facts sufficiently to make intelligent determinations concerning adequacy and fairness"); *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195 (5th Cir. 1981) (in approving a class settlement notwithstanding objections, the court should provide an opportunity for objectors to

---

[10] *See, e.g.*, U.S. Prelim. Br. at 5 (stating concern that settlement would release claims as to additional drugs beyond those originally pled by Relator).

present evidence and argument and should "set forth on the record a reasoned response to the objections including findings of fact and conclusions of law necessary to support the response" (internal citations omitted)); *see generally* 7B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1797.5 & n.12 (2009).  The case of *White* v. *Nat'l Football League*, 836 F. Supp. 1458, 1499-1500 (D. Minn. 1993) is particularly instructive.  In *White*, the court approved the settlement of an antitrust class action that called for the court to make "requested findings" that the terms of the settlement would be protected by the nonstatutory labor exemption to federal antitrust laws notwithstanding objections that the requested findings constituted an advisory opinion.  As with findings accompanying the approval of any Rule 23 class action settlement, the Proposed Findings here, entered only after objectors are given an opportunity to be heard, would support the Court's approval of this Settlement as fair, adequate, and reasonable, and would not constitute an advisory opinion.

That the Proposed Findings are requested in the context of a False Claims Act settlement does not in any way limit this Court's authority to make them.  Fact finding is a core function of an Article III court, and the FCA envisions the Court evaluating the fairness, adequacy, and reasonableness of the Settlement.  The Proposed Findings, and the evidence supporting them, sustain both the breadth of the release and the adequacy of the consideration paid to obtain that release.  The suggestion by certain objectors that the proposed findings seek an "advisory opinion" carries no weight at all.[11]  By analogy, where the law requires a court to approve a

---

[11]   None of the cases cited in the United States' Preliminary Brief and Massachusetts' Motion to Intervene hold that a court cannot make findings in support of a settlement where applicable law requires the Court to approve the settlement. *See United States* v. *Fruehauf*, 365 U.S. 146, 157 (1961) (Supreme Court, on direct appellate review could not issue an "advance expression[] of legal judgment upon issues which remain unfocused" before the district court judge who had dismissed the case on other grounds); *Overseas Military Sales Corp.* v. *Giralt-Armada*, 503 F.3d 12, 16, 18 (1st Cir. 2007) (specific rule prohibiting circuit courts of appeal from vacating or reversing judgment of the district court based on a settlement between the parties applied but parties could seek vacatur of the district court judgment pursuant to a joint motion under Fed. R. Civ. P. 60(b)); *Osediacz* v. *City of Cranston*, 414 F.3d 136, 137 (1st Cir. 2005) (dismissing plaintiff's First Amendment facial challenge to a city policy allowing private parties

settlement, the court is empowered to make findings proposed by the settling parties to effectuate the deal agreed to and to resolve any uncertainties. *See Jensen* v. *United States*, 743 F. Supp. 1091, 1103 (D.N.J. 1990) (rejecting the argument that the court's decision was advisory where the settlement agreement provided for a judicial determination of the constitutionality of certain agency procedures before triggering the agency's right to return property to plaintiff); *see also City of New York* v. *Exxon Corp.,* 697 F. Supp. 677, 681 (S.D.N.Y. 1988) (in the context of approving a settlement as required by law, court determined that it could rule on the application of a provision of CERCLA to the case even though the issue would impact related litigation by non-settling parties). Likewise, where, as here, the FCA requires that the Court's consent to the settlement, the Court is empowered to enter the Proposed Findings without running afoul of the constitutional prohibition against advisory opinions.

The evidence supporting the Proposed Findings is set forth in the Affidavit of Dr. Sumanth Addanki, filed herewith, which includes the spreads, measured by the difference between AWP and AMP, by year, on each of the Schering Covered Drugs, and the percentage of sales at WAC for each of the Schering Covered Drugs. Dr. Addanki's Affidavit confirms that the patterns of spreads and sales at list price for the Schering Covered Drugs do not give rise to a claim for damages under the standards that this Court announced in its MDL Opinion. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp.2d 20, 39 (D. Mass. 2007). Schering/Warrick provided this same analysis, and the underlying data supporting it, to DOJ in furtherance of DOJ's investigation of the Relator's *qui tam* Complaint, more than 18 months ago. If DOJ objects to Dr. Addanki's calculations submitted in support of the Proposed Findings, or if

---

to erect holiday and seasonal displays on the city hall lawn because plaintiff's status as a taxpayer is insufficient to confer standing to sue); *Rhode Island* v. *Narragansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir. 1994) (in declaratory judgment proceeding regarding gaming regulation, matters concerning the full extent of statutory jurisdiction were not ripe and court would not indulge in "abstract inquiry" or make "*ex ante* determination" that particular future or "hypothetical" exercises of concurrent jurisdiction would conflict).

it believes that the standards this Court announced in its MDL Opinion are inappropriate for evaluating the claims in this action, it should say so now.  Likewise, if any other proposed objector challenges the Settlement because it disagrees with the Proposed Findings, then it should state the basis for that disagreement during the requested evidentiary hearing.  After considering the objections, if any, and evaluating whatever evidence the Court deems necessary at the evidentiary hearing, the Settling Parties are confident that the Court will find the Proposed Findings to be familiar to this Court, accurate, and supportive of the reasonableness of this Settlement.

