**EXHIBIT 5**

Case 1:01-cv-12257-PBS   Document 6482-6   Filed 09/04/09   Page 2 of 5

Gorospe, Pharm. D., J. Kevin - Vol. II											September 22, 2008
Sacramento, CA

Page 394

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-----------------------------x

IN RE PHARMACEUTICAL INDUSTRY )

AVERAGE WHOLESALE PRICE       )

LITIGATION                    )

_____)

THIS DOCUMENT RELATES TO      ) MDL No. 1456

State of California, ex rel. ) Civil Action:

Ven-A-Care v. Abbott          ) 01-12258-PBS

Laboratories, Inc., et al.    )

-----------------------------x

VOL. II

--oOo--

MONDAY, SEPTEMBER 22, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

J. KEVIN GOROSPE, Pharm.D.

--oOo--

Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

Case 1:01-cv-12257-PBS   Document 6482-6   Filed 09/04/09   Page 3 of 5

Gorospe, Pharm. D., J. Kevin - Vol. II                                September 22, 2008
Sacramento, CA

Page 659

1  wasn't accurate enough to use for reimbursement.
2      Q.  And did they explain what they meant by
3  that?
4      A.  Yes, but I don't recall the content.
5      Q.  Okay.  When they were talking to you
6  about AMP and confidentiality and the accuracy of
7  AMP, were they speaking to you about Mylan's AMP
8  specifically or were they speaking about something
9  that sprung from the report?
10     A.  I don't recall specifically.
11     Q.  Okay.  So other than the confidentiality
12 and the accuracy concerns was there any other
13 concern that you can remember that they expressed
14 to you?
15     A.  Not that I can recall, no.
16     Q.  Okay.  Now, other than this May 2007
17 one-hour meeting with the Mylan person have you had
18 any other contact with Mylan that you can remember?
19     A.  Not that I can recall, no.
20     Q.  Okay.  Now, several times today you had
21 mentioned that in the -- that your knowledge or
22 your understanding of AMP -- or AWP had -- had come

Page 660

1  to a point where you understood in the late 1990s
2  that AWP reimbursement was -- was not -- did not
3  correlate well with actual -- actual acquisition
4  costs.
5         Do you remember that testimony?
6      A.  Yes.
7      Q.  Okay.  Was there something that you
8  remember in particular that happened in the late
9  1990s that -- that led to that -- to that
10 realization about AWP?
11     A.  No, not specifically.
12     Q.  Okay.  Is there anything you read that
13 might have given you that understanding?
14     A.  No, not that I can recall.
15     Q.  Any conversations you had with anybody?
16     A.  Yes, conversations.
17     Q.  Do you remember who those conversations
18 were with?
19     A.  Members of the Pharmacy Contracting
20 Section.
21     Q.  Okay.  Do you remember who specifically?
22     A.  Len Terra, Doug Hillblom, Tom Aherns.

Page 661

1      Q.  What was the last name?  Tom --
2      A.  Aherns, A-h-e-r-n-s.
3      Q.  And were these multiple conversations or
4  one?
5      A.  Multiple.
6      Q.  And so is it fair to say there were
7  conversations with each of those people from
8  time-to-time that led to this realization about
9  AWP?
10     A.  Yes.
11     Q.  And did you understand what the source
12 was for the information that they were
13 communicating to you?
14     A.  No.
15     Q.  Okay.  Was the conversation
16 collaborative?
17         In other words, did they tell you things
18 that you didn't know and you also told them things
19 that they didn't know, or were they sort of
20 reporting to you information that was -- that was
21 news to you?
22     A.  The discussions were conversational in

