**EXHIBIT 8**

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


  IN RE:                           )
                                   ) CA No. 01-12257-PBS
  PHARMACEUTICAL INDUSTRY AVERAGE  )
  WHOLESALE PRICE LITIGATION       ) Pages 1-47
                                   )




                    STATUS HEARING

          BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE




                       United States District Court
                       1 Courthouse Way, Courtroom 19
                       Boston, Massachusetts
                       February 12, 2009, 10:40 a.m.








               LEE A. MARZILLI
            OFFICIAL COURT REPORTER
         United States District Court
         1 Courthouse Way, Room 3205
             Boston, MA  02210
               (617)345-6787
```

Page 2

```
 1  A P P E A R A N C E S:
 2
    FOR THE PLAINTIFFS:
 3
        KENNETH M. RESNIK, ESQ., Stern Shapiro Weissberg &
 4  Garin, LLP, 90 Canal Street, Boston, Massachusetts,
    02114-2022.
 5
        NICHOLAS N. PAUL, ESQ., Supervising Deputy Attorney
 6  General, Civil Prosecutions Unit, P.O. Box 85266,
    110 West A Street, #1100, San Diego, California, 92186.
 7
        JAMES JOSEPH BREEN, ESQ., The Breen Law Firm,
 8  5755 North Point Parkway, Suite 260, Alpharetta, Georgia,
    30022.
 9
10  FOR THE DEFENDANTS:
11      KEATHER K. McDEVITT, ESQ., White & Case,
    1155 Avenue of the Americas, New York, New York, 10036-2787.
12
        JOHN T. MONTGOMERY, ESQ., JOHN P. BUEKER, ESQ.,
13  and DANIEL J. BENNETT, ESQ., Ropes & Gray, LLP,
    One International Place, Boston, Massachusetts, 02110-2624.
14
        ANTONIA GIULIANA, ESQ., Kelley Drye & Warren, LLP,
15  101 Park Avenue, New York, New York, 10178-0002.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              P R O C E E D I N G S
 2         THE CLERK:  In re:  Pharmaceutical Industry
 3  Average Wholesale Price Litigation, Civil Action 01-12257
 4  and 06-11337, will now be heard before this Court.  Will
 5  counsel please identify themselves for the record.
 6         MR. PAUL:  Nicholas Paul with the California
 7  Department of Justice for California.  Good morning, your
 8  Honor.
 9         THE COURT:  Welcome.
10         MR. BREEN:  Good morning, Judge.  Jim Breen.  I
11  represent the Relator, Ven-A-Care of the Florida Keys.
12         MR. RESNIK:  Good morning, your Honor.  Kenneth
13  Resnik, Stern Shapiro Weissberg & Garin, also for Ven-A-Care
14  of the Florida Keys.
15         THE COURT:  Let me ask you this from California:
16  I said you could do this on the teleconference, but Mr. Alba
17  said you insisted on flying here.
18         MR. PAUL:  Well, your Honor, this is an important
19  case, and I felt the Court might be better served if --
20         THE COURT:  If I hear from the Attorney General
21  himself.
22         MR. PAUL:  Yes, your Honor.  We're glad to be
23  here.
24         THE COURT:  Well, it's not a good time to come.
25         All right, Mr. Montgomery, who are you
```

Page 4

```
 1  representing here?
 2         MR. MONTGOMERY:  Schering and Warrick.
 3         THE COURT:  Just the two of them.
 4         MR. BUEKER:  Good morning, your Honor.  John
 5  Bueker with Mr. Montgomery for Schering and Warrick.
 6         MS. McDEVITT:  Good morning, your Honor.  Heather
 7  McDevitt from White & Case for Sandoz, Inc.
 8         MS. GIULIANA:  Antonia Giuliana for Dey and Mylan.
 9         MR. BENNETT:  Dan Bennett, also from Ropes & Gray,
10  for Schering and Warrick.
11         THE COURT:  So how many defendants are there?
12         MR. BUEKER:  There are only three defendants
13  remaining in the case at this point.
14         MR. PAUL:  Well, three out of four.
15         THE COURT:  All right, so tell me about -- I am
16  worried that this case is taking so long, and from my point
17  of view, unlike for yours, every year I get a new law clerk.
18  So that when you extend out schedules, I get to start all
19  over again, unless I'm lucky enough to persuade the First
20  Circuit to extend something, and they don't tell me right
21  away.  So when you all agree to schedules that don't give me
22  enough time to complete it within a clerkship year, it
23  creates a problem for me.  That's unfortunately how these
24  cases are staffed.  And so I want to know what's happening
25  with production of documents.  Why are things taking so
```

Page 5

```
 1  long?  Do I have a definitive schedule that's really going
 2  to stick?  So maybe you can just -- I'm glad you flew out
 3  from California, it shows you care, so let me hear about it.
 4         MR. PAUL:  Yes, your Honor.  I think the parties'
 5  position is that the order that the Court signed in
 6  mid-November --
 7         THE COURT:  Yes, I know, and I goofed, okay,
 8  because for some reason someone in my office put the same
 9  order into my "in" box two different times; and one time I
10  signed it fast and I said agreed upon, and the second time,
11  when I saw how far it spun out, I got very worried.  So I
12  didn't know you all were relying on it, but let's just talk
13  about it now.
14         MR. PAUL:  To answer your question --
15         THE COURT:  Yes, I want to understand, and I
16  decided I needed to hear from you so it just doesn't get
17  kicked over and kicked over and kicked over.  I want it to
18  move.
19         MR. PAUL:  Yes, your Honor.  To answer your
20  question about what kind of schedule is going to stick here
21  that you can count on, that schedule will stick and you can
22  count on that schedule.
23         THE COURT:  So tell me what's happening, why it's
24  taking so long, what I can expect.  As you may know, I've
25  been at this case now for eight years, and every time I
```

Page 6

1  think I see a light at the end of the tunnel --
2       MR. PAUL: Your Honor, I appreciate that. Just to
3  back up to the beginning a little bit, California originally
4  named a large number of defendants. We've dismissed some.
5  We've been in mediation over the past year. We've actually
6  settled the case with eleven different defendants here
7  through mediation.
8       THE COURT: This is what I want to hear, okay.
9  See, I don't see this stuff.
10      MR. PAUL: Sure.
11      THE COURT: All right, you settled with eleven.
12 Who's left?
13      MR. PAUL: There are four defendants left, your
14 Honor. They have a couple of parents here, and they are
15 Mylan, Sandoz, Dey, and Warrick.
16      THE COURT: Is everyone represented here? Okay.
17      MR. PAUL: So California has made ten document
18 productions since initial disclosures. There's another one
19 being made tomorrow.
20      THE COURT: About what? What's still left? Tell
21 me.
