# Exhibit 182

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS
Exhibit to the September 22, 2009, Supplemental Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL NO. 1456 / CIVIL ACTION NO. 01-12257-PBS

- - - - - - - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

- - - - - - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:

UNITED STATES OF AMERICA, EX REL.

VEN-A-CARE OF THE FLORIDA KEYS, INC.

             vs.

BOEHRINGER INGELHEIM CORPORATION, ET AL.

CIVIL ACTION NO. 07-10248-PBS

- - - - - - - - - - - - - - - - - - - -x

    CAPTIONS CONTINUED ON FOLLOWING PAGES

    Videotape deposition of MARK SHAFFER, taken

pursuant to the Federal Rules of Civil Procedure,

before Melissa J. Kelly, RPR, CRR, Licensed

Shorthand Reporter #00307, and Notary Public within

and for the State of Connecticut, held at the

Sheraton Danbury Hotel, 18 Old Ridgebury Road,

Danbury, Connecticut, on May 21, 2007, at 10:09 a.m.

1       UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

3       MDL NO. 1456 / CIVIL ACTION NO. 01-12257-PBS

4  - - - - - - - - - - - - - - - - - - - - - - -x

5  IN RE: PHARMACEUTICAL INDUSTRY AVERAGE

6  WHOLESALE PRICE LITIGATION

7  - - - - - - - - - - - - - - - - - - - - - - -x

8  THIS DOCUMENT RELATES TO:

9  STATE OF CALIFORNIA, EX REL.

10 VEN-A-CARE

11                    vs.

12 ABBOTT LABORATORIES INC., ET AL.

13 CASE NO. 03-CV-11226-PBS

14 - - - - - - - - - - - - - - - - - - - - - - -x

15

16

17

18

19

20

21

22 (CAPTIONS CONTINUED)

1  to 300 5 milligrams Roxicodone tablets"; is that
2  correct?
3       A.   That's what it says, yes.
4            MS. POLLACK:  I'm going to mark as
5  Shaffer 22 a memo to the palliative care sales
6  team from Mark Shaffer dated September 8, 2000,
7  the one you've been waiting for.
8            (Exhibit Shaffer 022:  Marked for
9  identification.)
10 BY MS. POLLACK:
11      Q.   This is a memorandum you sent to your
12 team in September of 2000?
13      A.   Yes, it is.
14      Q.   Okay.  And I notice at the top of the
15 memo it says "Boehringer Ingelheim" and then it
16 says "Roxane Laboratories"; is that correct?
17      A.   That's what it says, yes.
18      Q.   Was there a company at that time known
19 as Boehringer Ingelheim Roxane Laboratories?
20      A.   There was a company, Boehringer
21 Ingelheim; and we were with Roxane Laboratories,
22 a subsidiary of Boehringer Ingelheim.

1　　　Q.　And is this the document you were
2　mentioning that provides a historical review of
3　pharmaceutical pricing and reimbursement issues
4　along with a review of how retail pharmacies are
5　reimbursed?
6　　　A.　Yes.
7　　　Q.　Did you write this cover letter, memo?
8　　　A.　I believe I did.  I'm not sure.
9　　　Q.　Okay.  And at that time you indicated:
10　"Knowledge of pharmaceutical reimbursement
11　practices, especially how they may affect
12　pharmacists' acceptance for Roxicodone 15
13　milligram and 30 milligram tablets, will play an
14　important part in your successful stocking of
15　these new strengths in your retail accounts after
16　the launch meeting," correct?
17　　　A.　Yes.
18　　　Q.　And you ask your staff to read this
19　material.
20　　　A.　"Please review the material."
21　　　Q.　Right.
22　　　　Did you write the attached memorandum?

1   A.   No, I did not.
2   Q.   Who wrote it?
3   A.   I do not know.  I don't remember.
4   Q.   Did Mr. Bierl wrote it -- write it?
5 Excuse me.
6   A.   It may have come from the agency that
7 Doug Bierl's with.  I don't recall.
8   Q.   Did it come from the Roxane marketing
9 department?
10       MS. RIVERA:  Object to form.  He's
11 already said he doesn't know where it came from.
12       THE WITNESS:  I don't know where it
13 came from.
14       MS. POLLACK:  I'm trying to refresh his
15 recollection.
16       THE WITNESS:  I know I didn't write it.
17 BY MS. POLLACK:
18   Q.   Did you see drafts of the attachment
19 before you mailed it out to your team?
20   A.   I don't recall.
21   Q.   Is it likely that you saw drafts?
22   A.   I'm not sure.

1    Q.   If there had been information in this
2  paper that you disagreed with, would you have
3  sent it out to your team?
4    A.   I'm not sure.  I may have.
5    Q.   Do you recall there being any
6  information in this material that you disagreed
7  with?
8    A.   I don't recall the specific content of
9  this document.
10   Q.   After having reviewed it with your
11 counsel, was your memory refreshed about the
12 contents of this document?
13   A.   Not the specific content, no.
14   Q.   Do you know if this document went to
15 Mr. Heart?
16   A.   I do not know.
17   Q.   How about Mr. King?
18   A.   I do not know.
19   Q.   Okay.  And you point out that:  "The
20 ability to understand reimbursement issues will
21 assist you being the sales people in your
22 discussions with your retail accounts to ensure a

1  successful stocking program." Do you see that on
2  the second paragraph?
3          MS. RIVERA: Object to form. What --
4          THE WITNESS: I'm not sure where you're
5  at again. On the first page?
6  BY MS. POLLACK:
7      Q.  No. I'm sorry. The reimbursement
8  background document, second paragraph.
9      A.  Yeah, again, I didn't write this, this
10 document.
11     Q.  Did you have an understanding what was
12 contained in this document before you sent it to
13 your sales team?
14     A.  From what I recall my understanding
15 was, it was an overview, a backgrounder, for-
16 your-information-type document, from what I
17 recall.
18     Q.  But they were supposed to be familiar
19 with it to discuss it at a workshop at the launch
20 meeting, correct?
21     A.  The memo was sent out for our folks to
22 review to understand the background, yes.

        Q.   Do you recall learning anything new
from this document when you read it?
        A.   I don't recall.  It's a pretty thorough
document.  I don't recall at the time
specifically, you know, what my feedback was when
I went through this document.
        Q.   But you did read it?
        A.   I believe I read it.
        Q.   And the first line under "historical
perspective" says:  "During the past decade,
reimbursement to providers for healthcare
products and services has grown increasingly
complex and controversial.  In few industries is
the process for receiving payment for a product
of services indirect and complicated as it is for
healthcare services and products."
            Do you agree with those statements?
        A.   Again, I'm not going to comment because
I didn't write this document.
        Q.   I'm not asking if you wrote it.  I'm
asking as you sit here today and you read those
sentences, do you agree with what they say?