# TAB 89

1

NO. GV3-03079

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| ex rel. | ) | |
|    VEN-A-CARE OF THE | ) | |
|    FLORIDA KEYS, INC., | ) | |
|       Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| ROXANE LABORATORIES, INC., | ) | |
| BOEHRINGER INGELHEIM | ) | |
| PHARMACEUTICALS, INC., BEN | ) | |
| VENUE LABORATORIES, INC., | ) | |
| and BOEHRINGER INGELHEIM | ) | |
| CORPORATION, | ) | |
|       Defendant(s). | ) | 201ST JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

SHELDON BERKLE

JANUARY 27TH, 2005

VOLUME 1 OF

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF SHELDON BERKLE, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on the 27th of January, 2005, from 9:01 a.m. to 5:15 p.m., before CAROLYN J. FORD, Registered Professional Reporter and Notary Public, State of Florida at Large, reported by machine shorthand at the Doubletree Guest Suites, 12200 Tamiami Trail North, Naples, Florida, pursuant to the Texas Rules of Civil Procedure and the provisions attached previously.

22

1   have or not have.
2       Q   Let me see the organizational chart.
3           MR. BREEN: What's our next exhibit number?
4           MR. CRAWFORD: 139.
5           MR. McCONNICO: It should be a lot more than
6   that. It sure seems like we're past that.
7           MR. CRAWFORD: We can skip 100 if you want to, I
8   guess.
9           MR. COVAL: This is the second case.
10          MR. BREEN: 139, you said?
11          MR. CRAWFORD: 139, I believe.
12          (Exhibit No. 139, Organizational Chart, was
13   marked for identification.)
14      Q   [By Mr. Breen] I'm going to hand you
15   Exhibit 139.
16          MR. COVAL: Is there a Bates on that?
17          MR. BREEN: Yes, sir. It's ROX-01438
18          MR. COVAL: Thank you.
19          MR. BREEN: Sure.
20      Q   [By Mr. Breen] Have you ever seen this before?
21      A   I'm sure I probably have seen it. I mean, I
22   don't recall specifically seeing this particular layout,
23   but certainly I'm familiar with organization charts.
24      Q   You -- you see you're -- you're on there as
25   executive VP --

23

1       A   Correct.
2       Q   -- BU Ethical Pharmaceuticals, S. Berkle?
3       A   Correct.
4       Q   That's you; right?
5       A   That's me.
6       Q   That would be the business unit?
7       A   Yes, that's correct.
8       Q   And the business unit was basically Boehringer
9   Ingelheim, Roxane Laboratories -- Boehringer Ingelheim
10   being BIPI, Boehringer Ingelheim Pharmaceuticals, Inc.,
11   the U.S. company and later Ben Venue Laboratories all
12   rolled into one?
13      A   The business unit concept which, by the way, was
14   changed subsequently. You know, I'm not sure I would have
15   100 percent agreement on this. As an example where it has
16   under me BV and RLI multisource, T. Russillo --
17      Q   Yes, sir.
18      A   -- that really should have been a dotted line as
19   opposed to a straight line.
20      Q   Why?
21      A   Because I didn't have exclusive responsibility
22   for that end of the business. I had a strategic
23   responsibility, but not an operational day-to-day
24   responsibility.
25      Q   So if the -- well, this -- because that's the

24

1   generic business. Is that what you're saying?
2       A   Correct.
3       Q   So who was minding the store when it came to the
4   generic business from a sales and marketing perspective?
5       A   There was a chief executive of Roxane
6   Laboratories.
7       Q   Who was that?
8       A   That was -- at that point it would have been
9   Mr. Jerry Wojta. And for Ben Venue, which is also
10   mentioned, that's what BV stands for, that was Mr. Tom
11   Russillo.
12      Q   So who was responsible for making sure that the
13   German executives in Ingelheim understood what they needed
14   to understand regarding this business of reporting prices
15   that were pertinent to state Medicaid reimbursement?
16      A   I think you're being too specific. I think the
17   responsibility for information flow to the German parent
18   company laid in the hands of the CEO which was Mr.
19   Gerstenberg.
20      Q   Was Roxicodone a branded pharmaceutical?
21      A   No, it was not.
22      Q   Then why was it represented to be a branded
23   pharmaceutical?
24      A   And I'm not clear on who would make that
25   representation. I have no idea who would make that

25

1   representation.
2       Q   So if they --
3       A   It may have been stated as a branded generic, but
4   certainly in my life, in my pool, it would not be
5   considered a branded pharmaceutical.
6       Q   How would it be reimbursed by the Medicaid
7   programs, as a brand or a generic?
8       A   I have no idea because I wasn't involved with
9   that business.
10      Q   Who had primary responsibility for the Boehringer
11   U.S. operations advertising budget when you were the
12   vice -- senior vice president for sales and marketing?
13      A   Are you referring to the branded business or the
14   generic business?
15      Q   Were there two different budgets?
16      A   Absolutely.
17      Q   So when the budgets were reported to and approved
18   by the German executives, you sent two budgets up, one for
19   brands and one for generics?
20      A   Absolutely.
21      Q   Okay. So who's responsible for the advertising
22   budget for generics?
23      A   Again, when I was still employed, the last person
24   would have been Mr. Tom Russillo as the president of
25   Roxane and Ben Venue Laboratories.

26

1   Q   And who was responsible for the advertising
2   budget for brands?
3   A   Myself.
4   Q   Now, are you aware that the budget for
5   advertising and marketing for the Boehringer Ingelheim
6   U.S. operations was substantially greater than the budget
7   for research and development during the years that you
8   were the executive -- or the vice president for sales and
9   marketing?
10      MR. McCONNICO: Objection; form.
11   A   I'm certainly -- you know, I'm not aware of that
12   at all and I'm not sure. Are you referring -- again, are
13   you referring to branded business? Are you referring to
14   generics business?
15   Q   [By Mr. Breen] Well, let's take the branded
16   business since you had control of that budget.
17   A   Right.
18   Q   What was bigger, the budget for advertising or
19   the budget for research and development?
20   A   Research and development.
21   Q   How about the generic side?
22   A   I have no idea.
23   Q   Did you ever supervise Judy Waterer?
24   A   No.
25   Q   She was not in your chain of command?

