# TAB 90

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

| | |
|---|---|
| IN RE: PHARMACEUTICAL | ) MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) CIVIL ACTION |
| PRICE LITIGATION | ) 01-CV-12257-PBS |

-------------------------------X

| | |
|---|---|
| THIS DOCUMENT RELATES TO | ) |
| United States of America, et al,) | Judge Patti B. |
| Ven-a-Care of the Florida Keys, ) | Saris |
| Inc., | ) |
|     vs. | ) |
| Boehringer Ingelheim, Corp., | ) Chief Magistrate |
| et al. | ) Judge Marianne B. |
| Civil Action 07-10248-PBS | ) Bowler |

-------------------------------X


(Cross-caption appears on following page)

VIDEOTAPED DEPOSITION OF SHELDON BERKLE

VOLUME I

Naples, Florida

Friday, October 31, 2008

---

**26**

1  Altus?
2  **A.  May 2005.**
3  Q.  Prior to that time where did you work?
4  **A.  Just prior to that I had been retired**
5  **for just over a year, and prior to that with**
6  **Boehringer Ingelheim in the United States, and**
7  **prior to that in Canada.**
8  Q.  When you say Boehringer Ingelheim in
9  the United States, do you mean Boehringer
10  Ingelheim Pharmaceuticals, Incorporated?
11  **A.  Correct.**
12  Q.  Is it okay if we refer to that
13  sometimes today as BIPI?
14  **A.  Yes.**
15  Q.  Is BIPI part of a larger family of
16  companies?
17      MR. GASTWIRTH:  Objection to form.
18      THE DEPONENT:  Yes, it is.
19  BY MR. FAUCI:
20  Q.  Is that -- Is it okay if I call that
21  sometimes the Boehringer Ingelheim family of
22  companies?

---

**27**

1      MR. GASTWIRTH:  Objection to form.
2      THE DEPONENT:  Are you referring to the
3  U.S. family or to the worldwide family?
4  BY MR. FAUCI:
5  Q.  To the worldwide family I guess.  If I
6  -- If I use Boehringer Ingelheim family, I'm
7  talking about the whole broad --
8  **A.  The whole shebang.**
9  Q.  The whole shebang.
10  **A.  That's fine.**
11  Q.  When did your employment begin with any
12  Beohringer entity and the Beohringer Ingelheim
13  family of companies?
14  **A.  1973.**
15  Q.  With what entity?
16  **A.  Boehringer Ingelheim Canada.**
17  Q.  And obviously that's a Canadian
18  company?
19  **A.  Correct.**
20  Q.  Was there a point in time when you
21  transferred to Boehringer Ingelheim's American
22  operations?

---

**28**

1  **A.  Yes, there was.**
2  Q.  When was that?
3  **A.  It was November 1994.**
4  Q.  And when did you stop working for
5  Boehringer Ingelheim's American operations?
6  **A.  The end of 2003.**
7  Q.  Upon transfer to the U.S., which
8  specific entity did you work for?
9  **A.  BIPI.**
10  Q.  BIPI.  What was your position there?
11  **A.  Executive vice president.**
12  Q.  Executive vice president.
13      Did you have -- Did you have a position
14  at any other Boehringer Ingelheim entities in
15  America at that time?
16      MR. GASTWIRTH:  Objection to form.
17      THE DEPONENT:  I was a vice president
18  for BI Corporation.
19  BY MR. FAUCI:
20  Q.  Is it okay if we refer to that as BIC?
21  **A.  Sure.**
22  Q.  What about a company known as Roxane

---

**29**

1  Laboratories, did you have a position with them?
2      MR. GASTWIRTH:  Objection to form.
3      THE DEPONENT:  No.
4  BY MR. FAUCI:
5  Q.  Can you describe in general the
6  business of BIPI in the 1994 time frame.  By
7  business I mean, among other things, what types
8  of products was the company marketing or selling?
9  **A.  Again, it was involved in the research;**
10  **basic research, clinical research and marketing**
11  **sales of human pharmaceuticals.  It was a**
12  **relatively smaller company in the U.S.**
13  **pharmaceutical business.  And we were involved in**
14  **a couple therapeutic areas at that point,**
15  **respiratory medicine predominantly.**
16  Q.  Were most of BIPI's products branded
17  drugs or generic drugs?
18  **A.  Branded drugs.**
19  Q.  Can you describe the business of BIC at
20  about the same time, the 1994 time frame.
21  **A.  My understanding of what BIC was was**
22  **really as a holding company for the U.S.**

34

1  the 1994 time frame?
2      A.  Yes.
3      Q.  I know I asked you this earlier, but I
4  just see it here again.  Can you tell me what you
5  mean by the term "ethical pharmaceuticals"?
6          MR. GASTWIRTH:  Objection to form.
7  BY MR. FAUCI:
8      Q.  What you think that means when it says
9  head of business unit, ethical pharmaceuticals.
10     **A.  Again, it refers to my responsibility**
11  **for the pharmaceutical -- human pharmaceutical --**
12  **marketing human pharmaceuticals in the United**
13  **States.**
14     Q.  And human pharmaceuticals one more
15  time, what are those?
16         MR. GASTWIRTH:  Objection to form.
17  Asked and answered.
18         THE DEPONENT:  Drugs that are used in
19  the treatment of diseases affecting human beings.
20  BY MR. FAUCI:
21     Q.  Could those be multi-source products as
22  well as branded products?

35

1          MR. GASTWIRTH:  Objection to form.
2          THE DEPONENT:  Again, in the broad
3  definition, yes, it could.
4  BY MR. FAUCI:
5      Q.  Can you tell me which -- which
6  businesses were included within the business unit
7  ethical pharmaceuticals?  I can rephrase that if
8  you want.
9      **A.  It depends on the time frame that we're**
10  **talking about.**
11     Q.  Was BIPI -- At any point in time during
12  the time you worked for the BI family of
13  companies in America, was BIPI included within
14  the business unit ethical pharmaceuticals?
15         MR. GASTWIRTH:  And I'll just object to
16  form.  And also, I don't believe that this
17  witness has said he's worked for the BI family of
18  companies in America.  So I think when you talk
19  about where the witness has worked, we're just
20  going to have to be specific about the companies.
21  Okay?
22         MR. FAUCI:  Sure.  That's a good point.

36

1  BY MR. FAUCI:
2      Q.  So when you worked for BIPI -- And I
3  believe you said you also worked for BIC; is that
4  correct?  You had a position for BIC?
5      **A.  I had -- I had a position within BIC.**
6      Q.  During that time frame, approximately
7  1994 until the end of 2003, was BIPI within the
8  business unit ethical pharmaceuticals?
9      **A.  Not -- Not through 2003.**
10     Q.  Approximately what period of time was
11  BIPI part of or within the business unit ethical
12  pharmaceuticals?
13     **A.  I believe until approximately 2000.**
14     Q.  2000.
15         And was Roxane Laboratories included
16  within the business unit ethical pharmaceuticals
17  for any point within the 1994 to 2003 time frame?
18     **A.  No.  It was a separate division.**
19     Q.  Did the business unit exist prior to
20  1994?
21     **A.  I'm -- I'm not sure what the title**
22  **would have been.  I'm only familiar with when I**

37

1  **came to the United States and was responsible for**
2  **the business unit.  So I can't recall and I'm not**
3  **sure as to whether that acronym was used prior to**
4  **1994.**
5      Q.  If you look at the last full paragraph
6  on the first page of Exhibit 1, can you read that
7  paragraph for me.
8          MR. GASTWIRTH:  You want him to read
9  that into the record?
10         MR. FAUCI:  Please.
11         THE DEPONENT:  Is that the paragraph
12  beginning with "of primary"?
13  BY MR. FAUCI:
14     Q.  That's the paragraph.
15     **A.  Of primary importance to this position**
16  **will be the achievement of sales and marketing**
17  **objectives under OPINA, the attainment of**
18  **consolidated contributions, the maximizing of**
19  **synergies of the two leading entities, BIPI and**
20  **Roxane, and the coordination of sales and**
21  **marketing with medical and research and**
22  **development.**

38

1    Q.  I believe your testimony earlier was
2  that Roxane was not included within the business
3  unit; is that correct?
4    **A.  I believe I said that it was a separate**
5  **division.**
6    Q.  Can you elaborate what you mean by
7  that.
8    **A.  Roxane was a separate business entity.**
9  **They had their own budgets, their own plans.  Any**
10  **involvement that I had was really on a strategic**
11  **level with Roxane.**
12    Q.  So is it your testimony that the
13  business unit was just limited to BIPI?
14    **A.  The business unit was primarily BIPI**
15  **plus a strategic oversight of Roxane, but Roxane**
16  **had its own management team and it was**
17  **responsible for the annual budgets, marketing**
18  **plans, day-to-day operations.**
19    Q.  But at least on a strategic level -- Is
20  it fair to say that on a strategic level Roxane
21  sat within the business unit?
22    MR. GASTWIRTH:  Objection to form.

39

1    THE DEPONENT:  I don't think I would
2  use the term "sat."  They had a separate physical
3  presence, separate facilities.  And within the
4  strategic oversight, yes.
5  BY MR. FAUCI:
6    Q.  What is OPINA?
7    **A.  OPINA is an acronym that stood for the**
8  **optimization of the pharmaceutical business**
9  **within North America.**
10    Q.  The two -- I'm going to read again just
11  from the end of that paragraph.  It says, The two
12  leading entities, BIPI and Roxane -- I'm sorry,
13  I'm going to go back a little bit before.
14    Of primary importance to this position
15  will be, and then it says among other things, the
16  maximizing of synergies of the two leading
17  entities, BIPI and Roxane.  Were there synergies
18  between BIPI and Roxane?
19    **A.  Certainly not -- not at the -- not when**
20  **I first came in '94.  There really were two**
21  **separate businesses.**
22    Q.  Did you view as one of your goals when

40

1  you were hired to maximize synergies between the
2  two companies?
3    **A.  I -- Again, I -- Certainly at that**
4  **point in time my primary focus was on building**
5  **the branded human pharmaceutical business within**
6  **BIPI.  And certainly one of my -- one of my**
7  **objectives was to look down the road as to**
8  **whether there were, in fact, any synergies**
9  **between the BIPI operation and the Roxane**
10  **operation.**
11    Q.  And down the road were there any
12  synergies that could be exploited or --
13    **A.  Yeah.  We --**
14    MR. GASTWIRTH:  Objection to form.
15    THE DEPONENT:  We certainly did look at
16  certain things where we were able to create some
17  synergies, yes.
18  BY MR. FAUCI:
19    Q.  Was this a -- a goal that-- was one of
20  the goals that you were hired for, to look into
21  improving the synergies or exploiting or finding
22  synergies between these companies?

