**TAB 94**

```
                                                                    1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

       -----------------------------X

       IN RE: PHARMACEUTICAL        )  MDL No. 1456

       INDUSTRY AVERAGE WHOLESALE   )  Civil Action No.

       PRICE LITIGATION             )  01-12257-PBS

       -----------------------------X

       THIS DOCUMENT RELATES TO:    )  Judge Patti B. Saris

       United States of America,    )

       ex rel. Ven-A-Care of the    )  Magistrate Judge

       Florida Keys, Inc, et al. v.)  Marianne B. Bowler

       Boehringer Ingelheim Corp., )

       et al., Civil Action No.     )

       07-10248-PBS                 )

       -----------------------------X

          VIDEOTAPED DEPOSITION OF WALTER FREDERICK DUY

                 Tuesday, December 16, 2008

                         9:57 a.m.

                   Habash, Reasoner & Frazer

             471 East Broad Street, 15th floor

                   Columbus, Ohio  43215

            REPORTED BY:  SUSAN L. COOTS, RPR
```

**178**

1  Did the launch plan and the
2  Introductory Pricing Proposal appear to be the
3  two attachments to the e-mail that we just
4  reviewed, which is also the first page of this
5  Exhibit 34?
6      A. Yes, ma'am.
7      Q. So does Exhibit 34 include the launch
8  plan that you sent to Mr. Berkle?
9      A. Yes. It appears to.
10     Q. Would you have any reason to think that
11 it's not?
12     A. No.
13     Q. If you could go to page 23 of the
14 launch plan, which is Bates page SHAFFER001474.
15 The top of this page says, "Situation Analysis
16 Market Characteristics Summary." Do you see
17 that?
18     A. Uh-huh.
19     Q. Do you see that very last bullet which
20 states, "Price and reimbursement driven"?
21     A. Uh-huh.
22     Q. What is your understanding of that?

**179**

1      A. Well, one of the -- in this market, the
2  breakthrough pain market, there were lots of
3  generic products. There were several brand
4  products. Roxicodone 15 and 30 were going to be
5  unique. The strategy for developing them -- the
6  reason for developing them was, in breakthrough
7  pain, there was -- the only oxycodone tablets
8  available, both branded and generic, were 5
9  milligram, and in breakthrough pain, many of the
10 doses were 15 to 30 to 50 milligrams.
11     Q. Could you tell the jury what
12 breakthrough pain is?
13     A. Many patients, terminally ill patients,
14 are in significant pain, and the -- the normal
15 treatment for that pain, normal in the biggest
16 markets are sustained release products, sustained
17 release tablets, maybe patches, that act for
18 several hours. So the patient takes the drug
19 twice a day, three times a day, puts the patch on
20 once a day. But during that day, the -- the
21 patient's going to move or bump their elbow.
22 That, to us, wouldn't mean much, but to them,

**180**

1  because they're already in pain, treating that
2  pain, they're going to have an episode of what we
3  call breakthrough pain, where even though they're
4  on the 12-hour morphine, and it's only hour six,
5  because they moved differently or they stood up,
6  or they hit their elbow, they're going to have an
7  intense pain above what the patch or the 12-hour
8  pill can control. So they take a short-acting
9  product to alleviate that episode of pain.
10     Q. And was Roxicodone supposed to address
11 that type of pain?
12     A. Yes. Instead of the patient having to
13 take three or five or six, or however many 5
14 milligrams tablets, the doctor could prescribe
15 Roxicodone 15 milligram or 30 milligram tablets,
16 some patients would only have to take one. And
17 because we were the only 15 or 30 milligram
18 tablet available, to the extent we could get
19 physicians to prescribe Roxicodone 15 or 30, the
20 pharmacy could still substitute, but they would
21 have -- they wouldn't have an equivalent product
22 on the shelf. They wouldn't have the same

