# TAB 98

1

-------------------------------------------x

UNITED STATES OF AMERICA, ex rel,

VEN-A-CARE, FLORIDA KEYS, INC.,

                        Plaintiffs,

                        Case No. 07-10248

          -against-

BOEHRINGER INGELHEIM CORPORATION,

et al.,

                        Defendants.

-------------------------------------------x


                        May 19, 2009

                        9:00 a.m.


                CONFIDENTIAL

        Deposition of JONATHAN R. MACEY, taken at

the offices of Kirkland & Ellis, Citigroup Center,

153 East 53rd Street, New York, New York, before

Georgette K. Betts, a Certified Shorthand

Reporter, Registered Professional Reporter and

Notary Public within and for the States of New

York and New Jersey.

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
New York, NY

5  (Pages 14 to 17)

### 14

1  Court opinion that I referred to as Best Foods. I
2  think it's the U.S. against Best Foods, which
3  articulates the standards that should be applied
4  in cases in which there are -- there's charges of
5  strict liability under CERCLA in the context of an
6  affiliate corporation or a parent/subsidiary
7  corporation.
8      Q.  Are the Best Foods standards relevant to
9  corporate control issues, or piercing the
10 corporate veil issues, or both?
11     A.  Both.
12     Q.  I think the last case we cited is the
13 South Carolina Electric and Gas Company versus
14 UGI, can you briefly tell me what that case was
15 about?
16     A.  That also is the same exact kind of
17 constellation of operative facts as the previous
18 case, meaning that it was a reverse piercing case
19 brought by a former subsidiary of a utility
20 holding company that had been forced to divest the
21 subsidiary pursuant to the Public Utility Holding
22 Company Act and the subsidiary was now bringing a

### 15

1  lawsuit against its former parent for contribution
2  in an environmental cleanup action.
3      Q.  Thank you.
4          Do you understand that you're offering
5  an opinion in a federal False Claims Act case
6  today?
7      A.  Yes.
8      Q.  What's your understanding of the case
9  that has been brought by the United States against
10 Roxane and the Boehringer defendants?
11     A.  I'm sorry, I don't understand what you
12 mean.
13     Q.  Do you have an understanding of the
14 allegations that the United States has made
15 against Roxane Laboratories and the Boehringer
16 defendants?
17     A.  I think so.
18     Q.  Can you tell me what that understanding
19 is?
20     A.  You mean sort of just generally
21 speaking?
22     Q.  In broadest terms.

### 16

1      A.  So, in the broadest terms, the
2  government is bringing a lawsuit charging that a
3  pharmaceutical company overcharged and contributed
4  to the overcharging of reimbursement for certain
5  of its clients in connection with Medicare and
6  Medicaid reimbursement claims.
7      Q.  How did you acquire this understanding
8  of the case?
9      A.  I think that understanding was acquired
10 from reading the complaint.
11     Q.  Have you talked about the United States'
12 allegations with Roxane or the Boehringer
13 defendants' counsel?
14     A.  I believe so, yes.
15     Q.  The defendants in this -- can you list
16 the defendants in this case?
17     A.  Certainly.  I can list -- so, defendants
18 in this case are Roxane Laboratories, a holding
19 company called B-I-C or Boehringer Ingelheim
20 Corporation and a -- which is a -- which owns
21 Roxane.  And another corporation which I refer to
22 as BIPI, Boehringer Ingelheim Pharmaceuticals,

### 17

1  Incorporated, which is another subsidiary of BIC.
2      Q.  I guess from your answer that you're
3  okay with this, but is it okay if we refer to
4  Boehringer Ingelheim Pharmaceuticals Incorporated
5  as BIPI, and Boehringer Ingelheim Corp. as BIC?
6      A.  Yes, that would be fine with me.
7      Q.  Is it your understanding that both
8  Roxane and BIPI are wholly-owned subsidiaries of
9  BIC?
10     A.  Yes, that is my understanding.
11     Q.  Are you aware that the United States has
12 alleged that BIPI and BIC were actively involved
13 in the underlying alleged fraudulent conduct
14 including decisions to set inflated AWPs?
15     A.  Yes.
16     Q.  Are you offering any opinion as to
17 whether or not BIC and/or BIPI are liable under
18 the False Claims Act for any role they played in
19 pricing, marketing, or selling Roxane's products?
20     A.  Could you repeat that, I'm sorry I
21 missed the first part of the question.
22         (Record read.)

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
                            New York, NY

6  (Pages 18 to 21)

18

1      A.  I'm not offering any opinions about the
2  ultimate conclusions of law or fact in this case.
3  I am offering conclusions about the corporate
4  governance control and control relationships among
5  the three companies Roxane, BIC, and BIPI that
6  we've -- that I previously identified as
7  defendants.
8      Q.  Are you offering an opinion as to
9  whether or not BIC or BIPI's conduct itself
10  violates the False Claims Act?
11      MS. RIVERA:  Object to form.
12      A.  Again I would give -- I'm not offering
13  any, you know, ultimate conclusions about how the
14  resolution of the case or even about what the law
15  is. I'm offering opinions about the relationships
16  among these corporations and it would really be up
17  to the judge, I think, to draw whatever
18  conclusions about ultimate liability.
19      Q.  Do you know what the standard for
20  liability is under the False Claims Act?
21      A.  In general terms I believe I do, yes.
22      Q.  What is it?

19

1      A.  Under the False Claims Act it's illegal
2  to -- and I can't remember the exact language of
3  the statute, but it's something to the effect of
4  submitting a false claim or causing a false claim
5  to be submitted to the government.
6      Q.  Are you offering any opinion as to
7  whether or not BIC and/or BIPI knowingly or
8  recklessly participated in the submission of false
9  claims to the government?
10      A.  Again, I'm offering opinions not about
11  any kind of ultimate legal issue but about the
12  control relationships among these firms and their
13  corporate governance relationships.
14      Q.  What do you mean by the control
15  relationships and corporate governance
16  relationships?
17      A.  So I'm offering opinions about -- as a
18  general matter of corporate governance, that is,
19  with respect to common practice among
20  corporations, what the relationship is between
21  parent companies and wholly-owned subsidiaries
22  such as BIC and Roxane and BIPI and what sort of

20

1  ordinary, typical business practices are and how
2  those ordinary and customary business practices
3  relate to or are consistent or inconsistent with
4  the practices that we observe in this case.
5      Q.  When were you first contacted by a
6  lawyer regarding any cases brought against Roxane
7  or a Boehringer entity relating to allegations of
8  inflated AWPs?
9      A.  Sometime in early 2009.
10      Q.  Who was that lawyer?
11      A.  I'm not certain but I believe that it
12  was an attorney at the Kirkland & Ellis firm named
13  Meghan Dolan.
14      Q.  And that was early 2009?
15      A.  Yes.
16      Q.  What other Roxane or Boehringer
17  attorneys have you spoken with about the case?
18      A.  I've also spoken with Maria Rivera, and
19  I have spoken with an attorney name Anne Sidrys, I
20  believe is the name.
21      Q.  Can you think of any others?
22      A.  No, I cannot.

21

1      Q.  How many times, in your best guess,
2  would you say you've spoken with a Roxane or
3  Boehringer attorney since your first conversation
4  in early 2009?
5      A.  Ten is approximately, that is not by any
6  stretch an attempt to be -- to get the exact
7  number.
8      Q.  Have your communications with defense
9  counsel been by phone or e-mail or both?
10      A.  Phone.
11      Q.  Have you been retained by Roxane or
12  Boehringer Ingelheim to provide opinions in any
13  cases other than the United States' lawsuit?
14      A.  No.
15      MR. FAUCI:  Let me introduce your
16  engagement letter as Exhibit 2.
17      (Whereupon, Engagement letter, was
18  marked as Exhibit Macey 002 for identification, as
19  of this date.)
20      Q.  I neglected to mention this earlier, I
21  try and take breaks every hour or so, but if at
22  any point you need a break just let me know and

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
                            New York, NY

7 (Pages 22 to 25)

22

1   we'll do our best to accommodate that.
2       A.  Thank you very much, I appreciate that.
3       Q.  Is this a copy of the letter you signed
4   with Kirkland & Ellis starting your engagement in
5   this matter?
6       A.  Yes, it is.
7       Q.  If you turn to the last page, do you see
8   that it's signed on behalf of the Boehringer
9   Ingelheim Corporation, BIPI, and Roxane
10  Laboratories by Sheila Denton?
11      A.  Yes, I do.
12      Q.  Have you spoken with Ms. Denton?
13      A.  No, I have not.
14      Q.  If you turn back to the first page, is
15  $750 per hour your customary fee?
16      A.  Yes, it is, it's my customary hourly
17  rate for my time.
18      Q.  You can put that aside.
19          I'm going to introduce your list of
20  materials considered as Exhibit 3.
21          (Whereupon, list of materials
22  considered, was marked as Exhibit Macey 003 for

23

1   identification, as of this date.)
2       Q.  Take a moment to familiarize yourself
3   with it. Tell me if you can identify this as a
4   complete and up-to-date list of the materials you
5   reviewed or considered in forming your opinions in
6   this case?
7       A.  I believe that it is. I was just
8   looking through, there might be -- I don't think
9   so, but there might be something that's cited in
10  my report that's not listed here, although I
11  believe that everything cited in my report is
12  listed in here.
13      Q.  Is there a particular document cited in
14  your report that you have in mind or just in
15  general there may be something that's not here?
16      A.  Well the reason I looked through it I
17  was particularly concerned about item 505 but I
18  see that it's listed here, so I believe that that
19  means that everything is in here.
20      Q.  Why were you concerned about item 505?
21      A.  Oh, just because it was one that I had
22  located on the Internet and I was concerned that

24

1   it hadn't made the list since it was a little bit
2   different than some of the other ones. It hadn't
3   been marked as a previous exhibit or anything like
4   that, so it just popped into my head.
5       Q.  Did you actually read all the materials
6   listed in Exhibit 3?
7       A.  I looked at all these materials. Some I
8   read several times, some I skimmed, but I
9   consulted all of these materials, yes.
10      Q.  I understand this list is voluminous,
11  but to the best of your knowledge, have you looked
12  at any materials, any new materials since the
13  submission of your expert report that would not be
14  reflected on this list?
15      A.  The only thing I can think of is, if you
16  notice, if you look at items 501 and 502 and they
17  mention the Matthew Perri rough transcript, I
18  believe that I have -- in addition to looking at
19  the rough transcript, I think between the date of
20  the preparation of this document and today I've
21  seen the final version of that deposition
22  transcript.

