TAB 99

Macey, Jonathan R. - Vol. II  CONFIDENTIAL          May 20, 2009
New York, NY

259

```
---------------------------------------------x

UNITED STATES OF AMERICA, ex rel,

VEN-A-CARE, FLORIDA KEYS, INC.,

                         Plaintiffs,

                         Case No. 07-10248

          -against-

BOEHRINGER INGELHEIM CORPORATION,

et al.,

                         Defendants.

---------------------------------------------x



                    May 20, 2009

                    8:03 a.m.



                  CONFIDENTIAL

        Continued deposition of JONATHAN R.

MACEY, taken at the offices of Kirkland & Ellis,

Citigroup Center, 153 East 53rd Street, New York,

New York, before Georgette K. Betts, a Certified

Shorthand Reporter, Registered Professional

Reporter and Notary Public within and for the

States of New York and New Jersey.
```

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                    May 20, 2009
New York, NY

4  (Pages 268 to 271)

268

1    Roxane. Not so much coordinate in the sense of do
2    things together, but get, you know, synergistic
3    benefits from working with each other, seeing how
4    the other people work.  So they are getting people
5    performing the same functions in the same place I
6    think -- so they could be monitored more easily,
7    so they would be evaluated better.
8        Q.  Do you know whether Ms. Waterer and Ms.
9    Paoletti's job responsibilities changed in any way
10   following the January 1st, 2002 move to Cleveland?
11       A.  Well, my recollection -- and this is why
12   I characterized this not -- you know, these people
13   are moving location but they continue -- my
14   understanding is they continued to work for Roxane
15   during this time while they were physically at the
16   Ben Venue corporate campus.
17       Q.  So you're not aware that their job
18   responsibilities changed when they moved from one
19   campus to the other campus?
20       A.  I don't recall that -- I assume that
21   there were some changes just because that would be
22   natural, but my understanding is that they

269

1    retained responsibility for -- they continued to
2    do the same functions with respect to Roxane that
3    they previously had done.
4           It certainly would make sense in terms
5    of business justification for the move if there
6    were some, you know, change and expansion of their
7    roles to provide even a better, you know,
8    efficiency justification for the move.  I just
9    don't recall offhand seeing that their
10   responsibilities expanded when they moved to
11   Cleveland.
12       Q.  Thank you.
13          In forming an opinion as to whether a
14   person acted as an agent of Roxane, did you
15   consider whether or not Roxane paid the employee's
16   salary as a factor?
17       A.  I certainly took that into account, but
18   I had to weigh it against a few things.  Number
19   one, just in general there's no requirement for
20   someone to act in an agency capacity that they
21   actually receive compensation.  In fact, quite the
22   opposite.  Number two, the overwhelming business

270

1    practice in the United States is to have people
2    receive a single paycheck.  And in the particular
3    context of these facts, it's my understanding that
4    the companies involved, BIPI, RLI, Ben Venue, and
5    BIC, actually had different pension plans such
6    that it would have been very difficult to take an
7    employee, say Mrs. Waterer, whoever, and say,
8    well, you're going to be 80 percent allocated to
9    Roxane and 20 percent allocated to Ben Venue and
10   you'll have -- 20 percent of your pension will be
11   here.  It would create a truly human resources
12   administrative nightmare.
13          So it is my -- it is absolutely the case
14   that while people wear many hats in corporations,
15   it is -- I'm not aware of very many, if any,
16   situations where a company would, while having
17   somebody wear two hats go to the sort of, kind of
18   extreme bureaucratic step of making some attempt
19   to, you know, give -- pay them two different
20   paychecks, et cetera.
21          So I think, you know, starting with the
22   premise that people can work for more than one

271

1    entity, if they work for more than one entity they
2    either have to be paid by one or both.  And it's
3    just inefficient to be paid by both and we don't
4    observe that in the way business is conducted.
5        Q.  Are you aware whether any employees were
6    paid by multiple entities within the Boehringer
7    Ingelheim family?
8        A.  I looked for that and didn't find a
9    single case, even with respect to Mr. Gerstenberg
10   where there were -- people were getting multiple
11   paychecks, I looked for that and I did not see it.
12       Q.  Where did you look to see who paid Mr.
13   Gerstenberg's salary?
14       A.  I looked -- there were a number of -- in
15   a lot of these depositions I think you actually,
16   you were asking the question where do people's
17   paychecks come from, so I was looking for that
18   question.  I thought it was a good question and I
19   was looking for it with respect to, you know, to
20   see were what the -- you know, what the answers
21   were because I would have been interested if
22   somebody -- I think we had different approaches,

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                    May 20, 2009
New York, NY

5  (Pages 272 to 275)

