# TAB 101

Roxane Laboratories, Inc (James F. McIntyre)                     February 26, 2009

## Chicago, IL

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------X

In Re:  PHARMACEUTICAL             )

INDUSTRIAL AVERAGE WHOLESALE       )   MDL No. 1456

PRICE LITIGATION                   )  Civil Action No.

------------------------------X 01-12257-PBS

THIS DOCUMENT RELATES TO:          )

United States of America ex        )

rel. Ven-a-Care of the             )

Florida Keys, Inc., et al.         )

v. Boehringer Ingelheim            )

Corp., et al., Civil Action        )

No. 07-10248-PBS                   )

------------------------------X

        The videotaped 30(b)(6) deposition of

Roxane Laboratories, Inc., Roxane Laboratories, Inc.

n/k/a Boehringer Ingelheim Roxane, Inc., Boehringer

Ingelheim Pharmaceuticals, Inc., and Boehringer

Ingelheim Corporation by JAMES F. McINTYRE

            Chicago, Illinois

          Thursday, February 26, 2009

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009

## Chicago, IL

8  (Pages 26 to 29)

| | 26 |
|---|---|
| 1 | Q. Take a moment to review. You can let me |
| 2 | know when you're ready for a couple questions. |
| 3 | A. I'm ready. |
| 4 | Q. Have you seen this document before? |
| 5 | A. Yes. |
| 6 | Q. Who is Hermann Tetzner? |
| 7 | A. Hermann Tetzner at this time was the |
| 8 | chief financial officer of BIC. |
| 9 | Q. Do you know if he had responsibilities on |
| 10 | behalf of BIPI? |
| 11 | A. Well, he's chief financial officer for |
| 12 | BIC, so as a part of the corporate parent company, |
| 13 | yes. |
| 14 | Q. Would that have included Roxane, his |
| 15 | responsibilities? |
| 16 | MS. RIVERA: Object to form. |
| 17 | BY THE WITNESS: |
| 18 | A. No direct responsibilities for Roxane, |
| 19 | no. |
| 20 | BY MR. FAUCI: |
| 21 | Q. Do you see the first page, the second |
| 22 | slide down, under the heading, "Why Restructure?" |

| | 27 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Can you read that first paragraph. |
| 3 | A. "The current legal and operational |
| 4 | structure of the U.S. business has evolved over |
| 5 | time and served well for a long period" -- |
| 6 | MS. RIVERA: Hold on. Hold on. |
| 7 | BY MR. FAUCI: |
| 8 | Q. I'm sorry, we're on different pages of |
| 9 | the document. If you go to -- |
| 10 | MS. RIVERA: Did you mean the second |
| 11 | slide -- |
| 12 | MR. FAUCI: Yes, the very first -- |
| 13 | MS. RIVERA: -- on the first page? |
| 14 | BY THE WITNESS: |
| 15 | A. All right. |
| 16 | BY MR. FAUCI: |
| 17 | Q. The very first page -- |
| 18 | A. Sorry. |
| 19 | Q. -- the second slide -- |
| 20 | A. Sorry. |
| 21 | Q. -- under the heading, "Why" -- |
| 22 | A. "Why" -- |

| | 28 |
|---|---|
| 1 | Q. -- "Restructure?" |
| 2 | A. -- "Restructure?" Sorry. |
| 3 | MS. RIVERA: It's okay. |
| 4 | BY THE WITNESS: |
| 5 | A. "We currently operate" -- what -- I'm |
| 6 | sorry, which paragraph again? |
| 7 | BY MR. FAUCI: |
| 8 | Q. It's the paragraph beginning with, "We |
| 9 | currently operate." |
| 10 | A. "We currently operate in the U.S. with a |
| 11 | variety of legal entities that do not necessarily |
| 12 | reflect the nature of our business. This results |
| 13 | in two sets of reporting: One in terms of legal |
| 14 | entities and another in terms of business." |
| 15 | Q. How did the Boehringer Ingelheim |
| 16 | companies report, quote, "in terms of legal |
| 17 | entities," quote? |
| 18 | A. Could you clarify the question? I'm not |
| 19 | quite sure. |
| 20 | Q. I'm not quite sure what it means either. |
| 21 | I'm -- I'm reading the -- I'm sure what the |
| 22 | question means. |

| | 29 |
|---|---|
| 1 | A. Well, all of our operating units are |
| 2 | separate legal entities, so each one reported |
| 3 | separately. |
| 4 | Q. I'm looking at this -- well, let's maybe |
| 5 | take a step back. When was the first time you saw |
| 6 | this document? |
| 7 | A. I don't recall whether I saw this back at |
| 8 | the time of the project or not, but certainly |
| 9 | during the course of preparing for this deposition |
| 10 | I've seen it. |
| 11 | Q. Does this appear to be a presentation |
| 12 | that Mr. Tetzner made? |
| 13 | A. That's what it appears to be, yes. |
| 14 | Q. And the language you just read, he says - |
| 15 | - or the slide says, "We currently operate in the |
| 16 | U.S. with a variety of legal entities that do not |
| 17 | necessarily reflect the nature of our businesses. |
| 18 | This results in two sets of reporting: One in terms |
| 19 | of legal entities and another in terms of |
| 20 | businesses." Do you see that? |
| 21 | A. Yes. |
| 22 | Q. I'm trying to understand what -- what's |

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009
                          Chicago, IL

                                              9  (Pages 30 to 33)

---

**30**

1  the difference between a -- a reporting that is in
2  terms of legal entities as opposed to reporting in
3  terms of businesses?
4      A.  Well, Roxane Laboratories is a legal
5  entity.  But the sales is sales and marketing, and
6  -- and the operations piece is a manufacturing.  We
7  report separately in terms of -- of the -- the
8  performance results for those two segments of that
9  particular company, so we really had two businesses
10  within that one legal entity.  And that's what the
11  organization was trying to -- reorganization was
12  trying to fix.
13     Q.  Why was this regarded as something that
14  needed to be fixed?
15     A.  The -- the manufacturing business, who
16  was -- the COO was Rob Fromuth, reported directly
17  to the CEO of the U.S.
18     Q.  Mr. Fromuth was a Roxane employee?
19     A.  Yes.
20     Q.  And who did he report to?
21     A.  Marti Carroll, CEO of the U.S. of BIC.
22     Q.  CEO -- CEO of BIC?

**31**

1      A.  Yes.  And he was responsible for
2  operations, our manufacturing.
3      I believe the question I had asked
4  earlier was:  Why was this situation regarded as a
5  problem that needed to be fixed?
6      A.  Well, the sales and marketing side of the
7  business, who was the vice president or general
8  manager of the -- the -- the multi-source or the
9  generic business for Roxane Laboratories, reported
10  to someone different.
11     Q.  Who was that person?  Who -- who was the
12  person in charge of the marketing and sales of
13  Roxane Laboratories?
14     A.  Paul Kersten.
15     Q.  When was Mr. Kersten in charge of that?
16     A.  Oh, at least since 2001.  I don't know if
17  it goes back any further than that.
18     Q.  And who did he report to?
19     A.  He reports to -- at that time, 2001, Tom
20  Russillo.
21     Q.  Do you know who Mr. Russillo reported to?
22     A.  Marti Carroll.

**32**

1      Q.  When did Marti Carroll become the CEO of
2  BIC?
3      A.  End of 2002 or early 2003, I'm not sure.
4      Q.  Do you know who's -- who his predecessor
5  was?
6      A.  Werner Gerstenberg.
7      Q.  And so prior to, when Mr. Gerstenberg was
8  CEO of BIC, would Tom Russillo have reported to him
9  then?
10     A.  Yes, I would suspect so.
11     Q.  The second paragraph reads, "This system
12  often does not convey clearly the performance of
13  our businesses and leads to complexity in
14  interpreting how each business is faring.  The
15  accounting reconciliations between the legal
16  entities and the businesses reduce but do not
17  remove this complexity."  Do you see that?
18     A.  Yes.
19     Q.  What is an accounting reconciliation?
20     A.  To identify -- basically identifying the
21  costs that are related to the marketing side of the
22  business versus the manufacturing side of the

**33**

1  business.
2      Q.  What do you mean, "identifying"?
3      A.  I'm sorry?
4      Q.  Can you clarify what you mean by
5  "identifying the" --
6      A.  If we --
7      Q.  -- "costs"?
8      A.  -- want to separate, we can identify
9  which costs go with the sales -- sales side of the
10  business versus which costs go with the
11  manufacturing side of the business.  By having
12  those two legal entities together, that was a diff
13  -- that was a challenge.
14     Q.  When would an accounting reconciliation
15  have been performed?
16     A.  Every month.
17     Q.  Do you know if Roxane and BIPI had their
18  own internal accounting systems?
19     A.  Roxane and BIPI -- beginning --
20        MS. RIVERA:  Object to form.  Sorry.
21        MR. FAUCI:  It's all right.
22  BY THE WITNESS:

