# TAB 105

Page 1

SUPERIOR COURT STATE OF CONNECTICUT
COMPLEX LITIGATION DOCKET
AT TOLLAND
X07/CV/03/0083296/S(CLD)

STATE OF CONNECTICUT,
      Plaintiff,

  -against-

DEY, INC., ET AL.,
      Defendants.
------------------------

CONFIDENTIAL DEPOSITION OF

JAMES ROWENHORST

October 7, 2005
9:10 a.m.

21 Lake Avenue Extension
Danbury, Connecticut

Margaret Gmerek, CSR

Page 78

1  a reimbursement obstacle or is this
2  different from a reimbursement obstacle?
3      A.   I would lump it in as a
4  reimbursement obstacle.
5      Q.   Okay. I'm confused because I'm
6  not an expert in this area and I was
7  geared for selling obstacles and we
8  switched into reimbursement obstacles so
9  I'm going to try to breakdown what you
10 said into 2,000 or 3,000 thousand.
11     A.   Okay. Fair enough.
12     Q.   On reimbursement obstacles,
13 what's an example of a reimbursement
14 obstacle?
15     A.   (No response)
16         MR. TUCCI: Objection to the
17 form of the question.
18         Other than the ones that he has
19 already given?
20         THE WITNESS: (Responding) In
21 consideration of a reimbursement obstacle
22 that would be a situation where our
23 product would be disadvantaged versus the
24 competition so it creates an adverse
25 selling environment as a result.

Page 79

1      Q.   Now, the reimbursement obstacles
2  during this time period, February 1998 to
3  June of 2000, did you deal with
4  reimbursement obstacles just for BIP
5  products or where there examples or
6  instances where you also dealt with
7  Roxane's products?
8      A.   I vaguely recall being brought
9  in on some Roxane product reimbursement
10 issues as well.
11     Q.   And what product, if it's just
12 one product -- was it just one product
13 that you can recall?
14     A.   (Pause) I don't know that I
15 can even recall the product.
16     Q.   That was my next question: As
17 you sit here now you can't recall what
18 that Roxane product was, that was involved
19 in a reimbursement obstacle?
20     A.   No, not that I can 100 percent
21 recall.
22     Q.   As you sit here now do you
23 recall any specific examples with BIP
24 products during this time period, February
25 1998 to June of 2000?

Page 80

1      A.   Yes, I would say we had some
2  concerns with Combivent and Flomax. Those
3  are the ones that I can recall.
4      Q.   Now, Combivent, do you consider
5  that, at that time period, February 1998
6  to June of 2000, a BIP product or a
7  Roxane product?
8      A.   That would have -- that is a
9  BIP product and was.
10     Q.   And what about Flomax?
11     A.   That, at that time period, was
12 also a BIP product.
13     Q.   Is Flomax still a BIP product?
14     A.   Yes, it is.
15     Q.   What about Combivent, is that
16 still a BIP product?
17     A.   Yes, it is.
18     Q.   And as you sit here you can't
19 recall the one Roxane product that had an
20 adverse reimbursement obstacle, as we're
21 talking about it, during this time period?
22     A.   Not that I can recall 100
23 percent.
24     Q.   You would have to guess, is
25 that what you're saying?

Page 81

1      A.   Yes.
2      Q.   What would your guess be?
3      A.   (No response)
4         MR. COVAL: Objection.
5         He shouldn't guess.
6      Q.   What is your best recollection?
7      A.   (No response)
8         MR. TUCCI: Same objection, to
9  the extent it's a guess.
10        You can answer.
11        THE WITNESS: (Responding) It
12 may have been lithium.
13     Q.   And, Jim, what is Combivent
14 used for?
15     A.   It's used for treating patients
16 with chronic obstructive pulmonary disease,
17 it helps them breathe easier.
18     Q.   How is it administered to the
19 patient?
20     A.   As an inhaler, metered dose
21 inhaler.
22     Q.   Is that covered by Medicare?
23     A.   No, not that I'm aware of.
24     Q.   What's Flomax?
25     A.   It's a drug used for treating

James Rowenhorst												October 7, 2005

Page 158

1    His understanding was he was
2    unaware of it.
3         THE WITNESS: (Responding) I
4    mean, yeah, with respect to Roxane I'm
5    unaware of their practice of establishing
6    price, AWP being one.
7     Q.   Right, prior to today, what I'm
8    asking you now is:  Having reviewed this
9    document today --
10    A.   The review of this --
11    Q.   -- does that change your --
12         MR. TUCCI:  Wait a minute.
13   The question isn't done.
14    Q.   Having reviewed this document
15   today is your understanding of how AWP is
16   set or determined altered in any way?
17    A.   (No response)
18         MR. TUCCI:  Objection.
19         MR. GOLDENBERG:  I'm going to
20   shut the door.
21         MR. TUCCI:  It should be
22   closed.
23         MR. GOLDENBERG:  Oh, it is?
24         MR. TUCCI:  Note my objection
25   to the form of the question.

