**TAB 106**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE ) | Master File No. |
| LITIGATION ) | 01-12257-PBS |
| _____) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | VIDEOTAPED |
| ) | DEPOSITION OF |
| United States of America ex rel. ) | THOMAS RUSSILLO |
| Ven-a-Care of the Florida Keys, ) | |
| Inc., v. Boehringer Ingelheim ) | JANUARY 8, 2009 |
| Corp. et al., Civil Action No. ) | |
| 07-10248-PBS, and The City of ) | |
| New York et al. v. Abbott ) | |
| Laboratories et al., Civil ) | |
| Action No. 03-10643-PBS. ) | |
| _____) | |

(Cross-noticed captions on following pages.)

Page 22

1  Q  Are you familiar with a company called
2  Bedford Labs?
3  A  Yes, I am.
4  Q  What is that?
5  A  That was the name of our generic division,
6  Ben Venue's generic division.
7  Q  So Bedford Laboratories is a part of
8  Ben Venue. Is that fair to say?
9  A  That's right. That's correct.
10 Q  And are you familiar with a company called
11 Boehringer Ingelheim Pharmaceuticals, Incorporated?
12 A  Yes.
13 Q  If I refer to that as BIPI today, will you
14 understand that I mean Boehringer Ingelheim
15 Pharmaceuticals, Incorporated?
16 A  Yes.
17 Q  Can you describe in general the business of
18 BIPI as of 1998? By business I mean, among other
19 things, the types of products the company marketed
20 and sold.
21 A  To the best of my knowledge, BIPI included
22 Ben Venue Laboratories, Roxane Laboratories, a

Page 23

1  consumer health business, and branded products.
2  Q  To your knowledge, Roxane Laboratories was a
3  part of BIPI?
4  A  I believe it was.
5  Q  Were you ever an employee of BIPI?
6  A  I think -- I'm not sure. I told you
7  earlier, my paycheck came from Ben Venue.
8  Q  Your paycheck came from Ben Venue?
9  A  Yes.
10 Q  Did your paycheck ever come from any other
11 Boehringer Ingelheim entities from the period of
12 November 1997 until 2005?
13 A  I don't believe so.
14 Q  Did you have any responsibility for any
15 portions of BIPI's business?
16 A  Yes.
17 Q  What responsibilities were those?
18 A  At what point in time are you talking about?
19 Q  Take me from 1998 up to the present, to the
20 best of your ability.
21 A  From 1997, November 1997, at the time of the
22 acquisition, I was retained in my current title,

Page 24

1  retained as president and chief operating officer
2  of Ben Venue Laboratories.
3     So Ben Venue Laboratories, its contract
4  manufacturing division, and Bedford Laboratories,
5  its generic marketing arm for injectables
6  manufactured by Ben Venue, was under my
7  responsibility.
8     Sometime at the end of 1998, I was also
9  given additional responsibilities for the Roxane
10 multisource business.
11 Q  Did you ever have any responsibilities for
12 the branded drug business?
13 A  No, I did not.
14 Q  What is Roxane Laboratories?
15 A  Roxane Laboratories, as I understood them,
16 was a Columbus-based manufacturing operation that
17 had some branded products and multisource products.
18 Q  And to your knowledge, you were never paid
19 by Roxane Laboratories?
20 A  That is correct.
21 Q  But in the course of your employment with
22 Ben Venue Laboratories, from some point in 1998

Page 25

1  onwards, you had responsibility for part of
2  Roxane's business?
3  A  That's correct.
4  Q  I'm going to show you a document that the
5  court reporter will mark as Exhibit 1.
6     (Exhibit Russillo 001 is marked.)
7  Q  BY MR. FAUCI: As a general ground rule for
8  whenever I show you a document, take time to
9  familiarize yourself with it. If it's a lengthy
10 document, I will try and direct your attention to
11 specific points of it.
12    Are you familiar with this document?
13 A  I don't recall actually seeing this
14 document, but -- so I have to say no, I'm not
15 familiar with this document.
16 Q  At the top, it says "Roxane Laboratories,
17 Inc., Unanimous Written Consent of Directors." Do
18 you see that?
19 A  Yes, I do.
20 Q  If you look at the last paragraph, beginning
21 with the word "resolved."
22 A  Yes.

**Page 26**

Q  Can you read that section for me?
A  "Resolved that, effective October 23, 1998, Mr. Thomas R. Russillo, President and Chief Operating Officer of this Corporation's affiliate, Ben Venue Laboratories, Inc., of Bedford, Ohio, be, and he hereby is, assigned responsibility for the Marketing of Multisource Products, Medical Affairs, Drug Regulatory Affairs, and Scientific Affairs functions of this Corporation."
Q  What does it mean that you were assigned responsibility for these functions?
A  I'm not sure what this meant. I only know what happened.
Q  Did you regard Ben Venue and Roxane as separate companies?
A  Yes, I did.
Q  If you were an employee of Ben Venue, why do you think you were put in charge of Roxane's marketing department?
A  I was put in charge of Roxane's multisource marketing because they marketed generics, and Ben Venue had been marketing generics since 1992.

**Page 27**

Q  From November 1997 -- oh, sorry. Strike that.
    From the date of this document, October 1998, is it accurate to say that you were in charge for the marketing of multisource products at Roxane?
    MS. RIVERA: Object to form.
    THE WITNESS: I'm not sure of the exact date it happened. It was at the end of 1998.
Q  BY MR. FAUCI: If you look at the bottom, it says, "In witness whereof, we have duly signed this instrument effective as of the 14th day of October, 1998."
    Do you see that?
A  Yes, I do.
Q  From that point on, do you think it's fair to say that you were in charge of Roxane's marketing?
    MS. RIVERA: Object to form.
    THE WITNESS: I'm not sure that that's fair to say. No.
Q  BY MR. FAUCI: Was there a point in time at

**Page 28**

which you became in charge of Roxane's marketing department for multisource drugs?
A  Yes, there was.
Q  And was that around the 1998 time frame?
A  The end of 1998, yes.
Q  Was there anyone at Roxane that you had to report to regarding marketing decisions for Roxane's multisource products?
    MS. RIVERA: Object to form.
    THE WITNESS: Werner Gerstenberg was the president of Roxane Laboratories. As such, I had an obligation to keep him informed as to what was going on.
Q  BY MR. FAUCI: How often did you talk to Mr. Gerstenberg?
A  I would say weekly.
Q  If you made a marketing decision on a Roxane's product, did you have to run it by Mr. Gerstenberg?
A  Not normally, no.
Q  Were there occasions when you needed to have Mr. Gerstenberg approve a Roxane marketing

