# TAB 109

Sykora, Robert C.                            December 4, 2008
Atlanta, GA

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL   ) MDL No. 1456
INDUSTRY AVERAGE WHOLESALE ) Civil Action No.
PRICE LITIGATION         ) 01-12257-PBS
_____)
THIS DOCUMENT RELATES TO:  )
United States of America,  )
et al. v. Ven-a-Care of the)
Florida Keys, Inc. v.      )
Boehringer Ingelheim Corp.,)
et al., CIVIL ACTION NO.   )
07-10248-PBS               )
                            - - -

      Videotaped deposition of ROBERT C. SYKORA, taken pursuant to the stipulations agreed to herein, before Suzanne Beasley, Registered Professional Reporter and Notary Public, at 1031 Virginia Avenue, Atlanta, Georgia, on the 4th day of December, 2008, commencing at the hour of 10:38 a.m.

Henderson Legal Services, Inc.
202-220-4158                                     www.hendersonlegalservices.com

Sykora, Robert C.                                December 4, 2008
Atlanta, GA

13 (Pages 46 to 49)

Page 46

1  managers and try to help them resolve any issues
2  they may have that were hindering them.
3      Q. Was it important in your job as
4  director of national accounts to monitor the
5  marketplace that your national account managers
6  were dealing with?
7      A. Yes.
8      Q. And that marketplace was, as a general
9  matter, large corporate buyers such as buyers at
10 the national wholesalers and, for instance, chain
11 drugstores, correct?
12     A. Correct.
13     Q. Do you feel like you did a good job?
14     A. I got a raise.
15     Q. Did you from time to time go on sales
16 calls with your national account managers where
17 you would visit drug purchasers?
18     A. Occasionally, yes.
19     Q. Including chain drugstores?
20     A. Correct.
21     Q. Including group purchasing
22 organizations representing independent

Page 47

1  pharmacies?
2      A. In most cases, no.
3      Q. But from time to time, you did?
4      A. Not that I can recall.
5      Q. All right. You're leaving open the
6  possibility that you did, but you just don't
7  remember it?
8      A. That's correct.
9      Q. And you also, I'm sure, participated in
10 sales calls to wholesalers, correct?
11     A. That is correct.
12     Q. Because after all, that was your
13 background?
14     A. Correct.
15     Q. During your tenure as director of
16 national accounts, did you come to learn that
17 Roxane's customers were interested in
18 reimbursement issues?
19     A. Yes.
20     Q. How did you come to that understanding?
21     A. Typically complaints about how low the
22 Roxane AWPs were.

Page 48

1      Q. And what, if anything, did Roxane and
2  Boehringer Ingelheim do to rectify those
3  complaints?
4          MR. KAVANAUGH: Objection to form.
5          THE WITNESS: Boehringer Ingelheim
6  didn't do anything.
7          Roxane operated as an independent unit
8  within the Boehringer Ingelheim family of
9  companies, so any decisions that we made, they
10 were Roxane decisions, they weren't Boehringer
11 decisions, and then we would evaluate the
12 customer's, you know, complaint, and if
13 appropriate, take action on it.
14 BY MR. ANDERSON:
15     Q. During your tenure as director of
16 national accounts, were you -- did you feel like
17 all of your actions were authorized?
18     A. Can you --
19         MR. KAVANAUGH: Objection to form.
20         THE WITNESS: Can you define
21 "authorized"?
22 BY MR. ANDERSON:

Page 49

1      Q. Well, I'll come at it from a slightly
2  different angle.
3          Were you ever disciplined for taking
4  any unauthorized action when you were director of
5  national accounts?
6      A. Not that I'm aware of.
7      Q. Do you believe that all of the actions
8  that you performed as director of national
9  accounts were within the course and scope of your
10 employment for Boehringer Ingelheim?
11     A. Within the scope of Roxane
12 Laboratories, yes.
13     Q. Why do you say Roxane Laboratories?
14     A. Because during this particular time
15 period I had very little interaction with
16 Boehringer Ingelheim. There was a kind of an
17 indirect reporting relationship between Roxane
18 and Boehringer, but we ran as a completely
19 standalone company.
20     Q. Well, you agreed just a few minutes
21 ago, didn't you, sir, that you were employed by
22 Boehringer Ingelheim when you were the director

