# Exhibit 2

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories,*
*Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Kramer, Sandra                                    March 25, 2008

Page 1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS


        IN RE:  PHARMACEUTICAL INDUSTRY        MDL NO. 1456

        AVERAGE WHOLESALE PRICE LITIGATION     Civil Action:

                                               01-CV-12257-PBS

        THIS DOCUMENT RELATES TO U.S.          Judge Patti B. Saris

        Ex rel. Ven-A-Care of the Florida      Magistrate Judge

        Keys, No. 06-CV-11337-PBS             Marianne B. Blower

                                     /




            The Videotaped Deposition of SANDRA KRAMER,

            Taken at 2860 Eyde Parkway,

            East Lansing, Michigan,

            Commencing at 9:08 a.m.,

            Tuesday, March 25, 2008,

            Before Cynthia A. Chyla, CSR 0092.

Kramer, Sandra                                    March 25, 2008

Page 2

1    APPEARANCES:

2

3    GEORGE B. HENDERSON, ESQ.

4    Assistant United States Attorney

5    U.S. Department of Justice, U.S. Attorney's Office

6    United States Courthouse

7    1 Courthouse Way, Suite 9200

8    Boston, Massachusetts 02210

9    (617) 748-3272

10        Appearing on behalf of the United States

11        of America.

12

13   LOUIS P. GABEL, ESQ.

14   Jones Day

15   51 Louisiana Avenue, N.W.

16   Washington, D.C. 20001-2113

17   (202) 879-3939

18        Appearing on behalf of Abbott Laboratories.

19

20

21

22

Henderson Legal Services, Inc.

Kramer, Sandra                                         March 25, 2008

1    AWP had to be discounted?

2         A.    Yes.

3         Q.    What was the basis of your belief that AWP

4    had to be discounted to estimate the acquisition cost

5    to providers?

6         A.    It was my understanding that pharmacies did

7    not pay AWP for their drugs.

8         Q.    And if you look at your Affidavit, in

9    particular Paragraph 8, it starts:  "During

10   implementation of the new policy in 1995, I performed

11   simulation studies on Medicaid expenditures to assure

12   that the new policy would remain budget neutral."

13                Could you describe for me what the

14   simulation studies entailed?

15        A.    Previous to implementation of the EAC policy

16   the State of Michigan paid, or reimbursement technique

17   I think would be a better way of explaining it, was

18   based on actual acquisition cost, and when we were

19   mandated to implement EAC, we were mandated to do it in

20   a budget neutral fashion so that additional

21   expenditures would not occur.  And, so, the simulation

22   studies that I performed were based on claims that were

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

                                                        Page 80

1   paid under the actual acquisition costs -- can I -- is

2   it --

3        Q.    Sure.

4        A.    -- fair to say AAC?

5        Q.    We'll use AAC for actual acquisition costs;

6   EAC for estimated acquisition costs.

7        A.    And, so, I took claims that were paid under

8   the AAC policy and, you know, came up with percentages

9   that represented the average discount off of AWP.

10       Q.    Okay.  And you personally did those studies;

11  is that right?

12       A.    I was innately involved in doing those

13  studies.  A programmer helped me.

14       Q.    Who was the programmer who helped you?

15       A.    I just remember Andy.

16       Q.    Okay.  Now, you mentioned that when there

17  was the switch from AAC to an EAC payment methodology,

18  that it was to remain budget neutral.

19               Now, tell me if I'm right on what

20  budget neutral means.  Am I correct that budget neutral

21  means that the amount you were paying for prescription

22  drugs on the AAC system would have to remain the same

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 86

1    AWPs were inflated over a pharmacy's purchase cost well

2    before 2001?

3                         MR. HENDERSON:   Objection to the

4    form.

5                         MR. MATUS:   Well is a vague term.

6         A.    Yeah, I don't understand your well.

7    BY MR. GABEL:

8         Q.    You understood it before 2001; right?

9         A.    My understanding was that for brand name

10   drugs, AWP minus 13 1/2 for, you know, stores that had

11   one to four, and four -- I'm sorry, I'm forgetting the

12   policy, it's been so long.   But if I had the bulletin

13   in front of me.   What was issued in the bulletin would

14   be reflective of the pharmacy's cost.

