# Exhibit 3

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

Page 1

                UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

     MDL No. 1456   Master File No. 01-CV-12257-PBS

-----------------------------------X

In re:  PHARMACEUTICAL INDUSTRY      )

AVERAGE WHOLESALE PRICE LITIGATION   )

-----------------------------------X

United States of America ex rel      )

Ven-A-Care of the Florida Keys,      )

Inc., et al. v. Dey, Inc., et al.,   )

Civil Action No. 05-11084-PBS        )

-----------------------------------X

United States of America ex rel      )

Ven-A-Care of the Florida Keys, Inc.,)

et al. v. Boehringer Ingelheim Corp.,)

et al., Civil Action No. 07-10248-PBS)

-----------------------------------X

      30(b)(6) DEPOSITION OF THE STATE OF ALASKA

        DEPARTMENT OF HEALTH AND SOCIAL SERVICES

              DESIGNEE:  DAVID CAMPANA

              Thursday, August 21, 2008

                  Anchorage, Alaska

State of Alaska (David Campana)                    August 21, 2008
                          Anchorage, AK

```
                                                          Page 2

   1                    A-P-P-E-A-R-A-N-C-E-S

   2

   3      For Plaintiff United States of America:

   4

   5           George B. Henderson, II, Esq.

   6           (via speaker phone)

   7           Assistant Attorney General

   8           Office of the United States Attorney

   9           United States Courthouse

  10           1 Courthouse Way, Suite 9200

  11           Boston, Massachusetts 02210

  12           (617) 748-3282

  13

  14

  15      For the State of Alaska:

  16

  17           Richard M. Burnham, Esq.

  18           NEIDER & BOUCHER, SC

  19           440 Science Drive

  20           Madison, Wisconsin 53705-0510

  21           (608) 661-4500

  22
```

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

Page 266

1         MR. HENDERSON:  Now, I would like to

2    have item C marked as the next exhibit.

3              (Exhibit DC US 003 marked.)

4         Q.    This is a copy of two pages from a

5    federal register publication dated July 31, 1987,

6    am I correct?

7         A.    Yes.

8         Q.    Now, that is the same publication

9    that's referenced in Exhibit B in section 43.591,

10   subparagraph D; is that right?

11        MS. WITT:  Objection.  There is no

12   Exhibit B.

13        Q.    I'm sorry.  Exhibit No. 2.

14        A.    And let's see.  In which paragraph

15   again?

16        Q.    Paragraph D.

17        A.    "D" as in dog?

18        Q.    "D" as in dog.

19        A.    Yes.  I see CFR 447.331.

20        Q.    Referring to Exhibit No. 3, the federal

21   register publication, I direct your attention to

22   Section 447.301 entitled "Definitions".

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

                                                        Page 267

 1        A.    Okay.

 2        Q.    And if you could read aloud the

 3   definition of "estimated acquisition cost".

 4        A.    "Estimated acquisition cost means the

 5   agency's best estimate of the price generally and

 6   currently paid by providers for a drug marketed

 7   or sold by a particular manufacturer or labeler

 8   in the package size of the drug most frequently

 9   purchased by providers."

10        Q.    Now, can you tell me, Mr. Campana,

11   whether you have an understanding about whether

12   the words "estimated acquisition cost" in the

13   Alaska regulation are meant to be consistent with

14   that federal definition that you just read?

15             MS. WITT:   Object to form.

16        A.    Yes.

17        Q.    You believe the terms in the state's

18   regulation are intended to be consistent with the

19   federal regulation?

20        A.    Yes.

21        Q.    To your knowledge, has the federal

22   government, the Department of Health and Human

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

Page 268

1    Services ever issued an interpretation of

2    estimated acquisition cost that is different from

3    the one that you just read aloud to us?

4              MS. WITT:   Objection; form.

5         A.   I'm not aware of any.

6         Q.   When your agency has implemented the

7    estimated acquisition cost provisions, Section

8    43.591-D, of its regulations, has your agency

9    attempted to determine estimated acquisition

10   costs in accordance with the federal definition?

11             MR. TORBORG:   Object to form.

12        A.   Yes, they did.  As far as I understand,

13   they did.

14        Q.   Now, coming back to Exhibit No. 2, the

15   Alaska regulation, subsection G on the second

16   page deals with -- sets forth a somewhat involved

17   formula for determining the dispensing fee; is

18   that fair to say?

