# Exhibit 4

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Chapman, Allen D.                                           December 15, 2008
                              Denver, CO

Page 1

              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

    ---------------------------------X

    In Re: PHARMACEUTICAL INDUSTRY    )

    AVERAGE WHOLESALE PRICE LITIGATION)

    ---------------------------------X MDL No. 1456

    THIS DOCUMENT RELATES TO:         ) Master File No.

    United States of America ex rel.  ) 01-CV-12257-PBS

    Ven-A-Care of the Florida Keys,   ) Subcategory Case

    Inc., et al. v. Dey, Inc., et al.,) No. 06-11337

    Civil Action No. 05-11084-PBS     ) Hon. Patti B.

    ---------------------------------X Saris


        VIDEOTAPED DEPOSITION OF:  ALLEN D. CHAPMAN

                   December 15, 2008

         PURSUANT TO AMENDED NOTICE AND SUBPOENA,

    the deposition of ALLEN D. CHAPMAN was taken on

    behalf of Defendant Dey, Inc., at 1701 California

    Street, Silverton Room, Denver, Colorado 80202, on

    December 15, 2008, at 10:06 a.m., before Tammie E.

    Singer, Professional Court Reporter and Notary

    Public within Colorado.

Chapman, Allen D.                                            December 15, 2008
                                  Denver, CO

```
                                                              Page 2
 1                    A P P E A R A N C E S
 2
 3    For the Plaintiff:
 4         GEJAA T. GOBENA, ESQ.
 5         United States Department of Justice
 6         Office of Assistant Attorney General
 7         Civil Division
 8         Commercial Litigation Branch
 9         P.O. Box 261, Ben Franklin Station
10         Washington, D.C. 20044
11
12    For the Relator:
13         JARRETT ANDERSON, ESQ.
14         Anderson LLC
15         208 W. 14th Street, Suite 203
16         Austin, Texas 78701
17
18    For Defendant Dey:
19         CLIFFORD KATZ, ESQ.
20         Kelley Drye & Warren LLP
21         101 Park Avenue
22         New York, New York 10178
```

Page 107

1    that rebates are paid subsequent to the
2    transaction --
3         A.   Right, irregardless of who they are
4    paid to.
5         Q.   Right.  Okay.  And that was something
6    that you were aware of in the 1980s about these
7    rebates subsequently paid, right?
8         A.   Correct.
9         Q.   Now I would like you to take a look at
10   the last page of this letter.  And if you look at
11   the second-to-the-last paragraph, second
12   sentence, it says, "For multiple-source drugs, I
13   would make extensive use of state upper limits as
14   neither the FUL or AWP mean anything for generic
15   drugs."
16             Do you agree with Mr. Hazelwood's
17   statement that the AWP does not mean anything for
18   generic drugs?
19             MR. ANDERSON:  Objection, form.
20        A.   I guess my comment was there's probably
21   more of a variation between AWP and actual cost
22   with generic than there are the other.

Chapman, Allen D.  December 15, 2008
Denver, CO

Page 108

1  Q.   (BY MR. KATZ)  "The other" would be
2  brand?
3  A.   Brand -- no -- the other would be
4  brand, right, but --
5  Q.   And that was something you were aware
6  of going back to the 1980s?
7  A.   I think that -- but I guess what I
8  think he's -- what he was talking about in this
9  memo was a push to try to have state MACs for
10 generic products that the federal government did
11 not have federal upper limits for and the basis
12 for that.
13 Q.   And the --
14 A.   This is what he's really trying to do
15 here.
16 Q.   And the reason for having state maximum
17 allowable cost or federal upper limits for
18 generic drugs is that it was known that the AWPs
19 for generic drugs exceeded the actual acquisition
20 costs of providers, right?
21 A.   I'm not sure that --
22      MR. ANDERSON:  Objection --

Chapman, Allen D.                                    December 15, 2008
                            Denver, CO

Page 136

1  Q. Do you see where it says, "If the AWP
2  spread disappears, the dispensing fee may have to
3  be increased"?
4  MR. ANDERSON: Objection, form.
5  A. I see that.
6  Q. (BY MR. KATZ) Is that something that
7  Colorado Medicaid considered when considering
8  changes to its reimbursement methodology?
9  MR. ANDERSON: Objection, form.
10 A. Not specifically. I don't remember it
11 that way.
12 Q. (BY MR. KATZ) Okay. I would like you
13 to go back to Dey Exhibit 355.
14 A. Where are we?
15 Q. Dey Exhibit 355.
16 A. Okay.
17 Q. And the last paragraph in this document
18 refers to a survey which indicated the cost of
19 dispensing to be $4.58 for pharmacies.
20 A. Okay.
21 Q. Now, at this time, Colorado Medicaid
22 had a dispensing fee of only $4.08, right?

