# Exhibit 9

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

In Re: PHARMACEUTICAL INDUSTRY      )

AVERAGE WHOLESALE PRICE LITIGATION  )

----------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:           ) Master File No.

United States of America ex rel.    ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,     )

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,      ) Hon. Patti B.

and United States of America ex     ) Saris

rel. Ven-A-Care of the Florida      )

Keys, Inc., et al. v. Boehringer    )

Ingelheim Corp., et al., Civil      )

Action No. 07-10248-PBS             )

----------------------------------X

VIDEOTAPED DEPOSITION OF THE NORTH DAKOTA DEPARTMENT

OF HUMAN SERVICES-MEDICAID DIVISION by BRENDAN JOYCE

     DATE:           Friday, December 12, 2008

     PLACE:          Bismarck, North Dakota

     REPORTED BY:    Deanna L. Sager, R.P.R.

Page 2

1           A P P E A R A N C E S

2

3   FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.:

4

5           Berger & Montague, P.C.

6           1622 Locust Street

7           Philadelphia, Pennsylvania  19103

8           By:  Susan Schneider Thomas, Esq.

9

10  FOR DEY, INC.; DEY, LP, INC.; DEY, LP:

11

12          Kelley Drye & Warren, LLP

13          101 Park Avenue

14          New York, New York  10178

15          By:  Michael J. Maloney, Esq.

16

17  FOR ABBOTT LABORATORIES, INC.:

18

19          Jones Day

20          77 West Wacker Drive, Suite 3500

21          Chicago, Illinois  60601

22          By:  Carol P. Geisler, Esq.  (By telephone)

Page 120

1   paying the same as the primary payer in the state
2   that accounts for about 80 percent of the
3   payments, we said that they could not complain if
4   they already accepted through them.  And Blue
5   Cross Blue Shield had 100 percent participation
6   as well.  Therefore, we did not anticipate it to
7   change anything.
8       Q.   And participation was something that
9   North Dakota Medicaid considered in making this
10  change to reimbursement?
11           MS. THOMAS:  Objection.  Form.
12      A.   Not necessarily.  Or not explicitly.
13      Q.   What do you mean by that?
14      A.   We implemented the MAC pricing to get
15  more in line with actual acquisition costs and
16  address the inflated AWPs.  And we knew that the
17  pharmacies must have known about the differences
18  in the increased reimbursement that they were
19  receiving.  And as far as a concern that someone
20  could bring up saying are you worried about
21  participation and pharmacies dropping out, we
22  simply had the argument ready, if necessary,

Page 121

1   saying that they're going to get paid the same as
2   they're getting paid in the private sector which
3   they already accept 100 percent.  Therefore, they
4   will have no basis of complaining with Medicaid
5   reimbursement doing the same.
6           MR. MALONEY:  I'd like to mark this as
7   Dey 713.
8           (Whereupon, Exhibit Dey 713 was
9   marked for identification by the court reporter.)
10      Q.   (Mr. Maloney continuing)  Take a minute
11  to look at this document.  Let me know when
12  you're ready.
13      A.   I'm ready.
14      Q.   Do you recognize this document?
15      A.   Yes.
16      Q.   This is a memo authored by you
17  addressed to pharmacies participating in the
18  North Dakota Medicaid Program, correct?
19      A.   Correct.
20      Q.   And it's dated July 12, 2002?
21      A.   Yes.
22      Q.   And this memo discusses the

1  where the AWPs would actually be different among
2  that range.  So the higher one would actually
3  have a lower or higher AWP and the lower count
4  bottle would have a different AWP.  There was no
5  consistencies.
6       Q.   Did those pricing practices by the drug
7  manufacturers make it more difficult for the
8  Medicaid department to assess whether it was
9  appropriately estimating provider acquisition
10 costs?
11           MR. MALONEY:  Objection to form.
12      A.   Yes.
13      Q.   At the time when you recommended to the
14 North Dakota Medicaid department that it
15 institute a MAC program, was it your observation
16 that AWPs for generic drugs were often random by
17 which I mean not a set or knowable percentage
18 differential from actual acquisition prices?
19           MR. MALONEY:  Objection to form.
20      A.   The difficulty we had, the other option
21 besides MAC is to set AWP minus, you know, the
22 reference price minus percent.  And the reports

ND Dept of Human Services - Medicaid Division (Brendan Joyce)                December 12, 2008
Bismarck, ND

Page 271

1  would show minus 40 percent for the average, but
2  that's just the average.  Therefore, we couldn't
3  use it specifically because of exactly what you
4  say, it was random from product to product,
5  manufacturer to manufacturer.  Since it was so
6  random we couldn't use the AWP in the calculation
7  of the price.  We had to use MAC.
8       Q.   Did you find at least for some
9  manufacturers that the AWPs were random even
10 within a given manufacturer?
11           MR. MALONEY:  Objection to form.
12      A.   I believe so.  One of their products
13 could have a fair relationship to actual
14 acquisition and another product within their
15 package of products would have a different one,
16 different relationship.
17      Q.   Did --
18      A.   Or no relationship.
19      Q.   Did you sometimes find that with
20 respect to different NDC numbers of the same drug
21 type?
22           MR. MALONEY:  Objection to form.

