# Exhibit 11

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE           ) Civil Action No.

LITIGATION                        ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:         ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,   )

Inc. v. Dey, Inc., et al., Civil  )

Action No. 05-11084-PBS; and      )

United States of America ex rel.  )

Ven-A-Care of the Florida Keys,   )

Inc. v. Boehringer Ingelheim      )

Corp., et al., Civil Action No.   )

07-10248-PBS                      )

--------------------------------X

              Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK - VOLUME II

December 10, 2008 - Newark, Delaware

Page 274

1              A P P E A R A N C E S:

2

3     Counsel for the United States of America

4          UNITED STATES ATTORNEY'S OFFICE

5          BY:  BARBARA HEALY SMITH, ESQUIRE

6          barbara.h.smith@usdoj.gov

7          Assistant U.S. Attorney

8          John J. Moakley U.S. Courthouse

9          1 Courthouse Way

10         Boston, Massachusetts 02110

11         617-748-3100

12

13    Counsel for the State of Delaware

14         DEPARTMENT OF JUSTICE

15         BY:  A. ANN WOOLFOLK, ESQUIRE

16         ann.woolfolk@state.de.us

17         BY:  SUSAN PURCELL, ESQUIRE

18         spurcell@state.de.us

19         Carvel Office Building, 6th Floor

20         820 N. French Street

21         Wilmington, Delaware 19801

22         302-577-8400

1    I'm not sure that the Division defined
2    our methodology as reasonable or not.
3            I think it is the Division's
4    understanding that this was our methodology and
5    our level of reimbursement.  We did have access
6    to provide -- we had a -- sufficient providers
7    willing to accept the rate that we were
8    reimbursing that we were within the federal
9    regulations that we had to provide -- that we
10   should provide service, if we opted to provide a
11   drug benefit program.  But whether it was
12   reasonable or not reasonable was not part of the
13   discussion.
14       Q.   You indicated that the dispensing fee
15   has remained at the $3.65 rate since at least
16   1991; is that correct?
17       A.   That's correct.
18       Q.   Do you know when it was established
19   initially?
20       A.   The Division does not know when it was
21   established.  We believe that it most likely was
22   prior to 1985.

Page 372

1  officials you discussed cross-subsidization with?
2       A.   Not specifically.
3       Q.   Officials from the EMPAA meetings; is
4  that correct?
5       A.   Definitely would have been a
6  presentation from the EMPAA states, yes.
7       Q.   To the extent you know, how did other
8  state Medicaid officials feel with respect to
9  cross-subsidization?
10           MS. HEALY SMITH:  Objection.
11           THE WITNESS:  To the best of my
12 recollection, it would have been that something
13 probably needed to be done, but nobody had a good
14 solution that they were investigating or able to
15 pursue that could be shared and leveraged by
16 other programs.
17 BY MS. RAMSEY:
18      Q.   So there was knowledge that, while it
19 may not have been a perfect situation, cross-
20 subsidization was occurring?
21           MS. HEALY SMITH:  Objection.
22           THE WITNESS:  Correct.

Page 379

1  effect of you need to do the best that you can,
2  given the information that you have.
3      Q.  Was Delaware ever directed by CMS that
4  it was prohibited from paying a margin on
5  ingredient costs to compensate for an inadequate
6  dispensing fee?
7          MS. HEALY SMITH:  Objection.
8          THE WITNESS:  I've not seen any -- any
9  Medicaid director letters from CMS commenting on
10 that, no.
11 BY MS. RAMSEY:
12     Q.  So it was the understanding of Delaware
13 Medicaid that this was an appropriate way to
14 compensate providers under the Delaware Medicaid
15 Program?
16         MS. HEALY SMITH:  Objection.
17         THE WITNESS:  I wouldn't agree that the
18 Division thought it was appropriate --
19 BY MS. RAMSEY:
20     Q.  You didn't think there was anything
21 wrong with it?
22     A.  No, I didn't agree to that either.

Page 380

1        Q.   Oh, I'm sorry.
2        A.   I believe that the Division's response
3   to that would be that they were doing the best
4   they could with the data elements that were
5   available to them.
6        Q.   Is it fair to say that the Delaware
7   Medicaid Program would not utilize reimbursement
8   methodologies or policies that it felt violated
9   federal regulations?
10       A.   I would agree that the Division would
11  never knowingly violate federal regulations.
12       Q.   And you would agree that Delaware did
13  not believe its reimbursement policies did
14  violate federal violations; --
15            MS. HEALY SMITH:  Objection.
16  BY MS. RAMSEY:
17       Q.   -- is that correct?
18       A.   That is correct.
19       Q.   Now, we discussed yesterday your
20  participation in the '94 and '95 meetings with
21  OIG in -- in conjunction with the OIG's report on
22  Delaware's Medicaid reimbursement system?

