# Exhibit 12

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories,*
*Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS


Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

# Atlanta, GA

Page 1

              IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

---------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,    ) by JERRY

Inc., v. Boehringer Ingleheim      ) DUBBERLY

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) DECEMBER 15, 2008

---------------------------------X

Page 2

1                VIDEOTAPED DEPOSITION OF

2                    JERRY DUBBERLY

3

4                  December 15, 2008

5                     8:51 a.m.

6

7              75 Spring Street, SW

8              600 U.S. Courthouse

9                Atlanta, Georgia

10

11    Jennifer D. Hamon, CCR-B-2287, RPR

12

13

14

15

16

17

18

19

20

21

22

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

# Atlanta, GA

Page 36

```
 1            That vender changed in 2000 -- I
 2     believe it was July 1st of 2000 -- when the
 3     department contracted and went live with Express
 4     Scripts to process the pharmacy claims and
 5     perform the similar functions.
 6            And then that role changed again
 7     January 1st of 2007, when the department moved to
 8     a company called SXC.
 9       Q.    But continuously from 1991 through to
10     the present, the process has been delegated to an
11     outside contractor?
12       A.    The process for claims adjudication and
13     payment, yes.
14       Q.    Has that always been a computerized
15     system?
16       A.    At -- I'm not sure at what point it
17     converted from -- from paper or -- or other means
18     to -- to electronic, but my understanding is it
19     has been since 1991 at least.  So --
20       Q.    What's the approximate annual -- can
21     you give us any sense of the approximate annual
22     budget for the pharmacy program over the years?
```

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 67

1    which we don't use in our reimbursement

2    methodology.  It also includes new AWP, which our

3    definitive source of AWP is our PBM's drug file.

4    And so we do not update individual NDC pricing

5    outside of our established mechanism with -- for

6    AWP with the PBM.

7         Q.   You don't send this type information on

8    to the physical agent that --

9         A.   No.

10         Q.   -- processes the claims?

11         A.   We don't forward that on to them.

12         Q.   Does the Georgia Medicaid program have

13    a MAC program for its pharmaceutical benefits?

14         A.   We do.

15         Q.   What is that?

16         A.   It's a maximum allowed cost program

17    where a price is established for a medication

18    that is attempted to be more reflective of their

19    actual acquisition cost in the market.

20         Q.   What does MAC stand for?

21         A.   Maximum allowable cost.

22         Q.   Where has Georgia historically obtained

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 69

1      Q.    What is the general point of the MAC

2    program?

3      A.    The point of the MAC program is to try

4    to comply with the federal regulations of

5    reimbursing closer to the actual acquisition cost

6    of the drug.

7      Q.    Is one of the goals also to help save

8    money for the Medicaid program?

9      A.    It does that as well.

10     Q.    How do federal upper limit prices come

11   into play in that regard?

12     A.    The federal upper limit prices are set

13   by the feds.  Those prices are loaded into the

14   PBM system as well, and it's one of the points of

15   comparison when a claim processes to identify the

16   lesser-of reimbursement.

17     Q.    How does the State of Georgia identify

18   the usual and customary charge of a provider?

19     A.    The -- the usual and customary charge

20   is the charger submitted by the pharmacy on the

21   claim.  By their submission, they are conveying

22   to us that that is their cash paying price for a

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 75

1    necessary or appropriate.

2         Q.   Are you aware of any time when the MAC

3    amount had to actually be changed as a result of

4    a provider submitting invoice information?

5         A.   Yes.  Yes.  There was -- there was one

6    instance which actually applied to a -- a larger

7    -- it wasn't -- it wasn't specific to one drug.

8    Our PBM was applying a method -- the methodology

9    that was more aggressive than what we had

10   authorized.

11            And so we had them readjust the

12   methodology to -- to suit what we had proposed to

13   them, which was an AWP of approximately -- AWP

14   minus 65 percent range is where we had looked for

15   most of our MACs to be set, 65 to 70 percent.

16        Q.   But what was the outcome of that

17   particular situation?  The MAC was set at a

18   higher level?

19        A.   Correct.

20        Q.   And that was the only time you can

21   think of where that happened?

22        A.   Right.

Henderson Legal Services, Inc.

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 92

1        calculate the rebate, the supplemental rebate.

2                When we changed methodologies under

3        Georgia -- under Exhibit Georgia 17, AMP was not

4        used in -- in this calculation explicitly.

