# Exhibit 13

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

```
              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

   IN RE: PHARMACEUTICAL

   INDUSTRY AVERAGE

   WHOLESALE PRICE LITIGATION

                         MDL NO. 1456

                         NO. 01-CV-12257-PBS

                         JUDGE PATTI SARIS

                         MAG. MARIANNE BOWLER

   THIS DOCUMENT RELATES

   TO U.S. EX REL.

   VEN-A-CARE OF THE FLORIDA

   KEYS, INC. V. ABBOTT

   LABORATORIES, INC., ET AL.,

   NO. 06-CV-11337-PBS

              VIDEOTAPED DEPOSITION OF MARY

   JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

   BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

   OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

   HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

   STREET, BATON ROUGE, LOUISIANA 70806, ON THE

   31ST DAY OF MARCH, 2008.
```

1     APPEARANCES:

2

3        UNITED STATES ATTORNEYS OFFICE, BOSTON

4        (BY:  JEFF FAUCI, ESQUIRE)

5        JOHN JOSEPH MOUHLEY COURTHOUSE

6        1 COURTHOUSE WAY

7        BOSTON, MASSACHUSETTS  02110

8           (ATTORNEYS FOR THE UNITED STATES)

9

10       LOUISIANA DEPARTMENT OF HEALTH AND

11          HOSPITALS

12       (BY:  KIMBERLY SULLIVAN, ESQUIRE)

13       628 N. FOURTH STREET

14       BIENVILLE BUILDING

15       BATON ROUGE, LOUISIANA  70806

16          (ATTORNEYS FOR THE LOUISIANA

17             DEPARTMENT OF HEALTH AND

18             HOSPITALS)

19

20

21

22

1    A.   What were my expectations of --

2    Q.   Yes.  Stated another way, did you expect
3    that the AWPs reported in the compendia for generic
4    drugs would actually represent the actual
5    acquisition cost of pharmacies net of discounts,
6    rebates and charge-backs?

7         MR. FAUCI:  Is there a time frame on the
8    question?

9    BY MR. TORBORG

10   Q.   From 1991 through 2001.

11   A.   Did I expect it?  No.

12   Q.   Why not?

13   A.   Because I think both of those have two
14   different definitions.  AWP has a different
15   definition than actual acquisition cost, and we
16   were getting AWPs from First DataBank, not actual
17   acquisition cost.

18   Q.   Your understanding of the definition of
19   AWP is it is something that does not include the
20   impact of rebates, discounts and charge-backs,
21   correct?

22   A.   Correct.  It would be the average from

1   the wholesalers, as I understand it. They were
2   supposed to do surveys from wholesalers and
3   determine an average.  But how they did that, I
4   don't know.
5        Q.   But you didn't think that the prices
6   reported in the compendia were the actual average,
7   net of all rebates, charge-backs and discounts,
8   that pharmacies were actually paying from 1991
9   until 2001, did you?
10       A.   That's correct, I did not.
11       Q.   And were there any classes of drugs in
12  particular for which you knew AWPs were not a
13  reliable indicator of actual acquisition costs?
14       MR. FAUCI:  Objection.
15       THE WITNESS:  No.
16  BY MR. TORBORG
17       Q.   But you became aware of, through your
18  review of reports like Myers and Stauffer's and the
19  OIG, that generic drugs, there was a larger
20  variability between AWP and actual acquisition
21  costs for generic drugs?
22       A.   I don't recall that.  It may be in here,

Page 133

1    until I had the appropriate information before me.
2         Q.   What information would you need?
3         A.   I would need some justification to know
4    that the prices were accurate.
5         Q.   And would you assume that AMP, if the
6    state tried to go to an AMP reimbursement
7    methodology during the period 1991 through 2001,
8    that there would be provider complaints?
9         A.   I would assume so, yes.
10        Q.   And those provider complaints may have
11   prohibited or inhibited the state of Louisiana's
12   ability to go to an AMP-based reimbursement
13   methodology, correct?
14        MR. FAUCI:  Objection.
15        THE WITNESS:  I think if the data was correct
16   and there were appropriate surveys, perhaps it
17   would have been a structure that could have been
18   used, a benchmark that could have been used.
19   BY MR. TORBORG
20        Q.   Do you recall a time back in early 1989
21   when the department attempted to enact an emergency
22   rule to lower reimbursement from AWP minus 10.5

1    percent to AWP minus 15 percent?

