# Exhibit 16

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           ) CIVIL ACTION:

LITIGATION                        ) 01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO          )

ALL CLASS ACTIONS                 )

---------------------------------X


VIDEOTAPED DEPOSITION OF THE NEW JERSEY DEPARTMENT

OF HUMAN SERVICES by EDWARD J. VACCARO


C O M P U T E R I Z E D   T R A N S C R I P T

of the stenographic notes of the proceedings in the

above-entitled matter as taken by and before MARY T.

NOVAK, a Certified Shorthand Reporter and Notary

Public of New Jersey, at the U.S. Attorney's Office,

402 East State Street, Trenton, New Jersey on

Tuesday, December 2, 2008 commencing at fifteen

minutes after nine o'clock in the forenoon.

```
                                                              Page 2
 1                   A P P E A R A N C E S

 2

 3    Attorneys for United States and United States ex

 4    rel. Ven-a-Care of the Florida Keys v. Abbott

 5    Laboratories, Inc., Dey Labs and Roxane

 6              UNITED STATES DEPARTMENT OF JUSTICE

 7              BY: JAMIE ANN YAVELBERG, ESQ.

 8              Commercial Litigation Branch

 9              Ben Franklin Station, P.O. Box 261

10              Washington, D.C. 20044

11              (202) 514-6514

12              jamie.yavelberg@usdoj.gov

13

14    Attorney for the State of New Jersey and

15    Edward J. Vaccaro

16              STATE OF NEW JERSEY

17              BY: ZOE J. McLAUGHLIN, ESQ.,

18              DEPARTMENT OF LAW & PUBLIC SAFETY

19              25 Market Street

20              Trenton, New Jersey  08625

21              (609) 341-3689

22              zoe.mclaughlin@law.dol.lps.state.nj.us
```

Page 83

1   wants and needs of constituents, typically,
2   demonstrated to the legislature through lobbying
3   efforts.  Inevitably, these efforts would result
4   in certain initiatives that we would propose
5   being turned down.
6       Q.   And were, I think you mentioned
7   pharmacy associations?
8       A.   Yes.
9       Q.   What are the names of some of those
10  pharmacy associations?
11      A.   Garden State Pharmacy Owners.  New
12  Jersey Pharmacists Association.  Pharma.
13  Pharmaceutical Manufacturers Association.  IPA,
14  Independent Pharmacy Association.  1, 2, 3, 4.
15  Of course, the Association of Long Term Care
16  Pharmacy Providers.  That's pretty well it.
17      Q.   In that list there you mentioned
18  Pharma.  Are they a pharmacy association?
19      A.   They are a manufacturer organization.
20      Q.   And did they also play a role with the
21  general assembly in these measures?
22      A.   Very large role.

Page 84

1     Q.   And in what way?
2     A.   They had the resources to lobby.
3  Legislatives, representatives to discourage
4  passage of certain bills that would impact their
5  marketplace.
6     Q.   And would the reimbursement rate impact
7  their marketplace?
8     A.   Absolutely.
9     Q.   And did they lobby on reimbursement
10 rates?
11    A.   Oh, sure.  They would try to discourage
12 any reduction in reimbursement.
13    Q.   And are there any pharmaceutical
14 companies located in New Jersey?
15    A.   Many.
16    Q.   Can you name some of them?
17    A.   Merck, you're going to get me on this
18 one.  Merck is one.  Lily is another one.  Lily
19 is Annapolis.  That's not it.  The only one that
20 sticks in my mind is Merck.
21    Q.   Is there more than one?
22    A.   There's many.  At this point they're

NJ Dept of Human Services (Edward J Vaccaro)                         December 2, 2008
Trenton, NJ

