# Exhibit 18

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

                                                                      Page 1

               UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
    - - - - - - - - - - - - - - -x
    IN RE:  PHARMACEUTICAL          :  MDL NO. 1456
    INDUSTRY AVERAGE WHOLESALE      :  CIVIL ACTION:
    PRICE LITIGATION                :  01-CV-12257-PBS
    THIS DOCUMENT RELATES TO        :
    U.S. ex rel. Ven-a-Care of      :  Judge Patti B. Saris
    the Florida Keys, Inc. v.       :
    Abbott Laboratories, Inc.,      :  Chief Magistrate
    No. 06-CV-11337-PBS             :  Judge Marianne B.
    - - - - - - - - - - - - - - -x     Bowler
               IN THE CIRCUIT COURT OF
            MONTGOMERY COUNTY, ALABAMA
    - - - - - - - - - - - - - - -x
    STATE OF ALABAMA,               :
              Plaintiff,            :
            vs.                     :  Case No.: CV-05-219
    ABBOTT LABORATORIES, INC.,      :  Judge Charles Price
    et al.,                         :
              Defendants.           :
    - - - - - - - - - - - - - - -x

Booth, Charles R. April 23, 2007
Washington, DC

Page 2

1  IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2      IN AND FOR LEON COUNTY, FLORIDA
3
4  THE STATE OF FLORIDA
5  ex rel.
6  - - - - - - - - - - - - - - - - - -x
7  VEN-A-CARE OF THE FLORIDA          :
8  KEYS, INC., a Florida              :
9  Corporation, by and through its    :
10 principal officers and directors,  :
11 ZACHARY T. BENTLEY and             :
12 T. MARK JONES,                     :
13           Plaintiffs,              :
14      vs.                           : Civil Action
15 MYLAN LABORATORIES INC.; MYLAN     : No.: 98-3032G
16 PHARMACEUTICALS INC.; NOVOPHARM    : Judge: William
17 LTD., SCHEIN PHARMACEUTICAL, INC.;:    L. Gary
18 TEVA PHARMACEUTICAL INDUSTRIES     :
19 LTD., TEVA PHARMACEUTICAL USA;     :
20 and WATSON PHARMACEUTICALS, INC.,  :
21           Defendants.              :
22 - - - - - - - - - - - - - - - - - -x

Page 156

1     A.    Well, it's my answer.

2     Q.    Fair enough.  Would you agree that for the
3  physicians surveyed, this report advised officials
4  within the Office of Payment Policy that for these
5  physicians, these chemotherapy drugs could be
6  purchased at amounts below AWP?

7           MR. BREEN:  Objection, form.

8     A.    My answer would be the same because I
9  don't -- I don't understand what the IG is really
10 trying to say here.

11    Q.    Well, can you understand what the IG is
12 trying to say in the next bullet point, AWP is not a
13 reliable indicator of the cost of a drug to
14 physicians?  Did you understand that?

15    A.    Yes.  That doesn't mean it's too high, it
16 doesn't mean it's too low, it doesn't mean it's just
17 right.  It just means it's not reliable.

18    Q.    Did you believe that AWP was a reliable
19 indicator of the cost of a drug to a physician in
20 November of 1992?

21          MR. GOBENA:  Object to the form.

22    A.    I actually I think in 1992 thought it was

bd14de97-b1b2-417d-8ba1-2a1c3fba062a

Page 157

1   a relatively reliable indicator, though it was
2   certainly not a consistent indicator.
3        Q.   And in October of 1992 when your office
4   was advised that vancomycin could be purchased at
5   $3.45 and the median AWP was $19.17, you still
6   believed that AWP could be a reliable indicator of
7   acquisition cost?
8        A.   In certain cases, yes.
9        Q.   In which cases is that?
10       A.   Well, I'm not prepared to be specific.
11  It's been too long since I've been involved with
12  this.
13       Q.   How did you determine at the time in which
14  cases --
15       A.   I have no idea.  I do not remember.  I'm
16  sorry, I'm 70 years old.  I have not dealt with
17  these issues for at least 13 years, and when I dealt
18  with these issues, they were very minor in the
19  scheme of things.  I spent extremely little time
20  during my career in payment policy on drugs because
21  we did not have a drug benefit.
22       Q.   But you were the person responsible within

Page 158

1    HCFA.
2         A.    And I was dealing with billion dollar
3    issues, not million dollar issues.
4         Q.    And did you deal with that by delegating
5    to someone else responsibility for million dollar
6    issues?
7         A.    No, I never delegated responsibility.
8    Only authority.
9         Q.    Did you delegate authority to someone else
10   to deal with the million dollar issues?
11        A.    Yes.
12        Q.    To whom did you delegate responsibility
13   for dealing with this million dollar issue?
14        A.    That would have been somebody in
15   Mr. Patashnik's area.
16        Q.    So Mr. Patashnik and the people who worked
17   for Mr. Patashnik would have had the responsibility
18   for determining the extent to which AWP was a
19   reliable indicator of acquisition cost?
20              MR. GOBENA:  Object to the form.
21        A.    They would not.
22        Q.    Who would?

