# Exhibit 21

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories,*
*Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Buto, Kathleen                              September 12, 2007

Washington, DC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      ) CIVIL ACTION

PRICE LITIGATION                ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      ) Judge Patti B.

the Florida Keys, Inc.          ) Saris

    v.                          ) Chief Magistrate

Abbott Laboratories, Inc.,      ) Judge Marianne B.

No. 06-CV-11337-PBS             ) Bowler

- - - - - - - - - - - - - - - -

        (captions continue on following pages)

        Videotaped deposition of Kathleen Buto

                    Volume I

                  Washington, D.C.

            Wednesday, September 12, 2007

                    9:00 a.m.

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 2

1                 IN THE CIRCUIT COURT OF

2                MONTGOMERY COUNTY, ALABAMA

3      - - - - - - - - - - - - - - - - -

4    STATE OF ALABAMA,                    )

5               Plaintiff,                ) Case No.

6          vs.                           ) CV-05-219

7    ABBOTT LABORATORIES, INC.,           ) Judge Charles

8    et al.,                              ) Price

9               Defendants.               )

10     - - - - - - - - - - - - - - - - -

11

12

13          STATE OF WISCONSIN CIRCUIT COURT

14                  DANE COUNTY

15     - - - - - - - - - - - - - - - - -

16   STATE OF WISCONSIN,                  )

17               Plaintiff,               )

18          vs.                           ) CASE NO.

19   AMGEN INC., et al.,                  ) 04-CV-1709

20               Defendants.              )

21     - - - - - - - - - - - - - - - - -

22

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 105

1   or Blue Book, whichever is lower."

2           Do you recall that HCFA had proposed

3   and then eventually decided to set the limit at

4   150 percent of the lowest reported price?

5           A.   No, I don't.  I don't remember that.

6           Q.   Do you recall any discussion during

7   your time at HCFA of steps the federal government

8   was taking to encourage providers to use generic

9   drugs?

10          A.   No.  I don't remember that.  Steps we

11  were taking?  What do you mean by steps?  Can you

12  be clearer about that?  Regulatory changes or --

13  let me just be clear.  The government doesn't

14  usually take steps unless it's through a

15  regulation or a manual instruction or that kind

16  of thing.  So I don't know quite what you mean by

17  -- or maybe it's public relations, but --

18          Q.   Let me rephrase.  Do you recall HCFA

19  proposing any regulations proposing or issuing

20  any regulations to encourage use of generic

21  drugs?

22          A.   My recollection is that this was

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                        September 12, 2007
                    Washington, DC

Page 128

1    appear to be important to obtaining long term

2    equity and effectiveness.  The published Red

3    Book/Blue Book prices have been shown to have

4    serious deficiencies as a base for

5    reimbursement."

6            Were you aware during your time at HCFA

7    that there were serious deficiencies in using Red

8    Book and Blue Book prices as a basis for

9    reimbursement?

10        A.   We were aware that based on some IG

11   surveys that we believed that those were not

12   reliable reflections of what we should actually

13   be paying.  So whether you'd call that a

14   deficiency or not, we felt they were just not a

15   reliable basis.

16        Q.   Now, when you say not a reliable basis,

17   what do you mean by that?

18        A.   They seemed to -- if we continued

19   paying based on average wholesale price they

20   seemed to be inflated.  And the inspector general

21   surveys seemed to indicate that it was in the

22   neighborhood of 15 or 16 percent too high.  So

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                              September 12, 2007
                        Washington, DC

Page 129

1    that's what I mean by not a good basis.  Our

2    premise was always what should we be fairly

3    paying, not -- and we were always looking for

4    ways to be more accurate.

5              MR. TORBORG:  Why don't we take a

6    break.

7              THE WITNESS:  Okay.

8              THE VIDEOGRAPHER:  This concludes tape

9    2 in the deposition of Catherine Buto.  Off the

10   record at 11:39.

11              (Recess).

12              (Exhibit Abbott 287 was marked for

13   identification.)

14              THE VIDEOGRAPHER:  This begins tape 3

15   in the deposition of Kathleen Buto.  On the

16   record at 11:59.

