# Exhibit 22

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Vladeck, Ph.D., Bruce C.                              May 4, 2007
                       New York, NY

```
                                                                Page 1

               UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

     ----------------------------------X  MDL NO. 1456

     IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

     AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

     ----------------------------------X

     THIS DOCUMENT RELATES TO:          :

     U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

     Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

     Laboratories, Inc.                 :

     ----------------------------------X


              IN THE CIRCUIT COURT OF

           MONTGOMERY COUNTY, ALABAMA

     ----------------------------------X

     STATE OF ALABAMA,                  :  CASE NO.

              Plaintiff,                :  CV-05-219

         v.                             :

     ABBOTT LABORATORIES, INC.,         :  JUDGE

     et al.,                            :  CHARLES PRICE

              Defendants.               :

     ----------------------------------X
```

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                       May 4, 2007
                                New York, NY

```
                                   Page 2                                              Page 4
 1  STATE OF WISCONSIN  CIRCUIT COURT  DANE COUNTY    1   IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2  ----------------------------------X                2            STATE OF MISSOURI
 3  STATE OF WISCONSIN,       : CASE NO.               3  -------------------x
 4       Plaintiff,           : 04-CV-1709             4  STATE OF MISSOURI, ex rel.,      :
 5    v.                      :                        5  JEREMIAH W. (JAY) NIXON,         :
 6  AMGEN INC., et al.,       :                        6  Attorney General,                :
 7       Defendants.          :                        7  and                              :
 8  ----------------------------------X                8  MISSOURI DEPARTMENT OF SOCIAL    :
 9                                                     9  SERVICES, DIVISION OF MEDICAL    : Case No.:
10        IN THE COURT OF COMMON PLEAS                10  SERVICES,              : 054-1216
11           FIFTH JUDICIAL CIRCUIT                   11       Plaintiffs,    : Division
12  ----------------------------------X               12                      : No. 31
13  STATE OF SOUTH CAROLINA, and    :  STATE OF       13       vs.            :
14  HENRY D. McMASTER, in his official : SOUTH CAROLINA 14 DEY INC., DEY, L.P., MERCK KGaA, :
15  capacity as Attorney General for  :  COUNTY OF    15  EMD, INC., WARRICK              :
16  the State of South Carolina,  :  RICHLAND         16  PHARMACEUTICALS CORPORATION,    :
17       Plaintiff,        :                          17  SCHERING-PLOUGH CORPORATION, and :
18    v.             : CIVIL ACTION:                  18  SCHERING CORPORATION,           :
19  MYLAN LABORATORIES, INC.     : 07-CP-40-0283      19       Defendants.     :
20       Defendant.         :                         20  -------------------x
21  ----------------------------------X               21
22                                                    22

                                   Page 3                                              Page 5
 1    IN THE COURT OF THE SECOND JUDICIAL CIRCUIT      1        New York, New York
 2         IN AND FOR LEON COUNTY, FLORIDA             2        Friday, May 4, 2007
 3  THE STATE OF FLORIDA                               3
 4  ex rel.                                            4
 5  -----------------x                                 5      Videotaped Deposition of BRUCE C.
 6  VEN-A-CARE OF THE FLORIDA       :                  6  VLADECK, Ph.D., a witness herein, called for
 7  KEYS, INC., a Florida           :                  7  examination by counsel for Abbott Laboratories in
 8  Corporation, by and through its :                  8  the above-entitled matter, pursuant to Subpoena,
 9  principal officers and directors, :                9  the witness being duly sworn by JOMANNA DEROSA, a
10  ZACHARY T. BENTLEY and          :                 10  Notary Public in and for New York, taken at the
11  T. MARK JONES,                  :                 11  offices of Jones Day, 222 East 41st Street, New
12         Plaintiffs,   :                            12  York, New York, at 8:38 a.m. on Friday, May 4,
13      vs.          : Civil Action                   13  2007, and the proceedings being taken down by
14  MYLAN LABORATORIES, INC.; MYLAN  : No.: 98-3032G  14  Stenotype by JOMANNA DEROSA, and transcribed under
15  PHARMACEUTICALS INC.; NOVOPHARM  : Judge:         15  her direction.
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.   16
17  TEVA PHARMACEUTICAL INDUSTRIES   : Gary           17
18  LTD., TEVA PHARMACEUTICAL USA;   :                18
19  and WATSON PHARMACEUTICALS, INC. :                19
20         Defendants.    :                           20
21  -----------------x                                21
22                                                    22
```

2 (Pages 2 to 5)

Henderson Legal Services
202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

**Page 30**

```
 1  needs to introduce themselves for the record?
 2       MR. RORTVEDT:  This is Victor Rortvedt,
 3  for Endel.
 4       THE VIDEOGRAPHER:  Anybody else?
 5       MS. BROOKER:  Is there anyone else new
 6  on the phone call who hasn't introduced
 7  themselves?
 8       THE VIDEOGRAPHER:  Okay.  Will the
 9  reporter please swear in the witness.
10       MS. BROOKER:  Well, I'm sorry.
11       THE VIDEOGRAPHER:  Oh, keep going.
12       MS. BROOKER:  A couple of matters.  I
13  just wanted to -- to make this easy for everyone.
14  Do you want to have an agreement that if there is
15  an objection to form or any questions at the
16  deposition --
17       MR. COOK:  One will do.
18       MS. BROOKER:  One will do.  It's
19  preserved with respect to all others.
20       MR. COOK:  That is my first two bullet
21  points.
22       MS. BROOKER:  Okay.  The second thing
```

