# Exhibit 23

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 535

```
              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris

the Florida Keys, Inc.         )

    v.                         )  Chief Magistrate

Abbott Laboratories, Inc.,     )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

- - - - - - - - - - - - - - - -

          (cross-captions on following pages)



                   Washington, D.C.

                   Wednesday, March 26, 2008

                   9:22 a.m.



       Videotaped deposition of DEIRDRE DUZOR

                   Volume III
```

Page 536

```
 1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2         IN AND FOR LEON COUNTY, FLORIDA
 3    ------------------)
 4    THE STATE OF FLORIDA, ex rel.    )
 5    VEN-A-CARE OF THE FLORIDA KEYS,  )
 6    INC., a Florida Corporation, by and )
 7    through its principal officers and )
 8    directors, ZACHARY T. BENTLEY and )
 9    T. MARK JONES,                   )
10        PLAINTIFFS,        ) Civil Action
11      vs.              ) No. 98-3032A
12    BOEHRINGER INGELHEIM CORPORATION, )
13    et al.,            ) Judge William
14        DEFENDANTS.        ) L. Gary
15    ------------------)
16
17
18
19
20
21    (CONTINUED)
22
```

Page 537

```
 1          IN THE CIRCUIT COURT OF
 2        MONTGOMERY COUNTY, ALABAMA
 3    ---------------
 4    IN THE MATTER OF:       )
 5    ALABAMA MEDICAID        ) MASTER DOCKET NO.
 6    PHARMACEUTICAL AVERAGE  )  CV-2005-219
 7    WHOLESALE PRICE LITIGATION )
 8    ---------------
 9    THIS DOCUMENT RELATES TO:  )
10    ALL ACTIONS             )
11    ---------------
12            Washington, D.C.
13            Wednesday, March 26, 2008
14      Volume III of the videotaped deposition of
15    DEIRDRE DUZOR, called for examination by counsel for
16    Dey, defendants in the above-entitled matter, taken
17    at the law offices of Jones Day, 51 Louisiana
18    Avenue, N.W., Washington, D.C., the proceedings
19    being recorded stenographically by Deborah Hommer, a
20    Registered Professional Reporter and Notary Public
21    of the District of Columbia, and transcribed under
22    her direction.
```

Page 538

```
 1           APPEARANCES OF COUNSEL
 2
 3    On behalf of the United States of America:
 4
 5        ANA MARIA MARTINEZ, ESQ.
 6        United States Department of Justice
 7        99 N.E. 4th Street
 8        Miami, Florida 33132
 9        (305) 961-9431
10        ana.maria.martinez@usdoj.gov
11
12
13    On behalf of the U.S. Department of Health &
14    Human Services:
15
16        BRIAN A. KELLEY, ESQ.
17        U.S. Department of Health & Human Services
18        Office of General Counsel, CMS Division
19        330 Independence Avenue, S.W., Room 5345
20        Washington, D.C. 20201
21        (202) 205-8702
22
```

Page 539

```
 1           A P P E A R A N C E S (Cont'd)
 2
 3    On Behalf of Dey, Inc., Dey, L.P., and Mylan:
 4        NEIL MERKL, ESQ.
 5        Kelley, Drye & Warren, LLP
 6        101 Park Avenue
 7        New York, New York 10178
 8        (212) 808-7811
 9        nmerkl@kelleydrye.com
10
11
12    On Behalf of Abbott Laboratories:
13        R. CHRISTOPHER COOK, ESQ.
14        Jones Day
15        51 Louisiana Avenue, N.W.
16        Washington, D.C. 20001-2113
17        (202) 879-3939
18        ccook@jonesday.com
19
20
21
22    (CONTINUED)
```

2 (Pages 536 to 539)

Page 616

1  program overall, how would that affect your match
2  rate?
3       A.   If -- I really can't explain it.  It's
4  really not an area that I'm responsible for or
5  ever have been.
6       Q.   Who is responsible for that?
7       A.   Jim Frizzera.
8       Q.   Is Mr. Smith involved in that area at
9  all?
10      A.   Well, yes.  He is the overall director
11 of Medicaid, so yes.
12      Q.   Does Mr. Smith ever meet with your team
13 to discuss in general reimbursement issues for
14 pharmaceuticals?
15      A.   He generally meets with me and with
16 Larry Reed and sometimes the analyst.
17      Q.   Okay.  And has he ever provided
18 direction or guidance to you on when he expects
19 to be done or criteria he expects to be observed
20 in terms of approving or disapproving state
21 plans?
22      A.   We discuss them on a case-by-case

