# Exhibit 24

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

```
             UNITED STATES DISTRICT COURT

           OF THE DISTRICT OF MASSACHUSETTS

------------------------------x

IN RE:  PHARMACEUTICAL        :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :   CIVIL ACTION

PRICE LITIGATION              :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-A-Care of    :   Judge Patti B.

The Florida Keys, Inc.,       :      Saris

          Plaintiff,          :

     vs.                      :

ABBOTT LABORATORIES, INC.,    :   Chief Magistrate

No. 06-CV-11337-PBS           :   Judge Marianne B.

          Defendants.         :      Bowler

------------------------------x

                       VOLUME I

              Baltimore, Maryland

              Wednesday, September 26, 2007

Videotape Deposition of:

           LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing
```

Reed, Larry                                                September 26, 2007
Baltimore, MD

```
                                    Page 2                                            Page 4
 1  at 9:26 a.m., at the law offices of           1      IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2  Hogan & Hartson, 111 South Calvert Street,    2         IN AND FOR LEON COUNTY, FLORIDA
 3  Baltimore, Maryland, before Dawn A. Jaques,   3  THE STATE OF FLORIDA
 4  Certified Shorthand Reporter and Notary Public in  4  ex rel.
 5  and for the State of Maryland, when were present   5  -----------------------------x
 6  on behalf of the respective parties:          6  VEN-A-CARE OF THE FLORIDA    :
 7                                                7  KEYS, INC., a Florida        :
 8                                                8  Corporation, by and through  :
 9                                                9  its principal officers and   :
10                                               10  directors, ZACHARY T.        :
11                                               11  BENTLEY and T. MARK JONES,   :
12                                               12         Plaintiffs,    :
13                                               13         vs.            :
14                                               14  MYLAN LABORATORIES, INC.,    : Civil Action No.:
15                                               15  MYLAN PHARMACEUTICALS, INC., :  98-3032G
16                                               16  NOVOPHARM LTD., SCHEIN       :
17                                               17  PHARMACEUTICAL, INC., TEVA   : Judge William L.
18                                               18  PHARMACEUTICAL INDUSTRIES    :    Gary
19                                               19  LTD, TEVA PHARMACEUTICAL USA,:
20                                               20  WATSON PHARMACEUTICALS, INC.,:
21                                               21         Defendants.    :
22  (CAPTIONS CONTINUED)                         22  -----------------------------x
                                    Page 3                                            Page 5
 1       IN THE CIRCUIT COURT                     1    FRANKLIN CIRCUIT COURT - DIVISION II
 2     OF MONTGOMERY COUNTY, ALABAMA              2       CIVIL ACTION NO. 03-CI-1134
 3  ------------------------x                     3
 4  STATE OF ALABAMA,      :                      4  -----------------------------X
 5      Plaintiff,   :  Case No.                  5  COMMONWEALTH OF KENTUCKY,    :
 6      vs.          :  CV-05-219                 6      Plaintiff,   :
 7  ABBOTT LABORATORIES,   :                      7      vs.          :  Judge
 8  INC., et al.,   :  Judge Charles              8                   :  Crittenden
 9      Defendants.  :  Price                     9  ABBOTT LABORATORIES, INC.,   :
10  ------------------------x                    10      Defendant.   :
11                                               11  -----------------------------X
12                                               12
13    IN THE CIRCUIT COURT OF THE FIRST CIRCUIT  13     STATE OF WISCONSIN CIRCUIT COURT
14          STATE OF HAWAII                      14          DANE COUNTY
15  ----------------------------x                15          Branch 9
16  STATE OF HAWAII,      :                      16  ------------------------x
17      Plaintiff,  :  Case No.                  17  STATE OF WISCONSIN,  :
18      vs.         :  06-10720-04-EEH           18      Plaintiff,   :
19  ABBOTT LABORATORIES, et al.,: Judge Eden     19      vs.          :  Case No.
20      Defendants. :  Elizabeth Hifo            20  AMGEN, INC., et al.,  :  04-CV-1709
21  ----------------------------X                21      Defendants.  :
22                                               22  ------------------------x
```

2 (Pages 2 to 5)

**270**

1  General I believe as well.
2          (A discussion was held off the
3  record.)
4          MS. MARTINEZ: Maybe we should go off
5  the record.
6          MR. TORBORG: Let's go off the record
7  again until this fiasco is solved.
8          THE VIDEOGRAPHER: Going off the
9  record. The time is 15:38:48.
10         (A discussion was held off the
11 record.)
12         THE VIDEOGRAPHER: Going back on the
13 record. The time is 15:40:37.
14 BY MR. TORBORG:
15     Q. Sorry about that, Mr. Reed --
16     A. That's okay.
17     Q. -- although it's technically not my
18 fault, I guess.
19         MS. MARTINEZ: Not your fault.
20 BY MR. TORBORG:
21     Q. We were talking about the
22 confidentiality provisions of the manufacturer

