# Exhibit 25

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 994

```
                 UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

    - - - - - - - - - - - - - - -x

    IN RE:  PHARMACEUTICAL          :  MDL NO. 1456

    INDUSTRY AVERAGE WHOLESALE      :  CIVIL ACTION

    PRICE LITIGATION                :  01-CV-12257-PBS

    THIS DOCUMENT RELATES TO:       :

    U.S. ex rel. Ven-a-Care of      :  Hon.  Patti B. Saris

    the Florida Keys, Inc.          :

          v.                        :

    Dey, Inc., et al.               :

    No. 05-11084-PBS                :

    - - - - - - - - - - - - - - - -x

            (captions continue on following pages)




           Videotaped deposition of LARRY REED

                      Volume V



                     Washington, D.C.

                     Thursday, October 2, 2008
```

```
                                       Page 995                                                  Page 997
 1         CAUSE NO. D-1-GV-07-001259              1          IN THE COURT OF COMMON PLEAS
 2  ---------------x                               2             FIFTH JUDICIAL CIRCUIT
 3  THE STATE OF TEXAS, ex. rel  :                 3  Master Caption No.
 4  VEN-A-CARE OF THE FLORIDA    : IN THE DISTRICT COURT 4  2006-CP-40-4394
 5  KEYS, INC.            : TRAVIS COUNTY, TEXAS   5  -----------------x
 6         Plaintiffs,  : 201ST JUDICIAL DISTRICT  6  STATE OF SOUTH CAROLINA      :
 7       v.            :                           7  COUNTY OF RICHLAND           :
 8  SANDOZ, INC., et al.    :                      8  In Re: South Carolina        :
 9         Defendants.  :                          9  Pharmaceutical Pricing Litigation :
10  ---------------x                              10  This Matter Relates to: Sandoz, Inc.:
11      COMMONWEALTH OF KENTUCKY                  11  Civil Action No. 2006-CP-40-4390  :
12        FRANKLIN COURT - DIV. II                12  Civil Action No. 2006-CP-40-4399  :
13  --------------x                               13  -----------------x
14  COMMONWEALTH OF KENTUCKY  :                   14
15  ex rel. GREGORY D. STUMBO, :                  15
16  ATTORNEY GENERAL         :                    16
17      Plaintiff,   : Civil Action No.           17
18    vs.        : 03-CI-1135                     18
19  WARRICK PHARMACEUTICALS   :                   19
20  CORP., INC., et al.    :                      20
21       Defendants.  :                           21
22  --------------x                               22

                                       Page 996                                                  Page 998
 1      COMMONWEALTH OF KENTUCKY                   1          IN THE COURT OF COMMON PLEAS
 2       FRANKLIN COURT - DIV I                    2             FIFTH JUDICIAL CIRCUIT
 3       CIVIL ACTION NO. 04-CI-1487               3  MASTER FILES NUMBER: 06-CP-40-4394
 4  --------------x                                4  CIVIL ACTION NUMBER: 07-CP-40-0282
 5  COMMONWEALTH OF KENTUCKY  :                    5  CIVIL ACTION NUMBER: 07-CP-40-0283
 6  ex rel. JACK CONWAY,    :                      6  -------------------x
 7  ATTORNEY GENERAL        :                      7  STATE OF SOUTH CAROLINA and HENRY  :
 8      Plaintiff,   :                             8  D. McMASTER, in his official      :
 9    vs.        :                                 9  capacity as Attorney General for the :
10  ALPHARMA USPD, INC.,    :                     10  State of South Carolina,     :
11  et al.,         :                             11      Plaintiff,            :
12       Defendants.  :                           12  vs.                      :
13  --------------x                               13  MYLAN LABORATORIES, INC.,     :
14                                                14     Defendant.            :
15                                                15  -----------------x
16                                                16
17                                                17
18                                                18
19                                                19
20                                                20
21                                                21
22                                                22
```

```
                         Page 1223                                    Page 1225
 1  that point.  That might be that -- I just don't    1  during the time period that you were responsible?
 2  know if we were, if HCFA was using disks, that     2         MS. OBEREMBT:  Objection.
 3  old, floppy disks or whatever.                     3  BY MR. MERKL:
 4      Q.  Do you know who John Schlegel is, the      4      Q.  Or did it change somehow?
 5  addressee on the letter?                           5         MS. OBEREMBT:  Objection.
 6      A.  Other than what's indicated in the         6         THE WITNESS:  I'm just trying to figure
 7  letter, no.                                        7  out what you're referring to, because just
 8      Q.  And you recognize the letterhead,          8  reading the sentence by itself, it's hard to
 9  right?                                             9  determine its context.  Designing a variety of
10      A.  Yes.                                      10  payment systems.  I mean, CMS -- and now CMS
11      Q.  That is HCFA letterhead, correct?         11  controls the number of payment systems, or
12      A.  Correct.                                  12  regulates, rather.
13      Q.  Would you turn to page 2 of the letter,   13  BY MR. MERKL:
14  first full paragraph?  It says, rather -- I'm     14      Q.  So you're saying you don't understand
15  reading midway down.  "Rather, it has always been 15  what the sentence means?
16  our intent to permit and encourage the states to  16      A.  I'm saying that the sentence, reading
17  exercise maximum flexibility in designing a       17  it by itself, it's hard to determine what its --
18  variety of payment systems that would be subject  18  what it's referring to.
19  to maximum payment levels established by federal  19      Q.  Well, you know what's referred to by
20  regulations."  Do you see that?                   20  the maximum payment levels, right?
21      A.  I see that sentence.                      21      A.  No.  Again, I'm just trying to -- what
22      Q.  Has that also always been your            22  maximum payment levels?  You mean the EAC and the
```

```
                         Page 1224                                    Page 1226
 1  understanding while you were in your position      1  dispensing fee payment levels?
 2  approving SPAs at HCFA/CMS?                        2      Q.  Right.  They are all maximum payment
 3      A.  Without -- without knowing the full        3  levels, right?  You pay the lower of?
 4  context of the letter, we would -- CMS would       4      A.  But we have hospital payment levels.
 5  certainly, in the Medicaid program, offer states   5  We have physician payment levels.  We have a
 6  flexibility in their payment systems, including    6  number of payment levels.
 7  for drugs.                                         7      Q.  This is talking about prescription
 8      Q.  So that sentence is an accurate            8  drugs, isn't it?
 9  statement of HCFA policy while you were there?     9      A.  That's what I'm looking for.
10         MS. OBEREMBT:  Objection.                  10      Q.  So you don't know if that sentence
11         THE WITNESS:  It's a statement of          11  refers to drugs or not, that's your testimony?
12  policy that there is flexibility within the       12      A.  As I read through the rest of the
13  regulations as to how to meet the requirements of 13  letter, the letter appears to refer to the reg
14  the regulation here.                              14  that was published on August 19th, 1986.
15  BY MR. MERKL:                                     15      Q.  Why don't we read the next sentence.
16      Q.  And it's consistent with your             16  "Moreover, these maximum payment levels include
17  understanding of policy while you were there,     17  sufficient margins in both the markup factor for
18  right?                                            18  generic substitutes and the reasonable dispensing
19      A.  If the states had flexibility in          19  fees that would enable pharmacists to realize
20  determining EAC and dispensing fee, is that what  20  profits through prudent purchasing and efficient
21  you -- is that what you mean?                     21  business operations."  Doesn't that suggest to
22      Q.  I'm asking if the sentence is accurate    22  you that this letter or these two sentences are
```

