# Exhibit 26

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 242

```
             UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

  --------------------------- X

IN RE PHARMACEUTICAL           )

INDUSTRY AVERAGE WHOLESALE     ) MDL No. 1456

PRICE LITIGATION,              ) Civil Action No

THIS DOCUMENT RELATES TO:      ) 01-12257-PBS

United States of America,      ) Judge Patti B.

ex rel. Ven-A-Care of the      ) Saris

Florida Keys, Inc., v.         ) Mag. Judge

Abbott Laboratories Inc.       ) Marianne Bowler

Civil Action No.               )

06-11337-PBS                   )

  --------------------------- X

         (cross-captions on following pages)


                     Washington, D.C.

                     Thursday, March 27, 2008

                     9:40 a.m.


       Videotaped deposition of DENNIS G. SMITH

                  Volume II
```

Page 243

```
 1                 UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MASSACHUSETTS
 3     - - - - - - - - - - - - - - - - -
 4     IN RE: PHARMACEUTICAL          ) MDL NO. 1456
 5     INDUSTRY AVERAGE WHOLESALE     ) CIVIL ACTION:
 6     PRICE LITIGATION               ) 01-CV-12257-PBS
 7     - - - - - - - - - - - - - - - -
 8     THIS DOCUMENT RELATES TO:      ) JUDGE PATTI B. SARIS
 9     ALL CASES IN MDL NO. 1456      ) MAGISTRATE JUDGE
10     - - - - - - - - - - - - - - - - MARIANNE B. BOWLER
11
12                    IN THE CIRCUIT COURT OF
13                   MONTGOMERY COUNTY, ALABAMA
14     - - - - - - - - - - - - - - - -
15     IN THE MATTER OF:              )
16     ALABAMA MEDICAID               ) MASTER DOCKET NO.
17     PHARMACEUTICAL AVERAGE         )    CV-2005-219
18     WHOLESALE PRICE LITIGATION     )
19     - - - - - - - - - - - - - - - -
20     THIS DOCUMENT RELATES TO:      )
21     ALL ACTIONS                    )
22     - - - - - - - - - - - - - - - -
```

1  Q. -- amend their state plan --

2  A. Yes.

3  Q. -- and come up with some new formula,
4  whatever that formula is?

5  A. Yes.

6  Q. Based upon AMP?

7  A. Yes.

8  Q. But you can't simply take AWP out and
9  substitute AMP into the existing formula to come
10 up with what the Medicaid program should pay,
11 right?

12           MS. MARTINEZ: Objection. Form.

13           THE WITNESS: No. You would have to
14 submit a state plan to have permission to pay
15 differently, but presumably that is what states
16 will do.

17 BY MR. COOK:

18 Q. And today, because they're paying at
19 published AWPs minus 5 percent, Alaska is not
20 overpaying for its drugs in a technical sense?

21           MS. MARTINEZ: Objection. Form.

22           THE WITNESS: Well, again, I think

cc43ea99-da09-4c6b-a9be-38f3e69a241f

1  there is an underlying assumption that AWPs are
2  accurately being reported.  And so when -- they
3  are saying we will pay on a 5 percent discount
4  off an accurately reported AWP.  But if the AWP
5  is not accurate, then the state may not have any
6  -- they're paying off AWP minus 5 believing they
7  are paying accurately.  But if the AWPs
8  themselves are wrong, then they are
9  unintentionally paying wrong.
10 BY MR. COOK:
11       Q.   But in terms of the laws and the
12 regulations that the govern state Medicaid
13 program, the state is complying with those laws
14 and regulations, correct?
15            MS. MARTINEZ:  Objection.  Form.
16            MR. WINGET-HERNANDEZ:  Objection.
17 Form.
18            THE WITNESS:  They are paying off an
19 approved state plan.
20 BY MR. COOK:
21       Q.   And they are complying with the
22 estimated acquisition cost regulations that

1              MS. MARTINEZ:  Objection.  Form.
2              THE WITNESS:  I don't -- I would not
3    agree that that encompasses the entirety of how
4    AWP is relied upon by all purchasers.  I think
5    this is overly simplified.  I would agree that it
6    is not further defined in law or regulation.  AWP
7    is average wholesale price.
8    BY MR. MERKL:
9        Q.   When you say it's not further defined,
10   it's not defined anywhere at all, is it?
11             MS. MARTINEZ:  Objection.  Form.
12             THE WITNESS:  There is no definition,
13   precise.
14   BY MR. MERKL:
15       Q.   And then it continues, "Manufacturers
16   periodically report AWPs to publishers of drug
17   pricing data" --
18       A.   Again, if I can go back, what I -- what
19   I was referring to in saying that's I don't think
20   how -- entirely accurate that the manufacturer is
21   free to set any -- to set an AWP at any level.
22       Q.   Well, is there some rule that

1   Gortner, Roxane.  Objection.  Form.  Excuse me,
2   Mr. Smith.
3            THE WITNESS:  I think the -- again,
4   reading the letter, I -- I think the letter
5   refers specifically to how they use the rebate
6   information, including the URA, which, again,
7   they have, so how can they use that or not.  But
8   it is confirming that they may not use the --
9   they may not use the rebate information for
10  calculating their estimated acquisition cost for
11  reimbursement.
12  BY MR. WINGET-HERNANDEZ:
13       Q.  Okay. All right.  Let's back up a
14  little bit.  Just as plainly as you can, tell us,
15  what is the unit rebate amount?  To move things
16  along, let me just ask you this way.
17       A.  Okay.
18       Q.  Is the unit rebate amount a certain --
19  in the case of generic drugs, a particular
20  percentage of the average manufacturer's price?
21       A.  Correct.  You're looking at each
22  individual drug.

Smith, Dennis G. - Vol. II                                March 27, 2008
                        Washington, DC

Page 580

1           MR. WINGET-HERNANDEZ:  Objection.
2   Form.
3           MS. MARTINEZ:  Objection.  Form.
4           THE WITNESS:  In that respect I would
5   say now you are using it.  And whether or not the
6   confidentiality applies to using that
7   information...
8   BY MR. COOK:
9       Q.   But you would agree with me that it's
10  possible to set MACs for drugs without setting
11  that MAC based upon the AMP, right?
12      A.   You can set a MAC without the
13  information.  You can -- but in what you were
14  describing to me, what you're saying is now I am
15  going to start using it.
16      Q.   But what I am asking you is a different
17  mechanism; that is, using the AMP to identify
18  which drugs should be subject to a MAC, and then
19  actually picking the number for the MAC in
20  whatever other mechanism is available to the
21  state or used by the state for setting MACs.  Do
22  you understand what I am saying?

Page 581

1            MS. MARTINEZ:  Objection.  Form.
2            THE WITNESS:  I understand what you're
3   saying.  I -- again, my understanding is about
4   use, and my understanding of the confidentiality
5   is the state can't use it.  And we told states
6   they couldn't use it, specifically post-DRA,
7   because -- until we had the final regulation, et
8   cetera.
9   BY MR. COOK:
10       Q.   And there certainly are uses of AMP for
11  setting a MAC or setting EAC which would reveal
12  the AMP to the world, right?  For example, if the
13  AMP became the MAC, or twice the AMP became the
14  MAC, right?
15       A.   Again, if you were describing what you
16  were doing, then you would be revealing it.
17       Q.   Right.  And that is what -- I think
18  that, we both can agree, would -- or we both can
19  agree you would consider it to be a breach of the
20  confidentiality provision, right?
21       A.   Yes.
22       Q.   But to use another mechanism that did