# Exhibit 27

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Duzor, Deidre - Vol. II                                February 27, 2008
                          Washington, DC

Page 250

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -

         (cross-captions on following pages)


                        Washington, D.C.

                        Thursday, February 27, 2007

                        9:00 a.m.


         Videotaped deposition of DEIRDRE DUZOR

                        Volume II

Duzor, Deidre - Vol. II                         February 27, 2008
                         Washington, DC

Page 251

1           IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2               IN AND FOR LEON COUNTY, FLORIDA
3   THE STATE OF FLORIDA
4   ex rel.
5   - - - - - - - - - - - - - - - - - - -
6   VEN-A-CARE OF THE FLORIDA KEYS,      )
7   INC., a Florida Corporation, by and  )
8   through its principal officers and   )
9   directors, ZACHARY T. BENTLEY and    )
10  T. MARK JONES,                       )
11            Plaintiffs,                ) Civil Action
12       vs.                             ) No. 98-3032G
13  MYLAN LABORATORIES INC.; MYLAN       )
14  PHARMACEUTICALS INC.; NOVOPHARM      ) Judge William
15  LTD., SCHEIN PHARMACEUTICAL, INC.;   ) L. Gary
16  TEVA PHARMACEUTICAL INDUSTRIES       )
17  LTD.; TEVA PHARMACEUTICAL USA; and   )
18  WATSON PHARMACEUTICALS, INC.,        )
19            DEFENDANTS.                )
20  - - - - - - - - - - - - - - - - - - -
21
22

Page 347

1  reduce pharmacy reimbursement from the higher
2  rate that it was going to revert to.
3      Q.  It was a temporary reduction to AWP
4  minus 14 percent because the governor wanted to
5  reduce Medicaid expenditures for a certain fiscal
6  year; is that right?
7          MS. MARTINEZ: Objection, form.
8      A.  Yes. That's what it appears to be. I
9  don't, you know, at the present time really
10 recall this in detail. So based upon the
11 document that I'm looking at, yes.
12     Q.  In order for you to approve this state
13 plan would Minnesota need to provide you
14 documentation that AWP minus 11 percent was their
15 best estimate of the price that providers were
16 currently and generally paying for drug products
17 in Minnesota?
18         MS. MARTINEZ: Objection, form.
19     A.  At the time our interest was
20 encouraging states to reduce their payment. And
21 so if they were going to be reducing their
22 payment, as long as that would not result in an

Page 348

1  access problem we were generally accepting their
2  documentation that this was a better payment than
3  what would otherwise be paid, more appropriate
4  payment.
5      Q.  So this would fall under the decision
6  memo options that we saw earlier in Abbott
7  Exhibits 328 and 487?
8          MS. MARTINEZ: Objection, form.
9      A.  I don't know that it would -- I
10 wouldn't say it would fall under those. That was
11 guidance or an expansion of the kinds of factors
12 that we would look at as we were evaluating state
13 plan amendments. So it is consistent with it to
14 the extent that the result of this amendment
15 would be to lower reimbursement to a more
16 appropriate level than would otherwise be the
17 case.
18     Q.  What if the proposed amendment did not
19 reduce the reimbursement amount to the prices at
20 which pharmacies were generally and currently
21 paying for drugs?
22     A.  We did not have independent evidence as

Page 349

1  to what the pharmacies were currently paying for
2  drugs. So, you know, we didn't have that
3  information in order to compare to it. The only
4  thing we had was the Inspector General's report.
5      Q.  Which showed that AWP was at this time
6  for brand-name drugs AWP minus 20 for brand-name
7  drugs and AWP minus roughly 66 percent for
8  generics, right?
9          MS. MARTINEZ: Objection to form.
10     A.  I thought it was AWP minus 17.
11 Whatever, it was lower than what the state was
12 proposing here. But again, this was lower than
13 what they would have otherwise been paying. So
14 it was -- they were moving in the right
15 direction.
16         (Exhibit Abbott 490 was marked for
17 identification.)
18 BY MR. TORBORG:
19     Q.  For the record, what I've marked as
20 Abbott Exhibit 490 bears the Bates numbers HHC
21 002-0172 through 75. It is a December 10th 2002
22 letter from John Coster to Sharon Summers at the

