# Exhibit 28

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL            )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE        )   CIVIL ACTION

PRICE LITIGATION                  )   01-CV-12257-PBS

THIS DOCUMENT RELATES TO          )

U.S. ex rel. Ven-a-Care of        )   Judge Patti B. Saris

the Florida Keys, Inc.            )

    v.                            )   Chief Magistrate

Abbott Laboratories, Inc.,        )   Judge Marianne B.

No. 06-CV-11337-PBS               )   Bowler

- - - - - - - - - - - - - - - -

         (cross-captions on following pages)


                        Washington, D.C.

                        Tuesday, October 30, 2007

                        9:00 a.m.


       Videotaped deposition of DEIRDRE DUZOR

                  Volume I

Duzor, Deirdre                                          October 30, 2007
                         Washington, DC

                                                                  Page 2
 1         IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
 2             THIRD JUDICIAL DISTRICT AT ANCHORAGE
 3      - - - - - - - - - - - - - - - - -
 4      STATE OF ALASKA,                  )
 5                 Plaintiff,             )
 6         vs.                            )   Case No.
 7      ABBOTT LABORATORIES and           )   3AN-06-12297 CI
 8      DEY, INC.,                        )
 9                 Defendants.            )
10      - - - - - - - - - - - - - - - - -
11
12
13               IN THE CIRCUIT COURT OF
14             MONTGOMERY COUNTY, ALABAMA
15      - - - - - - - - - - - - - - - - -
16      STATE OF ALABAMA,                 )
17                 Plaintiff,             )
18         vs.                            )   Case No. CV-2005-219
19      ABBOTT LABORATORIES, INC.,        )   Judge Charles Price
20      et al.,                           )
21                 Defendants.            )
22      - - - - - - - - - - - - - - - - -

                      Henderson Legal Services
                          202-220-4158

f5f0cb67-5db5-4a19-acea-ff4afd75844b

Page 194

1  increasingly difficult to require the states to
2  establish payment rates in adherence to regulatory
3  requirements."  Do you see that?
4     A.   Yes, I do.
5     Q.   Do you know what that means?
6     A.   No.  And I think my difficulty is that --
7  the idea of increasingly difficult, I wasn't there
8  at the prior point in time to have an appreciation
9  of how it had been before I arrived.
10    Q.   Do you know what the regulatory
11 requirements were that are being referred to here?
12    A.   I believe they would be the regulatory
13 requirements related to estimated acquisition cost.
14    Q.   And what the authors of this document are
15 saying is that it's becoming difficult to require
16 states to set payment rates that get to estimated
17 acquisition cost, correct?
18         MR. WINGET-HERNANDEZ:  Objection to form.
19         MS. MARTINEZ:  Objection, form.
20    A.   The plain reading of it, yes.
21    Q.   Oh, is there a hidden meaning that I'm
22 not getting?

Page 195

1          MR. WINGET-HERNANDEZ:  Objection, form.
2      A.  No.  Again, I'm just saying that not
3  having the history I don't know the basis of the
4  statement saying that it is proving increasingly
5  difficult.
6      Q.  But based on your experience you did
7  observe that it was difficult to get states to
8  establish payment rates in adherence with the
9  estimated acquisition cost, correct?
10         MR. BATES:  Objection to the form.
11         MS. MARTINEZ:  Objection to form.
12     A.  Well, in order to determine estimated
13 acquisition cost my understanding of what had been
14 done previously was to require states to do surveys
15 and get invoices.  And I think states were saying
16 that that was too difficult, too time consuming, too
17 out of date.  By the time they did it prices were
18 changing.  So that states were telling us that they
19 couldn't really do that anymore.
20     Q.  Is it your testimony that you didn't know
21 that states were reimbursing drugs at levels higher
22 than estimated acquisition cost?

Page 196

1          MR. WINGET-HERNANDEZ:  Objection it form.
2          MR. BATES:  Objection to form.
3          MS. MARTINEZ:  Objection to form.
4      A.  I think based on the IG reports, yes, we
5  expected that they were.  But they were faced with
6  difficult choices in terms of reducing their
7  payments, which many states were doing, but they
8  were doing it in a cautious manner.  They didn't
9  want to do it in a very precipitous manner because
10 of course their pharmacy -- their pharmacist and
11 their pharmacy organizations were telling people
12 that the sky would be falling in then.
13         So I think they were in a difficult
14 position to know how much they could reduce their
15 rates.
16     Q.  Do you believe that their actions were
17 reasonable?
18         MS. MARTINEZ:  Objection to form.
19         MR. BATES:  Objection to form.
20     A.  I think we thought the direction they
21 were going was the proper direction.  Whether they
22 were being overly cautious or not I think is a hard

