# Exhibit 29

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:   PHARMACEUTICAL         ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      ) CIVIL ACTION

PRICE LITIGATION                ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      ) Judge Patti B. Saris

the Florida Keys, Inc.          )

     v.                         ) Chief Magistrate

Abbott Laboratories, Inc.,      ) Judge Marianne B.

No. 06-CV-11337-PBS             ) Bowler

- - - - - - - - - - - - - - - -

          (caption continues on following pages)



          Videotaped deposition of DENNIS G. SMITH

                    Volume I


                    Washington, D.C.

                    Tuesday, February 26, 2008

                    9:00 a.m.

Smith, Dennis G.                                            February 26, 2008
                              Washington, DC

                                                                    Page 2
 1          IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2                IN AND FOR LEON COUNTY, FLORIDA
 3   THE STATE OF FLORIDA
 4   ex rel.
 5   - - - - - - - - - - - - - - - - - - -
 6   VEN-A-CARE OF THE FLORIDA KEYS,      )
 7   INC., a Florida Corporation, by and  )
 8   through its principal officers and   )
 9   directors, ZACHARY T. BENTLEY and    )
10   T. MARK JONES,                       )
11            Plaintiffs,                 ) Civil Action
12       vs.                              ) No. 98-3032G
13   MYLAN LABORATORIES INC.; MYLAN       )
14   PHARMACEUTICALS INC.; NOVOPHARM      ) Judge William
15   LTD., SCHEIN PHARMACEUTICAL, INC.;   ) L. Gary
16   TEVA PHARMACEUTICAL INDUSTRIES       )
17   LTD.; TEVA PHARMACEUTICAL USA; and   )
18   WATSON PHARMACEUTICALS, INC.,        )
19            DEFENDANTS.                 )
20   - - - - - - - - - - - - - - - - - - -
21
22

```
                    Page 134                                        Page 136
 1  would ask a state -- if sort of outside those    1  were doing in reviewing state plan amendments?
 2  parameters you saw a big disparity amongst the   2       MR. WINGET-HERNANDEZ:  Objection, form.
 3  states you would say, well, how did you get that,3       MS. MARTINEZ:  Objection, form.
 4  where did you get that from.                     4    A.  Every piece of a regulation is there
 5       So in general if they met the               5  for a purpose and they all fit together.
 6  requirements of the regulation then it would go  6    Q.  But the standards that you felt
 7  into effect.                                     7  governed the approval of state plans extended
 8    Q.  But you're getting ahead of me a little    8  beyond merely the definition in section 447.301
 9  bit.  My question to you is what you understand -9  and the language in 447.331 and extended to the
10  - and since 2001 have understood -- the         10  other goals and purposes of the Medicaid program,
11  regulatory requirements to be.  And we'll get to11  correct?
12  the policy decisions that affect how that's     12       MR. WINGET-HERNANDEZ:  Objection, form.
13  implemented in a moment.                        13    A.  I'm not following you.
14       MR. WINGET-HERNANDEZ:  Objection, form.    14    Q.  Sure.  You would agree with me that one
15    Q.  And I'll ask that as a more clear         15  could read the language in section 447.301 and
16  question.  Could you describe to me what you    16  447.331 to allow for the approval of a state plan
17  understood those regulatory requirements to be? 17  amendment only if it with precision, as much as
18       MR. WINGET-HERNANDEZ:  Objection, form.    18  possible, estimated the invoice price of the
19    A.  The regulatory requirements are for a     19  drugs to the pharmacy?  That would be one
20  state to pay its reimbursement for prescription  20  interpretation of this language, correct?
21  drugs to meet the entirety of the regulations   21       MR. WINGET-HERNANDEZ:  Objection to
22  that include that they are based on the agency's22  form.

                    Page 135                                        Page 137
 1  best estimate of the acquisition cost and a      1       MR. KELLEY:  Objection to form.
 2  reasonable dispensing fee.                       2    A.  The regulation itself doesn't say
 3    Q.  And so I understand --                     3  invoice price, I don't think.  So, I mean, you're
 4    A.  And if we believe them not to meet         4  asking me to read things into the regulation
 5  those then it would be -- well, a state, if it   5  where the words aren't there.
 6  didn't meet those requirements or fit within     6    Q.  Did you understand this regulation to
 7  those parameters, we would have -- we would      7  require you to approve a state plan only if the
 8  question the state further.  And again, as the   8  formula proposed by the state would pay as the
 9  October 2002 memo states, we would look at the   9  ingredient cost an amount that approximated the
10  individual circumstances in the state as well as10  invoice price for drugs to pharmacies?
11  its supporting documents.                       11       MS. MARTINEZ:  Objection, form.
12       So the documentation of how do you meet    12    A.  I'm going back to my previous answer.
13  the regulations, they fit together.  You can't  13  You are -- you have to look at it in the
14  just pull one piece out and say that represents 14  entirety.  You can't just pick one piece of it
15  the entirety.  That would be not accurate.      15  out and say would you approve or disapprove on
16    Q.  And so if one were -- let me back up      16  that alone.  You have to look at the entirety.
17  just a little bit.  I apologize.  Tell me if I'm 17    Q.  I actually intended that to be a
18  correct in hearing what you're telling me.  Is it18  softball question.
19  that looking simply at the definition of        19    A.  Okay.
20  estimated acquisition cost without taking into  20    Q.  Is it fair to say that you did not see
21  account all of the goals of the Medicaid program21  this regulation as requiring you -- or requiring
22  would provide an incomplete picture in what you 22  states, rather -- to establish a formula that set
```

