# Exhibit 31

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
--------------------------------x
In re: PHARMACEUTICAL INDUSTRY  )
AVERAGE WHOLESALE PRICE         )
LITIGATION                      )
--------------------------------)
United States of America ex rel.) MDL No. 1456
Ven-A-Care of the Florida Keys, )
Inc. v. Abbott Laboratories,    ) Civil Action
Inc., Civil Action No. 06-      ) No. 01-12257-PBS
11337-PBS; and United States of )
America ex rel. Ven-A-Care of   ) Honorable
the Florida Keys, Inc., v. Dey, ) Patti B. Saris
Inc., et al., Civil Action No.  )
05-11084-PBS; and United States )
of America ex rel. Ven-A-Care   )
of the Florida Keys, Inc., v.   )
Boehringer Ingelheim Corp., et  )
al., Civil Action No. 07-10248- )
PBS                             )
--------------------------------x
```



7ce5a780-185e-426a-a9ae-dc7b0f28408e

December 10, 2008
Volume I
VIDEOTAPED DEPOSITION OF SUZETTE BRIDGES

Taken on behalf of the Plaintiff, produced, sworn, and examined on the 10th day of December, 2008, between the hours of nine o'clock in the forenoon and six o'clock in the evening of that day, at the offices of United States Attorneys' Office, 425 West Capitol, Suite 500, Metropolitan Building, Little Rock, Arkansas, before BRENDA ORSBORN, a Certified Court Reporter within and for the State of Missouri, in a certain cause now pending before the United States District Court, District of Massachusetts, In re: Pharmaceutical Industry Average Wholesale Price litigation.



I N D E X O F E X A M I N A T I O N


Page
Questions by Ms. Oberembt ..................... 9
Questions by Mr. Reale ........................ 81


I N D E X O F E X H I B I T S


Exhibit Bridges 001 (Notice of Deposition) 12
Exhibit Bridges 002 (Federal Register) 29
Exhibit Bridges 003 (Draft) 31
Exhibit Bridges 004 ARK0004141 37
Exhibit Bridges 005 HHC092-0726 38
Exhibit Bridges 006 ARK00003540 to 5026 41
Exhibit Bridges 007 ARK00003068 to 3081 45
Exhibit Bridges 008 ARK00002640 to 2646 47
Exhibit Bridges 009 ARK00002783 to 3313 48
Exhibit Bridges 010 ARK00003057 to 3067 53
Exhibit Bridges 011 ARK00002742 to 2770 54
Exhibit Bridges 012 ARK00000087 to 0132 55
Exhibit Bridges 013 ARK00000117 to 0147 58
Exhibit Bridges 014 ARK00002151 to 2187 60
Exhibit Bridges 015 ARK00000788 to 0783 61
Exhibit Roxane 001 Amended Notice of Deposition 84




EXHIBITS CONTINUED: PAGE


Exhibit Roxane 002 Federal Register 129
Exhibit Roxane 003 Code of Federal Regulations 129
Exhibit Roxane 004 DHS Document 151
Exhibit Roxane 005 HHC0190087 160
Exhibit Roxane 006 HHC9020486 162
Exhibit Roxane 007 HHC)100997 165
Exhibit Roxane 008 HHD1860650 to 0663 168
Exhibit Roxane 009 HHD0210076 to 0114 191
Exhibit Roxane 010 ARK00007310 to 7436 205
Exhibit Roxane 011 ARK00007688 to 7806 233
Exhibit Roxane 012 (Memorandum) 235
Exhibit Roxane 013 AWP-IL-00010143 269
Exhibit Roxane 014 (Survey) 275
Exhibit Roxane 015 ARK00006870 to 6932 292
Exhibit Roxane 016 ARK00006933 to 6993 294




A P P E A R A N C E S

For the United States:
Ms. Laurie A. Oberembt
U.S. Department of Justice
Commercial Litigation Fraud
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
(202)514-3345
Laurie.oberembt@usdoj.gov

For the Witness and Arkansas Department of Human Services:
Ms. Carmen Mosley-Sims
Arkansas Department of Human Services
700 Main Street, Slot S-260
Little Rock, Arkansas 72203
(501)602-1366
Carmen.mosley-sims@arkansas.gov

Page 30

that to yourself? Do you -- do you see where it says that it refers to payment levels that the agency has determined by applying the lower of, one, estimated acquisition cost, plus reasonable expense and fees established by the agency, or, two, the provider's usual and customary charges to the general public?
