# Exhibit 32

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories,*
*Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

```
1:1                  UNITED STATES DISTRICT COURT

  2                  DISTRICT OF MASSACHUSETTS

  3    ------------------------------X

  4    IN RE PHARMACEUTICAL INDUSTRY  )

  5    AVERAGE WHOLESALE PRICE        )  MDL No. 1456

  6    LITIGATION                     )

  7    ------------------------------X

  8    THIS DOCUMENT RELATES TO       )  Civil Action:

  9    State of California, ex rel.   )  01-12258-PBS

 10    Ven-A-Care v. Abbott           )

 11    Laboratories, Inc., et al.     )

 12    ------------------------------X

 13                      --oOo--

 14              WEDNESDAY, DECEMBER 3, 2008

 15                      --oOo--

 16              VIDEOTAPED DEPOSITION OF

 17    THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES

 18              by J. KEVIN GOROSPE, Pharm.D.

 19                      --oOo--

 20

 21    Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

 22                  Registered Merit Reporter
```

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

```
2:1                  UNITED STATES DISTRICT COURT

  2                   DISTRICT OF MASSACHUSETTS

  3     ----------------------------------X

  4     IN RE PHARMACEUTICAL INDUSTRY        )

  5     AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

  6     ----------------------------------X

  7     THIS DOCUMENT RELATES TO            ) Civil Action:

  8     United States of America ex rel.    ) 01-12257-PBS

  9     Ven-a-Care of the Florida Keys,     )

 10     Inc., et al., v. Abbott             )

 11     Laboratories, Inc., Civil Action    )

 12     No. 06-11337-PBS; United States of )

 13     America ex rel.  Ven-a-Care of the )

 14     Florida Keys, Inc., et al., vs.     )

 15     Dey, Inc., et al., Civil Action No.)

 16     05-11084-PBS; United States of      )

 17     America ex rel. Ven-a-Care of the  )

 18     Florida Keys, Inc., et al., v.      )

 19     Boehringer Ingelheim Corp., et al.,)

 20     Civil Action No. 07-10248-PBS       )

 21     ----------------------------------X

 22
```

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

201:1   Kevin Gorospe.

2                    We are on the record at 2:35 p.m.

3        BY MR. HENDERSON:

4            Q.   Mr. -- Dr. Gorospe, referring back to

5        Exhibit 12, if you -- I'd like to direct your

6        attention to Section 447.301 in the upper

7        righthand corner of the first page,

8        "Definitions."

9            A.   Okay.

10           Q.   Do you see that?

11                   And you see there's a definition of

12       "estimated acquisition cost," and it says

13       "'Estimated acquisition cost' means the agency's

14       best estimate of the price generally and

15       currently paid by providers for a drug marketed

16       or sold by a particular manufacturer or labeler

17       in a package size of drug most frequently

18       purchased by providers."

19                   Do you see that?

20           A.   Yes, I do.

21           Q.   From time-to-time has Medi-Cal used the

22       term "estimated acquisition cost"?

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

202:1     A.   Yes.

2          MR. COLE:  Object to the form.

3          THE WITNESS:  Yes, we have.

4   BY MR. HENDERSON:

5     Q.   And in your experience has Medi-Cal's

6   use of the term "estimated acquisition cost" been

7   consistent or inconsistent with the definition

8   that's shown here in this Exhibit 12?

9     A.   Consistent.

10     Q.   Now, we've handed you some additional

11  exhibits that have been marked, and what I'd like

12  to do is to -- for probably the next hour, maybe

13  two, ask you questions about the methodology

14  employed by Medi-Cal for determining the amount

15  of reimbursements to pharmacy providers for drugs

16  covered under the Medi-Cal fee-for-service

17  program and how that methodology has evolved and

18  changed over time.

19       These first few exhibits, I recognize

20  that they're dated before you were at the

21  Department, but I'd like to ask you to look at

22  what's been marked as Exhibit 13, which is a

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

247:1    extent by the Legislature in 2004.

2            MR. HENDERSON:  I see.  Okay.

3            I'd like this next document marked as

4    Exhibit 22.

5                (Exhibit CA-Gorospe 022 was marked

6    for Identification.)

7            MR. HENDERSON:  And I'm sorry.  There's

8    no Bates number on this -- this document.

