# Exhibit 33

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Springfield, IL

Page 1

```
             IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE:   PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

---------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    ) Magistrate Judge

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE ILLINOIS

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) HEALTHCARE AND

Ven-a-Care of the Florida Keys,    ) FAMILY SERVICES

Inc., v. Boehringer Ingleheim      ) by   JAMES PARKER

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) NOVEMBER 18, 2008

---------------------------------X
```

IL Department of Healthcare and Family Services (James Parker)                              November 18, 2008
Springfield, IL

Page 2

1    Videotaped deposition of JAMES PARKER,
2  called by the Plaintiffs for examination, taken
3  pursuant to notice, agreement and by the provisions
4  of the Rules of Civil Procedure for the United
5  States District Courts pertaining to the taking of
6  depositions, taken before DEBORAH HABIAN, a Notary
7  Public within and for the County of Cook, State of
8  Illinois, and a Certified Shorthand Reporter of
9  said State, at the United States Attorney's Office,
10 318 South 6th Street, Springfield, Illinois, on the
11 18th day of November, 2008, at 9:17 a.m.
12
13
14
15
16
17
18
19
20
21
22

IL Department of Healthcare and Family Services (James Parker)　　　　　November 18, 2008
Springfield, IL

Page 32

1    at 9:42 a.m.
2    BY MS. OBEREMBT:
3        Q.   Mr. Parker, could you review Exhibit 2?
4        A.   Okay.
5        Q.   Does this appear to be the federal
6    regulation regarding payment for prescription
7    drugs in state Medicaid programs?
8        A.   Yes, it does.
9        Q.   If I could direct your attention to
10   Section 447.331(b) entitled "Other drugs."  If
11   you could take a minute to read that paragraph?
12       A.   (Witness reviewing document.)
13            Okay.
14       Q.   Do you see where it says that it refers
15   to "...payment levels that the Agency has
16   determined by applying the lower of the -- (1)
17   Estimated acquisition cost plus reasonable
18   expense and fees established by the Agency; or
19   (2) Providers' usual and customary charges to the
20   general public"?
21       A.   Yes.
22       Q.   Has HFS established a reimbursement

IL Department of Healthcare and Family Services (James Parker)                November 18, 2008
Springfield, IL

Page 33

1   methodology that applies these elements?
2       A.   Yes.
3       Q.   What about usual and customary charges
4   to the general public, how does the State define
5   that?
6       A.   It's defined as the price that a
7   pharmacy would charge to a cash-paying customer.
8       Q.   I'd like you to also look at Section
9   447.301 "Definitions."
10      A.   (Witness so doing).
11      Q.   Which I'm not sure that's on here,
12  actually.
13           MR. LIBMAN:  Yes.
14           THE WITNESS:  Yes.
15           MS. OBEREMBT:  Oh, right above, sure.
16  If you could take a look at that where the second
17  sentence says, "Estimated acquisition cost"?
18      A.   Okay.
19      Q.   Are you familiar with that definition?
20      A.   Yes, I am.
21      Q.   Has Illinois tried to determine
22  estimated acquisition cost in accordance with

1   that definition?
2       A.   Yes, we have.
3       Q.   Does the State have a formula for
4   reimbursing for the drug ingredient portion of
5   pharmacy claims?
6       A.   Yes, we do.
7       Q.   And where is the State's formula
8   typically written down?
9       A.   It is both in the rules that we publish
10  under the Illinois Administrative Procedure Act
11  and in our State Plan on file with Federal CMS.
12      Q.   When you use the term "CMS," to what
13  are you referring?
14      A.   The Centers for Medicaid and Medicare
15  Services or whichever one they put first.
16      Q.   And is that part of the Department of
17  Health and Human Services?
18      A.   Yes, it is.
19           MS. OBEREMBT:  I'd like the court
20  reporter to mark as Exhibit 3 a summary exhibit.
21           (Plaintiff's Exhibit Parker 003
22  was marked for ID)

Page 61

1    you issue a final version of a rule?
2         A.   Our rulemaking process internally to
3    the Agency does circulate the rules to all of the
4    divisions, and the rules would be commented upon
5    by the Division of Finance and the Office of
6    General Counsel and at times the Office of
7    Information Systems, which is the computer people
8    that have to program every policy change into the
9    computers.
10        Q.   Turning back to Exhibit 3, has the
11   State of Illinois historically determined its
12   Estimated Acquisition Costs separate from its
13   determination of a dispensing fee?
14        A.   Yes, I mean there was a period when
15   there was a correlation between a dispensing fee
16   on an individual product and acquisition cost,
17   but the process of determining each is separate.
18        Q.   Has the State of Illinois ever had a
19   practice or a policy of paying increased
20   ingredient cost in order to make up for some type
21   of inadequate dispensing fee?
22        A.   No.

