# Exhibit 35

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL NO. 1456
AVERAGE WHOLESALE PRICE          )
LITIGATION                       ) CIVIL ACTION:
                                 ) 01-CV-12257-PBS
                                 ) Judge Patti B. Saris
                                 ) Magistrate Judge
                                 ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____

VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

```
                                                              Page 2
 1                    COMMONWEALTH OF KENTUCKY

 2                 FRANKLIN CIRCUIT COURT - DIV 1

 3                   CIVIL ACTION NO. 04-CI-1487

 4   COMMONWEALTH OF KENTUCKY                      PLAINTIFF

 5   ex rel. JACK CONWAY, ATTORNEY GENERAL

 6   v.

 7   ALPHARMA USPD, INC., et al.

 8

 9                   VIDEOTAPED DEPOSITION OF

10                         CODY WIBERG

11                    Taken March 14, 2008

12                    Commencing at 9:13 a.m.

13

14        REPORTED BY:  SUZANNE HAGEN, RPR, CRR, CBC

15        Videotaped Deposition of Cody Wiberg, taken on

16   March 14, 2008, commencing at 9:15 a.m., at the law firm

17   of Meagher & Geer, 33 South Sixth Street, #4400,

18   Minneapolis, Minnesota, 55402, before Suzanne Hagen,

19   Registered Professional Reporter, Certified Realtime

20   Reporter, Certified Broadcast Captioner, and Notary

21   Public of and for the State of Minnesota.

22                         **********
```

1   a dispensing fee.
2           In theory, in the best -- this is more of an
3   opinion.  In the best of all possible worlds, there
4   would be pricing transparency, and payers would
5   know exactly what purchasers, end -- not end users,
6   but providers, pharmacies and doctors, paid for
7   drugs.  You would reimburse at that amount.  And
8   then you would set, on the -- in the case of a
9   pharmacy, your dispensing fee.  Or in the case of a
10  physician, an administration fee.  You would set
11  that at a rate that would allow them to cover the
12  cost of dispensing, which includes things like
13  paying for staff, paying for computers, paying for
14  electricity, paying for the rent on the building.
15  Paying for all of those sort of things.  And then,
16  because they are for-profit businesses, and you
17  want them to remain Medicaid providers, you would
18  build in some -- what you hoped was some reasonable
19  profit into the calculations.  That would -- that
20  would be the best of all possible worlds, if you
21  had that.  We didn't have that.  We don't have
22  pricing.  Didn't have pricing transparency then, I

1   don't think we have it now.  And so what you end up
2   doing -- in our case, because we didn't have the
3   authority to go in and actually find out what a
4   wide range of pharmacies or physicians were paying
5   for drugs, in our case, we did our best using the
6   contacts that we had.  Also, mentioning -- should
7   have mentioned this before, is we did take a look
8   at what other payers had for Maximum Allowable
9   Costs, other state Medicaid programs.  And also
10  remember, we had managed care organizations under
11  contract for us.  And they would provide us with
12  what their Maximum Allowable Costs were. So that's
13  kind of a crucial thing I forgot to mention. The
14  pharmacies, as I mentioned, were more of a reality
15  check to make sure that the information we were
16  collecting from these other sources sort of fit
17  what was happening in Minnesota.
18      Q.   And so you said that you didn't have the --
19  the ideal world, where the dispensing fee would
20  cover costs, plus a profit.
21      A.   Right.
22      Q.   And the ingredient cost would cover the

1   notes like this that might be the reason, or it
2   might be because you see how the number of people
3   on this call, you keep your comments short.
4           Basically -- there's no doubt that I thought
5   that AWP was a flawed concept.  Because, again, as
6   I mentioned early on, in my perfect world, there
7   would be pricing transparency.  And you would
8   adjust reimbursement rates accordingly for
9   dispensing fees and administration fees.
10          When I -- when this attributes to a statement
11  to me that the market has adapted, I would not read
12  into that that I thought, because I did not think
13  then, and I do not think now, that the market
14  adapted perfectly. You know, again, going back to
15  that joke/serious phrase, AWP, "ain't what's paid,"
16  we thought we had some understanding, especially
17  when you look at the OIG report, and that sort of
18  thing about some sort of understanding about the
19  level of discounts off of AWP that drugs were being
20  sold for.  However, as a result of some of the AWP
21  litigation I had been aware of, I don't know that
22  we understood as peers the extent to which in some

1    instances the discounts that providers were
2    purchasing off of AWP were perhaps greater than we
3    had assumed or we had thought.
4        Q.  Are you talking about greater as a
5    percentage, or greater as an absolute dollar
6    amount?
7        A.  Greater as a percentage.  Basically, that,
8    you know -- that -- that basically, when you are
9    reading the OIG report, and they're talking about
10   brand name drugs being 21 at first or 70 percent
11   off AWP, that, in fact, in some instances, for some
12   drugs, and I'm not going to be able to name them
13   for you now, but the actual discounts that were
14   being provided were more than that.
15       Q.  And so for a brand, where you were expecting
16   AWP minus 17, you, in fact, found out that some
17   brands had AWP minus something much more than 17
18   percent.
19       A.  As I recall, yes.  There were instances of
20   that happening.
21       Q.  Now, for a generic you can't get much more
22   than --

```
 1      Q.  Okay.  I believe you also testified to a
 2   phrase that if you've seen one state Medicaid
 3   pharmacy program, you've only seen one.  Would you
 4   agree that states have a flexibility in determining
 5   how they structure their -- their own program?
 6      A.  Yes, they do.
 7      Q.  Okay.  And --
 8      A.  Within certain general parameters.
 9      Q.  Right.
10      A.  As I testified earlier as to what a State
11   Plan is, I'm not sure if I mentioned that every
12   time -- once -- once that initial State Plan is
13   approved, which is what would have happened years
14   ago, every time you make a change, a substantive
15   change, you have to do a State Plan amendment.  And
16   that has to be approved by CMS.
17      Q.  Okay.  So you could choose -- Minnesota could
18   choose to use AWP or WAC, or any other of these
19   pricing --
20      A.  At the time I was there, yes.  You know, I'm
21   not familiar with -- with what's going on now.  I
22   think the Deficit Reduction Act, I think is what
```

1   it's called, has made some changes to what states
2   are supposed to be doing in the last couple years,
3   since I left.  But at the time, yes, we had some
4   flexibility.
5       Q.  Okay.  And you -- I mean, you didn't have to
6   choose to use AWP.
7       A.  No.
8       Q.  All right.  Okay.  And basically, the
9   different states are able to structure their
10  programs in ways to meet their access needs and
11  their different kind of individual state needs.
12      A.  Yeah.  Again, within general constraints.
13      Q.  Right.  Okay.  You also had earlier testified
14  about the usual and customary charge, and you
15  explained that Minnesota uses a lesser of formula.
16      A.  Correct.
17      Q.  AWP and MAC or usual and customary.  Would
18  you agree that the usual and customary charges is
19  set by the provider, you testified, correct?
20      A.  Correct.
21      Q.  Is that basically the price at which the
22  provider values his or her services as a whole?