# Exhibit 38

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS


Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

SD Department of Social Services (Larry Iversen)                    December 15, 2008

## Pierre, SD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Abbott Laboratories, Inc.)

Civil Action No. 06-11337-PBS;   ) TRANSCRIPT OF

United States of America ex rel. ) PROCEEDINGS

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil ) DEPOSITION OF

Action No. 05-11084-PBS; and     ) THE SOUTH DAKOTA

United States of America ex rel. ) DEPARTMENT OF

Ven-A-Care of the Florida Keys,  ) SOCIAL SERVICES

Inc. v. Boehringer Ingelheim     ) by LARRY IVERSEN

Corp., et al., Civil Action No.  )

07-10248-PBS                     ) DECEMBER 15, 2008

-------------------------------X

Henderson Legal Services, Inc.

354e3b13-d775-406f-912c-c8856c7f542c

SD Department of Social Services (Larry Iversen)                    December 15, 2008

Pierre, SD

Page 2

1              VIDEOTAPE DEPOSITION OF THE SOUTH DAKOTA

2          DEPARTMENT OF SOCIAL SERVICES by LARRY IVERSEN

3

4

5              BEFORE:      Carla A. Bachand, RMR, CRR

6                           Court Reporter and Notary Public

7                           Pierre, South Dakota

8          DATE:      December 15, 2008, at 8:15 a.m.

9          PLACE:      Kings Inn Convention Center

10                          110 East Sioux Avenue

11                          Pierre, South Dakota

12

13

14

15

16

17

18

19

20

21

22

Pierre, SD

Page 85

1    second program establishes a maximum per unit

2    price for multiple source drugs and functions in

3    much the same fashion as and in conjunction with

4    the federal upper limit program."  Do you

5    understand this to refer to the SMAC program?

6        A.    Yes.

7        Q.    And if you look at the top of this

8    page, the fax date is November 26, 2002, correct?

9        A.    Yes.

10       Q.    So does this refresh your memory a

11   little about the time period that the MAC program

12   would have been implemented in 2002?

13       A.    Yes.

14               (Deposition Exhibit Dey 911 marked

15   for identification.)

16       Q.    (BY MS. KHANDHAR)  I have given you

17   what's been marked as Dey Exhibit 911.  This is a

18   document that was produced to us by the State of

19   South Dakota and it's entitled the "State of

20   South Dakota Department of Social Services

21   Division of Medical Services consultant contract

22   for consultant services between SXC Health

354e3b13-d775-406f-912c-c8856c7f542c

SD Department of Social Services (Larry Iversen)                    December 15, 2008

Pierre, SD

Page 86

1    Solutions, Inc., and the State of South Dakota,"

2    correct?

3        A.   Yes.

4        Q.   And if you need a minute to review the

5    document, you can take a look.  Have you seen

6    this document before?

7        A.   Yes.

8        Q.   Can you identify it for me?

9        A.   It's a contract between the Department

10   of Social Services Division of Medical Services

11   and SXC Health Solutions.

12       Q.   And can you turn to page seven of the

13   document.  Is that your signature on the second

14   line at the top of the page?

15       A.   Yes.

16       Q.   Can you describe for me the services

17   that SXC's Health Solutions provides the South

18   Dakota Medicaid relating to this MAC program?

19       A.   They give us the SMAC pricing and then

20   they also provide a Web site for providers to be

21   able to access and find out what the MAC pricing

22   is on a particular drug.

SD Department of Social Services (Larry Iversen)                    December 15, 2008

Pierre, SD

                                                              Page 92

1      sentence they are described as stakeholders.

2      Would you agree with that description?

3            A.   Yes.

4            Q.   And how are providers stakeholders in

5      the political process?

6            A.   I believe that actually that providers

7      are stakeholders in terms of the Medicaid

8      program, not necessarily the political process.

9            Q.   And how are they stakeholders in the

10     Medicaid program?

11           A.   Because they are enrolled providers,

12     they agree to accept what the reimbursement rates

13     are from Medicaid and serve Medicaid recipients.

14     That makes them stakeholders.

15           Q.   They would be stakeholders in that way

16     because the reimbursement would be important to

17     them in terms of how much money they make and

18     whether they make a profit, correct?

19           A.   Yes.

20           Q.   And providers are important to the

21     overall South Dakota Medicaid because it would be

22     important to South Dakota Medicaid to have enough

354e3b13-d775-406f-912c-c8856c7f542c

SD Department of Social Services (Larry Iversen)                    December 15, 2008
Pierre, SD

Page 138

1      Q.   Previously you referenced that there
2  was a political nature to the levels at which
3  South Dakota would reimburse providers; do you
4  recall that?
5           MS. ACTON:  Object to the form.
6      A.   I recall that there was a particular
7  sentence within the SXC document that stated that
8  there was a political nature.
9      Q.   (BY MS. RAMSEY)  Would that include
10 push back from providers relating to
11 reimbursement rates?
12     A.   Providers occasionally, yes, do push
13 back as related to reimbursement.
14     Q.   When we looked at some language on the
15 last page of that document regarding the fact
16 that neither the FUL or AWP means anything for
17 generic drugs, what do you understand?
18     A.   Last page of which document?
19     Q.   I'm sorry, the same exhibit we are
20 looking at, Dey 912.
21     A.   Okay.  What's your question, please?
22     Q.   Relating to the sentence that states,

SD Department of Social Services (Larry Iversen)                                      December 15, 2008
Pierre, SD

Page 139

1    "For multiple source drugs, I would make

2    extensive use of state upper limits as neither

3    the FUL nor AWPs means anything for generic

4    drugs," what do you understand that sentence to

5    mean?

6        A.    I understand that to be Mr. Hazelwood's

7    opinion about FUL and AWP.

