# Exhibit 41

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

In Re: PHARMACEUTICAL INDUSTRY       )

AVERAGE WHOLESALE PRICE LITIGATION   )

----------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:            ) Master File No.

United States of America ex rel.     ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,      )

Inc., et al. v. Dey, Inc., et al.,   )

Civil Action No. 05-11084-PBS,       ) Hon. Patti B.

and United States of America ex      ) Saris

rel. Ven-A-Care of the Florida       )

Keys, Inc., et al. v. Boehringer     )

Ingelheim Corp., et al., Civil       )

Action No. 07-10248-PBS              )

----------------------------------X

VIDEOTAPED DEPOSITION OF

THE RHODE ISLAND DEPARTMENT OF HUMAN SERVICES

by JOHN YOUNG

Providence, Rhode Island

Wednesday, December 3, 2008

```
                                                            Page 2
 1                   A P P E A R A N C E S
 2
 3    On behalf of Boehringer Ingelheim Corp. and Roxane
 4    Laboratories:
 5
 6              SARA K. RANKIN, ESQ.
 7              Kirkland & Ellis LLP
 8              200 East Randolph Drive
 9              Chicago, IL  60601
10              312-861-3486
11              srankin@kirkland.com
12
13
14    On behalf of the United States of America:
15
16              BARBARA HEALY SMITH, ESQ.
17              Assistant United States Attorney
18              United States Courthouse
19              1 Courthouse Way, Suite 9200
20              Boston, MA  02210
21              617-748-3272
22              barbara.h.smith@usdoj.gov
```

1   BY MS. RANKIN:
2        Q.   Okay.  So is it fair to say then that
3   there may have been some profit margin on the
4   ingredient cost side that was subsidizing the
5   dispensing fee, the inadequacy of the dispensing
6   fee?
7             MS. BAUM:  Objection.
8             MS. SMITH:  Objection.
9             THE WITNESS:  I really can't conjecture
10  what a provider's logic for participation would
11  be.  I think that there are many factors
12  including the total price paid, the attraction in
13  the case of retail pharmacists for collateral
14  business that extended beyond the prescription.
15  BY MS. RANKIN:
16       Q.   When you say totality, that the
17  totality of the reimbursement must have been
18  adequate, we've acknowledged that there's two
19  components to the reimbursement, right, the
20  ingredient cost, and the dispensing fee, right?
21       A.   Correct.
22       Q.   And you've said that you had the

1        Q.    And did that happen at any time during
2   your tenure as a result to a change in the
3   reimbursement methodology?
4        A.    Not to my knowledge, no.
5        Q.    And did that happen during your tenure
6   as far as, you know, in response to provider
7   complaints that the dispensing fee was too low?
8             MS. RANKIN:   Objection to the form.
9             THE WITNESS:   It did not.
10  BY MS. SMITH:
11       Q.    And I believe you said that your
12  primary concern in discussion of various
13  proposals in connection with the Medicaid
14  Modernization Act and proposals for changing
15  reimbursement between generics versus brand, I
16  believe you said you wanted transparency.  Did I
17  get that down correctly?
18       A.    That's correct.
19       Q.    What did you mean by transparency?
20       A.    Speaking for myself and perhaps
21  speaking for my colleagues in other states, I
22  think we were all looking for an independently

e56b5548-1f6a-4f27-a21d-46b66f77af45

1   verifiable file of data that described
2   appropriate pharmaceutical pricing to end the
3   guesswork around varying pricing strategies or
4   adopted by different states at different times
5   such that if CMS wanted to adopt a price schedule
6   for legend and branded drugs that it felt were
7   appropriate given that their resources are
8   substantially greater than any of the states
9   individually, that that simply would be the most
10  straightforward way of adjudicating claims.
11         Q.   And what was your understanding about
12  how transparent the current system was, is.  I'll
13  start over.
14              What was your understanding of how
15  transparent the system was based on the price
16  reporting to the three pricing compendia and
17  states in turn using those as a basis for
18  reimbursement?
19              MS. RANKIN:  Objection to the form.
20  Foundation.
21              THE WITNESS:  My impression of at least
22  the two that I'm most familiar with, that being

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008
                         Providence, RI

Page 238

1   AWP and WAC, as supported, provided to us by the
2   source we subscribe to, was that it was subject
3   to certainly some level of variability from
4   publishing to publishing; that there would be
5   differences in interpretation of what a value
6   meant manufacturer to manufacturer; and that, as
7   I have testified earlier, that it was never clear
8   to me that it adequately described the impact of
9   trade discounts and other trade or procurement
10  considerations that may have been offered to
11  different parties at different times.  But it was
12  the best available source we had.
13  BY MS. SMITH:
14       Q.   When you were Medicaid Director, did
15  you ever have conversations with any
16  representatives of Abbott, Dey, or Roxane or
17  Boehringer in which they informed you that their
18  reported prices were inflated?
19           MS. RANKIN:  Objection, leading; and
20  asked and answered.
21           MS. SMITH:  It is an open ended.  Did
22  you ever have conversations?

Page 239

1           MS. RANKIN: That's been asked and
2   answered.  He said he never spoke with any of the
3   representatives of the defendants before.
4           MS. SMITH: I'm asking for very
5   specific conversation, Counsel.
6   BY MS. SMITH:
7       Q.  Did you ever have a conversation with a
8   representative from any of the defendant
9   companies in which they reported to you that
10  their reported prices were inflated?
11      A.  No.
12      Q.  Did you ever inform in a conversation
13  or otherwise any of the defendant companies that
14  you were aware of their reporting of inflated
15  prices to the compendia?
16          MS. RANKIN: Objection to the form.
17          THE WITNESS: No.
18  BY MS. SMITH:
19      Q.  Has there ever been a policy
20  articulated by your agency to allow manufacturers
21  to set the estimated acquisition cost
22  reimbursement at something that would suit their

1    marketing strategies?
2            MS. RANKIN:  Objection to the form,
3    leading.
4            THE WITNESS:  I don't believe so.
5    BY MS. SMITH:
6        Q.   To your knowledge, did Rhode Island
7    have a practice of intending to make up for
8    inadequate dispensing fees by paying inflated
9    ingredient reimbursement?
10           MS. RANKIN:  Objection to the form,
11   leading.
12           THE WITNESS:  No, we did not.
13   BY MS. SMITH:
14       Q.   Did any of the defendant pharmaceutical
15   manufacturers ever inform you that they believed
16   Rhode Island's dispensing fee was too low?
17       A.   Not to the best of my recollection, no.
18       Q.   Or that they were reporting higher
19   prices so that the state would pay more in
20   reimbursement to balance out too low dispensing
21   fee?
22           MS. RANKIN:  Objection to the form.