# Exhibit 42

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

In Re: PHARMACEUTICAL INDUSTRY        )

AVERAGE WHOLESALE PRICE LITIGATION )

---------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:             ) Master File No.

United States of America ex rel.      ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,       )

Inc., et al. v. Dey, Inc., et al.,    )

Civil Action No. 05-11084-PBS,        ) Hon. Patti B.

and United States of America ex       ) Saris

rel. Ven-A-Care of the Florida        )

Keys, Inc., et al. v. Boehringer      )

Ingelheim Corp., et al., Civil        )

Action No. 07-10248-PBS               )

---------------------------------X

VIDEOTAPED DEPOSITION OF

THE RHODE ISLAND DEPARTMENT OF HUMAN SERVICES

by PAULA AVARISTA

Providence, Rhode Island

Thursday, December 4, 2008

```
                                                              Page 2
 1                    A P P E A R A N C E S

 2

 3    On behalf of Boehringer Ingelheim Corp. and Roxane

 4    Laboratories:

 5

 6              SARA K. RANKIN, ESQ.

 7              Kirkland & Ellis LLP

 8              200 East Randolph Drive

 9              Chicago, IL  60601

10              312-861-3486

11              srankin@kirkland.com

12

13

14    On behalf of the United States of America:

15

16              BARBARA HEALY SMITH, ESQ.

17              Assistant United States Attorney

18              United States Courthouse

19              1 Courthouse Way, Suite 9200

20              Boston, MA  02210

21              617-748-3272

22              barbara.h.smith@usdoj.gov
```

Page 120

1    Q.   When you say with pricing, what do you
2  mean?
3    A.   What the pharmacists were buying the
4  drugs at the time when it was first introduced
5  probably in the early '70s or whatever, that was
6  an average price is what the average was at the
7  time.  Over the years I think it has changed.
8    Q.   When did your understanding that AWP
9  did not reflect a proxy for the actual cost for
10 the drug paid by the pharmacy change?
11   A.   1990.
12   Q.   In 1990?
13   A.   Yes.
14   Q.   And in 1990 is that when you had some
15 understanding that AWP was the manufacturer's
16 suggested price, which generally is higher than
17 the actual cost of the drug paid by the pharmacy?
18   A.   Right.  That's when the understanding
19 was that it was not in line any longer with the
20 purchase price.
21   Q.   And does 1990 also the point at which
22 you understood that pharmacies typically purchase

1   drug products at prices much less than AWP?
2           MS. BAUM:  Objection, form of the
3   question, foundation.
4           MS. SMITH:  Objection.
5           MS. BAUM:  You can answer.
6           THE WITNESS:  Okay.  We knew that it
7   was not what they purchased it at.  Didn't know
8   how much it wasn't, but we know that it wasn't
9   exactly.  And other states were paying less at
10  the time.
11  BY MS. RANKIN:
12      Q.  Did you have an understanding from 1990
13  on, that average wholesale price was higher than
14  actual acquisition cost?
15      A.  Yes.
16      Q.  I am sorry?
17      A.  Yes.  I am sorry.
18      Q.  And that was your understanding
19  consistently from 1990 to the present?
20      A.  Yes.
21          MS. BAUM:  If you could just let
22  counselor --

Page 135

1    except for the rebates and discounts than AWP; is
2    that correct?
3         A.   Yes.
4         Q.   Did that understanding change over
5    time?
6         A.   It's beginning to, yes.
7         Q.   It is beginning to currently?
8         A.   Yes.
9         Q.   When you submitted the proposal in
10   1995, we talked about the Exhibit B which showed
11   actual acquisition costs for pharmacies for
12   certain drugs and showed the WAC.  And I believe
13   you also testified that you would be concerned
14   about using actual acquisition cost as an
15   ingredient cost for reimbursement because it may
16   be too low.  Is that fair to say was your
17   previous testimony?
18        A.   Yes.
19        Q.   And so the decision was made by Rhode
20   Island Medicaid not to use actual acquisition
21   cost as the basis, as the ingredient cost
22   reimbursement basis in favor of WAC, a WAC-based

