# Exhibit 46

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
|       v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - -

        Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

        MENTAL HYGIENE BY JOSEPH L. FINE

                                Baltimore, Maryland

                                Tuesday, December 9, 2008

                                9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

Page 2

Videotaped deposition of THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND MENTAL HYGIENE BY JOSEPH L. FINE, held at the law offices of Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Room C-111, Baltimore, Maryland, the proceedings being recorded stenographically by Jonathan Wonnell, a Registered Professional Court Reporter and Notary Public of the State of Maryland, and transcribed under his direction.

Page 104

1    complaints over both the validity of the IG estimates
2    (the report exaggerated somewhat the discrepancies in
3    prices) and its failure to recognize that many states
4    have deliberately held down dispensing fees as a quid
5    pro quo for known 'fat' in published wholesale
6    prices."  Do you see that?
7        A.   Yes.
8        Q.   Do you recall, Mr. Fine, criticisms of the
9    OIG's work for failure to recognize that states had
10   deliberately held down dispensing fees as a quid pro
11   quo for known fat of published wholesale prices?
12           MR. DAVIS:  Objection, form.
13           MS. YAVELBERG:  Objection, form.
14       A.   What I do know is that the State of
15   Maryland separated the cost of a drug and the
16   dispensing fee and did not consider dispensing fees
17   and the differential in purchasing cost from the
18   wholesale price in setting their upper limits for
19   payment.
20       Q.   Is it your testimony, Mr. Fine, on behalf
21   of the department that Maryland has never considered a
22   potential inadequacy of dispensing fees in what it has

Page 105

1  paid for ingredient cost?  Would that be your
2  testimony?
3          MS. YAVELBERG:  Objection, form.
4     A.   Maryland looks at the dispensing fee in one
5  entity separate from that of the ingredient cost.  It
6  has always been understood that the listed price or
7  the wholesale price of the wholesaler is not what the
8  pharmacist pays for it.  And we also knew from the
9  survey that was done by Myers & Stauffer that the
10 dispensing fee -- the cost of filling a prescription
11 was in Maryland's case lower than what was portrayed
12 in the survey.  Okay?  We knew both of these.  But
13 there wasn't a concerted decision to combine the two
14 in setting our fees, our reimbursement to pharmacy.
15    Q.   So it's your testimony -- let me make sure
16 I get this right.
17    A.   Uh-huh.
18    Q.   It's your testimony that the department
19 doesn't believe that you should consider the
20 components together to see if the reimbursement is
21 fair?
22         MS. YAVELBERG:  Objection to form.

Page 106

1               MR. DAVIS:  Objection.
2          A.   I didn't say that.  I said we looked at it
3     separately.  Okay?  When we reviewed the Myers &
4     Stauffer survey we knew that we were underpaying.
5     Okay?  When we looked at the acquisition cost of
6     products we knew that we were not at the actual
7     acquisition cost or estimated acquisition cost where
8     there was a differential in what the pharmacist paid
9     for it to what we allowed.  We understood this.
10              But we didn't set up a policy, well,
11    because we're higher here and lower here it's okay.
12    We looked at each one individually.  And that's the
13    best way I can answer that to you.  It wasn't our
14    policy to combine them both and say we're okay.
15         Q.   Did you talk with your attorneys about
16    this?
17         A.   I have not talked to the attorneys --
18         Q.   About this issue?
19         A.   Have I talked to the attorneys about this
20    issue?
21              MS. YAVELBERG:  We're not going to allow
22    the witness to testify about what he talked to the

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                December 9, 2008
Baltimore, MD

Page 229

1    drug, most drugs are bought at some sort of discount
2    which is lower than WAC."  Do you see that?
3         A.    This is an incorrect statement.  I see it.
4    But it's an incorrect statement.
5         Q.    This is an incorrect statement?
6         A.    Mm-hmm.
7         Q.    How so?
8         A.    Wholesale acquisition cost is what the
9    wholesaler lists the price for for their cost.
10   Pharmacy purchases using that as a baseline and the
11   wholesaler gives them, 1, 2, 3, 4 percentage points,
12   sometimes 5 or 6 percentage points above that as the
13   charged amount as to what pharmacy pays for it.  So
14   it's not below wholesale acquisition cost.  It
15   actually should be it's a WAC plus.  That's how we
16   arrive at a WAC plus 10.
17               Some small pharmacies can get their drug
18   based on the wholesale cost -- don't get the same
19   discount as others.  So a very high volume purchasing
20   pharmacy could get pricing when they buy it at plus
21   two points above wholesale acquisition cost and the
22   smaller pharmacies may not get it for 7 or 8 percent

