# Exhibit 47

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 311

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

IN RE:   PHARMACEUTICAL INDUSTRY     )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Dey, Inc., et. al., Civil )

Action No. 05-11084-PBS; and United)

States of America, ex. rel.        ) December 3, 2008

Ven-a-Care of the Florida Keys,    ) 9:32 a.m.

Inc., v. Boehringer Ingleheim      )

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) VOLUME II

----------------------------------X

Continued deposition of THE NEBRASKA DEPT. OF HEALTH AND

HUMAN SERVICES by GARY CHELOHA, taken by Defendants,

pursuant to Notice, held at the Cornhusker Hotel, Lincoln,

Nebraska, before Shana W. Spencer, a Certified Shorthand

Reporter and Notary Public of the State of Nebraska.

Page 312

A P P E A R A N C E S:

Attorney for Plaintiff

    UNITED STATES DEPARTMENT OF JUSTICE
    601 D Street, NW, Room 9929
    Ben Franklin Station
    Washington, D.C. 20004
    BY:   ANDY MAO, ESQUIRE
        andy.mao@usdoj.gov


Attorney for Deponent

    DEPARTMENT OF HEALTH AND HUMAN SERVICES
    301 Centennial Mall South
    Fifth Floor
    Lincoln, Nebraska 68509
    BY:   MATTHEW DUNNING, ESQUIRE


(CONTINUED)

1      Exhibit No. 4.
2          Q.   (BY MR. MAO)  Mr. Cheloha, I'd like to
3      turn your attention to the second page, the last
4      full paragraph.
5          A.   I see that.
6          Q.   Can you read that aloud, please?
7          A.   We would like to clarify HFCA policy
8      that a dispensing fee determination must be
9      separate and distinct from the EAC determination
10     and unrelated to the cost of the drug products.
11     In every instance, regardless of the State
12     determination of individual prescription payment
13     limits, the State must have established the
14     reasonable dispensing fees which would be used to
15     determine whether the State is in compliance with
16     the upper limits as specified in current drug
17     regulations at 42 CFR 447.331.
18         Q.   Thank you.  Has Nebraska ever increased
19     its ingredient cost reimbursement to make up for
20     inadequate dispensing fees?
21              MS. LORENZO:  Objection.  Form.
22              MS. CITERA:  Form.

1  THE WITNESS:  No, it has not.
2      Q.   (BY MR. MAO)  Has Nebraska ever
3  increased its dispensing fee in order to make up
4  for inadequate ingredient cost payments?
5           MS. LORENZO:  Objection.  Form.
6           MS. CITERA:  Form.
7           THE WITNESS:  No, it has not.
8      Q.   (BY MR. MAO)  Has Nebraska Medicaid
9  ever decreased its dispensing fee to adjust for
10 inflated ingredient cost reimbursements?
11          MS. LORENZO:  Objection.  Form.
12          THE WITNESS:  No, it has not.
13     Q.   (BY MR. MAO)  Thank you.  In your --
14 one more question.  In your extensive time with
15 the Medicaid program in Nebraska, has it ever
16 been the policy of the Nebraska program to use
17 one component of the pharmacy cost reimbursement,
18 be it ingredient cost or dispensing fee, to make
19 up for potential inadequacies of the other
20 component?
21          MS. LORENZO:  Objection.  Form.
22          THE WITNESS:  No, it has not.

1   in the Nebraska Medicaid program.  Do you
2   remember talking to her about that?
3       A.   Yes.
4       Q.   Okay.  And I believe you testified that
5   one of the considerations in setting the pharmacy
6   cost reimbursement was to make sure that enough
7   pharmacies were adequately compensated for their
8   pharmacy costs such that they could continue
9   participating in the Medicaid program; is that
10  correct?
11      A.   Yes, it is.
12      Q.   Okay.  We also talked about the 1986
13  Jacobs study, the survey that was done.  And as a
14  result of that, is it correct that Nebraska
15  adopted an EAC calculation of AWP minus 8.71
16  percent?
17      A.   Yes.
18      Q.   And do you recall that the 8.71
19  discount was based on a 70th percentile of
20  certain discounts that were offered?
21           MS. LORENZO:  Objection.  Form.
22           THE WITNESS:  Yes.  I believe that's

