# Exhibit 50

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories,*
*Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS


Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Clifford, Margaret                  October 29, 2008
Concord, NH

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION ) Master File No.

--------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:         )

United States of America ex rel.  ) Hon. Patti B.

Ven-A-Care of the Florida Keys,   )     Saris

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,    ) VIDEOTAPED

and United States of America ex   ) DEPOSITION

rel. Ven-A-Care of the Florida    ) OF MARGARET

Keys, Inc., et al. v. Boehringer  ) CLIFFORD

Ingelheim Corp., et al., Civil    )

Action No. 07-10248-PBS and United ) OCTOBER 29, 2008

States, ex rel. Ven-A-Care of the )

Florida Keys v. Abbott            )

Laboratories, Inc. Civil Action   )

Nos. 06-CV-11337 and 07-CV-11618  )

--------------------------------X

Clifford, Margaret                    October 29, 2008
                    Concord, NH

---

Page 2

1    Videotaped Deposition of MARGARET CLIFFORD
2              Concord, New Hampshire
3            Wednesday, October 29, 2008
4                    9:30 a.m.
5
6
7
8
9         A P P E A R A N C E S
10
11   On behalf of the United States of America:
12
13      GEORGE B. HENDERSON, ESQ.
14      Assistant United States Attorney
15      United States Courthouse
16      1 Courthouse Way
17      Suite 9200
18      Boston, MA  02210
19      617-748-3272
20      george.henderson2@usdoj.gov
21
22   (CONTINUED)

---

Page 3

1         A P P E A R A N C E S  (CONTINUED)
2
3    On behalf of the Witness:
4       DEBORAH WEISSBARD, ESQ.
5       Assistant Attorney General
6       Department of Justice
7       Office of the Attorney General
8       33 Capitol Street
9       Concord, NH  03301
10      603-271-1196
11      deborah.weissbard@doj.nh.gov
12
13   On behalf of Dey, Inc.:
14
15      CLIFFORD KATZ, ESQ.
16      Kelley Drye & Warren LLP
17      101 Park Avenue
18      New York, NY  10178
19      212-808-7609
20      ckatz@kelleydrye.com
21
22

---

Page 4

1        A P P E A R A N C E S  (CONTINUED)
2
3    On behalf of Abbott Laboratories, Inc.:
4
5       ERIC P. BERLIN, ESQ. (Via telephone.)
6       Jones Day
7       77 West Wacker
8       Chicago, IL  60601-1672
9       312-269-4117
10      epberlin@jonesday.com
11
12   ALSO PRESENT:  Patrick Battle, Videographer
13             Dwight Schwader (DOJ Associate)
14
15
16
17
18
19
20
21
22

---

Page 5

1              I N D E X
2
3    WITNESS:  MARGARET CLIFFORD           PAGE
4    Examination By Mr. Katz.................... 009
5    Examination By Mr. Berlin................. 166
6    Examination By Mr. Henderson............... 196
7    Examination By Mr. Katz.................... 248
8    Examination By Mr. Berlin................. 285
9    Examination By Mr. Henderson............... 318
10
11
12          D E Y   E X H I B I T S
13   NUMBER        DESCRIPTION          PAGE
14   Exhibit Dey 200-HHD127-0322 to 0326 US DHHS
15        OIG Survey.................... 073
16   Exhibit Dey 201-OIG Report, August 1998
17        HHD121-0987 to 1004............ 115
18   Exhibit Dey 202-Ipratropium Chart............. 127
19   Exhibit Dey 203-Dey letter of 8/10/99
20        Marked Confidential
21        DL-0050553.................... 160
22   Exhibit Dey 204-Grant Thornton Study........... 268

---

                              2  (Pages 2 to 5)

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                    October 29, 2008
                    Concord, NH

Page 58

1  BY MR. KATZ:
2      Q.  Okay.  There was a proposal by
3  legislature for Most Favored Nation clause?
4      MR. HENDERSON:  Objection.
5      MS. WEISSBARD:  Can you ask her direct
6  question?  You're leading her.  It is going to get
7  confused.  You're not clearing up the record.
8  You're making it worse.  This was a Legislative
9  mandate.
10     When you're answering question, instead
11 of saying "uh-hum" got say "yes" or "no" so she
12 can get it down clearer.
13     MR. KATZ:  I disagree with that
14 characterization.
15 BY MR. KATZ:
16     Q.  But okay.  Can you tell me in your own
17 words how the reimbursement rate went from AWP
18 minus 10 percent plus a variable dispensing fee
19 to AWP minus 12 percent plus a $2.50 dispensing
20 fee?
21     A.  That was done through the legislature
22 and that House Bill 32 which had nothing to do

