# Exhibit 54

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants



# Congressional Record

United States
of America

PROCEEDINGS AND DEBATES OF THE *109th* CONGRESS, FIRST SESSION

*Vol. 151*          WASHINGTON, THURSDAY, NOVEMBER 3, 2005          *No. 144*

# Senate

The Senate met at 9 a.m. and was called to order by the President pro tempore (Mr. STEVENS).

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Almighty God, who gathers the waters of the sea together as a heap, Your counsel stands forever. Lord, keep us today both outwardly in our body and inwardly in our souls.

Give us the health and strength we need for today's journey. Help us to avoid the pitfalls of too much and too little. Prevent us from driving ourselves to exhaustion or growing weak through too much ease. Keep our minds at rest and peace as we trust You moment by moment.

Bless our Senators. Save them from being so busy with things which are seen and temporal that they forget the things which are unseen and eternal.

Bless us all in body, soul, and spirit that we may learn to rest in Your love. Let Your eye be on those who fear You and who hope in Your mercy. We pray in Your loving Name.

Amen.

### PLEDGE OF ALLEGIANCE

The PRESIDENT pro tempore led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### RESERVATION OF LEADER TIME

The PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

### RECOGNITION OF THE MAJORITY LEADER

The PRESIDENT pro tempore. The majority leader is recognized.

### SCHEDULE

Mr. FRIST. Mr. President, we will shortly begin this morning's session with a rollcall vote on the adoption of the conference report to accompany the Agriculture appropriations bill. After that vote, we will resume the deficit reduction reconciliation bill. All time expired last night, and therefore we will begin a series of rollcall votes in relation to the pending amendments. We will, in a few moments, enter into an agreement which states the order for those votes. At this time, there are approximately 16 pending amendments that we would need to vote on.

Following those votes, additional amendments may be offered, and therefore the voting sequence would continue. This stacked series of votes could be very lengthy, but we will continue voting until we complete the deficit reduction bill or up until 6 o'clock tonight. I hope and believe we can finish this afternoon, but that will depend on the number of amendments and how many will be offered over the course of the so-called vote-arama that we will be in a little bit later today. We have asked Senators to remain in and around the Senate Chamber over the course of the day to avoid missing any recorded votes. These vote-aramas are very trying as the day goes on so I do wish to thank everybody in advance for their patience during what will be a very busy session of voting today.

### ENERGY INDEPENDENCE AND ANWR

Mr. FRIST. Mr. President, over the past couple of weeks prices at the pump have been steadily falling—thank goodness. After the shock of paying nearly $3, sometimes over, sometimes well over $3 a gallon, families are finally getting some relief when they are filling up their cars or trucks, automobiles with gas. Gas prices are finally back to pre-Katrina levels.

And that is the good news. The bad news is that prices are still much higher than they were a year ago. Americans are paying significantly more to fill up their cars, their automobiles with gas. And as we all know with winter right around the corner, home heating costs threaten to literally break the family bank.

Meanwhile, America's oil companies are making multibillion dollar profits, record profits. You could not miss the news last week that oil companies posted these record-breaking profits with one company posting the biggest profit in U.S. history. So while Americans have been reeling from Katrina, standing in long lines at the pump at gas stations following Katrina and the other hurricanes and their cutting back on the necessities of everyday life, what they see are oil profits that are booming, going off the chart. And we have constituents naturally calling and writing and e-mailing saying, Why? How could that possibly be?

Literally, what they see is pumping gas and watching the little figures come up higher and higher and higher, seeing money go out of their pocket and then going home and turning on the news and seeing that the coffers of oil companies, that same money going into the gas tank almost being in the coffers of these large oil companies, and they are asking why.

I think these are legitimate questions, and Americans do have the right to know what is going on. Is this the way the market works and, if so, what are those dynamics? They need to know why those gas prices and those oil and natural gas prices are so much higher than they used to be at the same time these profits are off the chart.

That is why last week I asked Chairman DOMENICI and Chairman STEVENS to hold a joint hearing to be able to answer those basic questions. Next week, several executives will be coming in from some of the biggest oil companies to explain. We may well learn that there are no sinister reasons behind all

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.


Printed on recycled paper.

this, but I think we all agree that our free market works best when we all know and we all follow the rules of the road and all have confidence in that system.

That is what the focus of those hearings will be. If there are people abusing the free enterprise system to advantage themselves or their businesses at the expense of everyday Americans, they need to be exposed and they should be ashamed.

Next week's hearings will help shed light on this very important matter.

Meanwhile, the Senate is also working to strengthen and secure America's energy supply. Indeed, we are doing it, in part, in the bill that we will be voting on over the course of today.

Last summer, the Senate passed a comprehensive energy plan that looked, in terms of framework, at production, at consumption, at conservation, at alternative uses of fuel, at nuclear, at hydrogen, at the investment of science and technology to make fuel use more efficient, and that was a good first step. But we have a lot more to do.

When you go home and you are talking to constituents and you say: What if I told you that most of the oil that you are pumping into your gas tank comes from overseas, from foreign sources, from countries that are very specifically hostile to the United States, and what if I told you that the United States has barely 45 days' worth of oil on hand in our own Strategic Petroleum Reserve, the answer is obvious. You would want to diversify your energy sources, you would want to move toward energy independence, and that is exactly what we need to do.

Now, if I told you that in the United States we have untapped oil reserves comparable to all of the oil in Arizona, California, Oregon, Washington, Idaho, Montana, Wyoming, Colorado, Utah, New Mexico, North Dakota, and South Dakota combined, you would want to find it since it is here and get it to the American people.

Well, we do have that resource. It is in Alaska under the Arctic National Wildlife Reserve, ANWR. We all know ANWR is the Nation's single greatest prospect for future oil. The Government estimates that ANWR contains approximately 10.4 billion barrels of technically recoverable oil. At peak production at this one site could be produced more oil than any other U.S. State, any other State in this country, Texas or Louisiana, from this one site.

In 1968, the Federal Government estimated that Prudhoe Bay held 9 billion barrels of oil. To date, Prudhoe Bay has produced 13 billion barrels and it is still producing. Now, more than ever, we need to recognize the need to strengthen America's oil supply and now we have the opportunity to do that. America can't afford $3 a gallon, and we can't afford to depend on sources many of which are hostile to the United States.

Some critics complain that drilling in ANWR will hurt the environment. It is simply not true. It was stated again and again in the Chamber yesterday and explained, the prospective drilling site is an area equivalent to the size, if you took a tennis court, of a single postage stamp.

State-of-the-art drilling technology has made remarkable advancements to preserve and protect the environment. It is now possible to extract oil using that horizontal drilling technique from a site that could reach way out from a site that is very tiny, as you look at it on the horizon or area. These are called extended reach wells. We talked yesterday about how far out you can go. You can go out horizontally twice as far as you can vertically, therefore reducing the number of drilling sites.

Developing the Reserve will create hundreds of thousands of jobs for hardworking Americans. It will contribute billions to the economy and strengthen America's energy independence. The oil in ANWR is critical to our economic and national security. I look forward to the vote today on developing this tremendous resource. Responsible, environmentally sensitive exploration will help ease the bottom line for every American family. We are working hard to deliver real solutions for the real problems facing the American people by taking strong, decisive action. Indeed, by today's floor action, we are moving America forward.

---

## ORDER OF PROCEDURE

### AMENDMENT NO. 2347 WITHDRAWN

Mr. FRIST. Mr. President, I ask for the regular order with respect to amendment No. 2347 and I ask that the amendment be withdrawn. I further ask unanimous consent that the Senate proceed to votes in relation to the pending amendments in the order offered; provided further that there be 2 minutes equally divided for debate prior to the votes in relation to any of the pending amendments, in addition to any second degrees offered.

The PRESIDENT pro tempore. Is there objection? Without objection, it is so ordered.

Mr. REID. Mr. President, has the majority leader completed his statement?

---

## RECOGNITION OF THE MINORITY LEADER

The PRESIDENT pro tempore. The Democratic leader is recognized.

Mr. REID. I thank the Chair.

---

## THE BUDGET

Mr. REID. Mr. President, I strongly oppose the Republican budget and the package of reconciliation bills we will be debating and have debated this past week. The Republican budget and the reconciliation bills are fiscally irresponsible and simply will increase the deficit, which is already staggering—$8 trillion.

The budget and these reconciliation bills are based on the wrong values.

They harm vulnerable Americans. And these cuts simply provide tax breaks for special interests. With so many other serious problems facing middle-class families and our Nation, the decision to focus on this reconciliation legislation reflects seriously misplaced priorities. Certainly, together we can do better than this.

The budget of the United States ought to be a mirror of our Nation's values. The budget should reflect what we think is important, what we care about and what we don't. It says a lot about who we are and what we value as a people and a nation, this thing we call the budget.

In essence, a budget is a moral document. Unfortunately, the Republican budget is an immoral document. That is not my term, Mr. President. That is the conclusion of some of our Nation's leading religious leaders who, citing scripture and the Bible, have urged all of us to oppose this budget reconciliation process. As Bishop Mark Hanson, the presiding bishop of the Evangelical Lutheran Church in America, put it, "This is not the time to cut . . . important programs while using the cuts to pay for tax breaks for those who don't need them."

My Republican friends will portray their budget as a way to reduce the deficit. In truth, their budget and these reconciliation bills actually make the deficit worse. In fact, debt under their budget would go up by about $3 trillion in just 5 years. That is fiscally responsible? No. It is irresponsible at any time but especially when we should be saving to prepare for the baby boomers' retirement.

Let's review a little bit of the history. When this administration came to power, our Nation had finally put our fiscal house in order. After many years of deficits and raids on Social Security to pay for other programs, Democrats, without the help of a single Republican vote, stopped that practice.

As a result of our efforts, this Nation ran a surplus from 1998 through 2001, and it was projected we would enjoy surpluses as far as the eye could see. At the time, our future looked so bright that many economists, including Alan Greenspan, seriously worried about what would happen to financial markets if we eliminated our debt altogether. Unfortunately, in these 5 short years, with Washington Republicans in control of the House, the Senate, and the White House, we have moved from a period of record surpluses to a time of record deficits. Once again, we are raiding Social Security, and the deficits in each of the last 3 years have been higher than at any time before President Bush took office.

This year, Social Security has had taken from it—I don't know the exact amount—about $175 billion to mask the deficit. The latest Republican budget before us will make matters even worse. While the majority has divided its budget in a way that obscures its overall effect, nobody should be fooled.

Viewed as a whole, budget reconciliation would increase the deficit by more than $30 billion. After 5 years under their budget, our national debt would exceed $11 trillion.

But the problems with their budget go well beyond its fiscal irresponsibility. This budget reflects the wrong values. It puts more burdens on those already struggling. And if that isn't bad enough, it takes the sacrifices it demands of the less fortunate to partially pay for another round of large tax breaks for the elite of this country.

Let's look at what is in the bill before us.

The budget increases burdens on America's seniors by increasing Medicare premiums, and we have not seen what the House is going to give us.

It cuts health care, both Medicare and Medicaid, by a total of $27 billion.

It cuts support for our farmers by $3 billion.

It cuts housing.

It allows drilling in an Alaskan wildlife refuge, at the behest of the oil and gas industry, even though this year they are going to make a $100 billion profit.

If we take a look at what is happening in the House of Representatives, we can see what is likely coming down the pike from them:

Student loan cuts, food stamp cuts, cuts in child support enforcement, deeper and more painful cuts in health care.

Why? Why are we using expedited procedures for cuts that will harm millions of seniors and working Americans? Is it to reduce the deficit or to pay for Katrina? No; no on both counts. Is it to prepare for the avian flu? No. It is to provide congressional Republicans fiscal cover today so they can turn around tomorrow to provide tax breaks to special interests and multimillionaires.

Let me be more specific. The capital gains and dividend tax breaks in the Republican budget would provide 53 percent of its benefits to those with incomes greater than $1 million. Those lucky few would get an average tax break of about $35,000.

What about those with incomes between, say, $50,000 and $200,000? Well, they will get an average cut of $112. How about those with incomes of less than $50,000? Six dollars—$35,000 for those with incomes of more than $1 million, $6 for those earning less than $50,000. And to partially pay for these tax breaks, many Republicans now want to cut Medicare, cut Medicaid, cut agriculture, cut housing, cut student loans, cut child support enforcement, cut services on which Katrina survivors should be relying, cut benefits needed by our Nation's most vulnerable Americans.

Now you know why some of our Nation's most respected religious leaders call this budget immoral. These choices do not reflect the best of American values. That is not what Americans would want. America can do better.

Finally, beyond the fiscal irresponsibility of this budget and the disturbing choices it makes, there are other more important priorities the Senate should be addressing. Take, for example, skyrocketing prices of fuel. Families are struggling to fuel their vehicles and heat their homes. Farmers and businesses are feeling the pinch. Democrats have a plan to respond, to address price gouging, and ultimately make our Nation energy independent. That is more important than harming the vulnerable to provide tax breaks to special interests while increasing the deficit.

Hurricane survivors are still struggling. Thousands lack health care coverage. More than 200,000 still live in motel and hotel rooms. Devastated communities have been forced into massive layoffs and are unable to provide even basic services, such as a place for kids to go to school. And many survivors who have lost everything are facing the threats of foreclosure and bankruptcy in homes that do not even exist. Democrats have a plan to address these urgent needs. That is more important than harming the vulnerable to provide tax breaks to special interests and multimillionaires while increasing the deficit.

The Iraq war is not going well, as we all know. We were promised by this administration that it would. Mr. President, 2,036 American soldiers have been killed in Iraq. Tens of thousands have been wounded, badly injured; 150,000 more are still in harm's way in Iraq, while the administration still has no plan to end the conflict and bring them home. Instead of being greeted as liberators, the violence continues nearly 3 years after the start of this conflict. Our Nation badly needs a strategy for success, and that, too, is more important than harming the vulnerable to provide tax breaks to special interests and multimillionaires while increasing the deficit.

I urge my colleagues to defeat this budget piece by piece. It is fiscally irresponsible. It is based on the wrong values and reflects the wrong priorities. I would hope together we could do better. Let's reject this budget, and let's focus on the real needs of the middle class and our Nation.

_____

APPROPRIATIONS FOR AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES FOR THE FISCAL YEAR ENDING SEPTEMBER 30, 2006—CONFERENCE REPORT—Resumed

Mr. KERRY. Mr. President, while I recognize there are good things in this bill, today I will be voting against the Agriculture appropriations conference report for two primary reasons. One, it delays the implementation of the country- of-origin labeling for beef and other foods. U.S. consumers deserve to know where their food is grown and processed, and domestic producers deserve the opportunity to differentiate their products from foreign imports. While mandatory country-of-origin food labeling passed as part of the 2002 farm law, its implementation continues to be delayed and this bill would delay it an additional 2 years.

My other primary concern is that the bill cuts funding for many important conservation programs, such as the Conservation Security Program. Since the farm bill was enacted in 2002, the USDA conservation programs have taken hits year after year. They have been used repeatedly as a source of offsets to fund other needs. Including this conference report, the annual appropriations measures from fiscal year 2003 through fiscal year 2006 have cut $1.13 billion in mandatory funds that we dedicated to conservation in the farm bill.

I appreciate the hard work of the chairman and the ranking member, but what came back from the House is not good for our Nation's farmers, it is not good for consumers, and it is not good for conservation. I will, therefore, be voting against it.

Mr. McCAIN. Mr. President, today the Senate will vote on the conference report to H.R. 2744, the Agriculture Appropriations bill for fiscal year 2006. Unfortunately, I cannot support final passage of this bill.

The conference agreement to H.R. 2744 appropriates about $100.9 billion in spending, an amount that is approximately $848 million over the administration's request, $258 million more than the Senate-approved bill and $660 million more than the House-passed bill. As is the case with many of the appropriations bills that come to the floor, this bill and its accompanying report contain earmarks and pork projects which have not been authorized or requested.

I believe that some Federal involvement is necessary to assist low-income families under the Food Stamp Program and that we ensure that our farmers stay out of the red. And to this end, many of the programs under the Agriculture Department are worthwhile and I support their funding. I know that many of my colleagues have spoken before the Senate about the economic struggles of America's farmers, but as Congress looks ahead towards legislating a new farm bill in the near future, we once again conform to the practice of diverting taxpayer dollars into an array of special interest pork projects.

Let's take a look at some of the earmarks that are in this bill: $350,000 for a report on the economic development of the sheep industry in the United States; $1,250,000 for the National Sheep Industry Improvement Center; $210,000 to the Little Red River Irrigation project, Arkansas; $1,800,000 for the Muskingam River Watershed, Mohican River, Jerome and Muddy Fork obstruction removal projects, Ohio; $1,000,000 for a flood prevention project

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 5 of 91

in Kane County, Illinois; $200,000 for a grant to administer a private lands wildlife management program in Alaska; $1,000,000 for a grant to the Ohio Livestock Expo Center in Springfield, OH; $2,250,000 for a grant to the Wisconsin Federation of Cooperatives for pilot Wisconsin-Minnesota health care cooperative purchasing alliance; $200,000 for a grant to the Utah State University for a farming and dairy training initiative; and $500,000 for a grant to the Nueces County, Texas Regional Fairground.

It is a violation of Senate rules to legislate on an appropriations bill, and this fact is far too often overlooked. Authorizing policy is a function reserved for the authorizing committees, not the appropriations committee. As is done far too frequently, this appropriations bill includes a variety of policy changes. Examples include:

The conference agreement authorizes the purchase of land by the Agriculture Research Service in Florence, SC.

The conference agreement authorizes the lease of 40 acres of Federal ARS land to the Colorado State University system.

The conference agreement authorizes the ARS to convey 19 acres of Federal land to Oktibbeha County, MS.

The conference agreement allows for the granting of easements at the Beltsville, MD, Agricultural Research Center.

The conference agreement amends the Rural Electrification Act of 1936 regarding Federal loans.

The conference agreement amends the Immigration and Nationality Act.

The conference agreement amends the Organic Food Production Act of 1990.

The conference agreement amends the Federal Meat Inspection Act.

The statement of managers that accompanies this conference report also includes hundreds of earmarks and questionable projects. Here are some examples: $300,000 for beaver management in North Carolina; $625,000 for game bird predation work with the University of Georgia; $50,000 for control of feral hogs in Missouri; $50,000 for animal tracking systems in the State of Washington; $380,000 to continue control measures for minimizing blackbird damage to sunflowers in North Dakota and South Dakota; $196,000 for geese control in the State of New York; $75,000 for research into peanut production, Dawson, GA; $75,000 for research into seafood waste, Fairbanks, AK; and $250,000 for turf grass research, Beaver, WV.

Despite high gas prices, despite a swelling budget deficit, despite our military operations overseas, and despite our domestic emergencies, pork continues to thrive in good times and bad. The cumulative effect of these earmarks erode the integrity of the appropriations process and, by extension, our responsibility to the taxpayers. We can do better for our farmers and the American people.

Mr. DORGAN. Mr. President, I voted to reject the conference committee's report on the fiscal year 2006 Agriculture appropriations bill. There is much about this bill that I support. It funds important research in North Dakota and across the country that will greatly benefit American agriculture.

I voted against the conference report because of how it treats an important issue called country-of-origin labeling. The 2002 farm bill required that fruits, vegetables, seafood, and meat sold in grocery stores and supermarkets be labeled with its country of origin. This is a consumer-friendly, farmer-friendly, rancher-friendly law, and I strongly supported it. After all, if we can look at a label on our T-shirt and know where it came from, we should be able to do the same with the T-bone steak on our dinner plate.

Country-of-origin labeling, or COOL, was supposed to begin in September 2004. If we had followed the law we passed in the farm bill, American consumers would today be able to know where their food comes from, and our farmers and ranchers would be reaping the benefits. Unfortunately, 2 years ago, opponents of this commonsense law hid a provision in a massive spending bill that delayed the start date for COOL until 2006.

COOL is the law of the land. The Senate has voted overwhelmingly in favor of it. It should have gone into effect years ago. So I was outraged to learn there was another 2-year delay of COOL in this year's Agriculture Appropriations bill.

I knew some opponents of COOL wanted to delay this important program. But I expected that when the conference committee met to write a final version of the Agriculture appropriations bill, we would get a chance to debate this issue and vote on it, in public. Instead, a handful of Republican Senators and Representatives went behind closed doors and decided on their own to delay the program for an additional 2 years.

That is an outrage. I voted no today because I think we should send this bill back to the conference committee and force the conference committee to vote on this issue.

Mrs. CLINTON. Mr. President, today I discuss the Agricultural Appropriations conference report, which recently passed the Senate. Though I was not pleased with all aspects of the final report, I voted in favor of this bill because I support New York farmers and consumers.

I am proud to support the increases made to the Food Stamp Program, which is vital to feeding New York families and children.

The Food Stamp Program plays a critical role in fighting hunger and ameliorating poverty in both our urban and rural communities. This program provides critical resources to millions of low-income families with children, seniors and individuals with disabilities.

In addition, hundreds of thousands of displaced evacuees are currently in need of critical food assistance due to Hurricanes Katrina and Rita. As the Nation works to recover and rebuild from these devastating natural disasters, the widespread need for increased assistance demands that Federal Government food relief efforts be expanded, not cut.

I also welcomed increased funding to child nutrition programs, though I was upset to see that New York State was not included in the USDA's Fruit and Vegetable Program this year. I will continue to work with my Senate colleagues on the Agriculture Committee to ensure that New York is added next year. New York children deserve to have access to fresh produce in their lunch lines and in their schools.

These positive aspects of the bill won my support for the bill as a whole. However, the bill has several important flaws that I must make note of. I am dismayed by the decision to cut funds to the Conservation Security Program, CSP, which provides voluntary incentives for farmers and ranchers to participate in efforts to preserve and enhance their farmland, their natural resources and the environment.

Five watersheds in New York State are currently eligible for CSP sign up in FY 2005—Ausable, Northern and Southern Long Island, Buffalo and Niagara—and about 2,860 farms and over 436,000 acres are enrolled. Two additional New York State watersheds have been proposed to be added to CSP for FY 2006—East Branch Delaware and Oak Orchard—which would add an estimated 1,800 new farms and almost 390,000 acres to the program. Due to the drastic nature of the cuts to the Conservation Security Program, these contracts to New York State farmers are in jeopardy.

I am also extremely disappointed by several of the provisions that were included in the conference report, particularly the decision to once again delay mandatory country-of-origin labeling. This provision was inserted behind closed doors and does not serve the interests of producers and consumers in my state of New York.

The 2002 farm bill required that the U.S. Department of Agriculture write rules and implement mandatory country-of-origin labeling, COOL, of meat products, seafood, fresh and frozen fruits and vegetables, and peanuts by September 2004.

My producers want mandatory COOL because it will give them a competitive advantage over foreign goods, particularly for the fresh market specialty crops that New York produces. It is also good for consumers, who will be able to make an informed choice and buy food produced closer to home. In addition, mandatory COOL will enhance food safety through increased traceability of our food products and will better protect animal and human health.

Despite practical suggestions from small farmers and ranchers for streamlining the country-of-origin labeling process, I am disheartened to see that the decision has instead been made by agribusiness, which doesn't want consumers to know where food comes from.

While I voted for this bill because I feel that it is imperative to keep agriculture and nutrition programs moving forward, I hope to continue to work with my Senate colleagues to address some of the shortcomings in the future.

Mr. CONRAD. Mr President, the fiscal year 2006 Agriculture appropriations conference report was written under some very difficult spending constraints compared to the needs of U.S. agriculture. Because the bill contains many positive elements for North Dakota agriculture, I intend to vote for its passage. However, I am deeply concerned that the appropriators have again adopted a delay in the implementation of the mandatory country-of-origin labeling for U.S. agricultural products. This provision is broadly supported by U.S. farmers and livestock producers who wish to be able to differentiate their products in the marketplace. It is also supported by our consumers who desire to know where their food is produced. It is unfortunate the conference failed to represent those interests.

Mr. SALAZAR. Mr. President, I rise to speak about the fiscal year 2006 Agriculture appropriations bill. I want to thank Chairman BENNETT and Ranking Member KOHL for their long, hard work on this important bill. In the current fiscal environment, it is extremely difficult to put together an Agriculture appropriations bill that meets the needs of rural communities across the U.S., and I believe that Senators BENNETT and KOHL have done an admirable job.

I am very pleased that two of my amendments that were adopted during Senate consideration of this bill were included in the final conference report—specifically, my first amendment will result in a thorough review of the impact the increased cost of gas, natural gas, and diesel is having on farmers, ranchers, and rural communities; and my second amendment will help to address ongoing bark beetle infestation problems.

In addition, I am pleased that Colorado State University will receive funding for several important agricultural research programs such as infectious disease research, Russian wheat aphid research, and beef cattle genetics research.

Unfortunately, I am still concerned about the rural communities this conference report is primarily designed to assist. I am concerned that we are not doing everything we can on behalf of those farmers, ranchers and agri-businesses that continue to play a vital role in our Nation's rural communities. We are not making the necessary investments to keep our young people in

these communities, and we are not making the necessary investments in research and development that will allow those communities to compete economically.

I am also concerned that this bill includes yet another delay for country-of-origin labeling. I believe this is a commonsense provision that will provide American consumers with information about where their food is coming from—information they need and deserve. Common sense dictates that if we can label where our shirts and socks are made, we can surely label where our meat and other kinds of food come from. I was disappointed to see this provision in the conference report, one that I believe will prevent our consumers from receiving the information they need to make an informed choice—the choice to buy American meat.

We can do more. Here is what I am hearing from my State: During harvest, agricultural producers are some of the largest fuel consumers in the U.S., and producers are facing enormous fuel costs. In Grand Junction, CO, diesel prices are over $3.00.

I have heard from one Colorado farmer in Kit Carson County who has estimated that, in order to harvest this year, he will need an additional $46,000 to cover fuel costs alone.

I have also heard from a farmer in northeastern Colorado who, in order to cover the increasing price of fuel, has applied for additional loans at his bank—only to be turned down because he is already overextended with existing loans.

That is why I am so pleased this bill now includes my amendment to require the Secretary of Agriculture to work with the Secretary of Energy to produce a comprehensive report on the impact of high gas prices on our farmers, ranchers, and rural communities across the country. That data is the first step toward a comprehensive solution that will help these communities address these terrible prices.

When you consider that these increasing fuel costs come on top of both natural disasters and an overall budget picture that has resulted in $3 billion worth of cuts to important agricultural programs, it is painfully clear that we must do more to help our producers. I believe we must cooperate to provide our rural residents with increased rural development and sustainable agricultural opportunities as well as reasonable commodity supports and eligibility guidelines to ensure that Federal supports go to the family farmers who are the intended beneficiaries.

Our family farmers, ranchers, and rural business people deserve fair farm, rural development, and conservation programs. They also deserve a safe food supply and other policies that help create more successful communities. I will support this bill, which is a step in the right direction. However, I do so with the recognition that it is not the whole answer, and that we must con-

tinue to fight—fight for the important investments that will assure our rural communities that we have not forgotten them.

The PRESIDENT pro tempore. Under the previous order, the Senate will proceed to a vote on the adoption of the conference report to accompany H.R. 2744.

Mr. GREGG. Mr. President, have the yeas and nays been ordered?

The PRESIDENT pro tempore. They have not.

Mr. GREGG. I ask for the yeas and nays.

The PRESIDENT pro tempore. Is there a sufficient second?

There is a sufficient second.

Mr. FEINGOLD. Mr. President, in September I was pleased to support the Senate version of H.R. 2744, the fiscal year 2006 appropriations bill providing funding for the Department of Agriculture, Food and Drug Administration, and related agencies. I want to thank Senators BENNETT and KOHL for their hard work in crafting that legislation. While I may not have supported every provision, on balance, the Senate bill provided important funding to support our Nation's farmers, rural communities, and conservation programs and to provide nutritious food for seniors, children, and those in need. While I still support many of the provisions that remained in the conference report, there were significant changes and new provisions added that prevent me from supporting the final conference report.

After years of delay, I was encouraged that the Senate bill included funds to implement mandatory country-of-origin labeling, COOL, for meat, vegetables, and fruits. Unfortunately the conference report delays COOL for another 2 years, which is unacceptable for a provision that was part of the 2002 farm bill. Country-of-origin labeling is vitally important to enable our farmers to show their pride in the quality of their products, from ginseng to cheese to cranberries. Wisconsin farmers are proud of their work, and many consumers want to support American products—with country-of-origin labeling, both farmers and consumers benefit.

The strength of the organic certification and labeling program through USDA has been the ability of organic consumers, farmers, processors, and retailers to work together to create a seal that everyone has confidence in. The Harvey court decision challenged some of the procedures in place for organic farming and food processing. This situation should have caused the organic community to again come together, openly discuss the issues, and more than likely propose consensus changes to the law to both ensure the reputation of the organic label and allow for the continued record growth of the organic market. The Senate had included an amendment to require the USDA to report on the effects of the Harvey decision as part of this open process.

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 7 of 91

Unfortunately, some powerful corporate interests who see organic foods simply through the lens of potential profit were able to have language inserted in conference. While some of the inserted changes might ultimately have been adopted after open discussions with interested parties, backroom deals in the dead of night are not the way to go and have the potential for undermining confidence in the entire organic program.

This closed-door process extended to other provisions that were changed in conference to the detriment of the final report, including reductions in conservation funding and the removal of a provision proposed by Senator HARKIN that would have prevented the privatization of food stamp offices.

I am also disappointed that there are not stronger protections against the politicization of decisions made by the Food and Drug Administration. There is no room for politics in science, yet the FDA has demonstrated an alarming indifference to scientific integrity in its unprecedented decision preventing emergency contraception, or Plan B, from being offered over the counter. I strongly believe women should have access to all available contraceptive methods so that they can make choices regarding their personal health. I have supported scientific integrity in the past, and I must express my displeasure that stronger language was not included in the final conference report to prevent the FDA from allowing politics to affect its decision making.

By highlighting the problems with the conference report's process and policy I don't mean to suggest that nothing good remains from the Senate bill. The conference report still rejects a number of administration proposals to reduce or eliminate important programs such as funds for research at our land-grant colleges and universities, conservation partnerships through resource conservation and development councils, and funds to combat Johne's disease in our dairy industry. I was also heartened that the conferees included critical funds to address chronic wasting disease, and an amendment I proposed with Senator ALLARD to speed USDA's development of uniform regulations governing captive deer and elk. But, on balance, I simply cannot support the detrimental changes made in conference to the Senate bill.

Mrs. FEINSTEIN. Mr. President, as a member of the Agriculture Appropriations Subcommittee, I rise today to speak in support of the Agriculture appropriations conference report.

I would particularly like to thank the chairman and ranking member of the Subcommittee, Senators BENNETT and KOHL, for including $7 million in the bill for specialty crop funding.

Americans tend to forget that California is the largest agricultural producing State in the Nation. Of the top 10 agricultural producing counties nationwide, 8 are located in California. We export more crops than any other State, and I am proud to say that 97 percent of our farms are family owned.

As a result, I supported the Specialty Crop Competitiveness Act, legislation to boost the marketing of highly nutritious fruits, vegetables and other specialty crops to American consumers and international markets. The legislation provided, for the first time, a dedicated source of funding to promote the marketing of specialty crop products.

Specialty crops are fruits and vegetables, tree nuts, dried fruits, and nursery crops, including floriculture. Farms in the Golden State produce more than half of the Nation's fruits, vegetables and nuts from just 3 percent of the Nation's farmland. While California accounts for about 13 percent of national cash receipts from agriculture, it receives only about 3 percent of direct government payments to agriculture. These funds, while open to all 50 States, will help California specialty crop farmers.

As the globalization of markets continues, it is becoming increasingly difficult for United States producers to compete against heavily subsidized foreign producers in both the domestic and foreign markets. United States specialty crop producers also continue to face serious tariff and nontariff trade barriers in many export markets. The funding for specialty crops will promote the marketing of specialty crops and improve access to foreign markets and competitiveness.

I am extremely pleased that we were able to include $7 million for crops that are so vital to our Nation's food supply.

In addition, I would like to thank the chairman and ranking member for including other projects that will benefit California.

They include: $1.35 million for the California County Pest Detection Augmentation Program. These funds will help California counties increase high-risk pest exclusion inspection activities of new shipments of plants, seeds, fruits, vegetables, and animals. Pest exclusion is critical to a successful agricultural industry because it is more effective and less costly to prevent the introduction and establishment of potentially harmful exotic pests from the local environment than it is to eliminate them;

$24.25 million for the Glassy-winged Sharpshooter/Pierce's Disease Control Program. The glassy-winged sharpshooter is an invasive pest that spreads bacteria that kills grapes, almonds and tree fruits. This funding will be used to develop the resources to eliminate the spread of the disease;

$200 million for the Market Access Program. This nationwide program provides funding to promote the export of American agricultural products;

$1.929 million for Exotic Pest Disease Research at the University of California. The Exotic Pest and Disease Research Program funds research to combat a wide variety of exotic organisms that have invaded or could invade California. Recent successes in the program include determining the origin of avocado thrips found in Ventura and Orange counties—causing an $8.7 million annual loss to growers—and identifying natural enemies to control the thrips and replace pesticides previously in use. A similar approach is being developed for the Avocado Lace Bug. In addition, the program has funded work on such organisms as Sudden Oak Death, red imported fire ant, and Mediterranean fruitfly;

$20 million for the Farmers' Market Nutrition Program. The program provides nutritional information and supplements as well as healthcare referrals to low-income mothers and pregnant women. The Farmers Market Nutrition Program provides coupons to participants to use to buy produce from small farmers, and nutrition information is provided through the local Farmers Market Nutrition Program agency;

$3.076 million for the Sudden Oak Death Control Program. Funding will be used to continue researching Sudden Oak Death Disease, which infects and destroys oak and tanoak trees;

$401.00 for Ozone Air Quality Research by the San Joaquin Valleywide Air Pollution Study Agency. A multiyear, intensive air quality study is needed to meet the requirements of Regional Haze State Implementation Plans anticipated after 2008. This study would build upon the Central California Ozone Study and the California Regional Air Quality Study. These new studies will include an ozone filed study, data analysis, modeling performance evaluations, air quality and meteorological modeling improvements, and a retrospective look at previous State Implementation Plan modeling.

This bill is extremely important to ensuring a safe and secure domestic food supply. I would like to again thank the chairman and the ranking member for all of their hard work on this bill.

The question is on agreeing to the conference report. The clerk will call the roll.

The assistant journal clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER (Mr. SUNUNU). Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 81, nays 18, as follows:

[Rollcall Vote No. 282 Leg.]

YEAS—81

| | | |
|---|---|---|
| Akaka | Burr | Cornyn |
| Alexander | Byrd | Craig |
| Allard | Cantwell | Crapo |
| Allen | Carper | Dayton |
| Bennett | Chafee | DeMint |
| Biden | Chambliss | DeWine |
| Bingaman | Clinton | Dole |
| Bond | Cochran | Domenici |
| Boxer | Coleman | Durbin |
| Brownback | Collins | Feinstein |
| Bunning | Conrad | Frist |

| Graham | Lincoln | Salazar |
| Gregg | Lott | Santorum |
| Hagel | Lugar | Sarbanes |
| Hatch | Martinez | Schumer |
| Hutchison | McConnell | Sessions |
| Inhofe | Mikulski | Shelby |
| Inouye | Murkowski | Smith |
| Isakson | Murray | Snowe |
| Jeffords | Nelson (FL) | Specter |
| Kennedy | Nelson (NE) | Stabenow |
| Kohl | Obama | Stevens |
| Landrieu | Pryor | Talent |
| Lautenberg | Reed | Vitter |
| Leahy | Reid | Voinovich |
| Levin | Roberts | Warner |
| Lieberman | Rockefeller | Wyden |

NAYS—18

| Baucus | Ensign | Kerry |
| Bayh | Enzi | Kyl |
| Burns | Feingold | McCain |
| Coburn | Grassley | Sununu |
| Dodd | Harkin | Thomas |
| Dorgan | Johnson | Thune |

NOT VOTING—1

Corzine

The conference report was agreed to.

Mr. BENNETT. Mr. President, I move to reconsider the vote.

Mr. INHOFE. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

## DEFICIT REDUCTION OMNIBUS RECONCILIATION ACT OF 2005—RESUMED

AMENDMENT NO. 2351

The PRESIDING OFFICER. It is now in order to consider the Conrad amendment. There is 2 minutes equally divided.

Mr. CONRAD. Mr. President, I ask unanimous consent that Senator BIDEN be added as a cosponsor.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CONRAD. Mr. President, the best argument made for my amendment, which is to restore fiscal responsibility, is the argument made by the chairman of the Budget Committee in 2002. Here is what he said:

The second budget discipline, which is pay-go, essentially says if you are going to add a new entitlement program, or you are going to cut taxes, you must offset that event so that it becomes a budget neutral event. If we don't do this, if we don't put back in place caps and pay-go, we will have no budget discipline, and as a result we will dramatically aggravate the deficit, which, of course, impacts a lot of important issues but especially impacts Social Security.

The budget chairman was right then. It is the right position now. Support the restoration of the budget discipline of pay-go.

The PRESIDING OFFICER. The Senator's time has expired.

The Senator from New Hampshire is recognized.

Mr. GREGG. Mr. President, I was correct then, and that is why we put pay-go into this resolution. The budget resolution does have pay-go in it, and it is the appropriate approach to pay-go because it recognizes there is a difference between tax relief and raising spending. The other side of the aisle has always looked on people's taxes as their

money. We don't look at it that way on this side of the aisle. We look at it as the people's money, and they should be able to keep it. We should not have a rule that arbitrarily takes it from them.

For that reason, I oppose the amendment.

I make a point of order that the pending amendment is not germane before the Senate, and I raise a point of order under section 305 of the Budget Act.

Mr. CONRAD. Mr. President, pursuant to section 904 of the Congressional Budget Act of 1974, I move to waive the applicable section of the act for the consideration of the pending amendment.

I ask for the yeas and nays, and I ask my colleagues to support this budget discipline.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The question is on agreeing to the motion.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. (Ms. MURKOWSKI). Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted—yeas 50, nays 49, as follows:

[Rollcall Vote No. 283 Leg.]

YEAS—50

| Akaka | Durbin | Mikulski |
| Baucus | Feingold | Murray |
| Bayh | Feinstein | Nelson (FL) |
| Biden | Harkin | Nelson (NE) |
| Bingaman | Inouye | Obama |
| Boxer | Jeffords | Pryor |
| Byrd | Johnson | Reed |
| Cantwell | Kennedy | Reid |
| Carper | Kerry | Rockefeller |
| Chafee | Kohl | Salazar |
| Clinton | Landrieu | Sarbanes |
| Collins | Lautenberg | Schumer |
| Conrad | Leahy | Snowe |
| Dayton | Levin | Stabenow |
| Dodd | Lieberman | Voinovich |
| Dorgan | Lincoln | Wyden |
|  | McCain |  |

NAYS—49

| Alexander | Dole | McConnell |
| Allard | Domenici | Murkowski |
| Allen | Ensign | Roberts |
| Bennett | Enzi | Santorum |
| Bond | Frist | Sessions |
| Brownback | Graham | Shelby |
| Bunning | Grassley | Smith |
| Burns | Gregg | Specter |
| Burr | Hagel | Stevens |
| Chambliss | Hatch | Sununu |
| Cochran | Hutchison | Talent |
| Coleman | Inhofe | Thomas |
| Cornyn | Isakson | Thune |
| Craig | Kyl | Vitter |
| Crapo | Lott | Warner |
| DeMint | Lugar |  |
| DeWine | Martinez |  |

NOT VOTING—1

Corzine

The PRESIDING OFFICER. On this vote, the yeas are 50, the nays are 49. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected. The point of order is sustained and the amendment falls.

Mr. OBAMA. Madam President, I rise today to speak in favor of fiscal respon-

sibility. This pay-go amendment introduced by Ranking Member CONRAD of the Budget Committee, of which I am a cosponsor, seeks to fully reinstate the pay-as-you-go requirement for direct spending and revenue legislation in the Senate through 2010.

This is about restoring responsible budgeting. Previously, pay-go rules applied equally to increases in mandatory spending and decreases in revenue. New spending or tax cuts could only become law if they were offset or found 60 votes in support. This enforced a badly needed budget discipline. It said, either pay for your priorities whether entitlement spending or tax cuts or both or find a supermajority of colleagues willing to override the rule. Simple logic. Simple balance. Common sense. Pay-go worked well in the 1990s to reduce deficits and it can work well today.

Unfortunately, the rules were changed, and the balance was overturned. Now, the requirements of budget discipline apply to only half of the budget. Tax breaks are exempt from the logic and balance and common sense of budget discipline.

The problem is that there is no such thing as half a budget. Budget discipline requires enforcing control over both sides of the ledger. You can't fill a bath tub just by plugging the drain. You can't drive a car just by pressing on the brakes.

The original pay-go rules were abandoned to provide for a series of unfunded tax breaks. And since the tax breaks were unfunded, the Government had to borrow money to pay for them. So we borrowed from countries like Japan and China. And we borrowed from the Social Security trust fund. In the process, our national debt shot up to $8 trillion, and it is still rising. Last year, for example, our national commitments exceeded our national resources by more than $550 billion. And we continue to borrow.

Some have argued that this first chapter of reconciliation is an effort to reduce the deficit. They tout the reductions in spending, many of which I would support. But later this month, the Senate will get to chapter two of reconciliation, which proposes further unfunded tax breaks and guarantees additional deficits and growing debt. So much debt, in fact, that the third chapter of budget reconciliation, which no one really wants to talk about, will involve raising our country's debt ceiling to almost $9 trillion.

Americans deserve better financial leadership. The people I talk to in Illinois are not fooled by what is going on. They know what is happening with higher deficits and reduced levels of government service. They understand that, in this life, you get what you pay for and if you don't pay for it today, it will cost you more tomorrow.

Washington could learn a lot from the American people about fiscal responsibility. The people I have met with know that if you need to spend more money on something, you also

CONGRESSIONAL RECORD — SENATE *November 3, 2005*

need to make more money, and if your income falls, your spending must fall, too. This is the essence of the pay-go rules we are trying to reinstate in the Senate. Changes in spending must be offset by changes in revenue, and vice versa.

Americans know that when you are already deep in debt, it is not the optimal time to be gutting your revenue stream, whether it's a few hundred dollars in the case of a family or a $70 billion tax break in the case of the Federal Government.

They also understand the difference between a home mortgage, a student loan, a credit card debt for uninsured health care expenses, and an unpaid tab at the bar. They know that some debts are good investments or may be unavoidable. But some debts are irresponsible the result of spending more than you can afford on purchases you could postpone or do without.

The people I have met with know that you do not respond to emergencies by indiscriminately cutting all parts of the family budget. You make choices and forego luxuries before cutting back on essentials like food, heating, education, and healthcare. They understand that across the board cuts are neither fair nor responsible. Such cuts sound bold, but they represent a lack of leadership, not an example of it.

The American people also know that the whole family must share in sacrifice—it is not right to pick on any one member of the family, or any one State in our Union. We are in this together. Singling out Alaska's bridge projects or any one State's earmarked funds is the wrong approach. If Congress is going to eliminate frivolous pork projects, as we should to support the gulf coast, let's eliminate all of them, in all States, together.

Finally, the people I talk to understand that when you have massive costs coming down the road, you need to prepare for them. There is no excuse for ignoring the financial consequences of foreseeable expenses whether it is the rising costs of health care, the retirement of the baby boom generation, or the growing inequality of wealth in our society.

You don't have to be a deficit hawk to be disturbed by the growing gap between revenues and expenses. This makes sense to people because the same principles that apply to our national budget apply to their family budgets as well. Americans are willing to share in the hard choices required to get us back on track, as long as they know that everyone is pulling their weight and doing their fair share.

That is why it is so important that we reinstate pay-go in a way that meaningfully enforces the budget discipline both sides of the aisle need to honestly tackle our short-term and long-term fiscal challenges.

Mr. President, it is time for fiscal responsibility to return to Washington. Adult supervision must return to the budgeting process.

Pay-go provides a necessary tool at a necessary time. I urge my colleagues to support this amendment.

AMENDMENT NO. 2352, AS MODIFIED

The PRESIDING OFFICER. At this time there is 2 minutes on the Enzi amendment.

The Senator from New Hampshire.

Mr. GREGG. I will yield to Senator ENZI.

Mr. CONRAD. The Senate is not in order. The Senator deserves a chance to be heard.

The PRESIDING OFFICER. The Senate will be in order.

The Senator from Nevada.

Mr. ENSIGN. Madam President, at the end of 2 minutes, that time expired, I intend to send a second-degree amendment to the Enzi amendment to the desk. Let me briefly describe it. My amendment addresses the concerns of the Orthodox Union, the Catholic Bishops, and the Council on American Private Education. My amendment clearly establishes an indirect aid program for displaced private school students that meets all the constitutional requirements without placing unworkable and unnecessary restrictions on private schools serving these displaced families. It ensures accountability for the funds and, most important, delivers on the much-needed relief to ensure the restart and operation of schools at all levels in the affected areas.

The 2002 Zellman decision by the Supreme Court clarified that religious schools which accept Government funding do not have to modify their teachings and curricula in order to receive Government funding so long as the Government aid arrives at the school by virtue of an independent choice made by the student and parent, and this amendment complies with that decision and meets all of its constitutional requirements.

The PRESIDING OFFICER. The time of the Senator has expired.

The Senator from Wyoming.

Mr. ENZI. I hate to debate a second-degree amendment that has not yet been sent to the desk.

Mr. CONRAD. Could we have order, Madam President.

Mr. ENZI. At the appropriate point in time I will be raising the point of germaneness. This amendment shows the Gordian knot we are trying to cut through so we can do the right things for the children of Katrina.

What we have is constitutional. We are not trying, in the amendment that will be up as the original amendment, to resolve vouchers. We are not trying to resolve faith-based initiatives. What we are trying to do is do the right thing to treat the kids of Katrina the right way, and in order to solve this it has to be a very bipartisan way because we also will have to overcome a point of germaneness.

I yield the remainder of my time to Senator KENNEDY.

Mr. KENNEDY. Madam President, we should not penalize the children of Louisiana and the gulf, once by the storm and once by this amendment. This amendment does not have accountability. It allows Federal funds to be used for religious purposes. It guts the civil rights protections of our proposal.

For the sake of the children and for the sake of the schools, I hope this amendment will be defeated.

AMENDMENT NO. 2404 TO AMENDMENT NO. 2352, AS MODIFIED

(Purpose: To provide assistance for elementary and secondary schools and students, and institutions of higher education, affected by Hurricane Katrina)

Mr. ENSIGN. I send a second-degree amendment to the Enzi amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Nevada [Mr. ENSIGN] proposes amendment No. 2404 to amendment No. 2352, as modified.

Mr. ENSIGN. I ask unanimous consent the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

(The amendment is printed in today's RECORD under "Text of Amendments.")

Mr. ENZI. The pending amendment is not germane to the measure now before the Senate. I raise a point of order under section 305 of the Budget Act.

The PRESIDING OFFICER. The Senator from Nevada.

Mr. ENSIGN. Pursuant to section 904(c) of the Congressional Budget Act of 1974, I move to waive section 305 of the Budget Act for the consideration of the Ensign second-degree amendment. I ask for the yeas and nays on the motion.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Madam President, as I understand it, and I am not sure I understand it, I believe there is now still 2 minutes of debate available between the proponent of the second degree and the proponent in opposition. Is that correct?

The PRESIDING OFFICER. The Senator is correct.

Mr. GREGG. I presume Senator ENZI and Senator ENSIGN can continue their discussion.

Mr. KENNEDY. Madam President, will the Senator yield?

Is this the total time? I thought we had a minute on each side on each amendment. Are we now debating the Enzi underlying amendment?

The PRESIDING OFFICER. There is 2 minutes on the second-degree amendment, the Ensign amendment.

Mr. GREGG. Madam President, parliamentary inquiry. And I ask unanimous consent that this time not be applied to the time relative to the debate that is available.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from New Hampshire.

Mr. GREGG. As I understand the situation, the 2 minutes of debate has already occurred on the Enzi amendment. We are now under 2 minutes of debate on the second-degree amendment, which is the Ensign amendment. Is that correct?

The PRESIDING OFFICER. The Senator is correct.

Mr. GREGG. After this amendment is debated, there will be a vote on the motion to waive the point of order made by Senator ENZI from Wyoming, the motion to waive being made by Senator ENSIGN relative to the second-degree amendment. Is that correct?

The PRESIDING OFFICER. The Senator is correct.

The Senator from Massachusetts.

Mr. KENNEDY. Parliamentary inquiry, Madam President: I thought we were having the 2 minutes prior to each vote just over the course of the day on these different amendments. It is my mistake because I thought we were just voting on the Ensign amendment, and then, when we disposed of that, we would have a vote up or down on the underlying amendment. But I guess that is not the way we are going to proceed.

Mr. GREGG. Madam President, if I may respond to the Senator from Massachusetts.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Madam President, I say to the Senator from Massachusetts, because there was a second degree, the way it worked out, the debate on the Enzi amendment occurred as part of that process. So the 2 minutes did occur. However, because this is the first exercise here in this undertaking, I would suggest that, after the Ensign amendment is disposed of, if it is favorably disposed of, that there won't be 2 minutes, but if it is not favorably disposed of we would have another 2 minutes of debate on the Enzi amendment.

Mr. KENNEDY. I thank the chairman of the Budget Committee.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Wyoming.

Mr. ENZI. Madam President, to clarify this, why would we have the debate on the overlying motion before we have the debate on the underlying motion and then try to deny a debate on the overlying motion at the appropriate time?

I would ask the chairman and the ranking member to consider this process. It will save a lot of time if the person suggesting a second-degree amendment do the debate on the second-degree amendment. Did anybody here hear the debate on the first-degree amendment? That was debate on the second-degree amendment.

So we disposed with the debate on the second-degree amendment. Now we ought to have the vote on the second-degree amendment, not another debate

on the second-degree amendment and then go to the first-degree amendment without debate—or even with debate.

If we are going to limit the time, we need to limit the time each time. And if somebody is going to do a second-degree amendment, they ought to do their debate on the second-degree amendment, face the vote on the second-degree amendment, and move on. But you ought to get your time to debate your motion at the time of the vote on the motion, not an hour later.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Madam President, I think the Senator from Wyoming has made an excellent case. We will try to orchestrate it in that manner, should we get additional second degrees.

At this point, the debate for 2 minutes is on the second-degree amendment, and Senator ENSIGN has a minute, and whoever claims the opposition has a minute.

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. KENNEDY. Madam President, as I understand it, Senator ENZI has made the point of order, has he not, on this amendment?

The PRESIDING OFFICER. The Senator is correct.

The Senator from Wyoming.

Mr. ENZI. Parliamentary inquiry: I think I would have to withdraw that point of germaneness and he would have to withdraw his in order for us to have continuing debate. Is that not true?

The PRESIDING OFFICER. All debate is expired except under the order. There is now 2 minutes of debate on the second-degree amendment.

Mr. ENZI. Madam President, parliamentary inquiry: Does that mean my point of order was on my amendment and his motion to waive was on my amendment, not on his?

The PRESIDING OFFICER. The pending motion is to waive the point of order against the Ensign second-degree amendment.

Mr. ENZI. That will be what the debate is on? I thought debate did not happen once the germaneness was entered.

The PRESIDING OFFICER. By unanimous consent, the order was changed.

The Senator from Nevada.

Mr. ENSIGN. Madam President, now that we have been through all that, just to restate, the managers of the underlying amendment believe their proposal is constitutional. But the lawyers for the private schools, the ones who have looked at this, believe they could not accept the aid in a constitutional manner, that people will be able to bring a court case against them and that they would lose if they did not change the way they do their instruction. They have a moral, religious-based instruction. They believe they would have to change it.

Our amendment clearly makes the way they receive the funds constitutional. We both want to provide help

for those people who have been displaced, for those schools that have taken in these displaced students. We both want to have the help go. What we want to do, though, is allow the private schools to function as they have been functioning in the past. If you are a Catholic school, you would be able to function as a Catholic school functions and not be penalized for that because you have taken in these displaced students and are getting some Federal aid.

The PRESIDING OFFICER. The Senator from Wyoming.

Mr. ENZI. Madam President, I guess there have been a lot of constitutional lawyers involved in all of this. I certainly want people to know we also conferred with constitutional lawyers and found a way to be able to do, on a one-time emergency basis, what needs to be done properly for the kids of Katrina and for any other major event where we have a large number of displaced students. But this one just deals with the one-time emergency event. It is constitutional. It does not, however, as Senator ENSIGN would like to do, resolve the voucher issue, and it does not resolve the faith-based initiative issue. But it does get help to kids, and that is what we are trying to do with all the education amendments we have today.

I yield the remainder of my time to Senator KENNEDY.

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. KENNEDY. Madam President, as the chairman of the committee has pointed out, we have reviewed and cleared this with constitutional authorities. This is an indirect way of providing help and assistance to the children. The alternative is effectively a voucher program. We have tried to stay clear from ideological fixes on this.

Let's treat the children with respect and the schools with respect and in the generosity with which they have treated these children. I hope the amendment will be defeated.

Mr. BINGAMAN. Madam President, I would like to talk about the Enzi-Kennedy amendment to S. 1932, the deficit reduction bill. We all want to do the right thing and help the hundreds of thousands of students displaced by Hurricane Katrina. Just a few weeks after the tragic events surrounding Hurricane Katrina, I came to the floor of the Senate and offered an amendment to the Commerce-Justice-State appropriations bill to assist students and schools impacted by Hurricane Katrina. I also cosponsored a bill with Senators ENZI and KENNEDY, S. 1715, to assist schools and students impacted by Katrina. But I have tremendous concerns about the amendment before us today.

This amendment sets up an unworkable mechanism to assist displaced students attending private schools. It requires states to funnel Federal dollars to local school districts to establish private accounts to pay the tuition to private schools. In contrast, current

law provides a reasonable mechanism for local school districts to assist students attending private schools, called equitable participation, without establishing a national voucher program. I support efforts to use equitable participation to assist private schools serving these displaced students. Unfortunately, this amendment fails to use this mechanism. At the same time, it establishes the first national voucher program. Accordingly, along with educators, school boards, principals, teacher unions, and many civil rights and faith-based organizations, I must oppose this provision.

Mr. REED. Madam President, while the Enzi-Kennedy amendment passed on a voice vote, I want the record to reflect my opposition to this amendment.

We have all seen the devastation of Hurricanes Katrina and Rita, and I certainly understand and share my colleagues' desire to address the needs of displaced school children.

Unfortunately, this amendment, which frankly is more than 2 months overdue, falls far short of the help needed for the affected families and public schools. It falls short financially, since it provides less money than these schools need in order to re-open and serve the children of the Gulf Coast. It also falls short constitutionally by making payments to private religious schools on behalf of students who fled these hurricanes and are now attending such schools across the country.

Now, I understand that these hurricanes did not differentiate between public and private school students, and that we need to be able to provide some assistance for all students affected by them. However, this amendment is not the answer. As my colleagues are very well aware, we currently have a mechanism in current law to provide support to students in private schools. We do it everyday under Title I and Title V of NCLB, and under IDEA.

These children should have been helped over 2 months ago with the funding mechanisms we already have in place. That is why this amendment is not about getting help to these students. This is about using these students' needs as a pawn to further the Republican agenda of vouchers.

In addition, we are doing a disservice to families displaced by Hurricanes Katrina and Rita by not informing them that this assistance is just for this school year. No where in this legislation is there a requirement that parents be notified that this assistance is temporary and that it will not be renewed beyond August 2006. Instead of being fair to these parents by providing them with transparent information, this amendment fails to include a provision to notify parents that this assistance is time-limited. We have an obligation to inform parents receiving this assistance that this funding is a one-time deal. Without clear language on this point, language which I suggested to the sponsors of the amend-

ment, parents will have an unfounded expectation that this aid will be there next year and perhaps even for years to come. These families are settling down in new communities, and they may lack the resources, ability, or desire to go back to the gulf coast.

Of course, we want to help families in their moment of need and distress. I understand my colleague, Senator LANDRIEU's position on this matter, and her sincere desire to help her constituents. I too believe this assistance to schools, both public and private, is important, needed, and appropriate. But this amendment could and should have been structured in a way that contains clear notification requirements and that mirrors current law.

This legislation is not the direction we should be heading. This legislation is a stalking horse for a national voucher program. At the same time, it provides less funding than is needed to repair and fund our devastated public schools. It provides very little accountability for the use of taxpayers' funds and provides little or no enforcement of the civil rights protections that would exist if money were sent through existing funding mechanisms.

I want to thank Senators ENZI, ALEXANDER, KENNEDY, and DODD, because I know that they have worked very hard to improve this amendment, and I appreciate their efforts. I urge my colleagues to continue to work to address the concerns I have raised as this bill moves forward.

Mr. KOHL. Madam President, I support the Enzi amendment. This amendment would provide $1.6 billion in emergency funding to address the desperate funding needs of schools who have taken in displaced Katrina students and the schools that have been damaged or destroyed by the hurricane.

Over 2 months ago, hundreds of thousands of children in the gulf region were displaced from their homes, their communities, and their local schools. Neighboring communities have welcomed these students with open arms. It is only fair to provide school districts the funds necessary to educate and care for dislocated students left in the wake of Hurricane Katrina.

I know some are concerned about funding for displaced students who are attending private schools. However, this provision is carefully crafted to ensure that funding flows directly to school districts, much like similar provisions in Title I and special education. This program will not set up a national school voucher program. Rather, it simply ensures, on a temporary, one-time basis, that all students in need and schools that take them in have access to the relief they need. In this extraordinary circumstance, I believe that this provision takes a balanced approach, and we will continue to monitor its implementation.

It is my hope that my colleagues will join me in supporting the Enzi amendment, thereby supporting students who

became displaced through no fault of their own.

The PRESIDING OFFICER. All time has expired.

The question is on agreeing to the motion. The yeas and nays have been ordered. The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result yeas and nays resulted— yeas 31, nays 68, as follows:

[Rollcall Vote No. 284 Leg.]

YEAS—31

| | | |
|---|---|---|
| Allard | Dole | McCain |
| Allen | Ensign | McConnell |
| Bennett | Frist | Santorum |
| Brownback | Graham | Sessions |
| Bunning | Grassley | Shelby |
| Coburn | Gregg | Sununu |
| Coleman | Hagel | Thune |
| Craig | Hatch | Vitter |
| Crapo | Inhofe | Voinovich |
| DeMint | Kyl | |
| DeWine | Martinez | |

NAYS—68

| | | |
|---|---|---|
| Akaka | Dorgan | Murkowski |
| Alexander | Durbin | Murray |
| Baucus | Enzi | Nelson (FL) |
| Bayh | Feingold | Nelson (NE) |
| Biden | Feinstein | Obama |
| Bingaman | Harkin | Pryor |
| Bond | Hutchison | Reed |
| Boxer | Inouye | Reid |
| Burns | Isakson | Roberts |
| Burr | Jeffords | Rockefeller |
| Byrd | Johnson | Salazar |
| Cantwell | Kennedy | Sarbanes |
| Carper | Kerry | Schumer |
| Chafee | Kohl | Smith |
| Chambliss | Landrieu | Snowe |
| Clinton | Lautenberg | Specter |
| Cochran | Leahy | Stabenow |
| Collins | Levin | Stevens |
| Conrad | Lieberman | Talent |
| Cornyn | Lincoln | Thomas |
| Dayton | Lott | Warner |
| Dodd | Lugar | Wyden |
| Domenici | Mikulski | |

NOT VOTING—1

Corzine

The PRESIDING OFFICER. On this vote the yeas are 31, the nays are 68. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected. The point of order is sustained and the amendment falls.

Mr. BOND. I move to reconsider the vote.

Mr. KENNEDY. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 2352, AS MODIFIED

Mr. GREGG. Madam President, the next amendment is the Enzi amendment. I ask that we move immediately to a voice vote.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The amendment (No. 2352), as modified, was agreed to.

Mr. GREGG. I move to reconsider the vote.

Mr. KENNEDY. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GREGG. Madam President, the next amendment is the Lincoln amendment. I ask unanimous consent that all votes on additional amendments be 10 minutes.

We are going to clarify the issue of second-degree amendments that we just went through because, under the rule, all time has to expire on debate on the first degree before you can debate a second degree or offer it. That is why we had the confusion before. We are going to adjust that through this unanimous consent request.

I ask unanimous consent that for the purposes of today's votes, all second-degree amendments must be offered prior to beginning the 2 minutes of debate on the underlying first-degree amendment. Before the Chair rules, as a clarification, this will now mandate that second-degree amendments must be offered before we begin the 2-minute debate on the first degree. We would then have 2 minutes of debate on the second degree, both in relationship to the second degree, and then have 2 minutes of debate on the first degree prior to the vote in relationship to that amendment.

The PRESIDING OFFICER. The Senator from North Dakota.

Mr. CONRAD. Reserving the right to object, I would say to Senators who are in the back of the Chamber, who are most interested in this question, this is a good time to hear what is being done to correct what occurred previously. What occurred previously was, under the rule, all time had to expire on the first-degree amendment before a second-degree amendment could be offered. Under the interpretation of the Chair, that included the 2 minutes of debate on the first-degree amendment. Now what we are doing is modifying that through unanimous consent agreement so if someone offers a second degree, they have to offer it before the 2 minutes of debate on the first degree. Then we will be able to have 2 minutes of debate on the second degree, a vote on the second degree. Then, in consideration of the first degree, we will be able to have the 2 minutes of debate in conjunction with it. For the interest of our colleagues, that is what is being done.

We should take this moment, as well, to say to our colleagues, we have 35 amendments filed. That would take 12 hours of straight voting. We have to end today at 6 o'clock, which would mean we would be in tomorrow for at least 4 hours. I ask our colleagues to show restraint on calling up amendments that have been filed. We have had a good debate on this matter. It has been an absolutely fair debate in terms of how we have been treated with respect to amendments being offered. We really don't need to have 35 amendments offered to this measure. I urge my colleagues to show restraint.

I will not object.

Mr. GREGG. I also renew my request that votes on additional amendments be 10-minute votes.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. GREGG. The next amendment is that of Senator LINCOLN.

AMENDMENT NO. 2356, AS MODIFIED

The PRESIDING OFFICER. There is now 2 minutes of debate evenly divided on the Lincoln amendment.

The Senator from Arkansas.

Mrs. LINCOLN. Madam President, I modify my amendment with the language that is currently at the desk.

The PRESIDING OFFICER. The amendment is so modified.

The amendment, as modified, is as follows:

At the end of subtitle A of title VI, add the following:

**CHAPTER 7—EMERGENCY HEALTH CARE AND OTHER RELIEF FOR SURVIVORS OF HURRICANE KATRINA**

**Subchapter A—Emergency Health Care Relief**

**SEC. 6081. DEFINITIONS.**

In this subchapter:

(1) DIRECT IMPACT PARISH OR COUNTY.—

(A) IN GENERAL.—The term ''direct impact parish or county'' means a parish in the State of Louisiana, or a county in the State of Mississippi or Alabama, for which a major disaster has been declared in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170) as a result of Hurricane Katrina and which the President has determined, before September 14, 2005, warrants individual and public assistance from the Federal Government under such Act.

(B) EXCLUSION.—Such term does not include a parish in the State of Louisiana or a county in the State of Mississippi or Alabama which the President has determined warrants only public assistance from the Federal Government under such Act as a result of Hurricane Katrina.

(C) AUTHORITY TO RELY ON WEB SITE POSTED DESIGNATIONS.—The Secretary of Health and Human Services shall post on the Internet Web site for the Centers for Medicare & Medicaid Services a list of parishes and counties identified as direct impact parishes or counties in accordance with this paragraph. Any such parish or county that is posted on such Web site as a direct impact parish or county shall be treated for purposes of subparagraph (A) as described in such subparagraph.

(2) DRM ASSISTANCE.—The term ''DRM assistance'' means the short-term, non-cash, temporary, in-kind, emergency disaster relief health program established under section 6082 to assist Katrina Survivors in accordance with that section.

(3) DRM COVERAGE PERIOD.—

(A) IN GENERAL.—The term ''DRM coverage period'' means the period beginning on August 28, 2005, and, subject to subparagraph (B), ending on the date that is 5 months after the date of enactment of this Act.

(B) AUTHORITY TO EXTEND DRM COVERAGE PERIOD.—

(i) IN GENERAL.—The Secretary may extend the DRM coverage period for an additional 5 months. Any reference to the term ''DRM coverage period'' in this subchapter shall include any extension under this clause.

(ii) NOTICE TO CONGRESS AND STATES.—The Secretary shall notify the Majority and Minority Leaders of the Senate, the Speaker of the House of Representatives, the Minority Leader of the House of Representatives, the Chairs and Ranking Members of the Committee on Finance of the Senate and the Committees on Energy and Commerce and Ways and Means of the House of Representatives, and the States at least 45 days prior to—

(I) extending the DRM coverage period; or

(II) if the Secretary determines not to extend such period, the ending date described in subparagraph (A).

(4) KATRINA SURVIVOR.—

(A) IN GENERAL.—The term ''Katrina Survivor'' means an individual who is described in subparagraph (B) or (C).

(B) RESIDENTS AND EVACUEES OF DIRECT IMPACT PARISHES AND COUNTIES.—An individual who, on any day during the week preceding August 28, 2005, had a primary residence in a direct impact parish or county.

(C) INDIVIDUALS WHO LOST EMPLOYMENT.—An individual whose—

(i) worksite, on any day during the week preceding August 28, 2005, was located in a direct impact parish or county; and

(ii) employment with an employer which conducted an active trade or business on August 28, 2005, in a direct impact parish or county and with respect to whom such trade or business is inoperable on any day after August 28, 2005, and before January 1, 2006, as a result of damage sustained in connection with Hurricane Katrina, is terminated.

(D) TREATMENT OF CURRENT MEDICAID BENEFICIARIES.—Nothing in this subchapter shall be construed as preventing an individual who is otherwise entitled to medical assistance under title XIX of the Social Security Act from being treated as a Katrina Survivor under this subchapter.

(E) TREATMENT OF HOMELESS PERSONS.—For purposes of this subchapter, in the case of an individual who was homeless on any day during the week described in subparagraph (B), the individual's ''residence'' shall be deemed to be the place of residence as otherwise determined for such an individual under title XIX of the Social Security Act.

(5) POVERTY LINE.—The term ''poverty line'' has the meaning given that term in section 2110(c)(5) of the Social Security Act (42 U.S.C. 1397jj(c)(5)).

(6) SECRETARY.—The term ''Secretary'' means the Secretary of Health and Human Services.

(7) STATE.—The term ''State'' has the meaning given that term for purposes of title XIX of the Social Security Act (42 U.S.C 1396 et seq.).

(8) STATE MEDICAID PLAN.—The term ''State Medicaid plan'' means a State plan for medical assistance under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.), including any medical assistance provided under a waiver of such plan.

**SEC. 6082. DISASTER RELIEF MEDICAID.**

(a) AUTHORITY TO PROVIDE DISASTER RELIEF MEDICAID.—

(1) IN GENERAL.—Notwithstanding any provision of title XIX of the Social Security Act, a State shall, as a condition of participation in the Medicaid program established under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.), provide medical assistance to DRM-eligible Katrina Survivors (as defined in subsection (b)) under a State Medicaid plan during the DRM coverage period in accordance with the following provisions of this section.

(2) AUTHORITY TO PROVIDE DRM ASSISTANCE AS SEPARATE COMPONENT OF REGULAR STATE MEDICAID PLAN OR UNDER SUCH PLAN.—

(A) IN GENERAL.—A State may provide DRM assistance without submitting an amendment to the State Medicaid plan and as a separate component of the State Medicaid plan or, subject to subparagraph (B), under such plan.

(B) CONDITIONS FOR PROVISION OF DRM ASSISTANCE UNDER REGULAR STATE MEDICAID PLAN.—A State may only provide DRM assistance under the State Medicaid plan if the

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 13 of 91

State provides such assistance in accordance with the requirements of this section and the State is able to separately identify and report expenditures or other information attributable to the provision of such assistance.

(b) DRM-ELIGIBLE KATRINA SURVIVOR DEFINED.—

(1) IN GENERAL.—In this section, the term "DRM-eligible Katrina Survivor" means a Katrina Survivor whose family income does not exceed the higher of—

(A) 100 percent (200 percent, in the case of such a Survivor who is a pregnant woman or child) of the poverty line; or

(B) the income eligibility standard which would apply to the Survivor under the State Medicaid plan.

(2) SPECIAL RULE FOR KATRINA SURVIVORS WHO ARE RECIPIENTS OF DISABILITY INSURANCE BENEFITS.—In the case of a Katrina Survivor who is a recipient of disability insurance benefits under section 202 or 223 of the Social Security Act (42 U.S.C. 402, 423), paragraph (1) shall be applied to such Survivor by substituting "300 percent of the supplemental security income benefit rate established by section 1611(b)(1) of the Social Security Act (42 U.S.C. 1382(b)(1))" for subparagraph (A) of such paragraph.

(3) NO RESOURCES, RESIDENCY, OR CATEGORICAL ELIGIBILITY REQUIREMENTS.—Eligibility under paragraph (1) shall be determined without application of any resources test, State residency, or categorical eligibility requirements.

(4) INCOME DETERMINATION.—

(A) LEAST RESTRICTIVE INCOME METHODOLOGIES; PROSPECTIVE DETERMINATION.—The State shall use the least restrictive methodologies applied under the State Medicaid plan under section 1902(r)(2) of the Social Security Act (42 U.S.C. 1396a(r)(2)) in determining income eligibility for Katrina Survivors under paragraph (1) and shall determine family income for such Survivors only prospectively from the date of application.

(B) DISREGARD OF UI COMPENSATION AND DISASTER RELIEF ASSISTANCE.—In determining such income eligibility, the State shall disregard—

(i) any amount received under a law of the United States or of a State which is in the nature of unemployment compensation by a Katrina Survivor during the DRM coverage period, including unemployment assistance provided under section 410 of the Robert T. Stafford Disaster and Emergency Assistance Act (42 U.S.C. 5177); and

(ii) any assistance provided (in cash or in kind) to a Katrina Survivor from any public or private entity as a result of Hurricane Katrina.

(5) DEFINITION OF CHILD.—For purposes of paragraph (1), a DRM-eligible Katrina Survivor shall be determined to be a "child" if such Survivor meets the definition of "child" under the State Medicaid plan.

(6) CERTAIN INDIVIDUALS DEEMED TO BE DRM-ELIGIBLE KATRINA SURVIVORS.—

(A) IN GENERAL.—Upon submission of an application from an individual attesting that the individual is an individual described in any of the categories described in subparagraph (B), or, if an individual is an individual described in subparagraph (C), the State shall deem the individual to be a DRM-eligible Katrina Survivor for purposes of eligibility for DRM assistance during the DRM coverage period.

(B) CATEGORIES DESCRIBED.—For purposes of subparagraph (A), the categories described in this subparagraph are the following:

(i) KATRINA SURVIVORS ENROLLED IN A STATE MEDICAID PLAN AS OF THE BEGINNING OF THE DRM COVERAGE PERIOD.—Any Katrina Survivor who can provide proof of enroll-

ment in a State Medicaid plan as of August 28, 2005.

(ii) KATRINA SURVIVORS WHO ARE RECIPIENTS OF UNEMPLOYMENT COMPENSATION.—Any Katrina Survivor who, during the DRM coverage period, is a recipient of an amount paid under a law of the United States or of a State which is in the nature of unemployment compensation, including unemployment assistance provided under section 410 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5177).

(iii) KATRINA SURVIVORS ENROLLED IN DRM ASSISTANCE IN ANOTHER STATE.—Any Katrina Survivor determined by another State to be a DRM-eligible Katrina Survivor who was enrolled in DRM assistance in that State and who relocates to the State during the DRM coverage period.

(C) KATRINA SURVIVORS PROVIDED MEDICAL ASSISTANCE PRIOR TO DATE OF ENACTMENT.—

(i) IN GENERAL.—An individual described in this subparagraph is any Katrina Survivor who is provided medical assistance under a State Medicaid plan in accordance with guidance from the Secretary during the period that begins on August 28, 2005, and ends on the date of enactment of this Act.

(ii) NONAPPLICATION TO CHILD HEALTH ASSISTANCE.—In the case of an individual who is a Katrina Survivor who is provided child health assistance under a State child health plan in accordance with guidance from the Secretary during the period described in clause (i), such individual shall not be deemed to be a DRM-eligible Katrina Survivor for purposes of receiving DRM assistance under this section. Nothing in the preceding sentence shall be construed as prohibiting such an individual from submitting an application for DRM assistance.

(c) ELIGIBILITY DETERMINATION; NO CONTINUATION OF DRM ASSISTANCE.—

(1) STREAMLINED ELIGIBILITY PROCESS.—The State shall use the following streamlined procedures in processing applications and determining eligibility for DRM-eligible Katrina Survivors and eligibility for the payment of private health insurance premiums under section 107(b)(2)(A):

(A) ONE-PAGE APPLICATION.—A common 1-page application form developed by the Secretary of Health and Human Services in consultation with the National Association of State Medicaid Directors. Such form shall—

(i) require an applicant to provide an expected address for the duration of the DRM coverage period and to agree to update that information if it changes during such period;

(ii) include notice regarding the penalties for making a fraudulent application under subsection (h);

(iii) require the applicant to assign to the State any rights of the applicant (or any other person who is a DRM-eligible Katrina Survivor and on whose behalf the applicant has the legal authority to execute an assignment of such rights) under any group health plan or other third-party coverage for health care;

(iv) require the applicant to—

(I) list any health insurance coverage which the applicant was enrolled in immediately prior to submitting such application; and

(II) indicate whether the applicant would rather receive DRM assistance from a State in accordance with this section or, if private health insurance is available, assistance in paying the premiums for such health insurance under section 6088(b)(2)(A); and

(v) be translated by the Secretary into languages other than English, and in cultural contexts, that are most appropriate for the applicants expected to submit such forms.

(B) SELF-ATTESTATION.—Self-attestation by the applicant that the applicant—

(i) is a DRM-eligible Katrina Survivor; and

(ii) if applicable, requires home and community-based services provided under such DRM assistance in accordance with subsection (d)(3).

(C) NO DOCUMENTATION.—The State shall not require documentation evidencing the basis on which the applicant qualifies to be a DRM-eligible Katrina Survivor or, if applicable, requires home and community-based services.

(D) ISSUANCE OF ELIGIBILITY CARD.—

(i) IN GENERAL.—Subject to clause (iii), the State shall, immediately upon submission of a complete application (including the self-attestation required under subparagraph (B)) by an applicant, issue a DRM assistance eligibility card to the applicant.

(ii) VALIDITY; NOTICE OF TERMINATION DATE.—A DRM assistance eligibility card shall be valid as long as the DRM coverage period is in effect and shall be accompanied by notice of the termination date for the DRM coverage period and, if applicable, notice that such termination date may be extended. If the Secretary extends the DRM coverage period, the State shall notify DRM-eligible Katrina Survivors enrolled in DRM assistance of the new termination date for the DRM coverage period.

(iii) APPLICATION TO STATES THAT ELECT TO PROVIDE DRM ASSISTANCE UNDER THE REGULAR STATE MEDICAID PLAN.—In the case of a State that elects under subsection (a)(2) to provide DRM assistance under the State Medicaid plan, the State may issue to an applicant who submits a complete application an eligibility card that is similar to the cards issued by the State to enrollees in the State medicaid plan, but only if the State is able to adapt the card in a manner which clearly identifies that the applicant is eligible for DRM assistance and provides notice of the termination date and the termination date for the DRM coverage period (and the new termination date applicable if the Secretary extends such coverage period).

(E) APPLICATION FOR MEDICAL ASSISTANCE UNDER REGULAR STATE MEDICAID PLAN.—Concurrent with the issuance of an eligibility card under subparagraph (D), the State shall provide the applicant with an application for medical assistance under the State Medicaid plan.

(F) PRESUMPTIVE ELIGIBILITY.—

(i) STATES THAT PROVIDE FOR PRESUMPTIVE ELIGIBILITY UNDER THE REGULAR STATE MEDICAID PLAN.—In the case of a State that, as of the date of enactment of this Act, provides for a period of presumptive eligibility under the State Medicaid plan in accordance with section 1920, 1920A, or 1920B of the Social Security Act (42 U.S.C. 1396r–1, 1396r–1a, 1396r–1b), the State shall deem an applicant to be a DRM-eligible Katrina Survivor eligible for DRM assistance in accordance with this section, subject to subsection (g), if the applicant completes an application for such assistance, presents it to a provider or facility participating in the State Medicaid plan that is qualified to make presumptive eligibility determinations under such plan (which at a minimum shall consist of facilities identified in section 1902(a)(55) of the Social Security Act (42 U.S.C. 1396a(a)(55)), and it appears to the provider or facility that the applicant is a DRM-eligible Katrina Survivor based on the information in the application.

(ii) APPLICATION TO STATES THAT DO NOT PROVIDE PRESUMPTIVE ELIGIBILITY UNDER THE REGULAR STATE MEDICAID PLAN.—In the case of a State which does not provide for a period of presumptive eligibility under the State medicaid plan, the State may elect to provide for a period of presumptive eligibility for DRM assistance by designating qualified providers (as defined in section 1920(b)(2) of such Act (42 U.S.C. 1396r–1(b)(2)) as providers that are specifically designated

Case 1:01-cv-12257-PBS   Document 6528-55   Filed 09/22/09   Page 14 of 91

by the State to make presumptive determinations in accordance with clause (i) with respect to eligibility for such assistance, but only if—

(I) the State elects to provide for a period of presumptive eligibility for such assistance for all Katrina Survivors who may be DRM-eligible Katrina Survivors in accordance with subsection (b); and

(II) the qualified providers designated by the State to make determinations of presumptive eligibility for such assistance, at a minimum, consistent of facilities identified in section 1902(a)(55) of the Social Security Act (42 U.S.C. 1396a(a)(55)) that are qualified providers under section 1920(b)(2) of such Act.

(G) CONTINUOUS ELIGIBILITY.—Continuous eligibility, without the need for any redetermination of eligibility, for the duration of the DRM coverage period.

(2) NO CONTINUATION OF DRM ASSISTANCE.—

(A) IN GENERAL.—Except as provided in subparagraphs (B) and (C), no DRM assistance shall be provided after the end of the DRM coverage period.

(B) PRESUMPTIVE ELIGIBILITY FOR MEDICAL ASSISTANCE UNDER REGULAR MEDICAID PLAN.—

(i) IN GENERAL.—If a State, as of the date of enactment of this Act, provides for a period of presumptive eligibility for medical assistance under the State Medicaid plan in accordance with section 1920, 1920A, or 1920B of the Social Security Act (42 U.S.C. 1396r–1, 1396r–1a, 1396r–1b), the State shall provide a DRM-eligible Katrina Survivor who is receiving DRM assistance from the State in accordance with this section and who, as of the end of the DRM coverage period, is an individual for whom a period of presumptive eligibility would be provided under the State Medicaid plan, with presumptive eligibility for medical assistance under the State Medicaid plan.

(ii) STATE OPTION TO PROVIDE PRESUMPTIVE ELIGIBILITY.—If a State is a State to which clause (i) does not apply, the State may elect to provide for a period of presumptive eligibility for medical assistance under the State Medicaid plan for a DRM-eligible Katrina Survivor who is receiving DRM assistance from the State in accordance with this section and who, as of the end of the DRM coverage period, is an individual for whom a period of presumptive eligibility would be provided under the State Medicaid plan in accordance with section 1920, 1920A, or 1920B of such Act, if the State were to provide such a period of presumptive eligibility under the State Medicaid plan.

(iii) STATE OPTION FOR ALL STATES TO PROVIDE PRESUMPTIVE ELIGIBILITY TO OTHER POPULATIONS OF DRM-ELIGIBLE KATRINA SURVIVORS.—In addition to the populations of DRM-eligible Katrina Survivors described in clauses (i) and (ii), a State to which clause (i) or (ii) applies, may elect to provide for a period of presumptive eligibility for medical assistance under the State Medicaid plan for other DRM-eligible Katrina Survivors who are receiving DRM assistance from the State in accordance with this section as of the end of the DRM coverage period.

(iv) LENGTH OF PERIOD.—A presumptive eligibility period provided in accordance with clause (i), (ii), or (iii) shall be provided until the earlier of—

(I) the date on which a determination with respect to the Survivor's application for medical assistance under the State Medicaid plan is made; or

(II) the end of the 60-day period that begins on the first day after the end of the DRM coverage period.

(C) PREGNANT WOMEN.—In the case of a DRM-eligible Katrina Survivor who is receiving DRM assistance from a State in accordance with this section and whose pregnancy ended during the 60-day period prior to the end of the DRM coverage period, or who is pregnant as of the end of such period, such Survivor shall continue to be eligible for DRM assistance after the end of the DRM coverage period, including (but not limited to) for all pregnancy-related and postpartum medical assistance available under the State Medicaid plan, through the end of the month in which the 60-day period (beginning on the last day of her pregnancy) ends.

(d) SCOPE OF COVERAGE.—

(1) CATEGORICALLY NEEDY BENEFITS.—The State shall treat a DRM-eligible Katrina Survivor as an individual eligible for medical assistance under the State plan under title XIX of the Social Security Act on the basis of section 1902(a)(10)(A)(i) of the Social Security Act (42 U.S.C. 1396a(a)(10)(A)(i)), with coverage for such assistance retroactive to items and services furnished on or after August 28, 2005 (or in the case of applications for DRM assistance submitted after January 1, 2006, the first day of the 5th month preceding the date on which such application is submitted).

(2) EXTENDED MENTAL HEALTH AND CARE CO-ORDINATION BENEFITS.—The State may provide, without regard to any restrictions on amount, duration, and scope, comparability, or restrictions otherwise applicable under the State Medicaid plan (other than restrictions applicable under such plan with respect to services provided in an institution for mental diseases), to DRM-eligible Katrina Survivors extended mental health and care coordination benefits which may include the following:

(A) Screening, assessment, and diagnostic services (including specialized assessments for individuals with cognitive impairments).

(B) Coverage for a full range of mental health medications at the dosages and frequencies prescribed by health professionals for depression, post-traumatic stress disorder, and other mental disorders.

(C) Treatment of alcohol and substance abuse.

(D) Psychotherapy, rehabilitation, and other treatments administered by psychiatrists, psychologists, or social workers.

(E) Subject to restrictions applicable under the State Medicaid plan with respect to services provided in an institution for mental diseases, in-patient mental health care.

(F) Family counseling.

(G) In connection with the provision of health and long-term care services, arranging for, (and when necessary, enrollment in waiver programs or other specialized programs), and coordination related to, primary and specialty medical care, which may include personal care services, durable medical equipment and supplies, assistive technology, and transportation.

(3) HOME AND COMMUNITY-BASED SERVICES.—

(A) IN GENERAL.—In the case of a State with a waiver to provide home and community-based services granted under section 1115 of the Social Security Act or under subsection (c) or (d) of section 1915 of such Act, the State may provide such services to DRM-eligible Katrina Survivors who self-attest in accordance with subsection (c)(1)(B)(ii) that they require immediate home and community-based services that are available under such waiver without regard to whether the Survivors would require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded. Such DRM-eligible Katrina Survivors include (but are not limited to) individuals described in subparagraph (B).

(B) INDIVIDUALS DESCRIBED.—Individuals described in this subparagraph are individuals who—

(i) on any day during the week preceding August 28, 2005—

(I) had been receiving home and community-based services under a waiver described in subparagraph (A) in a direct impact parish or county;

(II) had been receiving support services from a primary family caregiver who, as a result of Hurricane Katrina, is no longer available to provide services; or

(III) had been receiving personal care, home health, or rehabilitative services under the State Medicaid plan or under a waiver granted under section 1915 or 1115 of the Social Security Act; or

(ii) are disabled (as determined under the State Medicaid plan).

(B) WAIVER OF RESTRICTIONS.—The Secretary shall waive with respect to the provision of home and community-based services under this paragraph any limitations on—

(i) the number of individuals who shall receive home or community-based services under a waiver described in subparagraph (A);

(ii) budget neutrality requirements applicable to such waiver; and

(iii) targeted populations eligible for services under such waiver.

The Secretary may waive other restrictions applicable under such a waiver, that would prevent a State from providing home and community-based services in accordance with this paragraph.

(4) CHILDREN BORN TO PREGNANT WOMEN.—In the case of a child born to a DRM-eligible Katrina Survivor who is provided DRM assistance during the DRM coverage period, such child shall be treated as having been born to a pregnant woman eligible for medical assistance under the State Medicaid plan and shall be eligible for medical assistance under such plan in accordance with section 1902(e)(4) of the Social Security Act (42 U.S.C. 1396a(e)(4)). The Federal medical assistance percentage applicable to the State Medicaid plan shall apply to medical assistance provided to a child under such plan in accordance with the preceding sentence.

(e) TERMINATION OF COVERAGE; ASSISTANCE WITH APPLYING FOR REGULAR MEDICAID COVERAGE.—

(1) NOTICE OF EXPECTED TERMINATION OF DRM COVERAGE PERIOD.—A State shall provide DRM-eligible Katrina Survivors who are receiving DRM assistance from the State in accordance with this section, as of the beginning of the 4th month (and, if applicable, 9th month) of the DRM coverage period with—

(A) notice of the expected termination date for DRM assistance for such period and, if applicable, any extension of the DRM coverage period and the expected termination date for the extension of such period;

(B) information regarding eligibility for medical assistance under the State's eligibility rules otherwise applicable under the State Medicaid plan; and

(C) an application for such assistance and information regarding where to obtain assistance with completing such application in accordance with paragraph (2).

(2) APPLICATION ASSISTANCE.—A State shall provide DRM-eligible Katrina Survivors who are receiving DRM assistance from the State in accordance with this section with assistance in applying for medical assistance under the State Medicaid plan for periods beginning after the end of the DRM coverage period, at State Medicaid offices and at locations easily accessible to such Survivors.

(3) STATE REPORTS.—A State providing DRM assistance in accordance with this section shall submit to the Secretary the following reports:

(A) TERMINATION AND TRANSITION ASSISTANCE TO REGULAR MEDICAID COVERAGE FOR DRM-ELIGIBLE KATRINA SURVIVORS ELIGIBLE FOR SUCH ASSISTANCE.—Not later than the

last day of the 3rd month of the DRM coverage period, a report detailing how the State intends to satisfy the requirements of paragraphs (1) and (2).

(B) ENROLLMENT.—Not later than 3 months after the end of the DRM coverage period, a report regarding—

(i) the number of Katrina Survivors who are determined to be DRM-eligible Katrina Survivors; and

(ii) the number of DRM-eligible Katrina Survivors who are determined to be eligible for, and enrolled in, the State Medicaid plan.

(4) SECRETARIAL OVERSIGHT.—The Secretary of Health and Human Services shall ensure that a State is complying with the requirements of paragraphs (1) and (2) and that applications for medical assistance under the State Medicaid plan from DRM-eligible Katrina Survivors for periods beginning after the end of the DRM coverage period are processed in a timely and appropriate manner.

(5) NO PRIVATE RIGHT OF ACTION AGAINST A STATE FOR FAILURE TO PROVIDE NOTICE.—No private right of action shall be brought against a State for failure to provide the notices required under paragraph (1) or subsection (c)(1) so long as the State makes a good faith effort to provide such notices.

(f) 100 PERCENT FEDERAL MATCHING PAYMENTS.—

(1) IN GENERAL.—Notwithstanding section 1905(b) of the Social Security Act (42 U.S.C. 1396d(b)), the Federal medical assistance percentage or the Federal matching rate otherwise applied under paragraph 1903(a) of such Act (42 U.S.C. 1396b(a)) shall be 100 percent for—

(A) providing DRM assistance to DRM-eligible Katrina Survivors during the DRM coverage period in accordance with this section;

(B) costs directly attributable to administrative activities related to the provision of such DRM assistance, including costs attributable to obtaining recoveries under subsection (h);

(C) costs directly attributable to providing application assistance in accordance with subsection (e)(2); and

(D) medical assistance provided in accordance with subparagraph (B) of subsection (c)(2), and DRM assistance provided in accordance with subparagraph (C) of that subsection, after the end of the DRM coverage period.

(2) INCLUSION OF ASSISTANCE PROVIDED TO KATRINA SURVIVORS PRIOR TO DATE OF ENACTMENT.—Any assistance provided to a Katrina Survivor under a State Medicaid plan in accordance with guidance from the Secretary during the period that begins on August 28, 2005, and ends on the date of enactment of this Act, shall be treated as a DRM assistance provided to a DRM-eligible Katrina Survivor during the DRM coverage period for purposes of paragraph (1).

(3) 100 PERCENT FEDERAL MATCHING PAYMENTS FOR COSTS FOR PROVIDING CHILD HEALTH ASSISTANCE PRIOR TO DATE OF ENACTMENT; RESTORATION OF ALLOTMENTS USED TO PROVIDE SUCH ASSISTANCE.—With respect to child health assistance for items and services furnished during the period described in paragraph (2) to a Katrina Survivor—

(A) notwithstanding section 2105(b) of the Social Security Act (42 U.S.C. 1397ee(b)), the Federal matching rate for providing such child health assistance under a State child health plan and for costs directly attributable to all administrative activities that relate to the provision of such child health assistance, shall be 100 percent;

(B) payments to a State for the provision of such assistance shall not be considered to be payments from an allotment for the State under section 2104 of such Act (42 U.S.C 1397dd); and

(C) any payments that were made to a State for the provision of such assistance prior to such date of enactment, shall be disregarded for purposes of determining the unexpended amount of any allotment available for expenditure by the State under that section.

(4) DISREGARD OF PAYMENTS.—Payments provided to a State in accordance with this subsection shall be disregarded for purposes of applying subsections (f) and (g) of section 1108 of the Social Security Act (42 U.S.C. 1308).

(g) VERIFICATION OF STATUS AS A KATRINA SURVIVOR.—

(1) IN GENERAL.—The State shall make a good faith effort to verify the status of an individual who is enrolled in the State Medicaid plan as a DRM-eligible Katrina Survivor under the provisions of this section. Such effort shall not delay the determination of the eligibility of the Survivor for DRM assistance under this section or the provision of such assistance to the Survivor.

(2) EVIDENCE OF VERIFICATION.—A State may satisfy the verification requirement under subparagraph (A) with respect to an individual by showing that the State providing DRM assistance obtained information from the Federal Emergency Management Agency, the Social Security Administration, the Internal Revenue Service, or the State Medicaid Agency for the State from which individual is from (if the individual was not a resident of such State on any day during the week preceding August 28, 2005).

(h) PENALTY FOR FRAUDULENT APPLICATIONS.—

(1) INDIVIDUAL LIABLE FOR COSTS.—If a State, as the result of verification activities conducted under subsection (g) or otherwise, determines after a fair hearing that an individual has knowingly made a false self-attestation described in subsection (c)(1)(B), the State may, subject to paragraph (2), seek recovery from the individual for the full amount of the cost of DRM assistance provided to the individual under this section.

(2) EXCEPTION.—The Secretary shall exempt a State from seeking recovery under paragraph (1) if the Secretary determines that it would not be cost-effective for the State to do so.

(3) REIMBURSEMENT TO THE FEDERAL GOVERNMENT.—Any amounts recovered by a State in accordance with this subsection shall be returned to the Federal government.

(i) EXEMPTION FROM ERROR RATE PENALTIES.—

(1) IN GENERAL.—All payments attributable to providing DRM assistance in accordance with this section, including during a period of presumptive eligibility for such assistance in accordance with subsection (c)(1)(F), shall be disregarded for purposes of section 1903(u) of the Social Security Act (42 U.S.C. 1396b(u)).

(2) APPLICATION OF ERROR RATE PENALTIES FOR PRESUMPTIVE ELIGIBILITY PERIODS FOR MEDICAL ASSISTANCE AFTER THE END OF THE DRM COVERAGE PERIOD.—The rules for application of such section under the State Medicaid plan, as in effect on the date of enactment of this Act, shall apply with respect to any period of presumptive eligibility for medical assistance under such plan provided by a State in accordance with subsection (c)(2)(B).

(j) PROVIDER PAYMENT RATES.—In the case of any DRM assistance provided in accordance with this section to a DRM-eligible Katrina Survivor that is covered under the State Medicaid plan (as applied without regard to this section) the State shall pay a provider of such assistance the same payment rate as the State would otherwise pay for the assistance if the assistance were provided under the State Medicaid plan (or, if no such payment rate applies under the State Medicaid plan, the usual and cus-

tomary prevailing rate for the item or service for the community in which it is provided).

(k) APPLICATION TO INDIVIDUALS ELIGIBLE FOR MEDICAL ASSISTANCE.—Nothing in this section shall be construed as affecting any rights accorded to an individual who is a recipient of medical assistance under a State Medicaid plan who is determined to be a DRM-eligible Katrina Survivor, but the provision of DRM assistance to such individual shall be limited to the provision of such assistance in accordance with this section.

(l) NO ENTITLEMENT TO REGULAR MEDICAL ASSISTANCE SOLELY ON THE BASIS OF RECEIPT OF DRM ASSISTANCE OR IN THE ABSENCE OF A NEW APPLICATION FOR MEDICAL ASSISTANCE.—Notwithstanding paragraphs (3) and (8) of section 1902(a) of the Social Security Act (42 U.S.C. 1396a(a)), and section 435.930(b) of title 42, Code of Federal Regulations, subject to subparagraphs (B) and (C) of subsection (c)(2), and subsection (d)(4), nothing in this section shall be construed as providing an individual who is a DRM-eligible Katrina Survivor who receives DRM assistance in accordance with this section, with an entitlement to receive medical assistance under the State Medicaid plan after the end of the DRM coverage period—

(1) solely on the basis of the individual's receipt of such DRM assistance; or

(2) in the absence of a new application submitted by such individual for medical assistance under such plan.

(m) LIMITATION WITH RESPECT TO APPLICATION TO MEDICARE PRESCRIPTION DRUG BENEFIT.—In the case of an individual who is a DRM-eligible Katrina Survivor who receives DRM assistance from a State in accordance with this section, and who is eligible for part A of title XVIII of the Social Security Act (42 U.S.C. 1395c et seq.) or enrolled in part B of title XVIII of such Act (42 U.S.C. 1395j et seq.)—

(1) the State payment required under section 1935(c) of such Act (42 U.S.C. 1395u–5(c)) shall be determined without regard to the provision of DRM assistance to such individual; and

(2) such individual shall not be treated as a subsidy eligible individual for purposes of eligibility for the low-income subsidies provided under section 1860D–14 of such Act (42 U.S.C. 1395w–114) with respect to the prescription drug coverage provided under part D of title XVIII of such Act (42 U.S.C. 1395w–101 et seq.), or enrollment in such coverage, solely on the basis of the provision of DRM assistance to such individual.

(n) NO DRM ASSISTANCE IF THE SECRETARY IS MAKING PAYMENTS ON BEHALF OF THE INDIVIDUAL FOR PRIVATE HEALTH INSURANCE.—A DRM-eligible Katrina Survivor may not receive DRM assistance from a State in accordance with this section during any period in which the Secretary is making a payment for a health insurance premium on behalf of such Survivor under section 6088(b)(2)(A) with respect to that period.

SEC. 6083. TARGETED MEDICAID RELIEF FOR MAJOR DISASTER PARISHES AND COUNTIES IN LOUISIANA, MISSISSIPPI, AND ALABAMA.

(a) 100 PERCENT FEDERAL MATCHING PAYMENTS FOR MEDICAL ASSISTANCE PROVIDED IN MAJOR DISASTER PARISH OR COUNTY.—

(1) IN GENERAL.—Notwithstanding section 1905(b) of the Social Security Act (42 U.S.C. 1396d(b)), for items and services furnished during the period that begins on August 28, 2005, and ends on August 31, 2006, the Federal medical assistance percentage for providing medical assistance for such items and services under a State Medicaid plan to any individual, including a Katrina Survivor, residing in a major disaster parish or county (as

defined in subsection (c)), and for costs directly attributable to all administrative activities that relate to the provision of such medical assistance, shall be 100 percent.

(2) APPLICATION TO CHILD HEALTH ASSISTANCE.—Notwithstanding section 2105(b) of the Social Security Act (42 U.S.C. 1397ee(b)), for items and services furnished during the period described in subsection (a), the Federal matching rate for providing child health assistance for such items and services under a State child health plan in a major disaster parish or county, and for costs directly attributable to all administrative activities that relate to the provision of such child health assistance, shall be 100 percent.

(b) MORATORIUM ON REDETERMINATIONS.—During the DRM coverage period, the States of Louisiana, Mississippi, and Alabama shall not be required to conduct eligibility redeterminations under the State's Medicaid plan.

(c) MAJOR DISASTER PARISH OR COUNTY DEFINED.—For purposes of subsection (a), a major disaster parish or county is a parish of the State of Louisiana or a county of the State of Mississippi or Alabama for which a major disaster has been declared in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170) as a result of Hurricane Katrina and which the President has determined, as of September 14, 2005, warrants individual or public assistance from the Federal Government under such Act.

**SEC. 6084. AUTHORITY TO WAIVE REQUIREMENTS DURING NATIONAL EMERGENCIES WITH RESPECT TO EVACUEES FROM AN EMERGENCY AREA.**

(a) IN GENERAL.—Section 1135(g)(1) of the Social Security Act (42 U.S.C. 1320b-5(g)(1)) is amended by adding at the end the following:

"Any geographical area in which the Secretary determines there are a significant number of evacuees from an area that is considered to be an emergency area under the preceding sentence shall be considered to be an 'emergency area' for purposes of this section.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if enacted on August 28, 2005.

**SEC. 6085. EMERGENCY ASSISTANCE FOR STATES WITH SIGNIFICANT NUMBERS OF EVACUEES WITH RESPECT TO THE FEDERAL MEDICAL ASSISTANCE PERCENTAGE FOR FISCAL YEAR 2006.**

(a) IN GENERAL.—If the Federal medical assistance percentage (as defined in section 1905(b) of the Social Security Act (42 U.S.C. 1396d(b))) determined for a State described in subsection (b) for fiscal year 2006 is less than the Federal medical assistance percentage determined for such State for fiscal year 2005, the Federal medical assistance percentage for the State for fiscal year 2005 shall apply to the State for fiscal year 2006 for purposes of titles XIX and XXI of the Social Security Act (42 U.S.C. 1396 et seq., 1397aa et seq.).

(b) STATE DESCRIBED.—For purposes of subsection (a), a State described in this subsection is a State that, as of September 30, 2005, is hosting at least 10,000 Katrina Survivors described in section 6081(4)(A), as determined on the basis of Federal Emergency Management Authority data.

**SEC. 6086. EMERGENCY ASSISTANCE TO MEDICARE BENEFICIARIES.**

(a) EXCLUSION OF DRM COVERAGE PERIOD IN COMPUTING MEDICARE PART B LATE ENROLLMENT PERIOD.—In applying the first sentence of section 1839(b) of the Social Security Act (42 U.S.C. 1395r(b)) in the case of an individual who, on any day during the week preceding August 28, 2005, had a residence in a

direct impact parish or county, there shall not be taken into account any month any part of which is within the DRM coverage period.

(b) WRITTEN PLAN ON TRANSITION OF CERTAIN FULL-BENEFIT DUAL ELIGIBLE INDIVIDUALS TO PRESCRIPTION DRUG COVERAGE UNDER MEDICARE PART D.—

(1) IN GENERAL.—Not later than December 1, 2005, the Secretary of Health and Human Services (in this subsection referred to as the "Secretary") shall submit to Congress a written plan on how the Secretary will provide for the transition of coverage of prescription drugs for full-benefit dual eligible individuals (as defined in section 1935(c)(6) of the Social Security Act (42 U.S.C. 1396u-5(c)(6)) who, on any day during the week preceding August 28, 2005, had a residence in a direct impact parish or county, from the Medicaid program under title XIX of such Act to the Medicare program under part D of title XVIII of such Act.

(2) REQUIREMENTS.—The plan shall address issues relating to the following:

(A) The application of the rules for automatic assignment into prescription drug plans under section 1860D-1(b)(1)(C) of the Social Security Act (42 U.S.C. 1395w-101(b)(1)(C)).

(B) The communication by the Secretary and sponsors of prescription drug plans to individuals described in paragraph (1) of—

(i) information regarding such rules; and

(ii) if such an individual is automatically assigned to a plan, information on the plan.

(C) Beneficiary protections related to the emergency use of out-of-network and nonformulary benefits, including under circumstances related to a lack of medical records and access to prescribing physicians.

(D) Any other area determined appropriate by the Secretary.

**SEC. 6087. RELIEF FOR HOSPITALS LOCATED IN A DIRECT IMPACT PARISH OR COUNTY.**

(a) INCREASE IN MEDICARE PAYMENTS TO HOSPITALS FOR BAD DEBT.—During the DRM coverage period, section 1861(v)(1)(T)(iv) of the Social Security Act (42 U.S.C. 1395x(v)(1)(T)(iv)) shall be applied by substituting "0 percent" for "30 percent" with respect to—

(1) a hospital located in a direct impact parish or county; and

(2) any other hospital, but only to the extent that the bad debt is related to items and services furnished to an individual who, on any day during the week preceding August 28, 2005, had a residence in a direct impact parish or county.

(b) WAIVER OF CERTAIN MEDICARE QUALITY REPORTING REQUIREMENTS FOR HOSPITALS.—During the DRM coverage period, section 1886(b)(3)(B)(vii) of the Social Security Act (42 U.S.C. 1395ww(b)(3)(B)(vii)) shall not apply to a hospital that is located in a direct impact parish or county.

**SEC. 6088. DISASTER RELIEF FUND.**

(a) ESTABLISHMENT.—There is established in the Treasury of the United States the Disaster Relief Fund (in this section referred to as the "Fund") which—

(1) shall be administered by the Secretary; and

(2) shall consist of amounts made available under subsection (h).

(b) USE OF AMOUNTS IN FUND.—Amounts in the Fund shall be used by the Secretary for the following:

(1) PAYMENTS TO PROVIDERS.—The Secretary shall make payments directly to medicaid providers described in subsection (e) to offset the costs incurred by such providers as a result of Hurricane Katrina.

(2) PAYMENTS FOR PRIVATE HEALTH INSURANCE COVERAGE.—The Secretary shall make

payments to State insurance commissioners for the purpose of making payments to health insurance issuers—

(A) on behalf of individuals that would otherwise qualify for DRM assistance from the State under section 6082 but for subsection (n) of such section for such individual's share of their health insurance premium; and

(B) on behalf of qualified employers for the employer share of their employee's health insurance premiums, but only with respect to the days on which the employer meets the definition under subsection (f).

(c) RULES FOR PAYMENTS TO PROVIDERS.—

(1) CONSULTATION.—In making payments to medicaid providers under subsection (b)(1), the Secretary shall consult with the Louisiana Department of Health and Hospitals, the Mississippi Department of Health, and the Alabama Department of Public Health in order to best identify the providers with the greatest need of such payments.

(2) PRIORITY.—In making payments to medicaid providers under subsection (b)(1), the Secretary shall give priority to community-based hospitals, physician practices, and other providers located in a direct impact parish or county where the health care infrastructure was destroyed or nearly destroyed.

(3) DESCRIPTION OF NEED AND HOW FUNDING WILL BE USED.—In order for a medicaid provider to be eligible for a payment under subsection (b)(1), the provider shall provide the Secretary with a description of the need for the funding and how the funding will be used.

(4) TIMING FOR FIRST PAYMENT.—The first payment to medicaid providers under subsection (b)(1) shall be made by not later than 10 days after the date of enactment of this Act.

(d) RULES FOR PAYMENTS ON BEHALF OF INDIVIDUALS FOR PRIVATE HEALTH INSURANCE.—

(1) STREAMLINED ELIGIBILITY PROCESS.—In making payments on behalf of individuals under subsection (b)(2)(A), the Secretary shall use the streamlined eligibility process under section 6082(c)(1).

(2) NO PAYMENTS IF THE INDIVIDUAL IS RECEIVING DRM ASSISTANCE.—No payments may be made on behalf of an individual under subsection (b)(2)(A) with respect to any period in which the individual is receiving DRM assistance from a State under section 6082.

(e) MEDICAID PROVIDERS DESCRIBED.—For purposes of subsection (b)(1), medicaid providers described in this subsection are—

(1) any provider under such title, including a supplier of medical assistance consisting of durable medical equipment (as defined in section 1861(n) of such Act (42 U.S.C. 1395x(n)), that, during a period after August 28, 2005, as determined by the Secretary—

(A) experiences a significant increase, as determined by the Secretary, in their patient caseload; or

(B) experiences a significant drop, as determined by the Secretary, in their patient caseload, including a provider that is temporarily closed during such period; and

(2) any other provider under such title, including such a supplier, determined appropriate by the Secretary.

(f) QUALIFIED EMPLOYER DEFINED.—For purposes of subsection (b)(2)(B), the term "qualified employer" means any employer—

(1) which conducted an active trade or business on August 28, 2005, in a direct impact parish or county; and

(2) with respect to which the trade or business described in paragraph (1)—

(A) is inoperable on any day during the DRM coverage period as a result of damage sustained in connection with Hurricane Katrina; or

(B) is not paying salary or benefits to employees on any day during the DRM coverage

period as a result of damage sustained in connection with Hurricane Katrina.

(g) EXPEDITING IMPLEMENTATION.—The Secretary shall promulgate regulations to carry out this section which may be effective and final immediately on an interim basis as of the date of publication of the interim final regulation. If the Secretary provides for an interim final regulation, the Secretary shall provide for a period of public comments on such regulation after the date of publication. The Secretary may change or revise such regulation after completion of the period of public comment.

(h) APPROPRIATION.—Out of any money in the Treasury not otherwise appropriated, there is appropriated to the Fund $800,000,000 for fiscal year 2005, to remain available until expended.

(i) APPLICATION OF APPROPRIATIONS FUNDING PROVISIONS.—Amounts provided in this section for making payments to medicaid providers under subsection (b)(1) shall be governed by the terms of division F of the Consolidated Appropriations Act, 2005 (Public Law 108–447, 118 Stat. 3112) (or succeeding appropriations measures for a fiscal year) that apply to funding for Grants to States for Medicaid under Title XIX of the Social Security Act.

**SEC. 6089. NONAPPLICATION OF CERTAIN PROVISIONS.**

Notwithstanding any other provision of this Act, this Act shall be applied without regard to subsections (a) and (b) of section 6032.

### Subchapter B—TANF Relief

**SEC. 6090. REIMBURSEMENT OF STATES FOR TANF BENEFITS PROVIDED TO ASSIST FAMILIES OF STATES AFFECTED BY HURRICANE KATRINA.**

(a) IN GENERAL.—Section 3 of the TANF Emergency Response and Recovery Act of 2005 is amended to read as follows:

"**SEC. 3. REIMBURSEMENT OF STATES FOR TANF BENEFITS PROVIDED TO ASSIST FAMILIES OF STATES AFFECTED BY HURRICANE KATRINA.**

"(a) ELIGIBILITY FOR PAYMENTS FROM THE CONTINGENCY FUND.—

"(1) PERIOD OF APPLICABILITY.—Beginning with August 29, 2005, and ending with September 30, 2006, a State described in paragraph (2) or (3) shall be considered a needy State for purposes of section 403(b) of the Social Security Act (42 U.S.C. 603(b)).

"(2) DIRECT IMPACT STATES.—A State described in this paragraph is Louisiana, Mississippi, or Alabama.

"(3) OTHER STATES.—

"(A) IN GENERAL.—A State is described in this paragraph if the State provides any benefit or service that may be provided under the State program funded under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.) to a family which—

"(i) has resided in a direct impact State described in paragraph (2);

"(ii) has travelled (not necessarily directly) to the State from such direct impact State as a result of Hurricane Katrina; and

"(iii) if applying for benefits or services on or after October 28, 2005, the State has determined is not receiving cash benefits from any program funded under such part of any other State.

"(B) APPLICATION TO TERRITORIES.—

"(i) IN GENERAL.—Notwithstanding section 403(b)(7) of the Social Security Act, a territory (as defined in section 1108(c)(1) of such Act (42 U.S.C.1308(c)(1)) shall be considered to be a State described in this paragraph for purposes of this section.

"(ii) DISREGARD OF PAYMENTS.—Section 1108(a) of the Social Security Act (42 U.S.C. 1308(a)) shall be applied without regard to any amounts paid to a territory (as so defined) in accordance with this section.

"(b) MONTHLY PAYMENTS.—Notwithstanding paragraph (3)(C)(i) of subsection (b) of section 403 of the Social Security Act (42 U.S.C. 603), and in addition to any other amounts paid to a State under that subsection, the total amount paid during a month to a State under this section shall not exceed the following:

"(1) DIRECT IMPACT STATES.—In the case of a State described in subsection (a)(2), such amount shall not exceed, ¼ of 20 percent of the State family assistance grant.

"(2) OTHER STATES. — In the case of a State described in subsection (a)(3), such amount shall not exceed the lesser of—

"(A) the total amount of Hurricane Katrina Emergency TANF Benefits (as defined in section 6(c)(1)) provided by the State to families described in subsection (a)(3); or

"(B) ¼ of 20 percent of the State family assistance grant.

"(c) NO STATE MATCH OR MAINTENANCE OF EFFORT REQUIRED.—Sections 403(b)(6) and 409(a)(10) of the Social Security Act (42 U.S.C. 603(b)(6), 609(a)(10)) shall not apply with respect to a payment made to a State by reason of this section.

"(d) INCREASE IN FUNDING TO THE EXTENT NECESSARY TO ENSURE THAT STATES WILL BE ABLE TO ACCESS THE CONTINGENCY FUND.— For the period described in subsection (a)(1), paragraph (2) of subsection (b) of section 403 of the Social Security Act (42 U.S.C. 603) shall be applied without regard to the limitation on the total amount specified in such paragraph and funds appropriated pursuant to such paragraph shall be available for payments authorized under this section and under such subsection (b).".

(b) RETROACTIVE EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in the enactment of the TANF Emergency Response and Recovery Act of 2005.

**SEC. 6091. INCREASE IN AMOUNT OF ADDITIONAL TANF FUNDS AVAILABLE FOR HURRICANE-DAMAGED STATES.**

(a) IN GENERAL.—Section 4 of the TANF Emergency Response and Recovery Act of 2005 is amended—

(1) in subsection (a)(2), by striking "20 percent" and inserting "40 percent"; and

(2) in subsection (b), in the matter preceding paragraph (1), by inserting "(at any time during or after the period described in section 3(a)(1))" after "may not be imposed".

(b) RETROACTIVE EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect as if included in the enactment of the TANF Emergency Response and Recovery Act of 2005.

**SEC. 6092. RULES FOR RECEIPT OF HURRICANE KATRINA EMERGENCY TANF BENEFITS AND APPLICATION TO CHILD SUPPORT REQUIREMENTS.**

(a) IN GENERAL.—Section 6 of the TANF Emergency Response and Recovery Act of 2005 is amended to read as follows:

"**SEC. 6. RULES FOR RECEIPT OF HURRICANE KATRINA EMERGENCY TANF BENEFITS AND APPLICATION TO CHILD SUPPORT REQUIREMENTS.**

"(a) IN GENERAL.—During the period described in section 3(a)(1), a State described in paragraph (2) or (3) of section 3(a) or an Indian tribe with a tribal family assistance plan approved under section 412 of the Social Security Act (42 U.S.C. 612) may provide Hurricane Katrina Emergency TANF Benefits under the State or tribal program funded under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.).

"(b) CERTAIN RULES WAIVED.—

"(1) IN GENERAL.—Hurricane Katrina Emergency TANF Benefits shall not be considered assistance for purposes of sections 407, paragraphs (2), (3), or (7) of section 408(a), 411, or section 454(29) of the Social Security Act (42 U.S.C. 607, 608(a), 611, 654(29)).

"(2) LIMITED WAIVER OF RULES UNDER SECTION 454(4)(A)(I).—

"(A) IN GENERAL.—Subject to subparagraph (B), such benefits shall not be considered assistance for purposes of section 454(4)(A)(i) of such Act (42 U.S.C. 654(4)(A)(i)).

"(B) EXCEPTION FOR FAMILIES ALREADY RECEIVING CHILD SUPPORT SERVICES OR WHO APPLY FOR SUCH SERVICES.—Subparagraph (A) shall not apply with respect to such benefits that are provided to a family who—

"(i) at the time such benefits are provided, are receiving child support services under a State plan under section 454 of such Act (42 U.S.C. 654); or

"(ii) applies for child support services under such a State plan on behalf of a child who is receiving such benefits.

"(c) HURRICANE KATRINA EMERGENCY TANF BENEFITS.—

"(1) IN GENERAL.—In this section, the term 'Hurricane Katrina Emergency TANF Benefits' means any benefit or service that may be provided under a State or tribal program funded under part A of title IV of the Social Security Act to support families which the State or Indian tribe deems to be needy families based on their statement, circumstance, or inability to access resources and who—

"(A) are described in section 3(a)(3); or

"(B) subject to paragraph (2), reside in a State described in section 3(a)(2).

"(2) LIMITATION.—Any benefit or service provided under a State or tribal program funded under part A of title IV of the Social Security Act in a State described in section 3(a)(2) to a family who the State or Indian tribe deems to be a needy family in accordance with paragraph (1), shall only be considered to be a Hurricane Katrina Emergency TANF Benefit if the State or Indian tribe designates that the benefit or service is to be treated as a Hurricane Katrina Emergency TANF Benefit.

"(d) SIMPLIFIED DATA REPORTING.—

"(1) IN GENERAL.—Each State or Indian tribe which provides Hurricane Katrina Emergency TANF Benefits shall report to the Secretary of Health and Human Services on a monthly basis the following information:

"(A) The total amount of expenditures attributable to providing Hurricane Katrina Emergency TANF Benefits.

"(B) The total number of families receiving such benefits.

"(C) To the extent the State determines it is able to do so, the total amount of such benefits provided that are—

"(i) cash;

"(ii) child care; or

"(iii) other benefits and services.

"(2) REPORTS TO CONGRESS.—The Secretary of Health and Human Services shall submit, on a monthly basis, a compilation of the reports submitted in accordance with paragraph (1) to the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives.".

(b) RETROACTIVE EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in the enactment of the TANF Emergency Response and Recovery Act of 2005.

### Subchapter C—Miscellaneous Provisions

**SEC. 6093. DISCLOSURE BASED ON VALID AUTHORIZATION.**

(a) IN GENERAL.—Section 223(d)(5) of the Social Security Act (42 U.S.C. 423(d)(5)) is amended by adding at the end the following:

"(C) Notwithstanding any other provision of law, if the Commissioner of Social Security provides to a custodian of records a copy, facsimile, or electronic version of an authorization obtained from the individual to disclose records to the Commissioner, then such custodian shall not be held liable

under any applicable Federal or State law for disclosing any record or other information in response to such request, on the basis that the authorization relied upon was a copy, facsimile, or electronic version of the authorization.''.

(b) EFFECTIVE DATE.—The amendment made by this section shall apply with respect to disclosures of records or other information made on or after the date of enactment of this Act.

SEC. 6094. EMERGENCY PROCUREMENT AUTHORITY IN SUPPORT OF HURRICANE KATRINA RESCUE AND RELIEF EFFORTS.

(a) SMALL BUSINESS RESERVATION OFFSET.—Section 15(j) of the Small Business Act (15 U.S.C. 644(j)) is amended by adding at the end the following:

''(4) For any contracts involving the use of the special emergency procurement authority under section 32A(c) of the Office of Federal Procurement Policy Act (41 U.S.C. 428a(c)), the dollar ceiling of the small business reservation established in paragraph (1) shall be adjusted to match the applicable amount of the simplified acquisition threshold.''.

(b) RETENTION OF SMALL BUSINESS SUBCONTRACTING.—Section 8(d)(4)(D) of the Small Business Act (15 U.S.C. 637(d)(4)(D)) is amended—

(1) by striking ''(D) No contract'' and inserting the following:

''(D) SMALL BUSINESS PARTICIPATION.—

''(i) IN GENERAL.—No contract''; and

(2) by adding at the end the following:

''(ii) EMERGENCY PROCUREMENTS.—

''(I) IN GENERAL.—For any contract which otherwise meets the requirements of this subsection, and which involves the use of special emergency procurement authority under section 32A(c) of the Office of Federal Procurement Policy Act (41 U.S.C. 428a(c)), the subcontracting plan required under this subsection shall be negotiated as soon as is practicable, but not later than 30 days after the date on which the contract is awarded.

''(II) PAYMENT.—Not greater than 50 percent of the amounts due under any contract described in subclause (I) may be paid, unless a subcontracting plan compliant with this subsection is negotiated by the contractor.''.

(c) LIMITATIONS ON INCREASED MICRO-PURCHASE THRESHOLD.—Notwithstanding any other provision of law, the authority granted under section 101 of the Second Emergency Supplemental Appropriations Act to Meet Immediate Needs Arising From the Consequences of Hurricane Katrina, 2005 (Public Law 109–62), including the modifications under subsection (d), shall—

(1) be restricted for use solely within the geographic areas designated by the President as disaster areas due to Hurricane Katrina;

(2) not be exercised in a manner inconsistent with any Federal law providing for local preference in disaster relief and recovery contracting; and

(3) terminate 120 days after the date of enactment of this Act.

(d) MODIFIED THRESHOLD.—Notwithstanding section 101(2) of the Second Emergency Supplemental Appropriations Act to Meet Immediate Needs Arising From the Consequences of Hurricane Katrina, 2005 (Public Law 109–62), the amount specified in subsections (c), (d), and (f) of the section 32 of the Office of Federal Procurement Policy Act (41 U.S.C. 428) for purchases necessary for support of Hurricane Katrina rescue and relief operations shall be $50,000, or such an amount in excess of $50,000, but not to exceed $250,000, as may be approved by the head of the executive agency concerned (or any delegate of the head of such executive agency, who shall be an officer or employee of such executive agency who is a warranted contracting officer for making Federal acquisitions).

(e) OMB GUIDANCE ON USE OF GOVERNMENT CREDIT CARDS FOR MICRO-PURCHASES.—

(1) GUIDANCE REQUIRED.—Not later than 14 calendar days after the date of enactment of this Act, the Director of the Office of Management and Budget shall issue clear and concise guidance regarding the use of Government credit cards by Federal agencies to make micro-purchases under subsections (c), (d), and (f) of section 32 of the Office of Federal Procurement Policy Act (41 U.S.C. 428), as modified by this subsection.

(2) ELEMENTS.—The guidance under paragraph (1) shall include—

(A) a list of Government officials with the authority to approve purchases under subsection (d) in amounts in excess of $50,000, designated by agency, title, and pay grade;

(B) the number of credit cards, by agency, that may be utilized for purchases under subsection (d) in amounts in excess of $50,000;

(C) procedures for the immediate review of any purchase under subsection (d) in an amount in excess of $50,000 that was not approved by an official specified in that paragraph as required by that paragraph;

(D) procedures for the audit of all purchases made on Government credit cards after the expiration of subsection (d) under subsection (c); and

(E) procedures to ensure that such purchases are made with small business concerns and local small business concerns, to the maximum extent practicable under the circumstances.

(3) REPORTS ON PURCHASES.—Not later than 180 days after the date of the enactment of this Act, the head of each executive agency making any purchase under subsection (d) in an amount in excess of $50,000 shall submit to the appropriate Congressional committees a report on each such purchase made by such agency, including—

(A) a description of the property or services so purchased;

(B) a statement of the purpose of such purchase;

(C) a statement of the amount of such purchase;

(D) a statement of the name, title, and pay grade of the officer or employee of such agency making such purchase; and

(E) whether such purchases were made with small business concerns.

(4) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this subsection, the term ''appropriate Congressional committees'' means—

(A) the Committees on Appropriations, Small Business and Entrepreneurship, Finance, and Homeland Security and Governmental Affairs of the Senate; and

(B) the Committees on Appropriations, Small Business, and Government Reform of the House of Representatives.

SEC. 6095. TRANSFER OF FUNDS.

Notwithstanding any other provision of law, of the amounts made available to the Department of Homeland Security under the heading ''Disaster Relief'' under the heading ''Emergency Preparedness and Response'' of Public Law 109–62 (119 Stat. 1991), $6.2 billion shall be made available to the Secretary to carry out this chapter and remain available until expended. The Secretary shall use such sums as are necessary to carry out this chapter.

Mrs. LINCOLN. Madam President, this amendment truly reflects the values that we hold as an American family. When one of us is sick or ill, the rest of us are there to help. The amendment simply provides immediate access to Medicaid for displaced individuals from the gulf coast disaster. It provides full Federal support to the affected States only in the Medicaid Program so that we don't leave them

hanging without the means to be able to take care of their own people. We provide disaster relief funds through an uncompensated care pool for our providers who have, without being asked, provided the care for those individuals who needed it so desperately. I urge my colleagues to support this. We have tried time and time again to do what is right. We have the opportunity here. We have offered it many times. I encourage my colleagues, please do the right thing.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Madam President, this amendment is opposed by the Finance Committee. The Finance Committee has aggressively funded this account with $1.94 billion in this bill, which will cover 1.9 million victims of the hurricane. Therefore, these additional funds, if this amendment were to pass, would basically put the Finance Committee section of the bill out of compliance with the Deficit Reduction Act. Therefore, we oppose it.

I make a point of order that the pending amendment is not germane to the measure now before the Senate. I raise that as a point of order under section 305 of the Budget Act.

Mrs. LINCOLN. Madam President, pursuant to section 904 of the Congressional Budget Act of 1974, I move to waive the applicable sections of that act for consideration of the pending amendment, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the motion. The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted—yeas 48, nays 51, as follows:

[Rollcall Vote No. 285 Leg.]

YEAS—48

| | | |
|---|---|---|
| Akaka | Feingold | Mikulski |
| Baucus | Feinstein | Murray |
| Bayh | Harkin | Nelson (FL) |
| Biden | Hutchison | Nelson (NE) |
| Bingaman | Inouye | Obama |
| Boxer | Jeffords | Pryor |
| Byrd | Johnson | Reed |
| Cantwell | Kennedy | Reid |
| Carper | Kerry | Rockefeller |
| Clinton | Kohl | Salazar |
| Conrad | Landrieu | Sarbanes |
| Cornyn | Lautenberg | Schumer |
| Dayton | Leahy | Snowe |
| Dodd | Levin | Stabenow |
| Dorgan | Lieberman | Vitter |
| Durbin | Lincoln | Wyden |

NAYS—51

| | | |
|---|---|---|
| Alexander | Brownback | Chambliss |
| Allard | Bunning | Coburn |
| Allen | Burns | Cochran |
| Bennett | Burr | Coleman |
| Bond | Chafee | Collins |

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 19 of 91

| | | |
|---|---|---|
| Craig | Hagel | Santorum |
| Crapo | Hatch | Sessions |
| DeMint | Inhofe | Shelby |
| DeWine | Isakson | Smith |
| Dole | Kyl | Specter |
| Domenici | Lott | Stevens |
| Ensign | Lugar | Sununu |
| Enzi | Martinez | Talent |
| Frist | McCain | Thomas |
| Graham | McConnell | Thune |
| Grassley | Murkowski | Voinovich |
| Gregg | Roberts | Warner |

NOT VOTING—1

Corzine

The PRESIDING OFFICER. On this vote, the yeas are 48, the nays are 51. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is not agreed to. The point of order is sustained, and the amendment falls.

Mr. GREGG. I move to reconsider and I move to lay that motion on the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

CHANGE OF VOTE

Mr. CORNYN. Mr. President, I ask unanimous consent that my vote on the motion to waive with respect to the Lincoln amendment No. 2356, as modified, be recorded as a ''yea.'' This does not change the outcome of the vote.

The PRESIDING OFFICER. Without objection, it is so ordered.

(The foregoing tally has been changed to reflect the above vote.)

AMENDMENT NO. 2355

Mr. GREGG. Madam President, we are now going to the Inhofe amendment.

The PRESIDING OFFICER. The Senator from Oklahoma.

Mr. INHOFE. Madam President, there have been many sincere, well-meaning efforts to put fiscal discipline into this legislation. Some people have tried to stop projects only to find out it does not save any money; it just causes them to rearrange their projects.

This amendment actually does that. This is the only amendment that does. I will read it for my colleagues:

All non-defense, non-trust fund discretionary spending shall not exceed the previous fiscal year's level without a two-thirds vote.

I retain the remainder of my time.

The PRESIDING OFFICER. Who yields time in opposition?

The Senator from Mississippi.

Mr. COCHRAN. Madam President, the pending amendment contains matter within the jurisdiction of the Committee on the Budget. I raise a point of order against the amendment under section 306 of the Budget Act.

The PRESIDING OFFICER. Is all time yielded back on the amendment?

Mr. INHOFE. No.

The PRESIDING OFFICER. The Senator from North Dakota.

Mr. CONRAD. Madam President, the amendment of the Senator from Oklahoma would freeze spending on veterans, on homeland security, on education, on National Institutes of Health, not just for 1 year but permanently—permanently. Permanently is a long time. The only way you get around it is a supermajority vote of 67 votes in the Senate.

I urge colleagues to oppose the amendment.

The PRESIDING OFFICER. Is all time yielded back?

Mr. INHOFE. No, I believe I have 30 seconds remaining.

The PRESIDING OFFICER. The Senator from Oklahoma.

Mr. INHOFE. Madam President, what the Senator from North Dakota said is exactly right. That is exactly what this amendment does. And if you are really serious about doing something about the deficit, this is your chance to do it.

This morning we passed the Agriculture appropriations conference report which had a very small increase, but last week we passed the Labor-HHS appropriations bill with $107 billion more than the previous year. This has to stop, and that is why this is a very significant vote.

Mr. President, I say to my conservative friends, this is going to be scored very heavily by conservative organizations, such as the National Taxpayers Union. I urge a positive vote.

The PRESIDING OFFICER. The Senator from Mississippi.

Mr. COCHRAN. Madam President, I renew my point of order. The pending amendment contains matter within the jurisdiction of the Committee on the Budget. I raise a point of order against the amendment under section 306 of the Budget Act.

Mr. INHOFE. Madam President, pursuant to section 904 of the Congressional Budget Act of 1974, I move to waive the applicable sections of the act for the consideration of the pending amendment. I urge a ''yes'' vote.

I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the motion. The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 32, nays 67, as follows:

[Rollcall Vote No. 286 Leg.]

YEAS—32

| | | |
|---|---|---|
| Allard | DeMint | Martinez |
| Allen | Dole | McCain |
| Brownback | Ensign | McConnell |
| Bunning | Frist | Santorum |
| Burns | Graham | Sessions |
| Burr | Grassley | Shelby |
| Chambliss | Hagel | Sununu |
| Coburn | Hutchison | Thomas |
| Cornyn | Inhofe | Thune |
| Craig | Isakson | Vitter |
| Crapo | Kyl | |

NAYS—67

| | | |
|---|---|---|
| Akaka | Baucus | Bennett |
| Alexander | Bayh | Biden |

| | | |
|---|---|---|
| Bingaman | Gregg | Nelson (NE) |
| Bond | Harkin | Obama |
| Boxer | Hatch | Pryor |
| Byrd | Inouye | Reed |
| Cantwell | Jeffords | Reid |
| Carper | Johnson | Roberts |
| Chafee | Kennedy | Rockefeller |
| Clinton | Kerry | Salazar |
| Cochran | Kohl | Sarbanes |
| Coleman | Landrieu | Schumer |
| Collins | Lautenberg | Smith |
| Conrad | Leahy | Snowe |
| Dayton | Levin | Specter |
| DeWine | Lieberman | Stabenow |
| Dodd | Lincoln | Stevens |
| Domenici | Lott | Talent |
| Dorgan | Lugar | Voinovich |
| Durbin | Mikulski | Warner |
| Enzi | Murkowski | Wyden |
| Feingold | Murray | |
| Feinstein | Nelson (FL) | |

NOT VOTING—1

Corzine

The PRESIDING OFFICER. On this vote, the yeas are 32, the nays are 67. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected. The point of order is sustained and the amendment falls.

Mr. COCHRAN. Madam President, I move to reconsider the vote.

Mr. GREGG. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 2357

Mr. NELSON of Florida. Madam President, my amendment would prevent a hike in Medicare premiums for our 42 million senior citizens. In the bill, doctors' fees are increased in their reimbursement. In my amendment, that is paid for with drug company money that would be staying the same under the existing law where the drug companies have to give discounts under the Medicaid law as they transition into Medicaid HMOs. This saves our seniors over $1 billion in increased premiums.

This amendment is supported and endorsed by the AARP. I want to welcome the bipartisan support of the Senate for this amendment.

The PRESIDING OFFICER. Who yields time in opposition?

The Senator from Iowa.

Mr. GRASSLEY. Madam President, I rise in opposition to the Nelson amendment. I think everybody knows that the taxpayers pay 75 percent of the Part B premium and 25 percent is paid by the individual. Whenever we increase doctors' reimbursement—and we do that in this bill by 5.3 percent so that doctors do not lose their money—then, obviously, the 25 percent is going to go up a little bit, just as the 75 percent goes up a little bit when reimbursement is increased.

The Senator from Florida takes offense at the fact that the premium is going to go up in the year 2007 by $1.69. It is the way the formula works. I think every Senator wants to vote to give the doctors fair reimbursement because without doctors senior citizens cannot be served. So we ought to let the formula work.

The offset is very egregious toward managed care as well. Also, do not forget that low-income people, people on

Medicaid, do not pay the Part B and those who are not on Medicaid but below the poverty level have help through the QI program that we passed and the President signed recently to continue that program. So I hope my colleagues will defeat the amendment.

Mr. GREGG. Madam President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the amendment.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDENT pro tempore. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 49, nays 50, as follows:

[Rollcall Vote No. 287 Leg.]

YEAS—49

| | | |
|---|---|---|
| Akaka | Durbin | Murray |
| Baucus | Feingold | Nelson (FL) |
| Bayh | Feinstein | Nelson (NE) |
| Biden | Harkin | Obama |
| Bingaman | Inouye | Pryor |
| Boxer | Jeffords | Reed |
| Burns | Johnson | Reid |
| Byrd | Kennedy | Rockefeller |
| Cantwell | Kerry | Salazar |
| Carper | Kohl | Sarbanes |
| Clinton | Landrieu | Schumer |
| Collins | Lautenberg | Snowe |
| Conrad | Leahy | Stabenow |
| Dayton | Levin | Talent |
| DeWine | Lieberman | Wyden |
| Dodd | Lincoln | |
| Dorgan | Mikulski | |

NAYS—50

| | | |
|---|---|---|
| Alexander | Dole | McCain |
| Allard | Domenici | McConnell |
| Allen | Ensign | Murkowski |
| Bennett | Enzi | Roberts |
| Bond | Frist | Santorum |
| Brownback | Graham | Sessions |
| Bunning | Grassley | Shelby |
| Burr | Gregg | Smith |
| Chafee | Hagel | Specter |
| Chambliss | Hatch | Stevens |
| Coburn | Hutchison | Sununu |
| Cochran | Inhofe | Thomas |
| Coleman | Isakson | Thune |
| Cornyn | Kyl | Vitter |
| Craig | Lott | Voinovich |
| Crapo | Lugar | Warner |
| DeMint | Martinez | |

NOT VOTING—1

Corzine

The amendment (No. 2357) was rejected.

Ms. MIKULSKI. Mr. President, I rise today to join my colleagues in support of Senator NELSON's amendment to protect seniors against the outrageous increases in their Medicare costs.

Health care costs are skyrocketing and seniors are paying a greater share out of their pockets for health care each year. Medicare premium increases are outpacing inflation. Prescription drug costs are shooting through the roof.

Other out-of-pocket medical expenses are also increasing. Seniors are facing higher copays and deductibles. Last year's Medicare bill increased deductibles for doctors' visits by 10 per-

cent. Deductibles for hospital and skilled nursing home visits are also rising.

Medicare beneficiaries spend a sizable portion of their income on health care. In 2004, beneficiaries spent about $3,725—nearly one-quarter—of their income on health care costs. Over the last 3 years, Medicare premiums have increased by 50 percent. Compare this to the only 10-percent increase in seniors' cost-of-living adjustments, COLA. Next year, Part B premiums will increase by another 12 percent.

But there is another problem this amendment addresses. The current Medicare physician payment formula, known as the sustainable growth rate, SGR, has serious flaws. The current formula has generated negative updates since 2001. Without congressional intervention, reimbursement rates for physicians in the Medicare Program will decrease by 4.3 percent next year.

I have long supported fixing this flawed formula. With the majority of my colleagues, I have written letters to CMS Commissioner Dr. Mark McClelan and the Director of the Office of Management and Budget, Mr. Joshua Bolten. I have supported legislation trying to address this issue. Without a permanent fix, this uncertainty causes considerable angst among the physician community every year. Although I believe Congress needs to enact a longterm solution, this amendment supports a 1 percent increase in the physician reimbursement rate for the next year.

But this increase in physician payments will also increase overall spending on Medicare Part B. This will in turn increase Medicare premiums, which are set at 25 percent of Part B expenses. While I strongly support the payment change, I believe it is equally important that Medicare beneficiaries not have their premiums unexpectedly increased.

This amendment ensures that Medicare beneficiaries will not have to pay unexpectedly higher premiums in 2007 because of the payment changes for 2006 in the Senate's budget reconciliation bill. This amendment prevents us from having to make a King Solomonlike decision. With this amendment, we do not have to consider "cutting the baby in half." We do not have to decide between this modest increase to physician reimbursement and a further hike to our senior citizens—especially for those who are forced to live on a fixed income.

In addition, the increase necessary to provide for physician reimbursement will not have to come from taxpayers. The offset for this amendment is an expansion of a drug rebate program currently in place since 1990. Drug manufacturers currently pay a rebate to participate in Medicaid. The Nelson amendment would offset the cost of protecting Medicare beneficiaries from the Part B premium increase by providing Medicaid managed care plans access to these drug rebates.

I think it is a good idea to expand the drug rebate program from Medicare fee-for-service to all of Medicaid, including the managed care programs. When we first passed this law, 15 years ago, Medicaid managed care did not have such a strong presence. It now accounts for much of Medicaid services and should be part of this rebate program.

I believe honor thy mother and father is not just a good commandment to live by, it is good public policy to govern by.

That's why I feel so strongly about Medicare. Congress created Medicare to provide a safety net for seniors. In 1965, seniors' biggest fear was the cost of hospital care. One heart attack could have put a family into bankruptcy. That is what Medicare Part A is all about.

Then Congress added Medicare Part B to help seniors pay for doctor visits as an important step to keep seniors healthy and financially secure. Now, Part B premium increases are racing ahead of seniors' ability to pay. So seniors may lose the ability to pay for coverage for their doctor's visits.

This amendment is not an answer to skyrocketing health care costs, but a stopgap measure to give seniors a little breathing room. I am working hard on several bills to fix the Medicare bill that was passed last year. I am fighting to protect seniors' Social Security COLAs from increases in both Part B and Part D premiums.

I am fighting to close the coverage gap to provide a real drug benefit for seniors. I am fighting to allow the Government to negotiate with drug companies to lower the cost of prescription drugs to save money for the Government and for seniors. I am fighting to end the giveaways to insurance companies and use those savings to improve Medicare.

And I could go on.

I am fighting to protect physician reimbursement rates by supporting legislation and writing to government officials who have the authority to make changes to the flawed formula.

And I will continue to fight.

This amendment is a good step down in our constant attempt to reign in Medicare premium costs for seniors while protecting reimbursement rates for physicians.

Seniors cannot afford 17-percent increases in their Medicare premiums. Physicians cannot afford to have their reimbursement rates cut. I urge my colleagues to join me in expressing support for this amendment.

Mr. GREGG. Mr. President, I move to reconsider the vote.

Mr. BOND. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 2358

Mr. GREGG. Mr. President, we are making progress, but it is slow. The next amendment is the amendment of Senator CANTWELL, which is obviously the big polar bear.

The PRESIDENT pro tempore. The Senator is recognized.

Ms. CANTWELL. My amendment strikes the language allowing for drilling in the Arctic National Wildlife Refuge. The underlying bill is a sweetheart deal for oil companies that have made a record $30 billion in profits last quarter. The bill gives oil companies a free ride with back-door language that allows them to circumvent environmental laws, legal standards and Federal agency oversight that every other business in America has to comply with.

This wildlife area has been protected since the Eisenhower days, and for good reason. There is an average of over 500 oil spills a year on the Alaska North Slope and over 4,000 spills in the last 10 years. Let's not pollute one of the great last refuges of America, and let's take the polluting language out of this bill. The Department of Energy says drilling in ANWR will do nothing in the near term and very little in the long term, reducing gas prices by only one penny. America wants a better energy plan than putting a sweetheart deal in the budget language.

I urge my colleagues to strike this language.

Mr. DODD. Mr President, I join with my colleagues in strong opposition to opening the Arctic National Wildlife Refuge, ANWR, to oil drilling. I believe including it in a reconciliation package is a backdoor attempt to achieve a shortsighted, environmentally irresponsible outcome. It is little more than a scheme to raise $2.5 billion that will ultimately be used to cover a portion of the cost of tax cuts for the wealthy. Further, it will have a great and lasting cost to the environment with few benefits in terms of affordable energy.

Let me lay out a few reasons why I oppose drilling in ANWR.

The area we are talking about is home to nearly 200 species of wildlife, including polar, grizzly, and black bears, rare musk oxen, and millions of migratory birds. Each year, thousands of caribou travel to the Coastal Plain of the Arctic Refuge to give birth to their calves. It has been protected for decades, during Republican and Democratic administrations. It is not as if we have said no to oil and gas exploration in the entire North Slope. It is only the remaining 5 percent—the Coastal Plain of the Arctic Refuge—that we want placed off limits. If we open this pristine land now, we can never turn the clock back. Setting the process in motion will entail a web of oil platforms, pipelines, production facilities, power facilities, support structures, and roads across the entire area. The administration contention that development would be confined to a 2,000-acre footprint is simply false because the recoverable oil is spread out in small deposits across the entire Coastal Plain.

I firmly believe we need to ensure our country's economic security, but drilling in ANWR will do nothing to reduce our energy price and supply problems in the near term and very little to reduce our dependence on foreign supplies of oil. With transportation accounting for nearly 70 percent of oil use in this country, the Bush administration and many of my colleagues on the other side of the aisle have refused to tackle the issue of automobile fuel efficiency. According to the American Council for an Energy-Efficient Economy, if the Corporate Average Fuel Economy, CAFE, standards are raised by just 5 percent annually until 2012, and by just 3 percent thereafter, more than 1.5 million barrels of oil per day could be saved by 2010, and 67 billion barrels of oil over the next 40 years—more than 10 times what could be recovered in ANWR. In 1998, the U.S. Geological Survey estimated that there is no more than 5.2 billion barrels of economically recoverable oil in ANWR, a number that is equivalent to what the United States consumes in about 6 months.

Any recoverable oil that might be below the Refuge would not begin flowing for at least 10 years and would never meet more than a small percentage of our oil needs at any given time. So, therefore, it would have no impact on my constituents and your constituents for at least a decade. Further, the Energy Information Administration, EIA, has said that because the price of oil is set by the world market, ANWR would have a negligible impact on gasoline prices.

The United States dependence on foreign oil is growing, with current imports at 58 percent. We currently have about 3 percent of the world's oil reserves but consume more than a quarter of the world's oil supply. We simply cannot drill our way out of our problems. Last year, EIA stated that at peak production, oil from ANWR would account for just a fraction of our consumption—no more than 4 percent. Further, there is no guarantee that any oil produced domestically from ANWR would make it to the rest of the country. There is no assurance that it will not all be exported to foreign countries. It is simply too big a risk to take when there are other, less intrusive ways to truly alleviate our dependence on oil—fuel efficiency, renewable and alternative sources of energy, and, dare I say it, conservation, something the Bush administration would have you now believe it wholly endorses.

ANWR drilling proponents are always quick to contend that 735,000 jobs would be created by opening this area to oil extraction. Those estimates are based on figures from 15 years ago that the forecasters have since acknowledged were based on flawed assumptions. In October 2005, the Congressional Research Service reported that full development of the Arctic Refuge would result in 60,000 jobs. Even the three oil companies that stand to reap the most profits by expanding their presence in Alaska—ExxonMobil, BP, and Conoco-Phillips—have been relatively silent this year about their interest in ANWR.

Little oil industry interest, less job creation than anticipated, minimal recoverable oil deposits, no impact on current energy prices and negligible impact on future prices, no reduction in foreign oil dependence, and a web of infrastructure across the Coastal Plain—does that justify pillaging the Arctic Refuge? I think it is irresponsible to do so.

Therefore, I urge my colleagues to support the Cantwell amendment and work with us to enact policies that provide economic relief for residential and business consumers and set our country on a path to energy security.

Ms. MIKULSKI. Mr. President, I rise to oppose drilling in the Arctic National Wildlife Refuge. Opening the refuge is not the answer to solving our country's energy needs. We cannot drill our way out of our energy problems.

We need to focus on real solutions not gimmicks—solutions that decrease our dependence of foreign oil, protect the environment and help consumers at a time when the costs to fill up their gas tanks and heat their homes are at all time highs.

If we open the Arctic Refuge for oil and gas drilling, it would provide only about a 6-month supply of oil and would not even be available for 10 or more years. That means that drilling in the wildlife refuge would not affect our current oil and gasoline prices nor will it reduce our country's dependence on foreign oil. Even in 10 or so years when we might get the oil, drilling in the Arctic National Wildlife Refuge will help little if at all.

Rather than trying to get a couple of months of oil supply in 10 years, we need to address the most pressing issues facing our country now: our growing dependence on foreign oil, sky-high oil and gas prices, and global warming. This is what I have been fighting for—real solutions to real problems that would help today's consumers and tomorrow's energy needs.

That is why I fought to include an amendment to the Commerce, Justice, Science Appropriations bill that would provide a million dollars to the Federal Trade Commission to immediately investigate claims of price gouging. While oil companies and refineries report record profits, American consumers shouldn't have to scrimp to buy gasoline to go to work, or church or to buy groceries. I also cosponsored a bill that would place a federal ban on price gouging for oil, gasoline and other petroleum products during times of energy emergencies. To drive this point home, I sent a letter to the chairwoman of the FTC, expressing my concern over the consolidation of oil refineries, resulting in the lack of competition.

I also recently sent a letter to President Bush urging him to convene a White House summit of oil and gas company CEOs to insist that they

lower their sky-high gas and home heating oil prices. These are some of the President's closets political supporters and friends They are also the same men and women who the President called on to write the administration's energy policy in 2001. If the President can call them in to help themselves, he should call them back to help ordinary Americans. Another letter called on the oil and gas company CEOs to temporarily halt unnecessary exports of any home heating oil products that they are currently sending abroad. We cannot expect Americans to pay over $1,000 to heat their homes this winter when U.S. companies are exporting billions of gallons of refined heating oil and propane.

We need to find solutions for tomorrow's energy needs as well as those facing Americans today. I introduced a bill that would provide tax incentives for energy efficient hybrid and fuel cell vehicles, which was included in the Energy bill. I also voted for a proviso in the Senate energy bill that would have required utilities to generate 10 percent of their energy from renewable sources. In addition, I supported a provision in the bill that requires the Federal Government to get at least 7.5 percent of our energy from renewable sources by 2013. I also supported an amendment that would require the U.S. to reduce foreign oil imports by 40 percent in 20 years

Just last week, oil companies reported record third quarter profits, some more than 85 percent higher than last year. As Americans struggle to fill their gas tanks and pay high home heating bills, the oil and gas companies are filling their pockets with historic profits. And now, here we are, in the Senate, giving them the opportunity to drill in federally protected land.

This is not a time to reward oil and gas companies with the promise of more profits. We need to give these companies the opportunity to be patriots—not profiteers. They need to join us by holding down prices, investing in renewable energy, serving the needs of Americans and conserving as much as possible. Together, America can do better.

The PRESIDENT pro tempore. The time of the Senator has expired.

Who yields time in opposition? The Senator from New Mexico.

Mr. DOMENICI. Mr. President, let me say to the Senate it is finally time. It is finally time that we decide to do something about our oil dependency. It is time that we do something for the American people about the rising, escalating price of gasoline at the pump.

As I see it, this is a rare opportunity to produce substantial quantities of crude oil from our own homeland, from one of our States. Not only will it produce oil, it will produce the equivalent of what the State of Texas has in reserves. To say it has very little is to say the full State of Texas has very little reserves.

It will produce jobs, up to 736,000. You see them on this list. America

cries out for good jobs. We wonder why we don't have them. Then we ignore our own source of supply which would create them.

Any time I have left I yield to the Senator from Alaska.

The PRESIDENT pro tempore. The Senator has 5 seconds.

Ms. MURKOWSKI. Mr. President, this is the Senate's opportunity and the country's opportunity to address our national security, our energy security, and our environmental security. Defeat this amendment.

Mr. GREGG. Mr. President, I ask for the yeas and nays

The PRESIDENT pro tempore. Is there a sufficient second? There is a sufficient second.

The question is on agreeing to the amendment. The clerk will call the roll.

The assistant journal clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER (Ms. MURKOWSKI.) Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 48, nays 51, as follows:

[Rollcall Vote No. 288 Leg.]

YEAS—48

| | | |
|---|---|---|
| Baucus | Dorgan | Mikulski |
| Bayh | Durbin | Murray |
| Biden | Feingold | Nelson (FL) |
| Bingaman | Feinstein | Nelson (NE) |
| Boxer | Harkin | Obama |
| Byrd | Jeffords | Pryor |
| Cantwell | Johnson | Reed |
| Carper | Kennedy | Reid |
| Chafee | Kerry | Rockefeller |
| Clinton | Kohl | Salazar |
| Coleman | Lautenberg | Sarbanes |
| Collins | Leahy | Schumer |
| Conrad | Levin | Smith |
| Dayton | Lieberman | Snowe |
| DeWine | Lincoln | Stabenow |
| Dodd | McCain | Wyden |

NAYS—51

| | | |
|---|---|---|
| Akaka | Dole | Lugar |
| Alexander | Domenici | Martinez |
| Allard | Ensign | McConnell |
| Allen | Enzi | Murkowski |
| Bennett | Frist | Roberts |
| Bond | Graham | Santorum |
| Brownback | Grassley | Sessions |
| Bunning | Gregg | Shelby |
| Burns | Hagel | Specter |
| Burr | Hatch | Stevens |
| Chambliss | Hutchison | Sununu |
| Coburn | Inhofe | Talent |
| Cochran | Inouye | Thomas |
| Cornyn | Isakson | Thune |
| Craig | Kyl | Vitter |
| Crapo | Landrieu | Voinovich |
| DeMint | Lott | Warner |

NOT VOTING—1

Corzine

The amendment (No. 2358) was rejected.

Mr. STEVENS. Madam President, I move to reconsider the vote.

Mr. FRIST. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 2362

Mr. STEVENS. Madam President, parliamentary inquiry: The next amendment is the Wyden amendment on export of oil. I make a parliamen-

tary inquiry if that amendment is subject to the Byrd rule.

The PRESIDING OFFICER. In the opinion of the Chair, it is not.

Mr. STEVENS. Madam President, as long as this amendment is not changed and comes back to this floor in the conference report, it will not be subject to the Byrd rule.

The PRESIDING OFFICER. The language as stated is not subject to a point of order.

Who yields time?

Mr. WYDEN. Madam President, I call up the Wyden-Collins amendment.

The PRESIDING OFFICER. The amendment is pending.

Mr. WYDEN. Madam President, you cannot look the public in the eye after all the speeches about how the oil is needed here at home and pass legislation that is an invitation to export Alaskan oil to countries such as China. The history is, if you do not ban these exports, this oil is going to go to Asia. That was confirmed not long ago by oil company executives who came before the Senate Commerce Committee. Without this amendment, there is no assurance that even one drop of Alaskan oil will get to hurting Americans. I hope the Senate agrees to this amendment to, at the very least, put a Band-Aid on a flawed policy.

I yield to my cosponsor, the Senator from Missouri.

Mr. TALENT. Madam President, I congratulate my friend from Oregon for his fine work.

Briefly, as a very strong supporter of exploring for oil in the Arctic, one of the big reasons we are doing it is to enhance our national security and our own domestic oil supply, which is why I support the amendment I am cosponsoring.

Mr. WYDEN. Madam President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There is a sufficient second. The yeas and nays were ordered.

Mr. STEVENS. Is there time in opposition?

The PRESIDING OFFICER (Mr. GRAHAM). There is 1 minute in opposition.

Mr. STEVENS. In principle, I am opposed, but as long as it does not violate the Byrd rule, I will not vote against it.

I yield back the time.

The PRESIDING OFFICER. The question is on agreeing to the amendment numbered 2362.

The yeas and nays have been ordered. The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 83, nays 16, as follows:

[Rollcall Vote No. 289 Leg.]

YEAS—83

| | | |
|---|---|---|
| Akaka | Ensign | Murkowski |
| Baucus | Enzi | Murray |
| Bayh | Feingold | Nelson (FL) |
| Biden | Feinstein | Nelson (NE) |
| Bingaman | Frist | Obama |
| Bond | Graham | Pryor |
| Boxer | Grassley | Reed |
| Burns | Hagel | Reid |
| Byrd | Harkin | Roberts |
| Cantwell | Hatch | Rockefeller |
| Carper | Hutchison | Salazar |
| Chafee | Inouye | Santorum |
| Chambliss | Isakson | Sarbanes |
| Clinton | Jeffords | Schumer |
| Coburn | Johnson | Shelby |
| Cochran | Kennedy | Smith |
| Coleman | Kerry | Snowe |
| Collins | Kohl | Specter |
| Conrad | Lautenberg | Stabenow |
| Crapo | Leahy | Stevens |
| Dayton | Levin | Talent |
| DeMint | Lieberman | Thomas |
| DeWine | Lincoln | Thune |
| Dodd | Lott | Vitter |
| Dole | Lugar | Voinovich |
| Domenici | Martinez | Warner |
| Dorgan | McConnell | Wyden |
| Durbin | Mikulski | |

NAYS—16

| | | |
|---|---|---|
| Alexander | Burr | Landrieu |
| Allard | Cornyn | McCain |
| Allen | Craig | Sessions |
| Bennett | Gregg | Sununu |
| Brownback | Inhofe | |
| Bunning | Kyl | |

NOT VOTING—1

Corzine

The amendment (No. 2362) was agreed to.

Mr. GREGG. I move to reconsider the vote.

Mr. LEVIN. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Mr. President, we now go to Senator GRASSLEY's amendment.

Mr. CONRAD. Mr. President, will the Senator withhold for one moment?

Mr. GRASSLEY. Yes.

The PRESIDING OFFICER. The Senator from North Dakota.

Mr. CONRAD. Mr. President, colleagues, we now have a list of the number of amendments that have been filed and that are pending and that Senators have noticed to us they intend to insist to have a vote on. That is 25 in number. That would take 8 hours. We have to stop at 6 o'clock. There is no way we would complete business today if every one of our colleagues insists on a vote on their amendment.

So I am asking on our side—I am asking, please—if you have an amendment filed that you really don't need a vote on or that you could possibly work out, let's work very hard in the next few hours to try to work it out. I would implore colleagues to not force a vote on every amendment they have filed.

I thank the Chair.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Mr. President, I would like to second the request of the Senator from North Dakota. I think it is a very appropriate statement.

AMENDMENT NO. 2359

The PRESIDING OFFICER. Who yields time on the amendment?

The Senator from Iowa.

Mr. GRASSLEY. Mr. President, how much time do I have?

The PRESIDING OFFICER. One minute.

Mr. GRASSLEY. Mr. President, this is a bipartisan amendment, the Grassley-Dorgan amendment, with a lot of cosponsors. We have a problem in the existing bill that will hurt family farmers. It cuts farm payments across the board for 100 percent of the farmers. It cuts conservation programs, so it harms the environment to a greater extent. What we do is solve a problem and help every family farmer in the process.

Ten percent of the farmers in the United States get 72 percent of the benefit out of the farm program. That is unfair. The farm programs have always been targeted toward medium- and small-sized farmers. So we put in a hard cap of $250,000. Mr. President, $250,000 is all one farm entity can get from the farm program. We redistribute that money so we do not have that 2.5-percent cut. We restore some money for conservation and things of that nature.

So I hope you will support our amendment. The last time it was up, we got 66 votes for it.

Mr. KYL. Mr. President, reducing overall Federal spending on farm programs is important if we are to succeed in reducing the Federal budget deficit. The current budget-reconciliation package includes $39 billion in savings, including $3 billion from agriculture programs. To achieve these savings, the Senate Agriculture Committee cuts farm spending by implementing an across-the-board 2.5 percent reduction in payments for all farm commodities. I wholeheartedly support these cuts in farm spending.

However, I cannot support waiving the Budget Act to consider the Grassley Dorgan amendment to impose more restrictive payment limits on farm commodities. This amendment is being offered as a substitute to the cost savings achieved by the fair, across-the-board reductions currently in the package. Substituting the Grassley-Dorgan payment limits is eerily reminiscent of the flawed formula in the highway bill: Instead of all States bearing the burden equally, the farm cuts would be achieved on the backs of Arizona farmers and other farmers of capital intensive crops in the West and South.

The advocates of the Grassley-Dorgan amendment claim that reducing payment limits preserves the family farm. What they meant to say is that it preserves family farms in North Dakota, Iowa, and other Midwestern States that grow certain commodities: namely grains and oilseeds such as corn, wheat, and soybeans. Family farmers in Arizona farm cotton. It is a highly capital intensive crop, in fact, one of the two most expensive program crops to grow. To illustrate, cotton program payments represent 39 percent of western farmers' cash costs of production. Corn and wheat program payments represent 49 percent and 50 percent of Midwestern farmers' cash costs, respectively.

Thus, in order to achieve economies of scale and remain competitive, Arizona farms must be large. According to the Economic Research Service, over 30 percent of cotton production occurs on farms operating on an average of 3,500 acres. Are we to believe that none of these large farms are owned by Arizona families? I know for a fact that they are.

The average farming operation in Arizona consists of about 7,000 acres. Using a farm in near Buckeye, AZ as an example, this family farm is run by four brothers. Several children are managers of the operation, including performing marketing and financial services. About a third of the farm grows cotton, about a third grows feed grains, and the remaining third alfalfa. The annual budget is $5 million, and the brothers draw an annual salary of about $50,000 each when the farm generates sufficient income. This farm would be hit hard by the payment limitations in the Grassley-Dorgan amendment. Its operators would be forced to cut the amount of acres on which they grow cotton. In years when prices decline at harvest, their cash flow would be restricted and their ability to qualify for financing would be severely hampered.

The Grassley-Dorgan amendment, in equating large with bad, ultimately favors growers of corn, wheat, and soybeans at the expense of farmers of cotton, rice, and peanuts. To further illustrate what I am talking about, let us apply the limitations in the amendment: a farm that produces cotton or rice would, at today's world prices and average yields, hit the limit on payments at about 400 to 600 acres. This acreage is generally deemed to be too small to sustain the investment in the specialized equipment necessary for cotton and rice production. In contrast, a corn farmer with an expected yield of 190 bushels per acre, would not hit the limit on payments until just over 3,100 acres. Clearly, very few corn farmers will ever feel the effects of the Grassley-Dorgan amendment.

It has been further estimated that the more restrictive eligibility rules that are part of the amendment, combined with the limits on direct payments, would reduce direct payments to Arizona growers by $24.6 million. This represents a reduction of 62 percent, the highest of any State. Iowa would see a loss of just 4 percent and North Dakota, 10 percent.

I am not going to argue that the farm law is off limits for the purpose of finding savings for the American taxpayer. However, I encourage my colleagues to look closely at the ways we achieve that savings. It is simply not fair to use a faulty perception of what

constitutes a family farm to favor one farming region of the country at the expense of another. Yet, that is exactly what the Grassley-Dorgan amendment would do. Thus, I cannot support a motion to waive the Budget Act with respect to this amendment and must vote against it.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Mr. President, I yield to the Senator from Georgia.

The PRESIDING OFFICER. The Senator from Georgia is recognized for 1 minute.

Mr. CHAMBLISS. Mr. President, in 2002, this body, along with the House and along with the President, made a commitment to farmers and ranchers all across America with the signing and implementation of the 2002 farm bill. This was an issue back then, in 2002, in the farm bill. It will be an issue in the farm bill in 2007.

Today, when our farmers are hit with high fuel prices, with low commodity prices, and with disasters all across the country in different sections, this is not the time to say to our farmers, who feed all of America, we are going to change the program in midstream. This issue will be dealt with in the farm bill in 2007.

Mr. President, I raise a point of order under section 305 of the Budget Act that the pending amendment is not germane to the measure now before the Senate.

The PRESIDING OFFICER (Mr. BUNNING). The Senator from Iowa.

Mr. GRASSLEY. Mr. President, pursuant to section 904(c) of the Congressional Budget Act of 1974, I move to waive section 305 of the Budget Act for the consideration of amendment No. 2359, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The question is on agreeing to the motion. The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER (Mr. GRAHAM). Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted—yeas 46, nays 53, as follows:

[Rollcall Vote No. 290 Leg.]

YEAS—46

| | | |
|---|---|---|
| Allard | Feingold | Reid |
| Bayh | Grassley | Salazar |
| Bingaman | Hagel | Santorum |
| Brownback | Harkin | Sarbanes |
| Byrd | Hatch | Schumer |
| Cantwell | Johnson | Smith |
| Chafee | Kennedy | Snowe |
| Clinton | Kerry | Specter |
| Collins | Lautenberg | Stabenow |
| Conrad | Levin | Sununu |
| Dayton | Lugar | Thomas |
| DeWine | Mikulski | Thune |
| Dorgan | Murray | Voinovich |
| Durbin | Nelson (NE) | Wyden |
| Ensign | Obama | |
| Enzi | Reed | |

NAYS—53

| | | |
|---|---|---|
| Akaka | Crapo | Lieberman |
| Alexander | DeMint | Lincoln |
| Allen | Dodd | Lott |
| Baucus | Dole | Martinez |
| Bennett | Domenici | McCain |
| Biden | Feinstein | McConnell |
| Bond | Frist | Murkowski |
| Boxer | Graham | Nelson (FL) |
| Bunning | Gregg | Pryor |
| Burns | Hutchison | Roberts |
| Burr | Inhofe | Rockefeller |
| Carper | Inouye | Sessions |
| Chambliss | Isakson | Shelby |
| Coburn | Jeffords | Stevens |
| Cochran | Kohl | Talent |
| Coleman | Kyl | Vitter |
| Cornyn | Landrieu | Warner |
| Craig | Leahy | |

NOT VOTING—1

Corzine

The PRESIDING OFFICER. On this vote, the yeas are 46, the nays are 53. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected. The point of order is sustained and the amendment falls.

AMENDMENT NO. 2365

The PRESIDING OFFICER. The Senator from New Mexico.

Mr. BINGAMAN. Mr. President, this amendment deals with the fact that under current law, 31 of our States are seeing significant cuts in Federal support for Medicaid because of a reduction in the percentage the Federal Government will pay, the FMAP, as we always refer to it, the Federal matching rate. Alaska is held harmless in the underlying bill. They will not suffer a cut. My amendment would say that for the other 30 States, the cut should not be more than five-tenths of 1 percent next year. The amendment is more than offset. In fact, the offset is supported strongly by Secretary Leavitt's Medicaid Commission. It is supported strongly by the National Governors Association. It would save the States over $3 billion if this offset is agreed to as part of this amendment.

I urge my colleagues to support the amendment. This map shows the States in red that would get a more fair share of Medicaid funds, if the amendment passes.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Mr. President, I ask Members to vote no on this amendment. There is an odd situation here. We have had a formula in the legislation for 40 years. That formula regularly has some States getting more reimbursement, some States getting less. Next year your State might go up. The next year it might go down. That is the way it has been working. All of a sudden, some States are receiving a reduction, and they want to keep it where it is. I have never had a situation where, when the formula worked to the benefit of the State, their reimbursement went up, that you come in here and ask for us to reduce the reimbursement. No, you accept the formula. If you want to change the formula, Senator BAUCUS and I have a good plan to change the formula. It would smooth out the peaks and valleys. That is what

we ought to be doing instead of piecemeal doing it this way. I ask Members to vote against the amendment.

AMENDMENT NO. 2365, AS MODIFIED

Mr. BINGAMAN. Mr. President, I call up the modified version of the amendment, and I ask unanimous consent that that be the pending amendment.

The PRESIDING OFFICER. Without objection, the amendment is modified.

The amendment, as modified, is as follows:

On page 188, after line 24, add the following:

**SEC. 6037. LIMITATION ON SEVERE REDUCTION IN THE MEDICAID FMAP FOR FISCAL YEAR 2006.**

(a) LIMITATION ON REDUCTION.—In no case shall the FMAP for a State for fiscal year 2006 be less than the greater of the following:

(1) 2005 FMAP DECREASED BY THE APPLICABLE PERCENTAGE POINTS.—The FMAP determined for the State for fiscal year 2005, decreased by—

(A) 0.1 percentage points in the case of Delaware and Michigan;

(B) 0.3 percentage points in the case of Kentucky; and

(C) 0.5 percentage points in the case of any other State.

(2) COMPUTATION WITHOUT RETROACTIVE APPLICATION OF REBENCHMARKED PER CAPITA INCOME.—The FMAP that would have been determined for the State for fiscal year 2006 if the per capita incomes for 2001 and 2002 that was used to determine the FMAP for the State for fiscal year 2005 were used.

(b) SCOPE OF APPLICATION.—The FMAP applicable to a State for fiscal year 2006 after the application of subsection (a) shall apply only for purposes of titles XIX and XXI of the Social Security Act (including for purposes of making disproportionate share hospital payments described in section 1923 of such Act (42 U.S.C. 1396r–4) and payments under such titles that are based on the enhanced FMAP described in section 2105(b) of such Act (42 U.S.C. 1397ee(b))) and shall not apply with respect to payments under title IV of such Act (42 U.S.C. 601 et seq.).

(c) DEFINITIONS.—In this section:

(1) FMAP.—The term "FMAP" means the Federal medical assistance percentage, as defined in section 1905(b) of the Social Security Act (42 U.S.C. 1396d(b)).

(2) STATE.—The term "State" has the meaning given such term for purposes of title XIX of the Social Security Act (42 U.S.C. 1396 et seq.).

(d) REPEAL.—Effective as of October 1, 2006, this section is repealed and shall not apply to any fiscal year after fiscal year 2006.

**SEC. 6038. EXTENSION OF PRESCRIPTION DRUG REBATES TO ENROLLEES IN MEDICAID MANAGED CARE ORGANIZATIONS.**

(a) IN GENERAL.—Section 1927(j)(1) (42 U.S.C. 1396r–8(j)(1)) is amended by striking "dispensed" and all that follows through the period and inserting "are not subject to the requirements of this section if such drugs are—

"(A) dispensed by health maintenance organizations that contract under section 1903(m); and

"(B) subject to discounts under section 340B of the Public Health Service Act (42 U.S.C. 256b).".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of enactment of this Act and apply to rebate agreements entered into or renewed under section 1927 of the Social Security Act (42 U.S.C. 1396r–8) on or after such date.

Case 1:01-cv-12257-PBS   Document 6528-55   Filed 09/22/09   Page 25 of 91

## SEC. 6039. EXTENSION OF THE MEDICARE PART A AND B PAYMENT HOLIDAY.

Section 6112(b)(1) of this Act is amended by striking "September 22, 2006" and inserting "September 21, 2006".

Mr. GREGG. Mr. President, I ask unanimous consent that the Byrd amendment, which was to be the next amendment, be moved to be after the Landrieu amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. GREGG. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the amendment.

The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER (Mr. MARTINEZ). Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 54, nays 45, as follows:

[Rollcall Vote No. 291 Leg.]

YEAS—54

| | | |
|---|---|---|
| Akaka | Dorgan | Lincoln |
| Baucus | Durbin | Mikulski |
| Bayh | Feingold | Murkowski |
| Biden | Feinstein | Murray |
| Bingaman | Harkin | Nelson (FL) |
| Boxer | Hutchison | Nelson (NE) |
| Byrd | Inhofe | Obama |
| Cantwell | Inouye | Pryor |
| Carper | Jeffords | Reed |
| Chafee | Johnson | Reid |
| Clinton | Kennedy | Rockefeller |
| Coburn | Kerry | Salazar |
| Collins | Kohl | Sarbanes |
| Conrad | Landrieu | Schumer |
| Cornyn | Lautenberg | Snowe |
| Dayton | Leahy | Specter |
| Dodd | Levin | Stabenow |
| Domenici | Lieberman | Wyden |

NAYS—45

| | | |
|---|---|---|
| Alexander | DeWine | McCain |
| Allard | Dole | McConnell |
| Allen | Ensign | Roberts |
| Bennett | Enzi | Santorum |
| Bond | Frist | Sessions |
| Brownback | Graham | Shelby |
| Bunning | Grassley | Smith |
| Burns | Gregg | Stevens |
| Burr | Hagel | Sununu |
| Chambliss | Hatch | Talent |
| Cochran | Isakson | Thomas |
| Coleman | Kyl | Thune |
| Craig | Lott | Vitter |
| Crapo | Lugar | Voinovich |
| DeMint | Martinez | Warner |

NOT VOTING—1

Corzine

The amendment (No. 2365), as modified, was agreed to.

Mr. BINGAMAN. Mr. President, I move to reconsider the vote.

Mr. GREGG. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

### AMENDMENT NO. 2360

The PRESIDING OFFICER. There is 2 minutes equally divided on the Lott amendment No. 2360.

Mr. GREGG. Mr. President, the next amendment is the Lott amendment, the Amtrak amendment.

The PRESIDING OFFICER. The Senator from Mississippi.

Mr. LOTT. Mr. President, I call up amendment No. 2360.

The PRESIDING OFFICER. The amendment is pending.

Mr. LOTT. Mr. President, I will take a couple minutes to discuss the amendment. First of all, my cosponsor on this amendment is Senator LAUTENBERG.

This is an amendment that adds provisions of S. 1516, the Passenger Rail Investment and Improvement Act of 2005. It was reported out of the Commerce Committee in July and has been ready to be considered by the Senate, but repeated efforts to have it brought up in the regular order were not cleared.

We are running out of time. The administration has made it clear that without reform, they are not going to be supportive of future funds through the appropriations process for Amtrak. This is genuine reform with a lot of input from management and labor, the administration, and both sides of the aisle.

I believe this is the last chance for the Senate to act on this important legislation, making it possible for us to have it included in some legislation, before we finish this year, to reform Amtrak.

Mr. GREGG. Mr. President, I yield 1 minute to the Senator from New Hampshire.

Mr. SUNUNU. Mr. President, I appreciate the work the Senator from Mississippi and the Senator from New Jersey have done on this bill.

It is absolutely true that this does represent some significant additional reforms for Amtrak. In discussions with Senator LOTT from Mississippi and others, I do believe there is an opportunity to do a lot more. Unfortunately, the House has not really undertaken any reform effort at all, and that is certainly one of the concerns that I have, that this not be a dead-end process, that we do more in this bill to deal with long distance routes that lose $200 or $300 per passenger on every single car that rides on those long distance routes and labor constraints that the management of Amtrak has said they want to have modified and adjusted so they can operate more effectively and more efficiently. These items are not in this legislation, although it does represent a step forward.

I look forward to continuing to work to improve the legislation, but I certainly cannot support its adoption on this reconciliation bill.

The PRESIDING OFFICER. The Senator's time has expired.

Mr. LOTT. Mr. President, I note that Senator BURNS has also been active in this process.

I ask unanimous consent that other Senators' names be allowed to be added as cosponsors to the amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. LOTT. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the amendment. The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 93, nays 6, as follows:

[Rollcall Vote No. 292 Leg.]

YEAS—93

| | | |
|---|---|---|
| Akaka | Dodd | Lugar |
| Alexander | Dole | Martinez |
| Allard | Domenici | McCain |
| Allen | Dorgan | McConnell |
| Baucus | Durbin | Mikulski |
| Bayh | Enzi | Murkowski |
| Bennett | Feingold | Murray |
| Biden | Feinstein | Nelson (FL) |
| Bingaman | Frist | Nelson (NE) |
| Bond | Graham | Obama |
| Boxer | Grassley | Pryor |
| Brownback | Hagel | Reed |
| Bunning | Harkin | Reid |
| Burns | Hatch | Roberts |
| Burr | Hutchison | Rockefeller |
| Byrd | Inhofe | Salazar |
| Cantwell | Inouye | Santorum |
| Carper | Isakson | Sarbanes |
| Chafee | Jeffords | Schumer |
| Chambliss | Johnson | Shelby |
| Clinton | Kennedy | Smith |
| Coburn | Kerry | Snowe |
| Cochran | Kohl | Specter |
| Coleman | Kyl | Stabenow |
| Collins | Landrieu | Stevens |
| Conrad | Lautenberg | Talent |
| Cornyn | Leahy | Thomas |
| Craig | Levin | Thune |
| Crapo | Lieberman | Vitter |
| Dayton | Lincoln | Warner |
| DeWine | Lott | Wyden |

NAYS—6

| | | |
|---|---|---|
| DeMint | Gregg | Sununu |
| Ensign | Sessions | Voinovich |

NOT VOTING—1

Corzine

The amendment (No. 2360) was agreed to.

Mr. LOTT. Mr. President, I move to reconsider the vote.

Mr. LAUTENBERG. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

### AMENDMENT NO. 2370

The PRESIDING OFFICER. There is 2 minutes now equally divided prior to a vote on the McCain amendment.

Who yields time?

The Senator from Arizona.

Mr. McCAIN. Mr. President, this amendment does one very simple thing. It would move the DTV transition date forward by 1 year, making the completion date April 7, 2008. My colleagues will be asked to believe the earlier date is not doable. Do not believe it. We have the ability. We have the technology. It can be accomplished. It is supported by every first responder organization in America, every single one. The National Governors Association: We support the amendment, based upon certain clearing of channels. People's lives are at stake. The only people who are against this amendment are the National Association of Broadcasters. We will see if they win again.

The PRESIDING OFFICER. Who yields time?

The Senator from Alaska.

Mr. STEVENS. Mr. President, this amendment would close off the analog broadcasting too close to the auction of spectrum. We currently have an April 2009 date. The auction date is January of 2009. It is just too close together. The leases cannot be processed. There is no way those auction proceeds can be available until licenses are issued. This amendment would end analog broadcasts before the funds are available for the converter box fund or the translator conversion fund authorized by S. 1932. We need help in this transition. The amendment makes spectrum available to public safety groups before they can put it to use because we are informed public safety groups must have at least 3 years to prepare for the use of spectrum.

We are going to get them the spectrum. They will not be able to use it until we have the money to bring about the transition. I believe our whole committee should oppose this amendment.

The PRESIDING OFFICER. The Senator's time has expired.

The yeas and nays were previously ordered on the amendment.

The question is on agreeing to the amendment.

The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 30, nays 69, as follows:

[Rollcall Vote No. 293 Leg.]

YEAS—30

| | | |
|---|---|---|
| Bayh | Feingold | Lieberman |
| Biden | Feinstein | McCain |
| Boxer | Graham | Mikulski |
| Carper | Harkin | Nelson (FL) |
| Clinton | Jeffords | Rockefeller |
| Coburn | Kennedy | Salazar |
| Collins | Kerry | Schumer |
| DeWine | Kyl | Stabenow |
| Dodd | Lautenberg | Sununu |
| Ensign | Levin | Warner |

NAYS—69

| | | |
|---|---|---|
| Akaka | DeMint | McConnell |
| Alexander | Dole | Murkowski |
| Allard | Domenici | Murray |
| Allen | Dorgan | Nelson (NE) |
| Baucus | Durbin | Obama |
| Bennett | Enzi | Pryor |
| Bingaman | Frist | Reed |
| Bond | Grassley | Reid |
| Brownback | Gregg | Roberts |
| Bunning | Hagel | Santorum |
| Burns | Hatch | Sarbanes |
| Burr | Hutchison | Sessions |
| Byrd | Inhofe | Shelby |
| Cantwell | Inouye | Smith |
| Chafee | Isakson | Snowe |
| Chambliss | Johnson | Specter |
| Cochran | Kohl | Stevens |
| Coleman | Landrieu | Talent |
| Conrad | Leahy | Thomas |
| Cornyn | Lincoln | Thune |
| Craig | Lott | Vitter |
| Crapo | Lugar | Voinovich |
| Dayton | Martinez | Wyden |

NOT VOTING—1

Corzine

The amendment (No. 2370) was rejected.

Mr. GREGG. Mr. President, I move to reconsider the vote.

Mr. CONRAD. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GREGG. Mr. President, I want to point out for the edification of our colleagues that we still have a lot of amendments to go. The estimate is in the high teens or potentially low twenties. At the pace we are going, we are not going to get them all done today, and we are going to be here on Friday.

I ask, Mr. President, if we can be advised as to how long the last three votes have taken. If we could hear from the clerks, approximately how long? We do not have to be precise.

How long have the votes taken?

The PRESIDING OFFICER. An hour 6 minutes for three votes.

Mr. GREGG. At this pace, we are here Friday.

I hope Members will think about their amendments, if they have some they are still talking about, and give serious consideration to allowing a voice vote or allowing it to be worked out.

AMENDMENT NO. 2368, WITHDRAWN

I ask unanimous consent that the Corzine amendment, No. 2368, be withdrawn.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

AMENDMENT NO. 2372

Mr. GREGG. Mr. President, we are now on to Senator MURRAY's amendment.

Mrs. MURRAY. Mr. President, I ask unanimous consent that Senator CORZINE be added as a cosponsor.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mrs. MURRAY. Mr. President, in a few short weeks some of our most vulnerable Americans, our sickest and poorest, so-called dual eligibles, are going to be shifted from Medicaid to Medicare. We have a train wreck coming. Medicare is going to randomly assign these people to a plan which they may not know about and which might not cover their lifesaving drugs. Doctors, hospitals, and pharmacists are scrambling. These prescription drug policies themselves have not defined the drugs they are going to cover. My amendment simply gives a 6-month transition for those people so they do not get lost in this switch. I support Medicare coverage for these dual eligibles, but I cannot—and I don't think we should—support turning these people away at the drugstore.

This amendment does not delay the implementation of the Medicare drug benefit. It simply assures thousands of our most vulnerable Americans that they will not be lost in the transition from Medicaid to Medicare coverage.

I thank Senator ROCKEFELLER and my cosponsors, and I urge adoption of this amendment.

Mr. GREGG. Mr. President, CMS has a plan in place, and 6 months ago CMS introduced a strategy for transitioning dual eligibles from Medicaid to Medicare which lays out in great detail the steps CMS will take to ensure the continuity of coverage in this valuable group of beneficiaries. Therefore, the leadership of the Finance Committee strongly opposes this amendment.

I make a point of order that the pending amendment is not germane to the measure now before the Senate, and I raise a point of order under section 305 of the Budget Act.

Mrs. MURRAY. Mr. President, pursuant to section 904 of the Congressional Budget Act, I move to waive the applicable sections of that act for purposes of the pending amendment, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The question is on agreeing to the motion.

The clerk will call the roll.

The assistant Journal clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted—yeas 43, nays 56, as follows:

[Rollcall Vote No. 294 Leg.]

YEAS—43

| | | |
|---|---|---|
| Akaka | Feingold | Mikulski |
| Baucus | Feinstein | Murray |
| Bayh | Harkin | Nelson (FL) |
| Biden | Inouye | Obama |
| Bingaman | Jeffords | Pryor |
| Boxer | Johnson | Reed |
| Byrd | Kennedy | Reid |
| Cantwell | Kerry | Rockefeller |
| Carper | Kohl | Salazar |
| Clinton | Landrieu | Sarbanes |
| Conrad | Lautenberg | Schumer |
| Dayton | Leahy | Stabenow |
| Dodd | Levin | Wyden |
| Dorgan | Lieberman | |
| Durbin | Lincoln | |

NAYS—56

| | | |
|---|---|---|
| Alexander | DeWine | McConnell |
| Allard | Dole | Murkowski |
| Allen | Domenici | Nelson (NE) |
| Bennett | Ensign | Roberts |
| Bond | Enzi | Santorum |
| Brownback | Frist | Sessions |
| Bunning | Graham | Shelby |
| Burns | Grassley | Smith |
| Burr | Gregg | Snowe |
| Chafee | Hagel | Specter |
| Chambliss | Hatch | Stevens |
| Coburn | Hutchison | Sununu |
| Cochran | Inhofe | Talent |
| Coleman | Isakson | Thomas |
| Collins | Kyl | Thune |
| Cornyn | Lott | Vitter |
| Craig | Lugar | Voinovich |
| Crapo | Martinez | Warner |
| DeMint | McCain | |

NOT VOTING—1

Corzine

The PRESIDING OFFICER (Mr. ALEXANDER). On this question, the yeas are 43, the nays are 56. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected. The point of order is sustained. The amendment falls.

Mr. GREGG. I move to reconsider the vote.

Mr. SANTORUM. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 2366 WITHDRAWN

The PRESIDING OFFICER. The pending question is the Landrieu amendment numbered 2366.

Mr. GREGG. I yield to the Senator from Louisiana for the purpose of sending a modification to the desk.

Mr. VITTER. Mr. President, with Senator LANDRIEU's consent, I request the Landrieu amendment be withdrawn, and we call up the Stevens-Vitter-Landrieu-Domenici amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 2412

The PRESIDING OFFICER. The clerk will report the amendment.

The assistant legislative clerk read as follows:

The Senator from Louisiana [Mr. VITTER], for Mr. STEVENS, for himself, Mr. VITTER, Ms. LANDRIEU, and Mr. DOMENICI, proposes an amendment numbered 2412.

Mr. GREGG. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To modify the distribution of excess proceeds from the auction authorized by section 309(j)(15)(C)(v) of the Communications Act of 1934)

On page 95, strike lines 13 through 21, and insert the following:

(f) USE OF EXCESS PROCEEDS.—Any proceeds of the auction authorized by section 309(j)(15)(C)(v) of the Communications Act of 1934, as added by section 3003 of this Act, that exceed the sum of the payments made from the Fund under subsection (c), the transfer from the Fund under subsection (d), and any amount made available under section 3006 (referred to in this subsection as "excess proceeds"), shall be distributed as follows:

(1) The first $1,000,000,000 of excess proceeds shall be transferred to and deposited in the general fund of the Treasury as miscellaneous receipts.

(2) After the transfer under paragraph (1), the next $500,000,000 of excess proceeds shall be transferred to the interoperability fund described in subsection (c)(3).

(3) After the transfers under paragraphs (1) and (2), the next $1,200,000,000 of excess proceeds shall be transferred to the assistance program described in subsection (c)(5).

(4) After the transfers under paragraphs (1) through (3), any remaining excess proceeds shall be transferred to and deposited in the general fund of the Treasury as miscellaneous receipts.

The PRESIDING OFFICER. There is 2 minutes of debate evenly divided.

Mr. VITTER. Mr. President, I present this on behalf of Mr. STEVENS, the main author, as well as myself, Ms. LANDRIEU, Mr. DOMENICI, Mr. BINGAMAN, Mr. LOTT, Mr. INOUYE, Mr. CRAIG, and others. This will not change our budget numbers or our goal of deficit reduction in any way. In fact, it could enhance it.

This amendment says if and when—and only if and when—the spectrum auction produces more than is forecast,

the first $1 billion over that amount would go to deficit reduction, the next $500 million would go to interoperability, the next $1.2 billion, in that order, goes to a coastal program under Commerce jurisdiction, and the remainder, if at all, would go to deficit reduction. This could, in fact, enhance deficit reduction.

Of course, it is very important to coastal States, including Louisiana, to beef up the coastline and to protect us in the future from major storms like Hurricane Katrina.

I yield the remaining time to Senator LANDRIEU.

The PRESIDING OFFICER. The Senator from Louisiana.

Ms. LANDRIEU. Mr. President, I thank my colleague from Louisiana and particularly thank the leadership of Senator STEVENS and Senator DOMENICI and so many who have joined the effort. It has been a great effort. We thank our colleagues.

Mr. GREGG. Mr. President, I ask for a voice vote.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The amendment (No. 2412) was agreed to.

Mr. CONRAD. Mr. President, just to update our colleagues, we now have 19 amendments still pending. On our current course, that is going to take at least 6½ hours. That would take us to 8:30. I ask colleagues, please, if you can withhold on your amendment, do so. If you have a chance to work out the amendment, please work hard and diligently to work it out. I urge colleagues, we have a drop-dead time at 6 o'clock tonight. We cannot go beyond that with business. We have less than 4 hours to go through 19 amendments. The only way this is going to happen is if colleagues will give up on some of their amendments. Otherwise, we are here tomorrow. Once we are here tomorrow, we all know what happens: we will be here a long time tomorrow.

AMENDMENT NO. 2367

The PRESIDING OFFICER. The Senator from West Virginia is recognized.

Mr. BYRD. Mr. President, the reconciliation bill would increase immigrant work visas by 350,000 per year, about one-third of the current level. It is a massive and destabilizing increase that does not belong on the reconciliation bill.

My amendment would strike the increase in immigrant work visas and impose a $1,500 immigrant application fee on multinational corporations. With my amendment, the Judiciary Committee would exceed its reconciliation savings targets and do so without increasing immigrant work visas. We authorized over half a million H–1B visas in 2000. Last year, we authorized another $100,000 over 5 years. Do we really need another 150,000 visas on top of that? When is enough enough?

My amendment has the support of the unions. It has the support of immigrant enforcement groups. It has the

support of Republican and Democrat Senators. I urge agreement of the amendment.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. SPECTER. Mr. President, I am opposed to this amendment because the fees for L visas would raise funds but would do nothing to fill very important jobs in the United States. The existing plan submitted by the Judiciary Committee imposes a fee, but it extends the H–1B visa and recaptures the visas which were not used in the last 5 years. There are very careful safeguards so that U.S. jobs are not lost.

I understand the position of the distinguished Senator from West Virginia, the position of the unions, but I believe their concerns are misplaced and that there is a real need for these positions of highly skilled professionals, Ph.D.s, advanced degrees. Therefore, with due respect to my colleague from West Virginia, I ask for a "no" vote.

The PRESIDING OFFICER. All time has expired. The question is on agreeing to the amendment.

Mr. BYRD. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 14, nays 85, as follows:

[Rollcall Vote No. 295 Leg.]

YEAS—14

| | | |
|---|---|---|
| Akaka | Durbin | Rockefeller |
| Byrd | Feingold | Sessions |
| Dayton | Inhofe | Stabenow |
| Dodd | Jeffords | Vitter |
| Dorgan | Landrieu | |

NAYS—85

| | | |
|---|---|---|
| Alexander | Dole | McConnell |
| Allard | Domenici | Mikulski |
| Allen | Ensign | Murkowski |
| Baucus | Enzi | Murray |
| Bayh | Feinstein | Nelson (FL) |
| Bennett | Frist | Nelson (NE) |
| Biden | Graham | Obama |
| Bingaman | Grassley | Pryor |
| Bond | Gregg | Reed |
| Boxer | Hagel | Reid |
| Brownback | Harkin | Roberts |
| Bunning | Hatch | Salazar |
| Burns | Hutchison | Santorum |
| Burr | Inouye | Sarbanes |
| Cantwell | Isakson | Schumer |
| Carper | Johnson | Shelby |
| Chafee | Kennedy | Smith |
| Chambliss | Kerry | Snowe |
| Clinton | Kohl | Specter |
| Coburn | Kyl | Stevens |
| Cochran | Lautenberg | Sununu |
| Coleman | Leahy | Talent |
| Collins | Levin | Thomas |
| Conrad | Lieberman | Thune |
| Cornyn | Lincoln | Voinovich |
| Craig | Lott | Warner |
| Crapo | Lugar | Wyden |
| DeMint | Martinez | |
| DeWine | McCain | |

NOT VOTING—1

Corzine

The amendment (No. 2367) was rejected.

Mr. GREGG. I move to reconsider the vote.

Mr. CONRAD. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GREGG. Mr. President, the next item is the Harkin amendment, a sense of the Senate. I ask unanimous consent that we have 2 minutes equally divided on this amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. GREGG. For the information of the Senate, we are now off of the original list, having completed that. So we are into a period where, between myself and the Senator from North Dakota, we have organized a series of amendments to come forward. These will continue to be 10-minute votes, and they are going to be hard 10 minutes. That means that at the end of 10 minutes, I am going to ask the vote to be closed. Secondly, I ask unanimous consent that for all amendments which are brought forward from here on, there be 2 minutes equally divided between the proponent and the opponent.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from North Dakota.

Mr. CONRAD. Mr. President, let us repeat the message loud and clear: These next three votes are going to be strict 10-minute votes. At the end of 10 minutes, the manager and I are going to call the vote. That is the only possible, conceivable way we can get done today.

Mr. GREGG. Of course, we may actually get a voice vote in here, hopefully.

The PRESIDING OFFICER. The Senator from Iowa is recognized.

AMENDMENT NO. 2363

(Purpose: To affirm that the Federal funding levels for the rate of reimbursement of child support administrative expenses should not be reduced below the levels provided under current law, that States should continue to be permitted to use Federal child support incentive payments for child support program expenditures that are eligible for Federal matching payments, and to express the sense of the Senate that it does not support additional fees for successful child support collection)

Mr. HARKIN. Mr. President, my amendment is a sense-of-the-Senate resolution that the Senate go on record opposing the House's $9 billion cut to child support enforcement programs. It is not reasonable to cut a program that last year served 17,300,000 children. This is money that goes out to States for child support enforcement to go after deadbeat dads to get them to pay the money for child support. As a matter of fact, this is one of the best things that has happened out of welfare reform. For every $1 we spend, we are getting back $4.38, not to the Government but to the families and the kids who need it. This is just a sense-of-the-Senate resolution that says we do not agree with the House 40-percent cut in this program and we won't hold up to it when it goes to the conference. It is a sense-of-the-Senate resolution.

The bill approved by Ways and Means would slash funding for child support enforcement efforts by 40 percent over the next 10 years. The Congressional Budget Office estimates that, as a result of these cuts, more than $24 billion in delinquent payments will go uncollected. And the biggest negative impacts will be felt by children living in poverty and children in low-income households.

And let's be clear: Why is the House doing this? Why is it cutting this essential program that benefits some of the most vulnerable, disadvantaged, neglected children in our society? They are doing this in order to make room for another $70 billion in tax cuts—tax cuts overwhelmingly benefiting our wealthiest citizens.

Indeed, that is what this entire reconciliation process is all about. For 25 years, the budget reconciliation process was used to reduce the deficit. But, today, the majority party has a different idea. They are using reconciliation to increase the deficit. They are cutting child support enforcement, food assistance for the poor, foster care benefits, Medicaid, and other programs for the most disadvantaged Americans. At the same time they are ramming through another $70 billion in tax cuts for the most privileged.

There is no other word for it: This is simply immoral. Last year, more than 17 million children received financial support through the Child Enforcement System, including nearly two-thirds of all children in single-parent households with incomes below twice the poverty line.

Child support helped to lift more than 1 million Americans out of poverty in 2002. As a result of cuts passed by the House, many of those people—mostly children—would be plunged back into poverty. Not only is this cruel, it is also counterproductive. It is penny wise and pound foolish, because those families that are shoved into poverty by the House's action will end up on food stamps, Medicaid, Temporary Assistance for Needy Families, and other forms of public assistance.

This chart shows the State-by-State impact of the cut in child support collection. In my State of Iowa, alone, children would lose some $239 million over the next 10 years. This is a proven program, an effective program. It reduces poverty. It gets resources to children who desperately need them. It is cost effective. Research has shown that the decline in families relying on TANF in recent years is directly linked to improvements in the Child Support Enforcement Program. For all these reasons, this program has enjoyed broad bipartisan support.

In the past, President Bush himself has praised this program, calling it one of our highest performing social services programs. And he is right because for every Government dollar spent, $4.38 is recovered for families in child support payments. With good reason. Reforms over the last decade have made this program even more effective. Since 1996, there has been an 82-percent increase in collections, from $12 billion to $22 billion.

Child Support Enforcement is essential to helping families to achieve self-sufficiency. For families in poverty who receive child support, those payments account for an average of 30 percent of their income. Next to a mother's earnings, child support is the largest income source for poor families receiving assistance. Child support payments are used to pay for food, child care, shelter, and the most basic essentials of life.

If we were smart, if we were compassionate, if we were looking at ways to get maximum bang for the buck, we would be increasing funding for this essential program. But the action of the other body, slashing Child Support Enforcement by 40 percent to make way for more tax cuts, is just unconscionable. It is bad public policy, bad values, and bad priorities.

A strong bipartisan vote for this resolution will send a strong message to the House conferees that this cut is unacceptable to the Senate and that this body will not accept a slash-and-burn attack on a program that lifts more than 1 million people out of poverty every year. I urge my colleagues to support this resolution.

The PRESIDING OFFICER. The clerk will report the amendment.

The assistant legislative clerk read as follows:

The Senator from Iowa [Mr. HARKIN], for himself, Mr. KOHL, Mr. OBAMA, and Mr. BAYH, proposes an amendment numbered 2363.

The amendment is as follows:

At the appropriate place, insert the following:

SEC. ___. SENSE OF THE SENATE.

(a) FINDINGS.—The Senate makes the following findings:

(1) On October 26, 2005, the Committee on Ways and Means of the United States House of Representatives approved a budget reconciliation package that would significantly reduce the Federal Government's funding used to pay for the child support program established under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) and would restrict the ability of States to use Federal child support incentive payments for child support program expenditures that are eligible for Federal matching payments.

(2) The child support program enforces the responsibility of non-custodial parents to support their children. The program is jointly funded by Federal, State and local governments.

(3) The Office of Management and Budget gave the child support program a 90 percent rating under the Program Assessment Rating Tool (PART), with the highest performing social services program.

(4) The President's 2006 budget cites the child support program as "one of the highest rated block/formula grants of all reviewed programs government-wide. This high rating is due to its strong mission, effective management, and demonstration of measurable

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 29 of 91

progress toward meeting annual and long term performance measures.''

(5) In 2004, the child support program spent $5,300,000,000 to collect $21,900,000,000 in support payments. Public investment in the child support program provides more than a four-fold return, collecting $4.38 in child support for every Federal and State dollar that the program spends.

(6) In 2004, 17,300,000 children, or 60 percent of all children living apart from a parent, received child support services through the program. The percentage is higher for poor children—84 percent of poor children living apart from their parent receive child support services through the program. Families assisted by the child support program generally have low or moderate incomes.

(7) Children who receive child support from their parents do better in school than those that do not receive support payments. Older children with child support payments are more likely to finish high school and attend college.

(8) The child support program directly decreases the costs of other public assistance programs by increasing family self-sufficiency. The more effective the child support program in a State, the higher the savings in public assistance costs.

(9) Child support helps lift more than 1,000,000 Americans out of poverty each year.

(10) Families that are former recipients of assistance under the temporary assistance for needy families program (TANF) have seen the greatest increase in child support payments. Collections for these families increased 94 percent between 1999 and 2004, even though the number of former TANF families did not increase during this period.

(11) Families that receive child support are more likely to find and hold jobs, and less likely to be poor than comparable families without child support.

(12) The child support program saved costs in the TANF, Medicaid, Food Stamps, Supplemental Security Income, and subsidized housing programs.

(13) The Congressional Budget Office estimates that the funding cuts proposed by the Committee on Ways and Means of the House of Representatives would reduce child support collections by nearly $7,900,000,000 in the next 5 years and $24,100,000,000 in the next 10 years.

(14) That National Governor's Association has stated that such cuts are unduly burdensome and will force States to reevaluate several services that make the child support program so effective.

(15) The Federal Government has a moral responsibility to ensure that parents who do not live with their children meet their financial support obligations for those children.

(b) SENSE OF THE SENATE.—It is the sense of the Senate that the Senate will not accept any reduction in funding for the child support program established under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.), or any restrictions on the ability of States to use Federal child support incentive payments for child support program expenditures that are eligible for Federal matching payments, during this Congress.

Mr. OBAMA. Mr. President, I rise today to speak in favor of the Harkin amendment, which expresses the sense of the Senate that this body will not accept the cuts to the child support program that have been proposed by the Committee on Ways and Means in the House of Representatives. I am proud to be a cosponsor of this amendment.

The child support program is an effective and efficient way to enforce the

responsibility of noncustodial parents to support their children. For every public dollar that is spent on collection, more than $4 is collected to support children. That is a good return on our investment in families. Moreover, these families are then less likely to require public assistance and more likely to avoid or escape poverty. This is a program that works.

The evidence is compelling. For example, in 2004, enforcement efforts helped collect almost $22 billion in child support. Our aggressive State and Federal efforts have translated into $1 billion in collected child support payments in Illinois alone this year. That means 386,000 Illinois families will be better equipped to provide for their children.

Preliminary budget estimates suggest the cuts proposed by the Ways and Means Committee will translate into $7.9 billion in lost collections within 5 years, increasing to a loss of over $24 billion within 10 years. This proposal is not even pennywise, and it is certainly pound foolish. Today, the State of Illinois reports a 32 percent child support collection rate. Let's not take a step backwards in the progress that has been made by stripping the States of necessary Federal support. Moreover, the welfare of too many is at stake. Child support is the second largest income source for qualifying low-income families. We cannot balance our budget on the backs of families who rely on child support to remain out of poverty.

This Congress claims that strengthening the family is a priority. Senator HARKIN's amendment is a firm expression that we are serious about this worthwhile investment.

I urge my colleagues to support this amendment.

Mr. GREGG. Mr. President, the Senator from Iowa has been kind enough to represent that he will accept a voice vote on this. I move that we proceed to a voice vote.

The PRESIDING OFFICER. The question is on agreeing to amendment No. 2363.

The amendment (No. 2363) was agreed to.

Mr. GREGG. Mr. President, I move to reconsider the vote.

Mr. CONRAD. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GREGG. Mr. President, the next item of business will be Senator BYRD's amendment.

The PRESIDING OFFICER. The Senator from North Dakota.

Mr. CONRAD. Mr. President, the Senator from Iowa set a very good example. We encourage other Senators to follow that example.

The PRESIDING OFFICER. The Senator from West Virginia is recognized.

AMENDMENT NO. 2414

(Purpose: To provide for the suspension of the debate limitation on reconciliation legislation that causes a deficit or increases the deficit)

Mr. BYRD. Mr. President, my amendment will suspend the time limitations

on debate for reconciliation bills that increase the deficit. The Congress will never succeed in balancing the budget, cutting the deficit, as long as the reconciliation process can be used to shield controversial tax-and-spending decisions from debate and amendment. If Senators want to ensure offsets for deficit-increasing measures, then we must protect our rights to debate and amend within the budget process. The more tax cuts that can be forced through now without offsets, the tougher the budget decisions and the worse the pain in the coming months and years. The budget cuts that seem tough now will grow enormous, and they will be unbearable, if tax cuts continue without offsets. I urge adoption of the amendment.

I ask unanimous consent that Senator HARKIN be added as a cosponsor.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BYRD. I send the amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from West Virginia [Mr. BYRD], for himself and Mr. HARKIN, proposes an amendment numbered 2414.

Mr. BYRD. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

At the appropriate place, insert the following:

**SEC. ___. SUSPENSION OF DEBATE LIMITATION ON RECONCILIATION LEGISLATION THAT CAUSES A DEFICIT OR INCREASES THE DEFICIT.**

(a) IN GENERAL.—For purposes of consideration in the Senate of any reconciliation bill or resolution, or amendments thereto or debatable motions and appeals in connection therewith, under section 310(e) of the Congressional Budget Act of 1974, section 305(b)(1), (2), and (5), section 305(c), and the limitation on debate in section 310(e)(2) of that Act, shall not apply to any reconciliation bill or resolution, amendment thereto, or motion thereon that includes reductions in revenue or increases in spending that would cause an on-budget deficit to occur or increase the deficit for any fiscal year covered by such bill or resolution.

(b) GERMANENESS REQUIRED.—Notwithstanding subsection (a), no amendment that is not germane to the provisions of such reconciliation bill or resolution shall be received.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Mr. President, the practical effect of this amendment would be to essentially vitiate the reconciliation process. It would mean we would end up with an event that could be filibustered. The whole purpose of reconciliation is to have a time limit and to get to a vote. Therefore, this amendment would undermine completely the concept of reconciliation which, as is hopefully going to be proven by this

bill and others, is a very constructive way to get legislation through this institution and move forward with the business of the people.

Therefore, I make a point of order that the pending amendment contains matter within the jurisdiction of the Committee on the Budget, and I raise a point of order against the amendment under section 306 of the Budget Act.

Mr. BYRD. Mr. President, I move to waive the act in connection with this amendment.

Mr. GREGG. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be.

The yeas and nays were ordered.

Mr. GREGG. Mr. President, I ask unanimous consent that votes on this and all further amendments be 10 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

The question is on agreeing to the motion.

The clerk will call the roll.

The assistant Journal clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted—yeas 44, nays 55, as follows:

[Rollcall Vote No. 296 Leg.]

YEAS—44

| | | |
|---|---|---|
| Akaka | Feingold | Mikulski |
| Baucus | Feinstein | Murray |
| Bayh | Harkin | Nelson (FL) |
| Biden | Inouye | Nelson (NE) |
| Bingaman | Jeffords | Obama |
| Boxer | Johnson | Pryor |
| Byrd | Kennedy | Reed |
| Cantwell | Kerry | Reid |
| Carper | Kohl | Rockefeller |
| Clinton | Landrieu | Salazar |
| Conrad | Lautenberg | Sarbanes |
| Dayton | Leahy | Schumer |
| Dodd | Levin | Stabenow |
| Dorgan | Lieberman | Wyden |
| Durbin | Lincoln | |

NAYS—55

| | | |
|---|---|---|
| Alexander | DeWine | McConnell |
| Allard | Dole | Murkowski |
| Allen | Domenici | Roberts |
| Bennett | Ensign | Santorum |
| Bond | Enzi | Sessions |
| Brownback | Frist | Shelby |
| Bunning | Graham | Smith |
| Burns | Grassley | Snowe |
| Burr | Gregg | Specter |
| Chafee | Hagel | Stevens |
| Chambliss | Hatch | Sununu |
| Coburn | Hutchison | Talent |
| Cochran | Inhofe | Thomas |
| Coleman | Isakson | Thune |
| Collins | Kyl | Vitter |
| Cornyn | Lott | Voinovich |
| Craig | Lugar | Warner |
| Crapo | Martinez | |
| DeMint | McCain | |

NOT VOTING—1

Corzine

The PRESIDING OFFICER. On this vote, the yeas are 44, the nays are 55. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is not agreed to. The point of order is sustained and the amendment falls.

Mr. GREGG. I move to reconsider and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GREGG. The next amendment is Senator LAUTENBERG's.

The PRESIDING OFFICER. The Senator from New Jersey is recognized.

Mr. LAUTENBERG. I have offered an amendment to ensure that people understand what they are signing up for when the new Medicare drug benefit comes to life and that is beginning in 2006. There is such a mix of things that the recipient beneficiaries, I am sure, will be very confused as to what the cost is going to be on the gap of coverage, whether they have to pay it all out of their pockets. I want to make sure they understand what it is they are applying for and the pitfalls or the advantages thereof.

This is very simple. We ask them to sign a note when they apply for the plan so that they are saying they are fully aware of the consequences of their signature. This should be passed, Mr. President, because it helps the senior citizens understand what it is they are getting into.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Mr. President, I am sure this amendment is well-intentioned, as are all amendments from the Senator from New Jersey, but essentially it creates an unnecessary level of paperwork for the enrollee in the plan, and in addition, as a practical matter, it enters into a portion of the Medicare trust fund which we have not addressed in this reconciliation bill, which is the Part D section of the trust fund, that being the new drug program the theory being that program should be allowed to get rolling before it gets amended.

There are a number of regulations coming out from CMS relative to making sure the beneficiaries are adequately protected under their plan, and I believe they pick up the issues that are raised by the Senator from New Jersey.

That being said, I make a point of order that the pending amendment is not germane to the measure now before the Senate, and I raise that point of order under section 305 of the Budget Act.

Mr. LAUTENBERG. Mr. President, pursuant to the relevant sections of the Congressional Budget Act of 1974, I move to waive those sections for consideration of the pending amendment.

Mr. GREGG. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

Mr. GREGG. Mr. President, I would simply announce that this is a 10-minute vote and it will be 10.

The PRESIDING OFFICER. The question is on agreeing to the motion. The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER (Mr. COLEMAN). Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted—yeas 43, nays 56, as follows:

[Rollcall Vote No. 297 Leg.]

YEAS—43

| | | |
|---|---|---|
| Akaka | Feingold | Murray |
| Baucus | Feinstein | Nelson (FL) |
| Bayh | Harkin | Nelson (NE) |
| Biden | Inouye | Obama |
| Bingaman | Johnson | Pryor |
| Boxer | Kennedy | Reed |
| Byrd | Kerry | Reid |
| Cantwell | Kohl | Rockefeller |
| Carper | Landrieu | Salazar |
| Clinton | Lautenberg | Sarbanes |
| Conrad | Leahy | Schumer |
| Dayton | Levin | Stabenow |
| Dodd | Lieberman | Wyden |
| Dorgan | Lincoln | |
| Durbin | Mikulski | |

NAYS—56

| | | |
|---|---|---|
| Alexander | DeWine | McCain |
| Allard | Dole | McConnell |
| Allen | Domenici | Murkowski |
| Bennett | Ensign | Roberts |
| Bond | Enzi | Santorum |
| Brownback | Frist | Sessions |
| Bunning | Graham | Shelby |
| Burns | Grassley | Smith |
| Burr | Gregg | Snowe |
| Chafee | Hagel | Specter |
| Chambliss | Hatch | Stevens |
| Coburn | Hutchison | Sununu |
| Cochran | Inhofe | Talent |
| Coleman | Isakson | Thomas |
| Collins | Jeffords | Thune |
| Cornyn | Kyl | Vitter |
| Craig | Lott | Voinovich |
| Crapo | Lugar | Warner |
| DeMint | Martinez | |

NOT VOTING—1

Corzine

The PRESIDING OFFICER. On this vote, the yeas are 43, the nays are 56. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected. The point of order is sustained, and the amendment falls.

Mr. GREGG. Mr. President, I move to reconsider the vote.

Mr. BENNETT. I move to lay that motion on the table. The motion to lay on the table was agreed to.

Mr. GREGG. I ask unanimous consent that 10 minutes be given to the Senators from Hawaii, to be divided as they deem appropriate.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Hawaii.

(The remarks of Mr. INOUYE, Mr. AKAKA and Mr. BYRD are printed in today's RECORD under "Morning Business.")

The PRESIDING OFFICER. What is the will of the Senate? The Senator from North Dakota.

Mr. CONRAD. Mr. President, I ask the Chair of the committee if it would be appropriate now to go to the Cantwell amendment?

Mr. GREGG. Absolutely.

Mr. CONRAD. Mr. President, I direct my colleagues' attention to the Cantwell amendment and indicate that we are now trying to make an analysis of

where we are with respect to the funding of the bill, where we are with respect to the requirements the Senate is under under reconciliation, to make certain that all of this fits together. That is the reason for the delay at this moment, to make certain that the numbers work correctly.

With that, we will go to the Cantwell amendment.

The PRESIDING OFFICER. The Senator from Washington.

AMENDMENT NO. 2400

Ms. CANTWELL. Mr. President, I rise to offer a perfecting amendment. In order to raise the $2.4 billion claimed in the underlying bill, it assumes a 50–50 split of oil leasing revenues between the State of Alaska and the Federal Treasury.

But my colleagues may be surprised to learn that whether or not this 50–50 legislative language is upheld in court is a matter of some uncertainty. The State of Alaska has long maintained it is due 90 percent of these revenues, so instead of the Federal Government getting $2.4 billion, it would only get $480 million.

If you don't believe me, the State of Alaska just passed a resolution this spring, saying it would insist on the 90–10 split. I ask my colleagues to be faithful in telling the taxpayers the real story. Let's support maintaining the 50–50 and not moving forward until we are certain that is $2.4 billion of revenue for the Federal Government.

The PRESIDING OFFICER. The Senator from Alaska.

Mr. STEVENS. Mr. President, this bill already contains the first portion of this amendment: Notwithstanding any other provision of law, the existing law applies to this area of Alaska.

This is a vindictive amendment. It says if my State decides to pursue a legal right that all production in ANWR would stop. There would be no further production. I don't understand this amendment because we have been a State since 1958. We have not filed that suit. That resolution passed the State legislature almost every year, and it is an act of the State legislature, but the Federal law governs this area and it says a 50–50 split, which applies to all States.

I yield to the Senator from New Mexico what time we have left.

Mr. DOMENICI. Mr. President, we had a very critical vote. You all listened to it. This is nothing but an amendment to try to come in the back door and kill ANWR. It is absolutely wrong. We ought not even be considering it. The very same people who wanted to kill it for 30 years are making this last-ditch effort. The amendment should not even be on the floor, and we ought to kill it. If it doesn't take 10 minutes we ought to do it in 8 minutes.

The PRESIDING OFFICER. The clerk will report the amendment.

The legislative clerk read as follows:

The Senator from Washington [Ms. CANTWELL] proposes an amendment numbered 2400.

The amendment follows:

On page 101, strike lines 12 through 19 and insert the following:

(d) RECEIPTS.—

(1) IN GENERAL.—Notwithstanding any other provision of law, of the amount of adjusted bonus, rental, and royalty receipts derived from oil and gas leasing and operations authorized under this section—

(A) 50 percent shall be paid to the State of Alaska; and

(B) the balance shall be deposited into the Treasury as miscellaneous receipts.

(2) JUDICIAL REVIEW.—

(A) IN GENERAL.—Any civil action brought by the State of Alaska to compel an increase in the percentage of revenues to be paid under paragraph (1) shall be filed not later than 90 days after the date of enactment of this Act.

(B) LIMITATION.—

(i) IN GENERAL.—If a civil action is filed by the State of Alaska under subparagraph (A), until such time as a final nonappealable order is issued with respect to the civil action and notwithstanding any other provision of law—

(I) production of oil and gas from the Arctic National Wildlife Refuge is prohibited;

(II) no action shall be taken to establish or implement the competitive oil and gas leasing program authorized under this title; and

(III) no leasing or other development leading to the production of oil or gas from the Arctic National Wildlife Refuge shall be undertaken.

(ii) FINAL ORDER.—If the court issues a final nonappealable order with respect to a civil action filed under subparagraph (A) that increases the percentage of revenues to be paid to the State of Alaska—

(I) production of oil and gas from the Arctic National Wildlife Refuge is prohibited; and

(II) no leasing or other development leading to the production of oil or gas from the Arctic National Wildlife Refuge shall be undertaken.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

Ms. CANTWELL. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There is a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER (Mr. CORNYN). Are there any Senators in the Chamber desiring to vote?

The result was announced—yeas 48, nays 51, as follows:

[Rollcall Vote No. 298 Leg.]

YEAS—48

| | | |
|---|---|---|
| Baucus | Dorgan | McCain |
| Bayh | Durbin | Mikulski |
| Biden | Feingold | Murray |
| Bingaman | Feinstein | Nelson (FL) |
| Boxer | Harkin | Nelson (NE) |
| Byrd | Jeffords | Obama |
| Cantwell | Johnson | Pryor |
| Carper | Kennedy | Reed |
| Chafee | Kerry | Reid |
| Clinton | Kohl | Rockefeller |
| Coleman | Landrieu | Salazar |
| Collins | Lautenberg | Sarbanes |
| Conrad | Leahy | Schumer |
| Dayton | Levin | Snowe |
| DeWine | Lieberman | Stabenow |
| Dodd | Lincoln | Wyden |

NAYS—51

| | | |
|---|---|---|
| Akaka | Dole | Martinez |
| Alexander | Domenici | McConnell |
| Allard | Ensign | Murkowski |
| Allen | Enzi | Roberts |
| Bennett | Frist | Santorum |
| Bond | Graham | Sessions |
| Brownback | Grassley | Shelby |
| Bunning | Gregg | Smith |
| Burns | Hagel | Specter |
| Burr | Hatch | Stevens |
| Chambliss | Hutchison | Sununu |
| Coburn | Inhofe | Talent |
| Cochran | Inouye | Thomas |
| Cornyn | Isakson | Thune |
| Craig | Kyl | Vitter |
| Crapo | Lott | Voinovich |
| DeMint | Lugar | Warner |

NOT VOTING—1

Corzine

The amendment (No. 2400) was rejected.

Mr. McCONNELL. I move to reconsider the vote.

Mr. SANTORUM. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENTS NOS. 2350, 2378, 2418, 2411, 2413, EN BLOC

Mr. GREGG. Mr. President, I ask unanimous consent the following amendments, which are acceptable to both sides, upon being sent to the desk, be agreed to, en bloc, and the motions to reconsider be laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendments, en bloc, were agreed to, as follows:

AMENDMENT NO. 2350

(Purpose: To amend the definition of independent student to include students who are homeless children and youths and unaccompanied youths for purposes of the need analysis under the Higher Education Act of 1965)

On page 647, between lines 11 and 12, insert the following:

(3) in subsection (d)—

(A) in paragraph (2), by striking "is an orphan or ward of the court" and inserting "is an orphan, in foster care, or ward of the court or was in foster care";

(B) in paragraph (6), by striking "or" after the semicolon;

(C) by redesignating paragraph (7) as paragraph (8); and

(D) by inserting after paragraph (6) the following:

"(7) has been verified as both a homeless child or youth and an unaccompanied youth, as such terms are defined in section 725 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a), during the school year in which the application for financial assistance is submitted, by—

"(A) a local educational agency liaison for homeless children and youths, as designated under section 722(g)(1)(J)(ii) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11432(g)(1)(J)(ii));

"(B) a director of a homeless shelter, transitional shelter, or independent living program; or

"(C) a financial aid administrator; or".

AMENDMENT NO. 2378

(Purpose: To fund justice programs)

At the end of title VIII, insert the following:

SEC. ____. JUSTICE PROGRAMS.

(a) IN GENERAL.—The Secretary of the Treasury—

(1) for fiscal year 2006, out of the funds in the Treasury not otherwise appropriated,

shall pay to the Attorney General, by December 31, 2005, the amounts listed in subsection (b) that are to be provided for fiscal year 2006; and

(2) for each subsequent fiscal year provided in subsection (b) out of funds in the Treasury not otherwise appropriated shall pay to the Attorney General the amounts provided by November 1 of each such fiscal year.

(b) AMOUNTS PROVIDED.—The amounts referred to in subsection (a), which shall be in addition to funds appropriated for each fiscal year, are—

(1) $8,000,000 for fiscal year 2006, $17,000,000 for fiscal year 2007, $15,000,000 for fiscal year 2008, $10,000,000 for fiscal year 2009, and $10,000,000 for fiscal year 2010, to fund the Bulletproof Vest Partnership Program as authorized under section 4 of Public Law 108–372.

(2) $3,700,000 for fiscal year 2006, $6,300,000 for fiscal year 2007, $5,000,000 for fiscal year 2008, $5,000,000 for fiscal year 2009, and $5,000,000 for fiscal year 2010, to fund DNA Training and Education for Law Enforcement, Correctional Personnel, and Court Officers as authorized by section 303 of Public Law 108–405.

(3) $8,000,000 for fiscal year 2006, $12,000,000 for fiscal year 2007, $10,000,000 for fiscal year 2008, $10,000,000 for fiscal year 2009, and $10,000,000 for fiscal year 2010, to fund DNA Research and Development as authorized by section 305 of Public Law 108–405.

(4) $500,000 for fiscal year 2006, $500,000 for fiscal year 2007, $500,000 for fiscal year 2008, $500,000 for fiscal year 2009, and $500,000 for fiscal year 2010, to fund the National Forensic Science Commission as authorized by section 306 of Public Law 108–405.

(5) $1,000,000 for fiscal year 2006, $1,000,000 for fiscal year 2007, $1,000,000 for fiscal year 2008, $1,000,000 for fiscal year 2009, and $1,000,000 for fiscal year 2010, to fund DNA Identification of Missing Persons as authorized by section 308 of Public Law 108–405.

(6) $8,000,000 for fiscal year 2006, $27,000,000 for fiscal year 2007, $26,000,000 for fiscal year 2008, $25,000,000 for fiscal year 2009, and $25,000,000 for fiscal year 2010, to fund Capital Litigation Improvement Grants as authorized by sections 421, 422, and 426 of Public Law 108–405.

(7) $2,500,000 for fiscal year 2006, $3,000,000 for fiscal year 2007, $2,500,000 for fiscal year 2008, $2,500,000 for fiscal year 2009, and $2,500,000 for fiscal year 2010, to fund the Kirk Bloodsworth Post-Conviction DNA Testing Grant Program as authorized by sections 412 and 413 of Public Law 108–405.

(8) $1,000,000 for fiscal year 2006, $1,000,000 for fiscal year 2007, $1,000,000 for fiscal year 2008, $1,000,000 for fiscal year 2009, and $1,000,000 for fiscal year 2010, to fund Increased Resources for Enforcement of Crime Victims Rights, Crime Victims Notification Grants as authorized by section 1404D of the Victims of Crime Act of 1984 (42 U.S.C. 10603d).

(c) OBLIGATION OF FUNDS.—The Attorney General shall—

(1) receive funds under this section for fiscal years 2006 through 2010; and

(2) accept such funds in the amounts provided which shall be obligated for the purposes stated in this section by March 1 of each fiscal year.

SEC. ___. COPYRIGHT PROGRAM.

(a) IN GENERAL.—The Secretary of the Treasury—

(1) for fiscal year 2006, out of the funds in the Treasury not otherwise appropriated, shall pay to the Librarian of the Congress, by December 31, 2005, the amounts listed in subsection (b) that are to be provided for fiscal year 2006; and

(2) for each subsequent fiscal year provided in subsection (b) out of funds in the Treasury

not otherwise appropriated shall pay to the Librarian of the Congress the amounts provided by November 1 of each such fiscal year.

(b) AMOUNTS PROVIDED.—The amounts referred to in subsection (a), which shall be in addition to funds appropriated for each fiscal year, are: $1,300,000 for fiscal year 2006, $1,300,000 for fiscal year 2007, $1,300,000 for fiscal year 2008, $1,300,000 for fiscal year 2009, and $1,300,000 for fiscal year 2010, to fund the Copyright Royalty Judges Program as authorized under section 803(e)(1)(B) of title 17, United States Code.

(c) OBLIGATION OF FUNDS. The Librarian of the Congress shall—

(1) receive funds under this section for fiscal years 2006 through 2010; and

(2) accept such funds in the amounts provided which shall be obligated for the purposes stated in this section by March 1 of each fiscal year.

AMENDMENT NO. 2418

(Purpose: To amend chapter 21 of title 38, United States Code, to enhance adaptive housing assistance for disabled veterans and to reduce the amount appropriated for the Medicaid Integrity Program by $1,000,000 for each of fiscal years 2007 through 2010)

On page 90, between lines 19 and 20, insert the following:

Subtitle D—Adaptive Housing Assistance

SEC. 2031. SHORT TITLE.

This subtitle may be cited as the "Specially Adapted Housing Grants Improvements Act of 2005".

SEC. 2032. ADAPTIVE HOUSING ASSISTANCE FOR DISABLED VETERANS RESIDING TEMPORARILY IN HOUSING OWNED BY A FAMILY MEMBER.

(a) ASSISTANCE AUTHORIZED.—Chapter 21 of title 38, United States Code, is amended by inserting after section 2102 the following new section:

"§ 2102A. Assistance for veterans residing temporarily in housing owned by a family member

"(a) ASSISTANCE AUTHORIZED.—If a disabled veteran described in subsection (a)(2) or (b)(2) of section 2101 of this title resides, but does not intend to permanently reside, in a residence owned by a member of such veteran's family, the Secretary may assist the veteran in acquiring such adaptations to such residence as are determined by the Secretary to be reasonably necessary because of the veteran's disability.

"(b) LIMITATION ON AMOUNT OF ASSISTANCE.—Subject to section 2102(d) of this title, the assistance authorized under subsection (a) may not exceed—

"(1) $10,000, in the case of a veteran described in section 2101(a)(2) of this title; or

"(2) $2,000, in the case of a veteran described in section 2101(b)(2) of this title.

"(c) LIMITATION ON NUMBER OF RESIDENCES SUBJECT TO ASSISTANCE.—A veteran eligible for assistance authorized under subsection (a) may only be provided such assistance with respect to 1 residence.

"(d) REGULATIONS.—Assistance under this section shall be provided in accordance with such regulations as the Secretary may prescribe.

"(e) TERMINATION OF AUTHORITY.—The authority to provide assistance under subsection (a) shall expire at the end of the 5-year period beginning on the date of enactment of the Specially Adapted Housing Grants Improvements Act of 2005.".

(b) LIMITATIONS ON ADAPTIVE HOUSING ASSISTANCE.—Section 2102 of such title is amended—

(1) in subsection (a), by striking "The assistance authorized by section 2101(a)" and all that follows through "any one case—"

and inserting "Subject to subsection (d), the assistance authorized under section 2101(a) of this title shall be afforded under 1 of the following plans, at the election of the veteran—";

(2) by amending subsection (b) to read as follows:

"(b) Subject to subsection (d), and except as provided in section 2104(b) of this title, the assistance authorized by section 2101(b) of this title may not exceed the actual cost, or in the case of a veteran acquiring a residence already adapted with special features, the fair market value, of the adaptations determined by the Secretary under section 2101(b) to be reasonably necessary."; and

(3) by adding at the end the following new subsection:

"(d)(1) The aggregate amount of assistance available to a veteran under sections 2101(a) and 2102A of this title shall be limited to $50,000.

"(2) The aggregate amount of assistance available to a veteran under sections 2101(b) and 2102A of this title shall be limited to the lesser of—

"(A) the sum of the cost or fair market value described in section 2102(b) of this title and the actual cost of acquiring the adaptations described in subsection (a); and

"(B) $10,000.

"(3) No veteran may receive more than 3 grants of assistance under this chapter.".

(c) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter of such title is amended by inserting after the item relating to section 2102 the following:

"2102A. Assistance for veterans residing temporarily in housing owned by family member.".

SEC. 2033. GAO REPORTS.

(a) INTERIM REPORT.—Not later than 3 years after the date of enactment of this Act, the Comptroller General of the United States shall submit to Congress an interim report on the implementation of section 2102A of title 38, United States Code (as added by section 2(a)), by the Department of Veterans Affairs.

(b) FINAL REPORT.—Not later than 5 years after the date of enactment of this Act, the Comptroller General of the United States shall submit to Congress a final report on the implementation of such section 2102A by the Department of Veterans Affairs.

On page 166, strike lines 12 through 15 and insert the following:

"(A) for fiscal year 2006, $50,000,000;

"(B) for each of fiscal years 2007 and 2008, $49,000,000;

"(C) for each of fiscal years 2009 and 2010, $74,000,000; and

"(D) for fiscal year 2011 and each fiscal year thereafter, $75,000,000.

AMENDMENT NO. 2411

(Purpose: To authorize the continued provision of certain adult day health care services or medical adult day care services under a State Medicaid plan)

On page 188, after line 24, add the following:

SEC. 6037. AUTHORITY TO CONTINUE PROVIDING CERTAIN ADULT DAY HEALTH CARE SERVICES OR MEDICAL ADULT DAY CARE SERVICES.

The Secretary shall not—

(1) withhold, suspend, disallow, or otherwise deny Federal financial participation under section 1903(a) of the Social Security Act (42 U.S.C. 1396b(a)) for adult day health care services or medical adult day care services, as defined under a State medicaid plan approved on or before 1982, if such services are provided consistent with such definition and the requirements of such plan; or

(2) withdraw Federal approval of any such State plan or part thereof regarding the provision of such services.

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 33 of 91

AMENDMENT NO. 2413

(Purpose: To provide additional ProGAP assistance to certain students)

On page 369, between lines 11 and 12, insert the following:

''(D) the Secretary—

''(i) shall determine if an increase in the amount of a grant under this section is needed to help encourage students to pursue courses of study that are important to the current and future national, homeland, and economic security needs of the United States; and

''(ii) after making the determination described in clause (i), may increase the maximum and minimum award level established under subparagraph (A) by not more than 25 percent, for students eligible for a grant under this section who are pursuing a degree with a major in mathematics, science, technology, engineering, or a foreign language that is critical to the national security of the United States; and

''(E) not later than September 30 of each fiscal year, the Secretary shall notify Congress, in writing, of the Secretary's determination with respect to subparagraph (D)(i) and of any increase in award levels under subparagraph (D)(ii).

AMENDMENT NO. 2378

Mr. LEAHY. Mr. President, I am thrilled that the Senate has agreed to accept by unanimous consent to the Budget Reconciliation Act, S. 1932, a bipartisan amendment offered by Senator SPECTER and myself to allocate the extra $278,000,000 in revenue provided from the Judiciary Committee markup on reconciliation to supplement funding for the Bulletproof Vest Partnership, programs authorized by the Justice For All Act, and the Copyright Royalty Judges Program.

I thank my good friend and colleague, Senator SPECTER, for his leadership on and commitment to seeing that these important programs are funded as much as we can during these tough fiscal times. As Chairman and Ranking Member of the Judiciary Committee, Senator SPECTER and I have joined forces before to champion funding for these programs. I am privileged to partner with him again in that pursuit.

The Judiciary Committee markup on its reconciliation title provided $278,000,000 more in revenue than was mandated by the budget resolution instructions. We now seek to include additional provisions within the jurisdiction of our committee into the Senate reconciliation package. Our bipartisan amendment funds a number of Judiciary programs that enjoyed broad bipartisan support when Congress authorized them. These mandatory spending changes would simply spend some of the additional revenue that we raised through increases in immigration fees during our markup.

Our proposal would provide $60,000,000 over the next 5 years for such initiatives as the Bulletproof Vest Partnership Program, which helps law enforcement agencies purchase or replace body armor for their rank-and-file officers. Recently, concerns over body armor safety surfaced when a Pennsylvania police officer was shot and critically wounded through his new vest outfitted with a material called Zylon. The Justice Department has since announced that Zylon fails to provide the intended level of ballistic resistance. Unfortunately, an estimated 200,000 vests outfitted with that material have been purchased—many with Bulletproof Vest Partnership funds—and now must be replaced. Law enforcement agencies nationwide are struggling to find the funds necessary to replace defective vests with ones that will actually stop bullets and save lives. Our amendment will help them replace those faulty vests.

Our amendment also provides over $216,000,000 for programs authorized by the Justice For All Act of 2004, a landmark law that enhances protections for victims of Federal crimes, increases Federal resources available to State and local governments to combat crimes with DNA technology, and provides safeguards to prevent wrongful convictions and executions. The bipartisan amendment that Senator SPECTER and I propose will, among other things, allow for training of criminal justice and medical personnel in the use of DNA evidence, including evidence for post-conviction DNA testing. It will promote the use of DNA technology to identify missing persons. With these funds, State and local authorities will be better able to implement and enforce crime victims' rights laws, including Federal victim and witness assistance programs. State and locals can apply for grants to develop and implement victim notification systems so that they can share information on criminal proceedings in a timely and efficient manner. The amendment will also help improve the quality of legal representation provided to both indigent defendants and the public in State capital cases.

Last, but certainly not least, our amendment provides $6,500,000 over 5 years for the Copyright Royalty Judges Program at the Library of Congress. The Copyright Royalty Distribution Reform Act of 2004 created a new program in the Library to replace most of the current statutory responsibilities of the Copyright Arbitration Royalty Panels program. The Copyright Royalty Judges Program will determine distributions of royalties that are disputed and will set or adjust royalty rates, terms and conditions, with the exception of satellite carriers' compulsory licenses. Our amendment would help pay the salaries and related expenses of the three royalty judges and three administrative staff required by law to support this program.

The Specter-Leahy amendment will give to programs that help protect police officers and victims of violent crime, allow State and local governments to combat crimes with DNA technology, and provide safeguards to prevent wrongful convictions and executions. Chairman SPECTER and I are proud that the Judiciary Committee was able to agree to a reconciliation package that will provide $278 million more in revenue than was mandated by the Budget Resolution instructions. I thank our colleagues for supporting our amendment and agreeing to use that additional money to fund some of these important priorities that continue to lack adequate Federal resources.

AMENDMENT NO. 2413

Mr. WARNER. Mr. President, I rise today in support of an amendment to S. 1932, the deficit reduction bill. I am pleased to be joined in this bipartisan effort with Senators LIEBERMAN, ROBERTS, DURBIN, and ALLEN. I am grateful to each of them for working closely with me in crafting this amendment. In addition, I would like to thank Chairman ENZI and Senator KENNEDY for working closely with me in support of this amendment.

Under the deficit reduction bill, certain educational programs are authorized or reauthorized that provide Federal dollars to help low-income students with the costs associated with higher education. These programs include: (1) Pell grants—in fiscal year 2005 $12.787 billion was spent on Pell grants by the Federal Government; (2) ProGAP grants—a new mandatory spending program consisting of approximately $1.45 billion a year that is designed to provide supplemental grants to low-income Pell grant recipients, regardless of their majors; and (3) SMART grants—a new mandatory spending program consisting of $450 million a year that is designed to provide supplemental grants to low-income Pell grant recipients in their third and fourth year of college who are pursuing majors in math, science, engineering, and foreign languages.

These initiatives are commendable. I support them. Each program will significantly increase dollars targeted to low-income individuals who wish to pursue higher education to help them with the costs associated with their schooling.

But while I support these programs, I also fervently believe that when the Congress expends taxpayer money, it ought to do so in a manner that meets our Nation's needs.

The fact of the matter is that should this bill become law, the Federal Government will spend, next year alone, approximately $14.5 billion on grants to help low-income students attend higher education. I repeat $14.5 billion.

Of this $14.5 billion, though, without this amendment, only $450 million each year will be specifically targeted towards encouraging students to enter courses of study that are critical to our national security. That amounts to only about 3 percent of the total amount spent. I repeat, 3 percent. That is astonishing to me.

It is astonishing to me because a key component of America's national, homeland, and economic security in the post 9/11 world of global terrorism is having home-grown, highly-trained scientific minds to compete in today's one-world market. Yet alarmingly,

America faces a huge shortage of these technical minds.

Strikingly, America faced a similar situation nearly 50 years ago. On October 4, 1957, the Soviet Union successfully launched the first manmade satellite—Sputnik—into space. The launch shocked America, as many of us had assumed that we were preeminent in the scientific fields. While prior to that unforgettable day America enjoyed an air of post World War II invincibility, afterwards our Nation recognized that there was a cost to its complacency. We had fallen behind.

In the months and years to follow, we would respond with massive investments in science, technology and engineering.

In 1958, Congress passed the National Defense Education Act to inspire and induce individuals to advance in the fields of science and math. In addition, President Eisenhower signed into law legislation that established the National Aeronautics and Space Administration, NASA. And a few years later, in 1961, President Kennedy set the Nation's goal of landing a man on the Moon within the decade.

These investments paid off. In the years following the Sputnik launch, America not only closed the scientific and technological gap with the Soviet Union, we surpassed them. Our renewed commitment to science and technology not only enabled us to safely land a man on the Moon in 1969, it spurred research and development which helped ensure that our modern military has always had the best equipment and technology in the world. These post-Sputnik investments also laid the foundation for the creation of some of the most significant technologies of modern life, including personal computers, and the Internet.

Why is any of this important to us today? Because as the old saying goes: he or she who fails to remember history is bound to repeat it.

The truth of the matter is that today America's education system is coming up short in training the highly technical American minds that we now need and will continue to need far into the future.

The fact is that over the last two decades the number of young Americans pursuing bachelor degrees in science and engineering has been declining. In fact, the proportion of college-age students earning degrees in math, science, and engineering is now substantially higher in 16 countries in Asia and Europe than it is in the United States. If these current trends continue, then, according to the National Science Board, less than 10 percent of all scientists and engineers in the world will be working in America by 2010.

This shortage in America of highly trained, technical minds is already having very real consequences for us as a country. For example, the U.S. production of patents, probably the most direct link between research and economic benefit, has declined steadily relative to the rest of the world for decades, and now stands at only 52 percent of the total.

In the past, this country has been able to compensate for its shortfall in homegrown, highly trained, technical and scientific talent by importing the necessary brain power from foreign countries. However, with increased global competition, this is becoming harder and harder. More and more of our imported brain power is returning home to their native countries. And regrettably, as they return home, many American high-tech jobs are being outsourced with them.

Simply put, in today's one world market, while we in America are sleeping at night, the other half of the world is thinking and contriving of every possible way to compete against us economically. Moreover, while we are sleeping at night, there are persons in this world who are awake, working hard in support of efforts aimed at taking our security and our freedoms away from us.

Fortunately, we can do something here today to help us become better prepared. Certainly, the SMART grant program is an important step in the right direction. But while the SMART grant program is one small step for man, it is not a giant leap for America. More has to be done. Remember, even with the SMART grant program, next year only 3 percent of the $14.5 billion targeted towards low-income students will be focused on meeting our security needs.

That is why I am offering this amendment today. The Warner, Lieberman, Roberts, Durbin, and Allen amendment is simple. It simply allows the Secretary of Education to provide to low-income Pell grant recipients who pursue majors at the college and university level in critical national and homeland security fields of math, science, engineering, and foreign languages, an additional sum of money on top of their normal ProGAP grants. The amendment gives incentives and inducements to students who accept the challenge of pursuing the more rigorous and demanding curriculum of these studies that are critical to our Nation.

The amendment achieves its goal without adding a single new dollar to the underlying bill.

The Warner, Lieberman, Roberts, Durbin, and Allen amendment does not change the Pell grant program or the SMART grant program in any way. It merely changes the formula of payments to students who will receive ProGAP grants. This change is desperately needed to put our nation on the road to meeting the ever increasing competition from India, China, and other nations where more and more of their students are pursuing studies in the scientific area.

The amendment builds upon the SMART grant program by enabling the Secretary to provide even greater in-

centives to encourage individuals to pursue studies critical fields. The amendment accomplishes this goal by allowing the Secretary of Education to award larger ProGAP grants to students majoring in programs of math, science, engineering and foreign languages that are key to our national and homeland security.

While I believe studying the liberal arts is an important component to having an enlightened citizenry, we simply must do more to address this glaring shortage in other critical fields.

America can ill afford a 21st century Sputnik. This amendment will make sure that additional monies get focused on training the highly skilled minds that are needed in the 21st century to protect our national, economic, and homeland security.

I urge my colleagues to support this amendment.

Mr. GREGG. The game plan is to go to the Santorum or Baucus amendment.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. CONRAD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 2383

Mr. CONRAD. The next amendment in order is the Baucus amendment.

The PRESIDING OFFICER. The Senator from Montana.

Mr. BAUCUS. I call up amendment 2383 and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Montana [Mr. BAUCUS] proposes an amendment numbered 2383.

Mr. BAUCUS. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To exclude discounts provided to mail order and nursing facility pharmacies from the determination of average manufacturer price and to extend the discounts offered under fee-for-service Medicaid for prescription drugs to managed care organizations)

On page 110, after line 24, add the following:

(4) EXCLUSION OF DISCOUNTS PROVIDED TO MAIL ORDER AND NURSING FACILITY PHARMACIES FROM THE DETERMINATION OF AVERAGE MANUFACTURER PRICE.—

(A) IN GENERAL.—Section 1927(k)(1)(B)(ii)(IV) (42 U.S.C. 1396r–8(k)(1)(B)(ii)(IV)), as added by paragraph (1)(C), is amended to read as follows:

"(IV) Chargebacks, rebates provided to a pharmacy (excluding a mail order pharmacy, a pharmacy at a nursing facility or home, and a pharmacy benefit manager), or any other direct or indirect discounts.".

(B) EFFECTIVE DATE.—Paragraph (3) shall apply to the amendment made by subparagraph (A).

(5) EXTENSION OF PRESCRIPTION DRUG DISCOUNTS TO ENROLLEES OF MEDICAID MANAGED CARE ORGANIZATIONS.—

(A) IN GENERAL.—Section 1903(m)(2)(A) (42 U.S.C. 1396b(m)(2)(A)) is amended—

(i) in clause (xi), by striking "and" at the end;

(ii) in clause (xii), by striking the period at the end and inserting "; and"; and

(iii) by adding at the end the following:

"(xiii) such contract provides that payment for covered outpatient drugs dispensed to individuals eligible for medical assistance who are enrolled with the entity shall be subject to the same rebate agreement entered into under section 1927 as the State is subject to and that the State shall have the option of collecting rebates for the dispensing of such drugs by the entity directly from manufacturers or allowing the entity to collect such rebates from manufacturers in exchange for a reduction in the prepaid payments made to the entity for the enrollment of such individuals.".

(B) CONFORMING AMENDMENT.—Section 1927(j)(1) (42 U.S.C. 1396r-8(j)9))) is amended by inserting "other than for purposes of collection of rebates for the dispensing of such drugs in accordance with the provisions of a contract under section 1903(m) that meets the requirements of paragraph (2)(A)(xiii) of that section" before the period.

(C) EFFECTIVE DATE.—The amendments made by this paragraph take effect on the date of enactment of this Act and apply to rebate agreements entered into or renewed under section 1927 of the Social Security Act (42 U.S.C. 1396r–8) on or after such date.

Mr. BAUCUS. Mr. President, this amendment modifies the way retail pharmacies are paid for brand-name generic drugs under Medicaid. The underlying bill makes some important, positive changes but has the unintended consequence of forcing the independents—that is, the independent drugstores and the chains—in a disadvantaged position compared with mail-order drug companies and long-term care drug companies, the point being that the last category, because they are large-sized, have greater purchasing power to be able to acquire drugs on a discount basis, whereas the earlier category, the independent pharmacist and the chains themselves who do not have the same purchasing power, will be forced to pay higher prices compared to the larger. It is a complicated subject.

This is an amendment designed to even the playing field so the smaller guys get a break. It will not be to the disadvantage of the larger guys, because with their larger size, they will be able to get discounts that will more than offset the amendment provided for the smaller guys.

Mr. GREGG. I ask unanimous consent for a voice vote.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The amendment (No. 2383) was agreed to.

Mr. GREGG. I move to reconsider the vote.

Mr. CONRAD. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

### AMENDMENT NO. 2417

Mr. GREGG. I send to the desk an amendment by Senator LEVIN.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from New Hampshire [Mr. GREGG] for Mr. LEVIN, proposes an amendment numbered 2417.

Mr. GREGG. I ask unanimous consent the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To establish an International Border Community Interoperable Communications Demonstration Project)

On page 95, after line 21, insert the following:

SEC. 3005A. COMMUNICATION SYSTEM GRANTS.

(a) DEFINITIONS.—In this section—

(1) the term "demonstration project" means the demonstration project established under subsection (b)(1);

(2) the term "Department" means the Department of Homeland Security;

(3) the term "emergency response provider" has the meaning given that term in section 2(6) the Homeland Security Act of 2002 (6 U.S.C. 101(6)); and

(4) the term "Secretary" means the Secretary of Homeland Security.

(b) IN GENERAL.—

(1) ESTABLISHMENT.—There is established in the Department an "International Border Community Interoperable Communications Demonstration Project".

(2) MINIMUM NUMBER OF COMMUNITIES.—The Secretary shall select not fewer than 2 communities to participate in a demonstration project.

(3) LOCATION OF COMMUNITIES.—Not fewer than 1 of the communities selected under paragraph (2) shall be located on the northern border of the United States and not fewer than 1 of the communities selected under paragraph (2) shall be located on the southern border of the United States.

(c) PROJECT REQUIREMENTS.—The demonstration projects shall—

(1) address the interoperable communications needs of police officers, firefighters, emergency medical technicians, National Guard, and other emergency response providers;

(2) foster interoperable communications—

(A) among Federal, State, local, and tribal government agencies in the United States involved in preventing or responding to terrorist attacks or other catastrophic events; and

(B) with similar agencies in Canada and Mexico;

(3) identify common international cross-border frequencies for communications equipment, including radio or computer messaging equipment;

(4) foster the standardization of interoperable communications equipment;

(5) identify solutions that will facilitate communications interoperability across national borders expeditiously;

(6) ensure that emergency response providers can communicate with each another and the public at disaster sites or in the event of a terrorist attack or other catastrophic event;

(7) provide training and equipment to enable emergency response providers to deal with threats and contingencies in a variety of environments; and

(8) identify and secure appropriate joint-use equipment to ensure communications access.

(d) DISTRIBUTION OF FUNDS.—

(1) IN GENERAL.—The Secretary shall distribute funds under this section to each community participating in a demonstration project through the State, or States, in which each community is located.

(2) OTHER PARTICIPANTS.—Not later than 60 days after receiving funds under paragraph (1), a State receiving funds under this section shall make the funds available to the local governments and emergency response providers participating in a demonstration project selected by the Secretary.

(e) FUNDING.—Amounts made available from the interoperability fund under section 3005(c)(3) shall be available to carry out this section without appropriation.

(f) REPORTING.—Not later than December 31, 2005, and each year thereafter in which funds are appropriated for a demonstration project, the Secretary shall provide to the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives a report on the demonstration projects under this section.

Mr. GREGG. I ask unanimous consent it be agreed to and the motion to reconsider be laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment (No. 2417) was agreed to.

Mr. GREGG. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. CONRAD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

### AMENDMENT NO. 2348

Mr. CONRAD. Mr. President, the next amendment in order is the Schumer amendment.

The PRESIDING OFFICER. The Senator from New York.

Mr. SCHUMER. Mr. President, I offer amendment 2348.

The PRESIDING OFFICER. The clerk will report.

The bill clerk read as follows:

The Senator from New York [Mr. SCHUMER], for himself and Mr. ROCKEFELLER, proposes an amendment numbered 2348.

Mr. SCHUMER. Mr. President, I ask unanimous consent the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To strike the provisions increasing the Medicaid rebate for generic drugs)

On page 125, strike lines 3 through 14.

Mr. ROCKEFELLER. Mr. President, I will speak for a moment about the Schumer-Rockefeller generics amendment to the budget reconciliation bill.

The amendment that Senator SCHUMER and I are offering today would eliminate the provision in this bill that increases the generics Medicaid rebate from 11 percent to 17 percent. Increasing the rebate for generics would jeopardize consumer access to lower-cost prescription drugs and that's why this provision needs to be stricken from this bill.

The reconciliation bill before us has a number of flaws—it cuts Medicaid by $7.5 billion despite Hurricane Katrina and the high health care costs working families continue to face. It imposes even greater premiums on Medicare beneficiaries when Part B premiums have already gone up by more than $10 per month in each of the last 2 years. And, it fails to address many of the problems we know will occur when the Medicare drug benefit is implemented on January 1, 2006. But, that's not all.

This bill also includes a provision—which was added to the Finance Committee reconciliation bill the night before the markup—that would increase the rebate amount that generic manufacturers pay to State Medicaid programs from 11 percent to 17 percent. That's an increase of 55 percent.

At a time when access to generic drugs represents the greatest opportunity for prescription drug cost savings, this bill seeks to limit such access. Not only will this policy result in greater costs to Medicaid over the long term, but it could also threaten access to lower-cost drugs for all Americans.

In the recent past, when Missouri and New Jersey considered implementing generic drug rebate increases for the purpose of achieving savings, they actually found they would have incurred greater costs as a result of reduced access to affordable generic drugs.

New Jersey officials estimated that increasing rebates on generics used in their Pharmaceutical Assistance for the Aged and Disabled and Senior Gold programs would have increased state costs $18 million in the first year. Missouri's SeniorRx Program estimated that increasing generic rebates would have increased state costs by $8.5 million dollars in the first year alone.

According to a 1998 study by the Congressional Budget Office, generic drugs save consumers approximately $8–10 billion each year. Why would we undercut access to generics when low-cost prescription drugs should be a priority?

I question the merits of such a far-reaching policy that was added in the dead of night seemingly for the purpose of achieving greater budget savings. I understand the temptation to act in reconciliation to accomplish long-standing policy goals as well as to address requests from special interest groups.

We should resist such temptation when we have not done our homework—when we don't know the real rationale or effects of this policy or the interaction with other policies. We can do better.

We can be more thoughtful—and we have a responsibility to be very careful when we're dealing with pocketbook issues that affect working families, our states, as well as long-term costs to the Federal Government.

I thank the Chair and urge my colleagues to vote ''yes'' on the Schumer-Rockefeller generic drug amendment.

Mr. SCHUMER. Mr. President, this is a very simple amendment. In a sincere effort to cut costs, what has happened in this bill is, in effect, we have eliminated the ability of generic drugs to be sold using Medicaid. That will raise costs dramatically.

Over half the prescription drugs used in Medicaid are generic. They are only 16 percent of the cost, but because we have raised the fees so dramatically on what a generic drug company must pay a pharmacy to handle the drug, it is now going to be the same as a prescription drug. Even though the prescription drug costs a whole lot more and, therefore, it is a much lower base, pharmacies are not going to use the generic. In the long run, that will cost the Medicaid Program billions of dollars.

This is a huge mistake. It was not done by design. They raised all the fees and figured that will bring this amount of money in the next year.

Can anyone imagine we are saying, in Medicaid, where we need to save money, we are not going to use generic drugs? My amendment corrects that situation and is within the fiscal confines of the bill.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Mr. President, we do not need an amendment to improve this situation because this bill has in it already very significant incentives for generic utilization through the way we reimburse generics and the dispensing fee we require.

A very significant thing is to remember that brand drugs account for 67 percent of Medicaid prescriptions, but they also account for 81 percent of the Medicaid rebates. This is reasonable policy for us, then, to create parity between brand and generic rebates. This amendment would upset that parity.

The amendment before the Senate also simply strikes generic rebates; it does not pay for it. So I strongly oppose bringing the Committee on Finance out of compliance with our budget instructions. This amendment would do that. I ask Members to oppose the amendment.

Mr. GREGG. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 49, nays 50, as follows:

[Rollcall Vote No. 299 Leg.]

YEAS—49

| | | |
|---|---|---|
| Akaka | Baucus | Biden |
| Allen | Bayh | Bingaman |
| Boxer | Jeffords | Nelson (NE) |
| Byrd | Johnson | Obama |
| Cantwell | Kennedy | Pryor |
| Carper | Kerry | Reed |
| Clinton | Kohl | Reid |
| Collins | Landrieu | Rockefeller |
| Conrad | Lautenberg | Salazar |
| Dayton | Leahy | Sarbanes |
| Dodd | Levin | Schumer |
| Dorgan | Lieberman | Snowe |
| Durbin | Lincoln | Specter |
| Feingold | McCain | Stabenow |
| Feinstein | Mikulski | Wyden |
| Harkin | Murray | |
| Inouye | Nelson (FL) | |

NAYS—50

| | | |
|---|---|---|
| Alexander | DeWine | Martinez |
| Allard | Dole | McConnell |
| Bennett | Domenici | Murkowski |
| Bond | Ensign | Roberts |
| Brownback | Enzi | Santorum |
| Bunning | Frist | Sessions |
| Burns | Graham | Shelby |
| Burr | Grassley | Smith |
| Chafee | Gregg | Stevens |
| Chambliss | Hagel | Sununu |
| Coburn | Hatch | Talent |
| Cochran | Hutchison | Thomas |
| Coleman | Inhofe | Thune |
| Cornyn | Isakson | Vitter |
| Craig | Kyl | Voinovich |
| Crapo | Lott | Warner |
| DeMint | Lugar | |

NOT VOTING—1

Corzine

The amendment (No. 2348) was rejected.

Mr. McCONNELL. I move to reconsider the vote.

Mr. CRAIG. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Mr. President, I ask unanimous consent that the Senator from Nebraska have 2 minutes to introduce an amendment and then withdraw it.

The PRESIDING OFFICER. The Senator from Nebraska.

AMENDMENT NO. 2391

Mr. HAGEL. Mr. President, I call up amendment No. 2391 and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Nebraska [Mr. HAGEL], for himself and Mr. SUNUNU, proposes an amendment numbered 2391.

Mr. HAGEL. I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To require Fannie Mae and Freddie Mac to register under the Securities Act of 1933)

At the appropriate place, insert the following:

SEC. ___. REGISTRATION OF GSE SECURITIES.

(a) FANNIE MAE.—

(1) MORTGAGE-BACKED SECURITIES.—Section 304(d) of the Federal National Mortgage Association Charter Act (12 U.S.C. 1719(d)) is amended by striking the fourth sentence and inserting the following: ''Securities issued by the corporation under this subsection shall not be exempt securities for purposes of the Securities Act of 1933.''.

(2) SUBORDINATE OBLIGATIONS.—Section 304(e) of the Federal National Mortgage Association Charter Act (12 U.S.C. 1719(e)) is

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 37 of 91

amended by striking the fourth sentence and inserting the following: ''Obligations issued by the corporation under this subsection shall not be exempt securities for purposes of the Securities Act of 1933.''.

(3) SECURITIES.—Section 311 of the Federal National Mortgage Association Charter Act (12 U.S.C. 1723c) is amended—

(A) in the section heading, by striking ''AS-SOCIATION'';

(B) by inserting ''(a) IN GENERAL.—'' after ''SEC. 311.'';

(C) in the second sentence, by inserting ''by the Association'' after ''issued''; and

(D) by adding at the end the following:

''(b) TREATMENT OF CORPORATION SECURI-TIES.—

''(1) IN GENERAL.—Any stock, obligations, securities, participations, or other instruments issued or guaranteed by the corporation pursuant to this title shall not be exempt securities for purposes of the Securities Act of 1933.

''(2) EXEMPTION FOR APPROVED SELLERS.—Notwithstanding any other provision of this title or the Securities Act of 1933, trans-actions involving the initial disposition by an approved seller of pooled certificates that are acquired by that seller from the corpora-tion upon the initial issuance of the pooled certificates shall be deemed to be trans-actions by a person other than an issuer, un-derwriter, or dealer for purposes of the Secu-rities Act of 1933.

''(3) DEFINITIONS.—For purposes of this sub-section, the following definitions shall apply:

''(A) APPROVED SELLER.—The term 'ap-proved seller' means an institution approved by the corporation to sell mortgage loans to the corporation in exchange for pooled cer-tificates.

''(B) POOLED CERTIFICATES.—The term 'pooled certificates' means single class mort-gage-backed securities guaranteed by the corporation that have been issued by the cor-poration directly to the approved seller in exchange for the mortgage loans underlying such mortgage-backed securities.

''(4) MORTGAGE RELATED SECURITIES.—A single class mortgage-backed security guar-anteed by the corporation that has been issued by the corporation directly to the ap-proved seller in exchange for the mortgage loans underlying such mortgage-backed secu-rities or directly by the corporation for cash shall be deemed to be a mortgage re-lated security, as defined in section 3(a) of the Securities Exchange Act of 1934.''.

(b) FREDDIE MAC.—Section 306(g) of the Federal Home Loan Mortgage Corporation Act (12 U.S.C. 1455(g)) is amended to read as follows:

''(g) TREATMENT OF SECURITIES.—

''(1) IN GENERAL.—Any securities issued or guaranteed by the Corporation shall not be exempt securities for purposes of the Securi-ties Act of 1933.

''(2) EXEMPTION FOR APPROVED SELLERS.—Notwithstanding any other provision of this title or the Securities Act of 1933, trans-actions involving the initial disposition by an approved seller of pooled certificates that are acquired by that seller from the Corpora-tion upon the initial issuance of the pooled certificates shall be deemed to be trans-actions by a person other than an issuer, un-derwriter, or dealer for purposes of the Secu-rities Act of 1933.

''(3) DEFINITIONS.—For purposes of this sub-section, the following definitions shall apply:

''(A) APPROVED SELLER.—The term 'ap-proved seller' means an institution approved by the Corporation to sell mortgage loans to the Corporation in exchange for pooled cer-tificates.

''(B) POOLED CERTIFICATES.—The term 'pooled certificates' means single class mort-gage-backed securities guaranteed by the

Corporation that have been issued by the Corporation directly to the approved seller in exchange for the mortgage loans under-lying such mortgage-backed securities.''.

(c) NO EFFECT ON OTHER LAW.—Nothing in this section or the amendments made by this section shall be construed to affect any ex-emption from the provisions of the Trust In-denture Act of 1939 provided to the Federal National Mortgage Association or the Fed-eral Home Loan Mortgage Corporation.

(d) REGULATIONS.—The Securities and Ex-change Commission may issue such regula-tions as may be necessary or appropriate to carry out this section and the amendments made by this section.

(e) EFFECTIVE DATE.—The amendments made by this section shall become effective 1 year after the date of enactment of this Act.

Mr. HAGEL. Mr. President, the sig-nificance of Fannie Mae and Freddie Mac to our economy cannot be over-stated. Together they guarantee al-most 46 percent of all mortgage loans in the United States. They also back over $3.9 trillion in mortgage-backed securities and have amassed over $1.7 trillion in outstanding debt. This amendment would require Fannie and Freddie to register their debt in securi-ties with the Securities and Exchange Commission, like any other company. Both are currently exempt from having to do so and, because of this, both are exempt from the accounting require-ments of Sarbanes-Oxley. The Senate Banking Committee, under the leader-ship of Chairman SHELBY, passed a comprehensive, strong, GSE regulatory reform bill earlier this year. We need to take this bill up in this Congress.

AMENDMENT NO. 2391, WITHDRAWN

I ask unanimous consent that Sen-ator SUNUNU be allowed to speak for 1 minute, after which I ask that amend-ment No. 2391 be withdrawn.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from New Hampshire.

Mr. SUNUNU. Mr. President, I join the Senator from Nebraska in sup-porting this amendment. We absolutely need strong, credible, effective regula-tion of Fannie Mae and Freddie Mac. These are enormous, complex financial institutions. We want to ensure their safety and soundness. We want to en-sure they stay focused on their char-tered mission, which is to provide li-quidity in our secondary mortgage market. It sends the wrong message if we treat them differently from other big investment services companies. It sends the wrong message if we don't have a credible regulator. We need to pass legislation that includes this kind of a provision, SEC registration for their stocks and bonds. It is common sense. We have passed legislation in the Banking Committee that is increas-ingly unlikely, given the opposition, lack of cooperation of the GSEs in working on this legislation. Their al-lied interest groups have weighed in against the legislation. I think it does a disservice to the capital markets and to the consumers if we fail to have a strong, credible regulator. I certainly support the amendment, but I will yield back to the Senator from Ne-braska.

The PRESIDING OFFICER. The amendment is withdrawn.

The Senator from New Hampshire.

Mr. GREGG. I ask unanimous con-sent that the only amendments re-maining in order be two by Senator REED, one by Senator LIEBERMAN, one by Senator SANTORUM, and one by Sen-ator SNOWE.

The PRESIDING OFFICER. In my personal capacity as a Senator from Texas, I object.

Mr. GREGG. The Chair objects.

Mr. CONRAD. The Chair objects.

Mr. GREGG. And one by Senator CORNYN.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CONRAD. Mr. President, reserv-ing the right to object, the last one is a Cornyn amendment?

Mr. GREGG. It appears there may be.

Mr. CONRAD. I think we can accept it.

Mr. GREGG. We will now go to Sen-ator SANTORUM.

The PRESIDING OFFICER. The Sen-ator from Pennsylvania.

AMENDMENT NO. 2419

(Purpose: To amend title XVIII of the Social Security Act to make a technical correc-tion regarding purchase agreements for power-driven wheelchairs under the Medi-care program, to provide for coverage of ultrasound screening for abdominal aortic aneurysms under part B of such program, to improve patient access to, and utiliza-tion of, the colorectal cancer screening benefit under such program, and to provide for the coverage of marriage and family therapist services and mental health coun-selor services under part B of such title)

Mr. SANTORUM. Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Pennsylvania [Mr. SANTORUM], for himself, Mr. BUNNING, Mr. THOMAS, Mr. VOINOVICH, Mr. LIEBERMAN, Mr. DODD, and Mr. ROCKEFELLER, proposes an amendment numbered 2419.

(The amendment is printed in today's RECORD under ''Text of Amendments.'')

Mr. SANTORUM. Mr. President, this is a four-part amendment. The first part would provide for a screening for aortic aneurysms, offered by Senator BUNNING and Senator DODD. The second part of the amendment would allow for the purchase of electronic mobility equipment for our seniors, something Senator VOINOVICH has been working on, as opposed to having a long-term lease. The third part is offered by Sen-ator THOMAS, which has to do with rural mental health care under Medi-care. And finally, the piece I have been offering is on colorectal screenings. We passed that benefit back in 1997. As a result of payment of the benefit for screenings, we have only seen a 1-percent increase in screenings. This is an attempt to try to increase that by allowing for the payment of the pre-doctor visit as well as the part B de-ductible.

I ask unanimous consent to add Sen-ator LANDRIEU as a cosponsor of the amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CONRAD. Mr. President, I ask unanimous consent to be listed as a co-sponsor of the amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. GREGG. Mr. President, I ask for a voice vote.

The PRESIDING OFFICER. The question is on agreeing to amendment No. 2419.

The amendment (No. 2419) was agreed to.

Mr. GREGG. Mr. President, I move to reconsider the vote and to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GREGG. We now go to Senator REED.

The PRESIDING OFFICER. The Senator from Rhode Island.

AMENDMENT NO. 2409

Mr. REED. Mr. President, I ask that amendment No. 2409 be called up for immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The bill clerk read as follows:

The Senator from Rhode Island [Mr. REED], for himself, Mr. BAUCUS, Mrs. MURRAY, Mr. KENNEDY, Mr. BINGAMAN, Mr. CORZINE, Mrs. CLINTON, and Mr. OBAMA, proposes an amendment numbered 2409.

The amendment is as follows:

(Purpose: To strike provisions relating to reforms of targeted case management)

Strike section 6031 of the bill.

Mr. REED. This amendment strikes section 6031 of the reconciliation act which pertains to case management services. States have the ability to identify groups such as children and adults with AIDS, children in foster care, other vulnerable groups, and find comprehensive services. These services include educational and social as well as medical services. The underlying reconciliation bill will force these services to be paid for by third parties, the State or others. That will decrease the use of these services and actually end up costing more to the States, and it will disrupt many of the very appropriate programs we have. In fact, many of these programs save money by dealing with these people.

I would point out that this legislation does not require an offset, nor does it require a supermajority vote since we are striking language in the underlying bill.

I reserve any time I have.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Mr. President, I am shocked anybody from the other side of the aisle would raise any questions against the policy we have in our bill. This is not a Republican policy. This is not a Bush administration policy. This is a policy that was offered by the previous administration, the Clinton administration. The targeted case management provision of this bill merely codifies that policy that was offered by the Clinton administration. I have a

letter I got from the U.S. Psychiatric Rehabilitation Association expressing thanks for the targeted case management provisions:

Your measured steps and considerations of TCM will preserve the needed services to those who cannot attain housing, employment, or health care on their own. [We] appreciate your work in helping to ensure that mentally disabled Americans have the opportunity to access Medicaid services.

It seems to me this is something that ought to be of the heart and the brain of anybody on the other side of the aisle.

The PRESIDING OFFICER. The Senator's time has expired.

The Senator from Rhode Island has 7 seconds.

Mr. REED. Mr. President, this bill will hurt programs that exist today that help children, people with AIDS, a host of people. I received this information not from the Clinton administration but from providers in my own community, Christian Brothers who deal with children, social workers who deal with adults.

Mr. GREGG. Mr. President, I ask unanimous consent that Senator SMITH be added to the list of amendments that will be considered.

Mr. CONRAD. Reserving the right to object, we don't yet know what the Smith amendment is. Can we get that first?

Mr. GREGG. I withdraw that.

Mr. REED. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be.

The question is on agreeing to amendment No. 2409.

The clerk will call the roll.

The bill clerk called the roll.

Mr. McCONNELL. The following Senator was necessarily absent: the Senator from Oklahoma (Mr. COBURN).

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 46, nays 52, as follows:

[Rollcall Vote No. 300 Leg.]

YEAS—46

| | | |
|---|---|---|
| Akaka | Durbin | Mikulski |
| Baucus | Feingold | Murray |
| Bayh | Feinstein | Nelson (FL) |
| Biden | Harkin | Nelson (NE) |
| Bingaman | Inouye | Obama |
| Boxer | Jeffords | Pryor |
| Byrd | Johnson | Reed |
| Cantwell | Kennedy | Reid |
| Carper | Kerry | Rockefeller |
| Chafee | Kohl | Salazar |
| Clinton | Landrieu | Sarbanes |
| Conrad | Lautenberg | Schumer |
| Dayton | Leahy | Stabenow |
| DeWine | Levin | Wyden |
| Dodd | Lieberman | |
| Dorgan | Lincoln | |

NAYS—52

| | | |
|---|---|---|
| Alexander | Brownback | Cochran |
| Allard | Bunning | Coleman |
| Allen | Burns | Collins |
| Bennett | Burr | Cornyn |
| Bond | Chambliss | Craig |

| | | |
|---|---|---|
| Crapo | Inhofe | Smith |
| DeMint | Isakson | Snowe |
| Dole | Kyl | Specter |
| Domenici | Lott | Stevens |
| Ensign | Lugar | Sununu |
| Enzi | Martinez | Talent |
| Frist | McCain | Thomas |
| Graham | McConnell | Thune |
| Grassley | Murkowski | Vitter |
| Gregg | Roberts | Voinovich |
| Hagel | Santorum | Warner |
| Hatch | Sessions | |
| Hutchison | Shelby | |

NOT VOTING—2

| | |
|---|---|
| Coburn | Corzine |

The amendment (No. 2409) was rejected.

Mr. GREGG. I move to reconsider the vote.

Mr. SANTORUM. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENTS NOS. 2380, AS MODIFIED, 2420, AND 2386

Mr. GREGG. Mr. President, I now send three amendments to the desk and ask that they be considered and agreed to en bloc, and the motions to reconsider be laid on the table—one for Senator LIEBERMAN and two for Senator SUNUNU.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

The amendments were agreed to, as follows:

AMENDMENT NO. 2380, AS MODIFIED

On page 368, between line 5 and 6, insert the following:

SEC. 6116. QUALITY MEASUREMENT SYSTEMS AMENDMENTS.

Section 1860E–1, as added by section 6110(a)(2), is amended—

(1) in subsection (b)(1)—

(A) in subparagraph (B)—

(i) in clause (vi), by striking "and" at the end;

(ii) in clause (vii), by striking the period at the end and inserting "; and"; and

(iii) by adding at the end the following new clause:

"(viii) measures that address conditions where there is the greatest disparity of health care provided and health outcomes between majority and minority groups."; and

(B) in subparagraph (E)—

(i) in clause (v), by striking "and" at the end;

(ii) by redesignating clause (vi) as clause (vii); and

(iii) by inserting after clause (v) the following new clause:

"(vi) allows quality measures that are reported to be stratified according to patient group characteristics; and";

(2) in subsection (c)(4)—

(A) in subparagraph (B), by striking "and" at the end;

(B) in subparagraph (C), by striking the period at the end and inserting "; and"; and

(C) by adding at the end the following new subparagraph:

"(D) The report commissioned by Congress from the Institute of Medicine of the National Academy of Sciences, titled 'Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care'."; and

(3) in subsection (d)(2), by inserting "experts in minority health," after "government agencies,".

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 39 of 91

AMENDMENT NO. 2420

(Purpose: To convert the Digital Transition and Public Safety Fund program payment amounts into limitations, and for other purposes)

On page 94, line 7, after "(1)" insert "not to exceed".

On page 94, line 13, after "(2)" insert "not to exceed".

On page 94, line 19, after "(3)" insert "not to exceed".

On page 95, line 1, after "(4)" insert "not to exceed".

On page 95, line 4, after "(5)" insert "not to exceed".

On page 95, beginning in line 10, strike "The amounts payable" and insert "Any amounts that are to be paid".

On page 95, line 12, after the period insert "Any amount in the Fund that is not obligated under subsection (c) by that date shall be transferred to the general fund of the Treasury.".

AMENDMENT NO. 2386

(Purpose: To ensure that amounts are not obligated out of the Digital Transition and Public Safety Fund until the proceeds of the auction are actually deposited by the FCC)

On page 95, line 12, after the period insert "The Secretary may not obligate any amounts from the Fund until the proceeds of the auction authorized by section 309(j)(15)(C)(v) are actually deposited by the Commission pursuant to subsection (b).".

Mr. LIEBERMAN. Mr. President, a very important provision is being passed in this year's reconciliation bill establishing Medicare Value-Based Purchasing Programs. Value-based purchasing brings a pay-for-performance provision to Medicare. Senator GRASSLEY and Senator BAUCUS and the Finance Committee staff on both sides of the aisle have pushed forward an initiative that has been needed for a long time in American health care. I applaud them for their efforts.

A recent study published in the New England Journal of Medicine found that less than 55 percent of patients in America receive appropriate medical care. This means that if you go to the doctor and have pneumonia there is a good chance you may not receive the right antibiotic; or CPR might be performed on a patient with the incorrect number of breaths; or you may not receive the best surgery for your heart condition. Americans are not systematically receiving appropriate medical treatment. And receiving appropriate medical treatment should not be a matter of luck.

We know that it is too easy for Americans to get inappropriate medical care. But there are patient groups throughout our country that are in even more medical danger. Disparities in health care quality in minority groups are well documented. This would mean that a Hispanic or African-American male is less likely to receive the right medication for a heart condition than a White male. These findings are not related to income, insurance status, age, or what hospital a person goes to, among other factors. Special attention must be paid to minority patient groups in our current efforts to improve the quality of medical care in the U.S.

The 2003 Institute of Medicine report, Unequal Treatment, recommended that the "collection, reporting, and monitoring of patient care data by health plans and federal, and state payors should be encouraged" to move towards eliminating health disparities.

My amendment to section 6110 S. 1932 addresses this IOM recommendation to more specifically encourage the collection and reporting of health care quality data for both majority and minority groups as Medicare Value-Based Purchasing Programs are being developed and established.

My amendment encourages the Secretary of the Department of Health and Human Services to focus on diseases where there are disparities between majority and minority groups. Diseases such as infant mortality, diabetes, heart disease, breast cancer, cervical cancer, HIV/AIDS, childhood immunizations, and adult immunizations are all disproportionately problematic in minority patient groups. They must be considered in any systematic attempt to measure and improve health care quality.

My amendment also encourages the collection of specific data on patient characteristics that are key to measuring and collecting data on health care quality. Collecting information on gender, race/ethnicity, language spoken, and insurance status are encouraged. Without this information, we will not have any way of knowing whether or not disparities between majority and minority groups are decreasing.

In the existing provisions of section 6110, the Secretary of the Department of Health and Human Services will work with various expert groups in development and implementing quality measurement systems. However, experts in minority health are not currently included in the legislation. My amendment ensures that experts in minority health will be included in developing and implementing a health care quality measurement system.

Lastly, my amendment would reward hospitals, physicians, clinics, and home health care providers, among other groups that demonstrate improvement in quality of care for patient subgroups and minorities.

I thank Senators GRASSLEY and BAUCUS and the Finance Committee staff for working with us to try to focus necessary attention on the health care needs of all Americans. This would mark the first time our Federal Government made a commitment to improving the quality of health care that minority groups—our constituents—are receiving. I believe this groundbreaking legislation to bring pay-for-performance accountability to Medicare is an important step forward and I believe it will be much more powerful and have much greater impact if we tackle how to eliminate racial and ethnic disparities in health care.

Mr. GREGG. Mr. President, we now turn to Senator REED for his second amendment.

Mr. REED. Mr. President, I call up amendment No. 2396.

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will report.

The assistant journal clerk read as follows:

The Senator from Rhode Island [Mr. REED] proposes an amendment numbered 2396.

The amendment is as follows:

(Purpose: To strike subtitle C of title II relating to FHA asset disposition)

On page 86, strike line 22 and all that follows through page 90, line 19.

Mr. REED. Mr. President, my amendment would restore the ability of HUD to preserve and rehabilitate affordable housing.

The FHA upfront grant and below-market sales programs are designed to help local governments purchase FHA foreclosed multifamily properties in order to preserve and rehabilitate these units into affordable housing.

Currently, the money for this program comes from the FHA General Insurance Fund, not from appropriations. This gives HUD significant flexibility in providing these funds if the need arises.

The proposal before us today will restrict HUD from using the FHA General Insurance Fund to support both the below-market sales program and the upfront grant program. It is a program of about $50 million a year.

My amendment would strike the language prohibiting the use of these funds to allow them the flexibility to continue this program. Because it strikes language, no supermajority vote is necessary, and no offset is necessary.

I retain the remainder of my time.

The PRESIDING OFFICER. The Senator from Alabama.

Mr. SHELBY. Mr. President, I rise in opposition to the Reed amendment. In the Banking Committee, as part of the reconciliation process, we save, in this instance, $270 million. This proposal simply makes the FHA's use of rehab grants and below-market sales subject to appropriations.

If these programs are, in fact, beneficial—some of them are—appropriations can still be granted in the future, and using the appropriations process allows the Congress to better oversee the use of these dollars and to ensure that our resources are well spent.

I urge my colleagues to oppose this amendment. This $270 million is a lot of savings that we can put forth today.

Mr. GREGG. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER (Mr. CHAFEE). Is there a sufficient second?

There appears to be a sufficient second.

If all time is yielded back, the question is on agreeing to the amendment. The clerk will call the roll.

The assistant journal clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 48, nays 51, as follows:

[Rollcall Vote No. 301 Leg.]

YEAS—48

| | | |
|---|---|---|
| Akaka | Dorgan | Lincoln |
| Baucus | Durbin | Mikulski |
| Bayh | Feingold | Murray |
| Biden | Feinstein | Nelson (FL) |
| Bingaman | Harkin | Nelson (NE) |
| Bond | Inouye | Obama |
| Boxer | Jeffords | Pryor |
| Byrd | Johnson | Reed |
| Cantwell | Kennedy | Reid |
| Carper | Kerry | Rockefeller |
| Chafee | Kohl | Salazar |
| Clinton | Landrieu | Sarbanes |
| Conrad | Lautenberg | Schumer |
| Dayton | Leahy | Specter |
| DeWine | Levin | Stabenow |
| Dodd | Lieberman | Wyden |

NAYS—51

| | | |
|---|---|---|
| Alexander | Dole | McCain |
| Allard | Domenici | McConnell |
| Allen | Ensign | Murkowski |
| Bennett | Enzi | Roberts |
| Brownback | Frist | Santorum |
| Bunning | Graham | Sessions |
| Burns | Grassley | Shelby |
| Burr | Gregg | Smith |
| Chambliss | Hagel | Snowe |
| Coburn | Hatch | Stevens |
| Cochran | Hutchison | Sununu |
| Coleman | Inhofe | Talent |
| Collins | Isakson | Thomas |
| Cornyn | Kyl | Thune |
| Craig | Lott | Vitter |
| Crapo | Lugar | Voinovich |
| DeMint | Martinez | Warner |

NOT VOTING—1

Corzine

The amendment (No. 2396) was rejected.

Mr. GREGG. Mr. President, I move to reconsider the vote.

Mr. ENSIGN. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GREGG. I ask unanimous consent that Senator SMITH be allowed to offer an amendment.

Mr. CONRAD. Reserving the right to object.

The PRESIDING OFFICER. The Senator from North Dakota.

Mr. CONRAD. Could we also put in order my amendment?

Mr. GREGG. And at a later date, Senator CONRAD be put on the list of Senators who can offer an amendment.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

The Senator from Oregon.

AMENDMENT NO. 2390

Mr. SMITH. I ask unanimous consent to call up amendment No. 2390. I also ask unanimous consent that Senator FEINGOLD be added as a cosponsor to my amendment. I am already pleased that Senator CLINTON is a cosponsor.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Oregon [Mr. SMITH], for himself, Mrs. CLINTON, and Mr. FEINGOLD, proposes an amendment numbered 2390.

Mr. SMITH. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To provide for a demonstration project regarding medicaid coverage of low-income HIV-infected individuals)

On page 188, after line 24, add the following:

**SEC. 6037. DEMONSTRATION PROJECT REGARDING MEDICAID COVERAGE OF LOW-INCOME HIV-INFECTED INDIVIDUALS.**

(a) REQUIREMENT TO CONDUCT DEMONSTRATION PROJECT.—

(1) IN GENERAL.—The Secretary shall establish a demonstration project under which a State may apply under section 1115 of the Social Security Act (42 U.S.C. 1315) to provide medical assistance under a State medicaid program to HIV-infected individuals described in subsection (b) in accordance with the provisions of this section.

(2) LIMITATION ON NUMBER OF APPROVED APPLICATIONS.—The Secretary shall only approve as many State applications to provide medical assistance in accordance with this section as will not exceed the limitation on aggregate payments under subsection (d)(2)(A).

(3) AUTHORITY TO WAIVE RESTRICTIONS ON PAYMENTS TO TERRITORIES.—The Secretary shall waive the limitations on payment under subsections (f) and (g) of section 1108 of the Social Security Act (42 U.S.C. 1308) in the case of a State that is subject to such limitations and submits an approved application to provide medical assistance in accordance with this section.

(b) HIV-INFECTED INDIVIDUALS DESCRIBED.—For purposes of subsection (a), HIV-infected individuals described in this subsection are individuals who are not described in section 1902(a)(10)(A)(i) of the Social Security Act (42 U.S.C. 1396a(a)(10)(A)(i))—

(1) who have HIV infection;

(2) whose income (as determined under the State medicaid plan with respect to disabled individuals) does not exceed 200 percent of the poverty line (as defined in section 2110(c)(5) of the Social Security Act (42 U.S.C. 1397jj(c)(5)); and

(3) whose resources (as determined under the State medicaid plan with respect to disabled individuals) do not exceed the maximum amount of resources a disabled individual described in section 1902(a)(10)(A)(i) of such Act may have and obtain medical assistance under such plan.

(c) LENGTH OF PERIOD FOR PROVISION OF MEDICAL ASSISTANCE.—A State shall not be approved to provide medical assistance to an HIV-infected individual in accordance with the demonstration project established under this section for a period of more than 5 consecutive years.

(d) LIMITATIONS ON FEDERAL FUNDING.—

(1) APPROPRIATION.—

(A) IN GENERAL.—Out of any funds in the Treasury not otherwise appropriated, there is appropriated to carry out this section, $450,000,000 for the period of fiscal years 2006 through 2010.

(B) BUDGET AUTHORITY.—Subparagraph (A) constitutes budget authority in advance of appropriations Act and represents the obligation of the Federal Government to provide for the payment of the amounts appropriated under that subparagraph.

(2) LIMITATION ON PAYMENTS.—In no case may—

(A) the aggregate amount of payments made by the Secretary to eligible States under this section exceed $450,000,000; or

(B) payments be provided by the Secretary under this section after September 30, 2010.

(3) FUNDS ALLOCATED TO STATES.—The Secretary shall allocate funds to States with approved applications under this section based on their applications and the availability of funds.

(4) PAYMENTS TO STATES.—The Secretary shall pay to each State, from its allocation under paragraph (3), an amount each quarter equal to the enhanced Federal medical assistance percentage described in section 2105(b) of the Social Security Act (42 U.S.C. 1397ee(b)) of expenditures in the quarter for medical assistance provided to HIV-infected individuals who are eligible for such assistance under a State Medicaid program in accordance with the demonstration project established under this section.

(e) EVALUATION AND REPORT.—

(1) EVALUATION.—The Secretary shall conduct an evaluation of the demonstration project established under this section. Such evaluation shall include an analysis of the cost-effectiveness of the project and the impact of the project on the Medicare, Medicaid, and Supplemental Security Income programs established under titles XVIII, XIX, and XVI, respectively, of the Social Security Act (42 U.S.C. 1395 et seq., 1396 et seq., 1381 et seq.).

(2) REPORT TO CONGRESS.—Not later than December 31, 2010, the Secretary shall submit a report to Congress on the results of the evaluation of the demonstration project established under this section.

(f) EFFECTIVE DATE.—This section shall take effect on January 1, 2006.

**SEC. 6038. ADDITIONAL INCREASE IN REBATE FOR SINGLE SOURCE AND INNOVATOR MULTIPLE SOURCE DRUGS.**

Section 1927(c)(1)(B)(i)(VI) (42 U.S.C. 1396r-8(c)(1)(B)(i)(VI)), as added by section 6002(a)(3), is amended by striking "17" and inserting "17.8".

Mr. SMITH. The amendment I am offering authorizes $450 million for State demonstration projects to provide Medicaid coverage to low-income individuals living with HIV. It is similar to S. 311, Early Treatment for HIV Act. I introduced this earlier this year with strong support of 33 of my colleagues. As Medicaid generally covers only those disabled by full-blown AIDS, the amendment would vastly improve the treatment available to some of our most vulnerable citizens.

With more States having difficulty maintaining their AIDS drug assistance program, it is imperative that we provide alternative methods of delivering treatment to those individuals with HIV who are living in poverty. It is simply the right thing to do. I ask for my colleagues' support for this fiscally and morally defensible policy.

Mr. GREGG. I ask for a voice vote.

The PRESIDING OFFICER. Is all time yielded back?

Mr. GREGG. Yes.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The amendment (No. 2390) was agreed to.

Mr. GREGG. Mr. President, I move to reconsider the vote and lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 2371

Ms. SNOWE. Mr. President, I call up amendment 2371 and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant journal clerk read as follows:

The Senator from Maine [Ms. SNOWE], for herself, Mr. WYDEN, Mr. McCAIN, Ms. STABENOW, and Mrs. CLINTON, proposes an amendment numbered 2371.

Ms. SNOWE. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To amend title XVIII of the Social Security Act to provide the authority for negotiating fair prices for medicare prescription drugs)

After section 6115, insert the following:

### SEC. 6116. NEGOTIATING FAIR PRICES FOR MEDICARE PRESCRIPTION DRUGS.

(a) IN GENERAL.—Section 1860D–11 (42 U.S.C. 1395w–111) is amended by striking subsection (i) (relating to noninterference) and inserting the following:

"(i) AUTHORITY TO NEGOTIATE PRICES WITH MANUFACTURERS.—

"(1) IN GENERAL.—Subject to paragraph (4), in order to ensure that beneficiaries enrolled under prescription drug plans and MA–PD plans pay the lowest possible price, the Secretary shall have authority similar to that of other Federal entities that purchase prescription drugs in bulk to negotiate contracts with manufacturers of covered part D drugs, consistent with the requirements and in furtherance of the goals of providing quality care and containing costs under this part.

"(2) MANDATORY RESPONSIBILITIES.—The Secretary shall be required to—

"(A) negotiate contracts with manufacturers of covered part D drugs for each fallback prescription drug plan under subsection (g); and

"(B) participate in negotiation of contracts of any covered part D drug upon request of an approved prescription drug plan or MA–PD plan.

"(3) RULE OF CONSTRUCTION.—Nothing in paragraph (2) shall be construed to limit the authority of the Secretary under paragraph (1) to the mandatory responsibilities under paragraph (2).

"(4) NO PARTICULAR FORMULARY OR PRICE STRUCTURE.—In order to promote competition under this part and in carrying out this part, the Secretary may not require a particular formulary or institute a price structure for the reimbursement of covered part D drugs.".

(b) EFFECTIVE DATE.—The amendment made by this section shall take effect as if included in the enactment of section 101 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Public Law 108–173).

Ms. SNOWE. Mr. President, I ask unanimous consent that Senator CLINTON be added as a cosponsor.

The PRESIDING OFFICER. Without objection, it is so ordered.

Ms. SNOWE. Mr. President, I am offering this amendment on behalf of myself and Senator WYDEN, who has offered considerable leadership on this issue over the years providing affordable medications to our seniors, along with Senator McCAIN and Senator STABENOW. So many of us in Congress have worked to make prescription drug coverage a part of the Medicare Program, but the fact remains that the costs are rising since the time we first created this program, from $523 billion to now up to $720 billion for the Part D Program.

As we see in this first chart, the brand-named prices are consistently outpacing inflation because they have no competition. As we can see with the generic drugs, where there is competition, the price is lower. We want to give the Secretary of Health and Human Services the ability to negotiate prices, particularly for those seniors who will not have access to more than two prescription drug plans or where the plans ask for negotiating authority.

This is not price setting. This is price saving. In fact, we have explicit language in the legislation that says this is not about price setting. It does not give the Secretary that authority. It allows him to save money for the Part D Program that is expected and projected to increase in cost by more than 8.5 percent as called for by the Congressional Budget Office. That is the CBO's very own numbers.

Finally, 80 percent of seniors in America have called for the Secretary to have this authority.

Mrs. FEINSTEIN. Mr. President, I rise today to voice my support for amendment No. 2371 offered by Senators SNOWE and WYDEN, which I am pleased to cosponsor. The amendment ensures that the Health and Human Services, HHS Secretary has an active role in managing the costs of the newly-created Medicare prescription drug program, part D, by striking language in the Medicare Modernization Act of 2003 that prohibits the HHS Secretary from using the bulk purchasing power of the Federal Government to obtain prescription drugs at the lowest possible cost to taxpayers.

On the eve of the vote on the final Medicare bill, my colleague Senator WYDEN and I agreed that this prohibition language, also referred to as "the noninterference clause," was a major flaw in the overall bill. Although we both voted in favor of the bill because it afforded seniors and the disabled the first-ever opportunity to voluntarily sign up for a drug benefit in Medicare, we agreed to work to repeal this prohibition language in the bill. I have been pleased to join with Senators SNOWE and WYDEN on legislation the past two Congresses to do just that.

Since casting my vote on the final Medicare bill which, at the time, I believed was for a $400 billion bill, we have all learned that more accurate estimates of the cost of the overall bill were withheld from Congress and that the true cost of the bill will now exceed $720 billion over the next 10 years. Now, more than ever, Congress must do everything it can to ensure that the government and taxpayer dollars are getting the best deal out there on the cost of drugs covered by Medicare.

That is what this amendment will do. The amendment strikes the so-called "noninterference" clause, gives the HHS Secretary authority to negotiate prices with drug manufacturers, and requires that the HHS Secretary do so for covered part D drugs for each fallback prescription drug plan—plans where the Federal Government is assuming the risk—and upon the request of an approved prescription drug plan or a medicare advantage prescription drug plan.

What the amendment does not do is require the Secretary to set drug prices or formularies. I have heard the argument that this amendment will result in price controls. That argument has been made time and time again by drug companies who would rather profit from the Federal Government paying too much for drugs than allow the Federal Government to use its purchasing power to negotiate for the best deals on drug prices.

The reality is that this amendment specifically states that the Secretary may not require a particular formulary or institute a price structure for the reimbursement of covered part D drugs.

I have also heard the argument that the Secretary won't be able to negotiate better drug prices than private plans currently do. I come from a State with the largest purchasing power in the country for drugs in its Medicaid program and it is clear that the size of California's market has helped California's ability to negotiate more competitive drug prices in Medicaid.

But don't take my word for it. In 2004, CBO stated, "giving the Secretary an additional tool—the authority to negotiate prices with manufacturers of such drugs—would put greater pressure on those manufacturers and could produce some additional savings." With respect to sole source drugs, CBO went on to say, "there is potential for some savings if the Secretary were to have the authority to negotiate prices with manufacturers of single-source drugs that do not face competition from therapeutic alternatives."

Prescription drug prices for existing drugs—these are not new drugs, but old ones—have been rising at two to three times the inflation rates, according to the Government Accountability Office. So I ask the question: Why are we not doing everything in our power to ensure the Federal Government is getting the lowest prices for drugs?

The Snowe-Wyden amendment ensures fiscal responsibility in an entitlement program whose escalating costs pose a very serious problem for future generations. I am pleased to be a cosponsor of this amendment and urge my colleagues to support the amendment.

The PRESIDING OFFICER. The Senator's time has expired.

Ms. SNOWE. The former Secretary of HHS said: I would like to have had the opportunity to negotiate.

Let us give this power to the Secretary to save money for the program and to save money for seniors.

The PRESIDING OFFICER. Who yields time in opposition?

Mr. GREGG. I yield to the Senator from Iowa.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Mr. President, the fact is that the Government does not negotiate prices, it sets prices. The second thing is that we set in place in the Medicare bill plans to negotiate prices, and we know now from experience, and I did not know it when this amendment was offered before, that these plans are negotiating prices that are much lower for beneficiaries and the taxpayers than we even anticipated when we passed the bill 2 years ago.

One thing that ought to be taken into consideration is the fact that there is no savings from this amendment. I would like to quote from The Washington Post, February 17: Governments are notoriously bad for setting prices, and the U.S. Government is notoriously bad at setting prices in the medical realm.

We need to defeat this amendment as we defeated it a few months ago.

Ms. SNOWE. I ask unanimous consent to add Senator KERRY and Senator DODD as cosponsors.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. GRASSLEY. Mr. President, the amendment is not germane to the measure before the Senate so I raise a point of order under section 305 of the Budget Act.

Ms. SNOWE. Mr. President, I move to waive it.

I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the motion.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted—yeas 51, nays 48, as follows:

[Rollcall Vote No. 302 Leg.]

YEAS—51

| | | |
|---|---|---|
| Akaka | Dorgan | Lincoln |
| Bayh | Durbin | McCain |
| Biden | Feingold | Mikulski |
| Bingaman | Feinstein | Murray |
| Boxer | Graham | Nelson (FL) |
| Brownback | Harkin | Obama |
| Byrd | Inouye | Pryor |
| Cantwell | Jeffords | Reed |
| Carper | Johnson | Reid |
| Chafee | Kennedy | Rockefeller |
| Clinton | Kerry | Salazar |
| Coburn | Kohl | Sarbanes |
| Collins | Landrieu | Schumer |
| Conrad | Lautenberg | Snowe |
| Dayton | Leahy | Specter |
| DeWine | Levin | Stabenow |
| Dodd | Lieberman | Wyden |

NAYS—48

| | | |
|---|---|---|
| Alexander | Bunning | Cornyn |
| Allard | Burns | Craig |
| Allen | Burr | Crapo |
| Baucus | Chambliss | DeMint |
| Bennett | Cochran | Dole |
| Bond | Coleman | Domenici |
| Ensign | Kyl | Shelby |
| Enzi | Lott | Smith |
| Frist | Lugar | Stevens |
| Graasley | Martinez | Sununu |
| Gregg | McConnell | Talent |
| Hagel | Murkowski | Thomas |
| Hatch | Nelson (NE) | Thune |
| Hutchison | Roberts | Vitter |
| Inhofe | Santorum | Voinovich |
| Isakson | Sessions | Warner |

NOT VOTING—1

Corzine

The PRESIDING OFFICER. On this vote, the ayes are 51, the nays are 48. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected. The point of order is sustained, and the amendment falls.

Mr. GREGG. I move to reconsider the vote, and I move to lay that motion on the table.

The motion to reconsider was laid on the table.

Mr. GREGG. I would now like to turn to the amendment of Senator CORNYN.

The PRESIDING OFFICER. The Senator from Texas.

AMENDMENT NO. 2408

Mr. CORNYN. I call up amendment No. 2408 and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Texas [Mr. CORNYN] proposes an amendment numbered 2408.

Mr. CORNYN. I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To eliminate the converter box subsidy program)

On page 94, strike line 7 through 12.

Mr. CORNYN. Mr. President, in 1928, Herbert Hoover ran for President based on the slogan "a chicken in every pot and a car in every garage."

Under the provisions of this bill, the American taxpayer is being asked to subsidize television—digital television to be specific—to the tune of $3 billion.

I congratulate the leadership and particularly Chairman GREGG for the good work he has done trying to save the beleaguered American taxpayer quite a bit of money and to reduce the Federal deficit. What we are being asked to do here, what the taxpayers are being asked to suffer is a transfer of money from their pocket basically to the living rooms of the television-watching public so we can transition from analog to digital TV. But to make things even more ironic, what this $3 billion is supposed to do is to provide converters so they can take the digital signal and transition it back to the analog and reverse the action of this Congress. It makes no sense. We can do better than this.

I urge my colleagues to support the amendment.

Mr. GREGG. Mr. President, I ask for a voice vote.

The PRESIDING OFFICER. If all time is yielded back, the question is on agreeing to the amendment.

The amendment (No. 2408) was rejected.

Mr. GREGG. Mr. President, I move to reconsider the vote, and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GREGG. At this point, I believe the Senator from North Dakota has an amendment to offer.

AMENDMENT NO. 2422

Mr. CONRAD. Mr. President, I call up amendment 2422.

The PRESIDING OFFICER. The clerk will report.

The Journal clerk read as follows:

The Senator from North Dakota [Mr. CONRAD], for himself and Mr. SALAZAR, proposes an amendment numbered 2422.

Mr. CONRAD. I ask unanimous consent the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To ensure Medicaid enrollees have access to small, independent pharmacies located in rural and frontier areas)

On page 121, after line 25, add the following:

"(5) RULES APPLICABLE TO CRITICAL ACCESS RETAIL PHARMACIES.—

"(A) REIMBURSEMENT LIMITS.—Notwithstanding paragraph (2)(A), in the case of a critical access retail pharmacy (as defined in subparagraph (C)), the upper payment limit—

"(i) for the ingredient cost of a single source drug, is the lesser of—

"(I) 108 percent of the average manufacturer price for the drug; or

"(II) the wholesale acquisition cost for the drug; and

"(ii) for the ingredient cost of a multiple source drug, is the lesser of—

"(I) 140 percent of the weighted average manufacturer price for the drug; or

"(II) the wholesale acquisition cost for the drug.

"(B) APPLICATION OF OTHER PROVISIONS.—The preceding provisions of this subsection shall apply with respect to reimbursement to a critical access retail pharmacy in the same manner as such provisions apply to reimbursement to other retail pharmacies except that, in establishing the dispensing fee for a critical access pharmacy the Secretary, in addition to the factors required under paragraph (4), shall include consideration of the costs associated with operating a critical access retail pharmacy.

"(C) CRITICAL ACCESS RETAIL PHARMACY DEFINED.—For purposes of subparagraph (A), the term 'critical access retail pharmacy' means an retail pharmacy that is not within a 20-mile radius of another retail pharmacy.".

(2) INCREASE IN BASIC REBATE FOR SINGLE SOURCE DRUGS AND INNOVATOR MULTIPLE SOURCE DRUGS.—Section 1927(c)(1)(B)(i)(VI) (42 U.S.C. 1396r–8(c)(1)(B)(i)(VI), as added by section 6002(a)(3), is amended by striking "17" and inserting "18.1".

Mr. CONRAD. Mr. President, in the interest of time, very briefly, this is to help rural remote pharmacies with modestly enhanced reimbursement. I very much thank my colleagues on both sides of the aisle who have agreed to support this amendment. I especially thank the chairman of the Finance Committee for his support.

Mr. GREGG. I urge the amendment be agreed to.

The PRESIDING OFFICER. Is all time yielded back?

Mr. GREGG. Yes.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The amendment (No. 2422) was agreed to.

AMENDMENT NO. 2392

Mr. GREGG. Mr. President, I wish to reiterate my statement which I inadvertently omitted from yesterday's RECORD with regard to amendment No. 2392 that we will support an effort to pass legislation to make the technical change deleted from our bill in a more appropriate vehicle.

PHARMACY DISPENSING FEES

Mr. REED. Mr. President, I engage my colleague, the Chairman of the Senate Finance Committee, in a colloquy about his intent regarding Medicaid pharmacy dispensing fees in the Medicaid pharmacy reimbursement reform section of the Budget Reconciliation Act.

As I understand the intent of these provisions, States are required to pay dispensing fees to pharmacies for Medicaid prescriptions, but there are no specific minimum fees set forth in the bill. States are given some guidance regarding the factors to use when setting the fees, but there are no requirements to do anything more than take those factors into "consideration" when setting fees.

I am concerned that the States will not be able to accurately account for these factors when setting these dispensing fees. As a consequence, pharmacies will be paid significantly less for the drug product that they provide to Medicaid recipients. This could make it difficult for Medicaid recipients to continue to obtain their prescription medications from their neighborhood pharmacy, and many pharmacies may have to close or reduce hours. The total payment to pharmacies for the drug product and dispensing fee must be adequate to pay pharmacies to buy the drug, dispense the medication, and have a reasonable return. It is my understanding that States would have to pay double or triple the dispensing fees currently being paid to he pharmacies just to break even.

I am also concerned that States do not have any guidance or direction in the bill on how to set their dispensing fees for generic drugs in relation to brand name drugs. While the bill does say that States should set dispensing fees for non innovator multiple source drugs higher than innovator multiple source drugs that are therapeutically equivalent and bioequivalent, I urge that the language require that fees for generic drugs in general be set higher than fees for brand name drugs. This will encourage the dispensing of generic drugs which can be one-fifth the cost of a brand name drug.

Mr. GRASSLEY. I thank the Senator for his concerns and want to clarify for him the intent of the bill regarding dispensing fees and respond to some of his concerns. I agree that States will need to review and increase the fees that they pay pharmacies for dispensing Medicaid prescriptions. We want to be sure that Medicaid recipients can continue to have access to prescription medications from their local pharmacies. Coming from a rural State, I know that many of my constituents rely on pharmacies for health care services and the pharmacist may be the only health care professional for many miles.

The overall assumptions made in the bill is that States will increase their dispensing fees to account for the fact that States would probably be paying pharmacists a lower amount for the drug product that more accurately reflects the cost of the drug product that is being dispensed. The amount of the dispensing fee increase will depend on many factors in each State.

We expect that each State will regularly undertake surveys of current pharmacy dispensing costs to determine their dispensing fees, and that such costs would include those that are listed in the bill. States would set their dispensing fees based on those surveys. We also expect that States will pay pharmacies a reasonable return for dispensing Medicaid prescriptions.

Our expectation is that States will do all they can to encourage the dispensing of generic drugs in Medicaid. It is my expectation that States will set significantly higher fees for generics than for brands, such as one and a half or twice the brand name fee. If an innovator multiple source drug is less than or equal to the cost of a generic, then the State should pay the generic dispensing fee for that drug.

Mr. REED. I thank the Chairman for his clarification regarding dispensing fees. I look forward to working with you as this process moves forward to ensure that any reforms in the Medicaid pharmacy payment system will provide adequate reimbursement to pharmacies for dispensing Medicaid prescriptions since beneficiary access to lifesaving medications depends on pharmacies to dispense them.

MEDICAID WAIVERS

Mr. ROCKEFELLER. Last month, the Centers for Medicare and Medicaid Services—CMS, approved a comprehensive Section 1115 waiver for the State of Florida, the latest in a string of waivers that allows States to dramatically reshape the financing and entitlement guarantees established by law in the Medicaid program. These far-reaching Medicaid waivers are generally negotiated in secret without input from the very beneficiaries who would be affected by such drastic changes to the program. That is why I have filed an amendment to this budget reconciliation bill that will require CMS to post public notification on their website within 5 business days whenever a State submits a waiver concept paper for feedback or a formal waiver proposal for discussion and review.

Mr. GRASSLEY. Senator ROCKEFELLER, I share your concerns about the Section 1115 waivers recently negotiated by CMS and several States, including Florida and Vermont. I am also concerned about pending waivers being negotiated in South Carolina, Kentucky, Georgia and West Virginia. Medicaid is a joint Federal-State partnership in all respects, including its financing, and both Congress and beneficiaries should be aware of the extent to which CMS is negotiating waivers with States that modify the Federal-State financing relationship or the Federal guarantee of health benefits. CMS has taken several steps to improve the waiver information available on its website since early 2002. However, as you pointed out at the Finance Committee hearing last week, CMS does not post notification on their website when they have received formal or informal communication from a State regarding a waiver and the "State Waiver Programs and Demonstrations" portion of the website is not updated by CMS on a regular basis.

Mr. BAUCUS. Senator GRASSLEY, I think it is more than just a question of transparency. It is also a question of legality. In many cases, the content of the waivers that CMS is negotiating fundamentally alters the Federal guarantee of Medicaid benefits. This is not the intended purpose of Medicaid demonstration authority. Section 1115 waiver authority allows the Secretary of the Department of Health and Human Services to waive certain provisions of the Medicaid program if the changes are determined to "promote the objectives" of Medicaid. I am concerned that the current waivers being approved by CMS go well beyond CMS' authority and that Congress should be more vigilant in its oversight.

Mr. GRASSLEY. Senator BAUCUS, I certainly appreciate your views on this issue. You and I have worked hard over the last couple of years to improve Medicaid waiver transparency, and I think we have made some progress. But, I understand your desire to do more. I want to continue working with you to ensure that the Senate Finance Committee fulfills its oversight obligation in this area. I also think that the Medicaid waiver amendment that Senator ROCKEFELLER is offering has merit, and I would like to continue working with him to improve the waiver information available on CMS' website.

Mr. ROCKEFELLER. Chairman GRASSLEY, I thank you for your willingness to work with me. This is a matter of good government. The Government Accountability Office has published several reports which indicate that the Department of Health and Human Services has failed to follow its own policy on providing opportunities for the public to learn about and comment on pending waiver requests. Congress has a responsibility to assert its oversight authority on Section 1115 waivers because Medicaid is too important a program to allow it to be waived

away through secret negotiations and without input from those who will be affected or their advocates.

### MEDICAID PHARMACY, REIMBURSEMENT FOR PRESCRIPTIONS

Mr. VOINOVICH. Mr. Chairman, I applaud your leadership on the Medicare and Medicaid portion of this reconciliation package and am committed to working with you to achieve reductions in mandatory spending programs under your jurisdiction as instructed in the congressional budget resolution. I believe that it is necessary to maintain fiscal constraint and recognize the difficult task involved in achieving that end while ensuring that the country's health care safety net remains available for our citizens who truly need it the most.

As we move forward in advancing that goal, I understand that there are several changes included in the reconciliation package being considered today that address Medicaid pharmacy reimbursement for prescription drugs dispensed in the pharmacy setting. I know you and your staff worked very hard to craft the Medicaid provisions contained in this legislation and that we both share the common goal of ensuring that Medicaid beneficiaries continue to have access to cost-effective prescription drugs reimbursed at an appropriate rate.

In that light, I understand that it is not your intent to inadvertently disrupt the highly efficient drug distribution system responsible for assuring access to needed drugs across the Nation's pharmacies. I think we both believe that the drug distribution system can best be preserved if prompt-pay discounts paid to distributors are excluded from the new Medicaid pharmacy reimbursement methodology. Was this the Chairman's intention?

Mr. GRASSLEY. I do recognize the valuable role drug distributors play in the delivery of prescription medication and our Nation's health care and did intend to exclude prompt pay discounts from the methodology.

I say to my colleague from Ohio that I will work with him to ensure that my intention to exclude the discounts is preserved through the conference and enacted into law.

Mr. VOINOVICH. I thank the chairman and look forward to working with him in this effort. I know he agrees with me that Congress should not establish a Medicaid pharmaceutical reimbursement system that might discourage manufacturers from paying distributors prompt-pay discounts if wholesalers pay their bill prior to their contractual obligation—a practice that has occurred for the past 30 years.

We both understand that the drug distribution system has consistently ensured that every pharmacy in the Nation has access to prescription drugs in a timely manner. This system is highly complex but provides an extremely efficient delivery model that reduces health care costs to the overall health care system.

Within the system, pharmaceutical distributors are able to reduce the cost by minimizing the overall number of transactions required to distribute prescription drugs, over-the-counter products, and medical supplies. Nationally, wholesalers serve more than 130,000 customers. The typical distributor purchases products from an average of 850 vendors. These distributors take ownership of the products and responsibility for warehousing and distributing individual orders to retail pharmacies and other sites of care on a daily basis. This efficient model ensures that pharmacies have pharmaceutical products available for their patients.

I look forward to working with Chairman GRASSLEY to maintain this current drug distribution system and to ensure that when the legislation before us is enacted into law, it clearly excludes prompt-pay discounts from the pharmacy reimbursement methodology that will be used to pay pharmacies for drugs dispensed to Medicaid beneficiaries.

### MEDICARE BAD DEBT, COLLECTION

Mrs. LINCOLN. I will discuss today with my distinguished colleague from Idaho, Senator CRAPO, to discuss the change in Medicare bad debt policy as proposed in this budget reconciliation bill. I feel there is a need to differentiate between debt owed by individuals and debt owed by States. The sponsors of this policy argue that it will encourage skilled nursing facilities to be more efficient in the collection of bad debt. However, how can the facility be more efficient if the state simply refuses to pay the Medicare copayments through its Medicaid program? In 2003, nursing homes in my home state of Arkansas never received the $589,263 in coinsurance owed to them from the Medicaid program. This body should examine the root of this problem before implementing the bad debt policy in this bill. It is my hope that the conference committee considers this when examining this policy.

Mr CRAPO. Senator LINCOLN makes a good point. While I support the Finance Committee's goal of encouraging accountability and incentivizing the collection of Medicare bad debt by skilled nursing facilities, I do see the need to differentiate between debt owed by individuals and debt owed by States. I believe this conference should consider this point as well.

Ms. MIKULSKI. Mr. President, I would like to take this opportunity to say how deeply concerned I am over the wrong priorities in the spending reconciliation bill that is before us today.

The United States faces a Federal deficit of $331 billion for fiscal year 2005 alone, according to the Congressional Budget Office. This is a complete turnaround from when President Bush took office just under five years ago. He inherited record budget surpluses and turned them into record deficits. Unfortunately, that has not stopped Republicans from pushing relentlessly for

the wrong priorities and irresponsible policies.

As a result, we now have encountered years of record deficits that have contributed to $3 trillion added to our country's debt. Moreover, under President Bush's watch, American debt to foreigners has doubled. Japan holds $680 billion of our debt, China holds $240 billion, and the Carribean Banking Centers hold over $100 billion. Increasingly, our fate is in the hands of their central banks and investors.

We must take action so that we don't put this burden on our Nation's future generations. The budget reconciliation process was designed for such a situation: to give Congress the tools necessary for deficit reduction. Reconciliation could have offered us the opportunity to work across the aisle to take responsible steps toward reducing the deficit.

Instead, my colleagues on the other side of the aisle are pushing for the wrong priorities. Take for example their opposition to Senator CONRAD's commonsense amendment on fiscal responsibility. His amendment, called paygo, would have reinstated a rule meant to stop Congress from worsening the deficit. It was my hope that it would have once again served as a check against irresponsible spending or new rounds of tax cuts at a time when the Nation cannot afford them.

My colleagues across the aisle say that tough choices are needed to get our fiscal house in order. I agree—we should balance the federal budget just as every American must balance theirs, unless a natural disaster or other national crisis demands it. Anytime Congress wants to raise spending—or lower revenue—Congress should pause and be required to stand up to vote and defend its action. That is what this amendment would have required, but Republicans voted against fiscal responsibility.

Today, we are debating the spending reconciliation bill for fiscal year 2006, but it is only half of the equation. This bill makes $39 billion in cuts to critical spending programs. Many of these cuts will directly hurt low- and middle-income Americans. The bill takes away Americans' access to health care and affordable housing and jeopardizes their pensions. The bill attacks important conservation efforts by cutting funding and opening up the Arctic National Wildlife Refuge to drilling. But the bill stays silent on lowering energy prices for working families who can no longer afford to pay their monthly gas bills. Simply put, it leaves too many Americans out in the cold.

In several weeks, the Senate will be taking up a tax reconciliation bill. That bill will cut taxes by $70 billion, with an average giveaway of $35,500 for those making more than $1 million each year. Those with incomes between $50,000 and $200,000 would get just over $100 on average. The difference is striking, but not so much as the fact that this will all be done under the Senate's

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 45 of 91

procedure of reconciliation—which was designed to lower the deficit, not raise it. These tax cuts will undermine the cuts that the bill is making today to critical spending programs and will add an additional $31 billion to the deficit. This is irresponsible. It's just another example of how the President and his allies in Congress have the wrong priorities, and not the best interest of America, at heart.

What is most frustrating is the knowledge that the final budget will likely be even worse than what we pass in the Senate. The House of Representatives plans to cut $50 billion in critical services, including student loans, food stamps, child support enforcement, foster care, and health care. Again, these cuts will not go to lowering the deficit. Instead, they will finance another round of tax cuts at a time when we also have staggering energy costs, a war in Iraq, many unfunded education needs, an exploding population of seniors, and an unprecedented relief and rebuilding effort stemming from Katrina.

I believe we must work together to realign priorities so they reflect those of the American people. Working together, we can do better. I strongly urge my colleagues to vote against this misguided bill.

Mr. REED. Mr. President, I strongly oppose the so-called Deficit Reduction Omnibus Reconciliation Act of 2005. This reconciliation bill and the administration's budget are fiscally irresponsible and reflect misguided priorities. As a matter of fact, the reconciliation bill at the end of the day will further increase the deficit by more than $35 billion over the next 5 years.

In 2 weeks, both the Senate Finance and the House Ways and Means Committees are expected to report a second reconciliation bill that will cut taxes by $70 billion. This $70 billion reduction in tax revenue will more than eliminate the effect of the cuts to critical programs in the reconciliation bill that we are considering this week. With the enactment of two reconciliation bills, there is a real effort by this administration and the majority to perform a bait and switch on the American people.

Significant portions of the reduction that are achieved in this reconciliation bill are achieved by cuts in programs on which low- and moderate-income Americans rely. The Senate reconciliation package includes a total of $39.1 billion in spending cuts over 5 years, of which $10 billion will come from Medicaid and Medicare. The House reconciliation package could have cuts as high as $50 billion over the same period, with $9.5 billion coming out of Medicaid.

In contrast, the benefits of the second reconciliation bill that this body will soon undertake will go overwhelmingly to high-income individuals. The tax reconciliation bill is expected to extend many provisions from the 2003 tax cut that expire in 2008 to 2010 that

lower the rate on dividend income and capital gains. Just extending these provisions through 2010 is likely to cost nearly $23 billion.

The bill before us today includes a series of spending reductions that target pharmaceutical pricing and reimbursement, curtail the definition of 'targeted case management' under Medicaid, and eliminate the 'HMO slush fund' under the Medicare Modernization Act of 2003 and the Federal Housing Administration's affordable housing preservation programs. A provision to update reimbursements for doctors will have a direct impact on seniors in the form of higher Medicare part B premiums.

Republicans have tried to disguise these cuts by restoring funding for the State Health Insurance Program SCHIP for States such as Rhode Island, allowing parents of severely disabled children to 'buy-into' Medicaid, and by increasing student financial aid.

Meanwhile, the House reconciliation bill is truly an even worse deal for low-income and vulnerable Americans, as it would impose new copayments on Medicaid beneficiaries and allow States to scale back coverage. It also would tighten rules designed to limit the ability of elderly people to shed assets in order to qualify for nursing home care. And, for the first time, people with home equity of $500,000 would be ineligible for nursing home care under Medicaid.

The House bill also includes $844 million in cuts to food stamps, overturns a critical court ruling, Rosales v. Thompson, which allows for Federal support of abused and neglected children in foster care who reside with family members, weakens States' ability to establish and enforce child support orders, and raises interest rates and fees that students pay on their college loans.

The House package takes almost $20 billion out of child support and student loans alone, compounding the effect on struggling working families.

I commend Chairman GRASSLEY and the rest of the Finance Committee for their diligence in attempting to craft a reconciliation measure that would not directly impact Medicaid beneficiaries. By contrast, the House, targeted beneficiaries through increased Medicaid cost sharing among other program changes.

In an effort to further minimize the impact of the reconciliation bill on these populations, I offered two amendments. The first amendment would restore Targeted Case Management services, TCM, to assist eligible high-need Medicaid beneficiary groups, such as children in foster care, children and adults with HIV/AIDS, children with developmental disabilities and mental retardation, individuals with substance abuse disorders and mental illness, and at-risk tribal populations, access to needed medical, social, educational, and other services. States have flexibility whether to offer TCM services

and which population to cover, and, nearly every state now offers TCM services. We should not jeopardize an essential bridge to services for these populations.

By focusing cuts on Medicaid and other essential Federal programs, the reconciliation package will most harshly impact those who cannot advocate for themselves—abused and neglected children in foster care, at-risk youth, single parents, the disabled, persons with mental illness, and vulnerable elderly.

I understand that the intent of the TCM provision was to codify a HHS policy from January 2001. Again, I applaud the Chairman for attempting to clarify this provision, however, I am deeply concerned that the provision, when implemented, will severely restrict the providers' ability to serve our most vulnerable Medicaid beneficiaries.

The second amendment would strike the Banking Committee's portion of the reconciliation bill that eliminates the ability of HUD to use the FHA General Insurance Fund to provide grants to help preserve FHA-foreclosed multifamily properties as affordable housing. Given the current affordable housing crises in our country, the grants are more important than ever and should be maintained. I am disappointed that these and other amendments that would have addressed many of the deficiencies of the bill failed.

One such amendment was Senator CANTWELL's amendment to protect the Artic National Wildlife Refuge from drilling. Earlier this year, the Senate Budget Committee included in the fiscal year 2006 budget resolution provisions that paved the way to arctic drilling. Senator CANTWELL offered an amendment to strike language authorizing artic drilling from the reconciliation bill, which would undo this exploitation of the budget process and permit an open debate of the issue. Unfortunately, her amendment failed. The bill not only opens up the Artic to oil and gas development, but does so in a way that does not accord this pristine wilderness protection under existing mineral leasing laws and regulations, existing environmental protections, and existing rules of administrative procedure and judicial review. In short, it affords the Arctic Refuge less protection than current law affords other refuge or public land that is open to oil and gas development. Drilling in the Artic will not help us address our nation's energy problems. It is yet another giveaway to big oil companies.

The reconciliation bill also includes a provision that would extend agricultural commodity payments until 2011. Extending existing subsidy programs will continue policies that are bad for the environment. While the bill extends the life of subsidy programs and three conservation programs until 2011, it does not extend the life of four other conservation programs past 2007. These programs, which restore wetlands,

grasslands, and other wildlife habitat and protect farmland and ranchland are critical to meeting some of the Nation's most significant environmental challenges.

In the wake of Hurricanes Katrina and Rita, escalating home energy prices, and stagnant wage growth, taking money from important federal programs in order to pave the way for billions of dollars in tax cuts shows how out of touch the majority and administration are with hardworking Americans.

The bill before us is lamentable, and I only hope that those who support it today will reassess their positions in the weeks ahead as we consider other reconciliation bills that will further add to our deficit and continue a path towards misguided priorities.

Mr. DURBIN. Mr. President, my Amendment No. 2415 would inject a dose of accountability and responsibility into America's efforts to rebuild the gulf coast and Iraq.

It will bar from all reconstruction efforts, both at home and in Iraq, all firms found—over the last 5 years—to have overcharged or improperly billed the government by more than $10 million on one or more occasions.

It will also bar from all reconstruction efforts—both at home and in Iraq—all firms that have overcharged or defrauded the Government of more than $10 million over the last 5 years.

It will also bar from all reconstruction efforts—both at home and in Iraq—all firms that have been suspended or debarred from competing for federal contracts.

It includes a national security waiver for those instances when dealing with such firms may serve the national interest.

These are serious penalties, but in both Iraq and on the gulf coast we face serious challenges, and we should not do anything less than our very best to face those challenges.

We cannot move forward on the gulf coast without looking at the administration's weak oversight of funds in Iraq. The amendment I offer today seeks to do that by assuring the American people that the Government will spend gulf coast reconstruction funds wisely.

The bill we are debating is ultimately about saving taxpayer dollars. Why not start by weeding out companies that have overcharged the taxpayer in the past?

We enjoy the privilege of living in a vastly diverse country of vastly talented citizens. In the country with the world's biggest economy, we don't need to rely on just a few privileged firms to do America's work.

We don't need over-billers, underperformers, or those who have defrauded the American taxpayer to do America's work. We need to entrust America's work, and American taxpayer dollars, to firms that embrace hard work, accountability, and a sense of responsibility about the public trust into which

they enter when they serve as a Government contractor.

America has countless firms that fit that bill. They come from across the gulf coast region and from across the country. This amendment simply helps assure that they will have a clear opportunity to shoulder the burden of rebuilding, by clearing away those firms that have abused the public trust.

Last Friday, the President announced that he would ask this Congress to reallocate $17.1 billion in hurricane emergency funding, taking it away from the Federal Emergency Management Agency's Disaster Relief Fund, and dedicating it to rebuilding and repairing of the gulf coast. The President wants the authority to replace critical infrastructure, facilities, and equipment damaged during this year's hurricanes. These are important projects addressing important needs, and I fully support them. We must move forward, but we have to do it right.

These are big projects, including the rebuilding of key stretches of Interstate 10, a main artery connecting Texas cities such as San Antonio to New Orleans and New Orleans to points east. The proposed projects include two Veterans Administration hospitals, major military bases, and other highways and bridges damaged by the storms.

This work will help shape the gulf coast region for a generation or more. We cannot afford to get it wrong.

Sadly, this administration has gotten it wrong before. On Sunday, the Special Inspector General for Iraqi Reconstruction, Stuart Bowen, released his latest report on reconstruction in Iraq. Bowen's report makes for sobering reading.

It tells a cautionary tale as we look forward to rebuilding our gulf coast communities. It paints a grim picture of conditions in Iraq and it tells a story of administration hubris, lack of foresight, poor planning, poor execution, and the squandering of millions and perhaps billions of U.S. taxpayer dollars.

The Special Inspector General has warned us all that America's ambitious reconstruction effort in Iraq, an effort managed by this administration, is, "likely to fall far short of its goals."

We cannot let the same fate befall our communities here at home. We need to ensure—here at home—the accountability that the administration's efforts in Iraq have sorely lacked. In both situations, the situation demands that we act with speed. In neither case, though, should we ignore our oversight responsibilities.

Special Inspector General Bowen's work assessing the administration's Iraq reconstruction efforts reveals the challenges we now face at home.

Since November 2003, Congress has appropriated $21 billion for Iraq reconstruction and relief. The President came to us that fall, seeking support for his ambitious plans to build Iraq

anew, and in a bipartisan fashion, we gave him everything he asked for.

Billions of dollars later, Iraq is still struggling to rebuild.

As Michael O'Hanlon and Nina Kamp of the Brookings Institution described Iraq last month in the New York Times:

On balance, the indicators are troubling. Electricity production remains stuck at prewar levels even as demand soars, and the power is off in Baghdad more often than it is on. Unemployment is stubbornly high. Infant mortality rates are still among the Middle East's highest. And Iraq is the most violent country in the region, not only in terms of war casualties but of criminal murders as well.

How did we come to this pass?

Secretary Rumsfeld and his tight circle of Defense Department advisors—awash in unreality—failed to plan for occupation and reconstruction. Their plans for rebuilding postwar Iraq were, according to the Inspector General, "insufficient in both scope and implementation."

The Coalition Provisional Authority managed Iraqi oil revenues placed in the Development Fund for Iraq. The Special Inspector General has found that it did so erratically and irresponsibly, often with no accountability, and no records.

The Special Inspector General found that in the town of Hillah, for example, the CPA left 7 million dollars worth of projects uncompleted. What's more, the money allocated for these projects is missing.

Indeed, the Special Inspector General has found that the CPA burned through nearly $100 million in Development Fund for Iraq money without keeping adequate records, and in too many instances, the money just vanished.

That is simply inexcusable, and there may be no way now to trace and recover those funds. But where we can track fraud and overbilling to specific companies, why should we keep giving more money to the offenders? If they won't protect the public trust, why should we trust them with new money?

Where is the accountability? Do we want any of the firms involved in the most egregious of these abuses handed new sums of money to rebuild New Orleans and the gulf coast?

Many of our Republican colleagues are demanding that we provide offsets for every penny we dedicate to Katrina reconstruction. In too many instances, they seek to place the burden for rebuilding the gulf coast squarely on the poor. Yet they failed to demand offsets, or even simple accountability, when the administration came to Congress looking for reconstruction funds for Iraq.

By adopting this amendment, we would promote honesty, transparency, and accountability in hurricane reconstruction and we would bar the door to contractors that have abused the public trust. We need to learn from the gross failings we have seen in Iraq, learn and do better.

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 47 of 91

Now we face a crisis at home. The President has waited 2 months to create his Gulf Coast Recovery and Rebuilding Council, which he announced yesterday, and 2 months to name Donald Powell to serve as Coordinator of Federal Support for the Gulf Coast's Recovery and Rebuilding. Let us hope history is not repeating itself.

Does the administration have a plan to hold accountable those who have misused Iraq reconstruction funds, and to ensure that the same companies, or similar firms, are not handed more taxpayer dollars in massive contracting projects?

All the major multinational firms working in Iraq have "cost plus" contracts. Under such contracts, the Government reimburses companies for all their costs, plus a percentage of those costs as a fee.

I don't think that is the best way to protect the taxpayer, but that is what this administration has done. If we are going to give corporations cost-plus contracts, is it too much to ask that they take care to charge us only for legitimate costs and not to take advantage of our trust, the public trust, to sneak in millions of dollars in illegitimate expenses? Why should we give this important work to companies that will pad their expense sheets and hope that we don't catch their overbillings?

Writing big, no-bid deals was quick and easy, but it wasn't good for America, and it wasn't good for our reconstruction efforts in Iraq. The administration has shown itself unable or unwilling to manage these contracts.

America can do better than this. At home on the gulf coast, it absolutely must do so. It is time to cut off companies that gorge themselves at the public trough.

General John Abizaid, the Commander of U.S. Central Command, said recently that the key to military success in Iraq, "is whether we can learn from our mistakes."

The same holds true for our reconstruction efforts, both at home and abroad. Yet poor financial controls and questionable performance by contractors continues to squander an important part of the treasure we sink into this effort. We already have seen how FEMA and the Administration dropped the ball in planning for disaster, and in responding to the crisis.

We must not fail. The reconstruction challenge now before us is here at home.

Mr. PRYOR. Mr. President, the average American might not follow the intricacies of our budget reconciliation process. However, they do know when the government has misplaced its priorities, shirked its responsibilities and shortchanged the families who need help the most.

Given our record budget deficits, I am prepared to make tough decisions to cut government spending, but what this bill represents is a misguided effort to balance the budget on the backs of hard-working families.

I question the rationale of some of my colleagues in this body who propose providing tax breaks for multimillionaires and special interests, while cutting resources that are critical to the families of Arkansas. For example, I am particularly disappointed that this package slashes: health care by $27 million for seniors and the poor; agriculture supports for farmers by $3 billion.

Mr. President, I want to tell you about Maya Romney of Arkansas. A Down's syndrome patient, Maya is able to receive critical therapies through Easter Seals, allowing her to interact in a classroom setting and live more independently. Quite simply, Maya's therapy services could be in jeopardy because Easter Seals is funded primarily through Medicaid. And while this saddens me greatly, it should also sadden everyone in this body because we all have Mayas in our State or others who depend on Medicaid.

This program, that some of my colleagues look to cut, provides vital resources for persons with disabilities and seniors. In my State, almost 50 percent of our Medicaid recipients are children. Additionally, 958 beneficiaries in Arkansas right now are Hurricane Katrina evacuees.

I know that in the long-term we can find ways to save money and improve the efficiency of Medicaid—in fact the Senate has supported measures to do just that. But, it is unacceptable to impose arbitrary cuts for a program that does so much to support families. By taking away these services we are endangering the health of too many Americans.

As an Arkansan, I am particularly disappointed in proposed cuts to agriculture. I know that the chairman of the Agriculture Committee has worked hard to make sure these cuts are distributed fairly, and he has done the best he can. I commend him for that.

But now is not the time to be cutting our support of agriculture in this country. Our farmers have gone through too much in the past year—rising energy costs, drought, and storm damage. They need us now more than ever.

But instead of reaching out to help the community that feeds America, some of my colleagues have proposed slashing $3 billion from agricultural programs, and imposing further payment limits that will dramatically hurt family farms.

Rural America is fed up. It seems as though every time this administration has needed to find revenue, whether to pay for the war in Iraq, cut the deficit, or provide relief from Hurricane Katrina, agriculture has been first on the chopping block.

Our farmers know they must do their fair share, but they are currently doing much more than that.

For the government's part, we should be investing in rural America not taking from it. There is enormous potential in rural communities and we should harness that potential to help drive our economy.

Now as I said earlier, the budget process requires us to take responsibility in balancing our books. But in the dense pages of the reconciliation package, we have lost sight of fiscal responsibility and are blithely ignoring several issues that will affect our budget for years to come.

After the Senate considers these budget cuts we will then vote on a set of tax breaks totaling $70 billion. It is no secret that the only reason we are looking at these budget cuts is to make room for tax cuts—most of which could be argued will not make it in to the pockets of people that need it the most.

And oddly enough, some of the tax cuts that we will be voting on, such as the capital gains and dividends cuts do not even expire for another 2 years.

But even more baffling is the fact that neither this budget bill or the tax cut bill we will consider in the coming weeks takes into account the billions of dollars we have spent and will continue to spend in Iraq. Neither bill takes into account the billions of dollars we have spent and will spend in the gulf coast.

I have voted for tax cuts in the past, and I will vote for them in the future but if we were truly being honest brokers this body would have the courage to look at all of our fiscal issues in a single package. Instead, we seem content to legislate in a vacuum where we refuse to recognize the reality of our fiscal situation.

We separate tax cuts bill from the budget bill, and the budget bill from emergency spending bill because deep down we know that we are wrong. We know that if we were to look at this fiscal puzzle as a whole, there would be no way to justify our actions. We would have to finally admit that we are being fiscally irresponsible.

Overall, this measure shows America that their government is willing to turn their backs on the families who need our help the most in order to provide favors for special interest groups. I cast my vote in opposition to this bill: it does not reflect my priorities, and it certainly does not reflect America's priorities.

Mr. President, I would like to express my serious concerns about efforts today, and possibly during the conference committee, that could dramatically cut Medicaid funding through this bill. Medicaid provides vital services for millions of Americans, especially persons with disabilities, children, and seniors. As we all know, access to health care is critically important for improving the quality of life and promoting greater independence for these individuals.

In my State alone, 17 percent of Arkansans depend on the Medicaid Program. An additional 1,000 Hurricane Katrina evacuees currently residing in Arkansas are receiving their health care through the State's Medicaid Program. It is essential that State Medicaid Programs and patients get the

support they need, particularly at a time when States are facing budgetary crises and struggling to deal with sky-rocketing costs associated with providing health care.

I understand that tough financial decisions have to be made in order keep this country's fiscal house in order, but I do not believe it is fair that we require our seniors, our children, and the disabled to shoulder this burden. It is simply unacceptable to impose arbitrary cuts for a program that does so much to support families in need. I believe we can find appropriate savings in Medicaid without jeopardizing the health care of so many Americans, and this body has supported measures to do that in the past. For example, I supported a bill to charge the Institutes of Medicine with evaluating Medicaid to find appropriate cost savings and improve efficiency within the program. But the proposals many Members of the House of Representatives are promoting in their version of this legislation completely fail to consider the implications for the health and well-being of Medicaid recipients. Rather, these cuts would have more to do with paying for tax cuts targeted to benefit the wealthiest Americans.

I believe Senator GRASSLEY and some members of the Finance Committee tried hard to soften the blow of the cuts required by the budget resolution, but I recognize that a much worse bill will likely emerge from the conference committee with the House of Representatives, and we will likely regret starting down this slope toward drastic cuts to an essential part of our Nation's health care system.

I have heard from many organizations and constituents who have expressed their concerns. Dana Plunkett and Angela Romney have both sent letter expressing their concerns for their children. Both of these mothers' children participate in the Easter Seals program which relies heavily on Medicaid. Dana's son Larry is able to live in an independent living facility because of Medicaid. Angela's daughter Maya who has Down's syndrome has been able to receive vital therapies to allow her to interact in a classroom setting and live more independently.

I am aware of the challenges many families, health care providers, States, and private payers for health care face under our burdened health care system. I appeal to my colleagues on both sides of the aisle to find a solution to adequately fund Medicaid and avoid gutting the program during conference negotiations.

Mr. BURNS. Mr. President, this week, the Senate is undertaking a significant effort to reduce Federal spending and return fiscal responsibility to the Congress. Not since 1997 has Congress attempted a budget reconciliation bill. But the fiscal situation facing the American people today demands a serious commitment from the Federal Government to reduce deficit spending. This reconciliation package is an important part of that process.

I recommend the chairman of the Budget Committee for his efforts on reconciliation. He has been an outstanding advocate for fiscal restraint, while trying to respond fairly to the competing demands for increased spending. While I do have some concerns about certain cuts included in this bill, on the whole I think it is a balanced package that accomplishes meaningful restraints on Government spending.

One of the positives of this bill is the provisions relating to energy production in the Arctic National Wildlife Refuge. It is time to open ANWR for oil production to increase our domestic supply of petroleum. We need to look no further than the gas pump to see what happens when U.S. oil production lulls. High gas prices hurt Montanans and dependence on foreign oil hurts our national security.

The Energy Information Administration states that the coastal plain region harboring the 1.5 million-acre 1002 Area is "the largest unexplored, potential productive onshore basin in the United States." Studies by the U.S. Geological Survey, USGS, estimate that drilling in ANWR could yield up to 16 billion barrels of oil—an amount roughly equal to 30 years of oil imports from Saudi Arabia.

Most people don't understand that the 1002 Area is only 1.5 million acres within the 19 million acre Arctic National Wildlife Refuge. This budget allows for development of only 2000 of those 19 million acres in ANWR. That means 99.99 percent of ANWR will be untouched. If this tragedy-filled hurricane season has taught us anything, we should realize that by concentrating our production and refinery capability in the Gulf of Mexico, we are risking supply disruption.

We need to do more offshore, and more onshore across this country. Last week, I held a hearing on onshore oil and gas development. The backlog we face in processing permits for reasonable onshore production contributes to the energy crisis we are facing now. All segments of the economy are directly impacted by the costs of fuel to produce and move our output. From keeping warm in our homes to moving food to the market, the American taxpayer faces a tighter budget as a result of skyrocketing energy costs. We simply must consider all options when it comes to increasing production, and ANWR are an important part of that.

The United States has some of the strictest environmental laws in the entire world. We can safely and carefully produce oil within our own shores, or we can ignore our responsibility to domestically produce this resource. Royalty revenues from oil production in ANWR is expected to produce $2.5 billion for the Federal Government over the next 5 years alone, plus provide valuable jobs, and reduce our dependence on foreign oil.

It is time for this body to do the right thing and increase our domestic

production of energy, and ANWR is a good place to start. So I applaud the work of the chairman of the Energy Committee for including ANWR in this budget.

I am also pleased with the provisions to address digital television transition. Setting a firm date of April 7, 2009, allows the FCC to make critical spectrum available for the emergency workers who protect our communities. Our first responders need access to this spectrum to ensure communications in times of national emergencies.

In a rural State like Montana, this spectrum can also be used to expand broadband access, linking rural communities not just for emergency needs, but for education, telehealth, and economic development.

The revenues generated by this spectrum auction generate billions toward paying down the national debt, but also give us the flexibility to address some other priorities, including essential air service. I was pleased to be able to include language in this bill that will provide an additional $75 million for essential air.

Thirty-seven States rely on essential air, but skyrocketing fuel prices are placing that service in jeopardy. The provision I included will increase EAS funding over the next 5 years, and ensure that communities relying on essential air will continue to have transportation options.

Also important to Montana is ensuring that Federal incentives for higher education remain intact. Though significant cost savings have been achieved in the reconciliation package adopted by the Senate's Health, Education, Labor and Pensions Committee, many positive changes have been made to benefit the students who most need assistance.

The higher education reforms save $9.8 billion over 5 years, while still preserving critical benefits for students across the country. For first- and second-year college students, the loan limits will be increased to $3,500 for the first year and $4,500 for the second year. This is especially important in a State like Montana, which ranks third-from-last in retention of first-year college students who continue on to their second year.

Not only are we increasing the overall aid available, but are also emphasizing the various types of education needed from the current workforce. This bill provides for additional funding for grants for Pell-eligible students who major in math, science, technology, engineering, and some foreign languages. All too often, employers comment that they have skilled jobs available, but are unable to find the kind of specialization they need from students, and by providing incentives for students to study in these under-utilized areas, they are able to obtain an affordable education and fill a much-needed place in the workforce.

I am especially proud of the provision in this bill which provides for

Case 1:01-cv-12257-PBS   Document 6528-55   Filed 09/22/09   Page 49 of 91

deferment on loan payment for borrowers serving in active duty or in the National Guard. This provision sends a strong message of support to our men and women in uniform, and I am pleased to support its inclusion.

While there is plenty to praise in this reconciliation package, I have very strong concerns about the proposals to cut $4 billion out of agriculture programs. When this Senate debated the spending cuts and reconciliation instructions earlier this year, this body agreed to $3 billion in agriculture cuts.

While I would prefer no cuts to farm bill programs, I understand that everyone must do his or her part to reduce Government spending. The House of Representatives wanted to cut more out of farm programs, as did the President. I think the Senate settled on a fair amount, and I applaud the chairman of the Budget Committee for retaining that level in conference.

But we are not talking about $3 billion in cuts, the $3 billion that we all agreed to. Instead, farm programs are taking a massively disproportionate cut. Commodity and conservation programs are being reduced by nearly $4 billion. The extra money is not being returned to the Government to pay down the debt. It is going to a select group of interests, to subsidize small dairies. These budget cuts pit one producer against another. My Montana wheat growers are being asked to pay for dairy subsidies. That is simply unreasonable.

In these times of high energy and fertilizer costs, we are asking farmers to bear much more than their fair share of program cuts. I urge my colleagues to reconsider this proposal. Cuts to agriculture spending need to be fair and shared across the board. Giving one sector of one industry a billion dollars for 2 years, at the expense of farmers all over the country sends a terrible message to the hardworking families that feed this Nation.

Lastly, I want to turn to the issue of cuts to Medicare and Medicaid. While I believe the proposals to reform and strengthen Medicare and Medicaid included in this reconciliation package are generally good, there are some issues I want to highlight.

I remain concerned about our community and independent pharmacists. In Montana, they are small business men and women, and, all too often, they are the only place in small towns where folks can get the medication they need. I remain concerned about how this package may affect them and will do what I can to make sure they are not adversely affected by provisions in this bill.

However, this bill also provides funding to states that face shortfalls in the State Children's Health Insurance Program. SCHIP, and expands outreach and enrollment activities to cover more children. The SCHIP program has been incredibly important in Montana, in ensuring children have the health care they need to lead healthy, fruitful

lives. I am glad to see that this bill also establishes a new grant program to finance innovative outreach and enrollment efforts designed to increase enrollment and promote an understanding of the value of health insurance coverage. I expect this outreach to be helpful in Montana, where reaching those in need is often difficult because of the vastness of our state.

This bill will also extend the Medicare Dependent Hospital program, which provides financial protections to rural hospitals with less than 100 beds that have a greater than 60 percent share of Medicare patients. Many of Montana's hospitals fall into this category, as our Medicare population, especially in the most rural areas continues to grow rapidly.

Medicaid options are expanded through the Family Opportunity Act, so that parents of severely disabled children can go to work, without risking Medicaid benefits. New incentives are provided to purchase long-term care, and new resources are provided to help states combat fraud and abuse that steal money away from low-income families that need it the most. These are good reforms, and they will greatly benefit Montanans.

Undertaking spending cuts on any scale is a difficult task. But Congress must do its duty to rein in the growth of the Federal Government, provide incentives to economic growth, and ensure that the safety nets we have in place are truly benefiting those who need assistance most. Although there are certainly things I would change about this package, I urge my colleagues to support it. The American public must know that Congress is willing to make difficult choices to reduce runaway Government spending and use tax dollars wisely. This budget is a good start, and I look forward to supporting its passage.

Mr. ROCKEFELLER. Mr. President, I oppose the legislation the Senate is considering today. This bill does not reflect American values. Although proponents of the bill try to claim that this is a deficit reduction bill, it is transparently no so. This bill is only the first half of their budget policy. The second half, which we will see in a couple of weeks, provides tax cuts almost double the size of these spending cuts. In the end, the policy advanced by this reconciliation process is to increase the deficit by more than $30 billion in order to provide additional tax cuts while shortchanging valuable programs.

I am extremely concerned about how this legislation will affect the people in my State of West Virginia. I believe that the effect will be very painful indeed. This bill cuts $10 billion from Medicaid, on which our most vulnerable members of society depend for basic health care. I have fought very hard to improve the provisions of this bill related to Medicare and Medicaid, but I am sorry to say that in the end, this bill will deal a terrible blow to

those programs. And the effects will certainly be felt by our neediest and sickest citizens.

In a letter to the Congress, the National Council of Churches said of this budget bill, "It violates all the fundamental Christian values of loving thy neighbor, caring for the poor, and showing mercy." In fact, they said that this proposed budget would be a "moral disaster of monumental proportion." I think it is a very sad day when the Senate of the United States would vote for such legislation, especially in the context of a fiscal policy that is focused on giving additional tax cuts.

In a broader sense, I am very concerned about what this bill says about the state of Congress' budget process. I am afraid that the budget reconciliation process that was originally intended to help Congress enact difficult policies to reduce deficits is being utterly abused by the majority to enact policies that not only cannot garner broad support but also do nothing to improve our nation's fiscal situation. The unique role of the Senate is undermined when the reconciliation process is used to enact policies that are not related to deficit reduction, most egregiously in this bill drilling for oil in the Arctic National Wildlife Refuge.

Today, Federal Reserve Chairman Greenspan testified to the Joint Economic Committee that unless reversed the nation's "budget trends will cause severe economic disruptions." I agree with Mr. Greenspan, and I stand ready to work with my colleagues toward the goal of deficit reduction. However, the reconciliation process underway in Congress today, in fact, will exacerbate our runaway deficits.

I vehemently oppose this bill. I ask my colleagues to join me in defeating it so that we can make real progress toward improving our Nation's budget situation in a way that is consistent with our American values, in a way that is truly compassionate toward the least fortunate of our fellow citizens.

Mr. President, I also wanted to make a brief statement about the fundamental importance of providing help and support to the families devastated by Hurricane Katrina. This is an unprecedented disaster. Many families lost every thing they own and they have been displaced for months, and that sadly will continue to be the case for quite some time.

For weeks, I joined Senators GRASSLEY, BAUCUS and others to fight for legislation to expand health care coverage for these needy families. Today, I voted for Senator LINCOLN's amendment to expand Medicaid coverage to help the evacuees of this disaster. I am disappointed that this amendment failed by a vote of 52 to 47. These families need and deserve health care. It is tragic that the Senate refused to help vulnerable Americans.

On the education front, the reconciliation package included by voice vote an Enzi-Kennedy amendment to provide support to the schools that have

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 50 of 91

already accepted evacuee students. The children and all the schools that accepted such students, without knowing how or when they would get funding deserve our support.

I voted against the Ensign-Santorum amendment that sought to change the Enzi-Kennedy bill into a direct voucher program. It would have removed the carefully negotiated provisions designed to maintain the basic civil rights protections in the underlying education package. This legislation, in my view, merely provides a one time emergency financial grant to the schools and communities that opened their doors and classrooms to evacuee students following such an historic disaster.

Mr. COBURN. Mr. President, I thank the leadership for giving me an opportunity to express some concerns with the version of "value-based purchasing" for physicians in the Medicare program, as presented in the Senate reconciliation legislation. While I commend the committee's efforts in finding budget off-sets to stop the Medicare payment cuts facing physicians next year I believe the committee, and Congress as a whole, has accepted the idea of "value-based purchasing" with little discussion, vetting and evidence that it will actually do what people say it will do.

We have a big problem in the Medicare system. Our physicians, the bread and butter of the Medicare program who provide millions of services each year to Medicare beneficiaries, are facing unprecedented cuts in their reimbursement at a time when their own costs are skyrocketing. We have known about this problem for years, have taken action to prevent previously scheduled cuts and once again we must take action this year to prevent more cuts. I commend the Senate Finance Committee's efforts for at least preventing these cuts for a year and recommending that physicians receive a modest one percent increase instead of a 4.4 percent cut. I know the physician community is grateful for this effort in a time of budget deficits, hurricanes and other problems.

I am concerned about another provision included in the bill—specifically, value-based purchasing, a.k.a. "pay-for-performance." My concern is that this concept is not ready to be codified and be taken to prime-time. In the last decade, we have already declared two Medicare physician payment systems—the current sustainable growth rate formula and the volume performance standard—dysfunctional and unworkable. I do not see the value of diving so quickly into adding a new, untested and unproven system on top of an already declared disaster—the sustainable growth rate or "SGR."

As a physician, I can attest that most doctors are dedicated to improving the quality of care they provide their patients. The concept of continuing medical education and continuous quality improvement is engrained

in our medical culture. For years, physicians have been involved in peer review, the development of clinical guidelines and best practices, and outcome measurement. The concept of value-based purchasing is to turn these practices into a payment system that pays higher performers more and pays less to those who cannot make the grade. In theory, this has great promise and I believe it will improve the quality of care provided to all Medicare beneficiaries while increasing efficiency in the system.

However, I am concerned that the language included in S. 1932, the "Deficit Reduction Omnibus Reconciliation Act of 2005" will not achieve these goals. While it does give physicians a 1 percent update for 2006, it does not address the impending cuts scheduled for January 1, 2007. The proposed legislation does not fix the SGR, it instead places cuts on top of cuts, and infuses a system that mandates greater volume on top of one that penalizes physicians for volume increases. Value-based purchasing and the SGR are not compatible and cannot work together. In exchange for a one percent increase in 2006, physicians could receive cuts of up to 7.5 percent in 2007, 2008, 2009, 2010 and 2011. If you think your physician constituents are frustrated now, wait until they understand this.

Under the suggested program, some physicians may have the opportunity to earn back that additional two percent cut if they meet specific "quality" and/or "efficiency" measures. Many of these measures have not yet been developed, have not yet been vetted by consensus building groups like the National Quality Forum and may or may not be evidenced-based. Before there is value-based purchasing, there must be agreed upon, comprehensive quality and efficiency measures for each medical specialty developed by the specialties themselves. In this proposed legislation, bureaucrats in Baltimore would primarily develop the measures that physicians across the country—with limited input from the physician and specialist community. I can tell you as a doctor that I am not interested in having some bureaucrat in Baltimore tell me how to deliver a baby in Muskogee, OK, and my patients are not either. Physicians must be the ones to develop these measures if they are going to be held accountable and if it is really going to improve quality and not just be another layer of paperwork and bureaucratic administration.

I believe pay-for-performance is critical to improving quality in our healthcare system. But we must get it right. Our physicians are facing year after year of cuts and beneficiaries are facing a loss of access to the physicians they know and trust. I believe the correct course is to deliberately and methodically build up toward a new physician payment system that accurately accounts for the cost in providing care to beneficiaries while encouraging and rewarding high quality and improvement.

Mr. DODD. Mr. President, I rise today to express my opposition to the spending reconciliation bill, which has been misleadingly titled the "Deficit Reduction Omnibus Reconciliation Act of 2005." As some of my colleagues have mentioned, the spending bill before us today is only one-third of the budget reconciliation picture—the other two pieces are a tax cut bill and a bill to increase the debt limit. Taken together, this package of reconciliation legislation would increase the budget deficit and impose greater costs on some of the most vulnerable members of our society. It would also allow for drilling in the Arctic National Wildlife Refuge, which would be environmentally damaging and do nothing to reduce our dependence on foreign oil. The bill fails to reflect the priorities of the people of our nation and it fails to seriously address the major challenges we face as a Nation.

We are living today in an increasingly global society, one that presents tremendous opportunities. But with those opportunities come challenges. Today, countries like China and India are becoming increasingly desirable for venture capitalists interested in investment, for students interested in higher education, and for companies interested in labor that is not only inexpensive but well-educated and well-trained, too. With economic development and expansion have come greater competitive pressures.

Our labor market is under strain—real wages are stagnating, health care is becoming increasingly unaffordable, and pension benefits are being eroded and cut. The science and math scores of our high school seniors are at the bottom of the pack of industrialized nations. And we are the only nation in the developed world where literacy levels of older adults are higher than those of young adults.

Our Nation faces a choice. Are the administration and Congress going to respond to new challenges in a sensible and progressive way or will they continue to ignore the facts and adhere to policies that have brought Americans higher deficits, higher unemployment, and lower incomes? Will they continue to hold to the primitive philosophy that lower taxes on the most affluent, higher taxes on everyone else, and less investment in education, research, and business growth will somehow magically restore us to our place of economic preeminence in the world?

This view is naive and betrays a fundamental misunderstanding of our history. Our economic success has not been achieved despite investments we made in our people, but because of them. The not-so-benign neglect that characterizes much of our current national economic policy is not a strategy for success. It's an excuse for complacency, and ultimately a recipe for mediocrity.

Regrettably, this reconciliation package continues failed policies that will only continue to erode our Nation's place in the world.

First and foremost, the budget reconciliation package takes the worst fiscal record of any president in history and makes it worse. It takes procedural rules specifically designed to reduce the deficit and uses them to increase the deficit by $30 to 35 billion over the next 5 years. Part one of this reconciliation legislation may be cutting spending by $35 billion, but part two will provide tax breaks costing even more—$70 billion.

This fiscal irresponsibility is not an isolated case. Under President Bush, the Federal budget has gone from a surplus of $236 billion in 2000 to a deficit of $319 billion in 2005. The national debt has risen by nearly two and a half trillion dollars since 2000, totaling roughly $8 trillion as of this morning. That amounts to $27,041.81 for every man, woman, and child in the United States. Every minute in 2005, Republican budget policies have added $1,048,952 to the national debt.

As we have borrowed more, we have been forced to rely increasingly heavily on foreign lenders—particularly the central banks of countries like China and Japan—to fund our profligate ways. Foreign holdings of U.S. Treasury debt have more than doubled under the Bush administration from $1.01 trillion in January 2001 to $2.06 trillion in August 2005. Japan now holds $684 billion of that debt and China now holds $248 billion. We are playing a dangerous game here by relying so heavily on borrowing from abroad.

Some in this administration have reportedly argued that deficits don't matter. I strongly disagree. By blowing a massive hole in our budget, this administration and the Republican majority in Congress have seriously jeopardized our ability to meet the needs of our nation's other critical priorities.

The cost of the Bush administration's deficits is reflected right here in this spending reconciliation bill. In order to pay for just a small piece of the Bush tax cuts for the most affluent, this legislation would impose harmful cuts that would fall disproportionately on working Americans and the most vulnerable in our society.

For example, this bill cuts funding for Medicare and Medicaid, which provide health care to poor children, working men and women, the disabled, and the elderly. It cuts funding to rehabilitate FHA-insured multi-family housing. It dramatically increases the premiums paid by pension plans to the Pension Benefit Guarantee Corporation, the Federal pension insurer, making it more expensive for companies to offer defined benefit pension plans for their employees.

While many of the health care cuts in the Senate's reconciliation bill are less severe than what is contained in the parallel House reconciliation proposal, I remain concerned that even under the Senate plan Medicare beneficiaries will have to pay more for critically needed services and access to Medicaid services could be limited for some beneficiaries.

As bad as the cuts are in the bill before this body, the companion legislation in the House of Representatives is much, much worse. It contains food stamp cuts for roughly 300,000 people, most of them in working families. It contains Medicaid cuts that would reduce health care benefits and increase health care costs for roughly 6 million children, as well as many low-income parents, the elderly, and people with disabilities. And it contains cuts in child support enforcement, child care assistance, and Federal foster care assistance.

So let us not be under any illusions: any conference agreement with the other body is likely to be even more harmful to the well-being of Americans.

The reason for these cuts is to pay for a small portion of President Bush's tax breaks for those who need them least. More than 70 percent of the benefits of the Bush 2001 and 2003 tax break packages have gone to the 20 percent of taxpayers with the highest incomes, according to the nonpartisan Tax Policy Center of the Urban Institute and the Brookings Institution. More than 25 percent of the tax-cut benefits have gone to the top one percent. I believe these priorities are seriously out of step with the values of this Nation.

In addition to cutting assistance for the poor to pay for tax cuts for the wealthy, this legislation would open the Arctic National Wildlife Refuge to drilling. Not only would such drilling be incredibly damaging to the region's fragile ecosystem, it would do nothing to reduce our Nation's dependence on foreign oil. Reasonable estimates project that drilling in the Refuge would provide only enough oil to satisfy U.S. demand for 6 months. Moreover, this supply would not even come on-line for 10 years. The belief that our country can drill our way out of dependence on foreign energy sources is misguided.

As a nation, we face significant challenges in both the short and long term. Americans are concerned about finding and keeping good jobs, paying for soaring energy prices, and whether they will have good health care when they need it. They are concerned about hurricane disaster relief and rebuilding assistance, and preparedness for the threat of an avian flu crisis. They are concerned about the war in Iraq and protecting the homeland from terrorist attacks. They are concerned about our education system and our competitiveness in the global economy.

The budget resolution—and the reconciliation legislation that carries out its instructions—is a statement of priorities. Unfortunately, the bill before this body today fails to seriously address the concerns of American families and businesses.

We can do better than this legislation. We can do better than harmful cuts for the poor and for children and for seniors. We can do better than using these cuts to pay for tax breaks

for the most well-off in our society—who are, by the way, hardly clamoring for the kind of tax largesse that this Administration and its allies in the Congress insist on heaping upon them.

We should be investing in our society—in our education system and our knowledge base. We should be investing in science and technology and research and development. This legislation is not about investing in America. It is about fiscal irresponsibility in the name of tax breaks for those who need them least. Therefore, Mr. President, I cannot support this bill.

While I am unhappy with this reconciliation package overall, I am pleased that this bill does contain lifesaving legislation that I have introduced the past two Congresses that will provide Medicare coverage for screening for a dangerous condition known as abdominal aortic aneurysm—or AAA—a silent killer that claims the lives of 15,000 Americans each year. AAAs occur when there is a weakening of the walls of the aorta, the body's largest blood vessel. This artery begins to bulge, most often very slowly and without symptoms, and can lead to rupture and severe internal bleeding. AAA is a devastating condition that is often fatal without detection, with less than 15 percent of those afflicted with a ruptured aorta surviving. Estimates indicate that 2.7 million Americans suffer from AAA. Further, research indicates that when detected before rupturing, AAAs are treatable and curable in 95 percent of the cases. And while most AAAs are never diagnosed, nearly all can be detected through an inexpensive and painless screening.

I want to thank my colleague Senator JIM BUNNING for joining me in supporting this important and lifesaving legislation. When we first introduced this legislation in the last Congress, we were joined by patients who had suffered a ruptured aorta as result of an AAA and their families. At this event these patients shared with us their harrowing and personal stories of battling this deadly condition. It is because of struggles like theirs that we are here today at the outset of an effort to prevent abdominal aortic aneurysms from advancing to the point of rupture by providing coverage for a simple yet lifesaving screening. Simply put this legislation is about saving lives and I am pleased that it is contained in the bill passed today.

Finally, I would also like to say a brief word about the amendment being offered by Senator BYRD that deals with the issue of H–1B and L–1 visas. His amendment would strike the text in the underlying bill dealing with immigrant worker visas and replace it with a $1,500 fee for employers who file a petition to hire a foreign worker under the L–1 visa program.

Immigration reform is a critical issue that this body must address. It is a matter of national security, of overall economic well being, and of protecting American workers. Simply put,

the underlying bill is not the appropriate place to address such critical and complicated immigration issues as the H–1B visa. So I thank Senator BYRD for offering his amendment. I strongly support it and I hope that my colleagues will as well when it comes to a vote.

Mr. FEINGOLD. Mr. President, today's vote is the first part of a three-step budget reconciliation package that actually leaves this Nation's budget worse off than it is now, not by tens of millions of dollars, which itself would have been a disservice to the American public, but by tens of billions of dollars.

Using reconciliation to push through legislation that will worsen our budget deficit and add billions more to the mountain of debt our children and grandchildren will have to pay is a perversion of a process designed to expedite measures to reduce the deficit.

Reconciliation was intended to help facilitate the enactment of measures to reduce the deficit. It is ironic, to say the least, that it should be used to enact measures that only aggravate our budget deficits and increase our massive debt.

No one who has served in this body for the past 10 years, and especially the past 4½ years, should pretend to be shocked, however. This is only the latest abuse of a reconciliation process that in recent years has been the principal tool used to enact some of the most reckless fiscal policies in recent history.

But for even the most cynical, there are new lows in this bill, most notably the use of reconciliation to jam through a controversial policy measure to permit drilling for oil in the Arctic National Wildlife Refuge. At the very least, the Senate should be allowed to conduct a full and open debate on this misguided decision to undermine the crown jewel of our National Wildlife Refuge System. To say that the inclusion of this provision in the reconciliation package is based on dubious revenue assumptions would be kind. By perverting the budget process to push through oil and drilling in the Arctic Refuge, the majority has successfully squandered away the legacy of environmental stewardship initiated by President Eisenhower in 1960.

Also of concern are the significant changes to the Medicare and Medicaid programs, cutting programs that offer critical health care services to people who most need it. The Senate package does adopt some positive changes, such as cutting the Medicare Advantage slush fund, preventing Medicare cuts to physician payments, and protecting inpatient rehabilitation hospitals. Unfortunately, the President has made it clear that he does not support many of the provisions that will protect beneficiaries, but instead would rather give money to insurance and pharmaceutical companies.

The administration has stated that it prefers provisions offered in the House budget package. The House plan for Medicaid cuts includes cutting programs for children, pregnant mothers, the disabled, and the elderly, while including stipulations to shift costs onto already poor and vulnerable populations. This bill will result in considerable changes to these programs that could negatively affect multiple generations of American families, and I am deeply concerned about the possibility of a final conference report that adopts the House approach on these issues.

In one of the few bright spots in this package, the Agriculture Committee overwhelmingly and in a bipartisan manner proposed an extension of the Milk Income Loss Contract, MILC, program as part of its reconciliation package. This committee action and the lack of an attempt to remove the extension on the floor show the strong support for this vital dairy safety net. I renew my call to the administration to fulfill the President's campaign promise and actively work with members of the House to reaffirm the Senate's strong support for MILC.

I close by cautioning my colleagues in the majority party that the precedents set by previous reconciliation bills and being set in this one lay the groundwork for the leveraging through of policies they may find troubling the day Democrats become the majority party in the Senate. And that day will come.

My friends across the aisle may be thinking, "We have nothing to lose. When Democrats take control, there will be enough of them who will object to the kinds of abuses of the reconciliation process in which we engaged."

Well, if that is their thinking, they may be right. But I suggest that it is an unreliable strategy. The best protection against possible Democratic abuse of reconciliation in the future is to ensure that the rules are enforced as they were intended at all times, not just when they serve your immediate policy objectives.

Using reconciliation to enact controversial energy and health policies is an abuse of that process. Using reconciliation to enact legislation that will worsen budget deficits and increase the debt is an abuse of that process.

And, please, let's not waste the Senate's time with arguments that somehow this particular bill before us isn't an abuse because this bill, by itself, does not worsen the deficit. No matter how many pieces you slice it into, the reconciliation package will leave us with bigger deficits, not smaller ones.

When Congress and the White House become serious about cleaning up the fiscal mess they created, and when they are willing to spread the burden of that clean up across all programs—defense and nondefense discretionary programs, entitlements, and the spending done through the Tax Code—I am ready to help. But so long as we see reconciliation measures that are contemptuous of the principles on which reconciliation was based, I must oppose them.

Mrs. BOXER. Mr. President, I strongly oppose the reconciliation bill before the Senate.

The bill would cut vital programs for the middle class, elderly, and poor in order to pave the way for yet another tax cut for the richest individuals in the county.

Hurricane Katrina focused the Nation's attention on America's poor and displaced. In the wake of the storm, the people demanded that Congress act to help Americans in need and were justifiably angry at the administration's slow and inadequate response. Americans recognize that their government should aid those in distress in order to make this a better country for everyone.

That is why I cannot believe only 2 months after Katrina, we have a bill that would cut Medicare and Medicaid by $27 billion, increase Medicare premiums for seniors, cut the availability of affordable housing, and cut support for our farmers by $3 billion.

Even worse, the House of Representatives is looking to make even deeper cuts to Medicare and Medicaid and to cut the food stamp program, child support enforcement, the foster care program, and student loan programs.

These cuts will harm millions of Americans.

And why are the Republicans doing this? Not to reduce the deficit, which is spinning out of control, but to provide tax cuts for millionaires that will at the end of the day actually increase the deficit.

The tax portion of the reconciliation package will provide $70 billion in tax breaks—$30 billion more than the proposed spending cuts. In a perversion of the budget reconciliation process, the Republicans will be adding to, not decreasing, the Nation's $8 trillion debt.

The majority of those $70 billion in tax breaks will go to the wealthy. People making over $1 million a year will get an average tax cut of $35,491. In comparison, those making between $50,000 to $200,000 a year will get a break of $122. And those making less than $50,000 a year will get an average tax cut of $6.

That means that people who are most hurt by the spending cuts—the middle class, seniors, and the poor—will get almost no benefit the tax cuts.

The reconciliation package also is a windfall for big oil. It would allow them to drill in one of American's most pristine areas—Alaska's Arctic National Wildlife Refuge. Fragile wilderness will be opened, threatened, and ultimately ruined for the sake of 6 months' worth of oil.

What makes America the greatest Nation in the world is our sense of community and compassion. Americans look out for each other, and our government should do the same.

The budget reconciliation package reflects none of the core American values of compassion and equity. Instead,

it harms those who are most vulnerable in order to benefit the rich and a handful of special interests.

For these reasons, I cannot support the budget reconciliation spending bill and will vote against it.

Mr. BUNNING. Mr. President, Earlier today, an amendment I have worked closely with Senator DODD from Connecticut on was passed as part of the budget reconciliation package. The amendment is based on legislation we introduced which would provide a new, one-time screening benefit for abdominal aortic aneurysms, AAAs, under Medicare for certain, eligible beneficiaries.

I am pleased this amendment was accepted, and I appreciate the hard work from Senator DODD in helping get this amendment passed. I hope that we can continue working to ensure that this provision is included in the final reconciliation package.

AAAs occur when there is a weakening of the walls of the aorta, the body's largest blood vessel. The artery begins to bulge and can lead to a rupture and often severe internal bleeding. In cases where an artery ruptures, the survival rate is less than 15 percent, and approximately 15,000 people die from ruptured abdominal aortic aneurysms each year.

When detected before rupturing, AAAs are treatable and curable in 95 percent of cases. Nearly all AAAs can be detected through an inexpensive ultrasound screening. Once detected, a physician can monitor small aortic aneurysms and begin treating the risk factors, such as high blood pressure and smoking. Large or rapidly growing aneurysms are often treated using either an open surgical procedure or a less invasive stent graft, both of which serve to repair the artery.

It is estimated that between 5 to 7 percent of adults of the age of 60 have AAAs.

Our amendment targets AAA screenings to Medicare beneficiaries with a family history and those who exhibit risk factors recommended for screening by the U.S. Preventative Services Task Force, specifically men who smoke. The amendment also limits its screening to those eligible beneficiaries who participate in the Welcome to Medicare Physical.

This amendment could save thousands of lives each year, and I am pleased we were able to include it in this package.

Mr. KOHL. Mr. President, I am in reluctant but adamant opposition to the reconciliation bill before us. I say reluctant, because I am glad to see the Senate using the reconciliation procedure for the purposes for which it was intended: making difficult choices to reduce spending. And reluctant because some of the policy changes incorporated in this bill are necessary and worthy of the Senate's support.

One such provision relates to extension of the Milk Income Lost Contract, MILC, program. MILC, which expired at the end of the last fiscal year, provides counter-cyclical support for the nation's dairy sector. It is targeted. It is fair. It is essential. Moreover, it enjoys the President's support. It makes sense as part of the balanced Agriculture package in this bill.

But my opposition to the entire package is adamant because this bill is just one piece of a fiscally and morally bankrupt budget. Though this bill asks for sacrifices from seniors, students, farmers and working families, the budget of which it is part will add over $30 billion to the deficit over the next 5 years. Though this bill makes real cuts in Medicaid, Medicare, aid to farmers and funding for conservation programs across the country, the budget of which it is part will add $3 trillion to the national debt by 2010.

If this bill was what many on the floor have argued—a carefully crafted compromise to cut $39 billion from our growing federal deficit, I would have to think hard before opposing it. But the budget calls for today's bill to be followed with $70 billion tax cut, the bulk of which will go to those with more than $1 million in annual income.

I am willing to make the hard choices to bring our budget deficit down. I am not willing to support taking needed services away from those that need them the most—and use those cuts as a fig leaf to hide tax breaks for those who need them the least.

Our budget is the most basic expression of what we stand for as a government. Is this budget really what we want to vote to say? That we are the sort of country that threatens our own economic stability by piling deficit upon deficit? That we show our fiscal toughness by chopping aid to those in need? That we show our compassion only to those whose biggest problem is finding a really good tax shelter for their growing capital gains?

Make no mistake, this bill is the first piece of the budget that says just that, and for that reason alone, it deserves our solid opposition. But beyond that, there are individual provisions in this bill to which I take exception. One is the use of this bill's extraordinary fast track procedures to accomplish what big Oil's proponents have not been able to get through the Senate in the past: opening the Arctic National Wildlife Refuge to oil drilling.

I have long supported protecting this valuable and fragile natural wonder, and I think it is unfortunate that we are drilling in this wilderness for a relatively small payback. Those on the other side of this issue who use the current high price of oil to justify the violation of this pristine area are short sighted. According to the Department of Energy's own analysis the oil from the refuge will only lower the price of a barrel of oil by one penny. In addition, this oil will not come on line for almost a decade. Instead of threatening our natural heritage, I believe we should be looking instead at encouraging conservation efforts, and taking a careful look at high oil company profits. We do need to act to lower our dependency on foreign oil, but we cannot drill our way out of dependency.

I'm also particularly disappointed that the bill we are considering today contains harmful program cuts that would fall disproportionately on the most vulnerable in our society. This legislation cuts funding for health care provided through the Medicaid program, which provides health insurance to poor children, pregnant women, and elderly. My Republican colleagues argue that we must cut waste and fraud in Medicaid and I am not opposed to that. However, I do not agree with the arbitrary way they have gone about cutting funding from this critical safety net program—without which millions of Americans would be uninsured—and using that money to pay for tax cuts for people with high incomes. I'm also concerned about the increased burden this bill places on seniors through additional cuts in the Medicare program and an increase in Medicare Part B premiums. I hope my colleagues will support several of the amendments offered today to help minimize the impact these cuts could have on our Nation's elderly.

I urge my colleagues to reject this bill—and the irresponsible and cruel budget of which it is part.

Mrs. FEINSTEIN. Mr. President, I rise today truly alarmed about the administration's fiscal irresponsibility. In the past 5 years, the President's policies have turned record surpluses into record deficits. Just a few weeks ago, the Department of Treasury announced that this year's budget deficit is the third largest in history at $319 billion.

But, that is not where the bad story ends.

By sleight of hand, the administration continues to use other resources to finance debt, including foreign lenders and Social Security. The real deficit is a staggering $551 billion, 4.5 percent of GDP.

Administration officials are nonchalant about the fiscal disarray.

I am deeply worried. We all should be.

On October 18, the national debt passed the $8 trillion mark. Even more disturbing, the national debt is being financed by Chinese, Japanese, and other overseas lenders. To put this into perspective, in absolute dollars, the country is borrowing more than ever in its history, close to $2 trillion from foreign nations. We owe over $680 billion to Japan, $390 billion to the European Union, $240 billion to China, and $57 billion to OPEC nations, to name a few.

It is beyond me how this administration can turn a blind eye to these numbers, or how Congress can approve legislation that exacerbates these fiscal problems.

Instead of facing up to the fiscal truth, President Bush ignores the mountain of debt that will burden generations to come.

First, this President shortened the budget timeline from 10 years to 5 years. Relying on this kind of gimmickry covers up for the President's destructive fiscal decisions, especially as they relate to tax cuts for the rich.

Second, this Republican Congress voted against a system to keep the budget in balance. I am referring to the pay-go rule endorsed by Federal Chairman Alan Greenspan and former Secretary of Treasury Robert Rubin. Pay-go would have required an offset for any decrease in revenue. The method would have ensured a balanced approach to tax cuts. Unfortunately, Republican congressional leaders opted for shunting aside integrity in budgeting. They back pay-go in name, but not in practice.

By any standard, the decisions to ignore a 10 year budget timeline and disregard balancing methods have caused massive red ink and send the country precisely in the wrong direction.

In fact, Federal Reserve Chairman Alan Greenspan put it this way:

The federal budget deficit is on an unsustainable path, in which large deficits result in rising interest rates and ever-growing interest payments that augment deficits in future years . . . Unless this trend is reversed, at some point these deficits will cause the economy to stagnate or worse.

I fear this reconciliation package, coupled with the administration's tax cuts, will lead us to even worse times.

Reconciliation is simply asking too much of middle income families who are facing cost increases for basic needs.

For instance, energy costs to heat one's home have increased 20 percent from last year. Education costs for public universities have increased 7.1 percent. Interest rates that impact college loan payments have doubled over the last 10 months. And, gas prices have increased 19 percent over the last 4 months.

Instead of assisting families with these increased costs, raising the standard of living for the poor, or improving the opportunities to attain a college education, this package adds to financial pressures.

For health care alone, premiums have climbed higher than $10,000 for families, and this bill will do nothing to reduce out-of-pocket health care spending.

More perniciously, what the bill does do is cut $10 billion in health care spending for the poorest Americans.

While the bill provides a 1-year temporary relief to physicians, a 1 percent increase in Medicare reimbursements is not enough. This is a Band-Aid fix, at best. When expenses to practice are increasing at a rate of 3 to 5 percent annually, a 1-year 1 percent increase in reimbursements is insufficient. In my State, where the cost of living is beyond the reach of many Californians, doctors are simply choosing not to see any new Medicare patients or are retiring early due to low reimbursement levels.

To make matters worse, the temporary relief for physicians in the bill is borne on the back of Medicare beneficiaries in the form of higher Part B premiums. This provision will directly increase the amount Medicare beneficiaries pay each month in premiums by $2.90 in 2007. That is a 33-percent increase in monthly premiums. While it is vital that Congress prevent future cuts in Medicare reimbursement to physicians, the provision in this bill amounts to a $1.4 billion tax on seniors. That is unacceptable.

Further, it is no secret that increased debt puts pressure on inflation. In just this past year, the Federal Reserve enacted 11 consecutive interest rate increases.

This means the American people will have to make higher mortgage payments, pay higher interest, and for those who own debt, it will take even longer to pay off their credit cards.

For some, this bill will put a college education out of reach. Middle-income families, who have no choice but to borrow money for college, will struggle even more to pay tuition bills.

Due to increasing costs of basic needs, there are 1 million more Americans living in poverty this year than there were last year. Not only does this budget reconciliation do nothing to reduce that number, it puts many more Americans at risk of poverty due to higher health care costs and reduced access to social services and education.

As for the environment, this reconciliation blatantly undermines the natural wonders of our country. Shamefully, it opens the Arctic National Wildlife Refuge for drilling to already profit-soaked oil companies.

And, if that is not enough, this administration's fiscal policy forces our children to pay it all back—not only to the Social Security Trust Fund, but to foreign nations.

At any point, foreign countries can stop investing in the dollar, and any small movement could have a significant and immediate impact on the fiscal stability of our Nation's currency.

Does this Congress believe it is good foreign policy to put our economic interests and security in the hands of China, Japan, and the European Union?

Let me be clear, this budget reconciliation is asking Americans to: pay more in interest payments, pay more in health care premiums without improving benefits, borrow more from foreign lenders, further damage our habitat and environment, and leave an even larger bill for future generations to pay.

We should be talking about helping American families, not punishing them with new financial burdens. And, for what good reason? None whatsoever.

The Bush administration's Pavlovian response to everything that ills the economy is: tax cuts—not to middle-and low-income families, who need it most, but, instead, to the wealthiest Americans.

The wealthiest Americans have received tax cuts that are 140 times the size of the average tax cut for middle-income families. That means millionaires have received an average tax break of $100,000 a year while middle-income families have received a mere $742.

Let me be frank, the President's tax cuts do not help working Americans. In fact, the after-inflation wages of the average American earners have dropped for the first time in a decade.

Meanwhile, the President's tax cuts account for 57 percent of the deficit increase. In fact, President Bush's tax cuts are more expensive than all spending increases combined, including new spending for homeland security, the war in Iraq, operations in Afghanistan, expanded antiterrorism efforts, and all domestic spending increases. It is a fiscal record of excess and recklessness.

And without batting an eye, this President goes right along, reiterating his intention of making tax cuts permanent—at a cost of $11 trillion over 75 years—making it clear that even in the wake of hurricanes, rising gas prices, increasing interest rates, and higher health care costs, this administration will continue to push for lining the pockets of the wealthy.

I believe we can do better. I believe we can bring fiscal responsibility back to the budget process and help middle-income families. We have done it in the past. We can do it now.

In 1982, Ronald Reagan agreed to undo a significant share of tax cuts to combat substantial budget deficits.

Ten years later, President George H.W. Bush changed his position on taxes and signed a bipartisan deficit-reduction package.

More recently, in the late 1990s, after inheriting a national deficit totaling 4.7 percent of GDP, the Clinton administration turned deficits into our first budget surpluses since 1969.

Today, with the national deficit including trust fund accounts reaching 4.5 percent of GDP, it is time to do the same.

In the words of Former Secretary of Treasury Robert Rubin:

We are at a critical juncture with respect to the longer-term future of our economy, and the outcome at this juncture will be enormously affected—for good or for ill—by the policy action we take in response to the great issues we face.

It is time to have the courage to act responsibly. This so called deficit reduction package is not what it claims to be. Yes, it will cut spending by more than $30 billion, but in a few weeks these savings will be spent on tax breaks for the rich. In the end, this reconciliation package titled "Deficit Reduction" will actually increase the deficit by $36 billion. This fiscal strategy edges us closer to fiscal insanity and leaves our children and their children impoverished and riddled with debt. The first step to doing better is voting no on this reconciliation bill.

Mr. JOHNSON. Mr. President, in order to meet its reconciliation instructions, the Banking Committee

recommended that S. 1562, the Safe and Fair Deposit Insurance Act of 2005 be included in the banking title of the budget reconciliation bill.

Earlier this year, I joined with Senators ENZI, HAGEL, and ALLARD in introducing this important legislation which has garnered strong bipartisan support and was overwhelmingly approved by the Banking Committee last month. Additionally, it has the strong support of the administration, Treasury Department, the Federal Deposit Insurance Corporation, and the financial services industry.

Deposit insurance is one of the cornerstones of our country's financial system. It protects depositors against risks they cannot control, ensures stability, and allows deposits to remain in our local communities. This important legislation will ensure that deposit insurance maintains its strength even during times of economic weakness.

Borne out of the need to promote financial stability during the Great Depression, deposit insurance has served depositors well by providing stability to banks and to the economy, and it is especially critical to our Nation's smaller financial institutions and community banks.

While there have been differing opinions as to how deposit insurance should be reformed, there is general agreement that the system needs to be reformed and modernized. The banking industry is rapidly evolving and is becoming increasingly complex and sophisticated. Yet the last time any change was made to our system of deposit insurance was over 20 years ago. Reform is long overdue. The time has come for the system that was put in place to promote the stability of the banking system be appropriately reformed to keep pace with the evolution of that system.

Depositors must have confidence that their hard-earned money is protected, including the funds that cover their daily living expenses to the funds they are saving for retirement and a rainy day. To that end, this legislation introduces some very key reforms.

First, it merges the bank insurance fund with the savings association insurance fund to create the deposit insurance fund. By doing so, we create a stronger and more diversified fund, and eliminate the possibility for disparities in premiums between banks and thrifts.

Second, insurance premiums will be risk-based to ensure that banks pay based on the risk they pose to the system, and the FDIC will be able to price insurance premiums accordingly. The current system does not allow for premium assessments to be based on risk, and therefore, safer banks are subsidizing riskier banks. This inflexibility will be eliminated and the assessment burden will be distributed more evenly and fairly over time. When deposit insurance is priced for risk, whether the coverage limit is higher or lower is less relevant. Banks will have

to pay higher premiums for riskier behavior, reducing any moral hazard. It is important to note, however, that in developing a new risk based premium system, the FDIC should not negatively impact the cost of homeownership or community credit by charging higher premiums to institutions simply because they fund mortgages and other types of lending through advances from Federal Home Loan Banks. Congress reaffirmed this relationship between community lenders and Home Loan Banks most recently in the Gramm-Leach-Bliley Act, and deposit insurance reform is not intended to impose any financial cost on the relationship through direct or indirect premiums.

Third, the FDIC will have the discretion to periodically index coverage levels for both general and retirement accounts to keep pace with inflation. This is a compromise made in order to secure the Bush administration's support. Frankly, I feel some form of automatic indexation would be far preferable, and I am disappointed that indexation is left as a discretionary matter. The real value of deposit insurance coverage is now less than half of what it was in 1980 when it was set at $100,000. By increasing the level of coverage for retirement accounts, we are adjusting for the real value of coverage. Insuring retirement accounts up to $250,000 will keep the coverage level up with inflation and will promote financial stability for individual retirees. Retirement accounts are the only accounts under this bill that will get a higher coverage level. I believe in the current environment, with the uncertainty surrounding social security and pension benefits, that it is critical that we provide appropriate coverage for the hard-working Americans who have saved for their retirement and long-term care needs. This legislation strikes the appropriate balance in that regard.

Finally, I would be remiss if I did not recognize the banking community in South Dakota for the invaluable and critical role they have played in this process over the past 5 years. I truly appreciate the input and recommendations that I have received from the industry overall. I would also like to thank Chairman SHELBY, and Ranking Member SARBANES for their leadership, Senators ENZI, HAGEL and ALLARD for the many hours of hard work, and FDIC Chairman Don Powell for his commitment to deposit insurance reform.

Mr. SALAZAR. Mr. President, I voice my opposition to the reconciliation bill before the Senate today. America can and should do better. This bill, which masquerades as a vehicle to help shrink the deficit, is actually a part of a broader, fiscally irresponsible package of policy and legislation that will actually increase the size of the deficit by over $30 billion in the next 5 years, even as this bill cuts programs that are important to the most vulnerable Americans. In other words, this series

of proposals moves America in exactly the wrong direction.

This bill moves in the wrong direction when it comes to agriculture. Agriculture program spending amounts to about 1 percent of the spending in the Federal budget, however, at a time when fuel prices are at a record high and many rural areas in Colorado across the country continue to feel the effects of weather-related natural disasters, agriculture programs have been forced to take $3 billion worth of cuts. These cuts will come out of the programs that farmers, ranchers and rural communities count on most, including commodity program payments and conservation programs like the Conservation Reserve Program, CRP. During my time in the Senate I have spoken many times about my concern that too often Washington leaves our rural communities to wither on the vine. I believe that this budget reconciliation package only contributes to their decline.

This bill moves in the wrong direction when it comes to health care and education. The bill cuts college student aid by over $7 billion, creating less opportunity for young Americans when we should be in the business of creating more. It makes deep Medicaid and Medicare cuts, hurting the poor, elderly, and disabled who struggle with healthcare costs. Because of this bill, seniors will see a 33 percent increase in premiums for Medicare Part B. Because of this bill, independent, community pharmacies, particularly in rural areas, will see a change in reimbursement formulas that could force them to close their doors, further eroding access to health care in this country.

This bill moves in the wrong direction when it comes to the environment and to energy policy. It would open the pristine Arctic National Wildlife Refuge to oil drilling. Ultimately, this fight is not about barrels of oil, it's about the deeper moral decisions we make as a nation about how best to address our energy needs. Drilling for oil in the Arctic National Wildlife Refuge won't do a thing for gas prices this winter. It won't do a thing for gas prices in 10 years or even 15 years. In fact, it won't do a thing for energy prices ever, because even if this provision passes and becomes law, the total amount of ''technically recoverable oil,'' according to the administration's own estimates, would reduce gas prices by only a penny—and then, not before 10 to 15 years from now.

This reconciliation bill does not reflect the right budget priorities. This bill tightens the squeeze already being felt by so many hardworking Americans trying to make ends meet as oil and gas prices soar and winter approaches. Adding insult to injury, these irresponsible cuts will not even help the country with the bottom line, because they are being combined with tax breaks for the wealthiest Americans that exceed, by tens of billions of dollars, the value of the cuts themselves. The average benefit of these tax

breaks for those with incomes more than $1 million would be $35,491. But for those with incomes under $50,000, the average benefit comes to $6. America can do better.

Mr. LEVIN. Mr. President, earlier this year I voted against the budget resolution that passed the Congress because it reflected the wrong priorities. That budget resolution short changed vital public needs such as education and health care for all Americans in order to further cut taxes mainly for the wealthiest Americans. The bill before us today is the first part of a three-part budget reconciliation process set up to help carry out that misguided budget. Budget reconciliation is a special process that gives privileged short cuts under the rules of the Senate. For many of the same reasons that I opposed the original budget resolution, I must also oppose this reconciliation bill. Instead of improving our fiscal situation, the reconciliation package worsens the problem.

This first of the three reconciliation bills is focused on spending cuts. It cuts funding for Medicaid, Medicare, low-income housing grants and other important programs. These cuts, along with the revenue that could be generated as a result of a shortsighted decision to drill in the Arctic National Wildlife Refuge, ANWR, in Alaska, are projected to reduce the deficit by $39.1 billion over the next 5 years.

However, at the same time, both Houses of Congress are working on separate versions of the second part of the reconciliation package—the tax bill. That bill would extend $70 billion worth of tax cuts benefiting largely the wealthiest Americans. It simply does not make sense to say we need to cut $39.1 billion out of vital programs to reduce the deficit while at the same time increasing the deficit with $70 billion in tax cuts. These bills continue an irresponsible and inequitable tax policy that recklessly adds to our deficit.

The third part of this three-part reconciliation process will be a bill to allow the national debt to increase by another $781 billion. The need for that third bill shows how dreadful our budget situation has become. The U.S. national debt has already climbed above $8 trillion. In the fiscal year that just ended, we spent over $350 billion just to pay the interest on that debt. That is 14 percent of the Federal Government's spending last year. That is money that doesn't go toward important infrastructure improvements, homeland security or other priorities like health care, education or environmental protection. We simply cannot afford to continue building up this massive debt.

Not only is it financially irresponsible to add to this already heavy debt, but it adds risk to our national security. Forty-four percent of our national debt is held by foreign investors. If these investors ever decide, for economic or political reasons, to stop financing our debt, our markets could be severely impacted. This can provide other countries with greater leverage during trade or other negotiations with us.

In addition to the fiscal irresponsibility in this reconciliation package, it is unconscionable that this body would once again decide to cut services for the poor and the disabled and the elderly and disadvantaged children and then to turn around next week and provide the mostly the wealthiest Americans with $70 billion of tax cuts. I will say at the outset, this bill contains some good provisions. This bill halts an unwise looming 4.4 percent decrease for physicians treating Medicare patients and instead provides a 1 percent increase. This bill was amended and now contains a provision that will prevent a reduction in Federal money for Michigan Medicaid. This bill also has several provisions to help victims of Hurricane Katrina.

However, a large portion of the spending cuts in this reconciliation bill impacts the millions of Medicare and Medicaid beneficiaries as well as providers. This is not the first time Congress has attempted to balance the budget on the backs of people who rely on Medicare and Medicaid. In 1997, Congress cuts payments to providers and services to beneficiaries and the cuts were overreaching. It is my fear the same result will come from our actions today. This bill before us cuts reimbursement for several types of Medicare providers including nursing facilities, hospitals and managed care. This bill also places caps on payments for Medicare and Medicaid services. People who rely on Medicare and Medicaid are going to be hurt by this bill. I hope that my colleagues take a long look at by how much the bad outweighs the good in this bill.

In addition, I also regret that the majority decided to include in this budget reconciliation the opening of the Arctic National Wildlife Refuge, ANWR, to oil and gas development.

I have consistently opposed opening ANWR to oil and gas development because I believe it is the wrong approach to addressing our Nation's need for long-term energy security. The actual reserves in the area that will be available for leasing under this provision are too small to have a significant impact on our Nation's energy independence and will not produce any oil for more than a decade. I do not believe that this limited potential for oil and gas development in ANWR warrants endangering what is one of the last remaining pristine wilderness areas in the United States.

But, also, the process for consideration of ANWR on the budget reconciliation bill has been flawed from the start. Including this important issue in the budget reconciliation bill has short-circuited the normal legislative process and has eliminated the opportunity for Congress to give the issue the consideration it deserves. In fact, this issue was not even considered when the Senate debated the Energy Policy Act of 2005 for 2 weeks this past summer. Opening ANWR to oil and gas development was not considered on the Energy bill because the votes were not there to pass it except by including it in the budget reconciliation bills that we are considering now.

On a positive note, I am pleased that I was able to include language in this bill that recognizes the needs of border States when awarding emergency and interoperable communications grants.

First responders in border States like Michigan, New Mexico, and Minnesota face unique challenges and must be able to communicate with a number of Federal, State, and local entities including FEMA, Customs and Border Protection, and the National Guard in addition to police, firefighters and emergency medical services personnel from other jurisdictions who may assist in the event of a large scale disaster or terrorist attack. What is often overlooked is that first responders near border crossings must also be able to maintain seamless communication with their Canadian or Mexican counterparts across the border. My amendment would assist our first responders by creating demonstration projects at our northern and southern borders. The amendment provides that the Secretary of Homeland Security shall establish at least two International Border Community Interoperable Communications Demonstration Projects—with at least one of these demonstration projects on each of the northern and southern borders. These interoperable communications demonstrations will address the interoperable communications needs of police officers, firefighters, emergency medical technicians, National Guard, and other emergency response providers at our borders.

In closing, I sincerely hope that future budgets coming from this body will be more responsible than this one. Furthermore, as imprudent as this bill is, I hope it won't be made worse in conference after merging with the even more misguided House bill. Major bipartisan efforts will be needed to make true progress on the long-term fiscal problems we face. I will continue to fight for fair and fiscally responsible policies that help generate jobs and economic security from which all Americans can benefit.

Mr. HATCH. Mr. President, this past March, I stood here to express my reluctant support for the fiscal year 2006 concurrent budget resolution. My support was reluctant for one reason only. I believed the budget did not go far enough in slowing the growth of Federal spending.

My colleagues will remember that passing that budget resolution was not an easy thing. Both the original Senate version and the conference report passed by very narrow margins. Not one Democrat voted in favor of the budget resolution, so it was left up to those of us on this side of the aisle to pass that resolution.

Case 1:01-cv-12257-PBS    Document 6528-55    Filed 09/22/09    Page 57 of 91

The major reason why the budget was so difficult to pass was the inherent problem in getting a majority to agree on legislation that cuts the growth in spending for entitlement programs. Entitlement programs are those that grow automatically without any action from Congress. While they are many of the most important programs in the Government, they are also the most expensive. Some Senators wanted more cuts in spending growth than did others, and it was hard to get a consensus, especially when there was absolutely no support from the other side.

Nevertheless, we did manage to pass the budget resolution, which was the first step in the process we are trying to complete here tonight with the budget reconciliation bill. This bill ''reconciles'' the spending in the budget with the programmatic changes necessary to achieve the budget numbers. And while the projected spending growth in this budget over the next few years is still alarming, the cuts in that growth included in this bill are very much a good first step in the right direction.

What Senator GREGG, the chairman of the Budget Committee, emphasized in his opening remarks is very significant. This is the first time since 1997 that Congress has attempted to restrain the growth of entitlement spending programs. I think we can conclude that although the magnitude of the change is not as large as many of us would like to see, the directional change is very important.

According to the Congressional Budget Office, this reconciliation bill would reduce federal outlays by more than $39 billion over the next 5 years and by almost $109 billion over the next 10 years. I realize that many of my colleagues on the other side of the aisle are scoffing at the idea these numbers are not large enough in terms of reducing the deficit. Why, then, are we not seeing any spending reduction proposals from them? It is because it is much easier to throw rocks at our attempts to rein in spending growth than it is to make the hard choices themselves.

Rather than having an honest debate about how best to deal with out-of-control budgets, most of what we are hearing from our friends on the other side is the same old tiresome accusation that we are reducing spending for lower-income Americans so that we can cut taxes, once again, for those Americans who are wealthy and do not need a tax reduction. This, of course, is a gross distortion of the truth.

As Chairman GREGG has pointed out, the spending growth reductions in this bill are not directed at low-income individuals. We worked very hard to make sure that was the case, especially in the Finance Committee which has jurisdiction over such important safety-net programs as Medicaid.

Indeed, the bill includes a significant amount of new spending. The amount of this new spending, some of which I recognize is necessary, is one of the problems I have with the bill. In addition, a great deal of the deficit reduction in this bill is achieved by raising fees or selling a portion of the broadcast spectrum. That being said, I will detail some of my specific objections about this in a little while.

As to criticisms about so-called tax cuts, there are not any in this bill. The tax reconciliation bill comes later, after this bill has passed. And the tax provisions that will be in that bill are generally in the nature of preventing tax increases on the middle class, not tax cuts for the wealthy. Moreover, most of those provisions enjoy broad support on both sides of the aisle.

Do I believe this reconciliation bill is perfect? Far from it.

Do I think we could have and should have done more in trimming the spending growth of entitlement programs? Absolutely.

As I mentioned before, the significance of this bill is not in the amount of deficit reduction it delivers, but in the change in direction that it represents. I hope we can pass it and then use it as a building block for more deficit reduction next year.

We have only a few short years to make much larger changes in our entitlement spending programs. All of us know that they are on an upward trajectory that is simply not sustainable. Passing this reconciliation bill now begins to turn the tide. It sets the stage for more responsible spending. With a smart mix of pro-growth policies that will help ensure continued economic growth and future spending restraint, we can begin to lower the deficit and put our budget in a condition to withstand the storms ahead.

Now, I would like to take the time to get into some of the details of the changes included in the bill by the three committees on which I serve.

As a senior member of the Senate Finance Committee, I worked hard with Chairman GRASSLEY to ensure that our Committee met the goal of finding $10 billion in savings. Unfortunately, the Finance package also spends a significant amount of money when I believe that our national focus needs to be on saving money. Some of it is necessary. Some not.

And, I am very troubled by how we are paying for this spending. Close to $5 billion comes from eliminating the MedicareAdvantage Regional Plan Stabilization Fund, something I strongly oppose. The stabilization fund is a critical component to facilitating regional Preferred Provider Organizations, PPOs, in the Medicare Advantage program, thus providing these plans to beneficiaries throughout the country, particularly in rural areas.

The MMA has made Medicare Advantage plans more widely available with greater beneficiary savings than ever before, including in rural areas and many other areas that previously were not served by Medicare Advantage plans.

Since the MMA was enacted in 2003, there has been a large increase in the availability of Medicare Advantage health plans that provide additional benefits and corresponding reductions in total health care costs. For example, in rural areas where there has historically been minimal managed care available, there are now three regional PPOs offering an integrated package of medical and prescription drug benefits with extra coverage at lower prices, one of these regional PPOs even offers a zero drug deductible.

The stabilization fund will help make it possible to provide secure access to these new, lower-cost coverage options in underserved areas. While more Medicare beneficiaries than ever will have regional Medicare Advantage options in 2006, further progress is needed for people with Medicare in 13 States, specifically: my home state of Utah; Alaska; Colorado; Connecticut; Idaho; Maine; Massachusetts; New Hampshire; New Mexico; Oregon; Rhode Island; Vermont; and Washington.

When developing the MMA, the Congress recognized that some states might not be served by regional Medicare Advantage plans in the initial years of the program and strategically created the benefit stabilization fund, which sunsets in 2013, to encourage plans to operate in all areas of the Nation. Utah is one of those States and that is why I strongly supported the creation of the stabilization fund during the MMA negotiations.

The stabilization fund helps to make sure that, in future years, plans will choose to serve the people with Medicare who do not have Medicare Advantage options in 2006. And, conversely, repealing the fund, or cutting its revenues, means reduced benefits and higher costs for these seniors in future years.

Many Medicare Advantage plans are already serving Medicare beneficiaries with some very generous benefit offerings for 2006, with the expectation that there would be stability in the program. For the health plans that are interested in potentially providing this regional PPO coverage, it is essential for them to know that they will get some help with starting up if they need it in areas that had been underserved before, and that the Medicare program will keep their payments predictable.

If Congress and the Centers for Medicare and Medicaid Services, CMS, start cutting promised funding and/or changing program rules even before the first benefit is administered, we send a very negative signal to plans, and that may mean worse coverage options and higher costs for Medicare beneficiaries in the future.

Cuts to or reductions in the stabilization fund, and therefore, payments to regional plans amount to adding costs for beneficiaries in the form of higher premiums, reduced benefits, or both. Without this fund, it will be difficult to convince plans to offer coverage to beneficiaries who currently do not have access to regional PPOs.

Maintaining the current stabilization fund will encourage more regional PPOs to enter the Medicare Advantage program and make sure that significantly more people, including my fellow Utahns, have access to Medicare Advantage plans next year.

I do not understand why we would be eliminating this fund, especially before the Medicare drug plan program is even operational. It just does not make good policy sense and that is why I oppose the elimination.

This is especially vexing given that there are a number of other sources for revenue. I will be fighting for more extensive restrictions on asset transfers and the inclusion of provisions which would prohibit intergovernmental transfers. Including these provisions would have severely curtailed activities where individuals and some State governments have intentionally defrauded the Medicaid program.

I have heard the arguments about why we should not have included them in the proposal, but I do not buy those arguments. More aggressive legislating in these areas would preclude some of the other reductions necessitated in this bill, such as those for the stabilization fund.

The provisions on payment for prescription drugs under the Medicaid program are another deep concern of mine. These have only been made worse by adoption of amendments in the Chamber. Let me say that while I agree that changes are warranted, I am very worried about the approach included in the bill. I am not sure that the new definitions created for Average Manufacturer's Price, AMP, Weighted Average Manufacturer's Price, WAMP, and the new formula which were created for the Federal Upper Payment Limit, FUPL, will address the criticisms of the current policy. In fact, these new definitions could make the situation worse. I am also troubled that the genesis of these changes was not a desire for good policy, but rather an interest in seeking funding from a ''deep pocket.'' That trend was only exacerbated during Senate consideration of the Finance title, as we added two rebate-related amendments with spending implications that totaled several billions of dollars more.

It is clear to me that, as consideration of the conference report begins, we must continue discussions with the various stakeholders who have a vested interest in making this policy work, in particular, the pharmacists and the pharmaceutical companies.

The budget resolution contained a reconciliation instruction directing the Senate Health, Education, Labor, and Pensions, HELP Committee, on which I serve, to reduce spending by $13.7 billion in 5 years. We on the HELP Committee worked very hard to achieve this goal, which required difficult spending vs. savings decisions.

Within the past months, as we wrote reauthorizing language for the Workforce Investment Act, WIA, Head Start, the Perkins Act, career and technical education, and the Higher Education Act, HEA, we kept in mind the need to meet the reduction in spending goals. Each of these reauthorization bills was unanimously approved in committee.

While I recognize the tough choices we needed to make, I am pleased overall with the reconciliation bill as it relates to education provisions, accounting for a total savings of $9.8 billion. Spending increases in the bill include increases in Pell grants, along with ProGAP, a new grant assistance to Pell eligible students.

Another new program, SMART grants, would provide assistance to students studying math, science, technology, engineering, or a foreign language. Subsidized borrowing levels were increased, along with a permanent extension of the Taxpayer-Teacher Protection Act. Additional loan deferments were made for members of the Armed Services or the reserves. These programs would give Utah students, particularly those of low or moderate income, greater access to college educations and will boast our local and national economy as we seek to meet the demands of the 21st century workforce.

Significant savings were found in student loans, mostly from lending institutions, including a requirement for guaranty agencies to deposit one percent of their collections in the Federal Reserve fund, a reduction in lender insurance and repeal of the provision that guarantees 100 percent of loans for certain lenders. An additional fee is charged for lenders originating consolidation loans, and permanent restrictions are made on transfer or refunding of certain tax-exempt bonds that receive a 9.5 percent rate of return.

I have concerns about last-minute changes to include major spending increases, even though they appear to have been reconciled by savings. However, my colleagues should know that I am paying particular attention to fixing the interest rate for undergraduate and graduate non-consolidation borrowing at 6.8 percent, preferring a choice of a variable rate similar to the House provision. I am also concerned about the way certain bills are structured that are currently before the Senate that deal with the inclusion of Katrina public and private school payments.

The HELP Committee also included provisions increasing significantly the amounts of premiums employers that sponsor defined benefit pension plans must pay to the Pension Benefit Guarantee Corporation, PBGC. These increases were larger than they needed to be, and represent placeholders until we can pass the pension reform bill that was produced by the Finance and HELP Committees. I hope we will soon be able to consider and pass that legislation, partly for the reason of reducing these premium increases to more reasonable amounts.

The Judiciary Committee greatly exceeded its reconciliation targets, and I applaud that accomplishment even though I do not support the means by which it was achieved. Federal spending is out of control and, as my colleagues know, this has been a concern of mine for a long time. I am gratified to see that so many others now share my concerns and, more importantly, that we are finally doing something about irresponsible spending despite the efforts of a few members on the other side of the aisle to scuttle this reconciliation bill.

I am pleased that the Judiciary Committee did not report a proposed tax on the explosives industry. It was just plain wrong, and it would have hurt a lot of people in Utah. Naturally, I fought tooth and nail to make sure it was off the table and I, along with others, succeeded in stopping it.

This brings us to the current Judiciary title. I do not think we should have used a reconciliation measure to alter immigration policy, particularly in light of the current debate on comprehensive immigration reform. For this, and other reasons, I offered an amendment that would have imposed a 5 percent increase in all immigration related fees instead of simply allowing more people into the country as a way of reducing our Nation's deficit. Unfortunately, my amendment was defeated in committee.

That being said, I recognize that it is not easy to come up with savings. It means tough choices. But it is our job to make the tough calls and the Judiciary Committee did just that.

I strongly support moving this package through the Senate. However, I want my colleagues to understand my concerns and that I intend to continue working with them on improving the package. I know this was an extremely difficult task, and I appreciate all the hard work of many of my colleagues, and particularly the chairmen of the committees on which I serve.

Mr. GRASSLEY. Mr. President, the Senate will vote shortly on final passage of S. 1932. We have had a good debate on this bill. I commend the chairman of the Budget Committee for his effective and fair management of the consideration of this bill this week.

The Senate Finance Committee title was carefully crafted to address a wide range of member priorities. The Senate Finance Committee title is a compromise—one that was meticulously negotiated over many months. It represents clear-headed, commonsense reforms.

But here is something that should make a lot of people wonder what is going on around here. I noted with interest a recent Washington Post article which notes:

The Senate package is gaining kudos from some unlikely sources. Liberal budget and antipoverty groups say the Senate budget-cutting legislation largely avoids cuts that will hit low-income beneficiaries . . .

And here is another one. The Associated Press reports:

As a result, the Senate's Medicare and Medicaid cuts largely won't touch beneficiaries of the programs, instead tapping

drug companies, pharmacies and insurance subsidies for much of the savings.

I am therefore somewhat confused why more of my friends and colleagues from the Democratic side are not going to support final passage of this bill. I think I know partly what the answer is—is it because the House version of this bill is much more far-reaching than the Senate proposal? Is it because the same groups that praise the Senate bill oppose the process moving forward on that basis?

I would make the point that I think the Senate's position in going to conference with the House would be strengthened if S. 1932 passed with strong bipartisan support. I do not understand why the liberal budget groups are not urging Democrats to unite in support of the Senate bill.

I believe that the American people want us to join together to get things done. They want us to get our fiscal house in order, but they also want us to enact compassionate policies that help honest-to-goodness working families. The Senate bill meets both of those priorities. Here is the bottom line, and I want all my friends on the other side of the aisle to hear this. Here is what a vote against the Senate bill we have before us today means. Opposition to the Senate bill's balanced approach to Medicaid reform and program improvements is opposition to achieving savings, preserving services, and protecting beneficiaries.

A ''no'' vote is a vote against cutting wasteful spending in Medicaid and other changes that provide additional resources to State Medicaid programs.

A ''no'' vote is a vote against having the State and Federal Government pay less for drugs.

A ''no'' vote is a vote against tightening up asset transfers, thereby paying less for nursing home care through Medicaid.

A ''no'' vote is a vote against increasing State and Federal payments from drug companies.

A ''no'' vote is a vote against a $2 billion windfall to the States.

Opposition to the Senate bill's balanced approach to Medicaid reform and program improvements is opposition to the bipartisan Family Opportunity Act.

So that means that a ''no'' vote is a vote against the Family Opportunity Act's expansion of Medicaid eligibility for severely disabled children. Opposition to this provision means forcing many working families to refuse better jobs or promotions—keeping them poor in order to qualify for Medicaid or, worse, relinquish custody of their disabled child to the State so that their child can continue to get the services they need.

A ''no'' vote is also a vote against the Family Opportunity Act's protection for families whose newborn is diagnosed with a severe disability from being liable for thousands of dollars of medical costs.

A ''no'' vote is a vote against ''Money Follows the Person,'' which provides grants to States to increase the use of home and community based services, rather than institutional services. ''Money Follows the Person'' also eliminates barriers so that individuals can receive support for long-term services in the settings of their choice.

Opposition to the Senate bill's balanced approach to Medicaid reform and program improvements is opposition to a down payment on Hurricane Katrina disaster relief.

So that means that a ''no'' vote is a vote against providing $1.8 billion to protect Medicaid benefits in Alabama, Louisiana, and Mississippi for people affected by Hurricane Katrina.

Opposition to the Senate bill's balanced approach to Medicaid reform and program improvements is opposition to protecting health coverage for thousands of children and improving the State Children's Health Insurance Program.

A ''no'' vote is a vote against preventing funding shortfalls in the Children's Health Insurance Program in 23 States.

A ''no'' vote is a vote against providing new options for private coverage of long-term care through Long-Term Care Partnerships.

A ''no'' vote also means opposition to closing loopholes that permit the unscrupulous ''gaming'' of Medicaid eligibility rules to intentionally shelter assets to qualify for taxpayer-financed long-term care coverage in Medicaid.

Those who vote against this bill are also opposing the Senate bill's balanced approach to Medicaid reform and program improvements is opposition to protecting access for rural beneficiaries.

So that means that a ''no'' vote is a vote against protecting small rural hospitals and sole community hospitals by extending the hold-harmless provisions that protect them from losses resulting from implementation of the hospital outpatient prospective payment system.

A ''no'' vote is also opposition to extending the Medicare Dependent Hospital Program, which provides financial protections to rural hospitals with less than 100 beds that have a greater than 60 percent share of Medicare patients.

A ''no'' vote also means opposition to expanding coverage of additional preventive benefits under Federal Qualified Health Centers.

Why would my Democratic colleagues oppose such commonsense, practical policies that save the States money, expand access for low income and disabled children, help rural hospitals and make progress to rebalancing the institutional bias in the Medicaid program?

I am saddened that it appears my colleagues cannot put partisan politics aside and get behind a bill that saves money for States, protects and expands access, and preserves benefits. I urge my colleagues to support the Senate bill. Let's show the American people that we can put politics aside and stand together and get things done for the good of the country.

Mr. GREGG. Mr. President, pursuant to section 313(c) of the Congressional Budget Act of 1974, I ask unanimous consent to have printed in the RECORD a list of material in S. 1932 considered to be extraneous under subsections (b)(1)(A), (b)(1)(B), and (b)(1)(E) of section 313. The inclusion or exclusion of material on the following list does not constitute a determination of extraneousness by the Presiding Officer of the Senate.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

EXTRANEOUS PROVISIONS—SENATE BILL
(Prepared by Senate Budget Committee Majority Staff)
TITLE I—AGRICULTURE, NUTRITION AND FORESTRY

| Provision | Violation/comments |
|---|---|
| N/A | N/A. |

TITLE II—BANKING, HOUSING, AND URBAN AFFAIRS

| Provision | Violation/comments |
|---|---|
| Sec. 2014(b)(3)(F) | 313(b)(1)(A)—Report to Congress. |
| Sec. 2018(a) | 313(b)(1)(A)—Studies of potential changes to the federal deposit insurance system—just a study. |
| Sec. 2018(b) | 313(b)(1)(A)—Studies of potential changes to the federal deposit insurance system—just a study. |
| Sec. 2025 | 313(b)(1)(A)—Authorization of Appropriations—no money involved. |

TITLE III—COMMERCE, SCIENCE, AND TRANSPORTATION

| Provision | Violation/comments |
|---|---|
| 3005(c)(2) | 313(b)(1)(E)—Low-power TV and translator outlays occur after 2010, increasing the deficit. |
| 3005(c)(3) | 313(b)(1)(E)—Interoperability grant outlays occur after 2010, increasing the deficit. |
| 3005(c)(4) | 313(b)(1)(E)—E911 outlays occur after 2010, increasing the deficit. |
| 3005(c)(5) | 313(b)(1)(E)—Coastal assistance outlays occur after 2010, increasing the deficit. |
| 3005(d) | 313(b)(1)(A)—Transferring offsetting receipts that federal government has already received does not produce a change in outlays. |

| Provision | Violation/comments |
|---|---|
| 3005(f) | 313(b)(1)(A)—Does not produce a change in outlays as additional receipts could not be spent and would be deposited in Treasury anyway. |

## TITLE IV—ENERGY AND NATURAL RESOURCES

| Provision | Violation/comments |
|---|---|
| N/A | N/A. |

## TITLE V—ENVIRONMENT AND PUBLIC WORKS

| Provision | Violation/comments |
|---|---|
| N/A | N/A. |

## TITLE VI—FINANCE

| Provision | Violation/comments |
|---|---|
| 6012(a)(5)(F) | 313(b)(1)(A)—Requirements on insurance sellers produce no change in outlays or revenues. |
| 6012(b)(4) | 313(b)(1)(A)—State reporting requirement produces no change in outlays or revenues. |
| 6012(c) | 313(b)(1)(A)—Annual report to Congress produces no change in outlays or revenues. |
| 6022 | 313(b)(1)(A)—CBO score of zero |
| 6026(a), Sec. 1937(a) | 313(b)(1 )(A)—Medicaid CFO produces no change in outlays or revenues. |
| 6026(a), Sec. 1937(b) | 313(b)(1)(A)—Oversight Board produces no change in outlays or revenues. |
| 6026(a), Sec. 1937(e) | 313(b)(1)(A)—Annual report produces no change in outlays or revenues. |
| 6036(e) | 313(b)(1)(A)—Reports produce no change in outlays or revenues. |
| 6043(c)(2) | 313(b)(1)(A)—Budget neutrality language produces no change in outlays or revenues. |
| 6103(c) | 313(b)(1)(A)—Study and Report by HHS Inspector General produces no change in outlays or revenues. |
| 6103(d) | 313(b)(1)(A)—Rehabilitation Advisory Council produces no change in outlays or revenues. |
| 6110(a), 1860E—1(e) | 313(b)(1)(A)—Arrangement with an Entity to Provide Advice and Recommendations produces no change in outlays or revenues. |
| 6110(b)(3)(E) | 313(b)(1)(A)—Report produces no change in outlays or revenues. |
| 6110(c)(1)(C) | 313(b)(1)(A)—Sense of the Senate produces no change in outlays or revenues. |
| 6110(g)(1) | 313(b)(1)(A)—Requirement for skilled nursing facilities to report functional capacity of Medicare residents upon admission and discharge produces no change in outlays or revenues. |
| 6113(d) | 313(b)(1)(A)—Evaluation of PACE providers serving rural service areas produces no change in outlays or revenues. |
| 6026(a), Sec. 1936(d) | 313(b)(1)(A)—5-year plan produces no additional change in outlays or revenues. |
| 6026(a), Sec. 1936(3)(3) | 313(b)(1)(A)—Annual report requirement produces no change in outlays or revenues. |

## TITLE VII—HEALTH, EDUCATION, LABOR AND PENSIONS

| Provision | Violation/comments |
|---|---|
| Sec. 7101(f) | 313(b)(1)(A)—Pro-GAP Sunset language/does not produce a change in outlays. |
| Sec. 7101(b) | 313(b)(1)(A)—Pro-GAP Sense of the Senate/does not produce a change in outlays. |
| Sec. 7102(a), (b) and (d) | 313(b)(1)(A)—SMART Grant findings/purpose/name, do not produce a change in outlays. |
| Sec. 7102(i) | 313(b)(1)(A)—SMART Grant matching assistance/does not produce a change in outlays. |
| Sec. 7109 | 313(b)(1)(A)—Single Holder Rule/does not produce a change in outlays. |
| Sec. 7122(b) | 313(b)(1)(A)—Evaluation of Simplified Needs Test/does not produce a change in outlays. |
| Sec. 7153(h), (i), (j), and Sec. 7155 | 313(b)(1)(A)—Authorizes waivers of provisions of discretionary and programs, and addresses certain reporting requirements/do not produce a change in outlays. |
| Sec. 7201(d)(3) | 313(b)(1)(A)—Pensions: (d)(3) special rule regarding future legislation/does not produce a change in outlays. |
| Sec. 7301, Sec. 7302 and Sec. 7311 | 313(b)(1)(A)—HEA general provisions and definitions/do not produce a change in outlays. |
| Sec. 7314 | 313(b)(1)(A)—Protection of Student Speech and Assoc Rights/does not produce a change in outlays. |
| Sec. 7315 | 313(b)(1)(A)—Nat'l Advisory Comm. on Inst Quality/does not produce a change in outlays. |
| Sec. 7316 | 313(b)(1)(A)—Drug and Alcohol Abuse Prevention/does not produce a change in outlays. |
| Sec. 7317 | 313(b)(1)(A)—Prior Rights and Obligations—updates discretionary authorizations/does not produce a change in outlays. |
| Sec. 7318 | 313(b)(1)(A)—Cost of Higher ED Consumer Info/does not produce a change in outlays. |
| Sec. 7319 | 313(b)(1)(A)—Performance Based Org for Delivery of Fed Student Assist/does not produce a change in outlays. |
| Sec. 7320 | 313(b)(1)(A)—Procurement Flexibility/does not produce a change in outlays. |
| Sec. 7331 | 313(b)(1)(A)—Teacher Quality Enhancement /does not produce a change in outlays. |
| Sec. 7341–7350 Sec. | 313(b)(1)(A)—Institutional Aid/does not produce a change in outlays. |
| Sec. 7351 | 313(b)(1)(A)—Technical Corrections/does not produce a change in outlays. |
| Sec. 7361 2(A) | 313(b)(1)(A)—Pell—max authorized grant. Nothing in Pro-GAP is driven off of "max" Pell Grant/does not produce a change in outlays. |
| Sec. 7362 | 313(b)(1)(A)—TRIO Programs/does not produce a change in outlays. |
| Sec. 7363 | 313(b)(1)(A)—GEAR-UP/does not produce a change in outlays. |
| Sec. 7364 | 313(b)(1)(A)—Repeal of Academic Achievement Scholarships/does not produce a change in outlays. |
| Sec. 7365 | 313(b)(1)(A)—SEOG/does not produce a change in outlays. |
| Sec. 7366 | 313(b)(1)(A)—LEAP/does not produce a change in outlays. |
| Sec. 7367 | 313(b)(1)(A)—Migrant ED/does not produce a change in outlays. |
| Sec. 7368 | 313(b)(1)(A)—Robert C. Byrd Honors/does not produce a change in outlays. |
| Sec. 7369 | 313(b)(1)(A)—Child Care Access Means Parents in School/does not produce a change in outlays. |
| Sec. 7370 | 313(b)(1)(A)—Repeal of Learning Anytime Anywhere Partnerships/does not produce a change in outlays. |
| Sec. 7386 | 313(b)(1)(A)—Reports to Credit Bureaus & Institutions/does not produce a change in outlays. |
| Sec. 7387 | 313(b)(1)(A)—Common Forms and Formats/does not produce a change in outlays. |
| Sec. 7388 | 313(b)(1)(A)—Information to Borrower and Privacy/does not produce a change in outlays. |
| Sec. 7389 | 313(b)(1)(A)—Consumer Education Information/does not produce a change in outlays. |
| Sec. 7391 | 313(b)(1)(A)—Federal Work Study/does not produce a change in outlays. |
| Sec. 7393 | 313(b)(1)(A)—Grants for Work Study Programs/does not produce a change in outlays. |
| Sec. 7394 | 313(b)(1)(A)—Job Location and Development Programs/does not produce a change in outlays. |
| Sec. 7395 | 313(b)(1)(A)—Work Colleges—discretionary program/does not produce a change in outlays. |
| Sec. 7412 | 313(b)(1)(A)—Terms of Loans—technical change/does not produce a change in outlays. |
| Sec. 7422 | 313(b)(1)(A)—Discretion of Financial Aid Administrators/does not produce a change in outlays. |
| Sec. 7432 | 313(b)(1)(A)—Compliance Calendar/does not produce a change in outlays. |
| Sec. 7437 | 313(b)(1)(A)—Institutional and Financial Aid/Assist to Students/does not produce a change in outlays. |
| Sec. 7438 | 313(b)(1)(A)—Nat'l Student Loan Data System/does not produce a change in outlays. |
| Sec. 7439 | 313(b)(1)(A)—Early Awareness of Financial Aid Eligibility/does not produce a change in outlays. |
| Sec. 7442 | 313(b)(1)(A)—Reg. Relief and Improvement/does not produce a change in outlays. |
| Sec. 7443 | 313(b)(1)(A)—Transfer of Allotments/does not produce a change in outlays. |
| Sec. 7445 | 313(b)(1)(A)—Purpose of Admin Payments/does not produce a change in outlays. |
| Sec. 7446 | 313(b)(1)(A)—Advisory Committee on Student Financial Assist/does not produce a change in outlays. |
| Sec. 7447 | 313(b)(1)(A)—Regional meetings/does not produce a change in outlays. |
| Sec. 7448 | 313(b)(1)(A)—Year 2000/does not produce a change in outlays. |
| Sec. 7451 | 313(b)(1)(A)—Recognition of Accrediting Agency or Assoc/does not produce a change in outlays. |
| Sec. 7452 | 313(b)(1)(A)—Administrative Capacity Standard/does not produce a change in outlays. |
| Sec. 7453 | 313(b)(1)(A)—Program Review and Data/does not produce a change in outlays. |
| Sec. 7501 | 313(b)(1)(A)—Developing Institutions Definitions/does not produce a change in outlays. |
| Sec. 7502 | 313(b)(1)(A)—Auth Activities/does not produce a change in outlays. |
| Sec. 7503 | 313(b)(1)(A)—Duration of Grant/does not produce a change in outlays. |
| Sec. 7504 | 313(b)(1)(A)—Hispanic American Post baccalaureate/does not produce a change in outlays. |
| Sec. 7505 | 313(b)(1)(A)—Applications/does not produce a change in outlays. |
| Sec. 7506 | 313(b)(1)(A)—Cooperative Arrangements/does not produce a change in outlays. |
| Sec. 7507 | 313(b)(1)(A)—Authorization of Appropriations/does not produce a change in outlays. |
| Sec. 7601 | 313(b)(1)(A)—International Education Programs/does not produce a change in outlays. |
| Sec. 7602 | 313(b)(1)(A)—Graduate and Undergraduate Language and Area Centers and Programs/does not produce a change in outlays. |
| Sec. 7603 | 313(b)(1)(A)—Undergrad International Studies and Foreign Languages/does not produce a change in outlays. |
| Sec. 7604 | 313(b)(1)(A)—Research Studies/does not produce a change in outlays. |
| Sec. 7605 | 313(b)(1)(A)—Tech Innovation and Cooperation for Foreign Info Access/does not produce a change in outlays. |
| Sec. 7606 | 313(b)(1)(A)—Selection of Certain Grant Recipients/does not produce a change in outlays. |
| Sec. 7607 | 313(b)(1)(A)—American Overseas Research Centers/does not produce a change in outlays. |
| Sec. 7608 | 313(b)(1)(A)—Auth of Appropriations/does not produce a change in outlays. |

| Provision | Violation/comments |
|---|---|
| Sec. 7609 | 313(b)(1)(A)—Centers for Intl Business Education/does not produce a change in outlays. |
| Sec. 7610 | 313(b)(1)(A)—Education and Training Programs/does not produce a change in outlays.. |
| Sec. 7611 | 313(b)(1)(A)—Auth of Appropriations/does not produce a change in outlays. |
| Sec. 7612 | 313(b)(1)(A)—Minority Foreign Service ProfDev Program/does not produce a change in outlays. |
| Sec. 7613 | 313(b)(1)(A)—Institutional Development/does not produce a change in outlays. |
| Sec. 7614 | 313(b)(1)(A)—Study Abroad Program/does not produce a change in outlays. |
| Sec. 7615 | 313(b)(1)(A)—Advanced Degree in Intl Relations/does not produce a change in outlays. |
| Sec. 7616 | 313(b)(1)(A)—Internships/does not produce a change in outlays. |
| Sec. 7617 | 313(b)(1)(A)—Financial Assistance/does not produce a change in outlays. |
| Sec. 7618 | 313(b)(1)(A)—Report/does not produce a change in outlays. |
| Sec. 7619 | 313(b)(1)(A)—Gifts and Donations/does not produce a change in outlays. |
| Sec. 7620 | 313(b)(1)(A)—Auth. of Appropriations for Inst of Intl Public Policy/does not produce a change in outlays. |
| Sec. 7621 | 313(b)(1)(A)—Definitions/does not produce a change in outlays. |
| Sec. 7622 | 313(b)(1)(A)—Assessment and Enforcement/does not produce a change in outlays. |
| Sec. 7701–Sec. 7716 | 313(b)(1)(A)—Graduate and Postsecondary Improvement Programs/does not produce a change in outlays. |
| Sec. 7801 | 313(b)(1)(A)—Misc. Discretionary Programs/does not produce a change in outlays. |
| Sec. 7901 | 313(b)(1)(A)—Amendments to Other Laws/does not produce a change in outlays. |
| Sec. 7902 | 313(b)(1)(A)—Agreement with Gallaudet University/does not produce a change in outlays. |
| Sec. 7903 | 313(b)(1)(A)—Agreement with Nat'l Tech Inst for the Deaf/does not produce a change in outlays. |
| Sec. 7904 | 313(b)(1)(A)—Cultural Experiences Grants/does not produce a change in outlays. |
| Sec. 7905 | 313(b)(1)(A)—Audit/does not produce a change in outlays. |

Mr. GREGG. Mr. President, at this time, we have come to the end of the amendment process. I now ask, before we go to final passage, we have 5 minutes equally divided between myself and Senator CONRAD, and then we will go to final passage.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CONRAD. Mr. President, first of all, I thank the staffs, the very professional staffs on both sides. I especially thank the chairman of the Budget Committee for his professionalism and his diligence in working on this bill. He has been such a pleasure to work with. His word is gold.

I appreciate very much his staff, as well—Scott Gudes, Gail Millar, Jim Hearn, Cheri Reidy, and the rest of the majority staff.

I want to also thank my staff—Mary Naylor, John Righter, my counsel Lisa Konwinski, Jim Esquea, Sarah Kuehl, Mike Jones, Cliff Isenberg, Jim Miller, Kobye Noel, Shelley Amdur, Steve Baily, Rock Cheung, Dana Halvorson, Tyler Haskell, Jim Klumpner, Jamie Morin, Stu Nagurka, Anne Page, Steve Posner, and David Vandivier.

Mr. President, you can't judge a book by its cover. The language being used here is that this is a package of deficit reduction. But this is the first chapter. The first chapter reduces spending by $39 billion. But the next chapter will reduce taxes by $70 billion. The third chapter will increase the debt by $781 billion. You have to read the whole book to know the conclusion. The conclusion of their book is more deficits and more debt.

No one should believe this vote is about deficit reduction while insisting on another $70 billion of tax cuts as part of this package. In the second chapter of the book, the deficit actually goes up. The majority's proposal to increase the debt by $781 billion, which is the third chapter of their book. With passage of this, the debt of this country will have increased by $3 trillion during just this President's administration.

This package represents a continuation of the failed fiscal policies of this administration.

We can do better as a nation, and we can do much better—and we must.

This budget, if approved, will increase the debt of this country over the next 5 years by another $3 trillion.

These policies are driving us deeper and deeper into debt to foreign nations.

In just the 4 years or 5 years of this administration, we have seen the debt of the country multiplied by $3 trillion.

I urge my colleagues to say no. Let us not continue any further down this course of deficits and debt.

Mr. GREGG. Mr. President, let me begin by thanking all my colleagues for their very constructive efforts today. The fact that we were able to complete the voting process today was a reflection of the willingness of people in this Chamber, especially the staff who acted in an extraordinarily professional way.

Also, of course, I want to thank Senator CONRAD and his staff, Mary Naylor and her team.

Senator CONRAD has been an incredibly positive, constructive, and professional individual to work with on this bill. This bill would not have been completed—even though he may not agree with the bill, which he doesn't, obviously, and he has argued his position—he has been more than fair in allowing us to proceed through the bill. And it is a reflection of his extraordinary professionalism.

I thank everyone on the staff, except his chart maker.

(Laughter)

I also especially want to thank my staff—led by the inimitable Scott Gudes—Gail Miller, Jim Hearn, Cheri Reidy, and the rest of the staff—Dave Fisher and Denzel McGuire. We have had two staff members who have had children just recently, Bill Lucia and Matt Howe. Matt's child was born just as the debate started. I am sure he called him "deficit reduction." We are all very excited about that. We very much appreciate the extraordinary job the staff has done here.

I think it is important for our membership to remember that this is the first time in 8 years that this Congress has stepped forward to try to reduce spending by addressing the entitlement and mandatory accounts of our Government. This is a major step forward in the activity of fiscal responsibility.

The other side of the aisle has tried to join this bill with other bills. The simple fact is, the only vote you will cast—the only vote that will be cast in the next few minutes—will be the only vote you are going to have to significantly reduce the deficit. It will be a veto to reduce the deficit by approximately $35 billion.

If you oppose the next bill that comes down the pike—the tax relief bill—that is your choice. But that is not what you are voting on here. What you are voting on here is the opportunity to reduce the deficit, and it is the only opportunity you are going to have, and it is the first time, as I mentioned, in 8 years that we will be proceeding down this road. It is a step toward fiscal responsibility, and it is a reflection of the Republican Congress's commitment to pursue a path of fiscal responsibility.

I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. The question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed for a third reading and was read the third time.

The PRESIDING OFFICER. The majority leader is recognized.

Mr. FRIST. Mr. President, it has been a long day. The next vote on final passage will be our last vote of the day. This will be our 22nd rollcall vote of the day.

I thank the chairman and the ranking member for a tremendous job. About 4 or 5 days ago, we said it was going to be done by 6 o'clock. We were going to complete this bill. Indeed, they have accomplished just that.

We will be in session tomorrow, but there will be no rollcall votes. We will go to the DOD authorization bill. Again, there will be no rollcall votes tomorrow. We will be on the DOD authorization bill on Friday and Monday.

We will have rollcall votes Monday night. We will not be voting before 5:30 on Monday.

With that, congratulations. I yield the floor.

The PRESIDING OFFICER. The bill having been read the third time, the question is, Shall the bill pass? The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE) is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 52, nays 47, as follows:

[Rollcall Vote No. 303 Leg.]

YEAS—52

| | | |
|---|---|---|
| Alexander | Ensign | Murkowski |
| Allard | Enzi | Nelson (NE) |
| Allen | Frist | Roberts |
| Bennett | Graham | Santorum |
| Bond | Grassley | Sessions |
| Brownback | Gregg | Shelby |
| Bunning | Hagel | Smith |
| Burns | Hatch | Specter |
| Burr | Hutchison | Stevens |
| Chambliss | Inhofe | Sununu |
| Coburn | Isakson | Talent |
| Cochran | Kyl | Thomas |
| Cornyn | Landrieu | Thune |
| Craig | Lott | Vitter |
| Crapo | Lugar | Voinovich |
| DeMint | Martinez | Warner |
| Dole | McCain | |
| Domenici | McConnell | |

NAYS—47

| | | |
|---|---|---|
| Akaka | Dodd | Lincoln |
| Baucus | Dorgan | Mikulski |
| Bayh | Durbin | Murray |
| Biden | Feingold | Nelson (FL) |
| Bingaman | Feinstein | Obama |
| Boxer | Harkin | Pryor |
| Byrd | Inouye | Reed (RI) |
| Cantwell | Jeffords | Reid (NV) |
| Carper | Johnson | Rockefeller |
| Chafee | Kennedy | Salazar |
| Clinton | Kerry | Sarbanes |
| Coleman | Kohl | Schumer |
| Collins | Lautenberg | Snowe |
| Conrad | Leahy | Stabenow |
| Dayton | Levin | Wyden |
| DeWine | Lieberman | |

NOT VOTING—1

Corzine

The bill (S. 1932), as amended, was passed.

Mr. GREGG. I move to reconsider the vote.

Mr. FRIST. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

## MORNING BUSINESS

Mr. FRIST. Mr. President, I ask unanimous consent that there now be a period of morning business with Senators permitted to speak for up to 10 minutes each; further, that Senator BUNNING be recognized now for 10 minutes, to be followed by Senator WYDEN for 10 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Kentucky.

## INTEGRITY IN PROFESSIONAL SPORTS ACT

Mr. BUNNING. Mr. President, today I and some of my colleagues, in a bipartisan effort, introduced the Integrity in Professional Sports Act. I especially thank my colleague from Arizona, Senator JOHN MCCAIN, for working with me on this important legislation. I thank the chairman of the Commerce Committee, Senator STEVENS, and Senators GRASSLEY and ROCKEFELLER, for cosponsoring our bill.

This is certainly not a bill any of us wanted to introduce. We wish Congress did not have to get involved in the issue of drug abuse in professional sports. Unfortunately, this might be the only way to get professional sports to finally clean up its act.

As a former major league baseball player and member of its Hall of Fame, protecting the integrity of our national pastime is a matter near and dear to my heart. I know it is near and dear to the hearts of so many across America. We have heard a lot of talk over the last year about the leagues working to implement new, tougher drug-testing standards. So far, that is all it has been, a lot of talk. Major League Baseball and its baseball union told us over a month ago they hoped to have a new agreement in place by the end of the World Series. The World Series is over and there is still no agreement. The time for talking is over. The leagues have had their chance and have failed to lead. Now we are going to do it for them.

We are, in a way, obligated to act since they cannot. We must not only ensure that our Federal drug laws are not being circumvented, but we also need to restore some integrity to the games that tens of millions of Americans enjoy so much. We must act for the sake of our children who see these players as heroes and want to emulate them. Like it or not, professional athletes are role models. They need to set a better example to kids who see them smashing home runs or sacking the quarterback and want to be like them. Unfortunately, too many professional athletes are injecting themselves and popping pills with false hopes and dangerous health effects. Now these acts are being emulated by kids even in high school because of the pressure they feel to perform at such a young age. We have a duty to help bring this to an end.

As Members of Congress, we can play an important role in educating the public on the terrible health effects from steroids. Illegal performance-enhancing drugs are a serious problem in professional sports and they need to stop now. I hope my colleagues will continue to join us in this bipartisan cause. I look forward to working with both sides of the aisle on moving this bill forward swiftly.

I yield to my colleague from Arizona, Senator MCCAIN.

The PRESIDING OFFICER. The Senator from Arizona.

Mr. MCCAIN. Mr. President, I am very proud to join Senator BUNNING, who many know is a Major League Baseball Hall of Famer. Not many know he was a founding member of Major League Baseball's Players Union. He brings to this issue impeccable credentials and an enormous amount of passion. I am pleased to be supportive of his leadership in this effort.

It is my hope this legislation would not be necessary. Senator BUNNING and I both come to this legislation with great reluctance. But as Senator BUNNING pointed out, the Major League Baseball players said they would, by the World Series, come up with an agreement. That has not happened.

The legislation is an effort to set minimum standards that have proven effective in Olympic sports and would also introduce independence—and this is crucial—into the drug testing programs of professional leagues.

Without an independent entity, such as the U.S. Anti-doping Agency that establishes and manages a testing and adjudication program, the fox will continue to guard the henhouse. That is exactly the problem that the U.S. Olympic movement faced several years ago, and they brought integrity back to American Olympic sports by putting the responsibility for testing in the hands of an independent entity.

There are some who argue that Senator BUNNING and I have no business legislating an issue which is basically a labor-management issue. We agree. We agree. We do not want to have to legislate. We do not want to have to force both entities to do something they otherwise should have done, but we have no choice. As the Senator from Kentucky has so eloquently pointed out, our obligation is not to the people who are making millions of dollars this year. Our obligation is not even to those who are members of professional sports. Our obligations are to the families of the young people who believe the only way they can make it in the major leagues is to inject these substances into their bodies.

Anybody who followed the hearing on the House side, where there was testimony from parents of young men who had committed suicide as a result of the use of these substances, knows this issue has now transcended a labor-management issue. Senator BUNNING and I come to this floor more in sorrow than in anger that we have had to take this extraordinary step. But we will take it; we will take it for the benefit of young Americans who believe the only way they can make it in the major leagues is by using these substances and to give hope to others who refuse to do it and want to make it on their own merits.

Mr. President, I again thank the Senator from Kentucky, who has been a role model to so many millions of young Americans for so many years, for his involvement in this effort.

Mr. President, I yield the remainder of my time.

Mr. BUNNING. I thank the Senator.

The PRESIDING OFFICER. The Senator from North Dakota.

Mr. CONRAD. Mr. President, might I speak for a moment?

Mr. President, I wish to say, before Senator MCCAIN and Senator BUNNING leave the floor, I think my colleagues know I must recuse myself from all matters on baseball because my wife represents Major League Baseball. But as a personal matter, I wish to thank Senator MCCAIN and Senator BUNNING for their moral leadership. It is a

scourge not only for professional sports but for amateur sports because, increasingly, those who are competing on an amateur level believe they have to use steroids to compete. That is a tragedy.

We are seeing usage of steroids at 20 to 40 percent in high school athletes because they read the stories, and they see what others are doing who have been at the very highest levels.

So I wish to give my profound thanks to Senator McCAIN and Senator BUNNING.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

---

## MEDICARE PRESCRIPTION DRUG COSTS

Mr. WYDEN. Mr. President, it has been a long day in the Senate, especially for our capable and dedicated staff. I wish to take a couple of minutes to say thank you to the Senators who, a bit ago, supported the Snowe-Wyden legislation to hold down the cost of prescription medicine.

Tonight a majority of the Senate voted to make the Federal Government a smart shopper when it comes to prescription drugs. For the first time, the Senate voted to remove an error of commission: the authorization of a provision in the prescription drug law that bars the Federal Government from negotiating to hold down the cost of prescription drugs.

For the life of me, at a time when the Federal budget is hemorrhaging, when the Government must pay for the costs of Katrina, I do not see how you can argue against the Snowe-Wyden amendment that was offered tonight. It prohibits price controls—that is certainly critical—so we can encourage innovation and research in the pharmaceutical area, but what the Snowe-Wyden amendment does is ensure that the Federal Government is going to do what everybody does in the marketplace—and that is use its bargaining power to hold down the costs. That is what the Federal Emergency Management Agency does when it buys cots, what every Federal agency does to make sure taxpayers and our citizens have their concerns addressed responsibly.

Now, tonight, Senator SNOWE and I had to get a supermajority to prevail. I want it understood that no matter how many procedural hurdles are put in front of us, no matter how many roadblocks are put up, we are going to keep coming back on this issue again and again and again until the needs of seniors and our taxpayers are met.

The older people of this country are insisting that an offensive piece of special interest legislation, one that defies common sense, get changed. The AARP made the case when they backed our bipartisan bill. They pointed out that drugs seniors use, such as Lipitor, are going up more than twice the rate of inflation. Seniors want that changed.

They will not abide it. Taxpayers will not abide it. And Senator SNOWE and I are going to stay at it until Medicare is liberated and can act as a smart shopper.

Fifty-one Senators—a majority of this body—said tonight it is time to get serious about holding down the cost of medicine in the United States. Fifty-one votes is not the supermajority we needed, but Senator SNOWE and I are going to stay at it until we get justice done for our older people.

Finally, I want to say a special thanks to our bipartisan group of sponsors and particularly thank Senator STABENOW, Senator McCAIN, and Senator FEINSTEIN. They are all Senators who got this from the get-go. They understood this was a question of making sure that, at a time when the Federal Government begins the biggest expansion of entitlement health care in years, we take steps to protect the interests of taxpayers and the interests of older people who, right now, are beginning to sign up for the program and will, in fact, start participating formally next year.

We believed it was important tonight to offer this amendment. We wish we had more time to discuss it this evening. I went into it at some length yesterday, but I am pleased we made real progress. For the first time, a majority of the Senate says that this provision that keeps the Federal Government from being a smart shopper simply does not add up. It does not make sense. It defies logic. It is contrary to what everybody else does in the marketplace across the country. I wish we could have gotten the 60 votes needed to prevail tonight, but for the first time we got a majority, and we are going to come back again and again and again. We are going to do it because the older people of this country deserve a fair shake. They are going to insist we keep coming back.

I close my comments tonight by thanking the Presiding Officer, as well, for his support in this effort.

Mr. President, with that, I yield the floor and suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. FRIST. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## JAMES GRAY, NATIONAL WRITING PROJECT FOUNDER

Mr. COCHRAN. Mr. President, I was saddened to learn today that James Gray passed away after a long illness on November 1, 2005. Mr. Gray was 78 years old and lived in Danville, CA. I knew him as the founder of the National Writing Project, which today is credited with perfecting the training

model of teachers teaching teachers how to teach writing.

For more than 30 years, teachers of all grades and nearly the entire spectrum of subject areas have benefitted from the vision and dedication of Jim Gray to finding better ways of raising a new generation of writers. Thousands of teachers have participated every year in workshops, classes and retreats to perfect their skills, and as a result, an exponential tens of thousands of students continue taking new steps to becoming skillful writers.

It was his work that gave me the good fortune of meeting him, and my becoming a close friend to the Writing Project as the sponsor of legislation to make it a Federal program under the U.S. Department of Education.

Across the country, many teachers and students mourn him, but I hope they take his serious creativity in teaching and live his legacy of the National Writing Project. I extend to his family, and to all who knew him, my message of gratitude for his life's work and my deep sympathy.

I ask unanimous consent that a copy of the obituary of James Gray released today by the National Writing Project be printed in the RECORD.

There being no objection, the material was ordered to be printed in the Record, as follows:

NATIONAL WRITING PROJECT FOUNDER JAMES GRAY DEAD AT 78

James Gray, founder of the National Writing Project, died November 1 in Danville, California, after a long illness.

Gray, a former high school teacher and then a senior lecturer at the University of California, Berkeley's Graduate School of Education, founded the innovative Bay Area Writing Project in 1974. Acting on his belief that successful classroom teachers were an untapped resource for providing their peers with professional development, Gray brought together 25 talented Bay Area teachers and charged them with sharing their expertise about the teaching of writing.

The Bay Area Writing Project became the first site that offered a professional development model for teachers of writing. Now known as the National Writing Project (NWP), the program has grown to 189 university-based sites located in fifty states, Washington, DC, Puerto Rico, and the U.S. Virgin Islands.

Gray served as Executive Director of the NWP until his retirement in 1994 and remained on the NWP Board of Directors until his death.

Gray's simple but highly successful model has been responsible for transforming classroom practices and improving student writing performance at schools in rural, urban, and suburban communities across the U.S.

"Jim's belief in teachers and their knowledge, commitment, and creativity never wavered," said NWP Executive Director Richard Sterling. "We are all the beneficiaries of his vision and his tireless work on behalf of the National Writing Project."

For more information about Jim Gray and the National Writing Project, visit the NWP website at www.writingproject.org.

---

## LAUNCHING OF JEWISH SOCIAL ACTION MONTH

Mr. LIEBERMAN. Mr. President, I rise today to announce the launching

of the first Jewish Social Action Month—a month where Jews around the world will be encouraged to engage in good works and service to their communities.

I am joined in this effort by my colleague in the House, Congressman STEVE ISRAEL of New York, as well as members of the Israeli Knesset.

Throughout the month—and every year in the second month of the Hebrew calendar, Heshvan, from here on out—Jews from across the globe will be encouraged to perform acts of loving kindness to their neighbors, regardless of faith.

The concept of Social Action can be interpreted broadly and there are endless possibilities for action.

The Israeli Friends of the Earth, for example, will be launching initiatives to clear up the debris which ruins our countryside.

In Boston, Jewish students are working to help students in inner city schools develop their reading and writing skills.

In New York, Jewish groups are delivering Thanksgiving meals to the elderly who are housebound.

These are just three quick examples of the kinds of service we hope people will be inspired to undertake in November and continue year round—inspiring people of all faiths to join in service to their neighbors as well.

The idea for Jewish Social Action Month came from two young men—Josef Abramowitz of Boston and Aryeah Green of Israel—during a retreat in the Israeli desert.

They wanted a way to motivate people of all ages to realize the words of The Scriptures that tells us to help those who have the least among us. For instance, in Deuteronomy we are told to love a poor stranger and give him food and clothing because we too were strangers in Egypt and God fed and clothed us.

The President of Israel, Moshe Katsav, has been an enthusiastic supporter of Jewish Social Action Month and is lending the prestige of his office in Israel to urge that people heed this call to community service.

I want to thank all of those individuals, groups, synagogue and temple leadership and membership who are joining this effort.

Mr. President, I ask unanimous consent to have printed in the RECORD a number of statements and articles relating to Jewish Social Action Month.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

DECLARATION REGARDING CHODESH CHESED VETZEDEK, THE SOCIAL ACTION MONTH

It has been taught to you O man what is good and what the Lord requires of you, only to do justice and loving kindness and to walk humbly with your G-d (Micah VI:8).

At the foundation of our faith lies the importance of acts of loving kindness. Through its narratives and the laws of the Torah, God calls on us to make our world a holier, more just and caring place.

At Rosh Hashanah and Yom Kippur we think about our responsibilities to God, and

everyone around us including the needy of the world who depend on our support. We promise to do more for them in the coming year. Just a few days later, we celebrate Succot. This festival recalls Biblical times when the Jewish people lived in temporary shelters as they journeyed through the desert. It also reminds us that in our own times there are people across the world in need of food, shelter, warmth and love.

As Succot ends, we enter the month of Cheshvan, the month that has no festivals, a time dedicated to putting into practice our pledges to be better people and to better the lives of those around us.

The Government of Israel, through its Ministry for Israeli Society and the World Jewish Community has invited communities in Israel and across the globe to proclaim this Cheshvan a month of Chesed and Tzedek (loving kindness and social justice). Everywhere, Jewish organisations will be launching Chesed and Social action programmes.

We are delighted to add our voices to this call which echoes the voice of our tradition. We invite our communities to seek ways to help and support those in need wherever they are, so that through our acts of loving kindness, we may indeed "mend the world according to the Kingship of God".

May our efforts bring peace and blessing upon our communities, the whole House of Israel and the whole world.

Rabbi Menachem HaCohen—Chief Rabbi of Romania, Rabbi Warren Goldstein—Chief Rabbi of South Africa, and Sir Jonathan Sacks—Chief Rabbi of the United Kingdom.

---

OFFICE OF THE PRIME MINISTER,
MINISTRY FOR ISRAELI SOCIETY &
THE WORLD JEWISH COMMUNITY,
*Jerusalem, November 3, 2005.*

I am delighted to send my greetings to this distinguished gathering at the Congress in Washington to launch the first ever Jewish Social Action Month. I would like to thank everyone who has come today and in particular my dear friend Senator Joe Lieberman and Congressman Steve Israel who are hosting this event. My thanks also Yossi Abramovitch, Rebecca Lieberman and all the members of Kol Dor who have worked so hard to make it such a success.

At the heart of the Jewish religion lies the importance of caring for others. According to the rabbis, God made all of humanity in his image in order to show that all people of all faiths, colors and creeds are important to the Almighty. We are taught in the Jerusalem Talmud that there is no limit to the amount of loving kindness we should do or to the Divine reward we receive for these actions.

It is therefore gives me great pride as Deputy Minister for Israeli Society and the World Jewish Community in the Government of Israel together with the Kol Dor Organisation to launch the very first ever Jewish Social Action month whereby Jews from all over the world and from every background will take part in different activities to mend the world and make it a better place for us all.

I wish everyone here much success in their activities and I thank you all once again for your support for this important project.

Rabbi MICHAEL MELCHIOR,
*Deputy Minister responsible for Israeli Society and the World Jewish Community.*

---

TESTIMONY OF YOSEF I. ABRAMOWITZ IN SUPPORT OF DECLARING THE HEBREW MONTH OF HESHVAN GLOBAL JEWISH SOCIAL ACTION MONTH

Chairwoman Collette Avital, other Members of Knesset, Kol Dor conference chair

Yael Andoran, fellow Kol Dor Members, friends and others who care about the future of the Jewish people and Jewish mission.

It is a great privilege to introduce a global Jewish idea to this important body, an idea that can: help unite Jews around the world; strengthen the global integrity of the Jewish people; highlight positive Jewish values; and, of course, catalyze the performance of hopefully countless acts of hesed and tzedek, of social action and social justice.

We at Kol Dor recognize that there are multiple points of entry into Jewish peoplehood, especially for the under-affiliated of the next generation who are not joining through traditionally prescribed ways. The prophetic call to repair the world, which resonates clearly in Israel's Declaration of Independence, clearly speaks to young Jews around the world, across the religious and political spectrum. We seek to harness this idealism, unfortunately often cast in a universal rather than particularly Jewish frame. We seek to join a strong social justice stream found in Jewish teachings—as Rav Gideon Sylvester just demonstrated—with the growing tide of alienated young Jews, and create a powerful current of Peoplehood with Purpose.

The idea is quite simple: The Jewish people, who have contributed so much to the moral advancement of civilization, will focus our energies and attention on the month of Heshvan and transforming it internationally into Jewish Social Action Month. Following the Yamim Noraim, when world Jewry is mobilized to celebrate the High Holy Days, Jews will be invited to express our people's universal hopes for humanity and civilization by actions—local, national, international—that express our values of aryevut, and tzedek.

The idea is to open-source this idea in all Jewish communities, from Hodu and Kush, from Metula to Eilat, from San Francisco to San Paulo, from Sydney to London, and everywhere in between.

As Jews, we know the power of symbols. In an era of Jewish history when we live with so many internal divisions, our communities want to rally around positive ideas and actions that unite Jews worldwide.

We seek neither to dictate nor control, but to provide leadership. We seek to link powerful ideas with personal example, doogma Isheet, and to seed the great imagination and intellectual power of Jews worldwide, as they seek ways to make a difference in the world.

We, Kol Dor members from sixteen countries, respectfully offer this committee and the Knesset the opportunity to provide not just leadership to Medinat Yisrael, but to Am Yisrael.

Thank you for your positive consideration of declaring Heshvan Global Jewish Social Action Month.

---

RABBI MICHAEL MELCHIOR OP ED PIECE FOR THE JTA FOR THE JEWISH SOCIAL ACTION MONTH

As the member of the Government of Israel with responsibility for the world Jewish community, I have the privilege of meeting Jews of all types, from all over the world. There are huge cultural, historical and theological variations amongst Jews and these lend color and variety to our people. But the differences also create problems. The deep rifts that occurred in Israel over the issue of disengagement and the battles between different groups demonstrated once again the profound divisions amongst us. The Jewish people stand in danger of splitting into different factions with different narratives. Amidst so much diversity, what can unite us?

Wherever I travel in the Jewish world, I am struck by the way that Jewish people of all types are determined to make a Kiddush Hashem (sanctification of God's name) and to avoid a Hillul Hashem (desecration of God's name). The concept of the Kiddush Hashem originates in the Biblical command "I shall be sanctified amongst the people of Israel". One interpretation of this verse is that Jews should display total dedication to their faith and even be willing to lay down their lives for it. This belief motivated millions of Jewish martyrs throughout our history to give up their lives rather than abandon their Judaism. Today, it is rare for Jews to be faced with such a stark choice between their faith and their lives, but Kiddush Hashem offers another powerful challenge which has particular resonance in our times. Each one of us has to ensure that the word "Jewish" is always associated with the highest levels of ethics and kindness, so that our behavior always brings credit to our heritage and to our God.

On a daily basis, we witness the disgrace that is attached to religion when it is linked with the horrors of priests engaging in child abuse and the fanaticism of "religious" suicide bombers. Tragically, throughout our long history, our own faith has also spawned instances of the desecration of God's name. The rabbis recognized these and declared that it was our failure to show care, compassion, decency and loving kindness to one another that caused so many of our sorrows including the destruction of the Temple. In our own times, the most famous desecration of God's name was the massacre of Arabs at prayer in the mosque in Hebron and the murder of the Israeli Prime Minister Yitzhak Rabin. It was these outrages that drove me to put to aside my work as a Chief Rabbi of Norway and to enter Israeli politics. I felt that it was crucial for the government of Israel to work on a grand scale to restore the image of Judaism from one of intolerance and fanaticism to one of ethics, tolerance and compassion. It was my duty as a rabbi to play my part in that campaign. This is a crucial message of Judaism. Holiness is not the exclusive possession of those who engage in detailed ritual observance nor is it the preserve of those who devote their energies to the pursuit of spirituality; true holiness is found in the small actions that make a profound difference to the lives of the people around us and the world they live in.

This is why I am so delighted that in partnership with the Koldor organization, my office is launching the Jewish Social Action Month this Cheshvan (November). It falls one month after Rosh Hashanah and Yom Kippur so it is a time to draw on all of the resolutions that we made over the High Holidays. It's also a month with no festivals in it which enables us to dedicate time to Social Action activities.

Throughout the month Jews from across the globe will be performing acts of loving kindness to their neighbors both Jewish and Gentile. The concept of social action can be interpreted broadly and there are endless possibilities for action. The Israeli Friends of the Earth, for example, will be launching initiatives to clear up the debris which ruins our countryside, the Israeli Police Force will be engaging in projects to show care and concern in the community, one youth movement will be organizing a sports event for the underprivileged, another arranging a national blood donation drive. It is beautiful to see how in Israel and spreading across South America, North America, Russia, and Europe, Jews ranging from Chief Rabbis to the most secular of our people will be engaged in the Social Action Month.

I very much hope that you will feel moved to join in the project; to make a Kiddush Hashem and turn our world into a better place. I look forward to hearing about your activities and reading about them on the website of the Prime minister of Israel.

---

CHECK THE CALENDAR—CHESHVAN IS NOW JEWISH SOCIAL ACTION MONTH

(By Tzvi Kahn)

NEW YORK, June 30.—Aryeh Green and Yosef Abramowitz were sipping tea in a Bedouin tent last year in Sde Boker, a kibbutz in Israel's Negev desert, when they had an idea.

Participants at a conference of Kol Dor, an organization that seeks to revitalize Jewish activism and unity across the globe, the two were discussing how the group could promote Jewish identity and peoplehood.

"Most Jewish institutions and endeavors are out of touch with the next generation of Jews because of a lack of relevance," Abramowitz, CEO of Jewish Family and Life, which publishes several Jewish Web sites and magazines, told JTA. "But we do know that the idealism and the desire to contribute to the world" are predominant.

It occurred to them that a month in the Jewish calendar formally dedicated to social action would be an ideal means of mobilizing and inspiring the Jewish community.

Their initiative received a major boost this week when the Knesset's Committee on Immigration, Absorption and Diaspora Affairs proclaimed the Jewish month of Cheshvan, which falls in November this year, as Social Action Month.

According to Green, who serves as an adviser to former Israeli Cabinet minister Natan Sharansky, "We agreed that if we wanted Kol Dor to succeed, we would have to focus on practical, tangible contributions."

"What makes this initiative interesting and unique is that it harnesses the power of different social action and Jewish organizations to get involved," Green said. The goal is not to spearhead specific projects, but to "pull together the existing frameworks of social action."

The effort has garnered the support of various Jewish groups, including the Jewish Agency for Israel and Hillel: The Foundation for Jewish Campus Life, the Israel Defense Forces' education branch and the World Union of Jewish Students.

Abramowitz said Labor Party legislator Colette Avital, who chairs the Knesset's immigration committee, has sent a letter to various Jewish organizations expressing support.

Jewish schools in Israel and the Diaspora will be a particular focus of the initiative. According to Abramowitz, Social Action Month will receive special attention in the BabagaNewz, a monthly magazine on Jewish values that JFL publishes for elementary school students. The magazine serves 1,400 Jewish schools and has a circulation of more than 40,000.

The JFL journal Sh'ma and magazine JVibe also intend to publish features on the subject, he said.

Abramowitz said Cheshvan was selected for the project because it immediately follows the High Holidays, which usually spur higher levels of Jewish observance.

The Knesset decision also represents a victory for Kol Dor, whose philosophy formed the ideological foundation for Social Action Month.

"The paradigm that we are advocating in Jewish life is that peoplehood is a central mobilizing force," Abramowitz said, citing the success of the movement to rescue Soviet Jewry as one example.

The group seeks to use the Jewish concept of tikkun olam, or repairing the world, as a unifying theme.

## REMEMBERING MRS. ROSA PARKS

Mr. ALEXANDER. This week we have honored the memory of Rosa Parks, a woman whose quiet stand for her individual rights reverberated across this country.

We often discuss how far we have to go as a country in terms of race relations. Thinking of Rosa Parks reminds me how far we have come. In 1955 when she refused to give up her seat on the bus in Montgomery, African Americans in the South could not eat in the same restaurants, go to the same colleges, sleep in the same motels, be cared for in the same hospitals or compete on the same sports teams as other Americans.

Rosa Parks' actions that day in Montgomery helped spark a movement that changed our country forever for the better. Condoleezza Rice, one of the bright minds leading our country today, rightly noted at the memorial service in Alabama, ". . . that without Mrs. Parks, I would not be standing here today as Secretary of State."

Rosa Parks and those who took up the call inspired me, too. As editor of the student paper at Vanderbilt University, I wrote editorials urging desegregation of that school in 1962.

We made great progress in those days, as we continue to do today. Our Nation has always been a work in progress, ever since our Founders signed the Declaration of Independence declaring that "all men are created equal." We're still working to achieve that noble goal of recognizing our equality. But thanks to Americans like Rosa Parks, we've come a long way.

Rosa Parks' courage has earned for her a noble place in the history of our Nation's struggle for equal opportunity. We will miss her.

## LOCAL LAW ENFORCEMENT ENHANCEMENT ACT OF 2005

Mr. SMITH. Mr. President, I rise today to speak about the need for hate crimes legislation. Each Congress, Senator KENNEDY and I introduce hate crimes legislation that would add new categories to current hate crimes law, sending a signal that violence of any kind is unacceptable in our society. Likewise, each Congress I have come to the floor to highlight a separate hate crime that has occurred in our country.

On October 1, 2003, just east of West Hollywood, a gay man was attacked in his home with a bat by a pair of assailants. The two assailants took the victims house key after he ran home and left his keys in the door as he hurried inside. The victim, who identified his attackers as Evar Rivera and Selvan Campos in court, said he received 14 stitches for his injuries. According to police, anti-gay slurs were yelled during the bat attack, and police later classified the attack as a hate crime.

I believe that our Government's first duty is to defend its citizens, in all circumstances, from threats to them at

Case 1:01-cv-12257-PBS    Document 6528-55    Filed 09/22/09    Page 66 of 91

home. The Local Law Enforcement Enhancement Act is a major step forward in achieving that goal. I believe that by passing this legislation and changing current law, we can change hearts and minds as well.

## NASA GLENN RESEARCH AWARDS

Mr. DeWINE. Mr. President, I rise today to honor the dedicated team of scientists, engineers, and innovators of NASA's Glenn Research Center in Cleveland for their hard work and perseverance. I have recognized in previous years the award-winning work of researchers and engineers at NASA Glenn and am proud to do so again today.

The Glenn Research Center has come up with a wide range of products that not only contribute to further progress in our space exploration mission, but also provide for remarkable enhancements in the quality of life of citizens throughout the United States. Through NASA's commercialization initiatives, these products have enabled the creation of new jobs in the country, thereby encouraging additional economic growth nationwide.

This year, four products introduced by NASA Glenn have been distinguished among the ''Top 100 Most Technologically Significant Products of the Year.'' They have been recognized by the editors of Research & Design Magazine and awarded four of the ''R&D 100'' awards—awards known by many as the ''Oscars of Invention.'' Their remarkable achievements clearly illustrate the high level of professionalism that distinguishes the Glenn Research Center, its employees, and the numerous organizations and individuals who work in partnership with the Center.

It is with great pride that I recognize each of the award participants and congratulate them for their outstanding work. In developing an award-winning family of rod-coil block copolymers, Dr. Mary Ann Meador and Dr. James Kinder of Glenn's Materials Division have improved ionic conductivity in lithium polymer batteries. These new polymers will enable cost-saving advances in battery technologies, resulting in improvements to products ranging from mobile phones to fuel cells. Through this important innovation, it will be possible to offer lower manufacturing costs, while increasing battery safety to meet future aerospace application requirements.

The NASA Glenn Sensors and Electronics Branch team has been recognized for its development of a new sensor-based fire detection system that effectively recognizes the presence of fire while screening out false alarms. Dr. Gary Hunter led the development effort in collaboration with colleagues from Case Western Reserve University, the Ohio State University, Makel Engineering, and the Federal Aviation Administration. This revolutionary device will improve fire alarms in cargo

and baggage compartments of commercial aircraft and is also specifically adapted to fit the requirements of the International Space Station.

The Center also has received recognition for its work on a material known as the Glenn Refractory Adhesive for Bonding and Exterior Repair, GRABER. This material, which was considered for use in the Space Shuttle Return to Flight program, was developed and tested by Dr. Mrityunjay ''Jay'' Singh, now a four-time ''R&D 100'' award winner, and Tarah Shpargel of NASA Glenn's Ceramics Branch. This dynamic material will allow in-space repair of both large and small cracks in the space shuttle thermal protection system—a capability that is absolutely essential for the safety and success of future Space Shuttle missions following the tragic loss of the *Columbia*. In addition to its applications in space, GRABER has a number of potential industrial applications due to its low cost and excellent adhesive properties.

Finally, NASA Glenn's Numerical Evaluation of Stochastic Structures Under Stress, NESSUS, software program has been recognized as an award winner this year. The NESSUS program combines state-of-the-art algorithms with general-purpose numerical analysis methods to predict responses in hi-tech systems, such as aerospace and automotive structures, biomechanics, and gas turbine engines. Dr. Shantaram Pai, of Glenn's Structural Mechanics and Dynamics Branch, was responsible for developing the probabilistic heat transfer module integrated in the system and managing the integration of nine other NASA-developed modules into NESSUS, enabling analysis of a diverse range of problems.

I extend my most genuine congratulations to everyone who participated in each of NASA Glenn's award-winning projects.

## SUPERFUND LITIGATION

Mr. BROWNBACK. Mr. President, I rise today to speak on the issue of clarifying Congress's intent regarding agricultural operations in respect to Superfund litigation. I, along with my colleague from Idaho, Senator CRAIG, offered an amendment during the agriculture appropriations conference committee that would have done that very thing. The amendment passed the Senate, by a 9 to 8 vote, yet was stripped from the final conference report. Needless to say, I am disappointed with this result. So much so, in fact, I decided not to sign the conference report.

When the Comprehensive Environmental Response, Compensation, and Liability Act, or CERCLA, was passed in 1980 and the Emergency Planning and Community Right-To-Know Act, or EPCLA, was passed in 1986, agriculture was never part of the deal. These acts were intended to provide for clean up of toxic waste dumps and spills such as

Love Canal and Times Beach. To this end, Congress created the Superfund to tax building blocks, such as petrochemicals, inorganic raw materials and petroleum oil, used to make all hazardous products and waste. Animal agriculture waste, or manure, is clearly not among these materials. In fact, if you would have tried to attach agriculture to either of these two acts, they would not have passed. It was not Congress's intent to apply Superfund rules to manure which contains naturally occurring organic compounds—such as orthophosphate, ammonia and hydrogen sulfide—which occur naturally in the environment in the same form as they appear in manure.

Recently, municipal and State governments have filed suit against livestock and poultry operations claiming Superfund liability in Texas and Oklahoma.

On April 24, 2004, the City of Waco, TX, filed suit in Federal court against eight dairies in the North Bosque River Watershed and later amended the suit to include six additional dairies, seeking $45 million in damages under Superfund. The suit alleges that orthophosphate is discharged from the dairies and has affected the water quality of Lake Waco which is located approximately 100 miles downstream from the dairies.

On June 13, 2005, the attorney general of the State of Oklahoma filed suit in Federal court against 14 major integrated poultry production firms claiming joint and several liability for damaged water quality in the Illinois River Watershed caused by poultry litter runoff from agricultural lands to which it has been applied as fertilizer. The suit seeks to recover past, present, and future response costs under Superfund, as well as natural resource damages that is expected to add up to several hundreds of millions of dollars. If these two cases are successful, other municipalities and States could bring similar lawsuits and every animal feeding operation and farm could be held liable under Superfund.

This is another example of our judicial system overstepping its boundaries. Our judicial system is usurping the will of Congress and creating laws Congress never meant to create.

Animal agriculture operations have been appropriately regulated and required to have permits for years under the Clean Water Act, the Clean Air Act, and various State laws to protect the environment, but never under Superfund. My amendment would have left these laws in place. My amendment would have only protected agricultural producers from another example of an activist judicial system. Agriculture is already an over regulated industry and adding the possibility of Superfund litigation will be too much to bear for farmers and ranchers.

Further, Superfund was created with a specific goal and mission in mind. The EPA is burdened to meet these goals as it is. To now add the millions

of acres of agriculture as possible Superfund sites would be too heavy a burden for the EPA to carry. Including agriculture within Superfund takes away from Superfund's initial, worthy mission.

As I stated earlier, I am disappointed that the Superfund amendment was stripped from this report after having passed the Senate. I fully intend to bring this item up next year and I am currently looking for ways to move this legislation. This needs to happen for our farmers and ranchers.

---

### PROTECTING OUR HOMELAND SECURITY

Mr. LEVIN. Mr. President, despite the potential threat from terrorists armed with easily accessible powerful firearms, Congress still has taken no action to require Federal registration of .50 caliber sniper rifles. We must do more to protect our families and communities.

The .50 caliber sniper rifle is a favorite weapon of militaries around the world and is also among the most powerful weapons legally available to private individuals in the United States. Published reports indicate that .50 caliber sniper rifles are capable of accurately hitting a target more than 1,500 yards away with a bullet measuring a half inch in diameter. In addition, these thumb-size bullets come in armor-piercing, incendiary, and explosive varieties that can easily punch through aircraft fuselages, fuel tanks, and engines. Currently, these highly destructive sniper rifles, which have no sporting purpose, are subject to only minimal Federal regulation and are treated the same as other long rifles, including shotguns, hunting rifles, and smaller target rifles.

In August, the House of Delegates of the American Bar Association adopted a resolution in support of "Federal, State, and territorial laws that would restrict the sale, distribution, transfer, and possession of .50 caliber sniper weapons except to the U.S. military, and the National Guard and law enforcement agencies." The ABA report that accompanied the resolution states:

Despite its destructive potential, the .50 caliber weapon is sold like any other rifle. Under current law, one needs only be 18 years of age, have a driver's license and pass a minimal background check in order to buy the gun.

The U.S. Congress has acted to restrict various weapons including specific firearms and ammunition. Rockets, mortars and ammunition over .50 caliber size cannot be sold or legally possessed by civilians. Machine guns, sawed-off shotguns, imported junk handguns, silencers, guns made of plastic or otherwise undetectable by metal screening devices and some armor-piercing ammunition are currently banned or restricted under federal law.

I am a cosponsor of the Fifty-Caliber Sniper Weapon Regulation Act introduced by Senator FEINSTEIN. This bill would reclassify .50 caliber rifles under the National Firearms Act, NFA, treating them the same as other high-powered or especially lethal firearms like several of those mentioned in the ABA's report. Among other things, reclassification of .50 caliber sniper rifles under the NFA would subject them to new registration requirements. Future transfers or sales of .50 caliber sniper rifles would have to be conducted through a licensed dealer with an accompanying background check. In addition, the rifle being sold would have to be registered with Federal authorities.

We must take proactive steps to help prevent terrorists armed with military style firearms purchased in the U.S. from carrying out attacks on innocent Americans. I urge the Senate to take up and pass commonsense gun safety legislation, like the Fifty-Caliber Sniper Weapon Regulation Act, to assist our law enforcement officials in protecting our homeland security.

---

### ADDITIONAL STATEMENTS

### TRIBUTE TO ARTHUR GIBB SR.

● Mr. JEFFORDS. Mr. President, this week my home State lost a devoted public servant, an environmental pioneer, a good friend, and a great Vermonter: Art Gibb.

I first met Art when we served together in the Vermont Legislature where Art was known for his unassuming and gracious temperament. Art also established a reputation as an insightful legislator with an unusual ability to forge consensus. These skills impressed me and, for over 30 years, I frequently sought Art's wisdom and advice when I found myself confronted with difficult decisions both in Washington and Montpelier.

Though Art was remarkably accomplished as a member of the Vermont Legislature, he will undoubtedly be remembered for his work on the Governor's Commission on Environmental Control through which he helped save Vermont's beauty and natural resources from reckless overdevelopment. Gov. Deane Davis appointed Art to lead the commission, which became known as the "Gibb Commission," in 1969 as developers began exploiting lenient building regulations in an effort to turn a quick profit at the expense of public health and the environment. The Gibb Commission traveled the State, held public hearings, and worked tirelessly to draft recommendations to address this pressing concern. The result of the Gibb Commission's work was the bold and pioneering Act 250, legislation that has protected Vermont's waterways, forests, and natural landscape ever since.

Art's leadership of the Gibb Commission and his work during his two decades in the legislature earned him well-deserved accolades. Still, Art never operated with any fanfare. Despite his newsworthy accomplishments, Art was never interested in seeing his name in the headlines. His temperament and fair and nonpartisan nature won Art the respect and admiration of colleagues on both sides of the aisle. Today, Art's portrait hangs in the State House, a rare honor and a fitting tribute for a man who left such an important mark on Vermont, both as a person and a policymaker.

When Art retired from the Vermont Senate in 1986 I noted, on the floor of the U.S. House of Representatives, "I am more than certain, however, that all of us in Vermont will continue to benefit from his,—Art's—wit, his intelligence, his commitment, and his grace for many, many years to come." This statement proved to be true, as Art remained an active member of the community and even served 12 years on the State Environmental Board after his retirement. Today, as we remember Art, I take comfort in the certainty that generations of Vermonters will continue to benefit for years to come from Art's devotion to the preservation and conservation of our great State.

I extend my deepest condolences to Art's surviving children Barbara, Dwight, Lowrie, Arthur, Jr. and Henry, as well as Art's ten grandchildren and seven great grandchildren. All Vermonters mourn with you knowing that without Art, Vermont would not be the beautiful and healthy place it is today.●

---

### HONORING DR. BONNIE J. DUNBAR

● Mrs. MURRAY. Mr. President, today I would like to recognize the extraordinary achievements of a gifted Washingtonian named Dr. Bonnie J. Dunbar. Dr. Dunbar is widely acknowledged as one of the world's most experienced female astronauts as well as a pioneer in biomedicl engineering. In tribute to her accomplishments, Dr. Dunbar has been selected to receive the distinguished Women in Engineering Achievement Award for 2005.

Born and raised on a ranch in Sunnyside, WA, Dr. Dunbar took an early interest in space. As a child, she studied the exploits of astronauts like Alan Shepherd and spent her nights studying the sky for signs of passing satellites. By the third grade, she had already declared that she would one day be an astronaut. Encouraged by her parents to follow her dreams, Bonnie Dunbar attended the University of Washington where she received her bachelor and master degrees in engineering, an important precursor to her career at NASA. However, her journey to space was not without its hurdles.

Like a true pioneer, Dr. Dunbar worked to break down barriers. At a time when women were generally discouraged from pursuing science based careers, Dr. Dunbar both succeeded and prospered in her field, paving the way for countless women who shared her interest in science. After receiving her doctorate in Mechanical and Bio-medical Engineering from the University of Houston, Dr. Dunbar went on to

hold a number of esteemed research and engineering positions in the private sector. During this time, Dr. Dunbar assisted in the development and manufacture of Space Shuttle Thermal Protection Systems integral to NASA flight operations.

In 1978, when NASA opened its astronaut program to women for the first time, Dr. Dunbar was one of the first candidates to enroll. Although she was not chosen in the final selection, NASA recognized her talents and hired her as a payload officer and flight controller. This would mark the beginning of a distinguished 27-year career at NASA. In 1981, Dr. Dunbar earned her astronaut wings and was assigned to the 1985 Challenger Spacelab mission. Following this successful mission, she was selected to participate in four more missions in space. All told, Dr. Dunbar logged more than 1,208 hours or 50 days in space.

Dr. Dunbar's exceptional performance during these missions garnered more than six NASA Space Flight Medals, including the Superior Accomplishment Award in 1997, and the NASA Exceptional Achievement Award in 1996.

Doctor Bonnie Dunbar's meteoric rise from a small ranching community in the State of Washington to a veteran of five successful missions to space is both extraordinary and inspiring. Her courageous trailblazing took the world's fascination for space to new plateaus and encouraged women to follow their dreams. She truly is a remarkable pioneer and a worthy recipient of the outstanding Women in Engineering Achievement Award for 2005.●

CELEBRATING THE 60TH ANNIVERSARY OF HULMAN-GEORGE FAMILY OWNERSHIP OF THE INDIANAPOLIS MOTOR SPEEDWAY

● Mr. LUGAR. Mr. President, I am pleased to rise today to recognize the important leadership of the Hulman-George family throughout their 60 years of stewardship of the Indianapolis Motor Speedway. I am honored to have this opportunity to congratulate them on reaching this signal milestone on November 14, 2005.

The Hulman-George family members have been remarkable champions of Indianapolis and the State of Indiana through their hosting of what many consider to be the greatest spectacle in racing, the Indianapolis 500. In recent years, they have also hosted the Brickyard 400 and the United States Grand Prix, remarkable events that bring people from around the world to Indianapolis to experience true Hoosier hospitality.

I have especially enjoyed a close relationship with the Hulman-George family, which began when I was Mayor of Indianapolis. My wife, Char, and I would take our four boys to the track for activities throughout the month of May.

On May 16, 1981, I first had the opportunity to participate in another great tradition at the Speedway when we gathered to celebrate the annual Armed Forces Induction Ceremony. This event came about because recruitment was low and members of our community were looking for a creative way to celebrate the decision of Hoosier men and women to serve our country in the Armed Forces. To address this dilemma, the Hulman-George family offered the Indianapolis Motor Speedway as a backdrop for an enlistment ceremony. Anyone who enlisted during the month of May would be a part of the Tony Hulman Squadron and would fly away from the infield to basic training. While the ceremony has evolved over the ensuing years, it remains special to me because it offers an excellent opportunity to celebrate the patriotism of so many talented and dedicated young Hoosiers.

As race fans gather in Indianapolis to cheer their favorite drivers on to victory, I am hopeful that they will take a moment to reflect upon the years of dedicated leadership that the Hulman-George family has provided in the Indianapolis community, leadership that has helped to make Indianapolis the motorsports capitol of world.

Like so many of my fellow Hoosiers, I am grateful that the Hulman-George family continues to call Indiana its home.●

DANNY J. BAKEWELL, SR.

● Mrs. BOXER. Mr. President, I am very pleased to take a few moments to recognize the many important accomplishments of Danny J. Bakewell, Sr., as he prepares to step down as CEO of the Brotherhood Crusade.

Danny J. Bakewell, Sr. has spent the past 35 years building the Brotherhood Crusade into a nationally-recognized charitable organization in southern California. In that time, he has raised over $60 million to support a host of programs. Nurturing nonprofit groups and local small businesses is first and foremost among the Brotherhood Crusade's priorities. The venerable institution funds programs that provide services for adults seeking job training and job placement, young people looking to realize their academic potential, and families seeking to improve their physical health.

The funding that Brotherhood Crusade provides is the lifeblood for many organizations, making it possible for them to be the catalyst in bringing change to communities and change to individuals.

Danny's commitment to equality for all, fair representation in the media, and strengthening communities has been steadfast, as evidenced by his activist work. He was active in the struggle to bring a peaceable end to apartheid in South Africa. Danny galvanized a coalition of community leaders to change the way entertainment companies represented slavery on prime time

television. Along with his family, Danny launched a foundation to uplift the lives of children during their treatments associated with leukemia and other life-threatening diseases.

Danny Bakewell's success in the private sector have been important to under-served communities throughout Los Angeles county as well. He is the publisher of the Los Angeles Sentinel, the largest and oldest African-American owned newspaper west of the Mississippi River. Danny was the catalyst behind two development projects—the Compton Towne Center and Compton Renaissance Plaza—which have helped to bring economic vitality into an area that had been written off by many. In addition to creating much needed jobs for community residents and additional tax revenues for the city, these projects are giving residents a deeper sense of pride in their neighborhood.

I invite my colleagues to join me and the thousands of people touched by his work in commending Danny J. Bakewell, Sr. for his great leadership of the Brotherhood Crusade and tireless advocacy throughout his lifetime.●

PAYING TRIBUTE TO THE DETROIT WINDSOR TUNNEL ON ITS 75TH ANNIVERSARY

● Ms. STABENOW. Mr. President, I rise today to recognize the 75th anniversary of the Detroit Windsor Tunnel. Over the past 75 years, the tunnel has been an indispensable link between the United States and Canada.

In the years before the construction of the tunnel, cars and trucks crossed the Detroit River on ferries. During the winter, the river froze and made the ferry ride between Detroit and Windsor dangerous. On November 3, 1930, President Herbert Hoover ushered in a new era in U.S.-Canadian relations when he officially opened the Detroit Windsor Tunnel.

Not only has the tunnel been a vital commercial and cultural link between the United States and Canada, at the time of its construction it was an unparalleled engineering feat. The tunnel is approximately 1 mile long and reaches depths of 75 feet below the river. It is the only underwater international vehicular border crossing in the world. At full capacity, 2,400 vehicles can pass between Detroit and Windsor each hour through the tunnel.

During the tunnel's construction, there were as many as 600 workers simultaneously building the structure. One group of workers called the "muckers" dug a 32-foot hole in tight quarters through sand and clay deep below the Detroit River. As a tribute to the workers who built the Detroit Windsor Tunnel a year ahead of schedule, the first person to drive the distance of the tunnel and back was Joseph Zuccatto, a construction worker who earned 35 cents an hour.

The Detroit Windsor Tunnel is one of the cornerstones of the close economic relationship between the United States

and Canada. The United States and Canada trade $1.2 billion worth of goods and services each day that supports 5.2 million jobs. Trade between the United States and Canada is valued over $400 billion per year. Michigan's trade with Canada represents 19 percent of the United States land-based trade and supports 174,000 Michigan jobs.

The Detroit Windsor Tunnel is a crucial link between the U.S. and Canadian economies. The tunnel is one of the 15 busiest border crossings nationally, with more than 9 million vehicles passing through the tunnel each year. Additionally, at least 850 trucks and 5,000 commuters pass through the tunnel for business, entertainment, and shopping each day.

In recent years, all U.S. ports of entry have balanced increased border security requirements with the needs of tourists and business travelers to quickly enter and leave the United States. The Detroit Windsor Tunnel has enthusiastically responded to these challenges and worked with local, State and Federal officials to meet these urgent needs.

Mr. President, I commend the Detroit Windsor Tunnel on its 75th anniversary, for its service to the people of the United States and Canada, and for its continuous innovation to serve those who rely on it.●

---

## MESSAGE FROM THE HOUSE

### ENROLLED BILL SIGNED

At 9:20 a.m., a message from the House of Representatives, delivered by Ms. Niland, one of its reading clerks, announced that the Speaker has signed the following enrolled bill:

H.R. 2967. An act to designate the Federal building located at 333 Mt. Elliott Street in Detroit, Michigan, as the "Rosa Parks Federal Building".

The enrolled bill was signed subsequently by the President pro tempore (Mr. STEVENS).

---

## MEASURES READ THE FIRST TIME

The following bill was read the first time:

S. 1960. A bill to protect the health and safety of all athletes, to promote the integrity of professional sports by establishing minimum standards for the testing of steroids and other performance-enhancing substances and methods by professional sports leagues, and for other purposes.

---

## EXECUTIVE AND OTHER COMMUNICATIONS

The following communications were laid before the Senate, together with accompanying papers, reports, and documents, and were referred as indicated:

EC–4507. A communication from the Assistant to the Secretary of Defense, Nuclear and Chemical and Biological Defense Programs, transmitting, pursuant to law, a report from the Counterproliferation Program Review Committee entitled "Report on Activities and Programs for Countering Proliferation and NBC Terrorism" (revised to include administrative corrections); to the Committee on Armed Services.

EC–4508. A communication from the Director, Administration and Management, Office of the Secretary of Defense, transmitting, pursuant to law, a report relative to the total cost for the planning, design, construction and installation of equipment for the renovation of Wedges 2 through 5 of the Pentagon; to the Committee on Armed Services.

EC–4509. A communication from the Acting Deputy Secretary of Defense, transmitting, pursuant to law, the Seventeenth Report of the Federal Voting Assistance Program; to the Committee on Armed Services.

EC–4510. A communication from the Director, Office of Personnel Management and the Secretary of Defense, transmitting, pursuant to law, a report jointly submitted by the Office of Personnel Management and the Department of Defense relative to final regulations for the National Security Personnel System (NSPS); to the Committee on Armed Services.

EC–4511. A communication from the Acting Director, Defense Procurement and Acquisition Policy, Department of Defense, transmitting, pursuant to law, the report of a rule entitled "Payment and Billing Instructions" (DFARS Case 2003–D009) received on October 31, 2005; to the Committee on Armed Services.

EC–4512. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a change a previously submitted reported information relative to the vacancy in the position of Assistant Secretary of Defense (Public Affairs), received on October 31, 2005; to the Committee on Armed Services.

EC–4513. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a change a previously submitted reported information relative to the vacancy in the position of Deputy Secretary of Defense, received on October 31, 2005; to the Committee on Armed Services.

EC–4514. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a nomination and the designation of an acting officer for the position of Assistant Secretary of Defense (Public Affairs), received on October 31, 2005; to the Committee on Armed Services.

EC–4515. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a nomination for the position of Assistant Secretary of Defense (International Security Policy), received on October 31, 2005; to the Committee on Armed Services.

EC–4516. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a nomination for the position of Under Secretary of Defense (Policy), received on October 31, 2005; to the Committee on Armed Services.

EC–4517. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of the discontinuation of service in the acting role for the position of Director, Operational Test and Evaluation, received on October 31, 2005; to the Committee on Armed Services.

EC–4518. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of the designation of an acting officer for the position of Director, Defense Research and Engineering, received on October 31, 2005; to the Committee on Armed Services.

EC–4519. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of the confirmation of a nominee for the position of Assistant Secretary of Defense (Legislative Affairs), received on October 31, 2005; to the Committee on Armed Services.

EC–4520. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a vacancy and designation of an acting officer for the position of Inspector General, received on October 31, 2005; to the Committee on Armed Services.

EC–4521. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a vacancy in the position of Deputy Under Secretary of Defense (Personnel and Readiness), received on October 31, 2005; to the Committee on Armed Services.

EC–4522. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a nomination for the position of Deputy Under Secretary of Defense (Logistics and Materiel Readiness), received on October 31, 2005; to the Committee on Armed Services.

EC–4523. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a recess appointment for the position of Under Secretary of Defense (Policy), received on October 31, 2005; to the Committee on Armed Services.

EC–4524. A communication from the Assistant Director, Executive and Political Personnel, Department of the Army, transmitting, pursuant to law, the report of the discontinuation of service in the acting role and the confirmation of a nominee for the position of Assistant Secretary of the Army (Installations and Environment), received on October 31, 2005; to the Committee on Armed Services.

EC–4525. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a nomination for the position of Director, Defense Research and Engineering, received on October 31, 2005; to the Committee on Armed Services.

EC–4526. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a vacancy in the position of Director, Defense Research and Engineering, received on October 31, 2005; to the Committee on Armed Services.

EC–4527. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of the discontinuation of service in the acting role and confirmation of a nominee for the position of Deputy Under Secretary of Defense (Logistics and Materiel Readiness), received on October 31, 2005; to the Committee on Armed Services.

EC–4528. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of the discontinuation of service in the acting role for

the position of Assistant Secretary of Defense (Legislative Affairs), received on October 31, 2005; to the Committee on Armed Services.

EC–4529. A communication from the Assistant Director, Executive and Political Personnel, Department of Defense, transmitting, pursuant to law, the report of a discontinuation of service in the acting role and a recess appointment in the position of Assistant Secretary of Defense (International Security Policy), received on October 31, 2005; to the Committee on Armed Services.

EC–4530. A communication from the Assistant Director, Executive and Political Personnel, Department of the Navy, transmitting, pursuant to law, the report of a nomination for the position of Assistant Secretary of the Navy (Research, Development and Acquisition), received on October 31, 2005; to the Committee on Armed Services.

EC–4531. A communication from the Assistant Director, Executive and Political Personnel, Department of the Navy, transmitting, pursuant to law, the report of a nomination for the position of Secretary of the Navy, received on October 31, 2005; to the Committee on Armed Services.

EC–4532. A communication from the Assistant Director, Executive and Political Personnel, Department of the Air Force, transmitting, pursuant to law, the report of a nomination for the position of Secretary of the Air Force, received on October 31, 2005; to the Committee on Armed Services.

EC–4533. A communication from the Assistant Director, Executive and Political Personnel, Department of the Air Force, transmitting, pursuant to law, the report of a nomination for the position of Under Secretary of the Air Force, received on October 31, 2005; to the Committee on Armed Services.

EC–4534. A communication from the Assistant Director, Executive and Political Personnel, Department of the Air Force, transmitting, pursuant to law, the report of the confirmation of a nominee for the position of Under Secretary of the Air Force, received on October 31, 2005; to the Committee on Armed Services.

EC–4535. A communication from the Assistant Director, Executive and Political Personnel, Department of the Air Force, transmitting, pursuant to law, the report of a vacancy and designation of an acting officer in the position of Assistant Secretary of the Air Force (Installations, Environment, and Logistics), received on October 31, 2005; to the Committee on Armed Services.

EC–4536. A communication from the Assistant Director, Executive and Political Personnel, Department of the Air Force, transmitting, pursuant to law, the report of the discontinuation of service in the acting role for the position of Secretary of the Air Force, received on October 31, 2005; to the Committee on Armed Services.

EC–4537. A communication from the Assistant Director, Executive and Political Personnel, Department of the Air Force, transmitting, pursuant to law, the report of the designation of an acting officer in the position of Secretary of the Air Force, received on October 31, 2005; to the Committee on Armed Services.

EC–4538. A communication from the Assistant Director, Executive and Political Personnel, Department of the Army, transmitting, pursuant to law, the report of the discontinuation of service in the acting role for the position of Assistant Secretary of the Army (Manpower and Reserve Affairs), received on October 31, 2005; to the Committee on Armed Services.

EC–4539. A communication from the Assistant Director, Executive and Political Personnel, Department of the Army, transmit-

ting, pursuant to law, the report of the discontinuation of service in the acting role for the position of Under Secretary of the Army, received on October 31, 2005; to the Committee on Armed Services.

EC–4540. A communication from the Assistant Director, Executive and Political Personnel, Department of the Army, transmitting, pursuant to law, the report of a nomination and designation of an acting officer for the position of Assistant Secretary of the Army (Installations and Environment), received on October 31, 2005; to the Committee on Armed Services.

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. SPECTER, from the Committee on the Judiciary, with an amendment in the nature of a substitute:

S. 1095. A bill to amend chapter 113 of title 18, United States Code, to clarify the prohibition on the trafficking in goods or services, and for other purposes.

By Mr. SPECTER, from the Committee on the Judiciary, with an amendment:

S. 1699. A bill to amend title 18, United States Code, to provide criminal penalties for trafficking in counterfeit marks.

## EXECUTIVE REPORTS OF COMMITTEES

The following executive reports of committees were submitted:

By Mr. SHELBY for the Committee on Banking, Housing, and Urban Affairs.

*Orlando J. Cabrera, of Florida, to be an Assistant Secretary of Housing and Urban Development.

*Katherine Baicker, of New Hampshire, to be a Member of the Council of Economic Advisers.

*Matthew Slaughter, of New Hampshire, to be a Member of the Council of Economic Advisers.

*Rodney E. Hood, of North Carolina, to be a Member of the National Credit Union Administration Board for a term expiring April 10, 2009.

*Gigi Hyland, of Virginia, to be a Member of the National Credit Union Administration Board for a term expiring August 2, 2011.

By Mr. SPECTER for the Committee on the Judiciary.

Wan J. Kim, of Maryland, to be an Assistant Attorney General.

Sue Ellen Wooldridge, of Virginia, to be an Assistant Attorney General.

Steven G. Bradbury, of Maryland, to be an Assistant Attorney General.

Thomas O. Barnett, of Virginia, to be an Assistant Attorney General.

*Nomination was reported with recommendation that it be confirmed subject to the nominee's commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.

(Nominations without an asterisk were reported with the recommendation that they be confirmed.)

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Mr. BROWNBACK (for himself and Mr. INHOFE):

S. 1956. A bill to amend the Federal Food, Drug, and Cosmetic Act to create a new three-tiered approval system for drugs, biological products, and devices that is responsive to the needs of seriously ill patients, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. HAGEL (for himself and Mr. NELSON of Nebraska).

S. 1957. A bill to authorize the Secretary of Interior to convey to The Missouri River Basin Lewis and Clark Interpretive Trail and Visitor Center Foundation, Inc. certain Federal land associated with the Lewis and Clark National Historic Trail in Nebraska, to be used as an historical interpretive site along the trail; to the Committee on Energy and Natural Resources.

By Ms. CANTWELL (for herself, Mrs. MURRAY, Mr. CRAPO, Mr. SCHUMER, Mr. LEAHY, Mr. CRAIG, Mr. LEVIN, Mr. DEWINE, Mr. DAYTON, Mr. BAUCUS, and Mrs. CLINTON):

S. 1958. A bill to authorize the Attorney General to establish and carry out a program, known as the Northern Border Prosecution Initiative, to provide funds to northern border States to reimburse county and municipal governments for costs associated with certain criminal activities, and for other purposes; to the Committee on the Judiciary.

By Mr. KERRY (for himself, Mr. OBAMA, Mr. LEVIN, Ms. STABENOW, Mr. KENNEDY, Mr. CORZINE, and Mr. SMITH):

S. 1959. A bill to direct the Architect of the Capitol to obtain a statue of Rosa Parks and to place the statue in the United States Capitol in National Statuary Hall; to the Committee on Rules and Administration.

By Mr. BUNNING (for himself, Mr. McCAIN, Mr. STEVENS, Mr. ROCKEFELLER, and Mr. GRASSLEY):

S. 1960. A bill to protect the health and safety of all athletes, to promote the integrity of professional sports by establishing minimum standards for the testing of steroids and other performance-enhancing substances and methods by professional sports leagues, and for other purposes; read the first time.

## SUBMISSION OF CONCURRENT AND SENATE RESOLUTIONS

The following concurrent resolutions and Senate resolutions were read, and referred (or acted upon), as indicated:

By Mr. HATCH (for himself and Mr. BENNETT):

S. Res. 298. A resolution designating Thursday, November 17, 2005, as "Feed America Thursday;" to the Committee on the Judiciary.

By Ms. LANDRIEU (for herself, Mr. DEMINT, Mrs. CLINTON, Mr. NELSON of Nebraska, Mr. BROWNBACK, Mr. CRAIG, Mr. KERRY, Mr. COLEMAN, and Mr. SALAZAR):

S. Res. 299. A resolution to express support for the goals of National Adoption Month by promoting national awareness of adoption, celebrating children and families involved in adoption, and encouraging Americans to secure safety, permanency, and well-being for all children; considered and agreed to.

By Mr. INOUYE (for himself, Mr. AKAKA, Mr. BYRD, Mr. FRIST, Mr. REID, Mr. ALEXANDER, Mr. ALLARD, Mr. ALLEN, Mr. BAUCUS, Mr. BAYH, Mr. BENNETT, Mr. BIDEN, Mr. BINGAMAN, Mr. BOND, Mrs. BOXER, Mr. BROWNBACK, Mr. BUNNING, Mr. BURNS, Mr. BURR, Ms. CANTWELL, Mr. CARPER, Mr. CHAFEE, Mr. CHAMBLISS,

Mrs. CLINTON, Mr. COBURN, Mr. COCHRAN, Mr. COLEMAN, Ms. COLLINS, Mr. CONRAD, Mr. CORNYN, Mr. CORZINE, Mr. CRAIG, Mr. CRAPO, Mr. DAYTON, Mr. DeMINT, Mr. DeWINE, Mr. DODD, Mrs. DOLE, Mr. DOMENICI, Mr. DORGAN, Mr. DURBIN, Mr. ENSIGN, Mr. ENZI, Mr. FEINGOLD, Mrs. FEINSTEIN, Mr. GRAHAM, Mr. GRASSLEY, Mr. GREGG, Mr. HAGEL, Mr. HARKIN, Mr. HATCH, Mrs. HUTCHISON, Mr. INHOFE, Mr. ISAKSON, Mr. JEFFORDS, Mr. JOHNSON, Mr. KENNEDY, Mr. KERRY, Mr. KOHL, Mr. KYL, Ms. LANDRIEU, Mr. LAUTENBERG, Mr. LEAHY, Mr. LEVIN, Mr. LIEBERMAN, Mrs. LINCOLN, Mr. LOTT, Mr. LUGAR, Mr. MARTINEZ, Mr. McCAIN, Mr. McCONNELL, Ms. MIKULSKI, Ms. MURKOWSKI, Mrs. MURRAY, Mr. NELSON of Florida, Mr. NELSON of Nebraska, Mr. OBAMA, Mr. PRYOR, Mr. REED, Mr. ROBERTS, Mr. ROCKEFELLER, Mr. SALAZAR, Mr. SANTORUM, Mr. SARBANES, Mr. SCHUMER, Mr. SESSIONS, Mr. SHELBY, Mr. SMITH, Ms. SNOWE, Mr. SPECTER, Ms. STABENOW, Mr. STEVENS, Mr. SUNUNU, Mr. TALENT, Mr. THOMAS, Mr. THUNE, Mr. VITTER, Mr. VOINOVICH, Mr. WARNER, and Mr. WYDEN):

S. Res. 300. A resolution relative to the death of Henry Ku'ualoha Giugni, former Sergeant-at-Arms of the United States Senate; considered and agreed to.

---

## ADDITIONAL COSPONSORS

### S. 331

At the request of Mr. JOHNSON, the name of the Senator from South Dakota (Mr. THUNE) was added as a cosponsor of S. 331, a bill to amend title 38, United States Code, to provide for an assured adequate level of funding for veterans health care.

### S. 333

At the request of Mr. SANTORUM, the name of the Senator from California (Mrs. BOXER) was added as a cosponsor of S. 333, a bill to hold the current regime in Iran accountable for its threatening behavior and to support a transition to democracy in Iran.

### S. 1496

At the request of Mr. CRAPO, the name of the Senator from Minnesota (Mr. COLEMAN) was added as a cosponsor of S. 1496, a bill to direct the Secretary of the Interior to conduct a pilot program under which up to 15 States may issue electronic Federal migratory bird hunting stamps.

### S. 1516

At the request of Mr. LOTT, the names of the Senator from Pennsylvania (Mr. SPECTER), the Senator from Pennsylvania (Mr. SANTORUM), the Senator from Rhode Island (Mr. CHAFEE), the Senator from Arkansas (Mr. PRYOR), the Senator from Delaware (Mr. BIDEN) and the Senator from New York (Mr. SCHUMER) were added as cosponsors of S. 1516, a bill to reauthorize Amtrak, and for other purposes.

### S. 1699

At the request of Mr. SPECTER, the names of the Senator from Oklahoma (Mr. COBURN) and the Senator from California (Mrs. FEINSTEIN) were added as cosponsors of S. 1699, a bill to amend title 18, United States Code, to provide criminal penalties for trafficking in counterfeit marks.

### S. 1767

At the request of Ms. SNOWE, the name of the Senator from North Dakota (Mr. DORGAN) was added as a cosponsor of S. 1767, a bill to require the Federal Communications Commission to reevaluate the band plans for the upper 700 megaHertz band and the unauctioned portions of the lower 700 megaHertz band and reconfigure them to include spectrum to be licensed for small geographic areas.

### S. 1791

At the request of Mr. SMITH, the name of the Senator from Idaho (Mr. CRAPO) was added as a cosponsor of S. 1791, a bill to amend the Internal Revenue Code of 1986 to allow a deduction for qualified timber gains.

### S. 1848

At the request of Mr. SALAZAR, the name of the Senator from Nevada (Mr. REID) was added as a cosponsor of S. 1848, a bill to promote remediation of inactive and abandoned mines, and for other purposes.

### S. 1947

At the request of Mr. SUNUNU, the name of the Senator from Georgia (Mr. ISAKSON) was added as a cosponsor of S. 1947, a bill to amend chapter 21 of title 38, United States Code, to enhance adaptive housing assistance for disabled veterans.

### S. RES. 219

At the request of Mrs. FEINSTEIN, the name of the Senator from Massachusetts (Mr. KERRY) was added as a cosponsor of S. Res. 219, a resolution designating March 8, 2006, as "Endangered Species Day," and encouraging the people of the United States to become educated about, and aware of, threats to species, success stories in species recovery, and the opportunity to promote species conservation worldwide.

### AMENDMENT NO. 762

At the request of Mr. NELSON of Florida, the name of the Senator from California (Mrs. FEINSTEIN) was added as a cosponsor of amendment No. 762 proposed to S. 1042, an original bill to authorize appropriations for fiscal year 2006 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe personnel strengths for such fiscal year for the Armed Forces, and for other purposes.

### AMENDMENT NO. 2346

At the request of Mr. INOUYE, the name of the Senator from Hawaii (Mr. AKAKA) was added as a cosponsor of amendment No. 2346 intended to be proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

### AMENDMENT NO. 2350

At the request of Mrs. MURRAY, the name of the Senator from New York (Mrs. CLINTON) was added as a cosponsor of amendment No. 2350 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

### AMENDMENT NO. 2353

At the request of Mrs. MURRAY, the name of the Senator from Illinois (Mr. OBAMA) was added as a cosponsor of amendment No. 2353 intended to be proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

### AMENDMENT NO. 2356

At the request of Mrs. LINCOLN, the names of the Senator from Wisconsin (Mr. KOHL), the Senator from New Jersey (Mr. CORZINE) and the Senator from New York (Mrs. CLINTON) were added as cosponsors of amendment No. 2356 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

### AMENDMENT NO. 2357

At the request of Mr. NELSON of Florida, the names of the Senator from Illinois (Mr. OBAMA) and the Senator from Wisconsin (Mr. FEINGOLD) were added as cosponsors of amendment No. 2357 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

### AMENDMENT NO. 2360

At the request of Mr. LOTT, the names of the Senator from Pennsylvania (Mr. SANTORUM), the Senator from Massachusetts (Mr. KENNEDY), the Senator from Vermont (Mr. JEFFORDS), the Senator from Illinois (Mr. DURBIN) and the Senator from North Dakota (Mr. DORGAN) were added as cosponsors of amendment No. 2360 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

### AMENDMENT NO. 2363

At the request of Mr. HARKIN, the name of the Senator from New York (Mrs. CLINTON) was added as a cosponsor of amendment No. 2363 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

### AMENDMENT NO. 2371

At the request of Ms. SNOWE, the names of the Senator from New York (Mrs. CLINTON), the Senator from Massachusetts (Mr. KERRY) and the Senator from Connecticut (Mr. DODD) were added as cosponsors of amendment No. 2371 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

AMENDMENT NO. 2372

At the request of Mrs. MURRAY, the name of the Senator from New Jersey (Mr. CORZINE) was added as a cosponsor of amendment No. 2372 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

AMENDMENT NO. 2373

At the request of Mr. REED, the name of the Senator from Minnesota (Mr. DAYTON) was added as a cosponsor of amendment No. 2373 intended to be proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

At the request of Mr. CARPER, his name was added as a cosponsor of amendment No. 2373 intended to be proposed to S. 1932, supra.

AMENDMENT NO. 2380

At the request of Mr. LIEBERMAN, the name of the Senator from Illinois (Mr. OBAMA) was added as a cosponsor of amendment No. 2380 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

AMENDMENT NO. 2390

At the request of Mr. SMITH, the name of the Senator from Wisconsin (Mr. FEINGOLD) was added as a cosponsor of amendment No. 2390 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

At the request of Mr. KERRY, his name was added as a cosponsor of amendment No. 2390 proposed to S. 1932, supra.

AMENDMENT NO. 2400

At the request of Ms. CANTWELL, the name of the Senator from Minnesota (Mr. DAYTON) was added as a cosponsor of amendment No. 2400 proposed to S. 1932, an original bill to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

---

STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. BROWNBACK (for himself and Mr. INHOFE):

S. 1956. A bill to amend the Federal Food, Drug, and Cosmetic Act to create a new three-tiered approval system for drugs, biological products, and devices that is responsive to the needs of seriously ill patients, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

Mr. BROWNBACK. Mr. President, I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1956

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the "Access, Compassion, Care, and Ethics for Seriously Ill Patients Act" or the "ACCESS Act".

SEC. 2. FINDINGS.

Congress finds the following:

(1) The necessity of placebo controlled studies has been questioned on both scientific and ethical grounds for seriously ill patients.

(2) The current standards of the Food and Drug Administration for approval of drugs, biological products, and devices deny the benefits of medical progress to seriously ill patients who face morbidity or death from their disease.

(3) Promising therapies intended to treat serious or life threatening conditions or diseases and which address unmet medical needs have received unjustified delays and denials of approval.

(4) Seriously ill patients have a right to access available investigational drugs, biological products, and devices.

(5) The current Food and Drug Administration and National Cancer Institute case-by-case exception for compassionate access must be required to permit all seriously ill patients access to available experimental therapies as a treatment option.

(6) The current emphasis on statistical analysis of clinical information needs to be balanced by a greater reliance on clinical evaluation of this information.

(7) Food and Drug Administration advisory committees should have greater representation of medical clinicians who represent the interests of seriously ill patients in early access to promising investigational therapies.

(8) The use of available investigational products for treatment is the responsibility of the physician and the patient.

(9) The use of combinations of available investigational and approved products for treatment is the responsibility of the physician and the patient.

(10) The development and approval of drugs, biological products, and devices intended to address serious or life-threatening conditions or diseases is often delayed by the inability of sponsors to obtain prompt meetings with the Food and Drug Administration and to obtain prompt resolution of scientific and regulatory issues related to the investigation and review of new technologies.

SEC. 3. TIERED APPROVAL SYSTEM FOR DRUGS, BIOLOGICAL PRODUCTS, AND DEVICES.

Section 506 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 356) is amended to read as follows:

"SEC. 506. TIERED APPROVAL SYSTEM.

"(a) IN GENERAL.—Notwithstanding any other provision of law, the sponsor of an investigational drug, biological product, or device may submit an application to the Secretary for Tier I or Tier II approval in accordance with this section.

"(b) TIER I APPROVAL.—

"(1) IN GENERAL.—

"(A) APPLICATION CONTENT.—A sponsor of an investigational drug, biological product, or device applying for Tier I approval of the product shall submit to the Secretary an application as described under section 505(b)(1) or 505(b)(2), section 351(a) of the Public Health Service Act, or section 510(k) or 515(c)(1), as applicable, which shall contain—

"(i) data and information from completed Phase I clinical investigations and any other nonclinical or clinical investigations;

"(ii) preliminary evidence that the product may be effective against a serious or life-threatening condition or disease, which evidence may be based on uncontrolled data such as case histories, information about the pharmacological mechanism of action, data from animal and computer models, comparison with historical data, or other preliminary information, and may be based on a small number of patients; and

"(iii) an assurance that the sponsor will continue clinical investigation to obtain Tier III approval.

"(B) LIMITATION.—Tier I approval shall be primarily based upon clinical evaluation, not statistical analysis.

"(2) DETERMINATION BY SECRETARY.—

"(A) IN GENERAL.—Not later than 30 days after the receipt of an application for Tier I approval, the Secretary shall either—

"(i) approve the application; or

"(ii) refer the application to the Accelerated Approval Advisory Committee.

"(B) RECOMMENDATION.—Within 90 days after receipt of an application for approval, the Accelerated Approval Advisory Committee shall issue a recommendation to the Secretary on whether the Secretary should approve the application.

"(C) FINAL DECISION.—Within 30 days after receipt of the recommendation from the Accelerated Approval Advisory Committee, the Secretary shall either approve the application or shall issue an order setting forth a detailed explanation of the reasons why the application was not approved and the specific data that the sponsor must provide so that the application may be approved.

"(3) APPEAL.—If the Secretary does not approve an application for which the Accelerated Approval Advisory Committee recommended approval, the sponsor of the application shall have the right to appeal the decision to the Commissioner of Food and Drugs. The Commissioner shall provide the sponsor with a hearing within 30 days following the nonapproval of the application and shall issue an order within 30 days following the hearing either concurring in the nonapproval or approving the application. The Commissioner shall not delegate the responsibility described in this paragraph to any other person.

"(4) CRITERIA.—In making a determination under paragraph (2), the Secretary shall consider whether the totality of the information available to the Secretary regarding the safety and effectiveness of an investigational drug, biological product, or device, as compared to the risk of morbidity or death from a condition or disease, indicates that a patient (who may be representative of a small patient subpopulation) may obtain more benefit than risk if treated with the drug, biological product, or device. If the potential risk to a patient of the condition or disease outweighs the potential risk of the product, and the product may possibly provide benefit to the patient, the Secretary shall approve the application.

"(5) PRODUCT LABELING.—The labeling approved by the Secretary for the drug, biological product, or device—

"(A) shall state that the product is intended for use by a patient whose physician has documented in writing that the patient has—

"(i) exhausted all treatment options approved by Secretary for the condition or disease for which the patient is a reasonable candidate; and

"(ii) unsuccessfully sought treatment, or obtained treatment that was not effective, with an investigational drug, biological product, or device for which such individual is a reasonable candidate (which may include consideration of the lack of a source of supply or geographic factors); and

"(B) shall state that every patient to whom the product is administered shall, as a

mandatory condition of receiving the product, provide—

''(i) written informed consent, as described under part 50 of title 21, Code of Federal Regulations;

''(ii) a written waiver of the right to sue the manufacturer or sponsor of the drug, biological product, or device, or the physicians who prescribed the product or the institution where it was administered, for an adverse event caused by the product, which shall be binding in every State and Federal court; and

''(iii) consent for the manufacturer of the product to obtain data and information about the patient and the patient's use of the product that may be used to support an application for Tier II or Tier III approval.

''(6) LIMITATION ON CONDITIONS.—Tier I approval may be subject to the requirement that the sponsor conduct appropriate post-approval studies.

''(c) TIER II APPROVAL.—

''(1) IN GENERAL.—A sponsor of an investigational drug, biological product, or device applying for Tier II approval shall submit to the Secretary an application as described under section 505(b)(1) or 505(b)(2), section 351(a) of the Public Health Service Act, or section 510(k) or 515(c)(1), as applicable, which shall contain—

''(A) data and information that the drug, biological product, or device has an effect on a clinical endpoint or on a surrogate endpoint or biomarker that is reasonably likely to predict clinical benefit to a patient (who may be representative of a small patient subpopulation) suffering from a serious or life-threatening condition or disease; and

''(B) an assurance that the sponsor will continue clinical investigation to obtain Tier III approval.

''(2) DETERMINATION BY SECRETARY.—

''(A) IN GENERAL.—Not later than 30 days after the receipt of an application for Tier II approval, the Secretary shall either—

''(i) approve the application; or

''(ii) refer the application to the Accelerated Approval Advisory Committee.

''(B) RECOMMENDATION.—Within 90 days after receipt of an application for approval, the Accelerated Approval Advisory Committee shall issue a recommendation to the Secretary on whether the Secretary should approve the application.

''(C) FINAL DECISION.—Within 30 days after receipt of the recommendation from the Accelerated Approval Advisory Committee, the Secretary shall either approve the application or issue an order setting forth a detailed explanation of the reasons why the application was not approved and the specific data that the sponsor must provide so that the application may be approved.

''(3) APPEAL.—If the Secretary does not approve an application for which the Accelerated Approval Advisory Committee recommended approval, the sponsor of the application shall have the right to appeal the decision to the Commissioner of Food and Drugs. The Commissioner shall provide the sponsor with a hearing within 30 days following the nonapproval of the application and shall issue an order within 30 days following the hearing either concurring in the nonapproval or approving the application. The Commissioner shall not delegate the responsibility described in this paragraph to any other person.

''(4) LIMITATION ON CONDITIONS.—

''(A) POST-APPROVAL STUDIES.—Tier II approval may be subject to the requirement that the sponsor conduct appropriate post-approval studies to validate the surrogate endpoint or biomarker or otherwise confirm the effect on the clinical endpoint.

''(B) RULE OF CONSTRUCTION.—Nothing in this subsection shall be construed to permit the Secretary to condition Tier II approval on compliance with any other standards, including any standard necessary to meet Tier III approval.

''(d) TIER III APPROVAL.—For purposes of this Act, the term 'Tier III approval' means—

''(1) with respect to a new drug or new biological product, approval of such drug or product under section 505(b)(1) or 505(b)(2) or section 351 of the Public Health Service Act, as the case may be; and

''(2) with respect to a new device, clearance of such device under section 510(k) or approval of such device under section 515(c)(1).

''(e) PROMOTIONAL MATERIALS.—Approval of a product under either Tier I or II may be subject to the requirements that—

''(1) the sponsor submit copies of all advertising and promotional materials related to the product during the preapproval review period and, following approval and for such period thereafter as the Secretary determines to be appropriate, and at least 30 days prior to the dissemination of the materials;

''(2) all advertising and promotional materials prominently disclose the limited approval for the product and data available supporting the safety and effectiveness of the product; and

''(3) the sponsor shall not disseminate advertising or promotional material prior to obtaining written notification from the Secretary that the advertising or promotional material complies with this subchapter.

''(f) EXPEDITED WITHDRAWAL OF APPROVAL.—The Secretary may withdraw Tier I or Tier II approval using expedited procedures (as prescribed by the Secretary in regulations which shall include an opportunity for a hearing) if—

''(1) the sponsor fails to conduct post-approval studies with due diligence, considering all of the circumstances involved;

''(2) a post-approval study fails to verify clinical benefit of the product for even a small patient subpopulation;

''(3) other evidence demonstrates that the product is not safe or effective under the conditions of use for even a small patient subpopulation; or

''(4) the sponsor disseminates false or misleading promotional materials with respect to the product and fails to correct the material promptly after written notice from the Secretary.

''(g) ACCELERATED APPROVAL ADVISORY COMMITTEE.—

''(1) IN GENERAL.—In order to facilitate the development and expedite the review of drugs, biological products, and devices intended to treat serious or life threatening conditions, the Secretary shall establish the Accelerated Approval Advisory Committee.

''(2) DELEGATION.—The Secretary may delegate authority for the Accelerated Approval Advisory Committee to the Commissioner of Food and Drugs. The Accelerated Approval Advisory Committee shall be staffed and administered in the Office of the Commissioner.

''(3) COMPOSITION.—

''(A) IN GENERAL.—The Committee shall be composed of 11 voting members, including 1 chairperson and 5 permanent members each of whom shall serve a term of 3 years and may be reappointed for a second 3-year term, and 5 nonpermanent members who shall be appointed to the Committee for a specific meeting, or part of a meeting, in order to provide adequate expertise in the subject being reviewed. The Committee shall include as voting members no less than 2 representatives of patient interests, of which 1 shall be a permanent member of the Committee. The Committee shall include as nonvoting members a representative of interests of the drug, biological product, and device industry.

''(B) APPOINTMENTS.—The Secretary shall appoint to the Committee persons who are qualified by training and experience to evaluate the safety and effectiveness of the types of products to be referred to the Committee and who, to the extent feasible, possess skill in the use of, or experience in the development, manufacture, or utilization of, such products. The Secretary shall make appointments to the Committee so that the Committee shall consist of members with adequately diversified expertise and practical experience in such fields as clinical medicine, biological and physical sciences, and other related professions. Scientific, industry, and consumer organizations and members of the public shall be afforded an opportunity to nominate individuals for appointment to the Committee. No individual who is in the regular full-time employ of the United States and engaged in the administration of this chapter may be a member of the Committee.

''(4) COMPENSATION.—Committee members, while attending meetings or conferences of the Committee or otherwise engaged in its business, shall be entitled to receive compensation at rates to be fixed by the Secretary, but not at rates exceeding the daily equivalent of the rate in effect for grade GS–18 of the General Schedule, for each day so engaged, including traveltime, and while so serving away from their homes or regular places of business each member may be allowed travel expenses (including per diem in lieu of subsistence) as authorized by section 5703 of title 5, for persons in the Government service employed intermittently.

''(5) ASSISTANCE.—The Secretary shall furnish the Committee with adequate clerical and other necessary assistance.

''(6) ANNUAL TRAINING.—The Secretary shall employ nongovernmental experts to provide annual training to the Committee on the statutory and regulatory standards for product approval.

''(7) TIMELINE.—The Committee shall be scheduled to meet at such times as may be appropriate for the Secretary to meet applicable statutory deadlines.

''(8) MEETINGS.—

''(A) OPPORTUNITIES FOR INTERESTED PERSONS.—Any person whose product is specifically the subject of review by the Committee shall have—

''(i) the same access to data and information submitted to the Committee as the Secretary;

''(ii) the opportunity to submit, for review by the Committee, data or information, which shall be submitted to the Secretary for prompt transmittal to the Committee; and

''(iii) the same opportunity as the Secretary to participate in meetings of the Committee.

''(B) ADEQUATE TIME; FREE AND OPEN PARTICIPATION.—Any meetings of the Committee shall provide adequate time for initial presentations and for response to any differing views by persons whose products are specifically the subject of the Committee review, and shall encourage free and open participation by all interested persons.

''(C) SUMMARIES.—At all meetings of the Committee, the Secretary shall provide a summary to the Committee of all Tier I and Tier II applications that the Committee did not consider that were approved by the Secretary since the last meeting of the Committee.

''(h) COMMENCEMENT OF REVIEW.—If the Secretary determines, after preliminary evaluation of the data and information submitted by the sponsor, that the product may be effective, the Secretary shall evaluate for filing, and may commence review of portions

of, an application for Tier I or Tier II approval before the sponsor submits a complete application. The Secretary shall commence such review only if the applicant provides a schedule for submission of information necessary to make the application complete.

''(i) INAPPLICABILITY OF PROVISIONS.—The following provisions shall not apply to Tier I or Tier II applications and approvals:

''(1) Chapter VII, subchapter C, parts 2 and 3 relating to fees for drugs, biological products, and devices.

''(2) The provisions of the Drug Price Competition and Patent Term Restoration Act of 1984 that authorize approval of abbreviated new drug applications and applications submitted under section 505(b)(2). Market exclusivity and patent term restoration of Tier I and Tier II approved drugs, biological products, and devices shall be determined solely at the time of Tier III approval without regard to prior Tier I or Tier II approval. Prior to Tier III approval, the Secretary shall not approve any application submitted under section 505(b)(2) or section 505(j) that references a drug approved under subsections (b) or (c) of this section.''.

### SEC. 4. ETHICS IN HUMAN TESTING.

Chapter V of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 351 et seq.) is amended by adding at the end of section 505(i) the following:

''(5) Notwithstanding any other provision of law, the Secretary shall prohibit placebo-only or no-treatment-only concurrent controls in any clinical investigation conducted under this chapter or, in the use of the last-observation-carried-forward convention, in any clinical investigation conducted under this chapter or section 351 of the Public Health Service Act with respect to any life-threatening condition or disease where reasonably effective approved alternative therapies exist for the specific indication.''.

### SEC. 5. EXPANDED ACCESS TO INVESTIGATIONAL DRUGS AND DEVICES.

(a) IN GENERAL.—Chapter V of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 351 et seq.) is amended by adding at the end of section 561 the following:

''(f) EXPANDED ACCESS PROGRAM.—The Food and Drug Administration shall establish a new program to expand access to investigational treatments for individuals with serious or life threatening conditions and diseases. In carrying out this expanded access program, the Secretary shall publish and broadly disseminate written guidance that—

''(1) describes such expanded access programs for investigational drugs, biological products, and devices intended to treat serious or life-threatening conditions or diseases;

''(2) encourages and facilitates submission of Tier I and Tier II applications and approvals; and

''(3) facilitates the provision of investigational drugs and devices to seriously ill individuals without unreasonable delay by recognizing that the use of available investigational products for treatment is the responsibility of the physician and the patient.

''(g) IMPLEMENTATION OF EXPANDED ACCESS PROGRAMS.—

''(1) TRAINING OF PERSONNEL.—Not later than 90 days after the date of enactment of this subsection, the Secretary shall implement training programs at the Food and Drug Administration with respect to the expanded access programs established under this section.

''(2) POLICIES, REGULATIONS, AND GUIDANCE.—The Secretary shall establish policies, regulations, and guidance designed to most directly benefit seriously ill patients.

''(h) DEVELOPMENT OF SURROGATE ENDPOINTS AND BIOMARKERS.—The Secretary shall—

''(1) establish a program to encourage the development of surrogate endpoints and biomarkers that are reasonably likely to predict clinical benefit for serious or life-threatening conditions for which there exist significant unmet medical needs;

''(2) request the Institute of Medicine to undertake a study to identify validated surrogate endpoints and biomarkers, and recommend research to validate surrogate endpoints and biomarkers, that may support approvals for products intended for the treatment of serious or life-threatening conditions or diseases; and

''(3) make widely available to the public a list of drugs, biological products, and devices that are being investigated for serious or life-threatening conditions or diseases and that have not yet received Tier I or Tier II approval for marketing.''.

(b) CONFORMING AMENDMENT.—Section 561(c) of the Federal Food, Drug, and Cosmetic Act is amended by striking the heading and inserting ''EXPANDED ACCESS TO INVESTIGATIONAL DRUGS AND DEVICES FOR SERIOUSLY ILL PATIENTS''.

### SEC. 6. MODERNIZATION OF THE FOOD AND DRUG ADMINISTRATION.

Subchapter E of chapter V of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb et seq.) is amended by adding at the end the following:

''SEC. 565. POLICIES RELATED TO STUDY EVALUATION INFORMATION.

''(a) IN GENERAL.—

''(1) NONSTATISTICAL MEASURES.—The Secretary shall give equal weight to clinical judgment and statistical analysis in the evaluation of the safety and effectiveness of drugs, biological products, and devices, and shall not disapprove a product application solely on the basis of a statistical analysis or the rigid use of the 95 percent confidence level convention. This policy shall apply—

''(A) in evaluating clinical study designs and endpoints; and

''(B) in making decisions with respect to product applications.

''(2) TYPES OF NONSTATISTICAL MEASURES.—The policy established under paragraph (1), for the purposes described in such paragraph—

''(A) shall include but not be limited to such nonstatistical information as—

''(i) clinical evaluation information, such as case history reports;

''(ii) scientific and clinical studies designed to measure or define mechanisms of action or molecular targeting;

''(iii) data from animal and computer models; and

''(iv) comparison with historical data; and

''(B) shall incorporate the use of—

''(i) evaluations of the adverse effect of delaying the availability of an investigational drug to even a small subpopulation of seriously ill patients; and

''(ii) scientific, observational, or clinical studies designed and conducted to collect well-documented information.

''(b) MEETINGS.—A meeting to address any pending scientific, medical, regulatory, or other issue relating to the development, investigation, review, or other aspect of a drug, biological product, or device shall ordinarily be held within 15 days of the receipt of a written request for the meeting by the sponsor of the product, which may be extended to 30 days for good cause. Such meetings shall ordinarily be conducted in person, but may be conducted by telephone or other form of communication if both parties agree. In order to reduce the burden of meetings, only those Food and Drug Administration

employees who are intended to actively participate in the discussion shall attend a meeting. Minutes of a meeting shall be promptly prepared and exchanged by both parties immediately following the meeting and shall accurately summarize what occurred at the meeting

''(c) RULE OF CONSTRUCTION.—The provisions of chapter V and section 351 of the Public Health Service Act shall be construed to incorporate the policy established in this section.''.

### SEC. 7. MEMBERSHIP OF ONCOLOGY DRUGS ADVISORY COMMITTEE.

Membership of the Oncology Drugs Advisory Committee of the Food and Drug Administration shall consist of no less than 2 patient representatives who are voting members of the committee.

By Mr. KERRY (for himself, Mr. OBAMA, Mr. LEVIN, Ms. STABENOW, Mr. KENNEDY, Mr. CORZINE, and Mr. SMITH):

S. 1959. A bill to direct the Architect of the Capitol to obtain a statue of Rosa Parks and to place the statue in the United States Capitol in National Statuary Hall; to the Committee on Rules and Administration.

Mr. KERRY. Mr. President, our Nation is mourning the recent loss of an icon in this country's civil rights movement and a true national hero, Ms. Rosa Parks. Today, along with Senators OBAMA, LEVIN, STABENOW, KENNEDY, CORZINE and SMITH, I am introducing legislation to honor the memory of Rosa Parks by placing her statue in the United States Capitol. This will help future generations understand her efforts to increase equality in the United States.

When I met Rosa Parks, I was overwhelmed by this graceful, small woman's quiet strength and humility—her conviction in taking on the army of power that was deployed before her—her courage to dig in, knowing full well the power of the courthouse, the power of the sheriff's badge, the power of the vigilante, the power of the establishment—knowing that on dark country roads or after a knock on the door in the middle of the night, people still disappeared and died almost anonymous deaths. So many were killed just trying to be citizens in the land of the free.

Rosa Parks reminded many and taught even more how to speak the truth to power. In an era when these words are thrown around too easily, she lived the words 'courage' and 'patriot'—she loved the dream of our country more than herself, and she was willing to risk it all to live the dream.

In the struggle for civil rights, some were called to stand up to Bull Connor's fire hoses and police dogs—some to stand up to Klan terrorism—and some to stand up to state sponsored acts of violence. But some were called simply to sit down—at lunch counters in Greensboro and Nashville and Atlanta—or on a bus in Montgomery.

Ms. Parks' dedication to civil rights has had an impact on the lives of all Americans. Her act of courage on December 1, 1955 inspired a movement that eventually brought about laws to

end segregation, ensure voting rights, end discrimination in housing, and create a greater equality throughout this Nation. Thanks to Rosa Parks, a path was forged for future generations to encourage freedom and social justice. Her legacy of courage and commitment plays an important role each time our Nation acts for equality and justice, and most of all, in the hope for a better America.

If just one woman was able to do all this, then how much greater the responsibility is for those of us with privilege and power who pay tribute to her today. The life of Rosa Parks demands deeds, not epitaphs. Our final words cannot be spoken or written while her cause is still unfinished. No simple words can match what she did in that sacred moment on a municipal bus in Montgomery, Alabama. What matters now is what we do after the candles are quenched, the speeches have been exhausted, and the next bus comes by.

I am grateful for the opportunity to join my colleagues in this body, as well as those in the House of Representatives, to honor the legacy of this graceful, humble, and courageous woman who embodies the American spirit. If this legislation is adopted, when our children and our grandchildren visit the United States Capitol, they will have the opportunity to learn more about the women who risked so much for their freedom. Ms. Parks belongs among the other great leaders that have shaped this country and made the world a better place.

Sometimes the days seem heavy and the odds seem high, but that moment on a bus in Montgomery always comes. Someone gets on that bus, refuses to equivocate or yield and changes history. Today, that someone must be us, for Rosa Parks and for our country.

The bus still comes by again and again and each time we have to decide whether to go quietly to the back, or by simple acts of courage and conviction, change the direction of our own country's journey. A statue of Rosa Parks in the Capitol can help future Senators and Congressmen find the courage necessary to make sure our Nation takes the right course in the future.

I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1959

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. PLACEMENT OF STATUE OF ROSA PARKS IN NATIONAL STATUARY HALL.**

(a) OBTAINING STATUE.—The Architect of the Capitol shall enter into an agreement to obtain a statue of Rosa Parks, under such terms and conditions as the Architect considers appropriate and consistent with applicable law.

(b) PLACEMENT.—Not later than 2 years after the date of enactment of this Act, the Architect shall place the statue obtained under subsection (a) in the United States Capitol in a suitable permanent location in National Statuary Hall.

**SEC. 2. AUTHORIZATION OF APPROPRIATIONS.**

There are authorized to be appropriated such sums as may be necessary to carry out this Act, and any amounts so appropriated shall remain available until expended.

━━━━━━

SUBMITTED RESOLUTIONS

━━━━━━

SENATE RESOLUTION 298—DESIGNATING THURSDAY, NOVEMBER 17, 2005, AS "FEED AMERICA THURSDAY"

Mr. HATCH (for himself and Mr. BENNETT) submitted the following resolution; which was referred to the Committee on the Judiciary:

S. RES. 298

Whereas Thanksgiving Day celebrates the spirit of selfless giving and an appreciation for family and friends;

Whereas the spirit of Thanksgiving Day is a virtue upon which our Nation was founded;

Whereas 33,000,000 Americans, including 13,000,000 children, continue to live in households that do not have an adequate supply of food;

Whereas almost 3,000,000 of those children experience hunger; and

Whereas selfless sacrifice breeds a genuine spirit of Thanksgiving, both affirming and restoring fundamental principles in our society: Now, therefore, be it

*Resolved,* That the Senate—

(1) designates Thursday, November 17, 2005, as "Feed America Thursday"; and

(2) requests that the President issue a proclamation calling on the people of the United States to sacrifice 2 meals on Thursday, November 17, 2005, and to donate the money that they would have spent on food to a religious or charitable organization of their choice for the purpose of feeding the hungry.

Mr. HATCH. Mr. President, I rise today to offer S. Res. 298, designating Thursday, November 17, 2005, as Feed America Thursday. I appreciate my friend, Senator ROBERT BENNETT, joining with me in this resolution.

On Thanksgiving Day, we remember with deep gratitude the many bounties of life, including an appreciation for families and friends and the great country in which we live. Part of what makes this country great is the spirit of selfless giving and generosity of its citizens. The great outpouring of support and assistance for the victims of Hurricane Katrina is a most recent example.

In this season of Thanksgiving, it is important to also remember that over 33 million Americans, including 13 million children, continue to live in households that do not have an adequate supply of food. These fellow citizens in need of food must not be forgotten.

On behalf of the Utah congressional delegation, Congressman CHRIS CANNON has submitted a companion resolution in the House of Representatives. We urge our distinguished colleagues to join us in designating Thursday, November 17, 2005, as Feed America Thursday, to encourage our fellow citizens to sacrifice two meals on that day and donate the money they would have spent on food to a religious or charitable organization of their choice for the purpose of feeding the hungry.

━━━━━━

SENATE RESOLUTION 299—TO EXPRESS SUPPORT FOR THE GOALS OF NATIONAL ADOPTION MONTH BY PROMOTING NATIONAL AWARENESS OF ADOPTION, CELEBRATING CHILDREN AND FAMILIES INVOLVED IN ADOPTION, AND ENCOURAGING AMERICANS TO SECURE SAFETY, PERMANENCY, AND WELL-BEING FOR ALL CHILDREN

Ms. LANDRIEU (for herself, Mr. DEMINT, Mrs. CLINTON, Mr. NELSON of Nebraska, Mr. BROWNBACK, Mr. CRAIG, Mr. KERRY, Mr. COLEMAN, and Mr. SALAZAR) submitted the following resolution; which was considered and agreed to:

S. RES. 299

Whereas there are approximately 532,000 children in the foster care system in the United States, approximately 129,000 of whom are waiting to be adopted;

Whereas the average length of time a child in foster care remains in foster care is almost 3 years;

Whereas for many foster children, the wait for a loving family in which they are nurtured, comforted, and protected is endless;

Whereas every year 25,000 children "age out" of foster care by reaching adulthood without being placed in a permanent home;

Whereas, since 1987, the number of annual adoptions has ranged from 118,000 to 127,000;

Whereas approximately 2,100,000 children in the United States live with adoptive parents;

Whereas approximately 6 of every 10 Americans have been touched personally by adoption in that they, a family member, or a close friend was adopted, has adopted a child, or has placed a child for adoption;

Whereas every day loving and nurturing families are formed when committed and dedicated individuals make an important difference in the life of a child through adoption; and

Whereas on November 4, 2004, the President proclaimed November 2004 as National Adoption Month: Now, therefore, be it

*Resolved,* That the Senate recognizes November 2005 as National Adoption Month.

━━━━━━

SENATE RESOLUTION 300—RELATIVE TO THE DEATH OF HENRY KU'UALOHA GIUGNI, FORMER SERGEANT-AT-ARMS OF THE UNITED STATES SENATE

Mr. INOUYE (for himself, Mr. AKAKA, Mr. BYRD, Mr. FRIST, Mr. REID, Mr. ALEXANDER, Mr. ALLARD, Mr. ALLEN, Mr. BAUCUS, Mr. BAYH, Mr. BENNETT, Mr. BIDEN, Mr. BINGAMAN, Mr. BOND, Mrs. BOXER, Mr. BROWNBACK, Mr. BUNNING, Mr. BURNS, Mr. BURR, Ms. CANTWELL, Mr. CARPER, Mr. CHAFEE, Mr. CHAMBLISS, Mrs. CLINTON, Mr. COBURN, Mr. COCHRAN, Mr. COLEMAN, Ms. COLLINS, Mr. CONRAD, Mr. CORNYN, Mr. CORZINE, Mr. CRAIG, Mr. CRAPO, Mr. DAYTON, Mr. DEMINT, Mr. DEWINE, Mr. DODD, Mrs. DOLE, Mr. DOMENICI, Mr.

DORGAN, Mr. DURBIN, Mr. ENSIGN, Mr. ENZI, Mr. FEINGOLD, Mrs. FEINSTEIN, Mr. GRAHAM, Mr. GRASSLEY, Mr. GREGG, Mr. HAGEL, Mr. HARKIN, Mr. HATCH, Mrs. HUTCHISON, Mr. INHOFE, Mr. ISAKSON, Mr. JEFFORDS, Mr. JOHNSON, Mr. KENNEDY, Mr. KERRY, Mr. KOHL, Mr. KYL, Ms. LANDRIEU, Mr. LAUTENBERG, Mr. LEAHY, Mr. LEVIN, Mr. LIEBERMAN, Mrs. LINCOLN, Mr. LOTT, Mr. LUGAR, Mr. MARTINEZ, Mr. McCAIN, Mr. McCONNELL, Ms. MIKULSKI, Mrs. MURKOWSKI, Mrs. MURRAY, Mr. NELSON OF FLORIDA, Mr. NELSON OF NEBRASKA, Mr. OBAMA, Mr. PRYOR, Mr. REED, Mr. ROBERTS, Mr. ROCKEFELLER, Mr. SALAZAR, Mr. SANTORUM, Mr. SARBANES, Mr. SCHUMER, Mr. SESSIONS, Mr. SHELBY, Mr. SMITH, Ms. SNOWE, Mr. SPECTER, Ms. STABENOW, Mr. STEVENS, Mr. SUNUNU, Mr. TALENT, Mr. THOMAS, Mr. THUNE, Mr. VITTER, Mr. VOINOVICH, Mr. WARNER, and Mr. WYDEN) submitted the following resolution; which was considered and agreed to:

S. RES. 300

Whereas Henry Ku'ualoha Giugni was born on January 11, 1925, in Honolulu, Hawai'i;

Whereas Henry Giugni served with distinction in the United States Army, after enlisting at the age of 16 after the attacks on Pearl Harbor, and served in combat at the Battle of Guadalcanal during World War II;

Whereas Henry Giugni began his service in the Senate in 1963 as Senior Executive Assistant and Chief of Staff to Senator Daniel K. Inouye;

Whereas Henry Giugni served as Sergeant-at-Arms from 1987 until 1990;

Whereas Henry Giugni was the first person of color and first Polynesian to be appointed to be the Sergeant-at-Arms;

Whereas Henry Giugni promoted minorities and women by appointing the first minority, an African American, to lead the Sergeant-at-Arms' Service Department, and was the first to assign women to the Capitol Police plainclothes unit;

Whereas Henry Giugni's special interest in people with disabilities resulted in a major expansion of the Special Services Office, which now conducts tours of the U.S. Capitol for the blind, deaf, and wheelchair-bound, and publishes Senate maps and documents in Braille;

Whereas in 2003, Henry Giugni received an Honorary Doctorate of Humane Letters from the University of Hawaii at Hilo in recognition of his extraordinary contributions to Hawaii and the nation;

Whereas Henry Giugni carried Hawai'i's flag while marching with Dr. Martin Luther King for civil rights in Selma, Alabama;

Whereas Henry Giugni presided over the inauguration of President George H.W. Bush, and escorted numerous foreign dignitaries, including Nelson Mandela, Margaret Thatcher, and Vaclav Havel when they visited the United States Capitol; and

Whereas on November 3, 2005, Henry Giugni passed away at the age of 80; Now therefore be it

*Resolved,* That the Senate has heard with profound sorrow and deep regret the announcement of the death of Henry Giugni.

*Resolved,* That the Secretary of the Senate communicate these resolutions to the House of Representatives and transmit an enrolled copy thereof to the family of the deceased.

*Resolved,* That when the Senate adjourns today, it stand adjourned as a further mark of respect to the memory of Henry Giugni.

## AMENDMENTS SUBMITTED & PROPOSED

SA 2402. Ms. SNOWE (for herself, Ms. COLLINS, Mr. ROCKEFELLER, and Mr. DURBIN) submitted an amendment intended to be proposed by her to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table.

SA 2403. Mr. COBURN submitted an amendment intended to be proposed by him to the bill S. 1932, supra; which was ordered to lie on the table.

SA 2404. Mr. ENSIGN (for himself, Mr. SANTORUM, and Mr. KYL) proposed an amendment to amendment SA 2352 proposed by Mr. ENZI (for himself, Mr. KENNEDY, Mr. ALEXANDER, Mr. DODD, Ms. LANDRIEU, Mr. COCHRAN, Mr. LOTT, and Mrs. HUTCHISON) to the bill S. 1932, supra.

SA 2405. Mrs. CLINTON (for herself, Ms. MIKULSKI, Mr. HARKIN, Mr. LAUTENBERG, Mr. JEFFORDS, Mr. REED, Mr. SALAZAR, Mr. OBAMA, Mrs. BOXER, Ms. STABENOW, Mr. CORZINE, Mr. SCHUMER, Mr. DURBIN, Mrs. FEINSTEIN, Mr. FEINGOLD, Mr. CARPER, Mr. JOHNSON, and Mr. LEAHY) submitted an amendment intended to be proposed by her to the bill S. 1932, supra; which was ordered to lie on the table.

SA 2406. Mr. DURBIN (for himself, Mr. DORGAN, Mr. LAUTENBERG, and Mr. JOHNSON) submitted an amendment intended to be proposed by him to the bill S. 1932, supra; which was ordered to lie on the table.

SA 2407. Mr. LEVIN submitted an amendment intended to be proposed by him to the bill S. 1932, supra; which was ordered to lie on the table.

SA 2408. Mr. CORNYN submitted an amendment intended to be proposed by him to the bill S. 1932, supra.

SA 2409. Mr. REED (for himself, Mr. BAUCUS, Mrs. MURRAY, Mr. KENNEDY, Mr. BINGAMAN, Mr. CORZINE, Mrs. CLINTON, and Mr. OBAMA) submitted an amendment intended to be proposed by him to the bill S. 1932, supra.

SA 2410. Mr. BAUCUS (for himself, Mr. OBAMA, Ms. MIKULSKI, Mrs. MURRAY, Ms. STABENOW, Mr. FEINGOLD, Mr. REED, and Mr. SCHUMER) submitted an amendment intended to be proposed by him to the bill S. 1932, supra; which was ordered to lie on the table.

SA 2411. Mrs. FEINSTEIN (for herself, Mrs. HUTCHISON, Mrs. BOXER, Mrs. MURRAY, Mr. LAUTENBERG, Mr. SCHUMER, Mr. CORZINE, Ms. CANTWELL, and Ms. MIKULSKI) proposed an amendment to the bill S. 1932, supra.

SA 2412. Mr. VITTER (for Mr. STEVENS (for himself, Mr. VITTER, Ms. LANDRIEU, Mr. DOMENICI, Mr. CRAIG, Mr. LOTT, Mr. INOUYE, and Mr. BINGAMAN)) proposed an amendment to the bill S. 1932, supra.

SA 2413. Mr. WARNER (for himself, Mr. LIEBERMAN, Mr. ROBERTS, Mr. DURBIN, Mr. ALLEN, and Mr. OBAMA) proposed an amendment to the bill S. 1932, supra.

SA 2414. Mr. BYRD (for himself and Mr. HARKIN) proposed an amendment to the bill S. 1932, supra.

SA 2415. Mr. DURBIN (for himself, Mr. DORGAN, Mr. LAUTENBERG, Mr. JOHNSON, and Mr. LIEBERMAN) submitted an amendment intended to be proposed by him to the bill S. 1932, supra; which was ordered to lie on the table.

SA 2416. Mr. SUNUNU (for himself and Mr. SANTORUM) submitted an amendment intended to be proposed by him to the bill S. 1932, supra; which was ordered to lie on the table.

SA 2417. Mr. GREGG (for Mr. LEVIN) proposed an amendment to the bill S. 1932, supra.

SA 2418. Mr. GREGG (for Mr. SUNUNU (for himself, Mr. DURBIN, Mr. CRAIG, Mr. PRYOR,

Mr. ISAKSON, Mr. NELSON of Nebraska, Mr. THUNE, Mr. KERRY, and Mr. CHAMBLISS)) proposed an amendment to the bill S. 1932, supra.

SA 2419. Mr. SANTORUM (for himself, Mr. BUNNING, Mr. THOMAS, Mr. VOINOVICH, Mr. LIEBERMAN, Mr. DODD, Mr. ROCKEFELLER, Ms. LANDRIEU, and Mr. CONRAD) proposed an amendment to the bill S. 1932, supra.

SA 2420. Mr. GREGG (for Mr. SUNUNU) proposed an amendment to the bill S. 1932, supra.

SA 2421. Mr. BURNS (for himself and Mr. BROWNBACK) submitted an amendment intended to be proposed by him to the bill S. 1932, supra; which was ordered to lie on the table.

SA 2422. Mr. CONRAD (for himself and Mr. SALAZAR) proposed an amendment to the bill S. 1932, supra.

## TEXT OF AMENDMENTS

**SA 2402.** Ms. SNOWE (for herself, Ms. COLLINS, Mr. ROCKEFELLER, and Mr. DURBIN) submitted an amendment intended to be proposed by her to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table; as follows:

On page 368, between lines 5 and 6, insert the following:

SEC. 6116. CLARIFICATION OF CONGRESSIONAL INTENT REGARDING THE COUNTING OF RESIDENTS IN A NONHOSPITAL SETTING.

(a) D-GME.—Section 1886(h)(4)(E) (42 U.S.C. 1395ww(h)(4)(E)) is amended by adding at the end the following new sentences: "For purposes of the preceding sentence, the term 'all, or substantially all, of the costs for the training program' means the stipends and benefits provided to the resident and other amounts, if any, as determined by the hospital and the entity operating the nonhospital setting. The hospital is not required to pay the entity any amounts other than those determined by the hospital and the entity in order for the hospital to be considered to have incurred all, or substantially all, of the costs for the training program in that setting.".

(b) IME.—Section 1886(d)(5)(B)(iv) (42 U.S.C. 1395ww(d)(5)(B)(iv)) is amended by adding at the end the following new sentences: "For purposes of the preceding sentence, the term 'all, or substantially all, of the costs for the training program' means the stipends and benefits provided to the resident and other amounts, if any, as determined by the hospital and the entity operating the nonhospital setting. The hospital is not required to pay the entity any amounts other than those determined by the hospital and the entity in order for the hospital to be considered to have incurred all, or substantially all, of the costs for the training program in that setting.".

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect on January 1, 2005.

**SA 2403.** Mr. COBURN submitted an amendment intended to be proposed by him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table; as follows:

On page 130, after line 25, insert the following:

**SEC. 6005. IMPROVED REGULATION OF DRUGS SOLD UNDER A NEW DRUG APPLICATION APPROVED UNDER SECTION 505C OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.**

Section 1927 (42 U.S.C. 1396r–8) is amended—

(1) in subsection (c)(1)(C), by adding at the end the following:

"(iv) Notwithstanding any other provision of this section, in the case of a manufacturer that approves, allows, or otherwise permits any other drug of the manufacturer to be sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act that has, as of January 1, 2006, been marketed for at least 6 months and where the product of the average manufacturer price of the manufacturer's authorized drugs and the total units of such authorized drugs, if any, during the second quarter of 2005 for which a rebate was paid under any State plan approved under this title (and which was reported as required under subsection (b)(2)(A)), does not exceed $10,000,000, the term 'best price' shall not include any price for such authorized drug available for the innovator multiple source drug of such manufacturer."; and

(2) in subsection (k)(1)(C), as amended by section 6003(b)(2)(A), by adding at the end the following:

"(G) Notwithstanding subparagraph (C) or any other provision of this section, in the case of a manufacturer that approves, allows, or otherwise permits any other drug of the manufacturer to be sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act that has, as of January 1, 2006, been marketed for at least 6 months and where the product of the average manufacturer price of the manufacturer's authorized drugs and the total units of such authorized drugs, if any, during the second quarter of 2005 for which a rebate was paid under any State plan approved under this title (and which was reported as required under subsection (b)(2)(A)), does not exceed $10,000,000, the term 'average manufacturer price' shall not include any price paid for such authorized drug by wholesalers for drugs distributed to the retail pharmacy class of trade for the innovator multiple source drugs of such manufacturer.".

---

**SA 2404.** Mr. ENSIGN (for himself, Mr. SANTORUM, and Mr. KYL) proposed an amendment to amendment SA 2352 proposed by Mr. ENZI (for himself, Mr. KENNEDY, Mr. ALEXANDER, Mr. DODD, Ms. LANDRIEU, Mr. COCHRAN, Mr. LOTT, and Mrs. HUTCHISON) to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

Strike all after the first word of the amendment and insert the following:

**D—Hurricane Katrina Education Relief**

**SEC. 7951. SHORT TITLE.**

This subtitle may be cited as the "Hurricane Katrina Education Relief Act".

**SEC. 7952. FINDINGS.**

Congress finds the following:

(1) Hurricane Katrina has had a devastating and unprecedented impact on students who attended schools in the disaster areas.

(2) Due to the devastating effects of Hurricane Katrina, a significant number of students have enrolled in schools outside of the area in which they resided on August 22, 2005, including a significant number of students who enrolled in nonpublic schools because their parents chose to enroll them in such schools.

(3) 372,000 students were displaced by Hurricane Katrina. Approximately 700 schools have been damaged or destroyed. Nine States each have more than 1,000 of such displaced students enrolled in their schools. In Texas alone, over 45,000 displaced students have enrolled in schools.

(4) In response to these extraordinary conditions, this subtitle creates a one-time only emergency grant for the 2005–2006 school year tailored to the needs and particular circumstances of students displaced by Hurricane Katrina.

**SEC. 7953. WAIVERS AND OTHER ACTIONS.**

(a) IN GENERAL.—If the Secretary of Education determines that it is necessary, in order to provide assistance as efficiently and expeditiously as possible to students, local educational agencies, institutions of higher education, States, or other individuals or entities affected directly or indirectly by Hurricane Katrina, the Secretary may waive or modify, on a case-by-case basis, any requirement of Federal law or regulation that the Secretary administers or enforces (other than a law or regulation of Government-wide applicability or regarding civil rights or safety). The waivers or modifications that the Secretary of Education may issue include extending program reporting deadlines or allowing States, local educational agencies, and institutions of higher education to use funds more broadly to help displaced students.

(b) EFFECTIVE PERIOD.—No waiver or modification issued pursuant to subsection (a) shall be in effect after September 30, 2006.

(c) REPORT ON WAIVERS.—

(1) INITIAL REPORT.—Not later than 1 month after the date of enactment of this Act, the Secretary of Education shall prepare and submit a report on the States and local educational agencies requesting a waiver of any provision under the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6301 et seq.) and the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) due to the impact of Hurricane Katrina to the Committee on Education and the Workforce and the Committee on Appropriations of the House of Representatives and the Committee on Health, Education, Labor, and Pensions and the Committee on Appropriations of the Senate.

(2) FOLLOW-UP REPORT.—Not later than 3 months after September 30, 2006, the Secretary of Education shall prepare and submit a report describing the waivers that were granted under this subtitle, and the impact of such waivers, to the Committee on Education and the Workforce and the Committee on Appropriations of the House of Representatives and the Committee on Health, Education, Labor, and Pensions and the Committee on Appropriations of the Senate.

**SEC. 7954. IMMEDIATE AID TO RESTART SCHOOL OPERATIONS.**

(a) PURPOSE.—It is the purpose of this section—

(1) to provide immediate and direct assistance to institutions of higher education and local educational agencies in Louisiana, Mississippi, and Alabama that serve an area in which a major disaster has been declared in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170), related to Hurricane Katrina;

(2) to assist administrators and personnel of such institutions and agencies who are working to restart operations;

(3) to facilitate the reopening of, and the re-enrollment of students in, institutions of higher education and elementary and secondary schools served by local educational agencies; and

(4) to assist institutions of higher education, elementary schools, and secondary schools in restoring operations disrupted by Hurricane Katrina.

(b) GRANTS AUTHORIZED.—From amounts appropriated to carry out this section, the Secretary of Education is authorized to make competitive grants—

(1) to institutions of higher education (as defined in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001)), in Louisiana, Mississippi, and Alabama, that serve an area in which a major disaster has been declared in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170), related to Hurricane Katrina; and

(2) to State educational agencies (as defined in section 9101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801 et seq.)) in Louisiana, Mississippi, and Alabama to enable those agencies to award subgrants, pursuant to subsection (d), to local educational agencies serving an area in which a major disaster has been declared in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170), related to Hurricane Katrina.

(c) AMOUNT OF GRANTS.—In determining the amount of a grant under this section, the Secretary of Education shall take into consideration—

(1) the number of schools and institutions of higher education in the State affected by Hurricane Katrina;

(2) the number of students in the State affected by Hurricane Katrina;

(3) the severity of the damage inflicted upon the affected schools and affected institutions; and

(4) the estimated length of time to restore operations at the affected schools and affected institutions.

(d) SUBGRANTS.—

(1) APPLICATIONS.—Each local educational agency desiring a subgrant under this section shall submit an application to the State educational agency at such time, in such manner, and accompanied by such information as the State educational agency may reasonably require to ensure expedited and timely payment to the local educational agency.

(2) ELIGIBILITY AND CONSIDERATION.—In determining whether to award a subgrant under this section, or the amount of the subgrant, the State educational agency shall consider the following:

(A) The number of school-aged children served by the local educational agency in the academic year preceding the academic year for which the grant is awarded.

(B) The severity of the impact of Hurricane Katrina on the local educational agency and the extent of the needs in each local educational agency in the State that is in an area in which a major disaster has been declared in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170), related to Hurricane Katrina.

(e) USES OF FUNDS.—

(1) IN GENERAL.—An institution of higher education receiving a grant, or a local educational agency receiving a subgrant, under this section shall use the subgrant funds for—

(A) recovery of student and personnel data, and other electronic information;

(B) replacement of information systems, including hardware and software;

(C) financial operations;

(D) reasonable transportation costs for students;

(E) rental of mobile educational units and leasing of neutral sites or spaces;

(F) initial replacement of instructional materials and equipment, including textbooks;

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 78 of 91

(G) redeveloping instructional plans, including curriculum development;

(H) initiating and maintaining education and support services; or

(I) such other activities related to the purpose of this section that are approved by the Secretary of Education.

(2) USE WITH OTHER AVAILABLE FUNDS.—An institution of higher education receiving a grant, or a local educational agency receiving a subgrant, under this section may use such funds in coordination with other Federal, State, or local funds available for the activities described in paragraph (1).

(3) PROHIBITIONS.—Grant funds or subgrant funds received under this section shall not be used for either of the following:

(A) Construction or major renovation of schools or institutions of higher education.

(B) Payments to administrators, faculty, or teachers who are not actively engaged in—

(i) restarting or re-opening schools or institutions of higher education; or

(ii) restoring operations of schools or institutions of higher education.

(f) SUPPLEMENT NOT SUPPLANT.—

(1) IN GENERAL.—Except as provided in paragraph (2), funds made available under this section shall be used to supplement, not supplant, any funds made available through the Federal Emergency Management Agency or through a State.

(2) EXCEPTION.—Paragraph (1) shall not prohibit the provision of Federal assistance under this section to an eligible educational agency or institution of higher education that is or may be entitled to receive, from another source, benefits for the same purposes as under this section if such agency or institution—

(A) has not received such other benefits by the time of application for Federal assistance under this section; and

(B) agrees to repay all duplicative Federal assistance received to carry out the purposes of this section.

(g) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated, and there is appropriated, out of any money in the Treasury not otherwise appropriated, $450,000,000 to carry out this section.

## SEC. 7955. HOLD HARMLESS FOR AGENCIES SERVING MAJOR DISASTER AREAS.

(a) LOCAL EDUCATIONAL AGENCIES AND TITLE I OF ESEA FUNDS.—In the case of a local educational agency that serves an area in which the President has declared that a major disaster exists in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170), related to Hurricane Katrina, the amount made available for such local educational agency under each of sections 1124, 1124A, 1125, and 1125A of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6333, 6334, 6335, and 6337) for fiscal year 2006 shall be not less than the amount made available for such local educational agency under each of such sections for fiscal year 2005.

(b) STATE EDUCATIONAL AGENCIES AND IDEA FUNDS.—In the case of a State educational agency that serves an area in which the President has declared that a major disaster exists in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170), related to Hurricane Katrina, the amount made available for such State educational agency under the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) for fiscal year 2006 shall be not less than the amount made available for such State educational agency under such Act for fiscal year 2005.

## SEC. 7956. TEACHER AND PARAPROFESSIONAL RECIPROCITY; DELAY.

(a) TEACHER AND PARAPROFESSIONAL RECIPROCITY.—

(1) TEACHERS.—

(A) AFFECTED TEACHER.—In this subsection, the term "affected teacher" means a teacher who is displaced due to Hurricane Katrina and relocates to a State that is different from the State in which such teacher resided on August 22, 2005.

(B) IN GENERAL.—A local educational agency may consider an affected teacher hired by that agency who is not highly qualified in the State in which the agency is located to be highly qualified, for purposes of section 1119 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6319) and section 612(a)(14) of the Individuals with Disabilities Education Act (20 U.S.C. 1412(a)(14)), through the last day of the 2005–2006 school year if such teacher was highly qualified, consistent with section 9101(23) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801(23)) and section 602(10) of the Individuals with Disabilities Education Act (20 U.S.C. 1401(10)), on or before August 22, 2005, in the State in which such teacher resided on August 22, 2005.

(2) PARAPROFESSIONALS.—

(A) AFFECTED PARAPROFESSIONAL.—In this subsection, the term "affected paraprofessional" means a paraprofessional who is displaced due to Hurricane Katrina and relocates to a State that is different from the State in which such paraprofessional resided on August 22, 2005.

(B) IN GENERAL.—A local educational agency may consider an affected paraprofessional hired by such agency who does not satisfy the requirements of section 1119(c) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6319(c)) in the State in which such agency is located to satisfy such requirements, for purposes of such section, through the last day of the 2005–2006 school year if such paraprofessional satisfied such requirements on or before August 22, 2005, in the State in which such paraprofessional resided on August 22, 2005.

(b) DELAY.—The Secretary of Education may delay, for a period not to exceed 1 year, applicability of the requirements of paragraphs (2) and (3) of section 1119(a) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6319(a)(2) and (3)) and section 612(a)(14)(C) of the Individuals with Disabilities Education Act (20 U.S.C. 1412(a)(14)(C)) with respect to the States of Alabama, Louisiana, and Mississippi (and local educational agencies within the jurisdiction of such States), if any such State or local educational agency demonstrates that a failure to comply with such requirements is due to exceptional or uncontrollable circumstances, such as a natural disaster or a precipitous and unforeseen decline in the financial resources of local educational agencies within the State.

## SEC. 7957. ASSISTANCE FOR HOMELESS YOUTH.

(a) IN GENERAL.—The Secretary of Education shall provide assistance to local educational agencies serving homeless children and youths displaced by Hurricane Katrina, consistent with section 723 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11433), including identification, enrollment assistance, assessment and school placement assistance, transportation, coordination of school services, supplies, referrals for health, mental health, and other needs.

(b) EXCEPTION AND DISTRIBUTION OF FUNDS.—

(1) EXCEPTION.—For purposes of providing assistance under subsection (a), subsections (c), (d)(2), and (e)(1) of section 722 and subsections (b) and (c) of section 723 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11432(c), (d)(2), and (e)(1), 11433(b) and (c)) shall not apply.

(2) DISBURSEMENT.—The Secretary of Education shall disburse funds under subsection (a) to State educational agencies based on demonstrated need, as determined by the Secretary, and those State educational agencies shall distribute funds available under subsection (c) to local educational agencies based on demonstrated need, for the purposes of carrying out section 723 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11433).

(3) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated, and there is appropriated, out of any money in the Treasury not otherwise appropriated, to carry out this section $10,000,000.

## SEC. 7958. GENERAL PROVISION.

Nothing in sections 7951 through 7957 of this subtitle shall be construed to permit discrimination on the basis of race, color, religion, sex (except as otherwise permitted under title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), national origin, or disability in any program funded under sections 7951 through 7957 of this subtitle.

## SEC. 7959. TEMPORARY EMERGENCY IMPACT AID FOR DISPLACED STUDENTS.

(a) TEMPORARY EMERGENCY IMPACT AID AUTHORIZED.—

(1) AID TO STATE EDUCATIONAL AGENCIES.—From amounts appropriated under subsection (o), the Secretary of Education shall provide emergency impact aid to State educational agencies to enable the State educational agencies—

(A) to make emergency impact aid payments to eligible local educational agencies and eligible BIA-funded schools to enable those eligible local educational agencies and schools to provide for the instruction of displaced students served by the agencies and schools; and

(B) to make immediate impact aid payments to individual accounts established on behalf of displaced students who are attending eligible nonpublic schools located within the State.

(2) AID TO LOCAL EDUCATIONAL AGENCIES AND BIA-FUNDED SCHOOLS.—A State educational agency shall make emergency impact aid payments to eligible local educational agencies and eligible BIA-funded schools in accordance with subsection (d).

(3) STATE EDUCATIONAL AGENCIES IN CERTAIN STATES.—In the case of the States of Louisiana and Mississippi, the State educational agency shall carry out the activities of eligible local educational agencies that are unable to carry out this section, including eligible local educational agencies in those States for which the State exercises the authorities normally exercised by the local educational agencies.

(b) DEFINITIONS.—In this section:

(1) CHILD WITH A DISABILITY.—The term "child with a disability" has the meaning given the term in section 602 of the Individuals with Disabilities Education Act (20 U.S.C. 1401).

(2) DISPLACED STUDENT.—The term "displaced student" means a student who enrolls in a school (other than the school that the student was enrolled in, or was eligible to be enrolled in, on August 22, 2005), and who resided, on August 22, 2005, in an area for which a major disaster has been declared in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170), related to Hurricane Katrina.

(3) ELIGIBLE LOCAL EDUCATIONAL AGENCIES.—The term "eligible local educational agency" means a local educational agency

Case 1:01-cv-12257-PBS   Document 6528-55   Filed 09/22/09   Page 79 of 91

that serves an elementary school or secondary school (including a charter school) in which there is enrolled a displaced student.

(4) ELIGIBLE NONPUBLIC SCHOOL.—The term "eligible nonpublic school" means a nonpublic school that—

(A) operates in accordance with State law or is accredited or licensed;

(B) was in existence on August 22, 2005; and

(C) serves a displaced student.

(5) ELIGIBLE BIA-FUNDED SCHOOL.—In this section, the term "eligible BIA-funded school" means a school funded by the Bureau of Indian Affairs in which there is enrolled a displaced student.

(c) APPLICATION.—

(1) STATE EDUCATIONAL AGENCY.—A State educational agency that desires to receive emergency impact aid under this section shall submit an application to the Secretary of Education at such time, in such manner, and accompanied by such information as the Secretary of Education may reasonably require, which shall include—

(A) information on the displaced student child count of the State provided by eligible local educational agencies in the State and eligible BIA-funded schools in the State under paragraph (2);

(B) information on the child count of the State of displaced students enrolled in eligible nonpublic schools;

(C) a description of how parents and guardians will be notified of their options for enrolling their children in public or nonpublic schools in the State;

(D) a description of the process by which parents and guardians may apply for payment through individual accounts, including the information such parents and guardians will be required to provide such State educational agency;

(E) a description of the procedure to be used by such State educational agency to provide payments to parents and guardians through individual accounts;

(F) a description of the process to be used by such State educational agency to obtain attestations of attendance of displaced students from eligible nonpublic schools, in order for such agency to provide payments to parents and guardians through individual accounts; and

(G) a description of how such State educational agency will prioritize funding for displaced students attending eligible nonpublic schools, if necessary, including any criteria such as household income.

(2) LOCAL EDUCATIONAL AGENCIES AND BIA-FUNDED SCHOOLS.—An eligible local educational agency or eligible BIA-funded school that desires an emergency impact aid payment under this section shall submit an application to the State educational agency at such time, in such manner, and accompanied by such information as the State educational agency may reasonably require, including documentation submitted for each quarter of the 2005–2006 school year that indicates the following:

(A) In the case of an eligible local educational agency, the number of displaced students enrolled in the elementary schools and secondary schools (including charter schools), including the number of displaced students who are identified as children with disabilities and are served under part B of the Individuals with Disabilities Education Act (20 U.S.C. 1411 et seq.), served by such agency.

(B) In the case of an eligible BIA-funded school, the number of displaced students, including the number of displaced students who are identified as children with disabilities and are served under part B of the Individuals with Disabilities Education Act (20 U.S.C. 1411 et seq.), enrolled in such school.

(3) DETERMINATION OF NUMBER OF DISPLACED STUDENTS.—In determining the number of displaced students for a quarter under paragraph (2), an eligible local educational agency or eligible BIA-funded school shall include in such number the number of displaced students served during such quarter prior to the date of enactment of this Act.

(d) AMOUNT OF EMERGENCY IMPACT AID.—

(1) AID TO STATE EDUCATIONAL AGENCIES.—

(A) IN GENERAL.—The amount of emergency impact aid received by a State educational agency for the 2005–2006 school year shall equal the sum of—

(i) the number of displaced students (who are not identified as children with disabilities and are not served under part B of the Individuals with Disabilities Education Act (20 U.S.C. 1411 et seq.), as determined by the eligible local educational agencies and eligible BIA-funded schools in the State under subsection (c)(2), and the number of such displaced students enrolled in eligible nonpublic schools in the State whose parents or guardians request payments pursuant to this section, times $6,000; and

(ii) the number of displaced students who are identified as children with disabilities and are served under part B of the Individuals with Disabilities Education Act, as determined by the eligible local educational agencies and eligible BIA-funded schools in the State under subsection (c)(2), and the number of such displaced students enrolled in eligible nonpublic schools in the State whose parents or guardians request payments pursuant to this section, times $7,500.

(B) INSUFFICIENT FUNDS.—If the amount available under this section to provide emergency impact aid under this subsection is insufficient to pay the full amount that a State educational agency is eligible to receive under this section, the Secretary of Education shall ratably reduce the amount of such emergency impact aid.

(2) AID TO ELIGIBLE LOCAL EDUCATIONAL AGENCIES AND ELIGIBLE BIA-FUNDED SCHOOLS; PAYMENTS TO INDIVIDUAL ACCOUNTS.—

(A) IN GENERAL.—A State educational agency that receives emergency impact aid under this subtitle shall provide payments under this section to eligible local educational agencies and eligible BIA-funded schools (as provided under subparagraph (B)), and to the individual accounts on behalf of displaced students enrolled in eligible nonpublic schools (as provided under subparagraph (C)) whose parents or guardians have requested such funds in accordance with subsection (e)(2), for the 2005–2006 school year by such dates as determined by the Secretary of Education. The Secretary of Education shall establish a timeline for reporting on the number of displaced students for each quarter in order to make the appropriate disbursements in a timely manner.

(B) PAYMENTS TO ELIGIBLE LOCAL EDUCATIONAL AGENCIES AND ELIGIBLE BIA-FUNDED SCHOOLS.—

(i) IN GENERAL.—Payments to eligible local educational agencies and eligible BIA-funded schools shall be based on the number of displaced students reported for each quarter under subsection (c)(2) and in the amount determined under clause (ii).

(ii) PAYMENT AMOUNT.—Each payment under clause (i) shall equal 25 percent of the sum of—

(I) the number of displaced students (who are not identified as children with disabilities and are not served under part B of the Individuals with Disabilities Education Act (20 U.S.C. 1411 et seq.) reported by the eligible local educational agency or eligible BIA-funded school for each quarter (as determined under subsection (c)(2)) times $6,000; and

(II) the number of displaced students who are identified as children with disabilities and are served under part B of the Individuals with Disabilities Education Act (20 U.S.C. 1411 et seq.) reported by the eligible local educational agency or eligible BIA-funded school for each quarter (as determined under subsection (c)(2)) times $7,500.

(iii) INSUFFICIENT FUNDS.—If the amount available under this section to make payments under this subsection is insufficient to pay the full amount that an eligible local educational agency or eligible BIA-funded school is eligible to receive for any quarter under this section, the State educational agency shall ratably reduce the amount of the payments.

(C) PAYMENTS TO INDIVIDUAL ACCOUNTS.—

(i) IN GENERAL.—A State educational agency shall make payments to an individual account on behalf of a displaced student for each quarter for which the displaced student is enrolled in an eligible nonpublic school in the amount determined under clause (ii).

(ii) PAYMENT AMOUNT.—Each payment under clause (i) shall equal 25 percent of the lesser of—

(I) $6,000; or

(II) the total amount of tuition, fees, and transportation costs, if any, of the displaced student for the 2005–2006 school year.

(iii) MAXIMUM AMOUNT.—In providing payments to an individual account for the 2005–2006 school year on behalf of a displaced student, a State educational agency may provide not more than 4 quarterly payments to such account.

(e) USE OF FUNDS.—

(1) DISPLACED STUDENTS IN PUBLIC SCHOOLS.—An eligible local educational agency or eligible BIA-funded school receiving emergency impact aid payments under this section shall use the payments to provide instructional opportunities for displaced students who enroll in elementary schools and secondary schools (including charter schools) served by such agency or in such a school, and for other expenses incurred as a result of the agency serving displaced students, which uses may include—

(A) paying the compensation of personnel, including teacher aides, in schools enrolling displaced students;

(B) identifying and acquiring curricular material, including the costs of providing additional classroom supplies, and mobile educational units and leasing sites or spaces;

(C) basic instructional services for such students, including tutoring, mentoring, academic counseling, supplemental educational services, or after-school programs;

(D) reasonable transportation costs for students;

(E) health services (including counseling); and

(F) alternative education services.

(2) DISPLACED STUDENTS IN NONPUBLIC SCHOOLS.—

(A) IN GENERAL.—A State educational agency that receives emergency impact aid under this section shall, at the request of the parent or guardian of a displaced student who enrolls in an eligible nonpublic school in the State, use such emergency impact aid to provide payment on a quarterly basis, in accordance with subsection (d)(2)(C), to an individual account on behalf of such displaced student. Payment shall be by individual check made payable to the displaced student's parent or guardian and mailed by the State educational agency to the eligible nonpublic school of the parent or guardian's direction and the parent or guardian shall restrictively endorse the check to such eligible nonpublic school.

(B) USE OF FUNDS.—An eligible nonpublic school that receives a check pursuant to subparagraph (A) may use the funds for—

(i) paying the compensation of personnel, including teacher aides;

(ii) identifying and acquiring curricular material, including the costs of providing additional classroom supplies, and mobile educational units and leasing sites or spaces;

(iii) basic instructional services for the displaced students, including tutoring, mentoring, academic counseling, or after-school programs;

(iv) reasonable transportation costs for the displaced students;

(v) health services (including counseling);

(vi) education and support services; and

(vii) alternative education services.

(3) PROVISION OF SPECIAL EDUCATION AND RELATED SERVICES.—

(A) IN GENERAL.—In the case of a displaced student who is identified as a child with a disability and is served under part B of the Individuals with Disabilities Education Act (20 U.S.C. 1411 et seq.), any payment made on behalf of such student to an eligible local educational agency or any payment available in an account for such student, shall be used to pay the cost of providing the student with special education and related services consistent with the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.).

(B) SPECIAL RULE.—Notwithstanding any other provision of this section, a State educational agency may provide payment to an eligible local educational agency that provides services to a displaced student attending an eligible nonpublic school under section 612(a)(10) of the Individuals with Disabilities Education Act (20 U.S.C. 1412(a)(10)) in an amount that is not more than $1,500 per displaced student served.

(C) SPECIAL EDUCATION; RELATED SERVICES.—In this paragraph, the terms ''special education'' and ''related services'' have the meaning given such terms in section 602 of the Individuals with Disabilities Education Act (20 U.S.C. 1401).

(f) RETURN OF AID.—

(1) ELIGIBLE LOCAL EDUCATIONAL AGENCY OR ELIGIBLE BIA-FUNDED SCHOOL.—An eligible local educational agency or eligible BIA-funded school that receives an emergency impact aid payment under this section shall return to the State educational agency any payment provided to the eligible local educational agency or school under this section that the eligible local educational agency or school has not obligated by the end of the 2005–2006 school year in accordance with this section.

(2) STATE EDUCATIONAL AGENCY.—A State educational agency that receives emergency impact aid under this section, shall return to the Secretary of Education—

(A) any aid provided to the agency under this section that the agency has not obligated by the end of the 2005–2006 school year in accordance with this section; and

(B) any payment funds returned to the State educational agency under paragraph (1).

(g) LIMITATION ON USE OF AID AND PAYMENTS.—Aid and payments provided under this section shall be used only for expenses incurred during the 2005–2006 school year.

(h) ADMINISTRATIVE EXPENSES.—A State educational agency that receives emergency impact aid under this section may use not more than 1 percent of such aid for administrative expenses.

(i) SPECIAL FUNDING RULE.—In calculating funding under section 8003 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7703) for an eligible local educational agency that receives an emergency impact aid payment under this section, the Secretary of Education shall not count displaced students served by such agency for whom an emergency impact aid payment is received under this section, nor shall such students be counted for the purpose of calculating the total number of children in average daily attendance at the schools served by such agency as provided in section 8003(b)(3)(B)(i) of such Act (20 U.S.C. 7703(b)(3)(B)(i)).

(j) TERMINATION OF AUTHORITY.—The authority provided by this section shall terminate on August 1, 2006.

(k) BY-PASS.—If a State educational agency is unable or unwilling to carry out this section, the Secretary of Education may make such arrangements with the State as the Secretary determines appropriate to carry out this section on behalf of displaced students attending an eligible nonpublic school in the State. For a State in which State law prohibits the State from using Federal funds to directly provide services on behalf of students attending nonpublic schools and provides that another entity shall provide such services, the Secretary of Education shall make such arrangements with that entity.

(l) NONDISCRIMINATION.—

(1) IN GENERAL.—A State educational agency may provide payment under this section to the parent or guardian of a displaced student who enrolls in an eligible nonpublic school in the State only if the eligible nonpublic school selected by the student provides assurances that it does not discriminate against participating displaced students on the basis of race, color, national origin, religion, or sex.

(2) APPLICABILITY AND SINGLE-SEX SCHOOLS, CLASSES, OR ACTIVITIES.—

(A) IN GENERAL.—Notwithstanding any other provision of law, the prohibition of sex discrimination in paragraph (1) shall not apply to a nonpublic school that is operated by, controlled by, or connected to a religious organization to the extent that the application of paragraph (1) is inconsistent with the religious tenets or beliefs of the school.

(B) SINGLE-SEX SCHOOLS, CLASSES, OR ACTIVITIES.—Notwithstanding paragraph (1) or any other provision of law, a parent or guardian may choose, and a nonpublic school may offer, a single-sex school, class, or activity.

(3) GENERAL PROVISION.—Nothing in this section may be construed to alter or modify the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.).

(4) RULE OF CONSTRUCTION.—Payments made to an individual account (or any other form of support provided to students under this section) under this section shall be considered assistance to the student and shall not be considered assistance to the school that enrolls the student. The amount of any payment (or other form of support provided on behalf of a displaced student) under this section shall not be treated as income of a parent or guardian of the student for purposes of Federal tax laws or for determining eligibility for any other Federal program.

(5) RELIGIOUSLY AFFILIATED SCHOOLS.—

(A) IN GENERAL.—Notwithstanding any other provision of law, an eligible nonpublic school participating in any program under this subtitle that is operated by, supervised by, controlled by, or connected to, a religious organization may exercise its rights in matters of employment consistent with title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), including the exemptions provided under such title.

(B) MAINTENANCE OF PURPOSE.—Notwithstanding any other provision of law, funds made available under this section to displaced students that are received by an eligible nonpublic school, as a result of the student's parent or guardian's choice, shall not, consistent with the first amendment of the United States Constitution, necessitate any change in the eligible nonpublic school's teaching mission, require any eligible nonpublic school to remove religious art, icons, scriptures, or other symbols, or preclude any eligible nonpublic school from retaining religious terms in its name, selecting its board members on a religious basis, or including religious references in its mission statements and other chartering or governing documents.

(C) RULE OF CONSTRUCTION.—For purposes of this section, the provisions of section 909 of the Education Amendments of 1972 (20 U.S.C. 1688) shall apply to this section as if section 909 of the Education Amendments of 1972 (20 U.S.C. 1688) were part of this section.

(m) TREATMENT OF STATE AID.—A State shall not take into consideration emergency impact aid payments received under this section by a local educational agency in the State in determining the eligibility of such local educational agency for State aid, or the amount of State aid, with respect to free public education of children.

(n) RETURN OF UNEXPENDED FUNDS.—The Secretary of Education shall return to the Treasury any funds appropriated under this section that are unexpended or unobligated by September 30, 2006.

(o) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated, and there is appropriated, out of any money in the Treasury not otherwise appropriated, $1,200,000,000 to carry out this section.

**SEC. 7960. LIMITATION ON USE OF FUNDS.**

Aid, payments, assistance, or other funding provided under this subtitle shall be used only for expenses incurred during the 2005–2006 school year.

**SEC. 7961. SUNSET PROVISION.**

Except as otherwise provided in this subtitle, the provisions of this subtitle shall be effective for the period beginning on the date of enactment of this Act and ending on August 30, 2006.

**SA 2405.** Mrs. CLINTON (for herself, Ms. MIKULSKI, Mr. HARKIN, Mr. LAUTENBERG, Mr. JEFFORDS, Mr. REED, Mr. SALAZAR, Mr. OBAMA, Mrs. BOXER, Ms. STABENOW, Mr. CORZINE, Mr. SCHUMER, Mr. DURBIN, Mrs. FEINSTEIN, Mr. FEINGOLD, Mr. CARPER, Mr. JOHNSON, and Mr. LEAHY) submitted an amendment intended to be proposed by her to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. con. Res. 95); which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**TITLE ___ KATRINA COMMISSION**

**SEC. ___ 01. ESTABLISHMENT OF COMMISSION.**

There is established in the legislative branch the Katrina Commission (in this title referred to as the ''Commission'').

**SEC. ___ 02. COMPOSITION OF COMMISSION.**

(a) MEMBERS.—The Commission shall be composed of 10 members, of whom—

(1) 1 member shall be appointed by the President, who shall serve as chairman of the Commission;

(2) 1 member shall be appointed by the leader of the Senate (majority or minority leader, as the case may be) of the Democratic Party, in consultation with the leader of the House of Representatives (majority or minority leader, as the case may be) of the Democratic Party, who shall serve as vice chairman of the Commission;

(3) 2 members shall be appointed by the senior member of the Senate leadership of the Democratic Party;

(4) 2 members shall be appointed by the senior member of the leadership of the House of Representatives of the Republican Party;

(5) 2 members shall be appointed by the senior member of the Senate leadership of the Republican Party; and

(6) 2 members shall be appointed by the senior member of the leadership of the House of Representatives of the Democratic Party.

(b) QUALIFICATIONS; INITIAL MEETING.—

(1) POLITICAL PARTY AFFILIATION.—Not more than 5 members of the Commission shall be from the same political party.

(2) NONGOVERNMENTAL APPOINTEES.—An individual appointed to the Commission may not be an officer or employee of the Federal Government or any State or local government.

(3) OTHER QUALIFICATIONS.—It is the sense of Congress that individuals appointed to the Commission should be prominent United States citizens who represent a diverse range of citizens and enjoy national recognition and significant depth of experience in such professions as governmental service, emergency preparedness, mitigation planning, cataclysmic planning and response, intergovernmental management, resource planning, recovery operations and planning, Federal coordination, military coordination, and other extensive natural disaster and emergency response experience.

(4) DEADLINE FOR APPOINTMENT.—All members of the Commission shall be appointed on or before October 1, 2005.

(5) INITIAL MEETING.—The Commission shall meet and begin the operations of the Commission as soon as practicable.

(c) QUORUM; VACANCIES.—After its initial meeting, the Commission shall meet upon the call of the chairman or a majority of its members. Six members of the Commission shall constitute a quorum. Any vacancy in the Commission shall not affect its powers, but shall be filled in the same manner in which the original appointment was made.

SEC. ___ 03. DUTIES.

The duties of the Commission are to—

(1) examine and report upon the Federal, State, and local response to the devastation wrought by Hurricane Katrina in the Gulf Region of the United States of America especially in the States of Louisiana, Mississippi, Alabama, and other areas impacted in the aftermath;

(2) ascertain, evaluate, and report on the information developed by all relevant governmental agencies regarding the facts and circumstances related to Hurricane Katrina prior to striking the United States and in the days and weeks following;

(3) build upon concurrent and prior investigations of other entities, and avoid unnecessary duplication concerning information related to existing vulnerabilities;

(4) make a full and complete accounting of the circumstances surrounding the approach of Hurricane Katrina to the Gulf States, and the extent of the United States government's preparedness for, and response to, the hurricane;

(5) planning necessary for future cataclysmic events requiring a significant marshaling of Federal resources, mitigation, response, and recovery to avoid significant loss of life;

(6) an analysis as to whether any decisions differed with respect to response and recovery for different communities, neighborhoods, parishes, and locations and what problems occurred as a result of a lack of a common plan, communication structure, and centralized command structure; and

(7) investigate and report to the President and Congress on its findings, conclusions, and recommendations for immediate corrective measures that can be taken to prevent problems with Federal response that occurred in the preparation for, and in the aftermath of, Hurricane Katrina so that future cataclysmic events are responded to adequately.

SEC. ___ 04. FUNCTIONS OF COMMISSION.

(a) IN GENERAL.—The functions of the Commission are to—

(1) conduct an investigation that—

(A) investigates relevant facts and circumstances relating to the catastrophic impacts that Hurricane Katrina exacted upon the Gulf Region of the United States especially in New Orleans and surrounding parishes, and impacted areas of Mississippi and Alabama; and

(B) shall include relevant facts and circumstances relating to—

(i) Federal emergency response planning and execution at the Federal Emergency Management Agency, the Department of Homeland Security, the White House, and all other Federal entities with responsibility for assisting during, and responding to, natural disasters;

(ii) military and law enforcement response planning and execution;

(iii) Federal mitigation plans, programs, and policies including prior assessments of existing vulnerabilities and exercises designed to test those vulnerabilities;

(iv) Federal, State, and local communication interoperability successes and failures;

(v) past, present, and future Federal budgetary provisions for preparedness, mitigation, response, and recovery;

(vi) the Federal Emergency Management Agency's response capabilities as an independent agency and as part of the Department of Homeland Security;

(vii) the role of congressional oversight and resource allocation;

(viii) other areas of the public and private sectors determined relevant by the Commission for its inquiry; and

(ix) long-term needs for people impacted by Hurricane Katrina and other forms of Federal assistance necessary for large-scale recovery;

(2) identify, review, and evaluate the lessons learned from Hurricane Katrina including coordination, management policies, and procedures of the Federal Government, State and local governments, and nongovernmental entities, relative to detection, planning, mitigation, asset prepositioning, and responding to cataclysmic natural disasters such as Hurricane Katrina; and

(3) submit to the President and Congress such reports as are required by this title containing such findings, conclusions, and recommendations as the Commission shall determine, including proposing organization, coordination, planning, management arrangements, procedures, rules, and regulations.

SEC. ___ 05. POWERS OF COMMISSION.

(a) IN GENERAL.—

(1) HEARINGS AND EVIDENCE.—The Commission or, on the authority of the Commission, any subcommittee or member thereof, may, for the purpose of carrying out this Act—

(A) hold such hearings and sit and act at such times and places, take such testimony, receive such evidence, administer such oaths; and

(B) subject to paragraph (2)(A), require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents, as the Commission or such designated subcommittee or designated member may determine advisable.

(2) SUBPOENAS.—

(A) ISSUANCE.—

(i) IN GENERAL.—A subpoena may be issued under this subsection only—

(I) by the agreement of the chairman and the vice chairman; or

(II) by the affirmative vote of 6 members of the Commission.

(ii) SIGNATURE.—Subject to clause (i), subpoenas issued under this subsection may be issued under the signature of the chairman or any member designated by a majority of the Commission, and may be served by any person designated by the chairman or by a member designated by a majority of the Commission.

(B) ENFORCEMENT.—

(i) IN GENERAL.—In the case of contumacy or failure to obey a subpoena issued under subsection (a), the United States district court for the judicial district in which the subpoenaed person resides, is served, or may be found, or where the subpoena is returnable, may issue an order requiring such person to appear at any designated place to testify or to produce documentary or other evidence. Any failure to obey the order of the court may be punished by the court as a contempt of that court.

(ii) ADDITIONAL ENFORCEMENT.—In the case of any failure of any witness to comply with any subpoena or to testify when summoned under authority of this section, the Commission may, by majority vote, certify a statement of fact constituting such failure to the appropriate United States attorney, who may bring the matter before the grand jury for its action, under the same statutory authority and procedures as if the United States attorney had received a certification under sections 102 through 104 of the Revised Statutes of the United States (2 U.S.C. 192 through 194).

(b) CONTRACTING.—The Commission may, to such extent and in such amounts as are provided in appropriation Acts, enter into contracts to enable the Commission to discharge its duties under this title.

(c) INFORMATION FROM FEDERAL AGENCIES.—

(1) IN GENERAL.—The Commission is authorized to secure directly from any executive department, bureau, agency, board, commission, office, independent establishment, or instrumentality of the Government, information, suggestions, estimates, and statistics for the purposes of this title. Each department, bureau, agency, board, commission, office, independent establishment, or instrumentality shall, to the extent authorized by law, furnish such information, suggestions, estimates, and statistics directly to the Commission, upon request made by the chairman, the chairman of any subcommittee created by a majority of the Commission, or any member designated by a majority of the Commission.

(2) RECEIPT, HANDLING, STORAGE, AND DISSEMINATION.—Information shall only be received, handled, stored, and disseminated by members of the Commission and its staff consistent with all applicable statutes, regulations, and Executive orders.

(d) ASSISTANCE FROM FEDERAL AGENCIES.—

(1) GENERAL SERVICES ADMINISTRATION.—The Administrator of General Services shall provide to the Commission on a reimbursable basis administrative support and other services for the performance of the Commission's functions.

(2) OTHER DEPARTMENTS AND AGENCIES.—In addition to the assistance prescribed in paragraph (1), departments and agencies of the United States may provide to the Commission such services, funds, facilities, staff, and other support services as they may determine advisable and as may be authorized by law.

(e) GIFTS.—The Commission may accept, use, and dispose of gifts or donations of services or property.

(f) POSTAL SERVICES.—The Commission may use the United States mails in the same manner and under the same conditions as departments and agencies of the United States.

### SEC. ___ 06. NONAPPLICABILITY OF FEDERAL ADVISORY COMMITTEE ACT.

(a) IN GENERAL.—The Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to the Commission.

(b) PUBLIC MEETINGS AND RELEASE OF PUBLIC VERSIONS OF REPORTS.—The Commission shall—

(1) hold public hearings and meetings to the extent appropriate; and

(2) release public versions of the reports required under section ___ 10.

(c) PUBLIC HEARINGS.—Any public hearings of the Commission shall be conducted in a manner consistent with the protection of information provided to or developed for or by the Commission as required by any applicable statute, regulation, or Executive order.

### SEC. ___ 07. STAFF OF COMMISSION.

(a) IN GENERAL.—

(1) APPOINTMENT AND COMPENSATION.—The chairman, in consultation with the vice chairman, in accordance with rules agreed upon by the Commission, may appoint and fix the compensation of a staff director and such other personnel as may be necessary to enable the Commission to carry out its functions, without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, except that no rate of pay fixed under this subsection may exceed the equivalent of that payable for a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

(2) PERSONNEL AS FEDERAL EMPLOYEES.—

(A) IN GENERAL.—The executive director and any personnel of the Commission who are employees shall be employees under section 2105 of title 5, United States Code, for purposes of chapters 63, 81, 83, 84, 85, 87, 89, and 90 of that title.

(B) MEMBERS OF COMMISSION.—Subparagraph (A) shall not be construed to apply to members of the Commission.

(b) DETAILEES.—Any Federal Government employee may be detailed to the Commission without reimbursement from the Commission, and such detailee shall retain the rights, status, and privileges of his or her regular employment without interruption.

(c) CONSULTANT SERVICES.—The Commission is authorized to procure the services of experts and consultants in accordance with section 3109 of title 5, United States Code, but at rates not to exceed the daily rate paid a person occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code.

### SEC. ___ 08. COMPENSATION AND TRAVEL EXPENSES.

(a) COMPENSATION.—Each member of the Commission may be compensated at not to exceed the daily equivalent of the annual rate of basic pay in effect for a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day during which that member is engaged in the actual performance of the duties of the Commission.

(b) TRAVEL EXPENSES.—While away from their homes or regular places of business in the performance of services for the Commission, members of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in the Government service are allowed expenses under section 5703(b) of title 5, United States Code.

### SEC. ___ 09. SECURITY CLEARANCES FOR COMMISSION MEMBERS AND STAFF.

The appropriate Federal agencies or departments shall cooperate with the Commission in expeditiously providing to the Commission members and staff appropriate security clearances to the extent possible pursuant to existing procedures and requirements, except that no person shall be provided with access to classified information under this title without the appropriate security clearances.

### SEC. ___ 10. REPORTS OF COMMISSION; TERMINATION.

(a) INTERIM REPORTS.—The Commission may submit to the President and Congress interim reports containing such findings, conclusions, and recommendations for corrective measures as have been agreed to by a majority of Commission members.

(b) FINAL REPORT.—Not later than 6 months after the date of the enactment of this title, the Commission shall submit to the President and Congress a final report containing such findings, conclusions, and recommendations for corrective measures as have been agreed to by a majority of Commission members.

(c) TERMINATION.—

(1) IN GENERAL.—The Commission, and all the authorities of this Act, shall terminate 60 days after the date on which the final report is submitted under subsection (b).

(2) ADMINISTRATIVE ACTIVITIES BEFORE TERMINATION.—The Commission may use the 60-day period referred to in paragraph (1) for the purpose of concluding its activities, including providing testimony to committees of Congress concerning its reports and disseminating the final report.

### SEC. ___ 11. FUNDING.

(a) EMERGENCY APPROPRIATION OF FUNDS.—There are authorized to be appropriated $3,000,000 for purposes of the activities of the Commission under this title and such funding is designated as emergency spending under section 402 of H. Con. Res. 95 (109th Congress).

(b) DURATION OF AVAILABILITY.—Amounts made available to the Commission under subsection (a) shall remain available until the termination of the Commission.

## SA 2406. Mr. DURBIN (for himself, Mr. DORGAN, Mr. LAUTENBERG, and Mr. JOHNSON) submitted an amendment intended to be proposed by him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

### SEC. ___ . ACCOUNTABILITY IN FEDERAL CONTRACTING.

(a) IN GENERAL.—Except as provided in subsection (b), none of the funds appropriated or otherwise made available by the Emergency Supplemental Appropriations Act to Meet Immediate Needs Arising From the Consequences of Hurricane Katrina, 2005 (Public Law 109–61), by the Second Emergency Supplemental Appropriations Act to Meet Immediate Needs Arising From the Consequences of Hurricane Katrina, 2005 (Public Law 109–62), or through the Iraq Relief and Reconstruction Fund may be obligated or expended in connection with a contract with a contractor that, during the previous 5 years—

(1) has been found by an executive agency, the Special Inspector General for Iraq Reconstruction, or any Inspector General having oversight authority with respect to Hurricane Katrina and Hurricane Rita reconstruction contracts to have overcharged or improperly billed the Federal Government by a total of at least $10,000,000 through one or more overcharges;

(2) has been found by an executive agency, the Special Inspector General for Iraq Reconstruction, or any Inspector General having oversight authority with respect to Hurricane Katrina and Hurricane Rita reconstruction contracts to have committed one or more fraudulent acts resulting in total costs or losses to the Federal Government of at least $10,000,000; or

(3) has had rendered against it a judgment or conviction for an offense constituting a cause for suspension or debarment under the Federal suspension and debarment regulations.

(b) NATIONAL SECURITY WAIVER.—The President may waive the restrictions under subsection (a) on a case-by-case basis if the President determines that such waiver is in the national security interest of the United States and submits to the appropriate congressional authorities a report describing the reasons for such determination.

(c) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL AUTHORITIES.—The term ''appropriate congressional authorities'' means—

(A) the Majority Leader and the Minority Leader of the Senate;

(B) the Speaker of the House of Representatives and the Minority Leader of the House of Representatives; and

(C) the Committees on Appropriations of the Senate and the House of Representatives.

(2) EXECUTIVE AGENCIES.—The term ''executive agency'' has the meaning given that term in section 4 of the Office of Federal Procurement Policy Act (41 U.S.C. 403).

## SA 2407. Mr. LEVIN submitted an amendment intended to be proposed by him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table; as follows:

On page 95, after line 21, insert the following:

### SEC. 3005A. COMMUNICATION SYSTEM GRANTS.

(a) DEFINITIONS.—In this section—

(1) the term ''demonstration project'' means the demonstration project established under subsection (b)(1);

(2) the term ''Department'' means the Department of Homeland Security;

(3) the term ''emergency response provider'' has the meaning given that term in section 2(6) the Homeland Security Act of 2002 (6 U.S.C. 101(6)); and

(4) the term ''Secretary'' means the Secretary of Homeland Security.

(b) IN GENERAL.—

(1) ESTABLISHMENT.—There is established in the Department an ''International Border Community Interoperable Communications Demonstration Project''.

(2) MINIMUM NUMBER OF COMMUNITIES.—The Secretary shall select not fewer than 2 communities to participate in a demonstration project.

(3) LOCATION OF COMMUNITIES.—Not fewer than 1 of the communities selected under paragraph (2) shall be located on the northern border of the United States and not fewer than 1 of the communities selected under paragraph (2) shall be located on the southern border of the United States.

(c) PROJECT REQUIREMENTS.—The demonstration projects shall—

(1) address the interoperable communications needs of police officers, firefighters,

emergency medical technicians, National Guard, and other emergency response providers;

(2) foster interoperable communications—

(A) among Federal, State, local, and tribal government agencies in the United States involved in preventing or responding to terrorist attacks or other catastrophic events; and

(B) with similar agencies in Canada and Mexico;

(3) identify common international cross-border frequencies for communications equipment, including radio or computer messaging equipment;

(4) foster the standardization of interoperable communications equipment;

(5) identify solutions that will facilitate communications interoperability across national borders expeditiously;

(6) ensure that emergency response providers can communicate with each another and the public at disaster sites or in the event of a terrorist attack or other catastrophic event;

(7) provide training and equipment to enable emergency response providers to deal with threats and contingencies in a variety of environments; and

(8) identify and secure appropriate joint-use equipment to ensure communications access.

(d) DISTRIBUTION OF FUNDS.—

(1) IN GENERAL.—The Secretary shall distribute funds under this section to each community participating in a demonstration project through the State, or States, in which each community is located.

(2) OTHER PARTICIPANTS.—Not later than 60 days after receiving funds under paragraph (1), a State receiving funds under this section shall make the funds available to the local governments and emergency response providers participating in a demonstration project selected by the Secretary.

(e) FUNDING.—Amounts made available from the interoperability fund under section 3005(c)(3) shall be available to carry out this section without appropriation.

(f) REPORTING.—Not later than December 31, 2005, and each year thereafter in which funds are appropriated for a demonstration project, the Secretary should provide to the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives a report on the demonstration projects under this section.

**SA 2408.** Mr. CORNYN submitted an amendment intended to be proposed by him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 94, strike line 7 through 12.

**SA 2409.** Mr. REED (for himself, Mr. BAUCUS, Mrs. MURRAY, Mr. KENNEDY, Mr. BINGAMAN, Mr. CORZINE, Mrs. CLINTON, and Mr. OBAMA) submitted an amendment intended to be proposed by him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

Strike section 6031 of the bill.

**SA 2410.** Mr. BAUCUS (for himself, Mr. OBAMA, Mrs. MIKULSKI, Mrs. MURRAY, Ms. STABENOW, Mr. FEINGOLD, Mr. REED, and Mr. SCHUMER) submitted an amendment intended to be proposed by

him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table; as follows:

On page 256, between lines 5 and 6, insert the following:

**Subchapter D—Sense of the Senate**

**SEC. 6065. TO EXPRESS THE SENSE OF THE SENATE REGARDING MEDICAID RECONCILIATION LEGISLATION TO BE REPORTED BY A CONFERENCE COMMITTEE.**

(a) FINDINGS.—The Senate makes the following findings:

(1) The Medicaid program provides essential health care and long-term care services to more than 50,000,000 low-income children, pregnant women, parents, individuals with disabilities, and senior citizens. It is a Federal guarantee that ensures that the most vulnerable will have access to needed medical services.

(2) The Medicaid program provides critical access to long-term care and other services for the elderly and individuals living with disabilities, and is the single largest provider of long-term care services. The Medicaid program also pays for personal care and other supportive services that are typically not provided by private health insurance or under the Medicare program, but are necessary to enable individuals with spinal cord injuries, developmental disabilities, neurological degenerative diseases, serious and persistent mental illnesses, HIV/AIDS, and other chronic conditions to remain in the community, to work, and to maintain independence.

(3) The Medicaid program supplements the Medicare program for more than 6,000,000 low-income elderly or disabled Medicare beneficiaries, assisting those beneficiaries with their Medicare premiums and co-insurance, wrap-around benefits, and the costs of nursing home care that the Medicare program does not cover. The Medicaid program spent nearly $40,000,000,000 in 2002 on services not covered under the Medicare program.

(4) The Medicaid program provides health insurance for more than ¼ of America's children and is the largest purchaser of maternity care, paying for more than ⅓ of all the births in the United States each year. The Medicaid program also provides vital access to care for children with disabilities, covering more than 70 percent of the poor children with disabilities in the United States.

(5) Medicaid's benefits for children are comprehensive, including mandatory coverage for Early and Periodic Screening Diagnosis and Treatment benefits covering all medically necessary care. Medicaid ensures that children have the benefits, health services and health care support they need to be fully immunized and that children can secure eyeglasses, dental care, and hearing aids when necessary, and that children have access to comprehensive, regularly scheduled, and as-needed health examinations, as well as preventive interventions, to correct physical and mental conditions that threaten to delay proper growth and development.

(6) More than 16,000,000 American women depend on the Medicaid program for their health care. Women comprise the majority of seniors (71 percent) on Medicaid. Half of nonelderly women with permanent mental or physical disabilities have health care coverage under the Medicaid program. The Medicaid program also provides critical access to treatment for low-income women diagnosed with breast or cervical cancer.

(7) The Medicaid program is the Nation's largest source of payment for mental health services, HIV/AIDS care, and care for chil-

dren with special needs. Much of this care is either not covered by private insurance or is limited in scope or duration. The Medicaid program is also a critical source of funding for health care for children in foster care and for health care services provided in schools.

(8) Funds under the Medicaid program help to ensure access to care for all Americans. The Medicaid program is the single largest source of revenue for the Nation's safety net hospitals, health centers, and nursing homes, and is critical to the ability of these providers to adequately serve all Americans.

(9) The Medicaid program serves a major role in ensuring that the number of Americans without health insurance, approximately 45,000,000 in 2003, is not substantially higher. The system of Federal matching for State Medicaid expenditures ensures that Federal funds will grow as State spending increases in response to unmet needs, enabling the Medicaid program to help buffer the dip in private coverage during recessions. More than 4,800,000 Americans lost employer-sponsored health care coverage between 2000 and 2003, during which time the Medicaid program enrolled an additional 8,400,000 Americans.

(10) Many individuals living below the Federal poverty level are ineligible for Medicaid because of stringent income eligibility rules. For parents, eligibility levels are often very far below the Federal poverty level. On average, a working parent in a family of three would have to make less than $224 per week and a non-working parent in a family of three would have to make less than $150 per week to qualify. Single individuals with disabilities would be ineligible if they have more than $147 per week in income.

(11) Eligibility levels for pregnant women and children are generally at or just above the Federal poverty level, but a family with income just over minimum wage can be disqualified for Medicaid. At the minimum eligibility levels for pregnant women, earning as little as $8.80 per hour at a full-time job could disqualify a pregnant woman from Medicaid eligibility. A working parent in a family of three earning less than $8.40 per hour at a full-time job could make their child 6 years-old or older ineligible for Medicaid.

(12) Title III of the budget reconciliation bill of the House of Representatives, as reported out by the Committee on Energy and Commerce, would adversely affect these low-income beneficiaries, many of whom are children or have special health care needs, by increasing beneficiary cost-sharing, limiting access to benefits, and restricting eligibility for long-term care services that the Medicaid program covers. These new limits make up ⅔ of the House of Representatives's projected Medicaid spending reductions, accounting for $30,100,000,000 of the total $45,300,000,000 in Medicaid reductions over 10 years.

(13) Making beneficiaries pay more for more limited benefits under Medicaid may put a significant financial burden on these very low-income individuals. Research also demonstrates that increasing beneficiary cost-sharing can make prescription drugs and other essential health services unaffordable for beneficiaries, can cause the health of children and adults to deteriorate, and can lead to higher emergency room and hospital costs.

(14) By contrast, while this title includes substantial cuts to the Medicaid program, it does not include direct limits on beneficiary access to Medicaid services. Even so, enactment of this title would result in a net Medicaid cut of $14,200,000,000 over 10 years, less than ⅓ of the projected Medicaid reductions contained in the House of Representative's budget reconciliation bill.

(b) SENSE OF THE SENATE.—It is the sense of the Senate that the conferees for any budget reconciliation bill of the 109th Congress shall not report a reconciliation bill that would—

(1) with respect to low-income children, pregnant women, disabled individuals, elderly individuals, individuals with chronic illnesses like HIV/AIDS, cancer, and diabetes, individuals with mental illnesses, and other Medicaid beneficiaries—

(A) impair access to Medicaid services;

(B) undermine eligibility for such Medicaid beneficiaries;

(C) make Medicaid services unavailable by making them unaffordable to such Medicaid beneficiaries; or

(D) cut health care services for such Medicaid beneficiaries; or

(2) undermine the Federal guarantee of health insurance coverage that the Medicaid program provides, which would threaten not only the health care safety net of the United States, but the entire health care system of the United States.

———

SA 2411. Mrs. FEINSTEIN (for herself, Mrs. HUTCHISON, Mrs. BOXER, Mrs. MURRAY, Mr. LAUTENBERG, Mr. SCHUMER, Mr. CORZINE, Mrs. CANTWELL, and Ms. MIKULSKI) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 188, after line 24, add the following:

SEC. 6037. AUTHORITY TO CONTINUE PROVIDING CERTAIN ADULT DAY HEALTH CARE SERVICES OR MEDICAL ADULT DAY CARE SERVICES.

The Secretary shall not—

(1) withhold, suspend, disallow, or otherwise deny Federal financial participation under section 1903(a) of the Social Security Act (42 U.S.C. 1396b(a)) for adult day health care services or medical adult day care services, as defined under a State medicaid plan approved on or before 1982, if such services are provided consistent with such definition and the requirements of such plan; or

(2) withdraw Federal approval of any such State plan or part thereof regarding the provision of such services.

———

SA 2412. Mr. VITTER (for Mr. STEVENS (for himself, Mr. VITTER, Ms. LANDRIEU, Mr. DOMENICI, Mr. CRAIG, Mr. LOTT, Mr. INOUYE, and Mr. BINGAMAN)) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 95, strike lines 13 through 21, and insert the following:

(f) USE OF EXCESS PROCEEDS.—Any proceeds of the auction authorized by section 309(j)(15)(C)(v) of the Communications Act of 1934, as added by section 3003 of this Act, that exceed the sum of the payments made from the Fund under subsection (c), the transfer from the Fund under subsection (d), and any amount made available under section 3006 (referred to in this subsection as "excess proceeds"), shall be distributed as follows:

(1) The first $1,000,000,000 of excess proceeds shall be transferred to and deposited in the general fund of the Treasury as miscellaneous receipts.

(2) After the transfer under paragraph (1), the next $500,000,000 of excess proceeds shall be transferred to the interoperability fund described in subsection (c)(3).

(3) After the transfers under paragraphs (1) and (2), the next $1,200,000,000 of excess proceeds shall be transferred to the assistance program described in subsection (c)(5).

(4) After the transfers under paragraphs (1) through (3), any remaining excess proceeds shall be transferred to and deposited in the general fund of the Treasury as miscellaneous receipts.

———

SA 2413. Mr. WARNER (for himself, Mr. LIEBERMAN, Mr. ROBERTS, Mr. DURBIN, Mr. ALLEN, and Mr. OBAMA) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 369, between lines 11 and 12, insert the following:

"(D) the Secretary—

"(i) shall determine if an increase in the amount of a grant under this section is needed to help encourage students to pursue courses of study that are important to the current and future national, homeland, and economic security needs of the United States; and

"(ii) after making the determination described in clause (i), may increase the maximum and minimum award level established under subparagraph (A) by not more than 25 percent, for students eligible for a grant under this section who are pursuing a degree with a major in mathematics, science, technology, engineering, or a foreign language that is critical to the national security of the United States; and

"(E) not later than September 30 of each fiscal year, the Secretary shall notify Congress, in writing, of the Secretary's determination with respect to subparagraph (D)(i) and of any increase in award levels under subparagraph (D)(ii).

———

SA 2414. Mr. BYRD (for himself and Mr. HARKIN) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

At the appropriate place, insert the following:

SEC. ___. SUSPENSION OF DEBATE LIMITATION ON RECONCILIATION LEGISLATION THAT CAUSES A DEFICIT OR INCREASES THE DEFICIT.

(a) IN GENERAL.—For purposes of consideration in the Senate of any reconciliation bill or resolution, or amendments thereto or debatable motions and appeals in connection therewith, under section 310(e) of the Congressional Budget Act of 1974, section 305(b)(1), (2), and (5), section 305(c), and the limitation on debate in section 310(e)(2) of that Act, shall not apply to any reconciliation bill or resolution, amendment thereto, or motion thereon that includes reductions in revenue or increases in spending that would cause an on-budget deficit to occur or increase the deficit for any fiscal year covered by such bill or resolution.

(b) GERMANENESS REQUIRED.—Notwithstanding subsection (a), no amendment that is not germane to the provisions of such reconciliation bill or resolution shall be received.

———

SA 2415 Mr. DURBIN (for himself, Mr. DORGAN, Mr. LAUTENBERG, Mr. JOHNSON, and Mr. LIEBERMAN) submitted an amendment intended to be proposed by him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

SEC. ___. ACCOUNTABILITY IN FEDERAL CONTRACTING.

(a) IN GENERAL.—Except as provided in subsection (b), none of the funds appropriated or otherwise made available by the Emergency Supplemental Appropriations Act to Meet Immediate Needs Arising From the Consequences of Hurricane Katrina, 2005 (Public Law 109–61), by the Second Emergency Supplemental Appropriations Act to Meet Immediate Needs Arising From the Consequences of Hurricane Katrina, 2005 (Public Law 109–62), or through the Iraq Relief and Reconstruction Fund may be obligated or expended in connection with a contract entered into after the date of the enactment of this Act with a contractor that, during the previous 5 years—

(1) has been found by an executive agency, the Special Inspector General for Iraq Reconstruction, or any Inspector General having oversight authority with respect to Hurricane Katrina and Hurricane Rita reconstruction contracts to have overcharged or improperly billed the Federal Government by a total of at least $10,000,000 through one or more overcharges;

(2) has been found by an executive agency, the Special Inspector General for Iraq Reconstruction, or any Inspector General having oversight authority with respect to Hurricane Katrina and Hurricane Rita reconstruction contracts to have committed one or more fraudulent acts resulting in total costs or losses to the Federal Government of at least $10,000,000; or

(3) has been suspended or debarred under the Federal suspension and debarment regulations.

(b) NATIONAL SECURITY WAIVER.—The President may waive the restrictions under subsection (a) on a case-by-case basis if the President determines that such waiver is in the national security interest of the United States and submits to the appropriate congressional authorities a report describing the reasons for such determination.

(c) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL AUTHORITIES.—The term "appropriate congressional authorities" means—

(A) the Majority Leader and the Minority Leader of the Senate;

(B) the Speaker of the House of Representatives and the Minority Leader of the House of Representatives; and

(C) the Committees on Appropriations of the Senate and the House of Representatives.

(2) EXECUTIVE AGENCIES.—The term "executive agency" has the meaning given that term in section 4 of the Office of Federal Procurement Policy Act (41 U.S.C. 403).

———

SA 2416. Mr. SUNUNU (for himself and Mr. SANTORUM) submitted an amendment intended to be proposed by him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table; as follows:

On page 130, after line 25, add the following:

Case 1:01-cv-12257-PBS Document 6528-55 Filed 09/22/09 Page 85 of 91

**SEC. 6005. ELECTRONIC PRESCRIPTION INCENTIVES FOR MEDICAID MANAGED CARE ORGANIZATIONS.**

(a) IN GENERAL.—Section 1903(m)(2)(A) (42 U.S.C. 1396b(m)(2)(A)) is amended—

(1) in clause (xi), by striking "and" at the end;

(2) in clause (xii), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(xiii) notwithstanding clause (x), such contract provides that—

"(I) for each electronic prescription written by a physician during the period beginning on January 1, 2006, and ending on December 31, 2009, the entity shall make a payment of an amount equal to—

"(aa) $1.00, minus

"(bb) an amount equal to the percentage of total claims that consist of electronic prescription drug claims under this title by medicaid managed care organizations (as determined under section 6005(b) of the Deficit Reduction Omnibus Reconciliation Act of 2005, expressed in cents);

"(II) for each non-electronic prescription written by a physician during the period described in subclause (I), the entity shall reduce the dispensing fee otherwise applicable by an amount equal to—

"(aa) $1.00, minus

"(bb) an amount equal to the percentage of total claims under this title by medicaid managed care organizations that consist of non-electronic claims (as so determined and expressed in cents).".

(b) DATA FOR DETERMINING ELECTRONIC CLAIMS.—

(1) IN GENERAL.—For purposes of section 1903(m)(2)(A)(xiii) of the Social Security Act (as added by subsection (a)), subject to the update required under paragraph (2), in determining the percentage of total claims that consist of electronic prescription drug claims by medicaid managed care organizations under title XIX of the Social Security Act and the percentage of total claims that consist of non-electronic prescription drug claims, the Secretary shall use an estimate of the number of electronic claims and non-electronic claims that will be submitted as of January 1, 2006.

(2) UPDATE.—For each 6 month period beginning after January 1, 2006, the Secretary shall update the estimate of the number of electronic prescription drug claims and non-electronic prescription drug claims used to determine the percentage of total claims that consist of such electronic claims and the percentage of total claims that consist of such non-electronic claims.

(3) MOST RECENT DATA.—To the extent feasible, the Secretary shall use the most recent data available, including real-time data on drug claims submitted under title XIX pf the Social Security Act with respect to medicaid managed care organizations, to determine the percentage of total claims that consist of electronic claims and the percentage of total claims that consist of non-electronic claims.

(c) STUDY AND REPORT.—The Comptroller General of the United States shall conduct a study regarding the feasibility of applying electronic prescription incentives similar to the incentives required under section 1903(m)(2)(A)(xiii) of the Social Security Act (as added by subsection (a)) to fee-for-service Medicaid. Not later than January 1, 2007, the Comptroller General shall submit a report to Congress on the results of the study conducted under this subsection.

**SA 2417.** Mr. GREGG (for Mr. LEVIN) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 95, after line 21, insert the following:

**SEC. 3005A. COMMUNICATION SYSTEM GRANTS.**

(a) DEFINITIONS.—In this section—

(1) the term "demonstration project" means the demonstration project established under subsection (b)(1);

(2) the term "Department" means the Department of Homeland Security;

(3) the term "emergency response provider" has the meaning given that term in section 2(6) the Homeland Security Act of 2002 (6 U.S.C. 101(6)); and

(4) the term "Secretary" means the Secretary of Homeland Security.

(b) IN GENERAL.—

(1) ESTABLISHMENT.—There is established in the Department an "International Border Community Interoperable Communications Demonstration Project".

(2) MINIMUM NUMBER OF COMMUNITIES.—The Secretary shall select not fewer than 2 communities to participate in a demonstration project.

(3) LOCATION OF COMMUNITIES.—Not fewer than 1 of the communities selected under paragraph (2) shall be located on the northern border of the United States and not fewer than 1 of the communities selected under paragraph (2) shall be located on the southern border of the United States.

(c) PROJECT REQUIREMENTS.—The demonstration projects shall—

(1) address the interoperable communications needs of police officers, firefighters, emergency medical technicians, National Guard, and other emergency response providers;

(2) foster interoperable communications—

(A) among Federal, State, local, and tribal government agencies in the United States involved in preventing or responding to terrorist attacks or other catastrophic events; and

(B) with similar agencies in Canada and Mexico;

(3) identify common international cross-border frequencies for communications equipment, including radio or computer messaging equipment;

(4) foster the standardization of interoperable communications equipment;

(5) identify solutions that will facilitate communications interoperability across national borders expeditiously;

(6) ensure that emergency response providers can communicate with each another and the public at disaster sites or in the event of a terrorist attack or other catastrophic event;

(7) provide training and equipment to enable emergency response providers to deal with threats and contingencies in a variety of environments; and

(8) identify and secure appropriate joint-use equipment to ensure communications access.

(d) DISTRIBUTION OF FUNDS.—

(1) IN GENERAL.—The Secretary shall distribute funds under this section to each community participating in a demonstration project through the State, or States, in which each community is located.

(2) OTHER PARTICIPANTS.—Not later than 60 days after receiving funds under paragraph (1), a State receiving funds under this section shall make the funds available to the local governments and emergency response providers participating in a demonstration project selected by the Secretary.

(e) FUNDING.—Amounts made available from the interoperability fund under section 3005(c)(3) shall be available to carry out this section without appropriation.

(f) REPORTING.—Not later than December 31, 2005, and each year thereafter in which funds are appropriated for a demonstration project, the Secretary shall provide to the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives a report on the demonstration projects under this section.

**SA 2418.** Mr. GREGG (for Mr. SUNUNU (for himself, Mr. DURBIN, Mr. CRAIG, Mr. PRYOR, Mr. ISAKSON, Mr. NELSON of Nebraska, Mr. THUNE, Mr. KERRY, and Mr. CHAMBLISS) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 90, between lines 19 and 20, insert the following:

**Subtitle D—Adaptive Housing Assistance**

**SEC. 2031. SHORT TITLE.**

This subtitle may be cited as the "Specially Adapted Housing Grants Improvements Act of 2005".

**SEC. 2032. ADAPTIVE HOUSING ASSISTANCE FOR DISABLED VETERANS RESIDING TEMPORARILY IN HOUSING OWNED BY A FAMILY MEMBER.**

(a) ASSISTANCE AUTHORIZED.—Chapter 21 of title 38, United States Code, is amended by inserting after section 2102 the following new section:

**"§ 2102A. Assistance for veterans residing temporarily in housing owned by a family member**

"(a) ASSISTANCE AUTHORIZED.—If a disabled veteran described in subsection (a)(2) or (b)(2) of section 2101 of this title resides, but does not intend to permanently reside, in a residence owned by a member of such veteran's family, the Secretary may assist the veteran in acquiring such adaptations to such residence as are determined by the Secretary to be reasonably necessary because of the veteran's disability.

"(b) LIMITATION ON AMOUNT OF ASSISTANCE.—Subject to section 2102(d) of this title, the assistance authorized under subsection (a) may not exceed—

"(1) $10,000, in the case of a veteran described in section 2101(a)(2) of this title; or

"(2) $2,000, in the case of a veteran described in section 2101(b)(2) of this title.

"(c) LIMITATION ON NUMBER OF RESIDENCES SUBJECT TO ASSISTANCE.—A veteran eligible for assistance authorized under subsection (a) may only be provided such assistance with respect to 1 residence.

"(d) REGULATIONS.—Assistance under this section shall be provided in accordance with such regulations as the Secretary may prescribe.

"(e) TERMINATION OF AUTHORITY.—The authority to provide assistance under subsection (a) shall expire at the end of the 5-year period beginning on the date of enactment of the Specially Adapted Housing Grants Improvements Act of 2005.".

(b) LIMITATIONS IN ADAPTIVE HOUSING ASSISTANCE.—Section 2102 of such title is amended—

(1) in subsection (a), by striking "The assistance authorized by section 2101(a)" and all that follows through "any one case—" and inserting "Subject to subsection (d), the assistance authorized under section 2101(a) of this title shall be afforded under 1 of the following plans, at the election of the veteran—";

(2) by amending subsection (b) to read as follows:

"(b) Subject to subsection (d), and except as provided in section 2104(b) of this title, the assistance authorized by section 2101(b)

of this title that may not exceed the actual cost, or in the case of a veteran acquiring a residence already adapted with special features, the fair market value, of the adaptations determined by the Secretary under such section 2101(b) to be reasonably necessary.''; and

(3) by adding at the end the following new subsection:

''(d)(1) The aggregate amount of assistance available to a veteran under sections 2101(a) and 2102A of this title shall be limited to $50,000.

''(2) The aggregate amount of assistance available to a veteran under sections 2101(b) and 2102A of this title shall be limited to the lesser of—

''(A) the sum of the cost or fair market value described in section 2102(b) of this title and the actual cost of acquiring the adaptations described in subsection (a); and

''(B) $10,000.

''(3) No veteran may receive more than 3 grants of assistance under this chapter.''.

(c) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter of such title is amended by inserting after the item relating to section 2102 the following:

''2102A. Assistance for veterans residing temporarily in housing owned by family member.''.

**SEC. 2033. GAO REPORTS.**

(a) INTERIM REPORT.—Not later than 3 years after the date of enactment of this Act, the Comptroller General of the United States shall submit to Congress an interim report on the implementation of section 2102A of title 38, United States Code (as added by section 2(a)), by the Department of Veterans Affairs.

(b) FINAL REPORT.—Not later than 5 years after the date of enactment of this Act, the Comptroller General of the United States shall submit to Congress a final report on the implementation of such section 2102A by the Department of Veterans Affairs.

On page 166, strike lines 12 through 15 and insert the following:

''(A) for fiscal year 2006, $50,000,000;

''(B) for each of fiscal years 2007 and 2008, $49,000,000;

''(C) for each of fiscal years 2009 and 2010, $74,000,000; and

''(D) for fiscal year 2011 and each fiscal year thereafter, $75,000,000.

---

**SA 2419.** Mr. SANTORUM (for himself, Mr. BUNNING, Mr. THOMAS, Mr. VOINOVICH, Mr. LIEBERMAN, Mr. DODD, Mr. ROCKEFELLER, Ms. LANDRIEU, and Mr. CONRAD) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 368, between lines 5 and 6, insert the following:

**SEC. 6116. TECHNICAL CORRECTION REGARDING PURCHASE AGREEMENTS FOR POWER-DRIVEN WHEELCHAIRS.**

(a) IN GENERAL.—Section 1834(a)(7)(A) (42 U.S.C. 1395m(a)(7)(A)), as amended by section 6109 of this Act, is amended—

(1) in clause (i)(I), by striking ''Payment'' and inserting ''Except as provided in clause (iii), payment''; and

(2) by adding at the end the following new clause:

''(iii) PURCHASE AGREEMENT OPTION FOR POWER-DRIVEN WHEELCHAIRS.—

''(I) IN GENERAL.—In the case of a power-driven wheelchair, at the time the supplier furnishes the item, the supplier shall offer the individual the option to purchase the item, and payment for such item shall be made on a lump-sum basis if the individual exercises such option.

''(II) MAINTENANCE AND SERVICING.—In the case of a power-driven wheelchair for which a purchase agreement has been entered into under subclause (I), maintenance and servicing payments shall, if the Secretary determines such payments are reasonable and necessary, be made (for parts and labor not covered by the supplier's or manufacturer's warranty, as determined by the Secretary to be appropriate), and such payments shall be in an amount determined to be appropriate by the Secretary.''.

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to items furnished on or after October 1, 2006.

**SEC. 6117. MEDICARE COVERAGE OF ULTRASOUND SCREENING FOR ABDOMINAL AORTIC ANEURYSMS; NATIONAL EDUCATIONAL AND INFORMATION CAMPAIGN.**

(a) IN GENERAL.—Section 1861 (42 U.S.C. 1395x) is amended—

(1) in subsection (s)(2)—

(A) by striking ''and'' at the end of subparagraph (Y);

(B) by adding ''and'' at the end of subparagraph (Z); and

(C) by adding at the end the following new subparagraph:

''(AA) ultrasound screening for abdominal aortic aneurysm (as defined in subsection (bbb)) for an individual—

''(i) who receives a referral for such an ultrasound screening as a result of an initial preventive physical examination (as defined in section 1861(ww)(1));

''(ii) who has not been previously furnished such an ultrasound screening under this title; and

''(iii) who—

''(I) has a family history of abdominal aortic aneurysm; or

''(II) manifests risk factors included in a beneficiary category (not including categories related to age) recommended for screening by the United States Preventive Services Task Force regarding abdominal aortic aneurysms;''; and

(2) by adding at the end the following new subsection:

''Ultrasound Screening for Abdominal Aortic Aneurysm

''(bbb) The term 'ultrasound screening for abdominal aortic aneurysm' means—

''(1) a procedure using sound waves (or such other procedures using alternative technologies, of commensurate accuracy and cost, that the Secretary may specify) provided for the early detection of abdominal aortic aneurysm; and

''(2) includes a physician's interpretation of the results of the procedure.''.

(b) INCLUSION OF ULTRASOUND SCREENING FOR ABDOMINAL AORTIC ANEURYSM IN SCREENING SERVICES FOR WHICH EDUCATION, COUNSELING, AND REFERRAL IS PROVIDED FOR UNDER BENEFITS FOR INITIAL PREVENTIVE PHYSICAL EXAMINATION.—Section 1861(ww)(2) (42 U.S.C. 1395x(ww)(2)) is amended by adding at the end the following new subparagraph:

''(L) Ultrasound screening for abdominal aortic aneurysm as defined in section 1861(bbb).''.

(c) PAYMENT FOR ULTRASOUND SCREENING FOR ABDOMINAL AORTIC ANEURYSM.—Section 1848(j)(3) (42 U.S.C. 1395w–4(j)(3)) is amended by inserting ''(2)(AA),'' after ''(2)(W),''.

(d) FREQUENCY AND QUALITY STANDARDS.—Section 1862(a)(1) (42 U.S.C. 1395y(a)(1)) is amended—

(1) by striking ''and'' at the end of subparagraph (L);

(2) by striking the semicolon at the end of subparagraph (M) and inserting '', and''; and

(3) by adding at the end the following new subparagraph:

''(N) in the case of ultrasound screening for abdominal aortic aneurysm—

''(i) which is performed more frequently than is provided for under section 1861(s)(2)(AA); or

''(ii) which is performed by an individual or diagnostic laboratory that does not meet quality assurance standards that the Secretary, in consultation with national medical, vascular technologist and sonographer societies, shall establish, including with respect to individuals performing ultrasound screening for abdominal aortic aneurysm (other than physicians) and diagnostic laboratories, that the individual or laboratory is certified by the appropriate State licensing or certification agency or, in the case of a service performed in a State that does not license or certify such individuals or laboratories, by a national certification or accreditation organization recognized by the Secretary;''.

(e) NON-APPLICATION OF PART B DEDUCTIBLE.—Section 1833(b) (42 U.S.C. 1395l(b)) is amended in the first sentence—

(1) by striking ''and (6)'' and inserting ''(6);'' and

(2) by inserting '', and (7) such deductible shall not apply with respect to ultrasound screening for abdominal aortic aneurysm (as defined in section 1861(bbb))'' before the period at the end.

(f) NATIONAL EDUCATIONAL AND INFORMATION CAMPAIGN.—

(1) IN GENERAL.—After consultation with national medical, vascular technologist, and sonographer societies, the Secretary of Health and Human Services shall carry out a national education and information campaign to promote awareness among health care practitioners and the general public with respect to the importance of early detection and treatment of abdominal aortic aneurysms.

(2) USE OF FUNDS.—The Secretary may use amounts appropriated pursuant to this subsection to make grants to national medical, vascular technologist, and sonographer societies (in accordance with procedures and criteria specified by the Secretary) to enable them to educate practitioners and providers about matters relating to such aneurysms.

(3) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated for fiscal year 2006 and each fiscal year thereafter such sums as may be necessary to carry out this subsection.

(g) EFFECTIVE DATE.—The amendments made by this section shall apply to ultrasound screenings for abdominal aortic aneurysm performed on or after January 1, 2007.

**SEC. 6118. IMPROVING PATIENT ACCESS TO, AND UTILIZATION OF, COLORECTAL CANCER SCREENING UNDER MEDICARE.**

(a) INCREASE IN PART B REIMBURSEMENT FOR COLORECTAL CANCER SCREENING AND DIAGNOSTIC TESTS.—

(1) IN GENERAL.—Section 1834(d) (42 U.S.C. 1395m(d)) is amended by adding at the end the following new paragraph:

''(4) ENHANCED PART B PAYMENT FOR COLORECTAL CANCER SCREENING AND DIAGNOSTIC TESTS.—

''(A) NONFACILITY RATES.—Notwithstanding paragraphs (2)(A) and (3)(A), the Secretary shall establish national minimum payment amounts for CPT codes 45378, 45380, and 45385, and HCPCS codes G0105 and G0121 for items and services furnished on or after January 1, 2007, which reflect a 5-percent increase above the relative value units in effect as the nonfacility rates for such codes on December 31, 2006, with such revised payment level to apply to items and services performed in a nonfacility setting.

''(B) FACILITY RATES.—Notwithstanding paragraphs (2)(A) and (3)(A), the Secretary shall establish national minimum payment amounts for CPT codes 45378, 45380, and 45385,

and HCPCS codes G0105 and G0121 for items and services furnished on or after January 1, 2007, which reflect a 5-percent increase above the relative value units in effect as the facility rates for such codes on December 31, 2006, with such revised payment level to apply to items and services performed in a facility setting.

''(C) ANNUAL ADJUSTMENTS.—In the case of items and services furnished on or after January 1, 2007, the payment rates described in subparagraphs (A) and (B) shall, subject to the minimum payment amounts established in such subparagraphs, be adjusted annually as provided in section 1848.''.

(2) NO EFFECT ON HOPD PAYMENTS.—The Secretary shall not take into account the provisions of section 1834(d)(4) of the Social Security Act, as added by subsection (a), in determining the amount of payment for any covered OPD service under the prospective payment system for hospitals outpatient department services under section 1833(t) of such Act (42 U.S.C. 1395l(t)).

(b) MEDICARE COVERAGE OF OFFICE VISIT OR CONSULTATION PRIOR TO A SCREENING COLONOSCOPY OR IN CONJUNCTION WITH A BENEFICIARY'S DECISION TO OBTAIN SUCH A SCREENING.—

(1) COVERAGE.—Section 1861(s)(2) (42 U.S.C. 1395x(s)(2)), as amended by section 6117, is amended—

(A) in subparagraph (Z), by striking ''and'' at the end;

(B) in subparagraph (AA), by inserting ''and'' at the end; and

(C) by adding at the end the following new subparagraph:

''(BB) an outpatient office visit or consultation for the purpose of beneficiary education, assuring selection of the proper screening test, and securing information relating to the procedure and sedation of the beneficiary, prior to a colorectal cancer screening test consisting of a screening colonoscopy or in conjunction with the beneficiary's decision to obtain such a screening, regardless of whether such screening is medically indicated with respect to the beneficiary;''.

(2) PAYMENT.—

(A) IN GENERAL.—Section 1833(a)(1) (42 U.S.C. 1395l(a)(1)) is amended—

(i) by striking ''and'' before ''(V)''; and

(ii) by inserting before the semicolon at the end the following: '', and (W) with respect to an outpatient office visit or consultation under section 1861(s)(2)(BB), the amounts paid shall be 80 percent of the lesser of the actual charge or the amount established under section 1848''.

(B) PAYMENT UNDER PHYSICIAN FEE SCHEDULE.—Section 1848(j)(3) (42 U.S.C. 1395w–4(j)(3)), as amended by section 6117, is amended by inserting ''(2)(BB),'' after ''(2)(AA),''.

(C) REQUIREMENT FOR ESTABLISHMENT OF PAYMENT AMOUNT UNDER PHYSICIAN FEE SCHEDULE.—Section 1834(d) (42 U.S.C. 1395m(d)), as amended by subsection (a), is amended by adding at the end the following new paragraph:

''(5) PAYMENT FOR OUTPATIENT OFFICE VISIT OR CONSULTATION PRIOR TO SCREENING COLONOSCOPY.—With respect to an outpatient office visit or consultation under section 1861(s)(2)(BB), payment under section 1848 shall be consistent with the payment amounts for CPT codes 99203 and 99243.''.

(3) EFFECTIVE DATE.—The amendments made by this subsection shall apply to items and services provided on or after January 1, 2007.

(c) WAIVER OF DEDUCTIBLE FOR COLORECTAL CANCER SCREENING TESTS.—

(1) IN GENERAL.—Section 1833(b) (42 U.S.C. 1395l(b)), as amended by section 6117, is amended in the first sentence—

(A) by striking ''and'' before ''(7)''; and

(B) by inserting before the period at the end the following: '', and (8) such deductible shall not apply with respect to colorectal cancer screening tests (as described in section 1861(pp)(1))''.

(2) CONFORMING AMENDMENTS.—Paragraphs (2)(C)(ii) and (3)(C)(ii) of section 1834(d) (42 U.S.C. 1395m(d)) are each amended—

(A) by striking ''DEDUCTIBLE AND'' in the heading; and

(B) in subclause (I), by striking ''deductible or'' each place it appears.

(3) EFFECTIVE DATE.—The amendments made by this subsection shall apply to items and services furnished on or after January 1, 2007.

## SEC. 6119. COVERAGE OF MARRIAGE AND FAMILY THERAPIST SERVICES AND MENTAL HEALTH COUNSELOR SERVICES UNDER PART B OF THE MEDICARE PROGRAM.

(a) COVERAGE OF SERVICES.—

(1) IN GENERAL.—Section 1861(s)(2) (42 U.S.C. 1395x(s)(2)), as amended by section 6118(b), is amended—

(A) in subparagraph (AA), by striking ''and'' after the semicolon at the end;

(B) in subparagraph (BB), by inserting ''and'' after the semicolon at the end; and

(C) by adding at the end the following new subparagraph:

''(CC) marriage and family therapist services (as defined in subsection (ccc)(1)) and mental health counselor services (as defined in subsection (ccc)(3));''.

(2) DEFINITIONS.—Section 1861 (42 U.S.C. 1395x), as amended by section 6117, is amended by adding at the end the following new subsection:

''Marriage and Family Therapist Services; Marriage and Family Therapist; Mental Health Counselor Services; Mental Health Counselor

''(ccc)(1) The term 'marriage and family therapist services' means services performed by a marriage and family therapist (as defined in paragraph (2)) for the diagnosis and treatment of mental illnesses, which the marriage and family therapist is legally authorized to perform under State law (or the State regulatory mechanism provided by State law) of the State in which such services are performed, as would otherwise be covered if furnished by a physician or as an incident to a physician's professional service, but only if no facility or other provider charges or is paid any amounts with respect to the furnishing of such services.

''(2) The term 'marriage and family therapist' means an individual who—

''(A) possesses a master's or doctoral degree which qualifies for licensure or certification as a marriage and family therapist pursuant to State law;

''(B) after obtaining such degree has performed at least 2 years of clinical supervised experience in marriage and family therapy; and

''(C) in the case of an individual performing services in a State that provides for licensure or certification of marriage and family therapists, is licensed or certified as a marriage and family therapist in such State.

''(3) The term 'mental health counselor services' means services performed by a mental health counselor (as defined in paragraph (4)) for the diagnosis and treatment of mental illnesses which the mental health counselor is legally authorized to perform under State law (or the State regulatory mechanism provided by the State law) of the State in which such services are performed, as would otherwise be covered if furnished by a physician or as incident to a physician's professional service, but only if no facility or other provider charges or is paid any

amounts with respect to the furnishing of such services.

''(4) The term 'mental health counselor' means an individual who—

''(A) possesses a master's or doctor's degree in mental health counseling or a related field;

''(B) after obtaining such a degree has performed at least 2 years of supervised mental health counselor practice; and

''(C) in the case of an individual performing services in a State that provides for licensure or certification of mental health counselors or professional counselors, is licensed or certified as a mental health counselor or professional counselor in such State.''.

(3) PROVISION FOR PAYMENT UNDER PART B.—Section 1832(a)(2)(B) (42 U.S.C. 1395k(a)(2)(B)) is amended by adding at the end the following new clause:

''(v) marriage and family therapist services and mental health counselor services;''.

(4) AMOUNT OF PAYMENT.—Section 1833(a)(1) (42 U.S.C. 1395l(a)(1)), as amended by section 6118, is amended—

(A) by striking ''and (W)'' and inserting ''(W)''; and

(B) by inserting before the semicolon at the end the following: '', and (X) with respect to marriage and family therapist services and mental health counselor services under section 1861(s)(2)(CC), the amounts paid shall be 80 percent of the lesser of the actual charge for the services or 75 percent of the amount determined for payment of a psychologist under subparagraph (L)''.

(5) EXCLUSION OF MARRIAGE AND FAMILY THERAPIST SERVICES AND MENTAL HEALTH COUNSELOR SERVICES FROM SKILLED NURSING FACILITY PROSPECTIVE PAYMENT SYSTEM.— Section 1888(e)(2)(A)(ii) (42 U.S.C. 1395yy(e)(2)(A)(ii)) is amended by inserting ''marriage and family therapist services (as defined in section 1861(ccc)(1)), mental health counselor services (as defined in section 1861(ccc)(3)),'' after ''qualified psychologist services,''.

(6) INCLUSION OF MARRIAGE AND FAMILY THERAPISTS AND MENTAL HEALTH COUNSELORS AS PRACTITIONERS FOR ASSIGNMENT OF CLAIMS.—Section 1842(b)(18)(C) (42 U.S.C. 1395u(b)(18)(C)) is amended by adding at the end the following new clauses:

''(vii) A marriage and family therapist (as defined in section 1861(ccc)(2)).

''(viii) A mental health counselor (as defined in section 1861(ccc)(4)).''.

(b) COVERAGE OF CERTAIN MENTAL HEALTH SERVICES PROVIDED IN CERTAIN SETTINGS.—

(1) RURAL HEALTH CLINICS AND FEDERALLY QUALIFIED HEALTH CENTERS.—Section 1861(aa)(1)(B) (42 U.S.C. 1395x(aa)(1)(B)) is amended by striking ''or by a clinical social worker (as defined in subsection (hh)(1)),'' and inserting '', by a clinical social worker (as defined in subsection (hh)(1)), by a marriage and family therapist (as defined in subsection (ccc)(2)), or by a mental health counselor (as defined in subsection (ccc)(4)),''.

(2) HOSPICE PROGRAMS.—Section 1861(dd)(2)(B)(i)(III) (42 U.S.C. 1395x(dd)(2)(B)(i)(III)) is amended by inserting ''or one marriage and family therapist (as defined in subsection (bbb)(2))'' after ''social worker''.

(c) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to services furnished on or after January 1, 2007.

SA 2420. Mr. GREGG (for Mr. SUNUNU) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 94, line 7, after ''(1)'' insert ''not to exceed'';

On page 94, line 13, after ''(2)'' insert ''not to exceed'';

On page 94, line 19, after ''(3)'' insert ''not to exceed'';

On page 95, line 1, after ''(4)'' insert ''not to exceed'';

On page 95, line 4, after ''(5)'' insert ''not to exceed'';

On page 95, beginning in line 10, strike ''The amounts payable'' and insert ''Any amounts that are to be paid'';

On page 95, line 12, after the period insert ''Any amount in the Fund that is not obligated under subsection (c) by that date shall be transferred to the general fund of the Treasury.''.

———

**SA 2421.** Mr. BURNS (for himself and Mr. BROWNBACK) submitted an amendment intended to be proposed by him to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); which was ordered to lie on the table; as follows:

On page 122, strike line 23 and all that follows through page 124, line 10, and insert the following:

(3) EFFECTIVE DATE.—The amendments made by this subsection take effect with respect to a State on the date on which a positive certification is made by the Secretary under paragraph (4)(B)(ii).

(4) PHARMACY REIMBURSEMENT STUDY.—

(A) STUDY AND REPORT.—

(i) STUDY.—The Secretary shall conduct a pharmacy reimbursement study comparing weighted AMP (as determined under section 1927(k)(1)(C) of the Social Security Act, as added by subsection (a)) to actual retail pharmacy acquisition costs and the cost of dispensing a prescription. The study shall include an analysis of the range in variation that can occur related to acquisition and dispensing costs with respect to chain and independent rural and urban pharmacies.

(ii) REPORT.—Not later than October 1, 2006, the Secretary shall submit a report to Congress on the results of the study conducted under this subparagraph that includes recommendations on dispensing fee levels that would adequately reimburse pharmacies and encourage the use of cost-effective generic drugs when appropriate.

(B) CERTIFICATION.—

(i) DETERMINATION.—Upon review of the findings of the study conducted under subparagraph (A), the Secretary shall make a determination as to whether the amendments made by this subsection would have a negative impact on access to healthcare.

(ii) POSITIVE DETERMINATION.—If the Secretary makes a determination under clause (i) that the amendments made by this subsection will not have such negative impact, the Secretary shall submit a positive certification to that effect.

(c) INTERIM UPPER PAYMENT LIMIT.—

(1) IN GENERAL.—With respect to a State program under title XIX of the Social Security Act, during the period that begins on January 1, 2006, and ends on the date on which a positive certification is made by the Secretary under subsection (b)(4)(B)(ii), the Secretary shall—

(A) apply the Federal upper payment limit established under section 447.332(b) of title 42, Code of Federal Regulations to the State by substituting ''125 percent'' for ''150 percent''; and

(B) in the case of covered outpatient drugs under title XIX of such Act that are marketed as of July 1, 2005, and are subject to Federal upper payment limits that apply under section 447.332 of title 42, Code of Federal Regulations, use average wholesale prices, direct prices, and wholesale acquisition costs for such drugs that do not match such prices and costs as of such date to determine the Federal upper payment limits that apply under section 447.332 of title 42, Code of Federal Regulations to such drugs during such period.

(2) APPLICATION TO NEW DRUGS.—Paragraph (1)(A) shall apply to a covered outpatient drug under title XIX of the Social Security Act that is first marketed after July 1, 2005, but before the date on which a positive certification is made by the Secretary under subsection (b)(4)(B)(ii), and is subject to the Federal upper payment limit established under section 447.332(b) of title 42, Code of Federal Regulations.

———

**SA 2422.** Mr. CONRAD (for himself and Mr. SALAZAR) proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

On page 121, after line 25, add the following:

''(5) RULES APPLICABLE TO CRITICAL ACCESS RETAIL PHARMACIES.—

''(A) REIMBURSEMENT LIMITS.—Notwithstanding paragraph (2)(A), in the case of a critical access retail pharmacy (as defined in subparagraph (C)), the upper payment limit—

''(i) for the ingredient cost of a single source drug, is the lesser of—

''(I) 108 percent of the average manufacturer price for the drug; or

''(II) the wholesale acquisition cost for the drug; and

''(ii) for the ingredient cost of a multiple source drug, is the lesser of—

''(I) 140 percent of the weighted average manufacturer price for the drug; or

''(II) the wholesale acquisition cost for the drug.

''(B) APPLICATION OF OTHER PROVISIONS.—The preceding provisions of this subsection shall apply with respect to reimbursement to a critical access retail pharmacy in the same manner as such provisions apply to reimbursement to other retail pharmacies except that, in establishing the dispensing fee for a critical access pharmacy the Secretary, in addition to the factors required under paragraph (4), shall include consideration of the costs associated with operating a critical access retail pharmacy.

''(C) CRITICAL ACCESS RETAIL PHARMACY DEFINED.—For purposes of subparagraph (A), the term 'critical access retail pharmacy' means an retail pharmacy that is not within a 20-mile radius of another retail pharmacy.''.

(2) INCREASE IN BASIC REBATE FOR SINGLE SOURCE DRUGS AND INNOVATOR MULTIPLE SOURCE DRUGS.—Section 1927(c)(1)(B)(i)(VI) (42 U.S.C. 1396r–8(c)(1)(B)(i)(VI), as added by section 6002(a)(3), is amended by striking ''17'' and inserting ''18.1''.

———

# AUTHORITY FOR COMMITTEES TO MEET

## COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

Mr. GREGG. Mr. President, I ask unanimous consent that the Committee on Banking, Housing, and Urban Affairs be authorized to meet during the session of the Senate on November 3, 2005, at a time to be determined, to conduct a vote on the nomination of Mr. Matthew Slaughter, of New Hampshire, to be a member of the Council of Economic Advisers; Ms. Katherine Baicker, of New Hampshire, to be a member of the Council of Economic Advisers; Mr. Orlando J. Cabrera, of Florida, to be an Assistant Secretary of Housing and Urban Development; Ms. Gigi Hyland, of Virginia, to be a member of the National Credit Union Administration Board; and Mr. Rodney E. Hood, of North Carolina, to be a member of the National Credit Union Administration Board.

The PRESIDING OFFICER. Without objection, it is so ordered.

## COMMITTEE ON THE JUDICIARY

Mr. GREGG. Mr. President, I ask unanimous consent that the Committee on the Judiciary be authorized to meet to conduct a markup on Thursday, November 3, 2005 at 12:15 p.m. in Senate Dirksen Office Building Room 226.

### Agenda

I. Nominations: Wan Kim, to be an Assistant Attorney General, Civil Rights Division; Steven G. Bradbury, to be an Assistant Attorney General for the Office of Legal Counsel; Sue Ellen Wooldridge, to be an Assistant Attorney General, Environment and Natural Resources Division; Thomas O. Barnett, to be an Assistant Attorney General, Antitrust Division; James O'Gara, to be Deputy Director for Supply Reduction, Office of National Drug Control Policy; Emilio Gonzalez, to be Director of the Bureau of Citizenship and Immigration Services, Department of Homeland Security; Julie L. Myers, to be an Assistant Secretary of Homeland Security.

II. Bills: S. 1088, Streamline Procedures Act of 2005; Kyl, Cornyn, Grassley, Hatch; S. 1789, Personal Data Privacy and Security Act of 2005; Specter, Leahy, Feinstein, Feingold; S. 751, Notification of Risk to Personal Data Act, Feinstein, Kyl; S. 1699, Stop Counterfeiting in Manufactured Goods Act, Specter, Leahy, Hatch, DeWine, Cornyn, Brownback, Feingold, Durbin, Kyl; S. 1095, Protecting American Goods and Services Act of 2005, Cornyn, Leahy; H.R. 683, Trademark Dilution Revision Act of 2005, Smith—TX; S. 1787, Relief to Victims of Hurricane Katrina and Other Natural Disaster Act of 2005, Vitter, Grassley, Cornyn, DeWine; S. 1647, Hurricane Katrina Bankruptcy Relief and Community Protection Act of 2005, Feingold, Leahy, Durbin, Kennedy, Feinstein.

The PRESIDING OFFICER. Without objection, it is so ordered.

———

# PRIVILEGES OF THE FLOOR

Mr. LEAHY. Mr. President, I ask unanimous consent that Molly Barrett of my staff be given the privilege of the floor throughout the day and the votes that occur today.

The PRESIDENT pro tempore. Without objection, it is so ordered.

## MEASURE READ THE FIRST TIME—S. 1960

Mr. FRIST. Mr. President, I understand there is a bill at the desk. I ask for its first reading.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

A bill (S. 1960) to protect the health and safety of all athletes, to promote the integrity of professional sports by establishing minimum standards for the testing of steroids and other performance-enhancing substances and methods by professional sports leagues, and for other purposes.

Mr. FRIST. I ask for its second reading and, in order to place the bill on the calendar under the provisions of rule XIV, I object to my own request.

The PRESIDING OFFICER. Objection is heard.

The bill will be read a second time on the next legislative day.

## NATIONAL ADOPTION MONTH

Mr. FRIST. Mr. President, I ask unanimous consent the Senate proceed to the immediate consideration of S. Res. 299 submitted earlier today.

The PRESIDING OFFICER. The clerk will report the resolution by title.

The assistant legislative clerk read as follows:

A resolution (S. Res. 299) to express the support for the goals of National Adoption Month by promoting national awareness of adoption, celebrating children and families involved in adoption, and encouraging Americans to secure safety, permanency, and well-being for all children.

There being no objection, the Senate proceeded to consider the resolution.

Mr. FRIST. I ask unanimous consent that the resolution be agreed to, the preamble be agreed to, the motion to reconsider be laid upon the table, and any statements relating thereto be printed in the RECORD.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Res. 299) was agreed to.

The preamble was agreed to.

The resolution, with its preamble, reads as follows:

S. RES. 299

Whereas there are approximately 532,000 children in the foster care system in the United States, approximately 129,000 of whom are waiting to be adopted;

Whereas the average length of time a child in foster care remains in foster care is almost 3 years;

Whereas for many foster children, the wait for a loving family in which they are nurtured, comforted, and protected is endless;

Whereas every year 25,000 children "age out" of foster care by reaching adulthood without being placed in a permanent home;

Whereas, since 1987, the number of annual adoptions has ranged from 118,000 to 127,000;

Whereas approximately 2,100,000 children in the United States live with adoptive parents;

Whereas approximately 6 of every 10 Americans have been touched personally by adoption in that they, a family member, or a close friend was adopted, has adopted a child, or has placed a child for adoption;

Whereas every day loving and nurturing families are formed when committed and dedicated individuals make an important difference in the life of a child through adoption; and

Whereas on November 4, 2004, the President proclaimed November 2004 as National Adoption Month: Now, therefore, be it

*Resolved,* That the Senate recognizes November 2005 as National Adoption Month.

## HENRY KU'UALOHA GIUGNI, FORMER SERGEANT-AT-ARMS

Mr. FRIST. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of S. Res. 300 submitted earlier today.

The PRESIDING OFFICER. The clerk will report the resolution by title.

The assistant legislative clerk read as follows:

A resolution (S. Res. 300) relative to the death of Henry Ku'ualoha Giugni, former Sergeant-at-Arms of the United States Senate.

There being no objection, the Senate proceeded to consider the resolution.

Mr. INOUYE. Mr. President, I am deeply saddened to inform my colleagues that at 3:30 this morning, my friend and colleague, Henry Giugni, passed away at Shady Grove Adventist Hospital in Rockville, MD. His passing is a great loss for the people of Hawaii, the United States, and the Senate, an institution he loved dearly, and in which he served as its 30th Sergeant at Arms for 4 years, beginning on January 6, 1987.

I had the privilege of knowing Henry for nearly 50 years, beginning in 1956 when he joined my re-election campaign to the Hawaii Territorial House of Representatives. We quickly forged an unbreakable bond.

With his tireless work, dedication, and loyalty, he proved invaluable as the top aide on my staff when I served as a Hawaii legislator, U.S. Representative, and U.S. Senator.

His keen political instincts also made him invaluable on campaigns, and beginning with my first congressional race in 1959, when I successfully ran to be the State of Hawaii's first U.S. Representative, he coordinated my campaign activities on all of Hawaii's islands.

And, I am proud to say, I once anointed Henry as "the supreme commander of Hawaiian politics" in recognition of his political acumen and skill as a political strategist. It was an unofficial title that Henry relished.

Henry also enjoyed being called "Dr. Giugni." Circumstances prevented him from receiving his undergraduate degree, but 2 years ago, the University of Hawaii at Hilo conferred upon him an honorary doctorate of humane letters for his exemplary service to the State of Hawaii and the Nation, and for serving as a role model for Native Hawaiians. It was an honor he truly deserved.

From January 6, 1987, to December 31, 1990, Henry served as the Senate's Sergeant at Arms, ably managing a budget of nearly $120 million, overseeing a staff of more than 2,000, and supervising support services, which included law enforcement and telecommunications.

More importantly, as the first person of color and the first person of Polynesian ancestry to serve in this position, he left an indelible mark during his tenure by promoting minorities and women. He appointed the first minority, an African-American man, to lead the Sergeant at Arms' Service Department, and he was the first to assign women to the Capitol Police plainclothes unit.

His special interest in people with disabilities resulted in a major expansion of the Special Services Office, which now conducts tours of the U.S. Capitol for the blind, deaf, and wheelchair-bound, and publishes Senate maps and documents in Braille.

In 1991, Henry joined Cassidy & Associates, one of Washington's leading public policy consulting firms. With his intimate knowledge of Hawaii and Washington, and with a vast network of contacts that spanned the entire country and crossed party lines, Henry was able to continue his support for policies that he believed best served the Nation.

Even as a high-powered vice chairman of Cassidy & Associates, Henry continued to describe himself as "just a poor Hawaiian boy." Henry's soul was very much Hawaiian, but he was never poor in experience, generosity of the heart, or patriotism.

After the attack on Pearl Harbor, he enlisted in the Army at the age of 16, and saw combat at Guadalcanal. He was part of the Hawaii delegation that greeted then-Vice President Lyndon Baines Johnson in the islands just before the start of the Cuban missile crisis. As a staunch support of civil rights, he carried the Hawaii flag and marched with Dr. Martin Luther King in Selma, AL.

He volunteered to drive Senator ED-WARD KENNEDY following the assassination of his brother, President John F. Kennedy. Henry was also a member of one of the first official delegations that traveled to the People's Republic of China following President Nixon's historic visit.

As Senate Sergeant at Arms, he presided over the inauguration of President George H.W. Bush, and escorted numerous foreign dignitaries, including Nelson Mandela, Margaret Thatcher, and Vaclav Havel, when they visited the U.S. Capitol.

Indeed, for a "poor Hawaiian boy" who was born in Hawaii in 1925 to Alfred Giugni and Kealoha Hookano, Henry has done much on the national stage since his days when he studied at Hanahauoli School, Iolani School, and the University of Hawaii at Manoa, and when he worked as a Honolulu firefighter, police officer, and liquor inspector.

However, while he was an acquaintance of Presidents and kings, his heart was always with the native people of Hawaii, who are still struggling for their moment in the sun.

I ask my colleagues to join me and all who have known and loved Henry in expressing our heartfelt condolences to his wife, Muriel Roselani; his four daughters, H. Kealoha Giugni, Deborah Roselani McMillan, Heather Haunani Giugni, and Gina Pilialoha Giugni-Halbach; 11 grandchildren; and 12 great-grandchildren.

I look forward to submitting a resolution expressing our condolences to the Giugni family.

The PRESIDING OFFICER. The Senator from West Virginia.

Mr. BYRD. Mr. President, it is with deep sadness that I learned of the death of Henry K. Giugni, who passed away this morning. He was a former Sergeant at Arms.

In January 1987, it was my pleasure, as the Senate majority leader, to nominate Mr. Giugni to be the Sergeant at Arms of the Senate. When the Senate elected him to the position, Mr. Giugni became not only the thirtieth Sergeant at Arms of the Senate, he became the first Polynesian-American to serve in this capacity.

Mr. Giugni brought a wealth of experience to this most important Senate position. Born in Hawaii in 1925, he enlisted in the U.S. Army during World War II. After the war, he joined the Honolulu Police Force. From 1963 to 1987, he had served as the administrative assistant in the office of my dear friend and colleague, my hero—Senator DANIEL K. INOUYE.

As the second ranking officer in the United States Senate, Mr. Giugni performed the duties of the office of Sergeant at Arms of the Senate proudly and with distinction. In his 4 years as head of the largest office in the Senate, Mr. Giugni supervised a number of major changes and improvements. This included the purchase and installation of millions of dollars of new computer and telecommunications equipment for Senators and their offices.

Mr. Giugni took special pride in having helped to make the U.S. Capitol accessible to the disabled by expanding the Special Services Office. Under his direction, the office implemented tours and other programs for the disabled, and published a braille version of Senate documents.

Sergeant at Arms Giugni worked with the House Sergeant at Arms to improve the operation of the Capitol Police Force. And, his office instituted cost-effective measures of hiring civilian guards to perform duties which he did not believe required uniformed officers.

Mr. Giugni left his work at the Senate in 1990 to become vice president of corporate development for Washington, DC, firm, Cassidy Associates. His presence in the Senate, and his devotion to it, were quickly and sorely missed. But I was pleased and proud of having nominated him to this most important position, and I was even more pleased and proud of the work he had performed while there.

I close my remarks with a poem that I have always cherished. It is a poem that evokes the triumph of a life well lived over the sorrow of death. It is a poem that addresses the life and career of my good friend, Henry K. Giugni.

Let fate do her worst, there are relics of joy,
Bright dreams of the past, which she cannot destroy;
that come, in the nighttime of sorrow and care,
And bring back the features that joy used to wear.

Long, long be my heart with such memories filled,
Like the vase in which roses have once been distilled,
You may break, you may shatter the vase, if you will,
But the scent of the roses will hang around it still.

Mr. AKAKA. Mr. President, I would like to take a moment to say a few words of a dear friend, Henry Giugni, who passed away this morning. Henry enjoyed an illustrious career both on and off Capitol Hill. He began his career in Washington as Senator INOUYE's Chief of Staff and continued until he was appointed Sergeant at Arms of the United States Senate. In both positions, he enjoyed the confidence and respect of all and he served them well. He was a well-recognized presence on the Hill, particularly in the Senate. After leaving the Hill, Henry joined one of the largest consulting firms in Washington where he was serving his clients effectively.

I will remember Henry as one of the first friends who welcomed me and my family to Washington when I was elected to Congress nearly 30 years ago. His kindness continued over many years and we knew him to be a loving husband and father. Millie and I always appreciated his visits whether for business or a social call.

It was only a few weeks ago that Millie and I chatted with him and we were extremely saddened to hear of his passing. Millie and I express our warmest aloha to his wife Lani and their family. Henry was our dear and cherished friend and we will miss him greatly. May he rest in peace.

Mr. FRIST. Mr. President, I ask unanimous consent that the resolution be agreed to, the preamble be agreed to, the motion to reconsider be laid upon the table, and any statements relating thereto be printed in the RECORD.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Res. 300) was agreed to.

The preamble was agreed to.

The resolution, with its preamble, reads as follows:

Whereas Henry Ku'ualoha Giugni was born on January 11, 1925, in Honolulu, Hawai'i;

Whereas Henry Giugni served with distinction in the United States Army, after enlisting at the age of 16 after the attacks on Pearl Harbor, and served in combat at the Battle of Guadalcanal during World War II;

Whereas Henry Giugni began his service in the Senate in 1963 as Senior Executive Assistant and Chief of Staff to Senator Daniel K. Inouye;

Whereas Henry Giugni served as Sergeant-at-Arms from 1987 until 1990;

Whereas Henry Giugni was the first person of color and first Polynesian to be appointed to be the Sergeant-at-Arms;

Whereas Henry Giugni promoted minorities and women by appointing the first minority, an African American, to lead the Sergeant-at-Arms' Service Department, and was the first to assign women to the Capitol Police plainclothes unit;

Whereas Henry Giugni's special interest in people with disabilities resulted in a major expansion of the Special Services Office, which now conducts tours of the U.S. Capitol for the blind, deaf, and wheelchair-bound, and publishes Senate maps and documents in Braille;

Whereas in 2003, Henry Giugni received an Honorary Doctorate of Humane Letters for the University of Hawaii at Hilo in recognition of his extraordinary contributions to Hawaii and the nation;

Whereas Henry Giugni carried Hawai'i's flag while marching with Dr. Martin Luther King for civil rights in Selma, Alabama;

Whereas Henry Giugni presided over the inauguration of President George H.W. Bush, and escorted numerous foreign dignitaries, including Nelson Mandela, Margaret Thatcher, and Vaclav Havel when they visited the United States Capitol; and

Whereas on November 3, 2005, Henry Giugni passed away at the age of 80; Now therefore be it

*Resolved,* That the Senate has heard with profound sorrow and deep regret the announcement of the death of Henry Giugni.

*Resolved,* That the Secretary of the Senate communicate these resolutions to the House of Representatives and transmit an enrolled copy thereof to the family of the deceased.

*Resolved,* That when the Senate adjourns today, it stand adjourned as a further mark of respect to the memory of Henry Giugni.

---

## ORDERS FOR FRIDAY, NOVEMBER 4, 2005

Mr. FRIST. I ask unanimous consent that when the Senate completes its business today, it stand in adjournment until 9:30 a.m. on Friday, November 4. I further ask that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved, and the Senate then proceed to the consideration of S. 1042, the Defense authorization bill, as under the previous order. I further ask unanimous consent that during Friday and Monday's sessions, amendments may be debated and then set aside with the time reserved for use at a later time.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## PROGRAM

Mr. FRIST. Mr. President, we are going to be in session tomorrow to resume consideration of the Defense authorization bill. Chairman WARNER and Senator LEVIN expect to have amendments offered on Friday, but we will

not have votes on those amendments on Friday. We will return to the bill on Monday and, as announced earlier, we will begin voting Monday evening at approximately 5:30.

Again, I appreciate everyone's patience over the last 9 hours. Vote-aramas are not a pretty part of the budget process, but under the direction of our able, our outstanding chairman and ranking member, it was made a lot less painful than it could have been. They give tremendous success to the American people—35, or just right at $35 billion in savings, and that goes directly to the bottom line when it comes to deficit reduction. As we travel around the country, people will say: Get serious, Congress, on fiscal discipline, on spending.

Well, this is the first time in 8 years that this body has gone after mandatory spending in a responsible way to the tune of $35 billion.

I also wish to thank my colleague, the assistant Republican leader, Mitch McConnell, who did a tremendous job. We had, I guess, 22 rollcall votes today, and he did a terrific job in terms of whipping those votes on our side of the aisle, a truly remarkable accomplishment.

---

## ADJOURNMENT UNTIL 9:30 A.M. TOMORROW

Mr. FRIST. If there is no further business to come before the Senate, I ask unanimous consent that the Senate stand in adjournment as a further mark of respect to the late Henry K. Giugni.

There being no objection, the Senate, at 6:40 p.m., adjourned until Friday, November 4, 2005, at 9:30 a.m.