# Exhibit 68

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Landsidle, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007

# London, England, UK

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -)

In re: PHARMACEUTICAL        ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE ) Civil Action No.

PRICE LITIGATION            ) 01-12257-PBS

_____)

THIS DOCUMENT RELATES TO:  ) Judge Patti. B

United States of America,  ) Saris

ex re. Ven-a-Care of the   )

Florida Keys, Inc.,        ) Magistrate Judge

CIVIL ACTION NO.           ) Marianne B.

06-11337-PBS               ) Bowler

- - - - - - - - - - - - - -)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Oral videotaped deposition of MR DAVID

LANDSIDLE held at the offices of Jones Day, 21

Tudor Street, London EC4Y, England, United Kingdom

at 8.59 a.m. on Monday, October 15, 2007 before

Miss Leah Willersdorf, Associate of the British

Institute of Verbatim Reporters

(CAPTION CONTINUED)

ed7527cb-cb30-4a6a-b378-6c7a3f0e3ace

Landside, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007

# London, England, UK

| Page 2 | Page 4 |
|---|---|
| 1       IN THE UNITED STATES | 1       A P P E A R A N C E S |
| 2       DISTRICT OF MASSACHUSETTS | 2 |
| 3 - - - - - - - - - - - - -) | 3   FOR THE DEPARTMENT OF JUSTICE |
| 4 IN RE: PHARMACEUTICAL     ) MDL No. 1456 | 4      MR GEJAA T. GOBENA, ESQ. |
| 5 INDUSTRY AVERAGE WHOLESALE ) Civil Action No. | 5      UNITED STATES DEPARTMENT OF JUSTICE |
| 6 PRICE LITIGATION       ) 01-CV-12257-PBS | 6      Civil Division / Commercial Litigation |
| 7 _____) Hon. Patti Saris | 7      - Fraud Section |
| 8 THIS DOCUMENT RELATES TO: ) | 8      601 D Street, N.W. |
| 9 State of Arizona v. Abbott ) | 9      PHB - 9028/P.O. Box 261 |
| 10 Labs., et al., Civil      ) | 10      Washington, CD 20044 |
| 11 Action No. 06-CV-11069-PBS ) | 11      U.S.A. |
| 12 - - - - - - - - - - - - -) | 12      Telephone: (202) 307 1088 |
| 13       IN THE CIRCUIT COURT OF | 13      Email: Gejaa.Gobena@usdoj.gov |
| 14       MONTGOMERY COUNTY, ALABAMA | 14 |
| 15 - - - - - - - - - - - - -) | 15   FOR THE COMMONWEALTH OF PENNSYLVANIA |
| 16 STATE OF ALABAMA,      ) | 16      MR MICHAEL J. LORUSSO, ESQ. |
| 17     Plaintiff,    ) Case No. | 17      THE HAVILAND LAW FIRM, L.L.C. |
| 18    vs.       ) CV-05-219 | 18      740 S. Third Street, Third Floor |
| 19 ABBOTT LABORATORIES, INC., ) Judge Charles | 19      Philadelphia, PA 19147 |
| 20 et al.,       ) Price | 20      U.S.A. |
| 21     Defendants.   ) | 21      Telephone: (215) 609 4661 |
| 22 - - - - - - - - - - - - -) | 22      Email: lorusso@havilandlaw.com |

| Page 3 | Page 5 |
|---|---|
| 1       IN THE UNITED STATES | 1      A P P E A R A N C E S (CONTINUED) |
| 2       DISTRICT OF MASSACHUSETTS | 2 |
| 3 - - - - - - - - - - - - -) | 3 FOR THE STATE OF CALIFORNIA DEPARTMENT OF JUSTICE |
| 4 IN RE: PHARMACEUTICAL     ) MDL No. 1456 | 4      MR NICHOLAS N. PAUL, ESQ. (Via telephone) |
| 5 INDUSTRY AVERAGE WHOLESALE ) Civil Action No. | 5      Bureau of Medi-Cal Fraud & Elder Abuse |
| 6 PRICE LITIGATION       ) 01-CV-12257-PBS | 6      Office of the Attorney-General |
| 7 _____) Magistrate Judge | 7      1455 Frazee Road, Suite 315 |
| 8 THIS DOCUMENT RELATES TO: ) Marianne Bowler | 8      San Diego, CA 9210 |
| 9 State of California, ex   ) | 9      U.S.A. |
| 10 rel. Ven-a-Care vs. Abbott ) | 10      Telephone: (619) 688 6099 |
| 11 Laboratories, Laboratories,) | 11      Email: Nicholas.Paul@doj.ca.gov |
| 12 et al., Cause Nos.      ) | 12 |
| 13 030-cv-11226-PBS     ) | 13 FOR THE STATE OF ALABAMA |
| 14 - - - - - - - - - - - - -) | 14      MR H. CLAY BARNETT, ESQ. (Via telephone) |
| 15 | 15      BEASLEY ALLEN |
| 16 | 16      218 Commerce Street |
| 17 | 17      Montgomery, AL 36104 |
| 18 | 18      U.S.A. |
| 19 | 19      Telephone: (800) 898 2034 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 (CONTINUED) |

