# Exhibit 82

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL          :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      :   CIVIL ACTION

PRICE LITIGATION                :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO        :

U.S. ex rel. Ven-a-Care of      :   Judge Patti B. Saris

the Florida Keys, Inc.          :

     v.                         :

Abbott Laboratories, Inc.,      :   Chief Magistrate

No. 06-CV-11337-PBS             :   Judge Marianne B.

- - - - - - - - - - - - - - - -x    Bowler

                                Baltimore, Maryland

                                Friday, September 14, 2007


     Videotaped Telephone Deposition of ROBERT NIEMANN

Niemann, Robert                                                September 14, 2007
                              Baltimore, MD

                                                          70 (Pages 274 to 277)

### 274

1   MR. COOK: Before moving on, I think we
2   wanted to put on the record that for both sides, an
3   objection for one is an objection for all.
4       MS. OBEREMBT: That sounds fine.
5       MR. HOVAN: That's great.
6       MS. OBEREMBT: The Three Musketeers
7   objection policy.
8           (Exhibit Abbott 314 was
9            marked for identification.)
10      BY MR. COOK:
11  Q.  Mr. Niemann, I've handed you what we have
12  marked as Exhibit Abbott 314, which is a document
13  with no apparent date on the first page at least
14  entitled Medicare program payment for drugs with
15  titles, current policy proposal and average wholesale
16  price on the first page. It bears Bates numbers HHC
17  902-0001 through page 0016. Could you look through
18  that document and tell me if you recognize at all
19  what it is?
20  **A.  I don't remember the context of it, but it**
21  **looks like various, various ways to pay for drugs.**
22  Q.  Is this the sort of document that -- well,

### 275

1   let me ask you to flip through to Bates number page
2   0010 of the document. It's in the bottom right-hand
3   corner. And you see at the top, there is a date
4   December 6, 1995?
5   **A.  Uh-huh.**
6   Q.  Assuming that this document is dated in or
7   around December of 1995, that would be a time in
8   which you would be the policy analyst responsible for
9   the Medicare program payment for drugs, correct?
10  **A.  Yes.**
11  Q.  Is this the type of document or draft that
12  you would have prepared as the policy analyst on that
13  topic?
14  **A.  Yes.**
15  Q.  And looking through this, do you recall
16  preparing this document or a document such as this
17  one?
18  **A.  I actually don't.**
19  Q.  Does this document jog your memory about
20  some of the issues that you were considering in or
21  about December of '95 on the question of payment for
22  drugs?

### 276

1   **A.  Yes. I wouldn't have remembered the time**
2   **frame, but I remember the terminology.**
3   Q.  All right. The second paragraph on the
4   first page under proposal. Tell me if I'm right, but
5   I believe it reads, "we propose to eliminate the EAC
6   criterion and add two others, the actual acquisition
7   cost and the median AAC for the previous 12 months."
8   Is that correct?
9   **A.  Yes.**
10  Q.  Based upon your work in the agency, do you
11  have some idea who we might be?
12  **A.  Usually that was the agency, i.e. the**
13  **administrator, et al.**
14  Q.  Just from looking at this document and the
15  nature of the issues discussed in this document, do
16  you have some idea of who the target audience for the
17  document might have been?
18  **A.  I have a guess. I mean --**
19  Q.  Who would that be? What would the guess
20  be?
21      MS. OBEREMBT: You can guess.
22      THE WITNESS: To me this reads like

### 277

1   something that would go in the Federal Register. The
2   target audience would be the public.
3       BY MR. COOK:
4   Q.  And so this appears as if it might be a
5   draft of a notice of proposed rule making that never
6   made it into the Federal Register?
7   **A.  That's what it looks like to me. That**
8   **would be my guess. That's how it reads to me.**
9   Q.  Do you recall that in fact the agency was
10  considering promulgating a rule to go to actual
11  acquisition costs and eliminate the estimated
12  acquisition cost criteria?
13      MS. OBEREMBT: Object on the grounds of
14  deliberative process and instruct you not to answer.
15      BY MR. COOK:
16  Q.  Mr. Niemann, would you agree with me that
17  this document itself reflects a consideration by the
18  agency of eliminating the EAC criterion and going to
19  an actual acquisition cost methodology?
20      MS. OBEREMBT: Objection.
21      THE WITNESS: But I should respond?
22      MS. OBEREMBT: Yes. You can answer. If

