# Exhibit 84

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

ONE HUNDRED SIXTH CONGRESS

TOM BLILEY, VIRGINIA, CHAIRMAN

[Committee member roster]

U.S. House of Representatives
Committee on Commerce
Room 2125, Rayburn House Office Building
Washington, DC 20515-6115

May 5, 2000

Mr. Charles Rice
Chief Executive Officer
Dey Laboratories
2751 Napa Valley Corporate Drive
Napa, CA 94558

Dear Mr. Rice:

    Per our previous correspondence, I am writing to further inquire about your company's pricing practices for certain pharmaceuticals currently covered under the Medicare program. As you know, the Committee on Commerce has, over the past year, been engaged in a thorough examination of the prices that Medicare pays for the limited number of Medicare-covered outpatient drugs. This investigative work has produced evidence indicating that some drug companies may be reporting artificially-inflated reimbursement rates for certain Medicare-covered drugs, and may be manipulating such prices in order to assist their sales and marketing efforts aimed at health care providers. In writing to you today, I am seeking additional information that may shed further light on such practices.

    Based on information provided in your response to the Committee's prior inquiries, as well as through the course of its investigation, the Committee has identified significant discrepancies that exist between the price Medicare pays for certain drugs and the prices charged to many private sector purchasers of the same drugs. As you know, under Federal law, the reimbursement rate for Medicare-covered outpatient drugs and biologicals is supposed to be 95 percent of the "Average Wholesale Price" (AWP), a price mainly established by the pharmaceutical manufacturers themselves and reported in the *Red Book* and other pricing publications used by the pharmaceutical industry. Yet the significance of the discrepancies identified by the Committee would seem to strongly suggest that the AWPs set for certain Medicare-covered drugs cannot reasonably be construed to reflect the plain meaning of the terms "average" and "wholesale," or any reasonable price projections that might have been anticipated by Medicare's Federal regulators, who first linked Medicare drug reimbursements to AWP.

Mr. Charles Rice
Page 2

When queried by the Committee about the setting of AWPs, the trade association representing the drug manufacturing industry, the Pharmaceutical Research and Manufacturers of America (PhRMA), essentially admitted that AWP is not what it claims to be on its face -- the average price charged to wholesalers -- but is rather just a publicly available benchmark set by manufacturers in their discretion, and upon which insurers base their reimbursements. Indeed, for certain Medicare-covered drugs, it appears that very few, if any, purchasers actually pay the AWP or any price close to it – except, of course, the Federal government. This finding is supported both by the information you provided in response to the Committee's prior inquiries, and by information identified by the Office of Inspector General (OIG) at the Department of Health and Human Services. The OIG has determined that the Medicare-allowed amount for albuterol sulfate, a pharmaceutical product sold by your company, in Fiscal Year 1996 was $0.42. The OIG further estimated that the actual wholesale price of this drug was $0.15 and the highest available wholesale price that the OIG was able to identify was $0.21. The OIG has also estimated that, in Fiscal Year 1996 alone, Medicare could have saved $447 million if it had purchased Medicare-covered drugs at prices similar to those generally made available to private sector purchasers.

During the course of its investigation, the Committee also has learned some troubling information that may suggest why at least some of these substantial price variations are occurring with respect to Medicare-covered drugs. It appears that certain manufacturers may be inflating Medicare drug reimbursement rates as set by the AWP in order to help them better market their drugs. By establishing the AWP for Medicare-covered drugs at prices far above what doctors or other providers are actually charged, manufacturers create a "spread." The spread is defined as the difference between the Medicare reimbursement price (95 percent of AWP) and the actual cost to doctors. Because providers can keep the spread, they thus have a monetary incentive to prescribe or utilize drugs with larger spreads. Likewise, the manufacturers of these drugs have an incentive to manipulate the AWP in order to increase spreads, and thus improve their competitiveness and sales of their drugs. In fact, the Committee has learned information indicating that some companies may have increased the spread on certain drugs in a calculated and deliberate effort to use this Medicare-funded windfall as a marketing tool to induce medical providers to use their drugs, and thereby enable themselves to gain additional market share in the sale of their products.

If true, such actions would not only result in the Medicare program paying far more for certain drugs than the average wholesale price, but also cause Medicare beneficiaries to pay more out of their pockets for Medicare-covered drugs and biologicals, since they are responsible for co-payment charges tied to the AWP as well. Such outcomes clearly would be unacceptable and, as Chairman of the Committee charged with oversight of certain aspects of the Medicare program, I intend to find out whether the Medicare program and our Nation's senior citizens are being financially gouged for certain drugs. I will not tolerate taxpayers and Medicare beneficiaries being forced to subsidize the efforts of certain drug manufacturers to increase their sales. If drug manufacturers are deliberately gaming the setting of reimbursement rates for such purposes, I firmly believe that they should be exposed and held fully accountable.

