# Exhibit 86

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories,
Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS


Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Buto, Kathleen - Vol. II                    September 13, 2007
                    Washington, DC

Page 275

              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

PRICE LITIGATION              ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    ) Judge Patti B.

the Florida Keys, Inc.        ) Saris

     v.                       ) Chief Magistrate

Abbott Laboratories, Inc.,    ) Judge Marianne B.

No. 06-CV-11337-PBS           ) Bowler

- - - - - - - - - - - - - - - - -

        (captions continue on following pages)




        Videotaped deposition of Kathleen Buto

                  Volume II



               Washington, D.C.

          Thursday, September 13, 2007

                 9:00 a.m.

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                September 13, 2007
                    Washington, DC

Page 276

```
 1          IN THE CIRCUIT COURT OF
 2        MONTGOMERY COUNTY, ALABAMA
 3       ----------------
 4   STATE OF ALABAMA,          )
 5         Plaintiff,      ) Case No.
 6     vs.               ) CV-05-219
 7   ABBOTT LABORATORIES, INC.,    ) Judge Charles
 8   et al.,                ) Price
 9         Defendants.     )
10   ---------------
11
12
13      STATE OF WISCONSIN CIRCUIT COURT
14           DANE COUNTY
15   ----------------
16   STATE OF WISCONSIN,       )
17         Plaintiff,      )
18     vs.               ) CASE NO.
19   AMGEN INC., et al.,       ) 04-CV-1709
20         Defendants.     )
21   ---------------
22
```

Page 278

```
 1         IN THE COURT OF COMMON PLEAS
 2           FIFTH JUDICIAL CIRCUIT
 3       ------------------
 4   STATE OF SOUTH CAROLINA, and    )  STATE OF
 5   HENRY D. McMASTER, in his official ) SOUTH CAROLINA
 6   capacity as Attorney General for   )   COUNTY OF
 7   the State of South Carolina,     )   RICHLAND
 8         Plaintiffs,        )
 9     vs.               ) Civil Action No.
10   WARRICK PHARMACEUTICALS        ) 2006-CP-40-4390
11   CORPORATION, et al.,          ) 2006-CP-40-4399
12         Defendants.        )
13   ------------------
14   STATE OF SOUTH CAROLINA, and    )  STATE OF
15   HENRY D. McMASTER, in his official ) SOUTH CAROLINA
16   capacity as Attorney General for   )   COUNTY OF
17   the State of South Carolina,     )   RICHLAND
18         Plaintiffs,        )
19     vs.               ) Case No.
20   ABBOTT LABORATORIES, INC.       ) 2006-CP-40-4394
21         Defendant.         )
22   ------------------
```

Page 277

```
 1        UNITED STATES DISTRICT COURT
 2         DISTRICT OF MASSACHUSETTS
 3       ------------------
 4   THE COMMONWEALTH OF MASSACHUSETTS, )
 5         Plaintiff,         )
 6     vs.               ) Civil Action No.
 7   MYLAN LABORATORIES, INC., et al.  ) 03-CV-11865-PBS
 8         Defendants.        )
 9   ------------------
10
11        SUPERIOR COURT OF NEW JERSEY
12            UNION COUNTY
13   ------------------
14   CLIFFSIDE NURSING HOME, INC., on )
15   behalf of itself and all others   )
16   similarly situated, as defined    )
17   herein,                ) LAW DIVISION
18         Plaintiffs,      ) DOCKET NO.
19     vs.               ) UNN-L-2329-04
20   DEY, INC., et al.,          )
21         Defendants.       )
22   ------------------
```

Page 279

```
 1         IN THE COURT OF COMMON PLEAS
 2           FIFTH JUDICIAL CIRCUIT
 3       ------------------
 4   STATE OF SOUTH CAROLINA, and    )   STATE OF
 5   HENRY D. McMASTER, in his official ) SOUTH CAROLINA
 6   capacity as Attorney General for   )   COUNTY OF
 7   the State of South Carolina,     )   RICHLAND
 8         Plaintiffs,        )
 9     vs.               ) Civil Action No.
10   PAR PHARMACEUTICALS COMPANIES,    ) 2006-CP-40-7151
11   INC.,                  ) 2006-CP-40-7153
12         Defendant.         )
13   ------------------
14   STATE OF SOUTH CAROLINA, and    )   STATE OF
15   HENRY D. McMASTER, in his official ) SOUTH CAROLINA
16   capacity as Attorney General for   )   COUNTY OF
17   the State of South Carolina,     )   RICHLAND
18         Plaintiffs,        )
19     vs.               ) Civil Action No.
20   MYLAN LABORATORIES INC.       ) 2007-CP-40-0282
21         Defendant.       ) 2007-CP-40-0283
22   ------------------
```

