# Exhibit 88

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

# SUPPLEMENTAL ANALYSIS OF WHY THE UNITED STATES SHOULD DECLINE INTERVENTION IN

*UNITED STATES ex rel. VEN-A-CARE V. ABBOTT LABORATORIES, INC., et al.,*

C.A. No. 95-1354-CIV-GOLD (S.D. Fla.) (Under Seal)

Submitted on behalf of:

Abbott Laboratories, Inc.
Aventis Behring L.L.C.
Baxter Healthcare Corporation
Ben Venue Laboratories
Bristol Myers Squibb Company
Dey, L.P.
ESI Lederle, Inc.
Fujisawa Healthcare, Inc.
Glaxo Wellcome, Inc.
Immunex Corporation
Novartis Pharmaceuticals Corporation
Smithkline Beecham Pharmaceuticals
Warrick Pharmaceuticals Corp.

Dated: October 5, 2000

October 5, 2000

# SUPPLEMENTAL ANALYSIS OF WHY THE UNITED STATES SHOULD DECLINE INTERVENTION IN *UNITED STATES ex rel. VEN-A-CARE V. ABBOTT LABORATORIES, INC., et al.*, C.A. No. 95-1354-CIV-GOLD (S.D. Fla.) (Under Seal)

The Department of Justice (the "Department") has advised the undersigned drug manufacturers (the "Manufacturers") that they are defendants in a *qui tam* False Claims Act action filed in 1995 but still under seal in the United States District Court for the Southern District of Florida. According to the Department, the theory of the Complaint is that the Manufacturers caused their customers to file "false claims" for Medicare and Medicaid payment for drugs by providing the commercial pharmaceutical pricing services with "false" information concerning the "average wholesale price" ("AWP") of their drugs. The information was allegedly "false" because the Manufacturers regularly sold their drugs at discounts from AWP. As a result, the Manufacturers' customers received alleged "overpayments" from Medicare and Medicaid because their payments were based on "inflated", and therefore "false", AWPs.

On March 17, 2000, eleven of the Manufacturers submitted to the Department an Analysis of why the Department should decline to intervene in support of that Complaint. Because the Department has not yet responded to that Analysis, the Manufacturers do not know the Department's evaluation of that Analysis. The Relator has, however, produced a "Memorandum in Support of Government Intervention and in Response to Defendants' Arguments Against Government Intervention" (the "Relator's Response").[1]

---

[1] In their discussions with the Manufacturers, Department attorneys have mentioned that some state Medicaid programs pay for drugs based on wholesale acquisition cost ("WAC"), which those programs define in various ways. The Relator makes no effort to define WAC or to argue that any person submitted any allegedly false claim to any state Medicaid program that has used WAC as a basis for payment. Hence, our Analysis remains unrebutted.

1

Second, the Relator cannot prove that the Manufacturer "knowingly" provided "false" information as would be required for False Claims Act liability. Because the Relator's proposed definition of AWP has never before seen the light of day, none of the Manufacturers could have been aware of it.[14] The Relator tries to argue that the Manufacturers acted "knowingly" by pointing to how some of them purportedly have "marketed the spread", that is, told drug purchasers of the difference between their purchase price and what Medicare and Medicaid would likely pay. This argument misses the point. That some Manufacturers may have provided information concerning the differential between what their customers would pay for drugs and what Medicare and/or Medicaid would likely pay for those drugs has no bearing on the question of whether a Manufacturer "knew" it was providing "false" information by not providing transaction prices when it provided "AWP" information.

Third, the Relator cannot prove that AWPs are derived from information provided solely by the manufacturers. The federal and state governments decided to pay for drugs based on AWP as published by the commercial pricing services. This spring, First Data, the publisher of the Blue Book used by most state Medicaid programs, issued a Price Alert describing how it determines AWP by conducting surveys of drug wholesalers. In that Price Alert, First Data directly contradicted the theory of the Relator's Complaint:

> Many customers are under the impression that the manufacturer sets the AWP. This is not true.

(Emphasis added.) This year, the commercial pricing services have undertaken to revise their published prices in response to a request from state Medicaid programs. One state Attorney General described this revision as "First Data more effectively performing the task it is already required to perform."[15] The services could always have revised their published prices in the same manner as they have this year, if HHS or the state Medicaid agencies had asked.

---

[14] "Actual or constructive notice" of the definition would be required for government prosecution under the "Holder Guidelines." (See Memorandum dated June 3, 1998, from Eric H. Holder, Jr. to All United States Attorneys, et al., at paragraph (1)(A)(ii)(a).

[15] See letter to state Medicaid agencies dated February 16, 2000, from Jose Maldanado,

7