# Exhibit 89

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

89-4566

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NO. 89-4566

---

THE STATE OF LOUISIANA,

                              Petitioner,

        v.

THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

                              Respondent.

---

Appeal from The Final Decision of
the Secretary of Health and Human
Services Disapproving Louisiana
State Plan Amendment No. 87-33
HHS #88-11

---

BRIEF FOR RESPONDENT

---

                    JOHN VOLZ
                    United States Attorney
                    Eastern District of Louisiana

                    DONALD F. DICKEY
                    Attorney
                    United States Department of
                      Health and Human Services
                    Room 500 East High Rise Building
                    6325 Security Blvd.
                    Baltimore, MD  21207
                    (301) 965-8861
                    (FTS) 625-8861

OF COUNSEL:

MICHAEL J. ASTRUE
General Counsel

DARREL GRINSTEAD
Chief Counsel

United States Department of
  Health and Human Services

U. S. COURT OF APPEALS
**FILED**

JAN 1 6 1990

GILBERT. F. GANUCHEAU,
CLERK

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NO. 89-4566

---

THE STATE OF LOUISIANA,

                              Petitioner,

        v.

THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

                              Respondent.

---

Appeal from The Final Decision of
the Secretary of Health and Human
Services Disapproving Louisiana
State Plan Amendment No. 87-33
HHS #88-11

---

BRIEF FOR RESPONDENT

---

JOHN VOLZ
United States Attorney
Eastern District of Louisiana

DONALD F. DICKEY
Attorney
United States Department of
  Health and Human Services
Room 500 East High Rise Building
6325 Security Blvd.
Baltimore, MD  21207
(301) 965-8861
(FTS) 625-8861

OF COUNSEL:

MICHAEL J. ASTRUE
General Counsel

DARREL GRINSTEAD
Chief Counsel

United States Department of
  Health and Human Services

## STATEMENT REGARDING ORAL ARGUMENT

The Medicaid program and the drug reimbursement regulations promulgated thereunder are extremely complex.  In addition, the issues and policies involved in this case have national significance.  Therefore, in the opinion of counsel, oral argument is warranted.

.

TABLE OF CONTENTS

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . 2

    I.    Course of Proceedings and Disposition in
        Administrative Hearing Below. . . . . . . . . . . . . 2

    II.   Statement of Facts. . . . . . . . . . . . . . . . . . 3

        A.    Statutory and Regulatory Background. . . . . . . 3

        B.    The Secretary's Policy With Regard To Use Of
            Published AWP In Determining The Upper Limit. .  8

        C.    The Disapproval of Louisiana State Plan
            Amendment No. 87-33. . . . . . . . . . . . . . 15

        D.    The HCFA Administrator's Decision. . . . . . . 16

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    THE DECISION OF THE ADMINISTRATOR DISAPPROVING LOUISIANA
    STATE PLAN AMENDMENT NO. 87-33 IS REASONABLE AND
    CONSISTENT WITH THE MEDICAID STATUTE AND REGULATIONS. . 20

        I.    Standard of Review. . . . . . . . . . . . . . 20

        II.   The Administrator Properly Found That Use Of The
            Published Average Wholesale Price (AWP) Is Not A
            Reasonable "Best Estimate" Of The Price Generally
            Paid By Pharmacies For Prescription Drugs. . . 21

            A.    The Weight of Evidence Demonstrates That AWP
                Significantly Overstates The Prices That
                Providers Pay for Drug Products. . . . . . 22

            B.    The Secretary Has Followed A Consistent
                Policy Against Use Of Published AWP Under
                The Upper Limits Regulations. . . . . . 24

C.   The Secretary Properly Exercised His
     Authority To Assure That States Do Not
     Establish The Upper Limit Based On Pricing
     Methods That Have Been Shown To Be
     Inaccurate.  . . . . . . . . . . . . . . . 30

D.   The State Cannot Use AWP In Determining The
     Upper Limit Simply Because Other Features In
     Its Plan Constrain Costs. . . . . . . . . 34

E.   The Secretary's Policy Against Use Of AWP In
     Determining the Upper Limit Applies To All
     States. . . . . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 42

TABLE OF AUTHORITIES

**CASES**

Alcaraz v. Block, 746 F.2d
593 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . 29

American Hospital Ass'n v. Bowen,
834 F.2d 1037 (D.C. Cir. 1987) . . . . . . . . . . . . . . 29

American Medical Ass'n v.
Mathews, 429 F. Supp. 1179 (N.D. Ill. 1977) . . . . . . . . . 5

Arkansas Pharmacists Ass'n v.
Harris, 627 F.2d 867 (8th Cir. 1980)  . . . . . . . . .   5, 24, 40

Atkins v. Rivera, __ U.S. __,
106 S. Ct. 2456 (1986) . . . . . . . . . . . . . . . . . 4

Batterton v. Marshall,
648 F.2d 694 (D.C. Cir. 1980) . . . . . . . . . . . . . . 33

Cabais v. Egger,
690 F.2d 234 (D. C. Cir. 1982)  . . . . . . . . . . . . . 34

Chevron U.S.A., Inc. v. Natural
Resources Defense Council, Inc.,
467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . 20, 40

Cieutat v. Bowen,
824 F.2d 348 (5th Cir. 1987)  . . . . . . . . . . . . . 20, 21

Citizens to Preserve Overton Park, Inc.
v. Volpe, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . 20

District of Columbia Podiatry Society
v. District of Columbia,
407 F. Supp. 1259 (D.D.C. 1975) . . . . . . . . . . . . . 4

Harris v. McRae,
448 U.S. 297 (1980) . . . . . . . . . . . . . . . . . . 4

Homan & Crimen, Inc. v. Harris,
626 F.2d 1201 (5th Cir. 1980), cert.
denied, 450 U.S. 975 (1981) . . . . . . . . . . . . . 20, 29

Homemakers North Shore, Inc. v. Bowen,
832 F.2d 408 (7th Cir. 1987)  . . . . . . . . . . . . . . . 27

iv

<u>Johnson's Professional Nursing Home v.</u>
   <u>Weinberger,</u>
   490 F.2d 841 (5th Cir. 1974) . . . . . . . . . . 20

<u>Lewis v. Hegstrom,</u>
   767 F.2d 1371 (9th Cir. 1985) . . . . . . . . . . 4

<u>Mercy Hospital of Laredo v. Heckler,</u>
   777 F.2d 1028 (5th Cir. 1988) . . . . . . . . . . 20, 21

<u>National Ass'n of Chain Drug</u>
   <u>Stores, Inc. v. Bowen,</u>
   [1989-2 Transfer Binder] Medicare &
   Medicaid Guide (CCH) ¶ 37,871 (April
   12, 1989) . . . . . . . . . . . . . . . . . 5, 24, 39

<u>New York Dept. of Social Services v. Bowen,</u>
   835 F.2d 360 (D.C. Cir. 1987),
   <u>cert. denied,</u> ___ U.S. ___,
   108 S. Ct. 2820 (1988) . . . . . . . . . . . . . 27

<u>Ostrow Pharmacies, Inc. v. Beal,</u>
   394 F. Supp. 22 (E.D. Pa. 1975),
   <u>aff'd mem.</u>, 527 F.2d 645 (3rd Cir. 1976) . . . . . . . . . . . 5

<u>Pennsylvania Pharmaceutical Ass'n</u>
   <u>v. Dept. of Public Welfare,</u>
   542 F. Supp. 1349 (W.D. Pa. 1982) . . . . . . . . . . . . 5, 24

<u>Pharmacist Political Action Committee</u>
   <u>of Maryland (PHARMPAC) v. Harris,</u>
   502 F. Supp. 1235 (D. Md. 1980) . . . . . . . . . . . . 5

<u>Schweiker v. Gray Panthers,</u>
   453 U.S. 34 (1981) . . . . . . . . . . . . . . 4

<u>Schweiker v. Hogan,</u>
   457 U.S. 569 (1982) . . . . . . . . . . . . . . 4

<u>Udall v. Tallman,</u>
   380 U.S. 1 (1965) . . . . . . . . . . . . . . . 20


**STATUTES**

42 U.S.C. §§1316(a)(1) . . . . . . . . . . . . . . 4

42 U.S.C. §1316(a)(3) . . . . . . . . . . . . 1, 2, 3, 4, 5

42 U.S.C. §1396 <u>et seq.</u> . . . . . . . . . . . . . . 4, 5

42 U.S.C. §1396a . . . . . . . . . . . . . . . . 4

v

42 U.S.C. §1396c . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. §706(2)(A) . . . . . . . . . . . . . . . . . . . 20


Medicare Catastrophic Coverage Act,
    Pub. L. No. 100-360 (1988), repealed,
    Pub. L. No. 101-234 (1989) . . . . . .  . . . . . . . . . . . . . 23

## REGULATIONS

42 C.F.R. §430.0 et seq. (1988) . . . . . . . . . . . . . 4

42 C.F.R. §430.10 . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. §430.15 . . . . . . . . . . . . . . . . . . 4, 5

