# Exhibit 95

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc v. Abbott Laboratories, Inc.; Dey, Inc., et al.; Boehringer Ingelheim Corp., et al.;*
Civil Action No. 01-12257-PBS

Exhibit to the September 22, 2009, Declaration of George B. Henderson, II
In Support of Plaintiff's Response to Defendants' Combined Local Rule 56.1
Statement of Additional Material Facts Pertinent to the United States' Motions
for Partial Summary Judgment Against Defendants

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - - -

        (captions continue on following pages)


     Videotaped deposition of THOMAS A. GUSTAFSON

                    Volume I



                    Washington, D.C.

                    Friday, September 28, 2007

                    9:00 a.m.

8d657762-8fb9-483b-bb85-12b9bc9eea17

Gustafson, Thomas A.                                              September 28, 2007
                              Washington, DC

```
                          Page 2                                              Page 4
 1       COMMONWEALTH OF KENTUCKY                   1         Washington, D.C.
 2     FRANKLIN CIRCUIT COURT - DIV. II             2         Friday, September 28, 2007
 3   -----------------                              3         9:00 a.m.
 4   COMMONWEALTH OF KENTUCKY,     )                4
 5        Plaintiff,     ) Civil Action No.         5
 6     vs.              ) 03-CI-1134                6      Videotaped deposition of THOMAS A. GUSTAFSON,
 7   ABBOTT LABORATORIES, INC., et al., )           7   called for examination by counsel for Abbott
 8        Defendants.       )                       8   Laboratories in the above-entitled matter, pursuant to
 9   -----------------                              9   subpoena, taken at the law offices of Jones Day, 51
10                                                 10   Louisiana Avenue, N.W., Washington, D.C. 20001-2113,
11       IN THE COURT OF COMMON PLEAS              11   before Jonathan Wonnell, a Registered Professional Court
12          FIFTH JUDICIAL CIRCUIT                 12   Reporter and Notary Public of the District of Columbia.
13   -----------------                             13
14   STATE OF SOUTH CAROLINA, and    )  STATE OF   14
15   HENRY D. McMASTER, in his official ) SOUTH CAROLINA 15
16   capacity as Attorney General for  )  COUNTY OF 16
17   the State of South Carolina,   )  RICHLAND    17
18        Plaintiffs,     )                        18
19     vs.              ) Case No.                 19
20   ABBOTT LABORATORIES, INC.    ) 2006-CP-40-4394 20
21        Defendant.        )                      21
22   -----------------                             22

                          Page 3                                              Page 5
 1    IN THE CIRCUIT COURT OF THE FIRST CIRCUIT     1      A P P E A R A N C E S  O F  C O U N S E L
 2            STATE OF HAWAII                       2
 3   ---------------                                3   On behalf of the United States of America:
 4   STATE OF HAWAII,       )                       4      ANDY J. MAO, ESQ.
 5        Plaintiff,   ) Case No.                   5      JUSTIN DRAYCOTT, ESQ.
 6     vs.           ) 06-1-0720-04 EEH             6      U.S. Department of Justice
 7   ABBOTT LABORATORIES, INC.,  )                  7      Civil Division
 8   et al.,          ) JUDGE EDEN                  8      P.O. Box 261, Ben Franklin Station
 9        Defendants.     ) ELIZABETH HIFO          9      Washington, D.C. 20044
10   ---------------                               10      (202) 305-9300
11                                                 11      andy.mao@usdoj.gov
12       STATE OF WISCONSIN CIRCUIT COURT          12      justin.draycott@usdoj.gov
13            DANE COUNTY                          13
14   ---------------                               14   On behalf of the U.S. Department of Health
15   STATE OF WISCONSIN,       )                   15      and Human Services:
16        Plaintiff,    )                          16      BRIAN A. KELLEY, ESQ.
17     vs.            ) CASE NO. 04-CV-1709        17      U.S. Department of Health & Human
18   AMGEN INC., et al.,    )                      18       Services
19        Defendants.    )                         19      Office of General Counsel, CMS Division
20   ---------------                               20      330 Independence Avenue, S.W., Room 5345
21                                                 21      Washington, D.C. 20201
22                                                 22      (202) 205-8702
```

2 (Pages 2 to 5)

