UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) | Subcategory Docket: 06-CV-1137-PBS |
| | ) | |
| *United States of America, ex rel. Ven-a-Care* | ) | Hon. Patti B. Saris |
| *of the Florida Keys, Inc. v. Abbott* | ) | |
| *Laboratories, Inc.*, | ) | |
| CIVIL ACTION NO. 06–CV-11337-PBS | ) | |

UNITED STATES' RESPONSE TO ABBOTT LABORATORIES RULE 56.1 STATEMENT
OF ADDITIONAL FACTS THAT PRECLUDE SUMMARY JUDGMENT

Dated: September 22, 2009

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA
Mark A. Lavine
Ann M. St. Peter-Griffith
Special Assistant Us Attorneys
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101
*Counsel for the United States*


JAMES J. BREEN
The Breen Law Firm, P.A.
5755 North Point Parkway
Alpharetta, Georgia 30022
Phone (770) 740-0008
*Counsel for the Ven-A-Care of the Florida
Keys, Inc.*

TONY WEST
ASSISTANT ATTORNEY GENERAL
Joyce Branda
Daniel Anderson
Renée Brooker
Justin Draycott
Rebecca Ford
Elizabeth Strawn
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088
Fax: (202) 307-3852

MICHAEL K. LOUCKS
ACTING UNITED STATES ATTORNEY
George B. Henderson, II
Assistant Us Attorney
John Joseph Moakley Us Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3398
Fax: (617) 748-3272


*Counsel for the United States*

The United States respectfully submits its Response to Abbott Laboratories, Inc.'s Rule 56.1 Statement of Additional Facts ("ABT SOAF") which Abbott contends should preclude summary judgment for the United States.  Contemporaneously herewith, the United States files its Response to Defendants' Combined Statement of Additional Facts (US Resp. to Combined SOAF).

## GENERAL RESPONSES AND OBJECTIONS

1.      The ABT SOAF does not purport to be a statement of facts submitted in support of Abbott's motion for summary judgment pursuant to LR 56.1, and to the extent it is intended as such, the United States objects because LR 56.1 requires such a statement to be submitted at the time Abbott filed its motion for summary judgment.  *See* LR 56.1, first sentence.  The United States considers the ABT SOAF to be part of Abbott's opposition to the United States' motion for partial summary judgment, submitted pursuant to the third sentence of LR 56.1.  Therefore, any part of the ABT SOAF not controverted herein shall not be deemed admitted for any purpose, except to the extent expressly admitted, and in that case it is admitted solely for purposes of defendants' oppositions to the United States' motions for partial summary judgment. To the extent the ABT SOAF is proffered by Abbott in support of its motion for summary judgment, the United States requests that the Court disregard it for that purpose.

2.      To the extent that any assertions set forth in the ABT SOAF overlap with those in the Def. Combined SOAF, the United States adopts and incorporates by reference its responses to the same facts as set forth in the US Resp. to Combined SOAF.  Any additional responses below to such overlapping facts in no way amend or are intended to withdraw the responses set

forth in the US Resp. to Combined SOAF.

3.      With respect to testimony from current and former state and federal officials, the United States adopts herein the US Resp. to Combined SOAF, *passim*, (numerous responses by the United States pertaining to federal and state witness testimony, including additional statements 91.1 to 91.9).   Under *United States v. Lachman*, 387 F.3d 42, 54-55 (1st Cir. 2004), the non-public or informal understandings of agency officials concerning the meaning of agency regulations are not relevant to interpreting the regulations.

## STATEMENTS AS TO WHICH THERE IS GENERALLY NO DISPUTE

The United States submits that for the following statements in the ABT SOAF, there is generally no dispute as to their accuracy as they relate to the Subject Drugs: Nos. 1, 4, 5, 6, 9, 10, 14, 16, 17, 20, 21, 28, 29, 30, 31, 32, 49, 50, 65, 69, 70, 71, 72, 73, 77, 78, 81.  As stated above, these statements are only undisputed in the context of Abbott's opposition to the United States' cross-motion for partial summary judgement against Abbott.  The United States does not admit that the above statements are material to the resolution of the Abbott's motion for summary judgment against the United States.  Further, the United States does not admit that the testimony or documents referenced in ABT-SOAF actually support the above-listed statements or that the referenced testimony or documents either constitute competent evidence or are admissible at trial.

## STATEMENTS THAT ARE IDENTICAL OR NEARLY IDENTICAL TO THE DEFENDANTS' COMBINED ADDITIONAL STATEMENTS OF FACT

For the following statements, the United States incorporates and repeats the US Resp. to Combined SOAF as designated below, which are identical or virtually identical to certain of the

Defendants' Combined SOAF.  Because these statements have already been addressed in the US

Resp. to Combined SOAF, the United States will not repeat the statements from the ABT SOAF.

United States' Response to ABT SOAF ¶ 84:

The United States incorporates its US Resp. to Combined SOAF ¶ 2(h).

United States' Response to ABT SOAF ¶ 85:

The United States incorporates its US Resp. to Combined SOAF ¶ 2(i).

United States' Response to ABT SOAF ¶ 87:

The United States incorporates its US Resp. to Combined SOAF ¶ 3(h) .

United States' Response to ABT SOAF ¶ 91:

The United States incorporates its US Resp. to Combined SOAF ¶ 51.

United States' Response to ABT SOAF ¶ 92:

The United States incorporates its US Resp. to Combined SOAF ¶ 52.

United States' Response to ABT SOAF ¶ 93:

The United States incorporates its US Resp. to Combined SOAF ¶ 53.

United States' Response to ABT SOAF ¶ 96:

The United States incorporates its US Resp. to Combined SOAF ¶ 80(b).

United States' Response to ABT SOAF ¶ 102:

The United States incorporates its US Resp. to Combined SOAF ¶ 74.

United States' Response to ABT SOAF ¶ 103:

The United States incorporates its US Resp. to Combined SOAF ¶ 75.

United States' Response to ABT SOAF ¶ 104:

The United States incorporates its US Resp. to Combined SOAF ¶ 78.

United States' Response to ABT SOAF ¶ 107:

The United States incorporates its US Resp. to Combined SOAF ¶ 140.

United States' Response to ABT SOAF ¶ 108:

The United States incorporates its US Resp. to Combined SOAF ¶ 141.

United States' Response to ABT SOAF ¶ 109:

The United States incorporates its US Resp. to Combined SOAF ¶ 120.

United States' Response to ABT SOAF ¶ 119:

The United States incorporates its US Resp. to Combined SOAF ¶ 88.

**INDIVIDUAL RESPONSES TO ABBOTT'S STATEMENT OF ADDITIONAL FACTS**

2.      These multi-source generic products are generally administered via an infusion pump or IV injection.  (Montanez Expert Rep. at 4, Ex. 92.)

United States' Response to ABT SOAF ¶ 2:

The United States objects to Abbott Statement of Additional Fact 2 on the ground that the

expert report of Dr. Montanez is hearsay.  Responding further, the United States incorporates,

herein, its discussion of Dr. Montanez's inadequacies as an expert witness and his lack of a

factual predicate for his report and opinions, as set forth in the United States' Response to Abbott

Statement of Additional Fact 110.

3.      Administration of the Subject Drugs requires much more labor than traditional pharmacy pill dispensing: the products generally must be mixed in a sterile environment per physician's orders, mUst often be refrigerated and transported directly to a patient's home, and are dispensed through the Use of ancillary supplies (such as bags, tubes, and pumps), often with a nurse's assistance.  (Montanez Expert Rep. at 11-20, Ex. 92.)

United States' Response to ABT SOAF ¶ 3:

The United States objects to Abbott Statement of Additional Fact 3 on the ground that the

expert report of Dr. Montanez is hearsay.  Further responding, the above statement is not true for all applications and administrations of the Subject Drugs.  Notably, especially the dispensing of fluids like Dextrose or Saline can be as simple as providing the bag of fluid from a stocking shelf.  The United States also incorporates by reference herein, its discussion of Dr. Montanez's inadequacies as an expert witness and his lack of a factual predicate for his report and opinions, as set forth in the United States' Response to Abbott Statement of Additional Fact 110.

7.     HBS marketed its products to hospitals, and it accounted for approximately 90% of all HPD revenues.  (3/31/08 Sellers Dep. 482:9-15, Ex. 76; 6/3/08 Gonzalez Dep. 88:3-10, Ex. 28.)

United States' Response to ABT SOAF ¶ 7:

Disputed. This statement is not material to the United States' cross-motion for summary judgment.  Moreover, Abbott refused to produce information concerning sales other than sales for the Subject Drugs.  Through its refusal to produce information or evidence which it now asserts is material in this case, Abbott is in violation of Fed. R. Civ. P. 37(b),(c).  *See Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (holding that Fed. R. Civ. Proc. 37(c)(1) "applies with equal force" to the preclusion of evidence in summary judgment proceedings).  Furthermore, evidence concerning Abbott's lobbying efforts reveals that Calcijex, a product sold by Abbott's Renal department, which was part of Abbott's Alternate Site Business Unit (US-A-SF ¶10), accounted for one-third of Abbott HPD's profits, at least in or around 1996-1997. (St. Peter-Griffith Decl. Ex. 12 (Abbott Case Plaintiffs Ex. 1138))

8.     HBS's hospital customers were not generally reimbursed by reference to compendia prices such as AWP, but rather by Diagnosis Related Group codes - a lump payment that includes all products associated with a particular treatment.  (3/16/08 Sellers Dep. 98:2-6, Ex. 75.)

United States' Response to ABT SOAF ¶ 8:

This statement is not material to the United States' cross-motion for summary judgment.

Moreover, the United States lacks information to admit or deny Abbott Statement of Additional

Fact 8 because Abbott refused to produce information concerning sales to hospitals and any sales

for the Subject Drugs other than those made by its Alternate Site Business Unit.  Through its

refusal to produce information or evidence which it now asserts is material in this case, Abbott is

in violation of Fed. R. Civ. P. 37(b),(c).  *See Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 60

(1st Cir. 2001) (holding that Fed. R. Civ. Proc. 37(c)(1) "applies with equal force" to the

preclusion of evidence in summary judgment proceedings).

11.     The Renal group was responsible for about 50% of Alternate Site revenues.  (*See e.g.*, ABT-DOJ 0312188, 0312219, 0312248, 0312279, 0312306, 0312399, 0312583, and 0312708, Ex. 124.)

United States' Response to ABT SOAF ¶ 11:

This statement is not material to the United States' cross-motion for summary judgment.

Moreover, the United States lacks information to admit or deny Abbott Statement of Additional

Fact 11 because Abbott refused to produce information concerning sales other than sales for the

Subject Drugs.  Through its refusal to produce information or evidence which it now asserts is

material in this case, Abbott is in violation of Fed. R. Civ. P. 37(b),(c).  *See Lohnes v. Level 3*

*Communs., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (holding that Fed. R. Civ. Proc. 37(c)(1) "applies

with equal force" to the preclusion of evidence in summary judgment proceedings).

12.     As with HBS's hospital customers, the Renal group's customers were generally not reimbursed by reference to compendia prices, such as AWP.  Instead, there was specialized reimbursement for end-stage renal disease.  (8/22/06 Heggie Dep. 25:19-26:3, Ex. 35.)

<u>United States' Response to ABT SOAF ¶ 12:</u>

This statement is not material to the United States' cross-motion for summary judgment. Moreover, the United States lacks information to admit or deny Abbott Statement of Additional Fact 12 because Abbott refused to produce information concerning sales other than sales for the Subject Drugs. Abbott produced very little information pertaining to its Renal operations, though the documents reveal that for its Renal Product Calcijex, Abbott HPD reported AWP information directly to the compendia. (*See* Collection of Heggie and HPD documents re: Calcijex AWP reporting) (Lavine Decl. Exs. 17, 18, 19, 20, 21, 22, & 23) (Dkt. 6302)) Through its refusal to produce information or evidence which it now asserts is material in this case, Abbott is in violation of Fed. R. Civ. P. 37(b),(c). *See Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (holding that Fed. R. Civ. Proc. 37(c)(1) "applies with equal force" to the preclusion of evidence in summary judgment proceedings).

13.     Alternate Site Product Sales and Home Infusion Services together accounted for about 5% of total HPD revenues. (6/3/08 Gonzalez Dep. 125:3-6, Ex. 28.)

<u>United States' Response to ABT SOAF ¶ 13:</u>

This statement is not material to the United States' cross-motion for summary judgment. Moreover, the United States lacks information to admit or deny Abbott Statement of Additional Fact 13 because Abbott refused to produce information for any sales other than for the Subject Drugs. Through its refusal to produce information or evidence which it now asserts is material in this case, Abbott is in violation of Fed. R. Civ. P. 37(b),(c). *S ee Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (holding that Fed. R. Civ. Proc. 37(c)(1) "applies with equal force" to the preclusion of evidence in summary judgment proceedings).

15.    Home Infusion Services, a small group with fewer than 40 customers, was not sales-oriented.  (6/28/07 Kreklow Dep. 273:10-274:10, Ex. 43; 10/11/07 Rodman Dep. 524:10-18, Ex. 64; 3/31/08 Sellers Dep. 457:15-458:6, Ex. 76; 2/13/07 Sellers Dep. 210:2-16, Ex. 72.)

United States' Response to ABT SOAF ¶ 15:

The United States does not dispute that Abbott Home Infusion Services catered to a smaller number of revenue share partners and customers.  However, Abbott witnesses at deposition could not confirm the exact number of contracts, and therefore the United States cannot admit or deny this statement.  Overall, from 1991 to 2001, Abbott Home Infusion Services billed over $1.7 billion to and was paid over $660 million by third-party payors.  Of that total, claims to Medicare and Medicaid that included at least one of the Subject Drugs accounted for $232 million in billings and over $45 million paid to Abbott. (Tables A, B & C to Duggan Supplemental Report) (St. Peter-Griffith Decl. Ex. 20)

18.    Home Infusion Services was in part a means to allow Abbott to expand its presence in the field of home infusion therapy.  (1/17/08 Leone Dep. 194:7-21, Ex. 45; 4/19/07 Snead Dep. 132:5-133:15, Ex. 78.)

United States' Response to ABT SOAF ¶ 18:

The United States does not dispute that Abbott witnesses provided testimony that supports this statement.  The United States disputes, however, any implied inference that the sales made by Abbott's Home Infusion Services business unit were insignificant.  To the contrary, Abbott Home Infusion Services billed over $1.7 billion to and was paid over $660 million by third-party payors during the relevant time period.  Further, it billed more than $232 million to Medicare and Medicaid on claims that included at least one of the Subject Drugs.  *See* US Resp. ABT SOAF ¶ 15.  (St. Peter-Griffith Decl. Ex. 20)

19.     For its services to customers, Abbott was paid either at a per diem rate, or based upon a percentage of the amounts collected from third party payers.  (6/28/07 Kreklow Dep. 277:7-17, Ex. 43; 6/02/05 Tobiason Dep. 50:4-25, Ex. 82.)

United States' Response to ABT SOAF ¶ 19:

The United States does not dispute that Abbott witnesses provided testimony that supports this statement.  Importantly, however, Abbott does not provide data regarding the number of customers who paid Abbott a per diem rate versus those who paid Abbott based upon a percentage of the amounts Abbott collected from third party payers.  Abbott's Home Infusion Services business unit, billed more than $232 million dollars directly to Medicare and Medicaid, so its revenues attributable to federal programs was significant.  These revenues also suggest that the vast majority of Home Infusion Services' customers aggreed to pay Abbott a percentage of its collection from third party payors, such as Medicare and Medicaid.  The United States also incorporates, herein, its Response to ABT SOAF ¶ 15.

22.     In 1998, Abbott decided to discontinue Home Infusion Services.  (12/20/05 Sellers Dep. 72:19-73:4, Ex. 71; 2/14/07 Sellers Dep. 414:11-415:2, Ex. 73.)

United States' Response to ABT SOAF ¶ 22:

The United States does not dispute that Abbott witnesses provided testimony that supports this statement.  Further responding, even after the decision was made in 1998 to close Home Infusion Services, employees of that unit were not notified until 2000, and in 1998, 1999, 2000 and 2001, Abbott continued to bill Medicare and Medicaid through its Home Infusion Services business unit.  The United States also incorporates, herein, its Response to ABT SOAF ¶ 15.

23.     The decision to close Home Infusion Services was made because, among other things, the business model was outside Abbott's core business of pharmaceutical development

and sales and because the business was, at best, only marginally profitable.  (6/03/08 Gonzalez Dep. 172:9-173:6, Ex. 28.)

