# EXHIBIT 1

Page 348

```
             UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION                       MDL No. 1456
_____
THIS DOCUMENT RELATES TO:        Master File No.
                                    01-CV-12257-PBS
_____  Subcategory No.
                                    06-CV-11337-PBS
United States of America, ex rel.
Ven-A-Care of the Florida Keys,  Judge Patti B. Saris
Inc., v. Abbott Laboratories,
Inc.                             Magistrate Judge
                                  Marianne B. Bowler
CIVIL ACTION NO. 06-11337-PBS


   VIDEOTAPED DEPOSITION OF ELVIN M. MONTANEZ, PHARM.D.
     Taken on Behalf of the United States of America
                       VOLUME II

        DATE TAKEN:   APRIL 30, 2009
        TIME:         8:32 a.m. - 4:28 p.m.
        PLACE:        Sheraton Orlando North
                      600 North Lake Destiny Drive
                      Maitland, FL 32751



           Stenographically Reported by:
               Delina M. Valentik,
          Registered Professional Reporter
            Florida Professional Reporter
```

Page 401

1  Q.  What --
2  A.  In general let me rephrase.  This is
3  what I thought a pharmacist earned during that
4  time period.
5  Q.  But you didn't --
6  A.  In ball park range.
7  Q.  But you didn't look at any salary
8  information or any studies or any time sheets or
9  any pay stubs to derive this information.
10 Correct?
11     MR. TORBORG:  Objection.
12     THE WITNESS:  I did not.  I would have
13 stated it in a subsection.  I would have
14 subheaded it.
15 BY MS. ST. PETER-GRIFFITH:
16 Q.  So this is all based upon your own
17 personal recollection?
18 A.  And experience, yes.
19 Q.  And from '91 through '94 you didn't
20 work in the home infusion market, did you?
21 A.  I worked in the pharmacy -- at -- in
22 the hospital section, yes.

Page 402

1  Q.  Well, are these prices intended to
2  reflect salaries for home infusion pharmacy or
3  for a regular pharmacy?
4     MR. TORBORG:  Objection, form.
5     THE WITNESS:  Let me clarify for you --
6     MR. ANDERSON:  What's the basis of that
7  form objection?
8     MR. TORBORG:  She's suggesting that
9  there's a difference between the two, so...
10    MR. ANDERSON:  She's not suggesting
11 anything.  She's asking the man if there is a
12 difference.
13    MR. TORBORG:  I -- that's not what she
14 asked.
15    MS. ST. PETER-GRIFFITH:  That was what
16 I asked.
17    MR. TORBORG:  Read back the question
18 then.
19    (Thereupon the record was read.)
20    MR. TORBORG:  Objection stands.
21    THE WITNESS:  I don't think --
22    MR. ANDERSON:  What's the basis of the

Page 403

1  objection?
2     MR. TORBORG:  I told you.
3     MR. ANDERSON:  It's suggestive?  Is
4  that a -- is that a basis, suggestive question?
5     MR. TORBORG:  The question is implying
6  that there is a difference between the two.
7     MS. ST. PETER-GRIFFITH:  There isn't an
8  implication.  It's not implying anything.  The
9  man can than answer.
10    MR. TORBORG:  Okay.
11    MR. ANDERSON:  I move to strike the
12 objection as unfounded.
13    THE WITNESS:  Let me go ahead and
14 answer the question.  The home infusion industry
15 hires pharmacists and nurses that have a certain
16 level of expertise in injectable drugs and the
17 administration of the injectable drugs and the
18 management of those injectable drugs.  That
19 expertise is found in hospital where those
20 products are also used, therefore, the industry
21 has to compete with hospital on salary, wage and
22 benefits in order to attract the same resource.

Page 404

1  So I do believe them to be very similar, yes.
2  BY  MS. ST. PETER-GRIFFITH:
3  Q.  Are they the same?
4  A.  I believe them to be estimates that are
5  very similar.
6  Q.  And what do you base that on?
7  A.  My experience.
8  Q.  Just solely your experience?
9  A.  (Nods head.)
10 Q.  And what is it that -- in your
11 experience that informs that factual bases?
12 A.  My CV indicates I worked in both
13 institution as well as home infusion.
14 Q.  How much did you make an hour as a
15 pharmacist from 1991 to 2001?
16 A.  It varied between 50 to $60,000.
17 Q.  How much did you make on an hourly
18 basis?
19 A.  I was salaried.
20 Q.  Then how can you identify what the --
21 an hourly wage figure is?
22 A.  I don't have an hourly -- well, I put

15 (Pages 401 to 404)

Page 405

1  it down in hourly, but what you can do is you can
2  take that figure, multiply it by twenty eighty
3  and that's your salary.
4     Q.  What is twenty eighty?
5     A.  Two thousand eighty hours which is the
6  average work year if you work 40 hours a week and
7  you have two weeks of vacation.
8     Q.  And is that what you did in arriving at
9  this figure?
10    A.  Yes.
11    Q.  Okay.
12    A.  I put it in -- I could have used the
13 salaries for both the pharmacist and the nurse
14 because those are typically salaried positions.
15 But I went ahead and simplified the process, so
16 it would be more relatable in time since we were
17 talking about time, I put it in terms of time
18 just by dividing it out.
19    Q.  Did you do any kind of analysis of over
20 time how salaries would increase or decrease
21 based upon market conditions?
22    A.  No, I didn't.  Again, it's my

Page 406

1  experience and I have to live in those market
2  conditions, so I feel like my experience was part
3  of those differences that you reference.
4     Q.  And --
5     A.  Or conditions that would create a
6  difference.
7     Q.  And those market conditions that you
8  worked in were exclusively in the mid -- middle
9  Florida range area.  Right?
10    A.  In the Florida area, yes.  In -- you
11 can't say mid Florida, you -- I would go all the
12 way down to south Florida up to north central
13 Florida where we had facilities located in Ocala.
14    Q.  Do you pay your pharmacists the same
15 from '95 through 2001 in every single pharmacy in
16 every geographic region where ProHealth has a
17 pharmacy?
18    A.  We have minor variations which is why I
19 stated in my, you know, paper here, these are
20 estimates and, again, if I wanted to take those
21 variations into consideration, I don't think that
22 we would have any meaningful difference, you

Page 407

1  know, we -- we would -- I would come up with, you
2  know, $29 or $27, but still the calculation is
3  still going to render you a number and, again, to
4  keep this paper from becoming something that is
5  an encyclopedia or compendium and without having,
6  you know, the need to spend a year compiling that
7  information to get a point across, again, I
8  simplified the term and put it here in estimates.
9     Q.  Okay.
10    A.  This is -- this is an estimate.
11    Q.  I want you to take me through your
12 methodology --
13    A.  Uh-huh.
14    Q.  -- based upon what personal experience
15 you had in your head --
16    A.  Uh-huh.
17    Q.  -- as to how you calculated this $28.85
18 pharmacy -- pharmacist's hourly wage.
19    A.  If I had to hire a pharmacist back in
20 that time period, it would have taken me anywhere
21 between, you know, anywhere in the $60,000 range
22 to attract that pharmacist to come over.  And

Page 408

1  then I would have had to offer a good benefits
2  package to do the same.  And I would look for a
3  pharmacist with experience.
4     Q.  So take me through the math --
5        MR. ANDERSON:  Objection,
6  nonresponsive.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Take me through the math of how you did
9  -- how you got to this $28.85 figure?
10       THE WITNESS:  I was --
11       MR. TORBORG:  Objection, asked and
12 answered.
13       THE WITNESS:  I was hiring back in the
14 time period of '95, '96, you know, '97 when I was
15 in a specific entity, and I was also responsible
16 after '97, '98 when I got to the corporate office
17 for oversight of that responsibility of what
18 salaries were being paid and was our company
19 maintaining its competitiveness in being able to
20 recruit the resource.  That's what I relied on,
21 again, my experience.
22 BY MS. ST. PETER-GRIFFITH:

