# EXHIBIT 3

Page 574

NO. D-1-GV-04-001286

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| ex rel. | ) |
|     VEN-A-CARE OF THE | ) |
|     FLORIDA KEYS, INC., | ) |
|         Plaintiffs, | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| ABBOTT LABORATORIES INC., | ) |
| ABBOTT LABORATORIES, and | ) |
| HOSPIRA, INC. | ) |
|         Defendant(s). | ) 201ST JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
MICHAEL SELLERS
April 12, 2007

VOLUME 3

HIGHLY CONFIDENTIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL SELLERS, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on the 12th of April, 2007, from 9:06 a.m. to 3:42 p.m., before CYNTHIA VOHLKEN, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Jones Day, 77 West Wacker, Chicago, Illinois, pursuant to the Texas Rules of Civil Procedure and the provisions attached previously.

ABT-DOJ 0236167
Highly Confidential

| Page 659 | Page 661 |
|---|---|

Page 659

1  result of WAC optimization to First Data in January of
2  2001 and that was a change that Abbott intended for
3  the AWPs to still remain high on Abbott products?
4       MS. TABACCHI: Object to the form.
5    A.  We don't -- we don't control, nor do we set
6  AWP. We never have. And so AWP was not a
7  consideration when we reported the prices in January.
8    Q.  (BY MR. ANDERSON) Why was it that Jerrie
9  Cicerale and Kay Morgan had this argument in Exhibit
10 586 about how AWP would be calculated?
11      MS. TABACCHI: Object to the form.
12 Beyond the scope.
13   A.  It -- it -- it was a -- it was a statement
14 from Jerrie that she was surprised that it would have
15 any impact because her understanding prior to that was
16 it had been based on list price.
17   Q.  (BY MR. ANDERSON) And given --
18   A.  So I don't -- I don't -- you know, I don't
19 think she intended it as a challenge to Kay Morgan or
20 a challenge to the way First DataBank does anything.
21 It was just a reaction to it's never changed it in the
22 past and it's never had any impact in the past, why
23 does it have an impact today.
24   Q.  So given that testimony, you'll agree with
25 me, won't you, sir, that Abbott certainly believed

Page 660

1  that when it reported lower WACs that were the result
2  of WAC optimization for the first time in January 2001
3  that Abbott believed that the AWPs would remain
4  unaffected, correct?
5       MS. TABACCHI: Object to the form.
6  Beyond the scope.
7    A.  I think that would be a generally accepted
8  understanding, yes.
9    Q.  (BY MR. ANDERSON) Right. And Abbott had
10 that belief that the AWPs would remain unaffected in
11 light of Abbott's prior understanding that low AWPs
12 negatively impact sales.
13      MS. TABACCHI: Object to the form.
14 Beyond the scope.
15   A.  I can't go that logic leap with you.
16   Q.  (BY MR. ANDERSON) Well, I mean, we've
17 already worked out the dates here, sir. You-all were
18 aware that AWPs, if lowered, would negatively impact
19 sales at least as early as August of 2000, correct?
20   A.  I don't --
21      MS. TABACCHI: Object to the form.
22 Beyond the scope.
23   A.  I don't think AWPs were a concern in the
24 reporting that we did in January.
25   Q.  (BY MR. ANDERSON) So Abbott was able to set

Page 661

1  aside that knowledge about how low AWPs could
2  negatively impact sales when it came to reporting
3  prices and communicating directions to First DataBank
4  in January 2001?
5       MS. TABACCHI: Object to the form.
6  Beyond the scope.
7    A.  I just don't believe those two were put
8  together.
9    Q.  (BY MR. ANDERSON) Let's take a look at the
10 second page of Exhibit --
11      THE VIDEOGRAPHER: There's about four
12 minutes to tape.
13      MR. ANDERSON: Okay.
14   Q.  (BY MR. ANDERSON) -- 587. You'll agree with
15 me that that's titled "Revised AWP Impact Analysis,"
16 correct?
17   A.  Correct.
18   Q.  And this is the spreadsheet that Lynn Leone
19 was forwarding to you back in January 17, 2001,
20 correct?
21   A.  Yes.
22   Q.  And specifically there's a section there
23 titled "Medicaid," correct?
24   A.  Yes.
25   Q.  How did Abbott go about calculating the

