# EXHIBIT 4

Page 1

```
            THE UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

_____



              Videotaped Rule 30(b)(6) Deposition

              of MICHAEL SELLERS, at 77 West Wacker

              Drive, Chicago, Illinois, commencing

              at 9:00 a.m. on Sunday, March 16,

              2008, before Donna M. Kazaitis, RPR,

              CSR No. 084-003145.
```

Page 42

1  was the president's office of the Hospital
2  Products Division.  And I can't remember where
3  the, the March meeting may have been over in Rick
4  Gonzalez's corporate area.
5     Q.   Did anyone else other than those five
6  individuals have input into the decision to make
7  the 2001 price change?
8     A.   No.
9        MS. TABACCHI:  Object to the form.
10
11 BY MS. ST. PETER-GRIFFITH:
12    Q.   What were your thoughts, and I
13 appreciate you're testifying in your personal
14 capacity, but what were your thoughts on whether
15 the 2001 price change occurred?
16       MS. TABACCHI:  Object to the form,
17 beyond the scope of the Notice, and the witness
18 has already testified about this in a previous
19 deposition taken by you in this case.
20       THE WITNESS:  It was a consensus
21 decision to make the change.
22 BY MS. ST. PETER-GRIFFITH:

Page 43

1     Q.   Did you agree with it?
2     A.   Yes.
3     Q.   Did you have any reservations about the
4  2001 price change?
5        MS. TABACCHI:  Object to the form,
6  beyond the scope, asked and answered previous
7  testimony.
8        THE WITNESS:  Early on I probably did,
9  but later in the process I agreed with it.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.   Why early on did you have reservations?
12       MS. TABACCHI:  Again, all of these
13 questions have been posed already to Mr. Sellers
14 in his individual deposition.
15       MS. ST. PETER-GRIFFITH:  No, they
16 haven't.
17       MS. TABACCHI:  I'm going to object to
18 the line of questioning, beyond the scope.
19       THE WITNESS:  I think initially I had
20 some concern with regard to the fact that it might
21 be used against us and seen as agreeing with the
22 claims being made.

Page 44

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   What claims being made?
3        MS. TABACCHI:  Objection, same
4  objections.
5        THE WITNESS:  That we had manipulated
6  price.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   And you said eventually you changed your
9  view on that?
10       MS. TABACCHI:  Same objections.
11       THE WITNESS:  As I said, as we went
12 through the analysis I agreed with the end result.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.   Did anyone else have reservations about
15 the 2001 price changes?
16       MS. TABACCHI:  I'm going to caution the
17 witness not to reveal the substance of any
18 communications between anyone at any meeting in
19 which counsel was present.
20       MS. ST. PETER-GRIFFITH:  I'm going to
21 have to ask you, Tina, whether you intend to rely
22 upon advice of counsel.

Page 45

1        MS. TABACCHI:  We've been through this
2  before.  Mr. Sellers is not going to waive any
3  privilege today in his testimony.
4        THE WITNESS:  I don't know of anybody
5  else.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.   Sir, were the two meetings that you
8  testified the only meetings regarding the proposed
9  price change in 2001?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  They were the only
12 meetings with that team.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.   Were other meetings held?
15    A.   I worked with Laura Schumacher on the
16 analysis --
17       MS. TABACCHI:  I'm going to caution the
18 witness not to reveal the substance of any
19 communications with Ms. Schumacher.
20       THE WITNESS:  And there were a number of
21 meetings that I held with her.
22 BY MS. ST. PETER-GRIFFITH:

12 (Pages 42 to 45)

Page 332

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL         )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )   CIVIL ACTION

PRICE LITIGATION              )   01-CV-12257-PBS

_____    Volume II


        Continued Videotaped Rule 30(b)(6)

        Deposition of MICHAEL SELLERS, at

        77 West Wacker Drive, Chicago,

        Illinois, commencing at 9:00 a.m.

        On Monday, March 31, 2008, before

        Donna M. Kazaitis, RPR, CSR

        No. 084-003145.

