# EXHIBIT 6

Helms, Ph.D., Robert B. - Vol. II                    May 1, 2009
Washington, DC

Page 316

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   ) CIVIL ACTION

PRICE LITIGATION             ) 01-CV-12257-PBS

                             )

THIS DOCUMENT RELATES TO     )

U.S. ex rel. Ven-a-Care of   ) Judge Patti B. Saris

the Florida Keys, Inc.       )

    v.                       ) Chief Magistrate

Abbott Laboratories, Inc.,   ) Judge Marianne B.

No. 06-CV-11337-PBS;         ) Bowler

(caption continues)          )

- - - - - - - - - - - - - - -


    Videotaped deposition of ROBERT B. HELMS, PH.D.

                Volume II


                Washington, D.C.

                Friday, May 1, 2009

                9:00 a.m.

e7c00c15-4817-43e4-b1e4-ba3cd1069e93

Helms, Ph.D., Robert B. - Vol. II                          May 1, 2009
                          Washington, DC

Page 489

1  was to describe how they were going to come up
2  with their aggregate payment amount, which they --
3  if you go on, they were then going to put into
4  their state plan, their findings and assurances,
5  that they were going to meet the aggregate limit.
6      Q.  I just want to know, sir, if
7  subparagraph A of 42 C.F.R. 447.333 is according
8  to you the policy of the United States Government
9  with respect to state plans for Medicaid purposes.
10     A.  Yes.
11     Q.  That's all I want to know.  And has it
12 changed as far as you know up until today?
13     A.  It's still in the federal regulations as
14 far as I know.  It's still that the state is
15 subject to making that available.  I could say
16 some things about the practical side of that from
17 the various testimony and so on that it doesn't
18 seem to be very comprehensive when they actually
19 put it in there.
20     Q.  Let me ask this question.  If a state
21 plan for reimbursing for drugs by Medicaid
22 provides for reimbursement which in the aggregate

Page 490

1  is less than the maximum allowed amount in the
2  aggregates amounts under the regulation we're
3  looking at here, say your plan results in less
4  being paid than what they would otherwise be
5  allowed -- are you aware of any state plans that
6  do that?
7      A.  No.  And I think it's, you know, a
8  hypothetical that is very unlikely.
9      Q.  Really?
10     A.  Well, because you've got -- if I
11 understand your question right -- and I may not
12 have.  Okay? -- you're saying what happens if a
13 state comes in with a plan that's under the
14 amount.
15     Q.  Yeah.  What if the plan states, look, we
16 see your federal upper limit for multiple-source
17 drugs described in the preceding section of this
18 regulation.
19     A.  Mm-hmm.
20     Q.  But we're going to put -- our
21 reimbursement system is going to be based upon
22 something that's going to result in a lesser

Page 491

1  amount than this in the aggregate.
2      A.  Yeah.
3      Q.  I mean, there's nothing in the
4  regulation -- the in the aggregate in this
5  regulation provides for maximum amounts, right?
6      A.  Now I'm thinking I didn't understand
7  your question before.  But I think I do.
8      Q.  So does the state have to pay the
9  maximum amounts permitted under this regulation or
10 could they pay something less as long as in the
11 aggregate it's not more?
12     A.  They can certainly pay less and we
13 encouraged them to do so.  And they kept coming in
14 in their letters and saying they could do that and
15 they wanted the flexibility to do it which they
16 couldn't do under the old system.  That was a
17 motivation to reform the regs.  And certainly if
18 they could save more then they saved the federal
19 government money and the state government money.
20     Q.  You anticipated my next question.  Which
21 if they can save more it benefits the federal
22 government and the state government, correct?

