# EXHIBIT 11

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


  IN RE:  PHARMACEUTICAL          )
  INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
  PRICE LITIGATION                ) Civil Action No.
                                  )    01-12257-PBS
                                  )
  THIS DOCUMENT RELATES TO:       )
                                  )
  United States of America,       ) Hon. Patti Saris
  ex rel. Ven-a-Care of the       )
  Florida Keys, Inc., v.          )
  Abbott Laboratories, Inc.,      )
  and Hospira, Inc.               )
  CIVIL ACTION NO. 06-11337-PBS   )


  ******************************************************

              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


  IN RE:  PHARMACEUTICAL          )
  INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
  PRICE LITIGATION                ) Civil Action No.
                                  )    01-CV-12257-PBS
                                  )
  THIS DOCUMENT RELATES TO:       )
                                  ) Judge Patti B. Saris
  State of Arizona v. Abbott      )
  Labs., et al.                   )
  Civil Action No. 06-CV-11069-PBS )


  ******************************************************

           ORAL AND VIDEOTAPED DEPOSITION OF
                   BRUCE E. RODMAN
                   August 29, 2007

                       Volume 1

                   HIGHLY CONFIDENTIAL


  ******************************************************
```

Page 18

1  service that has to do -- that requires clinical
2  pharmacists, who are quite involved with advising the
3  physicians who are ordering the medications, in
4  monitoring and interpreting and advising physicians on
5  lab results, through sometimes others in the
6  organization or others outside, such as nurses or
7  people within the pharmacy that are following up with
8  patients and listening if there are particular
9  problems or issues that the patients are bringing up.
10          The pharmacy -- pharmacists do a lot of
11 quality control checking.  The drug themselves are
12 quite often compounded in a sterile clean room.  And
13 the -- the -- actually, the -- the -- the billing that
14 is the reimbursement process for home infusion therapy
15 is -- is very complicated and difficult.  And in order
16 to provide the home infusion therapy service to a
17 patient, it requires quite a few people on it.
18          And it also requires administration,
19 supplies, tubing, that sort of thing, needles and
20 equipment such as infusion pumps.  And those are not
21 free in terms of -- you know, obviously there's a high
22 cost.  If you were to tour a home infusion pharmacy
23 facility, it will depend clearly on the size of the
24 patients, you know, their census, if you will.  But if
25 you were to tour, you walk, you are going to see a ton

Page 19

1  of people there and it's going to be a very different
2  experience from looking -- from walking into any
3  retail community pharmacy.
4          And so in order to provide the service,
5  there has to be reimbursement for them that is
6  adequate for them to provide the service and stay in
7  business.  And part of that service is -- part of --
8  part of providing that is a margin that would be
9  achieved, i.e., a profit, gross profit, if you will,
10 the difference between what they may have paid for a
11 drug as compared to what they were reimbursed for the
12 drug.
13          And it is -- there are -- there are
14 other ways, you know, other billing aspects of home
15 infusion therapy, also, in addition to billing for the
16 drug, but they all add up to provide a necessary
17 return for them to provide the service.  So that's
18 what I meant.
19    Q.  Okay.  And why did Mr. Sellers -- strike
20 that.
21          What did you mean when you said that
22 Mr. Sellers asked for an organization or entity that
23 would be helpful?
24    A.  You know, I can't tell you word for word our
25 conversation because I don't have that type of memory,

Page 20

1  but generally I can tell you my recollections, which
2  were that he was wanting to see if it's possible to
3  get, either from the association or a provider, you
4  know, or whatever individuals that might be willing to
5  make some sort of statement to attest to the type of
6  information that I just said, which is that the margin
7  that would be made for -- by the provider from a drug
8  was one of the necessary aspects of being able to stay
9  in business.
10    Q.  Did he -- strike that.
11          When you say "margin," how is the margin
12 achieved?
13    A.  Well, I guess I would define the margin in
14 this case as gross margin being the difference between
15 what the drug when it's billed is reimbursed for as
16 compared to what it cost the provider.
17    Q.  And are you aware of drugs being billed at
18 AWP rates?
19    A.  The predominant methodology -- well, the
20 predominant methodology in -- in this -- in this
21 business of the aspect of the billing for billing of
22 the drugs has been based on an average wholesale price
23 figure.
24    Q.  And when you say "average wholesale price"
