# EXHIBIT 12

Landsidle, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007
# London, England, UK

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -)

In re: PHARMACEUTICAL      ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE ) Civil Action No.

PRICE LITIGATION           ) 01-12257-PBS

_____)

THIS DOCUMENT RELATES TO:  ) Judge Patti. B

United States of America,  ) Saris

ex re. Ven-a-Care of the   )

Florida Keys, Inc.,        ) Magistrate Judge

CIVIL ACTION NO.           ) Marianne B.

06-11337-PBS               ) Bowler

- - - - - - - - - - - - - -)

   HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

          Oral videotaped deposition of MR DAVID

LANDSIDLE held at the offices of Jones Day, 21

Tudor Street, London EC4Y, England, United Kingdom

at 8.59 a.m. on Monday, October 15, 2007 before

Miss Leah Willersdorf, Associate of the British

Institute of Verbatim Reporters

                    (CAPTION CONTINUED)

Landside, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007

# London, England, UK

Page 78

1    A.  No, I have no reason to know that I did
2  not get it.
3    Q.  I would like to walk you through this
4  letter again, sir. The first paragraph starts,
5  from Miss Hanrahan:
6        "Pursuant to our conversation, I have
7  been in contact with the Washington
8  representatives of Bristol-Myers Squibb, Amgen,
9  Zeneca and the American Society for Clinical
10  Oncology (ASCO)..."
11        Sir, are you familiar with Ms Hanrahan
12  being in contact with these companies?
13        MS TABACCHI: Object to the form.
14        THE WITNESS: No, other than what the
15  memo says.
16  BY MR LORUSSO:
17    Q.  Are you familiar, sir, of anybody in
18  your Abbott Washington office being in contact
19  with these specific companies around the time of
20  June of 1994?
21        MS TABACCHI: Object to the form.
22        THE WITNESS: No, I am not aware of

Page 79

1  that.
2  BY MR LORUSSO:
3    Q.  As you read this, sir, do you have any
4  reason to believe that Ms Hanrahan was not in
5  fact in contact with the companies I have listed
6  (BMS, Amgen, Zeneca and ASCO) around June of
7  1994?
8        MS TABACCHI: Object to the form. Lack
9  of foundation.
10        THE WITNESS: No because -- I have to
11  assume that if that is what the memo said, then
12  that is what Ms Hanrahan did.
13  BY MR LORUSSO:
14    Q.  Would that be something that she would
15  be directed by you to do, sir?
16        MS TABACCHI: Object to the form.
17        THE WITNESS: No, not necessarily
18  because Dolly didn't report directly to me.
19  Well, let's see, June 8, 1994. I can't -- I don't
20  know if this was something that I would have
21  directed her to do, if that was your question.
22  Was the question -- I'm sorry, was the question,

Page 80

1  did I direct her to have the meeting? I'm sorry.
2  BY MR LORUSSO:
3    Q.  Well, yes, sir.
4    A.  Okay. I do not know if I directed her
5  to have the meeting or participate in the
6  meeting. I do not know that.
7    Q.  You said earlier, sir, that Ms Hanrahan
8  would, from time to time, and in fact often in
9  the Abbott Washington office, certain
10  representatives would meet with other drug
11  companies. Would such a meeting be set up by
12  yourself?
13        MS TABACCHI: Object to the form.
14        THE WITNESS: No, not necessarily. It
15  could have been set up by Amgen or Zeneca or
16  Bristol-Myers or ASCO. So apparently it could
17  have been set up by any of these parties.
18  BY MR LORUSSO:
19    Q.  I am sorry, sir. I am certain that I am
20  the one who misspoke. What I want to know, sir,
21  is if such a meeting took place between Ms
22  Hanrahan or anybody from Abbott Washington, would

Page 81

1  you be a person, sir, that would direct Ms
2  Hanrahan to attend such a meeting? Would you be
3  aware of such a meeting?
4        MS TABACCHI: Object to the form.
5        THE WITNESS: Possibly before or
6  possibly after. I cannot guarantee that, though.
7  I mean, if it was something that she was working
8  on, she wouldn't necessarily be telling me every
9  day, "Today I'm going to do this and tomorrow I'm
10  going to do that." So I do not know if I would
11  have been aware of this meeting before it
12  occurred or not.
13  BY MR LORUSSO:
14    Q.  Sir, looking at these companies that
15  are listed (Bristol-Myers Squibb, Amgen and
16  Zeneca), sir, do you agree that these companies'
17  drugs were implicated on the survey referred to
18  by Mr Booth in the memo we just looked at?
19        MS TABACCHI: Object to form. Lack of
20  foundation.
21        THE WITNESS: I do not know.
22  BY MR LORUSSO:

21 (Pages 78 to 81)

Landside, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007

## London, England, UK

Page 226

1  on a particular reimbursement issue, would say
2  they, "Okay, we want this" and then you just go
3  and implement that, you know -- or take that
4  position on the company's behalf?
5      A.  Well, they wouldn't really say -- they
6  wouldn't really make the decision. I mean, they
7  are going to convey to us an opinion of their
8  divisions as to what would be the preference.
9      Q.  Right.
10     A.  Again, the Working Group had no power,
11  had no authority. It was just a kind of an
12  information umbrella group for us to sound ideas
13  off.
14     Q.  Okay. And so I guess the next question
15  is who makes the decision?
16     A.  Someone -- some other people that I am
17  not really familiar with, within the divisions or
18  the corporation.
19     Q.  So it could be above your level
20  basically, a divisional -----
21     A.  Someone else would say that the best
22  thing for us is X and not Y, and that would be

Page 227

1  arrived at by a process that I was not a part of.
2      Q.  If the company, at a higher level,
3  makes a decision to take a position on a Medicare
4  reimbursement policy issue, would that decision
5  be filtered down through Mr Barmak?
6      A.  It might be. It might be through Mr
7  Barmak. I cannot swear to that though.
8      Q.  Our -----
9      A.  In our -----
10     Q.  Go ahead, sorry. Please.  I didn't mean
11  to interrupt you.
12     A.  And our job was to supply a political
13  analysis. Again going back to Mr Thomas's
14  situation, Mr Thomas had no interest in changing
15  to acquisition cost, therefore that issue was off
16  the table. The issue that was on the table was
17  AWP.
18     Q.  And so the decision might have filtered
19  through Mr Barmak but you are not 100% sure?
20     A.  I am not, no.
21     Q.  Would it ever have filtered down
22  through Mr de Lasa, "it" being the decision to

Page 228

1  take a particular decision on Medicare -----
2      A.  I don't know. I don't know.
3      Q.  Okay. Let's continue on with this
4  memorandum.  Let's go to the third paragraph. You
5  say you:
6          "...would like to retain Nancy Taylor
7  with the lobby firm of Greenberg Traurig [T-R-A-
8  U-R-I-G]."
9          You discuss Ms Taylor's background as a
10  former policy advisor to Senator Hatch and you
11  estimate the cost to $10,000 to $20,000. Why is
12  it that you wanted to hire Ms Taylor in
13  particular to work on the Medicare drug
14  reimbursement issue in 1997?
15     A.  She had come off Capitol Hill. She had
16  worked for Senator Hatch who was very
17  knowledgeable in the health care field and the
18  Senate side, and knew a lot of the House, members
19  of the House staff. So she was a good, well-
20  corrected person.
21     Q.  Why did you believe that Abbott needed
22  the access to various senators and staffers with

Page 229

1  respect to this Medicare drug reimbursement issue
2  in 1997?
3          MS TABACCHI: Object to the form.
4          THE WITNESS: As I said earlier, largely
5  because we had such a small office, the sense was
6  we probably needed another soldier on Capitol
7  Hill.
8  BY MR GOBENA:
9      Q.  Did you have serious concerns, in or
10  around June of 1997, that Congress ultimately
11  might adopt a Bill on Medicare drug reimbursement
12  that would have given discretion to the Secretary
13  to set reimbursements at below 95% of AWP.
14         MS TABACCHI: Object to the form.
15         THE WITNESS: Because the House had
16  already included language, you have to assume
17  that that was in play. It was a distinct
18  possibility.
19  BY MR GOBENA:
20     Q.  So it was imperative, then, to hire Ms
21  Taylor in order to put as many resources as
22  possible into blocking that language from being

58 (Pages 226 to 229)

London, England, UK

Page 230

1  implemented; correct?
2       MS TABACCHI: Object to the form.
3       THE WITNESS: It was imperative to hire
4  her to try and get a solution that did not allow
5  discretion to the Secretary.
6  BY MR GOBENA:
7       Q.  If you go to the fourth paragraph now.
8       A.  Yes.
9       Q.  You say in the second sentence:
10      "While other groups, including the
11  oncologists and urologists, are also working on
12  the issue, I believe Abbott could use some
13  additional help."
14      Was Abbott coordinating with the
15  oncologists in terms of working on the Medicare
16  drug reimbursement issues that were taking place
17  in 1997?
18      MS TABACCHI: Object to the form.
19      THE WITNESS: Not coordinating, no.
20  BY MR GOBENA:
21      Q.  But Abbott was aware of the positions
22  that the oncologists were taking with respect to

Page 231

1  the various proposals on the Hill on drug
2  reimbursement by Medicare in 1997; correct?
3       MS TABACCHI: Object to the form.
4       THE WITNESS: One of your earlier
5  documents was a position paper, I think, from the
6  oncologists.  So the answer would be yes because
7  there was paper floating around Washington DC on
8  positions by different associations.
9  BY MR GOBENA:
10      Q.  And while I think your testimony
11  earlier was that you don't recall any specific
12  communications you had with any oncologists
13  groups; correct?
14      A.  That is correct.
15      Q.  But it is possible that Ms Sensibaugh,
16  for example, might have been having
17  communications with oncologists groups regarding
18  these Medicare drug reimbursement issues in 1997;
19  correct?
20      MS TABACCHI: Object to the form.
21      THE WITNESS: Possibly. Possibly.
22  BY MR GOBENA:

Page 232

1       Q.  And what about the urologists; do you
2  recall any communications with any groups
3  representing urologists regarding Medicare drug
4  reimbursement issues in 1997?
5       A.  I don't because as I said earlier on
6  the oncologists, I can't remember -- I can't
7  remember the name of a person who worked for
8  either of those associations.
9       Q.  But is it fair to say, in reading the
10  second sentence, that you believe that the work
11  of the oncologists and urologists on the Medicare
12  drug reimbursement issue, in combination with the
13  Washington office's work, was not sufficient to
14  address Abbott's desire to have the legislation
15  to read "95% of AWP"; isn't that correct?
16      MS TABACCHI: Object to the form.
17      THE WITNESS: The last part of your
18  sentence was?
19  BY MR GOBENA:
20      Q.  You wanted -- Abbott wanted the law to
21  read that Medicare drug reimbursement would be at
22  95% of AWP; correct?

Page 233

1       A.  No.
2       MS TABACCHI: Object to the form.
3       THE WITNESS: Rather than the
4  discretionary power?
5  BY MR GOBENA:
6       Q.  Exactly.
7       A.  Yes.
8       Q.  Okay.  And you felt that although the
9  fact that the oncologists and urologists were
10  working on that issue, you needed additional help
11  to make sure that the legislation read "95% of
12  AWP with no discretion to the Secretary";
13  correct?
14      MS TABACCHI: Object to the form.
15      THE WITNESS: We can never make sure of
16  anything unfortunately, but the idea was that Ms
17  Taylor would be helpful in trying to lead the
18  decision-making process to a "95% of" rather than
19  discretionary powers.
20  BY MR GOBENA:
21      Q.  At the bottom of the document, the last
22  paragraph, you talk about -- this is part of your

59 (Pages 230 to 233)

ed7527cb-cb30-4a6a-b378-6c7a3f0e3ace

Landside, David HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER October 15, 2007

## London, England, UK

Page 234

1  request, I guess, for a budget from Ms Taylor.
2  You mention various people in the last sentence
3  who approved on her hiring.
4      A.  Yes.
5      Q.  Can you tell me who Kris Kringel is? K-
6  R-I-N-G-E-L for the court reporter. Thank you, go
7  ahead.
8      A.  Okay, I'm sorry. He was an executive at
9  Abbott. I cannot recall if he was the -- I can't
10 recall his title. He may have been the President
11 of the Hospital Products Division.
12     Q.  How about Mr Paul Clark?
13     A.  Mr Clark was the Head of, the President
14 of the Pharmaceutical Division.
15     Q.  That goes by the acronym of PPD;
16 correct?
17     A.  PPD. That is PPD, yes.
18     Q.  And also you have -- and I am going to
19 spell this for the court reporter -- Yasu
20 Hasegawa. (Y-A-S-U H-A-S-E-G-A-W-A). Who is Mr
21 Hasegawa?
22     A.  He worked for TAP.

Page 235

1      Q.  So you think Mr Kringel might have
2  worked at HPD; is that correct?
3      A.  I believe he was the Head of HPD.
4      Q.  So insofar as getting the approval
5  authority to hire Ms Taylor, you had sought the
6  approval from the Head of HPD; correct?
7      A.  If that was Mr Kringel's position, the
8  answer is yes.
9      Q.  Okay. And the Head of PPD; correct?
10     A.  Which was Mr Clark, yes.
11     Q.  And also the Head of TAP; correct?
12     A.  Yes.
13     Q.  I think you testified earlier that from
14 time to time you would do some lobbying work on
15 TAP's behalf; correct?
16     MS TABACCHI: Object to the form.
17     THE WITNESS: On -- yes, on certain
18 issues we would.
19 BY MR GOBENA:
20     Q.  So the issue of getting the statute to
21 set Medicare drug reimbursement at "95% of AWP
22 with no discretion to the Secretary" is an issue

Page 236

1  that was important to those three either
2  divisions or companies; correct?
3      MS TABACCHI: Object to the form.
4      THE WITNESS: Yes.
5      MR GOBENA: Right.  I will have this
6  marked as Exhibit Landsidle 022 by the court
7  reporter. I have one copy.
8      (Exhibit Landsidle 022 marked for
9  identification)
10     (Pause)
11     Q.  While you are reviewing the document,
12 Mr Landsidle -- and frankly I am go only going to
13 ask you about the first, and maybe the second
14 page, and possibly the third but that is less
15 likely. As you are reading it, I am just going to
16 read the details into the record.
17     A.  Okay.
18     Q.  It is a faxed document from Merck's (M-
19 E-R-C-K) Government Relations Department from a
20 Nancy Carlton to you, dated June 19, 1997,
21 approximately two weeks after the last memo we
22 looked at.

