# EXHIBIT 13

Page 1

```
          UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - x

IN RE:  PHARMACEUTICAL         : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     : CIVIL ACTION:

PRICE LITIGATION               : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO       :

U.S. ex rel. Ven-a-Care of     : Judge Patti B. Saris

the Florida Keys, Inc. v.      :

Abbott Laboratories, Inc.,     : Chief Magistrate

No. 06-CV-11337-PBS            : Judge Marianne B.

- - - - - - - - - - - - - - - x Bowler

            IN THE CIRCUIT COURT OF

          MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - - x

STATE OF ALABAMA,              :

            Plaintiff,         :

       vs.                     : Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,     : Judge Charles Price

et al.,                        :

            Defendants.        :

- - - - - - - - - - - - - - - x
```

DeParle, Nancy-Ann                                                May 18, 2007
Washington, DC

Page 226

1  in September of 1995?
2      A.  No.
3          MS. YAVELBERG:  Objection; form.
4      Q.  If I can get you to flip through to
5  page 2900624 in the Bates numbering.  It's what
6  appears to be two-to-a-page Power Point
7  presentation slides, the first of which describes
8  Ven-A-Care as a specialized infusion pharmacy.
9  Do you recall Ven-A-Care characterizing itself as
10 a specialized infusion pharmacy?
11         MS. YAVELBERG:  Objection; form.
12     A.  No.
13     Q.  Do you recall anything that Ven-A-Care
14 told you about the nature of their practice and
15 what they did as a specialized infusion pharmacy?
16     A.  I don't recall knowing specialized
17 infusion pharmacy.  No.  I would have said home
18 health, something about home health.  I just
19 don't remember.
20         VIDEOGRAPHER:  Excuse me, counsel.  Can
21 I ask the witness, please, to move her
22 microphone.  I think what's happening is your

Page 227

1  necklace is hitting up against the microphone and
2  I'm getting very bad static.  Thank you.
3  BY MR. COOK:
4      Q.  If you could turn to page 646 of the
5  last three numbers of the Bates numbers.  The
6  first of the slides there alleges that
7  manufacturers make misleading statements to the
8  United States government officials as to the
9  origins of AWPs and WACs.  Do you see that?
10     A.  I do.
11     Q.  Do you recall any discussion in this
12 meeting about Ven-A-Care's allegations that
13 manufacturers were making misleading statements
14 to government officials?
15     A.  No.
16     Q.  And there is a reference there to a
17 1992 OIG report on physician costs for
18 chemotherapy drugs.  Do you recall Ven-A-Care
19 referring you to that 1992 report?
20     A.  No.
21     Q.  Do you recall whether you asked anybody
22 to look at that 1992 OIG report?

Page 228

1      A.  No.
2      Q.  The next slide is entitled
3  manufacturers deny that they influence the
4  setting of AWPs and it refers to a Barron's
5  article from June of 1996 entitled Hooked on
6  Drugs.  First of all, do you recall any
7  discussion at this meeting about the Barron's
8  article Hooked on Drugs?
9      A.  No.
10     Q.  Do you recall ever seeing that Barron's
11 article from June of 1996?
12     A.  No.
13     Q.  The next page.  It's a slide that
14 alleges that First Databank, Medco's Red Book,
15 and Medispan rely on manufacturer representations
16 regarding AWP and WAC.  Do you recall Ven-A-Care
17 describing anything about alleged reliance by
18 those compendia on manufacturers regarding AWP
19 and WAC?
20     A.  No.
21         MS. YAVELBERG:  Objection; form.
22     Q.  Do you know what Red Book and First

