# EXHIBIT 14

**From:** M J TERREBONNE
**To:** "JReeder@cms.hhs.gov"@DHH-INET-DO01.inet, SANDRA ...
**Date:** Fri, Aug 24, 2001 11:28 AM
**Subject:** Re: Louisiana #01-08

Attached is the informal response per your request.

>>> "Joe Reeder" <JReeder@cms.hhs.gov> 08/08 9:24 AM >>>
August 8, 2001

Sandra Victor, Chief
Policy Development and Implementation
Louisiana Department of Health and Hospitals
Baton Rouge, Louisiana

Sandra,

Per our recent telephone discussion, the CMS RO needs the following additional information for your proposed amendment #01-08 to pharmacy reimbursement:

1) Please provide an explanation of why the change in reimbursement is needed since your pharmacy reimbursement methodology was changed last year to consider the differential between change and independents.

2) The 7/30/01 letter from Myers and Stauffer indicates that your amendment is not inconsistent with their survey findings. Please indicate where we can find this documentation in the 1998 pharmacy dispensing cost survey report.

3) The 7/30/01 letter from Myers and Stauffer also indicates that the proposed reimbursement rates will closely parallel the reimbursement rates in other States. Please amplify on this statement.

Our wish is to work informally on the additional information. The 90th day for approving the amendment is November 5, 2001. We need your responses to the above before the 45th day which is September 24. If not, we must submit a formal request for additional information.

Please let me know if you have any questions about this informal request.

Joe Reeder
Health Insurance Specialist
Medicaid Operations and
Financial Management Branch


CC: "RCowan@cms.hhs.gov"@DHH-INET-DO01.inet, Ben Bear...



EXHIBIT
ABBOTT
1057

**1) Please provide an explanation of why the change in reimbursement is needed since your pharmacy reimbursement methodology was changed last year to consider the differential between chains and independents.**

The pharmacy reimbursement rates of the Louisiana Medicaid program are designed to reflect the observations of actual pharmacy dispensing and acquisition cost as well as state budget realities. Myers and Stauffer's study of pharmacy cost concluded that variations in cost exist with regards to both the dispensing and acquisition components. The ingredient reimbursement rates set by the Department of Health and Hospitals were set at a level such that the costs of most, but not all, pharmacies were reimbursed in full. As budget situations change, it has become desirable to increase the level of ingredient reimbursement such that the full costs of a greater number of pharmacies are met. Improvements in cost coverage will result in further stability for the Louisiana Medicaid pharmacy program and promote the achievement of program objectives.

**2) The 7/30/01 letter from Myers and Stauffer indicates that your amendment is not inconsistent with their survey findings. Please indicate where we can find this documentation in the 1998 pharmacy dispensing cost survey report.**

In addition to reporting the "average" measurements associated with dispensing and acquisition cost, Myers and Stauffer has made an effort to report the associated distributions of cost. It is important to keep in mind that averages merely represent a measure of central tendency of an underlying distribution. It is also important to be aware of the variability that is present in the distribution.

Variations in pharmacy dispensing cost are in Myers and Stauffer's report on pages 19 and 20 including the histogram in Chart 3.3. Additionally, variability in pharmacy acquisition cost is displayed in Exhibit 14.

**3) The 7/30/01 letter from Myers and Stauffer also indicates that the proposed reimbursement rates will closely parallel the reimbursement rates in other States. Please amplify on this statement.**

There are approximately 45 states that base the ingredient portion of Medicaid pharmacy reimbursement upon discounted AWP systems. Of these states, there are approximately 30 states that pay at a level of AWP minus 11% or greater (i.e. a lesser discount from AWP). There are approximately 10 states with reimbursement between AWP minus 11% and AWP minus 13.5%. Only two states have ingredient reimbursement rates of AWP minus 15% or lower (notably these states are Texas and Louisiana, however, it is significant to observe that Texas has a 2% of ingredient cost add-on to the pharmacy dispensing fee).

