# EXHIBIT 18

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------X

In re: PHARMACEUTICAL         )   MDL No. 1456

INDUSTRY AVERAGE WHOLESALE    )   CIVIL ACTION

PRICE LITIGATION              )   No. 01-12257-PBS

------------------------------X


VIDEOTAPED DEPOSITION OF MICHAEL TOOTELL

OCTOBER 25, 2007

CHICAGO, ILLINOIS


Videotaped Deposition of MICHAEL TOOTELL, at

71 South Wacker Drive, 32nd Floor, Chicago,

Illinois, commencing at 9:00 a.m. on Thursday,

October 25, 2007, before Donna M. Kazaitis, RPR,

CSR  No. 084-003145.

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                                October 25, 2007
                                    Chicago, IL

Page 26

1  information concerning Ven-a-Care or KTM
2  litigation?
3      A.  Absolutely not.  Ven-a-Care was not a
4  Ross customer as far as I know.
5      Q.  What about litigation by Whistle
6  Blowers, have you prepared any materials
7  concerning that?
8      A.  No.  I have not.
9      Q.  Sir, are you currently an Abbott
10 employee?
11     A.  No.
12     Q.  When did you leave Abbott's employ?
13     A.  May 26th.
14     Q.  Why did you leave?
15     A.  I was able to retire.
16     Q.  So you decided to retire?
17     A.  Yes.
18     Q.  What are you doing now?
19     A.  Several things.  Pretty important to me
20 as a hospice volunteer.
21     Q.  That's tremendous.
22     A.  I spend sometime with hospice and

Page 27

1  hospice patients.  That's important to me.
2         I also have a small consulting company.
3  It's called MGT Decisions.  It's focused on
4  Medicare's competitive bidding program.  And I've
5  been selected by, nominated by, an organization
6  called AdvaMed, Health Industry Manufacturers
7  Association, and that association nominated me to
8  represent healthcare manufacturers on Medicare's
9  Program Advisory and Oversight Committee.  So I'm
10 helping Medicare to craft a competitive bidding
11 program.
12     Q.  Are you drawing from your experience
13 with Abbott and with Blue Cross for that
14 particular consulting?
15     A.  Absolutely.
16     Q.  Is your consulting work limited to the
17 parenteral or enteral nutrition market, or do you
18 provide consulting services that go beyond that
19 particular market?
20     A.  My consulting is focusing on the
21 competitive bidding initiative that Medicare is
22 doing now.  There are ten products involved.

Page 28

1  Enteral is included, parenteral is not included.
2  We include wheelchairs, hospital beds, walkers,
3  several kinds of oxygen equipment.
4      Q.  So is your consulting then limited to
5  the issue concerning Medicare's competitive
6  bidding?
7      A.  Yes, absolutely, yes, it is.
8      Q.  Is Abbott a client of yours?
9      A.  No.  We have a six-month rule.  You
10 can't work for Abbott within six months.  No.
11     Q.  I understand.  We've got comparable
12 rules in the government.
13        Sir, what I'd like you to do now is
14 take us through your employment history with
15 Abbott and the titles that you've held with
16 Abbott.
17     A.  Okay.  I was brought in as manager for
18 insurance development I believe, and after
19 several years that title became senior manager
20 for health policy and reimbursement, which
21 several years later became director of health
22 policy.

Page 29

1      Q.  What were your job responsibilities --
2  well, let me ask you, during the course that you
3  held these three titles did you have the same job
4  responsibilities?
5      A.  Similar.
6      Q.  Why don't we start with your position
7  in insurance development.  What does that mean?
8  What did the position entail?
9      A.  This was the beginning of a marketing
10 theme called market expansion.  It was a major
11 initiative to improve the size of the Ross
12 nutritional division, particularly opening up
13 retail markets in oral supplement uses and other
14 products I'm sure.
15     Q.  What were your responsibilities?
16     A.  I was the liaison between third-party
17 payors, particularly Medicare, which is our tube
18 feeding business, and the Ross business unit and
19 division leadership.
20     Q.  What other responsibilities did you
21 have?
22     A.  I did a fair amount of calling on

Page 30

1  Medicare carriers, explaining the features and
2  benefits of Ross products to them, variety of
3  associated chores as issues came up.
4     Q.  Okay.  And you've listed --
5         MS. ST. PETER-GRIFFITH:  Great timing
6  because I'd like to discuss with you how you'd
7  describe this.
8         MR. FERGUSON:  Are those the right
9  ones?
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  Actually, if I could put that in front
12 of the witness.
13        MS. ST. PETER-GRIFFITH:  And why don't
14 we label this separately, is that all right, as
15 the next exhibit, Exhibit Tootell 003.
16           (WHEREUPON Deposition Exhibit
17 Tootell 003 was marked as of 10/25/2007.)
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  I've noticed on what's been marked as
20 Exhibit Tootell 003, which says at the top MGT
21 Tootell, MGT Decisions LLC.  (Document tendered
22 to the witness.)

