**Exhibit B**

IN THE CIRCUIT COURT OF TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT OF MEMPHIS

JOHN V. DIGEL, on behalf of himself
and all other similarly situated individuals,

    Plaintiff,

Docket No.: CT-007177-02

vs.

**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED** Div. 5

ABBOTT LABORATORIES, INC.; BAXTER
PHARMACEUTICAL PRODUCTS, INC.;
BAYER CORPORATION; BRISTOL-
MYERS SQUIBB COMPANY; DEY, INC.;
GLAXOSMITHKLINE CORPORATION;
GLAXO WELLCOME, INC.; PHARMACIA
CORPORATION; PHARMACIA &
UPJOHN COMPANY; SMITH KLINE
BEECHAM CORPORATION;  WARRICK
PHARMACEUTICALS CORPORATION;
and DOES 1 through 100,

12-18-200~

Bel                    D.C.

    Defendants.

---

### CLASS ACTION COMPLAINT

COMES now the Plaintiff, John V. Digel, on behalf of himself and all other similarly situated individuals, by and through counsel, and for cause of action against the above described defendants (hereinafter collectively referred to as "Defendants") respectfully states as follows:

### I.

### JURISDICTION AND VENUE

1.    This is an action to recover damages and civil penalties on behalf of the Plaintiff and all similarly situated individuals in the State of Tennessee arising out of the deceptive and fraudulent business and/or trade practices of the Defendants.

2.    All of the Defendants transact business in Memphis, Shelby County, Tennessee, have placed their respective products in the stream of commerce in Memphis, Shelby County, Tennessee, and each actively advertises and seeks revenues from resident citizens of the State of Tennessee. Moreover, the fraudulent and deceptive acts and/or practices complained of herein occurred  in part within this judicial district.

3.    The deceptive acts engaged in by Defendants occurred in Shelby County, Tennessee

and therefore, venue is proper pursuant to T.C.A. §47-18-109(2).

**II.**

**INTRODUCTION**

4.      The Plaintiff brings this action for monetary damages, treble damages, pre-judgment and post-judgment interest, attorneys' fees and costs on behalf of himself and all similarly situated individuals in the State of Tennessee, including thousands of Tennessee patients[1], who have paid inflated charges for medications based in whole or in part on defendants' use of the Average Wholesale Price ("AWP") Scheme, as described below.

5.      Each of the defendants is or has been engaged in the business of manufacturing, marketing and selling prescription pharmaceuticals throughout the State of Tennessee. The principal payors for such prescription pharmaceuticals are federal and/or state governments (under, respectively, the Medicare and Medicaid Programs), private insurers and self-insured employers (Third-Party Payors), and private individuals (Patients), including elderly and low income patients who make payments for drugs under Tennessee's TennCare program.

6.      The damage to the named Plaintiff and to each of the Class Members, including attorney's fees and costs, does not and will not exceed $74,999.00. In addition, the Plaintiff does not allege and is not seeking any claim or remedy based on the violation of any federal law.

**A.      THE DEFENDANTS' UNLAWFUL SCHEME**

7.      The standard practice in the pharmaceutical industry is that the federal Medicare Program, state Medicaid agencies, Third-Party Payors and Patients reimburse physicians and pharmacies for hundreds of prescription drugs based upon the Average Wholesale Price ("AWP"), as published and reported by third-party publications such as *First Data Bank, Red Book, Blue Book, or Medispan*.

8.      Physicians and pharmacies purchase the prescription drugs for which they are reimbursed directly from the pharmaceutical manufacturer or indirectly through wholesalers.

9.      The AWP is generally not independently determined by the First Data Bank or other third-party reporting agencies. Rather, as part of the AWP Scheme described in this Complaint, pharmaceutical companies purportedly "self-police" and "self-report" the AWP to third-party

---

[1] As used herein, Patients refers to two groups of persons as follows: (1) Persons who were prescribed drugs manufactured by any defendants which were subject to defendants' Average Wholesale Price scheme as alleged herein and who paid for such drugs out-of-pocket, and (2) Persons who were prescribed such drugs and incurred an obligation for co-payment (or actually made co-payments) under either a government or private insurance program where the amount of co-payment was based on the total reimbursement by the government or private insurer.

publications (such as First Data Bank), which then publish the purported AWP, as provided to them by the pharmaceutical manufacturers.

10.     Pursuant to federal regulations and industry and State practice, reimbursement for prescription drugs is based upon the reported AWP.

11.     In fact, as an extensive and ongoing Congressional investigation has recently revealed, numerous pharmaceutical manufacturers (including each of the defendants named herein as well as others not yet named herein) have engaged in a scheme involving the fraudulent reporting of fictitious AWP for certain prescription pharmaceuticals including but not limited to prescription pharmaceuticals covered by Medicare and Medicaid.

12.     Specifically, defendants' AWP Scheme involves the reporting by each defendant of inflated Average Wholesale Prices. The fraudulent reporting of Average Wholesale Prices has the effect of materially misrepresenting the actual prices paid to defendants by physicians and pharmacies for prescription drugs.

13.     The Plaintiff alleges, upon information and belief that, in many instances, the purported AWP reported by the defendant pharmaceutical manufacturers bears little or no relationship to the prices actually paid by physicians or pharmacies.

14.     In addition, while federal Medicaid law requires the defendants to provide quarterly rebates to the State of Tennessee if it charges the State more than the lowest or "best price" offered to any commercial customer, the defendants routinely failed to do so as a direct result of the AWP Scheme.

15.     As a result of the fraudulent and illegal manipulation of AWP for certain drugs and supplies by the defendant pharmaceutical manufacturers, they and the other manufacturers have reaped tens of millions of dollars in illegal profits at the expense of American governmental payors and consumers, including the Plaintiff, all similarly situated individuals in the State of Tennessee. In particular, the elderly and low income individuals who are on Medicare and/or TennCare bear the burden of this scheme as they make payments or co-payments based on the fictitious AWP charges.

**B.     THE DAMAGES CAUSED BY DEFENDANTS' ILLEGAL CONDUCT**

16.     The intended and foreseeable consequence of the defendants' scheme are several and far reaching, including but not limited to, increased drug costs to the Plaintiff and to all similarly situated Tennessee residents.