## II.    AS SCHERING/WARRICK URGE, THE COURT SHOULD FIND AS A PART OF APPROVING THE PROPOSED SETTLEMENT THAT THE SETTLEMENT EXTINGUISHES ALL CLAIMS FOR THE FEDERAL-SHARE OF ANY ALLEGED MEDICAID OVERPAYMENT NATIONWIDE.

### A.    The Court Should Resolve Any Questions Presented Concerning the Preclusive Effect of the Proposed Settlement in the Context of this Case for at Least Two Reasons.

*First*, one of the primary objections to the proposed settlement lodged by states that have pending AWP claims is that the Settlement would create an uncertainty as to their rights to recover the federal-share of any alleged Medicaid overpayment.  However, these states, such as Massachusetts, should be economically indifferent as between (i) recovering in their pending action the federal and state shares of any alleged Medicaid overpayment and then having to refund the federal share to the federal government or (ii) being able to recover only the state-share of any alleged Medicaid overpayment, but then being allowed to keep all of the monies recovered.  It is the specter of CMS seeking after-the-fact to offset a portion of a state-only recovery that creates the uncertainty to which these states understandably object.  Resolving questions as to the preclusive effect of this settlement on claims for the federal-share would eliminate the uncertainty that concerns the states and should obviate many of the preliminary

objections to the proposed settlement.  For similar reasons, Schering/Warrick would welcome the same certainty as is sought by the objecting states.

*Second*, the False Claims Act requires this Court to "give written consent to the dismissal and [its] reasons for consenting."  *See* 31 U.S.C. § 3730(b)(1).  As a prerequisite to any determination that the proposed settlement is "fair, adequate, and reasonable," the Court presumably will want to understand the scope of the claims being extinguished by the proposed settlement.  Clearly articulating the preclusive effect of the proposed settlement would be of great benefit to the parties and should not be a significant burden for the Court.  For this reason too, the Settling Parties urge the Court to resolve these questions in the context of this case.

### B.  As Schering/Warrick Urge, the Court Should Find that the Proposed Settlement Extinguishes All Claims to the Federal-Share of Any Alleged Medicaid Overpayment Nationwide.[12]

Each of the preliminary objectors raised as a concern the likelihood that, if approved, the proposed settlement would extinguish – finally – all claims for the federal-share of any alleged Medicaid overpayment whether sought directly by the federal government or by any state on behalf of the federal government.  (*See, e.g.*, U.S. Prelim. Br. (objecting to the settlement because the release would "dismiss with prejudice the United States's claims against Schering/Warrick for the federal share of Medicaid damages arising from the Covered Conduct in states <u>other than</u> California and Florida") (emphasis in original).)  This reaction among the objectors – that the proposed settlement is likely to extinguish the federal-share of any alleged Medicaid overpayment – is entirely unsurprising to Schering/Warrick.  In Schering/Warrick's view, the preclusive effect of the proposed settlement, if approved, extends to all rights to recover the federal-share of any alleged Medicaid overpayment, and follows simply, logically,

---

[12] As noted above, Ven-A-Care does not join in the position expressed by Schering/Warrick and apparently shared by certain of the objectors, but believes that this Court should resolve this issue in the context of these proceedings.

and directly from the terms of the Settlement, by operation of well-settled law, and for sound policy reasons.

The United States Supreme Court reiterated this past term that, even in a non-intervened *qui tam* action, the United States is the "real party in interest" in such actions. *United States ex rel. Eisenstein* v. *City of New York*, __ U.S. __, 129 S.Ct. 2230, 2235 (2009). Indeed, it was settled almost a decade ago, when a challenge was made to a relator's standing to bring claims on behalf of the United States under the False Claims Act, that the relator has standing to bring such claims as "a partial assign[ee] of the Government's damages claim." *Vermont Agency of Nat. Res.* v. *United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). Even more to the point, in reaching its decision in *Eisenstein*, the Court recognized that "the United States is bound by the judgment in all FCA actions regardless of its participation in the case," relying on a case that was decided during the Court's 2008 term, *Taylor* v. *Sturgell*, 553 U.S.__, 128 S.Ct. 2161, 2171-74 (2008), which describes "six established categories" in which a nonparty may be bound by a judgment, including several that the Court found applicable to the United States in a non-intervened False Claims Act case. *Eisenstein*, 129 S.Ct. at 2236. It follows, therefore, as the Supreme Court has recently held, that the United States is the real party in interest in a *qui tam* action, whether or not it intervenes in the case, and is bound by the judgment.