Page 662

1  nature, give-and-take.
2      Q.  Was the result of any of these
3  conversations reduced to any kind of writing?
4      A.  Not that I can recall, no.
5      Q.  So none of them submitted a memo to you
6  or to anybody else that detailed information about
7  AWP?
8      A.  Not that I can recall.
9      Q.  Okay.  So it didn't make its way in to
10 any other kind of report?
11     A.  Not that I know of, no.
12     Q.  Okay.  When you -- when you had this --
13 this realization about AWP in the 1990s, was it --
14 was it gradual, or did it -- was there a point
15 where you can say that your mind turned and you had
16 a much different view of AWP from that point on?
17         MR. PAUL:  Object to form.
18         THE WITNESS:  Probably more gradual.
19 BY MR. ROBBEN:
20     Q.  Did there come a point in that gradual
21 learning process where you felt that there was a
22 need for you to act as part of your duties to the

Case 1:01-cv-12257-PBS   Document 6482-6   Filed 09/04/09   Page 4 of 5

Gorospe, Pharm. D., J. Kevin - Vol. II                                September 22, 2008
Sacramento, CA

Page 675

 1  Executive Branch to put that type of decision
 2  through the Legislature and not through the
 3  regulatory process?
 4       MR. PAUL:  Objection to the extent that
 5  you're seeking testimony from him beyond his status
 6  as a fact witness if you're asking him to speak for
 7  the Legislature.
 8  BY MR. ROBBEN:
 9     Q.  I'm just asking for your understanding
10  of it.
11     A.  My understanding of the process is that
12  in order for something that's going to affect the
13  budget to go through it would be related to the
14  Governor's budget proposal in January and then
15  vetted through the budget process through
16  supposedly June, because budget savings that would
17  have potentially related to a change in the
18  reimbursement or reduction in the reimbursement
19  would need to be scored pursuant to that.
20     Q.  Now, just putting aside the -- the
21  budget process --
22     A.  Uh-huh.

Page 676

 1     Q.  -- and how you would haven enacted a
 2  change in reimbursement, wouldn't knowing the AMP
 3  for -- for a drug be interesting to you as a -- as
 4  a Medi-Cal official because it would have given you
 5  a sense of whether or not the reimbursement was too
 6  high or too low or closer to acquisition costs or
 7  further from acquisition costs?
 8       MR. PAUL:  Objection to form.  No
 9  foundation.
10       THE WITNESS:  Yes.
11  BY MR. ROBBEN:
12     Q.  Okay.  Why -- why is that?
13     A.  Factual information in general is
14  interesting for the program, whether I acted upon
15  it or not.
16     Q.  Couldn't you have used that type of
17  information to -- for example on a drug that --
18  where reimbursement was much higher than the
19  prevailing acquisition costs set a MAIC or M-A-I-C?
20     A.  No.
21     Q.  Why?
22     A.  Because prevailing statutory regulations

Page 677

 1  at the time prevented us from using AMP as a
 2  reimbursement methodology.
 3     Q.  Okay.  Well, I'm not saying as a part of
 4  the reimbursement methodology, but just you --
 5  again, I'm asking for your understanding of it.
 6       Couldn't you, as a person in the policy
 7  part of Medi-Cal that dealt with reimbursement, use
 8  AMP as a tool to figure out which drugs were being
 9  overreimbursed and then use that to guide your
10  process of setting MAICs?
11       MR. PAUL:  Objection to form.
12       THE WITNESS:  No.
13  BY MR. ROBBEN:
14     Q.  And why is that?
15     A.  Because the process of setting MAICs was
16  specifically laid out in the regulations or
17  statutes, and we had to follow that.
18     Q.  And your understanding was that those
19  statutes and regulations prohibited you from using
20  AMP as part of that process?
21     A.  That is correct.
22     Q.  I believe you said that in your position

Page 678

 1  that the -- I think you called it "the Policy
 2  Unit."
 3       Do I have that right?
 4     A.  Depends on the time frame.
 5     Q.  When you first started?
 6     A.  Yes.
 7     Q.  Policy Unit?
 8     A.  When I first started, it was called the
 9  Pharmacy Unit, I believe.
10     Q.  Pharmacy Unit.
11       And that unit was responsible for both
12  reimbursement policy and rebate policy?
13     A.  Generally, yes.
14     Q.  Okay.  Supplemental rebate policy?
15     A.  Yes.
16     Q.  Okay.  Other than your --
17       Well, let me ask you this.
18       Have you -- you personally been involved
19  with setting policy regarding supplemental rebates?
20     A.  What context?
21     Q.  Well, whether to enter in to
22  supplemental rebate agreements with a -- with a