22      MR. PAUL: From the point of view of California,
23 your Honor, what is on our plate that we owe the defendants
24 is a large production that stems from plugging in some
25 search terms that were specified by the defendants, and

Page 7

1  there was a lot of back-and-forth over this last fall, and
2  we felt that possibly the search terms were too large, but
3  they stuck to their guns. That's fine. So those search
4  terms generated a large number of documents and a large
5  number of electronic database documents in Access and Excel
6  and other media that all take a long time to look at and go
7  through. And we are producing the first --
8       THE COURT: Like what were the search terms?
9       MR. PAUL: Well, your Honor, these are 50 some odd
10 search terms with various --
11      THE COURT: But are they unique to these
12 defendants, or are they about knowledge of the spread? I
13 mean, what is this about?
14      MR. BUEKER: Yes, some of them are unique to the
15 defendants, your Honor. Some of them include terms like
16 "AWP" that may produce a lot of hits in terms of documents
17 but are kind of at the core of this case. It's a list that
18 was narrowed by the defendants on three separate occasions.
19 This was a long process that was worked out.
20      THE COURT: But just so I can understand it,
21 weren't most of these, except when they're
22 defendant-specific, weren't most of them produced for all
23 these eleven others?
24      MR. PAUL: Actually, no, your Honor, no. Abbott
25 Pharmaceuticals was sort of the lead defendant in the case

Page 8

1  in terms of who was representing the defendants' side, and
2  we got one electronic search accomplished working with
3  Abbott as defendant representative. That production has
4  been completed. Then we were in mediation with Abbott and
5  other defendants, and Abbott sort of disappeared off the
6  scene.
7       THE COURT: But didn't Abbott ask for all these?
8       MR. PAUL: No, your Honor, no. This is a far more
9  comprehensive, thorough. You know, I'm using neutral
10 adjectives because I don't want to get into the nature of
11 the search, but it's a big search.
12      MR. BUEKER: Actually, wait a minute. The search
13 term list has only been narrowed down. The original Abbott
14 search list included all of the terms that are at issue now
15 and has been narrowed further.
16      THE COURT: I just want to know why this wasn't
17 produced -- when was this unsealed, like three years ago?
18      MR. PAUL: Your Honor, the complaint was filed in
19 August, 2005, yes.
20      THE COURT: It's just very late into the
21 litigation still to be producing documents. But, in any
22 event, I don't understand why it's taken so long, but if you
23 produce these things when, tomorrow?
24      MR. PAUL: No, your Honor. We will not be able to
25 complete this electronic production until mid-March. And as

Page 9

1  I notified counsel last night, there are large numbers.
2       THE COURT: Can't you do a rolling production?
3       MR. PAUL: We are going to get this production out
4  the last week of February. We will do a rolling production,
5  if it comes to that, of these electronic databases, these
6  spreadsheets that have been captured by the search terms,
7  and --
8       THE COURT: I mean, do you have some now that are
9  ready to be produced?
10      MR. PAUL: We have the entire volume of e-mails
11 and attached documents ready to be produced by the last week
12 of February. There are electronic databases that we cannot
13 produce by the last week of February --
14      THE COURT: But you'll produce it in a rolling
15 way.
16      MR. PAUL: Yes, your Honor.
17      THE COURT: Because now they don't get it till
18 mid-March. So I don't know enough about what's in there,
19 whether it was an overly broad request or whatever. Then
20 what happens to my schedule? You haven't even started the
21 depositions in a three-and-a-half-year-old case.
22      MR. PAUL: No, your Honor, no, that --
23      THE COURT: So tell me, what's happening?
24      MR. PAUL: A lot of depositions have been
25 happening, your Honor, actually.

Page 10

1    THE COURT: But what is it you told me you
2 couldn't do till the production happened?
3    MR. PAUL: Well, I think from the defendants'
4 point of view, they want our documents so they can wrap up
5 depositions. They have a list --
6    THE COURT: I thought some, you were telling me,
7 haven't even been -- because I had put some limit on the
8 noticing, and everyone flipped out on me, so I don't
9 understand. Let me just say, from my point of view, it was
10 filed a gazillion years ago, and it was unsealed in 2005.
11 It's now four years into the litigation. It is
12 inconceivable to me as to -- I understand you did settle
13 with eleven. That's making me feel better that you settled
14 with eleven, but it's still a very old case.
15    MR. BUEKER: Your Honor, from defendants' point of
16 view, let me answer kind of what's been going on with the
17 depositions because we have taken some depositions. We
18 started a 30(b)(6) deposition. We've taken depositions
19 of --
20    THE COURT: How many?
21    MR. BUEKER: Eight fact and a 30(b)(6) deposition,
22 your Honor, some of which have been left open because there
23 will be additional electronic documents produced. But
24 there's an efficiency --
25    THE COURT: I understand that.

Page 11

1    MR. BUEKER: There's an efficiency issue with
2 several of the people who we have not noticed as of yet.
3    THE COURT: You still haven't noticed everyone?
4    MR. BUEKER: No, because of your Honor's order.
5    THE COURT: How many are left? How many are left?
6    MR. BUEKER: I think we've identified a universe
7 of thirty-five possible people.
8    THE COURT: That's crazy.
9    MR. BUEKER: I think the number will turn out to
10 be much less than that, but it depends on seeing what's in
11 the electronic production.
12    THE COURT: There are not going to be thirty-five
13 depositions, okay. So now let's -- this is what I'm worried
14 about, right? Right now, what is the proposal as to when
15 depositions finish?
16    MR. PAUL: I'm sorry, your Honor?
17    THE COURT: What's your proposal? You're going to
18 have a rolling production. You're going to give whatever
19 you have by the end of February, and then you're going to
20 finish up the production by what date?
21    MR. PAUL: The middle of March, your Honor.
22    THE COURT: The middle of March is what, the Ides?
23    MR. PAUL: The Ides of March, your Honor.
24    THE COURT: All right, March 15.
25    MR. PAUL: Now, you know, I don't know if there

Page 12

1 may be some complications that would make this rolling into
2 the end of March -- I'm being honest -- with these
3 electronic databases. These are massive spreadsheets that
4 are captured by these search terms. But I think what the
5 defendants are truly concerned about are documents, e-mails
6 and documents attached to e-mails, that they will get by the
7 end of February, by February 27.
8    THE COURT: All right, by 2/27, all docs except
9 spreadsheets, right?
10    MR. PAUL: Correct.
11    THE COURT: And then I don't know what you mean by
12 spreadsheets. Maybe that's just the spreads on the drugs?
13    MR. PAUL: Well, these are spreadsheets prepared
14 at various times by individuals within the agency.
15    THE COURT: Looking at the spreads and the costs,
16 is that it?
17    MR. PAUL: Not that kind of spread, your Honor,
18 but looking at drugs and the cost of drugs and reimbursement
19 issues for budgeting purposes, just all sorts of analyses
20 that happen to embrace their drugs. But those have to be
21 redacted of third-party manufacturer information because
22 it's sensitive proprietary information.
23    THE COURT: You mean one of the other drug
24 companies.
25    MR. PAUL: So that's part of the delay here.

Page 13

1    THE COURT: So, all right, let's assume everything
2 is coming in by March 15. Beware, okay? So now what? So
3 what is your proposal? You haven't even noticed all the
4 depositions.