27

1   A   Correct.
2   Q   How about Christine Ferrara?
3   A   Again, she reported into someone who reported to
4   me.
5   Q   Did Judy Waterer report to somebody that reported
6   to you?
7   A   Again, for a period of time when I had a dotted
8   relationship with Roxane, in other words, through about
9   1999. After that, not.
10   Q   Did you ever have responsibility for Roxane's
11   ipratropium bromide meter dose inhaler?
12   A   No.
13   Q   Don't know anything about it?
14   A   I did not say I didn't know anything about it.
15   I'm most certainly aware that they launched a generic
16   version of a brand Atrovent that I was responsible for in
17   the United States.
18   Q   You were responsible for the brand Atrovent;
19   correct? God bless you.
20   A   Right.
21   Q   God bless you. So you never conveyed any orders
22   or directions from the German executives to Judy Waterer
23   or anybody else regarding the Roxane meter dose inhaler?
24   A   I did not convey orders. I may have been
25   involved in discussions, but never being -- I was not

28

1   responsible for conveying orders.
2   Q   Why would you be involved in discussions about
3   Roxane's meter dose inhaler between the German parent
4   executives and people at Judy Waterer's level?
5   A   Again, it wouldn't have been with Judy Waterer's
6   level, at her level. It would have been with superiors to
7   her. So, again, I would be involved in discussions
8   because, again, we marketed Atrovent, the brand. And
9   Roxane was a sister company. And, therefore, there was
10   cross fertilization of general information about our
11   experiences with Atrovent.
12   Q   Who was Roseann Press?
13   A   Roseann Press was my administrative assistant.
14   Q   Was the Combivent meter dose inhaler a brand or a
15   generic?
16   A   A brand.
17   Q   Was the proposed Combivent unit dose product a
18   brand or a generic?
19   A   Again, if we're talking about Combivent as a unit
20   dose, a potential unit dose vial form of -- available form
21   to deliver the medication, then that in my mind is a
22   brand.
23   Q   So the Atrovent unit dose product --
24   A   Uh-huh.
25   Q   -- that was a brand; correct?

29

1   A   Correct.
2   Q   And you were responsible for it?
3   A   Yes.
4   Q   Including any arrangements to deeply discount it
5   to hook big clients?
6   A   I'm -- I'm not aware of anything referring to
7   that.
8   Q   You don't know Rick Powell, do you?
9   A   I'm sorry?
10   Q   You don't know Rick Powell, do you?
11   A   I never heard of him.
12   Q   Never heard of him?
13   A   No.
14   Q   Ever heard of RDI, a respiratory -- a respiratory
15   company RDI?
16   A   Again, I'm aware of the name, but I don't know
17   any details.
18   Q   Ever heard of Accurate Pharmacy?
19   A   No.
20   Q   Well, who -- who approved the prices that the
21   branded products that you were responsible for in the
22   sales and marketing business could be sold at?
23   A   Again, they would have to have the approval of
24   the CEO, Mr. Gerstenberg, and with the parent company.
25   Q   For the branded products?

38

1   A   Yes, I do.
2   Q   Why are you telling the generic side or conveying
3   information that the German executives say you're going to
4   have to do about a generic product? Why are you involved
5   in conveying that information?
6   A   Again, this happens to be a generic product of a
7   Boehringer branded product. And as a result there are
8   obvious implications for the branded product once --
9   excuse me, the generic is launched. And it was natural
10  for the sister companies to have -- share information and
11  convey -- the branded company to convey their experience
12  of the marketplace to their sister company.
13          Having responsibility for the strategic
14  responsibility for the business unit which was in
15  existence at that time, then I would facilitate discussion
16  between the two units. But anything beyond that in terms
17  of the specific details of the generic launch were
18  established by the Roxane organization.
19  Q   Number four (as read): Review of Persantin,
20  slash, ASA press.
21  A   Right. That -- that refers to a branded product
22  Aggrenox which was being scheduled for launch within the
23  planning period.
24  Q   What do the German executives at Ingelheim,
25  Germany have to do with the price of that particular drug

39

1   in the United States?
2   A   Again, the parent company had to agree to the
3   establishment of price -- launch prices for any branded
4   product.
5   Q   All right. Do they have to agree to any price
6   reductions for a branded product?
7   A   In most cases we would inform them certainly from
8   an informational point of view. Sometimes they got
9   involved, sometimes they didn't get involved. And, again,
10  in my experience in my tenure in the United States, I'm
11  not aware of reducing prices within the branded
12  marketplace.
13  Q   If prices had been reduced in the branded
14  marketplace, would it have been your responsibility to
15  take action to modify reports of those prices that were
16  used for government reimbursement programs?
17  A   Again, people in my organization would have made
18  recommendations which I would approve if that was to
19  occur.
20  Q   Would you have ever allowed a situation to occur
21  in the branded side where the price of a brand was
22  reduced, but you didn't tell the entities reporting those
23  prices to the government so that you could keep the
24  reimbursement up even though the price went down?
25  A   Well, I can say that if that was ever to happen

40

1   that would never occur.
2   Q   Wouldn't occur?
3   A   Absolutely not.
4   Q   Would you allow it to occur?
5   A   Absolutely not.
6   Q   Okay. Now, moving down to review of Duraclon --
7   A   Yes.
8   Q   -- in the Roxane forecast. What's Duraclon?
9   A   Duraclon was a branded product. It was an
10  injectable quantity. And at that point in time Roxane
11  marketed predominantly multisource products, generic
12  products, but they also had some branded products in their
13  line. At a later date when we reorganized, any branded
14  products were taking out -- taken out of the Roxane line.
15  Q   But at this particular point in time in 1996, if
16  Roxane was working with a branded product, then you would
17  have some operational responsibility for marketing with
18  respect to that product?
19  A   Correct.
20  Q   Okay. And then review of the tam --
21  A   Tamsulosin.
22  Q   -- tamsulosin price.
23  A   Correct. Tamsulosin is marketed under the
24  trademark Flomax.
25  Q   That's a brand?