41

1    MR. GASTWIRTH:  Objection to form.
2    THE DEPONENT:  The primary reason why I
3  was brought to the U.S. was really to grow the
4  branded pharmaceutical business within BIPI.
5  BY MR. FAUCI:
6    Q.  That was the primary reason?
7    **A.  Right.  Primary reason.**
8    Q.  Was coordinating or improving upon the
9  synergies between BIPI and Roxane a reason that
10  you were hired?
11    **A.  Yes.**
12    Q.  If you turn to the next page of Exhibit
13  2. Do you see where it says basic
14  responsibilities, essential functions?
15    **A.  Yes, I do.**
16    Q.  Can you read into the record the third
17  bullet point.
18    **A.  The one that begins with "insures**
19  **optimization"?**
20    Q.  That's correct.
21    **A.  Sure.  Insures optimization of**
22  **performance in the U.S. through the development**

46

1 BY MR. FAUCI:
2    Q.   Take a moment to familiarize yourself
3 with the document.  Whenever you're ready, you
4 can tell me if you recognize this document.
5    **A.   That's fine.**
6    Q.   Do you recognize this document?
7    **A.   Not specific.  You know, I can't**
8 **remember it specifically.**
9    Q.   Do you see in the upper left-hand
10 corner it says employee bulletin?
11   **A.   Yes, I do.**
12   Q.   Which company issued this employee
13 bulletin?
14       MR. GASTWIRTH:  Objection to form.
15       THE DEPONENT:  I really don't know.
16 BY MR. FAUCI:
17   Q.   Do you know whether this employee
18 bulletin would have been sent to BIPI employees?
19   **A.   I would assume it was.**
20   Q.   Do you know whether it would have been
21 sent to Roxane employees?
22       MR. GASTWIRTH:  Objection to form.

47

1        THE DEPONENT:  It's possible.
2 BY MR. FAUCI:
3    Q.   Do you have any reason to believe it
4 wasn't sent to Roxane employees?
5    **A.   I don't know whether it was or wasn't**
6 **to be honest with you.**
7    Q.   Do you see at the second page that this
8 document was signed by--I might mispronounce his
9 name--Werner Gerstenberg?
10   **A.   Yes.  And that's correct by the way.**
11   Q.   Thank you.
12       Who is Mr. Gerstenberg?
13   **A.   Mr. Gerstenberg was the CEO of**
14 **Boehringer in the United States.**
15   Q.   And by Boehringer in the United States,
16 do you mean BIPI?
17   **A.   I mean all the divisions.  The total**
18 **company.**
19   Q.   So was he the CEO of BIC?
20   **A.   You know, again, I don't know what the**
21 **legal aspects were, but he was basically the**
22 **overall country manager for the United States.**

48

1    Q.   Including Roxane?
2    **A.   Including Roxane.**
3    Q.   Did you report to Mr. Gerstenberg?
4    **A.   Yes, I did.**
5    Q.   Was there anyone in between you and Mr.
6 Gerstenberg in the hierarchy of the corporation
7 or were you pretty much directly reporting to
8 him?
9        MR. GASTWIRTH:  Objection to form.
10       THE DEPONENT:  I reported directly to
11 Mr. Gerstenberg.
12 BY MR. FAUCI:
13   Q.   On the first page in the fourth
14 paragraph down, can you just read the first
15 sentence into the record.
16   **A.   Starting with Shelly's duties?**
17   Q.   Yes.  Thank you.
18   **A.   Shelly's duties will mainly focus on**
19 **the strategic alignment of our ethical**
20 **pharmaceutical business in the U.S. and he will**
21 **be responsible for the operating result for this**
22 **area.**

49

1    Q.   What is the strategic alignment of our
2 ethical pharmaceutical business?
3    **A.   Again, I think it is relative to what**
4 **we have spoken about before.  For those products**
5 **being used for the treatment of diseases in human**
6 **beings.  So for -- again, on the strategic level**
7 **for products marketed within BIPI and Roxane**
8 **Laboratories.**
9    Q.   In the next sentence it states, As in
10 other countries business will develop in line
11 with the strategy of the strategic business unit
12 (SBU) ethical pharmaceuticals BIGmbH.  What is
13 the strategic business unit ethical
14 pharmaceuticals BIGmbH?
15   **A.   Again, on a global basis Boehringer was**
16 **organized within a business unit framework.  So**
17 **as we've talked about a business unit --**
18 **strategic business unit in the United States, you**
19 **can expand that from various operative units**
20 **around the world into the parent company which**
21 **had a head of strategic business unit ethical**
22 **pharmaceuticals.**

50

1    Q.  If you'd turn to page two.
2    A.  Yeah.
3    Q.  The first paragraph.  The first
4  sentence says, In order to create a unified
5  management for our ethical pharmaceutical
6  business in the U.S, Edward Tupa, vice president
7  sales and marketing, Roxane Laboratories, and
8  Fred Duy -- Is that correct?
9    A.  Correct.
10    Q.  -- vice president business planning and
11  development also of Roxane Laboratories will
12  report to Shelly.
13    A.  Will report functionally to Shelly.
14    Q.  Will report functionally to Shelly.
15  Thank you.
16    A.  Key word.
17    Q.  Who is Mr. Tupa?
18    A.  Mr. Tupa worked within the Roxane
19  business entity.
20    Q.  Do you know what his responsibilities
21  were at Roxane?
22    A.  Responsible as it says here for sales

51

1  and marketing of Roxane products.
2    Q.  Would that include multi-source
3  products?
4    A.  Yes.
5    Q.  Would it include branded generic
6  products?
7    A.  Yes.
8    Q.  What does it mean that Mr. Tupa
9  reported functionally to you?
10    A.  Basically that means there was a dotted
11  line responsibility to me and a direct report and
12  responsibility to the president of Roxane
13  Laboratories.
14    Q.  A dotted line responsibility.  Can you
15  explain what that means.
16    A.  Again, I go back to what I've said
17  before.  I really had a strategic involvement
18  with Roxane, not an operational day-to-day
19  involvement.
20    Q.  And Fred Duy, can you tell me a little
21  bit more about his responsibilities.
22    A.  Basically, as it says here, business

52

1  development.  So really looking at opportunities
2  for new business within the Roxane business
3  entity.
4    Q.  The employee bulletin states that you
5  were the executive vice president of BIPI.
6    A.  Correct.
7    Q.  And it also says that you were a vice
8  president of BIC; is that correct?
9    A.  Correct.
10    Q.  How were these -- Were there different
11  job responsibilities as executive vice president
12  of BIPI and vice president of BIC, or were they
13  the same type of responsibilities?
14    MR. GASTWIRTH:  Objection to form.
15    THE DEPONENT:  Again, my primary
16  responsibility was within BIPI.  You know, and
17  again, I reemphasize that it was directed towards
18  growing the branded business within BIPI.
19    BIC really -- I would define it as a
20  holding company.  And I was an officer within
21  BIC, but BIC really didn't have a direct
22  business, as we've talked about before.

53

1  BY MR. FAUCI:
2    Q.  Were you an officer at any other -- any
3  other Boehringer Ingelheim companies besides BIPI
4  and BIC?
5    MR. GASTWIRTH:  Objection to form.
6    THE DEPONENT:  No.
7  BY MR. FAUCI:
8    Q.  Which company paid your salary?
9    A.  I believe it was BIPI that paid my
10  salary.
11    Q.  Did you receive a salary from BIC?
12    A.  No.
13    Q.  Did you sit on any boards of directors
14  for Boehringer Ingelheim companies?
15    MR. GASTWIRTH:  Objection to form.
16    THE DEPONENT:  The only board -- The
17  only direct position I believe I had was with --
18  was with Roxane Laboratories.
19  BY MR. FAUCI:
20    Q.  Do you know approximately how long you
21  served on the Roxane board?
22    A.  Off the top of my head I can't

54

1  remember.  It may be a few years, but I can't
2  remember specifically.
3      Q.  Do you remember anyone else who served
4  on the board?
5      A.  Of?
6      Q.  Of Roxane.
7      A.  Certainly Mr. Gerstenberg.
8      Q.  Can you remember anyone else?
9      A.  I'm not -- Again, it was not an active
10  board per se.  I think it was more of a legal --
11  legal entity.
12      Q.  What do you mean it wasn't an active
13  board?
14      A.  There -- Again, very -- You know, it's
15  a number of years ago, so it's hard for me to
16  remember, but as far as I remember there were
17  very, very infrequent meetings and it was more to
18  form than anything else.  It wasn't operational
19  in other words.
20      Q.  Do you recall any meetings of the
21  Roxane board of directors?
22      A.  Not specific.