**181**

1  product on the shelf. They could build one by
2  telling the patient to take five tablets instead
3  of -- or three tablets instead of one.
4      But we thought we could drive the
5  market for these unique strengths by getting
6  physicians to write them for their patients who
7  needed more than 5 or 10 milligrams of
8  breakthrough medication.
9      Q. And how did price and reimbursement as
10 listed here form part of that strategy?
11     A. Well, the -- the thing we knew we had
12 to do with price and reimbursement was take them
13 out of the pharmacist's decision to stock the
14 product or not. If -- if we spent the effort to
15 generate a prescription for Roxicodone 15
16 milligrams, and the patient took it to the
17 pharmacy, and his pharmacist said, "Well, I don't
18 have that, but I can give you Purdue Frederick's
19 5 milligram tablet or Endos (phonetic) 5
20 milligram tablet, or any of the other three or
21 four, ten, 5 milligrams tablets; you just have to
22 take three of them instead of one," and he'd

182

1  write the directions, and the patient would
2  probably accept that. The physician would
3  probably accept that.
4      So we had to make sure there was no
5  incentive -- financial incentive for the
6  pharmacist to do that. And to -- so that the
7  pharmacist would, in fact, stock, give up shelf
8  space, for both the 5 milligram oxycodone
9  product, and the 15 and 30 oxycodone products.
10     Q.  And how does that relate to
11 reimbursement?
12     A.  Well, it would -- if the pharmacist's
13 reimbursement for a 5 milligram tablet, for three
14 5 milligram tablets, for instance, were greater
15 than our 15 milligram tablets, he had a
16 disincentive to stock our product. He had more
17 of an incentive to substitute 5 milligram tablets
18 versus 5 and 15.
19     Q.  So did you want to use reimbursement to
20 create an incentive to stock the Roxicodone
21 products?
22     A.  We wanted to make sure that

183

1  reimbursement -- that the spread in the end, his
2  spread, was not a disincentive to stocking
3  Roxicodone 15 and 30.
4      Q.  So you wanted to make sure that the
5  spread that Roxane -- you wanted to make sure
6  that the spread on the Roxane product was at
7  least equal to the spread the pharmacist would
8  earn on the competing product?
9      A.  Correct.
10     Q.  And when you talk about reimbursement
11 here, are you talking -- are you including
12 Medicare and Medicaid in that?
13         MR. KAVANAUGH: Objection to form.
14         THE WITNESS: Yes. It would be any
15 third-party payor.
16 BY MS. OBEREMBT:
17     Q.  If you could turn to page 31 of the
18 launch plan. Do you see the heading Distribution
19 Plan at the top of this page?
20     A.  Yes, ma'am.
21     Q.  And do you see a reference to sales
22 representatives informing retail pharmacies of

184

1  reimbursement?
2      A.  Uh-huh.
3      Q.  And what does that mean?
4      A.  Well, I don't remember specifically,
5  but I -- I'm sure we gave the sales
6  representatives some information that
7  reimbursement spreads to the pharmacists should
8  not be an obstacle. And I'm not sure what the
9  stocking incentive was specifically, but there
10 probably was one; order three and get four or get
11 10 percent back or something.
12     Q.  And, again, when you refer to
13 reimbursement here, are you referring to any
14 third-party payor, including Medicare and
15 Medicaid?
16         MR. KAVANAUGH: Objection to form.
17         THE WITNESS: Yes.
18 BY MS. OBEREMBT:
19     Q.  Would you turn to page 34, please.
20 Does the top of this page say Pricing?
21     A.  Uh-huh.
22     Q.  And is there a bullet that references

185

1  pharmacy reimbursement based on percentage off
2  AWP for brand compared to generics?
3      A.  Yes.
4      Q.  And what does that mean?
5      A.  Again, I don't remember specifically,
6  but what I do remember is there was a different
7  discount from AWP assumed for generic products
8  versus brand products.
9      Q.  And do you recall which discount was
10 greater?
11     A.  I believe the generic was greater.
12     Q.  And is this phrase communicating that
13 the pharmacy reimbursement is going to be based
14 off the lesser discount provided for brand drugs
15 off of AWP?
16         MR. KAVANAUGH: Objection to form.
17         THE WITNESS: Yes. As I remember, the
18 next bullet point is the important one. We
19 wanted the comparison to the equivalent number of
20 5 milligram tablets, the products they already
21 had on the shelf, to be revenue neutral.
22 BY MS. OBEREMBT:

Duy, Walter Frederick                               December 16, 2008
                      Columbus, OH
                                        48 (Pages 186 to 189)

**186**

1  Q. Would you turn to the next page, page
2  35. Does the top of this page say Pricing
3  Approach?
4  A. Yes.
5  Q. And does it reference setting AWP and
6  WAC at a level favorable to the average for
7  oxycodone class for equivalent number of 5
8  milligram tablets?
9  A. Yes.
10 Q. And does it also reference equivalent
11 or higher reimbursement levels?
12 A. Yes.
13 Q. So does this indicate to you that there
14 was a possibility that it would not be revenue
15 neutral, but, in fact, the reimbursement would be
16 greater for the Roxane product than for the
17 competition?
18     MR. KAVANAUGH: Objection to form.
19     THE WITNESS: Yes. I mean, what it
20 says to me is it will not be lower.
21 BY MS. OBEREMBT:
22 Q. And it might actually be higher?

**187**

1  A. And it might actually be higher.
2  Q. Would you go to page 37, please, of the
3  launch plan. Is that titled Pricing
4  Recommendation at the top?
5  A. Yes.
6  Q. And are those the prices that you
7  actually recommended be set for the product?
8  A. Yes.
9  Q. And did you expect that -- let me
10 rephrase that.
11     Did you expect that Roxane would report
12 any of these prices to pricing services?
13     MR. KAVANAUGH: Objection to form.
14     THE WITNESS: AWPs.
15 BY MS. OBEREMBT:
16 Q. Did you expect that either the direct
17 or the WAC price here would be reported to
18 pricing services?
19 A. Well, I -- I actually wouldn't have
20 known or remembered, except that you showed me
21 the Feldman letter that said AWP only.
22 Q. All right. So did you expect that WAC

**188**

1  or direct price would be reported to the pricing
2  publisher?
3      MR. KAVANAUGH: Objection to form.
4      THE WITNESS: Not now.
5  BY MS. OBEREMBT:
6  Q. Would you turn to page 39 of the launch
7  plan. Is there a heading on here that refers to
8  Medicaid Reimbursement Plan?
9  A. Yes.
10 Q. And what was the Medicaid Reimbursement
11 Plan?
12 A. To announce the availability to
13 Medicaid programs and to have 15 and 30 added to
14 Medicaid formulas.
15 Q. Was it important to the plan to have
16 Medicaid cover the drug?
17 A. I don't remember what portion of any of
18 the palliative care product sales were Medicaid.
19 It -- it certainly didn't hurt, but I don't
20 remember Medicaid being a large factor to any of
21 the products.
22     So was it important? Sure, it was the

**189**

1  thing. Had we not had it in here, Shelly or one
2  of the other people would have said, "Have you
3  guys forgotten about Medicaid?"
4  Q. Okay. Would you turn to the second
5  attachment to the e-mail, which is the last page
6  of this exhibit, entitled Introductory Pricing
7  Proposal. Did you draft this?
8  A. I don't think so.
9  Q. Do you know who drafted this?
10 A. My -- no, for sure. I do not know for
11 sure who drafted it. My guess would be Bob
12 Sykora who worked for Rich Feldman maybe. Maybe
13 Don Comston in the accounting group who often
14 pulled numbers like this together. He may well
15 have done the words. I would guess Sykora or
16 Feldman or some of the trade people provided the
17 words or the -- the reimbursement assumptions
18 that went into this.
19 Q. Would you have approved this before you
20 sent it to Mr. Berkle?
21 A. Sure.
22 Q. Does this document reference a