25

1       Q.  Other than that you can't think of any
2   documents that you looked at for the first time
3   after your submission of your expert report?
4       A.  That's correct. Yes.
5       Q.  Who decided that the materials listed in
6   Exhibit 3 were the materials you were going to
7   review?
8       A.  These materials -- very early in the
9   engagement I -- once I understood, once I read the
10  complaint by the government, I felt as though I
11  was able to, in general terms, identify the kinds
12  of documents that would be useful to me in the
13  preparation of my opinion. And so I, in broad
14  terms, asked for the documents that fit that
15  description and those were identified and sent to
16  me.
17      Q.  What kind of documents?
18      A.  So, I asked for documents that related
19  to corporate governance, internal corporate
20  governance, corporate control, the corporate
21  relationships between the firms, information about
22  the directors of various companies. Information

Macey, Jonathan R.          CONFIDENTIAL                May 19, 2009
                            New York, NY

26

1   about board action.
2       Obviously 30(b)(6) witness testimony,
3   deposition testimony of people that were in
4   positions to make decisions or engage in oversight
5   of the various companies.  So in just in general
6   terms things that related -- documents and
7   information of any kind that related to corporate
8   governance and corporate control.
9       Q.   What kinds of documents relate to
10  corporate governance and corporate control more
11  specifically?
12      A.   Well, so items such as corporate
13  charters, bylaws, evidence of board action such as
14  consents or minutes.  Items related to the way the
15  company conducted business and did business and
16  the way in which these various organizations
17  related to one another.
18      Q.   Did you ask to look at org charts?
19      A.   I did ask to look for organizational
20  charts although I will tell you in my experience
21  with corporations, both as a director and as
22  somebody who teaches corporate governance,

27

1   organizational charts are often more useful in
2   terms of getting a sense of head counts within a
3   company than they are for actually determining
4   lines of organization and control.
5       Q.   Why is that?
6       A.   Generally speaking, it's because the
7   people who prepare organizational charts are often
8   either in the human resources department of a
9   company or may be in some unrelated business to
10  the actual operational business and they know how
11  many people are working in each area but they
12  don't really know on the ground on a day-to-day
13  basis who was reporting to whom or who was doing
14  what.  So there often will be cases in which there
15  will be people who, you know, may be listed as
16  reporting to others who in fact don't and vice
17  versa.
18      Q.   Do you know who prepared Roxane or
19  Boehringer Ingelheim's organizational charts?
20      A.   No, I don't.
21      Q.   And your opinion that these charts don't
22  always accurately reflect reporting relationships,

28

1   that's based on your experience as a board of
2   director for various corporations?
3       A.   And as -- both as a member of corporate
4   boards and someone who studies corporate
5   governance and teaches it.
6       Q.   Is there any literature on this that
7   you're aware of?
8       A.   I've seen passing references over time,
9   I could not cite you to an article specifically
10  related to organizational charts inaccuracies.
11      Q.   This list consists of I believe 612
12  entries, am I correct that most of these refer to
13  individual documents?
14      A.   Yes.
15      Q.   Did you ask to review any marketing
16  plans, launch plans?
17      A.   I recall reviewing documents that
18  related to product launches.  I did not -- in my
19  general document request it was as I conveyed it
20  to you and did not specifically -- I didn't use
21  the words "product launch" when I was making my
22  document request, although some -- in the course

29

1   of my review of material I do recall looking at
2   materials related to product launches.
3       Q.   Is it fair to say that the documents you
4   requested to look at most related to whether or
5   not Roxane observed and adhered to corporate
6   formalities?
7       A.   No.  No.
8       Q.   What other aspects of corporate
9   governance did the documents you asked to look at
10  cover?
11      A.   So, I, in other words -- so I believe
12  your question was -- the previous question you
13  asked me was, was the focus of my document request
14  related to materials having to do with corporate
15  formalities and I said no because in my opinion
16  while corporate formalities are a relevant issue
17  with respect to issues having to do with corporate
18  control, corporate governance, and corporate
19  responsibility, I don't view it as the only factor
20  that is relevant.  It's simply one of -- you know,
21  of a large number of factors.  So I was certainly
22  interested in corporate formalities but it was by

Macey, Jonathan R.        CONFIDENTIAL        May 19, 2009
New York, NY

9 (Pages 30 to 33)

---

**30**

1    no means the only or even, you know, kind of a
2    primary focus of my document requests or my
3    investigation.
4         Q.   Did you ask to look at materials
5    relating to the approval of pricings, various
6    prices at Roxane?  I can rephrase that, that's a
7    poorly worded question.
8         Did you ask to look at materials
9    relating to the processes by which Roxane set
10   prices for its products?
11        A.   Yes.
12        Q.   In forming your opinion, are there any
13   materials that you relied on more than others that
14   you regarded as more important than others and, if
15   so, which?
16        A.   It's difficult to answer that because in
17   some ways the materials are kind of interrelated
18   in the sense that there would be a deposition of
19   somebody and that person would make reference to
20   documents and so it's difficult to kind of
21   separate out the document from the discussion in
22   the deposition that related to the document.

**31**

1         Having said that, I can't say that there
2    was any -- there was no document that was, you
3    know -- that I regarded as kind of, you know,
4    clearly dispositive that they were all, most --
5    there were a huge number of relevant documents
6    that I regarded as kind of useful in formulating
7    my opinion.
8         Q.   Are there documents listed in Exhibit 3
9    that you looked at and determined that they had no
10   bearing on your opinion?
11        A.   I do not -- sitting here right now I
12   can't recall thinking that any document had no
13   bearing on my opinion, no.  I don't -- I can't
14   recall -- I wouldn't want to say categorically no,
15   obviously some appeared to me -- maybe not
16   obviously, but some appeared to be more relevant
17   than others but I can't think of any that I, you
18   know, thought were, you know, entirely -- that I
19   could think of immediately as being entirely use -
20   - you know, unhelpful.
21        Q.   Logistically how did you receive the
22   documents?

**32**

1         A.   I received the documents in hard copy.
2         Q.   Was it one batch?
3         A.   I think -- well, there was one sort of
4    main batch then other things such as the Perri
5    deposition -- right, that may have come -- there
6    may have been other things that came separately.
7    So I would say both.  There was a batch and then
8    there's some other separate things.
9         Q.   Did you only request documents at one
10   time or did you request documents, look at
11   materials and then request different kinds of
12   documents?
13        A.   Well my -- I tried to make my first
14   request as broad as possible since I tried to ask
15   for -- I mean I asked for documents that were
16   generally related.  I'm trying to think if I had
17   any -- I had the sense that I might have asked for
18   some follow ups but sitting here right now I can't
19   recall specifically what it was that I -- which
20   specific things I asked for and by way of follow
21   up, although I do have the sense that I did
22   discuss with some attorneys additional

**33**

1    documentation.
2         Q.   If you could turn to page 11 of Exhibit
3    3, some of these entries reflect deposition
4    transcript and exhibits, do you see that?
5         A.   Yes.
6         Q.   Did you read all of these deposition or
7    did you conduct searches in them?
8         A.   I read of these, the depositions
9    certainly Berkle, Duy, Russillo, Sykora, Tupa
10   Ciarelli -- yes, I read all these depositions.
11   Paoletti, Waterer, McIntyre.  Perri is somewhere
12   else I guess.
13        Q.   Who suggested that these were the
14   depositions you should look at?
15        A.   I believe that these depositions were --
16   I mean I can't speak for what the people supplying
17   me with the material thought, but I think my
18   understanding, expectation, and belief is that
19   these depositions were supplied to me in response
20   to my -- the request that I described to you a
21   moment ago for relevant information about the
22   relationships among these companies and the

---

Henderson Legal Services, Inc.

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
New York, NY

10  (Pages 34 to 37)

**34**

1   corporate governance of these businesses.
2       Q.  Did you identify people by name or was
3   it certain categories of depositions that you
4   requested?
5       **A.  It was categories of depositions.**
6       Q.  Is it your understanding that all of the
7   documents identified in Exhibit 3 have been
8   produced to the United States?
9       **A.  I have no information or opinion about**
10  **the document production to the government.  I**
11  **don't -- that never came up.**
12      Q.  Other than deposition transcripts, can
13  you identify any document listed in Exhibit 3 that
14  was not originally a Roxane or Boehringer
15  document?
16      **A.  Okay.  Excuse me, other than which**
17  **documents?**
18      Q.  Other than the deposition transcripts
19  and exhibits?
20      **A.  Oh, sorry.  Okay.  Well, we discussed**
21  **item 505 --**
22      Q.  Right.

**35**

1       **A.  -- that was not a Roxane or Boehringer**
2   **document.  I suppose -- I mean, you know,**
3   **obviously I reviewed, as I mentioned to you**
4   **before, the complaint.  I don't know if it's on**
5   **this list but that would be another separate one.**
6   **Those are the only ones I can recall at the**
7   **moment.**
8       Q.  So to your recollection, entry number
9   505 is the only document you located as a result
10  of your own research?
11      **A.  I believe that's correct.**
12      Q.  Did you conduct any interviews with
13  Roxane or BIPI employees?
14      **A.  No, I did not.**
15      Q.  I think you can put this aside.
16      I'm going to introduce this letter as
17  Exhibit 4.  For the record, it's a March 1st, 2009
18  letter, appears to be from Professor Macey to
19  Kirkland & Ellis.
20          (Whereupon, March 1st, 2009 letter
21  from Mr. Macey to Kirkland & Ellis, was marked as
22  Exhibit Macey 004 for identification, as of this

**36**

1   date.)
2       Q.  Does this appear to be a letter you sent
3   to Kirkland & Ellis?
4       **A.  Yes.**
5       Q.  Can I direct your attention to the
6   itemized statement of time and expenses, the
7   second page of the letter.  Does this reflect all
8   your work in this case?
9       **A.  No.**
10      Q.  Does this reflect all the work in this
11  case prior to the production of your expert
12  report?
13      **A.  I don't recall but I don't -- I notice**
14  **this date, the date -- the last date -- this**
15  **invoice represents my time during the month of**
16  **February.  I believe that my expert report was**
17  **submitted in March at some point, so to the best**
18  **of my recollection, there was time in March**
19  **devoted to the expert report that would be**
20  **reflected on a different invoice.  That would be**
21  **reflected on the March invoice.**
22      Q.  Have you sent a March invoice to

**37**

1   Kirkland & Ellis?
2       **A.  Yes.**
3           MR. FAUCI:  I'll just say to Maria, we
4   haven't received that.
5           MS. RIVERA:  Okay.  I will check on
6   that, I will get you a copy.  My understanding was
7   that it had been produced, so I can get you that
8   today.
9           MR. FAUCI:  Yes, any time before
10  tomorrow would be great.
11      Q.  Have you submitted a -- I think I just
12  asked if you submitted a March invoice?
13      **A.  Yes.**
14      Q.  Have you submitted an April invoice?
15      **A.  No, not that -- I don't believe that I**
16  **have.  I'm pretty sure that I have not.**
17          MR. FAUCI:  I'll ask Maria to produce
18  whatever invoices you have.
19      Q.  Since the last date on this invoice is
20  February 28th, 2009, since that date can you
21  describe what you've done in connection with this
22  case?