| 272 | 274 |
|---|---|
| 1  obviously.  My approach would have been I would | 1  yesterday he's not giving opinions on the law and |
| 2  have been shocked to see somebody getting, you | 2  what the rules are for piercing the corporate |
| 3  know, one-third of their pay from this entity, | 3  veil.  So are you asking him this outside the |
| 4  one-third of their pay from that entity, one-third | 4  context of the expert opinions he's here to |
| 5  of the pay from another entity.  So I was looking | 5  testify to in this case? |
| 6  for those sources. | 6       MR. FAUCI:  I'm going to ask Professor |
| 7       Q.  Did you consider any interests of | 7  Macey, you can just object to the record and if |
| 8  fairness or equity in forming your opinion that | 8  Professor Macey wants clarification he'll ask for |
| 9  Roxane's corporate veil should -- well, in forming | 9  it, I assume. |
| 10  your opinions in this case? | 10       MS. RIVERA:  Well, I object. |
| 11       A.  Certainly, yes. | 11       MR. FAUCI:  That's fine. |
| 12       Q.  What about interests of the public | 12       Q.  The question, Professor Macey, is: |
| 13  convenience or welfare? | 13       How do concepts of fairness and the |
| 14       A.  Yes. | 14  public welfare enter into the analysis of whether |
| 15       Q.  Are these concepts relevant to the | 15  or not a corporation's veil should be pierced? |
| 16  analysis of whether a court should pierce a | 16       A.  Okay.  Well, as I stated in my report, |
| 17  corporation's veil? | 17  there are strong efficiency reasons for limited |
| 18       A.  Often they are. | 18  liability.  In fact, most economists do not |
| 19       Q.  How so? | 19  believe that it is possible to have a developed |
| 20       A.  Now just to be clear, in that particular | 20  economy that has reasonable levels of income for |
| 21  question, just to make my answers as clear as I | 21  people unless people are able to organize |
| 22  can, I testified yesterday that at the level of | 22  businesses in the corporate form, and that means |

| 273 | 275 |
|---|---|
| 1  abstraction at which I'm talking there really | 1  limited liability. |
| 2  isn't a difference in the policies and rules of | 2       So that means we have to -- we raise the |
| 3  disregarding the corporate form from state to | 3  question under what circumstances should we ignore |
| 4  state. | 4  the corporate form and notwithstanding the proper, |
| 5       Now you're asking me a more specific | 5  you know, incorporation of a firm, we would |
| 6  question having to do with should fairness be | 6  disregard the corporate form.  And as we -- as I |
| 7  taken into account.  And that -- with respect to | 7  talked about in chapter two -- I'm sorry, |
| 8  that more specific question, I will represent to | 8  paragraph two of my report, I'd say the -- |
| 9  you in answering your question that this is an | 9  piercing the corporate veil should only be done in |
| 10  area in which there are differences.  That is to | 10  rare and unusual circumstances.  Generally the way |
| 11  say, some states require an element of unfairness, | 11  this is organized is a matter of implementing |
| 12  most do, as a condition for disregarding the | 12  policy is to say, well, we need a whole lot of bad |
| 13  corporate form.  Although there are a few states | 13  stuff.  Like we need, you know, disregarding |
| 14  where that requirement is not in place. | 14  corporate form, we need under capitalization, we |
| 15       I do think that the trend is decidedly | 15  need fraud, we need all sorts of, you know, these |
| 16  in favor of imposing this -- these requirements | 16  kind of various factor tests.  And then the courts |
| 17  that you're describing. | 17  say even where we have that, we will still not |
| 18       Q.  How do these concepts enter the | 18  disregard the corporate form unless the problems |
| 19  analysis? | 19  that the various factors that might otherwise go |
| 20       A.  Well -- | 20  into a decision to disregard the corporate form |
| 21       MS. RIVERA:  Can I just object? I just | 21  are combined with elements of unjustness or |
| 22  want to object.  You're asking him -- he testified | 22  elements of unfairness. |

Macey, Jonathan R. - Vol. II  CONFIDENTIAL          May 20, 2009
New York, NY

11 (Pages 296 to 299)

---

296

1    capitalization is one indication, not the only but
2    one indication of the capacity of a firm to
3    operate sort of under its own steam, if you will.
4        Q.  You formed an opinion in this case that
5    Roxane was sufficiently capitalized, correct?
6        A.  Yes, that's correct.
7        Q.  Did you evaluate Roxane's capitalization
8    at the time of its incorporation?
9        A.  Well, I didn't look -- I didn't find any
10   specific balance sheets relating to the initial
11   capitalization.  I did look into the history of
12   Roxane and -- let me see if I can refresh my
13   recollection.
14       So the firm was formed in 1885 as a
15   company called Columbus Pharmacal.  I had no
16   financial information from that date, although I
17   do know as a matter of my historical research and
18   expertise that in 1885 there was -- it would have
19   been impossible legally to form a corporation
20   without adequate capitalization.
21       Then we have the purchase of the company
22   in 1959 when the firm's name was changed to

---

297

1    Phillips Roxane and then the acquisitions by
2    Boehringer Ingelheim in '78 that the corporate
3    history that I reviewed was consistent with the
4    firm being well capitalized when it was formed and
5    well capitalized up until at least, obviously, the
6    time at which the analysis in my report begins.
7        Q.  Did you also evaluate Roxane's level of
8    capitalization over time?
9        A.  Yes.
10       Q.  What steps did you take to evaluate
11   whether Roxane's level of capitalization was
12   sufficient?
13       A.  I'm sorry.
14       Q.  What steps did you take to evaluate
15   whether Roxane's level of capitalization was
16   sufficient?
17       A.  Essentially what I did was to examine
18   the company's balance sheets and profit and loss
19   statements to determine whether or not the company
20   had been -- had adequate levels of capitalization
21   and had resources to pay its debts as they came
22   due in the ordinary course of business.