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

## Chicago, IL

17 (Pages 62 to 65)

---

**62**

1     A.  Apparently, it says so, yes.
2     Q.  Mr. Russillo testified that
3  notwithstanding his responsibilities for Roxane, he
4  was on the Ben Venue payroll, and he was not paid
5  by Roxane. I'm on page 23 of his January 8, 2009,
6  deposition. And I'll just read you what he said.
7        "Answer: I told you earlier my paycheck
8  came from Ben Venue.
9        "Question: Your paycheck came from Ben
10 Venue?
11       "Answer: Yes.
12       "Question: Did your paycheck ever come
13 from any other Boehringer Ingelheim entities from
14 the period of November 1997 until 2005?
15       "Answer: I don't believe so."
16       My question to you was: Was there any
17 formal accounting mechanism within Boehringer
18 Ingelheim for Roxane to reimburse Ben Venue for
19 work Mr. Russillo did on Roxane's behalf?
20    A.  Not to my --
21    MS. RIVERA:  Object --
22 BY THE WITNESS:

---

**63**

1     A.  -- knowledge.
2     MS. RIVERA:  -- to form and foundation.
3  BY THE WITNESS:
4     A.  Not to my knowledge. It was for the
5  other sales and marketing people though.
6  BY MR. FAUCI:
7     Q.  What do -- say that again.
8     A.  There was reimbursement for the other
9  sales and marketing people that were on Ben Venue
10 payroll but worked for our -- for Roxane. Those
11 costs were charged back to Roxane.
12    Q.  Which sales and marketing people do you
13 have in mind?
14    A.  The Roxane Laboratories sales and
15 marketing.
16    Q.  Can you give me some names?
17    A.  Paul Kersten, Judy Waterer, Leslie
18 Paoletti.
19    Q.  So those people were on Ben Venue's
20 payroll?
21    A.  At that time, yes.
22    Q.  Which -- at what time?

---

**64**

1     A.  2005.
2     Q.  Do you know when they started going on
3  Ben Venue's payroll?
4     MS. RIVERA:  Object to --
5  BY THE WITNESS:
6     A.  Not --
7     MS. RIVERA:  -- form and foundation.
8  BY THE WITNESS:
9     A.  Not exactly.
10 BY MR. FAUCI:
11    Q.  What was the mechanism whereby Roxane
12 paid for the services?
13    A.  There was accounting entries to charge
14 back for Roxane legal entity.
15    Q.  Do you know how their salaries were
16 allocated?
17    A.  They were completely allocated. All the
18 Roxane Laboratories sales and marketing people were
19 completely allocated to the Roxane legal entity.
20    Q.  So if a employee had responsibilities on
21 behalf of both companies, would his salary be
22 allocated to both companies?

---

**65**

1     A.  I don't know that.
2     Q.  Would that be reflected in accounting
3  records, the allocation?
4     A.  Yes.
5     Q.  Would it show up on a Roxane income
6  statement?
7     A.  You'd have to drill down to the cost
8  center level. We wouldn't see it specifically on
9  the income statement.
10    Q.  And so you may have gathered I'm not the
11 most sophisticated accounting person in the world.
12 You say drill down to where?
13    A.  The cost center level.
14    Q.  What does that mean?
15    A.  It's a department.
16    Q.  And so if you drill down far enough
17 somewhere, there would be a record that employee X
18 was paid by Ben Venue but did work on behalf of
19 Roxane, and then how would that be accounted for?
20    A.  It would be charged back to Roxane, and
21 you'd see it in the sales and marketing department
22 cost center.

---

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009

Chicago, IL

18  (Pages 66 to 69)

66

1       Q.  But you don't know if that happened for
2   Mr. Russillo?
3       A.  I don't know.
4       Q.  I'm just -- why -- can you think of a
5   reason why it would have happened for people like
6   Judy Waterer and Leslie Paoletti but not for Mr.
7   Russillo?
8       MS. RIVERA:  Object to form and
9   foundation.
10  BY THE WITNESS:
11      A.  They -- those folks were fully allocated
12  to Roxane.  They didn't do any work for Ben Venue
13  Laboratories.
14      MR. FAUCI:  I think it's time just to
15  take a five-minute break.
16      THE VIDEOGRAPHER:  We are off the record
17  at 10:03 a.m.
18      (WHEREUPON, a recess was had.)
19      THE VIDEOGRAPHER:  We are back on the
20  record at 10:18 a.m.
21      (WHEREUPON, MS. DOLAN entered the
22  deposition proceedings.)

67

1   BY MR. FAUCI:
2       Q.  Mr. McIntyre, a moment ago you testified
3   that people in the Roxane sales and marketing
4   department, such as Leslie Paoletti and Judy
5   Waterer, though they were paid by Ben Venue, their
6   salaries were allocated back to Roxane, do you
7   recall that?
8       A.  Yes.
9       Q.  Do you know when that started?
10      A.  Not -- not for certain, no.
11      Q.  Do you know if it would've started before
12  the 2005 reorg?
13      A.  Yes.
14      Q.  Do you know who Robert Sicora is?
15      A.  No.
16      Q.  I'll represent to you that he is or was
17  the director of national accounts.
18      A.  For?
19      Q.  Well, we'll get -- we're going to get
20  into that briefly.
21      Mr. Sicora testified -- this is his
22  December 4, 2008, deposition, at page 50.

68

1       Mr. Sicora testified:  "My paycheck said
2   'Boehringer Ingelheim,' but all of the interactions
3   were with Roxane."
4       "Question:  All right.  Who did you
5   believe was your employer?
6       "Answer:  Roxane."
7       My question to you is:  For employees
8   such as Mr. Sicora, that said they were paid by
9   Boehringer Ingelheim but had Roxane job
10  responsibilities, would that have been allocated,
11  as well?
12      A.  Yes.
13      Q.  Similar to the way that --
14      A.  Well --
15      Q.  Oh, go on.
16      A.  -- if I could clarify.  I don't think it
17  would be allocated.  It'd be a direct charge as
18  opposed to an allocation.
19      Q.  What is the difference?
20      A.  The difference is if he's a -- if he's a
21  Roxane legal entity employee, it would be a direct
22  charge as payroll -- when they cut the payroll

69

1   check, it would hit right into his particular cost
2   center as opposed to an accounting entry that would
3   be an allocation.
4       Q.  If he testified he was paid by BIPI,
5   would your answer be the same?
6       MS. RIVERA:  Hold on.  Object to form,
7   misstates the testimony.
8   BY THE WITNESS:
9       A.  I mean, you're -- it calls for
10  speculation, I think.  If he was paid by dippy --
11  BIPI, no, then -- then it would have to be an
12  allocation.  But I don't know that he said he was
13  paid by BIPI.
14  BY MR. FAUCI:
15      Q.  No, it's -- I'm not sure he did either.
16  He said he was paid by Boehringer Ingelheim.
17      A.  I think in those days, all our checks
18  said, "Boehringer Ingelheim."
19      Q.  Someone in the Roxane contracts
20  department -- well, strike that.
21      MR. FAUCI:  Let me introduce an exhibit.
22      (WHEREUPON, there was some

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

# Chicago, IL

21  (Pages 78 to 81)

---

**78**

1   MS. RIVERA: Yeah, I was just several
2   pages in.
3         MR. FAUCI: I'm on the top paragraph.
4         MS. RIVERA: Okay.
5         MR. FAUCI: I'll read it again.
6   BY MR. FAUCI:
7         Q.  Mr. Berkle says: "Again, in the context
8   that Roxane preemptively launched Ipratropium prior
9   to any other generic competitors had a cost from a
10  BIPI perspective.  It allowed sales for the Roxane
11  product at a lesser price than the branded price at
12  a time when Atrovent still was patent protected."
13        My question to you is: Did Roxane pay
14  any money to BIPI for the right to market
15  Ipratropium Bromide at a time when BIPI still had a
16  patent protection for Atrovent?
17        A.  They paid the 11 percent royalty.
18        Q.  The same 11 percent royalty they paid
19  after Atrovent was no longer patent protected?
20        A.  Yes.
21        MR. FAUCI: What are we on, Exhibit 7?
22  I'm going to introduce Exhibit 7.

---

**79**

1         (WHEREUPON, a certain document was
2   marked Exhibit McIntyre 007, for identification.)
3   BY MR. FAUCI:
4         Q.  This is a series of e-mails in the August
5   to October 1999 time frame.  I'm going to direct
6   your attention to the third page of the document,
7   an e-mail -- feel free to read it all to get
8   familiarized at any time.  I'm focusing on the
9   August 9, 1999, e-mail from Ann Maloney, sent at
10  1:18 p.m.  Do you see that?
11        A.  Yes.
12        MS. RIVERA: Yeah, Jim, you should make
13  sure you look at the whole document just to make
14  sure you're familiar with it.
15        Ready?
16        THE WITNESS: Yes.
17  BY MR. FAUCI:
18        Q.  Ms. Maloney writes -- well, do you know
19  who Ms. Maloney is?
20        A.  Yes.
21        Q.  Who is she?
22        A.  Well, she's no longer with the company.