Page 159

1         THE WITNESS: (Responding)
2    After viewing this document my
3    understanding of establishment of -- the
4    awareness and my understanding of how
5    Roxane establishes prices does not change.
6         THE REPORTER:  I need to change
7    stenographic paper.
8         MR. GOLDENBERG:  Sure.
9         (Whereupon, there was a brief
10   intermission had for the court reporter to
11   change stenographic paper.)
12        MR. GOLDENBERG:  Back on the
13   record now.
14       EXAMINATION
15       BY-MR.GOLDENBERG:
16    Q.   Jim, if you go back to the
17   first page of this document.
18    A.   (Witness perusing documents.)
19   Um-hmm.
20    Q.   And it's RoxCt0051141?
21    A.   Yes.
22    Q.   The sentence that starts with,
23   I'll just read the sentence:  "Due to the
24   fact that the AWP has changed notification
25   will also be sent to third-party pricing

Page 160

1    services;" did I read that correctly?
2     A.   You've read that correctly.
3     Q.   Okay.  What is your
4    understanding of what "third-party pricing
5    services" means?  Let me rephrase that:
6    What is your understanding of who are the
7    third-party pricing services?
8     A.   To my knowledge third-party
9    pricing services include First Data Bank,
10   Medispan, Redbook, those entities that --
11   those pricing services.
12    Q.   And this sentence indicates that
13   these AWP changes will be sent to those
14   third-party pricing services sometime in
15   the future; correct?
16    A.   This document indicates that
17   those third-party pricing services will
18   receive this document.
19    Q.   Right.  And that they have not
20   already received it, according to this
21   document; is that right?
22    A.   (No response)
23         MR. TUCCI:  I object to the
24   form of the question.
25         THE WITNESS:  (Witness perusing

Page 161

1    documents.)
2         It says they will also be sent
3    so, you know, whether they received it
4    prior to, I don't know.
5     Q.   Are you familiar with any of
6    the, are you familiar with this price
7    change to furosemide that occurred around
8    August of 2000?
9     A.   Am I familiar with it?
10    Q.   Well, let me ask you:  Do you
11   have any recollection of it?
12    A.   No, I don't.
13    Q.   Other than what you've seen
14   through this document; correct?
15    A.   Correct.
16    Q.   So you didn't have any
17   conversations with anybody about furosemide
18   AWP price changing, did you, as far as
19   you can recall?
20    A.   Not that I recall, no.
21         MR. GOLDENBERG:  I'm going to
22   move on another exhibit, this is Exhibit
23   4.
24         (Document bearing Bates Stamp
25   Nos. RoxCT0075121 through RoxCT0075123 was

Page 162

1  marked as Rowenhorst Deposition Exhibit-4
2  for identification, as of this date.)
3      Q.   Jim, take some time and flip
4  through the three pages of this document.
5      A.   (Witness perusing documents.)
6  Okay. I've reviewed the document.
7      Q.   Do you recognize this document?
8      A.   I do not.
9      Q.   You don't have any recollection
10 of seeing this before; is that right?
11     A.   That's correct, I don't recall.
12     Q.   But on the top of the first
13 page, which is RoxCT0075121, it reads:
14 "Scenario Analysis Process Impact of
15 Medicare Reform on Combivent UDV;" is that
16 correct?
17     A.   That is correct.
18     Q.   Okay. Combivent UDV, I think
19 we talked about that earlier.
20     A.   We briefly discussed it, yes.
21     Q.   And so just refresh me, what is
22 Combivent UDV again?
23     A.   Combivent UDV is a form of
24 Combivent in a unit dose vial that would
25 be used as part of nebulization treatment.

Page 163

1      Q.   And because it would be through
2  Nebulization treatment it would be eligible
3  for state Medicaid reimbursement; is that
4  correct?
5      A.   (No response)
6          MR. COVAL: Objection.
7      Q.   If you know?
8      A.   The drug was never brought to
9  market so it -- you know, whether it
10 would have been reimbursed or not is
11 speculation, I guess.
12     Q.   If it would have been brought
13 to market would it have been -- it would
14 have been reimbursable under Medicaid; is
15 that correct?
16     A.   (No response)
17         MR. TUCCI: Objection.
18         That calls for a legal
19 conclusion, No. 1. We are getting way
20 far afield here. This is a drug that
21 was never brought to market, it's not a
22 Boehringer, it's not a Roxane drug, it's
23 a BIP drug that was under research.
24         At some point I'm going to
25 direct him not to answer these questions,

Page 164

1  we're getting way out.
2          MR. GOLDENBERG: Well, we are
3  going to be looking at additional
4  documents related to Combivent UDV
5  which --
6          MR. TUCCI: Which has what to
7  do with this case?
8          MR. GOLDENBERG: Which deals
9  with AWP, focusing on AWP and competing
10 on AWP.
11         MR. TUCCI: We're --
12         MR. COVAL: For BIPI who is
13 not a defendant in the case.
14         MR. GOLDENBERG: Well...
15         MR. TUCCI: Where does it show
16 up in your revised complaint on the
17 attached list of drugs?
18         MR. GOLDENBERG: Well, it
19 doesn't but what I'm saying is if there
20 is evidence of them competing on AWP,
21 whether -- and I believe Jim has
22 testified to the fact that he has done
23 work for both Roxane and BIP during his
24 tenure with Boehringer Ingelheim, --
25         MR. COVAL: For a short period

Page 165

1  of two years.
2          MR. GOLDENBERG: Well, I mean
3  it's clear that these companies
4  interact --
5          MR. COVAL: I don't think --
6          MR. GOLDENBERG: -- with
7  respect to employees.
8          MR. COVAL: That's not the
9  case.
10         MR. TUCCI: That may be your
11 view of it, that's not the view of
12 reality.
13         MR. GOLDENBERG: Well, we each
14 have a different view of reality.
15         MR. TUCCI: That may be.
16         MR. GOLDENBERG: So I mean this
17 is a deposition --
18         MR. TUCCI: I know it's a
19 deposition but under Connecticut rules you
20 are not entitled to annoy, oppress, or
21 harass the witnesses and you are here to
22 take a deposition of fact and issues
23 relating to Roxane, not related to
24 affiliated companies, parent companies,
25 other organizations and their business