**Page 29**

decision?
A  Those occasions would have been limited. And they would have been at my discretion to advise him, as he was my supervisor.
Q  When might you have advised him of a decision that you wanted his sign-off on?
A  I don't recall any specific ones.
Q  Was there anyone at Boehringer Ingelheim that you had to report to regarding marketing decisions for Roxane's multisource products?
    MS. RIVERA: Object to form.
    THE WITNESS: As I said earlier, I reported to Werner Gerstenberg. So anything that I did as either Ben Venue COO or as head of multisource business, ultimately I reported to Werner.
    So anything that I thought was -- that he was in need of being aware of, I would advise him of.
Q  BY MR. FAUCI: Did you ever report to Shelly Berkle?
A  No, I did not.
Q  Other than Mr. Gerstenberg, can you think of

**Page 30**

1  anyone else that you reported to during your time
2  from 1998 to the present -- to the end of your time
3  at Roxane?
4     A  Yes.
5     Q  Who else?
6     A  I reported -- Werner Gerstenberg retired in,
7  I believe, December of 2003 and was replaced by
8  Marty Carroll as the new CEO. I reported to him.
9     Q  Anyone else?
10    A  I can't think of anyone.
11    Q  You said Roxane also marketed branded
12 products?
13    A  At some point in time, yes.
14    Q  Are you familiar with the term "branded
15 generic"?
16    A  Yes.
17    Q  What is a branded generic?
18    A  As the name would indicate, it is a generic
19 that has been given a brand name.
20    Q  Who had responsibility for marketing
21 Roxane's branded generics?
22    A  At what point in time?

**Page 31**

1     Q  1998 onwards.
2     A  Some of the branded generics became the
3  responsibility of Roxane multisource at the end of
4  1998. So I had responsibility, people who worked
5  for me had responsibility.
6     Q  Can you think of anyone else that had
7  responsibilities for Roxane's branded generics?
8     A  As I said, not all branded generics at
9  Roxane were my responsibility.
10    Q  Do you know whose responsibility they were?
11       MS. RIVERA: Object to form.
12    Q  BY MR. FAUCI: Do you know -- let me
13 rephrase that question.
14       For the drugs at Roxane that you did not
15 have responsibility for marketing for, who was in
16 charge of marketing?
17       MS. RIVERA: Object to form.
18       MR. FAUCI: That's a horrible question. Let
19 me rephrase that.
20    Q  For the branded generic drugs at Roxane, can
21 you tell me who had responsibility for marketing
22 decisions?

**Page 32**

1        MS. RIVERA: Object to form.
2        THE WITNESS: There were many branded
3  generics. Some of those branded generics were
4  retained by the multisource division. So for those
5  products, I would have still had responsibility.
6        The others, the ones that were not -- they
7  were branded generics, but they were not part of
8  the multisource business, those products were
9  transferred to BIPI.
10    Q  BY MR. FAUCI: Who would have had
11 responsibility for those products at BIPI?
12    A  Well, there was a group of Roxane employees
13 who managed the branded Roxane business.
14    Q  Can you tell me who those people are?
15    A  Again, they changed at various times. Ed
16 Tupa would be the name that comes to mind.
17    Q  Did Shelly Berkle have responsibility for
18 Roxane's branded generic products?
19    A  My recollection is that Ed Tupa at some
20 point in time reported to Shelly.
21    Q  Do you know if Mr. Berkle had responsibility
22 for Roxane's branded generic products at any point

**Page 33**

1  in time?
2        MS. RIVERA: Object to form. Asked and
3  answered.
4        THE WITNESS: I think he had oversight of
5  that, just like I had oversight of multisource
6  business.
7     Q  BY MR. FAUCI: I'm going to direct your
8  attention to the names at the bottom of this
9  document, Exhibit 1. Who is Walter Poerschmann?
10    A  Walter Poerschmann was a German-based
11 employee of Boehringer Ingelheim, who was head -- I
12 think he was head of North America and South
13 America Ethical Pharmaceuticals.
14    Q  What does Ethical Pharmaceuticals mean?
15    A  Branded pharmaceuticals.
16    Q  What about Philip Franks?
17    A  Philip Franks was, I believe, the general
18 counsel at the time.
19    Q  And Sheldon Berkle. Can you tell me who he
20 was?
21    A  He was head of Ethical Pharmaceuticals
22 business unit.

**Page 34**

Q  Did any of Mr. Poerschmann, Mr. Franks, or Mr. Berkle have day-to-day responsibility at Roxane Laboratories?

A  As I said, Shelly had oversight for the branded business. So that portion of the branded business that was being handled by Roxane, I guess he had some responsibility for.

Q  And how often was Mr. Gerstenberg at Roxane?

A  You know, I really don't know how many times he went there.

Q  Was he based there?

A  No, he was not.

Q  Did you see him once a month, more than that, or less than that, in person?

A  In relation to?

Q  How often, to the best of your memory, was Mr. Gerstenberg present on the Roxane campus?

A  I couldn't answer that question. I don't know.

Q  I'm going to show you a document the court reporter is going to mark as Exhibit 2.

(Exhibit Russillo 002 is marked.)

**Page 35**

Q  BY MR. FAUCI: Take a moment to familiarize yourself with it. I'll ask you a question, but answer it when you're ready.

What is the business unit Ethical Pharmaceuticals?

A  Would you repeat your question, please?

Q  Sure. I believe it was, what is the business unit Ethical Pharmaceuticals?

A  From my recollection, the business unit Ethical Pharmaceuticals was the unit that oversaw the brand business within Boehringer Ingelheim.

Q  Was Roxane's multisource business included in the business unit Ethical Pharmaceuticals?

A  No, they were not.

Q  Exhibit 2 is a news release dated January 28, 1999. Do you agree with that?

A  That's what it appears to be.

Q  Who would this news release be sent to?

A  I don't know who it was sent to.

Q  Do you think it would have been sent to Roxane employees?

A  It may have.

**Page 36**

Q  Do you think it would have been sent to people outside of the Boehringer Ingelheim family of companies?

A  I don't know.

Q  Next to the date, it says Ridgefield, Connecticut. Which company was based in Ridgefield, Connecticut?

A  Ridgefield, Connecticut, to me meant BIPI.

Q  Did it also mean BIC?

A  It could have, yes.

Q  Was there any difference in your mind between BIC and BIPI?

MS. RIVERA: Object to form.

THE WITNESS: I believe that BIC was the overriding holding company, and BIPI was an operating arm.

But as I said earlier, the Boehringer Ingelheim structure at that level was, you know, not something I was extremely familiar with.

Q  BY MR. FAUCI: When you thought of Connecticut, you thought of Boehringer Ingelheim?

A  That's correct.

**Page 37**

MS. RIVERA: Object to form.

Q  BY MR. FAUCI: To your knowledge, did BIC have any active businesses of its own?

A  I don't know.

Q  Is it consistent with your recollection that Mr. Berkle worked for Boehringer Ingelheim Corporation?

A  I'm not sure who wrote his paycheck.