**50**

1  of national accounts, correct?
2     A. My paycheck said Boehringer Ingelheim,
3  but all of the interactions were with Roxane.
4     Q. All right. Who did you believe was
5  your employer?
6     A. Roxane.
7        MR. KAVANAUGH: Objection to form.
8        Go ahead. You can answer.
9        THE WITNESS: Roxane Laboratories.
10 BY MR. ANDERSON:
11    Q. What gave you that impression?
12    A. I was on the Roxane campus. The
13 building on -- the sign on the front of the
14 building where I worked said "Roxane Sales and
15 Marketing." I reported in to Rich Feldman, who
16 was a Roxane employee. He reported in to Ed
17 Tupa, who was a Roxane employee. When a decision
18 was made, it was Roxane employees that were
19 making the decision.
20    Q. Well, we'll get into some documents
21 later, but you recall that you sold BI products,
22 didn't you?

**51**

1     A. There were times where we helped on the
2  launch of the brand BI products, correct.
3     Q. And you were overseeing a sales force
4  that was actively promoting BI products, correct?
5     A. Not actively promoting. Could you
6  define "promoting"?
7     Q. All right. I understand your
8  distinction. I'll rephrase.
9        You managed a sales force that was
10 selling BI, Boehringer Ingelheim, products,
11 correct?
12    A. We weren't selling. We would go out
13 and discuss with the wholesalers at new product
14 launches the products and provide them
15 information so they could make purchase orders.
16    Q. In other words, try to elicit
17 purchases?
18    A. Correct, by the wholesalers.
19    Q. Why were you doing that for Boehringer
20 Ingelheim if you felt like you worked for Roxane?
21    A. Efficiency. Rather -- you know,
22 Boehringer Ingelheim's a brand company only.

**52**

1  Rather than have a national accounts group that
2  they may only need two or three times a year
3  during a new product launch, it made sense to
4  utilize a subsidiary's existing national accounts
5  department during those times when they needed
6  it.
7     Q. Is that why you were hired by
8  Boehringer Ingelheim?
9        MR. KAVANAUGH: Objection.
10 BY MR. ANDERSON:
11    Q. And paid by Boehringer Ingelheim?
12       MR. KAVANAUGH: Objection to form.
13       THE WITNESS: I was hired to go out and
14 talk about the Roxane Laboratories products.
15 BY MR. ANDERSON:
16    Q. But doesn't it stand to reason that one
17 of the reasons why you were hired by Boehringer
18 Ingelheim and paid by Boehringer Ingelheim when
19 you were director of national accounts is because
20 you were performing some duties for Boehringer
21 Ingelheim?
22    A. That I do not know.

**53**

1     Q. All right. Do you agree that there
2  were individuals who were involved in decisions
3  on the pricing of Roxane drugs that didn't work
4  for Roxane?
5        MR. KAVANAUGH: Objection to form.
6        THE WITNESS: Not at least in the first
7  two years that I was there.
8  BY MR. ANDERSON:
9     Q. But later, for instance, after 1999 or
10 during 1999, some other individuals that weren't
11 employed by Roxane got involved in Roxane pricing
12 matters, correct?
13    A. I don't know.
14    Q. Well, you know Tom Russillo, don't you?
15    A. I do know Tom Russillo.
16    Q. And you know Tom was involved in some
17 pricing decisions on Roxane drugs, correct?
18    A. Correct.
19    Q. In fact, he was one of the top
20 executives making those discussions, correct?
21    A. Yes.
22    Q. But he wasn't working for Roxane, was

**134**

1    A.  That is correct.
2    Q.  And you are -- the meeting's noted to
3  take place Monday, September 18th, through
4  Thursday, September 21st, correct?
5    A.  Yes.
6    Q.  And you are noted as being a person
7  who's going to make some presentations, correct?
8    A.  That's correct.
9    Q.  For instance, you're shown on the
10 second page as presenting a presentation on
11 distribution to all attendees, correct?
12   A.  That's correct.
13   Q.  And then on the second page -- I mean,
14 pardon me, third page of the Exhibit 012, you're
15 shown also as presenting a distribution workshop
16 to two different groups of people attending the
17 sales meeting?
18   A.  That's correct.
19   Q.  Then if you look at the back of this
20 document, the second to last page, Mr. Sykora,
21 you see a group A and a group B listing of
22 individuals?