15        Q.    Okay.   We'll look at the bulletin in a

16   second, but I just want to finish up this document.

17                         And you -- with respect to generics,

18   not brands?

19        A.    Oh, in respect to generics, because of --

20   can you rephrase your question again?

21        Q.    Sure.   With respect to generics, you knew

22   before 2001 that AWPs for generics were inflated over

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Kramer, Sandra                                    March 25, 2008

Page 87

1    what the purchasers were actually paying for the drugs?

2         A.    What I knew is that our maximum allowable

3    cost drug prices which I felt were representative of

4    the purchasing costs were definitely lower than the

5    AWPs reported by manufacturers.

6         Q.    And the MACs were for generic drugs; right?

7         A.    In the main.

8         Q.    I'm sorry?

9         A.    In the main.

10        Q.    What do you mean by that?

11        A.    Predominantly.

12        Q.    Okay.  Were there other drugs besides

13   generics included on the MAC list?

14        A.    Yes.

15        Q.    So were some brand names on the MAC list?

16        A.    Yes.

17        Q.    What -- well, who determined which drugs

18   made it onto the MAC list?

19        A.    They were based on which drugs were the

20   highest volume and highest cost.

21        Q.    So regardless --

22        A.    It depends on the time period, you know,

Kramer, Sandra                                    March 25, 2008

Page 208

1      A.    I'm sort of confused.  I recognize those

2  also by another name, like Medicaid AWPs.

3      Q.    Okay.

4      A.    That were available from First DataBank.

5      Q.    Now, the Medicaid AWPs which I'll refer to

6  as DOJ AWPs -- is that fair --

7      A.    Yes, um-hmm.

8      Q.    -- to use those terms interchangeably?

9              Did you have any involvement in

10 Michigan Medicaid's decision to either adopt those AWPs

11 or not adopt those AWPs?

12     A.    Before I left the department, I did initial

13 research and I believe I wrote up one memo on the issue

14 that I can at least remember from seeing from my files.

15     Q.    Okay.  What was the subject matter of the

16 memo you wrote, to the best you can recall?

17     A.    I would have to look at it again.  I'm

18 sorry.

19     Q.    Did you make a recommendation on whether the

20 DOJ AWPs should be used?

21     A.    I was hesitant about whether they should be

22 used.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Kramer, Sandra                                    March 25, 2008

Page 209

1        Q.    And why were you hesitant?

2        A.    I was unclear about the maintenance process

3    for the prices.

4        Q.    What do you mean by the maintenance process?

5        A.    How they would be updated.

6        Q.    If you look at the second page of Abbott

7    Exhibit 670, I guess the second, third -- the second

8    and third page, is that your handwriting?

9        A.    No.

10        Q.    Do you know whose handwriting that is?

11        A.    I'm uncertain.

12        Q.    Okay.  Did you do any comparisons of how the

13    DOJ's AWPs compared to Michigan's MACs?

14        A.    I remember doing so, yes.

15        Q.    Do you recall what the results of that

16    analysis were?

17        A.    Not in detail, no.

18        Q.    Do you have a general recollection of how

19    the DOJ AWP stacked up against the Michigan MAC prices?

20        A.    I think our prices were competitive, but,

21    again, it's been a long time.

22        (EXHIBIT ABBOTT 671

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                March 25, 2008

Page 255

1              With regard to Abbott Exhibit 652,

2    which is a copy of the transcript of your earlier

3    testimony and in 2001 --

4         A.    Yes.

5         Q.    -- when was the last time you read this

6    transcript, if ever?

7         A.    I believe shortly after it was written, so

8    ....

9         Q.    Sometime in 2001?

10        A.    Yes.

11        Q.    So six and a half years ago or so?

12        A.    Yes.

13        Q.    Okay.  Is it possible that if you read it

14   today there could be some error that you're not aware

15   of today?

16        A.    Yes.

17        Q.    Is it possible that there could be some

18   statement that if you were to review it today you would

19   phrase it differently?