19        A.   Yes.

20        Q.   And does that formula take into account

21   the size of the pharmacy and the amount of the

22   Medicaid business, among other things?

State of Alaska (David Campana)                 August 21, 2008
                        Anchorage, AK

Page 270

1   documented costs of dispensing, plus a reasonable

2   profit factor via a dispensing fee, which will

3   vary for each pharmacy based on those individual

4   characteristics which accurately reflect their

5   costs to dispense."

6           Did I read that correctly?

7   A.    Yes.

8   Q.    And can you tell me whether the

9   intention that is reflected in the paragraph that

10  I just read is incorporated, in particularly as

11  regards a profit factor, is incorporated in that

12  73 cent profit that you referred to that is in

13  the state regulation, subparagraph G?

14          MR. KATZ:   Objection; form.

15  A.    The reasonable profit that -- it's my

16  understanding that the reasonable profit factor

17  that was addressed in this letter is the

18  equivalent to the 73 cents that is listed in the

19  regulation.

20  Q.    Now, do you have any understanding as

21  to whether or not this profit factor is linked in

22  any way to the amount of the estimated

State of Alaska (David Campana)                    August 21, 2008
                      Anchorage, AK

                                                        Page 271

1    acquisition cost?

2         A.    I do not believe.

3         MR. KATZ:   Objection; form.

4         A.    I do not believe it is linked to the

5    acquisition cost.

6         Q.    Do you have any understanding as to

7    whether or not the determination of the

8    dispensing fee is separate and distinct from the

9    determination of the estimated acquisition cost?

10        MR. KATZ:   Objection; form.

11        A.    It's my understanding that the

12   dispensing fee was independent of the ingredient

13   cost, and there was -- and there was a separate

14   survey to determine a dispensing fee and then a

15   different survey for the ingredient cost.

16        Q.    And those were separate efforts that

17   the agency undertook in 1989?

18        A.    That is my understanding.

19        Q.    Do you have an understanding of what

20   the -- what, if any, policy of the Federal

21   Department of Health and Human Services has been

22   on whether or not the determination of the

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
Anchorage, AK

Page 272

1  dispensing fee should be separate and distinct

2  from the determination of estimated acquisition

3  costs?

4          MR. TORBORG:  Object to form.

5      A.   It is my understanding that they wanted

6  those reviewed separately and determined

7  separately.

8          MR. HENDERSON:  I would like to ask Mr.

9  Burnham to have marked what I identified as item

10 D as the next exhibit.

11          (Exhibit DC US 004 marked.)

12     Q.   Mr. Campana, you have been handed

13 Exhibit No. 4, which is a September 15, 1994

14 document on the letterhead of the Department of

15 Health and Human Services, Health Care Finance

16 Administration Region 10 entitled "Title XIX

17 State Agency Letter Number 94-43".

18          Do you have that document in front of

19 you?

20     A.   Yes.

21     Q.   Is Alaska within the oversight and

22 responsibilities of Region 10 of what is now

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

Page 308

1    Exhibit 32, which was the document containing

2    summaries of testimony --

3         A.   And what is your question on that

4    again?

5         Q.   My question, if you could turn to page

6    12 of that document at the bottom and read for

7    us, if you would, what Mr. -- read for us

8    starting at the bottom paragraph beginning with

9    "Mr. Ron Sedwick".

10             MS. WITT:   Object to form.

11        Q.   Read to us what he said --

12             MS. WITT:   Object.

13        Q.   -- according to this document?

14             MS. WITT:   Same objection.

15        A.   In this document, Mr. Ron Sedwick,

16   pharmacist from Juneau, member of the Alaska

17   Pharmacy Association and member of the Pharmacy

18   Steering Committee, said that DHSS based its

19   program on the published AWP because it was the

20   starting point for the only computer tape able to

21   deal with the program.

22             He said that AWP is the actual price he

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

                                                          Page 309

1    pays the wholesaler before discounts.  Discounts

2    can be gained by ordering certain quantities of

3    drugs or by paying in advance, the result of

4    which is a cost savings to the pharmacists in

5    Alaska of AWP minus 10 percent.

6              He commented that the discount was

7    earned and was a way to increase his margin by

8    operating prudently, but DHSS was trying to

9    confiscate the margin.

10        Q.   Thank you.  Now, I would like Mr.

11   Burnham to mark as the next -- have marked as the

12   next exhibit what I identified as item H.

13             MR. BURNHAM:  Bunker, I have no H here

14   in the documents Mr. Picket left.  I have an E,

15   an F, a J and a K.

16             MR. HENDERSON:  Okay.  We're missing

17   more documents.