Page 221

1   Q. And do you recall how you first learned
2   that AWP was not an actual average of wholesale
3   prices?
4   A. Probably from conversations and
5   observation. But I guess I should say that in
6   all of -- in most of my career leading up to when
7   I went to work for Medicaid, AWP wasn't something
8   that I spent much time talking about since we
9   always had contracts.
10  Q. And the contracts were prices that were
11  below AWP, right?
12  A. Were expected to be, yes, because of
13  the fact that we were a governmental agency or we
14  were part of a consortium of University Hospitals
15  during the later time in my days at University.
16  Q. And at the University, did you have any
17  feeling -- I'm not asking for a precise number,
18  but just any feeling for how much lower than AWP
19  the prices that the hospital got?
20      MR. ANDERSON: Objection, form.
21  A. No, I don't have a number.
22  Q. (BY MR. BERLIN) Well, even if you

1  don't have a number, I'm asking just for a
2  general area.  I mean, was it your feeling it was
3  10 percent below or 50 percent below or 80
4  percent below?  Can you give any sort of an
5  estimate?
6       A.   No.
7       Q.   While you were working for the hospital
8  -- in other words, prior to your employment with
9  Medicaid, did you have an understanding that
10 there were substantial discounts below AWP?  And
11 by substantial, I mean it's not just 5 percent,
12 but there may be 20 or 30 or even 50 percent
13 below AWP?
14          MR. ANDERSON:  Objection, form.
15      A.   I guess I was -- I was aware of the
16 fact that different types of providers got
17 different pricing based on who they were,
18 nonprofit hospitals, governmental entities.  And
19 I had really spent very little if no thinking
20 about what happened in the retail marketplace
21 until I got to the Medicaid program.
22      Q.   (BY MR. BERLIN)  At the time that you

Chapman, Allen D.                                December 15, 2008
                        Denver, CO

Page 223

1  were working for the hospital, was it your view
2  that AWP was essentially a list price and that
3  there were discounts below it for different
4  providers?
5      A.   I guess to probably characterize my
6  thought of that, it was something if you looked
7  up a product in the Red Book or the Blue Book,
8  whatever it was, you saw a price there, but it
9  had no relationship to the price that we might be
10 paying in our marketplace.
11     Q.   And then when you started with Colorado
12 Medicaid, you saw that part of their formula was
13 based on AWP minus a percent, right?
14     A.   That was one of the percentages -- that
15 was one of the factors, yes.
16     Q.   Did you raise with anyone in the
17 Medicaid program a concern about using AWP as
18 part of the reimbursement formula?
19     A.   I guess not on my first day or probably
20 -- I'm sure there were discussions about that.  I
21 don't recall -- you know, I think that -- to
22 point out the fact that when I got to Medicaid

Chapman, Allen D.                                    December 15, 2008
                              Denver, CO

Page 307

1        Q.    I understand.  Let me see if this will
2    more specifically refresh your memory.
3        A.    Okay.
4                 (Deposition Exhibit Chapman 003
5    was marked.)
6        Q.    What I've marked as Chapman Exhibit 3,
7    sir, is a copy of a federal regulation.
8    Specifically it's a Section 447.301 of Title 42.
9        A.    Right.
10       Q.    I'm going to direct your attention to
11   that definition there listed for estimated
12   acquisition cost, and I'll read it for the
13   record.
14            "Estimated acquisition cost means the
15   agency's best estimate of the price generally and
16   currently paid by providers for a drug marketed
17   or sold by a particular manufacturer or labeler
18   in the package size of drug most frequently
19   purchased by providers."  Did I read that
20   correctly --
21       A.    Yes.
22       Q.    -- other than getting a little tongue-