Page 273

1           MR. MALONEY:  Objection to form.
2      A.   No.
3      Q.   Did you ever hear anyone at North
4  Dakota Medicaid inform manufacturers that random,
5  unknown, and large spreads were beneficial to the
6  department in any fashion?
7           MR. MALONEY:  Objection to form.
8      A.   No.
9      Q.   Are you aware of any North Dakota
10 Medicaid policy that suggests that random,
11 unknown, and large spreads are beneficial to the
12 department?
13          MR. MALONEY:  Objection to form.
14     A.   No.
15     Q.   Various manufacturers in the pricing
16 litigation that is going on around the country
17 have argued that government entities embraced the
18 spreads that were created by the reported AWPs
19 because those spreads served policy goals of the
20 government programs.  Do you have any reaction to
21 that statement?
22          MR. MALONEY:  Objection to form.

ND Dept of Human Services - Medicaid Division (Brendan Joyce)                December 12, 2008
Bismarck, ND

Page 274

1   A.   That would not apply to North Dakota.

2   Q.   Why is that?

3   A.   We had no such policy goal to where the
4   lack of specificity of AWP or nonrelationship to
5   the acquisition cost benefited us.

6   Q.   Would you have always considered it
7   within the Medicaid department's role to decide
8   what profit, if any, to build into provider
9   reimbursement?

10  A.   Yes.

11  Q.   To your knowledge, did the North Dakota
12  Medicaid department ever delegate that authority
13  to drug manufacturers?

14       MR. MALONEY:   Objection to form.

15  A.   No.

16  Q.   Did you always consider it the state's
17  role to decide whether and how much of a cushion
18  it wanted to build in between reimbursements
19  amount -- between reimbursement amounts and
20  average acquisition costs?

21       MR. MALONEY:   Objection to form.

22  A.   Yes.

Page 291

1  have no reason to object, correct?
2           MS. THOMAS:  Objection.  Form.
3      A.   As discussed earlier, I think that's
4  what I said.
5      Q.   Could you please take a look at Dey
6  Exhibit 711, the state plan exhibit?
7      A.   Okay.
8      Q.   And Ms. Thomas asked you several
9  questions about the sentence in this -- in --
10 under item 13 on these state plan versions that
11 states, "Estimated acquisition cost will be this
12 agency's best estimate of the price generally and
13 currently paid by providers for a drug marketed
14 or sold by a particular manufacturer or labeler."
15 Do you remember that discussion?
16     A.   Yes.
17     Q.   And I believe you testified that that
18 language has been consistent in North Dakota's
19 state plan throughout the various changes to the
20 state plan.  Is that accurate?
21     A.   Yes.
22     Q.   Now when North Dakota Medicaid

Page 292

1  considered the amounts that Blue Cross Blue
2  Shield of North Dakota paid to providers for
3  prescription drugs, it wasn't considering the
4  price generally and currently paid by providers
5  for a drug marketed or sold by a particular
6  manufacturer, was it?
7              MS. THOMAS:  Objection.  Form.
8       A.   We would have to assume that a private
9  company that has such market share would be
10 paying on their definition of estimated
11 acquisition cost appropriately.
12      Q.   But actually when you consider the
13 amount Blue Cross Blue Shield of North Dakota is
14 paying pharmacies for prescription drugs, North
15 Dakota Medicaid was actually considering the
16 price generally and currently paid to providers
17 for a drug marketed or sold by a particular
18 manufacturer or labeler, correct?
19             MS. THOMAS:  Objection.  Form.
20      A.   No.  As we would have to assume that
21 Blue Cross Blue Shield would be paying
22 appropriate estimated acquisition costs.

Page 293

1  Therefore, if one is doing it, they're estimating
2  the acquisition cost to be that for the prices
3  paid by the providers, then that same logic would
4  then cross over to Medicaid if we used the same
5  rates as paid by providers.
6       Q.   But you have no recollection of North
7  Dakota Medicaid actually surveying the prices
8  generally and currently paid by providers for a
9  drug marketed or sold by a particular
10 manufacturer or labeler?
11      A.   No.  As discussed earlier, no, we have
12 not done that.
13      Q.   And other than the -- okay.  I think
14 that's it for that.  Now you mentioned that North
15 Dakota Medicaid receives URAs, correct?
16      A.   Yes.
17      Q.   And what does URA stand for?
18      A.   Unit rebate amount.
19      Q.   And North Dakota Medicaid receives URAs
20 from CMS, correct?
21      A.   Correct.
22      Q.   And CMS calculates URAs based on AMPs