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Page 474

1   the time to investigate the accuracy of the
2   published prices for all of the NDCs in your drug
3   file?
4           MS. RAMSEY:  Objection.
5           THE WITNESS:  So the question you're
6   asking me is the AWPs and the WAC that we obtain
7   from the drug file, could we validate that they
8   were the AWPs that were published?
9   BY MS. HEALY SMITH:
10      Q.   No, could you validate that they were
11  the accurate wholesale acquisition costs and
12  accurate average wholesale price?
13      A.   The true, actual average price --
14  average wholesale price is not obtainable by any
15  individual.  Wholesalers don't release that
16  information.
17      Q.   Yesterday you testified that the state
18  -- and I think again today, that the state could
19  have continued to use actual acquisition costs as
20  the estimated acquisition costs or EAC in its
21  reimbursement formula.  Did I remember that
22  correctly?

Page 475

1    A.   That's correct.
2    Q.   And yesterday you said you would not
3  have recommended that; is that right?
4    A.   That's correct.
5    Q.   Why not?
6    A.   Because, to the best of my knowledge,
7  the pharmacies were not submitting the actual
8  acquisition cost plus the dispensing fee.  And if
9  they were, and if they were part of a chain, then
10 the actual acquisition costs that they were
11 charged based on their distribution center
12 because of the chain was not a reasonable rate
13 that the Division should be reimbursing at.  It
14 was, in my opinion, and what I would have
15 recommended to the Division, an inflated rate.
16   Q.   Why not audit the pharmacy invoices as
17 you did in 2002?
18   A.   Well, several reasons why not to audit:
19 Number one, it is a very time-consuming and
20 expensive process.  In some situations, as I
21 testified, Rite-Aid wouldn't even release all of
22 their information.  And I am not confident that

Page 476

1   even with trained auditors we would have been
2   able to look at all of the different elements
3   that might have related to an overall total cost
4   of a full set of prescriptions that were ordered.
5        Q.   Is that because not all of the elements
6   would appear on a single invoice?
7        A.   That's true.
8        Q.   If you would look, please, at Dey
9   Exhibit 616.
10       A.   Okay.  I have it in front of me.
11       Q.   This is the letter that counsel showed
12  you yesterday, July 18th, 2000, apparently
13  addressed to state Medicaid Administrator from an
14  executive vice president of sales and marketing
15  at Dey, LP.
16            Yesterday you talked about the second
17  page, the large paragraph underneath the table,
18  and I'd like you to turn to that now, please.
19            First, do you know whether you actually
20  received this particular letter?
21       A.   It looks familiar, but whether I got
22  this actual July 18th, 2000 letter, I don't

Page 483

1  sentence that refers to AWP and says, It is
2  dramatically inflated and will influence any
3  study that has to take it into account.
4          When you drafted this for the
5  Secretary, is that the adjective that you used?
6     A.   Yes.
7     Q.   And in 1996, what percentage of
8  inflation of AWP over actual costs did you
9  consider dramatic?
10         MS. RAMSEY:  Objection.
11         MR. CYR:  Objection.
12         THE WITNESS:  I would have thought
13 something close to 20 percent off of AWP would
14 have been dramatic at the time.
15 BY MS. HEALY SMITH:
16    Q.   Are you aware of any confidentiality
17 restrictions on the use of AMP data that
18 manufacturers provide to CMS?
19    A.   To the best of my knowledge, we were --
20 we as state entities are not allowed to use AMP
21 in any way, that it is considered proprietary.
22    Q.   Are you aware of a proposal to change

Page 485

1      Q.   Did a representative from any of the
2  defendants in this case ever come to you and
3  suggest that it was -- that they were reporting
4  inflated AWPs to compensate for a dispensing fee
5  that in the State of Delaware that they
6  considered to be too low?
7           MR. CYR:  Objection.
8           MS. RAMSEY:  Objection.
9           THE WITNESS:  I have never had any
10 manufacturer propose that, or manufacturer's
11 representative propose that to me.
12 BY MS. HEALY SMITH:
13     Q.   Did you ever communicate to any
14 manufacturer that you understood and approved
15 their reporting of AWPs that were two or three or
16 four or five or even ten times higher than actual
17 prices?
18          MR. CYR:  Objection.
19          MS. RAMSEY:  Objection.
20          THE WITNESS:  I would never -- I don't
21 recall ever, and I don't have the opinion that it
22 is a reasonable thing to have an inflated AWP, so

Page 486

1  I would have never had a conversation stating
2  that I approved of what they were doing.
3  BY MS. HEALY SMITH:
4      Q.   And what is your opinion of an inflated
5  AWP?
6           MS. RAMSEY:  Objection.
7           MR. CYR:  Objection.
8           THE WITNESS:  I think it is sad
9  commentary on the profession that we have no data
10 element that we can reliably use for ingredient
11 costs so that we can move to reimbursing the
12 professional clinician for their services
13 rendered.
14 BY MS. HEALY SMITH:
15     Q.   If you would look at Exhibits 612, 613,
16 614 and 615, please.
17          MS. RAMSEY:  I'm sorry.  Which numbers
18 did you say? 612 through 615; is that correct?
19          MS. HEALY SMITH:  Yes.
20          THE WITNESS:  Okay.  These are the OIG
21 reports is what you're asking me to look at.
22          Okay.  Got 'em.