5        However, it was a guaranteed net unit price --

6        guaranteed pricing which would have taken into

7        account the federal rebate which is calculated

8        from AMP.  So --

9                        (Whereupon a document was

10       identified as Exhibit Georgia 018.)

11            Q.    (By Mr. Lavine)  I've just marked as

12       Exhibit 18 a letter-sized document.  It states on

13       the front cover "Georgia Department of Community

14       Health," June 30th, 2000.  In the upper right-

15       hand corner it states "Deloitte & Touche."

16                I'll just ask you to take a look and

17       tell me if you recognize that document.

18            A.    I do.

19            Q.    What is it?

20            A.    This is a dispensing fee survey that

21       the department paid Deloitte to conduct in 2000

22       to determine the cost of dispensing to Medicaid

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 93

1    pharmacies.

2         Q.   On page 3, in the very first paragraph,

3    it states that, "During Fiscal Year 1999, the

4    Medicaid Program paid pharmacy providers on

5    behalf of its recipients for 12.7 million

6    prescription claims with a total expenditure of

7    $435 million."

8              And then, Dispensing fees accounted for

9    approximately 10 percent of the total

10   expenditure.

11             Do those numbers appear generally

12   accurate to you?

13        A.   Yes.

14        Q.   And this report was prepared by

15   Deloitte & Touche at the request of the Georgia

16   Medicaid program?

17        A.   That's correct.

18        Q.   And the purpose of it was to help

19   administer the Medicaid program?

20        A.   Yes.

21        Q.   I just wanted to go back to the

22   provision we talked about for the reimbursement

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                              December 15, 2008

## Atlanta, GA

Page 94

1    methodology for I think it was July of '93

2    through the end of 1995, where the dispensing fee

3    for certain drugs was based upon 10 percent of

4    the estimated acquisition cost.

5              Do you remember that provision?

6         A.   Yes.

7         Q.   Is it fair to say that that provision

8    paid a higher dispensing fee for higher cost

9    drugs?

10             MR. ROBBEN:  Object to the form.

11        A.   Yes.  That would be generally true.

12        Q.   (By Mr. Lavine)  Are you familiar with

13   the reasoning behind that approach?

14        A.   I'm not familiar with the department's

15   actual documentation on that rationale.  But the

16   argument that is routinely heard is that it costs

17   more -- more overhead, more inventory cost to

18   store higher cost drugs.

19        Q.   For the provision that we saw for

20   Georgia Medicaid, the trigger for the increased

21   dispensing fee would have been the amount of the

22   reimbursement as determined by the lower-of

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                                December 15, 2008

# Atlanta, GA

Page 95

1    methodology; is that right?

2         A.    I'm sorry.  Could you clarify.

3         Q.    Sorry.

4              If a -- why don't we just pull out

5    Exhibit 3, I think it is.

6         A.    4.

7         Q.    Were there -- there were two types of -

8    - or two approaches to calculating a dispensing

9    fee in that time frame; is that right?

10        A.    Can you remind me which time frame

11   you're speaking of again.

12        Q.    I think it's the July '93, where it

13   talks about the dispensing fee of 10 percent of

14   the GEAC up to $15.

15        A.    All of the dispensing fees listed for

16   that time period on the historical document are

17   10 percent of the Georgia estimated acquisition

18   cost.

19        Q.    I'm sorry.  Actually we're looking at

20   Exhibit 4.

21              All right.  So the -- there was just

22   one approach to calculating the dispensing fee.

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

## Atlanta, GA

Page 96

1    It was just 10 percent of the estimated

2    acquisition cost up to $15.

3            A.    Correct.

4            Q.    So the $15 would be a cap on the

5    dispensing fee.

6            A.    Correct.

7            Q.    But the 10 percent was calculated by

8    reference to the -- what's referred on Exhibit 4

9    as the GEAC; correct?

10           A.    Correct.

11           Q.    And the GEAC is what we talked about as

12   being determined on the basis of the lower-of the

13   various items we discussed, AWP minus 10 percent

14   at that time --

15           A.    The --

16           Q.    -- or the MAC, et cetera?

17           MR. ROBBEN:    Object to the form.

18           A.    The GEAC itself refers to the discount

19   off AWP.    So when we say "GEAC," we're referring

20   to AWP minus 10 percent in that case.