2         A.   Yes.

3         Q.   And what happened?

4         A.   Lots of things happened.

5         Q.   Tell me about what happened.

6         A.   I don't know that I can remember
7    everything that happened, but there was an
8    emergency rule to lower the ingredient cost, and
9    there were a lot of complaints and I can't tell you
10   the chronology of events, but Myers and Stauffer
11   conducted a survey, and they determined a
12   reasonable discount off of AWP, and the department
13   did rule making and a state plan amendment and
14   changed the reimbursement formula at that time.

15        Q.   To AMP minus 15 percent.  Is that
16   consistent with your recollection?

17        A.   Well, it was 13 and a half and 15 for
18   chains.  The chains have more than 15.

19        (Exhibit Abbott 1052 was marked.)

20        MR. TORBORG:  For the record, what I have
21   marked as Abbott Exhibit 1052 bears the Bates Nos.
22   JD-SUB-LA-000218 through 34.  It appears to be a

Terrebonne, Mary Julia                                    March 31, 2008

Page 138

1    A.    Because I wrote the date up here.
2    Q.    I see.  So, it is the same day?
3    A.    Right.
4    Q.    The same day as you received the findings
5  from Myers and Stauffer, finding AWP minus 17
6  percent for brand name drugs, you sought to change
7  the reimbursement to AWP minus 15 percent.  Is that
8  right?
9    A.    I'm sure I was directed to, yes.
10   Q.    Do you recall who directed you to do
11 that?
12   A.    I do not.
13   Q.    And is this -- who is this form going to?
14   A.    This form goes to our fiscal intermediary
15 to do the program changes.
16   Q.    And if we go to the page ending 237, this
17 is dated 4-7-99, correct?
18   A.    Correct.
19   Q.    "Project Title:  AWP minus 10.5 percent."
20 Do you see that?
21   A.    Yes.
22   Q.    And at the top it says, "Emergency Rule

Terrebonne, Mary Julia                           March 31, 2008

Page 270

```
 1        Q.   Sure.  Would you agree that under
 2   Louisiana's state plan, reimbursement for
 3   acquisition cost, the ingredient cost in a drug,
 4   was intended solely to reimburse for the cost of
 5   acquiring the drug?
 6        MR. TORBORG:  Object to the form.
 7        THE WITNESS:  No.  We had a dispensing
 8   component as well.
 9   BY MR. FAUCI
10        Q.   Right.  We have two components, we have
11   the dispensing component and then the ingredient
12   component.  Correct?
13        A.   Correct.
14        Q.   And would you agree that under the state
15   plan, the ingredient reimbursement part of the
16   methodology, that was solely intended to compensate
17   a provider for its cost of acquisition?
18        MR. TORBORG:  Object to the form.
19        THE WITNESS:  For the ingredient component?
20   BY MR. FAUCI
21        Q.   Yes.
22        A.   Yes.
```

1    Q.   And that under the state plan, the actual
2  cost of dispensing a drug and any profit to a
3  provider was to be reflected in the dispensing fee?
4       MR. TORBORG:  Object to the form.
5       THE WITNESS:  No.  There is some profit
6  reviewed in the ingredient cost as well.
7  BY MR. FAUCI
8    Q.   Under the state plan?
9    A.   Under the survey results.
10   Q.   No, but under the state plan, Louisiana
11 submitted a state plan to Medicaid or CMS or HCFA.
12 Correct?
13   A.   Yes.
14   Q.   And under that state plan as it was
15 submitted to what is now known as CMS, was it your
16 understanding that the dispensing fee was the only
17 part of the reimbursement methodology that was
18 intended to compensate for the cost of dispensing a
19 drug and any profit associated with dispensing a
20 drug?
21      MR. TORBORG:  Object to the form.
22      THE WITNESS:  I probably don't feel