Page 89

1   reimbursement rate was going to be addressed by
2   the budget, and you were working in the budgetary
3   process, were you aware of any lobbying by any
4   entities with regard to that reimbursement rate?
5         A.   It's actually a phenomenal process.
6   The Pharma would actually come in-house and
7   discuss with us their wants and needs so that we
8   could carry these want and needs to the
9   department who, of course, was in closer to the
10  budget process, as well the five pharmacy
11  associations would come in and meet with us, as
12  well, almost in every budget year that it would
13  take place.  We had a very close relationship
14  with Pharma and a close relationship with the
15  five pharmaceutical manufacturers -- five
16  pharmaceutical associations in New Jersey.
17        Q.   And did Pharma, did any drug company
18  specifically apart from Pharma also meet with
19  you?
20        A.   Sometimes they did accompany the Pharma
21  representative who came to the state, sure.
22        Q.   And when Pharma or a drug company or a

Page 90

1    drug association met with you or met with the
2    Department of Human Services, did they also
3    indicate to you that they were speaking with
4    state legislators?
5         A.   Oh, absolutely.  Absolutely.  In fact,
6    they can identify the ones they were targeting.
7              MS. YAVELBERG:  Thank you.  We'll take
8    a short break.
9              THE VIDEOGRAPHER:  The time is now
10   10:33.  We're going off the video record.
11             (A recess is taken.)
12             THE VIDEOGRAPHER:  The time is now
13   10:47.  This begins videotape number 2 of the
14   videotape deposition.  You may proceed.
15   BY MS. YAVELBERG:
16        Q.   In addition to drug ingredient cost,
17   Mr. Vaccaro, is there another portion of
18   reimbursement for pharmacy claims?
19        A.   Yes.
20        Q.   And what is that?
21        A.   The dispensing fee.
22        Q.   And what is the actual amount of the

1  methodology consistent or inconsistent with that
2  policy?
3      A.   Consistent with that policy.
4      Q.   Does your state have, currently have
5  any practice or policy to pay inflated ingredient
6  costs in order to make up for inadequate
7  dispensing?
8          MR. KIM:  Objection to form.
9      A.   No.
10     Q.   Has your state ever had a policy or
11 practice of paying inflated ingredient cost in
12 order to make up for an inadequate dispensing?
13         MR. KIM:  Same objection.
14     A.   No.
15     Q.   Okay.  Now, I'd like to talk for a
16 couple of minutes about the claims processing
17 process.
18     A.   Okay.
19     Q.   You mentioned earlier that New Jersey
20 processed about 15,000,000 claims a year; is that
21 right?
22     A.   Correct.

NJ Dept of Human Services (Edward J Vaccaro)                        December 2, 2008
Trenton, NJ

Page 140

1  reasonable basis so New Jersey happens to be a
2  week.
3      Q.  And if New Jersey receives a price in a
4  field that is not updated on a regular basis, can
5  it use it?
6      A.  It continues as is until such time that
7  it's impacted by change.  So in answer to your
8  question, if there's a price on file and there's
9  no change in a particular week it stays what it
10 is until the next time there's an update to
11 change it.
12     Q.  Did New Jersey, from time to time, get
13 mail from drug companies?
14     A.  Yes.
15         MS. YAVELBERG:  I'd like to mark this
16 next document as Exhibit 7.
17             (A letter dated January 1996 to
18 Edward Vaccaro on the letterhead of Dey
19 Laboratories is received and marked as Exhibit
20 Vaccaro 007 for identification.)
21         MR. KIM:  Could you just state for the
22 record where this document came from?

Page 141

1        MS. YAVELBERG:  It appears to have the
2   Bates label on the bottom, multiple Bates labels
3   on the bottom.  One is Abbott.  One is Ven-a-Care
4   MDL.  One is R 1.  Is was produced in the
5   litigation.  I'm pretty sure of it.  Do you have
6   a question about that?
7        MR. KIM:  No, I just wanted to get that
8   on the record.
9        MS. YAVELBERG:  Okay.
10      Q.   I've handed you a one page document,
11  Mr. Vaccaro, dated January 1996.  It is a letter
12  addressed to you, Edward Vaccaro.  It is on Dey
13  Laboratories letterhead.
14           Do you see that there?
15      A.   Yes, I to.
16      Q.   Is this the kind of mail that New
17  Jersey would occasionally get from a drug
18  company?
19      A.   Yes.
20      Q.   Do you know whether or not New Jersey
21  received this particular letter?
22      A.   It's Bates stamped so I assume we did.