Booth, Charles R.                         April 23, 2007
Washington, DC

Page 159

1      A.     They would have been trying to determine
2 whether or not there were changes that we could make
3 that would pay more fairly for the drugs for which
4 we paid at all.  By this time, the regulation had
5 been issued for paying AWP.  We would have been
6 trying to figure out whether there was something
7 different that we could do to pay differently and be
8 fair to the physicians and fair to the
9 beneficiaries.
10      Q.     What do you mean by paying fairly?
11      A.     Paying an appropriate amount.  Obviously
12 $19 for a $5 drug is not appropriate.
13      Q.     And yet assuming the regulations weren't
14 changed, that's precisely what HCFA continued to do
15 after 1992, correct?
16          MR. GOBENA:  Objection to the form.
17          MR. BREEN:  Object to the form.
18      A.     For one drug.
19      Q.     For that one, HCFA was advised in 1992
20 that there was a difference of as much as $3.45.
21      A.     Okay, someone else is paying $26 for the
22 drug.  Tell me what the price ought to be.

Booth, Charles R.                                           April 23, 2007
                          Washington, DC

Page 160

1    Q.   Well, you're the one that said it was an
2    inappropriate amount.  What is the appropriate
3    amount if the spread --
4    A.   I don't know.  I would have to study the
5    issue, but obviously there are great diversions from
6    what people are paying and what AWP is, both ways.
7    Q.   Assume for me that the data with respect
8    to vancomycin is accurate in the OIG report and that
9    at least one provider is paying $26, at least one
10   provider is paying $3.45.  How should HCFA go about
11   determining a fair amount?
12   A.   I don't know.  And the other problem is I
13   don't know how often one provider paid $3.45.  Is
14   this one time?  Is this consistent?
15        MR. KELLEY:  Mr. Booth is not in a
16   position to say what a provider should do.
17        MR. COOK:  Mr. Booth can testify for
18   himself.
19        MR. KELLEY:  Absolutely.
20        MR. COOK:  If you want to testify for
21   yourself, we'll get a subpoena out, but I'll let
22   Mr. Booth testify.

Booth, Charles R.   April 23, 2007
Washington, DC

Page 171

1  Q. How did you learn about the program
2  memorandum?
3  A. I believe I knew it had gone out shortly
4  after it had been released.
5  Q. And we'll get back to that later, but
6  confining ourselves to the '92 to '97 time frame,
7  you indicated that it was your personal opinion that
8  it would be politically difficult to change the
9  reimbursement methodology for chemotherapy drugs,
10 right?
11 A. Yes.
12 Q. Do you have an opinion about whether there
13 was any difficulty in changing the reimbursement
14 amount for other drugs?
15 A. I do not.
16 Q. Are you aware of any impediments to HCFA
17 changing the manner in which it paid for drugs other
18 than chemotherapy drugs?
19 A. Just the ones we've discussed.
20 Q. In -- I guess about 30 minutes ago we were
21 talking about the fact that for some drugs, in your
22 experience, it can be a wide range of prices

Henderson Legal Services
202-220-4158

Booth, Charles R.   April 23, 2007
Washington, DC

Page 172

1   available to providers, correct?
2            MR. GOBENA:  Object to the form.
3       A.   This is a fact.
4       Q.   Did you know?
5       A.   I knew there were variations in prices
6   that suppliers and physicians paid for drugs.
7       Q.   Did you know that for some drugs, the
8   range between the lowest price available to a
9   supplier or a provider and the highest price paid by
10  a provider or supplier could be quite large?
11           MR. GOBENA:  Object to the form.
12      A.   No.
13      Q.   You thought that they were all tight, or
14  you didn't know either way?
15           MR. GOBENA:  Object to the form.
16      A.   I thought there was a range, 15, sometimes
17  20 percent.  Not more than that.
18      Q.   On what did you base your belief that it
19  wouldn't be more than 29 percent -- I forget.  What
20  was the number that you picked?
21      A.   Twenty.
22      Q.   Twenty percent.  On what did you base your

Booth, Charles R.  April 23, 2007
Washington, DC

Page 173

1   belief that it wouldn't be more than 20 percent?
2       A.   Well, the IG reports that I recall talked
3   about an average of 15 or something in that
4   neighborhood percent.  It was clear that some were
5   lower than that, therefore, some were higher than
6   that, so I assumed we were in the 15 to 20 percent
7   range.
8       Q.   To the extent that there were OIG reports
9   that showed discounts available from AWP in excess
10  of 20 percent, is that something that you would
11  expect individuals within your office to have
12  investigated?
13      A.   Again --
14           MR. GOBENA:  Object to the form.
15      A.   It depends upon the drug, it depends upon
16  the dosage, it depends upon who did the study, it
17  depends upon the volume.  It depends upon too many
18  things to answer the question.
19      Q.   And did you rely upon individuals within
20  your office to take the information and determine
21  whether given all of those factors, it was something
22  worth following up on?