17   BY MR. TORBORG:

18        Q.   Welcome back, Ms. Buto.

19        A.   Thank you.

20        Q.   I have handed the witness what we've

21   marked as Exhibit Abbott 287.  It bears the Bates

22   number HHC 002-0540 through 44.  It appears to be

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                        Washington, DC

Page 133

1    in to me.  Probably authored by the office of

2    eligibility policy.

3          Q.    And why did the central office agree

4    with the regional office's decision to disapprove

5    this particular plan amendment?

6          A.    There were -- I haven't looked at this

7    in great detail.  But one of the principal

8    reasons was, you know, our belief based on --

9    particularly on IG surveys that AWP would overpay

10   for drugs and that the state had sort of failed

11   its requirement to use a methodology that would

12   essentially be a proxy for estimated acquisition

13   costs.  It would be their way of arriving at

14   estimated acquisition costs.

15         Q.    And the term estimated acquisition

16   cost, was that a regulatory term?

17         A.    I believe it was in regulations, yes.

18         Q.    And what was the definition of

19   estimated acquisition cost, as you remember?

20         A.    I don't remember it.  But it was meant

21   to be -- I'll tell you what it was meant to be.

22   It was meant to be our best proxy for actual

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 134

1   acquisition cost.  So the agency and the regions

2   themselves found it difficult or somehow

3   precluded by paperwork concerns or whatever from

4   actually collecting actual acquisition cost data.

5   And so estimated acquisition cost was trying to

6   get at the -- as close to an accurate acquisition

7   cost as a state in this case could sort of come

8   up with.

9              So what would the method be that would

10  lead them to think they had gotten close to what

11  that acquisition cost would be, how would they

12  estimate it.  And then we applied just our own

13  sort of oversight of that to see whether or not

14  we thought they had taken a responsible position

15  in that regard.

16       Q.    You have mentioned a few times reports

17  from IG.  You're referring to the office of

18  inspector general?

19       A.    Yes.  Office of inspector general.

20       Q.    If I could ask you to look at the

21  second page, 543, the second paragraph, you wrote

22  or you signed a letter that wrote the following

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 137

1    cost.  In meeting those requirements it's

2    supposed to be trying to come up with a

3    methodology that gets to the acquisition costs

4    for the drugs and should not take into account

5    these other costs.

6          Q.   It's your position that these other

7    costs should be dealt with separately in

8    establishing the dispensing fee?

9          MR. DRAYCOTT:  Objection to form.  You

10   can answer.

11         THE WITNESS:  Justin, just --

12         MR. DRAYCOTT:  I said objection to

13   form. Witness can answer.

14         A.   You know, I don't have a formed opinion

15   on how you establish the dispensing fee so it's

16   really kind of hard for me to respond to that.  I

17   did feel at the time when I signed this that

18   estimated acquisition cost was meant to cover

19   certain costs and that the methodology ought to

20   be accurate to the best of the state's ability

21   and that's what we were trying to get at.

22         These other costs for dispensing fees

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                         September 12, 2007
                      Washington, DC

Page 138

1    or other costs of the pharmacy or provider were
2    not meant to be included.  That's really all the
3    meaning of that statute or of that paragraph was.
4         Q.   You stated that when you signed this
5    that estimated acquisition cost was meant to
6    cover certain costs.  What other costs or what
7    costs were supposed to be included in EAC?
8         A.   Acquiring the drug.  "The price
9    generally and currently paid by providers for a
10   drug marketed or sold by a particular
11   manufacturer or labeler in the package siz of the
12   drug most frequently purchased by providers."
13        Q.   So when you signed this you interpreted
14   the term estimated acquisition cost to include
15   just the amount --
16        A.   For a drug.
17        Q.   -- for the drug?
18        A.   Yeah.
19        Q.   Do you recall that that definition ever
20   changed during your time at --
21        A.   I don't recall.
22        Q.   -- HCFA?

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 143

1    OIG?

2         A.   I don't know.

3         Q.   I'd like to ask --

4         A.   Let's just look at the states for a

5    second.  So they were cross country.  They

6    weren't in just one region.  Yeah.  I don't know.

7    I don't remember a meeting with them.

8         Q.   I'd like to ask you to go towards the

9    top of the very first paragraph with the page we

10   were looking at the report, 10.193.  The report

11   states "Within the pharmaceuticals industry AWP

12   means nondiscounted list price."  Is that

13   something that you knew during your time at HCFA?