**Page 31**

```
 1  is, do you also want to agree that if it's a form
 2  objection, it's sufficient to say "objection,
 3  form" to preserve the objection?
 4       MR. COOK:  Yes.
 5       MS. BROOKER:  Okay.
 6       MR. COOK:  And I'll -- and I'll ask, if
 7  -- if -- if I have a question, to see whether
 8  it's curable.
 9       MS. BROOKER:  Okay.  One other thing I
10  wanted to cover.  I just wanted it to be very
11  clear at the outset of the deposition, and to
12  state on the record that Dr. Vladeck is here in
13  his capacity as a former HCFA administrator.
14  He's not here in his personal capacity.  He is
15  certainly not here on behalf of the agency as a
16  corporate designee.  He's not speaking on behalf
17  of the agency, and he's not here as an expert
18  witness to express his opinion.
19       So, I -- I just wanted to state that at
20  the outset.
21       MR. COOK:  Yes.  I don't know what all
22  the consequences of that are, but we certainly
```

**Page 32**

```
 1  sent a deposition notice and subpoena for -- for
 2  Dr. Vladeck, and he appeared and -- and not only
 3  appeared, we did not send a 30(b)(6) notice to
 4  him.
 5       MS. BROOKER:  Okay.  Thank you.
 6       MR. AZORSKY:  And also, let me speak
 7  for the record that -- I'm speaking specifically
 8  now with relation to the Florida case.
 9       Insofar as this deposition is cross-
10  noticed in the Florida case and no documents have
11  been produced by the defendants in that case
12  personally to properly serve the request for
13  production of documents, the plaintiffs in that
14  case object to the introduction and use of any
15  exhibits at this deposition, and reserve the
16  right to strike any testimony based upon such
17  exhibits as may be used in this deposition.
18       MR. COOK:  And if I could ask the
19  Department of Justice, if this deposition needs
20  to be retaken because of objections that are
21  being asserted by the plaintiffs, will the
22  government assert objections to Mr. Vladeck
```

**Page 33**

```
 1  testifying again?
 2       MS. BROOKER:  We'll take it under
 3  consideration.
 4       MR. COOK:  And so, there's a
 5  possibility that the plaintiffs' objection would
 6  result in Dr. Vladeck's testimony never being
 7  placed into the Florida case.
 8       MS. BROOKER:  Well, I think we're
 9  premature on -- on this, but --
10       MR. COOK:  Okay.
11       MS. BROOKER:  -- we'll -- we'll --
12  we'll consider that.
13       Chris, did you have anything else
14  before we start?
15       MR. COOK:  No.
16       MS. BROOKER:  I think we can swear the
17  witness.
18       THE VIDEOGRAPHER:  Just -- just -- just
19  a reminder to people on the conference phone, now
20  that we finished introductions, please put your
21  phones on mute.
22
```

Page 138

1   A.  No.
2   Q.  You'll notice that in 1989, one of your
3   predecessors, Acting Administrator Hays, referred
4   to average wholesale price as a sticker price, as
5   did Secretary Shalala in 1997, and President
6   Clinton again in 1997.
7       While you were administrator of HCFA
8   between 1993 and 1997, did you understand average
9   wholesale price to be the sticker price for
10  drugs?
11      MS. BROOKER:  Objection.  Form.
12  A.  That would have been one of the
13  metaphors or analogies we used to describe it,
14  yes.
15  Q.  Turning to Exhibit Abbott 156, the
16  radio address by President Clinton, is there any
17  aspect of President Clinton's statement that I've
18  read into the record with which you disagree?
19      MR. BREEN:  Objection.  Form.
20      MS. BROOKER:  Objection.  Form.
21  A.  The -- had I been engaged in the
22  process of preparing this speech or whatever, the

Page 139

1   sentence on the -- that concludes the paragraph
2   carrying over on to Page 2, "in fact, some pay
3   just one-tenth of the published price," I would
4   have raised concerns about because I would not
5   have been aware, at the time, of any gap between
6   actual acquisition cost and AWP and the compendia
7   of -- of that magnitude.
8   Q.  So, it's your recollection that as of
9   December 1997, you personally were not aware of a
10  gap of one to ten between provider acquisition
11  cost and published average wholesale price?
12  A.  That's correct.  My understanding at
13  the time was that there was not a constant, but a
14  pretty systematic spread of the kind one might
15  find in the apparel or automobile industries
16  between sticker or list price and the price to
17  the -- the final seller.
18  Q.  And when you described your
19  understanding of the difference between
20  acquisition cost and published average wholesale
21  prices, did you distinguish, in your mind, in
22  1997, between brand name drugs and generic drugs?