Page 617

1  basis, and from that we build sort of a body of
2  expectations of what he thinks is approvable and
3  not approvable.
4       Q.   And as best you can recall, would you
5  tell me what your current understanding of Mr.
6  Smith's expectations in that regard are?
7       A.   Yes.  We generally continue to believe
8  that most states are overpaying for the
9  ingredient cost and, therefore, were generally
10 interested in approving state plans that reduce
11 the ingredient cost payment.  And with dispensing
12 fees, we are concerned that some states are
13 paying high dispensing fees and proposing to pay
14 even higher ones.  And we are concerned that they
15 may be overpaying in dispensing fees, so we are
16 scrutinizing those more than we are when states
17 want to reduce ingredient costs.
18      Q.   When you scrutinize a state proposal to
19 increase dispensing fees, other than the material
20 the state might actually submit, what data do you
21 rely on?
22      A.   We rely on the state making its case to

Page 618

1  us as to why it's a reasonable dispensing fee.
2       Q.   So you don't have any independent data
3  or benchmarks that you look to?
4       A.   We do not.
5       Q.   You just assess the validity of the
6  evidence the state submits?
7       A.   That's right.
8       Q.   Okay.  In your group, the Medicaid
9  group, is there anyone in the group that you feel
10 has expertise in either the area of dispensing
11 fees or what's appropriate in terms of ingredient
12 cost reimbursement?
13           MS. MARTINEZ:  Objection.  Form.
14           THE WITNESS:  We don't have any
15 benchmark data that we can use to assess state
16 plan amendments.
17 BY MR. MERKL:
18      Q.   No, I understand that.  In your group -
19 - is there anyone within your group that you look
20 to as a person who has expertise in the area of
21 assessing either ingredient costs or dispensing
22 fees?

Page 619

1            MS. MARTINEZ:  Objection.  Form.
2            THE WITNESS:  I don't know what kind of
3  expertise you're referring to.
4  BY MR. MERKL:
5       Q.   Well, is there anyone who is
6  particularly experienced in examining state plans
7  and data submitted by the states over the years
8  who you consider to be knowledgeable about the
9  sort of factors that should be considered or not
10 considered?
11      A.   I consider Larry Reed and myself to be
12 in that category.
13      Q.   Other than you two, is there anyone
14 else?
15      A.   Some of our analysts are more
16 experienced than others.
17      Q.   Who are your most experienced analysts?
18      A.   Kim Howell, Marge Watchorn, Gail
19 Sexton.
20      Q.   Now, I think Mr. Smith mentioned that
21 the pharmacy team hired an actual pharmacist.
22      A.   We have two pharmacists on staff.

22 (Pages 616 to 619)

```
                                Page 868                                      Page 870
 1  purposes of reimbursement under Medicaid?        1  amount to reverse engineer a number for
 2      MR. MERKL:  Objection.                       2  reimbursement purposes?
 3      MR. GORTNER:  Objection to form.             3      MR. MERKL:  Objection to form.
 4      THE WITNESS:  Yes.  It's a statement of      4      THE WITNESS:  We believe that that
 5  CMS policy reflecting what we believe to be the  5  would cause the prices that are required to
 6  correct statutory interpretation of the          6  remain confidential by statute to be revealed
 7  restrictions.                                    7  and, therefore, that would be inappropriate and
 8  BY MR. WINGET-HERNANDEZ:                         8  contrary to the statute.
 9      Q.  Did it -- is it fair to characterize     9  BY MR. WINGET-HERNANDEZ:
10  this letter as being a request from the attorney 10     Q.  Are you under the impression that the
11  general's office in Texas for guidance with     11  states generally are aware that they are not
12  respect to this issue?                          12  supposed to do that based on CMS' policy?
13      MR. MERKL:  Objection.  Form.               13      MR. MERKL:  Objection to form.
14      THE WITNESS:  Yes.  I believe they          14      THE WITNESS:  I believe they are aware
15  asked us these questions to which we're         15  of it.
16  responding.                                     16  BY MR. WINGET-HERNANDEZ:
17  BY MR. WINGET-HERNANDEZ:                        17      Q.  What is your impression of the state's
18      Q.  In order to cure Mr. Merkl's objection, 18  awareness about whether or not they can reverse
19  can you describe for me, please, what this letter 19 engineer either AMP or the unit rebate amount in
20  does?  What is the purpose of the letter?       20  order to estimate acquisition costs?
21      A.  The purpose of the letter is to respond 21      A.  Well, No state has requested permission
22  to questions raised by the Texas Vendor Drug    22  to do that in a state plan amendment, indicating

                                Page 869                                      Page 871
 1  Program regarding the use of unit rebate amounts  1  to me that they are aware that that would not be
 2  and other drug pricing information to set         2  acceptable to us.
 3  reimbursement, and regarding whether they could   3      Q.  You've also testified in response, I
 4  take any action against manufacturers in terms of 4  believe, to Mr. Merkl's questions primarily
 5  removal from the Medicaid program or restricting  5  about, in general terms, what states could
 6  the use of drugs for manufacturers that did not   6  consider, what they might consider in the context
 7  provide them directly with the AMPs.             7  of reaching an estimated acquisition cost.  Do
 8      Q.  Were they also asking you about whether  8  you remember a little bit of that testimony?
 9  they could reverse engineer the unit rebate      9      A.  Yes.
10  amount in order to help them estimate acquisition 10     Q.  When you talk about what the states
11  costs?                                          11  might consider or what they could consider, are
12      A.  Well, I think that that was -- that was 12  you considering anything other than federal CMS
13  the basis of our responding that they could not 13  Medicaid policy or regulations?
14  use those things because reverse engineering    14      A.  I'm not following the question.  I'm
15  would be quite easy to do if they were to do    15  sorry.  Maybe you could restate it.
16  that.                                           16      Q.  Let me ask you a different way.  When
17      Q.  So what --                              17  you testified earlier about what the states could
18      A.  And that would breach the               18  or might consider in reaching estimated
19  confidentiality.                                19  acquisition costs, did you do so because you were
20      Q.  Okay.  So the bottom line is what?      20  aware of the details or even of the general
21  What's the answer to this state's question about 21  contours of each state's own regulatory
22  whether they can use AMP or the unit rebate     22  requirements or each state's own statutory
```