**271**

1  drug pricing data under the legislation that
2  implemented the Medicaid Drug Rebate Program --
3      A. Correct.
4      Q. -- correct?
5          And I think you agreed with me that the
6  statute itself limited the information to CMS and
7  the states, correct?
8      A. I believe it also adds and their
9  contractors, if I'm remembering correctly.
10     Q. All right. But at some point --
11         MR. HERNANDEZ: Objection, form.
12 BY MR. TORBORG:
13     Q. At some point, a provision was made
14 that the actual AMP information would not be
15 shared with the states; is that right?
16     A. As a result of those negotiations, the
17 information that was passed on to the states was
18 not the AMP and the best price. It was a unit
19 rebate amount.
20     Q. Tell me about those negotiations.
21     A. Those negotiations were basically the
22 parties sitting down to go over the law. We had

**272**

1  a very limited time to implement the law, at that
2  point, less than two months, as I remember. It
3  needed a way to implement it, it needed a way to
4  deal with partners we had never had before, which
5  were drug manufacturers.
6          Medicaid generally is a program that
7  deals with the states, and the states deal with
8  providers, so it's a very limited relationship to
9  other parties so that to try to best do that, we
10 sat down, got all the parties together, and
11 started to go through how we would implement
12 this.
13     Q. Were you involved in those negotiations
14 yourself?
15     A. Yes.
16     Q. Okay. Who else was involved in those
17 negotiations?
18     A. On the HCFA side, at that point, they
19 were led by Bill Hickman, Peggy Rahn was also
20 involved, and the people -- the people on the
21 manufacturers' side, on the pharmacy side, and
22 the states' side, I don't remember those names at

**273**

1  this point.
2      Q. Do you know how many manufacturers were
3  involved?
4      A. I don't know offhand. It wasn't a
5  great -- it was not a great deal. It wasn't
6  every manufacturer.
7      Q. Do you know --
8      A. Although I don't remember if every
9  manufacturer were invited to attend or to
10 participate in some other manner.
11     Q. Was Abbott involved in those?
12     A. I don't remember.
13     Q. You indicated pharmacy groups were also
14 in attendance?
15     A. That's correct.
16     Q. Do you recall which pharmacy groups
17 were in attendance?
18     A. I don't recall.
19     Q. Do you have a concept of the number of
20 pharmacy groups?
21     A. There's a limited number of pharmacy
22 groups, so, again, whether -- if the invitations

Reed, Larry                                                September 26, 2007
Baltimore, MD

77 (Pages 302 to 305)

302

1  that are not necessarily included in the AWP
2  number --
3      MS. POLLACK:  Objection to form.
4  BY MR. TORBORG:
5      Q.  -- such as discounts and rebates?
6      A.  That I don't know, again, because there
7  was no -- there is no definition of AWP that we
8  maintain.
9      Q.  So you had access to the AMP
10 information, correct?
11     A.  Yes.
12     Q.  And there's nothing in the law that
13 precluded you from using that information in
14 deciding whether or not to approve or disapprove
15 a state plan for reimbursement; is that right?
16     MR. DRAYCOTT:  Objection.  You can
17 answer.
18     THE WITNESS:  Okay.  In using that,
19 again, the confidentiality provisions would
20 prohibit us using that data in a way which would
21 make it public.
22 BY MR. TORBORG:

303

1      Q.  Let me see if you can answer my
2  question.
3      A.  Sure.
4      Q.  Maybe you've done the best you can.
5      Do you know if there's anything in the
6  statute that would preclude HCFA from using the
7  AMP information in deciding whether or not to
8  approve or disapprove state plans?
9      MS. MARTINEZ:  Objection to form.  You
10 can answer.
11     THE WITNESS:  And that is the best I
12 think I can answer.  To use that AMP data to
13 judge a state plan amendment would mean to
14 disclose that AMP information to be able to say
15 here's the AMP for this drug, your AWP discount
16 is too low, or for this set of drugs.  And, I
17 mean -- and, again, these are just completely
18 different systems.
19 BY MR. TORBORG:
20     Q.  Why would you have to disclose the AMP
21 information in order to disapprove a state plan?
22     A.  At that point, a methodology -- if a

304

1  plan is disapproved, the state either goes back
2  to its prior methodology or it has to submit a
3  new state plan or, before the disapproval, revise
4  its state plan and come up with an acceptable
5  methodology.
6      Q.  But there's nothing in your HCFA
7  practice or regulations that would require you to
8  put forth the AMP information if you disapproved
9  a state plan, is there?
10     A.  I think the logical outcome there would
11 be to get an approvable state plan, you would
12 have to have a definition that reflected AMP.
13     Q.  So your understanding was that you
14 could not use AMP information in deciding whether
15 or not to approve or disapprove a state plan?
16     A.  We did not use AMP in deciding whether
17 to approve or disapprove a state plan.
18     Q.  Okay.  And was that something that
19 Congress directed of HCFA or something that HCFA
20 determined itself?
21     MS. MARTINEZ:  Objection to form.
22     THE WITNESS:  Again, I think our -- our