59 (Pages 1223 to 1226)

Page 1339

1    Q.  And you have no reason to doubt that
2  these minutes are accurate, right?
3    A.  Right.
4    Q.  Did you used to get copies of these
5  minutes in the ordinary course?
6    A.  Of the P-TAG minutes?
7    Q.  Yes.
8    A.  I believe generally so.
9    Q.  What did you do with them?
10   A.  I'm not sure.
11   Q.  Did do you throw them out or do you
12 file them?
13   A.  I just don't remember what happened to
14 them.  The most recent ones I think -- I have,
15 but I don't know about any of the older ones.
16   Q.  Well, would you send them -- I
17 understand that you don't know where they are
18 today.  That I accept.  But was your practice
19 when you got a P-TAG minute, you would read it
20 and rip it up and throw it out, or would you just
21 read it and send it to a file and hand it to
22 somebody.  What did you do with it?

Page 1340

1    A.  Over this time period, I don't recall.
2  I just don't know what happened to them.
3    Q.  So these minutes, and minutes like
4  them, might still exist in files, they might not,
5  you just don't know?
6    A.  Yes.  Personally, I don't know.
7    Q.  Do you have any reason to believe that
8  they are not kept, or they are destroyed?
9    A.  I'm sorry, that they are not what?
10   Q.  Do you have any reason to believe that
11 the minutes going back to 1990 from P-TAG were
12 not kept and were destroyed by HCFA?
13       MS. OBEREMBT:  Objection.
14       THE WITNESS:  I simply don't know what
15 happened to them.
16 BY MR. MERKL:
17   Q.  Okay.  I seem to recall hearing that
18 Texas enacted some legislation that required
19 manufacturers to report AMP, the federal AMP to
20 Texas Medicaid authorities.  Do you know if
21 that's the case?  Have you heard of that?
22   A.  I do recall that Texas had -- that