Page 350

1  Delaware Policy and Program Implementation Unit.
2  And copied on the memo are some individuals that
3  include Ms. Duzor.
4          Ms. Duzor, if you would take a look at
5  this document and let me know if you recognize
6  it.
7      A.  (Reading.) I don't recall this
8  document.
9      Q.  Have you had conversations with Mr.
10 Coster regarding Medicaid pharmacy issues?
11     A.  Yes, over the years.
12     Q.  Do you recall approximately how many?
13     A.  A very rough guess would be two to
14 three a year.
15     Q.  What would occasion those meetings?
16     A.  The National Chain Drug Store
17 Association repeatedly sought to come in and
18 speak to us at the agency. And we granted their
19 request on occasion. Not nearly as often as they
20 would probably have liked.
21     Q.  If you would look at the note on the
22 front page, the handwritten note there?

26 (Pages 347 to 350)

Page 391

1  see that.
2      A.  I do see that.
3      Q.  Okay.  And do you recall that subject
4  being discussed at the panel meeting?
5      A.  I remember the discussion about the
6  discounts on AWP.  I don't recall the discussion
7  -- a discussion about dispensing fees.
8      Q.  But it's something that may have been
9  discussed?  You just don't recall?
10     A.  It may have been discussed, yes.  I
11 just don't recall.
12     Q.  Would you agree that Medicaid
13 dispensing fees are low relative to actual
14 dispensing costs?
15         MS. MARTINEZ:  Objection, form.
16     A.  No.  I don't consider myself
17 knowledgeable enough to make that statement.
18     Q.  So you wouldn't have any basis to
19 disagree with ABT's statement that "Experts agree
20 that Medicaid dispensing fees are low relative to
21 actual dispensing costs"; is that fair to say?
22         MS. MARTINEZ:  Objection, form.

Page 392

1      A.  The only problem I have is Medicaid
2  dispensing fees being talked about as a unit I
3  think is a bit problematic, because they do vary
4  quite substantially across states.  So --
5      Q.  But this firm felt it appropriate to
6  refer to Medicaid dispensing fees in the
7  aggregate and make comments upon it.  Do you
8  think that's inappropriate for them to do that?
9          MS. MARTINEZ:  Objection to form.
10     A.  I don't think it was inappropriate for
11 them to do that.  But your question to me was do
12 I concur with this statement as written.  And I
13 think it's a bit overbroad to just talk about
14 them in general in the aggregate.  Because they
15 do vary quite a bit.
16     Q.  Do you have any basis to disagree with
17 the contention that most experts agree that
18 generally speaking Medicaid dispensing fees are
19 low relative to actual dispensing costs?
20         MS. MARTINEZ:  Objection, form.
21     A.  I just am not knowledgeable enough to
22 speak to what most experts think.  I just don't

Page 393

1  know.
2      Q.  Do you think that there are others who
3  know more about the actual cost to dispense drugs
4  than you?
5      A.  Oh, I'm sure there are many people who
6  know more than me.
7      Q.  And who know more than anyone else at
8  CMS?
9          MS. MARTINEZ:  Objection, form.
10     A.  I don't think we at CMS are very
11 knowledgeable on this subject.
12     Q.  If you go to the next line, it states
13 in the next sentence "One panel member commented
14 'If it weren't for the AWP spread, the pharmacies
15 would be out of business.'"
16     A.  I see that.
17     Q.  Do you recall that comment being made?
18     A.  No.  I don't recall it.
19     Q.  But you don't disagree that the comment
20 was made during the panel conference?
21         MR. KELLEY:  Objection to form.
22         MS. MARTINEZ:  Objection, form.