Page 197

1  judgment at the federal level to make.  But, you
2  know, I think we thought they were going in the
3  right direction.
4      Q.  What would have happened if overnight all
5  the AWPs reported for all drugs were automatically
6  turned into real prices?
7          MR. WINGET-HERNANDEZ:  Objection to form.
8          MS. MARTINEZ:  Objection to form.
9      Q.  What would have happened?
10         MR. BATES:  Objection to form.
11     A.  I think that a lot of telephones would
12 have been ringing all over the country in Medicaid
13 offices from pharmacists would be saying -- and they
14 do now, when states -- my understanding -- when
15 states establish MACs.  If a pharmacist can't get
16 the drug at the price that they're being reimbursed
17 by Medicaid they don't hesitate to call Medicaid and
18 say I'm going to come in and show you my invoice.
19 Here it is.  Here's what I'm paying.  I can't take
20 reimbursement from you that's less than what it's
21 costing me.
22         So I think they hear about it from the

50 (Pages 194 to 197)

**210**

1  does she do?
2     A.  I don't know.  She appears to work in our
3  Chicago regional office.  But I don't know her.
4     Q.  How about Alan Freund in the copy field?
5     A.  He works in the Chicago regional office.
6     Q.  How about Glenn Stanton?
7     A.  I don't know him.
8     Q.  If you would look at Ms. Carson's e-mail,
9  this is to Kim and Larry?
10    A.  Yes.
11    Q.  Kimberly Howell and Larry Reid.  She
12 wrote "I think it is time that you make decision on
13 whether or not the additional changes you are
14 requesting from the state are in violation of
15 federal law or regulation.  Remember Secretary
16 Thompson does not want SPA approvals held up on
17 policy only."  And then she continues on.
18      Secretary Thompson, was that secretary
19 Tommy Thompson?
20    A.  I would think so, yes.
21    Q.  HHS secretary?
22    A.  Yes.

**211**

1     Q.  So the top official within the entire
2  Department of Health and Human Services; is that
3  right?
4     A.  Admin level official, yes.
5     Q.  And do you recall him making a comment or
6  a policy that he did not want SPA approvals to be
7  held up on policy only?
8     A.  No.  I do not recall him making any
9  statement like that that I was aware of.
10    Q.  Do you recall becoming aware of that
11 policy?
12      MR. WINGET-HERNANDEZ:  Objection, form.
13    A.  This is the first time I've heard anyone
14 say that that was a policy of Secretary Thompson's.
15    Q.  Is that consistent with -- is this e-mail
16 consistent with your earlier testimony regarding how
17 the administration did not want to be very directive
18 to states in telling them how to run their state
19 Medicaid programs?
20      MR. BATES:  Object to the form.
21      MS. MARTINEZ:  Object to the form.
22    A.  Frankly, in reading this I wonder if it's

**212**

1  a quick e-mail that has a typo.  It sounds a little
2  incredulous to believe that the secretary would not
3  want to hold up state plan amendments due to policy.
4  That's kind of basically what they are.  They're
5  establishing policy.  So it almost seems like maybe
6  that's a misstatement.  But I frankly just don't
7  understand it.
8     Q.  You agree that CMS's approval of state
9  plan amendments go to the heart of the policy of
10 whether CMS approves or disapproves of the
11 provisions in those state Medicaid programs?
12      MS. POLLACK:  Objection to form.
13      MR. WINGET-HERNANDEZ:  Objection to form.
14      MS. MARTINEZ:  Objection to form.
15    A.  Our decisions on state plans should
16 reflect our policy, as I understand it.  That would
17 be my role as a minor policy official, but -- to
18 make sure that when we approve things they were
19 consistent with agency and departmental and
20 administration policy.
21    Q.  And where would I go to find out an
22 enunciation of what the policy was?

**213**

1       MR. WINGET-HERNANDEZ:  Objection to form.
2       MS. MARTINEZ:  Objection, form.
3     A.  Well, in this case, I mean, the policy
4  needs to be consistent with the law and the
5  regulations.  So in this case by reviewing the
6  regulations.  And then what we had done up to that
7  point in time, as I understand it, was to seek
8  pharmacy invoices or, you know, some documentation
9  as to actual prices paid.  So that was the way we
10 applied the policy was to look for that kind of
11 documentation of state payment rates.
12    Q.  Revisiting Exhibit Abbott 328, that
13 document that we looked at earlier, do you recall
14 discussion in your office that these were policies
15 and options such as approving SPAs that decrease the
16 ingredient cost as long as it is no lower than that
17 of another state that CMS was already following?
18      MS. MARTINEZ:  Objection, form.
19    A.  I'm not clear on your question.  Are you
20 saying that at the point that we were proposing or
21 setting forward this option paper that we were
22 already using these guidelines?