214

1  Reduction Act of 2005 the federal upper limit is
2  higher than the average acquisition cost for
3  providers assuming AMP is an accurate reflection
4  of acquisition cost, correct?
5      A.  250 percent of the lower.  Again,
6  because they're -- whether or not the absolute
7  lowest is available to all pharmacists across the
8  country is why it was pegged at two and a half
9  times that amount.  Not everyone can get the
10 lowest price.
11     Q.  But the amount is two and a half times
12 greater than the average of the lowest price's
13 generic, correct?
14     A.  In the aggregate of all the drugs that
15 are on the federal upper limit, which, to be on
16 the FULs, you have to have more than -- you have
17 to have a generic.  You have to have at least two
18 of that drug.  And then all of those -- again,
19 this is a limit in the aggregate on federal
20 reimbursement for all of the drugs combined, not
21 an individual -- not an individually priced drug.
22     Q.  You would agree with me that AMP and

215

1  average wholesale prices are two very different
2  concepts, correct?
3      A.  They are two different units of
4  measurement.  Yes.
5      Q.  The AMP is what I think you refer to as
6  a real price, correct?  That is, an empirical
7  average of prices in the marketplace, correct?
8      A.  Well, it is what the manufacturer is
9  reporting.  And again, an average of what they
10 are reporting.  Again, these snapshots I think
11 are -- now it's a combination of both.  On the
12 rebate side AMPs have been used on the rebate
13 side, which had to be reported quarterly by the
14 manufacturer.  Now -- I leave myself open to
15 correcting.  But now they're monthly and
16 quarterly.  But they're still averages of what
17 should be a real -- I mean, it's the price that
18 the manufacturer is now reporting, not through a
19 third party of having been handled through
20 wholesalers as reported through the compendiums.
21     Q.  And it's your understanding that
22 average wholesale prices by contrast are not an

216

1  empirical average of real prices?
2          MS. MARTINEZ:  Objection to form.
3      A.  They are still supposed to be based on
4  what manufacturers are reporting.
5      Q.  On what do you base that statement?
6      A.  The manufacturers -- as I understand
7  it, what the wholesaler and what the retailer, as
8  reported to the compendium, are still going to be
9  based off of something that the manufacturer had
10 made available his product.  I don't think --
11     Q.  My question to you is on what do you
12 base that?
13     A.  On markets, on how things work.
14 Manufacturers, I think would -- again, knowing
15 that you have competitors out there, I think
16 would want to report accurately in terms of -- if
17 you have a lower price or if you're offering
18 discounts, you want people to know that.  So
19 otherwise how would they know to choose your
20 product.
21     Q.  Mr. Smith, your testimony was "That
22 AWPs are supposed to be based on what

217

1  manufacturers are reporting."  Right?
2      A.  Give a few more words to that.
3      Q.  All right.  "They are still supposed to
4  be based on what manufacturers are reporting."
5  That was your testimony, correct?
6          MR. WINGET-HERNANDEZ:  Objection, form.
7      A.  I recognize AMPs and AWPs are different
8  units of measurement, that AWPs are off of the
9  compendiums and there is a middle person between
10 the manufacturer and the wholesaler and what is
11 being reported.  But I think in general the
12 information on sort of the other side is --
13 reflects reality in the market or -- and again,
14 there are lots of experts who can testify much
15 greater than I can about how manufacturers price
16 their products and how manufacturers -- how they
17 want to enter a market, et cetera.
18         There are -- I've never worked for a
19 manufacturer, so I don't know how they do their
20 pricing, what business decisions that they make
21 on how they are entering a particular market they
22 weren't in before, how they deal with authorized