A. Yes.
Q. Has your agency established a reimbursement methodology that applies these elements?
A. Yes, ma'am.
Q. How does the State define the usual and customary charges to the general public?
A. Based on -- we base it based on cash reimbursements by -- by that -- the usual and customary is determined on an audit. When the -- when the auditors go in, they look at what cash payers have paid on prescription drugs, is how we look at a usual and customary charge.
Q. If you could look at Section 447.301 which is the definition section. It's in the

Page 31

second column --
A. Okay.
Q. -- about three-quarters of the way down. Actually, it's in the third column. I'm sorry. Do you see where that second definition says "estimated acquisition costs"?
A. Yes, ma'am.
Q. Are you familiar with that definition?
A. Yes, ma'am.
Q. Has the State tried to determine estimated acquisition costs in accordance with that definition?
A. To our best estimate, yes, we do.
MS. OBEREMBT: I'd like to mark as Exhibit 3 a chart that tries to summarize Arkansas' reimbursement formulas and dispensing fees since 1990.
[Marked Exhibit Bridges 003]
A. Thank you.
Q. (By Ms. Oberembt) Would you take a second to look over that chart, please? Is this chart familiar to you?

Page 32

A. Yes, it is.
Q. Do you know who prepared this chart?
A. Yes, I do. I assisted the preparation. We had to have -- because I wasn't totally remembering what all of the reimbursement formulas were in the past, I had EDS begin -- kind of go back in their history and see if they could find something and had them put some of this together and then worked on it from there.
Q. Is -- is this chart an accurate summary of Arkansas' reimbursement methodology, including the dispensing fee?
A. Yes. The only thing that I question on this chart since it's been updated is I've -- the Footnote No. 4 with the first line, I'm not definite on that, so I don't think it -- it needs to be removed.
Q. So other -- other than possibly deleting the reference to Footnote 4 there, is this chart an accurate summary of Arkansas' reimbursement methodology, including the dispensing fee?

Page 33

A. It is -- as far as I know, it is -- it is accurate.
Q. Where is the State's reimbursement formula typically written down?
A. It will be in the State Plan Amendment, and it will be in the policy manual.
Q. What's a State Plan Amendment?
A. A State Plan Amendment is what we -- for lack of better terminology, it's what we apply to CMS for for any of our programs, to get their approval, to obtain their approval.
Q. And what is CMS?
A. Centers for Medicare and Medicaid.
Q. Is CMS a state entity or a federal entity?
A. Federal entity.
Q. Okay. And what agency is CMS a part of?
A. The federal agency.
Q. Okay. Is that the Department of Health and Human Services?
A. Health and Human services.

Page 66

Q. Why not?
A. If the brand is going -- if we're going to -- if the ingredient cost on the brand is less than the -- the generic, then that defeats the purpose of why you're setting a MAC. Because you're setting a MAC because you've got a high-price brand out there, and you've got generic equivalents. So you want to make sure that the pharmacies will dispense the more cost-effective product. So if you would set a MAC on a brand, you would force use of a higher-cost generic, if such a thing existed. So that wouldn't make any sense.
Q. We've also gone over the dispensing fees that Arkansas has paid over the years. Has Arkansas ever faced any type of access issue caused by an allegedly too-low dispensing fee?
A. No.
Q. When -- when you said earlier that the pharmacist complained about the State's proposed change to AWP minus 25 percent, did -- did DHS receive any information from a pharmacist saying

Page 67

that -- that "My dispensing fee is too low, and so you need to make it up for me on the ingredient cost"?
A. Oh, no. I mean, no. They wouldn't have said -- no. Our -- our dispensing fee has generally been claimed to be some -- at one time we were higher than most of the other states on our dispensing fee, so we've never really had pharmacists complain about our dispensing fee.