9            This is a copy of the first page of

10   Assembly Bill Number 442 followed by selected

11   pages from what was a lengthy bill.

12           This states, indicates, on the first

13   page that it was approved by the Governor and

14   filed with the Secretary of State on September

15   30, 2002.

16           The -- do you recall that changes were

17   made in the reimbursement methodology that became

18   effective on approximately September 30, 2002?

19       A.   Yes, changes to the reimbursement

20   pursuant to this would be the health budget

21   trailer bill of 2002, were made effective

22   December 1st of that year.

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

248:1     Q.   On the second page of this document,

2    Section 58 amends Section 141 -- I'm sorry --

3    14105.337, and this has some changes that --

4    appear to affect what you previously described as

5    a 50 percent reduction -- bottom line reduction

6    off the amount of the reimbursement.

7        Do you recall these statutory changes

8    in 2002?

9    A.   Yes.  In existence in the original

10    discussion we had was regarding Section 14105.336

11    which implemented the 50 cent reduction.

12    Q.   Yep.

13    A.   Subsequent to that an Assembly Bill not

14    related to the budget was passed which

15    implemented Subdivisions A and B, which would

16    have been essentially moving from 50 cents to a

17    25 cent reduction, and then from the 25 cent

18    reduction to a 10 cent reduction because it

19    states that we're going to increase the

20    reimbursement by 15 cents.  So the difference

21    would be 10 cents.

22        442 subsequently added Subdivision C

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

249:1   and -- in an interesting way to -- to do this,

2   that basically said that the Department would no

3   longer do A or B until Subdivision C was

4   inoperative on July 1, 2004, so essentially

5   reverting back to the 50 cent reduction that was

6   -- that was previously there.

7       Q.   On a temporary basis?

8       A.   On a temporary basis.

9       Q.   Okay.  And then effective July 1, 2004

10   --

11       A.   Effective July 1, 2004 because

12   Subdivision B would have been the operative

13   subdivision, we went to a 10 -- from a 50 cent

14   reduction to a 10 Cent reduction.

15       In the health budget trailer of 2004

16   Senate Bill 1103 sunsetted or eliminated this

17   provision effective, I think, September 1st of

18   2004.

19       Q.   Okay.  Actually, I'll come back to this

20   just for a little more clarification later.

21       A.   Okay.

22       Q.   But don't put that exhibit away yet.

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

250:1       A.   No.  I --

2           Q.   If you could refer to a page that's

3      marked at the top of -- as page 89.

4           A.   Okay.

5                MR. PAUL:  You said "89."  98.

6                MR. HENDERSON:  I'm sorry.  98.

7      BY MR. HENDERSON:

8           Q.   There's a Section 72 that indicates

9      "Amendments made to Section 14105.45 of the

10     Welfare and Institutions Code," and this

11     discusses the MAIC program.

12               Do you recall these changes?

13          A.   Yes, I do.

14          Q.   Was the Department involved in

15     developing this legislation?

16          A.   Yes, it was.

17          Q.   If you could -- describe to us what

18     this legislation did in your own words, if you

19     can.

20          A.   What this section of statute was doing

21     was eliminating the process of setting MAICs

22     pursuant to state regulations and establishing a

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

251:1   new process by which the Department would base

    2   MAICs on the mean of the wholesale selling price

    3   of drugs, generically equivalent drugs, in

    4   California from the various major wholesale drug

    5   wholesalers.

    6       Q.   All right.  This term "wholesale

    7   selling price," did I understand you correctly to

    8   indicate that that was a price that was to be

    9   obtained from major drug wholesalers?

   10       A.   That is correct.

   11       Q.   What did the Department do to -- if

   12   anything, to get that pricing information from

   13   wholesalers?

   14       A.   The Department had some discussion with

   15   a few of the major wholesalers, but we also were

   16   contacted by a variety of smaller wholesalers

   17   stating that it would be more appropriate if we

   18   did a much broader approach than just the major

   19   wholesalers because small wholesalers also sold

   20   drugs to a variety of pharmacies throughout

   21   California.

   22           Beyond that contact, those initial

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

252:1    contacts, nothing else developed.