IL Department of Healthcare and Family Services (James Parker)                November 18, 2008
Springfield, IL

Page 76

1  a data element that is passed to the State for
2  the 41,000 NDCs that we cover on a regular basis,
3  and it needs to be accurate to solve the
4  problems.
5     Q.   Is it the State's understanding that
6  the pricing provided to it by FDB is based on
7  prices reported by a drug manufacturers?
8     A.   Yes.
9          MR. BERLIN:  Excuse me.  Objection to
10 form.
11 BY MR. OBEREMBT:
12    Q.   Has either Abbott Laboratories or Dey
13 Labs or Roxane or Boehringer Ingelheim ever come
14 to the State of Illinois and informed the State
15 that its reported AWPs did not reflect accurate
16 prices?
17         MR. BERLIN:  Objection, form.
18         MR. MALONEY:  Objection.
19         MR. REALE:  Objection.
20         THE WITNESS:  No.
21 BY MS. OBEREMBT:
22    Q.   The United States in its complaints

1    against Dey and Abbott and Roxane has alleged
2    that the manufacturers reported falsely inflated
3    AWPs to FDB with the intention of causing the
4    Medicaid program to pay inflated reimbursements
5    to its customers and that they did this for the
6    purpose of increasing the sales to their
7    customers.
8             Has the State of Illinois ever approved
9    of that conduct?
10            MR. REALE:  Objection.
11            MR. MALONEY:  Objection.
12            MR. BERLIN:  Objection.
13            THE WITNESS:  No.
14   BY MS. OBEREMBT:
15        Q.   If I told you that Dey and Abbott and
16   Roxane's reported AWPs for certain generics were
17   sometimes three to ten times higher than the
18   actual sales prices, do you think that was
19   something that Illinois understood and accepted
20   when it established the various reimbursement
21   methodologies we've seen in Exhibit 3?
22            MR. MALONEY:  Objection, form.

IL Department of Healthcare and Family Services (James Parker)                November 18, 2008
Springfield, IL

Page 78

1           MR. REALE:  Objection.
2           THE WITNESS:  No.
3    BY MS. OBEREMBT:
4      Q.    If these manufacturers, Dey, Abbott and
5    Roxane, indeed reported prices to to FDB in the
6    manner that I've described, knowing and intending
7    that the State Medicaid program would pay
8    inflated reimbursement to providers who purchased
9    those drugs, would you consider that fraudulent?
10          MR. REALE:  Objection, form.
11          MR. MALONEY:  Objection, form.
12          THE WITNESS:  Yes.
13          MS. OBEREMBT:  I'd like to take a quick
14   break and see if I have anything else.
15          THE VIDEOGRAPHER:  Going off the record
16   at 10:54 a.m.
17                (Recess taken.)
18          THE VIDEOGRAPHER:  Back on the record
19   at 11:06 a.m.
20   BY MS. OBEREMBT:
21      Q.    Mr. Parker, I wanted to ask you about
22   the relationship between the rebates the State

Page 240

1  sentence, "We are recommending that HCFA work to
2  insure that States reimburse the ingredient
3  portion of Medicaid drugs in a manner more
4  consistent with the findings of this report."
5  Correct?
6        A.   Correct.
7        Q.   Did you ask Mr. Hazelwood what steps
8  were undertaken to reimburse prescription drugs
9  "in a manner more consistent with the findings of
10 this report"?
11       A.   Well, not with -- specifically, you
12 know, what did we do in reaction to this report.
13 What did we do in reaction to this report and
14 reports like it and other information we had.  We
15 continued to change our discount off of AWP.  We
16 increased the use of MAC pricing to typically try
17 to chase what the accurate acquisition cost was.
18       Q.   But at no time has Illinois adopted a
19 definition of Estimated Acquisition Cost for
20 generic drugs that approaches the levels in this
21 OIG report? And when I say "levels," I'm
22 referring to the difference between acquisition

1  cost and AWP.
2           MR. LIBMAN: Objection to form.
3           THE WITNESS: In reality, we have.
4  BY MR. REALE:
5      Q.  Okay, explain to me how.
6      A.  Because you need to understand surveys
7  like this are talking about aggregate numbers.
8      Q.  Right.
9      A.  They are not saying that every generic
10 is available at AWP minus 45 or 85 or 60 or any
11 of the other numbers in there, and in fact,
12 evidence would suggest they're not.
13          That's the problem caused by inaccurate
14 AWPs, you don't know where they are with relation
15 to reality on a drug-by-drug basis, and we have
16 to reimburse on a drug-by-drug basis.
17          Were we to use a formula that simply
18 said "AWP -85%," we would be grossly underpaying
19 costs on many generics, particularly newer
20 generics.  Hence, the need to have a multitiered
21 process that uses a formula based on AWP or a
22 Federal Upper Limit or a State MAC.