8        Q.    How does that relate to South Dakota's

9    opinion regarding published AWPs as compared to

10   the price at which providers can acquire multiple

11   source products?

12       A.    My opinion is that we get the AWP from

13   First Data Bank and that that is an accurate AWP.

14       Q.    What do you mean by accurate AWP?

15       A.    That that is the average wholesale

16   price.

17       Q.    And what leads you to have the belief

18   that the published AWPs are averages of wholesale

19   price?

20       A.    Because that's what it's been

21   represented to us as.

22       Q.    Who has made that representation?

354e3b13-d775-406f-912c-c8856c7f542c

SD Department of Social Services (Larry Iversen)                    December 15, 2008

Pierre, SD

Page 140

1      A.   First Data Bank, by supplying us with

2   the file.

3      Q.   Why would South Dakota implement a

4   reimbursement methodology where it would be --

5   where it would be reimbursing providers for lower

6   than an average, if that were the case?

7      A.   Well, it would appear, I guess, that

8   there are some drugs that maybe AWP less 10 and a

9   half percent isn't a reimbursement level where at

10  that reimbursement level we could actually save

11  some money using a MAC.

12         MS. RAMSEY:  I'm sorry, I don't know

13  whether that answered my question.  Can the court

14  reporter please read back my last question.

15         (Whereupon, the Court Reporter

16  read back the requested portion.)

17     A.   Are you waiting for me to respond?

18     Q.   (BY MS. RAMSEY)  Yes, sir.

19     A.   Oh, I thought that my answer had

20  answered your question.

21     Q.   Well, you certainly would not expect

22  providers to be reimbursed at less than their

SD Department of Social Services (Larry Iversen)                    December 15, 2008

# Pierre, SD

Page 155

1    31, 2005, correct?

2          A.    Correct.

3          Q.    Now I'm handing you Government Exhibit

4    No. 4 and Exhibit No. 4 is the South Dakota state

5    plan 91-04, correct?

6                    (Deposition Exhibit Government 004

7    Identified.)

8          A.    Correct.

9          Q.    And this state plan became effective

10   also on July 1, 1991, correct?

11         A.    Yes.

12         Q.    And this supersedes state plan 90-11,

13   correct?

14         A.    Yes.

15         Q.    And this state plan states South

16   Dakota's reimbursement methodology for

17   prescription drugs from July 1, 1991 to December

18   31, 2005, correct?

19         A.    Yes.

20         Q.    I'm handing you Government Exhibit No.

21   5.

22                    (Deposition Exhibit Government 005

SD Department of Social Services (Larry Iversen)                    December 15, 2008
                               Pierre, SD

                                                            Page 156

 1      Identified.)

 2              MS. RAMSEY:  Counsel, I believe we only

 3      have a couple minutes left, to give you a heads

 4      up about time.

 5              MS. ACTON:  Okay.  Yeah.

 6      Q.   (BY MS. ACTON)  And Exhibit 5 is state

 7      plan 90-11, correct?

 8      A.   Yes.

 9      Q.   And this state plan became effective on

10      January 1, 1990, correct?

11      A.   Yes.

12      Q.   And this supersedes state plan 84-14,

13      correct?

14      A.   Yes.

15      Q.   And this states South Dakota's

16      reimbursement methodology for prescription drugs

17      from January 1, 1990 to June 30, 1991, correct?

18      A.   Yes.

19      Q.   Now, can you read out loud, as quickly

20      as you can, looking at Exhibit No. 2, which is

21      your current state plan, can you read out loud

22      the first paragraph of that?

                  Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

354e3b13-d775-406f-912c-c8856c7f542c

Pierre, SD

Page 161

1        MS. ACTON:  I'm going to go as fast as

2    I can, okay?

3        Q.   (BY MS. ACTON)  All the state plans

4    that I've showed you use the phrase "estimated

5    acquisition costs," correct, or EAC?

6        A.   Yes.

7        Q.   And all the state plans establish the

8    EAC by using AWPs, correct?

9        A.   Yes.

10       Q.   Now, I'm going to hand you what I've

11   marked as Exhibit No. 1.  And this is a copy of

12   the Federal Register going back to July 1987

13   regarding the Code of Federal Regulations on

14   payments for services; do you see that?

15            (Deposition Exhibit Government 001

16   Identified.)

17       A.   Yes.

18            MS. RAMSEY:  Can that question be read

19   back?  The phone cut out, I didn't hear it.

20            MS. ACTON:  Basically I'm asking him

21   about the Code of Federal -- the CFR or 447.301,

22   you are familiar with that, right?  On the

354e3b13-d775-406f-912c-c8856c7f542c

Page 162

1    definition of estimated acquisition cost.

2              MS. RAMSEY:  I understand your topic

3    now.

4              MS. ACTON:  I haven't asked him the

5    question yet.

6              MS. RAMSEY:  Thank you.

7         Q.   (BY MS. ACTON)  So if you look at the

8    first -- the definition of estimated acquisition

9    cost under Section 447.301; do you see that?

10        A.   Yes.

11        Q.   Can you read that quietly to yourself

12   right now and tell me when you are done.

13        A.   Okay.

14        Q.   In using AWPs in your reimbursement

15   methodology, specifically in determining the

16   estimated acquisition cost, has the Department of

17   Social Services endeavored to determine the

18   estimated acquisition cost in accordance with

19   that definition in the federal regulation that

20   you are looking at?

21        A.   Yes.

22              MS. RAMSEY:  Objection to form.

SD Department of Social Services (Larry Iversen)                    December 15, 2008

Pierre, SD

Page 163

1      Q.    (BY MS. ACTON)   Do Exhibits 2 through

2   5, which are the state plan amendments, state how

3   South Dakota has determined the estimated

4   acquisition cost from 1990 to the present?