1  methodology; is that right?
2           MS. BAUM:  Objection, foundation.
3           MS. SMITH:  Objection.
4           THE WITNESS:  Actual acquisition cost
5  varies between pharmacies, so the Wholesale
6  Acquisition Costs was more of a general average
7  of all the pharmacies because they all cannot
8  purchase at the same price.  What actual for one
9  may be a lot less for another or more for
10 another.  So to use the actual acquisition cost,
11 which would be very difficult to obtain, would
12 not necessarily be equal for everybody.  So the
13 Wholesale Acquisition Cost was an average of all
14 the companies, so it would be more easily to, if
15 that was available to us and it would be more
16 reflective of the general price.
17 BY MS. RANKIN:
18      Q.   But you clearly had actual acquisition
19 cost available to you in Exhibit B for some
20 drugs.  Did you make any effort to incorporate
21 those actual acquisition costs into the
22 reimbursement algorithm for those drugs?

```
 1        A.    No.
 2        Q.    Why not?
 3        A.    That was only one -- that was only one
 4   wholesaler and how that one wholesaler sold their
 5   drugs.  Other wholesalers might sell it
 6   differently or direct prices differently or chain
 7   drug stores buy it differently.  So using that
 8   actual acquisition cost could only be maybe for
 9   that particular manufacturer, wholesaler.
10   Doesn't mean everybody's reflected that way.  So
11   the Wholesale Acquisition Cost gave us an average
12   of what everybody was purchasing for.
13        Q.    Are you familiar with the claim form
14   that's used by Medicaid providers to submit
15   claims for Medicaid reimbursement for pharmacies?
16        A.    Through Rhode Island Medicaid?
17        Q.    Uh-hum.
18        A.    It is electronically and we also have a
19   paper claim form, yes.
20        Q.    Are you familiar with the paper claim
21   form?
22        A.    Yes, I am.
```

Page 211

1  so one of the three, in 99 percent of the time,
2  is available.
3      Q.   Are you familiar with CMS' policy that
4  determination of a dispensing fee should be
5  separate and distinct from determination of the
6  Estimated Acquisition Cost?
7           MS. RANKIN:  Objection to the form and
8  foundation.
9           THE WITNESS:  Yes.
10 BY MS. SMITH:
11     Q.   Is Rhode Island State Plan Amendment
12 consistent or inconsistent with that policy?
13          MS. RANKIN:  Objection to the form.
14          THE WITNESS:  It is consistent.
15 BY MS. SMITH:
16     Q.   To your knowledge, when on the three
17 occasions when Rhode Island changed its State
18 Plan to change the reimbursement methodology for
19 prescription drugs, was there any -- was the
20 determination to change the reimbursement
21 methodology based at all on the cost of
22 dispensing drugs?

1   Rhode Island Medicaid pharmacy program to
2   investigate the accuracy of the published prices?
3           MS. RANKIN:  Objection to the form and
4   foundation.
5           THE WITNESS:  Not with the current
6   staff, no, it would be impossible.
7   BY MS. SMITH:
8       Q.   Did representatives from any of the
9   defendant companies ever come to you to suggest
10  that they were reporting inflated AWPs or WACs so
11  that the state of Rhode Island would pay a little
12  more for ingredients and it would make up for a
13  dispensing fee that they believed was too low?
14          MS. RANKIN:  Objection to the form.
15  Foundation, leading.
16          THE WITNESS:  No.
17          MS. SMITH:  Wait until she's finished.
18          THE WITNESS:  I'm sorry.
19          MS. SMITH:  We're going to take a two-
20  minute break to change the tape.
21          VIDEOGRAPHER:  Time is 1:54.  This ends
22  cassette number 2.  We are going off the record.

Page 217

1      Q.    Would that be possible on a regular
2  basis?
3            MS. RANKIN:  Same objections.
4            THE WITNESS:  No.  No.
5  BY MS. SMITH:
6      Q.    Has it ever been the policy of Rhode
7  Island Medicaid agency or pharmacy program to use
8  a little extra reimbursement on the ingredient
9  cost to make up for a deficit in dispensing fee?
10           MS. RANKIN:  Objection to the form,
11 foundation, leading.
12           THE WITNESS:  No.
13 BY MS. SMITH:
14     Q.    I believe you testified earlier that
15 your understanding of reported Wholesale
16 Acquisition Costs or WAC is that it was more of
17 an average for all companies of their acquisition
18 costs?
19     A.    All pharmacies.
20           MS. RANKIN:  Objection to the form.
21 BY MS. SMITH:
22     Q.    I'm sorry.  Do you remember that