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                                December 9, 2008
Baltimore, MD

Page 230

1   above wholesale acquisition cost.  But that's the way
2   they purchase.
3            So we always knew that -- as far as I knew
4   representing the State of Maryland that wholesale --
5   average wholesale price was an inconsistent price,
6   that the wholesale acquisition cost was a more
7   consistent price and that pharmacy buys cost-plus.
8   They changed their modality of buying from an AWP
9   minus discount in the '80s to early '90s to a
10  cost-plus purchasing.  So that's why Maryland
11  addressed that right away.  And we were one of the few
12  states that saw that.
13       Q.   Didn't Maryland know, Mr. Fine, that WAC
14  was generally AWP minus 20 percent?  Didn't Maryland
15  know that?
16            MS. YAVELBERG:  Objection to form.
17            MR. DAVIS:  Objection to the form.
18       A.   Maryland was uncertain of that as far as --
19  when you asked me about average wholesale price it was
20  approximately 20 percent above what the wholesaler
21  acquisition cost is.  But we knew that the wholesalers
22  in Maryland had different list prices.  And because

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                                December 9, 2008
Baltimore, MD

Page 231

1   they had different list prices we wanted to go to a
2   more consistent price.  And that's wholesale
3   acquisition cost.
4           MR. TORBORG:  Let's mark this as the next
5   document.
6                       (Exhibit Abbott Maryland 020
7                        was marked for
8                        identification.)
9           BY MR. TORBORG:
10      Q.   Mr. Fine, what I've marked as Abbott
11  Maryland 20 is an April 4th 1997 memo from Janet
12  Freeze --
13      A.   Mm-hmm.
14      Q.   -- to Lawrence Triplett?
15      A.   Yes.
16      Q.   Who is Ms. Freeze?
17      A.   Ms. Freeze worked in quality assurance.
18  She did a lot of surveys and read reports and reported
19  back to the compliance administration on different
20  subject matters of interest.
21      Q.   The last paragraph of that page --
22      A.   Yes.

Page 232

1    Q.    -- it says "An easier but potentially
2  unpopular approach would be to implement new
3  regulations to lower the overall medical assistance
4  reimbursement.  The current WAC plus 10 pricing is
5  generally equivalent to average wholesale price less
6  10 percent."  Do you see that?
7    A.    Yes.
8    Q.    Is that what the department knew in or
9  around April of 1997?
10    A.    The word generally equivalent has -- again,
11  it's not exactly equivalent.  And what -- again, as
12  restating, what we noticed in drug pricing was that
13  the wholesale acquisition costs amongst wholesalers
14  were more stable that the different listed prices the
15  wholesalers charged as their wholesale selling price
16  or wholesale list price.  So "generally" is just a
17  general statement.  It's not "is."
18    Q.    Let's go back to the document marked
19  previously, the April 20th 1995 memo.
20    A.    Mm-hmm.
21    Q.    The bullet says "While we are paying WAC
22  plus 10 percent for the ingredient cost of the drug,

Page 233

1    most drugs are bought at some sort of discount which
2    is lower than WAC."  Do you see that?
3         A.    Right.  And that's an incorrect statement.
4         Q.    Says who?
5         A.    Says me.
6         Q.    Okay.  So you sitting here some 13 years
7    later are saying that what Ms. Burkholder said in
8    April 1995 was not what Maryland thought at the time?
9              MR. DAVIS:  Objection to the form.
10        Q.    Is that your testimony?
11        A.    It's what this person who works for the
12   State of Maryland or these two people were saying at
13   the time.  Wholesale acquisition cost was the baseline
14   price or what the wholesaler's costs are for the
15   product.  It's not the AWP.  So the WAC plus 10 for
16   the ingredient cost of the drug, most drugs are bought
17   at some sort of discount which is lower than WAC.
18   It's not so.  It's the other way.  Most drugs are
19   bought with a plus off of WAC.  That is the way drugs
20   are purchased.
21        Q.    So it's your testimony, Mr. Fine, on behalf
22   of the department for the period 1989 through, say,