 1    correct.
 2        Q.   (BY MR. MAO)  And by choosing the 70th
 3    percentile, does that -- strike that.
 4             By choosing the 70th percentile as the
 5    point of establishing the discounts off of AWP
 6    for all drugs covered by Nebraska Medicaid, is it
 7    necessarily the case that not every pharmacy will
 8    be able to purchase every drug at AWP minus 8.71
 9    percent?
10             MS. LORENZO:  Objection.  Form.
11             THE WITNESS:  Yes.  That would mean
12    that some could not purchase it at that price.
13        Q.   (BY MR. MAO)  And is it that,
14    notwithstanding the fact that it was one of
15    Nebraska Medicaid's responsibilities to ensure
16    access, that it was also one of its
17    responsibilities to be fiscally prudent as the
18    steward of the Medicaid funds?
19             MS. LORENZO:  Objection.  Form.
20             THE WITNESS:  Yes, it is.
21        Q.   (BY MR. MAO)  And that, based upon the
22    Nebraska Medicaid program's best judgments, AWP

1   minus 8.71 at the 70th percentile represented the
2   best balancing of those dual competing
3   objectives?
4          MS. LORENZO:  Objection.  Form.
5          THE WITNESS:  Yes, it does.
6       Q.   (BY MR. MAO)  When Nebraska Medicaid
7   moved to AWP minus 10 as the calculation method
8   for EAC, was a survey done to determine what
9   percentile that represented in terms of discounts
10  to Nebraska pharmacies?
11      A.   No.  The survey was not done.
12      Q.   Notwithstanding that a survey was not
13  done, do you believe that that discount
14  percentage would have resulted in certain
15  pharmacists not being able to purchase drugs at
16  that discount?
17         MS. LORENZO:  Objection.  Form.
18      Q.   (BY MR. MAO)  AWP minus 10 percent?
19      A.   Yes.  I do believe that's the case.
20      Q.   And, again, the AWP minus 10 percent
21  was the State's best attempt at balancing its
22  objectives of reimbursing -- reimbursing

Page 388

1   pharmacists adequately for their costs and being
2   fiscally prudent with the Medicaid funds?
3           MS. LORENZO:  Objection.  Form.
4           THE WITNESS:  Yes.  That's correct.
5       Q.   (BY MR. MAO)  And the same question
6   with regard to when the State moved to AWP minus
7   11 percent.  Do you assume -- was a survey done
8   to determine what percentile of discounts that
9   represented --
10          MS. LORENZO:  Objection.
11      Q.   (BY MR. MAO)  -- for Nebraska
12  pharmacists?
13          MS. LORENZO:  Objection.  Form.
14          THE WITNESS:  No.  No survey was done.
15      Q.   (BY MR. MAO)  But do you assume that,
16  based upon that discount off the AWP, that
17  certain pharmacies in Nebraska might not be able
18  to purchase certain drugs at that discounted
19  rate?
20          MS. LORENZO:  Objection.  Form.
21          THE WITNESS:  Yes.  That's correct.
22  Certain ones would not be able to.

1    Q.   (BY MR. MAO)  And that was the best
2    balancing of its interests by the Nebraska
3    Medicaid program?
4              MS. LORENZO:  Objection.  Form.
5              THE WITNESS:  Yes.  That's correct.
6              MR. MAO:  I have no more further
7    questions.  Thank you very much for your time,
8    Mr. Cheloha.
9              THE WITNESS:  You're welcome, Mr. Mao.
10             MR. DUNNING:  Now, you've --
11             MS. LORENZO:  Right.  I've got --
12             MR. DUNNING:  -- provided us an
13   informal request to have some redirect questions?
14             MS. LORENZO:  Right.  Is that -- it
15   looks like we're on schedule.  Would that be
16   correct?
17             MR. DUNNING:  Yes.  I think so.  And,
18   Toni, will you have redirect questions, also?
19             MS. CITERA:  I may have a couple.
20             MR. DUNNING:  Okay.  I think we're fine
21   on time.
22             MS. LORENZO:  Could we just take, like,