Page 59

1  with me or the department.
2      Q.  Okay.  Did it have to do with
3  negotiations with the pharmacy association?
4      A.  No.
5      Q.  Did New Hampshire Medicaid or any
6  personnel of New Hampshire Medicaid meet with any
7  pharmacy associations regarding this change from
8  reimbursement from AWP minus 10 percent and a
9  variable dispensing fee to AWP minus 12 percent
10 and $2.50 dispensing fee?
11     A.  No.  The meetings were over the
12 pharmacy, the pharmacy groups associations
13 concern over the Most Favored Nation clause that
14 was also part of that same legislation that was
15 changing the reimbursement rate.  The concern
16 wasn't over the reimbursement rate or the
17 dispensing fee.  It was over the Most Favored
18 Nation, and the language of that.
19     Q.  Have you had any other communications
20 with New Hampshire Pharmacists Association?
21     A.  Since that time or?
22     Q.  During the time period of 1994 to 2000?

Page 60

1      A.  No.
2      Q.  What about the NACDS?  Tell me about
3  the communications you had with them from 1994 to
4  2000.
5      A.  I already said, the communications were
6  meetings where representatives from each of those
7  associations were at the table.  It wasn't
8  individual communication with each group.  It was
9  a set of meetings where representative from each
10 group was at the table.
11     Q.  Aside from those, have you had any
12 communications with the NACDS during that time
13 period?
14     A.  No.
15     Q.  And same question for the others.  Were
16 your communications with these four associations
17 limited to that one instance?
18     A.  Yes.
19     Q.  Did you use e-mail while you were an
20 employee from 1994 to 2000?
21     A.  Yes.
22     Q.  Were you on any e-mail list serves with

Page 61

1  other state Medicaid officials from other states?
2      A.  Yes, I believe I was.
3      Q.  What are the names of those?
4      A.  I don't -- it was through EMPA, Eastern
5  Medicaid Pharmacy Administrators.
6      Q.  Was there more than one list serve that
7  you were on?
8      A.  That's the only one I recall.
9      Q.  Was there one called NMPAA?
10     A.  No, not that I recall.
11     Q.  The National Medicaid Pharmacy
12 Administrators list serve?
13     A.  Well, that would be the EMPA.
14     Q.  Under the national.  I think you gave
15 me the Eastern Medicaid.
16     A.  I was a member of EMPA.  I was on a
17 list serve that they put me on, so I would assume
18 it was EMPA.  But if you're telling me it is
19 national, I don't know.
20     Q.  In 2000 you left your employment with -
21 - as a pharmaceuticals services specialist,
22 right?

16 (Pages 58 to 61)

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                          October 29, 2008
                        Concord, NH

Page 90

1    administration or distribution and make sure they
2    are complying with state and federal laws.
3        Q.   Do you investigate compliance in any
4    way relating to prices?
5        A.   No.  We have nothing to do with prices.
6    Consumer protection is what we are looking at.
7        Q.   And that is your current position,
8    right?
9        A.   Well, currently I'm the chief
10   compliance investigator.  I was just promoted in
11   September.
12       Q.   Are you currently a member of any
13   pharmacy associations?
14       A.   No.
15       Q.   Going to hand you a document previously
16   marked Abbott Exhibit 158.  Like you to take a
17   look through the document.
18            Is this an OIG report that you
19   recognize?
20       A.   I think that I may have seen this, yes.
21       Q.   Like you to -- like to direct your
22   attention to page lower case "i" in the summary.