2 (Pages 2 to 5)

ed7527cb-cb30-4a6a-b378-6c7a3f0e3ace

Landside, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007
## London, England, UK

Page 78

1     A.   No, I have no reason to know that I did
2  not get it.
3     Q.  I would like to walk you through this
4  letter again, sir. The first paragraph starts,
5  from Miss Hanrahan:
6         "Pursuant to our conversation, I have
7  been in contact with the Washington
8  representatives of Bristol-Myers Squibb, Amgen,
9  Zeneca and the American Society for Clinical
10 Oncology (ASCO)..."
11        Sir, are you familiar with Ms Hanrahan
12 being in contact with these companies?
13        MS TABACCHI: Object to the form.
14        THE WITNESS: No, other than what the
15 memo says.
16 BY MR LORUSSO:
17    Q.  Are you familiar, sir, of anybody in
18 your Abbott Washington office being in contact
19 with these specific companies around the time of
20 June of 1994?
21        MS TABACCHI: Object to the form.
22        THE WITNESS: No, I am not aware of

Page 79

1  that.
2  BY MR LORUSSO:
3     Q.  As you read this, sir, do you have any
4  reason to believe that Ms Hanrahan was not in
5  fact in contact with the companies I have listed
6  (BMS, Amgen, Zeneca and ASCO) around June of
7  1994?
8         MS TABACCHI: Object to the form. Lack
9  of foundation.
10        THE WITNESS: No because -- I have to
11 assume that if that is what the memo said, then
12 that is what Ms Hanrahan did.
13 BY MR LORUSSO:
14    Q.  Would that be something that she would
15 be directed by you to do, sir?
16        MS TABACCHI: Object to the form.
17        THE WITNESS: No, not necessarily
18 because Dolly didn't report directly to me.
19 Well, let's see, June 8, 1994. I can't -- I don't
20 know if this was something that I would have
21 directed her to do, if that was your question.
22 Was the question -- I'm sorry, was the question,

Page 80

1  did I direct her to have the meeting? I'm sorry.
2  BY MR LORUSSO:
3     Q.  Well, yes, sir.
4     A.  Okay. I do not know if I directed her
5  to have the meeting or participate in the
6  meeting. I do not know that.
7     Q.  You said earlier, sir, that Ms Hanrahan
8  would, from time to time, and in fact often in
9  the Abbott Washington office, certain
10 representatives would meet with other drug
11 companies. Would such a meeting be set up by
12 yourself?
13        MS TABACCHI: Object to the form.
14        THE WITNESS: No, not necessarily. It
15 could have been set up by Amgen or Zeneca or
16 Bristol-Myers or ASCO. So apparently it could
17 have been set up by any of these parties.
18 BY MR LORUSSO:
19    Q.  I am sorry, sir. I am certain that I am
20 the one who misspoke. What I want to know, sir,
21 is if such a meeting took place between Ms
22 Hanrahan or anybody from Abbott Washington, would

Page 81

1  you be a person, sir, that would direct Ms
2  Hanrahan to attend such a meeting? Would you be
3  aware of such a meeting?
4         MS TABACCHI: Object to the form.
5         THE WITNESS: Possibly before or
6  possibly after. I cannot guarantee that, though.
7  I mean, if it was something that she was working
8  on, she wouldn't necessarily be telling me every
9  day, "Today I'm going to do this and tomorrow I'm
10 going to do that." So I do not know if I would
11 have been aware of this meeting before it
12 occurred or not.
13 BY MR LORUSSO:
14    Q.  Sir, looking at these companies that
15 are listed (Bristol-Myers Squibb, Amgen and
16 Zeneca), sir, do you agree that these companies'
17 drugs were implicated on the survey referred to
18 by Mr Booth in the memo we just looked at?
19        MS TABACCHI: Object to form. Lack of
20 foundation.
21        THE WITNESS: I do not know.
22 BY MR LORUSSO:

21 (Pages 78 to 81)

ed7527cb-cb30-4a6a-b378-6c7a3f0e3ace

Landside, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007

## London, England, UK

Page 226

1  on a particular reimbursement issue, would say
2  they, "Okay, we want this" and then you just go
3  and implement that, you know -- or take that
4  position on the company's behalf?
5      A.  Well, they wouldn't really say -- they
6  wouldn't really make the decision. I mean, they
7  are going to convey to us an opinion of their
8  divisions as to what would be the preference.
9      Q.  Right.
10      A.  Again, the Working Group had no power,
11  had no authority. It was just a kind of an
12  information umbrella group for us to sound ideas
13  off.
14      Q.  Okay. And so I guess the next question
15  is who makes the decision?
16      A.  Someone -- some other people that I am
17  not really familiar with, within the divisions or
18  the corporation.
19      Q.  So it could be above your level
20  basically, a divisional -----
21      A.  Someone else would say that the best
22  thing for us is X and not Y, and that would be

Page 227

1  arrived at by a process that I was not a part of.
2      Q.  If the company, at a higher level,
3  makes a decision to take a position on a Medicare
4  reimbursement policy issue, would that decision
5  be filtered down through Mr Barmak?
6      A.  It might be. It might be through Mr
7  Barmak. I cannot swear to that though.
8      Q.  Our -----
9      A.  In our -----
10      Q.  Go ahead, sorry. Please.  I didn't mean
11  to interrupt you.
12      A.  And our job was to supply a political
13  analysis. Again going back to Mr Thomas's
14  situation, Mr Thomas had no interest in changing
15  to acquisition cost, therefore that issue was off
16  the table. The issue that was on the table was
17  AWP.
18      Q.  And so the decision might have filtered
19  through Mr Barmak but you are not 100% sure?
20      A.  I am not, no.
21      Q.  Would it ever have filtered down
22  through Mr de Lasa, "it" being the decision to

Page 228

1  take a particular decision on Medicare -----
2      A.  I don't know. I don't know.
3      Q.  Okay. Let's continue on with this
4  memorandum.  Let's go to the third paragraph. You
5  say you:
6          "...would like to retain Nancy Taylor
7  with the lobby firm of Greenberg Traurig [T-R-A-
8  U-R-I-G]."
9          You discuss Ms Taylor's background as a
10  former policy advisor to Senator Hatch and you
11  estimate the cost to $10,000 to $20,000. Why is
12  it that you wanted to hire Ms Taylor in
13  particular to work on the Medicare drug
14  reimbursement issue in 1997?
15      A.  She had come off Capitol Hill. She had
16  worked for Senator Hatch who was very
17  knowledgeable in the health care field and the
18  Senate side, and knew a lot of the House, members
19  of the House staff. So she was a good, well-
20  corrected person.
21      Q.  Why did you believe that Abbott needed
22  the access to various senators and staffers with

Page 229

1  respect to this Medicare drug reimbursement issue
2  in 1997?
3          MS TABACCHI: Object to the form.
4          THE WITNESS: As I said earlier, largely
5  because we had such a small office, the sense was
6  we probably needed another soldier on Capitol
7  Hill.
8  BY MR GOBENA:
9      Q.  Did you have serious concerns, in or
10  around June of 1997, that Congress ultimately
11  might adopt a Bill on Medicare drug reimbursement
12  that would have given discretion to the Secretary
13  to set reimbursements at below 95% of AWP.
14          MS TABACCHI: Object to the form.
15          THE WITNESS: Because the House had
16  already included language, you have to assume
17  that that was in play. It was a distinct
18  possibility.
19  BY MR GOBENA:
20      Q.  So it was imperative, then, to hire Ms
21  Taylor in order to put as many resources as
22  possible into blocking that language from being

58  (Pages 226 to 229)

ed7527cb-cb30-4a6a-b378-6c7a3f0e3ace

Landside, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007

London, England, UK

| Page 230 |
|---|

1  implemented; correct?
2       MS TABACCHI: Object to the form.
3       THE WITNESS: It was imperative to hire
4  her to try and get a solution that did not allow
5  discretion to the Secretary.
6  BY MR GOBENA:
7       Q.   If you go to the fourth paragraph now.
8       A.   Yes.
9       Q.   You say in the second sentence:
10  "While other groups, including the
11  oncologists and urologists, are also working on
12  the issue, I believe Abbott could use some
13  additional help."
14       Was Abbott coordinating with the
15  oncologists in terms of working on the Medicare
16  drug reimbursement issues that were taking place
17  in 1997?
18       MS TABACCHI: Object to the form.
19       THE WITNESS: Not coordinating, no.
20  BY MR GOBENA:
21       Q.   But Abbott was aware of the positions
22  that the oncologists were taking with respect to