Henderson Legal Services
202-220-4158

### 278

 1  you know.
 2      THE WITNESS: I wish -- I'm actually
 3  embarrassed that I can't remember this better.
 4  That's unbelievable. My answer to your question
 5  would be predicated on my guess as to who we is. And
 6  that this actually was intended for the Federal
 7  Register. Then I'd have to agree -- I certainly
 8  agree that that's what this says. The question mark
 9  is whether this was far enough along that it was
10  actually the agency considering doing this. I don't
11  remember.
12      BY MR. COOK:
13      Q.  And if you turn to the next page in the
14  definitional section describing actual acquisition
15  cost, AAC, the first sentence reads, "we propose to
16  require suppliers to submit their actual acquisition
17  costs for each drug when billing the program for the
18  drug." Do I read that correctly?
19      A.  Yes, you do.
20      Q.  Would you agree with me that it was within
21  the authority of HCFA to require suppliers to submit
22  their actual acquisition costs when billing the

### 279

 1  program for the drug?
 2      A.  I just have a vague, gnawing -- if this
 3  had made it to the Federal Register, I would
 4  certainly agree because OGC would have signed off on
 5  it. But given the nature of it, and we are not sure
 6  how far along this got, I'm not certain what the
 7  problems were with that. I don't -- I don't
 8  remember.
 9      Q.  Would you agree with me that one of the
10  reasons why such a proposed rule might not make it
11  into the Federal Register would be political backlash
12  from providers who would see their reimbursement cut?
13      A.  That -- that certainly is reasonable that
14  that would have come into play.
15      Q.  But you don't have a specific memory of
16  whether or not that's the reason why this proposal
17  never made it into the Federal Register?
18      A.  No. Not that.
19      Q.  Do you have a specific memory of why this
20  proposal never made it into the Federal Register?
21      A.  It's vague. So once again, I'm not
22  betting the farm on this, but I think complaints

### 280

 1  about burden, it might have had to do with burden.
 2      Q.  And when you refer to burden, it would be
 3  the burden on the supplier?
 4      A.  That's right. The reporting burden.
 5      Q.  If you can look under the discussion on
 6  page --
 7      A.  I just want to be clear.
 8      Q.  Yes, sir. Please.
 9      A.  I wasn't saying that I remembered that
10  burden was the reason this didn't see the light of
11  day. I don't. I'm responding to when you asked me
12  about political pressure, what the nature of the
13  pressure might be. And in my vague recollection,
14  pressure would have been more likely in the arena of
15  burden as far as getting people's attention. But I
16  don't really remember why it was we didn't go forward
17  with this.
18      Q.  On page 3 of this document, under the
19  heading discussion. You agree with me that this
20  discussion refers to data from 1995, and indicating
21  an increase from 1992 to 1995 of Medicare allowed
22  charges for drugs from 680 million to $1.6 billion,

### 281

 1  correct?
 2      A.  Yes.
 3      Q.  The next sentence reads -- and tell me if
 4  I'm correct -- "there are numerous accounts of prices
 5  for drugs charged to the Medicare program in excess
 6  of the true marketplace, and the suppliers who bill
 7  Medicare receive discounts below the manufacturer's
 8  published average wholesale price." And then the
 9  next sentence reads, "in effect, the published
10  average wholesale price is not the average price
11  actually charged to wholesale customers." Did I read
12  that accurately?
13      A.  Yes, you did.
14      Q.  And is that something that was likely
15  written, if not by you, then by someone in a similar
16  position to you?
17      MS. OBEREMBT: Objection.
18      THE WITNESS: I think I did write that.
19      BY MR. COOK:
20      Q.  And so assuming that this document
21  actually was dated approximately December of '95, if
22  the date on the latter pages is an accurate