Mr. Charles Rice
Page 3

I have long been a champion of free-market policies, particularly in the field of health care. I strongly believe that the marketplace is the best and most efficient means for delivering quality health care in this country. Because of these beliefs, I am deeply disturbed by the information referenced above. I would find it hard to believe that, when AWP was adopted as the benchmark for Medicare reimbursements, Congress intended to allow drug manufacturers to charge Medicare whatever they wanted, or permit the use of Medicare dollars to incentivize the use of particular drugs or increase sales or market share. To ensure that the delivery of health care services continues to be based on free market principles, it is imperative that those who provide these services insure that the prices being paid by Medicare reflect actual market-based prices, consistent with the intent of Federal law.

I am writing to you because one of the drugs reflecting a significant variation between the AWP-based prices paid by Medicare and the prices generally charged to private sector purchasers is albuterol sulfate, a drug manufactured by Dey Laboratories. In order to better understand the price setting practices of your company as they relate to Medicare-covered drugs such as albuterol sulfate, I am requesting that, pursuant to Rules X and XI of the U.S. House of Representatives, you provide the following information to the Committee no later than May 26, 2000:

1. Please provide all records (exclusive of invoices) relating to the prices that you have set for the sale of, or at which you have sold albuterol sulfate to any wholesaler, distributor, specialty wholesaler, purchasing group, home health agency, physician, or other health care provider during the years 1993 to date, including but not limited to contracts, price lists, or any documents reflecting charge back agreements, rebates (excluding Medicaid rebates), discounts, free goods, grants, or other items of value offered or given.

2. All advertisements, offers, catalogs, correspondence, and drafts thereof, for albuterol sulfate, that contains a representation of a price for albuterol sulfate, including internal price lists used by sales representatives to give oral representations of prices for albuterol sulfate.

3. Please provide all records relating to any decision to increase the amounts of any of the price representations (including, but not limited to "Average Wholesale Price," "Wholesaler Acquisition Cost," "List Price," "Catalog Price" and "Net Wholesale Price") of albuterol sulfate as reported by you to *Medical Economics Red Book*, *First Data Bank*, or *Medi-Span*.

4. Please provide all records relating to any decision to increase, maintain, or decrease the net price (i.e., the price actually paid for the product net of credits, rebates, chargebacks, free goods, or other inducements) at which you actually sold albuterol sulfate to wholesalers, distributors, specialty wholesalers, purchasing groups, home health agencies, physicians, or other health care providers.

5. Please provide all records that relate to the price representations made by you with regard to albuterol sulfate and any of the following: a) Reimbursement by Medicare or any of the

Mr. Charles Rice
Page 4

state Medicaid programs, b) Price representations made by others in connection with any generic equivalent, c) Price representations made by others in connection with any therapeutic equivalent.

6. Please provide all records that relate to your marketing strategy for albuterol sulfate, including percentage of the product that is sold to different classes of trade or types of health care providers, cost/benefit analyses of the differing methods of pricing and marketing the product, market share for the listed pharmaceuticals as well as for any generic or therapeutic equivalent products that are manufactured by others.

7. Please provide all records that relate to proposed or actual changes by HCFA to Medicare reimbursement for pharmaceutical products.

For purposes of this request, the terms "records," "relating," and "relate" should be interpreted in accordance with the Attachment to this letter.

If you should have any questions, please contact Charles Clapton, Committee Counsel, at (202) 226-2424. I appreciate your prompt cooperation in this matter.

Sincerely,

Tom Bliley
Chairman

Attachment

cc:   The Honorable John D. Dingell, Ranking Member

## ATTACHMENT

1. The term "records" is to be construed in the broadest sense and shall mean any written or graphic material, however produced or reproduced, of any kind or description, consisting of the original and any non-identical copy (whether different from the original because of notes made on or attached to such copy or otherwise) and drafts and both sides thereof, whether printed or recorded electronically or magnetically or stored in any type of data bank, including, but not limited to, the following: correspondence, memoranda, records, summaries of personal conversations or interviews, minutes or records of meetings or conferences, opinions or reports of consultants, projections, statistical statements, drafts, contracts, agreements, purchase orders, invoices, confirmations, telegraphs, telexes, agendas, books, notes, pamphlets, periodicals, reports, studies, evaluations, opinions, logs, diaries, desk calendars, appointment books, tape recordings, video recordings, e-mails, voice mails, computer tapes, or other computer stored matter, magnetic tapes, microfilm, microfiche, punch cards, all other records kept by electronic, photographic, or mechanical means, charts, photographs, notebooks, drawings, plans, inter-office communications, intra-office and intra-departmental communications, transcripts, checks and canceled checks, bank statements, ledgers, books, records or statements of accounts, and papers and things similar to any of the foregoing, however denominated.

2. The terms "relating," "relate," or "regarding" as to any given subject means anything that constitutes, contains, embodies, identifies, deals with, or is in any manner whatsoever pertinent to that subject, including but not limited to records concerning the preparation of other records.