2 (Pages 276 to 279)

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                                September 13, 2007
                              Washington, DC

Page 296

1  a series of related correspondence that we looked
2  at yesterday relating to your response to Mr.
3  Rosen who had been advised by the medical
4  director of a carrier about some questions on
5  whether or not physicians could profit from the
6  resale of drugs and they administered, correct?
7      A.  Right.  Yes.
8      Q.  And I believe this is the document
9  yesterday that you stated that you didn't answer
10  the question that the medical director had posed,
11  which was are physicians allowed to profit on the
12  drugs that they administer?
13      A.  That's correct.
14      Q.  Would you agree with me that HCFA was
15  aware that physicians were profiting from drugs?
16      A.  You know, I'll be totally transparent
17  with you.  I don't think we thought of it as
18  profit.  We understood that we were overpaying,
19  if you will, for the drug in relation to their
20  cost. I don't think we thought of that as profit,
21  but in fact I know that's the way others look at
22  it.  We thought of it as an overpayment.

Page 297

1      Q.  And you knew that some physicians were
2  charging at least two to four times the amount of
3  the drug; is that right?
4      A.  I didn't personally know that.  I
5  assumed that in our staff there may be people who
6  focused on what some physicians were doing.  I
7  just really knew the aggregate numbers.
8      Q.  If we look at Bates page 168 of the
9  Exhibit Abbott 295, this is Mr. Rosen's
10  memorandum dated November 8th 1992.
11      A.  Mm-hmm.
12      Q.  And in the third paragraph you wrote
13  "Dr. Deutsch has noticed that physicians are
14  billing beneficiaries an amount much higher than
15  the actual cost of the drugs or biologicals.  The
16  charge is sometimes two to four times greater
17  than the amount paid to the supplier for the drug
18  or biological."
19      A.  Right.  Like I say, that was from the
20  carrier operations branch chief in New York.  We
21  didn't dispute that, but I didn't personally know
22  what the charges were for individual physicians,

Page 298

1  if that was your question.
2      Q.  But he had informed you of an instance
3  where the charge could be sometimes two to four
4  times greater, correct?
5      A.  He had informed me in his memo.  Now, I
6  think this was his informing me of something he
7  learned from someone else, Dr. Deutche, in New
8  York.
9      Q.  That's my understanding.
10      A.  So just to be clear, he was informing
11  me of something someone was informing him of.
12          (Exhibit Abbott 302 was marked for
13  identification.)
14  BY MR. TORBORG:
15      Q.  For the record, what I've marked as
16  Exhibit Abbott 302 is a copy of a privilege log
17  that the government has provided to us in this
18  litigation. I'd ask if you would flip, please, to
19  page 35 of 42.  Do you see the numbers at the
20  very bottom of the page?
21      A.  Mm-hmm.  (Witness complies.)
22      Q.  Specifically, if you go to the fifth

Page 299

1  item down, HHC 906- -- I'm sorry.  Seventh item
2  down.  HHC 906-01660171.  Is that the same Bates
3  number as the document that we've looked at as
4  Exhibit Abbott 295?
5      A.  Let's see.  You're asking me whether
6  the fifth item down is the same -- sixth item
7  down?
8      Q.  The same Bates number.  Seventh item
9  down.
10      A.  Seventh item down -- is the same -- it
11  doesn't appear to be the same because it's from
12  Chicago, not New York.  Is that --
13      Q.  I think we're looking at the wrong one.
14  Maybe I've given you the wrong number.  One, two,
15  three, four, five, six, seven.  I'm looking -- it
16  has a title Request for Guidance.
17      A.  Yes.  Dated June 13th 1991.
18      Q.  Yes.  If you look at the Bates number
19  on the left side, HHC 906 --
20      A.  Yeah.
21      Q.  -- does that correspond with the Bates
22  number on Exhibit Abbott 295?