42 C.F.R. §§430.18 . . . . . . . . . . . . . . . . . . . . 5

42 C.F.R. §430.30 . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. §430.60 et seq. . . . . . . . . . . . . . . . . 5

42 C.F.R. §447.300 et seq. . . . . . . . . . . . . . . . 18

42 C.F.R. §447.301 . . . . . . . . . . . . . . 16, 21, 22, 27, 31, 38

42 C.F.R. §447.331(b) . . . . . . . . . . . . . . . 7, 22, 36

42 C.F.R. §447.332(b) . . . . . . . . . . . . . . . 7, 40, 41

42 C.F.R. §447.333 . . . . . . . . . . . . . . . . . 31, 33, 39

45 C.F.R. § 19.5 (1986) . . . . . . . . . . . . . . . . . 7

34 Fed. Reg. 1244 (January 25, 1969) . . . . . . . . . . . . 6

39 Fed. Reg. 41,480 (November 27, 1974) . . . . . . . . . 8, 25, 38

40 Fed. Reg. 34,516 (August 15, 1975) . . . . . . . . . . 8, 25, 40

51 Fed. Reg. 29,560 (August 19, 1986) . . . . . . . . . . . 14, 26

52 Fed. Reg. 28,648 (July 31, 1987) . . . . . . . . 7, 14, 30, 31, 33

**MISCELLANEOUS**

In re: The Disapproval of Louisiana State Plan
    Amendment No. 87-33, No. 88-11 (HCFA
    Administrator June 9, 1989)  . . . . .  . . . . . . . . . . PASSIM

Fed. R. App. P. 15 . . . . . . . . . . . . . . . . . . . . . . . .42

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NO. 89-4566

THE STATE OF LOUISIANA,

Petitioner,

v.

THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

Respondent.

Appeal from The Final Decision of
the Secretary of Health and Human
Services Disapproving Louisiana
State Plan Amendment No. 87-33
HHS #88-11

BRIEF FOR RESPONDENT

STATEMENT OF JURISDICTION

The statutory basis of the jurisdiction of this Court is 42
U.S.C. §1316(a)(3).  That statute provides for review by the
United States Courts of Appeals of a final determination of the
Secretary disapproving a state plan for failure to comply with
the requirements for federal approval.

1

## STATEMENT OF ISSUES

Whether the Administrator properly disapproved Louisiana State Plan Amendment 87-33, which provides for the use of average wholesale prices (AWPs) reported in national drug pricing compendia as the State's best estimate of the prices that pharmacies are paying for prescription drugs, when the great weight of evidence shows that published AWPs significantly overstate the prices paid by pharmacies.

## STATEMENT OF THE CASE

I.   Course of Proceedings and Disposition in Administrative Hearing Below.

This case presents a challenge by the State of Louisiana ("the State") to a final determination of the Secretary of Health and Human Services ("the Secretary") disapproving an amendment to the State's Medicaid state plan that was submitted to bring the state plan into compliance with certain federal requirements governing drug reimbursement.  See 42 U.S.C. §1316(a)(3).  The Secretary's final decision was rendered by the Administrator of the Health Care Financing Administration ("HCFA") after a reconsideration hearing held pursuant to 42 U.S.C. §1316(a)(2).[1]

Louisiana State Plan Amendment No. 87-33 was disapproved by HCFA by a notice dated May 12, 1988.  Administrative Record, p.

---

[1] The Secretary has delegated authority for carrying out the federal duties under the Medicaid statute to the Administrator of HCFA, an agency within HHS.

2

1142 ("A.R. 1142").[2]  Louisiana filed a request for

reconsideration of the disapproval on July 1, 1988.  A.R. 1145.

On August 4, 1988, the Administrator published a notice in the

Federal Register announcing the date of an administrative hearing

to reconsider the disapproval decision, the issues presented, and

the timetable for participation by interested parties.  A.R.

1613-14.  The State and three pharmaceutical associations

participated in the reconsideration hearing.  A.R. 5-6.  The

hearing officer issued a decision on December 29, 1988

recommending that the state plan amendment be disapproved.  A.R.

2.  Exceptions to the recommended decision were filed by the

State and the pharmaceutical associations.  A.R. 2.  On June 9,

1989, the HCFA Administrator issued his final decision upholding

disapproval of the state plan amendment.  In re: The Disapproval

of Louisiana State Plan Amendment No. 87-33, No. 88-11 (HCFA

Administrator June 9, 1989), A.R. 2-9.  The State then filed a

petition for review by this Court pursuant to 42 U.S.C.

§1316(a)(3).

II.  Statement of Facts.

      A.   Statutory and Regulatory Background.

      The Medicaid program, provided for under Title XIX of the

Social Security Act, is a cooperative federal-state program to

furnish medical assistance to eligible low-income individuals.

---

        [2] All references will be to the original record on review.
However, for the Court's convenience, the Secretary has provided
an appendix containing exerpts of essential materials in the
record.

42 U.S.C. §1396 <u>et seq</u>. <u>See Atkins v. Rivera</u>, __ U.S. __, 106
S.Ct. 2456, 2458 (1986); <u>Schweiker v. Hogan</u>, 457 U.S. 569, 571
(1982); <u>Harris v. McRae</u>, 448 U.S. 297, 301 (1980). The program
is jointly financed by the federal and state governments and is
administered by the states. <u>Id</u>. While the Medicaid program is
voluntary, states which choose to participate must submit a
"state plan" that fulfills the requirements imposed by the
Medicaid statute and other requirements imposed by the Secretary.
42 U.S.C. §1396a. <u>See Schweiker v. Gray Panthers</u>, 453 U.S. 34,
36-37 (1981); <u>Harris v. McRae</u>, 448 U.S. at 301. <u>See also</u> 42
C.F.R. §430.0 <u>et seq</u>. (1988). The state plan must be approved by
the Secretary. 42 U.S.C. §1316(a)(1); 42 C.F.R. §430.10. Upon
approval of the state plan, the state becomes entitled to
reimbursement by the federal government, termed "federal
financial participation" (or "FFP"), for a portion of its
payments to providers furnishing services to Medicaid recipients.
42 U.S.C. §1396b(a); 42 C.F.R. §430.30.

The Secretary is charged with responsibility to ensure that
state plans (including plan amendments and administrative
practices under the plans) originally meet and continue to meet
the federal requirements. 42 U.S.C. §§1316(a)(1), 1396a, 1396c;
42 C.F.R. §430.15. States have considerable discretion to design
and operate their individual programs, but they must maintain
their plans in compliance with the federal requirements. <u>See</u>
<u>Lewis v. Hegstrom</u>, 767 F.2d 1371, 1373 (9th Cir. 1985); <u>District</u>
<u>of Columbia Podiatry Society v. District of Columbia</u>, 407 F.

Supp. 1259, 1264 (D.D.C. 1975).  This **rule fully applies** in the
context of Medicaid plan provisions providing for prescription
drug reimbursement.[3]  If, on reviewing a state plan amendment,
the Secretary determines that the amendment does not meet the
federal requirements, he issues a disapproval.  42 C.F.R.
§§430.15(c).  A state may seek administrative and judicial review
of these disapproval determinations.  See 42 U.S.C. §1316(a)(2),
(c); 42 C.F.R. §§430.18, 430.60 et seq.

State plans for implementing Medicaid must, among other
things, "provide such methods and procedures relating to the
utilization of, and payment for, care and services available
under the plan . . . as may be necessary . . . to assure that
payments are consistent with efficiency, economy, and quality of
care."  42 U.S.C. §1396a(a)(30)(A).  If a state provides
prescription drug coverage, its plan must provide for payments
that are in accordance with that standard.  See Arkansas
Pharmacists Ass'n, 627 F.2d at 869; Pennsylvania Pharmaceutical
Ass'n, 542 F. Supp. at 1353.  See National Ass'n of Chain Drug
Stores, Inc. v. Bowen, [1989-2 Transfer Binder] Medicare &
Medicaid Guide (CCH) ¶ 37,871, at 20,099 (April 12, 1989) (Copy
in Respondent's Appendix).  To implement this requirement, the

---

[3] See Arkansas Pharmacists Ass'n v. Harris, 627 F.2d 867,
869 (8th Cir. 1980); Pennsylvania Pharmaceutical Ass'n v. Dept.
of Public Welfare, 542 F. Supp. 1349, 1353 (W.D. Pa. 1982);
Pharmacist Political Action Committee of Maryland (PHARMPAC) v.
Harris, 502 F. Supp. 1235, 1243 (D. Md. 1980); American Medical
Ass'n v. Mathews, 429 F. Supp. 1179, 1194 (N.D. Ill. 1977);
Ostrow Pharmacies, Inc. v. Beal, 394 F. Supp. 22, 25 (E.D. Pa.
1975), aff'd mem., 527 F.2d 645 (3rd Cir. 1976).

Secretary has, on three occasions, promulgated regulations governing the maximum amounts of state expenditures for prescription drugs that HCFA will recognize in paying FFP to the states.