Henderson Legal Services
202-220-4158

Page 30

1  it. Not use the title, that is. We used the
2  degree a lot, but not the title.
3      Q.   If I could turn your attention to the
4  second page of your resume, Mr. Gustafson. And am
5  I getting the accent right? Is it Gustafson or
6  Gustafson?
7      A.   I usually pronounce it Gustafson.
8      Q.   So none of the above.
9      A.   Accent on the first syllable.
10     Q.   I see you went to Williams College and
11 studied economics; is that right?
12     A.   That's correct.
13     Q.   And then spent a short time at Harvard
14 Divinity School?
15     A.   Yes, sir.
16     Q.   And then went on to Yale University and
17 obtained your Ph.D. in economics?
18     A.   That's correct.
19     Q.   What was your focus of study in
20 economics both at Williams College and at Yale
21 University, sir?
22     A.   At Williams I was an economics major,

Page 31

1  which was -- you know, didn't really have a focus
2  of specialization within that major. I also did a
3  fair amount of study in other social sciences and
4  tried to take advantage of the breadth of liberal
5  arts disciplines available in such a school.
6          In graduate school I specialized in
7  several areas that would be classified under the
8  rubric of applied microeconomics so that I sat for
9  oral exams, which was how you sort of enunciated
10 your specialty, in labor economics and in
11 industrial organization. I also studied public
12 finance a fair bit.
13     Q.   After obtaining your degree -- and I'll
14 move backwards through your resume. That's the
15 easiest way I think to do it -- you became a
16 director at the division of policy research office
17 of income security policy at the Department of
18 Health and Human Services; do I have that correct?
19     A.   Actually, I think if you look at the
20 block of text immediately above that, that spans
21 the period during which I had that acting director
22 hat. I became an economist with the office of

Page 32

1  income security policy in a staff capacity
2  initially and then served in this managerial
3  capacity for a couple of years.
4      Q.   How did you come to obtain this position
5  with the Department of Health and Human Services in
6  1976?
7      A.   I was recruited actively by the office
8  that I later joined.
9      Q.   Could you describe for me at a fairly
10 high level of generality what your responsibilities
11 were as an economist at the Department of Human
12 Services between 1976 and 1985?
13     A.   I worked on a variety of income security
14 programs, welfare and pension programs, pension to
15 include Social Security, dealing with both policy
16 and research issues in those areas. I helped with
17 the development of legislation, worked on
18 simulation modeling to try to understand the impact
19 of various proposals, managed major research
20 programs, issues in that sort of broad spectrum.
21     Q.   Did your work between 1976 and 1985
22 involve in any way payment for prescription drugs

Page 33

1  by government payors?
2          MR. MAO: Objection to form.
3      A.   Not that I can recall.
4      Q.   When is the first time in your career
5  that your official duties had any bearing on the
6  payment of prescription drugs by government payors?
7      A.   In 1985 when I joined the -- as you will
8  note here on the resume, joined The Office of
9  Legislation and Policy of the Health Care Financing
10 Administration.
11     Q.   We'll come into that in a little more
12 detail later. But how was it that you made that
13 job change in 1985?
14     A.   It was the eight year inch. I had been
15 with the office of income security policy during
16 some very busy times where we worked on President
17 Carter's welfare reform plan and subsequently on
18 the major reform in Social Security policy that was
19 embodied in the Social Security amendments of 1972.
20         After that time the issues were -- those
21 particular set of issues, while not resolved, were
22 at a lower ebb and I was becoming bored. I was

9 (Pages 30 to 33)

Page 34

1  interested in some new challenges.
2       I was then recruited by a former
3  colleague to join the HCFA, and I thought this
4  would be something interesting to try so I went off
5  and tried it.
6     Q.   What were your responsibilities between
7  1985 and 1988 as the director of the division of
8  Medicaid and long term care at the Office of Policy
9  Analysis, Office of Legislation and Policy?
10    A.   Actually, I think it was Office of
11 Legislation and Policy.  But I'm not sure.  I would
12 have to go back and look at some of the documents.
13      During that period I was in charge of a
14 small staff that worked on legislative policy for
15 the agency.  The Office of Legislation Policy of
16 which we were one of the components was the
17 interface with Congress.  The office as a whole did
18 a lot of work on testimony and congressional
19 service issues of one sort or another, service or
20 constituents related by congressional offices.
21      Our responsibilities related to the
22 development of the president's legislative program