United States' Response to ABT SOAF ¶ 23:

The United States does not dispute that Mr. Gonzalez provided testimony that supports Abbott Statement of Additional Fact 23, however, this statement is not material to the United States' cross-motion for summary judgment.  Further, the United States has no independent information to admit or deny this statement.  Abbott did not produce to the United States any information to gauge the profitability of the business unit.  Further, the United States lacks detail on the cost of uncharged inventory and services that Abbott provided to its revenue partners.  The United States also incorporates, herein, its Response to ABT SOAF ¶¶ 8, 15.

24.     Home Infusion Services was phased out gradually, to allow the existing to be honored through their completion.  (2/14/07 Sellers Dep. 414:11-415:2, Ex. 73.)

United States' Response to ABT SOAF ¶ 24:

The United States refers to and incorporates by reference, herein, its Response to ABT SOAF ¶ 22.

25.     Home Infusion Services closed in 2001.  (11/01/07 Sellers Dep. 68:14-18; 124:4-9, Ex. 74.)

United States' Response to ABT SOAF ¶ 25:

The United States refers to and incorporates by reference, herein, its Response to ABT SOAF ¶ 22.

26.     Abbott had different price levels for the Subject Drugs for different types of customers.  (2/28/08 Baker Dep. 415:13-417:11, Ex. 5; 12/6/05 Karas Dep. 116:2-6, Ex. 38; 3/31/08 Sellers Dep. 351:2-14, Ex. 76)

United States' Response to ABT SOAF ¶ 26:

The United States refers to and incorporates by reference herein, its Response to ABT

SOAF ¶ 22.

27.    The lowest (best) price for the Subject Drugs was made available directly to the Government, and Abbott sold the Subject Drugs at this low price (far below the compendia AWP) to such governmental agencies as the Veteran's Administration and the Department of Defense.  (3/16/08 Sellers Dep. 311:1-313:3, Ex. 75.)

United States' Response to ABT SOAF ¶ 27:

Disputed.  This statement is not material to the United States' cross-motion for summary

judgment. Moreover, the United States disputes that Abbott accurately reported or sold at its

lowest prices to government agencies such as the Veteran's Administration, during the operative

period of this case.  Abbott did not produce all of its 340B pricing and sales information during

discovery.  Abbott witnesses admit that Abbott's best price calculations for HPD products were

not accurately calculated during the operative period of this case.  *See* US-A-SF ¶¶ 115, 118.

The United States was unable to discover more information concerning the nature and breadth of

the miscalculations due to Abbott's assertion of attorney-client privilege and instructions to

witness not to answer.

33.    List Price sales, though not common, were valuable to Abbott, since they comprised the highest profit margin of any sales.  (3/16/08 Sellers Dep. 57:1-9, Ex. 75; 4/24/07 Eichhorn Dep. 74:13-75:14, Ex. 22; 8/29/07 Karas Dep. 63:18-64:22, Ex. 39.)

United States' Response to ABT SOAF ¶ 33:

Disputed.  *See* US-A-SF ¶ 62.

34.    These sales sometimes occurred in situations where a competitor might have a supply shortage and be unable to fill its customers' needs, allowing Abbott to make opportunistic sales at the high List Price as those customers sought to cover the shortage.  (3/16/08 Sellers Dep. 288:14-289:16, Ex. 75; 5/17/07 Sebree Dep. 51:13-52:10, Ex. 69; 8/29/07 Karas Dep. 33:7-19, Ex. 39.)

United States' Response to ABT SOAF ¶ 34:

The United States does not dispute that Abbott witnesses provided testimony that supports this statement.  The United States disputes, however, the implication that sales at less than two-tenths of one percent of Alternate Sites' sales were "significant" to Abbott, particularly given Abbott's allegation that Alternate Site comprised less than 5% of its revenue.

35.     In addition, List Price was Useful to Abbott because it gave customers an incentive to contract with Abbott (to obtain a lower price for generics) and it served as the pricing point for proprietary products.  (8/23/07 Mershimer Dep. 85:2-86:12, Ex. 51; 9/13/07 Robertson Dep. 142:12-143:4, Ex. 65)

United States' Response to ABT SOAF ¶ 35:

The United States refers to and incorporates by reference herein, its Response to ABT SOAF ¶ 33.

36.     In the early 1980s, Ven-A-Care's former President Luis Cobo, then-owner of a retail pharmacy, did not have a contract with Abbott for saline solution (one of the Subject Drugs).  When one of Cobo's pharmacy customers asked to order a small quantity of saline, Mr. Cobo was required by Abbott to pay List Price and purchase an entire case.  (1/8/08 Cobo Dep. 132:13-136:8, Ex. 16.)

United States' Response to ABT SOAF ¶ 36:

The United States does not have sufficient information to admit or deny Abbott Statement of Additional Fact 36.  Moreover, this statement is not material as it pertains to sales made by Abbott in the 1980s, which is outside of the operative time period of this case (1991 to 2001).  Abbott itself moved to preclude the United States from obtaining discovery concerning its transactions outside of this time period.  Through its refusal to produce information or evidence which it now asserts is material in this case, Abbott is in violation of Fed. R. Civ. P. 37(b),(c).  See Lohnes v. Level 3 Communs., Inc., 272 F.3d 49, 60 (1st Cir. 2001) (holding that Fed. R. Civ.

13

Proc. 37(c)(1) "applies with equal force" to the preclusion of evidence in summary judgment proceedings).

37.     List Prices for the Subject Drugs were set by HBS.  (3/16/08 Sellers Dep. 97:20-99:12, Ex. 75; 8/23/07 Mershimer Dep. 81:11-22, Ex. 51; 5/17/07 Heggie Dep. 202:6-18, Ex. 34.)

United States' Response to ABT SOAF ¶ 37:

The United States generally agrees with this statement as applying much of the time during the operative time period of this case.  However, the United States submits that Abbott did not always adhere to this policy.  (*See* US-A-SF ¶¶ 39, 71-81)  On at least one occasion in 1995, Abbott Alternate Site employees were involved in the lowering and re-raising of the price of Vancomycin.  Moreover, the fact that HBS set list prices does not mean that HPD HBS employees, including Jerrie Cicerale, the Abbott employee responsible for reporting list prices for HPD, or Abbott employees in general, lacked an understanding of the impact of Abbott HPD's reported list price on government reimbursement.  Michael Heggie actually directly reported AWP for Abbott HPD's product Calcijex.  *See also* US-A-SF ¶¶ 31-38, 48, 87 and 88.

38.     Alternate Site had no role in setting List prices.  (3/16/08 Sellers Dep. 273:18-275:2, Ex. 75; 8/23/07 Mershimer Dep. 81:11-22, Ex. 51; 5/17/07 Heggie Dep. 202:6-18, Ex. 34.)

United States' Response to ABT SOAF ¶ 38:

The United States refers to and incorporates by reference  herein, its Response to ABT SOAF ¶ 37.

39.     List prices were not set by reference to, or in order to influence, the AWPs for the Subject Drugs.  (3/16/08 Sellers Dep. 163:10-165:22; 169:17-170:14; 207:2-19; 216:20-217:3; Ex. 75; 3/31/08 Sellers Dep. 369:17-370:14; 391:1-12; 421:2-11, Ex. 76; 4/24/07 Eichhorn Dep. 83:22-84:3, Ex. 22.)

<u>United States' Response to ABT SOAF ¶ 39:</u>

Disputed.  There is a plethora of evidence to demonstrate that Abbott, in its List price setting and reporting, knew or should have known, of the effect it would have on creating spreads and causing the submission of false claims to the Medicare and Medicaid programs.

A business unit in the same Abbott HPD division, Home Infusion, itself was submitting claims for inflated reimbursement on the Subject Drugs to Medicare and Medicaid.   (US-A-SF ¶¶ 132-146)  Key Abbott Alt Site employees, including a manager of reimbursement, a national account manager, and the Home Infusion contract marketing manager admit they had varying pieces of knowledge about the relationship between list price, AWP and Medicare and Medicaid reimbursement.  (US-A-SF ¶ 31-38)  Similarly, the HPD HBS's Basic Operating Procedure contract marketing manual reflected the formula used by the compendia to translate list price to an AWP.  (US-A-SF ¶ 104)  Abbott itself, in its PPD division, employed a list price calculation whereby it reported for most of its products at list prices calculated as WAC, plus 5%.  Yet, Abbott HPD from 1991 to 2001, still used a formula that created the megaspreads on the Subject Drugs that are the basis for this action.  (US-A-SF ¶ 47)

Abbott kept abreast of Medicare and Medicaid statutes, engaged in lobbying, and monitored legislation for changes in reimbursement through its Medicare Working Group which had an HPD representative.  (*See* US Resp ABT SOAF ¶ 82)(St. Peter-Griffith Decl. Ex. 12)  It aggressively lobbied in 1997 to preclude language in the Balanced Budget Act that would have afforded discretion to the HHS Secretary to adjust reimbursement down from 95% of AWP if it was excessive.

Finally, during this same period of this case in the late 1990s and 2000, Abbott's joint

venture TAP Pharmaceuticals was the subject of a criminal probe.  In 2001, TAP ultimately

entered into a plea arrangement, and agreed to a fine and civil settlement totaling nearly $850

million for its AWP spread and spread marketing conduct.  Abbott itself entered into a side letter

agreement with the United States incident to the TAP plea and settlement.  (US-A-SF ¶¶ 130,

131)  Abbott's in-house lawyers, who had exclusive domain within Abbott over Medicare and

Medicaid compliance, worked with TAP Pharmaceuticals on its AWP issues and problems,

including serving as co-counsel on a 1987 legal brief concerning AWP reimbursement.  (US-A-

SF  ¶¶ 130-131)

40.     During the period 1991-1999, List prices for the Subject Drugs were adjusted
approximately annually to reflect changes in the Consumer Pricing Index.  (3/16/08 Sellers Dep.
98:20-99:9, Ex. 75; 8/23/07 Mershimer Dep. 45:3-46:2; 319:2-7, Ex. 51; 8/29/07 Karas Dep.
32:23-33:4, Ex. 39.)

United States' Response to ABT SOAF ¶ 40:

The United States refers to and incorporates by reference herein, its Responses to ABT

SOAF  ¶¶ 37 and 39.

41.     This annual adjustment typically resulted in an increase in the List prices of about
3-5%.  (3/16/08 Sellers Dep. 100:17-22; 104:1-12, Ex. 75; 4/24/07 Eichhorn Dep. 77:17-78:1,
Ex. 22.)

United States' Response to ABT SOAF ¶ 41:

The United States refers to and incorporates by reference herein, its Responses to ABT

SOAF ¶¶ 37 and 39.

42.     HBS was responsible for reporting prices for the Subject Drugs to the various
third-party pricing compendia.  (3/16/08 Sellers Dep. 94:21-95:22; 135:8-12, Ex 75; 2/13/07
Sellers Dep. 140:21-141:2, Ex. 72; 5/30/07 Cicerale Dep. 14:11-22; 59:20-60:4, Ex. 13.)

<u>United States' Response to ABT SOAF ¶ 42:</u>

The United States generally agrees with this statement as applying much of the time during the operative time period of this case.  However, the United States submits that Abbott did not adhere to this policy 100% of the time.  *See* US-A-SF ¶¶ 39, 71-81.  On at least one occasion, Abbott's Alternate Site unit employees were involved in the lowering and re-raising of the price of Vancomycin in 1995, and directing the reporting of those changed prices.

Moreover, HPD employees, including Jerrie Cicerale, the Abbott employee responsible for reporting list prices for HPD, or Abbott employees in general, had an understanding of the impact of Abbott HPD's reported list price on government reimbursement.  In 2001, explained to her HPD HBS boss Harry Adams, who was responsible for *setting* HPD list price, her 20 year belief that First Databank calculated its published AWPs from Abbott's List price information.  She wrote in January 2001:

> Harry, I sent the price decrease changes for the WAC prices to the databank companies today and I am not really understanding how First Databank calculates the AWP that is in their system.  *I have always known that price to be a calculation from our direct (list) price not the wholesale price.*

(*See* Plaintiffs' Exhibit 941) (St. Peter-Griffith Decl. Ex. 2)

Ms. Cicerale wrote in a follow-up email at 3:35 p.m. : "Kay - I wasn't trying to question what you are doing but that is how I have understood the process for over 20 years. . . ."  *Id*. Ms. Morgan thereafter e-mailed:  "Let me reiterate what I [said] below.  AWP is AVERAGE WHOLESALE PRICE.  We determine AWP by contacting the wholesalers for the mark-up.  As long as your direct [list] was equal to WAC life was fine."  Notably, this email exchange occurred incident to Abbott in 2001 reporting WAC prices on its Subject Drugs, among others.

(*See* Sellers Dep. Ex. 586) (St. Peter-Griffith Decl. Ex. 2)  *See also* US-A-SF ¶¶ 31-38, 87 & 88

Michael Heggie also actually directed the reported AWP for Abbott HPD's product Calcijex.

*See also* US-A-SF ¶¶ 31-38, 87, 88 104.  (*See* Collection of Heggie and HPD documents re:

Calcijex AWP reporting) (Lavine Decl. Exs. 17, 18, 19, 20, 21, 22, & 23) (Dkt. 6302)

43.     Alternate Site also had no role in reporting prices for the Subject Drugs to the various publishing compendia.  (2/13/07 Sellers Dep. 167:23-168:11; 175:2-24, Ex. 72; 3/16/08 Sellers Dep. 129:3-15, Ex. 75.)

United States' Response to ABT SOAF ¶ 43:

The United States refers to and incorporates by reference herein, its Response to ABT

SOAF ¶ 42.

44.     HBS accurately reported to the compendia Abbott's List (Direct) price and its published Wholesale Acquisition Cost (WAC) for the Subject Drugs.  (3/16/08 Sellers Dep. 93:6-94:16, Ex. 75; 5/30/07 Cicerale Dep. 60:5-10; 61:18-62:1, Ex. 13; Ex. 125 (Cicerale Ex. 925).)

United States' Response to ABT SOAF ¶ 44:

Disputed.  Abbott HBS may have reported its list prices as set forth in its catalogs to the

compendia, but it did not report its true average wholesale price (AWP).  Further Abbott knew,

or should have known, that its list prices were used to calculate the AWPs reported by the

compendia.  Abbott admits that its list prices were not reflective of its average wholesale prices

in the market place.  Indeed, Abbott's Home Infusion Services business model, in part, was

predicated on its ability to collect spreads on behalf of its revenue share partners from Medicare

and Medicaid.  *See* US-A-SF ¶¶ 107-108, 132-146.

By Abbott's own admission, First Databank did not report WAC prices for the vast

majority of the Subject Drugs.  In making this statement, Abbott appears to create a disputed

issue of fact concerning its own Statement of Undisputed Fact No. 174. (MD 6320)  The United

States refers to and incorporates by reference herein, its Response to ¶¶ 37 and 39.  *See also* US-

A-SF ¶¶ 31-38, 87-88, 104.

46.  HBS did not provide to the compendia an AWP or a "suggested" AWP for the
Subject Drugs.  (3/16/08 Sellers Dep. 204:5-18, Ex. 75; 3/31/08 Sellers Dep. 370:4-14, Ex. 76;
5/30/07 Cicerale Dep. 87:6-8; 137:17-20; 159:20-23, Ex. 13; Ex. 127 (2003 HPD Direct and
Wholesale Price Changes); Ex. 128 (2003 HPD Drug Wholesaler Price Catalog); Ex. 129 (2003
HPD Price Catalog).)

United States' Response to ABT SOAF ¶ 45:

Denied.  The United States incorporates and repeats it Response to ABT SOAF ¶¶ 37, 39

and 44.  There is overwhelming evidence in this case that Abbott understood the relationship

between AWPs and reimbursement, and that it knew, or should have known, that its formulaic

equivalent list price reporting directly contributed to the calculation of AWPs by the compendia.

There is no dispute that Abbott reported the List prices that, in turn, were used by the compendia

to calculate the AWPs for Abbott products that the compendia reported.

The United States incorporates and repeats it US Resp. ABT SOAF  ¶¶ 37 and 39.  As

one example, Abbott vigorously lobbied in 1997 to preclude in the BBA language that would

have afforded discretion to the Secretary to lower reimbursement for Medicare below 95% of

AWP.  (US Resp to ABT SOAF ¶ 82)  Further, Abbott HPD employees did not work in an

isolation chamber.  Abbott's Pharmaceutical Products Division reported its List prices to the

compendia for the vast majority of its products, setting its List prices at WAC plus 5 %.  When

Abbott in 2001 decided to lower its list prices, it used PPD's historic WAC plus 5 % formula to

do so.  PPD is Abbott just as much as HPD is Abbott, and it is questionable, at best, for Abbott to

suggest that HBS employees believed that grossly inflated List price reporting was acceptable

when their colleagues in the PPD division were not engaging in the same fraudulent conduct

(other than with respect to PPD's erythromycin products).