16 (Pages 405 to 408)

Page 425

1  conversation about your doing two different types
2  of analyses for purposes of this report.
3      A.  Uh-huh.
4      Q.  An analysis of the labor --
5      A.  Uh-huh.
6      Q.  -- as well as a supply analysis --
7      A.  Uh-huh.
8      Q.  -- I think is what we called it.
9      A.  Uh-huh.
10     Q.  Is this -- are these diagrams and flow
11 charts --
12     A.  Uh-huh.
13     Q.  -- in section A --
14     A.  Uh-huh.
15     Q.  -- the labor analysis that we talked
16 about?
17     A.  Yes, what I did was I took you through
18 the process so that you could understand how I
19 derived a certain calculation where I got my
20 information from, where I got my time from.  I
21 tried to make it as clear as possible.  I think
22 diagrams help in that scenario.  But what I

Page 426

1  indicate in table or diagram one is the actual
2  time involved and then I take information from
3  that in table two that is the wage analysis or
4  estimates.  And then in table one of the hourly
5  wage, rather.
6          In table two, cost by personnel, what I
7  do is on the left column I add time for each
8  individual discipline and then multiply it all
9  out by the wage.
10     Q.  Okay.
11     A.  And add it here so it's clear.
12     Q.  We might be covering a little bit of
13 the same ground that we covered yesterday, but
14 what I'd like to do is break it down based upon
15 what you just said.  How long did it take you to
16 put together the -- and do -- do the analysis --
17     A.  Uh-huh.
18     Q.  -- and put together the hourly wage
19 table?
20     A.  You know, it would be a component of
21 however long it took me to do the report.  You
22 know, I don't really know specifically how long

Page 427

1  it took me to do the table, but you know an hour
2  or two, would be a guess.
3      Q.  Okay.  What about the flow diagram one,
4  the process, personnel and time?
5      A.  Maybe an hour.
6      Q.  And then finally what about the cost of
7  -- by personnel?
8      A.  That's really something that I didn't
9  -- you know, that time was nominal.  That's the
10 calculations.
11     Q.  Okay.  So you took sort of --
12     A.  Information.
13     Q.  -- flow diagram one --
14     A.  Yeah.
15     Q.  -- information from the hourly wage and
16 sort of did the math?
17     A.  Right.
18     Q.  Is that fair?
19     A.  Right.
20     Q.  Okay.  So that was a few minutes?
21     A.  Nominal, yeah.
22     Q.  Okay.  Now, you said with regard to

Page 428

1  flow diagram one that you -- that this is the
2  actual time involved.  First, what I'd like to
3  ask is what is the time period for the actual
4  time involved in flow diagram one?
5      A.  Well, the time period --
6          MR. TORBORG:  Object to form.
7          THE WITNESS:  The time period could be
8  1995. It could be 2005.  Again, the
9  responsibility and the requirement is still the
10 same.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Okay.  What -- does this cover the time
13 period from '91 through '94?
14     A.  Yes, in 1991 when I inquired as to what
15 home infusion was all about back then it was the
16 same as it is today with exception, we have now
17 more covered therapies and essentially TPN was
18 being performed back in 1991.  You know, IV
19 antibiotics were being administered back in 1991.
20     Q.  Who did you inquire of?
21     A.  Colleagues, associates.  If anything,
22 the time would be greater back in the earlier

21 (Pages 425 to 428)

Page 429

 1  days because administering these drugs in the
 2  home was less understood, the risks were less
 3  understood and, therefore, we tended to -- you
 4  know, in the early years we tended to perform
 5  more analysis on the patient to make sure that
 6  they were responding to treatment and no
 7  complications were occurring.
 8      Q.  That statement that you just made --
 9      A.  Uh-huh.
10      Q.  -- what do you predicate that on?
11      A.  My experience.
12      Q.  And which colleagues and associates did
13  you consult or survey to obtain information
14  concerning the '91 through '94 time period
15  represented in this flow diagram?
16      A.  Same colleagues and associates that
17  we've talked about since we began our deposition
18  yesterday.  You know, we're talking about 14 years
19  of historical questions and answers.  And how
20  long have you been open and how long have you
21  been performing home infusion and when did you
22  open your doors and, you know, how did you open

Page 430

 1  your doors, what was your first patient, what was
 2  your first TPN like, you know, those are all
 3  things that come into conversation.
 4      Q.  Who did you have those conversations
 5  with?
 6      A.  I don't know.  They were, you know,
 7  people I met throughout the years.
 8      Q.  But you can't name a single person?
 9      A.  I cannot.
10      Q.  What about for '95 through 2001, what
11  do you base this -- these time representations
12  upon in --
13      A.  Again, it's like --
14      Q.  -- flow diagram one?
15      A.  It's based on my experience and, again,
16  the same networking opportunities that we had.
17      Q.  So when you say the same networking
18  opportunities, those are the ones where you can't
19  name me anyone.  Right?
20      A.  It's the same network opportunities
21  that I've had throughout the past -- the 14 years
22  in attending seminars and presentations,

Page 431

 1  roundtable discussions, et cetera.
 2      Q.  But you can't identify a single
 3  presentation, you can't identify a single
 4  individual that you spoke with.  Right?
 5      A.  No.
 6      Q.  For the time representations here are
 7  they based upon your experience with the
 8  ProHealth -- with the market that ProHealth and
 9  its pharmacies were operating in?
10      A.  The five home infusion pharmacies, yes.
11      Q.  Anything else?
12      A.  No.
13      Q.  And what did you do to ascertain that
14  it took 60 minutes for an intake nurse --
15      A.  A couple of things.  You are part of
16  the process.  You can perform the intake yourself
17  that a nurse would do.  It doesn't take a nurse
18  to do it.  You hire a nurse to do it.  There's
19  obvious advantages because they speak.  The
20  language that someone on the referring end is
21  speaking, but you can do it yourself and I have
22  done it many times myself.  I know the time it

Page 432

 1  takes.  And let me tell you, that 60 minutes is a
 2  perfect scenario.  It could go far beyond that.
 3  Because there are many unknown questions that
 4  need to be answered and that takes up time, so...
 5      Q.  And is it your belief or your position
 6  that this time should be covered through the
 7  ingredient cost spread for Medicare and Medicaid?
 8          MR. TORBORG:  Objection, form.
 9          THE WITNESS:  It is my belief that that
10  time adds to the cost that I incur in providing
11  the service that is required for the
12  administration of a drug in home infusion.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  And is it your position that the
15  reimbursement for the ingredient cost and the
16  spread associated with that, that you -- that
17  your ProHealth entities or pharmacies billed to
18  Medicare and Medicaid should cover -- should they
19  cover any of the costs on this flow diagram one?
20      A.  It's my position that my costs should
21  be considered when reimbursing me.  Otherwise, if
22  my costs aren't considered in any kind of

                                       22 (Pages 429 to 432)

Page 557

1  ABT's 2006 result. Right?
2     A. Uh-huh.
3     Q. Is that right?
4     A. That's correct.
5     Q. Okay. But you agree that your method
6  is completely different than ABT's method.
7  Correct?
8     A. Yes.
9     Q. Okay. Would you say that your result
10 was more important to you than the method you
11 used?
12    MR. TORBORG: Objection, form.
13    THE WITNESS: No, I believe that my
14 method was absolutely important and I was fairly
15 confident of the result that I would show. But
16 my method was very important because my method is
17 the validity of the report.
18 BY MR. ANDERSON:
19    Q. Do you --
20    A. It doesn't -- I believe, Mr. Anderson,
21 that you don't have to have a specific method of
22 conducting research in order to draw a