Page 662

1  negative impact on its Medicaid business that lower
2  AWPs would have?
3       MS. TABACCHI: Object to the form.
4  Beyond the scope.
5    A.  I -- I think Lynn basically identified some
6  assumptions, some assumptions being that 12.6 percent
7  of the net sales might be for Medicaid patients.
8    Q.  (BY MR. ANDERSON) Why would Abbott care if
9  Medicaid sales were decreased as a result of lower
10 AWPs?
11      MS. TABACCHI: Object to the form.
12 Beyond the scope.
13   A.  This analysis was looking at a worst case
14 issue and what Lynn was trying to break down was
15 what's the difference in all of the components of our
16 sales and what might have an impact on that.
17      MR. ANDERSON: Objection, nonresponsive.
18   Q.  (BY MR. ANDERSON) I was asking the why, sir,
19 not the how. I'm asking why. Why would Abbott care
20 if Medicaid sales were negatively impacted by lower
21 AWPs?
22      MS. TABACCHI: Object to the form.
23 Beyond the scope of the notice.
24   A.  Well, we were -- we were looking here at 12.6
25 percent of our sales under this assumption, which is

23 (Pages 659 to 662)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

ABT-DOJ 0236189
Highly Confidential          70a0744a-d263-4360-8594-f666b466ba1c

ABT110-0168

Page 663

1  purely what it was because we had no specific data to
2  that point, but based on that assumption those were
3  sales that would be at risk.
4    Q.  So we are talking about money, right?  Abbott
5  would lose sales and not earn as much money, correct?
6       MS. TABACCHI:  Object to the form.
7  Beyond the scope of the notice.
8    A.  Correct.
9    Q.  (BY MR. ANDERSON) And in this case Abbott
10 projected that to be about 2.5 million dollars,
11 correct?
12      MS. TABACCHI:  Object to the form.
13 Beyond the scope.
14   A.  Correct.
15      MR. ANDERSON:  All right.  Let's change
16 the tape.
17      MS. TABACCHI:  Let's take a break.
18      THE VIDEOGRAPHER:  This is the end of
19 Tape 2, Volume 3 of the video deposition of Michael
20 Sellers.  Local time is approximately 11:09 a.m.
21 central.  Off the record.
22      (Recess from 11:09 to 11:24)
23      THE VIDEOGRAPHER:  This is the beginning
24 of Tape 3 of the video deposition of Michael Sellers.
25 Local time is approximately 11:24 a.m. central.  We

Page 664

1  are on the record.
2    Q.  (BY MR. ANDERSON) Mr. Sellers, on Exhibit
3  587 I notice there's some handwriting there.  Is that
4  yours?
5    A.  Yes.
6    Q.  And it reads "25 top total sales," correct?
7    A.  Yes.
8    Q.  What does that mean?
9    A.  I don't recall.
10   Q.  Was there some other analysis about AWP
11 impact on Abbott sales beyond that that's reflected in
12 Exhibit 587?
13      MS. TABACCHI:  Object to the form.
14 Beyond the scope.
15   A.  This is the only one I recall.
16   Q.  (BY MR. ANDERSON) Did you ever request that
17 some analysis of the top 25 customers, or something
18 like that, be -- be performed in connection with AWP
19 decreases?
20      MS. TABACCHI:  Object to the form.
21 Beyond the scope.
22   A.  Not that I recall.
23   Q.  (BY MR. ANDERSON) Now, you mentioned in
24 connection with the Jerrie Cicerale/Kay Morgan
25 exchange in -- on January 31st and February 1st of

Page 665

1  2001 that you were informed by your people that this
2  communication had occurred, correct?
3    A.  Correct.
4    Q.  And did you learn that from Jerrie Cicerale
5  herself?
6    A.  I believe I talked to both Harry and Jerrie.
7  Who came and told me originally, I'm not sure.  May
8  have been Harry.
9    Q.  Did you ultimately make the decision as to
10 whether or not Harry would follow up with Kay?
11   A.  Yes.
12   Q.  And did you tell Harry, "Don't call Kay"?
13   A.  I told both of them to cease any of this --
14   Q.  Why?
15   A.  -- communication.  We had reported prices.
16 That's the way we should end it.  If they choose to
17 publish the prices, that's -- that's their decision.
18   Q.  All right.  With that let's go back and take
19 a look at 586.  Will you agree with me that on the
20 first page of 586 --
21   A.  That's the e-mail string?
22   Q.  Yes, it is.
23   A.  Okay.
24   Q.  Looking at the first page, in the middle of
25 the first page of Exhibit 586 beginning with that

Page 666

1  sentence written by Kay Morgan beginning with the word
2  "We."  I will read for the record.
3       "We will start on this tomorrow, but
4  will probably not get it all on till next week, so it
5  will miss the monthly and weekly database."
6       Did I read that correctly?
7    A.  Yes.
8    Q.  Does that indicate to you that Kay, in fact,
9  was ready, willing and able to publish the new WAC
10 prices that Abbott had reported as a result of the WAC
11 optimization?
12      MS. TABACCHI:  Object to the form.
13 Beyond the scope.
14   A.  It appeared she was ready to move forward,
15 yes.
16   Q.  (BY MR. ANDERSON) Did you have that
17 understanding that First DataBank was ready to move
18 forward when you told Harry not to talk to Kay
19 anymore?
20      MS. TABACCHI:  Object to the form.
21 Beyond the scope.
22   A.  I don't -- I don't think I saw this string of
23 e-mails.  I believe I understood what Kay had pushed
24 back on and that's when I said let's -- let's just go
25 on.  Let's not continue this discussion.