Page 349

1  to understand what costs they had to consider as
2  through their business?
3      MS. TABACCHI: Object to the form,
4  beyond the scope.
5      THE WITNESS: Well, while it's always
6  important to understand your customer and what
7  drives their or what gives them motivation,
8  whatever they did to process our products was the
9  same they were going to do when they processed
10 somebody else's products. Ours were no different.
11     The only place where there was a
12 difference was where we had a delivery system that
13 would have obviated a certain process that they
14 would have had to do.
15     For instance, if we were selling a
16 pre-filled syringe product, that product could be
17 priced higher than just a vial or ampule product
18 because it eliminated steps that the provider had
19 to go through to draw up the syringe and so on.
20     So from that standpoint, it was
21 important to understand. But if they bought a
22 vial of a certain drug from us and they bought a

Page 350

1  vial of a certain drug, of that same drug, from
2  one of our competitors, they'd have to go through
3  the same processes to prepare the drug, administer
4  the drug, whatever else needed to go on.
5      So we really didn't take that into
6  consideration because it was really what did we
7  need to remain competitive with other drug
8  suppliers on that drug.
9      Q.  Did dispensing fees for the end
10 providers ever factor into Abbott's pricing
11 decisions?
12     A.  No.
13     Q.  What about inventory carrying costs for
14 the end user providers, did that ever factor into
15 Abbott's pricing decisions?
16     MS. TABACCHI: Object to the form.
17     THE WITNESS: No.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Other than just the competitive price of
20 the actual product itself, was there any other
21 factor pertaining to the provider that factored
22 into Abbott's pricing decisions?

Page 351

1      MS. TABACCHI: Object to the form.
2      THE WITNESS: The only other factor that
3  plays here is the size of the customer in terms of
4  what does the customer buy from Abbott or what
5  could the customer buy from Abbott.
6      So if, for instance, it was a large
7  GPO that brought to us two thousand members that
8  would then buy our products, they might be
9  eligible for a lower price than an individual
10 coming to us with two or three, four, or five
11 locations that might buy our drugs.
12     So the critical mass of the
13 customer may have played some role in the price
14 considerations at times.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Would it have been the contract price
17 considerations or the list price considerations or
18 both?
19     MS. TABACCHI: Object to the form.
20     THE WITNESS: Purely contract.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  How did Abbott's marketing of product

Page 352

1  lines, meaning packaging more than just one
2  individual product, how did that impact pricing
3  for Abbott's individual products, if at all?
4      MS. TABACCHI: Object to the form.
5      THE WITNESS: Usually not in the subject
6  drugs that we're talking about here.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Okay.
9      A.  Primarily because the awards that would
10 be made by a GPO for instance often times ended up
11 being line item awards. They weren't we're going
12 to give you every product that you bid, we're
13 going to give you, you know, instead they'd come
14 back and say no, we're going to give you a hundred
15 twenty out of the three hundred fifty products
16 that you bid we're going to give those to you and
17 we're going to give somebody else the other two
18 hundred some odd.
19     So it never was a practice to try
20 to link them together because we knew that our
21 customers, which were primarily pharmacists, not
22 professional purchasers, they liked to do a pick

6 (Pages 349 to 352)

Page 353

1  and choose across the awards. So you really had
2  to price each one so it would stand alone.
3     Q.  So, for example, in the example that you
4  just gave for those a hundred twenty or so line
5  items, would it be price that would be the
6  determining factor as to whether or not Abbott
7  would receive the contract from the GPO with
8  regard to those items?
9         MS. TABACCHI: Object to the form,
10 beyond the scope.
11        THE WITNESS: It was one of the factors.
12 I mean all things I said before in terms of
13 dependability, in terms of quality, in terms of
14 delivery mode would contribute to their decision.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.  Let me ask you a slightly different way.
17        Would it be the prices on the
18 individual line items that would be awarded, for
19 example the hundred twenty that you referenced, as
20 opposed to the entire package or portfolio of the
21 product line that would be the driving factor?
22        MS. TABACCHI: Object to the form,

Page 354

1  beyond the scope.
2         THE WITNESS: My experience is that it
3  was the individual price for that individual line
4  item that was awarded.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Were there any other factors that
7  factored other than what you already testified to
8  this morning and earlier that factored into
9  Abbott's pricing decisions?
10        MS. TABACCHI: Object to the form.
11        THE WITNESS: No. The one other one, I
12 guess I back, the one other one we talked about
13 before is inflationary environment of the year
14 that we were in.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.  What do you mean by that?
17    A.  Well, we monitored the CPI bundle for
18 urban, CPIU is what we called it, I think that's
19 what it's called on the government website.
20        We monitored CPIU. So we were
21 aware whether we were in a high inflationary
22 environment or we were in a low inflationary