Page 492

1      A.  Yes.
2      Q.  Because it's a joint federal/state
3  funded program, right?
4      A.  That's right.  And it has the attaching
5  rate.  And if you go look at my dissent to the
6  Medicaid commission you will even see some
7  analysis of why I think the matching rate takes
8  away the incentives for the states to be very cost
9  conscious about this.
10     Q.  One of you're -- you may not know this,
11 but one of your co-experts I believe describes
12 this as an incentive for so-called fiscal gaming.
13 Have you ever heard that?
14     A.  That term was used in the Medicaid
15 commission quite a bit.
16     Q.  In other words --
17     A.  One of the things I learned -- it didn't
18 relate to this case, but I learned from reading
19 this thing that there have been -- we spent a lot
20 of time in what was called provider taxes and so
21 on that were these schemes that were used to get
22 the state more federal matching money.  I mean,

                                    45 (Pages 489 to 492)

e7c00c15-4817-43e4-b1e4-ba3cd1069e93

Helms, Ph.D., Robert B. - Vol. II                              May 1, 2009
Washington, DC

Page 501

1      Q.   "The agency payments for brand-name
2    drugs certified in accordance with paragraph
3    little C of this section and drugs other than
4    multiple-source drugs for which a specific limit
5    has been established under Section 447.332 must
6    not exceed in the aggregate payment levels that
7    the agency has determined by applying the lower of
8    the --"
9          Do you see that?
10     A.   Yes.
11     Q.   And the lower of the, what is the first
12   one?
13     A.   "Estimated acquisition cost plus a
14   reasonable dispensing fee."
15     Q.   And that estimated acquisition cost we
16   know means the agency's best estimate of the price
17   generally and currently paid by providers for a
18   drug marketed or sold by a particular manufacturer
19   or labeler in the package size of drug most
20   frequently purchased by providers, correct?
21     A.   That's what the definition says.
22     Q.   All right.  And then we go down to

Page 502

1    number 2, "a provider's usual and customary
2    charges to the general public."  Do you see that?
3      A.   Yes.
4      Q.   All right.  So would you agree with me -
5    - which is where we started this line of
6    questioning a long time ago -- that the regulation
7    basically provides for the state agency making an
8    in the aggregate determination and representation
9    to HCFA for its drugs that are -- multiple-source
10   drugs that are subject to the federal upper limit
11   on the one hand, and making another in the
12   aggregate determination and representation to HCFA
13   for all the other drugs on the other hand?
14     A.   That's right.  And there's different
15   time requirements on those two categories.
16     Q.   And different time requirements.  Now,
17   would it surprise you if a state in its state plan
18   were to meet these requirements by applying a
19   formula for all drugs where the state plan
20   provides that it would pay the lesser of usual and
21   customary, EAC, state MAC or FUL, if set?
22         MR. COOK:  Objection.

Page 503

1      A.   Would it surprise me, no, because we
2    urged the states, you know, that we were giving
3    them maximum flexibility.  And I think I have read
4    that there are states that have this sort of all
5    inclusive system.
6      Q.   Okay.  And as long as it's a lesser of
7    for each of those factors you would agree that the
8    state would then be in compliance with the
9    regulation for both its multisource drugs subject
10   to an FUL and all other drugs?
11         MR. COOK:  Objection.
12     A.   That would be up to the HCFA staff,
13   first of all, who's reviewing the plan to
14   determine if they think that what they've actually
15   set up would work that way and would meet the
16   aggregate standard.
17     Q.   So if the HCFA staff had reviewed a
18   state plan and the state plan was approved by the
19   HCFA administrator or the secretary of HHS,
20   whoever approves these things -- by the way, who
21   does approve it, the administrator of HCFA or the
22   HHS secretary?

Page 504

1      A.   Well, my impression is historically even
2    HCFA left it pretty much to the regional
3    administrators.  And as Deirdra Duzor has
4    testified at some point they thought the regional
5    offices were being inconsistent about their
6    standards and so on and so they attempted to bring
7    it back into the central office.  But as a
8    practical matter I don't think these things,
9    unless they're particularly controversial, ever
10   even get up to the HCFA administrator.  I think
11   they're done by the Medicaid staff.
12     Q.   But when you say done by the staff or
13   done by the regional administrator or even done by
14   the administrator, what we're really saying here
15   is that officially and legally -- or officially --
16   the secretary of the Department of Health and
17   Human Services has the responsibility and has
18   delegated to those various subordinates?
19     A.   Yes.
20     Q.   So whoever signs off on it is a matter
21   of internal department authorizations and policies
22   at the time?