25 and I say "AWP," are we talking about --

Page 21

1    A.  Yes, we are.
2    Q.  -- the same thing?
3    A.  Yes.
4    Q.  Okay.  One other thing I don't think I said
5  is -- is when I -- I'm going to try when you're giving
6  an answer not to talk over you.
7    A.  Okay.
8    Q.  If you could do the same for me just because
9  it's very difficult for our court reporter to take
10 down two people talking at the same time.  Okay?
11    A.  I will try.
12    Q.  Okay.
13          MR. STETLER:  You anticipated her
14 question, you got it right, but it may not always be
15 the case.  So let her -- just let her finish, that's
16 all.  You may sneak a nod in there at the end.
17    Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  So you
18 understood that the predominant methodology for
19 reimbursement is based upon average wholesale price or
20 AWP.
21    A.  Well, I understand that extremely well now.
22    Q.  Okay.  What do you mean by that?
23    A.  Well, one of the things I want you to
24 understand is that in my experience at Abbott Home
25 Infusion, I started with that business unit in

Page 22

1  January of 1993 and spent approximately five years as
2  being a reimbursement supervisor and I was learning
3  the business.  And this is a -- this is not an easy
4  business to learn.  And after approximately 1998 I was
5  doing other things that were not directly related to
6  the reimbursement.
7       But in any event, when I left Abbott and
8  began consulting and ultimately took a position for
9  the National Home Infusion Association, you know, I
10 learn every day.  And, you know, my knowledge in
11 general about these aspects of reimbursement and other
12 aspects of the home infusion therapy business on the
13 provider side, at least, is far more than what I knew
14 in those five years as reimbursement supervisor at
15 Abbott.
16      So, I'm sorry, what was your question?
17 Q.  No.  Well --
18 A.  I related to it.
19 Q.  -- now I have another question for you.
20 A.  Okay.
21 Q.  How is it that -- that your knowledge now,
22 based upon the position that you're in now regarding
23 reimbursement, has either grown or changed from what
24 it was when you were reimbursement supervisor at
25 Abbott?

Page 23

1       MS. FUMERTON:  Objection, form.
2  Q.  (BY MS. ST. PETER-GRIFFITH)  Oh, I also --
3       MR. STETLER:  Ignore that.
4  Q.  (BY MS. ST. PETER-GRIFFITH)  Forgot to tell
5  you that she --
6       MR. STETLER:  She'll object.
7  Q.  (BY MS. ST. PETER-GRIFFITH)  That every once
8  in a while Ms. Fumerton might have an objection.
9  Unless Mr. Stetler instructs you not to answer, if you
10 could respond to my question that I asked.
11 A.  So what did we just say?  I am or am not --
12      MR. STETLER:  She'll object and unless I
13 say something, which would be rare, indeed, you just
14 kind of ignore it and answer the question.
15      MS. FUMERTON:  My objection --
16      MR. STETLER:  It's a legal thing.
17      MS. FUMERTON:  My objection is to her
18 questions, not to anything that you're saying.  So it
19 doesn't really actually involve you, but I just wanted
20 to explain that.
21 A.  Please ask the question again.
22      MS. ST. PETER-GRIFFITH:  Sure.  Can you
23 read it back, Cindy?
24      (Requested portion was read)
25 A.  I think I would like to answer that in two

Page 24

1  aspects.
2       One is that specifically with relating
3  to drug pricing in the industry and the importance of
4  that and, perhaps, the evolving mystery of it and an
5  understanding of just what AWP is at this point is far
6  more than I understood in those five years that I was
7  responsible for a portion of the reimbursement in
8  Abbott.
9       The second is I have, I think, a
10 better -- a much better appreciation of the importance
11 of all of the aspects of how providers bill, i.e., the
12 importance of, you know, how they do claims, what they
13 bill for and how that all adds up necessary for them
14 to have -- have appropriate margins so that they can
15 stay in business.
16      You know, can I give you specifics?
17 Maybe if you ask some real questions that are
18 specific, I might be able to answer something.  But in
19 general --
20 Q.  Okay.
21 A.  -- I just know a lot more now than I did
22 then.
23 Q.  Okay.  What is your understanding of what AWP
24 is?
25 A.  Now?

Page 25

1  Q.  Yes.
2  A.  It is a benchmark that is published by now
3  three drug compendiums that is identified with drugs
4  by NDC numbers, drug by drug by drug.  That it is
5  something that is -- been a mystery as to how those
6  compendiums actually develop AWP, that there's been
7  media controversy about it and lawsuits about it, but
8  it still is the predominant method throughout most
9  payers for home infusion providers through which the
10 billings that they submit on claims for drugs are paid
11 with and these days there's typically a steep discount
12 for most payers off of that published AWP price.
13 Q.  Do you know why there's a steep discount or
14 do you have an understanding as to why?
15 A.  I guess what I can tell you is it's my