Page 237

1      In the "Re:" line it reads:
2      "Payments for Outpatient Prescription
3  Drugs under Medicare."
4      Once you have had a chance to peruse
5  the first three pages, let me know and we will
6  get started.
7      (Pause)
8      Q.  Okay?
9      A.  Yes.
10     Q.  My first question is sort of a general
11 background one and maybe you will be able to
12 answer this by looking and seeing Ms Carlton's
13 name. The "Merck" at the top there, do you know
14 whether that is the German Merck or the US
15 company Merck?
16     A.  That is the US company Merck.
17     Q.  Okay. And the fax is, again, dated June
18 19, 1997 and it is from Nancy Carlton. Do you
19 know who Ms Carlton was?
20     A.  Yes, I do.
21     Q.  And who was she?
22     A.  She was a lobbyist in Merck's

60 (Pages 234 to 237)

ed7527cb-cb30-4a6a-b378-6c7a3f0e3ace

JUN 09 '94 09:25AM ABBOTT CHED HUMAN RESOURCES          ABBOTT LABORATORY     P.2
                                                                   JUN 09 '94 09:18AM

# ＡBBOTT

**INTEROFFICE CORRESPONDENCE**

FROM: WASHINGTON OFFICE     Dolly A. Hanrahan

DEPT. NO.:          BLDG.:          EXT.

TO:     Alan MacKenzie          DATE: June 8, 1994

RE:   Medicare Proposal

Pursuant to our conversation, I have been in contact with the Washington representatives of Bristol-Myers Squibb, Amgen, Zeneca and the American Society for Clinical Oncology (ASCO) regarding the memorandum from Charles R. Booth, Director, Office of Payment Policy at HCFA, to the Medicare carriers regarding changes in payment for certain drugs.

Everyone shares our concerns over the survey HCFA is conducting on the acquisition price versus the average wholesale price on certain drugs. ASCO issued a memorandum to its members advising them that compliance with the survey is voluntary and that physicians are under no legal obligation to complete the survey issued by the carriers. HCFA is not pleased with ASCO's guidance to its physicians. ASCO is working directly with the Office of Management and Budget (OMB) to essentially kill the survey based on the grounds that HCFA has not followed administrative procedures. OMB may stop the survey but this would only serve to buy more time; HCFA would simply resubmit the survey following appropriate procedures. We can guess this would take two or three months.

The physician who chairs ASCO's Clinical Practice Subcommittee strongly recommends that the drug manufacturers stay out of the negotiations. Legal counsel for Bristol-Myers concurs saying that it would only agitate the situation further, particularly since HCFA is focused on high volume drugs. ASCO has asked us to discuss other ways in which physicians might be helpful and to advise them of our ideas.

The Washington representatives are prepared to meet if we all determine the best course of action is to do so. Please think about what our next steps should be and let me know how to proceed. I agree with ASCO that we need to be careful and maintain a certain distance from the issues.

Thank you and I look forward to talking with you soon.

cc:  G. Coughlan    CFO - Abbott
     D. Landsidle

TAP GB 08146

LANDSIDLE #14
Oct 15, 2007
Deposition Exhibit

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Health Care
Financing Administration

Refer to: FQA-541

**Memorandum**

Date **MAR 1 5 1994**

From  **Director**
      **Office of Payment Policy, BPD**

Subject  **Determination of Acquisition Cost of Drugs--INFORMATION**

To  **All Associate Regional Administrators**
    **for Medicare**

Medicare regulations (42 CFR 405.517) provide for payment for
drugs based on the lower of the estimated acquisition cost or
the national average wholesale price (AWP) of the drug.  The
purpose of this memorandum is to provide instructions on the
determination of the acquisition cost of drugs and to provide
additional information on other aspects of drug pricing.

We are requesting each carrier to ascertain the acquisition
costs for certain high volume drugs for which expenditures
exceed $10 million in 1992, including low osmolar contrast
materials used in radiology procedures, colony stimulating
factors, and EPO (for non-ESRD uses).  (See attached listing.)
These drugs account for the majority of the total expenditures
for drugs.  Carriers may, of course, extend their determina-
tion of acquisition costs to any other drugs they deem
appropriate.  Also, carriers who have made cost determinations
for drugs need not alter their methodology for etermining
costs.

<u>Acquisition costs is the cost of that drug to the physician.</u>
The invoice from the supplier is the best source of
information about how much the drug costs.  Sometimes the
invoice shows discounts on the purchase of the drugs.
However, sometimes discounts are received at the end of a
period of time or after a specified number of purchases rather
than for each purchase and this is not shown on each invoice.

To help carriers determine acquisition costs for high volume
drugs, we suggest that they <u>request copies of the most current
invoice from a sample of 5 - 10 physicians who bill for the
drugs in question.</u>  The sample can be for the entire carrier
area, i.e., separate samples are not needed for each locality.
Physicians should be asked whether there are any discounts not
reflected on the invoices.  <u>The median price (net of any
discounts) paid by the sampled physicians should be considered
the estimated acquisition cost.</u>

TAP GB 08147

2

Carriers should complete these calculations within 60 days of their receiving these instructions. When the carrier has accumulated this information and has determined the estimated acquisition cost, it can start paying claims under the lower of the AWP or estimated acquisition cost policy after first providing physicians with 30 days notice. Carriers should send their payment amounts for the drugs (indicate whether AWP or cost) to their regional offices. You should forward this information to us.

Please remind carriers that in the interim, while they are determining the estimated acquisition cost of the drug, in no case should drugs be paid at an amount greater than AWP. This policy was announced in an All ARA memorandum dated January 14, 1992 (Q and A 18). This survey should be repeated at least annually, or more frequently if there are indications that prices have changed substantially.

Additional Issues:

Determination of AWP - To determine the AWP, calculate the median price of the generic form of the most frequently administered dosage of the drug as reflected in sources such as the Red Book, Blue Book, or Medispan. In calculating the median price, use the price of the smallest unit of packaging offered by the manufacturer that includes the most frequently administered dosage of the drug. Also, brand name products are not included in the array of prices used to determine the cost of multiple source drugs. Only prices for the generic form of the drug are to be used in the calculation of the median price.

Multiple source situations - When calculating the median price for all sources of the generic form, use the payment per dose amount of all sources to determine the median price. If there is a difference in strengths, array that difference separately.

Single source situations - Use the payment per dose amount of the drug. If there is a difference in strengths array that difference separately.

Payment per dose for single dose vials - If a physician uses less than the amount of drug in a single use vial, pay for the cost or AWP of the vial, not the amount actually used. The difference between what is paid for and what is used is the waste. By paying for the cost or AWP of the vial, we are paying for waste directly.

TAP GB 08148

3

<u>Payment per dose for multiple use vials</u> - The carrier should estimate the "usual" or "average" number of doses that can be extracted routinely from a multiple use vial and divide this number into the cost or AWP of the vial to arrive at the payment per dose.

<u>Additional Costs</u> - Section 405.509 of the regulations permits the carriers to consider additional costs when determining the estimated acquisition costs of a drug. <u>We have been told that for some drugs, notably chemotherapy drugs, physicians may incur additional costs related to the drugs</u>. These costs have been described as <u>overhead costs and include storage, waste, spoilage, breakage, and handling</u>. Some physicians do not incur costs for handling drugs in their offices because they use a drug dispensing service. In addition to the estimated acquisition costs, consider allowing an additional fee for the overhead of handling or dispensing drugs. <u>However, in no case can the payment for the drug plus a dispensing fee exceed the AWP for the drug</u>.

Charles R. Booth

Attachment

cc:
Stewart Streimer, BPO
Field Operations
Office of Issuances

PQA-541:Stan Weintraub/x64498
DATE:February 3, 1994/FINAL:Joan 2/9;2/15;3/15/94
DISC:J11/DOC:PricDrug.sw/FILE CODE:D
Additional Information:Inc BPO's comments;
   ARAs via PROFS only

TAP GB 08149

Attachment

| | |
|---|---|
| J0640 | Injection, leucovorin calcium, per 50 mg vial (Wellcovorin) |
| J7190 | Factor VIII (anti-hemophilic factor (human)) per IU, (Hemofil M, Koate-HP, Monoclate-P) |
| J9010 | Doxorubicin HCL, 50 mg vial, (Adriamycin PFS, Adriamycin RDF, Rubex) |
| J9045 | Carboplatin, 50 mg (Paraplatin) |
| J9182 | Etoposide, 100 mg (VePesid) |
| J9202 | Goserelin acetate implant, per 3.6 mg (Zoladex) |
| J9217 | Leuprolide acetate (for depot suspension), 7.5 mg (Lupron) |

Colony Stimulating Factors

| | |
|---|---|
| J1440 | Injection, filgrastim (G-CSF), 300 (Neupogen) |
| J1440 | Injection, filgrastim (G-CSF), 480 (Neupogen) |
| J2820 | Injection, sargramostim (GM-CSF), 250 mcg (Leukine, Prokine) |

EPO

| | |
|---|---|
| Q9930 | Erythropoietin per 1000 units, at patient Hct of 30 |

Low Osmolax and Paramagnetic Contrast Materials

| | |
|---|---|
| A4644 | Supply of low osmolar contrast material (100 - 199 mg of iodine) |
| A4645 | Supply of low osmolar contrast material (200 - 299 mg of iodine) |
| A4646 | Supply of low osmolar contrast material (300 - 399 mg of iodine) |
| A4647 | Supply of paramagnetic contrast material (e.g., gadolinium) |

TAP GB 08150

# ⊃ ABBOTT

**From:** David W. Landsidle
Divisional Vice President
Washington

**INTEROFFICE CORRESPONDENCE**

**Dept:** Washington Office

**TO:** Duane L. Burnham

**DATE:** June 9, 1997

**RE:** Outside Help on Reimbursement of Medicare Drugs

--------------VIA FAX--------------

We would like to retain an outside lobbyist to assist us on the Medicare reimbursement issue. The issue has major impact on Lupron, Calcijex, and Abbokinase.

There is language in the House Ways and Means and House Commerce Committees' Medicare bills that changes the way Medicare reimburses drugs. Rather than reimbursing according to the average wholesale price (AWP) as it is now, the bill would provide reimbursement "at no more than 95% of AWP, as specified by the Secretary (of HHS)". This language is troubling because it could be, and is likely to be, read as a maximum and would allow the Secretary to establish other criteria as long as it is no more than 95% of the AWP (e.g., actual acquisition cost). We are working to change this language to provide that reimbursement would be only at 95% of AWP with no discretion left to the Secretary. This should address as well the issue raised in our South Carolina lawsuit (i.e., the authority of HCFA and its carriers to be creative on reimbursement).

I would like to retain Nancy Taylor with the lobby firm of Greenberg,Traurig. Nancy was Orrin Hatch's former health policy advisor and the firm is connected on Capitol Hill. The cost would be in the $10,000 to $20,000 range. If we do retain Nancy she will need to file a lobbying report identifying Abbott as her client and the project she worked on.

With reimbursement for Lupron, Calcijex and Abbokinase at issue, hiring Greenberg Traurig could be most useful. Reimbursement of Medicare drugs is the Washington offfice's top priority. While other groups including the oncologists and the urologists are also working the issue, I believe Abbott could use some additional help.

As you know, Congress is moving very fast on the Medicare bill. The House Committees are to report the week of June 9 and the Senate Finance Committee the week of June 16. If we are to do this, we need to move quickly. Kris Kringel, Paul Clark and Yasu Hasegawa have approved.

Please advise.

cc: Jose M. de Lasa
Paul N. Clark
John G. Kringel
Yasuchikau Hasegawa
Mark Barmak

**Highly Confidential**

EXHIBIT
LANDSIDLE #20
Oct 15, 2007

**ABT-DOJ 0300477**

**ABBOT**

INTEROFFICE CORRESPONDENCE

From:  David W. Landsidle
Divisional Vice President
Washington

Dept:  Washington Office

TO:   Mark Barmak
      Loreen Mershimer
      John Campbell
      Michael Heggie
      Rich Masterson
      Don Buell
      Chris Lockett

DATE: June 5, 1997

RE:   AWP

----------------VIA FAX----------------

The Health Subcommittee of the House Ways and Means Committee reported the Medicare bill last night on a 13-0 vote.  The bill passed without amendment.

When asked about the AWP language by Rep. Jon Christensen (R-NE), Subcommittee Chairman Bill Thomas (R-CA) said the provision is still open to revision and is not a closed issue.  Thomas said he supports the Administration's desire to lower the cost of Medicare drugs, but feels the switch to acquisition cost would be so difficult that it would negate the savings.  He feels staying with AWP but reducing it some percentage is a fair approach.

I spoke with Congressman Christensen during the mark up.  He is pleased we have come so far by dropping acquisition cost, but wants to go further.  We will see what can be done between now and full Ways and Means markup on Monday.  Issues under review include having the provision reading "AWP minus 5%" rather than "no more than 95% of AWP as specified by the Secretary" since "no more than" means that a reduction of more than 5% is permissible.  Congress should not permit HHS to determine reimbursement rates drug by drug.

Also, we have checked with the House Commerce Committee which also marks up its Medicare bill next week.  It, too, has dropped acquisitiion cost and gone with the same "no more than 95% of AWP" language.

Highly Confidential



EXHIBIT

LANDSIDLE #21
Oct 15 2007

ABT-DOJ 295985
ABT129-0007    FL

**⊃ ABBOTT**

**INTEROFFICE CORRESPONDENCE**

**From:** David W. Landsidle
Divisional Vice President
Washington

**Dept:** Washington Office

---

**TO:**   Jose M. de Lasa

**DATE:**   July 11, 1997

    cc: D. L. Burnham
       G. P. Coughlan
       M. E. Barmak
       C. M. Brock
       H. L. Goldberg
       B. J. Smith
       S. F. Weinstock

**RE:**   Monthly Highlights -- June, 1997
      Washington Office

**I.**   MEDICARE REFORM

   A. Met with Members of Congress and staff on House and Senate proposals which would change reimbursement for Medicare drugs to 95% of average wholesale price (AWP).