Page 229

1  Databank -- those are what we referred to earlier
2  as Red Book and Blue Book?
3      A.  Yes.
4      Q.  And you knew that at the time Medicare
5  was relying upon Red Book and Blue Book to obtain
6  AWPs to implement BBA in 1997?
7          MS. YAVELBERG:  Objection; form.
8      A.  Well, as I've testified, HCFA published
9  a program memorandum that instructed the carriers
10 to pay statutory pricing of BBA, which was 95
11 percent of the average wholesale price, and
12 average wholesale price had historically been
13 determined by reference to these compendia.  But
14 you said Medicare relied.  I don't know that I
15 would say that, but that's what the carriers
16 used.  That was historically what they would use.
17     Q.  And as of 1998, to the best of your
18 knowledge, the carriers were still using Red Book
19 and Blue Book to determine AWP; correct?
20     A.  Yes, and I guess Medispan, too.  That
21 was the third source.
22     Q.  Were you aware that Medicaid programs

58 (Pages 226 to 229)

Page 657

1    A.  No.
2        MR. HAVILAND:  Okay.  I have no more
3   questions, Ms. DeParle.  I appreciate your time.
4        MR. LIBMAN:  This is Ms. Libman.  Am I
5   next up with a few questions, if I could?
6        MS. YAVELBERG:  Yes.
7
8            EXAMINATION BY COUNSEL FOR THE
9            STATES OF ALASKA, HAWAII, IDAHO,
10           ILLINOIS, KENTUCKY, SOUTH CAROLINA
11           AND WISCONSIN
12  BY MR. LIBMAN:
13   Q.  Ms. DeParle, I'm having a hard time
14  hearing you.  Let me try something else here.
15  Can you hear me Ms. DeParle?
16   A.  Yes.
17   Q.  Great.  My name is Robert Libman.  And
18  I'm outside counsel seven states I identified
19  earlier -- they include Alaska, Hawaii, Idaho,
20  Illinois, Kentucky, South Carolina and Wisconsin
21  -- in litigation brought against numerous drug
22  companies, including those who have been sued by

Page 658

1   the U.S. Department of Justice.
2        Our claims are brought under state law
3   and among other things allege that all the
4   defendants have reported and caused to be
5   published average wholesale price for their drugs
6   that are in fact not true prices, not true
7   average prices and not true average wholesale
8   prices.  In other words, not the price, the
9   average price charged by wholesalers to their
10  customers.
11       Do you have any knowledge or have you
12  heard anything about the litigation brought by
13  the seven states that I represent?
14   A.  I believe I've seen articles in the
15  newspapers about the state litigation.  But
16  otherwise, no.
17   Q.  Okay.  Well, I only have a few
18  questions for you.  Starting with -- and I
19  apologize.  I don't have the exhibit number in
20  front of me.  But you were shown one OIG report.
21  Do you recall that I believe Mr. Cook read a
22  portion of it to you that made a representation

Page 659

1   therein that the drug companies themselves were
2   the ones who set the AWPs that were published by
3   First Databank, Medi-Span and Red Book?  Do you
4   recall that?
5        MR. COOK:  Objection to form.
6    A.  I recall -- well, generally.  I'm
7   hesitating because you said First Databank and I
8   don't remember that.  I remember Red Book, Blue
9   Book and Medi-Span.
10   Q.  Okay.  But as to those three publishers
11  you understood that among other things they
12  published information including AWPs for certain
13  drugs; is that correct?
14   A.  Yes.
15   Q.  And do you recall the HHS OIG report,
16  one of those that was shown to your earlier
17  today, indicated that it was the drug company
18  that set the AWPs that were published by those
19  publications?
20   A.  You know, I'm sorry.  It's been a long
21  day.  I don't remember that precisely.
22   Q.  That's fine.  Was that your

Page 660

1   understanding during the time you were HCFA
2   administrator that the AWPs that were published
3   in those publications were in fact set and
4   controlled by the drug manufacturers?
5    A.  No.
6    Q.  Are you aware that in the cases for the
7   states whom I represent that the drug companies,
8   many of the drug companies have admitted that
9   they in fact reported AWPs to these publications
10  intending that the identical AWPs would be
11  published by those publications?
12   A.  I'm not really aware of the claims or
13  testimony in the state litigation.
14   Q.  Okay.  Let me ask you to assume for the
15  next series of questions that that is in fact the
16  case; that is, that the drug companies controlled
17  the AWPs either by directly reporting an AWP that
18  was published in its identical form by these
19  publications or reported a different number known
20  as a WAC, a wholesale acquisition cost, by which
21  the publication applied a mathematical formula to
22  arrive at an AWP.  And then let me ask you a few