There have been recent changes in ingredient reimbursement in states other than Louisiana. For example, the state of Florida has reduced ingredient reimbursement to AWP minus 13.25% in July 2000 and Indiana has just recently announced a reduced ingredient reimbursement of AWP minus 13%. It is notable that Louisiana, even with a modest increase to the current ingredient reimbursement levels, will have rates that are comparable to these noteworthy efforts to bring ingredient reimbursement into synch with actual acquisition costs.

**Comments Related to the Recent OIG Report on Pharmaceutical Acquisition Cost**

Myers and Stauffer was asked by the Louisiana Department of Health and Hospitals to make comments regarding the Department's current efforts to modify its ingredient cost reimbursement for its Medicaid pharmacy program. Specifically, it was requested that Myers and Stauffer's recent acquisition cost study performed for the Louisiana Medicaid program be compared with a recent study performed by the U.S. Department of Health and Human Services Office of the Inspector General (see Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products, August 2001, A-06-00-00023).

The OIG study was performed with data from eight states (Montana, Florida, Colorado, Indiana, Texas, Washington, West Virginia, and Wisconsin). Invoices from a total of 216 pharmacies were utilized in the study. The study concludes that the average acquisition cost for brand name drugs was 21.84% below the Average Wholesale Price (AWP).

Myers and Stauffer has performed several acquisition cost studies in recent years. These studies have been performed for the states of Wyoming, Kentucky, Arkansas, and Louisiana. These studies were performed between 1998 and 2001. In all of these studies, the average discount from the AWP for brand name drugs ranged from 17.0 to 17.7%. Specifically, the Louisiana study, performed in 1998, found that the average discount from the AWP for brand name drugs was 17.0%.

A comparison of the Myers and Stauffer studies to the recent conclusions of the OIG study resulted in a concern that the results of the OIG study were slightly inconsistent with the results of studies which Myers and Stauffer has performed. This apparent discrepancy has led to some speculation to explain the reasons for the differing results. It should be understood that Myers and Stauffer's only understanding of the OIG study is the written report issued by the OIG. Myers and Stauffer does not have access at this time to any other details related to the methodology of the OIG study.

The following issues are presented as possible explanations:

> **Selection of Drug Products.**
> The OIG study specifically cites conclusions for "brand-name" drug products. It has been observed in the past by Myers and Stauffer that confusion sometimes exists as to the subtle differences between the terms "brand" and "generic" and the terms "single-source" and "multi-source." Although the terms "brand" and "single-source" are often considered by be synonymous, it is significant to note that is possible for a "branded" product to also be a "multi-source" product. For example the branded product Zantac is also available in "generic" versions and is therefore a multi-source product. If in fact the OIG had included branded versions of multi-source products in their sample, one might expect a higher average discount from the AWP. Myers and Stauffer, however, distinctly uses single-source products in the category identified as "brands." This approach would seem to be the most appropriate since some branded multi-source products are subject to federal and state upper limits and are not reimbursed using the same "estimated

JD-SUB-LA-000689

acquisition cost" methodology as brand name drugs.

### Importance of Data Editing
Myers and Stauffer has found through experience that when performing a study of acquisition cost it is essential that close attention be paid to the integrity of the invoice data. Not only is it necessary to ensure that data entry was performed accurately, but also one has to account for the many complexities associated with pharmaceutical package sizes. AWP prices are stated in terms of certain units and those units can be tablets, capsules, vials, milliliters, etc. It is essential that the acquisition cost data in invoices be stated in the exact same terms as the AWP unit price. Myers and Stauffer has learned from experience that extensive editing is often needed to ensure the integrity of units in the invoice data. The OIG report makes no mention of data validity procedures. While this omission does not imply that such steps were not taken, Myers and Stauffer sees this as a source of possible error.

### Improper use of AWP and WAC Prices
The OIG report makes reference to the fact that the used the AWP price for January 1999. However, the report also states that invoices were collected from months throughout the year of 1999. When Myers and Stauffer performs an acquisition cost study, the AWP or WAC price used is always the price in effect on the data of purchase reflected on the pharmacy invoice. Myers and Stauffer believes that the OIG methodology of using only one price is an error and does not reflect the way pharmacy claims are usually paid which relies upon the AWP and/or WAC price in effect on the date of service.