Page 31

1       Let me ask you first, is that your
2  consulting company?
3     A.  Yes, it is.
4     Q.  And you've identified your work with
5  Ross Products Division.
6     A.  Absolutely.
7     Q.  You only have one title there.  It says
8  Director of Health Policy, 2002 to 2007.
9     A.  That's true.
10    Q.  Is that when you held that --
11    A.  No.  As I said before, I had several
12 titles, similar responsibilities.  This is a
13 resume to be used by MGT clients, and clearly I
14 finished my time at Ross with that title.
15    Q.  Well, you've listed several items under
16 Medicare, Medicare Competitive Billing, and
17 Medicaid.  Do you see that?
18    A.  Uh-huh.
19    Q.  Do those particular listings identify
20 what you did in your capacity as Director of
21 Health Policy for Ross Products Division, Abbott
22 Laboratories?

Page 32

1     A.  Yes, and with the preceding titles as
2  well.
3     Q.  Under Medicare it says "Successfully
4  protected $140-$180 million in annual Medicare
5  Part B reimbursed sales for seventeen years."  Do
6  you see that?
7     A.  Yes.
8     Q.  What do you mean by that?
9     A.  That Ross business, Ross is the major
10 market leader for enteral tube feeding, and we
11 had a major part of that business.  I was the key
12 person for Ross explaining the features and
13 benefits of our products to Medicare carriers and
14 Medicare policy makers.
15    Q.  Was that to secure the ability to have
16 Medicare or Medicaid reimbursement for those
17 products?
18    A.  Yes.
19    Q.  It also indicates that you worked with
20 ten trade and professional associations to modify
21 adverse Medicare policies.  Do you see that?
22    A.  Yes.

Page 33

1     Q.  What do you mean by that?
2     A.  There are ten different trade
3  associations that we were members of over the
4  time, they were not always the same.  There was
5  ebb and flow as Washington organizations grow and
6  merge and flounder, whatever.  And I worked with
7  those associations.
8         AdvaMed, Health Industry Manufacturers
9  Association, is a key group.  For years I was
10 chair of their competitive bidding working group.
11 So I would help out writing papers and writing
12 presentations helping the associations craft
13 position statements that would be helpful.
14    Q.  Were there any particular Medicare
15 policies that Abbott or Ross or you considered
16 adverse that you were successful in modifying?
17    A.  Yes.
18        MR. WINCHESTER:  Objection, form.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  What were those?
21    A.  Well, over seventeen years a number of
22 things come up.  Do you want to narrow it more

9 (Pages 30 to 33)

Tootell, Michael                                          October 25, 2007

Chicago, IL

Page 34

1  specifically?
2      Q.  Yes, please.  If you can just identify
3  what those particular policies were.
4      A.  There was a proposal to reduce payment
5  rates for our enteral nutritional products using
6  a legal principle called inherent reasonableness.
7          The Medicare carriers, there are four
8  insurance companies that worked with Medicare and
9  had contracts to cover enteral nutritional
10 products, did a bad survey.  It was statistically
11 flawed.  We pointed out the statistical flaws.
12 We worked with a national association, National
13 Alliance for Infusion Therapy, that took some of
14 my concepts and went to outside economic research
15 programs who wrote up a complete draft, an
16 explanation of that situation.
17         That was reviewed by a number of
18 Washington agencies, and at the end new
19 provisions were put into law, or procedures, that
20 required more statistical rigor in the use of
21 inherent reasonableness rate reductions.
22     Q.  Any other policies that you can think

Page 35

1  of that you, to use your terms, were successful
2  in modifying?
3      A.  I'm looking at other things that I
4  mentioned in this process.
5          There was an effort in the early '90s
6  to include enteral nutritional products in a drug
7  rebate program, working with Washington attorneys
8  I identified the legislative language.  It was
9  restricted to pharmaceutical products, not to
10 nutritional products.
11         A number of us worked to point this out
12 to the CMS group in charge of the OBRA rebate
13 negotiations, and that resulted in a letter from
14 the National Medicaid Program to all the state
15 Medicaid directors explaining that OBRA did not
16 include nutritional products and that nutritional
17 products were not subject to the rebate
18 requirements.  And it's because of the craft of
19 the underlying legislation did not permit
20 rebates.
21     Q.  Anything else?
22     A.  I prefer to take issues as they come

Page 36

1  forward.  Obviously I spent seventeen years with
2  Ross.  There's many activities.
3      Q.  Okay.  Well, I'm just trying to exhaust
4  your memory before we start reviewing the
5  documents.  I just want to exhaust your memory as
6  to what initiatives that you can recall that,
7  again, to use your language, involved your
8  working to modify adverse Medicare policies.
9      A.  I think I've covered those and will be
10 glad to take any further questions.
11     Q.  Okay.  Were you involved -- well, let
12 me ask you this:  Was this something that you did
13 on your own, or was this part of your job
14 responsibilities with Abbott?
15     A.  These were consistent with my job
16 responsibilities.
17     Q.  You were the reimbursement, to use lack
18 of a better term, sort of guru within the Ross
19 division; is that fair?
20         MR. FERGUSON:  Object to form.
21         MR. WINCHESTER:  Object to form.
22 BY MS. ST. PETER-GRIFFITH:

Page 37

1      Q.  Go ahead.
2      A.  I was responsible for reimbursement
3  policies for the Ross division for the medical
4  nutritional product line.
5      Q.  Were there other people within other
6  divisions that were similarly responsible for
7  other Abbott product lines for reimbursement?
8      A.  Yes.
9      Q.  Who can you think of?
10     A.  There were a number of other people
11 that we, you know, from the documents we've
12 produced.  And those names changed over time, as
13 people, for some people this was a career.  For
14 me it was.  For Virginia Tobiason it was.  For
15 other people it was a shorter term program, part
16 of a much larger career.
17     Q.  Did you work with Virginia Tobiason?
18     A.  Yes.
19     Q.  What was your relationship with
20 Virginia?
21     A.  When I came to Ross, my hiring vice
22 president brought me to meet Virginia.  He and

10 (Pages 34 to 37)

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

```
                                    Page 262
 1         THE WITNESS:  Yes.
 2   BY MR. ANDERSON:
 3       Q.  The answer was "Absolutely"?
 4       A.  The answer is "Yes."
 5       Q.  Thank you.
 6            Mr. Tootell, if you could look at
 7   what's been marked today as Mike Tootell Exhibit
 8   Tootell 007.  Looking at II, Subsection (b) on
 9   the first page of that exhibit.  I'll read for
10   benefit of the record, "Improved data reporting
11   to First Databank and associated data warehouses
12   to assure sound calculation of AWP rates."  Did I
13   read that correctly?
14       A.  Yes, you did.
15       Q.  What is a sound calculation of an AWP
16   rate?
17       A.  The sound calculation begins with the
18   manufacturer's list price and it results in the
19   plus a mark-up by the publisher.  That's the
20   process of developing a sound calculation.
21       Q.  And what mark-up specifically
22   constitutes a sound mark-up?
```

```
                                    Page 263
 1         MR. WINCHESTER:  Objection, form.
 2         THE WITNESS:  That would be the
 3   business of the publisher.  And each of the
 4   publishers did a survey and there were some
 5   differences between the publishers about the size
 6   of their mark-up.
 7   BY MR. ANDERSON:
 8       Q.  What was the standard mark-up for
 9   Abbott products?
10       A.  For Abbott pharmaceutical products it's
11   twenty-five percent.  For Ross products they were
12   in the eighteen and a half to nineteen percent.
13       Q.  And what about for HPD products?
14       A.  I have no idea.
15       Q.  When you say "pharmaceutical products,"
16   do you mean products sold by the division known
17   as PPD, or do you mean drugs generally?
18       A.  Products recognized as drugs.
19       Q.  So that would encompass HPD products as
20   well; correct?
21       A.  The drug part of their business, yes.
22       Q.  And when you say a mark-up of twenty-
```

```
                                    Page 264
 1   five percent, what price term specifically would
 2   be marked up to twenty-five percent?
 3         MR. WINCHESTER:  Objection, asked and
 4   answered.
 5         THE WITNESS:  I believe it's the list
 6   price provided by the pricing people in those
 7   divisions.
 8   BY MR. ANDERSON:
 9       Q.  The Abbott personnel; correct?
10       A.  Yes.
11       Q.  I think along those lines you testified
12   this morning that WAC price is known as list
13   price; is that correct?
14       A.  That's the way we use that phrase.
15       Q.  The list price from whom to whom?
16       A.  The list price as designated by the
17   manufacturer.
18       Q.  Is it also the -- strike that and I'll
19   rephrase to be more specific.
20            Is the WAC price the price charged by
21   Abbott to wholesalers?
22         MR. WINCHESTER:  Objection, form.
```

```
                                    Page 265
 1         THE WITNESS:  No.  There would be other
 2   prices and there would be other contracts
 3   directly between the pharmaceutical distributors
 4   and Ross, and I have not seen those contracts.  I
 5   don't know the content of those.
 6   BY MR. ANDERSON:
 7       Q.  What customer, if any, to your
 8   knowledge is charged WAC?
 9       A.  We wouldn't use that phrase in Ross.
10       Q.  Ross does not charge customers WAC, to
11   your knowledge?
12       A.  To my knowledge, no.
13       Q.  To your knowledge, does Abbott or any
14   other division of Abbott other than Ross charge
15   any customer WAC?
16       A.  Those are pricing decisions that I
17   don't, I just don't have that information.  I
18   don't know of any either way.
19            Pricing decisions tend to be
20   confidential, and appropriately so.  I did not
21   hear those.  I did not participate in those
22   discussions.
```