**C.   DAMAGES TO PLAINTIFF AND SIMIARLY SITUATED PATIENTS**

17.   As the intended and foreseeable consequences of the defendants' AWP Scheme, the Plaintiff and many other private persons residing in Tennessee have suffered monetary losses and damages.

18.   The general public, who must make co-payments for drugs based upon these inflated AWP prices, suffered immense damages.  A major group of consumers adversely impacted by this practice are the elderly and low income individuals who make co-payments as part of Medicare and/or TennCare.

19.   The plaintiff, on behalf of himself and all other similarly situated individuals,  seeks the recovery of the above described losses and/or damages in this case.

**D.   THE OBJECTIVES OF THIS ACTION**

20.   In this action, the Plaintiff seeks to secure for the State of Tennessee a fair and open market, free from unfair or deceptive acts or practices, and to enable Patients in this State to better shoulder the financial burden of necessary medications.

21.   In addition, the Plaintiff brings this action to return to the resident Patients of the State of Tennessee the increased medication costs caused by defendants' wrongful conduct and artificially inflated AWP Scheme accomplished through violations of state law.

**III.**

**PARTIES TO THE ACTION**

**A.   PLAINTIFF**

22.   The Plaintiff, John V. Digel, is a United States citizen and a resident of Hardeman County, Tennessee and brings this action on behalf of himself and all other similarly situated individuals in the State of Tennessee.

**B.   DEFENDANTS**

23.   Defendant Abbott Laboratories, Inc. ("Abbott") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals.  Abbott conducts extensive business in the State of Tennessee including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein.  This Court has personal jurisdiction over Abbott and venue is properly laid in this County.

24.   Defendant Baxter Pharmaceutical Products, Inc. ("Baxter Pharmaceutical") is a

4

highly diversified health care company whose principal business is the development manufacture and sale of health care products and services, including pharmaceuticals. Baxter Pharmaceutical conducts extensive business in the State of Tennessee, including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein. This Court has personal jurisdiction over Baxter Pharmaceutical and venue is properly laid in this County.

25. Defendant Bayer Corporation ("Bayer") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals. Bayer conducts extensive business in the State of Tennessee, including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein. This Court has personal jurisdiction over Bayer and venue is properly laid in this County.

26. Defendant Bristol-Myers Squibb Company ("Bristol") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals. Bristol conducts extensive business in the State of Tennessee, including the sale of pharmaceuticals that are the subject of the AWP Scheme alleged herein. This Court has personal jurisdiction over Bristol and venue is properly laid in this County.

27. Defendant Dey, Inc. ("Dey") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals. Dey conducts extensive business in the State of Tennessee, including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein. This Court has personal jurisdiction over Dey and venue is properly laid in this County.

28. Defendant GlaxoSmithKline Corporation ("GSK") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals. GSK conducts extensive business in the State of Tennessee, including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein. This Court has personal jurisdiction over GSK and venue is properly laid in this County.

29. Defendant Glaxo Wellcome, Inc. ("Glaxo") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals. Glaxo conducts extensive business in the State of Tennessee, including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein. This Court has personal jurisdiction over Glaxo and venue is properly laid in this County.

30.     Defendant Pharmacia Corporation ("Pharmacia") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals.  Pharmacia conducts extensive business in the State of Tennessee, including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein.  This Court has personal jurisdiction over Pharmacia and venue is properly laid in this County.

31.     Defendant Pharmacia & Upjohn Company ("Pharmacia Upjohn") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals.  Pharmacia Upjohn conducts extensive business in the State of Tennessee, including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein.  This Court has personal jurisdiction over Pharmacia Upjohn and venue is properly laid in this County.

32.     Defendant SmithKline Beecham Corporation ("SmithKline") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals.  SmithKline conducts extensive business in the State of Tennessee, including the sale of the pharmaceuticals that are the subject of the AWP Scheme alleged herein.  This Court has personal jurisdiction over SmithKline and venue is properly laid in this County.

33.     Defendant Warrick Pharmaceuticals Corporation ("Warrick") is a corporation organized under the laws of Delaware with its principal place of business in Reno, Nevada.  At all times material to this action, Warrick has transacted business in the State of Tennessee including but not limited to, selling and distributing to purchasers in the State of Tennessee pharmaceutical products that are the subject of this action.  This Court has personal jurisdiction over Warrick and venue is proper in this County.

34.     The true names and capacities, whether individual, corporate associate, or otherwise, of defendants named herein as Does 1-100 are unknown to plaintiff, who therefore sues such defendants by such fictitious names.  Each of the defendants designated herein as Doe Defendant is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as Does when such identities become known.  Collectively, these companies are

referred to as the "pharmaceutical defendants" or defendants.

35.    Each of the defendants named above participated in the Medicaid and/or TennCare

Rebate Program.

## IV.

## THE MEDICARE AND/OR TENNCARE INSURANCE PROGRAM

36.    While this case is not solely about Medicare and/or TennCare, the Medicare and/or

TennCare program and its method of using AWP as a basis for reimbursement is an important

factual predicate to the scheme alleged herein.

37.    In 1965, Congress enacted Title XVIII of the Social Security Act (known as

"Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.

38.    The Department of Health and Human Services ("HHS") is an agency of the United

States Government that is responsible for the funding, administration and supervision of the

Medicare Program. At all relevant times, the Health Care Financing Administration ("HCFA") was

a division of HHS, now known as the Center for Medicare and Medicaid Services ("CMS"), and was

directly responsible for the administration of the Medicare Program.

39.    As a general matter, the Medicare Program does not cover the cost of prescription

pharmaceuticals which a Medicare beneficiary obtains pursuant to a prescription and thereafter self

administers (e.g., by swallowing the drug in liquid or pill form). However, Medicare Part B does

cover some drugs, namely, those that cannot be self-administered and are furnished incident to a

physician's services, including injectables that are administered by a medical provider.

40.    Medicare calculates the "allowable amount" (i.e., the amount that Medicare will pay)

based upon the payment methodology set forth in 42 C.F.R. § 405.517, which regulation was

published in the Federal Register on November 25, 1991, and became effective on or about January

1, 1992. Section 405.517 provides:

> Payment for drugs and biologicals that are not paid on a cost or
> prospective payment basis.
>
> (a) Applicability. Payment for a drug or biological that is not paid
> on a cost or prospective payment basis is determined by the standard
> methodology described in paragraph (b) of this section. Examples of
> when this procedure applies include a drug or biological furnished
> incident to a physician's service, a drug or biological furnished by an
> independent dialysis facility that is not included in the ESRD
> composite rate set forth in § 413.170(c) of this chapter, and a drug or
> biological furnished as part of the durable medical equipment benefit.