The doctrine of res judicata, or claim preclusion, provides that a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Montana* v. *United States*, 440 U.S. 147, 153 (1979). Dismissal of a claim with prejudice, pursuant to a settlement agreement, constitutes a final judgment on the merits for purposes of res judicata. *See Larken, Inc.* v. *Wray*, 189 F.3d 729, 732 (8th Cir. 1999) (collecting cases). Because a *qui tam* plaintiff brings claims on behalf of the United States, the government is the real party in interest

in a *qui tam* case, even when it does not intervene.  *See United States ex rel. Milam* v. *Univ. of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 50 (4th Cir. 1992); *see also United States ex rel. Barajas* v. *Northrop Corp.*, 147 F.3d 905, 910 (9th Cir. 1999); *United States ex rel. Killingsworth* v. *Northrop Corp.*, 25 F.3d 715, 720 (9th Cir. 1994).  In fact, a relator's standing is entirely derivative of the government's claim for damages.  *Vermont Agency of Nat. Res.*,  529 U.S. at 773 (upholding the relator's standing under the False Claims Act because the False Claims Act provides for a partial assignment of the Government's claim to the relator); *see also Barajas*, 147 F.3d at 910 (*qui tam* relator has standing to sue only as a relator on behalf of the government as an assignee of the government's claim.).  Unsurprisingly, as confirmed in *Eisenstein*, courts hold that FCA relators and the government are in privity for purposes of res judicata such that a settlement by the government can bar subsequent litigation by a relator even as to claims, theories, and defendants against whom the government decided not to intervene.  *See, e.g., Barajas*, 147 F.3d at 910 (construing the res judicata effect of a *qui tam* settlement by the United States); *United States ex rel. Sarafoglou* v. *Weill Medical College of Cornell Univ.*, 51 F.Supp.2d 613, 619 (S.D.N.Y. 2006) (citing *Barajas*, 147 F.3d at 910) (same).

Likewise, a settlement by the relator in an action in which the United States has declined to intervene can release claims on behalf of the United States.  *See Killingsworth*, 25 F.3d at 718 (acknowledging that, in an action where the government has declined to intervene, the relator could dismiss the action "with prejudice" as to the United States even over the government's objection); *United States ex rel. Pratt* v. *Alliant Techsystems, Inc.*, 50 F. Supp. 2d 942 (C.D. Cal 1999) (approving a settlement releasing liability under the FCA for claims asserted in a non-intervened *qui tam* complaint as to the United States).  Moreover, any judgment on the relator's claims can preclude future litigation on behalf of the United States.  *See In re Schimmels*, 127

F.3d 875, 884 (9th Cir. 1997) (holding that, because the government is in privity with the relator, a ruling in a bankruptcy proceeding dismissing the relator's claim was binding on the government and barred further proceedings by the government as to the claim); *United States ex rel. Stillwell* v. *Hughes Helicopters, Inc.*, 714 F. Supp. 1084, 1090-91 (C.D. Cal. 1989) (noting that the relator's ability to control a suit in which the government has declined to intervene may include the ability to trigger res judicata and collateral estoppel).  As one court aptly explained, "inasmuch as the government under the Act 'assigns' the relator its fraud claim, it is bound by the relator's actions."  *Schimmels*, 127 F.3d at 884.

Indeed, there is a powerful policy justification for permitting the relator to extinguish claims on behalf of the United States where the United States declines to intervene and act on its own behalf.  The *Barajas* court noted that a government settlement had to be able to preclude subsequent claims of the relator because defendants would not settle if the government could not provide a release that would protect them from subsequent litigation on the same underlying facts and claims.  *See Barajas*, 147 F.3d at 910.  In deciding that the converse was also true – that the relator can provide a release of the government's claims in settling an action in which the government has declined to intervene – the court in *Pratt* noted as an important policy consideration that limiting the relator's ability to release the government's claims "would . . . deter the possibility of future settlement" because the relator would not be able to "'give defendants releases that will protect them from more litigation based on the same [facts.]'"  *Pratt*, 50 F. Supp. 2d at 948 (quoting *Barajas*, 147 F.3d at 910).  Where, as here, the government's declination to intervene occurs after years of full access to the evidence developed by the relator in litigation with the defendant, the policy justification stands in especially sharp focus.

For these reasons, Schering/Warrick urge the Court to find, in the context of this case, that the propose settlement has preclusive effect and extinguishes all claims for the federal-share of any alleged Medicaid overpayment whether asserted directly by or on behalf of the United States or indirectly in a state court action.