Case 1:01-cv-12257-PBS   Document 6482-6   Filed 09/04/09   Page 5 of 5

Gorospe, Pharm. D., J. Kevin - Vol. II                           September 22, 2008
Sacramento, CA

Page 679

1  manufacturer, what amount to set the supplemental
2  rebate at, with the selection of drugs -- any --
3  you know, in any connection.
4      A.  Okay.  Yes.
5      Q.  Okay.  Has anybody worked with you in
6  that endeavor?
7      A.  Yes.
8      Q.  Okay.  Who?
9      A.  Tom Aherns, Vic Walker.
10     Q.  Is that Dick Walker?
11     A.  Vic, Victor Walker.
12         Roy Takeuchi, Richard Morida, Doug
13 Hillblom, Mike Namba, Dan Farakawa, Sam Hodges,
14 Chris Amaral, Paul Pantrelli, Rodney Yamamura, more
15 recently Marvin Chu, Katharine Aherns.  Her name
16 used to was Katharine Cabacungan at one time.
17         Mike Neth, Len Terra, Jan Howard, Mary
18 Ann Lewis -- Ludley.
19         That's --
20     Q.  Is that all the names?
21     A.  All I can remember off the top of my
22 head, yes.

Page 680

1      Q.  Okay.  Now, are those -- were those
2  people involved with it from the time you started
3  until now or were they involved with policy process
4  just at one period in time?
5          MR. PAUL:  Objection to form.
6  BY MR. BENNETT:
7      Q.  What I'm trying to find out is, is your
8  answer limited in some way by time?
9      A.  Oh, no.
10     Q.  Okay.  So that's all that you can
11 remember for the whole time that you've been there?
12     A.  That's correct.
13     Q.  Okay.  Do you know somebody named Craig
14 Miller?
15     A.  Yes.
16     Q.  What's his -- what's his role?
17     A.  Craig Miller is the Chief of the Rebate
18 Branch, I guess it's called now.
19         He was a Chief of the Rebate Unit that
20 oversees the invoicing and collection and dispute
21 resolution process.
22     Q.  Okay.  So they're the people who deal

Page 681

1  with the billing, collections, figuring out whether
2  somebody has been overcharged for rebates, dealing
3  with manufacturers who say they've been charged
4  wrongly, that's his part of the program?
5      A.  That's correct.
6      Q.  Okay.  How long has he been in that
7  role?
8      A.  I don't recall how long.
9      Q.  Okay.  Do you remember who preceded him
10 in that position?
11     A.  Jan Howard.
12     Q.  Okay.  Did --
13         Strike that.
14         Has Mr. Miller played any part in policy
15 discussions in terms of supplemental rebates?
16     A.  No.
17     Q.  Okay.  How about Jan Howard?
18     A.  Not that I can recall.
19     Q.  Okay.  So it's the people you said in
20 your longer list that really have been the policy
21 people?
22     A.  Yes.

Page 682

1          MR. ROBBEN:  Okay.  I'd like to show you
2  another document.
3          (Exhibit Gorospe 063 was marked for
4          Identification.)
5  BY MR. ROBBEN:
6      Q.  So this is Exhibit 63, and the Bates
7  number is DEY-MDL-0105073 through 5076.
8          Can you take a look at that and let me
9  know when you're ready?
10     A.  Okay.
11     Q.  If you look on the -- the page 5075, up
12 at the top of the column, it's all the way to the
13 right under the words "Medicaid AWP Labels" there's
14 a -- there's an address for you.
15         Do you see that?
16     A.  Yes.
17     Q.  Okay.  And this document is dated March
18 16th, 1999.
19         As of that time, March 1999, was that
20 your address?
21     A.  Yes.
22     Q.  Okay.  So mail sent to that address