5    MR. BUEKER: The depositions will be completed by
6 June 15.
7    THE COURT: And then what?
8    MR. BUEKER: Then I would assume we would --
9    THE COURT: Then I start with a new law clerk by
10 the time you brief the whole thing. I mean, this is what
11 the big issue is for me. What do you anticipate -- so you
12 couldn't possibly by March 15 go through all the
13 documents -- I mean, maybe it's great for the litigation
14 department at Ropes -- but go through all the documents and
15 take thirty-five depositions.
16    MR. BUEKER: No, and as I think I've indicated, I
17 think we will be able to, when we see the documents, carve
18 down on the number of depositions we're talking about,
19 but we --
20    THE COURT: Why couldn't you have noticed all the
21 depositions -- how many -- when you -- you need to create a
22 finite universe. Otherwise this makes a -- I'm going to get
23 another motion for a continuance, I know it. But let's
24 assume for a minute I say June 15, and if you don't finish,
25 you don't finish. But then I always worry, then that means

Page 14

 1  that ten associates are doing all-nighters, you know.  So I
 2  want to understand, how many depositions would you want to
 3  take?
 4       MR. PAUL:  Your Honor, we haven't announced any
 5  defendants for 30(b)(6) depositions, just one each.  We're
 6  waiting for responses.  And we have a few more depositions
 7  regarding transactional data, and we have a side issue
 8  regarding whether or not depositions --
 9       THE COURT:  Well, maybe your four can be taken in
10  the next month.
11       MR. PAUL:  They probably can, your Honor, but we
12  need their -- they're not complete with their transactional
13  data and --
14       THE COURT:  When can your data get to them?
15       MR. BUEKER:  By the end of the month.
16       THE COURT:  All right, so both are going to get
17  all the transactional data by 2/27.  But as a practical
18  matter, until you get him that budget information, he can't
19  begin to take depositions, right?  Or could he?
20       MR. PAUL:  Well, in my opinion, your Honor, once
21  they get the production that we're giving them by
22  February 27, they're going to be on the road.  They're also
23  getting a production tomorrow.  We have withdrawn virtually
24  all of our deliberative process privilege assertions.
25  Reading your orders and your hearing transcripts, we see the

Page 15

 1  writing on the wall, and we understand the test that has to
 2  be satisfied.  So they're getting a large number of
 3  documents tomorrow from us that result from a rereview and a
 4  purging of our privilege log, which is now far smaller.
 5       THE COURT:  All right, so some comes in tomorrow
 6  which is the 13th.  You'll start getting people working on
 7  them.  Then the 27th and then the 15th.  And right now, how
 8  many depositions have you taken so far?
 9       MR. BUEKER:  We've taken eight fact depositions,
10  your Honor, and a --
11       MR. PAUL:  Seven.
12       MR. BUEKER:  Seven?  And a 30(b)(6).
13       THE COURT:  You know, I'm not going to allow you
14  take to thirty-five depositions, so we need to really pare
15  this down.  The local rules give you what, seven, ten?  And
16  I understand that this is an MDL case and I don't have to
17  follow them, but I'm not going to allow forty-two
18  depositions.
19       MR. BUEKER:  Okay.
20       THE COURT:  Okay?  So let's try and talk through
21  with me what you might need.
22       MR. BUEKER:  I think, your Honor -- and let me
23  break the depositions into three categories to start with.
24  There were twenty-three depositions that we -- in filing the
25  joint motion to amend the scheduling order, we tried to set

Page 16

 1  forth the universe of everyone we could think of who had
 2  been identified to date, and we broke that universe into
 3  three separate categories of people.  There are four
 4  individuals who are associated with Ven-A-Care of the
 5  Florida Keys who are the plaintiffs, the relators in this
 6  case, so those four depositions.  There are thirteen of
 7  those depositions --
 8       THE COURT:  Well, wait a minute.  So four of them,
 9  why do you need four people?  Are they just people who over
10  time oversaw their drug program?
11       MR. BUEKER:  These are people who are bringing
12  the -- these are the nominal plaintiffs in this case, the --
13       THE COURT:  Why do we care about them?  Are there
14  some technical whistleblower defenses?
15       MR. BUEKER:  Yes, and we need to understand what
16  information they came forward with when.
17       THE COURT:  Is this one of these, you know, it's
18  impossible, there's a thicket of case law and whether it was
19  publicly available?  Is that what you're getting at?
20       MR. BUEKER:  Yes, yes.
21       THE COURT:  So there are four people, and why
22  hasn't that been done yet?  That's just something that
23  wasn't dependent on these documents.  That can happen now,
24  right?
25       MR. BUEKER:  You're right.

Page 17

 1       THE COURT:  Okay.  And you haven't noticed them
 2  yet?
 3       MR. BUEKER:  No.
 4       MR. BREEN:  Your Honor, Jim Breen for Ven-A-Care.
 5  My clients have been deposed for weeks in these cases, in
 6  related cases, some by some of the parties here.
 7       THE COURT:  On the exact same issues?
 8       MR. BREEN:  The exact same issues.
 9       THE COURT:  Is it this case?
10       MR. BREEN:  In this case.  They have been
11  deposed in the -- when I say "this case," in the MDL.
12       MR. BUEKER:  I'm happy to read transcripts, if he
13  wants to agree that they'll be made available in this case.
14       THE COURT:  Of course they're going to be made
15  available.  This is why I'm doing this hearing.  Of course.
16       All right, so you're not going to do any of the
17  Ven-A-Care parties unless you find that there's some gap
18  that applies to one of the four of you.
19       MR. BUEKER:  Okay.
20       MR. BREEN:  And we'll certainly cooperate in
21  scheduling those depositions.
22       THE COURT:  So what's the next group?
23       MR. BUEKER:  There are twenty-three individuals
24  who worked for the state Medicaid program.
25       THE COURT:  So you're going to produce the

Page 18

1  Ven-A-Care transcripts by when? By the end of the month,
2  2/27?
3       MR. BREEN: I'm sorry, your Honor?
4       THE COURT: By 2/27 you're going to produce all
5  the transcripts? Or can you do it sooner?
6       MR. BREEN: I think they've got them, but we can
7  do it sooner.
8       THE COURT: Okay, but no later than.
9       MR. BREEN: Definitely by 2/27.
10      THE COURT: Okay, all the transcripts, okay, all
11 right.
12      MR. BUEKER: There are twenty-three individuals
13 associated with the California Medicaid program who were
14 responsible in part for running the Medicaid program. I
15 suspect that some of that will be duplicative, your Honor,
16 and we will endeavor to do --
17      THE COURT: Is that because we're dealing with
18 different time periods?
19      MR. BUEKER: Yes.
20      THE COURT: Okay, rather than just different
21 people in the hierarchy?
22      MR. BUEKER: Some of them are different people in
23 the hierarchy, but we've identified kind of the pharmacy
24 branch where there are four or five different people who
25 have -- there's been a significant amount of turnover over

Page 19

1  time. They tend to be the people, from the depositions
2  we've taken to date, are the people who were actually
3  running this day to day and had more of the knowledge.