41

1   A   Branded product.
2   Q   This was your personal request. And then, seven
3   (as read): Inclusion of up to date Mirapex forecast?
4   A   Mirapex is a branded product used in the
5   treatment of Parkinson's disease.
6   Q   And then (as read): Tentative revision of
7   Combivent introduction. I'll have to feed this into you.
8   A   Again, Combivent is a branded product and we were
9   looking towards trying to develop data sufficient for
10  regulatory approval.
11  Q   And then it goes on to number nine (as read):
12  Review and confirmation of all product pricing long term.
13  Ed, please review this for Roxane. I would like to see
14  all the recommended pricing for BIPI.
15  A   Right. So, in other words, I'm conveying the
16  message that I received from parent company, but I'm
17  saying Ron -- Ed, the Roxane multisource products, that's
18  your responsibility. Anything to do with the branded
19  products, you know, or relative to BIPI I would look at.
20  But it doesn't indicate that I would be looking at the
21  generic prices.
22  Q   Well, Ed Tupa is the Ed here; right?
23  A   Correct.
24  Q   So when you say to Ed, Look at this for Roxane,
25  you knew that Roxane also manufactured some brands; right?

42

1   A   Yes.
2   Q   And then you said, I'll look at it for the
3   recommended pricing for BIPI. You were talking about
4   Boehringer Ingelheim Pharmaceutical, Inc., which primarily
5   manufactures branded products?
6   A   Yes.
7   Q   Who was going to look at Roxane's branded
8   products?
9   A   Again, that would be the senior executive within
10  the Roxane organization. And at that time it would have
11  been Jerry Wojta and then ultimately Werner Gerstenberg as
12  CEO and head of BIC.
13  Q   So in November of 1996, the German executives
14  were looking, reviewing all product pricing for both the
15  brand side and the generic side of the Boehringer U.S.
16  operations?
17  A   Again, I can only talk for the branded.
18  Certainly for the branded side, I don't know the details
19  that they would have got involved in with the generics.
20  Q   Well, why would you have put out this information
21  saying that one of their points, number nine, that you're
22  giving everybody a heads up on is they want to review and
23  confirm all product pricing long-term. And you're telling
24  Ed to review this for Roxane. Doesn't -- doesn't that
25  tell you that they want to look at the generic prices as

43

1   well as the brand prices?
2   A   Again, I can't interpret, you know, what the
3   parent company wanted. I would have been conveying a
4   message.
5   Q   Well, Ed Tupa, can you please tell us what -- he
6   was the guy responsible for the generic side; right?
7   A   Yes.
8   Q   So why would you be bringing Ed into this picture
9   giving him a specific job telling him in connection with a
10  review and confirmation of all -- of all product pricing
11  long-term if you didn't think the Germans wanted to look
12  at generic pricing?
13  A   Again, I don't know what they wanted to look at
14  or not look -- wanted or did not want to look at. Ed
15  would have discussed this with Mr. Wojta and they would
16  have had whatever appropriate discussions with the parent
17  company.
18  Q   Then you go on. You say (as read): The timeline
19  for development of these numbers will be very short and I
20  would recommend that you start looking at this
21  immediately.
22  A   Right.
23  Q   (As read): I will confirm the required dates by
24  Monday, the latest. This is a top priority. And you put
25  that in all caps.

44

1   A   Uh-huh.
2   Q   Did you ordinarily send memos around saying "I
3   want to see it Monday at the latest and this is a top
4   priority" in all caps. Was that common?
5   A   I would not say it's common. I think it probably
6   relayed the message I received from the parent companies
7   saying they have some timeline that they want to look at
8   -- look at everything.
9   Q   Is it -- then you were trying to convey some
10  sense of urgency?
11      MR. McCONNICO: Objection; form.
12  A   Again, you know, I only see what you see and it
13  would appear that there was some timeline urgency here.
14  Q   [By Mr. Breen] Now, if we go back to the first
15  page and we -- we move up the e-mail chain here to
16  November 25, 1996, at 1:13 p.m. Do you see this memo from
17  Herman -- from Herman Dick?
18  A   Uh-huh.
19  Q   He works with Roxane; right?
20  A   I -- I assume on the signature on the top that he
21  did. I don't even recall him to be honest with you.
22  Q   And you see that it's a memo to Ed -- or e-mail
23  to Ed saying (as read): Judy Waterer and I changed the
24  budgeted units for ipratropium MDI to reflect a October
25  1st, 1997 launch.

45

1   A   Uh-huh.
2   Q   And then they go on --
3       MR. McCONNICO: Shelly, try to say yes or no when
4   you respond because --
5   A   Yes.
6       MR. McCONNICO: -- it's difficult for the
7   reporter.
8   A   Yes.
9   Q   [By Mr. Breen] Then they go on to provide the
10  information that you told them they were going to have to
11  provide for the ipratropium MDI?
12  A   Again, I don't think I told them specifically
13  what to do. This, again, is an informational e-mail.
14  Q   So when you were saying I will -- all right. And
15  you're -- you're copied on here; do you see that?
16  A   Yes, I do.
17  Q   Why would they have copied you if you had
18  absolutely nothing to do with ipratropium bromide MDI?
19  A   Again, there was a dotted-line responsibility
20  that I had strategically for the organization. I believe
21  I also previously mentioned to you for ipratropium, this
22  was a unique case in that it was a generic version of a
23  brand Atrovent that was marketed by BI Pharmaceuticals.
24  And, therefore, there was an information exchange between
25  the two organizations.

Page 46

1  Q  Who was David Townley?
2  A  David Townley is employed by Boehringer Ingelheim
3  and has had various roles serving during my time within
4  Boehringer on an international level.
5  Q  Where does he work for them?
6  A  Today?
7  Q  Yes.
8  A  I have no idea.
9  Q  Where did he work for them in February of 1996?
10 A  I'm not sure. He may have been in Ingelheim at
11 that point in time.
12 Q  Was he ever assigned to the U.S. corporation
13 living in the United States?
14 A  No, he was not.
15 Q  So all of your dealings with him had -- occurred
16 when he was actually living in Ingelheim, Germany working
17 at the parent?
18 A  Correct.
19 Q  How about Warren Lackstrom?
20 A  Warren Lackstrom worked within the Boehringer
21 Pharmaceuticals organization.
22 Q  In the United States?
23 A  In the United States.
24    MR. BREEN: Okay. We're about to run out of tape
25 here so maybe this is a good time to take a break.