55

1      Q.  And did you serve on any other boards
2  for Boehringer Ingelheim companies beyond Roxane?
3      A.  No.
4      Q.  Do you know if BIC and/or BIPI had
5  boards of directors?
6      A.  Yes, they did.
7      Q.  Did you ever attend meetings of the BIC
8  and BIPI boards of directors?
9          MR. GASTWIRTH:  Objection to form.
10         THE DEPONENT:  Usually only partly
11  during the times when the human pharmaceutical
12  business would have been discussed, but not as a
13  -- not normally for the whole complete meeting.
14  BY MR. FAUCI:
15      Q.  I'm going to -- When you did attend a
16  BIC and/or BIPI board meeting, would Roxane
17  business be discussed?
18      A.  Again, you know, there was always an
19  agenda set.  So it may have been on occasion,
20  but, you know, I can't specifically say yes or no
21  as I wasn't a board member, so...
22      Q.  But when you presented or talked at the

56

1  board meetings, did any of your -- At any of the
2  points in time when you were at the meeting do
3  you have any recollection as to whether or not
4  Roxane business was ever discussed?
5          MR. GASTWIRTH:  Objection to form.
6          THE DEPONENT:  Yes, I do.  Again, on
7  occasion if it was a topic on the agenda.
8  BY MR. FAUCI:
9      Q.  Thank you.
10         I'm going to show you what the court
11  reporter has marked as Exhibit I believe 4.
12         (Exhibit Berkle 004 was marked.)
13  BY MR. FAUCI:
14      Q.  Please take a minute to look at this
15  document.  Feel free to read it, but I'll tell
16  you in advance I'm only going to be asking you
17  questions about a narrow subsection of it.  So --
18      A.  Sure.
19      Q.  -- you can look at it with that in mind
20  and read it more if you need to later I guess.
21         The page I'm going to be asking you
22  questions about is marked BIC Juris 0236 on the

57

1  bottom right-hand corner.
2          Do you recognize this document?
3      A.  Not specifically.
4      Q.  Do you see on the first page it says,
5  Minutes of the meeting of board of directors,
6  Boehringer Ingelheim Corporation, October 28,
7  1998?
8      A.  Yes, I do.
9      Q.  I'm going to direct your attention to
10  BIC Juris 0236.
11      A.  Okay.
12      Q.  Can you please read the first sentence
13  from the paragraph starting, Mr. Berkle.
14      A.  Mr. Berkle explained the reorganization
15  of the strategetic business unit ethical
16  pharmaceuticals advising that it now has two
17  components, one being generic drugs and the other
18  branded generic drugs.
19      Q.  Do you agree that the strategic
20  business unit ethical pharmaceuticals had two
21  components, one being generic drugs and the other
22  branded generic drugs?

---

**58**

1    A.  I -- A slight variation of that.  I
2  think this refers to the Roxane component of the
3  strategic business unit.  It doesn't refer to the
4  BIPI component, which is purely branded.
5    Q.  So there was --
6    A.  Really three.
7    Q.  I'm sorry.  What do you mean by really
8  three?
9    A.  Again, this is -- this refers only to
10  Roxane Laboratories.
11    Q.  Okay.
12    A.  Okay?  That's --
13    Q.  And so there was a Roxane Laboratories
14  component of the business unit?
15    A.  Yes.  According to -- According to this
16  anyway definition.
17    Q.  The third sentence down in the same
18  paragraph it says, Sales and marketing for
19  branded generics will report to BIPI
20  counterparts.  Are branded generics, are those
21  Roxane products?
22    A.  Yes, they were.

---

**59**

1    Q.  Why are Roxane sales and marketing
2  reporting to their BIPI counterparts?
3      MR. GASTWIRTH:  Objection to form.
4  That's not what this document says.
5  BY MR. FAUCI:
6    Q.  Well, I can -- Let's just look at the
7  sentence.  It says, Sales and marketing for
8  branded generics will report to BIPI
9  counterparts.  Can you tell me what -- what you
10  think that sentence means?
11    A.  Well, I can tell you what the situation
12  actually was.
13    Q.  Okay.  That's --
14    A.  Okay.  And -- And again, because I
15  certainly can't recall having seen this document,
16  and I certainly didn't write this document.
17      The situation was that there were
18  people within the Roxane organization, within the
19  Roxane business unit, business entity that had
20  responsibility for the day-to-day operations and
21  the various functions, including marketing and
22  sales.

---

**60**

1      And as I think we talked about
2  previously in the document, just slightly above
3  that particular line, there's two components of
4  the Roxane business, multi-source generic and
5  branded generic.
6      So for the branded generic products
7  there was only a few of them.  Those people
8  within the Roxane business entity did report
9  functionally to designated people within the BIPI
10  organization, but the day-to-day operations were
11  still conducted by Roxane people.
12    Q.  Okay.  The last sentence of this same
13  paragraph reads, The contracting and pricing
14  departments will be combined for ROI and BIPI.
15  Do you recall if this -- if this happened?
16    A.  This happened really from the
17  administrative perspective, so that there was --
18  you know, the actual establishment of pricing or
19  contracting was done by individuals within the
20  Roxane business entity, but the processing of the
21  administration, the submission of prices, were
22  done by a central unit within -- within BIPI that

---

**61**

1  had that responsibility for both BIPI and Roxane.
2    Q.  Why were they combined in this way?
3    A.  Again, it was -- it was a synergistic
4  decision in the sense of rather than having two
5  separate organizations making submissions it made
6  sense to -- from an efficiency point of view to
7  combine that.
8    Q.  And submissions to who?
9    A.  To wherever, you know, pricing or
10  contract -- contracts had to be submitted to.
11      MR. FAUCI:  I think it's a good time
12  for a quick break.
13      THE DEPONENT:  Sure.
14      THE VIDEOGRAPHER:  It's 9:59.  We're
15  going off the record.
16      (Short break was taken.)
17      (Exhibit Berkle 005 was marked.)
18      THE VIDEOGRAPHER:  It's 10:24.  We're
19  back on the record.
20  BY MR. FAUCI:
21    Q.  Welcome back, Mr. Berkle.
22    A.  Thank you.

62

1      Q.  I'm going to hand you a document that's
2   been marked by the court reporter as Exhibit 5.
3   Can you take a moment to look at it and I'll have
4   a few questions for you.
5          MR. GASTWIRTH:  I'll just take a copy.
6          MR. FAUCI:  Oh, I'm sorry.
7          MR. GASTWIRTH:  That's okay.  Thank
8   you.
9          THE DEPONENT:  Okay.
10  BY MR. FAUCI:
11     Q.  Do you recognize this document?
12     A.  No, I do not.
13     Q.  Does it appear to be on Roxane
14  letterhead?
15     A.  Yes, it does.
16     Q.  Do you see that the document is signed
17  by Gerald Wojta?  Am I pronouncing his name
18  correctly?
19     A.  Wojta.
20     Q.  Wojta.  Do you see that it's signed by
21  Mr. Wojta?
22     A.  Yes, I do.

63

1      Q.  Who is Mr. Wojta?
2      A.  Mr. Wojta, as appears below his
3   signature, was president of Roxane Laboratories.
4      Q.  Did he work for other companies in the
5   Boehringer Ingelheim family?
6      A.  No.
7      Q.  Do you -- It says this letter, the
8   first thing which appears under the date is dear
9   fellow employees.  Do you suspect this letter --
10  Would this letter have gone out to Roxane
11  employees?
12         MR. GASTWIRTH:  Objection to form.
13         THE DEPONENT:  Again, I -- you know, I
14  don't know for sure, but I would assume that's
15  probably where it went.
16  BY MR. FAUCI:
17     Q.  Can you read the first sentence
18  beginning with the word "following."
19     A.  Following an internal study which we
20  began last fall of the U.S. business unit ethical
21  pharmaceuticals we are now prepared to implement
22  plans for a restructured business unit, including

64

1   the marketing, sales and business development
2   departments at Roxane Laboratories, Inc. and
3   Boehringer Ingelheim Pharmaceuticals, Inc.
4      Q.  Do you recall an internal study
5   regarding the organization of the business unit
6   in the fall of 1995?
7      A.  I can't recall specifics of it to be
8   honest.  I knew there was some -- Certainly I'm
9   aware there was something going on, but I can't -
10  - you know, I don't remember the specifics per
11  se.
12     Q.  The third paragraph states that the
13  Roxane marketing and sales departments will be
14  led by Mr. Edward Tupa who currently has this
15  responsibility.  Ed will also assume
16  responsibility for the BU sales training, BU
17  trade relations and BU contract functions.  What
18  is BU sales training?
19     A.  You know --
20         MR. GASTWIRTH:  Objection to form.
21         THE DEPONENT:  You know, BU would stand
22  for business unit I -- I think.  Again, I don't

65

1   recall, you know, this particular memo.  These
2   functional responsibilities, sales training trade
3   relations, really would refer to those functions
4   within the Roxane organization.
5   BY MR. FAUCI:
6      Q.  Did the BU have a -- a single sales
7   training staff that was responsible for both BIPI
8   and Roxane?
9      A.  No.
10     Q.  And so BU trade relations, can you --
11  can you tell me what that means?
12     A.  Again, you know, I -- I can't say for
13  sure, but I believe that really this is an error,
14  because the trade relations -- as I said before,
15  trade relations, sales training and contracts,
16  this really would refer to those functions within
17  the Roxane organization only; therefore, really
18  the BU is an incorrect designation from my
19  perspective.
20         MR. GASTWIRTH:  And I'm just going to
21  object on the record to the extent that you're
22  asking this witness questions about a document

74

1    MR. GASTWIRTH: I'm -- And just to
2  respond to that commentary by counsel, I'm not
3  instructing the witness not to answer these
4  questions, I'm just objecting to the extent that
5  questions are being asked about documents that
6  were not provided to the witness about his
7  understanding of terms or phrases within
8  documents he's never seen before.
9    MR. BREEN: You're giving this witness
10  the answer. It's improper and I object to it.
11    MR. GASTWIRTH: Okay.
12    THE DEPONENT: Could you repeat the
13  question.
14  BY MR. FAUCI:
15    Q. Sure. The language I read, the bolded
16  language in paragraph three --
17    A. Uh-huh. Right.
18    Q. -- does that language -- do you
19  understand -- can you tell me what you understand
20  that language to mean?
21    A. Yeah. How do I -- How do I answer
22  that? You know, I read it. I under -- you know,

75

1  based on what it says here -- You know, I'm just
2  going to repeat what it says. It says that the -
3  - a pharmacy is reimbursed by the payer on a
4  formula AWP less a defined percentage plus a
5  dispensing fee. So ultimately the money that
6  goes to the pharmacy.
7    Now, other than reading it and taking
8  it exactly what it says, I don't know whether
9  it's right or wrong or -- you know, I certainly
10  don't offer any other opinion beyond what the
11  actual words say.
12    Q. Did Roxane ever set AWPs for its
13  products to ensure that a pharmacist made a
14  larger profit margin when he or she dispensed the
15  Roxane product?
16    MR. GASTWIRTH: Objection. Can I hear
17  that question back for a second, please.
18    THE COURT REPORTER: Actually, Counsel,
19  can you repeat that.
20  BY MR. FAUCI:
21    Q. Sure. Do you know if Roxane ever set
22  AWPs for its products to ensure that a pharmacist

76

1  made a larger profit margin when he or she
2  dispensed a Roxane product?
3    MR. GASTWIRTH: Objection to form.
4    THE DEPONENT: As I said before, I was
5  not involved in the day-to-day operations of
6  Roxane or in basically how they set their prices
7  in general or how they marketed their generic
8  drugs. I really did not get involved. So I am
9  not aware whether they did or didn't do the type
10  of thing that you said.
11  BY MR. FAUCI:
12    Q. And I'll ask a similar question. Do
13  you recall if Roxane ever promoted the profit
14  margin available on its products as a reason for
15  a pharmacist to dispense the product?
16    MR. GASTWIRTH: Objection.
17    THE DEPONENT: I'm not aware of that.
18  BY MR. FAUCI:
19    Q. Are you familiar with the
20  pharmaceutical product known as Ipratropium
21  Bromide?
22    A. Yes, I am.