Macey, Jonathan R.          CONFIDENTIAL                    May 19, 2009
                             New York, NY

18  (Pages 66 to 69)

66

1    Q.   Are there other officers for a company
2  that you would consider top officers besides the
3  CEO?
4    A.   Well, again it depends on the business,
5  but the person in charge of the finances generally
6  would be the other kind of key person.
7    Q.   What about vice presidents in charge of
8  certain aspects of the operating business?
9    A.   From the standpoint of comparing really
10  officers with directors those people would really
11  be in a little bit of a different category.
12    Q.   They generally have more responsibility
13  for day-to-day functioning?
14    A.   Well all of the officers -- that's what
15  the officers are supposed to do.  The difference
16  is not so much day-to-day versus non day-to-day,
17  rather the difference would be with respect to
18  kind of more discrete or specialized function as
19  opposed to kind of an overall responsibility for
20  the firm as a whole.
21    Q.   Is there a difference in your mind
22  between discrete and global responsibilities on

67

1  one hand and strategic or high level and day-to-
2  day responsibilities on the other?
3    MS. RIVERA:  Object to form.
4    A.   I think -- if I understood your question
5  correctly, I think there are a number of
6  distinctions in that question.  So, there are
7  difference between strategic decision making and
8  nonstrategic decision making.  And I think there
9  are also differences between global nonstrategic
10  decision making and discrete nonglobal decision-
11  making.  So you'd have two employees, like one
12  could be a CEO who's -- or a comptroller or
13  financial officer who are involved in every single
14  aspect of the firm but much of their work may not
15  be strategic.  And then you could have somebody
16  with a specialized function, say, in research or
17  accounting or law or whatever, who may be -- who
18  is also a nonstrategic but is not global because
19  they're involved only in a specific aspect of a
20  company's business.
21    Q.   In general terms, as compared to a board
22  of directors, a corporation's officers are tasked

68

1  with managing its operations; is that correct?
2    A.   Can you give that to me again?
3    (Record read.)
4    A.   Yes, the day-to-day business.
5    Q.   And officers can include the president,
6  the treasurer, the CEO, the CFO, positions like
7  that are officers?
8    A.   Well with respect to your last question,
9  just in terms of the operations of the business it
10  would include -- yeah, it would include a broad
11  sort of group of people, yes.  So in terms of
12  running the day-to-day business, that would
13  include a fairly broad group of people.
14    Q.   Is it your opinion that it is routine
15  for holding companies to provide certain services
16  to subsidiaries such as legal, IT, financial and
17  accounting services?
18    A.   Yes.
19    Q.   Did BIC provide such services to its
20  subsidiaries?
21    A.   My recollection here is that most of the
22  kind of shared services were provided by a

69

1  separate company with respect to certain of these
2  services or with respect to others that BIPI
3  provided those services.
4    Q.   Is it normal and typical that such
5  services would be provided by one subsidiary
6  corporation to another?
7    A.   Yes, very common.
8    Q.   What is that opinion based on?
9    A.   It's based on my own experience as well
10  as research and analysis.
11    Q.   Is it typical that one subsidiary
12  corporation will emerge as the primary operating
13  company within a group of subsidiary corporations?
14    A.   I'm not quite sure I understand what you
15  mean.  I will say that it is extremely common that
16  for one subsidiary among a group of subsidiaries
17  to, for lack of a better term, really to be -- I
18  don't know, kind of the alpha subsidiary, to be
19  the subsidiary that's the most profitable, that
20  gets the most attention, the most resources, its
21  businesses evolve over time, some just become more
22  important than others as a consequence of the

Macey, Jonathan R.        CONFIDENTIAL        May 19, 2009
New York, NY

19 (Pages 70 to 73)

---

**70**

1　market really.
2　　Q.　And in such a circumstance is it typical
3　for the alpha subsidiary to participate in the
4　management of other subsidiary corporations?
5　　A.　What would be -- well, just to be very
6　clear here, I want to make it something that I
7　think is important to clarify is -- at the risk of
8　stating the obvious but I think it's necessary, a
9　corporation of course is an inanimate object, as
10　the saying goes.  It has no -- what is the term,
11　no soul to damn, no body to kick or something like
12　that.  So corporations cannot act, period.  They
13　have to have -- there have to be individuals who
14　in, you know, corporations to act, so it's -- so a
15　caveat to that is, you know, it's just a matter of
16　corporate governance it's imperative to kind of
17　figure out some way to figure out to determine
18　when a corporation is acting for many, many, many,
19　many, many reasons and when, you know, individuals
20　within the corporation are either acting on their
21　own behalf or acting as agents for other
22　corporations.

**71**

1　　　So the answer to your question is
2　complicated based on that, which is, one, it is
3　exceedingly common for, as I mentioned earlier,
4　for people in a sibling company or in a subsidiary
5　company to play multiple roles, to be agents both
6　of the company that the sort of alpha company or
7　one company within a corporate group and other
8　companies within the corporate group.  It's also
9　common for the subsidiary company to deal -- a
10　subsidiary company to deal with other subsidiary
11　companies and for those companies to have
12　interactions and relationships.
13　　　I just -- the point I want to make in
14　brief is simply that these are two very different
15　things.  It's one thing to say a company is acting
16　on behalf of another company, and that occurs
17　sometimes and it also occurs sometimes that
18　individuals within a subsidiary company are acting
19　on behalf of that subsidiary company and they may
20　at various times act on behalf of other subsidiary
21　companies, so we see both going on simultaneously
22　and I saw both going on with respect to BIPI's

**72**

1　relationship to Roxane.
2　　Q.　Can you turn to paragraph 21 of your
3　report?
4　　A.　Okay.
5　　Q.　I'm looking at the second sentence.  You
6　say that holding companies routinely nominate and
7　elect boards of directors of their subsidiary
8　companies, participate in the management of their
9　subsidiaries, provide advice and strategy and
10　financial support, and perform various services
11　for their operating subsidiaries including tax
12　reporting, legal services, accounting services and
13　cash management services.
14　　　Do you see that?
15　　A.　Yes.
16　　Q.　My question is, is it typical for one
17　subsidiary corporation to do all of those things
18　for another subsidiary corporation?
19　　A.　Yes, I understood that question when you
20　asked it before and yes.
21　　Q.　And based on your review of the
22　materials in this case, is it your opinion that

**73**

1　BIPI, in fact, performed many of the functions
2　identified in paragraph 21?
3　　　MS. RIVERA:  Object to form.
4　　A.　Yes.  To put it as clearly as I can, as
5　I talked a moment ago, companies evolve at
6　different rates and in different ways and it may
7　be that in a subsidiary's development it requires
8　certain services, say, legal service as an
9　internal legal function before other subsidiaries
10　within the group.  And having already established
11　a legal function in subsidiary A, it often is
12　efficient, and the reason the holding companies
13　are considered to be, you know, efficient in the
14　economies that before -- in situations where it
15　might otherwise not be cost effective or efficient
16　for another subsidiary to, as a free standing
17　entity create such a function, it could be
18　economical for it to utilize the services provided
19　by the other subsidiary.  So that's why it's
20　extremely common for affiliate companies to
21　perform these services.  And holding companies
22　frequently have, not always, but very frequently

---

Henderson Legal Services, Inc.

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
                            New York, NY

19 (Pages 70 to 73)

---

**70**

1  market really.
2      Q.  And in such a circumstance is it typical
3  for the alpha subsidiary to participate in the
4  management of other subsidiary corporations?
5      A.  What would be -- well, just to be very
6  clear here, I want to make it something that I
7  think is important to clarify is -- at the risk of
8  stating the obvious but I think it's necessary, a
9  corporation of course is an inanimate object, as
10  the saying goes.  It has no -- what is the term,
11  no soul to damn, no body to kick or something like
12  that.  So corporations cannot act, period.  They
13  have to have -- there have to be individuals who
14  in, you know, corporations to act, so it's -- so a
15  caveat to that is, you know, it's just a matter of
16  corporate governance it's imperative to kind of
17  figure out some way to figure out to determine
18  when a corporation is acting for many, many, many,
19  many, many reasons and when, you know, individuals
20  within the corporation are either acting on their
21  own behalf or acting as agents for other
22  corporations.

---

**71**

1      So the answer to your question is
2  complicated based on that, which is, one, it is
3  exceedingly common for, as I mentioned earlier,
4  for people in a sibling company or in a subsidiary
5  company to play multiple roles, to be agents both
6  of the company that the sort of alpha company or
7  one company within a corporate group and other
8  companies within the corporate group.  It's also
9  common for the subsidiary company to deal -- a
10  subsidiary company to deal with other subsidiary
11  companies and for those companies to have
12  interactions and relationships.
13      I just -- the point I want to make in
14  brief is simply that these are two very different
15  things.  It's one thing to say a company is acting
16  on behalf of another company, and that occurs
17  sometimes and it also occurs sometimes that
18  individuals within a subsidiary company are acting
19  on behalf of that subsidiary company and they may
20  at various times act on behalf of other subsidiary
21  companies, so we see both going on simultaneously
22  and I saw both going on with respect to BIPI's

---

**72**

1  relationship to Roxane.
2      Q.  Can you turn to paragraph 21 of your
3  report?
4      A.  Okay.
5      Q.  I'm looking at the second sentence.  You
6  say that holding companies routinely nominate and
7  elect boards of directors of their subsidiary
8  companies, participate in the management of their
9  subsidiaries, provide advice and strategy and
10  financial support, and perform various services
11  for their operating subsidiaries including tax
12  reporting, legal services, accounting services and
13  cash management services.
14      Do you see that?
15      A.  Yes.
16      Q.  My question is, is it typical for one
17  subsidiary corporation to do all of those things
18  for another subsidiary corporation?
19      A.  Yes, I understood that question when you
20  asked it before and yes.
21      Q.  And based on your review of the
22  materials in this case, is it your opinion that

---

**73**

1  BIPI, in fact, performed many of the functions
2  identified in paragraph 21?
3      MS. RIVERA:  Object to form.
4      A.  Yes.  To put it as clearly as I can, as
5  I talked a moment ago, companies evolve at
6  different rates and in different ways and it may
7  be that in a subsidiary's development it requires
8  certain services, say, legal service as an
9  internal legal function before other subsidiaries
10  within the group.  And having already established
11  a legal function in subsidiary A, it often is
12  efficient, and the reason the holding companies
13  are considered to be, you know, efficient in the
14  economies that before -- in situations where it
15  might otherwise not be cost effective or efficient
16  for another subsidiary to, as a free standing
17  entity create such a function, it could be
18  economical for it to utilize the services provided
19  by the other subsidiary.  So that's why it's
20  extremely common for affiliate companies to
21  perform these services.  And holding companies
22  frequently have, not always, but very frequently

---

Henderson Legal Services, Inc.

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
                            New York, NY

74

1   have a very small number of employees.  They're
2   really set up to sort of management the investment
3   part and not to provide operational functions.
4       Q.  Is it appropriate for one subsidiary
5   company to participate in the management of
6   another subsidiary company?
7       MS. RIVERA:  Object to form.
8       MR. FAUCI:  What's the objection?
9       MS. RIVERA:  What do you mean by
10  management, it's very vague.
11      Q.  Go ahead.
12      A.  Oh, I'm sorry.  As I mentioned before,
13  it's extremely common, routine, beyond routine,
14  normal for personnel within subsidiaries to be
15  actively involved in the management and operations
16  of sibling companies because, as I mentioned, it's
17  extremely common to see people in these various
18  corporate groups wear a multitude of hats.  And
19  it's also extremely common for companies,
20  subsidiary companies to contract with each other
21  and to have interactions of a variety of kinds so
22  that the expertise of one is utilized or the

75

1   services of one are utilized for the benefit or
2   the benefit of the other.  The issue is always,
3   from a corporate governance perspective and from a
4   perspective of evaluating whether this is
5   appropriate or not, is whether or not it's
6   possible to figure out where one of these
7   subsidiary ends and the other one begins.  So just
8   to be -- just as a very general matter, a lot of
9   your -- a lot of your questions kind of -- this
10  question, I should say, takes the form of is it
11  normal for a subsidiary to provide services for
12  another subsidiary, and I just want to make it
13  clear, from my perspective this kind of jumps into
14  the question kind of midway in the analysis in the
15  sense that, generally, what one of the things I'm
16  doing in this report and in my analysis in this
17  case, is trying to figure out, you know, are these
18  companies separate and distinct, do they operate
19  as separate and distinct businesses with kind of
20  unique integrity as discrete entities.  And so
21  when, you know, you say to me, well is BIPI
22  providing services to Roxane let's say, that

76

1   already assumes part of my analysis, which is fine
2   I just want to make it clear, and that is, you
3   know, we have separate, identifiable entities,
4   BIPI and Roxane, so that we can tell who's doing
5   what for whom at all purposes.  And from the
6   standpoint of sort of my methodology and analysis
7   that's a very important distinction among various
8   kinds of corporate governance relationships that
9   we observe.
10      Q.  You've opined that the corporate
11  relationship between Roxane and BIPI was, quote,
12  normal and typical, correct?
13      A.  Right.
14      Q.  And you've opined that the corporate
15  relationship between Roxane and its parent, BIC,
16  was, quote, normal and typical correct?
17      A.  Yes.
18      Q.  I understand from paragraph 21 of your
19  report that it is routine for holding companies to
20  provide various services for their operating
21  subsidiaries?
22      A.  Correct.