---

298

1        Q.  Was the first step actually measuring
2    Roxane's level of capitalization?
3        A.  Yes.
4        Q.  And what documents did you consider in
5    doing that?
6        I believe you said balance sheets and
7    profits and loss sheets.  Was there any types of
8    documents you looked at in measuring Roxane's
9    capitalization?
10       A.  I certainly looked at Jim McIntyre's
11   deposition testimony because he was an accountant
12   and a financial -- who had kind of lived with the
13   financial condition of Roxane to see if he had
14   anything to say.  It was sort of inconsistent with
15   what I was saying.
16       I'm trying -- there may have been other
17   documents that I looked at, but those were my sort
18   of most important touchstones.
19       Q.  Are you an accountant?
20       A.  I'm not a CPA, no.
21       Q.  Do you consider yourself to have
22   expertise in accounting?

---

299

1        A.  Yes.  I have been qualified as a member
2    of the board of a public company as someone who is
3    knowledgeable about accounting.  I'm not an
4    accounting expert.
5        Q.  Which company is that?
6        A.  This is WCI Communities, where I serve
7    on the audit committee.
8        Q.  What are your responsibilities there?
9        A.  Well, I'm on the corporate governance
10   committee and the audit committee.  My
11   responsibilities include hiring and firing the
12   company's auditors, reviewing the company's
13   financial statements, reviewing press releases
14   related to financial information, making sure that
15   the -- having general oversight responsibility for
16   ensuring that the financial statements of the
17   company are presented fully and fairly and in
18   accordance with the appropriate accounting
19   principles.
20       Q.  You said you were qualified -- they
21   qualified you as --
22       A.  Correct.

---

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                    May 20, 2009
New York, NY

16  (Pages 316 to 319)

|  | 316 |
|---|---|
| 1 | A.  Okay. |
| 2 | Q.  I'm looking at the paragraph under the |
| 3 | subheading "A, Core Characteristics of Banking." |
| 4 | A.  Right. |
| 5 | Q.  There you write, the third sentence, "On |
| 6 | average well-capitalized banks have debt-equity |
| 7 | ratios of 10:1 as opposed to the 1:1 debt-equity |
| 8 | ratios typical of nonfinancial firms." |
| 9 |     Do you see that? |
| 10 | A.  Yes. |
| 11 | Q.  As you sit here today, do you agree that |
| 12 | a 1-to-1 debt-equity ratio is typical of |
| 13 | nonfinancial firms? |
| 14 | **A.  This is -- the context here is these are** |
| 15 | **nonfinancial firms that compete with banks like** |
| 16 | **mutual funds, but yes.** |
| 17 | **Actually rephrase that.  At the time** |
| 18 | **this was I think more or less correct certainly** |
| 19 | **for looking now these numbers are vastly different** |
| 20 | **or were that debt-equity ratios of banks is now 30** |
| 21 | **or 40-to-1.  And debt-equity ratios of the** |
| 22 | **nonfinancial firms I'm talking about in this** |

|  | 317 |
|---|---|
| 1 | **context, which are nonfinancial firms that compete** |
| 2 | **with banks, it would be probably more like the ten** |
| 3 | **to 12-to-1.** |
| 4 | Q.  So just so I'm clear on this, when you |
| 5 | refer to nonfinancial firms in this article, |
| 6 | specifically in the paragraph we just were talking |
| 7 | about, what types of firms are you referring to? |
| 8 | **A.  So in the context of this article, what** |
| 9 | **I'm talking about is the basic competition between** |
| 10 | **banks and nonbank forms of business enterprise.** |
| 11 | **If banks -- which are characterized by insured** |
| 12 | **deposits and loans, then you have money market** |
| 13 | **mutual funds which have a deposit-like feature** |
| 14 | **because you can have, you know, write checks and** |
| 15 | **use the ATM card.  But they don't lend money, they** |
| 16 | **take the money and put the money in money market** |
| 17 | **instruments.  And those money -- that, as I think** |
| 18 | **I talked about in this article certainly in** |
| 19 | **others, there is an exact match not only in the** |
| 20 | **debt-equity ratio but there's also a -- you know,** |
| 21 | **in the term structure of the assets and** |
| 22 | **liabilities so that -- you know, because when --** |

|  | 318 |
|---|---|
| 1 | **to kind of prevent themselves -- to prevent them** |
| 2 | **from being susceptible to bank runs.** |
| 3 | Q.  I believe you testified that the |
| 4 | benchmark -- I'm sorry, I don't recall we can |
| 5 | either have the court reporter read it back or you |
| 6 | can tell me again. |
| 7 | A.  Okay. |
| 8 | Q.  What is the benchmark in the |
| 9 | pharmaceutical industry? |
| 10 | **A.  Well, there's a range, of course, of** |
| 11 | **firms but you would see ranges in the 5-to-1 to** |
| 12 | **10-to-1 range would not be unusual.** |
| 13 | Q.  What is that standard based on? |
| 14 |     What is your understanding of that |
| 15 | standard based on? |
| 16 | **A.  It's based on looking at pharmaceutical** |
| 17 | **firms and looking -- and computing averages.** |
| 18 | Q.  Have you done that? |
| 19 | A.  Have I personally done it? |
| 20 | Q.  Yes. |
| 21 | A.  No. |
| 22 | Q.  But you read where that's done |

|  | 319 |
|---|---|
| 1 | elsewhere? |
| 2 | A.  Correct. |
| 3 | Q.  Can you think of an article that -- off |
| 4 | the top of your head that does that? |
| 5 | A.  Not off, no. |
| 6 | Q.  The ratio, the benchmark you cited, do |
| 7 | you have an opinion as to whether that benchmark |
| 8 | is larger as we sit here today than it would have |
| 9 | been 1995? |
| 10 | A.  Oh.  No.  No. |
| 11 | Q.  No, you don't have an opinion? |
| 12 | A.  Correct.  I will say -- I don't have a |
| 13 | specific opinion.  I will add, though, that these |
| 14 | are fairly stable over time in general, although |
| 15 | this may have been a hot time of higher |
| 16 | volatility.  I would add, to the extent that they |
| 17 | vary, it's more likely that higher debt-equity |
| 18 | ratio rather than lower would have been tolerated. |
| 19 | Q.  In the past? |
| 20 | A.  Well, in that period.  Not in all of the |
| 21 | past, but in 2005 versus, say, right now. |
| 22 | Q.  I'm sorry, 1995. |