---

**80**

1   She was -- I don't know exact -- I don't recall her
2   exact position at this time.
3         Q.  It's a e-mail.  The subject of the e-mail
4   is: "Atrovent UDV," and then it says, "AM11,"
5   slash, "US." Ms. Maloney writes, "BIPI is the
6   holder for the Atrovent NDA.  Roxane distributes
7   the generic product Ipratropium Bromide legally out
8   of the NDA.  Also, Novation distributes Ipratropium
9   Bromide out of the NDA.  All three products are
10  manufactured by Roxane."  Do you see that?
11        A.  Yes.
12        Q.  Does this refresh your recollection as to
13  whether at least by 1999 Roxane had filed an ANDA
14  for Ipratropium Bromide UDV?
15        A.  It doesn't say that they filed an ANDA.
16        Q.  And it actually says that Roxane
17  distributes the generic product out of the NDA,
18  which was held by BIPI; correct?
19        A.  Correct.
20        Q.  It also says that all three products are
21  manufactured by Roxane.  Do you see that?
22        A.  Yes.

---

**81**

1         Q.  Roxane manufactured Atrovent?
2         A.  Yes.
3         Q.  When did that start?  Focusing on the
4   Atrovent UDV.
5         A.  UDV, 1993, I believe.
6         Q.  Did Roxane sell Atrovent to BIPI?
7         MS. RIVERA: Object to form.
8   BY THE WITNESS:
9         A.  Yes, they would've sold the -- the
10  Atrovent UDV would've been sold to -- to -- to BIPI
11  by RLI.
12  BY MR. FAUCI:
13        Q.  And then BIPI would turn around and
14  market and sell the products to customers under a
15  BIPI label?
16        A.  That's correct.
17        Q.  Were there written contracts evidencing
18  sales of Atrovent from Roxane to BIPI?
19        A.  Yes, I believe there was a 1993 contract
20  manufacturing agreement.
21        Q.  And that contract would have governed for
22  the life of Atrovent UDV?

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

22  (Pages 82 to 85)

---

**82**

1     A.  My recollection is, it's a ten-year
2  contract, renewable.
3     Q.  How was the price -- the sale price from
4  Roxane to BIPI determined?
5     A.  Cost plus.
6     Q.  What does that mean?
7     A.  Manufacturing cost plus some -- some
8  markup.
9     Q.  What does "manufacturing cost" mean?
10    A.  Manufacturing cost is the cost of all the
11 ingredients plus labor and overhead.
12    Q.  Where did Roxane get the ingredients?
13    A.  The -- the active ingredient would have
14 come from BII.  The Ipratropium Bromide is the
15 active ingredient.
16    Q.  And they would have purchased that from
17 the German parent?
18    A.  Yes.
19    Q.  And they --
20    A.  Well, I can't be sure.  It could've come
21 from BIPI, 'cause BIPI purchased Ipratropium from
22 other products, but -- but it's a BII product.

---

**83**

1     Q.  So they would buy the -- the active
2  ingredient -- Roxane would buy the active
3  ingredient from another Boehringer Ingelheim
4  entity?
5     A.  Yes.
6     Q.  And then Roxane would manufacture it?
7     A.  Yes.
8     Q.  And you said that the cost included what
9  else besides the ingredient costs?
10    A.  Labor and overhead.
11    Q.  What's included in overhead?
12    A.  General plan overhead, depreciation of
13 the equipment, depreciation of building, travel
14 expenses.  There's a whole list of items that are
15 part of overhead.
16    MR. FAUCI:  I think we need to take a
17 break.
18    THE VIDEOGRAPHER:  We are off the record
19 at 10:39 a.m. with the end of tape number one.
20    (WHEREUPON, a recess was had.)
21    (WHEREUPON, MS. DOLAN left the
22 deposition proceedings.)

---

**84**

1     THE VIDEOGRAPHER:  We are back on the
2  record at 10:50 a.m. with the start of tape number
3  two.
4  BY MR. FAUCI:
5     Q.  We were just talking about the process by
6  which Roxane sold Atrovent to BIPI.  Do you
7  remember that?
8     A.  Yes.
9     Q.  And you said that it sold it at cost
10 plus, do you recall that?
11    A.  Yes.
12    Q.  And we were trying to educate me and the
13 jury on what cost plus meant.  And you said that
14 cost includes the ingredient costs, the labor costs
15 and the overhead costs, do you recall that?
16    A.  Yes.
17    Q.  What's the plus?
18    A.  The margin.
19    Q.  Do you recall what the margin was?
20    A.  No.  In the 1993 contract, we were unable
21 to determine exactly what the margin would have
22 been and how that pricing was determined for that -

---

**85**

1  - and during that time frame.
2     Q.  So what was the result?
3     A.  I'm not sure I understand the question.
4     Q.  Oh, when you say you were unable to
5  determine what the margin was, what do you mean?
6  In preparation for today?
7     A.  Yes.
8     Q.  But there was a margin in the 1993
9  contract that --
10    A.  I'd have to --
11    Q.  -- presumably?
12    A.  -- believe that there was, yes.
13    Q.  Do you know what the margin was at any
14 point in time from 1996 to the present?
15    A.  Yes.
16    Q.  What was it, and when did it become that?
17    A.  We're talking specifically about
18 Ipratropium Bromide UDVs?
19    Q.  Atrovent UDV.
20    A.  Atrovent -- Atrovent UDVs.  Well,
21 Atrovent UDVs were discontinued in 2003, so --
22    Q.  Okay.

---

Henderson Legal Services, Inc.

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009

Chicago, IL

23  (Pages 86 to 89)

86

1    A. -- but be -- up until 2003, the margin
2  was based -- was 2.2 percent, based on full cost.
3    Q.  What does that mean, "based on full
4  cost"?
5    A.  Well, it includes the cost of the active
6  ingredient.
7    Q.  In addition to the labor and the
8  overhead?
9    A.  Labor and the overhead, that's --
10    Q.  How was --
11    A.  -- correct.
12    Q.  -- the 2.2 percent figure arrived at?
13    A.  2.2 percent on total cost is -- gives --
14  gives the same absolute margin or absolute profit
15  as ten percent on cost minus API.
16    Q.  What is "API"?
17    A.  Active pharmaceutical ingredient; that's
18  the Ipratropium Bromide.  The way we do things
19  today is we charge ten percent on only third-party
20  acquired materials.
21    Q.  Materials acquired from outside --
22    A.  Outside, nonaffiliate companies.  If it

87

1  has affiliate material in there, we subtract that
2  from the total cost, because that affiliate
3  material already has some markup, so we don't --
4  it's not fair to mark it up twice.
5    Q.  Okay.  So focusing on the Atrovent UDV,
6  that there would be some markup applied to the
7  ingredient that Roxane would have purchased from
8  either BIPI or BII?
9    A.  Based -- yes, based on the way we do it
10  now or did it in -- from -- up until 2003.
11    Q.  And so based on the way it was done up
12  until 2003?
13    A.  Yes.
14    Q.  And because of that, the margin from
15  Roxane to BIPI was only 2.2 percent, is that
16  correct?
17    A.  At that time, yes.  We don't know what it
18  was back in '93.
19    Q.  When did it become 2.2 percent?
20    A.  About that time, 2001, 2002.
21    Q.  And it stayed that way until 2003?
22    A.  Yeah, we discontinued the product.

88

1    Q.  And I understand that the -- why the 2.2
2  was used in place of the ten percent, but how was
3  the 2.2 number arrived at?
4    A.  Because it gave the same -- as I
5  mentioned, it gave the same level of profit as
6  using ten percent on a cost excluded the API.
7    Q.  Was it negotiated?
8    A.  Yes, and later -- later validated by
9  outside consultants.
10    Q.  And would this 2.2 percent or ten percent
11  markup have been true on all the products that
12  Roxane manufactured for Boehringer Ingelheim
13  entities?
14    A.  Yes.
15    Q.  Let me show you a document marked Exhibit
16  8.
17      (WHEREUPON, a certain document was
18  marked Exhibit McIntyre 008, for identification.)
19  BY THE WITNESS:
20    A.  1998 Expectation and Budget.
21  BY MR. FAUCI:
22    Q.  It's a September 30, 1998, document, that

89

1  says, "Commentary, 1998 Expectation, 1999 Budget,
2  Roxane Laboratories, Incorporated."  Take a moment
3  to familiarize yourself with it, but I will be
4  asking you questions about specific parts.
5    A.  Okay.  Okay.
6    Q.  Are you familiar with this document?
7    A.  I've never seen this particular one, but
8  I'm somewhat familiar with it, yes.
9    Q.  What is an expectation?
10    A.  Expectation is an update of the current
11  year.  So when you start out the year, you have
12  your budget; later in the year, we do an update of
13  what that budget is and what the expectation -- I
14  mean, what we're gonna come in at at the end of --
15  the end of the year.  So it's our projection for
16  what our actual costs or what our actual will be by
17  December 31st.
18    Q.  So it's --
19    A.  So it has no actual numbers, per se, in
20  there.
21    Q.  It's the revised budget based on the
22  year-to-date?