Q  I'm going to direct your attention to the first paragraph, about three lines down. The document says, "The companies" -- I'm sorry. Let me say this again.

It says, "Sheldon Berkle, Executive Vice President and Head, Business Unit, Ethical Pharmaceuticals," comma, "Boehringer Ingelheim Corporation, USA, has announced some recent changes in the Business Unit.

"The companies involved in the Business Unit reorganization include: Boehringer Ingelheim Pharmaceuticals, Incorporated, Ridgefield Connecticut; Roxane Laboratories, Incorporated, Columbus, Ohio; and Ben Venue Laboratories,

Page 38

1  Incorporated, Bedford, Ohio.
2       "This reorganization will allow the Business
3  Unit to manage as a unified and focused
4  organization."
5       Do you see that?
6  A  Yes, I do.
7  Q  Does this refresh your recollection as to
8  whether Roxane was part of the business unit?
9  A  No, not really.
10 Q  Let's turn the page. Do you see at the top
11 it says, "Tom Russillo, President and COO of
12 Ben Venue Laboratories, Incorporated"?
13 A  Yes.
14 Q  It says you will add to your
15 responsibilities of multisource business at Roxane
16 Laboratories, allowing Boehringer Ingelheim to
17 capitalize on the synergy of these businesses.
18      Do you see that?
19 A  Yes, I do.
20 Q  Why is that being included in a news release
21 about the business unit Ethical Pharmaceuticals?
22 A  I think the issue here is that there were a

Page 39

1  lot of things that happened to be -- either there
2  was a difference between the form, the substance.
3       In this particular case, this document would
4  indicate, as you said, that I was part of the
5  Ethical Pharmaceuticals business unit. And on
6  paper I may have been, but in practicality I was
7  not.
8  Q  This document's a news release; correct?
9  A  Yeah, but -- yes.
10 Q  And so this news release is indicating that
11 you and the multisource business were part of the
12 Ethical Pharmaceuticals business; correct?
13      MS. RIVERA: Object to form.
14      THE WITNESS: That's apparently what it
15 says.
16 Q  BY MR. FAUCI: Looking a little further down
17 on page 2, it says, "James King has been promoted
18 to Head, Boehringer Ingelheim Pharmaceuticals,
19 Inc./Roxane Laboratories, Inc., Branded Sales."
20      Who's Mr. King?
21 A  My recollection is Jim King was the head of
22 the Boehringer sales force.

Page 40

1  Q  Do you know which company he worked for?
2  A  No, I do not.
3  Q  Did Boehringer and Roxane have a single
4  sales force that was responsible for branded
5  products?
6  A  No, they did not.
7  Q  Why do you think it says that Mr. King is
8  the head, Boehringer Ingelheim Pharmaceuticals,
9  Inc./Roxane Laboratories, Inc., branded sales?
10      MS. RIVERA: Object to form.
11      THE WITNESS: I don't know why it says that.
12 Q  BY MR. FAUCI: Did you sit on any boards of
13 directors?
14 A  Yes, I did.
15 Q  Which companies' boards of directors did you
16 sit on?
17 A  Can you give me a time frame or when you're
18 asking for?
19 Q  From the period from 1997 till the end of
20 your employment with Roxane Laboratories, can you
21 tell me any Boehringer Ingelheim companies where
22 you sat on the board of directors?

Page 41

1  A  You said my employment by Roxane
2  Laboratories. I was not an employee of Roxane
3  Laboratories.
4  Q  You were an employment of who -- an employee
5  of who?
6  A  Ben Venue Laboratories.
7  Q  From the time 1997 to the present, can you
8  tell me if you sat on the board of directors of any
9  Boehringer Ingelheim affiliated entities, and
10 identify those entities?
11 A  Yes, I did. From November, the end of
12 November of 1997, until the end of 2004, I sat on
13 the board of directors for Ben Venue Laboratories.
14      At some time in 1998, 1999, somewhere in
15 that time frame, I was also appointed a member of
16 the board of directors of Roxane Laboratories. And
17 I sat on that board until I retired from Boehringer
18 Ingelheim in 2004.
19 Q  Sorry. I just didn't hear you. When did
20 you start on the Roxane board?
21 A  Sometime between -- I don't know exactly.
22 It would have been either at the very end of 1998

```
                                    42
 1   or the beginning of 1999, somewhere in that time
 2   frame.
 3      Q   Did the Roxane board meet frequently?
 4      A   Yes, they did.
 5      Q   How often did they meet?
 6      A   We met as a group, although we probably
 7   didn't call it a board meeting. I think we may
 8   have called it an executive committee meeting or an
 9   operating committee meeting.
10         We met sometimes once a month, sometimes
11   once a quarter. I can't tell you exactly.
12      Q   And you think those meetings were meetings
13   of the board of directors?
14      A   The attendees were the board members, with
15   additional people brought in to update us on
16   various activities that were happening.
17      Q   Were minutes kept at those meetings?
18      A   I don't recall.
19      Q   Who else was at those meetings?
20      A   Depending on the time of the year, it would
21   have been -- or the year -- well, let me go back.
22         Depending on whether it was 1998 or 2004, it
```

```
                                    43
 1   would have been either Werner Gerstenberg or Marty
 2   Carroll. It would have been Holger Huels or Herman
 3   Tesner. It would have been myself. It would have
 4   been Jerry Perez or Rob Fromuth. Let's see.
 5   Shelly Berkle.
 6         And then other people who would have been
 7   brought in, as I mentioned.
 8      Q   I'm going to show you a document marked --
 9   the court reporter will mark as Exhibit 3.
10         (Exhibit Russillo 003 is marked.)
11      Q   BY MR. FAUCI: This document appears to be
12   minutes of the meeting of the board of directors,
13   Boehringer Ingelheim Corporation, October 28, 1998.
14   Do you see that?
15      A   Yes, I do.
16      Q   Did you ever attend BIC board meetings?
17      A   As that would indicate, I attended some as
18   an invitee.
19      Q   How often would you attend BIC board
20   meetings?
21      A   I don't recall.
22      Q   Did you represent Roxane at those board
```

```
                                    44
 1   meetings when you attended?
 2      A   Sometimes, yes.
 3      Q   Sometimes you represented Ben Venue?
 4      A   Sometimes both.
 5      Q   Direct your attention to the page labeled
 6   BIC JURIS 0236.
 7         MS. RIVERA: And, Tom, you should feel free
 8   to look through the rest of it to the extent you
 9   need to.
10         I'm sorry. Which page, Jeff?
11         MR. FAUCI: BIC JURIS 0236. It's internal
12   page 9.
13         MS. RIVERA: 6, okay.
14      Q   BY MR. FAUCI: Are you at that page,
15   Mr. Russillo?
16      A   Yes, I am.
17      Q   It says -- there's a bolded part of it that
18   says, "Roxane Laboratories, Inc.," dash, "Latest
19   Preview for 1998 and Budget 1999. Invited guests:
20   Mr. Berkle, Dr. Shepard, and Mr. Russillo."
21         Do you see that?
22      A   Yes.
```

```
                                    45
 1      Q   It goes on to say, "Mr. Berkle explained the
 2   reorganization of the Strategic Business Unit
 3   Ethical Pharmaceuticals, advising that it now has
 4   two components: One being generic drugs; and the
 5   other, branded drugs."
 6         Does this refresh your recollection?
 7         MS. RIVERA: I'm sorry, Jeff. It says "the
 8   other, branded generic drugs."
 9         MR. FAUCI: Is that not what I said?
10         MS. RIVERA: No. You just said "branded
11   drugs."
12         MR. FAUCI: I'm sorry. Let me read it
13   again.
14      Q   "Mr. Berkle explained the reorganization of
15   the Strategic Business Unit Ethical
16   Pharmaceuticals, advising that it now has two
17   components: One being generic drugs," and the
18   other being -- "and the other, branded generic
19   drugs."
20         Do you see that?
21      A   Yes, I do.
22      Q   Does this refresh your recollection as to
```