**135**

1    A.  I do.
2    Q.  Is that the listing of sales
3  representatives that you presented these two
4  presentations to?
5    A.  To tell you the truth, I don't
6  remember, but that's probably a pretty good
7  guess.
8    Q.  It stands to reason, given that they're
9  identified as group A and B, and then over here
10 where you're shown as presenting the workshop on
11 distribution, there's two groups listed, A and B,
12 correct?
13   A.  Correct.
14   Q.  And I've been to the Biltmore.  That's
15 a pretty nice place, isn't it?
16   A.  You know, I don't remember it too much,
17 but --
18   Q.  You don't remember going to the
19 Biltmore?
20   A.  No, but we have a Biltmore in North
21 Carolina just not too far and it's pretty nice up
22 there.

**136**

1    Q.  Yeah.
2    A.  So I'm guessing this is pretty nice
3  too.
4    Q.  Did y'all play golf and stuff like
5  that?
6    A.  To tell you the truth, I don't
7  remember.
8         (Exhibit Sykora 013 was marked for
9  identification.)
10 BY MR. HENDERSON:
11   Q.  Let's take a look, if we could, at
12 Exhibit 13.
13   A.  Okay.
14   Q.  After reviewing Exhibit 13, Mr. Sykora,
15 do you agree this appears to be an e-mail with
16 one of your PowerPoints attached?
17   A.  It is a PowerPoint that I believe that
18 I did present, yes.
19   Q.  And it's actually, this Exhibit 13
20 appears to be a couple of tabs out of a notebook.
21 Do you agree?  Like look at the first page.  Do
22 you see that tab five on the very first page of

**137**

1  the exhibit?
2    A.  Okay.
3    Q.  And then looking toward the middle of
4  the page, I mean the exhibit, do you see a page
5  titled tab six?
6    A.  Yes.
7    Q.  Do you know Doug Bierl?
8    A.  The name doesn't ring a bell.
9    Q.  Do you have any idea why Doug Bierl
10 would be forwarding to a guy named Eric your
11 slide show?
12   A.  I do not.
13   Q.  Do you know a company known as
14 D-e-l-o-r?
15   A.  I do not.
16   Q.  Do you have any idea what
17 eric@delor.com references?
18   A.  I do not.  I know there was a company
19 called Adair-Greene that put the presentation
20 together.  I don't know if Adair-Greene is a
21 division of Delor.  I'm not familiar with Delor.
22   Q.  So you wrote the slides, and then tell

**138**

1  me how this worked with this other company,
2  Adair-Greene.
3      MR. KAVANAUGH: Objection to form.
4      THE WITNESS: Adair-Greene actually put
5  the slides together. I presented them.
6  BY MR. ANDERSON:
7      Q. All right. What role, if any, did
8  Adair-Greene perform for Roxane?
9      A. They were an advertising agency, so
10 since this was a plan of action meeting, sales
11 meeting, and I believe they might have been the
12 advertising agency for Roxicodone, IR, SR,
13 whatever this particular product is, they would
14 be responsible for all collateral material for
15 the sales meeting.
16     Q. So for instance, there's two PowerPoint
17 presentations that are attributable to you in
18 Exhibit 13, correct?
19     A. There were two that I presented, yes.
20     Q. Okay. In addition to presenting these
21 two PowerPoints, were you responsible for the
22 content of the PowerPoints?

**139**

1      A. I probably assisted in putting together
2  the content, yes.
3      Q. Did you literally work with a
4  representative of the ad agency in communicating
5  what the substance of the slides should be?
6      A. That I can't remember.
7      Q. You recall generally that you were
8  involved, but you just don't recall exactly how
9  you were involved?
10     A. Yeah. I mean it might have been -- I
11 doubt if it was me by myself. It was probably a
12 group of people who worked with the ad agency to
13 put this together.
14     Q. A group of Roxane personnel?
15     A. Correct.
16     Q. All right. So looking at the third
17 page of Exhibit 13, which appears to be the first
18 page of your slides, do you agree that looks like
19 the slides for your distribution overview?
20     A. Appear to be, yes.
21     Q. And these slides would be the slides
22 that comprised the presentation you made to the