20        A.    Yes.

21        Q.    Just to be clear with regard to the

22   methodology, the reimbursement methodology in effect

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 256

1    before September 1st, 1995, and let us say generally

2    for the time period 1991 up through September 1st,

3    1995, the pharmacy -- am I correct in understanding

4    that the pharmacy was generally to bill the lower of

5    the actual acquisition cost or the usual and customary

6    amount?

7         A.    Yes.

8         Q.    And then the agency would apply a screen

9    often consisting of AWP minus 10 percent?

10                   MR. GABEL:  Objection; form.

11   BY MR. HENDERSON:

12        Q.    Is that a fair description of the

13   reimbursement methodology at that time?

14        A.    What was the time period?

15        Q.    1991 up through September 1995?

16        A.    There was also direct pricing involved.

17        Q.    Okay.  So the screen could involve AWP minus

18   10 percent, and also perhaps a reference to a direct

19   price?

20        A.    Yes.

21                   MR. GABEL:  Objection; form.

22                   MR. HENDERSON:  Okay.

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 257

1    BY MR. HENDERSON:

2         Q.    And in addition you also testified that a

3    MAC could limit the amount of reimbursement on a drug?

4         A.    Yes.

5         Q.    Now, with regard to Exhibit -- Abbott

6    Exhibit 659, in a discussion of actual acquisition cost

7    on the second page, this states that the acquisition

8    costs must reflect trade and quantity discounts,

9    rebate, free goods and price concessions.

10                   Can you tell us whether or not you

11   understood that -- whether or not pharmacists believed

12   that the actual acquisition cost methodology was

13   cumbersome?

14                   MR. GABEL:   Objection; form.

15   BY MR. HENDERSON:

16        Q.    Did you ever hear complaints to that effect?

17        A.    Yes.

18        Q.    And is that because they needed to take into

19   account these various price concessions that are

20   described here in Abbott Exhibit 659?

21                   MR. GABEL:   Objection; calls for

22   speculation.

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

1      A.     They complained how they would track it in

2   their computer systems.

3   BY MR. HENDERSON:

4      Q.     Did they complain about the administrative

5   burdens?

6      A.     Yes.

7      Q.     Is that because a pharmacist would typically

8   dispense numerous different types of drugs manufactured

9   by a number of different manufacturers?

10                   MR. GABEL:   Objection; form.

11  BY MR. HENDERSON:

12     Q.     And that this would complicate the task of

13  trying to come up with actual acquisition costs to

14  bill?

15     A.     Yes.

16                   MR. GABEL:   Objection.

17  BY MR. HENDERSON:

18     Q.     Okay.  Do you have any understanding as to

19  whether the desire to change from an actual acquisition

20  cost methodology to an estimated acquisition cost

21  methodology was prompted in part by these

22  administrative burdens?

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 259

1        A.     As I mentioned before, I knew those

2    concerns, but I wasn't involved in why that particular

3    boiler plate was put in place and the negotiations to

4    do so.

5        Q.     Okay.  There was a period of time when you

6    were working to evaluate and study the changeover to an

7    estimated acquisition cost methodology in 1994 and '95,

8    I think you testified about that; right?

9        A.     Yes.

10        Q.     And I think you also said you had -- in

11   connection with that work you had meetings with

12   pharmacists and the pharmacists association?

13        A.     Yes.

14        Q.     Did you also receive comment letters from

15   pharmacists relating to the proposed change in

16   methodology?

17        A.     Yes.

18        Q.     And in those meetings and comment letters,

19   did -- did pharmacists express support for the change

20   in methodology?

21        A.     The draft policy was sent to interested

22   parties, including not only pharmacists but

Henderson Legal Services, Inc.

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

                                                        Page 262

1                    MR. GABEL:   Objection; calls for

2      speculation.

3          A.    I don't know.

4      BY MR. HENDERSON:

5          Q.    You don't?

6          A.    (Shakes head.)

7          Q.    Okay.  Do you know whether the governor of

8      Michigan who signed the 1995 -- 1994 Appropriations Act

9      shared your understanding of the term average wholesale

10     price?