18             MR. BURNHAM:  By the way, you were

19   referencing earlier a March 31st letter.  There

20   is one such letter in the prior exhibits.

21             I don't know if it's the right one,

22   from Hansen to Ruth Alton.  Was that the March

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                August 21, 2008
                    Anchorage, AK

Page 310

1    31st letter you were interested in?

2              MR. HENDERSON:  No.  Thank you.

3    BY MR. HENDERSON:

4         Q.   Mr. Campana, I'm going to read to you

5    from an exhibit in another deposition.

6              MR. KATZ:  Is this the exhibit we don't

7    have?

8              MR. HENDERSON:  Correct.

9              MR. KATZ:  I'm going to have to object

10   to this because I can't see the contents.  I

11   can't see the document.

12             MR. HENDERSON:  Who is speaking,

13   please?

14             MR. KATZ:  This is Cliff Katz.

15             MR. TORBORG:  I join the objection.

16             MR. HENDERSON:  Well, subject to your

17   objections, I'll proceed.

18   BY MR. HENDERSON:

19        Q.   I'll represent to you, Mr. Campana,

20   that this is a publication of FirstDataBank

21   called "Monthly Interest" dated September 1991.

22             And in this document, FirstDataBank

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

Page 311

1    states:  "AWP represents an average price which a

2    wholesaler would charge a pharmacy for a

3    particular product.

4              The operative word is 'average'.  AWP

5    never means that every purchase of that product

6    would be exactly at that price.  There are many

7    factors involved in pricing at the wholesale

8    level which can modify the prices charged, even

9    among a group of customers from the same

10   wholesaler," end quote.

11             Is that description of AWP consistent

12   or inconsistent with your understanding of AWP in

13   the early 1990s?

14             MS. WITT:  Objection.

15             MR. KATZ:  Objection; form,

16   mischaracterizes the evidence and the testimony.

17        A.   Can I have you read that again?

18        Q.   "AWP represents an average price which

19   a wholesaler would charge a pharmacy for a

20   particular product.  The operative word is

21   'average'.

22             AWP never means that every purchase of

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
Anchorage, AK

Page 312

1   that product will be exactly at that price.

2   There are many factors involved in pricing at the

3   wholesale level which can modify the prices

4   charged, even among a group of customers from the

5   same wholesaler."

6           MS. WITT:   Objection; form.

7       A.   And that was my understanding of

8   average wholesale at the time I was working at --

9   for the state, based on my date of employment.

10      Q.   Now, I would like to -- Mr. Burnham, do

11  you have what I -- I think we're at -- no, wait a

12  second.   I think we do not have --

13          Forgive me.   I'm trying to figure out

14  what documents we have and what we don't.

15          I would like to refer your attention to

16  Exhibit 41.   This is a December 21, 1989 letter

17  to Albert J. Bents, which was discussed

18  previously.

19          And is it fair to say, Mr. Campana, is

20  this letter a letter from the Alaska Medicaid

21  agency to HCFA providing some additional

22  information in support of the agency's attempt to

State of Alaska (David Campana)                    August 21, 2008
Anchorage, AK

Page 326

1        A.    Not that I recall.

2        Q.    I would like to have Mr. Burnham show

3    you, if he has it, what I marked as item F.

4                (Exhibit DC US 009 marked.)

5        Q.    Could you tell us what this is, Mr.

6    Campana?

7        A.    This is a memo through my supervisor

8    who was in effect at that time to the Medicaid

9    director Bob Labbe.

10       Q.    Tell us what prompted you to write this

11   memorandum.

12       A.    This was written following the

13   placement of the DOJ pricing into the average

14   wholesale price on FirstDataBank submission to

15   our drug formulary.

16       Q.    And at or around this time, did you

17   come to learn that inflated average wholesale

18   prices were being published as a result of

19   intentionally false reporting practices of

20   certain drug manufacturers?

21                MS. WITT:   Objection; form.

22                MR. TORBORG:   Objection.

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

Page 327

1        A.    I remember in an AMPA meeting, American

2   Medicaid Pharmacy Administrators meeting there

3   was some discussion about prices that were

4   submitted and called average wholesale prices

5   that were extraordinarily above the actual

6   acquisition cost.

7        Q.    Now, the third paragraph indicates that

8   you had had some discussions with providers about

9   the issue of using these new AWPs, these DOJ

10  AWPs; is that right?

11       A.    That is correct.

12       Q.    And tell us about the discussions you

13  had with certain providers.

14       A.    The providers indicated that they could

15  not purchase the drugs at our reimbursement, that

16  they could not -- their acquisition costs were

17  above what our reimbursement was for these drugs.