Page 308

1   tied there?
2           Do you agree that that definition
3   comports with your understanding of how the
4   federal government has defined estimated
5   acquisition cost over the years?
6       A.   I remember reading the 42 CFR when I
7   first got there.  And I --
8       Q.   And --
9       A.   And I remember it, you know, being --
10  and this was basically what we would use when we
11  would do our state plan, is that it would have to
12  be in compliance with that.  But yes, I would
13  agree with that.
14      Q.   Well, thank you.  That was going to be
15  my next --
16      A.   Yeah.
17      Q.   -- question.  Did Colorado Medicaid try
18  to follow the def -- the federal definition of
19  estimated acquisition cost?
20      A.   Yes.
21      Q.   And to your knowledge, over the years
22  in implementing different reimbursement

Chapman, Allen D.                                    December 15, 2008
                              Denver, CO

Page 309

1    methodologies, did Colorado Medicaid try to
2    achieve estimated acquisition cost as defined in
3    federal regulation?
4            MR. KATZ:  Objection to the form.
5        A.  I don't know much about that last piece
6    that we've been talking about, those 2002 ones
7    where I was not --
8        Q.  (BY MR. ANDERSON)  I --
9        A.  Okay.
10       Q.  I understand.  Limiting to --
11       A.  Limiting to the ones --
12       Q.  -- your experience --
13       A.  Limiting to the ones that I had -- I
14   had contact with and I think that we all worked
15   with this, and this was essentially part of that
16   federal review that, you know, when -- that
17   period of time between when the state submitted
18   something and the Fed people looked at that is
19   that they looked at this state plan amendment and
20   made sure it met with that or it would not get
21   approved.
22       Q.  And that was -- at least as you

Chapman, Allen D.                                  December 15, 2008
                                Denver, CO

Page 310

1    understood it during your tenure at Colorado
2    Medicaid from 1990 through a portion of '95 and
3    then 1996 through a portion of 2002 --
4         A.   Correct.
5         Q.   -- that was the -- your experience?
6         A.   Right.
7              MR. KATZ:  Objection to form.
8         Q.   (BY MR. ANDERSON)  Is that right, sir?
9         A.   That's right.
10             MR. KATZ:  Objection to form.
11        Q.   (BY MR. ANDERSON)  And so as far as you
12   knew, the conduct and actions of Colorado
13   Medicaid were consistent with the federal mandate
14   concerning the definition of estimated
15   acquisition cost?
16        A.   That's right.
17             MR. KATZ:  Objection to the form.
18        Q.   (BY MR. ANDERSON)  Okay.  Now I'm going
19   to have some additional big-picture questions for
20   you.  Is there any way that Colorado Medicaid
21   could have manually processed pharmacy
22   reimbursement claims?

Chapman, Allen D.                                December 15, 2008
Denver, CO

Page 342

1  Q. And do you see down in the lower left-
2  hand corner, it says, "Supersedes TN No. 90-03"?
3  A. Yes.
4  Q. And this one's dated effective July 1,
5  2001, correct?
6  A. Correct.
7  Q. Does this look like this is the
8  reimbursement methodology set forth in this state
9  plan that superseded the one that was effective
10 July 1, 1990?
11 A. Yes.
12 Q. Thank you.  Are you aware of any drug
13 companies creating marketing plans based on
14 incentivizing pharmacies with Medicaid
15 reimbursement?
16 A. No.
17 Q. Have you ever been privy to any
18 communications from any source about drug
19 companies incentivizing pharmacies with Medicaid
20 reimbursement?
21 A. No.
22 Q. Does that seem appropriate in your

Chapman, Allen D.                                    December 15, 2008
                              Denver, CO

Page 343

1   view?
2       A.   No.
3            MR. KATZ:  Objection to form.
4            MR. BERLIN:  Objection to form.
5       A.   No.
6       Q.   (BY MR. ANDERSON)  Is there anything
7   that you're aware --
8            THE COURT REPORTER:  I'm sorry.  Hold
9   on.  Who was objecting on the phone?
10           MR. BERLIN:  Eric Berlin for Abbott.
11           THE COURT REPORTER:  Thank you.
12      Q.   (BY MR. ANDERSON)  Is there any
13  information that you're aware of, Mr. Chapman,
14  over your years at Colorado Medicaid that would
15  indicate to you that Colorado Medicaid approved
16  of drug companies incentivizing pharmacies based
17  on Medicaid reimbursement?
18           MR. KATZ:  Objection to form.
19      A.   No.
20           MR. ANDERSON:  I'll pass the witness.
21           MR. KATZ:  I just have a few follow-up
22  questions.  I'll go first, if you don't mind,