21           Q.    (By Mr. Lavine)    And you said that a

22   commonly articulated reason for a higher

Henderson Legal Services, Inc.

dd23118e-9e82-4fd1-afbb-155015bf3b99

Atlanta, GA

Page 97

1    dispensing fee on higher cost drugs is the higher

2    inventory carrying cost; is -- did I say that

3    right?

4         A.   That's the argument that the provider

5    community makes for that.

6         Q.   And if a -- if a higher dispensing fee

7    was paid in connection with a drug that had an

8    AWP, for example, of $60 or $70 even though the

9    actual acquisition cost of that drug was in the

10   $4 to $5 range, would the -- the stated basis of

11   trying to cover for the increased inventory cost

12   be applicable?

13        MR. ROBBEN:  Object to the form.

14        A.   Can you restate.  I apologize.

15        Q.   (By Mr. Lavine)  Well, the -- that's

16   okay.  It was a quite a long --

17        A.   Okay.

18        Q.   -- question.

19        We're looking at a dispensing fee

20   that's 10 percent of the GEAC; correct?

21        A.   Correct.

22        Q.   And you said one of the reasons for

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

# Atlanta, GA

Page 98

1  paying a higher dispensing fee for the higher

2  cost drugs is that there's a higher inventory

3  carrying cost for those drugs.

4      A.   Correct.

5      Q.   At least that's the articulated basis;

6  is that right?

7      A.   Correct.

8      Q.   In circumstances, however, where that

9  larger dispensing fee would have been paid on the

10  basis of a GEAC of let's say $60 even though the

11  pharmacy was actually acquiring it for $40, would

12  you agree that that stated basis for the higher

13  dispensing fee would be inapplicable?

14          MR. ROBBEN:  Object to the form.

15      A.   Yes.

16      Q.   (By Mr. Lavine)  For example, if the

17  reimbursement on a 1-gram flip-top vial of

18  Vancomycin was approximately $60, that would have

19  led to a dispensing fee of 10 percent of that $6

20  -- 10 percent of the $60 would be $6; is that

21  right?

22      A.   Correct.

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008
Atlanta, GA

Page 99

1      Q.   But if the actual cost to the pharmacy

2    was $5, the inventory cost rationale for the

3    higher dispensing fee would not apply --

4            MR. COLE:   Object the form.

5      Q.   (By Mr. Lavine)  -- is that right?

6      A.   The rationale would still stand, but

7    the -- but -- but the dispensing fee would

8    probably -- would be overstated based upon the

9    intent of the methodology.

10     Q.   Are you aware of the general

11   allegations of fraud that are -- that have been

12   made in this litigation against the defendants

13   Abbott Laboratories, Dey, and Boehringer-

14   Ingelheim, or Roxane?

15     A.   In general, yes.

16     Q.   So the State of Georgia is currently

17   aware of the idea that at least some drug

18   companies have been purposely creating spreads on

19   their drugs between the AWP and the actual

20   selling price in order to drive business to their

21   products?

22            MR. ROBBEN:   Object to the form.

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

# Atlanta, GA

Page 101

1       Q.     (By Mr. Lavine)  Did Georgia gain any

2    knowledge of those types of allegations from any

3    information directly provided by the

4    representative of any drug company?

5       A.    No.

6            MR. COLE:  Object to the form.

7       Q.     (By Mr. Lavine)  For example, did

8    anybody -- any representative of Abbott

9    Laboratories ever convey information to Georgia

10   to the effect that it was purposely increasing

11   its AWPs on certain drugs to create larger

12   spreads so that it would be more profitable for

13   its customers, and that way Abbott would sell

14   more product?

15           MR. COLE:  Object to the form.

16      A.    No.

17      Q.     (By Mr. Lavine)  Did any representative

18   from Dey ever tell Georgia that it was purposely

19   increasing its spreads on at least some of its

20   products so that it would be more profitable to

21   its customers in order to increase its sales?

22           MR. ROBBEN:  Object to the form.

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 102

1        A.    No.

2        Q.    (By Mr. Lavine)  Did any representative

3    from Roxane or Boehringer-Ingelheim ever tell the

4    State of Georgia that it was purposely creating

5    larger spreads on its drugs so that its drugs

6    would be more profitable to its customers, and

7    thereby it could increase its sales?

8            MR. ROBBEN:  Object to the form.

9        A.    No.

10        Q.    (By Mr. Lavine)  So to the extent that

11    Georgia has knowledge of those types of

12    allegations, would it be fair to say that it came

13    from sources other than communications from drug

14    companies?