1  comfortable answering that because that happened in
2  1989 and I was not as involved in that submission
3  when it was initially discounted.
4  BY MR. FAUCI
5       Q.   You have indicated that you believe that
6  inflated reimbursement for ingredient costs may
7  have been appropriate to offset purportedly
8  inadequate dispensing fees.  Is that correct?  Is
9  that a correct statement of your testimony?
10      A.   I'm sorry.  Could you repeat your
11 question?
12      Q.   As I understand your testimony, you have
13 indicated that inflated reimbursements for
14 ingredient costs may have been appropriate in order
15 to offset purportedly inadequate dispensing fees.
16 Is that correct?
17      A.   I don't think I said that.
18      Q.   You don't?  Okay.
19           Do you think that under the state plan,
20 it is appropriate for the ingredient cost part of
21 the methodology to be used to cover a pharmacy's
22 dispensing costs?

1        MR. TORBORG:  Object to the form.
2        THE WITNESS:  I said it is a double equation
3    with both ingredient cost and the dispensing fee,
4    and it should be looked at that way. And it is
5    approved by CMS, so it is ultimately not my
6    decision.
7    BY MR. FAUCI
8        Q.   Just take a step back then, and at a very
9    general level, do you believe that the
10   determination of what a state pays in dispensing
11   fees should be something that is determined by
12   state officials?
13       A.   I think it should be conducted based on
14   survey results.
15       Q.   But that the final determination should
16   be made by a state official?
17       A.   Well, the final determination is made by
18   CMS.
19       Q.   In the form of an approval of a plan
20   submitted by a state?
21       A.   Correct.
22       Q.   Could you envision a fair and reasonable

1   reimbursement methodology that allowed each drug
2   manufacturer to determine for itself what the state
3   is to pay as reimbursement?
4          MR. TORBORG:  Object to the form.  Misstates
5   facts.
6          MR. FAUCI:  It is just a question.
7          THE WITNESS:  I don't know the answer to that.
8   BY MR. FAUCI
9       Q.   Hypothetically, do you think it could
10  ever be a fair and reasonable reimbursement
11  methodology wherein a drug manufacturer was allowed
12  to set the cost -- allowed to set the reimbursement
13  for dispensing fees?
14         MR. TORBORG:  Same objection.
15         THE WITNESS:  For a drug manufacturer to set
16  the cost?
17  BY MR. FAUCI
18      Q.   Yes.
19      A.   For a dispensing fee?
20      Q.   Yes.
21      A.   No.
22      Q.   You don't think that would be a

Terrebonne, Mary Julia                                    March 31, 2008

Page 275

1    reasonable way to --
2        A.    No.
3        MR. TORBORG:  Object to the form.
4    BY MR. FAUCI
5        Q.    Throughout the 1990s, 1991 to 2000 time
6    frame, did you have any understanding as to whether
7    or not drug manufacturers were causing specific
8    AWPs to be published primarily for the purpose of
9    increasing reimbursement to providers?
10       MR. TORBORG:  Objection.
11       THE WITNESS:  No.
12   BY MR. FAUCI
13       Q.    And did you have any understanding as to
14   whether or not the Louisiana legislature intended
15   to allow drug manufacturers to determine how much
16   the state should reimburse them for their drugs?
17       MR. TORBORG:  Objection.
18       THE WITNESS:  No.
19       MR. FAUCI:  Those are all my questions.
20                EXAMINATION BY MR. TORBORG
21       Q.    Two quick follow-up questions.
22             If you would take out Exhibit 1051.  It's