Page 142

1  Q. And did New Jersey keep these letters
2  on file?
3  A. Yes, we did.
4  Q. And how did you keep them on file?
5  A. By manufacturer.
6  Q. And where did you keep them on file?
7  A. In the pharmacy unit in DMAHS.
8  Q. Paper format?
9  A. Yes.
10 Q. And if we take a look at this letter
11 here, it's titled Addition of Products to State
12 Formulary for the State of New Jersey.
13    Do you see that?
14 A. Yes.
15 Q. And the first line talks about
16 introducing an Albuterol Inhalation Aerosol.
17    Do you see that there?
18 A. Yes, I do.
19 Q. If you look at the middle of the page
20 there's a chart.
21    Do you see that?
22 A. Yes.

1      Q.   And the headings on here, if you could
2  read each of those for me.
3      A.   "NDC/Order Number, Description, Bottle
4  Size, Units per Carton, Cartons per Case, Average
5  Wholesale Price (AWP)."
6      Q.   Thank you.  Are there any other fields
7  on this letter?
8      A.   No.
9      Q.   Any price information besides AWP
10 appear on this letter?
11     A.   No.
12     Q.   Now, did New Jersey receive letters
13 more than just this one?
14          MR. KIM:  Objection.  Vague.
15     Q.   Did New Jersey receive additional
16 letters from other drug companies?
17     A.   Yes.
18     Q.   May New Jersey have received additional
19 letters from Dey Labs?
20     A.   Yes.
21     Q.   About how often per year would New
22 Jersey receive this kind of communication from

1   drug companies?
2       A.   Probably four or five times a year.
3       Q.   Combined all drug companies?
4       A.   It depended upon what their marketing
5   strategy was in New Jersey.  If they were
6   implementing a new program or they had price
7   changes that would generate a communication to
8   their customers and we were on their list as one
9   of their customers.
10      Q.   And, now, you testified that you would
11  have kept these price letters that you received
12  in a file?
13      A.   Yes.  I found out to be the only one in
14  the country that kept these letters.
15      Q.   But what did you do with the
16  information that was provided in these letters?
17      A.   It was intended to support any need we
18  might have to verify information that came over
19  from First DataBank.  It never really happened,
20  but we felt that we had a resource of information
21  that if we just kept it on file we could use it
22  if we needed to.

1    Q.   So you were relying on the
2  representations in the letter for verification
3  purposes?
4    A.   Yes, yes.
5    Q.   Now, is it, if you receive a letter
6  like, you testified that, in fact, New Jersey
7  received this, likely received this letter
8  because it is date stamped and New Jersey --
9    A.   Yes.
10   Q.   -- in fact, received letters from
11 other companies as well.  Could New Jersey change
12 the reimbursement rate for a particular drug in
13 response to a letter of this type?
14   A.   No.
15   Q.   How would the reimbursement system
16 function if you adjusted reimbursement rates each
17 time you received a letter like this?
18   A.   Chaos.
19   Q.   Why?
20   A.   You're processing millions of claims
21 and you have to determine at what point a pricing
22 change impacts the payment of a claim.  So you're