14        A.   No, not really.  As I said, my

15   understanding was based more on AWP was something

16   that was collected and published by certain

17   sources from manufacturers.  But what it amounted

18   to was not something I really understood, except

19   that I thought -- we all did, based on some of

20   these surveys -- it was too high a payment rate.

21        Q.   You knew by using average wholesale

22   price in reimbursement methodologies that you

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 144

1   were not getting to a real acquisition cost; is

2   that right?

3        A.   We strongly suspected we were not, but

4   we did not have the data to prove that we were

5   not, which is why -- in my time there were

6   numerous attempts to try to figure out how to get

7   better data.  The OIG was one source of that

8   data.

9        Q.   I'd like to ask you to go to the page

10  on the report 10,205.

11       A.   Okay.

12       Q.   The last paragraph of that page states

13  "On February 22nd members of our staff discussed

14  the Texas state agency's plans for a future drug

15  reimbursement with the director of the Medicaid

16  prescription drug program and his staff.  We were

17  told that the Texas board of human resources has

18  directed the state that they alternative drug

19  reimbursement policies."

20            "In this connection the program

21  director and his staff have decided upon a

22  tentative plan of action which they believe will

Henderson Legal Services
202-220-4158

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

1    payment is the only available payment mechanism

2    for the services that are essential to providing

3    good quality care.  The long-standing use of AWP

4    to determine reimbursement has masked the failure

5    of Medicare and Medicaid payment policies to

6    define an account for the service component."

7            Is that something, Ms. Buto, that you

8    became aware of during your time at HCFA, that

9    the use of AWP in determining reimbursement for

10   drugs was masking the failure of Medicare and

11   Medicaid payment policies to pay for the

12   services?

13       A.   That's not the way I would have -- I

14   wouldn't have characterized it that way.  You

15   know, again, I come at it -- I came at it then

16   from the standpoint of this is drug payment.

17   It's supposed to be paying a fair rate.  That has

18   been shown or we believe it to be the case that

19   it's overpaying for the drug.  We should do

20   something about that.

21           This issue of what it was covering or

22   compensating for, to me that's a separate issue

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 206

1   that really needs to be taken on directly.  If we

2   should be covering these services we should be

3   covering these services and we should do it in a

4   straight-up way and it shouldn't be under some

5   other mechanism.

6                So I think of those as two separate

7   issues and I would not have said, well, you know,

8   a problem with AWP is it masks the, you know, the

9   need to account for services that are otherwise

10  needed.  I don't -- you know, that's not the way

11  I would have looked at it.

12       Q.   Would you agree with me that if you

13  were attempting to evaluate how much the

14  government has overpaid for the administration of

15  home IV therapy, assuming that it is something

16  that should be covered, do you think that you

17  need to consider both sides of the equation?

18                MR. DRAYCOTT:  Objection.  You can

19  answer if you can.

20                THE WITNESS:  Okay.

21       A.   I would look at the drug because that's

22  the covered service and determine the overpayment

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                         Washington, DC

1    identification.)

2    BY MR. TORBORG:

3        Q.    For the record, what I've marked as

4    Exhibit Abbott 298 is a Westlaw printout of

5    certain portions of the proposed rule dated June

6    5th 1991 for fee schedule for physician services.

7    The actual proposed regulation is quite long.  I

8    printed out portions that I wanted to ask you

9    some questions about.

10       A.    Okay.

11       Q.    And I believe you stated earlier that

12   this was an effort, this particular fee schedule

13   regulation, that you were involved in, correct?

14       A.    Correct.

15       Q.    If I could direct you to the second

16   page of the document that I've handed you.  It

17   has page 24 at the top?

18       A.    Yes.  Mm-hmm.

19       Q.    The section under drugs states "The

20   program currently pays for drugs furnished in

21   physician's offices that are not self-

22   administered under the incident 2 provision set

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 266

1    for drugs."

2              And in that sentence in your final rule

3    the reference to national AWP was to what?

4         A.    Say that again.

5         Q.    The reference to the term AWP in this

6    regulation was referring to what?