Page 140

1   A.  No.  I would -- I would say that most
2   of my focus in that period of time was on brand
3   name drugs, that the issues we were most
4   concerned about, in terms of Medicare drug
5   payments and drug policies primarily involved
6   brand name drugs.
7       And out of naivete, or for whatever
8   reason, I believe that the -- the market for
9   generic was more truly competitive in that
10  transaction prices in the market were probably
11  more constrained or limited than they were for --
12  for brand name drugs.
13  Q.  How do you mean that the prices in the
14  marketplace would be constrained or limited for
15  generics?
16  A.  Just in the sense of classic economic
17  theory, in which a patent creates a monopoly
18  pricing power on the part of the patent holder
19  that essentially permits substantially greater
20  latitude or discretion in setting the price.
21  Whereas a product that has identical competitors
22  in the market, producers, would have less freedom

Page 141

1   to unilaterally change their price or certainly
2   to unilaterally raise their prices.
3   Q.  So, let's step back and address first
4   brand name drugs, and then -- and then generic
5   drugs.
6       What was your understanding, in 1997,
7   of the relationship between published average
8   wholesale price and prices within the marketplace
9   for brand name drugs?
10      MS. BROOKER:  Objection.  Form.
11  A.  My understanding, which I think is
12  consistent with, for example, the Secretary's
13  response in the exhibit we just discussed a few
14  minutes ago, is that average wholesale price was
15  an -- almost literally, a list price.  That is to
16  say, a price prepared for public consumption and
17  public dissemination by the manufacturers, and
18  that their general industry practice meant that
19  the manufacturers actually provided that product
20  to the pharmacist or physicians, whoever was
21  selling it, at some discount, which we estimated
22  averaged between 15 and 20 percent.

36 (Pages 138 to 141)

Page 154

1       MS. BROOKER: Objection. Form.
2       MR. COOK: That's a bad question. I can
3  ask a better question.
4       Q. What did you mean when you said that
5  you understood that there was, on average, a
6  percentage difference between AWP and the price
7  to providers?
8       A. Again, I would have been very much
9  influenced by my perception of the relationship
10 of sticker price to transaction prices in other
11 sectors or other industries. And, again, it was
12 my belief that, on average, the actual
13 acquisition price for brand drugs was somewhere
14 in the range of 15 percent below average
15 wholesale price, as we understood it, but that,
16 again, the buyers or the providers with the least
17 market power were probably paying amounts closest
18 to the average wholesale price, and that the most
19 powerful purchasers might well be paying less
20 than 85 percent or so of the -- of the average
21 wholesale price.
22      Q. And so, your understanding, do I have

Page 155

1  it correct, is that for a single drug, there
2  would be variation among providers in their
3  acquisition cost. Correct?
4       MS. BROOKER: Objection. Form.
5       A. That is correct.
6       Q. Was it your understanding also that for
7  different drugs, the variations between
8  acquisition cost and AWP wouldn't necessarily be
9  the same?
10      MS. BROOKER: Objection. Form.
11      A. I think my perception was -- and,
12 again, to the extent I spent a lot of time
13 thinking about it or whatever, that the -- the
14 differential between average market price or
15 average acquisition price on the one hand and
16 average wholesale price on the other was probably
17 pretty standard, pretty constant, pretty uniform
18 across drugs would have been my understanding at
19 the time.
20      Q. But you would agree with me that
21 different drugs might have different markets and
22 different purchasers?

Page 156

1       MS. BROOKER: Objection. Form.
2       A. Absolutely.
3       Q. And so, it would certainly be possible
4  that for one drug there would be a different
5  variation in a different range of market prices
6  than for another drug.
7       Right?
8       MR. BREEN: Objection. Form.
9       A. Again, to the extent I was -- you know,
10 I was thinking about these issues in this detail,
11 I would say that at the time, my perception was
12 there was a pretty standard relationship between
13 AWP and average prices in the market. I could
14 have -- had you posed that question then, I
15 probably could have envisioned particular drugs
16 that might have been different, but that was not
17 how I understood the issue at the time, I don't
18 believe.
19      Q. And, again, we're talking about brand
20 name drugs. Correct?
21      A. That's correct.
22      MR. COOK: I'd like to show you a

Page 157

1  couple of OIG reports that may be among the ones
2  you've seen already.
3       The first comes from 1992, just before
4  you were administrator of -- of HCFA. It's been
5  marked in the past as Exhibit Abbott 082.
6       And for the record, this is a report,
7  with an accompanying cover memo, dated October
8  20, 1992. It's from Bryan B. Mitchell, Principal
9  Deputy Inspector General to William Toby, Jr.,
10 who was the acting administrator of HCFA.
11      Do I recall correctly that William Toby
12 immediately preceded you as the acting
13 administrator of HCFA?
14      A. That is correct.
15      Q. The subject, as described on the cover
16 page, the third page of the exhibit you have, is
17 "Cost of Dialysis Related Drugs" and indicates a
18 date of October 1992.
19      Do you recall ever seeing this report
20 before, Dr. Vladeck?
21      A. I don't believe I have.
22      Q. This would have been before your time.

40 (Pages 154 to 157)