85 (Pages 868 to 871)

Page 896

 1     A.  Yes.
 2     Q.  What does average wholesale price refer
 3  to in this 2003 chart?
 4     A.  Likewise, whatever price is labeled
 5  that in the drug pricing compendia.
 6     Q.  And if I could turn your attention to
 7  States Exhibit 2, which is the May 3, 2004,
 8  letter from Dennis Smith to Patrick O'Connell --
 9  did you write this?
10     A.  I had part of writing it.  I don't know
11  that I was the initial author.  I don't recall.
12     Q.  I can't say as I have seen the letter
13  that Mr. O'Connell sent to Mr. Smith.  Do you
14  know if that has been produced by CMS in this
15  litigation?
16     A.  I don't know.
17     Q.  When was the last time you saw -- well,
18  was there a letter from Mr. O'Connell to Mr.
19  Smith?
20     A.  I believe there was, and I think the
21  response also supports that.
22     Q.  Do you remember what that letter said?

Page 897

 1     A.  No.  I mean, I assume that we
 2  accurately characterized the questions, but I
 3  don't recall the letter itself at this point.
 4     Q.  Do you know who else helped write this
 5  May 3, 2004, letter to Mr. O'Connell?
 6     A.  No, I don't know specifically who wrote
 7  it or -- I'm sure Larry Reed was also at least
 8  part of the review process.
 9     Q.  Do you know why it was that Mr.
10  O'Connell told Mr. Smith the State of Texas was
11  asking the question being posed here?
12         MS. ALBEE:  Objection.  Form.
13         THE WITNESS:  No, I don't recall what
14  the incoming letter -- whether that provided a
15  reason why they were asking these questions or
16  not.
17  BY MR. COOK:
18     Q.  Do you know whether Mr. O'Connell's
19  letter -- or did anybody tell you whether Mr.
20  O'Connell's letter and Mr. Smith's response was
21  in any way related to the fact that Texas had
22  litigation pending against Abbott and other

Page 898

 1  manufacturers?
 2         MS. MARTINEZ:  Objection.  Form.
 3         THE WITNESS:  I don't know.  I don't
 4  recall what the incoming letter said or -- I
 5  don't recall knowing of that fact.
 6  BY MR. COOK:
 7     Q.  And when you were asked questions by
 8  Mr. Winget-Hernandez about this letter, you said
 9  that this was an accurate reflection of how CMS
10  interpreted the statutes that are cited here.  Do
11  I have that correct?
12     A.  Yes.
13     Q.  And just so as I understand it, these
14  statutes govern the conduct of CMS and states, as
15  I understand it, correct?
16         MS. MARTINEZ:  Objection.  Form.
17  BY MR. COOK:
18     Q.  I can ask that a little bit better.
19  The statute that you're referring to regarding
20  the interpretation is a statute that imposes
21  confidentiality obligations on CMS and the states
22  when it comes to average manufacturer's price,