305

1  issue there would be having that AMP made public
2  through, again, sort of to get to the point where
3  you would have a payment rate that reflects AMP
4  would mean you would have to disclose AMP.
5      The other issue that does bear on that
6  is a state needed to make a reasonable estimate
7  on its own of what its payment rate should be.
8  BY MR. TORBORG:
9      Q.  Are you aware of any specific
10 legislation that prevented HCFA from using the
11 AMP information in deciding whether or not to
12 disclose -- or approve or disapprove a state
13 plan?
14     MS. MARTINEZ:  Objection to form.
15     THE WITNESS:  And here again, are you -
16 - if you're asking me is there something in
17 Section 1927 that says HCFA, do not use AMP to
18 approve or disapprove a state plan, there is
19 nothing like that.
20     If your question is is that how we
21 looked at it, then that is how we looked at it.
22 BY MR. TORBORG:

**314**

1     MR. TORBORG: Was that a -- and I'd
2  like to ask Justin, the limited instruction that
3  you gave him, is that based upon a deliberative
4  process privilege, the attorney-client privilege
5  or both?
6     MR. DRAYCOTT: Both.
7  BY MR. TORBORG:
8     Q. Okay. Mr. Reed, can you tell me which
9  attorneys you spoke with about the issue of
10 whether or not HCFA could share AMP data with the
11 states?
12    MR. DRAYCOTT: You may answer the
13 question.
14    THE WITNESS: There were different
15 attorneys at different times in the CMS Division
16 of the Office of General Counsel. Mary Sallus is
17 one attorney. Bob Jay, who I believe has since
18 retired, is another attorney.
19 BY MR. TORBORG:
20    Q. Do you recall anyone else?
21    A. I don't recall anybody else.
22    Q. Do you recall discussing that with Mary

**315**

1  Riordan?
2     A. I don't recall discussing that with
3  Mary Riordan.
4     Q. You do not?
5     A. I do not know recall that.
6     Q. Mr. Reed, did you have discussions
7  within HCFA about whether or not HCFA itself
8  could use the AMP data in deciding whether or not
9  to approve or disapprove state plans?
10    MR. DRAYCOTT: Same instruction I
11 previously gave you. You can answer the question
12 except to the extent it will reveal the content
13 of the deliberations or the content of any
14 communications with agency counsel.
15    THE WITNESS: We concluded that we
16 couldn't use AMP whether -- where, rather, it
17 would have the effect of making that information
18 -- that AMP information public.
19 BY MR. TORBORG:
20    Q. Did you have -- did those discussions
21 include conversations with counsel?
22    MR. DRAYCOTT: You may answer that

**316**

1  question.
2     THE WITNESS: Yes.
3  BY MR. TORBORG:
4     Q. And with whom did you have that
5  discussion?
6     A. Mary Sallus.
7     Q. Anyone else?
8     A. Again, it could have been Bob Jay.
9     Q. If you would take out Exhibit Abbott
10 284, Mr. Reed, it should be in one of the orange
11 binders.
12    For the record, Exhibit Abbott 284 are
13 some pages out of the Federal Register dated July
14 31, 1987, containing a final rule titled
15 "Medicare and Medicaid Programs, Limits on
16 Payment for Drugs."
17    And, Mr. Reed, if you could review this
18 particular final rule to the extent necessary to
19 tell me whether or not you recall it, whether or
20 not you had any involvement in it, then I'll have
21 a few questions for you.
22    A. I do recall it. I didn't have any

**317**

1  involvement in it, in its promulgation.
2     Q. Okay. Did you have occasion to review
3  the final rule at some point in your career at
4  HCFA?
5     A. After it was published, yes.
6     Q. And the first page indicates, for
7  further information, contact Anthony LeVecchio.
8     Do you know Mr. LeVecchio?
9     A. At one point I did. At least I knew
10 him to say hello.
11    Q. And is he retired from HCFA today, do
12 you know?
13    A. I haven't had contact with him for a
14 long time. I believe he is retired.
15    Q. I'm going to ask you now to take out
16 Exhibit Abbott 081 in the binders.
17    For the record, Exhibit Abbott 081 is a
18 Majority Staff Report from the Special Committee
19 on Aging, United States Senate, titled
20 "Prescription Drug Prices: Are We Getting Our
21 Money's Worth?"
22    Mr. Reed, if you would take a glance