Page 1341

1  there was an issue with Texas and AMP.
2    Q.  And is Texas or any state allowed to do
3  that, pass their own law and require the
4  manufacturers to report them their AMP?  Is that
5  allowed?
6        MS. OBEREMBT:  Objection.
7        THE WITNESS:  I believe that they --
8  they wrote to us, and if I remember correctly, we
9  indicated that they could not get that AMP.
10 BY MR. MERKL:
11   Q.  I don't know whether you're talking
12 about -- this is a statute, okay?  Texas has a
13 statute or a regulation that requires
14 manufacturers to send them AMP information
15 directly, as distinct from Texas getting AMP
16 information from CMS.  Do you know anything about
17 that regulation?  Or statute?
18   A.  The state statute separate and apart
19 from the other correspondence?
20   Q.  Yes.
21   A.  No, I don't.
22   Q.  Now, is there any reason from CMS's

Page 1342

1  perspective that a state could not require
2  manufacturers to give the states AMP information?
3    A.  The AMP would still be confidential
4  under the act.
5    Q.  So a state could ask to get the AMP
6  from the manufacturers, but the state would still
7  be required to treat the AMP as manufacture -- as
8  confidential, consistent with the terms of the
9  act?
10       MS. OBEREMBT:  Objection.
11       THE WITNESS:  And I think we would want
12 to see the specific statute, specific uses and
13 specific disclosure for that.
14 BY MR. MERKL:
15   Q.  So is it fair to say that if the state
16 got AMP information, that might be permissible,
17 but even if they did get the AMP information, the
18 state could only use the AMP information
19 consistent with the overall federal legislation?
20       MS. OBEREMBT:  Objection.
21       THE WITNESS:  And I just don't
22 understand that question.  I just don't know what

88 (Pages 1339 to 1342)

### Page 1343

1  that means. Do you mean for rebate purposes?
2  BY MR. MERKL:
3    Q.  No. For instance, could the state get
4  AMP information? Say the state requires them to
5  report AMP information. Could the state then
6  turn around and publish the AMP information?
7  Would that be legitimate?
8      MS. OBEREMBT: Objection.
9      THE WITNESS: I think the use of AMP
10 information would be held confidential under the
11 statute, any of that information for any purpose
12 other than what's contemplated by the statute.
13 BY MR. MERKL:
14   Q.  They could use it as long as they kept
15 it confidential under the statute?
16     MS. OBEREMBT: Objection.
17     THE WITNESS: I'm not sure what you
18 mean by the term, use it.
19 BY MR. MERKL:
20   Q.  Could you take a look at Dey Exhibit
21 172, please. Do you recognize this? It's a
22 proposed rule?

### Page 1344

1    A.  Yes, I do.
2    Q.  Can you tell me what the proposed rule
3  was?
4    A.  This was a proposed rule that was
5  implementing OBRA 90.
6    Q.  And what was the purpose of this
7  particular rule? This proposal?
8    A.  The proposed rule would be -- basically
9  would be publishing it in the federal regulations
10 to get it into the CFR.
11   Q.  Okay. And what was on this particular
12 reg here? What did this reg do?
13   A.  As I remember, this reg was -- was
14 putting into federal regulations a number of
15 provisions of the rebate law.
16   Q.  And this is in 1995?
17   A.  Correct.
18   Q.  And what role, if any, did you have in
19 connection with this Federal Register item?
20   A.  My role would have been to be involved
21 with this, with this regulation.
22   Q.  Did you work on preparing the comments

### Page 1345

1  or statements from HCFA?
2    A.  A number of people worked on it. I
3  would have been among those people.
4    Q.  Would you turn to page, I guess 48446,
5  upper left-hand corner. It talks about average
6  manufacture under Section 9, third column, right?
7    A.  Section 9, okay.
8    Q.  It says it's "to clarify that AMP for
9  rebate period is the average price paid to the
10 manufacture for the drug in the United States by
11 wholesalers for drugs distributed to the retail
12 pharmacy class of trade after deducting customary
13 prompt pay discounts. The policy that AMP would
14 be calculated after deducting prompt pay
15 discounts is reflected in the national rebate
16 agreements." That's still the case, right?
17   A.  No.
18   Q.  Oh, no. How is that different?
19   A.  AMP no longer includes deduction of
20 customary prompt pay discounts.
21   Q.  Okay. But all other discounts are in
22 AMP, right?

### Page 1346

1      MS. OBEREMBT: Objection.
2  BY MR. MERKL:
3    Q.  True?
4    A.  No.
5    Q.  What other discounts are in AMP?
6    A.  There is subsequent regulation that
7  specifies which discounts -- which prices are in
8  and which discounts are in, and which are out.
9    Q.  Okay. Why were prompt pay discounts
10 taken out?
11     MS. OBEREMBT: Objection. Calls for
12 deliberative process. You can't answer.
13 BY MR. MERKL:
14   Q.  Turn to page 48475, please. In the
15 left-hand column, do you see it says C. Do you
16 see that?
17   A.  Yes.
18   Q.  It says, comment and then response?
19   A.  Yes.
20   Q.  Now comment, who does the comment?
21   A.  The comment would be comments from the
22 general public.

89 (Pages 1343 to 1346)