Page 394

1      A.  I assume since it's reported here that
2  -- I accept it on its face value that it was
3  probably said, yes.
4      Q.  So you don't recall who made the
5  statement?
6      A.  No, I don't.
7      Q.  Then it says "Payments based on the
8  cost structure experienced by pharmacies may
9  warrant payment of a reasonable and managed
10 spread (an amount paid above the actual
11 acquisition cost) in addition to a fixed
12 dispensing fee and an appropriate service fee for
13 medication therapy management."  Do you see that?
14     A.  Yes.
15     Q.  And is it your view that a reasonable
16 and managed spread should not be paid above
17 acquisition cost by Medicaid programs?
18         MS. MARTINEZ:  Objection, form.
19     A.  I believe our regulations call for an
20 actual acquisition cost, which is a cost very
21 close to, if not precisely -- but, you know,
22 certainly a cost close to what is paid by the

Page 395

1  pharmacy for the drug ingredient.  So I would not
2  agree that that statement is consistent with the
3  Medicaid regulation for Medicaid.
4       Q.  And you were aware, were you not, that
5  there was empirical evidence indicating that
6  states were not paying estimated acquisition cost
7  or actual acquisition cost or anything close to
8  those numbers for generic drugs at the time --
9  roughly around the time you started the job?
10          MS. MARTINEZ:  Objection, form.
11      Q.  Am I right?
12      A.  Based on the findings in the Inspector
13 General, yes, we knew that the states -- that's
14 when we started to understand that states were
15 paying too much for drugs.
16      Q.  And you don't know what CMS understood
17 about these issues before you started?
18      A.  No.  I couldn't speak to that.
19      Q.  This may have been something that had
20 been going on for five, ten years or more and you
21 wouldn't know?
22          MS. MARTINEZ:  Objection, form.

Page 396

1       A.  I have not studied the history.  I
2  don't know.
3       Q.  So fair to say that you know that
4  states for generic drugs are not complying with
5  the estimated acquisition cost regulation --
6           MS. MARTINEZ:  Objection to form.
7           MR. KELLEY:  Objection to form.
8       Q.  -- to put it simply?
9       A.  I can't put it that simply because I
10 don't think that states mean not to be complying
11 with our regulation.  I think they are at a lack
12 of knowing what price to pay to meet the
13 requirements of that regulation as we are
14 similarly at a lack to know what to approve for
15 states.
16      Q.  Well, they received OIG's reports that
17 showed findings across eight states an average
18 discount of 66 percent for generic drugs, did
19 they not?
20          MR. WINGET-HERNANDEZ:  Objection to
21 form.
22          MR. KELLEY:  Objection to the form.

Page 397

1       A.  Yes.
2       Q.  And you saw that too?
3       A.  Yes, we did.
4       Q.  And you don't know of any empirical
5  evidence suggesting that those findings are
6  wrong, do you?
7       A.  No.  I'm sure they are what they are
8  represented to be, which is looking at eight or
9  nine states and 200 pharmacies.  They certainly
10 represent that.  That doesn't mean they -- it's
11 true -- certainly not precisely true -- in the
12 other 42, 43 states and we don't know about for
13 other pharmacies.  So what they looked at, I
14 accept their findings as being what in fact they
15 found in doing their review.
16      Q.  Is it your testimony, Ms. Duzor, that
17 CMS did not know in 2002 at the latest that
18 states were not abiding by the estimated
19 acquisition cost regulation for generic drugs?
20          MR. KELLEY:  Objection to form.
21          MS. POLLACK:  Objection to form.
22          MS. MARTINEZ:  Objection to form.