Q. On the chart that's Exhibit 3, there's a reflection that beginning in March of 2002, an additional differential dispensing fee of $2 shall be given to pharmacy providers when a generic that does not have a State or Federal upper limit is dispensed, and I'm reading from Footnote 8 on Exhibit 3, if you want to pull that out. What was the purpose of -- of that change to the reimbursement formula?
A. We had some generics that didn't have upper limits on them, and so as an incentive for the pharmacist to -- to dispense those, rather than trying to dispense a

Page 68

therapeutically-equivalent brand, we -- that was an incentive for the pharmacist to dispense the therapeutically-equivalent generic.
Q. Say in fast ten times.
A. No, thank you. No, thank you.
Q. Is it -- is it your understanding that the State is supposed to make its dispensing fee determination separate from its determination of ingredient cost?
A. We've always considered them a separate entity, separate -- two separate things.
Q. Has Arkansas ever had any practice or policy of paying increasing ingredient costs to make up for inadequate dispensing fees?
A. No.
Q. Does the State itself operate the MAC Program?
A. We do, yes, our state MAC Program.
Q. And does the State have any assistance from an outside contractor on that?
A. We have a -- an individual that works strictly for us through an outside contract, yes.

Page 69

Q. And is the outside contract with EDS?
A. Yes.
Q. And why did the State decide to have an outside contract with EDS for its MAC Program?
A. Well, we really needed somebody that could be more dedicated to applying the MACs and have that time to spend to -- so that we could apply -- have more drug -- what am I trying to say? There are so many drugs available, generically available, we didn't have the staff to -- to apply State MACs to all of those that didn't have federal upper limits on them. So it was in the best interest of the state to get somebody in there that could be more -- could be dedicated to establishing upper limits on -- on generics that were available.
Q. If a -- if a pharmaceutical manufacturer wrote to the State and said that its reported AWP was not reliable, do you have a way to sort of manually change the reimbursement for a particular drug?
A. We can't --

Page 70

MR. REALE: Objection, form.
A. We can't change the -- we have no control over the AWP field. We can't -- we can't manipulate that.
Q. (By Ms. Oberembt) So whatever AWP is reported by the manufacturer, that's the AWP that you have to use in your system; is that correct?
A. Well, whatever AWP is submitted to us by First DataBank is what we have to use.
MR. BERLIN: Objection to form. And if we can just have a little bit of room to make objections, if necessary, please.
MS. OBEREMBT: I think John objected to that, Eric.
MR. BERLIN: Okay. I just didn't hear. Thanks, though.
Q. (By Ms. Oberembt) Have you ever heard the term "AMP"?
A. I've heard the term "AMP". Yes.
Q. Okay. What does "AMP" stand for?
A. Average Manufacturer Price.
Q. And what's your understanding of that?

Page 71

A. Basically, the definition, what I picture it to be is an average of the manufacturer's prices to different entities. But that's really all I know. I don't -- I'm not that familiar with -- with the actual AMP. My understanding, too, is that the AMP is not a public -- let me think of the word I'm looking for. Give me a minute. Published. The AMP is not a published price, so it's not something we have access to.
Q. Is it your understanding that AMP is -- is confidential effectively?
A. Correct.
Q. Prior to 2006, did DHS ever receive AMP data?
A. No, we didn't. With the -- when the Deficit Reduction Act talked about the changes in calculating the FUL, they began to send us some AMP information, but because of the -- they weren't moving forward on the FUL changes, we really didn't utilize it. We had no reason to use it.

Page 72

Q. Have you ever heard of the concept of -- of trying to reverse engineer an AMP from something called the unit rebate amount?
A. Not -- I've -- no. I've never heard of such a thing of trying to go backwards, no.
Q. Has anybody at DHS, to your knowledge, ever attempted to reverse engineer an AMP from a unit rebate amount?
A. Not that I'm aware of, no. I can't imagine anybody wanting to try to attempt to do that.
Q. In the -- in the preparation you've done today for the deposition, have you seen any evidence that anybody at DHS ever tried to reverse engineer an AMP from a unit rebate amount?