2            Q.   All right.  Did the -- when you -- when

3    there were contacts made with major wholesalers,

4    did they agree to provide wholesale pricing

5    information to the Department?

6            A.   No, they did not.

7            Q.   Was -- was any explanation given?

8            A.   In our discussions with the wholesalers

9    it was provided -- or they provided to the

10   Department the -- an argument or a discussion

11   that it would be significant changes to their

12   system in order to accomplish what we wanted them

13   to do and that it would take time and it would be

14   costly to them.

15           Q.   So were they simply unwilling to

16   provide it?

17           A.   I wouldn't say they were unwilling, but

18   they were -- they were hesitant to get in the

19   process.

20           Q.   The -- these changes to the MAIC

21   program, would it be fair to characterize them as

22   an effort to obtain more accurate pricing

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

253:1   information about drugs for reimbursement

2   purposes?

3        MR. BUEKER:  Objection as to form.

4        THE WITNESS:  Yes.

5   BY MR. HENDERSON:

6     Q.   As compared to AWPs?

7        MR. BUEKER:  Objection as to form.

8        THE WITNESS:  Yes.

9   BY MR. HENDERSON:

10     Q.   In your opinion, Dr. Gorospe, if

11   manufacturers had reported AWPs truthfully as --

12   as accurate measures of actual wholesale prices,

13   would this legislation and the efforts made to

14   implement it have -- have been necessary?

15        MR. BUEKER:  Objection as to form.

16        THE WITNESS:  If you mean by "truthful"

17   the description as stated here, what wholesale

18   selling price represents?

19        MR. HENDERSON:  Yes.

20        THE WITNESS:  Yes, this legislation

21   would not have been necessary.

22   BY MR. HENDERSON:

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

254:1          Q.   I'd like to ask you to turn the page to

    2    the last page of this Exhibit 22, and Section 73

    3    adds a Section 14105.46 to the Welfare and

    4    Administrations Code to provide for various

    5    definitions.

    6             The first definition reads "'Estimated

    7    acquisition cost' means the Department's best

    8    estimate of the price generally and currently

    9    paid by providers for a drug product sold by a

    10   particular manufacturer or principal labeler in a

    11   standard package."

    12            Do you -- do you recognize that

    13   definition?

    14       A.   Yes, I do.

    15       Q.   Is that to your recollection similar to

    16   the federal definition in the federal regulations

    17   that we looked at a little while ago?

    18       A.   It is probably fairly close to word-

    19   for-word.

    20       Q.   Now, in the -- skipping down to clause

    21   number 5, this has a definition of "Average Sales

    22   Price."

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

255:1          It's defined to mean "The price

    2    reported to the Department as required by

    3    agreements between the State of California and

    4    the manufacturer."

    5          Do you recall that definition being --

    6    put in to place in -- by the Assembly Bill Number

    7    442?

    8       A.   Yes.

    9       Q.   And in Subparagraph B(2), a little

   10    further down the page --

   11          Actually, Subparagraph B says "The

   12    Department shall establish the estimated

   13    acquisition cost of legend and nonlegend drugs as

   14    follows:"

   15          And then Clause 2 that says that "For

   16    innovator multiple source drugs the estimated

   17    acquisition cost shall be equal to the lower of

   18    the Average Sales Price as reported to the

   19    Department by a drug manufacturer and the Average

   20    Wholesale Price minus 10 percent."

   21          First of all, the reference to "Average

   22    Wholesale Price minus 10 percent," was that new

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

256:1    compared to methodology in place prior to this?

2          A.   Yes.

3               The intent of this was to move the

4    reimbursement rate methodology and ingredient

5    cost methodology from the regulatory process in

6    to the statute, because the Legislature wanted to

7    have more control in terms of they would make

8    changes pursuant to the budget and the

9    requirements of the budget.

10        Q.   Okay.  And it changed the AWP component

11   of the estimated acquisition cost from AWP minus

12   5 percent, to AWP minus 10 percent; is that

13   right?

14        A.   That is correct.

15        Q.   Okay.  Now, the other piece here that

16   refers to Average Sales Price as a component of -

17   - of the reimbursement methodology, was -- what,

18   if anything, did the Department do to implement

19   that feature?