IL Department of Healthcare and Family Services (James Parker)                    November 18, 2008
Springfield, IL

Page 242

1       If you weighted our reimbursement today
2  on generics and compared our aggregate spend to
3  AWP, you would get a number somewhere in the 50
4  to 60 range as a discount off of AWP, but you
5  can't do that on every single drug because not
6  every single drug is available at that price.
7       Q.   And the regulations, the federal
8  regulations themselves permit Illinois Medicaid
9  to pay more than Estimated Acquisition Cost on
10 some drugs, correct?
11           MR. LIBMAN:  Objection to form.
12           THE WITNESS:  No.
13 BY MR. REALE:
14      Q.   Well, let's look at the language to the
15 regulations that you have out in front of you.
16 It states, 447.331 --
17           MR. LIBMAN:  Jeff, for the record, what
18 exhibit number are you looking at?
19           MR. REALE:  DOJ Exhibit 2.
20           MR. LIBMAN:  Exhibit 2, okay.
21 BY MR. REALE:
22      Q.   In paragraph (b) Other drugs, "The

Page 244

1    Q.   There's nothing in these regulations
2    that prohibit Illinois Medicaid from paying more
3    than Estimated Acquisition Cost for a particular
4    drug?
5              MR. LIBMAN:   Same --
6              MS. OBEREMBT:   Objection.
7              MR. LIBMAN:   Same objection.
8              THE WITNESS:   It could be read that
9    way, yes.
10   BY MR. REALE:
11   Q.   And the Federal -- you're familiar with
12   the Federal Upper Limits program generally?
13   A.   Yes.
14   Q.   And in the regulations that govern the
15   Federal Upper Limits, they refer to "in the
16   aggregate," correct?
17   A.   Clearly, for Federal Upper Limits.
18   Q.   Right, the Federal --
19   A.   You can -- it's an aggregate
20   calculation.  You can pay on a particular drug
21   greater than the Federal Upper Limit, if in the
22   aggregate.  That, I agree.

IL Department of Healthcare and Family Services (James Parker)                              November 18, 2008
Springfield, IL

Page 245

1    Q.   And the same language appears here, the
2    same language being the "in the aggregate"
3    language referring to the total payments made for
4    drugs that have no FUL or brand name drugs as
5    specified in this regulation?
6    A.   Yes, it does appear that you could pay
7    on a particular drug higher than the Estimated
8    Acquisition Cost.
9    Q.   Let's go back to Roxane Illinois
10   Exhibit 9.
11   A.   (Witness so doing).
12   Q.   All right, let's turn to the very last
13   page of this document.  It's 2 of 2, Appendix 3,
14   Bates page HHD014-0460, and this is Bruce
15   Vladeck, Administrator at HCFA's response to the
16   OIG's report.  It's entitled, "HCFA Comments on
17   Office of Inspector General Draft Report
18   Entitled:  'Medicaid Pharmacy -- Actual Cost of
19   Generic Prescription Drug Products.'"
20        In the last paragraph, he states, "We
21   believe the findings in this report are
22   significant and warrant the attention of all

IL Department of Healthcare and Family Services (James Parker)　　　　　　　November 18, 2008
Springfield, IL

Page 289

1　　　　　　What is a JCAR Staff Analysis?
2　　　A.　I can only assume it's what it purports
3　　to be.  It's not a document that we would see in
4　　our Agency.  It would appear to be a document
5　　prepared by staff for the committee to brief the
6　　legislative members of the committee.
7　　　Q.　Do you know who Alphonso Cano is --
8　　　A.　No.
9　　　Q.　-- or Con-no?
10　　A.　No, I do not.
11　　Q.　Now, in this document, it refers to the
12　　elimination of Whole Acquisition Cost as "one of
13　　the options for determining the maximum price DPA
14　　pay for a drug," correct?
15　　A.　Yes.
16　　Q.　And this document is discussing the
17　　move back to Average Wholesale Price and
18　　eliminating Whole Acquisition Cost in the State's
19　　definition of Estimated Acquisition Cost,
20　　correct?
21　　A.　My fault, I was reading and not
22　　listening.

1  BY MR. REALE:
2      Q.   "The audit reports that pharmacies can
3  purchase generic and brand name drugs for 65% and
4  22%, respectively, less than the wholesale
5  price."  And, "In this rulemaking, DPA is
6  increasing the percentage deduction from the AWP
7  for generic drugs from 12% to 20% and brand names
8  from 10% to 11%.  When deducted from the
9  percentage discount allowed for generic and brand
10 name drugs (64% and 22%), an overall profit of
11 44% is made by the pharmacy when the generic
12 drugs are dispensed and 11% when brand name drugs
13 are dispensed.  This profit disparity is another
14 way this rule promotes the dispensing of generics
15 over brand names."
16          Did I read that correctly?
17     A.   Yes, you did.
18     Q.   Now, does Illinois Medicaid promote the
19 dispensing of generic drugs through the
20 ingredient cost reimbursement?
21          MS. OBEREMBT:  Objection.
22          THE WITNESS:  No.