5      A.    Yes.

6      Q.    Do these state plans, Exhibits 2

7   through 5, also state the source of the AWPs to

8   be used in determining the estimated acquisition

9   cost from 1990 to the present?

10      A.    Yes.

11      Q.    And do you know if the state has ever

12   used what has been referred to as DOJ AWPs?   I

13   think you answered that already.

14      A.    No.

15      Q.    Would you be able to obtain on a

16   regular basis the AWPs and other information for

17   all the NDCs in your program without having a

18   database as provided by First Data Bank, RedBook,

19   or Medispan?

20      A.    No.

21           MS. KHANDHAR:   Objection, form.

22           MS. RAMSEY:   Objection.

354e3b13-d775-406f-912c-c8856c7f542c

ATTACHMENT 4.19-B
PAYMENTS FOR MEDICAL AND REMEDIAL CARE AND SERVICES

10. <u>Dental Services</u>

Payment will be based on a fee schedule established by the State Agency. The fee schedule was established at 63% of the 75th percentile of the usual and customary charge reported for procedures that were reported 10 or more times during the base year. For covered services for which a fee has not been established the payment will be equal to 55% of billed charges.

11a. <u>Physical Therapy</u>

See physician services - section 5 of this attachment.

11b. <u>Occupational Therapy</u>

Not provided.

11c. <u>Services for Individuals with Speech, Hearing, or Language Disorders</u>

See physician services - section 5 of this attachment.

12a. <u>Prescription Drugs</u>

Payment will be the lower of the usual and customary charge to the general public and the upper limit for multiple source drugs as listed in Part 6 of the State Medicaid Manual plus a dispensing fee or the estimated acquisition cost (EAC) plus a dispensing fee. In addition the State Agency will maintain a list of drugs for which payment will be limited to the lower of a state maximum allowable cost (SMAC) used plus a dispensing fee or the pharmacy's usual and customary charge for the product.

The EAC is established first utilizing the monthly MediSpan listing or, for items not in the MediSpan list, the Redbook and:

1. Using the average wholesale price for class II substances;

2. Using the average wholesale price less 10.5% for all other substances except for items listed under the SMAC; or

3. Using the average of the average wholesale price less 10.5% for all generic products available for a specific drug listed on the SMAC.

The dispensing fee was established using information received from participating pharmacies relative to their costs of operating the prescription department within the store and the volume of prescriptions dispensed. The dispensing fee will be updated from time to time as authorized by the South Dakota Legislature.

TN # 90-11
SUPERSEDES
TN # 84-14          APPROVAL DATE 9/21/90          EFFECTIVE DATE 1-1-90


GOVERNMENT
EXHIBIT
5
PENGAD 800-631-6989

HHC014-1555

Agreement #:09-0800-_ _ _ _
Purchase Order #: 09SC08 3 0 0 3

### STATE OF SOUTH DAKOTA
### DEPARTMENT OF SOCIAL SERVICES
### DIVISION OF MEDICAL SERVICES

Consultant Contract
For Consultant Services
Between



SXC Health Solutions, Inc.
3025 Windward Plaza, Suite 200
Alpharetta, GA 30005

State of South Dakota
Department of Social Services
DIVISION OF MEDICAL SERVICES
700 Governors Drive
Pierre, SD 57501-2291

| | |
|---|---|
| Referred to as Consultant | Referred to as State |

1.  The State hereby enters into a contract for consultant services with the Consultant.
    While performing services hereunder, Consultant is an independent contractor and not an
    officer, agent, or employee of the State of South Dakota.

2.  The Consultant's Vendor Number is   12153365.

3.  PERIOD OF PERFORMANCE:

    This agreement shall be effective as of July 1, 2008 and shall end on May 31, 2011, unless
    sooner terminated pursuant to the terms hereof.

4.  Will the Consultant use State equipment, supplies, or facilities?
    No.

5.  PROVISIONS:

    a.   The Consultant agrees to:

    1.  Provide all State Maximum Allowable Cost (SMAC) services requirements as requested
        in the Request for Proposal (RFP) dated May 16, 2008.  See Attachment 1.
    2.  Provide all SMAC services pursuant to Consultant's response to RFP, dated June 6, 2008.
        See Attachment 2.
    3.  Provide access, via a hyperlink to their website, the SMAC for the State, and its
        contracted pharmacy providers.  Consultant shall provide an initial full SMAC file in
        Excel format, followed by monthly updates as dictated by SMAC price changes.
    4.  Should Consultant fail to maintain the level of service required through the RFP and
        indicated in the Consultant's response to the RFP and such failure remains uncured thirty
        (30) days following notice of such failure being given to Consultant, the Consultant shall

Revised 0508

1

Agreement #:09-0800-___
Purchase Order #: 09SC08-3002

be considered to be in breach of contract and good cause for immediate termination through Section 11 of this agreement shall exist.

    b.   The State agrees to:

        1.   Make payment for services upon satisfactory completion of services and within thirty (30) days of receipt of a bill. Payment in the amount of $7,500.00 will be made each month, for services rendered during the previous month.

        2.   Will the State pay Consultant expenses as a separate item?
           YES ( )    NO ( X )
           If YES, expenses submitted will be reimbursed as stated in attachment 1, section 5.2 Cost Proposal.

        3.   The TOTAL CONTRACT AMOUNT will not exceed $ 262,500.00.

6.   FINAL BILLING:

Consultant agrees to submit a final bill within 45 days of the contract end date to receive payment for completed services. If a final bill cannot be submitted in 45 days, then a written request for extension of time and explanation must be provided to the State.