1   2004 that DHMH believed that pharmacies did not
2   purchase drugs from a discount of WAC as published in
3   the compendia?  Is that your testimony?
4            MS. YAVELBERG:  Objection, form.
5        A.   It's my testimony with the experience of
6   drug pricing that pharmacy did not buy drugs that way
7   and still today does not.
8        Q.   So you're saying that the department was
9   not aware that pharmacists were purchasing drugs at
10  discounts below the WAC published in the compendia?
11  That's your testimony?
12           MR. DAVIS:  Objection.
13           MS. YAVELBERG:  Objection, form.
14       A.   I'm not clear as to what you're saying.
15  What we have here is an internal memo that I was not
16  part of.  I did not write this memo.  I'm looking at
17  this memo 13 years later and from my experience I'm
18  looking at one point, a statement that appears
19  incorrect.
20       Q.   Are you saying that Maryland believed from
21  1989 through 2004 that pharmacists were not purchasing
22  drugs from discounts from WAC as published in the

Page 235

1   compendia?

2              MS. YAVELBERG:  Objection, form.

3              MR. DAVIS:  Objection, asked and answered.

4              MR. TORBORG:  He didn't answer it last

5   time.

6              MR. DAVIS:  I think he did.

7              MR. TORBORG:  It's a yes or no answer.

8              MS. YAVELBERG:  Objection to form.

9       A.   Could you restate the question again?  I

10  just want to make sure I understand what you're

11  saying.

12             MR. TORBORG:  Would you read it for me?

13             (Whereupon, the requested portion was read

14  by the reporter.)

15             MS. YAVELBERG:  Objection, form.

16      A.   I can say representing the State of

17  Maryland that discounts off of WAC did not occur.  It

18  was a discount above WAC that was paid to pharmacy.

19             BY MR. TORBORG:

20      Q.   Are we talking about brand name drugs or

21  generic drugs?

22      A.   I'm talking any purchase of drug from a

Page 300

1    and the integrity of the program?
2              MR. TORBORG:  Object to form.
3         A.   I'm not following you on your question.
4         Q.   Do you expect participants in the program
5    to be honest?
6         A.   When you talk about participants you're
7    talking about providers?
8         Q.   Yes.
9         A.   The expectation is that they are honest in
10   their billing.
11             MS. YAVELBERG:  I'm going to mark this next
12   document as 24.
13                       (Exhibit DOJ 024 was marked
14                        for identification.)
15             BY MS. YAVELBERG:
16        Q.   And DOJ 24 is a copy of the United States
17   first amended complaint in In Re: Pharmaceutical
18   Industry Average Wholesale Price Litigation in the
19   United States District Court for the District of
20   Massachusetts.  Mr. Fine, if I could ask you to read
21   the first paragraph of this complaint on this first
22   page, just read it out loud.

1     A.    "The United States brings this action to
2  recover losses sustained by the Medicare and Medicaid
3  programs as a result of the sustained efforts of the
4  defendants, Dey Incorporated, Dey L.P. Incorporated,
5  and Dey L.P. (collectively 'Dey') to defraud these
6  programs.  Over the course of a number of years Dey
7  has reported inflated drug prices knowing that
8  Medicare and Medicaid would rely on those prices to
9  set reimbursement rates for Dey's pharmaceutical
10 products.
11             "Dey's actual sales prices for its
12 pharmaceutical products were and are far less than the
13 prices reported by Dey.  By knowingly reporting
14 fraudulently inflated prices - sometimes a thousand
15 percent higher than Dey's actual prices - Dey has
16 ensured that its retail customers and other providers
17 who dispense its drugs receive inflated reimbursement
18 and profits from Medicare and Medicaid.
19             "Dey has used the public fisc as a
20 marketing tool, actively promoting the government-
21 funded spread between, one, its fraudulently inflated
22 prices and, two, its actual sales prices as an

Page 302

1   inducement to its customers.  These efforts have
2   allowed Dey to increase its profits by boosting sales
3   for its drugs."
4          Q.    Thank you.  Did Maryland know that Dey was
5   engaging in this conduct?
6                MR. TORBORG:  Objection.  Hold on.
7                MS. MANGIARDI:  Objection.
8                MR. TORBORG:  Hold on.  This is way outside
9   the scope of my notice and what the foundation can --
10  there's been no foundation that he's even prepared to
11  answer this question.
12               MS. YAVELBERG:  I think it's within the
13  scope and I think he is prepared having been with the
14  State of Maryland for over 20 years to testify about
15  whether Maryland knew of or approved of this conduct.
16               MR. TORBORG:  It's kind of a broad
17  question.  I mean, you're asking about all of it as
18  once?
19               MS. YAVELBERG:  Sure.
20               MR. TORBORG:  All of the various elements
21  of this?  You're asking about it at once?
22               MS. YAVELBERG:  If he can't answer the