Page 91

1    Now, if you see the third paragraph, the first
2    sentence.  Can you read that for the record?
3        A.   "We estimate that on average actual
4    acquisition costs of generic drugs was 42.5
5    percent below AWP."
6        Q.   Is this something that you were either
7    aware of or recall learning in 1997?
8        A.   I recall seeing this document.  I don't
9    recall when I saw this document.
10       Q.   Would it have been during the first
11   period of your employment from 1994 to 2000 or
12   from 2001 to 2005?
13       A.   I don't recall when it was.
14       Q.   Well, look through it more.  Let's go
15   through some others.
16       A.   I don't think it is going to help me
17   remember when I saw it.
18       Q.   Okay.  Let's go to page 1.  Now, if you
19   look in the third full paragraph, it says,
20   "however" -- the fourth sentence in.
21       A.   I don't think my page 1 is the same.
22            MR. HENDERSON:  Sorry, what page?

Page 92

1            MR. KATZ:  HHD 014-0449.  When I say
2    page 1, I meant the page actually marked one, not
3    page one of the exhibit.
4    BY MR. KATZ:
5        Q.   If you look in the middle of the third
6    paragraph, it states:  "However, the OIG issued a
7    report in 1984 which stated that on average
8    pharmacies purchase drugs for 15.9 percent below
9    AWP.  In 1989, the OIG issued a follow-up report
10   which concluded that pharmacies were purchasing
11   drugs at discounts of 15.5 percent below AWP.
12   Both the 1984 and 1989 reports combined brand
13   name and generic drugs in calculating the
14   percentage discounts and included a comparison of
15   3469 and 4723 purchases respectively."
16            Are you familiar with the 1984 and 1989
17   OIG reports?
18       A.   No.
19       Q.   And now you understand this report
20   relates specifically to generic drugs, right?
21            MS. WEISSBARD:  Do you know that?
22            THE WITNESS:  No, I don't know.

Page 93

1    BY MR. KATZ:
2        Q.   Okay, well, if you look at the title of
3    the report?
4        A.   Okay.  I can see it says that.
5        Q.   Medicaid Pharmacy Actual Acquisition
6    Costs of Generic Prescription Drug Products.  Do
7    you see that?
8        A.   Okay, yes.
9        Q.   Now, if you go down another three
10   paragraphs, it says, "An article in the June 10,
11   1996 issue of Baron's entitled 'Hooked on Drugs'
12   focused additional attention on AWP and its
13   relationship to actual acquisition costs.
14   Baron's compared about 300 dose forms of the top
15   20 Medicare drugs and concluded that the true
16   cost was 10 to 20 percent below AWP for brand
17   name drugs and 60 to 85 percent below AWP for
18   generic drugs.  Baron's also reported the
19   industry insider's joke that AWP really means
20   'ain't what's paid.'"
21            Do you recall ever reviewing this
22   Baron's article called "Hooked on Drugs"?

                                    24  (Pages 90 to 93)

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                          October 29, 2008
                    Concord, NH

Page 94

1    A.  No, I've never even heard of Baron's.
2    Q.  Have you ever heard the expression
3  'ain't what's paid'?
4    A.  No.  I mean, I may have read it when I
5  saw this document years ago, but nothing that
6  stuck with me.
7    Q.  Is it consistent with your
8  understanding that the difference between AWP and
9  actual acquisition costs was greater for generic
10  drugs than brand drugs?
11    A.  No.
12    Q.  How is that inconsistent?
13    A.  In my understanding of what an AWP was
14  is the average -- it is the prices the
15  manufacturer would report for their average price
16  between all the contracts they had for selling
17  that product.
18    Q.  What is that understanding based on?
19    A.  Just understanding that I've had.  I'm
20  not sure where it comes from.  In my training as
21  a pharmacist I would assume.
22    Q.  But as a retail pharmacist you

Page 95

1  testified that you didn't know the prices at
2  which the pharmacies were purchasing drugs, so
3  you didn't have --
4    A.  Right, I didn't.
5    Q.  You couldn't compare them to the AWPs,
6  right?
7    A.  Right.  I assumed that AWP was the cost
8  or near the cost.
9    Q.  What is the basis for that assumption?
10    A.  That's just what I thought.  When I had
11  to look up something to order it, I would look at
12  the AWP and I would think that's the cost, you
13  know.  If I was ordering something over the
14  counter special for somebody, the price would be
15  calculated based on that as being our cost.
16    Q.  What is your basis for testifying that
17  the price will be calculated based on AWP?
18    MR. HENDERSON:  Objection.
19    MS. WEISSBARD:  I don't understand your
20  question.  She just explained to you based on her
21  training and experience as pharmacy.  I am sorry
22  you don't like her answer but it is what it is.