| Page 231 |
|---|

1  the various proposals on the Hill on drug
2  reimbursement by Medicare in 1997; correct?
3       MS TABACCHI: Object to the form.
4       THE WITNESS: One of your earlier
5  documents was a position paper, I think, from the
6  oncologists.  So the answer would be yes because
7  there was paper floating around Washington DC on
8  positions by different associations.
9  BY MR GOBENA:
10       Q.   And while I think your testimony
11  earlier was that you don't recall any specific
12  communications you had with any oncologists
13  groups; correct?
14       A.   That is correct.
15       Q.   But it is possible that Ms Sensibaugh,
16  for example, might have been having
17  communications with oncologists groups regarding
18  these Medicare drug reimbursement issues in 1997;
19  correct?
20       MS TABACCHI: Object to the form.
21       THE WITNESS: Possibly. Possibly.
22  BY MR GOBENA:

| Page 232 |
|---|

1       Q.   And what about the urologists; do you
2  recall any communications with any groups
3  representing urologists regarding Medicare drug
4  reimbursement issues in 1997?
5       A.   I don't because as I said earlier on
6  the oncologists, I can't remember -- I can't
7  remember the name of a person who worked for
8  either of those associations.
9       Q.   But is it fair to say, in reading the
10  second sentence, that you believe that the work
11  of the oncologists and urologists on the Medicare
12  drug reimbursement issue, in combination with the
13  Washington office's work, was not sufficient to
14  address Abbott's desire to have the legislation
15  to read "95% of AWP"; isn't that correct?
16       MS TABACCHI: Object to the form.
17       THE WITNESS: The last part of your
18  sentence was?
19  BY MR GOBENA:
20       Q.   You wanted -- Abbott wanted the law to
21  read that Medicare drug reimbursement would be at
22  95% of AWP; correct?

| Page 233 |
|---|

1       A.   No.
2       MS TABACCHI: Object to the form.
3       THE WITNESS: Rather than the
4  discretionary power?
5  BY MR GOBENA:
6       Q.   Exactly.
7       A.   Yes.
8       Q.   Okay.  And you felt that although the
9  fact that the oncologists and urologists were
10  working on that issue, you needed additional help
11  to make sure that the legislation read "95% of
12  AWP with no discretion to the Secretary";
13  correct?
14       MS TABACCHI: Object to the form.
15       THE WITNESS: We can never make sure of
16  anything unfortunately, but the idea was that Ms
17  Taylor would be helpful in trying to lead the
18  decision-making process to a "95% of" rather than
19  discretionary powers.
20  BY MR GOBENA:
21       Q.   At the bottom of the document, the last
22  paragraph, you talk about -- this is part of your

59  (Pages 230 to 233)

ed7527cb-cb30-4a6a-b378-6c7a3f0e3ace

Landside, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007
## London, England, UK

Page 234

1 request, I guess, for a budget from Ms Taylor.
2 You mention various people in the last sentence
3 who approved on her hiring.
4     A.  Yes.
5     Q.  Can you tell me who Kris Kringel is? K-
6 R-I-N-G-E-L for the court reporter. Thank you, go
7 ahead.
8     A.  Okay, I'm sorry. He was an executive at
9 Abbott. I cannot recall if he was the -- I can't
10 recall his title. He may have been the President
11 of the Hospital Products Division.
12     Q.  How about Mr Paul Clark?
13     A.  Mr Clark was the Head of, the President
14 of the Pharmaceutical Division.
15     Q.  That goes by the acronym of PPD;
16 correct?
17     A.  PPD. That is PPD, yes.
18     Q.  And also you have -- and I am going to
19 spell this for the court reporter -- Yasu
20 Hasegawa. (Y-A-S-U H-A-S-E-G-A-W-A). Who is Mr
21 Hasegawa?
22     A.  He worked for TAP.