                                       7 (Pages 296 to 299)

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                    September 13, 2007
                    Washington, DC

Page 300

1      A.  It corresponds.  But the document is
2   not the same document.  One is from the regional
3   office in Chicago and the other is from the
4   regional office in New York.  At least the one I
5   have here.
6      Q.  That may well be a typo.
7      A.  And the date -- yeah.  I don't know.
8   I'm just telling you that it says associate
9   regional administrator region 5 Chicago.
10     Q.  Okay.
11     A.  So --
12     Q.  Does the column on the left that has
13  the Bates number and indicates redacted portions
14  on 170, if you would go to that page of Abbott
15  exhibit --
16     A.  On that page of this document?
17     Q.  Yeah, of Exhibit Abbott 295.  Do you
18  recall anything else of interest being in this
19  document?
20     A.  You're assuming these are the same
21  document, I assume.
22     Q.  I am assuming that, yes.

Page 301

1      A.  I don't recall anything else.  Again, I
2   think -- so I'm trying to figure out whether
3   they're the same.  I mean, I guess I'm wondering
4   are they really the same documents.  But you have
5   the same document number, so it would be.  But
6   you've got the letter -- so can I just ask,
7   because I didn't put this list together, these
8   were the same documents?
9          MR. DRAYCOTT:  I'm in the same place
10  where Mr. Torborg is.  I'm looking at the Bates
11  number at the bottom of the document and I'm
12  looking at the Bates number on the privilege log.
13  So I'm assuming that they're the same going just
14  from the Bates number.
15         THE WITNESS:  Uh-huh.  Okay.  But he's
16  asking me --
17     A.  You're asking me about 170.
18         MR. DRAYCOTT:  You're asking whether or
19  not the witness agrees that the document
20  referenced on the log is the same as the Exhibit
21  Abbott 295?
22         MR. TORBORG:  I'm asking her if she

Page 302

1   remembers anything in this document that was
2   redacted on page 170.  Yes or no.
3          MR. DRAYCOTT:  Objection.  I just don't
4   know -- I think you have to have a foundation as
5   to whether or not she remembers the content of
6   the original document.  I mean, I think it's a
7   tough question.
8          MR. TORBORG:  I think we talked about
9   that yesterday.  I think she did say she recalled
10  this correspondence after reading thing it.
11         THE WITNESS:  Yes.  After reading.  Do
12  I remember if anything has been redacted?  No.
13  Or do I even know.  Had I seen this particular
14  document before yesterday?  I don't remember
15  seeing it before yesterday but I recall the issue
16  and the documents as a total in the issue.  But
17  could I speak to whether anything was redacted
18  here, I can't.
19  BY MR. TORBORG:
20     Q.  And what was the issue again that you
21  recalled?
22     A.  Well, this question that came up about

Page 303

1   whether or not the limiting charges for drugs and
2   biologicals, how those applied in the context of
3   physician payments and whether beneficiaries
4   would be, you know, liable for sort of unlimited
5   additional charges for physicians who don't
6   accept assignment.
7      Q.  And the question that Mr. Deutsch
8   finished his letter or asked in the first page of
9   his document is whether physicians were permitted
10  to profit on drugs, correct?
11     A.  That's right.  That was his question.
12     Q.  I'd like to ask you to take out Exhibit
13  Abbott 301, which is the November 25th final
14  rule, November 25th 1991 final rule.
15  Specifically it has the page number 56 in the
16  upper right-hand corner.
17     A.  Okay.
18     Q.  Do you recall testifying about
19  yesterday HCFA originally proposed reimbursing
20  for drugs incident to a physician service at 85
21  percent of the average wholesale price, correct?
22     A.  Yes.

8 (Pages 300 to 303)

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                    September 13, 2007
                    Washington, DC

Page 304

1    Q.  And you indicated -- and HCFA indicated
2  in its rule that they received many comments on
3  this issue, correct?
4    A.  Correct.
5    Q.  And subsequent to those comments HCFA
6  changed its rule in some ways that included
7  paying the lower of EAC, estimated acquisition
8  cost, or 100 percent of average wholesale price,
9  correct?
10    A.  Right.
11    Q.  Why did HCFA change the AWP-based
12  formula from 85 percent of AWP to 100 percent of
13  AWP?
14    A.  And I think they use a different
15  terminology, don't they, or we did at the time.
16  So they didn't seem to use the same term,
17  although later -- but why did they go from one
18  proposed policy to the final policy?
19    Q.  Yes.
20    A.  Let me answer that.  Based on comments
21  and based on a lot of concern that was raised --
22  and I think you picked out a couple of the