In 1969, the Secretary provided that the upper limit on state prescription drug expenditures would be the lower of "cost as defined by the state plus a dispensing fee" or "customary charges which are reasonable." 34 Fed. Reg. 1244 et seq. (January 25, 1969), codified at 45 C.F.R. §250.30(b)(2) (1970), A.R. 1006.

In 1975, the Secretary revised the regulations to provide that the upper limit would be based on the lower of "the cost of the drug plus a dispensing fee" or "the provider's usual or customary charge to the general public." 40 Fed. Reg. 34,516 et seq. (August 15, 1975); codified at 45 C.F.R. §250.30(b)(2) (1976), A.R. 1015. To contain federal spending on prescription drugs, the regulations established specific requirements governing what states could determine to be the "cost of the drug" under the cost-plus-dispensing-fee limit. Id., A.R. 1012. These requirements divided drugs into two categories: (1) certain commonly dispensed multiple-source drugs[4] and (2) all other drugs. Id., A.R. 1012-15.

For the multiple-source drug category, "cost" was defined as the lower of either the maximum allowable cost ("MAC") or the

---

[4] Multiple-source drugs are drugs that are available under different brand names or both under a brand name and in generic form.

6

estimated acquisition cost ("EAC").  Id.  The MAC was the lowest
price at which a drug product was widely and consistently
available for purchase by pharmacists, as determined by a
Pharmaceutical Reimbursement Board pursuant to procedures set
forth at 45 C.F.R. § 19.5 (1986).  Id.  The EAC was defined as
"the State's closest estimate of the price generally and
currently paid by providers" for a drug.  Id.  For the "other
drugs" category, comprised of multiple-source drugs not on the
federal MAC list and single-source drugs, the "cost of the drug"
was simply the EAC.  Id.  It is the application of the EAC limit
in the context of "other drugs" that is involved in this case.

In 1987, the Secretary further revised the upper limit
regulations.  52 Fed. Reg. 28,648 et seq. (July 31, 1987),
codified at 42 C.F.R. §447.332 (1988), A.R. 1057.  For the "other
drugs" category, the final rule retained the mechanism that had
been in place since the 1975 final rule -- the lower of EAC-plus-
dispensing-fee or customary charges.  42 C.F.R. §447.331(b).
However, while retaining this familiar mechanism, the final rule
made one significant variation.  The rule provided that this
upper limit would now apply on an aggregate rather than a drug-
specific basis.  Id.[5]

---

[5] The main purpose of the 1987 final rule was to replace the
cumbersome MAC system with a simple formula, under which HCFA
establishes ingredient cost for specified multiple-source drugs
at 150% of the lowest price published in drug price compendia.
42 C.F.R. §447.332(b).  In addition, the 1987 rule provided that
this new upper limit (HCFA-established cost plus state's
dispensing fee) would apply on an aggregate basis rather than on
a prescription-by-prescription basis.  Id.  This upper limit for
certain multiple-source drugs is not involved in this case.

B.   The Secretary's Policy With Regard To Use Of
     Published AWP In Determining The Upper Limit.

HCFA's predecessor in the administration of the Medicaid
program, the Social and Rehabilitation Service (SRS), first
adopted EAC as a specific upper limit requirement in 1975, in an
effort to achieve federal savings.  40 Fed. Reg. 34,516 et seq.,
A.R. 1015.  In the proposed rule, the SRS noted that most states
defined drug "cost" under the upper limit as AWP or other
standard prices that were "frequently in excess of actual
acquisition costs to the retail pharmacist."  39 Fed. Reg. 41,480
(November 27, 1974), A.R. 1009.  The SRS proposed to obtain
program savings by requiring use of actual acquisition cost for
the "cost" component of the upper limit.  Id.  When several
commenters suggested that AWP would be a better standard, the
Secretary responded that AWP was not acceptable because "AWP data
are frequently inflated."  40 Fed. Reg. 34,518 (August 15, 1975),
A.R. 1014.  While the increased audit and administrative expense
involved in determining actual acquisition cost led the SRS to
modify its proposal in the final rule, the EAC standard that was
adopted was defined as "the State's closest estimate of the price
generally and currently paid by providers."  Id., A.R. 1014,
1015.

In July 1976, the year in which the 1975 rule became
effective, the Department sent a memorandum to states enclosing
drug pricing data to assist them in determining their EACs.  A.R.
222.  The memorandum emphasized that this pricing data was being
furnished only "as guide material" and that it was still "each

8

State's responsibility to determine estimated acquisition costs
(EAC) as closely as feasible to actual acquisition costs."   Id.
In December 1977, the Department sent an action transmittal to
states which stated that although the regulations did not require
states to limit drug cost to actual acquisition cost, "the intent
of those regulations is to have each State's estimate be as close
as feasible to the price generally and currently paid by the
provider." A.R. 222-23.  According to this transmittal, the
Department was "not convinced" that those states which continued
to reimburse at average wholesale price (AWP) had "made a real
effort to approach AAC [actual acquisition cost]." Id.  It
suggested that states might make their EAC's more accurate by
reducing AWP by a percentage or by using the direct prices of
certain manufacturers.[6] Id.  A recommendation that states reduce
AWP by a percentage was also included in draft guidelines on the
drug upper limits that were circulated to states in 1977.  A.R.
671.

In June 1984, the Office of Inspector General ("OIG")
published a lengthy report of an audit of pharmacy drug purchases
in six states, entitled "Changes to the Medicaid Prescription
Drug Program Could Save Millions."  Office of Inspector General,
Audit No. 06-40216, A.R. 633-72 ("OIG Report").  The OIG report
found that 99.6 percent of the 3,469 pharmacy purchases audited

---

[6] The direct price is the price at which a manufacturer with
a direct-to-retailer distribution system will sell a product
directly to a pharmacist, bypassing the wholesaler in the channel
of distribution.

were made at prices averaging about 15.93 percent below AWP, as a
result of purchase and trade discounts that were routinely
available to purchasing pharmacies. A.R. 643.  The report found
that the availability of discounts was not affected by the
location or size of towns where pharmacies were located, nor by
the types of ownership (chain-owned or independent).  Id.  The
OIG found that, as of 1984, 27 states used AWP primarily in
establishing their reimbursement and 20 other states used AWP to
a great extent.  A.R. 637.  Consequently, the OIG concluded that
"the findings presented in this report demonstrate that the
methods used nationwide in determining EAC have predominantly
resulted in drug reimbursement limits that are significantly
higher than the prices pharmacies generally pay for their drugs."
A.R. 656.

The OIG report made a number of recommendations to HCFA.
A.R. 657.  Among other things, the OIG recommended that HCFA
provide guidance and work with State agencies in developing
alternative methods for determining EAC that would more closely
approximate the prices pharmacies pay for drugs.  Id.  The OIG
also recommended that HCFA revise the upper limit regulations to
include a specific prohibition on use of AWP in establishing the
EAC.  Id.

HCFA generally agreed with the OIG's findings.  A.R. 669.
However, in its comments on the draft report, HCFA maintained
that it was premature to preclude state reliance on AWP in
determining EAC until alternative pricing mechanisms were

10

developed.  A.R. 670.  HCFA also stated that it was not prepared
to propose any changes in the regulations until the Secretary had
made a decision on the report of a Task Force appointed to review
prescription drug regulations for federally funded health
programs.  A.R. 669.   HCFA did agree, though, to explore
alternative data sources for use in determining acquisition
costs, and to advise states of the problems with AWP and to
suggest alternatives.  A.R. 670.  HCFA mentioned as one possible
alternative that AWP might be reduced by a certain percentage to
reflect purchase discounts not reflected in Red Book prices.  Id.
HCFA agreed that steps were needed to provide additional
direction to states on establishing reasonable EAC levels.  A.R.
671.

Around June 1984, the same month in which the OIG report was
issued, HCFA's central office began formulating policy for an
"EAC Initiative" that was to "focus specifically on examining the
levels of reimbursement that states employ for prescription drugs
under the Medicaid program."  A.R. 1196.  In September 1984, HCFA
sent the OIG audit report to all state Medicaid agencies to make
them aware of the potential savings that would result "if States
will make a greater effort to determine more closely the price
pharmacists pay for drugs rather than using AWP."  A.R. 633.
HCFA's cover letter conveyed the OIG's finding -- described at
the time as "contrary to widely held beliefs" -- that purchase
discounts were "taken by pharmacies in all areas of the states in

11

the audit, regardless of population, by both chain-owned and independently-owned pharmacies." Id.[7]

Meanwhile, staff in HCFA's regional office in Region VI (comprising Arkansas, Louisiana, New Mexico, Oklahoma, and Texas) conducted reviews of pharmacy purchasing prices in Louisiana, New Mexico, Oklahoma, and Texas which provided further evidence, in HCFA's opinion, that AWP significantly overstates prices paid by providers.  A.R. 198, 1466-67.  The regional office also convened a region-level workgroup, composed of HCFA regional office staff and staff from state Medicaid agencies, which met in November 1984 and January 1985 to examine the use of AWP as the EAC and to develop alternative methods that could be used in arriving at more accurate estimates.  See A.R. 1538, 1550.