Page 35

1  each year, usually embodied in the budget
2  submission that would go up to Congress in January
3  or February, and then working with the members of
4  the authorizing committee staffs providing
5  technical assistance as they developed the
6  legislation that would actually pass, which might
7  or might not embody elements of the president's
8  program, but which the agency would eventually have
9  to administer.
10      Sorts of legislation I'm speaking of
11 here are largely reconciliation bills such as the
12 Consolidated Omnibus Budget Reconciliation Act of
13 1985 and there are a series that followed during
14 the next decade.
15    Q.   During this time period did your
16 responsibilities ever in any way touch on
17 reimbursement for drugs?
18    A.   Yes, they did.
19    Q.   In what way?
20    A.   You'll have to understand that my memory
21 is a little hazy of this period being some time
22 ago.  And my more recent responsibilities have not

Page 36

1  dealt with Medicaid.  However, during this period
2  the agency was concerned about the payment rates
3  that states were using in paying for drugs,
4  prescription drugs, under the Medicaid program.
5       So we were exploring issues surrounding
6  concepts such as estimated acquisition cost, trying
7  to prod the states into more economical policies in
8  terms of how they paid for drugs.  Understand that
9  in the Medicaid program the payment rate is
10 ultimately set by the state on most issues.  And
11 the federal government picks up a portion of the
12 tab but in this area at that time had limited
13 ability to control what states did.
14      I believe during this period we were
15 advancing legislative proposals to Capitol Hill for
16 their consideration.  And in that capacity I would
17 have been discussing those proposals with members
18 of the authorizing committee staff, things of that
19 sort.  I have not gone back to look in detail.  One
20 could conceivably find detail on this if one
21 wanted.  But that would have been the sort of thing
22 I would have been involved with.

Page 37

1       I was responsible for any legislative
2  issues, legislative policy issues as distinct from
3  constituent service issues, that related to
4  Medicaid or as the title of the group suggests,
5  long term care policy and Medicare.  So it did
6  intrude into Medicare to some degree.  But anything
7  that was going on in Medicaid I presumably had
8  cognizance of -- I'd like to think I had cognizance
9  of.
10    Q.   Where would one go to find the details
11 that you mentioned about what the legislative
12 proposals and policies were during this time period
13 relating to Medicaid payment for prescription
14 drugs?
15    A.   Well, in terms of the -- of what the
16 president's program might have included, this would
17 have been contained in the president's budget, fat
18 books that come out at the time the budget is sent
19 up to Congress.  Those were not always completely
20 detailed in terms of exactly what the
21 administration was proposing so that there were
22 sort of two sources of additional information that

10 (Pages 34 to 37)

Gustafson, Thomas A.                                              September 28, 2007
                           Washington, DC

Page 38

1  one could refer to.
2       The first is what were referred to as
3  the budget press releases.  Each year the office of
4  what was then the assistant secretary for
5  management and budget -- it has changed names
6  several times now, but the budget office at the
7  Office of the Secretary level would prepare a
8  150-page document that would go up to Capitol Hill
9  and anybody else who was interested, given to
10 reporters, that sort of thing, that would explain
11 usually in some detail, not necessarily perfect
12 detail, what was -- what the president was in fact
13 proposing.  And it must be in departmental files.
14      In some years but not all years we would
15 articulate those policies further in draft
16 legislation we would submit to Capitol Hill so that
17 there would have been a series of bills
18 representing the administration's budget on the
19 Medicare and Medicaid area that we would draft
20 working with the legislation division of the office
21 of general counsel and send to Capitol Hill.
22      Legislation people would seek a sponsor

Page 39

1  to introduce that legislation and that sort of
2  thing.  So there would be some treatment of those
3  proposals in those bills.  But as I said, we didn't
4  do them every year.  The interest of congressional
5  staff in seeing those drafts was somewhat limited.
6       The other direction one might look would
7  be in the records of the various committees, so
8  that insofar as the committees took up these issues
9  they would be bringing them forth in markup and
10 obviously -- I'm sure I don't need to tell you.
11 You look at the committee reports of the
12 legislation that was developed in the various
13 committees as it moved through the process.
14    Q.   In your experience would CMS maintain
15 copies of any of the documents that you've
16 described from this time period?
17    A.   When I was in the Office of Legislation
18 I always made sure we had a file someplace that had
19 those back issues.  We'd sometimes need to go back
20 and refer to what was in the press release two
21 years ago and that sort of thing.  And I am fairly
22 confident that the office of the -- as I said, it