If Abbott truly did not understand the relationship between its price reporting conduct and

its published AWPs, then there would have been no reason for Abbott to react negatively to the

publication of the DOJ AWPs, or to not address the reimbursement overpayment problems

created by its inflated AWPs when it first was contacted by the Attorney General in 1996, and

then again when it received the 1997 and 2000 OIG subpoenas, or the 1999 letter from the

Department of Justice.  Abbott similarly would have had no reason to become a signatory to the

to a white paper with other manufacturers, encouraging the United States not to intervene in this

case and other AWP related litigation. (US-A-SF ¶113)

Further, for some products, Abbott Alternate Site did provide AWP information directly

to the Compendia.  For Abbott's Calcijex, which constituted one third of HPD's profits,

Alternate Site reimbursement manager Michael Heggie directed the compendia as to what the

AWP should be.  (Lavine Decl. Exs. 17, 18, 19, 20, 21, 22, & 23)

Finally, the fact that not all of Abbott HPD's employees, including some of its sales

representatives did not understand the relationship between Abbott's List price reporting and

Abbott's published AWPs, is immaterial.

46.    The 2003 Red Book policy stated that "[w]hen the manufacturer does not provide
an AWP or markup formula from which AWP can be calculated, the AWP will be calculated by
applying a standard 20% markup over the manufacturer-supplied WAC.  If a WAC is not
provided, the standard markup will be applied to the DIRP."  (Ex. 126 (2003 Red Book Policy).)

United States' Response to ABT SOAF ¶ 46:

The United States disputes the materiality of the policy set forth above from the 2003

Redbook.  The relevant time period in this case as it pertains to Abbott's prices and conduct is

from 1991 to 2001.  Abbott is conspicuous in its failure to provide the Red Book policies for that

operative period.  Until early 2003, manufacturers controlled the AWPs.  *See* US-C-SF ¶ 93.

47.     HBS representatives reported List price and WAC to the compendia because that
is what they believed was requested.  (3/16/08 Sellers Dep. 93:6-94:16, Ex. 75; 2/13/07 Sellers
Dep. 168:12-21; 170:25-72:9; 178:14-21, Ex. 72.)

United States' Response to ABT SOAF ¶ 47:

The United States incorporates and repeats it Response to ABT SOAF ¶ 44.

48.     When Abbott discussed with First Data Bank the issue of price reporting, FDB
representative Kaye Morgan (who was responsible for the pricing information that FDB
published) stated that FDB expected Abbott to report its highest, undiscounted price.  (8/27/07
Morgan Dep. 28:19-29:3; Ex. 55; 10/25/07 Tootell Dep. 80:1-21, Ex. 84).

United States' Response to ABT SOAF ¶ 48:

Disputed.  The United States incorporates and repeats it US Resp. ABT SOAF ¶45.  In

her instructions regarding Abbott's price reporting, Ms. Morgan explained to Ms. Cicerale:

"AWP stands for AVERAGE WHOLESALE PRICE – it is the price from the wholesaler.  As

long as WAC and Direct were equal, it does not matter whether we were Using WAC or Direct. .

. . [*W]e cannot use Direct to determine AWP if it is different*."  (Morgan to Cicerale, 1/31/01 at

2:16(time)(emphasis supplied)).  (*See* St. Peter-Griffith Decl. Ex. 2 (Ex. 941)) Ms. Morgan then

wrote in that same email chain: "Let me reiterate what I [said] below.  AWP is AVERAGE

WHOLESALE PRICE.  We [FDB] determine AWP by contacting the wholesalers for the mark-

up.  As long as your direct [list] was equal to WAC life was fine." (*See* St. Peter-Griffith Decl.

Ex. 2 (Sellers Ex. 586))

Abbott has never provided documentary evidence reflecting that any compendium

provided its instructions to report its highest catalog price; nor did Abbott obtain any testimonial evidence from a compendium to that effect, even though Abbott counsel attended compendia depositions.  Critically, the record support provided by Abbott for Ms. Morgan does not include any evidence supporting the argument that Ms. Morgan instructed Abbott to report its highest undiscounted prices for its HPD division.  Abbott's cited testimony for Ms. Morgan simply confirms that when employed by FBD, Ms. Morgan populated the FDB databank with price reports from manufacturers.  Ms. Morgan did not testify that she "stated that FDB expected Abbott to report its highest, undiscounted price".

Abbott's reliance upon hearsay testimony from a non-HPD employee, Mr. Tootell, who worked exclusively for Abbott's nutritional Ross Products division, does not provide Abbott the record support for this proposition.  Indeed, Mr. Tootell is the Abbott employee who advised Abbott's in-house counsel about his concerns about the legalities of Abbott's list price reporting.  (*See* US-A-SF ¶¶ 120, 121).  Mr. Tootell only worked in the Ross Products Division, and his job responsibilities did not entail HPD.  (10/25/07 Tootell Dep. 28:11-22; 29-36; 37:1-4) (St. Peter-Griffith Decl. Ex. 18).  Mr. Tootell was unfamiliar with the reimbursement mark-ups made by the compendia for HPD products.  (10/25/07 Tootell Dep. 263:8-14) (St. Peter-Griffith Decl. Ex. 18).

Mr. Tootell's testimony merely recounts his undetailed recollections of a hearsay conversation.  Mr. Tootell claims he spoke with Ms. Morgan "in the 90's", but if that conversation took place, it would have had to have been in 1999.  Ms. Morgan was an Abbott employee from 1975 until 1999; in 1999 she moved to a position with FDB.  (8/27/07 Morgan Dep. 27:17-20) (St. Peter-Griffith Ex. 17)

No witness from HPD testified to having a similar communication with Ms. Morgan.  Mr. Tootell provides no testimony concerning his belief that the information allegedly imparted to him, by Ms. Morgan, applied to HPD.   Nor did he testify that he communicated that information to anyone within HPD.  There is also no record support for the proposition that the HPD HBS employees relied in any way upon that purported conversation between Mr. Tootell and Ms. Morgan.

Moreover, the comments lack context and there are no written materials corroborating the conversation.  Finally, Ms. Morgan's email instructions to Ms. Cicerale in 2001 belie any assertion that the conversation Mr. Tootell recalls in any way is applicable to HPD, as Ms. Morgan made clear to HPD that for HPD, FDB expected Abbott's reported price to be in line with its wholesale price.

This additional statement of fact is also belied by Abbott's own corporate representative testimony.  When asked why, prior to 2001, Abbott reported list prices, Mr. Sellers, as Abbott's corporate representative, did not identify any instructions from the compendia justifying or explaining Abbott's decision to report it list prices as opposed to a price more reflective of contract prices:

> Q.     (BY MR. ANDERSON)  And why was it that prior to April 2001 Abbott had chose not to report list prices that were in line with the prevailing contract prices?
>
> A.      Well, we reported all of our list prices.  So prior to that time we were using a different practice.
>
> Q.      Okay.  Given that distinction, why is it that prior to April 2001 Abbott was using a practice that resulted in direct or list prices being set at levels that were not reflective of prevailing contract prices?

23

MS. TABACCHI:  Object to the form of the question.

A.     It was -- it was -- it was just a practice of ours.

4/12/07 Sellers Corporate Rep. Dep. (Texas) at 705:11-25 (St. Peter-Griffith Decl. Ex. 3)

51.     During the claims period, Abbott did not understand AWP as published in the various compendia to mean an actual average market price.  (8/27/09 Sellers Decl.  7, 10-11, Ex. 89.)

United States' Response to ABT SOAF ¶ 51:

Disputed. The United States incorporates and repeats it US Resp. ABT SOAF ¶¶ 37, 39 and 45.

52.     There was no uniform understanding of AWP within the relevant division of Abbott.  (8/27/09 Sellers Decl. 11, Ex. 89.)

United States' Response to ABT SOAF ¶ 52:

Disputed. The United States incorporates and repeats its US Resp. ABT SOAF ¶¶ 37, 39 and 45.

53.     As numerous witnesses testified, Abbott did not set AWP for the Subject Drugs. (12/20/05 Sellers Dep. 153:4-12; 157:10-158:16, Ex. 71; 1/30/08 Haines Dep. 141-49, Ex. 31;  2/7/08 Kreklow Dep. 347:2-7, Ex. 44.)

United States' Response to ABT SOAF ¶ 53:

Disputed.  The United States incorporates and repeats its US Resp. ABT SOAF ¶¶ 37, 39,

42, 45 and 48.  Abbott's citation does not list "numerous" witnesses.  Moreover, at least some

Abbott employees did testify to that understanding.  (*See* US-A-SF ¶¶ 31-35).  Also, Ms.

Cicerale's January 2001 email chain to Ms. Morgan and Mr. Adams make clear that for 20 years

the employee who was responsible for reporting to the pricing compendia had an understanding

of the relationship between the published AWPs and Abbott's list price reporting.  (St. Peter-

Griffith Ex. 2)

Abbott, as a manufacturer whose products were reimbursed by Medicare and Medicaid, knew, or should have known, of the significance of AWP to Medicare and Medicaid reimbursement and the correlation to Abbott's list price reporting.  The fact that not all HPD employees may have had that understanding is immaterial.

54.     Abbott did not publish or report AWP for the Subject Drugs. (8/27/09 Sellers Decl. 12, Ex. 89; 8/29/07 Rodman Dep. 25:2-4, Ex. 63.)

United States' Response to ABT SOAF ¶ 54:

Disputed.  The United States incorporates and repeats it Response to ABT SOAF ¶ 53.

55.     Abbott did not charge AWP for the Subject Drugs to any of its customers. (2/7/08 Kreklow Dep. 131:2-7, Ex. 44; 11/1/07 Sellers Dep. 131:6-133:22, Ex. 74.)

United States' Response to ABT SOAF ¶ 55:

Disputed.  Abbott's Home Infusion documents reflect that it pegged its usual and customary pricing, at times, based upon AWP, or multiples of AWP.  (*See* US-A-SF ¶ 143(g); (citing Lavine Exh. 92 & 93).

56.     Plaintiffs deposed more than 65 persons who were formerly employed in Abbott HPD.

United States' Response to ABT SOAF ¶ 56:

Abbott does not provide record support for this fact.  The number of witnesses deposed in this case, out of thousands of employees, is immaterial.

57.     Fewer than 15 of these witnesses actually understood how the compendia calculated AWP for the Subject Drugs, namely by applying a markup to Abbott's List price. (*e.g.*, 10/25/07 Tootell Dep. 296:21-297:22, Ex. 84.)

United States' Response to ABT SOAF ¶ 57:

Abbott does not provide record support for this fact.  The actual number of witnesses

deposed who understood how the compendia calculated AWP is immaterial.  Mr. Tootell was not

an HPD employee.  The United States incorporates and repeats it US Resp. ABT SOAF ¶¶  37,

39 and 45.  (*See* US-A-SF ¶¶ 82-92).

58. A few others understood generally that AWP was published by the compendia and
had some relationship to Abbott's prices, but did not know the precise nature of that relationship.
(2/26/08 Cannon Dep. 391:1-393:3, Ex. 12; 10/9/07 Robertson Dep. 530:9-531:4, Ex. 66.)

United States' Response to ABT SOAF ¶ 58:

The United States incorporates and repeats it Response to ABT SOAF ¶ 57.

59. Many others testified that they did not really understand the nature of AWP at all,
except that it stood for "average wholesale price."  (2/28/08 Miser Dep. 201:4-17, 214:3-4,
230:9-15, Ex. 54; 2/13/08 Rayford Dep. 104:7-17; 120:4-10, Ex. 57; 2/21/08 Aldy Dep.
157:1-158:3; 332:2-337:7, Ex. 1; 3/13/08 Johnson Dep. 81:9-82:3, Ex. 37; 9/7/07 Rotz Dep.
152:5-8, Ex. 67.)

United States' Response to ABT SOAF ¶ 59:

The United States incorporates and repeats its Response to ABT SOAF ¶ 57.  Notably,

the witnesses cited by Abbott are primarily individuals interested in sales, not actual price setting

or reporting.

60. One witness, Bruce Rodman, testified that at one time he assumed AWP was a
literal average price, but as he learned more about it later, he discovered that it was merely a
benchmark, undiscounted price.  (8/29/07 Rodman Dep. 21:17-27:1, Ex. 63.)

United States' Response to ABT SOAF ¶ 60:

The United States admits that Mr. Rodman provided such testimony.  However, Mr.

Rodman testified that his alleged understanding about a "benchmark" was formulated years after

he left Abbott.  During his tenure as an Abbott employee who supervised Abbott Home

Infusion's collection of spread-based reimbursement for Medicare and Medicaid, among other payors, Mr. Rodman understood AWP to be a literal average.  (8/29/07 Rodman Dep. 21:17-25; 22-24; 25:1-12) (St. Peter-Griffith Ex. 11)

61.     At most, Abbott understood AWP to be an undiscounted price calculated by the compendia.  (8/27/09 Sellers Decl. 11, Ex. 89.)

United States' Response to ABT SOAF ¶ 61:

Disputed.  The United States incorporates and repeats it Response to ABT SOAF ¶¶ 45 and 48.

62.     Abbott reported Average Manufacturers Price ("AMP") for the Subject Drugs directly to the Government on a quarterly basis.  (6/27/07 Lyman Dep. 36:3-20, Ex. 50.)

United States' Response to ABT SOAF ¶ 62:

Disputed.  Abbott may have reported prices it called Average Manufacturer Prices (AMPs) during the operative period of the case to a particular office within CMS.  The United States, however, denies the accuracy of that data based upon Abbott's own witness testimony and documents, which reflect that, since the inception of the AMP program requirement, the methods that Abbott was using to calculate its AMPs, as well as its 304b program pricing was inaccurate. Abbott had an independent PriceWaterhouseCoopers audit to confirm this information.  (*See* US-A-SF ¶¶ 114-118).  Since Abbott is asserting privilege over much of this information, and the United States cannot assess the nature and magnitude of Abbott's false AMP price reporting, Abbott should be foreclosed from asserting or using any AMP arguments in defense the United States' summary judgment motion.

63.     In all, Abbott reported its AMP for the Subject Drugs directly to CMS about 40 times during the claims period.

United States' Response to ABT SOAF ¶ 63:

Disputed.  The United States incorporates and repeats it Response to ABT SOAF ¶ 62.

64.     Rather than focusing on individual products, Alternate Site Product Sales field representatives marketed the entire HPD product portfolio as a package.  (3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 45; 3/5/09 Reisetter Expert Rep. 28, Ex. 58; Sales Training Module, Ex. 96.)

United States' Response to ABT SOAF ¶ 64:

Disputed.  Abbott's own Rule 30(b)(6) witness denied this factual assertion.  Sellers

30(b)(6) explained how for the Alternate Site Market, which was largely governed by Group

Purchasing Organization (GPO) awards, GPOs would not award bids for its member based upon

an whole portfolio.  Rather the awards were made on the basis of pricing for an individual drug.

(Sellers 3/16/08 30b6 Dep at 351:22; 352-353; 354:1-4) (St. Peter-Griffith Ex. 4)  Unless Abbott

received a GPO contract for its entire portfolio, it could not sell to the GPO customers based

upon its entire portfolio, but rather the sales staff could sell based upon the individual drugs

awarded under the GPO contract on a drug by drug basis.

66.     Sales representatives were not instructed to market products based upon any "spread" between the customer's acquisition cost and the payment amount the customer would receive for dispensing that product from Medicare or Medicaid.  (3/18/08 Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep. 39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09 Reisetter Expert Rep.  28, Ex. 93; Sales Training Module, Ex. 96.)

United States' Response to ABT SOAF ¶ 66:

Disputed.  It was acceptable for Abbott sales representatives to provide information

concerning Abbott's AWPs to GPOs.  (1/23/08 Rhodus Dep. 134:5-13) ((Lavine Decl. Ex. 88

(Sellers 30b6, 3/16/08 at 193:2-22; 194:1-12 )) (*See also*, US-A-SF ¶¶ 96-103)  GPOs made

28

awards to Abbott for contracts for individual products based upon AWPs; and, at times Abbott

paid GPOs to assist in promoting Abbott products among its members.  (Rhodus Dep. 169:6-22;

167-172; 173:1-20)(St. Peter-Griffith Decl. Ex. 10)

National Accounts manager Christine Snead testified that it was common knowledge

among the Abbott sales representatives and anyone in the marketplace that Abbott's customers

used AWP for reimbursement.  Ms. Snead further understood that AWP was involved in

reimbursement.  She could not think of any other reason why a customer would want AWP

information other than to do an analysis on reimbursement spread. (US-A-SF ¶ 32).  Mr.