Page 558

1  conclusion. There are many different ways to get
2  from point A to point B.
3     Q. Explain your research method to the
4  jury that you used in your work in this
5  litigation.
6     A. I didn't claim it to be research
7  method. I claimed it to be the exper -- what is
8  home infusion, what is the cost of home infusion
9  based on my experience, what is all involved, et
10 cetera.
11    Q. Do you -- do you contend, sir, that
12 your cost analysis regarding home infusion
13 practice and services is applicable to the
14 country?
15    MR. TORBORG: Object to form.
16    MR. ANDERSON: I'll rephrase it.
17 BY MR. ANDERSON:
18    Q. Sir, do you contend that your cost work
19 and analysis that's shown in your report is
20 somehow applicable or representative of home
21 infusion pharmacy costs throughout the country?
22    MR. TORBORG: Objection. Do you really

Page 559

1  think that question has not been asked yet?
2     MS. ST. PETER-GRIFFITH: Do you have a
3  form objection?
4     MR. ANDERSON: Look, I want an answer.
5     THE WITNESS: I contend that my
6  information is similar. That my estimates are
7  fair. And that if you were to take and perform
8  this type of activity elsewhere, you would get a
9  similar result.
10 BY MR. ANDERSON:
11    Q. How do you know that?
12    A. Again, based on my experience of 14
13 years in interacting with people in those 14
14 years, I feel like we're all operating very, very
15 similar in our approach to providing this care.
16 And the reason being is we have standards of
17 practice and -- and accreditation requirements
18 that put us very close.
19    Q. Have you considered wage rates in
20 Seattle?
21    A. I did not.
22    Q. Dallas, St. Angelo, Texas?

Page 560

1     A. I did not.
2     Q. New York City?
3     A. Again --
4     Q. I'm asking the question, sir, have you
5  considered wage rates in New York City?
6     A. I did not.
7     Q. Have you considered any salary
8  information for any region within the country
9  other than central and south Florida?
10    A. Not beyond my experience, no.
11    Q. Okay. Have you considered any data or
12 statistics of any sort regarding any home
13 infusion costs other than your experience in
14 central and south Florida?
15    A. I didn't think it was necessary to
16 provide the expert opinion.
17    Q. Okay. So the answer to my question is
18 no?
19    A. The answer to your question is no.
20    Q. All right. Have you conducted any
21 survey of any informal or formal type of any home
22 infusion pharmacies throughout the country?

54 (Pages 557 to 560)

Page 565

 1  and answered.
 2        THE WITNESS:  I don't have any other
 3  criteria.
 4  BY MR. ANDERSON:
 5     Q.  Do you have any criteria?
 6     A.  I believe the -- the criteria --
 7  experience is a criteria, is it not?  And that's
 8  a question.
 9     Q.  That's a question to me?
10     A.  Yes, sir.
11     Q.  You don't know whether your experience
12  constitutes criteria for reliability of your
13  method?
14     A.  I believe it does.  I believe it does.
15     Q.  Well, then why are you asking me?
16     A.  I was asking you, not for my own
17  edification, to see where you stood.
18     Q.  So you feel quite sure that it's a
19  perfectly sufficient survey method and the
20  criteria that indicates to you that your survey
21  was completely accurate and reliable and
22  representative because you had these

Page 566

 1  conversations?
 2        MR. TORBORG:  Object to form.
 3        THE WITNESS:  Not --
 4        MR. TORBORG:  Misstates testimony.
 5        THE WITNESS:  It's not just
 6  conversations, Mr. Anderson, it's operation --
 7  operating as well.  I don't believe that I would
 8  be here today or my company would be successful
 9  and be viable today if what we weren't doing was
10  -- was valid.
11  BY MR. ANDERSON:
12     Q.  Did you consider anything like
13  variances in your data, such as maybe you had a
14  conversation with some guy who you thought was
15  kind of different than other pharmacists?
16        MR. TORBORG:  Object to form.
17        THE WITNESS:  You know, I could have
18  considered variances.  I didn't think it was
19  necessary to, again, express what does a home
20  infusion company do, why does it do what it does,
21  what does it cost, what it does, I mean, the cost
22  variances are going to be there.  Of course, the

Page 567

 1  salary variances are going to be there,
 2  absolutely, but again...
 3  BY MR. ANDERSON:
 4     Q.  Why didn't you consider those
 5  variances?
 6     A.  Because I didn't think it was necessary
 7  for the points that I was trying to make --
 8     Q.  Did you have --
 9     A.  In this expert -- in this expert report
10  --
11     Q.  Uh-huh.
12     A.  -- I could have variances, but still
13  the -- the -- the point would still be made, if
14  I'm paying $6 an hour for a driver in Texas, it
15  would still cost me money to get that drug to a
16  patient's home.  If it cost -- if it was only 30
17  minutes rather than an hour, it would still cost
18  me money to get that drug to a patient's home.
19        Again, the expert report was designed
20  to educate a jury as to what home infusion is.
21     Q.  Let me read you something, Dr.
22  Montanez, that came from your files about

Page 568

 1  problems inherent in analyzing home infusion
 2  pharmacy cost data.  This is in the conclusion
 3  section of a report titled Survey of Operational
 4  Cost By Home Infusion Pharmacies.
 5     A.  Uh-huh.
 6     Q.  It's Bates labeled ABT Montanez. That's
 7  you?
 8     A.  Uh-huh.
 9     Q.  000263.
10     A.  Uh-huh.
11     Q.  Here's what a professional surveyor
12  said, quote, as noted in the limitations, readers
13  should be cautious in relying heavily on the
14  absolute values for optional -- for operational
15  costs, productivity indicators and cost per
16  productivity unit reported in the study. However,
17  this data may serve as a preliminary basis for
18  comparisons.  The difficulties inherent in
19  collecting sensitive and detailed financial
20  information are clear.  Additional work is needed
21  in this area to facilitate the data gathering
22  process, validate cost and productivity data,

56 (Pages 565 to 568)

Page 569

```
 1  provide data from larger and more representative
 2  samples and investigate alternative approaches
 3  such as activity-based costing to identify cost
 4  components.  Did you understand what I just read
 5  to you?
 6      A.  Uh-huh.
 7      Q.  Do you agree --
 8          MR. TORBORG:  Would you like to have a
 9  copy of that?
10  BY MR. ANDERSON:
11      Q.  Do you agree that those --
12      A.  What page are you on, Mr. Anderson?
13      Q.  I'm on the last page.
14      A.  Okay.
15      Q.  Do you agree that those are inherent
16  problems in gathering data concerning home
17  infusion services and costs?
18      A.  I agree.
19      Q.  If you --
20      A.  It -- it specifies --
21          MR. TORBORG:  Just let him finish his
22  answer.
```

Page 570

```
 1          MR. ANDERSON:  Well, I'm sorry, Dave,
 2  but --
 3          MR. TORBORG:  You said you were going
 4  to give him a little -- a little tiny bit of --
 5  you know, a little bit more of a pause and you
 6  keep interrupting his answer and losing the flow.
 7          THE WITNESS:  If --
 8          MR. TORBORG:  I just ask that you --
 9          THE WITNESS:  You know, Mr. --
10          MR. TORBORG:  -- let him finish.
11          THE WITNESS:  Am I clear to go?
12          MR. ANDERSON:  You're clear to go.
13          THE WITNESS:  I agree with the
14  conclusions that are written here.  I believe
15  that's required in a scientific evaluation that
16  you declare what you're doing and what are the
17  inherent strengths and weaknesses of a scientific
18  analysis.
19          I don't claim my expert report to be a
20  scientific analysis.  I claim it to be a
21  realistic view, an expert report of what home
22  infusion is and, again, I can consider these
```