24 (Pages 663 to 666)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

ABT-DOJ 0236190
Highly Confidential       70a0744a-d263-4360-8594-f666b466ba1c

ABT110-0169

Page 703

1  MS. TABACCHI: Object to the form.
2  Beyond the scope of the notice.
3  A. I'm not sure I would agree with that. I
4  think Calcijex had some contract prices as well as it
5  had list and WAC prices.
6  Q. (BY MR. ANDERSON) But Calcijex did not have
7  the extent of contract prices that most HPD products
8  do, correct?
9  MS. TABACCHI: Object to the form.
10  Beyond the scope of the notice.
11  A. It didn't have as broad a diversity because
12  it was a proprietary pharmaceutical. It was not a
13  generic pharmaceutical like the rest of our product
14  line.
15  Q. (BY MR. ANDERSON) Would you agree with me
16  that back in 2000 Abbott was aware that for most of
17  its products the direct prices were not reflective of
18  the prevailing prices sold in the marketplace?
19  MS. TABACCHI: Object to the form.
20  Beyond the scope.
21  A. No, I wouldn't.
22  Q. (BY MR. ANDERSON) And, again, the reason you
23  disagree with me is because some minimal sales, albeit
24  1.5 percent or less of total sales, were occurring at
25  direct price?

Page 704

1  MS. TABACCHI: Object to the form.
2  A. Some sales were happening at direct price,
3  some price -- some sales were happening at parameter
4  pricing and you've shown me that the parameter pricing
5  is not that much different from the list price, so,
6  you know, that's why -- that's why I would say -- you
7  know, I wouldn't minimize the impact of those two
8  price levels.
9  Q. (BY MR. ANDERSON) Did Abbott, in fact,
10  ultimately lower its direct or list prices down to
11  another level?
12  MS. TABACCHI: Object to the form.
13  A. Time frame?
14  Q. (BY MR. ANDERSON) In 2001.
15  A. Yes, we did.
16  Q. And which level did Abbott ultimately choose
17  to lower its list or direct prices? Was it high
18  parameter or was it WAC or was it some other level?
19  MS. TABACCHI: Object to the form.
20  A. I think -- I think if you -- if you were to
21  look at each of those, it was a different price by
22  list.
23  Q. (BY MR. ANDERSON) And wasn't it roughly
24  about wholesale invoice price plus five percent?
25  MS. TABACCHI: Object to the form.

Page 705

1  A. I don't -- I don't believe there was a --
2  there was a formula like that.
3  Q. (BY MR. ANDERSON) What was the basic purpose
4  of lowering the prices in 2001? I'll be more
5  specific. What was the basic purpose of lowering the
6  direct prices in or about April of 2001?
7  MS. TABACCHI: Object to the form of the
8  question.
9  A. To bring our list prices more in line with
10  our general contract range of prices.
11  Q. (BY MR. ANDERSON) And why was it that prior
12  to April 2001 Abbott had chose not to report list
13  prices that were in line with the prevailing contract
14  prices?
15  A. Well, we reported all of our list prices. So
16  prior to that time we were using a different practice.
17  Q. Okay. Given that distinction, why is it that
18  prior to April 2001 Abbott was using a practice that
19  resulted in direct or list prices being set at levels
20  that were not reflective of prevailing contract
21  prices?
22  MS. TABACCHI: Object to the form of the
23  question.
24  A. It was -- it was -- it was just a practice of
25  ours.

Page 706

1  Q. (BY MR. ANDERSON) Why was it that Abbott
2  switched from that older practice of reporting direct
3  prices that were not connected with prevailing
4  contract prices and switched to a practice where
5  direct prices were reported at levels that reflected
6  prevailing contract prices?
7  MS. TABACCHI: I'm going to instruct the
8  witness not to answer this question on the grounds of
9  attorney-client privilege.
10  Q. (BY MR. ANDERSON) Okay. Setting aside
11  communications with counsel, can you answer my
12  question?
13  A. No.
14  Q. Other -- is it true, sir, that all
15  information that you have as Abbott's corporate
16  representative about the changes in direct pricing in
17  April 2001 is derived from communications with
18  counsel?
19  MS. TABACCHI: Object to the form of the
20  question.
21  A. No.
22  Q. (BY MR. ANDERSON) Okay. Set your
23  communications with counsel aside. Share with me what
24  you know about why Abbott switched from its prior
25  practice of setting direct prices that did not have

34 (Pages 703 to 706)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

ABT-DOJ 0236200
Highly Confidential          70a0744a-d263-4360-8594-f666b466ba1c

ABT110-0179