Page 355

1  environment. So if CPIU, a lot of our contracts
2  are geared to whatever the CPIU does in terms of
3  our ability to increase prices. So that would be
4  another factor in determining contract price. And
5  as I've said before, in the 1990s it was a factor
6  for list price changes as well.
7         (WHEREUPON Exhibit Sellers 016
8         was marked as of 3/31/2008.)
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Sir, I'm not going to ask you detailed
11 questions about this document. I'm going to ask
12 Abbott whether it recognizes the document, but
13 we're not going to go line-by-line. (Document
14 tendered to the witness.)
15        MS. TABACCHI: Object to the question as
16 beyond the scope of the Notice.
17        THE WITNESS: I don't remember reviewing
18 this particular document.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  Sir, previously we had discussed in the
21 first day of your deposition various pressures
22 that may have influenced Abbott's decision making

Page 356

1  with regard to lowering its list pricing. Do you
2  recall that?
3         MS. TABACCHI: Object to the form.
4         THE WITNESS: Yeah. I believe we talked
5  about a number of environmental factors that were
6  going on at the time.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  In 1999 I'll represent to you this is a
9  letter that was sent to by the Department of
10 Justice to Abbott's counsel, Daniel Reidy.
11        Did Abbott see a copy of this
12 document?
13        MS. TABACCHI: Object to the form,
14 object as beyond the scope of the Notice.
15        THE WITNESS: I can't comment because I
16 didn't see it.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  Why didn't Abbott consider lowering its
19 list prices upon receipt of this letter?
20        MS. TABACCHI: Object to the form,
21 beyond the scope of the Notice. This is an
22 improper hypothetical.

7 (Pages 353 to 356)

**Sellers, Mike W    APX**

| | |
|---|---|
| From: | Leone, Lynn E   APX |
| Sent: | Wednesday, January 17, 2001 7:29 PM |
| To: | Sellers, Mike W   APX |
| Subject: | Re: AWP Impact Analysis |

Mike here is the analysis. However, I don't think this really tells us what we want to know. When I did this the first time, it was based on what we thought we would lose by having lower AWP's than our competitors. I used the same logic, but I think there are flaws in the managed care nutritional and S&E piece.

Here are my assumptions:
1. I ignored the May changes completely for Abbott and competitors and reviewed proposal at WAC+5% against old AWP's for everyone. This may be part of the problem - should I continue to take that into consideration?
2. Total sales for impacted products based on 2001 plan - $46.177 million.
3. We retain with higher AWP's - $16.370
4. We retain because S&E and part-fills - $10.095
5. Net sales $19.713.
6. For Medicare, I assumed 11.7% of total sales, removed the nutritionals because of TPN reimbursement, which left impact of $1.748 for Medicare.
7. For Medicaid, I assumed 12.6% of net sales and said all would be impacted - total $2.484. This may not make sense based on no. 1 above.
8. Managed Care/All Other Payers - I just took 30% of the balance of the net sales, but that may not make sense - especially if we are looking at spreading this analysis across all products with an AWP. Managed Care pays TPN like Medicare and everything else is at a per diem plus AWP. I can probably continue to consider the anti-infectives and oncology and a-methapred, but should probably ignore the rest of the injectables because they would be part of the per diem.

Bottom line - I think the $8.709 may not be a true reflection of what this means.

I don't know why this made sense in August and doesn't today. Maybe we can talk Thursday sometime.

Revised AWP Impact Analysis.xl...

Lynn

*(handwritten annotation: 25 TOP TOTAL SALES)*

1

EXHIBIT 587
WIT: Sellers
DATE: 4-12-02
Cynthia Vohlken

TXABT 158775
HIGHLY CONFIDENTIAL

## Revised AWP Impact Analysis

| | | |
|---|---:|---:|
| Total Sales Impacted Products | $46,177,388 | |
| Retained Abbott Product - Abbott Maintains Advantage | ($16,369,570) | |
| Total Worst Case Abbott Sales Loss | $29,807,818 | |
| Retained Abbott Product - Abbott Disadvantage Small | ($10,094,874) | |
| Net Sales at Risk | $19,712,944 | |
| | | |
| Medicare | | |
| 11.7% of Net Sales | $2,306,414 | |
| Nutritionals Not Impacted | ($558,461) | |
| Total Medicare Impact | | $1,747,953 |
| | | |
| Medicaid | | |
| 12.6% of Net Sales | $2,483,831 | $2,483,831 |
| | | |
| Managed Care/All Other Payers | $14,922,699 | |
| 30% Reimburse based on AWP | $4,476,810 | $4,476,810 |
| | | |
| Net Sale Loss | | $8,708,594 |

TXABT 158776
HIGHLY CONFIDENTIAL