48 (Pages 501 to 504)

e7c00c15-4817-43e4-b1e4-ba3cd1069e93

Helms, Ph.D., Robert B. - Vol. II                    May 1, 2009
                        Washington, DC

Page 505

1      A.   Normal operating procedure, yes.
2      Q.   But as far as the regulation is
3  concerned, this is a regulation that is -- as you
4  made the point correctly earlier, this is the
5  secretary of the Department of Health and Human
6  Services' regulation, isn't it?
7      A.   Yes.  It's all done under the
8  secretary's name.
9      Q.   And while the HCFA administrator is an
10 important official position -- isn't it?
11     A.   Oh, yes.
12     Q.   The secretary of HHS is a cabinet level
13 secretary?
14     A.   That's right.
15     Q.   Okay.  Who reports directly to whom?
16     A.   To the President.
17     Q.   To the President.  So if I understand
18 this regulation then, if a state plan were
19 approved that paid the lesser of usual and
20 customary, federal upper limit, state MAC or EAC
21 for all drugs and it saved money so that less was
22 paid than the amount that would be paid based upon

Page 506

1  the in the aggregate for the drugs subject to the
2  FUL alone, those savings would be shared by the
3  federal and state government, correct?
4          MR. COOK:  Objection.
5      A.   It's my understanding -- yes.  If those
6  savings are reflected in the claims that go in
7  through the normal process of reimbursement and it
8  meets -- that then goes through, as I understand
9  it, a second sort of double-check and auditing and
10 so on before they send the -- well, actually,
11 there is a system of sending the federal financial
12 payment on the basis of estimates and then they're
13 resettled later after they do some checking to
14 make sure they're accurate.
15         So there is a separate auditing system
16 that's supposed to be controlling the payment of
17 the federal money back to the states.
18     Q.   So if I understand the regulation from
19 the perspective of your area of expertise, which
20 is what I'm trying to get here, we've got a
21 regulation that's got basically some checks and
22 balances in it to protect the federal funds and

Page 507

1  indirectly the state funds, correct?
2      A.   I think that's a fair characterization,
3  yes.
4      Q.   All right.  And it's a joint
5  federal/state program, correct?
6      A.   Yes.
7      Q.   And in any regulations where you've got
8  a joint federal/state program the federal
9  regulations are there to, at least in part,
10 protect the federal FISC, correct?
11     A.   Meaning -- FISC meaning the federal
12 expenditures?
13     Q.   Correct.
14     A.   Because as you well know this is an
15 open-ended entitlement.  It's not an appropriated
16 amount from the Congress.
17     Q.   Right.  Well, okay.  Thank you for
18 correcting me.  But the bottom line is the
19 regulation that is in part due to your good work
20 was there to at least in part protect the federal
21 tax dollars, correct?
22     A.   Yes.  I would have to agree with that.

Page 508

1  We put a good bit of emphasis in -- as I testified
2  yesterday, that was one of -- I think the major
3  objective of trying to reform these things.
4      Q.   Now, in preparing your expert -- doing
5  your expert work in this case I think you read Mr.
6  Scully's deposition.  Right?
7      A.   No.  I have not.  I was actually not
8  aware that that had been taken until I saw it on
9  some list.  But I have not read it.
10     Q.   How about Mr. Scully's testimony in
11 September of 2001 before the House Committee On
12 Commerce and Energy?
13     A.   I have known Tom for years.  I consider
14 him a friend.  But I was not aware of that
15 particular testimony.
16     Q.   Do you know what he testified about
17 average wholesale price and its use to estimate
18 acquisition cost of drugs?
19         MR. COOK:  Objection.
20     Q.   Let me restate the question.  Do you
21 know that he testified about average wholesale
22 price and its relationship to Medicare