16 general impression and -- and that's all that I can
17 give you, that there is reimbursement for home
18 infusion in general and that includes the drug
19 billings specifically has been ratcheted back by
20 various payers over the last 15 years and that
21 includes AWP.
22 Q.  Okay.  What was your understanding of AWP
23 prior to your having this understanding?
24      MS. FUMERTON:  Objection, form.
25 Q.  (BY MS. ST. PETER-GRIFFITH)  I mean --

Page 26

1  strike.  Actually, let me ask this:  Your
2  understanding of AWP that you just described, when did
3  you come to have that understanding of what AWP was?
4      A.  Oh, that would be difficult to say, I guess.
5  I -- somewhere in the period of which -- and I think
6  it's the period that I was probably still a
7  reimbursement manager, but it could have been later.
8  I was reimbursement supervisor, but it could have been
9  later.  I came to an understanding that AWP was not
10 what I had thought it was, was what Bruce Rodman
11 thought it was from the name.
12     Q.  Okay.  And what did you think AWP was?
13     A.  I thought --
14         MS. FUMERTON:  Objection, form.
15     A.  -- from the name, not because anybody told
16 me, I just thought from the name that it was an
17 average based on statistical sampling or reporting or
18 something like that, but an average of what a
19 provider, in fact, would be paying to acquire a drug
20 from their source.  Specifically from their
21 wholesaler.
22     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  And
23 what -- when did you have that understanding?
24     A.  Well, certainly I would say through much of
25 those five years or so that I was the reimbursement

Page 27

1  supervisor.
2      Q.  When you were the reimbursement supervisor
3  within the -- and we'll get into your employment
4  history for a second, but --
5      A.  Uh-huh.
6      Q.  -- when you were a reimbursement supervisor,
7  did you receive any training as to what AWP was or
8  what Abbott's understanding of AWP was?
9      A.  Not that I can recall.
10     Q.  Okay.  I would like to circle back and round
11 out my questions concerning Mister -- your
12 conversation with Mr. Sellers.  Do you remember
13 anything else concerning your conversation with
14 Mr. Sellers?
15     A.  Not at that conversation.  I did do some
16 follow up.
17     Q.  Okay.  And what did you do for follow up?
18     A.  Well, you know, I do remember one more
19 thing --
20     Q.  Sure.
21     A.  -- actually, which was that, you know, I was
22 briefly thinking, well -- our -- our association's
23 executive director actually had just been in the
24 process of resigning and a new one was starting and,
25 you know, my first thought was, well, possibly if

Page 28

1  someone from the association was going to say
2  something, it was the executive director, but that
3  wouldn't be appropriate because the new executive
4  director was just starting to learn the business.  So
5  I -- at least in my own mind I briefly thought, well,
6  maybe I could say something.
7          And I don't recall whether Mike Sellers
8  brought it up first or whether I said something, but
9  in any event, he said, "Well, that probably wouldn't
10 be appropriate" given that I had worked with Abbott
11 and I agreed with that, so I concurred.
12         So I did provide the names of two
13 individuals to Mike Sellers that he might follow up in
14 contact with.
15     Q.  Okay.  And do you know whether he did?
16     A.  Yes.  I talked to one of them and I know that
17 he did with one of them.  And I do not know about the
18 other.
19     Q.  Okay.  What was your conversation with the
20 individual that you spoke with that Mr. Sellers
21 contacted?
22     A.  That -- well, then I get the phone call from
23 Ms. Citera and that occurred after.  So I did have a
24 conversation with this one individual at one point and
25 just said, you know, just -- just be careful that --

Page 29

1  don't run into more grief then you really want to.  In
2  effect, that's what I said.  I don't recall the exact
3  words.
4      Q.  Who were you speaking to?
5      A.  His name is Larry Robinson.
6      Q.  Okay.  And what is -- who is Mr. Robinson
7  affiliated with?
8      A.  Well, he was affiliated at the time with the
9  home infusion business and I think some other home
10 businesses, also, for the Methodist Hospital in
11 Memphis, Tennessee.  Their business name is Methodist
12 Alliance.
13     Q.  And why did you make that comment to him?
14     A.  Because I just try to operate prudently as
15 general practice and I got this request to do the
16 deposition, which I -- was a surprise to me, frankly,
17 and that it would take up some time.  And I just
18 said -- you know, I just wanted to be -- you know,
19 Larry -- I consider Larry a friend.  I just wanted to
20 let him know that he -- he'd want to just be careful
21 in that sense because it may take him some time that
22 he doesn't want to be involved with.  It was that
23 simple.
24         You know, and, frankly, if -- if the
25 situation had been reversed and I had the phone call

8 (Pages 26 to 29)