   B. Worked to include coverage for prostate testing and diabetes test strips and monitors. Diabetes will be covered, prostate testing stands a good chance.

   C. Continued discussions with Lab Budget Coalition regarding competitive bidding and reduction in reimbursement for lab services.

**II.**  HEALTH CARE

   A. Participated in lobbying effort to reduce excise tax on vaccines covered under the Vaccine Compensation Trust Fund. Tax lowered in both House and Senate budget bills.

   B. Participated in ADAP coalition meetings and visits with congressional staff to increase FY '98 funding for state AIDS drug assistance programs. Also, met with GAO staff to discuss its study of ADAP and our experience with state ADAP programs.

   C. Attended Healthcare Leadership Council Board meeting.

   D. Met with Rep. John Porter (R-IL) on getting additional money for a CDC education campaign on H. pylori treatment.

**III.**  TRADE

   A. Worked with the Emergency Committee for American Trade (ECAT) on Mr. Burnham's testimony before the Senate Finance Committee in favor of fast track negotiating authority.

   B. Participated in industry meetings on fast track.



EXHIBIT
LANDSIDLE #23
Oct 15, 2007

**Highly Confidential**

**ABT-DOJ 0300479**

IV. PATENTS

    A. Attended industry meeting on introducing a bill to revise the Hatch-Waxman patent law.

    B. Met with attorneys from Fox, Bennett on a proposal to get 5 new years of exclusivity in return for paying a royalty to the NIH.

V. TAXES

    A. Worked Capitol Hill in favor of extending the R&D tax credit and in opposition to changes in both the export source rule and deferral. The R&D credit will be extended and the source rule and deferral appear safe.

VI. FDA REFORM

    A. Attended and reported on Senate Labor Committee mark-up of FDA reform legislation. The bill cleared the Committee 14-4 and could be on the Senate floor in July.

VII. MEDISENSE

    A. Toured MediSense and received briefings by staff.

    B. Participated via conference call in the American Diabetes Association's Government Affairs Committee meeting.

VIII. ADD

    A. Met with Miles White to brief him on issues to be discussed at the HIMA Board meeting and attended Board meeting.

    B. Attended a House hearing and had discussions with congressional staff on blood safety issues.

IX. GOVERNMENT AFFAIRS

    A. Attended numerous fundraisers.

    B. Worked with Public Affairs on final details concerning rededication of the Womens Suffrage statue. Attended ceremonies held on June 26. Abbott helped finance its move from the basement of the Capitol to the Rotunda.

Highly Confidential

**ABBOTT**

**INTEROFFICE CORRESPONDENCE**

**From:** Cynthia Sensibaugh _CBS_
Director, Washington Affairs

**Dept:** Washington Office
202/659-8524

**TO:** Don Buell
Michael Heggie
Chris Lockett
Rich Masterson

**DATE:** February 10, 1997

**cc:** Mark Barmak
David Landsidle

**RE:** <u>President's Budget Proposal on Medicare Reimbursement of Outpatient Drugs</u>

********************_Via Fax_********************

    As you know, the President included a provision in his FY 1998 budget proposal that would base the Medicare reimbursement for outpatient drugs on acquisition cost rather than AWP.  An industry meeting to discuss strategy with regard to this issue has been tentatively scheduled for Thursday, February 20.  We would like to get your thoughts on this issue before the meeting.  I will call to set up a conference call on Friday or Monday.

Highly Confidential

ABT-DOJ 296012



EXHIBIT

Plaintiffs 1125

RmJ 2-12-07

PENGAD 800-631-6989



## ABBOTT LABORATORIES

1710  Rhode Island Avenue, N.W. #300
Washington, DC  20036

Phone: 202/659-8524
Fax:     202/486-8386

### FACSIMILE COVER SHEET

TO: Mark Bartrak · Loreen Mershimer   DATE: June 4, 1997
John Campbell / Michael Heggie
Rich Masterson  Don Buell
Chris Lockett

FR: David W. Landsidle              No. of Pages: 23
    Cynthia Sensibaugh  ✓
    Rosemary Haas       ___
    Sandie Preiss       ___
    Lee Harp            ___
    Lorna Huff          ___

### Additional Comments:

House Ways and Means Health Subcommittee provision on awp.
Scheduled to be marked up Wednesday at 4:00pm. Need your reaction
immediately.

Here is the Legislative language on the awp provision.

Highly Confidential

ABT-DOJ 296121



EXHIBIT
Plaintiffs 1133
Rms   7-12-07
PENGAD 800-631-6989

93

### Section 10616.  Reimbursement for Drugs and Biologicals

*Current Law.* Payment for drugs is based on the lower of the estimated acquisition cost or the national average wholesale price. Payment may also be made as part of a reasonable cost or prospective payment.

*Explanation of Provision.* The provision would specify that in any case where payment is not made on a cost or prospective payment basis, the payment could not exceed 95 percent of the average wholesale price, as specified by the Secretary.

### Section 10617.  Coverage of Oral Anti-Nausea Drugs Under Chemotherapeutic Regimen

*Current Law.* Medicare provides coverage for certain oral cancer drugs. The Administration has specified that Medicare will pay for self-administrable oral or rectal versions of self-administered anti-emetic drugs when they are needed for the administration and absorption of primary Medicare covered oral anticancer chemotherapeutic agents when a high likelihood of vomiting exists.

*Explanation of Provision.* The provision would provide coverage, under specified conditions, for an oral drug used as an acute anti-emetic used as part of an anticancer chemotherapeutic regimen. It would have to be administered by or under the supervision of a physician for use immediately before, during or after the administration of the chemotherapeutic agent and used as a full replacement for the anti-emetic therapy which would otherwise be administered intravenously.

The provision would establish a per dose payment limit equal to 90 percent of the average per dose payment basis for the equivalent intravenous anti-emetics administered during the year, as computed based on the payment basis applied in 1996. The Secretary would be required to make adjustments in the coverage of or payment for the anti-nausea drugs so that an increase in aggregate payments per capita does not result.

### Section 10618.  Rural Health Clinics (RHCs)

*Current Law.* Medicare establishes payment limits for RHC services provided by independent (RHCs). RHCs, among other requirements, must have appropriate procedures for utilization review of clinic services. The Secretary is required to waive the RHC requirement for certain staffing of health professionals if the clinic has been unable to hire a physician assistant, nurse practitioner, or certified nurse-midwife in the previous nine years. The Secretary is prohibited from granting a waiver to a facility if the request for the waiver is made less than 6 months after the date of the expiration of previous waiver of the facility. RHCs are required to be located in a health professionals shortage area. For RHCs that are in operation and subsequently fail to meet the requirement of being located in a health professions shortage area , the Secretary would be required to

*[handwritten: Ways and Means Health Subcommittee awp language 6/4/97]*

Highly Confidential

ABT-DOJ 296122

SENT BY:

93

### Section 10616.  Reimbursement for Drugs and Biologicals

*Current Law.* Payment for drugs is based on the lower of the estimated acquisition cost or the national average wholesale price. Payment may also be made as part of a reasonable cost or prospective payment.

*Explanation of Provision.*  The provision would specify that in any case where payment is not made on a cost or prospective payment basis, the payment could not exceed 95 percent of the average wholesale price, as specified by the Secretary.

### Section 10617.   Coverage of Oral Anti-Nausea Drugs Under Chemotherapeutic Regimen

*Current Law.* Medicare provides coverage for certain oral cancer drugs.  The Administration has specified that Medicare will pay for self-administrable oral or rectal versions of self-administered anti-emetic drugs when they are needed for the administration and absorption of primary Medicare covered oral anticancer chemotherapeutic agents when a high likelihood of vomiting exists.

*Explanation of Provision.* The provision would provide coverage, under specified conditions,  for an oral drug used as an acute anti-emetic used as part of an anticancer chemotherapeutic regimen. It would have to be administered by or under the supervision of a physician for use immediately before, during or after the administration of the chemotherapeutic agent and used as a full replacement for the anti-emetic therapy which would otherwise be administered intravenously.

The provision would establish a per dose payment limit equal to 90 percent of the average per dose payment basis for the equivalent intravenous anti-emetics administered during the year, as computed based on the payment basis applied in 1996.  The Secretary would be required to make adjustments in the coverage of or payment for the anti-nausea drugs so that an increase in aggregate payments per capita does not result.

### Section 10618.  Rural Health Clinics (RHCs)

*Current Law.*  Medicare establishes payment limits for RHC services provided by independent (RHCs).   RHCs, among other requirements, must have appropriate procedures for utilization review of clinic services.  The Secretary is required to waive the RHC requirement for certain staffing of health professionals if the clinic has been unable to hire a physician assistant, nurse practitioner, or certified nurse-midwife in the previous nine years.  The Secretary is prohibited from granting a waiver to a facility if the request for the waiver is made less than 6 months after the date of the expiration of previous waiver of the facility.  RHCs are required to be located in a health professionals shortage area.  For RHCs that are in operation and subsequently fail to meet the requirement of being located in a health professions shortage area , the Secretary would be required to

Highly Confidential

ABT-DOJ 296123

**ABBOTT**

**INTEROFFICE CORRESPONDENCE**

From: David W. Landsidle
Divisional Vice President
Washington

Dept:  Washington Office

TO:  Jose M. de Lasa

DATE:  June 5, 1997

cc: D. L. Burnham
G. P. Coughlan
M. E. Barmak
C. M. Brock
H. L. Goldberg
B. J. Smith
S. F. Weinstock

RE:  Monthly Highlights — May, 1997
Washington Office

I.  <u>TAXES</u>

A. Worked to have an extension of the R&D tax credit in the budget reconciliation act.

B. Worked to keep changes to the Export Source Rule out of the reconciliation act.

II.  <u>TRADE</u>

A. Started preparation for Mr. Burnham's testimony on fast-track trade negotiation authority before the Senate Finance Committee.

B. Worked with corporate public affairs staff on an Abbott <u>Issues Monitor</u> focusing on trade.

III.  <u>PATENTS</u>

A. Worked on the omnibus patent bill which has now passed both the House and the Senate.

B. Met with staff of Senator Hatch (R-UT), Chairman of the Judiciary Committee, to discuss Hatch-Waxman reform.

IV.  <u>HEALTH CARE</u>

A. Held meetings on Capitol Hill in opposition to a proposal to permit state and local governments to buy off the Federal Supply Schedule.  The provision was to go into effect in August, but has been delayed until the Fall.

Highly Confidential

ABT-DOJ 295983



EXHIBIT
Plaintiffs 1134
RMJ   7-12-07
PENGAD 800-631-6989

V.   MEDICARE REFORM

A.   Met with Members of Congress and staff on the issue of Medicare drug reimbursement being changed from average wholesale price to acquisition cost.

B.   Continued discussions with Lab Budget Coalition regarding competitive bidding and costs in reimbursement for lab services.

C.   Worked to include coverage for prostate testing and diabetes test strips and monitors in the Medicare bill.

VI.   FDA REFORM

A.   Analyzed Senate FDA reform proposal regarding issues of importance to Abbott.

VII.   MEDISENSE

A.   Participated in two-day diabetes education program at the International Diabetes Center in Minneapolis.

VIII.   PPD

A.   Participated in ADAP coalition meetings and Hill visits in an effort to secure FY '97 supplemental funding for AIDS drug assistance programs.  Began planning strategy for FY '98 appropriations process.

B.   Had discussions with other companies and PhRMA concerning GAO's interest in the industry's experience with state ADAPs.

IX.   ROSS

A.   Attended coalition meeting to discuss anti-tampering legislation which Ross believes may help fight diversion of infant formula.

X.   AI

A.   Gathered information on status of possible trade sanctions against New Zealand due to anticompetitive practices of its pharmaceutical management agency, PHARMAC.

XI.   GOVERNMENT RELATIONS

A.   Hosted two-day joint meeting in Washington of Abbott's federal and state government affairs staffs

B.   Attended First Lady's luncheon hosted by the Congressional Wives Club.

C.   Attended numerous fundraisers..

Highly Confidential

ABT-DOJ 295984

## ABBOTT LABORATORIES

1710 Rhode Island Avenue, N.W. #300
Washington, DC  20036

Phone:  202/659-8524
Fax:     202/466-8386

### FACSIMILE COVER SHEET

**TO:** Mark Balmak
Don Buell
Michael Heggie
Chris Lockett

**DATE:** 6/13/97

**FR:** David W. Landsidle
Cynthia Sensibaugh ✓
Rosemary Haas ___
Sandie Preiss ___
Lee Harp ___
Lorna Huff ___

**No. of Pages:** 3

**Additional Comments:**

Here is the description of the awp language that will be included in the Senate Finance Committee bill. Legislative language will probably not be available until after the Committee considers the bill. At this point, the Committee is scheduled to begin consideration of the bill on Tuesday.

Highly Confidential

ABT-DOJ 296119



EXHIBIT
Plaintiffs 1136
RMJ   7-12-07

additional payment from the beneficiary for the amount of the difference between the Medicare payment and the cost of the enhanced item.  The Committee provision provides for the promulgation by the Secretary of consumer protection regulations, at which time this provision becomes effective.

*Effective Date.*--Generally January 1, 1998.

## UPDATES FOR AMBULATORY SURGICAL SERVICES

*Present Law.*--Under current law, payments to ambulatory surgical centers are  made of the basis of prospectively determined rates, determined by the Secretary for each covered procedure.  Payments are updated annually for inflation.

*Committee Provision.*--The Committee bill would reduce updates for payments to ambulatory surgical centers by two percentage points each year for 1998 through 2002.

*Effective Date.*--January 1, 1998.

 PAYMENTS FOR OUTPATIENT PRESCRIPTION DRUGS

*Present Law.*--Under current law, Medicare provides a very limited outpatient prescription drug benefit (however, Medicare generally pays for drugs provided to a beneficiary while in a hospital).  With some exceptions, Medicare pays only for outpatient drugs that cannot be "self-administered" -- for example, drugs that must be administered directly by a physician in his office, such as intravenous drugs for cancer therapy; or require specialized equipment in the home, such as infusion therapy.

*Committee Provision.*--The Committee provision would specify that in any case where payment is not made on a cost or prospective payment basis, the payment could not exceed 95 percent of the average wholesale price, as specified by the Secretary.  In any case, the amount payable for any drug or biological shall not exceed the amount paid on January 1, 1997, increased annually by consumer price index.