84 (Pages 657 to 660)

Page 681

 1  that the actual wholesale price is lower than the
 2  average wholesale price?
 3        MS. YAVELBERG:  Objection, form.
 4     A.  I'm sorry.  This chart has six columns
 5  or seven columns.  And it's got the lowest, the
 6  highest.  Which one are you looking at?
 7     Q.  I'm looking at the first two columns.
 8  The average Medicare allowed amount in column 1
 9  and the actual average wholesale price in column
10  2.
11     A.  All right.
12     Q.  Can you confirm for me that in each of
13  those instances the that actual average wholesale
14  price reported by the OIG is lower than the
15  average Medicare allowed amount?
16     A.  Yes.
17     Q.  And so at least as of October 1, 1997
18  you knew that for those 22 drugs representing 67
19  percent of Medicare Part B spending on drugs that
20  the average wholesale prices published in
21  compendia were not actual averages of wholesale
22  prices, correct?

Page 682

 1        MS. YAVELBERG:  Objection, form.
 2     A.  No, I can't say that.  I knew that for
 3  these 22 drugs based on a statistical sampling
 4  the OIG had determined what she called an actual
 5  average wholesale price that was different in the
 6  ways that were described in this chart.  But I
 7  don't know if that was an actual wholesale price.
 8  It was a statistical sampling.  We had a
 9  discussion about what that is earlier.
10        So some might have been lower, some
11  might have been higher.  I don't know -- the word
12  actual is a pretty technical term.
13     Q.  And leaving semantics aside, is it fair
14  to say that the October 1, 1997 memorandum that
15  you initialed and that appears at page D2 of
16  Exhibit Abbott 002 accurately represents what you
17  understood and believed as of October 1, 1997?
18        MR. HAVILAND:  Object to the form.
19     A.  Yes.
20     Q.  Three very quick questions, Ms.
21  DeParle.  Has anyone representing Abbott ever
22  made any inappropriate lobbying attempts with

Page 683

 1  respect to you or Congress of which you're aware?
 2        MS. YAVELBERG:  Objection to form.
 3        MS. ALBEE:  Objection to form.
 4        MR. HAVILAND:  Objection to form.
 5     A.  I don't recall.
 6     Q.  Can you tell me of any
 7  misrepresentations that anybody representing
 8  Abbott has ever made to you or to the government
 9  of which you're aware?
10        MR. HAVILAND:  Objection.
11        MS. YAVELBERG:  Objection.
12     A.  Well, I can't speak for the government,
13  first of all.  To me, I can't recall.
14     Q.  And can you recall or testify about any
15  instance in which Abbott ever made any
16  representations to you about AWP, how it was
17  reported or what it represents?
18     A.  To me, no.
19        MR. COOK:  I have no more questions.
20        MR. HAVILAND:  I have a couple of
21  follow-ups unless others do in the room.
22        MR. WALLACH:  I have two.  Jason

Page 684

 1  Wallach on behalf of Baxter.
 2        MR. GORTNER:  Why don't we go in order.
 3        MR. WALLACH:  Oh, I apologize.
 4        THE VIDEOGRAPHER:  I'm going to have to
 5  change tapes.
 6        MS. YAVELBERG:  Okay.
 7        THE VIDEOGRAPHER:  This is the end of
 8  tape 5.  Off the record at 5:09.
 9           (Recess.)
10        THE VIDEOGRAPHER:  This is the
11  beginning of tape 6 in the deposition of Ms.
12  DeParle.  On the record at 5:22.
13
14        FURTHER EXAMINATION BY COUNSEL FOR
15        THE DEY COMPANIES
16  BY MS. REID:
17     Q.  This is Sarah Reid again.  And I only
18  have a few questions.
19        You had testified not too long ago your
20  belief that when you started as administrator
21  that AWP reflected an actual average price.  Do
22  you remember that testimony?