### Comparison of AWP and WAC Discounts in the OIG Report
One cause for concern noted in the OIG report is the variances between the observed discounts from the AWP and discounts from the Wholesale Acquisition Cost (WAC). It has been the experience of Myers and Stauffer that the WAC price for brand name drug products is proportionate to the AWP most commonly by the following formula:

$$AWP = WAC / 1.20$$

While this relationship is not true for all drugs, it is true for a majority. It would therefore be expected that the discount from the WAC for each of the classifications of pharmacies identified in Appendix 2, would be proportionate to the discount from the AWP in a similar manner. Per the discounts in the OIG report, the ratios are closer to 1.24 (AAC as % of WAC / AAC as % of AWP). This is inconsistent with relationships that one would expect. Given the lack of specific examples of data in the OIG report and exhibits, the exact cause of this discrepancy cannot be determined.

### Conclusions
Myers and Stauffer continues to stand by the findings of the recent acquisition cost study performed for the Department of Health and Hospitals. The study was performed using proven data methods and used pharmacy invoice data from pharmacies specifically located in the state of

Louisiana. This study concluded that the average discount from the AWP for brand name drugs was 17.0%. The study also goes further to explain that there is some variability from pharmacy to pharmacy in the underlying distribution. Because of this variability, it is quite possible that the ideal payment rate for a Medicaid program is some number other than the average.

**Other Alternatives for the State of Louisiana**
It would appear that CMS is strictly interpreting federal regulations which govern pharmacy reimbursement for Medicaid programs. These regulations, at CFR 447.331-333, state that the ingredient cost for single-source drug products should be reimbursed using the "estimated acquisition cost" (EAC). By performing a study to determine the EAC in the state of Louisiana, the Department may have created a situation in which paying anything above EAC is not in strict compliance with the law. Clearly CMS is enforcing this standard on states that have studied the EAC in their state, and yet attempt to set reimbursement above that level, despite the reasons for which a Medicaid program may wish to do so.

In light of this attitude at CMS, perhaps the Department should now explore other alternatives to increase the reimbursement of pharmaceuticals. The alternative which is most obvious is to allow for an increase in the pharmacy dispensing fee. Federal regulations governing the dispensing fee merely state that it should be "reasonable."

The follow ways of increasing the dispensing fee are presented for consideration:

> **Redefine the Definition of the Usual and Customary Charge**
> Federal regulations require that the reimbursement for pharmaceuticals be limited to the pharmacy's "usual and customary charge" to the public. In most states, this has been interpreted as the price charged to cash-paying customers. Only a very limited number of states, including Louisiana, have modified that definition to include the charges to private commercial insurance plans (see *Louisiana Register*, Vol. 26, No. 6, June 20, 1999, page 1300). Private plans are known to pay dispensing fees as low as $2.50 per prescription. If the Department were to redefine the usual and customary charge to exclude private insurance plans, the end result would be an increase in the average dispensing fee paid. This would not only help to accomplish the objective of increasing pharmacy reimbursement, but the change would also very likely be very popular to providers and could eliminate some cumbersome aspects of the Department's current pharmacy audit program. Changing this definition would also make further increases in the dispensing fee (as discussed below) more feasible.

> **Create a Variable Dispensing Fee**
> Some states have established variable dispensing fees that include a component that varies with the ingredient cost of the drug being dispensed. Examples of states with such a fee include Texas, and the former dispensing fee used in Arkansas until approximately 1999. Possibly, since federal regulations merely state that a dispensing fee be "reasonable," such a change could receive CMS approval. It is also possible that CMS will interpret such a variable fee as only a semantic difference from the current proposal to increase the ingredient reimbursement.

**Increase the Dispensing Fee by a Flat Amount**
As another alternative to increase the pharmacy reimbursement by means of the dispensing fee, the Department could raise the dispensing fee above its current $5.77 level. A higher dispensing fee, though the same for all drugs, would serve the purpose of meeting the Department's objectives to increase pharmacy reimbursement. There is actually some merit to increasing the dispensing fee while holding ingredient reimbursement at levels to actual acquisition cost. Such a system would allow for pharmacy margins not just on high priced brand products, but spread over all products. A higher dispensing fee may create further incentives for generic dispensing and reduce utilization of higher cost products.