(b) Methodology.  Payment for a drug or biological described in paragraph (a) of this section is based on the lower of the actual charge on the Medicare benefits or 95 percent of the national average wholesale price of the drug or biological.

(c) Multiple-source drugs.  For multiple-source drugs and biologicals, for purposes of this regulation, the average wholesale price is defined as the lesser of the median average wholesale price for all sources of the generic forms of the drug or biological or the lowest average wholesale price of the brand name forms of the drug or biological (Emphasis added.)

41.     Medicare and many Medicaid programs and other Third-Party Payors based reimbursement to physicians and other providers of drugs on AWP.  AWPs are published for each drug identified by a National Drug Code ("NDC").  Manufacturers periodically report AWPs for NDCs to publishers of drug pricing data, such as Medical Economics Company, Inc., which publishes the *Red Book*, or First Data Bank, which compiles the National Drug Data File.  Publishers of AWPs and other drug prices state that they list the prices reported to them by the manufacturers.  There is no required frequency for manufacturers to report AWPs, but publishers claim that they attempt to update AWPs at least annually.  Medicare carriers, the contractors responsible for paying Part B claims, use published AWPs to determine the Medicare-allowed amount, or payment level, which is 95 percent of AWP for each HCPCS-coded drug.

42.     Physicians are able to obtain drugs at prices significantly below current Medicare reimbursements.  The widely available prices that are available from wholesalers and group purchasing organizations ("GPO's") for physician-administered drugs are considerably less than AWPS, used to establish the Medicare payment.  For most of the high-expenditure or high-volume physician-administered drugs, widely available discounts from AWP ranged from 13 percent to 34 percent.  Physicians who have been identified as low-volume billers for oncology drugs can also purchase drugs for considerably less than Medicare's payment.  In addition to receiving reimbursement for drugs, physicians are paid separately for services associated with drug administration under the Medicare physician fee schedule.

43.     Prior to January 1, 1998, the Medicare Part B "allowed amount" was interpreted as being the lower of the "estimated acquisition cost" or 95% of the "national average wholesale price,"

---

[2] NDCs are the universal product identifiers for drugs for human use; the Food and Drug Administration assigns the first part of the NDC, which identifies the firm that manufactures, repackages, or distributes a drug.  Each NDC is specific to a chemical entity, dosage form, manufacturer, strength, and package size.  For example, a drug made by one manufacturer, in one form and strength, but in three package sizes, would have three NDCs.

[3] HCPCS is the Health Care Financing Administration Common Procedure Coding System, as maintained and distributed by the Department of Health and Human Services.

i.e., the AWP for the drug. The estimated acquisition cost for a drug could be determined by the Medicare Program "based on surveys of the actual invoice prices paid for the drug," taking into consideration the estimated acquisition cost, including "factors such as inventory, waste and spoilage." However, historically the AWP published in the *First Data Bank* and similar publications has been used to determine Medicare reimbursement.

44.    In determining the AWP, HCFA uses the AWP published in industry publications such as *First Data Bank, Blue Book,* or *Medispan* as the basis for reimbursement. Specifically, in PM AB-99-63 (as of January 1, 1998), HCFA stated that is will pay drug and biologicals based on the lower of the actual billed charge or 95 percent of the AWP reflected in pharmaceutical industry publication sources such as *Red Book, Blue Book,* or *Medispan.*

45.    In fact, and by common understanding, usage and practice in the industry, Medicare, Medicaid and other providers have continued to determine the allowable payment for a prescription drug based upon the AWP reported by the applicable pharmaceutical manufacturer. This is due, in large measure, to practical problems with ascertaining "actual" or "estimated acquisition cost" charges, given necessary adjustments for the enumerated factors such as spoilage, waste, and inventory.

46.    Medicare Part B reimburses medical providers for 80% of the allowable amount. The remaining 20% is paid by the Medicare beneficiary and is called the "co-payment" amount. In addition, beneficiaries under Medicare Part B are required to pay an annual deductible amount before Part B benefits are payable.

47.    Throughout the 1990s, the *Red Book* and other publications such as *Blue Book* and *Medispan* published AWPs for pharmaceuticals. The *Red Book* and other publications simply publish the prices that are supplied to them by the pharmaceutical manufacturers, including defendants, generally without independent verification. Defendants knew that they could directly control and fraudulently inflate the AWP for pharmaceuticals at any time by simply forwarding a higher, fictitious AWP to the *Red Book* or other publication.

48.    The actual price that providers pay for Medicare Part B drugs is not disclosed to the State and certainly not to patients. Physicians and suppliers may belong to "GPOs" that pool the purchase of multiple entities to negotiate prices with wholesalers or manufactures. GPOs may negotiate different prices for different purchasers, such as physicians, suppliers, or hospitals. In

addition, providers can purchase Part B covered drugs from general or specialty pharmaceutical wholesalers or they can have direct purchase agreements with manufacturers.

49.    Certain practices involving these various entities has resulted in prices paid at the time of sale that do not reflect the final net cost to the purchaser. Manufacturers or wholesalers offer purchasers rebates based on the volume of products purchased not in a single sale but over a period of time. Manufacturers also establish "chargeback" arrangements for end purchasers, which result in the AWP overstating what those purchasers pay. Under these arrangements, the purchaser negotiates a price with the manufacturer that is lower than the price the wholesaler charges for the product. The wholesaler provides the product to the purchaser for the lower negotiated price, and the manufacturer then pays the wholesaler the difference between the wholesale price and the negotiated price.

50.    Most manufacturers sell drug products to physicians at a discount from AWP. Sometimes these discounts are substantial. As noted herein, under Medicare rules physicians are permitted to bill for such drugs at 95 percent of AWP, regardless of the drug's cost to the physician. This practice of taking advantage of the difference between the physician's purchase price and the amount that a physician is permitted to bill Medicare and/or TennCare is referred to internally by the defendants as "marketing the spread."