## III.   THE PROPOSED SETTLEMENT IS "FAIR, ADEQUATE, AND REASONABLE UNDER ALL THE CIRCUMSTANCES."

### A.   This Court Should Evaluate and Approve the Settlement at Issue.

In order for a settlement to resolve a FCA action, a court must give its written consent to the dismissal and state its reasons for consenting. *See* 31 U.S.C. § 3730(b)(1).  Elsewhere, the FCA provides insight as to the standard that a court should use to evaluate settlement agreements and proposed dismissals in a *qui tam* case.  Where, for example, the United States seeks to settle a *qui tam* case notwithstanding a relator's objections to the settlement, the FCA provides that the court must first "determine, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *Id.* § 3730(c)(2)(B).  As a corollary, it stands to reason that this Court, should consider whether, under all the circumstances here, the Settlement is fair, adequate, and reasonable.

### B.   The $55 Million Settlement Amount Is "Fair, Adequate, and Reasonable Under All the Circumstances."

Earlier this year, this Court reviewed the case law in this Circuit concerning the factors that a court should consider in evaluating the fairness of a settlement. *See New England Carpenters Health Benefit Fund* v. *First Databank, Inc.*, 602 F. Supp.2d 277, 280-81 (D. Mass. 2009).  After noting that "[t]he First Circuit has not established a fixed test," *id.* at 280, this Court went on to conclude that "many courts have relied on the factors set forth by the Second Circuit" in *City of Detroit* v. *Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), and quoted the Second Circuit's nine factor test:

> (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 280-81 (quoting *Grinnell*, 495 F.2d at 463).  The Court also noted that "[o]ther courts have used pared down versions of the *Grinnell* list" including such factors as the "quality of counsel," the "conduct of the negotiations," and the "stage of the litigation."  *Id.* at 281.  The Court then proceeded to apply a version of that test examining first the "risks of litigation."  *Id.*

Viewed through the prism of the *Grinnell* test, or any other prism for that matter, this $55 million Settlement will result in a "fair, adequate, and reasonable" payment to the United States.  The "risks of litigation" are plainly manifest by this Court's decision in the MDL Class Action case.  In that case, as the Court well knows, it ultimately entered a judgment in favor of both Schering and Warrick, even as to Warrick's generic drugs.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp.2d 20, 109 (D. Mass. 2007); *In re Pharm. Indus. Average Wholesale Price Litig.*, 520 F. Supp.2d 267, 273 (D. Mass. 2007).  That case, as against Schering and Warrick, raised many of the very same issues that Ven-A-Care would face if it continued its litigation of the federal case, but did so in the Medicare context – a context with a much less robust record of government activities.  In addition, in the Medicaid context, the FCA action must be proven with respect to each state's individual Medicaid program and reimbursement system.[13]  Clearly, then, there are significant "litigation risks."

---

[13] It should be noted that Ven-A-Care has accepted this burden in this and other AWP cases; however, it is one that requires the investment of tremendous litigation resources by the parties and judicial resources by the Court.

Certain of this Court's other prior rulings further highlight the litigation risks, especially for certain of the litigating states who brought their claims against Schering/Warrick much later than Ven-A-Care.  In its MDL Opinion, this Court found that, "[b]y 2001, there was a perfect storm of information that reflected the size of the spreads, largely because of the compelling information collected by the HHS Office of Inspector General ("OIG")."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 Supp.2d at 41.  In its *Commonwealth of Massachusetts* v. *Mylan Laboratories* decision, this Court – focusing specifically on Warrick's albuterol – noted that "the Commonwealth's expert conceded that large spreads between AWP and the price of albuterol began reaching public awareness in 1996" and then singled out albuterol as possibly being different from other drugs for "the start date for the statute of limitation."  *Commonwealth of Massachusetts* v. *Mylan Labs.*, 609 F. Supp.2d 127, 136, 151 (D. Mass. 2008).  Most recently, in the context of the case brought by certain New York counties, the Court wondered out loud, whether the fact that "any damages figure" for Medicaid claims reimbursed on the basis of a Federal Upper Limit might be too "speculative" would, thus, preclude a viable cause of action as to these claim.  (7/8/09 Hr. Tr. at 92:6-7.)[14]  Even though these prior rulings may not be binding on Ven-A-Care and the United States in this litigation, this Court's precedents in this consolidated MDL proceeding must – at the very least – constitute "good grounds" that can be considered in evaluating the applicable litigation risks, and accordingly, the fairness, adequacy, and reasonableness of a settlement.  *See* Manual for Complex Litigation (Fourth) § 22.36 (2004) (although MDL "test case" method of case management is not technically preclusive,

---

[14] Ven-A-Care must evaluate the potential impact of the disputed "perfect storm" factors on a case-by-case basis. By 2002, some drug manufacturers (such as Schering/Warrick) began responding to the Ven-A-Care induced AWP investigations and litigation by becoming more transparent in their price representations to the government programs, while Ven-A-Care believes others (who are not parties to this Settlement) merely continued or redoubled their efforts to deceive.  From Ven-A-Care's perspective, this important factor weighs in favor of settling with Schering/Warrick, makes litigation with other defendants less risky, and supports Ven-A-Care's decision to invest its litigation resources in cases where the potential recovery for the government is far greater.