4  There is, nevertheless, several layers of management within
5  the department, and some of those people are also reflected
6  in that twenty-three. They too have changed significantly
7  over time, and that's why the number is what it is. I
8  suspect that to the extent there is duplication, to the
9  extent we see in the documents an ability to narrow this
10 list down, we will do that.
11      THE COURT: Well, we saw in Massachusetts, for
12 example, that there were, you know, like a handful of key
13 guys over time. You know, they were -- I don't remember
14 even their names right now, but there were only, like, six
15 maybe.
16      MR. MONTGOMERY: True, but in Massachusetts for
17 the entire time period from 1988 to date, there's really
18 only been two people who have run the pharmacy program,
19 so --
20      THE COURT: And that's been dramatically different
21 in California?
22      MR. BUEKER: Yes.
23      THE COURT: What's the time span we're talking
24 about?
25      MR. BUEKER: The same time span, your Honor.

Page 20

1       THE COURT: How many key people over that time
2  period would you say there were, so they can make sure that
3  every time period is covered without duplicating? Who would
4  be the people?
5       MR. PAUL: Well, your Honor, I think we have a
6  disagreement about the number of key people. There has been
7  a layer of continuity. They have deposed some prior people,
8  and I think they want to depose some other prior people, but
9  it's not as if everyone, there's been a wholesale
10 transition.
11      THE COURT: Have you done a 30(b)(6) yet of the
12 Medicaid --
13      MR. BUEKER: We've done part of the 30(b)(6), yes.
14      MR. PAUL: We've done seven 30(b)(6) depositions
15 on 47 topics so far, your Honor.
16      THE COURT: But has it covered all the time
17 periods?
18      MR. PAUL: Yes, your Honor. We have one 30(b)(6)
19 that is still open.
20      THE COURT: So I don't understand why that isn't
21 sufficient, short of your seeing stuff in these documents
22 where you need -- you know, there's someone, you know, like
23 one or two key people like in the Massachusetts case -- why
24 the 30(b)(6) isn't -- as long as you're getting good
25 coverage.

Page 21

1       MR. BUEKER: First of all, I would dispute that
2  we're getting good coverage as to the time periods. The
3  witness that has been produced is currently in the program.
4  You know, part of this is, the depositions we've taken, the
5  fact witness depositions that we've taken so far have been
6  of the earlier people, and that was a conscious decision
7  made because we don't suspect we're going to see their
8  e-mails. What we've tried to do is --
9       THE COURT: Well, I think you are now. I think
10 they say they've cut way back on deliberative and that
11 you're going to be getting all this stuff.
12      MR. PAUL: I think he's just referring to the fact
13 that e-mail wasn't used as much in the early-mid-'90s as it
14 is now.
15      THE COURT: Oh, I see what you mean.
16      MR. BUEKER: So we've tried to structure this and
17 move this along as efficiently as possible by taking those
18 depositions we thought we were unlikely to need to redo when
19 we saw the electronic production. What we've held off on
20 are people who are knowledgeable, we think, about the later
21 time period. That's how we tried to --
22      THE COURT: Well, why don't we do this because
23 that number you gave me seems totally out of whack. Why
24 don't we do -- we're carving off the Ven-A-Care because
25 you're going to take theirs, unless there's some little nook

Page 22

1  that you need to clean up. And then what you're going to do
2  is do this: You can look at all the things, finish up the
3  30(b)(6)s, and then take ten other depositions. And I think
4  that is realistic.
5        You need to start right away in dealing with
6  noticing what you think are the key people.
7        MR. BUEKER: Okay.
8        THE COURT: And set up the date so we don't get
9  into this -- you know, people have weddings and graduations,
10 people have lives. And so you'll do a rain dance, and I
11 know at the end, if you don't set up these dates -- you need
12 to set up your dates with them.
13       MR. PAUL: Yes, your Honor. You mentioned a few
14 minutes ago that of course depositions that have been taken
15 earlier ought to be usable in this case. We do have a
16 dispute with one defendant over that defendant's refusal to
17 agree that depositions of its clients that were taken in
18 other actions can be used as if taken here.
19       THE COURT: Of course they can. They're
20 admissions of a party opponent.
21       MR. PAUL: Dey wishes to be heard on that.
22       THE COURT: Of course they can.
23       MS. GIULIANA: Good morning, your Honor. With
24 respect to several of the depositions that we're arguing
25 about, we don't believe that the case law supports a finding

Page 23

1  that they would be party admissions for several reasons.
2  For some of the employees, they were former employees at the
3  time their deposition was taken, and for others they were
4  former employees; and while they were employed, they were
5  low-level employees who could not bind the corporation.
6        THE COURT: Okay, well, let me just make it clear:
7  Yes, they can be used. We are going to cross-generate all
8  the depositions to minimize the expenses in this case. Now,
9  I don't know what they said that you're so terrified of,
10 but, in any event, there may be additional items that need
11 to be -- does that satisfy you? Are you done with Dey? You
12 don't need any more depositions?
13       MR. PAUL: There are a couple of people who have
14 never been deposed at Dey, your Honor, and we're evaluating
15 the need for deposition. It's only one or two, three at the
16 most.
17       THE COURT: All the other depositions from the
18 other cases can be used, but I'm not going to estop people
19 if there are little corners that need to be cleaned up.
20 That's what we do in these multidistrict litigations. It
21 may be you'd have an argument about one of these people. I
22 can't answer that. You'll have to take the risk of that.
23       MS. GIULIANA: Well, your Honor, you know, with
24 respect to -- and I just want to put this into perspective
25 so you can understand.

Page 24

1        THE COURT: Which firm are you with?
2        MS. GIULIANA: I'm with Kelley Drye & Warren.
3        THE COURT: Where are you from?
4        MS. GIULIANA: I'm from New York. You know, so
5  far, in the past year our client has sat for five days of
6  30(b)(6) depositions in this case, five sales
7  representatives have been deposed, and another individual
8  from the contracts department has been deposed. So we sat
9  for about eleven days of depositions in this case. In
10 addition, we also agreed that there are seven depositions
11 from prior actions that we would agree could be used in the
12 California case as if they were taken in California.
13       There are three depositions that we have not
14 agreed to because for those three witnesses, they were taken
15 in the Texas litigation a long time ago before all these
16 other cases, the pricing cases around the country were
17 filed. And our view is that at the time those depositions
18 were taken, we did not have the motive or opportunity to
19 develop cross-examination of those witnesses that would be
20 relevant in California.
21       THE COURT: But they were your people.
22       MS. GIULIANA: They were former --
23       THE COURT: You know what? Tell you what, I can't
24 do this off the cuff. You have an uphill battle, but if you
25 want to move to strike them, you can. I can't rule off the

Page 25

1  cuff. I don't know if they may be -- were they people you
2  named?
3        MS. GIULIANA: They were not people that we named.
4        THE COURT: They were 30(b)(6) depositions?
5        MS. GIULIANA: They weren't 30(b)(6). Two were
6  former employees, and one was --
7        THE COURT: Why will you take them all? That's
8  ridiculous.