Page 47

1    THE WITNESS: Sure.
2    MR. BREEN: If that's okay.
3    THE WITNESS: Sure.
4    MR. BREEN: We can change the tape.
5    THE WITNESS: Thank you.
6    THE VIDEOGRAPHER: This concludes Videotape No. 1
7  of Sheldon Berkle. We are going off the record. The
8  time is 9:56 a.m.
9    (Short recess was taken.)
10   THE VIDEOGRAPHER: For identification purposes
11 this is Videotape No. 2 of Sheldon Berkle. We're back
12 on the record. The time is 10:14 a.m.
13   (Exhibit No. 141, Inter-Office Memorandum dated
14 2/29/96, was marked for identification.)
15 Q  [By Mr. Breen] Okay. Mr. Berkle, I've now
16 marked as Exhibit 141 or had the court reporter mark what
17 purports to be a inter-office memo from you to Warren
18 Lackstrom dated February 29, 1996. It's Bates stamped
19 ROX-04295, 296, 297 and 298. I've handed a copy to your
20 counsel. I'll ask you to take a moment to look at that.
21 A  Okay.
22 Q  Now, on February 29th, 1996 -- well, first off,
23 did you send this memo to Mr. Lackstrom?
24 A  No, I received that from Mr. --
25 Q  I'm sorry.

Page 48

1  A  Yes.
2  Q  You received that from Mr. Lackstrom? Okay.
3  A  Correct.
4  Q  Do you have a recollection of having received
5  this --
6  A  No.
7  Q  -- from Mr. Lackstrom?
8  A  No, I don't.
9  Q  All right. Now, the subject is the respiratory,
10 slash, UDV strategy. Would UDV be unit dose vial?
11 A  Correct.
12 Q  And in February of 1996, what kind of respiratory
13 unit dose vial pharmaceutical products did the Boehringer
14 U.S. operation have available to sell?
15 A  At that point I believe it was Atrovent.
16 Q  And Atrovent is known by the generic name of
17 ipratropium bromide; correct?
18 A  Yes.
19 Q  All right. Any others?
20 A  Not that I can recall.
21 Q  So you're --
22 A  Not -- not within the -- certainly the branded
23 business.
24 Q  All right. Were you aware of any other
25 respiratory unit dose vial pharmaceutical that was

Page 49

1  manufactured or otherwise distributed by the Boehringer
2  U.S. operations in February of 1996 other than ipratropium
3  bromide?
4  A  I -- I can't recall specifically whether Roxane
5  had any other generic UDVs, so I'm not sure.
6  Q  All right. So if this was being directed to you,
7  though, it was -- must have been talking about ipratropium
8  bromide; correct?
9  A  Not true.
10 Q  No?
11 A  No.
12 Q  What other types of unit dose vial respiratory
13 pharmaceuticals were you involved with in February of 1996
14 besides ipratropium bromide?
15 A  What this memo refers to is a international
16 strategy that the parent company wished to explore. In
17 other words, finding other potential products --
18 respiratory products that they could produce and market
19 and sell within a UDV delivery system.
20 Q  Would that include generics?
21 A  It may but not necessarily. We were looking
22 predominantly for products we could market under a branded
23 trademark on a global basis.
24 Q  Now, are you aware that Roxane launched a generic
25 ipratropium bromide sometime around the time of this

Page 70

1  Roxane's generic ipratropium bromide as being of the same
2  quality as Boehringer's brand Atrovent?
3      A    Again, I'm not aware of the details that would
4  have been used in the marketing statements by Roxane.
5      MR. BREEN:  Let's have this one marked as the
6  next exhibit.  I'll give you yours first, Steve.
7      MR. McCONNICO:  Thanks.  I appreciate, Jim.
8      MR. COVAL:  150?
9      THE COURT REPORTER:  Yes.
10     (Exhibit No. 150, E-mail dated 10/20/97, was
11  marked for identification.)
12     Q    [By Mr. Breen]  This is Bates labeled ROX 5980.
13  It purports to be an e-mail from Edward Tupa dated Monday,
14  October 20th, 1997, to Dr. Kirk Shepard, to Jim King, to
15  various other individuals one of whom is Mr. Shelly
16  Berkle.  Now, Dr. Kirk Shepard, where did he work?
17     A    He -- he worked in Connecticut.
18     Q    The same thing --
19     A    -- the Connecticut office.
20     Q    The same with Dr. Wolfgang Baiker?
21     A    Yes.
22     Q    Were they U.S. nationals or were they over here
23  from the German parent?
24     A    Dr. Baiker was from the German parent working
25  within the U.S. organization.  Dr. -- Dr. Shepard is a

Page 71

1  national.
2      Q    And you see that one of the addressees is a
3  Mr. Feldman, Richard Feldman?
4      A    Correct.
5      Q    A copy went to your administrative assistant,
6  Roseann Press?
7      A    Uh-huh, yes.
8      Q    A copy went to Judy Waterer of Roxane?
9      A    Yes.
10     Q    And the subject is BUOC.  Do you know what BUOC
11  is?
12     A    Business unit operating committee.
13     Q    Now, this business unit operating committee was a
14  committee involved in operations; right?
15     A    Yes.  But, again, more on a strategic level as
16  opposed to a detailed level.
17     Q    And this is when you were the executive vice
18  president for sales and marketing for the business unit;
19  correct?
20     A    Yes.
21     Q    So -- but that's -- but you didn't have any
22  operational responsibility for multisource?
23     A    Correct.
24     Q    Even though -- and multisource then was never
25  part of the business unit operating committee's agenda;