77

1    Q. What is that?
2    A. Ipratropium Bromide is a human
3  pharmaceutical product that was originated within
4  Boehringer research and marketed as an original
5  brand named Atrovent marketed by BIPI in the
6  United States. It is used in the treatment of
7  chronic obstructive lung disease.
8    Q. Is Atrovent a BIPI product?
9    A. Yes, it is.
10    Q. And is it fair to characterize Atrovent
11  as a branded product?
12    A. Yes, it is.
13    Q. And Ipratropium Bromide, is it fair to
14  say that's a generic equivalent of Atrovent?
15    A. Yes, it is.
16    Q. Were you involved in any way in making
17  decisions about the marketing or pricing of
18  Ipratropium Bromide?
19    MR. GASTWIRTH: Objection to form.
20    THE DEPONENT: You're talking about the
21  generic version?
22  BY MR. FAUCI:

**78**

1    Q.  Yes.  When I -- When I refer to
2  Ipratropium Bromide, I'll be referring to the
3  generic version.
4    **A.  Yeah.  I was not involved in the**
5  **marketing or pricing of Ipratropium Bromide.**
6    Q.  Did you have any involvement at all
7  with Ipratropium Bromide?
8    **A.  Yes, I did.  In the sense that we were**
9  **sister companies and there was discussions**
10  **between the two companies relative to the**
11  **experience that BIPI had in the marketing with**
12  **Atrovent.**
13    Q.  Was there any coordination between the
14  marketing of Atrovent and Ipratropium Bromide?
15    MR. GASTWIRTH:  Objection to form.
16    THE DEPONENT:  Define coordination.
17  BY MR. FAUCI:
18    Q.  Was there any -- Was there any link how
19  Atrovent was marketed and Ipratropium was
20  marketed?
21    MR. GASTWIRTH:  Objection to form.
22    THE DEPONENT:  Not -- Not in terms of

**79**

1  how they were marketed.  The only discussion was
2  that, you know -- when Atrovent was approaching
3  the end of its patent term, there was discussion
4  with the sister company Roxane in terms of their
5  launching of a generic version of Atrovent.
6  BY MR. FAUCI:
7    Q.  I'm going to show you a document the
8  court reporter marked as Exhibit 7.
9    (Exhibit Berkle 007 was marked.)
10  BY MR. FAUCI:
11    Q.  Take a moment to familiarize yourself
12  with it.
13    **A.  Sure.**
14    **Okay.**
15    Q.  Do you recognize this document?
16    **A.  Not specifically.**
17    Q.  Do you see on the second page that
18  you're copied on this document along with D.
19  Marshall and N. Valentin?
20    **A.  Yes, I do.**
21    Q.  It appears this document was authored
22  by Dave Townley.  Do you see his name in the

**80**

1  signature block?
2    **A.  Yes, I do.**
3    Q.  Who is Dave Townley?
4    **A.  David worked in the parent company in**
5  **Germany.**
6    Q.  Which company?
7    **A.  BIGmbH.**
8    Q.  Who is Ian Mills?
9    **A.  Ian Mills worked within BIPI.  He was**
10  **vice president of marketing and sales reporting**
11  **to me.**
12    Q.  And the other two recipients we've
13  talked about before.  Mr. Tupa, who is he?
14    **A.  Ed was head of marketing sales within**
15  **the Roxane organization.**
16    Q.  If you look at the first bullet point
17  it says Atrovent UDV exclusively expires 30/9/96.
18  What is UDV?
19    **A.  Unit dose vials.**
20    Q.  And Atrovent exclusively, that means
21  the patent was expiring?
22    **A.  Correct.**

**81**

1    Q.  And it was going to be subject to
2  generic competition?
3    **A.  Correct.**
4    Q.  Further down the document says Roxane
5  will launch preemptive, unbranded Ipratropium
6  Bromide UDV 1/7/96.
7    Was the launch of Ipratropium Bromide
8  timed to coincide with the expiration of
9  exclusivity for Atrovent?
10    MR. GASTWIRTH:  Objection to form.
11    THE DEPONENT:  Again, this is a memo.
12  You know, obviously I don't remember specifics to
13  this memo.  So the concept of launching
14  preemptively is correct.  The timing I'm not sure
15  of.
16  BY MR. FAUCI:
17    Q.  What does it mean to launch
18  preemptively?
19    **A.  Again, and I think some of these points**
20  **are made in this memo, it was anticipated that**
21  **multiple companies would be ultimately launching**
22  **generic versions of Ipratropium Bromide UDVs.**

82

1  And the thought process was that Roxane as a
2  sister company to Boehringer would, in fact, also
3  market sell their generic version of Ipratropium,
4  and that strategically we would have Roxane
5  launch their generic version onto the market
6  prior to other companies being able to come onto
7  the marketplace.  So that was reference to the
8  preemptive.
9      Q.  Who is Dey Labs?
10     A.  Dey Labs was a competitive company
11  within the generic marketplace.
12     Q.  Were they a competitor of Roxane?
13     A.  Yes, they were.
14     Q.  Did they compete with BIPI?
15     A.  Not -- Not -- No.  They did not have
16  drugs that competed that -- that point
17  specifically with BIPI.
18     Q.  It says the fourth bullet point down,
19  Dey will be able to offer a full UDV package from
20  this date, i.e, IPBr plus Albuterol plus
21  Cromoglycate.  What are those products?
22     A.  Well, IPBr is Ipratropium.  And the

83

1  Albuterol and Cromoglycate are other respirat --
2  products used in the treatment of respiratory
3  disease.
4      Q.  Would it be advantageous today that
5  they had other products, other respiratory
6  products in addition to Ipratropium?
7      MR. GASTWIRTH:  Objection to form.
8      THE DEPONENT:  You'd have to ask Dey
9  Labs that.
10  BY MR. FAUCI:
11     Q.  The next -- The next bullet point down
12  it says, Roxane Albuterol and Cromoglycate UDV
13  developments cannot be introduced until Q3/98,
14  thus leaving a two-year, quote, gap, quote, where
15  only IPBr, Ipratropium, unit dose vials can be
16  offered.
17     Was it a concern of yours that Roxane
18  did not have Albuterol and Cromoglycate UDV
19  products for a two-year gap?
20     A.  Was it a concern of mine?  I think --
21  You know, I could only reference this memo, which
22  is not my memo, which -- basically what it means

84

1  is that Roxane, as other generic companies, their
2  goal was to have a breadth of product offers
3  within any therapeutic area.
4      So ultimately Roxane was hoping to
5  launch not only Iprop -- Ipratropium, but other
6  respiratory products, such as Albuterol, such as
7  Cromoglycate.
8      Q.  Why were they looking to launch other
9  respiratory products?
10     A.  Well, again, just, you know, trying to
11  cover the gambit of therapeutic treatments for
12  these diseases and, therefore -- you know,
13  basically building their business.
14     Q.  Would it be an advantage in their
15  marketing of Ipratropium Bromide if they had
16  other respiratory products available?
17     MR. GASTWIRTH:  Objection to form.
18     THE DEPONENT:  I -- You know, I really
19  can't say that.  I don't know.
20  BY MR. FAUCI:
21     Q.  Why are you copied on this e-mail?
22     A.  Why am I copied on this e-mail?

85

1  Because basically I was heading the
2  pharmaceutical business.
3      Q.  The pharmaceutical business for who?
4      A.  For BIPI with a strategic involvement
5  for Roxane, and again BIPI not only -- one of the
6  leading therapeutic areas of Boehringer worldwide
7  was respiratory disease.
8      Q.  Was this memo confidential?
9      A.  To whom?
10     Q.  To people outside of BIPI and Roxane.
11  Was it expected that this memo would stay within
12  those two companies?
13     A.  I don't think there's any huge
14  confidentiality to it.  I think it was intended
15  for those people in the business unit who were
16  involved with marketing of respiratory drugs.
17  So, you know, I don't know if it would be of
18  interest to anybody else.
19     MR. GASTWIRTH:  I'll just state on the
20  record that the document appears to have been
21  Bates labeled confidential attorneys' eyes only.
22  So with respect to having this document produced

122

1    A. No.
2    Q. Who -- Have you seen this document?
3    A. I can't recall.
4    Q. Do you have any reason to believe that
5 you didn't see it?
6    A. I can't answer that yes or no.
7    Q. Is it -- This is a marketing plan for
8 Ipratropium Bromide; is that correct?
9    A. It appears to be.
10    Q. Is it likely you would have been sent a
11 copy of a document like that?
12       MR. GASTWIRTH: Objection to form.
13       THE DEPONENT: It's possible.
14 BY MR. FAUCI:
15    Q. I'm going to direct your attention to
16 page five. It's the internal page numbers.
17 There's a bunch of Bates numbers below, but --
18    A. Right. Yeah.
19    Q. It says pricing. Do you see that?
20    A. Yes, I do.
21    Q. Can you read me the first two
22 sentences.