77

1       Q.  Is it also routine for -- and I
2   understand from your testimony -- correct me if
3   I'm wrong -- that it is also your opinion that it
4   is routine for one subsidiary to provide those to
5   another?
6       A.  Correct.
7       Q.  Is it routine for one subsidiary to not
8   provide such services to another?
9       A.  Well that's a difficult question.  In
10  other words, it would be very surprising to see a
11  holding company with two subsidiaries particularly
12  if they're in, you know, where there are economies
13  of scale or efficiencies to see no services being
14  performed.  So if you've said, oh, here are a
15  couple of subsidiaries and there are no
16  relationships or interactions between the two, I'd
17  say that is extremely rare.
18      Q.  What services did you see Roxane provide
19  BIPI?
20      A.  My recollection is that Roxane had a
21  couple of sales forces and that one of these sales
22  forces would occasionally, particularly with

Macey, Jonathan R.          CONFIDENTIAL                    May 19, 2009
                            New York, NY

78

1  respect to new product launches by BIPI products,
2  go around and kind of include the BIPI product in
3  its kind of marketing and sales or whatever. So I
4  saw that. There were some other things, too, I
5  believe, I don't know that might or might not be
6  described -- I would describe them as, you know,
7  to the extent that the services are, you know --
8  there are services where there's kind of give and
9  take on both sides in my observations these are
10 situations in which, you know, Roxane provided a
11 service and received a benefit of some sort. And
12 BIPI may have done the same.
13     Q.  Are you aware of whether any Roxane
14 employees served in corporate officer or
15 management positions within BIPI?
16     A.  Whether any Roxane people were in
17 management positions in BIPI; I don't recall.
18     Q.  Do you recall whether any BIPI employees
19 served in management capacities in Roxane?
20     A.  There was a time when an officer at
21 BIPI, Sheldon Berkle, was involved in certain
22 oversight responsibilities involving certain

79

1  Roxane products, but in those situations he really
2  wasn't doing anything by or on behalf of BIPI, I
3  would not characterize him as a BIPI agent. I
4  would say that he was wearing two hats and he was
5  operating as a Roxane person.
6      Q.  Are you aware of whether he held any
7  employment position with Roxane?
8      A.  As I said before, it's my understanding
9  -- it's my belief and opinion that Mr. Berkle
10 operated -- was acting as an agent of -- was
11 acting as an agent of Roxane, so in that sense he
12 was a Roxane agent within the commonly held
13 understanding of that term.
14     Q.  Can one -- if someone's an employee of
15 BIPI, you owe fiduciary duties to your employer,
16 correct?
17     A.  Under state law if you're a -- fiduciary
18 duties are typically limited to the very top
19 officers CEO, CFO and the directors. And that the
20 other employees have obligations of good faith and
21 fair dealing in their relationships with their
22 firm for, you know, lower level employees is not

80

1  dictated by fiduciary duties but rather by the
2  terms of their employment contract.
3      Q.  So if Mr. Berkle was an employee of BIPI
4  he owed certain duties to BIPI that were incident
5  to his employment, correct?
6      A.  That's correct.
7      Q.  What were the duties that he would owe
8  to Roxane if he was not an employee of Roxane?
9      A.  Well, as I mentioned before, he was an
10 agent of Roxane and as such he owed duties as an
11 agent. So in acting as an agency capacity the --
12 somebody who was working -- it it's very common
13 for corporations to have nonemployees who are
14 agents who have the same kinds of duties that
15 officers and directors would have.
16     Q.  Is there a test to look at to determine
17 whether -- when an employee of one company
18 participates in another company and is not
19 employed by that company, is there a test to
20 determine when he is acting as an employee of
21 company A or as an agent of company B?
22     A.  Yes.

81

1      Q.  What is that?
2      A.  So, the typical agency test is whether
3  the agent is -- on whose behalf the agent is
4  acting and whether the principal, which is the
5  entity on whose behalf the agent is acting, has
6  agreed to accept the services of the agent. So
7  the idea is that if you have, you know -- again,
8  extremely common for people to serve two hats,
9  that means they have dual agency relationships at
10 various levels within holding companies and their
11 subsidiaries. And so while in some situations it
12 may be -- that I've observed actually, it may be
13 difficult to tell how -- in what capacity someone
14 is operating. For a variety of reasons, peculiar
15 to this case, it's extremely easy to tell, for
16 example, when Mr. Berkle is acting for Roxane and
17 when Mr. Berkle is acting for BIPI.
18     Q.  What are those reasons?
19     A.  Well, for one thing, both -- at all
20 relevant times that I've observed in this case,
21 Roxane manufactured particular products that were
22 wholly separate and distinct from the products

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
New York, NY

22 (Pages 82 to 85)

---

82

1  that BIPI manufactured.  So that fact is by no
2  means true for every, you know, subsidiary
3  situation.  Often subsidiaries will -- separate
4  subsidiaries will be in exactly the same line of
5  business and manufacture the same product.
6          So when Mr. Berkle is interacting with a
7  Roxane product or engaged in oversight with
8  respect to a Roxane product, it's not confusing
9  because one can't say, oh, that's also a BIPI
10  product so we don't really know what he's doing.
11  It's not a situation, this is very common where
12  somebody can say, you know, this is something that
13  -- this is a decision made that applies to both
14  companies.  These are decisions sometimes Mr.
15  Berkle would make decisions that related to BIPI
16  and sometimes he would make decisions when he was
17  working for -- was serving as an agent for Roxane.
18  So that's one of the kind of peculiarities of kind
19  of the fact pattern in this case that was relevant
20  to my analysis.
21      Q.  Do you know whether Mr. Berkle was ever
22  paid by Roxane?

---

83

1      A.  It's my understanding, and my opinion
2  was predicated on the kind of belief and
3  assumption that Mr. Berkle was paid by BIPI and
4  never received -- and did not receive a Roxane
5  paycheck.
6      Q.  Was he an employee of BIPI?
7      A.  He was an agent of --
8      Q.  I'm sorry, was he an employee of Roxane?
9  I believe I said BIPI.
10      A.  Right.  Again, he was in agency
11  relationship with Roxane.  Roxane was the
12  principal.  He was the agent.  And whether he was
13  -- how that was thought of, it might have been an
14  employee/employment relationship, it could have
15  been a consulting.  There are many, many kind of
16  different vague and not very useful ways of
17  characterizing that.  But to my way of thinking
18  and my experience, the accurate way of
19  characterizing Mr. Berkle's relationship with
20  Roxane is that he served a dual -- in what is
21  known as dual agency capacity.  He was an agent
22  both for Roxane and for BIPI in various

---

84

1  capacities.
2      Q.  Do you have an opinion as to whether or
3  not Mr. Berkle was an employee of Roxane?
4      A.  Again, I would say he is an agent.  I
5  don't have an opinion about whether an
6  employee/employer relationship existed, no.
7          MR. FAUCI:  Let's take a couple minute
8  break.
9          (Recess.)
10      Q.  Can I ask you to turn to paragraph 2 of
11  your report again?
12      A.  Certainly.
13      Q.  Paragraph 2 of your report also states
14  that you analyzed whether defendant corporations
15  operated as separate and independent corporate
16  entities.
17          Do you see that?
18      A.  Yes, I do.
19      Q.  Can you describe what it means for a
20  corporation to function as a separate and
21  independent corporate entity?
22      A.  Yes.  So, basically the test here is

---

85

1  whether or not sufficient distinctions among the
2  corporations have been made such that it's
3  possible to tell when one corporation ends and
4  when the next corporation begins, so that there's
5  sufficient difference in the product orientation
6  and in the -- and that there's, you know, when
7  we're talking about, you know, the parent and the
8  sibling we can have some degree of certainty that
9  if we're talking about, say for example, a
10  particular asset, we can say well, that asset
11  belongs to the parent or that asset belongs to the
12  sibling and that we don't allow kind of people to
13  make determinations at their kind of whim and
14  caprice about, you know, who owns what and the
15  like.
16      Q.  The test is whether or not you can tell
17  when one corporation begins and another ends; is
18  that correct?
19      A.  Yes.
20      Q.  And the criteria you look to include
21  product -- different products?
22      A.  So that would be -- that would certainly

---

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
New York, NY

24 (Pages 90 to 93)

90

1    Q.   What other factors, whether a company
2  has a board of directors, whether the company has
3  assets?
4    A.   Looking at -- one should look at the
5  relationships between the companies, do they do
6  business with one another, if so, how is the
7  business conducted --
8    Q.   Can I cut you off?
9    A.   Absolutely.
10   Q.   If companies -- you look at whether
11  companies do business with one another; is that
12  correct?
13   A.   Yes.
14   Q.   How is that factor relevant to the
15  determination of whether companies are independent
16  or not?
17   A.   Well, if you look at the way the
18  companies do business with one another and if you
19  see over time problems with the relationship,
20  conflicts or failure to treat another entity as a
21  discrete entity, then that would auger against
22  treating the companies as separate and discrete

91

1  legal entities.  So by way of specific example,
2  you want to look at whether a company's making a
3  relationship with another company is whether the
4  company's making a loan to the other company, if
5  so, is there interest being paid, or alternatively
6  is money just being shifted around in the
7  organizations in such a way that you can't really
8  trace whose assets are whose in a given time and
9  are there -- you know, are people being shuttled
10  in such a way you don't know who is doing what for
11  whom and that kind of thing.
12   Q.   Did you see evidence in this case that
13  employees were being shuttled from company to
14  company in such a way that you didn't know who was
15  doing what for whom?
16   A.   In this case there was -- every time an
17  employee of one company was doing something for
18  another company there was some kind of
19  documentation that I was able to observe, so I
20  didn't see that kind of shuttling, no.
21   Q.   We've agree that Shelly Berkle did some
22  work on behalf of Roxane, correct?

92

1    A.   He provided some -- he did some things
2  on behalf of Roxane, yes.
3    Q.   What documentation reflects that?
4    A.   Well I saw documents indicating, for
5  example, that Mr. Berkle was a member of board of
6  directors of Roxane.  So in that capacity it would
7  be expected that he would owe fiduciary duties to
8  the corporate entity and would perform the normal
9  oversight functions of a director.  In addition to
10  that, there was a period of time in which Mr.
11  Berkle -- not for the entire period of time I
12  examined but for some subset of the period of time
13  that I examined, there was a guy, let's think
14  about his name, Mr. Wojta I think was head of
15  Roxane.  At some point he left, at some point Mr.
16  Berkle came to the kind of U.S. BIC family of
17  companies and was given some very high level
18  oversight responsibility for certain -- a certain
19  kind of small subset of products in the Roxane
20  product line.  He was given some kind of, you
21  know, oversight responsibility with respect to
22  marketing as I recall.

93

1    Q.   What type of documents reflected that?
2    A.   There was a -- I forget the title of
3  this document, it was some sort of internal office
4  communication --
5    Q.   An employee bulletin?
6    A.   -- that indicated that Mr. Berkle was
7  assuming the responsibilities that I've described.
8  I think it was called the employee bulletin.
9    Q.   And so if an employee bulletin said that
10  Shelly Berkle is assuming responsibility for some
11  portion of Roxane's business, that would be
12  evidence of an agency relationship between Mr.
13  Berkle and Roxane?
14   A.   That would be evidence of an agency
15  responsibility; that is to say, this is telling
16  the people in the organization that Mr. Berkle had
17  agreed to accept certain responsibilities I guess
18  in addition to his director responsibility on
19  behalf of Roxane.
20   Q.   Do you agree that the objective of any
21  corporation's management is to maximize
22  shareholder wealth?