Macey, Jonathan R. - Vol. II  CONFIDENTIAL          May 20, 2009
New York, NY

17  (Pages 320 to 323)

**320**

1     A.  In 1995, right.
2     Q.  Did you compare Roxane's level of
3  capitalization to that of other pharmaceutical
4  companies?
5     A.  Not specific other ones, no, just
6  specific industry average.
7     Q.  And you did in forming your opinions in
8  this case compare Roxane's capitalization to the
9  industry average, the industry benchmark?
10    A.  Right.
11    Q.  And your understanding of the industry
12  benchmark is based on your review of other
13  literature in the field which has articulated that
14  benchmark?
15    A.  Yes, that's my recollection of what the
16  benchmark is.
17    Q.  And as you sit here today, there's no
18  authority you could point me to for the benchmark,
19  specific authority?
20    A.  Correct.
21    Q.  What is a debt-to-equity ratio?
22    A.  A debt-to-equity ratio is simply the

**321**

1  ratio of the amount of debt that a company has to
2  the amount of equity that it has.
3        So if we imagine a company with a
4  hundred dollars in assets, $50 in debt, and $50 in
5  equity, we reach the 50-dollar in equity figure
6  because the hundred dollars in assets minus the
7  $50 in liabilities equals $50 equity.  Since the
8  firm now has $50 in debt and $50 in equity, that
9  firm's debt-to-equity ratio would be 1-to-1 by way
10  of example.
11    Q.  Is debt the same thing as liability?
12    A.  Well...
13    Q.  I can focus this for you a little if you
14  want.
15    A.  Okay.
16    Q.  Why don't we go back to Exhibit 15, that
17  statement of financial position.
18    A.  Okay.
19    Q.  Which is page 10 of Exhibit 15.
20    A.  Okay.
21    Q.  Can you calculate a debt-to-equity ratio
22  based on this document?

**322**

1     A.  Let me see.
2        Yes.
3     Q.  How would you do that?
4     A.  I would take the total liabilities of 42
5  million 954 and compare it to the total
6  shareholders' equity of 101298, and then I would
7  fiddle with a fraction to get the lower -- get the
8  lowest ratio.  In other words, I would -- then I
9  would try to just, you know, reduce the fraction
10  by, you know, reducing the numerator and the
11  common -- and numerator and the denominator by
12  common amounts.
13    Q.  By that you mean just simplify the
14  fraction.
15    A.  Right, thank you, simplify the fraction.
16        So it would be 42 million 954 debt, 101
17  million 298 equity.
18    Q.  In paragraph 62 of your report, the very
19  last sentence, you write, "Roxane's debt-equity
20  ratio was reasonable."
21        Do you see that?
22    A.  Not yet -- yes, I do.

**323**

1     Q.  Did you calculate Roxane's debt-to-
2  equity ratio for various points in time?
3     A.  Yes.
4     Q.  What periods of time did you consider?
5     A.  Well, the period of time that I looked
6  at here was 2002 -- let me just check but I think
7  it was 2002 to 2005.
8        1995 to 2005.
9     Q.  Are there written notes that reflect
10  your calculations?
11    A.  No.
12    Q.  How did you make the calculations?
13    A.  I just did them on a calculator.
14    Q.  And so for the 1995 time frame, the
15  calculation that you did would have been
16  essentially what we just walked through, comparing
17  the liabilities to the equity and finding a
18  fraction therefrom?
19    A.  Sitting here right now that's my -- wait
20  let me -- yes, I believe that's correct.
21    Q.  You may have answered this without me
22  fully even getting it, so I'll just ask it again.

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                    May 20, 2009
New York, NY

20  (Pages 332 to 335)

**332**

1    different from a loan from a bank?
2         A.  Well, it's -- to be as simple as I can,
3    this is not maybe -- this may lose some subtlety,
4    but I think it will make the point clear, a loan
5    from a subsidiary -- and I'm not talking here now
6    about Roxane, I'm talking about, generally
7    speaking, loans from subsidiary is different from
8    a loan from a bank for in much the same way that
9    somebody who obtains a loan from one's uncle is
10   different than obtainin a loan from a bank.  That
11   is, it could be worse.  The uncle could be really
12   mean and assiduously require all sorts of, you
13   know, atrocious terms, et cetera.  But it also is
14   the case that it could be the uncle could be more
15   understanding about late payments, will have
16   greater degree of identification and empathy and
17   if the person who's borrowed money from their
18   uncle needs another loan, and goes to a bank and
19   says, gee, I need a loan, they say, well, you have
20   this other loan and they say -- that it's easier,
21   it's more likely than in the case of the affiliate
22   loan that the borrower can say I can get my uncle