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

30  (Pages 114 to 117)

---

114

1        MS. RIVERA:  -- my objection for the
2   record that Roxane's agreements and -- with its
3   customers and contracts with its customers falls
4   into the subject matter of that --
5        MR. FAUCI:  That's --
6        MS. RIVERA:  -- of that topic and doesn't
7   pertain to sales of those drugs between the
8   companies.
9        MR. FAUCI:  I think how -- this is just
10  for the record, but I -- it's my position that how
11  rebates were booked for sales of Roxane's products,
12  including rebates on BIPI's products, falls
13  squarely within the topic that is about Defendants'
14  practices, including accounting practices, with
15  respect to sales of certain products.  But your
16  objection is on the record.
17  BY MR. FAUCI:
18       Q.  So my question was:  Do you know which
19  company, Roxane or BIPI, paid this rebate?
20       A.  No, I do not.
21       Q.  Who would I talk to to find that out?
22       A.  I -- I don't know.

---

115

1        Q.  I want to show you a document the court
2   reporter's gonna mark as Exhibit 14.
3            (WHEREUPON, a certain document was
4   marked Exhibit McIntyre 014, for identification.)
5        MR. FAUCI:  Oops, I wrote on yours.
6        MS. RIVERA:  That's okay.
7        MR. FAUCI:  I think I have an extra, so.
8        MS. RIVERA:  What are we on, 13?
9        MR. FAUCI:  I think we're on 14.
10           (WHEREUPON, MS. DENTON entered the
11  deposition proceedings.)
12  BY MR. FAUCI:
13       Q.  This is a November 20, 1997, e-mail from
14  Judy Waterer to Dave Roberts, subject is:
15  "Respiratory Bundle."  Are you familiar with this
16  document?
17       A.  No.
18       Q.  In bold, do you see where it says,
19  "Discussion Questions Related to Proposed
20  Respiratory Bundling Agreements"?
21       A.  I see that, yes.
22       Q.  And do you see the fourth bullet down,

---

116

1   "Which company pays the rebate; BIPI, RLI or both?
2   This is still being decided upon.  We'll have to
3   make the decision based on what is most cost
4   effective for the combined companies.  We'll need
5   to plan to do it either way until it's resolved.
6   Hopefully, we'll have the final answer in a week or
7   two."  Do you see that?
8        A.  I see that.
9        Q.  What do you understand Ms. Waterer to
10  mean when she writes "the combined companies"?
11       MS. RIVERA:  Object to form and
12  foundation.
13  BY THE WITNESS:
14       A.  I can't speak to what she meant.
15  BY MR. FAUCI:
16       Q.  Can you think of a reason why BIPI would
17  pay a rebate -- the rebate described in the Exhibit
18  13?
19       MS. RIVERA:  Object to form and
20  foundation.
21  BY THE WITNESS:
22       A.  No, I don't know why.

---

117

1        MR. FAUCI:  I think we're at a natural
2   breaking point.
3        MS. RIVERA:  Okay.
4        MR. FAUCI:  We're going to go in a
5   different direction after this.
6        MS. RIVERA:  Okay.
7        THE VIDEOGRAPHER:  We are off the record
8   at 11:31 a.m.
9            (WHEREUPON, a recess was had.)
10       THE VIDEOGRAPHER:  We are back on the
11  record at 11:50 a.m.
12  BY MR. FAUCI:
13       Q.  I have a few more questions about the
14  period of time in 1996 when Atrovent was
15  substituted for generic Ipratropium Bromide.
16  Roxane and BIPI are separate companies, correct?
17       A.  Correct.
18       Q.  And just to recapture this, when Roxane
19  had a shortage of its generic Ipratropium Bromide
20  product, BIPI allowed Roxane to substitute Atrovent
21  in its place; is that correct?
22       A.  That's correct.

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
## Chicago, IL

| | 118 |
|---|---|

1    Q.   And, in fact, the -- the sales prices for
2  generic Ipratropium were -- in effect, the sales
3  were at Roxane's generic prices; is that right?
4    A.   To the customers, sales to the customers?
5    Q.   Yes.
6    A.   Yes, I believe that's the case.
7    Q.   And so the sales price that BIPI booked
8  was -- was well within its average sales price for
9  Atrovent, correct?
10    A.   That's correct.
11    Q.   Please explain to the jury why BIPI would
12  allow Roxane to sell its Atrovent product at a
13  reduced price.
14        MS. RIVERA:  Object to form.
15        Go ahead.
16  BY THE WITNESS:
17    A.   Well, in this particular case, it was
18  because BIPI had distressed product.  They had --
19  they -- they had product that was gonna go short
20  code and would've had been destroyed had it not had
21  the opportunity to sell it through the Roxane
22  customers.  So it represented a win-win, that we

| | 120 |
|---|---|

1    A.   Uh-huh.
2    Q.   She writes, "I plan to take the
3  discounted product to select customers that will be
4  the least likely to divert it."  Do you see that?
5    A.   Yes.
6    Q.   "The customers that have been identified
7  as likely targets for Atrovent substitution of
8  generic IB-UDV are direct warehousing retail
9  chains, Accurate, and RDI."  Do you see that?
10    A.   Yes.
11    Q.   Please tell me your testimony as to why
12  Roxane chose not to sell Atrovent at generic prices
13  to wholesalers.
14    A.   My understanding from the wholesale --
15  the way the business works with wholesalers is that
16  it takes too long to get through their distribution
17  channel, and that's -- and that's when this product
18  might expire.
19    Q.   Ms. Waterer writes that she plans to take
20  the disproduct -- discounted product to select
21  customers that will be the least likely to divert
22  it.  What does that mean?

| | 119 |
|---|---|

1  were able to get a price better than nothing,
2  better than throwing it away.
3  BY MR. FAUCI:
4    Q.   What do you mean it was a distressed
5  product?
6    A.   It was short code.
7    Q.   What does that mean?
8    A.   It means that it could expire.
9    Q.   What do you mean, "could expire"?
10    A.   Well, every product has a certain shelf
11  life, and once it gets within -- typically once you
12  get within 12 months, you can't sell it through
13  wholesalers, which is why some of this document
14  says that sales wouldn't go through wholesalers,
15  because it takes them too long to get it through
16  their distribution channel, and the product would
17  expire before -- before it -- it reached the
18  customer.
19    Q.   Can you look back at Exhibit 11.  I'm
20  looking at the second page of the exhibit, the
21  paragraph starting, "I plan."  This is Ms. Waterer
22  writing.

| | 121 |
|---|---|

1    A.   I'm not sure what that means.
2    Q.   A little bit further down, she writes,
3  "Apria, MP Total Care, and Health Scripts will also
4  be candidates for this substitution once they sign
5  the 14 percent Loyalty Bonus Program Contract, as
6  it has very specific definitions and penalties
7  regarding diversion."  You don't know what
8  "diversion" means in that context?
9    A.   No.
10    Q.   Are you familiar with the difference --
11  how is a sale to a wholesaler different than a sale
12  to a customer such as a chain pharmacy?
13        MS. RIVERA:  Object to form and
14  foundation.
15  BY THE WITNESS:
16    A.   Chain pharmacies run their -- have their
17  own warehouses, so they go -- they can go directly
18  through their individual stores and move the
19  product through quicker, whereas the wholesalers
20  wouldn't.
21  BY MR. FAUCI:
22    Q.   Isn't it also true that a sale to a

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

36  (Pages 138 to 141)

---

138

1      A.  Yes.
2      Q.  Would this in large part be explained by
3   its decision to dividend up $320 million to its
4   parent corporation?
5          MS. RIVERA:  Object to form.
6   BY THE WITNESS:
7      A.  Yes.
8   BY MR. FAUCI:
9      Q.  And do you see that Roxane's loans from
10   affiliates have gone from zero to $140 million?
11      A.  I see that.
12      Q.  Why at this -- why would Roxane dividend
13   $320 million to its parent only to take a loan from
14   an affiliate of $140 million?
15          MS. RIVERA:  Object to form.
16   BY THE WITNESS:
17      A.  The loan would have been to help fund the
18   $320 million because they didn't have enough cash
19   on hand.
20   BY MR. FAUCI:
21      Q.  Well, let's look at Exhibit 20, which is
22   Roxane's year-end statement for 2001.  Do you see