Page 46

1   whether Roxane's generic business was included in
2   the business unit Ethical Pharmaceuticals?
3       A   It doesn't change my opinion.
4       Q   Do you have any sense why Mr. Berkle would
5   make that representation to the BIC board?
6           MS. RIVERA:  Object to form and foundation.
7           THE WITNESS:  I believe that on an
8   organization chart, that's the way it was set up;
9   but in actuality, that is not the way it was
10  operated.
11      Q   BY MR. FAUCI:  Was it common for Roxane
12  business to be discussed at BIC board meetings?
13          MS. RIVERA:  Object to form and foundation.
14          THE WITNESS:  I wasn't at BIC board meetings
15  all the time, so I don't know how many or what was
16  discussed.
17      Q   BY MR. FAUCI:  Do you have a recollection as
18  to approximately how many you attended?
19      A   No, I don't.
20      Q   Was it more than one?
21      A   I would imagine so.
22      Q   Let's look at a new document that the court

Page 47

1   reporter will mark as Exhibit 4.
2           (Exhibit Russillo 004 is marked.)
3       Q   BY MR. FAUCI:  This document says, "Roxane
4   Laboratories, Inc., Budget 1999," and it appears to
5   be an organizational chart.
6           Take a moment to familiarize yourself with
7   it, and let me know verbally when you're ready for
8   a question.
9       A   Yes, I'm ready.
10      Q   Do you see that Mr. Berkle, as head of the
11  business unit Ethical Pharmaceuticals, appears in
12  this organizational chart?
13      A   Yes, I do.
14      Q   Do you have any knowledge as to why
15  Mr. Berkle would be appearing in a Roxane Labs
16  organizational chart?
17      A   I can only surmise why.
18      Q   What would that be?
19      A   That would be --
20          MS. RIVERA:  Object to form.  Calls for
21  speculation.
22          Go ahead.

Page 48

1           THE WITNESS:  I would assume it's because he
2   was head of branded business, and there was a
3   portion of the Roxane products that were in the
4   branded business.
5       Q   BY MR. FAUCI:  And he was responsible for
6   those?
7           MS. RIVERA:  Object to form.
8           THE WITNESS:  Ultimately.
9       Q   BY MR. FAUCI:  Below Mr. Berkle, your name
10  is listed as "BV and RLI Multisource."  Do you see
11  that?
12      A   Yes, I do.
13      Q   Does RLI refer to Roxane?
14      A   RLI refers to Roxane Labs, Incorporated.
15      Q   And is this entry in the chart consistent
16  with your recollection that from 1990 -- in the
17  1999 time frame, you were in charge of the
18  multisource business at both Roxane and Ben Venue?
19      A   Would you repeat that question?
20          MR. FAUCI:  Can you repeat that question,
21  please?
22          (Record is read.)

Page 49

1           THE WITNESS:  My title is correct, if that's
2   the question you're asking.
3       Q   BY MR. FAUCI:  And functionally, would you
4   agree that you were responsible for the marketing
5   department at Ben Venue and Roxane?
6       A   Yes.
7       Q   Below you, it lists "Manager, Multisource,
8   J. Waterer."
9       A   Yes.
10      Q   Who is J. Waterer?
11      A   Judy Waterer was the manager of marketing.
12      Q   Did she report to you?
13      A   Yes, she did.
14      Q   What were her job responsibilities?
15      A   She was responsible for the Roxane
16  multisource product portfolio, marketing of those
17  products, setting of prices, and coordination with
18  the salespeople.  She was responsible for preparing
19  pipeline models, for forecasting sales.
20      Q   Which prices?
21      A   Judy was responsible for all Roxane product
22  pricing, Roxane multisource product pricing.

Page 94

1   Q   Turn your attention to Step 3, the paragraph
2   starting, "Product manager to coordinate following
3   departments/personnel."
4       Do you see that?
5   A   No, I don't.
6   Q   Do you see Step 3?
7   A   I see Step 3. Okay, the second?
8   Q   The second bolded --
9   A   Yeah, I have it.
10  Q   And then for an AWP change, do you see that
11  Mr. Feldman, executive director, trade and pharmacy
12  affairs, is to compose a letter to the pricing
13  compendia?
14  A   Yes.
15  Q   Is that consistent with your recollection
16  that Mr. Feldman would notify the pricing compendia
17  when Roxane changed its AWP?
18  A   It all depends on the time. This is a
19  procedure -- I don't know if it was ever
20  implemented or not.
21      In that 2000, 2001 time frame, Feldman was
22  there, so I guess he could have been doing that.

Page 95

1   Subsequent to that, Judy was in charge of that.
2   Q   Was it your understanding that if Roxane
3   changed the AWP, that change would be reported to
4   the pricing compendia?
5   A   Yes.
6   Q   If a WAC changed, do you know if Roxane
7   would notify the pricing compendia?
8   A   I'm not sure whether we were reporting WACs
9   or not.
10  Q   Can you think of a reason why you wouldn't
11  be reporting WACs?
12  A   I don't believe there was any requirement to
13  report WACs.
14  Q   Skip ahead to Step 5. It's two pages
15  turned, where it says, "Create gold sheet for
16  product if AWP or NWDA changes."
17      Do you see that?
18  A   Yes.
19  Q   And then it says, "Gold sheet standard form
20  (Roxane) is to be used to notify internal personnel
21  of price changes, packaging changes, as well as
22  additions and deletions to product line. Note:

Page 96

1   Only AWP is to be listed for multisource, as WAC is
2   not for general publication."
3       Does this refresh your recollection as to
4   whether or not Roxane published its WAC prices?
5   A   No, it doesn't.
6   Q   You just don't know one way or the other?
7   A   I don't know whether this procedure was ever
8   implemented or not.
9   Q   My question is do you -- does this document
10  refresh your recollection as to whether in fact
11  Roxane reported its WAC pricing?
12  A   It doesn't.
13  Q   In your opinion, would it be appropriate for
14  Roxane to lower its WACs on a product but not
15  report the new WAC to the pricing compendia?
16      MS. RIVERA: Object to form.
17      THE WITNESS: I don't know whether it's
18  appropriate or not. I don't think there was any
19  requirement to report any WAC prices to the pricing
20  compendia.
21      MR. FAUCI: I'm going to show you a document
22  marked Exhibit 12.