**140**

1  entire sales group as reflected in the itinerary?
2      A. Appears to be, yes.
3      Q. And then looking toward the middle of
4  Exhibit 13 where we get to tab six, specifically
5  the page Bates labeled RLI-TX 63208, those --
6  that appears to be the beginning of the slides of
7  the presentation you made in the distribution
8  workshops to each of the two sales groups?
9      A. Looks like it would be, yes.
10     Q. Okay. And do you have -- strike that.
11     Has your memory been refreshed now
12 after reviewing these slides that you did in fact
13 make these presentations?
14     A. I believe I did make these
15 presentations, yes.
16     Q. Looking at the first presentation,
17 which is the distribution overview, directing
18 your attention to page two of the distribution
19 overview, which is Bates labeled RLI-TX 63202, up
20 in the upper right-hand corner you've got a slide
21 there titled "Retail Overview," correct?
22     A. Correct.

**141**

1      Q. And then it reads, "Percent of
2  third-party insurance scripts 80 percent, hot
3  button is reimbursement." Did I read that
4  correctly?
5      A. You did.
6      Q. Is that an accurate statement?
7      A. Yeah. At that time, 80 percent of
8  prescriptions in the United States were
9  reimbursed by third parties.
10     Q. Would you include Medicaid within that
11 percentage of third-party reimbursement?
12     A. I would not.
13     Q. How much was Medicaid?
14        MR. KAVANAUGH: Objection to form.
15        THE WITNESS: Some portion of the other
16 20 percent. Some of it's going to be cash pay,
17 some of it's going to be Medicaid out of that 20
18 percent that's remaining.
19 BY MR. ANDERSON:
20     Q. Do you -- strike that.
21        Looking at the next page, you see a
22 second down from the upper left-hand corner a

**170**

1   Q. Do you know any -- do you have any
2   information about how MACs are set?
3   A. I do not.
4   Q. Do you have any information about how
5   another ceiling price known as the federal upper
6   limit is set?
7   A. I do not.
8       THE VIDEOGRAPHER: 2:35. We're off the
9   record. This is the end of tape number three.
10      (A recess was taken.)
11      THE VIDEOGRAPHER: 2:50. We're back on
12  the record. This is the beginning of tape number
13  four.
14      (Exhibit Sykora 014 was marked for
15  identification.)
16  BY MR. ANDERSON:
17  Q. Mr. Sykora, take a look at Exhibit 014.
18  Don't necessarily set 13 aside, because I think
19  14 is just a larger version of the second
20  PowerPoint presentation that's set forth in 13,
21  but I need you to confirm that.
22      Do you agree, Mr. Sykora, that Exhibit

**171**

1   -- what's been marked as Exhibit, Exhibit 014,
2   also marked as Shaffer Exhibit 29, appears to be
3   the same PowerPoint slides that are shown in the
4   second half of Exhibit 13?
5   A. They appear to be, yes.
6   Q. The -- and again, this was a
7   presentation you made at the palliative care
8   national sales meeting in the year 2000?
9   A. It appears to be, yes.
10  Q. And we've already gone through some of
11  these slides, and so I won't bother with going
12  through them again since they're the same, but I
13  did want to focus your attention on the
14  Roxicodone reimbursement model slide, and
15  unfortunately I don't have a page number to give
16  you, but it's --
17  A. I think I accidently found it.
18  Q. Yeah, perfect. You're on it. Okay.
19  So now in Exhibit 014 you're at the Roxicodone
20  reimbursement model page, and if I'm
21  understanding this slide correctly, Roxicodone is
22  listed as the brand and Oxycodone is listed as

**172**

1   the generic, correct?
2   A. Yes.
3   Q. And then there's some calculations of
4   the relative profit between the two drugs,
5   correct?
6   A. Correct.
7   Q. And there's actually some spread
8   calculations in the middle of the page, and the
9   Roxicodone product of Roxane's is shown to have a
10  spread advantage?
11  A. Appears to be, yes.
12  Q. Can you explain why the Roxane product
13  had a spread advantage over the generic?
14  A. It would appear to be the biggest
15  difference is the Roxicodone 15 and 30-milligram
16  are being reimbursed at AWP minus 12 percent,
17  which is a brand type reimbursement.
18  Q. Uh-huh.
19  A. Whereas the Oxycodone is being
20  reimbursed, or at least this model shows it being
21  reimbursed at AWP less 30 percent, which tends to
22  be a generic type reimbursement.