11                   MR. GABEL:   Objection.

12         A.    Likely not.

13     BY MR. HENDERSON:

14         Q.    Okay.  In 1995 did you have any

15     understanding that average wholesale prices as

16     published in the pricing compendia had no relation at

17     all to actual prices?

18         A.    Could you repeat that again for me.

19         Q.    Did you have any understanding one way or

20     the other that the average wholesale prices that were

21     published in the compendia had no relation at all to

22     actual prices?

Kramer, Sandra                                    March 25, 2008

Page 263

1              MR. GABEL:  Objection; form.

2        A.    I thought that having a standard discount

3    would be the representation of actual acquisition

4    costs.

5    BY MR. HENDERSON:

6        Q.    Did you understand in 1995 that drug

7    manufacturers were causing specific AWPs to be

8    published for the purpose of increasing reimbursements

9    to their customers?

10              MR. GABEL:  Objection; form.

11        A.    No.

12    BY MR. HENDERSON:

13        Q.    Do you have any reason to believe that the

14    Michigan legislators understood that?

15              MR. GABEL:  Objection.

16              MR. CYR:  Objection.

17        A.    I wouldn't have any knowledge.

18    BY MR. HENDERSON:

19        Q.    Did -- do you recall anything in the

20    materials that -- I think -- I'm sorry, let me start

21    over again.

22              I think you testified earlier that

Kramer, Sandra                                    March 25, 2008

Page 264

1    you submitted a report, possibly more, to one or more

2    members of the Michigan legislature?

3        A.    I personally wouldn't have; the department,

4    Michigan Department of Community Health or Department

5    of Social Services.

6        Q.    Submitted that?

7        A.    Would have submitted that.

8        Q.    Thank you for correcting me.

9              Do you recall anything in any of the

10   materials that you understood were submitted to the

11   Michigan legislature that informed the legislature that

12   drug manufacturers were responsible for setting average

13   wholesale prices?

14             MR. GABEL:  Objection; form.

15       A.    I do not.

16   BY MR. HENDERSON:

17       Q.    Now, turning to Abbott Exhibit 657, please.

18             Now, this report I believe you said

19   that you prepared.  Did you prepare this before you

20   undertook a detailed study of pricing information from

21   the agency's actual acquisition cost data system?

22       A.    Yes.

Kramer, Sandra                                    March 25, 2008

1        Q.    So you had not looked carefully at the

2    actual acquisition cost pricing information at the time

3    you wrote this; correct?

4        A.    No.

5                    MR. GABEL:   Objection; form.

6    BY MR. HENDERSON:

7        Q.    And you had not yet spoken or heard from the

8    pharmacists' association about some of their comments

9    on that data; is that correct?

10       A.    No -- or, yes, I hadn't heard from them.

11       Q.    All right.

12       A.    I'm sorry.

13       Q.    Turning to page 8 of Abbott Exhibit 657, and

14   the language under the bolded heading Average Wholesale

15   Price, the third sentence says:   "Procurement costs are

16   based on a discounted price off AWP or wholesaler

17   acquisition costs plus a percent."

18                   Can you tell us what you meant in

19   that sentence or what your understanding was at that

20   time?

21       A.    My understanding was that pharmacists paid

22   for drugs based on a discounted AWP or a wholesale or

Kramer, Sandra                                    March 25, 2008

Page 266

1    acquisition cost markup.

2         Q.    So, did you have an understanding at that

3    time that AWP prices did have a fairly predictable

4    relationship to actual procurement costs?

5                        MR. GABEL:  Objection.

6                        MR. CYR:  Objection; form.

7         A.    Yes.  It was my understanding they were the

8    benchmark.

9    BY MR. HENDERSON:

10        Q.    Okay.  Now, the term estimated acquisition

11   cost was a term used --

12                       MR. HENDERSON:  I'm sorry, I need to

13   get a drink.  Can we take a short break.

14                       THE VIDEOGRAPHER:  Going off the

15   record at 3:19 and 2 seconds p.m.

16        (Short recess taken.)

17                       THE VIDEOGRAPHER:  We're back on the

18   record of the 3:27 and 14 seconds p.m.