18       Q.    Now, the third paragraph says, "The

19  providers who have discussed this issue with us

20  say there were value-added services that they

21  provided free of charge while receiving

22  exorbitant reimbursements."

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

                                                      Page 328

 1          Do you recall having such discussions

 2    with certain providers?

 3          A.    Yes.

 4          Q.    The next sentence says, "These services

 5    included free IV nursing, free infusion supplies,

 6    free shipping, free delivery and free night

 7    call."

 8          Do you recall that?

 9          A.    Yes.

10          Q.    And then in the next sentence you

11    remark, "Since we were never billed for these

12    services, it is difficult to find if these

13    services were provided."

14          Could you tell us what you meant by

15    that?

16          A.    Since there wasn't a billing mechanism

17    for those, we didn't have any data saying that

18    those were actually provided, other than

19    anecdotal information.

20          Q.    Now, with these services that were

21    apparently provided for free because of

22    exorbitant reimbursements, were these services

State of Alaska (David Campana)                August 21, 2008
                      Anchorage, AK

                                                    Page 329

1    that would otherwise have been appropriately

2    billed to Medicaid?

3        A.    The infusion supplies could have been

4    billed.  The shipping could have been billed.

5    The delivery, only if it was -- the provider was

6    in the urban area, Anchorage and was sending

7    those by mail out to some outlying area.

8             The night call could not have been

9    billed or recovered, at least under the

10   reimbursement formula during that time.

11       Q.    Did you do any follow-up to see whether

12   or not any of the so-called services that were

13   provided free of charge were in fact billed for?

14       A.    Not that I can remember.

15       Q.    Are you just recounting here the

16   discussions that you had with certain providers?

17       A.    I was memorializing those encounters

18   that I had with providers.

19       Q.    Now, the next paragraph says, "One

20   hemophilia blood factor provider, Care For Life,

21   indicated they donated many of their profits to

22   the Alaska Hemophilia Association.

                Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

                                                      Page 330

1            These donations allowed the Alaska

2    Hemophilia Association to offer specialized

3    clinics for education and treatment of

4    hemophilia.  However, these excess profits were

5    provided by our generous Medicaid reimbursement

6    based on erroneous AWPs."

7            Did I read that correctly?

8        A.   You read it correctly.

9        Q.   Does Alaska Medicaid pay for donations

10   for education and treatment of hemophilia?

11       A.   Not directly.

12       Q.   In Alaska, Mr. Campana, who has

13   responsibility for determining whether a

14   particular service should be covered and paid for

15   by the Medicaid program?

16       A.   It could be done by the legislature.

17   They could determine that some service is covered

18   and they want the Medicaid agency to carry that

19   out.

20            Or it could be that the Medicaid agency

21   finds where that can fit under a currently

22   covered service and then implements that under a

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                August 21, 2008
Anchorage, AK

Page 331

1    currently covered service.

2         Q.   In either event, the decision is made

3    by the state; is that right?

4         A.   That is correct.

5         Q.   It's not a decision that's left to the

6    provider?

7              MS. WITT:  Objection; form.

8         A.   That is correct.

9         Q.   If that decision were left to the

10   provider, do you have an opinion as to whether or

11   not that would invite abuse?

12             MR. KATZ:  Objection; form.

13        A.   My opinion is that it would invite

14   abuse.

15        Q.   And would Alaska lose control of its

16   Medicaid expenditures if those decisions were

17   left to the providers?

18             MR. KATZ:  Objection; form.

19        A.   I believe so.

20        Q.   The decision is not left to the

21   manufacturer either, is it?

22        A.   That is correct.

b402ad78-7827-456e-987c-3331b70c1138

Page 332

1      Q.   And for the same reasons?

2      A.   Yes.

3           MR. HENDERSON:  I have no further

4      questions.

5

6                     RE-EXAMINATION

7      BY MS. WITT:

8      Q.   I have a few redirect questions.  Mr.

9      Henderson asked you about the various challenges

10     that Alaskans face due to its geographic position

11     and its weather, and asked whether those had been

12     taken into account in consideration of Medicaid

13     reimbursement, correct?

14     A.   Correct.

15     Q.   Were any of those challenges ever

16     described to CMS or HCFA in connection with

17     Alaska's description of its justifications and

18     reasons for the methodology that it wanted to

19     adopt?

20     A.   It's my understanding those were.

21     Q.   Alaska made sure that the federal

22     agency understood the unique challenges that

b402ad78-7827-456e-987c-3331b70c1138