15            MR. ROBBEN:  Object to the form.

16        A.    Yes.

17        Q.    (By Mr. Lavine)  And some of its

18    information Georgia accumulated on its own?

19            MR. ROBBEN:  Object to the form.

20        A.    Yes.

21        Q.    (By Mr. Lavine)  Did anybody from the

22    State of Georgia, to your knowledge, ever tell

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 103

1    Abbott -- ever tell anybody from Abbott, Dey, or

2    Roxane that it wanted them to purposely increase

3    the spreads on their products to help them sell

4    more drugs?

5              MR. ROBBEN:  Object to the form.

6              MR. COLE:  Object to the form.

7       A.    No.

8              MR. COLE:  Is there a question pending,

9    or did he answer the last question?

10             MR. LAVINE:  He answered the last

11   question.

12             MR. COLE:  What was the answer?

13             THE WITNESS:  No.

14             MR. COLE:  Thank you.

15      Q.    (By Mr. Lavine)  Can you explain the

16   manner in which the State of Georgia would

17   reimburse for what it considers to be compounded

18   drugs.

19      A.    Compounded drugs we reimburse at the

20   sum of the AWPs of the ingredients of the

21   compound plus a dispensing fee.

22      Q.    And what is the difference between a

Henderson Legal Services, Inc.

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 256

1        A.   I wasn't privy to this discussion at

2   this time.

3        Q.   (By Mr. Robben)  Has -- it refers to an

4   agreement made with the state legislature; right?

5             MR. SULLIVAN:  Object to the form.

6        A.   It does state that.

7        Q.   (By Mr. Robben)  Has -- is -- is that a

8   common phrasing of the -- of the relationship

9   between the Georgia Medicaid program and the

10  state legislature --

11            MR. LAVINE:  Object to form.  Sorry.

12            MR. ROBBEN:  Strike that.

13       Q.   (By Mr. Robben)  Is it common for

14  people who work for the Georgia Medicaid program

15  to refer to having made an agreement with the

16  state legislature?

17            MR. LAVINE:  Object to form.

18       A.   I can't think of an example where we

19  have made an agreement with the legislature.  I

20  guess for that to be common practice, it would

21  have to be something I would be familiar with,

22  and I'm not familiar with that practice.

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 257

1       Q.    (By Mr. Robben)   Is it fair to say that

2    the reimbursement rate -- strike that.

3            Is it fair to say that the

4    reimbursement formula that Georgia Medicaid

5    applies has been shaped at least in part by

6    political considerations?

7            MR. LAVINE:   Object to form.

8       A.    Yes.

9       Q.    (By Mr. Robben)   And is that because

10   providers have lobbied Georgia Medicaid and the

11   state legislature and the governor when

12   reimbursement hasn't been to their liking?

13           MR. LAVINE:   Object to form.

14           MR. SULLIVAN:   Object to form.

15      A.    The reason is that rate changes are

16   included in the budget which is included in the

17   bill which goes through the legislative process.

18           I'm not aware of a situation where we

19   have pulled back on reimbursement changes due to

20   some agreement or other consideration made with

21   the legislature.

22      Q.    (By Mr. Robben)   Has it ever -- strike

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                                    December 15, 2008

# Atlanta, GA

Page 357

1        Q.    (By Mr. Lavine)   Do you remember

2    Exhibit 14 -- or can you pull out Exhibit 14,

3    please.

4             The very -- the next-to-last paragraph,

5    "We would also clarify our policy that a

6    dispensing fee determination must be separate and

7    distinct from the EAC determination and unrelated

8    to the cost of the drug product."

9             Has it been the understanding of the

10   Georgia Medicaid program that that is the

11   directive of the federal -- the federal program

12   that runs Medicaid?

13        A.    Yes.

14             MR. COLE:   Object to the form.

15        A.    Yes.

16             MR. LAVINE:   Let me just mark two more

17   exhibits real quick.

18             MR. COLE:   Was there an answer to the

19   last question?

20             THE COURT REPORTER:   It was, "Yes."

21             MR. COLE:   Thank you.

22                  (Whereupon a document was

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

# Atlanta, GA

Page 361

1          MR. ROBBEN:  Object to the form.

2          MR. COLE:  Object to the form.

3      A.   Yes.  The practice is frowned upon by

4  CMS.  However, subsequent state plans have been

5  approved that do the same thing.