1  sensitive to dates of service and from to dates
2  for the pricing change and, of course, we're not
3  going to know the through date for any pricing
4  change because that's not something that's
5  provided to us so it would be impossible to
6  process a claim.
7            MR. KIM:  Do you mind if I close that
8  door?
9            MS. YAVELBERG:  Go off the record.
10           THE VIDEOGRAPHER:  The time is 11:42.
11 We are going off the video record.
12           MR. KIM:  Do you mind if I close this?
13                (The last answer is read back by
14 the Reporter.)
15           THE VIDEOGRAPHER:  The time is now
16 11:43.  We're back on the video record.
17 BY MS. YAVELBERG:
18     Q.   Now, I'd like to turn to really the
19 center, the issue that's at the center of the
20 case.
21           MR. KIM:  Objection to form.
22           MS. YAVELBERG:  I'm going to hand you

Page 171

1    Q.   Is there a discussion about the
2 differences between acquisition cost and average
3 wholesale price in New Jersey pharmacies?
4    A.   Yes.
5    Q.   And what was the difference there?
6    A.   Depending upon the type of drug for
7 generic it was 18.3 percent and for brands it
8 was, I'm sorry, other way around.  For brands it
9 was 18.3 percent and generics was 42.5 percent.
10   Q.   And what about specifically for New
11 Jersey?
12           THE REPORTER:  I'm sorry.  18 point --
13           THE WITNESS:  18.3 percent for brands.
14 And 42.5 percent for generics.
15           That was a national estimate.  For New
16 Jersey it was 19.8 percent for brand and 39.9
17 percent for generics.
18   Q.   And we've already looked at the last
19 two pages of this document which represent the
20 New Jersey --
21   A.   Right.
22   Q.   -- letter in response to that report,

Page 172

1   correct?
2       A.   Correct.
3       Q.   And is this, the differences between
4   acquisition price and average wholesale price
5   represented in this report, is that consistent
6   with what New Jersey knew at that time?
7       A.   Yes.
8       Q.   Now, does New Jersey have any way, have
9   a way of knowing from the prices that are listed
10  in the First DataBank database which ones might
11  have AWPs that are more than, for example, the
12  39.9 percent for generic drugs?
13      A.   No.
14           MR. KIM:  Objection to form.
15      Q.   And which ones may not --
16           MS. YAVELBERG:  I'm sorry.  What was
17  the objection?
18           MR. KIM:  It's, first of all, vague.
19  Are you talking about particular drugs?
20           MS. YAVELBERG:  No.  Let me try to
21  rephrase the question.
22           MR. KIM:  Please do.

Page 173

1    Q.   Now, I think you testified earlier that
2    New Jersey used the First DataBank drug reference
3    file; is that correct?
4    A.   Correct.
5    Q.   And New Jersey covers about 50,000
6    drugs?
7    A.   Correct.
8    Q.   So based on the drug reference file
9    that New Jersey used for, and it did use for
10   reimbursement purposes; is that correct?
11   A.   Correct.
12   Q.   Did New Jersey have any way of knowing,
13   from the database that it received, which AWPs in
14   the database might exceed the, for example, 39.9
15   percent that's listed in this OIG report?
16   A.   No, we did not.
17   Q.   Could you tell from looking at the
18   database?
19   A.   No.
20   Q.   If a manufacturer reported inflated
21   prices to First DataBank --
22        MR. KIM:  Objection to form.

1    Q.    -- would New Jersey be able to detect
2    those prices in its use of the file?
3    A.    No.
4         MR. KIM:  Objection to form.
5    Q.    And even if you could detect these
6    inflated prices, did you have an alternative
7    source of pricing available?
8         MR. KIM:  Objection to form.
9    A.    No, we did not.
10   Q.    Did New Jersey know that some drug
11   companies used the difference between acquisition
12   price and AWP as a marketing tool to promote
13   their drug over others?
14        MR. KIM:  Objection to form.
15   A.    We had experience with providers and
16   how they purchased drugs and an expectation
17   regarding AWP and the fact that there was an
18   acquisition cost involved to manufacture a
19   product, yes.
20   Q.    Did New Jersey know that some drug
21   companies used the difference, the so-called
22   spread as a marketing tool?