7         A.    Well, it sounds like they're -- I guess

8    the thing that I'm stuck on is that it's defined

9    as a median price for all sources of the generic

10   form of the drug.  It doesn't seem to address the

11   brand where there is no generic substitution.

12   The national AWP is a median price for all

13   sources of the generic form of the drug.

14        Q.    My question I think was a little

15   simpler one than than.

16        A.    Okay.  Sorry.

17        Q.    What does AWP mean in that language?

18        A.    Average wholesale price?  Is that what

19   you mean?

20        Q.    Yes.  Does it refer to the prices in

21   Red Book and other compendia?

22        A.    It doesn't seem to.

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

1       Q.   It does not explicitly there, correct?

2       A.   It's not explicitly here.

3       Q.   Let's go, if we could to section --

4   page 265 at the end of the document.  And if you

5   would also have side by side the proposed rule

6   that we looked at previously --

7       A.   Right.

8       Q.   Do you have that in front of you?

9       A.   Mm-hmm.

10      Q.   Under the final rule the methodology

11  section B states "Payment for a drug described in

12  paragraph A of this section is based on the lower

13  of the estimated acquisition cost or the national

14  average wholesale price of the drug," correct?

15      A.   Yes.

16      Q.   The proposed rule had stated under B,

17  payment rule, "Except as specified in paragraph D

18  of this section, payment for drugs furnished

19  incident to a physician's service is limited to

20  85 percent of the national average wholesale

21  price as determined by HCFA."  And it's that "as

22  determined by HCFA" language that NMC and ASCO

6d424235-0f61-4f68-bb27-bd89de0f8093

**Kathleen A. Buto**
Johnson & Johnson
1350 Eye Street, NW #1210
Washington, DC  20005
(202) 589-1000
kbuto@corus.jnj.com



## Career History

**Johnson & Johnson** (9/01 – present)
Washington, DC
*Vice President, Health Policy*

Johnson & Johnson is the world's most comprehensive and broadly based manufacturer of health care products, as well as a provider of related services, for the consumer, pharmaceutical, and medical devices and diagnostics markets.

- ◆ Develops policy proposals and analysis on the Medicare drug benefit, federal, state, and international pricing and regulation, coverage of new technologies, and other government policies that affect J&J products.
- ◆ Responsible for helping to identify areas of opportunity for J&J to take a leadership role in shaping health care policy.
- ◆ Directs company-based issue managers, finance analysts, and policy staff in developing J&J-wide policies and reimbursement strategy across pharmaceuticals, devices, and consumer products.

**Congressional Budget Office** (7/00 – 9/01)
Washington, DC
*Senior Health Advisor*

The Congressional Budget Office develops economic forecasts, cost estimates, and economic analyses for the U.S. Congress.

- ◆ Serves as "in house" consultant on Medicare and Medicaid issues, including a Medicare prescription drug benefit, Medicare reform proposals, and the impact of proposed legislative changes on the health care industry.
- ◆ Assists in development of estimating models for key Medicare proposals.
- ◆ Develops seminars for CBO staff on health care topics such as Medicare prescription drug coverage, competitive bidding approaches for Medicare and alternative approaches for providing coverage for the uninsured.

**Health Care Financing Administration** (7/97 – 7/00)
Baltimore, Maryland
*Deputy Director, Center for Health Plans and Providers*

The Health Care Financing Administration (HCFA) (now the Centers for Medicare and Medicaid Services) is the agency that administers both the Medicare and Medicaid programs at the federal level in the U.S.  The Center for Health Plans and Providers in HCFA was created in 1997 and was the focal point for administration of the Medicare program, which accounts for expenditures exceeding $200 billion annually.

- ◆ With the Director, led a staff of 400 in the development of reimbursement and benefits policy and operations for Medicare, affecting managed care plans, hospitals, physicians, nursing homes, and other health care providers.  The initiative taken by Ms. Buto and her colleagues contributed significantly to the reduction in spending growth in the program over the last 3 years.

- Directed the claims processing and managed care operations functions of the Center.
- Led efforts to test competitive approaches in Medicare.
- Represented the agency before Congressional committees, media, industry, and private sector audiences.

**Health Care Financing Administration (11/93 - 7/97)**
Washington, DC
*Associate Administrator for Policy*

As HCFA's Associate Administrator for Policy, Ms. Buto was the senior official responsible for policy development, research/demonstration programs, and actuarial functions of the agency.