Page 899

 1  right?
 2     A.  Well, on CMS, on the secretary -- you
 3  know, again, in terms of the states, I think it
 4  depends on whether the Secretary thinks that it's
 5  appropriate to provide it to states -- or there
 6  is some caveat in there.
 7     Q.  And how did you come to determine that
 8  this was an accurate description of how CMS
 9  interprets that statute?
10     A.  Well, we're the interpreters of the
11  statute.  That's our job.
12     Q.  In this particular letter, Mr. Smith
13  states to Mr. O'Connell that the state cannot
14  disclose the unit rebate amount or the AMP that
15  can be derived from the unit rebate amount for
16  certain drugs, correct?
17     A.  Well, it says that they may not use the
18  information to calculate their EAC.
19     Q.  And the reason why the states cannot
20  use the information to calculate the EAC --
21  that's E-A-C, right?
22     A.  Yes, that's correct.

Page 900

1  Q. The reason why the state cannot use the
2  unit rebate amount and the AMP to calculate the
3  EAC is because doing so would disclose the AMP
4  and, thereby, breach the confidentiality
5  obligations of the statute, correct?
6  A. That's correct.
7  Q. And Mr. Smith was not telling Mr.
8  O'Connell that the state somehow had to avert its
9  eyes from the AMP information to avoid knowing
10 the AMP information, right?
11     MS. ALBEE: Objection. Form.
12     THE WITNESS: It -- it doesn't address
13 that question.
14 BY MR. COOK:
15 Q. But it's your understanding that the
16 policy of CMS was that states could know the AMP
17 information; they simply could not disclose that
18 to third parties, right?
19 A. Well, I think there is a realization
20 that, for generic drugs, as we went through this
21 morning, the math of unveiling the AMP is pretty
22 simplistic.

Page 901

1  Q. You gave some testimony about whether
2  retail pharmacies could purchase drugs at the
3  prices that were available under the federal
4  supply schedule and the 340B providers. Do you
5  recall that testimony?
6  A. Yes.
7  Q. How do you know that retail pharmacies
8  cannot purchase drugs at those prices?
9  A. Because the statute only provides those
10 prices to specified entities.
11 Q. Just so we're clear, when you said in
12 response to questions that retail pharmacies
13 cannot purchase at those prices then, you weren't
14 expressing an opinion about how retail
15 pharmacies' pricing compares to the federal
16 supply schedule, only that they can't call up and
17 order off of the federal supply schedule, right?
18     MR. WINGET-HERNANDEZ: Objection.
19 Form.
20     MS. MARTINEZ: Objection. Form.
21     THE WITNESS: I don't have any direct
22 information as to what prices retail pharmacies

Page 902

1  pay for drugs.
2  BY MR. COOK:
3  Q. For all you know, Wal-Mart and CVS can
4  purchase at lower prices than the federal supply
5  schedule, right?
6      MS. MARTINEZ: Objection. Form.
7      THE WITNESS: I don't believe that to
8  be the case, but I don't know that not to be the
9  case.
10 BY MR. COOK:
11 Q. Why don't you believe that to be the
12 case?
13 A. Because the statute provides low
14 pricing for federal -- a certain federal
15 purchaser and for safety net providers, and I
16 believe that drug companies sell their drugs for
17 higher prices to others than those who they have
18 to sell at those very low prices.
19 Q. What's your understanding of how the
20 federal supply schedule and VA price schedules
21 are established?
22 A. I don't know the details of either of

Page 903

1  them as to how they're established.
2  Q. You testified that in the time that you
3  have had your position on the pharm -- is it the
4  pharm team, p-h-a-r-m?
5  A. Yes, it was, until we became the
6  pharmacy division.
7  Q. In the time since you have been either
8  on the pharm team or in the pharmacy division,
9  there have been no access problems or
10 participation problems in state Medicaid programs
11 for pharmacies to your knowledge; do I have that
12 correct?
13 A. That's correct.
14 Q. What is the largest discount off of AWP
15 that you're aware of that any state Medicaid
16 program applies from AWP in order to reach its
17 defined estimated acquisition cost?
18 A. I believe it's the State of Washington
19 that pays for generics at AWP minus 50 percent.
20 Q. The vast majority of states are paying
21 a substantially higher amount than AWP minus 50
22 percent, correct?

93 (Pages 900 to 903)