Page 398

1       A.  Again, I don't think it was that states
2  were not abiding by it.  I think that they didn't
3  know where to set their payment rates.  And it's
4  difficult to get from one place to another in one
5  fell swoop.  So we were encouraging states and we
6  were having success with states in starting to
7  ratchet down how much they paid for drugs based
8  upon the information that the IG had presented.
9       Q.  What did CMS do to encourage the states
10 to ratchet down the reimbursement?
11      A.  We gave them the IG report.  We started
12 to approve state plan amendments with decreasing
13 pharmacy cost.
14      Q.  Even when they didn't decrease at
15 amounts consistent with OIG's findings, right?
16          MS. MARTINEZ:  Objection, form.
17      A.  Well, if we had not approved those
18 state plan amendments then their payments would
19 have been yet higher than with the approval of
20 the amendments.  So again, they were moving in
21 the right direction.
22      Q.  But you could have caused them to

38 (Pages 395 to 398)

423

1  Q. Do you recall knowing or have you been
2  aware of the fact that states, at least
3  Minnesota, according to Mr. Wiberg, considered
4  the spread between AAC and AWP when determining
5  what to pay for dispensing fee?
6     MR. KELLEY: Objection, form.
7     MS. MARTINEZ: Objection, form.
8  A. As I said, I have never seen this e-
9  mail before. So no, I was not aware that
10 Minnesota thought of that in setting theirs, in
11 setting their ingredient cost.
12 Q. Does this --
13 A. Dispensing fee. I'm sorry.
14 Q. Does this surprise you, this language?
15    MS. MARTINEZ: Objection, form.
16 A. No. It doesn't surprise me. But I
17 think it's a well established fact at this point
18 in time. I'm not sure whether this would have
19 been surprising or not back in 2000. He may have
20 been ahead of his time. This may have been a
21 revelation at that point.
22 Q. Or it could have been just what

424

1  everyone knew at the time who was operating in
2  the state pharmacy area?
3     MS. MARTINEZ: Objection to form.
4  A. I can't speak to that. I wasn't part
5  of that at that time.
6  Q. If I can skip a paragraph, Mr. Wiberg
7  wrote "Some public and private third party payors
8  have purposely kept dispensing fee low precisely
9  because there is a spread between AWP and AAC."
10 Do you see that?
11 A. Yes, I do.
12 Q. Is that repeating the same sentiment
13 that he made earlier?
14    MS. MARTINEZ: Objection to form.
15 A. It seems to be, with the extension of
16 it to private third parties in addition to public
17 payors.
18 Q. He says "In fact when pharmacy
19 organizations have sought an increase in
20 dispensing fees, the AWP spread has been pointed
21 out to legislatures." Do you see that?
22 A. Yes, I do.

425

1  Q. And do you have any knowledge about
2  that?
3  A. No, I don't.
4  Q. Do you have any reason to believe that
5  what Mr. Wiberg was saying here was not correct?
6     MR. KELLEY: Objection to form.
7     MS. MARTINEZ: Objection to form.
8  A. No, I have no reason to have any
9  opinion on it. It's not something I am familiar
10 with.
11 Q. If we go to the next paragraph, he ends
12 it with the sentence "However, the problem should
13 be approached in one of two ways. One, state
14 Medicaid agencies should be allowed to work out
15 their own solutions (by increasing the discount
16 off of AWP, adjusting the dispensing fee,
17 establishing MACs, et cetera); or two, a national
18 solution should be pursued that accounts for all
19 aspects of the problem and that is developed by
20 and with input from all interested parties
21 (NAMFCU, state Medicaid agencies, private third
22 party payors, First Databank, pharmacy

426

1  organizations, et cetera.)" Do you see that?
2  A. Yes.
3  Q. Have you heard any discussion with
4  states or within CMS that on this issue of
5  pharmacy reimbursement the state agencies should
6  be able to work out their own pricing, their own
7  solutions to what they think is most effective?
8     MS. MARTINEZ: Objection, form.
9  A. No. I don't recall ever being part of
10 any discussions.
11 Q. Is that something that you have
12 considered in your role as the co-lead of the CMS
13 pharmacy team charged with approving state plans
14 for payment of drugs?
15    MS. MARTINEZ: Objection, form.
16    MR. WINGET-HERNANDEZ: Objection, form.
17 A. There is a regulation that says that
18 state Medicaid payments should be estimated
19 acquisition cost plus reasonable dispensing fee.
20 So I would have to say that the answer is no,
21 that we wouldn't think it appropriate to allow
22 states to be totally on their own because to the