A. No, ma'am.
Q. Is the Rebate Program separate from the -- the Reimbursement Program here?
A. They're two different things. They're -- the reimbursement and the rebate are not -- are two totally separate entities.

Page 73

Q. Does Arkansas have a Supplemental Rebate Program?
A. Yes.
Q. Okay. And does -- does your staff operate that, or did you contract that out?
A. It's be -- well, we handle the contracts, but EDS is the one who processes all of the rebate invoices for that.
Q. The United States alleges in its complaint that the defendants here, Dey, Abbott and Roxane, knowingly reported falsely-inflated AWPs to FDB with the intention of causing the Medicaid Program to pay inflated reimbursements to their customers. In your preparation for the deposition, have you seen any -- any evidence that anybody at DHS approved the reporting of inflated AWPs by either Dey or Abbott or Roxane?
A. No.
MR. REALE: Objection, form. Outside the scope.
MS. MANGIARDI: Objection.
Q. (By Ms. Oberembt) You can answer.

Page 74

A. No, ma'am.
Q. Have you seen any evidence that Dey or Abbott or Roxane came in and informed anybody at DHS that they were reporting falsely-inflated AWPs to FDB?
MR. REALE: Objection, form.
A. No, ma'am, not that I'm aware of at all.
Q. (By Ms. Oberembt) What does the term "NDC" stand for?
A. National Drug Code. It's what identifies the manufacturer, the package size and the product.
Q. And how many NDCs does the Arkansas Medicaid Program cover?
A. There are approximately 25,000 NDCs that we reimburse for at any given time.
Q. How many claims does the Arkansas Pharmacy Program process every year?
A. It ranges from 4.5 to 5 million. With the change in Medicare Part D, it dropped a little bit, and then it's -- so it was at 5

Page 75

million, but it's right about 4.5 now.
Q. And I believe you said earlier that EDS processes the claims electronically; is that right?
A. That's correct.
Q. Does EDS send pharmacy claims data to CMS?
A. Yes. That's my understanding.
Q. Are there any provider types whose claims are not paid based on the reimbursement methodologies set forth in Exhibit 3?
A. Well, only pharmacy providers --
Q. Right.
A. -- are reimbursed under this. Other provider types would not be reimbursed under these formulas.
Q. Okay. Are there any pharmacy providers who are reimbursed under formulas, other than what we have shown here in Exhibit 3?
A. Oh, no. No. All pharmacies are reimbursed the same. It's consistent to all pharmacy providers.

Page 76

Q. In -- in the processing of the claims, are any numbers ever rounded by EDS?
A. The system would round when the payment is made. The -- the way the price is in -- in the system, I want to say it's a four-digit price that calculates the EAC, but when the final payment is calculated, it's rounded to two digits.
Q. When there's a change in the reimbursement methodology, as we've seen in Exhibit 3 over the years, is that made effective on the date of service?
A. It's based on date of service, yes.
Q. How frequently does EDS get updated prices from FDB?
A. First Data -- we are one of the states that receive a weekly tape from First DataBank. It's my understanding that that is implemented or put into the system on Tuesdays, for the most part.
Q. Have you ever heard of a -- a price being missing from the database?

Page 77

A. Actually, I've never heard of that. Like a -- like a -- an AWP missing or something?
Q. Right.
A. Not that I'm aware of.
Q. Okay. What would happen -- or do you know what would happen if a price was missing from the database?
A. If an AWP price was missing, the claim wouldn't be able to pay. Now, if had an upper limit in that field, then it could -- it would pay at the upper limit price. But if -- if those fields were missing, the claim would just reject.
Q. Are there any payments for repackaging or unit dose or some type of other add-on that might not be represented in the State's claims data?
A. No.
Q. Are there any deductions that might not be represented in the States claims data?
A. No. I mean, the co-pay, if that -- but that would still be represented in our data, so --

Page 242

second full paragraph, OIG reports that it's estimated that pharmacies pay an average of 42.5 percent less than AWP for drugs sold to the Medicaid beneficiaries. Do you see that language?
A. Yeah. I'm trying to read it, actually.
Q. Okay. Now, Arkansas never disputed the findings of this report, correct?
MS. OBEREMBT: Objection.