20        A.   The Department contacted a few single

21   source manufacturers who indicated that they

22   weren't interested in enter -- entering in to

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

257:1    agreements to supply that information for a

2    variety of reasons.

3        Q.   Okay.  Did the Department contact any

4    multiple source drug manufacturers?

5        A.   Not to my recollection, no.

6        Q.   Do you know why not?

7        A.   I believe the Department wanted to

8    start with the manufacturers whose products were

9    the bulk of the -- of the payments in the

10    program.

11        Q.   And those were the single source

12    manufacturers?

13        A.   Absolutely.

14        Q.   Okay.  Did the Department's experience

15    with regard to single source manufacturers inform

16    the Department as to what it might expect if it

17    were to contact multiple source drug

18    manufacturers?

19           MR. BUEKER:  Objection as to form.

20           THE WITNESS:  It was -- it was a hint

21    as to the likely reaction since the statute did -

22    - did not have a requirement for either

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

258:1    wholesalers, for wholesale selling price, or

2    manufacturers to report these numbers.

3    BY MR. HENDERSON:

4        Q.   Okay.  Did the -- did the Department

5    generally feel that it was -- it would -- it was

6    unable to implement this feature on the statute?

7        A.   Yes, it was.

8            That's why this subsequent statute that

9    the Legislature -- the statute was changed in

10   2004 to contain penalties.

11       Q.   Okay.  Subparagraph C on this page says

12   "Direct price shall not be used by the Department

13   to establish estimated acquisition costs."

14            Does that refer -- is it your

15   understanding that that refers to the -- what you

16   described earlier as the use of direct price with

17   respect to certain manufacturers' drugs including

18   Abbott?

19       A.   That is correct.

20       Q.   The -- this -- that particular

21   provision, Subsection C, which terminated the use

22   of direct price, do you recall when that was

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

263:1   quarter.

2               And by requirements of CMS they can

3       only go back -- and approval they can only be

4       issued to the first day of the quarter of

5       submission.

6               MR. HENDERSON:  I see.

7               Okay.  All right.

8               I'll have this next document marked as

9       Exhibit 25 -- correct?

10              THE REPORTER:  (Nodding head)

11                  (Exhibit CA-Gorospe 025 was marked

12      for Identification.)

13      BY MR. HENDERSON:

14          Q.  If you could take a look at -- take a

15      look at this, it is for the record -- there's no

16      Bates stamp numbers.

17              This is a print from Westlaw of the

18      California Welfare and Institutions Code Section

19      14105.45 effective August 16, 2004 to August 23,

20      2007.

21              Have you had a chance to look at that,

22      Dr. Gorospe?

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

264:1       A.   Yes.

     2       Q.   This -- do you recall this legislation

     3  generally, when it went in to effect in August of

     4  2004?

     5            MR. BUEKER:  Objection as to form.

     6            THE WITNESS:  Yes.  This is where it

     7  changes to Sections 14105.45 and 14105.46

     8  pursuant to the health budget trailer bill of

     9  2004, which would have been Senate Bill 1103, and

     10  the effective date of August 16th, 2004 is when

     11  the -- would have been filed by -- in to -- in to

     12  the record.

     13            The actual -- any changes that --

     14  pursuant to this in terms of reimbursement rate

     15  methodology went in to effect, I believe, on

     16  September 1st, of 2004.

     17       Q.   Okay.  You mentioned Section 14105.46,

     18  --

     19       A.   Yes.

     20       Q.   -- which apparently I neglected to

     21  include here.

     22            You recall what those -- what that

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

265:1    section provided for, generally speaking?

2       A.   Actually, the change was to take

3    14105.45 and .46 and merge them in to .45, thus

4    eliminating .46.

5       Q.   Okay.

6       A.   So the two previous sections were

7    merged in to one and new language was added or

8    changed.

9       Q.   Okay.  So we're not missing anything

10   significant in this Exhibit 25?

11      A.   No, you're not.

12        You're looking at the concatenated

13   effort by the Legislature to put the two

14   together.