7.   TECHNICAL ASSISTANCE:

The State agrees to provide technical assistance regarding Department of Social Services rules, regulations and policies to the Consultant and to assist in the correction of problem areas identified by the State's monitoring activities

8.   LICENSING AND STANDARD COMPLIANCE:

The Consultant agrees to comply in full with all licensing and other standards required by Federal, State, County, City or Tribal statute, regulation or ordinance in which the service and/or care is provided for the duration of this agreement. Liability resulting from noncompliance with licensing and other standards required by Federal, State, County, City or Tribal statute, regulation or ordinance or through the Consultant's failure to ensure the safety of all individuals served is assumed entirely by the Consultant.

9.   ASSURANCE REQUIREMENTS:

The Provider agrees to abide by all applicable provisions of the following assurances: Lobbying Activity, Debarment and Suspension, Drug-Free Workplace,Executive Order

Agreement #:09-0800-_ _ _
Purchase Order #: 09SC08 3 CO 5 _ _

11246 Equal Employment Opportunity, Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, Section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, Drug Abuse Office and Treatment Act of 1972, Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, Age Discrimination Act of 1975, Americans with Disabilities Act of 1990, Pro-Children Act of 1994, Hatch Act, Health Insurance Portability and Accountability Act (HIPAA) of 1996, and Charitable Choice Provisions and Regulations.

10.  RETENTION AND INSPECTION OF RECORDS:

The Consultant agrees to maintain or supervise the maintenance of records necessary for the proper and efficient operation of the program, including records and documents regarding applications, determination of eligibility (when applicable), the provision of services, administrative costs, statistical, fiscal, other records, and information necessary for reporting and accountability required by the State. The Consultant shall retain such records for six years following termination of this agreement. If such records are under pending audit, the Consultant agrees to hold such records for a longer period upon notification from the State. Provided advance notice is given to Consultant, the State, through any authorized representative, will have access to and the right to examine and copy all records, books, papers or documents related to services rendered under this Agreement.

All payments to the Consultant by the State are subject to site review and audit as prescribed and carried out by the State. Any over payment of this agreement shall be returned to the State within thirty days after written notification to the Consultant.

All reports, recommendations, documents, drawings, plans, specifications, technical data and information, copyrights, patents, licenses, or other products produced as a result of the services rendered under this Agreement will become the sole property of the State. The State hereby grants the Consultant the unrestricted right to retain copies of and use these materials and the information contained therein in the normal course of the Consultant's business for any lawful purpose. Either the originals or reproducible copies satisfactory to the State, of all technical data, evaluations, reports and other work product of the Consultant shall be delivered to the State upon completion or termination of services under this Agreement.

11.  TERMINATION:

This Agreement may be terminated by either party hereto upon thirty (30) days written notice, and may be terminated by the State for cause at any time, with or without notice. Upon termination of this agreement, all accounts and payments shall be processed according to financial arrangements set forth herein for services rendered to date of termination.

Agreement #:09-0800-___
Purchase Order #: 09SC08 ̲3̲C̲C̲S̲

12. FUNDING:

This contract depends upon the continued availability of appropriated funds and expenditure authority from the Legislature for this purpose.  If for any reason the Legislature fails to appropriate funds or grant expenditure authority, or funds become unavailable by operation of the law or federal funds reduction, this Agreement will be terminated by the State.  Termination for any of these reasons is not a default by the State nor does it give rise to a claim against the State.

13. AMENDMENTS:

This Agreement may not be assigned without the express prior written consent of the State.  This Agreement may not be amended except in writing, which writing shall be expressly identified as a part hereof, and be signed by an authorized representative of each of the parties hereto.

14. CONTROLLING LAW:

This Agreement shall be governed by and construed in accordance with the laws of the State of South Dakota.  Any lawsuit pertaining to or affecting this Agreement shall be venued in Circuit Court, Sixth Judicial Circuit, Hughes County, South Dakota.

15. SUPERCESSION:

All other prior discussions, communications and representations concerning the subject matter of this Agreement are superseded by the terms of this Agreement, and except as specifically provided herein, this Agreement constitutes the entire agreement with respect to the subject matter hereof.

16. SEVERABILITY:

In the event that any provision of this Agreement shall be held unenforceable or invalid by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

17. NOTICE:

Any notice or other communication required under this Agreement shall be in writing and sent to the address set forth above.  Notices shall be given by and to the Division being contracted with on behalf of the State, and by the Consultant, or such authorized designees as either party may from time to time designate in writing.  Notices or communications to or between the parties shall be deemed to have been delivered when mailed by first class mail, provided that notice of default or termination shall be sent by registered or certified mail, or, if personally delivered, when received by such party.

Agreement #:09-0800-_ _ _
Purchase Order #: 09SC08 ̅3 ̅ ͻ̅⌐̅_

18. SUBCONTRACTORS:

The Consultant may not use subcontractors to perform the services described herein without express prior written consent form the State. The Consultant will include provisions in its subcontracts requiring its subcontractors to comply with the applicable provisions of this Agreement, to indemnify the State, and to provide insurance coverage for the benefit of the State in a manner consistent with this Agreement. The Consultant will cause its subcontractors, agents, and employees to comply with applicable federal, state and local laws, regulations, ordinances, guidelines, permits and requirements and will adopt such review and inspection procedures as are necessary to assure such compliance.

19. HOLD HARMLESS:

The Consultant agrees to hold harmless and indemnify the State of South Dakota, its officers, agents and employees, from and against any and all actions, suits, damages, liability or other proceedings which may arise as the result of performing services hereunder. This section does not require the Consultant to be responsible for or defend against claims or damages arising solely from errors or omissions of the State, its officers, agents or employees.