Page 303

1    question he'll tell us.
2              MR. TORBORG:  I object to this line of
3    questioning as outside the scope of anything that I
4    asked about.
5              BY MS. YAVELBERG:
6         Q.   Mr. Fine, did the State of Maryland approve
7    of this conduct?
8              MR. TORBORG:  Object to form.
9              MS. MANGIARDI:  Objection.
10             MR. TORBORG:  Alleged conduct.
11        A.   First of all, I've just got to qualify
12   this.  The State of Maryland receives drug information
13   from the compendia.  We base our price based on that
14   information.  Okay?  I have as a representative of the
15   State of Maryland no knowledge of this activity.
16        Q.   And if I represent to you that the United
17   States has filed a similar complaint against the
18   Roxane defendants and the Abbott defendants would
19   Maryland have approved such conduct by those
20   companies?
21             MR. TORBORG:  Same objections.
22             MS. MANGIARDI:  Objection.

Page 304

1    A.    Approval, that would be an outlandish
2    assertion that the company would do this.  And it
3    would really cause issues with the state having
4    overpaid based on a fictitious price.
5         Q.    You can put that aside.  Now I am going to
6    jump around a little bit because we're running out of
7    time and you're being very patient.  In preparation
8    for your deposition today in addition to meeting with
9    attorneys your testified that you reviewed some
10   documents; is that correct?
11        A.    Yes, mm-hmm.
12        Q.    Did you also talk with current employees of
13   Maryland Medicaid?
14             MR. TORBORG:  Object.  Asked and answered.
15             MS. YAVELBERG:  No.  I don't believe so.
16             MR. TORBORG:  Yes.  It was asked.  I don't
17   know if it was answered correctly, but it was asked.
18             BY MS. YAVELBERG:
19        Q.    Would you like to clarify your answer?
20        A.    I spoke somewhat with Frank Tetkowsi in
21   preparation at the tail end of my -- after our
22   preparation with us.  And just to clarify a couple

Page 320

1    today.

2        Q.    For those products that were in the IDC
3    program you didn't use the compendia price to set the
4    amount, correct?

5        A.    We used the wholesalers that the
6    pharmacists were buying the products from in the State
7    of Maryland for pricing.

8        Q.    You did not use the compendia prices for
9    those products on the IDC, correct?

10       A.    Correct.

11       Q.    Okay.  And so when you see a document such
12   as DOJ 24, which is the United States complaint
13   against Dey which talked about fraudulently inflated
14   prices sometimes 1,000 percent higher than Dey's
15   actual prices, if you had an IDC on those drugs for
16   those prices --

17       A.    We were protected.

18       Q.    You were protected?

19       A.    Yes.

20       Q.    And that was part of your job?

21       A.    Absolutely.

22       Q.    To make sure that you protected yourself --

Page 321

```
 1                MS. YAVELBERG:  Objection, form.
 2        Q.   -- correct?
 3        A.   The reason we set our EAC with the four
 4   different possibilities was to protect the payment --
 5   the State of Maryland's, you know, expenditures to
 6   ensure that to the best of our knowledge we could come
 7   as close as possible.  But those four different
 8   modalities, the wholesale acquisition cost, et cetera,
 9   we depended on the compendia for that information.
10        Q.   But for prices where there's IDC, you
11   didn't use the compendia?
12        A.   No.
13        Q.   And you didn't rely upon the compendia?
14        A.   No, we did not.
15        Q.   You indicated that in the 1980s you were
16   getting manufacturer catalogs.
17        A.   Yes.  Mm-hmm.  '70s and '80s.
18        Q.   '70s and '80s.  Tell me what you were
19   getting.
20        A.   I had a whole series of books, Squibb,
21   Abbott, whoever was selling direct, and we were able
22   to set our prices based on that for those products
```

0bd2b054-a753-4e97-a066-e37ff7ee308f