Page 96

1  BY MR. KATZ:
2    Q.  That doesn't really give me any basis.
3    MS. WEISSBARD:  That's too bad you
4  don't have the information you want.
5    MR. KATZ:  Sorry, that's a speaking
6  objection.
7    MS. WEISSBARD:  I know but I'm not
8  going to let you badger my witness.  She just
9  gave you an answer.
10    MR. KATZ:  I am not badgering the
11  witness.
12    MS. WEISSBARD:  You just don't like it.
13  BY MR. KATZ:
14    Q.  What about your training did you learn
15  which informed you that AWP relates to the cost?
16    A.  When we would order a drug that we
17  didn't have in stock, and maybe a brand new drug
18  to the market or whatever, could be brand new
19  brand or brand new generic to the market, if that
20  drug was not in the computer system, you couldn't
21  fill a prescription for it until you entered it
22  into the computer.  The cost that we would put in

Page 97

1  that, that I would put, if I was entering the
2  drug because it wasn't in there either when I
3  worked for a chain or an independent.  When I
4  worked for a chain, if I had to add the drug, I
5  would base the cost based on the AWP that was
6  published.  And the corporate would have their --
7  they typically were the ones that added new drugs
8  to the system.  But if you got a prescription
9  before something was in there, you could add it
10  at store level.  And we would use the AWP to put
11  in as the price.  And that was true both at
12  Gosselin's, which was an independent, and at
13  Brooks and Rite-Aid.
14    Now we would have weekly price updates
15  where corporate would then overlay what they put
16  in, or with Gosselin's we would get a weekly
17  update from the wholesaler that would adjust to
18  anything that I had manually put in.
19    Q.  Okay.  I understand the part about you
20  would enter AWPs into the computer systems of the
21  pharmacies that you worked in.
22    A.  As the cost.  When it asked me what

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                                    October 29, 2008
                          Concord, NH

Page 206

1        MR. KATZ: Objection.  The document
2  speaks for itself.  There's no question.
3        MR. HENDERSON:  I'm working up to my
4  question.
5        MR. KATZ: Okay.
6  BY MR. HENDERSON:
7     Q.  And then on Dey -- I'm sorry, Exhibit
8  Number 5, this indicates that effective beginning
9  May 1, 1994 the co-pay for a brand drug is $1 and
10  dispensing fee is $3.25.  Whereas for generic or
11  branded generic drugs, the co-pay is lower, $.50;
12  and dispensing fee is higher, at $4.15.  Do you
13  see that?
14     A.  Yes.
15        MR. KATZ: Objection, form.
16        MR. HENDERSON:  I'll ask my question
17  but first we'll take a break so that the
18  videographer can change the tape.
19        VIDEOGRAPHER:  The time is 2:24.  This
20  ends cassette number 2.  We are off the record.
21        VIDEOGRAPHER:  This beginning of
22  cassette number 3.  We are back on the record.

Page 207

1  BY MR. HENDERSON:
2     Q.  Ms. Clifford, having looked at Exhibits
3  3, 4 and 5, do you have a recollection of whether
4  or not during the period when you were at the
5  agency that the agency encouraged -- had a policy
6  of encouraging the use of generics?
7     A.  Yes.
8     Q.  Was one of those ways to have a co-pay
9  that was lower for generics than it was for
10  branded products?
11     A.  Yes, it was.
12     Q.  Now, the co-pay, was that something
13  that would be deducted from the payment to the
14  pharmacist?
15     A.  I thought it always had been, but I see
16  from these earlier notice, I started in '94, I
17  believe during my time that, yes, the co-pay was
18  always deducted.  But looks like prior to that it
19  was not.
20     Q.  And what are you referring to, Exhibit
21  3, or where does it indicate that the co-pays
22  were not deducted from the amount paid to the