Page 235

1     Q.  So you think Mr Kringel might have
2 worked at HPD; is that correct?
3     A.  I believe he was the Head of HPD.
4     Q.  So insofar as getting the approval
5 authority to hire Ms Taylor, you had sought the
6 approval from the Head of HPD; correct?
7     A.  If that was Mr Kringel's position, the
8 answer is yes.
9     Q.  Okay. And the Head of PPD; correct?
10     A.  Which was Mr Clark, yes.
11     Q.  And also the Head of TAP; correct?
12     A.  Yes.
13     Q.  I think you testified earlier that from
14 time to time you would do some lobbying work on
15 TAP's behalf; correct?
16         MS TABACCHI: Object to the form.
17         THE WITNESS: On -- yes, on certain
18 issues we would.
19 BY MR GOBENA:
20     Q.  So the issue of getting the statute to
21 set Medicare drug reimbursement at "95% of AWP
22 with no discretion to the Secretary" is an issue

Page 236

1 that was important to those three either
2 divisions or companies; correct?
3         MS TABACCHI: Object to the form.
4         THE WITNESS: Yes.
5         MR GOBENA: Right.  I will have this
6 marked as Exhibit Landsidle 022 by the court
7 reporter. I have one copy.
8         (Exhibit Landsidle 022 marked for
9 identification)
10         (Pause)
11     Q.  While you are reviewing the document,
12 Mr Landsidle -- and frankly I am go only going to
13 ask you about the first, and maybe the second
14 page, and possibly the third but that is less
15 likely. As you are reading it, I am just going to
16 read the details into the record.
17     A.  Okay.
18     Q.  It is a faxed document from Merck's (M-
19 E-R-C-K) Government Relations Department from a
20 Nancy Carlton to you, dated June 19, 1997,
21 approximately two weeks after the last memo we
22 looked at.

Page 237

1     In the "Re:" line it reads:
2     "Payments for Outpatient Prescription
3 Drugs under Medicare."
4     Once you have had a chance to peruse
5 the first three pages, let me know and we will
6 get started.
7         (Pause)
8     Q.  Okay?
9     A.  Yes.
10     Q.  My first question is sort of a general
11 background one and maybe you will be able to
12 answer this by looking and seeing Ms Carlton's
13 name. The "Merck" at the top there, do you know
14 whether that is the German Merck or the US
15 company Merck?
16     A.  That is the US company Merck.
17     Q.  Okay. And the fax is, again, dated June
18 19, 1997 and it is from Nancy Carlton. Do you
19 know who Ms Carlton was?
20     A.  Yes, I do.
21     Q.  And who was she?
22     A.  She was a lobbyist in Merck's

## Henderson Legal Services
## 202-220-4158

ed7527cb-cb30-4a6a-b378-6c7a3f0e3ace

JUN 09 '94  09:16AM CHEP HUMAN RESOURCES                    ABBOTT LABORATORY    P.2
                                                              JUN 09 '94  09:16AM

# ◻ÁBBOTT

**INTEROFFICE CORRESPONDENCE**

FROM: WASHINGTON OFFICE   Dolly A. Hanrahan

DEPT. NO.:        BLDG.:        EXT.

TO:    Alan MacKenzie              DATE: June 8, 1994

                    RE:  Medicare Proposal


            Pursuant to our conversation, I have been in contact with
the Washington representatives of Bristol-Myers Squibb, Amgen,
Zeneca and the American Society for Clinical Oncology (ASCO)
regarding the memorandum from Charles R. Booth, Director, Office
of Payment Policy at HCFA, to the Medicare carriers regarding
changes in payment for certain drugs.

            Everyone shares our concerns over the survey HCFA is
conducting on the acquisition price versus the average wholesale
price on certain drugs.  ASCO issued a memorandum to its members
advising them that compliance with the survey is voluntary and
that physicians are under no legal obligation to complete the
survey issued by the carriers.  HCFA is not pleased with ASCO's
guidance to its physicians.  ASCO is working directly with the
Office of Management and Budget (OMB) to essentially kill the
survey based on the grounds that HCFA has not followed
administrative procedures.  OMB may stop the survey but this
would only serve to buy more time; HCFA would simply resubmit
the survey following appropriate procedures.  We can guess this
would take two or three months.

            The physician who chairs ASCO's Clinical Practice
Subcommittee strongly recommends that the drug manufacturers
stay out of the negotiations.  Legal counsel for Bristol-Myers
concurs saying that it would only agitate the situation further,
particularly since HCFA is focused on high volume drugs.  ASCO
has asked us to discuss other ways in which physicians might be
helpful and to advise them of our ideas.

            The Washington representatives are prepared to meet if we
all determine the best course of action is to do so.  Please
think about what our next steps should be and let me know how to
proceed.  I agree with ASCO that we need to be careful and
maintain a certain distance from the issues.