Page 305

1  comments, but they weren't the only ones -- that
2  pointed to the fact that on the one hand HCFA
3  seemed to be saying there was going to be a
4  national -- I've forgotten what the term is --
5  but a national average wholesale price didn't
6  refer to published average wholesale price.  And
7  that in describing what HCFA planned to do it was
8  clear HCFA was going to try to get accurate price
9  data.
10        And they went on to say if HCFA gets
11  accurate price data if you pay at 85 percent of
12  an accurate price you're going to be
13  systematically underpaying.  So they pushed back
14  on that and there was a lot of logic to their
15  comment, that if you're going to pay accurately
16  and then lower the price to less than a 100
17  percent there's an issue.
18        So the compromise that was come up with
19  was the final rule position, which is 100
20  percent. However, that would be sort of the lower
21  of that or the acquisition cost and that the --
22  or the actual acquisition cost.  And that would

Page 306

1  be based on surveys.
2    Q.  But if we used the average wholesale
3  price method it would be based on what was
4  published in the Red Book, correct?
5    A.  Yes.  That was made clear later in one
6  of the other documents, that it was based on the
7  published.  But in the -- I think in the original
8  description they didn't refer to published.
9    Q.  Why did HCFA remove the 15 percent
10  discount from AWP?
11    A.  Again, because HCFA was concerned that
12  it conveyed -- what HCFA was really after was
13  getting an accurate reimbursement level or price
14  -- okay? -- what price should reimbursement be
15  set at. And the concern was that what we really
16  wanted to convey there is that we were going to
17  try to find out what that was.
18        And so the mechanism was getting or
19  conducting surveys of actual acquisition costs
20  and that the AWP was the fallback.  And actually
21  high-volume drugs were going to be a special
22  target for the surveys of actual acquisition

Page 307

1  costs because of the greater impact on Medicare.
2    Q.  Did some of the comments -- if we go
3  back to page 56 of the rule, the second paragraph
4  on payment for drugs states "Also a number of
5  comments from the oncologists indicated that we
6  should use an add-on to cover the cost of
7  breakage, wastage, shelf life limitations and
8  inventory costs associated with chemotherapy
9  agents.
10        "Some commentators also suggested that
11  this add-on payment was needed to account for
12  shortfalls in chemotherapy administration
13  payments. Without adequate compensation,
14  commenters suggested, many physicians would
15  performed the service in hospital outpatient
16  departments at substantially higher costs.
17        "Also some commenters suggested that
18  physicians would refuse to supply the drugs to
19  patients, forcing patients to purchase the drugs
20  themselves and bring them to the physician's
21  office to be administered.  In the latter case
22  the drugs would not be covered by Medicare since

9 (Pages 304 to 307)

Henderson Legal Services
202-220-4158

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                     September 13, 2007
                    Washington, DC

Page 308

1   the physician did not incur any costs for the
2   drug."
3         Was there any connection between the
4   removal of the 15 percent discount on AWP to
5   concerns about shortfalls in administrative
6   payments and the need to cover other costs
7   associated with the administration of drugs?
8     A.  I'm looking at -- if you'd give me a
9   couple seconds here, I'm looking at the response.
10  Because I don't recall that that was the reason.
11  But let me just look and see what we said in
12  response to that comment.  (Reading).
13        It looks to me as if we dodged the
14  question.  In other words, they didn't respond
15  one way or the other to whether that was at a
16  reason for going to the alternative methodology.
17  And I'm sure we discussed it.  As a general
18  matter, not related per se to this issue, the
19  government doesn't like to pay for some things
20  under one mechanism that was intended for one use
21  and sort of overpay there in order to compensate
22  for other costs.

Page 309

1         In reality it happens.  It looks to me
2   as if what we decided to do is avoid that whole
3   issue, but try to say, okay, here's a compromise
4   approach that we think will address general
5   concerns about the 85 percent but also get us
6   where we want to go, which is to pay accurately
7   for drugs that Medicare is paying for.  And that
8   would be the survey approach that the carriers
9   would use and the estimated acquisition cost or
10  the actual acquisition cost.
11    Q.  You stated in your answer that you
12  thought you dodged the question, right?
13    A.  Yup.
14    Q.  Is it your experience during your time
15  at HCFA that there were times when HCFA did not
16  put its -- all of its rationales in its decision-
17  making in a published document such as a
18  regulation?
19    A.  No, I wouldn't say that.  I would say
20  that if we thought the response and the change in
21  the regulation addressed the concern we would
22  basically put that out there as the overall