In a letter sent the National Association of Retail Druggists in April or May of 1985, the HCFA Administrator expressed HCFA's view that use of AWP as a drug upper limit was "not consistent with the federal requirements."  A.R. 198.  The Administrator explained, however, that HCFA's policy was to make states aware of alternatives to AWP, and not to mandate any specific approach.  Id.

On September 4, 1985, a conference call was held between senior HCFA central office officials and the ten HCFA regional office administrators to make sure that all of the regional

---

[7] According to HCFA correspondence in 1985, before the OIG's audit of drug pricing practices, HCFA was "unaware of the great discrepancy between published AWPs and the price providers generally pay for drug products."  A.R. 1535-36, 1549.

offices were following the policy on EAC that had been decided on
by senior HCFA management.  A.R. 1196.  Under that policy,
"states were to be free to develop and adopt any method of drug
pricing that resulted in a more accurate reflection of providers'
cost since no specific methodology developed at the federal level
was mandated."  Id.

On September 17, 1985, a model letter concerning EAC policy
was sent at the direction of HCFA central office officials to
HCFA regional offices, to be immediately transmitted to states.
A.R. 1197-98.  The purpose of the letter was "to clear up
inconsistencies or errors in policy that may earlier have been
implied by some regional officials to states" and "to dispel the
notion that states were required to adopt any particular
methodology to achieve the objective of a more accurate drug
pricing methodology."  A.R. 1197-98.  See A.R. 1192, 1552.

The letter expressed HCFA's view that, in light of the OIG
audit findings, "States that rest solely on AWPs can no longer do
so and still claim that they are applying their best estimate to
determining prescription drugs costs as required by [the EAC
regulation] unless they can provide other evidence that supports
a contrary conclusion."  A.R. 1552.  In addition, the letter
stated that while HCFA was not mandating any particular method
for prescription drug reimbursement, each state was expected to
examine its drug pricing methodology with an eye toward
developing methods that would reflect more accurately than AWPs
the prices generally paid by pharmacists for drugs.  A.R. 1197,

13

1552-53.  The letter advised that states were free to develop
alternative approaches to those recommended by HCFA if the
alternative methodology was supported by documentation showing
that it accurately reflected provider purchasing patterns.  A.R.
1553.

During 1986 and 1987, a rulemaking proceeding was conducted
to consider three proposals for revising the Department's drug
reimbursement regulations.  See 51 Fed. Reg. 29,560 (August 19,
1986), A.R. 1029.  One of the options would have eliminated the
EAC requirement altogether.[8]

In 1987, HCFA revised the upper limit regulations and
decided, ultimately, to retain the EAC provision.  52 Fed. Reg.
28,657, A.R. 1066.  Two weeks after these regulations became
effective, the Under Secretary of the Department explained to an
officer of a major pharmaceutical association that, because AWP
"seldom represents true costs," an EAC relying on AWP was
"unlikely" to be accepted without "some reasonable discount."
A.R. 40.

_____

[8] The proposed rule set forth three options.  Two of the
options would have replaced or revised the federal MAC program
affecting certain multiple-source drugs, but they proposed to
continue unchanged the upper limit mechanism applicable to the
"other drugs' category -- namely, the lower of EAC-plus-
dispensing-fee or customary charges.  Id., A.R. 1032-38.  The
third proposed option would have eliminated both the federal MAC
program and the EAC limit, by adopting a single upper limit based
solely on the individual pharmacist's retail charge, with a
special discount on single source drugs of 5 or 10 percent "to
maintain the level of savings achievable under the EAC
requirement."  Id., A.R. 1039, 1038-42.

14

C.   The Disapproval of Louisiana State Plan
     Amendment No. 87-33.

Louisiana State Plan Amendment No. 87-33 was submitted to
HCFA in October 1987 to bring the state plan into compliance with
the 1987 revisions in the upper limit regulations.  A.R. 4, 1083,
1096.  The amendment proposed to define EAC as "the Average
Wholesale Price of the drug dispensed," as reported by the
American Druggist Blue Book or other national compendia of drug
prices.  A.R. 1087.

On December 11, 1987, the HCFA regional office processing
the amendment sent a letter to the State requesting additional
information needed to complete review.  A.R. 1114.  The letter
requested the State Medicaid agency to "explain how you concluded
that AWP is your best estimate of the price generally and
currently paid by providers for drug products."  A.R. 1115.  On
February 12, 1988, the State responded that "[r]eviews conducted
by the State Agency indicate that Blue Book tape data is a
reliable indicator of the prices charged by wholesalers
throughout the State.  A.R. 1121.  The letter stated that to the
extent some providers received discounts from manufacturers and
wholesalers, the State would account for those discounts when
establishing the dispensing fee.  Id.

On May 16, 1988, the HCFA Administrator informed the State
that its state plan amendment was being disapproved for lack of
compliance with the federal regulations.  A.R. 1142.  The
Administrator explained the basis for the disapproval as follows:

15

> We believe there is a preponderance of evidence that
> demonstrates that AWP significantly overstates the
> price that pharmacy providers actually pay for drug
> products and, thus, is not "the price generally and
> currently paid by providers."  The continued use of AWP
> results in significant potential overpayments to
> pharmacy providers.  Consequently, the proposed state
> plan amendment violates 42 C.F.R. §447.301 and section
> 1902(a)(30) of the Social Security Act, requiring that
> State payments comply with efficiency, economy, and
> quality of care.

A.R. 1142.  Louisiana then filed a request for reconsideration of

the decision, and the matter proceeded as set out above at pages

2-3.

> D.   The HCFA Administrator's Decision.

The HCFA Administrator sustained HCFA's disapproval after a

reconsideration hearing.  A.R. 2-9.  In his decision, the

Administrator found that "an unmodified AWP does not meet the

regulatory requirements of EAC" based on the evidence in the

hearing record showing that AWP significantly overstates the

prices actually paid by pharmacists.  A.R. 8.  The Administrator

noted that throughout the reconsideration proceedings, "neither

the State nor the Intervenors challenged the conclusion that AWP

overstates the prices actually paid."  Id.  The Administrator

recounted the history of HCFA's interpretation of the EAC

regulation and found that, since 1975, HCFA had a consistent

policy to move states away from use of published AWP.  A.R. 6-7.

The Administrator rejected the argument by the State that the

hearing officer had failed to take into account the cost-reducing

effect on drug payments of Louisiana's Maximum Allowable Cost

(LMAC) program.  A.R. 8.  The Administrator pointed out that the

16

issue was the effectiveness of the EAC in approximating cost for the drugs that were subject to it.  A.R. 8.  He noted that "[i]f EAC had been set at a level lower than AWP, the average reimbursement would have better approximated the acquisition cost for those drugs subject to it."  A.R. 9.  Finally, the Administrator responded to the State's concern that other states' plans using an unmodified AWP as the EAC had been approved by HCFA.  Id.  The Administrator concluded that "the correct approach to this apparent inconsistency is to initiate change to those other State plans rather than to approve another plan with an improper EAC."  Id.

### SUMMARY OF ARGUMENT

The fundamental issue in this case is whether the Secretary has reasonably determined that, absent supporting documentation, Louisiana's Medicaid program cannot rely on the average wholesale prices (AWPs) reported in national drug pricing compendia as its "best estimate" of the drug prices paid by pharmacies.  The Secretary's position is clearly reasonable because the overwhelming weight of evidence in the record shows that published AWPs significantly overstate drug prices.  Because the State of Louisiana has presented virtually no evidence to the contrary, Louisiana State Plan Amendment No. 87-33 was disapproved.

The federal Medicaid regulations establish a system for determining the maximum amounts of state expenditures for prescription drugs that will be recognized by the Secretary in

17

paying FFP.  See 42 C.F.R. §447.300 et seq.  A state cannot claim
federal reimbursement for expenditures that exceed these upper
limits.  One of the federal upper limits restricts payment for
the ingredient cost of prescription drugs to the "estimated
acquisition cost" (EAC), which is defined as the state Medicaid
agency's "best estimate of the price generally and currently paid
by providers."  The Secretary has always interpreted the EAC
requirement to require that states approximate as closely as
feasible the actual prices paid by pharmacists in light of the
best available information concerning these prices.  Moreover, he
has always viewed the use of AWP in establishing the EAC as
inconsistent with the intent of the Medicaid regulations.

     Prior to around 1984, the Secretary lacked cumulative, well-
documented evidence affirmatively demonstrating that AWP was in
fact not an accurate measure of the prices generally paid by
providers.  Because the Medicaid program is administered by the
states, state assurances of compliance with federal requirements
are presumed valid absent clear indications to the contrary.
Consequently, in the absence of firm evidence to support his
position, the Secretary attempted to move states away from use of
AWP through a strategy of technical assistance and encouragement
that was largely unsuccessful.