Page 40

1  was then called the assistant secretary for
2  management and budget -- similarly maintained a
3  file of past information they had sent to the Hill.
4       These were public documents, so they
5  should be readily available.
6    Q.   Is the Office of Legislation still
7  physically located in the same place as it was when
8  you last worked there?
9    A.   Yes.
10   Q.   And how long ago was that that you
11 worked at the Office of Legislation?
12   A.   I believe I left there in 1996.  Yes.
13   Q.   Assuming that the files are in the same
14 location as they were in 1996, which may be a big
15 assumption, where physically would I find the files
16 this you've described in the Office of Legislation?
17   A.   I really don't remember.  And it could
18 well have been that I pitched them at the time I
19 was leaving the job as the deputy director there.
20 But you could confer with the staff there and if
21 they have them I'm sure they would be prepared to
22 deliver them.

Page 41

1    Q.   Is there a particular staff person who
2  is responsible for or is most likely to know the
3  location of these types of documents?
4       MR. MAO:  Objection, form.
5    A.   The person that you might consult would
6  be Don Johnson, who is now doing the job I used to
7  do.  So he is now the deputy director.  And I don't
8  know if he would know, but he would know how to
9  find out.  Just as one additional footnote on that,
10 I believe that the more likely possibility for the
11 maintaining of a file of these documents would be
12 in the budget office I spoke of earlier, because
13 they were the people who produced those documents
14 and would keep them from year to year.
15   Q.   That would be the budget office within
16 CMS?
17   A.   Within the Office of the Secretary.  Not
18 the HCFA budget office but the Office of the
19 Secretary budget office.
20      MR. COOK:  Counsel, we would ask that
21 you make that search in perhaps 48 hours of
22 Mr. Gustafson's second day of deposition.

11 (Pages 38 to 41)

Gustafson, Thomas A.	September 28, 2007
Washington, DC

---

Page 42

1	MR. MAO: We'll look into it.
2	MR. COOK: These are documents we have
3	asked for for quite a while and we're going to need
4	to get those.
5	MR. MAO: And to the extent they're
6	public documents --
7	MR. COOK: I can represent to you that
8	we have not been able to find budgets that went up
9	to the Hill at the Library of Congress or elsewhere
10	as recently as 1996 and 1995. So you may have the
11	only copies that would be available.
12	MR. MAO: We'll look into it.
13	BY MR. COOK:
14	Q. In 1988 when you left your position
15	as -- well, let me just ask you. What happened
16	with your job position in 1988?
17	A. In 1988 there was some shuffling around
18	at the levels above me and I was asked to become
19	the acting director of the Office of Policy and
20	Analysis, which is the component within The Office
21	of Legislation and Policy that my division was part
22	of. So there were two divisions within that office

Page 43

1	reporting to a single person. That person in turn
2	reported to the director of the Office of
3	Legislation and Policy.
4	The guy who was in that middle job went
5	off to another job on an acting basis and so I was
6	asked to fill in. It turned out that I filled in
7	for quite a long while.
8	Q. How long was that?
9	A. I think it was about three years.
10	Q. What were your job responsibilities
11	during that last three years?
12	A. It was very much the same as it had been
13	but with a broader scope of subject area so that
14	the -- I took over -- I retained responsibility at
15	the supervisory level for the division that I had
16	previously been in charge of and all the issues
17	that I was concerned with, and took over as well
18	responsibility for the coordinate division that
19	dealt with Medicare policy.
20	Q. So you were responsible not just for the
21	Medicaid side but also for the Medicare side?
22	A. Correct. But with the same sorts of

Page 44

1	duties and sorts of functions that were described
2	earlier, that I described earlier.
3	Q. In this position did your job
4	responsibilities touch in any way on reimbursement
5	for prescription drugs?
6	A. Insofar as that was on the table, yes.
7	Q. Do you recall whether it was on the
8	table?
9	A. I don't recall specifically details of
10	that.
11	Q. How did your job responsibilities change
12	in 1991, three years later?
13	A. Only minorly. There was a
14	reorganization of the office that created a deputy
15	position, deputy to the director of the office
16	being The Office of Legislation and Policy. And I
17	was put in that job. So I maintained very much the
18	same functions. I had a broader responsibility in
19	terms of organizational administrative functions
20	for keeping track of hiring and staff and space and
21	things of that sort for the Office of Legislation
22	Policy as a whole.