Kipperman's decision to arm the Abbott Alt Site Sales force with AWP information also

conflicts with this statement.   (US-A-SF ¶ 103).  Finally, Abbott never memorialized in writing

its prohibition against its sales force discussing AWPs or spreads with customers.

67.     To the contrary, many former sales representatives deposed by plaintiffs testified
that they understood it was Abbott's practice not to market the spread.  (3/31/08 Sellers 348:9-17,
Ex. 76; 4/23/08 Zackowski 148:8-17, Ex. 88.)

United States' Response to ABT SOAF ¶ 67:

Disputed.  Abbott only cites to the testimony of one sales employee.  The United States

incorporates and repeats its Response to ABT SOAF 66.

68.     Numerous others testified that the issues of AWP and spread were not at all
relevant to their work, and that they did not discuss those issues with their customers.  (3/18/08
Blackwell Dep. 221:13-222:9, Ex. 9; 5/3/07 Balzer Dep. 51:14-22, Ex. 7; 10/30/07 Harling Dep.
39:1-8, Ex. 32; 1/17/08 Leone Dep. 305:10-19, Ex. 46; 3/5/09 Reisetter Expert Rep.  28, Ex. 93;
Sales Training Module, Ex. 96.)

United States' Response to ABT SOAF ¶ 68:

The United States recognizes that for all of Abbott HPD's employees, AWP and spreads

may not have been relevant to their work.  It was important for other employees, however.  For

example, Abbott Home Infusion Department collected the spread to make money under its

revenue share arrangement.  (US-A-SF ¶¶ 132-145)  Further, Abbott Alternate Site Contract

marketing department employees knew that GPOs were looking at AWPs and spreads in the bid

process.  Some Alternate Site contract marketing personnel and national account managers

provided the GPOs with AWP information, were aware of the significance of the information to

the GPO customers, and were aware of the significance of the information to Abbott.  (US-A-SF

¶¶ 31-36)

71.     Over these years, contract prices for HPD generic products generally decreased
due to market forces, particularly as more generics flooded the marketplace and customers began
to band together into large GPOs, increasing their bargaining power.  (3/16/2008 Sellers Dep.
58:21-59:13; 103:13-21; 214:7-21, Ex. 75; 3/28/08 Young Dep. 67:19-68:14, Ex. 86; 10/30/07
Harling Dep. 40:11-13, Ex. 32.)

<u>United States' Response to ABT SOAF ¶ 71:</u>

The United States admits that over the years the contract prices for Abbott's HPD generic

products generally decreased.  Abbott, however, offers no explanation for why, during the

operative period of the case, Abbott's Vancomycin generic was more than four times higher than

the price of Eli Lilly's brand –  Vancocin – the same product.  For example, prior to the HPD

2001 list price drop, the RedBook AWP in 2001 for Vancomycin was $76.42 per gram (based on

a 10 pack price of $764.16.) ((Lavine Decl. Ex. 1, Ormond Decl. Appdx B2, page 7 (Docket

6302) and Lavine Decl. Ex. 40A, 2001 Red Book, page 550) (Docket 6305)).  At the same time,

Eli Lilly's brand –  Vancocin – the same product – had an AWP of just $15.80.  ((Lavine Decl.

Ex. 40A, 2001 Red Book, page 550 (listed under Vancocin) (Docket 6305)).

74.     This disparity was unintentional, and was not designed by Abbott to influence
Government payment levels under the Medicare or Medicaid programs.  (3/16/2008 Sellers Dep.
58:21-59:13; 59:19-60:3, Ex. 75)

<u>United States' Response to ABT SOAF ¶ 74:</u>

Disputed.  The United States incorporates and repeats it responses to US Resp to ABT SOAFs  ¶¶ 37, 39, and 45.

75.     As part of this internal review, Abbott considered many factors, including its own business, the industry generally, and the overall discourse in Congress and elsewhere about pharmaceutical issues.  (3/16/2008 Sellers Dep. 66:16-17; 69:6-14; 70:9-12; 71:5-10, Ex. 75)

<u>United States' Response to ABT SOAF ¶ 75:</u>

Disputed.  The United States admits that Abbott lowered its prices in 2001.  (See US-A-SF ¶¶ 56-70)  Abbott HPD's public explanation for its 2001 list price drop was that it wanted to bring its list prices more in line with prevailing market prices.  Mr. Gonzalez made the final decision to change the prices due to Congressional inquiries and press concerns. Sellers 30b6, 3/16/08 at 81:13-16 & Sellers 30b6 Exs. 34-36; Gonzalez Dep. 123:15-22; 124; 125:1-14; 327:3-22; 328:1-6.  (Lavine Decl. Exs. 74, 76, 88, 102) (*See* US-A-SF ¶ 58).

Michael Sellers, who conducted the study leading up to the 2001 price drop, conceded that he evaluated whether Abbott could lose revenue.

> Q.     (BY MR. ANDERSON)  I was asking the why, sir, not the how.  I'm asking why.  Why would Abbott care if Medicaid sales were negatively impacted by lower AWPs?
>
> MS. TABACCHI:     Object to the form. Beyond the scope of the notice.
>
> A.     Well, we were -- we were looking here at 12.6 percent of our sales under this assumption, which is purely what it was because we had no specific data to that point, but based on that assumption those were sales that would be at risk.
>
> Q.     So we are talking about money, right?  Abbott would lose sales and not earn as much money, correct?

> MS. TABACCHI:      Object to the form.
> Beyond the scope of the notice.

A.      Correct.

Q.      (BY MR. ANDERSON)  And in this case Abbott projected that to be about 2.5 million dollars, correct?

> MS. TABACCHI:      Object to the form.
> Beyond the scope.

A.      Correct.

(4/12/07 Sellers Corporate Rep. Dep. (Texas) at 662:18-25; 663:1-14 (St. Peter-Griffith Decl. Ex. 3))

HPD HBS Contract Marketing Manager, Michael Sellers, initially had reservations about changing the prices based upon his concern that changing the prices may be viewed as agreeing with the government's claims that Abbott HPD had manipulated prices.  (Sellers 30b6, 3/16/08 at 43:1-22; 44:1-12 (St. Peter-Griffith Decl. Ex. 3)).

76.      Viewing the totality of the circumstances, a decision was made to reduce the List Prices for certain HPD products, thereby decreasing the unintended disparity between List Prices and negotiated contract prices.  (3/16/2008 Sellers Dep. 67:13-15, Ex. 75.)

United States' Response to ABT SOAF ¶ 76:

Disputed.  Abbott knew or should have known of the disparity and its impact on reimbursement programs, and the United States disputes that it was "inadvertent".  Abbott's conduct in 1995 reducing and reraising its Vancomycin pricing reflects its complete understanding of the effect of list price reporting on its AWPs, list price drop too.  (*See* US-A-SF ¶¶ 71-82).  The United States incorporates and repeats it US Resp. ABT SOAF ¶¶ 37, 39, 45, and 75.

32

79.     About two months later, HBS raised those List prices back up to the price level in Abbott's 1995 Catalog. (3/31/08 Sellers Dep. 425:5-426:1, Ex. 76; Response to TX Interrog. 12, Ex. 97.)

United States' Response to ABT SOAF ¶ 79:

It is undisputed that Abbott raised the Vancomycin list prices again in 1995.  However,

Abbott raised them to levels that were higher than their previous published price two months

earlier.  (*See* US-A-SF ¶¶ 71-82)

80.     Abbott witnesses, including its corporate designee, have testified that the prices were raised back up, among other reasons, because HBS's practice is to make List price changes only as part of the traditional annual cycle, and the March 1995 changes were outside that practice.  (3/31/08 Sellers Dep. 428:3-13, Ex. 76; 4/24/07 Eichhorn Dep. 185:19-186:5, 199:10-200:7, Ex. 22.)

United States' Response to ABT SOAF ¶ 80:

It is undisputed that Abbott raised the Vancomycin list prices again in 1995.  However,

Abbott customer inquiries also factored into the decision to raise the Vancomycin list prices once

again.  (*See* US-A-SF ¶¶ 71-82)

82.     The Medicare Working Group merely reviewed legislative initiatives; it never took any action on any such initiatives.  (8/9/07 Rieger Dep. 342:8-13, Ex. 62; 7/30/07 Miller Dep. 237:1-9, Ex. 52).

United States' Response to ABT SOAF 82:

It is undisputed that the Medicare Working Group reviewed legislative initiatives.  The

extensive Medicare Working Group documents reflect that the group was also very involved in

evaluating Medicare issues.  (*See* US-A-SF ¶ 119-121)(St. Peter-Griffith Decl. Ex. 12 (Tobiason

17 - listing of key participants)).  One group member expressed his concern regarding the legal

exposure and potential negative consequence of AWP spreads.  (*See* US-A-SF ¶121).  Further,

other members, including David Landsidle, were directly involved in lobbying, notably, to ensure

33

the 1997 BBA did not afford discretion to the Secretary to make reimbursement adjustments. The Medicare Working Group assisted Abbott's Washington office in reviewing legislative and regulatory issues, and in helping formulate Abbott's position on the 1997 BBA.

As detailed below, Abbott's lobbying activities in 1997 demonstrate that Abbott did not believe HCFA had made a policy choice to pay inflated reimbursement for cross-subsidization, or any other purpose. These activities also run contrary to Abbott's claim that it was ignorant about AWP-related reimbursement matters pertaining to HPD. The documents and testimony reflecting this vigorous lobbying Abbott effort on the 1997 BBA, as undertaken by some members of the Medicare Working Group, are contained in composite St. Peter-Griffith Decl Ex. 12 (individually filed additional copies of the referenced documents are also filed as Henderson Reply Exs. 68-77) (*See also,* US Resp. to Combined SOAF ¶98)

Abbott and other members of the pharmaceutical industry undertook lobbying efforts to kill efforts by HCFA to obtain more reliable acquisition cost information. Specifically, in June 1994, Abbott's Washington Office employee Dolly Hanrahan forwarded a memo to Alan Mackenzie, with ccs: to Abbott's Chief Financial Officer G. Coughlan and Medicare Working Group member D. Landsidle (a Divisional Vice President), wherein she described her work for Abbott, together with that of other manufacturers and industry members. Ms. Hanrahan wrote:

> I have been in contact with the Washington representatives of Bristol-Myers Squibb, Amgen, Zeneca, and the American Society for Clinical Oncology (ASCO), regarding the memorandum from Charles Booth, Director, Office of Payment Policy at HCFA, to the Medicare carriers regarding changes in payment for certain drugs. Everyone shares our concerns over the survey HCFA is conducting on the acquisition price versus the average wholesale prices on certain drugs. ASCO issued a memorandum to its members advising them that compliance with the survey is voluntary and

34

> that physicians are under no legal obligation to complete the survey issued by the carriers.  HCFA is not pleased with ASCO's guidance to physicians.  ASCO is working directly with the Office of Management and Budget (OMB) to essentially kill the survey based on the grounds that HCFA has not followed administrative procedures.  OMB may stop the survey but this would only serve to buy more time; HCFA would simply resubmit the survey following appropriate procedures. . . .
> ASCO has asked us to discuss other ways in which physicians might be helpful, and to advise them of our ideas.
>
> The Washington representatives are prepared to meet if we all determine the best course of action is to do so.  Please think about what our next steps should be and let me know how to proceed.

(St. Peter-Griffith Decl. Ex. 12 (Landside Dep. 78:3-22; 79:1-15 & Ex. 14)).  The Office of Management and Budget eventually disapproved the proposal to conduct surveys.  (10/29/2007 Booth Dep. 310:22 - 311:15.) (St. Peter-Griffith Decl. Ex. 19)

Abbott lobbied vigorously to oppose language in the 1997 BBA that would have given the Secretary of HHS greater authority to adjust Medicare drug payments to more closely reflect acquisition costs.  On February 10, 1997, Abbott's Director of Washington Affairs and Medicare Working Group member Cynthia Sensibaugh wrote to various Abbott employees, including in-house counsel Mark Barmak, and Michael Heggie, an Alternate Site Reimbursement Specialist, stating that:

> [T]he President included a provision in his FY 1998 budget proposal that would base the Medicare reimbursement for outpatient drugs on acquisition cost rather than AWP.  An industry meeting to discuss strategy with regard to this issue has been tentatively scheduled for Thursday, February 20.  We would like to get your thoughts on this issue before the meeting.  I will call to set up a conference call on Friday or Monday.

(St. Peter-Griffith Decl. Ex. 12 (Plfs' Ex. 1125))

In his "Monthly Highlights," Abbott's Divisional Vice President David Landsidle reported that in May and June of 1997, he met with members of Congress and their staff to discuss "House and Senate proposals which would change reimbursement for Medicare to 95% of average wholesale price (AWP)." (St. Peter-Griffith Decl. Ex. 12 (Landsidle Dep. Ex. 23; Plfs.' Ex. 1134.))  On June 5, 1997, Mr. Landsidle wrote to key Abbott employees, including Michael Heggie, Mark Barmak, and HPD Renal Division head Loreen Mershimer, to explain his lobbying efforts to forestall proposals by the House that would permit HHS to determine reimbursement rates on a drug-by-drug basis.  He explained:

> I spoke with Congressman Christensen during the mark up.  He is pleased we have come so far by dropping acquisition cost, but wants to go further.  We will see what can be done between now and full Ways and Means markup on Monday.  Issues under review include having the provision reading "AWP minus 5%" rather than no more than 95% of AWP as specified by the Secretary" since "no more than" means that a reduction of more than 5% is permissible. *Congress should not permit HHS to determine reimbursement rates drug by drug.*
> Also, we have checked with the House Commerce Committee which also marks up its Medicare bill next week.  It, too, has dropped the acquisition cost and gone with the same "no more than 95% of AWP."

(emphasis supplied)(St. Peter-Griffith Decl. Ex. 12 (Landsidle Dep. Ex. 21)).  *See also* Abbott case Plaintiffs Ex. 1133, setting forth proposed House language.

In the months before passage of the Balanced Budget Act of 1997, Pub. L. 105-33, 111 Stat. 462-463 (August 7, 1997), Abbott continued to actively lobby members of the House of Representatives to limit the reimbursement language in the bill to require simply that reimbursement be set at "95% of AWP," and to strip any discretion on the subject from the Secretary.  On June 9, 1997, David Landsidle wrote a second memorandum to Abbott President

36

Duane Burnham, asking permission to hire an outside lobbyist, Nancy Taylor, from Greenberg
Traurig.  Noting that "Reimbursement of Medicare drugs is the Washington Offfices (sic) top
priority[,]." Landsidle wrote:

> There is language in the House Ways and Means and House Commerce
> Committee's Medicare bills that change the way Medicare reimburses
> drugs.  Rather than reimbursing according to average wholesale price
> (AWP) as it is now, the bill would provide reimbursement 'at no more
> than 95% of AWP, as specified by the Secretary (of HHS).'  This language
> is troubling because it could be, and is likely to be, read as a maximum
> and would allow the Secretary to establish other criteria as long as it is no
> more than 95% of AWP (e.g. actual acquisition cost).  We are working to
> change this language to provide that reimbursement would be only at 95%
> of AWP with no discretion left to the Secretary.  This should address as
> well the issue raised in our South Carolina lawsuit (i.e. the authority of
> HCFA and its carriers to be creative in reimbursement).
> I would like to retain Nancy Taylor with the lobby firm of Greenberg
> Traurig. . . . The cost would be in the $10,000 to $20,000 range. . . .
> With reimbursement for Lupron, Calcijex and Abbokinase at issue, hiring
> Greenberg Traurig could be most useful.  Reimbursement of Medicare
> drugs is the Washington Offfices (sic) top priority. . . .

(emphasis supplied)(St. Peter-Griffith Decl. Ex. 12 (Landsidle Dep. 228: 3-22; 229:1-18 & Ex.

20)).

    According to Mr. Landsidle, at the time he wrote the June 9, 1997, memorandum, there

was a distinct possibility that a bill might pass that would afford the Secretary of HHS discretion

to set Medicare reimbursement at rates below 95% of AWP, since the House had at that point

already included the discretion language.  Mr. Landsidle, sensing that Abbott needed another

"soldier on Capitol Hill," recommended the hiring of Ms. Taylor. (St. Peter-Griffith Decl. Ex. 12

(Landsidle Dep. 228: 3-22; 229:1-18))

    The hiring of Ms. Taylor was approved by Kris Kringel, Vice President of Abbott's

Hospital Products Division ("HPD").  Abbott HPD's drug Calcijex, which accounted for a full

one-third of the HPD's profits, was noted by Mr. Landsidle as an Abbott drug that could be

adversely affected in a significant way if the Medicare reimbursement formula was changed.  (St.