Page 571

```
 1  issues that would cause the data to be variant in
 2  different ways.  But am I going to conclude the
 3  same thing that it costs the home infusion
 4  company more than just the drug to provide that
 5  drug to a patient.  And I believe the answer to
 6  that to be, yes.
 7  BY MR. ANDERSON:
 8      Q.  Sir, do you contend that you are an
 9  expert in home infusion costs?
10      A.  I contend that I'm an expert in the
11  provision of home infusion and as such I have to
12  be aware of costs.  I don't -- I don't contend
13  myself to be a statistician or an expert in home
14  infusion costs per se that you would say, okay,
15  well, you know, let's go out and write a paper
16  that involves all these variances that you just
17  mentioned in this report.
18      Q.  Has that --
19          MR. TORBORG:  Were you done?
20          THE WITNESS:  Yes.
21  BY MR. ANDERSON:
22      Q.  Has that report that you have in front
```

Page 572

```
 1  of you been marked yet as an exhibit?
 2          MS. ST. PETER-GRIFFITH:  Yes, that is
 3  the last pages of a composite exhibit that are
 4  his Bates labeled --
 5          MR. ANDERSON:  What's the exhibit
 6  number?
 7          MS. ST. PETER-GRIFFITH:  You would ask
 8  me that, Jarrett.
 9          Five.
10  BY MR. ANDERSON:
11      Q.  Okay.  Looking at that report, sir,
12  that --
13      A.  What page?
14      Q.  The last page.
15      A.  Okay.
16      Q.  The -- which is the last portion of
17  Exhibit 5.  Do you agree that to the extent you
18  haven't considered these limitations and
19  considerations in the context of your cost
20  analysis for this litigation, that your cost
21  analysis is not conducted appropriately?
22          MR. TORBORG:  Object to form.
```

Page 573

1           THE WITNESS:  Again, I don't feel that
2     -- my cost analysis to be conducted appropriately
3     to identify what a home infusion company does,
4     why it does what it does, where the costs come
5     from and provide estimates of what those costs
6     are to help someone see what those costs are and
7     where they're derived from as required to the
8     scientific level that you see here.
9           I mean, if you want to publish
10    something, I believe that that's a different
11    story.  I believe if you want to educate an
12    audience as to how, you know, a McDonald's
13    operates, you're going to ask a McDonald's
14    operator -- a manager to come in there and say,
15    okay, tell me how does a McDonald's operate.  And
16    they won't need to do all this research.
17    BY MR. ANDERSON:
18       Q.  I'm not --
19       A.  Essentially it'll be the same.
20       Q.  I'm not asking about Big Macs.
21       A.  I understand.
22       Q.  I'm not asking about Quarter Pounders.

Page 574

1     Okay. I'm asking you about your cost analysis in
2     this case.
3        A.  Uh-huh.
4        Q.  You have work product in your report
5     purporting to show cost analysis, nursing fees,
6     pharmacy fees, et cetera.
7        A.  Uh-huh.
8        Q.  Is that true?
9        A.  Yes, I do.
10       Q.  Okay.  And you in conducting that
11    analysis did not consider any possible variances
12    or limitations or considerations about how you
13    surveyed and gathered that data, did you?
14          MR. TORBORG:  Object to form, asked and
15    answered.
16          THE WITNESS:  I did not.  I don't
17    believe that that was necessary.  I believe the
18    conclusions would have been the same.
19    BY MR. ANDERSON:
20       Q.  Why is it not necessary for you to
21    follow industry accepted techniques in surveying
22    and gathering cost data in the context of this --

Page 575

1     in the context of this litigation?
2           MR. TORBORG:  Objection to form.  And
3     the question --
4           THE WITNESS:  That's not what I was
5     asked to do.
6     BY MR. ANDERSON:
7        Q.  By whom?
8        A.  By the law firm that retained me.
9        Q.  Well, when the law firm asked you to
10    work on this case, did they ask you to set forth
11    some home infusion cost data?
12       A.  They did.
13       Q.  Okay.  In that context did you think to
14    yourself as an expert I need to make sure that I
15    do this appropriately and I survey in a reliable
16    and representative manner?
17       A.  I had discussions related to my
18    experience and I felt that that was --
19       Q.  Discussions with whom?
20       A.  With Jones Day.
21       Q.  Okay.  Did you tell the lawyers that
22    you felt like you needed to conduct a survey that

Page 576

1     used reliable techniques, methods and approaches
2     to gather data that could be representative of
3     the home infusion cost throughout the country?
4        A.  I did not.
5        Q.  Okay.  Do you feel like you need to
6     follow any type of industry accepted tools,
7     criteria or other mechanisms in expressing
8     opinions about the national cost of home infusion
9     services?
10          MR. TORBORG:  What industry standards
11    are you speaking of?
12          MR. ANDERSON:  Any industry standards
13    such as those noted in the last portion of
14    Exhibit 5 about data collection, survey and other
15    processes related to collecting cost information,
16    Dave.
17          MR. TORBORG:  Okay.
18          THE WITNESS:  I don't --
19          MR. TORBORG:  Where are they in there
20    exactly?  I don't see that.
21          THE WITNESS:  I don't believe --
22          MR. ANDERSON:  He's the expert.  He

Page 585

1  not been privy to manufacturers. I've not worked
2  in a manufacturer. Again, my experience doesn't
3  cross over into the manufacturer. So I'm not
4  preview as to the what, wheres and whys. So it
5  would be inappropriate for me even to have an
6  opinion.
7  BY MR. ANDERSON:
8      Q.  Have you considered any payments that
9  the state of Texas has received for
10 reimbursements they paid back in the 1990s, for
11 instance, to pharmacies including home infusion
12 pharmacies in judging whether or not the
13 reimbursements were appropriate?
14     A.  I have not.
15     Q.  Do you have any opinion whatsoever
16 about the legality of Abbott Laboratories price
17 reporting for any of the complaint products?
18     A.  I have not given that any
19 consideration. I don't believe I'm qualified to
20 have an opinion.
21         MR. TORBORG: Objection.
22 BY MR. ANDERSON:

Page 586

1      Q.  Okay. Do you have any opinions
2  whatsoever about the ethical considerations
3  concerning Abbott Laboratories reporting or
4  publishing of prices for the complaint products?
5      A.  I have not given that any
6  consideration. And, again, I don't believe that I
7  would be qualified to know everything that would
8  be to render an opinion on the ethicalness in the
9  question that you're asking, so no, I have not.
10     Q.  Would it bear upon your opinion at all
11 about whether the pharmacies themselves had acted
12 ethically in receiving reimbursements for
13 infusion products if you learned, for instance,
14 that Abbott Laboratories paid almost $30,000,000
15 to the state of Texas to settle claims regarding
16 price reporting?
17         MR. TORBORG: Object to form.
18         THE WITNESS: I would say that, you
19 know, I would have to know more about what you're
20 suggesting, Mr. Anderson, before I would feel
21 that I'm even qualified to have that opinion.
22 But, yes, I would -- I would have to know more.

Page 587

1  BY MR. ANDERSON:
2      Q.  You feel like it could bear upon your
3  opinions and you would need to investigate it
4  further?
5      A.  No, I feel like I would need to know --
6  we're going outside of what I asked -- I was
7  asked to do. And you're asking me questions to,
8  you know, to project or conjecture what my
9  opinion would be. And if I understand correctly,
10 you're asking me how would I feel or what would
11 my opinion be if I was aware that a
12 pharmaceutical manufacturer paid a state millions
13 over a period of time to do what.
14     Q.  You're saying you don't understand the
15 question?
16     A.  You know, if you could restate it, yes.
17     Q.  Okay. I'm going to try to draw you
18 back to something that you've testified to
19 previously.
20     A.  Uh-huh.
21     Q.  And -- and we'll come at it from that
22 angle.