49  (Pages 505 to 508)

e7c00c15-4817-43e4-b1e4-ba3cd1069e93

Helms, Ph.D., Robert B. - Vol. II                    May 1, 2009
                        Washington, DC

Page 573

1  other systems, going to some other system if they
2  wanted to under the regulation.  So that's what my
3  expert opinion is about, the activities, the
4  options, that the states had under the regulation.
5     Q.  But the states stuck with the compendia
6  because that was the most efficient and cost
7  effective way to reimburse for the health care
8  needs of their poor, correct?
9         MR. COOK:  Objection.
10    A.  There were lots of testimony before our
11 public hearing and also in the letters, you know,
12 in defense of that system that it did provide them
13 with a sort of practical way to handle the claims
14 process.
15    Q.  So as the senior economist --
16    A.  Is the what?
17    Q.  As the senior economist in our
18 government responsible for the health care arena
19 and specifically responsible for advising our
20 government --
21    A.  Mm-hmm.
22    Q.  -- on this regulation, did you expect

Page 574

1  that a drug company would after the regulation was
2  promulgated cause its average wholesale price to
3  be increased from $25.20 to $76.42 over a 13 year
4  period when in fact and in truth its real prices
5  were falling precipitously all the way down to $4?
6         MR. REALE:  Objection.
7         MR. COOK:  Objection.
8     A.  Well, let me say that particular example
9  I don't have any details about.  I have not
10 studied that.
11        MR. BREEN:  Objection, nonresponsive,
12 move to strike.  I'd ask the court reporter to
13 read my question back ask listen to it carefully
14 and I want an answer.
15        (Whereupon, the requested portion
16 was read by the reporter.)
17        MS. REID:  Same objection.
18        MR. COOK:  Objection.
19    A.  I have no basis for answering your
20 question.  I have not studied this market even in
21 terms of the individual drug or the class of
22 drugs.  So I have no basis for answering your

Page 575

1  question.  And it's not part of my opinion.
2  BY MR. BREEN:
3     Q.  My question is whether it's part of your
4  opinion or not, because you were there, sir --
5     A.  Mm-hmm.
6     Q.  -- you were the deputy assistant
7  secretary and later became the assistant
8  secretary, you were the senior economist in our
9  Department of Health and Human Services in terms
10 of your position.  You've said you had
11 responsibility for this regulation.  And I want to
12 know if you knew at that time you expected that a
13 drug company after the regulation was promulgated
14 would increase its price report so that its
15 average wholesale price went from the $25.20 level
16 to the $72.42 level when its real price went down
17 to the $4 level, did you know that was going to
18 happen?  Did you expect that kind of thing to
19 happen?
20        MR. COOK:  Objection.
21        MS. REID:  Objection.
22    A.  Let me say again I have no particular

Page 576

1  knowledge of this case.  I have no way to judge
2  the numbers that you have used.  But I will go
3  back and say what we thought about that as a
4  general matter, that we didn't see -- we viewed
5  that this list price was an ordinary business
6  practice that, as I talked about yesterday, that
7  was part of the marketing strategy to be able to
8  sell to different groups of people at different
9  prices.
10        And if you're going to do that you don't
11 want to reveal the discounts that you've
12 negotiated with one buyer with another buyer.  And
13 we viewed this in the pharmacy context that if we
14 had a system where the state was doing this, I
15 don't think that we thought that the pharmacist --
16 that the company had any basic incentive.
17        Their usual sort of way to get market
18 share was not to manipulate the list price, but to
19 go out through detailing and advertising and so on
20 to the physicians who were writing the
21 prescriptions, and as time evolved and pharmacists
22 began to have more power to substitute things,