The Secretary would be required to conduct such studies or surveys to determine the average wholesale price or other appropriate price of outpatient prescription drugs and report to Congress within six months following the date of enactment.  If the Secretary further adjusts the payment amounts for outpatient prescription drugs, the Secretary is authorized to pay a dispensing fee to pharmacies.

79

Highly Confidential

ABT-DOJ 296120

**ABBOTT LABORATORIES**

1710 Rhode Island Avenue, N.W. #300          Phone: 202/659-8524
Washington, DC 20036                          Fax:    202/466-8388

## FACSIMILE COVER SHEET

TO: _Mark Barmak_                    DATE: _6/13/97_
    _Chris Lockett_

FR:  David W. Landsidle              No. of Pages: _3_
     Cynthia Sensibaugh
     Rosemary Haas
     Sandie Preiss
     Lee Harp
     Lorna Huff

**Additional Comments:**

Here is the amendment to the awp provision that we will
be asking Senators to support. This incorporates the suggestions made
by Ann Vickery.

Highly Confidential

ABT-DOJ 296018



EXHIBIT
Plaintiff's 1137
RMJ      7-12-07

## Clarification of Reimbursement for Drugs and Biologicals

### Amendment to Section 10616

On page 250[1], line 11, after "payable for the" insert "specific".

On Page 250, line 12, strike the period after "price" and insert "for the specific drug or biological.".

### Explanation

The amendment clarifies that reimbursement for a drug or biological shall be equal to 95 percent of the average wholesale price of the specific drug or biological. Single source drugs and biologicals represent unique chemical or molecular entities which have been shown to be safe and effective. Payment may not be limited to the price of other, "similar" drugs and biologicals.

\

---

[1]  Page reference relates to House Ways and Means Committee Print dated 6/8/97.

Highly Confidential

ABT-DOJ 296016

JUN-09-97 12:36   From:H & H 12E-400                    T-081  P.02/02  Job-137

F:\P6\HREC\MCARE\NTBOWM\FULL.001

250

*Ways and*
*Means*
*Full Comm Hre*

H.I.C.

1   SEC. 10416.  REIMBURSEMENT FOR DRUGS AND
2        BIOLOGICALS.
3        (a) IN GENERAL.—Section 1842 (42 U.S.C. 1395u) is
4   amended by inserting after subsection (n) the following new
5   subsection:
6        "(o) If a physician's, supplier's, or any other person's bill
7   or request for payment for services includes a charge for a drug
8   or biological for which payment may be made under this part
9   and the drug or biological is not paid on a cost or prospective
10  payment basis as otherwise provided in this part, the amount

*specific*  11  payable for the drug or biological is equal to 95 percent of the
12  average wholesale price".  *for the specific drug or biological.*
13       (b) EFFECTIVE DATE.—The amendments made by sub-
14  section (a) apply to drugs and biologicals furnished on or after
15  January 1, 1998.
16  SEC. 10417.  COVERAGE OF ORAL ANTI-NAUSEA DRUGS
17       UNDER CHEMOTHERAPEUTIC REGIMEN.
18       (a) IN GENERAL.—Section 1861(s)(2) (42 U.S.C.
19  1395x(s)(2)), as amended by section 10103(a)(1), is amended
20  by inserting after subparagraph (P) the following new subpara-
21  graph:
22       "(Q) an oral drug (which is approved by the Federal
23  Food and Drug Administration) prescribed for use as an
24  acute anti-emetic used as part of an anticancer
25  chemotherapeutic regimen if the drug is administered by a
26  physician (or under the supervision of a physician)—
27            "(i) for use immediately before, immediately after,
28       or at the time of the administration of the anticancer
29       chemotherapeutic agent; and
30            "(ii) as a full replacement for the anti-emetic ther-
31       apy which would otherwise be administered intra-
32       venously.".
33       (b) PAYMENT LEVELS.—Section 1834 (42 U.S.C. 1395m),
34  as amended by sections 10421(a)(2) and 10431(b)(2), is
35  amended by adding at the end the following new subsection:
36       "(m) SPECIAL RULES FOR PAYMENT FOR ORAL ANTI-
37  NAUSEA DRUGS.—

June 8, 1997

Highly Confidential

ABT-DOJ 296017

 **ABBOTT**

**From:** David Landsidle
Divisional Vice President ,
Washington

**INTEROFFICE CORRESPONDENCE**

**Dept:** Washington Office
202/659-8524

**TO:** Mark Barmak                                    **DATE:** June 20, 1997

**cc:** Cynthia Sensibaugh

**RE:** *Lobbying Medicare Drug Reimbursement*

- - - - - - - - - -**VIA FAX**- - - - - - - - -

The House and Senate are expected to vote next week on the budget reconciliation bills. The bills will pass and the conference committee will begin work the week of July 7. The conference could take anywhere from 2 to 4 weeks. The Congress plans to vote on the conference bill before the August 2 start of the summer recess.

Regarding the Medicare reimbursement issue, the House has a good provision although we need to add "specific" drug or biological. The Senate provision is not good. It says:

- payment could not exceed 95% of the AWP, as specified by the Secretary

- the effective date is retroactive to May 1, 1997 (changed by a Moseley-Braun amendment from January 1, 1997)

- the amount payable is limited by an annual CPI adjustment

- an HHS study is required to determine the AWP or other appropriate price of outpatient prescription drugs which then could be used to "further adjust the payment amounts for outpatient prescription drugs.

The Senate provision also lacks the "specific" drug language.

Lupron and Calcijex benefit enormously from Medicare reimbursement. In 1994, (the last year for which I have data) the HHS allowance for TAP's Lupron was $381.2 million, by far the largest allowance. The second largest was only $74.3 million. HPD's Calcijex comprises 1/3 of division's profits. For these reasons, I suggest two additional lobbying actions be considered.



**EXHIBIT**

Plaintiff. 1138

Rmj  7-12-07

Highly Confidential

ABT-DOJ 296200

First, targeted grassroots to specific conferees calling on them to support the House bill over the Senate bill. For example, Congressman Bill Archer (R-TX) will be a conferee. While he's from Houston, we could ask employees at our Texas plants in Austin and Irving to write. Or, Rep. Denny Hastert (R-IL) is a likely conferee. We could have Illinois employees write Hastert. Texas Senator Gramm (R) and Illinois Senator Moseley-Braun (D) will not be conferees but are on the Finance Committee and could be asked in letters to talk to conferees. The drawback to grassroots is that the reimbursement rate message is not a good grassroots message, although not giving the Secretary discretionary powers could be put in a letter.

Second, I suggest having Duane come to town to lobby. We would see conferees or those who could influence conferees, such as the four cited above. Our basic message would be to support the House provision. This office, in consultation with you and others, would prepare background papers.

Abbott has a lot at stake in the reimbursement fight. I do not want to feel, or having others feel, we did not do everything possible to win in conference. Duane could help. I can not get an appointment with Archer during conference. With Duane I can. A visit by him increases the importance of Abbott to the issue, which congressmen can understand. He reinforces our efforts and those of Nancy Taylor, our consultant. Nancy has done a good job--she got Senator Hatch to introduce our amendment--but a CEO adds a good deal of clout. Using Duane certainly does not guarantee success, but it increases our chances.

The downside is Duane being exposed to having to defend our position which is profit motivated. There is no way to avoid that fact. But our reasons for opposing the Senate bill are justifiable and defendable. Also he would be seeing people who are either with us (i.e. Archer who wants the House language to prevail) or are inclined to help if possible (i.e. Moseley-Braun). He is not going to see someone like Henry Waxman.

Duane's lobbied before, on 936, trade and the Clinton health bill. He is good and knows CEOs have influence on Capitol Hill. I do not know if he is available to come to Washington, but if he is, do you think he should be asked?

Highly Confidential

ABT-DOJ 295994

**ABBOTT**

**INTEROFFICE CORRESPONDENCE**

From: David W. Landsidle
Divisional Vice President
Washington

Dept: Washington Office

TO: Duane L. Burnham

DATE: June 30, 1997

---------------VIA FAX---------------

RE: Medicare Drug Reimbursement

The House and Senate have passed different changes to how Medicare reimburses drugs (i. e., Lupron and Calcijex). The basic change is that future reimbursement will be 95% of average wholesale price (AWP) rather than full AWP. However, the Senate bill has additional language we oppose.

o The Senate bill makes the reimbursement rate retroactive to May 1, 1997. The reimbursement rate would the AWP on that date. The House bill's effective date is January 1, 1998.

o The Senate bill says that the amount reimbursed can not exceed the May 1, 1997, amount increased annually by the CPI. The House has no CPI lanuage.

o The Senate bill calls on the Secretary of HHS to do a study of AWP and report back to Congress within 6 months. This gets HHS looking at prices. The House bill has no such language.

I am putting together phone calls between you and Ways and Means Chairman Bill Archer (R-TX) and Congressman Denny Hastert (R-IL). Both will be House conferees when the House and Senate meet to reconcile differences. Your message to both men is simple:

o Abbott thinks the House language providing for Medicare reimbursement of drugs at 95% of AWP, effective January 1, 1998, is much better than the Senate language. It raises $300 million without the unnecessary Senate provisions.

o Abbott asks that you fight to retain the House language in the conference committee and that Abbott joins you in fighting for their language.

You should also congratulate both congressmen for putting together legislation that will bring the Federal budget into balance for the first time since 1969. This was a massive undertaking and Archer and Hastert were crucial to the deal being struck.

Archer will call you. I have given his office your number. I will not know until tomorrow if Hastert will call you or if you are to call him. I will tell Debbie which way it is scheduled and get her a phone number, if necessary.

cc: Mark Barmak

Highly Confidential

ABT-DOJ 295996



EXHIBIT
Plaintiffs 1139
RMJ 7-12-07

MAY. 4. 1990 12.40PM    ABBOTT EXEC OFFICE

# ABBOTT

August 5, 1997

The Honorable Bill Archer
1236 Longworth House Office Building
United States House of Representatives
Washington, DC 20515

Dear Bill:

First, let me congratulate you for leading the effort to pass the balanced budget legislation. The tax and spending bills you passed are truly historic in importance and their passage was due, in no small part, to the many hours you personally spent putting the package together.

Second, I want to express our gratitude for what you accomplished with the Medicare drug reimbursement provision. When we spoke on the telephone you said you intended to hold the House language in the conference committee, and you did. Your language was clearly superior to the Senate's and Abbott thanks you for convincing the rest of the conferees. I know you had far bigger issues on the agenda. Taking the time to call me and discuss our concerns was greatly appreciated.

I wish you continued success in the 105th Congress.

Sincerely,

DLB:par

Highly Confidential

ABT-DOJ 296003



**ABBOTT**

August 5, 1997

The Honorable J. Dennis Hastert
2241 Rayburn House Office Building
United States House of Representatives
Washington, DC  20515

Dear Denny:

Congratulations for putting together the balanced budget legislation, an
accomplishment of truly historic importance.  Your personal efforts helped create a
package that benefits all Americans.  I specifically want to thank you for holding the
House Medicare drug reimbursement language in conference.  Although we never
were able to hook up together by telephone, Abbott appreciates all you did to
address our concerns.  We, and Illinois, were fortunate to have you negotiate such
important legislation.

I wish you continued success in the 105th Congress.

Sincerely,

Duane

DLB:par

Highly Confidential

ABT-DOJ 296002



**⊐a ABBOTT**

**From:** David W. Landsidle
Divisional Vice President
Washington

**INTEROFFICE CORRESPONDENCE**

**Dept:** Washington Office

**TO:** Jose M. de Lasa

**DATE:** November 7, 1997

cc: D. L. Burnham
G. P. Coughlan
M. E. Barmak
C. M. Brock
H. L. Goldberg
B. J. Smith
S. F. Weinstock

**RE:** Monthly Highlights -- October, 1997
Washington Office

I. TRADE

A. Continued lobbying in favor of fast track negotiating authority. Votes scheduled the first week in November. The Senate looks good but the House is a problem. (Landsidle, Sensibaugh)

II. TAXES

A. Began strategy on how to extend the R&D tax credit which expires next June. The credit is a multi-million dollar savings to Abbott. (Landsidle)

III. MEDICARE REIMBURSEMENT

A. Met with congressional staff to ensure that the Health Care Financing Administration correctly interprets this summer's Medicare reimbursement law. (Landsidle)

IV. HEALTH CARE REFORM

A. Began strategy on how to structure the health care reform debate in 1998, especially considering that 1998 is an election year and politicians may feel forced to do something to please voters. (Landsidle)

V. PATENTS

A. Attended Senate Labor Appropriations Subcommittee hearing on a legislative proposal which would provide additional exclusivity for certain drugs in exchange for a royalty paid to the National Institutes of Health for research. This proposal was not included in the FY '98 labor appropriations bill. (Sensibaugh)

VI. ENVIRONMENTAL

A. Provided Abbott Corporate Environmental Services a report on PhRMA efforts to stop EPA's development of an air rule for R&D facilities. (Haas)

Highly Confidential

ABT-DOJ 296004



1354

EXHIBIT NO.