90 (Pages 681 to 684)

Page 685

1      MR. HAVILAND: Can counsel bring her
2  voice up? It's real hard to hear on the phone.
3  I apologize for interjecting.
4      Q. Do you recall that's the testimony that
5  you gave to Mr. Haviland?
6      A. I thought average wholesale price meant
7  average wholesale price, yeah.
8      Q. An actual price. That AWP was an
9  actual price.
10     A. I don't know that I would use the word
11 actual. What I meant was that I thought that the
12 Red Book and the Blue Book had the wholesale
13 prices that were paid out there in the
14 marketplace and that's what it's an average of.
15 I guess that's actual.
16     Q. So I want to direct your attention to
17 March of 1998, shortly after you became the
18 administrator and you had your meeting with Ven-
19 A-Care representatives. And we've marked when
20 you were examined on the first day of your
21 deposition the materials of Ven-A-Care presented
22 at that meeting. Do you recall?

Page 686

1      MS. YAVELBERG: Objection, form.
2      A. This is from day one. I don't think
3  we've looked at it today. But yeah, I recall
4  that Mr. Cook presented those to me.
5      Q. And during that meeting Ven-A-Care
6  representatives told you that AWP was not an
7  actual price or an actual average price, didn't
8  they?
9      MS. YAVELBERG: Objection to form.
10     A. I don't recall that. What I recall is
11 that they said that the drug companies were
12 committing fraud.
13     Q. And do you recall that they explained
14 to you or showed you material of how the AWPs
15 were reported to the publications and that they
16 did not represent any actual price? Do you
17 recall any discussion about that whatsoever?
18     MS. YAVELBERG: Objection, form.
19     A. I don't.
20     Q. And do you recall their discussion
21 about how they alleged the manufacturers and the
22 pharmaceutical companies were marketing the

Page 687

1  spread?
2      MS. YAVELBERG: Objection, form.
3      A. I don't recall those words, no.
4      Q. And do you recall seeing any slides in
5  which Ven-A-Care basically explained how the
6  spread was used to cover Medicare's 20 percent
7  copayment, to pay kickbacks and provide windfall
8  profits?
9      MS. YAVELBERG: Objection to form.
10     A. No, I don't.
11     Q. Let me just show you that page that was
12 marked as Exhibit Abbott 206. And if you can't
13 find it I'll just hand this one up to you. It's
14 a whole volume. It's Exhibit Abbott 206.
15     A. It's several hundred pages, it looks
16 like.
17     Q. If you look in Exhibit Abbott 206 at
18 what's been Bates stamped as 2900669 --
19     A. As I said before, I don't recall having
20 seen this. And I'm puzzled when I look at the
21 first page of it because it says HCFA Office of
22 Financial Management. I don't remember anyone

Page 688

1  from there being at this meeting or having
2  anything to do with it. So I wonder if this was
3  actually given to me.
4      Tell me the number again.
5      Q. 2900669. It has a slide on the top
6  where it talks about the spread?
7      A. Yes.
8      Q. You see what it's referring to, that
9  the spread is used to -- and then it goes through
10 its five bullet points?
11     A. (Nods head).
12     Q. So is your testimony this having
13 attended this meeting with Ven-A-Care you have
14 absolutely no memory whatsoever that the
15 gentleman from Ven-A-Care basically came in and
16 told you that AWP was a false figure being
17 falsely reported to the various compendia in
18 order to pay kickbacks, provide windfall profits,
19 drive utilization, influence which drug a
20 physician utilizes? Is that your testimony?
21     MS. YAVELBERG: Objection to the form.
22     MS. ALBEE: Objection to the form.

91 (Pages 685 to 688)