51.    There is a wide disparity between a drug's estimated acquisition cost and Medicare's payment for that drug. Physician-billed drugs account for the bulk of Medicare spending on Part B drugs. Of those billed by physicians, drugs used to treat cancer accounted for most of Medicare's expenditures.

52.    In a September 21, 2000, report, the United States Government Account Office ("GAO") found that:

> Widely available discounts for 17 of the physician-billed drugs we examined averaged between 13 percent and 34 percent less than AWP.
>
> For two other physician-billed drugs, Dolasetron mesylate and Leucovorin calcium, average discounts were considerably larger – 65 percent and 86 percent less than AWP.

53.    Two drugs, albuterol and ipratropium bromide used for respiratory conditions, account for most of the pharmacy-supplied drugs paid for by Medicare. In 2001, they were available to pharmacy suppliers at prices that averaged, respectively, 85 percent and 78 percent less than

AWP.

54.    Two of the four high-volume oral immunosuppressive were available from wholesalers with average discounts of 14 percent and 77 percent.  Wholesale price information on the other two was not available, but retail prices from online pharmacies were as much as 13 percent and 8 percent below AWP.

55.    According to the GAO report, the discounts on physician-billed drugs, based on wholesaler and the GPO's catalogue prices, are notably lower than Medicare's payment, which reflects a discount of five (5) percent below AWP.  The discounts indicate that, on a national level, Medicare's payments for these drugs were at least $532 million higher than provider's acquisition costs in just the year 2000.  Further, the discounts reported may only be the starting point for additional discounts provided to certain purchasers, as charge backs, rebates, and other discounts may drive down the final sale price.

56.    The following table illustrates some of the discounts provided by physicians[4]:

Table 1:    **Widely Available Discounts from AWP for Medicate-Covered Drugs Billed Primarily by Physicians, 2001**

| Drug Name | Specialty most frequently billed for drug | Average AWP[a] | Average widely available discount from AWP (Percentage)[b] |
|---|---|---|---|
| Leuprolide acetate (for depot suspension) | urology | $618.93 | 17.6 |
| Rituximab | oncology[c] | $478.47 | 19.2 |
| Goserelin acetate implant | urology | $469.99 | 21.9 |
| Docetaxel | oncology | $313.51 | 22.0 |
| Filgrastin (G-CSF) 480 mcg | oncology | $300.40 | 18.0 |
| Pamidronate disodium | oncology | $279.86 | 16.8 |
| Hylan G-F 20 | orthopedic surgery | $225.13 | 17.7 |
| Filgrastim (G-CSF) 300 mcg | oncology | $193.62 | 18.4 |
| Paclitaxel | oncology | $180.57 | 19.0 |
| Irinotecan | oncology | $141.32 | 22.9 |

---

[4] Source: September 2001 GAO Report-01-1118.

| Carboplatin | oncology | $120.48 | 20.3 |
|---|---|---|---|
| Gemcitabine HCI | oncology | $112.34 | 21.3 |
| Dolasetron mesylate, injection | oncology | $ 45.02 | 65.0 |
| Granisetron HCI, injection | oncology | $ 19.52 | 29.3 |
| Leucovorin calcium | oncology | $ 18.44 | 85.6 |
| Epoetin alpha for non-ESRD use | oncology | $ 12.91 | 15.2 |
| Ondansetron HCI, injection | oncology | $ 6.41 | 12.8 |
| Botulinum toxin type A | neurology | $ 4.86 | N/A |
| Imiglucerase | oncology | $ 3.95 | N/A |
| Dexamethasone sodium phosphate | oncology | $ 1.44 | 14.2 |
| Heparin sodium | oncology | $  .43 | 34.4 |

ᵇ "Average AWP" is the average of AWP of each NDC for that product adjusted to the HCPCS-defined dosage.

ᵇ "Average widely available discount from AWP" for each drug was calculated by (1) determining the average widely available price(s) for each NDC for that drug, (2) determining the percentage difference between the average widely available price(s) and the AWP for each NDC for the drug, and (3) averaging the percentage differences for all NDCs for that drug.

ᶜ "Oncology" specialty includes hematology/oncology and medical oncology.

---

The "spread" is so significant that in some instances a patient's 20% co-payment is more than the cost of the drug to the doctor or provider, as evidenced in the table below.ʷ

| Drug | HCPCS | 1999 Medicare Allowable | 20% Co-Payment | 1999 Wholesale cost |
|---|---|---|---|---|
| Leucovorin 50 mg | J0640 | $19.50 | $3.90 | $1.48 |
| Gentamycin 80 mg | J1580 | $4.74 | $0.95 | $0.56 |
| Sodium Chloride 0.9% 500 ml | J7040 | $10.30 | $2.06 | $1.46 |
| 5% Dextrose/Sodium Chloride 0.9% 500 ml | J7042 | $10.75 | $2.15 | $2.00 |
| Sodium Chloride 0.9% 25 ml | J7050 | $10.90 | $2.18 | $1.33 |
| 5% Dextrose in Water 500 ml | J7060 | $9.73 | $1.95 | $1.50 |
| Lacted Ringers 1000ml | J7120 | $$12.67 | $2.53 | $2.25 |
| Doxorubicin 10mg | J9000 | $46.42 | $9.28 | $6.10 |
| Cyclophosphamide Lyophillzed | J9096 | $48.85 | $9.77 | $9.95 |

---

⁵ *Stark Investigative Materials.*

| | | | | |
|---|---|---|---|---|
| Etoposide 10mg | J9181 | $12.93 | $2.59 | $0.75 |
| Etoposide 100mg | J9182 | $129.34 | $25.87 | $7.50 |
| Vincristine 1mg | J9370 | $30.16 | $6.03 | $3.50 |
| Vincristine 2mg | J9375 | $33.33 | $6.67 | $5.95 |

57.   Examples of the manipulation of AWP are contained in the investigative

materials compiled by Congressman Pete Stark (D-California):

(a)   In the 2000 edition of the *Red Book*, defendant Bristol reported an AWP of $1,296.64

for one 20mg/ml, 50ml vial of Vepesid (Etoposide) for injection, while selling the

exact same drug to a GPO for $70.  This represents a spread between Bristol's falsely

inflated AWP and the real price of $1,226.64.