MDL transferee judge may be in the best position to "isolate and resolve a disputed and dispositive threshold issue" such as whether plaintiffs' best cases could establish liability).

Moreover, as the Court pointed out at the July 24 scheduling conference, DOJ faces another significant litigation risk in this case:  "What happens if [Ven-A-Care] just simply says, 'I'm sick of it'" and "walk[s] away from this suit"?  (7/24/09 Hrg. Tr. at 47:7-11.)  To answer the Court's question directly, DOJ would be left without _any_ claim directly against Schering or Warrick.  The statute of limitations long ago expired on the claims being asserted by Ven-A-Care on behalf of the United States and, at some point, the alleged misconduct became so well-known, as Schering and Warrick would assert, and as this Court has found, that DOJ could not possibly expect to maintain a cause of action.[15]  Accordingly, DOJ would be left to rely for any recovery solely on the claims being asserted by those states pursuing AWP claims in separate state court proceedings,[16] a litigation strategy that Schering/Warrick assert is contrary to the purpose of the FCA and raises significant constitutional concerns.  *See* Affidavit of Beth Trent.

This Settlement presents an opportunity for the Court to resolve the core question of whether a drug manufacturer makes a false statement for federal Medicaid reimbursement purposes when it reports prices that fall within the reimbursement formula prescribed by federal regulations.  The Court's consideration of the issues presented, and DOJ's ultimate position as to the dismissal language, will also inform Ven-A-Care as to whether it is rational for it to continue to expend its scarce litigation resources in its declined federal AWP False Claims Act *qui tam* actions.  It may make little sense for Ven-A-Care, the defendants, and this Court to continue to

---

[15] Ven-A-Care and California disagree that the government's knowledge of potential fraud on a government program ever causes an otherwise false claim under the FCA to somehow cease to be a violation of the Act. They also disagree that any evidence exists that the government ever approved of false statements about the drug prices at issue in the AWP cases.  That said, the FCA's statute of limitations provisions and "first to file" bar would likely preclude further action by the Department of Justice or another relator.

[16] Notably, 31 U.S.C. § 3730(c)(5) provides that a relator has the same rights to recover an award if the government elects to proceed through such an alternative remedy.

expend time and effort directed at resolutions of these federal False Claims Act cases if, at the end of the day, settlements will fail because there is a theoretical risk that they might limit the recoveries of federal-shares in other state court cases.[17]

Among the other factors that this Court noted should be considered in evaluating the fairness of a settlement are the "quality of counsel," the "conduct of the negotiations," and the "stage of the litigation."  *See Carpenters Health Benefit Fund*, 602 F. Supp.2d at 81.  It cannot be overlooked that the Relator and its counsel first brought the allegedly fraudulent scheme to the attention of the United States Department of Justice, that this Settlement has been reached only after a prolonged and hard-fought arm's length negotiation between sophisticated counsel under the auspices of Professor Eric Green, and at a stage in this litigation when Schering/Warrick have tried three AWP cases – one before this Court – and settled many others, including several that were initiated by the Relator in this case.

In fact, each of the Schering/Warrick settlements secured to date resulted in large part from Ven-A-Care's efforts, particularly those in the Texas case.  Ven-A-Care believes, at this point, that its limited litigation resources should be devoted to securing recoveries for the state and federal governments in the numerous other non-intervened cases brought against other defendants, and the three intervened United States cases pending in this MDL, as well as the numerous other cases that Ven-A-Care is helping to bring on behalf of California, Florida, and Texas against other defendants.  These "AWP" cases exist because Ven-A-Care vigilantly

---

[17] Perhaps it was the Court's recognition of this very possibility that caused the Court to press DOJ at the July 24 hearing to find a solution that would allow states that wanted to do so "to settle the[ir] state share."  (*See* 7/24/09 Hrg. Tr. at 37:25- 40:16.)  Regardless, if the Court manages to facilitate such a resolution, then the United States really might be left with nothing if Ven-A-Care, to use the Court's words, simply "walk[ed] away from this suit." (7/24/09 Hrg. Tr. at 47:11.)  Put more directly, the United States should evaluate the fairness, adequacy, and reasonableness of the proposed Settlement as though it were a litigant *directly* against Schering/Warrick – and not through the lens of pending or potential state court proceeding.  Otherwise, it will always remain a "roadblock" to the resolution of these matters – standing between settlement funds and states that badly need them – and may, in the end, wind up recovering nothing for the federal-share of any alleged Medicaid overpayment.

investigated the facts based upon its knowledge as an industry insider with access to true market prices, repeatedly disclosed the fruits of that knowledge and investigation to the United States and the states, and then aggressively pursued litigation of the very theories of liability and damages that it applied in reaching this Settlement.