9        MS. GIULIANA: Well, our argument is that if those
10 depositions are used, we think that they should be called
11 again in this case so that we have a chance because at this
12 point they're all former employees who are outside of our
13 control, and there's cross-examination of those witnesses
14 that we would like to have --
15       THE COURT: Well, you're going to have to brief it
16 because at least right now I think that the odds are I'm
17 going to allow in all depositions from other cases involving
18 this issue. So that's what I've done in multidistrict
19 litigation, which is this part of it. It's been almost a
20 standing rule that we'd all designate. So if you want to
21 move to strike them, you're just going to have to brief it,
22 but you can't -- I mean, I think it's ridiculous. Maybe
23 what you do is a supplement of them, and then you can sort
24 of ask them to clarify. I don't have a serious problem with
25 that, now that there's new case law, et cetera, but I'm not

Page 26

1  going to start from scratch.  On the basic fact questions,
2  they'll be binding.
3      MR. BREEN:  Your Honor, just to kind of add to
4  what you just said, these are all depositions we took -- I
5  think I took these depositions in the Texas case.  Just like
6  the First DataBank depositions early on in this MDL that
7  were taken in the Texas case that your Honor under the name
8  of (Inaudible) brought in this case, so the only additional
9  deposition testimony was something that was supplemental or
10 necessary to augment or whatever.  And we would respectfully
11 request, obviously, that these depositions, like all the
12 other ones, be allowed in the case, and we'll be happy to
13 cooperate and supplement --
14     THE COURT:  Yes, all prior depositions.  All
15 right, so assume for a minute that all discovery will have
16 been produced by March.  And so you want all depositions to
17 be done, no more than ten depositions -- is that for
18 everyone?  You're talking for all the parties?
19     MR. BUEKER:  Well, I mean, if you'd allow ten
20 depositions for each party, that would be --
21     THE COURT:  No, no.
22     MR. BUEKER:  I thought I'd try.  Actually, what I
23 was standing back up to say is, there's a category of
24 potential discovery that we didn't talk about, which is
25 third-party discovery.  There were thirteen --

Page 27

1      THE COURT:  This is why I am annoyed.  This case
2  is exploding.  Why haven't you deposed them already?
3      MR. BUEKER:  Of the thirteen we've listed, I'd ask
4  that we be permitted to take two.
5      THE COURT:  I said ten.  Of the ten, if you want
6  two of them to be that, fine.  I don't understand it.  But
7  here's my problem:  Once all the fact discovery is done,
8  then what?
9      MR. BUEKER:  I suspect that we, at least, will
10 make a partial motion, anyway, for summary judgment.
11     THE COURT:  How about just going to trial?  Are
12 there experts?  Is expert discovery complete?
13     MR. PAUL:  Your Honor, expert discovery has not
14 started.  We need the transactional data for our experts.  I
15 assume they have needs.
16     THE COURT:  Well, what are the big issues in the
17 case?
18     MR. PAUL:  This is a California False Claims Act
19 case, your Honor.  It's fairly simple in that respect.
20 There are four counts that survive your order on motion to
21 dismiss and --
22     THE COURT:  At some point I send it back, you
23 know, right?
24     MR. PAUL:  Yes, your Honor.  I assume you'll send
25 it back to the Central District in California.

Page 28

1      THE COURT:  Yes, yes, so where would it be,
2  Northern, Southern?
3      MR. PAUL:  Central, your Honor.
4      THE COURT:  Who was the judge who had it
5  initially, that poor soul?  Who has it?
6      MR. PAUL:  Pregerson, your Honor.
7      THE COURT:  Judge Pregerson?
8      MR. PAUL:  Yes, the younger of the District Court.
9      THE COURT:  So I want to get this to the point
10 where I can -- so, all right, this is now in 2005, we're now
11 in 2009, and we haven't started on expert discovery?
12     MR. PAUL:  Well, that's right, your Honor.  I
13 mean, the original effect cutoff date was mid-December, so I
14 don't think we're extraordinarily far behind.  We've labored
15 under some mutual confusion, obviously, at the end of 2008.
16 I mean, I don't think expert discovery is hideously overdue.
17     THE COURT:  So what's the proposal?
18     MR. PAUL:  Well, the proposal, your Honor, is
19 if -- I mean, it sounds to me like you're saying depositions
20 must be complete --
21     THE COURT:  I'm trying to understand whether I
22 need expert discovery in order to handle motions for summary
23 judgment.
24     MR. PAUL:  You do, your Honor, yes.
25     THE COURT:  Okay, so what kinds of issues will hit

Page 29

1  me on summary judgment?  Are they the technical
2  whistleblower kinds of things, or are they whether it was in
3  the public domain?
4      MR. PAUL:  I think these are the same issues, your
5  Honor, that have are already come before you expertwise or
6  will come before you in the Ven-A-Care federal Abbott, Dey,
7  and Roxane case.  These have to do with the marketing of the
8  spread, explaining damages.  That from the plaintiff point
9  of view, that's the primary --
10     THE COURT:  So you're going to be moving for
11 summary judgment?
12     MR. PAUL:  At least partially, your Honor, yes.
13     THE COURT:  And are you going to be moving for
14 summary judgment probably?
15     MR. BUEKER:  I would think, at a minimum, the
16 statute of limitations --
17     THE COURT:  Do I need an expert for all of this?
18     MR. BUEKER:  Do we need an expert on the summary
19 judgment motion?  I don't know.  I would have to consult, I
20 think, with my codefendants before I could answer that.
21     THE COURT:  I'm not sure how I would, with you,
22 how I would need an expert.
23     MR. BREEN:  Your Honor, one of the areas that may
24 come in is in this whole area of government knowledge.
25 Depending upon what your Honor rules in terms of the

Page 30

1  substantive applicability of some of this evidence --
2         THE COURT:  This will be under California state
3  law, though, right?
4         MR. BREEN:  It will be under California state law
5  and on the general Medicaid federal law that applied to the
6  program.  So I can see -- and from our perspective, they're
7  the same experts or types of experts that we've already put
8  up in all of our other cases, including the federal cases
9  where we're just now finishing expert discovery.  But as
10 your Honor --
11        THE COURT:  That's partly factual.  I mean, that's
12 mostly factual, whether you knew it to the point of
13 embracing it versus --
14        MR. BREEN:  It is, and there's the speed bump
15 issue, how that's calculated.
16        THE COURT:  And what are you all doing with that?
17 Are you going to embrace the Hartman 30 percent?  Remember,
18 I've left that sort of open.
19        MR. BREEN:  Yes, your Honor.  I think what you're
20 going to see, your Honor, from the perspective of our
21 experts is, the damages models are going to allow for
22 sufficient variance that it will not be a relevant issue.
23 In other words, we're not -- in none of our Ven-A-Care
24 cases, including the California, have we looked for any kind
25 of damages or liability on these small spreads.  So they're

Page 31

1  all going to be in excess of the 30 percent as a matter of
2  practicality.