Page 72

1  correct?
2      A    Again, not in the details.  Dr. Shepard sat on
3  that committee.  And, again, I don't recall this memo at
4  all and it doesn't necessarily mean that this subject
5  would have been discussed at the operating committee.
6      Q    All right.  Well, let's read the memo.  It says
7  (as read):  As a miscellaneous item, I need to bring up a
8  topic at BUOC regarding our difficulty maintaining the
9  ipratropium bromide UDV business.  We have known that Dey
10  came in with the advantage of a bundle of three products,
11  ipratropium, albuterol and cromolyn, as well as a more
12  user-friendly package and these advantages would be
13  difficult for us to compete with.  We assumed that the
14  home care market would be their greatest opportunity.
15  That turned out to be true at the beginning.  We did not
16  expect they would be able to carry the same clout over the
17  hospital and retail side.  That no longer appears to be a
18  valid assumption.  Our market share in these later markets
19  is falling significantly.
20     Is that something that you were -- had any
21  interest in as the executive vice president for sales and
22  marketing of the business unit?
23     A    Again, in the case of ipratropium which was a
24  unique case because the branded product was marketed by
25  Boehringer Ingelheim Pharmaceuticals.  There was a sharing

Page 73

1  of information to make sure everybody on both sides -- in
2  other words, both with Roxane and Boehringer, knew it was
3  occurring in the marketplace.  But anything to do with the
4  establishment of pricing was decided within the Roxane
5  organization, had to be approved by the CEO of the Roxane
6  -- or the president of the Roxane organization.  And,
7  again, opinions would perhaps be offered between the two
8  sister companies, but wouldn't necessarily dictate what
9  occurred within the Roxane organization.
10     Q    Well, okay.  So Mr. Tupa is talking about the
11  significant declining of the market share for the
12  ipratropium UDV business; do you see that?
13     A    Yes, I do.
14     Q    Is that the brand Atrovent business or is that
15  the multisource ipratropium business or is it both?
16     A    I would -- I would assume it refers to the Roxane
17  business because he had responsibility for the multisource
18  and not for the branded.
19     Q    It goes on to say (as read):  We now need to
20  bring greater strength to our offering by utilizing the
21  power of the BIPI and Roxane respiratory products.
22     Do you see that?
23     A    Yes, I do.
24     Q    Now, what respiratory products -- what
25  multisource respiratory products did BIPI offer?

74

1  A  None.
2  Q  So is he talking about multisource there or is he
3  talking about brand?
4  A  He would, I assume, be referring perhaps to
5  Atrovent. But, again, what he says and what was, you
6  know, ultimately done isn't necessarily the same thing.
7  He would have no responsibility for the branded product.
8  Again, because there was a constant sharing of
9  information, there could be suggestions from one to the
10  other but not necessarily acted upon.
11  Q  Let me go on. It says (as read): This is in
12  keeping with our strategic imperative to be a leader in
13  respiratory products.
14     Do you see that?
15  A  Yes, I do.
16  Q  Did he make a misrepresentation when he said
17  that?
18  A  In which way?
19  Q  Well, was -- did -- did Boehringer have a
20  strategic imperative to be a leader in respiratory
21  products?
22  A  I think we discussed that already. There was a
23  global strategy to be a world leader in respiratory
24  products. Roxane was one small cog within that strategy.
25  Q  It goes on to say (as read): What I propose is a

75

1  rebate to wholesalers and central warehousing drug chains,
2  amount to be still being worked on, but one percent as a
3  target, to commit to all of our respiratory products.
4     Do you see that?
5  A  Yes, I do.
6  Q  (As read): This move would offset the advantages
7  Dey brings to the market. We have seen what the move of a
8  major wholesaler from our product on their, quote, source
9  program to Dey has done to sales. We must find a means to
10  bring this business back. I believe the bundle rebate
11  would have significant appeal.
12     Do you see that?
13  A  Yes, I do.
14  Q  So he's talking about bundling the Roxane
15  multisource with the Boehringer brand; correct?
16  A  I have no idea. He -- perhaps that may be one
17  interpretation, but I can't tell you that's what it refers
18  to specifically.
19  Q  Well, is it your testimony that Mr. Tupa is not
20  recommending a unified marketing approach for the
21  Boehringer brand ipratropium bromide known as Atrovent and
22  the Roxane ipratropium multisource product?
23  A  I -- I can't attest to that. That may be one
24  interpretation. And, again, it doesn't mean that it was
25  necessarily followed. Again, people -- we opened -- we

76

1  operated on an open basis and many individuals make many
2  recommendations and suggestions. Mr. Tupa's
3  responsibility was for driving the Roxane business. If he
4  came up with an idea of perhaps that would help his side
5  of the business, he could state it. It doesn't
6  necessarily mean that it would be accepted and followed.
7  Q  Well, let me ask this question: During your
8  entire tenure at the Boehringer Ingelheim U.S. operations,
9  was there ever a unified or combined marketing strategy
10  that encompassed the Roxane multisource ipratropium
11  product and the Boehringer branded Atrovent ipratropium
12  product?
13  A  No.
14  Q  Never?
15  A  No.
16  Q  You're sure about that?
17  A  I can't be 100 percent sure. In my recollection
18  I don't believe so.
19  Q  Well, if there was a unified strategy to market
20  these two products together, the branded Atrovent and the
21  generic ipratropium bromide, who would be the senior
22  executive in the sales and marketing function responsible
23  for such a unified strategy in the U.S.?
24  A  I don't think we should speculate on that sort of
25  thing.