123

1    A. Under pricing?
2    Q. Yes.
3    A. Pricing of the IB UDV will need to
4 follow the traditional parameters of a generic
5 product. Specifically AWP will be brand less 10
6 percent or $44.06 for the 25-count package. WAC
7 will be AWP less 40 percent or $26.44 for the 25-
8 count package.
9    Q. Is that -- Is it your under -- In your
10 understanding is it typical that the AWP for a
11 generic product would be AW -- would be brand
12 less 10 percent?
13       MR. GASTWIRTH: Objection to form.
14       THE DEPONENT: Again, my familiarity
15 was primarily with the branded products where we
16 set a wholesale acquisition cost and that I
17 cannot tell you what precisely is common relative
18 to AWP which from my perspective was familiar --
19 was more associated with generic drugs.
20 BY MR. FAUCI:
21    Q. The next sentence, The reason this type
22 of price structure is used for a generic launch

124

1 is to create an attractive spread between WAC and
2 AWP encouraging accounts to convert from the
3 brand name to the generic product as quickly as
4 possible.
5       Do you have any reason to dispute that
6 the purpose of the pricing structure was as it is
7 stated in the marketing plan; i.e., to create an
8 attractive spread between the WAC and AWP
9 encouraging accounts to convert from the brand
10 name to the generic product as quickly as
11 possible?
12       MR. GASTWIRTH: Objection to form.
13       THE DEPONENT: Yeah. The only comment
14 I'll make to that is that, you know, certainly my
15 understanding was -- on pricing for Roxane was to
16 ensure that they were competitive. Beyond that
17 I'm not prepared to make any comments.
18 BY MR. FAUCI:
19    Q. Would you have approved of this plan
20 had you seen that the stated reason for the
21 pricing structure was to create an attractive
22 spread between WAC and AWP?

125

1       MR. GASTWIRTH: Objection to form.
2       THE DEPONENT: I'm not going to
3 speculate on that. In general I've said to you
4 before that I really did not get involved in the
5 details of pricing for the generic products
6 within the Roxane line.
7 BY MR. FAUCI:
8    Q. I think we're going to move on from
9 that document.
10    A. Okay.
11       MR. FAUCI: It is 11:57. I'm happy to
12 keep going. Lunch isn't here.
13       MR. GASTWIRTH: That would be fine.
14       MR. FAUCI: Stop whenever people are
15 ready.
16 BY MR. FAUCI:
17    Q. I'm going to show you a document the
18 court reporter will mark as Exhibit 15.
19       (Exhibit Berkle 015 was marked.)
20 BY MR. FAUCI:
21    Q. Please take a moment.
22    A. Okay.

126

1    Q.  Have you seen this document?
2    A.  I don't recall.
3    Q.  It looks like an early version of an e-
4   mail.
5    A.  You're right.
6    Q.  It seems to be from Jim King.  Regards,
7   Jim King.  Do you see that at the bottom?
8    A.  Yes, I do.
9    Q.  Who's Jim king?
10   A.  Jim King was vice president of sales
11  reporting to me.
12   Q.  For BIPI?
13   A.  For BIPI.  For BIPI, sorry.
14   Q.  Did he have responsibility for Roxane
15  as well?
16   A.  No, he did not.
17   Q.  In the "to" line it's to a bunch of
18  different groups it seems; all RDs.  What does
19  that mean?
20   A.  Regional directors that would have been
21  reporting directly to Jim King.
22   Q.  Would they be in the trade relations

127

1   group?
2    A.  No.
3    Q.  What -- What group would they be in?
4   Where do they fall in the company?
5    A.  What's called the sales group.
6   Basically responsible for medical representatives
7   calling on physicians.
8    Q.  And those people, would they be BIPI
9   employees?
10   A.  Yes, they would.
11   Q.  And they would be responsible just for
12  BIPI products?
13   A.  Yes.
14   Q.  What about DMs?
15   A.  DM stands for direct managers and they
16  report to the regional directors.
17   Q.  And then reps?
18   A.  Reps are individual sales reps
19  reporting to the DMs.
20   Q.  And all these people are BIPI?
21   A.  Yes, they are.
22   Q.  Subject, Atrovent IB solution.  Do you

128

1   see that?
2    A.  Yes, I do.
3    Q.  I'm going to look at the second
4   paragraph.
5    A.  Uh-huh.
6    Q.  Just so you are clear on sales
7   commissions, if Roxane's Ipratropium Bromide is
8   sold or if an Atrovent solution is sold, you get
9   credit for it.  It is in the corporation's best
10  interest to shift business to Roxane as quickly
11  as possible.
12       Did sales personnel -- BIPI sales
13  personnel get credit for sales whether or not
14  they were BIPI products or Roxane products?
15       MR. GASTWIRTH:  Objection to form.
16       THE DEPONENT:  I can only --
17  BY MR. FAUCI:
18   Q.  Go ahead.
19   A.  I can only say according to this they
20  did.
21   Q.  Do you have any reason to believe they
22  didn't?

129

1    A.  No, I don't.
2    Q.  Had you seen this e-mail or known of
3   this, would you have approved of BIPI people
4   getting credit for Roxane sales?
5    A.  I would have been aware of it and I
6   would have approved it.
7    Q.  You would have approved it?
8    A.  Yeah.  The reason being is that -- and
9   again, I'm making certain assumptions here, that
10  this was during only -- this was only for a
11  period of time.  Okay.  And this was the period
12  of time when Roxane was preemptively launching
13  Ipratropium Bromide.
14       Okay.  So the agreement was that
15  Boehringer medical reps would still be promoting
16  the compound to physicians and to hospital
17  physicians, therefore, trying to grow the market
18  penetration of Ipratropium within the respiratory
19  marketplace.
20       And because they were putting an effort
21  but allowing -- but allowing Roxane to sell a
22  generic version during that exclusive period that

182

1 BY MR. FAUCI:
2    Q.  Who was that?  Do you recall who the
3 CFO was?
4    **A.  At that -- I don't know what -- What's**
5 **the date here?**
6    Q.  I think the date is around the 1998
7 time frame.  Signed 8/25/98.
8    **A.  Probably Holger Huels.**
9    Q.  And just for the record it was signed
10 by the wholesaler on 8/25/98 and by Roxane Labs
11 on 10/28/98.
12   **A.  Gotcha.**
13   Q.  Moving on.  I'm going to mark as
14 Exhibit 26 -- I shouldn't do that, let the court
15 reporter do that.
16       (Exhibit Berkle 026 was marked.)
17       MR. FAUCI:  Just so counsel for the
18 Defendant knows, this is an amended notice of
19 deposition.
20 BY MR. FAUCI:
21   Q.  Have you ever seen this document?  Feel
22 free to read it.

183

1    **A.  Yes.**
2    Q.  When was the first time?
3    **A.  This is the amended copy?**
4    Q.  Yes.  Although I can represent that the
5 only change on that from there to the original is
6 the location.
7    **A.  So the original was about a week ago.**
8    Q.  Were you asked to look for documents
9 prior to this deposition?
10   **A.  Yes, I was.**
11   Q.  Did you find any?
12   **A.  No, I did not.**
13   Q.  Where did you look?
14   **A.  Where did I look?  In my home.**
15   Q.  That's good enough.
16   **A.  Yeah.**
17   Q.  When you left BIPI in late 2003, were
18 you asked to look for documents or search for e-
19 mails in connection with the Texas case that
20 we've talked about previously or any other case
21 involving allegations about average wholesale
22 price?

184

1       MR. GASTWIRTH:  Objection to form.
2       THE DEPONENT:  The Texas case was after
3 I had retired from BIPI.
4 BY MR. FAUCI:
5    Q.  When you left, were you -- That's fine.
6 The question is, when you left, did anybody tell
7 you that you should look through your documents
8 and set aside certain documents?
9    **A.  No.**
10      MR. GASTWIRTH:  Objection to form.
11 BY MR. FAUCI:
12   Q.  What number was that, 26?
13   **A.  26, yeah.**
14   Q.  I'm going to show you a document which
15 the court reporter will mark as 27.
16      (Exhibit Berkle 027 was marked.)
17 BY MR. FAUCI:
18   Q.  Take a moment to familiarize yourself.
19   **A.  Okay.**
20   Q.  Turning to the second page.
21   **A.  All right.**
22   Q.  Actually just go to the back.  There's

185

1 two documents here.  There's a cover one.
2    **A.  Yes.**
3    Q.  I'm going to mostly focus on the second
4 part of it.  Is it fair to say that you drafted
5 pages two through four of this?
6    **A.  I'm sorry?**
7    Q.  Is it fair to say that you drafted
8 pages two through four of this?
9    **A.  It's got my signature on it so I assume**
10 **that's so.**
11   Q.  Do you recall drafting this?
12   **A.  Not specifically.**
13   Q.  Is this an employee bulletin?  Do you
14 see that at the top?
15   **A.  Yes.**
16   Q.  Who do you -- Who did you understand
17 that this employee bulletin would go to?
18   **A.  I would assume that it was directed**
19 **towards BIPI and Roxane employees.**
20   Q.  I'm going to look at the paragraph
21 beginning, As we are all aware.  Do you see that?
22   **A.  Yes.**

186

1    Q.   As we are all aware, we have taken
2 several steps in the past two years to increase
3 the level of business unit collaboration and
4 focus across organizations; e.g., business unit
5 operating committee, ethical pharmaceutical
6 committee.
7        Would you agree that -- Is that your
8 recollection now that over the past two years
9 leading up to 1998 you took several steps to
10 increase the level of business unit
11 collaboration?
12   **A.   Again, the goal would be to create eff**
13 **-- efficiencies and synergies where it made**
14 **sense.  However, Roxane and BIPI were always**
15 **separate entities, they were always separate**
16 **management within each entity and the day-to-day**
17 **business for each of those entities was done**
18 **within that entity.**
19   Q.   It says, The changes I will describe in
20 this announcement build on this foundation.
21 These changes also are designed to build on the
22 strengths of Boehringer Ingelheim

187

1 Pharmaceuticals, Inc., BIPI, Roxane Laboratories
2 and Ben Venue Laboratories while achieving much
3 greater synergy across the entire business unit.
4 Do you see that?
5    **A.   Yes, I do.**
6    Q.   We've talked about synergy a bit
7 earlier today.  What does it mean to increase the
8 synergy across the entire business unit?
9    **A.   Again, to do away with wasted effort in**
10 **the sense that you have duplication of -- of**
11 **effort in various functions.  And where it made**
12 **sense to amalgamate services that were common to**
13 **the various companies and divisions, then we**
14 **attempted to do that.  But, again, the day-to-day**
15 **operations for each of those businesses was**
16 **conducted and carried out by management within**
17 **those divisions.**
18   Q.   If you look at the next page, the first
19 bullet point.
20   **A.   Okay.**
21   Q.   We want to expand our important multi-
22 source business by capitalizing on and

188

1 strengthening the synergy between our solid
2 liquid dosage and injectable multi-source
3 businesses.  Is that what you talked about
4 earlier with Ben Venue being an injectable
5 company?
6    **A.   Correct.  So the solid liquid dose was**
7 **-- referred to Roxane and the injectable referred**
8 **to Ben Venue.**
9    Q.   It says, I've asked Tom Russillo to
10 take on this critical and complex challenge.
11 Multi-source marketing within RLI, Roxane, now
12 will report to Tom.  Who's Tom Russillo?
13   **A.   Tom Russillo was president of Ben Venue**
14 **Laboratories and obviously with this change took**
15 **over responsibility for the multi-source business**
16 **within Roxane as well.**
17   Q.   Was Tom Russillo at Ben Venue prior to
18 its acquisition by the Boehringer Ingelheim
19 family?
20   **A.   Yes, he was.**
21   Q.   Do you know if Russillo came to work
22 for Roxane?