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
New York, NY

25 (Pages 94 to 97)

94

1       A.  Generally speaking, that is the default
2   objective, not the only objective and doesn't have
3   to be the objective, but as I've written about
4   that's what I would call the default rule.
5       Q.  Did you see any evidence that that was
6   anything other than the rule in the management of
7   defendant companies?
8       A.  No, I did not.
9       Q.  Is there a distinction between
10  maximizing shareholder wealth and maximizing
11  corporate wealth?
12      A.  In theory, no.
13      Q.  But in practice?
14      A.  Well in practice, there may be -- no, I
15  think in practice there's no -- let me see how to
16  put this.  In practice, no, there's no distinction
17  that aspirationally, I guess I would say in
18  practice.  Hopefully there's no distinction.
19      Q.  Who is Roxane's shareholder?
20      A.  Roxane's shareholder is BIC.
21      Q.  And BIPI's shareholder?
22      A.  Is BIC.

95

1       Q.  So would you agree that Roxane and
2   BIPI's management are both tasked with maximizing
3   profitability for BIC?
4       A.  Maximizing shareholder value for BIC,
5   both Roxane and BIPI.
6       Q.  How would Roxane go about attempting to
7   maximize profitability for its shareholder?
8       A.  It would attempt to run the company as
9   efficiently as possible as a means of trying to
10  realize what I would describe as long-term
11  shareholder wealth and long-term-value.  So, you
12  know, I think it involves a big picture approach
13  where you try to, you know, take a long-term
14  perspective and you try to maximize goodwill,
15  build up the reputation of the firm, have a good
16  reputation for making high quality products and
17  trying to keep costs as reasonable as possible.
18  So those are the kinds of issues that one would
19  focus on in connection with trying to maximize
20  shareholder value, obviously depending on the
21  business, customer services and other factors
22  would be relevant.

96

1       Q.  So for Roxane over the long haul it's
2   try and sell as many drugs as profitably as it
3   could?
4       A.  I think that would be a rather -- maybe
5   a somewhat, maybe slightly different way than I
6   would put it.  Maybe a little more stilted in a
7   way that certainly one of the things that
8   somebody, a company involved in sales is
9   interested in selling, is selling products,
10  but, you know, in focusing on -- you know, it's
11  very important to understand that when -- by
12  describing BIC as a shareholder of Roxane and BIC
13  as a shareholder of BIPI, that unlike other
14  claimants on the cash flows of the firm, there's
15  no maturity date to their claims.  They don't get
16  paid back at a certain date and then go away.
17  These claims are perpetual in nature which makes
18  the job of Roxane and the job of BIPI very long
19  term, very long term in nature.
20      So I guess, you know, I would agree with
21  you as long as what you're talking about is
22  maximizing sales over the long term or maximizing

97

1   profits over the long term and keeping in mind
2   that as is often I'm afraid may be ignored, that
3   focusing too much on the short term can come at
4   great cost to the long term claimant, long term
5   constituent, which in corporations of course is
6   the equity holder or the shareholder.
7       Q.  In the case of a wholly-owned
8   subsidiary, can the goal of maximizing shareholder
9   wealth be different from the goal of maximizing
10  the profitability of the individual subsidiary?
11      A.  All right, keep in mind -- well, so --
12  all right, I'm really not sure I understand that
13  one.  Maybe --
14      Q.  You want me to try it again?
15      A.  That would be great, if you don't mind.
16      Q.  So focusing on wholly-owned subs, can
17  the goal of maximizing -- let me take a step back.
18  In the case of a situation where you have a
19  holding company that owns multiple subsidiaries --
20      A.  Right.
21      Q.  -- can the goal of maximizing
22  shareholder wealth for the management of one

Macey, Jonathan R.          CONFIDENTIAL                    May 19, 2009
                            New York, NY

---

**102**

1    expired at the time that Roxane launched the
2    product.
3           MR. FAUCI:  Let's introduce exhibit, I
4    think this is 6.
5           (Whereupon, e-mail dated October
6    26, 1995, was marked as Exhibit Macey 006 for
7    identification, as of this date.)
8       Q.  Take a moment to familiarize yourself
9    and tell me if you've seen this document before?
10      A.  Okay.
11      Q.  Do you see that this document refers to
12   strategies to defend against the generic erosion
13   of Atrovent from non-BI companies?
14      A.  Yes.
15          MS. RIVERA:  Where are you referring?
16          MR. FAUCI:  I'm looking at the third
17   bullet point.
18          MS. RIVERA:  Okay.
19      Q.  Then could you look to the fifth
20   paragraph down, the paragraph starting with
21   "Shelly and I have talked through"?
22      A.  Okay.

---

**103**

1       Q.  I'm looking at the sentence starting on
2    the fourth line it says, "This should be from a
3    total U.S.A. perspective, i.e., BIPI and Roxane
4    combined strategy.  For example, how much
5    ipratropium UDV business can Roxane take away from
6    BIPI and how do we shut out other non-BI generics
7    as far as possible."
8           Do you see that?
9       A.  I do.
10      Q.  If Roxane and BIPI were not affiliated
11   sister corporations would you expect them to adopt
12   such a strategy?
13      A.  I could easily see the adoption of such
14   a strategy for non-affiliate companies, yes.
15      Q.  Why would two independent, non-
16   affiliated companies adopt a strategy whereby one
17   company is supposed to quote/unquote take away
18   business from the other?
19      A.  Because one company is receiving a
20   licensing fee from the other company, so the
21   theory would be that for the company whose
22   business is being taken away, the gains in the

---

**104**

1    licensing fee would be greater than the losses
2    associated with the business that's, quote, being
3    taken away, end quote.
4       Q.  Do you have an opinion as to whether
5    BIPI benefited from the preemptive launch of
6    ipratropium bromide?
7       A.  It is my opinion that they were likely
8    to have benefited, I haven't seen any financial
9    results but to my way of thinking it stands to
10   reason that they benefited.
11      Q.  Do you know if employees at BIPI thought
12   that the decision to allow Roxane to preemptively
13   launch ipratropium bromide would be a benefit to
14   BIPI?
15      A.  I don't know.
16      Q.  I'm just going to read you a quick
17   snippet from Shelly Berkle's deposition taken on
18   December -- no, October 31st, 2001.
19      A.  Okay.
20      Q.  It's on Halloween.
21      A.  Do you want me to read along with you or
22   just listen?

---

**105**

1       Q.  I'll just read to you, I'm not going to
2    introduce it, if you need to see it to make it
3    clear, let me know.
4       A.  Okay.
5       Q.  I don't think it's that long.
6           MS. RIVERA:  And I would just object for
7    not providing him an actual copy of the whole
8    deposition.
9           MR. FAUCI:  What's the basis of the
10   objection?
11          MS. RIVERA:  That you're not providing
12   him a copy of what you're going to read to him and
13   providing it in the context of the whole
14   deposition.
15          MR. FAUCI:  Okay.
16      Q.  You've read Mr. Berkle's 10/31/2008
17   deposition, correct?
18      A.  Yes.
19      Q.  The question is:
20          "Question: Would there be any long-term
21   strategic benefits to BIPI of relinquishing
22   today's profit dollars?

---

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
New York, NY

32 (Pages 122 to 125)

122
1  reviously sworn, resumed and testified further as
2  follows:
3
4          EXAMINATION (Continued)
5  BY MR. FAUCI:
6      Q.  Professor Macey, I'm going to go back to
7  paragraph 2 of your report.
8      A.  Okay.
9      Q.  It says you evaluated whether Roxane
10 maintained operational control over its business,
11 including operational control over the pricing and
12 marketing of its products.
13         Do you see that?
14     A.  Yes, I do.
15     Q.  Did you form an opinion about this?
16     A.  Yes.
17     Q.  What is it?
18     A.  That Roxane did, as this phrase says,
19 operate as a separate and distinct corporate
20 entity, maintain that Roxane did maintain
21 operational control over its business, and that
22 that operational control included operational

123
1  control over the pricing and marketing of its
2  products.
3      Q.  Does your opinion encompass all of
4  Roxane's products or just the products identified
5  in the United States' complaint?
6      A.  My analysis included all Roxane's
7  general way of doing business, which would include
8  all of Roxane's products not just the ones
9  identified in the complaint.
10     Q.  Are you offering any opinion as to the
11 extent or nature of BIC's involvement in the
12 pricing and marketing of Roxane's products?
13     A.  Yes, to the extent that I reached
14 conclusions in the course of my analysis about
15 Roxane's operational control over its business,
16 and Roxane's marketing and pricing of its product,
17 I regard this operational control to be an
18 exclusive concept such that it would exclude other
19 entities including BIC.
20     Q.  Are you offering an opinion as to
21 whether or not BIC knowingly participated in
22 decisions to set inflated AWPs for Roxane's

124
1  products?
2      A.  Again, since Roxane, in my opinion,
3  exerted and maintained operational control over
4  the pricing and marketing of its products, then
5  this would exclude the notion that BIC was
6  exerting operational control simultaneously.
7      Q.  I'm sorry, my question is:  Are you
8  offering an opinion as to whether or not BIC
9  knowingly participated in the decision to set
10 inflated AWPs for Roxane's products?
11         MS. RIVERA:  Object to form.
12     A.  I guess I'm struggling a little bit
13 because I did reach an opinion about whether BIC
14 knowingly participated or contributed in any
15 pricing of any kind, so to that extent I did reach
16 -- I didn't draw any conclusions with respect to
17 whether prices were inflated or not.  I simply
18 reached conclusions with respect to the corporate
19 governance including who set prices.
20     Q.  Is it your opinion that BIC played no
21 involvement whatsoever in setting -- in the
22 decisions to set AWPs for Roxane's products?

125
1      A.  I don't recall seeing any evidence that
2  BIC was participating in setting prices or
3  marketing products that this was -- these
4  functions resided within Roxane.
5      Q.  Do you have an opinion as to whether BIC
6  or BIPI's conduct, to the extent it exists,
7  subjects them to liability under the False Claims
8  Act?
9      A.  Do I have a personal opinion?  I'm
10 sorry.
11     Q.  Are you offering an opinion as to
12 whether or not BIC and/or BIPI are liable under
13 the False Claims Act?
14     A.  Oh, I'm not -- I don't consider myself
15 an expert in the False Claims Act so I have not
16 analyzed -- I'm not offering any opinion with
17 respect to sort of ultimate liability or other --
18 my opinion is restricted to the issues I described
19 in my report, the corporate governance, corporate
20 control issues.
21     Q.  Have you analyzed what is the standard
22 for liability under the False Claims Act?