**333**

1    or I can get my affiliate company to agree to
2    subordinate, to give you priority in repayment.
3    Whereas if it were a loan from a third party -- it
4    likely will say forget it, I want to maintain my
5    priority.
6         Q.  If a lending affiliate is more forgiving
7    in loan terms to a member of its same corporate
8    group than it would be to a third party, is that a
9    factor suggesting that the companies are not fully
10   independent?
11        A.  What's relevant in that standpoint is
12   you want to see are the loans documented, is there
13   a business reason.  Generally speaking, in a -- so
14   generally speaking, the answer is no because if
15   I'm a subsidiary of a company, it often is for
16   many reasons really bad for my business if a
17   related subsidiary finds itself in financial
18   distress.  And so I have an extremely strong
19   personal interest in -- to the extent -- up to a
20   certain point, obviously you don't want to throw
21   good money after bad but up to a certain point you
22   want to do everything you can to make sure that

**334**

1    the affiliate, you know, is able to weather stormy
2    times and continue on as a viable business because
3    by definition, as I say in the report, the idea of
4    having these corporate groups is there are
5    synergies but among the various companies if one
6    subsidiary fails or is unable to obtain capital or
7    loans, et cetera, then, obviously, the other
8    subsidiaries in the holding company or parent lose
9    those -- no longer can avail themselves of those
10   synergies.
11        MR. FAUCI:  I think if we take a five
12   minute break I can be done for the next break.
13        MS. RIVERA:  Great.
14        (Recess.)
15        (Whereupon, Invoice from Professor
16   Macey, was marked as Exhibit Macey 017 for
17   identification, as of this date.)
18   BY MR. FAUCI:
19        Q.  Welcome back, Professor Macey.
20        A.  Thank you, Mr. Fauci.
21        Q.  Just in the way of housekeeping, I would
22   ask if you're able to find the article that we

**335**

1    were talking about that supports the benchmark we
2    discussed for average debt-equity ratios?
3         A.  Certainly.
4         Q.  If Maria could send that to us, that
5    would be great.
6         A.  Okay.
7         Q.  One more bit of housekeeping, let's just
8    introduce -- it's already been premarked Exhibit
9    17.  Which is the second invoice.
10        Is this --
11        MS. RIVERA:  Can I get a copy, Jeff?
12        MR. FAUCI:  Sure.
13        Q.  Is this a true and accurate copy of the
14   -- of your most up-to-date invoice in this
15   litigation?
16        A.  Yes.
17        Q.  Quickly directing your attention to the
18   actual invoice, seven entries down under work
19   performed it says "legal capital calculations"?
20        A.  Yes.
21        Q.  Those -- I just want to understand what
22   that involved.  Can you just describe how you made

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                    May 20, 2009
New York, NY

21  (Pages 336 to 339)

|  | 336 |
|---|---|
| 1 | those calculations one more time. |
| 2 | A.  Certainly, of course. |
| 3 | So this involved several things.  In |
| 4 | fact, I will say that having looked back myself at |
| 5 | this particular item, I don't believe -- I believe |
| 6 | that it may have taken me longer than two and a |
| 7 | quarter hours, but it is what it is on the time |
| 8 | sheet. |
| 9 | So this involved the following things: |
| 10 | One, I looked at every year in the -- in |
| 11 | this time frame that I discussed previously with |
| 12 | respect to capitalization.  I looked at whether |
| 13 | there had been any incursions on the initial |
| 14 | capitalization of the firm, which is -- reflects |
| 15 | on the balance sheet as the term paid-in capital. |
| 16 | There is also another amount of capital called |
| 17 | capital surplus, which is the amount that |
| 18 | shareholders have paid in to the company above the |
| 19 | amount of the stated capital amount.  And then a |
| 20 | third thing that I looked at was I looked at |
| 21 | retained earnings. |
| 22 | So put it differently, from an |

|  | 337 |
|---|---|
| 1 | accounting or a legal capital point of view, |
| 2 | capitalization point of view, a firm's capital can |
| 3 | be divided into basically three categories; stated |
| 4 | capital, capital surplus, and retained earnings. |
| 5 | So I looked at all three of those what are known |
| 6 | as capital accounts and then I -- you know, as we |
| 7 | talked -- and then I did the things we talked |
| 8 | about earlier, looked at debt-equity ratios, and |
| 9 | dividend payment policy, and et cetera. |
| 10 | Q.  Is capital surplus the same as |
| 11 | additional paid-in capital? |
| 12 | A.  Yes. |
| 13 | Q.  When you looked at retained earnings, |
| 14 | the actual calculations that you performed, were |
| 15 | those measuring the liabilities that show up in |
| 16 | the balance sheet against the assets in the |
| 17 | balance sheet? |
| 18 | A.  Yes, I think that's -- I'm not quite |
| 19 | sure if I understand the question, but I believe - |
| 20 | - I certainly what I did involved that.  I think |
| 21 | there may have been other things that I did, but |
| 22 | yes. |

|  | 338 |
|---|---|
| 1 | Q.  What other things? |
| 2 | MS. RIVERA:  All the things he just |
| 3 | said. |
| 4 | A.  The other things -- |
| 5 | Q.  I can try and be more precise then. |
| 6 | What other actual calculations did you |
| 7 | do? |
| 8 | A.  So I did the calculations described in |
| 9 | paragraph 54, meaning I computed an average of the |
| 10 | retained earnings of the company from 1995 to |
| 11 | 2005.  And I computed an average of the dividend |
| 12 | payments between 1995 and 2005. |
| 13 | Q.  In calculating debt-equity ratios, you |
| 14 | compared liabilities as reflected in balance |
| 15 | sheets against assets -- against the equity as |
| 16 | reflected in the balance sheet? |
| 17 | A.  Yes. |
| 18 | Q.  Why did you look -- what is the |
| 19 | relevance of the fact that Roxane never intruded |
| 20 | upon, for a lack of a better word, its initial |
| 21 | paid-in capital and its additional paid-in |
| 22 | capital? |