---

140

1      A.  When the dividend gets paid, you would
2   credit retained earnings -- actually, debit
3   retained earnings, because retained earnings is a
4   credit balance account, and you'd have to debit
5   something or credit something.  So a credit has to
6   be either out of cash or some other -- or take out
7   a loan to increase your -- your loans payable to
8   fund that payment.
9      Q.  Retained earnings are the amount of money
10   that the corporation has earned over time, correct?
11          MS. RIVERA:  Object to form.
12   BY THE WITNESS:
13      A.  Less any dividends that have been paid,
14   yes.
15   BY MR. FAUCI:
16      Q.  And so at the end of 2001, Roxane had
17   $358,522,000 in retained earnings; correct?
18      A.  Yes.
19      Q.  Why couldn't it have funded the dividend
20   out of that?
21      A.  'Cause it has to come from somewhere.
22      Q.  Doesn't it come from --

---

139

1   the retained earnings as of the end of 2001?
2          MS. RIVERA:  Hold on.  20?  Okay.
3          MR. FAUCI:  Yes, we're on Exhibit 20.
4          MS. RIVERA:  Okay.
5   BY THE WITNESS:
6      A.  Yes.
7   BY MR. FAUCI:
8      Q.  And what are the retained earnings at the
9   end of 2001?
10      A.  $358,522,000.
11      Q.  And so Roxane could have funded the 320
12   million dividend out of its own retained earnings,
13   is that correct?
14          MS. RIVERA:  Object to form.
15   BY THE WITNESS:
16      A.  But you have -- you have to pay the
17   dividends with something, so some other account on
18   the balance sheet would've had to change, they
19   would've had -- have enough money to -- to fund
20   that payment.
21   BY MR. FAUCI:
22      Q.  I'm not following.  Can you explain that?

---

141

1      A.  'Cause you would --
2      Q.  -- the retained --
3      A.  -- credit --
4      Q.  -- earnings?
5      A.  You would -- you would -- you'd have to
6   debit retained earnings and credit something else
7   on your balance sheet to pay that dividend.  And
8   typically that goes through the affiliate accounts.
9      Q.  And so in year-end 2002, turning back to
10   Exhibit 22, Roxane shows loans from affiliates of
11   $140 million; is that correct?
12      A.  Yes.
13      Q.  Are those real loans?
14          MS. RIVERA:  Object to form.
15   BY THE WITNESS:
16      A.  Real loans in what sense?
17   BY MR. FAUCI:
18      Q.  Did Roxane actually borrow money from its
19   affiliates?
20      A.  I'd have to say yes based -- 'cause this
21   here.
22      Q.  And you testified earlier that they paid

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

142

1    interest on those loans.
2        A.  Yes.
3        Q.  And so I'm trying to understand what this
4    $140 million entry is.  Did -- does this reflect
5    that at the end of 2002, Roxane had to borrow 140
6    million doll -- Roxane chose to borrow $140 million
7    from its affiliates?
8        A.  Yes.
9        Q.  And it chose to -- it paid interest
10   on those loans?
11       A.  Believe so, yes.
12       Q.  And it did that -- and in the year prior
13   to that, if you look at Exhibit 20, Roxane had no
14   loans outstanding to affiliates; is that correct?
15       A.  Correct.
16       Q.  And so between 2001 and 2002, Roxane paid
17   a dividend of $320 million to its parent; correct?
18       A.  Correct.
19       Q.  And then took out loans of $140 million
20   from its affiliates, is that correct?
21       A.  Correct.
22       Q.  How was that beneficial to Roxane?

143

1        MS. RIVERA:  Object to form.
2    BY THE WITNESS:
3        A.  I'm not sure how to -- how to answer
4    that.
5        MS. RIVERA:  Do you need him to re --
6    give you more information or rephrase it, or --
7        THE WITNESS:  No.
8        MS. RIVERA:  -- are you just thinking?
9        THE WITNESS:  I'm thinking.
10       MS. RIVERA:  Okay.
11   BY THE WITNESS:
12       A.  I -- I don't know how to answer that.
13   BY MR. FAUCI:
14       Q.  Can I show you exhibit --
15       MR. FAUCI:  Why don't we take a break.
16   We only have a couple minutes on the tape.
17       MS. RIVERA:  Oh, okay.
18       THE VIDEOGRAPHER:  We are off the record
19   at 12:24 p.m. with the end of tape number two.
20       (WHEREUPON, a recess was had.)
21       THE VIDEOGRAPHER:  We are back on the
22   record at 1:15 p.m. with the start of tape number

144

1    three.
2    BY MR. FAUCI:
3        Q.  Welcome back.
4        A.  Thank you.
5        Q.  I just have a few more questions.  And I
6    think we should start by what the court reporter
7    has marked as Exhibit 23.
8        (WHEREUPON, a certain document was
9    marked Exhibit McIntyre 023, for identification.)
10   BY THE WITNESS:
11       A.  Thank you.
12   BY MR. FAUCI:
13       Q.  This is another in the series of
14   documents, which is a Roxane Laboratories Unanimous
15   Written Consent of Directors, and this appears to
16   contain the closing -- year-end closing for 2003,
17   is that correct?
18       A.  That's correct.
19       Q.  I'm going to ask you to turn to the
20   balance sheet.  It's a number of pages in.  It's
21   the page Bates labeled BOEH04600471.  And do you
22   see that the retained earnings for Roxane at the

145

1    end of 2003 were $65 million?
2        A.  Yes.
3        Q.  Can you turn the page.  This is -- says,
4    "Roxane Laboratories Statement of Financial
5    Position, Actual 2003 versus Budget 2003."  Do you
6    see that?
7        A.  Yes.
8        Q.  Look at the very bottom.  Can you read
9    what it says under "Retained Earnings"?
10       A.  "Retained earnings was $241.9 million
11   below budget.  This reduction is the result of
12   increased dividend payments made at year-end 2002."
13       Q.  And then can you read the section "Loans
14   From Affiliates" directly above it.
15       A.  "Loans from affiliates were 62.3 million
16   above budget.  The reason for the increase is the
17   interim dividend payment made in 2002.  For the
18   Budget, the planned dividend was 75 million versus
19   the actual payment of 320 million."
20       Q.  What does it -- what does it mean that
21   it's an "interim dividend payment"?
22       A.  I'm not sure what the reference to

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

41  (Pages 158 to 161)

---

158

1      A.  My understanding is Roxane did.
2      Q.  Was the trademark for that drug ever
3  owned by BIPI?
4      A.  Not to my knowledge.
5      Q.  If I ask you the same question for
6  Roxicodone --
7      A.  Yes.
8      Q.  -- was that a drug that was marketed by
9  Roxane prior to 2001?
10     A.  Yes.
11     Q.  Did Roxane own the trademark for that
12  drug?
13     A.  Best of my knowledge, yes.
14     Q.  Let me ask you a question about the
15  distribution agreement for Viramune.  Do you know
16  when, if at all, that distribution agreement ended?
17        MS. RIVERA:  Do you mean the licensing
18  agreement, Ros?
19        MS. POLLACK:  Sorry, the licensing
20  agreement.
21  BY THE WITNESS:
22     A.  The licensing agreement ended in 2001.

---

159

1  BY MS. POLLACK:
2      Q.  And why was that?
3      A.  2001 was the year that Roxane divested
4  itself of the pain medication products, which
5  included the Roxicodone and the Oramorph we just
6  discussed.  As a result of that divestment, the
7  sales force that marketed those products was -- was
8  eliminated; and as a result, BIPI took the product
9  back.  And at the same time, BIPI had a -- another
10  aged related drug in development.  And with that
11  product coming online soon, they wanted -- they had
12  the combination of those two A drugs that they
13  would be marketing.
14     Q.  What was the term of the license
15  agreement that Roxane had for Viramune; in other
16  words, was it yearly, monthly?
17     A.  Viramune license agreement.
18        MS. RIVERA:  Object to form, beyond the
19  scope of the notice.
20        If you know.
21  BY THE WITNESS:
22     A.  Yeah, I don't -- I don't recall what the

---

160

1  term -- the length -- by "term," you mean length of
2  term, I assume.
3  BY MS. POLLACK:
4      Q.  Right.  Length of time.
5      A.  I -- I don't recall.
6      Q.  Do you recall if Roxane paid any fee to
7  terminate that license agreement in 2001?
8      A.  No, but they -- they would just have
9  discontinued paying the royalty.
10     Q.  Well, Mr. Fauci marked a number of year-
11  end statements and balance sheets earlier today.
12  Are you familiar with the fact that on occasion
13  Roxane made short-term advances to affiliates?
14     A.  Yes.
15     Q.  Okay.  When would those kinds of advances
16  be made?
17     A.  Well, just similar to the short-term
18  loans, all of that, either advances or loans,
19  they're all part of the cash pooling process that
20  takes place with all the activity that goes on
21  between the companies.
22     Q.  When there was a short-term advance to an

---

161

1  affiliate made by Roxane, would there be any
2  documentation relating to that advance?
3      A.  It would be in -- in the internal
4  accounting records.
5      Q.  Would there be a note signed?
6      A.  I don't know if there'd be a note signed.
7      Q.  Would -- would there be any kind of
8  letter agreement or contract re -- relating to that
9  advance?
10     A.  I don't know.
11     Q.  Would there be interest associated with
12  the short-term advance?
13     A.  Yes, there should be, based on that LIBOR
14  rate we discussed earlier, on the affiliate loan.
15     Q.  When you say, "there should be," were
16  there, in fact, interest terms associated with the
17  short-term --
18     A.  Yes --
19     Q.  -- investment --
20     A.  -- there were interest terms.
21     Q.  And would the interest be paid by a
22  bookkeeping line item?