Page 97

1       (Exhibit Russillo 012 is marked.)
2   Q   BY MR. FAUCI: It's a September 22, 2000,
3   e-mail from Joe Puma. And it's attaching a file
4   called "!Reorg_PAC_2.ppt," also a document labeled
5   "091800 minutes final.doc."
6       Take a moment to familiarize yourself with
7   Exhibit 12 and tell me when you're ready for
8   questions.
9   A   Okay.
10  Q   Who's Joe Puma?
11  A   I don't know.
12  Q   He writes on the first page of this, the
13  e-mail transmitting the attachment, "On the
14  PowerPoint presentation, slide 6, please correct
15  the spelling for Tom Russillo.
16      "You may also want to include that in
17  addition to WAC changes (not always increases), Tom
18  Russillo in coordination with Judy Waterer (Assoc.
19  Director, Multisource Products) also review and
20  recommend AWP changes for the line."
21      Do you see that?
22  A   Yes.

```
                                98
 1    Q   Is it consistent with your recollection that
 2   you and Mr. Waterer reviewed and recommended AWP
 3   changes for the multisource line of products?
 4    A   I don't recall doing that.  No.
 5    Q   You don't recall doing what?
 6    A   Recommending AWP changes.
 7    Q   Do you recall approving AWP changes?
 8    A   I do.
 9    Q   Did you ever ask anyone at Boehringer
10   Ingelheim to sign off on an AWP change that you
11   were involved with?
12        MS. RIVERA:  Object to form.
13        THE WITNESS:  There would have been -- it
14   would have been at my discretion.  I would have
15   asked Werner Gerstenberg, if I thought there was a
16   sensitive AWP issue.
17    Q   BY MR. FAUCI:  Is there anyone else you
18   would have talked to about a sensitive AWP issue?
19    A   No.
20    Q   What would make an AWP issue sensitive?
21    A   Well, at this time --
22        MS. RIVERA:  Hold on.  Object to form.
```

```
                                99
 1        THE WITNESS:  At this point in time, I was
 2   very sensitive to the AWP litigation that was
 3   floating around.
 4    Q   BY MR. FAUCI:  So as of the late 1990s, you
 5   were aware that there was investigations into
 6   inflated AWPs?
 7    A   Yes, I was.
 8    Q   Let's turn to the first page of the exhibit,
 9   of the attachment, where it says, "Impact of June
10   2000, BU Reorganization on PAC Process."
11    A   Yes.
12    Q   Was there a reorganization of the business
13   unit in or around June 2000?
14    A   Yes, there was.
15    Q   What was the result of that?
16    A   The result of that was, as best I recall,
17   the pricing decision committees, as you've shown me
18   in the previous things, were implemented on the
19   brand side, and we were left pretty much on the
20   side to do our own thing, on the multisource side.
21    Q   Turn to page 4 of the document, where it
22   says "PTC Team Post-June 2000."  What is the PTC
```

```
                               100
 1   team?
 2    A   It's -- it was rolled into the PAC, I
 3   believe, at this point in time.
 4    Q   And the permanent members:  Do you see
 5   those?
 6    A   Yes, I do.
 7    Q   "Ciarelli, Diez, Ellexson, Hankins, King,
 8   Powers, Sykora, Terrillion, Marketing Controller
 9   Elizabeth Cochran."
10    A   Yes.
11    Q   Who are each of those people, to the best of
12   your recollection?  Which companies did they work
13   for?
14       I can make it easier.  Did any of those
15   people work for Roxane Laboratories post-June 2000?
16    A   I don't know for sure.  John Powers and Bob
17   Sykora were Roxane -- I think were Roxane
18   employees.
19    Q   Were the rest of those BIPI employees?
20    A   They were on the brand side.  I would
21   imagine they were BIPI.
22    Q   The third bullet point down, it says,
```

```
                               101
 1   "G. Ciarelli, H. Diez, and J. King to collaborate
 2   to provide leadership to team and make final calls
 3   on difficult decisions."
 4    A   Yes.
 5    Q   "If a decision cannot be made, the issues
 6   are brought to S. Berkle."
 7    A   Yes.
 8    Q   Do you see that?
 9    A   Yes.
10    Q   Would those difficult decisions have to do
11   with Roxane multisource products?
12    A   No.
13    Q   What about Roxane's branded generic
14   products?
15        MS. RIVERA:  Object to form, foundation.
16        THE WITNESS:  I believe they could.  I don't
17   know how they handled those.
18    Q   BY MR. FAUCI:  Page 6 of the same exhibit
19   says "PTC and Multisource."  Do you see that?
20    A   Yes.
21    Q   "Multisource is addressed by the PTC team
22   only when administrative, legal, and government
```

**102**

1  issues are involved (primarily program driven)."
2      Do you see that?
3  A  Yes.
4  Q  Why would the PTC Team, with all those
5  Boehringer Ingelheim folks, get involved in a
6  price -- multisource pricing issue?
7  A  The team you're referring to was responsible
8  for processing all the orders within the Boehringer
9  Ingelheim group of companies.
10 Q  Why would processing the orders ever involve
11 a legal or government issue?
12 A  Because there were contracting issues in
13 terms of whether rebates were paid properly,
14 whether pricing was correct, those kind of things.
15 Q  What type of pricing?
16 A  Contract pricing.
17 Q  Why would that involve the government?
18 A  Didn't necessarily involve the government.
19 Q  It says here that, "Multisource is addressed
20 by the PTC team only when administrative, legal,
21 and government issues are involved."
22     Can you think of a government issue that

**103**

1  would require PTC involvement?
2  A  Pricing on a federal schedule maybe.
3  Q  Not AWP pricing?
4  A  No. I don't believe that's what they were
5  talking about.
6  Q  We've been mostly discussing Roxane's
7  multisource products. Just want to turn very
8  quickly to the branded products at Roxane.
9      Who, to your knowledge, had authority on
10 pricing decisions for Roxane's branded products
11 during the 1999 to 2000 time frame?
12     MS. RIVERA: Object to form and foundation.
13 Q  BY MR. FAUCI: Do you know who had approval
14 authority on pricing decisions for Roxane's branded
15 products during the 1999 to 2000 time frame?
16 A  I was not involved with that.
17 Q  So you don't know?
18 A  I -- no. I'd have to speculate. I don't
19 know for sure.
20     MR. FAUCI: I think we're at a good time for
21 a very short break.
22     THE VIDEOGRAPHER: We're off the record at