**173**

1   Q. And do you agree also that the AWPs on
2   the Roxane product are shown to be higher than
3   the AWPs of the Oxycodone product?
4   A. They are. Though I mean, truthfully
5   they're not that far off.
6   Q. Yeah. Like the 15 milligram Roxicodone
7   is $110, while the Oxycodone is $93.12?
8   A. Yes.
9   Q. And then the 30 milligram is, the AWP
10  on the Roxane Roxicodone is $212 and the AWP on
11  the Oxycodone is $186.24, correct?
12  A. Correct.
13  Q. What would you say was the general
14  thrust of the Roxane sales technique on
15  Roxicodone and the reimbursement of Roxicodone
16  over OxyContin -- I mean Oxycodone?
17  A. I'm not sure I understand your
18  question.
19  Q. Can you summarize what the thrust of
20  the presentation was?
21  A. Yeah. This was to educate the sales
22  force that they shouldn't go out there and be

174

1  concerned that the pharmacy would want to
2  generically substitute the Oxycodone for the
3  Roxicodone product.
4      Q.  Because, unlike most situations where a
5  generic is more profitable for a pharmacy to
6  dispense than the brand, this was a situation
7  where the Roxicodone brand was actually more
8  profitable than the generic?
9      A.  That would be correct.
10     Q.  And that was not a normal situation,
11 and the pharmacies needed to be educated on that?
12         MR. KAVANAUGH:  Objection to form.
13         THE WITNESS:  We didn't actually
14 educate the pharmacies on it.  Physician sales
15 representatives call on the physicians.  They may
16 occasionally go into a pharmacy, determine
17 whether the product is stocked on the shelf or
18 not, but they have not enough knowledge or
19 expertise in reimbursement to present something
20 as complicated as what I'm seeing here to a
21 pharmacy and talk about reimbursement.  So it was
22 really to allay their fear.

175

1          If I recall correctly, originally there
2  was a Roxicodone, I think it was a 5-milligram,
3  and Roxane tried to sell that as a brand.  What
4  was happening though, when the prescription got
5  to the pharmacy, it was being converted to a
6  generic because it was more profitable for the
7  pharmacy to dispense the generic.
8          So the sales force, the physicians
9  sales force would always complain that they had
10 an unfair -- a disadvantage in the field because
11 they'd generate all these prescriptions for
12 Roxicodone 5 milligrams and it would end up
13 getting substituted, so they were doing a lot of
14 work and getting no reward, because salespeople
15 get reimbursed, get bonused on the number of
16 prescriptions written by a physician for the
17 product they're detailing.
18         So you can imagine if you go in and you
19 work really hard eight hours a day, five days a
20 week, and every one of those prescriptions you
21 generate from your physicians is being converted
22 to a generic and, you know, you're the last

176

1  ranked of all the salespeople because of that
2  substitution and you're not making any bonus
3  money, you'd be kind of mad.
4          Well, this was an example to show them
5  that in this particular case, you know, there is
6  no incentive for the pharmacy to go ahead and
7  generically substitute, so the prescriptions that
8  got generated by the physicians were going to be
9  actually filled.
10 BY MR. ANDERSON:
11     Q.  And if physicians received calls from
12 pharmacies seeking to switch the script from
13 dispensed as written or brand necessary, the
14 physician could presumably be prepared, based on
15 their conversations with the Roxane sales force,
16 to explain to the pharmacy that a switch to the
17 generic was unnecessary?
18         MR. KAVANAUGH:  Objection to form.
19         THE WITNESS:  Only if the physician
20 believed that the clinical benefits of the 15 and
21 the 30 milligram outweighed the clinical benefits
22 of the generic.