19   BY MR. HENDERSON:

20        Q.    Now, before we broke, Ms. Kramer, we were

21   talking about Abbott Exhibit 657, which is a report

22   that you prepared in March of 1994.  And in this you

Henderson Legal Services, Inc.

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                March 25, 2008

Page 267

1    addressed issues relating to a change to using

2    estimated acquisition cost as a basis for

3    reimbursement; is that right?

4         A.    Yes.

5         Q.    And the term estimated acquisition cost, was

6    your understanding of that term based on the plain

7    meaning of those words?

8                   MR. GABEL:  Objection; form.

9         A.    Yes.  Federal regulations referred to states

10   must -- I would have to look at the regulations, but

11   there's a reference to estimating acquisition costs in

12   the federal regulations.

13   BY MR. HENDERSON:

14        Q.    Okay.  And the words estimated acquisition

15   costs, have you interpreted that according to the plain

16   meaning of those words?

17                  MR. GABEL:  Objection; form.

18        A.    Yes.

19   BY MR. HENDERSON:

20        Q.    It means an estimate of acquisition costs;

21   is it fair to say?

22        A.    Yes.

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 268

1      Q.     There's no secret to those words; is that

2   true?

3                    MR. GABEL:  Objection.

4                    MR. CYR:  Objection; form.

5      A.     Not that I'm aware of.

6   BY MR. HENDERSON:

7      Q.     Okay.  And in the pharmacy context it refers

8   to an estimate of the pharmacist's costs of acquiring

9   the drug?

10     A.     Yes.

11     Q.     Now, in Exhibit 657 at page 4 marked MSA 33,

12  you were asked questions earlier about the language at

13  the top of the page including the sentence, it says:

14  "In other words, pharmacies are guaranteed the EAC

15  price regardless of the cost of the drug."

16                   Do you recall that question and

17  answer, or at least the question?

18     A.     Somewhat, yes.

19     Q.     Okay.  Now, in the case of an estimate of

20  acquisition costs, it is -- I think you said --

21  testified that if the cost of the drug were less than

22  the EAC, they would still get paid the larger amount of

Kramer, Sandra                                    March 25, 2008

Page 269

1    the EAC; is that right?

2         A.    Yes.

3         Q.    Okay.  If the actual cost of the drug were

4    more than the EAC amount, would they -- would the

5    pharmacist get paid less than the actual acquisition

6    cost?

7         A.    Yes.

8         Q.    Okay.  And is that possible in an EAC

9    reimbursement methodology, that that will occur?

10        A.    I suppose so.

11        Q.    Okay.  Is that something that's inevitable

12   when the department pays based on an estimate of cost?

13        A.    It's unclear to me how frequently or whether

14   it would happen.

15        Q.    Is it --

16        A.    It's possible.

17        Q.    Okay.  When you undertook your -- you did a

18   study then in 1995 looking at actual acquisition costs

19   information.  Do you recall that?

20        A.    Yes.

21        Q.    When you did that study was it your

22   intention to estimate the actual acquisition costs that

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 271

1        July 19, 1995 letter

2        WAS MARKED BY COUNSEL

3        FOR IDENTIFICATION.)

4                    MR. GABEL:  Mr. Henderson, I see

5    this document doesn't have a Bates number on it.  Has

6    it been produced to Abbott in this case?

7                    MR. HENDERSON:  Yes, it has.

8                    MR. GABEL:  By the DOJ or by

9    Michigan Medicaid?

10                    MR. HENDERSON:  By Michigan

11    Medicaid.

12    BY MR. HENDERSON:

13        Q.    Do you recognize this document, Ms. Kramer?

14        A.    Yes.

15        Q.    Okay.  This is a -- the letters appear to be

16    a complete copy of one letter and an incomplete

17    identical copy to a different individual dated July 19,

18    1995.

19        A.    I'm unclear whether the last page was

20    actually sent with it.

21        Q.    The last page being what?

22        A.    The very last page Estimated Acquisition

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

1    Cost (EAC) Study Findings.

2         Q.    Okay.  Referring you to the third page of

3    this -- I'm sorry, the page marked attachment page 2.