6      Q.   (By Mr. Lavine)  Is there --

7          MR. COLE:  I'm sorry.  Could I have

8  that answer read back, please.

9              (The record was read by the

10  reporter.)

11          MR. COLE:  Thank you.

12      Q.   (By Mr. Lavine)  You're referring to

13  the particular situation in Exhibit 34 that

14  describes that a -- a dispensing fee based upon

15  the ingredient as a percentage of the ingredient

16  cost?

17      A.   No.

18      Q.   What do you mean?

19      A.   Subsequent state plans, for example,

20  moving the reimbursement to AWP minus 11 percent

21  plus the 4.63 --

22      Q.   Is there a provision in the state plan

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 362

1    that specifies that the ingredient cost is higher

2    than it otherwise would be --

3         A.   No.

4         Q.   -- and, therefore, the dispensing fee

5    is lower than it would be?

6              MR. ROBBEN:  Object to the form.

7         A.   No.

8              MR. COLE:  Object to form.

9         A.   No.

10        Q.   (By Mr. Lavine)  That's not something

11   that would be approved by CMS, is it?

12             MR. ROBBEN:  Object to the form.

13             MR. COLE:  Object to the form.

14        A.   Can you clarify what the question is

15   again.

16        Q.   (By Mr. Lavine)  If -- if the State of

17   Georgia explained to CMS that it wanted to

18   implement a policy of purposely overpaying

19   ingredient costs so that it could underpay the

20   dispensing fee, would you expect that to be

21   approved by CMS?

22             MR. ROBBEN:  Object to the form.

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 363

1          MR. COLE:   Object to the form.

2     A.   No.

3     Q.   (By Mr. Lavine)   Georgia -- Georgia's

4  Medicaid program understands that a directive

5  from the federal end of the Medicaid program was

6  to keep those two items separate.

7          MR. COLE:   Object to the form.

8     A.   Yes.

9     Q.   (By Mr. Lavine)   Look at Exhibit 18

10  quickly.   It's the Deloitte & Touche exhibit.

11  Look at page 8.

12          The average total cost to dispense a

13  prescription in the state of Georgia at a 95

14  percent confidence rate is $5.01 plus or minus 44

15  cents.

16          So would you agree that that would lead

17  to a dispensing fee of between $5.45 and -- I

18  need to do the math so I get it right -- $4.77?

19          MR. ROBBEN:   Object to the form.

20     Q.   (By Mr. Lavine)   Did I get my math

21  wrong?

22     A.   I'm very tired, but I think it's 4.57.

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 364

1          Q.    I think you're right.

2                So the Deloitte & Touche report

3     commissioned by the Georgia Department of Health

4     dated June 30th, 2000 concluded that the average

5     cost to dispense a prescription in the state of

6     Georgia is between $4.50 and $5.45.

7                Would you agree with that?

8          A.    Yes.

9          Q.    And what was the actual dispensing fee

10    in the state of Georgia at that time?

11               And Exhibit 4 might be a good

12    reference.

13         A.    $4.63 and $4.33.

14         Q.    Would you agree that there is not a

15    substantial difference between the actual

16    dispensing fee and the results of the Deloitte

17    study?

18               MR. ROBBEN:  Object to the form.

19               MR. COLE:  Object to the form.

20         A.    There's not a substantial difference,

21    in my opinion.

22         Q.    (By Mr. Lavine)  Can you look at

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 368

1    by Mr. Robben, on the third page, We estimate

2    that the actual generic drug acquisition cost was

3    a national average of 65.93 percent below AWP.

4         A.   I see that.

5         Q.   So would you agree that the size of the

6    discounts of AWP were getting larger and larger

7    over -- over time?

8         A.   They appear to be, all other things

9    being equal with the study design.

10             THE COURT REPORTER:  What was the last

11   part?

12             THE WITNESS:  They appear to be getting

13   larger, all other things being equal given the

14   study design.

15        Q.   (By Mr. Lavine)  What was the average

16   discount below AWP found in the Deloitte & Touche

17   study commissioned by the State of Georgia?

18        A.   I believe it was 22.

19             Let's look.

20        Q.   For generic drugs; right?

21        A.   In response to your question, on

22   Exhibit 18, page 11, the discount for generic

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 369

1    drugs on average was 22 percent.