- Participated in the working group that developed the Administration's health care reform proposal and led cost containment efforts aimed at reducing the growth of Medicare spending.
- Played a major role in approving Medicaid waivers to allow States, such as New York and Tennessee, develop more flexible health delivery options for low income beneficiaries and to expand coverage to uninsured individuals.
- Led efforts to launch demonstration projects that form the basis for restructuring the Medicare program, including competitive bidding, centers of excellence, and chronic care management.

**Health Care Financing Administration (12/89 - 11/93)**
Baltimore, Maryland
*Director, Bureau of Policy Development*

The Bureau of Policy Development was the HCFA unit responsible for eligibility, payment, and benefits policy in the Medicare program. Functions ranged from developing payment fee schedules for hospitals, physicians, and other providers, health and safety standards for hospitals and nursing homes, and medical technology coverage for Medicare.

- Directed the development of a nationwide Medicare physician fee schedule, which has been adopted by private insurers, State Medicaid programs, and other countries.
- Led efforts to reform Medicare coverage of new technology.
- Completed the reform of nursing home standards, approval of heart and liver transplant centers of excellence, and phase out of cost-based payments to hospitals for capital expenditures.

**Health Care Financing Administration  (8/85 - 12/89)**
Baltimore, Maryland
*Deputy Director, Bureau of Policy Development*

- Worked with the director to oversee Medicare and Medicaid policy development and issuance of regulations.
- Had principal responsibility for Medicare coverage of new technologies, reimbursement policy for ambulatory services, standards for hospitals and other health care providers, and approval of State Medicaid waivers..

2

**Health Care Financing Administration** (3/83 - 8/85)
Washington, DC
*Director, Office of Executive Operations*

- Provided executive direction in organizing all Medicare and Medicaid program and policy issues for decisionmaking by the Administrator and Secretary of the Department of Health and Human Services.
- Served as the focal point for contacts with the Secretary's office, the Office Management and Budget, and other agencies of government.
- Directed the review and analysis of regulatory issues and the release of instructions to claims processing contractors.
- Managed the paperflow of correspondence, reports to Congress, and decision documents between the agency and the White House, the Secretary of HHS, Congress, and the public.

**Health Care Financing Administration** (5/82 - 3/83)
Washington, D.C.
*Deputy Director, Office of Executive Operations*

- Performed all the functions described above in lieu of a Director.

**Department of Health and Human Services** (12/79 - 5/82)
Washington, D.C.
*Deputy Executive Secretary for Health, Immediate Office of the Secretary*

- Managed the Secretary's immediate office staff on all public health and health financing issues.
- Served as "honest broker" for the Secretary in identifying areas for Secretarial decisions and providing background and briefings ranging from health care cost containment to food safety and environmental health.
- Undertook special projects for the Secretary, including representing HHS with the White House, the Environmental Protection Agency, the Federal Emergency Management Agency, and Congress on concerns about toxic waste disposal at Love Canal, NY. Worked with the Domestic Policy Council at the White House, HCFA, and the National Institutes of Health to expand Medicare coverage to heart transplantation.

**Department of Health, Education and Welfare** (4/78 - 12/79)
Washington, D.C.
*Policy Coordinator, Immediate Office of the Secretary*

- Worked on issues of interest to the Secretary in health and health care financing, including hospital cost containment, community health centers, family planning, and maternal and infant care.
- Served as staff to the Secretary, the Director of NIH, the Director of the Centers for Disease Control, the Commissioner of Food and Drugs, and other health officials during the crisis at Three Mile Island. Worked with the Director of FDA's Bureau of Radiological Health to monitor radiation levels on the ground and in the food supply.

**Review Panel on New Drug Evaluation** (1/76 – 5/77)
Washington, D.C.
*Research Analyst*

♦   Worked with an advisory panel established to evaluate the Food and Drug
Administration's process for reviewing and approving new drugs.  With a panel of
scientists, attorneys, and technical staff, conducted 16 studies of FDA's process and
interaction with the pharmaceutical industry.
♦   Co-authored studies of FDA's relationships and communications with the
pharmaceutical industry and a case study of a new drug approval.