427

1  extent that what they would do would be
2  inconsistent with our regulation we would have an
3  obligation to review their state plan and these
4  prices have to be in their state plan.
5         (Exhibit Abbott 493 was marked for
6  identification.)
7  BY MR. TORBORG:
8     Q.  For the record, what I've marked as
9  Exhibit 493 is a September 3rd 2007 article from
10 Drug Topics titled "On AWP issue feds and
11 pharmacists are wide apart."  And Ms. Duzor, if
12 you would take a look at this document and let me
13 know if you are familiar with it.
14    A.  No.  I'm not familiar with it.
15    Q.  This is an article that quotes you; is
16 that right?
17    A.  I haven't gotten that far.
18    Q.  I'm sorry.
19    A.  (Reading.)  Okay.  I've completed
20 reading it.
21    Q.  This is an article that's quoting you;
22 is that right?

428

1     A.  Yes, it does.
2     Q.  And it concerns a topic we covered
3  earlier today, which is the use of AMP to
4  calculate federal upper limits; is that right?
5     A.  Yes.  Indirectly.  It doesn't actually
6  talk about federal upper limits, but --
7     Q.  Well, the average manufacturer price
8  final rule referred to in the second and third
9  sentences of this article, can you think of any
10 other AMP final rule besides the federal upper
11 limit rule?
12    A.  No.  I agree with you it is -- the AMP
13 final rule does deal with the issue of the new
14 federal upper limits.
15    Q.  In the fourth paragraph the article
16 states "In contrast, Duzor" -- that would be you,
17 right?
18    A.  That would be me.
19    Q.  "Said the AMP rule would allow Medicaid
20 to pay more appropriately for drugs since the
21 agency has been overpaying for these products
22 using former sources of pricing that overstated

429

1  costs.  Duzor acknowledged that CMS is concerned
2  about whether AMP will hurt patient access to
3  care, but she believes things will work out for
4  pharmacies as long as states figure out how to
5  make it work."  Do you see that?
6     A.  Yes, I do.
7     Q.  What did you mean when you said "as
8  long as states figure out how to make it work"?
9     A.  Actually, that last sentence doesn't
10 sound to me like something I said.  So I think
11 it's probably -- it's their reworking of
12 something I said.  I don't believe I said that we
13 had concerns about whether AMP will hurt patient
14 access to care.  We don't have any concerns.  We
15 don't believe it will.
16    Q.  So --
17    A.  I mean, if it did have an adverse
18 effect on patient care we would care about that.
19 But we don't believe that it would.
20    Q.  So it's your testimony that you've been
21 in this article misquoted?
22        MS. MARTINEZ:  Objection, form.

430

1     Q.  Is that fair to say?
2        MS. MARTINEZ:  Objection, form.  This
3  was not a direct quote in that paragraph.
4     Q.  You've been misparaphrased?
5     A.  Yes.  I would say I believe in that
6  last sentence I've been misparaphrased, yes.
7     Q.  Do you believe her article does not
8  fairly reflect what -- did you talk to Judy Chi?
9     A.  No, I didn't.  She --
10    Q.  Do you know where she's getting this
11 from?
12    A.  I did speak to several groups after the
13 final rule was published.  So I assume it was
14 from one of those presentations.
15    Q.  So it's your testimony to the jury that
16 you don't believe that CMS has concerns about
17 whether AMP will hurt patient access to care?
18        MR. WINGET-HERNANDEZ:  Objection to
19 form.
20        MS. MARTINEZ:  Objection, form.
21    Q.  That's your testimony?
22        MS. MARTINEZ:  Objection, form.