A. This was just information. There was nothing to respond to or comment on, to my knowledge. I mean, this doesn't look like it's a document to respond to. It just looks like it's information.
Q. (By Mr. Reale) And it's information that is available to Arkansas' Medicaid Program to consider when it sets its reimbursement rates?
A. Again, it's information for us to -- to be aware of.
Q. And the specific information in this report is the level of discounts that were available, on average, to pharmacies that

Page 243

purchased generic drugs?
A. Are you asking me a question?
Q. Yes.
A. I'm sorry. I thought you were making a statement.
Q. In the information in -- in this report was the level of discounts that were available to pharmacies that purchased generic drugs, correct?
A. This appears to be -- the statement we read in the back referred to -- to generic drugs, yes.
Q. And in 1997, all the way up to the present, Arkansas' Medicaid department has never adopted a reimbursement rate to reflect the average discounts that were reported in 1997?
MS. MOSLEY-SIMS: Objection.
A. Again, although that may not have changed, we -- we still have a State upper limit that -- that would -- based -- based on any type of information like this, that doesn't mean we're not pursuing, because we -- when we're setting State upper limits or our MACs, then we are

Page 244

trying our best to reimburse closer to the acquisition cost on a generic drug.
Q. (By Mr. Reale) How long has Arkansas' Medicaid MAC Program been in place, the State Upper Limit Program?
A. When I came onboard, there were State MACs in place at that point in time.
Q. And you testified that the MAC prices -- sorry. You state -- you testified earlier that the MAC prices set by Arkansas' Medicaid Program were based on actual acquisition cost to pharmacies?
A. I never said that.
Q. Well, how is the MAC Program set up?
A. Again, the -- the MAC Program, we -- we have an individual that currently does that for us today. Basically, he will -- when we are aware that there are some generics that have become available for a brand, generic equivalents, he will obtain -- he'll -- he'll find out from different pharmacies. He'll call pharmacies who -- who are willing to work with us, give us their

Page 245

invoice price, what they pay for the drug.
We don't -- their invoice price. He'll also get from them the different prices that they pay for their generics and just kind of -- through some type of an analysis -- I don't know the full detail of how he does it, but we'll determine a MAC on -- on that generic -- on the generic, on the GCN. Are you familiar with the GCN?
Q. Yes. But why don't, for the record, you say what that is?
A. The GCN is a single number that will encompass multiple NDCs, so that rather than having to apply something to each specific NDC, it represents that specific drug, its dosage form, its route of administration, so that you don't have to be with a lot of numbers.
Q. So is -- is it fair to say that a MAC price that's set for a generic drug is not based on AWP?
A. It's not -- it doesn't reimburse off of AWP. We might look at what the acquisition cost

Page 246

of that brand is.
Q. Okay.
A. Okay. We -- like if -- if you have a -- the easiest way for me to explain it, if you have a brand and you know that -- what we would reimburse based on our reimbursement formula, AWP minus 14 percent, then you -- he also finds out from the pharmacy what that actual cost of that brand is just as a comparison tool, so that when he is setting the MAC, he can make that -- make a comparable determination.
Q. Is -- is the MAC based in part on the invoice price of generic drugs within the GCN?
A. The MAC looks at what the pharmacies tell us are the invoice price for the different NDCs within that GCN. So he has a -- he'll determine -- he'll put them -- I'm not good at explaining how he does it. He puts them all on a spreadsheet. He develops a spreadsheet of all of the NDCs that he can obtain within that GCN and gets the invoice prices from the -- from the pharmacies.

Page 247

Q. Right. And those invoice prices aren't AWP, but those are the invoice prices at which they actually pay the wholesale of the actual --
A. That's the invoice price. The invoice price. We don't know in the -- you know, if there's other discounts involved in that at all. It's strictly the invoice price. What the pharmacy tells us. We don't actually see the invoice. He will call, and they will say this is what I pay. So it's at our best -- we're taking the pharmacy at their word for what they're saying they actually pay for -- for some products.
Q. Do you have any reason to suspect that the pharmacies are giving you a fraudulent number?
MS. OBEREMBT: Objection.