15      Q.   Oh, okay.

16        Now, when we talked about Assembly Bill

17   Number 442, which was Exhibit 22, and the changes

18   that were made in -- in 2002, and those -- those

19   2002 changes referred to -- was it "Average Sales

20   Price" was the term, I think?

21        Yes, "Average Sales Price."

22        Are you aware that in 2003 the Federal

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

266:1    Congress changed the Medicare law to -- phase out

2    reliance on AWP for purposes of reimbursing under

3    -- under the Medicare program and started using

4    Average Sales Price as a basis for reimbursement?

5              Were you aware of that in 2004?

6        A.   Yes.

7              In fact, the definition you will see

8    here refers to those changes made in 2003 by the

9    federal government.

10       Q.   Okay.  Because I see on this first page

11   of Exhibit 25 there's a definition of "Average

12   Sales Price" that is considerably more detailed

13   than what was in the 2000 Assembly Bill 442.

14       A.   The -- that's correct.

15       Q.   Okay.  What, if anything, that --

16            Well, let me back up.

17            If the Department had been unsuccessful

18   previously in getting Average Sales Price

19   information from manufacturers, what -- what

20   prompted what appears to be a -- a -- another

21   effort to implement an Average Sales Price

22   methodology?

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

267:1          A.    The intent was still to produce an

    2    Average Sales Price methodology.

    3              This legislation tried to define the

    4    Average Sales Price consistent with the federal

    5    statute.

    6              And, also, if you'll look on page -- 4

    7    of this document at the very bottom in

    8    Subdivision C, Paragraph 3 it instituted a

    9    penalty for manufacturers who did not report to

   10    the Department, which says for manufacturers that

   11    fail to provide average selling price, I think it

   12    was information pursuant to this section, the

   13    Department may subject their drug's availability

   14    to preauthorization, and the provisions of the

   15    subdivision shall be included in contracts or

   16    contract amendments entered in to by the

   17    Departments pursuant to 14105.3.  .33, .37, and

   18    .39, which are drug contracting statutes, and

   19    manufacturers shall continue to pay -- continue

   20    rebate payments according to the rebate

   21    provisions in the contract.

   22          Q.    So your understanding is that this

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

268:1   legislation imposed a penalty on manufacturers

2   that failed to provide average selling price

3   information, and that penalty consisted of a -- a

4   prior authorization requirement on their drugs?

5      A.   That is correct.

6      Q.   Okay.  Not a monetary penalty, but a

7   penalty that would essentially potentially reduce

8   their market share in the state?

9      A.   That is correct.

10      Q.   What, if anything, did the Department

11   do to implement this feature of the statute, the

12   Average Wholesale Price feature?

13        MR. BUEKER:  Do you mean "average

14   selling price feature"?

15        MR. HENDERSON:  "Average Sales Price,"

16   I think, is what it says.

17        Thank you.

18        MR. BUEKER:  You said "wholesale."

19        MR. HENDERSON:  Did I say --

20        Okay.  Let me state the question again.

21   BY MR. HENDERSON:

22      Q.   What, if anything, did the Department

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

269:1   do to implement the Average Sales Price feature

2   of this statute?

3      A.   The Department issued letters to

4   manufacturers that it was going to begin work on

5   this process.

6        It invited manufacturers or their

7   representatives to attend a -- a meeting, a

8   morning meeting, in which we presented the

9   information about the legislation and the intent

10   of the Department to obtain this information.

11        We also just had individual discussions

12   with a handful of manufacturers who came forward

13   and -- and provided us information on how they

14   did or did not calculate Average Sales Price

15   information for all their drugs, but only for

16   selected drugs.

17        And -- we also had meetings with

18   wholesalers on the wholesale selling price

19   provisions of the statute along the same lines.

20      Q.   Can you describe to us --

21        Well, when were these meetings?

22        When did they take place?

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

270:1     A.   In 2005.

2     Q.   Can you describe generally what the

3   reaction was from drug manufacturers?

4     A.   In general the -- the reaction was that

5   they would comply with the statute, but they

6   would need time to do so.