20. INSURANCE:

Before beginning work under this Agreement, Consultant shall furnish the State with properly executed Certificates of Insurance which shall clearly evidence all insurance required in this Agreement and which provide that such insurance may not be canceled, except on 30 days' prior written notice to the State. Consultant shall furnish copies of insurance policies if requested by the State.

a. Commercial General Liability Insurance:

Consultant shall maintain occurrence-based commercial general liability insurance or an equivalent form with a limit of not less than $1,000,000.00 for each occurence. If such insurance contains a general aggregate limit, it shall apply separately to this Agreement or be no less than two times the occurrence limit.

b. Business Automobile Liability Insurance:

Consultant shall maintain business automobile liability insurance or an equivalent form with a limit of not less than $0 for each accident. Such insurance shall include coverage for owned, hired, and non-owned vehicles.

c. Worker's Compensation Insurance:

Consultant shall procure and maintain workers' compensation and employer' liability insurance as required by South Dakota law.

Agreement #:09-0800-_ _ _
Purchase Order #: 09SC08 3602

d. Professional Liability Insurance:

Consultant agrees to procure and maintain professional liability insurance with a limit not less than $1,000,000.00.

Consultant agrees to report to the State any event encountered in the course of performance of this Agreement which results in injury to any person or property, or which may otherwise subject Consultant, or the State of South Dakota or it officers, agents or employees to liability. Consultant shall report any such event to the State immediately upon discovery.

21. CERTIFICATION REGARDING DEBARMENT, SUSPENSION, INELIGIBILITY, AND VOLUNTARY EXCLUSION:

Consultant certifies, by signing this agreement, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

22. CONFLICT OF INTEREST

Provider agrees to establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal organizational conflict of interest, or personal gain.

23. REPORTING PROVISION

Consultant agrees to report to the State any event encountered in the course of performance of this Agreement which results in injury to any person or property, or which may otherwise subject Consultant, or the State of South Dakota or it officers, agents or employees to liability. Consultant shall report any such event to the State immediately upon discovery.

Consultant's obligation under this section shall only be to report the occurrence of any event to the State and to make any other report provided for by their duties or applicable law. Consultant's obligation to report shall not require disclosure of any information subject to privilege or confidentiality under law (e.g., attorney-client communications). Reporting to the State under this section shall not excuse or satisfy any obligation of Consultant to report any event to law enforcement or other entities under the requirements of any applicable law.

24. AUTHORIZED SIGNATURES: In witness hereto, the parties signify their agreement by affixing their signatures hereto.

_____          _____

Consultant Signature                                                        Date

Agreement #:09-0800-_ _ _
Purchase Order #: 09SC08 _____

_____   _____
Consultant Signature                Date

_____   _____
State - DSS Division Director Larry Iversen   Date

_____   _____
State – DSS Chief Financial Officer Brenda Tidball-Zeltinger   Date

_____   _____
State - DSS Secretary Deborah K. Bowman   Date


CONTRACT DESCRIPTION CODE: _____
STATE VIN NUMBER: _____

State Agency Coding:

| Company | 1000 (50%) | 2004 (50%) | | |
|---|---|---|---|---|
| Account | 5204330 | 5204330 | | |
| Center Req | 0831100 | 0831100 | | |
| Center User | 50194 | 50194 | | |
| Dollar Total | $135,000 | $135,000 | | |
| SVC PO Code | | | | |

DSS Program Contact Person  Mike Jockheck
                    Phone  605-773-3495

DSS Fiscal Contact Person  Patty Hanson
                   Phone  605 773-5191

Consultant Program Contact Person _____
                           Phone _____

Consultant Fiscal Contact Person _____
                          Phone _____
        Consultant Email Address _____

SDCL 1-24A-1 states that a copy of all consulting contracts shall be filed by the State agency with the State Auditor within five days after such contract is entered into and finally approved by the contracting parties. For further information about consulting contracts, see the State Auditor's policy handbook.

Revised 03/08                    7

ATTACHMENT 1

**DSS**
**Strong Families - South Dakota's Foundation and Our Future**

**DEPARTMENT OF SOCIAL SERVICES**
DIVISION OF MEDICAL SERVICES
700 GOVERNORS DRIVE
PIERRE, SD 57501-2291
PHONE: 605-773-3495
FAX: 605-773-5246
WEB: dss.sd.gov

May 16, 2008

Re:  Request for Proposal

The South Dakota Department of Social Services, Division of Medical Services is seeking proposals from entities interested in providing State Maximum Allowable Cost (SMAC) prescription drug pricing data.

History:

The South Dakota Medical Assistance Program implemented State Maximum Allowable Cost (SMAC) pricing in 2002.  Current SMAC pricing is implemented for drugs that are widely and consistently available to South Dakota pharmacies at a price that is less than the average wholesale price.  The maximum allowable price for each drug is based on the cost at which the drug is available to South Dakota pharmacy providers.

Proposal Requirements:

o  Section explaining the qualifications and experience of the entity in providing SMAC pricing data.
o  Section explaining the methodology used in developing the SMAC pricing.  Any proprietary information must be marked as such.  Proprietary information will not be made public.
o  Cost section will include monthly cost proposals for possible one, two, and three-year contract durations.
o  If submitted electronically, the proposal must be a Microsoft Word document.
o  Length of proposal is to be no more than four pages.

Level of Service Requirements:

o  SMAC pricing list will include prescription and program covered over-the-counter products.
o  SMAC pricing list will be provided at least monthly to the Division of Medical Services.
o  SMAC pricing list will be provided in an Excel (.xls) format.
o  Entity will develop and support a website that lists all SMAC reimbursed drugs with corresponding SMAC price.  Website must be updated to remain current to pricing.
o  Entity will have professional level staff available to field SMAC inquiries from Division of Medical Services staff.  Response to the inquiries must be received within two business days.
o  Entity must be able to respond to urgent pricing issues, and resulting pricing changes, and provide an updated file within five business days.

Proposal Timeframes:

- o   Questions regarding this request must be received in writing by May 28, 2008.
- o   Response to all questions will be sent by May 30, 2008.
- o   Proposals are due to the Division of Medical Services by close of business on June 6, 2008.