Page 208

1  pharmacist in reimbursement?
2     A.  In the second paragraph of Exhibit 3 it
3  says they will no longer deduct the $.50
4  copayment from the reimbursement allowance.
5     Q.  Okay.  So Exhibit 3 is indicating they
6  are eliminating the co-pay entirely; is that
7  right?
8     A.  I'm not sure.  This was before my time.
9  And I don't know if they were eliminating the co-
10  pay or just eliminating taking it, deducting it
11  from the reimbursement to the pharmacy.
12     Q.  Okay.  Your memory is that when a co-
13  pay existed, it would be an amount that the
14  department would deduct from the payment, the
15  reimbursement payment made to the pharmacist,
16  correct?
17     A.  Yes.
18     Q.  At any rate, back to my question.  Was
19  one of the ways that the department encouraged
20  the use of generics was to have a lower co-pay
21  deducted from the reimbursement for generics as
22  compared to branded drugs?

Page 209

1     A.  Yes.
2     Q.  Document exhibits -- or Exhibit 5
3  indicates that the department in May of 1994
4  established a dispensing fee that was higher for
5  generics than for branded products, correct?
6     A.  Correct.
7     Q.  Was that one of the ways that the
8  department encouraged the use of generics?
9     A.  Yes.
10     Q.  To your recollection, at any time
11  during your work for Health and Human Services in
12  New Hampshire, did the department ever have a
13  policy of encouraging the use of generics by
14  intentionally paying an inflated Estimated
15  Acquisition Cost?
16     A.  No.
17        MR. KATZ: Objection, form.
18  BY MR. HENDERSON:
19     Q.  Did, to your recollection, did the
20  Health and Human Services ever intend to pay more
21  than a good faith estimate of acquisition costs
22  plus a dispensing fee?

                              53 (Pages 206 to 209)

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                                    October 29, 2008
                            Concord, NH

Page 210

1        MR. KATZ:  Objection, form.
2        THE WITNESS:  No.
3   BY MR. HENDERSON:
4        Q.   To your knowledge, Ms. Clifford, did
5   the Health and Human Services in New Hampshire
6   ever determine an Estimated Acquisition Cost by
7   or based upon a consideration of the cost of
8   dispensing the drug?
9        MR. KATZ:  Objection, form.
10       THE WITNESS:  No.
11  BY MR. HENDERSON:
12       Q.   Did the department ever determine a
13  dispensing fee based on the cost of acquiring a
14  drug?
15       MR. KATZ:  Objection, form.
16       THE WITNESS:  No.
17       MR. BERLIN:  Just like to add, not sure
18  if Mr. Katz's objection covers it but objection
19  to foundation.  Because very first question was
20  if she had absolutely nothing to do with
21  reimbursement rates and that sort of thing; and
22  all of these questions go to that, so I would

Page 211

1   like a running objection to foundation if that's
2   fine.
3        MR. HENDERSON:  Okay.
4        MR. KATZ:  Do I assume correctly that
5   you agree objection to form covers foundation?
6        MR. HENDERSON:  Yeah, yeah.  And I also
7   agree that an objection by one of you is an
8   objection by both.
9        MR. BERLIN:  Okay, thank you.
10  BY MR. HENDERSON:
11       Q.   Ms. Clifford, my questions were
12  intended to cover not only the time period when
13  you were there from 1994 through 2000 but also
14  the time period from 2001 through 2005,
15  specifically my questions about whether the
16  department ever encouraged the use of generics by
17  paying an inflated Estimated Acquisition Cost.
18       Throughout your time period at Health
19  and Human Services, did the department ever
20  encourage the use of generics through the use of
21  paying inflated estimated acquisition costs?
22       MR. KATZ:  Objection, form.

Page 212

1        THE WITNESS:  No.
2   BY MR. HENDERSON:
3        Q.   And similarly, throughout the entire
4   time that you worked at the department -- well,
5   I'll just -- well, I'll repeat it just so it is
6   clear.  Did the department ever determine an
7   Estimated Acquisition Cost based upon a
8   consideration of the cost of dispensing a drug?
9        A.   No.
10       MR. KATZ:  Objection to form.
11  BY MR. HENDERSON:
12       Q.   And conversely, throughout the time
13  period that you were at the department, did the
14  department ever determine a dispensing fee based
15  on the cost of acquiring a drug?
16       MR. KATZ:  Objection, form.
17       THE WITNESS:  No.
18  BY MR. HENDERSON:
19       Q.   To your knowledge, throughout the time
20  period that you worked at the department, did the
21  department ever have a policy or practice of
22  paying an inflated Estimated Acquisition Cost for