            Thank you and I look forward to talking with you soon.


    cc:  G. Coughlan   CFO - Abbott
         D. Landsidle

                                                      TAP GB 08146


                                               ┌─────────────────┐
                                               │ LANDSIDLE  #14  │
                                               │ Oct 15, 2007    │
                                               │ Deposition Exhibit │
                                               └─────────────────┘

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Health Care
Financing Administration

Refer to: FQA-541

**Memorandum**

Date **MAR 15 1994**

From **Director**
**Office of Payment Policy, BPD**

Subject **Determination of Acquisition Cost of Drugs--INFORMATION**

To **All Associate Regional Administrators**
**for Medicare**

Medicare regulations (42 CFR 405.517) provide for payment for drugs based on the lower of the estimated acquisition cost or the national average wholesale price (AWP) of the drug. The purpose of this memorandum is to provide instructions on the determination of the acquisition cost of drugs and to provide additional information on other aspects of drug pricing.

We are requesting each carrier to ascertain the acquisition costs for certain high volume drugs for which expenditures exceed $10 million in 1992, including low osmolar contrast materials used in radiology procedures, colony stimulating factors, and EPO (for non-ESRD uses). (See attached listing.) These drugs account for the majority of the total expenditures for drugs. Carriers may, of course, extend their determination of acquisition costs to any other drugs they deem appropriate. Also, carriers who have made cost determinations for drugs need not alter their methodology for determining costs.

Acquisition costs is the cost of that drug to the physician. The invoice from the supplier is the best source of information about how much the drug costs. Sometimes the invoice shows discounts on the purchase of the drugs. However, sometimes discounts are received at the end of a period of time or after a specified number of purchases rather than for each purchase and this is not shown on each invoice.

To help carriers determine acquisition costs for high volume drugs, we suggest that they request copies of the most current invoice from a sample of 5 - 10 physicians who bill for the drugs in question. The sample can be for the entire carrier area, i.e., separate samples are not needed for each locality. Physicians should be asked whether there are any discounts not reflected on the invoices. The median price (net of any discounts) paid by the sampled physicians should be considered the estimated acquisition cost.

TAP GB 08147

Carriers should complete these calculations within 60 days of their receiving these instructions. When the carrier has accumulated this information and has determined the estimated acquisition cost, it can start paying claims under the lower of the AWP or estimated acquisition cost policy after first providing physicians with 30 days notice. Carriers should send their payment amounts for the drugs (indicate whether AWP or cost) to their regional offices. You should forward this information to us.

Please remind carriers that in the interim, while they are determining the estimated acquisition cost of the drug, in no case should drugs be paid at an amount greater than AWP. This policy was announced in an All ARA memorandum dated January 14, 1992 (Q and A 18). This survey should be repeated at least annually, or more frequently if there are indications that prices have changed substantially.

Additional Issues:

Determination of AWP - To determine the AWP, calculate the median price of the generic form of the most frequently administered dosage of the drug as reflected in sources such as the Red Book, Blue Book, or Medispan. In calculating the median price, use the price of the smallest unit of packaging offered by the manufacturer that includes the most frequently administered dosage of the drug. Also, brand name products are not included in the array of prices used to determine the cost of multiple source drugs. Only prices for the generic form of the drug are to be used in the calculation of the median price.

Multiple source situations - When calculating the median price for all sources of the generic form, use the payment per dose amount of all sources to determine the median price. If there is a difference in strengths, array that difference separately.

Single source situations - Use the payment per dose amount of the drug. If there is a difference in strengths array that difference separately.

Payment per dose for single dose vials - If a physician uses less than the amount of drug in a single use vial, pay for the cost or AWP of the vial, not the amount actually used. The difference between what is paid for and what is used is the waste. By paying for the cost or AWP of the vial, we are paying for waste directly.

TAP GB 08148

3

**Payment per dose for multiple use vials** - The carrier should estimate the "usual" or "average" number of doses that can be extracted routinely from a multiple use vial and divide this number into the cost or AWP of the vial to arrive at the payment per dose.

**Additional Costs** - Section 405.509 of the regulations permits the carriers to consider additional costs when determining the estimated acquisition costs of a drug. We have been told that for some drugs, notably chemotherapy drugs, physicians may incur additional costs related to the drugs. These costs have been described as overhead costs and include storage, waste, spoilage, breakage, and handling. Some physicians do not incur costs for handling drugs in their offices because they use a drug dispensing service. In addition to the estimated acquisition costs, consider allowing an additional fee for the overhead of handling or dispensing drugs. However, in no case can the payment for the drug plus a dispensing fee exceed the AWP for the drug.