Page 310

1   response to a range of comments on an issue.  So
2   basically what the oncologists were saying was
3   this was an unfair cut.
4         Our response, we're going to go back to
5   100 percent of AWP and for high volume drugs
6   we're going to look at a methodology for going
7   after actual acquisition costs.  So that was
8   believed to be a valid response to the overall
9   concerns about the cut.
10    Q.  Are HCFA's determinations and
11  rationales for decisions that they make or don't
12  make always in a published document?
13    A.  Well, you know, I can only speak to my
14  experience.  We would try to to the best of our
15  ability respond to the comments that were raised.
16  It may not be every specific, but the rationale
17  for taking the position is what we tried to put
18  in responses to comments.  So always?  You know,
19  I can only speak from my own experience.
20    Q.  But this was a situation where the
21  oncologists, perhaps others, had raised the issue
22  that the 15 percent was perhaps too much of a

Page 311

1   cut. And those were concerns that you heard,
2   correct?
3     A.  Right.
4     Q.  And you responded to?
5     A.  Right.  In the final policy.
6     Q.  And you would agree with me that this
7   particular regulation -- and I think you said
8   earlier by using the word "dodge" -- doesn't
9   exactly articulate that rationale?
10        MR. DRAYCOTT:  Objection.  You can
11  answer.
12    A.  My reason for using that word was we
13  didn't directly answer the question, but we
14  answered the question.
15    Q.  By the policy?
16    A.  By the policy.
17    Q.  So the policy itself sort of
18  demonstrated what HCFA's thinking was itself?
19    A.  Yes.  The policy responded to the range
20  of comments we got, in our view.
21    Q.  If I could ask you to go back to
22  Exhibit Abbott 299.  That was the public comment

                              10 (Pages 308 to 311)

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                    September 13, 2007
                    Washington, DC

Page 312

1  to the proposed rule for the fee schedule that
2  was provided by National Medical Care.  We looked
3  at this document a little bit yesterday and I
4  wanted to ask you some questions starting on the
5  second page under general comments.
6           I'll read it into the record.  If you
7  could follow along.  National Medical Care, Inc.
8  wrote "For reasons detailed below NMC opposes the
9  current proposal to establish payment limites for
10 drugs furnished incident to a physician's
11 services at 85 percent of average wholesale price
12 (AWP) as published in the Red Book."
13          And they go on to say on the next page
14 "The proposal is seriously flawed in its reliance
15 upon the principle of discounted Red Book price
16 as the determinant of Medicare's payment level
17 for drugs."
18          And they go on "Review of the OIG
19 studies of drug pricing to retail pharmacies (not
20 physicians' offices) relied upon by HCFA as
21 support for this proposal reveal that the
22 observed average discount of 15 percent hides

Page 313

1  drug-specific discounts ranging from 0.23 percent
2  to 42 percent below Red Book."
3           And do you recall if the -- let me back
4  up.  The 15 percent amount was something that
5  came from OIG's 1984 report?
6      A.  It came from -- yeah -- OIG surveys.
7  Yeah.
8      Q.  And do you recall that OIG had already
9  identified a range of drug-specific discounts?
10 The discount --
11     A.  I vaguely recall a range.  I think he
12 went and looked at individual drugs.
13     Q.  The next paragraph states "HCFA
14 acknowledges in its commentary that the Red Book
15 is simply unreliable as a real price data
16 source." Was that something that HCFA knew at the
17 time?
18     A.  Yes.
19     Q.  The next sentence says "While HCFA is
20 impressed by a class of drugs for which Red Book
21 AWP appears routinely to overstate real price,
22 albeit by greatly varying amounts" -- and it

Page 314

1  continues.  Was HCFA aware that the Red Book --
2  the difference between Red Book price and
3  acquisition cost could be -- could vary greatly
4  depending on the drug?
5      A.  We weren't -- we were only aware of
6  that based on the OIG information.  One of the
7  flaws is that -- and I think we acknowledged this
8  by our final policy -- we didn't have real
9  acquisition cost data.  So the point of the
10 policy was to say we were going to try to get it.
11 But I think the policy points to the fact that we
12 knew there was a problem.  We just didn't know
13 what the dimension of the difference was.
14     Q.  If we go to the sixth page under
15 summary and conclusions, NMC wrote "The
16 relationship between Red Book AWP and actual
17 purchase price is extraordinarily variable from
18 drug to drug and across different classes of
19 purchasers."  Was that something that HCFA was
20 aware of, that the relationship between Red Book
21 AWP and actual purchase prices was
22 extraordinarily variable?