     In June 1984, these circumstances changed dramatically when
the Secretary's Office of the Inspector General issued a report
based on an extensive audit of pharmacy purchasing practices.
The OIG audit provided, for the first time, carefully documented

18

evidence that average wholesale prices significantly overstate the prices that pharmacies actually pay for drugs.  The OIG found that virtually all states relied on AWP primarily or to a great extent in establishing reimbursement.  As a direct result of this report, HCFA launched a major program initiative to examine on a state-by-state basis the price-setting methods used by states in establishing their EACs.  HCFA made clear that, in light of the clear evidence showing that AWP did not reflect actual drug prices, it would no longer be acceptable for a state to base its "best estimate" of drug prices on published AWP without providing valid documentation to support its position.  This approach was consistent with the structure of the Medicaid program, under which a state may be required to furnish documentation if HCFA has a problem with a state's representation that it has complied with the federal requirements.

The State of Louisiana and the intervenors have not attempted to show that AWP is an accurate indicator of drug prices in Louisiana.  Instead, they argued that the Secretary's disapproval is invalid for other reasons.  However, none of these arguments has merit, and the Secretary's reconsideration decision disapproving Louisiana State Plan Amendment No. 87-33 must be upheld.

<u>ARGUMENT</u>

<u>THE DECISION OF THE ADMINISTRATOR DISAPPROVING LOUISIANA
STATE PLAN AMENDMENT NO. 87-33 IS REASONABLE AND
CONSISTENT WITH THE MEDICAID STATUTE AND REGULATIONS.</u>

I.   <u>Standard of Review.</u>

In this challenge to a final administrative decision, the
standard of judicial review is the familiar, highly deferential
standard of the Administrative Procedure Act, under which the
decision must be upheld unless "arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law."  5
U.S.C. §706(2)(A).  <u>See generally</u> <u>Citizens to Preserve Overton
Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971); <u>Mercy Hospital of
Laredo v. Heckler</u>, 777 F.2d 1028, 1031 (5th Cir. 1988).  Agency
rulings of law concerning the programs they execute are entitled
to great deference, especially those involving the interpretation
of the agency's own regulations.  <u>See</u> <u>Udall v. Tallman</u>, 380 U.S.
1, 16-17 (1965); <u>Mercy Hospital of Laredo</u>, 777 F.2d at 1031-32;
<u>Cieutat v. Bowen</u>, 824 F.2d 348, 352 (5th Cir. 1987).  Such
interpretations will be upheld unless they are plainly erroneous
or inconsistent with the regulations.  <u>Id.</u>  Even where a court
believes that an alternative interpretation would be "more
appropriate," it will not reverse an agency interpretation that
is a "permissible construction" of the regulation.  <u>See</u> <u>Chevron
U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S.
837, 865 (1984); <u>Homan & Crimen, Inc. v. Harris</u>, 626 F.2d 1201,
1208-09 (5th Cir. 1980), <u>cert. denied</u>, 450 U.S. 975 (1981);
<u>Johnson's Professional Nursing Home v. Weinberger</u>, 490 F.2d 841,

844 (5th Cir. 1974).  Accordingly, those challenging an agency
decision interpreting its own regulations must necessarily
shoulder a heavy burden.  <u>Mercy Hospital of Laredo</u>, 777 F.2d at
1032; <u>Cieutat v. Bowen</u>, 824 F.2d at 352

The Administrator's decision clearly passes muster under
this standard.  As shown below, the applicable Medicaid
regulations governing upper limits for prescription drugs require
that a State Medicaid agency establish the "estimated acquisition
cost" of a drug at "the agency's best estimate of the price
generally and currently paid by providers." 42 C.F.R. §§447.301,
447.331(b).  The evidence in the record shows that published AWP
significantly overstates the prices generally paid by providers
and that alternative drug pricing methods will result in far more
accurate estimates of pharmacy purchase prices.  Faced with a
state plan amendment which proposed to establish EAC at published
AWP, the Administrator properly ruled that the state plan could
not be found in compliance with the Medicaid regulations when no
showing was made that AWP was an accurate indicator of the prices
generally paid by pharmacists.

II.  The Administrator Properly Found That Use Of The
     Published Average Wholesale Price (AWP) Is Not A
     Reasonable "Best Estimate" Of The Price Generally Paid
     <u>By Pharmacies For Prescription Drugs.</u>

The Administrator acted reasonably and consistent with his
authority in disapproving Louisiana State Plan Amendment No. 87-
33 for failure to comply with the upper limit regulations.  Under
these regulations, states must establish the "estimated
acquisition cost" (EAC) of certain prescription drugs that are

21

referred to as "other drugs" in 42 C.F.R. §447.331.  The EAC is
used in determining the maximum amounts of FFP that will be
available in state expenditures for those drugs.  42 C.F.R.
§447.331(b).  The regulations define "estimated acquisition cost"
as the State Medicaid agency's "best estimate of the price
generally and currently paid by providers for a drug marketed and
sold by a particular manufacturer or labeler in the package size
of drug most frequently purchased by providers."  42 C.F.R.
§447.301.  Louisiana's state plan amendment proposed to set the
State's EAC at "the Average Wholesale Price of the drug . . .
reported in one or more national compendia."  A.R. 8.  The
Secretary, through the Administrator of HCFA, ruled after a
reconsideration hearing that the State's use of published AWP did
not comply with the definition of EAC set forth in the
regulations "[i]n light of evidence showing that AWP
significantly overstates the price actually paid by pharmacists."
Id.  This conclusion was reasonable and based on the overwhelming
weight of evidence in the record.

> A.   The Weight of Evidence Demonstrates That AWP
>      Significantly Overstates The Prices That
>      Providers Pay for Drug Products.

The great weight of evidence in the record supports the
Secretary's position that AWP significantly overstates the prices
that pharmacists are generally paying for prescription drugs.  In
June 1984, the Office of the Inspector General issued a report
based on an extensive audit of pharmacy purchasing practices.
A.R. 633-72.  The OIG audit provided, for the first time,

carefully documented evidence that average wholesale prices overstate the prices that pharmacies actually pay for drugs. Based on a review of 3,469 pharmacy purchases in six states, the OIG report found that, because of purchase discounts, over 99 percent of the purchases were made at prices averaging about 16 percent below AWP. A.R. 643. The report also found that these purchase discounts were routinely available to pharmacies, regardless of where they were located or whether they were chain-owned or independent. Id. HCFA conducted surveys and interviews with wholesalers and pharmacists that corroborated the OIG's finding that AWP is not a reliable tool for use by a state in establishing its "best estimate" of what providers are paying. A.R. 198, 1358-60, 1466-67, 1473. Thus, at the time that the State submitted its state plan amendment, the Secretary was aware of a considerable body of evidence demonstrating that published average wholesale prices overstate the prices that providers generally pay for drugs.[9]

---

[9] As a HCFA official stated at the administrative hearing, AWP has become like the "sticker price on an automobile. It is the very highest price that anyone would be expected to pay for a drug product." A.R. 1450. See A.R. 1472-73. Congress evidently recognized the inflated nature of AWP in the Medicare Catastrophic Coverage Act, Pub. L. No. 100-360 (1988), repealed, Pub. L. No. 101-234 (1989). Congress established a system that would have required prices to be set in six-month increments known as payment calculation periods. See A.R. 247-49. Drug product prices paid during the period July 1 through December 1 were to be those AWPs that were in effect on January 1 of that year. Id. This time lag between price setting and benefit payments would have served to reduce AWP by a significant amount given the current high inflation rates for prescription drugs.

23

In view of this evidence, HCFA had ample reason, indeed an
affirmative obligation, to question the State's findings and
assurances that its EAC methodology complied with the upper limit
regulations.  See A.R. 1115.  The State's response provided only
conclusory statements and no documentation that would
substantiate that AWP did in fact accurately reflect pharmacy
purchase prices in Louisiana.  A.R. 1121.  See A.R. 815, 1424-45
(indicating that the state agency supplied HCFA with everything
it had to support its finding).  In addition, as the
Administrator recognized, throughout the reconsideration
proceedings, "neither the State nor the intervenors challenged
the conclusion that AWP overstates the prices actually paid."
A.R. 8.  Because the State failed to show that AWP meets the
regulatory definition of EAC, its plan amendment was disapproved.
A.R. 1142.  This action was clearly proper.  See Arkansas
Pharmacists Ass'n, 627 F.2d at 869 (A state plan providing
prescription drug coverage must provide for payments that are in
accordance with the regulations); Pennsylvania Pharmaceutical
Ass'n, 542 F. Supp. at 1353 (same); National Ass'n of Chain Drug
Stores, [1989-2 Transfer Binder] Medicare & Medicaid Guide (CCH)
¶ 37,871 at 20,099 (same).

B.   The Secretary Has Followed A Consistent
     Policy Against Use Of Published AWP Under The
     Upper Limits Regulations.