Page 45

1	Later in my tenure there I fell into a
2	much larger responsibility than I had previously
3	for the development of testimony and so I worked on
4	presentation issues to a greater extent.
5	Q. When did you fall into that
6	responsibility?
7	A. During the last two years that I was
8	there. I don't really remember detail. It wasn't
9	a -- there was no sort of organizational shift or
10	landmark accompanying that. It was just those guys
11	started needing more help and I started to give it.
12	Q. In about which years were those?
13	A. That would have been '93, '94, '95.
14	Q. When did you leave this position as
15	deputy to the director of the Office of Legislation
16	and Policy?
17	A. It was 1996, I believe in May of that
18	year. Sometime in that summer.
19	Q. Do you recall whether between 1991 and
20	1996 your work related in any way to payment for
21	prescription drugs?
22	A. I do not. I can only assert that in

12 (Pages 42 to 45)

Henderson Legal Services
202-220-4158

8d657762-8fb9-483b-bb85-12b9bc9eea17

Page 46

 1  general terms insofar as they were legislative
 2  proposals and so forth being dealt with or that
 3  Congress was dealing with, I do not believe that
 4  was an active time, at least in the Medicare
 5  program, for that issue in the legislative sphere,
 6  which is perhaps why I don't have much memory of
 7  it.
 8          But in general had something been going
 9  on I would have been involved with it.  But I
10  honestly don't recall what if anything was going
11  on.
12      Q.  Do you recall whether there were any
13  proposals during that time period to move away from
14  an average wholesale price-based reimbursement
15  system and towards an actual acquisition cost-based
16  system?
17      A.  I do not.
18          MR. MAO:  Objection, form.
19      Q.  How did your job responsibilities change
20  in May of 1996?
21      A.  Excuse me?
22      Q.  In May of 1996 how did your job

Page 47

 1  responsibilities change?
 2      A.  It was a very substantial departure from
 3  my previous job.  I moved to sort of laterally to
 4  become the deputy director of the Office of
 5  Research and Demonstrations, as it was then called.
 6  This was a research component.  It as the name
 7  suggests did research, ran research projects,
 8  conducted demonstration projects.  And it was in
 9  Baltimore as opposed to Washington.  It took me
10  very much out of the sphere of legislation and out
11  of policy development generally.
12      Q.  How long did you hold that position?
13      A.  It was about two years.  Until October
14  of '98, I believe.
15      Q.  How did your job responsibilities change
16  in October of 1998?
17      A.  Another significant shift.  I moved at
18  that time to become the -- at the time the acting
19  director of what was then called the -- are you
20  ready for this? -- Plan and Provider Purchasing
21  Policy Group, which was way too long a name so we
22  changed it after a while to the Hospital and

Page 48

 1  Ambulatory Policy Group which is what it is called
 2  today.  And you will probably see that -- you may
 3  see both of those names in documents at different
 4  times.
 5          This was an office in what was then
 6  called the Center for Health Plans and Providers,
 7  otherwise known as CHPP.  And it was concerned with
 8  the development and articulation of payment policy,
 9  primarily, for the acute care side of the Medicare
10  fee for service program.
11          So there were two offices within the
12  center that dealt with this sphere of policy.  One
13  dealt with basically the acute benefits, the other
14  with the chronic benefits.  So on the chronic side
15  it would be durable medical equipment, end stage
16  renal disease, home health, skilled nursing
17  facility and a couple of others.
18          The group I was in charge of dealt with
19  payment for hospitals, physicians, ambulance,
20  outpatient clinical laboratories and prescription
21  drugs insofar as they were delivered incident to a
22  physician's services.

Page 49

 1      Q.  I forgot to ask, but between 1996 and
 2  1998 when you were with the office of research and
 3  demonstrations -- if I have that correct -- did
 4  your job responsibilities relate in any way to the
 5  payment for prescription drugs?
 6      A.  Not that I recall.  It was not a
 7  significant issue as I recall.  But before that
 8  office and not one that I recall working on.  I
 9  can't say there wasn't some research going on.  But
10  we had many, many research projects and I was at a
11  supervisory level.
12      Q.  How long did you hold the position as
13  acting director of Hospital and Ambulatory Policy
14  Group?
15      A.  I was confirmed as director about six
16  months later as a permanent position and I held
17  that until -- I believe it was May of 2003 when I
18  was promoted -- moved upstairs -- to become the
19  deputy director of the center, which by then had
20  changed focus somewhat and had been renamed the
21  Center for Medicare Management.
22          That remained my job of record until the

13 (Pages 46 to 49)