Peter-Griffith Decl. Ex. 12 (Landsidle Dep. 233:21-22; 234:1-11; 235:20-22; 236:1-3, Ex. 20;

Abbott case Plaintiffs Ex. 1138))

 According to Mr. Landsidle, it was imperative for Abbott to hire Ms. Taylor "to try and

get a solution that did not allow discretion to the Secretary."  As Mr. Landsidle testified:

> Q. Did you have serious concerns, in or around June of 1997,
> that Congress ultimately might adopt a Bill on Medicare drug
> reimbursement that would have given discretion to the Secretary to
> set reimbursements at below 95% of AWP.
>
>  MS TABACCHI: Object to the form.
>
> THE WITNESS: Because the House had already included
> language, you have to assume that that was in play.  It was a
> distinct possibility.
>
> BY MR GOBENA:
> Q. So it was imperative, then, to hire Ms. Taylor in order to
> put as many resources as possible into blocking that language from
> being implemented; correct?
>
>  MS TABACCHI: Object to the form.
>
> THE WITNESS: It was imperative to hire her to try and get a
> solution that did not allow discretion to the Secretary.

(St. Peter-Griffith Decl. Ex. 12 (Landsidle 10/15/07 Dep. 230: 9-22; 230:3-5)).

 In a memorandum to Abbott in-house counsel Mark Barmak, Mr. Landsidle explained the

impact of the competing House and Senate proposals concerning the Medicare reimbursement

issue in the budget reconciliation bills:

> The House and Senate are expected to vote next week on the
> budget reconciliation bills.  The bills will pass and the conference

committee will begin work the week of July 7.  The conference
could take anywhere from 2 to 4 weeks.  The Congress plans to
vote on the conference bill before the August 2 start of the summer
recess.

Regarding the Medicare reimbursement issue, the House has a
good provision although we need to add "specific" drug or
biological.  The Senate provision is not good.  It says:

- payment could not exceed 95% of the AWP, as specified by
  the Secretary

                     \*   \*   \*

- the amount payable is limited by an annual CPI adjustment

- an HHS study is required to determine the AWP or other
  appropriate price of outpatient prescription drugs which
  then could be used to "further adjust payment amounts for
  outpatient prescription drugs."

(emphasis supplied) (St. Peter-Griffith Decl. Ex. 12 (Abbott Case Pltfs. Ex. 1138 ))

Mr. Landsidle's concern about possible reductions in reimbursement was so great that he

recommended that Abbott's CEO come to Washington to meet with members of Congress.  Mr.

Landsidle explained:

> Abbott has a lot at stake in the reimbursement fight.  I do not want
> to feel, or having others feel, we did not do everything possible to
> win in conference.  Duane [Burnham, Abbott's CEO in 1997]
> could help.  I can not (sic) get an appointment with [Congressman]
> Archer during conference.  With Duane I can.  A visit by him
> increases the importance to Abbott to the issue, which
> congressmen understand. . . . [A] CEO adds a good deal of clout.

(St. Peter-Griffith Decl. Ex. 12 (Plfs' Ex. 1138))

Mr. Landsidle cautioned that bringing Mr. Burnham to Washington and involving him in

the lobbying effort did have a downside, which was that Abbott's interest in the AWP fight was

"profit motivated."  He cautioned: "[t]he downside is Duane being exposed to having to defend

our position which is profit motivated.  There is no way to avoid that fact."  (St. Peter-Griffith

Decl. Ex. 12 (Pltfs. Ex. 1138).))

On June 30, 1997, Mr. Landsidle wrote to Abbott's CEO about his involvement in the

lobbying efforts.  He wrote:

> The House and Senate have passed different changes to how
> Medicare reimburses drugs (i.e. Lupron and [HPD's] Calcijex).
> The basic change is that future reimbursement will be 95% of
> average wholesale price (AWP) rather than full AWP.  However,
> the Senate bill has additional language we oppose. . . .
>
> • The Senate bill says that the amount reimbursed can not
>    (sic) exceed the May 1, 1997 amount increased annually by
>    the CPI.  The House has no change in CPI language.
>
> • The Senate bill calls on the Secretary of HHS to do a study
>    of AWP and report back to Congress within 6 months.
>    This gets HHS looking at prices.  The House bill has no
>    such language.

(St. Peter-Griffith Decl. Ex. 12 (Abbott case Plaintiffs Ex. 1139))

In that same memo, Mr. Landsidle explained to Mr. Burnham what the CEO should say

to members of Congress:

> I [Mr. Landsidle] am putting together calls between you and Ways and
> Means Chairman Archer (R-Tx) and Congressman Denny Hastert R-IL).
> Both will be House conferrees when the House and Senate meet to
> reconcile differences.  Your message to both men is simple:
>
> • Abbott thinks the House language providing for Medicare
>    reimbursement of drugs at 95% of AWP, effective January
>    1, 1998, is much better than the Senate language. . . .
>
> • Abbott asks that you fight to retain the House language in
>    the conference committee and that Abbott joins you in
>    fighting for their language.

(St. Peter-Griffith Decl. Ex. 12 (Abbott Case Pltfs Exs. 1139))(*see also*, Abbott Case Ptfs. Ex.

1136, setting forth Senate language proposal))

After Congress adopted the House version of the bill with the language setting Medicare

reimbursement at "95% of AWP", Abbott's CEO wrote to Congressmen Archer and Hastert,

thanking them for their efforts.  (St. Peter-Griffith Decl. Ex. 12 (Abbott Case Pltfs. Ex. 1140))

and 1141)).

In October of 1997, Mr. Landsidle reported to Abbott's general counsel, Mr. de Lasa, that

he met with congressional staffers to "ensure that the Health Care Financing Administration

correctly interprets this summer's Medicare reimbursement law." (St. Peter-Griffith Decl. Ex. 12

(Pltfs Ex. 1354)).

83.    OIG documents from a 1991 invoice study showed that dialysis clinics were
purchasing Vancomycin at discounts of about 80% off of AWP.  For example, OIG notes reflect
that in 1991, Abbott's AWP for Vancomycin was $24.88.  (Ex. 98 (HHD200-0016))  One of the
collected invoices from the same year reflects sales of Vancomycin at $4.59-a discount of nearly
82%.  (Ex. 99 (HHD200-1431.))

United States' Response to ABT SOAF ¶ 83:

Disputed.  As support for this fact, Abbott attaches as Exhibits 98 and 99 a one page

invoice which has pricing on it for one provider, and handwritten notes.  Abbott provides no

record support for the proposition that these are OIG documents representing a "1991 invoice

study" of Vancomycin.  Moreover, Abbott's statement that one of the collected invoices reflects

a particular price is meaningless without more information concerning the generation of the

documents, and the nature of the Medicare reimbursement study, which does not appear to relate

to Medicare Part B reimbursement.  These documents, in the context of the 1992 OIG report,

pertain to Medicare Part A reimbursed (ESRD) benefits.

The United States disputes that these documents put the United States on notice of

41

Abbott's megaspreads on Vancomycin from 1991 to 2001, or that they reflect CMS's approval of

those prices.

86.     On August 30-31, 1994, representatives from OIG, HCFA, and ten State Medicaid
programs met in Richmond, Virginia to discuss OIG's plan to conduct a nationwide audit
surveying the difference between the invoice price for drugs and AWP, for Medicaid providers.
(Ex. 133 (Abbott Ex. 581).)  OIG prepared a "Record of Discussion" of that meeting.  (*Id.*)  OIG's
Record of Discussion includes the following statement:  They stated that we should include a
fifth category of pharmacies to include non-traditional retail pharmacies such as hospitals, home
IV, nursing homes, physicians etc . . .  The State officials believed that these pharmacies
purchased at substantially bigger discounts than traditional retail pharmacies.  (*Id.* at 2-3.)

United States' Response to ABT SOAF ¶ 86:

The United States admits that Abbott correctly quoted the document.  The proposed

review was limited to acquisition cost only.  *See* U.S. Response to ABT SOAF ¶ 88.

88.     In December 1997, OIG reported that GPO prices for Vancomycin ranged from
$2.02 to $6.99, while the AWP was about $10.07.  (Ex. 101 at A-1 to B-2.)  (Abbott Ex. 002.)

United States' Response to ABT SOAF ¶ 88:

To the extent that "GPO" prices references Group Purchasing Organization prices, the

United States admits that the cited information is contained in the attached exhibit.  Abbott's

additional statement of fact does not disclose that Abbott was concerned that the OIG report

would lead to more efforts to reduce drug reimbursement.  Cynthia Sensibaugh, Abbott's

Director of Washington Affairs and Medicare Working Group member, wrote to various

individuals, including HPD employees Michael Heggie, Don Robertson and Loreen Mershimer,

as follows:

> Reducing the amount Medicare pays for drugs continues to be a hot topic.  And
> this summer's 95% of AWP change did nothing to lessen the pressure.  Note on
> page two of Inspector General Brown's letter her statement that the new
> reimbursement methodology will not curtail "excessive" payments. . . .  The drug
> price issue will not go away; not with this kind of data being circulated.  HHS,

HCFA and Congress are all interested.

(St. Peter-Griffith Ex. 12 (Abbott Case Plaintiff's Ex. 1505))

89.     The record evidence developed in this case shows, overwhelmingly, that relevant state and federal officials were aware of that AWPs reported in the compendia was not a reliable indicator of acquisition cost for generic drugs, and that large percentage discounts were commonplace.  (*See* Defs. Comb. Rule 56.1 Add'l SOF  1-4.)

United States' Response to ABT SOAF ¶ 89:

The United States incorporates and repeats US Resp. to Combined SOAF ¶¶ 1-4.  The United States disputes this statement.  Abbott itself readily admits that it never informed the United States of its market average wholesale prices for the Subject Drugs, and that it never sought approval from the United States to maintain highly inflated AWPs by virtue of its list price reporting from 1991 to 2001. (*See* US-A-SF ¶¶ 105-113)  The United States incorporates and repeats US Resp. ABT SOAF  ¶¶ 37, 39, 45, and 75.  *See* US Resp. to Combined SOAF, *passim*, (numerous responses by the United States pertaining to federal and state witness testimony, including additional statements 91.1 to 91.9).

Abbott expert Louis Rossiter, a former Virginia Secretary of Health and Human Resources, testified that he would never have accepted drug companies' inflated price reporting to manipulate the spread on Virginia Medicaid reimbursement.  Dr. Rossiter testified:

> MR. BREEN:        Well, my question was, back when you were the Secretary of Health and Human Resources for the State of Virginia, was it okay with you if your state Medicaid program reimbursed based upon AWPs where the manufacturer had knowingly established them or inappropriately maintained them with a purpose to manipulate the spread and to induce customers to purchase its products, and I said was that okay with you when you were Secretary of Health and Human Resources.
>
> THE WITNESS:        Well, of course not.  But there's a difference

between -- by the same token, it's not illegal to increase the price of
your drug.

(Rossiter 4/15/09 501:19-22, 502:1-10) (St. Peter-Griffith Decl. Ex. 5)

Another Abbott expert, Robert Helms, the former Assistant Secretary of the United States

Department of Health and Human Services confirmed his understanding that Medicaid's

"estimated acquisition cost" (EAC) regulation requirement meant the best estimate of the price

generally and currently paid in the marketplace.  (Helms 501:15-21) (St. Peter-Griffith Decl. Ex.

6)

> Q.      So does the state have to pay the maximum amounts
> permitted under this regulation or could they pay something less as
> long as in the aggregate it's not more?
>
> A.      They can certainly pay less and we encouraged them to do
> so.  And they kept coming in in their letters and saying they could
> do that and they wanted the flexibility to do it which they couldn't
> do under the old system.  That was a motivation to reform the regs.
> And certainly if they could save more then they saved the federal
> government money and the state government money.
>
> Q.      You anticipated my next question.  Which if they can save
> more it benefits the federal government and the state government,
> correct?
>
> A.      Yes.
>
> Q.      Because it's a joint federal/state funded program, right?
>
> A.      That's right.  And it has the attaching rate.  And if you go
> look at my dissent to the Medicaid commission you will even see
> some analysis of why I think the matching rate takes away the
> incentives for the states to be very cost conscious about this.
>
> *   *   *
>
> Q.      And that estimated acquisition cost we know means the
> agency's best estimate of the price generally and currently paid by

44

providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers, correct?

A.      That's what the definition says.

(05/01/09 Helms Dep. 491:8 - 492:9; 501:15 - 501:21) (St. Peter-Griffith Decl. Ex. 6)

Prof. Helms also confirmed that the EAC requirement was a check and balance intended to protect the federal and state public fisc.  He testified:

Q.      . . . So if I understand this regulation then, if a state plan were approved that paid the lesser of usual and customary, federal upper limit, state MAC or EAC for all drugs and it saved money so that less was paid than the amount that would be paid based upon the in the aggregate for the drugs subject to the FUL alone, those savings would be shared by the federal and state government, correct?

A.      It's my understanding -- yes.  If those savings are reflected in the claims that go in through the normal process of reimbursement and it meets -- that then goes through, as I understand it, a second sort of double-check and auditing and so on before they send the -- well, actually, there is a system of sending the federal financial payment on the basis of estimates and then they're resettled later after they do some checking to make sure they're accurate. So there is a separate auditing system that's supposed to be controlling the payment of the federal money back to the states.

Q.      So if I understand the regulation from the perspective of your area of expertise, which is what I'm trying to get here, we've got a regulation that's got basically some checks and balances in it to protect the federal funds and indirectly the state funds, correct?

A.      I think that's a fair characterization, yes.

Q.      All right.  And it's a joint federal/state program, correct?

A.      Yes.

Q.      And in any regulations where you've got a joint

45

federal/state program the federal regulations are there to, at least in part, protect the federal FISC, correct?

A.     Meaning -- FISC meaning the federal expenditures?

Q.     Correct.

A.     Because as you well know this is an open-ended entitlement.  It's not an appropriated amount from the Congress.

Q.     Right.  Well, okay.  Thank you for correcting me.  But the bottom line is the regulation that is in part due to your good work was there to at least in part protect the federal tax dollars, correct?

A.     Yes.  I would have to agree with that. We put a good bit of emphasis in -- as I testified yesterday, that was one of -- I think the major objective of trying to reform these things.

(05/01/09 Helms Dep. 505:17 - 508:3) (St. Peter-Griffith Decl. Ex. 6)

Finally, Prof. Helms testified that he did not anticipate that drug manufacturers would

manipulate and inflate price reports:

Q.     My question is whether it's part of your opinion or not, because you were there, sir –

A.     Mm-hmm.

Q.     -- you were the deputy assistant secretary and later became the assistant secretary, you were the senior economist in our Department of Health and Human Services in terms of your position.  You've said you had responsibility for this regulation. And I want to know if you knew at that time you expected that a drug company after the regulation was promulgated would increase its price report so that its average wholesale price went from the $25.20 level to the $72.42 level when its real price went down to the $4 level, did you know that was going to happen?  Did you expect that kind of thing to happen?

MR. COOK:   Objection.

MS. REID:    Objection.

46

A.      Let me say again I have no particular knowledge of the numbers that you have Used.  But I will go back and say what we thought about that as a general matter, that we didn't see -- we viewed that this list price was an ordinary business practice that, as I talked about yesterday, that was part of the marketing strategy to be able to sell to different groups of people at different prices. And if you're going to do that you don't want to reveal the discounts that you've negotiated with one buyer with another buyer.  And we viewed this in the pharmacy context that if we had a system where the state was doing this, I *don't think that we thought that the pharmacist – that the company had any basic incentive.*  Their usual sort of way to get market share was not to manipulate the list price, but to go out through detailing and advertising and so on to the physicians who were writing the prescriptions, and as time evolved and pharmacists began to have more power to substitute things, then to go directly to the pharmacist, you know, and give them incentives to substitute their generic products when they could do it.

(Helms 5/1/09 575:3-22, 576:1-22, 577:1-3)(emphasis supplied) (St. Peter-Griffith Decl. Ex. 6)

90.      Between 1987 and until the mid-1990s, a publication titled the *Medicaid Pharmacy Bulletin* was published with input from state Medicaid pharmacy officials.  The *Medicaid Pharmacy Bulletin* was designed "to assist the Medicaid pharmacy community in keeping abreast of the latest program management practices and developments in health care policy that affect Medicaid pharmacy." (Ex. 104 (Abbott Ex. 292).)  In its January-February 1987 issue, the *Medicaid Pharmacy Bulletin* included an article titled "Medicaid Reimbursement for the Pharmacy Component of Home I.V. Therapy." (*Id.*)  Among other things, that article stated:

        The Establishment of a Fair and Reasonable Pricing Methodology for Home I.V. Products is a Major Concern of Most State Medicaid Programs.