Page 588

1      A.  Okay.
2      Q.  I believe earlier today you said
3  something along the lines of, quote, as an
4  industry we can defend home infusion pharmacies
5  reimbursement and use of AWP differences or as
6  you say spreads. Does that sound like your
7  testimony from earlier today?
8      A.  Yeah, I would be cautious not to take
9  it out of context, you know. I mean, when you
10 take a sentence out of a paragraph, it could read
11 very differently. So I would just caution
12 against that.
13     Q.  Okay. Well, I'm -- I'm going to ask
14 you about this statement.
15     A.  Okay.
16     Q.  So I don't want to take it out of
17 context at all.
18     A.  Okay.
19     Q.  I want to elaborate on it, if you
20 could.
21     A.  Okay.
22     Q.  How can home infusion defend its use of

Page 589

 1  AWP differences or spreads?
 2      A.  By educating those involved in
 3  providing payment for home infusion services as
 4  to what those services entail.
 5      Q.  Is -- is that defense part of what
 6  you're doing in this litigation?
 7          MR. TORBORG:  Object to form.
 8          THE WITNESS:  I believe that part of
 9  what I'm doing in this deposition is providing an
10  expert report that indicates, based on my
11  experience and my expertise in the home infusion
12  industry, those costs involved in home infusion
13  that payors may not be aware of.
14  BY MR. ANDERSON:
15      Q.  Would you consider yourself to be
16  defending the interest of home infusion in the
17  context of this litigation?
18      A.  No, sir.
19      Q.  Do you consider yourself to be
20  independent, objectively analyzing all the data
21  pertinent to your work in this case?
22      A.  That is the only reason why I accepted

Page 590

 1  the agreement or what we call the -- what was the
 2  document that I signed?
 3          MR. TORBORG:  Engagement letter.
 4          THE WITNESS:  The engagement letter.  I
 5  felt like I could act independently.
 6  BY MR. ANDERSON:
 7      Q.  Okay.  With respect to analyzing the
 8  appropriateness of pharmacies use of AWP spreads
 9  or differences, what information did you
10  consider?
11          MR. TORBORG:  Object to form, asked and
12  answered.
13          THE WITNESS:  Again, what do you mean
14  by what -- what information do I use as far as my
15  acceptance of the use of the difference between
16  the AWP and the actual acquisition costs?
17  BY MR. ANDERSON:
18      Q.  What do you information do you feel
19  supports your defense of home infusions -- home
20  infusion pharmacies acceptance of AWP spreads
21  over the years for the complaint products?
22      A.  The two -- the true cost of providing

Page 591

 1  those drugs.
 2      Q.  Did you consider the fact that the
 3  government does not -- strike that.
 4          Are you aware of any government
 5  investigations or litigation concerning the
 6  appropriateness of the AWP spreads?
 7      A.  I believe that's implicated in the
 8  complaint, as I understand it.
 9      Q.  Okay.  Other than the complaint are you
10  aware of other government investigations or
11  litigation about the appropriateness of AWP
12  spreads?
13      A.  I am not.
14      Q.  Are you aware of any jury verdicts that
15  have been rendered regarding AWP spreads?
16      A.  I am not.
17      Q.  Are you aware of any settlements that
18  have been paid by drug companies regarding AWP
19  spreads?
20      A.  No, I'm not.
21      Q.  Does any of that information concerning
22  prior settlements or litigation that's pending or

Page 592

 1  jury verdicts that have been rendered about the
 2  appropriateness of AWP spreads bear upon any of
 3  your defense of AWP spreads?
 4      A.  I can't say that it would or wouldn't
 5  without being aware of it.  All I can say is I'm
 6  aware of the current complaint.  I'm aware of the
 7  current considerations regarding how we used the
 8  complaint products and what it costs us to
 9  provide those complaint products.  And to date I
10  believe that it was always our intention to use
11  the difference between the acquisition costs and
12  that of the AWP spread of any drug that was
13  utilized during that time period was assumed to
14  be going towards the covering of our cost of
15  services and supplies.
16      Q.  You said it was our understanding, who
17  is our?
18          MR. TORBORG:  Objection, asked and
19  answered.
20          THE WITNESS:  I believe I speak for
21  myself.  I believe I speak for many in our
22  industry just from conversations I'm had over the

62 (Pages 589 to 592)

Page 613

1  the breadth of those portfolios.  You don't tend
2  to look at one particular item, you know,
3  individually.  If you have a manufacturer that
4  comes in and says, okay, we have that one
5  particular item and we have all these things that
6  you're using here and if you commit to this
7  particular item, all these other items we can,
8  you know, reduce the cost as well.  I mean, you
9  negotiate that way.
10         MR. ANDERSON:  I understand.
11         THE WITNESS:  Uh-huh.
12  BY MR. ANDERSON:
13     Q.  And Lilly had a full line, so it would
14  have been ethical for you to dispense Lilly's
15  Vancocin.  Correct?
16     A.  Lilly didn't have a TPN line.  Lilly
17  didn't have an ambulatory infusion device.  No,
18  Lilly didn't compare as far as the breadth of
19  supply items that we use here.  Lilly didn't do
20  the medical supplies that Abbott was producing at
21  the time such as IV tubings, you know, spikes and
22  other things that you use in the pharmacy

Page 614

1  department.  Their -- Abbott's breadth of product
2  lines were pretty significant.
3         MR. ANDERSON:  We got to change the
4  tape.
5         THE WITNESS:  Okay.
6         MR. SPECTOR:  It's 2:52.  We're going
7  off the record.
8         (Thereupon a recess was taken after
9  which the deposition continued as follows:)
10        MR. SPECTOR:  This is the beginning of
11  tape number eight of the deposition of Dr. Elvin
12  Montanez.
13        It is 3:05.  We're back on the record.
14  BY MR. ANDERSON:
15    Q.  Sir, I wanted to talk with you a little
16  bit just about the nature of compounding product.
17    A.  Uh-huh.
18    Q.  I think you've talked about this a
19  little bit here and there, but I want to, if I
20  could start from the beginning to the end.
21        Is it true that when you compound a
22  product you're talking about joining multiple

Page 615

1  drug products or NDC numbers into one bag, for
2  instance?
3     A.  Yes.
4     Q.  So you would take, for instance, a vial
5  of vancomycin and you would insert that and put
6  that into a bag of saline.  Correct?
7     A.  That's correct.
8     Q.  And when you would bill for that
9  vancomycin in a compounded form, you would bill
10  for multiple NDC numbers.  Correct?
11        MR. TORBORG:  Objection, form.  Which
12  program?
13        THE WITNESS:  Which program are you
14  indicating here?
15  BY MR. ANDERSON:
16    Q.  Medicaid and Medicare.
17    A.  Okay.  Medicare only would pay for the
18  primary drug, not the diluent.
19    Q.  Okay.
20    A.  Medicaid does pay for the drug and the
21  diluent.
22    Q.  And in those situations you would have

Page 616

1  multiple AWP spreads that you would be billing.
2  Correct?
3     A.  You would have the diluent -- in the
4  case of the payor that's paying for both the
5  diluent and the drug, yes.
6     Q.  And what is the typical formulation of
7  compound of vancomycin?
8     A.  The most common is one gram in 250 ccs
9  of normal saline.  That's probably the most
10  common dosage form.
11    Q.  And in that situation you would have
12  the billing for the NDC number for the one gram
13  vial of vanco and you would also have the one for
14  the billing for the NDC of the 250 CC saline.
15  Correct?
16    A.  That's correct.
17    Q.  And in your practice for your five
18  pharmacies typically those would both be Abbott
19  products?
20    A.  Yes.
21    Q.  And when you would bill Medicaid, for
22  instance, you would be billing for two NDCs that

Page 617

1 would result in potentially two AWP spread
2 reimbursements?
3     MR. TORBORG: Object to form.
4     THE WITNESS: You would have two
5 different items that are being billed to
6 Medicaid, yes, and Medicaid would reimburse based
7 on an AWP minus a percentage or a WAC plus a
8 percentage for two different NDC numbers.
9 BY MR. ANDERSON:
10    Q. What about the dispensing fee?
11    A. The dispensing fee would be paid one
12 time for the dispensing activity. So if I
13 dispensed a three-day supply or a seven-day
14 supply, I would get one dispensing fee.
15    Q. Would you get one dispensing fee per
16 NDC number or just one dispensing fee?
17    A. One dispensing fee.
18    Q. What does that apply to? Strike that.
19 I'll be more specific.
20       Does that hold true for Florida
21 Medicaid?
22    A. Yes, it does.