                                66 (Pages 573 to 576)

e7c00c15-4817-43e4-b1e4-ba3cd1069e93

Helms, Ph.D., Robert B. - Vol. II                    May 1, 2009
                        Washington, DC

|  | Page 577 |
|---|---|

1  then to go directly to the pharmacist, you know,
2  and give them incentives to substitute their
3  generic products when they could do it.
4      Q.  Thank you.
5      A.  So I'm -- that's I think the best answer
6  I can give you.
7      MR. BREEN:  Thank you.  Let's take a
8  break.
9      THE VIDEOGRAPHER:  This is the end of
10 tape 4.  Off the record at 4:03.
11     (Recess.)
12     THE VIDEOGRAPHER:  This is the beginning
13 of tape 5 in the deposition of Dr. Helms.  On the
14 record at 4:15.
15 BY MR. BREEN:
16     Q.  You refer to IV pharmacy a couple times
17 in your report.  And -- correct?
18     A.  I think so, yes.
19     Q.  Now, prior to being engaged as an expert
20 in this case did you have any area of expertise in
21 the area of IV pharmaceuticals?
22     A.  No.

|  | Page 578 |
|---|---|

1      Q.  So any information about IV
2  pharmaceuticals in this case would it be correct
3  to say that you were just assuming facts as they
4  were presented to you to be true?
5      A.  No.  I wouldn't say I'm assuming facts.
6  I read several things about it.
7      Q.  Okay.  Do you know that Abbott
8  Laboratories had its own IV pharmacy provider
9  operation?
10     A.  I don't know much about that.  I think
11 it was mentioned that they have products in that
12 line.
13     Q.  Okay.  Well, do you know they actually
14 had reimbursement systems that they used for their
15 own pharmacies and for client pharmacies where
16 they would bill Medicare and Medicaid and others?
17     A.  No.  I have not been asked to look at
18 that.
19     Q.  Just so I'm clear about this, whenever I
20 ask you a question and you say no I have not been
21 asked to look at that, you mean no you don't know
22 and no you didn't look into it, right?

|  | Page 579 |
|---|---|

1      MR. COOK:  Objection.
2      A.  No.  That's it's outside the scope of
3  what I've been asked to look at.
4      Q.  Well, I just don't want to keep asking
5  the same question and leave it hanging because
6  maybe what you mean is no I wasn't asked to look
7  at it but maybe you do have some information about
8  it.
9      A.  Well, I think you should have learned by
10 now that if I know something about it I volunteer
11 it, you know.  It goes against all the advice I
12 get from lawyers, not just these, but -- but I
13 usually try to give you a straight answer about
14 what I know and what I don't.
15     Q.  Okay.
16     A.  And in these particular company-related
17 questions I do not know -- I have not looked at
18 them and I don't have any basis for answering your
19 questions.
20     Q.  Okay.  Are you aware that in the late
21 '90s and perhaps after that several states
22 increased their dispensing fee or administrative

|  | Page 580 |
|---|---|

1  fee for the IV pharmaceuticals?
2      A.  I have read in some of the publications
3  that the whole history of this line of treatment
4  has evolved a lot since the 1980s and that there
5  has been a lot of emphasis on trying to get more
6  of this out of the hospital into the home.  And it
7  was very cost effective.  I've even seen reference
8  to one study about this done by a pharmacy school,
9  a pharmacy professor, about the cost savings of
10 getting this into home therapy.  So there were
11 advantages -- I'm aware of those market
12 developments.
13     And your question -- I'm sorry.  Your
14 question was --
15     Q.  Are you aware that -- it was a different
16 question.  I'll ask it again.
17     A.  Yeah.
18     Q.  Are you aware that in the late '90s the
19 states began to increase the administrative or
20 dispensing fee for IV pharmacies?
21     A.  Yes.  And I meant to get to that.  I was
22 aware and I've read some about that some of the

Henderson Legal Services, Inc.