KY  8/30k7

VII.   <u>TAP</u>

    A. Had meeting with TAP staff and staff of Senator Roth (R-DE), Chairman of the Senate Finance Committee, to discuss HCFA's current reimbursement policy for Lupron. (Sensibaugh)

VIII.   <u>ADD</u>

    A. Attended Lab Coalition meeting to discuss implementation of the competitive bidding provisions of the Balanced Budget Act. (Sensibaugh)

    B. Reviewed public comments on the time needed for implementing a change in the Mandatory Guidelines for Federal Workplace Drug Testing Programs regarding changes to the drug levels for heroin. (Sensibaugh)

    C. Met with HIMA President to discuss HIMA's activities over the past year. (Landsidle, Sensibaugh)

    D. Attended HIMA task force meetings on CLIA and IVD issues. (Sensibaugh).

IX.   <u>PPD</u>

    A. Lobbying continued to increase funding for AIDS Drug Assistance Programs under the Ryan White Act. Final bill includes an increase of $118.5 million for FY '98 total of $285.5 million. Arranged meeting for PPD to discuss pharmaeconomic models for AIDS combination therapies. Met with congressional staff to discuss hearing on AIDS issues. (Haas)

X.   <u>ROSS</u>

    A. Reported on conclusion of FY '98 appropriations process and status of GAO report on the impact of rebates on the marketplace. Also reviewed WIC reauthorization issues that are likely to arise in 1998. (Haas)

XI.   <u>CAPD</u>

    A. Had discussions with congressional staff and others concerning Senator Harkin's (D-IA) request to.FDA to review approval of fluoroquinolones for use in food animals. (Haas)

XII.   <u>AI</u>

    A. Organized meetings and accompanied AI on visits to Washington-based government agencies and private organizations involved with U. S. food assistance programs. (Haas)

XIII.   <u>ALBGF</u>

    A. Continued revising ALBGF brochure. (Sensibaugh)

    B. Attended PAC conference sponsored by the National Association of Business PACS. (Sensibaugh)

XIV.   <u>GOVERNMENT RELATIONS</u>

    A. Attended several fundraisers. (Landsidle, Sensibaugh, Haas)

    B. Attended luncheon with Steve Forbes. (Landsidle)

    C. Attended annual meeting of the Business Government Relations Council. (Landsidle)

Highly Confidential

ABT-DOJ 296005

# ⊿ ABBOTT

**INTEROFFICE CORRESPONDENCE**

**From:**  Cynthia Sensibaugh *CBS*
Director, Washington Affairs

**Dept:**  Washington Office
202/659-8524

---

**TO:**  Cathy Babington
Mark Barmak
Don Buell
John Campbell
Rich Daly
Dave Goffredo
Michael Heggie
Chris Lockett
Alan MacKenzie
Loreen Mershimer
Dave Olson
Rich Rieger
Don Robertson

**DATE:**  December 9, 1997

**cc:**  David Landsidle

**RE:**  *HHS Office of Inspector General's Report on Medicare Payments for Prescription Drugs*

*********************VIA FED-EX*********************

Enclosed is a copy of the December 5 HHS Office of the Inspector General's report on Medicare payments for prescription drugs and three press articles.  Reducing the amount Medicare pays for prescription drugs continues to be a hot topic.  And this summer's 95% of AWP change did nothing to lessen the pressure. Note on page two of Inspector General Brown's letter her statement that the new reimbursement methodology will not curtail "excessive" payments.  HCFA concurs with Brown on page 12.  Lupron is by far the largest reimbursed drug.

The drug price issue will not go away; not with this kind of data being circulated.  HHS, HCFA and Congress are all interested.  In addition, the National Bipartisan Committee on the Future of Medicare is being formed and the Medicare Payment Advisory Committee has the ongoing responsibility to examine payment rates.  It is too early to say if Congress has any legislative intentions in 1998, but we should expect items in the press, inclusion in the President's FY'99 budget, and the topic to be raised in various commission meetings.

Highly Confidential

ABT-DOJ 296109





**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of Inspector General

## Memorandum

Date   DEC  5 1997

From  June Gibbs Brown
      Inspector General

Subject OIG Final Report, "Excessive Medicare Payments for
      Prescription Drugs," OEI-03-97-00290

To   Nancy-Ann Min DeParle
     Administrator
     Health Care Financing Administration

Attached is our final inspection report that compares Medicare
allowances for drugs with drug acquisition prices available to
the physician and supplier communities.

Medicare allowances for 22 drugs exceeded actual wholesale
prices by $447 million in 1996.  For the 22 drugs reviewed,
Medicare payments would have been reduced by 29 percent if
actual wholesale prices had been used instead of manufacturers
published wholesale prices.

For more than one-third of the 22 drugs reviewed, Medicare and
its beneficiaries paid more than double the actual average
wholesale price available to physicians and suppliers.  For
every one of the 22 drugs reviewed, Medicare reimbursed more
than the average actual price in both 1995 and 1996.  Not only
did Medicare allow more than the average price, the program
reimbursed more than even the highest wholesale price for every
drug.

We also found there is no consistency among carriers in
establishing and updating Medicare drug reimbursement amounts.
In some cases, the difference in allowed amounts for the same
drug were significant.

The information in this report provides further support for a
recommendation made in an earlier report entitled "Medicare
Payments for Nebulizer Drugs" where we advised that the Health
Care Financing Administration (HCFA) reexamine its Medicare
drug reimbursement methodologies with a goal of reducing
payments as appropriate.  The HCFA concurred with the
recommendations.  In this report, we also recommended that HCFA
require all carriers to reimburse a uniform allowed amount for
each Common Procedural Coding System drug code.

Highly Confidential

ABT-DOJ 296045

Page 2 - Nancy-Ann Min DeParle

We support HCFA's continued effort to reduce drug payments where appropriate. We do not believe that the new reimbursement methodology for prescription drugs recently adopted by Congress will curtail the excessive drug payments identified in the Medicare program.

If you have any questions or comments about this report, please call me or George Grob, Deputy Inspector General for Evaluation and Inspections, or have your staff contact Mary Beth Clarke at (202) 619-2481.

Attachment

cc:

Margaret A. Hamburg
Assistant Secretary for
   Planning and Evaluation

John J. Callahan
Assistant Secretary for
   Management and Budget

Richard J. Tarplin
Assistant Secretary
   for Legislation

Melissa Skolfield
Assistant Secretary for
   Public Affairs

Highly Confidential

ABT-DOJ 296046

Department of Health and Human Services

# OFFICE OF
# INSPECTOR GENERAL

## EXCESSIVE MEDICARE PAYMENTS
## FOR PRESCRIPTION DRUGS



**JUNE GIBBS BROWN**
Inspector General

DECEMBER 1997
OEI-03-97-00290

Highly Confidential

ABT-DOJ 296047

# EXECUTIVE SUMMARY

### PURPOSE

To compare Medicare allowances for prescription drugs with drug acquisition prices currently available to the physician and supplier communities.

### BACKGROUND

Medicare allowances for prescription drugs increased 25 percent from $1.8 billion in 1995 to $2.3 billion in 1996.  However, the number of services allowed increased only 9 percent between the two years.

Medicare does not pay for over-the-counter or many prescription drugs that are self-administered.  However, the program does pay for certain categories of drugs used by Medicare beneficiaries.

On January 1, 1998, Medicare Part B will begin to reimburse covered drugs at 95 percent of the average wholesale price.  Currently, Medicare carriers may determine the amounts that Medicare will pay for these drugs based on either the lower of the Estimated Acquisition Cost (EAC) or the national Average Wholesale Price (AWP).  The EAC is determined based on surveys of the actual invoice prices paid for the drug.  The AWP is reported in *The Red Book* and other pricing publications and databases used by the pharmaceutical industry.  Historically, it has been the AWP that carriers have used to develop Medicare reimbursement for prescription drugs.

To determine if average wholesale prices paid by Medicare truly represent wholesale prices available to physicians and prescription drug suppliers, we focused on 22 drug codes representing the largest dollar outlays to the program in 1995.  We then compared the Medicare allowances for these drug codes with prices available to the physician and supplier communities.

### FINDINGS

*Medicare allowances for 22 drugs exceeded actual wholesale prices by $447 million in 1996.*

Medicare and its beneficiaries payments for the 22 drugs would have been reduced by an estimated 29 percent ($447 million of $1.5 billion) if actual wholesale prices rather than AWP's were the basis for Medicare reimbursement.  Similar savings of $445 million were also identified for 1995.  If the savings percentage for just the 22 drugs was applied to Medicare's allowances for all drugs, the program and its beneficiaries would have saved an estimated $667 million in 1996.

---

i

Highly Confidential

ABT-DOJ 296048

*For more than one-third of the 22 drugs reviewed, Medicare allowed amounts were more than double the actual wholesale prices available to physicians and suppliers.*

Medicare allowed between 2 and 10 times the actual average wholesale prices offered by drug wholesalers and group purchasing organizations for 8 of the 22 drugs reviewed.  Medicare allowed at least 20 percent more than the actual average wholesale price for over 80 percent of the 22 drugs.  For every one of the 22 drugs reviewed, Medicare allowed amounts were more than the actual average wholesale price in both 1995 and 1996.  Not only did Medicare pay more than the actual average wholesale price, the program allowed more than the highest average wholesale price for every drug.

*There is no consistency among carriers in establishing and updating Medicare drug reimbursement amounts.*

Although Medicare's reimbursement methodology for prescription drugs does not provide for different payment rates based on geographical factors, the allowed amounts for individual drug codes varied among the carriers.  Medicare guidelines allow carriers to update prescription drug reimbursement on a quarterly basis.  However, not only did some carriers update yearly rather than quarterly but carrier allowed amounts for the same drug code differed within a single quarter.

## RECOMMENDATIONS

The findings of this report provide evidence that Medicare and its beneficiaries are making excessive payments for prescription drugs.  The published AWPs that are currently being used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices that are available to the physician and supplier communities that bill for these drugs.

We believe the information in this report provides further support for a previous recommendation made by the Office of Inspector General.  We recommended that HCFA reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments as appropriate.  Beginning in January 1998, Medicare reimbursement for prescription drugs will be 95 percent of average wholesale price.  We believe that the 5 percent reduction is not a large enough decrease and that further options to reduce reimbursement should be considered.

We also believe that the variance of Medicare reimbursement for individual drug codes among carriers is inappropriate.  The rate at which physicians and suppliers are paid for drugs should not depend on which carrier the providers bill.  We, therefore, recommend that HCFA require all carriers to reimburse a uniform allowed amount for each HCFA Common Procedural Coding System (HCPCS) drug code.  The HCFA could choose to supply all carriers with a list of average wholesale prices that it has determined represent each drug code.  The carriers could then use the uniform prices to calculate payment.  The HCFA could also designate one single entity to perform all

ii

Highly Confidential

ABT-DOJ 296049

necessary calculations to determine reimbursement for each drug code on a quarterly basis. All carriers would then use this standard reimbursement amount.

## AGENCY COMMENTS

The HCFA concurred with our recommendations. The HCFA's proposal in the President's 1998 budget that would have required physicians to bill Medicare the actual acquisition cost for drugs was not adopted by Congress. However, the agency states that it will continue to pursue this policy in other appropriate ways.

We support HCFA's continued pursuance of reducing drug payments where appropriate. We do not believe that the reimbursement methodology for prescription drugs recently adopted by Congress will curtail the excessive drug payments we've identified in the Medicare program. In this report we've identified Medicare allowances that were 11 to 900 percent greater than drug prices available to the physician and supplier communities.

To address the issue of uniformity among carriers, HCFA has convened a workgroup to develop an electronic file consisting of the average wholesale prices for drugs covered by Medicare. The agency reports it will distribute this file to Medicare contractors for their use in paying drug claims.

iii

Highly Confidential

ABT-DOJ 296050

# TABLE OF CONTENTS

PAGE

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

   ● Estimated savings based on actual wholesale drug prices . . . . . . . . . . . . . . . . .  7

   ● Medicare allowed amounts more than double the average actual price  . . . . . . .  8

   ● Lack of consistency in reimbursement rates for drug codes . . . . . . . . . . . . . . .  9

RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

APPENDICES

A:  Description of 22 HCPCS Codes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

B:  Summary of Wholesale Prices and Estimated Savings for 1995 and 1996  . . . .  B-1

C:  Individual Drug Allowances and Savings Percentages for 1995 and 1996  . . . .  C-1

D:  Health Care Financing Administration Comments . . . . . . . . . . . . . . . . . . . . . .  D-1

Highly Confidential

ABT-DOJ 296051

# INTRODUCTION

## PURPOSE

To compare Medicare allowances for prescription drugs with drug acquisition prices currently available to the physician and supplier communities.

## BACKGROUND

Medicare allowances for prescription drugs increased 25 percent from $1.8 billion in 1995 to $2.3 billion in 1996. However, the number of services allowed increased only 9 percent between the two years.

### Medicare Coverage and Payment for Prescription Drugs

While Medicare does not pay for over-the-counter or many prescription drugs that are self-administered, it does pay for certain categories of drugs used by Medicare beneficiaries. Under certain circumstances, Medicare Part B covers drugs that are used with durable medical equipment or infusion equipment. Medicare will cover certain drugs used in association with dialysis or organ transplantation. Drugs used for chemotherapy and pain management in cancer treatments are also covered. The program also covers certain types of vaccines such as those for flu and hepatitis B.

Depending on the type of drug, both local carriers and four Durable Medical Equipment Regional Carriers (DMERCs) are responsible for processing claims for drugs covered under Part B of the Medicare program. The carriers are responsible for determining the allowance that Medicare will pay for these drugs.

Carriers base their current allowance rates on the regulations established in 42 Code of Federal Regulation 405.517. According to the regulations, Medicare computes an allowed amount for drugs based on either the lower of the Estimated Acquisition Cost (EAC) or the national Average Wholesale Price (AWP). The allowed amount is the price that Medicare and its beneficiaries pay a drug supplier. The EAC is determined based on surveys of the actual invoice prices paid for the drug. The AWP is determined through *The Red Book* or similar pricing publications and databases used by the pharmaceutical industry. The AWPs are mainly provided to these sources by pharmaceutical manufacturers. If a drug has multiple sources (more than one brand or generic version), the price is based on the lower of the EAC or the median of the national AWP for all generic sources. Historically, carriers have utilized AWP and not estimated acquisition cost to develop Medicare reimbursement for prescription drugs.

Drugs are billed to the Medicare program based on codes developed by the Health Care Financing Administration (HCFA). These codes are developed as part of the HCFA Common Procedure Coding System (HCPCS). The codes define the type of drug and, in most cases, a dosage amount. The codes do not indicate whether a brand

1

Highly Confidential

ABT-DOJ 296052

or generic version of the drug was administered; nor do the codes provide information on the manufacturer or distributor of the drug provided.

*Change in Medicare Reimbursement for Prescription Drugs*

In recent legislation, Congress established reimbursement for prescription drugs at 95 percent of a drug's average wholesale price. This change will be implemented on January 1, 1998.

A different proposal to change the Medicare reimbursement methodology for prescription drugs was included in the President's FY 1998 budget. The proposal provided for the amendment of 42 U.S.C. 1395u(o) to set payment for drugs not otherwise paid on a cost or prospective payment basis. The revision set payment at the lowest of: actual acquisition cost to the provider, AWP, median actual acquisition cost, or an amount otherwise determined under the Code. The actual acquisition cost was defined to include all discounts, rebates, or any other benefit in cash or in kind. This proposal was supported by HCFA but was not the version eventually adopted by Congress.