(b)   As the following excerpts from Bristol's own documents reveal, Bristol's earlier

participation in the false price manipulation scheme with respect to Etoposide

(Vepesid) interfered with physicians' medical decisions to use Etopophos: "The

Etopophos product profile is significantly superior to that of etoposide injection...."

"Currently, physician practice can take advantage of the growing disparity between

Vepesid's [name brand for Etoposide] list price and, subsequently, the Average

Wholesale Price [AWP] and the actual acquisition cost when obtaining

reimbursement for etoposide purchases.  If the acquisition price of Etopophos is

close to the list price, the physician's financial incentive for selecting the brand is

largely diminished."

(c)   Thus, defendant Bristol acknowledges that financial inducements influence the

professional judgment of physicians and other healthcare providers.  Bristol's

strategy of increasing the sales of its drugs by enriching, with taxpayer dollars, the

physicians and others who administer drugs is reprehensible and a blatant abuse of

the privileges that Bristol enjoys as a major pharmaceutical manufacturer in the

United States.

(d)   Bristol employed a number of other financial inducements to stimulate the sales of

its drugs as the expense of the Medicare and Medicaid Programs that were concealed

from the U.S. Government and the State of Tennessee.  Such inducements included

volume discounts, rebates, off-invoice pricing and free goods designed to lower the

net cost to the purchaser while concealing the actual cost of the drug from

13

reimbursement officials. For example, Bristol provided free Etopophos to Drs. Lessner and Troner in exchange for these Miami, Florida oncologists' agreement to purchase other Bristol cancer drugs. This arrangement had the effect of lowering the net cost of the cancer drugs to the oncologists and creating an even greater spread than would already result from the invoiced prices. The value of the free goods is often significant. Similarly, other documents show that Bristol provided free Cytogards in order to create a lower than invoice cost to physicians that purchased other cancer drugs through the Oncology Therapeutic Network.

(e)    The above-referenced free goods example created financial incentives to the physicians that were over and above the spread created by the difference between Bristol's reported prices and regular prices provided to the market.

(f)    Bristol's price manipulation scheme was directed at both the Medicare and Medicaid Programs. Bristol commonly reported prices directly to Medicare carriers as well as state Medicaid Programs.

(g)    Defendant Glaxo was no different, as evidenced in a letter from SmithKline. In an apparent effort to increase reimbursement to physicians and clinics, effective January 10, 1995, defendant Glaxo increased the AWP for Zofran by 8.5% while simultaneously fully discounting this increase to physicians. The net effect of these adjustments was to increase the amount of reimbursements available to physicians from Medicare and other Third-Party Payors whose reimbursement is based on the AWP. Because the net price paid to Glaxo for the non-hospital sales of the Zofran multi-dose vial is actually lower, it does not appear that the increase in the AWP was designed to increase revenue per unit to Glaxo. Absent any other tenable explanation, this adjustment appears to reflect an intent to induce physicians to purchase Zofran based on the opportunity to receive increased reimbursement from Medicare and other Third-Party Payors.

(h)    Defendant Pharmacia also engaged in use of inflated AWP; for example, it wrote to an oncology clinic boasting of the savings offered off AWP:

> Some of the drugs on the multi-source list offer you savings of over 75% below list price of the drug. For a drug like Adriamycin, the reduced pricing offers

14

[the clinic] a reimbursement of over $8,000,000 profit
when reimbursed at AWP.

(i)    Defendant Bayer acknowledged the AWP Scheme in an internal e-mail message, stating that "many" health care providers are "paid on a discount from AW[P]."

(j)    In a document entitled "Confidential Baxter Internal Use Only," defendant Baxter admitted to the impact of the AWP Scheme:

Increasing AWP's was a large part of our negotiations with the large homecare companies.

Homecare companies that reimburse based on AWP make a significantly larger margin....

## OTHER EXAMPLES INCLUDE THE FOLLOWING:

Adriamycin, an antibiotic used in cancer treatment and manufactured by Pharmacia, had an AWP of $241.36 as of April 2000. The real wholesale price was $33.43. In 1997, when the reported AWP for this drug was $946.94, it was being offered to physicians for as low as $152.00

Amikacin, used to treat an infection that HIV+ people get and manufactured by Abbott, had an AWP of $54.56. The actual best price was $6.75.

Toposar, also manufactured by Pharmacia, is used to treat testicular and lung cancer. Its AWP as of April 2000 was $28.38; DOJ found that retailers were buying it for $1.70.

Vancomycin, an antibiotic used to treat intestinal infections and manufactured by Abbott, had an AWP of $68.77 as of April 2000. DOJ adjusted it to $8.14.

58.    Upon information and belief, each of the defendant pharmaceutical companies has also utilized a large array of other inducements to stimulate sales of their drugs. These inducements, including "educational grants," volume discounts, and rebates or free goods, were designed to result in a lower net cost to the purchaser while concealing the actual cost price beneath a high invoice price. A product invoiced at $100 for ten units of a drug item might really only cost the purchaser one-half that amount. If we assume a subsequent shipment of an additional ten units at no charge, or a "grant," "rebate" or "credit memo" in the amount of $50, the transaction would truly cost just $5.00 per unit net. Through all these "off-invoice" means, drug purchasers were provided the substantial discounts that induced their patronage while maintaining the fiction of a higher invoice price – the price that corresponded to reported AWPs

and inflated reimbursement from Medicaid and Medicare.  Some examples of this are set forth

below:

> BAYER: "I have been told that our present Kogennate price, $.66, is the highest price that Quantum is paying for recombinant factor VIII. In order to sell the additional 12mm/u we will need a lower price. I suggest a price of $.60 to $.62 to secure this volume.  From Quantum's stand point, a price off invoice, is the most desirable.  We could calculate our offer in the form of a marketing grant, a special educational grant, payment for specific data gathering regarding Hemophilia treatment, or anything else that will produce the same dollar benefit to Quantum Health Resources."

> BAXTER: "The attached notice from Quantum Headquarters was sent on April 10th to all their centers regarding the reduction on Recombinate pricing. Please note that they want to continue to be invoiced at the 4.81 price. They have requested that we send them free product every quarter calculated by looking at the number of units purchased in that quarter and the $.13 reduction in price ... free product given to achieve overall price reduction."