The Settlement must also be evaluated in light of the needs and interests of the States of Florida and California. The economic crisis has had a severe impact on state and local governments and their ability to discharge their responsibilities to their citizens.  This Settlement provides some much-needed relief for two states whose Attorneys General intervened in the Ven-A-Care "AWP" cases and who have shouldered a significant amount of the litigation burden.  Like Texas, Florida and California still face many more defendants in AWP cases, mostly defendants against whom the United States has declined to proceed.  This settlement will enable Florida and California to concentrate their scarce resources on cases with the potential for far greater recoveries, for themselves and for the United States.

This Settlement is clearly fair, adequate, and reasonable under all the circumstances, and should be approved by the Court.

## IV.   IF DOJ WITHHOLDS ITS CONSENT TO THE SETTLEMENT, IT SHOULD BE REQUIRED TO SET FORTH ITS REASONS IN WRITING, WHICH REASONS ARE PRESUMED REVIEWABLE BY THE COURT.[18]

### A.   DOJ Has Not Definitively Declined to Consent to the Settlement.

While "the United States does not object to the Parties reaching a settlement of these Civil Actions," DOJ nevertheless has submitted a series of preliminary objections to the settlement.  (U.S. Prelim. Br. 5, July 21, 2009.)  At the July 24 scheduling conference, DOJ confirmed that "at this point . . . the government is refraining from [asserting] a full-blown

---

[18] It should be noted that Ven-A-Care, as a *qui tam* relator under the False Claims Act, does not take a position as to the merits of Schering/Warrick's arguments regarding the requirement (or lack thereof) that the United States consent to dismissal under the *qui tam* provisions of the False Claims Act.  California makes the same reservation.

37[30](b)(1)" refusal to consent, but nonetheless DOJ raised concerns with the structure of the

Settlement, asserted that it has a statutory right to consent in this case, and suggested that it may

eventually decline to do so.  (7/24/09 Hrg. Tr. at 16:18-22.)  Absent a definitive position, this

Court should not assume that DOJ will refuse to consent even after the Court makes the legal and

factual determinations contemplated by the Settlement.[19]

> **B.     The False Claims Act Does Not Confer an Absolute Veto Power on DOJ in a Non-Intervened Case.**

Although Schering/Warrick maintain that the Ninth Circuit's view is correct – that DOJ's

right to consent is limited to the initial 60-day sealing period[20] – the Court need not reach that

question here unless it concludes, after the review process proposed by the Settling Parties plays

out fully, that DOJ has stated some legitimate reason for refusing to consent to the Settlement.[21]

---

[19] Schering/Warrick have taken seriously this Court's admonition "to set a time with Professor Green and see if you can do something here," (7/24/09 Hrg. Tr. 49:18-19), and have contacted Professor Green and had preliminary discussions directly with the United States Department of Justice.  Should it become clear as a result of those discussions, or DOJ's response to this joint motion, that DOJ considers the settlement amount being paid by Schering/Warrick to be something less than fair, adequate, and reasonable in the aggregate, then Schering/Warrick would be prepared to explain, using standards that would undoubtedly be familiar to the Court, why the $55 million amount that it has agreed to pay is fair consideration for the potential liability that it asserts will be extinguished if the Settlement is approved as requested.

[20] *Compare Killingsworth*, 25 F.3d at 723-24 (consent provision is "absolute" only during initial seal/intervention period), *with United States* v. *Health Possibilities, PSC*, 207 F.3d 335, 341 (6th Cir. 2000) (consent provision allows DOJ to "veto" settlement reached at any time during the course of the litigation), *and Searcy* v. *Philips Electronics N. Am. Corp.*, 117 F.3d 154, 160 (5th Cir. 1997) (same).