3         THE COURT:  I think it was New York who wanted to
4  reserve the right to play with -- everyone agrees there's
5  some speed bump.  Everybody agrees there's some speed bump,
6  but there's some dispute as to whether it's 20 or 25 or 30
7  or --
8         MR. PAUL:  The way we filed our case, your Honor,
9  it incorporated the speed bump.  We said that we had to
10 exceed it by at least 20 percent, even to get the NDC in our
11 complaint exhibit, and that was all briefed in the motion to
12 dismiss.
13        THE COURT:  So for me that is the classic
14 government knowledge kind of issue:  Everyone knew it in
15 government and in industry who was sophisticated enough, not
16 these little plans, and the issue is the mega spreads.
17        MR. PAUL:  Yes, your Honor.
18        THE COURT:  So that is the big issue.  And I don't
19 know whether you all think that that's going to be summary
20 judgment-able, but if that's it, I don't see why I need to
21 wait for the experts.  That is something I can handle, I
22 think, without the experts, right?  Am I wrong?
23        MR. BREEN:  Your Honor, particularly if you find
24 an area that raises an issue of fact that might be pertinent
25 for expert testimony.  You've had enough expert reports in

Page 32

1  all these cases now where I think everybody kind of knows
2  what those issues are, so if there's something that raises
3  an issue of fact that would be pertinent for expert
4  testimony, then --
5         THE COURT:  Maybe you can agree to -- who's your
6  expert going to be?  Is it going to be Dr. Hartman or your
7  own?
8         MR. BREEN:  We've got our own, your Honor.
9         THE COURT:  Who is it?
10        MR. PAUL:  Our damages expert is a firm in
11 Los Angeles, an econometrics firm.
12        MR. BREEN:  For some of the defendants, we may use
13 Professor Duggan who we've used in these actions.
14        THE COURT:  So would I be wrong in doing this, is
15 a little bit of a fast-forward on the government knowledge
16 thing, so at least I can have some over- -- I mean, can't we
17 do the government knowledge thing sooner rather than later?
18        MR. BUEKER:  A lot of that's being developed
19 through the depositions.
20        THE COURT:  Fair enough, but not the experts.  I
21 don't think I need the experts.  In other words, I think, as
22 soon as your fact discovery is over, both sides can move for
23 summary judgment.
24        MR. PAUL:  Your Honor, you're referring to the
25 government knowledge issue, at least get it off the table?

Page 33

1         THE COURT:  Yes.  In other words, you could have
2  damage discovery ongoing, but there's knowledge, and what
3  else would there be, statute of limitations?  Why do I need
4  an expert for that?  I'm just trying to play it out.  The
5  expert, of course there's going to be some damage model
6  issues.  Perhaps there's a causation issue like in some of
7  these cases.
8         MR. BUEKER:  I mean, that's what turned out to be
9  the case in Massachusetts was that there was a causation
10 issue on the U and C.
11        THE COURT:  A big one, and there's a big one in
12 the big trial.  So, I mean, is it the same kind of issues
13 over here?  How about FUL, which is one I've never totally
14 resolved?
15        MR. BUEKER:  Well, as I think about a California
16 summary judgment motion, your Honor, that is the issue that
17 comes to mind.  And in one instance, I can see at least one
18 need for an expert, which would be to analyze the claims
19 data that California has produced and to come up with and
20 identify the basis of payment, so that if FUL was an issue
21 that the Court resolved in defendants' favor, there would be
22 a record as it relates to the claims data and FULs in
23 California, the basis of payment.
24        THE COURT:  I should be getting that stuff in New
25 York, right, soon?

Page 34

1      MR. BUEKER:  Very soon, your Honor.
2      THE COURT:  Would that be equally applicable to
3  you?  Could we litigate the FUL case all at once?  Is that
4  the same issue across the country?
5      MR. PAUL:  Well, there's only one FUL, your Honor.
6      THE COURT:  Right.
7      MR. PAUL:  And I'm not completely up to speed on
8  what the theory of the New York counties' case is regarding
9  FUL damages, but obviously there is only one FUL, and
10 California has paid some of these claims under a FUL.
11     THE COURT:  I think --
12     MR. BUEKER:  And, yes, your Honor, we've cross-
13 noticed all of that discovery into this California case.
14     THE COURT:  What I'd like you to do is, so I don't
15 have to do this twice and you can't claim foul, which you
16 might well if somehow I rule against New York and it affects
17 you, you need to be up to speed on that, prepared in full,
18 shall we say.  It's the Federal Upper Limit.  No one has
19 ever explained to me how it's calculated, and whether or not
20 if somebody magnified their AWP, let's say, in a way that
21 was inappropriate, whether you could ever possibly say that
22 any one firm's AWP -- am I saying this correctly?
23     MR. BUEKER:  You are.
24     THE COURT:  -- affected the Federal Upper Limit.
25     MR. BUEKER:  We intend to explain that to you very

Page 35

1  soon.
2      THE COURT:  Not even the lawyers, who know this
3  stuff better than I do, understood FUL.  But I think we're
4  all getting there, right?  We should be able to pinpoint
5  that.
6      MR. BREEN:  There's going to be two FUL issues in
7  this case, your Honor.  One is real simple, and that is a
8  simple straight damages analysis if they paid FUL but would
9  have paid less had a reported price been accurate or
10 truthful.  In other words, they're all lesser of, the lesser
11 of the FUL and the EAC.  So in that case our damages
12 model --
13     THE COURT:  That might be easier.
14     MR. BREEN:  That's just the incremental amount
15 between the FUL and what they should have paid.  The more
16 complicated issue is the fact that FULs were set 150 percent
17 of the lowest published price, and had a defendant reported
18 a truthful price, it would have been picked up as the FUL --
19     THE COURT:  Well, I know you disagree.
20     MR. BUEKER:  Well, and that's an open issue, and
21 that will be resolved --
22     THE COURT:  But that's why I want you all to be in
23 on it.
24     MR. BREEN:  I'm just stating the issue.  Those are
25 two different issues.

Page 36

1      THE COURT:  That's the one I've never, I think,
2  resolved, and no one's really totally teed it up, and it's
3  going to be in New York.
4      MR. BREEN:  So do you want us to weigh in with the
5  New York case on the FUL?
6      THE COURT:  Yes, just so we don't have to litigate
7  it twice.  All right.  But we can do the government
8  knowledge one and the statute of limitations and likely
9  causation without expert reports.  Am I not seeing that
10 right?
11     MR. BREEN:  As long as it's understood that we can
12 eliminate factual issues that might be answered by an expert
13 just like any other factual issue.
14     THE COURT:  Well, why don't I do this.  I feel as
15 if you haven't really thought through your motion for
16 summary judgment completely, right?  I'm assuming government
17 knowledge will be there, but --
18     MR. BUEKER:  Right.  I don't know whether or not
19 we could do it with or without an expert.  I can't answer
20 that question definitively.  You're right, I have not
21 thought through that completely.