77

1     (Exhibit No. 151, E-mail dated 11/22/95, was
2     marked for identification.)
3  Q  Would you please look at what has been handed --
4  what is the number on that one, 151, which purports to be
5  an e-mail with some attachment from Ed Tupa to David
6  Townley, Bates labeled ROX 04987, 988 and 989, dated 22
7  November 1995 at 6:02 p.m., and you are cc'd on it.
8  A  Okay.
9  Q  And if you look at the -- I mean, this is talking
10  about sales and market projections for the unit dose vial
11  product of albuterol, correct -- or rather ipratropium
12  bromide?
13  A  Amongst other products.
14  Q  All right. And if you go to the next page
15  there's a spreadsheet with some projections regarding
16  ipratropium; correct?
17  A  Yes.
18  Q  And you see they've got the Roxane generic
19  projections on there right next to Boehringer Ingelheim
20  brand projections; do you see that?
21  A  Yes.
22  Q  And if you go back to the first page, the third
23  paragraph down, it says (as read): In the U.S., Roxane
24  will be launching a generic of Atrovent. Underlying the
25  attached forecast is the assumption that Roxane will begin

Page 78

1  shipping product on May the 1st.
2      Do you see that?
3   A  Yes, I do.
4   Q  Then we go down to the next paragraph (as read):
5  The total market for ipratropium UDV had not yet been
6  fully developed due to the lack of adequate supplies of
7  Atrovent UDV in the marketplace.
8      Do you see that?
9   A  Yes, I do.
10  Q  Why would Mr. Tupa be talking about Roxane's
11 projected launch of a generic version of ipratropium
12 bromide in the same e-mail with projections about Roxane's
13 brand ipratropium bromide known as Atrovent?
14  A  You mean, BIPI's brand --
15  Q  I'm sorry, BIPI.
16  A  -- of Atrovent. Again, it follows along what
17 I've said previously. There's a sharing of information.
18 Mr. Tupa would have received the Atrovent forecast from
19 the appropriate people in the BIPI organization and would
20 comment on it but really from a generic perspective. But
21 he would not have developed the Atrovent brand forecast.
22  Q  All right. And this e-mail doesn't refresh your
23 recollection or cause you to reconsider your -- your
24 testimony before that there was never a combined marketing
25 strategy for the brand and the generic ipratropium

Page 79

1  bromide?
2   A  Absolutely not.
3   Q  Okay.
4      MR. McCONNICO: These two exhibits, I just got an
5  extra copy of the same one.
6      MR. BREEN: I probably handed you two or --
7      (Exhibit No. 152, E-mail dated 10/26/95, was
8  marked for identification.)
9   Q  [By Mr. Breen] This is Bates labeled ROX 04860.
10 It purports to be an e-mail from David Townley to Ian
11 Mills and Ed Tupa copied to Shelly Berkle. Subject, UDV
12 strategy USA, Thursday, October 26, 1995 at 7:06 p.m.
13     MR. CRAWFORD: This has been marked Exhibit 152;
14 is that right?
15     MR. BREEN: Yes.
16  A  Yes.
17  Q  [By Mr. Breen] Now, if you look at this, number
18 one, who is Ian Mills?
19  A  Ian Mills was my vice president of marketing and
20 sales at that point in time.
21  Q  For the business unit?
22  A  Yes.
23  Q  And David Townley?
24  A  I'm sorry. For the BIPI branded business.
25  Q  Oh, for the BIPI branded business?

Page 80

1   A  Correct.
2   Q  And -- and Ed Tupa was his counterpart on the
3  Roxane multisource side; correct?
4   A  Correct.
5   Q  And so you're -- they both reported to you?
6   A  Again, Ed Tupa on a dotted-line relationship.
7   Q  Dotted line. And David Townley was with
8  corporate headquarters over in Germany; correct?
9   A  Yes.
10  Q  So he's writing to Ian and Ed and saying (as
11 read): During recent PEP workshops --
12     What's PEP workshops?
13  A  Pep was a strategic initiative from the parent
14 company.
15  Q  (As read): There could be significant latent
16 sales potential in the nebulizer solution and specifically
17 the UDV market if we were to take the leadership in the
18 following ways. Then it goes on. One, strongly force
19 UDVs in markets were introduced. Two, launch UDVs in new
20 markets particularly continental Europe. Three, defend
21 against generic erosion of Atrovent from non-BI companies.
22 Four, add non-BI substances to the range, ie, albuterol,
23 cromoglycate, bud --
24  A  Budesonide.
25  Q  -- budesonide. And then it goes on and says

Page 81

1  about half way down it says (as read): The USA currently
2  accounts for some 50 percent of the world nebulizing
3  solution market. I would greatly appreciate your input as
4  we put the meat onto the bones on this strategy. Shelly
5  and I have talked through this tonight, and he suggested
6  that I approach you directly to request your assistance.
7  What we need from you is a clear strategic outline of
8  overall USA plans with specific references to points one,
9  three and four above to also include sales forecasts for
10 the PEP planning period, ie, 1996 through 2000. This
11 should be from a total USA perspective, ie, BIPI and
12 Roxane combined strategy. For example, how much
13 ipratropium UDV business can Roxane take from BIPI and how
14 do we shut out, in quotes, other nongenerics as far as
15 possible. What is likely to be the change in price
16 levels? Does offering a bundle of UDV substances assist
17 and by how much? Who are our likely competitors, both
18 current and new entrants and what is their likely
19 response?
20     Do you see that?
21  A  Yes, I do.
22  Q  I'm going to ask you again, is it your testimony
23 today that there was never a combined strategy at
24 Boehringer Ingelheim U.S. that encompassed both the
25 branded Atrovent and the equivalent generic ipratropium

82

1  bromide manufactured by Roxane?
2      MR. McCONNICO: Objection; form. Go ahead and
3  answer.
4      A   Correct. Again, this is a memo from an
5  individual, David Townley, who's at a lower level in
6  parent company, who has no directive or responsibility to
7  tell how to establish strategies. Again, I believe his
8  intent was and the reason he wrote to both Ed and to Ian
9  was recognizing that they each had to provide input from a
10 BIPI strategic point of view and from a Roxane strategic
11 point of view.
12     Q   [By Mr. Breen] So when he says that he spoke to
13 you about this tonight, are you -- is it your testimony
14 that he never talked to you about some combined strategy?
15     A   I can't -- I can't recall that. Again, I only
16 interpret that as saying we -- you know, we talked and
17 Shelly said why don't you write each of the individuals.
18     Q   Okay.
19     A   That's how I interpret it.
20         MR. BREEN: We're about at the end of the tape
21 again so why don't we take our tape break.
22         THE VIDEOGRAPHER: This concludes Videotape No. 2
23 of Sheldon Berkle. We're going off the record. The
24 time is 11:12 a.m.
25         (Short recess was taken.)