189

1       MR. GASTWIRTH:  Objection to form.
2       THE DEPONENT:  I believe he was a Ben
3 Venue employee, but you would have to check that
4 with people more in the know than I.
5 BY MR. FAUCI:
6    Q.   But it's fair to say regardless of who
7 he formally worked for that Roxane employees
8 reported to him?
9    **A.   Yes.**
10   Q.   I'm going to look down at another
11 bullet point.  It says, To ensure that we are
12 bringing BIPI's medical and drug regulatory
13 affairs' knowledge to bear on both our multi-
14 source and specialty products, Roxane's, or
15 RLI's, medical and drug regulatory affairs'
16 current product will report with Doug Wilson's
17 BIPI medical/DRA organization.  What are the
18 medical and drug regulatory affairs departments?
19   **A.   Again, these are the people within that**
20 **organization that are responsible for conducting**
21 **clinical research and for liaising with the FDA.**
22   Q.   It says that RLI's medical and drug

190

1 regulatory affairs will report within Doug
2 Wilson's BIPI/DRA organization. Why was that?
3    A.  Again, in order to create efficiencies.
4    Q.  What type of efficiencies could that
5 create?
6    A.  BIPI had a large department, you know,
7 consisting of many more physicians,
8 statisticians, et cetera. So it would allow
9 Roxane -- people responsible for these areas to
10 tap into the larger BIPI medical regulatory
11 organization.
12    Q.  Next bullet point it says, RLI branded
13 and specialty products. Are those branded
14 generics?
15       MR. GASTWIRTH:  Objection to form.
16       THE DEPONENT:  I assume it's branded
17 generics.
18 BY MR. FAUCI:
19    Q.  Our RLI branded and specialty products
20 will become an important component of our
21 national and international business strategy. We
22 want to expand our support to these products by

191

1 increasing the degree of collaboration between
2 the marketing of RLI product lines and BIPI
3 product lines. Do you see that?
4    A.  Yes, I do.
5    Q.  How would increasing the degree of
6 collaboration between Roxane and BIPI marketing
7 be beneficial?
8    A.  Again, this was specific to the branded
9 -- RLI branded products. So at that time BIPI of
10 course had a much greater expertise and
11 experience in marketing these types of products.
12       Keep in mind that Roxane was made up of
13 a couple different types of businesses. The
14 multi-source, which was very -- and then they had
15 these so-called branded generics, which they
16 hoped to market more along the lines of a true
17 original brand such as contained in the BIPI
18 product line.
19       And strategically we made the decision,
20 fine, let's see what we could do and it made
21 sense to combine, you know, at certain levels the
22 reporting relationship to add to be able -- to be

192

1 able to allow Roxane to benefit from the
2 expertise within BIPI.
3       But, again, I emphasize that the day-
4 to-day operations were conducted for the Roxane
5 branded products -- branded generic products
6 within the Roxane structure.
7    Q.  Next bullet point it says, BIPI and RLI
8 contacting will be combined into a single
9 organization. What are BIPI and RLI contracting?
10       I'm on the next page, I'm sorry, the
11 last bullet point.
12    A.  Okay. Again, these are the -- this is
13 the department that would set up contracts with
14 purchasing groups or distributors of the BIPI and
15 Roxane products.
16    Q.  What do you mean set up contracts?
17    A.  Again, if there was a -- a distribution
18 agreement that was negotiated with a purchasing
19 group or a wholesaler or a -- you know, any other
20 distributor, that a contract would be put
21 together representing the terms of the agreement
22 between the two parties.

193

1    Q.  Next sentence it says, John Powers will
2 lead the day-to-day management of this operation.
3 He did lead the day-to-day management for BIPI
4 and Roxane?
5       MR. GASTWIRTH:  Objection to form.
6       THE DEPONENT:  You know, I recall that
7 he was predominantly involved on the Roxane's
8 products, but I can't recall specifically beyond
9 that.
10 BY MR. FAUCI:
11    Q.  You drafted this document, correct?
12    A.  I did. This was also ten years ago.
13    Q.  I'm going to ask you to go back to the
14 second page. The first page of this document,
15 second page of the exhibit.
16    A.  Right.
17    Q.  By the year 2004, very beginning, our
18 ethical pharmaceutical business is expected to
19 generate in the USA more than 40 percent of
20 Boehringer Ingelheim's worldwide ethical
21 pharmaceutical business. I'm just trying to
22 understand what that means. Can you tell me what

214

1    Q.  The first page of this is an e-mail.
2    It's from Dan Gerrity.
3    A.  Right.
4    Q.  It seems to attach a document about the
5    pricing policy and procedures.  Do you see that?
6    A.  Yes.
7    Q.  It says, Please review the attached
8    draft pricing policy and procedure and provide me
9    any changes you deem appropriate.  Do you see
10   that?
11   A.  Yes, I do.
12   Q.  And this e-mail is dated May 3rd, 2001.
13   Do you see that?
14   A.  I do.
15   Q.  Let's turn to the pricing policy and
16   procedure document.  It says, Scope, this policy
17   is applicable to wholesale acquisition cost,
18   average wholesale price, minimum bid price,
19   direct price for brand products of Boehringer
20   Ingelheim Pharmaceuticals, Inc. and Roxane
21   Laboratories.
22        I had to adjust my microphone there.

215

1    Was there a single policy applicable to those
2    prices for brand products of Boehringer Ingelheim
3    Pharmaceuticals and Roxane Labs?
4        MR. GASTWIRTH:  Objection.  Form.
5        THE DEPONENT:  A single policy?
6    BY MR. FAUCI:
7        Q.  Let me rephrase that.  It says, This
8    policy is applicable to various prices for brand
9    products of Boehringer Ingelheim Pharmaceuticals,
10   Inc. and Roxane Labs.  Do you see that?
11   A.  Yes, I do.
12   Q.  Does it surprise you that there's a
13   document out there that says that there's one --
14   that there's a policy that's applicable to prices
15   for both companies?
16        MR. GASTWIRTH:  Objection.  Form.
17        THE DEPONENT:  My understanding of this
18   is that it's applicable to the branded products.
19   Okay.  So BIPI and branded generics of Roxane.
20   BY MR. FAUCI:
21   Q.  So you think this pertains to a pricing
22   policy for Roxane's branded generics and BIPI's

216

1    brand products; is that correct?
2        A.  I believe so.  And, you know, again my
3    memory isn't a hundred percent, but this was in
4    May of '01, according to the cover memo -- cover
5    e-mail --
6        Q.  Cover e-mail.  Sure.
7        A.  -- and I believe this was approaching
8    the time when we divested of the Roxane branded
9    generic line.
10       Q.  What do you mean you divested of the
11   Roxane branded generic line?
12       A.  The -- Again, if I recall correctly
13   Viramune, which was under the Roxane label, was
14   transferred to the BIPI label and then the
15   palliative care line was in fact divested sold.
16       Q.  To who?
17       A.  It was initially sold to Elan who then
18   I know in turn sold it somewhere else.  So this
19   was -- you know, this would have been for a very
20   short period of time.
21       Q.  What was the -- the drug that you said
22   was transferred to BIPI?

217

1        A.  Viramune, which is a drug for treatment
2    of AIDS.
3        Q.  What do you mean it was transferred to
4    BIPI?
5        A.  Well, rather than be sold under the
6    Roxane label, it was sold under the BIPI label.
7        Q.  I'm a neophyte in this --
8        A.  Right.
9        Q.  -- so I'm going to ask a question, it
10   might be ignorant to you, but for Viramune --
11       A.  Viramune.
12       Q.  Viramune, when it was sold under the
13   Roxane label did they have any special rights to
14   it?
15        MR. GASTWIRTH:  Objection to the -- to
16   the extent that you're asking questions now about
17   a drug that's not at issue in the case.  I'm just
18   going to object on the record.
19        MR. FAUCI:  Okay.
20        THE DEPONENT:  Still answer?
21   BY MR. FAUCI:
22   Q.  Please.

222

1   A.  Yes, it was.
2   Q.  And this policy is applicable to
3   wholesale acquisition costs and average wholesale
4   prices.  That's what it says at the top?
5   A.  Yes.
6   Q.  When you -- If you were to approve a
7   wholesale acquisition cost or an average
8   wholesale price, what would be sent to you to
9   make the decision on whether or not to approve
10  it?        MR. GASTWIRTH:  Objection.  Form.
11          THE DEPONENT:  You know, let me
12  reiterate that I can't recall exactly what was
13  sent to me.  My focus was on WAC.  It would have
14  been a summary of the information that is listed
15  under pricing proposals.
16          MR. FAUCI:  Can you repeat the answer
17  for me.
18          (Record was read by the court
19  reporter.)
20  BY MR. FAUCI:
21  Q.  What types of information would be

223

1   listed in a pricing proposal?
2   A.  I think if you read this, you'll --
3   you'll see what it is.  You know as much as I do.
4   Q.  Tell me what you're looking at that --
5   What are you looking at?
6   A.  Well, look under new product pricing
7   proposals.  You know, competitive situation.
8   Q.  Why don't you just read that into the
9   record then.
10  A.  Forecasted net sales generated -- And
11  again, I would emphasize it's probably a summary,
12  it doesn't necessarily include all that
13  information.  Forecasted net sales generated
14  based on proposed price, growth rates, market
15  conditions, current and anticipated market share
16  of BI competitive products, daily wholesale
17  prices of direct competitors, impact on
18  competitive position, expected discounts that
19  will be given, probable reaction of managed care
20  organizations, impact on potential medical
21  rebates and any market research that was
22  conducted.