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
                            New York, NY

126

1     A.  Again, as I said at the very beginning
2 of the deposition when you asked me, I articulated
3 then my understanding about the False Claims Act.
4 I didn't -- I mean again -- and I don't consider
5 myself an expert, I just have a general
6 understanding what the statute says.
7     Q.  So you're not putting forth -- you're
8 not proffering an expert opinion on standards for
9 liability under the False Claims Act?
10    A.  My opinions relate to the corporate
11 governance and control.  I'm not reaching any
12 ultimate decisions or conclusions about liability
13 or the meaning of the False Claims Act.
14    Q.  How did you evaluate whether or not
15 Roxane maintained operational control over the
16 pricing of its products?
17    A.  I looked at information about the way
18 that Roxane did business on a day-to-day basis,
19 how the company was organized, at what sort of
20 levels within the organizations decisions were
21 made, what the sort of type and nature of these
22 decisions were, what the company said it was

127

1 doing, both contemporaneously and in the
2 deposition testimonies of the various people.  So
3 that I just basically looked at the way the
4 business operated.
5     Q.  Is operational control a term of art?
6     A.  Yes.
7     Q.  What does it mean?
8     A.  It means -- operational control in the
9 context of corporate governance means controlling
10 day-to-day operations.  It means controlling
11 decisions on an ongoing basis, it means the
12 management on a day-to-day basis.  It means, in
13 other words, things related to daily operations as
14 opposed to sort of one-off decisions and/or -- so
15 usual as opposed to unusual kinds of decisions and
16 issues.
17    Q.  What is the source of that definition?
18    A.  Just generally speaking, people who
19 write and teach about business distinguish
20 operational control from other kinds of control.
21 So it's just -- it's in the lexicon of the
22 business community.

128

1     Q.  Is it different than the concept of
2 control expressed in a statute like CERCLA?
3     A.  I mean in theory one could write a
4 statute and define the terms however one wanted.
5 As it happens operational control in -- the route
6 that the U.S. Supreme Court chose to take in U.S.
7 against Best Foods adopts this sort of ordinary
8 business term of operational control, so within
9 the context of your particular question it happens
10 to be the same thing.  Obviously, Congress is not
11 bound by the definition that I have or that may
12 exist in common industry custom.
13    Q.  What are the criteria you look to in
14 evaluating whether a company maintains operational
15 control over its business?
16    A.  Again, I look at basically how the
17 company functions.  So I looked at was there a
18 separate company in fact, meaning did this company
19 have assets, did it have employees, did it have
20 enough employees that looking at what they did,
21 these employees could -- would -- you know, might
22 logically be expected to actually run the

129

1 business.  I look at in particular in
2 parent/subsidiary and in affiliate relationships
3 parent/affiliate relationships it's important to
4 look at the various kinds of contracts that often
5 exist between companies to see how control is
6 obligated both by consent as well as by practice.
7     Q.  What factors might cause you to conclude
8 that a company did not maintain operational
9 control of its business?
10    A.  So a classic case of a situation which a
11 company does not maintain operational control over
12 its business would be something like the
13 following:  One, if there was an outsourcing of
14 day-to-day management.  So I have observed
15 several, many, I guess, situations in which a
16 parent company or an affiliate company has
17 actually signed a contract in which the parent or
18 the affiliate is given contractual and is paid for
19 managing the day-to-day business of a company.  So
20 that would be, you know, that would be an example.
21    Similarly, where if some or all of the
22 employees -- if the parent were a single affiliate

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
                            New York, NY

---

130

1  of a subsidiary, has a training operation and says
2  this is the way we train people and we expect
3  everyone to operate according to this sort of
4  template, that is a situation I've observed where,
5  in my view, there would be a -- one could see
6  operational control particularly where there's
7  ongoing training and a continued effort to make
8  sure that sort of business policies and practices
9  are carried out in an ongoing way.  If there's a -
10 - you know, if the operations of the subsidiary
11 are carried out according to some formula or
12 algorithm that has been -- you know, that is
13 proprietary with the parent, I've observed
14 situations like that which would -- you know, all
15 of which would give me the indication that, you
16 know, the company was not independent, it did not
17 maintain its own operational control.  Where you
18 have instead of a holding company parent, you have
19 an operational parent and it's actually operating
20 the various subsidiaries, I've seen that on -- as
21 well.  So those are the kinds of situations where
22 that I've observed and which facts would lead me

131

1  to the conclusion that a company did not maintain
2  operational control.
3      Q.  Paragraph 78 of your report, you write,
4  that it is standard practice for a parent
5  corporation to monitor and oversee its
6  subsidiaries' operations.
7      Do you see that?
8      A.  Yes.
9      Q.  It also states it is standard practice
10 for a parent corporation to set high level policy
11 and strategy at a subsidiary?
12     A.  Yes.
13     Q.  Do you see that?
14     A.  Yes, I do.
15     Q.  How is such monitoring by a parent
16 corporation different than assuming operational
17 control?
18     A.  Well the short answer is that monitoring
19 involves -- I'm trying to think of a synonym for
20 monitoring.  Monitoring involves the process of
21 observing and evaluating as opposed to the process
22 of implementing or administrating.

132

1      Q.  What about approval, is approving a
2  decision on a price offered by a Roxane employee,
3  is that a high level decision or is that an
4  operational decision?
5      A.  That would -- it would depend on what
6  you're -- what specifically you meant.
7      Q.  Well, approving the launch plan and
8  average wholesale price for one of Roxane's
9  products, is that an operational decision or a
10 high level strategic decision?
11     A.  That would depend in large part on how
12 many such factors -- I don't know whether you're
13 talking about generally or specifically, but
14 generally -- I think you're talking generally so
15 I'll answer it, generally it depends on how many
16 products the subsidiary has and a variety of other
17 contextual features.  So if you said -- your
18 question was, what if the parent approved one of
19 the subsidiary's marketing and pricing or product
20 launch decisions, I think that was some reasonable
21 facsimile of your question, and there it depends
22 on, you know, is this one decision out of two, or

133

1  one decision out of 47.
2      Q.  Do you know how many products Roxane had
3  at any given time?
4      A.  I, only in general terms, I don't know
5  exactly.
6      Q.  Do you know enough to hazard a guess or
7  no?
8      A.  I know that it was many but I don't know
9  enough to hazard a precise numerical guess.
10     Q.  More than 50?
11     A.  I don't know if it was more than 50, but
12 it was in the -- it was a significant number of
13 products.
14     Q.  And are you aware there were various
15 prices set for each of Roxane's products?
16     A.  Just to be clear, you mean am I aware
17 that there were -- yeah, well, I'm sorry in some
18 way I'm aware of that, yes.
19     Q.  That there's contract prices, wholesale
20 acquisition costs, average wholesale prices, are
21 those terms all familiar to you?
22     A.  Yes.

Macey, Jonathan R.   CONFIDENTIAL   May 19, 2009
New York, NY

### Page 154

1 possible despite whatever cooperative activities
2 they engage in that people on the outside of the
3 businesses can still make a determination about
4 what the proper contours, whether -- what the
5 assets are of a corporation, where one company
6 begins and another company ends. Of course, it
7 would be important to the extent you have a
8 business unit that envelopes business
9 organizations or corporations you'd want the
10 corporations to maintain their, you know, filings
11 with the secretary of state, to make whatever
12 corporate tax payments, to keep a board of
13 directors, maintain corporate formalities, but
14 again those are part of the picture. To my way of
15 thinking the critical issue is that it be possible
16 for an objective observer to delineate the actual
17 contours of the companies and say, this is what
18 this company is, there are its assets, here's its
19 corporate campus, here are its employees, this is
20 its board of directors. And here is another
21 company and there may be people who wear two hats
22 in both of these organizations. There may be

### Page 155

1 people who -- you know, there may be coordinated
2 activities and there will be lots of interactions,
3 but, you know, we still -- we're still not in a
4 situation where one is unable to tell where one
5 company ends and the other begins.
6    Q. Are you familiar with the Ethical
7 Pharmaceuticals Business Unit?
8    A. Yes.
9    Q. What is it?
10   A. Just in broad terms, the Ethical
11 Pharmaceuticals Business Unit was -- is the term
12 for an initiative that was started and in which
13 Sheldon Berkle was put in charge with the idea of
14 trying to find some sort of common approaches and
15 methodology to business issues as between Roxane
16 and BIPI.
17   Q. Do you have an opinion as to whether or
18 not the Ethical Pharmaceuticals Business Unit
19 included BIPI's business?
20   A. I believe that's what I just said.
21   Q. And so the answer is yes?
22   A. I believe that the concept, as it was

### Page 156

1 described, initially included both Roxane and
2 BIPI.
3    Q. Do you have an opinion as to whether the
4 Ethical Pharmaceuticals Business Unit, as it came
5 into being, included both BIPI and Roxane?
6    A. In certain respects it did, yes.
7    Q. What certain respects?
8    A. Well, so, there was an effort made to
9 seek these kind of synergies or efficiencies and
10 Roxane was included in the sense that they were
11 included in the effort, but it is my understanding
12 that this initiative did not sort of result in --
13 you know, it was an unsuccessful attempt to
14 integrate the various aspects of these companies
15 even in a limited way.
16   Q. What is that opinion based on?
17   A. It's based on deposition testimony, Mr.
18 Berkle and others.
19   Q. Do you know how long the Ethical
20 Pharmaceutical Business Unit existed?
21   A. Not precisely but I know it existed for
22 several years.

### Page 157

1    Q. And for all -- do you have any reason to
2 doubt that for the years that it existed it
3 included both Roxane and BIPI?
4    A. I recall seeing documents that
5 specifically -- looking at documents that
6 suggested that while the Ethical Pharmaceuticals
7 Business Unit kind of made an effort to include
8 Roxane it actually ultimately, particularly with
9 respect to multisource products did not follow
10 through, did not actually do it.
11   Q. What do you mean it did not follow
12 through?
13   A. In other words, whatever efforts that
14 were being made to coordinate and/or the
15 activities of Roxane and BIPI did not actually
16 result in the coordination of those efforts and
17 that those synergies weren't realized and those
18 efficiencies weren't achieved and those efforts
19 were not coordinated.
20   Q. Isn't it a different question whether
21 the benefits that were hoped for by the creation
22 of the Ethical Pharmaceutical Business Unit

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
                            New York, NY

158

1  materialized, isn't that a different question than
2  whether or not Roxane and BIPI were part of the
3  part of the Ethical Pharmaceuticals Business Unit?
4      A.  Well, no.  Or to put it differently, I'm
5  regarding -- if you look at the history of this
6  Ethical Pharmaceuticals Business Unit it was
7  basically an effort to achieve certain goals, that
8  the idea was we're going to work to achieve
9  certain goals, so I'd regard that as sort of the
10 idea.  And so to the extent that this -- that
11 there was an idea or a goal associated with this,
12 I think that one can make an assessment about
13 whether or not that goal was reached or achieved.
14     Q.  Starting with 1994, who was in charge of
15 the business unit?
16     A.  My recollection -- I can't recall
17 whether Mr. Berkle came in to the business unit in
18 '94 or '96, it's my recollection that he was in
19 charge from the beginning, although I may be
20 mistaken about that.
21     Q.  I direct your attention to paragraph 86
22 of your report.  You're talking about an October

159

1  1998 reorganization.  I'm going to quote midway
2  through the paragraph but feel free to read the
3  whole paragraph.  You write: "To further these
4  goals, certain BIPI employees were given high
5  level supervisory roles over the sales and
6  marketing of Roxane's brand and branded generic
7  products."
8         Who are you referring to?
9      A.  I think this is actually very poorly
10 worded.  Here what I'm referring to is that for a
11 brief period of time with respect to certain of
12 Roxane's drugs, like Mr. Russillo who is placed in
13 as an agent with dual responsibilities, there were
14 some other people who were also, if you will,
15 seconded, given additional responsibilities beyond
16 their responsibilities to BIPI were also given
17 responsibilities at Roxane.
18     Q.  Who were they?
19     A.  So these people, my recollection is,
20 there was Leonetti, there were three -- I think
21 four of these people, I don't recall, Fulton and
22 Leonetti are two of them.  Ciarelli, I think maybe