|  | 339 |
|---|---|
| 1 | A.  Well, there's a very conservative theory |
| 2 | -- there are people who have taken the view that |
| 3 | that amount -- and other people disagree with but |
| 4 | there are people who take the view that those sums |
| 5 | are considered to be the basic capitalization for |
| 6 | the firm on which a firm should not encroach. |
| 7 | I believe that to be the case for stated |
| 8 | capital.  It's generally not the case for |
| 9 | additional paid-in capital, which is sometimes |
| 10 | referred to as capital surplus.  But to the extent |
| 11 | that some people are of that view, then I take the |
| 12 | view, you know, at least in looking at it, knowing |
| 13 | that there are people who take that view, I wanted |
| 14 | to see, you know, if somebody taking that |
| 15 | perspective would be concerned.  And the answer |
| 16 | would be they would not be because Roxane never -- |
| 17 | didn't encroach or diminish the amount of its |
| 18 | initial paid-in capital or its capital surplus. |
| 19 | It always stayed the same. |
| 20 | Q.  In evaluating Roxane's capitalization in |
| 21 | 2000, is looking at whether or not it encroached |
| 22 | upon its initial paid-in capital and its |

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                    May 20, 2009
New York, NY

22  (Pages 340 to 343)

340

1  additional paid-in capital an important part of
2  the inquiry as to whether or not it's well
3  capitalized?
4      A.  It is among the factors that I took into
5  consideration.  There are lots of factors, none of
6  which is dispositive but I would certainly
7  describe it as relevant.
8      Q.  Are you aware whether or not Roxane grew
9  in size as a corporation -- whether it was a
10  bigger corporation in 2000 than it was in 1995?
11      A.  Sitting here right now, I can't -- I
12  don't recall.
13      Q.  Why don't you go back to -- or maybe we
14  can short change this -- is the quantity, is the
15  amount of net sales that a corporation has at
16  least a relevant barometer of the corporation's
17  size?
18      A.  Dollar volume of net sales?
19      Q.  Yes.
20      A.  Is there --
21          MS. RIVERA:  Are you looking for this
22  one?

341

1          THE WITNESS:  Oh, it's right here.
2      A.  That would certainly be -- with other
3  factors such as the amount of sales is a useful
4  statistic that for -- particularly for a company
5  like this whose business is sales.  It is
6  partially sales.  So it would be one -- something
7  that would be relevant in thinking about the size
8  of a company.
9      Q.  What are Roxane's net sales in 1995
10  according to Exhibit 15?
11      A.  Let me see.
12          1995 actual net sales are 188,765,000.
13          MR. FAUCI:  I'm going to introduce
14  Exhibit 18.
15          (Whereupon, Roxane Laboratories
16  Unanimous Written Consent of Directors, Bates-
17  stamped BOEH04600363 through 368, was marked as
18  Exhibit Macey 018 for identification, as of this
19  date.)
20      Q.  This is another Roxane Laboratories
21  Unanimous Written Consent of Directors that
22  attaches the year-end closing for 2000, including

342

1  the balance sheet and profit and loss statement.
2          If you turn five pages in, you will see
3  the net income for 2000.  The statement of income
4  for 2000 I mean.
5      A.  Right.
6      Q.  And the net sales there are $632
7  million?
8      A.  Yes.
9      Q.  Does that suggest to you that Roxane
10  grew as a corporation in size from 1995 to 2000?
11      A.  Yes.  Well, it suggests certainly that
12  sales grew, holding all else constant and it looks
13  as though the company grew.
14      Q.  Assuming Roxane grew -- strike that.
15          Given that Roxane's sales, net sales in
16  2000 were significantly higher than they were in
17  1995, does the fact that it never encroached on
18  its capital stock and additional paid-in capital
19  become less significant as the company grows in
20  size?
21      A.  I don't see why, no.  Keep in mind that
22  the calculations that I performed on Roxane's

343

1  financial numbers control for size in the sense
2  that I'm dealing with ratios.
3          So if the debt-equity ratio is X, it
4  could be the same X, say, 15-to-1 for two
5  companies.  One company could be -- could have
6  only $15 in debt and $1 in equity.  The other
7  company could have $15 billion in debt and a
8  billion dollars in equity.  It would be the same
9  debt-equity ratio.
10          And what keeps the debt-equity ratio
11  relevant is that as the companies go up, its
12  liabilities go up.  But its assets also have to go
13  up in order to maintain the debt-equity ratio.  So
14  in that way, you know, the analysis that I
15  performed takes into account company growth.
16      Q.  I'm just focusing on the part of your
17  analysis that analyzes whether or not Roxane
18  encroached upon its initial paid-in capital and
19  it's additional capital surplus.
20      A.  Right.
21      Q.  If you look at the statement of
22  financial positions that are reflected in both

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                    May 20, 2009
New York, NY

23  (Pages 344 to 347)