---

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009

Chicago, IL

42  (Pages 162 to 165)

---

162

1      A.  If -- well, what do you mean by
2  "bookkeeping line item" --
3      Q.  Yeah --
4      A.  -- please?
5      A.  -- let me -- let me rephrase that.
6          How would the interest payments be made?
7      A.  It would be made as part of the -- the
8  accounting records.
9      Q.  Would actual cash transfer from one
10  entity to another?
11     A.  Again, that's all part of the -- all of
12  these loans and things are all part of the cash
13  pooling and the -- and the -- and the netting of
14  the -- the affiliate transactions that take place.
15     Q.  Could you describe what you mean by "the
16  cash pooling."
17     A.  The -- Boehringer uses what's called a
18  zero balance cash, so every -- every legal entity
19  has their own bank account, so to speak.  But at
20  the end of the day, the -- the bank where all these
21  accounts are just kind of sweeps all that cash into
22  one pool.  And then they still record the quant --

---

163

1  the amount of cash by legal entities, but that --
2  they pool it all together so that they can invest
3  that money to earn interest.
4      Q.  Is that --
5      A.  It's much -- much --
6      Q.  -- money invested on behalf of BIC?
7      A.  It's invested on behalf of all the legal
8  entities.
9      Q.  Is the money swept out of that pool daily
10  and -- and sent out of the country?
11     A.  It's swept out of the pool daily.  I
12  don't know that it's swept -- or sent out of the
13  country, no.
14     Q.  If Mr. --
15     A.  It remains --
16     Q.  -- Tetzner --
17     A.  -- in -- it remains in BIC's -- it
18  remains in BIC's account or in fund with all the --
19  with all the individual legal entities.  It's kept
20  track of by the legal entity account numbers, but
21  it's all in one pool.
22     Q.  But if Mr. Tetzner had testified that the

---

164

1  money in the pool was swept out daily and sent to
2  Germany, you wouldn't have any reason to disagree
3  with that?
4      A.  I wouldn't, no.
5      Q.  Can you take a look at Exhibit 8, that
6  Mr. Fauci asked you about earlier.
7      A.  Yes.
8      Q.  And on page 23, it states that the "MDI
9  and SM standard based upon bulk material being
10  transferred to RLI at zero cost.  This assumption
11  is no longer valid."
12     A.  Yes.
13     Q.  Yes, you read that.  Does that indicate
14  to you that prior to a change being reflected in
15  the budget, the cost of goods sold were being
16  reflected at a zero cost --
17         MS. RIVERA:  Object to form.
18  BY MS. POLLACK:
19     Q.  -- for the MDI and the SM products?
20     A.  And I think I testified earlier that I
21  was unaware what the -- what the accounting change
22  meant, so I couldn't speak to this.

---

165

1      Q.  It doesn't say to you that whatever the
2  accounting change meant, it was a change from zero
3  to something else?
4          MS. RIVERA:  Object to form.
5  BY THE WITNESS:
6      A.  I -- I see that's what it says, but I
7  can't speak to it.
8  BY MS. POLLACK:
9      Q.  Now, this statement also indicates that
10  there's something called the self medication
11  product.
12         MS. RIVERA:  Where are you, Ros?
13         MS. POLLACK:  Right on that same page on
14  the --
15         MS. RIVERA:  Oh, okay.
16         MS. POLLACK:  -- standard cost of goods
17  sold, self medication product.
18         MS. RIVERA:  I got it.
19         MS. POLLACK:  You see that?
20         MS. RIVERA:  Yep.
21         Sorry, Jim.
22  BY MS. POLLACK:

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
## Chicago, IL

174

1    of one of the options, the preferred option.
2         Q.   And the third bullet says, "Moves
3    employees under the legal entity to which they
4    report;" is that correct?
5         A.   That's correct.
6         Q.   So there were people who were employed by
7    one company but reporting to another, is that what
8    that means?
9         A.   Yes, specifically the manufacturing
10   situation we just discussed.
11        Q.   Are you talking about the Combivent?
12        A.   Yes.
13        Q.   Well, weren't these people prior to 19 --
14   I'm sorry, prior to 2005, who were manufacturing
15   Combivent, BIPI employees?
16        A.   That's correct.
17        Q.   And that prior to 2005, Combivent was a
18   BIPI drug; right?
19        A.   That's correct.  It still is.
20        Q.   So why would you have to move them under
21   the legal entity which -- to which they report when
22   they were already under the legal entity to which

175

1    they reported?
2         A.   Because -- because the -- the Roxane
3    manufacturing people were responsible for that
4    manufacturing line.  And those manufacturing people
5    in BIPI were reporting to people in Roxane, or BIRI
6    after the 2005 split.  And that's why this comment
7    says move people -- move people -- employees under
8    the legal entity to which they report.  That was
9    one of the anomalies of the -- of our organization,
10   that the 2005 organization wanted to -- wanted to
11   correct.  Remember, the overriding driver of the
12   reorganization was to separate the two businesses
13   that were part of the Roxane business prior to 2005
14   and part of the Roxane legal entity.
15        Q.   But the Combivent was part of BIPI prior
16   to 2005?
17        A.   That's correct, the manufacturing was,
18   yes, but managed --
19        Q.   And --
20        A.   -- by BIRI people.
21        Q.   I'm sorry, I didn't hear that.
22        A.   But managed by Roxane manufacturing

176

1    people.
2         Q.   The next bullet point, there's a line,
3    the oper -- the organization with the actual
4    businesses, what's meant by that?
5         A.   Again, given that the overriding driver
6    for the separation or for the reorganization was to
7    separate the two legal entities or to separate the
8    two businesses that were part of the Roxane legal
9    entity, we wanted to get the organization aligned
10   so that the manufacturing people were all part of
11   the manufacturing organization and the sales and
12   marketing people were part of the sales
13   organization, so that those two businesses could be
14   judged and -- their performance could be judged
15   independently.
16        Q.   And what does the last bullet point say
17   under "the advantages of the new legal entity"?
18        A.   At the -- way down at the bottom, the
19   "allows for separation of liability"?
20        Q.   Yes.  Could you read that into the
21   record, please.
22        A.   "Allows for separation of liability for

177

1    Marketing and Sales of Multisource and
2    manufacturing of Multisource products."  The intent
3    of that bullet is to -- is to -- we're really just
4    trying to align liability with the business, so if
5    manufacturing had a -- if there was a manufacturing
6    liability, the manufacturing legal entity was --
7    was accountable for that.  So we're just trying to
8    align liability with the business.
9         Q.   Whereas, prior to that time, any of those
10   liabilities would have been part of Roxane
11   Laboratories, Inc., which had both the
12   manufacturing and the sales for the multisource
13   product; is that correct?
14        A.   Excuse -- I -- I didn't hear your entire
15   question, so if you could repeat it, please.
16             MS. POLLACK:  Could you read it back?
17   Did you get it --
18             THE COURT REPORTER:  You trailed off --
19             MS. POLLACK:  -- the court reporter?
20             THE COURT REPORTER:  -- at the end for
21   me, too.
22   BY THE WITNESS:

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009
Chicago, IL

46  (Pages 178 to 181)

---

178

1       A.  She didn't get it either.
2           THE COURT REPORTER:  Prior to that time -
3   -
4   BY MS. POLLACK:
5       Q.  Sure.  Let me try again.
6           So prior to this time, however, the
7   liabilities for the Roxane manufacturing operation
8   and the Roxane sales and marketing organization
9   would have been liabilities of Roxane Laboratories,
10  Inc.?
11      A.  That's correct.
12          MS. POLLACK:  I have nothing further.
13          MS. RIVERA:  Anybody else on the phone?
14          MR. WINGET-HERNANDEZ:  Yeah, I'm here,
15  but I'm reserving my questioning.
16          MS. RIVERA:  Okay.  Can we take like a
17  15, 20 minute break so I can get my ducks in a row,
18  and then we can come back?
19          MR. FAUCI:  Thank you.
20          THE VIDEOGRAPHER:  We are off the record
21  at 1:58 p.m.
22          (WHEREUPON, a recess was had.)