**104**

1  11:16.
2      (Recess is taken.)
3      THE VIDEOGRAPHER: We're back on the record.
4  It's 11:26.
5  Q  BY MR. FAUCI: Welcome back, Mr. Russillo.
6  Are you familiar with a drug known as lithium
7  carbonate?
8  A  Yes, I am.
9  Q  Is that a Roxane multisource product?
10 A  Yes, it is.
11 Q  Do you recall a decision to raise prices for
12 lithium in or around 1999?
13 A  I remember that we had a situation with
14 lithium where we raised the prices, but I don't
15 remember when it happened.
16 Q  Do you know if the AWP was raised?
17 A  I don't recall.
18 Q  Let's look at Exhibit 13.
19     (Exhibit Russillo 013 is marked.)
20 Q  BY MR. FAUCI: This is a series of e-mails
21 from the March 1999 time frame. Take a moment to
22 familiarize yourself. The subject of, I believe,

**105**

1  all the e-mails is lithium pricing.
2  A  Okay.
3  Q  I'm going to direct your attention to the
4  third and fourth pages of the e-mail -- of the
5  exhibit, I should say. It's an e-mail from Richard
6  Feldman to yourself, dated March 28, 1999.
7      Mr. Feldman writes, "Tom" -- I'm sorry.
8      MS. RIVERA: Yeah.
9  Q  BY MR. FAUCI: It's an e-mail from yourself,
10 Tom Russillo, to Mr. Feldman --
11 A  Yes.
12 Q  -- dated Friday, March 26, 1999.
13 A  Uh-huh.
14 Q  And you write, "Rich, as we've discussed
15 ad nauseam, I'm very concerned with lithium
16 pricing. We are probably the only generic company
17 with an exclusive product that we are selling at a
18 loss."
19     How is lithium an exclusive product?
20 A  We were the only ones on the market with it.
21 Q  But it was still under your supervision --
22 A  Yes.

### 170

1  ripe on furosemide." Do you see that?
2  A  Yes, I do.
3  Q  A few lines down, she says, "Tom is aware of
4  the AWP situation and will support the increase
5  provided we have solid supporting information. The
6  change will be submitted as soon as we receive the
7  necessary information from you."
8       What do you understand her to mean when you
9  say -- when she says that, "Tom will support the
10 increase"?
11 A  I will approve it.
12 Q  So just like champion equaled approved,
13 support equals approved as well?
14 A  **Exactly. She's reiterating the same thing**
15 **she said in the previous e-mail two days ago.**
16 Q  And so by support the increase, she means
17 that you'll approve it?
18 A  Yes.
19 Q  Uh-huh.  Let's look at the e-mail from Bob
20 Sykora on the next page -- the first page.  I'm
21 looking at paragraph 2, third line down.
22      Mr. Sykora writes, "I realize there is

### 171

1  political pressure on AWP currently, but it
2  shouldn't run our business."  Do you see that?
3  A  Yes, I do.
4  Q  Is the political pressure on AWP the fact
5  that government was investigating AWP inflations?
6       MS. RIVERA:  Object to form.  Calls for
7  speculation.
8       THE WITNESS:  Would you repeat that, please?
9       MR. FAUCI:  Let me rephrase that.
10 Q  Do you see that you're copied on
11 Mr. Sykora's e-mail?
12 A  Yes, I do.
13 Q  As you read what he writes, do you
14 understand -- what do you understand him to mean by
15 political pressure on AWP?
16      MS. RIVERA:  Object to form.
17      THE WITNESS:  I think he is referring to the
18 fact that he is aware that there are lawsuits
19 pending on AWPs and there are perceptions that AWPs
20 have been used incorrectly in the industry.
21 Q  BY MR. FAUCI:  He goes on to write, "Logic
22 dictates that no matter what the AWP is, if big

### 172

1  brother wants to punish, they will, so why not make
2  some money meanwhile."
3       Do you see that?
4  A  Yes, I do.
5  Q  What do you understand Mr. Sykora to be
6  referring to when he writes "big brother"?
7       MS. RIVERA:  Object to form and foundation.
8       THE WITNESS:  I don't know for sure.  I can
9  only speculate who he meant.
10 Q  BY MR. FAUCI:  Have you ever heard of the
11 government referred to as big brother?
12 A  Yes.
13 Q  And you know the government was concerned
14 about inflated AWPs?
15 A  Yes.
16 Q  As early as 1999?
17 A  Yes, I do.
18 Q  Can you think of any reason why Boehringer
19 Ingelheim would be upset with Roxane for raising
20 its AWPs on furosemide?
21      MS. RIVERA:  Object to form.
22      THE WITNESS:  What do you mean by Boehringer

### 173

1  Ingelheim?
2  Q  BY MR. FAUCI:  BIC and/or BIPI.
3       MS. RIVERA:  Object to form and foundation.
4       THE WITNESS:  Yeah.  You mean that the
5  company would be upset?
6  Q  BY MR. FAUCI:  Yeah.  The question is can
7  you think of any reason why BIC and/or BIPI would
8  punish Roxane for raising its AWPs?
9       MS. RIVERA:  Object to form and foundation.
10      THE WITNESS:  I don't know whether in this
11 case the AWP was actually raised or not.  All I
12 know is that I would have reviewed it.  If I
13 thought it was justified, I would have approved it.
14      And I believe that the people you're
15 referring to, BIC or BIPI or whomever, would not
16 have had any objection.  I wouldn't have signed off
17 on it if I thought there was going to be a problem.
18 Q  BY MR. FAUCI:  You wouldn't have signed off
19 on it without their approving?
20 A  **I wouldn't have signed off on it if I**
21 **thought it was going to be a problem.**
22      **If I was concerned about it, I would have**

**174**

1 called Werner Gerstenberg and told him what I
2 thought was going on and what I thought should be
3 done. And then he would have either agreed or
4 disagreed.
5    Q  So do you think you consulted with Werner
6 Gerstenberg about the decision as to whether or not
7 to raise AWPs for Roxane?
8    A  Don't recall.
9    Q  For furosemide, I apologize.
10   A  I don't recall.
11   Q  In the top e-mail from Ms. Waterer, the
12 second paragraph down, she writes, "You've
13 indicated that AWP on furosemide is critical now
14 and that we'd have real business opportunities if
15 we could change it. As you've been informed, Tom
16 is prepared to take furosemide up the line."
17      Do you see that?
18   A  Yes.
19   Q  Who would you be taking furosemide up the
20 line to?
21   A  I believe she's referring to that if I
22 needed to, I would take it up the line.