177

1  BY MR. ANDERSON:
2      Q.  Okay.  And the two products are
3  clinically therapeutically equivalent, correct?
4          MR. KAVANAUGH:  Objection.  Which two
5  products?
6  BY MR. ANDERSON:
7      Q.  The Oxycodone and Roxicodone.
8          MR. KAVANAUGH:  Objection to form.
9  Vague.
10         THE WITNESS:  I believe the 15
11 milligrams would be the equivalent to three times
12 5 milligrams of the Oxycodone, and that the 30
13 milligrams would be equivalent to six times 5.
14         Now, as a patient, if you ask me
15 whether I want to take six tablets a day or one
16 tablet a day, I can tell you my answer would be
17 one.  Most pain medications are not taken once a
18 day, they're taken every three to four hours, and
19 so now you're starting to talk about six tablets
20 taken six times a day.  That's 36 tablets.  I
21 personally wouldn't want to take 36 tablets a
22 day.

**178**

1   So I think there was some compliance
2   benefits to the patient on the 15 and the 30
3   milligrams.
4   BY MR. ANDERSON:
5       Q.  Uh-huh.
6       A.  Probably no perhaps clinical benefits
7   other than better compliance.
8       Q.  I got you.  And the compliance being
9   the patients would be more inclined to take the
10  fewer number of tablets?
11      A.  Correct.  It's more convenient.
12      Q.  Right.  But before Roxane took these
13  steps with respect to the AWPs and reimbursement
14  on the 15 milligram and the 30 milligram, they
15  were facing a problem because pharmacies were
16  dispensing the 5 milligram Oxycodone?
17          MR. KAVANAUGH:  Objection to form.
18  Misstates the record.
19          THE WITNESS:  That's correct.
20  BY MR. ANDERSON:
21      Q.  I think along those lines, if you
22  could, Mr. Sykora, flip to the fourth to last

**179**

1   page of the slide slow in Exhibit 014.  It's
2   titled "What have we learned?"
3       A.  Uh-huh.
4       Q.  And in this slide are you basically
5   describing the relative profitability of the
6   Roxicodone compared to the Oxycodone?
7       A.  It would appear to be, yes.
8       Q.  And that second to last bullet reads,
9   "No incentive for pharmacists to substitute
10  generics," correct?
11      A.  That is correct.
12      Q.  And that's what you were driving at
13  just a moment ago, which is the field sales force
14  of Roxane's palliative care unit could go out and
15  promote physicians writing prescriptions from
16  Roxicodone and not worry about pharmacies
17  switching to Oxycodone because Roxane had set up
18  the reimbursement on Roxicodone to be relatively
19  high for a brand?
20          MR. KAVANAUGH:  Objection to form.
21          THE WITNESS:  Or at least comparable
22  enough to the generic that there wasn't a desire

**180**

1   for the pharmacist to change to the generic.
2   BY MR. ANDERSON:
3       Q.  And Roxane took these steps to increase
4   the reimbursement on Roxicodone consciously,
5   correct?
6           MR. KAVANAUGH:  Objection to form.
7           THE WITNESS:  I personally didn't set
8   the AWP.  I gave the presentation that showed
9   that there was at least comparable profitability
10  for the pharmacy.
11  BY MR. ANDERSON:
12      Q.  And that effort to create comparable
13  profitability was a formalized business objective
14  of Roxane's?
15          MR. KAVANAUGH:  Objection to form.
16          THE WITNESS:  I don't know if it was a
17  formalized.  It was a desire for -- it was desire
18  to give the salespeople confidence that if they
19  worked hard, they would end up showing a
20  prescription generated by their physicians for
21  their efforts.
22  BY MR. ANDERSON:

**181**

1       Q.  My point really being, Mr. Sykora, is
2   that these AWPs on these Roxicodones were set
3   higher than your typical brand AWP would be set
4   in relation to the market pricing?
5           MR. KAVANAUGH:  Objection to form.
6   BY MR. ANDERSON:
7       Q.  Is that correct?
8       A.  I need to go find that.
9       Q.  Sure.  When you get there, tell me what
10  slide you're looking at and I'll be with you.
11      A.  Okay.  Yeah.  It would appear that the
12  difference between the WAC and the AWP is larger
13  than what you normally find on a brand.  However,
14  Roxane didn't determine whether a product was a
15  brand or not.  They would submit their AWP and
16  WAC to First DataBank and Medi-Span, and they
17  would designate whether something was a brand or
18  a generic based upon that difference.
19      Q.  You're looking at the Roxicodone
20  reimbursement model spreadsheet?
21      A.  I am.
22      Q.  And you're referencing the fact that