4    And you see the section entitled Study Procedures for

5    Estimated Acquisition Cost and Sole Source Drugs?

6         A.    Yes.

7         Q.    Does this summarize the procedures that you

8    followed when you prepared your study on changing over

9    to an estimated acquisition cost methodology that would

10   be budget neutral?

11        A.    The best that I can recall and it would have

12   been written shortly after the procedures were actually

13   done, so ....

14        Q.    Okay.  Do you know who wrote this letter?

15        A.    I did.

16        Q.    Okay.  Now, in subparagraph 3E -- do you see

17   that subparagraph on that page?

18        A.    Yeah.

19        Q.    It starts with Further focused.  It states:

20   "Further focused on prescriptions with AWP discounts

21   between AWP minus 20 percent and AWP minus 0 percent."

22               Then it states in parentheses, "This

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                          March 25, 2008

Page 273

1   step was recommended by the Michigan Pharmacists

2   Association.  It eliminated outlier charges from the

3   study since these charges were presumed to be billing

4   errors; however, department staff forwarded these

5   outliers to audit staff for review," close paren.

6                Did that -- does that language

7   address the same point that you talked about earlier

8   today when you discussed the representations of the

9   pharmacists association about certain of the data that

10  you were looking at in Abbott Exhibit 664?

11       A.    Let me see if I can just quick find that.

12                It would be the second page of 664.

13       Q.    Okay.  So, when you were answering questions

14  about that earlier today and you indicated that you did

15  not use certain of the -- certain of the pricing

16  information that indicated a much deeper discount off

17  of AWP, that was also summarized in this Government's

18  Exhibit 1 here on Paragraph 3E; is that right?

19       A.    Yes.

20       Q.    Okay.  So, is it fair to say that at this

21  time you did not have any general understanding that

22  AWPs were -- were radically inflated over actual

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                      March 25, 2008

                                                        Page 274

1    acquisition costs?

2              MR. GABEL:  Objection; form.  You're

3    talking about branded or generics?

4    BY MR. HENDERSON:

5         Q.    The drugs that were the subject of your

6    study in 1995?

7         A.    No, I did not.

8         Q.    And when you prepared this study, did you

9    believe that with the discounts that you recommended

10   that the reported AWPs as discounted as you recommended

11   would represent a reasonable estimate of acquisition

12   costs?

13        A.    Yes.

14        Q.    In 1995 did you have any belief about why

15   published AWPs were higher than actual prices?

16        A.    Could you phrase that a little bit

17   differently for me?

18        Q.    In 1995 did you have any belief about why

19   the published average wholesale prices tended to be

20   higher than actual acquisition costs?

21        A.    Did I know why that occurred?

22        Q.    Right.  That's my question.

Kramer, Sandra                                    March 25, 2008

Page 275

1        A.     No.

2        Q.     Okay.  Did you -- did you believe that by

3    changing to an EAC system that the State was giving

4    license to drug manufacturers to set reimbursement

5    levels far above any reasonable estimate of acquisition

6    costs?

7                        MR. GABEL:  Objection; form.

8                        MR. CYR:  Objection.

9        A.     No.

10   BY MR. HENDERSON:

11       Q.     Would that -- would it have been consistent

12   with State's goal of being a prudent payer for drugs

13   dispensed to Medicaid beneficiaries to allow

14   manufacturers to set reimbursement levels that would be

15   far above acquisition costs?

16       A.     No.

17                       MR. GABEL:  Objection; form.

18                       MR. CYR:  Objection.

19   BY MR. HENDERSON:

20       Q.     The -- there was earlier questions about

21   Exhibit 656, Abbott Exhibit 656.

22       A.     Was that number 656 --

Kramer, Sandra                                    March 25, 2008

```
                                                    Page 276

 1        Q.    Yes.

 2        A.    --  Mr. Henderson?

 3        Q.    Yes.

 4        A.    Thank you.

 5        Q.    And the accompanying information by Geneva

 6    Pharmaceuticals.

 7                     Did you ever know that Abbott was

 8    reporting AWPs that were 500 percent to 1,000 percent

 9    higher than actual acquisition cost?

10                     MR. GABEL:  Objection; form.

11        A.    No.

12    BY MR. HENDERSON:

13        Q.    Did you ever understand that Dey had a price

14    reporting practice like that?

15                     MR. CYR:  Objection; form.

16        A.    No.

17    BY MR. HENDERSON:

18        Q.    Did you ever understand that Roxane

19    Laboratories was reporting AWPs that were between 300

20    percent and 1,000 percent higher than its actual?

21        A.    No.

22        Q.    If you had known that while you were working
```

Kramer, Sandra                                    March 25, 2008

Page 277

1    at the Medical Services Administration, is that

2    something you would have approved of?