2        Q.   And for brand name drugs?

3        A.   For brand name drugs, the average

4    discount from AWP was minus 11 percent.

5             MS. TOWNES:  Are we almost ready to

6    wrap up?

7             MR. LAVINE:  Yeah.  Just probably five

8    minutes.

9        Q.   (By Mr. Lavine)  Let me just ask

10   general questions about the different reports

11   issued over the years that you had discussed

12   earlier.

13            You -- you had talked about government

14   reports issued from health and human services and

15   other sources.

16            Do you remember that?

17       A.   I do.

18       Q.   Do you remember any of those reports

19   that specifically stated that one of the reasons

20   for the differential between the published AWP

21   and the actual cost was that some -- some drug

22   companies were exercising control over those

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

## Atlanta, GA

Page 372

1        MR. COLE:  Object to the form.

2    A.    I do not.

3    Q.    (By Mr. Lavine)  And the -- and you

4    talked about the State of Georgia having

5    knowledge about there being discounts from --

6    between the AWP and the actual acquisition cost.

7        Do you remember that?

8    A.    Yes.

9    Q.    And you agree that that's information

10   that over the years came into the -- or was that

11   information that was accumulated by the State of

12   Georgia over the years?

13       MR. ROBBEN:  Object to the form.

14   A.    Yes.

15   Q.    (By Mr. Lavine)  I mean, slowly it

16   picked up more and more information about the

17   details of the spread; is that right?

18       MR. ROBBEN:  Object to the form.

19   A.    Yes.

20   Q.    (By Mr. Lavine)  Are you aware of any

21   information about the size of the spread and a

22   reason that some spreads continue to get larger

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 373

1   on the part of the State of Georgia being derived

2   from any kind of a disclosure from a drug

3   company?

4          MR. ROBBEN:  Object to the form.

5       A.   No.

6       Q.   (By Mr. Lavine)  So it's information

7   that the State of Georgia figured out on its own?

8       A.   Yes, and in conjunction with

9   conversations with other payers in the industry.

10      Q.   But not because any drug company came

11  to the State of Georgia and explained any of this

12  information?

13      A.   No.

14         MR. ROBBEN:  Object to the form.

15      Q.   (By Mr. Lavine)  Can you look at

16  Exhibit 13 quickly, please.  That's the one with

17  the prices of some of the Dey products followed

18  by a paragraph stating, "the AWP listed here does

19  not represent any actual price."

20      A.   Yes.

21      Q.   Do you remember that exhibit?

22      A.   Yes.

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 377

1      - an actual pharmacy?

2          A.    The --

3              MR. COLE:   Object to the form.

4          A.    The generally accepted consensus is

5      that it was to represent the cost at which the --

6      the pharmacy was able to purchase the drug from

7      the manufacturer.  So --

8          Q.    (By Mr. Lavine)  But wouldn't that be a

9      direct price?

10         A.    Could be.

11             MR. COLE:   Object to the form.

12         A.    There's -- there's no definition.

13         Q.    (By Mr. Lavine)  You're not familiar

14     with the differences between a wholesale

15     acquisition cost, a direct price, and an average

16     wholesale price?

17             MR. ROBBEN:   Object to the form.

18         A.    I'm not familiar with -- I mean, direct

19     price is a price that a pharmacy would buy the

20     drug directly from a manufacturer.

21         Q.    (By Mr. Lavine)  All right.  What is --

22         A.    The wholesale acquisition cost would be

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                December 15, 2008

Atlanta, GA

Page 378

1    the cost at which a wholesaler obtains the drug

2    typically from a manufacturer.

3        Q.   And then the AWP?

4        A.   Is a price at which the pharmacy --

5    erroneously is the price at which the pharmacy

6    would obtain the drug.

7        Q.   But it does pertain to that level of

8    the marketplace; right?

9            MR. ROBBEN:  Object to the form.

10       Q.   (By Mr. Lavine)  I understand you're

11   saying there's -- there might be discounts from

12   the AWP.

13           But your -- aren't you agreeing that

14   it's -- represents the price between the

15   wholesaler and the pharmacy?

16           MR. ROBBEN:  Object to the form.

17           MR. COLE:  Object to the form.

18       A.   That's how it is intended.  But it does

19   not represent that.

20       Q.   (By Mr. Lavine)  If you include the

21   word -- let me start over.

22           Are you saying it doesn't represent

dd23118e-9e82-4fd1-afbb-155015bf3b99