**U.S. Commission on Civil Rights** (11/72 – 1/76)
Washington, DC.
*Associate Office Director and Supervisory Equal Opportunity Specialist*

♦   Directed and conducted numerous studies involving federal civil rights including, the
effectiveness of State human rights commissions, an evaluation of bilingual
education, and enforcement of Title VI of the Civil Rights Act in school
desegregation.
♦   Participated in interviewing potential witnesses and conducting a hearing on school
desegregation in Boston, Massachusetts.

**U.S. Office of Education** (7/70 – 5/72)
Washington, D.C.
*Management Intern*

♦   Served as a project officer for Upward Bound/Special Services and the Right to Read
programs.  Responsibilities included budgeting, contract negotiation, monitoring, and
program evaluation.
♦   Also had oversight for an on-site demonstration day care center for Federal
employees, using methods and research supported by U.S. Office of Education
grants.

## Education

**Harvard University** (1981)
Master of Public Administration

**Rutgers University** (1970)
Bachelor of Arts, American Studies

## Honors and Awards

♦   *Modern Healthcare (business news weekly),* "100 Most Powerful People in
Healthcare," 2003 and 2005.
♦   Secretary's Award for Distinguished Service (2000)
♦   National Public Service Award (National Association of Public Administration, 1999)
♦   Administrator's Achievement Award (1977, 2000)
♦   Executive Excellence Award (Senior Executives Association, 1996)
♦   Presidential Distinguished Rank Award (1988, 1994)
♦   Presidential Meritorious Rank Award (1987, 1992, 1998)
♦   William Jump Foundation Award, Certificate of Recognition (1985)
♦   Secretary's Award for Exceptional Achievement (1980)

## Publications

- Buto, K. and Peter Juhn. "Can a Center for Comparative Effectiveness Information Succeed?  Perspectives for a Health Care Company."  Health Affairs, Web Exclusive, November 7, 2006.
- Strengthening Community – Social Insurance in a Diverse America, National Academy of Social Insurance, Kathleen Buto, Martha Priddy Patterson, William E. Spriggs, Maya Rockeymoore, editors, 2004.
- Buto, K.  "Medicare Reform:  A Broader Framework,"  Policy Options for Reforming the Medicare Program, Stuart H. Altman and Uwe Reinhardt, ed., Section Two, pp. 89-93, July 1997.
- Buto, K.  "How Can Medicare Keep Pace with Cutting Edge Technology?"  Health Affairs, Summer 1994, pp. 137-140.
- Buto, K.  "Decisionmaking in the Health Care Financing Administration," Medical Innovation at the Crossroads:  Adopting New Medical Technology, National Academy Press, 1994.
- Buto, K.  "Physician Payment Reform – Putting the Fee Schedule Together,"  The Medical Staff Counselor, Vol. 5, No. 2, pp. 1-9, Matthew Bender, Spring 1991.
- Buto, K.  "Medicare's Policy Perspective on Coverage and Payment for Medical Technology,"  The Medical Device Industry – Science, Technology, and Regulation in a Competitive Environment, Norman F. Estrin, ed., Chapter 47, pp. 695-701, 1990.
- Buto, K.  (contributing author), Final Report – Review Panel on New Drug Regulation, U.S. Department of Health, Education, and Welfare, May 1977.
- Buto, K. and Bruce Gelber.  IND/NDA Case Study – Tolmetin, U.S. Department of Health, Education, and Welfare, February 1977.
- Buto, K. and Robert Wenger.  FDA's Relationships and Communications with the Pharmaceutical Industry, U.S. Department of Health, Education, and Welfare, November 1976.
- Buto, K., Jane O'Connell, Olga Garcia Harper, and Rosa Morales.  A Better Chance to Learn:  Bilingual Bicultural Education, U.S. Commission on Civil Rights, May 1975.
- Buto, K.  The Federal Civil Rights Enforcement Effort – 1974, Volume III, To Ensure Equal Educational Opportunity, Chapter 1, January 1975.

## Boards and Memberships

- Member, Board of Directors, AcademyHealth
- Member, National Academy of Social Insurance
- Member, Board of Directors, National Center for Healthcare Leadership
- Member, Board of Directors, National Japanese American Memorial Foundation

*SBN lifetime*