A. Objection. Listen to me, objection. No, I'm going -- no, I don't suspect that they're giving us a fraudulent number. I mean, it's based on trust, so I definitely don't feel like they're giving us a fraudulent number. I'm just

Page 248

saying we don't have a physical invoice to look at. We're calling them and we're -- we're putting our trust in them that they're giving us an honest number of what they pay for the drug.
Q. (By Mr. Reale) And -- and the MAC price is below the AWP, correct?
A. Yes.
Q. And it's actually below the estimated acquisition cost, correct?
A. Yeah. That's correct.
Q. So the MAC price is not based on AWP?
A. That's correct.
Q. It's based on actual invoices that --
A. It's based on what pharmacies say they have paid for the prescription.
Q. How many drugs are subject to the MAC?
A. I don't know. I don't know.
Q. More than 1,000?
A. That's a -- when you say actual drugs or GCNs, there's a big difference.
Q. Well --
A. And so I don't know how to answer that

Page 249

question. There would have been --
Q. How many GCNs are subject to the State MAC?
A. I honestly -- I honestly do not know. I'd have to pull the upper limit list online and look to see which ones are Federal upper limits and which ones are State. I don't know.
Q. Do you believe it's more than 500 that are subject to a State MAC?
A. I don't know. I mean, there are -- there are several, but I honestly cannot tell you how many. I've never just gone in to look to count. That's -- that's not part of what I do. That's not --
Q. And I believe you testified it's an individual EDS that actually surveys the pharmacies to determine their acquisition --
A. He's contracted to do that for us. That's just one of his job duties. He has several other job duties, but that's one of his.
Q. But one of his job duties is dedicated solely to determining a MAC price?

Page 250

A. One of his job duties is to assist us with the MAC pricing.
Q. Okay. We can take a break now.
VIDEOGRAPHER: Going off record at 3:11 p.m., ending Tape 5.
(Whereupon, a break was taken.)
VIDEOGRAPHER: Back on the record at 3:23 p.m.
Q. (By Mr. Reale) Hello again. Before our break, we were talking about Arkansas' State MAC Program, and you testified that the State MAC prices that were set for generic drugs were not based on AWP; is that correct?
A. That's correct.
Q. And the State MAC prices that were set were lower than the estimated acquisition cost as that is defined by Arkansas Medicaid?
A. That's correct.
Q. And they're based, the MAC prices, on actual invoice prices of drugs in Arkansas?
A. Well, again, they're based on what the pharmacy says they have paid for the product.

Page 251

Q. And you have no reason to doubt that pharmacies are submitting you accurate and truthful information?
A. I have no reason to doubt.
Q. Now, when we looked at the 1997 report, which we marked as Roxane Exhibit 12, and in particular, the finding that pharmacies, on average, paid 42.5 percent less than AWP for drugs sold to Medicaid beneficiaries, you referenced the State's MAC Program in the context that -- of our discussion. Do you recall that?
A. Yes.
Q. Is it your testimony that the State's MAC Program achieved savings of 42.5 percent less than AWP on most drugs?
A. I really can't answer that. I don't -- I can't be definite on that.
Q. Why wouldn't Arkansas' Medicaid Program adopt a definition of estimated acquisition cost for generic drugs of AWP minus 40 percent?
A. If we knew that the AWPs that were being provided to us were accurate, then we could

Page 252

have an accurate percent off of AWP, but I mean, based on this, we're -- again, this is an average. Not every pharmacy might be able to accommodate that average. So we just can't do that.
Q. Right. I mean, that's precisely how averages work. Some receive discounts off of AWP much greater than 40 percent, correct?
MS. OBEREMBT: Objection.
A. I don't know the answer to that. I know that there are discounts off of AWP for generics that may be greater than 40 percent, but I don't know about much greater. And I don't know that -- again, I don't know the spread of -- and the quantities of each percent off of AWP.
Q. (By Mr. Reale) Well, why not then adopt a definition of estimated acquisition cost for generic drugs of AWP minus 30 percent if, on average, pharmacies were acquiring those drugs at discounts of over 40 percent off of AWP?