7     Q.   Has the Department received Average

8   Sales Price data from drug manufacturers to date?

9     A.   No, we have not.

10     Q.   Do you know why not?

11     A.   During the process of implementing this

12   program the early versions of the Deficit

13   Reduction Act of 2005 was issued -- were issued,

14   in which Congress had proposed a move to an

15   Average Manufacturer Price upper limit

16   methodology for all drugs, and when that occurred

17   both the manufacturers and the wholesalers said -

18   - basically said, if Congress is moving to a

19   singular methodology for all states, then what

20   purpose does it serve to have a California only

21   methodology that would cost us lots of money to

22   do and lots of work to do, and -- and California

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

271:1    -- the Department agreed that we should stop the

2    process to see what -- what transpired in

3    Congress.

4           And subsequently most of those

5    provisions were removed, and only the Federal

6    Upper Limit based on AMP was established pursuant

7    to the 2005 DRA.

8    Q.  All right.  Are you familiar with the

9    nature of the Average Sales Price information

10    that manufacturers are required to report under

11    the Medicare -- federal Medicare system?

12    A.  Only generally.

13    Q.  Okay.

14    A.  Yes.

15    Q.  Do you know whether or not the -- the

16    drugs covered by that Average Sales Price

17    requirement in terms of the span of -- of NDCs or

18    -- or drug categories are the same, are broader,

19    or narrower than the drugs covered by the

20    California Medi-Cal program?

21           MR. BUEKER:  Objection as to form and

22    foundation.

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

272:1          THE WITNESS:  Narrower.

2    BY MR. HENDERSON:

3         Q.   There are fewer drugs covered by that

4    piece of the Medicare program as compared to the

5    Medi-Cal program?

6              MR. BUEKER:  Same objections.

7              THE WITNESS:  That's correct.

8    BY MR. HENDERSON:

9         Q.   Are you able to quantify that in any

10   way?

11        A.   Not specifically, but the ASP

12   provisions are related to drugs billed pursuant

13   to Medicare Part B, which are largely physician-

14   administered products, whereas the Medi-Cal

15   pharmacy program covers primarily self-

16   administered medications.

17             So they're in different groups of

18   medications.

19        Q.   Okay.  So would the ASPs that are

20   reported under the Medicare program -- work as a

21   basis for reimbursing under the Medi-Cal program?

22             MR. BUEKER:  Objection as to form.

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

293:1   pursuant to the statute pay claims appropriately.

    2     Q.   Okay.  Do you know whether or not the

    3  Department ever, for example, would use a WAC,

    4  Wholesale Acquisition Cost, published price?

    5     A.   We wouldn't be allowed to pursuant to

    6  the -- the reimbursement statutes.

    7      Statutory change would have to occur

    8  for that to -- to be able to do that.

    9     Q.   All right.  Mr. Cole asked you some

  10  questions about home infusion drugs and costs

  11  associated with dispensing or administering those

  12  drugs.

  13      Did -- did Abbott Laboratories ever

  14  come to the Department to your knowledge and tell

  15  the Department that the dispensing fees for its

  16  drugs were too low?

  17      MR. COLE:  Object to the form.

  18      THE WITNESS:  No.

  19  BY MR. HENDERSON:

  20     Q.   Did Abbott Laboratories ever come to

  21  the Department and tell the Department that it

  22  was inflating the AWPs for its drugs because it

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

294:1    wanted to increase the -- the reimbursement for

2    providers who purchased its drugs?

3              MR. COLE:  Object to the form.

4              THE WITNESS:  No.

5    BY MR. HENDERSON:

6         Q.   Did the -- did the Department ever

7    delegate to drug manufacturers the authority to

8    determine how much dispensing fees should be paid

9    to providers?

10        A.   No.

11        Q.   Did the Department ever take a position

12   that drug manufacturers should be permitted to

13   report false AWP pricing information so that --

14   in order to compensate for inadequate dispensing

15   fees?

16             MR. BUEKER:  Objection as to form.

17             THE WITNESS:  No.

18   BY MR. HENDERSON:

19        Q.   In your opinion, Dr. Gorospe, would it

20   be a reasonable government policy to give drug

21   manufacturers the -- the power to increase

22   reimbursements in order to make up for what they

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

295:1   perceive to be inadequate dispensing fees?

2                MR. BUEKER:  Objection as to form.

3                THE WITNESS:  No.

4   BY MR. HENDERSON:

5        Q.   Why not?

6                MR. BUEKER:  Same objection.

7                THE WITNESS:  Why not what?

8   BY MR. HENDERRSON:

9        Q.   Well, why wouldn't that be a reasonable

10   policy to pursue?