All inquiries and proposals are to be addressed to:

Mike Jockheck, RPh
Pharmacy Consultant
Division of Medical Services
Department of Social Services
700 Governors Drive
Pierre, SD 57501

Questions and proposals may be emailed to mike.jockheck@state.sd.us

*Attachment a*



3025 Windward Plaza, Suite 200
Alpharetta, GA 30005
Telephone:  770-776-2008
Facsimile:  770-776-2050
www.sxc.com

June 6, 2008

<u>Sent Via Electronic Mail to</u>
<u>mike.jockheck@state.sd.us</u>

Mike Jockheck, R.Ph.
Pharmacy Consultant
Division of Medical Services
South Dakota Department of Social Services
700 Governors Drive
Pierre, SD 57501

Re: Request for Proposal for State Maximum Allocable Cost (SMAC)

Dear Mr. Jockheck:

SXC Health Solutions, Inc. (SXC) appreciates the opportunity to submit our response to the South Dakota Department of Social Services, Division of Medical Services, RFP for State Maximum Allowable Cost (SMAC) prescription drug pricing data.

SXC is the premier technology and drug benefit services provider for pharmacy benefit/management solutions for public sector programs, including State Medicaid and Federal Government programs, pharmacy benefit managers (PBMs), retail and independent pharmacies, and other drug benefit programs. We are the "power" behind many of the largest PBMs in the industry; in fact over 100 million Americans' pharmacy needs are currently met by SXC's services and systems. Additionally, SXC's pharmacy point-of-sale claims adjudication systems are in use in 14 State Medicaid Fee-for-Service (FFS) pharmacy programs (Washington State will be the fifteenth and South Dakota will be number sixteen); additionally, SXC processes pharmacy claims for more than 3 million managed Medicaid recipients. In designing technical solutions for customers, SXC focuses not only on exceeding minimum technical requirements, but remaining keenly aware of the relationship that exists among business needs and processes that drive technology, the technology itself *and* the stakeholders who interact with that technology on a daily basis. Specific to the needs of the South Dakota SMAC program, SXC has the qualified professional staff to field SMAC inquiries, to respond to urgent pricing issues and resulting pricing changes, to develop websites and support processes and procedures, in addition to extensive experience in both the development and mangement of MAC lists for other customers.

Thank you for your consideration of our response. As Senior Vice President, Public Sector and Resident Care Management, I personally assure you that SXC is fully dedicated to providing an innovative, low-risk, economical, and responsive SMAC Program that offers best value to South Dakota.

If you have any questions, please feel free to contact me in any of the following ways:

Mail:          3025 Windward Plaza, Suite 200, Alpharetta, GA 30005
Telephone:     770-776-2008
Cell:          630-300-4407
Facsimile:     770-776-2050
E-Mail:        dan.hardin@sxc.com

Sincerely,

*Dan Hardin*

Dan Hardin, R.Ph., M.B.A.
Senior Vice President,
Public Sector and Resident Care Management
SXC Health Solutions, Inc.

*South Dakota State Maximum Allowable Cost (SMAC)*

Request for Proposal                    **Proprietary and Confidential**

**DSS**
Strong Families – South Dakota's Foundation and Our Future

# Qualifications and Experience

Section explaining the qualifications and experience of the entity in providing SMAC pricing data

SXC Health Solutions, Inc. (SXC) is an industry leader in the design and management of MAC programs. We have the requisite professional and technical background and experience that matches directly to the objectives of the South Dakota SMAC program. Our history provides evidence of well-honed functional skills in those very areas required for successful performance of this program. It is a history that articulates an organizational culture and philosophy shaped by extensive experience servicing government-sponsored programs.

Maximum Allowable Cost (MAC) lists are utilized by many State Medicaid agencies as an effective cost savings measure. These lists, when utilized by Fee-for-Service (FFS) State Medicaid programs are typically referred to as State Maximum Allowable Cost (SMAC) programs.   In general, SMAC programs have demonstrated the ability to make significant contributions to pharmacy program savings by (1) encouraging pharmacies to dispense generics rather than brand name products, (2) directly limiting the reimbursement for the generic products listed, and (3) requiring pharmacies to become more fiscally responsible when selecting generic products. The rationale behind MAC lists is simple – once a brand name product loses patent protection and equivalent generic products enter the market, that drug becomes a commodity. Once a commodity status has been reached, *there is nothing to distinguish the various available products other than price.* As a result, the State (and its recipients) garners no value (either economic or clinical) in utilizing a more expensive product (brand or generic equivalent) of the drug.

SXC has the experience required to effectively manage SMAC programs from our understanding of the factors that contribute to a program's success. Through the development and management of our own proprietary MAC list, SXC understands that it is vitally important to create a SMAC list that not only encompasses a large number of products, but contains products that represent significant utilization to the customer. In general, the larger the MAC list, the better. However, utilization of the drugs contained on the list are equally important. Since utilization of the drugs dramatically affects savings, it is critical to ensure that the generic drugs utilized most frequently by the State's recipients are included in the SMAC list. Further, SXC understands that SMAC pricing must be established at a point where providers are incentivized to dispense generic products. Since Medicaid programs are operated in a political environment in which providers are stakeholders, the methodology employed in constructing the SMAC list must be sound in order to validate the appropriateness of the program as well as respond to inquiries from providers.