Page 213

1   the purpose of making up for an inadequate
2   dispensing fee?
3        MR. KATZ:  Objection, form.
4        THE WITNESS:  No.
5   BY MR. HENDERSON:
6        Q.   I'm done with those exhibits and
7   actually if you'll hand them back, I'll put them
8   back in order so we can keep things.  Thank you.
9        I'm going to hand you Exhibit 80 which
10  I presume you've never seen this before, have
11  you?
12       A.   No, I have not.
13       Q.   And this, I think, is dated proposed
14  effective date of this is February 1, 1996.  This
15  describes the change in the payment rates for
16  drugs that became effective February 1, 1996 when
17  the EAC was changed from AWP minus 10 percent to
18  AWP minus 12 percent, and the dispensing fee was
19  lowered to $2.50.  Do you generally recall that
20  occurring?
21       A.   Yes.
22       Q.   And I can't recall, did you have any

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                                  October 29, 2008
                          Concord, NH

Page 322

1        MR. BERLIN:  Objection, form.
2        THE WITNESS:  No.
3   BY MR. HENDERSON:
4        Q.   Now, if a manufacturer, any
5   manufacturer had done that, had come to your
6   agency and said that they were reporting inflated
7   AWPs because they thought New Hampshire's
8   dispensing fees were too low, can you tell me in
9   your opinion whether that is something the Health
10  and Human Services in New Hampshire would have
11  approved of?
12       MR. KATZ:  Objection, form.
13       THE WITNESS:  In my opinion, no.
14  BY MR. HENDERSON:
15       Q.   Did the department give manufacturers
16  the authority to increase dispensing fees?
17       MR. KATZ:  Objection, form.
18       THE WITNESS:  No.
19  BY MR. HENDERSON:
20       Q.   Did the department give drug
21  manufacturers the authority to decide whether
22  dispensing fees were inadequate?

Page 323

1        MR. KATZ:  Objection, form.
2        THE WITNESS:  No.
3   BY MR. HENDERSON:
4        Q.   Is it fair to say that it is the Health
5   and Human Services that makes decisions about
6   dispensing fees, not drug manufacturers?
7        MR. KATZ:  Objection, form.
8        THE WITNESS:  Yes.
9   BY MR. HENDERSON:
10       Q.   Why is that?
11       MR. KATZ:  Objection, form.
12       THE WITNESS:  Because we are the ones
13  paying the bill; we should set what we are going
14  to pay.
15       MR. HENDERSON:  No further questions.
16       MR. KATZ:  I have no questions.
17       MR. BERLIN:  We're done then.
18       VIDEOGRAPHER:  The time is 5:04.
19  Deposition is concluded.  This ends cassette
20  number 4.  We are off the record.
21           (Deposition concluded at 5:04
22  p.m.)

Page 324

1      W I T N E S S'  S I G N A T U R E  P A G E
2
3        I have read the foregoing pages which
4   contain a correct transcription of answers made by
5   me to the questions therein recorded, with the
6   exception(s) and/or addition(s) reflected on the
7   correction sheet attached hereto, if any.
8        Signed this the ___day of _____, 2008.
9
10       _____
11            Margaret Clifford
12       **************************
13  STATE OF _____
14  COUNTY OF_____
15
16       Subscribed and sworn to before me this
17  _____day of _____, 2008.
18
19       _____
20            Notary Public
21  My Commission Expires:_____
22  (Seal)

Page 325

1        C E R T I F I C A T E
2
3        I, JANE WORTHEN EATON, Court Reporter and
4   Notary Public, do hereby certify that the foregoing
5   transcript consists of the testimony of said witness,
6   after having been duly sworn, and constitutes a true and
7   correct record of the testimony given by said witness.
8        I further certify that I am not a relative
9   or attorney of either party nor financially interested
10  in the outcome of this action.
11
12
13       _____
14       Jane Worthen Eaton, RMR, CRR, CMRS
15       Registered Professional Reporter
16
17
18
19
20
21
22

                              82 (Pages 322 to 325)

3eda5f7f-7115-47a9-9291-d4198c3ab619