Charles R. Booth

Attachment

cc:
Stewart Streimer, BPO
Field Operations
Office of Issuances

FQA-541:Stan Weintraub/x64498
DATE:February 3, 1994/FINAL:Joan 2/9;2/15;3/15/94
DISC:J11/DOC:PricDrug.sw/FILE CODE:D
Additional Information:Inc BPO's comments;
  ARAs via PROFS only

TAP GB 08149

Attachment

| | |
|---|---|
| J0640 | Injection, leucovorin calcium, per 50 mg vial (Wellcovorin) |
| J7190 | Factor VIII (anti-hemophilic factor (human)) per IU, (Hemofil M, Koate-HP, Monoclate-P) |
| J9010 | Doxorubicin HCL, 50 mg vial, (Adriamycin PFS, Adriamycin RDF, Rubex) |
| J9045 | Carboplatin, 50 mg (Paraplatin) |
| J9182 | Etoposide, 100 mg (VePesid) |
| J9202 | Goserelin acetate implant, per 3.6 mg (Zoladex) |
| J9217 | Leuprolide acetate (for depot suspension), 7.5 mg (Lupron) |

Colony Stimulating Factors

| | |
|---|---|
| J1440 | Injection, filgrastim (G-CSF), 300 (Neupogen) |
| J1440 | Injection, filgrastim (G-CSF), 480 (Neupogen) |
| J2820 | Injection, sargramostim (GM-CSF), 250 mcg (Leukine, Prokine) |

EPO

| | |
|---|---|
| Q9930 | Erythropoietin per 1000 units, at patient Hct of 30 |

Low Osmolar and Paramagnetic Contrast Materials

| | |
|---|---|
| A4644 | Supply of low osmolar contrast material (100 - 199 mg of iodine) |
| A4645 | Supply of low osmolar contrast material (200 - 299 mg of iodine) |
| A4646 | Supply of low osmolar contrast material (300 - 399 mg of iodine) |
| A4647 | Supply of paramagnetic contrast material (e.g., gadolinium) |

TAP GB 08150

**ABBOTT**

INTEROFFICE CORRESPONDENCE

From:  David W. Landsidle
    Divisional Vice President
    Washington

Dept:  Washington Office

---

TO: Duane L. Burnham

DATE: June 9, 1997

RE: Outside Help on Reimbursement of Medicare Drugs

-------------VIA FAX-------------

  We would like to retain an outside lobbyist to assist us on the Medicare reimbursement issue. The issue has major impact on Lupron, Calcijex, and Abbokinase.

  There is language in the House Ways and Means and House Commerce Committees' Medicare bills that changes the way Medicare reimburses drugs. Rather than reimbursing according to the average wholesale price (AWP) as it is now, the bill would provide reimbursement "at no more than 95% of AWP, as specified by the Secretary (of HHS)". This language is troubling because it could be, and is likely to be, read as a maximum and would allow the Secretary to establish other criteria as long as it is no more than 95% of the AWP (e.g.; actual acquisition cost). We are working to change this language to provide that reimbursement would be only at 95% of AWP with no discretion left to the Secretary. This should address as well the issue raised in our South Carolina lawsuit (i.e., the authority of HCFA and its carriers to be creative on reimbursement).

  I would like to retain Nancy Taylor with the lobby firm of Greenberg, Traurig. Nancy was Orrin Hatch's former health policy advisor and the firm is connected on Capitol Hill. The cost would be in the $10,000 to $20,000 range. If we do retain Nancy she will need to file a lobbying report identifying Abbott as her client and the project she worked on.

  With reimbursement for Lupron, Calcijex and Abbokinase at issue, hiring Greenberg Traurig could be most useful. Reimbursement of Medicare drugs is the Washington offfice's top priority. While other groups including the oncologists and the urologists are also working the issue, I believe Abbott could use some additional help.

  As you know, Congress is moving very fast on the Medicare bill. The House Committees are to report the week of June 9 and the Senate Finance Committee the week of June 16. If we are to do this, we need to move quickly. Kris Kringel, Paul Clark and Yasu Hasegawa have approved.

  Please advise.

cc:  Jose M. de Lasa
  Paul N. Clark
  John G. Kringel
  Yasuchikau Hasegawa
  Mark Barmak

**Highly Confidential**

EXHIBIT
LANDSIDLE #20
Oct 15, 2007

**ABT-DOJ 0300477**

# ▢ ABBOTT

**INTEROFFICE CORRESPONDENCE**

**From:** David W. Landsidle
Divisional Vice President
Washington

**Dept:** Washington Office

**TO:** Mark Barmak
Loreen Mershimer
John Campbell
Michael Heggie
Rich Masterson
Don Buell
Chris Lockett

**DATE:** June 5, 1997

**RE:** AWP

---------------VIA FAX---------------

The Health Subcommittee of the House Ways and Means Committee reported the Medicare bill last night on a 13-0 vote. The bill passed without amendment.