Page 315

1      A.  Again, I don't think -- because we
2  lacked the data ourselves, we heard that but we
3  didn't have any sense that the -- you know, the
4  actual data.  So it says actual purchase prices.
5  We didn't have actual purchase prices.
6      Q.  But you had been advised that the
7  differences between Red Book and actual purchase
8  prices were extraordinarily variable?
9      A.  If you mean by advised that people gave
10 us that feedback, yes.  We got lots of comments -
11 - or we got some comments to that effect.  But
12 what -- you know, again, people -- as a
13 governmental agency people make a lot of
14 assertions in order to overturn a policy.
15 However, we believed it was a flawed source which
16 is why the policy came out the way it did saying
17 we wanted to collect better data.
18     Q.  And when you proposed reimbursing at 85
19 percent of AWP in your proposed rule, HCFA knew
20 there would be some drugs that it was still over-
21 reimbursing and some drugs that it was under-
22 reimbursing, correct?

11 (Pages 312 to 315)

Henderson Legal Services
202-220-4158

7b157f28-df3f-40ae-bc12-b3227fef509e

Buto, Kathleen - Vol. II                    September 13, 2007
                        Washington, DC

Page 316

1        MR. DRAYCOTT:  Objection.
2        MR. TORBORG:  We need to go off the
3   record.
4        THE VIDEOGRAPHER:  Off the record at
5   9:42.
6        (Recess).
7        THE VIDEOGRAPHER:  On the record at
8   9:45.
9   BY MR. TORBORG:
10      Q.  Apologies for that, Ms. Buto.
11      A.  No problem.
12      Q.  Before we had to go off the record, I
13  asked the question.
14         (Whereupon, the requested portion
15  was read by the reporter.)
16      MR. DRAYCOTT:  Objection, you may
17  answer.
18      A.  As I said, the basis for our going with
19  85 percent was the OIG's survey.  And the OIG
20  survey as I recall did show that there was a
21  variation or variance in the relationship between
22  AWP and actual acquisition cost for some drugs.

Page 317

1   So we knew there was a variance.  But that was
2   really based on a sample or a selected survey
3   that the OIG did.
4        We didn't have our own independent data
5   because we didn't collect data on acquisition
6   costs.  So we didn't know what the difference
7   was, and that's what led to the final policy.
8      Q.  And NMC in their comments also refers
9   to the fact that the relationship between AWP and
10  Red Book in purchase prices could vary across
11  different classes of purchasers?
12      A.  They do in their comments, yes.
13      Q.  And is that something that HCFA was
14  aware of?
15      MR. DRAYCOTT:  Objection.  And you may
16  answer.
17      A.  Again, because we didn't have our own
18  data we believed based on the OIG survey that
19  there was a variance, but we didn't have any way
20  to actually validate that, which is why the
21  policy came out saying that we intended to do
22  some surveys.

Page 318

1      Q.  Are you familiar with the concept of
2   differential pricing?
3      A.  Yes.
4      Q.  And what is that?
5      A.  In my understanding it's the ability to
6   charge -- the ability and the practice of
7   charging differential prices depending on the
8   nature of the customer relationship.  So for
9   example a high volume customer might get a better
10  deal than a smaller, low volume customer, would
11  be an example of it.
12      Q.  And that was something that HCFA had to
13  consider in forming its reimbursement policy; is
14  that right?
15      A.  Well, actually no.  And I should just
16  say that my understanding of differential pricing
17  really came after I left the government.  We in
18  HCFA -- it's hard for me to convey this.  But the
19  government is most concerned about overusing or
20  overpaying based on its responsibilities as a
21  steward of taxpayer dollars.  So the focus is
22  always on are we overpaying based on what we know

Page 319

1   we should be paying.  And in many cases the
2   knowledge is not perfect.
3        So that's different than coming at it
4   from the standpoint of we're a marketplace
5   player. Let's recognize certain attributes of the
6   market. That's not the way government regulators
7   look at these things.
8      Q.  But you would agree with me that HCFA
9   was advised at least by virtue of this comment
10  that there was extraordinarily variable prices
11  for drugs across different classes of purchasers?
12      MR. DRAYCOTT: Objection.  You may
13  answer.
14      A.  I don't -- this comment talks about
15  different classes of purchasers.  I'd have to go
16  find that.  Can you point me to that language?
17      Q.  Number 1 on page 6.  "The relationship
18  between Red Book AWP and actual purchase price is
19  extraordinarily variable from drug to drug and
20  across different classes of purchasers."
21      A.  Okay.  HCFA was advised through this
22  comment that that was the case.  But again,

12 (Pages 316 to 319)

Henderson Legal Services
202-220-4158

7b157f28-df3f-40ae-bc12-b3227fef509e