The Administrator's decision properly concluded that the
Department of HHS has had a consistent policy against the use of
unmodified AWP as a state's EAC.  See A.R. 6-7.  HCFA's

24

predecessor in the administration of the Medicaid program, the
Social and Rehabilitation Service (SRS), first adopted EAC as a
specific upper limit requirement in 1975, in an effort to achieve
federal savings.  In the proposed rule, the SRS noted that most
states defined drug "cost" as AWP or other standard prices that
were "frequently in excess of actual acquisition costs to the
retail pharmacist."  39 Fed. Reg. 41,480, A.R. 1009.  The SRS
proposed to obtain program savings by requiring use of actual
acquisition cost for the "cost" component of the upper limit.
Id.  When several commenters suggested that AWP was a better
standard, the Secretary responded that AWP was not acceptable
because "AWP data are frequently inflated."  40 Fed. Reg. 34,518
(August 15, 1975), A.R. 1014 (emphasis added).  While the
increased audit and administrative expense of an actual
acquisition cost standard led the SRS to modify its proposal, the
EAC standard that was finally adopted required States to make the
"closest estimate of the price generally and currently paid by
providers."  Id., A.R. 1014, 1015.  The clear purpose of the EAC
regulation was to have states estimate provider prices with as
much precision as possible.  The objective was the same as set
forth under the proposed rule -- to achieve savings by moving
states away from primary reliance on AWP.

     After 1975, HCFA continued to make clear that use of
unmodified AWP as the state's EAC was not contemplated by the
regulations.  In 1976 and 1977, HCFA reminded states that it was
each state's responsibility to estimate drug prices "as close as

25

feasible" to the prices generally paid by providers, and that a
percentage markdown appeared appropriate for AWP.  See A.R. 222-
23.  See also A.R. 671.  In 1984, the HCFA Administrator
concurred with the OIG's audit report which concluded that AWP
significantly overstated provider purchase prices, and HCFA's
comments on the report indicated that action would be taken to
advise states of the problems with AWP and to make them aware of
alternatives.  A.R. 669-70.  In early 1985, the HCFA
Administrator stated in a letter to the National Association of
Retail Druggists that use of AWP as a drug upper limit was "not
consistent with the federal requirements."  A.R. 198.  The
Administrator indicated that HCFA's policy was to make states
aware of alternatives, but not to mandate any specific approach.
A.R. 198.  In September 1985, an affidavit articulating official
HCFA policy described a program initiative that involved
contacting States to urge them to adopt more accurate drug
pricing methods in establishing EAC, without dictating any
specific method developed at the federal level.  A.R. 1196-97.
That same month, a letter was sent at the direction of HCFA
central office officials that put states on notice that, in light
of the OIG audit findings, states could no longer rely solely on
AWP as their best estimate of pharmacy drug prices without
providing evidence to support their position.  A.R. 1552.  During
1986 and part of 1987, a rulemaking proceeding was conducted in
which one option would have entirely eliminated EAC.  51 Fed.
Reg. 29,560, A.R. 1038-42.  In November 1987, however,

26

immediately after HCFA revised the upper limit regulations and decided, ultimately, to retain the EAC provision, the Under Secretary of Department expressed in a letter to the National Association of Retail Druggists essentially the same position that had been maintained prior to the rulemaking.  A.R. 40.  See A.R. 14-15.  These policy pronouncements issued by the Department and by high officials within the Department reflect substantial overall consistency concerning the policy of the EAC regulation to move states away from sole reliance on AWP.[10]

The Secretary's disapproval of Louisiana State Plan Amendment No. 87-33 was consistent with his longstanding interpretation of the EAC requirement and did not represent a substantive change in the regulations.  The position articulated by the HCFA Administrator in the letter disapproving Louisiana's state plan amendment was as follows:

> We believe there is a preponderance of evidence that demonstrates that AWP significantly overstates the price that pharmacy providers actually pay for drug products and, thus, is not "the price generally and currently paid by providers."  The continued use of AWP results in significant potential overpayments to pharmacy providers.  Consequently, the proposed state plan amendment violates 42 C.F.R. §447.301 and section 1902(a)(30) of the Social Security Act, requiring that State payments comply with efficiency, economy, and quality of care.

---

[10] Although the Secretary acknowledges that errors and inconsistencies in policy were implied from statements made by regional officials in 1985, the record shows that these statements did not represent official agency policy or the "position of the Department as an entity."  See A.R. 1197; New York Dept. of Social Services v. Bowen, 835 F.2d 360, 365-66 (D.C. Cir. 1987); cert. denied, ___ U.S. ___, 108 S.Ct. 2820 (1988); Homemakers North Shore, Inc. v. Bowen, 832 F.2d 408, 413 (7th Cir. 1987).

A.R. 1142.  The position articulated in this letter is consistent
with the interpretation of the regulations that is reflected in
the preamble to the 1975 regulations and in subsequent HCFA
pronouncements, as set forth just above.  As the disapproval
letter indicates, what changed over time was not the Secretary's
interpretation of the EAC requirement, but rather the weight of
the evidence that AWP overstates drugs prices and thus is not a
reasonable "best estimate" of acquisition cost.  After 1984, the
Secretary was aware of a widening base of documented evidence
demonstrating that AWP significantly overstates provider purchase
prices.  In light of this evidence, it became clear that HCFA
could no longer stand by and permit states to rest on mere
assurances that AWP was their "best estimate," without requiring
them to provide support for their use of AWP in establishing
EAC.[11]

    HCFA's more assertive enforcement initiative was fully
consistent with its obligation to assure that states are using
"best estimates" and not pricing methods that have been shown to
be inaccurate.  Indeed, HCFA would have been remiss not to have
undertaken such action once the Department became convinced as a

---

    [11] Previously, HCFA had deferred to states' representations
that AWP was their "best estimate" primarily because there was
inconclusive evidence that it was not a reasonable "best
estimate."  In fact, as the OIG audit revealed, pricing
information that HCFA had been providing to states for use in
evaluating the EACs frequently equaled or exceeded AWP, revealing
the HCFA's substantial lack of awareness of the purchase and
trade discounts routinely received by pharmacies.  See A.R. 651-
52.  See also A.R. 222-23.

factual matter that there was a significant discrepancy between AWP and the actual purchase prices.  Consequently, HCFA's disapproval letter did not "effect a change in existing law or policy" or otherwise constitute a substantive rule.  See American Hospital Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C. Cir. 1987), quoting Alcaraz v. Block, 746 F.2d 593, 613 (9th Cir. 1984).  On the contrary, the letter articulated the same view of the law that HCFA has consistently maintained over the life of the EAC regulation and applied in light of the best available information.  See Homan & Crimen, Inc. v. Harris, 626 F.2d at 1210 (letter merely elaborated on what was already contained in the regulations and was consistent with other agency pronouncements).[12]

---

[12] The State and intervenors argue that the necessity of notice and comment rulemaking is apparent from the fact that the Secretary's own Department concluded that rulemaking was necessary.  State's Brief at 18; Intervenors' Brief at 26; A.R. 15.  They refer to an internal agency discussion concerning whether to adopt a national policy to require that EAC be established as AWP minus a specific percentage, which, the Department concluded, would have required notice and comment rulemaking.  Id.  But their version of events is incomplete.  As the Secretary has stated in a letter, the Department decided not to adopt this rulemaking option, and elected instead to proceed with "an initiative to provide states greater assistance in the determination of an appropriate EAC."  A.R. 15.  Since this initiative "merely involved the application of the existing rules in light of the best available information, new rulemaking was not necessary."  A.R. 15 (emphasis added).

29

C.   The Secretary Properly Exercised His
     Authority To Assure That States Do Not
     Establish The Upper Limit Based On Pricing
     Methods That Have Been Shown To Be
     Inaccurate.

The Administrator's disapproval of Louisiana's state plan
amendment represented a proper exercise of his authority under
the federal Medicaid statute and regulations to assure that
states are not establishing EAC based on drug pricing methods
that have been shown to overstate drug prices.  The unrefuted
evidence in the record demonstrates that AWP is not a reliable
indicator of drug prices and cannot be considered an acceptable
EAC.  See A.R. 8.

Under the upper limit regulations, states have discretion to
establish their own payment methods and levels, but only after
they have established an acceptable EAC against which payment
levels can be measured.  As explained in the preamble to the 1987
final rule, under the subheading "Increased State Flexibility,"
the aggregate upper limit approach gives states leeway to develop
their own payment policies, and they need not adopt the upper
limit methodology set forth in the regulations as a payment
model.  52 Fed. Reg. 28,655, A.R. 1064.  Instead, to solve
problems of "economy, availability, or therapeutic efficacy,"
states are free to pay higher amounts (e.g., published AWP) for
some drugs as long as they pay lower amounts for other drugs and
maintain total payments within the aggregate limit.  Id.  As
discussed later in the preamble, it is precisely this flexibility
that enables each state to "evolve its own payment system" and

30

its own solutions to local problems of availability and efficiency. Id. at 28657, A.R. 1066. See State's Brief at 21. However, this flexibility to determine payment levels and methods is still subject to the requirement that a state establish an EAC that represents its "best estimate of the price generally and currently paid by providers." 42 C.F.R. §447.301.