        One of the major obstacles to the development of adequate home I.V. pricing methodologies the fact that the dispensing of home I.V. Medications is more complex than the dispensing of other outpatient drugs.

        * * *

47

<u>Providers and Pharmacist Consultants Concur That it is Not
Appropriate to Apply the Same Ingredient-Based Pricing
Mechanisms to Home I.V. Medications as Those Applied to Other
Outpatient Drugs</u>.

For lack of a better alternative, some state Medicaid programs use
the same ingredient-based formula they apply to other legend drugs
when calculating reimbursement for home I.V. medications.  Most
pharmacist consultants are not convinced that this process reflects
actual provider costs for home I.V. reimbursement.  Home I.V.
treatments are frequently a combination of multiple drug entities,
dispensed in varying doses and administered several times daily. . .
. It is, therefore, difficult to estimate, based on single, daily or even
weekly administrations, the purchase prices providers are paying
with volume and trade discounts.  These discounts are generally
not revealed in drug pricing publications such as the *Red Book*, the
*Blue Book* and *Medispan*.  Consequently, programs are reluctant to
increase reimbursement for home I.V. medications, suspecting that
reported costs for these substances may already be exaggerated.

(*Id.* at 2-3).  The table contained within the article indicated that Oregon based its reimbursement
for intravenous prescriptions at "80% of usual and customary charge," that Montana paid the
"lower of usual and customary charge or up to 2 ½ times the cost of ingredients plus a
$2.00-$3.75 dispensing fee."  (*Id.* at 4.)  The chart also indicated that Massachusetts paid a
percentage "mark up" on the drug depending on the cost of the drug, whereby lower-priced
products received a higher-percentage mark up.  (*Id.*)   State Medicaid official Cynthia
Denemark, Delaware's Pharmacy Consultant, testified that the *Medicaid Pharmacy Bulletins*
were "valuable publications."  (12/10/08 C. Denemark Dep. at 349:13-351:01, Ex. 18.)  Former
Maryland Medicaid official Joseph Fine also testified that the *Medicaid Pharmacy Bulletins* were
a Useful source of information containing very reliable information.  (12/9/08 J. Fine Dep. at
82:16-83:10, Ex. 23.)

<u>United States' Response to ABT SOAF ¶ 90:</u>

Abbott selectively quotes from the Medicaid Pharmacy Bulletin document.  Hearsay

articles are wholly immaterial to this case and had no bearing whatsoever on any decision by

Medicare or Medicaid to reimburse for Abbott's products.

94.    Myers and Stauffer published other reports for state Medicaid programs that
detailed the increased dispensing costs associated with the provision of home Infusion and I.V.
solutions.  These include:

48

- Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky, October 2003 (Ex. 108 (Excerpts of Abbott Ex. 1110));

- Survey of Dispensing Costs in the State of Kansas, September 1999 (Ex. 109) (Excerpts Attached);

- Survey of Dispensing Costs in the State of Arkansas, June 2001. (Ex. 110) (Excerpts Attached);

- Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the State of California, December 2007 (Ex. 111 (Excerpts of Abbott Schondelmeyer Ex. 3));

- Analysis of Pharmacy Dispensing Fees for the Indiana Medicaid Program, August 2005 at 24-25. (Ex. 112 (Excerpts of Ex. Abbott Shirley-7)); and,

- Determining the Cost of Dispensing Pharmaceutical Prescriptions for the Texas Vendor Drug Program, August 2002 (Ex. 113 (Excerpts of Abbott Ex. 21).)

United States' Response to ABT SOAF ¶ 94:

At the outset, the United States disputes this statement to the extent that any of the referenced reports (Kentucky, California, Indiana and Texas) post-date 2001, the end of the operative damages period of the case, and thus are wholly immaterial. The remaining reports from Kansas and Arkansas do not reference Abbott's products (Murray Decl. Exs. 109 & 110). This case involves the inflation of ingredient cost reimbursement paid by Medicaid, not dispensing fees. *See* US Resp. to Combined SOAF, *passim*, (numerous responses by the United States pertaining to federal and state witness testimony, including additional statements 91.1 to 91.9).

95.     On January 27, 2006, Abt Associates, Inc. prepared a report for The National Home Infusion Association (NHIA) titled "The Per Diem Costs of Home Infusion Therapy Services." (Ex. 114.) NHIA contracted with Abt Associates, Inc. to conduct a survey and analysis of the per diem costs associated with providing home Infusion therapy services. The report noted the difference in services necessary for home Infusion therapy and found the average per diem cost for three hours of antibiotic therapy was $102. (*Id.* at 7.) The report further stated:

It is noted earlier that services necessary for home Infusion therapy are notably different than those provided from traditional community retail pharmacies. As compared to much lower dispensing fees typically reimbursed to traditional community retail pharmacies for filling prescriptions, the average direct cost for the delivery component alone was found to be $38.25. In addition to delivery, the many other incurred costs--referral processing, intake qualification and documentation setup, care coordination, verifying physician order set, sterile compounding, packaging, patient education, clinical monitoring, insurance administration, etc.-are reported in the per diem costs. (*Id.* at 7.)

United States' Response to ABT SOAF ¶ 95:

The United States disputes this statement because the 2006 Abt report is wholly immaterial to this case as it is outside of the operative 1991 to 2001 damages time period of this case.

97.     Benny Ridout, former North Carolina Medicaid Pharmacy Director, testified:

Q.     You mentioned that it was common knowledge that Vancomycin had a spread, do I have that correct?

        MS. HAYES:  Objection to form.

A.     Yes.

Q.     When was it common knowledge that Vancomycin had a spread?

A.     I don't remember the year, just like it was this, but I just remember that drug was one of the antibiotics.

        MS. YAVELBERG:   Objection, form.

        MS. HAYES:  Objection, form.

A.     We had no idea what the specialty pharmacists were paying for that drug, what kind of deals they struck with the manufacturers, but it was of their opinion of us that there was some kind of spread in there because of what they were able to do that a

50

regular pharmacist couldn't do at AWP.  You see, we still paid at AWP.

Q.      What do you mean what they could do that other pharmacists couldn't?

Q.      Do you recall whether it was similarly common knowledge that Infusion products had spreads?

A.      Infusion drugs is a whole lot more than just putting a pill in bottle. You got to prepare.  In fact, the pharmacists wanted a special fee to do this under-the-hood preparation, you know, also injection takes longer, you got to have syringe and all the stuff to do that.  Of course they were shipping that on top of the cost to ship the product.  If you add up all that extra cost in a regular pharmacy or regular pills, you know, you think well, how in the world can they afford to do this and accept that same price?

Q.      What was your conclusion?

A.      That somehow they were getting some kind of special deal back or discount from the manufacturers to be able to do it or something.  That was just my own personal feeling. How did they do it?

(12/5/08 B. Ridout Dep. 62:6-64:3, Ex. 61.)

<u>United States' Response to ABT SOAF ¶ 97:</u>

The United States incorporates and repeats the US Resp to Combined SOAF ¶ 1c.  Mr. Rideout was testifying in his individual capacity and his testimony does not bind the United States or the state of North Carolina.  Mr. Rideout's testimony concerning Vancomycin is immaterial; he only recollects that it was one of the antibiotics and cannot name a time period regarding his knowledge of a Vancomycin spread.  His testimony also does not reveal the dollar or percentage level of that Vancomycin spread.

98.     M.J. Terrebonne, Louisiana Pharmacy Director, testified:

Q.      If you look to the footnote 8 on page 21 of the Myers and
Stauffer report-

A.      Right.

Q.      -that states-Would you read that into the record?

A.      "Although typical dispensing fees reimburse less than the
dispensing cost of I.V. pharmacies, they are generally able   to
break even based on the margin allowed on ingredient cost
reimbursement."

Q.      And do you have an understanding of-of what that's saying?

A.      I believe what he's saying is that there's a margin on the
ingredient side, so that's how they're generally able to dispense.

Q.      And this is something that-that you would have read back
in 1999; correct?

        MR. FAUCI:   Objection to form.

THE WITNESS:        Probably.

BY MR. TORBORG:
Q.      Okay. And if you disagreed with that footnote, would you
have told Myers and Stauffer that?

A.      Well, they were the surveyors, so they had the information.
We were relying on-

Q.      Well, was it your understanding, Miss Terrebonne, that
because of the higher cost to dispense home I.V. drugs and the fact
that Louisiana was only paying a $5.77 dispensing fee for those
drugs, that the margin being earned on the ingredient cost was
covering that cost to dispense?

        MR. FAUCI: Objection to form.

THE WITNESS:        Based upon the survey results, yes.

52

(11/7/08 M. Terrebonne Dep. 91:11-93:1, Ex. 81.)

United States' Response to ABT SOAF ¶ 98:

Abbott correctly, but selectively quoted from Ms. Terrebone's testimony, which is immaterial and seeks her personal views.  Additionally, in written answers submitted in response to an August 2001 HCFA questionnaire regarding a proposed increase in Louisiana's reimbursement rate, Ms. Terrebonne explained: "It is notable that Louisiana, even with a modest increase to the current ingredient reimbursement levels, will have rates that are comparable to [] noteworthy efforts to *bring ingredient reimbursement in synch with actual acquisition costs.*

(Abbott 1057, at JD-SUB-LA-000687) (St. Peter-Griffith Ex. 14)

100.    Mr. Wells understood that services provided by home Infusion providers were significantly different than those provided by retail pharmacies.  Mr. Wells testified:

> Q.    What are some of the issues that you're referring to there when you talk about these square peg/round hole problems between Infusion pharmacies and community pharmacies?
>
> A.    Infusion pharmacies were involved in preparation of sterile product for injectible use, which is a little more involved than putting prescription tablets or capsules into a vial and dispensing in the community environment.  There were some issues with disposal supplies that providers would like to be reimburse for and we had no provision to reimburse them for.

(12/15/08 J. Wells Dep. 125:12-126:1, Ex. 85.)

> * * *
>
> Q.    What do you recall about those conversations with home Infusion vendors in the 1990 time period?
>
> A.    They were desirous of having Infusion supplies, tubing, IV sets, butterflies, and that sort of thing, added as a reimbursable item under the prescription drug program, and because those products frequently did not have a national drug code, we didn't

53

have any way to pay for them, and the DME, durable medical
equipment supply program, would not pay for those by policy for
patients that were over the age of 21.

(*Id.* at 129:19-130:8.)

      Q.     And so while you didn't know the precise size of the margin
on the drug ingredient reimbursement for home Infusion
pharmacies as of 1990, were you aware that to some degree those
home Infusion pharmacies were using profits on the drug
ingredient side to offset additional costs in the dispensing of IV
drugs?

        MS. ST. PETER-GRIFFITH: Object to the form.

        MS. WALLACE:  Objection to form.

        MR. BREEN:  Objection to form.

    THE WITNESS:      I had been told that by two or three of those
providers.

    BY MR. COOK:
    Q.     Did you believe them?

        MS. ST. PETER-GRIFFITH:  Object to form.

        MS. WALLACE:  Objection to form.

    THE WITNESS:      I had no reason not to believe them.  I felt
like they were being honest and. . .

(*Id.* at 132:3-133:1.)

<u>United States' Response to ABT SOAF ¶ 100:</u>

    Abbott correctly but selectively quoted from Mr.  Wells's Rule 30(b)(1) testimony, which

is immaterial and seeks his personal views and information about third-party hearsay

conversations.  Mr. Wells also testified to the following regarding those same conversations:

      Q.     Do you recall Infusion pharmacies in the 1990 time period

54

> coming to you in your position with Florida Medicaid and asking
> that ancillary supplies and pumps for the administration of IV
> medication be added to Florida Medicaid benefits?
>
> A.      I had discussions with a number of parenteral pharmacy
> vendors.  I don't recall this specific discussion.

(12/15/08 Wells Dep at 129:10-18) (St. Peter-Griffith Ex. 8)

Mr. Wells's conversations in 1990 with two or three providers, whom he cannot

remember, about their desire to have various infusion supplies covered as reimbursable items

does not reflect that Florida ever agreed to use reimbursement for ingredient cost to cross-

subsidize these expenses.

101.    Mr. Dubberly from Georgia Medicaid testified that Georgia knew was providing
providers a profit margin:

> Q.      Mr. Robben asked you some questions about the interplay
> between the -- the reimbursement of ingredient costs and the
> reimbursement for dispensing costs. Do you remember those
> questions, sir?
>
> A.      Yes.
>
> Q.      And I believe you said that -- that the Georgia Medicaid
> program understood that -- that they were providing a -- a profit
> margin to providers in reimbursing them for the ingredient costs; is
> that right?
>
> MR. LAVINE:        Object to form.
>
> A.      Yes. I acknowledged that there was profit margin in the
> current ingredient cost formula.
>
> Q. (By Mr. Cole)      And that if -- if that margin were to be
> eliminated, then Georgia would have to pay a higher dispensing fee
> to providers to make up for the lost margin on the ingredient cost
> side; is that fair?
>
> MR. LAVINE:        Object to form.

A.      That's fair.

Q. (By Mr. Cole)      And would that approach apply even more in the home Infusion setting where you have pharmacies incurring even greater dispensing costs?

MR. SULLIVAN:      Object to form.

A.      No. That equation that we spoke about was only looking at the acquisition cost of the drug, not the -- the overhead.

Q. (By Mr. Cole)      What do you mean by that?

A.      When we were talking about the fact that there was margin in the ingredient cost of the drug, the cost by which the pharmacy purchased the drug -- when you're talking -- you're talking about an additional cost to dispense. So changing the ingredient cost and getting that more in line with the actual acquisition cost would not necessarily mean that we would adjust and make a differential for home health or for long-term care or any other provider. We may review that, but it -- it would actually be an additional exercise.

Q.      Going back to the let's say mid to late '90s time period when the dispensing fee paid by Georgia Medicaid was roughly in the $4 to $4.63 range, do you believe that the dispensing fee paid by Georgia Medicaid during that time frame was adequate to cover pharmacies' dispensing costs?

A.      No.

Q.      And in the home Infusion setting -- if at that level -- if -- if the $4.63 was not adequate to cover a retail pharmacy's dispensing costs, then I assume you would agree with me that it certainly did not cover the dispensing costs of a home health pharmacy or some other pharmacy that administered prescriptions in the home Infusion setting.

MR. SULLIVAN:      Object to the form.

A.      Agreed.

Q. (By Mr. Cole)      Is it fair to say, Mr. Dubberly, that in assessing whether to increase the dispensing fee, it has been the

policy of the Georgia Medicaid program to consider the margin on ingredient cost?

MR. LAVINE: Object to form.

A.      It's been the practice.

(12/15/08 Dubberly Dep. 314:3-317:7, Ex. 20.)

United States' Response to ABT SOAF ¶ 101:

The United States incorporates its US Resp. to Combined SOAF ¶¶ 1.q., 38.a. and 45.b. herein.  Also, in the testimony quoted by Abbott, Mr. Dubberly did not testify that *Georgia* was providing a profit margin to providers on the ingredient cost in the manner suggested by Abbott. To the contrary, Mr. Dubberly simply acknowledged there was a profit margin in the formula. Furthermore, Mr. Dubberly also testified that Georgia based its dispensing fee upon surveys of pharmacies and expected that CMS would not have approved any divergence from that policy. 12/15/08 Deposition of Jerry Dubberly at 356:8 to 20, 361:22 to 363:8 (St. Peter-Griffith Decl. Ex. 16).  He also testified that in a June 30, 2000 report commissioned by the state of Georgia, Deloitte and Touche determined that the average dispensing fee costs for a Georgia pharmacy were in the range of $4.50 to $5.45 at a time when the actual dispensing fee paid by Georgia Medicaid was $4.63 to $4.33.  *Id.* at 363:9 to 364:21, Exhibit 18 to the deposition.  Mr. Dubberly also explained that Georgia's dispensing fee determination must be separate and distinct from any estimate of the ingredient cost.  *Id.* at 92:11 to 22, 357:1 to 13.