Page 618

1     Q. Do you know whether or not that holds
2 true for any other Medicaids?
3     A. I'd have to look at the reports --
4     Q. And I realize --
5     A. -- to recall.
6     Q. -- there's several different pages
7 there. But from your review of the Myers and
8 Stauffer pages do you recall any differences in
9 how home infusion dispensing fees were paid?
10    A. There were differences.
11    Q. Like what?
12    A. But differences in dispensing fees.
13 Some states attempted to advance those dispensing
14 fees to recognize something particular to home
15 infusion. Some, you know, would be dispensing
16 fees that were less.
17    Q. When you say advance, what do you mean?
18    A. Higher dispensing fee. Significantly
19 higher dispensing fee. More like ten or $15 when
20 it involved an injectable drug.
21    Q. And in those situations do you believe
22 that dispensing fee is adequate?

Page 619

1     A. Again, I would have to see how that
2 formula is being applied in conjunction with that
3 dispensing fee and would it be adequate to cover
4 the service that's being provided. I think that
5 that would -- I would have to look at it, Mr.
6 Anderson.
7     Q. When you look at it can you describe
8 what criteria or analysis you would conduct to
9 evaluate the adequacy of the dispensing fee?
10    A. I would like at what I know is the
11 direct cost, you know, for the provision of the
12 service. And then if I'm looking at it from my
13 own perspective and from my own business, I would
14 provide or I would apply my own knowledge of what
15 our indirect costs are.
16    Q. Our being you and your five pharmacies?
17    A. Yes.
18    Q. Okay.
19    A. If I was making that decision -- if I
20 was making the decision, you know, as a provider.
21    Q. Okay. Well, I'm not asking you about
22 as a provider.

Page 620

1     A. Uh-huh.
2     Q. Let's be crystal clear about that. I'm
3 asking you in your role as an expert testifying
4 as an expert --
5     A. Uh-huh.
6     Q. -- paid as an expert in this case.
7     A. Uh-huh.
8     Q. Okay. How would you go about as an
9 expert in this case evaluating the adequacy of
10 the dispensing fee?
11    A. Again, I would apply the formula what I
12 know to be the cost of the drug, the cost of the
13 service and the cost of the supplies. The only
14 way to do that is to have an inherent knowledge
15 of the overhead costs in general and I believe
16 that I would probably refer to the ABT report
17 that was published in 2006 to give me a reference
18 for the indirect costs. I would be comfortable
19 using either theirs or my expert report as far as
20 being able to apply the direct costs and then
21 seeing what my calculations yielded.
22    Q. Just to be clear you haven't conducted

69 (Pages 617 to 620)

Page 621

 1  any study concerning the adequacy of dispensing
 2  fees, have you?
 3       MR. TORBORG:  Object to form.
 4       THE WITNESS:  No, I haven't conducted
 5  any formal study.
 6  BY MR. ANDERSON:
 7     Q.  Have you provided any informal analysis
 8  or opinions about the adequacy of dispensing
 9  fees?
10     A.  I believe I have in this report.
11     Q.  Okay.  Just a moment ago when I was
12  asking you about how you would go about
13  determining the adequacy of dispensing fees, you
14  said you would look to the ABT 2006 report.
15  Correct?
16     A.  Uh-huh.
17     Q.  Yet when you were creating and drafting
18  the precise report that you filed in this lawsuit
19  in forming your opinions for this lawsuit you
20  didn't actually possess that report, did you?
21     A.  I did not repess -- possess the paper
22  report.

Page 622

 1     Q.  And you -- and you've got to agree,
 2  don't you, Dr. Montanez, that there is really no
 3  human way that you could have recalled all of the
 4  facts and figures from that presentation you
 5  heard three years ago?
 6     A.  Not for every S code.  What was
 7  exciting for us is to really have something that
 8  was finally being presented that was in an
 9  unbiased fashion that was from an independent
10  source that really recognized the complexity and
11  comprehensiveness of the home infusion industry,
12  so...
13     Q.  I understand you were excited about it.
14  But you couldn't really use any of that
15  information in forming your opinions for that
16  lawsuit, could you?
17       MR. TORBORG:  Object to form.
18       THE WITNESS:  I believe I stated
19  earlier that, you know, I -- I was aware of the
20  study.  I was aware of the general conclusions.
21  You know, you're not going to remember the
22  details, but you're going to remember the general

Page 623

 1  conclusions.  The general conclusions are, you
 2  know, again the cost is significant.  The cost
 3  can be looked at daily.  It could be looked at
 4  per dispensing.  It could be looked at in
 5  different ways.  But it was significant and
 6  substantial.
 7  BY MR. ANDERSON:
 8     Q.  Did you take any notes when you heard
 9  that presentation three years ago?
10     A.  No, it was a lecture.  So I took it at
11  -- I listened to it.  I didn't take any notes.
12     Q.  Can you recall anything about the cost
13  data from that presentation?
14     A.  As in specifics?
15     Q.  Like what -- what did they find was a
16  pharmacist's wage rate?
17     A.  Okay.  Those are -- those specifics I
18  don't recall.
19     Q.  Okay.  All right.  Now going back to
20  evaluating adequacy of dispensing fees, do you
21  have any other methodology or technique of
22  conducting analysis that you can share with us on

Page 624

 1  how to evaluate the adequacy of the dispensing
 2  fee?
 3     A.  I don't have a technique or a
 4  methodology to analyze.  I would say that if you
 5  are proposing, Mr. Anderson, to pay for a home
 6  infusion services and you're proposing to pay for
 7  those services based on an AWP minus formula for
 8  an NDC and that NDC number is the only thing that
 9  is going to be utilized in the calculation of
10  that formula, today or back in 1995, that you
11  would be -- you would not be considering the cost
12  that's substantial to the business which is the
13  service and the supplies.
14     Q.  I'm shifting gears, sir.  You've said a
15  couple of times that you haven't tested your
16  opinions in this case.  Is that correct?
17       MR. TORBORG:  Objection to form.
18       THE WITNESS:  I believe I test my
19  opinions every day when we -- when we're out
20  there working.
21       Be more specific as to how you mean by
22  testing?