*Related Work by the Office of Inspector General*

This report is one of several Office of Inspector General reports concerning Medicare payments for prescription drugs. In 1996, we released a report entitled *Appropriateness of Medicare Prescription Drug Allowances* (OEI-03-96-00420) which compared Medicare drug reimbursement mechanisms with Medicaid payment mechanisms for 17 drugs and found that Medicare could achieve significant savings by adopting reimbursement strategies similar to those used by Medicaid. The OIG has also produced several reports focusing on inhalation drugs paid for by Medicare. In *Medicare Payments for Nebulizer Drugs* (OEI-03-94-00390), we found that Medicaid reimbursed albuterol sulfate and other nebulizer drugs at significantly lower prices than Medicare. In a companion report called *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392), we found that many retail and mail-order pharmacies charge customers less for generic albuterol sulfate than Medicare's allowed price. *Suppliers' Acquisition Costs for Albuterol Sulfate* (OEI-03-94-00393) found that Medicare's allowances for albuterol sulfate substantially exceeded suppliers' acquisition costs.

The Office of Inspector General also recently issued a report on acquisition costs of brand name drugs by Medicaid pharmacies. In *Medicaid Pharmacy - Actual Acquisition Costs of Prescription Drug Products for Brand Name Drugs* (A-06-96-00030), the Office of Audit Services estimated that the actual acquisition cost for brand name drugs was 18 percent below AWP.

## METHODOLOGY

To determine if average wholesale prices paid by Medicare truly represent wholesale prices available to physicians and prescription drug suppliers, we focused on drug

---

2

ABT-DOJ 296053

codes representing the largest dollar outlays to the program in 1995. We then compared the Medicare allowances for these drug codes with prices available to the physician and supplier communities.

We collected from three sources the data needed to compare Medicare allowed amounts to actual wholesale prices. For information on Medicare allowances for prescription drugs, we compiled statistics from HCFA's National Claims History (NCH) File. We then collected Medicare reimbursement rates for specific drugs from contracted carriers. Lastly, we analyzed wholesale prices from drug wholesalers and group purchasing organizations.

*Medicare Allowance Data for Prescription Drugs*

We decided to review the 30 drug codes with the highest Medicare allowances for 1995. We chose 1995 since the Medicare claims data was 98 percent complete at the commencement of the inspection. To determine the Medicare allowances for prescription drugs in 1995, we compiled a list of HCPCS codes that represent all of the drugs which Medicare reimburses. The drug code list primarily contained HCPCS codes beginning with a J (known as J codes) which represent mainly injectable drugs or drugs used in conjunction with durable medical equipment. Also included in our list of drugs were K codes which usually represent immunosuppressive drugs, Q codes which represent mainly drugs used for End Stage Renal Disease, several A codes that represent drugs used for diagnostic imaging, and immunization or vaccine codes that are represented by a five digit numeric code.

We then retrieved NCH allowance and utilization data using HCFA's Part B Extract and Summary System (BESS). We aggregated the allowances for each code to calculate Medicare's total prescription drug allowance for 1995. We then determined the 30 drug codes with the highest individual allowances for that year.

Using NCH data, we calculated the Medicare allowances for all drugs in 1996. We also determined the 1996 allowances for the 30 drug codes with the highest allowances in 1995. At the time of our inspection, the NCH data for 1996 was 95 percent complete.

*Carrier Allowances for Prescription Drugs*

We sent requests for carrier drug reimbursement rates to Medicare's 26 fraud information specialists. The fraud information specialists coordinate work among all HCFA contractors in the regions they represent. There are a total of 61 geographical regions that local carriers cover. We received drug allowances from 50 of the 61 areas. We also received responses from two of the four DMERCS.

We requested allowed amounts for prescription drug codes with the highest total allowances in 1995. The allowed amount reflects the dollar reimbursement that Medicare will allow for the specific dosage defined by the HCPCS drug code. We

---

3

Highly Confidential

ABT-DOJ 296054

asked the carriers to provide allowed amounts by quarter for calendar years 1995, 1996, and 1997.  However, some carriers provided us with data on a yearly basis and others only for certain quarters.

Some carriers also furnished allowed amounts for both participating and non-participating physicians.  Physicians participating in the Medicare program agree to accept Medicare allowed amounts as total reimbursement for their services.  Participating physicians receive 5 percent more in Medicare reimbursement for services.  In the instances where both participating and non-participating allowed amounts were provided, we used the participating physician allowed amounts.  More than three-quarters of physicians across the nation now participate in the Medicare program.

Utilizing the data provided by carriers, we calculated an average Medicare allowed amount for each drug code by year.  These allowed amounts were used to compare Medicare reimbursement with drug acquisition costs for physicians and suppliers.

*Prescription Drug Costs for Physicians and Suppliers*

In order to determine acquisition costs for the top drugs, we reviewed 1995 and 1996 prices offered by wholesale drug companies and group purchasing organizations (GPOs).  We obtained pricing lists/catalogs for seven wholesale drug companies and seven group purchasing organizations.  Group purchasing organizations provide members with lower cost products by negotiating prices for specific drugs from manufacturers.  The member can then purchase drugs at the negotiated price either directly from the manufacturer or a drug wholesaler that agrees to accept the negotiated price.  For the GPOs we reviewed, most of the major drug wholesalers accept the GPO contracted price.

The 14 pricing sources we used provided pharmaceutical products mainly to physician practices and specialized or closed pharmacies.  Depending on individual State licensing practices, specialized or closed pharmacies normally do not provide retail prescription drug dispensing to walk-in customers.  Instead, they often provide prescription drugs for home infusion or inhalation therapy.

After beginning our review of wholesale drug costs, we determined that 2 of the top 30 drugs codes we identified for 1995 could not be used for the inspection.  Code J7699 represents not-otherwise-classified inhalation drugs and Code J7190 for Factor VIII (human anti-hemophilic factor) has a dosage requirement that is difficult to determine.  Therefore, obtaining wholesale prices for these two codes would not be possible.

For the remaining 28 drug codes identified for our analysis, 17 were used for the treatment of cancer/leukemia, 5 were inhalation drugs, 2 were vaccines, and 2 were used for organ transplantation or valve replacement complications.  There was also a drug used for immunodeficiencies and another for severe infections.  The majority of

---

4

Highly Confidential

ABT-DOJ 296055

these drugs would most likely be purchased and administered by physicians or other health care practitioners. The inhalation drugs or drugs used for home infusion would most likely be provided by a specialized pharmacy or supplier.

For the 28 drug codes, we collected 1995 and 1996 prices from the 14 drug pricing lists/catalogs. We decided not to present prices for drugs where fewer than two different pricing sources could be identified per year. There were 6 codes that did not meet the two source minimum. These codes were: vaccine codes 90724 and 90732, inhalation codes J7645 and J7660, and codes K0121 and J1245 used for transplants/valve replacements. A list of the HCPCS codes' descriptions and dosages for the final 22 drugs used for our evaluation is provided in Appendix A.

The 22 drug codes represented 10 single-source, 9 multiple-source, and 3 multiple-brand drugs. A single-source drug has only one brand of drug available. A multiple-source drug has both brand and generic forms of the drug available. There were no drug products manufactured in the dosage defined by the HCPCS code for five drugs (J7620, Q0136, J2405, J9181, J9293). We selected all the drugs with higher dosages that met the drug description and applied a conversion factor to achieve prices for the HCPCS-specified dosage. For an additional code (J1561), we found that out of the multitude of prices we could find for the drug only three met the exact dosage requirement. Since the higher dosage products seemed to be the more prevalent way of purchasing this drug, we included them in our analysis.

We searched the 14 price lists for both brand and generic prices during 1995 and 1996. For nine drug codes, we obtained between 5 and 8 separate prices. Eight of the nine were single-source drugs. For another eight codes, we found between 12 and 29 separate prices. We found between 30 and 70 separate prices for the remaining five drug codes.

*Calculation of Potential Medicare Savings for Prescription Drugs*

To determine the potential savings to Medicare if acquisition costs rather than published AWPs were used for reimbursement, we compared Medicare's allowed amounts to the wholesale prices we collected. To do this, we compiled all the pricing information from the sources reviewed and calculated an average price by year for all 22 codes. We believe that the pricing information supplied by the drug wholesalers and group purchasing organizations provides factual evidence of acquisition costs available to physicians and suppliers.

The average price or average acquisition cost for each drug code was then compared to the average Medicare allowed amount that we calculated from the carrier data. For each drug code, the difference between the average price and the Medicare allowed amount was computed. We then applied this amount to the number of services paid by Medicare for each drug in 1995 and 1996. The resulting dollar amounts were aggregated to determine the total estimated savings to Medicare if acquisition costs rather than AWP had been used to determine reimbursement.

5

Highly Confidential

ABT-DOJ 296056

Appendix B provides the average Medicare allowed amounts and actual average wholesale prices computed for the 22 drug codes reviewed.  Although we utilized the actual average wholesale price to report savings in the findings section of this report, the appendices also contains the potential savings to Medicare if the lowest and highest wholesale prices found were compared to the Medicare allowed amount.

6

Highly Confidential

ABT-DOJ 296057

# FINDINGS

**MEDICARE ALLOWANCES FOR 22 DRUGS EXCEEDED ACTUAL WHOLESALE PRICES BY $447 MILLION IN 1996.**

Medicare carriers now base prescription drug reimbursement on published average wholesales price of drugs. However, physicians and suppliers are often able to purchase drugs for prices that are much lower than the official AWPs provided by manufacturers.

After reviewing wholesale drug catalogs and group purchasing organizations' prices for the 22 drugs, we estimated that $447 million would have been saved by Medicare and its beneficiaries if Medicare had based reimbursement on actual wholesale prices rather than published AWPs in 1996. These wholesale prices are available to physicians, specialized pharmacies, and other suppliers. These wholesale prices represent the actual acquisition costs to physicians and suppliers that bill Medicare for these drugs.

Total allowed charges for the 22 drugs would have been reduced by 29 percent ($447 million of $1.5 billion) if actual wholesale prices rather than AWP were the basis for Medicare reimbursement. The 22 drugs represented 67 percent of the $2.3 billion in total Medicare drug allowances for 1996. If the savings percentage for just the 22 drugs was applied to Medicare's reimbursement for all drugs, the program and its beneficiaries would have saved an estimated $667 million in 1996.

The savings for individual drugs ranged from 13 percent of allowances for three drugs (J9202, Q0136, J9185) to a high of 92 percent for leucovorin calcium (J0640). Almost half of the drugs (10 of 22) had estimated savings greater than 40 percent of allowances. A table provided in Appendix C lists the 1996 allowances and estimated savings for the 22 drugs. The table also lists the percentage of allowance saved for each individual drug if reimbursement had been based on the actual average wholesale prices available for the drug.

*Similar savings of $445 million were identified for 1995.*

If Medicare had based reimbursement on actual wholesale costs in 1995, the program and its beneficiaries would have saved an estimated 35 percent in payments for the 22 drugs. This would have amounted to savings of $445 million on $1.3 billion in total 1995 program expenditures for these drugs. The $1.3 billion in expenditures for the 22 drugs represented 70 percent of the $1.8 billion in Medicare total drug allowances for 1995.

The percentage of allowance saved for individual drugs ranged from 15 percent for carboplatin (J9405) and fludarabine phosphate (J9185) to 95 percent for leucovorin calcium (J0640). Half of the drugs (11 of 22) had estimated savings greater than 40

Highly Confidential

ABT-DOJ 296058

percent of their 1995 allowances. Individual drug allowances and savings for 1995 are presented in Appendix C.

**FOR MORE THAN ONE-THIRD OF THE 22 DRUGS REVIEWED, MEDICARE ALLOWED AMOUNTS WERE MORE THAN DOUBLE THE ACTUAL AVERAGE WHOLESALE PRICE AVAILABLE TO PHYSICIANS AND SUPPLIERS.**

Medicare allowed between 2 and 10 times the actual average wholesale prices offered by drug wholesalers and group purchasing organizations for 8 of the 22 drugs reviewed. For one drug, Medicare allowed 900 percent more than the average price available for the drug in 1995 and 673 percent more in 1996. The chart below provides the percentage of the Medicare allowed amount that is greater than the actual average wholesale price for each of the eight drugs.



**MEDICARE ALLOWED MORE THAN DOUBLE THE WHOLESALE PRICE FOR EIGHT DRUGS**

Medicare allowances were also significantly higher than acquisition costs for the remaining 14 drugs reviewed. Medicare allowed 60 to 95 percent more than the actual average wholesale price for 3 drugs in 1995 and 2 drugs in 1996. Medicare allowed amounts were higher by 20 to 50 percent for 9 drugs in 1995 and 8 drugs in 1996. Reimbursement was between 11 and 18 percent more for the remaining 2 drugs in 1995 and 4 drugs in 1996.

---

8

Highly Confidential

ABT-DOJ 296059

Medicare and its beneficiaries paid at least 20 percent more than the actual average wholesale price for over 80 percent of the 22 drugs. For every one of the 22 drugs reviewed, Medicare allowed more than the average actual price in both 1995 and 1996. Not only did Medicare pay more than the average price, the program allowed more than even the highest wholesale price obtained for every drug. Appendix B provides information on the highest and lowest wholesale price available for each drug in 1995 and 1996.

Based on the differences found between Medicare allowed amounts and actual wholesale prices, it is apparent that the current Medicare reimbursement methodology is based on an significantly inflated AWP statistic which bears little resemblance to actual wholesale prices available in the marketplace.

## THERE IS NO CONSISTENCY AMONG CARRIERS IN ESTABLISHING AND UPDATING MEDICARE DRUG REIMBURSEMENT AMOUNTS.

Although Medicare's reimbursement methodology for prescription drugs does not provide for different payment rates based on geographical factors, the allowed amounts for individual drug codes varied among the carriers. Medicare guidelines allow carriers to update prescription drug reimbursement on a quarterly basis. However, not only did some carriers update yearly rather than quarterly but carrier allowed amounts for the same drug code differed within a single quarter.