59.     In 2000, state and federal investigators challenged the reported AWP of various

drugs.  Thereafter, Abbott lowered its reported AWP on various drugs, thereby admitting that

prior reported AWPs were artificially inflated.

60.     Among those indirectly harmed by the defendants' manipulation of the AWP in

the Medicare context are Tennessee residents who, as Patients, have been compelled to pay

excessive co-payments for medications based upon the falsely inflated AWPs.

## THE AWP SCHEME ALSO INFLICTS DAMAGES ON THE STATE OF TENNESSEE

61.     The damages inflicted by the AWP Scheme are not confined to Medicare payors.

62.     Numerous State agencies have overpaid for medications based upon the fraudulently

reported AWPs.

63.     Likewise, most Medicaid payors, including the State of Tennessee, historically have

also typically based reimbursement on the AWP.

64.     On August 10, 2001, the U.S. Department of Health and Human Services, Office of

the Inspector General ("OIG"), reported the results of a survey of 216 pharmacies in eight states and

obtained 16,024 invoices for brand name drug products.  The OIG report concluded that nationally,

pharmacy cost was 21.84 percent below AWP, a 19.3 percent increase from 1994.  This report

further concluded that although many states paid a discount of 10 percent off AWP, this was not

---

[6] Source: Attachments to U.S. House Committee on Ways and Means correspondence dated September 28, 2000.

sufficient to "ensure that a reasonable price is paid for drugs."

65.     Recently, defendant Bayer agreed to settle claims asserted by the U.S. Government arising from this practice. According to the Department of Justice's litigation release:

> The government's investigation of the allegations revealed that Bayer beginning in the early 1990s falsely inflated the reported drug prices – referred to by the industry as the Average Whole Price (AWP), the Direct Price and the Wholesale Acquisition Cost – used by state and federal governments to set reimbursements rates for the federally and state funded Medicaid Program. By setting an extremely high AWP and subsequently, selling the product to doctors at a dramatic discount, Bayer enabled physicians to receive excess reimbursement from private and government insurers. The Bayer AWPs, at issue in the investigation, involved several of Bayer's biologic products such as Kogenate, KoateHIp, and Gamimmune, which are widely used in treating hemophilia and immune deficiency diseases.

> The investigation further revealed that Bayer was engaging in a practice referred to as "marketing the spread" that also has the effect of discouraging market competition from companies that do not inflate AWPs as a way of attracting doctors to their products. The department's probe also showed that some physicians and home health companies ignore the products of companies that refuse to create these profit windfalls for customers.
> The parties also are settling allegations that Bayer knowingly underpaid the Medicaid Program for rebates owed by it to the states. The Medicaid Rebate program was initiated in 1991 to require drug companies to pay quarterly rebates to states in a way that accounts for discounts that drug companies give to customers. Under the program, Bayer was required to report the best price offered to any commercial, for-profit customer to the government and calculate a quarterly rebate based, in part, upon the best price. The investigation revealed that certain of Bayer's customers received discounts unaccounted for by the multi-national pharmaceutical company in its quarterly best price calculations thereby allowing Bayer to underpay the rebates it owed.

66.     Under 47 U.S.C. § 1396r-8, in order for a manufacturer of a drug to have its products compensated under a state's Medicaid Program, the manufacturer had to enter into a rebate agreement with the Secretary of Health and Human Services. Pursuant to the rebate agreement, the manufacturer promised to report to the Medicaid Program its best price. The statute defines the best price as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity or governmental entity." The section also provides that "best price" includes "cash discounts, free goods that are contingent on any purchase requirement, volume discounts and rebates" and does not include "prices that are merely nominal in amount."

67.     Each defendant entered into a Rebate Agreement with the U.S. Secretary of Health and Human Services. In that agreement, each agreed to comply with Section 1396r-8, and hence:

(a)     Agreed to report its best price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts, and rebates, in any quarter and to make rebates where necessary;

(b)     Agreed that it would determine its best price based upon its average manufacturer's price, calculated as "net Sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements) and that it would include in that calculation cash discounts and all other price reductions "which reduce the actual price paid"; and

(c)     Agreed that the beset price would not take into account nominal prices, defined as prices that are less than 10 percent of the average manufacturer's price in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

68.     After execution of this agreement, each defendant reported its average manufacturer's price in each quarter to the Medicaid Program.

69.     In keeping with their artificial inflation of the AWPs, each defendant did not report the actual "best price" but, instead, excluded from best price discounts and other inducements offered to physicians to increase use of a drug being reimbursed by governmental entities at AWP.

## MOTIVATION FOR DEFENDANTS' AWP PRICING SCHEME

70.     The purpose and intent of defendants' fraudulent AWP Scheme is to manipulate and thereby increase the amount of reimbursement received by physicians or other health care providers who prescribe drugs manufactured and sold by defendants.

71.     Specifically defendants' AWP Scheme contemplates that (a) defendants will intentionally report falsely and fraudulently inflated AWP prices for these drugs to industry publications; and (b) defendants will actually charge health care providers amounts for these drugs that are substantially less than the AWP that defendants have fraudulently reported.

72.     The health care provider then receives reimbursement from Medicare, Medicaid, TennCare or a Third-Party Payor based upon the fraudulently inflated AWP. This circumstance results in a substantial financial incentive to the provider, representing the difference between the inflated AWP-based reimbursement to the provider and the significantly lower direct price charged by defendants to the health care provider.

73.     Defendant pharmaceutical manufacturers refer to the amount received by the health care provider resulting from the difference between the fraudulently inflated AWP reimbursement and the price actually paid by the provider as the "spread."

74.     Each of the defendants has sought to manipulate the market for drugs covered by Part B by inducing health care providers to prescribe these drugs, rather than competing drugs, because of the higher "spread" resulting from the falsely and fraudulently inflated AWP.

75.     By participating in the AWP Scheme, defendants seek to influence doctors to prescribe the drug with the greatest "spread" between the AWP and the actual direct price paid by the provider to the manufacturer. In fact, defendants have greatly increased their market share and resulting profits by manipulating the AWP to create falsely inflated "spreads" and resulting financial incentives to providers to prescribe specific drugs subject to the AWP Scheme.