[21] It is Schering/Warrick's view that, in *Killingsworth*, the Ninth Circuit properly interpreted the consent provision as limited, reading the False Claims Act "as a whole" and with due regard for the overall statutory scheme, its object, and policy.  *United States ex rel. Killingsworth* v. *Northrop Corp.*, 25 F.3d 715, 722 (9th Cir. 1994) (reconciling FCA's instruction that in a declined action, relator "shall have the right to conduct the action," 31 U.S.C. § 3730(b)(4)(B) & (c)(3), with the limited application of the consent provision to the intervention/seal period); *see Richards* v. *United States*, 369 U.S. 1, 11 (1962) ("[A] section of a statute should not be read in isolation from the context of the whole Act, and . . . [the court] must not be guided by a single sentence or member of a sentence, but (should) look to the provisions of the whole law, and to its object and policy.").  Despite the Fifth and Sixth Circuit's contrary assertions, the legislative history of the amendments to the FCA support this interpretation.  Moreover, the Fifth and Sixth Circuit's criticisms of the failure of *Killingsworth* to adhere to the "clear" language and "plain import" of the consent provision are unpersuasive in light of their own contradictory holdings that the consent provision does not apply to involuntary court-ordered dismissals, where no distinction is made between voluntary and involuntary dismissals in the "clear" and "plain" words of the consent provision.  *See United States* v. *Health Possibilities, PSC*, 207 F.3d 335, 339-40 (6th Cir. 2000); *Searcy* v. *Philips Electronics N. Am. Corp.*, 117 F.3d 154, 158-59 (5th Cir. 1997); s*ee also* Matthew H. Solomson & Sarah M. Brackney, *What Would Scalia Do?-A Textualist Approach to the Qui Tam Settlement Provision of the False Claims Act*, 36 PUB. CONT. L.J. 39, 49, 50-51, 52-53 (2006).  The Ninth Circuit's interpretation, furthermore, avoids the untenable

In any event, even if this Court eventually determines that DOJ's right to consent to a proposed *qui tam* settlement extends beyond the initial sixty-day period during which DOJ must decide whether or not to intervene as a matter of right, no court has found that DOJ has an *absolute* right to obstruct a reasonable settlement reached between a relator and defendant in a non-intervened FCA case.[22]  In fact, this Court already has denied DOJ's assertion of an unconditional authority to exercise its "consent" powers in the absolute.  *See In re Pharmaceutical Industry Avg. Wholesale Price Litig.*, 538 F. Supp. 2d 392, 397-98 (D. Mass. 2008) (distinguishing *Health Possibilities* and *Searcy* to allow dismissal of claims in relator action over DOJ's "insist[ance] that the dismissal of the claim . . . was ineffective because the government never consented in writing").  Accordingly, even if DOJ's consent authority survives a determination not to intervene in a FCA action, the consent provision is qualified and limited.

C.     **If DOJ Ultimately Declines to Consent to the Settlement, the DOJ Decision Is Subject to Judicial Review.**

If DOJ declines to consent to the settlement at a later stage of the process, DOJ should be required to provide its reasons for objecting to the Settlement in writing, so that the Court may

---

practical difficulties of forcing the parties to litigate, *Killingsworth*, 25 F.3d at 723, or leaving a "case to sit and do nothing on th[e] Court's docket," *United States ex rel. Summit* v. *Michael Baker Corp.*, 40 F. Supp. 2d 722 (E.D. Va. 1999).  For this reason and others, the leading FCA treatise questions the rationale and conclusions reached in *Searcy* and *Health Possibilities* where the Fifth and Sixth Circuits fail "to explain the practical question of how a court or the government can force the parties to continue to litigate."  *See* JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 4.07[B][2] (3d. ed. 2009).  That question is acutely presented in this case after more than a decade of litigation.

[22] Confirming that the consent provision does not operate "absolutely" or without qualification, all the circuit courts to have confronted the question have held that DOJ's consent is *not* a prerequisite to the court ordering an involuntary dismissal of an FCA action.  *See Health Possibilities*, 207 F.3d at 344 ("Our conclusion might be different if we construed the consent requirement to apply to involuntary dismissals."); *Searcy*, 117 F.3d at 158 ("[R]equiring the government's consent to an involuntary dismissal would raise separation-of-powers concerns."); *Killingsworth*, 25 F.3d at 722 & n.5 (consent provision "has limited application," and "government's consent to dismissal is not required . . . [for] court-ordered dismissals and involuntary dismissals"); *Minotti* v. *Lensink*, 895 F.2d 100, 103-04 (2d. Cir. 1990) (where case was to be dismissed for failure to comply with discovery obligations, "little rationale remains for requiring consent of the Attorney General before an action may be dismissed"); *see also* Matthew H. Solomson & Sarah M. Brackney, *What Would Scalia Do?- A Textualist Approach to the Qui Tam Settlement Provision of the False Claims Act*, 36 PUB. CONT. L.J. 39, 49, 50-51, 52-53 (2006) (consent provision does not create a "categorical" rule if in some situations (*e.g.*, involuntary dismissals) DOJ's consent in *not* required, and accordingly, the provision cannot be read "literally" without leading to an unconstitutional result).

evaluate them.  The FCA expressly requires DOJ to state in writing its reasons for consenting to a settlement.  *See* 31 U.S.C. § 3730(b)(1) (the "consent provision").  Implicitly, the converse must also hold true, and DOJ should state in writing its reasons for refusing to consent to a False Claims Act settlement reached between the relator and defendant in a non-intervened case.  *Cf. Killingsworth*, 25 F.3d at 715 (reasoning that government "retains the right, upon showing of good cause, to object to proposed settlement" by relator because False Claim Act provides "in the converse situation in which the government settles the action" that relator may object at a hearing to challenge whether "the proposed settlement is fair, adequate, and reasonable under all the circumstances").