22     THE COURT:  So if you were to do experts, doesn't
23 that bring me into another year?
24     MR. BREEN:  We've got a pretty short time frame in
25 the orders up until now for experts, Judge.  I don't --

Page 37

1      MR. PAUL:  The order that had discovery cutoff in
2  mid-June had summary judgments filed in December of 2009.
3      THE COURT:  Yes, but now what do you have me
4  extend?  There's another seven or eight months.
5      MR. PAUL:  No, no, your Honor, I don't think
6  that's an issue at all.  I'm referring to the Court's
7  November order that had discovery cut off --
8      THE COURT:  Yes, but let's assume for a minute you
9  end up at June 15, all fact discovery closed.  When do your
10 expert reports come in?
11     MR. PAUL:  They were due at the end of August,
12 your Honor.
13     THE COURT:  Yours?
14     MR. PAUL:  Ours were.
15     MR. BUEKER:  And ours were due at the middle of
16 September.
17     THE COURT:  And then the depositions?
18     MR. BUEKER:  They would be completed in that
19 30-day -- you had allowed through December 15 to complete
20 all expert depositions.
21     THE COURT:  And then what?
22     MR. BREEN:  Summary judgments.
23     MR. BUEKER:  Summary judgments.
24     THE COURT:  When?
25     MR. BREEN:  15 December I think was the deadline.

10 (Pages 34 to 37)

Page 38

1      MR. BUEKER:  It actually was January 15.
2      THE COURT:  2010.  So when were they originally
3  supposed to be done under the old order?  We were supposed
4  to be there almost, right?
5      MR. BUEKER:  No.  Fact discovery wasn't supposed
6  to close until I think summary judgment motions --
7      MR. PAUL:  July 15, your Honor, deadline to file
8  motions for summary judgment.
9      THE COURT:  So essentially this puts us behind six
10  or seven months, right?
11      MR. PAUL:  Yes, your Honor.  I realize how much
12  the Court hates this kind of delay.
13      THE COURT:  But then I've got --
14      MR. PAUL:  It's a large program.
15      THE COURT:  I know, but you create -- it's just
16  huge delay.  This probably all should have happened.  And
17  I've got to then -- I face the specter of not even not
18  having this year's clerk but next year's clerk not get to
19  it.  So if you finish -- I'm not sure we need to wait for
20  all these expert reports to do the motions for summary
21  judgment.  Maybe we can do this in pieces.
22      MR. PAUL:  Certainly, your Honor.  We could
23  certainly propose a schedule where we have at least motions
24  for summary judgment on the issues we've talked about this
25  morning.

Page 39

1      THE COURT:  All right, so why don't we --
2      MR. BUEKER:  It strikes me, your Honor, just
3  thinking out loud here, that between September 15 and
4  December 15 is quite some time to take the experts'
5  discovery.  Maybe we could shorten the schedule by
6  shortening that period which --
7      THE COURT:  Well, how many experts are we talking
8  about?
9      MR. BREEN:  Usually there are about four on each
10  side, not including attorneys' fees and anything like that,
11  and sometimes there are supporting experts.  Usually you've
12  got a damages --
13      THE COURT:  But don't we have -- I don't know your
14  Medicaid scheme.  Is it unique?  Is that what's going to
15  create a causation -- like, we had this weird thing come up
16  in some of these other states, you know, some quirky thing
17  we didn't understand.
18      MR. PAUL:  No, I think California is going to be
19  fairly simple, your Honor.  There's not this usual and
20  customary issue that there was in Massachusetts in
21  California.
22      MR. BREEN:  The only thing in California is, some
23  defendants were direct-price defendants; and they're all
24  gone, we settled with them.  So all the defendants that were
25  remaining were AWP-based reimbursement.

Page 40

1      MR. PAUL:  This is, I think, your first state AWP
2  case, and Massachusetts is a WAC case.
3      THE COURT:  Yes, right.
4      MR. PAUL:  There's some distinction there.
5      THE COURT:  Okay, so what we're going to do is --
6  I don't see how you both read all the documents and you do
7  fact discovery and do it anywhere before June 15, even with
8  only ten depositions.  I just don't see it happening, all
9  right?  So why don't we do the expert report -- can't we get
10  it in, your expert reports, before that?
11      MR. PAUL:  Just to clarify, your Honor, you're
12  referring to addressing the issue of government knowledge?
13  That's really their --
14      THE COURT:  No.  Whatever you said you needed
15  experts for.
16      MR. PAUL:  Well, we think we do need an expert to
17  adequately establish damages, and I believe that we could
18  get that report in by the end of June.
19      THE COURT:  Right, because you're not dependent on
20  all these fact depositions.  So why don't we just say your
21  expert report by the end of June, your expert report -- so
22  let's just do this -- 6/30.  Just to not lose so much time,
23  your expert report by 7/30?  Can you do that?
24      MR. BUEKER:  Sure.
25      THE COURT:  The depositions by 9/30?  All right,

Page 41

1  so I've regained some time here.  By 10/30 -- and if you can
2  do some before then, you can -- by 10/30 any motions for
3  summary judgment, opposition by 11/30, reply by 12/15,
4  surreply by -- I don't want to disrupt people's vacations
5  totally -- let's say by 1/8 so that people can have a
6  vacation and not get it done till 1/8, and then a hearing
7  sometime in the end of January.  I think you could even
8  break this up a little bit, but I think I'm going to have to
9  rule on it before I ship it off to California.  I think
10  these are the things I'm expected to do as an MDL judge.
11      MR. BREEN:  Can I make sure we understand where we
12  are, Judge?  Ten depositions?
13      THE COURT:  Yes.
14      MR. BREEN:  In total?
15      THE COURT:  Well, for their side.
16      MR. BREEN:  For their side, okay.
17      THE COURT:  And ten for you as well.  But I'm
18  assuming, the way you're talking, you don't really --
19      MR. PAUL:  That's fine.
20      THE COURT:  -- you might not need them all.  And
21  you incorporate all the other depositions.  That's why I'm
22  doing it is, you incorporate everything else.
23      MR. BREEN:  Fact discovery cutoff by 3/15, the
24  Ides of March.
25      MR. BUEKER:  No.

Page 42

1     MR. BREEN:  June 15, I'm sorry.
2     THE COURT:  Gee, I was happy.  You've been
3  fighting so hard, I --
4     MR. BREEN:  Yes, that's why I don't want to talk
5  much.  Expert reports by the end of June, summary judgment
6  motions by October 30, oppositions by 11/30, replies by
7  12/15, surreplies by 8 January, and an MSJ hearing sometime
8  towards the end of the --
9     THE COURT:  Month.
10    MR. BREEN:  -- the end of the month.
11    THE COURT:  And then I've got plenty of time so
12 that whoever the new law clerk is will be up to speed, can
13 do it before he or she leaves.
14    MR. BREEN:  And our expert reports are due 8 --
15    MR. BUEKER:  June 30.
16    MR. BREEN:  June 30.  And the defendants' expert
17 reports are due?