83

1          THE VIDEOGRAPHER: We're back on the record.
2  This is for identification purposes. This is
3  Videotape No. 3. The time is 11:22 a.m.
4      Q   [By Mr. Breen] When you were the -- in charge of
5  sales and marketing for the business unit back in the
6  1996, 1997 time frame, did there ever come a point in time
7  where you became concerned about an excess inventory of
8  Atrovent and concern that the company would incur a
9  financial loss if the Atrovent were not sold in time
10 before it reached and became -- was close to its
11 expiration date?
12     A   I certainly don't recall any specific time that I
13 would have had that concern. I think as a general
14 business rule I would always look at inventory numbers,
15 look at sales numbers, look at are we meeting a marketing
16 expectations or budget expectations. But, again, it was a
17 general business overview as opposed to being excessively
18 worried about one point or another.
19     Q   If you -- if you had an excess supply of
20 Atrovent, would you turn it over to the generic division
21 and say just go ahead and sell it at your generic prices
22 so we can get rid of it?
23     A   No.
24     Q   Why not?
25     A   Again, the ethical business was the ethical

84

1  business. The generic business was the generic business.
2  The label for both products is different. There are
3  regulatory issues involved. So even from a regulatory
4  point of view, I don't think I'd even be able to do that.
5      Q   Well, I mean, I'm not suggesting that they would
6  mislabel it or change the label. I'm saying just go ahead
7  and sell it to some of your big customers for generic
8  prices and let them go ahead and get reimbursed like it's
9  a brand. They'll make some money -- we'll get rid of --
10 extra money. We'll get rid of the excess inventory of the
11 brand and everybody's happy?
12         MR. McCONNICO: Objection; form.
13     A   No. I mean, we had a branded strategy and we had
14 a generic strategy and we just wouldn't do that.
15     Q   [By Mr. Breen] And never -- they never met, did
16 they, those two strategies?
17     A   No.
18     Q   They were never combined?
19     A   Not that I'm aware of.
20     Q   Well, let me show you what has been marked as
21 Exhibit 111 in the deposition of Mr. King that was taken
22 on December the 1st, 2004. It purports to be a Roxane
23 Laboratories inter-office memo to Ed Tupa from Judy
24 Waterer dated October 20th, 1996. (As read): Ipratropium
25 bromide Back Order Management Plan.

85

1          And then in the second paragraph it says (as
2  read): On Friday -- Friday I met with Mike Spitalli and
3  Jim King to discuss the possibility of about substituting
4  the brand Atrovent for the generic. Mike gave me the
5  following information.
6          And it goes on in the next paragraph (as read):
7  Mike would like to move this product through Roxane as it
8  is very near its dating cut-off. He has no way to move it
9  without drastically impacting his brand sales price for
10 many months to come.
11         Then it goes on in the next page, second
12 paragraph (as read): I plan to take the discounted
13 product to select customers that will be the least likely
14 to divert it. The customers that have been identified as
15 likely targets for Atrovent substitution of generic IB-UDV
16 are direct warehousing retail chains, Accu-care (sic) and
17 RDI. Apria, MP Total Care and Health Scripts will also be
18 candidates for this substitution one they -- once they
19 sign the 14 percent loyalty bonus program contract as it
20 has a very specific definitions and penalties regarding
21 diversion.
22         Next to the last paragraph on that page (as
23 read): I'd like to have BI hold the inventory until we
24 sell it.
25         The next page at the top (as read): I would like

**Page 106**

1  Answer: I don't know that.
2  Is that -- is it that you do not recall or you
3  don't know whether or not any other approvals were needed?
4  Answer: I don't know beyond -- I don't -- I
5  don't know if Mr. Berkle needed approval higher up, so I
6  just don't know that. Now --
7  MR. CRAWFORD: Why don't you state the ending
8  page number.
9  MR. BREEN: Yes. I ended at page 38 and line 13.
10  Q  [By Mr. Breen] Now, are you aware of any reason
11  why Mr. Tupa would have been confused or mistaken in his
12  testimony that you would have given final approval for the
13  ipratropium bromide marketing plan?
14  MR. McCONNICO: Objection; form.
15  A  I would like you to repeat. There was a line
16  that referenced me in that and if I -- if you don't mind
17  could you repeat that line?
18  Q  [By Mr. Breen] Okay. Well, the first time
19  you're referenced is at -- at least in the section I wrote
20  -- read is page 37 at line 16. And the question begins on
21  13. (As read): And who would that be that would have to
22  give approval?
23  Answer: Well, the president of the company would
24  be involved and I -- I believe that Mr. Berkle had been
25  involved as well.

**Page 107**

1  And then he's asked at line 21 (as read): And
2  who is Mr. Berkle?
3  Answer: He was head of the pharmaceutical
4  business -- for human pharmaceuticals business for
5  Boehringer companies in the United States.
6  And then at page 38, line 5 (as read): Other
7  than Mr. Wojta and Mr. Berkle, was there anyone else who
8  would have had to approve the marketing plan for
9  ipratropium bromide?
10  Answer: I -- I don't know that.
11  And then you're mentioned again.
12  A  That's fine. Thank you. Again, going back to
13  that reference, Mr. Tupa himself he said "I believe," and
14  I think that's very telling in the sense that I would be
15  involved in the general strategy, but I would not have had
16  access necessarily to the detailed marketing plan. I was
17  concerned with the overall forecasts and general
18  strategies, but not in the nitty-gritty of the marketing
19  plan. Mr. Wojta really had the responsibility and the
20  authority to approve that.
21  Q  And he was the president of Roxane Laboratories
22  at the time?
23  A  Correct.
24  Q  Before Mr. --
25  A  Russillo.