224

1   Q.  Plan changes to prices are extremely
2   confidential and should be kept to PTC, pricing
3   committee members only.  Do you see that?
4   A.  Yes, I do.
5   Q.  And would you keep -- if you received
6   information in this process on a branded generic
7   for Roxane would you agree that plan changes to
8   their price would be extremely confidential?
9          MR. GASTWIRTH:  Objection.  Form.
10          THE DEPONENT:  I -- I would think it
11  was because a branded generic there is still
12  multi-source products out there and, therefore,
13  it be would very critical in terms of making sure
14  that competitors weren't aware of the plans that
15  were to be put in place regarding pricing.
16          MR. FAUCI:  We can move on from that
17  document.
18          MS. ROGERS:  Jeff, before you go I just
19  want it to be clear on the record, and maybe the
20  court reporter could read it back, when he was
21  reading that paragraph I think he -- perhaps he
22  misspoke.  When he read impact on potential

225

1   Medicaid rebates.  I thought he said medical
2   rebates.  Perhaps I misheard.  I just want to be
3   sure that that's clear.  Did anyone hear it?
4          Did you read Medicaid rebates?  Is that
5   what you read?
6          THE DEPONENT:  You know, I mean, I
7   assume I read what it says there, but --
8          MS. ROGERS:  Okay.
9          THE DEPONENT:  -- I don't know.
10          MR. FAUCI:  We'll stipulate that he
11  meant to read what it says.
12          THE DEPONENT:  My intent was to read
13  Medicaid.
14          MS. ROGERS:  Thank you.
15  BY MR. FAUCI:
16  Q.  This document on -- One more thing.
17  I'm sorry.  I know I told you to put it away, but
18  one final question on it.  Do you know if this --
19  The e-mail says that this was a draft pricing
20  policy procedure.
21  A.  Right.
22  Q.  Do you know if it was enacted?

226

```
 1      A.  I believe it was -- The committee was
 2   put in place certainly for BIPI products, but I
 3   don't want to say that I'm absolutely sure it was
 4   for Roxane only because of what I told you
 5   previously.  I knew that there were discussions
 6   taking place to divest of part of the branded
 7   generic line and -- relative to Viramune.  So I'm
 8   not -- my memory fails me.  I'm not a hundred
 9   percent sure.
10      Q.  You can put that aside now for real.
11      A.  Okay.
12      Q.  Are you familiar with the
13   pharmaceutical product known as Furosemide?
14      A.  As an ex-pharmacist, yes.
15      Q.  When were you a pharmacist?
16      A.  Many years ago.  I graduated with a
17   pharmacy degree.  I really didn't -- I practiced
18   for an extremely short period of time.
19      Q.  What is Furosemide?
20      A.  Furosemide is a generic name for a
21   diuretic, a so-called water pill.
22      Q.  Was it a BIPI product?
```

227

```
 1      A.  No, it was not.
 2      Q.  Do you know if it was a Roxane product?
 3      A.  I think it was within the Roxane multi-
 4   source product line.
 5      Q.  It's not a brand of generic, is it?
 6      A.  It is not.
 7      Q.  I'm going to hand you Exhibit Number
 8   32.
 9          (Exhibit Berkle 032 was marked.)
10      THE DEPONENT:  Okay.
11   BY MR. FAUCI:
12      Q.  Are you familiar with this document?
13      A.  No, I'm not.
14      Q.  Who's Judy Waterer again?
15      A.  She was a Roxane employee.
16      Q.  Do you know who Lesli Paoletti was?
17      A.  You know, the name is vaguely familiar,
18   but I couldn't even tell you what position she
19   held.  She was a Roxane employee.
20      Q.  She was at Roxane?
21      A.  Yeah.
22      Q.  It's an e-mail from Lesli Paoletti to
```

228

```
 1   Judy Waterer.  It says, Attached is a document
 2   called standby statement, Furosemide price
 3   change.  Do you see that?
 4      MR. GASTWIRTH:  Objection.  Form.
 5      THE DEPONENT:  Yes, I do.
 6      MR. GASTWIRTH:  I believe you just
 7   switched the from and the to.
 8   BY MR. FAUCI:
 9      Q.  Fair enough.  The document is from Judy
10   Waterer to Lesli Paoletti.  I stand corrected.
11          It says, Here's a shot at it, please
12   make modifications as you see fit, then pass it
13   by Pam Demala.  Who's Pam Demala?
14      A.  Pam Demala was a BIPI -- either BIPI or
15   BIC employee, I'm not sure, but certainly within
16   the BI side, in the public relations area.
17      Q.  Why would a Furosemide price change be
18   passed by Pam Demala?
19      A.  I haven't got a clue.
20      Q.  And it says that, You may need to call
21   her and let her know the background, she'll
22   probably want to pass it by Berkle and Russillo
```

229

```
 1   as well.  Any idea why Ms. Waterer would think
 2   that Pam Demala would want to pass it by you?
 3      A.  I don't know.  And the only other
 4   comment I would make is I'm not sure in the
 5   timing but there's somewhere in 2000 that we --
 6   we totally changed the structure of the
 7   organization and I really was no longer involved
 8   in the Roxane business after that point in time.
 9   So I don't know whether this coincides with that
10   time period or not.
11      Q.  Do you remember around this time Roxane
12   -- Do you have any knowledge about the fact that
13   around this time Roxane raised the AWPs for its
14   Furosemide products?
15      MR. GASTWIRTH:  Objection.  Form.  I'm
16   sorry.  Can I hear that back, please.
17          (Record was read by the court
18   reporter.)
19      MR. FAUCI:  I can read it again if
20   you'd like.
21      MR. GASTWIRTH:  Thanks.
22   BY MR. FAUCI:
```

230

1    Q.  Do you have any recollection whether
2  around the 2000 time frame Roxane raised the AWPs
3  for its Furosemide products?
4    A.  I'm not aware.
5    Q.  We can move on from that document.
6      Can we go off the record for two
7  minutes.
8      THE VIDEOGRAPHER: It's 3:14.  We're
9  going off the record.
10      (Short break was taken.)
11      (Exhibit Berkle 033 was marked.)
12      THE VIDEOGRAPHER: It's 3:28.  We're
13  going back on the record.
14  BY MR. FAUCI:
15    Q.  Mr. Berkle, I've handed you what's been
16  marked as Exhibit 33.
17    A.  Yes.
18    Q.  Can you take a moment to familiarize
19  yourself with it.
20    A.  Okay.
21    Q.  What's the subject line of this e-mail?
22    A.  It says Furosemide tablet AWP

231

1  adjustment.
2    Q.  Have you read or seen this before?
3    A.  No, I have not.
4    Q.  That's all.  We're going to do another
5  document.
6      (Exhibit Berkle 034 was marked.)
7  BY MR. FAUCI:
8    Q.  The court reporter has handed you
9  what's been marked as Exhibit 34.  It's a very
10  lengthy document.  Feel free to read it, but I'm
11  going to direct your attention to specific parts
12  of it, so just tell me when you feel ready to
13  have some questions -- have some questions asked.
14      MR. BREEN:  Did you already mark this
15  one?
16      MR. FAUCI:  Yep.  34.
17      THE DEPONENT:  Okay.
18  BY MR. FAUCI:
19    Q.  Do you recognize this document?
20    A.  Not specifically.
21    Q.  Look at the first page.  It appears to
22  be an e-mail from Fred Duy.  Who's he?

232

1    A.  Fred was a Roxane employee.
2    Q.  And it's sent to you, Shelly Berkle?
3    A.  Yes, it is.
4    Q.  Subject, Roxicodone 15/30mg launch
5  plan.  Do you see that?
6    A.  Yes, I do.
7    Q.  And then does the attachment to this e-
8  mail appear to be a launch plan for Roxicodone?
9    A.  It certainly appears to be at least a
10  summary of a launch plan.  Highlights.
11    Q.  Is Roxicodone a Roxane product?
12    A.  Yes, it was.
13    Q.  Second sentence of the e-mail, The
14  strategy is essentially what you saw in
15  Tarrytown.  What's Tarrytown?
16    A.  It's -- Tarrytown is a town in New York
17  State close -- just across the border from
18  Connecticut.
19    Q.  What brought you to Tarrytown?
20    A.  I'm sorry?
21    Q.  What brought you to Tarrytown?
22    A.  Well, there's a conference that was

233

1  utilized frequently for meetings by -- by the
2  BIPI people, BIPI/Roxane people.
3    Q.  Do you recall -- The strategy is
4  essentially what you saw in Tarrytown.  Do you
5  recall being exposed to strategies relating to a
6  launch document in Tarrytown?
7    A.  I can't -- I can't remember
8  specifically that meeting.  You know, certainly I
9  was at multiple meetings over the years in
10  Tarrytown, but I can't remember the details.
11    Q.  It goes on to say that, It--I think the
12  strategy--has been updated and expanded with
13  specific tactics by Doug Bierl with input from
14  lots of people here and in Ridgefield.  Who's
15  Doug Bierl?
16    A.  I haven't got a clue.
17    Q.  What's Ridgefield?
18    A.  Ridgefield is the town -- location of
19  BI Pharmaceuticals.
20    Q.  Where was Roxane?
21    A.  In Columbus, Ohio.
22    Q.  Ridgefield means BIPI?