160

1  King, I'm not quite certain of all four of their
2  names.  But the basic idea is that they were
3  people at BIPI with expertise in one kind of
4  subsegment of the Roxane constellation of
5  products, if you will, that is branded generics
6  and branded drugs and those people were brought
7  in, as I say, not to, you know -- and, literally,
8  as we see I think in this organizational chart,
9  kind of layered into the Roxane organization.
10 They retained their roles at BIPI but they also
11 took over some responsibilities at, you know -- I
12 wouldn't say take over some responsibilities but
13 they were involved, as I think Mr. Berkle
14 testified, in with high level supervisory roles
15 over the sales and marketing of Roxane's branded
16 and branded generic products.
17     Q.  So we've identified Mr. Leonetti, Mr.
18 Fulton, Mr. Ciarelli and maybe Mr. King?
19     A.  I think that's right.
20     Q.  Are these -- these people were BIPI
21 employees, correct?
22     A.  It's my opinion and belief that prior to

161

1  this 1998 corporate reorganization, these people
2  were exclusively BIPI employees but at some point
3  they moved over to -- they took on kind of a
4  second hat, they took on a second job just in the
5  way that Mr. Berkle did who had responsibilities
6  both in Roxane and in BIPI.  These people were
7  given responsibilities in Roxane -- in Roxane and
8  in BIPI as well.
9      Q.  Did they become Roxane employees?
10     A.  Again, they became agents of Roxane.  I
11 have no opinion about, you know, whether they
12 became employees, but they were acting as agents
13 of Roxane, to the extent they were involved in the
14 high level supervision of these subset products
15 for this 1998, late 1998 period of time.
16     Q.  Is there a test for determining when
17 someone becomes an agent of a company?
18     A.  Yes.
19     Q.  What is that?
20     A.  Okay.  So the test hasn't -- well, so
21 the test is whether or not someone is offered and
22 is willing to serve an organization, whether that

Macey, Jonathan R.          CONFIDENTIAL                    May 19, 2009
                            New York, NY

42  (Pages 162 to 165)

162

1   organization or principal, as the agent's
2   principals, as the term is used, to act by and on
3   behalf of the principal.  So the basic test for an
4   agent is kind of an offer and acceptance of
5   performing the role of an agent.  And there is
6   absolutely no requirement in agency principals
7   that the agent be compensated by the principal in
8   the form of being an employee or kind of direct
9   cash, but the agency is, you know, is an extremely
10  well recognized concept in business organizations.
11      Q.  You're aware that Werner Gerstenberg,
12  for instance, served as an employee of both Roxane
13  and BIC, correct?
14      A.  Again, as I mentioned with respect to
15  these other people, my determination in terms of
16  corporate organization relate to fiduciary
17  relationships, agency relationships,
18  responsibilities of reporting.  I have made no
19  determination about people's employment
20  relationships, although I will say that, generally
21  speaking, somebody who has a title of president
22  and COO is, generally speaking, is considered to

163

1   be an employee of the company for which they are a
2   president or COO.
3       Q.  Are you aware of formal documents, board
4   minutes or otherwise, that designated either Mike
5   Leonetti, Greg Fulton, Jim King, Gregg Ciarelli to
6   be agents of Roxane?
7       A.  The 1998 reorganization which gave these
8   people certain high level oversight
9   responsibilities would have satisfied the
10  requirements for the creation of an agency
11  relationship.
12      Q.  Are there -- what are the requirements
13  for the creation of an agency relationship?
14      A.  So the agent has to be willing to act on
15  the principal's behalf, in this case the agents
16  are the people who at BIPI who are being asked to
17  put on a second Roxane hat.  And the principal has
18  to accept that the agent is going to be acting by
19  and on behalf of it, the principal.
20      Q.  In that paragraph 86 of your report you
21  write that certain BIPI employees were given high
22  level supervisory roles, why did you refer to them

164

1   as BIPI employees if it's your testimony that they
2   are really also Roxane agents?
3       A.  Right.  Well two things -- and again the
4   first is that, as I mentioned earlier, I don't
5   think this is the most artfully worded paragraph
6   I've ever written, and second that it's my
7   recollection -- it was my belief at the time I
8   wrote this and still my belief that at the time
9   these people were sort of given their second hat,
10  they were, in fact, BIPI employees.  That's what
11  they were exclusively BIPI -- you know, that they
12  didn't have an agency relationship prior to this.
13      Q.  Prior to 1998?
14      A.  Right.  Prior to these October 1998
15  organizational changes.
16      Q.  So it's your belief, as you sit here
17  today, that Mike Leonetti, Jim King, Gregg
18  Ciarelli, Greg Fulton's agency relationship
19  started with Roxane in 1998?
20      A.  Sitting here right now, that's my
21  recollection.
22      Q.  Are there circumstances when -- taking a

165

1   step back from there, the Roxane situation.
2       A.  Okay.
3       Q.  Are there circumstances when an employee
4   of one subsidiary works on behalf of another
5   subsidiary and does not thereby become an employee
6   -- an agent of the second subsidiary?  I can give
7   that another shot if you want.
8       A.  No, no, no.  Well I just want to focus
9   on the term, you used the word on behalf of, so
10  the essence of an agency relationship is that as
11  an agent I'm working on behalf of the principal.
12  So I could -- so my answer to the question is, if
13  the person who's performing this capacity is doing
14  so knowingly and volitionally, and if the
15  principal has acquiesced or accepted the
16  relationship, then it's axiomatic that it's an
17  agency relationship because that's what an agency
18  relationship.
19      Q.  Just to be clear, if we have a situation
20  with multiple corporations within a single
21  corporate family, when an employee of subsidiary A
22  accepts and does work on behalf of subsidiary B,

Macey, Jonathan R.        CONFIDENTIAL        May 19, 2009
New York, NY

50 (Pages 194 to 197)

194

1  here, does that suggest an agency relationship is
2  created between Mike Leonetti and Roxane?
3      A.  It doesn't -- in this paragraph the
4  expression -- I'm not sure I'm exactly where you
5  are, but correct me if I'm mistaken, if you're
6  saying does the sentence, I've asked Mike Leonetti
7  to lead the business unit's managed care and trade
8  relations organization reporting directly to me,
9  that doesn't convey really enough information for
10 me to make a judgment as to whether an -- by
11 itself as to whether an agency relationship was
12 created.
13     Q.  Do you see that Rich Feldman was in
14 charge of the RLI trade relations according to
15 this document?
16     A.  Yes, I do.
17     Q.  Do you see that Rich is reporting to
18 Mike Leonetti according to this document?
19     A.  Yes, I don't see it but that's my
20 recollection.  I'm sure I could find it.  Yes, I
21 do see it now, thank you.  Yeah.
22     Q.  If Mr. Feldman is reporting to Mr.

195

1  Leonetti, how do you evaluate whether Mr. Leonetti
2  is acting as a BIPI employee or whether he's
3  turned in to a Roxane agent?
4      A.  Well there the -- this is, you know,
5  part of some sort of set of information that I
6  would take into account in making that analysis.
7  Other things that I would look at would be
8  precisely what it was that Mr. Leonetti did, what
9  actions.  So my point is that the terminology, and
10 again this is generally speaking, my impression of
11 Mr. Berkle's writing but, if you look at the
12 sentence says, I have asked Mr. Berkle to lead the
13 business units managed care and trade relations
14 organizations reporting directly to me --
15     Q.  Do you mean --
16     A.  -- it doesn't necessarily create an
17 agency relationship unless we understand, you
18 know, did Mike Leonetti -- what exactly Mike
19 Leonetti did pursuant to that request.
20     Q.  If a court is looking to evaluate
21 whether a BIPI employee who performs -- who
22 promotes some product on Roxane's behalf has

196

1  become a Roxane agent, what factors do they look
2  at?
3      A.  You'd look at the two factors I pointed
4  to earlier, which are the person acting, does
5  the person, you know, volunteer or acquiesce in
6  acting on behalf of the principal and is the
7  principal accepted that designation and derived a
8  benefit from it such that the agent can be held
9  responsible for acting and accountable for acting
10 in the principal's behalf.
11     Q.  Can you describe the pricing approval
12 process at Roxane?
13         We can move those documents for the time
14 being.
15     MS. RIVERA:  Object to form.
16     Q.  Rephrase then.  Can you describe the
17 process by which AWPs were implemented for
18 Roxane's products?
19     A.  Generally speaking, yes, or that is to
20 say, as we've been talking about for the last few
21 hours, Roxane had a lot of products over a long
22 period of time and that were dealt with in

197

1  discrete and individual ways, some generalizations
2  are possible though.  As I point out in my report,
3  generally speaking, there were with respect to
4  what average wholesale prices, AWPs, it is my
5  understanding that personnel within the Roxane
6  organization had day-to-day line responsibility
7  consistent with the deposition testimony of Mr.
8  Russillo and Mr. Berkle for establishing prices
9  and that in terms of the ordinary day-to-day
10 operations of Roxane that people at the level of
11 Judy Waterer and Linda -- I'm trying to remember
12 her last name -- Leonetti.
13     Q.  Lesli Paoletti.
14     A.  I'm sorry, did I say Linda, Lesli
15 Paoletti, were making those decisions with respect
16 to pricing.
17     Q.  Did the process differ for Roxane's
18 branded generic products as opposed to what it
19 regarded as its pure multisource products?
20     A.  The pricing process?
21     Q.  The process by which average wholesale
22 prices were set and approved?

Macey, Jonathan R.          CONFIDENTIAL                    May 19, 2009
                            New York, NY

230

1   Gerstenberg's capacity as president of BIC. I
2   don't remember focusing on what or seeing very
3   much in the record that I can recall right now
4   about what Mr. Russillo thought in that way, but
5   in my experience in corporations people who are
6   nonlawyers typically don't really think in those
7   terms. They just think generally about reporting.
8   So I'm not sure what Mr. -- what was going on in
9   Mr. Russillo's mind.
10      Q. Let's go back to paragraph 2 of your
11  report. I'm at subpart A, the second sentence you
12  write: "I also examined the theory and public
13  policy considerations that drive the circumstances
14  under which the corporate form should be
15  disregarded and explained why the corporate form
16  generally should be respected such that piercing
17  the corporate veil should only be done in rare and
18  unusual circumstances that are not present in this
19  case."
20      Do you see that?
21      A. Yes, I do.
22      Q. Are you offering an opinion that

231

1   Roxane's corporate veil should not be pierced in
2   this case?
3       A. Well in this paragraph I'm not, in this
4   paragraph I'm simply saying that I've examined
5   these theories and I believe that as somebody who
6   does teaching and research in this area I
7   understand these policy considerations.
8       Q. I'm just focusing on, I guess, the
9   second clause where you say that you explain why
10  the corporate form generally should be respected
11  such that piercing the corporate veil should be
12  only done in rare and unusual circumstances that
13  are not present in this case. Maybe I'm just
14  trying to understand that sentence.
15      A. Okay.
16      Q. Are you offering an opinion that
17  Roxane's corporate veil should not be pierced?
18      A. No. What I'm doing in this sentence --
19  maybe it's not clear, but what I'm doing in this
20  sentence is offering an explanation for why the
21  corporate form, generally, should be respected and
22  making the observation as an empirical matter

232

1   based on my own experience that both positively
2   and normatively piercing the corporate veil should
3   only be done in rare and unusual circumstances
4   that are not present in this case. It would be --
5   it's not really up to me, it would be up to a
6   judge or a jury I would think to reach the
7   determination of whether this one of those cases
8   or not. So I'm not offering -- I don't see this
9   as my offering a legal opinion with respect to,
10  you know, the issue of whether the corporate veil
11  should be pierced with respect to Roxane. I don't
12  think I mention Roxane in this paragraph,
13  subparagraph A of paragraph 2.
14      Q. Well you specify that the corporate veil
15  should only be pierced in certain rare and unusual
16  circumstances, correct?
17      A. Yes. I do.
18      Q. Are you offering an opinion that those
19  rare and unusual circumstances are not present in
20  this case?
21      A. Again, with respect to the ultimate
22  conclusions in this case I might have formed a