344

1    Exhibit 15 and Exhibit 18.  You could take a
2    minute to find those.
3        A.  Okay.  Sure.
4            MS. RIVERA:  Is it on the statement of
5    income or...
6        A.  Looks like the statement of financial
7    position.
8        Q.  Yes.
9            Do you observe that Roxane's capital
10   stock and additional paid-in capital stayed the
11   same from 1995 as they were in 2000?
12       A.  Unless -- just as a matter of what
13   capital stock and initial paid-in capital are --
14   unless -- that one would expect those numbers to
15   stay the same, generally speaking.  That is to
16   say, that the notion, the theory behind capital
17   stock or initial capital, additional paid-in
18   capital or capital surplus is this is the amount
19   of the firm's initial capitalization and it should
20   be sort of kept -- you know, and that amount
21   should not be encroached upon.  There is no theory
22   or practice, certainly, that suggests in any way,

345

1    shape, or form that as a company grows its capital
2    stock or additional paid-in capital should
3    increase.
4        Q.  Understood.
5            Is the fact that a corporation does not
6    encroach upon its capital stock and additional
7    paid-in capital decrease in usefulness as the
8    company grows in size?
9        A.  No, not at all.  Because you could
10   imagine a company that grows in size but its
11   liabilities are growing faster than its assets
12   and, therefore, it encroaches on its capital stock
13   or additional paid-in capital.
14           So what matters really is what these
15   numbers tell you holding them constant is
16   notwithstanding the fact that the company is
17   growing, the liabilities are growing sufficiently
18   in size along -- sorry, the assets are growing
19   sufficiently in size along with the liabilities
20   such that you don't encroach on the capital stock
21   or paid-in capital.
22       Q.  Is it fair to say that the analysis

346

1    focuses on -- focuses more on the liabilities and
2    assets, the entire balance sheet as a company
3    grows as opposed to just whether or not the
4    initial paid-in capital and additional paid-in
5    capital is encroached upon?
6        A.  Certainly one would look at both of
7    those things.  You wouldn't want to look at only
8    one or the other, but yes, I agree with you that
9    the analysis encompasses both, yes.
10       Q.  Let's just introduce one other article
11   you wrote.  You can clarify what you mean.
12           (Whereupon, Article written by
13   Professor Macey entitled "Creditors Versus Capital
14   Formation: The Case Against the European Legal
15   Capital Rules", was marked as Exhibit Macey 019
16   for identification, as of this date.)
17       Q.  Exhibit 19 is an article you wrote
18   called Creditors Versus Capital Formation: The
19   Case Against the European Legal Capital Rules.  It
20   is dated September 2001 and it was published in
21   the Cornell Law Review.
22           Again, feel free to familiarize yourself

347

1    with it, but I can tell you I'll be asking you
2    questions about the first paragraph on page 12 --
3        A.  Okay.
4        Q.  -- starting with the "primary reason?
5        A.  Yes, I see it.
6        Q.  I'm looking at the second sentence that
7    you write:
8            "Because a firm may immediately begin to
9    incur losses, either merely in the normal course
10   of business or by entering into one of the many
11   kinds of unfair transactions that Article 11 of
12   the second directive does not cover, the initial
13   paid-in capital is a meaningless amount.  In other
14   words, creditors willing to inform themselves
15   about a firm's existing equity cushion must
16   examine its entire balance sheet."
17           Do you see that?
18       A.  Yes.
19       Q.  Can you clarify what you mean by the
20   initial paid-in capital is a meaningless amount?
21       A.  The idea is that if you start -- let's
22   imagine we start a firm with a hundred dollars in

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                    May 20, 2009
New York, NY

26  (Pages 356 to 359)

356

1  testimony?
2      A.  Yes.
3      Q.  Could you tell us what was discussed
4  about the complaint?
5      A.  To the best of my recollection, I think
6  the discussions went something along these lines:
7  That as is consistent with my practice is, you
8  know, my ordinary kind of practice I -- the
9  document that I look at first in a matter is the
10  complaint.  So I asked people -- someone at the
11  Kirkland firm if the complaint would be available
12  and they made the complaint available to me and I
13  read it.  And in the course of reading it, I was -
14  - let me see how to put this.  You know, my
15  attention was drawn to a couple of paragraphs in
16  the report, so that's essentially what happened.
17      Q.  Do you recall what paragraph that you
18  referred to?
19      A.  I believe I refer to this in my report,
20  so let me -- if you'll give me just a second, I
21  think I can respond to that.  I remember -- I'm
22  sorry, okay, if you look at paragraph 38 of my

357

1  report in footnote seven it refers to the
2  complaint at paragraph 19.
3      Q.  Right.  Okay.
4      A.  So that would have been -- I don't have
5  the complaint with me, I'm sorry to say, but -- so
6  it would be that and maybe, you know, paragraphs -
7  - those weren't the only parts of the complaint
8  that I looked at.  I read the whole thing, but
9  that I think I remember as being something that I
10  noticed in the complaint as being something that
11  was interest to me in light of my areas of
12  research and focus.
13      Q.  Did you discuss paragraph 19 of the
14  complaint with Roxane's attorneys?
15      A.  Not -- not in any way that I recall.
16      Q.  Can you tell us what, from your
17  experience -- what parts of your experience have
18  informed your opinion in this case?
19      A.  Well, so with respect to my general
20  experience, I was involved in financial modeling
21  as an investment banker when I graduated from
22  college.  So I'm used to thinking about cash flows

358

1  and the way that cash flows are used to pay debts
2  of company and the concepts -- the basic
3  financial, you know -- basic finance concepts.
4      And then in my teaching career I teach
5  finance, and I teach corporate governance, and I
6  teach relationships among firms.  I also have done
7  -- served on boards of directors and on various
8  committees of boards of directors that have
9  subsidiary corporations that are parent
10  corporations.  So I've observed firsthand the
11  relationships between parent companies and
12  subsidiaries and subsidiaries and affiliates.  And
13  these are areas that I've -- in which -- that I've
14  taught in and that I've done research in.
15      So the various topics relating to
16  corporate governance practice, ordinary behavior
17  among corporate members of corporate groups, you
18  know, shared services transactions, shared cash
19  management systems, all of these are sort of
20  touchstones in things that I actively am involved
21  in in terms of teaching and in terms of serving as
22  a director.