---

179

1           (WHEREUPON, MR. ANDERSON
2   disconnected from telephonic communication.)
3           THE VIDEOGRAPHER:  We are back on the
4   record at 2:30 p.m.
5
6           EXAMINATION
7   BY MS. RIVERA:
8       Q.  Good afternoon, Mr. McIntyre.  I just
9   wanted to take a few minutes to follow-up on a few
10  things that you discussed with Mr. Fauci and
11  clarify a few things.
12          Do you recall a discussion with Mr. Fauci
13  about a time period in 1996 where brand name
14  Atrovent was substituted for Roxane's Ipratropium
15  Bromide?
16      A.  Yes.
17      Q.  Okay.  And I wanted -- wondered if you
18  could look in your stack back at Exhibits 10 and
19  11.  Do you have them?  Keep going.  There --
20      A.  They're probably --
21      Q.  -- they are.
22      A.  -- further down.  Here's 10 and 11.

---

180

1       Q.  Okay.  If you looked at Exhibit 10, which
2   is the October 23, 1996, interoffice memo from Mr.
3   Spitalli, do you see that?
4       A.  Yes.
5       Q.  Okay.  I just wanted to direct your
6   attention in the third paragraph, the last
7   sentence, do you see where it says, "We are able to
8   fill selected orders because the BIPI's Atrovent
9   Solution inventory is, quote, "distressed" due to
10  dating and lowering sales volumes."  Do you see
11  that?
12      A.  Yes, I see that.
13      Q.  Okay.  Is that consistent with your
14  testimony that you believe that BIPI was willing to
15  engage in this project in part because its
16  inventory was short dated?
17          MR. FAUCI:  Objection to the form.
18  BY THE WITNESS:
19      A.  Yes.
20  BY MS. RIVERA:
21      Q.  Okay.  And if BIPI was unable to sell
22  this product through the substitution program for

---

181

1   Roxane's Ipratropium Bromide, what was likely to
2   happen to that inventory that was distressed?
3       A.  Expired product would have been
4   destroyed.
5       Q.  Okay.  And if the product had been
6   destroyed, would BIPI make any money on that
7   product?
8       A.  No.
9       Q.  Okay.  And, in fact, in two paragraphs
10  down, there's a sentence from Mr. Spitalli who
11  says, "This is a win-win situation."
12      A.  I see that.
13      Q.  Okay.  Is that consistent with your
14  understanding of -- of the situation for BIPI and
15  Roxane?
16          MR. FAUCI:  Objection to form.
17  BY THE WITNESS:
18      A.  Yes.
19  BY MS. RIVERA:
20      Q.  Okay.  And then if you would just look at
21  Exhibit 11, the paragraph at the bottom on the
22  first page, where it says, "Mike."  It says, "Mike

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
## Chicago, IL

48  (Pages 186 to 189)

---

186

1   A.  I confirmed that with Judy Waterer.
2   BY MS. RIVERA:
3   Q.  Okay.  There was also some discussion
4   about some commitment agreements and rebates that
5   were paid.  Do you recall that discussion?
6   A.  Yes.
7   Q.  Okay.  It's in reference to Exhibit 17.
8       MS. RIVERA:  Oh, actually -- well, can
9   you mark --
10      MR. FAUCI:  I'm thinking it's on 17.
11      MS. RIVERA:  It's what?
12      MR. FAUCI:  Nothing.
13      MS. RIVERA:  Oh, you know what --
14  BY THE WITNESS:
15      A.  13.
16  BY MS. RIVERA:
17      Q.  Yeah, it's -- I'm looking at -- yeah, and
18  set that aside for one minute.  I wanted to mark
19  one more document with you on the last issue.
20          (WHEREUPON, a certain document was
21  marked Exhibit McIntyre 026, for identification.)
22  BY MS. RIVERA:

---

187

1   Q.  Okay.  The court reporter's handed you
2   what has been marked as Exhibit 26.
3       MS. RIVERA:  And for the record, the top
4   -- it's an e-mail chain, the top e-mail is from
5   Judy Waterer, dated November 4, 1996.
6   BY MS. RIVERA:
7   Q.  Do you see that?
8   A.  Yes, I do.
9   Q.  Okay.  If you would look to what looks
10  like the third e-mail on this page from John Swartz
11  to Ed Tupa.
12  A.  Yes, I have it.
13  Q.  Okay.  And that's dated Thursday, October
14  31st?
15  A.  Yes.
16  Q.  Okay.  If you could take a look at this,
17  it says, "This is regarding the RLI sales of
18  Ipratropium that will be filled with BIPI's
19  Atrovent."  That's referring to the substitution
20  that we were discussing?
21      MR. FAUCI:  Objection to the form.
22  BY MS. RIVERA:

---

188

1   Q.  Is that --
2   A.  Yes.
3   Q.  -- referring to the substitution that we
4   were discussing?
5   A.  Yes.
6   Q.  Okay.  He says, "I have listed below the
7   process I -- as I understand it, which was
8   implemented as of last Friday, October 25th."  Can
9   you read through that, and tell me whether that
10  supports your testimony as to whether BIPI booked
11  these sales, and there were no intra-company sales.
12      MR. FAUCI:  Objection to the form.
13  BY THE WITNESS:
14      A.  I see in point three that Judy Waterer is
15  going to communicate to the -- the BI Services
16  Center which orders will be processed as BIPI
17  invoices.
18  BY MS. RIVERA:
19      Q.  And what does that mean?
20      A.  So that confirms -- to me, that confirms
21  that BIPI was gonna book the sale for the -- that
22  entry.

---

189

1   Q.  Okay.  If Roxane had booked the sale,
2   what would you expect that to be?
3   A.  It would have referenced Roxane invoices.
4   Q.  Okay.  Okay.  Okay.  Now moving on to the
5   bundling and rebate agreements.  I believe you were
6   asked who booked and paid for the rebates on BIPI
7   products that are a part of this -- these
8   commitment and loyalty agreements.  Do you recall
9   that?
10  A.  Yes, I do.
11  Q.  Okay.
12          (WHEREUPON, a certain document was
13  marked Exhibit McIntyre 027, for identification.)
14  BY MS. RIVERA:
15      Q.  What number is that?  I'm sorry.
16      A.  27.
17      Q.  Thank you.  Okay.  You've been handed a
18  document, which is dated -- I'm sorry, which has
19  been marked Exhibit 27.  And in the first paragraph
20  there, it says, "After discussing the one percent
21  rebate for the branded product and in doing an
22  analysis," et cetera, "Shelly and I agree that the

---

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009

## Chicago, IL

49 (Pages 190 to 193)

---

**190**

1  one percent rebate should be charged against the
2  Roxane P&L."
3       What does that indicate to you in terms
4  of how rebates for BIPI products that were part of
5  Roxane loyalty or commitment agreements were
6  booked?
7       A.  They're going to be paid for by Roxane.
8       Q.  Okay.  And were you able to do any other
9  research to confirm that this is the way it worked
10 for -- for all of these various agreements?
11      A.  Yes, I confirmed this with Judy Waterer.
12      Q.  Okay.  So BIPI was not paying the rebate
13 even though the rebate was based on BIPI products?
14      A.  That's correct.
15           MR. FAUCI:  Objection to form.
16 BY MS. RIVERA:
17      Q.  Okay.  You were also asked some questions
18 about dividend payments from Roxane to BIC.  Do you
19 recall that discussion?
20      A.  Yes.
21      Q.  Okay.  What is the purpose of dividend
22 payments?

---

**191**

1       A.  Typically it's to return part of the
2  investment to the parent company.
3       Q.  Okay.  And is this a normal procedure
4  between subsidiary and parent companies?
5       A.  Yes.
6            MR. FAUCI:  Objection to form.
7  BY THE WITNESS:
8       A.  Yes.
9  BY MS. RIVERA:
10      Q.  Okay.  Based on your -- well, let me ask
11 you this: Based on your -- sorry, strike that
12 again.
13           You were a member of Roxane's finance
14 department from 1996 to 2005, is that correct?
15      A.  That's correct.
16      Q.  Okay.  And as a member of Roxane's
17 finance department, were you familiar with Roxane's
18 financial condition during that time frame?
19      A.  Yes.
20      Q.  Okay.  And in preparation for this
21 deposition, did you review Roxane's financial
22 statements over time?