**175**

1    Q  To who?
2    A  Werner Gerstenberg.
3    Q  Anyone else?
4    A  No.
5    Q  Where is Werner Gerstenberg based?
6    A  Connecticut.
7    Q  What was his job function?
8    A  He was the CEO of -- now, let's take it in
9 respect. In this particular case, he would have
10 been acting as the president of Roxane.
11   Q  Was he also the president of other
12 Boehringer Ingelheim companies?
13   A  Yes, he was.
14   Q  Which companies, to your knowledge?
15   A  I believe he was the president of BIC.
16   Q  Which was the parent company based in
17 Connecticut?
18   A  Yes.
19   Q  Can you think of any other Roxane employees
20 that were based in Connecticut?
21   A  Can I think of any?
22   Q  Yeah.

**176**

1    A  There were thousands of Roxane employees --
2 oh, in Connecticut. Sorry.
3    Q  Based in Connecticut.
4    A  Roxane actual employees. Let me think about
5 that. There actually may have been a couple.
6       We had a number of situations where people
7 worked for a subsidiary but were officed other
8 places, so there may have been. I can't think
9 right now of any.
10   Q  Can't think of any off the top of your head?
11   A  Not specifically, no.
12   Q  I'm going to show you Exhibit 26.
13      (Exhibit Russillo 026 is marked.)
14   Q  BY MR. FAUCI:  Take a moment to familiarize
15 yourself with this e-mail, but my questions will
16 just be focusing on the top couple lines.
17   A  Okay.
18   Q  The e-mail I'm going to focus your attention
19 on is from Tom Russillo, dated July 7, to Bob
20 Sykora, Judy Waterer, Richard Feldman.
21      Do you see that in this e-mail you were
22 responding to the e-mail we just discussed in

**177**

1 Exhibit 25, where Mr. Sykora was discussing the AWP
2 increase for furosemide?
3    A  It would appear that's correct. Yes.
4    Q  Can you read your response?
5    A  "Bob, I assure you it's real. To get the
6 approval we need from Connecticut, though, we need
7 some hard info. Don't shoot the messenger. Judy
8 is only doing what I asked her to do. Rich can
9 assure you of the mood in BI."
10   Q  Does "Connecticut" mean Boehringer
11 Ingelheim?
12      MS. RIVERA:  Object to form.
13      THE WITNESS:  It could mean Boehringer
14 Ingelheim. I suspect it does here.
15   Q  BY MR. FAUCI:  What approval would you need
16 from Boehringer Ingelheim?
17      MS. RIVERA:  Object to form.
18      THE WITNESS:  I believe Judy was under the
19 impression that I needed approval, and I may have
20 told her that so that she wouldn't just be
21 bombarding me with requests.
22   Q  BY MR. FAUCI:  Just to be clear, who wrote

178

1  this e-mail I asked you to read?
2     A  I wrote it.
3     Q  Did you need approval from Boehringer
4  Ingelheim to make a decision to raise the AWPs on
5  furosemide?
6        MS. RIVERA: Object to form.
7        THE WITNESS: It would have -- as I've told
8  you before, it would have depended on the
9  situation.
10       I would have evaluated all the data and made
11 the decision. If I needed to go to Connecticut, in
12 this case to Werner Gerstenberg, I would.
13    Q  BY MR. FAUCI: Well, we're talking about
14 this situation, which is a proposed increase on
15 AWPs for furosemide in July 2000.
16    A  Uh-huh.
17    Q  And you write, "To get the approval we need
18 from Connecticut, though, we need some hard info."
19       Did you need approval from Boehringer
20 Ingelheim?
21       MS. RIVERA: Object to form.
22       THE WITNESS: I did not need approval from

179

1  Boehringer Ingelheim in Connecticut, unless I felt
2  there were circumstances that I needed to review
3  with Werner Gerstenberg.
4     Q  BY MR. FAUCI: And do you recall if you felt
5  as if there were circumstances you needed to review
6  that related to the AWP increase for furosemide?
7     A  I don't recall at this point in time,
8  because I didn't have the data yet.
9     Q  You just have no recollection one way or the
10 other?
11    A  No. I'd have to see the next series of
12 e-mails and information that would have passed.
13    Q  So it's possible that depending on what the
14 sales justification looked like, you might have
15 felt the need to go to Boehringer Ingelheim; is
16 that correct?
17    A  It is possible.
18       MS. RIVERA: Object to form.
19    Q  BY MR. FAUCI: And you don't know one way or
20 another whether you did?
21    A  No, I don't.
22    Q  Did you regard the decision to raise AWPs on

180

1  furosemide as sensitive?
2        MS. RIVERA: Object to form.
3        THE WITNESS: I regarded any decision to
4  raise AWPs as needing to be justified.
5     Q  BY MR. FAUCI: You write, "Rich can assure
6  you of the mood in BI." Do you see that?
7     A  Yes.
8     Q  Is "Rich" Richard Feldman?
9     A  I believe that's who I'm referring to. Yes.
10    Q  What do you mean, the mood in BI?
11    A  The mood at Boehringer Ingelheim was the
12 same as mine. It was very sensitive to AWP
13 changes.
14    Q  Because of its awareness of the lawsuits
15 that had been filed?
16    A  Yes.
17    Q  You can put that aside. I'm going to show
18 you an exhibit marked Exhibit 27.
19       (Exhibit Russillo 027 is marked.)
20    Q  BY MR. FAUCI: This is a somewhat lengthy
21 document. Take a moment to review it, and just
22 indicate to me when you're ready for a question.

181

1     A  You want me to read all of this? Are we
2  planning to go through the whole thing, or --
3     Q  Just be familiar with it. I'll direct you
4  where I'm going to ask my questions.
5     A  All right. Then I'm going to have to read
6  all of it. Let's give it a try. Is this for me?
7        MS. RIVERA: Yeah.
8     Q  BY MR. FAUCI: This document appears to be
9  an e-mail sent from Robert Sykora to Judy Waterer,
10 July 25, 2000. Several people are copied,
11 including yourself.
12       Subject is "Furosemide Tablet AWP
13 Adjustment." Ms. Waterer writes, "Per your
14 request, attached is a sales justification for an
15 upward adjustment in the AWPs of furosemide
16 tablets."
17       Do you see that?
18    A  Yes, I do.
19       MS. RIVERA: Jeff, just to clarify, it's
20 from Bob Sykora to Judy Waterer.
21       MR. FAUCI: So Mr. Sykora writes that.
22       MS. RIVERA: Yes.