3                        MR. GABEL:  Objection; form.

4        A.    No.

5    BY MR. HENDERSON:

6        Q.    Is it something that you would have found

7    desirable?

8                        MR. GABEL:  Objection; form.

9                        MR. CYR:  Objection.

10       A.    No.

11   BY MR. HENDERSON:

12       Q.    Is it something that your agency expected

13   manufacturers to do?

14                       MR. GABEL:  Objection.

15                       MR. CYR:  Objection.

16       A.    No.

17   BY MR. HENDERSON:

18       Q.    Now, with regard to a dispensing fee,

19   Michigan pays -- has always paid a dispensing fee to

20   pharmacists as part of the reimbursement; is that

21   right?

22       A.    Since I worked for the Michigan Medicaid

Kramer, Sandra                                    March 25, 2008

Page 278

1    program.

2         Q.    Okay.  And that's in addition to the, at

3    least since 1995, that's in addition to the EAC

4    component; correct?

5         A.    Yes.

6         Q.    Does the -- what is the dispensing -- what

7    is your understanding about what the dispensing fee

8    covers?

9         A.    I'd have to defer to the policy manual.

10        Q.    Okay.  Do you understand whether it covers

11   the labor involved in dispensing the drug?

12        A.    Yeah.

13        Q.    Do you know whether it covers overhead of

14   the pharmacist?

15        A.    Yes.

16        Q.    Do you know whether it covers profit to the

17   pharmacist?

18        A.    I would have to look into the policy

19   statements.

20        Q.    Okay.  Now, the EAC component, is that

21   different in its objective than the -- is it different

22   in its nature than the dispensing fee component?

Kramer, Sandra                                    March 25, 2008

Page 279

1        A.     Yes.

2                      MR. GABEL:   Objection; form.

3    BY MR. HENDERSON:

4        Q.     Is the -- do you have -- is it -- what's

5    your understanding as to whether or not the EAC

6    component is intended to compensate the pharmacist for

7    the time or labor involved in dispensing a drug?

8        A.     It is not.

9        Q.     It is not.   Okay.

10                     What is your understanding as to

11   whether the EAC component is intended to provide a

12   profit margin to the pharmacist?

13                     MR. GABEL:   Objection.

14                     MR. CYR:   Objection.

15       A.     It is not.

16   BY MR. HENDERSON:

17       Q.     And what is your understanding as to whether

18   or not the EAC component is meant to pay for the

19   pharmacist's overhead in operating his business?

20       A.     It's not.

21       Q.     And when you recommended the discounts off

22   of AWP in 1995, did you intend to include in that -- in

Kramer, Sandra                                    March 25, 2008

Page 280

1    the EAC component that you were developing profit to

2    the pharmacist?

3         A.    No.

4         Q.    Referring you to Abbott Exhibit 654, the

5    glossary of terms, the -- you were asked in your

6    earlier testimony about your understanding of the term

7    average wholesale price.  This language says:  "Average

8    wholesale price (AWP) is the price of a product as

9    published by First DataBank."

10                   What do you understand the word

11   price to mean?

12        A.    Pretty general there.  It looks -- it

13   appears at least by this definition what the pharmacy

14   would purchase the drug at.

15        Q.    Okay.  It's -- in your view is it a

16   fictional number with no relation to amounts actually

17   paid for a product?

18                   MR. GABEL:  Objection; form.

19        A.    Is the AWP?

20   BY MR. HENDERSON:

21        Q.    No, the word price.

22        A.    This definition confuses me.  Yeah, it

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

a2ec164a-d34e-4eff-9164-2373f4149e12