A. I can't answer why. I -- I don't have a direct answer for that. Again, we -- we

Page 253

establish MACs, and our discount off of AWP is right now at AWP minus 20 percent.
Q. And although AWP minus 20 percent is still not approximating the findings of OIG back in 1997, right?
A. According to this, they're saying on average that the -- a -- the discount is 42.5 percent less than AWP.
Q. So on average, pharmacies are receiving a 22.5 percent net margin for generic drugs reimbursed by Arkansas' Medicaid Program?
MS. MOSLEY-SIMS: Objection.
A. Again, I'm not meaning to sound difficult, but what I'm -- what I'm going to say is the State should not have to be the ones to police this issue. If the manufacturers would provide a more accurate AWP, then we wouldn't have to be worrying about, you know, what pharmacy received what price and what percentage off. So then it would be a much easier process. So why we don't do it, I can't answer that question directly.

Page 298

FUL price that had also been set, correct? For drugs for which there was a FUL they were purchased at rates on average of 45.9 percent of the FUL? In other words, the FUL minus about 54 percent; isn't that correct?
A. I don't know. I'm trying to -- I'm trying to make sure I'm -- I'm answering correctly. It's just saying 45.9 percent of the FUL. It's not saying what it is off of the AWP. That's why I'm a little bit concerned.
Q. Oh, I'm sorry. I meant off the FUL. So the FUL minus 54 percent. Let me -- let me ask that again. If I was -- if I said that incorrectly.
Even for drugs for which a FUL had been set, the average acquisition cost for pharmacies was at a level below the Federal upper limit; isn't that correct?
A. That's what this is stating, that these were -- that's what this is stating.
MR. REALE: I can only assume that they're letting us out, right?

Page 299

VIDEOGRAPHER: Going off record at 4:19 p.m. ending Tape 6.
(Whereupon, a break was taken.)
(At this point in the proceedings, Ms. Oberembt left the deposition. Rebecca Ford entered the deposition telephonically.)
VIDEOGRAPHER: Back on record at 4:27 p.m.
Q. (By Mr. Reale) Continuing with Roxane Exhibit 16, on Bates Page 6936, Myers and Stauffer, excuse me, presents its conclusions. Do you see that section of the report?
A. I'm sorry. I went ahead of you.
Q. And you can review that first paragraph if you'd like.
A. I see it.
Q. Do you agree that there are several factors that should be considered in determining an appropriate Medicaid pharmacy reimbursement formula, other than dispensing and drug acquisition costs incurred by pharmacies?
A. I see that.

Page 300

Q. Do you agree with that statement?
MS. MOSLEY-SIMS: Objection.
A. Do I agree with that statement? It depends on in what way you mean I agree with that statement. I think there should be several factors as far as it relates to maintaining access.
Q. (By Mr. Reale) Right. So one of the factors that Arkansas must consider when it sets the reimbursement rate is the need to maintain sufficient access to services for Medicaid recipients throughout the state; is that correct?
A. That's correct.
MS. FORD: Objection to form.
Q. (By Mr. Reale) And another factor that Arkansas must consider are the politics and provider relations; is that correct?
MS. MOSLEY-SIMS: Objection.
Q. (By Mr. Reale) Okay. So do you remember the question?
A. Yes. I think I'm with you now.
Q. Okay. So another factor that Arkansas

Page 301

must consider when it sets its reimbursement rate are politics. Do you agree with that?
A. I think that that's the -- the consideration of politics and provider relations are -- will also be involved, yes. I don't disagree.
Q. And how have politics played a role in Arkansas' setting of the reimbursement rate?
A. Well, I hate to use the word "politics", but provider relations more than anything. When we set the rate as we had talked about earlier today at AWP minus 25 percent and the pharmacy community was very vocal that they felt that -- those that were vocal felt that 25 percent, they could not purchase all of their generics at that price, so that -- and that 20 percent was a recommendation or a suggestion.
Q. Did pharmacies at that time tell you that on average, they couldn't acquire their multiple-source drugs at rates of AWP minus 25 percent?
A. Honestly, I don't remember the exact





7ce5a780-185e-426a-a9ae-dc7b0f28408e