11               MR. BUEKER:  Same objection.

12               THE WITNESS:  The management of the --

13   the program is -- with the State of California

14   and with -- and the federal government, and to

15   allow a -- what is considered in California a

16   provider type, which a manufacturer is, to set

17   rates for providers would -- would not make

18   sense.

19   BY MR. HENDERSON:

20        Q.   It would give the manufacturer control

21   over how much money is -- of the State's money is

22   spent; is that fair to say?

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

296:1      A.    Potentially.

     2      Q.    To your knowledge has --

     3            Let me withdraw that and ask a

     4      different question.

     5            If Abbott Laboratories reported grossly

     6      inflated Average Wholesale Prices to First

     7      DataBank knowing and intending that those prices

     8      would be used by state Medicaid agencies,

     9      including Medi-Cal, to pay inflated

    10      reimbursements to customers, people who bought

    11      Abbott drugs, would you consider that to be

    12      deceptive?

    13            MR. COLE:  Objection.  Form.

    14            THE WITNESS:  Yes.

    15      BY MR. HENDERSON:

    16      Q.    Did Dey ever to your knowledge come to

    17      the California Department of Health Care Services

    18      and tell the Department that it was reporting

    19      grossly inflated Average Wholesale Prices on its

    20      drugs?

    21            MR. ROBBEN:  Objection as to form.

    22            THE WITNESS:  No.

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

297:1   BY MR. HENDERSON:

2       Q.   And if Dey reported grossly inflated

3   Average Wholesale Prices to First DataBank

4   knowing and intending that this would cause state

5   Medicaid agencies to pay inflated reimbursements

6   to customers who bought their drugs, would you

7   consider that to be deceptive?

8           MR. ROBBEN:  Objection as to form.

9           THE WITNESS:  Yes.

10  BY MR. HENDERSON:

11      Q.   Likewise, if Roxane Laboratories

12  reported grossly inflated Average Wholesale

13  Prices to First DataBank knowing and intending

14  that those prices would be used by the California

15  Medi-Cal program to pay inflated reimbursements

16  to providers who bought Roxane's drugs, would

17  your consider that to be deceptive?

18          MS. DANNA:  Objection to form.

19          THE WITNESS:  Yes.

20  BY MR. HENDERSON:

21      Q.   Did Roxane ever come to the Department

22  to your knowledge and tell the Department that it

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

298:1    was reporting grossly inflated Average Wholesale

2    Prices?

3             MS. DANNA:  Objection to form.

4             THE WITNESS:  No.

5    BY MR. HENDERSON:

6        Q.  I want to return to Abbott, because I

7    realized that one of my questions -- Mr. Cole may

8    have had a legitimate question to the form.

9             If -- did Abbott ever come to the

10   Department and tell the Department that it was

11   reporting grossly inflated direct prices to First

12   DataBank?

13            MR. COLE:  Object to the form.

14            THE WITNESS:  No.

15   BY MR. HENDERSON:

16       Q.  And if Abbott reported grossly inflated

17   direct prices to First DataBank knowing and

18   intending that those prices would be used by

19   Medi-Cal to pay inflated reimbursements to

20   providers who purchased Abbott's drugs, would you

21   consider that to be deceptive?

22            MR. COLE:  Objection.  Form.

Gorospe, Kevin J. - December 3, 2008 09:14:00 a.m.

299:1            THE WITNESS:  Yes.

2    BY MR. HENDERSON:

3        Q.    Has the Department ever had a -- any

4    policy or practice of paying inflated acquisition

5    costs in order to compensate for perceived

6    inadequate dispensing fees?

7            MR. BUEKER:  Objection as to form.

8            THE WITNESS:  Was it a policy?

9            MR. HENDERSON:  Yes.

10           THE WITNESS:  No.

11           MR. HENDERSON:  Okay.

12   BY MR. HENDERSON:

13       Q.    Dr. Gorospe, if AWPs had -- as a

14   general rule had no relationship whatsoever to

15   actual market prices but were simply set by

16   manufacturers according to whatever their

17   marketing strategy might be, would it make any

18   sense to use AWPs at all for determining

19   reimbursement?

20           MR. BUEKER:  Objection as to form.

21           THE WITNESS:  If that was the only or

22   the most available information, you would use AWP