SXC currently administers our own proprietary MAC list, as well as over 25 customized MAC/SMAC lists in support of FFS Medicaid, managed Medicaid, Medicare Part D, and commercial customers. The base SXC MAC List includes over 48,500 generic National Drug Codes (NDCs) and over 1,100 different Generic Products (single drug, strength, and dosage form). This base list delivers a generic effective discount of AWP MINUS 58% to 62%. Depending on the options chosed by South Dakota, SXC has the capability to provide various options in the management and further development of the State's SMAC Program. The State has the option of utilizing the base SXC MAC List "as is" or utilizing SXC's Provider Relations department as a resource to assist in customization of the SXC base MAC list to meet the unique needs of the State. Should the State desire, SXC can "inherit" the current SMAC program and employ the selection criteria and price calculation methodologies that are currently being utilized. Regardless of the option, SXC provides a comprehensive service offering meeting the State's needs.

## MAC Experience
SXC has utilized our customized MAC for a State Medicaid FFS customer with similar covered lives to that of the South Dakota recipient population. Over the past five quarters, the following results have been realized:

| Quarter | Percent Discount From AWP | Savings |
|---------|---------------------------|---------|
| 1Q07 | 60.76% | $23.7M |
| 2Q07 | 66.89% | $26.2M |
| 3Q07 | 69.04% | $27.7M |
| 4Q07 | 76.75% | $35.8M |
| 1Q08 | 78.07% | $39.3M |

For this analysis, claims that were priced at MAC were extracted. The AWP unit cost was applied to the units dispensed. The actual cost was compared to the cost that would have priced at AWP. The result reflected a percentage discount off AWP and resulted MAC savings.

Below, we have provided specific examples regarding our experiences in developing, implementing, and monitoring a customer-specific MAC program.

*Georgia Medicaid FFS* – current list can be viewed at
https://www.ghp.georgia.gov/wps/output/en_US/public/Provider/PharmacyServices/20080401_GMAC.pdf
SXC serves as the pharmacy benefit manager for the FFS Medicaid program in Georgia. As part of our responsibilities, SXC manages the State's SMAC program. The State utilizes a customized version of the base SXC MAC List that excludes



*South Dakota State Maximum Allowable Cost (SMAC)*
Request for Proposal                    Proprietary and Confidential

**DSS**
Strong Families – South Dakota's foundation and our future

items such as some over-the-counter products, devices, covered prescription iron products and multivitamins but includes non-drug items such as spacers and peak flow meters. SXC is responsible for providing quarterly recommendations to the State. The recommendations are based on research conducted by SXC and involve drug additions and deletions (with appropriate rationale) as well as pricing increases and decreases. SXC also provides the State with intra-quarter recommendations when market circumstances dictate such as the generic release of a blockbuster drug or a change in the availability of a generic product.

*Med Metrics Health Partners/Vermont Medicaid FFS*
Med Metrics Health Partners serves the FFS Medicaid program in Vermont. When this customer came on board with SXC, the decision was made to combine the base SXC MAC List and the customer's existing MAC list, supplied by their previous vendor. The rules for the new custom SMAC list allowed calculation of SMAC pricing to be the lower of the base SXC MAC or the customer's existing SMAC. The existing SMAC was only available in an alphabetical list, so SXC assisted in the creation of a new file format that could be utilized by SXC's claims processing system to process claims. SXC spent many hours prior to the beginning of January 1, 2006 comparing the customer SMAC to the SXC MAC. A final combination custom SMAC list resulted from these efforts.

*University of Michigan Prescription Drug Plan* – annual report can be viewed at
http://www.umich.edu/~benefits/forms/2006U-MDrugPlanAnnualReport.pdf
In CY2006, the University of Michigan (UofM)contracted its Prescription Drug Plan administration with SXC. The UofM began utilizing SXC's MAC pricing for generic drugs at retail pharmacies and at Walgreens Mail Service. Anticipated savings under the SXC agreement was initially estimated at approximately $1.5 million. Once CY 2006 was completed, the UofM performed additional analyses and revealed that the additional discounts resulted in as much as $4.5 million in total savings as compared with their prior vendor, based on an annual drug spend of $74 million.

## Methodology

Section explaining the methodology used in developing the SMAC pricing. Any proprietary information must be marked as such. Proprietary information will not be made public.

The SXC MAC unit pricing methodologies vary based on the marketplace characteristics of a particular drug – but in general look at number of product lines available and at the range of acquisition prices for those products, and through a series of algorithms, arrives at a MAC price for a drug product. SXC's proprietary MAC list is designed to provide a reimbursement rate to pharmacies that encourages generic dispensing and product substitution by the pharmacies while achieving competitive discounts and cost controls on generically available drug products.

While the formulas employed by SXC to establish MAC pricing are proprietary, SXC can provide the logic and processes that have been employed to calcuate the prices. In general, the following methodologies/logical steps are applied.

- First, the final selection of drug products is made. Acquisition prices are obtained from wholesalers, retailers, and the Medispan drug file. These prices flow into SXC and are identified with a date received and a source code. The most recent prices obtained for each drug are extracted and organized by generic drug name/strength/dosage form (for all NDCs available, excluding unit dose). Unit dose products are excluded as they generally are not dispensed in a retail pharmacy setting and are more expensive per unit due to their specialized packaging.

- Second, average wholesale prices, and average sell prices are examined for each of the drugs in question, when dispensed for a 30 day supply at the recommended dose. Through a series of proprietary algorithms, the MAC price for each generic drug/strength/dosage form is determined. The MAC price is then applied across all package sizes available, but is structured to ensure that the profit to the pharmacist to dispense the generic product is higher than that associated with dispensing the brand product. This strategy provides pharmacists with an incentive to dispense generic products as well as to make recommendations to prescribers that they substitute brand products with generic therapy alternatives. When required, MAC pricing is applied at the NDC level to allow for different pricing for different package sizes.