When asked about the AWP language by Rep. Jon Christensen (R-NE), Subcommittee Chairman Bill Thomas (R-CA) said the provision is still open to revision and is not a closed issue. Thomas said he supports the Administration's desire to lower the cost of Medicare drugs, but feels the switch to acquisition cost would be so difficult that it would negate the savings. He feels staying with AWP but reducing it some percentage is a fair approach.

I spoke with Congressman Christensen during the mark up. He is pleased we have come so far by dropping acquisition cost, but wants to go further. We will see what can be done between now and full Ways and Means markup on Monday. Issues under review include having the provision reading "AWP minus 5%" rather than "no more than 95% of AWP as specified by the Secretary" since "no more than" means that a reduction of more than 5% is permissible. Congress should not permit HHS to determine reimbursement rates drug by drug.

Also, we have checked with the House Commerce Committee which also marks up its Medicare bill next week. It, too, has dropped acquisitiion cost and gone with the same "no more than 95% of AWP" language.

Highly Confidential



EXHIBIT 21
LANDSIDLE 21
Oct 15 2007

ABT-DOJ 295985
ABT129-0007    FL

**ABBOTT**

From: David W. Landsidle
Divisional Vice President
Washington

**INTEROFFICE CORRESPONDENCE**

Dept: Washington Office

---

TO:  Jose M. de Lasa

DATE: July 11, 1997

cc: D. L. Burnham
G. P. Coughlan
M. E. Barmak
C. M. Brock
H. L. Goldberg
B. J. Smith
S. F. Weinstock

RE:  Monthly Highlights -- June, 1997
Washington Office

## I.   MEDICARE REFORM

A. Met with Members of Congress and staff on House and Senate proposals which would change reimbursement for Medicare drugs to 95% of average wholesale price (AWP).

B. Worked to include coverage for prostate testing and diabetes test strips and monitors. Diabetes will be covered, prostate testing stands a good chance.

C. Continued discussions with Lab Budget Coalition regarding competitive bidding and reduction in reimbursement for lab services.

## II.   HEALTH CARE

A. Participated in lobbying effort to reduce excise tax on vaccines covered under the Vaccine Compensation Trust Fund. Tax lowered in both House and Senate budget bills.

B. Participated in ADAP coalition meetings and visits with congressional staff to increase FY '98 funding for state AIDS drug assistance programs. Also, met with GAO staff to discuss its study of ADAP and our experience with state ADAP programs.

C. Attended Healthcare Leadership Council Board meeting.

D. Met with Rep. John Porter (R-IL) on getting additional money for a CDC education campaign on H. pylori treatment.

## III.   TRADE

A. Worked with the Emergency Committee for American Trade (ECAT) on Mr. Burnham's testimony before the Senate Finance Committee in favor of fast track negotiating authority.

B. Participated in industry meetings on fast track.



EXHIBIT
LANDSIDLE #23
Oct 15, 2007

Highly Confidential

ABT-DOJ 0300479

IV.   PATENTS

    A.  Attended industry meeting on introducing a bill to revise the Hatch-Waxman patent law.

    B.  Met with attorneys from Fox, Bennett on a proposal to get 5 new years of exclusivity in return for paying a royalty to the NIH.

V.   TAXES

    A.  Worked Capitol Hill in favor of extending the R&D tax credit and in opposition to changes in both the export source rule and deferral.  The R&D credit will be extended and the source rule and deferral appear safe.

VI.   FDA REFORM

    A.  Attended and reported on Senate Labor Committee mark-up of FDA reform legislation. The bill cleared the Committee 14-4 and could be on the Senate floor in July.

VII.   MEDISENSE

    A.  Toured MediSense and received briefings by staff.

    B.  Participated via conference call in the American Diabetes Association's Government Affairs Committee meeting.

VIII.   ADD

    A.  Met with Miles White to brief him on issues to be discussed at the HIMA Board meeting and attended Board meeting.

    B.  Attended a House hearing and had discussions with congressional staff on blood safety issues.

IX.   GOVERNMENT AFFAIRS

    A.  Attended numerous fundraisers.

    B.  Worked with Public Affairs on final details concerning rededication of the Womens Suffrage statue. Attended ceremonies held on June 26.  Abbott helped finance its move from the basement of the Capitol to the Rotunda.

Highly Confidential

ABT-DOJ 0300480