The federal government, which in the case of Louisiana currently pays over 70 percent of the cost of Medicaid, has not limited itself to rubber-stamping any "best estimate" of cost that a state chooses to make. On the contrary, the regulations require that a state Medicaid agency (1) describe comprehensively its payment methodology in its state plan; (2) make a finding for each of the two upper limit categories that total expenditures will not exceed the applicable aggregate upper limit; (3) make an assurance to HCFA that the state has made such findings; and (4) maintain and make available to HCFA, upon request, documentation to support such findings. 42 C.F.R. §447.333. See 52 Fed. Reg. 28,651, A.R. 1060. The documentation that a state must provide at HCFA's request includes "data, mathematical and statistical computations, comparisons, and any other pertinent records." 42 C.F.R. §447.333(c). See 52 Fed. Reg. 28,652, A.R. 1061 (further discussion of required documentation). As stated in the preamble to the 1987 final rule, although acceptable state assurances confer a presumption of validity on the State's findings, "if HCFA finds a problem with a State's assurance, HCFA can request the State to provide data to support its assurance, and, if

31

appropriate, HCFA will disallow FFP or consider whether the State ought to be subject to the statute's compliance procedures." Id.

The Secretary's actions in disapproving Louisiana State Plan Amendment No. 87-33 were fully consistent with this regulatory structure. After reviewing the state plan amendment, HCFA asked the State to explain how it had concluded that AWP was its best estimate of the price generally and currently paid by providers for drugs. A.R. 1115. The State did no more to support its position than to claim that reviews conducted by the Medicaid agency indicated that AWP was a reliable indicator of the prices charged by wholesalers throughout the State. A.R. 1121. The State offered no substantiating evidence or documentation to support this finding. A.R. 1121. See A.R. 815, 1424-45.[13] In addition, no convincing evidence was presented at the reconsideration hearing to show that AWP accurately reflected Louisiana pharmacy purchase prices. See A.R. 8. Accordingly, the Secretary's action was proper and consistent with his role in enforcing the upper limits regulations.

HCFA's disapproval was based on the State's failure to adequately support its use of published AWP. It did not add new requirements to the regulations, as the State alleges, by dictating that the State either determine actual acquisition cost

---

[13] Having received the OIG report and numerous other indications of HCFA's concern with published AWP, and having had a previous state plan amendment denied over the issue, the State was certainly aware of the possibility of disapproval if it did not change its plan or offer convincing support for its position. See A.R. 905, 1017.

based on actual drug pricing data or reduce AWP by a HCFA-
specified percentage.  <u>See</u> State's Brief at 18.  To the contrary,
the record shows that the Secretary acted through established
enforcement mechanisms to implement a longstanding and oft-
repeated policy.  That policy was to make states aware of the
unacceptability of AWP and to recommend alternatives, but not to
dictate any specific approach for complying with the EAC
regulation.  <u>See</u>, <u>e.g.</u>, A.R. 198, 1196-97, 1552.  Indeed, in this
case, the options and alternatives open to the State were
considerable.  As contemplated by the regulations, the State had
the opportunity to provide documentation to HCFA to support its
finding that AWP was a "best estimate" of pharmacy purchase
prices.  42 C.F.R. §447.333(c).  <u>See</u> 52 Fed. Reg. 28,652, A.R.
1061.  Alternatively, the State could have determined its EAC
using its choice of any combination of price-setting methods that
would accurately reflect the prices that providers were paying.[14]
Clearly, HCFA did not rely on any requirements not already
contained in the regulations or inflexibly "prescribe the
regulatory structure" by which the State might achieve compliance
with the EAC requirement.  <u>See</u> <u>Batterton v. Marshall</u>, 648 F.2d
694, 706 (D.C. Cir. 1980).  Nor is this a case where a federal
agency has imposed on states "detailed rules with mathematical
formulae" for calculating EAC.  <u>Cabais v. Egger</u>, 690 F.2d 234,

---

[14] Some examples of alternatives to published AWP include
AWP minus a percentage markdown, wholesaler cost plus a
percentage mark-up, direct prices of manufacturers who sell
directly to pharmacies, and any other methods that reasonably
approximate pharmacy purchasing prices.

239 (D. C. Cir. 1982).  Rather, the regulatory structure that the
Secretary relied on is the one set forth in the current
regulations.

    D.    The State Cannot Use AWP In Determining The
           Upper Limit Simply Because Other Features In
           Its Plan Constrain Costs.

In establishing their "best estimate" of what providers are
paying, states are free to employ any method of estimating
provider prices that accurately reflects the prices generally
paid.  However, they cannot seek exemption from this requirement
by claiming that other elements in their plan will control
program expenditures.  The Administrator noted that Louisiana's
state plan amendment included some features "which will properly
constrain Medicaid drug reimbursement costs." A.R. 8.  In
particular, the Administrator mentioned the Louisiana Maximum
Allowable Cost (LMAC) program. Id.  Yet, the Administrator
correctly determined that the State's LMAC program, although
"commendable," is not a substitute for an accurate EAC and cannot
bring the State's plan into compliance with the specific EAC
requirement set forth in the regulations. See A.R. 1546 (1985
HCFA letter expressing same view).  The crux of the matter is
that use of AWP for the EAC sets an artificially high upper limit
and overstates the maximum amount of FFP that is due from the
Federal Government.[15]

_____

    [15] The intervenors presume that HCFA wants the State to
abandon the LMAC program and other cost-saving features in favor
of an across-the-board reduction of AWP. See Intervenors' Brief
at 23.  The Secretary's position, however, is not that the state
                                                 (continued...)

The State's LMAC program does not replace or otherwise affect the determination of EAC.[16]  As stated by a HCFA official at the administrative hearing, LMAC "has nothing to do with estimated acquisition cost."  A.R. 1410.  An LMAC is a separate state approach to controlling prescription drug expenditures and is not to be confused with, or utilized as a substitute for, an acceptable EAC.  See A.R. 1089-90.  The State must still determine an EAC for every drug in the "other drugs" category for which the State makes payment.  Id.  See 42 C.F.R. §447.331(b).[17]

---

[15](...continued)
should forsake these commendable cost-saving payment methods, but only that its plan would be "more economical and efficient if the EAC did not rely upon an unmodified AWP."  A.R. 8.


[16] The LMAC program is designed to deter pharmacies from dispensing the more costly brand-name and generic equivalents available in the marketplace.  It does this by providing, for a group of multiple-source drugs that are considered equivalent products, that the State will pay no more for any of these drugs than the median of the AWPs for the group.  A.R. 1025, 1088-90. The LMAC program thus gives pharmacists a powerful economic incentive not to dispense multiple-source products that are priced above median AWP, inducing them to substitute the lower cost generics.  The LMAC limit may be overridden if a physician certifies that a higher priced drug is medically necessary.  A.R. 1090.  For all drugs in the LMAC program that are priced below median AWP, or made subject to a physician certification, the State not only pays AWP plus a dispensing fee (if lower than customary charges), but also calculates the aggregate upper limit for the "other drugs" category using AWP instead of a pricing standard that accurately reflects drug prices.  Id.

[17] As a practical matter, the level at which EACs are set for drugs in the LMAC program has direct bearing on the amount of FFP that the State can claim from the Federal Government.  For every drug in the LMAC program that is priced below median AWP, or that is dispensed under a physician certification, the State would be comparing AWP with the customary charge to determine the "lower of" and to calculate the aggregate upper limit.  This would cause the aggregate upper limit for the "other drugs"
(continued...)

As the Administrator pointed out, the crux of the issue is
not the impact of the State's LMAC program, but "the
effectiveness of the EAC for those drugs subject to it."  A.R. 8.
Most clearly of all, the EAC is the primary cost screen for all
single source drugs in the "other drugs" category.  A.R. 8.
Single source drugs comprise at least 40 percent of the drugs in
this category.  A.R. 923.  The record shows that determining the
EAC at published AWP for these single source drugs would
overstate the prices that pharmacists are generally paying and
impair the effectiveness of the EAC as a cost screen.  It is
clear that use of AWP for the EAC results in an aggregate upper
limit that would be significantly higher than if the State were
to use an EAC that accurately reflected what pharmacists were
paying.