105.    Effective April 1, 2001, Utah implemented special category dispensing fees for NDCs covered by the revised pricing issued by the United States Department of Justice.  (Ex. 119 (HHC014-0833).)  An April 2001 document titled "The Amber Sheet" prepared by the Utah State Medicaid DUR Committee stated:

> MULTIPLE DISPENSING FEES ASSOCIATED WITH HOME Infusion PHARMACY SERVICES.  The U.S. Department of Justice (DOJ) as part of a legal process, has established 'true' AWP for 437 NDC specific products and has directed the Division to implement this price list.  Home Infusion pharmacy services have low volume and high expenditures.  The DOJ's price list place the 'true AWP' close to actual acquisition costs, thus eliminating the 'spread' or profit that pharmacies have enjoyed for years.

(*Id.*)

United States' Response to ABT SOAF ¶ 105:

The United States disputes that ABT SOAF 105 is material.  The United States does not dispute that Abbott has correctly, but partially, quoted text from a document titled "The Amber Sheet."  Effective April 1, 2001, Utah implemented the special category of dispensing fee, one month before Abbott voluntarily lowered its AWPs on the subject drugs.

106.   In May and September 1993, there were hearings before the House of Representatives Subcommittee on Oversight and Investigations regarding Medicare's reimbursement for home drug Infusion therapies.  (Ex. 120 (excerpts).)  Testimony was provided by individuals representing home Infusion interest groups, such as the National Alliance for Infusion Therapy, as well as government officials from the Office of Inspector General, the Department of Health and Humans Services, and HCFA.  (*Id.* at III.)

(a)   Congressman Dingle stated that "[t]he Medicare program has a convoluted system for paying for [home Infusion] services.  Some are paid for under Part A, some under Part B.  Some are billed as durable medical equipment, some under laboratory services and some under drug provisions.  Obviously, it is a situation where it is difficult to keep track of what is going on."  (*Id.* at 2.)

(b)   Elaine J. Power, Senior Analyst, Health Program Office of Technology Assessment testified that "Medicare has no explicit benefit that covers home drug Infusion therapy.  Components of this therapy are sometimes covered through various existing Medicare benefits.  Because this coverage is fragmented, the amount that Medicare spends on home drug Infusion therapy is unknown, and the quality of the overall Infusion related services received by Medicare beneficiaries cannot be evaluated or monitored." (*Id.* at 26.)  Ms. Power further stated:

> For Medicare, the fact that Medicare does not cover it-probably the most significant effect is the fact that there is not any of the overlying Federal

regulatory structure that tends to come along when Medicare starts covering something.  So, for example, under the Medicare Catastrophic Act, where home I.V. drug therapy was going to be an explicit covered benefit, there were going to be regulations that would have defined what a home IV provider was and what kinds of services they could provide and so forth.  So, the fact that Medicare does not explicitly recognize the benefit means that that regulatory structure does not exist at the Federal level.

(*Id.* at pg. 43.)

      (c)    Gary Kavanagh, then Deputy Director of the Bureau of Program Operations for HCFA, provided the following testimony in response to questioning from Congressional Dingle:

Mr. Dingle. So you have got a whole package.  You have told us that you are addressing the question of drug costs, pharmaceutical. I think that is splendid.  But that is only a minute portion or at least a small portion of the overall costs of services of delivery to the patient, isn't this right?

Mr. Kavanagh: That is correct, but the Medicare program does not pay for many of the services that were discussed earlier for home Infusion therapy.  We do not pay physicians for their services unless there is an office visit, or whatever, involved.

We do not pay, unless it is a home health agency or a hospice, for a nurse to come in and provide home Infusion therapy, because we do not have statutory basis to do so-the home Infusion benefit is not a separate benefit under the Medicare program.

(*Id.* at 247.)

* * *

Mr. Dingle:  . . .  This leaves me with the regrettable conclusion that HCFA and HHS don't really have a clear pattern of payments for these kinds of services which work . . . .  I sent that-and I want you to understand, this is what we call oversight here-that we have a system that is moving somewhat more slowly than the times, and that the services which are being given are being billed in ways that don't necessarily compensate anybody fairly, don't look to the interests of the taxpayers, don't look to the interest even of the

beneficiaries.  And the result is that the whole system seems to
need some very substantial review.

(*Id.* at 248.)

(d)        Miles Gilman, CEO for HealthInfusion, Inc., a home Infusion provider,
testified regarding the inadequacies of Medicare's payment structure for home Infusion therapy.
He testified:

> All of the elements of care are included in the price of the drug,
> ranging from nursing care to the overhead attributable to
> coordinating the care provided to the patient.
>
> I can assure you that providers do not want to do business in this
> fashion.  However, as the reimbursement system is structured for
> Infusion therapy today, providers often will not be able to cover the
> costs of their services if they do not include those costs in the price
> of the drugs and supplies.
>
> * * *
>
> Although it is commonly understood that it is the nursing and
> pharmaceutical services that enable Infusion therapy to be provided
> in a home at all, Medicare's current coverage criteria still do not
> acknowledge that those services have any role in home Infusion
> therapy.

(*Id.* at 172-173.)

<u>United States' Response to ABT SOAF ¶ 106:</u>

Abbott accurately, but selectively, quotes and cites to certain testimony from the House of

Representative Subcommittee on Oversight and Investigations.  This testimony, however, is

wholly immaterial.  Under *United States v. Lachman*, 387 F.3d 42, 54-55 (1st Cir. 2004), the non-

public or informal understandings of agency officials concerning the meaning of agency

regulations are not relevant to interpreting the regulations.  The Untied States incorporates herein

its US Resp ABT SOAF ¶ 82.

110.    On March 6, 2009, Dr. Elvin Montanez, a pharmacist with extensive first-hand experience in the home drug Infusion industry, submitted an expert report on behalf of Abbott in this case.  Dr. Montanez's report described the home Infusion industry, how services and the specific costs associated with home Infusion therapy.  (Ex. 92, Expert Report of Dr. Elvin Montanez.)  Dr. Montanez's report further describes the ineffectiveness of the Medicare reimbursement system with respect to the home Infusion industry from 1991-2001, as there was no direct reimbursement mechanism to account for the service component variables or quantities of medical supplies required.  (*Id.* at 24.)  Dr. Montanez also states that most state Medicaid programs did not provide sufficient compensation for the cost necessary to provide home Infusion.  (*Id.*)  As such, Dr. Montanez states that it was well-recognized in the industry that from "1991-2001, home Infusion providers relied upon the differential between the actual cost of the medication and the AWP to subsidize the cost of Infusion drug therapy that Medicare and Medicaid payment methodologies did not recognize." (*Id.* at 24-25.)  Dr. Montanez provides that "this differential was the only payment mechanism available from Medicare and many Medicaid programs to compensate for the higher costs" associated with the costs associated with administering home Infusion treatments. (*Id.* at 25.)  Finally, Dr. Montanez opines that the differential between the drug cost and the published AWP "was accepted as the method that CMS and state programs would keep the provider whole while providing access to care."  (*Id.*)

United States' Response to ABT SOAF ¶ 110:

The United States disputes this statement.  First, Abbott improperly relies solely upon Dr.

Montanez's unsworn report which includes hearsay, and ignores Dr. Montanez's deposition

testimony.  At deposition, Dr. Montanez acknowledged that he has no factual predicate for the

assertions in his report other than his recollection of conversations he may have had with industry

insiders - the identity of whom he was unable to recall.  The citations provided by Abbott in

paragraph 110 are contradicted or undermined by Dr. Montanez's testimony (St. Peter-Griffith

Decl. Ex. 1), including but not limited to the following:

Dr. Montanez stated that he is advocating for, and defending, home infusion pharmacies

in this case.  (*See* Montanez Dep. 588:2 – 589:13)(St. Peter-Griffith Decl. Ex. 1) Although Dr.

Montanez has worked in only in Central and South Florida for five pharmacies, he still claims to

have opinions about home infusion pharmacies throughout the United States.  (*See* Montanez

Dep. 404:14 – 406:13; 558:18 – 560:19; 619:7 – 17; 673:16 – 21)(St. Peter-Griffith Decl. Ex. 1).

Dr. Montanez  conducted no study of home infusion pharmacy dispensing fees and formed his opinions without considering any relevant data. (*See* Montanez Dep. 620:22 – 621:5)(St. Peter-Griffith Decl. Ex. 1).  Dr. Montanez admits that he did not perform any scientific analysis and did not consider cost variances that exist throughout the United States with regard to his purported survey of home infusion pharmacy operating expenses.  (*See* Montanez Dep. 567:21 – 569:18; 570:13 – 571:17; 572:17 – 576:4) (St. Peter-Griffith Decl. Ex. 1). Instead, Dr. Montanez's opinions are founded upon "ad hoc," personal conversations with un-named pharmacists over the course of a 14-year career as a home infusion pharmacist in Florida. (*See* Montanez Dep. 661:14 – 662:5)(St. Peter-Griffith Decl. Ex. 1)  Dr. Montanez was unable to identify a single person involved in the conversations upon which he claims to have based his survey findings and opinions in this case.  (*See* Montanez Dep. 427:22; 431:12)(St. Peter-Griffith Decl. Ex. 1) .

111.   Mr. John Carmody, former President of OptionCare of Western Illinois and later Cottage Home Options, a company which provided home health services, signed a sworn declaration whereby he provided information regarding the home Infusion industry and Medicaid reimbursement.  Mr. Carmody stated that he recalls specific conversations during the mid-1990s that he had with Ron Gottrich, who then worked for the Illinois Medicaid program   (Ex. 90, Carmody Declaration at 1.)  During those conversations, Mr. Carmody explained to Mr. Gottrich that there were considerably higher costs associated with preparing and delivering compounded prescriptions, including Vancomycin and associated diluents, in the homecare setting.  (*Id.* at 1-2.)  Mr. Carmody wrote that Mr. Gottrich understood and acknowledged the higher costs associated with administering home Infusion therapy and knew "that the dispensing fee paid by Illinois Medicaid (which he acknowledged was designed for retail pill prescriptions) did not come close to covering the costs to dispense home Infusion drug therapies." (*Id.* at 2.)  Mr. Carmody recalls "Mr. Gottrich indicating that the 'split' between AWP and providers' acquisition costs on the drugs served to partially compensate home Infusion providers for the extra costs associated with home Infusion therapy."  (*Id.*)  Mr. Carmody stated that "[i]t was well-understood and agreed that the split between AWP and actual acquisition cost was providing the payment necessary to cover the extra costs of home Infusion drug therapy."  (*Id.*)  Mr. Carmody stated that

"[t]his was how Illinois Medicaid paid home Infusion providers for dispensing home Infusion drug therapies to Illinois Medicaid beneficiaries until early 2000," when the Illinois Department of Public Aid "drastically reduced reimbursement for the 'drug component' of several intravenous therapies.  (*Id.* at 2-3.)  In response to this, Mr. Carmody sent a letter to three Illinois legislators to express his concern over the change in the reimbursement policy.  (*Id.* at 3.)  Mr. Carmody indicated that "[s]ubsequent to the change in policy, I observed that Illinois Medicaid beneficiaries faced challenges obtaining access to home Infusion drug therapies" and that he was "aware of several home Infusion companies that quit providing services to Medicaid patients because doing so was no longer fiscally feasible."  (*Id.*)

United States' Response to ABT SOAF ¶ 111:

The United States disputes this statement.  Mr. Carmody's general recounting in an undated declaration of his hearsay conversations with an individual who worked for the state of Illinios is wholly immaterial.  According to Mr. Carmody's undated statement, he does not even recall the years that these alleged conversations took place, let alone the dates.  The United States does not dispute that Mr. Carmody, as an industry insider, may have wanted more reimbursement for his services.  His declaration is not evidence of any lack of access to care occasioned by the Illinois Medicaid program.  Mr. Carmody's recitation of his subjective understanding that some home infusion companies in early 2000 stopped providing services to Medicaid patients is speculative.

Upon receipt of an inquiry to one of the legislator addressees to Mr. Carmody's letter, Illinois Medicaid officials began preparing a draft response.  In the email exchange and draft letter to Illinois State Senator Hawkinson, Illinois Medicaid employee Marvin Hazelwood asserted "they have little argument about the Federal requirement that States must pay their best estimate of the pharmacy's acquisition cost."  (Hazelwood Illinois 6/26/00 email and attached draft correspondence) (St. Peter-Griffith Decl. Ex. 7).   The draft letter to Senator Hawkinson also points out that in Illinois, dispensing fees paid by CMOs and other third party payors in

Illinois are $3.00 or less, while the Illinois Medicaid program's dispensing fee component is

averaging $5.00 per prescription.

112.   On June 12, 2000, Mr. Carmody wrote a letter to Congressman Lane Evans, Senator Carl Hawkinson, and Representative David Hultgren.  The letter included the following statements:

> "A significant issue regarding governmental reimbursement for our [home Infusion]services has suddenly occurred . . . .  On May 1st of this year the Illinois Department of Public Aid drastically reduced reimbursement for the 'drug component' of IV medication based upon an investigation which was promulgated by the Federal Department of Justice."

> "Some years ago when the State of Illinois developed its current reimbursement mechanism, I had many discussions with the then pharmacy coordinator, Ron Gottrich concerning the mechanism for reimbursing IV medications.  It is well understood that the dispensing fee in NO WAY is able to compensate the pharmacy organization for the costs of preparing and delivering compounded I.V. solutions, HOWEVER, it was further understood that IV pharmacies were and are able to purchase pharmaceuticals at well below AWP pricing thus partially compensating them for the costs from the drug component." (emphasis in original).

> "[T]here are significant costs associated with the preparation and delivery of sterile intravenous products for patient home use that are NOT seen in the standard 'pour and count' practice i.e. traditional pharmacy practice. Such costs include accreditation by JCAHO (Joint Commission on Accreditation of Homecare Organizations), which as an aside our last accreditation was $27,000; significantly more pharmacist time which must be spent on professional activities, delivery costs and certainly far greater time spent in compounding activities - illustratively it takes less than a minute to count pills and label a vial while it may take hours to compound complex sterile IV products." (emphasis in original)

> "[M]y pharmacy, which is one of the larger in the area is unable to purchase anything under the revised pricing which has been issued.  If we therefore assume that I am to cover my costs under the dispensing fee, which both sides agree is inadequate to do so, it should leave me with no rational business alternative than to reduce my services to Medicaid and Medicare patients."

(Ex. 123, 6/12/00 Letter from J. Carmody) (Ex. A to Carmody Declaration.)

64

<u>United States' Response to ABT SOAF ¶ 112:</u>

The United States disputes the materiality of this statement.  Mr. Carmody's general

recounting of information in a hearsay letter to complain about wanting higher reimbursement for

his business in 2000 is immaterial.  Further, they are not evidence of any lack of access to care

occasioned by the Illinois Medicaid program.  Mr. Carmody's recitation in his June 2000 letter of

his subjective understanding that some home infusion companies will not be able to allow other

private insurance collections to "subsidize" them is speculative.  He provides no firsthand

knowledge or evidence as to the factual predicate for such a statement, and the United States

cannot test his assertions.  No evidence concerning Mr. Carmody's businesses' costs, their

reduction in revenue in 2000 due to changes in Illinois Medicaid reimbursement, or evidence of

impact to his business was ever presented in this case.  Conspicuously, Mr. Carmody did not

provide evidence that his business interests could not afford to provide such care to Illinois

Medicaid beneficiaries. The United States incorporates and repeats its Response to ABT SOAF

¶ 111.

113.    Mr. Ron Gottrich, Consultant Pharmacist for the Illinois Department of Public
Aid (IDPA) from 1980 to 2004, signed a sworn declaration whereby he provided information
regarding Illinois's reimbursement policies from the time of his employment as well as
information relating to the provision and reimbursement for home Infusion services by Illinois
Medicaid.  (Ex. 91, Gottrich Affidavit).

> Mr. Gottrich "was very familiar with the policies underlying Illinois's
> reimbursement to providers for dispensing prescription drugs to Illinois citizens
> eligible to receive Medicaid assistance."  (*Id.* at 1.)
>
> "During the entirety of my time at [Illinois Department of Public Health], I was
> aware that the Average Wholesale Prices, or 'AWPs,' published in the drug
> compendia, such as *Red Book* and *Blue Book/First Databank*, were list prices not
> reflective of the actual prices - net of discounts, rebates, and chargebacks - paid by
> pharmacies in the marketplace."  (*Id.*)

65

"In particular, I was aware that the differences between AWPs published in the compendia and the actual prices paid in the marketplace were significantly greater for generic drugs.  I was also aware that the differences between AWPs published in the compendia and the actual prices paid in the marketplace could be substantial for intravenous solutions (such as sodium chloride and dextrose) and injectable drugs commonly infused or injected into patients."  (*Id.* at 1-2.)