70 (Pages 621 to 624)

```
                                    Page 625                                        Page 627
 1   BY MR. ANDERSON:                               1   profit.
 2     Q.  In your report you've set forth some     2   BY MR. ANDERSON:
 3   information and in your testimony --           3     Q.  What's the description of modest, what
 4     A.  Uh-huh.                                  4   range of dollars means modest?
 5     Q.  -- you've actually announced four        5     A.  I think it varies.  I think, it's --
 6   opinions.  Correct?                            6   you know, that definitely -- that introduces a
 7        MR. TORBORG:  Objection to form,          7   significant subjectivity, you know, what I would
 8   misstates his testimony.                       8   consider modest and what you would consider
 9        THE WITNESS:  (Nods head.)                9   modest would probably be very different, so...
10   BY MR. ANDERSON:                              10     Q.  All right.  Back to the industry --
11     Q.  Is that true, sir?                      11     A.  Uh-huh.
12     A.  We've gone through testimony that has   12     Q.  -- You've said that you've had a lot of
13   cited my opinions, four different opinions.  And 13 conversations with the industry.  Correct?
14   we've, I believe, taken those opinions and    14     A.  People in the industry.
15   brought them into where I've cited various things 15   Q.  Yeah.  Who -- who -- who do you mean to
16   in the paper.                                 16   refer to when you refer to the industry?
17     Q.  Okay.  Have you tested any of those?    17        MR. TORBORG:  Objection, asked and
18        MR. TORBORG:  Object to form.            18   answered several times.  Please move on.
19        THE WITNESS:  I believe the answer is    19        MR. ANDERSON:  Absolutely not.
20   I've been testing those opinions for the last 14 20        MS. ST. PETER-GRIFFITH:  Move to
21   years. I've been formulating those opinions for 21   strike.
22   the last 14 years.  Do they get tested every time 22        MR. TORBORG:  He's not coming back for

                                    Page 626                                        Page 628
 1   you discuss the -- the same question as to what  1   a third day to answer the same question so many
 2   you're doing in home infusion in a particular    2   times.
 3   state over and over again and the answer is the  3        MR. ANDERSON:  I challenge -- I
 4   same that is a test.  I have been testing and    4   guarantee you, you will not see that question
 5   formulating that information over the last 14    5   anywhere.  We have never asked him what he means
 6   years.                                           6   by the industry. I'm entitled to that answer. And
 7   BY MR. ANDERSON:                                 7   I would appreciate you not filibustering so that
 8     Q.  How have you tested your opinion that     8   I can conclude my questioning.
 9   nobody in the home infusion industry defrauded   9        THE WITNESS:  What I mean by the
10   the United States?                              10   industry is I mean people representative of the
11        MR. TORBORG:  Objection to form, asked    11   industry. People who work in the industry I feel
12   and answered numerous times.                    12   are representative of the industry.
13        THE WITNESS:  That is not an -- it's      13   BY MR. ANDERSON:
14   not something that I tested, Mr. Anderson, I    14     Q.  What sectors of the industry?
15   think it would be unfair to sit there and say   15     A.  Home infusion.
16   that testing is a proper word.  I would say that 16     Q.  Okay.  So when you say the industry you
17   I've had enough discussions in our industry to  17   mean home infusion pharmacy and business owners.
18   know that I've never encountered anyone who has 18   Correct?
19   ever felt in our industry that they were        19     A.  And employees and pharmacists and
20   uncomfortable receiving a difference between AWP 20   nurses and --
21   and the acquisition cost of what they paid for a 21     Q.  Do you include any government personnel
22   product to cover their costs and have a modest  22   in your definition of the industry?
```

71 (Pages 625 to 628)

Page 629

1    A.  No, I do not.
2    Q.  Do you include any government personnel
3  in your references to what the industry intended
4  or mean?
5    A.  I do not.  I would love to, but I do
6  not.
7    Q.  Do you en -- do you encompass any
8  pharmaceutical executives or employees in your
9  definition of the industry?
10    A.  No, they're not -- they don't provide
11  home infusion services, so they don't represent
12  the industry of home infusion.
13    Q.  So are you able in any way to testify
14  about whether or not pharmaceutical employees,
15  pharmaceutical company employees defrauded the
16  United States?
17    A.  No, I'm not able to testify against
18  that.
19    Q.  Are you at all able to testify about
20  whether pharmaceutical employees misrepresented
21  information to the United States?
22    A.  No, sir.

Page 630

1    Q.  You understand, I think, sir, that the
2  allegations in this case are that Abbott was
3  involved in misconduct which caused state
4  Medicaid and federal Medicare programs to pay
5  excessive reimbursements.  Correct?
6    A.  That's correct.
7    Q.  You actually stated those words in your
8  report.  Correct?
9    A.  Uh-huh.
10    Q.  Okay.
11    A.  Yes.
12    Q.  Did you do anything to investigate that
13  allegation?
14    A.  I was not asked to provide expert tes
15  -- an expert report on that particular subject,
16  no.  I was asked to provide an expert report on
17  my expertise which was home infusion.
18    Q.  Do you have any opinion on that
19  allegation?
20    A.  I do not.
21    Q.  Do you have any information whatsoever
22  about the validity of that allegation?

Page 631

1    A.  I do not.  Other than what we've
2  discussed here.
3    Q.  Which is --
4    A.  This deposition process.  That's --
5  that's the only information I have about this
6  case.
7    Q.  I know.  But I'm asking very
8  specifically about this allegation.
9    A.  Yeah.
10    Q.  Do you have any information whatsoever
11  about the allegation that Abbott caused Medicare
12  and Medicaid to overpay for drug reimbursements?
13    A.  Mr. Anderson, I do not except for the
14  complaint.
15    Q.  But you don't have any information that
16  would somehow undermine the allegations in the
17  complaint or for that matter buttress the
18  allegations in the complaint?
19    A.  I do not.
20    Q.  One way or the other?
21    A.  One way or the other.
22    Q.  Have you ever been concerned that the

Page 632

1  significant AWP spreads on infusion products may
2  not survive public scrutiny?
3    A.  I've not given that any consideration.
4    Q.  What -- do you -- I understand that
5  you're saying most people in home infusion seem
6  to think that these significant AWP spreads on
7  infusion products are acceptable.  Is that right?
8    A.  Yes.
9    Q.  Do you think that every day people like
10  my dad who's a cotton farmer in west Texas would
11  think that a spread of a thousand percent on a
12  drug is acceptable?
13    A.  Well, Mr. Anderson, if we're going to
14  use -- you know, personal examples, I would say
15  that once I educated your father -- if he needed
16  my service, once I educated him on everything
17  that I was performing for him to get better and
18  once he received my services and his satisfaction
19  for those services, that he would understand
20  where those differences are applied.
21    Q.  Do you think that Abbott HPD personnel
22  would have been educated about how the AWP

72 (Pages 629 to 632)

Page 661

1   MR. TORBORG: Are you finished? I
2   don't think he's finished.
3   THE WITNESS: I'm finished.
4   MR. ANDERSON: Ask him.
5   THE WITNESS: I'm finished.
6   MR. ANDERSON: He was.
7   MR. TORBORG: I think you cut him off.
8   MR. ANDERSON: No.
9   MR. TORBORG: He was in the middle of
10  saying something and you cut him off.
11  MR. ANDERSON: Well, great, I disagree
12  with you, Dave.
13  BY MR. ANDERSON:
14  Q. Sir, would you agree that the informal
15  surveys or as you call it networking that you
16  conducted were on an ad hoc basis?
17  A. Define ad hoc.
18  Q. It was something that just happened
19  when you were at a conference from time to time
20  you would have a discussion with somebody?
21  A. Uh-huh.
22  Q. Right?

Page 662

1   A. Yes.
2   Q. You didn't set up any specific criteria
3   or protocol for how you would select the people
4   you would have conversations with. Correct?
5   A. That's correct. I was --
6   Q. So --
7   A. I've been -- I've been real specific
8   with that, saying this is conversation.
9   Q. I know. I just want to flesh it out
10  some. So, for instance, you might have had a
11  conversation in an elevator?
12  A. Correct.
13  Q. But the selection of that person could
14  have been completely unrepresentative of home
15  infusion pharmacists. Correct?
16  A. If it's a home infusion pharmacist, why
17  wouldn't they be representative of the industry?
18  Q. Well, do you believe that Mr. Gardner's
19  testimony is representative of the industry?
20  A. Yes, he ran the industry -- he ran home
21  infusion in the industry, if you say, yeah, he's
22  a representative of the industry, absolutely.