For some drug codes, the differences in allowed amounts were significant. Carriers' allowed amounts varied even for single-source drugs where the reimbursement rate is based on only one AWP. A carrier reimbursed code J9217 (leuprolide acetate, a single-source drug) at $496.25 for all of 1995. Another carrier allowed $412.29 for the first quarter of 1995, $439.30 for the second and third quarters, and $477.50 for the fourth. For the first quarter of 1995, providers in one State were receiving 20 percent more in reimbursement than providers billing the same drug code in another State. The second carrier eventually paid $496.26 for this code in the first quarter of 1996. However, the first carrier increased reimbursement to $515.63 in the same quarter.

Little uniformity was found among carriers when comparing changes in reimbursement from the first quarter of 1995 to the second quarter of 1997. One carrier's reimbursement for code J9000 (doxorubicin hcl, 10 mg.) increased 128 percent from $20 to $45.50. Another carrier's rate for the same code decreased 19 percent from $48.20 to $39.10.

Since Medicare does not allow geographical differences to effect drug reimbursement, variations would seem to be caused by carriers' decisions regarding when to update reimbursement, what sources to use for documenting AWPs, and in the case of multiple-source drugs which generic drugs to include in calculating the median statistic.

---

9

Highly Confidential

ABT-DOJ 296060

# RECOMMENDATIONS

The findings of this report provide evidence that Medicare and its beneficiaries are making excessive payments for prescription drugs. The published AWPs that are currently being used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices that are available to the physicians and suppliers that bill for these drugs. By basing reimbursement on published AWPs rather than more appropriate acquisition or wholesale prices, we estimate that Medicare and its beneficiaries paid nearly one billion dollars more for 22 drugs in 1995 and 1996.

We believe the information in this report provides further support for a previous recommendation made by the Office of Inspector General. We recommended that HCFA reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments as appropriate. The HCFA concurred with the recommendation. We urge readers to review our prior report, *Medicare Payments for Nebulizer Drugs*, which provided the full text of HCFA's comments on our recommendation.

For our readers' convenience, the options for changing Medicare's reimbursement methodology that appeared in the recommendation are presented below. We have modified the original discounted AWP and acquisition cost options in response to the evidence presented in this report concerning the large disparity between published AWPs and actual average wholesale prices available for prescription drugs.

*Options for Changing Medicare's Reimbursement Methodology for Prescription Drugs*

Discounted Wholesale Price

Beginning in January 1998, Medicare will reimburse prescription drugs at 95 percent of AWP. Many State Medicaid agencies use greater discounted AWPs to establish drug prices. Medicare could also base its drug payments on this larger discounted average wholesale prices. We believe that the 5 percent discount that will soon be implemented is not a large enough decrease. Upon implementation of this option, some type of general limit should be applied to the prices to ensure that inappropriate increases in average wholesale prices that could occur in subsequent years do not adversely affect Medicare payments. In addition, the Secretary should be granted the authority to conduct sample surveys of actual wholesale prices to determine the amount of difference between actual average wholesale prices and published AWPs. The percentage difference found in the sample could then be applied to all AWPs used by the program to determine drug reimbursement.

Acquisition Cost

Medicare could base the payment of drugs on either actual or estimated acquisition costs. Although Medicare currently has the authority to use EAC, carriers have yet to

---

10

Highly Confidential

successfully implement the option. Upon implementation of either the actual or estimated method, we believe that some type of general limit should be applied to ensure that inappropriate increases in drug prices do not occur in subsequent years.

## Manufacturers' Rebates

Medicare could develop a legislative proposal to establish a mandated manufacturers' rebate program similar to Medicaid's rebate program. We recognize that HCFA does not have the authority to simply establish a mandated manufacturers' rebate program similar to the program used in Medicaid. Legislation was required to establish the Medicaid rebate program, and would also be required to establish a Medicare rebate program. We have not thoroughly assessed how a Medicare rebate program might operate, what administrative complexities it might pose, or how a Medicare rebate program might differ from a Medicaid rebate program. We believe, however, the legislative effort would be worthwhile. The same manufacturers that provide rebates to Medicaid make the drugs that are used by Medicare beneficiaries and paid for by the Medicare program.

To implement this option, HCFA would have to revise Medicare's claims coding system which does not identify the manufacturer or indicate if the drug is a brand name or a generic equivalent, information that is needed to discount the AWP and obtain a rebate for a specific drug. Medicaid uses National Drug Codes (NDC) in processing drug claims. The NDC identifies the manufacturer and reflects whether the drug is a brand name or a generic equivalent.

## Competitive Bidding

Medicare could develop a legislative proposal to allow it to take advantage of its market position. While competitive bidding is not appropriate for every aspect of the Medicare program or in every geographic location, we believe that it can be effective in many instances, including the procurement of drugs. Medicare could ask pharmacies to compete for business to provide Medicare beneficiaries with prescription drugs. All types of pharmacies could compete for Medicare business, including independents, chains, and mail-order pharmacies.

## Inherent Reasonableness

Since Medicare's guidelines for calculating reasonable charges for drugs result in excessive allowances, the Secretary can use her "inherent reasonableness" authority to set special reasonable charge limits. If this option is selected, however, it will not be effective unless the Secretary's authority to reduce inherently unreasonable payment levels is streamlined. The current inherent reasonableness process is resource intensive and time consuming, often taking two to four years to implement. Medicare faces substantial losses in potential savings--certainly in the millions of dollars--if reduced drug prices cannot be placed into effect quickly.

---

11

Highly Confidential

ABT-DOJ 296062

We also believe that the variance of Medicare reimbursement for individual drug codes among carriers is inappropriate. The rate at which physicians and suppliers are paid for drugs should not depend on which carrier providers bill. **We, therefore, recommend that HCFA require all carriers to reimburse a uniform allowed amount for each HCPCS drug code.** The HCFA could choose to supply all carriers with a list of average wholesale prices that it has determined represent each drug code. The carriers could then use the uniform prices to calculate payment. The HCFA could also designate one single entity to perform all necessary calculations to determine reimbursement for each drug code on a quarterly basis. All carriers would then use this standard reimbursement amount.

## AGENCY COMMENTS

The HCFA concurred with our recommendations. The HCFA's proposal in the President's 1998 budget that would have required physicians to bill Medicare the actual acquisition cost for drugs was not adopted by Congress. However, the agency states that it will continue to pursue this policy in other appropriate ways. The full text of HCFA's comments are provided in Appendix D.

We support HCFA's continued pursuance of reducing drug payments where appropriate. We do not believe that the reimbursement methodology for prescription drugs recently adopted by Congress will curtail the excessive drug payments we've identified in the Medicare program. In this report we've identified Medicare allowances that were 11 to 900 percent greater than drug prices available to the physician and supplier communities.

To address the issue of uniformity among carriers, HCFA has convened a workgroup to develop an electronic file consisting of the average wholesale prices for drugs covered by Medicare. The agency reports it will distribute this file to Medicare contractors for their use in paying drug claims.

12

Highly Confidential

ABT-DOJ 296063

# APPENDIX A

## Description of 22 HCPCS Codes

| Code | Description |
|------|-------------|
| J9217 | Leuprolide Acetate (for depot suspension), 7.5 mg. |
| J7620 | Albuterol Sulfate, 0.083%, per ml., inhalation solution administered through DME |
| J9265 | Paclitaxel, 30 mg. |
| J9202 | Goserelin Acetate Implant, per 3.6 mg. |
| J0640 | Injection, Leucovorin Calcium, per 50 mg. |
| J9045 | Carboplatin, 50 mg. |
| J1440 | Injection, Filgrastim (G-CSF), per 300 mcg. |
| Q0136 | Injection, Epoetin Alpha, (For Non-ESRD Use), per 1000 units |
| J2405 | Injection, Ondansetron Hydrochloride, per 1 mg. |
| J1625 | Injection, Granisetron Hydrochloride, per 1 mg. |
| J1561 | Injection, Immune Globulin, Intravenous, per 500 mg. |
| J7670 | Metaproterenol Sulfate, 0.4%, per 2.5 ml., inhalation solution administered through DME |
| J1441 | Injection, Filgrastim (G-CSF), per 480 mcg. |
| J9182 | Etoposide, 100 mg. |
| J9000 | Doxorubicin HCL, 10 mg. |
| J9031 | BCG (Intravesical) per instillation |
| J9181 | Etoposide, 10 mg. |
| J7672 | Metaproterenol Sulfate, 0.6%, per 2.5 ml., inhalation solution administered through DME |
| J9293 | Injection, Mitoxantrone Hydrochloride, per 5 mg. |
| J9185 | Fludarabine Phosphate, 50 mg. |
| J9010 | Doxorubicin HCL, 50 mg. (code discontinued 12/31/96) |
| J3370 | Injection, Vancomycin HCL, up to 500 mg. (code discontinued for infusion 9/1/96) |

A - 1

Highly Confidential

ABT-DOJ 296064

# APPENDIX B

SUMMARY OF WHOLESALE PRICES AND ESTIMATED SAVINGS
FOR 1995 AND 1996

B - 1

Highly Confidential

ABT-DOJ 296065

SUMMARY OF WHOLESALE PRICES AND ESTIMATED SAVINGS FOR 1995

| HCPCS Code | Average Medicare Allowed Amount | Actual Average Wholesale Price | Savings Based on Actual Average Wholesale Price | Lowest Wholesale Price Found | Savings Based on Lowest Wholesale Price | Highest Wholesale Price Found | Savings Based on Highest Wholesale Price |
|---|---|---|---|---|---|---|---|
| J9217 | $474.67 | $394.33 | $83,728,802 | $391.00 | $87,202,882 | $396.00 | $81,991,762 |
| J7620 | $0.42 | $0.15 | $106,352,439 | $0.12 | $119,040,331 | $0.21 | $85,081,951 |
| J9265 | $180.82 | $148.70 | $14,425,220 | $146.10 | $15,592,891 | $150.00 | $13,841,385 |
| J9202 | $353.82 | $292.95 | $11,716,412 | $286.84 | $12,891,775 | $296.00 | $11,128,731 |
| J0640 | $23.27 | $2.33 | $61,175,769 | $1.89 | $62,449,291 | $2.90 | $59,499,161 |
| J9045 | $78.01 | $66.67 | $7,226,520 | $64.90 | $8,352,014 | $67.55 | $6,663,773 |
| J1440 | $149.46 | $124.47 | $8,620,001 | $124.20 | $8,711,972 | $125.00 | $8,436,058 |
| Q0136 | $11.92 | $9.92 | $7,942,246 | $8.84 | $12,246,366 | $10.70 | $4,850,833 |
| J2405 | $5.65 | $4.33 | $10,591,319 | $3.91 | $14,012,161 | $5.31 | $2,712,031 |
| J1625 | $165.29 | $123.58 | $9,709,625 | $117.00 | $11,240,029 | $132.80 | $7,562,405 |
| J1561 | $42.21 | $16.12 | $23,339,871 | $9.33 | $29,422,374 | $32.11 | $9,036,521 |
| J7670 | $1.22 | $0.32 | $23,986,743 | $0.26 | $25,544,703 | $0.40 | $21,872,652 |
| J1441 | $234.96 | $195.50 | $5,256,151 | $188.90 | $6,135,284 | $198.80 | $4,816,584 |
| J9182 | $131.25 | $76.70 | $11,660,930 | $56.00 | $16,085,515 | $113.55 | $3,783,570 |
| J9000 | $42.14 | $13.12 | $11,445,719 | $10.90 | $12,319,556 | $14.70 | $10,821,019 |
| J9031 | $155.20 | $120.54 | $3,659,236 | $94.28 | $6,430,898 | $138.44 | $1,769,236 |
| J9181 | $14.03 | $7.80 | $6,688,786 | $5.60 | $9,052,665 | $11.36 | $2,872,584 |
| J7672 | $1.22 | $0.31 | $11,560,517 | $0.26 | $12,175,863 | $0.40 | $10,400,217 |
| J9293 | $206.69 | $127.49 | $6,846,261 | $123.23 | $7,214,694 | $132.01 | $6,456,006 |
| J9185 | $173.03 | $149.08 | $1,890,949 | $145.25 | $2,193,648 | $152.00 | $1,660,634 |
| J9010 | $204.21 | $64.86 | $9,942,878 | $52.00 | $10,860,640 | $73.50 | $9,326,551 |
| J3370 | $10.07 | $3.69 | $7,235,171 | $2.02 | $9,122,193 | $6.99 | $3,491,965 |
| TOTAL | | | $445,001,565 | | $498,297,745 | | $368,075,629 |

B - 2

Highly Confidential

ABT-DOJ 296066

SUMMARY OF WHOLESALE PRICES AND ESTIMATED SAVINGS FOR 1996

| HCPCS Code | Average Medicare Allowed Amount | Actual Average Wholesale Price | Savings Based on Actual Average Wholesale Price | Lowest Wholesale Price Found | Savings Based on Lowest Wholesale Price | Highest Wholesale Price Found | Savings Based on Highest Wholesale Price |
|---|---|---|---|---|---|---|---|
| J9217 | $499.72 | $414.73 | $104,365,435 | $409.27 | $111,066,902 | $421.00 | $96,663,201 |
| J7620 | $0.41 | $0.19 | $92,199,355 | $0.16 | $105,604,026 | $0.25 | $67,530,255 |
| J9265 | $181.32 | $148.56 | $22,757,465 | $140.26 | $28,526,148 | $155.43 | $17,986,896 |
| J9202 | $378.29 | $329.43 | $11,215,983 | $317.00 | $14,067,894 | $341.85 | $8,364,073 |
| J0640 | $21.70 | $2.81 | $52,514,021 | $2.39 | $53,670,253 | $3.45 | $50,724,087 |
| J9045 | $82.76 | $67.64 | $12,539,724 | $64.90 | $14,814,584 | $70.55 | $10,128,000 |
| J1440 | $154.65 | $123.39 | $11,592,740 | $121.56 | $12,271,393 | $126.00 | $10,624,824 |
| Q0136 | $11.93 | $10.37 | $10,399,198 | $9.31 | $17,440,772 | $10.70 | $8,195,663 |
| J2405 | $6.08 | $4.28 | $14,319,348 | $3.92 | $17,172,050 | $4.73 | $10,776,959 |
| J1625 | $170.02 | $125.71 | $13,399,842 | $122.90 | $14,250,690 | $128.00 | $12,708,277 |
| J1561 | $42.21 | $16.65 | $24,808,622 | $12.50 | $28,833,317 | $34.00 | $7,967,739 |
| J7670 | $1.23 | $0.41 | $9,935,367 | $0.32 | $10,965,079 | $0.51 | $8,658,040 |
| J1441 | $246.34 | $196.76 | $8,470,488 | $191.99 | $9,285,542 | $202.25 | $7,532,512 |
| J9182 | $137.57 | $70.91 | $13,362,365 | $37.06 | $20,147,028 | $112.57 | $5,011,200 |
| J9000 | $44.19 | $13.65 | $12,480,751 | $10.87 | $13,616,851 | $17.95 | $10,723,475 |
| J9031 | $157.53 | $133.13 | $2,682,097 | $112.00 | $5,004,749 | $148.95 | $943,131 |
| J9181 | $14.14 | $8.02 | $5,909,155 | $3.71 | $10,077,601 | $11.26 | $2,784,899 |
| J7672 | $1.23 | $0.44 | $4,805,175 | $0.32 | $5,492,908 | $0.55 | $4,117,563 |
| J9293 | $172.81 | $142.40 | $2,712,650 | $139.91 | $2,935,141 | $145.38 | $2,447,586 |
| J9185 | $179.45 | $156.50 | $2,049,320 | $152.00 | $2,451,148 | $161.00 | $1,647,493 |
| J9010 | $207.12 | $65.46 | $10,513,722 | $54.00 | $11,364,260 | $76.00 | $9,731,464 |
| J3370 | $9.44 | $4.42 | $4,213,709 | $3.45 | $5,027,227 | $6.45 | $2,509,417 |
| TOTAL | | | $447,246,532 | | $514,085,563 | | $357,776,754 |