76.     The manipulation of AWP at the expense of Medicare, Medicaid and their respective patients if further revealed when the defendants sell drugs that are not reimbursed by Medicare or Medicaid. In these circumstances, the drug companies often report accurate AWPs and actually compete with other drug companies on the basis of having a lower AWP than the other company. The company with the lower AWP will urge physicians to consider the cost to the patient when selecting drugs and promote its lower AWP as a selling tool. Thus, where Medicare and Medicaid are not involved, defendants often ensure that their AWPs are accurate so as to compete for market share based on price.

77.     Defendants were aware that physicians would purchase and utilize products that have the widest spread between the providers' true costs and the reimbursement paid by third parties. All defendants made representations of their AWP for various drugs, which representations were not accurate. In doing so, defendants hoped that providers would view the inflated AWP as a reason for selecting their drug. Defendants also knew that this selection would be at the expense of patients, like the Plaintiff and all similarly situated Tennessee residents, who were making a co-payment and at the expense of governmental payors.

78.     For example, a GAO report focusing on sales of a drug in Florida found that Medicaid usage of Vancomycin nearly doubled when Abbott raised the AWP. When Bayer retained its spread on Whin Rho while other manufacturers did not, its use "skyrocketed."

79.     The AWP Scheme has a profound and dangerous additional effect by influencing

19

some medical practitioner's judgments. This is acknowledged, for example, by defendant Bristol

who developed a second-generation etoposide, namely, Etopophos:

> Bristol: "The Etopophos produce profile is significantly superior to that of etoposide for injection..."

> Currently, physician practices can take advantage of the growing disparity between Vepesid's lists price (and, subsequently, the Average Wholesale Price [AWP]) and the actual acquisition cost when obtaining reimbursement for etoposide purchase. If the acquisition price of Etopophos is close to the list price, the physicians' financial incentive for selecting the brand is largely diminished.

80.   This influence is further demonstrated by SmithKline Beecham:

> SMITHKLINE: "In the clinic setting however, since Medicare reimbursement is based on AWP, product selection is largely based upon the spread between acquisition cost and AWP ....Therefore, the spread between the AWP and clinic cost represents a profit to the clinic of $50.27 for the medication alone....From this analysis, there seems to be no other reason, other than profitability, to explain uptake differentials between the hospital and clinic settings, therefore explaining why physicians are willing to use more expensive drug regiments."

81.   Thus, although they are competitors, each of the defendants agreed to a scheme

whereby each would publish in the *Red Book, Blue Book* and *Medispan* its artificially inflated

"AWP." Each defendant knew that the AWPs were fictitious, but each one followed course and

published its own fictitious AWP pursuant to its express or tacit agreement to do so.

## THE CONGRESSIONAL INVESTIGATION

82.   The United States Congress has been investigating defendants' wrongful

activities. In an letter sent to each of the defendants dated October 31, 2000, Congressman Stark

stated in pertinent part:

> You should by now be aware of Congressional investigations revealing that Abbott has for many years reported and published inflated and misleading data and has engaged in other deceptive business practices. This letter is a call for your company to immediately cease overcharging taxpayers and jeopardizing public health . . . The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price (AWP) and direct price ("DP") which are utilized by the Medicare and Medicaid Programs in establishing drug reimbursements to providers. The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to in your industry as "the spread." The evidence amassed by Congress clearly shows that Abbott has intentionally reported inflated prices

---

[7]   Source: Correspondence from Committee on Ways and Means dated September 28, 2000, to Alan Holmes.

and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Abbott manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs. This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims . . . Based on the evidence collected, Abbott should make arrangements to compensate taxpayers for the financial injury caused to federally funded programs. Any refusal to accept responsibility will most certainly be indicative of the need for Congress to control drug prices. If we cannot rely upon drug companies to make honest and truthful representations about their prices, then Congress will be left with no alternative but to take decisive action to protect the public.

83.     In a letter dated September 28, 2000, sent from the House of Representatives Committee on Ways and Means, Subcommittee on Health to the President of the trade organization known as the Pharmaceutical Research and Manufacturers of America, Congressman Stark stated:

This corruptive scheme is perverting financial integrity of the Medicare program and harming beneficiaries who are required to pay 20% of Medicare's current limited drug benefit.

In his letter, Congressman Stark made the following five "shocking conclusions":

First - Certain drug manufacturers have abused their position of privilege in the United States by reporting falsely inflated drug prices in order to create a de facto improper kickback for their customers.

Second - Certain drug manufacturers have routinely acted with impunity in arranging improper financial inducements for their physicians and other healthcare provider customers.

Third - Certain drug manufacturers engage in the fraudulent price manipulation for the express purpose of causing federally funded health care programs to expend scarce tax dollars in order to arrange de facto kickbacks for the drug manufacturers' customers at a cost of billions of dollars.

Fourth - Certain drug manufacturers arrange kickbacks to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive effect upon the physician/patient relationship and the exercise of independent medical judgment.

Fifth - Certain drug manufacturers engage in illegal price manipulation in order to increase utilization of their drugs beyond that which is necessary and appropriate based on the exercise of independent medical judgment not affected by improper financial incentives.

**V.**

**DIRECT DAMAGE SUSTAINED BY STATE OF TENNESSEE
PATIENTS AND THIRD-PARTY PAYORS**

84.     The Plaintiff and other similarly situated Tennessee patients are directly damaged by defendants' AWP Scheme because patients frequently are required to make a co-payment for a pharmaceutical, or because patients occasionally make payment in full.  The amount of the co-payment is often a direct function of the overall reimbursement paid on behalf of the patient by Medicare or Third-Party Payors.

85.     For example, as alleged herein, Medicare and/or TennCare recipients must pay 20% of the total amount that is reimbursed by Medicare to the pharmaceutical manufacturer.  Thus, if Medicare reimburses $100 for a covered drug based upon the reported AWP, the Medicare beneficiary is responsible for 20% (or $20.00) in this situation.

86.     Many Medicare beneficiaries obtain supplemental insurance known as "Medigap" or "Medicare Plus" to cover the costs of pharmaceuticals as well as other costs not paid by Medicare. Such supplemental insurers are also Third-Party Payors who are damaged by the AWP Scheme.

87.     The AWP Scheme also affected the Plaintiff and all similarly situated Tennessee residents because, in each instance of a drug payment made under Medicaid and/or TennCare, the State paid an inflated amount.