Even those circuits that have held that DOJ's consent right extends beyond the initial sealing period and that DOJ has the right to "veto" a settlement reached at any point in a non-intervened litigation have exercised judicial review and scrutinized the reasons advanced by DOJ for objecting to a settlement.  *See Health Possibilities*, 207 F.3d at 338, 341 (finding DOJ's objection that settlement "channeled damages payments" away from the government well-founded where settlement provided "no monetary recovery on the FCA claim"); *Searcy*, 117 F.3d at 158, 160 (determining that DOJ's objection to the scope of the release raised a "legitimate concern" where relator "bargained away" government's potential claims in the face of DOJ's minimal (120 day) investigation).  Although the Fifth and Sixth Circuits appear to endorse "veto" authority by DOJ, their decisions confirm that DOJ had, at least, "good cause" to object in the circumstances of each case.[23]  Thus, all of the circuits are in accord with the proposition that a decision by DOJ to withhold its consent is subject to judicial review by the Court for good cause.

---

[23] Similarly, the Ninth Circuit reviews DOJ's objections to a settlement to ensure that they "rest on good cause." *Killingsworth*, 25 F.3d at 725.

Judicial review in these circumstances is strongly grounded in core principles.  The

United States Supreme Court instructs that courts are to proceed from the "'strong presumption

that Congress intends judicial review,'" particularly when the determination to be reviewed is a

matter of the Attorney General's exercise of statutory authority.  *Gutierrez de Martinez* v.

*Lamagno*, 515 U.S. 417, 424 (1995) (*quoting Bowen* v. *Michigan Academy of Family*

*Physicians,* 476 U.S. 667, 670 (1986)).  Accordingly, the Supreme Court has "stated time and

again that judicial review of executive action 'will not be cut off unless there is persuasive reason

to believe that such was the purpose of Congress.'"  *Id.* (*quoting Abbott Labs.* v. *Gardner*, 387

U.S. 136, 140 (1967)).  Here, nothing in the statute overcomes the presumption favoring judicial

review.  Indeed, failing to exercise review over DOJ's withholding of consent would allow DOJ

to block a reasonable settlement without any "obligation on the part of the Attorney General's

delegate to conduct a fair proceeding, indeed, any proceeding," without any opportunity for

defendants or Relator to test the reasonableness of the objections, and without "any explanation

for [DOJ's] action."  *See id.* at 429.  The Supreme Court has said such circumstances are to be

strongly disfavored.  The statutory language adopted by Congress, to use the Court's words, in a

case such as this one, merely permits DOJ "the first, but not the final word" on whether the

action may be dismissed.  *See id.* at 432.  The "final word" should be, and is, reserved for the

Court.

## CONCLUSION

For all of the foregoing reasons, the Settling Parties respectfully request that this Court (i)

proceed to evaluate the fairness, adequacy, and reasonableness of their proposed settlement

sequentially, as outlined above; (ii) enter the requested the findings of fact after conducting an

evidentiary hearing at which all objectors are provided an opportunity to be heard; (iii) consent

to the Settlement in writing clearly stating its reasons for consenting; (iv) after making the

determinations relating to the Settlement, request that the United States indicate whether it

consents to the dismissal and that it specify its reasons; and (v) ultimately approve

the proposed settlement and enter an appropriate order dismissing these actions with prejudice as

requested in the Settlement.

Respectfully submitted,

/s/ John P. Bueker               

John T. Montgomery

John P. Bueker

Ropes & Gray LLP

One International Place

Boston, MA  02110-2624

(617) 951-7000

John P. McDonald

Locke Lord Bissell & Liddell

2200 Ross Avenue, Suite 2200

Dallas, TX  75201

Attorneys for Schering Corporation,

Schering-Plough Corporation and

Warrick Pharmaceuticals Corporation

/s/ James J. Breen               

James J. Breen

Alison W. Simon

The Breen Law Firm, P.A.

P.O. Box 297470

Pembroke Pines, FL  33029-7470

(954) 874-1635

Attorneys for Ven-A-Care of the
Florida Keys, Inc.

/s/ Nicholas N. Paul            

Nicholas N. Paul

Supervising Deputy Attorney General

Bureau of Medi-Cal Fraud and Elder Abuse

Office of the Attorney General

1455 Frazee Road, Suite 314

San Diego, CA 92108

Attorney for the State of California

Dated:  August 7, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2009, a true copy of the above Joint Memorandum was served
on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered
by the Honorable Patti B. Saris in MDL 1456.

August 7, 2009

/s/ John P. Bueker     

John P. Bueker