18    MR. BUEKER:  July 30.
19    MR. BREEN:  July 30.
20    THE COURT:  Now, am I likely to see any motions to
21 compel that's going to hold this all up?
22    MR. PAUL:  There's one pending right now, your
23 Honor, that was filed last week that concerns a 30(b)(6)
24 witness issue.
25    THE COURT:  Who has filed it, you?

Page 43

1     MR. PAUL:  We filed it.  Sandoz did not want to
2  produce a 30(b)(6) witness.
3     THE COURT:  Who's Sandoz?
4     MS. McDEVITT:  That's me, your Honor, Heather
5  McDevitt.
6     THE COURT:  What's the issue?
7     MS. McDEVITT:  Well, there are a number of issues.
8  One is that we believe that some of the testimony sought,
9  which goes to Sandoz's knowledge or understanding of
10 California's Medicaid scheme, has already been -- he's
11 already testified as a fact witness.
12    THE COURT:  Well, good, so designate it.  We've
13 now established that you can designate that, but then are
14 there additional issues?
15    MS. McDEVITT:  The additional issue that we've
16 identified is that some of the topics seem to go to issues
17 that we don't believe are appropriate for 30(b)(6)
18 testimony.
19    THE COURT:  Like?
20    MS. McDEVITT:  Namely, Sandoz's understanding of
21 whether California explicitly approved its setting of AWP
22 and accepted it.  And it seems to be more of an ultimate
23 issue in the case, and we haven't believed that it's
24 appropriate for 30(b)(6) testimony.  We also believe that
25 we've had other witnesses who have testified to the fact --

Page 44

1     THE COURT:  I think it's appropriate for 30(b)(6),
2  but I also think that if it's been done, it's been done.
3  They have the right, as I've said to all of you -- you know,
4  you're all unique parties -- if there's some little cleanup,
5  that you just put it all in and then just clean up what the
6  rest is.
7     MR. PAUL:  I understand, your Honor.  Some of
8  Sandoz's depositions will be taken of its former employees,
9  who obviously can't bind the corporation, and we just ask
10 for one.  The defendants have taken seven different 30(b)(6)
11 witnesses on 37 topics.  We ask for just one person on a
12 very narrow range of topics.  We think it's reasonable.
13    THE COURT:  So the big issue, which it goes back
14 to what Dey is saying, is that with respect to these former
15 employees who are not management -- there's still an issue
16 speaking within the -- I don't know how low down they are or
17 how high up they are -- if they're unavailable witnesses,
18 you have that rule, and that's what you're going to have to
19 talk about if for some reason -- at most, it's not going to
20 be binding on the corporation, but it may be admissible if
21 they're unavailable parties in a litigation, right?
22    MR. PAUL:  Yes, your Honor.
23    THE COURT:  I don't know, do we have to retake
24 them?  Can't we have some agreement on them, all the --
25    MS. McDEVITT:  I'll just raise this idea now

Page 45

1  because we're here and we're talking about it.  One thought
2  that we had that we were planning on identifying in our
3  opposition to the motion to compel is that a number of the
4  categories of 30(b)(6) testimony that California has
5  identified we believe could be answered in an interrogatory
6  response, and --
7     THE COURT:  No.  They're allowed to take
8  depositions.  Interrogatories are disfavored.  What's going
9  on here, the company is giving -- it's a big suit, right?
10    MS. McDEVITT:  Indeed it is a big sue.
11    THE COURT:  You are allowed to have a 30(b)(6).  I
12 don't understand what the issue is.
13    MS. McDEVITT:  We will go back and confer, and I
14 will confer with Mr. Paul, and perhaps there's a way that
15 the topics could be narrowed.
16    THE COURT:  Yes, you can just, you know, see
17 what's been done.  If you feel it's not been done well
18 enough, you can have, you know, a few hours.  You know, of
19 course your understanding about how the Medicaid system
20 works is relevant to your scienter.  So, you know --
21    MS. McDEVITT:  We believe that we've already
22 proffered the witness.
23    THE COURT:  You may have.
24    MS. McDEVITT:  But I think that perhaps the best
25 course is that Mr. Paul and I will confer, and maybe there's

12 (Pages 42 to 45)

Page 46

1  a way to narrow the topics as you suggest, bring somebody in
2  for a few hours.
3       THE COURT:  All right.  Now let me go off the
4  record just for one minute.
5       MR. BREEN:  I just want to make a suggestion.
6  What we did with the 30(b)(6)s with the Ven-A-Care
7  witnesses, and there was all kinds of these ultimate
8  question issues, we went ahead we put them up.  We agreed
9  amongst counsel that we would reserve objections during the
10 course of the deposition, leave a little bit more leeway
11 there --
12      THE COURT:  As always.
13      MR. BREEN:  Well, as opposed to making the
14 objection and getting a ruling on it in advance, and --
15      THE COURT:  You must have very tolerant courts
16 where you're from.  Around here, that's not the culture.
17      MR. BREEN:  The long and short, Judge, it worked
18 out fine.  We didn't have anything to bring back to your
19 Honor or to Judge Bowler on that issue, on these ultimate
20 question issues --
21      THE COURT:  All right, let's just go off the
22 record for a minute.
23      (Discussion off the record.)
24      THE COURT:  So we've got a firm schedule.  You all
25 will memorialize it.  No more motions to continue, short of

Page 47

1  somebody getting sick, which I hope doesn't happen.  I mean,
2  if someone really, like, just -- I mean, obviously there are
3  certain life things that take us over which I would honor,
4  but, I mean, not just "The documents can't come in" or "I
5  can't review them" or whatever.
6       MR. PAUL:  So we'll jointly file an amendment to
7  the CMO pursuant to Dey.
8       THE COURT:  Yes.  No more motions to continue,
9  right?
10      MR. PAUL:  Right, your Honor.
11      MR. BUEKER:  Yes, your Honor.
12      THE COURT:  Scout's honor?
13      MR. BUEKER:  Yes, your Honor.
14      THE COURT:  All right.  Have a nice long weekend.
15      MR. PAUL:  Thank you, your Honor.
16      THE COURT:  Thank you for coming here.
17      MR. PAUL:  Yes, your Honor.
18      THE CLERK:  Court is in recess.
19      (Adjourned, 11:35 a.m.)
20
21
22
23
24
25

Page 48

1           C E R T I F I C A T E
2
3
   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5
6
7       I, Lee A. Marzilli, Official Federal Court
8  Reporter, do hereby certify that the foregoing transcript,
9  Pages 1 through 47 inclusive, was recorded by me
10 stenographically at the time and place aforesaid in Civil
11 Action No. 01-12257-PBS, In Re:  Pharmaceutical Industry
12 Average Wholesale Price Litigation, and thereafter by me
13 reduced to typewriting and is a true and accurate record of
14 the proceedings.
15      In witness whereof I have hereunto set my hand
16 this 15th day of February, 2009.
17
18
19
20
21      /s/ Lee A. Marzilli
        _____
22      LEE A. MARZILLI, CRR
        OFFICIAL FEDERAL COURT REPORTER
23
24
25