**Page 108**

1  Q  Who was the -- who succeeded him?
2  A  Mr. Russillo.
3  Q  Russillo succeeded Wojta and he was in turn
4  succeeded by whom?
5  A  That I don't know. Mr. Russillo, as I understand
6  it, just retired at the end of 2004.
7  Q  Okay.
8  MR. BREEN: Now, any more questions on that?
9  MS. O'KEEFFE: I guess not.
10  Q  [By Mr. Breen] Any idea why, though, the
11  ipratropium bromide for the generic Roxane discusses the
12  Boehringer Ingelheim Atrovent product?
13  A  Again, I think it's a natural. You know, whether
14  it's Roxane or a third party, Atrovent was the originator
15  within that marketplace. They built that market. And I
16  think from a competitive point of view, because that's how
17  you have to view it, you have to know what the brand did
18  in terms of establishing that market and where they are
19  and, you know, how do you then capture that market share
20  as a generic drug.
21  Q  So was the Roxane ipratropium bromide competing
22  with the Boehringer Atrovent brand?
23  A  Absolutely.
24  Q  Now, did there ever come a time where you
25  authorized or directed any of the Boehringer Ingelheim

**Page 109**

1  employees to go and meet with the senior management of a
2  competitor Dey Laboratories for the purposes of talking
3  about respiratory drugs that both companies were
4  competing?
5  A  Are you referring to the branded, you know, BIPI
6  or are you referring to Roxane?
7  Q  Either one.
8  A  Directed --
9  Q  Or authorized.
10  A  I am -- if I recall correctly, I'm aware that
11  there were discussions, I think, on a business development
12  perspective -- from a business development perspective in
13  terms of for potential acquisition, potential product
14  acquisition, that sort of thing. But as far as I know
15  nothing went forward.
16  Q  Well, why would Boehringer be talking with Dey
17  Laboratories about generic ipratropium bromide?
18  A  I don't know that they were talking about generic
19  ipratropium bromide.
20  Q  Do you recall contemplating a potential market
21  alliance between Dey and Roxane?
22  A  No, I don't.
23  Q  All right. Let's have this marked.
24  (Exhibit No. 154, Inter-Office Memorandum dated
25  5/21/96, was marked for identification.)

150

1  retirement?
2  A  I think there was some discussion as to his
3  quality of work. And there was a mutual understanding
4  that he would leave the -- the organization.
5  Q  Who would have been the person with BI who would
6  have had the primary responsibility to come to the
7  decision that it would be a good idea for him to go
8  elsewhere?
9  A  Certainly it would be a joint discussion with the
10 -- Mr. Wojta, with myself, with Mr. Gerstenberg and with
11 the representative HR senior executives in both
12 organizations.
13 Q  Was he given any type of a severance package or
14 early retirement that you recall --
15 A  My understanding again --
16 Q  -- Mr. Tupa?
17 A  Thank you. Again, this would have come out of
18 the Roxane; but my understanding there was as part of the
19 mutual understanding, a severance package involved.
20 Q  Do you know whether or not any of the reasons
21 having to do with his being asked to leave had to do with
22 the allegations in this lawsuit?
23 A  Not that I'm aware of.
24 Q  Can you give me any specifics about the quality
25 of his work that would have resulted in the decision to

151

1  ask him to leave?
2  A  Off the top of my head I can't recall specific
3  situations. I think it was just a general quality issue.
4  Q  How long had he been with the BI companies?
5  A  Again, I can't remember precisely what his -- you
6  know, when he did leave the organization, but it had to be
7  in the range of, what, six years, something like that.
8  Q  At one time he was Judy Waterer's boss; is that
9  right?
10 A  Correct.
11 Q  Do you know if Judy Waterer or anything that she
12 did or didn't do played a part in criticism of Mr. Tupa?
13 A  Not that I'm aware of.
14 Q  Who would be the individual who would have the
15 clearest understanding about all of the reasons why
16 Mr. Tupa was asked to consider going elsewhere?
17 A  Probably the head of HR within Roxane
18 Laboratories.
19 Q  And who is that person?
20 A  That would be Judy. Can I consult with my -- I
21 can't remember her last name.
22 Q  Is she in the Ridgefield office?
23 A  No. She's in the Columbus office.
24 Q  Columbus?
25 A  Yes.

152

1  Q  And her first name is Judy?
2  A  Yes.
3  Q  How long has she been the HR person for Roxane?
4  A  A number of years. Certainly since I -- I was in
5  the United States.
6  Q  Which was in '94?
7  A  Certainly from that point, yeah.
8  Q  Is her name Judy Orinski?
9  A  Yes.
10 Q  O-r-i-n-s-k-i?
11 A  I believe so.
12 Q  And she would be the HR person who would be at
13 the pinnacle of human relations for all Roxane employees?
14 A  Correct.
15 Q  An employee such as Dawn Gordon, and I hope I'm
16 not misstating anything, it's my understanding that Dawn
17 Gordon at least some point in time had responsibilities
18 for selling Roxane products and also BIPI products and
19 perhaps other products. Is that your understanding also?
20 A  For those two entities, yes.
21 Q  Okay. Where would her --
22 A  To the trade. You know, just to specify to the
23 distribution trade.
24 Q  Okay. And if -- and if Dawn Gordon worked then
25 for both of these corporate entities, who would her HR

153

1  person be?
2  A  Well, she reported in to Mr. Feldman which is
3  part of the BIPI organization.
4  Q  So her HR people would be the BIPI HR people?
5  A  Correct.
6  Q  And who is the head of the HR for BIPI?
7  A  It's -- I believe it's still Mr. David
8  Nurnberger.
9  Q  D-a-v-i-d and spell the last word for me, please,
10 so I don't embarrass myself.
11 A  N-u-r-n-b-e-r-g-e-r.
12 Q  And is he in the Ridgefield, Connecticut office?
13 A  Yes, he is.
14 Q  Has he been there for a number of years?
15 A  Yes, he is -- has.
16 Q  Can you tell me off the top of your head the
17 names of two or three other sales persons that you would
18 consider to be contemporaries or cohorts of Dawn Gordon?
19 A  Not off the top.
20 Q  Can you tell me the name of any other salesperson
21 that worked either for BIPI and/or Roxane that you believe
22 would be a contemporary or cohort of Dawn Gordon? Can you
23 name even one?
24 A  The primary person is Mr. Rich Feldman.
25 Q  Now, Mr. Rich Feldman is also -- we talked to him