234

1    **A. It means BIPI, BIC.**
2    Q. BIC. Why are people in Ridgefield
3  updating and expanding a strategy for the launch
4  of a Roxane product?
5       MR. GASTWIRTH: Objection. Form.
6       THE DEPONENT: This goes along with
7  some of the memos you've shown me before.
8  Roxicodone was a branded generic and, therefore,
9  there was some supervisory role that some -- a
10 few BIPI people played. But again, the launch
11 plan, as you see here, was put together by Roxane
12 employees.
13 BY MR. FAUCI:
14   Q. It says, We expect approval by the user
15 fee deadline, August 29th. What does that mean?
16   **A. I assume that refers to the FDA**
17 **approval.**
18   Q. FDA approval -- The FDA approval of the
19 drug?
20   **A. Correct.**
21   Q. Okay. Last sentence of that paragraph,
22 If you can fit it into your schedule, we would be

235

1  happy to present the launch plan to you and
2  whoever you think is appropriate in Ridgefield.
3  Do you recall if this launch plan was presented
4  to you in Ridgefield?
5    **A. I do not recall.**
6    Q. Do you recall if you read the launch
7  plan?
8    **A. I don't recall specifically if I did or**
9  **didn't.**
10   Q. Do you recall whether you approved the
11 launch of the Roxicodone product?
12      MR. GASTWIRTH: Objection. Form.
13      THE DEPONENT: The way you've said it
14 is basically we put together a data package for
15 FDA approval, which meant that the decision was
16 that we would move ahead once approved to market
17 the drug.
18      So this would have been not just a sole
19 decision on my part. Okay. This would have
20 involved Gerstenberg, Russillo, other people.
21 Medical department, regulatory department.
22 BY MR. FAUCI:

236

1    Q. Do you recall if you were one of the
2  people who gave approval for marketing the
3  Roxicodone product?
4       MR. GASTWIRTH: Objection. Form.
5       THE DEPONENT: I -- I believe I
6  certainly was a part of the senior management
7  team that -- that would have heard the
8  recommendation and would have agreed to -- to
9  marketing it.
10 BY MR. FAUCI:
11   Q. I direct your attention to page 23.
12 It's Shaffer 001474. The heading is Market
13 Situation, Market Characteristic Summary.
14   **A. Got it.**
15   Q. Do you see at the bottom it says price
16 and reimbursement driven. Do you see that?
17   **A. I see that.**
18   Q. At the top it's market characteristics
19 summary. Do you see that?
20   **A. Yes.**
21   Q. Let's break that down. What does it
22 mean for something to be price driven?

237

1       MR. GASTWIRTH: Objection. Form.
2       THE DEPONENT: What it means and versus
3  -- Its relative importance with Roxicodone and my
4  estimation may be two different things. So, you
5  know, to me price driven refers almost to a
6  straight multi-source type of product.
7       But again, if my memory is correct,
8  with Roxicodone the proposal was to launch it
9  with 15-milligram and 30-milligram forms, which
10 it says here. And I believe there was no generic
11 competition to those particular dosage forms.
12      So the reason for, in fact, putting
13 together the data package to gain FDA approval
14 was to, in fact, offer advantages unique to
15 Roxicodone versus other generic Oxycodone
16 products.
17 BY MR. FAUCI:
18   Q. What type of advantages?
19   **A. Well, the fact that -- the predominant**
20 **advantage would have been a number of pills that**
21 **one had to take. So again, my memory isn't**
22 **perfect here, but I know there was a 5-milligram**

258

1  and with the United States government. The State
2  -- The remaining state is the State of Florida
3  having resolved the Ven-a-Care Texas cases
4  regarding -- relating to Roxane and the Ven-a-
5  Care California matter relating to Roxane.
6      MR. GASTWIRTH:  And I'll just make a
7  statement on the record that I'm going to
8  reiterate my objection at the beginning of
9  today's deposition with respect to any cross-
10 notices that occurred in any other states last
11 minute that we were surprised with and any
12 testimony by Mr. Berkle being used in connection
13 with any other cases outside of the DOJ case for
14 which this deposition had been originally
15 noticed.
16 BY MR. BREEN:
17     Q.  Okay.  We'll deal with that later.
18 Hopefully we won't -- Hopefully we won't be
19 taking your deposition again in the Florida case.
20 I'm going to do all I can to avoid that --
21     A.  I would appreciate that.
22     Q.  -- today.  So you can be routing for me

259

1  on that one.
2      All right.  Let's get started.
3      Just for context, you went to the U.S.
4  operations of Boehringer Ingelheim in what year?
5      A.  1994.
6      Q.  1994.  And from 1994 until you left in
7  2003?
8      A.  End of 2003.
9      Q.  End of 2003.  You at no time worked
10 directly for or as an employee of Roxane
11 Laboratories, did you?
12     A.  That's correct.
13     Q.  You at all times worked for the entity
14 known as Boehringer Ingelheim Corporation?
15     A.  More correctly Boehringer Ingelheim
16 Pharmaceuticals, Inc.
17     Q.  Okay.  Which is -- the acronym for that
18 is BIPI, correct?
19     A.  Correct.
20     Q.  The Boehringer Ingelheim Corporation is
21 the parent of BIPI?
22     A.  The U.S. parent.

260

1      Q.  The U.S. parent.
2      A.  Of BIPI.
3      Q.  But you during your tenure at
4  Boehringer Ingelheim -- And I'll use that
5  generally to mean the U.S. operations unless I
6  say otherwise.  Okay?
7      A.  Fine.
8      Q.  During your tenure there, were you
9  aware as to whether or not the boards of BIPI and
10 Boehringer Ingelheim Corporation had identical
11 memberships?
12     MR. GASTWIRTH:  Objection.  Form.
13     THE DEPONENT:  I am not aware that they
14 have identical memberships.
15 BY MR. BREEN:
16     Q.  Were you a member of either board?
17     A.  No, I was not.
18     Q.  Did you ever attend any of their board
19 meetings?
20     A.  I would attend some meetings partially
21 if an agenda item reflected the BIPI
22 pharmaceutical business.

261

1      Q.  Did you ever attend a meeting of the
2  two corporations' boards that was held jointly?
3      MR. GASTWIRTH:  Objection.  Form.
4      THE DEPONENT:  I don't recall.
5  BY MR. BREEN:
6      Q.  Do you recall whether -- which
7  corporation's board you met with?
8      MR. GASTWIRTH:  Objection.  Form.
9      THE DEPONENT:  The -- Certainly the
10 majority of the meetings I would have attended as
11 an observer or for a particular agenda item would
12 be the BIC board.
13 BY MR. BREEN:
14     Q.  The Boehringer Ingelheim Corporation
15 board?
16     A.  Correct.
17     Q.  And where was -- And when I say BIC, we
18 mean Boehringer Ingelheim Corporation, correct?
19     A.  Correct.
20     Q.  Where was BIC headquartered?
21     A.  In Ridgefield, Connecticut.
22     Q.  Who was the president during your

262

1  tenure?
2      MR. GASTWIRTH: Objection. Form.
3      THE DEPONENT: Werner Gerstenberg.
4  BY MR. BREEN:
5      Q.  And who was the president of BIPI
6  during your tenure?
7      **A.  There was no president of BIPI.**
8      Q.  Then who was the chief executive
9  officer that ran the company?
10     **A.  Again, my position I believe was the**
11  **highest level position within BIPI reporting to**
12  **the present CEO of BIC.**
13     Q.  Okay.  So all and all Mr. Gerstenheimer
14  was your boss?
15     **A.  Mr. Gerstenberg.**
16     Q.  Gerstenberg.  I apologize.
17     Mr. Gerstenberg was your boss?
18     **A.  Correct.**
19     Q.  Okay.  Now, let's talk a little bit
20  more about Roxane.  I've heard your testimony
21  today in response to the Department of Justice's
22  questions, and after going back through the

263

1  deposition that we took some time ago, I got -- I
2  gathered a certain impression.  I'm going to
3  state that to you and tell me -- I want you to
4  tell me if I'm correct or not.
5      When it came to branded pharmaceuticals
6  being marketed by Boehringer Ingelheim's U.S.
7  operations, you generally had some
8  responsibilities for the sales and marketing
9  aspects?
10     MR. GASTWIRTH: Objection. Form.
11     THE DEPONENT: For the -- You're
12  talking about the branded business within BIPI?
13  BY MR. BREEN:
14     Q.  I'm talking about the branded business
15  in general.
16     MR. GASTWIRTH: Objection. Form.
17     THE DEPONENT: The --
18     MR. GASTWIRTH: I mean, there are --
19     MS. ROGERS: Please don't make speaking
20  objections.
21     THE DEPONENT: Let me -- Let me just
22  state that throughout my tenure I was responsible

264

1  for marketing -- sales and marketing of BIPI
2  branded products.  For Roxane branded products I
3  had responsibility for certain periods of time
4  during my tenure.
5      As an example, after year 2000 I had no
6  involvement whatsoever.  Oh, I'm sorry, I
7  shouldn't say that.  Let me rescind that comment.
8  That after 2000 I had no involvement with Roxane
9  multi-source business whatsoever.  I already
10  stated in my previous testimony that sometime
11  after 2000 the Roxane branded business
12  disappeared.
13  BY MR. BREEN:
14     Q.  That's because the Roxane corporate
15  entity was turned into a manufacturing entity?
16     MR. GASTWIRTH: Objection. Form.
17     THE DEPONENT: The -- Certainly the
18  physical company was a manufacturing site.  The
19  Roxane products were combined together with the
20  Ben Venue products under the leadership of Tom
21  Russillo in terms of relative to the marketing
22  and sales and product development, sorry.  Also

265

1  product development.
2  BY MR. BREEN:
3      Q.  And about when was that in 2000?
4      **A.  I don't remember the specific dates.**
5      Q.  Do you recall if it was earlier or
6  later in the year?
7      **A.  You know what, I don't even want to**
8  **hazard to guess.**
9      Q.  Why don't you take a look at Exhibit 32
10  -- or 35 which -- What happened to the originals?
11     **A.  Yeah.  It's right here.**
12     Q.  Thank you.
13     **A.  Okay.**
14     Q.  This is dated August 22nd, 2000.
15     **A.  Right.**
16     Q.  And this is the one where you and Mr.
17  Gerstenberg are approving Roxicodone prices.  Do
18  you see that?
19     **A.  Yes, I do.**
20     MR. GASTWIRTH: Objection. Form.
21  BY MR. BREEN:
22     Q.  Is there any doubt in your mind that