233

1   personal opinion but I'm not offering an expert
2   opinion with respect to whether those
3   circumstances are present in this case. I think
4   it would be up to the trier, somebody applying the
5   law in this case to make a determination about
6   whether or not -- you know, whether or not the
7   legal tests met.
8       Q. You're not offering an opinion as to
9   whether or not the criteria and factors necessary
10  to pierce the corporate veil have been satisfied
11  or haven't been satisfied in this case?
12      A. Correct. I'm offering analysis of the
13  corporate governance relationships and also
14  analysis of the policies both in favor of and
15  against disregarding the corporate form or in
16  favor of and against respecting the corporate
17  form.
18      Q. What are the rare and unusual
19  circumstances when the corporate veil should be
20  pierced?
21      A. So the classic situation in which the
22  corporate veil should be pierced is a situation in

Macey, Jonathan R.          CONFIDENTIAL          May 19, 2009
New York, NY

60  (Pages 234 to 237)

---

**234**

1  which you have an inability on the part of the
2  plaintiff, whether it's a contract creditor or a
3  tort creditor, to distinguish or make any judgment
4  about who the defendant is whether the from --
5  this is known as the alter ego theory.  Where the
6  contours of the corporation A and corporation B,
7  whether it's an affiliate or a parent begin and
8  end.  Also it is the case that there are, as many
9  people have observed including myself, a
10  significant difference in the kind of -- in
11  analytical properties of a disregarding the
12  corporate form situation that involves a tort and
13  one that involves a fraud, a contractual fraud;
14  that is to say, contract cases and tort cases, I
15  mean to say not fraud in tort cases, excuse me.
16      So the idea is in the contract cases the
17  issue is, in addition to the first issue of can we
18  tell where the corporation begins and ends, the
19  other issue is with respect to contract cases is,
20  was there any deception such that the counterparty
21  in the contractual relationship thought that it
22  was dealing with a parent, thought it was dealing

---

**235**

1  with the affiliate.  And in that case it's -- that
2  is frequently cited in economics discussions as a
3  reason why the corporate veil should be
4  disregarded.
5      In a torts case the issue is the where -
6  - because in torts cases there isn't by definition
7  any reliance, the question is again always that
8  first question that I've mentioned, can you -- is
9  it possible to discern the contours of the
10  corporation where it begins, does it have any
11  assets, what are those assets and then in the tort
12  case would also look, which the contract case
13  shouldn't do, add capitalization issues from a
14  policy point, were appropriate legal rules
15  followed with respect to licensing, insurance,
16  dividend policy and that sort of thing in the tort
17  context.
18      Q.  I'm going to try and make sure I
19  understand all that.  In the contract -- is it
20  fair to say that in the contract situation the
21  issue of deception is comparatively more important
22  than it is in the tort situation?

---

**236**

1      A.  Yes.
2      Q.  And is it fair to say in the situation
3  of a tort plaintiff, the issue of capitalization
4  is comparatively more important?
5      A.  In the contracts cases assuming equal
6  bargaining power, no fraud in a contracts case,
7  then capitalization should be irrelevant because
8  in a situation of equal contracting power, to the
9  extent that an entity is undercapitalized, unlike
10  the tort context, the price in the contract or the
11  interest rate charged for the loan or the other
12  contractual terms can compensate for the
13  additional risk associated in the contract setting
14  with doing business with an undercapitalized firm.
15  Whereas in the tort context, obviously -- I'm
16  sorry in the tort context because of the
17  involuntary nature of the relationship between the
18  plaintiff and the defendant, by definition, no
19  plaintiff can deal -- can take into account the
20  capitalization issue, so the capitalization issue
21  is relevant.
22      So I just make that clarification

---

**237**

1  because it's not that capitalization is very often
2  dispositive in any of these situations, but that
3  it's really irrelevant in the contract setting but
4  it is relevant in the torts context.
5      Q.  Is that because the contract plaintiff
6  has chosen to enter into a contract with the
7  defendant and presumably had access to make a
8  decision about how capitalized they were or
9  weren't assuming there is no fraud?
10      A.  Yes, exactly.  And as one veers away
11  from those assumptions, those fairly rigid,
12  stylized assumptions then one would bear away from
13  the strict sort of completely ignoring
14  capitalization.
15      Q.  Do you have an opinion as to whether
16  this case is more akin to a torts plaintiff or a
17  contracts plaintiff?
18      A.  Well in this case there was, if I'm
19  understanding the facts correctly, there's no -- I
20  guess it depends really how one looks at the case,
21  but the idea is I've seen no facts that suggest
22  reliance on any -- that there was sort of this

---

Macey, Jonathan R.              CONFIDENTIAL                    May 19, 2009
                                New York, NY

64  (Pages 250 to 253)

250

1   were transferred?
2       A. Not offhand, no.
3           (Whereupon, Document entitled,
4   "Trade Relations Structure", was marked as Exhibit
5   Macey 013 for identification, as of this date.)
6       Q. Exhibit 13 is a document entitled,
7   "Trade Relations Structure" and it lists the eight
8   national account managers and there are two
9   supervisors, do you see that?
10      A. Yes.
11          MS. RIVERA: Can I just put an
12  objection, my recollection is this is part of a
13  bigger document --
14          MR. FAUCI: It is.
15          MS. RIVERA: -- so to the extent it is
16  part of a larger document, I just object that the
17  witness has not been provided with the entire
18  document.
19      Q. I guess I'll say this, the only question
20  I have about this document is just to identify
21  that these people were, in fact, Roxane's and --
22  the eight national account managers with their two

251

1   supervisors.
2           Do you know if Richard Feldman ever
3   switched from one company to another?
4       A. I believe that he did, yes. I believe
5   he did. I'm not -- yes, that's my recollection.
6       Q. What about Bob Sykora?
7       A. I don't recall about Mr. Sykora.
8       Q. Mike Doan?
9       A. I don't recall.
10      Q. Do you recall any of the other people,
11  Anthony Tavalaro, Don Gordon, Colin Carr-Hall, Tom
12  Via, do you recall whether any of those people
13  switched companies?
14      A. Can you give me a time frame?
15      Q. I'm in the 2000, 2001 time frame?
16      A. There was a time when Roxane got out of
17  the branded and multisource business and my
18  recollection is that -- when that decision was
19  made, my recollection is, the multisource products
20  were -- sorry, the branded generic products were
21  sold to -- by Roxane to a company called Elan and
22  that the branded products as distinct from the

252

1   multisource or the brand generic products, were
2   transferred over to BIPI. And that if it may be
3   that these salespeople were -- I can't recall
4   specifically these names, but my recollection more
5   generally is that I analyzed the fact that some
6   employees did go over to BIPI, some Roxane
7   employees did go over to BIPI in connection with
8   that. But I regard that as a fairly major
9   reorganization of the companies by the holding
10  company that wouldn't involve a sort of hour to
11  hour or day-to-day you're working for this
12  company, you're working for that company tomorrow
13  and the next day you're working for a third
14  company and you're still sitting at the same desk,
15  which has been a serious concern, I'm aware, when
16  people go about thinking about how to organize
17  parent, subsidiaries and affiliates.
18      Q. Do you know whether Judy Waterer ever
19  transferred companies?
20      A. I don't recall that she did, no.
21      Q. Lesli Paoletti?
22      A. I don't recall.

253

1       Q. This will be our last document today.
2           (Whereupon, E-mail and attachment,
3   was marked as Exhibit Macey 014 for
4   identification, as of this date.)
5       Q. Handing you what the court reporter has
6   marked as Exhibit 14.
7           MR. FAUCI: I'll represent for Maria's
8   benefit that this is not -- this is a collection
9   of some documents.
10          MS. RIVERA: Collection of individual
11  documents?
12          MR. FAUCI: I'm not sure whether each
13  page is an individual document but my only
14  representation is that this Exhibit 14 is not one
15  contiguous document.
16      Q. I'm really just going to ask you to
17  focus on the first page of this, though. Does
18  this refresh your recollection as to whether Judy
19  Waterer, Lesli Paoletti, Steve Snyder and Deb
20  Kutner were transferred to Ben Venue effective
21  January 1st, 2002?
22      A. No.

Macey, Jonathan R.        CONFIDENTIAL        May 19, 2009
                          New York, NY

65  (Pages 254 to 257)

---

254

1      Q.  Do you have any reason to doubt Judy and
2  Lesli were transferred from Roxane to Ben Venue
3  January 1, 2002?
4      A.  Yes.  My recollection is that with
5  respect to these employees who were involved in
6  the multisource aspect of Roxane's business, that
7  at one point they were transferred from the --
8  physically transferred, is my recollection, from
9  the corporate campus, if you will, of Roxane to
10  the Ben Venue corporate campus, which was also
11  located in the state of Ohio but I think in a
12  different city.  I think Roxane was Columbus and
13  Ben Venue was in Cleveland.  And my understanding
14  is that and recollection of the record, this
15  document to the contrary notwithstanding, is that
16  they, while their paychecks said Ben Venue on
17  them, it is my recollection that they -- that the
18  salary that they were paid was reimbursed to Ben
19  Venue by Roxane via intercompany transfer, and
20  also it's my recollection that consistent with
21  that, these people continued to work exclusively
22  on Roxane products.  So I believe that -- so I did

---

255

1  take this entire -- you know, I looked carefully
2  at this entire sequence of events and I think that
3  basically the corporate practice in this firm, as
4  I think I mentioned in my report, was people
5  received a single paycheck and they typically
6  received that from the place where they were
7  tended to be physically located and -- but that
8  these people ultimately were remained dealing with
9  Roxane issues even after this date, I think that's
10  my recollection.
11      Q.  Is it your testimony that Judy Waterer
12  and Lesli Paoletti remained Roxane employees after
13  January 1st, 2002?
14      A.  Well to be clear, I may have said that
15  and that's the way I think of it, again I don't
16  regard myself as an expert on the employment
17  relationship.  It's my recollection that, again,
18  they were doing work on Roxane products and that
19  they received a paycheck that said Ben Venue, but
20  that Ben Venue reimbursed -- I'm sorry, Ben Venue
21  was reimbursed by Roxane.  So I would regard them
22  doing work, to use your term again, on behalf of

---

256

1  Roxane.  I haven't reached -- I refer to them
2  colloquially as employees of Roxane but I didn't
3  reach any conclusions on the precise, how I
4  characterize the nature of their employment
5  relationship other than, again I regard them as
6  agents of Roxane regardless of what employment law
7  would say.
8      Q.  This will be my last question for today,
9  can you identify what evidence you are referring
10  to when you state that Judy and Lesli's salaries
11  were reimbursed by Roxane to Ben Venue following
12  the January 1st, 2002 time frame?
13      A.  That's my recollection.  I believe this
14  was in a deposition testimony.
15      Q.  Do you have any -- as you sit here today
16  can you identify which testimony?
17      A.  No.
18      Q.  Fair enough.
19          MS. RIVERA:  Okay.  Should we go off the
20  record for our discussion of timing?
21          MR. FAUCI:  Sure.
22          (Time noted:  5:00 p.m.)

---

257

1          SIGNATURE OF THE WITNESS
2
3
4
5
6
7          _____
8          JONATHAN R. MACEY
9
10  Subscribed and sworn to before me
11  this _____ day of _____, 2009.
12
13  _____
14  NOTARY PUBLIC
15
16
17
18
19
20
21
22

---