359

1      Q.  Which companies that you served as a
2  director on had a shared services system?
3      A.  I'm currently on the board of WCI
4  Communities where there is -- you know, there are
5  shared services in that company.
6      Q.  Is there a separate subsidiary that
7  provides the services in that company similar to
8  the BISC for the Roxane Boehringer company?
9      A.  No.
10      Q.  So in that company the services are all
11  provided by one subsidiary to the other affiliate?
12      A.  That's my recollection, yes.
13      Q.  Are you aware of companies where there
14  is a shared services subsidiary and then other
15  types of shared services are provided by a
16  different affiliate as we have in the Boehringer
17  company?
18      A.  Yes.  In the case we have there is -- as
19  you point out, there are basically two types of
20  shared services.  There is what I would call
21  ministerial shared services, which are the shared
22  services that are conducted in the kind of

Macey, Jonathan R. - Vol. II  CONFIDENTIAL                May 20, 2009
New York, NY

27 (Pages 360 to 363)

| 360 | 362 |
|---|---|
| 1  dedicated subsidiary.  And then there are shared | 1  Q.  That's not done? |
| 2  services that are conducted -- that are -- I would | 2  A.  Well, I don't know that it's never done, |
| 3  describe as being more complicated than mere | 3  but it would be unusual.  That is, on the |
| 4  administrative or ministerial, which were | 4  companies I'm involved with and other companies |
| 5  conducted in BIPI. | 5  that I'm familiar with certainly we have top |
| 6  And while no particular companies come | 6  officers, they're going to receive one paycheck |
| 7  to mind at the moment, that -- this is something | 7  and they will not -- and their salaries won't be - |
| 8  that I've seen discussed as a common business | 8  - will not be billed back, generally speaking. |
| 9  arrangement.  It basically has to do with the | 9  Q.  And again, that's based on that WCI |
| 10  natural evolution of firms over time that a | 10  Communities? |
| 11  company may have a particular function like law, | 11  A.  Well, it's based on not just that one |
| 12  as I talked about yesterday.  And they won't move | 12  example, but generally speaking that's my |
| 13  that shared services out of a particular | 13  understanding of the way work is allocated in -- |
| 14  subsidiary like BIPI and put it in a dedicated | 14  among top officers, that you don't have this sort |
| 15  shared services company, but they might have a | 15  of billing back where people play multiple roles |
| 16  shared services company that does other things. | 16  within a firm. |
| 17  So the allocation of shared services in | 17  And the reason for that is that the |
| 18  this case between BIPI -- with BIPI doing some of | 18  companies really don't want people to say, well, |
| 19  it for Roxane and other entities, and the BISC | 19  I'm 4 percent with Roxane and 96 percent with or |
| 20  doing others of it struck me as having a rational | 20  92 percent with BIPI and 2 percent with BIC.  They |
| 21  basis in logic and being consistent with standard | 21  want people to make their own judgments about -- |
| 22  practice amongst corporations and subsidiaries. | 22  you know, at various particular time what's the |

| 361 | 363 |
|---|---|
| 1  Q.  Are you familiar with the concept of a | 1  appropriate allocation of their effort. |
| 2  shared services agreement? | 2  Q.  Well, how is it determined how to |
| 3  A.  Yes. | 3  allocate the salaries of managers and employees, |
| 4  Q.  Did you see any evidence that there was | 4  then, to the various affiliates where those folks |
| 5  that type of agreement in the Boehringer company? | 5  are wearing different hats? |
| 6  A.  I saw evidence that the shared services | 6  A.  Well, it's very difficult, which is why |
| 7  were billed and that the subsidiaries were | 7  in this case typical with what I observed |
| 8  compensated -- or were required to pay for the | 8  generally speaking, you don't observe that -- you |
| 9  services that they were provided. | 9  don't see this sort of allocation. |
| 10  So there was -- I took that as evidence | 10  So it's my recollection, for example, |
| 11  that there was an agreement in place.  I did not | 11  that when employees went to -- when there were |
| 12  see a formal agreement or at least not that I can | 12  Roxane employees that went to Ben Venue, like Judy |
| 13  recall sitting here right now. | 13  Waterer, all of her salary was allocated back to |
| 14  Q.  You discussed yesterday officers of BIC | 14  Roxane.  So there are a number of complicated |
| 15  and BIPI wearing various hats.  Do you remember | 15  factors that make it really difficult.  You know, |
| 16  that discussion? | 16  if you have -- so it would make it very difficult |
| 17  A.  Yes, I do. | 17  to do -- to have any alternative procedure because |
| 18  Q.  Would it be usual in that type of | 18  these companies -- you'd have to somehow give a |
| 19  situation for the officers' salary to be allocated | 19  person a percentage of their salary from company |
| 20  to the various subsidiaries and affiliates of a | 20  one, a percentage of their salary from company |
| 21  holding company? | 21  two, then some kind of a tax reporting for these |
| 22  A.  No. | 22  two.  You'd have different pension plans. |