---

**192**

1       A.  Yes, I did.
2       Q.  Okay.  Based on your knowledge of
3  Roxane's financial condition and the -- the payment
4  of these dividends, do you believe that any of the
5  dividend payments that were made by Roxane to BIC
6  during the relevant time frame left Roxane
7  undercapitalized?
8            MR. FAUCI:  Objection --
9            MS. POLLACK:  Objection --
10           MR. FAUCI:  -- to the form.
11 BY THE WITNESS:
12      A.  No.
13 BY MS. RIVERA:
14      Q.  Okay.  And why not?
15      A.  'Cause --
16           MR. FAUCI:  Objection to the form.
17 BY THE WITNESS:
18      A.  They continued to have positive retained
19 earnings, and they also had positive working
20 capitals to fund their day-to-day operations.
21 BY MS. RIVERA:
22      Q.  Okay.  And during the time that you were

---

**193**

1  in Roxane's financial department, do you know if
2  Roxane -- you know, during the entire time they --
3  that you were in Roxane's financial department, if
4  you have -- if Roxane had sufficient working
5  capital to fund its day-to-day operations?
6            MR. FAUCI:  Objection to the form.
7  BY THE WITNESS:
8       A.  Yes.
9  BY MS. RIVERA:
10      Q.  Okay.  Was there ever a time when Roxane
11 was unable to pay its day-to-day obligations during
12 this time period?
13      A.  No.
14           MR. FAUCI:  Objection to the form.
15 BY MS. RIVERA:
16      Q.  Okay.
17           MS. RIVERA:  What's your objection?
18           MR. FAUCI:  Can you repeat the question?
19           THE COURT REPORTER:  "Question: Okay" --
20           MR. FAUCI:  I can read it.
21           The objection is that I'm very unclear
22 what you mean by the phrase "day-to-day

---

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009
Chicago, IL

50 (Pages 194 to 197)

---

194

1  operations," so I would say it's vagueness.
2       MS. RIVERA:  Okay.
3  BY MS. RIVERA:
4       Q.  Are you aware -- let me just try to fix
5  it, even though I disagree with the -- do you
6  understand what I mean by "day-to-day operations,"
7  Mr. McIntyre?
8       A.  Yes.
9       Q.  And how would you describe the day-to-day
10 operations of Roxane?
11      A.  To be able to pay our bills, pay our --
12 our vendors, pay our employees, purchase --
13 purchase ingredients, raw materials for -- for
14 manufacturing.
15      Q.  Okay.  Okay.  So let me just ask it
16 again.  Based on that day-to-day -- based on that
17 definition of -- of day-to-day business, do you
18 believe based on your familiarity with Roxane's
19 financial con -- condition and your review of
20 Roxane's financial statements that Roxane had
21 sufficient capital to pay its day-to-day expenses -
22 -

---

195

1       MS. POLLACK:  Objection as to form.
2       MS. RIVERA:  I'm not done yet.
3       MS. POLLACK:  Sorry.
4       MS. RIVERA:  It's okay.
5  BY MS. RIVERA:
6       Q.  To pay its day-to-day expenses and fund
7  its day-to-day operations from 1996 through 2005?
8       MS. POLLACK:  Objection to form.
9  BY THE WITNESS:
10      A.  Yes.
11 BY MS. RIVERA:
12      Q.  Okay.  And this is your view even though
13 at certain points of time Roxane paid dividends to
14 its parent comp -- corporation?
15      A.  Yes.
16      Q.  Okay.  Do you have any understanding
17 whether the capitalization and Roxane's ability to
18 pay and fund its -- its day-to-day operations was
19 taken into account when determining whether
20 dividends should be paid to -- to BIC or not?
21      MR. FAUCI:  Objection.
22 BY THE WITNESS:

---

196

1       A.  Yes, there is a general rule, guideline
2  from our corporate parent, that the debt to equity
3  ratio shouldn't exceed a certain amount.  If it --
4  if it exceeded a certain amount, then dividends
5  would not be paid.
6  BY MS. RIVERA:
7       Q.  Okay.  Then there were some questions
8  specific to a dividend that was paid in 2002 from
9  Roxane to BIC, I think, in the amount of $320
10 million.  Do you remember that?
11      A.  Yes, I do.
12      Q.  Okay.  Were you able to determine why
13 that dividend payment was larger than dividend
14 payments that had been paid in the past, that Mr.
15 Fauci also referred you to?
16      A.  Yes.  There was a couple of things that
17 happened in the prior year that -- that resulted in
18 larger -- more income for Roxane.  First, we sold
19 the palliative care business, so the income was --
20 the income that Roxane reported in 2001 was a lot
21 larger than had been expected; two, there were some
22 tax issues pending that allowed us -- that was

---

197

1  gonna allow us to pay some additional dividends;
2  and, three, we hadn't paid a dividend in -- since
3  2000, so this -- the payment in 2002 was -- was a
4  catch-up for a two-year period.
5       Q.  Okay.
6       (WHEREUPON, a certain document was
7  marked Exhibit McIntyre 028, for identification.)
8  BY MS. RIVERA:
9       Q.  Okay.  Okay.  The court reporter has
10 handed you what's been marked as Exhibit 28.  Can
11 you tell me what this is?
12      A.  This is the 2001 year-end financial
13 commentary or commentary to the financial
14 statements.
15      Q.  Okay.  Are these documents that Roxane
16 generates in its normal course of business, or did
17 at this point in time?
18      A.  Yes.
19      Q.  And you're familiar with these kinds of
20 documents?
21      A.  Yes.
22      Q.  Okay.

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

## Chicago, IL

51 (Pages 198 to 201)

---

198

1      MR. FAUCI: Objection to form.
2  BY MS. RIVERA:
3      Q.  If you would turn to the page that ends -
4  - if you see the BOEH numbers there --
5      A.  Uh-huh.
6      Q.  -- that ends in 452, it's a -- it's right
7  -- it's a commentary right after the income
8  statement.
9      A.  Total company income statement, right?
10     Q.  Yes.
11     A.  Yes, okay.  I have it.
12     Q.  Okay.  And it says, "2001 actual income
13  is 175 million," and it says under that, attribute
14  -- "Attributable to the Elan deal for the purchase
15  of pain/palliative care products line." Can you
16  tell me what that means in terms of how much Roxane
17  was paid for its divestment of the Elan palliative
18  care line?
19     A.  That -- well, this -- this would
20  represent the amount of income that they were made
21  -- made on this sale of the -- the line.
22     Q.  Okay.  So is that the same as saying that

---

199

1  Roxane made $175 million from the divestiture of
2  the Elan products?
3      A.  Yes.
4      MR. FAUCI: Objection to form.
5  BY MS. RIVERA:
6      Q.  I mean the divestiture of the products to
7  -- to Elan.
8      A.  Yes.
9      Q.  Okay.  And can you tell from your
10  knowledge and from your review of the documents
11  whether that income was budgeted for in -- for
12  Roxane for 2001?
13     A.  I could -- yes, it was -- it was not
14  budgeted for.
15     Q.  Okay.  So is this consistent with your
16  testimony that in 2001 Roxane had a unbudgeted
17  influx of income in the amount of $175 million?
18     A.  Yes.
19     Q.  Okay.  And that contributed in part to
20  the reason why the 2002 dividend payment was
21  higher?
22     A.  That would be --

---

200

1      MR. FAUCI: Objection --
2  BY THE WITNESS:
3      A.  -- correct.
4      MR. FAUCI: -- to the form.
5  BY MS. RIVERA:
6      Q.  Okay.
7      A.  That is correct.
8      Q.  Were you able to determine, Mr. McIntyre,
9  whether the payment of the $320 million dividend in
10  2002 had anything to do with pending subpoenas or
11  litigation at Roxane?
12     MR. FAUCI: Objection to the form.
13  BY THE WITNESS:
14     A.  Yes, I was able to determine from
15  conversations with Frank Palmer that it had nothing
16  to do with any litigation.
17  BY MS. RIVERA:
18     Q.  Okay.  Okay.  Just a few general
19  questions.  Between the time you were in Roxane's
20  financial department, between 1996 and 2005, did
21  you view Roxane as a separate company from BIC and
22  BIPI?

---

201

1      MR. FAUCI: Objection --
2  BY THE WITNESS:
3      A.  Yes.
4      MS. RIVERA: -- to the form.
5  BY THE WITNESS:
6      A.  Yes.
7      MS. RIVERA: What's your objection?
8      MR. FAUCI: It calls for a legal
9  conclusion.
10  BY MS. RIVERA:
11     Q.  Okay.  In your view, was Roxane a
12  separate company from BIC and BIPI?
13     MR. FAUCI: Same objection.
14  BY THE WITNESS:
15     A.  Yes, they were a separate legal entity.
16  BY MS. RIVERA:
17     Q.  Okay.  And following the reorganization
18  in 2005, was it your opinion that BIRI was a
19  separate -- or did you consider BIRI a separate
20  company from BIC, BIPI and RLI at that point?
21     A.  Yes, it was -- again, it was a separate
22  legal entity, separate tax ID.

---