### Page 190

1  A  I do.
2  Q  Did you have any concern with raising the
3  AWPs for this product to a level more than 14 times
4  higher than the average contract price?
5      MS. RIVERA:  Object to form.
6      THE WITNESS:  No, because it was the same
7  AWP as Mylan.
8  Q  BY MR. FAUCI:  So as long as Mylan's AWP was
9  high, that high, it was okay?
10     MS. RIVERA:  Object to form.
11     THE WITNESS:  "High" is a word -- I don't
12 use the word "high."
13 Q  BY MR. FAUCI:  What if Mylan's AWP was $300?
14     MS. RIVERA:  Jeff, you've got to let him
15 finish his answer.
16 Q  BY MR. FAUCI:  I apologize.  Finish it.
17 A  Okay.  It doesn't matter what the number is.
18 We were trying to be competitive.  If Mylan's AWP
19 is $300, we probably would have raised it to $300
20 to be competitive.
21 Q  Do you think it mattered to Medicaid and
22 Medicare agencies what the AWP was?

### Page 191

1      MS. RIVERA:  Object to form, foundation.
2  Calls for speculation.
3  Q  BY MR. FAUCI:  You're aware that Medicaid
4  and Medicare relied on AWPs in setting their
5  reimbursement.  You've already testified to that;
6  correct?
7  A  I testified that they relied on a discount
8  from AWP for setting their reimbursement.
9  Q  Do you think it mattered to Medicare and
10 Medicaid what the AWPs were?
11     MS. RIVERA:  Object to form and foundation.
12     THE WITNESS:  I suppose it mattered.
13 Q  BY MR. FAUCI:  But it didn't matter to
14 Roxane?
15 A  Well, what mattered most --
16     MS. RIVERA:  Object to form.
17     THE WITNESS:  -- was their discount, not the
18 AWP.
19 Q  BY MR. FAUCI:  Now that we've looked a
20 little bit into the actual decision to raise AWPs
21 and your approval of that decision, does any of
22 this refresh your recollection as to whether or not

### Page 192

1  this is a decision that you would have taken to
2  Werner Gerstenberg?
3  A  Based on the data that I've seen here and
4  the quick review, I would say I probably did not.
5  Q  What was the type of decision you would take
6  to him?
7  A  If we were raising an AWP without adequate
8  justification, meaning I didn't see a competitor's
9  analysis that showed we were just blending in with
10 the rest.
11 Q  So with knowledge the AWP investigations
12 were going on, and with knowledge that this AWP
13 increase raised the AWPs to 14 times the average
14 contract price, that would not have been reason for
15 you to go to Mr. Gerstenberg and say, "Is this
16 okay?"
17 A  I can't answer your question exactly,
18 because this -- as you've seen from the e-mail
19 trails on this and others, there were a number of
20 these going on.
21     Once I had established Werner Gerstenberg's
22 position on this, I would have implemented it.

### Page 193

1  So -- and I don't remember eight years ago how
2  concerned he was.
3      I might have brought it to him.  I don't
4  think I did, because we've had others before that.
5  I knew where he stood.
6  Q  Would you have done this without feeling
7  comfortable that Mr. Gerstenberg was okay with it?
8  A  I can't tell you at the time.  I don't know
9  whether I went to him or not.
10 Q  You said you knew where he stood.  What do
11 you mean by that?
12 A  I knew that his position was if we were
13 meeting competitors, to stay competitive and that's
14 why we were raising the AWP, we would not be
15 perceived as taking advantage of the AWP.
16 Q  Where did you get that understanding of
17 Mr. Gerstenberg's position from?
18 A  Over many conversations with him.
19 Q  Did you have those -- was anybody else
20 involved in those conversations?
21 A  There may have been.  I don't -- I don't
22 recall the specific conversations.

258

1   Q   Experience with whom?
2   A   **With people. Experience with customers.**
3   **Experience with the trade relations people.**
4   **Experience with pharmacists.**
5   Q   What about experience with any government
6   personnel?
7   A   **I did not have personal experience with**
8   **government personnel.**
9   Q   So you don't know of any communications with
10  government personnel at all; do you?
11       MS. RIVERA: Object to form.
12       THE WITNESS: I don't know of any
13  communication with government personnel over
14  pricing?
15  Q   BY MR. ANDERSON: Yes, sir.
16  A   **If you're asking me if I ever told the**
17  **government they were paying too much, no.**
18  Q   Are you aware of anybody on Roxane's behalf
19  ever telling the government they were paying too
20  much?
21  A   **I'm not aware of anybody. No.**
22  Q   So other than interactions with pharmacies

259

1   who want big spreads, do you have any information
2   about the government being aware of the magnitude
3   of AWP spreads?
4        MS. RIVERA: Object to form.
5        THE WITNESS: I believe that the people who
6   were responsible for the Medicare system knew that
7   AWP was not the list price that people were paying.
8   Q   BY MR. ANDERSON: And I understand that
9   you're testifying to that, sir. I want to
10  understand the basis for that testimony.
11  A   **I have no proof.**
12  Q   Okay, all right. Did you consult with any
13  lawyers with respect to the legality of Roxane's
14  AWP practices?
15  A   **As a result of the lawsuits, our practices**
16  **were reviewed by lawyers who did investigations.**
17  Q   Lawyers for which company?
18  A   **Lawyers acting on behalf of Boehringer**
19  **Ingelheim.**
20  Q   And without disclosing any of the content of
21  your communications with those lawyers, did you
22  learn of any changes in the way AWPs for Roxane

260

1   products were set?
2   A   **No, I did not.**
3   Q   So as far as you know, despite the existence
4   of lawsuits and government investigations and
5   congressional investigations, the way in which
6   Roxane sets AWPs has remained the same?
7        MS. RIVERA: Object to form.
8        Go ahead.
9        THE WITNESS: As far as I know, it hasn't
10  changed.
11  Q   BY MR. ANDERSON: Would you say that there
12  was synergy or an economies of scale for Roxane,
13  Ben Venue, Bedford, BIPI, and BIC to operate as one
14  company?
15       MS. RIVERA: Object to form.
16       THE WITNESS: I think the intent of merging
17  the multisource businesses was that there were
18  synergies. I don't believe there were that many.
19  Q   BY MR. ANDERSON: And the purpose in
20  transitioning the different companies to operate as
21  one was to save money; right?
22       MS. RIVERA: Object to form. Misstates

261

1   testimony.
2        THE WITNESS: No. That was not the purpose.
3   Q   BY MR. ANDERSON: It was to align the
4   different units along multisource or brand focuses
5   to help save money and limit the number of
6   employees; correct?
7   A   It was --
8        MS. RIVERA: Object to form. Assumes facts
9   not in evidence.
10       THE WITNESS: It was one of the potential
11  effects, but it was not the main driving reason.
12  Q   BY MR. ANDERSON: And ultimately, some
13  Roxane personnel were given severance packages and
14  let go; correct?
15       MS. RIVERA: Object to form.
16       THE WITNESS: You're talking about Roxane
17  multisource people?
18  Q   BY MR. ANDERSON: I'm talking about Roxane
19  employees.
20       MS. RIVERA: Object to form. Can you
21  clarify when you're talking about, what you're
22  talking about? It's all very vague.