SXC's MAC List is available in two forms: a file layout that exists in the claims processing system that is utilized in the adjudication process (that can be delivered as an Excel file) and as a reference list for South Dakota, providers, and the provider relations department. The file against which claims are adjudicated is essentially a pricing file. Each price line has a begin and end date assigned in order to allow the most accurate adjudication based upon the date of service, not the date of adjudication. The SXC MAC file accommodates an unlimited number of pricing segments per drug entity. The MAC list is updated on a monthly schedule with ad hoc updates to particular drug entities as required.

The following paragraphs provide the State with more detail regarding SXC's approach to constructing and maintaining its base MAC List.

### Drug Selection Criteria
In general, a drug is considered for inclusion on the base SXC MAC List based on numerous factors including relative cost of the brand and generic versions, when identified as a generic product, availability from more than one source, has A-rated generic formulations available, and is utilized at a frequency which merits its inclusion on a list. Maintaining MAC pricing



that is current is a critical as well as labor intensive process. A list that includes a MAC price for every generic available on the market is not necessarily more effective, and is less efficiently maintained than one which consists of those drugs that are being utilized by a given population. It is especially important that generic drugs are classified appropriately in order to avoid provider relations issues secondary to less than ideal reimbursement. Conversely, missed opportunities in qualifying a medication as a generic also result in missed savings.

Generic status and identification methodology are keys to providing a sound MAC list. Reliance on a single indicator, such as GPI (Generic Price Indicator), GTI (Generic Therapeutic Indicator) or IC (innovator code) does not accurately identify all drugs correctly. For example, when a drug first becomes available as a generic product, it's GPI is often designated as "2" (Priced as a brand) due to the fact that the unit AWP of the newly released generic is close enough to the brand product AWP. SXC utilizes a defensible, sophisticated and comprehensive methodology for determining the generic status of a medication, that employs multiple indicators available from Medi-span in order to accurately identify drugs as brand, generic, or multi-source. These indicators are updated weekly.

Following the above steps ensures that pharmacists are able to work within the SMAC pricing schema.

### Frequency of MAC Updates
Frequent market changes, particularly in pricing and availability, necessitate diligent monitoring of acquisition cost. In order to operate at maximum efficacy, MAC lists should be updated as often as the pharmacy claims processing system permits. This ensures the most correct pricing at any given moment and secures provider cooperation and satisfaction. Pricing data received from Medispan is updated weekly, while additional acquisition pricing is updated monthly. At a minimum of every month or more frequently if market changes require (e.g., drug shortages, recalls), SXC completes a review of the acquisition cost and MAC price for *every* product on the MAC list. During this review, SXC also checks for product deletions, suspensions and new drug additions. MAC pricing files are refreshed utilizing pricing methodology algorithms to systematically re-calculate and update the MAC list storing historical begin and end dates for each iteration of the MAC price. A new South Dakota SMAC file is created from this update routine. The new South Dakota MAC file is provided to South Dakota. Changes to prices are accommodated using an end date for the prior record and a new pricing segment/begin date for the new price record. Concurrent to this process, a new South Dakota SMAC file is produced and uploaded to the website.

Should market conditions require, SXC has in place processes to update SMAC pricing within one business day. SXC monitors market changes through a variety of methods. SXC continuously monitors the ASHP and FDA websites regarding drug shortages. As a fail-safe method, we also receive regular communications from pharmacies and wholesalers when a generic product becomes backordered. Additionally, all pricing data (acquisition price, AWP, etc.) is obtained and examined for each generic drug name/strength/dosage form as part of the monthly update process.

Any time that a SMAC pricing change is recommended, South Dakota will be provided with the proposed changes and asked to approve them. This includes monthly changes, based on updated pricing data, as well as ad hoc changes that are initiated per marketplace changes.

### Website
Historically, SXC has successfully leveraged the Internet as an important resource for connecting individuals to the information they need to conduct business. As such, SXC excels in the marketplace in delivering an array of both informational content as well as functional and interactive online applications. SXC takes great pride in the comprehensive, informative, and user-friendly web sites available to our customer. The general purpose and objectives for deploying web-based systems and user sites are to centralize user access through portal connectivity and to make information retrieval more simplistic and efficient. The website provides a view into the State's program functions and features and can be branded with any look and feel desired. Navigation elements and page titles are customizable, and images, icons, colors, fonts and page sizing are all easy to adjust to South Dakota's specifications.

### Ongoing Quality Assurance of MAC Pricing
SXC understands the importance of ongoing quality assurance initiatives, especially as they pertain to issues that affect payment to providers, as accurate payment to pharmacies helps to secure relationships with providers and ultimately impacts the services that the State's recipients receive. The internal procedures followed at SXC prior to implementation and utilization of a MAC list include regular updates, manual file review by clinical and analytics personnel, and South Dakota review and sign-off.

However, it is still possible that the provider community is in disagreement with posted SMAC pricing. When a discrepancy is reported by a provider, a formal quality assurance process is initiated. The drug/strength/dosage form, current SMAC price, and detailed issue is recorded by SXC personnel. This information is forwarded to the Provider Services Team who verify/validate the SMAC against current acquisition pricing through application of the algorithm logic. Investigation into the availability of the drug is conducted. A final disposition is made and the provider is contacted with an explanation of findings. Should investigation warrant a change to the SMAC list, the State is contacted first, and after approval, the appropriate change is made to the SMAC list.



South Dakota State Maximum Allowable Cost (SMAC)
Request for Proposal                    Proprietary and Confidential

**DSS**
Strong Families – South Dakota's Foundation and Our Future

## Cost Section

Cost section will include monthly cost proposals for possible one, two, and three-year contract durations.

<u>One-year contract duration</u>
- $7,916.67 monthly
- $95,000 annually
- Total contract value $95,000.00

<u>Two-year contract duration</u>
- $7,708.33 monthly
- $92,500 annually
- Total contract value $185,000.00

<u>Three-year contract duration</u>
- $7,500.00 monthly
- $90,000 annually
- Total contract value $270,000.00