Furthermore, it must be emphasized that the aggregate upper
limit for "other drugs" only applies to drugs for which the State
makes payment.  See 42 C.F.R. §447.331.  The State may not
include in the equations for the upper limit those drugs for
which the State could have made payment, but did not.  The State
has not shown that it is actually paying for those drugs in the
LMAC program that are priced over the median AWP.  Indeed, it
would be quite astounding if pharmacists were widely dispensing
these high-cost drugs knowing that the State will pay only a

---

[17](...continued)
category to be higher than the level that would properly result
if the State used a pricing standard that accurately reflected
drug prices.

portion of the pharmacist's drug cost.  The aggregate upper limits as set forth in the regulations are not designed to recognize the money saved by the State by not making payments for high-cost multiple-source drugs.  While HCFA encourages states to target their payments to less expensive multiple-source drugs in the "other drugs" category by means of payment mechanisms like the LMAC program, states that do so are not exempted from the obligation under the regulations to use an acceptable EAC.  It is the propriety of using published AWP in establishing EAC levels for the upper limit that is at issue here, not how much the State may have saved by not paying for certain drugs.  The Administrator properly observed that "[i]f EAC had been set at a level lower than AWP, the average reimbursement would have better approximated the acquisition cost for those drugs subject to it." A.R. 9.[18]

---

[18] The intervenors' argument that AWP is reduced by 9.36 percent lacks merit because it is based on what the State claims to have saved by not paying for certain drugs.  Intervenor's Brief at 21-22.  In essence, the intervenors' argument is that the State "pays" less than AWP for high-cost drugs because the LMAC program largely discourages pharmacists from dispensing these drugs in the absence of physician certification.  They appear to believe that the State can apply these "savings" to counterbalance the payments made for drugs at AWP, and in this way offset the inflated nature of the aggregate upper limit.  But here again, what the State claims to have saved by not paying for certain drugs does not factor into the upper limits equation.  Moreover, to determine in any given case whether state drug payments balance out under the aggregate upper limit, it is first necessary to determine an upper limit that is not artificially inflated.  The State is establishing the EAC for "other drugs" at AWP, which overstates the prices paid by pharmacists for these drugs.  As the Administrator observed, "[t]he use of AWP as the EAC renders Louisiana's plan less economical than it would otherwise be."  A.R. 8.

The Secretary also properly rejected the State's plan to reduce its dispensing fee to account for the use of AWP as the EAC.  State's Brief at 22-23.  See A.R. 1121-22.  The State's proposal is entirely inconsistent with the regulations.  Since 1975, the regulations have always segregated ingredient cost from all other costs as a means of achieving "mandated economies in drug cost reimbursement."  39 Fed. Reg. 41,480, A.R. 1009.  They have required the separate determination of ingredient cost based on the State's "best estimate" of the "price" that providers are paying for a drug.  42 C.F.R. §447.301.  The State's proposal to use the dispensing fee allowance to account for discounts in "price" does not square with this framework of the regulations. The regulations require that the provider's "price" be reflected as closely as feasible in the EAC.

This requirement that EAC represent only the prices paid by pharmacists also diposes of the State's notion that it can provide for pharmacy profit through the EAC rather than through its dispensing fee.  State's Brief at 26.  See A.R. 923.[19]  The regulations have always provided that profit and all cost elements other than product cost (such as operating costs, overhead costs, and professional services) be reimbursed through the dispensing fee.  See, e.g., 52 Fed. Reg. 28,651-52, A.R.

---

[19] The State's argument that it does not include a profit factor in its dispensing fee is somewhat misleading.  The State sets the dispensing fee at the 60th percentile of dispensing cost, which means that efficient providers with costs below the 60th percentile do receive a bonus that is like profit.  See A.R. 923, 964-67.

1060-61; 42 C.F.R. §447.333 (1986).  The State appears to believe that all this changed with the shift to aggregate limits under the 1987 revision of the regulations.  See A.R. 954-55, 1121.  However, the 1987 final rule did not alter the existing requirement that the State include a separate dispensing fee to account for costs other than product cost; it just eliminated procedural requirements governing how states establish their dispensing fees.  See 52 Fed. Reg. 28,651-52, A.R. 1060-61; National Ass'n of Chain Drug Stores, [1989-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 37,871 at 20,101-02.  States must still base their EAC on their best estimate of the "price" generally paid by pharmacies for drugs, and they must adhere to the framework established by the regulations.[20]

The upper limits regulations must be applied as they are written.  While the State does not directly challenge the EAC standard, its arguments that the LMAC program and the dispensing fee can "modify" an inflated EAC are inconsistent with the structure of the upper limit regulations.  The wisdom of the EAC requirement and the policy concern with the use of AWP are issues that were aired in the 1975 rulemaking proceeding, when the Secretary rejected a proposal to define drug cost as AWP.  40 Fed. Reg. 34,518, A.R. 1014.  The Secretary declined to adopt

---

[20] Notwithstanding the evidence in the OIG study that purchase discounts of AWP are available to all pharmacies, the State has indicated concern with the fate of small independent pharmacies if it is required to move away from AWP.  A.R. 1121.  See OIG Report, A.R. 643.  While the State has shown little support for this concern, the answer would lie in adjusting the dispensing fee, not in using an inappropriate EAC.

that option in the belief that the EAC method would better

advance the statutory objectives of economy and efficiency.  Id.

Because the EAC mechanism was adopted, the State must comply with

its methodology, even if the State and intervenors would have

preferred some alternative methodology.  Concerns with the wisdom

of the Secretary's choices for implementing the statute are "more

properly addressed to legislators or administrators, not to

judges."  Chevron, 467 U.S. at 865.  See Arkansas Pharmacists

Ass'n, 627 F.2d at 870-71 (finding that the EAC plus dispensing

fee method meets the judicial test of reasonableness).[21]


      E.    The Secretary's Policy Against Use Of AWP In
           Determining the Upper Limit Applies To All
           States.

The Secretary is requiring all states that rely

significantly on published AWP in setting EAC to support its

position or adopt a more accurate method of estimating drug

prices.  The Administrator's decision recognized Louisiana's

concern that other states appeared to have had state plans using

---

[21] The State argues that the Secretary's upper limit
regulations are arbitrary and capricious because the federally
determined upper limit for listed multiple-source drugs (which is
not involved in this case) allows states to pay up to 150 percent
of "the lowest AWP" for equivalent products.  State's Brief at
24-25.  The State contends it is inconsistent to interpret the
"other drugs" upper limit (EAC) to preclude setting cost at AWP
when the other upper limit sets cost above AWP.  Id.  This
argument is misguided for several reasons.  Most important, the
regulations provide that the federally established cost limit be
set at the lowest "published price." 42 C.F.R. §447.332(b).  In
practice, this amount is almost always the lowest direct
manufacturers' price, which is usually considerably less than
AWP.  See A.R. 1069, 1115.

AWP approved by other HCFA regional offices.  A.R. 9.  The
Administrator responded, however, that "the correct approach to
this apparent inconsistency is to initiate change to those other
State plans rather than to approve another plan with an improper
EAC."  Id.  Since the policy decision was made to enforce the
regulation on a state-by-state basis, HCFA has been proceeding to
review state plans and question states that rely to a significant
extent on AWP in establishing their EAC.  See letter from
Secretary, A.R. 15.  As the Administrator stated in his decision,
in excess of 30 states have already established their EAC below
the published AWP.  A.R. 7.  This compares favorably with the
OIG's finding in 1984 that virtually all states were relying on
published AWP primarily or to a great extent.  A.R. 637.  As for
the remaining states that use AWP, the Administrator's position
remains "that a plan that relies to any significant degree on AWP
as its EAC does not meet the statutory requirements for an
economical and efficient plan."  A.R. 9.  If deemed necessary by
this Court, the Secretary would be willing to supplement the
record to reflect actions taken to assure uniform enforcement of
the Department's policy by all regional offices.[22]

---

[22] On a completely separate issue, the State disputes the
Administrator's determination that the language in the plan
amendment could be interpreted to preempt HCFA's obligation to
determine drug availability and that, therefore, the State must
change the language.  State's Brief at 30-31; A.R. 9.  As the
Administrator noted, however, the State earlier expressed
willingness to change the language.  A.R. 9.  If the State does
not intend preemption, it is surely not too much to ask that the
State simply clarify the language.

CONCLUSION

For all the foregoing reasons, the Administrator's
reconsideration decision disapproving Louisiana State Plan
Amendment No. 87-33 must be upheld, and the petitions of the
State and the intervenors to set aside the decision must be
denied.   Fed. R. App. P. 15.

                         Respectfully submitted,

                         JOHN VOLZ
                         United States Attorney
                         Eastern District of Louisiana

                         _____
                         DONALD F. DICKEY
                         Attorney
                         United States Department of
                           Health and Human Services
                         Room 500 East High Rise Building
                         6325 Security Blvd.
                         Baltimore, MD  21207
                         (301) 965-8861
                         (FTS) 625-8861

OF COUNSEL:

MICHAEL J. ASTRUE
General Counsel

DARREL GRINSTEAD
Chief Counsel

United States Department of
  Health and Human Services

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this 12th day of January, 1990, served a copy of Respondent's brief by first-class mail, postage prepaid, on counsel for the parties cited herein:

The State of Louisiana, Petitioner

        Jerry Phillips, Esq.
        Office of General Counsel
        Louisiana Dept. of Health and Hospitals
        P.O. Box 3776
        Baton Rouge, LA  70821

Louisiana Pharmacists Association,
National Association of Chain Drug Stores, Inc.,
Intervenors

        Stephen M. Sullivan, Esq.
        Sullivan and Stolier
        630 Camp Street
        New Orleans, LA  70130

        DONALD F. DICKEY
        Attorney
        Office of the General Counsel
        Department of Health and
          Human Services
        Room 500 East High Rise Building
        6325 Security Blvd.
        Baltimore, MD  21207
        Telephone: 301-965-8861