"It was commonly discussed amongst those who administered Illinois Medicaid pharmacy benefit that the dispensing fees paid by Illinois Medicaid were not sufficient to cover pharmacies' cost to dispense Medicaid to Medicaid participants, much less provide a profit."  (*Id.* at 2.)

"It was also commonly discussed amongst those who administered Illinois Medicaid pharmacy benefit that Illinois Medicaid's reimbursement formula for ingredient cost provided a margin relative to the cost of the drug, and that this margin service to both offset the inadequacy of the dispensing fee and compensate for the fact that Illinois Medicaid did not reimburse drug claims in a timely manner."  (*Id.*)

Mr. Gottrich "recall[s] having conversations with Mr. Carmody" and "[t]he discussions referenced by Mr. Carmody in his [June 12, 2000] letter are consistent with my recollection of numerous conversations with pharmacists over the years where it was recognized and understood that the margin paid on ingredient cost served to offset the acknowledged inadequacy of Illinois Medicaid's dispensing fee and the delay in receiving payment from Illinois Medicaid.  (*Id.* at 3.)

Mr. Gottrich stated that "I would agree that pharmacies dispensing IV medications have higher costs that are not seen in the traditional retail pharmacy practice."  (*Id.*)

"[I]t was also well understood by pharmacists and Medicaid officials with whom I spoke that the difference between AWPs published in the compendia and the actual prices paid in the marketplace could be substantial for intravenous solutions and other injectable and Infusion drugs commonly used by IV pharmacies."  (*Id.* at 3-4.)

United States' Response to ABT SOAF ¶ 113:

Denied.  The Rule 30(b)(6) witness for Illinois Medicaid testified as follows:

Q.     Has the State of Illinois ever had a practice or a policy of paying increased ingredient cost in order to make up for some type of inadequate dispensing fee?

66

A.   No.

(11/18/08 Parker Dep. 61:18-22)(St. Peter-Griffith Decl. Ex. 9)

Furthermore, the declaration referenced is not "testimony by state officials" because by the terms

of the declarant's own statement, he was employed by the Illinois Department of Public Health, a

separate state agency, and served only as a consultant pharmacist for Illinois Medicaid until

1994.  The United States incorporates and repeats its Response to ABT SOAF ¶ 111.

114.     Pursuant to the Omnibus Reconciliation Act of 1990, "HCFA shall establish a
Federal upper reimbursement limit for each multiple source drug for which the FDA has rated
three or more products therapeutically equivalent and pharmaceutically equivalent, regardless of
whether all such additional formulations are rated as such and shall use only such formulations
when determining any such upper limit."  (Ex. 102 (Abbott Ex. 463).)

United States' Response to ABT SOAF 114:

        This statement of fact merely quotes from the Omnibus Reconciliation Act of 1990.  It

calls for a legal conclusion to which no response is necessary.

115.     Sue Gaston worked as a Health Insurance Specialist at HCFA from 1991 to 2003,
reporting to Larry Reed.  During this time, Gaston's responsibilities included overseeing
policy-related issues for the Medicaid drug rebate program and working on Medicaid pharmacy
reimbursement matters, such as drug coverage, payment issues, and reviewing state plan
amendments.  (1/24/08 Gaston Dep. 40:7-42:8, Ex. 26.)  Gaston was also responsible for setting
Federal Upper Limits ("FULs").  (*Id.* at 45:2-5.)

United States' Response to ABT SOAF ¶ 115:

        The United States disputes the relevancy of the above statement because the United States

did not set FULs for the Subject Drugs in the Abbott case, and consideration of whether FULs

should have been established on the Subject Drugs from 1991 to 2001 is immaterial and

speculative.  *See* US Resp. to Combined SOAF ¶¶ 88-91.

67

116.    Between 1991 and 2003, Gaston, Peter Rodler, and Cindy Bergin were the personnel involved in setting FULs.  (1/24/08 Gaston Dep. 223:16-224:19, Ex. 26.)  Rodler trained Gaston to set FULs in 1991.  (3/19/08 Gaston Dep. 404:1-6, Ex. 27.)  Rodler left in the mid-1990s, and Gaston was solely responsible for setting FULs until Bergin arrived in 1999.  (*Id.* at 404:7-406:2.)  After 2003, Gail Sexton became involved in setting FULs.  (1/24/08 Gaston Dep. 224:4-8, Ex. 26.)

United States' Response to ABT SOAF ¶ 116:

The United States disputes the relevancy of the above statement because the United States

did not set FULs for the Subject Drugs in the Abbott case, and consideration of whether FULs

should have been established on the Subject Drugs from 1991 to 2001 is immaterial and

speculative.  *See* US Resp. to Combined SOAF ¶¶ 88-91.

117.    Gaston was aware that there was a large difference between acquisition costs and AWPs for certain injectable and Infusion drugs based on the Ven-A-Care litigation and presentation in the mid-1990s.  (3/19/08 Gaston Dep. 319:13-320:10, Ex. 27.)  Gaston testified that, although she was aware of the difference, CMS "did not set FUL prices on those types of drugs. . . it would be a matter of changing the criteria.  And that wouldn't be strictly my place to do that."  (*Id.* at 327:3-328:19.)

United States' Response to ABT SOAF ¶ 117:

The United States disputes the relevancy of the above statement because the United States

did not set FULs for the Subject Drugs in the Abbott case, and consideration of whether FULs

should have been established on the Subject Drugs from 1991 to 2001 is immaterial and

speculative.  It is undisputed that there were no FULs for the Subject Drugs, and therefore, that

FUL pricing has no bearing upon Medicare or Medicaid's reimbursement of the Subject Drugs or

the United States' damages.

Abbott's selective citation to Ms. Gaston's testimony is misleading.  Ms. Gaston also

testified that CMS policy was generally to attempt to set FULs for eligible drugs that were the

most commonly used and dispensed by pharmacies.   As Ms. Gaston explained, CMS generally

did not set FULs for injectable products:

> Q.     And we'll talk about that in a bit.  Why don't we talk about it now.  Why are not injectable products included on the FUL?
>
> MR. WINGET-HERNANDEZ:          Objection, form.
>
> A.     When I started to work on the FULs injectable products were not included.  And it's my understanding that the purpose of the FUL program is to set reimbursement rates on drugs that are generally used by the Medicaid population in an outpatient-type, like a pharmacy-type setting, most commonly used products.  And it's my understanding that injectables and other products many times are provided in a physician's office and other type of settings where they might not be claimed separately. They might be included in a payment, like a physician payment. Also, injectables, many times when they're billed on the claim form they're not – they're billed with codes rather than NDC numbers, which means that the states may not be paying for them through their pharmacy benefit but through another means, such as a physician's visit or a hospital or something like that.
>> So many times what we're trying to do with the FULs is use most commonly used drugs and covered outpatient drug type, so like tablets and capsules.

1/24/08 Sue Gaston Dep. 245:13-22; 246:1-16.  (St. Peter-Griffith Ex. 15) (*See also*, Fauci Ex.

146 (3/19/2008 Sue Gaston Dep. at 322:20 - 323:6); Fauci Exhibit 147 (1/24/2008 Sue Gaston

Dep. at 250:7 - 250:22)(Dkts. 6315))

    118.    Gaston testified that CMS "didn't set federal upper limit prices on injectable drugs or Infusion drugs.  [They] set them on drugs that were the most commonly Used such as tablets, capsules, creams." (3/19/08 Gaston Dep. 320:17-321:6, Ex. 27.)  Gaston is not aware of any statute or regulation that prohibited FULs for injectables or Infusion drugs.  CMS's internal criteria that FULs would apply to "drugs that were considered outpatient drugs, generally dispensed at the pharmacy level" was established before Gaston started working in the federal upper limit program.  (*Id.* at 321:12-322:3.)

United States' Response to ABT SOAF ¶ 118:

    The United States incorporates and repeats its Response to ABT SOAF ¶ 117.

120.   CMS Uses a computerized system to collect initial data for determining FULs. (1/24/08 Gaston Dep. 235:2-237:9, Ex. 26.)  The system pulls data from the Orange Book for drugs that meet the criteria for FULs.  (*Id.* at 237:10-238:12.)  Ms. Gaston testified that CMS specifically set up the computer program to identify and exclude injectable drugs.  (*Id.* at 248:13-17.)  She did not know why CMS did this.  (*Id.* at 248:21-249:12.)

United States' Response to ABT SOAF ¶ 120:

The United States incorporates and repeats its Response to ABT SOAF ¶ 117.

121.   Ven-A-Care's Zachary Bentley testified that he had conversations with Gaston wherein he inquired why CMS did not establish FULs for Infusion and injectable drugs.  Mr. Bentley testified:

Q.      Tell me about your conversations with Larry Reed and Sue Gaston.

A.      Sue Gaston, at this time, I don't know what she does now, she was in charge of determining the federal upper limit for Medicaid drugs, and Larry Reed was, I believe, her boss.

Q.      When did you speak to Ms. Gaston and Mr. Reed?

A.      I spoke to Sue Gaston several times. I don't remember the dates or times. I think Larry Reed I may have had one or two conversations with prior to this meeting.

Q.      What was the occasion for your speaking with Ms. Gaston and Mr. Reed?

A.      It would have had to have done with the Medicaid payment for prescription drugs.

Q.      Approximately how long before September of 1995 did you first speak to Ms. Gaston or Mr. Reed?

A.      I don't remember.

Q.      Was it more than a year before this time?

A.      With Sue Gaston, I'm fairly confident that it was probably several years prior.

70

Q.      How did you come to speak to Ms. Gaston at HCFA?

A.      I got her name and telephone number from somebody. I don't know how, but certainly I got her name and spoke to her.

Q.      Why did you want to speak to Ms. Gaston?

A.      Like I say, it would have -- it would have had to do with issues regarding Medicaid prices or reimbursement for prescription drugs.

Q.      What was your purpose for calling Ms. Gaston?

A.      I don't remember exactly, whether I was seeking information, or whether I was wishing to give her information. I was probably asking her for information.

Q.      What type of information were you asking from Ms. Gaston?

A.      I think one of the questions that I was curious about was how she went about formulating the, or the methodology used in establishing the federal upper limit or FUL.

Q.      Now, there were no FULs established for Infusion drugs as I recall.  Correct?

A.      That's correct.

Q.      Did you ask Ms. Gaston about that?

A.      Yes. I can't remember her answer. And I also asked her who determines what drugs go on the federal upper limit, because to my knowledge I couldn't find any rules or regulations that articulated exactly how a drug got chosen to be on the federal upper limit. So I was curious as to what that process was. To the best of my knowledge, I think she said it was within her discretion.

Q.      Did Ms. Gaston give any indication as to why she was exercising her discretion not to establish a federal upper limit for Infusion drugs?

A.      No.

71

> Q.      Do you have under -- did you have any understanding as this time about why it was that HCFA had not established a federal upper limit for Infusion drugs?
>
> A.      No, I don't -- I don't know why they didn't.

(3/5/08 Bentley Dep. 322:17-325:16, Ex 8.)

United States' Response to ABT SOAF ¶ 121:

Disputed.  Abbott's selective quotation of Mr. Bentley's testimony is misleading, and pure hearsay.  From the face of the transcript cited by Abbott, Mr. Bentley's Rule 30(b)(1) testimony about his inquiries to Ms. Gaston about FULs is speculative and he makes clear that he cannot remember the key components concerning his communication with Ms. Gaston. Furthermore, the United States disputes the relevancy of the above statement because the United States did not set FULs for the Subject Drugs in the Abbott case, and consideration of whether FULs should have been established on the Subject Drugs from 1991 to 2001 is immaterial and speculative.  It is undisputed that there were no FULs for the Subject Drugs, and therefore, that FUL pricing has no bearing upon Medicare or Medicaid's reimbursement of the Subject Drugs or the United States' damages.

122.    Jerry Wells, the former Pharmacy Program Director in Florida, also testified about conversations with CMS officials regarding the lack of FULs on Infusion and injectable drugs. Mr. Wells testified:

> Q.      Do you recall any specific conversations that related to whether or not injectable or Infusion drugs, including those listed on Pages 10 and 11 of Exhibit 1002, would be included within the federal upper limit program?
>
> A.      No. As I said, I think they excluded them. It was not their intent to put federal upper limit prices on those drugs.
>
> Q.      Do you know why it was that HCFA – strike that. Were you

ever told by anyone at HCFA why it was that HCFA intended to exclude injection and Infusion drugs from the federal upper limit program?

      MS. ST. PETE-GRIFFITH:   Object to form.

THE WITNESS:     I don't recall.

BY MR. COOK:

Q.    From your conversations with Larry Reid and others at HCFA, were you able to infer why it was that the federal government excluded injection and Infusion drugs from the federal upper limit program?

      MS. WALLACE:    Objection.

      MS. ST. PETE-GRIFFITH:   Objection.

THE WITNESS:     I don't think that I was ever satisfied or got a satisfactory answer for my purposes or that issue, but I just don't recall. That's many years ago.

BY MR. COOK:

Q.    Did you seek a satisfactory answer?

      MS. ST. PETE-GRIFFITH:   Object to the form.

THE WITNESS:     I think we had some discussions about it because I felt like they should, and they had some reasons that, as I said, I don't think I was ever satisfied with, but I don't even recall what their reasons were.

\*  \*  \*

Q.    You indicated that you never got a satisfactory answer from HCFA. Did you ever get any answer from someone at HCFA as to why the federal upper limit program was not expanded to include injection and Infusion products?

      MS. WALLACE:    Objection.

      MS. ST. PETE-GRIFFITH:   Object to the form.

THE WITNESS:        I may have. These were philosophical discussions, and we had lots of differences of opinion about what ought to and ought not to be done in managing the prescription drug program. I don't recall the answer. Obviously, it didn't stick in my mind or I'd tell you what it was.

BY MR. COOK:

Q.      And to be clear, the -- your inability to testify about why it was that HCFA told you is a function of the passage of time, correct?

MS. ST. PETE-GRIFFITH:   Object to the form.

MS. WALLACE:        Objection.

THE WITNESS:        Yeah, I think the function of the passage of time, and it wasn't -- apparently, wasn't satisfactory enough to stick.

(12/15/08 Wells Dep. 48:11-50:4, 55:11-56:3, Ex. 85.)

<u>United States' Response to ABT SOAF ¶ 122:</u>

The United States disputes this statement.  From the face of the transcript cited by Abbott, it is clear that Mr. Wells cannot recall the specifics of any such purported conversations. Furthermore, the United States disputes the relevancy of the above statement because the United States did not set FULs for the Subject Drugs in the Abbott case, and consideration of whether FULs should have been established on the Subject Drugs from 1991 to 2001 is immaterial and speculative.  It is undisputed that there were no FULs for the Subject Drugs, and therefore, that FUL pricing has no bearing upon Medicare or Medicaid's reimbursement of the Subject Drugs or the United States' damages.

123.    The Centers for Medicare & Medicaid Services has published a summary chart entitled "Medicaid Prescription Reimbursement Information by State - Quarter Ending June 2009," at http://www.cms.hhs.gov/Reimbursement/Downloads/reimbursementchart2q2009.pdf. The summary chart indicates that nearly every state Medicaid program sets its ingredient cost

reimbursement level by reference to AWP, either in whole or part, as of the quarter ending June 2009.  (Ex. 103.)

United States' Response to ABT SOAF ¶ 123:

The United States disputes this statement because the 2009 report is immaterial as it is outside of the operative 1991 to 2001 damages time period of this case.

Respectfully submitted,

For the United States of America,

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

 /s/ Ann M. St. Peter-Griffith_____
Mark A. Lavine
Ann St. Peter-Griffith
Special Assistant U.S. Attorneys
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone: (305) 961-9003
Fax: (305) 536-4101

For the relator, Ven-A-Care of the Florida
Keys, Inc.,
JAMES J. BREEN
The Breen Law Firm, P.A.
5755 North Point Parkway
Alpharetta, Georgia 30022
Phone (770) 740-0008
SUSAN S. THOMAS
GARY L. AZORSKY
ROSLYN G. POLLACK
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000

Dated: September 22, 2009

TONY WEST
ASSISTANT ATTORNEY GENERAL

 /s/ Justin Draycott_____
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca Ford
Elizabeth Strawn
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 305-9300
Fax: (202) 307-3852

MICHAEL K. LOUCKS
ACTING UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3398
Fax: (617) 748-3272

I hereby certify that I have this day caused an electronic copy of the above UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES RULE 56.1 STATEMENT OF ADDITIONAL FACTS THAT PRECLUDE SUMMARY JUDGMENT to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

                                                    /s/ Mark Lavine
Dated: September 22, 2009                          Mark Lavine