Page 663

1   Q. Okay. Did you have any conversations
2   over your 14 years with any other home infusion
3   pharmacists about how they would evaluate
4   relative reimbursement or AWP spreads in
5   purchasing generic drugs?
6   A. Rephrase the question. 'Cause it's
7   very detailed. You have a lot of information
8   there.
9   Q. Sure.
10  A. Uh-huh.
11  Q. Gladly. Over your 14-year tenure in
12  the home infusion field --
13  A. Uh-huh.
14  Q. -- have you ever had any conversations
15  with other home infusion personnel about them
16  considering ABT spreads or relative reimbursement
17  in buying generic drugs?
18  A. Yes.
19  Q. All right. Did you factor those
20  discussions or conversations into your opinion
21  that you have provided in this case?
22  A. Yes. I believe that I provided an

Page 664

1   opinion that said the spread -- that difference
2   between the acquisition cost and the AWP was what
3   we as a industry relied on to cover the costs
4   that we incurred in providing the service.
5   Q. Did you consider those conversations
6   you had with these other home infusion
7   pharmacists in rendering your opinion that you
8   corrected a few minutes ago, but up until a few
9   minutes ago it was your opinion that home
10  infusion pharmacies don't buy based upon the
11  spread?
12  A. Well, I don't --
13  MR. TORBORG: Objection to form.
14  THE WITNESS: I don't believe that that
15  was my opinion that I stated that pharmacists buy
16  on the -- based on the spread. We discussed the
17  fact that the spread information is available,
18  the AWP and the acquisition cost is available to
19  you in application, in catalogs and that --
20  certainly that comes into consideration. But I
21  didn't state that pharmacists purchase based on
22  the spread.

80 (Pages 661 to 664)

Page 673

1  pharmacy.
2      Q.  Would a $5 total labor cost have
3  supported your conclusion?
4          MR. TORBORG:  Object to form.
5          THE WITNESS:  Again, what you're
6  looking at is the dispensing fee.  Okay.  And the
7  dispensing fee and the $5 labor cost would it
8  have supported my conclusion, no.
9  BY MR. ANDERSON:
10     Q.  Would a $15 labor cost have supported
11 your conclusion?
12     A.  No, but I don't believe that you would
13 have seen a substantial shift to that nature in
14 -- in four years going from '95 to two -- 19 --
15 to '91 or in six years from '95 to 2001.
16     Q.  What's -- what's the information that
17 underlies that belief?
18     A.  My experience.
19     Q.  That's back to the 14 years here in
20 central and southern Florida?
21     A.  I've hired pharmacists, yes.
22     Q.  Do you know, sir, that there's been in

Page 674

1  the home infusion pharmacy arena the spread of
2  chain home infusion pharmacies?
3      A.  The spread of chain home infusion
4  pharmacies?
5      Q.  Yeah.
6      A.  Yes.
7      Q.  The proliferation, I should say, of
8  chain home infusion pharmacies.
9      A.  Yes.
10     Q.  And one of the benefits of operating
11 chain home infusion pharmacies is efficiency in
12 your operations.  Correct?
13     A.  Yes.
14     Q.  Did you factor those labor savings
15 through efficiency into your labor costs?
16     A.  I believe I do.  Because, again, the
17 chain pharmacies, the national home infusion
18 pharmacies still have to have a brick and mortar
19 presence.  They still have to have a licensed
20 pharmacist.  They have to have a technician
21 compounding in that licensed pharmacy area.  They
22 have to have somebody that drives the product to

Page 675

1  the patient's home.  They have to have somebody
2  that is billing the time whether it be at that
3  brick and mortar operation or somewhere else.
4  It's still -- you know, I look at the resource
5  regardless of where it's located. The resource is
6  still requiring a certain period of time.
7      Q.  Do you know anything about the
8  efficiencies or home infusion practice techniques
9  of Coram Pharmacies?
10     A.  No, I don't.
11     Q.  Do you know anything about the
12 efficiency or practices of any other chain home
13 care pharmacy?
14     A.  Those are usually considered
15 proprietary, but remember that I operate a small
16 chain of five pharmacies and we do take advantage
17 of some of these operational efficiencies.
18     Q.  Right.
19     A.  Again, it's still a resource that I
20 have to utilize.
21     Q.  But earlier you distinguished yourself
22 significantly from the chains --

Page 676

1      A.  I don't --
2      Q.  -- and you agree that you don't know
3  anything about the labor costs of the chains, do
4  you?
5      A.  I don't think that would be fair, Mr.
6  Anderson, to say that I don't know anything about
7  the labor costs.  I still know what it costs to
8  hire a nurse.  I still know what it costs to hire
9  a pharmacist, a technician, a driver.
10     Q.  Well, you agree --
11     A.  And those chain pharmacies are still
12 going to have to be competitive in whatever
13 region they're in.
14     Q.  Do you -- I'm going to switch gears
15 slightly.
16     A.  Okay.
17     Q.  Do you know that Abbott operated its
18 own home care pharmacies?
19     A.  I did.
20     Q.  And did you know that those home care
21 pharmacies were set up exclusively to make
22 compounded products and ship those out to

83 (Pages 673 to 676)

Page 689

1    Q.  Would it bear upon your opinions in
2  this case in any way if you learned that repeated
3  Abbott witnesses have sworn under oath that they
4  never, ever considered dispensing fees when they
5  set prices that they published to First DataBank
6  and Red Book on the complaint products?
7        MR. TORBORG:  Object to form.
8        THE WITNESS:  I would have to know more
9  about, you know, that specific subject.  But, you
10 know -- again, would it bear on my opinion as to
11 what, Mr. Anderson?
12 BY MR. ANDERSON:
13   Q.  Would it bear on any of your opinions
14 in this case if you learned that Abbott
15 executives swear under oath they never considered
16 dispensing fees, most specifically home infusion
17 dispensing fees when they set or published any
18 price including direct prices, resultant AWPs or
19 wholesale prices?
20        MR. TORBORG:  Object to form.
21        THE WITNESS:  Well, no, because that's
22 not what I was asked to do, Mr. Anderson.  I

Page 690

1  wasn't asked to do -- to render an opinion about
2  a vendor and their policy or their lack thereof
3  or whatnot.
4  BY MR. ANDERSON:
5    Q.  Regarding the CHIP system, sir, do you
6  agree that the CHIP system that you've used for
7  about 12 years now that came from Abbott has AWPs
8  in it?
9    A.  What I would tell you is that the CHIP
10 system that we purchased was an application that
11 was licensed and had all the drug information
12 database available to us with every NDC number.
13 We had to populate that information from updates
14 that were provided by, I believe, it was Red
15 Book.
16   Q.  And did you populate your CHIP system
17 as obtained from Abbott with AWPs from Red Book?
18   A.  Yes.
19   Q.  And did Abbott design the CHIP system
20 to contain a field titled AWP for which you and
21 other pharmacies could populate that data?
22   A.  The Red Book would populate that data

Page 691

1  automatically.  But, yes, it was on page 2 of the
2  item master file.
3    Q.  And what was your understanding as to
4  why AWPs needed to be in this standard claims
5  processing software?
6    A.  Well, I think it was in the Health Care
7  Automation software as well.  It's in present day
8  home infusion software, Mr. Anderson, because
9  that is a -- a reference number that is utilized
10 to create various reimbursement and claims
11 methodologies that are used to reimburse and
12 generate claims.
13   Q.  Shifting gears, Dr. Montanez, have you
14 ever had any involvement in setting the
15 government drug payment policy?
16   A.  No.
17   Q.  Are you aware of any authority that
18 Abbott has to control government drug
19 reimbursement policy by manipulating AWPs?
20   A.  I do not.
21        MR. TORBORG:  Object to form.
22 BY MR. ANDERSON:

Page 692

1    Q.  Answer.
2    A.  I do not.
3    Q.  Good.  Do you have any opinions in this
4  case that Abbott was somehow entitled to
5  manipulate published AWPs to alter drug
6  reimbursement?
7        MR. TORBORG:  Object to form.
8        THE WITNESS:  I have no opinion.  And I
9  have no knowledge of that.
10 BY MR. ANDERSON:
11   Q.  Are you aware of any authority
12 whatsoever granted by any government person
13 whatsoever to Abbott to set AWPs at high levels
14 on the complaint drugs to cause reimbursements to
15 be high?
16   A.  No, I'm not.
17   Q.  Do you plan to ever express an opinion
18 that the way Abbott set its AWPs was perfectly
19 appropriate?
20   A.  I've not been asked to do that.  And I
21 don't plan to do so.
22   Q.  I notice early in your testimony

87 (Pages 689 to 692)