B - 3

Highly Confidential

ABT-DOJ 296067

# APPENDIX C

**INDIVIDUAL DRUG ALLOWANCES AND SAVINGS PERCENTAGES**
**FOR 1995 AND 1996**

C - 1

Highly Confidential

ABT-DOJ 296068

Estimated Medicare Savings if Acquisition Costs
Were Used for 1995 Prescription Drug Reimbursement

| HCPCS Code | Drug Description | 1995 Allowances | Estimated Savings | Percent Saved |
|---|---|---|---|---|
| J9217 | Leuprolide Acetate | $455,238,461 | $83,728,802 | 18% |
| J7620 | Albuterol Sulfate 0.083% | $166,901,971 | $106,352,439 | 64% |
| J9265 | Paclitaxel | $79,672,417 | $14,425,220 | 18% |
| J9202 | Goserelin Acetate Implant | $65,806,263 | $11,716,412 | 18% |
| J0640 | Leucovorin Calcium | $64,687,013 | $61,175,769 | 95% |
| J9045 | Carboplatin | $49,306,732 | $7,226,520 | 15% |
| J1440 | Filgrastim, per 300 mcg. | $47,401,344 | $8,620,001 | 18% |
| Q0136 | Epoetin Alpha (Non-ESRD Use) | $47,324,218 | $7,942,246 | 17% |
| J2405 | Ondansetron Hydrochloride | $45,279,311 | $10,591,319 | 23% |
| J1625 | Granisetron Hydrochloride | $33,013,314 | $9,709,625 | 29% |
| J1561 | Immune Globulin | $31,646,866 | $23,339,871 | 74% |
| J7670 | Metaproterenol Sulfate 0.4% | $30,822,456 | $23,986,743 | 78% |
| J1441 | Filgrastim, per 480 mcg. | $29,865,814 | $5,256,151 | 18% |
| J9182 | Etoposide, 100 mg. | $25,713,304 | $11,660,930 | 45% |
| J9000 | Doxorubicin HCL, 10 mg. | $16,017,009 | $11,445,719 | 71% |
| J9031 | BCG (Intravesical) | $15,494,267 | $3,659,236 | 24% |
| J9181 | Etoposide, 10 mg. | $14,510,938 | $6,688,786 | 46% |
| J7672 | Metaproterenol Sulfate 0.6% | $13,876,217 | $11,560,517 | 83% |
| J9293 | Mitoxantrone Hydrochloride | $13,271,172 | $6,846,261 | 52% |
| J9185 | Fludarabine Phosphate | $12,725,400 | $1,890,949 | 15% |
| J9010 | Doxorubicin HCL, 50 mg. | $12,515,401 | $9,942,878 | 79% |
| J3370 | Vancomycin HCL | $12,051,885 | $7,235,171 | 60% |
| TOTAL | | $1,283,141,773 | $445,001,565 | 35% |

C - 2

Highly Confidential

ABT-DOJ 296069

Estimated Medicare Savings if Acquisition Costs
Were Used for 1996 Prescription Drug Reimbursement

| HCPCS Code | Drug Description | 1996 Allowances | Estimated Savings | Percent Saved |
|---|---|---|---|---|
| J9217 | Leuprolide Acetate | $577,547,780 | $104,365,435 | 18% |
| J7620 | Albuterol Sulfate 0.083% | $175,399,846 | $92,199,355 | 53% |
| J9265 | Paclitaxel | $125,093,980 | $22,757,465 | 18% |
| J9202 | Goserelin Acetate Implant | $84,187,487 | $11,215,983 | 13% |
| J0640 | Leucovorin Calcium | $57,323,221 | $52,514,021 | 92% |
| J9045 | Carboplatin | $67,530,797 | $12,539,724 | 19% |
| J1440 | Filgrastim, per 300 mcg. | $54,460,250 | $11,592,740 | 21% |
| Q0136 | Epoetin Alpha (Non-ESRD Use) | $79,558,670 | $10,399,198 | 13% |
| J2405 | Ondansetron Hydrochloride | $47,331,513 | $14,319,348 | 30% |
| J1625 | Granisetron Hydrochloride | $49,691,403 | $13,399,842 | 27% |
| J1561 | Immune Globulin | $35,104,622 | $24,808,622 | 71% |
| J7670 | Metaproterenol Sulfate 0.4% | $14,203,070 | $9,935,367 | 70% |
| J1441 | Filgrastim, per 480 mcg. | $40,592,257 | $8,470,488 | 21% |
| J9182 | Etoposide, 100 mg. | $25,739,111 | $13,362,365 | 52% |
| J9000 | Doxorubicin HCL, 10 mg. | $17,410,833 | $12,480,751 | 72% |
| J9031 | BCG (Intravesical) | $16,544,398 | $2,682,097 | 16% |
| J9181 | Etoposide, 10 mg. | $13,381,243 | $5,909,155 | 44% |
| J7672 | Metaproterenol Sulfate 0.6% | $6,595,854 | $4,805,175 | 73% |
| J9293 | Mitoxantrone Hydrochloride | $14,522,607 | $2,712,650 | 19% |
| J9185 | Fludarabine Phosphate | $15,462,970 | $2,049,320 | 13% |
| J9010 | Doxorubicin HCL, 50 mg. | $14,541,250 | $10,513,722 | 72% |
| J3370 | Vancomycin HCL | $8,234,140 | $4,213,709 | 51% |
| TOTAL | | $1,540,457,302 | $447,246,532 | 29% |

C - 3

Highly Confidential

ABT-DOJ 296070

# A P P E N D I X   D

### HEALTH CARE FINANCING ADMINISTRATION COMMENTS

D - 1

Highly Confidential

ABT-DOJ 296071



DEPARTMENT OF HEALTH & HUMAN SERVICES

Health Care Financing Administration

Deputy Administrator
Washington, D.C. 20201

**DATE:**   OCT - 1 1997

**TO:**   June Gibbs Brown
Inspector General

**FROM:**   Nancy-Ann Min DeParle NMD
Deputy Administrator

**SUBJECT:**   Office of Inspector General (OIG) Draft Report: "Excessive Medicare
Payments for Prescription Drugs," (OEI-03-97-00290)

We reviewed the above-referenced report that examines Medicare payments for
prescription drugs. Medicare allowances for prescription drugs increased 25 percent from
$1.8 billion in 1995 to $2.3 billion in 1996. However, the number of services allowed
increased only 9 percent between the 2 years.

Medicare does not pay for over-the-counter drugs or many prescription drugs that are
self-administered. However, the program will pay for certain categories of drugs used by
its beneficiaries. Contracted carriers determine the amounts that Medicare will pay for the
drugs based on the lower of the estimated acquisition cost (EAC) or the national average
wholesale price (AWP). The allowed amount is the price that Medicare and its
beneficiaries pay a drug supplier. OIG findings indicate that at present, it is the AWP
that carriers use to develop Medicare reimbursement for prescription drugs. The AWP is
reported in The Red Book and other pricing publications and databases used by the
pharmaceutical industry. The EAC is determined based on surveys of the actual invoice
prices paid for the drug.

The findings contained in the report indicate that Medicare is making excessive payments
for prescription drugs. The published AWPs currently used by Medicare carriers to
determine reimbursement do not resemble the actual wholesale prices which are available
to the physician and supplier communities that bill for these drugs.

---

D - 2

Highly Confidential

ABT-DOJ 296072

2

OIG suggests that the Health Care Financing Administration (HCFA): (1) reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments; and (2) require all carriers to reimburse a uniform allowed amount for each HCFA Common Procedural Coding System (HCPCS) drug code.

HCFA concurs with OIG's recommendations.  Our detailed comments are as follows:

OIG Recommendation 1

HCFA should require all carriers to reimburse a uniform allowed amount for each HCPCS drug code.

HCFA Response

We concur.  HCFA agrees with OIG's findings and recommendations contained in this report.  HCFA convened a workgroup to develop an electronic file consisting of the AWPs for drugs covered by Medicare. HCFA will then distribute this file to Medicare contractors for their use in paying claims for drugs.

OIG Recommendation 2

HCFA should reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments as appropriate.

HCFA Response

We concur.  We agree with OIG's findings and recommendations. We included a provision in the President's 1998 budget bill that would have eliminated the markup for drugs billed to Medicare by requiring physicians to bill the program the actual acquisition cost for drugs.  Unfortunately, this provision was not enacted, but we will pursue this policy in other appropriate ways.

---

D - 3

Highly Confidential

ABT-DOJ 296073

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of Inspector General

## Memorandum

Date  DEC  5 1997

From  June Gibbs Brown
      Inspector General

Subject  OIG Final Report: "Excessive Medicare Payments for
         Prescription Drugs," OEI-03-97-00290

To    Nancy-Ann Min DeParle
      Administrator
      Health Care Financing Administration

Attached is our final inspection report that compares Medicare
allowances for drugs with drug acquisition prices available to
the physician and supplier communities.

Medicare allowances for 22 drugs exceeded actual wholesale
prices by $447 million in 1996.  For the 22 drugs reviewed,
Medicare payments would have been reduced by 29 percent if
actual wholesale prices had been used instead of manufacturers
published wholesale prices.

For more than one-third of the 22 drugs reviewed, Medicare and
its beneficiaries paid more than double the actual average
wholesale price available to physicians and suppliers.  For
every one of the 22 drugs reviewed, Medicare reimbursed more
than the average actual price in both 1995 and 1996.  Not only
did Medicare allow more than the average price, the program
reimbursed more than even the highest wholesale price for every
drug.

We also found there is no consistency among carriers in
establishing and updating Medicare drug reimbursement amounts.
In some cases, the difference in allowed amounts for the same
drug were significant.

The information in this report provides further support for a
recommendation made in an earlier report entitled "Medicare
Payments for Nebulizer Drugs" where we advised that the Health
Care Financing Administration (HCFA) reexamine its Medicare
drug reimbursement methodologies with a goal of reducing
payments as appropriate.  The HCFA concurred with the
recommendations.  In this report, we also recommended that HCFA
require all carriers to reimburse a uniform allowed amount for
each Common Procedural Coding System drug code.

Highly Confidential

ABT-DOJ 296074

Page 2 - Nancy-Ann Min DeParle

We support HCFA's continued effort to reduce drug payments where appropriate. We do not believe that the new reimbursement methodology for prescription drugs recently adopted by Congress will curtail the excessive drug payments identified in the Medicare program.

If you have any questions or comments about this report, please call me or George Grob, Deputy Inspector General for Evaluation and Inspections, or have your staff contact Mary Beth Clarke at (202) 619-2481.

Attachment

cc:

Margaret A. Hamburg
Assistant Secretary for
  Planning and Evaluation

John J. Callahan
Assistant Secretary for
  Management and Budget

Richard J. Tarplin
Assistant Secretary
  for Legislation

Melissa Skolfield
Assistant Secretary for
  Public Affairs

Highly Confidential

ABT-DOJ 296075

## ABBOTT POSITION ON MEDICARE REFORM
### KEY PARTICIPANTS

**Corporate**
| | | |
|---|---|---|
| Jim Miller | Div. Vice President, Corporate Development | D-369 AP6D |
| Rich Rieger | Manager, Strategic Planning | D-369 AP6D |
| Cathy Babington | Vice President, Public Affairs | D-383 AP6D |

**PPD**
| | | |
|---|---|---|
| Don Buell | Director, Health Economics and Policy | D-21M AP30 |
| Don Conway | Director, Epidemiology and Outcomes Research | D-42J AP6C |

**ADD**
| | | |
|---|---|---|
| Paul Landauer | Director, External Affairs & Healthcare Economics | D-34J AP6C |

**HPD**
| | | |
|---|---|---|
| Dave Olson | Director, Strategic Planning | D-981 AP30 |
| Ginny Tobiason | Manager, Client Services | D-H56 APJ4 |

**AHD**
| | | |
|---|---|---|
| Bill Dwyer | Sr. Director, Strategic Marketing | D-49U AP6B |

**Ross**
| | | |
|---|---|---|
| Mike Tootell | Manager, Insurance Development | RP32/106715 |

**TAP**
| | | |
|---|---|---|
| John Campbell | National Manager, Government Accounts | BBURN/T36 |

**Washington, DC**
| | |
|---|---|
| David Landsidle | Divisional Vice President, Washington |
| Cindy Sensibaugh | Director, Washington Affairs |
| Rosemary Haas | Manager, Federal Affairs |

docs\memos\rr2.sam
2/7/97

**Confidential**
Subject to Protective Order

ABT 53216

**TXABT 674234**
**Confidential**

ABT087-0510

*Tobiason* DEP. EX. NO. 17
FOR ID., AS OF 1/22/08 LP