88.     The Plaintiff and all similarly situated individuals unaware of the fact of discounts from AWP, the extent of discounts and/or the fact their co-payments or drug payments were based on amounts that did not reflect the true market price.

**CLASS ACTION ALLEGATIONS**

89.     This case is brought as a class action pursuant to Rule 23 of the Tennessee Rules of Civil Procedure.  Plaintiffs seek certification of this action as a class action on behalf of the following two classes of individuals:  (1) all natural persons who are residents of the State of Tennessee who were prescribed drugs manufactured by any defendant which were subject to defendant's Average Wholesale Price scheme as alleged herein and who paid for such drugs out-of-pocket; and (2) all natural persons who are residents of the State of Tennessee who were prescribed drugs manufactured by any defendant and incurred an obligation for a co-payment (or actually made

22

a co-payment) under either a government or private insurance program where the amount of the co-payment was based on the total reimbursement by the government or private insurer.

90.    This action is appropriate as a class action pursuant to Rule 23. Since Plaintiff seeks monetary relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the Defendants. Further, adjudications with respect to individual Class Members would as a practical matter be dispositive of the interests of other Class Members who are not parties to the adjudications and may impair and impede their ability to protect their interests.

91.    Membership in the Class is so numerous that separate joinder of each member is impracticable. The number of Class Members is unknown but can be easily determined from the records of the Defendants. Plaintiffs believe that there are thousands of persons in the Class. Although Plaintiffs do not presently know the names of all Class Members, their identities and addresses can be readily ascertained from the Defendant and Tennessee State records.

92.    Plaintiffs are members of the class of victims described herein. They are subject to a fraudulent and deceptive scheme and common course of conduct by the Defendants described herein.

93.    There are numerous and substantial questions of law and fact common to all Class Members which control this litigation and which predominate over any individual issues. Included within the common questions are the following:

1.    Whether the Defendants knowingly and intentionally utilized deceptive and fraudulent trade practices in implementing the AWP scheme described herein;

2.    Whether the Companies failed to disclose to the Plaintiff and the Class Members the true and/or actual prices and/or the inflation of prices and co-payments for medications purchased in the State of Tennessee;

3.    Whether the Plaintiff and Class Members have sustained damages and the proper measure of those damages; and

4.    Whether the Plaintiff and Class Members are entitled to

23

treble damages, interest and attorney's fees pursuant to the Tennessee Consumer Protection Act.

94.   The claims of Plaintiff are typical of the claims of the Class, and Plaintiff has no interests which are adverse to those of other Class Members.

95.   The Plaintiff will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in the prosecution of class actions and complex litigation.

96.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Class Members will continue to suffer damages, and the Defendants' violations of law will proceed without remedy while the Defendants continue to retain the proceeds of their ill-gotten gains.

97.   Most individual Class Members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation, the size and scope of the Defendants' uniform sales scheme, the significant costs attendant to litigation on this scale, and the comparatively small, although significant, damages suffered by individual Class Members.

98.   This action will result in an orderly and expeditious administration of Class claims. Economies of time, effort and expense will be fostered and uniformity of decisions will be ensured.

99.   This action presents no difficulty that would impede its management by the Court as a class action, and a class action is superior to other available methods for the fair and efficient adjudication of their claims.

## VI.

## CLAIM FOR RELIEF

### COUNT I

### TENNESSEE CONSUMER PROTECTION ACT
(Violations of T.C.A. 47-18-101 Et Seq.)

100.   The Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

101.   This claim is brought for restitution of the losses incurred by the Plaintiff and all similarly situated Tennessee residents as a result of the AWP Scheme.

102.   Defendants' conduct as alleged in this Complaint constitutes deceptive acts or practices in violation of T.C.A. § 47-18-104 in that:

24

a.  Defendants have failed to disclose material facts in connection with the sale of goods in that they have not disclosed that the AWP does not reflect the true average wholesale price of the drug products they sell, but are instead inflated in order to drive up the prices paid by patients within the State of Tennessee;

b.  Defendants have made false or misleading statements of facts concerning the price of goods in that they have lied about the true AWP paid for their medications in order to drive up the prices paid by patients within the State of Tennessee; and

c.  Defendants have knowingly made false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs.

103.  The Defendants acted willfully and knowingly in committing the actions set forth above.

104.  The wrongful conduct alleged in this Complaint occurred and continues to occur in the ordinary course of defendants' business and has caused monetary loss and/or damage to the Plaintiff and all similarly situated Tennessee residents, who were foreseeable and direct victims of defendants' wrongful conduct.

105.  The Defendant's violations of the Tennessee Consumer Protection Act were committed with the intent to mislead and defraud. Therefore, the Plaintiff is entitled to and hereby seeks treble damages and attorney's fees as provided for pursuant to the Tennessee Consumer Protection Act.

106.  Defendants' wrongful, deceptive and illegal acts and practices have resulted in excessive and illegal profits to defendants and excessive payments made by the Plaintiff and all other similarly situated patients who are Tennessee residents.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays as follows:

A.  That the Court adjudge and decree that defendants have engaged in the conduct alleged herein.

B.  That the Court adjudge that the conduct is unlawful and in violation of T.C.A. § 47-18-104.

C.  That the Court adjudge that the conduct complained of herein was committed willfully and knowingly and that the Plaintiff is entitled to treble damages and attorney's fees

pursuant to the Tennessee Consumer Protection Act.

      D.    That the Court adjudge and award the Plaintiff pre-judgment and post-judgment interest.

      E.    That the Court make such orders or judgments as may be necessary to restore to the Plaintiff and all similarly situated Tennessee residents all monies which defendants acquired from them by means of any of the deceptive acts or practices complained of herein.

      F.    Plaintiff demands a jury to try the issues when joined.

Respectfully submitted,

**GLASSMAN, EDWARDS, WADE &WYATT P.C.**

By: _____
    B. J. WADE, TN BAR #5182
    WILLIAM F. BURNS #17908
    Attorneys for Plaintiff
    26 North Second Street
    Memphis, Tennessee 38103
    (901) 527-4673

OF COUNSEL:

**BEALSEY, ALLEN, CROW, METHVIN,
PORTIS, & MILES, P.C.**

W. Daniel Miles, IIII, Esq.
C. Gibson Vance, Esq.
Clinton C. Carter, Esq.
272 Commerce Street
Montgomery, Alabama 36103